**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM**,** on Behalf of Itself and All Others Similarly Situated,<br><br>                            Plaintiffs,<br><br>     -against-<br><br>STATE STREET CORPORATION, STATE STREET BANK AND TRUST COMPANY, and STATE STREET GLOBAL MARKETS, LLC,<br><br>                            Defendants. | **CIVIL ACTION NO. _____**<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Arkansas Teacher Retirement System ("ARTRS"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, makes the following allegations against Defendants State Street Corporation, State Street Bank and Trust Company ("State Street Bank" or the "Bank"), and State Street Global Markets, LLC ("State Street Global") (collectively, "State Street", or "Defendants") based upon the investigation of counsel, except as to the allegations pertaining specifically to Plaintiff that are based on personal knowledge.

**I.     INTRODUCTION**

         1.     State Street Bank, through its headquarters in Boston, Massachusetts, serves as the custodian for over 40% of public pension funds in the United States. State Street Bank is the largest such custodian in the country, and had $4.4 trillion in pension assets under custody globally as of March 31, 2010. State Street Bank also serves as the custodian for many non-public investment funds and other investors. As custodian, State Street Bank is responsible, *inter alia*, for undertaking (through affiliates such as State Street Global) the foreign currency

exchange ("FX") transactions necessary to facilitate a custodial customer's purchases or sales of foreign assets or the repatriation other foreign funds.

2. For over a decade, State Street, in violation of Massachusetts law, has maintained an unfair and deceptive practice whereby FX transactions are conducted so as to maximize profits to State Street (stemming from volatility in FX rates) at the expense of a substantial segment of its custodial customers. In sum, Defendants have charged many of their custodial customers (a) inflated FX rates when buying foreign currency for those customers, and (b) deflated FX rates when selling foreign currency for those customers, and pocketed the difference between the actual and reported rates.

3. Defendants' unfair and deceptive practices remained unknown to Plaintiff and the Class because, *inter alia,* the account statements Defendants provided to the affected custodial customers reported the FX transactions as having taken place at unspecified times during a 12 or 24-hour period, and as using FX rates falling within the "high-low" range of that period. However, the FX rates that State Street reported and applied to the transactions for these custodial customers were incorrect. State Street arrived at the reported FX rates "after the fact," often hours after performing the relevant FX transactions for the custodial customers.

4. Defendants' unfair and deceptive FX practice has generated as much as $500 million in profits annually for State Street, or roughly half of State Street's FX profits for the last ten years. This is money taken directly out of the pockets of State Street's custodial customers.

5. ARTRS brings this suit as a class action on behalf of all similarly affected custodial customers of State Street, except those government pension funds that are covered by independent qui tam actions that have been unsealed, or that become unsealed during the

pendency of this action (the "Class"), in order to recover the proceeds unlawfully obtained through State Street's FX activities, and for injunctive relief.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over the claims pursuant to the Court's diversity jurisdiction. 28 U.S.C. § 1332(a), and 28 U.S.C. § 1331 because Count Three arises under federal law.

7. This Court also has jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2)(A) and (C). With respect to CAFA, (i) the amount in controversy exceeds the jurisdictional amount, (ii) the Class consists of hundreds, and perhaps thousands, of injured parties, and (iii) some members of the Class are citizens of States other than those of Defendants.

8. Venue in this judicial District is proper under 28 U.S.C. § 1391(b)(1) and (2). A substantial part of the events or omissions giving rise to the claims occurred within this District. Defendants reside in and transact business in this District. Defendants are citizens of the Commonwealth of Massachusetts and are headquartered in this District.

## III. PARTIES

9. Since 2001, and at all times relevant hereto, Defendants and their subsidiaries, have served as the domestic and international custodial bank for the ARTRS' pension fund.[1] Since at least July 1, 2001, Defendants, as custodian for the ARTRS pension fund, have been responsible for executing the purchase, sale and pricing of FX contracts for the accounts of ARTRS.

---

[1] State Street Bank and Trust also serves as the securities lending agent for the fund.

