UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>STATE STREET CORPORATION, STATE STREET BANK AND TRUST COMPANY and STATE STREET GLOBAL MARKETS, LLC,<br><br>Defendants. | No. 11-CV-10230 (MLW)<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff Arkansas Teacher Retirement System ("ARTRS"), individually and on behalf of all other similarly situated entities, by its undersigned attorneys, for its Amended Class Action Complaint against Defendants State Street Corporation, State Street Bank and Trust Company ("State Street Bank"), and State Street Global Markets, LLC (collectively, "State Street" or "Defendants"), alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

## I.    INTRODUCTION

1.      State Street was the custodian bank for ARTRS and the other institutional investors that constitute the Class.  A custodian bank is an institution that holds securities on behalf of investors.  The responsibilities entrusted to a custodian include the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities.  Custodians may also perform ancillary services for their clients.  Custodians are typically used by institutional investors who do not

wish to leave securities on deposit with their broker-dealers or investment managers.  By separating these duties, the use of custodians—at least in theory—reduces the risk of fraud or other misconduct.  An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

2.      State Street Bank is the nation's second-largest custodian bank, with $21.5 trillion in assets, including $4.7 trillion in pension assets, under custody and administration as of December 31, 2010.  State Street charged ARTRS and its other custodial clients hundreds of millions of dollars a year in fees for custodial services.

3.      As part of its array of ancillary custodial services, State Street executed foreign currency exchange ("FX") transactions on behalf of its clients in order to facilitate clients' purchases or sales of foreign securities or the repatriation of foreign currency into U.S. dollars.  During the past decade, pension funds and other institutional investors have increasingly looked to overseas companies and securities markets in order to diversify their holdings and maximize investment returns.  The necessity for pension funds, in particular, to invest in foreign securities in order to properly diversify and meet their funding requirements is well-known to and appreciated by custodians such as State Street, as pension funds' investment guidelines are publicly and readily available.

4.      Because foreign investments are bought and sold in the foreign currencies of the nations in which they are issued, U.S.-based investors necessarily must purchase and sell those foreign currencies in order to complete the transactions.

5.      ARTRS and the members of the Class reposed a high degree of trust in State Street.  ARTRS and Class members authorized State Street to execute FX transactions under conditions in which State Street controlled all aspects of FX trades, including the cost.  ARTRS

and Class members depended upon State Street not only to execute FX trades honestly, but also to accurately report the FX rate and generally carry out the trades in a manner consistent with their custodial services contracts ("Custodian Contracts") and State Street's other written representations.

6.     ARTRS's Custodian Contracts expressly provided that State Street would execute FX transactions for no additional fees above the substantial annual flat fee ARTRS paid for custodial services. Indeed, while ARTRS's Custodian Contracts with State Street authorized State Street to charge ARTRS for additional fees for certain ancillary services, they did not authorize additional fees for executing FX transactions.

7.     In successive "Investment Manager Guides" made available to its custodial clients and their outside investment managers, State Street explained that the pricing of FX trades is ***"based on the market rates at the time the trade is executed."*** Thus, State Street assured its custodial clients, including ARTRS and the Class, that FX rates would reflect only the execution price, without additional fees or mark-ups.

8.     Despite these express provisions in the Investment Manager Guides and Custodian Contracts, in addition to the annual flat fees it charged its custodial clients, State Street has undertaken an unfair and deceptive practice since at least 1998 whereby FX transactions were conducted so as to maximize exorbitant and undisclosed profits to State Street at the direct expense of ARTRS and Class members. State Street charged its custodial clients inflated FX rates when buying foreign currency for them, reported deflated FX rates when selling foreign currency for them, and in both cases pocketed the difference between the actual and reported rates. In this regard, State Street charged ARTRS and the Class incorrect and often

fictitious FX rates unrelated to the market-based rates State Street actually paid or received in executing the FX trades.

9.      ARTRS and other Class members could not reasonably have detected State Street's deception.  Nothing in the FX rates State Street actually reported to its clients indicated that those rates included hidden and unauthorized mark-ups (or mark-downs).

10.     State Street's unfair and deceptive FX trading practices, perpetrated on ARTRS and the Class, generated hundreds of millions of dollars in profits annually for State Street.  This money was taken directly from the pockets of ARTRS and Class members.

11.     ARTRS brings this action as a class action on behalf of all similarly affected custodial clients of State Street during the Class Period defined below, except for those covered by independent *qui tam* actions that have been or that become unsealed during the pendency of this action, in order to recover the proceeds State Street reaped from Class members through its unfair and deceptive FX trading practices.

## II.     JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), because this is a class action filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds, if not thousands, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount; and many members of the proposed Class, including Plaintiff, are citizens of States other than Massachusetts.  This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different States and the matter in controversy with respect to the claims of the named Plaintiff exceeds the jurisdictional amount, and pursuant to 28 U.S.C. § 1367(a).

13.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2). A substantial part of the acts or omissions giving rise to Plaintiff's claims occurred within this judicial district.  Defendants are citizens of the Commonwealth of Massachusetts, and are headquartered in and conduct substantial operations within this judicial district.

III.     **PARTIES**

     A.     **Plaintiff ARTRS**

14.     ARTRS, based in Little Rock, Arkansas, is a cost-sharing, multiple-employer defined benefit pension plan that provides retirement benefits to public school and other public education-related employees in the State of Arkansas.  ARTRS was established by Act 266 of 1937, as an Office of Arkansas State government, for the purpose of providing retirement benefits for employees of any school or other educational agency participating in the system.  As of June 30, 2009, ARTRS included 343 participating employers and more than 115,000 members, and had net assets held in trust for pension benefits exceeding $8.8 billion.

15.     Like many institutional investors, ARTRS invests some of its net pension assets in foreign securities, referred to by ARTRS as "Global Equity" securities.  Global Equity investments are ARTRS's single largest investment asset class.  As of September 30, 2009, and consistent with its investment guidelines, ARTRS's Global Equity investments constituted approximately 33% of its net pension assets, worth more than $3.2 billion.  That percentage remained consistent through the end of 2010.

16.     State Street has been ARTRS's exclusive custodian bank since 1998.  ARTRS paid State Street $851,412.83 for disclosed and agreed-upon custodial fees for fiscal year 2009 (July 1, 2008-June 30, 2009).  Such fees did not include State Street's hidden and unauthorized FX trading charges.

**B.     Defendants**

17.     Defendant State Street Corporation is a Massachusetts corporation headquartered at State Street Financial Center, One Lincoln Street, Boston, Massachusetts 02111.

