**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) | No. 11-cv-10230 MLW |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) ) | |
| Defendant. | ) ) | |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, | ) ) ) ) | No. 11-cv-12049 MLW |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, | ) ) ) ) | |
| Defendants. | ) ) | |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, | ) ) ) ) ) | No. 12-cv-11698 MLW |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) ) | |
| Defendant. | ) ) ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF CLASS ACTION SETTLEMENT**

On August 11, 2016, this Court preliminarily approved a proposed settlement (the "Settlement") entered into by Plaintiffs and State Street Bank and Trust Company ("State Street" or the "Company").  In connection with those proceedings, the Court instructed State Street to submit a memorandum describing: (i) the reasons why the Settlement is reasonable from State Street's perspective; (ii) the interrelationship of the various agreements involved in the Settlement; and (iii) State Street's assessment of the damages in this case.  This constitutes State Street's submission.

## I.      REASONS WHY STATE STREET ENTERED INTO THE SETTLEMENT

Although State Street denies all liability and is confident of its defense (*see infra* § III), State Street nonetheless supports the Settlement for several reasons.

*First*, it goes without saying that litigation involves risk, costs, and distraction of Company personnel.  The breadth of the claims, spanning some twelve years and encompassing indirect foreign exchange ("indirect FX") trades with more than 1000 clients, and related regulatory proceedings involving different kinds of risk and similar costs and distractions, motivated State Street to enter into the settlement.  The alternative would have required significant expense and the diversion of the time and resources of senior management from their goals of growing and enhancing State Street's business.  To date, these matters have already consumed substantial resources.  With respect to this litigation alone, in the five years since the filing of the class action complaint by the Arkansas Teachers Retirement System on February 2, 2011, two other plaintiffs filed class actions, the parties briefed and argued a motion to dismiss, they exchanged over nine million pages of relevant documents, and they engaged in sixteen in-person mediation sessions, as well as numerous other arms-length negotiations.  These litigation costs were dwarfed by the costs incurred in other FX proceedings.  Although the cumulative cost

incurred to date has been significant, it pales in comparison to the anticipated costs of contested litigation, which could have included 100 depositions or more, additional documentary discovery, and extensive pretrial and trial proceedings.  Going forward with this litigation also would have entailed active litigation against at least three federal regulatory agencies, which would have markedly increased the complexity, costs, and distractions associated with these matters.  State Street concluded that avoiding these risks, costs, and distractions was in the best interests of State Street (and, for that matter, the judicial system and the class).

*Second,* continued litigation would have risked considerable harm to State Street's business interests and would have imposed considerable costs on State Street's clients who executed indirect FX trades with State Street (*i.e.*, the members of the class).  Should this case enter formal discovery, State Street likely would have no choice but to use third party discovery to gather evidence from its clients (present and former) and their investment advisors in order to demonstrate that State Street did not mislead its clients regarding indirect FX pricing.  State Street desired to avoid putting its clients through this process, which would have required the clients to engage counsel, review and produce documents, and distract client personnel with testimony.  State Street concluded that a settlement was in the interests of both State Street and its many clients.

*Finally*, as further detailed below in section II, the Settlement enables State Street to avoid litigation with various government regulators who have contended (or have contended in other cases advancing the same theories) that they can prevail without establishing that State Street misled any customers or caused any injury to customers.  The Settlement includes payments that the United States Securities and Exchange Commission (the "SEC") and the United States Department of Labor (the "DOL") deemed adequate to resolve some or all of their

3

requirements.  Payment to customers pursuant to the Plan of Allocation resolves these regulatory issues.  State Street's objective to settle these claims with regulators was a significant motivation for its decision to settle with the class plaintiffs.

## II.  THE CLASS SETTLEMENT IS INTERRELATED WITH REGULATORY SETTLEMENTS

In response to the Court's second question, State Street is in the final stages of entering into four regulatory settlements that are related to, and dependent upon, the settlement of this matter (the "Regulatory Settlements").  The Regulatory Settlements are with: 1) the United States Department of Justice (the "DOJ"); 2) the SEC; 3) the DOL; and 4) the Massachusetts Attorney General.  State Street understands that all of these regulators may have initiated an enforcement action or litigation against State Street in the absence of settlement.[1]  After discussions with these regulators, State Street negotiated the Regulatory Settlements.  The Regulatory Settlements credit State Street for certain payments made in this Settlement.  Specifically:

- The SEC settlement will credit State Street's payment to mutual fund clients pursuant to the Plan of Allocation in the Settlement of $75 million plus interest against its claim for disgorgement.

- The DOL settlement requires that State Street pay at least $60 million to ERISA plan customers, and those payments will be satisfied by the payments to the ERISA class members pursuant to the Plan of Allocation in the Settlement.

