# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

**DECLARATION OF LAWRENCE A. SUCHAROW IN SUPPORT OF
(A) PLAINTIFFS' ASSENTED-TO MOTION FOR FINAL APPROVAL
OF PROPOSED CLASS SETTLEMENT AND PLAN OF ALLOCATION
AND FINAL CERTIFICATION OF SETTLEMENT CLASS AND (B) LEAD
COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES, PAYMENT OF
LITIGATION EXPENSES, AND PAYMENT OF SERVICE AWARDS TO PLAINTIFFS**

LAWRENCE A. SUCHAROW declares as follows pursuant to 28 U.S.C. § 1746:

1.     I am a member and Chairman of the law firm of Labaton Sucharow LLP ("Labaton Sucharow"), attorneys for Plaintiff Arkansas Teacher Retirement System ("ARTRS") and Court-appointed Lead Counsel[1] for the Settlement Class in the above-titled consolidated Class Actions.  I am admitted to practice before this Court *pro hac vice*.

2.     I respectfully submit this declaration in support of the assented-to motion of Plaintiff ARTRS and Plaintiffs Arnold Henriquez, Michael T. Cohn, William R. Taylor, Richard A. Sutherland, The Andover Companies Employee Savings and Profit Sharing Plan, and James Pehoushek-Stangeland (collectively, the "ERISA Plaintiffs," and together with ARTRS, "Plaintiffs"), individually and on behalf of the Settlement Class, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed Class Settlement of these consolidated Class Actions (the "Settlement") and for approval of the Plan of Allocation of the Net Class Settlement Fund (the "Plan of Allocation").

3.     I also respectfully submit this declaration in support of Lead Counsel's motion, on behalf of all Plaintiffs' Counsel,[2] pursuant to Rules 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure, for an award of attorneys' fees, payment of Litigation Expenses, and payment of Service Awards to Plaintiffs.

---

[1] Unless otherwise indicated, capitalized terms have the same meanings as in the Stipulation and Agreement of Settlement, dated as of July 26, 2016 (the "Settlement Agreement," ECF No. 89).

[2] In addition to Labaton Sucharow, Plaintiffs' Counsel includes Thornton Law Firm LLP ("TLF"), Lieff Cabraser Heimann & Bernstein LLP ("Lieff Cabraser"), Keller Rohrback L.L.P. ("Keller Rohrback"), McTigue Law LLP ("McTigue Law"), and Zuckerman Spaeder LLP ("Zuckerman Spaeder").  Labaton Sucharow, TLF, and Lieff Cabraser are counsel in the *ARTRS* Action, No. 11-cv-10230, which asserted class claims on behalf of all otherwise eligible custody clients of State Street (including ERISA plans) for violations of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A ("Chapter 93A"), §§ 9, 11, and for breach of fiduciary duty and negligent misrepresentation.  Keller Rohrback and McTigue Law/Zuckerman Spaeder are counsel in the *Andover Companies* Action (No. 11-cv-12049) and *Henriquez* Action (No. 12-cv-11698), respectively, which asserted federal statutory claims under the Employee Retirement Income Security Act of 1974 ("ERISA") solely for the benefit of ERISA plan custody clients of State Street.

A.    **Benefits of the Settlement**
      **to the Settlement Class**

4.     The Settlement Agreement provides that Defendant State Street Bank and Trust Company ("State Street" or the "Bank") will pay or cause to be paid a total of Three Hundred Million Dollars ($300,000,000.00) in cash (the "Class Settlement Amount") into an interest-bearing escrow account for the benefit of the Settlement Class.

5.     Pursuant to the terms of the Settlement, the Class Escrow Account has been fully funded and earning interest for the benefit of the Settlement Class since September 6, 2016.

6.     To my knowledge, the Settlement is by far the largest common fund settlement in any case brought under Chapter 93A, and is the third-largest common fund settlement, excluding federal securities actions, to be filed within the First Circuit.

7.     The Settlement consideration and any accrued interest, after the deduction of attorneys' fees, Litigation Expenses, and any Service Awards awarded by the Court, Notice and Administration Expenses, and Taxes and Tax Expenses (the "Net Class Settlement Fund"), will be distributed among Settlement Class Members pursuant to the Plan of Allocation.

8.     As further described below, the proposed Plan of Allocation is itself an essential term of the Settlement because allocations of settlement monies to certain categories of Class Members will satisfy the financial terms of State Street's tandem regulatory settlements with the U.S. Department of Labor ("DOL") and the U.S. Securities and Exchange Commission ("SEC"). State Street has also entered into a separate regulatory settlement with the U.S. Department of Justice ("DOJ").

9.     In exchange for payment of the Settlement Amount, the Settlement Class will release all Released Class Claims against the Released Defendant Parties upon the Effective Date of the Settlement.  Settlement Agmt. ¶¶ 1(yy), 1(zz).  The Effective Date will be reached once

2

the Class Settlement has been approved, the Judgment has been entered and become Final, the

DOJ Settlement and DOL Settlement are final, State Street has submitted an offer of settlement

to the SEC (which will happen two business days after the Judgment becomes Final), and the

order approving the proposed Plan of Allocation has become Final.  Settlement Agmt. ¶ 55.

10.     The Settlement Class, which the Court has preliminarily certified for settlement

purposes, is defined as all custody and trust customers of State Street (including customers for

which State Street served as directed trustee, ERISA Plans, and Group Trusts), reflected in State

Street's records as having a United States tax address at any time during the period from January

2, 1998 through December 31, 2009, inclusive, and that executed one or more Indirect FX

Transactions with State Street and/or its subcustodians during the period from January 2, 1998

through December 31, 2009, inclusive (the "Class Period").

11.     Excluded from the Settlement Class are Defendants; California Public

Employees' Retirement System (CalPERS), California State Teachers' Retirement System

(CalSTRS), and the State of Washington Investment Board; the predecessors and affiliates of the

foregoing, or any entity in which they have a controlling interest; and the officers, directors, legal

representatives, heirs, successors, subsidiaries and/or assigns of any such excluded individual or

entity in their capacities as such.  Also excluded from the Settlement Class is any Person who

submits a timely and valid request for exclusion in accordance with the requirements set forth in

the Notice.  Settlement Agmt. ¶ 1(hhh).

**B.      Summary of Plaintiffs' Allegations and Claims**

12.     These Class Actions arise from State Street's allegedly unfair and deceptive

practice of charging its custody and trust customers excessive rates and spreads in connection

with certain foreign exchange ("FX") transactions, in violation of State Street's statutory,

contractual, and fiduciary obligations.

13.     State Street, headquartered in Boston, has long been one of the two or three largest U.S. custody banks.  A custody bank is a specialized financial institution that holds and services securities and other assets on behalf of investors.  Custodians are typically used by institutional investors that do not want to leave securities on deposit with their external investment managers ("IMs") or broker-dealers.  By separating these duties, the use of custodians—at least in theory—reduces the risk of fraud or other misconduct.  An independent custodian ensures that the investor has unencumbered ownership of the securities that other agents represent to have purchased on the investor's behalf.

14.     The custody bank's responsibilities include the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities.  Custody banks also generally provide a variety of ancillary services for their custody clients, and communicate with investment managers and others on the client's behalf.  In essence, custody banks can and do virtually everything for their custody clients other than make investment decisions.  And custody clients trust and rely upon their custodian to do those things properly.

15.     During the Class Period, U.S.-based public pension funds and other institutional investors increasingly looked to overseas securities markets in order to diversify their portfolios and maximize investment returns.  Such investors had to buy and sell foreign currency in order to carry out trades in foreign securities and to "repatriate" foreign-denominated dividend and interest payments into U.S. dollars.

16.     State Street executed hundreds of thousands of FX trades on behalf of Plaintiffs and Class Members during the Class Period.  These FX trades fell into two principal categories.  In "direct" (or "negotiated") FX trades, custody clients or their IMs personally communicated

with State Street's FX trading desk.  State Street would quote an exchange rate, bargaining would ensue, and a rate would be agreed to, often with a modest markup over the interbank rate in the case of a purchase, or a markdown in the case of a sale.

17.    "Indirect" (or "standing-instruction") FX trades—the trades at issue here—did not involve arm's-length negotiation of the price.  Custody clients and IMs did not negotiate rates with State Street in indirect trades, nor did State Street quote rates.  Rather, as the name suggests, custody clients (or their IMs) engaged State Street to provide ongoing custody FX services in accordance with standing instructions, and relied upon State Street to execute those FX trades on their behalf.  State Street's indirect FX services to custody clients—referred to as "Indirect FX Methods" for purposes of the Settlement—were a major profit center for the Bank during the Class Period.[3]

18.    The FX trading day covers nearly 24 hours and plays out worldwide in countless numbers of currency trades.  For each currency pair transaction during the course of the trading day, there is a high and a low trade, with all other trades falling in-between.  The difference between the low and the high rates, called the "range of the day," allegedly defines the range at which custody banks and other FX market participants purchased and sold foreign exchange that day.  ARTRS alleged that reported trades at rates that fall outside the range of the day did not bear a reasonable relationship to the interbank rate or other prevailing market prices.

---

[3] "Indirect FX Methods" means the methods at any time for submitting, processing, pricing, aggregating, netting, and/or executing foreign exchange transaction requests pursuant to instructions from custody or trust customers of SSBT [State Street] (or their investment managers) instructing SSBT or SSBT's subcustodians to execute such transactions at rates or spreads, which rates or spreads prior to December 2009 were not widely disclosed to the customers or investment managers prior to execution, including, but not limited to, the methods of executing foreign exchange transactions that are or were at any time known as Indirect FX, standing instruction foreign exchange, custody FX, Automatic Income Repatriation, Automated Dividend and Interest Income Repatriation Service, or Security Settlements and Holdings Foreign Exchange Service or Hourly Pricing Foreign Exchange Service.  Settlement Agmt. ¶ 1(ee).

