# Exhibit 2

**WILMERHALE**

March 18, 2011

**William H. Paine**

+1 617 526 6134 (t)
+1 617 526 5000 (f)
william.paine@wilmerhale.com

**By Certified Mail and E-Mail**

Joel H. Bernstein, Esq.
Labaton Sucharow LLP
140 Broadway
New York, NY 10005

Re: *Arkansas Teacher Retirement System v. State Street Corporation, et al.*

Dear Mr. Bernstein:

I am writing on behalf of State Street Corporation ("Corporation") in response to your letter, dated February 16, 2011, purporting to assert claims on behalf of the Arkansas Teachers Retirement System ("ARTRS") and other custody clients of State Street Bank and Trust Company ("Bank"), against the Bank, Corporation and State Street Global Markets, LLC ("LLC")(collectively "State Street").[1]

Your letter does not meet the requirements for a demand letter set forth in M.G.L. c. 93A, § 9. It does not "reasonably describ[e] the unfair or deceptive act[s] or practice[s] relied upon and the injury suffered," as required by Chapter 93A, §9. It does not identify the "many" custody customers supposedly injured. Even with respect to ARTRS, it is insufficiently specific. Among other things, it does not explain why Massachusetts law or Chapter 93A applies to this dispute, or discuss the terms of the custody contract between the Bank and ARTRS, or the inconsistencies between those terms and your claims.

ARTRS lacks standing to bring a claim pursuant to section 9 of Chapter 93A. ARTRS plainly "engages in the conduct of any trade or commerce." *See* Mass. Gen. Laws ch. 93A, § 11. Thus, ARTRS may not bring a Chapter 93A claim pursuant to section 9. Such a claim is available only to persons "other than a person entitled to bring action under section eleven . . . ." *Id.* § 9(1). You, of course, have already asserted a claim under § 11 – which is entirely inconsistent with the notion that you have any claim to bring under § 9. The Attorney General's disclosure regulations also do not apply. They apply "only to transactions involving private consumers, and not to business to business transactions." *In re First New England Dental Centers, Inc.*, 291 B.R. 229, 241 (D. Mass. 2003) (citing *Knapp Shoes, Inc. v. Sylvania Shoe Mfg. Corp.*, 418 Mass. 737 (1994)). ARTRS plainly is not a private consumer, and both plaintiff and defendants are engaged in business.

ARTRS' claims are barred by the four-year statute of limitations applicable to Chapter 93A claims. Your letter acknowledges receipt of account statements from the Bank reflecting the actual amount of currency ARTRS bought and sold in each of its foreign exchange transaction

---

[1]   Please note that neither the Corporation nor the LLC is involved in the Bank's foreign exchange dealing business, which is carried out exclusively by the State Street Global Markets division of the Bank.

WILMERHALE

Joel H. Bernstein, Esq.
March 18, 2011
Page 2

with State Street Global Markets. ARTRS, and all other asset owners to which the Bank provides custody services, received such statements, and thus had access to this information the day following each trade. Therefore, they had all the information necessary to determine that State Street Global Markets set rates for some of these transactions that were different from interbank rates at the time of execution.

Without waiving its objection to your letter's deficiencies, State Street has addressed certain of your allegations in more detail below. Given the number and breadth of your letter's misconceptions, this response does not set forth all of State Street's objections and defenses. To be clear, State Street denies any unfair or deceptive acts or omissions and denies that it has any liability under Massachusetts General Laws Chapter 93A or otherwise. State Street did not engage in any unfair or deceptive practices with respect to its foreign exchange business. There was nothing unfair or deceptive about either the rates for any foreign exchange transactions with the Bank, or how those transactions were reported to its custody clients, including ARTRS.

