UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
                              )
ARKANSAS TEACHER RETIREMENT    )
SYSTEM, on behalf of itself and )
all others similarly situated, )
                              )
         Plaintiffs,           )
                              )    Civil Action
v.                             )    No. 11-CV-10230-MLW
                              )
STATE STREET CORPORATION,      )
STATE STREET BANK AND TRUST    )
COMPANY and STATE STREET GLOBAL )
MARKETS, LLC,                  )
                              )
         Defendants.           )
                              )
```


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE


HEARING


November 2, 2016
2:05 p.m.


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

APPEARANCES:

<u>On behalf of Plaintiffs</u>:

Daniel P. Chiplock
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street
8th Floor
New York, NY 10013-1413
212-355-9500
dchiplock@lchb.com

David J. Goldsmith
Nicole Zeiss
Labaton Sucharow LLP
140 Broadway
New York, NY 10005
212-907-0777
dgoldsmith@labaton.com

Carl S. Kravitz
Zuckerman Spaeder LLP
1800 M Street, NW
Washington, DC 20036
(202) 778-1800
ckravitz@zuckerman.com


<u>On behalf of Defendants</u>:

Daniel W. Halston
William H. Paine
Timothy Perla
Wilmer Hale LLP
60 State Street
Boston, MA 02109
617-526-6134
daniel.halston@wilmerhale.com
william.paine@wilmerhale.com

P R O C E E D I N G S

THE CLERK:  All rise for the Honorable Court.  This is Civil Action No. 11-10230, *Arkansas Teacher Retirement System v. State Street Corporation, et al.*  You may be seated.

THE COURT:  Good afternoon.  Would counsel please identify themselves for the Court and for the record.

MR. GOLDSMITH:  Good afternoon, Your Honor.  David Goldsmith, Labaton Sucharow, for plaintiffs and the settlement class.

MS. ZEISS:  Good afternoon.  Nicole Zeiss for plaintiffs and the settlement class, from Labaton Sucharow.

MR. CHIPLOCK:  Good afternoon, Your Honor.  Daniel Chiplock from Lieff Cabraser Heimann & Bernstein also here for plaintiffs and the proposed class.

MR. PAINE:  Bill Paine, Dan Halston and Tim Perla, all from Wilmer Hale for the defendant.

MR. KRAVITZ:  Carl Kravitz.  I'm one of the ERISA counsel.

THE COURT:  Counsel for the ERISA plaintiffs?

MR. KRAVITZ:  Yes, just in case something arises.

THE COURT:  Following the August 8, 2016 hearing I issued an order preliminarily approving the certification of this as a class action and the proposed settlement as sufficiently fair, adequate and reasonable to be sent to the class members.

1          That notice was sent.  I've been informed that no

2     objections have been filed, nor have any class members opted

3     out.  The order established today, November 2, as the date for

4     hearing on the motion for class certification and final

5     approval of the settlement for a decision on the amount of the

6     attorneys' fees to be awarded if the settlement is approved, a

7     decision on the amount of expenses to be awarded and for a

8     decision as whether service awards ought to be made.

9          Are there any other items that ought to be on the

10    agenda for today?

11          MR. GOLDSMITH:  The only other item I believe would be

12    a very minor one, Your Honor, which would simply be to finalize

13    class certification for settlement purposes.

14          THE COURT:  I think --

15          MR. CHIPLOCK:  If Your Honor didn't mention that.

16          THE COURT:  I intended to say that.

17          MR. CHIPLOCK:  Okay.

18          THE COURT:  All right.  So I think with regard to

19    class certification, I went into some detail on August 8.  As

20    far as I know, nothing has changed.  It appears to me that for

21    the reasons I stated on August 8, class certification is

22    appropriate.  But do you want to be heard briefly on that?

23          MR. GOLDSMITH:  Thank you, Your Honor.

24          All I would say with regard to class certification is

25    to echo Your Honor.  I mean, Your Honor did put detailed

1 findings on the record during the hearing we had on August 8.

2 Nothing has happened since to cast any doubt on those findings.

3 There were no objections, as Your Honor noted, to class

4 certification or anything else, and so we would suggest that to

5 finalize class certification in order to implement the

6 settlement, should it be approved, would be proper.

7 　　　　　THE COURT:  All right.  Does the defendant want to be

8 heard on this?

9 　　　　　MR. PAINE:  No thanks, Your Honor.

10 　　　　　THE COURT:  All right.  Well, I think I'll address

11 that after I hear from you on whether the settlement is fair,

12 reasonable and adequate, since I believe essentially the

13 agreement, the class certification was conditioned on the

14 settlement being approved.  I've studied the excellent

15 submissions which were and are, among other things, responsive

16 to the questions that I raised in August.  It's my tentative

17 view that the settlement is fair, reasonable and adequate.  But

18 I would like to get orally the parties' positions on that.

19 　　　　　MR. GOLDSMITH:  Well, thank you, Your Honor.

20 　　　　　We are very pleased this afternoon to present for Your

21 Honor's consideration this proposed $300 million cash

22 settlement.  As Your Honor indicated, notice has gone out.  We

23 have proven that for the initial and supplemental declarations.

24 And so now the Court has to assess whether, in its discretion,

25 whether the settlement is real, fair, reasonable and adequate

1  in view of the risks, costs and duration of continued

2  litigation.

3       That standard of course allows for a range of

4  permissible settlements, and the Court knows that there is a

5  strong judicial policy that favors the settling of complex

6  class action litigation such as this.  There's also a

7  presumption in this circuit, which Your Honor has recognized

8  most recently in the *Disability Law Center* case, that a

9  settlement is reasonable when you have, one, arm's length

10 negotiations between the parties; and two, sufficient informal

11 or formal discovery so that the Court can be assured that the

12 plaintiffs entered into the settlement on a reasonably informed

13 basis.

14      THE COURT:  And negotiation between capable

15 experienced counsel.

