UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT SYSTEM,    )
on behalf of itself and all others     )
similarly situated,                    )
     Plaintiff                         )
                                       )
                                       ) C.A. No. 11-10230-MLW
        v.                           )
                                       )
STATE STREET BANK AND TRUST COMPANY,   )
     Defendants.                       )

ARNOLD HENRIQUEZ, MICHAEL T.           )
COHN,WILLIAM R. TAYLOR, RICHARD A.     )
SUTHERLAND, and those similarly        )
situated,                              )
     Plaintiff                         )
                                       )
        v.                           ) C.A. No. 11-12049-MLW
                                       )
STATE STREET BANK AND TRUST COMPANY,   )
     Defendants.                       )

THE ANDOVER COMPANIES EMPLOYEE         )
SAVINGS AND PROFIT SHARING PLAN, on    )
behalf of itself, and JAMES            )
PEHOUSHEK-STANGELAND and all others    )
similarly situated,                    )
     Plaintiff                         )
                                       )
        v.                           ) C.A. No. 12-11698-MLW
                                       )
STATE STREET BANK AND TRUST COMPANY,   )
     Defendants.                       )

MEMORANDUM AND ORDER

WOLF, D.J.                                    February 6, 2017


     I.   SUMMARY

     Questions have arisen with regard to the accuracy and
reliability of information submitted by plaintiffs' counsel on

which the court relied, among other things, in deciding that it was reasonable to award them almost $75,000,000 in attorneys' fees and more than $1,250,000 in expenses. The court now proposes to appoint former United States District Judge Gerald Rosen as a special master to investigate those issues and prepare a Report and Recommendation for the court concerning them. After providing plaintiffs' counsel an opportunity to object and be heard, the court would decide whether the original award of attorneys' fees remains reasonable, whether it should be reduced, and, if misconduct has been demonstrated, whether sanctions should be imposed.

The court is now, among other things, providing plaintiffs' counsel the opportunity to consent or to object to: the appointment of a special master generally; to the appointment of Judge Rosen particularly; and to the proposed terms of any appointment. A hearing to address the possible appointment of a special master will be held on March 7, 2017, at 10:00 a.m.

II. BACKGROUND

After a hearing on November 2, 2016, the court approved a $300,000,000 settlement in this class action in which it was alleged that defendant State Street Bank and Trust overcharged its customers in connection with certain foreign exchange transactions. It also employed the "common fund" method to determine the amount of attorneys' fees to award. See In re

Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 305 (1st Cir. 1995).  The court found to be reasonable an award to class counsel of $74,541,250 in attorneys' fees and $1,257,697.94 in expenses.  That award represented about 25% of the common fund.

Like many judges, and consistent with this court's long practice, the court tested the reasonableness of the requested award, in part, by measuring it against what the nine law firms representing plaintiffs stated was their total "lodestar" of $41,323,895.75.  See Nov. 2, 2016 Transcript ("Tr.") at 30-31, 34; see also Manual for Complex Litigation (Fourth) § 14.122 (2004) ("the lodestar is . . . useful as a cross-check on the percentage method" of determining reasonable attorneys' fees); Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050 (9th Cir. 2002) ("[T]he lodestar may provide a useful perspective on the reasonableness of a given percentage award.").  Plaintiffs' counsel represented that the total requested award involved a multiplier of $1.8%, which they argued was reasonable in view of the risk they undertook in taking this case on a contingent fee.  See Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees (Docket No. 103-1) at 24-25 ("Fees Award Memo").

A lodestar is properly calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.  See Blum v. Stenson, 465 U.S. 886, 889 (1984).  The

Supreme Court has instructed that "[r]easonable fees . . . are to be calculated according to the prevailing rates in the relevant community." Id. at 895. "[T]he rate that private counsel actually charges for her services, while not conclusive, is a reliable indicum of market value." United States v. One Star Class Sloop Sailboat built in 1930 with hull no. 721, named "Flash II", 546 F.3d 26, 40 (1st Cir. 2008)(emphasis added).[1]

In their memorandum in support of the fee request, plaintiffs' counsel represented that to calculate the lodestar they had used "current rather than historical billing rates," for attorneys working on this case. Fees Award Memo. (Docket No. 103-1) at 24. Similarly, in the related affidavits filed on behalf of each law firm counsel stated that "the hourly rates for the attorneys and professional support staff in my firm . . . are the same as my firm's regular rates charged for their services . . . ." See, e.g., Declaration of Garett J. Bradley on behalf of Thornton Law Firm LLP ("Thornton") (Docket No. 104-16) at ¶4; Declaration of Lawrence A. Sucharow on behalf of Labaton Sucharow LLP ("Labaton") (Docket No. 104-15) at ¶7. In view of the well-established jurisprudence and the representations of counsel, the court understood that in calculating the lodestar plaintiffs' law firms

_____

[1] The First Circuit cited a common fund case, In re Cont'l III Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992), for this proposition.

had used the rates they each customarily actually charged paying clients for the services of each attorney and were representing that those rates were comparable to those actually charged by other attorneys to their clients for similar services in their community.

On November 10, 2016, David J. Goldsmith of Labaton, on behalf of plaintiffs' counsel, filed the letter attached hereto as Exhibit A (Docket No. 116). Mr. Goldsmith noted that the court had used the lodestar calculated by counsel as a check concerning the reasonableness of the percentage of the common fund requested for attorneys' fees. Id. at 3, n.4. Counsel stated that as a result of an "inquiry from the media" "inadvertent errors [had] just been discovered in certain written submissions from Labaton Sucharow LLP, Thornton Law Firm LLP, and Lieff Cabraser Heiman & Bernstein LLP supporting Lead Counsel's motion for attorneys' fees . . . ." Id. at 1. Counsel reported that the hours of certain staff attorneys, who were paid by the hour primarily to review documents, had been included in the lodestar reports of more than one firm. Id. at 1-2. He also stated that in some cases different billing rates had been attributed to particular staff attorneys by different firms. Id. at 3.

