# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) | No. 11-cv-10230 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, | ) ) ) ) | No. 11-cv-12049 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, | ) ) ) ) | |
| Defendants. | ) ) | |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, | ) ) ) ) ) | No. 12-cv-11698 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |

## MOTION BY LIEFF CABRASER HEIMANN & BERNSTEIN, LLP FOR LEAVE TO FILE SURREPLY TO COMPETITIVE ENTERPRISE INSTITUTE'S MOTION FOR LEAVE TO FILE AMICUS CURIAE RESPONSE TO COURT'S ORDER OF

**FEBRUARY 6 AND FOR LEAVE TO PARTICIPATE AS GUARDIAN AD LITEM FOR CLASS OR AMICUS IN FRONT OF SPECIAL MASTER**

Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") respectfully seeks leave to file a surreply of no more than 6 pages responding to certain arguments raised in the Competitive Enterprise Institute's ("CEI's") Reply in Support of Motion for Leave to File *Amicus Curiae* Response to Court's Order of February 6 and for Leave to Participate as *Guardian ad Litem* for Class or *Amicus* in Front of Special Master ("Reply") [ECF No. 154].

Because the Reply incorporates new arguments, a surreply is appropriate. *See Klein v. MHM Corr. Servs.*, C.A. No. 08-11814-MLW, 2010 WL 3245291 (D. Mass. Aug. 16, 2010. In its surreply brief, Lieff Cabraser anticipates addressing the following issues:

1.      CEI Center for Class Action Fairness' ("CCAF's") claim in its Reply that Lieff Cabraser's conduct in *In re Capital One TCPA Litigation*, MDL No. 2416 (N.D. Ill.) is an example of how class counsel "cannot be trusted to play it straight" with the Court (Reply at 5-6);

2.      CCAF's claim that it "refuted" its status as a professional objector in the *Capital One* litigation, and criticizing such arguments as "fallacious," while failing to disclose the prior paid working relationship between its lead attorney (Theodore H. Frank) and well-known professional objectors that was revealed in that litigation (*id.*);

3.      The conduct by CCAF's lead attorney in the *Capital One* litigation, including improper disclosure of client communications; and

4.      A recent opinion and order, dated February 27, 2017, by another United States District Court concerning the conduct of Christopher Bandas, a professional objector with whom Mr. Frank was revealed in *Capital One* to have had a prior paid working relationship.

Lieff Cabraser believes this surreply will assist the Court in its analysis of the issues raised in CEI/CCAF's motion, and the instant motion is not interposed for delay or improper purpose. Counsel for CEI/CCAF has not assented to this motion.

A proposed surreply is attached hereto as Exhibit A. Should the Court grant Lieff Cabraser leave to file, Lieff Cabraser proposes to file its surreply on the day following the Court's grant.

WHEREFORE, Lieff Cabraser respectfully seeks leave to file a surreply to CEI's Reply of up to 6 pages.

Dated:  March 6, 2017

Respectfully submitted,

Lieff Cabraser Heimann & Bernstein, LLP

By:  /s/ Richard M. Heimann
Richard M. Heimann (*pro hac vice*)
Robert L. Lieff (*pro hac vice*)
275 Battery Street, 29th Floor
San Francisco, California  94111
Tel:  (415) 956-1000
Fax:  (415) 956-1008

Steven E. Fineman
Jonathan D. Selbin
Daniel P. Chiplock (*pro hac vice*)
Michael J. Miarmi
250 Hudson Street, 8th Floor
New York, New York  10018
Tel:  (212) 355-9500
Fax:  (212) 355-9592

*Co-counsel for the Plaintiff Class*

## CERTIFICATION PURSUANT TO LOCAL RULE 7.1

I, Richard M. Heimann, hereby certify that on March 5, 2017, CEI/CCAF's counsel Theodore H. Frank and M. Frank Bednarz were notified, by email, that Lieff Cabraser anticipated filing a proposed surreply to CEI's motion for leave to file an *amicus curiae* response to the Court's Order of February 6 and for leave to participate as *guardian ad litem* for the Class or *amicus* in front of the Special Master. In that email, CEI/CCAF's counsel were asked whether they would oppose Lieff Cabraser's requested relief herein. On the evening of March 5, 2017, Mr. Frank, on behalf of CEI/CCAF, indicated his opposition by email to Lieff Cabraser's request for leave to file a surreply. Counsel from Lieff Cabraser and CEI/CCAF met and conferred telephonically on March 6, 2017 and did not come to an agreement on Lieff Cabraser's request for leave to file a surreply.

/s/ Richard M. Heimann

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2017, I instructed and caused the foregoing MOTION BY LIEFF CABRASER HEIMANN & BERNSTEIN, LLP FOR LEAVE TO FILE SURREPLY TO COMPETITIVE ENTERPRISE INSTITUTE'S MOTION FOR LEAVE TO FILE AMICUS CURIAE RESPONSE TO COURT'S ORDER OF FEBRUARY 6 AND FOR LEAVE TO PARTICIPATE AS GUARDIAN AD LITEM FOR CLASS OR AMICUS IN FRONT OF SPECIAL MASTER, to be electronically filed, along with the proposed surreply attached hereto, and a Declaration in support thereof (attaching Exhibits A-D), by using the ECF system, thereby causing a true copy of said documents to be served upon counsel of record for each party identified on the Notice of Electronic Filing.

/s/ Richard M. Heimann

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | No. 12-cv-11698 MLW |

**[PROPOSED] SURREPLY BY LIEFF CABRASER HEIMANN & BERNSTEIN, LLP TO COMPETITIVE ENTERPRISE INSTITUTE'S MOTION FOR LEAVE TO FILE *AMICUS CURIAE* RESPONSE TO COURT'S ORDER OF FEBRUARY 6 AND FOR LEAVE TO PARTICIPATE AS *GUARDIAN AD LITEM* FOR CLASS OR *AMICUS* IN FRONT OF SPECIAL MASTER**

Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser"), co-counsel for the plaintiff class, respectfully submits this surreply in response to the reply memorandum (the "Reply") submitted on March 2, 2017 by the Competitive Enterprise Institute's Center for Class Action Fairness ("CCAF"), which was submitted in further support of CCAF's motion for leave to file an *amicus curiae* response to the Court's Order of February 6, 2017 and for leave to participate as *guardian ad litem* for the class or *amicus* in front of the Special Master [ECF No. 154].

In its Reply, CCAF asserts that class counsel "cannot be trusted to play it straight with this Court" and, in support thereof, invokes CCAF's prior experience "in at least one case where Lieff Cabraser was lead counsel."  Reply at 5.  CCAF further claims that, in that case, it "refuted" any characterization of itself as a "professional objector," and labels such characterizations "fallacious."  *Id.* at 5-6.  CCAF then refers back to the "Frank Memo," (*id.* at 11 n. 5), which had been attached as an exhibit to the Declaration of Theodore H. Frank in Support of Motion for Leave to Participate as *Amicus* and Motion for *Pro Hac Vice* Admittance (the "Frank Decl."), which was in turn attached to his Unopposed Motion for Admission *Pro Hac Vice.* [ECF Nos. 125, 125-1, 125-2].[1]  In the Frank Memo, Mr. Frank claims that CCAF "caught Lieff Cabraser and other firms overbilling by millions of dollars" in *In re Capital One TCPA Litigation*, MDL No. 2416 (N.D. Ill.), and that CCAF "achieved a $7 million reduction of fees at the district-court level," and (further) that CCAF was solely precluded by "legal ethics" from placing "$10 million of excessive fees . . . under appellate scrutiny."  Frank Memo at 4-5 [ECF No. 125-2].

---

[1] Although the Frank Memo has been part of the record since February 17, 2017 (as an exhibit to Mr. Frank's *pro hac vice* application), CCAF did not raise the *Capital One* litigation (and, specifically, Lieff Cabraser's and CCAF's respective roles in it) in its briefing on the instant motion until its Reply.  CCAF's new assertions concerning the parties' conduct in that litigation, including that any characterization of its status or association with professional objectors was "refuted" or is "fallacious," merit this surreply.

Mr. Frank's characterization of *Capital One* is demonstrably wrong, and leaves out critical facts about his misconduct in that case that two academic ethics experts concluded violated ethical obligations to his client.  In fact, the only party "caught" in *Capital One* doing anything improper was Mr. Frank, who, despite holding himself out as working for a non-profit that "refuses to engage in quid pro quo settlements and does not extort attorneys,"[2] was revealed (by his own declaration) to have "moonlighted" writing objections and appeals for other notorious professional objectors who sell objections and/or appeals for profit, to the tune of approximately $250,000 paid to Mr. Frank.  Despite obtaining (unprecedented) discovery access to *all* of Lieff Cabraser's lodestar reports in *Capital One* and other TCPA cases they and their co-counsel had handled for at least four years prior, Mr. Frank did not challenge—and the court in *Capital One* did not question—a single entry or aspect of Lieff Cabraser's (or co-counsel's) lodestar reports and billing records.

The actual, relevant facts of *Capital One* are as follows:

- Lieff Cabraser was one of two co-lead counsel appointed by the Court in that MDL case.  Together with their co-counsel, they secured what was then the largest settlement in the history of the Telephone Consumer Protection Act ("TCPA"): approximately $75.5 million in non-reversionary cash paid into a settlement fund. Class counsel sought attorneys' fees of 30% of that fund, or about $22.6 million in fees, based on $2.2 million in lodestar.  *In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781, 787 (N.D. Ill. 2015) (attached to the Heimann Decl.[3] as Exhibit A).

- CCAF, led by Mr. Frank, objected on behalf of its client Jeffrey Collins.  After seeking and obtaining access to the lodestar reports of Lieff Cabraser and their co-counsel in *Capital One* and every other TCPA case they had handled for the

_____

[2]  *See* Decl. of Theodore H. Frank in Support of Motion for Leave to Participate as *Amicus* and Motion for *Pro Hac Vice* Admittance, ¶ 19 [ECF No. 125-1].

[3]  "Heimann Decl." refers to the Declaration of Richard M. Heimann in Support of Motion for Leave to File Surreply to Competitive Enterprise Institute's Reply in Support of Motion for Leave to File *Amicus Curiae* Response to Court's Order of February 6 and for Leave to Participate as *Guardian ad Litem* for Class or *Amicus* in Front of Special Master.  Any references to "Exhibits" herein are attached to the Heimann Decl., as described *infra*.

previous four years, CCAF put in an expert report effectively arguing that class counsel's fees effectively should be awarded on a lodestar multiplier basis (they proposed a 1.57 multiplier), and that class counsel should be awarded approximately $3.5 million (representing 4.6% of the settlement fund). *Id.* at 807-08.

- The district court held that the percentage of the fund method of calculating fees advocated by class counsel was the correct method for calculating fees, and expressly rejected the model put forth by CCAF and its expert. Applying its own interpretation of Seventh Circuit law (and rejecting CCAF's), the district court held that it should (a) deduct approximately $5 million in notice and claims administration costs from the settlement fund for fee calculation purposes, and (b) apply a sliding scale fee based on the amount of the recovery. The court then awarded class counsel 36% of the first $10 million (30% plus a 6% risk enhancement), 25% of the next $10 million, 20% of the next $10 million, and so on, for a final blended percentage fee of 20.77%, which resulted in a fee award of $15.67 million. *Id.* at 794-95, 807-08;

- Lieff Cabraser's lodestar reports from every TCPA case the firm had litigated for at least four years prior to that point (including *Capital One*) were produced to Mr. Frank. Mr. Frank did not challenge any of the time or work entries in Lieff Cabraser's (or its co-counsel's) reports, and the Court did not question a single entry.

In sum, CCAF's objection was rejected in its entirety—in method applied (effective lodestar vs. percentage), percentage awarded (20.77 vs. 4.6), and total fee ($15.67 million vs. $3.5 million). The district court applied its own fee analysis based on its view of the Seventh Circuit requirements. As a result, it awarded a $15.67 million fee, $7 million less than what class counsel requested, but more than $12 million more than what CCAF argued was proper. Notably, CCAF appealed the district court's order, and class counsel did not. There is nothing in *Capital One* that supports Mr. Frank's claim that class counsel there did anything wrong, that he "caught them" doing anything wrong, or that the district court adopted CCAF's objection there.

Mr. Frank's representations regarding the *Capital One* case are notable for what he leaves out: his own misconduct. On appeal, Christopher Bandas, perhaps the most notorious

professional objector[4] and Mr. Frank's co-counsel, approached class counsel with news that Mr.

Frank's client (Jeffrey Collins) had "fired" Mr. Frank and was interested in settling.[5]   Although

class counsel previously had refused to negotiate with any objectors/appellants in the case

(despite outreach by the Seventh Circuit mediator to do so), class counsel ultimately agreed to

settle Mr. Collins' objection for $25,000 of their own money in order to avoid further delay in

payments to the class.  Pls. Br. at 9, 19.  Mr. Frank then filed papers with the Seventh Circuit

improperly revealing the substance of his client's privileged communications with CCAF and

criticizing his client for settling.  *Id.* at 10 (and Exhibit D to Heimann Decl.).  He also made

vague accusations that class counsel violated unspecified ethical rules by settling with his client.

Class counsel retained two well-regarded ethics experts to opine on their settlement of Collins'

appeal.  Both concluded that there was absolutely no wrongdoing on class counsel's part.  *Id.* at

10-12.[6]  Contemporaneously, those same ethics experts concluded in separate opinions that Mr.

---

[4] "Numerous courts throughout the country have publicly excoriated" Mr. Bandas "for the frivolous objections . . . he has penned and injected into class action settlements."  *See* Opinion & Order, *Garber v. Office of the Commissioner of Baseball*, No. 12-cv-03704 (VEC) (S.D.N.Y.), filed Feb. 27, 2017 (attached to Heimann Decl. as Exhibit C), at 10.  In that opinion (which was filed just last week), Judge Valerie Caproni of the Southern District of New York narrowly declined to sanction Mr. Bandas solely because she doubted she lacked jurisdiction to do so, but not before "join[ing] . . . other courts throughout the country in finding that Bandas has orchestrated the filing of a frivolous objection in an attempt to throw a monkey wrench into the settlement process and to extort a pay-off."  *Id.* at 11.  As detailed in his own Declaration filed in *Capital One* (described *infra* and attached to Heimann Decl. as Exhibit D), Mr. Frank's working relationship with Mr. Bandas overlaps with the time-frame giving rise to the criticism of Mr. Bandas described in Judge Caproni's Opinion & Order (*see id*. at 10-11).

[5] *See* Plaintiffs-Appellees' Response to Motion of Center for Class Action Fairness to Withdraw from Representation of Jeffrey Collins in Appeal No. 15-1546, to Intervene in Appeal Nos. 15-1400 and 15-1490 as Guardian Ad Litem for the Class, for an Order to Disclose Settlement Terms if Helpful to the Court, and, in the Alternative, an Order Issuing New Notice to the Class, and Opposition of Center for Class Action Fairness to Rule 42 Motion to Dismiss, *In re Capital One TCPA Litig.*, Nos. 15-1400 (L) and 15-1490 (7th Cir.) [ECF No. 81-1] ("Pls. Br."), at 9 (attached to Heimann Decl. as Exhibit B).

[6] *See also* Declaration of Alexandra D. Lahav in Support of Plaintiff-Appellees' Response to Center for Class Action Fairness' Motion to Intervene *and* Declaration of Robert P. Burns in

Frank violated ethical obligations to his client.[7]  While those separate opinions addressing Mr.

Frank's conduct were never filed or made part of the public record in *Capital One*, they are

available for this Court's review if necessary.  Mr. Frank previously was aware of their

existence, though he had not seen them.  As part of their meet and confer in advance of this

filing, Lieff Cabraser provided copies to Mr. Frank.

 In the midst of all the foregoing, Mr. Frank also filed a declaration where he admitted

that, for years, he had been "moonlight[ing]" and/or "ghostwrit[ing]" for both Mr. Bandas and

Darrell Palmer (another notorious professional objector) in exchange for more than $250,000 in

payments to himself, and that the professional objectors for whom he worked "used [his] name to

threaten class counsel into settling."  Pls. Br. at 2, 10.[8]  This contradicts Mr. Frank's stated

protestations against "bad-faith" objectors, and his claim never to have objected for purposes of

settling appeals.

 For all of the above reasons, Lieff Cabraser respectfully submits that Mr. Frank has

misrepresented the record with respect to *Capital One* and Lieff Cabraser's conduct in that

litigation.  Lieff Cabraser accordingly respectfully submits that, for this and for the other reasons

previously submitted, CCAF's motion for leave to participate as *guardian ad litem* for the Class

or as *amicus* in front of the special master should be denied.

---

Support of Plaintiff-Appellees' Response to Center for Class Action Fairness' Motion to
Intervene, filed as ECF Nos. 81-3 and 4 in *In re Capital One TCPA Litig.* (contained in Exhibit
B).

[7] *See* Declaration of Jonathan D. Selbin in Support of Plaintiff-Appellees' Response to Motion of
Center for Class Action Fairness and in Support of Motions to Dismiss Appeals, filed as ECF
No. 81-2 in *In re Capital One TCPA Litig.* (contained in Exhibit B), at ¶ 20.

[8] *See also* Declaration of Theodore H. Frank in Support of Motion to Intervene, filed as ECF No.
60-2 in *In re Capital One TCPA Litig.* (attached to Heimann Decl. as Exhibit D) at ¶¶ 12, 19-33,
69.

Dated:  March 6, 2017

Respectfully submitted,

Lieff Cabraser Heimann & Bernstein, LLP

By:     /s/ Richard M. Heimann
        Richard M. Heimann (*pro hac vice*)
        Robert L. Lieff (*pro hac vice*)
        275 Battery Street, 29th Floor
        San Francisco, California  94111
        Tel:  (415) 956-1000
        Fax:  (415) 956-1008

        Steven E. Fineman
        Jonathan D. Selbin
        Daniel P. Chiplock (*pro hac vice*)
        Michael J. Miarmi
        250 Hudson Street, 8th Floor
        New York, New York  10018
        Tel:  (212) 355-9500
        Fax:  (212) 355-9592

        *Co-counsel for the Plaintiff Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 12-cv-11698 MLW |

## DECLARATION OF RICHARD M. HEIMANN IN SUPPORT OF MOTION FOR LEAVE TO FILE SURREPLY TO COMPETITIVE ENTERPRISE INSTITUTE'S MOTION FOR LEAVE TO FILE AMICUS CURIAE RESPONSE TO COURT'S ORDER OF FEBRUARY 6 AND FOR LEAVE TO PARTICIPATE AS GUARDIAN AD LITEM FOR CLASS OR AMICUS IN FRONT OF SPECIAL MASTER

Richard M. Heimann, Esq., declares as follows, pursuant to 28 U.S.C. § 1746:

1.      I am a partner with the law firm of Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser").  I submit this declaration in support of Lieff Cabraser's Motion for Leave to File a Surreply to the Competitive Enterprise Institute's Motion for Leave to File *Amicus Curiae* Response to Court's Order of February 6 and for Leave to Participate as *Guardian ad Litem* for Class or *Amicus* in Front of Special Master ("Motion").

2.      Attached as Exhibit A is a true and correct copy of the reported decision by the District Court in *In re Capital One TCPA Litig.*, 80 F. Supp. 3d 781 (N.D. Ill. 2015).

3.      Attached as Exhibit B is a true and correct copy of Plaintiffs-Appellees' Response to Motion of Center for Class Action Fairness to Withdraw from Representation of Jeffrey Collins in Appeal No. 15-1546, to Intervene in Appeal Nos. 15-1400 and 15-1490 as Guardian Ad Litem for the Class, for an Order to Disclose Settlement Terms if Helpful to the Court, and, in the Alternative, an Order Issuing New Notice to the Class, and Opposition of Center for Class Action Fairness to Rule 42 Motion to Dismiss, filed in *In re Capital One TCPA Litig.*, Nos. 15-1400 (L) and 15-1490 (7th Cir.) at ECF No. 81-1 (attaching true and correct copies of the (i) Declaration of Jonathan D. Selbin in Support of Plaintiff-Appellees' Response to Motion of Center for Class Action Fairness and in Support of Motions to Dismiss Appeals, (ii) Declaration of Alexandra D. Lahav in Support of Plaintiff-Appellees' Response to Center for Class Action Fairness' Motion to Intervene *and* (iii) Declaration of Robert P. Burns in Support of Plaintiff-Appellees' Response to Center for Class Action Fairness' Motion to Intervene, which were filed as ECF Nos. 81-2, 3 and 4, respectively).

4.      Attached as Exhibit C is a true and correct copy of the Opinion & Order by U.S. District Court Judge Valerie E. Caproni in *Garber v. Office of the Commissioner of Baseball*, No. 12-cv-03704 (VEC) (S.D.N.Y.), filed Feb. 27, 2017.

5.      Attached as Exhibit D is a true and correct copy of the Declaration of Theodore

H. Frank in Support of Motion to Intervene, filed as ECF No. 60-2 in *In re Capital One TCPA*

*Litig.*, No. 15-1400 (L) (7th Cir.).

I declare under penalty of perjury that the foregoing is true and correct.  Executed on

March 5, 2017.

_____
    Richard M. Heimann

# EXHIBIT A

80 F.Supp.3d 781
United States District Court,
N.D. Illinois, Eastern Division.

In re Capital One Telephone
Consumer Protection Act Litigation,
Bridgett Amadeck, et al.,
v.
Capital One Financial Corporation,
and Capital One Bank (USA), N.A.
Nicholas Martin, et al.,
v.
Leading Edge Recovery Solutions, LLC,
and Capital One Bank (USA), N.A.
Charles C. Patterson,
v.
Capital Management Services, L.P.
and Capital One Bank (USA), N.A.

Master Docket No. 12 C 10064
|
MDL No. 2416
|
No. 12 C 10135
|
No. 11 C 5886
|
No. 12 C 1061
|
Signed February 12, 2015

**Synopsis**
**Background:** Consumers filed several class actions against
credit card company and its telemarketers alleging that
use of automatic telephone dialing systems or artificial or
prerecorded voice messages to contact consumers' cellular
telephones for debt collection purposes, without prior
express consent, violated Telephone Consumer Protection
Act (TCPA). Following transfer to Judicial Panel on
Multidistrict Litigation (JPML) and consolidation of the
cases, plaintiffs moved for final approval of class action
settlement, attorney fees, and incentive awards.

**Holdings:** The District Court, James F. Holderman, J.,
held that:

[1] proposed settlement was fair, reasonable, and
adequate;

[2] court would utilize percentage-of-the-fund method,
rather than lodestar method, to determine reasonable
attorney fees; and

[3] award of attorney fees at 20.77 percent of adjusted
settlement fund was reasonable.

Motion for final approval granted; motion for attorney
fees and incentive awards granted in part.

*784 *MEMORANDUM OPINION AND ORDER*

JAMES F. HOLDERMAN, District Judge:

The three above-captioned, nationwide class actions
were filed against Capital One, its subsidiaries, and its
Participating Vendors (collectively, "Defendants"), [1] as
a result of the Defendants' allegedly using automatic
telephone dialing systems or artificial or prerecorded voice
messages to contact consumers' cell phones without prior
express consent, in alleged violation of the Telephone
Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b)
(1)(A). (Dkt. No. 120.) On December 10, 2012, the
United States Judicial Panel on Multidistrict Litigation
(the "JPML") selected this court to coordinate pursuant
to 28 U.S.C. § 1408 the pretrial proceedings in these
three class actions, along with other individual lawsuits
filed throughout the United States. (Dkt. No. 1.) The
cases filed outside this district were transferred to this
district and assigned to this court's calendar. On February
28, 2013, Plaintiffs filed a Consolidated Master Class
Action Complaint ("Master Complaint") superseding
the complaints filed in the three class actions. (Dkt.
No. 19.) On June 13, 2014, after reaching a settlement
in principle, Plaintiffs filed an Amended Consolidated
Master Class Action Complaint ("Amended Master
Complaint"). (Dkt. No. 120 ("Am.Compl.").)

On July 29, 2014, the court granted Plaintiffs' unopposed
request for preliminary approval of class settlement, [2]
(Dkt. No. 129), and entered an Order (Dkt. No. 137)
conditionally certifying a settlement class, preliminarily
approving the class action settlement, approving the

notice plan, and appointing a claims and notice administrator. Since then, the parties have filed **785** memoranda in support of Plaintiffs' motion (Dkt. No. 260) for final approval of the class action settlement. Class Counsel, consisting of the attorneys who collectively represent the class, have also filed a motion for approval of attorneys' fees and for service awards to the class representatives (the "Named Plaintiffs"). (Dkt. No. 175.) Fourteen people out of the more than 17 million settlement class members filed briefs or statements in opposition to the Amended Settlement Agreement and Release ("Settlement Agreement") (Dkt. No. 131 Ex. 1) and Class Counsel's requested fee award. The court, after notice was provided, conducted a fairness hearing on January 15, 2015 to allow any class members who expressed the desire to address the court regarding the settlement to do so. (Dkt. No. 320.)

For the reasons explained below, the court grants the motion for final approval of the class action settlement, (Dkt. No. 260), because under the circumstances and the law the settlement reached in these three consolidated class action cases is fair, reasonable, and adequate. The court grants in part and denies in part Class Counsel's motion for approval of attorneys' fees, and grants Class Counsel's requested incentive awards to the five Named Plaintiffs in the amount of $5,000 each. (Dkt. No. 175.)

## BACKGROUND

**I. History of the Litigation**

In 1991, Congress enacted the TCPA "to address telephone marketing calls and certain telemarketing practices that Congress found to be an invasion of consumer privacy." *Jamison v. First Credit Servs.*, 290 F.R.D. 92, 96 (N.D.Ill.2013) (Kendall, J.). The "certain telemarketing practices" that drew Congress's legislative action were automatic telephone dialing systems and prerecorded voices. 47 U.S.C. § 227. The two technologies were relatively new in 1991 and greatly improved telemarketers' ability to contact consumers on their phones. In response to the "national outcry over the explosion of unsolicited telephone advertising," Congress passed the TCPA. *See* 137 Cong. Rec. 30,817 (1991) (statement of Senator Pressler). The TCPA prohibits callers from using "any automatic telephone dialing system or an artificial or prerecorded voice" to make any non-emergency call to a cell phone, unless they have the

"prior express consent of the called party." 47 U.S.C. § 227(b)(1)(A)(iii). The penalties Congress enacted to answer the public outcry are harsh: the TCPA imposes on callers statutory damages of $500 per call, which can be trebled if the court finds the violation to have been willful or knowing. 47 U.S.C. § 227(b).

The calls at issue in these three consolidated class actions were made for the decidedly non-emergency purpose of debt collection. According to the Amended Master Complaint, between January 18, 2008 and June 20, 2014, Capitol One or one of its Participating Vendors (on behalf of Capital One) called class members' cell phones using an automatic telephone dialing system or an artificial or prerecorded voice in connection with an attempt to collect on a credit card debt. (Am.Compl.¶ 52.)

After Plaintiffs filed their Master Complaint on February 28, 2013, the parties engaged in six months of class-wide discovery "sufficient to engage in meaningful settlement discussions." (Dkt. No. 129 at 13.) On July 2, 2013, November 4, 2013, and January 29, 2014, the parties participated in mediation sessions with retired United States Magistrate Judge Edward A. Infante. The parties also spoke with Judge Infante by phone on two other occasions. (*Id.*) Capital One and Plaintiffs agreed thereafter to a settlement in February **786** 2014. (*Id.* at 14.) The Participating Vendors agreed to join the settlement in the months thereafter. (*Id.*)

On June 13, 2014, Plaintiffs filed their request for an order certifying the proposed class for settlement purposes, preliminarily approving the settlement agreement, approving the notice plan, ordering the dissemination of notice as set out in the Settlement Agreement, and appointing BrownGreer as the Notice and Claims Administrator. (Dkt. No. 121.) Plaintiffs filed an amended motion seeking the same relief on July 13, 2014 and, on July 29, 2014, the court granted Plaintiffs' amended motion. (Dkt. No. 137.)

On August 12, 2014, BrownGreer began implementing the parties' notice plan, which entailed: (1) sending 12,342,000 summary notices via email to all potential class members who had email addresses reflected in Capital One's records; (2) mailing 4,303,218 postcard notices via first class mail to class members who had opted out of receiving email from Capital One, who did not have email addresses on file, or whose emails

were undeliverable; (3) running internet banner notices on 40 websites BrownGreer determined class members were likely to visit; (4) establishing a settlement website and toll-free information telephone number dedicated to answering telephone inquiries; and (5) providing notice of the settlement to the officials designated pursuant to Class Action Fairness Act, 28 U.S.C. § 1715. (Dkt. No. 264.)

BrownGreer provided a thorough summary of its execution of the notice plan in two separate declarations provided to the court. (Dkt.Nos. 264, 305.) Here, it is sufficient to note that the notice plan reached 15,983,613 known, unique settlement class members, a figure that represents 96.03% of the known settlement class and 91.22% of the estimated total settlement class.[3] (Dkt. No. 305 ¶ 6.) Despite the robust and effective notice plan, only 1,378,534 unique claimants—7.87% of the estimated class—filed claims with the administrator by the filing deadline. (*Id.* ¶ 14.) 462 class members have submitted valid opt-out requests and another 103 claimants have submitted opt-out requests that are invalid, either because they are incomplete or untimely. (*Id.* ¶ 8.) BrownGreer estimated that as of December 23, 2014 its total notice and administration costs were $5,093,000. (*Id.* ¶ 16.) No updated figures have been provided to the court.

**II. The Settlement Agreement**
The important provisions of the Settlement Agreement provide for both monetary and injunctive relief to class members.

The Settlement Agreement defines the settlement class as follows:

> All persons within the United States who received a non-emergency telephone call from Capital One's dialer(s) to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice in connection with an attempt to collect a credit card debt from January 18, 2008 through June 20, 2014, and all persons within the United States who received a non-emergency telephone call from a Participating Vendor's dialer(s) made on behalf of Capital One

> to a cellular telephone through the use of an automatic telephone dialing system or an artificial or prerecorded voice in connection with an attempt to collect on a credit card debt from February 28, 2009, through June 20, 2014.

**\*787** (Settlement Agreement § 2.39.) Plaintiffs estimate that the class includes 17,522,049 members.[4]

The Settlement Agreement requires Defendants to establish a non-reversionary settlement fund of $75,455,099.[5] (Settlement Agreement § 2.42.) After subtracting notice and administration costs ($5,093,000), Class Counsel's requested service awards for the five Named Plaintiffs ($25,000), and Class Counsel's requested fee award ($22,636,530)—all of which will be paid out of the settlement fund—the value of the settlement to class members is $47,700,569. (Dkt. No. 305.); *see Pearson v. NBTY, Inc.*, 772 F.3d 778, 780–81 (7th Cir.2014) (citing *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir.2014)) (holding notice costs, administration costs, and attorneys' fees are not part of the value received from the settlement by class members). If all 17,522,049 class members had filed a claim, they would have received $2.72 each. But because only a fraction of class members filed a claim, as is often the case in consumer class actions, the 1,378,534 timely claimants will receive at least $34.60 each, and possibly more if some claimants fail to cash their settlement checks within 210 days, allowing for a second *pro rata* distribution to class members who filed a claim and deposited their settlement checks on time. (Settlement Agreement § 7.04(e).) If, following the second *pro rata* distribution, there remain undeposited settlement checks, the remainder of the settlement fund will go to a *cy pres* recipient. The Settlement Agreement does not identify the recipient of the *cy pres* award because the parties decided to wait until after the claims period to gauge the potential size of any *cy pres* award. (Settlement Agreement § 7.04(f).) In their response to objectors, however, Class Counsel agreed to name the Electronic Frontier Foundation. (Dkt. No. 269 at 33.)

The Settlement Agreement also requires Capital One to institute a protocol under which it uses an automatic dialer to call a customer's (or debtor's) cell phone number only in cases where the individual provided the cell phone number on his or her credit application. Capital One will further

refrain from calling a cell phone number unless either the cell phone number is linked to the customer's name based on third party research or Capital One has made contact with the customer on the cell phone number within the past 90 days. (Dkt. No. 262 ¶ 21.) As discussed below, this change would bring Capital One's use of an automatic dialer within Plaintiffs' interpretation of the statutorily undefined term "prior express consent," which is excluded from the prohibitions of the TCPA, 47 U.S.C. § 227(b)(1).

The court, at final approval hearing on January 15, 2015, (Dkt. No. 320), heard from Class Counsel, counsel for Capital One, and counsel for objector Jeffrey Collins. Although the court invited specific objectors by name and anyone else present in the courtroom to speak, no other objector addressed the court even though some of the objectors had previously indicated their intent to address the court at the final approval hearing. [6]

**\*788  *LEGAL STANDARDS***

**I. Approval of a Proposed Settlement in Class Actions**
 [1]  A court may approve a settlement that would bind class members only if, after proper notice and a public hearing, the court determines that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(3). Under Seventh Circuit law, a district court must, in evaluating the fairness of a settlement, consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir.2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir.1996)).

 [2]   [3]  "The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.' " *Synfuel*, 463 F.3d at 653 (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir.1979)). Furthermore, "[i]n conducting this analysis, the district court should begin by 'quantifying the net expected value of continued litigation to the class.' To do so, the court

should 'estimate the range of possible outcomes and ascribe a probability to each point on the range.' " *Id.* (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284–85 (7th Cir.2002)).