10. ARTRS is a cost-sharing, multiple-employer defined benefit pension plan that covers any person employed by an employer covered by ARTRS. ARTRS employers include any public school, public educational agency, or other eligible employer participating in ARTRS.

11. As of June 30, 2009, ARTRS included 343 participating employers and more than 115,000 members. Since 2001, ARTRS employers have made actual contributions to ARTRS of $2,436,510,000.

12. As of June 30, 2009, ARTRS possessed net pension assets of approximately $8,802,987,225. As of the same date, ARTRS's net assets represented a funding ratio of 75.7% funded, reflecting an amortized funding horizon of 45.4 years.

13. As of June 30, 2009, ARTRS maintained a "Global Equity" asset class target percentage of 30% of ARTRS assets. As of the last annual report, ARTRS maintained an actual Global Equity investment percentage of 28.9%, reflecting a total international investment of $2,542,601,000. ARTRS's Global Equity investments are the single largest asset class investment for ARTRS.

14. ARTRS paid Defendants $851,413 for custodial fees in fiscal year 2009. The annual fees paid to Defendants by ARTRS do not include the Defendants' hidden FX charges.

15. Defendant State Street Corporation is a Massachusetts corporation headquartered in Suffolk County in Boston, Massachusetts with an address of State Street Financial Center, One Lincoln Street, Boston, MA 02111. State Street provides (or has provided) custodial banking services and FX services to ARTRS and the proposed Class through State Street, State Street Bank and Trust, and their subsidiaries, agents, employees and co-conspirators. State Street's FX trading desk is located in Boston, Massachusetts. State Street Corporation touts

itself and its subsidiaries as the "No. 1 servicer of U.S. pension plans," and as of March 31, 2010, had $4.4 trillion in pension assets under custody globally.

16. Defendant State Street Bank is headquartered in Boston, Massachusetts and has offices in various other states. State Street Bank currently provides (or has provided) custodial banking services and FX services to ARTRS and the proposed Class. State Street Bank is a wholly-owned subsidiary of State Street Corporation.

17. Defendant State Street Global Markets, formerly known as State Street Capital Markets, is headquartered in Boston, Massachusetts and has offices in various other states. State Street Global Markets currently provides (or has provided) custodial banking services and FX services to ARTRS and the proposed Class. In particular, State Street Global Markets provides specialized investment research and trading in foreign exchange, equities, fixed income and derivatives for State Street's custodial customers. State Street Global Markets is a wholly-owned subsidiary of State Street Corporation.

18. At all relevant times, each of the Defendants was and is the agent, employee, employer, joint venturer, representative, alter ego, subsidiary and/or partner of one or more of the other Defendants, and was, in performing the acts complained of herein, acting within the scope of such agency, employment, joint venture, or partnership authority, and/or is in some other way responsible for the acts of one or more of the other Defendants.

## IV.   CLASS ACTION ALLEGATIONS

19. This action is brought and may properly be maintained as a class action pursuant to Rules 23(a)(1)-(4), and 23(b)(2) and (3) of the Federal Rules of Civil Procedure and Mass. Gen. Laws c. 93A, § 11. This action satisfies the procedural requirements set forth by Rule 23 and c. 93A, § 11.

20. This suit is a class action brought on behalf of a Class defined as all public and private pension funds, mutual funds, endowment funds, investment manager funds, and any other funds for whom State Street Bank served as the custodial bank and executed FX trades on an "indirect" or "custody" basis since 1998, except those government pension funds that are covered by independent qui tam actions that have been unsealed, or that become unsealed during the pendency of this action, and which have suffered damages as a result of the conduct alleged herein. It is brought pursuant to Rule 23(b)(2) for injunctive or declaratory relief, and Rule 23(b)(3) for money damages.

21. Also excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

22. The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable.

23. There are questions of law and fact common to the Class, including:

(a) Did Defendants engage in unfair and deceptive acts and practices in connection with FX transactions so as to maximize profits to Defendants at the expense of their custodial customers?

(b) Did Defendants charge their custodial customers incorrect FX rates, and pocket the difference between the actual and incorrect rates?

(c) Did Defendants provide account statements to their custodial customers that reported incorrect FX rates?