18.     During the Class Period, State Street Corporation provided custodial banking and FX services to ARTRS and other members of the Class through State Street Bank and Trust, and its subsidiaries, agents, employees and co-conspirators.  At all relevant times, State Street's FX trading desk was located in Boston.

19.     Defendant State Street Bank is a wholly owned subsidiary of State Street Corporation and is similarly headquartered in Boston.  During the Class Period, State Street Bank provided custodial banking and FX services to ARTRS and members of the Class.

20.     Defendant State Street Global Markets, formerly known as State Street Capital Markets, is a wholly owned subsidiary of State Street Corporation and is similarly headquartered in Boston.  During the Class Period, State Street Global Markets provided custodial banking and FX services to ARTRS and members of the Class.  In particular, State Street Global Markets provides specialized investment research and trading in foreign exchange, equities, fixed income, and derivatives for State Street's custodial clients.

## IV.    CLASS ACTION ALLEGATIONS

21.     This action is brought and may properly be maintained as a class action pursuant to Rules 23(a)(1)-(4) and 23(b)(3) of the Federal Rules of Civil Procedure and Massachusetts General Laws ch. 93A, §§ 9 and 11.  This action satisfies the procedural requirements set forth by Rule 23 and ch. 93A, §§ 9 and 11.

22.     This suit is a class action brought for money damages on behalf of a Class defined as all institutional investors in foreign securities, including but not limited to public and private pension funds, mutual funds, endowment funds and investment manager funds, for which State

Street served as the custodial bank and executed FX trades on a "standing-instruction" or "non-negotiated" basis between January 2, 1998 and December 31, 2009, inclusive (the "Class Period"), and which suffered damages as a result of the deceptive acts and practices and other misconduct alleged herein.  Excluded from the Class are custodial clients of State Street that are covered by independent *qui tam* actions that have been unsealed or that are unsealed during the pendency of this action.  Also excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such entity.

23.    The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable.

24.    There are questions of law and fact common to the Class, including whether:

(a)    State Street engaged in unfair and deceptive acts and practices in connection with FX transactions, so as to maximize its own profits at the expense of its custodial clients;

(b)    State Street charged and reported to its custodial customers FX rates that did not reflect the actual cost of the FX transaction to State Street, and instead included hidden and unauthorized mark-ups (or mark-downs);

(c)    State Street pocketed the difference between the actual, market-based FX rates and the false FX rates reported and charged to its custodial clients;

(d)    State Street's acts and omissions with respect to ARTRS and the Class violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A;

(e)    State Street's acts and omissions with respect to ARTRS and the Class violated Massachusetts state and common law; and

(f)    State Street's acts and omissions caused ARTRS and the Class to suffer money damages and, if so, the proper measure of those damages.

25.    Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff is a member of the Class described herein.

26.    Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or which directly and irrevocably conflict with the interests of other members of the class.

27.    The interests of the Plaintiff are co-extensive with, and not antagonistic to, those of the absent Class members.  Plaintiff will undertake to represent and protect the interests of absent Class members.

28.    The undersigned counsel for Plaintiff and the Class are experienced in complex class action litigation, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiff and absent Class members.

29.    The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

30.    A class action is superior to other available methods for the adjudication of this controversy.  Individual litigation by all Class members would increase the delay and expense to the parties and the Court given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be more fair,

efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

31.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  Compared to individual actions by each Class member, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     The Nature of FX Trading

#### 1.     The Increasing Necessity of FX Trading in a Global Investment Portfolio

32.     During the past decade, in order to meet their investment and funding objectives, U.S.-based institutional investors have found it increasingly necessary to enter the overseas securities markets and expand the global scope of their investment portfolios.  ARTRS, for example, held approximately 15% of its investment portfolio in global markets as of mid-2003. By September 2009, however, that percentage had increased to more than 33%.

33.     Institutional investors that buy and sell foreign securities, such as ARTRS and other Class members, must engage in FX trading because the purchases, sales, dividends, and interest payments are all transacted in the currency of the nation in which the relevant securities exchange sits.

34.     If, for example, a U.S. investor wishes to buy shares of stock in a German company that trades on a German securities exchange, the investor must sell U.S. dollars and purchase euros in order buy those shares.  Further, any cash dividends paid on that German stock will be denominated in euros.  To "repatriate" those dividends, the investor must sell the euros

received and purchase dollars.  Accordingly, FX transactions are the means for converting U.S. dollars into foreign currency and vice versa.

> ### 2.    How FX Trading Works

35.    FX trading takes place around the world on a nearly 24-hour cycle, five-and-a-half days a week.  The official FX trading week begins at 7:00 a.m. New Zealand time on Monday, with each subsequent trading day ending at 5:00 p.m. New York City time.

36.    For each currency bought and sold during the course of the FX trading day, there will necessarily be a high trade and a low trade, with all other trades falling somewhere in between.  This information is determined through trade data monitored and tracked by proprietary services such as, but not limited to, Electronic Brokerage System ("EBS") and Reuters.

37.    The difference between the low trade and the high trade is called the "range of the day."  More precisely, the "spot range of the day" refers to FX rates as of a specific and prompt settlement date, usually two business days after the trade date.  To more accurately measure the trade cost for FX transactions that settle prior to or later than the date for spot trades, participants in the FX market also look to the "forward-adjusted range of the day."  Because FX trades do not always settle two days after the trade, the forward-adjusted range of the day is a more conservative and accurate measurement such that it takes into account the interest rate differential that exists at the time of trade between the trade date and settlement date for the underlying currencies.

38.    By way of example, assume 100 FX trades in euros-for-dollars (EUR-USD) during the course of one trading day.  If the lowest rate trade occurred at $1.25 to buy €1.00, and the highest rate trade occurred at $1.35 to buy €1.00, the range of the day would be $1.25-$1.35.

39.     Another useful measure is the daily "mid-rate," which is simply the sum of the forward-adjusted daily high and forward-adjusted daily low, divided by two.  This rate reflects the "average" FX rate in a given currency on a given day.

40.     The daily mid-rate is significant because of the absence of publicly accessible data showing the precise time of day at which FX trades occur (as exists with stock trading, for example) and because State Street did not disclose such information to its clients.  By looking at the mid-rate over a significant period of time, however, one can reasonably estimate the average FX trade cost on any given day.  Over the course of a month or years, it is reasonable to expect FX trades to regress to the mid-rate.  On any given day, some trades might settle above or below the daily mid-rate, but over increasingly lengthy periods of time, a significant number of FX trades can be expected to occur at or extremely close to the mid-rate.