---

[1] The DOJ settlement requires the payment of $155 million as a civil penalty under the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA") in return for a release from the DOJ.  The DOJ could have brought claims asserting that State Street violated FIRREA by making allegedly misleading statements when pricing indirect FX transactions.  The SEC could have asserted similar claims under Section 34(b) of the Investment Company Act of 1940.  The DOL could have asserted that State Street violated the Employee Retirement Income Security Act of 1974 ("ERISA") in executing indirect FX trades with retirement plans.

This Settlement, as structured in the proposed Stipulation of Settlement and Plan of

Allocation, meets the requirements of the Regulatory Settlements.  The Regulatory Settlements

all depend on the Court's approval of this Settlement without modification to the key elements

critical to each party.  The settlements will resolve all pending litigation and all U.S. regulatory

matters related to State Street's indirect FX business.  Should the Court decline to approve the

Settlement, the settlements with the various regulators may be terminated.

## III.     STATE STREET'S ASSESSMENT OF DAMAGES

In response to the Court's third question (*i.e.,* class damage assessment), it is difficult for

State Street to arrive at any damage assessment other than zero because it believes that no

customers were harmed or misled, and that the class was not likely to prevail on the merits.  In

any event, Plaintiffs' basic damages syllogism is flawed.  They assert that clients paid a "mark

up" on indirect FX without knowing they were doing so—in effect, that they thought indirect FX

rates were the same as interbank market rates.  Plaintiffs calculate damages based on the

estimated size of this allegedly unknown mark up.

In fact, there was no unknown and undisclosed mark up.  State Street executed indirect

FX trades as principal at rates that it set.  State Street generally was not required to set indirect

FX rates with reference to interbank market rates, and like any principal dealer generally had no

duty to disclose the basis for the rates that it set.  Moreover, State Street's  indirect FX rates

obviously were not as advantageous as interbank market rates; and therefore State Street's

customers could not have assumed that they were the same as interbank market rates.

State Street's clients are sophisticated actors, and very often are advised by even more

sophisticated investment advisors and consultants.  They have a wealth of experience and

information regarding indirect FX, including that State Street (like most FX traders) trades with

clients as a principal counterparty.  Industry participants have known for decades that indirect

FX typically comes with a price that is less favorable to custody bank clients than interbank

market rates and directly negotiated rates.  This fact was even published in the Federal Register

by the Department Labor.

The conclusion that these actors were confused also supposes that they do not appreciate

economic reality.  Plaintiffs' damages syllogism supposes that essentially retail trades (*i.e.*,

relatively small odd-lot indirect FX trades) should have been executed at the same rate as

wholesale trades (large round lot transactions between institutions generally having better credit

than State Street's custody clients).  Because the interbank market is State Street's source of

foreign currency, this is the equivalent of supposing most all of the world's most sophisticated

financial actors thought that indirect FX execution was free (*i.e.*, that State Street would sell at

the same price that it bought).  This makes no sense.  Moreover, because State Street obviously is

exposed to risks and incurs costs (particularly operational risks (ie., the risk that there could be

an error with respect to a trade), credit risks (ie.,  the risk that the counterparty will not or cannot

perform its side of the exchange), and settlement risks associated with executing the trades and

the systems and personnel costs used to manage these risks) in connection with indirect FX

execution, what Plaintiffs' damages theory really implies is that State Street's customers

believed that State Street would operate its indirect FX business consistently at a loss.  This

makes even less sense.

The trading patterns of State Street's clients during the class period are squarely at odds

with Plaintiffs' damage theory.  If these sophisticated clients, and their sophisticated investment

advisors, thought that indirect FX was free (or better than free), then they would have done all of

their FX execution using the indirect FX method.  That they plainly did not, and instead used

indirect FX sparingly, shows that they understood indirect FX pricing, and that they were not harmed in the way that Plaintiffs suppose.

At the most basic level, there are two species of FX transactions: (i) indirect FX transactions (*i.e.,* where there is no negotiation between the client and State Street at the time of the transaction); and (ii) "direct" FX transactions at individually negotiated rates (*i.e.*, the client specifically negotiates the rate at the time of the transaction).  Direct transactions that are not large round lots are priced at rates less advantageous than interbank market rates, to permit the bank executing the trades to cover its costs (including risks realized) and earn a profit.  That these trades are not executed at interbank rates is obvious, because the executing parties can refer to indicative interbank rates when they negotiate the trade.  Accordingly, if clients thought indirect FX rates were the same as interbank rates, they rationally never would choose to use direct FX, whether with State Street or some third party.  This is particularly true because indirect FX trades are easier and less expensive for them to manage, and because they allow the customers and their advisers to transfer operational and other risks to State Street.[2]

During the class period, State Street's custody clients executed only about 5% of their FX transactions using indirect methods.  The balance were direct FX transactions.  Indeed, more than 75% of the FX trades of these State Street clients were executed with third parties unrelated to State Street.  These third parties had no reason whatsoever to trade with State Street custody clients other than to make a profit; and trades executed in this way often resulted in additional processing charges imposed by State Street.  Clients generally used indirect FX infrequently, for