19.     Plaintiffs contended that custody clients, based on State Street's representations in its Custodian Contract with ARTRS governing the bank-client relationship, associated Fee Schedules governing State Street's compensation from custody services (which included hefty flat annual fees), and disclosure in State Street's Investment Manager Guides, were entitled to receive FX pricing on indirect FX trades that, at a minimum, was equivalent to the interbank rate and that was no less advantageous than the pricing on a comparable direct trade.

20.     Plaintiffs also contended that State Street's Indirect FX Methods were designed to ensure maximum profits for the Bank to Class Members' direct detriment.  State Street generally applied large markups and markdowns across the board that, for Indirect FX Transactions[4] relating to purchases and sales of foreign securities (referred to as Securities Settlement and Handling, or "SSH"), were subject only to the high or low of the range of the day.  For Indirect FX Transactions to repatriate dividend and income payments, referred to as Automated Income Repatriation, or "AIR," markups and markdowns were not so limited.

21.     Based in part on an empirical analysis of ARTRS's Indirect FX trades during the Class Period, ARTRS alleged that State Street's markups and markdowns on Indirect FX Transactions were undisclosed and excessive, such that they tended to exceed the spread expected on direct trades and often fell outside the range of the day.

22.     The ERISA Plaintiffs made similar allegations on behalf of custody clients that are plans governed by ERISA.

---

[4] "Indirect FX Transactions/Trading" means foreign exchange transactions executed with SSBT [State Street] or SSBT's subcustodians at any time using Indirect FX Methods, including all foreign exchange transactions submitted using Indirect Methods.  A transaction submitted or processed using an Indirect Method is an Indirect FX Transaction regardless of whether the rate at which the transaction was executed differed from the rates at which other transactions submitted using Indirect Methods were executed.  Settlement Agmt. ¶ 1(ff).  "Indirect FX" means Indirect FX Methods and Indirect FX Transactions/Trading.  Settlement Agmt. ¶ 1(dd).

23.     Plaintiffs collectively asserted that State Street's alleged unfair and deceptive Indirect FX Methods and nondisclosure thereof constituted violations of Sections 2, 9, and 11 of Chapter 93A; breach of alleged fiduciary duties owed by State Street to the Class Members; negligent misrepresentation by State Street; breach of ARTRS's Custodian Contract; violations of ERISA, 29 U.S.C. § 1106, for engaging in self-interested prohibited transactions and by causing the ERISA Plans to engage in party in interest prohibited transactions; violations of ERISA, 29 U.S.C. § 1104, for breaching duties of prudence and loyalty; and pursuant to ERISA, 29 U.S.C. § 1105, liability for breaches of co-fiduciary obligations.

**C.     ARTRS's and its Counsel's Due
        Diligence and Pre-Filing Investigation**

24.     The *ARTRS* Action has its origin in a *qui tam* complaint filed under seal on April 14, 2008 by Associates Against FX Insider Trading, a Relator represented by Plaintiffs' Counsel TLF and Lieff Cabraser, on behalf of California public pension funds.

25.     That lawsuit was unsealed on October 20, 2009, when the Attorney General of California filed a Complaint-in-Intervention charging State Street with misappropriating more than $56 million from California's two largest public pension funds, the California Public Employees' Retirement System (CalPERS) and the California State Teachers' Retirement System (CalSTRS).  The Complaint-in-Intervention was the first public indication of State Street's allegedly unfair and deceptive acts and practices concerning Indirect FX.

26.     ARTRS retained Lead Counsel to investigate potential class and individual claims against State Street shortly thereafter.  *See also* Declaration of George Hopkins, Executive Director of ARTRS ("Hopkins Decl."), Exhibit 1 hereto, ¶ 7.  With ARTRS's approval, Lead Counsel chose to associate with TLF and Lieff Cabraser given, among other considerations, their

unique knowledge arising from their representation of the Relator, and began an investigation.

Hopkins Decl., Ex. 1, ¶ 8.

27.     This investigation comprised numerous tasks.  ARTRS's counsel had to educate

themselves about the essentials of currency trading, and the nature of negotiated (or direct) and

non-negotiated (or standing-instruction or indirect) FX trades, and how they work in the context

of custody banking.  Counsel engaged FX Transparency LLC, a Massachusetts-based currency

trading expert, to consult regarding the FX markets and to assist in extracting and analyzing

ARTRS's global trading data.

28.     FX Transparency conducted several preliminary and final analyses as counsel's

investigation proceeded.  Ultimately, FX Transparency identified more than 4,200 indirect FX

trades executed by State Street for ARTRS's account during 2000-2010, with an aggregate

trading volume of more than $1.2 billion.  FX Transparency compared these trades to other FX

trades logged and tracked in a comprehensive database of more than 2 million buy-side currency

trades.  By comparing ARTRS's trades in certain currencies with the same currency pair trades

in the database, FX Transparency estimated the trading cost of ARTRS's indirect FX trades in

relation to trades made worldwide.

29.     Further, counsel for ARTRS reviewed an array of pertinent documents, including

ARTRS's Custodian Contracts and Fee Schedules, monthly custodial reports and invoices

received from State Street, other communications from State Street, and State Street's

periodically updated Investment Manager Guides.

30.     Further, counsel researched the applicable law on Chapter 93A, fiduciary duty,

and negligent misrepresentation, and also reviewed various *qui tam* lawsuits that had been

unsealed against The Bank of New York Mellon Corp. ("BNYM"), a major U.S. custody bank and State Street's primary competitor, concerning BNYM's indirect FX practices.

31.     Ennis Knupp & Associates ("Ennis Knupp") was a consultant engaged by ARTRS to oversee its investment managers and the performance of its investment portfolios.  On September 9, 2010, Lead Counsel, TLF, and George Hopkins, Executive Director of ARTRS, met in Chicago with representatives of Ennis Knupp to discuss FX issues and potential claims against State Street.  The discussion during the meeting generally supported the belief that ARTRS had claims against State Street concerning FX.  *See also* Hopkins Decl., Ex. 1, ¶ 9.

32.     Additionally, because ARTRS has been a custody client of State Street since 1998, and commencing litigation against one's custodian is not a routine matter, ARTRS sought to meet with State Street before filing an action.  On December 20, 2010, Lead Counsel, TLF, and Mr. Hopkins met in Boston with State Street's outside counsel and in-house legal and business personnel.  *See also id.* ¶ 10.

33.     The meeting was ultimately unproductive, and ARTRS authorized Lead Counsel to commence this Action.  *Id.*

**D.      The *ARTRS* Action Was the First Indirect FX Case**

34.     As the Court may be aware, a similar class action against BNYM was filed in 2012 and settled in September 2015 for a comparable $335 million in recovery to the class of BNYM custody clients, plus fines and penalties paid to various government agencies.  *In re The Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, No. 12-MD-2335 (LAK) (JLC) (S.D.N.Y.) ("*BNYM FX*").

35.     This action was the first indirect FX case brought, however.  In investigating the claims, counsel for ARTRS worked essentially from a clean slate in terms of analyzing ARTRS's FX trades for prima facie evidence of excessive markups, researching the applicability

of Chapter 93A to State Street's Indirect FX Methods, analyzing whether a custody bank owes a

fiduciary duty to its clients in connection with indirect FX services, and analyzing whether a

nationwide class of custody clients can be certified and on what claims.

36.     Notably, the first of several sealed *qui tam* complaints against BNYM was filed in

October 2009, the month the California Attorney General intervened in the State Street *qui tam*

lawsuit.  The first government intervention and unsealing in connection with BNYM did not

occur until January 2011.

37.     ARTRS's initial Complaint, filed in February 2011 as noted below, was the first

complaint publicly filed against a custody bank concerning indirect FX.  ARTRS's Amended

Complaint was filed before all but one of the constituent *BNYM FX* complaints, and predated all

of the rulings on motions to dismiss those complaints.

38.     Additionally, ARTRS investigated its claims and commenced its action without

the benefit of regulatory or investigative action by the SEC, DOL or DOJ.  To date, these

agencies have not issued any public allegations, factual findings, or consent orders that might

have benefitted ARTRS or the ERISA Plaintiffs in their efforts against State Street.

**E.**     **Procedural History of the Class Actions**

39.     On February 10, 2011, ARTRS filed a Class Action Complaint in this Court

against State Street Bank and Trust Company, State Street Corporation ("SSC"), and State Street

Global Markets, LLC ("SSGM"), alleging unfair and deceptive acts and practices in connection

with Indirect FX and asserting claims for violations of Chapter 93A, § 2, 11, breach of duty of

loyalty, and declaratory relief, on behalf of a class defined similarly to the Settlement Class.

ECF No. 1.

40.     On February 16, 2011, pursuant to Chapter 93A, § 9(3), ARTRS mailed a written demand for relief to State Street identifying the claimants and reasonably describing the unfair acts or practices relied upon and the injuries suffered.

41.     On March 18, 2011, counsel for State Street sent a written response, annexed hereto as Exhibit 2, contesting ARTRS's allegations and declining to make an offer of relief.

42.     On April 7, 2011, ARTRS filed an assented-to motion, pursuant to Rule 23(g)(3), to appoint Labaton Sucharow as Interim Lead Counsel for the proposed Class, designate TLF as liaison counsel for ARTRS and the proposed Class, and designate Lieff Cabraser as additional attorneys for plaintiffs and the proposed Class.  ECF Nos. 7-8.

43.     On April 15, 2011, ARTRS filed an Amended Class Action Complaint ("Amended Complaint"), again naming State Street, SSC and SSGM as Defendants and alleging unfair and deceptive acts and practices in connection with Indirect FX.  The Amended Complaint added detailed allegations, including analyses of ARTRS's trades conducted by FX Transparency.  The Amended Complaint asserted class claims for violations of Chapter 93A, §§ 2, 9, and 11, breach of fiduciary duty, and negligent misrepresentation, on behalf of a class defined similarly to the Settlement Class, and an individual claim for breach of contract on behalf of ARTRS.  ECF No. 10.