As you may be aware, foreign currency is a commodity that is sold over-the-counter and not on an organized exchange. Even at a particular point in time, there is no single interbank rate. State Street Global Markets buys and sells foreign currency in the interbank market—essentially a wholesale over-the-counter market in which large banks and other financial institutions participate. State Street Global Markets also participates in an over-the-counter market that is outside the interbank market, in which it buys and sells generally smaller amounts of currency from and to asset owners like ARTRS. State Street Global Markets is not an agent or broker in either market. Instead, it seeks to earn a profit by setting competitive rates and managing the risks inherent in its business (*e.g.*, the risk that the value of the currency it purchases in each exchange may decline).

State Street Global Markets has no responsibility for providing custody services. They are provided by a separate division of the Bank. ARTRS's custody contract did not require the Bank or ARTRS to execute FX with each other, and did not include FX execution as a duty to be performed pursuant to that contract.

An investment manager for ARTRS, to whom ARTRS committed the responsibility and discretion to manage ARTRS's assets (including currency assets), decided with whom and in what manner ARTRS would execute each foreign currency trade. When an ARTRS investment manager chose to deal with State Street Global Markets, it could choose to negotiate the terms of the trade (including exchange rate) in advance of execution, or it could select one of State Street Global Markets' value-added services (such as the indirect foreign exchange transactions addressed in your letter and complaint ("Indirect FX")).

State Street Global Markets' Indirect FX rates were neither unfair nor deceptive. Indirect FX makes up a small portion by volume of most asset owners' foreign exchange trading. For

WILMERHALE

Joel H. Bernstein, Esq.
March 18, 2011
Page 3

example, only about 5% of the ARTRS foreign exchange trading volume executed with State Street Global Markets was via Indirect FX. The large majority of ARTRS's trades with State Street Global Markets were done at rates that were directly negotiated between one of its investment managers and State Street Global Markets. The manner in which ARTRS's managers made these decisions is inconsistent with the claim that ARTRS or its investment managers thought ARTRS was receiving interbank rates for Indirect FX trades. If ARTRS or its managers truly believed that they were getting interbank rates *and* value-added services with Indirect FX, they would not have chosen Indirect FX for only 5% of ARTRS's FX trades, and would not have incurred the time and expense to negotiate rates about 95% of the time. Further, ARTRS's typical directly negotiated trade was much larger than ATRTRS's typical Indirect FX trade. Again, if ARTRS or its investment managers believed that Indirect FX rates were the same as or better than directly negotiated rates, they would not typically have used Indirect FX for trades smaller in size than those for which they negotiated rates.

State Street also rejects your assertion that State Street Global Markets' use of the daily range of interbank rates as part of its rate setting process for some Indirect FX trades made its reporting of such rates misleading. The foreign exchange trading data available daily to ARTRS and its investment managers accurately set forth the amount of currency exchanged in each transaction, and included many Indirect FX transactions at rates that were outside the daily range of interbank rates. State Street Global Markets had no obligation to explain the difference between its rates and interbank rates, and the fact that it sometimes charged rates for Indirect FX different from the interbank rate at the time of execution (and sometimes outside the daily range of interbank rates) was obvious to the sophisticated investment professionals who reviewed the trading records. Similarly, State Street Global Markets was not required to record the time at which it set the rates for Indirect FX trades - by ARTRS's contract or otherwise – and it was not the ordinary custom and practice in this industry for such time stamps to be provided. Any absence of time stamps likewise did not make State Street Global Markets' reporting of foreign exchange rates misleading.

Your letter also suggests incorrectly—without explaining why -- that when providing Indirect FX services State Street Global Markets was somehow required to offer rates that were the same as interbank rates at the time of execution.[2] In fact, State Street Global Markets was not required to exchange currency with ARTRS at interbank rates. *See Gossels v. Fleet Nat'l Bank*, 453 Mass. 366, 373–75 (2009) (no liability under Chapter 93A where bank credited foreign check at retail, not interbank, exchange rate). Interbank rates are the rates that some principal dealers quote to one another for large trades. Over-the-counter rates offered by dealers for smaller transactions with counterparties that are not interbank market participants are not interbank rates.