16      MR. GOLDSMITH:  As well as sophisticated counsel.

17 That's actually not -- that's not written into the standard as

18 we've read into the cases, but I certainly agree that should be

19 a component.  We certainly have both of them here or all three

20 of them here.

21      THE COURT:  Hold on just one second.

22      Actually I wrote that.  It's in *Berenson V. Faneuil*

23 *Hall Marketplace*, 671, F. Supp. 819, D. Mass. 1987, page 822.

24 "Whereas here a proposed class settlement has been reached

25 after meaningful discovery and after arm's length negotiation

1    conducted by capable counsel, it is presumptively fair."

2                    MR GOLDSMITH:  Well --

3                    THE COURT:  It was a long time ago.

4                    MR. CHIPLOCK:  It's like that scene in Annie Hall.

5                    THE COURT:  You're asking me to give you $74 million

6    in attorneys' fees.  You don't read my cases?

7                    MR. GOLDSMITH:  I have read Your Honor's case and we

8    cite it in our brief, and I've read *Disability Law Center* as

9    well and quoted that.  I stand corrected on that, Your Honor.

10                   THE COURT:  I probably said the same thing in that

11   case, but I don't remember.  It wasn't my first one.

12                   MR. GOLDSMITH:  Right.  I was actually referring to

13   the First Circuit on that, so I was unclear on that, Your

14   Honor.

15                   THE COURT:  Well, *Disability Law Center* I didn't echo

16   what I had said in 1987, apparently.  Go ahead.

17                   MR. GOLDSMITH:  Thank you.  So regardless, I would

18   suggest that we do have those prerequisites for the presumption

19   here as we show in our omnibus declaration and in the separate

20   declaration of Jonathan Marks, the mediator, which is Exhibit

21   5.

22                   The parties attended 14 separate mediation sessions

23   with Mr. Marks before finally reaching the agreement in

24   principle in this case in mid 2015.  We exchanged voluminous

25   documents and data, which included nine million pages of State

1    Street documents that plaintiffs' counsel reviewed and

2    analyzed.  We had various presentations that went back and

3    forth from time to time between the parties during the

4    mediation sessions.  This discovery and information exchange

5    insured, Your Honor, that we were very well informed about the

6    strengths and weaknesses or the claims and the defenses when we

7    agreed to the settlement.

8         And what's very important here is that this approach

9    we had of mediation and document discovery and information

10   exchange was very carefully worked out among the parties, and

11   it was presented to Your Honor for approval during a lobby

12   conference that we had in November of 2012.  And it was

13   approved by Your Honor as a way to approach these cases in a

14   focused and efficient way to explore settlement while insuring

15   a flow of information but also to attempt to save costs and to

16   avoid unnecessary disruption of party resources, third party

17   resources, and judicial resources.

18        So we took a different resolution approach here.  And

19   my recollection was that it was an approach that Your Honor

20   found to be commendable.  And fortunately, the approach

21   ultimately was successful.  So with that presumption

22   established, I think the question before the Court is are there

23   any circumstances here that would suggest that the settlement

24   is not fair and adequate and reasonable.  I would suggest the

25   answer is no.  This settlement is the largest ever to our

research in a Chapter 93A class action.  The next largest that we're aware of in Massachusetts is a $25 million settlement approved by Judge Saylor in the *Reebok* case, and there's also a $20 million settlement that was in state court.

So this case, Your Honor, is more than ten times larger.  There is a case called *Warfarin*, which is cited in our brief, which was larger, about $45 million, but that's a little different because in that case they proceeded under all of the consumer protection laws of all 50 states, so it's not really a Chapter 93A case, although they cite it.

This settlement, Your Honor, is the third largest ever filed in a Federal Court within the First Circuit, if you exclude securities class actions which tend to be very large. So you have the *Tyco* securities class action which was up in New Hampshire.  That was something like $3 billion.

THE COURT:  That was a securities class action?

MR. GOLDSMITH:  That was a securities fraud.

THE COURT:  I thought you were excluding that.

MR. GOLDSMITH:  I am just explaining the structure so Your Honor can the perspective.  So there was the *Tyco* case, which was $3 billion.  Then there was *Raytheon* securities class action which was in this district which was $460 million.  Then after that there's a trio of cases, the *Neurontin* case, which is one of those drug marketing cases, which was 325, then another one of those drug marketing cases also in this court

1    called *First DataBank,* which was 350, so actually bigger.  Then

2    there's this case.  So you have a trio of cases in the 300s,

3    and this falls right in there.  This is one of the largest

4    class action cases filed in the First Circuit.

5         So that's a broad generalization of why this is a big

6    settlement.  But to get more case-specific, one of the most

7    important factors of course is how big is the settlement as

8    compared to the maximum potential recovery at trial.  Your

9    Honor had asked me this question in one of our prior hearings:

10   How did we do?  We peg that percentage at 20 percent.  So a

11   very pie-in-the-sky damages figure that we put together is

12   approximately $1.5 billion.

13        THE COURT:  Mr. Paine is going to want to order this

14   transcript, although you're the lawyer, you're not the expert

15   witness.  You say "pie in the sky."

16        MR. GOLDSMITH:  Right.  If we were to achieve every

17   claim, and that's an outer limit.  I mean, Mr. Paine --

18        THE COURT:  Every claim your experts are to be

19   believed --

20        MR. GOLDSMITH:  Correct.  Mr. Paine has a very, very

21   different view of damages, and that's a very important fact for

22   this proceeding.  But even so, $300 million gives you 20

23   percent.  That's a very robust percentage, we would suggest.

24   That's well within, if not above, what courts routinely find to

25   be reasonable.  And importantly, that percentage, Your Honor,

1  is comparable to the percentage of the recovery that was

2  achieved in the *Bank of New York Mellon* FX case, which was very

3  similar to this case in the Southern District of New York.