The double-counting resulted in inflating the number of hours worked by more than 9,300 and inflating the total lodestar by more than $4,000,000. Id. at 2-3. As a result, counsel stated a multiplier of 2, rather than 1.8, should have been used to test

the reasonableness of the request for an award of $74,541,250 as attorneys' fees.  Id. at 3.  Counsel asserted that the award nevertheless remained reasonable and should not be reduced.  Id. The letter did not indicate that the reported lodestar may not have been based on what plaintiffs' counsel, or others in their community, actually customarily charged paying clients for the type of work done by the staff attorneys in this case.  Nor did the letter raise any question concerning the reliability of the representations concerning the number of hours each attorney reportedly worked on this case.

    Such questions, among others, have now been raised by the December 17, 2016 Boston Globe article headlined "Critics hit law firms' bills after class action lawsuits" which is attached as Exhibit B.  For example, the article reports that the staff attorneys involved in this case were typically paid $25-$40 an hour.  In calculating the lodestar, it was represented to the court that the regular hourly billing rates for the staff attorneys were much higher -- for example, $425 for Thornton, see Docket No. 104-15 at 7-8 of 14, and $325-440 for Labaton, see Docket No. 104-15 at 7-8 of 52.  A representative of Labaton reportedly confirmed the accuracy of the article in this respect.  See Ex. B at 3.

    The court now questions whether the hourly rates plaintiffs' counsel attributed to the staff attorneys in calculating the lodestar are, as represented, what these firms actually charged

for their services or what other lawyers in their community charge paying clients for similar services. This concern is enhanced by the fact that different firms represented that they customarily charged clients for the same lawyer at different rates. In general, the court wonders whether paying clients customarily agreed to pay, and actually paid, an hourly rate for staff attorneys that is about ten times more than the hourly cost, before overhead, to the law firms representing plaintiffs.

In addition, the article raises questions concerning whether the hours reportedly worked by plaintiffs' attorneys were actually worked. Most prominently, the article accurately states that Michael Bradley, the brother of Thornton Managing Partner Garrett Bradley, was represented to the court as a staff attorney who worked 406.40 hours on this case. See Docket No. 104-15 at 7 of 14. Garrett Bradley also represented that the regular rate charged for his brother's services was $500 an hour. Id. However the article states, without reported contradiction, that "Michael Bradley . . . normally works alone, often making $53 an hour as a court appointed defendant in [the] Quincy [Massachusetts] District Court." Ex. B at 1. These apparent facts cause the court to be concerned about whether Michael Bradley actually worked more than 400 hours on this case and about whether Thornton actually regularly charged paying clients $500 an hour for his services.

The acknowledged double-counting of hours by staff attorneys and the matters discussed in the article raise broader questions about the accuracy and reliability of the representations plaintiffs' counsel made in their calculation of the lodestar generally. These questions -- which at this time are only questions -- also now cause the court to be concerned about whether the award of almost $75,000,000 in attorneys' fees was reasonable.

III. THE PROPOSED SPECIAL MASTER

In view of the foregoing, the court proposes to appoint a special master to investigate and report concerning the accuracy and reliability of the representations that were made in connection with the request for an award of attorneys' fees and expenses, the reasonableness of the award of $74,541,250 in attorneys' fees and $1,257,697.94 in expenses, and any related issues that may emerge in the special master's investigation. In the final judgment entered on November 11, 2016, the court retained jurisdiction over, among other things, the determination of attorneys' fees and other matters related or ancillary to them. See Final Judgment (Docket No. 110) at 10. Federal Rule of Civil Procedure 23(h)(4) states that in class actions "the court may refer issues related to the amount of the [attorneys' fee] award to a special master . . . as provided in Rule 54(d)(2)(D)." Federal Rule of Civil Procedure 54(d)(2)(D) states that "the court may refer issues concerning the value of services to a special master under Rule 53 without regard

to the limitations of Rule 53(a)(1)." As the 1993 Advisory Committee's Note explains, "the rule [] explicitly permits . . . the court to refer issues regarding the amount of a fee award in a particular case to a master under Rule 53. . . . This authorization eliminates any controversy as to whether such references are permitted . . . ." Fed. R. Civ. P. 54 Advisory Committee's Note to 1993 Amendment.

The court proposes to exercise this authority to appoint Gerald Rosen, a recently retired United States District Judge for the Eastern District of Michigan, to serve as special master; Judge Rosen's biography is attached as Exhibit C. The court proposes to authorize Judge Rosen to investigate all issues relating to the award of attorneys' fees in this case. If appointed, he would be empowered to, among other things, subpoena documents from plaintiffs' counsel and third parties, interview witnesses, and take testimony under oath. Judge Rosen would be authorized to communicate with the court _ex_ _parte_ on procedural matters, but encouraged to minimize _ex_ _parte_ communications, and to avoid them if possible. He would be expected to complete his duties within six-months of his appointment, if possible.

At the conclusion of his investigation, Judge Rosen would prepare for the court a Report and Recommendation concerning: (1) the accuracy and reliability of the representations made by plaintiffs' counsel in their request for an award of attorneys'

fees and expenses, including, but not limited to, whether counsel employed the correct legal standards and had proper factual bases for what they represented to be the lodestar for each firm and the total lodestar; (2) the reasonableness of the amount of attorneys' fees and expenses that were awarded, including whether they should be reduced; and (3) whether any misconduct occurred; and, if so, (4) whether it should be sanctioned, see, e.g., In re: Deepwater Horizon, 824 F.3d 571, 576-77 (5th Cir. 2016). The court would provide plaintiffs' counsel an opportunity to object to the Report and Recommendation and, if appropriate, conduct a hearing concerning any objections. See Fed. R. Civ. Proc. 53(f)(1). The special master's report would be reviewed pursuant to Federal Rule of Civil Procedure 53(f)(3), (4) & (5).