 [4]   [5]  "Federal courts naturally favor the settlement of class action litigation." *Isby*, 75 F.3d at 1196. Nevertheless, the Seventh Circuit has warned that "the structure of class actions under Rule 23 ... gives class action lawyers an incentive to negotiate settlements that enrich themselves but give scant reward to class members, while at the same time the burden of responding to class plaintiffs' discovery demands gives defendants an incentive to agree to early settlement that may treat the class action lawyers better than the class." *Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289, 293 (7th Cir.2010) (emphasis omitted). District courts must therefore "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Synfuel*, 463 F.3d at 652. This court has endeavored to do that.

**II. Attorneys' Fees in Class Actions**
 [6]   [7]  "In a certified class action, the court may award reasonable attorney's fees ... that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). In determining a reasonable fee, the court "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir.1988), *cert. denied,* 493 U.S. 810, 110 S.Ct. 53, 107 L.Ed.2d 22 (1989). To determine the reasonableness of the sought-after fee in a common-fund case, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.,* 264 F.3d 712, 718 (7th Cir.2001) (*Synthroid I* ). The probability of success at the outset of **\*789** the litigation is relevant to this inquiry. *See Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir.1994).

In *Synthroid,* the Seventh Circuit held that the "market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case." *Synthroid I,* 264 F.3d at 721. The Seventh Circuit has further explained that "[t]he object in awarding a

reasonable attorney's fee ... is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible." *In re Cont'l Ill. Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992). *See also In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir.2011) (recognizing that "[s]uch [an] estimation is inherently conjectural").

[8] The Federal Rules of Civil Procedure allow the court, in a certified class action, to "award reasonable ... nontaxable costs that are authorized by law or by the parties' agreement." Fed.R.Civ.P. 23(h). The Seventh Circuit has instructed that district courts must exercise their discretion to "disallow particular expenses that are unreasonable whether because excessive in amount or because they should not have been incurred at all." *Zabkowicz v. W. Bend Co., Div. of Dart Indus., Inc.*, 789 F.2d 540, 553 (7th Cir.1986) (quoting *Henry v. Webermeier*, 738 F.2d 188, 192 (7th Cir.1984)).

## ANALYSIS

### I. Approval of the Class Settlement in This Litigation

Applying the five factors identified in *Synfuel,* the court concludes that the settlement is "fair, reasonable, and adequate," and therefore meets the requirements of Rule 23.

### A. Potential of Class Members' Recovery through Continued Litigation Balanced Against Settlement Amount Offered

[9] As noted above, "[t]he most important factor" in determining whether a proposed settlement satisfies Rule 23 is the "strength of [Plaintiffs'] case on the merits balanced against the amount offered in the settlement." *Synfuel,* 463 F.3d at 653 (citations omitted). The Settlement Agreement, as it stands, requires Defendants to pay $75.5 million into the settlement fund out of which all eligible class members who made a timely claim will receive their *pro rata* share, and maybe more if fellow claimants are delinquent in depositing their checks. At the time the court granted preliminary approval, Defendants stated that the settlement constituted the largest cash sum in the 22–year history of the TCPA, (Dkt. No. 129 at 7). That fact, though true, is slightly deceiving because the size of the settlement amount is attributable mainly to the large size of the class—17.5 million people.

The recovery per class member—excluding administrative costs, Named Plaintiff awards, and attorneys' fees—is a relatively diminutive $2.72. The court does not have the necessary data to compare this proposed settlement to other TCPA actions based on the recovery per *class member*. There are, however, a number of benchmark settlements to which the court can compare the recovery *per claimant*. The recovery per claimant here is $34.60. That number falls within the range of recoveries in other TCPA actions but, as Judge Davila notes in discussing a similarly sized settlement last year, it falls on the "lower end of the scale." *Rose v. Bank of Am. Corp.*, Nos. 11 C 2390 & 12 C 4009, 2014 WL 4273358, at *11 (N.D.Cal. Aug. 29, 2014). The settlement also falls far short of the $500 statutory recovery available for each phone call, of which there were many: **\*790** Capital One or its Participating Vendors made approximately 1.9 billion phone calls in alleged violation of the TCPA. (Dkt. No. 324 at 11:3.) So if Plaintiffs were to litigate their claims successfully through trial, Capital One would be on the hook for a minimum of $950 billion. Moreover, Plaintiffs' recovery could possibly be as high as $2.85 trillion if Plaintiffs proved the violations were knowing or willful.

[10] But a settlement is a compromise, and courts need not—and indeed should not—"reject a settlement solely because it does not provide a complete victory to plaintiffs." *In re AT & T Mobility Wireless Data Servs. Sales Litig.*, 270 F.R.D. 330, 347 (N.D.Ill.2010) (St.Eve, J.). This is especially true when complete victory would most surely bankrupt the prospective judgment debtor. It also bears mention that the $34.60 per claimant recovery in this case does not seem so miniscule in light of the fact that class members did not suffer any actual damages beyond a few unpleasant phone calls, which they received ostensibly because they did not pay their credit card bills on time.

More importantly, $34.60 per claimant is not insignificant considering Capital One's counsel's estimate that Plaintiffs will recover nothing through continued litigation. (Dkt. No. 267.) The court recognizes that Plaintiffs would indeed face myriad hurdles by proceeding to trial.

First, at a trial, Plaintiffs would have the burden to effectively rebut Capital One's chief defense that the class members' consented to be contacted on their cell phones. Capital One argues that it obtained consent to call from each class member because every version of

Capital One's standard cardholder agreement contained provisions expressing that Plaintiffs consented to receive calls through an autodialing technology. (Dkt. No. 267 at 2.) Plaintiffs admit that they agreed to the terms of their cardholder agreements, but argue they did not agree to be contacted "in violation of the TCPA." (Dkt. No. 262.) Many class members, however, even provided their cell phone numbers to Capital One as their primary contact numbers. (*Id.*) Under an FCC order in 2008 implementing the TCPA, autodialed collection calls to "wireless numbers provided by the called party in connection with an existing debt are made with the 'prior express consent' of the called party," and are therefore permissible. *In re Rules and Regulations Implementing the Telephone Consumer Prot. Act of 1991*, 23 F.C.C.R. 559 ¶ 9 (2008) ("2008 TCPA Order"); 47 U.S.C. § 227(b)(1)(A)(iii). The FCC's same 2008 TCPA Order, however, states that "prior express consent is deemed to be granted only if the wireless number was provided by the consumer to the creditor, and that such number was provided during the transaction that resulted in the debt owed." 2008 TPCA Order ¶ 10. Plaintiffs interpret the FCC's 2008 TCPA Order to mean that the cell phone number must have been provided during the origination of the credit relationship, *i.e.,* during the transaction. (Dkt. No. 262 at 21.) As United States District Judge J.P. Stadtmueller commented in a recent opinion, however, the 2008 TCPA Order is "far from clear." *Balschmiter v. TD Auto Finance LLC,* 303 F.R.D. 508, 517, 2014 WL 6611008, at *8 (E.D.Wis.2014). Furthermore, in this district, the only district judge to have addressed the issue held that a caller is entitled to summary judgment against a TCPA claim when it can show the plaintiff provided a cell phone number as a contact number. *See Greene v. DirecTV,* No. 10 C 117, 2010 WL 4628734, at *3 (N.D.Ill. Nov. 8, 2010) (Kocoras, J.). The parties' disparate interpretations of the 2008 TCPA Order are reflective of the split opinion among practitioners and the courts, a split that at least injects uncertainty **\*791** into this litigation and will continue to warrant caution by plaintiffs and defendants until clearer guidance is provided. *See, e.g., Baird v. Sabre, Inc.*, 995 F.Supp.2d 1100, 1106 (C.D.Cal.2014) (noting the FCC's series of TCPA Orders are not "model[s] of clarity").

 **[11]** Second, should Plaintiffs proceed to trial, there would be manageability concerns that may pose serious obstacles to class certification, thus depriving Plaintiffs of the benefits of a class action. Rule 23(b)(3) requires that "questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In assessing predominance, a court must analyze "the likely difficulties in managing a class action," *id.* 23(b)(3)(D), which "encompass[ ] the whole range of practical problems that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Identifying consenting class members and the precise timing and nature of that consent would require Capital One to locate documents and analyze call recordings for nearly all of the 17.5 million class members. These individual determinations do not always comport with Rule 23(b)(3)'s manageability requirement and have caused some courts to reject class certification on numerous occasions. *See, e.g., Balschmiter,* 303 F.R.D. at 527–29, 2014 WL 6611008, at *19–20; *see also Jamison,* 290 F.R.D. at 107 (denying certification of TCPA litigation where "parties would need to scour [defendant's] records" to determine consent).

Third, without the prompt and final resolution a settlement provides, Plaintiffs run the risk that forthcoming FCC orders may extinguish their claims. There are three sets of petitions currently before the FCC, all of which would eliminate or reduce Capital One's TCPA liability in this case. The first is the FCC's definition of an autodialer. Although the TCPA defines an autodialer as "equipment which has the capacity (A) to store or produce telephone numbers to be called, using a random or sequential number generator; and (B) to dial such numbers," 47 U.S.C. § 227(a)(1), the FCC has expanded the definition to cover predictive dialers that can "store or produce telephone numbers," even if they do not "us[e] a random or sequential number generator." *See In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991,* 18 F.C.C.R. 14014, 14091–93 (2003). The FCC is considering petitions seeking to exclude from the TCPA predictive dialers used for non-telemarketing purposes, such as debt collection. (*See* Dkt. No. 267 (collecting petitions).) The second and, perhaps, more pressing set of petitions to the FCC ask the FCC to clarify how and when consent may be expressed by consumers. *See* Michael O'Rielly, FCC Commissioner, *TCPA: It is Time to Provide Clarity,* FCC Blog (Mar. 25, 2014) (*available at* http://www.fcc.gov/blog/tcpa-it-time-provide-clarity) (asserting that "the FCC needs to

address this inventory of petitions as soon as possible," and "answer ... whether consent can be inferred from consumer behavior or social norms"). The final set of petitions seeks to clarify that a caller does not violate the TCPA when it makes autodialed calls to another cell phone subscriber by mistake. (*See* Dkt. No. 267 (collecting petitions).) If the FCC were to issue orders favoring callers in connection with any of the issues discussed above, Plaintiffs claims would be completely barred or materially limited.

In light of Capital One's potentially meritorious defenses and the legal uncertainty concerning the application of the TCPA, **\*792** the court concludes that Plaintiffs would probably face an uphill battle proceeding to trial and, once there, obtaining relief. The settlement provides value that is fair considering the very real possibility that Plaintiffs may recover nothing if they were to proceed further with the litigation.

### B. Likely Complexity, Length and Expense of Litigation

In *Synfuel,* the Seventh Circuit instructed that the likely complexity, length, and expense of continued litigation are relevant factors district court should consider in determining whether a class action settlement satisfies Rule 23. *Synfuel,* 463 F.3d at 653. All of these factors when considered in this litigation strongly weigh in favor of approval of the proposed settlement. Although the parties have conducted limited discovery for the purpose of evaluating settlement, they would need to engage in significant additional discovery of Capital One's millions (or billions) of call records, if the litigation were to proceed further. This would likely require each side to retain experts to analyze the mountains of data. There would be significant motion practice, and any judgment in favor of Plaintiffs would be further delayed by any appeal taken from the entry of a final judgment.

### C. Scant Opposition to Settlement

The Seventh Circuit has held that the amount of opposition to a settlement among affected parties is yet another factor district courts should consider in deciding whether to approve a class action settlement. *Synfuel,* 463 F.3d at 653. Only 565 class members have requested to be excluded from the settlement, representing approximately 0.0032% of all class members. [7] Of the approximately, 17.5 million class members, the court has

received 14 timely objections to the Settlement Agreement and only 9 of those objections take issue with the value of the settlement; the other 5 objectors limit their concerns to Class Counsel's requested fee award. Such a low percentage of opposition favors a finding that the settlement is fair, reasonable, and adequate under Rule 23. *See, e.g., In re AT & T Mobility Wireless Data Services Sales Tax Litigation,* 789 F.Supp.2d 935, 965 (N.D.Ill.2011) (citations omitted) (finding opt-out or objection by 0.01% of class members was "remarkably low" and supported the settlement).

### D. The Experience and Views of Counsel

Under *Synfuel,* the opinion of competent counsel is relevant to determining whether a class action settlement is fair, reasonable, and adequate under Rule 23. *Synfuel,* 463 F.3d at 653. The court accepts that Class Counsel in this case are experienced litigators, especially in the TCPA context, and that they strongly support the settlement. (Dkt. No. 262 at 20.) Even though Class Counsel may be considered biased because they stand to benefit from approval, under *Synfuel,* this factor weighs in favor of approval.

### E. Stage of the Proceedings and the Amount of Discovery Completed

The final factor the court is to consider under *Synfuel* concerns the stage of the proceedings and the amount of discovery completed at the time of the settlement. *Synfuel,* 463 F.3d at 653. The parties in this case engaged in substantial motion practice and discovery in two of the individual class actions before the JPML transferred the cases to this court. Class Counsel have analyzed a complete set of the contractual language Capital One offers **\*793** as the basis for class members' consent to be contacted. And prior to the mediation proceedings before retired Magistrate Judge Infante, the parties exchanged discovery over a six-month period sufficient to engage in "meaningful settlement discussions." Although this settlement-directed discovery is not identical to the type of full discovery that counsel may desire "to evaluate the merits of plaintiffs' claims," *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee*, 616 F.2d 305, 325 (7th Cir.1980), the court is not convinced that extensive formal discovery, when measured against the cost that would be incurred, would place the parties in a proportionally better position than they are now to determine an appropriate settlement value of this litigation. Evaluating the merits of Plaintiffs'

claims would, as discussed above, require an arduous scouring of Capital One's records for individual plaintiffs, undermining the cost-saving benefits of the settlement. The court finds that the parties have completed a sufficient amount of discovery to be able to place value on their respective positions in this case. The final *Synfuel* factor weighs in favor of settlement.

### F. Objections Presented Are Not Well Founded Under the Applicable Law

For the reasons explained above, the factors set out by the Seventh Circuit in *Synfuel* support approving the Settlement Agreement in this case. Notwithstanding the court's conclusion that the Settlement Agreement is fair, reasonable, and adequate under Rule 23, there are 14 class members who have filed timely objections, although only a subset of those 14 take issue with the amount of the settlement. (Dkt.Nos.144, 152, 184, 189, 193, 196, 199, 202, 215, 225, 227, 228.) These objections collectively state a number of arguments the court will discuss briefly below.

First, some objectors argue that class members are not receiving enough money in light of the available statutory damages. As the court discussed above, a class-wide recovery in line with the statutory awards is unrealistic and would ultimately result in class members finding their place in line among Capital One's unsecured creditors in a bankruptcy proceeding. Moreover, as discussed above, the strength of Plaintiffs' case did not warrant a settlement anywhere close to the statutory award, which is what Plaintiffs would have sought had they prevailed at trial on the liability issue.

Second, certain objectors complain that they should be able to make claims against the settlement fund for every call they received, consistent with the framework of the TCPA. Although the court inquired of counsel about the possibility of a call-based claims process as well, the court ultimately accepts the representations of Class Counsel and Capital One that it is unlikely that a material portion of the class had an average call volume greater or lesser than any other class member. The court also accepts Class Counsel's representation that a call-based claims process would be extremely costly to administer and is inadvisable given the fact that increased administration costs would result in a corresponding decrease in the money available to the class.

Lastly, the court rejects the complaints of the objectors who have any issue with the notice and claims process. The court agrees with Class Counsel that the notice provided by BrownGreer was state of the art and well-tailored to reach the maximum number of class members. Lead counsel for Capitol One represented to the court that percentage of class members reached through the notice process was the highest he had ever seen. (Dkt. No. 324 at 35:16–20.) Submitting a claim, in this court's experienced view, was exceedingly easy for the class members. Each **\*794** class members needed only to complete a short online form or return a postcard.

Accordingly, the court finds that none of the objections to the total amount of the settlement or its administration are well-founded and, for the reasons explained in detail above, the court grants the motion (Dkt. No. 260) for final approval of the class action Settlement Agreement.

## II. Attorneys' Fees

Although certain of 14 timely objectors contend that Class Counsel's requested fee is excessive, the court need not engage in a lengthy analysis of each objector's argument because the Seventh Circuit has directed district courts, when deciding whether requested fees are excessive, to estimate the contingent fee that the class would have negotiated with Class Counsel at the outset of the litigation, "had negotiations with clients having a real stake been feasible." *In re Trans Union Corp. Privacy Litig.,* 629 F.3d 741, 744 (7th Cir.2011). The court endeavors to approximate such a market fee below.

### A. Class Counsel's Requested Fees

**[12]** Class Counsel in this case represent that they have spent 4,268 hours in professional time over a three-year period litigating and settling this case on a contingent fee basis. (Dkt. No. 252.) They seek for their efforts an award of attorneys' fees equal to 30% of the $75,455,099 settlement fund or $22,636.530. They do not seek additional payment or reimbursement of any of their expenses on top of the requested fee award, nor do they seek compensation for the injunctive relief barring Capital One from calling an individual's cell phone without prior express consent.

To justify their request, Class Counsel argue that their requested fee is less than the 33.3% fee "consistently" awarded in TCPA and non-TCPA class action litigation in

this district. (*See* Dkt. No. 176 at 19–20 (collecting cases).) They further argue that the substantial risk they assumed in prosecuting the litigation on a purely contingent basis supports a 30% fee because there is a reasonable chance that this case, if litigated, could result in no recovery at all for the class. Class Counsel urge the court to adopt their preferred approach to calculating fees based on a percentage of the settlement fund rather than through a lodestar analysis, and to calculate that percentage from the total settlement fund inclusive of administrative costs, *cy pres* awards, and incentive awards.

### B. Fee Calculation Method

**[13]** Although the court granted limited discovery regarding Class Counsel's lodestar data, the court agrees with Class Counsel that the fee award in this case should be calculated as a percentage of the money recovered for the class. It has long been the law in the Seventh Circuit that in common fund cases like this one, district courts have discretion to choose either the lodestar or a percentage approach to calculating fees. *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 566 (7th Cir.1994) ("It bears reiterating here that we do not believe that the lodestar approach is so flawed that it should be abandoned.... We therefore restate the law of this circuit that in common fund cases, the decision whether to use a percentage method or a lodestar method remains in the discretion of the district court. We recognize here ... that there are advantages to utilizing the percentage method in common fund cases because of its relative simplicity of administration."). Ultimately, the district judge's job is to approximate the market rate between willing buyers and willing sellers that would have prevailed had the parties negotiated the rate at the outset of the representation. **\*795** *Silverman v. Motorola Solutions, Inc.*, 739 F.3d 956, 957 (7th Cir.2013) (citations omitted). Although the court need not adopt the calculation method that is most prevalent in the marketplace as it existed at the time of the hypothetical negotiation, *see Cook v. Niedert*, 142 F.3d 1004, 1013 (7th Cir.1998), such an approach is more efficient for the court and more likely to yield an accurate approximation of the market rate.

Here, had an arm's length negotiation been feasible, the court believes that the class would have negotiated a fee arrangement based on a percentage of the recovery, consistent with the normal practice in consumer class actions. An *ex ante* agreement based on lodestar requires a client to monitor counsel, and the class-member "clients"

here had little incentive to do so. There are approximately 17.5 million class members in this case, the prospective relief is minimal, and none of the class members suffered tangible damages beyond the inconvenience of receiving one or more debt-collection calls to their cell phones on ostensibly overdue credit card bills. The class would not have negotiated a compensation scheme that required a level of monitoring the class members were not interested in or capable of providing. Instead, the class would have chosen the compensation scheme that required the least monitoring to align the incentives of the class and its counsel—the percentage method. The court will therefore apply the percentage method as well.

**[14]** The court does not, however, agree with Class Counsel's assertion that "it is appropriate—and the norm in the Seventh Circuit—to include administrative and notice costs when calculating fees based on a percentage-of-the-fund." (Dkt. No. 269 at 17.) The Seventh Circuit has instructed district courts that the "ratio that is relevant to assessing the reasonableness of the attorneys' fee that the parties agreed to is the ratio of (1) the fee to (2) the fee plus what the class members received." *Redman v. RadioShack*, 768 F.3d 622, 630 (7th Cir.2014). Administration and notice costs, although paid through the settlement fund, are not benefits to the class and thus not part of "what the class members received." *Id.* Class Counsel argue that the Seventh Circuit's recent instruction in *Redman* applies only in cases involving a fund that must be monetized from coupon redemptions. The settlement in this case, by contrast, is a non-reversionary cash fund. (Dkt. No. 269 at 18.) The court does not agree with Class Counsel's limited interpretation of *Redman*. In *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir.2014), decided two months after *Redman,* the Seventh Circuit applied its holding in *Redman* to a reversionary cash fund and clarified that costs incurred as part of the settlement do not shed light on the fairness of the split between Class Counsel and class members. *Id.* at 781 (citing *Redman,* 768 F.3d at 630). The Seventh Circuit also extended its analysis to *cy pres* and service awards because neither award directly benefits the class, or at least the whole class, and therefore should not be included in the court's assessment of the settlement's value to the class. *Id.* at 784.

In order to evaluate the fairness of Class Counsel's fee request consistent with the Seventh's Circuit's recent guidance, the court must recalculate the percentage fee sought by Class Counsel. After subtracting administration

and notice costs ($5,093,000) and the Named Plaintiff service awards ($25,000), the total money available to split among the class and Class Counsel is $70,337,099. Class Counsel seeks 22,636,530 of that total, or slightly above 32%.

### C. Class Counsel's Requested 32% Fee Exceeds the Market Rate

[15] The Seventh Circuit has instructed district courts to approximate the market rate that would have prevailed at the **\*796** outset of the litigation had negotiations between Class Counsel and "clients having a real stake" been feasible. *Trans Union Corp. Privacy Litig.,* 629 F.3d at 744. The Seventh Circuit, however, has not expressed a preference for a particular method of determining that market fee. The market-mimicking approach is, as the Seventh Circuit acknowledged, "inherently conjectural." *Id.*; *see also Synthroid I,* 264 F.3d at 719 ("[I]t is indeed impossible to know *ex post* the outcome of a hypothetical bargain *ex ante*.") In *Synthroid I,* however, the Seventh Circuit explained that it is possible to learn about "similar bargains" and set forth three "guides" or "benchmarks" to help district courts estimate the market fee: (1) actual fee contracts between plaintiffs and their attorneys; (2) data from similar common fund cases where fees were privately negotiated; and (3) information from class-counsel auctions. *Synthroid I,* 264 F.3d at 719. At least two judges presiding in this district, and one judge from another district employing the Seventh Circuit's market-mimicking approach, have applied these three benchmarks to determine *ex post* the market contingent fee. *See In re AT & T Mobility Wireless Data Services Sales Tax Litigation,* 792 F.Supp.2d 1028, 1033–1034 (N.D.Ill.2011); *In re Trans Union Corp. Privacy Litig.,* No. 00 C 4729, 2009 WL 4799954, at *10–13 (N.D.Ill. Dec. 9, 2009) (Gettleman, J.), *rev'd on other grounds,* 629 F.3d 741 (7th Cir.2011); *In re Cabletron Sys., Inc. Sec. Litig.,* 239 F.R.D. 30, 40–45 (D.N.H.2006) (Smith, J.). This court will likewise analyze each benchmark to estimate the prevailing market rate for TCPA class action litigation generally, and then adjust that rate based on the risk of nonpayment in this case.

### 1. Class Counsel's Contingent Fee Agreements

[16] The first benchmark is any actual agreement between plaintiffs and attorneys in this case. This was a useful starting point in *Synthroid* because one group of sophisticated plaintiffs had negotiated a fee agreement at the outset and set the opening price. *Synthroid I,* 264 F.3d at 720. That, however, is not the case here. Like most consumer class actions, the only fee agreements are Class Counsel's retainer agreements with the Named Plaintiffs, which provide for contingent fees ranging from 33.3% to 40% of the settlement fund. (Dkt. No. 176 at 22.) These retainer agreements are of little value to determining the market rate because named plaintiffs are less often sophisticated buyers of legal services and more often "the cat's paws of the class lawyers." *In re Trans Union,* 629 F.3d at 744. Moreover, the agreements here were between Class Counsel and five individual plaintiffs who, individually, did not have "a sufficient stake to drive a hard—or any—bargain with the lawyer[s]." *Continental,* 962 F.2d at 572. The court therefore finds that Class Counsel's contingent fee agreements with the Named Plaintiffs do not inform the court's estimation sufficiently as to what Class Counsel would have received in an *ex ante* negotiation with the entire class, has such a negotiation occurred.

### 2. Data on Fee Awards in Other Cases

The second and third *Synthroid* benchmarks concern data from similar common fund cases where the parties set fee schedules *ex ante,* either through a private negotiation or a judicially conducted "auction." Because data from pre-suit negotiations and auctions tend to be sparse—and with regard to TCPA class actions, nonexistent—district courts have also examined empirical data analyzing fee awards in other class actions where fees were awarded at the end of the case. *See, e.g., AT & T Mobility,* 792 F.Supp.2d at 1033; *Trans Union,* 2009 WL 4799954, at *11–13. The Seventh Circuit has relied on the same **\*797** empirical data to determine the "norm" for fee awards, *see Silverman,* 739 F.3d at 958, and this court will do so as well. While large-scale empirical studies necessarily include *ex post* fee awards from other circuits that may not be reflective of the market price at the time those cases were filed, the awards likely affect the price at which national class action lawyers are willing to provide their services going forward. *See, e.g., Trans Union,* 2009 WL 4799954, at *11 (noting awards in class actions generally may influence expectations of a lawyer and client engaging in negotiation); *Nilsen v. York County,* 400 F.Supp.2d 266, 282–83 (D.Me.2005) ("Other courts' awards necessarily

affect the expectations of lawyers and, therefore, what they might agree to in voluntary negotiation.")

### i. Empirical Studies

In 2004, Theodore Eisenberg and Geoffrey Miller examined two data sets covering class actions from 1993 to 2002 and found that the mean fee award from settlements in the $38 to $79 million range was 16.9% and the median was 15.5%. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: An Empirical Study,* 1 J. Empirical Legal Studies 27, 73 (2004). In 2010, Eisenberg and Miller updated their study in to analyze class action settlements from 1993 to 2008. Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees in Class Action Settlements: 1993–2008,* 7 J. Empirical Legal Studies 248 (2010). The updated study found that the mean award from settlements in the $38.3 to $69.6 million range, the third highest decile, was 20.5% and the median was 21.9%; the mean award from settlements in the $69.6 to $175.5 range, the second highest decile, was 19.4% and the median was 19.9%. *Id.* at Tab. 7.

In the same year as Eisenberg and Miller published their updated 2010 study, Brian Fitzpatrick, who filed a declaration in this case on behalf of Class Counsel, (Dkt. No. 270), published a paper analyzing every federal class action settlement in 2006 and 2007. Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards,* 7 J. Empirical Legal Studies 811 (2010). Fitzpatrick found that the mean award from settlements in the $72.5 to $100 million range was 23.7% and the median was 24.3%. *Id.* at 839.

All three studies confirm Eisenberg and Miller's original finding of a scaling effect whereby the percentage fee decreases as the class recovery increases. *See* 1 J. Empirical Legal Stud. At 28 ("[A] scaling effect exists, with fees constituting a lower percent of the client's recovery as the client's recovery increases.") In Eisenberg and Miller's 2010 study, they found that settlements in the top decile by total recovery yielded a median and mean fee percentage that was less than one-third of the median and mean percentage fee in settlements in the lowest decile. 7 J. Empirical Legal Studies at 264. Fitzpatrick found a similar, although less pronounced scaling effect: settlements in the top decile by recovery yielded a mean fee of 18.4% and a median of 19%, whereas settlements in

the lowest decile yielded a mean fee of 28.8% and a median of 29.6%. 7 J. Empirical Legal Studies at 839; *see also Silverman,* 739 F.3d at 958 (observing that the empirical data show that the percentage of the fund awarded to counsel declines as the size of the fund increases).

Accordingly, if past awards are reflective of the market for this case and its $75.5 million negotiated settlement fund, and if the published empirical data discussed above accurately reflect the fees awarded in TCPA class actions, it is fair to conclude that class members would have negotiated an across-the-board fee somewhere between 20% and 24% of the settlement **\*798** fund. Class Counsel's requested 32% fee (or 30% fee, depending on the denominator) exceeds that across-the-board range.

### ii. The Court's TCPA Class Action Settlement Analysis

To assist the court in determining whether the findings from the above empirical studies are indeed representative of the across-the-board percentage fees awarded in TCPA class actions, the court requested class counsel in another settled TCPA case, *Wilkins v. HSBC Bank*, No. 14 C 190 (N.D.Ill.), pending on this court's docket, to submit data from other finally approved TCPA class action settlements since 2010. Class counsel in *HSBC,* many of whom also represent class members in this case, diligently compiled publicly available summary information contained in 73 TCPA class action settlements approved since 2010. *See HSBC,* No. 14 C 190 (N.D.Ill.) (Dkt. No. 109–1). The court has now analyzed the data from 72 of the cases—one case lacked publicly available fee information—and has attempted in the table below to recreate the Eisenberg–Miller and Fitzpatrick summaries for TCPA class action settlements. Like the empirical analyses discussed in the previous section, the table below reports the mean and median fee percentage, as well as the standard deviation, for each total recovery decile of the TCPA class action settlements provided by class counsel in *HSBC.*

**\*799**

[**Editor's Note:** The preceding image contains the reference for footnote [8] ]

**\*800** *HSBC*, No. 14 C 190 (N.D.Ill.) (Dkt. No. 109–1). Because this court lacks the technical expertise of Eisenberg, Miller, or Fitzpatrick, and because the sample size of cases (72) is quite small, the statistics set forth above are but an informal analysis.[9] The data similarly fail to provide a meaningful benchmark for a case like this one, where the $75.5 million recovery begins to approach what many courts consider a "megafund." Despite these shortcomings, the available TCPA data offer two important insights. First, the across-the-board percentage awards in TCPA class actions roughly track the fee awards in other types of cases, after controlling for class recovery amount. Second, TCPA class actions exhibit the same relationship between fee awards and recoveries as other types of cases: that is, the percentage of the fund awarded to counsel generally declines as the size of the fund increases.

### iii. Competitive Fee Structures Negotiated Ex Ante

The analysis desired by Seventh Circuit authority is not at an end, however, because the second and third benchmarks from *Synthroid* —*ex ante* arrangements and judicially overseen "auctions"[10]— reveal that sophisticated parties engaged in an pre-filing fee negotiations rarely agree to a single, across-the-board percentage fee structure, and rarely pay a percentage of the recovery equal to the benchmark established by past awards. The court has not uncovered any data about *ex ante* fee arrangements or auctions in the consumer class action context, let alone data on TCPA class actions. Data from published opinions in securities and antitrust cases do exist where district courts utilized a competitive approach to negotiate a fee structure on behalf of the class at the outset. As far as the court can tell, there are at least fourteen class action cases—twelve securities actions and two antitrust actions—where district court judges have selected lead counsel and negotiated a fee structure using a competitive process. *See In re Oracle Sec. Litig.,* 131 F.R.D. 688 (N.D.Cal.1990); *In re Wells Fargo Sec. Litig.,* 157 F.R.D. 467 (N.D.Cal.1994); *In re Amino Acid Lysine Antitrust Litig.,* 918 F.Supp. 1190 (N.D.Ill.1996) (Shadur, J.); *In re California Micro Devices Sec. Litig.,* 168 F.R.D. 257 (N.D.Cal.1996); *In re Cendant Corp. Litig.,* 182 F.R.D. 144 (D.N.J.1998); *In re Network Assocs., Inc., Sec. Litig.,* 76 F.Supp.2d 1017 (N.D.Cal.1999); *Sherleigh Assocs. LLC v. Windmere–Durable Holdings,*

*Inc.,* 184 F.R.D. 688 (S.D.Fla.1999); *In re Lucent Techs. Inc. Sec. Litig.,* 194 F.R.D. 137 (D.N.J.2000); *In re Bank One Shareholders Class Actions,* 96 F.Supp.2d 780 (N.D.Ill.2000) (Shadur, J.); *Wenderhold v. Cylink Corp.,* 188 F.R.D. 577 (N.D.Cal.1999); *In re Auction Houses Antitrust Litig.,* 197 F.R.D. 71 (S.D.N.Y.2000); **\*801** *In re Quintus Sec. Litig.,* 201 F.R.D. 475 (N.D.Cal.2001); *In re Commtouch Software Ltd. Sec. Litig.,* No. 01C–00719, 2001 WL 34131835, Order Re Lead Plaintiff Selection and Class Counsel Selection (N.D.Cal. June 27, 2001); *In re Comdisco Sec. Litig.,* 141 F.Supp.2d 951 (N.D.Ill.2001) (Shadur, J.) (Memorandum Opinion entering attached Apr. 6, 2001, Memorandum Order).