    (d)  Did the Defendant's actions with respect to the Class violate the Massachusetts Consumer Protection Act, Mass. Gen. Laws c. 93A, and Massachusetts common law?

    (e)  Did Plaintiff and Class members suffer monetary damages as a result of the Defendant's actions and if so, what is the proper measure of those damages?

    (f)  Is the Class entitled to injunctive relief?

  24.  Plaintiff's claims are typical of the claims of the members of the Class and the named Plaintiff is a member of the Class described herein.

  25.  The named Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or which directly and irrevocably conflict with the interests of other members of the class.

  26.  The interests of the named Plaintiff are co-extensive with, and not antagonistic to, those of the absent Class members.  The named Plaintiff will undertake to represent and protect the interests of absent Class members.

  27.  The named Plaintiff has engaged the services of the undersigned counsel.  These counsel are experienced in complex class action litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, the named Plaintiff and absent Class members.

  28.  The questions of law and fact common to the Class, as summarized in ¶ 23 above, predominate over any questions affecting only individual members, in satisfaction of Rule 23(b)(3), and each such common question warrants class certification under Rule 23(c)(4).

29. A class action is superior to other available methods for the adjudication of this controversy. Individualized litigation increases the delay and expense to all parties and the court system given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be far more fair, efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

30. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Compared to individualized actions, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

31. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

32. In the alternative, the above-referenced Class may be certified under Rule 23(b)(1) because:

    (a) The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members' claims which would establish incompatible standards of conduct for Defendants; and

    (b) The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter, be dispositive of the interests of other members of the class who are not parties to the adjudications, or which would substantially impair or impede the ability of other Class members to protect their interests.

29. A class action is superior to other available methods for the adjudication of this controversy. Individualized litigation increases the delay and expense to all parties and the court system given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be far more fair, efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

30. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Compared to individualized actions, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

31. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

32. In the alternative, the above-referenced Class may be certified under Rule 23(b)(1) because:

    (a) The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members' claims which would establish incompatible standards of conduct for Defendants; and

    (b) The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter, be dispositive of the interests of other members of the class who are not parties to the adjudications, or which would substantially impair or impede the ability of other Class members to protect their interests.

## V.    DEFENDANTS' FX PRICING PRACTICES

### A.    Background On Defendants' Relationship With Custodial Customers

33.    State Street holds itself out on its website as the "No. 1 servicer of U.S. pension plans" and the "leading custodian worldwide." In its Annual Report on Form 10-K for fiscal year end December 31, 2007, State Street reported that it had $15.3 trillion in assets under custody and $1.98 trillion in assets under management as of December 31, 2007. Assets under custody grew at a compound annual rate of 13% between 2004 and 2007, according to the 2007 10-K. In the 2007 Annual Report to Shareholders, Ronald Logue, State Street's Chief Executive Officer, stated that State Street had achieved 30 consecutive years of growth in operating earnings per share.

34.    For 2008, notwithstanding the troubled economic climate, State Street continued to report positive growth in operating earnings per share.

35.    According to State Street's 2007 Form 10-K, "fee revenue" from "trading services," which includes FX revenue, grew from $862 million in 2006 to $1.152 billion in 2007, an increase of 34%. State Street further reported in its Annual Reports filed with the S.E.C., foreign exchange trading revenues increased from $468 million in 2005 to $611 million in 2006, to $802 million to 2007, and to $1.08 billion in 2008, or an annual increase of 31% in 2006 and 2007 and 35% in 2007 and 2008. Over the past ten years State Street has reported foreign exchange trading revenues of more than $4 billion. Approximately one-half of these revenues were derived from the FX pricing practices alleged herein.

36.    State Street reported on its website on January 31, 2008 that it "currently services more than 40 percent of the public fund business in the United States through its dedicated public fund team, with customers in 33 states and the District of Columbia, Puerto Rico and the U.S. Virgin Islands."