### 3.     Negotiated vs. Non-Negotiated FX Trades

41.     State Street gave ARTRS and other custodial clients a choice with respect to the manner in which FX trades would be conducted.  In a "negotiated," or "active," FX trade, a custodial client or its outside investment manager would personally communicate the trade information to a State Street FX trader.  The State Street FX trader would then quote a rate, which would be accepted or rejected.  If accepted, State Street would execute the FX trade at the agreed-upon price, which could include a modest mark-up.

42.     A "non-negotiated" or "standing-instruction" FX trade is essentially the opposite of a negotiated trade.  There is no arm's-length negotiation of the price between the parties to the transaction.  With non-negotiated or standing-instruction trades, custodial clients and their outside investment managers do not negotiate rates with State Street, and State Street does not quote rates.  Instead, as the name "standing-instruction" suggests, custodial clients simply report the desired currency transaction to State Street, and trust and rely upon State Street, using "best

execution" practices, to execute the trade on the client's behalf.  According to its Investment

Manager Guides, State Street referred to standing-instruction FX transactions as "Indirect Deals"

between 2000 and May 2008, and "Institutional Investors FX Trading" between May 2008 and

November 2009.  Since November 2009, State Street has referred to such trading as "Custody

FX."

43.     State Street's custodial clients, including ARTRS and the Class, reasonably

expected that standing-instruction FX trades would have no mark-ups or fees.  This was in view

of, among other things, (a) the hefty annual fees custodial clients paid State Street to serve as

custodian over their assets, (b) the Custodian Contracts and associated fee schedules that gave no

indication that standing-instruction FX trading would incur extra fees or mark ups, and did not

authorize any such fees or mark-ups, and (c) State Street's Investment Manager Guides that

assured custodial clients and outside investment managers that the price of FX trades was ***"based

on the market rates at the time the trade is executed."***

44.     Institutional investors typically requested that State Street and other custodians

handle the smaller FX transactions, mostly the repatriation of dividend and interest payments,

through standing instructions because the amount of each trade rarely justified the time and effort

required for a negotiated trade.

### B.     ARTRS Placed its Trust in State Street as its Custodian Bank, Relying on State Street's Expertise and Loyalty

45.     Since at least September 15, 1998, State Street, as ARTRS's custodian bank,

executed the majority of ARTRS's FX transactions for its accounts, including purchases and

sales of U.S. and foreign currency as well as repatriations of dividends and interest payments

into U.S. dollars.

46.     ARTRS, like other Class members, reposed a high degree of trust in State Street to execute standing-instruction FX transactions.  In conducting these transactions, State Street occupied a superior position to ARTRS due to its control over all aspects of the FX trade, including the timing of the trades, and most importantly, the price at which the trades were executed.

47.     ARTRS depended upon State Street not only to execute the FX trades, but also to accurately and honestly report the FX rate and to carry out the trades in accordance with their Custodian Contracts, associated fee schedules, and guidelines as set forth in the Investment Manager Guides.

48.     Additionally, separate and apart from the Custodian Contracts and Investment Manager Guides, ARTRS, like State Street's other custodial clients, had a reasonable expectation that the FX rates that State Street charged (or credited) on standing-instruction FX trades would accurately reflect the true rates of those FX trades.  There is no reason a custodial client would expect its custodian bank—to which it was paying substantial annual fees for custodial services—to charge (or credit) it in connection with standing-instruction FX trades at any rate other than the actual rate for the FX trade.

C.      **State Street's Custodian Contracts
and Investment Manager Guidelines
Were Predicated on No-Cost FX Trading**

49.     ARTRS's initial Custodian Contract with State Street was dated September 15, 1998.  The parties superseded that contract on July 1, 2001 with a new Custodian Contract containing nearly identical terms and provisions.  The second contract was superseded by a Custodian Contract signed June 29, 2004, also containing identical provisions.  That third contract was eventually superseded by a Custodian Contract dated June 30, 2009, containing identical relevant terms.

50.     Each of the Custodian Contracts provided that State Street "shall be entitled to compensation for its services and expenses as Custodian" for ARTRS pursuant to "a written Fee Schedule between the parties."

51.     ARTRS and State Street agreed to and executed a series of Fee Schedules covering the following periods:

(a)     Effective September 15, 1998 through June 30, 2001;

(b)     Effective July 1, 2001 through June 30, 2004;

(c)     Effective July 1, 2004 through June 30, 2007;

(d)     Effective July 1, 2007 through June 30, 2009 (as revised);

(e)     Effective April 1, 2008 through June 30, 2009 (as revised);

(f)     Effective November 1, 2008 through June 30, 2009; and

(g)     Effective July 1, 2009 through June 30, 2014.

52.     The Fee Schedule effective September 15, 1998 provided for an "estimated total annual fee" of $233,534.  The remaining Fee Schedules provided for an annual flat fee to be paid by ARTRS to State Street for services as custodian:

(a)     $600,000 per year from July 1, 2001 through June 30, 2004;

(b)     $500,000 per year from July 1, 2004 through June 30, 2007;

(c)     $400,000 per year from July 1, 2007 through June 30, 2009, with a subsequent revision to $320,000 from April 1, 2008 through June 30, 2009; and

(d)     $200,000 per year from July 1, 2009 through June 30, 2014.

53.     The Fee Schedules also set forth certain categories of ancillary services for which State Street was permitted to charge ARTRS additional fees, including Wire Fees, Reporting Fees, Delivery Fees and Subcustody Fees.

54.     None of these particular ancillary service categories relate in any way to FX trading.  The Custodian Contracts did not state that those ancillary fees relate to FX trading or that State Street would impose any fees in connection with FX trading.

55.     Unlike most of the later Fee Schedules, which were silent as to fees and charges for FX trading, the September 15, 1998 Fee Schedule specifically mentioned FX trading, stating that **"No Charge"** would be assessed for any foreign exchange executed through State Street.

56.     The July 1, 2009 Fee Schedule also mentions FX trading: State Street specifically stated that "[t]ransaction costs for all foreign exchange trades transacted through State Street **will be waived**."  (Emphasis added.)

57.     As such, for more than a decade, ARTRS's Custodian Contracts with State Street (a) expressly provided that standing-instruction FX trades would be executed free of charge; or (b) did not list FX transactions among the services for which it was permitted to charge an additional fee or any other cost above the annual flat fee.

58.     Substantially similar terms were employed in the Custodian Contracts for other members of the Class during the Class Period.

59.     Additionally, during the Class Period, State Street provided Investment Manager Guides to custodial clients and outside investment managers that contained comprehensive information about State Street's custody practices and services, including procedural requirements, costs, and features.  The many services described therein included "State Street Foreign Exchange Transactions."