---

[2] This logic will be familiar to the Court.  *See* Transcript of Hearing on Motion to Dismiss at 94, *Arkansas Teacher Retirement System v. State Street*, No. 11-cv-10230 MLW (D. Mass. May 17, 2012) (Court:  "This may not prove to be a strong claim.  I do recognize that it's discernable from the complaint that the plaintiff was paying and knew it was paying something for negotiating the transactions and … the jury will hear repeatedly 'How can they honestly say they weren't paying for standing instructions?  If they thought they were free, why negotiate a rate'" [on the more than 85% of the trades that they chose to execute by means other than using indirect FX]?).

small odd-lot trades, when the convenience and risk mitigation features of indirect FX execution justified a higher price. This trading pattern permits only one logical inference—that clients understood that indirect FX rates were not as advantageous as interbank rates, and that they are not entitled to compensation for trades that they chose to make on terms that they understood.[3] This further confirms that State Street's clients made well-reasoned decisions on when to use indirect FX for their foreign exchange transactions.

Finally, although a detailed summary of State Street's legal defenses is beyond the scope of this memorandum, and apart from the fatal factual flaws of this case, State Street has a strong legal position that it had no duty to disclose pricing methodologies. Like the sellers of other goods, State Street could determine whether it would publicly compare its rates to wholesale rates as a part of its sales process. *See In re Mexico Money Transfer Litig.*, 267 F.3d 743, 749 (7th Cir. 2001) ("Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars. This is true in financial markets no less than markets for physical goods"; holding Western Union had no obligation to disclose difference between its FX rates and wholesale rates); *In re Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, 921 F. Supp. 2d 56, 88 n.186 (S.D.N.Y. 2013) (citing *Mexico Money* and holding custody banks had no duty to disclose difference between interbank market rates and indirect foreign exchange rates); *La. Mun. Police Emps.' Ret. Sys. v. J.P. Morgan Chase & Co.*, 12 CIV. 6659 DLC, 2013 WL 3357173, at *11 (S.D.N.Y. July 3, 2013) ("Thus, while there may be spreads between FX transactions, the exchange rate a Bank charges

---

[3] For most class members, State Street believes that the amounts paid to them from the settlement will be a windfall. Plaintiffs, and the investment advisors and consultants Plaintiffs hired to assist them in making investment decisions, reaped substantial benefits in their decision to use indirect FX. Namely, Plaintiffs received the convenience of indirect FX, and they mitigated and transferred risk to State Street. State Street set less advantageous rates for indirect FX as consideration for that convenience and for bearing that risk. Moreover, clients would most likely not have been able to negotiate individual rates for the large number of small trades that they handled through State Street's indirect FX method of execution. Trades using the third-party direct form of execution were on average 10 times larger than trades using the indirect FX method.

its customers is more naturally characterized as the price of the commodity the customer has chosen to purchase, rather than a fee for the provision of services.").[4]

Accordingly, for these and a host of other reasons, State Street does not accept the premise that any of its clients was damaged by the manner in which it priced and disclosed indirect FX transactions.  Even if Plaintiffs were to prevail on some theory of liability, for some portion of the class, the idea that they would obtain damages based on the difference between execution rates and interbank market rates is implausible.  The infrastructure and personnel necessary to manage the huge number of small trades that clients and their investment managers chose to execute indirectly are extraordinarily expensive.  Even accepting the counterfactual assertion that revenue could be determined by comparison to interbank rates, in light of the cost incurred State Street's profit was a tiny fraction of that amount.  State Street was prepared to present evidence from its expert that its profit on the Indirect FX trades for the entire twelve-year period was less than $50 million (*i.e.*, less than 20% of the amount being paid to the class under the Settlement).  Nonetheless, given State Street's desire to settle the claims with the government regulators, who contend that they did not need to show that State Street had misled its customers, and their willingness to credit the payments to the class to settle, in part, the regulators' claims, it made eminent sense for State Street to reach settlement with the Plaintiffs at the same time.  As noted above, doing so permitted State Street to avoid enormous expense and effort, to permit its employees to engage in profitable endeavors rather than litigation, to maintain good relations (and avoid adverse relations) with its clients, and to liquidate risk in an unfavorable environment.

---

[4] In 2009, State Street began making what it believes are the most comprehensive disclosures in the industry with respect to its indirect FX pricing.

## **CONCLUSION**

For all these reasons, State Street supports the Court's final approval of the Settlement.


      State Street Bank and Trust Company,

      By:  _/s/ William H. Paine_____
           William H. Paine     (BBO no. 550506)
           Daniel W. Halston    (BBO no. 548692)
           Timothy Perla       (BBO no. 660447)
           WILMER CUTLER PICKERING HALE
           AND DORR LLP
           60 State Street
           Boston, MA 02109
           Telephone: (617) 526-6000

Dated: September 15, 2016

## **CERTIFICATE OF SERVICE**

   I hereby certify that on September 15, 2016, I caused a true copy of the above document

to be served upon all counsel of record by electronic mail.


               _/s/ William H. Paine_ _____

               William H. Paine