44.     On June 3, 2011, Defendants moved to dismiss the Amended Complaint.  ECF Nos. 18-20.  Defendants argued that ARTRS's fiduciary duty claim should fail because the parties' custody contracts defined and limited the scope of the parties' relationship, which was not fiduciary in nature.  These contracts, according to Defendants, did not require State Street to execute FX transactions, to do so at a particular rate, or to disclose its margin on FX transactions.

Instead, the contracts required State Street to hold assets and provide administrative services to

ARTRS.  Defendants argued that Plaintiffs' contract claim should fail for the same reasons.

45.     Defendants argued that ARTRS's claims under Chapter 93A and for negligent

misrepresentation should fail because nothing unfair or deceptive occurs when the buyer or seller

of a commodity does not disclose its margin on a purchase or sale.  According to Defendants,

State Street had no more duty to disclose the mark up on FX transactions than would any other

merchant as to any other commodity.  Moreover, Defendants asserted, Plaintiff cannot plausibly

assert that ARTRS and its sophisticated IMs were unaware that the rates for its FX transactions

were marked up from market rates.  Defendants also argued that all of ARTRS's claims, which

sought relief for events dating back to 1998, are in part barred by the applicable statutes of

limitations.

46.     On July 20, 2011, ARTRS filed a 65-page brief in opposition and accompanying

submissions.  ECF Nos. 22-23.

47.     The motion to dismiss was fully briefed as of January 12, 2012.  ECF No. 29.

ARTRS filed notices of supplemental authority, to which Defendants responded.  ECF Nos. 24,

30-31.

48.     Also on January 12, 2012, the Court issued an Order appointing Labaton

Sucharow as Interim Lead Counsel and designating TLF and Lieff Cabraser as liaison and

additional counsel.  ECF No. 28.

49.     On November 18, 2011, Arnold Henriquez, on behalf of the Waste Management

Retirement Savings Plan and its participants and beneficiaries, filed a class action complaint in

this Court against State Street, SSGM, and Does 1-20.  The *Henriquez* Action asserted claims of

engaging in self-interested prohibited transactions under Section 406 of ERISA, 29 U.S.C.

§ 1106, breach of duties of prudence and loyalty under Section 404 of ERISA, 29 U.S.C. § 1104, and breach of co-fiduciary duties under Section 405 of ERISA, 29 U.S.C. § 1105, on behalf of a class of State Street custody clients that are ERISA plans.

50.     On February 24, 2012, Henriquez filed an amended class action complaint, adding as plaintiffs Michael T. Cohn, on behalf of the Citigroup 401(k) Plan, and William R. Taylor and Richard A. Sutherland, on behalf the Retirement Plan of Johnson & Johnson.

51.     On April 9, 2012, State Street and SSGM moved to dismiss the *Henriquez* Action.

52.     On May 8, 2012, the Court heard oral argument on Defendants' motion to dismiss ARTRS's Amended Complaint.  The hearing lasted nearly three hours, exclusive of a lunch break.  In a detailed bench ruling followed by a written Order dated May 8, 2012, the Court denied the motion in its entirety as against State Street, dismissed the claims as against SSC and, by agreement of the parties, dismissed the claims as against SSGM without prejudice.  ECF No. 33.  The Court reserved judgment on whether ARTRS's Chapter 93A claims could proceed under Section 9 or Section 11 pending development of a factual record on whether ARTRS was a "consumer" or a "business" for purposes of the statute.  *See* Transcript of May 8, 2012 Hearing, Exhibit 3 hereto, at 97:3-99:6.

53.     The Court held a lobby conference immediately following the hearing.  During the conference, and in the same Order dated May 8, 2012, the Court directed ARTRS and State Street to meet to discuss the possibility of settlement and participation in mediation, and to report back to the Court by July 13, 2012.  The Order also directed the parties, in the absence of an agreement to engage in mediation (or a settlement agreement), to respond to an attached Notice of Scheduling Conference by August 30, 2012 and attend a scheduling conference on September 18, 2012.  ECF No. 33.

54.     On May 16, 2012, the Court granted State Street an extension to June 12, 2012 to answer ARTRS's Amended Complaint.

55.     On June 11, 2012, the Court granted State Street a further extension to September 13, 2012 to answer ARTRS's Amended Complaint.

56.     On July 13, 2012, ARTRS and State Street filed a Joint Status Report under seal advising that they met on June 22, 2012 to discuss the possibility of settling this case and agreed to engage in mediation with a mediator to be agreed upon.  ECF Nos. 38-40.

57.     On July 30, 2012, the Court ordered that the Joint Status Report be unsealed. ECF No. 41.

58.     On August 17, 2012, ARTRS and State Street filed a further Joint Status Report advising that they had agreed to a mediation before a private mediator that is currently scheduled to conclude on October 25, 2012.  ECF No. 42.

59.     On August 21, 2012, the Court took the September 18, 2012 Scheduling Conference off calendar and directed the parties to report on the results of the mediation by November 2, 2012.  ECF No. 43.

60.     On September 12, 2012, Alan Kober, on behalf of The Andover Companies Employee Savings and Profit Sharing Plan, and James Pehoushek-Stangeland, as a participant and beneficiary of The Boeing Company Voluntary Investment Plan, filed a class action complaint in this Court against State Street and SSGM.  The *Andover Companies* complaint asserted claims for breach of duties of prudence and loyalty under Section 404 of ERISA, 29 U.S.C. § 1104, and prohibited transactions under Section 406 of ERISA, 29 U.S.C. § 1106, on behalf of a class of State Street custody clients that are ERISA plans.

61. Also on September 12, 2012, the Court granted State Street a further extension to November 9, 2012 to answer ARTRS's Amended Complaint.  ECF No. 46.

62. On October 18, 2012, plaintiffs in the *Andover Companies* Action filed an amended class action complaint, and voluntarily dismissed SSGM from the action.

63. On November 2, 2012, ARTRS and State Street filed a further Joint Status Report advising that they attended a mediation with a private mediator on October 23 and 24, 2012, and were unable to settle the case.  The parties further advised that they agreed, subject to the Court's approval, on a framework for conducting discovery and managing this case, and requested a status conference to discuss their proposed plan.  ECF No. 50.

64. State Street's transmittal letter filed with the Joint Status Report requested that a status conference include the ERISA Plaintiffs as well as ARTRS.  ECF No. 49.

65. Also on November 2, 2012, the Court granted State Street a further extension to November 30, 2012 to answer ARTRS's Amended Complaint.  ECF No. 48.

66. On November 8, 2012, the Court scheduled a status conference for November 15, 2012 in the three Class Actions, and directed the Parties to file a report by November 13, 2012 on the items to be addressed at the status conference.  ECF No. 51.

67. On November 13, 2012, the Parties filed a Joint Status Report stating their intention to discuss, at the status conference, the Parties' plan for coordinating all three Class Actions, subject to the approval of the Court; the Parties' plan for exchanging certain document discovery (including extensive informal informational exchanges), subject to the approval of the Court; the Parties' plan to obtain the assistance of the mediator to avoid disputes and to facilitate efficient information exchanges; the Parties' plan to submit motions for a protective order to govern the exchange of confidential information in these cases, subject to the approval of the

Court; and the Parties' proposed schedule for these cases, subject to the approval of the Court. ECF No. 56.

68.     During the status conference held on November 15, 2012, the Parties presented and discussed these issues in detail.  The Court endorsed the Parties' cooperative approach toward exploring a resolution of the Class Actions through mediation and extensive informational exchanges.  *See* Transcript of Nov. 15, 2012 Lobby Conference, Exhibit 4 hereto, at 13:18-14:21, 22:2-10, 25:6-16, 26:9-10.

69.     On November 19, 2012, further to the Parties' presentations and the Court's remarks and directives during the status conference, the Court issued three Orders:

70.     *First*, the Court approved the Parties' Stipulation, Joint Motion, and Proposed Order for the Production and Exchange of Confidential Information.  ECF No. 61.

71.     *Second*, the Court consolidated the three Class Actions for pretrial purposes.  ECF Nos. 62-63.

72.     *Third*, the Court approved the Parties' Stipulation and Joint Motion to Stay, which provided that the Parties will engage in informational exchanges, including formal document discovery where necessary, until December 1, 2013, during which time the Parties could also seek document discovery from and issue subpoenas to non-parties.  The Stipulation provided further that the Parties reserved all rights with respect to formal discovery, including seeking relief from the Court where necessary, but prior to presenting any issue to the Court, the parties would use their best efforts in cooperation with the mediator to resolve any dispute concerning information exchange or discovery.  The Stipulation stayed the Class Actions in all other respects until December 1, 2013, and provided for modification of the stay by the Court or the

Parties.  Finally, the Stipulation withdrew the pending motion to dismiss filed in the *Henriquez*

Action and certain other pending procedural motions without prejudice.  ECF No. 62.

73.     On December 26, 2013, the Court granted the Parties' request, filed on November

18, 2013 with the support of the mediator, to extend the stay to June 1, 2014.  ECF No. 70.

74.     On June 21, 2014, the Court granted the Parties' request, filed on May 30, 2014

with the support of the mediator, to further extend the stay to December 31, 2014.  ECF No. 72.

75.     On June 23, 2014, the Court issued an Order of Administrative Closing.  ECF No.

73.

76.     On June 2, 2016, ARTRS and State Street filed a letter with the Court advising

that the Parties had agreed to resolve the Class Actions subject to resolution of State Street's

ongoing discussions with various regulatory agencies, that these discussions were near

conclusion, and requesting a status conference.  Counsel indicated that they would make efforts

to file a settlement agreement and motion for preliminary approval as soon as possible.  ECF No.

76.

77.     On June 6, 2016, the Court scheduled a status conference for June 23, 2016, and

directed the Parties to file a status report by June 15, 2016 to update the Court as to any motion

for preliminary approval of the settlement.  ECF No. 77.

78.     The Parties subsequently requested extensions of time to June 21, 2016 to file a

Joint Status Report.  ECF Nos. 79, 80.

79.     On June 21, 2016, the Parties filed a Joint Status Report that set forth a summary

of the procedural history of the Class Actions and the mediation and discovery efforts to date,

and the general status of the settlement discussions.  ECF No. 81.