---

[2]   Interbank rates are quoted 24 hours a day, six days a week, and they change continuously throughout the trading period. There is no single interbank rate at any given time, nor is there consolidated reporting of recently executed transactions as exists in the equity markets. No two market makers will necessarily quote the same interbank rates or bid-offer spread for a particular currency pair at any given moment in time.

WILMERHALE

Joel H. Bernstein, Esq.
March 18, 2011
Page 4

ARTRS and its investment managers are not interbank market participants, and ARTRS's typical Indirect FX trade was between five and 55 times smaller than the smallest interbank market trades. By selecting Indirect FX, ARTRS obtained value-added services as well as execution outside the interbank market of trades much smaller than those executed within the interbank market. Accordingly, there is no logical reason for it to have expected to receive interbank rates applicable to much larger trades within the interbank market. To the extent that you rely on the contract between the Bank and ARTRS as support for your incorrect contention that the Bank had agreed that State Street Global Markets would execute FX with ARTRS at interbank rates, you have identified no part of the contract containing such a requirement and none exists. In any event, Chapter 93A does not apply to contract disputes. *Duclersaint v. Fed. Nat'l Mortg. Ass'n*, 427 Mass. 809, 814 (1998).

Your letter also is incorrect in asserting that State Street Global Markets' Indirect FX rates were not competitive. Rates for Indirect FX appropriately compensate State Street Global Markets for the bundle of services and benefits included in Indirect FX. These include daily trade aggregation, netting for pricing, mitigation of operational and settlement risk, avoided infrastructure and personnel costs, and a mechanism for executing conveniently small, frequent trades that are difficult to execute directly.[3] ARTRS's investment managers' decisions to increase their use of Indirect FX after written disclosure of the method by which the rates were set, and in light of daily disclosure of the relationship between the rates set and an interbank rate at the time of pricing, shows the competitiveness of State Street's rates.

Your letter also fails adequately or reasonably to describe the injury you claim that ARTRS and other unspecified custody customers suffered as a consequence of State Street's alleged violation of Chapter 93A, and assumes incorrectly that ARTRS could have received similar services from other foreign exchange dealers at interbank market rates. Accordingly, your letter fails to include any quantified amount of monetary damages. The letter does not refer to any particular trades or specific time frame, only refers vaguely to "whatever the size of the over-charge or under-payment for a particular buy or sell transaction" was during an unspecified "ten or eleven year period," and states that whatever figure might be derived on this basis "would grow to damages of approximately 3%." (p.3). This fails to comply with Chapter 93A, because it a reference to lost "opportunities" for appreciation of an unquantified amount of money does not provide State Street any meaningful demand to consider, nor does it provide State Street a meaningful "opportunity to review" the facts and law. *See Spring v. Geriatric Auth. of Holyoke*, 394 Mass. 274, 288 (1985) (Chapter 93A demand must provide sufficient information to allow prospective defendant an opportunity to review facts and law to determine if requested relief should be granted); *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 704 (1975) (purpose of

---

[3] Ordinarily, interbank market dealers are not interested in quoting prices for smaller trades. Generally, investment managers select indirect FX services for trades that are much smaller than trades executed in the interbank market, and smaller than trades for which investment managers choose to negotiate rates directly with State Street Global Markets or other foreign exchange dealers.

WILMERHALE

Joel H. Bernstein, Esq.
March 18, 2011
Page 5

demand letter is to "give the addressee the opportunity to review the facts and the law involved to see if the requested relief should be granted").

In sum, State Street denies liability under Chapter 93A (or any other law), and rejects the claims set described in your letter, for all of these reasons, because there was nothing unfair or deceptive about State Street's foreign exchange business, including its rates and its reporting of those rates, and for numerous other reasons to be detailed at any trial of this action. Given the conclusory, speculative and erroneous information provided in your letter, State Street has no basis to make any offer of settlement.

Very truly yours,

*/s/ William H. Paine*

William H. Paine

cc:   Jeffrey N. Carp, Esq.
      Daniel W. Halston, Esq.
      Jeffrey B. Rudman, Esq.