4          THE COURT:  "FX" meaning foreign exchange?

5          MR. GOLDSMITH:  Yes.  I'm sorry.  FX, foreign

6  exchange.  So as I mentioned in the prior hearing, there was a

7  case against Bank of New York Mellon, which was one of State

8  Street's major competitors that's very similar to this case.

9  But that proceeded in Federal Court in New York.  And

10 Mr. Chiplock was one of the lead counsel in that case.  I was

11 not involved in that case.

12         THE COURT:  And he hasn't retired yet?

13         MR. CHIPLOCK:  I haven't, Your Honor.

14         MR. GOLDSMITH:  Maybe next year.

15         The percentage there was about 24 percent on a

16 comparable class recovery of about $330 million.  And the judge

17 there -- this was Judge Kaplan -- had little trouble approving

18 that settlement as fair, reasonable and adequate.  So I think

19 the settlement falls right in line.

20         But referring to Your Honor's comment about State

21 Street's view of damages, I think that's really important.  So

22 State Street, at Your Honor's directive, put a memorandum in,

23 and they view damages at zero.  And even assuming liability,

24 Mr. Paine made an assertion that damages could maybe be $50

25 million, maybe.

1        So taking Mr. Paine at his word, if a jury -- assuming

2    a finding of liability, which of course is not assured -- could

3    rationally impose damages of $50 million, then I would suggest

4    that the fairness of a $300 million settlement is almost

5    self-evident.

6        So I mentioned litigation risk.  So litigation risk on

7    liability also supports the settlement, Your Honor.  And we

8    discuss this at some length in our brief and in our omnibus

9    declaration.  But again, I want to point to State Street's

10    brief, which I think is really very helpful on this point as

11    well.  So they put together a summary of the defenses that they

12    might mount.  It's no way -- I'm not suggesting it's their full

13    panoply of defenses or trial memorandum, but there's a cogent

14    list of their contentions.

15        Now, I don't agree with their individual contentions

16    saying that our theory doesn't make sense and things of that

17    nature, but I think it makes very clear that the ruling that

18    Your Honor gave us on the motions to dismiss in no way

19    guarantees success on summary judgment and it in no way

20    guarantees success at trial.  There were thorny factual issues

21    here, thorny legal issues.  There is a somewhat arcane fuzzy

22    area.  Custodians don't get sued very often.  And I think one

23    cannot deny that State Street had, you know, legitimate

24    defenses that they can marshal.

25        And there was one comment that Your Honor made during

1   the hearing on the motion to dismiss that I think is worth

2   pointing out.  When Your Honor raised the question of why, why

3   would a custody client do direct FX trades if the custody

4   client thought that the indirect trades, those are the trades

5   that are at issue in this case, were free.  And Your Honor had

6   asked that question I believe during the hearing on the motion

7   to dismiss.  And we have answers to that question, and we would

8   offer answers to that question if the case were to go further,

9   you know, into litigation.

10       But that's an issue that we would have to grapple

11  with.  That is an issue that Your Honor would have to grapple

12  with.  If the case were to go into summary judgment, that's an

13  issue that a jury would have to grapple with.  So I think there

14  is certainly litigation risk that supports a settlement at this

15  magnitude.  And the settlement was not handed to us, Your

16  Honor.  This was not piggyback regulation.  There are multiple

17  regulators that have some involvement in the matter as we've

18  discussed with Your Honor before.

19       THE COURT:  Department of Justice, Department of

20  Labor, Securities and Exchange Commission?

21       MR. GOLDSMITH:  Yes, sir.  And the interrelationship

22  is discussed in State Street's memorandum, and Your Honor had

23  directed that that question be answered.  But those regulators

24  came on the scene later.  This is not an instance where they

25  plowed the road with findings and then we showed up with a

1   complaint that recounted those findings.  We plowed the road.

2       And this case similarly was developed and started

3   actually before the Bank of New York case was up and running.

4   Even though that case was settled and that settlement was

5   approved some months ago, the timeline which we recount in our

6   papers shows that this case actually got started first.

7       Just one more note.  I mean, Your Honor mentioned or

8   noted that there are no objections, there are no opt-outs.  I

9   would suggest that that may have a particular relevance here

10  simply because we do have a class of institutional investors.

11  There are cases that suggest that when you don't have

12  institutional objectors, that may carry some more weight --

13      THE COURT:  Investors.

14      MR. GOLDSMITH:  I'm sorry.  The class here is made up

15  of institutional investors.  There are cases that say -- and we

16  cite them in our reply brief, that say when the response of the

17  class has no objections by institutional investors, the Court

18  may wish to give that more weight than when most of the class

19  is individual investors.

20      THE COURT:  I agree with that proposition.

21      MR. GOLDSMITH:  So the fact there are no objections

22  and no opt-outs is of perhaps some additional significance.

23      That's my presentation on the settlement, Your Honor.

24      THE COURT:  I am interested in hearing from State

25  Street on some of the relevant factors.  The written submission

1   was helpful, but if there are some things that you'd like to

2   reiterate or amplify, emphasize, it would be helpful to me.

3        MR. PAINE:  I think that our perspective on this case

4   is that we had a thorny and difficult problem that was going to

5   be hard for just about anybody who is not a custody banker to

6   understand.  State Street is an unusual bank.  Indirect FX is

7   an unusual business.  And the world in which they conduct this

8   business is inhabited by very sophisticated people in

9   institutions who we believe understand very well what's going

10  on inside that business.  But external observers, whether it's

11  a jury or a plaintiff or a Court or a regulator, has had a lot

12  of trouble understanding the details of this very complicated

13  business.

14       And as a result, we had not just litigation but

15  threatened litigation from a whole bunch of regulators, all of

16  whom have tremendous power to do harm to State Street and its

17  business.  So we had a big problem.  And one of the big players

18  in terms of the resolution, the problem is, Your Honor -- and

19  you said to everybody in this room or most everybody in this

20  room you really ought to figure out a way to resolve this that

21  doesn't involve, you know, extensive litigation proceedings.