Judge Rosen would be compensated at his regular hourly rate as a member of JAMS of $800 an hour or $11,000 a day.[2] Judge Rosen could be assisted by other attorneys and staff, who would be compensated at a reasonable rate approved in advance by the court. Judge Rosen and anyone assisting him would also be reimbursed for their reasonable expenses.

The fees and expenses of the Special Master would be paid, by the court, from the $74,541,250 awarded to plaintiffs' counsel.

---

[2] The court notes that plaintiffs' counsel reported billing rates of up to $1,000 an hour. See, e.g., Docket No. 104-17 at 8 of 135.

The court may order that up to $2,000,000 be returned to the Clerk
of the District Court for this purpose.

As required by Federal Rule of Civil Procedure 53(b)(3)(A),
Judge Rosen has submitted an affidavit disclosing whether there is
any ground for his disqualification under 28 U.S.C. §455, which is
attached as Exhibit D.  The only matter disclosed relates to
Elizabeth Cabraser, a partner in one of plaintiffs' law firms.
Ms. Cabraser reportedly worked 29.50 hours on this case.  Judge
Rosen reports that about four years ago he asked Ms. Cabraser to
become, with him and others, a co-author of the book <u>Federal
Employment Litigation</u>.  Since then they have had annually,
independently submitted updates to different chapters of the book.
They, and the other authors, share royalties from the book.  In
addition, Judge Rosen and Ms. Cabraser have participated together
on panels on class actions.  Although at least one lawyer from
plaintiffs' law firms has appeared before Judge Rosen, Judge Rosen
has had no other association with any of them.

Judge Rosen represents that he has no bias or prejudice
concerning anyone involved in this matter, or any personal
knowledge of potentially disputed facts concerning it.  Therefore,
it does not appear that his disqualification would be required by
28 U.S.C. §455(b)(1).  It also appears to Judge Rosen and the court
that his relationship with Ms. Cabraser could not cause a
reasonable person to question his impartiality.  Therefore, it

appears that his recusal would not be justified pursuant to §455(a). See United States v. Sampson, 12 F. Supp. 3d 203, 205-08 (D. Mass. 2014) (Wolf, D.J.) (discussing standards for recusal under §455(a)).[3]

However, the court is providing plaintiffs' counsel the opportunity to consent to the appointment of Judge Rosen as special master on the terms discussed in this Memorandum, register any objections, and/or comment on the proposal. Among other things, plaintiffs' counsel may propose alternative eligible candidates for possible appointment. See Fed. R. Civ. P. 53(b)(1).[4]

IV. ORDER

In view of the foregoing it is hereby ORDERED that:

1. Plaintiffs' counsel shall file by February 20, 2017, a memorandum addressing, among other things deemed relevant: whether they object to the appointment of a special master; whether they object to the selection of Judge Rosen if a special master is to

---

[3] Ideally, the court would propose a special master who presents no question of possible recusal. However, the court has found in exploring potential candidates to serve as special master that lawyers in larger law firms are unavailable because their firms have adversarial relationships with plaintiffs' counsel in other cases. Therefore, the court concluded that proposing a recently retired judge would be most feasible and appropriate.

[4] Any proposed alternative candidate must file an affidavit demonstrating that he or she does not have any conflict of interest and is not subject to disqualification pursuant to 28 U.S.C. §455.

be appointed; whether they believe Judge Rosen's disqualification would be required under 28 U.S.C. § 455(a) or (b) and, in any event, whether they waive any such ground for disqualification; whether they object to any of the terms of the appointment and powers of a special master discussed in this Memorandum; and whether they propose the appointment of someone other than Judge Rosen as special master. Counsel shall provide an explanation, with supporting authority, for any objection or comment.

2. A hearing to address the proposed appointment of a special master generally, and Judge Rosen particularly, shall be held on March 7, 2017, at 10:00 a.m. Each of plaintiffs' counsel who submitted an affidavit in support of the request for an award of attorney's fees, see Docket Nos. 104-15 - 104-24, shall attend.[5] Michael Bradley shall also attend. In addition the representative of each lead plaintiff who supervised this litigation (not a lawyer) shall attend.[6]

---

[5] Such counsel are: Lawrence A. Sucharow of Labaton; Garrett J. Bradley of Thornton; Daniel P. Chiplock of Lieff, Cabraser, Heimann & Bernstein, LLP; Lynn Sarko of Keller Rohrback LLP; J. Brian McTigue of McTigue Law; Carl S. Kravtiz of Zuckerman Spaeder LLP; Catherine M. Campbell of Feinberg, Campbell & Zack, PC; Jonathan G. Axelrod of Beins, Axelrod, PC; and Kimberly Keevers Palmer of Richardson, Patrick, Westbrook & Brickman, LLC.

[6] Such individuals are: George Hopkins on behalf of Arkansas Teacher Retirement System; Arnold Henriquez; Michael T. Cohn; William R. Taylor; Richard A. Sutherland; James Pehoushek-

Judge Rosen shall also be present and may be questioned. Regardless of whether Judge Rosen is appointed special master, the court will order that he receive reasonable compensation for his time and expenses from the fee award previously made to plaintiffs' counsel.

/s/ Mark L. Wolf

_____

UNITED STATES DISTRICT JUDGE

---

Stangeland; and Janet A. Wallace on behalf of The Andover Companies Employee Savings and Profit Sharing Plan.