The data from these securities and antitrust cases, where available, do not shed light on the market rate in consumer class actions, but they do illustrate that (1) negotiated fee agreements regularly provide for a recovery that increases at a decreasing rate and (2) negotiated fee agreements frequently result in lower fee awards than those suggested by the empirical data on past awards granted after the fact. In 2006, United States District Judge William Smith conducted a survey of the fee structures adopted in some of the cases listed above. *Cabletron,* 239 F.R.D. at 43. The findings of Judge Smith's survey are reprinted in part below and supplemented by this court's independent research. Because the case before Judge Smith was a securities class action, Judge Smith applied the negotiated fee schedule of each surveyed case to the settlement amount in *Cabletron.* This court will not conduct a similar analysis because, as discussed above, the court cannot impute the market rate for attorneys' fees charged in securities and antitrust cases onto a consumer class action. It is sufficient to note that in nearly every case, the presiding judge selected a bid with a declining contingent-fee scale.[11] *See Cabletron,* 239 F.R.D. at 44 ("[T]he competitive fee structures uniformly reflect a downward scaling as the settlement fund increases.").

Instead, the court compares the prevailing fee percentage (*i.e.,* the "blended" rate) in each case to the mean and median set forth in Eisenberg and Miller's 2010 study for the corresponding recovery amount. Such a comparison should help the court determine whether and to what extent the empirical data—which largely reflect past fee awards determined *ex post*—overestimate the contingent fees parties agree to when they actually negotiate at the outset of a case.

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works. 12

The summary is as follows:

**\*802**

[**Editor's Note:** The preceding image contains the reference for footnote 12 ]

*Cabletron*, 239 F.R.D. at 44; Laural L. Hooper & Marie Leary, *Auctioning the Role of Class Counsel in Class Action Cases: A Descriptive Study*, Washington, D.C.: Federal Judicial Center, 2001 (supplementing Judge Smith's analysis).

As discussed earlier, the foregoing analysis is merely illustrative and does not purport to approximate the contingent fee for a TCPA class action, had that fee been **\*803** negotiated at the outset of the case with a "client" having a real stake in the outcome. The analysis does, however, suggest that selecting competent counsel using a competitive process generates a lower percentage-of-the-fund fee arrangement than Eisenberg and Miller's mean and median percentages, which mostly reflect awards granted *ex post*. The spreads between the negotiated fees and Eisenberg and Miller's estimates vary from 0% to 17% and are especially pronounced for settlements that produced large recoveries. The particular spread depends on the unique facts and risk factors of each case, but the court's finding here is generally consistent with the experience of district court judges who have used a competitive-bid approach to select counsel in the past. *See, e.g., In re Comdisco Sec. Litig.,* 150 F.Supp.2d 943, 947 n. 7 (N.D.Ill.2001) ("[T]his Court's prior experience as well as the bidding results in the present case confirm that the cited mythic norm [of 25 percent to 35 percent] is grossly excessive even where substantially smaller [than $100 million] amounts are at stake.")

The remaining question is whether the findings discussed above apply to a hypothetical *ex ante* negotiation in the consumer class action context, or merely to securities and antitrust cases. The court believes the findings from securities and antitrust cases provide some guidance regarding the *ex ante* negotiation in any type of class action. As Eisenberg and Miller concluded in 2004 and again in 2010, "the overwhelmingly important determinant of the fee is simply the size of the recovery obtained by the class," not the subject matter of the litigation. 7 J. Empirical Legal Studies at 250. All of the empirical studies surveying past awards found similar across-the-board percentage awards for securities, antitrust, and consumer class actions. *Id.* at 264 (Tab.5); 7 J. Empirical Legal Studies at 835 (Tab.8). Additionally, this court's informal analysis discussed earlier in this opinion, and which the court could not have conducted without the diligent assistance of counsel, confirmed that the same conclusion applies to the TCPA subset of consumer class actions. Furthermore, the court has no reason to believe that securities or antitrust cases are any more or less predictable than consumer class actions, such that counsel would be willing to negotiate a scaled fee schedule in one set of cases but not the other. As the Seventh Circuit explained in *Silverman,* a downward scaling fee arrangement is well-suited to securities litigation because a large portion of class counsel's expenses must be devoted to establishing liability, whereas damages can be calculated mechanically from movements in stock prices. *Silverman,* 739 F.3d at 959. That applies equally, if not more, to TCPA cases because nearly all of counsel's efforts are devoted to determining liability. Damages are fixed by statute.

### 3. Court's Estimation of the Market Rate for TCPA Class Actions Exclusive of Risk

The Seventh Circuit acknowledged in *Synthroid I* that it is, of course, "impossible to know *ex post* the outcome of a hypothetical bargain *ex ante* .... [b]ut a court can learn about *similar* bargains." *Synthroid I,* 264 F.3d at 719 (emphasis in original). That is what the court has endeavored to do in the preceding sections and the court now draws the following conclusions. First, given the class's inability to effectively monitor counsel, an *ex ante* negotiation would have produced a fee arrangement based on a percentage of the recovery. Second, the data available on past awards in TCPA cases and other class actions show that the mean and median recovery for a $75.5 million TCPA case are between 20% and 24% of the settlement fund. Third, an *ex ante* negotiation between Class Counsel and class **\*804** members in this case, had individual class members had a real stake in the litigation, would have produced a downward scaling fee arrangement. *See Silverman,* 739 F.3d at 959 ("The [empirical data] reinforce the observation in the *Synthroid* opinions that negotiated fee agreements regularly provide for a recovery that increases at a decreasing rate.") Fourth, given the $75.5 million recovery, the downward scaling fee arrangement

would have produced an actual percentage award below or toward the bottom of Eisenberg and Miller's 20% to 24% range for similarly sized settlements.

The special master appointed by Judge Gettleman in *Trans Union* observed, correctly, that determining the criteria for the hypothetical negotiation is the easy part; attaching actual numbers to the hypothetical downward scaling fee agreement is "more art than science." *Trans Union, 2009 WL 4799954, at *15.* As a starting point, the court applies a slightly modified version of the fee schedule set out by the Seventh Circuit in *Synthroid II* because *Synthroid II* is the only consumer class action known to this court where the parties (or in this case the court) estimated a downward scaling fee agreement in a consumer class action. [13] *Synthroid II, 325 F.3d at 980.* As demonstrated in the table below, applying the modified *Synthroid II* scale to the total recovery in this case yields a result that is largely consistent with the conclusions drawn from the court's analysis in Section II.C.2. The fee structure affords Class Counsel a relatively high rate for the initial recovery consistent with Class Counsel's need to devote most of their efforts to determining liability. The marginal rates diminish as the recovery increases because, notwithstanding the class's desire to incentivize counsel to seek a higher award, the measure of damages depends more on the number of class members (or phone calls) than the additional efforts of counsel. Finally, the modified *Synthroid II* structure produces an actual percentage fee of 19.97%, which is .03% below Eisenberg and Miller's 20% to 24% range for similarly sized settlements.

In light of the *Synthroid II* structure's fit with this court's observations about the **\*805** TCPA class-action market, and the fact that the *Synthroid II* structure resembles the fee schedules actually put forth by lawyers in an *ex ante* negotiations (although it is admittedly less tailored), the court adopts the *Synthroid II* structure as its estimation of the market contingent fee for a $75.5 million TCPA class action independent of the risks associated with a particular case.

#### 4. Risk of the Litigation

The last factor the Seventh Circuit instructs a district court to consider is the risk plaintiffs' lawyers face of possibly losing the litigation when they undertake class representation. The estimated magnitude of the risk necessarily affects the price at which Class Counsel in this case would have been willing to offer their services in an *ex ante* negotiation, had such a negotiation occurred. *See Synthroid I, 264 F.3d at 721.* The Seventh Circuit has explained the risk premium in fee negotiations with the following hypothetical: "[I]f the market-determined fee for a sure winner were $1 million the market-determined fee for handling a similar suit with only a 50 percent change of a favorable outcome should be $2 million." *Trans Union, 629 F.3d at 746* (citations omitted).

As this court discussed earlier in this opinion, Class Counsel in this case faced a variety of serious obstacles to success in bringing the lawsuit, and faced the real prospect of recovering nothing. First, it was quite possible that the discovery may have revealed that many class members acquiesced to receiving calls on their cell phones when they agreed to their cardholder agreements with Capital One. Some customers provided Capital One with their cell phone numbers as their primary contact numbers, arguably waiving any right not to receive debt-collection calls on their cell phone from Capital One. Second, at the outset of the litigation there was a serious question whether the Plaintiffs' claims could meet Rule 23's manageability requirement given that Capital One would have to review its records to determine which class members provided consent through cardholder agreements, which class members actually provided their cell phone numbers to Capital One, and whether each class member actually owned their cell phone number at the time Capital One called it using an autodialer. Third, as Capital One has noted throughout this litigation, there are presently petitions before the FCC urging the FCC to (1) revise the TCPA's definition of "automatic telephone dialing system" to exclude dialers like those used by Capital One, and (2) provide a safe harbor for all calls that Capital One inadvertently made to wrong numbers. Consequently, the longer this litigation were to continue, the longer Plaintiffs would be exposed to the possibility that the FCC would take action that might extinguish Plaintiffs' claims.

On the flip side, Capital One's potential monetary liability in this litigation is staggering. Even if each of the 7.5 million class members in this case had only received one

phone call a piece and could not prove that any of the calls were made in willful violation of the TCPA, Capital One's exposure is still greater than $8.7 billion. That type of potentially bankruptcy-level exposure is sufficient to compel an *in terrorem* settlement before a liability determination is made and is accordingly a factor that reduces Class Counsel's risk of non-payment. *See AT & T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S.Ct. 1740, 1752, 179 L.Ed.2d 742 (2011) (noting class actions can produce *in terrorem* settlements).

The precise level of risk faced by Class Counsel more than two years ago, when the cases were filed, is difficult for a district court to determine and quantify after the fact. The Seventh Circuit, however, **\*806** has criticized at least one district court for failing to make an attempt to do so. *See Trans Union*, 629 F.3d at 746–48. As hard as the task may be, this court will endeavor to determine an appropriate risk multiplier. After preliminary approval of the Class Settlement and after the court granted limited discovery of Class Counsel's lodestar information in this case and other TCPA cases, Professor Todd Henderson submitted a report on behalf of class member objector Jeffery Collins. Professor Henderson's report calculated that Class Counsel recovered on behalf of the various classes they had represented (and themselves) in about 43% of past TCPA cases. [14] (Dkt. No. 294 ¶ 10.) Professor Henderson's determination was based on the limited sample of TCPA cases in which Class Counsel participated. It is, however, the best information available to court. As a result, the court assumes the average TCPA case carries a 43% chance of success, and the question the court ultimately must answer is whether Class Counsel in this case faced a greater or lesser chance of prevailing. Considering the circumstances of this case, the court believes that the class members' consent issues made the representation riskier than a typical TCPA class action, but only slightly so after considering the strong incentives to settlement created by the magnitude of Capitol One's potential liability.

The next question the court now faces is how to adjust the market fee structure the court has determined, as discussed earlier in this opinion, to account for the increased risk Class Counsel faced of losing. Eisenberg and Miller in their 2010 study concluded that "high risk" consumer class actions yield a percentage fee premium of about 6% above the "low or medium risk" cases. 7 J. Empirical Legal Studies at 265 (Tab.8). Absent better information

and in light of the court's determination that this case was only slightly riskier than a typical TCPA class action, the court adopts Eisenberg and Miller's risk premium and applies it to the court's estimated market rate. Although Eisenberg and Miller's 6% premium applied to the entire fee award, such an application does not make sense in a case like this one, where the risk existed only with regard to liability, not damages. Each of the potential impediments to establishing Capital One's liability: the class members' alleged consent to be called; Rule 23 manageability issues; and potentially forthcoming FCC orders; only affected Class Counsel's ability to prove their case on liability and consequently their ability to recover any damages. Once the risk resulting from the impediments to establishing liability was overcome and Capital One's liability established, Class Counsel's ability to obtain a large recovery was no longer materially affected by that risk. As discussed above, one of the purposes of a downward scaling fee schedule is to account for cases where the marginal costs of increasing the class's damages recovery are low. Class counsel in an *ex ante* negotiation must nevertheless be provided an incentive to take the case at the outset and seek the highest award on behalf of the class that is reasonable under the facts and law of the case.

Because all of the risk factors in this case were limited to the question of Capital One's liability, it follows that the risk premium related to Class Counsel's fees should apply only to the attorneys' fees **\*807** associated with the initial recovery tier negotiated between Class Counsel and the sophisticated class members before the case was filed. In the hypothetical *ex ante* negotiation, Class Counsel would have desired compensation for their enhanced risk regardless of the eventual level of recovery; the way to affect that desire is by incorporating the risk premium into the attorney fee percentage related to the first recovery tier. Sophisticated class members, by contrast, would have balked at agreeing to a similar adjustment to the second, third, and fourth recovery tiers, because the risk factors present in this case related only to establishing liability and would not have affected Class Counsel's ability to achieve the additional damages recovery reflected in second, third and fourth tiers. The court therefore applies the 6% premium only to the first $10 million in the first tier of the market fee structure. The court's risk-adjusted market contingent fee structure is set forth in the table below, and nets Class Counsel an additional $600,000.

### 5. Professor Henderson's Model

Lastly, as discussed earlier, the court granted objector Jeffrey Collins's request for discovery of information from Class Counsel regarding Class Counsel's hours and hourly fees to calculate the lodestar in this case and in Class Counsel's previous TCPA class cases. Collins sent Class Counsel's information to Professor Henderson, who in turn filed a report analyzing the data and proposing an alternative method for approximating the *ex ante* market rate at the conclusion of a case. Collins's counsel acknowledged at the final approval hearing that no district court or court of appeals has ever adopted Professor Henderson's methodology. (Dkt. No. 324 at 54:17–19.) This court similarly declines to apply Professor Henderson's method of estimating the appropriate fee award in this case. Professor Henderson's model, though not applied, nevertheless merits a brief discussion.

Using Class Counsel's lodestar data, Professor Henderson determined that Class Counsel, who are highly experienced, achieve a recovery for their "clients" in approximately 43% of their TCPA cases. (Dkt. No. 294 ¶ 10.) But after adjusting for Class Counsel's tendency to devote substantially more professional time to their winning cases than to their losing cases, Henderson concluded that Class Counsel have a 64% chance of obtaining recovery for any given dollar of lodestar invested in TCPA litigation. Given a 64% chance of recovery, Henderson determined that Class Counsel need only obtain a **\*808** weighted average 1.57 lodestar multiplier in successful cases to compensate Class Counsel for their lodestar investment and the contingent risk Class Counsel faces in TCPA class action litigation. (*Id.*) Applying that multiplier to this case, Professor Henderson concluded that Class Counsel would have represented the class in this case for 4.6% of the total recovery had they been forced to compete for the legal work at the outset of the case. [15]

Professor Henderson's model may possibly be a good predictor of the going rate in a competitive market of homogeneous plaintiffs lawyers. It does not, however, comport with the Seventh Circuit's guidance requiring the court to hypothetically approximate an *ex ante* fee negotiation. As a threshold matter, Professor Henderson's

model relies exclusively on data relating to cases that were resolved after Class Counsel filed this case. That is not a criticism of Professor Henderson's methodology —he had no choice because he was limited to the data available through discovery. The limitation, however, does undermine the applicability of Professor Henderson's model to this case. Class Counsel did not know, at the outset of the litigation, that they needed only to achieve a 1.57 lodestar multiplier to compensate themselves for the contingent risk, and accordingly could not have relied on that multiplier to formulate their hypothetical *ex ante* bid for the legal work in this case. Professor Henderson's model also assumes "a hypothetical competitive market for plaintiffs' lawyers' services," without ever establishing that such a market exists. (Dkt. No. 294 ¶ 64.) The court's job is to approximate the market as it existed before the litigation, including the degree of competition. In doing so, the court cannot assume a perfectly competitive market without the benefit of reviewing additional evidence that is absent from this record. Indeed, the joint representation model present in this case and many of the comparable TCPA cases suggests that the market among plaintiffs class action lawyers, at least for large TCPA cases, may not be highly competitive. *See also* Joseph Ostoyich and William Lavery, *Looks Like Price–Fixing Among Class Action Plaintiffs Firms,* Law360 (Feb. 12, 2014 11:30 AM), http://www.law360.com-/articles/542260/looks-like-price-fixing-among-class-action-plaintiffs-firms.

Ultimately, the court must follow the Seventh Circuit's guidance in approximating the fee that would have been negotiated *ex ante* in this TCPA case had such a negotiation occurred. Unfortunately for Professor Henderson, his model is not among the methods accepted by the Seventh Circuit. Using the benchmarks set forth in *Synthroid I,* as explained above, the court concludes that the tiered fee arrangement displayed above, which approximates the agreed-upon negotiated percentage of the attorneys' fees to be taken from a $75.5 million settlement had Class Counsel negotiated with capable, sophisticated class members having a real stake in the litigation, is about 20%. Although the court noted earlier that the fairness of a fee percentage is to be considered against the total value of the settlement to the class less administrative and notice costs, the benchmarks the court used to determine the market rate evaluated fees as a percentage of the total recovery. The court therefore grants Class Counsel $15,668,265 of fees which is equal to

about 20.77%, or about one fifth, of the entire $75,455,099 settlement fund.

 **\*809** The court further grants Class Counsel's requested incentive awards for the Named Plaintiffs in the amount of $5,000 each. Incentive payments sufficient to induce Named Plaintiffs to participate in the lawsuit are appropriate in the Seventh Circuit and, given the circumstances in this case, were necessary. *Continental,* 962 F.2d at 571. Moreover, a $5,000 award is consistent with the awards granted by other courts in this district in similar litigation. *See AT & T Mobility,* 792 F.Supp.2d at 1041 (collecting cases).

The Settlement Agreement states that Defendants' contributions to the settlement fund are non-reversionary, (Settlement Agreement § 2.42), and that the settlement will "continue to be effective and enforceable by the Parties," in the event that the court declines Class Counsel's fee request or awards less than the amounts sought (*id.* § 5.03). But the Settlement Agreement is silent on the matter of who, precisely, should receive the additional funds available should the court reduce the requested fee award, as it has done here. For the avoidance of doubt, the court orders that the additional money available as a result

of its reduction to Class Counsel's requested fee should go to the class members who made timely claims. After incorporating the court's reduced fee award, the money available to class as result of the settlement is $54,668,834, which results in a payment to each timely claimant of at least $39.66, and possibly more if some claimants fail to deposit their settlement checks within 210 days.

### CONCLUSION

For the reasons set forth above, Plaintiffs' motion for final approval of the class action settlement [260] is granted. The settlement is fair, reasonable, and adequate. Class Counsel's motion for approval of attorneys' fees [175] is granted in part and denied in part. The court awards attorneys' fees and costs in the total amount of $15,668,265 (about 20.77% of the $75,455,099 settlement amount) and incentive awards of $5,000 to each of the five Named Plaintiffs.

**All Citations**

80 F.Supp.3d 781

### Footnotes

1   Capitol One includes defendants Capital One Bank (USA), N.A., Capital One, N.A., Capital One Financial Corporation, Capital One Services, LLC, and Capital One Services II, LLC. The Participating Vendors include defendants Capital Management Services, LP ("CMS"), Leading Edge Recovery Solutions, LLC ("Leading Edge"), and AllianceOne Receivables Management, Inc. ("AllianceOne").

2   Plaintiffs never filed a proper motion for preliminary approval, although they filed two memoranda in support of such a motion. (Dkt.Nos.121, 129.) They captioned the memoranda as "motions" in the docket text, but the actual headings of the filings reveal that neither is a motion, merely a memorandum. The court ignored Plaintiffs' oversight in light of the need for a standalone order (Dkt. No. 137) granting preliminary approval.

3   The parties estimate that approximately 5% of the settlement class is unknown to Capital One or Plaintiffs. (Dkt. No. 264 ¶ 11.)

4   The court calculated this figure using BrownGreer's number of contacted class members, 15,983,613, in conjunction with its assessment that 15,983,613 represents 91.22% of the total class. (*See* Dkt. No. 305 ¶ 6.)

5   The settlement fund is actually $75,455,098.74. For the sake of simplicity, the court has rounded the numbers to the closest dollar, as it has done with the other figures discussed in this opinion.

6   The court originally set the final approval hearing for December 9, 2014, but rescheduled the hearing for January 15, 2015 after granting Collins' request for additional discovery. Class Counsel informed all objectors who had previously stated a desire to appear of the date change and, out an abundance of caution, the court's clerk waited in the courtroom designated for the hearing on December 9 to record the appearance of any objector who mistakenly appeared on that date. No objector came to the designated courtroom on December 9, 2014.

7   The court includes invalid and untimely opt-out requests in the total because those requests, although invalid, signal disapproval of the settlement.

8   In cases where any unclaimed portion of the settlement reverted to defendants, the court considered the total recovery to be the amount made available to class members before any reversion.

9　The court has expended considerable time and effort placing the information submitted by *HSBC* counsel into usable a dataset for this informal analysis. To assist judges in future cases, and to provide a starting point for more adept statisticians, the court will make its underlying dataset available in a separate order on the docket.

10　The Seventh Circuit has repeatedly stated that litigants do not select their own lawyers through auctions because there is no standard of quality of legal services. *Silverman,* 739 F.3d at 958; *In re Synthroid Marketing Litig.,* 325 F.3d 974, 979–80 (7th Cir.2003) ( *Synthroid II* ). To the extent that the term "auction" implies an iterative process where bidders compete exclusively on price, that is not the process described here. The auctions described in this section reflect cases where judges placed themselves in the "clients' " shoes and selected the "best bid" based on the quality of the legal work and the price offered. *See Synthroid I,* 264 F.3d at 720.

11　In *In re Auction Houses Antitrust Litigation,* 197 F.R.D. 71 (S.D.N.Y.2000), counsel agreed to the opposite approach, taking no fees for the first $405 million recovered and 25% of everything above $405 million. The government had already established liability and the lawyers (as well as the class and the court) believed that the first few hundred million would come easy. *See Synthroid I,* 264 F.3d at 721 (discussing fee structure selected in *Auction Houses*).

12　Unlike Judge Smith's analysis, and in recognition that Class Counsel in this case have not included a request for expenses on top of their overall fee request, the court includes expenses awarded to Class Counsel in calculating the fee award.

13　In *Synthroid II,* the Seventh Circuit set the third "recovery tier" of the consumer class fee schedule at $20–$46 million because it used the total recovery by third-party payers, $46 million, to benchmark the consumer class scale. Here, the court adopts $20–$45 million as the recovery range for the third tier of the estimated fee scale because fee scales negotiated *ex ante,* including those surveyed above, generally reflect uniform recovery ranges—in this case, multiples of five.

14　Professor Henderson further determined that after adjusting for the amount of effort Class Counsel invested in each case, about 64% of Class Counsel's total investments were in cases in which they recovered. (*Id.* ¶ 10.) Because the court is concerned with the riskiness of this case relative to other TCPA cases, however, it adopts Professor Henderson's 43% estimate, unadjusted for Class Counsel's investment savvy.

15　(Multiplier (1.57) x Lodestar ($2,213,769)) ÷ Recovery ($75,455,099) = 4.6%. Professor Henderson's model is more complicated than the court's basic description here. For purposes of this opinion, however, and because the court did not apply Professor Henderson's approach, the court's summary will suffice.

**End of Document**　　　　　© 2017 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT B

Nos. 15-1400 (L) and 15-1490
Consolidated with Nos. 15-1514, 15-1416, 15-1586, 15-1639

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

In re Capital One Telephone Consumer Protection Act Litigation,
APPEAL OF: Antonia Carrasco, *et al.*, Objectors-Appellants

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:12-cv-10064,
Judge James F. Holderman

Plaintiffs-Appellees' Response to Motion of Center for Class Action
Fairness to Withdraw from Representation of Jeffrey Collins in Appeal No. 15-
1546, to Intervene in Appeal Nos. 15-1400 and 15-1490 as Guardian Ad Litem for
the Class, for an Order to Disclose Settlement Terms if Helpful to the Court, and,
in the Alternative, an Order Issuing New Notice to the Class, and Opposition of
Center for Class Action Fairness to Rule 42 Motion to Dismiss

LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
Jonathan D. Selbin
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500

*Counsel of Record*

Douglas Cuthbertson
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500

Daniel M. Hutchinson
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000

TERRELL MARSHALL DAUDT & WILLIE
PLLC
Beth E. Terrell
Michael D. Daudt
936 North 34th Street, Suite 400
Seattle, WA 98103
Telephone: (206) 816-6603

KEOGH LAW, LTD
Keith James Keogh
55 W. Monroe
Suite 3390
Chicago, IL 60603
Telephone: (312) 726-1092

*Additional Counsel*

## TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ........................................................................iii

I.   INTRODUCTION ........................................................................ 1

II.  BACKGROUND ........................................................................ 4

     A.   The Settlement provides substantial relief and
          notice was highly effective ..................................................... 4

     B.   The fee proceedings in the District Court were adversarial................. 6

          1.   The District Court permitted the objectors to
               conduct unprecedented discovery regarding Class
               counsel's fee request ..................................................... 6

          2.   Class counsel and the objectors supported
               their respective positions regarding fees with
               extensive briefing and expert testimony .................................. 6

     C.   The District Court granted in part Class counsel's motion
          for fees in a well-reasoned order supported by empirical
          evidence. ......................................................................... 7

     D.   All appellants have settled their claims and moved to
          dismiss their appeals............................................................ 8

     E.   Mr. Frank erroneously accuses Class counsel of unprofessional
          Conduct. ......................................................................... 10

III. AUTHORITY AND ARGUMENT ................................................. 12

     A.   The appeals should be dismissed because no dispute
          remains to adjudicate.......................................................... 12

     B.   Mr. Frank lacks standing to intervene on behalf of the Class ........... 16

     C.   Appointment of a guardian ad litem is not appropriate
          in this case. .................................................................... 17

D.    Class counsel violated no ethical rules or engaged in
improper conduct.................................................................... 18

IV.    CONCLUSION ..................................................................................... 19

STATEMENT REGARDING ORAL ARGUMENT ................................................... 21

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. 32(a)(7)(C)
AND CIRCUIT RULE 30(d) ............................................................................... 22

CERTIFICATE OF SERVICE ............................................................................... 23

## TABLE OF AUTHORITIES

Page No.

### FEDERAL CASES

*Agretti v. ANR Freight Sys., Inc.*,
    982 F.2d 242 (1992) ........................................................................... 16

*Alvarado v. Corporate Cleaning Services*,
    782 F.3d 365 (7th Cir. 2015) ..................................................... 13, 14

*Americana Art China Co. v. Foxfire Printing & Packaging, Inc.*,
    743 F.3d 243 (7th Cir. 2014) ........................................................... 14

*Devlin v. Scardelletti*,
    536 U.S. 1 (2002) ............................................................................. 16

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
    183 F.3d 1 (1st Cir. 1999) ......................................................... 13, 19

*F.T.C. v. Trudeau*,
    606 F.3d 382 (7th Cir. 2010) ..................................................... 17, 18

*Gautreaux v. Chicago Housing Auth.*,
    475 F.3d 845 (7th Cir. 2007) ..................................................... 16, 18

*Gottlieb v. Barry*,
    43 F.3d 474 (10th Cir. 1994) ........................................................... 17

*Haas v. Pitt. Nat'l Bank*,
    77 F.R.D. 382 (W.D. Penn. 1977) ................................................... 17

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ......................................................................... 16

*Mills v. Green*,
    159 U.S. 651 (1895) ......................................................................... 12

*Preiser v. Newkirk*,
    422 U.S. 395 (1975) ......................................................................... 12

*Safeco Ins. Co. of Am. v. Am. Intern. Group, Inc.*,
    710 F.3d 754 (7th Cir. 2013) ..................................................... 12, 13

*Sierra Club v. Morton,*
     405 U.S. 727 (1972) ...................................................................... 16

*U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship,*
     513 U.S. 18 (1994) ........................................................................ 12

## STATUTES

47 U.S.C. §227 .................................................................................. 4

## RULES

Fed. R. Civ. P. 1 ............................................................................. 13

Fe. R. Civ. P. 23 ................................................................................ 13

Fed. R. App. P. 42(b) ........................................................................ 9

## OTHER AUTHORITIES

Brian T. Fitzpatrick, The End of Objector Blackmail?,
62 Vand. L. Rev. 1623, 1664 (2009) .......................................... 13, 15, 19

Nat'l Assoc. of Consumer Advocates, "Standards and Guidelines
for Litigating and Settling Consumer Class Actions" at 81 (3d ed. 2014) .............. 15

T.E. Willging & N.A. Weeks, "Attorney Fee Petitions:  Suggestions for
Administration & Management," Federal Judicial Center (1985) ......................... 17

William B. Rubenstein, Newberg on Class Actions
§14:12 (5th ed. June 2015) ........................................................... 16

# I.   INTRODUCTION

These consolidated appeals involve review of a class action settlement that creates a $75.45 million non-reversionary cash fund to be distributed *pro rata* to almost 1.4 million claiming Class members. After exhaustive review, unprecedented discovery into Class counsel's TCPA class action business, multiple rounds of briefing, multiple competing expert reports regarding the *ex ante* market for fees in cases like this one, and a lengthy contested fairness hearing, the District Court issued a forty-three page opinion approving the Settlement and granting in part and denying in part Class counsel's request for an award of attorneys' fees, and awarding 20.77% of the fund as fees. A fulsome description of the Settlement, the proceedings below, and the District Court's review of it, can be found in Plaintiffs' brief on the merits of this appeal. (App. Dkt. No. 75 at pp. 2–12.)

At the time this response is being filed, every objector-appellant has moved to dismiss their appeals. (App. Dkt. No. 35, 47, 55, 59, 74, 78.) However, Theodore Frank and the entity he heads, the Center for Class Action Fairness ("CCAF"), filed a motion to intervene so that he could pursue the appeals despite representing no Class member or client. Neither Mr. Frank nor the CCAF are Class members, nor have they been legally injured by the District Court's decisions. The only connection Mr. Frank has to the appeals is that he is the now-former lawyer for one of the appellants, Jeffrey Collins, who dismissed his appeal as a result of a settlement. In support of his motion, Mr. Frank submitted a declaration that, among other things, sets out in detail what appears to be a fee or partnership dispute between him and a

professional objector, Christopher Bandas. Apparently, according to Mr. Frank, he has been "moonlight[ing]" for several years for Bandas—working on appeals of class action settlements—to the tune of more than $220,000. (App. Dkt. 60-2, p. 37, ¶30.)

Mr. Frank and CCAF have now withdrawn that motion. (App. Dkt. No. 79.) The withdrawal was not the result of any agreement between Mr. Frank (or CCAF) and Class counsel—nor did Class counsel compensate Mr. Frank or CCAF to withdraw the motion. (Declaration of Jonathan D. Selbin ("Selbin Decl.") ¶ 22.) Plaintiffs file this response pursuant to the Court's June 11, 2015 order (App. Dkt. No. 57) to address certain accusations Mr. Frank makes that Class counsel's conduct was improper. The undersigned requested Mr. Frank retract those accusations in his motion to withdraw to avoid the necessity of this response; he declined. (Selbin Decl., ¶ 22–23.)

If the Court considers the merits of Mr. Frank's now-withdrawn motion, Plaintiffs submit the motion should be denied because there is no basis in law or fact to award the requested relief.

First, no party wants to pursue these appeals and no controversy remains to be adjudicated. Because courts should not issue opinions resolving litigation that the parties no longer wish to pursue, Mr. Frank's motion, if taken up, should be denied.

Second, as a nonparty who has suffered no injury by the District Court's decision, Mr. Frank and the CCAF lack standing to pursue any appeal.

Third, it is not necessary to appoint a guardian ad litem for the Class. In a highly adversarial process, the District Court carefully scrutinized Class counsel's fee request and rigorously applied this Court's "market-mimicking" approach to determining fees. The District Court permitted objectors to take discovery from Class counsel regarding their lodestar and other fee awards in TCPA settlements, considered detailed expert reports submitted by both Class counsel and CCAF, and relied on additional empirical research. Relying on all this information, the District Court issued a lengthy and well-reasoned opinion approving in part and denying in part Class counsel's fee request. Through the careful, thorough, and neutral manner in which the District Court conducted the approval proceedings, the District Court fulfilled its role as a true fiduciary to the Class.

Fourth, there is no authority supporting the appointment of a "guardian ad litem" for a class in an appellate proceeding. And doing so would be bad policy, as it would permit uninterested third parties to appeal every class action settlement, eviscerating the interest in finality shared by all parties and the courts, and the very efficiencies class actions are supposed to ensure.

Finally, Mr. Frank's suggestion that Class counsel engaged in unethical or otherwise improper conduct by settling the appeals is false. Class action appeals are often settled—indeed sometimes by this Court's own Circuit Mediator—for the very legitimate reason of avoiding litigation costs and delay. Mr. Frank's vague, unsupported accusations of ethical impropriety are meritless.  That is not just Class

counsel's view: it is the view of two academic experts in the fields of professional responsibility.

For all these reasons, Plaintiffs respectfully request that Mr. Frank's motion, if it is considered, be denied, and that the motions for dismissal of the appeals be granted.

## II.   BACKGROUND

### A. The Settlement provides substantial relief and notice was highly effective.

This case involves four consolidated class actions against defendant Capital One and/or its vendors ("Capital One"). Plaintiffs allege that Capital One violated the Telephone Consumer Protection Act, 47 U.S.C. § 227 (1991) ("TCPA") by placing calls to Plaintiffs and Class members' cell phones without their prior express consent.

Over a six-month period, the parties held three in-person mediation sessions and additional telephone conferences before retired United States Magistrate Judge Edward A. Infante. (Dkt. No. 129 at 7.) Judge Infante himself submitted a declaration vouching for the legitimacy and non-collusive nature of the process. (*See* Dkt. No. 123, Ex. 2.)