37. Neither ARTRS nor the Class authorized Defendants to charge FX rates other than those in effect at the time of the foreign currency trades. Nor have ARTRS or the Class ever approved the retention by Defendants of the difference between the actual FX cost and the incorrect amounts charged by Defendants. Nonetheless, Defendants charged ARTRS and the Class FX rates that were not the actual charges incurred. Defendants then made unfair and deceptive claims and statements regarding higher FX rates than were actually paid by Defendants in connection with purchases of foreign currencies on behalf of ARTRS and the Class, and lower FX rates than were credited to Defendants in connection with sales of foreign currencies on behalf of ARTRS and the Class. Defendants kept the excess of these two rates for themselves. Defendants had no right to retain such monies as "profit" on these FX transactions.

38. When such funds were wrongly kept by Defendants, ARTRS and the Class suffered monetary damages.

39. Upon information and belief, Defendants carried out these unfair or deceptive acts and practices by executing FX transactions requested by the Plaintiff and proposed Class as follows. Upon receipt of a request requiring a FX transaction, Defendants would execute a trade to fill the request at the FX rate at some point thereafter in the trading day.

40. Regardless of the price paid by Defendants for the FX transaction necessitated by the Plaintiff and proposed Class' FX trade, Defendants thereafter charged Plaintiff and proposed Class, a different, less favorable rate than the one at which Defendants actually settled the FX transaction on the interbank market.

41. Regardless of the rate for the FX trade by the Defendants, the Plaintiff and proposed Class would receive a less favorable exchange rate, the extremes of which would only be controlled by the volatility of the market, *i.e.* "range of the day" pricing.

42.     By substituting a different FX rate and price for the foreign currency trades of the Plaintiff and proposed Class, Defendants' unfairly and deceptively claimed to have paid a different rate than Defendants had actually paid to settle the trade.

43.     By engaging in this practice Defendants unfairly and deceptively collected money directly from, and at the expense of, their custodial clients.

44.     Because any reports that the Plaintiff and proposed Class would have received from Defendants would have indicated that each FX transaction was completed at a rate within the range of FX rates prevailing during that day, the Plaintiff and proposed Class were unable to discover this conduct.

45.     FX transactions on behalf of the Plaintiff and proposed Class would be initiated by sending a transaction request, usually by electronic means, to the custody side of the Bank, called the Securities Processing Unit.  The request would then be sent electronically by custody to the Bank's trading desk, where it would appear on software used by the FX traders, called the Money Order Management System (sometimes also referred to as the "Market Order Management System" or "MOMS").

46.     Upon the transaction request appearing in MOMS, the FX trader would check the status of the two currencies involved, set a price, and then execute the FX transaction. The transaction would be executed or "settled" in most cases by the bank trader making a transaction on the interbank FX market – usually through another bank. If the trader did the trade through another bank, a record of the trade would be entered into that other bank's system, and that bank would then send a confirmation of the trade to Defendants.

47. Defendants then confirmed the transaction through a separate software system, called Wall Street Systems[2], which memorialized it. At that point, the unfair and deceptive FX rate, or "spread," was determined and added to the custodial clients' costs. That is, Defendants' FX traders executed the trade at an interbank rate and then the additional cost (for purchases) or remitted a lesser payment (for sales) was added for transmission or charge to the custodial clients, such as the Plaintiff and proposed Class.

48. The FX price actually paid by the Defendants would also be noted by the trader in his or her "blotter," an informal running log or notebook of the trader's currency positions through the day. The Defendants maintain all relevant records of these transactions.

49. By pricing the Bank's custodial FX trades later in the day, the Bank obtained the widest possible "range of the day." Typically, there is at least some FX rate volatility every day, often occurring at times when key financial indices are reported, such as interest rate announcements in major countries. The bigger the range of the day, the bigger the Bank's profits on each custodial FX trade.

51. The difference between actual and charged rates to the Plaintiff and proposed Class can be very large. For example, if a pension fund placed a request to purchase 10 million Euro and the FX rate for EUR is 1.5355 at 10:00 a.m., but then the FX rate goes to 1.5475 at 3:30 p.m., a difference of .0120, the potential "profit" to State Street from their FX practices would be $120,000 (.0120 x 10,000,000 = $120,000).