60.     During the Class Period, State Street issued no fewer than 15 distinct Investment Manager Guides, including those dated July 9, 2003; August 9, 2005; September 26, 2006; October 17, 2006; November 20, 2006; December 15, 2006; January 25, 2007; October 30, 2007; November 21, 2007; December 19, 2007; January 28, 2008; May 1, 2008; October 31, 2008; December 30, 2008; and January 23, 2009, to custodial clients and outside investment managers.

61.     State Street represented in each of these Investment Manager Guides that "State Street Foreign Exchange Transactions . . . are **priced based on the market rates at the time the trade is executed."**  (Emphasis added.)

### D.     State Street's Deceptive Scheme Overcharged ARTRS and the Class for Standing-Instruction FX Trades

62.     State Street's FX practices diverged from what the Custodian Contracts authorized and what the Investment Manager Guides represented.  Despite assurances that FX transactions would be based on market rates, State Street reported and charged ARTRS and the Class FX rates on standing-instruction trades far above what State Street actually paid for foreign currency (or far below what State Street actually received for sales of foreign currency)— oftentimes, at rates that actually fell **outside of the range of the day.**

63.     As such, unbeknownst to ARTRS and the Class, State Street reported FX rates on standing-instruction trades to its clients that did not reflect the actual cost or proceeds of the FX transaction to State Street, and instead included a hidden and unauthorized mark-up.  Put simply, State Street invented the FX rates it reported and charged (or credited) to ARTRS and the Class. State Street paid or received one rate for FX, reported to ARTRS and Class members another rate that was either higher (in the case of a purchase) or a lower (in the case of a sale), and pocketed the difference.

16

64.     When custodial clients or their agents requested that State Street execute an FX transaction, the request was routed electronically via State Street's Market Order Management System (MOMS) to a group of "risk traders" working at State Street's FX trading desk who then executed the FX trades by entering trade information that did not reflect the actual rate State Street paid or received.

65.     To illustrate the deception, assume again the example set forth above—100 euro-for-dollar trades on a given day that ranged from $1.25 to $1.35 (the "range of the day") to purchase €1.00, with a day's mid-rate of $1.30.  On any, and all, standing-instruction euro-for-dollar trades on behalf of its custodian clients, State Street would have paid a rate between $1.25 and $1.35 for those euros, but reported to its clients that it paid more.  State Street charged its clients the false higher amount and kept the difference.

66.     This conclusion is supported by Plaintiffs' analysis of ten years of FX transactions executed by State Street on behalf of and reported to ARTRS.  Between January 3, 2000 and December 31, 2010, ARTRS had a total 10,784 FX transactions with reliable data.  Among these 10,784 transactions, 4,216, or 39%, were non-negotiated, standing-instruction trades.  These 4,216 FX trades had an aggregate trading volume exceeding $1.2 billion.

67.     In conducting the analysis, ARTRS's FX trades were compared to other FX trades logged and tracked in a comprehensive database of more than 2 million buy-side currency trades.  By comparing ARTRS's trades in certain currencies with the same currency pair trades in the database, one can estimate the trading cost of ARTRS's standing-instruction FX trades in relation to trades made worldwide.  For purposes of this analysis, the trading cost is the difference between the day's mid-rate and the rate that State Street charged (or credited) to ARTRS for standing-instruction FX trades.

68.     State Street did not report to ARTRS (or any other Class member) the actual time of execution of any FX trade.  Therefore, comparing the day's mid-rate to the standing-instruction FX rates State Street charged (or credited) to ARTRS is the best method of determining whether State Street charged (or credited) ARTRS a rate based on the actual market rate at the time of execution, as State Street represented in its Investment Manager Guides.

69.     State Street derived its false FX rates by adding (on purchases) or subtracting (on sales) "basis points" or "pips" from the actual FX rate.  A basis point, or pip, is a unit equal to 1/100th of a percentage point.  For example, the smallest move the euro/dollar currency pair generally makes is 1/100th of a penny, or one basis point.

70.     For the period of January 3, 2000 through December 31, 2010, the FX rates that State Street reported and charged (or credited) to ARTRS on its 4,216 non-negotiated FX trades were, on average, ***17.8 basis points*** above or below the day's mid-rate.  In other words, the FX rates that State Street reported and charged (or credited) to ARTRS for standing-instruction FX trades, on average and during this 10-year period, created a trading cost 17.8 basis points higher than the average FX rate (the day's mid-rate).

71.     By way of example, assume that the rate State Street actually paid to purchase €1.00 on a given day was $1.31551.  If State Street charged ARTRS 17.8 basis points more than it paid, the rate would be $1.31729 ($1.31729 - $1.31551 = 0.00178).  For a purchase of €10 million, the undisclosed profit to State Street on that single trade—and the concomitant unknown loss by ARTRS—would be $17,800.  Accordingly, the difference in total trading costs between the actual and false rates can be very large.

72.     Tellingly, for the same 10-year period, the FX rates that State Street reported and charged (or credited) to ARTRS on its more than 6,500 ***negotiated*** FX trades added, on average,

only **3.6 basis points** in trading costs as compared to the day's mid-rate.  As such, while the FX trades executed by State Street pursuant to so-called "best execution" practices incurred trading costs of 17.8 basis points on average, the FX trades actively negotiated between State Street and ARTRS or its outside investment managers incurred trading costs of only 3.6 basis points on average.

73.    The false or fictitious nature of the FX rates State Street reported and charged (or credited) to ARTRS is further demonstrated when viewing ARTRS's standing-instruction FX trades in the context of the forward-adjusted range of the day.  Among ARTRS's 4,216 standing-instruction FX trades, **2,217, or 53%, fell entirely outside the forward-adjusted range of the day.**  These 2,217 FX trades, with a total volume exceeding $200 million, added trading costs on average of **64.4 basis points** over the day's mid-rate—an enormous hidden and unauthorized mark-up.  Using the above example of a purchase of €10 million, an undisclosed fee of 64.4 basis points would result in a $64,400 profit to State Street on that single transaction.

74.    Rates consistently above (or below) the daily mid-rate alone demonstrate that State Street was not fulfilling its duties as a custodian by charging a hidden mark-up, and they demonstrate a violation of the terms of the Custodian Contracts and the representations in the Investment Manager Guides.  But when more than half of all standing-instruction FX trades for a particular custodial client fall *outside* the forward-adjusted range of the day, it becomes clear that those reported FX rates were not actual, market-based FX rates, but were instead fictitious and designed solely to gouge the custodial client and, in turn, its beneficiaries.  In the case of public pension funds, the beneficiaries include teachers, police officers, firefighters and many other public workers.