80.     On June 23, 2016, the Court held a status conference to discuss the matters set forth in the Joint Status Report.

81.     On June 24, 2016, following the status conference, the Court (a) directed the Parties to file, by July 27, 2016, a joint motion for class certification and preliminary approval of a proposed settlement or a motion for an extension of time to do so; (b) scheduled a hearing on that motion for August 8, 2016; and (c) tentatively scheduled a hearing on final approval of a proposed settlement for October 25, 2016.  ECF No. 83.

82.     On July 26, 2016, Plaintiffs filed the fully executed Stipulation and Agreement of Settlement with exhibits (ECF No. 89), and an assented-to motion for preliminary approval of the Settlement, preliminary certification of the Settlement Class, and approval of the proposed form and matter of class notice.  ECF Nos. 90-92.

83.     On August 8, 2016, the Court held a hearing on the preliminary approval motion.

84.     On August 10, 2016, pursuant to the Court's directives during the hearing, Plaintiffs submitted a proposed revised Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement ("Preliminary Approval Order"), Notice, and Summary Notice.  ECF No. 95.

85.     On August 11, 2016, the Court issued the Preliminary Approval Order.  ECF No. 97.  In the Preliminary Approval Order, the Court, *inter alia*:

      (i)      preliminarily found the Settlement to be fair, reasonable, and adequate, subject to further consideration at the Final Approval Hearing;

(ii)     preliminarily certified the Settlement Class pursuant to Rules 23(a)

and (b)(3);

(iii)    appointed Labaton Sucharow as Lead Counsel, TLF as Liaison

Counsel, and Lieff Cabraser as additional Counsel for the

Settlement Class pursuant to Rule 23(g);

(iv)    scheduled a Final Approval Hearing for November 2, 2016, at 2:00

p.m., to consider, among other things, whether to approve the

Settlement and Plan of Allocation, whether to finally certify the

Settlement Class, and whether to grant the motion of Lead

Counsel, on behalf of all Plaintiffs' Counsel, for an award of

attorneys' fees, payment of Litigation Expenses to Plaintiffs'

Counsel, and payment of Service Awards to Plaintiffs;

(v)     approved the form, substance and requirements of the Notice and

Summary Notice;

(vi)    approved the retention of A.B. Data, Ltd. ("A.B. Data"), an

independent settlement and claims administrator recommended by

Lead Counsel, as the Claims Administrator;

(vii)   approved the proposed program for disseminating notice to the

Settlement Class as meeting the requirements of Rule 23, the

United States Constitution (including the Due Process Clause), and

the Class Action Fairness Act of 2005, 28 U.S.C. § 1715;

(viii)  set deadlines and procedures for serving and filing objections to

the matters to be considered at the Final Approval Hearing;

(ix)   set deadlines and procedures for requesting exclusion from the

Settlement Class; and

(x)   set deadlines for filing papers in support of the matters to be

considered at the Final Approval Hearing and in response to any

objections.

**F.     The Court-Endorsed**
     **Mediation and Discovery Process**

86.   After the Court substantially denied State Street's motion to dismiss ARTRS's

Amended Complaint, Lead Counsel approached these Class Actions with the firm belief that a

practical, "business-like" approach to resolving them—assuming State Street's cooperation—

would ultimately produce an excellent settlement while controlling litigation costs and saving

party, third-party, and judicial resources.

87.   Lead Counsel submits that this approach has been fully vindicated by the

proposed Settlement here.  *See also* Declaration of Jonathan B. Marks ("Marks Decl."), Exhibit 5

hereto, ¶¶ 25-30.  The groundwork for this was laid during the first Court-ordered exploratory

settlement discussion on June 22, 2012, during which ARTRS and State Street agreed to

participate in private mediation.  Thereafter, the Parties and their counsel committed themselves

to the innovative mediation and discovery framework approved by the Court after the November

15, 2012 status conference.

88.   The Parties' arm's-length negotiations before Jonathan B. Marks, Esq. of

MarksADR, LLC, an experienced and nationally recognized mediator of complex financial

disputes, were protracted, intensive, and well-informed, and resulted in a valuable proposed

Settlement that Plaintiffs and their counsel submit is eminently fair, reasonable, and adequate.

89.     The Parties retained Mr. Marks on August 2, 2012, after the May 8, 2012 hearing

on the motion to dismiss and subsequent lobby conference.  *See also* Marks Decl., Ex. 5, ¶ 6.

90.     Between August and October 2012, Mr. Marks held preparatory conference calls

with the Parties, separate half-day in-person pre-mediation sessions with representatives of each

side, and a full-day in-person pre-mediation session with both sides.  *See also id.* ¶¶ 9-13.

91.     These initial efforts culminated in a two-day in-person mediation in Boston on

October 23-24, 2012, attended by numerous attorneys and Party representatives including Mr.

Hopkins of ARTRS and the Chief Legal Officer of State Street.  *See also* Marks Decl. ¶ 14;

Hopkins Decl., Ex. 1, ¶ 14.

92.     No settlement was reached in October 2012, but, as described above, the Parties

developed a specific framework for exchanging certain discovery and managing the cases, which

the Court endorsed.

93.     Thereafter, Mr. Marks conducted 14 additional in-person mediation sessions in

Boston, New York City, and Washington, D.C., some of which were *ex parte* and some were

joint.  The dates of these sessions were January 24, 2013; July 9, 2013; September 17, 2013;

November 13, 2013; March 4, 2014; May 9, 2014; January 5, 2015; February 4, 2015; February

26, 2015; April 30, 2015; June 2, 2015; June 9, 2015; June 26, 2015; and June 30, 2015.  Mr.

Hopkins and State Street's Chief Legal Officer attended several of these mediation sessions.  *See*

*also* Marks Decl., Ex. 5, ¶ 16; Hopkins Decl., Ex. 1, ¶ 14.

94.     The mediation sessions and additional discussions included extensive exchanges

of views on the merits, in which each side worked to persuade the other to modify positions

based on reevaluation of risks faced if the case did not settle.  These extensive exchanges of

views included presentations by both sides on certain class certification, liability and damages

issues, as well as a detailed presentation by a cost accounting expert engaged by State Street. *See also* Marks Decl., Ex. 5, ¶¶ 23-24.

95.     Between mediation sessions, Mr. Marks conducted numerous, often lengthy, telephone calls with counsel for the Parties to understand the perspectives of the Parties and to gauge the distance between the Parties' respective positions.  Additionally, the Parties and Mr. Marks exchanged hundreds of e-mails.  *See also id.* ¶ 17.

96.     The mediation sessions were informed by substantial discovery.  In response to ARTRS's counsel's requests, State Street produced, and counsel for ARTRS reviewed, more than nine million pages of confidential documents.  These documents included, among other categories, e-mails, presentation decks and other internal communications concerning Indirect FX pricing strategy and policy; documents concerning State Street's revenue derived from Indirect FX; FX pricing summaries and breakdowns for custodial clients; Investment Manager Guides; Product and Services Manuals; marketing presentations to prospective custodial clients; State Street's responses to Requests for Proposal from prospective custodial clients; and inquiries from custodial clients and their representatives concerning Indirect FX and State Street's responses thereto.

97.     Further, in response to State Street's requests, ARTRS produced more than 3,500 documents, exceeding 73,000 pages, concerning the full scope of ARTRS's custodial relationship with State Street, as well as its relationship with relevant IMs and a consultant responsible for overseeing the IMs.  The ERISA Plaintiffs also collectively produced more than 3,600 pages of documents relevant to their relationship with State Street.

98.     In addition to objectively and subjectively coding all documents, counsel for ARTRS sorted probative documents by topic areas and key State Street witnesses.  Counsel also

prepared various detailed factual memoranda to assist the mediation process and for use in

targeted deposition discovery and readiness for trial.  Topic areas broadly included historical

margins from SSH and AIR Indirect FX Trades, Indirect FX costs to State Street, State Street's

responses to Requests for Proposal from prospective custody clients, ARTRS's relationship with

State Street, complaints and inquiries to State Street from custody clients or IMs, time-stamping

of Indirect FX Transactions, the California Attorney General lawsuit, and changes to IM

guidelines over time.

99.     As such, counsel's work preparing for mediation and negotiation of the

Settlement was coupled with substantial work "behind the scenes" preparing for litigation,

including contested offensive and defensive discovery, depositions, and motion practice, in the

event the mediation process broke down.

100.     The settlement discussions were lengthened and complicated considerably by

State Street's regulatory issues.  State Street took a consistent position that any settlement with

the Plaintiffs would have to occur simultaneously with settlements between the Bank and the

DOL, SEC, and DOJ, each of which was investigating State Street's Indirect FX Methods.

101.     Ultimately, the formal mediation sessions and follow-up mediated telephonic

negotiations resulted in an agreement-in-principle to a monetary settlement of $300 million on

June 30, 2015.  The agreement-in-principle, however, was subject to State Street's final

resolution of the investigations by the DOL, SEC, and DOJ.  *See also* Marks Decl., Ex. 5, ¶ 18.

102.     Mr. Marks has confirmed that the terms of the Settlement represent a compromise

of the Parties' initial positions, and that these compromises are the product of the Parties'

assessment of the perceived strengths and weaknesses of their positions, and the risks inherent in

continued litigation as well as State Street's desire to reach finality with the government

regulators. *Id.* ¶ 25.

103.    Mr. Marks has further confirmed that the Settlement is consistent with the

judgments he himself reached about the strengths and weaknesses of the Parties' cases. *Id.* ¶ 26.

104.    Between June 30, 2015 and September 2015, as State Street's discussions with the

regulators continued, the Parties focused on memorializing the terms of the Settlement in a term

sheet.  The term sheet went through multiple iterations, given the number of interested parties

and constituencies involved.  The final Term Sheet was signed on September 11, 2015.

105.    During this time, Lead Counsel also undertook to prepare drafts of the formal

settlement documentation, including the Settlement Agreement (with multiple exhibits relating to

draft orders and notices), and an initial draft of a plan of allocation.