22  And we did.

23       THE COURT:  Litigation with your valued clients.

24       MR. PAINE:  And even if it wasn't litigation with them

25  directly, we viewed -- we watched the Bank of New York case

where they did it the old-fashioned way, and they did 100
depositions, and they subpoenaed dozens of their clients, and
their clients were not happy.  These are clients that -- our
clients are -- some of these relationships go back decades.
The bank wants those relationships to continue for decades.
And it's really only every five or ten years that people are
considering whether they want to change their custodian.  And
so it's a giant business risk to pick fights with the people
that you need the evidence from.

THE COURT:  I don't remember what I said to encourage
you to go through a process to settle it, but I wouldn't be
surprised if I pointed that out because it's something
particularly important in this case.

MR. PAINE:  It was a good observation you made.  It's
one we took to heart.  It's one that everyone took to heart.
The honest truth is that if the plaintiffs' lawyers and the
lead plaintiff as a group were not mature enough and if we
weren't patient enough and if you weren't patient enough to
allow this thing to unfold in the way that it did, we would
have spent $100 million on defense costs to present a very
complicated issue to you for summary judgment, and then we
would -- you know, we would have either won or lost that
motion.  But if we lost, it would have been another $50 million
associated with that exercise.

So the case was too big, too complicated, too many

1 adversaries for us to be comfortable just doing it the

2 old-fashioned way.  So we did it the way that you suggested.  I

3 think that everyone -- there were a lot of frustrations on

4 everyone's part.  The production and review of nine million

5 documents is not trivial.  The extensive back and forth

6 intermediated by Mr. Marks about the merits of the case was not

7 comfortable.

8 　　　　But at the end of the day, the litigation timeline

9 formed up with the regulatory timeline, and we were able to

10 accomplish, at great expense, the objective that we had, which

11 was to resolve this case once and for all at the same time with

12 respect to everybody.

13 　　　　THE COURT:  When you say, "once and for all with

14 respect to everybody," just so I think it's clear on this

15 record, your settlement with the Department of Labor, with

16 regard to ERISA claims and your settlement with regard to the

17 Securities and Exchange Commission is contingent upon the

18 approval of this settlement by me.  Is that right?

19 　　　　MR. PAINE:  That's correct.  That was a key term that

20 we were unwavering on.  We were not willing to resolve these

21 cases except as one big bundle, and that caused a lot of

22 difficulty because -- it caused a lot of difficulty for

23 everyone.  And I was sort of at the hub of this multi-spoked

24 negotiation, and every change by every party involved iterating

25 through all of the parties.

1            So I really do -- you know, it's not my mode to spend

2      a lot of time complementing my adversaries, but this is a

3      situation where State Street was unwilling to pay money like

4      this on any other basis than what's presented to you today, and

5      it required extreme effort and patience on behalf of everyone

6      involved to get to the point where that pool of assets could be

7      made available.  We think it's fair.  We think it's beyond

8      fair.  And we commend it to Your Honor.

9            THE COURT:  Okay.  Well, I'm going to address this

10     only briefly because I don't think either the question of class

11     certification or the question of whether the settlement is

12     fair, reasonable and adequate is a close question.  I think the

13     answer to both is yes.  I'm relying substantially on the

14     excellent submissions.  I'm relying on what was said today,

15     which I won't reiterate completely, but the following:

16            I went through the requirements for class

17     certification carefully in detail on August 8, 2016.  Those

18     factual findings which were then preliminary are reflected in

19     the transcript.  I don't think it's necessary or worthwhile to

20     reiterate them.  But the requirements for class certification

21     are fully met.

22            In addition, I also find that the settlement of $300

23     million is fair, reasonable and adequate, again essentially for

24     the reasons stated on August 8, 2016 and the additional facts

25     that no class member has objected, no class member has opted

1  out.  This is a situation in which each of the class members

2  is a sophisticated -- well, is an institutional investor, I

3  infer, a sophisticated party and the fact that there is

4  unanimous agreement among the class members that the settlement

5  is, from their perspective, fair, reasonable and adequate is an

6  important and somewhat unusual fact.

7        It's also important and unusual in my experience that

8  this is a settlement that regulatory agencies, expert

9  regulatory agencies, particularly the Department of Labor and

10  the Securities and Exchange Commission, want to see approved by

11  making their -- settlement of their claims or potential claims

12  against State Street contingent on the approval of this

13  settlement.  They're communicating to me that from their

14  perspective, having responsibilities to the public and

15  experience and expertise, this settlement is fair, reasonable

16  and adequate.

17        It was negotiated by experienced, capable counsel

18  after substantial discovery, including nine million documents.

19  It results from arduous arm's length negotiations, as I

20  understand it, 19 mediation sessions with a very experienced

21  and expert mediator.  So it's presumptively valid.  The class

22  members -- well, there are essentially two subclasses as I

23  understand it, but within those classes the class members are

24  each treated equally.  And the settlement provides a

25  substantial amount of money, $300 million, which is not as much

1    as the plaintiffs would advocate if they got this case to a

2    jury, but it's considerably more than defendants believe could

3    properly be awarded even if the plaintiffs prevailed.  And

4    whether the plaintiffs would prevail in this case is inherently

5    uncertain.

6            This is a complicated area.  State Street has

7    defenses.  I'm not in a position to make an informed prediction

8    concerning how the case would come out if it were tried, but I

9    can say it's uncertain whether it would survive a motion for

10   summary judgment.  It's uncertain how it would come out, and

11   it's uncertain how much in damages would be awarded if the

12   plaintiffs ultimately prevailed.

13           So for all of these reasons and others, essentially in

14   the submissions, I find this is fair, reasonable and adequate.

15           And implicit in that is a finding that State Street

16   had essentially valid reasons to settle.  This is not a

17   situation where the defendant agreed to pay something that will

18   assure the plaintiff significant -- let me confirm one thing we

19   haven't discussed.  Were the attorneys' fees -- the attorneys'

20   fees come out of a common fund, but were the attorneys' fees

21   discussed with the defendant before the $300 million figure was

22   reached?