# EXHIBIT A

# Labaton Sucharow

David J. Goldsmith
Partner
212 907 0879 direct
212 883 7079 fax
dgoldsmith@labaton.com

November 10, 2016

By ECF

Hon. Mark L. Wolf
United States District Judge
United States District Court
District of Massachusetts
John Joseph Moakley
    United States Courthouse
1 Courthouse Way
Boston, Massachusetts 02210

Re:    Arkansas Teacher Retirement System v. State Street Bank & Trust Co.,
       No. 11-CV-10230 MLW

Dear Judge Wolf:

We are writing respectfully to advise the Court of inadvertent errors just discovered in certain written submissions from Labaton Sucharow LLP, Thornton Law Firm LLP, and Lieff Cabraser Heimann & Bernstein LLP supporting Lead Counsel's motion for attorneys' fees, which the Court granted following the fairness hearing held on November 2, 2016. *See* Order Awarding Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs ("Fee Order," ECF No. 111).

These mistakes came to our attention during internal reviews that were conducted in response to an inquiry from the media received after the hearing. The purpose of this letter is to disclose the error and provide a corrected lodestar and multiplier. We respectfully submit that the error should have no impact on the Court's ruling on attorneys' fees.

As the Court is aware, the submissions supporting Lead Counsel's fee application included individual declarations submitted on behalf of Labaton Sucharow, Thornton, and Lieff Cabraser, reporting each firm's lodestar and number of hours billed. *See* ECF Nos. 104-15, at 7-9; 104-16, at 7-8; 104-17, at 8-9; *see also* ECF No. 104-24 (Master Chart).

The professionals and paraprofessionals listed in these firms' respective lodestar reports include persons denoted as Staff Attorneys, or "SAs." SAs are bar-admitted, experienced attorneys hired on a temporary, though generally long-term, basis, and are paid by the hour. The SAs in this action

# Labaton
# Sucharow

were tasked principally with reviewing and analyzing the millions of pages of documents produced by State Street.

Seventeen (17) of the SAs listed on the Thornton lodestar report are also listed as SAs on the Labaton Sucharow lodestar report.[1] Six (6) of the SAs listed on the Thornton lodestar report are also listed as SAs on the Lieff Cabraser lodestar report.[2] Both sets of overlap reflect the fact that as the litigation proceeded, efforts were made to share costs among counsel, such that financial responsibility for certain SAs located at Labaton Sucharow's and Lieff Cabraser's offices was borne by Thornton.

We have now determined that:

- The hours of the Alper SAs reported in the Thornton lodestar report mistakenly were also reported in the Labaton Sucharow lodestar report.
- Certain hours reported by one of the Alper SAs (S. Dolben) in the Thornton lodestar report mistakenly duplicated certain hours of another Alper SA (D. Fouchong).
- A portion of the hours of two of the Jordan SAs reported in the Thornton lodestar report (C. Jordan and J. Zaul) mistakenly were also reported in the Lieff Cabraser lodestar report.
- The hours of two other Jordan SAs (A. Ten Eyck and R. Wintterle) mistakenly were included in the Lieff Cabraser lodestar report.[3]

Because of these inadvertent errors, Plaintiffs' Counsel's reported combined lodestar of $41,323,895.75, and reported combined time of 86,113.7 hours, were overstated. *See* ECF No. 104-24 (Master Chart).

---

[1] These SAs, listed alphabetically, are D. Alper, E. Bishop, N. Cameron, M. Daniels, S. Dolben, D. Fouchong, J. Grant, I. Herrick, D. Hong, C. Orji, D. Packman, A. Powell, A. Rosenbaum, J. Saad, B. Schulman, A. Vaidya, and R. Yamada (collectively, the "Alper SAs"). *Compare* ECF No. 104-16, at 7-8 (Thornton lodestar report) *with* ECF No. 104-15, at 7-8 (Labaton Sucharow lodestar report).

[2] These SAs, listed alphabetically, are C. Jordan, A. McClelland, A. Ten Eyck, V. Weiss, R. Wintterle, and J. Zaul (collectively, the "Jordan SAs"). *Compare* ECF No. 104-16, at 7 (Thornton lodestar report) *with* ECF No. 104-17, at 8 (Lieff Cabraser lodestar report).

[3] The lodestar reports in the individual firm declarations submitted by ERISA counsel (ECF Nos. 104-18 to 104-23) are unaffected.

# Labaton
# Sucharow

We have corrected these errors by removing the duplicative time. When a given SA had different hourly billing rates, we removed the time billed at the higher rate. Deducting the duplicative time from the $41.32 million reported combined lodestar results in a reduced combined lodestar of **$37,265,241.25**, and a reduced combined time of 76,790.8 hours.

Cross-checking the $37.27 million reduced combined lodestar against the $74,541,250 percentage-based fee awarded by the Court yields a lodestar multiplier of **2.00**.[4] This is higher than the 1.8 multiplier we proffered in our submissions and during the hearing.

Plaintiffs' counsel respectfully submits that a 2.00 multiplier remains reasonable and well-within the range of multipliers found reasonable for cross-check purposes in common fund cases within the First Circuit, and that such an enhancement of the reduced lodestar represented by the 24.85% fee awarded by the Court remains well-supported by the $300 million Settlement obtained and fees awarded in comparable cases. *See* Fee Brief, ECF No. 103-1, at 24-25.

Accordingly, Plaintiffs' counsel respectfully submits that the Court should adhere to its ruling on attorneys' fees. *See* Fee Order ¶¶ 4, 6 (ECF No. 111)[5]; Nov. 2, 2016 Hrg. Tr. at 36:1-2 (finding 1.8 multiplier "reasonable").

We sincerely apologize to the Court for the inadvertent errors in our written submissions and presentation during the hearing. We are available to respond to any questions or concerns the Court may have.

Respectfully submitted,

David J. Goldsmith

---

[4] The Court found it "appropriate in this case to use the percentage of the common fund approach in determining the amount of attorneys' fees that should be awarded." Nov. 2, 2016 Hrg. Tr. at 22:25-23:2; *see also id.* at 35:12-13 ("I have used the percentage of common fund method. I've used the reasonable lodestar to check on that.").