After mediation, the parties entered into the largest class settlement in the history of the TCPA. The settlement agreement created a $75,455,098.74 non-reversionary cash fund that will be distributed pro rata, after deducting settlement expenses, to the 1,378,534 Class members who filed a claim. (Dkt. No. 131-1 § 4.01.) As a result of the Settlement, Capital One also implemented protocols governing its

use of automatic dialers to call cell phones that bring it into compliance with Plaintiffs' interpretation of the TCPA. (Dkt. No. 131-1 § 4.01; Dkt. No. 263 ¶¶ 20–21.)

The Settlement provides excellent relief given a host of risks, any one of which might result in zero recovery. Plaintiffs' brief on the merits of this appeal fully describes the substantial relief the Settlement provides to the Class and the risks they faced if the case had proceeded on a litigation track. (*See* App. Dkt. No. 72; *see also* Dkt. No. 329 at 36–37.)

Even at the preliminary approval stage, the District Court scrutinized the Settlement and the process that led to it. After receiving Plaintiffs' motion for preliminary approval and holding an initial hearing, it ordered Plaintiffs to submit additional information and briefing and to amend certain terms. (Dkt. No. 125.) The parties signed an amended settlement agreement addressing the District Court's questions and Plaintiffs submitted a second preliminary approval motion, which the Court granted.  (Dkt. Nos. 129–32.)

The Settlement included a best-in-class notice program that the District Court determined was "well-tailored to reach the maximum number of class members."  (Dkt. No. 329 at 18.) Direct individual notice reached 96% of the 16.6 million known class members (91% of the estimated total class of 17.5 million). (Dkt. No. 264 ¶ 30.) The claims process was remarkably simple:  Class members needed only to return a simple claims form in a pre-paid envelope that was sent with each notice, or complete a simple on-line claims form. The notice and claims

program was effective. Nearly 1.4 million Class members submitted a claim. (*Id.* ¶ 35.)

### B. The fee proceedings in the District Court were adversarial.

1. The District Court permitted the objectors to conduct unprecedented discovery regarding Class counsel's fee request.

Class counsel filed their fee petition nearly a month before the objection deadline and posted it to the Settlement website. (Dkt. No. 264 ¶ 26.) Fourteen Class members — out of over seventeen million — objected to the Settlement or Class counsel's fees, including Jeffrey Collins, represented by CCAF. Mr. Collins objected to Class counsel's 30% fee request as excessive, arguing for application of diminishing marginal rates. (Dkt. No. 197 at 5.) Collins sought discovery on Class counsel's lodestar and costs in this and unrelated TCPA cases over a four year period that Class counsel had litigated. (*See* Dkt. Nos. 191, 191-1 at 5.) The District Court granted Collins's request, postponed the fairness hearing to allow the discovery, and referred the case to a magistrate judge for the purpose of supervising discovery proceedings. (Dkt. Nos. 209, 210.) The contentious proceedings continued before the magistrate judge over the course of several months.

2. Class counsel and the objectors supported their respective positions regarding fees with extensive briefing and expert testimony.

On November 18, 2014, Plaintiffs filed their response to the fourteen objections, including Mr. Collins's objection to their fees. (Dkt. No. 269.) In support, Plaintiffs submitted expert reports from Professors Brian T. Fitzpatrick of Vanderbilt Law School (Dkt. No. 270) and David Rosenberg of Harvard Law School. (Dkt. No. 271.) These experts explained why the percentage of the fund method for

calculating attorneys' fees is superior to the lodestar method. (*See* Dkt. Nos. 270,

271.) Professor Fitzpatrick further opined that Class counsel's requested fee "is

consistent with the market for legal services." (Dkt. No. 270 ¶ 4.)

Collins filed a supplemental brief in support of his objection. (*See* Dkt. No.

293.) Abandoning his previous argument for "diminishing marginal rates," he

proposed an *ex post* model that would (as Collins's counsel admitted) award the

least successful attorneys the most compensation, and the most successful the least.

(*See* Dkt. 324 at 63:5–8.)

Plaintiffs filed a reply to Collins's supplemental brief, submitting

supplemental expert reports from Professors Fitzpatrick and Rosenberg that

detailed the flaws in Mr. Collins's methodology.  These included that he (1) utilized

data solely from cases that resolved after this case was filed; (2) failed to address

extensive empirical data that indicated the median fee percentage in this Circuit is

29%; and (3) if adopted, would require courts to analyze a "mindboggling" amount of

data. (*See* Dkt. Nos. 270, 271, 302, 302-2, 302-3.) Both experts concluded that Mr.

Collins's approach is really the lodestar method in disguise and Professor

Fitzpatrick pointed out that instead of the market model mandated by this Court,

the method is a central planner model "on steroids." (*See* Dkt. No. 302-2 ¶ 14.)

### C. The District Court granted in part Class counsel's motion for fees in a well-reasoned order supported by empirical evidence.

Armed with extensive briefing, expert reports, supplemental expert reports,

and empirical studies regarding attorneys' fees awarded in both the Seventh Circuit

and elsewhere, the District Court conducted a fairness hearing during which it

heard arguments from counsel for both parties and CCAF's counsel on behalf of Mr.

Collins. (*See* Dkt. No. 324.) Approximately one month later, the District Court

granted final approval to the Settlement and granted in part Class counsel's request

for attorneys' fees and costs. (Dkt. No. 329.)

In a thoughtful opinion analyzing all available facts and law, the District

Court significantly reduced the requested fees to 20.77% of the non-reversionary

cash fund, based on a tiered fee structure. In determining an appropriate market

rate, the District Court considered independent empirical studies regarding the

mean fee award in settlements involving funds similar in size to this one. (*See* Dkt.

No. 329 at 24.) This data included publicly-available summary data regarding 73

TCPA class action settlements approved since 2010. (*Id.*) The District Court also

examined data from cases in which fee amounts were determined using a

competitive process. (*Id.* at 28–29.) Relying on these sources, it concluded that the

market supports application of a downward scaling fee arrangement in these

circumstances. (*Id.* at 33–34.) It then adjusted the percentage for the risk involved

in this action, concluding Class counsel was entitled to 20.77% of the fund. (*Id.* at

43.)

### D. All appellants have settled their claims and moved to dismiss their appeals.

Of the fourteen original objectors, seven timely filed notices of appeal,

including Jeffrey Collins. Mr. Collins, via CCAF, expressly limited his objection and

appeal to the fee award, not the Settlement itself. (See App. Dkt. No. 23 (Collins

submission that his "appeal is limited to Rule 23(h) issues and does not affect any

defendants).)

This Court consolidated all of the appeals. One appellant — Stephen Kron — dismissed his appeal before filing a brief. (App. Dkt. No. 35.) The Circuit's Senior Conference Attorney approached Class counsel to see whether they would be willing to discuss settlement with the appellants. (Selbin Decl. ¶ 12.) Class counsel declined. (*Id.*) On June 3, 2015, attorney Christopher Bandas approached Class counsel to raise the possibility of settlement discussions on behalf of his client, and informed Class counsel that Mr. Collins had "fired" Mr. Frank. (*Id.* ¶¶ 13–14.) (Mr. Frank acknowledges that he was fired by Mr. Collins that day. (Dkt. No. 60-2 ¶ 64.) Mr. Frank subsequently called Class counsel to confirm that Class counsel had made Mr. Collins a settlement offer and its terms. (*Id.* ¶ 15.) Class counsel confirmed that they had made a settlement offer that included an offer of $25,000 to Mr. Collins in exchange for dismissal of his appeal and withdrawal of CCAF's fee motion in the District Court. (*Id.* ¶¶ 14–15.)

Mr. Frank initially rejected Class counsel's offer, apparently without consulting his client. (App. Dkt. No. 60-2 ¶ 3.) He contacted Mr. Selbin later to accept it. (*Id.*; *see also* Selbin Decl. ¶ 16.) Mr. Collins filed a motion pursuant to Fed. R. App. P. 42(b), seeking voluntary dismissal of his appeal, which this Court granted. (App. Dkt. No. 58-1.) On June 8, 2015, this Court issued a mandate to the District Court, informing it that the appeal had been dismissed. (Dkt. No. 426.) Soon thereafter all counsel who had appeared for Mr. Collins, including CCAF, moved in the District Court to withdraw as counsel for Mr. Collins. (Dkt. No. 429.) The District Court granted that motion. (Dkt. No. 433.) Now, all appellants' cases

have either been dismissed or motions to dismiss are currently pending.

### E.  Mr. Frank erroneously accuses Class counsel of unethical conduct.

After Mr. Collins filed his motion to dismiss, Mr. Frank filed the instant

motion seeking to withdraw as Mr. Collins's counsel and to intervene in other

appeals as "guardian ad litem." In support of his motion, Mr. Frank submitted a 22-

page declaration describing in detail the circumstances that led to his client's

motion to dismiss. Although Mr. Frank previously indicated to Class counsel that

Mr. Frank did not believe they had done anything wrong, Mr. Frank described the

offer Class counsel made to Mr. Collins as "an unethical settlement offer," though

he provided no explanation of why it was unethical. (*Compare* Selbin Decl. ¶ 15

*with* App. Dkt. No. 60-2 (Frank Decl.) ¶ 82.)

In his declaration Mr. Frank asserts that he has a "fundamental

disagreement with Mr. Collins' decision to accept [Class counsel's] settlement offer."

(Dkt. No. 60-2 ¶ 4.) Mr. Frank also touts the fact that CCAF "cannot and does not

settle its objections for a quid pro quo cash payment to withdraw, as many

professional objectors do." (*Id.* ¶¶ 15–18.) But Mr. Frank also admits that he has

been "moonlight[ing]" for years with approval of CCAF for well-known professional

objectors, Christopher Bandas and Darrell Palmer. (*Id.* ¶¶ 24, 12, 69.) He also

admits the professional objectors for whom he worked "used his name to threaten

class counsel into settling." (*Id.* ¶ 33.) Between 2013 and 2015 Mr. Frank says he

earned a net of $221,000 working for Mr. Bandas alone. (*Id.* ¶ 30.)

Class counsel retained two experts, Professor Alexandra D. Lahav, the Joel

Barlow Professor at the University of Connecticut School of Law, and Professor Robert P. Burns, the William W. Gurley Professor of Law at Northwestern University School of Law. They were tasked with evaluating Mr. Frank's allegations based on the entire record and to determine whether Mr. Selbin's conduct in settling the Collins appeal violated any ethical rules.[1] Professor Lahav focuses her academic research on class and complex litigation, including issues related to ethics and professional responsibility; Professor Burns focuses his academic work on professional responsibility and ethics generally across all practice areas.

Professor Lahav concludes unequivocally that Mr. Selbin violated no rules, ethical or otherwise. "There is no duty not to settle, both in the class action context and outside of it." (Declaration of Alexandra D. Lahav ("Lahav Decl.") ¶ 10.) Moreover, class counsel's fiduciary duty to the class "permits settling an appeal where it would be in the interests of class members to do so." (*Id.* ¶¶ 11–12.) Such interests include "the speedy resolution of the case so that the class members can obtain the payment they are entitled to under the settlement," which Professor Lahav opines "appears to be the case here." (*Id.*; *see also* Selbin Decl. ¶ 21 (stating that Class counsel settled the appeals "acting as fiduciaries for the class to ensure that baseless or improper objections and appeals do not delay class members from receiving the payments and other relief to which they are entitled").)

Professor Burns fully concurs with Professor Lahav's conclusions. (*See generally* Declaration of Robert P. Burns.) Thus, whether the issue is approached

---

[1] Class counsel also asked them to evaluate Mr. Frank's conduct; however, given the withdrawal of his motion to intervene, Class counsel have opted not to submit those opinions. Should the Court request them, Class counsel will provide them. (Selbin Decl. ¶ 18.)

from the perspective of ethics in class actions, as Professor Lahav does, or from that

of professional responsibility generally, as Professor Burns does, the conclusion is

the same: Class counsel violated no ethical rules and their conduct fully comported

with their fiduciary duties to the Class.

### III.   AUTHORITY AND ARGUMENT

**A. The appeals should be dismissed because no dispute remains to adjudicate.**

For purposes of the Article III cases and controversy requirement, "a case

must exist at all the stages of appellate review." *U.S. Bancorp Mortg. Co. v. Bonner*

*Mall P'ship*, 513 U.S. 18, 21 (1994) (citing *Preiser v. Newkirk*, 422 U.S. 395, 401

(1975); *Mills v. Green*, 159 U.S. 651, 653 (1895)). Where parties no longer want to

pursue an appeal, "courts should not issue opinions resolving [the] litigation."

*Safeco Ins. Co. of Am. v. Am. Intern. Group, Inc.*, 710 F.3d 754, 756 (7th Cir. 2013)

(holding dismissal of appeal was in order in case where no party opposed dismissal

of appeal because "no one now wants [the court] to adjudicate this dispute—or even

suggests that there is a dispute left to adjudicate").

Here, no controversy remains to adjudicate. The objectors' appeals have

either been dismissed or they have filed motions to dismiss. No party—direct or

absent—wishes to pursue an appeal. In such circumstances, any opinion would be

purely advisory.  *See Preiser*, 422 U.S. at 401.

Mr. Frank suggested that appellate courts have an obligation to deny a

motion to voluntarily dismiss in cases involving class action settlements. *See* Mtn.

at 9. That is wrong. The Rule he cites—Federal Rule of Civil Procedure 23(e)—

applies in the *district court* and requires it to approve any withdrawal of an

objection. *See* Fed. R. Civ. P. 23(e); *see also* Fed. R. Civ. P. 1 (providing that the

rules "govern the procedure in all civil actions and proceedings in the United States

district courts"); Brian T. Fitzpatrick, *The End of Objector Blackmail?*, 62 Vand. L.

Rev. 1623, 1664 (2009) (advocating extension of Rule 23(e)(3) and (5) to the

appellate context).

　　　To the extent this Court has discretion to deny a motion to dismiss, it is not

appropriate to do so here where none of the *parties* wish to pursue the appeal.  Such

an outcome also is contrary to the "systemic interest" that courts have in the

finality of judgments.  *See Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1,

8 (1st Cir. 1999) (holding that the court's interest in scrutinizing settlements for

collusion does not trump the court's interest in finality where there is no showing

that the parties engaged in fraud).

　　　This Court's decision in *Safeco* is instructive. *Safeco* involved a settlement at

the appellate level between a defendant and an objecting class member. Thus, a

concern existed that the defendant may have held back funds to pay the objector

that otherwise would have gone to the Class. No similar concern exists in this case,

which involves settlements between class counsel and objectors, and where the

underlying fee decision applied this Court's prior decisions. (*See* Selbin Decl. ¶ 21

(noting funds for the settlements with the objectors here came from Class counsel's

pockets and not the underlying settlement fund.)

　　　Mr. Frank's reliance on his now-withdrawn motion on *Alvarado v. Corporate*

*Cleaning Services*, 782 F.3d 365, 372 (7th Cir. 2015) and *Americana Art China Co.*

*v. Foxfire Printing & Packaging, Inc.*, 743 F.3d 243, 246 (7th Cir. 2014) is likewise

misplaced. In *Alvarado*, which involved a request to dismiss after full briefing and

oral argument, this Court found that the plaintiffs likely were dismissing their

appeals to avoid an adverse judgment. *See Alvarado*, 782 F.3d at 372–73. Similarly,

in *Americana Art*, plaintiffs' counsel appealed the district court's reduction of their

fees and then dropped the appeal after oral argument. *Americana Art*, 743 F.3d at

245. Noting "plaintiff's counsel must not have been pleased with the tenor of oral

argument," this Court declined to accept the voluntary dismissal and affirmed the

district court's fee reduction. *Id.*

No concern exists here that Class counsel here are avoiding a ruling on

appeal. As detailed in their merits brief, this Settlement is an excellent result for

the Class in the face of substantial risk and, although the District Court reduced

Class counsel's fees, it did so in a thoughtful order that was issued after contentious

adversarial proceedings and based on substantial empirical evidence. The District

Court's decision was not just faithful to this Court's prior decisions, it is in every

respect exemplary. In its opening brief on behalf of Mr. Collins, CCAF argued for a

*change* in law, and advocated for a rule that has never been adopted by this Court,

ever.

Mr. Frank never suggested that the parties reached the Settlement through

fraud; his brief on behalf of Mr. Collins challenged only the fee award, not the

underlying Settlement. The parties engaged in arms-length negotiations that

occurred over a six-month period and included three in-person mediation sessions with a well-respected former judge who vouched for their non-collusive nature. The District Court fully vetted the Settlement and the negotiations that led to the Settlement before approving it.

As for the settlements reached on appeal, Class counsel only agreed to settle after considering the costs of pursuing the appeal and the inevitable delay in payment to the Class that accompanies any appeal.  Initially, when the Circuit Mediator approached Class counsel to see if they were interested in settling with the appellants, Class counsel declined. (Selbin Decl. ¶ 12.) They only later concluded that settlements made sense after being approached directly by Mr. Bandas. Class counsel's decision was reasonable and in line with their fiduciary duties to the Class. (*See* Lahav Decl. ¶¶ 10–12; *see also* Fitzpatrick, 62 Vand. L. Rev. at 1634 (noting objector appeals "disrupt settlements by requiring class counsel to expend resources fighting appeals, and more importantly, by delaying the point at which settlements become final" and concluding "[i]t should therefore come as no surprise that class counsel are willing to dip into their own pockets to pay objectors to drop their appeals"); Nat'l Assoc. of Consumer Advocates, "Standards and Guidelines for Litigating and Settling Consumer Class Actions" at 81 (3d ed. 2014) (noting "there might be instances where the cost of getting rid of a greenmailer is far less than the benefit to the class of making a good settlement final and thus available to class members").

Any suggestion of wrongdoing is as meritless as it is reckless.

- 15 -

**B. Mr. Frank lacks standing to intervene on behalf of the Class.**

As a general rule, "a nonparty cannot challenge on appeal the rulings of a district court." *Gautreaux v. Chicago Housing Auth.*, 475 F.3d 845, 850 (7th Cir. 2007). Limited exceptions to this general rule exist. For example, "[n]onnamed class members who have objected in a timely manner to approval of the settlement at the fairness hearing have the power to bring an appeal without first intervening." *Devlin v. Scardelletti*, 536 U.S. 1, 2013 (2002). Non-class members may have standing to intervene, but only if they can show plain legal prejudice, which requires a showing that the settlement would disadvantage the appellant legally, not just factually or tactically in future litigation." William B. Rubenstein, Newberg on Class Actions § 14:12 (5th ed. June 2015). "The clearest example of legal (rather than factual) prejudice is a settlement that purported to release a nonparty's claims; that nonparty would have standing to appeal." *Id.*; *see also Agretti v. ANR Freight Sys., Inc.*, 982 F.2d 242, 247 (7th Cir. 1992) (observing a settlement which does not prevent the later assertion of a non-settling party's claims, although it may force a second lawsuit against the dismissed parties, does not constitute plain legal prejudice to the non-settling party).

To establish standing, the party seeking jurisdiction must first demonstrate an "injury in fact," an injury that is "concrete and particularized," as well as "actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations marks omitted). The "injury in fact" requirement demands more than just the articulation of some cognizable interest; rather, the party seeking review must be among those injured. *Sierra Club v.*

*Morton*, 405 U.S. 727, 734-35, 739 (1972) ("[A] mere 'interest in a problem,' no

matter how longstanding the interest and no matter how qualified the organization

is in evaluating the problem, is not sufficient.").

Neither Mr. Frank nor CCAF have standing to intervene. Neither is a Class

member and neither have any claims that would be affected by dismissal of this

appeal. Their only connection to this appeal is as the former attorneys of an

objecting Class member. Although the motion to intervene has now been

withdrawn, permitting them to intervene would have been tantamount to this

Court issuing an advisory opinion on issues no litigant requests be resolved.

### C. Appointment of a guardian ad litem is not appropriate in this case.

Courts sometimes appoint third parties to "assist the court in processing fee

petitions." S*ee* T.E. Willging & N.A. Weeks, "Attorney Fee Petitions: Suggestions for

Administration & Management," Federal Judicial Center (1985). But a third party

generally is appointed at the district court level to assist the court in cases where an

adversarial setting is lacking. *See, e.g., Haas v. Pitt. Nat'l Bank*, 77 F.R.D. 382, 383

(W.D. Penn. 1977) (approving appointment of GAL where no other objectors); *F.T.C.

v. Trudeau*, 606 F.3d 382, 385 (7th Cir. 2010) (appointing a neutral "amicus" to

assist the court where the F.T.C. took no position on a criminal contempt

judgment); *Gottlieb v. Barry*, 43 F.3d 474, 490 (10th Cir. 1994) (appointing guardian

ad litem in the fee award proceeding following settlement fulfills the advocate's role

abandoned by the defendant). In class action settlement approval proceedings, few

courts use guardians because the trial judge acts "as a fiduciary for the beneficiaries

of the [settlement] fund." *Id.* (internal marks and quotation omitted).

Here, the fee approval proceedings were highly contentious and adversarial. Both sides presented evidence regarding the appropriate fee in this case, including lengthy expert reports. The District Court's order reflects the court's careful consideration of not only the extensive factual record presented by Class counsel and the objectors, but also additional empirical studies and authority that the District Court independently reviewed. Thus, "[t]here is no indication that the district court failed to act in [the capacity of a fiduciary for the beneficiaries of the fund] in this case." *Id.*

Furthermore, although courts occasionally enlist a neutral third party to advocate regarding an issue on which neither party takes a position, *see, e.g., Trudeau*, 606 F.3d at 385, Mr. Frank failed to cite a single case in which a court grants a motion by a third party to intervene as guardian ad litem in an appeal in which no appellant with an actual interest in the case remains. Such an outcome turns traditional standing requirements on their head and would permit any organization purportedly with interests aligned with Class members to intervene on appeal. This is not the law. *See, e.g., Gautreaux*, 475 F.3d at 852–53 (holding the fact that the district court listened to the opinions of an organization "does not vest that organization with the right to appeal the district court's ultimate decision on the course that the parties must take").

### D.  Class counsel violated no ethical rules or engaged in improper conduct.

Mr. Frank suggested throughout his motion that Class counsel engaged in unethical conduct by settling with the objectors, albeit without ever providing specifics. Nothing can be further from the truth. "No rule of professional conduct …

forbids a lawyer from accepting an offer to settle an appeal in a class action, nor does current case law or procedural law forbid such settlements." (Lahav Decl. ¶ 10.) Class counsel's fiduciary duties to the Class also do not preclude settling an appeal when it is in the interests of the Class members to do so. (*See id.* ¶ 11–12.) For example, attorneys often legitimately settle class actions to avoid the costs to litigation and delay in recovery of the final judgment. *See* Fitzpatrick, 62 Vand. L. Rev. at 1634.

Class counsel initially refused to negotiate with the objectors, declining the Circuit's Mediator's services. (Selbin Decl. ¶ 12.) Although they would have preferred not to dip into their own pockets to resolve the case, they did so to avoid the costs and delay of the appeal. (*Id.* ¶ 21.) Counsel believe that this decision is in the best interests of the Class (*id.*) and has the further benefit of promoting the "systemic interest" in finality of judgments. *See Duhaime*, 183 F.3d at 8.

## IV.      CONCLUSION

For all the above reasons, Mr. Frank's motion is without merit.  Plaintiffs respectfully submit that should the Court be inclined to consider the motion, it should be denied in full.

RESPECTFULLY SUBMITTED AND DATED this 25th day of June, 2015.

LIEFF CABRASER HEIMANN
& BERNSTEIN, LLP

/s/ Jonathan D. Selbin
Jonathan D. Selbin
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500

*Counsel of Record*

Douglas Cuthbertson
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500

Daniel M. Hutchinson
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000

TERRELL MARSHALL DAUDT
   & WILLIE PLLC
Beth E. Terrell
936 North 34th Street, Suite 400
Seattle, WA 98103
Telephone: (206) 816-6603

KEOGH LAW, LTD
Keith James Keogh
55 W. Monroe
Suite 3390
Chicago, IL 60603
Telephone: (312) 726-1092

*Additional Counsel*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs request under Cir. R. 34(f) that the Court hear oral argument in this case which concerns this Court's jurisprudence on the most appropriate method for allocating attorneys' fees in common fund class action cases. Plaintiffs believe that oral argument will enable the Court to more easily render a decision.

# CERTIFICATE OF COMPLIANCE

## WITH FED R. APP. P. 32(a)(7)(C) AND CIRCUIT RULE 30(D)

Certificate of Compliance with type-volume limitation, typeface requirements, and type style requirements:

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5123 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 12-point Century.

DATED this 25th day of June, 2015.

  /s/ *Jonathan D. Selbin*
Johnathan D. Selbin

## CERTIFICATE OF SERVICE

I, hereby certify that on June 25, 2015, I electronically filed the foregoing document entitled "Plaintiffs-Appellees' Response to Motion of Center for Class Action Fairness to Withdraw from Representation of Jeffrey Collins in Appeal No. 15-1546, to Intervene in Appeal Nos. 15-1400 and 15-1490 as Guardian Ad Litem for the Class, for an Order to Disclose Settlement Terms if Helpful to the Court, and, in the Alternative, an Order Issuing New Notice to the Class, and Opposition of Center for Class Action Fairness to Rule 42 Motion to Dismiss" with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF System, thereby effecting service on counsel of record who are registered for electronic filing under Cir. R. 25(a).

I further certify that I have mailed the foregoing document by First Class mail, postage prepaid from Seattle, Washington, or have dispatched it to a third-party commercial carrier for delivery within three days to the following non-CM/ECF participants:

    Pamela McCoy
    6801 Garrett Road
    Ravenna, OH 44266

    DATED this 25th day of June, 2015.

                                        /s/ *Johnathan D. Selbin*
                                        Johnathan D. Selbin

## CERTIFICATION

I hereby certify that this version of Plaintiffs-Appellees' Response to Motion of Center for Class Action Fairness to Withdraw from Representation of Jeffrey Collins in Appeal No. 15-1546, to Intervene in Appeal Nos. 15-1400 and 15-1490 as Guardian Ad Litem for the Class, for an Order to Disclose Settlement Terms if Helpful to the Court, and, in the Alternative, an Order Issuing New Notice to the Class, and Opposition of Center for Class Action Fairness to Rule 42 Motion to Dismiss is identical to the brief which was electronically filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Ninth Circuit on June 25, 2015.

DATED this 25th day of June, 2015.

/s/ *Johnathan D. Selbin*
Johnathan D. Selbin

Nos. 15-1400 (L) and 15-1490
Consolidated with Nos. 15-1514, 15-1416, 15-1586, 15-1639

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

In re Capital One Telephone Consumer Protection Act Litigation,
APPEAL OF: Antonia Carrasco, *et al.*, Objectors-Appellants

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:12-cv-10064,
Judge James F. Holderman

Declaration of Jonathan D. Selbin in Support of Plaintiffs-Appellees' Response
to Motion of Center for Class Action Fairness and In Support of Motions to
Dismiss Appeals

LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
Jonathan D. Selbin
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500

*Counsel of Record*

Douglas Cuthbertson
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: (212) 355-9500

Daniel M. Hutchinson
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000

TERRELL MARSHALL DAUDT & WILLIE PLLC
Beth E. Terrell
Michael D. Daudt
936 North 34th Street, Suite 400
Seattle, WA 98103
Telephone: (206) 816-6603

KEOGH LAW, LTD
Keith James Keogh
55 W. Monroe
Suite 3390
Chicago, IL 60603
Telephone: (312) 726-1092

*Additional Counsel*

I, Jonathan D. Selbin, declare as follows:

1.      I am a member of the law firm of Lieff Cabraser Heimann & Bernstein,
LLP ("LCHB").  I am admitted to this Court's general bar and am a member in good
standing of the bars of the States of California and New York, and the bar of the District
of Columbia.  I respectfully submit this declaration in support of Plaintiffs-Appellees'
Response to the (now withdrawn) Center for Class Action Fairness' ("CCAF's") Motion
to Withdraw, Motion to Intervene as Guardian Ad Litem for the Class, for an Order to
Disclose Settlement Terms, and, in the Alternative, for an Order Issuing New Notice to
the Class, and Opposition to Rule 42 Motion to Dismiss (the "Motion").  Except as
otherwise noted, I have personal knowledge of the facts set forth in this declaration, and
could testify competently to them if called upon to do so.

2.      I have reviewed the Motion and supporting declaration filed by Theodore
H. Frank.

## Background and Experience

3.      LCHB is a national law firm with offices in San Francisco, New York, and
Nashville.  LCHB's practice focuses on complex and class action litigation involving
product liability, consumer, employment, financial, securities, environmental, and
personal injury matters.

4.      LCHB is one of the oldest, largest, most respected, and most successful
law firms in the country that represents plaintiffs in class actions. The firm brings to the
table a wealth of class action experience.  LCHB repeatedly has been recognized as one
of the top plaintiffs' law firms in the country.

- 2 -

5.      LCHB has extensive experience in the litigation, trial and settlement of

class actions in complex economic injury, consumer fraud, and product defect cases.

6.      Cases in which LCHB has served as Court-appointed Class counsel and in

which I have played a leading role have resulted in court-approved class action

settlements with a combined total recovery for class members of over $2.5 billion in

non-reversionary cash, plus other relief such as enhanced and extended warranties.

7.      I have served as court-appointed lead or co-lead counsel in dozens of

large class action cases over the last 20 years, in addition to this one. Among those are a

number of current and recent MDL cases:

a.      I currently serve as one of three co-lead counsel in *In Re: Navistar
Maxxforce Engines Marketing, Sales Practices and Products Liability Litigation,* MDL No.
2590 (N.D. Ill.), a case involving alleged concealment that certain Navistar trucks were
equipped with diesel engines that contain a defective emission system that cause the
trucks to suddenly break down;

b.      I currently serve as lead counsel in *In re Whirlpool Corporation Front-
Loading Washer Products Liability Litigation,* MDL No. 2001 (N.D. Ohio), a case involving
Whirlpool's allegedly defective front-loading washers in which the court certified a
litigation class in July 2010. The Sixth Circuit affirmed class certification in *In re:
Whirlpool Corporation Front-Loading Washer Products Liability Litigation,* 678 F.3d 409 (6th
Cir. 2012), reh'g en banc denied, 2012 U.S. App. LEXIS 12560 (June 18, 2012), vacated,
133 S. Ct. 1722 (2013), reinstated, 722 F.3d 838 (6th Cir. 2013);

c.      I served as one of four co-lead counsel in *In Re: Imprelis Herbicide
Marketing, Sales Practices & Products Liability Litigation,* MDL No. 2284 (E.D. Pa.), a case
involving DuPont's Imprelis herbicide, which allegedly causes harm to trees and other
non-target vegetation. A nationwide settlement was approved in 2013 that has paid out
approximately $575 million in cash to date to property owners; and

d.      I served as one of three co-lead counsel in *In re Mercedes-Benz Tele
Aid Contract Litigation,* MDL No. 1914 (D. N.J.), a case involving the premature
obsolescence of Mercedes's Tele Aid service. The district court certified a nationwide
litigation class under the New Jersey Consumer Fraud Act, and we defeated Rule 23(f)
and Rule 1292(b) appeals. A nationwide class settlement class was approved in 2011

- 3 -

that automatically sent checks to all those who paid to upgrade their Tele Aide worth $650 in cash or $1300 as a credit toward the purchase of a new car.

8.      I have argued in the Sixth Circuit Court of Appeals in *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 678 F.3d 409 (6th Cir. 2012), reh'g en banc denied, 2012 U.S. App. LEXIS 12560 (June 18, 2012), vacated, 133 S. Ct. 1722 (2013), reinstated, 722 F.3d 838 (6th Cir. 2013), cert. denied, 2014 U.S. LEXIS 1484 (U.S. Feb. 24, 2014); the Ninth Circuit Court of Appeals in *Omstead v. Dell, Inc.*, 594 F.3d 1081 (9th Cir. 2010), and *Oestreicher v. Alienware Corp.*, 322 Fed. Appx. 489 (9th Cir. 2009); and in the Fifth Circuit Court of Appeals in *McManus v. Fleetwood Ent. Inc.*, 320 F.3d 545 (5th Cir. 2003), as well as in several state supreme and appeals courts.

9.      I am appellate counsel of record in *Butler v. Sears*, 702 F.3d 359 (7th Cir. 2012), reh'g en banc denied, 2012 U.S. App. LEXIS 26202 (Dec. 19, 2012), vacated, 133 S. Ct. 2768 (2013), reinstated, 2013 U.S. App. LEXIS 17748 (7th Cir. Aug. 22, 2013), cert. denied, 2014 U.S. LEXIS 1507 (U.S. Feb. 24, 2014).

10.      I graduated *magna cum laude* from Harvard Law School in 1993 and clerked for The Honorable Marilyn Hall Patel of the U.S. District Court for the Northern District of California between 1993 and 1995.  I have worked at LCHB since 1995, starting as an associate and advancing through to partnership.  I currently serve on the firm's Executive Committee and am Chair of the firm's economic injury product defect group.