52. When State Street traded FX, it always did so at the interbank rate. Through the conduct alleged herein, State Street's custodial FX clients never received the interbank rate for their trades.

---

[2] Prior to Wall Street Systems, Defendants utilized another program that served the same function. That program was known as "IBIS" or "IBS."

53.     Damages to the Plaintiff and the proposed Class, however, would be even greater than the amount added to or subtracted from the interbank trade, because by paying the higher rate, proposed Class members would have lost the opportunity for those monies to appreciate. Over a ten or eleven year period, due to compounding and lost investment opportunities, a charge of 1% of the assets of the Plaintiff and proposed Class would grow to damages of approximately 3%. In other words, whatever the size of the overcharge or undercharge for a particular buy or sell transaction, the size of the damages would increase by threefold over 10 to 11 years.

### B.     All Trades Executed by the Defendants Are Equally Affected

54.     The conduct described herein affects the Plaintiff and proposed Class each time Defendants executed a FX trade for the Plaintiff or proposed Class. Although Defendants may not execute all of the Plaintiff's and the proposed Class' FX trades, the ones they do execute, often known as "indirect," "custody," "non-negotiated" or "standing instruction" trades, always suffer the Defendants' pricing practices, as described herein.

55.     Defendants, as the custodial bank for the Plaintiff and proposed Class, transacted the following FX trades for the Plaintiff and proposed Class: income repatriation trades; dividend payment and repatriation trades; emerging market trades; portfolio and foreign asset-based FX trades; all other non-negotiated and/or standing instruction trades, including spot, forward, and swap trades.

56.     When the Defendants executed these FX trades for Plaintiff and the proposed Class, they unfairly and deceptively priced these trades to their benefit and to the detriment of the Plaintiff and the proposed Class. This conduct was possible because Plaintiff and proposed Class believed that the Defendants maintained a duty with respect to them and because the

Defendants never informed the Plaintiff and proposed Class of their practice of charging higher or lower FX rates on FX trades executed by the Defendants.

58. Defendants' unfair practices affected all State Street custodial clients whose FX trades were executed by State Street. State Street treated all custodial FX clients equally when over-pricing or under-pricing the FX fees they paid. Without any regard to their respective custodial contracts, State Street treated all custodial client FX trades exactly the same, for each currency, for each trade.

### C. The California Attorney General Action

67. Plaintiff is aware of at least one ongoing governmental action against Defendants arising out of similar conduct alleged in this Complaint. The California Attorney General, on behalf of the people of the State of California, filed a Complaint in Intervention for violation of the California False Claims Act, Cal. Gov. Code, § 12651, against State Street and State Street California, Inc. charging the defendants with misappropriating over $56 million from the accounts of California's two largest pension plans – the California Public Employees' Retirement System ("CalPERS"), and the California State Teachers' Retirement System ("CalSTRS") – over a multi-year period in connection with the same FX practices pled in this Complaint. State Street acted as custodian for CalPERS and CalSTRS during that time.

68. The California Attorney General alleges that State Street inflated FX rates when buying foreign securities for CalPERS and CalSTRS, deflated FX rates when selling foreign securities, and pocketed the difference. The Attorney General further alleges that State Street hid its wrongful conduct by entering incorrect FX exchange rates into State Street's FX trading computer programs, and providing false records to CalPERS and CalSTRS.

69. The California Attorney General action is the only qui tam action against State Street that has been unsealed to date.

## FIRST CLAIM FOR RELIEF

### Violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A

70. Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs and further allege:

71. At all relevant times hereto the Defendants were engaged in trade or commerce.

72. While engaged in trade or commerce, Defendants engaged in unfair and deceptive acts and practices, as alleged in this complaint, in violation of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A, §§ 2, 11, including, without limitation:

    (a) Unfairly and deceptively charging FX transactions so as to maximize profits to Defendants at the expense of their custodial customers;

    (b) Unfairly and deceptively charging their custodial customers incorrect FX rates, and pocketing the difference between the actual and incorrect rates;

    (c) Unfairly and deceptively providing account statements to their custodial customers that reported incorrect FX rates;

    (d) Unfairly and deceptively engaged in custodial FX services that failed to conform to Defendants' representations and/or descriptions of their services; and

    (e) Violating Attorney General Regulations, including 940 CMR §§ 3.16(1-2).