75.     There is no rational, honest basis for a professional FX market participant like State Street, or indeed any FX market participant, to charge an FX rate outside the forward-adjusted range of the day without disclosing it.  The day's range defines the range at which primary dealing banks and custodian banks transacted in FX during that trading day.  The fictitious nature of rates assigned outside the forward-adjusted range of the day illustrates, perhaps most starkly, the unfair and deceptive nature of State Street's standing-instruction FX trading practices.  In short, these practices were designed to enrich State Street while deceiving and unfairly depriving institutional clients such as ARTRS and the Class of much-needed funds.

**E.     State Street's Deceptive Acts and Practices Could
Not Reasonably Be Detected by ARTRS and the Class**

76.     Neither ARTRS nor any Class member reasonably could have discovered State Street's deceptive acts and practices concerning FX trading during the Class Period.  State Street executed hundreds if not thousands of FX trades on behalf of its custodial clients every month.  The periodic reports State Street sent to ARTRS and the Class showed only the rate that State Street charged for its FX trades.  The reports did not include the range of the day, the daily mid-rate, or any indication of the time of the day that the trade was executed (known as "time-stamps").  Accordingly, there was no way for ARTRS and the Class to reasonably determine, or even suspect, that State Street was secretly charging more than it actually paid for FX or was paying clients less than it actually received for FX.

77.     It was reasonable for ARTRS and the Class to presume that the prices reflected in the reports State Street provided to them were an accurate representation of the true cost of the FX trades.  With respect to ARTRS specifically, the Custodian Contracts expressly provided that the "Custodian shall render to the [Plaintiff] a monthly report of all monies received or paid on

behalf of the Fund[.]"  Accordingly, State Street had an affirmative obligation to report accurately the amount of money it was paying or receiving for FX.

78.     Furthermore, based on the Investment Manager Guides' assurance that FX rates would be "priced based on the market rates at the time the trade is executed," neither ARTRS nor the Class had any reason to suspect that they were being charged (or credited) anything other the rate that State Street itself had paid or received on those standing-instruction FX transactions.

79.     Moreover, as alleged above, State Street occupied a position of trust and confidence with respect to its custodial clients.  Those clients would not, and did not, suspect that the custodian in which that trust resided, would profit to a gross and undisclosed degree on the services for which they paid a handsome annual fee.  Indeed, those custodial clients would, and did, presume that the custodian bank would act in and not against their best interests.

**F.     Events After October 2009 Begin to Shed Light
         on State Street's Deceptive Acts and Practices**

80.     On October 20, 2009, the Attorney General of California filed a Complaint in Intervention for violation of the California False Claims Act, Cal. Gov. Code § 12651, charging State Street with misappropriating more than $56 million from the accounts of California's two largest pension plans—CalPERS and CalSTRS—over a multi-year period in connection with the same unfair and deceptive FX practices alleged herein.  *People of the State of Cal. ex rel. Brown v. State Street Corp.*, Case No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento County Oct. 20, 2009).

81.     The California Attorney General alleges that State Street reported inflated FX rates when buying foreign securities for CalPERS and CalSTRS, reported deflated FX rates when selling foreign securities for them, and pocketed the difference between the reported and actual rates.  The Attorney General further alleges that State Street hid its wrongful conduct by

entering incorrect FX exchange rates into State Street's electronic FX trading systems and providing false records to CalPERS and CalSTRS.

82.     In the months that followed, State Street dramatically changed its FX trading policies and disclosure and so informed ARTRS and other Class members.  Under these new policies, State Street admitted for the first time that it had systematically imposed additional charges for FX trading.  For example, in an excerpt from an updated Investment Manager Guide dated November 20, 2009, State Street advised custodial clients that it would post on its website, my.statestreet.com, "current mark-ups and mark-downs used by State Street Global Markets for [standing-instruction] foreign exchange transaction requests."

83.     In a similar message sent to custodial clients, State Street admitted that **"*[s]ince December 2009*,** State Street has provided to all of its custody clients and their investment managers via our dedicated client portal, my.statestreet.com, comprehensive disclosure of the pricing and execution methodology (including the maximum mark-up or mark-down that may be applied) for each of its Indirect [standing-instruction] FX Services."  (Emphasis added.)  State Street added that "on the day after a trade is executed, State Street provides for each currency pair the reference interbank rates and the times at which they are obtained, the actual rates, the daily high/low range at the time of pricing (where applicable) and the actual mark-up or mark-down that was applied."

84.     State Street altered its practices to allow custodial clients more complete access to FX trading data only after its deceptive acts and practices began to be revealed.  State Street's late disclosure that it charged mark-ups and mark-downs on standing-instruction FX trades contradicts its previous repeated assurances that FX rates would be based on market rates at the time the trade is executed.

85.     According to a study conducted by an independent FX analyst after the California *qui tam* complaint was unsealed and State Street altered its FX policies, the cost of standing-instruction FX trades dropped by a remarkable ***63%.***  The study analyzed 498,940 FX spot and forward trades (196,280 standing-instruction trades and 302,660 negotiated trades) executed during 2000-2010, and found that investors who had their custodian banks, including State Street, execute FX trades on a standing-instruction basis during 2010 saw an overall 63% drop in trading costs from their average trading costs for the years 2000-2009.

## FIRST CLAIM FOR RELIEF

**Violation of the Massachusetts
Consumer Protection Act, M.G.L. ch. 93A, § 11
(Asserted Against All Defendants on
Behalf of Plaintiff ARTRS and the Class)**

86.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

87.     At all relevant times hereto State Street was engaged in trade or commerce.

88.     While engaged in trade or commerce, State Street engaged in unfair and deceptive acts and practices, as alleged in this Complaint, in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 11, including, without limitation:

(a)     Unfairly and deceptively pricing standing-instruction FX trades for custodial clients such as ARTRS and the Class in a manner designed to maximize profits to State Street at the direct and undisclosed expense of those custodial clients;

(b)     Unfairly and deceptively reporting false and fictitious FX rates for standing-instruction FX trades to State Street's custodial clients such as ARTRS

and the Class rather than the actual rates at which State Street had effected those

trades;

        (c)      Pocketing the difference between the actual FX rates at which

State Street effected custodial clients' standing-instruction FX trades and the false

and fictitious rates State Street reported to those custodial clients;

        (d)      taking undisclosed profits on standing-instruction FX trades from

custodial clients such as ARTRS and the Class that grossly exceeded the

customary prices at which similar services were readily obtainable in negotiated

FX transactions by like Class members; and

        (e)      Violating Attorney General Regulations, including

940 CMR §§ 3.16(1-2).

89.     These acts or practices violated Sections 2 and 11 of the Massachusetts Consumer

Protection Act, Mass. Gen. Laws ch. 93A.