106.    Negotiation of the Settlement Agreement and related documents was lengthy and

complicated considerably by State Street's ongoing and fluid discussions with the federal

agencies.  Dozens of drafts were circulated before the final Settlement Agreement was signed

and filed with the Court on July 26, 2016.

**G.    Risks, Costs and Duration**
**       of Continued Litigation**

107.    Plaintiffs and their counsel submit that the proposed $300 million Settlement is

eminently fair, reasonable, and adequate.  Because, as described above, the Settlement is the

product of arm's-length negotiations among sophisticated counsel facilitated by an experienced

mediator, and Plaintiffs undertook substantial discovery, a presumption of fairness applies.

108.    Plaintiffs and their counsel submit that there is nothing to rebut that presumption.

The Settlement provides a certain and robust recovery for the Class in light of the risks, costs,

and duration of continued litigation.

109.    Based on Plaintiffs' Counsel's analysis of nonpublic data and information received from State Street on a confidential basis during the mediation process, the $300 million Settlement equals approximately 20% of the estimated aggregate overcharges to Class Members on Indirect FX Transactions during the Class Period, as further described below.  Further, as disclosed in the Notice, the $300 million Settlement represents an average gross recovery of $200,000 per Class Member.

110.    This 20% metric is comparable to the percentage of estimated damages recovered in the similar *BNYM FX* class action.  The plaintiffs asserted there that the $335 million payment by BNYM to settle the customer class action equaled "nearly 24%" of plaintiffs' damages. Mem. of Law in Supp. of Lead Plaintiffs' Unopposed Mot. for (1) Provisional Certification of Settlement Class, etc., *In re The Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, No. 12-MD-2335 (LAK) (JLC) (S.D.N.Y. Mar. 27, 2015), at 27 n.43 (excerpt annexed as Exhibit 6).[5]

111.    While Plaintiffs believed their claims had merit, they and Plaintiffs' Counsel recognized that proceeding with litigation carried substantial risk and additional costs, and would entail significant delay.  The risks, costs, and duration of continued litigation support the proposed Settlement.

112.    **Violation of Massachusetts Consumer Protection Act.**  Plaintiffs faced a risk that Chapter 93A did not reach the conduct at issue, and that the Court would thus grant summary judgment or judgment as a matter of law at trial to State Street.  State Street would also argue that the facts do not show that Plaintiffs or other Class Members were deceived by the alleged misconduct, and would point to, among other things, the fact that ARTRS and other

---

[5] An additional payment by BNYM of $155 million, to be distributed to class members over and above the $335 million customer class payment, was attributed to the settlement of a separate action brought by the New York Attorney General ("NYAG"), which was not subject to attorneys' fees.  *See id.*

Class Members continued to engage in Indirect FX Transactions with the Bank after its Indirect

FX Methods were revealed.

113.     Further, in ruling on State Street's motion to dismiss, the Court reserved judgment

as to whether ARTRS's Chapter 93A claims could proceed under Section 9 or Section 11

pending development of a factual record as to whether ARTRS was a "consumer" or a

"business" for purposes of the statute.  Section 11 likely requires a greater showing to establish a

violation.  *See* May 8, 2012 Hearing Tr., Ex. 3, at 97:3-99:6.

114.     **Breach of Fiduciary Duty.**  Plaintiffs' common law fiduciary-duty claim, arising

from an agent's duty of trust or obligation to provide full disclosure to its beneficiaries, also

raised challenging questions of law.  Plaintiffs would have to prove both that State Street served

as a fiduciary to its custody clients, and that in its fiduciary capacity, the Bank had a duty to fully

disclose its Indirect FX practices to them.  Those prerequisites to liability carried risk for

Plaintiffs and other Class Members.

115.     **Negligent Misrepresentation.**  State Street would no doubt assert that Plaintiffs

could not prove that (1) the Bank made any actionable misrepresentations, (2) they relied on any

alleged misrepresentations, or (3) the alleged misrepresentations were material.  State Street

would likely further contend that Plaintiffs could not prove they suffered any injury, because (in

the Bank's view) they could have used information readily available to them to determine at any

time during the Class Period how much they were allegedly being overcharged for Indirect FX

Transactions.  State Street also would have likely challenged Plaintiffs' negligent

misrepresentation and other claims on statute of limitations grounds.

116.     **ERISA.**  Likewise, litigation of Plaintiffs' ERISA claims presented certain risks.

State Street does business using numerous wholly owned subsidiaries and operating entities,

allowing it to argue that even if one State Street entity is an ERISA fiduciary, other State Street entities are not.  Even within a single entity, State Street sometimes offers different products and services, allowing it to argue that even if it acts as a fiduciary for certain purposes, it is not a fiduciary for other purposes.  This different corporate relationships can lead to confusion and litigation risk.  In addition, State Street's liability depends on a number of fairly technical liability theories, including prohibited transactions under ERISA § 406(b), 29 U.S.C. § 1106(b), prohibited party-in-interest transactions under ERISA § 406(a), 29 U.S.C. § 1106(a), exceptions to the prohibited transaction rules under ERISA § 408(18), 29 U.S.C. § 1108(18), Prohibited Transaction Exemptions 94-20 and 98-54, and basic fiduciary obligations of loyalty, care, prudence, diligence, and monitoring under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

117.    **Class Certification.**  Class certification also presented complexities, which would have entailed a more extensive Rule 23 inquiry—and thus greater uncertainty and risk—than cases brought, for example, under the federal securities laws.  In mediation, State Street contended that Plaintiffs would face insuperable hurdles to class certification because, in the Bank's view, among other things, (1) Massachusetts law, in particular Chapter 93A, could not be applied to a nationwide class; and (2) State Street would be able to demonstrate that Class Members possessed varying levels of knowledge with respect to the Indirect FX Methods, precluding a showing of predominance under Rule 23(b)(3).

118.    Regarding the first point, Plaintiffs would have to show either that (i) Massachusetts law should generally apply to Class Members' claims, or (ii) if the laws of various states were to apply, a trial would be manageable.  Presenting sufficient evidence to demonstrate the manageability of a trial under the laws of several states would have required Plaintiffs to detail the relevant states' laws, including any material differences among them, and prepare a

trial plan.  While Plaintiffs believed a multistate class or subclasses could have been certified, obtaining certification would have been challenging and time-consuming.

119.    Additionally, Plaintiffs would have devoted significant time and resources to refuting State Street's argument that individual issues predominated because (in the Bank's view) Class Members had disparate levels of knowledge regarding the Indirect FX Methods. State Street likely would have sought to depose numerous Class Members and their agents, as The Bank of New York Mellon did in the *BNYM FX* customer class cases.  The parties also likely would present conflicting expert analysis on customer expectations within the FX market, heightening the costs and risks of litigation.  Class certification is often granted in ERISA litigation, but State Street certainly would have waged a vigorous opposition.  Success can never be assumed, and certification of the ERISA claims alone would have provided no relief to a majority of Class Members.

120.    Even were Plaintiffs to obtain class certification in whole or in part, the class might have been decertified before or during trial, or on appeal.  The risk of decertification is real where, as here, the Court might need to assess the manageability of a trial involving the laws of at least several states.

121.    **Damages.**  Further contributing to the risks Plaintiffs faced, the appropriate measure of damages was contested during the Parties' lengthy mediation process and would have been a focus of the litigation.  Plaintiffs thus faced the risk that the damages now forming the basis of Class Members' recovery through this Settlement could never be proven at trial or would be greatly offset.

122.    Plaintiffs' Counsel used the following basic methodology to estimate aggregate classwide damages.  State Street applied fixed markups or markdowns, measured by basis points,

to its SSH and AIR Indirect FX Trades during the Class Period.  The application of the fixed

spreads was limited in two circumstances.  First, State Street would "net" all of an IM's SSH

trades in a given currency prior to execution, reducing the amount of currency traded, and,

therefore, the total markup or markdown applied to the IM's clients' trades.  Second, for SSH

trades, the fixed spread markups and markdowns were limited by the high or low of the range of

the day.  Thus, if the difference between the starting point of the indirect pricing process and the

high or low of the day was less than the fixed spread, State Street only applied a markup or

markdown to the extent of the high or low rate and not beyond.  State Street referred to the

spread achieved on Indirect FX Trades after the application of such "netting" and "capping" as

the "effective" spread.

123.    Plaintiffs' Counsel began with the dollar volume of SSH Indirect FX Trades for

each year for 1998 through 2009.  The average effective markup across all currency pairs for

SSH trades for 2009 was a narrow basis point range.  Plaintiffs' Counsel multiplied the sum total

of SSH volume for 1998-2009 by the high end of State Street's stated range of effective

markups, to estimate damages on SSH trades at approximately $1.177 billion.

124.    Plaintiffs' Counsel then took the dollar volume of AIR Indirect FX Trades for

each year for 1998 through 2009.  The volume is a small fraction of the SSH volume.  Plaintiffs'

Counsel multiplied the annual AIR volume for 1998-2009 by the known markups for each year

to estimate damages on AIR trades at approximately $314.49 million.

125.    Plaintiffs' Counsel thus estimates total damages at approximately $1.49 billion, of

which the Class Settlement Amount would constitute 20 percent.

126.    State Street would no doubt dispute this $1.49 billion damages estimate,

contending, among other things, that it (a) materially overstates the effective spread for each year

during a long Class Period, (b) assumes that every fraction of penny of markup is an improper overcharge where custody clients willingly pay a spread on direct FX trades, and (c) ignores the actual costs to State Street of providing Indirect FX services.

127.    In any event, the complexities relating to class certification, liability and damages, as well as the sheer volume of evidence, virtually ensured that continuing to litigate would have entailed millions more dollars in lodestar and expenses for Plaintiffs' Counsel, with an uncertain outcome.

128.    As described herein, when the Settlement was reached, Plaintiffs and their counsel had a well-founded and realistic understanding of the strengths and weaknesses of the merits and value of the claims.  On this score, Lead Counsel had the particular benefit of associating with TLF and Lieff Cabraser, both of which were directly involved in the *BNYM FX* litigation.  TLF's and Lieff Cabraser's experience litigating *BNYM FX* at or about the same time as the mediation process here afforded valuable insight when balancing the certainty of the Settlement recovery against both the prospect of massive additional discovery and the risks attendant to trying these cases.