23           MR. PAINE:  No.

24           MR. GOLDSMITH:  No, Your Honor.

25           MR. PAINE:  No.

1          THE COURT:  I probably asked you that before.  That's
2     my understanding.  There's nothing collusive about this.  This
3     has been genuine arm's length negotiations between experienced,
4     capable counsel who each vigorously represented their clients'
5     interest.  So I've approved the settlement.
6          Is there anything you feel I didn't say that I should
7     have?
8          MR. GOLDSMITH:  One, I suppose, question, Your Honor,
9     did you want to hear any particular discussion of the terms of
10    plan of allocation?  Your Honor mentioned --
11         THE COURT:  Last time --
12         MR. GOLDSMITH:  I don't know -- just for completeness.
13    I wasn't sure.
14         THE COURT:  Why don't you remind me of the terms of
15    allocation.
16         MR. GOLDSMITH:  Sure.  We've discussed it before, Your
17    Honor.  I didn't want there to be something that was left out
18    that Your Honor wanted to hear.  We discussed it briefly.
19    There's a plan of allocation here.  There's three, I suppose
20    you could call them segments.  The funds will be divided among
21    the ERISA plans and the eligible group trusts.  Group trusts
22    are the class members where they have certain assets that are
23    ERISA-governed and certain aspects that are not.  So the ERISA
24    portion of group trusts are part of the ERISA settlement
25    allocation.

1    Then you have the registered investment companies or

2    mutual funds.  They have a portion.  And then you have what we

3    call public and other, which is basically everybody else.  That

4    includes our client, Arkansas Teacher, and they have a portion.

5    Essentially we used a volume-based calculation to

6    figure out how much everybody gets.  And that's largely how we

7    will be divvying up the money from the net settlement fund

8    after fees and expenses and the like are taken out.  We'll be

9    sending letters -- we have sent letters to the group trust

10   class members asking them to tell us about the proportion of

11   ERISA and non-ERISA so that we can get intelligence from them

12   so that we can figure all that out.  We have sufficient data

13   that State Street has provided us so that we can do the

14   calculations.  I just wanted to have that explained to Your

15   Honor.

16   THE COURT:  Thank you.  I'm persuaded that the plan of

17   allocation is fair.  And again, this is a complex area, but the

18   class members are institutional investors, I infer

19   sophisticated investors, and if they thought the plan of

20   allocation was inequitable, I expect I would have heard from

21   somebody.

22   So now with regard to requests for attorneys' fees.

23   The plaintiff's counsel requests $74,541,250 in fees,

24   $1,257,699.94 in expenses, and accrued interest on whatever sum

25   I award.  I do think it's appropriate in this case to use the

1   percentage of the common fund approach in determining the

2   amount of attorneys' fees that should be awarded.

3        Again, I've studied the submission, but I'm interested

4   in hearing your argument.

5        MR. GOLDSMITH:  Thank you very much, Your Honor.

6        So as Your Honor said, the fee of approximately 74 and

7   a half million dollars, that's about 24.85 of the gross

8   settlement fund.  The way we calculated that, Your Honor, is we

9   took the $300 million gross settlement fund.  We deducted the

10  $1.75 million expense figure, which was the maximum number in

11  the notice.  So we told class members in the notice that we

12  would seek no more than $1.75 million in expenses.  And then we

13  deducted the $85,000 in service awards that we would be

14  seeking.

15       We took that number, and then we divided it by four,

16  25 percent of that.  And that's how we came to the actual

17  figure in fees that we're seeking here.  And so the fees,

18  expenses combined is about 25.27 percent of the gross

19  settlement fund.

20       THE COURT:  My calculation came to the same number.

21       MR. GOLDSMITH:  Okay.  I just wanted the Court to see

22  how we --

23       THE COURT:  Because usually I do combine them.

24       MR. GOLDSMITH:  I'm aware of that, yeah.  So 25.27,

25  and then when you add on the service awards that we've

1    requested, if the Court were to award those, that pushes that

2    up a little bit to 25.3 percent.  So it's a little above 25

3    percent.

4            So my argument, Your Honor, first of all, is that a

5    fee just below 25 percent we think falls right in line with the

6    fees that the courts in this circuit generally award in class

7    action settlements.  There are a lot of cases, you know, in

8    class action settlements, large and small, where 25 percent

9    fees approximately have been awarded.  I mean, in the *Bezdek*

10   case, which is a 2015 case before Judge Woodlock, that's also a

11   Chapter 93A case, Judge Woodlock went so far as to say that 25

12   percent is the now benchmark fee in this circuit.  I don't know

13   if it's really a benchmark like you have in the Ninth Circuit,

14   but that's what His Honor said.  And it does seem to be maybe a

15   vibrating benchmark of sorts.

16           THE COURT:  Well, I studied this pretty closely after

17   I became a judge in 1985.  And in the *Berenson* case I discussed

18   it and I appointed a distinguished lawyer to help me.  But

19   basically I understood as a guideline 20 to 30 percent was an

20   appropriate range to consider, so 25 percent is in the middle

21   of the range.  It actually seemed to me that I've been creeping

22   up lately or at least some of my colleagues have been awarding

23   more than 30 percent in certain cases where of course the

24   adversary process is not working.  But I've tended to stay in

25   that 20 to 30 percent range.

1          MR. GOLDSMITH:  So one thing we presented in our

2     brief, Your Honor, to get a little bit more to the point, is we

3     compared the fee that we're requesting here with the fees in

4     every class action settlement in the First Circuit of $100

5     million or more.  There are some cases that refer to class

6     action settlements of $100 million or more as mega fund

7     settlements.  So we took all of those settlements in courts

8     within the First Circuit.  There are eight of them.  And we put

9     them together.  There's a chart on page 7 of our brief and lays

10    them out.  I would suggest that this fee falls in the middle

11    and looks fairly reasonable compared to the others.