[5] The Fee Order, at Paragraph 6(d), references the approximately 86,000 combined hours and $41.32 million combined lodestar reported in our written submissions.

**Labaton**
**Sucharow**

Hon. Mark L. Wolf
United States District Judge
November 10, 2016
Page 4

DJG/idi

cc:     All Counsel of Record
        (by ECF)

<u>Certificate of Service</u>

I certify that on November 10, 2016, I caused the foregoing Letter to be filed through the ECF system in the above-captioned action, and accordingly to be served electronically upon all registered participants identified on the Notices of Electronic Filing.

*/s/ David J. Goldsmith*

David J. Goldsmith

# EXHIBIT B

SPOTLIGHT FOLLOW-UP

# Critics hit law firms' bills after class-action lawsuits

**By Andrea Estes** | GLOBE STAFF  DECEMBER 17, 2016

Attorneys at the Thornton Law Firm had just helped win a $300 million settlement from State Street Bank and Trust in a complicated lawsuit involving eight other law firms. Now, it was time to submit their legal fees to the judge so that they could get paid.

That's when the younger brother of Thornton managing partner Garrett Bradley emerged as a $500-an-hour "staff attorney" at the Boston firm.

Michael Bradley is a lawyer, but he normally works alone, often making $53 an hour as a court-appointed defender in Quincy District Court, records show. Yet, according to his older brother's sworn statement on Sept. 14, 2016, Michael Bradley's services were worth nearly 10 times that rate in the State Street case.

The elder Bradley said Michael worked 406.4 hours on the lawsuit, which centered on international currency trades, at a cost of $203,200.

Michael Bradley wasn't the only lawyerfor whose work Thornton claimed stratospheric — and questionable — legal costs in the filing to US District Court Judge Mark L. Wolf. Garrett Bradley listed 23 other staff attorneys, each with hourly rates of $425, who collectively accounted for $4 million in costs.



View Story

# Law firm 'bonuses' tied to political donations

A small Boston law firm became a top funder of the national Democratic Party by paying lawyers "bonuses" for their political donations.

**Candidates returning donations from Thornton Law Firm attorneys**

**Hassan to return law firm's donations**

---

But one of the lawyers told the Globe he was actually paid just $30 an hour for his services — and not by Thornton. Like all the other staff attorneys on Garrett Bradley's list, except his brother, he worked for another firm in the case, which also counted his hours on its list of costs.

The sworn statement by Garrett Bradley — until recently an assistant House majority leader on Beacon Hill — raises troubling questions about the way Thornton and the other firms that brought the State Street lawsuit tallied legal costs to justify their enormous $75.8 million payday.



BRADLEY FOR SELECTMAN

**Michael Bradley, Quincy attorney.**

More than 60 percent of the costs that Thornton and two other law firms submitted to Judge Wolf came from the work of staff attorneys — all of them assigned hourly rates at least 10 times higher than the $25 to $40 an hour typical for these low-level positions — which involves document review.

A spokesman for the lead law firm in the case acknowledged that hourly rates the firms listed for staff attorneys were above the lawyers' actual wages, but argued that, essentially, everyone does it. Diana Pisciotta, spokeswoman for the Labaton Sucharow law firm in New York City, called it "commonly accepted practice throughout the legal community."

Critics of the way lawyers are paid in class-action lawsuits acknowledge that firms often dramatically mark up the rates of their lower-paid attorneys when seeking legal fees in court, but they say Thornton has pushed the practice to an extreme.

"This happens all the time," said Ted Frank, a lawyer at the Competitive Enterprise Institute in Washington and a leading national critic of legal fees in class-action lawsuits. "Lawyers pad their bills with overstated hourly work to make their fee request seem less of a windfall."

Lawyers in class-action lawsuits commonly receive a major share of any settlement because they are taking the risk that, if they lose, they will be paid nothing.

In fact, plaintiffs in the State Street case, many of them public pension funds, agreed in advance to set aside a quarter of any settlement for attorneys in their lawsuit alleging that the Boston-based bank routinely overcharged clients for their foreign currency exchanges, costing them more than $1 billion.

But, to actually collect the money, lawyers document their costs by filing affidavits under penalty of perjury.

The accounting must be based on actual time records, listing the names and hourly rates of the lawyers who worked on the case, and the total amount billed. The hourly rate is supposed to be what the lawyer would charge a paying client for

similar work, including the lawyer's salary and a markup for office costs and other expenses.

Comments

That's where, critics of contingency fee lawsuits say, lawyers have a built-in opportunity to inflate their bills. And, for a variety of reasons, their bills often get little scrutiny.

"Imagine you're a lawyer and you're allowed to write your own check for your fee," explained Lester Brickman, a Yeshiva University law professor and author of "Lawyer Barons: What Their Contingency Fees Really Cost America."

"I could write $3,000, but I could add a zero and write $30,000 or add two zeroes and charge $300,000," Brickman said. "That's the honor system."

Thornton officials insist that they did nothing wrong and that the 23 staff attorneys who actually work for Labaton or a firm in San Francisco belonged on Thornton's list.

Under a cost-sharing agreement between the firms, Thornton paid part of their wages while they were reviewing millions of pages of documents in the State Street case. These lawyers just receive their usual salary and don't share in the proceeds from the settlement.

Garrett Bradley's brother, by contrast, will receive the $203,200 listed for him on the filing to Judge Wolf, according to Thornton spokesman Peter Mancusi, who noted that Michael Bradley, unlike the other staff attorneys, was not paid previously for his work.

Neither Michael Bradley nor a spokesman for Thornton would say what he did on the case, but the spokesman described him as an experienced prosecutor and fraud investigator.

Globe questions about the legal bills prompted the lead law firm in the State Street case to submit an extraordinary letter to Judge Wolf admitting that Thornton and

$4 million. The author, David Goldsmith of Labaton Sucharow, blamed the inflated bills on "inadvertent errors."