**TCPA Litigation**

- 4 -

11.     I developed and run LCHB's Telephone Consumer Protection Act ("TCPA") practice. LCHB has been at the forefront of TCPA class litigation, and has actively and successfully litigated and resolved most of the largest class action lawsuits under the TCPA, including this action. I have been involved in the Capital One litigation since LCHB became involved in it, and have directed my firm's activities throughout LCHB's involvement. Other TCPA cases in which LCHB has served as Class counsel in which I have played a lead role include the following:

**Settled Cases**:

a.     *Arthur v. Sallie Mae, Inc.,* No. C10-0198 JLR (W.D. Wash.) ($24.15 million nationwide class settlement; final approval 2012);

b.     *Steinfeld v. Discover Financial Services,* Case No. 3:12-cv-01118-JSW (N.D. Cal.) ($8.7 million nationwide class settlement; final approval 2014);

c.     *Rose v. Bank of America Corp.,* No. 11-cv-02390 (N.D. Cal.) ($32.08 million nationwide class settlement; final approval 2014);

d.     *Wannemacher v. Carrington Mortgage Services LLC,* Case No. 8:12-cv-02016-FMO-AN (C.D. Cal.) ($1,035,000 class settlement; final approval 2014);

e.     *Connor v. JPMorgan Chase Bank,* Case No. 10 CV 1284 DMS BGS (S.D. Cal. Mar. 12, 2012) ($11.66 million nationwide class settlement; final approval 2014);

f.     *Wilkins v. HSBC Bank Nev.,* N.A., Case No. 14-cv-190 (N.D. Ill.) ($39.975 million nationwide class settlement; final approval 2015);

g.     *Bayat v. Bank of the West,* Case No. 3:13-cv-02376-EMC (N.D. Cal.) ($3.35 million nationwide class settlement; final approval 2015;

- 5 -

**Pending Cases**:

     h.     *Smith v. State Farm Mutual Auto. Ins. Co.*, Case No. 13-cv-02018 (N.D. Ill.)

(pending; serving as court-appointed Rule 23(g) interim lead counsel);

     i.     *Ossola v. American Express Co.*, Case No. 1:13-CV-4836 (N.D. Ill) (pending);

     j.     *Brown v. DIRECTV LLC*, Case No. 2:13-cv-01170-DMG-E (C.D. Cal.)

(pending);

     k.     *Thomas v. Dun & Bradstreet Credibility Corp.*, Case No. 2:15-cv-03194-BRO-

GJS (C.D. Cal.) (pending);

     l.     *Wolf v. Lyft, Inc.*, Case No. 4:15-cv-01441-DMR (N.D. Cal.) (pending);

     m.     *Aghdasi v. Mercury Ins. Group, Inc.*, Case No. 2:15-cv-04030-R-AGR (C.D.

Cal.) (pending);

     n.     *Jenkins v. National Grid USA*, Case No. 2:15-cv-02219-JS-GRB (E.D.N.Y)

(pending);

**Dismissed Cases**:

     o.     *TCPA Cases*, J.C.C.P. 4350 (Cal. L.A. County Super. Ct.) (defendant

insolvent);

     p.     *Moore v. Chase Bank USA, N.A.*, Case No. 2:12-cv-10316-PA-E (C.D. Cal.

Jan. 9, 2013) (dismissed);

     q.     *Delgado v. US Bankcorp*, 2:12-cv-10313-SJO-AJW (C.D. Cal. Jan. 17, 2013)

(dismissed);

     r.     *Brown v. DIRECTV, LLC, at al.*, 2013 U.S. Dist. LEXIS 90894 (C.D. Cal. June

26, 2013) (dismissed; Plaintiff compelled to arbitration);

- 6 -

s.      *Evans v. Aetna Inc.*, Case No. 2:13- cv-01039-LA (E.D. Wisc. Nov. 20, 2013)

(dismissed);

t.      *Martin v. Wells Fargo Bank*, N.A., 3:12-cv-06030- SI (N.D. Cal. Apr. 4, 2014)

(dismissed);

u.      *Heinrichs v. Wells Fargo Bank, N.A.*, Case No. 3:13-cv-05434-WHA (N.D.

Cal.) (dismissed);

v.      *Charvat v. The Allstate Corp.*, Case No. 13-cv-7104 (N.D. Ill.) (dismissed);

w.      *Ineman v. Kohl's Corp.*, Case No. 3:14-cv-00398-WMC (W.D. Wisc.)

(dismissed; Plaintiff compelled to arbitration); and

x.      *Balschmiter v. TD Auto Finance, LLC*, Case No. 2:13-cv-01186 (E.D. Wisc.)

(class certification denied; Rule 23(f) review denied; dismissed shortly before bench trial

following denial of renewed class certification motion).

**Settlement of Appeals**

12.     On March 12, 2015, liaison counsel Keith Keogh received a telephone call

from Senior Conference Attorney Joel Shapiro on behalf of the Settlement Conference

Program of the Seventh Circuit to explore whether Class counsel were interested in

mediating with the Appellants. After conferring with me and other co-counsel, Mr.

Keogh called Mr. Shapiro back that day or the next to explain that we did not intend to

mediate any of the appeals. On March 13, 2015, Mr. Frank noticed an appeal on behalf

of Jeffrey Collins.

13.     On or about June 3, 2015, Christopher A. Bandas, counsel for Objector-

Appellant Antonia Carrasco, contacted David Stellings, one of my partners, and raised

- 7 -

the possibility of settling the appeals.  Mr. Bandas explained that he was speaking on behalf of his own client.  He also informed Mr. Stellings that Mr. Collins had fired Mr. Frank and CCAF, which he knew because Mr. Frank had called Mr. Bandas to solicit Mr. Bandas' client so that CCAF could continue its involvement on appeal.  Neither Mr. Stellings nor I had any reason to doubt that Mr. Bandas was telling the truth that Mr. Frank had been fired by Mr. Collins, and it made sense that Mr. Bandas would know that, because of their relationship and because Mr. Frank and CCAF had filed a joint brief with Mr. Bandas on behalf of both Mr. Collins and Mr. Bandas' client.  Mr. Frank confirms in his declaration, paragraph 64, that Mr. Collins had in fact fired him on June 3, 2015.

14.  Mr. Bandas requested that Class counsel make an offer for his client and for Mr. Collins.  After consulting with me, Mr. Stellings conveyed to Mr. Bandas a settlement offer, which included an offer of $25,000 for Mr. Collins.  It is our understanding that Mr. Bandas then conveyed the offer to Mr. Collins via Mr. Frank.  I can disclose this because Mr. Frank has already done so in his declaration.  As I informed Mr. Frank when he requested it, I am ethically prohibited from disclosing the discussions regarding settlement of any of the other appeals, which were confidential and subject to the settlement/mediation privilege.

15.  On the afternoon of June 5, 2015, Mr. Frank contacted me to discuss the settlement offer we had made to Mr. Collins.  He asked me to confirm the offer relayed to him by Mr. Bandas and I did so, confirming that we offered Mr. Collins $25,000 to drop his appeal and withdraw his attorneys' fee motion before the District Court,

- 8 -

payable upon the Seventh Circuit dismissing his appeal (without regard to other appeals). Mr. Frank told me that he was rejecting this settlement offer. I asked whether Mr. Collins had authorized Mr. Frank to reject our offer; Mr. Frank stated that he did not need any authority because CCAF had filed the motion, not Mr. Collins. During the course of a phone conversation, I asked Mr. Frank whether he believed I had done anything wrong in making a settlement offer to Mr. Collins through Mr. Bandas. Mr. Frank stated, unequivocally, "no" (Mr. Frank later partly retracted this statement, though continued to admit that he had initially stated I had done nothing wrong).

16.     Following that conversation, Mr. Frank contacted me and accepted our offer on behalf of Mr. Collins, and filed a motion to dismiss Mr. Collins' appeal, which this Court granted. In addition, CCAF withdrew its then-pending fee motion in the District Court, and moved to withdraw from further representation of Mr. Collins there as well, which the District Court granted. Mr. Frank then filed the instant Motion.

17.     In support of his Motion, Mr. Frank filed a lengthy declaration describing our conversations and settlement efforts, including detailing many conversations with his own client. I disagree with much of what Mr. Frank says in his declaration, about what was said and done, and have contemporaneous records of all email communications and conversations that support my recollection of the events, rather than Mr. Frank's.

18.     Mr. Frank also makes vague, unsupported, summary accusations of unethical, fraudulent, or otherwise improper behavior by me and/or Class counsel more generally. Mr. Frank's accusations, however, are belied by detailed

- 9 -

contemporaneous records. Because CCAF has withdrawn the instant Motion, and to avoid the possibility of violating the attorney-client and/or the settlement/mediation privilege, I have opted not to include those details and documents in this Declaration. However, should this Court request that information, I stand ready to provide it in a manner consistent with my ethical obligations so that the Court can make its own independent evaluation of my—and Mr. Frank's—conduct, if it wishes to do so.

19. I firmly believe that ethical lines are not to be walked, but viewed from a safe distance, and have acted accordingly at every juncture in this action, including during all settlement discussions. However, given the serious nature of Mr. Frank's accusations, and in order to secure an independent evaluation of my (and Class counsel's) conduct, I retained two legal ethics academic experts to evaluate Mr. Frank's declaration and accusations, and opine as to the ethical issues. Both experts were provided a comprehensive set of my communications with Mr. Frank (and all relevant case materials). Both confirmed that neither I nor anyone at my firm (nor any of Class counsel) violated any ethical rules in our conduct in settling the appeals here. Their reports are filed contemporaneously with Plaintiffs' response.

20. I also asked both experts to opine on any ethical issues arising from Mr. Frank's conduct. While both reached opinions on that issue, I have asked them not to include those opinions in their currently-filed reports. However, as with the underlying materials themselves, I will make these reports including those opinions available should the Court wish to see them.

- 10 -

21.    Over my career I have had the unfortunate experience of dealing with many so-called "professional objectors," who advance baseless, often irrelevant and sometimes cut and paste, objections, and notice appeals solely for purposes of extorting money from Class counsel or, occasionally, defendants. I find these professional objectors to be extremely distasteful, detrimental to our system, and, ultimately, harmful to class members by delaying payment of class funds and implementation of other valuable settlement relief for no valid reason. I support efforts to prohibit such conduct. Despite that, there is no current mechanism that prevents professional objectors from engaging in this conduct, particularly once they appeal. As a result, we have in some cases resolved unmeritorious appeals with them. We have done so—as we did here—acting as fiduciaries for the class, to ensure that baseless or improper objections and appeals do not delay class members from receiving the payments and other relief to which they are entitled. Further, any payments to objectors in these cases *always* come from Class counsel's own pockets, not the class recovery; we have *never* offered—nor paid—money to resolve objector appeals out of class funds.

22.    On June 24, 2015, Mr. Frank withdrew the instant Motion. *See* App. Dkt. 79. Class counsel had no involvement in Mr. Frank's withdrawal of that motion. We did not pay nor promise him or CCAF anything to do so, nor did we give him anything of value to do so. Based upon Mr. Frank's communications with me, I understand it to result from his resolution of his dispute with Mr. Bandas. Prior to Mr. Frank filing the withdrawal, I requested that he include the following language in CCAF's withdrawal: "CCAF withdraws all allegations of fraud, unethical behavior, or any other impropriety

- 11 -

by Class counsel." In addition, I informed Mr. Frank that the withdrawal needed to make clear that CCAF did not withdraw its motion due to any resolution with Class counsel, and that Class counsel had not paid Mr. Frank or CCAF to withdraw the motion. Mr. Frank declined to do so.

23. Plaintiffs regret that Mr. Frank refused to withdraw his allegations of impropriety against me and Class counsel. As the legal ethics experts both conclude, there is nothing improper about our conduct. Mr. Frank's belief that our resolution of these appeals breaches our fiduciary duty to the Class is incorrect, as they both opine. Plaintiffs file their response in order to correct Mr. Frank's allegations and because, although CCAF has withdrawn its motion, this Court has not yet removed the motion from the docket, and a response is therefore required.

I declare under penalty of perjury of the laws of New York and the United States that the foregoing is true and correct, and that this declaration was executed in New York, New York on June 25, 2015.

Jonathan D. Selbin

1261481.8

Nos. 15-1400 (L) and 15-1490
Consolidated with Nos. 15-1514, 15-1546, 15-1586, 15-1639

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE SEVENTH CIRCUIT

---

**In re Capital One Telephone Consumer Protection Act Litigation,
APPEAL OF: Antonia Carrasco, et al., Objectors-Appellants**

---

**On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:12-cv-10064,
Judge James F. Holderman**

---

**Declaration of Alexandra D. Lahav in Support of Plaintiff-Appellees Response to Center
for Class Action Fairness' Motion to Intervene**

---

I, Alexandra D. Lahav, declare as follows:

**Summary**

1.  Having evaluated the motions and supporting documents filed by the Center for Class Action

    Fairness in support of their Motion to Withdraw from Representation of Jeffrey Collins and

    to Intervene as Guardian ad Litem for the Class, it is my opinion that class counsel's decision

    to settle with Mr. Collins did not violate any rules of professional responsibility nor did it

    violate class counsel's fiduciary duty to the class.

2.  I have also analyzed the ethical issues raised by Mr. Frank's declaration but omit that

    analysis at class counsel's request.

**Qualifications**

3.  I am the Joel Barlow Professor at the University of Connecticut School of Law where I teach

    Civil Procedure, Complex Litigation and Professional Responsibility (among other courses).

I am submitting this affidavit in response to the Center for Class Action Fairness' Motion to Withdraw from Representation of Jeffrey Collins and to Intervene as Guardian ad Litem for the Class.   I offer my opinions and analysis for the Court's consideration based on my background and experience in the professional ethics in the class action context, recognizing that my role is limited.

4.   I joined the University of Connecticut in 2004, received tenure in 2009 and was appointed Joel Barlow Professor of Law in 2013.   I have held appointments as a visiting professor at Yale, Columbia, Fordham and Tel Aviv University Law Schools and am slated to be a visiting professor at Harvard Law School in 2015.   I received my BA from Brown University and my JD from Harvard Law School, *magna cum laude*.   After graduating law school I served as a law clerk to Justice Alan Handler of the New Jersey Supreme Court, worked at a small law firm now called Emery Celli Brinckerhoff & Abady LLC, where I participated in litigating civil rights cases, and served as a Thomas C. Grey Fellow at Stanford Law School. I am admitted to practice in New York.

5.   In my academic career I have focused on the study of class actions and aggregate litigation. My articles on these topics have been published in high ranking law reviews, including most recently the Vanderbilt Law Review, Texas Law Review and UCLA Law Review.   My work has been cited in a number of federal court opinions, *see, e.g., In re Rolls Royce Corp.,* 775 F.3d 671 (5th Cir. 2014), *D.S. ex rel. S.S. v. New York City Dept. of Educ*., 255 F.R.D. 59, 64 (E.D.N.Y. 2008); *Malibu Media, LLC v. John Does 1-16*, 2012 WL 4717893, *12, 2012 Copr. L. Dec. P 30, 324 (E.D. Pa. 2012); *Mwani v. Laden*, 2013 WL 2325166, at *5 (D.D.C. 2013); *In re Heartland Admin. Payment Systems Customer Data Sec. Breach Litig*., 2012 WL 948365, at *39 (S.D. Tex. Mar 20, 2012) (NO. MDL 09-2046)); *In re Nexium*

*(Esomeprazole) Antitrust Litigation*, 297 F.R.D. 168 (D. Mass. 2013), and by the California

Supreme Court. *Duran v. U.S. Bank Nat'l Assoc.*, 172 Cal. Rptr. 3d 371 (2014).  My work

has also been cited in the ALI *Principles of the Law of Aggregate Litigation* § 2.02 (2012),

Wright & Miller's *Federal Practice and Procedure* treatise and the *Manual on Complex

Litigation* (4th).   I am the co-author (with Martha Minow, Steve Subrin, Mark Brodin and

Thomas Main) of a casebook currently used in 36 law schools by over 50 law professors:

*Civil Procedure, Doctrine, Practice and Context* (Aspen, 4th ed. 2012).   I also co-author a

yearly review of class action developments with John C. Coffee, Jr., the Adolf A. Berle

Professor of Law at Columbia Law School, which keeps me up to date on the latest

developments in class action jurisprudence.   I frequently present to lawyers and legal

academics on class action topics.   For example, I am slated to present at the ABA's 19th

Annual Class Action Institute in October 2015 in New Orleans, LA.   Additional information

regarding my qualifications and experience—including a complete list of my publications—

can be found in my curriculum vitae, attached hereto as Exhibit A.

6. As a result of my teaching and scholarly research, I am familiar with the law governing

   professional ethics in class actions.   In the course of my research on class actions I have

   reviewed hundreds of class action complaints, motions for class certification, objections to

   settlement and judicial opinions.   At the University of Connecticut I teach a course on

   Complex Litigation which covers professional ethics in the class action context specifically,

   and have also taught the required course on Professional Responsibility, which is a general

   introductory course to the rules of professional ethics.

7. I offer this report solely in my capacity as a class action scholar, not in my capacity as an

   employee of the State of Connecticut.

8. In preparing this Report, I reviewed case law, ABA ethics opinions and scholarly articles, as well as the following documents relating to this case:

    a. Motion of Center for Class Action Fairness to Withdraw from Representation of Jeffrey Collins in Appeal No. 15-1546, to Intervene in Appeal Nos. 15-1400 and 15-1490 as Guardian Ad Litem for the Class, for an Order to Disclose Settlement Terms if Helpful to the Court, and, in the Alternative, an Order Issuing New Notice to the Class, and Opposition of Center for Class Action Fairness to Rule 42 Motion to Dismiss.

    b. Declaration of Theodore H. Frank in Support of Motion to Intervene [hereinafter "Frank Decl."]

    c. Attorneys Melissa A. Holyoak, Kirstin B. Ives, and Megan A. Zmick's Motion For Leave of Court to Withdraw as Counsel for Objector Jeffrey T. Collins

    d. Email correspondence between Jonathan Selbin and Theodore H. Frank.

    e. Opening Brief and Required Short Appendix of Appellants Jeffrey Collins, Antonia Carrasco, Vanessa F.V. VanWieren, and Mary Smith Tweed.

**Class Counsel's Conduct Did Not Violate Any Rules of Professional Responsibility**

9. In this case, I understand plaintiffs' counsel negotiated a settlement with Mr. Collins after being approached by one of the objectors' counsel.  Mr. Frank suggests that this settlement offer was unethical. Frank Decl. ¶82. Accordingly, I have analyzed whether class counsel Jonathan Selbin's conduct in settling the Collins appeal violated any ethics rules or applicable case law, and it is my opinion that it does not.

10. There is no duty not to settle, both in the class action context and outside of it.  No rule of professional conduct I am aware of forbids a lawyer from accepting an offer to settle an appeal in a class action, nor does current case law or procedural law forbid such settlements.

11. There are rules governing counsel's conduct in class actions.  The courts have recognized that class counsel has a fiduciary duty to the class members.  *Reynolds v. Beneficial National Bank*, 288 F.3d 277, 280 (7th Cir. 2002).  Although the Rules of Professional Conduct include no special rules for lawyers representing classes, they do recognize that class counsel owes a duty to the class as a whole.  ABA Model R. of Prof'l Cond.1.8, Cmnt 13.  This fiduciary duty permits settling an appeal where it would be in the interests of class members to do so. Such interests can include the speedy resolution of the case so that the class members can obtain the payment they are entitled to under the settlement.

12.  Jonathan Selbin, acting as class counsel, made a judgment call about the benefits of settling the appeal that is consistent with the fiduciary duties he owes to the class.  The Collins appeal only concerns attorney's fees (there was no objection in that appeal to the settlement itself), the amount of fees raises no particular concerns (it is within the range that is usually awarded in class actions and is consistent with Seventh Circuit precedent), and the determination of the appeal will surely delay payouts to class members. The appeal appears to me to be an attempt to change the law governing fee awards in the Seventh Circuit.  There is no basis for thinking that it was likely that the objectors would prevail given the facts of this appeal (although of course one doesn't know the outcome of a case until it is decided) and therefore there is no reason to doubt Mr. Selbin's judgment here.

13. Furthermore, there are no red flags in this case such as indicia of collusion between class counsel and defendants, a lack of adversarial proceeding below, or a failure by the court

below to adequately analyze the propriety of the fee award.  The District Court determined the fee award after a fully adversarial proceeding, involving expert reports on both sides, and the court did not merely rubber stamp class counsel's fee request but modified the award downward.

14. There is a well-known policy concern that objectors may settle appeals unscrupulously, a problem that exists because there is no bar on objectors settling after filing an appeal.  See Brian T. Fitzpatrick, *The End of Objector Blackmail?* 62 VAND. L. REV. 623 (2009) (providing an overview of the policy issues).  A proposed change to the appellate rules would forbid alienation of appeals.  See Letter from Prof. Brian Fitzpatrick to Judge Sutton, August 22, 2012. (available at http://www.uscourts.gov/rules-policies/archives/suggestions/brian-t-fitzpatrick-12-ap-f).  I support this change because it will protect the legal system from abuse, but it does not implicate class counsel's decision to settle this appeal.

15. I declare the foregoing is based on information known to me and that it is true and accurate to the best of my knowledge, subject to the laws against perjury pursuant to 28 U.S.C. § 1746.

*Alexandra Lahav*

Alexandra D. Lahav

# EXHIBIT A

# ALEXANDRA DEVORAH LAHAV

University of Connecticut School of Law                    860.570.5217
55 Elizabeth Street, Hartford CT 06105        alexandra.lahav@law.uconn.edu

## ACADEMIC APPOINTMENTS

University of Connecticut School of Law
Joel Barlow Professor of Law (2013-present); Professor (2009-2013)**;** Associate Professor (2004-2009)

Visiting Professor Yale Law School (Fall 2013), Columbia Law School (Fall 2011), Fordham Law School (2009-2010), Buchmann Faculty of Law, Tel Aviv University (May-June 2007)

Courses taught: civil procedure, complex litigation, advanced civil procedure, professional responsibility, tort reform, tort law and alternatives seminar, legal ethics seminar.

## OTHER PROFESSIONAL EXPERIENCE

Stanford Law School, Thomas C. Grey Fellow (2002-2004)

Emery Cuti Brinckerhoff & Abady PC, Associate (1999-2002)

Justice Alan Handler, New Jersey Supreme Court, Law Clerk (1998-1999)

Debevoise & Plimpton LLC, Summer Associate (June-August 1997)

## EDUCATION

Harvard Law School, J.D., *magna cum laude*, 1998
Brown University, B.A. (with honors), 1993

## PUBLICATIONS

*Books*

CIVIL PROCEDURE: DOCTRINE, PRACTICE AND CONTEXT (4th edition, 2012) *with* Stephen N. Subrin, Martha L. Minow, Mark S. Brodin, and Thomas O. Main.

Alexandra D. Lahav                                              last updated 5/10/15

*Journal Articles*

The Market for Preclusion in Merger Litigation, 66 Vanderbilt L. Rev. 1053 (2013)(with Sean J. Griffith)
> Cited in In re Rolls Royce Corp., 775 F.3d 671 (5th Cir. 2014).

The Case for "Trial by Formula," 90 Tex. L. Rev. 571 (2012)
> Cited in Duran v. U.S. Bank Nat'l Assoc., 172 Cal.Rptr.3d 371 (2014); In re Nexium (Esomeprazole) Antitrust Litigation, 297 F.R.D. 168 (D. Mass. 2013); selected for the Branstetter New Voices in Civil Justice Workshop, Vanderbilt Law School, 2012.

Portraits of Resistance: How Lawyers Respond to Unjust Proceedings, 57 UCLA L. Rev. 725 (2010)
> Winner of Fred C. Zacharias Memorial Prize for best article in professional responsibility

Bellwether Trials, 76 Geo. Wash. L. Rev. 576 (2008)
> Cited in D.S. ex rel. S.S. v. New York City Dept. of Educ., 255 F.R.D. 59, 64 (E.D.N.Y. 2008); Malibu Media, LLC v. John Does 1-16, 2012 WL 4717893, *12, 2012 Copr.L.Dec. P 30,324 (E.D.Pa. Oct 03, 2012); Mwani v. Laden 2013 WL 2325166, 5 (D.D.C., 2013); ALI, Principles of the Law of Aggregate Litigation § 2.02 (2012)

The Law and Large Numbers: Preserving Adjudication in Complex Litigation, 59 Florida L. Rev. 383 (2007).

Fundamental Principles for Class Action Governance, 37 Indiana L. Rev. 65 (2003)
> Cited in Freeport Partners, L.L.C. v. Allbritton, 2006 WL 627140 (D.D.C. March 13, 2006); In re Relafen Antitrust Litigation, 231 F.R.D. 52 (D. Mass. 2005).


*Book Chapters, Shorter Works & Symposia*

Participation and Procedure, __ DePaul L. Rev. ___ (forthcoming 2015)

The Jury and Participatory Democracy, 55 William & Mary L. Rev. 1030 (2014).

Symmetry and Class Action Litigation, 60 UCLA L. Rev.  1494 (2013).

The Political Justification for Group Litigation, 81 Fordham L. Rev. 3193 (2013).

Due Process and the Future of Class Actions, 44 Loy. U. Chi. L.J. 545 (2012).

Rites without Rights: A Tale of Two Military Commissions, 24 Yale Journal of Law & Humanities 439 (2012).

Alexandra D. Lahav

Are Class Actions Unconstitutional? 106 Mich. L. Rev. 993 (2011) (book review of Martin H. Redish, Wholesale Justice: Constitutional Democracy and the Problem of the Class Action Lawsuit (2009)).

Two Views of the Class Action, 79 Fordham L. Rev. 1939 (2011)

> Quoted in In re Heartland Admin. Payment Systems Customer Data Sec. Breach Litig., 2012 WL 948365, *39 (S.D.Tex. Mar 20, 2012) (NO. MDL 09-2046)

The Curse of Bigness and the Optimal Size of Class Actions, 63 Vand. L. Rev. En Banc 117 (2010).

Recovering the Social Value of Jurisdictional Redundancy, 82 Tulane L. Rev. 2369 (2008).

Absence Makes the Heart Grow Fonder: Dead Souls, Phantom Clients and the Modern Class Action in 40 STUDIES IN LAW, POLITICS AND SOCIETY 340 (Austin Sarat ed., 2007).

Recent Publication: The Strange Career of Legal Liberalism, 32 Harv. Civil Rights – Civil Liberties L. Rev. 565 (1997) (book review of Laura Kalman, Strange Career of Legal Liberalism (1998)).


*Non-Academic Publications*

Testimony before the Committee on the Judiciary Subcommittee on the Constitution and Civil Justice, United States House of Representatives on H.R. 1927 "The Fairness in Class Action Litigation Act of 2015," April 29, 2015

The New Class Action Landscape: Trends and Developments in Class Certification and Related Topics 2012 with John C. Coffee (available on SSRN).

Brief Amicus Curiae of Civil Procedure Professors in Support of Respondents, Wal-Mart Stores, Inc. v. Dukes, No. 10-277 (S. Ct. 2011) with Melissa Hart, Arthur Miller, Paul Secunda and Adam Steinman.

Co-editor, Mass Tort Litigation Blog (http://lawprofessors.typepad.com/mass_tort_litigation/)

Alexandra D. Lahav                                                    last updated 5/10/15

## PRESENTATIONS

*Faculty Workshops*

Equality in Civil Litigation
> Roger Williams University School of Law (March 2015); University of Southern
> California - Gould School of Law (Sept. 2014)

The Market for Preclusion in Merger Litigation
> Fordham Law School (March 2012)

The Case for "Trial by Formula"
> Columbia Law School (Dec. 2011); Brooklyn Law School (Dec. 2011)

Rights Without Rights: A Tale of Two Military Commissions
> Northeastern Law School, March 2011

Rough Justice
> Pacific McGeorge School of Law (Nov. 2009); University of Florida, Levine College of
> Law (March 2010)

Portraits of Resistance: How Lawyers Respond to Unjust Proceedings
> Brooklyn Law School (Jan. 2009); Boston University School of Law (Jan. 2009); Seton Hall
> University School of Law (Oct. 2008); Boston College Law School (Sept. 2008).

Bellwether Trials
> St. John's School of Law (March 2008); Washington University School of Law – St. Louis,
> MO (Oct. 2007); Tel Aviv University (May 2007).

Absence Makes the Heart Grow Fonder: Dead Souls, Phantom Clients and the Modern Class
Action, Eastman Lecture, Department of Law, Jurisprudence and Social Thought, Amherst
College (April, 2006).

*Conferences*

Presenter, Participation and Procedure, Clifford Symposium, DePaul University College of Law,
April 24-25, 2014.

Presenter, Transparency in Civil Litigation, Through a Glass Starkly: Civil Procedure
Reassessed, Northeastern Law School, April 11, 2014.

Presenter, The Jury as a Political Institution, William & Mary Law School, February 22-23, 2013.

Alexandra D. Lahav

Presenter, Twenty-First Century Litigation: Pathologies and Possibilities, UCLA, January 24-25, 2013.

Presenter, Corporate Liability for Human Rights Violations, Tel Aviv University, Dec. 16-17, 2012.

Presenter, Representing Groups, Fordham Law School, November 30, 2012.

Commentator, Law as a Business, The Law: Business or Profession, Fordham Law School, April 23-24, 2012.

Presenter, Eugene P. and Delia S. Murphy Conference on Corporate Law, Fordham Law School, April 9, 2012.

Presenter, The Future of Class Actions and Its Alternatives, Loyola University-Chicago Law School, April 13, 2012.

Presenter, Aggregation and Mass Torts, Mass Torts and the Federal Courts, Charleston Law School, Feb. 24, 2012.

Presenter, Are Class Actions Unconstitutional?, Association of American Law Schools, Civil Procedure Section Panel, January 2012.

Conference Organizer, Actuarial Litigation, University of Connecticut Insurance Law Center, April 11, 2011.

Presenter, Rites Without Rights: A Tale of Two Military Commissions, Courts: Representing and Contesting Ideologies in the Public Spheres, Yale Law School, February 4, 2011.

Presenter, Provocation: Law and War, Northeast Law and Society Conference, Amherst, MA, October 2, 2010.

Invited Participant, Layering Governance: Multi-Level Regulation under Bush and Beyond, Center on Federalism and Intersystemic Governance, Emory University School of Law, May 1-2, 2009.

Presenter, Representing Guantanamo Detainees, A Place Beyond Law: Detainees Held in Guantánamo Bay, Cuba Panel, Law and Society Annual Conference, Montreal, Canada, May 30, 2008.

Presenter, Recovering the Social Value of Jurisdictional Redundancy, Tulane Law Review Symposium: The Problem of Multidistrict Litigation, New Orleans, LA, February 16, 2008.

Alexandra D. Lahav                                                last updated 5/10/15

Page 6 of 7

Presenter and Organizer, Wal-Mart: Inter-doctrinal and Interdisciplinary Approaches to Law, Association of American Law Schools, Open Source Panel, Washington, DC, January 5, 2007 (developed panel chosen by competition).

Presenter and Organizer, The Phantom Client, Association of American Law Schools, Professional Responsibility Section Panel, Washington, DC, January 6, 2007.

Invited Participant, Governance by Design: Cost, Effectiveness and Democratic Norms, Harvard Law School, Cambridge, MA, March 25, 2005.

Presenter, "Historicism in Judicial Opinions," Law Culture and Humanities Conference, New York, NY, 2003.

*Continuing Legal Education (Selected Presentations)*

The New Class Action Landscape, ABA 18th Annual Class Action Institute, Oct. 23, 2014.
The Robert's Court 2013-2014, ABA Annual Meeting, Section on Litigation, August 7, 2014.
A Preview of the Proposed Changes to the Federal Rules of Civil Procedure, Connecticut Bar Association Annual Meeting, June 17, 2013.
The Supreme Court Class Action Docket, Boston Bar Association, February 11, 2013.
Advocacy at Guantanamo Bay, District of Connecticut Bench Bar Conference, Oct. 8, 2010.
Eighth Annual Class Actions/Mass Torts Symposium, New Orleans Bar Association, Oct. 2008.

## SERVICE

*Select University & Law School Service*

Chair, Promotion and Tenure Committee, 2012, 2014-present
Member, Curriculum Reform Committee, 2011-2014 (Chair 2014)
Chair, Educational Policy Committee, 2012
Member, The Gladstein Committee (University committee), 2011-present
Member, Faculty Appointments Committee (elected by faculty), 2008-2009, 2010-2011
Member, Promotion and Tenure Committee (elected by faculty), 2010-2011, 2012, 2014-present
Member, Dean Search Committee (elected by faculty), 2006-2007
Advisor, Connecticut Law Review, 2006-2007, 2008-2011

*Other Service*

Member, Executive Committee, Professional Responsibility Section, AALS
Manuscript referee: Oxford University Press
Outside reviewer: American Political Science Review, Journal of Law & Society, Harvard Law Review, Yale Law Journal, Harvard/Yale/Stanford Junior Faculty Forum

Alexandra D. Lahav

**MEDIA**

Quoted in articles in the New York Times, Wall Street Journal, Bloomberg, Thompson Reuters, Law360, and New York Law Journal.  Appearances on the Diane Rehm Show (NPR), Southern California public radio (WKPCC) and New York public radio (WNYC).