73. These acts or practices violated sections 2 and 11 of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A.

74. As a result of the unfair and deceptive conduct of Defendants, Plaintiff ARTRS sustained damages including but not limited to the damages detailed above, incorporated herein.

**SECOND CLAIM FOR RELIEF**

**Breach of Agent's Duty of Loyalty**

76. Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs.

77. Plaintiff and the Class requested Defendants to act on their behalf to execute the FX transactions necessary to facilitate their purchases and sales of foreign securities.

78. Defendants entered into an agency relationship with Plaintiff and each of the Class members.

79. Defendants, by virtue of their capacity as agents for Plaintiff and the Class, and Defendants' superior knowledge and position of control as well as the confidence and trust placed in them by Plaintiff and the Class, owed the duty of loyalty to Plaintiff while executing FX transactions.

80. Defendants breached their duty of loyalty to Plaintiff and each of the Class members by: (a) over or under stating FX rates so as to maximize profits to Defendants at the expense of their custodial customers; (b) charging their custodial customers incorrect FX rates, and pocketing the difference between the actual and incorrect rates; (c) provided account statements to their custodial customers that reported incorrect FX rates; and (d) failing to conform their FX services to Defendants' representations and/or descriptions of their services.

81. As a result of Defendants' breach, Plaintiff and the Class sustained damages, including, but not limited to, the damages detailed above. Accordingly, Plaintiff and the Class are entitled to an award of monetary damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### Request for Declaratory Relief Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.

82. Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs.

83. As set forth above, Plaintiff contends that Defendants engaged in unfair and deceptive FX trading activities, whereas Defendants maintain their conduct in connection with FX trading is and has been proper.

84. As such, an actual controversy exists between Plaintiff and the Class and Defendants concerning the parties' rights and duties with respect to Defendants' FX trading activities.

85. The parties require this Court's declaration as to their respective rights, duties and any other relevant legal relations, whether or not the parties could seek or are otherwise entitled to further relief.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff demands judgment for itself and other members of the proposed Class as follows:

1) With regard to the First Claim for Relief, that the Court certify this action as a class action and enter judgment against Defendants in an amount equal to three times the amount of damages that Plaintiff and the Class have sustained as a result of Defendants' actions;

2) With regard to the Second Claim for Relief, that the Court certify this action as a class action and find the Defendants breached their duties of loyalty to Plaintiff and the Class, and award damages appropriate to compensate Plaintiff and the Class;

      3)      With regard to the Third Claim for Relief, that the Court certify this action as a class action and enter an order in favor of Plaintiff and the Class declaring that Defendants engaged in unfair and deceptive conduct in connection with FX transactions entered into on behalf of Plaintiff and the Class;

      4)      That Plaintiff and the Class be awarded all costs and expenses of this action, including attorneys' fees; and

      5)      That Plaintiff and the Class be awarded all such other relief as the Court deems just, equitable and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 10, 2011

Respectfully submitted,

**THORNTON & NAUMES LLP**

By: __/s/ Garrett J. Bradley_____

Michael P. Thornton
Garrett J. Bradley
100 Summer Street, 30th Fl.
Boston, MA 02110
Telephone: (617) 720-1333
Facsimile: (617) 720-2445

**LABATON SUCHAROW, LLP**
Joel H. Bernstein
Eric Belfi
Paul Scarlato
140 Broadway
New York, NY 10005
Telephone: (212) 907-0839
Facsimile: (212) 883-7039

.

      **LIEFF CABRASER HEIMANN &**
          **BERNSTEIN, LLP**
Steven E. Fineman
Daniel P. Chiplock
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

**LIEFF CABRASER HEIMANN &**
    **BERNSTEIN, LLP**
Richard M. Heimann
Lexi J. Hazam
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. (415) 956-1000
Fax. (415) 956-1008

*Attorneys for Plaintiff*