90.     State Street's unfair and deceptive acts or practices related to standing-instruction

FX transactions occurred primarily and substantially in Massachusetts, where State Street's FX

trading desk is located.

91.     As a result of the unfair and deceptive conduct of State Street, ARTRS and the

Class sustained economic damages in an amount no less than the difference between (a) the

actual dollar amounts paid or received by State Street when conducting standing-instruction FX

trades for ARTRS and the Class and (b) the false and fictitious dollar amounts charged or

credited by State Street to ARTRS and the Class for those same trades.

92.     State Street is in a unique position to know the exact amount of damages

sustained by ARTRS and the Class as a result of State Street's unfair and deceptive conduct,

because, *inter alia,* throughout the Class Period, State Street did not provide time-stamps to its custodial clients for its standing-instruction FX trades.

93.     State Street's unfair and deceptive conduct as described herein was willful and intentional, accordingly entitling Plaintiff and the Class to up to treble, but no less than double, damages, plus costs (including attorneys' fees).

94.     Application of Mass. Gen. Laws ch. 93A to all Class members located throughout the United States, regardless of their state or residence, is appropriate because Defendants are located and engage in trade or commerce in Massachusetts and are thus subject to the laws of the Commonwealth.  Defendants are registered to do business in Massachusetts, and their principal place of business is located in Massachusetts, from which they controlled and directed the deceptive and unfair practices described herein, including conducting FX trades on behalf of ARTRS and the Class.  Further, on information and belief, all employees of Defendants directly involved in the activities complained of herein are based in Massachusetts.

## SECOND CLAIM FOR RELIEF

**Violation of the Massachusetts
Consumer Protection Act, M.G.L. ch. 93A, § 9
(Asserted Against All Defendants on
Behalf of Plaintiff ARTRS and the Class)**

95.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

96.     This claim for relief is pleaded in the alternative to the First Claim for Relief on behalf of Plaintiff and those members of the Class who, as not-for-profit entities utilizing State Street to conduct FX transactions, were engaged in the furtherance of their core mission, which includes investing and building retirement funds for public employees.

97.     While engaged in trade or commerce, State Street engaged in unfair and deceptive acts and practices, as alleged in this Complaint, in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 9, including, without limitation:

(a)     Unfairly and deceptively pricing standing-instruction FX trades for custodial clients such as ARTRS and the Class in a manner designed to maximize profits to State Street at the direct and undisclosed expense of those custodial clients;

(b)     Unfairly and deceptively reporting false and fictitious FX rates for standing-instruction FX trades to State Street's custodial clients such as ARTRS and the Class rather than the actual rates at which State Street had effected those trades for those customers;

(c)     Pocketing the difference between the actual FX rates at which State Street effected custodial clients' standing-instruction FX trades and the false and fictitious rates State Street reported to those custodial clients;

(d)     taking undisclosed profits on standing-instruction FX trades from custodial clients such as ARTRS and the Class that grossly exceeded the customary prices at which similar services were readily obtainable in negotiated FX transactions by like Class members; and

(e)     Violating Attorney General Regulations, including 940 CMR §§ 3.16(1-2).

98.     These acts or practices violated Sections 2 and 9 of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A.

99.     State Street's unfair and deceptive acts or practices related to standing-instruction FX transactions occurred primarily and substantially in Massachusetts, where State Street's FX trading desk is located.

100.     As a result of the unfair and deceptive conduct of State Street, Plaintiff ARTRS and the Class sustained economic damages in an amount no less than the difference between (a) the actual dollar amounts paid or received by State Street when conducting standing-instruction FX trades for ARTRS and the Class and (b) the false and fictitious dollar amounts charged or credited by State Street to ARTRS and the Class for those same trades.

101.     State Street is in a unique position to know the exact amount of damages sustained by ARTRS and the Class as a result of State Street's unfair and deceptive conduct, because, *inter alia,* throughout the Class Period, State Street did not provide time-stamps to its custodial clients for its standing-instruction FX trades.

102.     Pursuant to the Mass. Gen. Laws. Ann. ch. 93A, § 9(3), on February 16, 2011—more than thirty (30) days prior to the filing of this Amended Class Action Complaint, which asserts, for the first time, a claim pursuant to Mass. Gen Laws ch. 93A, § 9—Plaintiff mailed, via certified mail, return receipt requested, a written demand for relief to State Street identifying the claimants and reasonably describing the unfair acts or practices relied upon and the injuries suffered.  State Street's response on March 18, 2011 contested Plaintiff's allegations and refused to make a reasonable (or any) offer of relief.  The refusal to grant relief was made in bad faith with knowledge or reason to know that the acts of the Defendants violated Mass. Gen. Laws Ann. ch. 93A, § 2.

103.   State Street's unfair and deceptive conduct as described herein was willful and intentional, accordingly entitling Plaintiff and the Class to treble damages, plus costs (including attorneys' fees).

104.   Application of Mass. Gen. Laws ch. 93A to all Class members located throughout the United States, regardless of their state or residence, is appropriate because Defendants are located and engage in trade or commerce in Massachusetts and are thus subject to the laws of the Commonwealth.  Defendants are registered to do business in Massachusetts, and their principal place of business is located in Massachusetts, from which they controlled and directed the deceptive and unfair practices described herein, including conducting FX trades on behalf of ARTRS and the Class.  Further, on information and belief, all employees of Defendants directly involved in the activities complained of herein are based in Massachusetts.

### THIRD CLAIM FOR RELIEF

**Breach of Duty of Trust**
**(Asserted Against All Defendants on**
**Behalf of Plaintiff ARTRS and the Class)**

105.   Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

106.   Plaintiff and the members of the Class placed their trust in Defendants to execute standing-instruction FX transactions necessary to facilitate the purchases and sales of foreign securities for the accounts of Plaintiff and the Class.

107.   Defendants occupied a superior position to Plaintiff and the Class such that they controlled all aspects of standing-instruction FX trading, including the timing of the FX trades and the prices at which the trades were executed and settled.  Plaintiff and the Class were entirely

dependent on Defendants to execute the FX trades and accurately report the price at which FX trades were settled.

108.    Defendants understood that Plaintiff and the members of the Class placed their confidence and trust in Defendants to report FX trades accurately.

109.    Defendants, by virtue of their superior knowledge and position of control as well as the confidence and trust placed in them by Plaintiff and the Class, owed a duty of loyalty to Plaintiff and the Class in connection with carrying out standing-instruction FX transactions.