129.    Plaintiffs support the Settlement.  *See* Hopkins Decl., Ex. 1, ¶¶ 17-18, 21; Declaration of Michael T. Cohn ("Cohn Decl."), Exhibit 7 hereto, ¶ 10; Declaration of Arnold Henriquez ("Henriquez Decl."), Exhibit 8 hereto, ¶ 10; Declaration of James Pehoushek-Stangeland ("Pehoushek-Stangeland Decl."), Exhibit 9 hereto, ¶¶ 4, 6; Declaration of Richard A. Sutherland ("Sutherland Decl."), Exhibit 10 hereto, ¶ 10; Declaration of William R. Taylor ("Taylor Decl."), Exhibit 11 hereto, ¶ 10; Declaration of Janet A. Wallace, Trustee of The Andover Companies Employee Savings and Profit Sharing Plan ("Wallace Decl."), Exhibit 12 hereto, ¶¶ 5, 7.

130.    In sum, the Settlement eliminates significant litigation risk and guarantees the Settlement Class a substantial cash recovery.  Settling the Class Actions for $300 million, now, is in the best interests of the Settlement Class.

H.    **The Plan of Allocation of the Net Class Settlement Fund**

131.    Pursuant to the proposed Plan of Allocation, which is set forth in full in the Notice, A.B. Data will calculate each Settlement Class Member's Recognized Claim using information supplied by State Street, including Indirect FX Trading Volume data and classifications of each Class Member.

132.    The Plan is based on transaction data maintained by State Street with respect to custodial clients that engaged in Indirect FX Transactions with the Bank during the Class Period. The Net Class Settlement Fund will be allocated to each participating Class Member based primarily on the Class Member's volume of Indirect FX Transactions during the Class Period and whether the Class Member is (a) an ERISA Plan; (b) a Group Trust, *i.e.*, an entity that has or had both ERISA-governed and non-ERISA assets; (c) an RIC (Registered Investment Company), most of which are mutual funds; or (d) entities not falling within those categories, including ARTRS and other public pension funds as well as private customers ("Public and Other").

133.    The parties have relied on Indirect FX Trading Volume information provided by State Street to develop this Plan of Allocation.  The respective allocations to each group of Class Members are summarized below.

134.    **ERISA Plans and Eligible Group Trusts.**  ERISA Plan and certain Group Trust Class Members will be allocated $60 million (the "ERISA Settlement Allocation"), on a gross basis, from the Class Settlement Fund, (i) plus 20% of any interest accrued on the Class Settlement Fund; (ii) minus 20% of any Taxes and Tax Expenses, Notice and Administration

Expenses, Service Awards, and Litigation Expenses; and (iii) minus attorneys' fees, if awarded

by the Court, in an amount not to exceed $10,900,000.

135.    ERISA Plans and eligible Group Trusts represent approximately 9%-15% of the

total Indirect FX Trading Volume, depending on what portion of the Group Trusts' volume

actually falls under ERISA.

136.    The $10.9 million cap of attorneys' fees deductible from the ERISA Settlement

Allocation means that if, for example, the Court awards the requested 24.85% fee, ERISA Plans

and eligible Group Trusts will pay fees at a lower percentage rate than other Class members.

137.    The ERISA Settlement Allocation was set based on the Indirect FX Trading

Volume provided by State Street, including information concerning the total amount of Indirect

FX Trading Volume executed during the Class Period by ERISA Plans and Group Trusts.  In the

course of administering the Settlement, A.B. Data will request information from Group Trusts

concerning their ERISA Volume during the Class Period.

138.    This allocation was negotiated directly between Lead Counsel, ERISA Counsel,

and DOL representatives and, in light of claims available under ERISA, provides a premium per

dollar of Indirect FX Trading Volume for ERISA Plans and eligible Group Trusts in comparison

to allocations to other Settlement Class Members.  The disparity between the recovery to ERISA

Plans/eligible Group Trusts and other Settlement Class Members reasonably derives from

differences in the remedies available to those respective entities.

139.    Both the $60 million ERISA Settlement Allocation and the $10.9 million cap on

fees deductible therefrom were agreed-to after Plaintiffs and State Street reached an agreement-

in-principle on the $300 million Class Settlement Fund.  *See also* Marks Decl., Ex. 5, ¶¶ 20-21.

Further, DOL first proposed a cap on fees to Plaintiffs' Counsel in mid-July 2015, weeks after

the ERISA Settlement Allocation had been agreed-to, as a further condition for DOL's support

of the entire Settlement.  Plaintiffs' Counsel and DOL did not reach agreement on the $10.9

million amount until late August 2015.

140.    **RICs.**  Based on information provided by State Street, after the ERISA Settlement

Allocation, the allocation to RICs will be approximately $142 million, on a gross basis.  This

amount, unlike the ERISA Settlement Allocation, does not reflect any premium and is derived

solely from the RICs' percentage of total Indirect FX Trading Volume (taking into account the

ERISA Settlement Allocation).  The RIC Settlement Allocation (assuming payment of a certain

amount of attorneys' fees, Litigation Expenses, Service Awards, and Notice and Administration

Expenses) will meet the required Registered Investment Company Minimum Distribution of

$92,369,416.51, which is an essential condition of State Street's settlement with the SEC.

141.    That minimum distribution to RICs, like the ERISA Settlement Allocation, is also

an essential condition of this Settlement, which State Street can terminate if those allocations are

not made.

142.    **Public and Other.**  The Public and Other Settlement Allocation will be

approximately $98 million, on a gross basis.  The Public and Other Settlement Allocation, like

the RIC Settlement Allocation, is derived solely from the Public and Other percentage of total

Indirect FX Trading Volume, taking into account the ERISA Settlement Allocation.

143.    Using information provided about each Class Member's Indirect FX Trading

Volume(s) during the Class Period, A.B. Data will calculate the Class Member's Recognized

Claim, and use those calculations to make the Settlement Allocations in accordance with the

Settlement Agreement.  To facilitate that process, State Street has provided A.B. Data with (1)

the total Indirect FX Trading Volume for each Class Member during the Class Period; and (2)

information concerning whether each Class Member was an ERISA Plan, RIC, or Group Trust during the Class Period.

144.    Under the allocation methodology described above, determining each Settlement Class Member's Recognized Claim will involve a two-step analysis:

145.    *First*, A.B. Data will divide the Class Member's total Indirect FX Trading Volume during the Class Period into (i) RIC Volume, (ii) ERISA Volume, and (iii) Public and Other Volume, depending on whether the Class Member falls into the RIC, ERISA Plan, or Public and Other category.  A.B. Data will then determine, based on the records provided by State Street, the respective amounts of each Class Member's RIC Volume, ERISA Volume, and Public and Other Volume.

146.    For RICs, ERISA Plans, or entities falling into the Public and Other category, those Class Members' total Indirect FX Trading Volume during the Class Period will simply equal its RIC Volume, ERISA Volume, or Public and Other Volume, respectively.  Because Group Trusts, on the other hand, may fall within more than one of the above categories, further scrutiny of their Indirect FX Transactions will be required.

147.    Specifically, each Group Trust must provide A.B. Data with a certification (as set forth in the Notice) reporting the average proportion of the Group Trust's State Street-custodied assets held by an ERISA Plan or Plans during the Class Period or the average volume of Indirect FX Trades made by the ERISA Plan(s) during the Class Period, and identifying by name each ERISA Plan within the Group Trust.  If the Group Trust does not have that information for each year of the Class Period but reasonably believes it held ERISA assets during the Class Period, it should report the years for which data is available and the results will be averaged by applying

the average proportion of the years with known ERISA assets or Indirect FX Trading Volume to the years with unknown ERISA assets or Indirect FX Trading Volume.

148.     Using the information provided by the Group Trust, its ERISA Volume will equal the volume of Indirect FX Trades made by the ERISA Plan(s) in the Group Trust, or, if the information concerning the volume of Indirect FX Trades is insufficient, the proportion of assets held by the ERISA Plan(s) in a particular Group Trust.  A.B. Data will categorize any non-ERISA Volume as Public and Other Volume (and its RIC Volume will be zero).

149.     Any Group Trust that does not provide the required certification by December 20, 2016 will be treated for allocation purposes as if it held no ERISA Plan assets and will not be entitled to a recovery from the ERISA Settlement Allocation.  Rather, its total Indirect FX Trading Volume during the Class Period will be categorized as Public and Other Volume (and its RIC Volume will be zero).  The Plan of Allocation provides for an exception with respect to Group Trusts that do not provide certifications but are known by the parties to have ERISA assets based on previous consultations with the DOL, as set forth in the Notice.

150.     *Second*, after calculating each Settlement Class Member's ERISA Volume, RIC Volume, and Public and Other Volume, A.B. Data will calculate the ERISA, RIC, and Public and Other Volumes for the entire Settlement Class.  A Class Member's ERISA Recognized Claim will equal the Class Member's ERISA Volume divided by the Classwide ERISA Volume, multiplied by the amount of the ERISA Settlement Allocation.  The same calculations will follow to determine the Class Member's RIC Recognized Claim and Public and Other Recognized Claim.  Again, with the exception of Group Trusts, a Class Member will have only an ERISA Recognized Claim, an RIC Recognized Claim, or a Public and Other Recognized Claim, corresponding to the category into which that Class Member falls.

151.    The Net Class Settlement Fund will be allocated among Class Members whose prorated distributions would be $10.00 or greater, given the fees and expenses associated with printing and mailing payments.  Plaintiffs and State Street will use their best efforts to cause an initial distribution of the Net Class Settlement Fund, including the RIC Settlement Allocation, within one year after the Settlement's Effective Date, including by seeking the Court's authorization.