12          And we have some explanation as to the percentages

13    that are below, and we talk about those in our brief.  I mean,

14    the *Tyco* case, for example, that was 14.5 percent, but that was

15    also a $3 billion recovery.  So that's different.  I mean, the

16    *Raytheon* case, which was the $460 million securities case, that

17    was 9 percent.  That's also a lot different because the

18    plaintiff in that case was the New York State Common Retirement

19    Fund, and I know too from personal experience that the New York

20    State Common Retirement Fund can be very demanding with

21    attorneys' fees.  And there was an affidavit that was filed in

22    that case that required counsel not to seek more than that

23    percentage.  We actually filed that affidavit.  So I think the

24    fee there was a function of that.  *First DataBank* -- I'm sorry.

25          THE COURT:  That was part of a fee agreement or just

1  the position of the client after the case was settled?

2          MR. GOLDSMITH:  I didn't hear your whole question.

3          THE COURT:  Was that part of a fee agreement that

4  counsel wouldn't seek more than 10 percent?

5          MR. GOLDSMITH:  In *Raytheon*?

6          THE COURT:  In the case you were just describing.

7          MR. GOLDSMITH:  Yes.  In *Raytheon*, what happened was,

8  I think there was a fee agreement that was -- at the beginning

9  of that case, I think that there was a fee grid that that

10  client and that counsel, which was not my firm, had agreed to

11  and it resulted based on the recovery in that fee.

12          THE COURT:  And your fee agreement in this case

13  provided what at the outset?

14          MR. GOLDSMITH:  It provided -- well, it's certainly

15  consistent with the fee that we're seeking here.

16          THE COURT:  Well, it was a contingent fee agreement,

17  right?

18          MR. GOLDSMITH:  It was a contingent fee agreement, of

19  course.

20          THE COURT:  Did it have a cap?

21          MR. GOLDSMITH:  I believe it was capped at 25 percent,

22  and we are seeking a fee that's slightly below.

23          THE COURT:  And it permitted expenses about 25

24  percent?

25          MR. GOLDSMITH:  Yes -- no, no.  The fee was -- it

1  permitted a fee of 25 percent of expenses that go below.  I

2  mean, Mr. Hopkins' affidavit --

3         THE COURT:  Expenses that would go above?

4         MR. GOLDSMITH:  I'm sorry.  Would go above.  I

5  misspoke, Your Honor.  Our affidavit from your client,

6  Mr. Hopkins, which was Exhibit 1, does support the fees and

7  expenses that we're seeking.  So the *First DataBank* case, which

8  had a 20 percent fee, what happened there actually was, counsel

9  were seeking a 25 percent fee, but that would have resulted in

10  a multiplier and lodestar multiplier of something like 10.  And

11  the judge there, I believe it was Judge Saris, found that that

12  was a bit too rich, so she reduced the fee to 20 percent, but

13  that still gave a lodestar multiplier of about 8.

14         So I think that's a little bit different.  In the

15  *Lernout and Hauspie* case, in all candor, we couldn't find a

16  record on that.  I don't know why 20 percent was awarded there

17  instead of something higher or something lower.  I don't know

18  the answer to that.

19         So one important point of the fee, again mentioning

20  the *Bank of New York* case, is that Mr. Chiplock and his

21  colleagues sought a 25 percent fee on a $335 million class

22  recovery and received that amount from Judge Kaplan in New

23  York.

24         THE COURT:  They were piggybacking on your work.

25         MR. GOLDSMITH:  No, they were not.  Hardly.

1          THE COURT:  I thought you said you went first.

2          MR. GOLDSMITH:  We went first but they came close

3     behind.  I would not call them piggybacking on our work.  They

4     were marching through the desert.  And the fee that we're

5     seeking here is slightly below.  And we would suggest that the

6     results achieved, what we've done here in terms of the work

7     would support the fee as well, including the work that Your

8     Honor had mentioned on the record in indicating Your Honor's

9     approval of the settlement.

10         One thing I'd like to mention is I'd like to point to

11    State Street's brief for a moment.  State Street of course

12    takes no position on our fee.  There's no reason for them to.

13    They don't have any interest in whatever fee the Court seeks

14    fit to award, but I think some of the assertions are relevant

15    actually to the fee, because if State Street's brief is to be

16    taken at face value, we produced a $300 million settlement, and

17    we're giving class members a windfall -- I think that's a word

18    that they use -- after bringing a case that doesn't make any

19    sense and that has no damages at all.  So I think, you know, a

20    fee of some substance would be in order for that, frankly.

21         THE COURT:  Do you think 74 million is of some

22    substance?

23         MR. GOLDSMITH:  It is.

24         THE COURT:  It's a number with a lot of substance to

25    somebody who works for $200,000 a year, but go ahead.

1          MR. GOLDSMITH:  True, sir, true.

2          The bank -- I think Mr. Paine alluded to this.  They

3     settled to avoid defense costs.  Okay.  I think they settled in

4     part to avoid inconvenience and business interruption, all

5     legitimate.  And they settled in part to close down the

6     regulatory actions, all the legitimate reasons to settle.  $300

7     million is more, I think, than what the defense costs would

8     have been here.  I don't know that for a fact, but I would

9     think so.  And $300 million is a lot more than the portion of

10    the settlement that is being used in part to satisfy certain

11    regulatory agencies.

12          So as we've discussed, $60 million will be used to

13    satisfy the Department of Labor, and there's also $92 million

14    which is part of the financial terms between State Street and

15    the SEC.  Adding those up, that's about $152 million.  That's

16    only about half of the size of the settlement.  So I think you

17    can see very clearly that there's real value here that counsel

18    produced alone, and we think, Your Honor, that that justifies

19    the fee that we are respectfully seeking.

20          One thing I also would note is that the *Bezdek* case,

21    which I mentioned, which was decided by Judge Woodlock, which

22    is a Chapter 93A case, you had a similar path here in terms of

23    the degree of work, the mediations, coupled with discovery and

24    so on, where you had a settlement that preceded summary

25    judgment, you know, and you had a certain amount of discovery

 1    but you didn't have 100 depositions and the like.  You had a 25

 2    percent fee awarded by Judge Woodlock there.