According to Goldsmith's Nov. 10 letter, Labaton and another firm, Lieff Cabraser Heimann & Bernstein, claimed the same staff attorneys that Thornton had listed on its legal expenses, double-counting the lawyers' cost. Goldsmith said the double-counted lawyers were employees of either Labaton or Lieff Cabraser, but their hours and costs should have been counted only once — by Thornton Law.

To resolve the issue, he said, the other firms dropped the lawyers and Thornton lowered the hourly rate it charged for numerous staff attorneys because it had assigned a higher rate than the other firms.

Despite the resulting drop in combined legal fees, Goldsmith urged Wolf not to reduce the lawyers' payment from the settlement. In class-action cases, lawyers commonly receive a payment that not only covers costs, but a financial reward for bringing a risky case that could have failed and paid nothing.

Goldsmith suggested that Wolf simply boost the reward to offset the reduced legal fees so that the firms still split the same $74 million, including $14 million for Thornton.

"We respectfully submit that the error should have no impact on the court's ruling on attorneys' fees," wrote Goldsmith, whose firm often joins forces with Thornton.

That may not be enough to satisfy Wolf, who has a reputation for closely questioning claims made in his court.

He called the legal fees "reasonable" at a Nov. 2 hearing and praised the plaintiffs' lawyers for taking on a "novel, risky case." But he approved the fees in part based on sworn statements that the lawyers now admit were in error. Wolf could reduce their payments, which were issued earlier this month, or hold a hearing to determine whether the lawyers knowingly submitted false information, a serious breach of professional ethics.

"The double-counting was likely the result of sloppiness, assuming that there would be no objectors' or court scrutiny of the fee request," said Frank, who has successfully challenged several settlements and fee requests in other cases, recouping more than $100 million for class members.

Get **Fast Forward** in your inbox:

Forget yesterday's news. Get what you need today in this early-morning email.

Enter email address

**Sign Up**

Frank said the problems with the legal fees go beyond the double-counting of attorneys. Other law firms contacted by the Globe said it's common to list an hourly rate for an attorney several times higher than the attorney's own pay, because the law firm has many other expenses aside from the lawyer him or herself. However, Thornton listed attorneys' rates at up to 14 times the lawyer's wages.

Frank said his analysis suggests that the $75.8 million award to the nine law firms was excessive — by at least $20 million and as much as $48.3 million — in part because the lawyers asked too much in the first place. He said that the lawyers' own documents show that, in similarly sized settlements, the legal fees average only 17.8 percent.

Thornton Law Firm, a personal injury firm that specializes in asbestos-related cases, is already the target of three investigations for its controversial campaign contribution program in which the law firm paid millions of dollars in "bonuses" to partners that offset their political contributions.

Federal prosecutors as well as two other agencies are investigating whether the bonuses were an illegal "straw donor" scheme to allow the firm to vastly exceed limits on campaign contributions. Thornton officials have insisted they did nothing wrong, because the bonuses were paid out of the lawyers' own equity in the firm.

Thornton's legal fees in the State Street case feed into a larger debate about how lawyers get paid in class-action lawsuits. Defenders of paying lawyers on contingency say the prospect of a high payoff encourages lawyers to take on exceptionally difficult cases, such as suing a wealthy bank like State Street.

However, Frank said there's little oversight of lawyers' fee claims. Defendants usually don't care what the plaintiffs' lawyers receive, because their costs don't change regardless of how much the plaintiffs' lawyers receive.

And individual plaintiffs typically get too little money to have a strong incentive to challenge legal fees. In the State Street case, the 1,300 plaintiffs would see increases in their individual payments of only about $20,000 apiece if the lawyers' fees were reduced by $20 million, Frank calculated. A plaintiff might have to spend that much or more to hire another lawyer to investigate.

None of the plaintiffs in the State Street case objected to their lawyers' request for legal fees. But neither the lawyers nor their clients apparently noticed that the exact same hours for nearly two dozen staff attorneys were claimed by more than one law firm.

"The mistakes came to our attention during internal reviews that were conducted in response to an inquiry from the media," explained Labaton partner Goldsmith, in his letter to Wolf.

Nor did they notice that Thornton consistently assigned a higher rate than the other firms for the same attorneys — often a difference of $90 an hour.

Labaton officials, in a prepared statement, said the affidavits supporting the fee request weren't as important as the percentage of the settlement fund the lawyers sought — just over 25 percent, once expenses are added.

"This fee award is reviewed by the Court for fairness . . . we believe the fees awarded are still fair," wrote Diana Pisciotta, a spokeswoman for Labaton.

In addition to its fees from the State Street case, Thornton Law will receive a portion of the $20 million the Securities and Exchange Commission awarded a whistle-blower who alerted regulators to State Street's international currency practices.

# How low-paid lawyers can rack up big legal bills

Comments

Law firms commonly hire junior-level "staff attorneys" to review documents for $25 to $40 an hour. Thornton Law Firm took advantage of these low-paid lawyers to make millions in its lawsuit against State Street Bank.

1 Thornton says it employed 24 staff attorneys in the State Street case.



staff attorneys

2 In court documents, Thornton listed the hourly rates for the staff attorneys at $425 to $500, more than ten times their actual pay.

| One attorney's actual pay | $30 |
| Rate listed by Thornton | $425 |

3 Thornton said the staff attorneys worked more than 10,000 hours on the case at a total cost of $4.5 million, accounting for 60 percent of the total costs of the case.

4 A federal judge approved Thornton's bills, and gave them a bonus for taking on such a risky lawsuit.

5 But there was a problem: 23 of Thornton's 24 staff attorneys were also listed as lawyers for other law firms working on the same case. Thornton and the other law firms double-counted the work of the staff attorneys, inflating their combined bills by $4 million.