**BAR ADMISSIONS**

New York, Massachusetts (inactive), Southern and Eastern Districts of New York

**AWARDS, DISTINCTIONS**

2011        Branstetter New Voices in Civil Justice Workshop, Vanderbilt Law School
2010        Fred C. Zacharias Memorial Prize for Best Article in Professional Responsibility
2008-2009   Human Rights Institute, University of Connecticut , Research Fellowship

Nos. 15-1400 (L) and 15-1490
Consolidated with Nos. 15-1514, 15-1546, 15-1586, 15-1639

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

---

In re Capital One Telephone Consumer Protection Act Litigation,
APPEAL OF: Antonia Carrasco, et al., Objectors–Appellants

---

On Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division, No. 1:12-cv-10064,
Judge James F. Holderman

---

Declaration of Robert P. Burns in Support of Plaintiff-Appellees Response to Center for
Class Action Fairness' Motion to Intervene

---

### AFFIDAVIT OF ROBERT P. BURNS

My name is Robert P. Burns.  I am the William W. Gurley Professor of Law at the
Northwestern University School of Law.  I have taught the Law of Professional Responsibility
and the Law of Evidence for over twenty years at Northwestern.   I have written in both fields
and have testified as an expert witness on issues of Professional Responsibility.  My resume,
which contains a list of all publications, is attached to this Affidavit.

I declare under penalty of perjury under the laws of the United States as follows:

I was retained by Class counsel in *In re Capital One Telephone Consumer Protection Act*
*Litigation*, Nos. 15-1400 (L) and 15-1490, Consolidated with Nos. 15-1586, 15-1639, and asked
whether I could form any opinions with regard to the conformity of Jonathan D. Selbin to his
professional obligations in proposing settlement terms to Jeffrey T. Collins in this appeal.

I have reviewed the following documents provided to me by Class counsel: 1) The
Declaration of Theodore H. Frank in Support of Motion to Intervene; 2) Motion of Center for
Class Action Fairness to Withdraw from Representation of Jeffrey Collins in Appeal No. 15-
1546, to Intervene in Appeal Nos. 15-1400 and 15-1490 as Guardian Ad Litem for the Class, for
an Order to Disclose Settlement Terms if Helpful to the Court, and, in the Alternative, an Order
Issuing New Notice to the Class, and Opposition of Center for Class Action Fairness to Rule 42
Motion to Dismiss; 3) Attorneys Melissa A. Holyoak, Kirsten B. Ives, and Megan A. Zmick's
Motion for Leave of Court to Withdraw as Counsel for Objector Jeffrey T. Collins, and the
Court's order thereon; 4) what I understand to be a complete set of emails between Ted Frank
and Jonathan D. Selbin dated June 5, 2015 through June 11, 2015; 5) Plaintiffs-Appellees' Brief
in Response in this Court in *In re Capital One Telephone Consumer Act Litigation: Appeal of*

*Jeffrey Collins,* et al.; 6) an Order on Application for Temporary Restraining Order and Petition

for Temporary and Permanent Injunction in *Christopher A. Bandas and Bandas Law Firm, P.C.*

*v. Theodore H. Frank,* No. 2015 DCV-2704-A (Nueces County, Texas, District Court); and 7)

Emails between Ted Frank and Jonathan D. Selbin dated June 20, 2015.   I am being

compensated at the rate of four hundred and fifty dollars ($450) per hour.   This Affidavit sets

forth my expert opinion in the field of legal ethics.

1.      As I understand it, the Seventh Circuit mediator initiated contact with Class

counsel to explore whether they would be willing to mediate the appeals in this case.   Class

counsel declined to do so.

2.      I am also informed that on or about June 4, 2015, Chris Bandas, counsel for one

of the Appellants, contacted David Stellings, one of Mr. Selbin's partners, and raised the

possibility of settling the appeals.   He indicated to Mr. Stellings that he was speaking upon

behalf of his own client, and that he thought several other Appellants, and, specifically, Mr.

Collins, might be interested in discussing settlement as well now that he, Collins, had fired Mr.

Frank.   Bandas requested that Class counsel make an offer.   After consulting with Mr. Selbin,

Stellings conveyed to Bandas a settlement offer, which included an offer of $25,000 for Mr.

Collins.

3.      I am further informed that Mr. Frank subsequently contacted Mr. Selbin directly,

represented that he had been "unfired" and was again representing Mr. Collins, and requested

that Selbin confirm the $25,000 offer, which Selbin did. The offer was a cash offer in the amount

of $25,000 for Mr. Collins, with nothing for Mr. Frank or his organization, the Center for Class

Action Fairness ("CCAF").   It included the conditions that payment would be made upon Mr.

Collins moving to dismiss his appeal and an order of dismissal by Seventh Circuit, and

withdrawal by CCAF of its motion for attorneys' fees in the District Court.  Mr. Frank initially

rejected the offer and then, after consulting with his client, accepted it.  Collins moved to dismiss

the appeal, which the Seventh Circuit ordered, and CCAF withdrew its fees motion in the

District Court.  CCAF also moved to withdraw from representing Collins further, which the

District Court granted.  Class counsel wired Mr. Collins the $25,000 at the direction of, and

using the instructions provided by, Mr. Frank.

4.      Mr. Frank, in his Motion to Intervene, cites Professor Brian T. Fitzpatrick's

opinion, expressed in a scholarly publication, that "it is usually not socially desirable to settle

nonfrivolous objections" to class action settlements.  Mr. Frank concludes that Fitzpatrick

"disapproves of the *ethics*" of class counsel's making such an offer. (emphasis added).  In his

email exchange with Mr. Selbin, Mr. Frank first stated that he "didn't think that [Selbin] had

done anything wrong" in making the offer, but then charged that "there is a possibility" that the

offer created a conflict between Frank and his client and may be "part of a conspiracy to defraud

the class out of over $10 million in wrongfully obtained fees …." In his "Declaration," Mr.

Frank refers to Mr. Selbin's offer as "an unethical settlement offer." (¶ 81).

5.      In my opinion, Mr. Selbin did not violate his professional responsibilities in

making an offer to settle Mr. Collins' appeal.  There is nothing unethical about communicating a

settlement offer to resolve an appeal, regardless of whether it is an appeal in an individual case or

a class action.  In my opinion, there is nothing improper about the substance of the settlement

Mr. Selbin proposed, the manner in which it was conveyed, or the conditions he placed on its

acceptance.  It is the client who determines, and may always redetermine, the objectives of the

representation and, as Mr. Frank recognizes, has the specific authority to accept or reject any

offer to settle the case.  Both the Model Rules of Professional Conduct and the Illinois Rules so

provide.  Rule 1.2 (a).   The client always has the right to terminate an attorney-client

relationship, regardless of the content of an engagement letter, and the attorney then has the

obligation to cease representing the client.  Rule 1.16 (a).  So long as the representation

continues, as it apparently did here at least intermittently through settlement, the attorney is

obliged to pursue the client's objectives and abide by the client's decisions with regard to

settlement.  In my opinion, it was not an ethical violation for Mr. Selbin to make a settlement

offer to Mr. Collins that was permitted by existing law.  This is true whether or not it is "socially

desirable" to permit such settlements, a matter on which I have no opinion.

*     *     *

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct, and that this Affidavit was executed on June 24, 2015 in Evanston, Illinois.

_____

Robert P. Burns

**ROBERT P. BURNS**

Northwestern University School of Law
357 E. Chicago Avenue
Chicago, Illinois 60611
(312) 503-6613

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1980 - | William W. Gurley Memorial Professor of Law (2015), Professor (1983), Associate Professor (1980):  Northwestern University School of Law. Subjects taught: Evidence, Civil Procedure, Constitutional Criminal Procedure, Professional Responsibility, Administrative Law, Health Care Law, Jurisprudence, Negotiation, Trial and Pretrial Practice. Clinical Teaching: criminal and federal civil rights litigation. Dean Search Committee, Faculty Advisory Committee, Library Director Search Committee, Communication and Legal Writing Search Committee, Tenure & Promotion Committee, Curriculum Committee, Appointments Committee, Lectures & Workshops Committee |
| | National Institute for Trial Advocacy: Program Director and Section Leader. Instructor: Palestine-Israel Trial Advocacy Program; Ontario Advocates Trial Program. Distinguished Faculty Certificate. |
| | Mediator: Center for Conflict Resolution & Resolution Resources Corporation. Arbitrator: Circuit Court of Cook County; Consultant to American Bar Association Committee on Alternative Dispute Resolution. |
| | Consultant & Expert Witness on the Law of Professional Responsibility |
| | Consultant & Instructor: Illinois Supreme Court Advanced Judicial Academy, Commodity Futures Trading Commission, Legal Services Corporation, Legal Assistance Foundation of Chicago, Cook County Public Guardian, AALS Clinical Section and Illinois Attorney General continuing education programs.  Instructor in Litigation Seminars: Cleary Gottlieb; Jenner & Block; Lord, Bissel & Brook, Winston & Strawn; Sonnenschein, Carlin, Nath & Rosenthal; Jones, Day, Reavis & Pogue; Keck, Mahin & Cate; Mayer, Brown, Rowe & Maw; Lyon & Lyon; White & Case; McDermott Will & Emory; Pennie & Edmonds; Porter Wright. |
| 1979 – 1980 | General Counsel: Illinois Legislative Commission to Revise the Public Aid Code: Author of Proposed Code. |
| 1974 – 1979 | Legal Assistance Foundation of Chicago: Staff Attorney; Public Benefits Litigation Unit (1977); Supervisor of Attorney Continuing Education (1979). |
| 1974 | Governor's State University: Instructor in Administrative Law in Graduate School of Public Administration. |

HONORS & AWARDS

William W. Gurley Memorial Professorship (2015)
*Choice* Outstanding Academic Titles Award for
   *The Death of the American Trial* (2009)
Phillip Corboy Annual Lecturer (2009)
Geoffrey Fieger Annual Lecturer (2006)
Dean's Teaching Award (2009, 2007 [Honorable Mention], 2005)
Robert Childress Award for Teaching Excellence (2002, 1998, 1996)
Rogers Visiting Scholar in Dispute Resolution and the Courts (2001)
Elected to Address Senior Class (1997)
Best Teacher of Smaller Classes (1997)
Class of 1940 Research Professorship (2002)
Sanford Clinton, Sr. Research Professorship
Perkins-Bauer Professorship
American College of Trial Lawyers Award for Excellence in Teaching Trial
   Advocacy (co-recipient)
National Institute for Trial Advocacy Distinguished Faculty Certificate
University of Chicago: Ph.D. with honors
National Science Foundation Graduate Fellow in the History and
   Philosophy of Science.
Danforth Foundation Kent Fellow in the Philosophy of Law

## BAR ADMISSIONS & PROFESSIONAL ASSOCIATIONS

1974          Supreme Court of Illinois (1974); United States District Court for the
Northern District of Illinois (1974); United States Court of Appeals for the
Seventh Circuit (1977); Supreme Court of the United States (1978);
Northern District of Illinois Federal Trial Bar (1982); American Bar
Association.

## EDUCATIONAL BACKGROUND

1982          UNIVERSITY OF CHICAGO: Ph.D. with honors, Graduate Division of the
Humanities. Concentrations: philosophy of law, history of philosophy, logic.
Danforth Foundation Kent Fellow.

1971 – 1974    UNIVERSITY OF CHICAGO LAW SCHOOL: J.D., 1974; Concentrations:
Administrative Law, Social Welfare Policy and Law, Philosophy of Law.

1969 - 1971    UNIVERSITY OF CHICAGO: courses for Ph.D.; National Science
Foundation Graduate Fellow in the History and Philosophy of Science.

1965 – 1969    FORDHAM UNIVERSITY: A.B., Magna Cum Laude, 1969; Majors:
Philosophy and American History; Minor: Classical Languages and
Literature.

## PUBLICATIONS

KAFKA'S LAW: *THE TRIAL* AND AMERICAN CRIMINAL JUSTICE (University of Chicago
  Press, 2014).

THE DEATH OF THE AMERICAN TRIAL (University of Chicago Press, 2009); *Choice*
  Outstanding Academic Title Award in the Social and Behavioral Sciences for 2009;
  *second printing,* 2010;  paperback & E-book,  2011.

 A THEORY OF THE TRIAL (Princeton University Press, 1999; Paperback & E-book, 2001);
  *excerpted and reprinted* in Carl F. Stychin and Linda Mulcahy, LEGAL METHODS AND
  SYSTEMS, 3rd ed. (London: Sweet & Maxwell, 2007).

EVIDENCE IN CONTEXT: A TRIAL EVIDENCE COURSEBOOK (National Institute for Trial
  Advocacy, 2010, 2004, 2001, 1998) (with Steven Lubet & Richard Moberly).

EVIDENCE IN CONTEXT: TEACHER'S MANUAL (National Institute for Trial Advocacy,
  2010, 2004, 2001, 1998) (with Steven Lubet & Richard Moberly).

PROBLEMS AND MATERIALS IN EVIDENCE AND TRIAL ADVOCACY (Vol. I): CASES
  (National Institute for Trial Advocacy, 2010, 2004, 2001, 1998, 1994) (with Steven Lubet
  & Richard Moberly).

PROBLEMS AND MATERIALS IN EVIDENCE AND TRIAL ADVOCACY (Vol. II):
  PROBLEMS (National Institute for Trial Advocacy, 2010, 2004, 2001, 1998, 1994) (with
  Steven Lubet & Richard Moberly).

PROBLEMS AND MATERIALS IN EVIDENCE AND TRIAL ADVOCACY: TEACHER'S
  MANUAL  (National Institute for Trial Advocacy, 2010, 2004, 2001, 1998, 1994) (with
  Steven Lubet & Richard Moberly).

EXERCISES AND PROBLEMS IN PROFESSIONAL RESPONSIBILITY (National Institute for
  Trial Advocacy, 2001, 1994) (with Thomas Geraghty & Steven Lubet).

EXERCISES AND PROBLEMS IN PROFESSIONAL RESPONSIBILITY: TEACHER'S
  MANUAL (National Institute for Trial Advocacy, 2001, 1994) (with Thomas Geraghty &
  Steven Lubet).

CRANBROOKE v. INTELLEX (National Institute for Trial Advocacy, 1994; 2nd ed. 2009) (with
  Steven Lubet et al.).

ILLINOIS TRIAL GUIDE, Vols. I-V (consulting editor) (1992).

REPORT TO THE ILLINOIS GENERAL ASSEMBLY ON CODE REVISION (with other
  members of the Commission staff) (1980).

"Social Science and the Ways of the Trial Court," in TRANSLATING THE SOCIAL WORLD
  FOR LAW: LINGUISTIC TOOLS FOR A NEW LEGAL REALISM (Oxford University
  Press, forthcoming  2015 ).

"Some Limitations of Experimental Psychologists' Criticism of the American Trial," ___ CHI-
KENT L. REV. ____ (forthcoming, 2015) ssrn.com/abstract=254879

"Popular Sovereignty and the Jury Trial," in *Symposium*: Juries and Mixed Tribunals Across the
Globe:  New Developments, Common Challenges and Future Directions _____Onati
Socio-Legal Series _____ (2015)

"Some Realism (and Idealism) About the Trial," in THEORETICAL FOUNDATIONS OF
CRIMINAL TRIAL PROCEDURE, Paul Roberts, ed. (Hampshire: Ashgate, 2014)
*reprinted from* 31 GEORGIA LAW REVIEW 715-69 (1997).

"Analyzing the Trial: Interdisciplinary Methods," *with others* in THEORETICAL
FOUNDATIONS OF CRIMINAL TRIAL PROCEDURE, Paul Roberts, ed. (Hampshire:
Ashgate, 2014), *reprinted from* 31 POLITCAL & LEGAL ANTHROPOLOGY REVIEW
303-29 (2008)

"What Will We Lose If the Trial Vanishes?"  61 DEFENSE LAW JOURNAL 1-23 [2012]
*reprinted from*  37 OHIO N. L. REV. 575-95 (2011).

"The Jury as a Political Institution: An Internal Perspective," 55 WM. & MARY L. REV. 805
(2014),

"The Withering Away of Evidence Law," 47 GEORGIA L. REV. 691 (2013).

"Advocacy in the Era of the Vanishing Trial,  61 KANSAS L. REV. 893 (2013).

"The Dignity, Rights, and Responsibilities of the Jury: The Structure of Normative Argument," 43
ARIZ. ST. L. REV. 1147 (2011).

"Narrative and Drama in the American Trial," *Postmodern Openings*, vol. 8, 101 (2011).

"The Importance of Preserving and Revitalizing the Jury Trial," *Voir Dire*, vol. 18, no. 2 (2011).

"What Will We Lose If the Trial Vanishes?" 37 OHIO N. L. REV. 575 (2011), *reprinted in*  61
DEFENSE LAW JOURNAL 1-23 (2012).

"Why America Still Needs the Jury Trial:  A Friendly Response to Professor Dzur," JOURNAL
OF CRIMINAL LAW & PHILOSOPHY (2010)

"A Critical Appreciation of the American Trial in (Current) Decline," STUDIES IN LAW,
POLITICS, AND SOCIETY, vol. 49 (2009).

"The Tasks of a Philosophy of Law" in ON PHILOSOPHY IN AMERICAN LAW, Francis J.
Mootz III ed. (Cambridge: Cambridge University Press, 2009).

"Cross-Examination: Moving Up to the Next Level," NITA NOTES (February, 2009).

"A Short Meditation on Some Remaining Issues in Evidence Law," 38 SETON HALL L. REV.
1435 (2008).

"Analyzing the Trial: Interdisciplinary Methods: Why a Philosopher in the United States Might Study the Trial," & "Discussion" 31 POLITICAL & LEGAL ANTHROPOLOGY REVIEW 303 (2008).

"The Lawfulness of the American Trial," in THE INTERNATIONAL LIBRARY OF ESSAYS IN LAW AND SOCIETY: TRIALS, Martha Merrill Umphrey, ed. (Hampshire: Ashgate 2008), *reprinted from* THE AMERICAN CRIMINAL LAW REVIEW.

"Some Philosophical Resources for the Study of Truth Practices in the American Trial," in THE ROLE OF SOCIAL SCIENCE IN LAW,  Elizabeth Mertz, ed. (Hampshire: Ashgate, 2008), *reprinted from*  THE POLITICAL AND LEGAL ANTHROPOLOGY REVIEW.

"On the Foundations and Nature of Morality," 39 HARV. J. LAW & PUB. POL. 7 (2008).

"The Practice of Law in the Peaceable Kingdom." 41 GA.. L. REV. 761 (2007).

"The Rule of Law in the Trial Court," 56 DEPAUL L. REV. 307 (2007).

"*Twelve Angry Men:* A Jury Between Fact and Norm," 82 CHI-KENT L. REV. 643 (2007).

"Civil Trials," ENCYCLOPEDIA OF LAW AND SOCIETY: AMERICAN AND GLOBAL PERSPECTIVES (London: Sage Publications) (2007).

"Fallacies on Fallacies: A Response," 3 INTERNATIONAL COMMENTARY ON EVIDENCE No. 1  (2006)

"Teaching Evidence Law in the Context of Trial Practices,"50 St.LOUIS  L. REV. 1155 (2006) (2006).

"A Wistful Retrospective on Wigmore and His Prescriptions for Illinois Evidence Law," 100 Nw. L. REV. 131 (2006).

"How Law Knows in the American Trial Court," in HOW LAW KNOWS, Austin Sarat ed., (Stanford University Press, 2006).

"The Distinctiveness of Trial Narrative," in THE TRIAL ON TRIAL: TRUTH AND DUE PROCESS [Hart Publishers, U.K., 2005].

"Evidence and Trial Advocacy Side by Side" in TEACHING THE LAW  SCHOOL CURRICULUM (Carolina Academic Publishers, 2004).

"Using Dramatization and Simulation in Professional Responsibility Teaching"in TEACHING THE LAW SCHOOL CURRICULUM (Carolina Academic Publishers, 2004).

"Law and Rhetoric" in A COMPANION TO RHETORIC & RHETORICAL CRITICISM (Walter Jost & Wendy Olmstead, eds.) (Oxford: Blackwell Publishing, 2004).

"Some Philosophical Resources for the Study of Truth Practices in the American Trial," 26 POL. & LEG. ANTHRP. REV. No. 2 (2003) *reprinted in* THE ROLE OF SOCIAL SCIENCE IN LAW,  Elizabeth Mertz, ed. (Hampshire: Ashgate, 2008).

"Professional Responsibility in the Trial Court," 44 S. TEX. L. REV. 81 (2003).

"A Conservative Perspective on the Future of the American Jury Trial" 78 CHI.-KENT LAW
    REV.1319 (2003).

"A Response to Four Readings of *A Theory of the Trial*," 28  LAW & SOCIAL INQUIRY 523
    (2003).

 "The Distribution of Authority between Lawyer and Client: The Case of the Benevolent
    Otolaryngologist," 2003 IL.L.REV. 1275 (2003)  (with Steven Lubet).

"Commentary on the Texas Code of Judicial Conduct: Model Code Comparisons" (2003).

"Teaching Evidence from Complex Factual Materials" in Newsletter of the Section of Evidence of
    the AALS (Spring, 2002).

"Some Ethical Issues Surrounding Mediation," 70 FORD.L.REV. 691 (2001), *excerpted and
    reprinted in* COOPER, NOLAN, & BALES, ADR IN THE WORKPLACE (West, 2004)
    and in SPENCER & BROGAN, MEDIATION LAW AND PRATICE (Cambridge, 2006) .

"The Lawfulness of the American Trial," 38 AM. CRIM. L. REV. 205 (2001) *reprinted in* THE
    INTERNATIONAL LIBRARY OF ESSAYS IN LAW AND SOCIETY: TRIALS, Martha
    Merrill Umphrey, ed. (Hampshire: Ashgate 2008).

"Notes on the Future of Evidence Law," 74 TEMPLE L. REV. 69 (2001).

"Report on Settlement Week in the United States District Court" (2001).

"Professional Responsibility in Trial Practice: Problems and Materials," in LITIGATION
    ETHICS, American Bar Association Section of Litigation  (2000) (with Donald B.
    Hilliker).

"Professional Responsibility in Trial Practice: Teacher's Manual," in LITIGATION ETHICS,
    American Bar Association Section of Litigation (2000) (with Donald B. Hilliker).

 "Review: James Boyd White, *From Expectation to Experience: Essays on Law and Legal
    Education*," 50 J. LEGAL ED. 147 (2000).

"The Practices of the American Trial," 4 BUDHI: A JOURNAL OF IDEAS & CULTURE 97
    (Manilla) (2000).

"Review: Charles Taylor, *A Catholic Modernity?*, 127 COMMONWEAL: A REVIEW OF
    RELIGION, POLITICS, AND CULTURE 27 (2000).

"The Purpose of Legal Ethics and the Primacy of Practice," 39 WM. & MARY L. REV 327
    (1998).

"Some Realism (and Idealism) About the Trial," 31 GA. L. REV. 715 (1997).

"Legal Ethics in Preparation for the Practice and Profession of Law," 75 NEB. L. REV.684 (1997).

"Teaching the Basic Ethics Course Through Simulation: The Northwestern Program in Advocacy
    and Professionalism," 58 L. & CONTEMP. PROBS. 37 (1996).

"The History and Theory of the American Jury: Review Essay," 83 CAL. L. REV. 1477 (1995).

"Forward: Bright Lines and Hard Edges: Anatomy of a Criminal Evidence Decision," 85 J. CRIM.
　　LAW & CRIMINOLOGY 843 (1995).

"When the Owl of Minerva Takes Flight at Dawn: Radical Constructivism in Social Theory," in
　　ESSAYS ON UNGER'S POLITICS (Cambridge University Press, 1989).

"Simulation: The Other Side of Clinical Teaching," (with Steven Lubet), 87 Northwestern
　　Reporter (Fall 1989).

"Rawls and the Principles of Welfare Law," 83 Nw. L. Rev. 184 (1989).

"The Appropriateness of Mediation: A Case Study and Reflection on Fuller and Fiss," 4 OHIO ST.
　　J. DIS. RES. 2 (1989).

"Enforceability," (with co-authors) in A STUDENT'S GUIDE TO MEDIATION AND THE LAW
　　(1988 Winner of Council on Public Resources Annual Book Award).

"Hannah Arendt's Constitutional Thought," in AMOR MUNDI: PERSPECTIVES ON THE
　　FAITH AND THOUGHT OF HANNAH ARENDT (Martinus Nijhof, The Hague, 1987).

"The Enforceability of Mediated Agreements: An Essay on Legitimation and Process Integrity," 2
　　OHIO ST. J. DIS. RES. 93 (1986).

"A Lawyer's Truth: Notes for a Moral Philosophy of Litigation Practice," 3 J. LAW & REL. 229
　　(1985).

"Blackstone's Theory of the Absolute Rights of Property," 54 CIN. L. REV. 67 (1985).

"The Federalist Rhetoric of Rights and the Instrumental Conception of Law," 79 Nw. U.L. REV.
　　949 (1985).

"Judicial Enforcement of the Illinois Administrative Procedure Act's Rulemaking Provisions," 55
　　CHI.-KENT L. REV. 383-406 (1979).

"Behavior Modification as a Punishment," 22 AM. J. JURIS. 19 (1977).

"Review of  H. Jones, *Kant's Principle of Personality,*" THEOLOGICAL STUDIES (1973).

"Review of H. Marcuse, *Counterrevolution and Revolt,*" AMERICA (1973).


## WORKS IN PROGRESS
.
I am working toward a general theory of legal procedure.  This would involve an exploration of the
　　actual details of the law of civil, criminal, and administrative procedure and the
　　philosophical and political commitments they reflect.

## PRESENTATIONS

"The Death of the American Trial?" Clarence Darrow Society annual celebration at the Museum of Science and Industry (2014).

"The Nature of Reasoning at Trial," Northwestern Economic Theory Luncheon (2014).

"Experimental Psychologists' Criticism of the Trial" Juries and Lay Participation: American Perspectives and Global Trends," Chicago-Kent School of Law (2014).

"Popular Sovereignty and the Jury,"  Onati, Spain, Conference on Lay Participation in Trials from a Global Perspective (2014).

"The Jury as a Political Institution: An Internal Perspective, "William & Mary Law School Conference on the Civil Jury as a Political Institution  (2013).

"The Withering Away of Evidence Law," University of Georgia Law School Conference on Reform in Evidence Law (2013).

"Advocacy in the Era of the Vanishing Trial," University of Kansas Symposium on the Seventy-Fifth Anniversity of the Adopting of the Federal Rules of Civil Procedure (2012).

"Hope and Hopelessness in Kafka," Northwestern University Humanities Conference (2012).

"Why We Shouldn't Let the Jury Vanish," American Board of Trial Advocates National Jury Summit (2011).

"Experiential Methods of Teaching Professional Responsibility Law," Pacific McGeorge School of Law Conference on Future Directions on the Teaching of Ethics (2011).

"Alternative Dispute Resolution: A Solution or More of the Same," Illinois Supreme Court Advanced Judicial Academy (2011).

"Kafka's *Der Prozess*" Illinois Supreme Court Advanced Judicial Academy (2011).

"Social Science and the Ways of the Trial Court," Cornell Law School Faculty Workshop (2011).

"What Will We Lose if the Trial Vanishes," Ohio Northern Law Review Symposium on Crises in the Legal Profession (2011).

Response to Paper, "A Pluralist Post-Secular Legitimation of Law" by Mark Modak-Truran; Conference: Politics as a Moral Question, University of Chicago (2010).

"The Ethics of Witness Preparation," Panelist, American Bar Association Section on Professional Responsibility Annual Meeting (2010).

"Legal Ethics and the Duke LaCrosse Prosecution," (Panelist) DRI Annual Convention (2009).

"The Death of the American Trial," Phillip Corboy Annual Lecture at Loyola Law School (2009).

Howard Trienens Visiting Judical Scholar Program: A Discussion with Justice Ginsburg at
Northwestern Law (2009).

"Integrating Trial Theory and Practice into Evidence Law," AALS Conference on the Law of
Evidence (2008).

"Qualitative Empirical Methods: Why a Legal Philosopher Would Study the Trial," Law &
Society Annual Meeting (2008)

"The Philosophy of the American Trial," Rutgers Camden Law School Faculty Seminar (2007).

"The Philosophical Significance of Trial Practices," Oxford University Jurisprudence Group
(2007)

"The 'Foundations' and Nature of Morality" Federalist Society Annual Student Meeting (2007).

"A Jury Between Fact and Norm," AALS National Convention Special Section (2007).

"Ethical Issues in the Employment Context," Chicago Bar Association (2006).

"Litigation Ethics: Immediate Trial Preparation and Trial Advocacy," Ungaretti & Harris
Workshop (2006).

"How Juries Know," The Geoffrey Fieger Annual Lecture at the Michigan State University
College of Law (2006).

"Wigmore the Reformer and the Conservative: His Illinois Experience," The Centenial
Celebration of the Northwestern Law Review. (2006).

"Aspects of the Ethics of Internal Investigations," ABA Section on Environment, Energy, and
Refining Law (2005).

"The ABA's Principles for the American Jury Trial, Accomplishments and Missed Opportunities".
Law and Society Annual Convention (2005).

"The Trial's the Thing: The Dependence of the Law of Evidence on a Philosophy of the Trial,"
AALS Section of Evidence: Annual Luncheon Speaker (2004).

"The Ethics of Negotiation," Wisconsin Office of the Attorney General Annual
Continuing Legal Education Conference (2003).

"The Law of Evidence and Basic Principles of Scientific Evidence," at
Northwestern Short Course for Prosecutors and Defense Attorneys (2003).

"Pragmatism and the Social Scientific Study of the Trial," Cornell University School of Law
(2003)

"Narrative and Rhetoric in the Trial," University of Edinburgh, Scotland: Conference on Truth and
Due Process in the Criminal Trial (2003).

"The Evidentiary Terrain of Effective Cross Examination." All-Star Cross Examination
Conference of the Seventh Circuit Bar Association (2002).

"Professional Responsibility in the Trial Court," South Texas Law School Litigation Ethics Conference (2002).

"*A Theory of the Trial*: The Author Meets His Critics," Law & Society Annual Meeting, Vancouver (2002).

"Ethics 2000 Symposium" at the University of Illinois School of Law (2002).

"The Languages of the Trial," Kaplan Center for the Humanities (2001).

"Lawyers, Philosophers, and Social Scientists," Law & Society Chicago Meeting (2001).

"Bureaucratic Decision Making and the Trial," Chicago-Kent School of Law (2000).

"The Forms of Argument in the Trial," Northwestern Argumentation Workshop (2000).

"The American Trial Between Facts and Norms," Northwestern Domain Dinner (2000).

"Professionalism and the Law School," ABA Annual Meeting, New York City (2000).

"Theories of the American Jury Trial," Bartlett Center Annual Program (2000).

"Simulation in a Clinical Program," Association of Canadian Law Schools, Ontario (2000).

Moderator of the Panel in Legal Ethics at the Garrett  Corporate Counsel Institute, Chicago, Illinois. (2000).

"Simulation in a Clinical Program," Association of Canadian Law Schools, Ontario (2000).

Panelist on the Panel on Legal Ethics at the Corporate Counsel Institute, San Francisco, California.

"The Purposes of Legal Ethics and Experiential Learning," WILLIAM & MARY CONFERENCE ON LEGAL ETHICS (1997).

"Litigation Ethics After the Amendments to Rule 11," WIGMORE INNS OF COURT WORKSHOP (1997).

"What I Is Hearsay These Days?" ILLINOIS ATTORNEY GENERAL'S OFFICE CONTINUING EDUCATION PROGRAM (1996).

"Integrating Practicing Lawyers into the Professional Responsibility Curriculum," American Bar Association Committee on Legal Education Annual Meeting (1996).

"Legal Ethics in the American Law School." Presentation to Visiting African Judges and Officials.

"Northwestern's Program in Advocacy and Professional." Duke University School of Law Conference on the Teaching of Legal Ethics.

"A Program in Critical Professionalism." ABA-NITA Conference on Teaching Trial Practice in the Nineties.

"Ethics and the Law of Evidence." AALS Annual Meeting (1990).

"Experimental Therapies with Elderly Patients: Analogies from Legal Ethics." Northwestern
        University Center on Aging.

"Distribution of Legal Services." Northwestern University Medical School Program in Medical
        Ethics.

"The Language and Truth of Trial and Cross-Examination." Northwestern Undergraduate
        Linguistics Seminar.

"Mediated Agreements: Contract Law and Codification." Ohio State University Law School.

"Administration and the Constitution: A Philosophical Response to Three Papers." American
        Political Science Association Annual Convention.

"Centralism and the Truth of Theory." Northwestern University Law School Bicentennial
        Workshop.

"The Conceptual Dilemmas and Political Paralysis of Welfare Reform." Northwestern Law School
        Welfare Litigation Seminar.

"Logistic Methods, Legal Positivism and the Judge's Role: Response to Professor Mashaw."
        Rosenthal Lectures.

"A Civil Rights Litigator's Perspective on Federal Jurisdiction." Northwestern University Law
        School Federal Jurisdiction Course.

"Public Welfare Law in America." Northwestern University Department of History Undergraduate
        Seminar.

"Administrative Rules and Illinois Agencies." Sangamon State University Seminar on the Illinois
        Administrative Procedures Act.

## EDITORIAL REVIEWS
Harvard Law Review
Yale Law Journal
Oxford University Press
Cambridge University Press
University of Chicago Press
Stanford University Press
Temple University Press
University of Missouri Press
University of Kansas Press
International Commentary on Evidence
Law, Probability, and Risk
Criminal Law & Philosophy
Law & Philosophy

## DOCTORAL COMMITTEES
Northwestern University School of Law
University of Illinois-Chicago, Department of English

# SUMMARY OF LITIGATION EXPERIENCE

The following is designed to give, in summary form, a description of the litigation in which I have participated.  The cases mentioned are among those on which I was lead counsel or played a major role at all or some points in the litigation.  They are in addition to many individual administrative hearings and to civil and criminal trials, including murder trials and federal civil rights trials.