110.    Defendants, by virtue of their capacity as custodian for Plaintiff and the Class, and their superior knowledge and position of control as well as the confidence and trust placed in them by Plaintiff and the Class, owed a duty of disclosure in connection with carrying out standing-instruction FX transactions.

111.    Defendants breached their duty of loyalty to Plaintiff and each of the Class members by: (a) charging Plaintiff and the Class higher FX rates than State Street actually paid when buying foreign currency; (b) paying Plaintiff and the Class lower FX rates than State Street actually received when selling foreign currency; (c) pocketing the difference between State Street's actual costs and the rates charged to Plaintiff and the Class; and (d) hiding their conduct by providing account statements to the Plaintiff and the Class that reported only the date on which standing-instruction FX trades were executed, and the price charged to Plaintiff and the Class, yet omitting important information such as the actual time the trade was executed, and the actual cost of the trade to State Street, that would have enabled Plaintiff and the Class to realize they were paying in excess of State Street's actual costs or receiving less than State Street's actual proceeds.

112.     Defendants breached their duty of disclosure to Plaintiff and each of the Class members by providing account statements to the Plaintiff and the Class that omitted the actual cost of the trade to State Street and the actual time the trade was executed.

113.     As a result of Defendants' breaches of duty, Plaintiff and the Class sustained damages, including, but not limited to, the difference between the amount of State Street's actual costs and the amounts charged to Plaintiff and the Class when purchasing foreign currency, and the difference between the amounts State Street received and the amounts paid to Plaintiff and the Class when selling foreign currency.  Accordingly, Plaintiff and the Class are entitled to an award of money damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### Negligent Misrepresentation
### (Asserted Against All Defendants on
### Behalf of Plaintiff ARTRS and the Class)

114.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

115.     Defendants' activities complained-of herein were performed in the course of State Street's business acting as custodian bank for Plaintiff and the members of the Class.

116.     In connection therewith, Defendants supplied Plaintiff and the Class with periodic reports and statements, including monthly reports and trade confirmations, regarding the purchase and sale of foreign currency by State Street on behalf of Plaintiff and the Class.  The reports and statements were provided by State Street for the guidance of Plaintiff and the Class in their business transactions.

117.    The reports and statements State Street provided to Plaintiff and the Class omitted material information about the actual cost to State Street of the purchases and sales of foreign currency, and omitted to state the actual time the foreign currency was purchased or sold by State Street.  Due to State Street's material omissions, Plaintiff and the Class were therefore unable to determine that State Street was charging them in excess of State Street's actual and reasonable costs for FX purchases, and remitting to Plaintiff and the Class less than the amounts State Street received for FX sales.

118.    Because of State Street's special position of trust with respect to Plaintiff and the Class, and because of its superior position controlling all aspects of standing-instruction FX trading and reporting, State Street had a duty to disclose the omitted material information to Plaintiff and the Class.  State Street's position of trust and superior position creates the duty to disclose.

119.    Justifiable reliance is presumed because this Claim for Relief is based on Defendants' material omissions.

120.    Defendants failed to exercise reasonable care or competence in obtaining or communicating the allegedly omitted information to Plaintiff and the Class.

121.    Defendants' negligent misrepresentations caused pecuniary loss to Plaintiff and the Class.

122.    Accordingly, Plaintiff and the Class are entitled to an award of money damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

**Breach of Contract**
**(Asserted Against Defendant State Street**
**Bank on Behalf of Plaintiff ARTRS Individually)**

123.    Plaintiff repeats and re-alleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs and further alleges:

124.    Plaintiff brings this Claim for Relief for breach of contract on behalf of itself individually.

125.    Plaintiff entered into valid, binding Custodian Contracts with State Street Bank, pursuant to which State Street Bank agreed to, *inter alia*, provide services as custodian of the Plaintiff's assets.

126.    The first Custodian Contract was dated September 15, 1998.  It was terminated and superseded by a written Custodian Contract dated July 1, 2001, containing nearly identical relevant terms.  It, too, was terminated and superseded by a written Custodian Contract dated June 29, 2004, containing identical relevant terms.  That Custodian Contract was terminated and superseded by another written Custodian Contact dated June 30, 2009 containing identical relevant terms.

127.    This Claim for Relief is brought pursuant to the law of the State of Arkansas. Each Custodian Contract provided that it "shall be construed and the provisions thereof interpreted under and in accordance with the laws of the State of Arkansas to the extent not pre-empted by federal law."

128.    One of the services State Street Bank agreed to provide to ARTRS pursuant to the Custodian Contracts is the purchase or sale of FX, including pursuant to "standing instructions": "The Custodian is permitted to pay out of moneys of Plaintiff's account, upon proper

instructions, and which may be 'standing instructions' . . . [f]or the purchase or sale of foreign exchange or foreign exchange contracts for the account of the Fund, including transactions executed with or through the Custodian, its agents or its subcustodians."

129.    The Custodian Contracts specified that the amount by which State Street Bank was entitled to be compensated for the services it performs for ARTRS pursuant to the Contracts would be set forth in a written Fee Schedule agreed-to by the parties: "The Custodian shall be entitled to compensation for its services and expenses as Custodian set forth in a written Fee Schedule between the parties hereto until a different compensation shall be in writing agreed upon between the System [ARTRS] and the Custodian."

130.    ARTRS and State Street Bank agreed to and executed the following Fee Schedules:

(a)     Effective September 15, 1998 through June 30, 2001;

(b)     Effective July 1, 2001 through June 30, 2004;

(c)     Effective July 1, 2004 through June 30, 2007;

(d)     Effective July 1, 2007 through June 30, 2009 (as revised);

(e)     Effective April 1, 2008 through June 30, 2009 (as revised);

(f)     Effective November 1, 2008 through June 30, 2009; and

(g)     Effective July 1, 2009 through June 30, 2014.

131.    The Fee Schedules each provided for an annual flat fee to be paid by ARTRS to State Street Bank for its services as custodian, and set forth certain categories of services, such as Domestic Transaction Charges and Global Transaction charges, for which State Street Bank was permitted to charge ARTRS an additional fee.

132.    The Fee Schedule dated September 15, 1998 discusses FX trading, stating that "***No charge*** will be assessed for each foreign exchange executed through a third party.  Foreign exchange through State Street – ***No Charge.***"  (Emphases in original.)

133.    The Fee Schedules dated July 1, 2001; July 1, 2004; July 1, 2007; April 1, 2008; and November 1, 2008 do not mention FX trading or list FX trading as one of the services for which State Street Bank is permitted to charge Plaintiff an additional fee.  Accordingly, each of these Fee Schedules contemplated that State Street Bank shall not be compensated for the purchase or sale of foreign exchange over and above the annual flat fee.