152.    Class Members are not required to submit claims.  In developing the Plan of Allocation, Plaintiffs took reasonable steps to ensure that State Street identified every custodial client of State Street, based on the Bank's records, which had a U.S. tax address and entered into an Indirect FX Transaction with the Bank during the Class Period.  Upon final approval of the Settlement, each Class Member that does not opt out will simply receive a check or wire transfer in the amount of the Class Member's net recovery.

153.    The Plan of Allocation reflects the considered judgment of Plaintiffs' Counsel, and has been reviewed and approved by the SEC and DOL.  Plaintiffs respectfully submit that it should be approved.

## I.    Compliance With the Court's Preliminary Approval Order

154.    The Preliminary Approval Order, among other things, approved the form and manner of individual and publication notice to the Settlement Class, and authorized Lead Counsel to retain A.B. Data as the Claims Administrator to supervise and administer the notice procedure for the Settlement.  Preliminary Approval Order ¶¶ 7-9, 12.

155.    In accordance therewith, Lead Counsel instructed A.B. Data to: (i) mail, on August 22, 2016, the Court-approved Notice by first-class mail to the Class Members identified in State Street's records; (ii) mail a cover sheet to Class Members that have been identified as Group Trusts to alert them of the certification requirement; and (iii) publish, on September 6,

2016, the Court-approved Summary Notice in the *Wall Street Journal* and over the PR Newswire. *Id.* ¶ 9; *see also* Declaration of Eric J. Miller of A.B. Data, Ltd. ("Miller Decl."), Exhibit 13 hereto, ¶¶ 2-8.

156.    A.B. Data has complied with the notice mailing and publication requirements in the Preliminary Approval Order. *Id.* & Exs. A-C thereto.

157.    Lead Counsel also worked with A.B. Data to establish a settlement-specific website, www.StateStreetIndirectFXClassSettlement.com. The website provides Class Members and other interested parties with information concerning the Settlement and the important dates and deadlines in connection with the Settlement, as well as access to downloadable copies of the Notice, the Settlement Agreement, the Preliminary Approval Order, and the Complaints in the Class Actions. *See* Miller Decl., Ex. 13, ¶ 11.

158.    Additionally, A.B. Data established and maintains a toll-free telephone number and interactive voice-response system to respond to inquiries regarding the Settlement. *Id.* ¶ 9. Class Members can also contact A.B. Data by sending an e-mail to info@StateStreet IndirectFXClassSettlement.com. *See* Miller Decl. Ex. A at 1.

159.    The deadline set forth in the Preliminary Approval Order for Class Members to file objections to the Settlement, Plan of Allocation, or application for attorneys' fees and expenses or to submit requests for exclusion from the Settlement Class is October 7, 2016. Preliminary Approval Order ¶¶ 14, 16.

160.    As of the date hereof, no objections to any of these matters have been received, and A.B. Data has received no requests for exclusion. Miller Decl., Ex. 13, ¶ 12.

**J.**     **Request for an Award of Attorneys' Fees**

161.    Lead Counsel, on behalf of all Plaintiffs' Counsel, respectfully requests an award of attorneys' fees in the amount of Seventy-Four Million Five Hundred Forty-One Thousand Two Hundred Fifty Dollars ($74,541,250.00), to be paid out of the Class Settlement Fund.

162.    The requested fee is approximately 24.85% of the $300 million Class Settlement Fund, and is equivalent to 25% of the Class Settlement Fund after deduction of the maximum Litigation Expenses disclosed in the Notice ($1,750,000) and the maximum Service Awards disclosed in the Notice ($85,000).  Lead Counsel seeks this fee despite the fact that actual Litigation Expenses are substantially less than $1.75 million as described below, and regardless of whether Service Awards, also described below, are granted in full.

163.    Lead Counsel submits that the fee request is supported by the fact that Plaintiffs' Counsel undertook these Class Actions with no assurance of compensation or recovery of costs, and faced substantial risk from the outset.

164.    These Class Actions are atypical with respect to the nature of the defendant, the subject matter, and the application of the statutory claims, and are in many respects hybrids between consumer, securities, and ERISA actions.

165.    These Class Actions are also complex.  State Street's alleged unfair and deceptive acts and practices, breaches of fiduciary duty, negligent misrepresentations, and violations of ERISA occurred over a 12-year Class Period in multiple locations, and concerned an opaque market and a little-understood area of the financial services industry.

166.    As more fully described in Part D above, the *ARTRS* Action was the first indirect FX case.  Besides State Street, there are only four major U.S. custody banks: BNYM, JPMorgan Chase, Citibank, and Northern Trust.  These banks were rarely, if ever, sued in relation to their custody businesses before these indirect FX pricing issues first began to surface.  When

Plaintiffs' Counsel investigated ARTRS's claims and commenced the action, they were working essentially from a clean slate.

167.    Additionally, as noted in Part D above, neither the litigation nor the Settlement was helped along by preexisting government enforcement actions or investigations.  Private plaintiffs led the charge against State Street.  Indeed, DOL and the SEC have benefitted significantly from Plaintiffs' Counsel's efforts in achieving the $300 million Settlement, as key terms of the Plan of Allocation are central to these agencies' settlements with State Street.

168.    Further, as more fully described in Part G above, Plaintiffs' Counsel brought about this Settlement in the face of an array of litigation risks.  These risks did not evaporate once Plaintiffs entered into mediation.  To the contrary, State Street brought these substantive issues to bear throughout the extended mediation process, pressing its contentions on, for example, the individualized nature of Class Members' written agreements and oral communications with State Street; the implicit (and sometimes explicit) awareness and acceptance of indirect FX pricing practices by Class Members and their IMs; cost accounting issues that supported the markups applied to Indirect FX Transactions; and the changing "real" interbank FX rates on a given currency pair at a given point in time.  *See also* Marks Decl., Ex. 5, ¶¶ 23-25.

169.    Lead Counsel further submits that the fee request is supported by the fact that Plaintiffs' Counsel devoted substantial time to this case while controlling costs and avoiding judicial intervention.

170.    As more fully described in Parts C and E above, counsel for ARTRS conducted a substantial pre-filing investigation, prepared detailed complaints, and litigated a substantial

motion to dismiss culminating in a three-hour oral argument before participating in the Court-approved mediation and discovery process.

171.    The mediation sessions were protracted and well-informed by, among other things, the review and close analysis of nine million pages of documents and various nonpublic data supplied by State Street.  The process was intended to, and did, bring about the best possible result for the Class in light of the risks, costs and duration of continued litigation while avoiding unnecessary expenditure of party, third-party and judicial time and resources—and Plaintiffs' Counsel put a great deal of focused effort into it.  *See also* Marks Decl., Ex. 5, ¶ 30.

172.    Settling the Class Actions was complicated considerably by the presence of the federal agencies, particularly the SEC and DOL, conducting their own investigations of State Street.  Because the financial terms of State Street's separate settlement with DOL will be satisfied by the ERISA Settlement Allocation, Plaintiffs' Counsel had to negotiate and coordinate with DOL with respect to the Settlement Agreement, the Notice, and the Plan of Allocation.  Negotiating the Plan of Allocation and other aspects of the Settlement with State Street and DOL simultaneously was a challenging and often complicated task.

173.    Further, the requested fee is comparable to the fee awarded in the similar *BNYM FX* class action.  As noted above, following the unsealing of several *qui tam* lawsuits, BNYM's custody clients asserted claims for, *inter alia*, unfair and deceptive acts and practices, violations of ERISA, and breach of fiduciary duty premised on a broadly similar alleged practice of excessive concealed markups on indirect FX transactions.

174.    In March 2015, the parties in *BNYM FX*, and various government agencies including the DOJ, SEC, DOL, and NYAG, announced settlements totaling $714 million.  This omnibus relief included a $335 million payment by BNYM specifically to settle the private

"Customer Class" cases.  In September 2015, the plaintiffs' counsel sought, and received, a fee of 25% of the $335 million recovery ($83.75 million) plus expenses.  *See* Order Awarding Attorneys' Fees, Service Awards, and Reimbursement of Litigation Expenses, *In re The Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, No. 12-MD-2335 (LAK) (JLC) (S.D.N.Y. Sept. 24, 2015), Exhibit 14 hereto.  The percentage fee requested here is slightly lower, on a comparable class settlement amount.

175.    The time spent working on the investigation, litigation and settlement of the Class Actions by Plaintiffs' Counsel is set forth in the individual firm declarations annexed hereto as Exhibits 15-23.[6]

176.    Included with these declarations are schedules that summarize the lodestar of each respective firm, as well as the expenses incurred by category (the "Fee and Expense Schedules"). The individual firm declarations and the Fee and Expense Schedules indicate the amount of time spent by each attorney and professional support staff on the case, and the lodestar calculations based on their current billing rates.  As stated in each of these declarations, they were prepared from contemporaneous daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.  *See also* Master Chart of Lodestars, Litigation Expenses, and Plaintiffs' Service Awards, Exhibit 24 hereto.

177.    In total, from the inception of the Class Actions through September 6, 2016, Plaintiffs' Counsel expended more than 86,000 hours on the investigation, prosecution, and resolution of the claims against Defendants, for an aggregate lodestar of $41,323,895.75. Plaintiffs' Counsel's hourly billing rates here range from $350 to $1,000 for Partners, $455 to

---

[6] In addition to Labaton Sucharow, TLF, Lieff Cabraser, Keller Rohrback, McTigue Law, and Zuckerman Spaeder, the law firms of Feinberg, Campbell & Zack, P.C.; Beins, Axelrod, P.C.; and Richardson, Patrick, Westbrook & Brickman, LLC have submitted individual firm declarations.  Exs. 21-23.  These three declarations report modest time spent and expenses incurred in connection with these counsel's appearances in the *Henriquez* and *Andover Companies* Actions.

$1,000 for Of Counsel, and $325 to $725 for other attorneys.  *See* Exs. 15-24.  Defense firms'

billing rates analyzed and gathered by Lead Counsel from bankruptcy court filings in 2015, in

many cases exceeded these rates.  *See* Exhibit 25 hereto.