 3         Now, there was an objection filed in that action, Your

 4    Honor.  There was an objection filed to the fee, and the

 5    objection stated that the plaintiffs' counsel didn't do enough

 6    work to justify a 25 percent fee.  And Judge Woodlock overruled

 7    that objection.  Judge Woodlock found that there was more than

 8    enough work done in terms of the work to produce the

 9    settlement, the work that was done in negotiating the

10    settlement, the work that was done in discovery, the work that

11    was done in investigation and motion practice and so forth.

12         And the First Circuit, in an opinion by Judge Lynch,

13    affirmed that finding and I think had little trouble affirming

14    the finding that Judge Woodlook was well within his discretion

15    in overruling the objection to the 25 percent fee, so I would

16    commend that authority to Your Honor as well.

17         THE COURT:  Okay.

18         MR. GOLDSMITH:  Finally, Your Honor, there was one

19    other matter I did want to note on the fee, if I may, which is

20    that many courts apply a lodestar crosscheck.  It's not

21    required.

22         THE COURT:  And I do that.

23         MR. GOLDSMITH:  But I'd be remiss if I didn't mention

24    it.  Here the multiplier that this fee would yield would be

25    1.8, which we think is pretty low under the circumstances.  The

1   review of the nine million documents and other work that was
2   associated with that took a lot of hours, and so that is one of
3   the reasons why the lodestar is large here, even though we
4   didn't take 100 depositions.  So the multiplier we think
5   compares favorably with or is frankly a lot lower than the
6   other cases.
7           THE COURT:  The total of the lodestar is --
8           MR. GOLDSMITH:  Approximately $41.3 million.
9           THE COURT:  And is it correct that your fee agreement
10  was a contingent fee agreement so if you didn't settle this
11  case or prevail at trial, you would have received nothing?
12          MR. GOLDSMITH:  Correct.
13          THE COURT:  All right.
14          MR. GOLDSMITH:  Thank you, Your Honor.
15          THE COURT:  Do you want to speak briefly to the
16  expenses?
17          MR. GOLDSMITH:  Thank you, Your Honor.  Yeah, I'll
18  speak briefly to that and the service awards, if I may.
19          THE COURT:  Yes.
20          MR. GOLDSMITH:  So the expenses, I believe Your Honor
21  quoted the figure, it's approximately $1.25 million.  We would
22  submit that these expenses were reasonably and necessarily
23  incurred in connection with the cases.  We've documented those
24  in the various firm-specific declarations, which are Exhibits
25  15 to 23 of our omnibus declaration.  And there's a master

1    chart which is Exhibit 24 if Your Honor wanted to see

2    everything on one page.

3          There's a number of principle categories that are

4    predominant with the expert fees, the mediation fees were high,

5    travel expenses, legal research expenses, document hosting fees

6    and the like.  We think that these are expenses that are

7    generally approved by courts.  It's a relatively small

8    percentage of the gross settlement.  It's less than one half of

9    one percent.  The notice, as I indicated, advised that expenses

10   would be no more than 1.75 million.  This is a lot less, and

11   there's been no objections.

12         THE COURT:  And I think Mr. Paine said that -- I don't

13   think he said what the defendants' fees were to date, but he

14   did say if this continued to summary judgment, it would be

15   about 100 million and, you know, if it went beyond that,

16   another 50 million.  So frequently, usually courts don't have

17   that information, but I think that's another check.  Okay.

18         MR. GOLDSMITH:  There's no question, Your Honor, that

19   if this case had gone through full discovery and if we had

20   settled on the courthouse steps -- let's say we settled on the

21   courthouse steps for $300 million.  More money would have come

22   out of the gross settlement, assuming court approval, than is

23   coming out today in terms of expenses.  So the settlement is

24   more valuable today to class members than it would be then, and

25   also it's today and not a year from now or however long it

1    would have taken.  So there's that.

2            THE COURT:  All right.

3            MR. GOLDSMITH:  And just very briefly on the requested

4    service awards.  What we are seeking is $25,000 for Arkansas

5    and $10,000 for each of the six ERISA plaintiffs, which total

6    $85,000.  This is a case in which incentive awards can be

7    approved by courts.  And the *Bezdek* case and the *Lupron* case

8    and *Neurontin* case all have granted incentive awards to the

9    plaintiffs in approving the settlement in the course of

10   approving fees.

11           This is different than a securities fraud case, Your

12   Honor, where there are statutory limitations on incentive

13   awards to plaintiff.  In a 93A case the Court has discretion to

14   do so.  In fact, Chapter 93A itself reflects a policy that

15   favors the bringing of class actions.  So I would suggest that

16   would be appropriate here.

17           Arkansas we think took a lot of risk in suing its own

18   custodian to bring a case like this.  Arkansas, if it's not

19   clear, remains a client of -- custody client of State Street.

20   And, you know, it wasn't easy for Arkansas to step forward and

21   to do this.  And Arkansas spent a lot of time and effort in

22   acting in this case.  And Mr. Hopkins was here for the motion

23   to dismiss hearing and for the conference we had thereafter.

24   He attended a number of the mediation sessions, not just one or

25   two.  He actually spoke with the representative of -- the State

Street executive who was there, and he had involvement in the case.  And they also produced documents and so forth.

And the ERISA plaintiffs also discharged their duties as well, and we have affidavits from each of them.  You'll find that as Exhibit 1 and Exhibits 7 to 12 that would support that, so we would respectfully submit that the service awards should be approved.

THE COURT:  And they're content -- well, they haven't objected, but are they content with you getting $74 million and them getting, for their services, 25,000 for Arkansas Teachers and 10,000 for the rest?

MR. GOLDSMITH:  Yes, because without the lawyers doing the legal work, there wouldn't be any service awards.  And their declarations support all of the requests that are before you, Your Honor.