6 The lawyers admitted the "inadvertent errors" to the judge and asked him not to reduce their legal fees.

**SOURCE: Court records**

GLOBE STAFF

## Related

- Welsh, Clinton join growing number of politicians returning donations from Thornton Law Firm

EXHIBIT C





**T:** 313-872-1100
**F:** 313-872-1101

**Case Manager**

Donna Vinson
JAMS
400 Renaissance
Center
26th Floor
Detroit, MI 48243
313-872-1100 Phone
313-872-1101 Fax
Email:
dvinson@jamsadr.com

*"Mediation works, and can produce great benefits much more efficiently than other approaches. There are four keys to success: candor, cooperation, creativity and courage. If the Detroit bankruptcy is any guide, early and committed use of mediated negotiation is likely to produce benefits that otherwise might never be achievable."*
*-Hon. Gerald E. Rosen (Ret.)*

*"Judge Rosen was indispensable and critical to the successful conclusion of the case. He and his fellow mediators were heroic in their commitment of time*

**Hon. Gerald E. Rosen (Ret.)**

**Hon. Gerald E. Rosen (Ret.)** joins JAMS following 26 years of distinguished service on the federal bench as a United States District Judge for the Eastern District of Michigan, including seven years as that Court's Chief Judge.

While on the bench, Judge Rosen had wide experience in facilitating settlements between parties in a great many cases, including highly complex Multi-District Litigation (MDL) matters and class actions.  Most recently, the Judge served as the Chief Judicial Mediator for the Detroit Bankruptcy case—the largest, most complex municipal bankruptcy in our nation's history—which resulted in an agreed upon, consensual plan of adjustment in just 17 months.

Prior to taking the bench, the Judge was a Senior Partner at the law firm of Miller, Canfield, Paddock and Stone where he was a trial lawyer specializing in commercial, employment and constitutional litigation.

*Read **counsel comments** about Judge Rosen's skills and style as a neutral.*

**ADR Experience and Qualifications**
Judge Rosen has extensive experience in the resolution of complex disputes in the following areas:

- Antitrust
- Bankruptcy (Municipal)
- Business/Commercial
- Class Action/Mass Tort
- Employment/FMLA
- Civil Rights/§1983
- Intellectual Property
- Real Property
- Securities
- Special Master/Discovery Referee

**Representative Matters**

- **Antitrust**
  - *Cason-Merenda v. Detroit Medical Center*, No. 06-15601  (Nurse wage case)
  - *In re Northwest Airlines Corp., et al.*, Antitrust Litigation, No. 96-74711 (Hidden-city ticketing case)
- **Arbitration**
  - *Quixtar Inc. v. Brady*, No. 08-14346, and *Amway Global v. Woodward*, No. 09-12946 (Addressing arbitrability of disputes and confirmation of arbitrator's award)
- **Bankruptcy**
  - *In re: City of Detroit* (Chapter 9 municipal bankruptcy)
  - *United States v. City of Detroit* (Detroit water and sewer case) (Mediated settlements)
- **Class Action/Mass Tort**
  - *Tankersley v. Ameritech Publishing, Inc.* (FLSA collective action and Rule 23 class action)
  - *Marquis v. Tecumseh Products Co.*, No. 99-75971 (Class action alleging sexual harassment at manufacturing plant)
  - *In re Rio Hair Naturalizer Products*, MDL 1055 (Multi-district product liability action)

*and effort in the entire process."*
*-Detroit Bankruptcy Counsel*

*"[Y]ou demonstrate[d] a keen sense of how to get parties moving together and closing deals."*
*-Financial Creditor Party, Detroit Bankruptcy*

- **Employment/FMLA**
  - *Redd v. Brotherhood of Maintenance of Way Employees Division of International Brotherhood of Teamsters*, No. 08-11457 (ERISA)
- **Civil Rights/§1983**
  - *Cheolas v. City of Harper Woods*, No. 06-11885 (Police raid of party with underage drinking)
  - *Flagg v. City of Detroit*, No. 05-74253 (Tamara Greene case)
- **Intellectual Property**
  - *I.E.E. International Electronics & Engineering, S.A. v. TK Holdings Inc.*, No. 10-13487 (Vehicle occupant sensors patent)
  - *Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc.*, No. 04-73461 (Remote-control garage door opener patent)
- **Real Property**
  - *United States v. Certain Land Situated in the City of Detroit* (Detroit International Bridge land condemnation case)
- **Securities**
  - *In re General Motors Corp. Securities and Derivative Litigation*, MDL No. 06-1749
  - *In re Collins & Aikman Corp. Securities Litigation*, No. 03-71173
  - *In re: Delphi Corporation Securities*, Derivative & "ERISA" Litigation, MDL 1725 (Multi-district securities fraud/ERISA action)

**Honors, Memberships, and Professional Activities**

- Widely published on a wide range of topics including, civil procedure, evidence, due process, criminal law, labor law and legal advertising, including:
  - Co-Author, *Federal Civil Trials and Evidence*, The Rutter Group Practice Guide, 1999-Present
  - Co-Author, *Federal Employment Litigation*, The Rutter Group Practice Guide, 2006-2016
  - Co-Author, *Michigan Civil Trials and Evidence*, The Rutter Group Michigan Practice Guide, 2008-2016
  - Contributing Editor, *Federal Civil Procedure Before Trial*, The Rutter Group Practice Guide, 2008-2016
- Co-Chair, Judicial Evaluation Committee for the U.S. District Court for the Eastern District of Michigan, 1983-1988
- Adjunct Professor, Evidence:
  - University of Michigan Law School, 2008
  - Wayne State University Law School, 1992-Present
  - University of Detroit-Mercy Law School, 1994-1996
  - Thomas M. Cooley Law School, 2004-2013
- U.S. Representative, United States Department of State's Rule of Law Program in Moscow, Russia; Tbilisi, Georgia; Beijing, China; Cairo, Egypt, Hebrew University (Jerusalem); and Malta
- Judicial Consultant, United States Departments of State and Justice missions to Thailand and the Ukraine
- Member, Sixth Circuit Judicial Council, 2009-2015
- Member, Board of Directors, Federal Judges Association, 1996-2002
- Member on the Board of Directors of several charitable organizations, including: Focus: HOPE; the Detroit Symphony Orchestra; the Community Foundation of Southeastern Michigan and the Michigan Chapter of the Federalist Society
- Member, Board of Advisors, George Washington University Law School, 2005-Present
- Member, U.S. Judicial Conference, Committee on Criminal Law, 1995-2001
- Founding Member, Michigan Intellectual Property Inn of Court