Youakim v. Miller, 440 U.S. 125 (1979) (United States Supreme Court) (unanimously affirming class-wide injunction that required the payment of foster care benefits to children placed with their relatives); Pasha v. Gonzales, 433 F.3d 530 (2005)(reversing the judgment of an immigration judge on evidentiary grounds in an asylum case);  Pressley v. Haeger, 977 F.2d 295 (7th Cir. 1992) (affirming a jury verdict in a race discrimination case and ordering a recalculation of attorney's fees); Pressley v. Haeger II, (United States District Court)(enjoining prior restraint on officer's public criticism of police department); Benzies v. Illinois Department of Mental Health, 810 F.2d 146 (7th Cir. 1987), cert. den. 107 S.Ct. 3231 (1989) (refusing to reverse a judgment of the district court for the defendant in an employment discrimination disparate treatment case); United States ex rel. Miller v. McGinnis, 744 F.2d 819 (7th Cir. 1985) (reversal of district court order denying a new trial); McKeever v. Israel, 689 F.2d 1315 (7th Cir. 1982) (reversing the dismissal of a prisoner's civil rights suit claiming physical abuse); Stokes v. United States II, 703 F.2d 572 (7th Cir.), cert. den. 464 U.S. 836 (1983) (refusing to reverse a judgment of the district court holding that the habeas petitioner was competent to stand trial); Stokes v. U.S.A. I, 652 F.2d 1 (7th Cir. 1981) (reversal on procedural grounds of the district court's denial of the federal prisoner's habeas petition); Anderson v. Thompson, 658 F.2d 1205 (7th Cir. 1981) (refusal to reverse a decision of the district court holding that only injunctive relief, but not damages, were available to parents of a handicapped child under the Education of All Handicapped Children Act); People v. Hennon, 228 Ill. App. 3d 759 (1992) (refusal to reverse murder conviction); Boris v. Blaisdell, 142 Ill. App. 3d 1034 (1986) (upholding the constitutionality of statutory child support guidelines); Johnson v. State Employees Retirement System, 155 Ill. App. 3d 616 (1987) (holding that even jurisdictional appeals periods would not run against a claimant denied  due process right to adequate notice of such time limits); People v. Miller, 107 Ill.App.3d 1078 (1982) (refusal to reverse murder conviction, but reducing sentence); Fisher v. Holt, 52 Ill.App.3d 164 (1st Dist. 1978 (expanding tenant's warranty of habitability to include counterclaims for more than the rent due); Spaulding v. Howlett, 59 Ill.App.3d 249 (1978) (affirming trial court ruling restricting the use of hearsay in administrative hearings); Lucien v. Doria (Federal District Court)(class settlement requiring the construction of new county jail); Hanley v. Health Care Service (Blue Cross) (Federal District Court) (class settlement for 15,000 persons whose hospitalization benefits were denied on the grounds that the hospital stays were not "medically necessary"); King v. Quern (Federal District Court) (summary judgment for plaintiff class of work-study students whose welfare benefits were wrongfully reduced); Custom v. Trainor, 74 F.R.D. 409 (N.D. Ill. 1977) (class settlement of constitutional claim that failure to timely process General Assistance applications violates the due process clause); Custom v. Trainor II, 482 F.Supp 1000 (N.D. Ill. 1980) (holding that legal services attorneys are entitled to full fees under the Civil Rights Attorney's Fee Act); Barnes v. Trainor (Federal District Court) (class settlement requiring expedited processing of administrative appeals;  Boddie v. Trainor (Federal District Court) (summary judgment on class claim that Department of Public Aid had not given adequate notice of its dispositions of recipient's requests for additional benefits); Illinois Health Care Association v. Quern (Federal District Court) (class settlement of claim that nursing home reimbursement structure violated the Social Security Act); Estep v. Illinois Department of Public Aid (Circuit Court of Cook County) (class preliminary injunction prohibiting the reduction of General Assistance benefits); Anderson v. Bilandic (Federal District Court) (class injunction entered after federal trial prohibiting expanded penalties for appealing occupational license decisions).

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------- X

FERNANDA GARBER, MARC LERNER,   :
DEREK RASMUSSEN, ROBERT SILVER,   :
GARRETT TRAUB, and VINCENT   :
BIRBIGLIA, representing themselves and all   :
others similarly situated,   :
   :
       Plaintiffs,   :
   :
      -against-   :
   :
OFFICE OF THE COMMISSIONER OF   :
BASEBALL, et al.,   :
   :
      Defendants. :

--------------------------------------------------------- X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/27/2017

12-CV-03704 (VEC)

OPINION & ORDER

VALERIE CAPRONI, District Judge:

       This sanctions proceeding stems from the filing of an objection (the "Hull Objection") to the proposed class action settlement in this case.[1]  Asserting that the Hull Objection was frivolous, Plaintiffs filed motions for sanctions pursuant to Federal Rule of Civil Procedure 11 against the objector, Sean Hull, and his counsel.  Although the Rule 11 motions ultimately were withdrawn by stipulation, the Court held a hearing to consider whether to impose *sua sponte* Rule 11 sanctions upon Christopher Bandas of Bandas Law Firm, an attorney representing Hull. For the reasons discussed below, although the Court has grave concerns about Bandas' conduct in this matter, it will not *sua sponte* impose sanctions on Bandas.

---

[1]     The Honorable Shira A. Scheindlin, to whom this case was initially assigned, approved the class settlement and awarded attorneys' fees and costs in this case.  Upon Judge Scheindlin's departure from the bench, this case, with its outstanding Rule 11 sanctions motion, was reassigned to the Undersigned.

## BACKGROUND

On the last day that he was permitted to do so, Hull filed a class-settlement objection that was drafted by Bandas.  The Hull Objection was frivolous for a variety of reasons.  It asserted that the proposed settlement was not fair, adequate, or reasonable because it did not provide for monetary damages, ignoring Judge Scheindlin's decision to certify the class only for injunctive relief and Plaintiffs' counsel's unsuccessful interim appeal of that decision.  Objection of Sean Hull (hereafter, "Hull Obj."), at 4, Dkt. 538; Opinion and Order, Dkt. 430; Mandate, Dkt. 440; *see also* April 25, 2016, Transcript ("Fairness Hr'g Tr."), at 8:3–12, 20:12–18, Dkt. 572.  Bandas acknowledged that he had "no idea" whether there was any likelihood that the decision not to certify a damages class would have been reversed had Plaintiffs continued to pursue the case rather than settling.  July 14, 2016, Transcript (hereafter, "Tr."), at 43:7–45:4, Dkt. 596.  The Hull Objection also asserted that the proposed attorneys' fees award was "excessive;" Hull's proposed fee award, however, would have resulted in a "very de minimis amount" of cash to be distributed to the class.  *See* Hull Obj. at 69; Tr. at 54:6.[2]  It further asserted that Hull was "a class member who has timely filed a claim," but, in fact, Hull had not filed a claim, as there was no procedure for filing a claim in this case.  Hull Obj. at 2; *see also* Memorandum in Support of Plaintiffs' Motion for Sanctions Pursuant to Rule 11 of the Federal Rules of Civil Procedure (hereafter, "Rule 11 Br."), at 2, Dkt. 558.

It is undisputed that the Hull Objection was drafted by Bandas but was filed by local counsel, David Stein of Samuel and Stein, after Stein's associate conducted a "basic review."

---

[2]     The proposed settlement awarded $16.5 million in attorneys' fees and costs for a case that had been litigated for approximately four years.  Hull proposed a reduced award of $10.6 million in attorneys' fees and costs.  Hull Obj. at 9.  Because there were approximately five million individual members in the class, Tr. at 54:4, Hull's proposal would have yielded approximately $1.18 per class member.  Of course, the costs of distribution would have reduced that figure further.

Tr. at 4:3–10, 5:3–7, 8:1–5, 16:8–9; April 21, 2016, Letter (hereafter, "April 21 Letter"), Dkt.

547.  After Plaintiffs threatened Rule 11 sanctions for the Hull Objection, Stein requested leave

to withdraw his firm's representation of Hull because his firm did not have "sufficient

confidence" in the Hull Objection and was not "sufficiently well-informed about the case."

April 21 Letter.  Judge Scheindlin granted Stein's request to withdraw.  April 21, 2016, Court

Endorsement, Dkt. 549.  Although Stein asked Bandas to withdraw the Hull Objection, Bandas

informed Stein that Hull refused to withdraw the objection.  April 21 Letter; Tr. at 5:20–6:1.

Stein had no communications with Hull; rather, Stein communicated only with Bandas.  April 21

Letter.[3]

     Several days later, Plaintiffs filed a Rule 11 Motion for Sanctions against Hull and Stein,

claiming that the Hull Objection was frivolous and that its "only purpose is to interfere with the

implementation of the settlement in order to extort a payment to drop the objection."  Rule 11 Br.

at 1.  Plaintiffs also informed the Court that they intended to request that Hull be required to post

a $150,000 bond if he appealed the order approving the class settlement.  April 18, 2016, Letter,

Dkt. 542.  Judge Scheindlin held a fairness hearing, at which she approved the proposed class

settlement and awarded attorneys' fees and costs.  Fairness Hr'g Tr. at 45:4–54:17; *see also*

Order Approving Class Settlement and Awarding Attorneys Fees and Costs (hereafter,

"Settlement Order"), Dkt. 561.  Among other things, Judge Scheindlin noted that although

several class members objected to the settlement because it did not provide monetary

compensation, "[a]s this class was certified for injunctive relief only, parties were not in a

position to negotiate for damages."  Fairness Hr'g Tr. at 49:12–16.  Though he had not yet been

---

[3]    Stein's associate informed the Court that "the understanding" between Bandas and Stein's law firm was that "if the [Hull] objection needed to be defended in any way that [Bandas] would step in and do it that he wasn't asking us to do that."  Tr. at 11:22–24.

retained by any interested party, Forrest Turkish appeared telephonically but did not participate at the hearing.  *See* Fairness Hr'g Tr. at 5:17–6:4.

After the settlement was approved and while discovery and briefing relating to the Rule 11 motion was proceeding, the case was reassigned to the Undersigned.  Because Stein no longer represented him, Hull himself submitted a letter "to advise the Court of [his] intent to respond substantively to class counsels' motion for sanctions."  April 25, 2016, Letter (hereafter, "Hull Letter"), at 1, Dkt. 570.  Although Hull's letter was labeled as *pro se*, it stated that it was "prepared with the assistance of Christopher A. Bandas, of Bandas Law Firm, P.C.," and it was transmitted by Bandas Law Firm.  Hull Letter at 1; Reply Memorandum of Law in Support of Plaintiffs' Motions for Rule 11 Sanctions Against Serial Objectors Christopher Bandas, Sean Hull, and David Stein, Ex. 2, Dkt. 575-2.  Bandas subsequently retained Turkish to defend the Rule 11 sanctions motion against Hull and to file a Notice of Appeal of the Order approving the settlement.  Tr. at 25:19–26:8; Notice of Appeal, Dkt. 574.[4]

Bandas drafted substantial portions of Hull's brief opposing sanctions, which Turkish reviewed and revised before filing.  Tr. at 26:1–2, 28:16–29:5 (Turkish: "Most of [the opposition brief] was not drafted by me."); *see also* Turkish Engag. Email at 1 (noting that as a term of Turkish's engagement, Bandas "will be preparing the substantive filings including the Motions.").  Turkish never spoke with Hull; all of Turkish's communications about the case were with Bandas.  Tr. at 28:3–6.

---

[4]      Turkish agreed to represent Hull only if "[i]n the event a sanction is threatened or awarded against me, you agree to defend, indemnify and hold me harmless for/from any such sanctions."  Memorandum of Law in Support of Plaintiffs' Motion for Rule 11 Sanctions Against Forrest Turkish (hereafter, "Turkish Rule 11 Br."), Ex. 1 ("Turkish Engag. Email"), at 1, Dkt. 605.  Turkish listed as additional terms of the engagement that Bandas would "prepare[] the substantive filings including Motions" and that Turkish "can file [Bandas'] notice of appeal but then [Bandas] will need to substitute as [Turkish is] not admitted in the 2nd Circuit."  Turkish Engag. Email at 1.  Bandas accepted Turkish's terms of engagement.  Turkish Engag. Email at 1.

Plaintiffs then filed a Rule 11 Motion for Sanctions against Bandas, to which Bandas refused to respond. Bandas stated that he was "fully aware" of the Rule 11 motion against him, but that he "ignored" it. Tr. at 20:24–22:4. He reasoned that because he had not filed a notice of appearance, he was not before the Court and, therefore, was not sanctionable. Tr. at 20:23–21:12.[5] Bandas acknowledged, however, that he represented Hull, drafted the Hull Objection as Hull's attorney, and also drafted Hull's opposition brief to the Rule 11 sanctions motion against Hull. Tr. at 18:16–20, 26:1–2, 28:16–29:5.

During discovery on Plaintiffs' Rule 11 motions, Plaintiffs served Hull with a subpoena directing him to produce documents and appear for a deposition relating to, among other things, the Hull Objection and Hull's communications and agreements with Bandas. Subpoena, Dkt. 576–1. Turkish opposed Plaintiffs' request for documents and Hull's deposition, and the Court scheduled a conference call to resolve the objection. June 3, 2016, Discovery Letter (hereafter, "June 3 Letter"), Dkt. 576; June 6, 2016, Court Endorsement, Dkt. 579. Turkish joined the call late because he erroneously thought that the conference was the following day, and he was entirely unprepared to respond to the arguments that Plaintiffs had presented in a letter filed the day before the call. June 7, 2016, Tr. at 4:1–7, 9:14–10:20, Dkt. 606.[6] This Court ordered Hull to appear for a deposition, which occurred shortly thereafter. June 3 Letter; Order, Dkt. 580; Memorandum of Law on Behalf of Christopher Bandas, Esq. Submitted for the Limited Purpose of Responding to the Question Posed by the Court at the July 14, 2016, Hearing (hereafter, "Bandas Mem."), at 3, Dkt. 59. Bandas, who was "assisted by" Turkish, "missed the deadline"

---

[5]     Bandas is not admitted in the Southern District of New York. He is admitted to the State Bar of Texas and is admitted in other federal courts, including the Second Circuit Court of Appeals. *See* Tr. at 13:18–24.

[6]     Hull had been served with the subpoena at least 13 days before the telephonic Court conference. *See* June 6, 2016, Letter (hereafter, "June 6 Letter"), at 2, Dkt. 578.

to assert privilege objections to the subpoena's document requests.  Bandas Mem. at 3.  Plaintiffs then filed three motions: a letter motion to compel Hull to produce documents responsive to the subpoena, Dkt. 581; a motion for  Hull to post an appellate bond, Dkt. 582; and a motion for sanctions against Turkish, Dkt. 583.

In July 2016—three months after the initial Rule 11 sanctions motions were filed, and while the Rule 11 motions, the motion to compel, and the motion for an appeals bond were pending before this Court, and while the appeal of the Settlement Order was pending in the Second Circuit—Bandas, Turkish, Hull, and Plaintiffs' Class Counsel filed a stipulation that settled the Hull Objection in exchange for the withdrawal of the sanctions motions against Hull and his counsel.  Stipulation to Withdraw the Objection of Sean Hull, To Withdraw Notice of Appeal & To Withdraw Plaintiffs' Motions for Sanctions Against Christopher Bandas, Sean Hull, David Stein, and Forrest Turkish (hereafter, "Stipulation"), Dkt. 587.[7]  The Court ordered Plaintiffs' Class Counsel and Bandas, Stein, and Turkish to appear for a hearing to discuss why the Court should not *sua sponte* issue an Order to Show Cause why sanctions should not be imposed upon the attorneys who represented Hull.  July 8, 2016, Court Endorsement, Dkt. 589. Following the hearing, Bandas submitted a brief regarding whether this Court has authority to impose sanctions against him.  Bandas Mem.

## DISCUSSION

Rule 11 of the Federal Rules of Civil Procedure governs the imposition of sanctions upon an attorney.  An attorney who presents a filing to the court certifies that "to the best of the

---

[7]     The stipulation stated that no payment was made by Plaintiffs or Plaintiffs' Class Counsel to Hull or his counsel.  Stipulation ¶ 8.

person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," the filing is not presented for an improper purpose, the legal contentions are nonfrivolous and supported by existing law, and the factual contentions have evidentiary support. Fed. R. Civ. P. 11(b). "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction." Fed. R. Civ. P. 11(c)(1). To impose sanctions, *sua sponte*, the court may order an attorney to show cause why certain conduct has not violated Rule 11(b). Fed. R. Civ. P. 11(c)(3).

Although the standard for imposition of sanctions initiated by an opposing counsel is a finding that the attorney's conduct was "objectively unreasonable," *sua sponte* sanctions initiated by the court "long after [the accused attorney or party] had an opportunity to correct or withdraw the challenged submission" may be imposed only upon a finding of subjective bad faith. *In re Pennie & Edmonds LLP*, 323 F.3d 86, 87, 91 (2d Cir. 2003); *Muhammad v. Walmart Stores East, L.P.*, 732 F.3d 104, 108 (2d Cir. 2013). This is because the court's power to issue *sua sponte* sanctions is "akin to the court's inherent power of contempt." *Muhammad*, 732 F.3d at 108 (discussing *Pennie*).[8] Courts in the Second Circuit have concluded that to find subjective bad faith, an attorney must "have *actual knowledge* that a pleading or argument that he or she is advancing is frivolous." *Braun ex rel. Advanced Battery Techss., Inc., v. Fu*, No. 11-cv-4383(CM)(DF), 2015 WL 4389893, at *15 (S.D.N.Y. July 10, 2015) (emphasis in original); *see*

---

[8]      *Pennie* declined to hold that a subjective bad-faith standard applies to *all* court-initiated sanctions proceedings. *See Pennie*, 323 F.3d at 91 ("It is arguable . . . that a 'bad faith' standard should apply to all court-initiated Rule 11 sanctions because no 'safe harbor' protection is available and because the Advisory Committee contemplated such sanctions for conduct akin to contempt. However, we need not make so broad a ruling in the pending case."). After *Pennie*, the Second Circuit has ruled only once that the subjective bad faith standard did not apply to court-initiated sanctions proceedings: in *ATSI Communications*, the Second Circuit concluded that *Pennie*'s subjective bad faith standard did not apply in the context of litigation governed by the Private Securities Litigation Reform Act of 1995 ("PSLRA") because the PSLRA itself required the court to make Rule 11 findings at the conclusion of the proceedings. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 146–47 (2d Cir. 2009).

*also Rivas v. Bowling Green Assoc.*, No. 13-cv-7812 (PKC), 2014 WL 3694983, at *2 (S.D.N.Y.

July 24, 2014) ("Proof of actual knowledge, and not merely what a reasonable attorney should

have known, is required."). Negligence, even gross negligence, does not suffice. *See Centauri

Shipping Ltd. v. W. Bulk Carriers KS*, 528 F. Supp. 2d 197, 201 (S.D.N.Y. 2007). Actual

knowledge may be proven through direct or circumstantial evidence, and "conscious avoidance

may be the equivalent of knowledge." *Rivas*, 2014 WL 3694983, at *2; *Cardona v. Mohabir*,

No. 14 Civ. 1596 (PKC), 2014 WL 1804793, at *3 (S.D.N.Y. May 6, 2014); *see also Braun*,

2015 WL 4389893, at *15 (citing *Cardona* and *Rivas*).

Throughout this proceeding, Bandas' behavior has been, at best, unprofessional, and at

worst, an unseemly effort to extract fees from class counsel in exchange for the withdrawal of a

meritless objection to the proposed class settlement.[9] The Hull Objection, which Bandas

admitted that he drafted, had no merit: it objected to the settlement because it provided no

damages when the Court had declined to certify a damages class; it objected to the attorneys'

fees award for being "excessive" only because the attorneys failed to secure damages, again

ignoring that the Court had declined to certify a damages class; and it proposed a reduced fee

award that would have resulted in such a low payout to each of the class members that it would

---

[9]     Bandas appears to fall within a class of attorneys called "professional objectors." Professional objectors are attorneys who "'file stock objections to class action settlements'—objections that are '[m]ost often ... nonmeritorious'—and then are 'rewarded with a fee by class counsel to settle their objections.'" *In re Elec. Books Antitrust Litig.*, 639 F. App'x 724, 728 (2d Cir. 2016) (summary order) (quoting WILLIAM B. RUBENSTEIN, NEWBERG ON CLASS ACTIONS § 13:21 (5th ed. 2012)). Professional objectors primarily seek to obstruct or delay settlement proceedings so as to extract attorneys' fees in exchange for the withdrawal of the objection. 7B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1797.4 (3d ed. 2005).

        Such behavior has led numerous courts to conclude that "professional objectors undermine the administration of justice by disrupting settlement in the hopes of extorting a greater share of the settlement for themselves and their clients." *In re Initial Pub. Offering Sec. Litig.*, 728 F. Supp. 2d 289, 295 (S.D.N.Y. 2010); *see also O'Keefe v. Mercedes-Benz USA, LLC*, 214 F.R.D. 266, 295 n.26 (E.D. Pa. 2003) ("Federal courts are increasingly weary of professional objectors: some of the objections were obviously canned objections filed by professional objectors who seek out class actions to simply extract a fee by lodging generic, unhelpful protests." (citation omitted)). In addition to undermining the administration of class action settlements, these baseless objections waste judicial time and energy that should be spent on more productive matters.

have made little economic sense to distribute it.  Bandas was aware that the Court had certified

the class for injunctive-relief only, and he admitted that he prepared the objection with "no idea"

of the likelihood that the Court's refusal to certify a damages class would have been reversed on

appeal.  *See* Tr. at 44:18–21.  Bandas asserted that the fees award was excessive for an

injunction-only class, but he failed to provide any examples of analogous cases in which a court

that refused to certify a damages class then reduced the plaintiffs' counsel's agreed-upon fee on

the grounds that the plaintiffs achieved only injunctive relief.  Tr. at 48:12–22.

Bandas' failure to provide any legitimate support for the Hull Objection would be enough

to cause this Court concern.  But Bandas' behavior throughout this proceeding has been unfitting

for any member of the legal profession.  Even though Bandas was substantially involved in all

stages of the Hull Objection—he drafted the Hull Objection and substantial portions of Hull's

opposition brief, and he "assist[ed]" in the preparation of Hull's "*pro se*" letter regarding

sanctions—Bandas refused to enter a notice of appearance in this case, and he refused to sign

any of the filings that he himself drafted.  Instead, Bandas orchestrated other attorneys, Stein and

Turkish, to "appear" on the various filings that Bandas drafted or prepared behind the scenes.

Bandas' machinations were designed to avoid his professional responsibilities to the Court and

were explicit with respect to Turkish:  Turkish required as a term of his engagement that Bandas

would "prepar[e] the substantive filings including Motions" and required Bandas to agree to

indemnify him if he were sanctioned for his role in this case.  Turkish Engag. Email at 1.  The

sanctions-indemnity provision in the engagement agreement between Turkish and Bandas

appears to the Court to be an improper attempt by Turkish to avoid any financial repercussions

for sanctionable behavior and a way for Bandas to avoid any collateral consequences to himself if his conduct resulted in sanctions being imposed.[10]

Bandas argues that he is not sanctionable by this Court because he never filed a notice of appearance; he asserts that his calculated decision not to file a notice of appearance was "not to avoid sanctions," but rather was because he did not have time to "travel around the country and make appearances in every objection matter that I am involved in." Tr. at 19:19–20:3.[11] Bandas' preparation of a meritless objection to the proposed settlement, his refusal to appear in this case despite his substantial involvement in preparing the Hull Objection that exposed two of his "local counsels" to potential sanctions, and his failure to affix his name to *any* of the litigation papers that he himself drafted and prepared, belie his specious assertion that his conduct was entirely innocent.

Numerous courts throughout the country have publicly excoriated Bandas for the frivolous objections that he has penned and injected into class action settlements. A district court in California, for example, wrote, "Bandas routinely represents objectors purporting to challenge class action settlements, and does not do so to effectuate changes to settlements, but does so for his own personal financial gain." Amended Order Granting Indirect Purchaser Plaintiffs' Motion to Compel Discovery from Objector Sean Hull (hereafter, "*CRT* Order") at 4, *In re Cathode Ray*

---

[10]     This is not the first time Turkish has been chastised by a judge of the Southern District of New York. Before Turkish ever entered this case, The Honorable Colleen McMahon reprimanded Turkish for filing a "patently frivolous" objection to a class action settlement. *City of Providence v. Aeropostale, Inc.*, 11 Civ. 7132 (CM)(GWG), 2014 WL 1883494, at *3 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015) (summary order). Although Judge McMahon declined to impose sanctions on him, Judge McMahon admonished, "Now that this court has become acquainted with Turkish, his reputation will precede him should he turn up in future cases." Order Closing Case, *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132 (S.D.N.Y. June 10, 2014), Dkt. 74. This Court also declines to impose sanctions on Turkish, but joins Judge McMahon in finding that Turkish should think twice before he participates in any further frivolous class settlement objections in the Southern District of New York.

[11]     Of course, if Bandas spent less time preparing and filing frivolous objections to proposed class settlements, he might have more time to appear in the cases in which there are legitimate grounds to object.

*Tube (CRT) Antitrust Litigation*, No. CV-07-5944 (N.D. Cal. April 16, 2012), Dkt. 1155.[12]

Similarly, a court in Illinois found:

> Bandas is a professional objector who is improperly attempting to "hijack" the settlement of this case from deserving class members and dedicated, hard working counsel, solely to coerce ill-gotten, inappropriate and unspecified "legal fees." Bandas has filed virtually identical, frivolous objections in South Carolina, Iowa, Missouri and Florida in settlements of similar [] class actions.

Order Denying Objections to the Settlement and Fees and the Motion to Intervene and for Pro Hac Vice Admission, at 2, *Brown v. Wal-Mart Stores, Inc.*, No. 01 L 85 (Ill. Cir. Ct. Oct. 29, 2009).

This Court joins the other courts throughout the country in finding that Bandas has orchestrated the filing of a frivolous objection in an attempt to throw a monkey wrench into the settlement process and to extort a pay-off. His plan was thwarted when the Court permitted discovery to proceed on the sanctions motions, which ultimately, apparently, created more risk for Bandas than he was prepared to endure. Hull testified that in Bandas' numerous representations of him in objections to class action settlements, Hull has *never* received funds from the settlement of any of his objections, whereas Bandas has. *See* Deposition of Sean Hull at 44:1–45:8.[13] That testimony, if true, is gravely concerning. It indicates that Bandas' settlement of objections has been without *any* benefit to his client, Hull, or to the class, supporting the conclusion that many, if not most, of the objections being raised by Bandas are

---

[12]     *In re CRT Litigation* contains a remarkable number of similarities to this one: the objecting class member was Hull, and the objection was not filed by Bandas but was sent from Corpus Christi, Texas, where Bandas maintains his law office (which is not where Hull resides). *CRT* Order at 3–4.

[13]     At the July 14 hearing, Bandas purported to have no recollection whether Hull had received any funds from Bandas' settlement of Hull's objections in other class action cases. Tr. at 23:24–24:22. The Court finds Bandas' purported lack of recollection not credible.

not being pursued in good faith.  Ultimately, Bandas wasted a substantial amount of judicial time and effort, without any benefit to Hull or to the class.

Although Bandas' behavior in this proceeding provides strong indicia of his subjective bad faith, the Court is not convinced that it has jurisdiction to sanction him, given that he has not appeared in this case, and he is not a member of the bar of the Southern District of New York. *See In re Hydroxycut Mktg. & Sales Practices Litig.*, Nos. 09md2087 BTM (KSC), 09cv1088 BTM (KSC), 2014 WL 815394, at *3 (S.D. Cal. Mar. 3, 2014) (collecting cases).  Therefore, the Court declines to impose Rule 11 sanctions on Bandas.

## CONCLUSION

For the foregoing reasons, the Court declines to impose Rule 11 sanctions on Bandas. Nevertheless, because the Court is gravely concerned that Bandas uses attorneys as "local counsel" without full disclosure of his track record and to shield himself from potential disciplinary action associated with frivolous objections, Bandas is ordered to provide a copy of this opinion to any local counsel he seeks to engage for any case pending in the Southern District of New York.  The Clerk of Court is respectfully directed to terminate any outstanding motions and close this case.

**SO ORDERED.**

**Date:  February 27, 2017**
      **New York, NY**
                                        **VALERIE CAPRONI**
                                        **United States District Judge**

# EXHIBIT D

### Declaration of Theodore H. Frank
### in Support of Motion to Intervene

1.      My name is Theodore H. Frank, and I have personal knowledge of the matters attested to in this declaration.

2.      I am the lead appellate counsel for appellant Jeffrey Collins in Appeal No. 15-1546, and the attorney who signed and filed the joint brief of appellants in Appeal Nos. 15-1400, 15-1490, and 15-1546, challenging the Rule 23(h) award to class counsel in this case.

3.      I had a telephone conversation after business hours on Friday, June 5, 2015, with Jonathan Selbin of class counsel Lieff Cabraser. In that conversation, he made Mr. Collins a settlement offer where Mr. Collins would dismiss his appeal and withdraw his pending fee petition in the district court, and class counsel would pay Mr. Collins $25,000 upon those two things happening. Based on my understanding of earlier communications with my client (including, but not limited to, Mr. Collins's retainer agreement; Mr. Collins's declaration under oath in the district court; and Mr. Collins's emails to me of November 19, 2014; March 25, 2015; May 11, 2015; May 27, 2015, at 7:48 AM Central; and June 4, 2015 at 7:35 AM Central), I declined that offer. Mr. Selbin repeated his offer in writing in an email, and threatened to subpoena Mr. Collins in the district court. In further communications between me and Mr. Collins on June 5, Mr. Collins indicated to me that he now wished to accept the offer notwithstanding his earlier agreement and statements, and I wrote Mr. Selbin on June 5 to indicate that Mr. Collins accepted the offer.

4.      Pursuant to that settlement, I separately filed on Mr. Collins's behalf a motion to dismiss in the form requested by class counsel on Monday, June 8, 2015, and Mr. Collins withdrew his pending fee petition in the district court on June 9, 2015; class counsel then wired $25,000 to Mr. Collins. I find the settlement agreement between Mr. Collins and Mr. Selbin repugnant, and have a fundamental disagreement with Mr.

Collins's decision to accept the settlement offer. Ethical rules required me to communicate that settlement offer to Mr. Collins and to permit him to accept it; moreover, Mr. Collins would have been prejudiced by my withdrawal, given the short time-frame he had to accept the offer, so I filed the motion to dismiss instead of withdrawing. The Court has granted Mr. Collins's motion to dismiss and issued a mandate in Appeal No. 15-1546.

5.      Mr. Selbin's written offer made clear that the offer to Mr. Collins is contingent only upon the dismissal of Mr. Collins's appeal no. 15-1546, and no other appeal. The Center for Class Action Fairness's motion to intervene in Appeal Nos. 15-1400 and 15-1490 as guardian ad litem for the class thus presents no conflict of interest with Mr. Collins.

6.      Because its retainer agreement complies with conservative interpretations of federal guidelines for non-profit public-interest law firms, the Center for Class Action Fairness has no rights to any of the $25,000 Mr. Collins has received for settling his appeal. It thus has no conflict of interest with the class in agreeing to the dismissal of Mr. Collins's appeal, while opposing any dismissal of Appeal Nos. 15-1400 and 15-1490.

7.      In my opinion, the merits brief filed in Appeal Nos. 15-1400, 15-1490, and 15-1546, challenging the fee award and violation of Rule 23(h), is meritorious, and has a substantial chance of success that will improve the class outcome. The class will be unfairly prejudiced if the appellants in No. 15-1400 and No. 15-1490 are also permitted to dismiss their appeals after Mr. Collins dismisses his appeal. In addition, I believe that the Seventh Circuit's decision in Appeal Nos. 15-1400 and 15-1490 is "an opportunity to provide additional guidance to the district court" in a "common and economically significant" scenario.

8.      I believe the settlement satisfied Rule 23(e) at the time it was made and approved, and do not believe the class will be unfairly prejudiced if settlement approval is affirmed.

### Theodore H. Frank and the Center for Class Action Fairness

9.      I graduated the University of Chicago Law School in 1994. I am a member of the Illinois, California, and District of Columbia bars; a former clerk for a judge on the U.S. Court of Appeals on the Seventh Circuit; and an elected member of the American Law Institute.

10.     I founded the Center for Class Action Fairness in 2009. It is a 501(c)(3) non-profit public-interest law firm, with its attorneys based out of Washington, DC.

11.     The goal of the Center is to protect class members in the class action settlement process from certain abuses of the class action system. The Center's attorneys have won class members millions of dollars and have received national acclaim from the press. *See, e.g.,* Adam Liptak, *When Lawyers Cut Their Clients Out of the Deal*, N.Y. TIMES (Aug. 13, 2013) (calling me "the leading critic of abusive class action settlements"); Jeffrey B. Jacobson, *Lessons From CCAF on Designing Class Action Settlements*, Law360 (Aug. 6, 2013) (discussing the Center's recent track record); Ashby Jones, *A Litigator Fights Class-Action Suits*, WALL ST. J. (Oct. 31, 2011).