134.    The Fee Schedule dated July 1, 2009 also makes this clear, and expressly states that "[t]ransaction costs for all foreign exchange trades transacted through State Street will be waived."  Accordingly, State Street Bank is not permitted to charge ARTRS for the purchase or sale of FX above the annual flat fee under the terms of the Custodian Contract.

135.    In the months after the California Attorney General filed its Complaint in Intervention against State Street on October 20, 2009, State Street Bank informed ARTRS of "current mark-ups and mark-downs used by State Street Global Markets for [standing-instruction] foreign exchange transaction requests."  These "mark-ups and mark-downs" continue to breach the express terms of the June 29, 2009 Custodian Contract and associated Fee Schedule (effective July 1, 2009 through June 30, 2014), which states that "[t]ransaction costs for all foreign exchange trades transacted through State Street will be waived."

136.    State Street's practices, detailed herein, of charging ARTRS inflated FX rates when buying foreign currency, and deflated FX rates when selling foreign currency, constitute a hidden and unauthorized charge to ARTRS above the annual flat fee.

137.     By charging ARTRS the hidden and unauthorized fees described herein, State Street Bank has breached the Custodian Contracts, and ARTRS has suffered substantial money damages as a result of that breach.

138.     The Custodian Contracts further provided that "[t]he Custodian shall render to the System [ARTRS] a monthly report of all monies received or paid on behalf of the System and an itemized statement of the securities for which it is accountable under this Contract as of the end of each month, as well as a list of all securities transactions that remain unsettled at that time."

139.     State Street, however, provided ARTRS with monthly reports that showed only the price being charged to the Plaintiff for standing-instruction FX trades and the date of the trade.  State Street omitted important information, such as the time-stamp of the actual time of the trade, and the actual price at which State Street paid for the purchase or sale of foreign exchange so as to hide the fact that ARTRS was being charged a secret profit on the trade.

140.     State Street Bank's failure to comply with the Custodian Contracts' reporting requirement constitutes an additional breach of the Contracts, and ARTRS has suffered substantial monetary damages as a result thereof.

141.     There is no limitations period that would act as a bar to this Claim for Relief pursuant to the maxim *nullum tempus occurrit regi* recognized under Arkansas law. Notwithstanding, ARTRS could not have discovered State Street Bank's breach even in the exercise of due diligence until the earliest, the unsealing of the California Attorney General complaint against State Street because, *inter alia,* the reports State Street provided to ARTRS showed only the price charged to Plaintiff for standing-instruction FX trades and the date of the trade.  By omitting important information, such as a time-stamp and the actual price paid or

received by State Street, Defendants hid or actively concealed their improper conduct.

Accordingly, even if a statute of limitations were to apply, it was tolled by State Street's actions.

## **Prayer for Relief**

WHEREFORE, Plaintiff demands judgment for itself and all other members of the proposed Class as follows:

A.      With regard to the First Claim for Relief, that the Court certify this action as a class action and enter judgment against Defendants in an amount equal to up to three but no less than two times the amount of damages Plaintiff and the Class have sustained as a result of Defendants' actions, plus costs (including attorneys' fees);

B.      With regard to the Second Claim for Relief, that the Court certify this action as a class action and enter judgment against Defendants in an amount equal to three times the amount of damages Plaintiff and the Class have sustained as a result of Defendants' actions, plus costs (including attorneys' fees);

C.      With regard to the Third Claim for Relief, that the Court certify this action as a class action, find that Defendants breached their duties of trust to Plaintiff and the Class, and award appropriate compensatory damages to Plaintiff and the Class in an amount to be determined at trial;

D.      With regard to the Fourth Claim for Relief, that the Court certify this action as a class action, find that Defendants negligently misrepresented to Plaintiff and the Class the hidden fees charged in connection with FX trading, and award appropriate compensatory damages to Plaintiff and the Class in an amount to be determined at trial;

E.     With regard to the Fifth Claim for Relief, that the Court find that Defendant State Street Bank breached each of its Custodian Contracts with Plaintiff, and award appropriate compensatory damages to Plaintiff in an amount to be determined at trial;

F.     That the Court award Plaintiff and the Class all costs and expenses of this action, including reasonable attorneys' and experts' fees; and

G.     That the Court award Plaintiff and the Class such other relief as the Court deems just and proper.

## Demand for Jury Trial

Plaintiff demands a trial by jury of all issues so triable.

Dated:  April 15, 2011                              THORNTON & NAUMES, LLP

                                                    By:   */s/ Garrett J. Bradley*
                                                    Michael P. Thornton (BBO #497390)
                                                    Garrett J. Bradley (BBO #629240)
                                                    Evan R. Hoffman (BBO #678975)
                                                    100 Summer Street, 30th Floor
                                                    Boston, Massachusetts  02110
                                                    Telephone:  (617) 720-1333
                                                    Facsimile:   (617) 720-2445

                                                    *Liaison Counsel for Plaintiff*
                                                    *ARTRS and Proposed Interim*
                                                    *Liaison Counsel for the Class*

LABATON SUCHAROW LLP
Joel H. Bernstein
Christopher J. Keller
Eric J. Belfi
David J. Goldsmith
Paul J. Scarlato
Michael H. Rogers
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477

*Counsel for Plaintiff*
*ARTRS and Proposed Interim*
*Lead Counsel for the Class*

.

LIEFF CABRASER HEIMANN
   & BERNSTEIN, LLP
Steven E. Fineman
Daniel P. Chiplock
Michael J. Miarmi
Daniel R. Leathers
250 Hudson Street, 8th Floor
New York, New York  10013
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

*Attorneys for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT
## FOR THE STATE OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT<br>SYSTEM, on behalf of itself and all others<br>similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>STATE STREET CORPORATION, STATE<br>STREET BANK AND TRUST COMPANY and<br>STATE STREET GLOBAL MARKETS, LLC,<br>      Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action<br>No. 11-CV-10230 (MLW) |

## CERTIFICATE OF SERVICE

I hereby certify that the forgoing Plaintiffs' Amended Class Action Complaint was filed through the ECF System on April 15, 2011 and accordingly will be served electronically upon all registered participants identified on the Notice of Electronic Filing.

/s/ Garrett J. Bradley_____
Garrett J. Bradley (BBO# 629240)
THORNTON & NAUMES, LLP
100 Summer Street, 30th Floor
Boston, MA  02110
Ph. (617) 720-1333
Fax (617) 720-2445
jbradley@tenlaw.com

Dated:  April 15, 2011