178.    Overall, the requested attorneys' fee yields a lodestar multiplier of 1.8.

179.    ARTRS, and all ERISA Plaintiffs, support the requested fee as reasonable in view

of the work performed and results obtained for the benefit of the Class.  *See* Hopkins Decl., Ex.

1, ¶ 19; Cohn Decl., Ex. 7, ¶ 10; Henriquez Decl., Ex. 8, ¶ 10; Pehoushek-Stangeland Decl., Ex.

9, ¶¶ 5-6; Sutherland Decl., Ex. 10, ¶ 10; Taylor Decl., Ex. 11, ¶ 10; Wallace Decl., Ex. 12, ¶¶ 6-

7.

180.    Annexed hereto as Exhibit 26 is a true and correct copy of cited excerpts of the

transcript of the June 23, 2016 Status Conference before this Court.

181.    Annexed hereto as Exhibit 27 is a true and correct copy of the Order and Final

Judgment in *In re CVS Corp. Securities Litigation*, Civ. No. 01-11464 JLT (D. Mass. Sept. 7,

2005).

182.    Annexed hereto as Exhibit 28 is a true and correct copy of the Order and Final

Judgment in *In re Lernout & Hauspie Securities Litigation*, No. 01-CV-11589 PBS (D. Mass.

Dec. 22, 2004).

183.    Annexed hereto as Exhibit 29 is a true and correct copy of the Order and Final

Judgment in *In re Raytheon Co. Securities Litigation*, Civ. No. 99-12142-PBS (D. Mass. Dec. 6,

2004).

184.    Annexed hereto as Exhibit 30 is a true and correct copy of the Declaration of Alan

P. Lebowitz, General Counsel to the Comptroller of the State of New York, in *In re Raytheon

Co. Securities Litigation*, Civ. No. 99-12142-PBS (D. Mass. Nov. 23, 2004).

185.     Annexed hereto as Exhibit 31 is a true and correct copy of Brian T. Fitzpatrick,

*An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. EMPIRICAL LEGAL

STUD. 811 (2010).

186.     Annexed hereto as Exhibit 32 is a true and correct copy of the Final Order

Approving Class Action Settlement in *In re Reebok Easytone Litigation*, No. 10-CV-11977 FDS

(D. Mass. Jan. 19, 2012).

**K.     Request for Payment of Litigation Expenses**

187.     Lead Counsel respectfully seeks payment of One Million Two Hundred Fifty

Seven Thousand Six Hundred Ninety-Seven and 94/100 Dollars ($1,257,697.94) out of the Class

Settlement Fund for Litigation Expenses incurred by Plaintiffs' Counsel in commencing,

prosecuting, and resolving the claims asserted in the Class Actions.  *See generally* Individual

Firm Declarations, Exs. 15-23, and Master Chart, Ex. 24.

188.     From the inception of the Class Actions, Plaintiffs' Counsel understood that they

might not recover any of the expenses they incurred, and, at a minimum, would not recover any

expenses until the actions were successfully resolved.  Plaintiffs' Counsel further understood

that, even assuming that the Class Actions were ultimately successful, an award of expenses

would not compensate counsel for the lost use or opportunity costs of funds advanced to

prosecute the claims against Defendants.  Plaintiffs' Counsel were motivated to, and did, take

steps to minimize expenses where practicable without jeopardizing the zealous and effective

prosecution of the Class Actions.

189.     Indeed, many of the expenses incurred in the *ARTRS* Action were paid out of a

central litigation fund created and maintained by Labaton Sucharow (the "Litigation Fund").

Labaton Sucharow, TLF, and Lieff Cabraser collectively contributed $319,000 to the Litigation

Fund.  A description of the payments from the Litigation Fund by category is included in the

individual firm declaration submitted on behalf of Labaton Sucharow. *See* Ex. 15, ¶ 10 & Ex. C thereto.

190.    Plaintiffs' Counsel's expenses include charges for, among other things, (i) experts and consultants; (ii) housing approximately nine million pages of documents produced by State Street; (iii) online factual and legal research; (iv) mediation; (v) travel; and (vi) document reproduction.

191.    In particular, the cost of experts and consultants, totaling approximately $200,000, represents one of the largest components of Plaintiffs' Counsel's expenses, representing approximately 16% of their total expenses. Experts were utilized principally to consult with respect to the FX market and industry and to analyze ARTRS's and other institutional investors' indirect and direct FX trades.

192.    Another large component of Plaintiffs' Counsel's expenses relates to electronic discovery, totaling approximately $445,000 or 35% of total expenses.

193.    Plaintiffs' Counsel's expenses also include the costs of online and electronic research in the amount of approximately $70,000. This amount represents charges for computerized research services such as LexisNexis, Westlaw, Courtlink, Thomson Financial, Bloomberg and PACER. It is now standard practice for attorneys to use online services to assist them in researching legal and factual issues, and indeed, courts recognize that these tools create efficiencies in litigation and ultimately save money for clients and the class.

194.    Plaintiffs' Counsel were also required to travel in connection with the claims against State Street, particularly with regard to the 16 mediation sessions, and to work after normal business hours, and thus incurred the related costs of rail and airline tickets, late-night transportation, meals, and lodging. Any first-class airfare has been reduced to economy rates.

Included in Plaintiffs' Counsel's total expense request is approximately $360,000 for these expenses (approximately 28% of total expenses).

195.    Further, Plaintiffs' Counsel paid approximately $130,000 for Plaintiffs' share of the mediator's fees and costs.

196.    The other expenses for which Plaintiffs' Counsel seek payment are the types of expenses that are necessarily incurred in litigation and routinely charged to clients billed by the hour.  These expenses include, among others, court fees, process servers, document-reproduction costs, long-distance telephone and facsimile charges, and postage and delivery expenses.

197.    All Plaintiffs support the requested Litigation Expenses.  *See* Hopkins Decl., Ex. 1, ¶ 20; Cohn Decl., Ex. 7, ¶ 10; Henriquez Decl., Ex. 8, ¶ 10; Pehoushek-Stangeland Decl., Ex. 9, ¶ 6; Sutherland Decl., Ex. 10, ¶ 10; Taylor Decl., Ex. 11, ¶ 10; Wallace Decl., Ex. 12, ¶ 7.

198.    Courts have generally found that these kinds of expenses are payable from a fund recovered by counsel for the benefit of a class.  Lead Counsel submits that the requested Litigation Expenses were reasonably and necessarily incurred and should be approved.

**L.    Request for Service Awards to Plaintiffs**

199.    Lead Counsel respectfully requests that the Court approve Service Awards of Twenty-Five Thousand Dollars ($25,000.00) to Plaintiff ARTRS and Ten Thousand Dollars ($10,000.00) to each of Plaintiffs Arnold Henriquez, Michael T. Cohn, William R. Taylor, Richard A. Sutherland, The Andover Companies Employee Savings and Profit Sharing Plan, and James Pehoushek-Stangeland, in consideration of their successful service as class representatives in these Class Actions.

200.    All Plaintiffs diligently discharged their core responsibilities by monitoring the litigations, conferring with Plaintiffs' counsel, and reviewing significant pleadings and documents.

45

201.     Plaintiff ARTRS, after conducting appropriate due diligence, stepped forward and took a risk to sue its custody bank, and consistently worked thereafter to support the prosecution of this case and the mediation process.  ARTRS's Executive Director, for example, attended the hearing on State Street's motion to dismiss and subsequent lobby conference as well as multiple mediation sessions in Boston and elsewhere.  ARTRS also made a complete document production in response to State Street's requests.  *See also* Hopkins Decl., Ex. 1, ¶¶ 11-16.

202.     Service Awards to the ERISA Plaintiffs are also justified.  The ERISA Plaintiffs effectively represented a key constituency of the Class and collectively produced thousands of pages of documents to State Street in response to State Street's requests.  *See* Cohn Decl., Ex. 7, ¶¶ 3-6, 9-10; Henriquez Decl., Ex. 8, ¶¶ 3-6, 9-10; Pehoushek-Stangeland Decl., Ex. 9, ¶¶ 3-4, 6; Sutherland Decl., Ex. 10, ¶¶ 3-6, 9-10; Taylor Decl., Ex. 11, ¶¶ 3-6, 9-10; Wallace Decl., Ex. 12, ¶¶ 3-4, 7.

203.     The $85,000.00 in requested Service Awards equal only 0.028% of the Class Settlement Fund, and were disclosed in the Notice.  Lead Counsel submits that the Service Awards are reasonable and should be approved.

**M.**     **Summary of Relief Sought**

204.     In view of the significant recovery to the Settlement Class against the risks, costs and duration of continued litigation, as described herein and the accompanying brief in support of final approval of the Settlement, I respectfully submit that the proposed $300 million Class Settlement should be approved as fair, reasonable, and adequate.

205.     Further, I respectfully submit that the proposed Plan of Allocation of the Net Class Settlement Fund is an appropriate method of apportionment of the settlement proceeds among the members of the Settlement Class as a whole, and should be approved as fair and reasonable.

46

206.    Further, I respectfully submit that Court should reaffirm as final its findings in Paragraphs 2-4 of the Preliminary Approval Order with regard to certification of the Settlement Class for settlement purposes.

207.    Finally, in view of the skilled, efficient, and focused efforts of Plaintiffs' Counsel in bringing about the Class Settlement in the face of substantial litigation risk and practical obstacles and complexities, as described herein and the accompanying brief in support of fees and expenses, I respectfully request that the Court:

(a)     award an attorneys' fee to Lead Counsel in the amount of $74,541,250.00, or approximately 24.85% of the Class Settlement Fund;

(b)     approve payment of Litigation Expenses in the total amount of $1,257,697.94;

(c)     approve payment of a Service Award to Plaintiff ARTRS in the amount of $25,000.00; and

(d)     approve payment of Service Awards to Plaintiffs Arnold Henriquez, Michael T. Cohn, William R. Taylor, Richard A. Sutherland, The Andover Companies Employee Savings and Profit Sharing Plan, and James Pehoushek-Stangeland in the amount of $10,000.00 each.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on September 15, 2016.

LAWRENCE A. SUCHAROW