THE COURT:  In my experience, service awards are a relatively recent but now common phenomenon.  But the plaintiffs are supposed to be controlling the lawyers.  This isn't a PLSRA case, but I think the concept applies.  Service awards seem modest compared to legal fees, but that's okay because it leaves more for the class members.  All right.

Well, when you cite *Bezdek* or several of Judge Saris' decisions, you almost make me wish that I could write you a long elegant decision, too, but I've got other things to write and you'd be waiting.  I think you'd probably prefer to get on

1  with getting $300 million for the class and $74 million for
2  yourselves.
3      So again, I'll decide this orally.  The transcript
4  will be the record of the decision, and I'm relying heavily on
5  the submissions and what's been said today and speaking
6  shorthand to some extent.  I do find that requests for
7  attorneys' fees of $74,541,250 is reasonable.  I find that
8  $1,257,697.94 in expenses is reasonable.  I'm awarding accrued
9  interest on each of those sums.  I also find that a service
10 award to each of the named plaintiffs is appropriate, $25,000
11 to Arkansas Teachers and $10,000 to each of the so-called ERISA
12 plaintiffs.  I have used the percentage of common fund method.
13 I've used the reasonable lodestar to check on that.  I've also
14 considered the awards in comparable cases.  The $74,500,000
15 plus is about -- well, is 24.48 percent of the settlement fund.
16 Adding in the litigation expenses brings it to 25.27 percent of
17 the settlement fund.  Adding the service awards makes it a
18 little higher.  This is in the 20 to 30 percent range usually
19 awarded by me in class action common fund cases and in many
20 cases with settlements in the First Circuit and in many cases
21 where the settlements are a $250 million to $500 million range.
22      Given the high number that roughly 25 percent award
23 comes to, I've considered whether some reduction is --
24 reduction from the request, something below $25,000 is most
25 appropriate.  I find that it is not.

The amount awarded is about 1.8 times the lodestar.
The lodestar is about $41 million. This is reasonable. In
this case the plaintiffs' lawyers took on a contingent basis a
novel, risky case. The result at the outset was uncertain, and
it remained, until there was a settlement, uncertain.

The plaintiffs' counsel were required to develop a
novel case. This is not a situation where they piggybacked on
the work of a public agency that had made certain findings.
They were required to be pioneers to a certain extent. They
were required to engage in substantial discovery that included
production of nine million documents. They engaged in arduous
arm's length negotiation that included 19 mediation sessions.
They had to stand up on behalf of the class to experienced,
able, energetic, formidable adversaries. They did that. And
as I said, they generated a fair and reasonable return for the
class, $300 million.

The litigation expenses of $1,257,697.94 are also
reasonable. Service awards have become increasingly common.
They provide an incentive to name plaintiffs to participate
actively in the litigation in exchange for reimbursement for
their pursuit on behalf of the overall class, as Judge Woodlock
wrote in *Bezdek*, 79 F. Supp. 3d at 352. And I think that's a
positive thing, to have sophisticated institutional investors
who are capable of being true partners with their lawyers and
directing the litigation and making decisions. So I find

1    $25,000 to Arkansas Teachers and $10,000 to each of the six

2    ERISA plaintiffs to be fully justified in the circumstances of

3    this case.

4         So I believe I've decided everything I need to decide.

5    Is that correct?

6         MR. GOLDSMITH:  Yes, Your Honor.  Thank you.  Thank

7    you very much indeed.  If it would assist the Court, we have

8    orders that we can hand up.

9         THE COURT:  I have them.  You filled in the blanks?

10        MR. GOLDSMITH:  I did on the off-chance that Your

11   Honor --

12        THE COURT:  Okay.  I didn't.  You were evidently more

13   certain about how this was going to come out than I was.

14        MR. GOLDSMITH:  Well, a man can dream.

15        THE COURT:  So these, I take it, are the same as the

16   orders that I reviewed, correct?

17        MR. GOLDSMITH:  Yes, sir, yes.

18        THE COURT:  Except the blanks are filled in?

19        MR. GOLDSMITH:  Yes.  Those are the orders we filed

20   with our reply brief, to be clear.

21        THE COURT:  Right.  I'm just striking out where it

22   says "Proposed" before "Order" on the first page of each of

23   these.  How many orders should I sign?

24        MR. GOLDSMITH:  There are three, Your Honor.

25        THE COURT:  It says there's going to be a separate

order on attorneys' fees.  Which order has your attorneys'

fees?

MR. GOLDSMITH:  I'm sorry.  There's one.

THE COURT:  Just a second.

Okay.  There were three.  All right.  I've signed the

three orders.  If you wait a while, Mr. Hohler will give you

copies of them even before docketing them.

MR. GOLDSMITH:  Thank you.

THE COURT:  Mr. Chiplock will take you all out to

dinner now that he's got two of these, everybody on the

plaintiffs' side.

I commend you.  This was a challenging case.  You

worked exceptionally hard to settle it.  It's taken five and a

half years I think.  But I think it's maybe a good model for

certain other cases because I do think it was in the

enlightened self-interests of the defendant to try to settle

with its clients and valued clients and get a global resolution

with the regulators and took a lot of hard work by the named

plaintiffs and plaintiffs' counsel to get to a mutually

acceptable point.  So I commend you for doing that.

Court is in recess.

(Adjourned, 3:15 p.m.)

1

2                    CERTIFICATE OF OFFICIAL REPORTER

3

4              I, Kelly Mortellite, Registered Merit Reporter

5       and Certified Realtime Reporter, in and for the United States

6       District Court for the District of Massachusetts, do hereby

7       certify that pursuant to Section 753, Title 28, United States

8       Code that the foregoing is a true and correct transcript of the

9       stenographically reported proceedings held in the

10      above-entitled matter and that the transcript page format is in

11      conformance with the regulations of the Judicial Conference of

12      the United States.

13                         Dated this 6th day of November, 2016.

14

15                         /s/ Kelly Mortellite

16                         _____

17                         Kelly Mortellite, RMR, CRR

18                         Official Court Reporter

19

20

21

22

23

24

25