**Selected Articles About the Detroit Bankruptcy**

- *Howes: Detroit Bankruptcy Kudos Widely Shared*, Detroit News, February 26, 2015.
- *Detroit Bankruptcy Shows Mediation Can Get the Job Done*, Detroit Free Press, January 18, 2015.
- *Detroit Bankruptcy Pros Write Off Millions in Fees*, Detroit Free Press, December 11, 2014.
- *How Detroit Was Reborn*, Detroit Free Press, Special Section, November 9, 2014.
- *Judge, A Mediator in Bankruptcy, Sees Hope for Detroit*, Detroit Free Press, November 9, 2014.

- *Finding $816 Million, and Fast, to Save Detroit*, The New York Times, November 7, 2014.
- Judge Rosen's Tough Tack on Creditors Helped Speed Detroit Bankruptcy Case, Crain's Detroit Business, November 6, 2014.
- *Mediator in Detroit Bankruptcy Walks Fine Line Between City, Creditors*, The Wall Street Journal, February 14, 2014.
- *How Mediation Has Put Detroit Bankruptcy on the Road to Resolution*, Detroit Free Press, February, 2, 2014.
- *Detroit Emerges From Nation's Largest Municipal Bankruptcy*, Los Angeles Times, November 10, 2014.

**Background and Education**

- United States District Judge, Eastern District of Michigan (Detroit), 1990-2017
  - Chief Judge, 2009-2015
  - Judge by Designation, United States Court of Appeals for the Sixth Circuit, Repeated Appointments
- Senior Partner, Miller, Canfield, Paddock and Stone, specializing in commercial, employment, real property, and constitutional litigation, 1979-1990
- J.D., George Washington University Law School, 1979
- Legislative Assistant, United States Senate, Sen. Robert P. Griffin (R-MI), 1974-1979
- B.A., Senior Fellow, Political Science Kalamazoo College, 1973

**Disclaimer**

This page is for general information purposes. JAMS makes no representations or warranties regarding its accuracy or completeness. Interested persons should conduct their own research regarding information on this website before deciding to use JAMS, including investigation and research of JAMS neutrals. See More

EXHIBIT D

AFFIDAVIT OF GERALD E. ROSEN

Gerald E. Rosen, being duly sworn, deposes and says

1. That I make this affidavit based upon personal knowledge.
2. That I served as a United States District Judge for the Eastern District of Michigan from March 14, 1990 through January 31, 2017.
3. That I have been asked by United States District Judge Mark L. Wolf about my availability and ability to serve as the Special Master in a matter involving the application for attorney fees and costs to the Court in the case of *Arkansas Teacher Retirement System on behalf of itself and all others similarly situated v. State Street Bank and Trust Company*, C.A. No. 11-10230 – MLW.
4. That the law firms submitting applications for fees and costs in this matter are: Labaton Sucharow LLP, The Thornton Law Firm LLP, Leiff Cabraser Heimann & Bernstein LLP, Keller Rohrback LLP, McTigue Law LLP, Zuckerman Spaeder LLP, Richardson Patrick Westbrook & Brickman LLC, Beins Axelrod PC, and Feinberg Campbell & Zack PC.
5. That pursuant to FRCivP 53(b)(3)(A) and 28 USC §455, a potential Special Master must disclose any possible conflicts or other grounds for disqualification.
6. That I do not believe there are any grounds for my disqualification to serve as a Special Master under 28 USC §455(b) and that no reasonable person would have grounds to question my impartiality under 28 USC §455(a).
7. That although there are no grounds for disqualification, I do wish to disclose a relationship with one of the named partners of one of the involved law firms, Leiff Cabraser Heimann & Bernstein.
8. That I have known Elizabeth Cabraser of that firm for approximately four years and first met her when she was recommended to me as a potential new co-author of a then-existing book on which I am a co-author, *Federal Employment Litigation*, published by The Rutter Group, a subsidiary of Thomson Reuters.
9. That after I met with Ms. Cabraser and discussed the book, I asked her to join as a co-author. She agreed, and joined the book in 2013. The other current co-authors include Judge Amy St. Eve (ND IL), Judge Marvin Aspen (ND IL), and attorney Thomas Schuck of the Taft Stettinius & Hollister law firm.
10. That each of the five co-authors share an approximate 16% royalty from the publisher, paid semi-annually. The royalty income of one co-author is independent of that of the other co-authors.
11. That the co-authors update the book annually and divide the update work by allocating chapters with each co-author updating two or three chapters. The updates are submitted independently to the publisher, who edits the updates for incorporation into the book.
12. That beyond this, over the past four years I have attended continuing legal education programs with Ms. Cabraser and have spoken with her on two or three panels unrelated to our book.
13. That I have no other relationship with Ms. Cabraser or any other member of her firm.

14. That I have no relationships with any of the other law firms or lawyers in the case. However, it bears mention that one firm, Keller Rohrback LLP, concluded by settlement an antitrust class action before me in 2015-2016, and one of the partners of that firm, Lynn Sarko, was one of the lead lawyers on that case. Other than this, lawyers from the other firms may have appeared before me in cases over my judicial career, but I have no specific recollection of such lawyers.
15. That this affidavit is made under pain and penalty of perjury.

Further affiant sayeth not.

Gerald E. Rosen

3 February 2017