12.     I have won over a dozen appeals on behalf of class members. I have argued before the Seventh Circuit three times in cases related to class action or shareholder derivative settlements on behalf of the Center, and won all three cases. *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014) (observing that CCAF "flagged fatal weaknesses in the proposed settlement" and demonstrated "why objectors play an essential role in judicial review of proposed settlements of class actions"); *Redman v. RadioShack Corp.*, 768 F.3d 622 (7th Cir. 2014); *Robert F. Booth Trust v. Crowley*, 687 F.3d 314 (7th Cir. 2012). In addition, I was retained in my private capacity by Christopher Bandas to ghostwrite the briefs and successfully argue *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014).

13.     Other courts have also praised the Center's work. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 716-17 (6th Cir. 2013) (describing CCAF's client's objections as

3

"numerous, detailed, and substantive."); *Richardson v. L'Oreal USA, Inc.*, 991 F. Supp. 2d 181, 205 (D.D.C. 2013) (describing CCAF's client's objection as "comprehensive and sophisticated" and noting that "[o]ne good objector may be worth many frivolous objectors in ascertaining the fairness of a settlement."). Through its efficient work as a watchdog, the Center has won class members millions of dollars. *See, e.g., McDonough v. Toys "R" Us*, No. 06-cv-00242, 2015 U.S. Dist. LEXIS 7510, at *141 ("CCAF's time was judiciously spent to increase the value of the settlement to class members") (internal quotation omitted); *In re Classmates.com Consol. Litig.*, No. 09-cv-0045-RAJ, 2012 U.S. Dist. LEXIS 83480, at *29 (W.D. Wash. Jun. 15, 2012) (noting that CCAF's client "was relentless in his identification of the numerous ways in which the proposed settlements would have rewarded class counsel … at the expense of class members" and "significantly influenced the court's decision to reject the first settlement and to insist on improvements to the second").

14.     CCAF receives many more requests to bring meritorious objections to class actions and excessive fee requests than it has resources to pursue, and thus has no interest in wasting resources bringing an objection it does not believe is legally meritorious.

**The Center for Class Action Fairness and Professional Objectors**

15.     Because CCAF is non-profit, it cannot and does not settle its objections for a *quid pro quo* cash payment to withdraw, as many professional objectors do.

16.     CCAF's clients would sometimes be co-appellants with so-called "professional objectors." In CCAF's early years, several professional objectors would become very angry with me when I would refuse to engage in settlement negotiations or accept payment to dismiss appeals.

17.     In a 2010 case, I represented a client with a meritorious Ninth Circuit appeal of approval of a settlement where the attorneys received $4 million and the class received zero. The appeals court ordered mediation, though I indicated to the mediator

that my clients did not want to settle. After we filed our opening brief, class counsel offered an extraordinary sum to my clients to dismiss their appeals. (Unfortunately, the offer was confidential, and I cannot disclose it absent a court order.) One of my clients, an attorney friend, apologetically indicated that the offer was too good to refuse. I withdrew as attorney for the two appellants, and they settled and dismissed the appeal. Neither the Center nor I received any compensation as part of that settlement.

18.     Since that time, the Center's retainer agreements contain multiple clauses relating to the motivations of the Center's clients and the possibility of settling objections for money. Among other provisions, the Center discloses that retaining the Center might deprive clients of the most financially advantageous outcome; clients promise that they are not seeking to settle their objections for money; and clients authorize the Center to move for an injunction prohibiting them from doing so. The Center also very carefully screens its clients to ensure their good faith in objecting and, when possible, uses Center attorneys or board members who are class members to object. We do not represent clients who do not agree to these terms.

### My Former Business Relationship with Mr. Bandas

19.     Christopher Bandas regularly represents clients who object to class action settlements. In 2012, both Mr. Bandas and I represented clients in a Third Circuit appeal. Mr. Bandas, unlike other professional objectors I had dealt with until then, cooperated with the Center's goals, did not complain about the Center's refusal to settle, joined the Center's brief with a Rule 28(i) letter instead of filing a separate brief that would distract the appeals court from the issues the Center wished to raise, and did not demand oral argument time. That appeal, *In re Baby Products Antitrust Litig.*, 708 F.3d 163 (3d Cir. 2013), was successful, and I greatly appreciated Mr. Bandas's cooperation.

20.     While the appeal was pending. Mr. Bandas telephoned me and praised my work and the work of the Center, and I was flattered. He asked if there was any way I could perform legal work for him.

21.     I was intrigued by the possibility. At the time, I was an independent contractor with the Center's then-parent § 501(c)(3) charity. I had been frustrated by the work of other objectors, who would make substandard arguments or otherwise waive the best arguments, and then lose appeals or district-court cases that would then create bad precedents that hurt the Center's work. And the Center was poorly funded and thinly staffed, so we were not able to object in many cases where we wished to represent clients or appeal in all the cases we wished to appeal. If I was able to brief and argue those non-Center cases instead, I could further the Center's goals. Furthermore, Mr. Bandas suggested that his contacts with other professional objectors could help the Center in cases with multiple objectors. Moreover, Mr. Bandas, along with Darrell Palmer, had recently won a Ninth Circuit appeal, *Dennis v. Kellogg*, so I believed him when he indicated that he was interested in the development of good case law. Finally, the supplemental income Mr. Bandas was paying me would permit me to take a pay cut from the Center, and use that money to hire an additional Center attorney.

22.     Mr. Bandas persuaded me that he was only agreeing to settle objections for money because courts failed to provide adequate compensation for successful objectors, and the settled and withdrawn objections were paying for the cases where he was successful but received nothing. My experiences with the Center where the Center often received nothing for successful objections, and had even our modest requests for fees reduced by district courts that would rubber-stamp much larger class counsel requests, were consistent with that, so I believed him: he was correct that settling objections for money was much more profitable than bringing successful objections. For example, though Mr. Bandas's and Mr. Palmer's *Dennis v. Kellogg* appeal was successful and resulted in material improvement in the settlement, the district court refused to award attorneys' fees to the objectors.

23.     Mr. Bandas's proposal thus seemed win-win-win-win: Mr. Bandas would be better off, the law of class action settlements would be better off, the Center would be

6

better off if I took a pay cut and if I won precedents on behalf of Mr. Bandas's clients, and I would be better off. (I did take a pay cut, and the difference largely paid for a junior attorney to work for the Center for a little over a year.)

24.     After receiving internal approval from the Center's Board of Directors and other Center attorneys, I agreed to consult with Mr. Bandas, subject to some ground-rules: (1) I would only work on objections that I believed to be meritorious; (2) I would only work on cases where the Center did not have a client and where independent Center attorneys agreed in advance that there was no conflict of interest; and (3) Mr. Bandas would not claim at any time that my work for him was being done by the Center for Class Action Fairness. I would only make appearances in cases where there was no prospect of settlement, and if a case settled after I made an appearance, I would be permitted to withdraw as counsel.

25.     My first assignment with Mr. Bandas was an expert report in a district-court case where I was paid by the hour.

26.     Mr. Bandas proposed that I receive a contingent fee of a share of the proceeds of settled objections in cases where I performed consulting. I at first agreed to this, subject to the exception that, if I provided expert testimony, I could not receive contingent payment and would need to be paid by the hour. However, I grew uncomfortable with receiving a percentage of settled objections, both because I disagreed with the idea of settling objections for money at the expense of the class, and because I was concerned that I was most often being consulted in difficult cases where Mr. Bandas's actions before I became involved was putting him at risk of sanctions and where payment was thus unlikely. In 2013, Mr. Bandas and I agreed to a set of new retainer agreements where I would be paid by the hour, subject to a monthly minimum payment, with separate payments and separate retainers for cases where I made an appearance on behalf of one of Mr. Bandas's clients. The contingent payments I had received to date would be retroactively treated as a partial payment in advance for my

appearance and argument in a Seventh Circuit appeal, *Eubank v. Pella Corp.*, where I had written final drafts of the briefs. I declined assignments from Mr. Bandas where I did not think the settlement or fee request was objectionable, or where I had a conflict of interest, and, until this case, Mr. Bandas did not complain.

27.     I regularly gave oral reports to and answered questions from the Center's Board of Directors about my outside consulting and legal work, how it was consistent with the Center's mission, and what I was doing to avoid conflicts of interest. Subject to their satisfaction with these reports, the Center continued to approve my outside work.

28.     While Mr. Bandas paid me much less than the written agreements anticipated, I was generally satisfied with the business arrangement because I was not especially interested in the money. I got to brief and argue interesting cases where the Center did not have the resources or the clients to participate in. The objectors prevailed in *Eubank v. Pella Corp.*, 753 F.3d 718 (7th Cir. 2014), and that was useful precedent that the Center cited in its cases. I took a paycut from the Center and the Center used the savings to hire expert witnesses and attorneys to bring more ambitious objections. Mr. Bandas helped wrangle objectors in other CCAF cases to reduce cacophony in oral arguments, and, until this case, did not interfere with CCAF cases or clients. I understood that my pay from Mr. Bandas was made possible and would not have occurred without Mr. Bandas profitably settling cases where I was not counsel of record, but rationalized accepting that money because of the benefit to caselaw of victories like *Eubank* that might not have occurred if I was not assisting Mr. Bandas.

29.     Mr. Palmer also retained me on behalf of five objectors to brief and argue two Fifth Circuit appeals that I believed (and still believe) meritorious, but three of those objectors fired him and me mid-appeal, and the other two chose to dismiss their appeals rather than proceed and risk sanctions in a pending Rule 11 motion in the district court for "filing a frivolous appeal." (For what it's worth, the argument class counsel made for why the appeal was "frivolous" was a claim that the objectors did not

have standing to object to settlement approval, an argument that the Seventh Circuit itself called frivolous in *Eubank v. Pella Corp.*) Mr. Palmer did not pay me any of the amount agreed upon in the retainer, or reimburse me for my expenses, and I have not pursued him for it.

30.     I grossed about $33,000 from Mr. Bandas in 2013, $125,000 in 2014, and $95,000 between January 1 and June 4, 2015; and incurred about $32,000 of expenses on contract attorneys assisting me on my work for Mr. Bandas (with an invoice from a contract attorney yet to come). Mr. Bandas apparently found these profitable sums to pay, because he became very upset when I terminated my business relationship with him.

31.     My annual pay from CCAF is $199,200; CCAF provides me no benefits. Mr. Bandas indicated to me on numerous occasions, including as recently as June 4, 2015, that I could increase my total income considerably if I quit CCAF and worked for him full-time. Mr. Palmer made me a similar offer in late 2013 or early 2014. I declined both gentlemen's offers.

32.     I terminated my relationship with Mr. Bandas on June 4, 2015, other than, on June 5, 2015, to send him an almost-complete draft of an appeal brief that was due on June 12, 2015.

33.     In May 2015, a reporter contacted me and stated that class action attorneys had complained to him that "bad" objectors who settled cases for money were using my name to threaten class counsel into settling. I acknowledged that I had been retained in a number of class action appeals, including *Eubank v. Pella Corp.*, explained the limitations on my willingness to represent for-profit class-action objectors, and noted that that threat only made a difference if the underlying objection was meritorious. I noted the problem that for-profit objectors had because of courts' unwillingness to allow them to collect fees for successful objections; for example, Mr. Bandas has not

received any payment for success in *Eubank*. To the best of my knowledge, the reporter decided not to pursue the story.

### Jeffrey Collins Retains the Center, Objects, and Appeals

34.     Jeffrey Collins is a class member in this case.

35.     On August 20, 2014, Mr. Collins emailed me asking for help objecting in this case.  We exchanged several emails collecting preliminary information about his class membership and I told him the Center may be interested, and offered to discuss the case with him the next week.

36.     On August 21, 2014, Mr. Collins submitted a *pro se* objection in this matter, Dkt. No. 143.

37.     Around this time, one of the Center's attorneys had a family emergency, and I had two appellate oral arguments the week of September 8, 2014, and a fairness hearing on August 29, 2014. Because of this and the fact that the objection deadline was in October, I did not contact Mr. Collins again until September 4, 2014, or speak with him until September 8, 2014.

38.     Melissa Holyoak and I conducted extensive due diligence on Mr. Collins to ensure he was a class member and could make a claim, to ensure that his motive were consistent with the Center's mission, and to ensure that he understood that class counsel would try to harass him in retaliation for retaining us; interviewing him in total for over an hour.

39.     We offered Mr. Collins a *pro bono* retainer agreement, telling him that our non-profit did not settle objections for money, and if that he was interested in maximizing his financial return, he should not sign the retainer and instead retain a contingent-fee attorney to assist with his objection. The Center would not have accepted the representation if we thought Mr. Collins would settle his objection for money or if he had not agreed that it was not his intent to do so. Mr. Collins's *pro se* objection was to both the settlement and fees; we told him we could only represent him if he limited his

objection to class counsel's fee request. Mr. Collins agreed and signed the retainer on
September 12, 2014.

40. On July 22, 2014, I'd asked a Center attorney, Adam Schulman, to monitor
this case in anticipation of filing an objection on behalf of a class member to what we
expected to be an oversized fee request. Multiple class members in the 17-million-
member class contacted me about the possibility of objecting without any effort on
CCAF's part to find objectors. If Mr. Collins had not retained CCAF, we probably
would have been able to arrange a retainer with another class member to object.

41. On October 26, 2014, Mr. Collins signed a declaration stating "I bring this
objection in good faith. But if the court has any skepticism of my good faith, I am
willing to stipulate to an injunction forbidding me from settling my objection without
the court's approval." Dkt. 197-1.

42. The Center retained local counsel, filed a superseding objection on Mr.
Collins's behalf solely to fees, successfully moved for discovery and successfully
compelled compliance with the discovery order, filed multiple rounds of briefing,
fought off a motion for protective order that would have required briefing to be filed
under seal, appeared at several interim hearings relating to discovery, and retained an
expert witness and filed an expert report. Center attorney Melissa Holyoak prepared for
and appeared at a lengthy fairness hearing on behalf of Mr. Collins. Mr. Collins was the
only objector who appeared, through counsel or otherwise, at the fairness hearing.

43. The objection was partially successful, and the district court reduced the
$22.6 million attorney-fee request of class counsel by about $7 million.

44. Mr. Bandas also had a client who had objected to the Capital One fee
request. He suggested to me that it would be very lucrative if Mr. Collins or the Center
found a way to decide not to appeal. I thought he was joking (or half-joking), and
reminded him that I had fiduciary duties to the Center, that I could not personally

profit from a case the Center was involved in, and that this was a landmark case that the Center was very interested in seeing through.

45.   Mr. Collins was one of six groups of appellants that filed a notice of appeal. His appeal, No. 15-1546, was consolidated with lead appeal No. 15-1400.

46.   Mr. Collins filed his opening merits brief in this Court on May 4. The Center authored that brief. Appellants represented by Mr. Christopher Bandas in No. 15-1400 and Mr. Darrell Palmer in No. 15-1490 joined the brief. Neither Mr. Bandas nor Mr. Palmer contributed to the brief, other than Mr. Palmer confirming for the jurisdictional statement that his clients had filed settlement claims.

47.   On May 14, Mr. Collins filed in the district court a request for attorneys' fees of $160,619, slightly less than the Center's lodestar and about 2.3% of the class benefit, and a request for a $1,000 incentive award to Mr. Collins, each to be paid by class counsel. In advance of that motion, Ms. Holyoak had a telephone conversation with Mr. Collins about it, and sent him a draft for his approval. The parties agreed to stay consideration of the fee petition until the appeal was resolved.

### The *HSBC* Appeal

48.   At the same time the *Capital One TCPA* fee petition was being decided in his court, Judge Holderman also had a pending fee petition for a TCPA settlement in *Wilkins v. HSBC Bank Nevada, N.A.*, No. 14-C-190 ("*HSBC*").

49.   Mr. Collins had also filed a *pro se* objection in *HSBC*, but the Center did not have the resources to represent him in both *Capital One* and *HSBC*, and chose to pursue only one objection on his behalf.

50.   Mr. Bandas and Mr. Palmer had clients who objected in *HSBC*, though they appeared through other counsel. Their clients filed papers in *HSBC* adopting many of Mr. Collins's arguments in *Capital One*.

51.   Antonia Carrasco, the appellant in No. 15-1400, also objected in *HSBC*, and appealed the fee ruling in that case in appeal No. 15-1640. Mr. Bandas filed a notice

of appearance in No. 15-1640 on March 27, 2015.

52.    On several occasions in March and April, Mr. Bandas and I discussed the
pending *HSBC* appeal and whether I could brief and argue that case. I noted that *HSBC*
was likely to be consolidated with *Capital One*, a CCAF case. I cannot personally profit
from CCAF's non-profit work under tax law, so I told Mr. Bandas that I could not brief
*HSBC*, but that CCAF would be willing to represent Ms. Carrasco under a standard *pro
bono* CCAF retainer agreement. I noted that it would be very problematic if Ms.
Carrasco settled her appeal after CCAF made an appearance on her behalf, and we
would need assurances that that did not happen.

53.    *HSBC* involved many of the same class attorneys as in the *Capital One*
appeals, including Mr. Selbin of Lieff Cabraser.

54.    Ms. Carrasco and the other *HSBC* appellants, including Mr. Palmer's
client, moved to voluntarily dismiss their *HSBC* appeals on April 22, 2015. This Court
granted those motions on April 23, 2015 without comment.

55.    I do not know how much Mr. Selbin and Ms. Carrasco and Mr. Bandas
settled the *HSBC* appeal for. Based on Mr. Bandas's conduct, I believe it is a substantial
sum, far in excess of the amount offered to Mr. Collins individually to settle his appeal
and fee petition, and that it would be informative of how much Mr. Bandas expects to
settle Ms. Carrasco's *Capital One* appeal for if there is not already an agreement in place.
In the absence of CCAF's motion for intervention, the *Capital One* settlement would
have been likely to settle for much more money than *HSBC*, because I do not believe
class counsel understood how strong the appellate arguments would be until they saw
the briefing on May 4, and because class counsel has a larger fee award at stake in
*Capital One* than in *HSBC*.

**Mr. Collins Expresses Discontent**

56.    On or about May 26, Mr. Palmer's clients filed in the district court a
motion for attorneys' fees of $1,500,000 and a request for a $2,000 incentive fee for each

of the two objectors he represented. Neither the Center nor I had any role in or advance notice of Mr. Palmer's fee petition.

57.     On the morning of May 27, Mr. Collins emailed me and two attorneys at the Center about Mr. Palmer's fee request. Mr. Collins had read Mr. Palmer's fee petition before I had.

58.     Ms. Holyoak immediately telephoned Mr. Collins, but he refused to take the call. He emailed Ms. Holyoak and I in response, asked us to take action on his behalf and said that we could contact him on June 3. Mr. Collins did not specify what that action should be.

59.     Immediately after I received Mr. Collins's email, I emailed Mr. Palmer and Mr. Bandas and demanded that Mr. Palmer withdraw his motion for fees, which I believed undermined the arguments Mr. Palmer signed onto on the appeal. Mr. Bandas also emailed Mr. Palmer and made the same request the same day. Ms. Holyoak and I began to make arrangements to file briefs in the district court opposing Mr. Palmer's fee request.

60.     I followed up with a text message to Mr. Palmer the same day. Mr. Palmer offered to modify his motion to satisfy us. Ms. Holyoak ceased preparing papers because we believed Mr. Palmer would be willing to file something consistent with our view of the law, though we were unsure whether Mr. Collins would be satisfied with that.

61.     That night I emailed Mr. Collins about Mr. Palmer's offer and asked for clarification. I followed up with another email on June 1. I received no response from Mr. Collins until June 3.

62.     On June 3, I emailed Mr. Palmer, and proposed a modification to his fee request. He gave an ambiguous response indicating that suggested he agreed, but did not respond to my queries about when and how he would file that modification. As of June 9, he has not filed a modification to the fee petition in the district court, and has not

14

responded to my attempts to contact him since June 5.

63.    Mr. Collins's May 27 and June 3 emails (six in total) were premised on misunderstandings about the Center's authority over Mr. Palmer and the Center's role in Mr. Palmer's fee request. They were also ambiguous. At various times, Mr. Collins both claimed to terminate our relationship and demanded that Ms. Holyoak and I to take actions on his behalf as his attorneys—sometimes in the same email. Ms. Holyoak and I did our best to clarify Mr. Collins's intentions—did he want us to act as his attorneys on his behalf or was he firing us?—a fact complicated by inconsistent and ambiguous instructions, and his refusal to talk to us by telephone.

64.    On June 3, at 2:17 PM, in response to an email asking for clarification, Mr. Collins dismissed us as his counsel. I emailed Mr. Collins on June 3 at 3:47 PM and informed him that we would be filing papers with the court telling the court we had been fired, and explaining to him what the likely consequences of that filing would be and what his options were. On June 3, at 5:34 PM Central, Mr. Collins emailed us and made an ultimatum if we were to continue as his attorneys.

65.    Based on Mr. Collins's six emails of May 27 and June 3, I believed it was likely that either Mr. Collins had terminated or would terminate his retainer with us or that the Center would have to terminate our representation of Mr. Collins. I also believed that there was a chance Mr. Collins would file a complaint with the district court. I had no concern about any truthful complaint Mr. Collins would file, other than the possibility that Mr. Collins's complaint to the court would come before Ms. Holyoak and I notified the appeals and district courts of our withdrawal, and that we would be accused of being less than forthright with the court.

66.    In an internal email I sent to the CCAF Board of Directors and other CCAF attorneys on June 3 at 9:13 PM Central, I notified them of plans to notify opposing counsel on June 4, and to file papers with the Court on June 5 withdrawing as Mr. Collins's counsel and seeking intervention as guardian ad litem for the class. We were

15

under no circumstances going to hide the fact that Mr. Collins had dismissed us if we were reasonably certain he had dismissed us; the only question requiring research preventing filing sooner was what we could and could not disclose to the Court about his ultimatum to us.

67.     On June 3, at 9:00 PM Central, I emailed Mr. Collins. I expressed regret that we declined his ultimatum, explained what we could and could not do on his behalf under the law, what we had and had not done to date, and the status of negotiations with Mr. Palmer about his fee request. I explained that I anticipated that he would be dissatisfied with our response, and offered to file a motion to withdraw as his attorneys, and gave him options as to what that motion would say.

68.     On June 4, at 7:35 AM Central, Mr. Collins emailed us, and indicated that, if we had not already filed papers withdrawing, he wished for the original retainer to remain in effect and to continue with the appeal. I sent Mr. Collins an email on June 4, 2015, at 8:35 AM Central, confirming that he wished to proceed with the appeal, that the original retainer was in effect and we were still his attorneys and he didn't want to fire us, and explaining how we would proceed from here to ensure he was happy with us. Ms. Holyoak ceased drafting motions to withdraw and to intervene.

**I Contact Mr. Bandas and Mr. Bandas Contacts Class Counsel**

69.     On June 3, at 2:17 PM Central, I called Mr. Bandas. I explained that our client was probably terminating our representation, and asked if there was a way to negotiate Center representation of Ms. Carrasco so that we could see the appeal through. He said he would have to check with his client. I noted that if Mr. Bandas profited from a dismissal of the appeal that was not in the public interest after CCAF had used non-profit resources to file a brief that he had joined, it would create a tremendous appearance of impropriety that might risk CCAF's non-profit status if I continued to moonlight for him, and that I would have to terminate my relationship with Mr. Bandas to protect CCAF.

16

70.     I further texted Mr. Bandas at 2:56 PM Central on June 3, noting that I would need to make a filing with the Court by Friday morning, and hoped to have an answer by close of business Thursday whether we could represent his client. He responded that it would depend on whether he could get a hold of his client.

71.     The Center hoped it would be uncontroversial to represent an existing appellant, and thus made the inquiry to Mr. Bandas, who had previously been cooperative with the Center's appeals. The plan was to file a motion to withdraw (or announcement of termination) on June 5, and then either make a notice of appearance in 15-1400 or a motion to intervene as guardian ad litem using the *Safeco v. AIG* precedent. We wanted a quick answer from Mr. Bandas so we knew what the motion would say. We did not want to settle the appeal.

72.     According to two June 5 emails from Mr. Selbin, Mr. Bandas contacted a Lieff Cabraser partner "late Wednesday afternoon," (i.e., June 3) and claimed to be representing both his client and Mr. Collins and myself in settlement negotiations. According to Mr. Selbin, Mr. Bandas represented that I had been fired and did not want to disclose that "embarrassing" fact to the Seventh Circuit. As this declaration and motion shows, I am not embarrassed about my representation of Mr. Collins or the fact that Mr. Collins considered firing me.

73.     I texted Mr. Bandas at 8:17 AM Central on June 4 and notified him that Mr. Collins had "unfired" us, and that was no need for the Center to represent his client. I had a 27-minute conversation with Mr. Bandas that morning about the issue and other pending matters; Mr. Bandas indicated that his client wanted to settle, and I reminded him that it was a good thing that Mr. Collins changed his mind, because I would have had to terminate my consulting with Mr. Bandas otherwise if Ms. Carrasco had then settled her appeal for payment to Mr. Bandas.

74.     On June 4 at 4:02 PM Central, Mr. Bandas communicated to me an oral exploding offer of settlement, purportedly from class counsel. Mr. Collins must dismiss

17

his appeal by close of business June 8, 2015, with $25,000 payable to Mr. Collins upon the appeal's dismissal. He suggested that there was a global settlement offer that everyone else had agreed to. He confirmed the $25,000 offer in the passive voice in a text at 4:41 PM Central. The offer mentioned did not include any requirement to dismiss the fee petition. At this time, I texted Mr. Bandas to terminate my separate business arrangement with him. Mr. Selbin confirmed in writing to me on June 5 that Lieff Cabraser did make a global settlement offer to Mr. Bandas; though he wasn't sure when the offer was made, he thinks it was June 4. On information and belief, Mr. Bandas and Mr. Palmer have agreed to settle with class counsel for a substantial sum of money in exchange for dismissing their appeals in Nos. 15-1400 and 15-1490; on June 10, 2015, Mr. Palmer moved to dismiss appeal no. 15-1490.

75.     In the course of several emails and phone calls with Mr. Bandas seeking clarification and documentation on June 4 and June 5, Mr. Bandas represented (1) class counsel would not be willing to put the offer in writing because class counsel was afraid of what I would tell the court; (2) class counsel was not willing to speak with me because they did not trust me not to tell the court; (3) if I was worried that class counsel would renege, $25,000 could be put in my trust account in advance of the motion being filed. Mr. Selbin has asserted to me that the first two claims are false, and he was indeed willing to speak to me and put the offer in writing. I do not recall whether Mr. Bandas's third representation was on behalf of class counsel, on behalf of himself, or spoken in the passive voice to obscure who would be providing the $25,000; Mr. Selbin denies offering advance payment.

76.     I jokingly said to Mr. Bandas that I wondered whether this was a settlement offer coming from him, rather than from class counsel. He became very defensive, but also said that if the offer had been from him, he would have offered $100,000 to make sure there was no chance Mr. Collins would decline the offer. From

this statement I infer that Mr. Bandas is being offered at least $200,000, and likely much more, to dismiss his appeal.

77.     I noted to Mr. Bandas that the Seventh Circuit has *sua sponte* refused to dismiss class action settlement appeals twice, and that there might be an investigation, and that the Seventh Circuit could issue an opinion on professional objectors that would threaten his entire business model, and perhaps even issue a *sua sponte* order to show cause why counsel should not be disbarred. This was meant as friendly advice that he wanted to get something in writing from class counsel rather than stick his neck out, lest they claim he was lying about their settlement offer, and the Seventh Circuit investigated, but he apparently took it to be a threat.

78.     Mr. Collins suggested in a June 5 email he would accept the offer if it was in writing. This answer contradicted multiple communications he had previously sent to us, as well as his sworn declaration, so I tried to have a phone call with him, but he indicated he didn't want to discuss the matter further.

79.     One can't file a motion to dismiss without knowing what class counsel's position on costs are, and Mr. Collins also wanted something in writing, so I continued to insist on having something in writing or at least having a conference call with class counsel. In response, Mr. Bandas told me I was "being a baby," and didn't have anything else to say to me. Mr. Bandas's panicked response was the first I truly realized he had misled me, and I noted that now there was going to be an investigation and that the Seventh Circuit was unlikely to dismiss the appeal under these circumstances. Mr. Bandas hung up on me, and then emailed me to say that the offer had been withdrawn.

### Class Counsel Demands Its Offer Be Considered

80.     I left a voice-mail with Mr. Selbin to find out what had happened. In his return phone call to me after business hours on June 5, 2015, he confirmed that he made Mr. Bandas a settlement offer where Mr. Collins would dismiss his appeal and withdraw his pending fee petition in the district court, and class counsel would pay Mr.

Collins $25,000 upon those two things happening, and he repeated that offer to me. Based on my understanding of earlier communications with my client (including, but not limited to, Mr. Collins's retainer agreement; Mr. Collins's declaration under oath in the district court; and Mr. Collins's emails to me of November 19, 2014; March 25, 2015; May 11, 2015; May 27, 2015, at 7:48 AM Central; and June 4, 2015 at 7:35 AM Central), and my understanding of existing law, I declined that offer. Mr. Selbin asked me if I was still Mr. Collins's counsel. I said I was. Mr. Selbin asked me if there was a time when we did not represent Mr. Collins. I admitted that Mr. Collins had considered firing us, but did not.

81.     Mr. Selbin repeated his offer in writing in an email, and threatened to subpoena Mr. Collins in the district court. In further communications between me and Mr. Collins, Mr. Collins indicated to me that he now wished to accept the offer notwithstanding his earlier agreement and statements. Research indicated that legal ethics rules required me to accept an unethical settlement offer, notwithstanding the retainer agreement and my reliance upon it and Mr. Collins's declaration under oath, and I wrote Mr. Selbin to indicate that Mr. Collins accepted the offer.

82.     I noted to Mr. Selbin that his offer to Mr. Collins was unethical. He responded in writing that "I would be happy for every aspect of this to be reviewed by the Seventh Circuit or District Court, as we have done absolutely nothing wrong."

83.     In response, I asked Mr. Selbin to disclose what Lieff Cabraser had offered Mr. Bandas to settle his appeal in this matter. Mr. Selbin refused to disclose that information to me. On information and belief, it is a substantially larger sum than Mr. Collins has been paid.

84.     I relied upon Mr. Bandas's promise not to interfere with CCAF cases, and believed he would adhere to that promise here once I rejected his proposal to pay me to not appeal. Mr. Collins had authorized the Center to move for an injunction barring alienability of appeals and objections. Had I known Mr. Bandas would actually take

steps to undermine Mr. Collins's appeal, I would not have confided in Mr. Bandas, and the Center would have sought an injunction at an early stage of the proceedings to "tie the sailors to the mast."

### Communications with Mr. Collins

85.     Over the course of the district court proceedings, class counsel and defendant made numerous filings that referred to Mr. Collins and to pending objections. Melissa and I had numerous communications with Mr. Collins regarding those filings. Throughout the process, Melissa and I ran drafts of proposed filings by Mr. Collins, who occasionally made suggested changes.

86.     Mr. Collins and I exchanged a number of emails about the fact that two other appellants joined our brief and what that meant.

87.     On May 11, 2015, Mr. Collins sent me and other Center attorneys an email relating to press coverage of a Ninth Circuit decision and about his goals and motives for proceeding with the appeal.

88.     Ms. Holyoak and Mr. Collins exchanged emails on May 12 and May 13 about the Center's request for fees.

89.     While the appeal was pending, Darrell Palmer, counsel for Vanessa FV VanWieren and Mary Smith Tweed, filed a motion for $1.5 million in attorneys' fees and $2,000 in objector incentive payments. Ms. Holyoak and I had numerous communications with Mr. Collins regarding those requests. Mr. Collins refused to speak on the phone with us about the issue.

90.     On June 3, 2015, I had an exchange of emails with Mr. Collins where he gave me a take-it-or-leave-it ultimatum about proceeding with the appeal. Based on that ultimatum, I proposed to Collins a motion for the Center to withdraw as his counsel.

91.     On June 4 and 5, 2015, I had numerous emails with Mr. Collins regarding Mr. Bandas's oral settlement offer, Mr. Selbin's written settlement offer, Mr. Selbin's threatened subpoena, what other appellants were likely receiving to settle the case, and

the possibility of enhanced court-ordered incentive payments to compensate Mr.
Collins for turning down settlement offers if he prevailed on appeal. Mr. Collins refused
to speak on the phone with us about the issue.

92.     These communications all provide relevant insight into why Mr. Collins
dismissed his appeal, why Mr. Collins settled, why the Center thought Mr. Collins did
not want to settle, why the Center thought it might be (or might have been) fired, and
why the Center has acted as it did. However, I do not have authority to disclose these
privileged attorney-client communications except *in camera* under a court order.

93.     To this day, I don't know whether Mr. Collins thinks he fired CCAF on
May 27, on June 3, or not at all, or whether he thinks CCAF did something wrong. Mr.
Collins does not want to discuss the case anymore, does not want to make decisions
relating to the case, and continued to give me instructions on how to act as his attorney
as late as June 5, but has not answered follow-up questions and has refused to speak to
me and Ms. Holyoak on the phone. I am following my client's June 5 instructions to the
best of my ability (which he would have no authority to give me if I had been fired
earlier) to protect his latest stated wishes, but even those instructions are ambiguous.

I hereby certify that the foregoing statements made by me are true. I am aware
that if any of the foregoing statements are willfully false, I am subject to punishment.

Executed on June 10, 2015, in Washington, DC.

_____
Theodore H. Frank