# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**ARKANSAS TEACHER RETIREMENT SYSTEM,**
on behalf of itself and all others
 similarly situated,

|  |  |
|---|---|
| **Plaintiff,** | No. 11-cv-10230-MLW |
| | Hon. Mark L. Wolf |

vs.

**STATE STREET BANK AND TRUST COMPANY,**

**Defendant.**
_____/

**ARNOLD HENRIQUEZ, MICHAEL T. COHN,
WILLIAM R. TAYLOR, RICHARD A.
SUTHERLAND, and those similarly situated,**

|  |  |
|---|---|
| **Plaintiffs,** | No. 11-cv-12049-MLW |

vs.

**STATE STREET BANK AND TRUST COMPANY,**

**Defendant.**
_____/

**THE ANDOVER COMPANIES EMPLOYEE
SAVINGS AND PROFIT SHARING PLAN, on**
Behalf of itself, and **JAMES PEHOUSHEK-
STANGELAND** and all others similarly situated,

|  |  |
|---|---|
| **Plaintiffs,** | No. 12-cv-11698-MLW |

**STATE STREET BANK AND TRUST COMPANY,**

**Defendant.**
_____

## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS

1

# *Table of Contents*

I. INTRODUCTION .................................................................................................................... 5

II. FINDINGS OF FACT ........................................................................................................... 8

    A.    BACKGROUND ............................................................................................ 8

        1. Background to the State Street Litigation ............................................ 10

    B.    THE PARTIES, ATTORNEYS, AND COMPLAINT HISTORY ................... 13

        1. The Customer Class Complaint ........................................................... 13

        2. The ERISA Complaints ........................................................................ 20

            a.  The *Andover* Complaint .............................................................. 21

            b.  The *Henriquez* Complaint ........................................................... 25

    C.    CHALLENGES, RISKS AND INTERNAL TENSION ................................... 28

    D.    EARLY LITIGATION .................................................................................. 34

        1.  Consolidation of the Cases ................................................................. 37

    E.    THE "HYBRID" MEDIATION .................................................................... 38

        1. Discovery and Document Review ......................................................... 39

        2. Staff Attorney Cost-Sharing Agreement .............................................. 42

    F.    ERISA FEE ALLOCATION ........................................................................ 45

    G.    SETTLEMENT AND NOTICE TO THE CLASS ......................................... 48

        1. Involvement of Government Agencies .................................................. 48

        2. Preparation and Filing of Settlement Documents ................................ 49

    H.    FEE PETITION REQUESTING ATTORNEYS' FEES AND EXPENSES ... 51

        1. Fee Negotiation Among Customer Class Counsel ............................... 51

        2. Submission of the Fee Petition ............................................................ 54

        3. The Lodestar Reports of Class Counsel .............................................. 62

            a.  Billing Rate-Setting Practices ...................................................... 65

        4. Staff Attorneys ..................................................................................... 70

            a.  Michael Bradley .......................................................................... 73

        5.  Service Awards .................................................................................... 77

    I.    COURT APPROVAL OF THE SETTLEMENT AND AWARD OF FEES ... 80

        1.  Provisional Class Certification and Preliminary Approval of Settlement ................................... 80

        2.  Final Approval ..................................................................................... 82

    J.    DISTRIBUTION OF SETTLEMENT AND ATTORNEYS' FEES ............... 84

        1. Payment of Fees and Expenses .......................................................... 85

        2. Previously Undisclosed Payment of Fees to Chargois & Herron LLP ... 87

    K.    DAMON CHARGOIS' INVOLVEMENT WITH LABATON AND ATRS ...... 89

        1. Labaton's Introduction to ATRS ........................................................... 89

        2. The Chargois "Arrangement" ............................................................... 92

            a. Labaton's Compartmentalization of the Chargois Arrangement ... 96

        3. The ATRS Request for Qualifications (RFQ) ....................................... 98

        4. ATRS's Lack of Knowledge of the Chargois Arrangement ................. 100

            a. Agreement Among Labaton, Lieff and Thornton to Share in Labaton's Obligation to Chargois ......... 104

        5. Lieff's and Thornton's Limited Knowledge of the Chargois Arrangement ................................. 106

            a. Thornton's Knowledge of the Chargois Arrangement ................. 107

            b. Lieff's Knowledge of the Chargois Arrangement ........................ 109

            c. Inconsistency of Information Regarding the Chargois Arrangement ......... 114

        6. ERISA Counsel's Lack of Knowledge of the Chargois Arrangement ... 115

        7. Failure to Disclose the Chargois Arrangement to the Special Master ... 119

        8. Payments to Chargois Pursuant to the Chargois Arrangement ......... 123

    L.    MEDIA SCRUTINY OF THE STATE STREET SETTLEMENT AND THE SPECIAL MASTER'S APPOINTMENT .. 125

        1.  The Boston Globe Inquiry and Discovery of Double-Counting Errors ... 125

        2.  The November 10, 2016 Letter to the Court ...................................... 128

3. The November 21, 2016 Claw-Back Letter Agreement ................................................ 132
4. The Boston Globe Article ............................................................................................. 133
5. The Court's Response to Goldsmith's Letter and the Boston Globe Article ............... 135
   a. Appointment of the Special Master ......................................................................... 135
   b. The Special Master's Investigative Team ................................................................ 136
   c. The Investigation ..................................................................................................... 137

III. CONCLUSIONS OF LAW .................................................................................................... 138
  A. APPLICABLE STANDARDS ............................................................................................. 138
    1. The Special Master's Authority to Decide Issues Regarding the Fee Award ............ 138
    2. Duties of the Court and Counsel in Class Action Fee Petition Proceedings ............. 139
  B. ACCURACY, RELIABILITY AND REASONABLENESS OF LODESTAR ......................... 141
    1. The Firms' Lodestar Petitions .................................................................................... 141
    2. Governing Law ............................................................................................................. 143
    3. Rates and Hours .......................................................................................................... 146
     a. Reasonableness of Hourly Rates ............................................................................. 146
     b. Prevailing Rates in the Community .......................................................................... 147
       i. First Circuit Rule – Local Forum ........................................................................ 147
       ii. The "Community" .............................................................................................. 149
       iii. The State Street Case ........................................................................................ 150
         1. Complexity of FX Trading Claims and the Need for Experienced Counsel .............. 151
         2. Unavailability of Local Counsel ............................................................................. 156
         3. National Scope of Class Action Litigation .............................................................. 156
         4. ERISA Claims ........................................................................................................... 157
       iv. Determination of National Rate ....................................................................... 158
     c. Market Rates in 2016 ............................................................................................... 159
       i. Legal Framework ................................................................................................ 159
         1. Relevant Practice Area ........................................................................................... 160
         2. Relevant Geographic Markets ................................................................................ 161
         3. Survey Design Flaws and Challenges ..................................................................... 162
       ii. Analysis ............................................................................................................... 164
         1. Partners and Associates .......................................................................................... 164
           (a) Comparison to Other Securities/Financial Fraud Cases ......................... 164
           (b) National Data: Market-to-Market Comparisons ..................................... 166
         2. Staff Attorneys ........................................................................................................ 169
     d. Rates Used in Lodestar ............................................................................................ 173
       i. Partner and Associate Rates .............................................................................. 173
       ii. Staff Attorneys' Rates ....................................................................................... 176
       iii. "Contract" Attorneys ......................................................................................... 182
       iv. Michael Bradley ................................................................................................. 189
         1. Relevant Background and Experience ................................................................... 191
         2. Contributions in the State Street Case ................................................................. 192
         3. Appropriate Hourly Rate ........................................................................................ 194
     e. Hours of All the Firms .............................................................................................. 198
       i. Records of Time for the Firms ............................................................................ 198
         1. Contemporaneity of Firms' Records ...................................................................... 198
           (a) Thornton's Records .................................................................................. 204
       ii. Reliability and Specificity .................................................................................. 209
           (a) Lieff ........................................................................................................... 211
           (b) Labaton ..................................................................................................... 213
           (c) Thornton ................................................................................................... 215
           (d) Michael Bradley ....................................................................................... 217
           (e) ERISA Firms .............................................................................................. 217
     f. Double-Counting of SA Hours .................................................................................. 219

3

        i. Causes of the Double-Counting Not Explained in Goldsmith's Letter ........................ 219

        ii. The Allocation of Staff Attorneys to Thornton.................................................... 221

        iii. Failure to Detect the Double-Counting ............................................................ 223

        iv. Thornton's Higher Billing Rates for Staff Attorneys Not Explained ..................... 224

    *4. Misrepresentations in the Thornton Fee Petition* ........................................................... 225

      a. Labaton Template Issues ..................................................................................... 225

        i. Garrett Bradley's Declaration Violates Fed. R. Civ. P. 11 ............................... 229

        ii. Garrett Bradley's Declaration Violates Mass. R. Prof. C. 3.3(a) and 8.4(c)...........239

    *5. Lodestar Multiplier* ....................................................................................................... 245

  C. ACCURACY AND RELIABILITY – CHARGOIS ISSUES ................................................................. 246

    *1. Duties to the Client* ....................................................................................................... 248

      a. Labaton Failed to Comply with Rule 1.5(e), as effective February, 8, 2011...................251

      b. Labaton Did Not Adequately Inform ATRS about the Chargois Arrangement ................. 254

      c. Application of Rule 7.2(b) ..................................................................................... 263

    *2. Duties to the Class* ........................................................................................................ 273

      a. Rule 23 Requirements ......................................................................................... 274

      b. Ethical Obligations .............................................................................................. 281

    *3. Duties to Co-Counsel* .................................................................................................... 287

      a. Governing Principles of Fairness and Transparency ............................................... 290

      b. Interference with Co-Counsel's Duties to Class Members ........................................ 292

      c. Contractual Implications of Non-Disclosure ......................................................... 295

        i. Misrepresentations and Material Omissions ................................................. 297

    *4. Duties to the Court* ....................................................................................................... 303

      a. Rule 23 Requirements ......................................................................................... 305

      b. Failure to Disclose the Chargois Agreement in the Fee Petition .............................. 309

        i. Sucharow and Labaton's Obligations under Fed. R. Civ. P. 11 ......................... 309

          1. Omission of Material Fact Is Sanctionable under Rule 11........................ 314

        ii. Violation of Mass. R. Prof. C. 3.3 .................................................................. 318

        iii. Violation of General Duty of Candor to the Court ........................................... 322

V. SPECIAL MASTER'S RECOMMENDATIONS ................................................................................. 327

  A. INTRODUCTION ................................................................................................................... 327

  B. RECOMMENDED LEGAL FINDINGS ...................................................................................... 329

  C. RECOMMENDED REMEDIES AND SANCTIONS ...................................................................... 362

  D. LESSONS LEARNED .............................................................................................................. 374

4

## I.     <u>INTRODUCTION</u>

This investigation, conducted in the post-settlement phase of the case, has raised a number of significant issues that are important to the conduct and administration of large class actions generally and this case in particular.  Among these issues are the appropriate rules and policies governing attorney fee petitions, the approach plaintiffs' counsel use in their fee petitions -- including appropriate billing rates -- and the obligations of lead counsel to act with candor and transparency toward their clients, the class, the court, and co-counsel, in general, and as to any financial obligation that will be paid from class funds in particular. After a lengthy investigation, the Special Master finds that in several significant areas, the Court was not provided accurate and reliable information in the fee petitions and at the fairness hearing and, unfortunately, these failings had profound and adverse ramifications throughout the fee approval process. The redress the Special Master recommends at the conclusion of the Report is intended, to the extent possible, to remedy these failings.

At the outset, the Special Master makes two observations.  First, the Special Master recognizes the important role class actions and plaintiffs' class action attorneys play in protecting and enforcing the rights of consumers, injured parties and the public in general.  To adequately fulfill this role, class action plaintiffs require sophisticated, well-resourced attorneys who should be compensated at rates comparable to those of the large, sophisticated, well-resourced defense firms who will in the vast majority of cases be opposing them.  Second, an equally important part of the class action framework is ensuring the integrity of the fee petition process.  Because the fee petition process is often

non-adversarial, as it was in this case, for the system to work properly, honesty, reliability and transparency are essential to enable the Court to adequately fulfill its assigned gatekeeping and fiduciary responsibilities to class members. This case and the evidence adduced during the Special Master's investigation fully exemplifies the importance of both of these policy objectives.

The underlying case here was a class action alleging unfair and deceptive practices in conducting complex foreign exchange transactions and required highly skilled and sophisticated counsel. After much work, dedication and exceptional effort in the discovery and mediation process, the parties ultimately reached a $300 million settlement. Given the risks, complexities and legal challenges inherent in the litigation, it must be said that the $300 million settlement, procured by skilled and dedicated plaintiffs' counsel, was an excellent result for the class. The Court approved the settlement on November 2, 2016. Of the $300 million, plaintiffs' counsel were awarded $74,541,250.00 in attorneys' fees and $1,257,699.94 for expenses. By itself, this attorneys' fee award was not disproportionate or unsupportable when measured against the positive result for the class and the attorneys' effort and skill that was required to achieve it. Indeed, all other things being equal, the attorneys' fee award was fair, reasonable and deserved.

Unfortunately, this investigation has shown that all other things were not equal. Almost immediately after approval of the settlement, the laudable result obtained for the class became tainted when questions began to arise as a result of media inquiries concerning the fee award which, in turn, caused the Court to appoint a Special Master to

investigate and prepare a Report and Recommendations concerning all issues relating to

the attorneys' fees, expenses and service awards the Court had approved in the case. The

Special Master's investigation has spanned a period of some fourteen months and

encompassed written discovery, the production of 200,000 pages of documents, 34

witness interviews and 63 depositions. Beyond this, the law firms that were the subject

of the investigation were given extensive opportunities to contribute to the legal and

factual record through briefing, providing expert opinions and oral argument, input which

was helpful to the Special Master in obtaining a more complete view of the factual, legal

and ethical issues raised in the investigation.

The investigation is now complete. The Special Master's Report and

Recommendations detail a mixed narrative of good intentions, great talent, and

undeniable accomplishment and result, undermined by serious albeit inadvertent mistakes

compounded by a troubling disdain for candor and transparency that at times crossed the

line into outright concealment of important material facts, including the payment of an

enormous amount of money from class funds to a lawyer who never appeared in the case,

did no work on the case, and whose identity was intentionally hidden from the clients, the

class, co-counsel and the Court.

Exacerbating matters is the fact that this payment grew out of an obligation that

long pre-existed the *State Street* case and was the sole obligation of one law firm -- an

obligation that this law firm shifted to the class and its co-counsel.

In short, this Report chronicles a lamentable and dismaying tale of a great result

achieved by fine and highly effective lawyering that became tainted and entangled in a

web of concealment and highly questionable ethical practices by experienced attorneys who should have known better.

Having heard and considered the testimony of the witnesses, many of whom were designated as experts, and the arguments of counsel, and having reviewed and considered the parties' interrogatory responses, the documents they produced, and their supplemental submissions, the Special Master now makes the following Findings of Fact, Conclusions of Law, and Recommendations to the Court. To the extent that any Findings of Fact constitute Conclusions of Law, they are adopted as such. To the extent that any Conclusions of Law constitute Findings of Fact, they are so adopted.

## II. FINDINGS OF FACT

### A. BACKGROUND

This litigation involves three separately-filed class action complaints against State Street Bank and Trust Company ("State Street") that were subsequently consolidated for pre-trial purposes. The three consolidated cases are:

| Case Number | Plaintiffs | Class Representatives | Attorneys |
|---|---|---|---|
| 11-cv-10230 | Arkansas Teachers Retirement System ("*ATRS*") | ATRS (George Hopkins, Executive Director) | Thornton Law Firm (f/k/a Thornton & Naumes, LLP); Labaton Sucharow LLP; and Lieff Cabraser Heimann & Bernstein, LLP |
| 11-cv-12049 | Arnold Henriquez, Michael T. Cohn, William R. Taylor, and Richard A. Sutherland (collectively the "*Henriquez* Plaintiffs") | Arnold Henriquez, Michael T. Cohn, William R. Taylor, and Richard A. Sutherland | McTigue Law LLP (formerly McTigue & Veis, LLP); Beins, Axelrod, P.C.; Richardson Patrick Westbrook & Brickman LLC (succeeded by Zuckerman Spaeder, LLP) |
| 12-cv-11698 | The Andover Companies Employee Savings and Profit Sharing Plan, and James Pehoushek-Stangeland (collectively the "*Andover* Plaintiffs") | Alan Kober and James Pehoushek-Stangeland | Keller Rohrback, L.L.P. |

In total, Plaintiffs alleged that State Street, which served as the custodial bank for public and private pension funds, mutual funds, and investment funds, engaged in unfair and deceptive practices in conducting "indirect" or "standing instruction" foreign currency exchange ("FX") transactions on behalf of its customers, without disclosing mark-ups to clients that ultimately inured to State Street's benefit. Specifically, that State Street executed FX transactions -- which required converting or "exchanging" foreign investments to/from foreign currencies -- either at the high end (when buying), low end (when selling), or outside the range of currency fluctuation for a particular day.

1. **Background to the State Street Litigation**

This litigation had its genesis in a California *qui tam* action filed under seal on

April 14, 2008 by "Associates Against FX Insider Trading," on behalf of California

public pension funds. [EX. 1]. The relators were represented by the Thornton Law Firm

("Thornton") and Lieff Cabraser Heimann & Bernstein, LLP ("Lieff" or "Lieff

Cabraser").[1] *See* 9/15/16 Declaration of Lawrence Sucharow in Support of Motion for

Final Approval of Class Settlement, MAD No. 11-cv-10230, Dkt. # 104, ¶ 24 [EX. 3];

*see also* Thornton 6/19/17 Dep., pp. 35:22 – 36:14 [EX. 2].[2] The *qui tam* lawsuit was

unsealed on October 20, 2009, when the California Attorney General filed a Complaint-

in-Intervention charging State Street with misappropriating more than $56 million from

California's two largest public pension funds: the California Public Employees'

Retirement System ("CalPERS") and the California State Teachers' Retirement System

("CalSTRS"). *See People of the State of California, ex rel. Edmund G. Brown, Jr. v.

State Street Corporation, et al.,* Cal. Super. Ct. No. 34-2008-00008457-CU-MC-GDS

---

[1] The relators in the California *qui tam* action had been referred to the Thornton Law Firm by Harry Markopolos, an individual who "makes his living by referring whistleblowers to law firms to bring actions." Thornton 6/19/17 Dep., p 37:9-24. [EX. 2].

[2] Michael Thornton testified that he asked Lieff Cabraser to join Thornton in the California *qui tam* action because of Thornton's long-time relationship with Bob Lieff and Richard Heimann:

> [W]e've known them for a long time. I can't tell you exactly when we started. I've known Bob Lieff. I've known Richard Heimann for a long time. From, I'd say the eighties and we got to know each other better because they were heavily involved in the tobacco litigation in the nineties. Unlike us, they represented several states so they were known. And I had an opportunity to work with and become friends with Bob Lieff and Richard Heimann and Elizabeth Cabraser. And I thought they were good lawyers and they're nice people, people to work with.
>
> So, when we were filing something in California, we obviously needed California counsel. None of my firm were members of the California bar, and we asked if they would join us and they did.

Thornton 6/19/17 Dep., pp. 36:17 – 37:8. [EX. 2].

[EX. 1]; *see also* Sucharow Decl., ¶ 25 [EX. 3]; Thornton 6/19/17 Dep., p. 40:1-9 [EX. 2].  The Complaint-in-Intervention was the first public indication of State Street's allegedly unfair and deceptive practices concerning indirect FX and the first largescale action concerning FX practices.  Sucharow Decl., ¶ 25 [EX. 3]; Thornton 6/19/17 Dep., p. 41:11-17 [EX. 2].

After the allegations against State Street became public, George Hopkins, the Executive Director of the Arkansas Teacher Retirement System ("ATRS"), became interested in the issue since State Street was ATRS's custodial bank.  Hopkins 6/14/17 Dep., pp.  37:11 – 38:15. [EX. 4].  ATRS then retained Labaton Sucharow LLP ("Labaton"), which was serving as one of its "monitoring counsel,"[3] to investigate potential class and individual claims that could be brought against State Street on behalf of ATRS and its members.  Sucharow Decl., ¶ 26.  [EX. 3]. This was Labaton's first foray into FX litigation.  Therefore, with ATRS's approval, Labaton teamed with Thornton and Lieff, given, among other considerations, their knowledge gained from their representation of the relators in the California *qui tam* action, and began an investigation.  *Id.  See also* George Hopkins Declaration, Dkt. # 104-1, ¶ 8 [EX. 5]; Thornton 6/19/17 Dep., pp. 43:13 – 44:4.  [EX. 2].

After investigating and researching potential claims against State Street, on February 10, 2011, Labaton filed a class action complaint on behalf of ATRS (superseded

---

[3] "Monitoring counsel" refers to lawyers who review the performance of securities held by institutional investors to ensure their investments are handled appropriately and are not the subject of fraud or other illegal activity.  *See* Eisenberg, Jonathan, *Litigating Securities Class Actions,* § 1.02(1)(d), "Portfolio Monitoring" (Lexis/Nexis 2017).

by an Amended Complaint on April 15, 2011) alleging that State Street had violated the Massachusetts Consumer Protection Act, and making several common law claims. *See Arkansas Teacher Retirement System v. State Street Corp., et al.*, MAD No. 11-cv-10230, Dkt. # 1 [EX. 6], 10.[4] [EX. 7]. The ATRS complaint was the first indirect (or "standing instruction") FX class action brought in any court. Sucharow Decl., Dkt. # 104, ¶ 35.[5] [EX. 3].

Although in investigating the claims, counsel worked essentially from a clean slate, after the ATRS complaint was filed, counsel had the benefit of a substantial amount of information they learned in the course of a subsequently-filed multi-district FX case brought against the Bank of New York Mellon, *In re The Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, SDNY No. 12-MD-2335 ("*BONY Mellon*").[6] The *BONY Mellon* MDL proceeded in the Southern District of New York at the same time that the *State Street* case was being litigated (and mediated) in this Court. *BONY Mellon* was settled before this case, in September 2015, for $335 million in recovery to the class of custody clients, plus fines and penalties paid to various government agencies. *See*

---

[4] The complaints also originally named State Street Corporation ("SSC"), State Street's parent corporation, and the separate subsidiary State Street Global Markets LLC ("SSGM LLC") as party-defendants. On May 8, 2012, the Court entered an Order dismissing all claims asserted against SSC and SSGM LLC.

[5] In "indirect" FX trades, custody clients and investment managers do not negotiate individual transaction rates with their custodian bank, nor does the bank quote rates for a given transaction. Rather, as the name suggests, custody clients (or their investment managers) engage their custodian bank to provide ongoing custody FX services in accordance with standing instructions, and rely upon the bank to execute those FX trades on their behalf. Sucharow Decl., Dkt. # 104, ¶ 17. [EX. 3].

[6] The first of the various complaints comprising the *BONY Mellon* MDL was filed in November 2011, nine months after the *ATRS* complaint was filed.

9/24/15 Order and Final Judgment, SDNY No. 12-MD-2335, Dkt. # 638.[7]  [EX. 8].  Lieff Cabraser was co-lead counsel for the nation-wide consumer class in the case.  Chiplock 6/16/17 Dep., pp. 23:25 – 24:4; 25:12-22.  [EX. 10].  The Thornton Law Firm, McTigue Law, and Keller Rohrback also were involved in the case.  Thornton 6/19/17 Dep., 85:18-21 [EX. 2]; McTigue 7/7/17 Dep., 9:23 – 10:11; 12:22 – 13:4.  [EX. 11].

Like this case, the *BONY Mellon* case was ultimately resolved by way of a mediated settlement, but unlike this case, the *BONY Mellon* case was vigorously litigated for three years prior to mediation.  Chiplock 6/16/17 Dep., pp. 29:23 – 30:15. [EX. 10]. ("It was a very, very hard-fought litigation."  *Id.*)  That case involved intense discovery: more than 120 depositions were taken and more than twenty million documents were produced and reviewed. *Id.* As Dan Chiplock of Lieff Cabraser testified, the attorneys' experience in *BONY Mellon* allowed counsel to develop a baseline of familiarity and expertise that they brought to the *State Street* case.  *Id.*, p. 27:11-17.

## B.  THE PARTIES, ATTORNEYS, AND COMPLAINT HISTORY

### 1.  The Customer Class Complaint

The first of the complaints comprising the *State Street* litigation was filed by the ATRS on February 10, 2011 (the "Customer Class Complaint").  *See Arkansas Teacher Retirement System v. State Street Corp., et al.*, MAD No. 11-cv-10230, Dkt. # 1.  [EX. 6].

ATRS is a cost-sharing, multi-employer defined-benefit pension plan, based in Little Rock, Arkansas, that provides retirement benefits to public school and other public

---

[7] Of the $335 million settlement, the attorneys in *BONY Mellon* were awarded $83,750,000 in fees and $2,901,734.19 in total expenses. SDNY No. 12-MD-2335, Dkt. # 637.  [EX. 9].

education-related employees in the State of Arkansas. *ATRS* Amended Complaint, ¶ 14, MAD No. 11-cv-10230, Dkt. # 10 ("the *ATRS* Complaint"). [EX. 7]. ATRS was established in 1937 as an office of the Arkansas state government for the purpose of providing retirement benefits for employees of any Arkansas school or other educational agency participating in the system. *Id.* According to George Hopkins, the Executive Director of the ATRS Board, ATRS is a $16 billion pension plan with 75,000 active members and 45,000 retirees. Hopkins 6/14/17 Dep., pp. 10: 20-21; 13:18; 14:8-9, 14-15. [EX. 4].

Like many institutional investors, ATRS invests some of its pension assets in foreign securities, referred to by ATRS as "Global Equity" securities. *See ATRS* Amended Complaint, ¶ 15. [EX. 7]. Global Equity investments are ATRS's single largest investment asset class. *Id.* State Street has been ATRS's exclusive custodian bank since 1998. *Id.*; Hopkins 6/14/17 Dep., pp. 38:14-15; 45:7-8. [EX. 4].

ATRS is a sophisticated, institutional plaintiff that has been involved in a number of securities and securities-related actions in recent years. George Hopkins testified that since he became Executive Director of ATRS in December 2008, ATRS has been lead or co-lead plaintiff in approximately 30 class actions. *Id.*, p. 32:9-13. Hopkins explained that shortly after he took over as Executive Director, some Arkansas state legislative leaders summoned him to the Capitol and told him they thought ATRS ought to be involved in securities litigation: "[T]he other [State] Retirement System was, and they thought we ought to be, too." Hopkins 9/5/17 Dep., p. 17:12-17. [EX. 12].

Q: And did the legislators that called you over indicate why they were
interested in securities litigation?

A [by Hopkins]: I got the idea that, you know, they understood the Retirement
System had a lot of, you know, financial issues. I mean, obviously, we did
-- when I got there, our system was in deep trouble both operationally, I
think politically because they thought that the system didn't have a strong
board, didn't have strong leadership, and we were, obviously, in trouble
actuarially, you know, when you have those kind of losses, and I think they
thought, you know, part of my duty was to bring in all the money I could.
That was sort of the message I got.

*Id.*, p. 18:4-19.

ATRS and the Customer Class are represented in this action by Labaton
Sucharow, Lieff Cabraser, and Thornton. Shortly after filing the *ATRS* Complaint,
Labaton moved for, and was subsequently appointed, Interim Lead Counsel for the
proposed class. *See* Dkt. # 7-8 [EX. 13; EX. 14]; 28.[8] [EX. 15]. Thornton was
designated as liaison counsel, and Lieff was designated as additional counsel for the
proposed class. *See id.*

Labaton has represented many pension funds and other institutional investors, and
has extensive securities class action experience. *See generally* Sucharow 6/14/17 Dep.,
pp. 10:13-14, 12:10-13 [EX. 16]; Belfi 6/14/17 Dep., pp. 9:16-20. [EX. 17]. Labaton
also had a pre-existing relationship with ATRS and its Executive Director, George
Hopkins, having served since 2008 as one of ATRS's monitoring counsel, and also
having represented ATRS in at least two full-scale securities class actions prior to the
*State Street* matter. *Id.*, p. 13:16-20.

---

[8] "Plaintiff's Assented to Motion for the Appointment of Interim Lead Counsel for the Proposed Class" and
supporting brief were filed on April 7, 2011 [Dkt. # 7; 8] [EX. 13; EX. 14] but not ruled upon by the Court until
January 12, 2012 [Dkt. # 28.] [EX. 15].

Lieff Cabraser has represented plaintiffs in many large class actions involving securities or financial fraud.  *See* Fineman 6/6/17 Dep., pp. 8: 23-25, 9: 2-8.  [EX. 18].  It is considered by many to be one of the preeminent plaintiffs' class action law firms in the nation.  The firm also has had substantial FX experience having represented, along with Thornton, the relators in the California *qui tam* action, and served as co-lead counsel in *BONY Mellon*.  *Id.*, pp. 10:24-25, 11:2-18; 12:2-24; Heimann 7/17/17 Dep., p. 32:3-6.  [EX. 19].  Thornton, the smallest of the three firms representing the Customer Class,[9] was also involved in the *BONY Mellon* case and, as indicated, also represented the relator in the California *qui tam* action. Thornton 6/19/17 Dep., pp. 32:17-20; 36: 8-14; 37:9-11 [EX. 2]; Lesser 6/19/17 Dep. pp., 16:20-24, 17:1. [EX. 20].

In its initial Complaint,  ATRS alleged that State Street engaged in unfair and deceptive acts and practices in connection with indirect FX transactions.  Its principal theories of recovery were violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws, ch. 93A, §§ 2, 11,[10] and breach of duty of loyalty.  *See Arkansas Teacher*

---

[9] Michael Thornton testified that the firm has only 18 lawyers.  Thornton 6/19/17 Dep., p. 32:15-18.  [EX. 2].  By contrast, the Labaton and Lieff firms each have 50-60 full-time lawyers.  *See* www.labaton.com; www.lieffcabraser.com.

[10] The Massachusetts Consumer Protection Act, Mass. Gen. Laws, ch. 93A, § 2, provides:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

Mass. Gen. Laws, ch. 93A, §2(a).

Section 11 of Chapter 93A extends the protections of the statute to businesses.  In relevant part, Section 11 provides:

Any person who engages in the conduct of any trade or commerce and who suffers any loss of money or property, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice declared unlawful by section two . . . may, as hereinafter provided, bring an action . . . , whether by

*Retirement System v. State Street Corporation,* MAD No. 11-10230, Dkt. # 1. [EX. 6].

The Amended Complaint added a new claim for relief under Section 9 of Chapter 93A.

*See id.*, Dkt. # 10.[11] [EX. 7]. The Amended Complaint also alleged class claims of

breach of duty of trust and negligent misrepresentation, and a separate claim for breach of

contract on behalf of ATRS, individually. *Id.*

State Street is the nation's second-largest custodian bank, with $21.5 trillion in

assets, including $4.7 trillion in pension assets, under custody and administration as of

December 31, 2010. *ATRS* Compl., ¶ 2. [EX. 7]. As part of its array of ancillary

custodial services, State Street executed "FX" transactions on behalf of its clients in order

to facilitate clients' purchases or sales of foreign securities or the repatriation of foreign

currency into U.S. dollars. *Id.*, ¶ 3.

Pension funds and other institutional investors have increasingly looked to

overseas companies and securities markets in order to diversify their holdings and

maximize investment returns. *Id.* The necessity for pension funds, in particular, to invest

---

way of original complaint, counterclaim, cross-claim or third-party action for damages and such
equitable relief, including an injunction, as the court deems to be necessary and proper.

Mass. Gen. Laws, ch. 93A, § 11.

[11] Section 9 of Chapter 93A provides, in relevant part:

(1) Any person . . . who has been injured by another person's use or employment of any method, act or
practice declared to be unlawful by section two . . . may bring an action . . . whether by way of
original complaint, counterclaim, cross-claim or third-party action, for damages and such equitable
relief, including an injunction, as the court deems to be necessary and proper.

(2) Any persons entitled to bring such action may, if the use or employment of the unfair or deceptive
act or practice has caused similar injury to numerous other persons similarly situated and if the court
finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the
action on behalf of himself and such other similarly injured and situated persons. . . .

Mass. Gen. Laws, ch. 93A, § 9.

in foreign securities in order to properly diversify and meet their funding requirements is well-known to and appreciated by custodians such as State Street, as pension funds' investment guidelines are publicly and readily available. *Id.*

Because foreign investments are bought and sold in the foreign currencies of the nations in which they are issued, U.S.-based investors necessarily must purchase and sell those foreign currencies in order to complete the transactions. *Id., ¶ 4.*

In support of its theories of recovery, ATRS alleged in its Amended Complaint that it reposed a high degree of trust in State Street and authorized State Street to execute FX transactions under conditions in which State Street controlled all aspects of FX trades, including the cost. *Id., ¶ 5.* ATRS further alleged that it depended upon State Street not only to execute FX trades honestly, but also to accurately report the FX rate and generally carry out the trades in a manner consistent with its custodial services contracts ("Custodian Contracts") and State Street's other written representations. *Id.*

ATRS's Custodian Contracts expressly provided that State Street would execute FX transactions for no additional fees above the substantial annual flat fee ATRS paid for custodial services. *Id., ¶ 6.* In successive "Investment Manager Guides" made available to its custodial clients and their outside investment managers, State Street explained that the pricing of FX trades is "based on the market rates at the time the trade is executed." *Id., ¶7.* Thus, State Street assured its custodial clients, including ATRS and the Class, that FX rates would reflect only the execution price, without additional fees or mark-ups. *Id.*

18

ATRS alleged, however, that despite these express provisions in the Investment
Manager Guides and Custodian Contracts charging custodial clients annual flat fees,
State Street engaged in the unfair and deceptive practice of charging its custodial clients
inflated FX rates when buying foreign currency for them, and likewise reporting deflated
FX rates when selling foreign currency, pocketing the difference between the actual and
reported rates. *Id.*, ¶ 8. This maximized State Street's profit at the direct expense of
ATRS and the Class members. In this regard, State Street allegedly charged ATRS and
the Class incorrect and often fictitious FX rates, unrelated to the market-based rates State
Street actually paid or received in executing the FX trades. *Id.*

Though the theory was novel, Customer Class Counsel were quite confident of the
merit of their claims, particularly their Chapter 93A claims. According to Dan Chiplock
of Lieff Cabraser, who developed the Chapter 93A theory and advocated the claim as
being "solid" throughout the litigation, Counsel viewed Chapter 93A as "a very powerful
statute for consumers . . . , a great vehicle for obtaining relief, and it also seemed to
present a very promising vehicle for class certification." Chiplock 6/16/17 Dep., pp.
15:17-18, 16:4, 17:9-14. [EX. 10]. He explained:

> [T]he case law and commentary in Massachusetts describes Chapter 93A as
> *sui generis*, it sort of stands on its own, it's neither contract nor tort theory,
> it's basically an all-encompassing theory that's meant to address unfair or
> deceptive conduct, and it applies not only to individual consumers, but it
> can also apply to businesses who are victimized, for lack of a better word,
> by that type of conduct in their inter-business dealings. It offers double or
> treble damages if the conduct is found to be willful or intentional, and it
> also allows for prejudgment interest, which I forget the exact number, but I
> think it's fairly generous. So it's a powerful statute.

*Id.*, pp. 17:17-18:8.

19

As defined in the *ATRS* Complaint, the class broadly encompassed:

> all institutional investors in foreign securities, including but not limited to public and private pension funds, mutual funds, endowment funds and investment manager funds, for which State Street served as the custodial bank and executed FX trades on a "standing-instruction" or "non-negotiated" basis between January 2, 1998 and December 31, 2009, inclusive (the "Class Period"), and which suffered damages as a result of the deceptive acts and practices and other misconduct alleged herein.

*ATRS* Compl., ¶ 22.  [EX. 7].

This broad definition included a number of both public and private pension and investment funds; however, no ERISA claims were alleged in either the original Complaint or the Amended Complaint.

## 2. **The ERISA Complaints**

As Carl Kravitz, co-counsel for the ERISA Plaintiffs, observed, "The class definition of the consumer people technically covered our clients. There was definitely a faction on the consumer side that said 'we represent these people.' . . ."  Kravitz 7/6/17 Dep., p. 28:20-23.  [EX. 21].  *See also* 11/15/12 Lobby Conference Tr., Dkt. #64, Remarks of Customer Class Counsel Michael Thornton, p. 16:23-25 ("[T]he ERISA claims are included in the class definition. So, we also have [an ERISA] claim.")  [EX. 22].  However, as noted, no ERISA claims were alleged in the *ATRS* Complaint.[12]

---

[12] Carl Kravitz testified that ERISA Counsel considered intervening in the Customer Class Action.  He explained:

> [T]hey didn't assert ERISA claims and, as it turned out, it was important that we did. And I think it was important to the outcome.
> But there was a risk that we were going to be somehow shunted to the side. And that was a big risk that we considered in terms of our taking the case. . . .
> And I will also tell you that we seriously considered the procedural issue of whether we needed to intervene in the consumer [case]. And we did fairly extensive research on that, and we may have even drafted a motion. We did not end up filing it because, as things started to play out, we were able to participate in the mediation. But that was a significant risk.

Therefore, on the heels of the filing of the *ATRS* Complaint, two separate class action complaints alleging ERISA violations were filed. The two sets of plaintiffs in these actions represented institutional private ERISA plans whose assets were managed by State Street (the "ERISA Class"). *See The Andover Companies Savings and Profit Sharing Plan, et al. v. State Street Bank and Trust Co.,* MAD No. 12-11698, Dkt. #1, 9 (the "*Andover* complaint") [EX. 23], and *Henriquez, et al. v. State Street Bank and Trust Co.*, MAD No. 11-12049, Dkt. Nos. 1, 24 (the "*Henriquez* complaint"). [EX. 24].

### a. The *Andover* Complaint

The *Andover* Complaint, filed in the United States District Court for the District of Massachusetts on September 12, 2012, was brought on behalf of two employee-benefit plans -- The Andover Companies Employees' Savings and Profit Sharing Plan (the "Andover Plain") and The Boeing Company Voluntary Investment Plan. *See The Andover Companies Savings and Profit Sharing Plan, et al., v. State Street Bank and Trust Co., et al.*, MAD No. 12-11698, Dkt. # 1, 9. [EX. 23]. The Complaint asserted claims for breach of duties of prudence and loyalty under Section 404 of ERISA, 29 U.S.C. § 1104, and prohibited transactions under Section 406 of ERISA, 29 U.S.C. § 1106, on behalf of a class of State Street custody clients that are ERISA plans. *See id.*

The Andover Plan is an ERISA-qualified defined contribution plan established for the benefit of the employees of Merrimack Mutual Fire Insurance Company ("Merrimack") and its sister companies, Cambridge Mutual Fire Insurance Company, and

---

Kravitz 7/6/17 Dep., pp. 28:24 - 29:19. [EX. 21].

Bay State Insurance Company, which, together with Merrimack, comprise the "Andover Companies." [MAD No. 12-cv-11698, Amended Class Action Complaint, ¶¶ 16-17, Dkt. # 9.] [EX. 23]. Alan Kober served as vice-president of the Andover Companies and an individual trustee of the Andover Plan from 2000 until June 1, 2014. Kober 7/6/17 Dep., pp. 7:4-5, 8:15-21 [EX. 25]; *Andover* Amended Compl., ¶ 16. [EX. 23]. Upon his retirement from the Andover Companies on June 1, 2014, Mr. Kober was succeeded by Janet Wallace. Kober 7/6/17 Dep., p. 10:11-15. [EX. 25].

During the Class Period, the Andover Plan offered its participants investments in several State Street-sponsored commingled funds, including international equity funds such as State Street's International Growth Opportunities Securities Lending Class A Fund, and the SSgA Daily International Alpha Select fund. *Andover* Amended Compl., ¶ 18. [EX. 23]. State Street served as both a Trustee for the Andover Plan and as an Investment Manager for the Andover Plan investments from 2001 through approximately 2009. *Id.* at ¶ 19.

As Trustee for the Andover Plan, State Street was required to exercise power and authority over the investment accounts for which it had express investment management discretion, or upon the direction of the Investment Manager. *Id.* at ¶ 20. Pursuant to the Master Trust Agreement, the investment power of the Trustee included the power to "purchase and sell foreign exchange and contracts for foreign exchange, including transactions entered into with State Street Bank and Trust Company, its agents or its subcustodians." *Id.*

22

By separate contract, State Street also served as investment manager for the Andover Plan's assets, invested in State Street's proprietary commingled funds. *Id.* Pursuant to the Investment Manager Agreement, State Street acted as both a discretionary investment manager and a designated ERISA fiduciary pursuant to Section 3(38) of ERISA with respect to all cash, securities, or other property designated by the Andover Plan. *Id.*

The other named plaintiff in the *Andover* action is James Pehoushek-Stangeland. Stangeland, a resident of Seattle, Washington, is an employee of the Boeing Company and a participant in The Boeing Company's 401(k) Voluntary Investment Plan ("the Boeing Plan"). *Id.* at ¶ 22; Stangeland 7/6/17 Dep., pp. 9:21-23. [EX. 26]. Like the Andover Plan, the Boeing Plan is an ERISA-qualified defined contribution plan established for the benefit of the employees of the Boeing Company, a multinational aerospace and defense corporation headquartered in Chicago, Illinois. *Andover* Amended Compl., ¶ 23. [EX. 23]. As a participant in The Boeing Plan, "Plaintiff Pehoushek-Stangeland has standing to bring suit on behalf of The Boeing Plan for losses to the Plan due to breaches of fiduciary duty pursuant to ERISA sections 409 [29 U.S.C. § 1109] and 502(a)(2) [29 U.S.C. § 1132(a)(2)]." *Id.* ¶ 22. State Street served as Trustee for The Boeing Company Employee Savings Plans Master Trust ("Boeing Master Trust"). *Id.* at ¶ 24.

During the Class Period, the Boeing Plan offered its participants investment options in several State Street-sponsored commingled funds. *Id.* at ¶ 25. Among the international equity funds offered were the Global All Cap Equity ex-US Index Non-

23

Lending Series Fund Class A ("Global Non-Lending Fund"), which Boeing designated as the "International Index Fund." *Id.* During the relevant time period, the Boeing Plan held approximately $1.9 billion in Plan assets in the International Index Fund. *Id.* at ¶ 26. These investments constituted approximately 6% of the Boeing Plan investments. *Id.* The International Index Fund invests in an index comprised of globally developed and emerging-country stocks from outside the U.S. *Id.*, p. 27. Its international investments require exchange of participants' U.S. dollars into various foreign currencies. *Id.*; Stangeland 7/6/17 Dep., p. 10: 3-7. [EX. 26].

The *Andover* Plaintiffs were represented by Keller Rohrback LLP ("Keller Rohrback").[13] Keller Rohrback is a sophisticated law firm with significant experience in complex commercial and ERISA class action litigation. Sarko 7/6/17 Dep., pp. 10: 20-25, 11:1-14. [EX. 28]. Keller Rohrback also represented ERISA plan members in the parallel *BONY Mellon* case. *Id.* at p. 13:1-2. In fact, the firm, in its own estimation, had been involved in almost every major ERISA class action brought in the United States in the last fifteen years. *Id.*, p.11:8-11.

Keller Rohrback, and in particular, Lynn Sarko, who served as Lead Counsel for his firm in the *State Street* litigation, maintained a strong professional relationship with the Department of Labor ("DOL"), which had oversight responsibilities for ERISA plans

---

[13] Keller Rohrback was assisted by local counsel Theodore Hess-Mahan of Hutchings Barsamian Mandelcorn LLP. As local counsel Mr. Hess-Mahan filed the initial *Andover* complaint and a number of other pleadings, handled service of process issues, and was the local point of contact for the Court, State Street Bank's defense counsel Wilmer Hale, the Boston Department of Labor office, and the press for matters pertaining to the *Andover* ERISA case. Keller Rohrback's Responses to Second Supplemental Interrogatories, Response No. 2. [EX. 27].

and was actively monitoring the *State Street* litigation. *Id.*, p. 16:12-15. Sarko testified that the DOL was concerned about the *State Street* litigation and was encouraged by the fact that Keller Rohrback had become involved in the action. *See id.,* pp. 14-17.[14]

### b. **The *Henriquez* Complaint**

A second ERISA action against State Street, initially filed on October 12, 2011 in the United States District Court for the District of Maryland, also joined the consolidated action. *See Henriquez v. State Street Bank and Trust Co., et. al.,* MDD No. 11-cv-02920, Dkt. # 1. [EX. 29]. In that case, the plaintiff, Arnold Henriquez, brought suit on behalf of the Waste Management Retirement Savings Plan and its participants and beneficiaries. *Id.* The *Henriquez* Complaint, on behalf of ERISA plans for whom State Street was a custodian, asserted a variety of claims under ERISA, including that State Street engaged in self-interested prohibited transactions under Section 406, 29 U.S.C. § 1106; breached its duties of prudence and loyalty under Section 404, 29 U.S.C. § 1104; and breached its co-fiduciary duties under Section 405, 29 U.S.C. § 1105. *See id.*

The *Henriquez* complaint in Maryland, however, was voluntarily dismissed shortly after it was filed, *see id.,* Dkt. # 7-8 [EX. 30; EX. 31]; it was later re-filed in this

---

[14] Sarko explained:

> The Department of Labor had good professional relationships with us, with me and some of the other lawyers. They thought we did a good job and knew the law. And this was a case that some people at the Department of Labor, lawyers, were concerned about. . . .
>
> . . . However, the Department of Labor has a limited budget, and they're very careful about what cases they come into, and they pretty much have the attitude that if the cases are being handled by, you know, competent, professional ERISA counsel, they will [be able to] use their resources other places.

Sarko 7/6/17 Dep., pp. 24:12-17, 24-25; 25:1-5. [EX. 28].

Court on November 18, 2011 as a "related case" to the *ATRS* case.  *See Henriquez v. State Street Bank and Trust Co., et al.,* MAD No. 11-12049, Dkt. # 1.  [EX. 24].  It was thereafter amended on February 24, 2012 to add three additional plaintiffs:  Michael T. Cohn, a participant in the Citigroup 401(k) Plan, and William R. Taylor and Richard A. Sutherland, participants in the Retirement Plan of Johnson & Johnson.  *See id.* Dkt. # 24 ("*Henriquez* Complaint").  [EX. 24].

Plaintiff Arnold Henriquez, a resident of Frederick, Maryland, is employed by Waste Management Company and a participant in the Waste Management 401(k) Retirement Savings Plan ("WM Plan"), an ERISA-covered plan.  Amended Class Action Complaint, MAD No. 11-cv-12049, ¶¶ 1, 10, Dkt. # 24 [EX. 24]; Henriquez 7/7/17 Dep., pp. 6:11-12, 15; 7:14-15.  [EX. 32].  Henriquez invested in the "International Equity Fund" sponsored by State Street and offered by the WM Plan.  *Henriquez* Amended Compl., ¶ 10.  [EX. 24].  He also invested in other funds sponsored by State Street and offered by the Plan during the Class Period, including the Large Cap Equity Fund, the Small Cap Equity Fund, the Conservative Asset Allocation Fund, the Moderate Asset Allocation Fund, the Aggressive Allocation Fund, the Bond Market, and the SSgA Target Retirement 2030 Fund.  *Id.*

Plaintiff Michael Cohn, a disability retiree, is a resident of Highland Park, Illinois and a participant in the Citigroup 401(k) Plan ("Citi Plan"), which is also an ERISA-covered plan.  *Henriquez* Amended Compl., ¶ 1, 11 [EX. 24]; Cohn 7/7/17 Dep., pp. 6:5, 14-17; 8:15-23.  [EX. 33].  From January 2005 through August 2007, Cohn was invested in the "Aggressive Focus Fund" offered by the Citi Plan.  *Henriquez* Amended Compl., ¶

11. [EX. 24]. The Aggressive Focus Fund was a "fund of funds" managed by State

Street. *Id.* In September 2007, the Citi Plan changed its investment options, and Cohn

invested in a newly offered "Emerging Market Equity" collective investment fund. *Id.*

State Street managed this Emerging Market Equity fund since it was first offered to the

Citi Plan in 2007. *Id.*

 Plaintiffs William Taylor and Richard Sutherland are Johnson & Johnson retirees,

and are participants in the Johnson & Johnson Pension Plan ("J&J Plan"), an ERISA-

covered plan. *Id.* at ¶¶ 12-13; Taylor 7/7/17 Dep., pp. 8:7-9, 23-25; 9: 1, 7-11. [EX. 34].

Mr. Sutherland is also a participant in the J&J 401(k) Plan. McTigue 7/7/17 Dep., p.

19:18-20. [EX. 11]. Taylor resides in Aston, Pennsylvania. *Id.*, p. 7:17-20; *Henriquez*

Amended Compl., ¶ 12. [EX. 24]. Sutherland resides in Albuquerque, New Mexico. *Id.,*

¶ 13. At all times relevant to this action, State Street served as the trustee and custodian

of both the J&J Plan and the Johnson and Johnson Pension and Savings Plan Master

Trust in which the J&J Plan was wholly invested. *Id.*, ¶¶ 12-13. The J&J Plan holds

foreign investments in international securities that cannot be purchased on a domestic

exchange and without foreign currency. *Id.* These holdings require FX transactions.

 The *Henriquez* Plaintiffs were represented by McTigue Law LLP ("McTigue")

and Zuckerman Spaeder LLP ("Zuckerman Spaeder").

 McTigue has extensive experience litigating ERISA class actions. McTigue

7/7/17 Dep., p. 9:1-7. [EX. 11]. McTigue, led by named attorney Brian McTigue, also

had some experience in FX cases prior to *State Street*, having represented ERISA plan

participants in the *BONY Mellon* case. *Id.*, p. 10:6-13. Zuckerman Spaeder is a boutique

litigation firm with extensive trial experience. Kravitz 7/6/17 Dep. p. 10:10-13, 21-22.

[EX. 21]. Carl Kravitz of Zuckerman Spaeder, like Sarko, was very involved with the

negotiations with the DOL: Sarko dealt principally with the DOL headquarters in

Washington and Kravitz dealt with the Boston DOL office. Sarko 7/6/17 Dep., pp. 50:14

– 51:5.[15] [EX. 28].

None of the firms representing the ERISA Class was ever appointed "lead

counsel" or to any other official capacity by the Court. (Later, however, Brian McTigue

of McTigue Law, attempted, albeit unsuccessfully, to secure appointment as lead counsel

for the ERISA class members. *See* TLF-SST-052975 – 2980 [EX. 35]; TLF-SST-054020

– 4022 [EX. 36]; Sarko 9/8/17 Dep. p. 97:12-21 [EX. 37]; Sucharow 9/1/17 Dep., p.

93:17-23.)[16] [EX. 38].

---

[15] Two other firms -- Beins, Axelrod, P.C. ("Beins Axelrod") and Richardson Patrick Westbrook & Brickman LLC ("Richardson Patrick") -- partnered with McTigue as co-counsel for the *Henriquez* Plaintiffs during the course of this litigation. These firms also had significant relevant experience. Beins Axelrod has represented a number of unions and pension and health and welfare funds. Axelrod 7/7/17 Dep., pp. 8-9:1-18. [EX. 39]. Richardson Patrick has a breadth of trial experience, including in litigating large class actions throughout the country. Brickman 7/7/17 Dep., pp. 8:22-25, 9:1-15. [EX. 40].

Beins Axelrod came into the case as McTigue's local counsel for the filing of the *Henriquez* complaint in Maryland, and stayed on as co-counsel for the Plaintiffs after the Maryland complaint was dismissed and refiled in Massachusetts, until September 30, 2013. Axelrod 7/7/17 Dep., pp. 10:25; 11:1-4; 14:15-17. [EX. 39].

Anticipating the amount of work that would be required in litigating a complex ERISA case that involved the pension plans of four major national/international companies, in early 2012, McTigue also asked Richardson Patrick to join the case. Brickman 7/7/17 Dep., pp. 10:13-15; 11:3-5. [EX. 40]. Richardson Patrick joined the case in March 2012 but only stayed on for six months, until September 2012. *Id.*, pp. 19: 21-25 – 20:1-9. Michael Brickman testified that Richardson Patrick's participation in the *Henriquez* case ended because he had a large trial scheduled in another case, to which he and his firm needed to devote a substantial amount of time in August and September 2012 and, therefore, could not give McTigue the time he thought was needed on *Henriquez*. *Id.*, pp. 24:10-25, 11:1-2. Zuckerman Spaeder replaced Richardson Patrick as of September 2012. Axelrod 7/7/17 Dep., p. 23:13-16 [EX. 39]; Kravitz 7/6/17 Dep., p. 11:10-12. [EX. 21].

[16] Labaton, Lieff, and Thornton, however, viewed the ERISA plaintiffs as their clients and Labaton as lead counsel for all class members, including ERISA class members. *See* Chiplock 9/8/17 Dep. pp. 93:24 – 94:2 ("We had a responsibility as class counsel to the class. And that included ERISA plans."); 97:3- 10 ("I felt that customer class counsel had a responsibility to the entire customer class with no distinctions. We didn't discriminate in our class definition. We didn't see the need to when we filed our case.") [EX. 41]. Goldsmith 9/20/17 Dep., pp. 42:11-14 ("[W]e did not assert an ERISA claim in our complaint, but we did allege a class which was broad enough to encompass ERISA governed assets."); 61:11-14 (How much of the settlement would go to ERISA clients "was

## C. CHALLENGES, RISKS, AND INTERNAL TENSIONS

Bringing these actions presented numerous risks and challenges to the various

plaintiffs and their counsel.

First, there was the novelty of bringing an action against one's custodian bank.  As

Dan Chiplock of Lieff explained,

> [T]his is not something that was done generally. Custody customers
> generally like their custodian, they have longstanding relationships with them.
> It is also not easy to change custodians, you have to go through a process, and
> it's not something that pension funds in particular, who have limited resources,
> relish doing.
> So it was not easy to bring people along to that theory, even if they felt that
> they may have been overcharged on some of their services. So that was [a]
> challenge to the case overall.

Chiplock 6/16/17 Dep., p. 105:3-24.  [EX. 10].  *See also* Sarko 7/6/17 Dep., pp. 28:25 –
29:10. [EX. 28].

Customer Class Counsel had further concerns about the ability to certify a

nationwide class under Chapter 93A: "There aren't a whole lot of cases out there where a

nationwide class has been certified under one state's consumer protection laws in federal

court."  Chiplock 6/16/17 Dep., p. 57:17-25.  [EX. 10].

_____

something that [DOL] were focused on. Of course, we were focused on it as well because they were our clients.")
[EX. 42].  *See also* colloquy at 11/15/12 Lobby Conference:

> MICHAEL THORNTON:  I just want to clarify one thing of Mr. Rudman's [State Street's attorney's] excellent
> summary that we might differ on. There are two clear ERISA cases, Henriquez and Andover, and in the
> third case, Arkansas, um, the ERISA claims are included in the class definition. So we also have a claim.
>                         ***
> ROBERT LIEFF:  . . . There is an overlap, that's all we're trying to say. We represent the same people.
>
> THE COURT: You do represent the same people?
>
> MR. LIEFF: Yes.

[11/15/12 Lobby Conference Tr., Dkt. # 64, pp. 16-17].  [EX. 22].

Class certification on the facts of the case presented a further significant challenge

for the Customer Class: State Street's various clients had separate custody contracts with

the bank and no two contracts were exactly alike. *Id.*, p. 64:17-25. "[T]he fact that

individual contracts varied potentially presented problems on class certification." *Id.*, p.

65:11-15; G. Bradley 6/19/17 Dep., p. 28:17-21 ("We looked at a significant amount of

contracts. They could argue that one contract was different.") [EX. 43]; Sarko 7/6/17

Dep., pp. 32:19 – 33:4 ("[93A] is based as misrepresentation, sort of fraud-like claims,

which … based on issues where you have different contracts can be a challenge…. So,

… class certification for the customer class was huge." *Id.*) [EX. 28].

On the ERISA side, counsel had their own concerns about class certification. As

Lynn Sarko explained:

> This case, I thought, was a no-brainer on class certification for ERISA,
> bringing it as a single case. The risk came whether you could bring what's
> called a class of plans case. Was it -- could you bring a case where State Street
> was the fiduciary for a plan on behalf of all plans that State Street was the
> fiduciary for. . . .
>
> So that was to me the class certification risk here.

*Id.*, p. 28:10-23.

Class certification was but one of the legal hurdles facing counsel. The various

contracts each included different choice of law provisions, which presented yet another

challenge. Chiplock 6/16/17 Dep., p. 64:20-21. [EX. 10]. Further, the issue of ERISA

preemption loomed large over the claims alleged by the Customer Class. *Id.*, pp. 65:19 –

66:12; Kravitz 7/6/17 Dep., p. 26:16-21 [EX. 21]; Sarko 7/6/17 Dep., p. 56:4-18 ("Their

whole argument was built on they were covered by 93A. And I think there's a very high chance it would be preempted." *Id.*)  [EX. 28].

The various legal theories under which the Plaintiffs were proceeding also presented significant risks.  A particular challenge was whether Class Counsel could establish that a custodian bank had any fiduciary responsibility for the transactions at issue.  Dan Chiplock explained:

> So the relationship between a custodian and its customer was normally considered one of a fiduciary and the beneficiary of the fiduciary relationship. However, when it came to ancillary services like foreign exchange, custody foreign exchange, standing instructions foreign exchange, that relationship could become more attenuated under the law and under the various contracts in play.

Chiplock 6/16/17 Dep., p. 106:7-17.  [EX. 10].  This was an equally risky issue for the ERISA plaintiffs:

> [T]here was an issue of whether or not the bank was actually an ERISA fiduciary. The issue of whether an entity like the bank is a fiduciary. It would turn on a number of things, but in particular whether it exercised discretion in what it did. That was a major factor.
>
> So that was one issue. And, obviously, if we didn't establish that the bank was an ERISA fiduciary, that would have been significant, both as to breach of fiduciary duty claim but also the prohibited transaction claim.

Kravitz 7/6/17 Dep., pp. 25:22 – 26:8. [EX. 21].

Counsel's concerns about the fiduciary duty issue and Plaintiffs' other substantive claims were borne out by a very unfavorable decision handed down by Judge Coté in the Southern District of New York in a factually similar case that

was brought against another custody bank, J.P. Morgan.[17] In a lengthy opinion,

Judge Coté ruled against the plaintiffs in that case on just about every legal issue

concerning the *State Street* Plaintiffs. Chiplock 6/16/17 Dep., p. 58:18 – 59:5.

[EX. 10].

> . . . [E]ssentially what she held was, as these banks always argued, that
> banks have a right to take a markup on services, just like any other vendor,
> that it was not difficult, in her view, for a customer to look and find a
> pattern, if they cared to look, that showed, you know, where their prices
> were falling on average over the course of time in foreign exchange trades.

> . . . [S]he also knocked down the breach of fiduciary duty theory, holding
> that although a custody bank in general is to be considered a fiduciary when
> providing custody to a client's securities and resources, they are not acting
> as a fiduciary when they provide ancillary services, like standing
> instructions foreign exchange trading or indirect foreign exchange trading.
> So -- in other words, the fiduciary relationship ends when they start
> providing ancillary services like that.

> She also held, to top it off, that sophisticated customers of a custody
> bank, when receiving a service like this, were not consumers as that term
> was understood under consumer protection law.

*Id.*, pp. 59:5 – 60:5.

Although the *J.P. Morgan* case was decided under New York law, the decision

challenged equally the ERISA and Customer Class Counsel because it provided State

Street with a road map for how to challenge the claims in this case. *Id.*, p. 60:13-15.

Beyond the legal hurdles and challenges, this case presented substantial financial

risks for both the Customer Class Counsel and the ERISA Counsel. Litigating this case

was going to take many years and be very expensive. *Id.*, p. 128:2-5; G. Bradley 6/19/17

---

[17] *See Louisiana Mun. Police Employees' Retirement Sys. v. J.P. Morgan Chase & Co.*, 2013 WL 3357173
(S.D.N.Y. July 3, 2013) ("*J.P. Morgan* case").

Dep., p. 29:18-21 [EX. 43]; Sarko 7/6/17 Dep., p. 36:3-12.  [EX. 28].  With the

regulatory agencies hovering over the case, another layer of financial risk was added.  In

particular, the DOL monitoring, oversight, and potential intervention presented a

financial risk to the Plaintiffs and Class Counsel alike.  Chiplock 6/16/17 Dep., p. 80:2-

18.  [EX. 10].  If the DOL were to intervene, Plaintiffs risked facing an automatic

reduction of any settlement amount:  DOL would take 10% of any settlement off the top,

and that money would go to the general Treasury, not the clients.  Sarko 7/6/17 Dep., pp.

35:17 – 36:2.  [EX. 28].

    And, of course, as all the firms took the case on a contingent-fee basis, they risked

not being paid anything in the end.  Chiplock 6/16/17 Dep., p 137:6-7 [EX. 10]; G.

Bradley 6/19/17 Dep., p. 43:6-8 [EX. 43]; Kravitz 7/6/17 Dep., p. 33:5-7 ("When we're

looking at the risk of the case. . . we could get in the case, expend fairly significant

amount of time, and not end up with anything at the end."  *Id.*)  [EX. 21].

    It was not just expending a great amount of time and financial resources that

presented a challenge for the Plaintiffs and their attorneys; it was also that Plaintiffs were

up against a "powerful institution" and very good, "Class A" defense firm, Wilmer Cutler

Pickering Hale and Dorr, LLP.  G. Bradley 6/19/17 Dep., p. 29:17-18 [EX. 43]; Kravitz

7/6/17 Dep., p. 27:17-18.  [EX. 21].  In addition to concerns about an inevitable motion to

dismiss, counsel were concerned that defense counsel would follow the "strong-arm"

tactics of the defendants in *BONY Mellon* and file contractual counterclaims against their

clients based on indemnification clauses in their custody contracts.  *See* Chiplock 6/16/17

Dep., pp. 63:3 – 64:12.  [EX. 10].  Counsel for State Street, in fact, threatened to do so

during the course of mediation, creating a tension that constantly loomed over the proceedings. *Id.*, p. 64:7-9.

Beyond the threats of opposing counsel that created tension in the case, there was also a fair degree of internal tension between and among Customer Class Counsel and ERISA Counsel -- tensions inherent in conflicting theories and potentially conflicting results. Kravitz 7/6/17 Dep., p. 46:5-12. [EX. 21]. As Kravitz testified, "There was definitely a faction on the consumer side that said 'we represent these people, what are you doing in the case?'" *Id.*, pp. 28:21-24. Although Kravitz believed it was important that the ERISA parties entered the case and that the ERISA claims were raised, "There was a risk that we were going to be somehow shunted aside." *Id.,* pp, 28:24 – 29:3. Kravitz explained, "Consumer people did not want us coming in and taking a chunk of their case." *See id.*, pp. 32:16-17; 45:6-17. "Every extra dollar that went to ERISA came out of the Consumer side." *Id.*, p. 51:18-20.

The tension between the Customer Class and the ERISA Class was manifested during the hybrid mediation and discovery process: ERISA Counsel were not provided with access to documents State Street had provided to the Customer Class. Sarko 7/6/17 Dep., p. 44:2-25. [EX. 28]. Nor were ERISA Counsel allowed access to the Customer Class's database. *Id.,* p. 45:1-23. Compounding the tension was the fact that there was never an order appointing leadership in the ERISA cases. *Id.,* pp. 42:24 – 43:3. As a consequence, the ERISA lawyers organized themselves. *Id.* at p. 42:1-2.

34

## D. **EARLY LITIGATION**

During most of 2011-2012, litigation in these three cases principally involved

motion practice and, in particular, briefing and argument of Rule 12(b)(1) and Rule

12(b)(6) motions to dismiss filed by State Street in the *ATRS* and the *Henriquez* cases.[18]

In moving to dismiss the *ATRS* Complaint, State Street argued that ATRS's breach

of fiduciary duty claim and its individual breach of contract claim lacked legal merit

because the applicable contracts defined and limited the scope of the parties' relationship,

which State Street contended was not fiduciary in nature.  *See* 6/3/11 Memorandum in

Support of Defendants' Motion to Dismiss, Dkt. # 19.  [EX. 44].  State Street further

argued that the contracts did not require it to execute FX transactions, to do so at a

particular rate, or to disclose its margin on FX transactions.  *Id.* Rather, State Street

argued, the contracts required it only to hold assets and provide administrative services to

ATRS.  *Id.*

State Street also argued that ATRS's claims under Chapter 93A and for negligent

misrepresentation lacked merit because there is nothing unfair or deceptive when the

buyer or seller of a commodity does not disclose its margin on a purchase or sale.  *Id.*  It

also claimed that, as a sophisticated investor, ATRS could not plausibly contend that its

investment managers were unaware that the rates charged for ATRS's FX transactions

were marked up from market rates. *Id.* Additionally, State Street asserted a statute of

---

[18]  At the time of motion practice, the *Andover* case had not yet been filed.

limitations argument seeking to bar all of Plaintiffs's claims seeking relief for events

dating back to 1998.  *Id.*

Finally, State Street argued that all claims asserted against State Street Corporation

("SSC"), the parent corporation and its separate subsidiary, State Street Global Market

LLC ("SSGM LLC"), should be dismissed because these entities had no interaction with

ATRS, did not enter into any contracts with ATRS, and did not conduct FX transactions.

*Id.*

The motion was fully briefed by both parties and the Court heard argument on the

motion on May 8, 2012.  During the hearing, the parties agreed to the dismissal of SSGM

LLC as a party-defendant.  *See* 5/8/12 Hearing Tr., Dkt. # 36, p. 80:8-10. [EX. 45].

Then, at the conclusion of the hearing, the Court entered an Order granting the motion to

dismiss with respect to ATRS's claims against SSC, the parent corporation, but denied

Defendant's motion in all other respects.  *See* 5/8/12 Order, Dkt. # 33.  [EX. 46].  The

Court further directed counsel to meet to discuss the possibility of settlement and, if

settlement could not be reached, to report back whether they wished to pursue mediation,

either privately or before a magistrate judge.  *Id.*

In the meantime, on August 8, 2012, State Street also moved to dismiss the

*Henriquez* Complaint arguing that the Complaint should be dismissed for lack of

jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1).[19]  State Street argued that the conduct

challenged in the Complaint did not amount to an injury-in-fact to the *Henriquez*

---

[19]   Again, the *Andover* complaint had not yet been filed.

Plaintiffs and the Plaintiffs, therefore, lacked standing to bring claims on behalf of pension plans other than their own, or on behalf of collective funds in which their own plans did not invest.  *See* 8/10/12 Memorandum in Support of Defendants' Motion to Dismiss, Case No. 11-12049, Dkt. # 59.  [EX. 47].  State Street also argued that the *Henriquez* Complaint should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim because the Plaintiffs did not plead an adequate factual basis to show that State Street acted as a fiduciary or that it engaged in a foreign exchange scheme. *Id.*  State Street further argued failure to plead fraud with particularity.  *Id.*

The *Henriquez* Plaintiffs did not file a written response. Instead, they filed their own motion arguing that they were unable to adequately respond to State Street's Motion to Dismiss without first obtaining some discovery.  *See* Motion for Order for Discovery, Dkt. # 43, 57.  [EX. 48; EX. 49].  State Street, of course, opposed Plaintiffs' request for discovery.  *See* Memorandum in Opposition, Dkt. # 61.  [EX. 50].

No substantive decision was ever rendered on either of these motions.  Instead, on November 15, 2012, at the request of counsel, the Court conducted an on-the-record conference with all counsel in the lobby of its chambers (the "Lobby Conference") to discuss further proceedings.  *See* 11/15/12 Lobby Conference Tr., Dkt. # 64 [EX. 22].  By this time the *Andover* Complaint had also been filed, and counsel for the *Andover* Plaintiffs also participated in the Lobby Conference.

1. **Consolidation of the Cases**

During the November 15, 2012 Lobby Conference, counsel informed the Court of their unsuccessful attempt to settle the *ATRS* case separately, and proposed that the three

cases -- *ATRS, Henriquez*, and *Andover* -- proceed in tandem in a "hybrid" mediation during which the parties and counsel could continue to pursue a mediated global settlement while at the same time engaging in "informal" document discovery. 11/15/12 Lobby Conference Tr., Dkt. # 64, pp. 10:15-18; 15:19-25. [EX. 22].  Counsel also proposed that they withdraw the then-pending motions in *Henriquez*, *id.,* pp. 24:22-25; 25:1-2, and that all further motion practice be "back-burnered." *Id.* at 15:6-7.

The Court agreed with counsel's proposals and, accordingly, ordered that the three actions be consolidated for all pre-trial purposes. *Id.*, pp. 10, 22, 24; Order to Stay, Dkt. # 62 [EX. 51]; Electronic Order Consolidating Cases, Dkt. # 63.  [EX. 52].  The Court further granted the parties' request to engage in informal discovery while mediating the matter. *See* 11/15/12 Lobby Conference Tr., p. 22:2-10.  [EX. 22].  The proceedings were stayed in all other respects during the "hybrid" mediation process. *See* Order to Stay, Dkt. # 62.  [EX. 51].

**E.  THE HYBRID MEDIATION**

After the Court substantially denied State Street's Motion to Dismiss the *ATRS* Amended Complaint in May 2012, ATRS and State Street agreed to participate in private mediation.  Sucharow Declaration, ¶ 87.  [EX. 3].  The parties retained Jonathan B. Marks as mediator. *Id.*, ¶ 89.  Between August and October 2012, in preparation for mediation, Marks held preparatory conference calls with the parties, separate half-day, in-person meetings with representatives of each side, and a full-day in-person session with both sides. *Id.*, ¶ 90.  These initial efforts culminated in a two-day in-person mediation in Boston on October 23-24, 2012, attended by counsel and party representatives, including

George Hopkins of ATRS and the Chief Legal Officer of State Street.  Sucharow Decl., ¶ 91 [EX. 3]; Jonathan Marks Declaration, Dkt. # 104-5, ¶ 14.  [EX. 53].

No settlement was reached at the October mediation, but the parties developed a framework for exchanging discovery and managing the cases, which the Court endorsed at the November 15, 2012 Lobby Conference.  Sucharow Decl., ¶ 92 [EX. 3]; 11/15/12 Lobby Conference Tr., Dkt. #64, p. 22.  [EX. 22].

Thereafter, between January 2013 and June 2015, Marks conducted fourteen additional mediation sessions with the parties and their attorneys in Boston, New York City, and Washington, D.C.  The mediation sessions included extensive exchanges of views on the merits, including PowerPoint presentations by both sides on legal issues, such as class certification, liability, and damages, as well as a detailed presentation by a cost accounting expert engaged by State Street.  Sucharow Decl., ¶ 94 [EX. 3]; *see also* Marks Decl., ¶¶ 23-24.  [EX. 53].

### 1. Discovery and Document Review

The mediation sessions were conducted in tandem with, and informed by, substantial discovery.  In response to ATRS's requests, State Street produced more than nine million pages of documents.  Sucharow Decl., ¶ 96.  [EX. 3].  Further, in response to State Street's requests, ATRS produced more than 3,500 documents, exceeding 73,000 pages, concerning the full scope of ATRS's custodial relationship with State Street as well as its relationship with relevant investment managers ("IMs") and a consultant responsible for overseeing the IMs. *Id.*, ¶ 97.  The ERISA Plaintiffs also collectively

produced more than 3,600 pages of documents relevant to their relationship with State Street. *Id.*

Review of these documents was performed throughout the course of the hybrid mediation. To assist in the document review, the Customer Class law firms enlisted the help of their staff attorneys ("SAs").[20]

While the *BONY Mellon* case was being actively litigated in 2013 and 2014, Lieff assigned at most five staff attorneys to review documents produced by State Street. Chiplock 6/16/17 Dep., pp. 107:15 – 108:12. [EX. 10]. During this early time, Labaton also allocated no more than five staff attorneys to review and analyze documents for the *State Street* case. Rogers 6/16/17 Dep., p. 57:7-10. [21] [EX. 54]. As the hybrid mediation progressed, State Street produced discovery related to the *Hill* case,[22] a significant production consisting of approximately 10 million pages. Rogers 6/16/17 Dep., pp. 68:25 – 69:11 [EX. 54]; Chiplock 6/16/17 Dep., p. 88:2-21. [EX. 10]. The *Hill* production added considerably to the total volume of documents that had yet to be reviewed by Customer Class Counsel.

By January 2015, Customer Class Counsel began to view discovery with greater urgency, informed in part by the favorable resolution in the *BONY Mellon* case and also

---

[20] "Staff attorneys" here were licensed attorneys with relevant experience hired specifically to perform large-scale document review.

[21] Michael Rogers recalls that, in 2013, Labaton assigned Todd Kussin, the staff attorney "team leader" in the *State Street* case, and four staff attorneys to perform document review during 2013 and 2014. Rogers 6/16/17 Dep., p. 57:7-10. [EX. 54].

[22] *Hill v. State Street Corp., et. al.*, MAD No.1:09-cv-12146-GAO.

by the fact that the parties had been in mediation for over two years without reaching an
agreement to resolve the case. Chiplock 6/16/17 Dep., p. 111:8-13 [EX. 10]; Dugar
6/16/17 Dep., p. 85:9-16.  [EX. 55].  As a result, Labaton and Lieff (which had then
recently freed up thirteen staff attorneys previously assigned to the *BONY Mellon* case, as
discovery in that case was coming to a close) expanded their respective document review
teams by adding additional staff attorneys to review and analyze the unreviewed material
accumulated in the *State Street* case.  *See* Chiplock 6/16/17 Dep., pp. 109:16 – 110:2
[EX. 10]; Rogers 6/16/17 Dep., pp. 69:8-14; 74:11-13.  [EX. 54].  Between January and
March 2015, Labaton bolstered its document review team, maintaining fifteen to twenty
different staff attorneys on the *State Street* case at any given time; Lieff acted similarly,
assigning fifteen staff attorneys -- thirteen staff attorneys who transitioned directly from
the *BONY Mellon* document review and two agency "contract" attorneys[23] -- to complete
the review.  Kussin 6/5/17 Dep., p. 17:6-13, 70:8-9 [EX. 56]; Dugar 6/16/17 Dep., p.
87:16 – 88:11, 23-24 [EX. 55]; Lieff Cabraser Response to June 1 Interrogatories, No.19.
[EX. 57].

All staff attorneys reviewing documents in the *State Street* case received a binder
of documents providing an overview of the case; the binder contained the *ATRS*
Complaint and related pleadings, an outline of the case theory, and a list of key terms,
search criteria, topics and categories to guide the staff attorney review. Goldsmith

---

[23] These "contract" attorneys were employed by an outside staffing agency rather than by the Lieff firm itself.  *See*
Lieff Cabraser's Response to Special Master's First Set of Interrogatories, No. 19.  [EX. 57].  Lieff later retained
two additional "contract" attorneys to work on the *State Street* case.  *Id.  See also* Chiplock 6/16/17 Dep., p. 112:12-
22.  [EX. 10].

7/17/17 Dep., pp.77:23 – 78:8 [EX. 58]; Rogers 6/16/17 Dep., p. 63:3-7 [EX. 54]; Lesser

6/19/17 Dep., p. 40:12-13.  [EX. 20].  Michael Lesser of Thornton also drafted emails

outlining important information for the staff attorneys to consider during their review.

Lesser 6/19/17 Dep., pp. 40:10 – 41:4.  [EX. 20].

       The Labaton and Lieff staff attorneys were well-qualified and well-equipped to

analyze the documents, which related to complex FX trading patterns and other financial

issues raised in the case.  *See* Rogers 6/16/17 Dep, pp. 58:12 – 59:7 (Staff attorneys hired

by Labaton had experience in "complex litigation, [the] financial industry, . . .  banking,

mutual funds, certainly currency trading, or experience legally on what I would call a

financial industry case.")  [EX. 54].  One Labaton staff attorney, David Alper, had

extensive experience in FX trading itself, having worked in the industry for twenty years.

*See infra.* Several of the Lieff staff attorneys had, in the words of Chiplock, "been

through war in *Bank of New York Mellon*, and [] [we]re extremely well-versed in the

issues." Chiplock 6/16/17 Dep., pp. 109:20-25; 117:16-25.  [EX. 10].  These staff

attorneys not only performed sophisticated document review; they also prepared

substantive memoranda on subject matters and potential witnesses critical to development

of the legal theories. Chiplock 6/16/17 Dep. p. 32:12-20 [EX. 10]; Zaul 6/6/17 Dep., pp.

24:4 – 25:5 [EX. 59]; Alper 6/5/17 Dep., p. 17:14-16 [EX. 60]; Oh 6/6/17 Dep., p. 21:20-

25 [EX. 61]; *see also* TLF-SST-005245 – 5270 (Memorandum by Maritza Bolano).  [EX.

62].

## 2. __Staff Attorney Cost-Sharing Agreement__

Because Thornton did not have staff attorneys of its own, or the facilities to hire and house new attorneys solely to work on the *State Street* document review, Labaton, Lieff, and Thornton entered into an agreement to "allocate" the costs of certain staff attorneys employed by and working at Labaton and Lieff's offices to Thornton. At times, this was referred to as the "10/10/10 agreement[24] -- designating an equal number of SAs to each firm. The purpose of the cost-sharing agreement was to share the cost and risk burdens of the litigation among the three Customer Class firms. Chiplock 6/16/17 Dep., pp. 127:23 – 128:5; 131:23 – 133:15 [EX. 10]; Belfi 6/14/17 Dep, pp. 51:8 – 53:12. [25] [EX. 17]. While the exact number of staff attorneys fluctuated over the course of the agreement, Thornton, in essence, agreed to pay Labaton and Lieff for five staff attorneys each. G. Bradley 6/19/17 Dep., p. 43:10-13. [EX. 43]. Thornton did not meet, interview, select, house, or supervise the staff attorneys allocated by Labaton or Lieff. *See* Hoffman 6/5/17 Dep., pp. 62:21, 63:7-17, 64:6-9, 65:3-6 [EX. 63]; *see also* Chiplock 6/16/17 Dep., pp. 134:17 – 135:19. [EX. 10]. Nor did it matter to Thornton which staff attorneys it paid for. *See* G. Bradley 6/19/17 Dep., p. 43:10-13. [EX. 43]. Pursuant to

---

[24] The concept of the "10/10/10 agreement" was introduced at the beginning of the Special Master's discovery, and while not all Customer Class Counsel were familiar with that exact terminology, they affirmed that the purpose of the cost-sharing agreements between Labaton and Thornton and between Lieff and Thornton, was to allocate costs and risks equally among all firms. This was accomplished by Labaton and Lieff each assigning approximately five staff attorneys to Thornton, so that each firm would bear the cost of ten staff attorneys. *See* G. Bradley 6/19/17 Dep., p. 42:5-13 [EX. 43]; Chiplock 6/16/17 Dep., p. 133:12-15. [EX. 10].

[25] Allocating the staff attorneys was not only a means for Thornton to equalize the costs and burdens, but was also, as Garrett Bradley of Thornton admitted, "the best way to jack up the load star [sic]…the best way for us [Thornton] to increase our load star [sic] and make it comparable to the other two firms… I was absolutely concerned about Thornton's load star [sic] vis-à-vis the other two firms." G. Bradley 6/19/17 Dep. p. 67:4-13 [EX. 43]; TLF-011124 - 11126. [EX. 64].

this cost-sharing arrangement, Labaton and Lieff internally designated certain staff attorneys to Thornton, and then billed Thornton periodically for the out-of-pocket cost of the staff attorneys and, in Lieff's case, for the contract attorneys "allocated" to Thornton, as well. *Id.*; *see also* Hoffman 6/5/17 Dep., p. 63:2-7. [EX. 63].

Thornton's collection of staff attorney hours was conducted piecemeal, coordinated largely by Evan Hoffman, then an associate and the most junior member of the Thornton team, with the assistance of firm administrative staff, rather than directly between the attorneys privy to the details of the staff attorney cost-sharing agreement: Garrett Bradley for Thornton, Belfi and Rogers at Labaton, and Chiplock at Lieff Cabraser. On the Lieff side, Lieff's accounting department prepared and forwarded invoices for staff attorneys employed by Lieff to Hoffman and Thornton's business administrator on a regular basis; Hoffman collected the names and hours for the case. Lieff Response to Interrogatory No. 38 [EX. 57]; Hoffman 6/5/17 Dep., pp. 57: 11–18; 61: 21-62:5. [EX. 63]. He also kept track of the contract attorneys housed at Lieff but employed by a staffing agency. For those individuals, the staffing agency invoiced Thornton directly for the work performed. Hoffman 6/5/17 Dep., p. 62: 6-9. [EX. 63].

Hoffman was also charged with tracking staff attorneys working at Labaton. At Labaton, the firm's accounting office prepared and forwarded monthly invoices reporting the hours performed by the firm's staff attorneys designated to Thornton to Garrett Bradley's attention, also copying Thornton administrators. Labaton Response to Special Master's First Set of Interrogatories, No. 37 [EX. 249]; *see* LBS003775 - 3776 (4/9/15 Ng Email to G. Bradley attaching April 2015 Invoice). [EX. 65].

Thornton further tracked the hours performed by Michael Bradley, the brother of Thornton managing partner Garrett Bradley, who worked for neither a firm nor a staffing agency but was hired by Thornton to perform document review in the case. Michael Bradley reported his hours to Hoffman by email on a weekly or biweekly basis. Hoffman 6/5/17 Dep., pp. 107: 24-108:7.  [EX. 63].

At the time Labaton and Lieff agreed to this arrangement, both firms were concerned primarily with spreading the costs -- and risks -- of the litigation; neither firm focused on what information would be reported in a potential fee petition. Belfi 6/14/17 Dep., p. 53:10-12.  [EX. 17].  Nevertheless, Thornton later listed all of the staff attorneys allocated to it under the cost-sharing agreement in its lodestar fee petition, accounting for 71.5% of all Thornton hours reported.  *See* Dkt. # 104-16.[26]  [EX. 66].  No explicit agreement to allow Thornton to claim the Labaton and Lieff staff attorneys on Thornton's lodestar has been disclosed during the Special Master's investigation.[27]

---

[26] Thornton also claimed 406.4 hours of staff attorney time for Michael Bradley, who was not affiliated with the firm but performed document review on a contingent basis during the *State Street* case. M. Bradley 6/19/17 Dep., pp. 28:20-23; 70:13-15.  [EX. 67].  Bradley worked from his own office and performed document review in his free time; he was not supervised by Labaton or Lieff lawyers. M. Bradley 6/19/17 Dep., pp. 49:7-16; 52:3-18, 54:15 – 55:3.  [EX. 67].  Unlike the Labaton and Lieff staff attorneys, Bradley did not prepare any memoranda. *Id*, at p. 46:21-23.  The record reveals no written work product created by Michael Bradley.

Bradley worked on a contingent basis; he would only be paid if the class recovered a settlement entitling counsel to fees. M. Bradley 6/19/17 Dep., p. 70:13-15.  [EX. 67].  After the Court approved the request for attorneys' fees, Bradley received a payment of $203,200, equal to the numbers reported at $500 per hour.  *Id.*, p. 70:18-23.

[27] Some of the attorneys from Labaton, Lieff, and Thornton, however, independently made assumptions based on the circumstances that Thornton would claim those staff attorneys' time on its lodestar.  *See e.g.*, G. Bradley 6/19/17 Dep., p. 48:1-5 ("We just assumed -- I just assumed where the local counsel were on the papers, we're litigating the case, we're putting the fee up, why wouldn't we put the people up that we were paying for?") [EX. 43]; Chiplock 6/16/17 Dep., p. 136:10-19 ("I would say it was completely understood by me when I talked with Garrett that that would be how it worked, because it was obvious to me that if you pay for the work that is being done, then, just as with any other employee when you're paying them, that you include their hours in your lodestar when you report it at the end of the day.") [EX. 10]; Rogers 6/16/17 Dep., pp. 91:18 – 92:16 ("I certainly assumed [Thornton] would [claim the SA time on their fee petition] . . . They were paying for it up-front, I assume they wanted to get paid on the back end.") [EX. 54]; Hoffman 6/5/17 Dep., p. 58:12-16 ("My understanding was that for attorneys who

45

## F.  ERISA FEE ALLOCATION

While the hybrid mediation-discovery process was ongoing in mid-2013,

Customer Class Counsel and ERISA Counsel negotiated among themselves an agreement

for the allocation of attorneys' fees between the two groups.  Sarko 7/6/17 Dep. p. 57:18-

23.  [EX. 28].  That agreement -- to allocate 9% of the total fee awarded (if successful) to

ERISA Counsel -- was based largely on the premise that the total ERISA case volume

comprised five to nine percent of the total FX trading volume.  Sarko 7/6/17 Dep., pp.

26:15-16 [EX. 28]; 59:14-22; Kravitz 7/6/17 Dep., p. 50:10-16.  [EX. 21].

At the time of negotiations -- and more so at the end of the case -- ERISA Counsel

did not view 9% as commensurate with the ERISA trading volume (which it was later

learned was actually about 12-15% of the total trading volume) or the value they added to

the *State Street* case. Sarko 7/6/17 Dep., p. 64:3-11 [EX. 28]; Kravitz 7/6/17 Dep., p.

54:7-11.[28]  [EX. 21].  Nonetheless, rather than create friction with Customer Class

Counsel over fees,[29] Lynn Sarko, often a liaison between ERISA and Customer Class

Counsel, advocated for, and all other ERISA Counsel ultimately agreed to make, a

"practical decision" to accept 9% of the fee total. *See* Sarko 7/6/17 Dep., p. 59:18-25.

---

Thornton was financially responsible for, they would be included on whatever the ultimate fee petition that Thornton would submit.") [EX. 63]; *see also* TLF-SST-011206 (6/29/15 email from Mike Lesser of Thornton to Dan Chiplock of Lieff) [EX. 68]; LCHB-0048939-48940 (3/9/15 Chiplock email regarding Lieff staffing to K. Dugar and N. Diamond: "[R]emember that whoever we choose Thornton is paying for them via the same arrangement we have for Jon Zaul and Chris Jordan.")  [EX. 69].

[28] During oral argument, counsel for Labaton indicated that the trading volume for the ERISA funds was in a range of 9% to 10%.  However, the record evidence on this point is incomplete.

[29] As noted above, from the beginning of the mediation, there was already fair degree of tension between and among Customer Class Counsel and ERISA Counsel.

[EX. 28].  The decision was intended to serve the dual goals of "mak[ing] the pie bigger" for the class members and promoting cooperation and teamwork across all counsel. Sarko 7/6/17 Dep., p. 59:18-25 [EX. 28]; *see also* Kravitz 7/6/17 Dep., p. 61:18-24.  [EX. 21].

From August to December 2013, Customer Class Counsel and ERISA Counsel exchanged drafts in an attempt to memorialize their agreement to respectively share the fee award 91/9.  *See* KR00000006 – 09 (8/30/13 Sarko email to Lieff (proposing draft agreement to capture the 91/9% split)) [EX. 70]; KR00000010 – 18 (9/11/13 Chiplock email to Sarko and Gerber (circulating redlined edits to proposed agreement)).[30]  [EX. 71].  Early drafts of the fee allocation agreement included a provision nullifying the 91/9 allocation if the *ATRS* case, the *Andover* case, or the *Henriquez* case resulted in no recovery; that provision was later struck.  *See* KR00000024 – 28 (8/30/13 Draft, Fee Allocation Agreement).  [EX. 73].  Also removed was a provision stating that counsel's division of fees was "consistent with the relative volume of FX trading by ERISA and non-ERISA plans as reflected in the data produced by State Street and the prospects of recovery on the various claims alleged, and is therefore reasonable and appropriate." *Id*.

Four months later, on December 11, 2013, Counsel finally memorialized their 91/9 understanding in writing.  Sarko 7/6/17 Dep.*,* p. 60:4-14 [EX. 28]; s*ee also* KR00000045

---

[30] While there were several iterations of the agreement, each draft alluded to the fact that the *ATRS* Complaint filed by Customer Class Counsel was brought on behalf of "all institutional investors in foreign securities, including public and private pension funds, *ERISA-qualified plans*, mutual funds, endowment funds and investment manager funds, for which State Street served as the custodial bank" (emphasis added). *See* KR00000003 – 05 (8/29/13 Draft, "Agreement Between Counsel for Consumer and ERISA Plaintiffs Regarding Division of Attorneys' Fees" (the "Fee Allocation Agreement").  [EX. 72].

– 50 (Final Fee Allocation Agreement) [EX. 74]; Settlement Agreement, Dkt. # 89, ¶ 21

[EX. 75]; McTigue, 7/7/17 Dep., pp. 44:23 – 46:18 [EX. 11]; Thornton 6/19/17 Dep., p.

57:12-16.  [EX. 2].  As part of that written agreement, ERISA Counsel and Customer

Class Counsel represented that they had "disclosed and explained this Agreement to their

respective clients and that their clients have consented to the Division of Fees and other

terms herein." *See* Fee Allocation Agreement at ¶ 5.  [EX. 72].

Although the terms of that agreement allocated just 9% to ERISA Counsel, that

percentage was increased to 10%, at the suggestion of Customer Class Counsel, as

counsel finalized the jointly filed Fee Petition.  Thornton 6/19/17 Dep., pp. 57:17 – 58:1

[EX. 2]; Sarko 7/6/17 Dep., p. 60:15-17, 60:24-61:12 [EX. 28]; Kravitz 7/6/17 Dep., p.

59:17-19.  [EX. 21].  While the Fee Allocation Agreement itself was not amended to

reflect the change, the 10% increase was memorialized in an email circulated by Nicole

Zeiss, Settlement Counsel for Labaton, confirming the itemization of fees and expenses

for both ERISA and Customer Class attorneys. *See* ZS000027 – 28 (11/23/16 Sarko email

to Kravitz ("I spoke with Labaton folks yesterday.  They didn't want to put it in the

formal letter but agreed to send us an email putting the numbers in and confirming the 10

percent."). [EX. 76].  ERISA Counsel welcomed the increase in percentage.  *See*

ZS000029 – 30 (11/23/16 Kravitz email to McTigue).  [EX. 77]

## G. SETTLEMENT AND NOTICE TO THE CLASS

### 1. Involvement of Government Agencies

The hybrid mediation spanned a period of two-and-a-half years. During that time,

discovery proceeded but settlement discussions were ongoing.  In addition to State Street

and Plaintiffs' counsel, three government agencies -- the DOL, the Securities and

Exchange Commission ("SEC"), and the Department of Justice ("DOJ") -- were involved

in, and integral to, the negotiations. Each agency independently investigated State

Street's alleged misconduct, and each agency reached its own settlement with State Street

in furtherance of its respective enforcement goals. *See* Dkt. # 104, ¶¶ 8, 38 [EX. 3]; *see*

*also* Sarko 7/6/17 Dep., p. 41:9-14 [EX. 28]; Kravitz 7/6/17 Dep., pp. 56:25 – 57:4.  [EX.

21]. In particular, the DOL -- charged with overseeing administration of the ERISA

statute -- paid particular attention to the settlement of the claims of the ERISA plan

participants, ensuring that the settlement recovery amount was adequate and

commensurate with the agency's own evaluation of the case.  Sarko 7/6/17 Dep., p. 79:6-

15.  [EX. 28].  Sarko was the lawyer principally responsible for negotiating with the

DOL. State Street, in turn, made it very clear that a global settlement with all private

class members and all government agencies was a necessary condition to its willingness

to reach a settlement. Sarko 7/6/17 Dep., pp. 36:24 – 37:11; *see also* 11/2/16 Hearing Tr.,

p. 17:8-23.  [EX. 78].

### 2.  Preparation and Filing of Settlement Documents

After a multi-year discovery, mediation and negotiation, on June 30, 2015, the

parties reached an agreement-in-principle to settle the consolidated class actions for $300

million.  Sucharow Decl., ¶ 101.  [EX. 3].  The terms of a final Term Sheet were

negotiated and signed on September 11, 2015.  Sucharow Decl., ¶ 104.  [EX. 3].  *See*

*also*, Zeiss 6/14/17 Dep., p. 13:10-22.  [EX. 79].

Over the ensuing months, Labaton, as Lead Settlement Counsel, assumed responsibility for preparing the formal settlement documentation. Zeiss had primary responsibility for drafting the settlement documents, including the Settlement Agreement and exhibits thereto, the Preliminary Approval (motion, brief, and proposed order), the Plan of Allocation, the judgment, and the long-form Notice of Pendency of Class Action and Summary Notice ("Notice").[31] Zeiss 6/14/17 Dep., pp. 13:10-22, 15:5-6.[32] [EX. 79]. Draft versions of the Notice were circulated among, and reviewed by, Customer Class Counsel and ERISA Counsel.[33] Zeiss also prepared the Omnibus Declaration and Brief in support of Lead Counsel's Motion for Attorneys' Fees and Expenses, and for payment of service awards. *Id.*, p. 16:2-6.

The Settlement and Fee Petition documents made clear that Labaton was representing both the Customer Class members and the ERISA Class members with respect to the settlement of the case. These documents, and in particular the Notice, all of which Labaton authored in whole or in part, were triple-captioned; bear the case names and numbers of all three class actions, including the ERISA actions; and provide notice to

---

[31] These documents and related filings submitted as part of the final approval process are referred to herein as "settlement" and "fee petition" documents, respectively.

[32] Rather than have a litigation team member handle settlement, Labaton has delegated that part of its practice to a specialized attorney (Zeiss), and in that compartmentalization, it created a separate "settlement counsel" position with responsibility for negotiating and documenting all issues related to memorializing and finalizing settlements. Zeiss 6/14/17 Dep., p. 10:24 – 11:12 [EX. 79]; Keller 10/13/17 Dep., p. 79:18-20. [EX. 80]. With respect to the *State Street* case, this compartmentalization contributed to some of the problems giving rise to the Special Master's investigation, in particular the failure to discover the "double-counting" of staff attorneys allocated to Thornton and the failure to disclose to the Court Labaton's fee arrangement with Texas attorney, Damon Chargois. These matters are discussed *infra.*

[33] In March 2017, at the request of the Special Master, the Customer Class and ERISA firms each produced a complete record of time entries performed in the *State Street* matter. These time records indicate that Customer Class Counsel reviewed the Notice and other settlement documents circulated by Zeiss.

members of the "Settlement Class" that a Class Settlement of $300 million has been

entered into "by and among (i) plaintiffs Arkansas Teacher Retirement System

("ARTRS"), Arnold Henriquez, Michael T. Cohn, William R. Taylor, Richard A.

Sutherland, The Andover Companies Employees Savings and Profit Sharing Plan and

James Pehoushek-Stangeland (collectively "Plaintiffs"), on behalf of themselves and each

Settlement Class Member, by and through their counsel, and (ii) State Street Bank and

Trust Company (the "Settling Defendant" or "SSBT")." *See* Notice, MAD No. 11-cv-

10230, Dkt. # 95-3, filed on August 10, 2016. [EX. 81]. The Notice further defines the

"Settlement Class" as

> All custody and trust customers of SSBT (including customers for which SSBT
> served as directed trustee, ERISA Plans, and Group Trusts), reflected in SSBT's
> records as having a United States tax address at any time during the period from
> January 2, 1998 through December 31, 2009, inclusive, and that executed one or
> more Indirect FX Transactions with SSBT and/or its subcustodians during the
> period from January 21, 1998 through December 31, 2009, inclusive.

*Id.*

## H. FEE PETITION REQUESTING ATTORNEYS' FEES AND EXPENSES

### 1. Fee Negotiations Among Customer Class Counsel

At the inception of the case, Customer Class Counsel had agreed to a fee-sharing

arrangement pursuant to which Labaton, Lieff, and Thornton would each be entitled to

20% of any fee award, with the remaining 40% to be distributed at the end of the

litigation, commensurate with each firm's contributions to the case. *See* TLF-SST-

033911 – 33913 (5/4/11 letter agreement, p. 2) [EX. 82]; Keller 10/25/17 Dep., pp.

414:14 – 420:10. [EX. 83]. *See also*, TLF-SST-040631 (8/28/15 email exchange

among Larry Sucharow, Dan Chiplock, Garrett Bradley, M. Thornton, and Bob Lieff

regarding the 20-20-20/40 agreement). [EX. 84].

Around the time the parties reached an agreement-in-principle, Customer Class

Counsel engaged in discussions about how to allocate the anticipated fee award among

themselves. It is apparent from these discussions that with regard to balancing fees, Lieff

and Thornton considered their respective roles in the *BONY Mellon* litigation, a fact

wholly unrelated to the value added in this case. Dan Chiplock conceded at deposition,

as did Garrett Bradley, that the *State Street* and *BONY Mellon* fee discussions became

intertwined. Chiplock 9/8/17 Dep., pp. 22:7 – 23:13 [EX. 41]; Garrett Bradley 9/14/17

Dep., pp. 114:23 – 125:16. [EX. 85]. Contemporaneous emails, discussed *infra*, also

reflect the intertwining of the fee negotiations in the two cases.

In August 2015, Dan Chiplock expressed an interest in determining the

appropriate allocation of the remaining 40% of the anticipated fee award. *Id.* Garrett

Bradley of Thornton resisted, opining that the final distribution should wait until the

Court made a total fee award. *Id.*[34]  What became apparent to Chiplock was that

Thornton viewed any allocation of *State Street* fees as tied to the as yet undecided *BONY*

*Mellon* fee award. *Id.*[35]  ("Not to be difficult but [this is a] very different situation, in

other words, from BNYM, (which I know doesn't involve you Larry, but seems to be

coloring this discussion.") *See also* TLF-SST-053087 (8/28/15 email from Sucharow to

---

[34] By this time, Bradley was also serving as "of counsel" for Labaton. The potential significance of this is discussed *infra*.

[35] The settlement in *BONY Mellon* would be finalized the following month, September 2015.

Chiplock ("I believe there are other cases and other agreements which are influencing

people's desire to either reach agreement now or later.")).  [EX. 86].

Garrett Bradley pressed for an agreement that Lieff share some portion of its

allotment in *BONY Mellon* with Thornton in recognition of the fact that Thornton had

developed the initial FX concept, and refused to settle on an allocation in *State Street*

until he saw that Thornton was treated "fairly" in *BONY Mellon.*  Chiplock 9/8/17 Dep.

pp. 22:8 – 23:13 [EX. 41]; TLF-SST-031166 - 31173 (G. Bradley 8/28/15 email to Bob

Lieff ("…I have not agreed that it would be equitable to split the balance of the forty

percent the way you described below. What I have said is that may be a fair approach

depending on the outcome of our fee in the Mellon matter. If we are treated fairly there,

then we will do all we can to treat you fairly in the state street matter…) [EX. 87]; *see*

*also* 8/28/15 email from Bradley to Chiplock of the same date, *id.* ("What I am pointing

out is the inequities of our different positions. In Mellon… when we had created that case

by developing the fx case *all that we got was some work that resulted in $1.5 million in*

*time*…  Now contrast that to state street where you had no client and no concept… Once

we have an idea of what our Mellon number looks like then we can discuss how to

approach the balance of the 40% with Labaton.") (emphasis added).

Dan Chiplock, the lead attorney in *BONY Mellon*, took exception to the

implication that Lieff was not treating Thornton fairly in that case.  He pushed back,

reminding Bradley in an email two days later that Lieff's role in creating the result in

*BONY Mellon* "doubled the value of State Street."  *Id.*  (8/30/15 email from Chiplock to

Bradley). He further reminded Bradley, "I also gave your firm more assignments than

53

others at the outset in BNYM until it became clear that the work simply wasn't getting

done." *Id.* Bradley asked what Chiplock meant when he said Thornton did not "get the

work done." *Id.* "That has never been specified and really should [not] be to be deemed

credible." *Id.* Chiplock agreed to provide Bradley with emails showing the assignments

given to Thornton. *Id.*

The discussion turned to lodestar reporting in *State Street*, with Chiplock warning

Bradley not to include unwarranted hours in Thornton's fee petition:

> In the meantime, while we're on the subject of credibility, I want to point
> out that we need to be consistent and credible with our lodestar reporting in State
> Street. We are gathering final lodestar reports now, but I heard third-hand that
> Mike [Thornton] recently said on a call (that I wasn't on) that Thornton Law Firm
> was showing $14 million. That number does not comport with the hours Mike
> Lesser told me for Thornton as of June 29 (around 12,750), which makes more
> sense given what we know about the work that was done. I am hopeful that Mike
> T simply misspoke or was guessing when he said $14 million and that we are not
> going to suddenly see an additional 12,000 hours mysteriously appear on Thornton
> Law Firm's behalf … Also recognize that your [document] reviewers were all
> housed outside your firm and their respective overhead and facilities expenses
> were paid for by others, which we were happy to do as a courtesy. Thanks.

*Id.*

### 2. **Submission of the Fee Petition**

Customer Class Counsel's discussions about fee-sharing were put on hold as *State*

*Street* settlement negotiations wrapped up, and in advance of the hearing on final

approval of the settlement, Labaton, as Lead Settlement Counsel, prepared a motion for

attorneys' fees and expenses and for payment of service awards (the "Fee Petition").

Nicole Zeiss, Labaton's Settlement Counsel, was tasked with that responsibility. Zeiss

6/14/17 Dep., pp. 15:18-25 – 16:1-18. [EX. 79]. The Fee Petition consisted of the

Omnibus Declaration[36] and Brief and nine individual declarations submitted by each law firm that had filed an appearance in the case.[37]  Labaton posted the Omnibus Declaration, complete with exhibits, to the settlement website making relevant case information available to the class members.[38]  The individual declarations described the work performed by each firm and the basis for its fee request.  Attached to each declaration was a chart ("Exhibit A") summarizing each firm's respective lodestar through August 30, 2016.  *See* Exhibit A to Dkt. # 104-15 [EX. 88], 104-16 [EX. 66], 104-17 [EX. 89], 104-18 [EX. 90], 104-19 [EX. 91], 104-20 [EX. 92], 104-21 [EX. 93], 104-22 [EX. 94], 104-23.  [EX. 95].  In most instances, the narrative descriptions and chart outlines were taken verbatim from a template provided by Labaton.  *See* Zeiss 6/14/17 Dep., pp. 16:10-16; 21-24.  [EX. 79].  Zeiss drafted the template for the small fee declarations, circulated it to the other firms, and worked with them on completing their declarations and exhibits. *Id*., pp. 16:14-16, 20:18-19.  Zeiss explained her role:

> . . . I sent out the template to all the firms, and asked them to complete the templates and send me drafts.
>
> Eventually everybody sent me a draft back, and I -- in general I reviewed each of them. There was kind of a -- each one had an individual,

---

[36] "Declaration of Lawrence A. Sucharow in Support of (A) Plaintiffs' Assented-To Motion for Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and (B) Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs."  Dkt. # 104.  [EX. 3].

[37] The Omnibus Fee Petition listed ten firms, each of which submitted a lodestar calculation identifying the names and rates of individual attorneys and staff at their respective firms. *See* Labaton Sucharow (Dkt. # 104-15) [EX. 88]; the Thornton Law Firm (Dkt. # 104-16) [EX. 66]; Lieff Cabraser Heimann and Bernstein (Dkt. # 104-17) [EX. 89]; Keller Rohrback, LLC (Dkt. # 104-18) [EX. 90]; Hutchings, Barsamiam Mandelcorn, LLP (Dkt. # 104-18) [EX. 90]; the McTigue Law Firm (Dkt. # 104-19) [EX. 91]; Zuckerman Spaeder, LLP (Dkt. # 104-20) [EX. 92]; Feinberg, Campbell & Zack, P.C. (Dkt. # 104-21) [EX. 93]; Beins, Axelrod, P.C. (Dkt. #104-22) [EX. 94]; and Richardson, Patrick, Westbrook, and Brickman, LLC (Dkt. # 104-23) [EX. 95].

[38] Available at http://www.labaton.com/en/cases/State-Street-Corp.cfm (Last visited on April 17, 2018).

more detail than usual, narrative of what each firm's role was, which we wanted here because there were so many different firms in different roles.

So I reviewed that, and asked David, I believe -- Goldsmith -- to make sure that comported with his recollection of what everybody did.
I reviewed the lodestar exhibits for form, to make sure everybody was reporting . . . all the information we needed.

So sometimes firms forget to put in hourly rates, sometimes the formatting is, you know, off, and hard for somebody to follow.

So reviewing for form to make sure all the information was actually there, that's really all I can do because I don't have people's time records.

It's not the practice to exchange time records, but, you know, sometimes if there's a timekeeper that says, you know, .2 hours, we just have sort of a practice where we like to cut that, so I might ask, you know, "Can you just report timekeepers with five hours?"

So that's pretty much what I do on the lodestar tables. . . .

\*\*\*

**[However, i]t wasn't my practice to put them next to each other and compare them**. . . .[39]

*Id*., pp. 21:4 – 23:9 (emphasis added).

Nicole Zeiss was not aware of the staff attorney allocation agreement between Labaton, Lieff, and Thornton.  Zeiss 6/14/17 Dep. p. 80:21-24.  [EX. 79].  Her involvement in the *State Street* case was "strictly as settlement counsel." *Id*., p. 79:5-9.

As Zeiss testified, Labaton has taken the negotiating of settlements out of the hands of the litigators, *id.*,  p. 10:24 – 11:17, resulting in one group of attorneys working on a case not knowing what other attorneys working on the same case were doing.  This is an example of the compartmentalization of work Labaton practices, which that contributed greatly to the problems experienced in this case.

---

[39] The failure to perform a side-by-side comparison of the lodestar reports of the three Customer Class firms contributed to the failure to catch and correct the double-counting errors as to the staff attorneys, discussed *infra*.

The Labaton template included several paragraphs describing the source of the lodestar calculations and billing rates. In particular, it included a generic description of the basis for the hourly rates listed in the lodestar calculation. With the exception of three ERISA firms -- McTigue Law,[40] Zuckerman Spaeder,[41] and Beins Axelrod[42] -- the Customer Class Counsel and the other ERISA Class Counsel adopted the template language in its entirety. Specifically, Labaton provided counsel with the following language:

- "The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by each attorney and professional support staff member of my firm who was involved in the prosecution of the Class Actions, and the lodestar calculation based on my firm's current billing rates. For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court. Time expended in preparing this application for fees and payment of expenses has not been included in this request." (Dkt. # 104-15, ¶ 6 [EX. 88]; 104-16, ¶ 3 [EX. 66]; 104-17, ¶ 4 [EX. 89]; 104-18, ¶ 3 [EX. 90]; 104-21, ¶ 3 [EX. 93]; 104-23, ¶ 3) [EX. 95].)

---

[40] The McTigue Law Firm's individual fee declaration states that "[t]he hourly rates for the attorneys and professional support staff in my Firm included in Exhibit A are the same as my Firm's regular rates otherwise charged for their services, which have been accepted in other complex class actions my firm has been involved in." Dkt. #104-18, ¶ 20. [EX. 90].

[41] Zuckerman Spaeder's individual fee declaration states that "[t]he hourly rates for the attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions and are charged to clients paying us currently by the hour." Dkt. #104-20, ¶ 4. [EX. 92].

[42] Beins Axelrod's individual fee declaration states that "[t]he hourly rates charged by the Timekeepers are the Firm's regular rates for contingent cases and those generally charged to clients for their services in non-contingent/hourly matters. Based on my knowledge and experience, these rates are also within the range of rates normally and customarily charged in Washington, D.C. by attorneys of similar qualifications and experience in cases similar to this litigation, and have been approved in connection with other class action settlements. The Firm has charged, and received, an hourly rate of $525.00 in litigation involving fiduciary breach by a former trustee and service providers. The Firm does charge a lower rate to longstanding Fund clients in non-contingency matters and to its Union clients. To serve the public interest, the Firm has also charged reduced rates to individual employees with employment discrimination claims. Dkt. # 104-22, ¶ 8. [EX. 94].

- The hourly rates for the attorneys and professional support staff in my firm [] are the same as my firm's regular rates charged for their service, which have been accepted in other complex class actions." **(**Dkt. # 104-15, ¶ 7 [EX. 88]; 104-16, ¶ 4 [EX. 66]; 104-17, ¶ 5 [EX. 89]; 104-18, ¶ 4 [EX. 90]; 104-21, ¶ 4 [EX. 93]; 104-23, ¶ 4) [EX. 95].)

While, as noted, several of the firms changed the template language in their declarations in support of their own small fee petitions,[43] Garrett Bradley did not do so in his sworn Declaration in support of Thornton's fee petition. Rather, Bradley's Declaration included the following statements:

- Exhibit A is a summary of time spent by attorneys and professional support staff members "of my firm."

- The billing rates for the SAs are "based on my firm's current billing rates."

- For personnel "who are no longer employed," the lodestar is based on their rates for the "final year of employment."

- The hourly rates "are the same as my firm's regular rates charged for their services." [44]

- These rates "have been accepted in other complex class actions."

*See* Declaration of Garrett J. Bradley, Esq. on Behalf of Thornton Law Firm, LLP, Dkt. # 104-16. [EX. 66].

All of these statements are factually untrue and have no support in the record.[45]

---

[43] *See* discussion, *supra.*

[44] As to both Thornton and Labaton, the use of the word "charged" in stating that the hourly rates shown for the firm's employees "are the same as *my firm's regular rates charged* for their services" is something of a misnomer and could readily cause confusion as neither Thornton nor Labaton has hourly clients. For these firms, it would be more accurate to simply say that these are "rates previously used in fee petitions that have been approved by the courts."

[45] *See* discussion *infra* in Part III.

In addition to the above statements, the statement in Bradley's Declaration that the schedule was prepared from "contemporaneous daily time records regularly prepared and maintained by my firm," as to Garrett Bradley and Michael Thornton, raises troublesome issues. Materials produced to the Special Master raise questions about contemporaneous record keeping.[46] Additionally, daily time records of many of the staff attorneys on Thornton's lodestar schedule were not kept by Thornton. Rather, they were kept by Labaton and Lieff.

Bradley testified in his deposition that he did not read his declaration closely before signing it; rather, using Labaton's model fee-declaration template, Mike Lesser of his firm, with the assistance of Evan Hoffman, drafted his Declaration and brought him the final version, which he signed. *See* G. Bradley 6/19/17 Dep., pp. 83:17 – 84:24. [EX. 43]. However, testimony shows that Bradley had ample opportunity to give the declaration the "close read" that was required. Evan Hoffman testified that using the template supplied by Labaton, the firm "put in all the hours that we had kept track of, I along with our accounting department and [Thornton Office Manager] Anasthasia put in the expenses and then mostly Mike Lesser and then Garrett Bradley, Mike Thornton and myself all reviewed" the declaration before Bradley signed it. Hoffman 6/5/17 Dep., p. 94:9-15. [EX. 63].

At the March 7, 2017 hearing, Garrett Bradley acknowledged the inaccuracy of the information in his Declaration, characterizing the information as "unclear" and admitting

---

[46] The Special Master, however, is unable to conclude that this statement is untrue.

59

that it "should have been clarified me at the time" it was prepared, but "it was not." 3/7/17 Hearing Tr., p. 88:14-19 [EX. 96]; *see* also p. 91:4-6. At numerous times during the March 7 hearing, Bradley acknowledged that he knew his Declaration contained inaccurate information but he signed it anyway. *See e.g.*, 3/7/17 Hearing Tr., p. 87:13-14; 88:2-9; 14-18; 91:5-7; 92:3-8.[47] [EX. 96].

The factual misrepresentations of Garrett Bradley in his sworn Declaration contributed to the double-counting in the fee petitions. Had Bradley accurately and fully described the true status of the Labaton and Lieff staff attorneys, it is probable that a diligent attorney such as Nicole Zeiss would have been alerted to the discrepancy and would likely have caught the double-counting in the three Customer Class declarations. Beyond this, truthful and accurate statements may also have alerted the Court in its review that something was amiss, because the practice of a law firm putting a different law firm's attorneys on its lodestar petition would have been highly unusual, and the Court may well have made detailed inquiries that would have led to the discovery of the double-counting. Because Bradley's Declaration statements were wholly misleading, no one was alerted to the possibility of irregularities.

---

[47] Although Bradley acknowledged that he "should have clarified" the information in his Declaration, he failed to do so at any time in the four months after the Declaration was filed on September 15, 2016 -- until called to task by the Court on March 7, 2017. In those intervening four months, Bradley could have taken the opportunity to "clarify" his Declaration at the Final Approval hearing which he attended on November 2, 2016. He could have done so immediately after the *Boston Globe*'s inquiry (discussed *infra*); he could have done so in the November 10, 2016 letter to the Court, which he was involved in drafting; he could have done so after the *Globe* article was published on December 17, 2016 or after receiving the Court's February 6, 2017 Order directing counsel to show cause why a Special Master should not be appointed to investigate the accuracy of their lodestar petitions. Bradley took no advantage of any of these opportunities to "clarify" his Declaration and never did so until called upon to do so by the Court on March 7, 2017.

The Omnibus Declaration and Fee Petition, along with all of the small fee declarations and lodestar report exhibits, were filed with the Court together with the parties' Assented to Motion for Final Settlement Approval on September 15, 2016.  *See* Dkt. # 104.  [EX. 3].

As represented in the Omnibus Declaration and the small fee declarations, Class Counsel sought an award of fees to compensate them for the work they did during the more than six years of investigation, litigation and mediation of this action, which, collectively, included:

- Factual investigation, including researching and reconstructing FX price movements for major currencies for institutional customers of State Street;
- Researching and drafting proposed class claims for inclusion in the Complaints;
- Researching and briefing responses to Defendants' motion to dismiss;
- Preparing for and attending Court hearings, including the hearing on Defendants' motion to dismiss;
- Preparing for and attending mediation sessions held in this Action;
- Participating in numerous phone calls between and among Plaintiffs' counsel, Defense counsel, government regulators, and State Street's counsel; in-person meetings between and among the same; and strategy sessions among Plaintiffs' counsel;
- Drafting discovery and information requests to State Street;
- Researching and arguing the merits of class certification in the context of mediation discussions;
- Analyzing State Street's recorded margins on indirect FX trades throughout the proposed class period, including total volumes attributable to registered investment companies ("RICs"), ERISA plans, and public pension plans;
- Reviewing and analyzing more than nine million pages of documents and data produced by State Street, in preparation for deposition discovery and trial;
- Negotiating terms of the global settlement;
- Drafting the term sheet and eventual settlement; and
- Briefing preliminary and final approval of the Settlement.

*See generally* Sucharow Decl., Dkt. # 104, ¶¶ 27 - 31, 89 - 100, 104 – 106 [EX. 3];

Chiplock Decl., Dkt. # 104-17, ¶ 3.  [EX. 89].

### 3.  The Lodestar Reports of Class Counsel

For their time, the eight law firms[48] representing the plaintiffs in this matter

collectively sought an award of fees in the total amount of $74,541,250.00.  In support of

this sum, the firms submitted lodestar reports reflecting the hours and lodestar of

partners, associates and staff attorneys[49] in the following amounts:

| FIRM[50] | PARTNERS | ASSOCIATES | STAFF ATTORNEYS |
|---|---|---|---|
| **LABATON** | 5,130.2 hrs. | 653.4 hrs. | 31,526.4 hrs. |
| | $4,417,753.50 | $367,162.50 | $11,684,111.00 |
| **LIEFF** | 1,996.3 hrs. | 28.8 hrs. | 17,066.1 hrs. |
| | $1,378,897.50 | $12,449.00 | $7,474,896.50 |
| **Thornton** | 3,864.8 hrs. | 328.3 hrs. | 10,537.9 hrs. |
| | $2,683,552.00 | $147,735.00 | $4,508,837.00 |
| **KELLER ROHRBACK** | 2,039.4 hrs. | 416.6 hrs. | |
| | $1,858,087.20 | $19,460.00 | |

[48] Excluding local counsel firms Hutchings Barsamian Mendelcorn LLP, and Feinberg, and Campbell & Zack, P.C, which each had total lodestar figures below $10,000.00.

[49] The hours for the staff attorneys include both attorneys employed directly by Labaton and Lieff and attorneys retained by the firms from staffing agencies (separately referred to herein as "contract attorneys").

[50] *See* Lodestar Reports at Dkt. # 104-15 – 104-23.  [EX. 88; EX. 95].

| | | | |
|---|---|---|---|
| **McTIGUE** | 3,624.18 hrs. | | |
| | $2,210,831.00 | | |
| **ZUCKERMAN** | 1,313.65 hrs. | | |
| | $1,155,383.50 | | |
| **RICHARDSON** | 245.2 hrs. | | |
| | $135,575.00 | | |
| **BEINS AXELROD** | 387.8 hrs. | | |
| | $187,712.00 | | |

The various lodestar reports of Plaintiffs' Counsel listed partners billing at hourly rates ranging from $535 to $1,000, and associates billing at hourly rates of $325 to $725: Labaton's report showed nine partners working on the case with billing rates of $800 - $925 an hour, and six associates with billing rates of $340 - $725 an hour. *See* Declaration of Lawrence Sucharow on Behalf of Labaton Sucharow LLP in Support of Motion for an Award of Attorneys' Fees and Payment of Expenses, Dkt. # 104-15, Ex. A. [EX. 88]. Lieff had ten partners with billing rates of $575 - $1,000 on the case, and two associates with billing rates of $425 and $435 an hour. *See* Declaration of Daniel P. Chiplock on Behalf of Lieff Cabraser Heimann & Bernstein, LLP in Support of Motion for an Award of Attorneys' Fees and Payment of Expenses, Dkt. # 104-17, Ex. A. [EX. 89]. Thornton's Lodestar report listed four partners at $535 - $850 an hour, and one associate at $450 an hour. *See* Declaration of Garrett J. Bradley, Esq. on Behalf of

Thornton Law Firm LLP in Support of Motion for an Award of Attorneys' Fees and

Payment of Expenses, Dkt. # 104-16, Ex. A. [EX. 66].

ERISA Counsel's range of hourly rates for partners and associates was similar:

Keller Rohrback's lodestar report listed fourteen partners with hourly billing rates

ranging from $550 to $925 and five associates with billing rates of $400 to $525 an hour.

*See* Declaration of Lynn Sarko, Dkt # 104-18, Ex. A.[51]  [EX. 90].  Zuckerman Spaeder

listed five partners billing at $650 to $990 an hour.  *See* Declaration of Carl Kravitz, Dkt.

#104-20, Ex. A.  [EX. 92].  McTigue's lodestar report listed seven attorneys (none

specifically designated as "partner" or "associate") with hourly billing rates of $325 to

$725. *See* Declaration of J. Brian McTigue, Dkt. # 104-19.  [EX. 91].  Richardson Patrick

showed three partners working on the case whose billing rates ranged from $500 to $800

an hour, *see* Declaration of Kimberly Keevers Palmer, Dkt. # 104-23, Ex. A [EX. 95],

and Beins Axelrod listed two attorneys billing at $455 and $525 an hour.  *See* Declaration

of Jonathan G. Axelrod, Dkt. # 104-22, Ex. A.  [EX. 94].

Customer Class Counsel's lodestar reports also included requests for fees for

"staff attorneys."  Labaton listed twenty-five staff attorneys:  three were billed at $410

per hour; four were billed at $390 per hour; one was billed at $375 per hour; seven were

billed at $360 per hour; and 10 were billed at $335 per hour.  Sucharow Decl., Dkt. #

---

[51] As noted, Keller Rohrback also retained a firm, Hutchings Barsamian Mendelcorn LLP, as local counsel, which appeared on Keller Rohrback's pleadings.  Keller Rohrback was advised by Nicole Zeiss not to have Hutchings Barsamian file a lodestar petition because the firm's lodestar was under $10,000. *See* KR00001192-98 (Zeiss 8/31/16 email to Keller Rohrback and other ERISA counsel.)  [EX. 97].  However, Keller Rohrback identifies the firm as its local counsel in its own fee petition. *See* Dkt. # 104-18, p. 4.  [EX. 90].

104-15, Ex. A.  [EX. 88].  Lieff's Report listed twenty staff attorneys, five of whom were

billed at $515 per hour, while fifteen were billed at $415 per hour.  Chiplock Decl., Dkt.

# 104-17, Ex. A.  [EX. 89].  Thornton listed twenty-four staff attorneys, twenty-three of

whom were billed at $425 per hour, while one -- Michael Bradley -- was billed at $500.

G. Bradley Decl., Dkt. # 104-16, Ex. A.[52]  [EX. 66].

### a.  Counsel's Billing Rate-Setting Practices

Labaton does not generally take on "billable" work; however, it does set uniform

attorney billing rates for use in all class action fee petitions.  Sucharow 6/14/17 Dep.,

47:17-18; 50:3-8.  [EX. 16].  As to how the rates for partners, associates, and staff

attorneys are determined, Ray Politano, Labaton's Chief Operating Officer, testified that

Labaton has a billing rates subcommittee comprised of three or four persons -- Politano

and two or three partners -- who meet annually and make billing rate recommendations

for the firm for the upcoming year.  *See* Politano 6/14/17 Dep., pp. 35:25 – 36:3.  [EX.

98].  Politano testified that before the subcommittee meets, he has a paralegal gather

billing rate information from a number of sources – Westlaw, Lexis, Law 360, fee

petitions that were filed in other cases, and bankruptcy filings – all publicly available

sources.  *Id.*, pp. 38:13 – 39:4.  Both plaintiff and defense firm rates are included.  *Id.*, p.

40:13-19.  In this process, Politano flags particular firms as competitors or

---

[52] Included among the staff attorneys in the lodestar reports of Lieff and Thornton were four "contract" attorneys hired by Lieff through one or more outside staffing agencies. Two of the contract attorneys, Ann Ten Eyck and Rachel Wintterle, were contracted by Lieff but "allocated" to Thornton, and Thornton paid the agency directly for the time of these two contract attorneys. Two other Lieff contract attorneys, Virginia Weiss and Andrew McClellan, were allocated only part of the time to Thornton, but Lieff paid the agency for the entire time these two attorneys worked on the *State Street* case. The billing rates for contract attorneys are discussed in greater detail, *infra*.

contemporaries that are most analogous to Labaton's practice.  *Id.*, p. 39:6-19.  On the plaintiffs' side, Politano said primarily firms that do class action work are identified.  *Id.*, 41:22-23.  Although occasionally he will look at an attorney's rates in another venue, the information provided to the subcommittee is principally information about New York firms' rates. *Id.*, p. 41:3-7.

Politano also provides the subcommittee members with the current billing rates of Labaton attorneys.  *Id.,* 37:14-16.  The subcommittee reviews and analyzes the Labaton attorney rates in light of the other information Politano has provided the members and then makes billing rate recommendations to the firm's Executive Committee. *Id.*

The Executive Committee reviews all the information again. *Id.*, 37:20-23.  Based upon the review and comments from the Executive Committee, changes are made or the billing rates as recommended by the subcommittee are approved.  *Id.,* 37:23-25.  Politano then informs accounting, the records department, and everyone else who would need to be informed of those new rates.  *Id.,*38:4-7.

Lieff has a similar process for setting attorney rates annually.  *See* Fineman 6/6/17 Dep., pp., 56:23 – 57:1.  [EX. 18].  Steve Fineman, Lieff's managing partner, explained the rate-setting procedure at his firm:

> [A]t the beginning of the year I get in touch with the director of our operations, Joe Dragicevic, and the communication with Joe will be what do you know about what's going on in the market, the billable rate market, and we'll talk about if there is [sic] any new surveys out, sometimes you get the surveys from American Lawyer, who does the survey that publishes all the big law firms, and we'll look at those.
> We'll look at whatever other publicly available surveys might be available on rates, we'll discuss it.

I will ask him if he heard anything in his world, which is sort of law
firm management world.

We'll see if there is anything we can find publicly about our
competitors' rates. Now, firms in my business, typically because we're not
billable rate law firms, you don't usually see our firms in the surveys and
we don't respond to the survey questions generally.

So you have to find publicly available fee applications in order to
see what people are doing, you can't, you know, as the judge knows, you
can't go asking other leaders of other law firms how much they're charging
for rates because then we get ourselves in all kinds of trouble.

So we don't do that; we look at what's publicly available and then I
make a proposal based on that conversation. . . .

I'll send that proposal early in the year to the executive committee
and then the executive committee generally -- what happens is at the
following executive committee meeting it will be on the agenda, we will
discuss it, it will be approved, and that will become the rates for the year.

*Id*., pp. 58:5 – 60:12.  *See also* Heimann 7/17/17 Dep., pp. 60:13 – 66:13.  [EX.

19].

Lieff does not only have class action/contingent fee clients; the firm also has

clients it bills on an hourly basis.  Fineman 6/6/17 Dep., pp. 68:3 – 70:25.  [EX. 18].

These hourly clients are billed largely at the same rates claimed by Lieff in this case.  *Id.*

ERISA Counsel also testified that their firms also have a formalized annual rate-

setting process.  Lynn Sarko, the managing partner of Keller Rohrback, testified that his

firm uses a three-part process:  First the executive committee gathers twenty to twenty-

five fee applications filed during the year by other plaintiffs' firms, including some

competitor firms, which are publicly available through PACER.  Sarko 7/6/17 Dep., pp.

94:16 – 95:7.  [EX. 28].  They then gather the rates of defense firms they litigate against,

which are also publicly available from bankruptcy filings.  *Id.*, pp. 95:9-15.  The third

part of the process involves analyzing Keller Rohrback's expense and income statements

to determine how much the firm's expenses for the year have gone up. *Id.*, p. 95:16-20.
From all this information, the executive committee sets rates for the firm's attorneys for
the coming year. *Id.,* p. 95:18-20.

Carl Kravitz testified that Zuckerman Spaeder's rate-setting system is similar.
Kravitz testified that at his firm, rates are also set annually, Kravitz 7/6/17 Dep., p.
115:24 [EX. 21], and, as at Keller Rohrback, the rate-setting process is directed by the
managing partner and the three-or-four-member executive committee. *Id.*, p. 115:16-21.
Kravitz, who has served on the firm's executive committee, said that, in setting rates for
the firm's attorneys, they look at what their competitors charge and also review market
data from studies performed by Citigroup or Wells Fargo. *Id.* at p. 116:4-25. Rates are
decided upon and are distributed to partners to see whether anybody disagrees or has
comments. *Id.*, p. 115:24 – 116:1. Then they are returned for approval by the executive
committee and the partnership board. *Id.*, p. 116:1-3.

Keller Rohrback and Zuckerman Spaeder have both hourly clients and class
action/contingent fee clients. Sarko 7/6/17 Dep. pp. 95:23 – 96:7 [EX. 28]; Kravitz
7/6/17 Dep., p. 88:19-25. [EX. 21]. The same rates annually set by their firms' executive
committees are used for billing both sets of clients. Sarko 7/6/17 Dep., pp. 96:22 – 92:5
[EX. 28]; Kravitz 7/6/17 Dep., 117:1-5. [EX. 21].

Richardson Patrick, a 100% contingent fee firm, also sets its attorney rates
annually. Brickman 7/7/17 Dep., pp. 41:21 – 43:3. [EX. 40]. Michael Brickman of
Richardson Patrick testified:

In our firm, we have an attorney who is referred to as the business manager of the firm. And on approximately an annual basis, he looks at our rates, he talks to a number of attorneys and gets information as to what other firms are charging, best he can tell. We also collect data -- and I can't tell you where it comes from -- as to -- you know, there are a number of sources where you can find out rates firms are charging and we use that. He then compiles a list, sends it around to all the partners. . . . And they then review it and tweak it. And that's how we come up with our list pretty much on an annual basis.

*Id*., pp. 42:14 – 43:3.[53]

Unlike the other firms, Thornton does not have any established mechanism for determining its attorneys' billing rates. *See* M. Thornton 6/19/17 Dep., p. 82:21-22 ("Because we are a contingent fee firm, we never, virtually never charge anybody by the hour.") [EX. 2]; Thornton Law Firm, LLP's June 9, 2017 Responses to Special Master's First Set of Interrogatories, Response No. 49 ("TLF performs the majority of its work on a contingency basis, and very rarely uses annual or hourly billing rates. When it does use such rates, whether for attorneys or non-attorney staff, those rates are based on the experience of the individual, in accordance with what is common to the industry and/or has been accepted by courts in other actions.") [EX. 99]; *see also* Garrett Bradley 6/19/17 Dep., p. 64:12-15 (explaining that the $500 per hour rate reported for his brother, Michael Bradley, was tethered only to "the fact of how many years he was an attorney, what he had recently billed to an hourly client, and the fact that he took it on contingent.") [EX. 43].

---

[53] Because their firms are very small, both Brian McTigue and Jonathan Axelrod testified that they do not annually determine their billing rates. *See* McTigue 7/7/17 Dep., pp. 84-85 [EX. 11]; Axelrod 7/7/17 Dep., p. 48. [EX. 39].

The unempirical nature of Thornton's billing rates was particularly evident with regard to the "staff attorneys." For each of the staff attorneys listed on Thornton's lodestar report (except Michael Bradley), Thornton simply used the $425 per hour billing rate previously used for staff attorneys in the *BONY Mellon* case. *Id*., pp. 48:20 – 49:4; Hoffman 6/5/17 Dep., p. 59:5-12. [EX. 63].

### 4. Staff Attorneys

As indicated, the staff attorney fees accounted for nearly 70% of the Customer Class attorneys' total lodestar. *See* Chart in Section 3, *supra*; *see also* Labaton's, Lieff's, and Thornton's Lodestar Reports, Dkt. # 104-15 [EX. 88], 104-16 [EX. 66], and 104-17 [EX. 89]; *see also* Master Chart of Lodestars & Expenses, Dkt. # 104-24. [EX. 100]. As explained, these attorneys were tasked with doing document-by-document review, looking for documents that would help build the plaintiffs' case as well as those that might support State Street's defense. *See* Chiplock 6/16/17 Dep., p. 31:6-11. [EX. 10].

The fact that they were designated as "staff attorneys" or that they were tasked with "document review" should not indicate that the work they did was routine or "paralegal" in nature. Both the work they performed and their professional qualifications and experience establish them as more akin to lower-level and mid-level associates. They were all attorneys with years of relevant legal experience, *e.g.,* Christopher Jordan (11 years' experience), Jordan 6/6/17 Dep., pp. 6-7 [EX. 101]; Jonathan Zaul (6 years' experience), Zaul 6/6/17 Dep., pp. 6-7 [EX. 59]; David Alper (28 years' experience), Alper 6/5/17 Dep., pp. 9-14 [EX. 60]; Comfort Orji (11 years' experience), Orji 6/5/17 Dep., pp. 7-10 [EX. 102]; Maritza Bolano (25 years' experience), Bolano 6/5/17 Dep.,

70

pp. 7-14 [EX. 103], and graduates of some of the top law schools in the nation, *e.g.,*
Stanford (Christopher Jordan; Marissa Oh); Harvard (Leah Nutting); UCLA (Joshua
Bloomfield); University of California Hastings College of Law (Ryan Sturtevant).  A
number of them were former judicial law clerks.  *See e.g.*, Zaul 6/6/17 Dep., p. 6:22-23
(law clerk for a California Superior Court judge) [EX. 59]; Bolano 6/5/17 Dep., p. 7:18-
21 (law clerk for two different Federal judges in the Southern District of New York and
the Eastern District of New York).  [EX. 103].  Several of them were former associates at
major law firms, *see e.g.*, Jordan 6/6/17 Dep., p. 6:24-25 [EX. 101]; Bolano 6/5/17 Dep.,
p. 7:22-25 [EX. 103]; Kussin 6/5/17 Dep., p. 8:9-13 [EX. 56]; Oh 6/6/17 Dep., p. 8:3-17
[EX. 61].

      Beyond this, the majority of the staff attorneys had specialized knowledge or skills
in FX, securities, or financial areas.  For example, David Alper, a Labaton staff attorney
for eight years prior to working on the *State Street* case, had 20 years' experience in the
financial services industry working as an interdealer trader where he handled FX
transactions.[54]  Alper 6/5/17 Dep., pp. 9:15 – 12:15.   [EX. 60].  Maritza Bolano had a
background in commercial litigation and contract law.  Bolano 6/5/17 Dep., pp. 7:22-25;
12:9-20.  [EX. 103].  Bolano also had been a procurement officer for the City of New
York where she oversaw the city's major health care plans, prepared RFPs when they
came in, and then prepared the contracts.  *Id.* She also had prior FX experience working
with a large banking institution.  *Id.*, p. 14:10-14.  Kelly Gralewski had a background in

---

[54] It might well be said that Alper's experience in FX transactions made him more valuable to the Labaton team than
attorneys billed at much higher rates.

international business.  Gralewski 6/6/17 Dep., p. 6:21-24.  [EX. 104].  Tryphena Greene

had her own practice, a significant part of which involved consumer fraud cases and

financial litigation involving FX transactions.  Greene 6/5/17 Dep., p. 8:14-19.  [EX.

105].  Marissa Oh spent several years as an associate at a major San Francisco law firm

where she worked on securities litigation.  Oh 6/6/17 Dep., p. 8:3-17.  [EX. 61].  As

noted, a large number of the staff attorneys had also worked on *BONY Mellon* before

working on *State Street*.  *See* Jonathan Zaul 6/6/17 Dep., p. 11:21 [EX. 59]; Christopher

Jordan 6/6/17 Dep., p. 11:10-18 [EX. 101]; Kelly Gralewski 6/6/17 Dep., p. 8:16-19 [EX.

104]; Marissa Oh 6/6/17 Dep., p. 8:4-6 [EX. 61]; Tanya Ashur 6/6/17 Dep., p. 12:15-20.

[EX. 106].  This experience made their work on the *State Street* case considerably more

valuable.

     With the exception of Michael Bradley, whose work is discussed separately, *infra*,

the staff attorneys at the Labaton and Lieff firms did much more than "low-level"

document review. The staff attorneys not only did first-level document review; they also

digested complex information and prepared very detailed, substantive legal memoranda

on issues that Customer Class Counsel wanted to explore in depositions once witnesses

were identified and also on areas that would require follow-up discovery and document

discovery if the mediation were to end without a resolution.  Chiplock 6/16/17 Dep. p.

32:12-20 [EX. 10]; Zaul 6/6/17 Dep., pp. 24:4 – 25:5 [EX. 59]; Alper 6/5/17 Dep., p.

17:14-16 [EX. 60]; Oh 6/6/17 Dep., p. 21:20-25 [EX. 61]; *see also* TLF-SST-005245-

5270 (Memorandum prepared by Maritza Bolano).  [EX. 62].  Most of these staff

attorneys were paid in the range of $40 - $60 an hour, plus benefits.  *See* Oh 6/6/17 Dep.,

p. 11:16 [EX. 61]; Ashur 6/6/17 Dep., p. 18:19 [EX. 106]; Gralewski 6/6/17 Dep. p.

26:14-17 [EX. 104]; Alper 6/5/17 Dep., p. 30:2 [EX. 60]; Jordan 6/6/17 Dep., p. 15:2

[EX. 101]; Zaul 6/6/17 Dep., p. 39:17:20. [EX. 59].

     In all, the staff attorneys of Labaton and Lieff were highly qualified professionals

who performed sophisticated and important work that contributed greatly to the

successful settlement. In this sense, labeling them "staff attorneys," and differentiating

from the perhaps more prestigious title of "associate," is something of a misnomer. It

would be more accurate to characterize them as "non-partnership-track" associates who

performed lower- and mid- level associate work. This is particularly so since many of

them had chosen this track for personal reasons.

### a. __Michael Bradley__

     Thornton also sought reimbursement of fees for another outside "staff attorney"

document reviewer, Michael Bradley. In contrast to the other staff attorneys who worked

on the *State Street* case, Michael Bradley worked entirely on a contingent basis. The

terms of the agreement were clear: Michael Bradley would be compensated for his work

only if, and when, Plaintiffs successfully settled or prevailed in the case. M. Bradley

6/19/17 Dep., pp. 28:20-23; 70:13-15. [EX. 67]. According to Michael Bradley's

deposition testimony, he requested that he receive $500 per hour for this work. *Id*. at

28:23-24, 29:1-5.[55] As part of the Fee Petition, Thornton submitted a lodestar assigning

---

[55] Garrett Bradley testified that he and his brother had a conversation about his fee when Michael began the
document review and recalls his brother telling him that he previously billed $450 in one case. Later, nearer to the
time when they were preparing the Fee Petition in 2016, Garrett determined that $500 would be an appropriate
hourly rate for his brother. *See* G. Bradley 6/19/17 Dep., p. 56:7-15. [EX. 43]. Emails between Bradley and
Thornton attorneys Mike Lesser and Evan Hoffman indicate that it was initially contemplated that Michal Bradley

to Michael Bradley a rate of $500 per hour for 406.4 hours, for a total of $203,200.00 in fees.  *See* Thornton's Lodestar Report, Ex. A to Garrett Bradley's Declaration, Docket #104-16.  [EX. 66].  Thornton has already paid Michael Bradley the entirety of this amount.  M. Bradley 6/19/17 Dep., p. 70: 18-19.  [EX. 67].

Michael Bradley is a solo practitioner licensed to practice in Massachusetts.  *See* Michael Bradley CV.  From March 2013 until June 2015, Bradley performed approximately ten hours per week of document review, on average, in the *State Street* case.  *Id.*, pp. 26:16-17, 30:8, 48:12, 51:16-20.  Michael Bradley does not currently work as an associate, staff attorney, or contract attorney for Lieff, Labaton, or Thornton, nor had he previously.  Michael Bradley's only connection with any of those firms -- outside of the *State Street* case -- is his brother, Garrett Bradley, of Thornton.  *Id*. at pp. 26:16 – 27-5, 29:11-14.[56]

During his involvement in the *State Street* case, Michael Bradley owned and operated his own law firm based in Quincy, Massachusetts.  Prior to that time, Bradley worked briefly, from 2005 to 2007, as an Assistant District Attorney in the Norfolk County District Attorney's Office.  *Id*., pp. 11:9-11; 12:6-7.  After leaving the DA's Office, Bradley opened his solo practice.  Within a few months, he took a position as executive director of the Underground Economy Task Force -- a newly created task force

---

be billed at an hourly rate less than $500 (i.e., $400 an hour) but at Bradley's instruction, this was increased to $500.  *See* TLF-SST-007843-7844 (7/28/15 emails to and from Garrett Bradley, Michael Lesser and Evan Hoffman).  [EX. 107].

[56] In fact, the Customer Class attorneys outside Thornton had never heard of Michael Bradley.  *See e.g.*, Zeiss 6/14/17 Dep., pp. 68:15 – 70:5, 71:5-10 [EX. 79]; Goldsmith 7/17/17 Dep., pp. 87:17 – 88:17 [EX. 58]; Sucharow 6/14/17 Dep., pp. 62:24 – 63:7 [EX. 16]; Rogers 6/16/17 Dep., p. 97:7-22.  [EX. 54].

charged with scrutinizing Massachusetts employment practices to identify routine violators of state and federal employment and wage laws. *Id*. at pp. 22:8-20; 23:6-8. In this position, Bradley oversaw interagency efforts but did not personally conduct any investigations. *Id*. at pp. 23: 6-8, 11-24. He served in this role from 2008 through 2011. *Id*., pp. 11:16 – 12:8.[57]

After leaving the Underground Economy Task Force, Michael Bradley returned to private practice as a solo practitioner. *Id*., p. 12:7-9. While Bradley has represented clients in personal injury, probate, and employment/labor matters, the vast majority of his practice is public and private criminal defense. *Id*., p. 12:16-19. On the private side, Bradley represents clients in OUI cases, domestic violence cases, and other matters in district court. *Id.* at 15:8-9; *see also* SSSM_MB_000257-000258. [EX. 108]. Bradley is also a member of the Norfolk County Bar Advocate Program. M. Bradley 6/19/17 Dep., pp. 12:18-20, 22-24, 13:1-2. [EX. 67]. As a bar advocate, Bradley represents clients in a range of cases from minor driving infractions to serious felonies such as assault and battery with a dangerous weapon. *Id*., p. 21:6-11.

Michael Bradley did not have any background relevant to securities cases or the FX market. *See* Answers of Michael Bradley Esq. to Special Master's First Set of Interrogatories, Interrog. Ans. No. 3. [EX. 109]. Nor did he possess any technical

---

[57] Garrett Bradley testified that Michael Bradley's work in this position provided experience that was relevant to the document review work in this case. In fact, this experience appears to have little, if any, relevance to the work required in the *State Street* case. This finding is not intended to diminish Michael Bradley's work experience, but merely to state that it was not relevant to the work required in the *State Street* case -- and certainly not as relevant as that of the Lieff and Labaton staff attorneys.

expertise with the Catalyst document review system to facilitate review. M. Bradley 6/19/17 Dep., p. 25:6-9.  [EX. 67].

 For over two years, Michael Bradley's contribution to the *State Street* case consisted exclusively of reviewing and coding documents in the Catalyst system.  *See* Answers of Michael Bradley Esq. to Special Master's First Set of Interrogatories, Interrog. Ans. No. 6 [EX. 109]; M. Bradley 6/19/17 Dep., pp. 47:8-10; 50:6-8.  [EX. 67]. While there is no clear evidence of this, Bradley testified that he recorded comments on a "handful" of documents.  *See id.,* pp. 39:7-13; 47:20-24; 50:19-24, 51:1-5.  This is consistent with his recollection that, in over two years, he found only a "handful" of highly relevant documents.  *Id*., p. 48:21-24.  He did not produce any substantive memoranda or other work product.  *Id*., 46: 21-24; Answers of Michael Bradley Esq. to Special Master's First Set of Interrogatories, Interrog. Ans. No. 6.  [EX. 109].

As agreed to upfront, Michael Bradley operated off-site, independently of the other staff attorneys.  M. Bradley 6/19/17 Dep., p. 49: 6-9.  [EX. 67].  He worked from his own office and performed the *State Street* document review in his free time; he was not supervised by Labaton or Lieff lawyers.  *Id.*, 49:7-16; 52:3-18; 54:15 – 55:3.  After receiving a basic onboarding from Thornton, Bradley's contact with the firm was limited to submitting weekly or bi-weekly emails tallying his hours or raising technical concerns about the software.  *Id*., p. 10:24; Hoffman 6/5/17 Dep., pp.107:9 – 108:7. [EX. 63].  His review, moreover, was beyond the purview of Todd Kussin and Kirti Dugar, the on-site staff attorney supervisors at Labaton and Lieff.  Kussin 6/5/17 Dep., pp. 63:20-23; 79:22-25, 80:1-2 [EX. 56]; Dugar 6/16/17 Dep., pp. 103:8-16; 104:9-14.  [EX. 55].

## 5. **Service Awards**

In their fee petition, Plaintiffs' counsel also requested payment of service awards for the named plaintiff class representatives: $25,000 for ATRS and $10,000 for each of the six named ERISA Plaintiffs -- Arnold Henriquez, Michael Cohn, William Taylor, Richard Sutherland, James Pehoushek-Stangeland, and the Andover Companies Employee Savings and Profit Sharing Plan. *See* Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, MAD No. 11-cv-10230, Dkt. # 102. [EX. 110]. These institutional and individual class representatives were very involved in the litigation.

George Hopkins, Executive Director of ATRS, spent extensive time and effort in acting on behalf of ATRS in this case. Prior to assuming the ATRS Executive Director position, Hopkins served as an Arkansas state senator for 14 years, during which time he served as the co-chair of the Senate Retirement Committee. Hopkins 6/14/17 Dep., pp. 10:8-11; 11:5-18. [EX. 4]. It was Hopkins who initially spotted the potential for bringing the case and spoke with Labaton about it. *Id.*, pp. 37:25 – 40:8. He was present at all of the hearings and at the lobby conference, *id.*, pp. 62:22 – 63:7, and he attended a number of the mediation sessions, *id.,* p. 65:18-20. He personally spoke directly with the State Street executives who attended the mediation sessions, *id.*, pp. 66:22 – 68:3, and directed and facilitated ATRS's production of documents. *Id.*, p. 104:7-15. Hopkins estimates that with all the lengthy evening calls with counsel, meetings with State Street,

meetings with experts and attorneys, the mediation sessions, and "think time," he spent several "hundreds of hours" on this case. *Id.*, pp. 102:3 – 102:5.[58]

Arnold Henriquez, one of the named ERISA plaintiffs, testified that he spent 25 to 30 hours on this case. Henriquez 7/7/17 Dep. p. 17:11. [EX. 32]. Although he did not attend any hearings or any mediation sessions, he testified that he reviewed pleadings, produced documents pertaining to his 401(k) and the statements and letters he received from the companies he was investing in, and was in continuous communication with his attorney about the case via phone calls, emails and texts. *Id.* at pp. 10:25 – 11:7; 14:1 – 15:14. Henriquez testified that he was never promised a service award, but that money was not what motivated him in being involved in the case; it was about righting what he believed was a wrong committed by the managers of his pension money. *Id.*, pp. 19:5 – 20:15.

Michael Cohn, another ERISA plaintiff, is disabled, but he estimates that he spent more than 50 hours searching through the "dozens and dozens" of boxes of records he stored in his basement for documents pertaining to his 401(k) needed by his lawyer. Cohn 7/7/17 Dep., pp. 23:8-17, 25:2-8. [EX. 33]. He explained:

> . . . I had dozens and dozens of boxes of records in my basement that
> required me go through all of those. And it's not like I sat down in one
> sitting. But it certainly was numerous hours. You know, more so for me
> being disabled than it probably would be for someone who doesn't have my

---

[58] The service award ultimately granted to Mr. Hopkins did not go to him personally; the entire award went to the Arkansas Teacher Retirement System fund. Mr. Hopkins merits special mention and commendation for his myriad contributions to the case. However, other aspects of his work as the Executive Director of ATRS -- the class representative in *State Street* -- discovered during this investigation present some complicated and potentially troublesome context for his role as the leader of the class representative. This is discussed *infra*, in the context of what Labaton told ATRS and Hopkins about an arrangement with Texas attorney Damon Chargois, and what Hopkins instructed Labaton attorneys not to share with him.

> physical issues. But it was hours and hours of going through those
> documents.

*Id.*, p. 23:8-17.

Cohn also spent a significant amount of time reading the "hundreds of pages" of documents his lawyer sent him to review. *Id*., p. 23:18 – 24:1. Like Mr. Henriquez, Cohn testified that a monetary service award was not a motivating factor in his decision to be a class representative, but, in retrospect, he did not think $10,000 was adequate for the amount of work he had to do on the case. *Id.*, pp. 24:23 – 25:5 ("[I]f money were the motivating factor, the answer would be no. If looking back on this case and if I were doing it for the money with the expectation of $10,000, in my personal case, no, I wouldn't do it. It's not worth it to me. To somebody who has a different background and different financial resources, the answer is probably yes.")

William Taylor is also a disability retiree, and though he did not attend any mediation sessions or hearings, like Cohn, Taylor estimates that he spent some 20 to 50 hours on the case gathering documents, reading pleadings, and discussing the case with his lawyers. Taylor 7/7/17 Dep., pp. 17:16 – 18:5; 12:18 – 13:7. [EX. 34]. He testified that his lawyers frequently sent him letters and emails and called him to keep him apprised of the proceedings. *Id.*, pp. 16:20 – 17:7. ("A lot of phone calls. I can tell you that." *Id*., pp. 17:25 – 18:1). In his opinion, the $10,000 service award he received was fair compensation for the work he put into the case. *Id.*, p. 19:13-16.

James Pehoushek-Stangeland estimates that he spent more than 50 hours working with his lawyers on this case. Stangeland 7/6/17 Dep., p. 19:16-18. [EX. 26]. He also

provided his lawyers with documents, and during the life of the litigation he read and

approved pleadings and was kept up-to-date with the proceedings by his lawyers

primarily via email and telephone.  *Id.*, pp. 12:12-14; 13:14 – 14:2; 17:8-17; 24:4 – 25:10.

Alan Kober, former vice-president of The Andover Companies, the only

institutional ERISA plaintiff in this action, was unable to estimate the total amount of

time he and his assistants spent on this case.  ("I wished I had kept a logbook or a journal.

Not only [of] my hours.  Janet [Wallace]'s hours.  Joline Pomerleau, who gathered all the

documents and stuff.  You know, there's a lot of hours involved and a lot of different pay

rates, too."  Kober 7/6/17 Dep., pp. 34:22 – 35:4).  [EX. 25].  He testified that for this

case, he compiled and supplied to the lawyers documents they requested and was kept

abreast of what was going on in the case through various phone conversations and emails

with the lawyers.  *Id.*, p. 10:4-9.[59]

Taken individually and together, the class representatives provided substantial

value to this case and the result ultimately achieved.

## I.      COURT APPROVAL OF THE SETTLEMENT AND AWARD OF FEES

### 1. Provisional Class Certification and Preliminary Approval of the Settlement

On August 8, 2016, the Court conducted a Preliminary Class Settlement Hearing

after which it granted preliminary approval of the class settlement,[60] provisionally

---

[59] As with George Hopkins, the service award to Kober/Wallace did not go to them personally; it went into The Andover Companies' pension fund.

[60] As explained by Goldsmith during the August 8 hearing, "the reason why [class certification is] preliminary and not final is because class members do have a constitutional right to object to class certification if they see fit to do so." 8/8/16 Tr., Dkt. # 93, p. 6:11-15.  [EX. 111].

80

certified the Settlement Class (as defined in the Notice of Pendency of Class Actions),

approved the long-form Notice and Summary Notice, and appointed Labaton Sucharow

LLP as Lead Counsel for the Settlement Class.  *See* MAD No. 11-cv-10230, Dkt. #97.

[EX. 112].

As indicated, the Notice defined the Settlement Class as

All custody and trust customers of SSBT (including customers for which SSBT
served as directed trustee, ERISA Plans, and Group Trusts), reflected in SSBT's
records as having a United States tax address at any time during the period from
January 2, 1998 through December 31, 2009, inclusive, and that executed one or
more Indirect FX Transactions with SSBT and/or its subcustodians during the
period from January 21, 1998 through December 31, 2009, inclusive.

*See* Notice, MAD No. 11-cv-10230, Dkt. # 95-3.  [EX. 81].

David Goldsmith of Labaton appeared on behalf of the Settlement Class at the

Preliminary Class Settlement hearing. 8/8/16 Tr., Dkt. # 93, pp. 4-6.  [EX. 111].  Michael

Thornton and Garrett Bradley of Thornton, Dan Chiplock of Lieff Cabraser, as well as

attorneys from the three ERISA firms, also attended the hearing.  *Id.*, pp. 2-4; *see also*

Garrett Bradley time records for 8/8/16 (noting "attend preliminary approval hearing in

front of Judge Wolf; meetings with co-counsel before and after to discuss strategy,

crafting language responsive to Judge Wolf's suggestions") (corroborated by David

Goldsmith who in his time records names Garrett Bradley as part of the discussions on

that day).

On behalf of all counsel, Goldsmith addressed plaintiffs' request for preliminary

class certification for settlement purposes, which involved meeting a two-prong test to

show that class representatives and class counsel adequately represented the class

members.  *Id.,* pp. 7:24 – 8:7.  In response to the Court's inquiry whether Labaton could

adequately represent both the ERISA and Customer classes, Goldsmith responded that

Labaton was "adequate"; he argued that the Court had "no reason to depart" from its

initial adequacy findings in the January 11, 2012 Memorandum and Order appointing

Labaton as interim class counsel.  *Id.*, p. 8:18-22.  The Court acknowledged, and

Goldsmith agreed, that a class member may opt out of the settlement if he or she "feels

that its [sic] interests justify a different path."  *Id.*, p. 11:6-13.

The Court further asked Goldsmith to explain why the $300 million private

settlement was reasonable, and specifically addressed the role of the DOJ, SEC, and DOL

in the settlement process.  *Id.*, p. 13:2-7.  The Court showed a clear interest in ensuring

that the global settlement was fair to all participants:  "if what I'm being asked to approve

is going to affect something you've negotiated at arm's length with the [DOJ] and

something you've negotiated with the SEC and something you've negotiated with the

[DOL], I think that goes into both the reasonableness of the settlement and the fairness of

the settlement."  *Id.*, p. 18:13-22.  Goldsmith affirmed that the reasonableness of the

settlement was evidenced, in part, by the fact that DOL signed off on it.  *Id.*, p. 18:2-6.

## 2. **Final Approval**

A hearing on the Motion for Final Approval of Settlement and Lead Counsel's

Motion for an Award of Attorneys' Fees and for Payment of Service Awards was held on

November 2, 2016.  David Goldsmith of Labaton, accompanied by Nicole Zeiss,

Labaton's Settlement Counsel, again represented the "plaintiffs and settlement class."

11/2/16 Hrg. Tr., Dkt. # 114, pp. 3:7-9, 10-11.  [EX. 78].  Dan Chiplock of Lieff Cabraser

and Carl Kravitz of Zuckerman Spaeder also attended the hearing.  *See id.*, pp. 2-3.

Garrett Bradley and Mike Thornton of Thornton also were in attendance.  *See* G. Bradley

9/14/17 Dep., pp. 152:19 – 153:11.[61]  [EX. 85].  During the hearing, the Court approved

the settlement, explaining that its approval was based, in part, on its finding that counsel

on both sides "vigorously represented their clients' interest."  *Id.*, p. 21:1-5.  The Court

also found the proposed Plan of Allocation, dividing the settlement among the ERISA

and Customer Class plaintiffs, to be fair.  *See id.,* p. 22:16-21. The Court further noted the

importance of the parties having reached a global settlement, including settlement with

the federal regulators, in particular the DOL and SEC.  *Id.* at pp. 17:8-23, 38:12-20.

Leading up to the hearing, counsel strategized how best to present the fee award to

the Court, nothing that, "Courts have expressed concern about the adversary system

breaking down in the fee context and Judge Wolf specifically noted that [issue] at the last

hearing."  TLF-SST-032617-2620 [EX. 203].  In considering the reasonableness of the

attorneys' fees requested, the Court inquired whether the plaintiffs' fee agreement was

disclosed to the class members "at the outset" of the case, to which Goldsmith responded

only that the fee agreement was "consistent with the fee [plaintiffs were] seeking here."

*Id.* p. 26:12-13.  In a colloquy with the Court, Goldsmith argued, "[W]e produced a $300

million settlement…. So I think … a fee of some substance would be in order, frankly."

*Id.*, p. 28:16-20.  The Court acknowledged that the $74 million in fees requested by

---

[61] There is nothing in the record evidence indicating that any other attorneys from Labaton, Lieff, Thornton, or any of the ERISA firms were in attendance at the final approval hearing.

counsel "is of some substance," *id*, p. 28:21-25, but noted that none of the class

representatives had objected to that fee request.  *Id*., p. 34-8-9.

      At the conclusion of the hearing, Judge Wolf stated that he was "relying heavily on

the submissions and what's been said today," and approved the $300 million gross

settlement, as well as approving a roughly 25% award of attorneys' fees in the amount of

$74,541,250.00, plus expenses in the amount of $1,257,699.94.[62]  *Id.*, p. 35:7-8.  In

making this fee award, the Court considered the lodestar as a check on the percentage-of-

common-fund method.  *Id*., p. 35:12-13.  The lodestar here was approximately $41.3

million, and the award was 1.8 times the lodestar, which the Court found reasonable. *Id.*

at pp. 31:7-8, 36:1-2.  The Court also approved service awards totaling $85,000 --

$25,000 for ATRS and $10,000 for each of the six ERISA plaintiffs.  *Id.* at pp. 33:4-6,

35:9-12.  Judgment was entered accordingly.  *See* Order and Final Judgment, Dkt. # 110.

[EX. 113].  The Judgment became final on December 2, 2016.

## J.  DISTRIBUTION OF SETTLEMENT AND ATTORNEYS' FEES

      As provided in the Plan of Allocation approved by the Court at the Final

Settlement Hearing, $60 million of the $300 million gross settlement was allocated to the

ERISA class plaintiffs, providing ERISA plan participants with a recovery ratio of

roughly $2 to every $1 of loss to the class.  *See* Sucharow Decl., Dkt. # 104, ¶ 134.  [EX.

3].  The Plan of Allocation further provided that a maximum of $10.9 million of the

---

[62] The Court calculated that the fee award amounted to 24.48% of the Settlement, and when including the amount for expenses the percentage awarded to the attorneys amounted to 25.27% of the Settlement.  *See* 11/2/16 Hearing Tr., Dkt. # 114, pp. 35:15-16.  [EX. 78].

approximately $75 million in total attorneys' fees could be paid out of the ERISA Class'
recovery for attorneys' fees.[63]  This allocation was negotiated and agreed to by Customer
Class Counsel and ERISA Counsel after the parties reached the agreement-in-principle
on the $300 million settlement, *See* Sucharow Decl., Dkt. # 104, ¶ 139 [EX. 3]; *see also*
Kravitz 7/6/17 Dep., pp. 54:25 – 55:1; 59:11-12 [EX. 21]; Sarko 7/6/17 Dep., p. 48:19
[EX. 28]; McTigue 7/7/17 Dep., p. 43:10-11.  [EX. 11].  In accordance with the Plan of
Allocation and the ERISA fee allocation previously agreed upon among the Customer
Class Counsel and ERISA Counsel, ERISA Counsel collectively received approximately
10% of the total fee award -- a sum of $7.5 million -- with the remaining $3.4 million
under the agreed-upon $10.9 million ERISA fee cap being paid to Customer Class
Counsel instead of to ERISA Counsel.  *See* Sucharow Decl., ¶¶ 134-139.  [EX. 3].

## 1. Payment of Fees and Expenses

On September 2, 2016, State Street paid the gross settlement sum of $300 million
into a Class Settlement Fund Escrow Account -- an escrow account maintained by
Labaton, as Lead Settlement Counsel, with Citibank -- where the funds remained pending
entry of Judgment.  *See* Stipulation and Agreement of Settlement, Dkt. # 89 [EX. 114];
Zeiss 9/14/17 Dep., pp. 122:15, 124:9-11, 130:21-23 [EX. 115]; *see also* LBS041692
(Citibank Escrow Account Statement).  [EX. 116].  Under the terms of the Stipulation,
Labaton agreed that, once Judgment became final, it would "in good faith promptly

---

[63] The $10.9 million cap on attorneys' fees from the ERISA class recovery was negotiated by DOL.  Sarko 9/8/17
Dep., p. 66:1-8 [EX. 37]; Kravitz 9/11/17 Dep., p. 66:8-23 [EX. 117]; *see also* TLF-SST-052694 – 52696 (8/21/15
email correspondence between Customer Class Counsel and ERISA Counsel related to negotiations with DOL
regarding fees) [EX. 118]; TLF-SST-052697 – 52698 (8/26/15 email from Lynn Sarko to Customer Class Counsel
and ERISA Counsel regarding negotiated deal with DOL) [EX. 119].

distribute any award of attorneys' fees and/or payments of litigation expenses among *plaintiffs' counsel.*"  Dkt. # 89 ¶ 21 (emphasis added).  [EX. 114].

After the Court issued its Order awarding fees, the total sum of the fee award was transferred by Labaton into a Lead Counsel Escrow Fund, also held by Citibank.  Zeiss 9/14/17 Dep., pp. 124:16-23; 125: 3-4.  [EX. 115].  On December 8, 2016, after Judgment became final, Labaton instructed the bank to disburse the fees, expenses, and service awards approved by the Court.  *Id*., p. 125:13-21. The fees and expenses were disbursed by the bank directly to Lieff, Thornton, McTigue, Keller Rohrback, and Zuckerman Spaeder.  Zeiss 9/14/17 Dep., p. 125:13-21.  [EX. 115].  Labaton also instructed the bank to transfer approximately $34 million to its firm's IOLA account, out of which Labaton that same day paid the service awards, obligations to "of counsel" attorneys,[64] and approximately $4.1 million -- 5.5% of the total Fee Award -- to Damon Chargois of Chargois & Herron, LLP ("Chargois"), who practices in Houston, Texas.  *Id*., pp. 140:21 – 141; 143:4-8.[65]

---

[64] "Of counsel" here refers to Goldman Scarlato & Penny. Goldman Scarlato & Penny performed work on the case and is reflected in the lodestar report Labaton submitted to the Court.  Zeiss 9/14/17 Dep., pp., 143:17-20; 144:6-7.  [EX. 115].

[65] Chargois initially instructed Labaton to direct the $4.1 million payment to an account held by "K&D Consulting & Investments."  *See* LBS030625 (12/5/16 Chargois email to Belfi and Keller).  [EX. 120].  Belfi and Keller expressed concerns that while the "fees will be received by lawyers," transferring money to K&D Consulting would make it "look[] like [Labaton] [was] sending part of [its] fee to an account that is not clearly a law firm."  *Id*.; LBS028053 (Belfi and Keller12/5/16 emails).  [EX. 121].

## 2. **Previously Undisclosed Fees Paid to Chargois & Herron LLP**

The $4.1 million payment to Chargois was discovered during the course of the Special Master's investigation.[66]  (Chargois and his relationship with Customer Class Counsel is discussed in detail in Section K, *infra*.)  Chargois never filed an appearance in the *State Street* case, nor did he or his firm, Chargois & Herron, submit any declaration or lodestar report as part of the *State Street* Fee Petition.  *See* Dkt. # 104 [EX. 3], 104-15 [EX. 88], 104-16 [EX. 66], 104-17 [EX. 89], 104-19.  [EX. 91].  All parties concede Chargois performed no work on the case.

The names Chargois and/or Chargois & Herron appear nowhere in the Omnibus Fee Petition, Labaton's or any other firm's small fee petition, nor in any lodestar or any exhibits.  *See id.*[67]  All parties concede that the Court was never informed about Chargois or the payment of $4.1 million to his firm.  *See* Belfi 9/5/17 Dep., pp. 87:24-88:11; 89:1-17; 90:7-12; 122:23-123:5 [EX. 122]; Goldsmith 9/20/17 Dep., p. 112:10-14 [EX. 42]; G. Bradley 9/14/17 Dep., pp. 152:19-153:16.  [EX. 85].

---

[66] This payment of fees to Chargois first came to light in a batch of emails on August 8, 2017, through emails produced by Thornton in June 2017, and gave rise to several additional months of depositions and written discovery. Neither Labaton nor Lieff produced any emails related to Chargois in response to the Special Master's initial requests for production of documents.  After the Chargois relationship was disclosed by the Thornton-produced emails in response to the Special Master's initial document requests, both Labaton and Lieff produced a significant number of emails and documents pertaining to the Chargois relationship and payment in response to subsequent document requests by the Special Master specifically related to Chargois.

[67] It is significant to note that while the $4.1 million payment to Chargois for doing no work on the case appears nowhere in any fee petition or lodestar, Labaton saw fit to include in its lodestar a significantly smaller payment of $331,000 to another non-Labaton "of counsel" attorney, Paul Scarlato, who, in contrast to Chargois, *did* perform work on the *State Street* case.  *See* Zeiss 9/14/17 Dep., pp. 137:4-11, 143:9 – 144:7 [EX. 115]; *see also* Labaton Citibank Bank statements, LBS041983 [EX. 254]; LBS041839 [EX. 255].  Scarlato was paid out of Labaton's fee award.  *Id.*  The only lawyer to receive class funds who did not appear in Labaton's Declaration or any of the small fee declarations is Damon Chargois.

The Special Master finds that the failure to include the payment to Chargois in the Fee Petition, or anywhere else in the settlement documents, was a material omission.

The fees to Chargois, Customer Class Counsel and ERISA Counsel, plus interest, were paid by Lead Counsel Labaton on December 8, 2016 as follows:

| FIRM | FEES | INTEREST ON FEES | EXPENSES | TOTAL |
|---|---|---|---|---|
| **Labaton** | $29,604,057.44 | $20,079.07 | $258,666.85 | $29,882,803.36 |
| **Thornton** | $18,266,333.31 | $12,389.21 | $295,315.50 | $18,575,038.02 |
| **Lieff** | $15,116,965.50 | $10,253.14 | $271,944.53 | $15,399,163.17 |
| **Keller Rohrback** | $2,484,708.33 | $1,685.26 | $342,766.63 | $2,829,160.22 |
| **McTigue** | $2,484,708.34 | $1,685.26 | $50,176.39 | $2,536,569.99 |
| **Zuckerman** | $2,484,708.34 | $1,685.26 | $38,670.29 | $2,525,063.88 |
| **Chargois** | $4,099,768.75 | $2,780.68 | -0- | $4,102,549.43 |
| TOTAL | **$74,541,250.00** | **$50,557.88** | **$1,257,540.19** | **$75,849,348.07**[68] |

The $4.1 million payment to Chargois was the fourth largest payment made from the total fee award, and significantly more money than was paid to any ERISA firm. *See* Labaton's 8/11/17 Response to Special Master's Supp. Interrog. No. 2 [EX. 123]; *see also* Master Chart of Lodestars, Litigation Expenses and Plaintiffs' Service awards, Dkt. # 104-24. [EX. 100]. In coordinating the payment to Chargois, Zeiss instructed Labaton's accounting department to remit payment from the firm's IOLA if "it will be a rush" to pay Chargois. LBS032881 – 32883 (2/7/16 Zeiss Email to Ng). [EX. 124]. Unlike payments from settlement escrow funds -- governed by escrow agreements -- payments made from Labaton's IOLA account did not require two additional signatures for disbursement. *See* Zeiss 9/14/17 Dep., p. 120:9-23. [EX. 115]. Chargois testified

---

[68] *See* Labaton's 8/11/17 Response to Special Master's Supp. Interrog. No. 2. [EX. 123].

that it did not matter to him when, or from which account, the payment was made.
Chargois 10/2/17 Dep., pp. 304:9-10; 305:3-10.  [EX. 125].

## K.     DAMON CHARGOIS' INVOLVEMENT WITH LABATON AND ATRS

### 1.  Labaton's Introduction to ATRS

The $4.1 million payment to Chargois merits separate and extensive factual discussion and findings.

Labaton represented ATRS throughout the *State Street* case, serving as Lead Counsel throughout the litigation. ATRS was headed by Executive Director George Hopkins.  Hopkins had succeeded Paul Doane, the previous Executive Director, on December 29, 2008.  Hopkins 9/5/17 Dep. p. 14:10-22.[69]  [EX. 12].

Labaton's relationship with ATRS began in or about 2007.  Around that time, Labaton -- which frequently acts as monitoring counsel[70] for its clients -- was looking to expand its securities monitoring practice and form new relationships with potential pension fund clients in the Southwest.  Keller 10/13/17 Dep., p. 21:1-22 [EX. 80]; Sucharow 9/1/17 Dep. pp. 15:3-16:19 [EX. 38]; Chargois 10/2/17 Dep., p. 32:3-22.  [EX.

---

[69] After Paul Doane resigned, for a brief period of time ("three or four months") ATRS was headed by an interim director, Gail Bolden, Doane's deputy director.  Hopkins 9/5/17 Dep., p. 14:14-22.  [EX. 12].  Hopkins succeeded Gail Bolden.  *Id.*, p. 14:18-20.

[70] *See infra*. As monitoring counsel, Labaton uses sophisticated in-house investigators and analysts to oversee a client's portfolio of securities investments for signs of possible securities law violations. If Labaton believes a client's portfolio may have been involved in a securities violation that could lead to a viable case, Labaton may ask the client whether it would be interested in serving as lead plaintiff in a potential class action litigation based on those violations.  *See* http://www.labaton.com/en/practiceareas/Institutional-Investor-Protection-Services.cfm (last visited April 2018).  Because Labaton's representation is contingent on the occurrence and detection of securities violations, it "takes a while for people … to understand [Labaton's work] to the point where it can be useful to them."  Keller 10/13/17 Dep., p. 24: 20-23.  [EX. 80].

125].  In an effort to "mak[e] inroads" in the Arkansas community, Labaton sought the

assistance of Damon Chargois, a lawyer admitted to practice in Arkansas and Texas (and

who at the time maintained law firms under the name Chargois & Herron in each state.)[71]

Labaton had previously retained Chargois to serve as its local counsel in *HCC*

*Holdings,*[72] a securities fraud class action case filed in federal court in Houston.

Chargois recalls meeting Eric Belfi of Labaton in late 2006 or early 2007 when

Labaton was looking for local counsel for the *HCC* case:

> A lawyer in our [Houston] office, Kamran Mashayekh, put us together --
> not sure -- basically he had spoken to them before me.
> Then Eric Belfi I believe called me directly and asked if I'd be interested in
> working on a case called *HCC Holdings* that was on file in Houston.
> I asked [him to] tell me a bit about it and what you would expect of me, and
> he said essentially filing documents, and you may have to sign off on a *pro hac
> vice* for any lawyers that are not authorized to appear in the case.

*Id.*, p. 17:7-18.

Chargois understood he was acting as local counsel in the *HCC* matter, and did, in

fact, appear at several hearings, sponsored several attorneys' *pro hac vice* applications,

and attended a mediation.  *Id.*, p. 18:8-17.[73]  Chargois also met Chris Keller of Labaton

while working on the *HCC* matter.  *Id.*, p. 19:8-14.

---

[71] Chargois & Herron's Arkansas office was closed in late 2009 or early 2010.  Chargois 10/2/17 Dep., p. 31:15-17.
[EX. 125].

[72] *In re HCC Insurance Holdings, Inc. Securities Litig.*, SDTX No. 07-00801.

[73] In contrast to this case, in *HCC Holdings,* Chargois filed an Affidavit in support of the Application for an Award
of Attorneys' Fees and Reimbursement of Expenses, which included a lodestar report of his firm, Chargois &
Herron LLP.  *See In re HCC Insurance Holdings, Inc.*, SDTX No. 07-00801, Dkt. # 71-3.

Chargois recalled Belfi asking him in 2007 to introduce him and his partner Chris

Keller to institutional investors in Arkansas, as Labaton was interested in creating client

relationships with institutional investors in that region.  *Id.*, p. 20:4-17.  Chargois readily

admitted that, at that time, he had no knowledge of any "institutional investors."  *Id.* at p.

20:20.[74]  Chargois' then partner, Tim Herron, did not have any relationships with

institutional investors either. *Id.*, p. 27:16-19.  However, Herron was friends with an

Arkansas state senator, Steve Farris, who at the time served on the Arkansas legislature's

Joint Committee on Public Retirement and Social Security which had an oversight role

with respect to ATRS.  Hopkins 9/5/17 Dep., p. 35:6 – 36:8.  [EX. 12].  Farris suggested

to Herron that they might want to try to contact Paul Doane who had then just recently

taken over as Executive Director of the Arkansas Teacher Retirement System.  Chargois

10/2/17 Dep., p. 33:16-21.  [EX. 125].  Herron told Chargois, and Chargois called Doane.

*Id.*, p. 33:24-34:1.

Chargois explained to Doane who he was and why he was calling, saying that he

was working with a New York law firm that specialized in institutional investors and

asked if Doane would meet with him, Belfi, and Keller, and Doane agreed.  *Id.*, p. 34:1-

---

[74] Belfi's testimony that he had known Chargois longer, having gotten to know him working on an American Express case in 2004, and that it was Chargois who raised the idea of him introducing Labaton to institutional investors, is not credible given the credible testimony of Chargois that he did not even know what an institutional investor was when Belfi broached the subject.  Belfi testified:

> He [Chargois] had a firm . . . . They do some litigation, but mostly what they do is find clients and refer it [sic] to other law firms such as ourselves.
> So he approached me and said he had some opportunities to introduce us to pension plans in the Texas, Arkansas, and Oklahoma region because he and his partner had contacts down there.
> So I asked him to proceed.

Belfi 9/5/17 Dep., p. 13:5-13.  [EX. 122].

35:3.  Within a week or so, a meeting took place in Little Rock.  Chargois 10/2/17 Dep.,

p. 35:8-16.  [EX. 125].  At that initial meeting, "Eric Belfi presented all the services that

Labaton has available and what their -- what they could do and presented as a courtesy

that they could do this monitoring of the portfolio."  Chargois 10/2/17 Dep., p. 36:13-16.

[EX. 125].  Doane later came to New York for another meeting with Belfi and Keller at

Labaton's offices; Chargois was not present.  Belfi 9/5/17 Dep., p. 38:2-6.  [EX. 122].  At

this meeting, Labaton conducted a presentation for Doane as to what services the firm

could provide.  According to Belfi, "[O]nce we did the presentation, we were kind of put

on their radar.  So, at some point later when they did the RFQ [Request for Qualifications

of prospective monitoring counsel], they sent an RFQ for us to respond to."  Belfi 9/5/17

Dep., p. 37:17-22.  [EX. 122].

## 2.  The Chargois "Arrangement"

As consideration for Chargois' efforts, Belfi and Keller agreed to pay Chargois'

firm, Chargois & Herron, a maximum 20% of any attorneys' fees received by Labaton in

any litigation involving an institutional investor for whom Chargois had facilitated the

introduction, including ATRS (hereinafter "the Chargois Arrangement").[75]  Chargois

10/2/17 Dep., pp. 50:18-25; 53:10-17 [EX. 125]; Keller 10/25/17 Dep., pp. 315:21-24,

---

[75] On the ERISA side, Keller Rohrback used Hutchings Barsamian, a Massachusetts firm familiar with the practices and procedures of the District Court, as local counsel in filing the *Andover* Complaint. Unlike Chargois, Hutchings Barsamian was counsel of record in the case. Keller Rohrback, apparently with the consent of all class counsel, compensated Hutchings Barsamian out of Keller Rohrback's portion of the joint fee award ($2,484,708.33, with interest). At Labaton's request, Keller Rohrback did not submit a separate lodestar petition for its local counsel, who incurred a lodestar of less than 0.017. *See* Keller Rohrback's Response to Special Master's 2d Supplemental Interrogatories, Nos. 1-4. [EX. 27].

316:11-14.[76]  [EX. 83].  Both Chargois and Belfi understood that it was the mere
introduction by Chargois to potential institutional investors or potential antitrust clients
that was the basis of the agreement to pay Chargois 20% of any legal fee Labaton earned
on any cases in which Labaton was lead counsel or co-lead counsel and the client was
lead or co-lead plaintiff.[77]  Chargois 10/2/17 Dep., p. 50:18-24 [EX. 125]; Belfi 9/5/17
Dep., pp. 19:6-21:21.  [EX. 122].  Chargois explained:

> Q.    Okay.  As a result of your having made this introduction of Labaton
>       to Arkansas Teachers, did you come to an agreement or contract or
>       something formal or informal with respect to your ongoing
>       relationship with Labaton?
> A.    Yes, sir.
> Q.    Could you tell us about that?
> A.    Sure.  If the -- the agreement as they presented it to me was if
>       ultimately they are selected to represent any institutional investor
>       that I facilitated an introduction to, if they are successful in obtaining
>       a recovery, they would split their attorneys' fees with my firm 80
>       percent/20 percent.

---

[76] Labaton had previously entered into an agreement to pay Thornton approximately 20% of its total fee in cases where Thornton (and, in particular, Thornton partner Garrett Bradley) interacted with local pension fund clients. As Christopher Keller of Labaton explained:

> [W]e had a very, sort of, good, productive relationship with the Thornton Law Firm and -- where, you know, we would -- we would jointly get retained by, you know, funds in the Northeast area, which was their sort of area of -- they had lots of relationships within the area. And we, you know, had an understanding they would get, sort of, let's say, up to 20 percent. And the understanding was that, it was going to be somewhat of a, I call it, a turnkey, but I'm using a -- what I mean is we didn't have to do any heavy lifting up in the -- up in the area, because there's a lot -- I mean, we're a national firm. Think about this, so we have over 200 pension fund clients, we may have one within driving distance of our office, okay.  So we maintain a national practice and -- but without offices all over the nation. So it's very important, any time that we can leverage others who -- who are ready and willing and able to do the heavy lifting locally, we're happy to sort of let that happen, and, of course, pension funds feel much more comfortable with people they know or people who are close by or were introduced through someone they know, so we made that a -- a -- this is how Labaton was going to build more business.

Keller 10/13/17 Dep., pp. 43:3-44:19.  [EX. 80].

[77] While Chargois understood that he would receive 20%, as Keller testified, Labaton believed that it was only obligated to pay Chargois a percentage of fees proportional to ATRS's share of the contributory losses incurred by all lead plaintiffs. By way of example, if ATRS was named co-lead counsel with another plaintiff in a successful litigation, Chargois' payment would not be 20% of Labaton's fee, but would reflect ATRS's pro rata portion of the total loss amount, offsetting the full 20% figure.

Q.      So you would receive 20 percent of the attorneys' fees?
A.      Yes, sir.
Q.      And they would receive 80 percent?
A.      Yes, sir.
THE SPECIAL MASTER: Was that in all cases in which they would be counsel
        to a party that you helped to facilitate a relationship with?
THE WITNESS:  Yes, sir.
THE SPECIAL MASTER:  Not limited to Arkansas?
THE WITNESS:  Correct.

Chargois 10/2/17 Dep., pp. 50:11 – 51:12.  [EX. 125].

This agreement was negotiated at the very outset of the Labaton request that

Chargois make introductions for Labaton, not after any introduction such as that to Paul

Doane was made.  *Id.*, p. 52:1-7.

Under this arrangement, Chargois was not expected to file an appearance, perform

any work, assume any role in any of the resulting litigation, or even interface with the

client.  Chargois 10/2/17 Dep., pp. 56:19-24; 57:1-6 [EX. 125]; Keller 10/25/17 Dep., p.

323:2-4.  [EX. 83].

While Chargois and Keller attempted on numerous occasions over the years to

reduce this agreement to writing, and exchanged several drafts to which they both agreed

in large measure, no formal agreement was ever put together; it was wholly "an email

relationship."  Chargois 10/2/17 Dep., p. 59:8-10 ("Only e-mails. There's no four-corner

document that -- in ceremony and signed or anything. It's just an e-mail relationship.")

[EX. 125].  Chargois was very clear that his understanding was that this was not a

"referral fee" arrangement, nor was he "local counsel"; it was just an "agreement":

THE SPECIAL MASTER: What is your understanding of the relationship? And if
        it evolved from something to something else --
THE WITNESS [Mr. Chargois]:  Right.

THE SPECIAL MASTER: -- we'd be very interested in that.

THE WITNESS: At the very beginning I thought I would be local counsel. I was not.

. . . .

When Eric informed me that [the Joint RFQ Response] had been kicked back, I needed to withdraw, ever since then I've only referred to this as an agreement. I don't have a client so ...

THE SPECIAL MASTER: Just an agreement?

THE WITNESS: Just an agreement.

THE SPECIAL MASTER: Not a referral fee arrangement?

THE WITNESS: No, sir.

THE SPECIAL MASTER: Not a local counsel arrangement?

THE WITNESS: No, sir.

THE SPECIAL MASTER: Not a forwarding fee arrangement?

THE WITNESS: I'm not sure what forwarding fee means.

MR. SINNOTT: Neither are we.

THE SPECIAL MASTER: We weren't either. I was going to follow up on that and ask you if you've ever heard the term.

THE WITNESS: I have not.

THE SPECIAL MASTER: So just a fee arrangement or just an arrangement?

THE WITNESS: I've always referred to it as our agreement.

Chargois 10/2/17 Dep. pp. 62:10-64:5. [EX. 125].

While Labaton's relationship with Chargois began with Chargois & Herron serving as "local counsel" in the *HCC Holdings* Texas class action, it is clear that the relationship evolved over time. *See* Chargois 10/2/17 Dep., pp. 17:19-21; 38:23-24, 39:1 [EX. 125]; Sucharow 9/1/17 Dep., p. 81:16-20. [EX. 38]. As a result, the terminology used to describe the Chargois Arrangement varies greatly between individuals. Some attorneys have labeled Chargois as "local counsel," or "the local," while on other occasions describing the Chargois Arrangement as based in "referral" or a "referral obligation." *See, e.g.,* LBS027776 (4/24/13 Bradley email to others) [EX. 126]; M. Thornton 9/1/17 Dep., p. 38:13-15 [EX. 127]; Chiplock 9/8/17 Dep., pp. 68:4-7, 102:3-8 [EX. 41]; Keller 10/13/17 Dep., pp. 45:11-16; 71:24-72: 4; 96:16-18; 212:5-12. [EX.

80].  In yet other instances, the Chargois Arrangement is characterized as a "forwarding

obligation."  Sucharow 9/1/17 Dep., pp. 59:13-19; 86:8-12.  [EX. 38].  Finally, Sucharow

testified that he considered Chargois a "joint venturer" working with Labaton to find

pension clients.  Sucharow. 9/1/17 Dep., p. 16:1-3.  [EX. 38].  Regardless of the title

used, it is undisputed that Chargois' sole contribution to -- and only role in -- the *State*

*Street* case was facilitating an introduction between Labaton and ATRS -- years before

the *State Street* case was even contemplated.  Sucharow 9/1/17 Dep., p. 82:7-10.  [EX.

38].

### a.  Labaton's Compartmentalization of Knowledge of the Chargois Arrangement

While the initial discussions about partnering with Chargois included only Keller

and Belfi of the Labaton firm, Larry Sucharow -- Co-Chairman and, in effect, managing

partner of Labaton[78] -- learned of the firm's obligation to pay Chargois (a "referring

attorney") a portion of the total attorneys' fees by 2015.[79]  Sucharow 9/1/17 Dep., p.18:2-

11; 20-13.  [EX. 38].  Sucharow, who acted as the "lead negotiator and lead strategist" in

the *State Street* case, knew of Chargois' entitlement for which he did not perform any

substantive work or bill any time on the case.  Sucharow 9/1/17 Dep., p.86:18- 87:1.

---

[78] In 1982, Sucharow was named partner of the firm. Sometime thereafter, he became managing partner. He served
in that role for "many years" until his appointment as Chairman of the firm. As Chairman, Sucharow assumed duties
of both the Chairman and managing partner.  Sucharow 6/14/17 Dep., p. 10:18-11:4.  [EX. 16].  Sucharow currently
is Co-Chairman of the firm. *See* http://www.labaton.com/en/ourpeople/Lawrence-Sucharow.cfm (last visited April
16, 2018).

[79] Sucharow testified that "[it] may be that I *should have known* [prior to 2015] because I know we had some
ongoing relationship with him, but it was nothing that was in the forefront of my mind."  Sucharow 9/1/17 Dep.,
p.18:3-6.  [EX. 38].  While the full nature of the Chargois Arrangement -- payment for performing no work on the
case -- was not initially disclosed to Sucharow, he learned firsthand that Chargois did not work on the case after
becoming involved in the settlement process.  Sucharow 9/1/17 Dep., 18:24-19:1.  [EX. 38].

[EX. 38].  At least as of 2015, Sucharow knew that Chargois had no role in the *State Street* case beyond the initial introduction to ATRS.  *See id.*

But beyond Belfi, Keller, and Sucharow, other Labaton lawyers, including those who worked on the *State Street* case, knew little or nothing about Damon Chargois and his fee arrangement with the firm, in large part due the substantial compartmentalization of Labaton's practice.  Although according to Christopher Keller, this compartmentalization was an effort to modernize and improve efficiency, *see* Keller 10/13/17 Dep., p. 79:18-20 [EX. 80], the end result was that attorneys in one department were generally unaware of decisions made or work done by attorneys in another department, even where the same client or lawsuit was involved.  *See supra*.  For example, Nicole Zeiss, who worked exclusively in Settlements, was not privy to decisions made by attorneys in the Litigation department or by the Relationship attorneys.  Zeiss 6/14/17 Dep., p. 79:5 - 80: 24.  [EX. 79].  Her involvement in the *State Street* case was "strictly as settlement counsel."  *Id.*, p. 79:5-9.  Similarly, litigators such as David Goldsmith were not privy to client agreements entered into by the firm's Relationship counsel.  *See* Goldsmith 9/20/17 Dep., pp. 112:10 – 113:9 [EX. 42]; *see also* Keller 10/13/17 Dep., p. 77:13-17 ("The client -- the client, you know, development, is a very kind of a siloed thing within the firm. They -- they -- they operate, you know, a lot on the road, amongst themselves.")  [EX. 80].  As a consequence, the arrangement Eric Belfi, Labaton's "Relationship" counsel, and Christopher Keller agreed to with Damon Chargois to pay him a percentage of fees in *State Street* was not shared with the Labaton attorneys who were involved with the litigation and settlement of the case.

David Goldsmith, who was Labaton's principal litigator in *State Street*, never knew about Damon Chargois or his fee arrangement until November 21, 2016 -- several weeks after the *State Street* settlement had been approved by the Court.  Goldsmith 9/20/17 Dep., pp. 111:13 – 113:9.  [EX. 42]  Nicole Zeiss, who appeared with Goldsmith at the Final Approval Hearing before Judge Wolf, testified that in her role as settlement counsel, she had a "general understanding" that Chargois and his firm had worked with Labaton "to develop relationships with clients in different cases," but she did not have any knowledge of the details of the firm's relationship with him.  Zeiss 9/14/17 Dep., p. 19:17-21.  [EX. 115].

### 3. The ATRS Request For Qualifications (RFQ)

Chargois' efforts got Labaton the "foot in the door" it wanted and needed with ATRS.  In mid-2008, ATRS issued a Request for Qualifications ("RFQ") to Labaton, among other firms.  Chargois 10/2/17 Dep., p. 37:19-22.  [EX. 125].  On July 30, 2008, Labaton responded by submitting a "joint proposal" on behalf of Labaton and Chargois & Herron.  LBS017738 – 17755 (7/30/08 Joint Response by Labaton Sucharow LLP & Chargois & Herron, LLP) [EX. 128]; *see also* Belfi 9/5/17 Dep., p. 37:20-23.  [EX. 122]. Labaton, through Belfi, received ATRS's response to Labaton's response to the RFQ on October 13, 2008 by email from ATRS Chief Counsel Christa Clark.  *See* LBS017455 - 17456 (10/13/08 email from C. Clark).  [EX. 129].

Clark advised Belfi that Labaton had been selected as an additional monitoring counsel for ATRS, but that Chargois & Herron was *not* approved as part of the proposal. *Id.*  Clark indicated that while there was no requirement to use Chargois & Herron,

Labaton could use Chargois & Herron on a "case by case basis" if they were "a necessary

and appropriate expense." *Id.* Specifically, Clark's email to Belfi stated in relevant part:

> I am pleased to inform you that subject to final approval of the Attorney General's
> ATRS has selected Labaton Sucharow as an additional monitoring counsel for our
> system.
>
> I would like to speak to you regarding the additional firm on your submission
> Chargois & Herron. This is a little awkward, but since your firms are not legally
> affiliated, we are unable to process the state contract form with both firms listed.
>
> If your firm is doing the monitoring and providing the financial backing for the
> cases, I think it is most appropriate that we add your firm independently to the list
> of approved firms. Your firm *may affiliate that firm or use them as independent
> contractors, if you deem is* [sic] *appropriate on a case by case basis. There would
> be no requirement that you use them if it was not a necessary and appropriate
> expense of a case.* I don't know how to best handle this point but the state
> procurement process is not conducive to a joint proposal.

*See* LBS017456 (10/13/08 email from C. Clark) (italics added). [EX. 129].

Chargois understood that his firm was not accepted as part of the RFQ process.

Chargois 10/2/17 Dep., pp. 48:15-49:1. [EX. 125].

At no point either before or after receiving Clark's email did Labaton inform Ms.

Clark or Mr. Doane (or his successor, Mr. Hopkins) of the pre-existing Chargois

Arrangement generally, or that it was obligated to pay Chargois a portion of any fees that

might be awarded in its representation of ATRS in the *State Street* matter.[80] Belfi, 9/5/17

---

[80] In response to a specific question in the RFQ, inquiring about fee agreements with other law firms, Labaton did
not mention the Chargois obligations, even though the Chargois Arrangement had already been agreed upon by
Labaton. [EX. 128].

Dep. pp., 23:5-16; 115:17-21; 118:16-19 [EX. 122]; Keller 10/25/17 Dep., p. 297:14-16.[81] [EX. 83].

### 4. ATRS's Lack of Knowledge of the Chargois Arrangement

Beginning in 2008, Labaton served as monitoring counsel for ATRS.[82] Belfi 9/5/17 Dep., p. 18:6-7. [EX. 122]. Shortly thereafter, George Hopkins replaced Paul Doane as Executive Director of ATRS. *Id*., p. 27:16-18. Belfi explained that Hopkins was a much more direct person, who only wanted to deal with Belfi. Belfi 9/5/17 Dep., pp. 27:18-28:7, 56:22-57:10. [EX. 122].

Hence, the relationship between Chargois and ATRS shifted with Hopkins' appointment. Belfi 9/5/17 Dep., p. 57:11-24. [EX. 122]. Labaton no longer needed Chargois to facilitate communications with ATRS. Nevertheless, Labaton continued to remit payments to Chargois under their previous agreement to avoid litigation by

---

[81] Belfi testified that after receiving ATRS's October 13, 2008 email response to the RFQ, he had a telephone conversation with Christa Clark in which he discussed with Ms. Clark Labaton working with Chargois & Herron:

> A.    I had a follow-up call with Christa after I got this e-mail, and we had a conversation concerning that, you know, we would be working with Chargois & Herron, but we would be the ones that would go on the contract.
>
> Q.    And did you tell her that Chargois & Herron would be a necessary and appropriate expense?
>
> A.    The issue at this point is this is like eight years ago, and I -- I can't spell out the conversation. I just know I had a follow-up conversation with Christa concerning the fact that they were going to be involved in the relationship. As far as being able to decipher anything else that happened in that conversation, I couldn't tell you.

Belfi 9/5/17 Dep., pp. 117:20 – 118:10. [EX. 122]. Nothing in Belfi's testimony, however, indicates that Clark was informed that because of the pre-existing Chargois Arrangement, Labaton was obligated to pay Chargois & Herron a portion of any fees it might be awarded in any class action lawsuit brought on behalf of ATRS.

[82] Labaton continues to serve as one of five firms "on retainer" to ATRS, responsible for monitoring ATRS's investment portfolio and alerting ATRS to potential misappropriation or unexpected monetary loss. Hopkins 6/14/17 Dep., pp. 29:9-22; 30:3-5. [EX. 4].

Chargois that would likely be filed in Chargois' home state, Texas.  Belfi 9/5/17 Dep.,

58:1-7, 10-15.  [EX. 122].

George Hopkins worked closely with Labaton in deciding to file the *State Street*

lawsuit, and he remained very involved in the case, including in the mediation process,

spending "hundreds of hours" working on the case during its five-year history.  Hopkins

6/14/17, p. 102:35.  [EX. 4].

Labaton sought Hopkins' approval before partnering with Lieff and Thornton in

the class action litigation.  However, Labaton did not seek Hopkins' approval to share

information with or remit payments to Chargois.  Hopkins, in fact, was never informed of

the existence of Damon Chargois nor of any agreement between Labaton and Chargois,

much less one that entitled Chargois to 20% of any attorney fee recovered by Labaton on

behalf of ATRS.  *See* Hopkins 9/5/17 Dep., pp. 21:5-10, 64:4-67:11 [EX. 12]; Belfi

9/5/17 Dep., pp. 18:9-20:17; 24:6-20.[83]  [EX. 122].

---

[83] Hopkins testified that he "had no idea" that Chargois had introduced Belfi and Keller to ATRS before his tenure.
In fact, Hopkins had never even heard of Damon Chargois or Chargois & Herron prior to their disclosure during the
Special Master's investigation in August 2017.  Hopkins 9/5/17 Dep, pp. 20:22-21:10; 64:4-65:24.  [EX. 12].
Hopkins testified regarding his knowledge of Chargois as follows:

> Q.  Were you aware that members of a law firm with a Little Rock office had introduced individuals that
> you would later come to know as Eric Belfi and Chris Keller to influential Arkansas officials in an
> effort to secure legal work with the state?
> A.  I had no idea.
> Q.  Are you familiar with the firm name Chargois & Herron?
> A.  As of about two weeks, ten days ago.
> Q.  But you never encountered them to the best of your recollection years ago?
> A.  I had never heard of that firm before.

Hopkins 9/5/17 Dep, pp. 20:22-21:10.  [EX. 12].

In a Declaration sent to the Special Master on March 17, 2018 -- eight weeks before the filing of this R&R
-- George Hopkins confirmed that he had no knowledge of the Chargois agreement, but states that he "did not want
to know the specifics of fee allocations between Labaton and other attorneys," and purports to "ratify that [the
Chargois] agreement."  Hopkins 3/15/18 Declaration, ¶¶ 7, 10, 16.  [EX. 130].  *See* further discussion of Hopkins'
Declaration, *infra*.

It is apparent from Labaton's email correspondence with George Hopkins that Labaton took pains at every turn not to reveal Damon Chargois, Chargois & Herron, or their 20% interest in ATRS cases to Hopkins. For example, rather than include Chargois as a co-addressee or cc him on email correspondence concerning ATRS cases in which Chargois & Herron had an interest, Eric Belfi of Labaton either blind-copied Chargois or Herron or separately forwarded the emails to them, the effect of both being the same -- to not reveal Chargois & Herron to Hopkins. *See, e.g.,*

- LBS018439 (Chargois and Herron bcc'd on 5/10/10 email from Belfi to Hopkins re: "Blue Ribbon" report for *Goldman Sachs* litigation) [EX. 131];

- LBS017505 (Tim Herron bcc'd on 5/6/10 email from Belfi to Hopkins updating status of *The Hartford* securities litigation) [EX. 132];

- LBS018437 – 18438 (5/15-16/10 email chain from Hopkins to Belfi re: potential joint filing of a case with Nix Patterson, forwarded by Belfi to Chargois) [EX. 133];

- LBS020417 – 20418 (5/14/10 letter from Belfi to Hopkins re: *Colonial BancGroup* case, forwarded to Chargois on 5/17/10) [EX. 134];

- LBS017822 (Chargois bcc'd on 5/2/13 email from Belfi to Hopkins re: motion to dismiss filed in the *Facebook* case) [EX. 135];

- LBS017824 (10/23/13 email from Belfi to Hopkins re: *Facebook* securities litigation, w/attachments, forwarded to Chargois) [EX. 136];

- LBS017825 – 17826 (Chargois bcc'd on 7/24/13 email from Belfi to Hopkins re: *Goldman Sachs* trial). [EX. 137].

*See also* Belfi 9/5/17 Dep., pp. 110:5 – 113:5 [EX. 122]; Keller 10/25/17 Dep., pp. 353:14-354:17; 358:1-24; 463:2-464:2. [EX. 83].

Nor did the Retention Agreement in *State Street* signed by Hopkins disclose the Chargois Arrangement.  The Retention Agreement provided, in relevant part, only that ATRS agreed that Labaton "may divide fees with other attorneys for serving as local or liaison counsel, as referral fees, or for other services performed in connection with the Litigation."  LBS011060-11062 (2/8/11 Retention Agreement email from Eric Belfi to George Hopkins).[84]  [EX. 138].  It further provided that "[t]he division of attorneys' fees with other counsel may be determined upon a percentage basis or upon time spent in assisting with the prosecution of the Litigation."  *Id*.  The Retention Agreement did not name any individual attorney nor specify which, if any, of these "services" it would seek as part of the litigation.  *See id*.  It contains only a vague reference to "referral fees," and it does not name Chargois or Chargois & Herron, and makes no reference to the obligation to Chargois the ATRS lawsuit would trigger or how the payment would be made.  Chargois acknowledged he played no role whatsoever in ATRS's *State Street* lawsuit, and only met George Hopkins once, when he happened to be in San Francisco visiting his sister and attended an unrelated court hearing.  Chargois 10/2/17 Dep., pp. 54:18-23, 74:21-75:3.  [EX. 125].

---

[84] Specifically, the Retention Agreement provides, in relevant part:

> Arkansas Teacher agrees that Labaton Sucharow *may allocate fees to other attorneys who serve as local or liaison counsel, as referral fees, or for other services performed in connection with the Litigation.*  The division of attorneys' fees with other counsel may be determined upon a percentage basis or upon time spent assisting with the prosecution of the Litigation.  Any division of fees among counsel will be Labaton Sucharow's sole responsibility and will not increase the fees payable by Arkansas Teacher or the class upon a successful resolution of the Litigation.

LBS011060 – 11062 (emphasis added).  [EX. 138].

Labaton's purported reason for not informing Hopkins of the Chargois

Arrangement is because Hopkins "did not want to know." *See* Hopkins 3/15/18

Declaration [EX. 130]; Belfi 9/5/17 Dep., pp. 23:17 – 24:5. [EX. 122].  This was a

unilateral decision by Belfi, however, who concluded after meeting Hopkins that he

would appreciate a more direct relationship.  Belfi 9/5/17 Dep., pp. 27-28; 56-57.  [EX.

122].  According to Belfi, the subject of Chargois "did not come up," and, admittedly,

Belfi did not want to bring another attorney not from Labaton into the case, Belfi 9/5/17

Dep., pp. 110, 122.  [EX. 122].

   a.   **Agreement Among Labaton, Lieff, and Thornton to Share in the
        Payment of Labaton's Obligation to Chargois**

Labaton's obligation to pay Chargois 20% of any fee it might be awarded in *State*

*Street* was disclosed to Lieff and Thornton in or about April 2013.  The subject was first

raised at a meeting during a Global Justice Network conference in Dublin, Ireland, an

event organized by Bob Lieff and attended by Michael Thornton, Garrett Bradley, and

Lynn Sarko.[85]  Lieff 9/11/17 Dep., p. 63:10-22.  [EX. 139].  In an April 26, 2013, email

from Garrett Bradley to Robert Lieff, Michael Thornton, Eric Belfi, Christopher Keller,

and Dan Chiplock, and copied to Chargois (referred to by the parties as the "Dublin

email"), Chargois was referred to as "the local counsel who assists Labaton in matters

involving Arkansas Teachers Retirement System."  LBS025771.  [EX. 140].  In that

---

[85] Bob Lieff testified that he does not have a specific recollection of a conversation with Bradley and Michael
Thornton regarding Chargois.  Lieff 9/11/17 Dep., p. 66:2-5.  [EX. 139].  Although Lynn Sarko attended the Global
Justice Network meeting, there is no evidence that he was a party to any discussion with Bob Lieff, Michael
Thornton or Garrett Bradley concerning Chargois, and Sarko testified that he did not learn about the Chargois
agreement until it was disclosed in the Special Master's investigation in August 2017.

email, Garrett Bradley memorialized an agreement reached earlier among the three

Customer Class law firms to share in the payment of Labaton's 20% obligation to

Chargois.[86]  In relevant part, Bradley's email stated as follows:

> Bob, as you, Mike and I discussed in Dublin last week, I am sending this e-mail
> regarding the obligation to the local counsel who assists Labaton in matters
> involving the Arkansas Teachers Retirement System. Labaton has an obligation to
> this counsel, Damon Chargois, copied on this e-mail, of 20 percent of the net fee
> to Labaton in the State Street FX cases before Judge Wolf. Currently this amount
> will be 4 percent because of the agreement between Labaton, Thornton and Lieff
> of a division of 20 percent guaranteed, each with the balance to be decided on at a
> later date. Obviously, this may go up should Labaton receive an amount higher
> than 20 percent. We have agreed that the amount due to the local, whatever it turns
> out to be, 4 or 5, will be paid off the top with the balance fee split between Lieff,
> Labaton, Thornton pursuant to our agreement. The local asks that I copy him on
> this e-mail so he will have confirmation of this agreement. When we spoke to him,
> he was agreeable to this as well. Garrett.

LBS025771 (4/25/13 G. Bradley email to R. Lieff, M. Thornton, E. Belfi, C. Keller and

D. Chiplock, copied to Chargois).  [EX. 140].

Discussions concerning the specific percentage to be paid Chargois were ongoing

while the parties continued with their hybrid mediation in 2013 and 2014.  Later, in late

2015, after the settlement had initially been agreed to by the parties, Customer Class

Counsel all agreed to allocate 5.5% of their collective fee award to Chargois.  Chiplock

9/8/17 Dep., pp. 106:18-107:1.  [EX. 41].  Labaton, Lieff, and Thornton contributed

---

[86] During the *State Street* litigation, Garrett Bradley had substantial contact with Belfi and Keller of Labaton, and
Chargois. Bradley attended annual marketing conferences hosted by Labaton and attended by Keller, Belfi, and
Chargois. Then, effective January 1, 2015 through late 2016, Garrett Bradley held a dual role as partner at Thornton
and "of counsel" to Labaton.  *See* LBS007086 – 7090 (Bradley's Of Counsel Agreement).  [EX. 141].  In this role,
Bradley agreed to "assist Labaton partners in identifying and seeking retention by clients for securities."  *Id.*

equally to satisfy this obligation.  Labaton Sucharow's 8/11/16 Responses to Special

Master's Supplemental Interrogatories, Response No. 1(b).  [EX. 123].

### 5. **Lieff's and Thornton's**[87] **Limited Knowledge of the Chargois Arrangement**

Lieff and Thornton were not privy to the origins of the Chargois Arrangement or

the details of Labaton's obligation to pay Chargois in all cases in which ATRS was a co-

lead counsel. Lieff 9/11/17 Dep., p. 92:2-12 [EX. 139]; Thornton 9/1/17 Dep., pp. 19-21,

35:12-24.  [EX. 127].  An original cost-sharing agreement circulated among Customer

Class Counsel in 2011 was drafted, but never executed, shortly after the *ATRS* Complaint

was filed. This draft referenced only that the firms acknowledged that "[t]here is an 'off

the top' obligation to 'referring counsel' of 6% of the fees awarded," without any

specifics.  *See* TLF-SST-033911 – 33913 (5/4/11 letter agreement).[88]  [EX. 82]. This

draft agreement, with its reference to "referring counsel," was shared between Labaton

and Garrett Bradley. However, a copy apparently was never circulated to Lieff. *See* Lieff

9/11/17 Dep., p. 98 [EX. 139]; Keller 10/25/17 Dep., p. 415 [EX. 83]; Oral Argument

Trans, pp. 94-95 (Ms. Lukey), pp. 221-222 (Mr. Heimann) [EX. 162].This is significant

both as to Garrett Bradley's knowledge of the true nature of the Chargois Arrangement,

as well as Lieff's knowledge, as it reflects that Bradley and Labaton referred to Chargois

---

[87] As discussed *infra*, Garrett Bradley stood in a unique position vis-à-vis Labaton (*see* note 86, *supra*), and specifically, the Chargois Arrangement. Thus, Bradley's knowledge must be considered separately from that of the other Thornton attorneys.

[88] Christopher Keller, who drafted the letter agreement, testified that the "off the top" percentage to referring counsel -- 6% -- reflected 20% of Labaton's 1/3 share of the fees: "20 percent of a third is 6 point something so we probably just went with 6 percent."  Keller 10/25/17 Dep., p. 419:8-9.  [EX. 83].

as "referring counsel" but that all emails and other communications to Lieff refer to

Chargois as "local counsel" or "the local."

This arrangement was next addressed among the three Customer Class firms in

the April 24, 2013, "Dublin" email in which Garrett Bradley described a financial

obligation owed to Chargois. In that email, Bradley characterized Chargois as "local

counsel who assists Labaton in matters involving the Arkansas Teachers Retirement

System." LBS 025771. [EX. 140]. The Labaton attorneys addressed on the email, Chris

Keller and Eric Belfi, did not offer any additional explanation. Nor did either attorney

inform their co-counsel that Chargois was not performing any work in the matter.

Understanding that Chargois was operating as "local counsel," Bob Lieff responded to

the email on April 23, 2013, stating "I am in full agreement [with splitting payment to

Chargois]." LBS030997 – 30998, (4/24/13 Lieff Email to G. Bradley, et al.). [EX. 142].

Eric Belfi responded to the email on May 6, 2013, stating "[w]e are in full agreement."

*Id*.

While members of the Lieff and Thornton firms were generally aware of

Labaton's obligation -- to be shared by Customer Class Counsel -- to pay Chargois a

percentage of Labaton's total fee in the *State Street* case, the exact percentage or details

of that arrangement were not discussed until settlement discussions were well underway

years into the litigation. Thornton 9/1/17 Dep., pp. 36:16-17, 22-24; 37:1-7. [EX. 127].

### a. **Thornton's Knowledge of the Chargois Arrangement**

Garrett Bradley of Thornton received an initial draft of the proposed cost-sharing

agreement on May 23, 2011. *See* TLF-SST-033910 – 33913 (email from Christopher

Keller to Garrett Bradley with draft cost-sharing agreement attached). [EX. 143].

Bradley knew at least three months before that Labaton had an ongoing relationship with

Chargois, and that Chargois was entitled to 20% of fees awarded in this case. TLF-SST-

075440-5441 (2/4/11 Keller email to Bradley). [EX. 204] Although the "referring

counsel" was not identified in the proposed cost-sharing agreement, Bradley testified that

he had never heard anyone other than Damon Chargois referred to as "referring counsel"

by Labaton in connection with the *State Street* litigation, G. Bradley 9/14/17 Dep., p.

43:1-20 [EX. 85], and his deposition testimony indicates that he was aware that Labaton

had an obligation to pay Chargois a percentage of the fees at least as early as "around the

time the complaint was filed or shortly" before. *Id.*, p. 44:7-12.[89]  Bradley testified,

however, that he did not know that Chargois would not have to do any work for a share

of the fees, nor did he know the details of the arrangement. ("I thought his role was

similar to ours; that he did substantive work, corresponded with the client, dealt with the

client, got authority. That's what I thought his role was." *Id.*, p. 45:10-13; *see also* p.

47:7-8).[90]

---

[89]  Bradley testified:

> I believe as early as -- just prior to or right around the time of filing in 2011, I raised with Chris [Keller] how are we going to deal with your obligation to Damon 'cause I was very concerned that he would try to apply for 20 percent of this entire case.
> And I asked them to deal with it.

G. Bradley 9/14/17 Dep. p. 44:7-13.  [EX. 85].

[90] It is difficult to credit Bradley's testimony on this point because Bradley, Chargois, Belfi, and Keller spent a considerable amount of time together during Labaton's "marketing" conferences during this period and, in addition, Bradley held a dual role from January 1, 2015 through late 2016 as Thornton's managing partner and as "Of Counsel" to Labaton with the sole responsibility of client development.  Further, Labaton's General Counsel, Mike Stocker, asked Bradley -- and not Labaton's own "relationship" lawyers, Belfi and Keller -- to intervene with Chargois in handling negotiations with Chargois when negotiations over Chargois' fee in the case became more pointed.  *See* 6/21/16 email, TLF-SST-012527 – 012528.  [EX. 144].  Beyond this, Thornton had arrangements with

Michael Thornton was included as an addressee of the May 4, 2011 draft letter, but testified that he never received or reviewed that letter at the time. Thornton 9/1/17 Dep., p. 148:6. [EX. 127]. Thornton testified that he was unaware of Chargois until Garrett Bradley told him of an obligation to pay "local/referring counsel" in or about 2013, and even then, did not know Chargois by name. *Id*., p. 148:7-13; p. 20: 14-17; p. 35: 14-24. While it is clear that Thornton understood that Chargois was entitled to receive a portion of the fees awarded in the *State Street* case due to his role in securing Labaton a position on the monitoring panel, *id*. at pp. 44: 8-22; 36: 16-19, Thornton did not know that Chargois was entitled to receive a 20% payment in every case in which ATRS served as lead or co-lead counsel. *Id*., p. 44: 16-24. And while Chargois did not serve as forum local counsel in the case, Thornton understood that Chargois was a referring attorney, *i.e.,* an attorney who referred the matter because he was either not competent or it was not his role to bring action on behalf of ATRS against State Street. *Id*. at p. 38: 4-11; p. 42:2-16.

### b. Lieff's Knowledge of the Chargois Arrangement

Bob Lieff and Dan Chiplock, both recipients of the "Dublin" email, testified that they understood Damon Chargois to be performing some substantive role as local counsel for Labaton in the *State Street* litigation, serving the class by assisting the ATRS client

---

Labaton similar to its arrangement with Chargois. And importantly, as noted, the draft of the original letter agreement as to sharing the Chargois fee – which refers to Chargois as "referring counsel," as opposed to "local counsel," was not shared with Lieff, indicating that Bradley was knowledgeable about the true nature of the Chargois Arrangement, and that Chargois was not acting as "local counsel," which is how he was referred in other correspondence in which Lieff is a party. Finally, as a more general matter, the Special Master finds Garrett Bradley to be a less than credible witness on a range of issues.

locally in Arkansas, *see* Lieff 9/11/17 Dep., pp. 58-80 [EX. 139]; Chiplock 9/8/17 Dep., pp. 101-116. [EX. 41].

In arriving at their understanding of the Chargois role, both Chiplock and Lieff relied both upon their understanding of Labaton's role as Lead Counsel and the representations made by Garrett Bradley in relation to Chargois. *See* 4/5/18 Declaration of Daniel Chiplock, ¶¶5-6 [EX. 145]; LBS 025771 [EX. 140], LCHB-0053483 (4/24/13 "Dublin email," in which Garrett Bradley referred to Chargois as "the local counsel who assists Labaton in matters involving Arkansas Teachers Retirement System" and to which Bob Lieff replied that he was in full agreement as to the proposed allocation). [EX. 146].

Bob Lieff testified that he thought Chargois was local counsel for Labaton dealing with the client in Arkansas. *See* Lieff 9/11/17 Dep., p. 67:9-13 ("I thought he was local counsel for Labaton in this particular case I assumed dealing with the Arkansas fund because that's what local counsel will do. That was my understanding.") [EX. 139]. He further testified that had he known that Chargois had done no work on the case, he would not have agreed to the allocation of part of his firm's fee award to Chargois. Lieff 9/11/17 Dep., p. 97:13-16.[91] [EX. 139]. Lieff also testified that had he known the full story of the Chargois-Labaton relationship, he would have encouraged the Labaton lawyers to make the Court aware of it. *See id.*

---

[91] While Bob Lieff's testimony on this point may reflect that he was incurious in not inquiring further as to Chargois' actual role in the case, the Special Master credits his testimony as it is supported by numerous contemporaneous documents and emails which refer to Chargois as "local counsel" or "the local" and the 2011 draft letter which referenced Chargois as "referring counsel" that was shared between Labaton and Garrett Bradley, but not Lieff.

Informing both Lieff and Chiplock's belief that Chargois played a local role was their recent experience in *BONY Mellon*, in which Lieff's local counsel interfaced with their Ohio pension fund client but otherwise had little contact with co-lead counsel and non-lead counsel participating in the New York litigation. *See* Lieff 9/11/17 Dep., pp. 58-80 [EX. 139]; Chiplock 9/8/17 Dep., pp. 101-116 [EX. 41]; 4/5/18 Declaration of Daniel Chiplock, ¶6. [EX. 145]. Subsequent email communications between Labaton, Thornton and Lieff in 2015 describing a financial obligation to a local Arkansas attorney reinforced Lieff's belief that Chargois fulfilled some local role in the case. *See*, *e.g.*, TLF-SST-040617 – 40618 [EX. 147], LCHB-0053491 – 53492 (8/6/2015 Bradley email to Lieff and Thornton regarding "Fee discussions" related to *BONY Mellon* and *State Street*, with reference to "Arkansas local") [EX. 148]; LCHB-0053493 [EX. 149], TLF-SST-038574 – 38579 (8/28/15 Lieff email to Bradley and Thornton regarding *State Street* and referring to Arkansas local counsel; Bradley response to same) [EX. 150]; TLF-SST-053117 – 53126 (8/28/15 Chiplock email to Sucharow, Bradley and Thornton regarding memorialization of the fee allocation agreement among the firms, and referencing payments to ERISA counsel and "local Arkansas counsel" in relation to the distribution of Customer Class Counsel fees) [EX. 151]; LCHB-0053513 - 53521 (continuation of correspondence among counsel regarding same) [EX. 152]; LCHB-0053507 – 53512 (8/28/15 separate correspondence between Chiplock and Lieff regarding same) [EX. 153]; TLF-SST-053117 – 53126 [EX. 151], LCHB-0053531 – 53532 (8/30/15 further response from Bradley to Chiplock, Lieff, and Sucharow referring to the "Arkansas firm" and the prior April 2013 correspondence, noting that there was already a "written

111

agreement between all the parties that the Arkansas component would come off the top")
[EX. 154]. Neither Labaton or Bradley corrected these characterizations of the Chargois
role as local counsel. Related communications from Chiplock to Lieff in mid-2016
demonstrate that Chiplock still believed that Chargois occupied this role during the
finalization of the Fee Petition. LCHB-0053538 – 53540 (forwarding 2013 and 2015
email correspondence) [EX. 155]; LCHB-0053541 (forwarding 2013 correspondence and
referencing calculation of "local counsel's" fee) [EX. 156].

     Attorneys from the firms exchanged emails related to the Arrangement again in
2015. On August 28, 2015, Dan Chiplock corresponded with Larry Sucharow, Garrett
Bradley, and Michael Thornton regarding memorialization of the fee allocation
agreement among the firms; Chiplock referred to payments to ERISA Counsel and "local
Arkansas counsel" in relation to the distribution of Customer Class Counsel fees. TLF-
SST-053117 – 53126 (8/28/15 Chiplock Email to Sucharow, G. Bradley, Thornton, and
Lieff). [EX. 151]. Garrett Bradley, referencing the prior emails in 2013, replied that
there was already "a written agreement between all the parties that the Arkansas
component would come off the top" and stated that the "ERISA piece" should be handled
the same way. *Id*. As Chris Keller and Eric Belfi were not included on this email
exchange, and Larry Sucharow was at that point unaware that Chargois was not
performing any work as the local Arkansas counsel, the 2013 characterization of the
Chargois role remained uncorrected.

The Chargois Arrangement was again raised in email correspondence between the three firms on July 8, 2016. Garrett Bradley wrote to Mike Thornton, Larry Sucharow, Dan Chiplock, Chris Keller, Eric Belfi, and Damon Chargois:

Gentlemen,

As we discuss how to distribute the fee between ourselves and, of course the ERISA attorneys, I have had discussion with Damon Chargois, the local attorney in this matter who has played an important role. Damon and his firm are willing to accept 5.5% of the total fee awarded by the Court in the State Street class case now pending before Judge Wolf. As you know, we had a prior deal with him that his fee would be "off the top". He understands that ERISA counsel is now in the same pool of money. He has agreed to come down to this number with a guarantee that it will be off the court awarded fee number. Please reply all if you agree. Given that it is off the total number their [sic] is no need to add the ERISA counsel to this email chain.

LBS039936 – 39937 (7/8/16 G. Bradley email to Lieff, Thornton, Sucharow, Chiplock, Keller, Belfi, and Chargois). [EX. 157].

At no time in this multi-year correspondence was the nature of Chargois' role -- *i.e.*, as a "referring attorney" -- made clear. None of the Labaton attorneys followed up on the July 2016 email in writing. Nor does the record contain any evidence that any of the Labaton attorneys informed their co-counsel, either before or after this email, that Chargois had played no role in the *State Street* case, nor did the Labaton attorneys attempt to explain what "important role" Chargois played. Bob Lieff and Mike Thornton replied to Bradley's July 8 email expressing their firms' respective agreement to these terms. *Id*.; LBS031152 – 31153 (7/8/16 Thornton Email to G. Bradley & 7/8/16 Lieff Email to G. Bradley, et al.). [EX. 158]. Separately, Chris Keller wrote to Garrett Bradley, "great work getting this done." LBS039936. [EX. 157].

113

### c. **Inconsistency of Information Regarding the Chargois Arrangement**

As noted above, even among Labaton attorneys, full knowledge of the Chargois

Arrangement appears to have been limited to Belfi and Keller and, later, Sucharow.  *See*

Sucharow 9/1/17 Dep., p. 17:10-13 ("I'm not sure I ever knew in the sense that I didn't

hear 'til later on that there was an obligation to [Chargois].")  [EX. 38].  For example,

Larry Sucharow, who described himself as the "lead negotiator and lead strategist" for

plaintiffs in the *State Street* case, testified that, although he knew who Chargois was, he

only learned of Labaton's financial obligation to Chargois in 2015.  *Id.,* pp. 18:20-23;

87:1. [92]  Similarly, David Goldsmith, the lead Labaton litigator who appeared and argued

on behalf of the purported Settlement Class in the Preliminary and Final Settlement

Approval Hearings before Judge Wolf, did not know anything about the Chargois

Arrangement until November 21, 2016, several weeks after the Final Approval Hearing**.**

Goldsmith 9/20/17 Dep., pp. 108:20-109:2.[93]  [EX. 42].  Even those who were aware of

the Arrangement were unfamiliar with Chargois' full name.  Sucharow 9/1/17 Dep., pp.

7-9; 35:17-24.  [EX. 38].

---

[92] Though he testified that he learned of his firm's obligation to Chargois in 2015, Sucharow signed the Omnibus Declaration, which was filed with the Court in September 2016; the Declaration did not disclose the Chargois Agreement or reference the intended payment to Chargois.

[93] David Goldsmith testified that he first learned of Chargois and his fee arrangement with Labaton on November 21, 2016.  Goldsmith 9/20/17 Dep., pp.111:13 -112:9.  [EX. 42].  He further testified that he had no idea that a payment was going to be made to Chargois out of the class funds or that the Chargois payment was going to be 5.5 percent of the total $75 million fee award.  *Id.,* pp. 112:10 – 113:9.  Goldsmith admitted that this was important information and that he would have liked to have known about it before he went before Judge Wolf at the Final Approval Hearing.  *Id.*  Goldsmith further admitted he knew of no work done by Chargois on the *State Street* case, nor had any other Labaton lawyer told him that Chargois did any work on the matter.  *Id.* at pp. 114:11 – 115:13.

Outside of Labaton attorneys, the terms "forwarding fee" and "referral fee" have no significance in a class action context. 9/11/17 Lieff Dep., p. 79:20-22. [EX. 139]. Robert Lieff testified that the term "local counsel" is also not descriptive of Chargois' role, as it is a term of art used to describe an attorney who works for a client on a case-by-case basis and submits a fee petition for services performed in a particular case, an understanding shared by Chargois himself. Lieff 9/11/17 Dep., p. 80:9-17. [EX. 139]. Although they now seek to cast Chargois in the role of "referring" counsel, Labaton attorneys never used the phrase "referring counsel" in discussions with Chargois, other than in the 2011 draft letter agreement which was not circulated to Lieff and ultimately was not executed. Chargois 10/2/17 Dep., p. 64:15-19. [EX. 125]. When asked, Chargois did not view his role as a "referring counsel," "liaison counsel," or "local counsel" in the *State Street* case or any case involving ATRS. Chargois 10/2/17 Dep., pp. 55: 8-13, 20-24; 63:11 – 64:6 [EX. 125]**;** this was just "an agreement." *Id.*, p. 63:5-21.

### 6.  **ERISA Counsel's Lack of Knowledge of the Chargois Arrangement**

Neither Labaton nor any other Customer Class Counsel ever informed ERISA Counsel of Labaton's obligation to Chargois, or Chargois' role in connection with this case. Sarko 9/8/17 Dep., pp. 56:18 – 57:9, 71:14-23 [EX. 37]; Kravitz 9/11/17 Dep. p. 70:8-10 [EX. 117]; McTigue, 9/8/17 Dep., p. 17:14-21 [EX. 159]. Like Hopkins, ERISA Counsel learned of the Chargois Arrangement only during the course of the Special Master's investigation in or about August 2017. Sarko 9/8/17 Dep., 71:14-23 [EX. 37]; Kravitz 9/11/17 Dep. 70:8-10 [EX. 117]; McTigue 9/8/17 Dep., p. 17:14-21 [EX. 159].

One effect of the Customer Class Counsel's failure to disclose the Chargois Arrangement to ERISA Counsel was the non-disclosure to the ERISA class representatives and members themselves.

As with Hopkins, Labaton was at pains to keep ERISA Counsel from learning about Chargois or the Chargois Arrangement.  *See e.g.,* Sucharow response to G. Bradley email regarding proposed Claw Back letter (discussed *infra*) addressed only to Customer Class Counsel advising "no reason for ERISA to see Damon's split."  TLF-SST-012272 – 12274 (11/22/16 Sucharow email to Goldsmith, G. Bradley, Keller, and Belfi) [EX. 160]; LBS039936 – 39937 (7/8/16 G. Bradley email to Lieff, Thornton, Sucharow, Chiplock, Keller, Belfi, and Chargois) ("Given that it is off the total number their [sic] is no need to add the ERISA counsel to this email chain.") [EX. 157]; TLF-SST-053117-53126 [EX. 151].

ERISA Counsel testified that had they known of the Chargois Arrangement during the *State Street* case, they would have proceeded differently in several material respects. Lynn Sarko of Keller Rohrback testified that had he known of the Chargois Arrangement, he "absolutely" would have felt an obligation to disclose the Arrangement to the ERISA class representatives and obtain their informed consent.  Sarko 9/8/17 Dep., p. 91:4-15. [EX. 37].  Moreover, had he become aware that an attorney who did no work on the case would receive in excess of $4 million prior to signing the ERISA Fee Allocation in 2013, Sarko would not have agreed to the ERISA lawyers receiving only 10% of the total fee award, *id.* pp.75:2-22, 78:19-79:4.  The other ERISA counsel, Brian McTigue of McTigue Law and Carl Kravitz of Zuckerman Spaeder, testified that they would not have

agreed to it, either.  *See* McTigue 9/8/17 Dep. p. 21:15-24 [EX. 159]; Kravitz 9/11/17

Dep., pp. 83:3-84:22 [EX. 117].  (It bears noting here that Chargois received more than

any of the ERISA firms received.  *See* Table in Section G, *supra*; *see also* Labaton's

8/11/17 Response to Special Master's Supp. Interrog. No. 2.)   [EX. 123].

      Sarko further testified that had he known about the payment to Chargois, he would

not have agreed to the filing of a joint fee petition with Customer Class Counsel because

"in order to do that, I would have had to get approval from the named [ERISA] plaintiffs

who would not have agreed…. They're straight shooters. They would say this doesn't

sound right."  Sarko 9/8/17 Dep., p. 75:18-22.  [EX. 37].  Nor would he have signed the

Claw Back Agreement (*see* Section L-3, *infra*) agreeing to reimburse Labaton for any

reduction in the fee award imposed by the Court as a result of the November 10, 2016

letter to the Court admitting the overstatement of the *State Street* lodestar (discussed

*infra*).  Sarko 9/8/17 Dep., pp. 75:2-22, 78:19 – 79:4.  [EX. 37].

      In addition, the failure to tell ERISA counsel about the Chargois Arrangement and

payment had yet another serious consequence:  The Department of Labor, which had

oversight and regulatory responsibility for the ERISA funds and was participating in the

settlement negotiations, was also kept entirely in the dark about the Chargois payment.

Lynn Sarko was the lawyer principally responsible for liaising with the DOL and keeping

its lawyers advised of the progress of settlement negotiations, including attorney fees, and

discovery documents and depositions clearly reflect that the DOL was acutely interested

in the payment of attorneys' fees.  *See* Sarko 7/6/17 Dep., pp. 51:2-3, 79:16-22, 8-:3-12

[EX. 28]; Sarko 9/8/17 Dep., p. 88:2-89:5  [EX. 37].  It was at the DOL's insistence that a

cap on the ERISA class's attorneys' fees was included in the Agreement of Settlement.

*See* Stipulation and Agreement of Settlement, Dkt. #89, ¶ 24 and footnote 1 [EX. 114];[94]

Sarko 9/8/17 Dep., p 35:1-8 ("That was a negotiated point with the Department of

Labor… they [we]re very focused on the ERISA portion.") [EX. 37]. Because it was not

informed by ERISA Counsel, and particularly Sarko, the DOL was kept ignorant of the

Chargois payment.[95] This is significant because State Street was insisting upon a global

settlement that included *all* interested parties -- especially the DOL. Sarko 9/8/17 Dep.,

pp. 23:19 – 24:4. [EX. 37]. In Sarko's opinion, "if you would have dropped this piece of

information [about the Chargois payment] into the mix, it would have blown that up."

*Id.*, p. 84:3.[96]

---

[94] Paragraph 24 of the Stipulation and Agreement of Settlement provided:

> 24. Except with respect to the amount of Plaintiffs' counsel's attorneys' fees chargeable to the ERISA Plans, as provided for below, the amount of the Class Settlement Fund allocated to the ERISA Plans and Registered Investment Companies and other Settlement Class Members shall be increased or decreased, as the case may be, by their proportional share (using the allocations set forth in the Plan of Allocation compared to the Class Settlement Amount) of any interest, costs (including Notice and Administration Expenses), Litigation Expenses, Service Awards, Taxes and Tax Expenses, and attorneys' fees of Plaintiffs' counsel, obtained or paid pursuant to permission of the Court. However: (i) the cost of any ERISA Independent Fiduciary shall be borne solely by SSBT and shall not be paid out of the Class Settlement Amount; and (ii) *no more than Ten Million Nine Hundred Thousand Dollars ($10,900,000.00) in attorneys' fees shall be paid out of the ERISA Settlement Allocation*.

Dkt. # 89, ¶ 24 (footnote omitted; emphasis added). [EX. 114].

A footnote appended to Paragraph 24 further made clear that "[i]f the Settlement Class seeks and/or the Court awards attorneys' fees at a rate which would, if applied to the $60,000,000 ERISA Settlement Allocation, result in a fee of less than $10,900,000, then such lower rate and resulting fee at that rate shall apply to the ERISA Settlement Allocation." *Id.,* note 1.

[95] The SEC and DOJ were similarly kept in the dark about the Chargois payment.

[96] The Special Master finds the testimony of Sarko, Kravitz, and McTigue to be credible on each of the points above.

### 7. **Failure to Disclose the Chargois Arrangement to the Special Master**

As noted *supra*, the Special Master first learned of Chargois' role the *State Street*

case after Thornton disclosed a handful of documents referencing payment to Chargois

during discovery.[97]  Chargois' name, however, did not appear in the thousands of

documents produced by Labaton or Lieff in response to substantially similar requests. At

the Special Master's request, Thornton, Lieff, and Labaton collectively provided

thousands of additional documents concerning what is now known as the Chargois

Arrangement.[98]

Labaton now argues that neither it nor Lieff had an obligation to produce

information related to that financial obligation in response to the Special Master's initial

discovery requests.[99]  *See* 4/12/18 Rebuttal Response by Labaton Sucharow LLP, at p. 11

[EX. 161]; 8/11/17 Labaton Sucharow LLP's Response to Supplemental Interrogatory

---

[97] *See* note 66, *supra*.

[98] While the lack of disclosure is somewhat disconcerting in light of the fact that Chargois received the fourth largest payout from the class fund, the Special Master does not conclude that the nondisclosure constitutes discovery misconduct. However, given the scope of the Special Master's mandate, certainly a more prudent practice would have been to inform the Special Master about the Chargois Arrangement, and produce all relevant documents, at the beginning of the investigation.

[99] *See* 4/12/18 Rebuttal Response by Labaton Sucharow LLP, at p. 11 ("The implication of discovery wrongdoing is clear, but incorrect. [EX. 161].  In fact, Request for Production No. 22 … which sought documents 'regarding the allocation of a certain percentage of the Fee Award among counsel,' and which is the only discovery request that arguably elicited information about the Chargois Agreement -- was withdrawn after a conference with the Special Master's counsel…. It is unclear why TLF produced the materials, but Labaton Sucharow and Lieff Cabraser were justified in not doing so."); *see also* 8/11/17 Labaton Sucharow LLP's Response to Supplemental Interrogatory 1(g) (stating that the firm did not read the Special Master's prior interrogatories or requests for production as requesting information related to the private referral arrangement or other information regarding the fee allocation).  [EX. 123].

It is significant to note that Labaton did not disclose Chargois to its own counsel. Oral Argument Trans., 29: 11-14; 29:17 – 30:1.  [EX. 162].  This is significant because, while Labaton had knowledge of the Chargois Arrangement, counsel whom it directed to negotiate with Special Master's counsel to limit the scope of the initial discovery requests did not.  *Id.* at 29:17 – 30:1 ([Lukey:] "I didn't have a clue about Mr. Chargois at that point.")

119

1(g) [EX. 123].  Labaton's argument is based in large part, if not entirely, on the fact that

Request for Production No. 22 -- seeking information about the allocation *among* counsel

-- was withdrawn by agreement of counsel.[100]  Several other discovery requests

propounded by the Special Master, however, did reasonably call for disclosure of

information and communications relating to Chargois and the Chargois Arrangement.

And, apart from any discovery obligation, disclosure of the Chargois Arrangement is a

critical piece of the Special Master's evaluation of the "accuracy and reliability of the

representations made by the parties in their requests for awards of attorneys' fees and

expenses."  March 8, 2017 Memorandum and Order, Dkt. # 173 at p. 2.[101]  [EX. 163].

On March 23, 2017, Labaton, Lieff, and Thornton received identically worded

Requests for Production[102] calling for "[a]ll documents referring to, relating to,

---

[100] On March 22, 2017, counsel for Labaton (Lukey and Wolosz) met with Special Master's Counsel (Sinnott and McEvoy) to discuss how best to streamline and prioritize the information sought in the Special Master's First Set of Interrogatories and Requests served on Customer Class Counsel on May 18, 2017.  Labaton's counsel also relayed concern shared by counsel for Lieff, who was unable to participate but had conferred with counsel for Labaton previously.  Of great concern to all counsel was the looming deadline for responding to the detailed discovery requests then set just fourteen days from the service date to accommodate an expedited deposition schedule in June and July 2017.  Counsel for the firms contended that several of the requests would be overly burdensome and/or otherwise unfeasible and potentially duplicative. After discussing the individual objections, the Special Master's Counsel agreed to narrow the scope of many of the requests prompting this concern and amended the upcoming deadline to a three-tiered deadline of June 1, June 9, and July 10, 2017, respectively. Because Lieff's counsel was neither present nor able to participate telephonically, the Special Master's Counsel sent Lieff a revised version of the May 18, 2017 discovery requests by email.  *See* Revised Requests for Production to Lieff dated May 23, 2017 [EX. 165].; *See also* 5/23/2017 email from Special Master's Counsel to Richard Heimann. [EX. 258].

Thornton's counsel (Mr. Kelly) communicated Thornton's objections in an email dated March 22 to the Special Master's Counsel. The Special Master's Counsel responded to those objections by email the next day and served revised versions of both requests.  *See* 5/23/17 Sinnott to Kelly [EX. 259].

[101] The March 8, 2017 order appointing the Special Master states that the Special Master "shall investigate and prepare a Report and Recommendation concerning *all issues* relating to the attorneys' fees, expenses, and service awards previously made in this case." (emphasis added) (March 8, 2017 Order, Dkt. # 173).  [EX. 163].

[102] After meeting with Labaton's counsel, and after receiving written objections from Thornton's counsel, Special Master's Counsel propounded revised discovery requests amending the original requests. *See* note 100, *supra*.

120

evidencing or constituting discussions between the Law Firm and the Plaintiffs' Law

Firms relating to sharing costs and/or expenses of the SST Document Review/SST

Litigation, including but not limited to sharing the cost of Staff Attorneys, hosting costs

for Catalyst database, and other expenses associated with conducting voluminous

document review." *See* Revised Requests for Production to Labaton (No. 18),[103] Lieff

(No. 16), and Thornton (No. 18) dated May 23, 2017.[104] [EX. 164; EX. 165; EX. 166].

In response to Request No. 18, Thornton produced June 2016 email communications

between Bradley and Labaton's Belfi, Keller, and Stocker, which related to the Chargois

obligation. *See* TLF-SST-012526. [EX. 144]. Thornton also produced TLF-SST-

012759, a June 2016 exchange between Bradley and Chargois related to the fee

negotiation.[105] [EX. 167]. Also included in Thornton's production was TLF-SST-

012671 - 12672, the "Dublin email" exchange between Thornton, Lieff, Labaton, and

Chargois in 2013. [EX. 168]. While these email communications were sent to or from

Labaton attorneys, and in some cases Lieff attorneys, neither firm produced them.

---

[103] As explained *infra*, Labaton's counsel met in person with the Special Master's Counsel on May 22, 2017, to narrow the scope of the initial requests propounded by the Special Master. During that meeting, counsel reached an understanding that several of the requests would be stricken and others significantly narrowed. Labaton thereafter memorialized their understanding of the new parameters in its written response to the Requests for Production. Because counsel for the Lieff and Thornton firms were not present at the May 22, 2017 meeting, the Special Master propounded "revised" requests on both firms shortly after that meeting.

[104] Labaton objected to the request on the basis of the volume of preliminary results, and Lieff joined in the objection. The firms were instructed by the Special Master to follow up, if necessary, to confer in relation to potentially narrowing relevant search terms; neither firm did.

[105] Bradley later referenced this exchange in email discussions with Belfi on the same date (*see* LBS037410) [EX. 169], which, after further negotiation, developed into confirmation by Bradley to Labaton and Lieff two weeks later that Chargois had agreed to a 5.5% fee (*see* LBS039936). [EX. 170].

Thornton also viewed the Dublin email as responsive to its Request No. 35, calling for "[a]ll documents relied upon by the Law Firm in preparing and filing the Firm's Fee Petition, including but not limited to expense reports, billing records, emails, invoices, and/or other records." Labaton and Lieff did not produce Chargois-related documents in response to identically worded Requests (Revised Requests Nos. 40 and 38, respectively) to their firms.[106]

The counterparts to those requests, the Revised Interrogatories, propounded by the Special Master that same date, also reasonably called for production of the Chargois Arrangement. Yet none of the three firms provided information about Chargois. For example, Revised Interrogatory No. 60 to Labaton ("Identify all billing entries, costs and/or expenses incurred by the Firm during the SST Litigation that the Firm did not include in its Fee Petition/Lodestar calculation, and the reasons therefor"), and identically worded Revised Interrogatory No. 62 to Lieff and No. 63 to Thornton, asked about financial expenditures not included in the Fee Petition. All three firms understood that Chargois' payment would be 5.5% of the Fee Award taken "off the top." *See* Labaton's June 9 Response to Special Master's First Set of Interrogatories [EX. 174]; Lieff's June 9

---

[106] Thornton's initial productions also included documents relating to Chargois that were responsive to Revised Request No. 40 ("All documents and/or communications relating to the discovery of billing errors disclosed in the November 10, 2016 Letter filed with the Court, including but not limited to communications between and among you, the Plaintiffs' Law Firms, class representatives, and/or the ERISA firms.") and Revised Request No. 43 ("All documents relating to, referring to, evidencing, or constituting the November 10, 2016 Letter, including all drafts, outlines, notes, and communications relating to the filing of that correspondence."). *See* TLF-SST-012272 [EX. 160], TLF-SST-012275 [EX. 171], TLF-SST-012279 [EX. 172], TLF-SST-012283 [EX. 173]. The reason for doing so appears to be that both requests seek communications among attorneys involved in the case about the attorneys' fees in this case, as implicated by the double-counting errors discovered in November 2016 (the subject of the November 10th letter to the Court) and the related claw back communications (discussed *infra*). Labaton and Lieff received corresponding requests (Revised Request No. 47 and Revised Request No. 50) of identical wording.

Response to Special Master's First Set of Interrogatories [EX. 175]; Thornton's June 9 Response to Special Master's First Set of Interrogatories [EX. 176].  Moreover, Labaton's obligation arose directly out of its portion of the total fee award.  Neither Chargois nor the Chargois Arrangement was referenced in response to this inquiry.

Perhaps the request most directly calling for disclosure of Chargois is Interrogatory No. 72 to Labaton: "Identify any other individuals, not listed above, who have knowledge of the Interrogatories and/or the SST Litigation and explain the general nature of such knowledge."[107]  Chargois was not listed in any of the interrogatory responses. The firms chose not to identify him in response to this catch-all question. Of course, all three firms were aware that Chargois received a fee based on the total fees awarded out of the settlement, and to that extent, had knowledge of the fees in the *State Street* case. While Labaton (and Thornton's Garrett Bradley) exclusively communicated with Chargois during the life of the case, and thus were uniquely situated to know his actual contributions to -- and by extension Chargois' own knowledge of -- the litigation, all three firms were aware of Chargois and his involvement in the fee allocation.[108]

## 8.  **Payments to Chargois Pursuant to the Chargois Arrangement**

---

[107] This language appears verbatim in Revised Interrogatories No. 74 to Lieff and No. 76 to Thornton.

[108] In responding, Labaton construed this Interrogatory as calling for identification of "the principal Labaton Sucharow attorneys or staff who worked on, or have unique knowledge regarding, the topic being reviewed by the Special Master."  *See* Labaton's June 9 Response to the Special Master's Revised Interrogatories [EX. 174].

Since the Chargois Arrangement began in 2008, Labaton has represented ATRS in

at least nine cases for which it has paid Chargois a percentage of Labaton's total fee

award:

- *In re A10 Networks, Inc. Shareholder Litigation,* No. 2015-1-CV-276207 (Cal. Super. Ct. Jan 29, 2015)

- *Brado v. Vocera Communications, Inc.* No. 13-CV-3567 (N.D. Cal. Aug.1, 2013)

- *Perry v. Spectrum Pharmaceuticals, Inc.*, No. 13-CV- 0433 (D. Nev. Mar.14, 2013)

- *Hoppaugh v. K12 Inc.,* No. 12-CV-0103 (E.D. Va. Jan. 30, 2012)

- *In re Hewlett-Packard Company Securities Litigation,* No. 11-CV-1404 (C.D. Cal. Sept. 13, 2011)

- *Arkansas Teacher Retirement System v. State Street Corporation,* No. 11-CV-10230 (D. Mass. Feb 10, 2011)

- *In re Beckman Coulter, Inc. Securities Litigation,* No. 10-CV-1327 (C.D. Cal. Sept. 3, 2010)

- *In re Colonial BancGroup, Inc. Securities Litigation*, No. 09-CV-0104 (M.D. Ala. Feb. 9, 2009)

- *In re Capacitors Antitrust Litigation*, No. 14-CV-3264-JD (N.D. Cal.) [109]

Labaton's 8/11/17 Response to Special Master's Supplemental Interrogatory, 1(a) [EX.

123]; Chargois 10/2/17 Dep., pp. 54:2-3; 65:1-71:13[110] [EX. 125].

---

[109] Chargois testified that *In re Capacitors* was not an ATRS case and hence not covered by the agreement. *See* Chargois 10/2/17 Dep., p.65:4-7. [EX. 125].

[110] While not identified in response to discovery, media reports also identify Labaton filing on behalf of ATRS and being named co-lead counsel in a multi-trillion-dollar action alleging that many of the country's leading banks harmed both the United States government and private investors by rigging the management of $13 trillion in securities sold by the U.S. Department of Treasury in *In Re: Treasury Securities Auction Antitrust Litigation,* (S.D.N.Y. 2017). Potentially, the Chargois Agreement would cover this case as well. *See*, *e.g*, Dunstan Prial, Law360, "Big Banks Face Wider Treasure Auction-Fixing Suit" (Nov. 16, 2017).

In each of these cases, Labaton paid Chargois a percentage -- more often amounting to 10-15% rather than the originally agreed-upon 20% -- of Labaton's total fee award.  Chargois 10/2/17 Dep., p. 60:17-20.[111]  [EX. 125].  Neither Chargois nor any Chargois & Herron attorneys entered an appearance or did any work in any of these actions.

L.      **MEDIA SCRUTINY OF THE STATE STREET SETTLEMENT AND THE SPECIAL MASTER'S APPOINTMENT**

1.      **The *Boston Globe* Inquiry and Discovery of Double-Counting Errors**

By all accounts, the $300 million settlement reflected an excellent result for the class members and was the product of the highly professional and skilled work of the class's law firms.  Sarko 7/6/17 Dep., p. 109:22-23 [EX. 28]; Kravitz 7/6/17 Dep., pp. 105:23 – 106:7 [EX. 21]; Hopkins 6/14/17 Dep., p. 100:1-10.  [EX. 4].  However, on

---

[111] Chargois was not happy with the frequent reductions in the amounts Labaton paid him.  He expressed his frustration in an October 18, 2014 email to Labaton:

> "… I am very concerned that you guys are attempting to significantly, substantially and materially alter our agreement. Our deal with Labaton is straightforward. We got you ATRS as a client after considerable favors, political activity, money spent and time dedicated in Arkansas, and Labaton would use ATRS to seek lead counsel appointments in institutional investor fraud and misrepresentation cases. Where Labaton is successful in getting appointed lead counsel and obtains a settlement or judgment award, we split Labaton's attorney fee award 80/20 period. As I said in my text to you regarding HP and your allocation, I understand the circumstances in this case and am okay with the fee split in this instance. We are not changing our fee split agreement for all the other pension fund cases. You promised me that you would give me advanced notice of when you guys would seek a modification or accommodation on a given settlement, and I want you to keep that going forward."

LBS017593 - 17594 (10/18/14 Chargois email to Belfi) [EX. 177]; *see also* Chargois 10/2/17 Dep., pp. 253:2-255:4. [EX. 125].

The Special Master did not investigate further into the background facts alleged by Chargois in this email as to how the Chargois/Labaton/ATRS relationship was originated and developed.  This subject is beyond the scope of the Special Master's assignment from the Court.  It is sufficient for the purposes of the Report and Recommendations for the Special Master to find, as he does, that Chargois was significantly involved at the inception of the Labaton/ATRS relationship by making the original contact with ATRS on Labaton's behalf and facilitating an introduction to the then-Executive Director of ATRS, Paul Doane, of Labaton attorneys Eric Belfi and Chris Keller.

November 8, 2016 -- less than a week after the Court had approved the Settlement and entered Judgment -- Garrett Bradley, managing partner at the Thornton Law Firm, received a phone call from the firm's counsel, Nixon, Peabody LLP, informing him that the firm had been contacted by a *Boston Globe* reporter. Garrett Bradley 6/19/17 Dep., pp. 85:23 – 86:11. [EX. 43]. According to Bradley, the reporter informed Thornton's attorneys that the *Globe* had reviewed the fee petitions submitted in the *State Street* matter and noted that certain staff attorneys' names appeared on both the Thornton lodestar report and the Labaton lodestar report with exactly the same number of hours down to a decimal point. *Id.*; *see also*, Michael Thornton 6/19/17 Dep., pp. 92:10-23 [EX. 2]; David Goldsmith 7/17/17 Dep., p. 132:16-24.[112] [EX. 58].

Bradley testified that after hearing this, he immediately went to see Evan Hoffman, the attorney at Thornton who had been in charge of in-taking the hours of the Labaton and Lieff staff attorneys assigned to Thornton on the *State Street* matter, and asked Hoffman to print out all of the fee declarations filed by the law firms in the case. G. Bradley 6/19/17 Dep., p. 86:15-17. [EX. 43]. Bradley stated that he then compared Thornton's fee declaration to Lieff's and Labaton's, "and immediately noticed same names, different rates, and [] knew something was wrong right away." *Id.*, 86:19-21. Bradley promptly called Labaton. *Id.* at p. 87:9. According to Bradley, "[T]hey pulled up what they had, we pulled up what we had and we could tell that there was a problem."

---

[112] David Goldsmith of Labaton testified that Garrett Bradley had also told him that the *Globe* reporter had made a comment about Thornton's billing rates, and "gave him [Garrett] grief about his brother," Michael Bradley, who was listed on the fee petition as one of the Thornton attorneys who worked on the *State Street* case. Goldsmith 7/17/17 Dep., p. 133:11-20. [EX. 58].

*Id.,* p. 87:9-11. Bradley also had Mike Lesser, one of his partners at Thornton, reach out to Dan Chiplock of Lieff Cabraser and have Chiplock check Lieff's fee declaration, as well. *Id.*, 87:11-12.

David Goldsmith testified that at Labaton, the attorneys tried to figure out what was going on. Goldsmith 7/17/17 Dep., p. 136:5-6. [EX. 58]. Goldsmith said that he had numerous discussions with people in the firm:

> I spoke with Mike Stocker [Labaton's General Counsel]. . . . Nicole Zeiss and I were talking a lot. I spoke with Howard Goldberg. I spoke with Danette McKenzie, I spoke with Todd Kussin. And I basically led an effort to determine internally what the double counting was and how we could correct it and disclose the problem to the court.

*Id.*, p. 137:11-19.

The attorneys at Lieff Cabraser also reviewed their records to locate any double-counting. *See* Chiplock 6/16/17 Dep., pp. 163:1 – 164:17. [EX. 10].

After conducting their internal reviews, Labaton, Lieff, and Thornton unanimously agreed that the *State Street* Fee Petition overstated hours worked by Customer Class Counsel by 9,322.9 hours due to the double-counting of certain lawyers' hours, resulting in a lodestar overstatement of $4,058,654.50.[113] The Fee Petition attributed hours of staff (and contract) attorneys allocated by Lieff and Labaton to Thornton for purposes of cost-sharing not only to the lodestar petitions of Lieff and Labaton -- the staff attorneys' host firms -- but also to Thornton's lodestar.

---

[113] The ERISA Counsel's lodestar reports were unaffected by the double-counting.

Specifically, the internal reviews revealed that 17 staff attorneys had been listed on both the Thornton and Labaton lodestar reports, and for all 17, the billing rates for the staff attorneys on the Thornton report were consistently higher. Goldsmith 7/17/17 Dep., p. 142:12-19. [EX. 58]. Lieff also confirmed that six staff attorneys on Thornton's lodestar report also appeared on Lieff's report. Chiplock 6/16/17 Dep., p. 164:9-17 [EX. 10]; *see also* Goldsmith 11/10/16 Letter to the Court, Dkt. # 116. [EX. 178]. This dramatically inflated the lodestar of Thornton. *See* 11/10/16 Letter from David J. Goldsmith to Hon. Mark L. Wolf, Dkt. # 116. [EX. 178].

### 2. The November 10, 2016 Letter to the Court

After Labaton, Thornton, and Lieff confirmed that the double-counting alleged by the *Globe* reporter had, in fact, occurred, David Goldsmith of Labaton took the lead in writing a letter to the Court to explain what had happened. G. Bradley 6/19/17 Dep., p. 87:15-17 [EX. 43]; Goldsmith 7/17/17 Dep., pp. 143:25 – 144:5. [EX. 58]. Goldsmith circulated his proposed letter to a number of people within his firm, and to the Thornton and Lieff firms. *Id.,* p. 144:5-9. He also circulated the letter to the ERISA firms. Various iterations of the letter were circulated within a compressed period of time. *Id.*

Goldsmith testified that he received a fair number of comments and proposed edits, but he recalled only two subjects on which there was some significant disagreement. One was that "when I wrote the letter, I said that we received an inquiry from the *Boston Globe*, and Garrett [Bradley] did not want to disclose that the media organization was the *Boston Globe*. He just wanted to say media organization. We ended up just saying media organization." *Id.*, p. 144:17-23. There was also some

128

disagreement about what exactly would be said with regard to the ERISA Counsel's part in this. *Id.*, p. 145:3-6. *See also* Sarko 7/6/17 Dep., p. 107:10-12 ("I remember the one thing I wanted to be in there was that it had nothing to do with the ERISA counsel." *Id.*) [EX. 28]; McTigue 7/7/17 Dep., p. 91:1-8 ("I suggested an edit ... which said the ERISA firms have not been involved in this staff attorney issue. In the actions that gave rise to the staff attorney issue." *Id.*) [EX. 11]. Goldsmith testified that ERISA Counsel's requested edits required some "massaging," and he ended up including a footnote in his draft that he thought pretty candidly said that the lodestar reports of the ERISA Counsel appeared unaffected. Goldsmith 7/17/17 Dep., p. 145:6-13. [EX. 58]. After all counsel finally agreed upon the language, Goldsmith finalized the letter and, on November 10, 2016, the letter was delivered to Judge Wolf.

The Goldsmith letter explained that due to "inadvertent errors," Plaintiffs' Counsel's reported combined time and lodestar were incorrect. Of the reported 86,113.7 hours, 9,322.9 hours were overstated. Of the reported lodestar of $41,323,895.75, $4,058,654.50 was overstated. 11/10/16 Goldsmith Letter, Dkt. # 116, p. 2. [EX. 178]. The letter stated that the mistakes had been brought to light as the result of a media inquiry and that the errors had been corrected by removing the duplicative time. *See id*. The letter also made clear that the lodestar reports in the individual firm declarations submitted by ERISA Counsel were unaffected by the double-counting errors found in Customer Class Counsel's lodestar reports. *See id*., footnote 3.

Notwithstanding that their original lodestar reports had been overstated, Goldsmith suggested to Judge Wolf that the $4,058,654.00 overstatement -- more than 9,300 double-

counted hours -- of the Customer Class Counsel's lodestar should not change the Court's

original determination of the reasonableness of his award of 24.85% of the gross

settlement as attorney fees.  *See* 11/10/16 Letter, p. 2.  [EX. 178].

In relevant part, the November 10, 2016 letter stated as follows:

Dear Judge Wolf:

We are writing respectfully to advise the Court of inadvertent errors
just discovered in certain written submissions from Labaton Sucharow
LLP, Thornton Law Firm LLP, and Lieff Cabraser Heimann & Bernstein
LLP supporting Lead Counsel's motion for attorneys' fees, which the Court
granted following the fairness hearing held on November 2, 2016. See
Order Awarding Attorneys' Fees, Payment of Litigation Expenses, and
Payment of Service Awards to Plaintiffs ("Fee Order," ECF No. 111).

These mistakes came to our attention during internal reviews that
were conducted in response to an inquiry from the media received after the
hearing.  The purpose of this letter is to disclose the error and provide a
corrected lodestar and multiplier.  We respectfully submit that the error
should have no impact on the Court's ruling on attorneys' fees.

As the Court is aware, the submissions supporting Lead Counsel's
fee application included individual declarations submitted on behalf of
Labaton Sucharow, Thornton, and Lieff Cabraser, reporting each firm's
lodestar and number of hours billed.  See ECF Nos. 104-15, at 7-9; 104-16,
at 7-8; 104-17, at 8-9; see also ECF No. 104-24 (Master Chart).

The professionals and paraprofessionals listed in these firms'
respective lodestar reports include persons denoted as Staff Attorneys, or
"SAs."  SAs are bar-admitted, experienced attorneys hired on a temporary,
though generally long-term, basis, and are paid by the hour.  The SAs in
this action were tasked principally with reviewing and analyzing the
millions of pages of documents produced by State Street.

Seventeen (17) of the SAs listed on the Thornton lodestar report are
also listed as SAs on the Labaton Sucharow lodestar report.  Six (6) of the
SAs listed on the Thornton lodestar report are also listed as SAs on the
Lieff Cabraser lodestar report.  Both sets of overlap reflect the fact that as
the litigation proceeded, efforts were made to share costs among counsel,

such that financial responsibility for certain SAs located at Labaton Sucharow's and Lieff Cabraser's offices was borne by Thornton.

***

Because of these inadvertent errors, Plaintiffs' Counsel's reported combined lodestar of $41,323,895.75, and reported combined time of 86,113.7 hours, were overstated. See ECF No. 104-24 (Master Chart).

We have corrected these errors by removing the duplicative time. When a given SA had different hourly billing rates, we removed the time billed at the higher rate. Deducting the duplicative time from the $41.32 million reported combined lodestar results in a reduced combined lodestar of $37,265,241.25, and a reduced combined time of 76,790.8 hours.

Cross-checking the $37.27 million reduced combined lodestar against the $74,541,250 percentage-based fee awarded by the Court yields a lodestar multiplier of 2.00. This is higher than the 1.8 multiplier we proffered in our submissions and during the hearing.

Plaintiffs' counsel respectfully submits that a 2.00 multiplier remains reasonable and well-within the range of multipliers found reasonable for cross-check purposes in common fund cases within the First Circuit, and that such an enhancement of the reduced lodestar represented by the 24.85% fee awarded by the Court remains well-supported by the $300 million Settlement obtained and fees awarded in comparable cases. See Fee Brief, ECF No. 103-1, at 24-25.

Accordingly, Plaintiffs' counsel respectfully submits that the Court should adhere to its ruling on attorneys' fees. See Fee Order ¶¶ 4, 6 (ECF No. 111); Nov. 2, 2016 Hrg. Tr. at 36:1-2 (finding 1.8 multiplier "reasonable").

We sincerely apologize to the Court for the inadvertent errors in our written submissions and presentation during the hearing. We are available to respond to any questions or concerns the Court may have.

Respectfully submitted,
/s/
David J. Goldsmith

11/10/16 Letter from David J. Goldsmith, Dkt. #116 (footnotes omitted). [EX. 178].

The Goldsmith letter made no attempt to explain how or why the double-counting occurred.  Nor did Labaton take this opportunity to disclose the Chargois Arrangement. (Of course, Goldsmith, himself, did not know about Chargois at the time he wrote the letter to the Court.)[114]

### 3. <u>The November 21, 2016 Claw Back Letter Agreement</u>

After the November 10, 2016 letter was delivered, Plaintiffs' Counsel awaited a response from the Court.  Recognizing that the Court might respond adversely and ultimately decide to reduce the fee award, on November 21, 2016, at the direction of Labaton's Chairman, Lawrence Sucharow, David Goldsmith drafted a letter that Sucharow then sent to all counsel -- including ERISA Counsel -- for their signature, asking all counsel to agree to refund to Labaton, for re-deposit into the *State Street* escrow account, their respective pro-rata share of any court-ordered reduction of fees, expenses, and/or service awards (the "Claw Back Letter").  *See* Goldsmith 7/17/17 Dep., pp. 152:17 – 155:13 [EX. 58]; *see also* TLF-SST-012264 – 12266 (11/21/16 Sucharow Draft Letter to Counsel).  [EX. 179].

The issue of whether to send a similar letter to Chargois was raised in an email addressed only to Customer Class Counsel by Garrett Bradley, to which Sucharow responded:

> Need two letters with breakdown, ERISA just gets sent to ERISA counsel with 10 percent off the top and then a third each.  Class co-counsel get one with ERISA 10 percent off the top, Damon's percentage also off the top, and each of class co-counsel split with the percentages agreed to.  *In short, no reason for ERISA to see*

---

[114] This is another instance of problems created at Labaton as a result of its compartmentalization of its practice.  *See* discussion, *supra.*

> *Damon's split. They only need to see their 10 percent and then split three ways.*
> By the way, I want to asterisk the 10 percent to ERISA with a footnote saying
> although our fee agreement with ERISA counsel only provides for a 9 percent
> allocation, co-class counsel have determined to increase that to 10 percent in light
> of the excellent work and contribution of ERISA counsel.

TLF-SST-012272 – 12274 (11/22/16 Sucharow email to Goldsmith, G. Bradley, Keller,

and Belfi) (emphasis added).[115]   [EX. 160].

Larry Sucharow then also directed Goldsmith to send a separate claw back letter to

Damon Chargois for his signature, as well.  Goldsmith 9/20/17 Dep., p. 171:14-23.  [EX.

42].  Accordingly, Goldsmith drafted a letter for Eric Belfi, the "ATRS relationship

partner" with Labaton, to send to Chargois.  *Id*, p. 172:10-15.  *See also* Belfi 9/5/17 Dep.

p. 93:13-16.  [EX. 122].

Goldsmith testified that all counsel ultimately complied with the request and

signed the letter agreement.  Goldsmith 7/17/17 Dep., p. 160:2-7.  [EX. 58].  Although

Goldsmith acknowledged that the ERISA firms had nothing to do with the errors in the

Thornton/Labaton/Lieff fee petitions, he testified, "We thought the best way to deal with

this would be to gather signatures from everybody, even if perhaps they apparently

weren't involved in the double counting, that if there was a reduction that applied to

them, that they would return the money."  *Id.,* pp. 158:25 - 159:9.  Goldsmith, however,

admitted that "if there was a determination that expressly applied only to some firms,

then I guess this letter would bring up some questions about how that would be handled."

*Id.*, p. 159:10-15.

---

[115] This was another attempt to ensure that ERISA lawyers did not learn about the Chargois Agreement or payment.

### 4. **The *Boston Globe* Article**

Before the Court had an opportunity to respond to Goldsmith's November 10

letter, on December 17, 2016, the *Boston Globe* published its article. *See* Andrea Estes,

*Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE, December 17,

2016. In addition to reporting the double-counting and Goldsmith's explanation, the

*Globe* article also criticized the rates at which the staff attorneys were billed in the *State*

*Street* action. *See id*. The article further specifically targeted the fees billed by Michael

Bradley, who, according to the article, "is a lawyer, but normally works alone, often

making $53 an hour as a court-appointed defender in Quincy District Court," but was

billed at "nearly 10 times that rate in the State Street case." *Id.* Citing Garrett Bradley's

Fee Declaration, the *Globe* reported that Michael Bradley was billed in the *State Street*

case as a "$500-an-hour 'staff attorney'" who "worked 406.4 hours on the lawsuit . . . at a

cost of $203,200." *Id.*

The *Boston Globe* also criticized the billing rates of the other staff attorneys:

> Michael Bradley wasn't the only lawyer for whose work Thornton
> claimed stratospheric – and questionable – legal costs in the filing to US
> District Judge Mark L. Wolf. Garrett Bradley listed 23 other staff
> attorneys, each with hourly rates of $425, who collectively accounted for
> $4 million in costs. But one of the lawyers told the *Globe* he was actually
> paid just $30 an hour for his services – and not by Thornton. Like all the
> other staff attorneys on Garrett Bradley's list, except his brother, he worked
> for another firm in the case, which also counted his hours on its list of
> costs.
>
> .    .    .    .    .
>
> More than 60 percent of the costs that Thornton and two other law
> firms submitted to Judge Wolf came from the work of staff attorneys – all
> of them assigned hourly rates at least 10 times higher than the $25 to $40
> an hour typical for these low-level positions – which involve document
> review.

134

*Id.*

### 5.  **The Court's Response to Goldsmith's Letter and the *Boston Globe* Article**

#### a.  **Appointment of the Special Master**

With questions having been raised as to the accuracy and reliability of the lodestar reports that had been submitted by Plaintiffs' counsel and relied upon by the Court in awarding fees, the Court proposed the appointment of a Special Master to investigate these issues and prepare a Report and Recommendation concerning them.  *See* 2/6/17 Memorandum and Order, Dkt. # 117.  [EX. 180].  The Court thereafter held a hearing on March 7, 2017 to discuss, among other issues, the appointment of Hon. Gerald E. Rosen as the Special Master.  *Id.*  At that hearing, all counsel consented to the appointment of Judge Rosen as Special Master.  *See* 3/7/17 Hrg. Tr., Dkt. # 176, pp. 43, 55. [116]  [EX. 96]. Counsel further consented to the payment of $2 million by Labaton, Lieff, and Thornton, collectively, for deposit with the Clerk of the Court to fund the Special Master's investigation.  *Id.,* pp. 51-52.

The following day, March 8, 2017, the Court entered a Memorandum and Order appointing Hon. Gerald E. Rosen, ret., as Special Master to investigate and prepare a

---

[116] McTigue initially filed a written objection to the appointment of Judge Rosen, *see* McTigue Law's Response to 2/6/17 Order, Dkt. # 138 [EX. 181], but on the record at the hearing, Brian McTigue withdrew that objection.  *See* 3/7/17 Hrg. Tr., Dkt. # 176, p. 55:3-4.  [EX. 96].

Report and Recommendation. *See* 3/8/17 Memorandum and Order, Dkt. # 173. [EX. 163]. The Order, in pertinent part, provides as follows:

> [I]t is hereby ORDERED that pursuant to Federal Rule of Civil Procedure 53:
>
> 1. Judge Rosen is appointed as Master (the "Master"). The Master may retain any firm, organization, or individual he deems necessary to assist him in the performance of his duties.
>
> 2. The Master shall investigate and prepare a Report and Recommendation concerning all issues relating to the attorneys' fees, expenses and service awards previously made in this case. The Report and Recommendation shall address at least: (a) the accuracy and reliability of the representations made by class counsel in their request for awards of attorneys' fees and expenses, including but not limited to whether counsel employed the correct legal standards and had a proper factual basis for what was represented to be the lodestar for each firm; (b) the accuracy and reliability of the representations made in the November 10, 2016 letter from David Goldsmith, Esq. of Labaton Sucharow, LLP (Docket No. 116); (c) the accuracy and reliability of the representations made by class counsel and each of the named plaintiffs in requesting service awards; (d) the reasonableness of the amounts of attorneys' fees, expenses and service awards previously ordered, and whether any or all of them should be reduced; (e) whether any misconduct occurred in connection with such awards; and if so, whether it should be sanctioned, *see e.g.,* Fed. R. Civ. P. 11(b)(3) & (c); Massachusetts Supreme Judicial Court Rule of Professional Conduct 3.3(a)(1) & (3).
> ***
> 4. The Master shall have the authority described in Federal Rule of Civil Procedure 53(c)(1) and (2). Therefore, among other things, the Master shall have the authority to compel, take and record evidence. This includes the authority to require the production of documents and other records from the parties and third-parties; require responses to interrogatories, and other requests for information and admissions; conduct depositions; and conduct hearings.
> ***
> 11. The Master shall make and preserve a complete record of the evidence concerning his recommended findings of fact and any conclusions of law. Such record shall be filed with the Master's Report and Recommendation.

3/8/17 Memorandum and Order, Dkt. # 173 (footnotes omitted). [EX. 163].

### b. The Special Master's Investigative Team

The Appointing Order in this case specifically authorized the Special Master to "retain any firm, organization, or individual he deems necessary to assist him in the performance of his duties." *See* 3/8/17 Memorandum and Order, Dkt. # 173, ¶ 1. [EX. 163]. Pursuant to that authority, the Special Master assembled a team led by William Sinnott, a partner in the Boston law firm of Donoghue, Barrett & Singal P.C. (now "Barrett & Singal, P.C.") ("Counsel to the Special Master") to assist him in the investigation. Other attorneys comprising the Special Master's investigative team were: Elizabeth McEvoy and Brian Mulcahy, also attorneys with Barrett & Singal; Linda Hylenski, former career law clerk for Judge Rosen in the United States District Court for the Eastern District of Michigan, currently a research attorney with JAMS; and the Hon. Mary Beth Kelly, a former Justice of the Michigan Supreme Court, currently a JAMS mediator and arbitrator. The Special Master also retained John Toothman, Esq., an authority on legal fees and legal fee management, to serve as the team's Technical Expert,[117] and Professor Stephen Gillers as an expert on the ethical and professional conduct issues raised in this case.

### c. The Investigation

---

[117] Several of Plaintiffs' Counsel objected to the appointment of Mr. Toothman. The Special Master overruled the objection. *See* Special Master's 3/31/17 Order Regarding the Law Firms' Objection to Retention of John Toothman, Dkt. # 193. [EX. 182]. This decision was appealed to the District Court which affirmed the Special Master. *See* Dkt. # 199 [EX. 183], 204 [EX. 184].

Over the course of a fourteen-month investigation, the Special Master and his investigative team conducted written discovery, reviewed over 200,000 pages of documents, interviewed 34 witnesses, and conducted 63 depositions in Boston, New York, Washington, D.C., and Detroit. As directed in the Appointing Order, the principal areas of inquiry at the core of the investigation were:

    a.   The accuracy and reliability of the fee petitions;

    b.   The accuracy and reliability of the representations made in Goldsmith's November 10, 2016 letter to the Court;

    c.   The accuracy and reliability of representations made by the parties requesting service awards;

    d.   The reasonableness of the amounts of attorneys' fees, expenses, and service awards previously ordered and whether any or all should be reduced; and

    e.   Whether any misconduct occurred in connection with the awards, and if so, whether it should be sanctioned.

The Findings of Fact set forth above inform the Special Master's Conclusions of Law that follow. To the extent that any Findings of Fact constitute Conclusions of Law, they are so adopted.

## III.   <u>CONCLUSIONS OF LAW</u>

### A. <u>APPLICABLE STANDARDS</u>

#### 1. <u>The Special Master's Authority to Decide Issues Regarding the Fee Award</u>

In a certified class action, the court may refer issues related to the amount of an award of attorneys' fees and nontaxable costs to a special master pursuant to Fed. R. Civ. P. 54(d)(2)(D). *See* Fed. R. Civ. P. 23(h). Rule 54(d)(2)(D) provides, "[T]he court may refer issues concerning the value of services to a special master under Rule 53 without

regard to the limitations of Rule 53(a)(1)."  As the 1993 Advisory Committee Note to Rule 54 explains, "the rule [] explicitly permits . . . the court to refer issues regarding the amount of a fee award in a particular case to a master under Rule 53. . . . This authorization eliminates any controversy as to whether such references are permitted . . ."  Fed. R. Civ. P. 54 Advisory Committee's Note to 1993 Amendment.  Pursuant to Rule 53, the appointing order delineates the special master's duties and authority.  Fed. R. Civ. P. 53(b)(2)(A).  *See* 3/8/17 Memorandum and Order, Dkt. # 173.  [EX. 163].

## 2.  Duties of the Court and Counsel in Class Action Fee Petition Proceedings

Fed. R. Civ. P. 23(e) squarely places the court in the role of protector of the rights of the class when a settlement is reached and attorneys' fees are awarded.  *See In re Agent Orange Product Liability Litigation,* 818 F. 2d 216, 222 (2d Cir. 1987).[118]  "In fulfilling this role, courts should look to the various codes of ethics as guidelines for judging the conduct of counsel."  *Id.* (citations omitted).

Attorneys seeking fees from a common fund have a duty to present all relevant facts to the court reviewing the petition.  *Id.* at 224-226.  This duty arises under Rule 23(e) as the court must, pursuant to that provision, ensure that a settlement, and the distribution of that settlement, in a class action are fair and reasonable.  *See Bezdek v. Vibram USA, Inc.,* 809 F.3d 78, 82 (1st Cir. 2015); Fed. R. Civ. P. 23(e)(2) ("[T]he court may approve [a proposed settlement] only after a hearing and on finding that it is fair, reasonable, and adequate.")  As noted in the Advisory Committee Notes to Rule 23,

---

[118] *Agent Orange* is the leading case in the area of judicial scrutiny of fee-sharing agreements among class action plaintiffs' attorneys.

"Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process. . . . In a class action, the district court must ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid. Even in the absence of objections, the court bears this responsibility." Fed. R. Civ. P. 23(h), Advisory Committee Notes, 2003 Amendment.

This gatekeeper duty on the part of the court clearly reflects the court's equitable authority to safeguard settlement funds as a fiduciary of the class. *Bezdek v. Vibram, USA, Inc.,* 809 F. 3d at 80; *In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 736 (1st Cir.1999) ("[T]he district court, called upon to make awards of fees and/or expenses… functions as a quasi-fiduciary to safeguard the corpus of the fund for the benefit of the plaintiff class."); *see also In re Eastman Kodak ERISA Litig.*, 213 F. Supp. 3d 503, 508 (W.D.N.Y. 2016) (quoting *Frankenstein v. McCrory Corp.*, 425 F. Supp. 762, 765 (S.D.N.Y.1977) ("[S]ince the fee award in some respects operates to reduce the amount of benefit which might otherwise have accrued to class members, the courts bear a special responsibility to safeguard the interests of these absent plaintiffs").

The fee petition process clearly places an enhanced duty of full disclosure and transparency upon counsel filing their petition for attorney fees so that the court can perform its gatekeeping function fully and completely advised of all factors and agreements that impact the allocation of attorneys' fees vis-à-vis the actual recovery of the class. The First Circuit has held that where courts must determine an award of attorneys' fees -- such as in approving an award requested in a common fund class action

140

case -- a court has a responsibility to "render a principled decision" by closely scrutinizing fees, even fees agreed upon by counsel and the client. *See Codex Corp. v. Milgo Electronic Corp.,* 717 F.2d 622, 632 (1st Cir. 1983), *cert. denied,* 466 U.S. 931 (1984). Absent full disclosure, the court cannot, with full knowledge, discharge its gatekeeping function and ensure fairness to the class. *Weinberger v. Great Northern Nekoosa Corp.,* 925 F. 2d 518, 528 (1st Cir. 1991).

The Special Master is guided by the foregoing general standards in deciding the issues presented in this case.

## B. ACCURACY, RELIABILITY, AND REASONABLENESS OF THE LODESTARS

The Court has called upon the Special Master to determine the accuracy and reliability of representations made to the Court in connection with the fee petition and the reasonableness of the fees previously ordered.

### 1. The Firms' Lodestar Petitions

To exercise its fiduciary duty to protect the class when responding to class counsel's fee request, a court needs accurate and complete information about the contributions of the firms seeking counsel fees. Here, the *State Street* fee petition requesting attorneys' fees in the amount of $74,541,250.00, plus $1,257,699.94 in expenses and accrued interest, was supported by the Omnibus Declaration of Lawrence A. Sucharow and nine individual declarations submitted by each law firm that had filed an appearance in the case.

141

The individual declarations incorporated a narrative provided to them in a "template" prepared by Labaton in setting forth the respective firms' attorneys' work on the case. Specifically, in these individual declarations, each of the law firms represented to the Court:

- The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by each attorney and professional support staff-member of my firm who was involved in the prosecution of the Class Actions, and the lodestar calculation based on my firm's current billing rates. For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court. Time expended in preparing this application for fees and payment of expenses has not been included in this request. (Dkt. Nos. 104-15, ¶ 6 [EX. 88]; 104-16, ¶ 3 [EX. 66]; 104-17, ¶ 4 [EX. 89]; 104-18, ¶ 3 [EX. 90], ¶ 3 [EX. 93]; 104-23, ¶ 3 [EX. 95]).

- The hourly rates for the attorneys and professional support staff in my firm [] are the same as my firm's regular rates charged for their service, which have been accepted in other complex class actions." **(**Dkt. Nos. 104-15, ¶ 7 [EX. 88]; 104-16, ¶ 4 [EX. 66]; 104-17, ¶ 5 [EX. 89]; 104-18, ¶ 4 [EX. 90]; 104-21, ¶ 4 [EX. 93]; 104-23, ¶ 4 [EX. 95].)[119]

---

[119]  With respect to hourly rates, three of the ERISA firms  -- McTigue Law, Zuckerman Spaeder, and Beins Axelrod -- used different language: McTigue Law's individual fee declaration states that "[t]he hourly rates for the attorneys and professional support staff in my Firm included in Exhibit A are the same as my Firm's regular rates otherwise charged for their services, which have been accepted in other complex class actions my firm has been involved in." Dkt. No. 104-18, ¶ 20.  [EX. 91].

Zuckerman Spaeder's individual fee declaration states that "[t]he hourly rates for the attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions and are charged to clients paying us currently by the hour." Dkt. No. 104-20, ¶ 4.  [EX. 92].

Beins Axelrod's individual fee declaration states that "[t]he hourly rates charged by the Timekeepers are the Firm's regular rates for contingent cases and those generally charged to clients for their services in non-contingent/hourly matters. Based on my knowledge and experience, these rates are also within the range of rates normally and customarily charged in Washington, D.C. by attorneys of similar qualifications and experience in cases similar to this litigation, and have been approved in connection with other class action settlements. The Firm has charged, and received, an hourly rate of $525.00 in litigation involving fiduciary breach by a former trustee and service providers. The Firm does charge a lower rate to longstanding Fund clients in non-contingency matters and to its Union clients. To serve the public interest, the Firm has also charged reduced rates to individual employees with employment discrimination claims. Dkt. No. 104-22, ¶ 8.  [EX. 94].

A chart ("Exhibit A") summarizing each firm's respective lodestar through August 30, 2016 was attached to each individual firm's declaration, which listed the hours of work done by partners, associates, staff attorneys, contract attorneys, "of counsel" attorneys, local counsel, research analysts, paralegals, and investigators, and the rates at which their work was billed.

## 2. <u>Governing Law</u>

In examining the Fee Petition in this case, the Special Master starts with the basic principle that an award of attorneys' fees from a common fund must be reasonable. *See* Fed. R. Civ. P. 23(h) ("In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement."). Because the Court derives its authority to order reimbursement from a common fund from its historical equitable powers, each fee request must be assessed on its own terms; "individualization is the name of the game." *In re Fidelity/Micron Sec. Litig.*, 167 F.3d 735, 737 (1st Cir. 1999) (authority to order reimbursement from a common fund has its origins in equity); *see also United States v. 8.0 Acres of Land*, 197 F.3d 24, 33 (1st. Cir. 1999) (recognizing, in a land dispute case involving a common fund award, that the common fund is an equitable award and the district court has broad discretion in determining the appropriateness of such an award).

Courts analyze fee awards using two different methods: the percentage-of-fund ("POF") method and the lodestar calculation. *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 305 (1st Cir.1995) (describing two methods); *see Heien v. Archstone*, 837 F.3d 97, 100 (1st Cir. 2016) (identifying

percentage-of-fund and lodestar as the two options for determining fee awards); *see also Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 377 (D. Mass. 1997).

Under the lodestar approach, the court calculates the number of hours reasonably expended by counsel multiplied by a reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983) ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate"). Alternatively, courts can award fees based on what the court determines is a reasonable percentage of the fund recovered. *See In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 77-79 (D. Mass. 2005) (discussing the applicability, use, and common percentage size when using the POF method); *Roberts v. TJX Companies, Inc*., No. 13-13142, 2016 WL 8677312, at *10 (D. Mass. 2016) (identifying factors the 1st Circuit has identified as relevant to the determination of the reasonableness of a POF award).

The First Circuit has taken a flexible approach and has determined that in a common fund case the district court, in the exercise of its informed discretion, may calculate counsel fees either on a POF basis or by fashioning a lodestar. *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig*., 56 F.3d at 308. ("Given the peculiarities of common fund cases and the fact that each method, in its own way, offers particular advantages, we believe the approach of choice is to accord the district court discretion to use whichever method, POF or lodestar, best fits the individual case. We so hold, recognizing that the discretion we have described may, at times, involve using a combination of both methods when appropriate."

144

Although the First Circuit has declared that the district court has a choice as to whether to use the POF or lodestar approach, a majority of courts in this circuit rely heavily on the POF calculation in determining the reasonableness of fee awards. *See In re Lupron Mktg. & Sales Practices Litig.*, 2005 WL 2006833, at *3-5 (D. Mass. Aug. 17, 2005); *Duhaime v. John Hancock Mut. Life Ins. Co.*, 989 F. Supp. 375, 377 (D. Mass. 1997) (POF method more aligns with interests of the class); *In re Relafen*, 231 F.R.D. at 79 (identifying POF as appropriate under the circumstances of the case). However, where the court begins with a POF analysis, it will nevertheless calculate the lodestar as a cross-check to confirm the reasonableness of the POF award. *See In re Thirteen Appeals*, 56 F.3d at 307; *Walsh v. Popular, Inc.*, 839 F. Supp. 2d 476, 485 (D.P.R. 2012) (using lodestar to confirm the reasonableness of the POF award for attorneys' fees in an ERISA class-action settlement); *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, No. 05–11148, 2009 WL 3418628, at *1 (D. Mass. 2009) (determining that lodestar is enough of a cross-check on the POF method; a full audit of all attorneys' fees and costs was too cumbersome and time-consuming). The lodestar cross-check is the approach used by the Court in this case. *See* 11/2/16 Hearing. Tr., pp. 30:18-22, 35:13. [EX. 78].

The transcript of the November 2, 2016 Hearing bears out that the Court accepted Class Counsel's calculation of fees and expenses, including service awards to the Plaintiff representatives, as 25.27% of the gross settlement fund. *See* 11/2/16 Hearing Tr., pp. 23:6-19; 35:3 – 37:3. The Court also applied the lodestar cross-check to the fees and found the fees reasonable. "The amount awarded is about 1.8 times the lodestar.

The lodestar is about $41 million.  This is reasonable." *Id.*, pp. 36:1-2.  The Court left no doubt as to the importance of the lodestar in approval of the award: "I have used the percentage of common fund method. I've used the reasonable lodestar to check on that." *Id.*, p. 35: 12-13.

In concluding that the amount of fees requested was reasonable, the Court reviewed in detail the relevant factors to determine reasonableness outlined in *Johnson v. Georgia Hwy. Express*, 488 F.2d 714 (5th Cir. 1974) and *Blum v. Stenson*, 465 U.S. 886, 898-99 (1984), highlighting the submission of the number of hours spent, the result achieved for the class, the novel theory pursued, the potential difficulty of achieving class certification, the global settlement reached with the ERISA class, the arduous discovery and mediation process that proceeded in tandem, and the involvement and agreement of the regulatory bodies involved, namely the DOL, the SEC, and the DOJ.

But beyond these factors -- and inherent in the application of the POF and lodestar cross-check -- any determination of the reasonableness of attorneys' fees depends entirely in the first instance on the accuracy and reliability of rates and hours submitted to the Court in the lodestar petitions of the parties.

### 3. **Rates and Hours**

#### a. **Reasonableness of Hourly Rates**

A reasonable hourly rate takes into account such factors as the type of work performed, who performed it, the expertise that it required, and when it was undertaken. *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950-51 (1st Cir. 1984) (internal citations omitted).  There is, of course, no universal rate for legal services.  *Hutchinson ex rel.*

146

*Julien v. Patrick*, 636 F.3d 1, 16 (1st Cir. 2011). Hourly rates vary based on "the nature of the work, the locality in which it is performed, the qualification of the lawyers, among other criteria." *United States v. One Star Class Sloop Sailboat*, 546 F.3d 26, 38 (1st Cir.2008) (when determining hourly rates for a lodestar calculation, a court may apply standard local rates for a specific type or work, even if the out-of-state attorney traditionally charges a higher rate for the same type of work), *citing Gay Officers Action League v. Puerto Rico*, 247 F.3d 288, 295 (1st Cir. 2001) (analyzing the factors to be considered when determining the reasonable hourly rate for a lodestar calculation under a fee-shifting statute). Given the great variance in hourly rates charged across different jurisdictions, and among attorneys of varying background and experience, the court must first determine the appropriate point of reference -- or venue -- against which the reported fees will be compared.

### b. Prevailing Rates in the Community

#### i. *First Circuit Rule -- Local Forum*

In the First Circuit, courts apply the prevailing rates in the community taking into account the qualifications, experience, and specialized competence of the attorneys involved. *Gay Officers Action League v. Puerto Rico*, 247 F.3d at 295. The presumption for cases pending in federal court in Boston is that Boston rates apply. *See Stokes v. Saga Int'l Holidays, Ltd.*, 376 F.Supp.2d 86, 92 (D. Mass. 2005). This forum venue presumption clearly should apply in cases involving the interpretation of local statutes or a straightforward application of state common law claims. *See Maceira v. Pagan*, 698 F.2d 38, 40 (1st Cir. 1983) ("Where it is unreasonable to select a higher priced outside

147

attorney -- as, for example, in an ordinary case requiring no specialized abilities not amply reflected among local lawyers -- the local rate is the appropriate yardstick").  This is because local counsel are often better equipped than out-of-town counsel to litigate the nuances presented by local statutes and navigate local rules and procedures.  *Id.*  For these reasons, the First Circuit has determined that the "community" is the venue where the case is pending.  *Id.* (discussing that a reasonable and well-informed client would be more willing to pay a local attorney at local rates if he or she could appropriately handle the legal issue); *see also Fryer v. A.S.A.P. Fire and Safety Corp., Inc*., 750 F.Supp.2d 331, 339 (D. Mass. 2010) (finding the community rate to be the rate in the community where the court sits); *Stokes*, 376 F.Supp.2d at 92.

As with any rule, however, there are circumstances in which a rate other than the local rate is more appropriate.  In *Maceira*, the First Circuit held that out-of-town specialists may be able to command a higher rate for their services if the case requires specialized abilities not amply reflected among local lawyers, or "when a specialist was required for the handling of the case and a smaller community does not have one available."  *Guckenberger v. Boston University*, 8 F. Supp.2d 91, 103-104 (D. Mass. 1998) (small communities may not have a specialist required to handle a case, and therefore an out-of-town specialist may be required).[120]

Courts have also found that where a case is national in scope and requires the expertise of counsel from outside the forum, "national rates" rather than local rates may

---

[120] Absent evidence that out-of-town rates should apply, courts adhere to the presumption that the local rates of the forum community will apply.  *See e.g., Vieques Conservation and Historical Trust Inc. v. Martinez*, 313 F. Supp. 2d 40, 46 (D. P.R. 2004).

148

be appropriate.  *See In re Agent Orange Product Liability Litigation*, 611 F. Supp. 1296,

1308-09 (E.D.N.Y. 1985) (finding that using a "nationally prevailing rate" was an

appropriate solution for determining attorneys' fees in complex, wide-scope cases); *see*

*also Feinberg v. Hibernia Corp.*, 966 F. Supp. 422, 447 (E.D. La. 1997) (declining to

apply the local New Orleans rates; considering multiple factors, including the relevant

New York rates and expenses of the firms involved, court found New York rates should

apply).

### ii.  *The "Community"*

The First Circuit rule and these exceptions underscore the importance of

identifying the underlying community in determining the appropriate billing venue for

legal services. The threshold question then becomes:  What is the relevant "community"

for purposes of national class action litigations?  As counsel suggested throughout

discovery, "community" refers not just to a geographic legal community, but more

broadly to a community of practitioners.  *See e.g.,* Heimann 7/17/17 Dep., pp. 70:5 –

71:4.  [EX. 19].  Indeed, several courts have applied a similar analysis.  *See, e.g., Boxell*

*v. Plan for Group Ins. of Verizon Comm., Inc.*, No. 1:13–CV–089 JD, 2015 WL 4464147

at *9  (N.D. Ind. July 21, 2015) ("when the subject matter of the litigation is one where

the attorneys practicing it are highly specialized and the market for legal services in that

area is a national market, the relevant community is not the local market area, but the

community of practitioners in that subject matter") (some internal punctuation omitted);

*Lucas v. Kmart Corp.*, No. 99–cv–01923–JLK–CBS, 2006 WL 2729260 *4 (D. Colo.

July 27, 2006) (relevant community for purposes of determining a reasonable billing rate

for class counsel consists of attorneys who litigate nationwide, complex class actions);
*see also Donnell v. United States,* 682 F2d 240, 252 (D.C. Cir. 1982); *Flash II, supra*,
546 F.3d at 40-41.  The Special Master agrees with counsel that what constitutes a
community for purposes of determining a prevailing billing rate in this case is a far more
nuanced inquiry than simply determining the situs of the Court.

### *iii. The State Street Case*

Counsel contend that the venue of the litigation is not determinative of the
community for purposes of selecting a billing venue in this case.  Heimann 7/17/17 Dep.,
pp. 69:13 – 71:9 [EX. 19]; Fineman 6/6/17 Dep., pp. 74:24 – 75:9 [EX. 18]; Zeiss
6/14/17 Dep., pp. 65:5 – 23 [EX. 79].  Instead, counsel have argued the relevant
community should be the community of practitioners equipped to handle the subject
matter.  Zeiss 6/14/17 Dep., pp. 65:24 – 66:13 [EX. 79]; *see also* Labaton Sucharow
Responses to Interrogatories Nos, 44, 51 [EX. 174].  Counsel thus take the position that
the relevant community in the *State Street* litigation is the community of practitioners
with similar experience and skills to assert a national class action on behalf of a national
class of plaintiffs.  *Id.* Accordingly, counsel suggest "national" rates, rather than local
rates, should apply.

It is certainly true that the forum venue of the *State Street* litigation is Boston, but
it is equally relevant that counsel were members of the plaintiffs' class action bar and had
extensive experience litigating complex class action matters across the country.  *See* Lieff
Cabraser Response to Special Master's First Set of Interrogatories, No. 1 [EX. 175];
Goldsmith 7/17/17 Dep., p. 11:4-9 [EX. 58]; Sucharow 6/17/17 Dep., 9:19-25; 13:11-13

[EX. 16].  Therefore, for purposes of determining billing venue, the community is one of

seasoned class action litigators with experience bringing large securities, consumer, and

ERISA claims.

Beyond this, the Plaintiff class members were situated throughout the United

States.

For these reasons, it is appropriate that, as suggested by counsel, national rates

should apply to the work performed in the *State Street* case.  A thorough investigation has

identified several factors that require expertise not readily available in the Boston market.

In this analysis, consideration of the totality of the circumstances surrounding the case is

required, including at least (1) the subject matter of the claims alleged; (2) availability of

capable local counsel; (3) whether litigation called for out-of-town expertise not

otherwise available in Boston; and (4) the national character of the litigation.  A close

examination of each factor strongly militates in favor of applying a national rate to the

work performed in the *State Street* litigation.

### 1. *Complexity of FX Trading Claims and the Need for Experienced Counsel*

It is well accepted that a case requiring specialized abilities may, and often does,

warrant higher attorney rates.  *See Maceira, supra*; *Palmigiano v. Garrahy*, 707 F.2d 636,

637 (1st Cir. 1983).  Cases involving complicated or novel legal concepts require clients

to obtain counsel with specialized knowledge of the subject area.  *See e.g., Interfaith*

*Community Organization v. Honeywell Intern., Inc.* 426 F.3d 694, 707 (3d Cir. 2005).

Specialized knowledge, however, may reside in out-of-town counsel.  National class

actions like the one brought against State Street are an area of specialty.  *LV v. New York*

*City Dept. of Education*, 700 F. Supp. 2d 510, 515-16 (S.D.N.Y. 2010). Counsel with

experience litigating complex class action cases do not reside in every legal market. That

is because prosecution of a complex national class action requires unique legal skills and

abilities as well as substantial resources. *Id; see also McClain v. Lufkin Indus., Inc.,* 649

F.3d 374, 382-83 (5th Cir. 2011); *Edmonds v. United States,* 658 F. Supp. 1126, 1146 (D.

S.C. 1987). This is especially true in securities class action cases, which often require

class members to meet heightened pleading requirements. *In re Omnivision*

*Technologies, Inc.*, 559 F.Supp.2d 1036, 1047 (N.D. Cal. 2008).[121]

Encompassed in all this is the requirement that in order to stand on equal footing

with well-resourced defendants in complex, sophisticated cases – defendants who will

invariably have highly skilled, highly experienced, and well-resourced counsel – the class

must have counsel of equal training, skill, experience, and resources. Such counsel on

the plaintiffs' side of the case may well not exist in the forum of the case. The Special

Master finds that this is an important factor in ensuring that class members are well

represented in complex, sophisticated class actions.

This was particularly true in this case. Given the complexity of the wrongs

alleged against State Street, finding counsel with highly specialized experience in

handling complex national class actions was essential. In this case, experience was

required in two different areas: First, there was a need for counsel who could

---

[121] While the *State Street* litigation does not fall squarely under the umbrella of a securities class action, the substantive and procedural legal challenges involved in the *State Street* litigation were as complicated, if not more, than a securities class action case brought under the PSLRA. Therefore, the analysis of the applicable billing venue in securities cases is instructive.

successfully navigate Fed. R. Civ. P. 23 and the other procedural hurdles in certifying a national class in a novel subject area. Second, the success of the litigation depended on finding counsel who were versed in the intricacies of the global FX market and could factually support a monetary claim for relief from State Street. The same was true for the ERISA claims.

Turning to the mechanics of class litigation, counsel faced several unique legal challenges that required a sophisticated legal strategy just to keep the case afloat. The legal claims asserted against State Street were novel. Goldsmith 7/17/17 Dep., pp. 25:8-10; 27:11-22 [EX. 58]; Chiplock 6/16/17 Dep., pp. 58:10 – 60:24 [EX. 10]. Prior to the *State Street* litigation, no court had the opportunity to opine on all the precise legal theories raised by counsel, most notably the ability to certify a national class under Mass. Gen. Laws. ch. 93A. Heimann 7/17/17 Dep., pp. 36:5 – 37:2; 40:14 – 41:7 [EX. 19]; Chiplock 6/16/17 Dep., 57:20-25 [EX. 10]. Counsel, in turn, did not have the benefit of relying on past judicial jurisprudence informing the likely outcomes of class certification under consumer protection law, fiduciary status, and other issues affecting certification of a national class. Goldsmith 7/17/17 Dep., pp. 28:7 – 29:5 [EX. 58]; Heimann 7/17/17 Dep., pp. 36:5 – 37:2; 41:23-25 [EX. 19]. Quite the opposite. The few courts that had weighed in on these threshold legal issues had reached outcomes that weighed against at least two of Plaintiffs' legal theories -- breach of fiduciary duty and violation of Massachusetts consumer protection laws. Heimann 7/17/17 Dep., p. 37:3-17 [EX. 19]; Chiplock 6/16/17 Dep., pp. 58:18 – 60:20 [EX. 10]. Counsel further faced the likely possibility that State Street, like BONY Mellon, would file meritorious counterclaims

against the individual customer funds to recover lost funds.  Chiplock 6/16/17 Dep., pp.

63:3 – 64:9.  [EX. 10].  *See also Southeast Pennsylvania Trans. Auth. v. The Bank of*

*New York Mellon Corp.*, SDNY No. 12-cv-3066, Dkt. # 111; *Int'l Union of Operating*

*Engineers, Stationery Engineers Local 39 Pension Fund v. The Bank of New York Mellon*

*Corp.*, SDNY No. 12-cv-3067, Dkt. # 155; *Ohio Police and Fire Pension Fund v. The*

*Bank of New York Mellon Corp.*, SDNY No. 12-cv-3470, Dkt. # 46.  Filing counterclaims

would markedly shift the parties' respective bargaining positions.

The non-legal hurdles required an equal, if not greater, level of sophistication.

Counsel in this case faced a formidable opponent in State Street and WilmerHale, a top

Boston-based national defense firm.  WilmerHale advocated doggedly on behalf of State

Street throughout the litigation and mediation.  Chiplock 6/16/17 Dep., p. 68:12

("[D]efense counsel made us work hard….") [EX. 10]; Michael Thornton 6/19/17 Dep.,

p. 15:7-14.  [EX. 2].  As experienced counsel, the WilmerHale attorneys skillfully

exploited the weaknesses and risks of plaintiffs' case at every stage.  Combating

sophisticated defense tactics required equally sophisticated and experienced plaintiffs'

counsel.  Plaintiffs' counsel skillfully matched defense counsel's arguments advanced

throughout a hard-fought mediation.  Chiplock 6/16/17 Dep., p. 69:10-12.  [EX. 10].

For the sake of brevity, it is unnecessary to summarize each attorney's substantive

contributions to the favorable settlement; rather only a few notable examples will be

highlighted.  Lawrence Sucharow, who led the mediation efforts, first raised the issue of

a hybrid mediation and sold the idea to his counterparts at WilmerHale, with whom he

had a long professional relationship.  Sucharow 6/14/17 Dep., p. 17:3-25.  [EX. 16].

154

Several other attorneys also brought significant experience and meaningful working relationships to the table. Lynn Sarko, who had a longstanding relationship and extensive experience litigating national cases alongside the DOL, served as the liaison to the DOL and was ultimately responsible for securing the DOL's approval of the settlement-in-principle, a necessary precondition for the global settlement insisted upon by Defendant. Sarko 7/6/17 Dep., p. 51:2-5 [EX. 28]; Chiplock 6/16/17 Dep., p. 85:7-19 [EX. 10]. Bob Lieff, who had participated in several multi-firm class action litigations, brought a different kind of expertise -- that of handling internal dynamics. Thornton 6/19/17 Dep., p. 57:3-4. [EX. 2]. Finally, Michael Lesser of the Thornton Law Firm, who had developed a comprehensive understanding of FX pricing during litigation of the California action, assumed a lead role in calculating the potential damages owed to the class and crafting a theory of damages to use as leverage in the mediation with State Street. Kravitz 7/6/17 Dep., p. 78:4-23 [EX. 21]; Lesser 6/19/17 Dep., pp. 22:22 – 23:1. [EX. 20].

But litigating and understanding complex legal issues was only half the battle. Simply understanding the intricacies of the FX market required a great deal of sophistication and familiarity with FX trading practices not commonly known by legal professionals -- even those with experience in securities and financial fraud matters. Goldsmith 7/17/17 Dep., pp. 24:15 – 25:12. [EX. 58]. There was a steep learning curve involved in understanding the mechanics of FX trading. Attorneys at Lieff and Thornton had already mastered the basics of the FX trading through their participation in the California *qui tam* action and the *BONY Mellon* MDL, making them akin to subject-

matter experts.  *See* §§ II(A)(1) and (B)(1), *supra*.  An advanced understanding of the

mechanics of the FX market were not just helpful, but essential to proving the case.  Just

to assert a damage figure during the pleading and mediation stages, counsel had to

analyze the differences in markups applied by State Street to its indirect customer trades

as opposed to the market differentials for those same days and times.  Hoffman 6/5/17

Dep., pp. 22:20 – 23:25 [EX. 63]; Lesser 6/19/17 Dep., pp. 21:14 – 22:13 [EX. 20].  This

was no easy task and required a high level of comprehension.

###### 2.  *Unavailability of Local Counsel*

As described above, the sophistication of the subject matter necessitated counsel

with significant experience.  After a thorough review, it is apparent that, in the local

plaintiffs' bar, there was no firm that possessed all of the requisite skills, experience, or

resources necessary to carry the litigation forward on its own. While Thornton is based in

Boston, Thornton's main contribution to the case was in its experience litigating national

class actions.  Moreover, Thornton lacked the human and financial resources to bring this

action on its own.  Hoffman 6/5/17Dep., pp. 31:25 – 32:23. [EX. 63].

###### 3.  *National Scope of Class Action Litigation*

The *State Street* case was national in scope in several other respects. The

Settlement Class, comprised of all custody and trust customers of State Street (including

ERISA Plans, Group Trusts, and State Street's direct trustees), included class members

from all over the country suing State Street, a large custodial bank with offices around the

country and in thirty countries around the world.  Moreover, the class representatives

who participated in the litigation resided in six different states:  Arkansas, Pennsylvania,

Washington, New Mexico, Illinois, and Maryland. Counsel themselves hailed from six different cities in six different states.[122] That most of the counsel involved in the case were not "local" to Boston, combined with the presence of a diverse class of plaintiffs from across the country, further supports the adoption of a national rate approach.

### 4. *ERISA Claims*

The case for national rates is even stronger when considering the work of ERISA counsel in bringing the *Henriquez* and *Andover* complaints. Courts reviewing fee petitions in ERISA cases have routinely considered the comparable rates of ERISA attorneys in other jurisdictions and determined that ERISA cases involve a "national standard." *See, e.g., Mogck v. UNUM Life Ins. Co. of America,* 289 F. Supp. 2d 1181, 1191 (S.D. Cal. 2007). In *Mogck,* the court noted that counsel handling ERISA matters often take on complex, undesirable cases. *Id.* ERISA counsel, moreover, tend to practice in various districts. And, as is the case in the *State Street* litigation, ERISA counsel frequently have extensive experience litigating under the ERISA statute. *Id.*

Further, despite counsel's having obtained a very favorable result for the class, representing ERISA plans in the *State Street* case was not without significant challenges. As ERISA and non-ERISA counsel readily acknowledged throughout the investigation, the definition of "ERISA funds" was a constantly evolving concept. Chiplock 6/16/17

---

[122] Customer Class Counsel included Labaton Sucharow, based in New York City with offices in Delaware, Washington D.C., and Illinois; Lieff Cabraser, based in San Francisco with offices in Nashville, New York City, and Seattle; and Thornton Law Firm, based in Boston. ERISA Counsel included Keller Rohrback, based in Seattle with offices in Oakland, New York, Phoenix, Santa Barbara, California and Ronan, Montana; Zuckerman Spaeder, based in Washington, D.C. with offices in New York City, Tampa, and Baltimore; and, McTigue Law, based in Washington, D.C. Two other firms also participated on behalf of the ERISA participants: Beins Axelrod and Richardson Patrick. Beins Axelrod is based in Washington, DC; Richardson Patrick is based in Mount Pleasant, South Carolina (but maintains a national litigation practice).

Dep., p. 86:3-25. [EX. 10]. The total trading volume attributable to the ERISA plans (providing a basis for calculating damages) was subject to change throughout the period of negotiating the final term sheet. *Id.* And, similar to the *ATRS* complaint, the *Henriquez* and *Andover* complaints were subject to several legal arguments that could be raised in an inevitable motion to dismiss, most notably whether a group plan had standing to bring a breach of fiduciary claim against State Street. Sarko 7/6/17 Dep., p. 28:12-18 [EX. 28]; Kravitz 7/6/17 Dep., pp. 35:22 – 36:15 [EX. 21].

ERISA counsel representing the *Henriquez* and *Andover* plaintiffs in the *State Street* litigation overcame these challenges by drawing on several decades of experience litigating complex ERISA cases across the country. Keller Rohrback and McTigue Law, in particular, had recently been involved in the *BONY Mellon* case representing ERISA participants bringing substantially similar claims to those alleged in *State Street*. Sarko 7/6/17 Dep., p. 13:1-2 [EX. 28]; McTigue 7/7/17 Dep., p. 10:1-24 [EX. 11]. McTigue, in fact, has represented ERISA participants in many investment cases throughout his entire career. *Id.*, p. 9:1-7.

### iv. *Determination of National Rate*

Given our decision that national, rather than regional, rates apply to this case, the next question is how to determine the appropriate national rate in the *State Street* case. The national rate applying to the *State Street* case, like any rate, must be tethered to the rates typically charged by counsel practicing in the subject matter -- here complex securities/financial fraud litigation -- in those geographic markets where securities and financial fraud litigation are typically brought. Like regional rates, national rates should

be commensurate with the legal rates for attorneys of comparable skill, experience, and reputation litigating substantially similar matters. Applying these principles, we rely on rates charged in comparable cases as well as those reported by firms in our target regions for partners, associates, and staff attorneys. Because of an apparent lack of data reported on "staff attorney" rates, as to the reasonableness of those rates we are further informed by courts that have weighed in on this issue.

### c. **Market Rates in 2016**

We return to the basic premise that there is "no universal rate." Due to the wide range of experience and reputation among firms, and significant differences in legal markets, different law firms (and different law practices within those firms) command different rates. Even focusing solely on the national market, no single hourly rate can accurately convey the value of an entire legal field. Given the inherent challenges involved in calculating a uniform rate, the Special Master examines each of the firms' rates from the perspective of a reasonable range of national rates.

### i. **Legal Framework**

In assessing the reasonableness of the hourly rates listed on the Fee Petition, it is important to identify the appropriate framework. Not all rates bear the same weight; some rates by virtue of the collector, subject-matter, or field, are more informative in our analysis than others. We look, then, to the source of the hourly rates rather than the dollar amounts themselves.

In deconstructing the Fee Petition rates, the Special Master has identified two threshold issues that inform and direct this analysis: first, what substantive practice

159

area(s) best reflect the legal work performed in the *State Street* case; and second, which

geographic regions best inform a national rate for that practice area.  Beyond this, even

where consideration of the practice area and geographic regions yields a reasonable

range, the Special Master must independently decide what, if any, adjustments must be

applied to correct for the biases in the reporting data.

### a)  *Relevant Practice Area*

We start, rather than end, our analysis by noting that *State Street*, while venued in

Boston, was a class action case of national scope with class members located all across

the country.  Even among national class actions, the *State Street* case was atypical in

several respects.  The alleged malfeasance in the FX trading market represented a

"hybrid" between consumer, securities, and ERISA-based claims.  Labaton's June 1

Response to Special Master's First Set of Interrogatories, No. 8  [EX. 249].  In 2009,

when the theory for the *State Street* case was originated,[123] FX trading was not a heavily

litigated area of the financial services industry.  Thornton 6/19/17 Dep., p. 41: 11-17 [EX.

2].  Indeed, the *State Street* case drew the attention of three separate governmental

agencies regulating three separate areas of law: the SEC, which monitors securities; the

DOL, which oversees the labor market and work-related benefits such as ERISA plans;

and the DOJ, which enforces the criminal code.

Given the novelty of the subject matter and the formidable size and resources of

State Street, we find the *State Street* case most comparable to a large securities or

---

[123] *See People of the State of California, ex rel. Edmund G. Brown, Jr. v. State Street Corporation, et al.*, Cal. Super.
Ct. No. 34-2008-00008457-CU-MC-GDS

financial fraud case, which typically involves complex financial data and implicates large national classes, rather than a more routine consumer class action case. We distinguish between securities class actions, on the one hand, and more ordinary class actions, on the other, in light of the higher demand for specialized and sophisticated market expertise required in litigating securities-based cases.[124]

### b)  *Relevant Geographic Markets*

It is axiomatic that the national rate is not merely an "average" of the rates charged across all legal markets in the United States.  While that average figure has some bearing, we do not adopt a one-size-fits-all approach here.  Rather, for our purposes, a national rate represents the appropriate hourly rate for counsel litigating national and highly complex securities or financial fraud cases -- whether in a multi-district or class action litigation -- based on what firms litigating in that space reasonably earn in their home market.  Because the *State Street* case is most accurately viewed as a complex securities and/or financial fraud class action, we turn now to the question of *which* legal markets provide high-quality securities litigation such that they tend to influence the national rate for these services.

---

[124] While the size of a law firm is one factor to consider in determining whether the rates charged by that firm are reasonable, it is not determinative in our analysis of the reasonableness of rates charged by firms involved in this case.  As was the case in *State Street*, firms specializing in plaintiffs' class action cases often operate with a smaller attorney team than that of a traditional large law firm.  This subset of plaintiff-side firms, however, are often just as sophisticated and capable as their large-firm adversaries, and thus are entitled to the same compensation and should not be limited by the number of attorneys they employ.  For this reason, we consider, but are not constrained by, the results of the NALFA survey, for which the majority of responses received were from firms with fifty or fewer attorneys.  *See* NALFA Survey Results.  [EX. 185].

Beyond this, as noted, the Special Master believes that because of the important societal role plaintiffs' firms play in protecting consumers and the public in these complex areas, plaintiffs' firms are entitled to the same levels of compensation as their large defense-firm counterparts.

The Plaintiffs' firms in this case were experienced in large-scale litigation and, specifically, FX litigation, and worked out of four major legal markets: New York City, Boston, San Francisco, and Washington, D.C.[125] For purposes of calculating a national rate, we rely heavily -- but not exclusively -- on the reported average hourly rates charged in these four legal markets.[126]

### c) Survey Design Flaws and Challenges

As with any data analysis, we must take into consideration the statistical challenges and flaws in the methodology through which the data is collected.

First, an immediate challenge we faced in conducting our review was the limited data upon which to ground our analyses. Due to the proprietary nature of hourly rates, hourly rate data, designated by one's location and position within a firm, are not readily available to the public in great quantity. As a result, practitioners and courts alike rely heavily on information reported on lodestar petitions and their equivalents, and rates accepted by courts in comparable actions.

Second, we recognize the great potential for biases among those firms who self-report data in hourly fee surveys. Practitioners who take contingent cases and therefore routinely rely on courts to approve their hourly rates have a strong interest in reinforcing substantial rates, and given the scarcity of reliable hourly rate information, there may be

---

[125] While the main Keller Rohrback attorney, Lynn Sarko, works out of the firm's Seattle office, Keller Rohrback maintains offices in major cities in five states, including an office in New York City.

[126] The National Law Journal survey, discussed *infra*, provides data based upon the state in which the firm has its largest U.S. Office.

an incentive for law firms presenting fee petitions to a court to submit artificially inflated rates to reinforce the reasonableness of their own rates.

Additionally, and as addressed elsewhere in the Report, we proceed with caution when considering rates previously approved in other class action cases. Those rates, while tethered to the market in which those attorneys practice -- which naturally varies from case to case -- are often artificially selected by firms at the fee petition stage but are otherwise insulated from the scrutiny of the legal market. That is, they have been approved by judges reviewing the lodestar, but not by a client that has the option of looking elsewhere for legal representation. Thus, such rates may be higher than those charged to a client paying on an hourly basis who has an incentive to negotiate a lower price.

Finally, even rates billed to a client that pays a firm on an hourly basis are often not collected in full and do not represent the rate actually realized in a given case. Thus, even hourly rates that are vetted through a scrutinizing client, supply and demand, and the realities of a free market for legal services may be inflated compared to somewhat lower actualization rates. These inflated rates can be a misleading guidepost for judges assigning a reasonable rate for the purposes of a lodestar cross-check in a class action fee petition.

2. **Analysis**

    *a)*     *Partners and Associates*

The lodestar reports of Plaintiffs' Counsel charge partners at hourly rates ranging from $535 to $1,000, and associates at hourly rates of $325 to $725.[127] As discussed below, we conclude that these rates are commensurate with partner and associate rates charged and approved in similarly complex class actions, and therefore are reasonable.

*Comparison to other securities/financial fraud cases*

Given the niche area of securities/financial fraud class actions, we find particularly instructive those rates awarded in comparable class actions cases throughout the country.[128]

---

[127] Labaton had nine partners working on the case with billing rates of $800 - $925 an hour, and six associates with billing rates of $340 - $725 an hour. See Declaration of Lawrence Sucharow on Behalf of Labaton Sucharow LLP in Support of Motion for an Award of Attorneys' Fees and Payment of Expenses, Dkt. No. 104-15, Ex. A. [EX. 88]. Lieff had 10 partners with billing rates of $575 - $1,000 on the case, and two associates with billing rates of $425 and $435 an hour. *See* Declaration of Daniel P. Chiplock on Behalf of Lieff Cabraser Heimann & Bernstein, LLP in Support of Motion for an Award of Attorneys' Fees and Payment of Expenses, Dkt. No. 104-17, Ex. A. [EX. 89]. Thornton's lodestar report listed four partners at $535 - $850 an hour, and one associate at $450 an hour. *See* Declaration of Garrett J. Bradley, Esq. on Behalf of Thornton Law Firm LLP in Support of Motion for an Award of Attorneys' Fees and Payment of Expenses, Dkt. No. 104-16, Ex. A. [EX. 66].

    On the ERISA side, Keller Rohrback had 14 partners with hourly billing rates of $550 - $925 and five associates billing at rates of $400 - $525 an hour. *See* Declaration of Lynn Sarko, Dkt. No. 104-18, Ex. A. [EX. 90]. Zuckerman Spaeder had five partners (and no associates) working on a case with billing rates of $650 - $990 an hour. See Declaration of Carl Kravitz, Dkt. No. 104-20, Ex. A. [EX. 92]. McTigue Law's lodestar report does not differentiate between partners and associates; the seven attorneys listed on McTigue's report had hourly billing rates of $325 - $725. *See* Declaration of Brian J. McTigue, Dkt. No. 104-19, Ex. A. [EX. 91]. Beins Axelrod's report lists only one partner, Jonathan G. Axelrod, who billed at $525 an hour, and one "of counsel" attorney who billed at $455 an hour. *See* Declaration of Jonathan G. Axelrod, Dkt. No. 104-22, Ex. A. [EX. 94]. Richardson Patrick lists three partners who worked on the case with billing rates of $500 - $800 an hour; no associates were listed. *See* Declaration of Kimberly Keevers Palmer, Dkt. No. 104-23, Ex. A. [EX. 95].

[128] The Special Master did not conduct an independent survey of all financial fraud class action cases. Such an effort would fall far outside his mandate to determine what rates are reasonable in the context of the *State Street* case. The Special Master, therefore, provides the following cases as representative of the range of rates accepted by Courts in other actions, but they are not intended to be an exhaustive collection of all such rates.

The *BONY Mellon* case, which overlapped with *State Street* in time and subject matter, which involved substantially similar legal claims in the FX arena, and which was litigated by five[129] of the nine firms listed on in *State Street* Fee Petition, is particularly instructive.  In *BONY Mellon*, the rates billed by Lieff, Thornton, Keller Rohrback, the McTigue Firm, and Beins Axelrod were generally consistent, if not identical, to those listed in the *State Street* case. In some instances, these rates reflected a modest increase from the rates submitted by the same timekeepers.[130] Such increases over time are not unexpected and need not detain us here.  *See* Exhibit B to Chiplock *BONY Mellon* Declaration, SDNY No. 2335, Dkt. No 622-1 [EX. 186]; Exhibit B to Lesser Decl. Dkt. No. 622-8 [EX. 187]; Exhibit B to Sarko Decl. Dkt. No. 622-3 [EX. 188]; Exhibit B to McTigue Decl. Dkt. No. 622-5 [EX. 189]; Exhibit B to Axelrod, Dkt. No. 622-4 [EX. 190].  In *BONY Mellon*, the hourly rates for partners ranged from $525 to $985, and for associates the range was $325 to $525.  *See* fee petitions at Dkt. No. 922.

The range of rates approved in antitrust, bankruptcy, and securities/financial fraud class actions settled at or around the time of submission of the Fee Petition are also instructive. And we pay particularly close attention to those cases the firms themselves highlighted by attaching to their individual declarations submitted to the Court in 2016.[131]

---

[129] Lieff Cabraser served as co-lead counsel in *BONY Mellon*.  The Thornton Law Firm, Keller Rohrback, the McTigue Law Firm, and Beins Axelrod also participated in that case.  All five firms submitted a fee petition that included a lodestar calculation.

[130] After review and consideration of the reasonableness of these rates, Judge Kaplan approved them.  As compared to *BONY Mellon*, where the *State Street* rates increased, they did so by a modest amount of $25 or $50.

[131] *See, e.g., In re HealthSouth Corp. Securities Litigation,* No. CV-03-BE-1501-S, (N.D. Ala. 2010); *In re Countrywide Financial Corp. Securities Litigation*, No. CV 07-05295 MRP (MANx), (C.D. Cal 2010); *In re*

The fees approved by Courts in almost all such matters, involving a class action case on par with the complexity and magnitude of *State Street*, are commensurate with the fees listed in the *State Street* Fee Petition. A modest increase in hourly rate over a five or six-year span is expected in this economy, given the ever-growing legal industry and its demands, not to mention ordinary inflation. Legal professionals are entitled to set their own rates, and the Court and clients can push back as they deem necessary. In that regard, a more-than-modest, or in some cases substantial, elevation in rates may not be patently unreasonable.[132]

### *National Data: Market-to-Market Comparisons*

While recognizing the potential biases and statistical limitations inherent in any fee survey, we also consider the national data collected on rates. As one such source, we highlight our review of the *National Law Journal*'s 2016 Billing Survey.

The partner and associate rates submitted on the *State Street* Fee Petition are consistent with the range of average hourly rates reported for Boston, New York City,

---

*American Int'l Group*, No. 04 Civ. 8141 (DAB) (AJP), (S.D.N.Y. 2012); *In re Composite Company*, No. 1:13-cv-10491-FDS (D. Mass. 2016); *In re Schering-Plough/ENHANCE Securities Litigation*, 2:08-cv-00397-ES-JAD, (D.N.J. 2013); *In re Facebook, Inc. IPO Securities And Derivative Litigation,* MDL No. 12-2389 (RWS), (S.D.N.Y. 2018) *In re Volkswagen Products Liability Litigation*, MDL No. 02672-CRB (JSC), (N.D. Cal. 2017). In reviewing the fees sought and approved in these and other cases relied on by the Customer Class and ERISA firms, we find equally as instructive the rates charged by contemporaries in the plaintiffs' class action bar who also participated in the matters

[132] Keller Rohrback's rates are but one example of a more noticeable upward trajectory. Of the several cases Keller Rohrback included in Exhibit C to Sarko's Declaration, the range of associate and partner rates, including Sarko's own hourly rate, have shifted over time. Dkt. # 104-18. [EX. 90]. For example, in 2011, associate and partner hourly rates in a previous securities class action and products liability action ranged from $275 to $740 and $295 to $450, respectively, as compared to *State Street*, where associates and partners charged hourly rates of between $400 and $925.*Compare In re Washington Mutual*, No. 2:08-md-1919 MJP, (W.D. Wash. 2011) and *In re Mattel, Inc., Toy Lead Paint Products Liability Litigation*, No. 2:07-ml-01897-DSF-AJW, (C.D. Cal. 2010) to Dkt. # 104-18. [EX. 90]. The listed rate for Sarko, who, as a senior member of the firm, billed at the top of that range, increased from $740 to $925 for *State Street*.

San Francisco, and Washington, D.C. The $535 to $1,000 range for partner hourly rates is generally consistent with the partner ranges of the four target regions, which collectively range from $475 to $1,350. It is also consistent with the **REDACTED** range charged by opposing counsel, WilmerHale. *See* 5/4/18 Paine Letter [EX. 250]. The $325 to $725 range for associate rate is also well within the range of hourly rates for associates reported in these representative geographic regions, which collectively reported $225 to $1,000, and is also consistent with associate (including senior associate) rates reported by WilmerHale for 2016, **REDACTED** . *See Id.*

The partner rates reported in the *NLJ* Survey for Boston (reporting only one firm) ranged from $607 - $792, with an average hourly rate of approximately $702; New York ranged from $225 - $1,350, with an average hourly rate of approximately $683; San Francisco ranged from $475 - $800, with an average rate of approximately $646 per hour; Washington DC ranged from $540 - $1,325, with an average rate of approximately $794 per hour.

The associate rates reported for Boston (four firms reporting) ranged from $225 - $508, with an average hourly rate of approximately $405; New York ranged from $250 - $1,000, with an average rate of $544 per hour (and counsel billing rates reported between $425 - $955, with an overall average rate of approximately $687 per hour); San Francisco ranged from $350 - $620, with an average rate of approximately $468 per hour (and counsel billing rates reported at an average of $630); Washington, D.C. ranged from $295 - $690, with an average rate of approximately $512 per hour (and counsel billing rates reported at an average hourly rate of $749).

167

While important for determining a baseline range, we do not go on to analyze each firm's rates against the reported trends in their geographic region. Local rates play a limited role in the calculation of a national rate for securities/financial fraud class actions. While law firms must maintain a physical office somewhere in the country, the going rate for services in that city has little bearing on the complexity, risks, undesirability, contingent nature, and/or sophistication of the work -- each of which is considered in the reasonable rate analysis -- taken on by a firm routinely engaged in plaintiffs' class action litigation. This is not to say that regional rates are insignificant; they are the benchmarks that drive our analysis. Lest we leave any doubt, regional rates provide the underpinnings of a national rate for this precise type of work.

While the *State Street* rates fall squarely within the bounds of the rates charged in 2016 in each home region, and thus are not patently *un*reasonable, whether the rates reported by the firms are, in fact, reasonable when compared to the most frequently charged rates for similar services requires further analysis. We look, then, to the average rates for each group. Overall, hourly billing rates for partners trended in the range of approximately $650 to $800 per hour in our sample markets, and for associates, $400 to $550. These rates are generally consistent with 2016 rates for the "NLJ 500" -- a list of the 500 largest U.S.-centric firms, which reported an average partner hourly rate of approximately $650 and average associate hourly rate of approximately $415 among the nationwide group. While the Plaintiffs' firms[133] are not included in the NLJ 500 based

---

[133] We recognize that, among the ERISA firms, Keller Rohrback and Zuckerman Spaeder have comparatively larger practices with 80-100 attorneys each, and offices in multiple locations. That said, we in no way diminish the

exclusively on their relatively small size, given the complexity of their specialized

practices, the firms nonetheless demand rates comparable to those of large nationwide

firms.

      *b) Staff Attorneys*

      We turn now to the reasonableness of the rates charged for the staff attorneys in

the *State Street* case. The Customer Class firms reported staff attorneys at hourly billing

rates of $335 to $515.[134] With the exception of two Lieff staff attorneys, those rates

landed mainly between $335 and $440. Given that the staff attorneys performed

associate-level work (albeit that of a junior-level associate) and on a more desirable

weekly work schedule, these rates properly reflect a small discount from the reported

$325 to $725 associate range.

      For reasons that are not entirely clear to the Special Master, firms do not report

staff attorney data with the same frequency as associate, counsel, and partner data. To

help fill the void, the Special Master commissioned a survey through the National

Association of Legal Fee Analysis ("NALFA") specifically soliciting information about

staff attorney rates among sophisticated plaintiff-side firms.[135] While NALFA's

---

important efforts of Brian McTigue and the McTigue Law Firm, which have initiated significant FX litigation that spurred national class actions, such as the *State Street* case, despite the firm's relatively small size.

[134] Labaton staff attorneys' rates ranged from $335 - $440 per hour, Lieff Cabraser staff attorneys were billed at $415, except for two staff attorneys (Joshua Bloomfield and Marissa Oh) who were charged at $515. Thornton billed $425 per hour for the staff attorneys.

[135] NALFA circulated the Staff Attorney Survey by email a total of 1,592 times. The emails targeted managing partners and office managers in the field of financial fraud/securities and other class actions. The "open rate" of the emails was a mere 15%; only 237 of the total emails sent were opened, as opposed to merely viewed, by recipients. And of the 237 opened emails, only 35 users clicked on the link to access the survey website, yielding a "click rate" of 15% of that subset. Overall, the results show that only 2% of recipients receiving the NALFA survey accessed

partner/associate counterpart survey received modest attention among recipients, none responded to the staff-attorney-specific questions.

Because the staff attorney survey did not generate any responses, NALFA could not reach any statistically significant conclusions or findings on the hourly rates of staff attorneys in the targeted legal community. *See* NALFA Report, p. 2. [EX. 191]. But the lack of response itself is significant to the Special Master's analysis. The difference between the click rate and the open rate may suggest either that law firms are less inclined to share data about the staff attorney position or that the firms do not employ attorneys in this capacity. This rate drops significantly -- to 2% -- when one looks at those users who successfully accessed the survey. The downward trend of responsiveness corroborates other record evidence that the use and designation of staff attorneys is not common practice and the classification itself is not, moreover, well understood among lawyers, including many of the firms involved the *State Street* case. Axelrod 7/7/17 Dep., pp. 29: 9-15 (testifying that firm did not use staff or contact attorneys), 35: 11-14, 37: 1-9 (familiar with the concept of non-tenured track attorneys and contract attorneys but not the term "staff attorney") [EX. 39]; Sarko 7/6/17 Dep., pp. 73: 9-26 (all attorneys working on *State Street* case appeared on firm website), p. 74: 6-17 (different firms use different titles for attorneys in non-associate roles) [EX. 28]; Kravitz 7/6/17 Dep., p. 84:8- 85: 22 [EX. 21].

---

the survey questions. Notably and regrettably, none of the recipients who visited the survey website submitted information.

As with partner and associate attorneys, we give considerable credence to the staff attorney rates approved in comparable cases. Indeed, several District Courts have evaluated the reasonableness of staff attorney rates and, in doing so, have weighed similar factors including the experience and skill of the individual attorneys, their contributions to the litigation, the prevailing market for their services, and the propriety of the rates in the context of the overall fee award.[136]

Applying these factors, courts have approved hourly rates between $300 and $395 for staff attorneys who participated in complex litigation in recent years. *See*, *e.g.*, *In re Optical Disk Drive Prod. Antitrust Litig.*, 2016 WL 7364803, at *6-13 (N.D. Cal. Dec. 19, 2016) (accepting staff and contract attorney rates between $300 - $350 where litigation was complex, presented novel issues, and required review of documents produced in foreign languages, and where the firm provided sufficient evidence of the expertise, language skills, and contributions of the attorneys to the litigation); *Gilbert v. Abercrombie & Fitch, Co.*, 2016 WL 4159682, at *1 (S.D. Ohio Aug. 5, 2016), *report and recommendation adopted*, 2016 WL 4449709 (S.D. Ohio Aug. 24, 2016) (approving requested hourly rate of $350 for staff attorney involved in shareholder litigation);

---

[136] Courts have evaluated the rates charged for staff attorneys employed by legal services and non-profit organizations in much the same way, focusing on the attorneys' relative experience, skill, and contribution to the litigation. *See*, *e.g.*, *King v. New York City Employees' Ret. Sys. (NYCERS)*, 2017 WL 1317851, at *5 (E.D.N.Y. Jan. 12, 2017), *report and recommendation adopted sub nom. King v. New York City Employees Ret. Sys. (NYCERS)*, 2017 WL 1317223 (E.D.N.Y. Apr. 5, 2017) (hourly rate of $350 for three senior staff attorneys at Brooklyn Legal Services with between 26 and 35 years of practice experience); *Song v. 47 Old Country, Inc.*,2015 WL 10641286, at *4 (E.D.N.Y. Oct. 1, 2015), *report and recommendation adopted*, 2016 WL 1425811 (E.D.N.Y. Mar. 31, 2016) (hourly rate of $300 for experienced staff attorney employed in Legal Aid's Employment Unit since 2006; $250 rate for staff employed with Unit since 2009; $225 rate for staff employed with Unit since 2011); *Garcia v. Los Angeles Cty. Sheriff's Dep't*, 2015 WL 13646906, at *18 (C.D. Cal. Sept. 14, 2015) (hourly rates of between $300 -$400 for experienced staff attorneys at the Disability Law Rights Center were reasonable, based on the organization's extensive experience litigating civil rights class actions).

*Phillips v. Triad Guar. Inc.*, 2016 WL 2636289, at *7 (M.D.N.C. May 9, 2016) (accepting rate of $350 for staff attorney participating in complex securities litigation, for which the total fee represented a negative lodestar multiplier); *In re Am. Apparel, Inc. S'holder Litig.*, 2014 WL 10212865, at *26 (C.D. Cal. July 28, 2014) (approving as reasonable hourly rate of $395 for two staff attorneys in case in which total requested fee was approximately half of total lodestar).[137] Courts have been reluctant to award those same rates, however, where the requesting firm fails to provide sufficient evidence corroborating the experience, qualifications, and contributions of staff attorneys.[138]

While many of the staff attorneys, including all the staff attorneys working for Lieff and Thornton, were billed at a rate above the $300 - $395 range, we find that the higher rates billed were justified in this instance. As discussed *infra*, Lieff and Labaton have presented sufficient evidence that the staff attorneys involved in this complex litigation performed substantive and valuable work beyond simple document review. In addition, the Special Master had the opportunity to interview and depose a number of staff attorneys during discovery and was highly impressed with their sophistication and knowledge of the FX market, especially given the two-year gap since intense fact review

---

[137] While it is not always clear from the available record in this case whether the attorneys involved are best described as staff attorneys, as opposed to agency attorneys, as we have defined them in this Report, to the extent we rely on these cases in determining the reasonableness of rates for *staff attorneys* (*see* discussion of the category of "contract" attorneys *infra*), we do so only to the extent they address licensed attorneys employed by the firms tasked with performing associate-level work.

[138] *See* pp. 231-231, *infra*.

in the *State Street* case ended.[139] Most, if not all, of the staff attorneys had specialized

experience and/or skills that made them particularly equipped to perform comprehensive

document review and spot important issues in the case. *See infra.* Beyond this, the staff

attorneys here performed tasks that were more important than simple document review,

such as preparing sophisticated legal memoranda and factual memoranda to prepare their

respective litigation teams for depositions should the case reach that stage. This work was

more in the nature of lower-level to mid-level associate work.[140]

### d. <u>Rates Used in Lodestar</u>

#### i. *<u>Partners and Associates</u>*

Turing then to the lodestar reports in this case, those of Plaintiffs' Counsel list

partners billing at hourly rates ranging from $535 to $1,000, and associates billing at

hourly rates of $325 to $725. *See* discussion *supra.* As explained above, Labaton, Lieff,

and the principal ERISA firms involved in this case all had structured annual fee-setting

mechanisms in place. *Id. See also* Politano 6/14/17 Dep, pp. 35:22-37:7 [EX. 98];

Fineman 6/6/17 Dep., pp. 58:5 – 60:12 [EX. 18]; Heimann 7/17/17 Dep., pp. 60:13 –

66:13 [EX. 19]; Sarko 7/6/17 Dep., 94:16 – 95:20 [EX. 28]; Kravitz 7/6/17 Dep., pp.

115:16 – 116:25 [EX. 21]; Brickman 7/17/17 Dep., pp. 42:14 – 43:3 [EX. 40]. These

---

[139] The Special Master was particularly impressed with one staff attorney, David Alper. Alper, who had a lengthy background in FX trading, possessed greater substantive and industry knowledge than the other staff attorneys, and likely the other attorneys litigating the *State Street* case.

[140] This review for the most part went beyond the "first-level" document review, to determine relevance and privilege, performed by contract attorneys hired by WilmerHale in this case. *See* 5/4/18 Paine Letter to Sinnott (detailing document-review services by outside and firm document reviewers in 2016 at $36.40 and $75 per hour, respectively) [EX. 250].

formalized methods show an effort on the part of Labaton, Lieff, and the ERISA firms to set their fees based on prevailing market rates in the community, as those firms viewed the market.[141]  Therefore, as discussed above, we find that the rates yielded by this process were reasonable.  Given the ever-growing complexity of class action cases, the large financial risks associated with taking on multi-year contingent litigation, and the fierce competition among firms vying for those cases, we find nothing improper with the firms maintaining rates commensurate with other class action firms, as well as their defense-side adversaries. The rates charged by their adversaries in this case are instructive: **REDACTED** for partners; **REDACTED** for counsel; **REDACTED** for associates. *See* 5/4/18 Paine Letter [EX. 250]. This is simply a reality of legal practice.[142] Accordingly, the rates at which these firms billed on their lodestar reports are presumptively reasonable.

Although Thornton does not appear to have had any established mechanism for determining its attorneys' billing rates and instead appears to take a somewhat arbitrary approach for setting fees, *see* Thornton Law Firm, LLP's June 9, 2017 Responses to

---

[141] As described above, the firms provided, and the Special Master has reviewed, the internal procedures maintained by the firms for determining annual billing rates within their respective firms. *See, e.g.,* Politano 6/14/17 Dep., pp. 35-45 [EX. 98].  With the exception of Thornton, which does not conduct an annual review, the firms each maintain executive committees to review the rates charged by the firm as compared to the rates charged by their direct competitors, accepted in other fee petitions, and as reported nationally in data collected through fee surveys.

[142] As a general proposition, the hourly rates submitted in some class action fee petitions may warrant heightened scrutiny.  Unlike hourly rates charged to clients paying for legal services by the hour, the rates submitted to the Court on a fee petition rates are insulated from the pressures and client scrutiny of the legal marketplace. Absent a "paying client," firms may be tempted to artificially inflate their hourly rates on a lodestar petition. While this may well be the reality of bringing class action cases in generally, we do not find that this to be the case with the rates presented on the Fee Petition in the *State Street* case.  This is borne out by the largely comparable rates charged by WilmerHale in this case. *See* 5/4/18 Paine Letter. [EX. 250].

Special Master's First Set of Interrogatories, Response No. 49 [EX. 176]; *see also* Garrett

Bradley 6/19/17 Dep., p. 64:12-15 (explaining that the $500 per hour rate reported for his

brother, Michael Bradley, was tethered only to "the fact of how many years he was an

attorney, what he had recently billed to an hourly client, and the fact that he took it on

contingent") [EX. 43], given that the rates at which Thornton partners and associates

were billed were comparable to (and indeed generally less than) Labaton's and Lieff's

billing rates, and given the intricacies and difficulties of this case, on the whole the

Special Master finds the hourly rates at which Thornton billed its partners and associates

on its lodestar report were within the realm of reasonableness.  The Special Master is

particularly persuaded that Thornton's billing rates here -- which range from an associate

rate of $450 to partner rates of $535 - $850 an hour -- are reasonable because rates in this

range were previously approved for Thornton by the Court in the *BONY Mellon* case.[143]

The *State Street* firms' billing rates are also consistent with the ranges of rates in

the relevant markets.  Examining the number of hours expended by partners at their

respective billing rates, Labaton billed approximately $861 per partner hour, Lieff billed

approximately $691 per partner hour, and Thornton billed approximately $694 per

partner hour.  Keller Rohrback billed approximately $755 per partner hour; Zuckerman

Spaeder billed approximately $856 per partner hour; the McTigue Firm billed

approximately $691 per partner hour; Richardson Patrick billed approximately $616 per

partner hour; and Beins Axelrod billed $525 per partner hour. *See* discussion*, supra.*

---

[143] In *BONY Mellon*, the Court approved Thornton's $1,600,683 lodestar which listed associates with billing rates of $420 - $485 and partners with rates of $650 - $850.  *See* SDNY No. 12-2335, Dkt. Nos. 622-8 [EX. 187]; 637 [EX. 9].

Considering the total number of associate hours included in the lodestar, Labaton billed at a rate of approximately $562 per associate hour expended, Lieff at a rate of approximately $432 per associate hour, and Thornton at a rate of $450 per associate hour. Keller Rohrback billed approximately $490 per associate hour. The other ERISA Class Counsel did not bill associate hours. *Id.* The range of rates included in the fee petition is generally consistent with the expected ranges for partners and associates practicing specialized class action litigation in the relevant markets, and the average hourly rates per partner-hour and associate-hour expended are similarly appropriate.

For all these reasons, the Special Master concludes that the hourly rates billed on the *State Street* Fee Petition for partners and associates were reasonable.

### ii. *Staff Attorneys' Rates*

The lodestar reports list staff attorneys' billing rates ranging from $335 to $515 per hour. Labaton listed 25 staff attorneys: Three were billed at $410 per hour; four were billed at $390 per hour; one was billed at $375 per hour; seven were billed at $360 per hour; and ten were billed at $335 per hour. Lieff's report listed twenty staff attorneys, five of whom were billed at $515 per hour and fifteen of whom were billed at $415 per hour. Thornton listed twenty-four staff attorneys, twenty-three of whom were billed at $425 per hour while one -- Michael Bradley -- was billed at $500.[144]

Contrary to the picture painted in the *Boston Globe* article, with the exception of Michael Bradley, whose work is discussed separately, *infra*, these staff attorneys did

---

[144] The ERISA firms had no staff attorneys or "contract" attorneys.

176

much more than "low-level" document review.  As noted, they were all attorneys with

years of experience and the majority of them had specialized knowledge or skills in the

FX and securities areas.  A number of them had worked on *BONY Mellon*, which raised

issues similar to those in the *State Street* case.  They all made substantive contributions to

the case:  They did not simply do first-level document review; they also digested complex

information and prepared topical memoranda and witness memoranda for depositions --

the same kind of work done by associates at large firms.  Rather than referring to them as

staff attorneys, it would be more accurate to refer to them as "non-partnership-track"

attorneys.

      The *Boston Globe* article also took issue with the staff attorney billing rates as

compared to what the staff attorneys were actually *paid*.  The article reported that these

attorneys were paid only $25 to $40 an hour.  In fact, the vast majority of the staff

attorneys were paid in the range of $40 - $60 an hour, plus benefits.  More importantly,

there is nothing impermissible about marking up an attorney's billing rate above "cost"

so long as the rate at which the attorney is billed is reasonable and commensurate with

experience and the value of the work performed.  *See City of Pontiac Gen. Employees*

*Retirement Sys. V. Lockheed Martin Corp*., 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013);

*see also Matter of Trinity Indus., Inc.*, 876 F.2d 1485, 1495 (11th Cir. 1989) ("private

practitioners whose overhead expenses must be, and ultimately are, passed onto clients

via a mark-up in hourly rates charged typically can recoup such expenses as part of a fee

award"); *Guckenberger*, 8 F. Supp. 2d at 105 (D. Mass. 1998); *In re Enron Corp. Sec.,*

*Deriv. & ERISA Litig*., 586 F. Supp. 2d 732, 782-83 (S.D. Tex. 2008).

As indicated, district courts determine the reasonableness of a petitioning firm's staff attorney rates in the same manner in which they examine the reasonableness of partner and associate rates -- by assessing the experience and skill of the individual attorneys, their contributions to the litigation, the prevailing market for their services, and the propriety of the rates in the context of the overall fee award.[145] *See, e.g.*, *In re Optical Disk Drive Prod. Antitrust Litig.*, *supra,* 2016 WL 7364803, at *6-13 (accepting staff and contract attorney rates between $300 - $350 where the firm provided sufficient evidence of the expertise, language skills, and contributions of the attorneys to the litigation); *Gilbert v. Abercrombie & Fitch, Co.*, *supra,* 2016 WL 4159682, at *1, *report and recommendation adopted*, 2016 WL 4449709 (approving requested hourly rate of $350 for staff attorney involved in shareholder litigation); *Phillips v. Triad Guar. Inc.*, *supra,* 2016 WL 2636289, at *7 (accepting rate of $350 for staff attorney participating in complex securities litigation, for which the total fee represented a negative lodestar multiplier); *In re Am. Apparel, Inc. S'holder Litig.*, *supra* 2014 WL 10212865, at *26 (approving as reasonable hourly rate of $395 for two staff attorneys in case in which total requested fee was approximately half of total lodestar); *see also In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 375-78 (S.D.N.Y. 2013) (commenting that a blended rate of $300 appeared more appropriate than $385 requested rate for staff attorneys whose work constituted more than 70% of attorney time expended and total lodestar value, but

---

[145] *See* note 133, *supra*.

declining to decide an "exact rate at which a hypothetical paying client would compensate a firm for the services of staff attorneys").

As noted, where firms fail to provide sufficient evidence of the experience, qualifications, and contributions of staff attorneys, courts may decline to award requested staff attorney rates or decline fees for staff attorney time altogether. *See*, *e.g.*, *Makaeff v. Trump Univ., LLC*, 2015 WL 1579000, at *5 (S.D. Cal. Apr. 9, 2015) (rejecting claimed staff attorney rate of $350, and excluding staff attorney fees of $121,047.50, where plaintiff did not produce satisfactory evidence of the prevailing market rate for staff attorneys in the district or the background, skill, and litigation experience of the attorneys); *City of Plantation Police Officers' Employees' Ret. Sys. v. Jeffries*, 2014 WL 7404000, at *14 (S.D. Ohio Dec. 30, 2014) (rejecting rates of $340 - $375 and applying rate of $185 for three staff attorneys where plaintiff provided no indication as to their qualifications and experience and no evidence of work performed beyond "assisting with investigating initial claims and reviewing document productions"); *see also Spangler v. Nat'l Coll. of Tech. Instruction*, 2018 WL 846930, at *2 (S.D. Cal. Jan. 5, 2018) (finding no issue with $315 staff attorney rate, but excluding staff attorney's 371.9 document review hours (Dkt. 199-6) as unreasonable or unnecessary); *St. Louis Police Ret. Sys. v. Severson*, 2014 WL 3945655, at *5 (N.D. Cal. Aug. 11, 2014) (reducing staff attorney rate from $395 to $350 and ultimately awarding no fee for seven hours expended by staff attorney, which were duplicative).

Here, as noted, the Customer Class firms have presented sufficient evidence that the staff attorneys involved in this complex litigation possessed specialized experience

and performed substantive and valuable work well beyond simple document review. The majority of the staff attorneys had specialized experience and skills in securities litigation, and a number of staff attorneys carried specialized knowledge from their prior participation in the *BONY Mellon* matter.

The Special Master concludes that the staff attorney billing rates in the lodestar fee petition are generally reasonable given that the staff attorneys were responsible for some 70% of the work billed on the case. These rates are particularly reasonable when compared to the relatively low number of hours billed by associates for the three Customer Class law firms (less than 2% of the total time billed). This can be attributed to the fact that the staff attorneys effectively did the work of lower- to mid-level associates. Thus, for purposes of the analysis here, the Special Master views the staff attorney work as associate-level work.

The rates at which the staff attorneys were billed, however, varied among the firms. Except for Michael Bradley's $500 per hour rate, Thornton billed all of the staff attorneys on its lodestar report at $425.[146]  Except in two instances,[147] Thornton billed all

---

[146] Evan Hoffman of Thornton testified that the $425 hourly rate was selected for all the staff attorneys on Thornton's lodestar because Dan Chiplock of Lieff Cabraser, who had been lead counsel in *BONY Mellon*, stated that this was the rate that had been approved by the Court for the staff attorneys in that case. *See* Hoffman 6/5/17 Dep., p. 59:5-12. [EX. 63].  In an email at the end of August 2015, after the agreement-in-principle to settle the *State Street* case, when counsel were gathering their time and expense information in anticipation of the finalization of the settlement, Chiplock asked his fellow Customer Class Counsel whether "we want to cap document reviewer rates at a certain level" and suggested that they "probably need to pick a consistent rate."  *See* LCHB-0052627 – 52628 [EX. 192]; *see also* Chiplock 6/16/17 Dep., pp. 182;5 – 183:5 [EX. 10].  "In *Bank of New York Mellon*, the top document reviewer rate was $425 an hour."  *Id.*  According to Chiplock, however, the discussion about setting rates for document reviewers was never picked up again.  It was more than a year later that the Fee Petition was prepared.  Yet, based on Chiplock's August 2015 email, Thornton decided to use $425 as the hourly rate for all the staff attorneys in its lodestar.  Chiplock 6/16/17 Dep., p. 184:20-25 [EX. 10]; Hoffman 6/5/17 Dep., p. 59:5-12 [EX. 63].

[147] Lieff billed two staff attorneys -- Ann Ten Eyck and Rachel Wintterle -- at $515 per hour.  *See* Lieff lodestar report, Dkt. No. 104-17(A).  [EX. 89].

the staff attorneys on its lodestar report at rates that were generally considerably *higher* than the rates at which those same attorneys were billed by Labaton and Lieff.[148]  The attorneys were billed by Labaton and Lieff at hourly rates ranging from $335 - $415, most in the range of $335 - $360 an hour.  *See* Labaton lodestar report, Dkt. No. 104-15(A) [EX. 88]; Lieff lodestar report, Dkt. No. 104-17(A) [EX. 89].[149]

Although the Special Master finds nothing unreasonable *per se* in the staff attorney rates billed by the Customer Class law firms, an adjustment of the amounts billed in Thornton's lodestar for staff attorneys will be required.[150]

### iii.  *"Contract" Attorneys*

Included within the staff attorneys listed on Lieff's and Thornton's lodestar reports were four "contract" attorneys who were hired by Lieff through one or more outside staffing agencies.  Chiplock 6/16/17 Dep., pp. 112:23 – 113:5.  [EX. 10].  It is a different question altogether whether the markup of billing rates for staff attorneys may be applied to "contract attorney" hours.

---

[148] The double-counting of the staff attorneys is addressed separately, *infra*.

[149] Labaton billed two staff attorneys -- David Alper and D. Hong -- at $425, the same rate used by Thornton.  *See* Labaton lodestar report, Dkt. No. 104-15(A).  [EX. 88].  These two attorneys were the highest billed Labaton staff attorneys.  *See id.*  The rate billed for David Alper, who had unique experience for this case because of his extensive work as a trader in the FX industry, was especially reasonable in view of the valuable contributions this experience allowed him to make in this case.

[150] Fees for these staff attorneys will be calculated at the same rate as they were billed on the Labaton and Lieff petitions.

Contract attorneys are distinguishable from non-partnership-track attorneys working on an hourly basis, as these are "attorneys who are not permanent employees of the law firm, are hired largely from outside staffing agencies, are not listed on counsel's law firm website or resume, are paid by the hour, and are hired on a temporary basis to complete specific projects related to a particular action." *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 394 (S.D.N.Y. 2013). Counsel nonetheless contend that because contract attorneys and non-partnership track staff attorneys performed functionally the same work, they should be treated equally for purposes of a lodestar calculation. Fineman 6/6/17 Dep., p. 47:5-12 [EX. 18]; Heimann 7/17/17 Dep., pp. 51:18 – 52:15 [EX. 19].

Viewed in isolation, as a basic proposition, it is not the least bit objectionable that law firms may charge clients legal fees that include a surcharge for overhead as well as profits. *Guckenberger*, *supra,* 8 F. Supp. 2d at 105; *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, *supra*, 586 F. Supp. 2d at 782-83. *See also* ABA Formal Opinion, 88-356. As several courts have held, there is nothing disingenuous about billing clients at market rates for work performed by attorneys, whether traditional or non-partnership-track. *See In re Tyco Intern, Ltd. Multidistrict Litigation*, 535 F. Supp. 2d at 272; *Charlebois*, 993 F. Supp. 2d at 1124 (hours of off-track attorneys and other attorneys not counsel of record properly included in lodestar). That one attorney is on a partnership track while another is not is, in this context, a distinction without a difference. Quite simply, similar work justifies similar rates.

182

But this logic rings hollow with respect to contract attorneys essentially "rented" by a firm on a temporary basis. Unlike the non-partnership-track staff attorneys, the contract attorneys utilized in this case did not enjoy an uninterrupted affiliation with the firm. Nor did the firm offer health insurance or provide other employment benefits made available to employees, including off-track staff attorneys. Further, the contract attorneys did not receive W-2s from the firm. Fineman 6/6/17 Dep, p.46:14-23. [EX. 18]. Beyond this, the contract attorneys, as non-employees, did not bring with them the full panoply of federal and state employment law obligations that relate to employees of a business.

For these reasons, the Special Master declines to treat the contract attorneys as the functional equivalent of associates or non-partnership-track staff attorneys employed by the firms. While courts that have previously weighed in on this issue have not drawn a clear distinction between temporary attorneys and partnership-track associates, *see In re Citigroup*, 395-396; *In re Beacon Assocs. Litig.*, No. 09 Civ. 777(CM), 2013 WL 2450960, at *18 (S.D.N.Y. May 9, 2013), further differentiation among the so-called "temporary attorneys," *i.e.,* contract attorneys and non-partnership-track staff attorneys, is necessary.

Lieff's hiring of contract attorneys in this case resembled a cost more akin to an outsourced expense, such as a consultant. In making this observation, there is no intent to pass judgment on the merits of the work performed by those contract attorneys or their professional qualifications. Quite the contrary. The recommendation made herein reflects the economic realities for law firms that retain low-cost contract attorneys to perform work readily assigned to a first- or second-year associate in a traditional law firm

model. Given the considerable economic benefits realized by those firms that hire

contract attorneys in a large class action case, such as *State Street*, law firms that realize

such a benefit should distinguish the costs of contract attorneys from those of staff

attorneys who perform the same or similar work on a matter when seeking

reimbursement of fees and expenses.

To be sure, federal courts "have not spoken with one voice concerning the proper

treatment of contract attorney costs in the calculation of a lodestar." *In re: Cathode Ray*

*Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 4126533, at *8-9 (N.D. Cal. Aug. 3,

2016), *dismissed sub nom. In re Cathode Ray Tube (CRT) Antitrust Litig.*, No. 16-16368,

2017 WL 3468376 (9th Cir. Mar. 2, 2017) (declining to decide whether contract

attorneys' rates should be reduced on plaintiffs' lodestar). Several courts, including two

within this Circuit, have applied market rates without regard to the actual wages paid to a

contract attorney. *See, e.g., In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F.Supp.2d 249,

272 (D.N.H. 2007); *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 410 (D. Conn. 2009);

*see also Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109, 1124 (C.D. Cal. 2012).

In *Tyco* and *Carlson*, the District Courts of New Hampshire and Connecticut,

respectively, applied market rates across the board without differentiating between

contract and non-partnership-track attorneys paid on an hourly basis. For the reasons

stated above, those decisions that find contract attorneys indistinguishable from off-track

associates are not acceptable for purposes of this Report. It is from this faulty premise

that both courts affirmed fee awards charging contract attorneys at the equivalent of

associate rates. *See Tyco*, 535 F. Supp. 2d at 272 (reasoning that calculation of market

rates is not intended to reflect actual costs incurred by firm in applying associate market rates to contract attorney hours); *Carlson*, 596 F. Supp. 2d at 410 ("not objectionable per se [] to apply a multiplier to a lodestar that includes work performed by contract attorneys"). While an inherent markup on attorneys' fees may apply to non-partnership track attorneys who are employees of a firm, such a markup grossly distorts the financial burdens of hiring true "temporary" or contract attorneys. We find these courts have painted with too broad a brush.

On the other end of the spectrum, other courts have refused to reimburse non-partnership-track attorneys at associate market rates. *See, e.g., City of Pontiac Gen. Employees' Retirement Sys.*, 954 F. Supp. 2d at 280; *In re Citigroup*, 965 F. Supp. 2d at 395–96. Where the law firm paid significantly less per hour for these attorneys -- between $40 and $50 per hour -- the presumption is that a reduction is required to reflect the economic discrepancy. *See City of Pontiac,* 954 F. Supp. 2d at 280 (court calculated a blended rate); *In re Citigroup,* 965 F. Supp. 2d at 398 (exercising its discretion to set a blended hourly rate between contract and staff attorneys). The Special Master joins the *City of Pontiac* and *In re Citigroup* courts in applying a healthy dose of skepticism to lodestar calculations charging equal rates for contract attorneys and non-partnership track staff attorneys.

Even more fundamental than the rate claimed on a fee petition is how contract attorney costs are passed to the clients -- here, the class members. That is, whether contract attorneys should be billed as expenses or legal service fees.

The Special Master diverges from those decisions applying a blended rate insofar as those courts accepted, without discussion, the billing of contract attorney expenditures as legal fees rather than as a cost or expense. Whether an expenditure constitutes a legal services fee or a reimbursable expense is not black-and-white. The ABA rules and judicial decisions leave attorneys a wide degree of latitude to decide: "[s]ervices of a contract lawyer may be billed to the client either as fees for legal services or as costs or expenses incurred by the retaining lawyer." ABA Formal Opinion 00-420. Moreover, the decision to bill a contract attorney as an expense or as a legal service fee is not a matter of ethics. *Id.* It is, rather, a measure of professional judgment. Attorneys must exercise that judgment considering the circumstances of each representation. At the very least, a decision must be informed by the role of the contract attorney vis-à-vis the other attorneys in the case.

Here, Lieff did not face the same long-term financial obligations in securing contract attorneys as it did with its non-partnership-track staff attorneys. The staff attorneys employed by Lieff full-time received health insurance and other employment benefits, such as participation in the firm's 401(k) plan. *See* Oh 6/6/17 Dep., p. 41:2-7 [EX. 61]; Ashur 6/6/17 Dep., p. 14:5-9 [EX. 106]; Fineman 6/6/17 Dep., p. 34:2 – 35:13 [EX. 18]. The firm paid others an annual salary (as opposed to an hourly wage), plus benefits. Zaul 6/6/17 Dep., p. 38:17-22. [EX. 59]. By contrast, Lieff does not offer contract attorneys paid through an agency any additional monetary benefits. In fact, the firm is largely not even privy to the compensation paid to contract attorneys because the agency is responsible for paying those wages. Fineman 6/6/17 Dep., p. 37:2-3. [EX. 18].

186

Charging contract attorneys as a fixed cost more accurately reflects the financial constraints, or lack thereof, in the contract attorney position. This is not to ignore the important role fulfilled by contract attorneys in large litigation matters. Contract attorneys have become increasingly common in complex cases requiring review of extensive electronic discovery. Johnson 7/17/17 Dep., pp. 17:10 - 18:6. [EX. 198]. In some instances, contract attorneys hired through a staffing agency can fulfill needs, particularly for document review, better than hiring new attorneys. Heimann 7/17/17 Dep., pp. 101:19 -102:19. [EX. 19].

This is no doubt true. But the fact remains that a law firm does not face the same long-term financial commitments and risks inherent in an employment relationship. Even in the most complex cases, a firm still pays only a modest hourly fee for contract attorneys, sometimes less than $50 per hour. *See* Fineman 6/6/17 Dep., pp. 36:21 – 37:11. [EX. 18]. In this respect, this cost is most akin to a disbursement of funds passed along to the client at face value. See ABA Formal Opinion, 93-379. [EX. 193]. Indeed, attorneys have an ethical obligation to pass along the benefit of a discount absent an agreement to the contrary. *Id.*

While legal and ethical rulings have not provided definitive guidance on this interesting issue, the better, more common-sensical view is that the costs of contract attorneys should be passed along as a reimbursable expense rather than as a marked-up profit center. *See Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 671 (S.D.N.Y. 2015) (expenses for contract attorney document review among expenses); *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 437 (S.D.N.Y. 2016) ("While courts in this Circuit have

187

permitted attorneys to garnish their lodestars with marked-up contract attorney fees, this Court appreciates Counsel's decision to treat these contractor fees as an expense. It saves the Court from having to determine a correct spread between the contract attorney's cost and his or her hourly rate and his or her salary. This Court encourages the Plaintiffs' class action bar to consider adopting this practice in future actions") (citation and internal punctuation omitted).

As a final caution against allowing a market-rate markup of contract attorneys, it bears noting that when contract attorneys are permitted to be marked up and billed at market rates on lodestar petitions in class actions, the effective rate usually does not stop there. In the vast majority of cases, a multiplier is applied to these market rates, often (as in this case) at a level of two times or even more. Thus, the actual realized rate on these contract attorneys can be twenty times as much as the firm actually paid the agency, or more. For example, if a firm pays an agency $40/hour for a contract attorney but claims $400/hour for that contract attorney on its lodestar, and then obtains a 2.0 multiplier, the actual recovery rate for this contract attorney is $800/hour -- or twenty times what the firm paid for the attorney.

In class actions, this is charged against class funds. Quite simply, this is far too steep a price for class members to pay for what amounts to rented workers.

The lodestar multiplier given to class attorneys is, as a general matter, justifiable in part by such factors as preclusion of taking other cases or work, the nature and length of the relationship with the client, time limitations, the amount invested and the results obtained, novelty and complexity, and the undesirability of taking the case. *Johnson v.*

188

*Georgia Highway Exp., Inc.* 488 F.2d 714, 717-719 (5th Cir. 1974); *see also Blum v. Stenson*, 465 U.S. 886, 898-901 (1984). These factors have little if any applicability to the hiring of contract attorneys.

To permit marked-up rates and then add a multiplier on contract attorneys is an unfair burden on class funds.

### iv. *Michael Bradley*

Counsel further sought reimbursement of fees for yet another outside "staff attorney" document reviewer in Michael Bradley, a Massachusetts-licensed attorney who is the brother of Garrett Bradley, the managing partner of Thornton. As part of the Fee Petition, Thornton submitted a lodestar assigning to Michael Bradley a rate of $500 per hour for 406.4 hours, for a total of $203,200.00 in fees. *See* Exhibit A to Garrett Bradley's Declaration, Docket #104-16. [EX. 66]. Despite the legal limbo of this case, Thornton has already paid Michael Bradley the entirety of this amount. M. Bradley 6/19/17 Dep., p. 70: 18-19. [EX. 67].

Put plainly, Michael Bradley's work did not justify a rate of $500 per hour.

Michael Bradley is a solo practitioner who practices in Quincy, Massachusetts. Bradley performed approximately ten hours per week of document review in the *State Street* case, working unsupervised from his own office, not at Thornton's offices. M. Bradley 6/19/17 Dep., p. 52:5-13. [EX. 67]. Michael Bradley does not currently work, nor has he previously worked, as an associate, staff attorney, or contract attorney for Lieff, Labaton, or Thornton. Indeed, Michael Bradley's only connection with any of those firms -- outside the *State Street* case -- is his brother. *Id*. at pp. 26:16 – 27:5; 29:11-

189

14.  It comes as no surprise that, apart from the Thornton attorneys who assigned document review work to Bradley during this period, none of the other attorneys or class representatives involved in the *State Street* litigation even knew of Michael Bradley prior to the publication of the *Globe* article.  *See* Heimann 7/17/17 Dep., p. 107:18-24 [EX. 19]; Chiplock 6/16/17 Dep., p. 209:20 – 21:3 [EX. 10]; Sarko 7/6/17 Dep., p. 103:18-21 [EX. 28]; *see also* Goldsmith 7/17/17 Dep., pp. 87:9 – 88:14 [EX. 58]; Zeiss 6/14/17 Dep., pp. 68:15 – 70:2.  [EX. 79].

This is not to say that plaintiffs' firms should avoid retaining sophisticated outside attorneys where there is a need for a qualified reviewer or expert.  Outside expertise can be a useful asset to plaintiffs' firms tackling complex financial issues such as those presented in *State Street*.  But a firm must still charge rates in line with those of an attorney of "reasonably comparable skill, experience, and reputation."  *Grendel's Den, Inc.*, 749 F.2d at 955.

### 1.    *Relevant Legal Background and Experience*

During his involvement in the *State Street* case from 2013 to 2015, Michael Bradley owned and operated his own law firm based in Quincy, Massachusetts.  Prior to that time, Bradley worked for two years, from 2005 to 2007, as an Assistant District Attorney in the Norfolk County District Attorney's Office, then spent a few years prior to 2011 as the executive director of the Underground Economy Task Force -- a task force charged with scrutinizing Massachusetts employment practices to identify routine

190

violators of state and federal employment and wage laws, where he oversaw interagency efforts but did not personally conduct any investigations. M. Bradley 6/19/17 Dep., pp. 11:9-11; 12:6-7; 22:8-20; 23:6-8, 11-24. [EX. 67]. After leaving the Underground Economy Task Force in 2011, Michael Bradley returned to private practice as a solo practitioner. *Id.*, p. 12:7-9.

In his practice, Bradley has represented clients in personal injury, probate, and employment/labor matters, but the vast majority of his practice is public and private criminal defense, principally representing, on the private side, clients in OUI cases, domestic violence cases, and other matters in district court, and as a court-appointed public defender, clients in a range of cases from minor driving infractions to serious felonies, such as assault and battery with a dangerous weapon. *Id.*, p. 21:6-11.

While Michael Bradley's experience is no doubt an asset to a potential client in need of criminal representation, it has no relevance to the allegations in the *State Street* case. Nor did Bradley's work as a prosecutor or as executive director of the Underground Economy Task Force uniquely qualify him to scrutinize the internal FX trading records produced by State Street. *But see* G. Bradley 6/19/17 Dep., 53:14-21. [EX. 43]. Michael Bradley did not have any relevant background in securities cases or with the FX market. *See* Answers of Michael Bradley Esq. to Special Master's First Set of Interrogatories, Interrog. Ans. No. 3. [EX. 109]. Nor did he possess any technical expertise with the Catalyst document review system used in this case by Labaton and Thornton to facilitate review. M. Bradley 6/19/17 Dep., 25: 6-9. [EX. 67]. He was no more qualified to review documents than any other attorney with six years of general practice experience.

191

### 2. *Contributions to the State Street Case*

Beyond this, Michael Bradley's contributions to this case were distinctly limited when compared to the staff attorneys of the other two firms. The superficial nature of Michael Bradley's occasional document review in this case provides yet more support for the conclusion that $500 per hour is disproportionate to the work performed. For over two years, Michael Bradley's contribution to the *State Street* case consisted exclusively of reviewing and coding documents in the Catalyst system. *See* Answers of Michael Bradley Esq. to Special Master's First Set of Interrogatories, Interrog. Ans. No. 6 [EX. 109]; M. Bradley 6/19/17 Dep., pp. 47:8-10; 50:6-8 [EX. 67]. While there is no clear evidence of this, Bradley testified that he recorded comments on a "handful" of documents. *See* M. 6/19/17 Bradley Dep., pp. 39:7-13; 47:20-24; 50:19-24, 51:1-5. [EX. 67]. This is consistent with his recollection that, in over two years, he found only a "handful" of highly relevant documents. M. Bradley 6/19/17 Dep., p. 48:21-24. [EX. 67].

Perhaps most telling is Michael Bradley's failure to produce any substantive memoranda or other work product. M. Bradley 6/19/17 Dep., 46: 21-24 [EX. 67]; Answers of Michael Bradley Esq. to Special Master's First Set of Interrogatories, Interrog. Ans. No. 6 [EX. 109]. The lack of work product distinguishes Bradley not only from the non-partnership-track staff attorneys employed by Lieff and Labaton who were conducting document review -- on a full-time basis -- but also from the contract attorneys retained by Lieff who were also called upon to draft substantive and topical memoranda

based on the documents they reviewed.  *See* Chiplock 6/16/17 Dep., pp. 115:11 – 116:10.
[EX. 10].

By and large, Michael Bradley was unsupervised.  As agreed to upfront, he
operated independently of the other attorneys.  M. Bradley 6/19/17 Dep., p. 49: 6-9.  [EX.
67].  After receiving a basic onboarding from Thornton, Bradley's contact with the firm
was limited to submitting weekly or bi-weekly emails tallying his hours and raising
technical concerns about the software.  M. Bradley 6/19/17 Dep., p. 10-24 [EX. 67];
Hoffman 6/5/17 Dep., pp.107:9-23; 107:24-25, 108:1-7 [EX. 63].  His review, moreover,
was outside the scope of Todd Kussin and Kirti Dugar, the on-site supervisors at Labaton
and Lieff, respectively.  Kussin 6/5/17 Dep., pp. 63:20-23; 79:22-25, 80:1-2 [EX. 56];
Dugar 6/16/17 Dep., pp. 103:8-16; 104:9-14 [EX. 55].

Beyond this, all of his work was performed in his free time and did not infringe
upon other paying work or reduce his earning opportunities.  Although he performed his
work on a contingency basis, with some contingent risk, in fact, aside from a modest
expenditure of time, he had little risk.

### 3.   *Appropriate Hourly Rate*

Looking at the benchmarks of comparable skill, experience, and reputation, the
Special Master concludes that the rate of $500 per hour is disproportionate to Michael
Bradley's contribution to the *State Street* case, particularly when compared to the other
staff attorneys on the case.  That rate grossly overstates the very basic skills and
experience Bradley brought to the *State Street* case.

But it must be noted that the $500 rate was not set at Michael Bradley's initiative or request.  Rather, Thornton -- specifically Garrett Bradley -- selected this rate in an apparent effort to increase Thornton's individual lodestar value.  In this context, the Special Master does not credit Garrett Bradley's explanation that, in 2013, before his brother commenced employment with Thornton, he and Michael discussed his rate and agreed at that time that Thornton would pay Michael $500 per hour for his work on a contingent basis.  *See* G. Bradley 6/19/17 Dep., pp. 53:24-54:10; 56:10-15.  [EX. 43].  In making this finding, the Special Master is informed by email correspondence between Garrett Bradley and the other Thornton attorneys years later that was still discussing what an appropriate rate for Michael Bradley should be.  *See* TLF-SST-012768 (G. Bradley 1/8/15 email correspondence with M. Lesser:  "What rate are we using for my brother's time in SST? . . .  Whatever it is, I'm sure we can bill him out higher") [EX. 196]; TLF-SST-01276 [EX. 197]].  *See also* discussion, *infra*.

The Special Master is equally unpersuaded that the hourly rates received by Michael Bradley immediately prior to the *State Street* case should determine his reasonable hourly rate in the *State Street* case.  For private criminal defense work, clients principally paid Bradley a flat fee without regard to actual hours expended on the representation.  *See* SSSM_MB_000119-123 [EX. 194]; SSSM_MB_000124-130 [EX. 195]; M. 6/19/17 Bradley Dep., 14: 18-19; 15: 22-24, 16: 1-11 [EX. 67].  Similarly, and as is typical for personal injury work, for such cases Michael Bradley received a contingent fee equal to one-third of the total recovery.  M. Bradley 6/19/17 Dep. 13:7-10, 20-23.  [EX. 67].

Michael Bradley has represented some clients on an hourly basis, but the hourly rates charged fall at opposite ends of the fee spectrum and are of little value to the analysis here.  For example, Michael Bradley earned $450 per hour in one case for his representation of an estate administrator who became party to the underlying will contest. M. Bradley 6/19/17 Dep., 71: 11-16.  [EX. 67].  And in one other case, Bradley charged $500 per hour for approximately three hours' work on a motion to seal records of a criminal matter. M. Bradley 6/19/17 Dep., pp. 16:17-24, 17:1-7 [EX. 67]; SSSM_MB_000257-261 [EX. 108].  On the other end of the spectrum, and far more frequently, Bradley has routinely received a mere $53 per hour for work as a court-appointed attorney through the Norfolk County Bar Advocate Program.  M. 6/19/17 Bradley Dep., pp.12:22-24; 13:16; 20:15-23.  [EX. 67].  That rate, of course, is set by the Legislature and not subject to fluctuations of the market.  M. Bradley 6/19/17 Dep., p. 20:15-23.  [EX. 67].

To determine the accuracy and reasonableness of the fees paid in the *State Street* case, one must look beyond the contemporaneous rates charged by Michael Bradley.  The rates charged by Michael Bradley to his private clients do, and should, reflect the market for comparable legal services.  Attorneys setting rates for a private client must consider several factors, such as overhead, risk, and profit. (The Special Master expresses no opinion whether the rates charged by Michael Bradley are in line with the market rates for similar services in the Greater Boston market.)  Nevertheless, these rates are untethered to the substantive work Bradley performed in the *State Street* case.

195

What rates Michael Bradley charged his own clients has little bearing, if any, on a reasonable rate for Bradley's document review efforts performed in this case. Unlike his solo work, Bradley did not assume great risk in the *State Street* case. He worked exclusively on a database hosted by another firm. M. Bradley 6/19/17 Dep., p. 30:11-12 [EX. 67]; G. Bradley 6/19/17 Dep., p. 53:10-11 [EX. 43]. He was not responsible for creating the document review; he merely followed an existing protocol. M. Bradley 6/19/17 Dep., p. 34:14-21. [EX. 67]. Furthermore, as noted, Bradley worked on his own schedule, giving priority to his own cases and performing document review at odd hours or when time allowed. M. Bradley 6/19/17 Dep., pp. 51:16-20; 52:5-8, 14-18. [EX. 67].

Michael Bradley's hourly work in this case most closely resembles that of a junior level associate. Thornton paid no overhead costs for Bradley's services. G. Bradley 6/19/17 Dep., p. 64:12-19. [EX. 43]. Thornton's claim that, based on the firm's alleged agreement to pay Michael Bradley $500 per hour for his time only in the event of a successful recovery, it faced a far greater risk in procuring Michael Bradley as opposed to a contract attorney hired through an agency, is without justification. In reality, the firm's financial risk was minimal. Thornton's internal email traffic indicates that the firm had not assigned Michael Bradley a rate, at least for lodestar purposes, as late as 2015. *See* TLF-SST-012768 (G. Bradley 1/8/15 email correspondence with M. Lesser: "What rate are we using for my brother's time in SST? . . .Whatever it is, I'm sure we can bill him out higher") [EX. 196]; TLF-SST-01276 [EX. 197]]. *See also* TLF-SST-007843-7844 (7/28/15 email from Bradley, Lesser, and Hoffman directing that Michael Bradley be

billed at $500 per hour instead of the $400 hourly rate Thornton had previously decided to use for him).  [EX. 107].

　　Given the unique circumstances governing Michael Bradley's work on the *State Street* case -- the minimal time commitment, the lack of supervision, and the fairly low level of work performed -- the Special Master finds that $500 is an unreasonable rate for purposes of a lodestar calculation.  This conclusion, of course, does not impact any private financial arrangement between Thornton and Michael Bradley.  Thornton is free to agree to any terms it sees fit, including to pay Michael Bradley $500 per hour or more.  Indeed, Thornton has already paid Michael Bradley in full for his work on the case and the findings here are not intended to invalidate any obligation Thornton has to Michael Bradley.  The Special Master leaves it to Thornton to take whatever action it sees fit to claw back those funds should it believe doing so is appropriate.

　　A final point must be made as to Michael Bradley's $500 per hour rate, both as to Bradley himself and as to Thornton.  Unlike the other staff attorneys on this case who were paid only $40 - $60 an hour despite being billed at much higher rates, Michael Bradley was paid the full $500 an hour; he received all of that himself.  This totaled over $200,000.  Beyond this, because of the 1.8 multiplier effect, Thornton received almost an additional $500 per hour on Michael Bradley's time, resulting in an additional almost $200,000 to the Thornton firm.  This is clearly unreasonable, and Thornton's award must be reduced by the amount earned by applying this inflated hourly rate at an almost two-times multiplier.

197

In sum, for purposes of the lodestar report presented by Thornton to the Court as support for the request for attorneys' fees, a substantial downward adjustment of the fees sought for Michael Bradley's work is necessary.

### e. **Hours of All the Firms**

A reasonable hourly rate, of course, is only half of the lodestar equation -- other factors must be weighed in the equation. In general, the lodestar is the product of the number of hours appropriately worked times a reasonable hourly rate or rates. *Hensley*, 461 U.S. at 433; *Hutchinson ex. rel. Julien*, 636 F.3d at 13; *Gay Officers Action League*, 247 F.3d at 295. The party seeking an award of attorney fees has the burden of producing evidence supporting both the hours worked and the rate claimed. *Hensley*, 461 U.S. at 433.

### i. *Records of Time for the Firms*

#### *1. Contemporaneity of the Firms' Records*

Courts in the First Circuit require that attorneys intending to seek fee awards maintain reasonably detailed contemporaneous time records to support a future fee application. *Gay Officers Action League*, 247 F.3d at 297.[151] The contemporaneous record requirement is designed to "ensure that the information presented is reliable and sufficiently detailed so that the reasonableness of the fee claimed may be challenged by the adversary and evaluated by the court. . . ." *Pontarelli v. Stone*, 781 F. Supp. 114, 120 (D.R.I. 1992). The First Circuit has warned that "in cases involving fee applications for

---

[151] Black's Law Dictionary defines "contemporaneous" as "living, occurring, or existing at the same time." Black's Law Dictionary (10th ed. 2014). Merriam Webster defines the term as "existing, occurring, or originating during the same time." *See* https://www.merriam-webster.com/dictionary/contemporaneously (last visited April 1, 2018).

services rendered. . . the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance." *Grendel's Den*, 749 F.2d at 952.

This requirement was first announced in relation to applications for fees and costs pursuant to 42 U.S.C. § 1988. *Id*. at 950-52. Courts in this Circuit have since adopted and applied the requirement in other contexts, including the review of fee applications related to class action settlements. *See*, *e.g.*, *Hutchinson ex rel. Julien, supra*, 636 F.3d at 13 (noting that fee-seeking party in negotiated class action settlement had burden of producing contemporaneous time and billing records); *Weinberger*, 925 F.2d at 523-527 (remanding where "woefully deficient" class action fee application failed to include contemporaneous time records or other documents). Where district courts employ the percentage of fund method in assessing the reasonableness of a requested fee, utilizing a lodestar cross-check, time records may "inform the court's inquiry into the reasonableness of a particular percentage" award. *See In re Thirteen Appeals*, 56 F.3d at 307, n. 11 (noting that "because the district court in any given case may eschew the [percentage of fund] method in favor of the lodestar method, [the First Circuit urges] attorneys to keep detailed, contemporaneous time records in common fund cases").

"The party seeking [an] award has the burden of producing materials that support the request… [t]hese materials should include counsel's contemporaneous time and billing records, suitably detailed, and information anent the law firm's standard billing rates." *Hutchinson*, 636 F.3d at 13 (citations omitted). Contemporaneous records serve as the best evidence that hours claimed were actually expended and provides a basis for a

court's review of the accuracy of the records and the reasonableness of time spent. *See Castaneda-Castillo v. Holder*, 723 F.3d 48, 79 (1st Cir. 2013) ("Records that include the different tasks each attorney performed, the total number of hours billed, the billing rate for those hours, the date on which each task[ ] was performed, and the amount of time spent on each task generally fulfill this requirement."); *see also Deary v. City of Gloucester*, 789 F. Supp. 61, 64 (D. Mass. 1992), *aff'd*, 9 F.3d 191 (1st Cir. 1993) (attorney affidavits detailing specific work completed on specific dates, coupled with attorney time slips, were essentially contemporaneous and sufficiently reliable in support of most hours claimed).

As a practical matter, it is time-consuming and laborious for a district court to review every underlying contemporaneous time entry, particularly in litigation spanning several years and involving numerous counsel. Thus, when assessing class action fee applications, district courts often rely upon summaries reflecting the contemporaneous time entries of attorneys involved. *See, e.g.*, *Authors Guild, Inc. v. Bass*, 614 F. App'x 564, 566 (2d Cir. 2015) ("The district court did not abuse its discretion in relying on the summaries rather than the records on which they were based"). *Gay Officers Action League*, 247 F.3d at 297 (where attorneys attested to having maintained contemporaneous time records, compilations of records submitted with fee application were acceptable in lieu of original records).

However, while a court may reasonably rely on summary evidence, such evidence must be based upon entries that are contemporaneously maintained in the first instance. *See*, *e.g.*, *Morin v. Sec'y of Health & Human Servs.*, 835 F. Supp. 1431, 1439 (D.N.H.

1993) (absent suggestion of a reconstructed record where no contemporaneous records had been maintained, district court concluded that submission was properly contemporaneous). Because a court has discretion in determining an appropriate fee award, it may properly reduce an award where counsel has not maintained reliable contemporaneous records. *See Hensley*, 461 U.S. at 438, n. 13 (1983). ("[T]he District Court properly considered the reasonableness of the hours expended, and reduced the hours of one attorney by thirty percent to account for his inexperience and failure to keep contemporaneous time records.").

"Casual after-the-fact estimates of time expended on a case are insufficient to support an award of attorneys' fees." *Nat'l Ass'n of Concerned Veterans v. Sec'y of Def.*, 675 F.2d 1319, 1327 (D.C. Cir. 1982). Some courts in this Circuit have found reconstructed estimates of attorney hours insufficient to satisfy the contemporaneous record requirement, resulting in substantial percentage reductions to claimed awards or, in extreme cases, denial of fees altogether.[152] However, because courts maintain discretion in determining an appropriate fee award, some have noted that the requirement

---

[152] *See, e.g., Gardner v. Simpson Fin. Ltd. P'ship*, 963 F. Supp. 2d 89, 92-95 (D. Mass. 2013) (citing cases involving a "deep discount" of 20-25% of hours on basis of reconstructed records, and substantially discounting requested award where counsel submitted no contemporaneous records and request was grossly inflated); *Mary G-N v. City of Northampton*, 2015 WL 9462080, at *3–4 (D. Mass. Dec. 28, 2015) (unpublished) (awarding 30% of claim by attorney that reconstructed time records on basis of dates on which computer files were saved and research was downloaded); *Wilson v. McClure*, 135 F. Supp. 2d 66, 73–74 (D. Mass. 2001) (district court reduced attorney's claimed hours "in order to reflect the strict minimum amount of time it would take one to perform the work actually performed"); *Libertad v. Sanchez*, 134 F. Supp. 2d 218, 231-34 (D.P.R. 2001) (50% reduction to claim based on reconstruction from attorney's memory, notes, assistant's records, and calendar of filings and court appearances; 75% reduction to claim based on attorney's memory and consultation with co-counsel 5-6 years after completing work, raising accuracy concerns); *Pontarelli*, 781 F. Supp. at 122 (denying fee application in entirety where failure to maintain contemporaneous records contributed to inaccuracies and discrepancies in records that cast "serious doubt" on their reliability).

should not be applied "blindly" and have that exercised discretion in awarding fees on the

basis of other sufficiently reliable evidence demonstrating the reasonableness of a

requested fee.[153]

In this case, the Special Master has found no evidence of a lack of

contemporaneity with respect to the records of Labaton, Lieff, and the ERISA law firms.

All of these firms kept track of attorney time electronically, and deposition testimony

confirms that attorney time was entered on their respective timekeeping systems on a

routine and regular basis. For example, at Labaton, attorneys used the "Rainmaker"

software to keep track of their time. *See* Goldberg 7/17/17 Dep. pp. 11:7 – 12:25; 30:25

– 31:7. [EX. 199].  Howard Goldberg, who was part of Settlement Counsel Nicole Zeiss's

team, testified that he used the Rainmaker program to prepare the firm's fee petition in

*State Street. Id.*, p. 11:21-24.  The software enabled him to isolate records for each

individual who worked on the case, create a report, and sort the time of each timekeeper

for use by Zeiss in preparing Labaton's lodestar fee petition.  *Id.*, p. 12:21-25.  Labaton

staff attorneys testified that, daily, they electronically submitted time. *See, e.g.*, Orji

---

[153] *See, e.g.*, *Awuah v. Coverall N. Am., Inc.*, 791 F. Supp. 2d 284, 289 (D. Mass. 2011) (substantial reduction not required where district court had a "unique vantage point" as to the work completed by attorney, and the benefit of contemporaneous records submitted by other counsel); *Nkihtaqmikon v. Bureau of Indian Affairs*, 723 F. Supp. 2d 272, 291 (D. Me. 2010) (district court considered fact that a small portion of requested were not contemporaneously documented, but were supported by a combination of contemporaneous and reconstructive billing); *see also Orantes-Hernandez v. Holder*, 713 F. Supp. 2d 929, 966 (C.D. Cal. 2010) (25% reduction where attorney reconstructed misplaced contemporaneous records on basis of memory and references to records of other counsel and documents filed with the court or distributed to government);  *Scott v. City of New York*, 643 F.3d 56, 59 (2d Cir. 2011) (entries in official court records could serve as reliable documentation of attorney time, if a district court chooses to rely upon them in a limited fashion, as they are comparable to contemporaneous attorney time records); *Scott v. City of New York*, 626 F.3d 130, 134 (2d Cir. 2010) (noting existence of "rare circumstances" in which, in the district court's discretion, attorney fees may be warranted in complete absence of contemporaneous); *Monaghan v. SZS 33 Assocs., L.P.,* 154 F.R.D. 78, 84 (S.D.N.Y. 1994) (collecting cases and noting that courts in the Second Circuit assessing reconstructed time records have applied roughly 30% reductions in absence of contemporaneous time records).

6/5/17 Dep., p. 22: 3-10 [EX. 102]; Bolano 6/5/17 Dep., p. 28:18- 29:8 [EX. 103].

Labaton staff attorneys also manually recorded their time "in" and "out" of the office

through by recording those times in a hard-copy binder designated for staff attorney

hours. *See* Alpert 6/5/17 Dep., p. 62: 18-22 [EX. 60]; Greene 6/5/17 Dep., p. 28: 4-14

[EX. 105]. In March 2014, Labaton provided a summary of its then-current lodestar and

expenses to the other Customer Class firms, evidence of its regular maintenance of time

records. *See* LCHB-0052426-2436 (5/27/14 email from Rogers to Lieff and TLF

recipients attaching billing memo). [EX. 205].

Lieff used a comparable electronic timekeeping system to maintain accurate and

contemporaneous time records for its attorneys. *See* Chiplock 6/16/17 Dep., pp. 151:20-

21, 153:6-9. [EX. 10]. By way of example, Dan Chiplock and Kirti Dugar testified that

staff attorneys employed by Lieff Cabraser are trained to "religiously send [their] time to

our internal time keeping department [and] keep careful record of [their] time." *Id.*;

Dugar 6/16/17 Dep., p. 115:8-15 ("Chris Jordan and Jon Zol [sic; Zaul] were entering

time in our system. . . , and then they [TLF] were getting invoiced. So the time entry

would maintain there because that's the source of the generation of an invoice.")[154] [EX.

55]. *See also* Heimann 7/17/17 Dep., p. 18:11-16 ("[I]n all of the cases that we are

involved in, we maintain the time devoted to the case on a contemporaneous basis. We

record our time [] whether or not we are going to be compensated on an hourly basis.")

[EX. 19]. *See also* Fineman 6/16/17 Dep., pp. 39: 15 -40: 16 [EX. 18]. Lieff also

---

[154] A training error with respect to two agency attorneys paid for by Lieff, who reported time both to Lieff's internal time keeping department and to their staffing agency, reportedly contributed to the double counting issue. See Chiplock 6/17/17 Dep., pp. 151: 15- 153:20 [EX. 10].

periodically shared its time and expense records with fellow Customer Class Counsel. *See, e.g.*, LCHB-0052576-2578 (5/21/15 lodestar summary provided from Lieff to TLF) [EX. 206].

Lynn Sarko testified that Keller Rohrback uses a similar electronic time-keeping system: "[W]e have a computerized system. Rates are put in for each department for each timekeeper. . . . Whenever you record your time, it goes into the system. . . ." Sarko 7/6/17 Dep., p. 89:1-6. [EX. 28]. Zuckerman Spaeder attorney time is kept by the firm's accounting department. Kravitz 7/6/17 Dep., pp. 111:23-24, 112:3-5. [EX. 21]. Carl Kravitz testified that, with this centralized system in place, he, as the firm's lead attorney on *State Street,* could review attorney hours on the case at any time, and did so periodically: "[W]e try to keep track of what our investment [is] I would keep an eye on how much time we were putting into the case." *Id.*, p. 112:11-18.

(a) *Thornton's Records*

Though Thornton also owned billing software, it was used only sporadically and by only some of the firm's attorneys. In fact, the testimony of Thornton attorneys who worked on *State Street* testified that they did not use the software to track time spent on this case. *See* Thornton 9/1/17 Dep., p. 121:13-21 [EX. 127]; G. Bradley 9/14/17 Dep., p. 151:3-9 [EX. 85]. According to Garrett Bradley of TLF,

> We don't keep our time like other firms keep their time as we're a majority plaintiffs' firm. Contingent firm. We do keep our time on matters that we obviously need to keep our time on. I understand there to be a software that's not functional. I don't believe it was used by anybody [from Thornton] in this case. It wasn't used by me.

G. Bradley 9/14/17 Dep., p. 151:3-9. [EX. 85].

204

Mike Thornton did not view time-keeping as particularly important in contingent

fee cases, such as the *State Street* case:

> You get contingency you get very sloppy about it normally 'cause you don't have
> to -- it doesn't make any difference, although some contingency law firms keep
> track of their hours because they want to see if they're justified -- that in the cases
> they're justified of the time they're putting in.

Thornton 9/1/17 Dep., p. 122:18-24. [EX. 127].

With those considerations in mind, the Special Master evaluates the reliability and

sufficiency of the records maintained and produced by Thornton attorneys in this

investigation. Notwithstanding that Thornton attorneys did not use an electronic time-

keeping system, the Special Master finds the evidence of contemporaneity sufficient as to

the time records submitted for Michael Lesser and Evan Hoffman.  *See* Hoffman 6/5/17

Dep., p. 125:2-13 [EX. 63]:

> Q.   When you gathered up your own particular time and submitted it to
>      Labaton, had you kept your time contemporaneously or did you just make it
>      up at the end of the process?
> A.   No, I kept my time contemporaneously.
> Q.   And the time that you kept was put down into various notes that we have
>      delivered to the special master and his counsel?
> A.   That's my understanding.

*See also* Thornton 9/1/17 Dep., p. 123:22-23 (Lesser and Hoffman were "very

methodical about [keeping] their time.") [EX. 127]. Thornton produced copies of

Hoffman's contemporaneous handwritten recordings. *See* TLF-SST-000420-0443 [EX.

207]. These records include a brief description of work completed, the date of

performance, and the number of hours expended. Crediting Hoffman's testimony that the

records were maintained during the course of the litigation, the Special Master deems the

records sufficiently reliable to support his time included in the Thornton lodestar.

Thornton also produced similar handwritten time records purportedly maintained by

Lesser. *See* TLF-SST-000492-0502 [EX. 208]. They similarly contain a description of the

work performed, and the number of hours expended, on a given date, and are sufficiently

detailed and reliable to support the Lesser time included in the Thornton lodestar.[155]

Mike Thornton and Garrett Bradley also presented evidence showing an attempt to

keep contemporaneous time records. To some degree, however, the Thornton and

Bradley time included in the Thornton lodestar appears to have been based on an after-

the-fact reconstruction through other available records, rather than contemporaneously

maintained time records.[156]

In including his time on TLF's lodestar, Mike Thornton testified that he simply

used his calendars:

> Q.    How did you put your work and hours on the time that was used for the
> load star [sic; lodestar] here? What sources did you use?

---

[155] Further evidence of Lesser and Hoffman's efforts to maintain contemporaneous time records is seen in 2014 email correspondence. In April 2014, in reference to the fee petition prepared in the concurrent *BONY Mellon* case, Chiplock reminded Lesser of the need to maintain sufficient time records for any potential fee petition. *See* TLF-SST-031020-1023 ("I've been meaning to check in with you guys and make sure you are keeping adequate time records for all of the good work you are doing – class action fee requests require time reports, and you don't want to be creating those after the fact. We can chat about it and I can send you samples if you like, just let me know.") [EX. 209]. In response, Lesser noted to Chiplock that he had "rough manual records" and requested that Chiplock provide the samples. *Id*. Chiplock provided Lieff's recent lodestar detail summary, which Lesser forwarded to Hoffman the next month with instruction to "enter the hours you have into forms like this[.]" TLF-SST-033600-3702 (5/20/14 Lesser to Hoffman) [EX. 210].

[156] While the District Court retains discretion to reduce those hours based solely on reconstructed records, *see Mary G-N,* 2015 WL 9462080, at *3–4, we do not recommend such a reduction here, based largely on the fact that the Court reviewed the hours as part of a lodestar cross-check, rather than reimbursing Thornton attorneys on a one-to-one basis. It is a close call. But given our finding that Garrett Bradley's Declaration, which included Thornton's individual lodestar calculation, was false, for which we recommend proposed remedies, we do not find it necessary to also reduce the hours.

A.     My calendars. My secretary would help. I tried to say on certain things
       where the hours were going to be necessary I said stop me at the end of the
       day and make me say how long I spent on times.
       I also -- my calendar helped in that I knew if I was doing a conference
       call, um, with other -- or co-counsel on this case, and there are many, many,
       many of those -- because I would have that on my calendar, and I may have
       a notation about the time; I might not, but then I could look at either Lieff
       Cabraser or Labaton's because they tend to be much more methodical than
       me.

M. Thornton 9/1/17 Dep., at p. 123:7-21 [EX. 127]. Thornton testified that while he and

his assistant kept calendars, Michael Lesser and Evan Hoffman largely kept track of the

hours he expended in the State Street matter. *Id.*, p. 121:22-122:3; 123:7-19.

Garrett Bradley testified that he sometimes wrote notes on the bottom of whatever

document he was reading and put it in the file for later compilation by Evan Hoffman or

an assistant; and other times he, like Thornton, simply used his calendar:

       The way I kept time on this matter would be I'd write on -- if I was reading
       a document, I'd write on the document and stick it in the file. I'd also jot down
       time long hand on pieces of paper.
       There's -- obviously, many people in the firm were on this case, and Evan
       [Hoffman] as the junior lawyer would track some time if we were all doing
       something; and, if need be, if there was something specific like a mediation, it
       may be tracked by calendar or e-mail.

G. Bradley 9/14/17 Dep., p. 151:10-19.[157]   [EX. 85].

There is evidence of Evan Hoffman's efforts to reconstruct time Thornton attorney

time through other records. TLF-SST-011246-1249 (5/21/14 Hoffman email to Lesser)

("All of the hours are taken from LCHB's chart where there were mentions of discussions

---

[157] While Mike Thornton's calendar entries and Bradley's handwritten notes purport to be kept contemporaneously,
we found no evidence to corroborate this contention other than Bradley's recent declaration. *See* 3/23/18 Declaration
of Garrett Bradley [EX. 219]. More importantly, the numeric notations and dates themselves lack sufficient detail to
allow the Court to evaluate the reasonableness of these expenditures based on a description of the tasks performed.

with either 'co-counsel' 'team' or, of course, Mike Lesser and/or MPT, GJB.") [EX. 200]. However, it appears that Hoffman did not always have access to Bradley's time records. TLF-SST-006839-6840 (6/29/15 Lesser email to Thornton and Hoffman, noting that "[w]e need hours for Garrett on this case" and Bradley's response, "I will get my time in…") [EX. 211].

Even accepting the records produced for Thornton and Bradley as contemporaneous -- that is, if we accept Thornton's representations as to their nature -- are limited and lack in sufficient detail to, alone, constitute reliable records in support of the Thornton (585.9 hours) and Bradley (734.9 hours) time included in the Thornton lodestar. For example, Thornton produced documents the firm has represented to contain calendar entries for Bradley (TLF-SST-036001-6037 [EX. 212]) and Thornton (TLF-SST-042987-30021 [EX. 213]), which do not account for all of the substantial number of hours expended by those attorneys. Thornton also produced records reflecting Bradley's time expenditure, which include versions of the lodestar compilation created by Hoffman and documents Hoffman used in creating that compilation. *See*, e.g., TLF-SST-000612-0620 (Bradley time entries) [EX. 214]; TLF-SST-000620-0637 (Bradley time entries) [EX. 215]. Bradley has also attested to having reviewed a set of documents during the litigation. *See* TLF-SST-090343-0346 (1/20/11 Internal Memo) [EX. 216]; TLF-SST-090347-0348 (12/8/10 Belfi Email to Lesser) [EX. 217]; TLF-SST-090657-0664 (12/22/10 Internal Memo) [EX. 218]; *see also* 3/23/18 Declaration of Garrett Bradley [EX. 219]. While a small percentage of these documents contain brief handwritten notations by Bradley, few contain any indication of the date of review and the number of

hours actually expended on a given date.[158]  These documents, alone, do not support the lodestar hours submitted for Bradley. Thus, the Thornton and Bradley hours ultimately included in the Thornton lodestar were based, at least in part, on a reconstruction from other records.

## ii. *Reliability and Specificity*

To support an award of fees, the First Circuit requires a "full and specific accounting" for time.  *King v. Greenblatt*, 560 F.2d 1024, 1027 (1st Cir. 1977); *Weinberger*, 925 F.2d at 527.  "[B]ills which simply list a certain number of hours and lack such important specifics as dates and the nature of the work performed during the hour or hours in question should be refused."  *King*, *supra.*  As described below, based on our review of the individual as well as firm-wide time entries recorded in this case, the time records produced by the firms participating in the *State Street* case sufficiently and reliably detail the firms' substantive, legal contributions to that case.[159]

To reach this conclusion, we rely, in large part, on comprehensive time records produced at the beginning of this investigation by each of the nine firms that received a

---

[158] Thornton was also asked to produce any other documentation supporting its fee petition. *See* Special Master's First Set of RFP, No. 53. [EX. 166] Many documents produced are copies of documents produced by State Street in relation to the California litigation. A small portion contain brief handwritten notes or markings, ostensibly made by a Thornton attorney or a staff attorney during document review. *See, e.g.*, TLF-SST-017998 ("Look for [m]ore") [EX. 220]; TLF-SST-018165 ("Get Dox") [EX. 221]; TLF-SST-019134 (notations related to volume and revenue figures) [EX. 222]; TLF-SST-023952-3954 (notation regarding "knowledge") [EX. 223]. A few contained more detailed notes. *See, e.g.*, TLF-SST-025463-5464 (more extensive handwritten notes regarding Automatic Repatriation) [EX. 224]. These written notations, however, do not reflect the date of review, the identity of the reviewing attorney, or the amount of time expended (or included on the lodestar summary) by the attorney, and are therefore of limited value in considering the reliability of the hours included in the Thornton lodestar.

[159] This is a different question than whether the records themselves were maintained contemporaneously by the respective firms. We distinguish Thornton along these lines. While Garrett Bradley and Michael Thornton's time records evidenced reasonable expenditures of time, given the complexity of the litigation, and described the work performed in sufficient detail, as we conclude above, they lacked sufficient indicia of contemporaneity. In fact, the record shows that Michael Thornton and Garrett Bradley's time was not kept on a daily basis.

portion of the Fee Award (except Chargois about whom the Special Master did not know)

produced at the request of the Special Master as well as testimony and emails produced in

discovery. In the aggregate, the attorneys in the *State Street* case expended approximately

77,000 hours. This total amount of time, while substantial, was appropriate given the

voluminous document productions and complex nature of the legal claims, potential

defenses, and damages implicated by the FX-based claims alleged in this case.

Aside from the reasonableness of the aggregate tally, we conclude that the hours

presented on the Fee Petition are reasonable for three additional reasons. First, the firms

appropriately staffed the case, assigning lawyers to specific tasks commensurate with

their experience and capabilities with a sensitivity to the costs ultimately passed on to the

client, the class, through the common fund. Thus, the hours expended by each individual

attorney accurately reflect the nature of the work assigned to him or her.  Second, the

narratives in the time records themselves capture the precise nature of these substantive

contributions in detailed -- and in some instances highly detailed -- descriptions of the

legal work performed within the individual records.[160] Finally, while some of the firms in

the case also worked on other FX cases before and during the *State Street* case, as

described *infra*, we found no evidence that those firms "double billed" time from the

other litigations to the *State Street* case, and deem it appropriate to include time spent

reviewing related FX-case, especially those concurrent with *State Street*, to the extent the

---

[160] Because Chargois did not perform any substantive work on the *State Street* case Chargois and Herron did not submit a lodestar calculation or any time entries to Judge Wolf or the Special Master appointed to investigate the Fee Award in the underlying case.

review informed strategy, settlement, and the course of the *State Street* litigation. We address each firm in more detail below.

### (a) Lieff

Over the life of the *State Street* case, Lieff billed the second largest number of hours in the case. We begin by acknowledging that the total amount billed by Lieff as well as its status vis-à-vis the other Customer Class firms as the second-highest billing firm in the case is consistent with the fact that Lieff housed a team of more than ten document reviewers throughout the multi-year hybrid mediation and played a significant role in the legal strategy and mediation. For the litigation team, Bob Lieff (665.9 hours) participated in the mediation sessions and consulted on settlement strategy, while Dan Chiplock (1357.9 hours) had a hands-on role with the case from inception of Lieff's involvement, from the researching and filing of the complaint, coordinating document review and discovery, to contributing to the drafting of the final approval briefs. *See* Lieff Cabraser Time Records (Chiplock). [EX. 247]. While Lieff listed other attorneys at the firm, and most importantly two senior partners -- Steve Fineman and Richard Heimann -- those attorneys' participation was far more limited than Chiplock, and in the case of Fineman and Heimann, was minimal[161] and related mainly to contacting potential clients. The billing entries of Lieff attorneys, moreover, sufficiently conveyed the nature of the work -- whether emails, meetings, drafting or reviewing -- along with the salient details, such as with whom and the basic substance of each task.

---

[161] Steve Fineman billed less than 100 hours on the case, while Richard Heimann billed less than 25 hours. *See* Lieff Time Records (Fineman and Heimann). [EX. 247].

While we recognize the danger that Lieff, as Co-Lead Counsel in the *BONY Mellon* case, could include hours in the *State Street* lodestar expended in litigating the *BONY Mellon* case or other FX matters, we conclude that Lieff did not do so here. All the hours submitted by Lieff in its *State Street* hours bear, directly or indirectly, on the legal issues presented in the *State Street* case.[162] *See* Chiplock 6/16/17 Dep., p.41: 2-7; Lieff Time Records (Chiplock entry, 4/9/2015 ["Telephone conference Dan Halston re ERISA recovery in BNYM settlement."]). [EX. 247]. These hours, however, represent a small percentage of the total hours and should not detract from the larger review of work performed in the *State Street* case.[163]

We comment separately on the time records submitted for Lieff's Staff Attorneys. While most of time entries submitted by Lieff staff attorneys include a generic narrative, such as "document review," or "review and code documents," we conclude that these descriptions, while generic, adequately describe their narrow yet important tasks. Although there is certainly room to improve these narratives,[164] such as to include

---

[162] Each of the three Customer Class firms included on their individual lodestars a certain amount of time spent meeting with pension funds other than ATRS. These efforts were unsuccessful, as evidenced by the fact that Arkansas was the only institutional class representative on the customer side, However, there is no class action unless a class representative is willing to come forward and bring a case. Thus, it is essential that plaintiffs-side law firms contemplating a meritorious class action secure at least one client to represent the class, which here was the non-ERISA class, and ideally, more than one. Finding an institutional client willing to sue their custodian bank is not an easy task, and it was reasonable for the firms to contact multiple institutional clients about participating in the *State Street* litigation, even after ATRS came on board. *See* discussion, *infra*.

[163] Lieff attorneys recorded less than fifteen hours for non-*State Street* FX litigations, and in each instance, those efforts had a direct benefit to the *State Street* case. *See* Lieff Time Records (Lieff, Chiplock). It is well within a Court's jurisdiction to allocate fees from a common fund for such hours performed outside the context of the litigation. *See Hawes v. Colorado Div. of Ins.*, 65 P.3d 1008, 1023–24 (Colo. 2003) (distinguishing facts of present cases from common fund situation and noting that "courts, under inherent powers may grant attorneys' fees for work completed before the court's jurisdiction was invoked") (citing *Winton v. Amos*, 255 U.S. 373, 394–95 (1921); *Wininger v. SI Management L.P.*, 301 F.3d 1115, 1120-21 (9th Cir. 2002) ).

[164] *See* Alper's time records. [EX. 264].

212

specific Bates ranges and topics, or to identify important documents or information uncovered during a day's review, both of which would yield a more complete record upon which to evaluate the hours spent, we nevertheless fully credit all the time entries submitted by Lieff's staff attorneys.

### (b) Labaton

Labaton recorded the most hours in the *State Street* case. [EX. 264]. This expenditure of time is commensurate with its role as Lead Counsel as well as with the complexity and extremely hard-fought nature of the five-year long litigation. It is also reflective of the fact that Labaton housed numerous reviewers -- as many as twenty at one time -- working full-time throughout the duration of the mediation/discovery, which contributed significantly to the total tally.

As compared to Lieff and Thornton, Labaton assembled a much larger team to work on the *State Street* case.[165] We find that creating an expansive team was required to carry out Labaton's duties as Interim Lead Counsel and lead settlement counsel in the case. Specifically, the key players at Labaton included Larry Sucharow -- "lead negotiator and lead strategist" (801.4 hours); David Goldsmith, who argued substantive motions before the Court at the Motion to Dismiss, Preliminary Approval, and Final Approval hearings (1310.7 hours); and Michael Rogers, then an associate at the firm,

---

[165] The Labaton time records include several internal meetings and telephone conferences in which only Labaton attorneys participated. While this practice has drawn scrutiny in other contexts by insurance companies overseeing outside litigation, such collaboration and collective thinking is a necessary, if not critical, tool in devising strategy and meaningfully litigating a case, especially a case as complex and multifaceted as *State Street*. Accordingly, we find such meetings appropriate in these circumstances.

who performed the bulk of the legal research, initial drafting of the complaint and opposition, and oversaw document review on the Labaton side (1578.4 hours); Eric Belfi, who had an ongoing relationship with George Hopkins and ATRS and assumed primary responsibility for communicating with ATRS throughout the litigation (669.5 hours);[166] and Nicole Zeiss, the settlement partner who was the chief drafter of the Plan of Allocation, drafted the Omnibus and individual declaration templates, and coordinated settlement efforts and submission of the final approval pleadings (361.2 hours).[167] [EX. 264]. Given the attorneys' respective experience, skill sets, and positions within the firm, these totals are reasonable.

Although Labaton did not participate in the *BONY Mellon* case, as evidenced in the individual time entries of its lawyers, it was nevertheless informed by the legal theories proffered and tested in that case. The *BONY Mellon* case and settlement, which alleged substantially similar misconduct of FX trading, paralleled the *State Street* case in several respects, perhaps most importantly in that *BONY Mellon* also yielded a very positive result for its class. In fact, the *BONY Mellon* case was considered by those prosecuting the *State Street* case as a "template" to a successful settlement. Chiplock 6/16/17 Dep., p. 110: 20-25. [EX. 10]. The fact that the Labaton lawyers, mainly David Goldsmith, but to some extent also Michael Rogers and Larry Sucharow, reviewed *BONY*

---

[166] According to Belfi's time records, Belfi communicated with the "client," mostly George Hopkins himself, on approximately 87 separate occasions between November 2009 and July 2016. *See* Labaton Time Records (Belfi). As discussed *infra*, at no point during any of these conversations updating Hopkins on the case did Belfi inform him of the Chargois Arrangement or about Labaton's financial obligation to pay Chargois.

[167] Christopher Keller (182.5 hours), a partner at Labaton, was also involved in the case, though mainly with "client retention" and "case strategy." Given his limited role, we conclude that his total of 182 hours was reasonable.

*Mellon* pleadings and transcripts -- and in one instance actually attended the settlement approval hearing in the *BONY Mellon* case -- is evidence of strategic lawyering.[168] It reflects the reality that the *State Street* case was not litigated in isolation.

Like Lieff, most, if not all, of the time records for Labaton staff attorneys sufficiently detailed their document review and related discovery tasks. While the level of detail varies among time keepers, all but a few referenced the precise document set or bates ranges, or topics, reviewed.[169]

### (c) Thornton

Thornton billed the third-largest amount in the *State Street* case, second only to Labaton and Lieff. The inclusion of Lieff and Labaton staff attorneys made up approximately 70% of these hours.[170] [EX. 245]. Putting aside how and when the time

---

[168] Labaton attorneys recorded fewer than twenty-five time entries, and no more than sixty hours, for consulting *BONY Mellon*-related pleadings and events.

[169] *See* Labaton Time Records (Alper, 2/18/15). We highlight one entry created by Labaton staff attorney, David Alper, which contains extensive details of the tasks performed and exemplifies the degree of detail that renders an entry more reliable than others to the Court:

> "Reviewed, analyzed and tagged emails spreadsheets and documents for responsiveness pertaining to the Arkansas Teacher Retirement System v. State Street case. Uncovered a Hot e email document which I promptly recorded in the Team's collective Excel spreadsheet for future reference and analysis. These numerous investment, pricing and revenue F/X documents are non-consecutive or the Bates range were missing from said documents." [EX. 264].

> For one, this entry details the precise efforts made by Alper on this date – reviewing, analyzing and tagging – and, secondly, describe the fruits of that labor, namely, "[u]ncover[ing] a hot e-mail document" that was simultaneously flagged for the litigation team. While the time pressures and practice challenges of performing document review, not to mention contemporaneously documenting one's time, make it difficult to record each day's efforts with this level of precision, we nonetheless highlight this entry as a "gold standard" for entries pertaining to document review and related efforts.

[170] Thornton's inclusion of Labaton and Lieff staff attorneys on its firm lodestar contributed to, but was not the sole cause of, the double-counting issues that first raised concerns about the Fee Petition in this case.

entries themselves were created or maintained, the total hours expended by each of the

Thornton lawyers were reasonable and sufficiently reliable.

Thornton's team included four key individuals: Mike Thornton (585.9 hours),

who, along with lawyers at Lieff, came up with the concept of bringing the *State Street*

case and oversaw the case strategy and mediations; Garrett Bradley (734.9 hours), who

participated in the mediation sessions, vetted potential clients, and communicated with

co-counsel during the case, including the finalization of the settlement; Michael Lesser

(1433.8 hours), who was hands-on through all stages in the litigation, and most notably

assigned discrete legal topics to lead the staff attorneys through complex issues presented

in discovery, and additionally developed the theory on damages; and Evan Hoffman

(1110.2 hours), who also participated in all stages of the litigation, contributed valuable

substantive research, and had the difficult task of tracking Thornton's hours for its own

attorneys as well as staff attorneys housed by Lieff and Labaton.

Thornton also made efforts, predating the filing of the *ATRS* Complaint in this

case, to secure institutional clients to bring a lawsuit against State Street. Given the

inherent challenges of finding any class member willing to publicly sue its custodian and

serve as class representative, it was reasonable for the firms to reach out to firms other

than ATRS at the initial stages of the case. Furthermore, Thornton attorneys, like its

Customer Class colleagues, billed relatively few hours for consulting and/or reviewing

pleadings and rulings in related FX cases, most notably in connection with the *BONY*

*Mellon* case in which it was also involved. Such minimal expenditures of time are

reasonable given the significance of the *BONY Mellon* decision as well as the substantive and procedural overlap between the two cases. [EX. 245].

### (d) Michael Bradley

While Michael Bradley's involvement raises several questions, for example, about the value he added to the case and the reasonableness of the rates charged on his behalf, we conclude that the total time Michael Bradley spent working on the *State Street* document review, 406.4 hours, was reasonable.[171] As described earlier, Michael Bradley performed his review largely during off-hours from his own private practice, typically billing between one to two or two-and-a-half hours per day, over a fifteen month period. *See* SSM_MB_000003-0052 (M. Bradley 3/29/13-7/1/15 Billing Records). [EX. 263]. Unlike the Lieff and Labaton staff attorneys, his time entries provide simply that he performed "Document Review" on each of these days. *See id*. However, because Michael Bradley only reviewed documents in the Catalyst system, "Document Review" adequately describes the tasks performed on each of those days.

### (e) ERISA Firms

The six ERISA firms collectively billed just over 11,600 hours, less than any single Customer Class firm. While Richardson Patrick Westbrook & Brickman, Feinberg Campbell & Zack, and to some extent, Beins Axelrod, had a more limited role, the value contributed by the other three ERISA firms far exceeded their straight hour tally. Each of

---

[171] In reviewing the handwritten and email time records submitted by Michael Bradley in support of his time, the Special Master was not able to independently verify the exact total of 406.4 hours reported on the Fee Petition. However, in reviewing the daily and weekly totals Michael Bradley emailed to Evan Hoffman at Thornton on a periodic basis, the Special Master confirmed that those hours totaled at least 400 hours. We find any difference *de minimis*.

the firms played a significant role. McTigue Law (4,914.05), led by Brian McTigue, filed

the *Henriquez* Complaint, initiating the ERISA suit, and represented four of the named

plaintiffs; Keller Rohrback (4,690.65), led by Lynn Sarko, filed the *Andover* Complaint,

represented two of the ERISA named plaintiffs, and engaged in extensive dialogue with

the DOL; Zuckerman Spaeder (1,400.5), led by Carl Kravitz, also interfaced with DOL

and contributed to the ERISA-specific strategy. [EX. 246]; [EX. 265]; [EX. 266]. Apart

from spending a reasonable number of hours, McTigue Law, Keller Rohrback, and

Zuckerman Spaeder appropriately delegated work among its senior and junior-level

attorneys and made best use of their respective skill sets.[172]

Like the Customer Class firms, the ERISA firms also recorded time for

periodically reviewing pleadings, docket entries, and decisions in related FX litigations.

Again, such an expenditure of time and effort was warranted in light of the novelty of the

FX-based legal claims and challenges, and the concurrent nature of those cases with the

*State Street* case. In this instance, a thorough review of current and pending FX cases was

good lawyering and we do not take issue with those entries.

---

[172] For McTigue Law Firm, Brian McTigue and James Moore (and Regina Markey after April, 2015) handled case strategy, conferences with co-counsel, and substantive work on the merits of the underlying case as well as approval of the settlement. *See* McTigue Law Time Records. [EX. 265]. Other attorneys at the firm participated in research and drafting efforts, and David Bond, a valuable nonlawyer at the firm, conducted important review of dockets and pleadings in other FX litigations. For Keller Rohrback, Laura Gerber, David Copley, and Lynn Sarko had the greatest involvement in filing the *Andover Complaint* and joining the other firms in litigating the *State Street* case, with Copley having greatest involvement during the negotiation of the term sheet and finalization of the settlement and Gerber expending the majority of her hours communicating with the firm's two named representatives, Mr. Stangeland and The Andover Companies, in the early stages of the litigation (2012-2013). [EX. 246]. Finally, for Zuckerman Spaeder, Adam Fotiades and Afton Hodge were heavily involved in reviewing discovery and coordinating document review among ERISA Counsel. Dwight Bostwick, the firm's Chairman, participated with Carl Kravitz in handling discussions with co-counsel and opposing counsel and determining strategy for the case. *See* Zuckerman Spaeder Time Records. [EX. 266].

### f. **Double-Counting of Staff Attorney Hours**

The hot-button issue which triggered the Special Master's investigation was the double-counting of staff attorney (SA) hours uncovered by the *Boston Globe* in November 2016. Internal reviews of the individual fee petitions conducted by Labaton, Lieff and Thornton following the *Globe* inquiry revealed that 17 staff attorneys had been listed on both the Thornton and Labaton lodestar reports and six staff attorneys appeared on both Thornton's and Lieff's reports. The result of the double-counting was a significant overstatement of the combined attorney time reported in the Lodestar Fee Petition: Of the reported 86,113.7 hours, 9,322.9 hours (or approximately 11%) were overstated; of the reported lodestar of $41,323,895.75, $4,058,654.50 was overstated. *See* 11/10/16 Letter to the Court, Dkt. # 116, pg. 2. [EX. 178].[173] The double-counting was disclosed to the Court in David Goldsmith's November 10, 2016 letter. *Id*

### i. *Causes of the Double-Counting Are Not Explained in Goldsmith's Letter*

As to the cause of the double-counting, the only explanation offered by Goldsmith in his letter was that the double-counting occurred due to "inadvertent errors." *See* 11/10/16 Letter to the Court, Dkt. No. 116. [EX. 178]. Though the letter explained that "efforts were made to share costs among counsel," such that Thornton bore "financial responsibility for certain SAs located at Labaton Sucharow's and Lieff Cabraser's offices," *id.*, no mention is made in the letter of the unusual agreement to "allocate" particular staff attorneys to Thornton or of the fact that Thornton decided that this cost-

---

[173] As part of its mandate, the Special Master reviewed voluminous documentation produced by the firms in support of their respective lodestar figures. The Special Master confirmed that the total hours and lodestar calculations were, in fact, accurate.

sharing arrangement entitled it to claim the time billed by the allocated staff attorneys in

its own lodestar.

It is clear, however, that some attorneys at Labaton, Lieff and Thornton

independently assumed that Thornton would claim the SA time on its lodestar. *See e.g.*,

G. Bradley 6/19/17 Dep., p. 48:1-5 ("We just assumed -- I just assumed where the local

counsel were on the papers, we're litigating the case, we're putting the fee up, why

wouldn't we put the people up that we were paying for?") [EX. 43]; Rogers 6/16/17 Dep.,

pp. 91:18 – 92:16 ("I certainly assumed [Thornton] would [claim the SA time on their fee

petition] .... They were paying for it up-front, I assume they wanted to get paid on the

back end.") [EX. 54]; *see also* Hoffman 6/5/17 Dep., p. 58:12-16 [EX. 63]; Chiplock

6/16/17 Dep., p. 136:10-19 [EX. 10]; TLF-SST-011206 (6/29/15 email from Lesser to

Chiplock) [EX. 68]. Nevertheless, the Special Master has found no evidence of any

explicit agreement by Labaton or Lieff to allow Thornton to claim on its lodestar the time

worked by Labaton or Lieff staff attorneys, and this arrangement was so unusual and

outside the norm that, had there been an agreement, it certainly should have been

captured or reflected in a formal contract or at least an informal writing.  Neither was the

case here, and it was this lack of an explicit or formalized agreement to allow the Labaton

and Lieff staff attorneys to be included on Thornton's fee petition that contributed greatly

to the double-counting of the staff attorney time.

Despite this, there is sufficient evidence in the record to find that at least some

attorneys at both Labaton and Lieff believed that the staff attorneys paid for and allocated

to Thornton would be included on Thornton's lodestar petition,[174] and that the inclusion of these same staff attorneys by Labaton and Lieff on their own fee petitions was simply a mistake that grew out of a combination of different circumstances. However, because the occurrence was so unusual and none of this was explained in the Goldsmith letter to the Court, this subject bears extensive examination and discussion.

### ii. *The Allocation of Staff Attorneys to Thornton*

The stated purpose of the staff attorney allocation arrangement was to share the cost and risk burdens of the litigation equally among the three Customer Class law firms. *See* Chiplock 6/16/17 Dep., pp 127:23 – 128:5; 131:23 – 133:15 [EX. 10]; Belfi 6/14/17 Dep., pp. 51:8 – 53:12. [EX. 17]. Sometimes referred to as the "10/10/10 agreement," as Labaton and Lieff each assigned five staff attorneys to Thornton so that each firm ended up bearing the cost of approximately ten staff attorneys, not only did this arrangement provide a means of equalizing the costs and burdens, but also as Garrett Bradley, managing partner of Thornton candidly admitted, it was "the best way to jack up the load star [sic]. . . the best way for us [Thornton] to increase our load star [sic] and make it comparable to the other two firms. . . . I was absolutely concerned about Thornton's load star [sic] vis-à-vis the other two firms." G. Bradley 6/19/17 Dep., p. 67:4-13 [EX. 43];

---

[174] After learning of the double-counting, Chiplock emailed Goldsmith explaining how the double-counting occurred. His email confirms that two Lieff staff attorneys, Rachel Wintterle and Ann Ten Eyck "*should not have been included in [Lieff]'s lodestar at all*," and then described how their time, as well as time for Chris Jordan and Jonathan Zaul, was "inadvertently" included with the time of other Lieff reviewers because Lieff "neglected to exclude time entries" for a specific time period. TLF-SST-032267 (11/9/16 Chiplock to Goldsmith). [EX. 261]. This sentiment is reflected in the November 10 Letter, drafted principally by Goldsmith, which states that certain hours of both Labaton and Lieff staff attorneys "mistakenly were [] reported" in those firms' respective lodestars. 11/10/16 Letter. [EX. 178]. During the investigation, both Mike Rogers and Kirti Dugar, the person on the ground at Lieff, testified that they assumed Thornton would claim the staff attorneys allocated to it on the Thornton lodestar. Rogers 6/16/17 Dep., pp. 91: 18-23; 92: 12-16 [EX. 54]; Dugar 6/16/17 Dep., pp. 114: 22 – 115:5 [EX. 55].

TLF-SST-011124 - 1126 (2/6/15 email from Garrett Bradley to Michael Thornton).  [EX. 64].

The allocation of staff attorneys was effectuated through normal billing/invoicing procedures, which was largely handled by those who knew nothing of the details of the arrangement.  *See* Politano 6/14/17 Dep., pp. 26:15 – 28:9 [EX. 98]; Chiplock 6/16/17 Dep., p. 156:16-21 ("I delegated that process [at Lieff Cabraser] to Nick [Diamond], and to Kirti [Dugar], to work out with our accounting department creating an invoice and sending it off to Thornton so that those hours are properly accounted for and paid for.") [EX. 10].  According to Labaton's chief operating officer, Ray Politano,[175] Labaton billed Thornton monthly for the hours worked by the allocated staff attorneys, without identifying the staff attorneys whose hours were being invoiced. Politano 6/14/17 Dep., pp. 26:15 – 28:9.  [EX. 98].  Politano further testified that Labaton had shared costs of staff attorneys in a similar manner in approximately ten other cases but that the staff attorneys would be listed on Labaton's fee petition, *not* on the other firms' fee petitions, "ninety percent of the time."  *Id.*, pp. 22:22 – 23:14. (In the other ten percent of the cases, the shared staff attorneys would enter their time directly into the other firm's database and never report it to Labaton; hence, Labaton did not list them on in its fee petition.  *Id.* at pp., 23:20 – 24:7.)  Michael Rogers testified that it was more common to simply invoice the other firm for the shared-cost staff attorneys, get reimbursed for the cost, and then at the end, if there was a successful resolution to the case, allocate a share of the fees

---

[175] Politano is not a lawyer; his background is in finance. Politano 6/14/17 Dep., p. 9:3-5.  [EX. 98].  He testified that his responsibilities at Labaton "are to maintain the review of the administrative area. I'm in charge of accounting, records, marketing, word processing, all the administrative functions within the firm."  *Id.*, p. 10:14-18.

to the other firm, which reflected what that firm might have gotten if it had billed themselves. Rogers 6/16/17 Dep., pp. 94:7-19; 96:13-17. [EX. 54]. Suffice it to say that had this more straight-forward method been followed here, rather than through the artifice of "allocating" the individual lawyers to Thornton, and Thornton putting those lawyers on its lodestar report as if the staff attorneys were Thornton's own lawyers, the double-counting would not have occurred.

### iii. *Failure to Detect the Double-Counting Error*

As noted, Goldsmith's November 10 letter makes no attempt to explain why the double-counting error occurred nor why it was not caught before the Fee Petition was filed. Labaton, Lieff and Thornton had agreed in May of 2011 "to exchange on a quarterly basis our then current lodestar reports showing quarterly and aggregate billings in this matter." TLF-SST-033911-3913 (5/4/11 Keller Letter). [EX. 82]. There is no evidence, however, that the three firms ever followed that agreement. Had they done so, the "inadvertent mistake" of double-counting would almost certainly have been detected.

The Special Master finds that one major reason that the double-counting error was not detected is Labaton's compartmentalization of its litigation practice, which resulted in the preparation of the fee petition by a Labaton partner, Nicole Zeiss, who was not involved in the litigation, and knew nothing of the SA cost-sharing arrangement but was responsible for preparing the settlement and fee petition documents. Zeiss testified she was not informed of any agreement for loaning Lieff or Labaton staff attorneys to Thornton, and, therefore, did nothing to verify the accuracy of any hours submitted by the various firms. Zeiss 6/14/17 Dep., pp. 24:8-20; 25:17 – 26:18; 84:16 – 86:12. [EX. 79].

Nor did Zeiss circulate among the class firms the individual declarations or lodestar reports. Zeiss 6/14/17 Dep., pp. 21:4-7, 22:24-25 ("I sent out the template to all the firms, and asked them to complete the templates and send me drafts. . . . It's not the practice to exchange time records [among the firms.]") [EX. 79]. As a consequence, neither Lieff nor any of the ERISA firms ever saw Labaton's or Thornton's fee petitions prior to their being filed with the Court and, therefore, were not in a position to catch the double-billing. (The ERISA firms did not utilize staff attorneys in this case, and as Goldsmith noted in his November 10 letter, the ERISA firms' lodestars were unaffected by the double-counting.)

If the November 10 letter had been fully explanatory, it would have, and should have, provided the Court with the details of the cost-sharing/staff attorney allocation agreement, including the reason(s) why the double-counting mistake was not caught before the Fee Petition was filed.

### iv. *Thornton's Higher Billing Rates for Staff Attorneys Not Explained*

The Goldsmith letter similarly does not explain how or why the hourly rates at which Thornton billed the shared-cost staff attorneys were rates *higher* than the rates at which the same staff attorneys were billed by Labaton and Lieff. As indicated above, Thornton billed all of the staff attorneys on its lodestar report at $425 per hour. *See* Thornton Lodestar Report at Dkt. No. 104-16. [EX. 66]. Labaton billed all but three of the shared-cost attorneys at rates ranging from $335 to $410 per hour, most in the $335 to

$360 range;[176] four of the six Lieff staff attorneys were billed at $415 per hour (the other two were billed at a higher rate, $515/hour.) *See* Lieff Lodestar Report at Dkt. No. 104-17. [EX. 89]. Thornton's explanation was that they simply used the same hourly rate ($425) that had been used as the rate for the staff attorneys in the *BONY Mellon* case in the Southern District of New York. Though Thornton contends that Dan Chiplock of Lieff and Mike Rogers of Labaton suggested that they use $425 as the hourly rate, *see* Hoffman 6/05/17 Dep., p. 59:5-12 [EX. 63], the evidence presented to the Special Master indicates only that Chiplock and Rogers suggested that they try to be "consistent" in the SA rates they used and that they use $425 as a "cap" on SA rates, *not* that they use $425 as the hourly rate for all staff attorneys. *See* LCHB-52627 – 52628. [EX. 192].

Rather than make any attempt to explain the discrepancy in billing rates in the November 10 letter, Goldsmith stated they merely removed the duplicative time and "[w]hen a given SA had different hourly billing rate, we removed the time billed at the higher rate." 11/10/16 letter, Dkt. No. 116. [EX. 178]. While this approach was prudent, it does not explain why the Thornton rates were higher than the Labaton and Lieff rates for the same staff attorneys.

### 4. Misrepresentations in Thornton Fee Petition

### a. Labaton Template Issues

As indicated, the individual fee petitions of the Customer Class and ERISA law firms incorporated a narrative provided to them in a "template" prepared by Labaton's

---

[176] Only three of the shared-cost staff attorneys -- D. Alper, D. Fouchong and D. Hong -- were billed by Labaton at the same rate used by TLF, $425/hour. *See* Labaton Lodestar Report at Dkt. No. 104-15. [EX. 88].

settlement counsel, Nicole Zeiss. Several law firms modified that template to provide the Court with accurate information concerning their particular firms. *See e.g.,* McTigue Declaration, Dkt. No. 104-18, ¶ 20 [EX. 90]; Kravitz Declaration, Dkt. No 104-20, ¶ 4 [EX. 92]; Axelrod Declaration, Dkt. No. 104-22, ¶ 8 [EX. 94]. Garrett Bradley, however, did not do so; instead, in petitioning for fees for Thornton, Bradley adopted, without any changes, the template prepared by Labaton. Unfortunately, the narrative in Bradley's sworn Declaration was affirmatively false and misleading in a number of important respects and these misleading statements were a contributing cause of the double-counting errors.

In his Declaration in support of Thornton's individual fee petition, Garrett Bradley declared, under penalty of perjury,

> 3. The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by each attorney and professional support staff-member of my firm who was involved in the prosecution of the Class Actions, and the lodestar calculation based on my firm's current billing rates. For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court. Time expended in preparing this application for fees and payment of expenses has not been included in this request.

> 4. The hourly rates for the attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their service, which have been accepted in other complex class actions.

Dkt. No. 104-16, ¶¶ 3, 4. [EX. 66].

Paragraphs 5 and 6 implicitly incorporate some of these statements.[177]

---

[177] These paragraphs state:

Exhibit A to Bradley's Declaration identifies 24 staff attorneys (SAs). The total compensation requested on the Thornton petition for these staff attorneys is $4,508,837 -- *i.e.,* more than 60% of Thornton's total lodestar -- at an hourly rate of $425 for each staff attorney (referred to as "SAs"), except Michael Bradley, who is also designated as an "SA" but is billed at $500. Additional compensation requested for four Thornton partners and one associate totals $2,831,187.

Garrett Bradley's Declaration contains numerous untrue statements:

- *Exhibit A is a summary of time spent by attorneys and professional support staff members "of my firm."* None of the SAs were employed by Thornton. 3/7/17 Hearing Tr., p. 87:8-10 [EX. 96]; G. Bradley 6/19/17 Dep., pp. 82:12-21; 83:4-7 [EX. 43].

- *The billing rates for the SAs are "based on my firm's current billing rates."* Thornton did not maintain "current billing rates" for SAs or other attorneys listed on its lodestar calculation in Exhibit A. 3/7/17 Hearing Tr., p. 87:14-19 [EX. 96]; G. Bradley 6/19/17 Dep., pp. 48:24 – 49:4, 64:12-15 [EX. 43]; Thornton Law Firm, LLP's June 9, 2017 Responses to Special Master's First Set of Interrogatories, Response No. 49 [EX. 99]; *see also* Exhibit A to Dkt. No. 104-16 [EX. 66].

- *For personnel "who are no longer employed," the lodestar is based on their rates for the "final year of employment."* Again, none of the SAs were employed by Thornton. 3/7/17 Hearing Tr., p. 87:8-10. [EX. 96].

- *The schedule was prepared from "contemporaneous daily time records regularly prepared and maintained by my firm."* Thornton did not prepare or maintain daily time records of the hours worked by the SAs listed on its

---

5. The total number of hours expended on this litigation by my firm during the Time Period is 15,302.5. The total lodestar for my firm for those hours is $7,460,139.

6. My firms lodestar figures are based upon the firm's billing rates, which rates do not include charges for expense items. Expense items are billed separately and such charges are not duplicated in my firm's billing rates.

.

lodestar. Hoffman 6/5/17 Dep., pp. 63:2-7; 69:19-25; 70:12-16; 79:19-23 [EX. 63]; Kussin 6/5/17 Dep., p. 69:4-17 [EX. 56]. Nor did Thornton maintain sufficiently reliable contemporaneous time records for all of the lawyers working on the *State Street* case. TLF-SST-011246 – 11249 (5/21/14 email from Hoffman to Lesser) ("All of the hours are taken from LCHB's chart where there were mentions of discussions with either 'co-counsel' 'team' or, of course, Mike Lesser and/or MPT, GJB."[178] [EX. 200].

- *The hourly rates "are the same as my firm's regular rates charged for their services."* Thornton did not maintain "regular rates" for the SAs listed on its lodestar report. 3/7/17 Hearing Tr., p. 88:2-5. [EX. 96].

- *These rates "have been accepted in other complex class actions."* With the exception of 4 staff attorneys, the $425 rate charged for the remaining staff attorneys listed on the lodestar, including Michael Bradley, had not been accepted in other complex class actions. G. Bradley 6/19/17 Dep., p. 54:1-7. [EX. 43].

Garrett Bradley admitted -- both in deposition and during the March 7, 2017 hearing before Judge Wolf that these statements were "not accurate." *See* G. Bradley 6/19/17 Dep., pp. 82:17-20, 83:4-7 [EX. 43]; *see also* 3/7/17 Hrg. Tr. p. 87:8-10; 88:6-8; 88:15-16; 88:18-19 [EX. 96].

Bradley testified in his deposition that he did not give his sworn declaration a very "close read" before signing it; that using Labaton's model fee declaration template, Mike Lesser of his firm, with the assistance of Evan Hoffman, drafted his Declaration and they brought him the final version which he signed, without closely reading it. *See* G. Bradley 6/19/17 Dep., pp. 83:17 – 84:24. [EX. 43].

---

[178] As noted *supra*, while the Special Master finds that Thornton did provide sufficient evidence of contemporaneity with respect to the time records of Mike Lesser and Evan Hoffman, it is questionable whether the handwritten notes and calendars of Garrett Bradley and Michael Thornton are sufficiently reliable to constitute contemporaneous records of their time.

Though Bradley testified in his deposition that he only looked at his declaration before it was filed, *id.*, p. 86:16, the record evidence shows that Bradley had ample opportunity to give the declaration the "close read" that was required. Emails during this time period show that Nicole Zeiss sent the template to Garrett Bradley on August 31, 2016 and asked they be returned on September 8, 2016. *See* TLF-SST-029796 – 29801 (8/31/16 Zeiss email to G. Bradley attaching model fee declaration). [EX. 201]. Emails among Garrett Bradley, Mike Lesser and Evan Hoffman show that drafts of the declaration were circulated among these Thornton attorneys for review. This is confirmed by the testimony of Evan Hoffman: "[w]e put in all the hours that we had kept track of, I along with our accounting department and Anasthasia put in the expenses and ***then mostly Mike Lesser and then Garrett Bradley, Mike Thornton and myself all reviewed***" the declaration before Bradley signed it. Hoffman 6/5/17 Dep., p. 94:9-15. [EX. 63].

At the March 7, 2017 hearing, Garrett Bradley acknowledged the inaccuracy of the information in his Declaration, characterizing the information as "unclear" and admitting that it "should have been clarified by me at the time" it was prepared, but "it was not." 3/7/17 Hearing Tr., p. 88:14-19 [EX. 96]; *see* also p. 91:4-6. At numerous times during the March 7 hearing, Bradley acknowledged that he knew his Declaration contained inaccurate information but he signed it anyway. *See e.g.*, 3/7/17 Hearing Tr., p. 87:13-14; 88:2-9; 14-18; 91:5-7; 92:3-8. [EX. 96].

### i. *Garrett Bradley's Declaration Violated Fed. R. Civ. P. 11*

Fed. R. Civ. P. 11 provides, in relevant part:

**(b) Representations to the Court**. By presenting to the court a pleading, written motion, or other paper -- whether by signing, filing, submitting, or later advocating it -- an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

\*\*\*

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Fed. R. Civ. P. 11(b)(3).

Rule 11(c) provides for sanctions for violation of Rule 11(b):

(1) If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation. Absent exceptional circumstances, a law firm must be held jointly responsible for a violation committed by its partner, associate, or employee.

Fed. R. Civ. P. 11(c)(1).

Sanctions for violations may be monetary or nonmonetary. Fed. R. Civ. P. 11(c)(4). "The court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons." Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment.

Rule 11(b)(3) required that before submitting his Declaration in support of Thornton's fee request, Garrett Bradley have conducted "an inquiry reasonable under the circumstances," and after such inquiry, submit a Declaration containing only "factual contentions hav[ing] evidentiary support." Garrett Bradley has admitted that the statements in his Declaration listed above are "not accurate," G. Bradley 6/19/17 Dep.,

pp. 82:17-20, 83:4-7 [EX. 43]; *see also* 3/7/17 Hrg. Tr. p. 87:8-10; 88:6-8; 88:15-16 [EX. 96]; 88:18-19.  and, hence, lack evidentiary support.   A simple reading by Bradley, much less a reasonable inquiry, would quickly have identified the above listed statements as false.

Bradley admits only that he did not take the time to "closely read" the Declaration before signing it.  G. Bradley 6/19/17 Dep., p. 84:22-24.  [EX. 43].  The Special Master believes Bradley did not read the narrative section at all or if he did, even in a cursory fashion, he turned a blind eye to the falsity of the statements, ignoring the ethical obligations imposed by Rule 11 and the potential impact of the false statements upon the attorney fees approval process.  Had he given the Declaration even a cursory reading, he would immediately have known the above sworn statements were untrue and would have -- or certainly should have -- corrected them.  Indeed, if he had read them, however fleeting, and left them uncorrected, as his statement at the March 7, 2017 hearing implies, this would increase the likelihood that the sworn statements were intentionally misleading or at least that he attributed no significance -- ethical or otherwise -- to the falsity of the sworn statements.

"Whether a litigant breaches his or her duty [under Rule 11] to conduct a reasonable inquiry into the facts and the law depends on the objective reasonableness of the litigant's conduct under the totality of the circumstances." *Aronson v. Advanced Cell Tech., Inc*., 972 F. Supp. 2d 123, 139 (D. Mass. 2013) (quoting *CQ Int'l Co., Inc. v. Rochem Int'l USA*, 659 F.3d 53, 62 (1st Cir. 2011)).  The factors that may be examined by a court include "the complexity of the subject matter, the party's familiarity with it,

the time available for inquiry, and the ease (or difficulty) of access to the requisite information." *CQ Int'l Co*., 659 F.3d at 62–63 (quoting *Navarro–Ayala v. Nunez*, 968 F.2d 1421, 1425 (1st Cir.1992).)

Here the subject matter -- information pertaining to Thornton's own professional staff and billing rates – was hardly complicated, and a matter with which Garrett Bradley, as the firm's managing partner, was certainly intimately familiar -- Thornton was a relatively small firm (18 lawyers). He had ready access to all information necessary to have made a truthful and accurate representation, and the email evidence demonstrates that he was kept apprised of all billing rates and hours of Thornton's professional staff -- including the staff attorneys (SAs) employed by Lieff and Labaton -- throughout the course of the *State Street* litigation. Emails between Bradley and other Thornton attorneys, namely Mike Lesser and Evan Hoffman, and Nicole Zeiss show that Bradley had more than a week to review the Labaton "template" and the information used to complete it. But more than this, Bradley knew without having to even perform a "reasonable inquiry" that the SAs identified in Exhibit A of his sworn Declaration were not employed by his law firm, as well as the inaccuracies attendant to the other misrepresentations in the Declaration.

The Advisory Committee Notes to the 1993 Amendment to Rule 11 identify other considerations that may be appropriate in deciding whether to impose a sanction and what sanctions would be appropriate in the circumstances. These include considering "[w]hether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only

one particular count or defense; whether the person has engaged in similar conduct in

other litigation; whether it was intended to injure; what effect it had on the litigation

process in time or expense; whether the responsible person is trained in the law; what

amount, given the financial resources of the responsible person, is needed to deter that

person from repetition in the same case; and what amount is needed to deter similar

activity by other litigants."  Fed. R. Civ. P. 11, Advisory Committee Notes, 1993

Amendment.

Several of these considerations require the imposition of significant and

substantive sanctions.  First, the Special Master finds that the statements were false, and

the false statements were not due to simple mere negligence, but rather Bradley

intentionally and willfully identified the SAs in his Declaration as members of his firm

and that their hourly rates were the same as the firm's regular rates charged for their

services.  Bradley's motivation for making the false statements is clear and well

supported by the record. The record evidence shows that Bradley intentionally sought to

"jack up" Thornton's individual firm lodestar vis-à-vis the other Customer Class firms,

and representing the SAs as members of Thornton with billing rates of $425 an hour

($500 an hour, in the case of Michael Bradley) was the way to do it.  *See* G. Bradley

6/19/17 Dep., p. 67:4-13 [EX. 43]; TLF-SST-011124 - 11126 (2/6/15 email from Garrett

Bradley to Michael Thornton) [EX. 64].[179]

---

[179] Here, beyond the emails in which Bradley specifically refers to "jacking up" the lodestar, the Special Master's
view is informed by the email exchanges between Bradley and Chiplock in which Bradley conveys his belief that
Thornton did not receive a fair share of the *BONY Mellon* fee, in part because its lodestar was too low. *See* TLF-
SST-031166 - 31173 (G. Bradley, Bob Lieff, Dan Chiplock email chain of  8/28/15.)  [EX. 87].  In its *State Street*

Further, Bradley's misrepresentations "infected the entire pleading" as Bradley's Declaration vouched the firm's lodestar, which lead to the approval of an inflated fee award.[180]  Although there is no evidence that Garrett Bradley has engaged in similar conduct in other litigation, Bradley is an experienced lawyer who practices regularly in federal court and should be expected to know his obligations under Rule 11.

Bradley's misrepresentations were not, as Thornton's Rule 11 expert, Professor Georgene Vairo, characterized them merely a "technical violation" of Rule 11, and the Special Master declines Professor Vairo's invitation to simply overlook Garrett Bradley's sworn misrepresentations to the Court.[181]  This was not simply a failure to "focus on certain aspects" of "boilerplate" language, Vairo 4/10/18 Dep. p. 105:24 – 106:11 [EX. 202]; rather the Special Master concludes that Bradley deliberately and intentionally

---

petition, the Labaton and Lieff staff attorneys included in Bradley's Declaration Exhibit A comprised more than 60% of TLF's lodestar.

[180] *See* discussion, *infra*.

[181] Professor Vairo testified as follows:

> THE SPECIAL MASTER: My question is, are you saying to Judge Wolf and to me that courts and in my role here as a special master should simply overlook the clearly inaccurate and misleading statements made in Garrett Bradley's declaration?
> ***
> THE WITNESS [VAIRO]: You know, I'm not saying that you shouldn't think about it. And again, the Rule 11 jurisprudence I think is very clear. Even in many, many cases some of which I have cited in my declaration courts should be concerned about ensuring that attorneys practice law in as professional a manner as possible. But we all know or anybody who's been an attorney -- and you were an attorney for many, many years before you joined the bench -- mistakes get made. People get called out for them. Getting called out is very, very different from sanctioning somebody when a mistake has been made.
> Garrett Bradley made a mistake by not taking a closer look at the template before he submitted it to the Court. But that does not mean that he violated Rule 11. . . .

Vairo 4/10/18 Dep., pp. 60:18 – 61:10.  [EX. 202].

Here, Professor Vairo's casual dismissal of the seriousness of sworn misrepresentations to the Court, and their potential impact upon the process, are as surprising as they are unhelpful to the decisional process in this investigation.

234

misrepresented the make-up of Thornton's professional staff and their hourly rates so that Thornton's lodestar petition would be grossly inflated.

The Special Master is further persuaded that Rule 11 sanctions are necessary because Bradley has admitted that he "should have clarified" the information in his Declaration "at the time" he prepared, reviewed and signed it. *See* 3/7/17 Hearing Tr., p. 88:14-19 [EX. 96]; *see* also p. 91:4-6. But, the violation was not simply at the time he signed the Declaration. Bradly had numerous opportunities after signing to correct the misrepresentations. Yet, despite having been presented with numerous opportunities to do so, he did not take advantage of any of those opportunities and continued to adhere to the falsehoods for more than four months after the Declaration was filed on September 15, 2016, until he was specifically called to the task by the Court on March 7, 2017. In those intervening four months, Bradley could have taken the opportunity to "clarify" his Declaration at the Final Approval hearing which he attended on November 2, 2016. He could have done so immediately after problems with the Fee Petition first surfaced with the *Boston Globe*'s initial inquiry; he could have done so on -- or soon after -- the November 10, 2016 letter to the Court, with which he was involved in drafting; he could have done so after the *Globe* article was published on December 17, 2017; or, at the very latest, immediately after receiving the Court's February 6, 2017 Order directing counsel to respond as to whether a Special Master need be appointed to investigate the accuracy of their lodestar petitions.

Bradley did not avail himself of any of these opportunities to "clarify" his Declaration and never did so until questioned by the Court on March 7, 2017. Even here,

Bradley's admissions were not at his own initiative; it was only after he was directly

questioned by the Court that he grudgingly acknowledged the he "could have been

clearer" in his Declaration statements.

Beyond these rather obvious factors, several additional factors inform the Special

Master's finding that these Rule 11 violations require a significant sanction. The first is

obvious. The misrepresentations made here were not made in a routine pleading, motion

or other paper -- they were made under oath directly to the Court, by an officer of the

Court, with the expectation and intent that the Court would rely upon them in awarding

millions of dollars in fees to his law firm. Professor Vairo's opinion that this all should

be chalked up to "sloppiness," Vairo 4/18/18 Dep., p. 109:17-18 [EX. 202], or that the

sworn misrepresentations were somehow less serious because the focus of the Court's fee

award was on a percentage of the total award to the class and that the lodestar was

essentially an unimportant part of the award -- and therefore, Bradley's

misrepresentations had no significant effect upon the award[182] -- both understates the

importance of the lodestar cross-check, which the Court indicated it was using, and

---

[182] Professor Vairo testified,

> So the Court was not misled in any manner, shape or form. Those [staff attorneys] time were going to be accounted for in somebody's fee petition.
> ***
> But if the agreement was to try to equalize the position of each of the firms within the context of the litigation, then I just fail to see what that has to do with Rule 11.
> The Court was using the lodestar check as a means of determining whether the 25 percent fee was an appropriate one. And so the dollar amount, the 41 million, would have been there regardless of how the individual firms manifested them on their individual fee declarations.

Vairo 4/10/18 Dep. pp. 46:19 – 48:8. [EX. 202].

diminishes the obligation of attorneys to be fully truthful and accurate in their submissions to the Court.

The second additional factor is perhaps less obvious, but equally important in the context of the double-counting error. The Special Master finds that had Garrett Bradley fully and accurately described the reason why the Labaton and Lieff SAs were being included on the Thornton petition -- and that these SAs were not employees of Thornton and did not have current billing rates with Thornton -- the entire double-counting error may well have been avoided. This is because if Garrett Bradley had been complete and accurate in his description and sent such an edited version of the Declaration to Nicole Zeiss at Labaton, it is likely her attention would have been drawn to the change in the template language, and she would have been alerted to the fact that Labaton's and Lieff's staff attorneys were included on Thornton's lodestar. So alerted, Zeiss may well have examined all three petitions with greater scrutiny and thereby have caught the double-counting of the SAs.

More importantly, given the Court's fiduciary role to the class, and beyond the possibility that Nicole Zeiss may have been alerted to the double-counting had Bradley accurately described the relationship of the SAs to TLF, the Court would likely have been alerted that something was amiss because claiming another firm's attorneys on your own lodestar would be so unusual as to raise red flags, the Court would have raised questions on its own, either at or before the November 2, 2016 Final Approval Hearing, thereby causing the lawyers to more carefully review their petitions and to catch the double counting.

While it would be saying too much to assign primary responsibility to Garret Bradley for the double-counting error, it is not too much to say that his misrepresentations to the Court were a contributing factor to the double-counting error.

For all of these reasons, the Special Master concludes that Garrett Bradley's Declaration was submitted in violation of Fed. R. Civ. P. 11(b).[183]  Accordingly, the Special Master recommends Rule 11 sanctions be imposed on Garrett Bradley and Thornton.[184]  For the reasons set forth here, the Special Master concludes that both a significant monetary and a non-monetary sanction is required.

In fashioning a monetary sanction, the Special Master is cognizant of the the financial resources of Bradley and Thornton.  Thornton received approximately $18.5 million of the fees awarded in this case. *See* Zeiss 9/14/17 Dep., p. 141: 1-2. [EX. 115].  The result of the double-counting of the staff attorneys in this case was a $4 million plus overstatement of the total lodestar for the case.  Under these circumstances, the Special Master recommends as an appropriate and proportionate monetary sanction in a range of $400,000 to $1 million, an amount equal to 10% to 25% of the overstatement

---

[183] Rule 11(b) contemplates that an attorney will receive notice and an opportunity to respond and correct any misstatements and misrepresentations. Professor Vairo conceded in her deposition that safe harbor does not apply here because sanctions would be court-imposed, not on a motion by a party.  Vairo Dep., p. 62:8 -12.  [EX. 202]. Nonetheless, Professor Vairo believes that even when a court *sua sponte* imposes sanctions, the "spirit" of the 1993 amendments to Rule 11 contemplates a safe harbor. *Id,* at p. 64:16-18. This seems a stretch, but even if Rule 11 is interpreted as contemplating a safe harbor in this context -- which we do not believe it does -- here, as outlined above, Garrett Bradley had numerous opportunities to correct his misrepresentations but he failed to take advantage of any of them to do so.

[184] In making this finding, the Special Master concludes that there is no evidence to support a finding that Michael Thornton, or any other Thornton attorney was involved in these misrepresentations to the Court. Therefore, no other Thornton attorney was individually in violation of Rule 11.  These misrepresentations are simply Garrett Bradley's sole responsibility.  However, Rule 11 violations of individual attorneys of a law firm are imputed to the law firm, except in "exceptional circumstances." Fed. R. Civ. P. 11(c).  Here, there are no exceptional circumstances.

of the lodestar and appropriately reflects the seriousness of an untrue sworn statement

made to a court by an attorney in connection with an application for millions of dollars in

attorneys' fees.[185]

### ii.    *Garrett Bradley's Declaration in Support of TLF's Fee Request Violates Mass. R. Prof. C. 3.3(a) and 8.4(c)*

Garrett Bradley's false statements in his Declaration and his failure to

correct those statements despite having had numerous opportunities to do so also violates

several Massachusetts Rules of Professional Conduct.

As the Massachusetts Supreme Judicial Court has recognized, "[a]n effective

judicial system depends on the honesty and integrity of lawyers who appear before their

tribunals." *Matter of Finnerty*, 418 Mass. 821, 829 (1994) (citing *Matter of Mahlowitz*, 1

Mass. Att'y Discipline Rep. 189, 192-194 (1979)).  The Court further has emphatically

stated, "[W]e cannot approve of any practice in which an attorney misleads a court."

*Finnerty*, 418 Mass. at 829 (quoting *Matter of Palmer*, 413 Mass. 33, 39, 594 N.E.2d 861

(1992)). "Were we to condone such conduct by an attorney, whether as a litigant or as

counsel, 'the integrity of the judicial process would be vitiated.'" *Id.*, pp. 829-30 (quoting

*Matter of Neitlich*, 413 Mass. 416, 423 (1992)).

Rule 3.3 of the Massachusetts Rules of Professional Conduct "sets forth the

special duties of lawyers as officers of the court to avoid conduct that undermines the

integrity of the adjudicative process**.**" Mass. R. Prof. C. 3.3, Comment [2].  Rule

---

[185] This proposed sanction is discussed in some detail in the Recommendations section, *infra.*

3.3(a)(1) provides, "A lawyer shall not knowingly (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer."  Mass. R. Prof. C. 3.3(a)(1).  Rule 1.0(g) defines "knowingly":

> "Knowingly," "known," or "knows," denotes actual knowledge of the fact in question.  A person's knowledge may be inferred from circumstances.

Mass. R. Prof. C. 1.0(g).

In the context of Rule 3.3(a)(1), a fact is "material" if, viewed objectively, it directly or circumstantially "had a reasonable and natural tendency to influence a judge's determination."  *In re Angwafo*, 453 Mass. 28, 35 (2009).  However, it is not necessary to show that the statement of material fact did, in fact, influence a determination by the judge. *Id.*

The proscriptions of Rule 3.3(a)(1) are encompassed within Rule 8.4(c) which provides that it is professional misconduct to engage in any kind of conduct involving dishonesty or misrepresentation.  *See* Mass. R. Prof. C. 8.4(c)

 The conduct of Garrett Bradley described in the previous section of this Report is specifically the kind of conduct Rule 3.3(a)(1) and 8.4(c) are intended to deter.

As emphasized by the Court in *In re Diviacchi*, 475 Mass. 1013, 1020 (2016), "[A]n assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer *knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry.*"  *Id.* (quoting Mass. R. Prof. C. 3.3, Comment [3] (emphasis in original)).

As set forth above, Garrett Bradley made the statements in his sworn Declaration knowing that they were false. Further, he failed to make a "reasonably diligent inquiry" to ascertain the truthfulness of the statements.

In *Matter of Schiff*, 677 A.2d 422, 425 (R.I. 1996), the Rhode Island Supreme Court ordered that a lawyer be suspended from the practice of law for a period of eighteen months for violating Rule 3.3 of the Rhode Island Rules of Professional Conduct (which is identical to the Massachusetts Rule)[186] for submitting a false affidavit in support of a petition for attorney's fees -- the same kind of conduct as Garrett Bradley engaged in in the *State Street* case. The Rhode Island Court's handling of *Schiff* informs the Special Master with regard to Bradley's false Declaration in this matter.

In *Schiff*, the attorney filed an application in the United States District Court for Rhode Island for attorney's fees and costs as a prevailing party in a civil action pursuant to 42 U.S.C. § 1988, seeking an award of attorney's fees for herself and others in the amount of $511,951 and payment of costs in the amount of $203,268.28. In support of her application for fees and costs, Schiff submitted an affidavit that stated, in pertinent part:

> "The summary of time and charges for my services attached hereto present an accurate statement of services performed in connection with this litigation and was prepared from contemporaneous time records and with respect to sums for costs and expenses from accounting records."

---

[186] Rule 3.3(a)(1) of the Rhode Island Rules of Professional Conduct provides:

(a) A lawyer shall not knowingly:
(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer.

R. I., Sup. Ct. Rules, Art. V, Rules of Prof. Conduct, Rule 3.3(a)(1).

677 A.2d at 423.

The U.S. District Judge who heard the fee application ruled that this statement contained in the attorney's sworn affidavit was simply not true: The billing sheets she submitted sought reimbursement for work unrelated to the case, sought payment for time not worked, and indicated that portions of those records had not been made from contemporaneous time records.  *Id.* Schiff conceded as much, admitting that these statements in support of her fee application was "*not entirely accurate*" and that some entries on her summary-of-time charges "were not, strictly speaking, derived from contemporaneous records." *Id*. at 423-24.  She also acknowledged that she had also made estimates regarding costs she had incurred that were not derived from accounting records. *Id.* at 424*.*

On the basis of these admissions the Rhode Island Bar's disciplinary board readily concluded that there was clear and convincing evidence that Schiff had violated Rule 3.3(a)(1).  *Id.*  The Rhode Island Supreme concurred with this finding of the board. "The record discloses that respondent had indeed filed a false affidavit with the Federal Court in support of her application for fees and costs."  *Id.*

At her disciplinary hearing, Schiff had pointed to several "mitigating factors" which she claimed demonstrated that her false affidavit statements were unintentional and, therefore, did not warrant disciplinary action. Among those mitigating factors considered by the board were that Schiff "had rushed to prepare her fee application to file

it within the time allowed by the court" and in her haste had borrowed "boilerplate

language" from a form submitted by a colleague in an unrelated case. *Id.*

      The Rhode Island Supreme Court refused to accept the attorney's claim that her

submission of a false affidavit was inadvertent, holding, "*No attorney can sign such an*

*affidavit without being fully responsible for its contents*." *Id.* (emphasis added).  The

Court also found it significant that Schiff "made no effort to advise the court or opposing

counsel about the inaccuracies contained in that affidavit at any time during the period of

almost two years during which the application was pending and that she continued to

defend the accuracy of her application throughout that time." *Id.*

      The disciplinary board had recommended that, for Schiff's violation of Rule

3.3(a)(1), she be publicly censured.  *Id.*  The However, the Rhode Island Supreme Court

did not find a public censure a severe enough penalty for the misconduct:

> Although we accept the findings of fact made by the board, we do not
> believe that the imposition of a public censure is a sufficiently severe
> response to the egregious character of the respondent's conduct. She
> submitted and subsequently defended a false affidavit in support of her
> claims for fees and costs. *This affidavit is not mere boilerplate or*
> *surplusage; rather it is a sworn statement designed to convince the trial*
> *court that the respondent's fee application was fair, reasonable, and*
> *accurate. The respondent knew or should have known that this statement*
> *was not true. Indeed, her misrepresentations to the court bear a close*
> *resemblance to an attempt to obtain money under false pretenses.* Her
> testimony about mitigating circumstances does not reduce or ameliorate
> the seriousness of her misconduct.

*Id*. at 424 (emphasis added).

      Therefore, instead of censure, the Court ordered that Schiff be suspended from the

practice of law for a total period of eighteen months.  *Id.*

The facts in *Matter of Schiff* are eerily similar to those here.  Just like Schiff's affidavit, Garrett Bradley's Declaration here was a sworn statement designed to convince Judge Wolf that Thornton's fee petition was fair, reasonable and accurate.  Further, just like Schiff, for the reasons stated above in this Report, Bradley knew or should have known that his statements were not true. And, just as with Schiff, Bradley's statements were made in conjunction with an attempt to persuade a court to award a large sum of money to his own firm.

Therefore, the Special Master concludes that Garrett Bradley violated Mass. R. Prof. C. 3.3(a)(1).

Even if it were to be determined that that Bradley "*un*knowingly" submitted a false Declaration, the Special Master would nonetheless find that Bradley violated the Massachusetts Rules of Professional Conduct.

Similar to Rule 3.3(a)(1)'s imposition of a duty to correct a false statement of material fact previously made to a tribunal, Rule 3.3(a)(3), requires that a lawyer who unknowingly offers false evidence to a tribunal and comes to know of its falsity must take reasonable remedial measures if the evidence is material.  Mass. R. Prof. C. 3.3(a)(3). "This duty is premised on the lawyer's obligation as an officer of the court to prevent the trier of fact from being misled by false evidence."  Mass. R. Prof. C. 3.3, Comment [5].  If evidence is offered that is subsequently ascertained to be false, Rule 3.3(a)(3) requires that its false character be "immediately disclosed."  Mass. R. Prof. C. 3.3, Comment [6].

Bradley's Declaration is "evidence" in the sense that it is information declared to be true and upon which the Court was invited to issue a ruling,

Even if Bradley did not know his Declaration statements were false -- which, as indicated, the Special Master does not find to be the case -- as set forth *supra*, he certainly was put on notice and should have ascertained the statements the statements were false after the *Boston Globe* inquired about the accuracy of the *State Street* Fee Petition at the beginning of November 2017. He could have -- and should have -- disclosed and corrected the falsehoods in the November 10, 2017 letter to the Court, or after the *Globe* article was published on December 17, 2017, at the latest, immediately after receiving the Court's February 6, 2017 Order. But, as set forth above, Bradley did not avail himself of any of those opportunities to disclose and correct the statements, which by then, he most assuredly should have determined were false.

For all of the foregoing reasons, the Special Master concludes that Garrett Bradley is guilty of professional misconduct for violating Rules 3.3(a)(1) and (3) and 8.4(c) of the Massachusetts Rules of Professional Conduct. Accordingly, for the reasons more fully discussed in the Recommendation section, *infra*, the Special Master recommends that Bradley be referred the Massachusetts Board of Bar Overseers for consideration of appropriate discipline.

### 5. Lodestar Multiplier

In performing a lodestar cross-check on a proposed percentage-of-fund fee award, a lodestar multiplier is used. A lodestar multiplier is determined by dividing the proposed percentage-of-fund award by the total lodestar. *See, e.g., In re Puerto Rico*

*Cabotage Antitrust Litig.*, 815 F. Supp. 2d 448, 465 (D.P.R. 2011). In the instant matter, Plaintiffs' counsel's combined lodestar was $41,323,895.75. Dividing the proposed fee of 25% of the total fund, $300,000,000, by the lodestar yields a multiplier of 1.8.

A 1.8 multiplier is certainly within the reasonable range. *See In re Relafen Antitrust Litig.*, 231 F.R.D. at 82 ("A multiplier of 2.02 is appropriate."); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 742 (3d Cir. 2001) (holding that a lodestar multiplier of three would be reasonable and appropriate); *In re TJX Cos. Retail Sec. Breach Litig.*, 584 F.Supp.2d 395, 408 (D. Mass. 2008) (applying a lodestar multiplier of 1.97); *In re Tyco Intern., Ltd. Multidistrict Litig.,*, 535 F.Supp.2d at 271 (applying a lodestar multiplier of 2.697); *In re Visa Check Mastermoney Antitrust Litig.*, 297 F.Supp.2d 503, 524 (E.D.N.Y. 2003) (applying a lodestar multiplier of 3.5); *see also In re Prudential Ins. Co. America Sales Practices Litig.*, 148 F.3d 283, 341 (3d Cir. 1998) ("[M]ultiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied.").

Judge Wolf found that a multiplier of 1.8 times the lodestar to be reasonable, *see* 11/2/16 Hearing Tr., Dkt. No. 114, p. 39:1-2 [EX. 78], and subject to the discussion of the rules and ethics issues in other parts of this Report, and the adjustments recommended therein, this is not an unreasonable starting point.

## C. ACCURACY AND RELIABILITY – CHARGOIS ISSUES

The most significant issues raised during this investigation arise out of the nondisclosure of a payment of $4,102,549.43 to Damon Chargois, an attorney who neither appeared in the *State Street* docket nor worked on the case. Chargois, who was

never disclosed to ATRS, the other class representatives, or the class members, stands in stark contrast to the numerous other litigating attorneys who, after dedicating a half-decade to skillfully negotiating and engaging in teamwork and assuming substantial financial and legal risk in taking on the litigation, secured an excellent result for the class members. While all three Customer Class firms shared in the payment, the relationship with, and financial obligation to, Chargois was Labaton's alone. By its nondisclosures, however, Labaton shifted its own pre-existing obligation to Chargois to the class and its co-counsel without their informed consent. The responsibility for not disclosing Chargois, therefore, must fall squarely on Labaton.

The evidence produced during the investigation clearly reveals that Labaton engaged in consistent, conscious, and calculated efforts to conceal Chargois from all the participants in the *State Street* litigation: Labaton's client, the class; the other Customer Class Counsel;[187] ERISA Counsel; and most importantly, the Court, upon whom the law imposes a fiduciary duty to protect absent class members. The Special Master finds that Labaton had a duty, or at least a legal obligation, to inform each of these participants in the class action.[188] Labaton's failure to disclose the Chargois Arrangement to anyone

---

[187] The record evidence shows that Labaton did not fully inform Lieff of the true nature of the Chargois Arrangement, i.e., that Chargois played no substantive role in the litigation and added no value to the case. *See* § II(K)(5)(b), *supra*. Nor did Labaton disclose these critical details about Chargois and his role to Thornton law firm attorneys Mike Thornton, Mike Lesser, and Evan Hoffman. *See* § II((K)(5)(a), *supra*. We find however, that Garrett Bradley had full knowledge of the Chargois Arrangement. *See id*.

[188] After completing a second round of discovery, made necessary by the discovery of the Chargois Arrangement, the Special Master's Counsel retained Professor Stephen Gillers from New York University Law School to opine on potential ethical and legal issues implicated by the Arrangement. Professor Gillers authored an "Ethical Report for Special Master Gerald E. Rosen," sent to the law firms on February 23, 2018. [EX. 232]. In response to Professor Gillers' Report, Customer Class Counsel requested an opportunity to respond. At Counsel's request, the Special Master requested from the Court an eight-week extension for the filing of his Final Report & Recommendation, which the Court granted. Customer Class Counsel retained seven additional experts who opined on the same issues,

247

else in the case raises serious questions regarding class action attorneys' ethical and legal obligations to clients and co-counsel, as well as considerable concerns about how judges can fulfill their essential fiduciary obligations to the class. We address each of these specific obligations in turn, and why Labaton failed to fulfill them.

## 1. DUTIES TO THE CLIENT

We begin with Labaton's duties to its direct client, ATRS, and eventually the class. [189] Upon its engagement in the *State Street* case, Labaton owed ATRS the full panoply of fiduciary duties normally owed in an attorney-client relationship. Those duties did not, and do not, exist in a vacuum. They are defined by ATRS's important role as class representative with duties of its own. As Lead Counsel, Labaton also owed fiduciary duties to the class whom it represented as clients, as least as of August 8, 2016, the date on which the Court certified the class for settlement purposes. *See* 8/8/16 Hearing. Tr., Dkt. # 93, p. 11 [EX. 111]; *see also* Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement, Dkt. # 97. [EX. 264].[190]

---

all but one of whom considered themselves experts in legal ethics -- Professors Wendel [EX. 229] [EX. 243], Joy [EX. 227] [EX. 241], Green [EX. 230] [EX. 240], and Vairo, and Hal Lieberman, Esq. [EX. 228] [EX. 242], and Timothy Dacey, Esq. [EX. 237] [EX. 244] -- as well as Professor Rubenstein [EX. 234], who opined on the interplay of the Federal Rules of Civil Procedure and disclosure obligations in a class action setting. Prompted by the discourse that took place during this intensive discovery process, Professor Gillers supplemented his Report to clarify previous opinions and identify new ones. [EX. 233].

[189] We agree with Professor Gillers' view that, because the *State Street* case was filed and pending in the United States District Court for the District of Massachusetts (Boston), the Massachusetts Rules of Professional Conduct govern the ethical conduct of lawyers involved in the case. *See* Gillers Supp. Report, § IV(A)(i) [EX. 233].

[190] We discuss Labaton's duty to the class members, *infra*.

As it would with any client, Labaton had a fundamental duty to keep ATRS "reasonably informed" about the status of the *State Street* matter.  Mass. R. Prof. C. 1.4(a)(1)(3).[191]  In the context of a class action case, a class representative such as ATRS must be given the information reasonably necessary to perform its fiduciary duties to the class.  Fed. R. Civ. P. 23(a)(4).  Such information includes both the identity of any attorney positioned to receive a portion of the final settlement award funding the common fund as well as the basic role played by that attorney, whether it be a referral role or something more substantive.  Thus, Labaton had a duty to inform ATRS as its client, but more so as a representative of the class, that Chargois would receive 20% of Labaton's share of the total fee award.  Indeed, Rule 1.5(e) governing attorney conduct as to fees speaks directly to this issue.  In its current form, Rule 1.5(e) imposes an unequivocal duty upon lawyers to obtain a client's consent before dividing fees with lawyers outside the

---

[191] Massachusetts Rule of Professional Conduct 1.4(a)(1) is also illustrative of the obligation a lawyer serving as class counsel has to his or her clients.  It provides that a lawyer "shall promptly inform the client of any decision or circumstance with respect to which the client's informed consent [] is required by these Rules."  Mass. R. Prof. C. 1.4(a)(1).  This same obligation was imposed in substantially the same language in 2011. *See* Mass. R. Prof. C. 1.4(a)(1) (eff. Jan. 1, 1998, providing "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information") [EX. 251].  As discussed *infra*, neither the current version of Rule 1.5(e) nor the version in effect in 2011 required a lawyer obtain "informed consent" to share fees with a lawyer outside the firm.  For example, the current version of Rule 1.5(e) does not use the exact phrase "informed consent," but rather requires that a lawyer *inform* the client that a division of fees will be made, and that the client *consents* in writing to the joint participation.  *See* Rule 1.5(e) ("[a] division of a fees between lawyers who are not in the same firm may be made only if, after *informing* the client that a division of fees will be made, the client *consents* to the joint participation[.]") (emphasis added).  We find this incongruence a distinction without a difference.  We read Rule 1.5(e) both now and then to require a lawyer seeking division of fees to inform the client of the key parameters of the fee division, including the identity of the recipient lawyer.  As written in Comment [7A] to the Rule, this does not, however, include the amount of the payment absent an inquiry from the client.

Rule 1.2 contemplates that material information about the representation be disclosed to the client at the beginning of the representation so that the client can duly authorize his or her attorney:  "[a]t the outset of a representation and subject to Rule 1.4, the client may authorize the lawyer to take specific action on the client's behalf without further consultation."  Mass. R. Prof. C. 1.2, cmt [3].  Should those circumstances change, a lawyer must again seek authority after disclosing the challenges:  "[a]bsent a material change in circumstances, a lawyer may rely on such an advance authorization, The Client may, however, revoke such authority at any time."  *Id*.

firm.[192]  By failing to inform Hopkins -- or anyone at ATRS -- of the Chargois

Arrangement, Labaton deprived its client of the opportunity to make a reasonably

informed decision.  In so doing, Labaton breached its duty under Rule 1.5(e).

In reaching this conclusion, we rely on the plain language of Rule 1.5(e) as

interpreted by Massachusetts' highest court in 2005. While Labaton's experts have

attempted throughout this investigation to characterize the firm's 2011 Retention

Agreement as "imperfect" compliance,[193] we do not accept their invitation to blur the

lines between compliance and noncompliance. While it is admittedly a close call, by not

disclosing to ATRS that it had a pre-existing obligation to pay Chargois 20% of its fee for

performing no work, we conclude that Labaton simply failed to comply with Rule 1.5(e)

and its requirement of disclosure to its direct client, ATRS.  Any other interpretation of

this Rule would invite a lack of candor and half-measure disclosures to a client and

deprive the client of the ability to make a meaningful decision in its own best interest.[194]

---

[192] For the reasons discussed *infra*, we conclude that the pertinent rule governing Labaton's conduct was the prior version of Rule 1.5(e), as in effect in 2011, which preceded the most recent amendments to Rule 1.5(e).  *See* Mass. R. Prof. C. 1.5(e) (eff. Jan 2., 2001) [EX. 225].

[193] *See* Joy 4/3/18 Dep., pp. 19:23 – 20:2 [EX. 227]; Joy Report, § IV(A) [EX. 241]; Lieberman 4/4/18 Dep. pp. 33:6-9, 77:10-12, 87:6 – 88:20 [EX. 228]; Lieberman Report, § IV(A),(B) [EX. 242]; Wendel 4/3/19 Dep., pp. 151:10 – 152:2 [EX. 229].

[194] This interpretation attains even more force where, as here, the client is a possible class representative that in some instances will be making decisions on behalf of the class.

### a. *Labaton failed to comply with Rule 1.5(e), as effective February 8, 2011.*

Since its adoption in 1997, the Massachusetts ethical rules on fee-sharing among

lawyers have undergone several revisions.[195] In 2011, at the time ATRS retained Labaton

to represent it in the *State Street* case, Rule 1.5(e) read:

> "A division of a fee between lawyers who are not in the same firm may be made
> only if, after informing the client that a division of fees will be made, the client
> consents to the joint participation and the total fee is reasonable. This limitation
> does not prohibit payment to a former partner or associate pursuant to a separate or
> retirement agreement.

Mass. R. Prof. C. 1.5(e) [EX. 225].[196]

While the current version of Rule 1.5(e) imposes additional requirements,[197] those

changes -- while adopted by the Supreme Judicial Court -- had not taken effect at the time

---

[195] Prior to the adoption of the Massachusetts Rules of Professional Conduct, DR2-107 of the Canon of Ethics and Disciplinary Rules Regulating the Practice of Law, SJC Rule 3:07, 382 Mass. 773 (1981), addressed fee-sharing between lawyers not in the same firm. Like its counterpart in the Rules of Professional Conduct, Rule 1.5(e), DR2-107(A) imposed strict limitations on the division of fees among lawyers not in the same firm. It provided, in pertinent part, that "A lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his law firm or law office, unless [1] [t]he client consents to employment of the other lawyer after a full disclosure that a division of fees will be made… [3] [t]he total fee of the lawyers does not exceed reasonable compensation for all legal services they rendered the client." DR2-107(A) [EX. 226]. In 1997, effective January 1, 1998, Massachusetts transitioned to the Rules of Professional Conduct. As a result, Rule 1.5(e) replaced DR-207(A)(1) as the prevailing ethical rule governing fee divisions between unaffiliated lawyers. As quoted above, Rule 1.5(e) required that an attorney dividing fees inform the client that a division of fees *will* be made, although the rule (as written) did not explicitly state *when* consent would occur nor that it be in writing. On December 20, 2010, the Supreme Judicial Court adopted formal amendments to Rule 1.5(e) requiring that the client be informed "before or at the time" of retention and provide written consent.

[196] The Special Master recognizes that Massachusetts is in the distinct minority in that it permits attorneys to receive referral payments despite performing no substantive work or assuming joint responsibility in a case -- i.e. "bare referrals." By permitting bare referrals, Massachusetts encourages attorneys to refer matters to those lawyers best equipped to handle them. Whether the legitimate policy objectives advanced by permitting bare referral fees are achieved by this practice, however, is a different matter than the potential harm and inequities that result from not informing a client about a payment of referral fees or fee-sharing agreements.

[197] Rule 1.5(e), effective as of March 15, 2011, now requires that "the client is notified *before or at the time* the client enters into a fee agreement for the matter that a division of fees will be made and consents to the joint participation *in writing* and the total fee is reasonable" (emphasis added).

ATRS became a client in *State Street*. Thus, as an initial matter, we look to the pre-2011

version of Rule 1.5.[198]  But, as Professor Gillers points out, the Rules of Professional

Conduct, like any statute, cannot be read in isolation.  *See* Gillers Supp. Report, pp. 66-

67.  Lawyers are held to know the law beyond what is written in codified rules.  Thus, we

look beyond the Rule itself and read Rule 1.5(e) in conjunction with the Supreme Judicial

Court's decision in *Saggese v. Kelley*, 445 Mass. 434 (2005), in which the Court opined

squarely on the issue of what constitutes a valid referral payment under Rule 1.5(e).  In

answering that query, the SJC held that a lawyer must disclose more than what was

written in 1.5(e).  Going forward,[199] the Court imposed two new obligations to take effect

immediately: (i) all fee-sharing agreements must be disclosed to the client before a

referral is made; and (ii) the client must consent in writing to the agreement.  *Id*. at

443.[200]

     The other experts proffered by Labaton differed as to what extent, if at all,

*Saggese* should be read as imposing new requirements -- i.e. a writing -- not appearing in

---

[198] Our reliance on the previous version, however, does not render Rule 1.5(e), as currently written, inconsequential. While not controlling, we look to the text of the current Rule as reflective of the spirit of Massachusetts' ethical obligations to disclose fee-sharing agreements.

[199] The SJC specifically held that the rules announced therein "will be construed to require this in fee-sharing agreements that are formed after the issuance of the rescript in this decision."  Id. at 443.  Under Massachusetts Rule of Appellate Procedure 23, rescripts are effective twenty-eight days after issuance of the final decision.

[200] Whether written consent was required in 2011, after the *Saggese* decision but prior to the March 15, 2011 amendments taking effect, is a close question.  But we are persuaded that a definitive statement by Massachusetts' highest court requiring that a client consent in writing must be followed as pronounced in a public decision of that Court.  In doing so, we reject Mr. Lieberman's opinion that the writing requirement articulated in *Saggese* was "dicta." Lieberman 4/4/18 Dep., pp. 130:12 – 131:1 [EX. 228].  When the highest Court in the jurisdiction specifically says, "[t]he rule will be construed to require this in fee-sharing agreements that are formed after the issuance of the rescript in this decision," lawyers act at their own peril if they treat such a specific pronouncement of a new legal standard as dicta.

the text of the Rule at that time. Professor Joy, for example, agreed with Mr. Lieberman's analysis that *Saggese* did not impose a writing requirement, and took the position that a practitioner is only bound by the Rules as written. Joy 4/3/18 Dep., pp. 69: 20-70: 3 [EX. 227]; Lieberman 4/4/18 Dep., p. 114: 20- 115:3, 121: 19-23 [EX. 228]. While that may well be a consideration in imposing discipline and/or sanction for a violation of the Rule(s), it does not change the scope of Labaton's duties owed to ATRS under Rule 1.5(e) when ATRS engaged the firm in 2011.

Professor Wendel distinguishes *Saggese* on different grounds. He reads the Court's decision in *Saggese* as confined to those instances in which a lawyer attempts to modify the terms of an ongoing client engagement "midstream," rather than as imposing new obligations as to what information a lawyer must provide a client at the beginning of the representation about a division of fees. Professor Wendel, therefore, opines that *Saggese*, despite announcing a requirement that consent to fee-sharing be captured in writing going forward, did not impose upon Labaton a duty to inform ATRS or Hopkins because that obligation arose before and not during the representation. Wendel 4/3/18 Dep., pp. 27: 2-8; 29: 14-19; 30: 22-31:13. [EX. 229].

We disagree with Professors Joy and Wendel and Mr. Lieberman on this point. Even in its pre-2011 form, Rule 1.5(e), alongside the requirements in *Saggese*, required written consent to any fee-sharing arrangement.[201] It is with these obligations in mind that

---

[201] Because these changes were not codified in the Rules of Professional Conduct until March 15, 2011, after a three-month notice period, we recommend that no disciplinary sanctions be imposed for failure to abide by the requirements added by *Saggese v. Kelley*. *See* Recommendations, § IV, *infra*.

we agree with Professor Gillers (Gillers Supp. Report, pp. 69-70) and conclude that

Labaton more than "imperfectly" complied with Rule 1.5(e); it violated the Rule,

however technical that violation may now be construed in hindsight.  While the violation

was not egregious in nature, it is a violation nonetheless, and one that had potentially far-

reaching implications given Labaton's obligations as Class Counsel and ATRS's

obligations as class representative.

### b. Labaton did not adequately inform ATRS about the Chargois Arrangement.

With the emergence of Rule 1.5(e) in this investigation, Labaton argues that, while

Hopkins did not have personal knowledge of Chargois, ATRS -- as an institution -- was

sufficiently on notice of Chargois' role in the *State Street* case. It reaches this result by

conflating three unrelated exchanges between Labaton and ATRS (or its representatives)

stretching back to 2008, years before the commencement of the *State Street* case: (1) the

joint application of Labaton and Chargois & Herron for, and the acceptance of Labaton

only, as monitoring counsel for ATRS in 2008; (2) Hopkins' instruction to Belfi not to

inform him about fee allocations in *State Street* or any other case in which ATRS served

as a class representative; and (3) the February 8, 2011 Retention Agreement, signed by

Hopkins, engaging Labaton.  This position is supported to varying degrees by all four

Labaton experts, who, while acknowledging that no single event meets Rule 1.5(e)'s

requirements,[202] focus on these events in the aggregate as evidence of sufficient notice of

---

[202] The expert testimony on this topic varied considerably.  Professors Joy and Wendel conceded that Belfi's 2008 email exchange with Christa Clark was not alone sufficient.  Joy 4/3/18 Dep., p. 172:7 – 173:19 [EX. 227]; Wendel 4/3/18 Dep, pp. 137:24 – 138:11 [EX. 229].

fee-sharing to ATRS. These factual conflations are, at most, constructive notice, and likely something less than that; regardless of the label used, we find that these communications did not satisfy the actual notice requirement of Rule 1.5(e).

Put simply, we are unconvinced by Labaton's strained post-hoc explanation of events and the legal theory that purports to flow from it. None of these communications, taken individually or together, disclosed the true nature of the Chargois Arrangement or Chargois' role in the case.[203]

We begin with the earliest event, Labaton and Chargois & Herron's Joint Response to the RFQ on July 30, 2008. *See* Joint RFQ Response [EX. 128]. There is no question that Damon Chargois' name and the Chargois & Herron firm appeared in the Joint RFQ Response. *See id*. But neither Labaton nor Chargois & Herron revealed, nor intimated, that after Chargois was rejected as co-monitoring counsel, he (or the Chargois & Herron law firm) would receive 20% of Labaton's fees earned from any and all future ATRS/Labaton litigation, regardless of whether Chargois worked on the cases.[204] More

_____

[203] While Labaton had a duty to disclose to its clients, ATRS and the class (at least through its class representatives), that Chargois was entitled to a significant portion of the fees awarded in the case based on an existing agreement that required Chargois to perform no work, under Massachusetts law, Rule 1.5(e) did not go so far as to require that Labaton inform ATRS the exact percentage that was allocated to Chargois unless asked. *See* 1.5(e), cmt [7a] ("The Massachusetts rule differs from its ABA counterpart in that it does not require disclosure of the fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer.") Had Hopkins learned of Chargois' role in the case, he may well have asked Labaton about the financial division between firms, and Labaton would have been required to respond truthfully.

[204] Specifically, the RFP (§ 5.10) solicited the firms to "describe proposed billing arrangements, including contingency fees, for securities litigation…. state what discounts, if any, to these rates the firm proposes to provide to ATRS." Joint RFQ Response [EX. 128]. In the Joint RFQ Response, neither Labaton nor Chargois and Herron informed ATRS of a contemplated agreement to pay referral fees to Chargois and Herron. If Labaton now wishes to rely on the RFQ approval process to prove that it gave ATRS notice of Chargois, Labaton must also bear responsibility for the incomplete answer it gave to the RFQ questions as to the terms of the Chargois Arrangement.
 There is some evidence that both Labaton and Chargois believed Chargois would serve as local counsel to Labaton in future litigation involving ATRS. Belfi 9/5/17 Dep., pp 27:11-15 [EX. 122]; Chargois 10/2/17 Dep., pp. 38:23- 39:1 [EX. 125]. That Chargois and Labaton intended for Chargois to perform substantive legal work on

importantly, ATRS, through its Chief Legal Counsel Christa Clark, explicitly rejected the joint relationship as proposed. She wrote that Chargois and Herron would *not* be added to the monitoring panel, and instead "add[ed] [Labaton] independently to the list of approved firms." [EX. 129]. While Labaton could, in its discretion, affiliate with Chargois and Herron as it "deem[ed] appropriate, on a case-by-case basis," if it was "a necessary and appropriate expense of the case," the Clark email left no doubt that only *Labaton* -- not Chargois and Herron -- would be appointed, and thereby serve the organization, as monitoring counsel. *See id*.

Moreover, neither the Joint RFQ Response itself, nor the Response when read in conjunction with Clark's email, met the requirements of Rule 1.5(e) read with *Saggese*. *See* Gillers Supp. Report, 69 [EX. 233]. Neither sufficiently informed ATRS of the Chargois Arrangement, as opposed to the identity of Chargois or his firm; that is, nothing in that response alerted ATRS that Chargois would receive 20% of Labaton's gross attorneys' fees earned in cases where ATRS served as lead or co-lead counsel.[205] Just the opposite. If anything, the Joint RFQ Response gave ATRS and Clark the false impression that Chargois would be performing substantive work alongside Labaton. While that may have been the intent early on, those discussions very soon thereafter gave

---

future cases involving ATRS does not change our analysis. As all the parties acknowledge, under the ultimate agreement reached (which we now refer to as the "Chargois Arrangement") Chargois was to receive 20% of any fees awarded to Labaton in an ATRS-lead (or co-lead) case. It is this sharing of fees that triggers Labaton's duty to inform under Rule 1.5(e). We read the rule as matter-specific. Thus, even if we accept Labaton's argument that the initial monitoring disclosures constituted notice and consent under Rule 1.5(e), Labaton had a duty to inform ATRS about the change in the relationship at the time it began representing ATRS in the *State Street* case.

[205] Belfi testified that he had subsequent telephone conversations with Christa Clark.

way to what is now known as the Chargois Arrangement. Under that agreement, Chargois' entitlement to 20% of the firm's gross fees -- whatever the amount -- was not up for discussion; it effectively created a floating lien interest on every Labaton/ATRS case. *See* Chargois 10/2/17 Dep., pp. 50:18 - 51:12. [EX. 125].

We are equally unpersuaded that Hopkins' statement to Belfi that Hopkins did "not want to know" (or otherwise be involved with) the specifics of Labaton's fee agreements effectively relieved Labaton of its ethical obligation to inform ATRS about Chargois. *See* Hopkins 9/5/17 Dep., pp. 60: 13 – 61: 13 ("…[w]hen I do these cases, I have one focus, and that is to get a good outcome. I'm not trying to be a referee. I'm not trying to be a bank teller. I'm not trying to be somebody that directs fees to one law firm or another, and I – I didn't want that. And I don't want that.") [EX. 12];[206] Hopkins Declaration, ¶14 ("Because of my instructions to Mr. Belfi regarding my desire *not to know or otherwise be involved with* the specifics of Labaton's fee agreements, I do not feel misled…") (emphasis added). [EX. 130].[207] As Professor Gillers so effectively puts

---

[206] In his first deposition, before the Special Master learned of the Chargois Arrangement, Hopkins testified that in the *State Street* matter, he "wasn't trying to figure out -- I wasn't trying to control how the attorneys divided up their fee." Hopkins Dep., p. 79: 9-11. But it is clear from his testimony that his deference to Labaton was in relation to how the fees would be divided between ERISA and Customer Class Counsel, not among counsel, in general. *See id.* p. 78:20-22 (Q: were you aware of the amounts in attorneys' fees that were ultimately awarded to the ERISA attorneys?"), p. 79: 12-16 ("If they divided [their fee] up in a way that -- in an amount that the judge ordered that they could all live with, you know, happiness to them. I 've got plenty to do – enough to do without trying to divide up the attorney fees.").

After the Chargois Arrangement came to the Special Master's attention, Hopkins testified a second time, this time addressing specifically his knowledge of Chargois' involvement in the *State Street* case. In his testimony, Hopkins stated (for the first time in this record) that "[Belfi] wanted me to understand everything about what all [the lawyers] were doing," but that Hopkins informed Belfi that he "expected the attorneys to handle the attorney stuff because, you know, once you become the gatekeeper of what law firms are hired…the last thing I wanted was to have any knowledge or power about what law firms were hired." Hopkins 9/5/17 Dep., p. 60: 8-12, 17-22. Hopkins later purported to ratify the agreement. *See* Hopkins Declaration, ¶¶ 11-12, 14.

[207] Hopkins' statements in his recent Declaration that he told Belfi "if [he] ever wanted to know the details of Labaton's fee-sharing agreements, [he] would ask him," and that Hopkins was "not concerned with how that

it, Labaton deliberately *chose* not to tell Hopkins about Chargois based on its own perception that the Chargois Arrangement would not matter to Hopkins.  *See* Gillers Supp. Report, p. 76 [EX. 233].

Contrary to Labaton's recent assertions, a client's request not to be informed does not constitute consent under Rule 1.5(e).  Far from it.  Even Labaton's distinguished panel of experts acknowledge that a client's desire, however explicit, not to know certain facts does not relieve lawyers of their ethical duty to inform that client of fee-sharing. *See* Lieberman 4/4/18 Dep., p. 30:3-5 [EX. 228]; Green 4/4/18 Dep., pp. 158: 6-159:10-15 [EX. 230]; Wendel 4/3/18 Dep. p. 151: 14- 152: 3. [EX. 229].  We cannot accept the notion raised by Professor Wendel that these inherent ethical duties are obviated simply because the client is sophisticated or familiar with the practices of the securities class action bar, or knows "the players" in class action cases.  *See* Wendel 4/3/18 Dep., p. 100: 2-6 [EX. 229].  While such a position is belied by black-letter ethical law, it is also particularly troublesome because, by shifting the burden to the client, it eviscerates the deep-seated protections built into the ethical rules to protect clients.  These protections are particularly critical where Labaton was anticipating an appointment as Lead Counsel,

---

aggregate fee is distributed among lawyers or law firms" in any way, raise serious questions about Hopkins' adequacy to serve as a class representative moving forward.  *See* Hopkins Decl., ¶¶ 10-11 [EX. 130]; Fed. R. Civ. P. 23(a)(4) ("One or more members of a class may sue or be sued as representative parties on behalf of all members *only if* … the representative parties will fairly and adequately *protect the interests of the class*.") (emphasis added). These concerns are not assuaged by Hopkins' blanket statement that "[i]n his view, this payment had no effect on the interests of the class."  Hopkins Decl., ¶ 15 [EX. 130]. The class had a right to know that Lead Counsel intended to, and did, pay $4.1 million out of settlement funds to a person who performed no work in the case, as a result of Lead Counsel's own pre-existing obligation, whether or not the payment itself was permitted under Massachusetts ethical rules.  We cannot see how, in light of a clear dereliction of his fiduciary duties to the class, Hopkins can fairly and adequately protect the class's interests moving forward.

and of ATRS as a class representative, and was well aware of the obligations to the class that are inherent in that position.

While shifting the burden to a client is inappropriate in any case, it is especially so here where the client was serving in a fiduciary role and owed ethical duties of his own to the class he represented.  In this context, a client such as Hopkins speaks not only for himself but for the absentee class members, a duty Hopkins clearly took seriously. Hopkins 6/14/17 Dep., p. 85:14-25 ("ultimately my duty is to ensure that the class got as good an outcome as they could under the circumstances presented to us.")  [EX. 4]. Labaton, therefore, had a clear obligation to affirmatively inform Hopkins of the full parameters of the Chargois Arrangement -- that pursuant to a pre-existing obligation of Labaton's, Chargois would receive a substantial payment if Labaton successfully recovered fees but had no obligation to do any work on the case -- and obtain his written consent.  *See* Chargois 10/2/17 Dep., pp. 50:18 - 51:12 [EX. 125].  Hopkins' instruction to Belfi did not waive that critical duty, much less rise to the level of informed consent contemplated by Rule 1.5(e).

Finally, in what is perhaps the most compelling of Labaton's three-part argument for compliance under Rule 1.5(e), Labaton argues that the February 8, 2011 Retention Agreement -- and specifically a single two-word phrase within it -- sufficiently notified ATRS of the Chargois Arrangement.  [EX. 138].  The Retention Agreement reads: "[ATRS] agrees that Labaton Sucharow may allocate fees to other attorneys who serve as local or liaison counsel, *as referral fees*, or for other services performed in connection with the Litigation." (emphasis added).  One can read this sentence in one of two ways.

259

The sentence can be read, according to Labaton's experts, as (1) permitting fee allocation

(a) to local or liaison counsel; (b) paid out as referral fees; *or* (c) paid for other services

performed in the litigation (*See* Wendel 4/3/18 Dep., pp. 25:15 – 26:2 [EX. 229]; Green

4/4/18 Dep., pp. 119: 11-17; 120:8-16 [EX. 230]; and Lieberman 4/4/18 Dep., pp. 30:6-

20, 37:1-11 [EX. 228]), or (2) providing only two options, (a) referral fee payments to

local/liaison counsel *or* (b) fees to other attorneys performing work on the case (in other

words, with "as referral fees" modifying "local or liaison counsel").  While the latter

interpretation is more plausible, this fact is of no moment.  Even if we were to read the

Retention Agreement as Labaton's experts suggest, that letter falls well short of

compliance under Rule 1.5(e).

On this point, we agree with Professor Gillers and part ways with Labaton's

various experts.  While Labaton's experts disagree whether the letter alone satisfies Rule

1.5(e) (Joy says that it does), or whether the letter must be read in conjunction with the

monitoring relationship and Hopkins' instruction to Belfi (as Green and Lieberman say),

they agree that the Retention Agreement adequately conveyed what was required under

Rule 1.5(e).  We simply do not agree.

Rule 1.5(e) contemplates disclosure of more than just the words "referral fees."

This is the only conclusion that reflects both the plain meaning of the Rule -- historical

and current -- and the significance of client consent in a "bare referral" state.  The history

of Rule 1.5(e) reinforces our view that a mere mention of "a division of fees" or "referral

fee," absent some explanation, does not suffice for the nature of the consent required.[208]

Reading the rule in this more meaningful fashion further enhances the significance of

obtaining a client's consent in a bare referral jurisdiction.  In bare referral states, such as

Massachusetts, an attorney is rewarded, if not encouraged, to refer matters to

substantially more capable counsel by making a referring attorney eligible to earn a fee

simply for making such a referral.  Because no work is required to receive this fee, the

only safeguard in place to prevent an attorney from abusing his or her discretion to share

fees with attorneys is Rule 1.5(e)'s consent requirement.[209]  By apprising the client of any

fee divisions up front, the client is empowered to ask questions, renegotiate, decline

representation, or agree to the arrangement as explained. Such decisions are the client's

prerogative and the client must have sufficient information to knowledgeably exercise

that prerogative.  We, therefore, view this obligation as an important one, not as a casual

or pro-forma empty one.

---

[208] On this point, we are informed by the original language of DR2-107(A)(1), the predecessor to Rule 1.5(e), which provided that "[a] lawyer shall not divide a fee for legal services with another lawyer who is not a partner in or associate of his firm or law office, unless… [t]he client consents to employment of the other lawyer after a *full disclosure* that a division of fees will be made." (emphasis added).  [EX. 226].  While that phrase no longer appears in the current version of the Rule or in the version effective in 2011, its inclusion in Massachusetts' ethical canon suggests that steps beyond those taken by Labaton are required to comply with Rule 1.5(e).

[209] Professor Gillers opines that Rule 1.5(a), prohibiting excessive fees, also applies to any division of fees paid to a lawyer under a fee-division agreement under Rule 1.5(e).  *See* Gillers Supp. Report, pp. 126-127 [EX. 233].  As he points out, this is a logical reading of Rules 1.5(a) and 1.5(e) -- intended to protect the client from unduly burdensome fees -- because it prevents lawyers from "teaming up" with other lawyers and dividing their fees to circumnavigate the reasonableness check imposed by Rule 1.5(e).  On the other hand, Labaton construes Rule 1.5(a) as limited to a singular fee with no bearing on fee divisions under 1.5(e).  Labaton 4/12/18 Rebuttal, pp. 21-23.  [EX. 161]  And, as the firm notes, at least one of the factors enumerating the "time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly" is incompatible with a bare referral fee (that requires no substantive work to be performed).  *Id.*, p. 22.  Although a $4.1 million fee paid to someone who does no work on a case is excessive by any definition of that word, we make no finding with regard to Rule 1.5(a).

Labaton's reliance on a multi-year, multi-topic dialogue with ATRS fails for the additional reason that consent under Rule 1.5(e) must be matter-specific.[210]  *See* 1.5(e) (fee division may occur only after informing the client that a division of fees "will be made.")  That is, it requires consent to division in every matter, regardless of a past or existing relationship with the client, however robust.  This is surely true of ATRS, whose relationship with Labaton predated the *State Street* case by three years, during which time ATRS's leadership turned over and the Executive Director (Paul Doane), with whom Chargois and Herron had the initial contact, was replaced by a new Executive Director, George Hopkins, who was told nothing about Chargois or the evolving nature of the Arrangement.  *See* Hopkins 9/5/17 Dep., pp. 21:5-10, 64:4-67:11.  [EX. 12].  On this point we firmly reject Labaton's attempts to bootstrap its own then-existing monitoring relationship and/or one-off conversations between Belfi and Hopkins to comprise meaningful consent to the fee-sharing agreement with Chargois.  This is simply a bridge too far.

Finally, the Special Master's view on the issue of the nature of the consent required under Rule 1.5(e) is informed by the unique and troubling nature of the entire Chargois Arrangement, itself.  It was not a relationship in which an attorney was

---

[210] Professor Wendel opines that the consent required for Rule 1.5(e) is not matter-specific absent a midstream modification of an existing attorney-client relationship.  *See* Wendel 4/3/18 Dep., pp. 30:15 – 31:17, 40:5-14.  [EX. 229.]  It defies logic that Rule 1.5(e), which requires that the client be told that a division of fees "will be made" can be satisfied by disclosing a *potential* referral arrangement in response to a securities monitoring rather than litigation-based RFQ, three years before the referred matter is initiated.  In short, a lawyer cannot advise his or her client that a referral *will* be made in the future, as required by the Rule, unless the matter triggering the referral obligation is underway.  This is the only reasonable reading of the Rule.

receiving a simple referral fee. Rather, it was a fee that grew out of a pre-existing obligation of Labaton, alone. Because ATRS was likely going to be a class representative in a class action, the phrase "as referral fees" takes on a more far-reaching meaning, as it would mean that ATRS was giving permission for the payment of this pre-existing obligation to be satisfied from class funds, effectively permitting Labaton to shift its own obligation to Chargois to the class.[211]

### c. *Application of Rule 7.2(b)*

A separate but related issue arising out of Labaton's noncompliance with Rule 1.5(e) is whether the firm's conduct also violated Rule 7.2(b)'s proscription on paying for a recommendation of a lawyer. Rule 7.2(b) prohibits a lawyer from "giv[ing] anything of value to a person for recommending the lawyer's services." Mass. R. Prof. C. 7.2(b).[212] This rule must be read in tandem with Rule 7.2(b)(5), which explicitly carves out fee-sharing agreements that comply with Rule 1.5(e). Mass. R. Prof. C. 7.2(b)(5).[213] Professor Gillers opines that a failure to comply with Rule 1.5(e) is a *per se* violation of Rule 7.2(b). *See* Gillers Supplemental Report, § IV(B)(i)-(ii). Labaton's experts respond

---

[211] This situation is exacerbated by the fact that Labaton similarly did not give notice of the pre-existing Chargois obligation to the class, *see infra*.

[212] This language previously appeared as Rule 7.2(c), with language substantially similar to Rule 7.2(b). *See* Mass. R. Prof. C. 7.2(c) (eff. 2011) ("A lawyer shall not give anything of value to a person for recommending the lawyer's services, except that a lawyer may: … [4] pay referral fees permitted by 1.5(e).) [EX. 231].

[213] In addition to Rule 7.2(b)(5), the broader language of Rule 7.2(b) also exempts from its general prohibition against payments for recommendations another category of fee division among lawyers: those made pursuant to reciprocal referral agreements under Rule 7.2(b)(4). Rule 7.2(b)(4) permits *lawyers* to receive payment from another lawyer or nonlawyer professional under a non-exclusive reciprocal referral agreement, of which the client is informed "of the existence and nature," and where payment of fees is not otherwise prohibited. While we recognize that the Chargois Arrangement did not involve a reciprocal referral arrangement, the carve-out in this section is further evidence (on top of the unambiguous language in Rule 7.2(b)(5)), that Rule 7.2(b) applies to lawyers and nonlawyers alike. To read these two textual exceptions otherwise is to render both of them meaningless.

that the two provisions are unrelated; in their view, Rule 7.2(b) governs payments to a

nonlawyer or non-referral fees, and Rule 1.5(e) governs fee-sharing. *See* Wendel 4/3/18

Dep., p. 209:1-9 [EX. 229]; Joy 4/3/18 Dep., 31:21 – 32:9 (Rule 7.2(b) may apply to

lawyers not acting in the capacity of a lawyer) [EX. 227]; Green 4/4/18 Dep., p. 63:4-14

(Rule 7.2(b) applies to payments for recommendations *not* in the context of fee-sharing)

[EX. 230]; Lieberman 4/4/18 Dep., p. 79:8-10 (membership in the bar takes a monetary

arrangement outside 7.2(b)) [EX. 228]. For the reason below, we find that Professor

Gillers has the stronger argument.

We must begin with the meaning of the word "person" under Rule 7.2(b). To the

uninformed, the answer to this question may appear obvious, based on common sense

and the application of a common dictionary term. But on this point Professor Gillers and

Labaton's experts sharply disagree.

On its face, Rule 7.2(b) proscribes giving anything to value to a *person*. As

Professor Gillers indicates, the most plausible reading, if not the only reading, is that a

person means just that, an individual, and applies equally to lawyers and nonlawyers. *See*

Gillers Supp. Report, p. 67-68. [EX. 233]. This commonsense approach is consistent

with, but not made explicit in, the Rules of Professional Conduct. The Rules define

"person" as a corporation, an association, a trust, a partnership, and any other

organization or legal entity, but are silent as to which *individuals* come within this

category.[214] Mass. R. Prof. C. 1.0(i). Perhaps because it defies logic that a lawyer would

---

[214] As used throughout the Rules of Professional Conduct, "person" refers broadly to all individuals, whether a
lawyer or nonlawyer; the terms person and lawyer are not mutually exclusive. *See* Rule 1.0, cmt. [6] ("any
explanation reasonably necessary to inform the client *or other person* of the material advantages and disadvantages

not be considered a person under the law, the omission of the common dictionary

meaning -- that a person is a human being -- does not give us reason to pause.  *See*

*Merriam-Webster Dictionary*; "Person" ("human, individual – sometimes used in

combination especially by those who prefer to avoid man in compounds applicable to

both sexes.")

But Labaton's experts, seizing on these semantic shortcomings, opine that

"person" refers only to *non*lawyers.  Therefore, they argue, Rule 7.2(b) has no application

to Labaton's payment to a licensed attorney such as Chargois.[215]  To justify this strained

reading of the rule, Labaton's experts point to the title assigned to Rule 7.2(b) --

"advertising" -- as evidence that Rule 7.2(b) has nothing to do with "fees" (the subject of

Rule 1.5(e)) or fee-sharing. Hence, "person" does not include lawyers.[216]  Wendel Report,

p. 16 [EX. 243]; Lieberman 4/4/18 Dep., pp. 81:20 – 82:4 [EX. 228].  Mr. Lieberman,

pushed to defend this position in the extreme during depositions, testified that a law

---

of the proposed course of conduct and a discussion of the client's or other person's options and alternatives")
(emphasis added).  "Nonlawyer," on the other hand, is used less frequently but with deliberation, mainly to indicate
a difference between the responsibilities owed by lawyers and nonlawyers in particular circumstances.  *See* Rule 3.8,
cmt. [6] ("Special Responsibilities of a Prosecutor"); Rule 4.2, cmt. [4] ("Communication with Person Represented
by Counsel"); Rule 5.3 ("Responsibilities Regarding Nonlawyer Assistants").

[215] Professors Wendel and Joy point out that the Rule has historically been applied to "runners" or "touts" or other
individuals pursuing clients in a lawyer's stead.  *See* Wendel Report, pp. 15-17 [EX. 243]; Joy Report, pp. 20-21
[EX. 241].  This is one fact to consider but does not persuade the Special Master that Rule 7.2(b), as written, is
inapplicable to lawyers.

[216] Labaton argues that the title of Rule 7.2, "advertising," is indicative of the Rule's limited scope.  This is
particularly evident when read alongside Rule 1.5(e), a subsection of the rule on "fees," which has nothing to do
with advertising conventions.  We do not agree.  Captions and titles of Rules are not substantive parts of a Rule.  *See*
*INS v. St. Cyr*, 533 U.S. 289, 309 (2001) (citing *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)
("The title of a statute … cannot limit the plain meaning of the text."); *see also Opinions of the Justices*, 309 Mass.
631, 639 (1941) ("[T]hough the title of an act of the General Court is part of such act in a legal sense, such title
cannot be given the effect of extending or restricting the scope of the act manifested by unambiguous language in
the body thereof.").

degree and membership in a legal bar fully insulates a lawyer from Rule 7.2(b).  *Id.*, p. 79:8-10.

The Rules of Professional Conduct themselves suggest otherwise.  "Nonlawyer" is a term of art.  That phrase appears several times throughout the Rules of Professional Conduct -- at least thirty-six times by our count -- and describes a lawyer's duties vis-à-vis a nonmember of the bar.  Despite the drafters' liberal use of the word throughout the Rules, "nonlawyer" does not appear anywhere within the text of Rule 7.2(b), or its predecessor, Rule 7.2(c).  Had the drafters intended "person" to refer only to nonlawyers, they could have used the term "nonlawyer" as they did in so many other instances.[217]  We do not accept Mr. Lieberman's testimony that omission of "nonlawyer" is simply "bad drafting."  Lieberman 4/4/18 Dep., p. 99: 1-3. [EX. 228].

We do not accept Labaton's strained reading of the rules for several other reasons, not the least of which is that none of the distinguished experts testifying in this case could point to any legal authority that has found a person to mean a nonlawyer.  Nor have we found any.  Labaton's experts focus, instead, on a handful of non-Massachusetts decisions and ABA or non-jurisdiction-specific guidance categorizing the conduct of nonlawyers as violations of Rule 7.2(b) or its equivalent.  *See* Joy Report, pp. 20-24 [EX. 241]; Wendel Report, pp. 15-16 [EX. 243]. The absence of decisions condemning

---

[217] A more reasonable interpretation of Rule 7.2(b)'s "person" requirement is that offered by Professors Joy and Green, who concede that a lawyer *can* be a person under Rule 7.2(b).  Joy 4/3/18 Dep., p. 31:9-20 [EX. 227]; Green 4/4/18 Dep., pp. 62:7 – 63:14 [EX. 230].  This is true, for example, when a lawyer is not acting in a legal capacity.  A quintessential example is a lawyer who drives a taxicab. The taxicab driving lawyer cannot avoid Rule 7.2(b) merely because he holds a license to practice law.  *See* Joy 4/3/18 Dep., p. 31:1-7. [EX. 227].

lawyers for engaging in similar conduct is evidence, they argue, that a lawyer is not a person under Rule 7.2(b). But we do not make this logical leap. The fact that several bar authorities charged with enforcing Rule 7.2(b) (or its equivalent) have disciplined lawyers for paying nonlawyers for a recommendation in no way restricts the scope of Rule 7.2(b) to the nonlawyer population. To do so runs the risk of disciplining conduct involving nonlawyers while exculpating the identical conduct of a lawyer.[218] We cannot read the judicial silence as limiting the plain language in that way.[219]

Finally, we disagree with Labaton's view that "person" refers only to nonlawyers for two additional but equally important reasons: Rules 7.2(b)(4) and 1.5(e), the two exceptions written into Rule 7.2(b) that expressly permit referral payments between *lawyers*. Rule 7.2(b)(4) permits lawyers to enter into non-exclusive reciprocal referral arrangements with lawyers and nonlawyers with client consent. Rule 7.2(b)(5), likewise, carves out an exception for referral fees between lawyers that meet the division-of-fee requirements of Rule 1.5(e). It would make little sense to insert not one, but *two*, provisions that have no bearing on the conduct of those whom the Rule itself governs. Neither exception would be necessary if we were to read the rule in the manner urged by Labaton and its experts (that a lawyer is not a person). Labaton's experts provide only a facile explanation for these explicit carve-outs of permissible payments by lawyers.

---

[218] Labaton's experts contend that monetary payments made by a lawyer are sufficiently governed by a combination of Rule 1.5(e) and Rule 7.3 (solicitation).

[219] While the lack of existing legal authority applying Rule 7.2(b) to lawyers specifically factors into our analysis as to whether sanctions are warranted, and is as a mitigating factor, it does not alter our analysis as to whether Chargois' early contact with Doane/ATRS violated Rule 7.2(b).

Professor Green says the exception in Rule 7.2(b)(5) for agreements complying with Rule 1.5(e) is merely "surplusage;" Mr. Lieberman says Rule 7.2(b)(5) is "redundant." Green 4/4/18 Dep., pp. 60:15-22, 63:19 – 64:5 [EX. 230]; Lieberman 4/4/18 Dep., p. 82:13-14 [EX. 228]. It is a basic rule of statutory construction that statutes and rules are to be read as they are written. We cannot accept the explanation that clear language in a Rule of Professional Conduct should be deemed surplusage or a redundancy. Such an argument ignores the tenets of statutory construction and offends notions of common sense.

In sum, we find the position of Labaton's experts belied by the construction of the rule -- cross-referencing fee-referral between *lawyers* in Rule 1.5(e) -- and largely conflating the lack of legal authority framing noncompliance with Rule 1.5(e) as a Rule 7.2(b) violation with Chargois' immunity from the rule as a lawyer. While informative, this argument ultimately does not persuade us to accept their view.

Beyond the plain language of Rule 7.2(b), its application to lawyers and nonlawyers who engage in proscribed conduct is evidenced from its historical application. In fact, the very cases upon which Labaton's experts rely to argue that Rule 7.2(b) categorically does not apply to lawyers involve recommendations factually similar, if not analogous, to what Chargois did in connecting Labaton and ATRS.[220] More to the point, Labaton's working arrangement with Chargois, and Chargois' conduct, raise the

---

[220] The Rules of Professional Conduct define recommendation as "[a] communication [that] endorses or vouches for a lawyer's credentials, abilities, competence, character, or other professional qualities." Mass. R. Prof. C. 7.2(b), cmt. [5].

same concerns that have led commentators to condemn more avaricious payment-for-referral models intended to be disciplined by 7.2(b).[221]

In evaluating Chargois' conduct under Rule 7.2(b), we again distinguish the payment to Chargois from a traditional referral fee.  Unlike cases where one lawyer pays another a fee for referring a client which the referring lawyer is not competent or able to represent, Chargois initiated the relationship between Labaton and ATRS at Labaton's request.  ATRS did not come to Chargois for legal representation or seek out Chargois for a referral, or even his opinion, on counsel; rather, it was the other way around.  While Chargois was licensed to practice in Arkansas, ATRS did not consult Chargois in his capacity as a licensed member of the bar.  In other words, ATRS did not ask Chargois to find it additional monitoring counsel, nor is there any evidence in the record that ATRS had such a need; in fact, it already had three firms performing monitoring.  Rather, it was Chargois who cold-called Doane, and soon after establishing contact, volunteered that he was working with a New York law firm that "specializes" in institutional investors.[222]  Chargois 10/2/17 Dep., p. 34:20-23. [EX. 125].  From there, Chargois attended an initial meeting with Labaton, at which Labaton successfully persuaded ATRS to hire it as a fourth monitoring counsel.  In all of this, Chargois was effectively acting as a "tout" of the same kind toward which Rule 7.2(b) was directed.

---

[221] *See* Ellen J. Bennett, et al., *Annotated Model Rules of Professional Conduc*t (7th ed. 20Il); Charles W. Wolfram, *Modern Legal Ethics* § 14.2.5, at 786 (1986).

[222] In fact, Chargois testified that he did not even know what an "institutional investor" was at the time Belfi first inquired about an introduction to Arkansas pension funds.  According to Chargois, whose testimony we credit, Chargois had to first explain to Doane who he was and why he was calling.  Chargois 10/2/17 Dep., p. 32: 19-24; 34:6-9.  [EX. 125].

Professor Gillers opines that these facts are evidence of a "recommendation" within Rule 7.2(b). *See* Gillers Supp. pp. 71-72, n. 80. [EX. 233]. We agree. Chargois' efforts went far beyond a neutral introduction; it was simply solicitation by another name. Chargois himself boldly described his extensive efforts later in the relationship, saying he spent "political favors" and considerable money to secure the introduction. *See* LBS017593-7594 (10/18/14 email from Chargois to Eric Belfi). [EX. 177]. Professor Green's attempt to parse between an implicit recommendation (not covered by Rule 7.2(b)), on the one hand, and the explicit statement by Chargois describing Labaton's securities practice as "specialize[d]" -- which Green opines does not rise to the level of a recommendation -- is awkward and unconvincing. *See* Green 4/4/18 Dep., pp. 43: 19-44:2; 45: 11- 46:4. [EX. 230]. The facts here are not that complicated. Chargois had no relationship with ATRS or Doane, was not sought out for legal advice or a referral, and effectively vouched for Labaton's specialized securities monitoring services, a recommendation that was given emphasis by Chargois attending a meeting between Doane, Belfi, and Keller.

This type of solicitation is analogous to *In re Disciplinary Action Against McCray*, 755 N.W.2d 835 (N.D. 2008), a case cited by Professor Joy in his Report (p. 23).[223] [EX. 241]. In *McCray*, the Court imposed Rule 7.2(b) discipline[224] on a lawyer who paid a

---

[223] The *McCray* disciplinary decision is not unique in its facts or its finding of a violation of Rule 7.2(b) on those facts. *See, e.g., Disciplinary Counsel v. Mason*, 925 N.E.2d 963 (Ohio Sup. Ct. 2010) (finding violation of Rule 7.2(b) where attorney paid a consultant to refer him cases).

[224] The discipline and appeal discussed in this case related to North Dakota Rule of Professional Conduct 5.4(a), which provided, "[a] lawyer or law firm shall not share legal fees with a nonlawyer." *See In re Discipline Action Against McCray*, 755 N.W. 2d 835, 845 (N.D. 2008).

nonlawyer marketing firm for recommending that attendees of bankruptcy seminars hosted by the marketing firm use the services of the lawyer, whose specialty was assisting individuals with improving their poor credit after bankruptcy.

Chargois' introduction to Doane parallels the *McCray* case in several ways. First, in both cases, the referring source (the nonlawyer) unilaterally recommended the lawyer. As noted above, Chargois had no preexisting relationship with ATRS, nor did ATRS consult Chargois seeking an attorney referral. Second, neither Chargois nor the nonlawyer in *McCray* worked on the referred securities or credit-related matter. While Massachusetts, as a bare referral state, does not require a lawyer to perform any work on a case to receive a fee, the failure to participate in any way in the *State Street* case -- or the other eight cases for which Labaton paid Chargois a fee -- is a fact of great significance. In fact, Chargois only learned of the progress in *State Street* through periodic updates from Belfi, who, as a practice, often forwarded Chargois correspondence originally sent to the client, thereby avoiding putting Chargois and Hopkins on the same email and keeping Chargois' identity from the client. *See* Chargois 10/2/17 Dep., p. 74: 9-15. [EX. 125] *see also supra*. Third, in both cases, the proscribed payments were not isolated incidents but rather part of a pattern of payments for the original recommendation. In *McCray*, the lawyer sponsored twenty-five seminars in one year. 755 N.W.2d at 839. The record in this case shows that, while Chargois' payment in the *State Street* case was the most lucrative, it was hardly his only compensation for the original recommendation. Under the Chargois Arrangement, Chargois received

payments in at least eight class action litigations involving ATRS.  *See* Findings of Fact,

§ II(K)(8), *supra.*

Chargois' role vis-à-vis Labaton and ATRS, therefore, is functionally

indistinguishable from the role played by the nonlawyers in the cases cited by Labaton's

experts.  We read these critical facts as taking Chargois' initiative to secure ATRS as a

client for Labaton outside the fee-sharing context altogether and, thus, outside Rule

1.5(e).  This was not a "referral fee" as that term is used and understood in the legal

profession.  As Professor Green recognized, a "referral" is rationally understood as

recommendation to another, more competent attorney.  *See* Green 4/4/18 Dep., pp. 77:16

– 78:5; 129: 19-14 [EX. 230]; s*ee also* Sarrouf 3/21/18 Dep., p. 34:12-20 [EX. 252].

Labaton's payments to Chargois were, instead, purely payments for a recommendation,

payments that Green himself acknowledges fall outside the fee-sharing context, and are

quite different from imperfect attempts to comply with fee-sharing rules.  Green 4/4/18

Dep., pp. 69:19 – 70:3, 72:6 – 73:15.  [EX. 230].  These payments were not made to

Chargois for directing ATRS to a more competent securities firm, though that may well

have turned out to be the case.  The financial obligations turned solely on ATRS's

involvement as class representative in a class action, not Labaton's competency to

represent ATRS.  Labaton also paid Chargois in numerous other ATRS cases, in various

jurisdictions, and yet never told Hopkins.  Indeed, evidence of an "attempt" to "notify"

ATRS of the Chargois Arrangement is extremely thin and is comprised mainly of the fact

that the word "referral" appears in the Retention Agreement signed by Hopkins.  *See*

2/8/11 Retention Agreement.  [EX. 138].

On balance, the scales tip toward a pure payment for recommendation. The entire Chargois/Labaton Arrangement seems more in the nature of providing Chargois with a finder's fee and a future floating lien over all Labaton/ATRS cases than a legitimate, professionally-based referral fee for professional services.

This finding takes us back to where we began this analysis, with Professor Gillers' view that Labaton's failure to sufficiently inform its client of a referral fee under Rule 1.5(e) implicates Rule 7.2(b). Despite a pattern of creative yet unconvincing arguments to the contrary by Labaton's experts, Professor Gillers makes a far stronger case to draw such a connection. This conclusion is warranted in large part by the construction of the Rule itself, which includes an explicit safe harbor provision in Rule 1.5(e). A lawyer who does not comply with Rule 1.5(e)'s safe harbor must then fall within the ambit of Rule 7.2(b).

Having found this, however, does not end the discussion. What does give us some pause before recommending redress for a violation of Rule 7.2(b) is the fact that, apparently, no bar disciplinary authority or Court has ever imposed discipline upon an attorney for a violation of this Rule by paying another attorney. Therefore, this factor must be weighed in the context of the larger questions raised by Labaton's involvement in the Chargois Arrangement and what redress is appropriate to remedy this pattern of conduct. These questions will be addressed in the Recommendations section below.

## 2. DUTIES TO THE CLASS

As Lead Counsel for the class, Labaton owed not only a duty to disclose the Chargois Arrangement to its direct client, ATRS, but equally, if not more importantly, a

fiduciary and ethical duty to disclose to the members of the class, including the ERISA

class members, that an attorney who did no work on the case would receive $4.1 million

from the Settlement Fund, and that this payment obligation arose from a pre-existing

obligation of Labaton's own.

### a. Rule 23 Requirements

From a procedural perspective, disclosure of the Chargois Arrangement falls

within the scope of Fed. R. Civ. P. 23, specifically subsections (e) and (h) of the Rule.[225]

---

[225] Rule 23(e) states:

> **(e) Settlement, Voluntary Dismissal, or Compromise.** The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:
>
> **(1)** The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.
>
> **(2)** If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.
>
> **(3)** The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.
>
> **(4)** If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.
>
> **(5)** Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Subsection (h) provides:

> **(h) Attorney's Fees and Nontaxable Costs.** In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:
>
> **(1)** A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.
>
> **(2)** A class member, or a party from whom payment is sought, may object to the motion.

By its terms, with respect to informing class members, Rule 23(e) prescribes only that a notice of a settlement be provided to class members "in a reasonable manner." Fed. R. Civ. P. 23(e)(1). There is no direct prescription as to the content of the notice. Rather, the content of the settlement notice is dictated by two other aspects of Rule 23: the requirement that the settlement be "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), and the guarantee that class members have the right to object to the settlement. Fed. R. Civ. P. 23(e)(5). To safeguard class members' opportunity to object, "notice must be sufficiently clear and informative to make those opportunities meaningful." Rubenstein Report, p. 29 [EX. 234]; *see also* Rubenstein 4/9/18 Dep., p. 116:6-11. [EX. 235].

With respect to the attorneys' fees aspect of any class action settlement, Rule 23(h) requires that a claim for an award be made by motion under Rule 54(d)(2).[226]

---

**(3)** The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

**(4)** The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

Fed. R. Civ. P. 23.

[226] Rule 54(d)(2) provides:

 **(2)** *Attorney's Fees.*

**(A)** *Claim to Be by Motion.* A claim for attorney's fees and related nontaxable expenses must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.

**(B)** *Timing and Contents of the Motion.* Unless a statute or a court order provides otherwise, the motion must:

**(i)** be filed no later than 14 days after the entry of judgment;

**(ii)** specify the judgment and the statute, rule, or other grounds entitling the movant to the award;

The Advisory Committee's note to the 2003 amendment of Rule 23 contemplates that when a class settlement is proposed for Rule 23(e) approval, "notice to class members about class counsel's fee motion would ordinarily accompany the notice to the class about the settlement proposal itself." Fed. R. Civ. P. 23(e), Advisory Committee Note to 2003 Amendment. The fee notice's content is primarily dictated by Rule 23(h)(2)'s guarantee that class members have a right to object to the fee motion.[227] As with the right to object to the settlement itself, the right to object to a fee motion also means that class members must be given sufficient information to do so. *See* Rubenstein Report, p. 30. [EX. 234].

Here, the caption of the Notice identifies ATRS, Henriquez, and the Andover Companies as named plaintiffs. *See* Notice, Dkt. # 95-3, Ex. C. [EX. 81]. It refers to the "class action lawsuits (collectively, the 'Class Actions')." *Id.* It defines the "Settlement Class" as follows:

> All custody and trust customers of SSBT (including customers for which SSBT served as directed trustee, ERISA Plans, and Group Trusts), reflected in SSBT's records as having a United States tax address at any time during the period from January 2, 1998 through December 31, 2009, inclusive, and that executed one or more Indirect FX Transactions with SSBT and/or its subcustodians during the period from January 2, 1998 through December 31, 2009, inclusive.

*Id.*, 3.

---

**(iii)** state the amount sought or provide a fair estimate of it; and

**(iv)** disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.

Fed. R. Civ. P. 54(d)(2).

[227] *See* Fed. R. Civ. P. 23(h)(2) and *supra*.

Labaton Sucharow and Lawrence Sucharow are identified as "Lead Counsel." *Id.*, pp. 2, 14. The Notice further states that "Labaton Sucharow LLP has been appointed Lead Counsel for the Settlement Class." *Id.*, p. 13. No other law firm or lawyer is identified. Recipients were told "Lead Counsel, on behalf of ERISA Counsel and Customer Counsel, will apply to the Court for an order awarding attorneys' fees in an amount not to exceed $74,541,250.00." *Id.,* pp.4, 13. Recipients were also told that attorneys' fees for ERISA counsel would not exceed $10.9 million, and they were told how fees for the other counsel would be computed "if the Court awards the total amount of fees that Lead Counsel intends to request." *Id.* at 9. They were told that additional fee information would be posted on the case website by September 15, 2016, and they were provided the website address. *Id.*, p. 13. Labaton's phone number, website, and email address were given as a source of "[a]dditional information." *Id.*, p. 2. Recipients were told their right to opt out and/or to object, and how to do so. *Id.*

However, the Notice did not identify Damon Chargois or his law firm, Chargois & Herron, nor did it disclose the Chargois Arrangement or make any mention of a $4.1 million payment to Chargois pursuant to his pre-existing arrangement with Lead Counsel Labaton. It defies common sense to believe that information that a lawyer who never appeared in the case and who did no work to produce the class recovery stood to receive more than $4 million from the class fund would not reasonably have influenced members of the class in deciding whether to exercise their right to object to the settlement and the fees contemplated to be awarded as summarized in the Notice. The fact that this payment grew out of a pre-existing obligation of Lead Counsel's alone only underscores this point.

277

Unfortunately, the Notice did not include any reference to that payment, and the class members never had an opportunity to consider this information and object to it.

Under Fed. R. Civ. P. 23(e)(3), "parties seeking approval of a class action settlement must file a statement identifying any agreement made in connection with the proposal." As explained in the *Manual of Complex Litigation*, this provision requires disclosure of agreements that may affect the interests of the class members by allocating money elsewhere that they may have received. *Manual for Complex Litigation, Fourth*, § 21.631. [EX. 248]. Precisely because the Chargois Arrangement allocated money that the class may have received elsewhere (i.e., to Chargois), Rule 23(e)(3) would appear to require that the class -- through a filing with the Court -- have been informed about it.[228] According to Professor Rubenstein, however, in general, fee allocation agreements do not need to be included in the notice to the class. Rubenstein 4/9/18 Dep., p. 116: 6-17. [EX. 235]. Professor Gillers acknowledged that the plain language does not require as much. *See* Gillers 3/20/18 Dep. pp. 150: 3-7 – 151: 17-22. [EX. 253].

Although he admits that Rule 23 is "peculiarly written," relying on the plain language of Rule 23(h)(2)(B)(iv),[229] Professor Rubenstein -- as he does with the duty to disclose to the Court itself -- contends that Labaton was under no duty to disclose the Chargois Arrangement to the class absent an order from the Court directing it to do so.

---

[228] Rule 23(e)(3)'s requirement that a statement be filed disclosing "any agreement made in connection with the [settlement] proposal" is addressed more fully in the "Duty to the Court" section, *infra*.

[229] Rule 54(d)(2)(B)(iv) states that a motion for fees must "disclose, *if the court so orders*, the terms of any agreement about fees for the services for which the claim is made." Fed. R. Civ. P. 54(d)(2)(B)(iv) (emphasis added).

Rubenstein 4/9/18 Dep*., pp. 119:7, 121:10-17.  [EX. 235]*.  "I'm saying Rule 23 says that the burden's on the Court.  That's how the framers wrote it.  They -- the experts who wrote this picked up the language of Rule 54 and put that burden on the Court."  *Id.*, p. 121:10-17.[230]

---

[230] Rubenstein conceded this is a lot to ask of the judge:

> THE SPECIAL MASTER: So I believe what you're saying here again is that the burden is on the Court at the notice stage to make sure that fee allocation agreements are in the class notice?
>
> THE WITNESS [PROF. RUBENSTEIN]: I'm saying Rule 23 puts that burden on the Court, that's correct.  I'm not saying it's the burden.  I'm saying Rule 23 says that's the burden's on the Court.  That's how the framers wrote it.  They -- the experts who wrote this picked up the language of Rule 54 and put that burden on the Court.
>
> THE SPECIAL MASTER: And the obligation under Rule 23(h)(2) that class members be given sufficient information to do so, meaning to object to a fee petition, is an obligation as to fee agreements and allocation agreements that is on the Court ? . . .
>
> THE WITNESS: Yes. . . .
>
> THE SPECIAL MASTER: And the obligation to provide sufficient information for the class means that as to fee allocation agreements the Court has to ask?  Yes?
>
> THE WITNESS: Yes.  That's what Rule 23 says. That's correct.
>
> ****
>
> THE SPECIAL MASTER: It's a lot to put on a judge.  Separate and aside from what Rule 54 says and the incorporation of Rule 54 into Rule 23, you said earlier the class only knows what it knows and can only object to what it knows, right?  Is that -- obviously that's a --
>
> THE WITNESS: Sounds like a truism.
>
> THE SPECIAL MASTER: -- truism.  That was the word I was going to use.  It's also true of a judge.  And this burden of requiring the judge to ask in every case tell me everything about every fee agreement, you know, that is in this case, don't judges have the right to rely upon what the lawyers are giving them as to be all of the necessary and material important information? . . . Without having to ask is anybody getting a fee here that didn't work in the case, this didn't appear in the lodestar, that didn't appear in the case? . . .
>
> *****
>
> THE WITNESS: I -- the sense that you're -- it's a lot to ask of a judge.  I think we ask an enormous amount of federal judges. They're incredibly busy in a wide range of things. And then at this moment in a class action lawsuit we say to the federal judge, hey, you're now a fiduciary for absent class members is an enormous burden to put on judges, but I think the courts that use

Although Professor Rubenstein is in agreement with the Special Master and advocates that, in the interest of transparency, fee allocation agreements should be made known to the class, *see* Rubenstein, *5 Newberg on Class Actions*, at § 15:12, as nothing in Rule 23 requires disclosure of fee agreements absent a court order, the Special Master cannot conclude with certainty that as a matter of law the nondisclosure of the Chargois Agreement in the Notice provided to the class members violated any Rule of Civil Procedure.[231] [EX. 236].

---

that language do so specifically to remind the judge you're the backstop. It's up to you. And you have to do something here.

THE SPECIAL MASTER: . . .[D]oesn't the judge have the right to expect the lawyers to tell him or her everything that the judge should know so that the judge can fully perform his or her fiduciary duties to the class? []

THE WITNESS: I'd answer it this way, your Honor. I think that lawyers have the right to rely on the rules, and the rule is the Court can ask for the fee agreements if they want. I think beyond that, it's a tough question for a lawyer to answer because you're now asking them to interpret what would be pertinent to a judge, and it varies wildly.

*****

But if a judge doesn't ask for it, are they supposed to predict that the judge really means to ask for it and didn't? . . .

*****

And so I think that lawyers appearing in [class action] cases have the right to rely on the rule structure, and it's hard to put on them a burden to predict what else would be important for the judge to know.

Rubenstein 4/9/18 Dep., pp. 121:6 – 125:19; 126:13 – 127: 23. [EX. 235].

[231] In the absence of clear law to the contrary, and with Professor Gillers in agreement, the Special Master is constrained to reach this conclusion. But this surely is a strained and unsatisfactory result, given the clear, plain-English mandates of Rule 23(e)(3) that "parties seeking approval of a class action settlement must file a statement identifying any agreement made in connection with the proposal." Certainly, the agreement to pay Chargois $4.1 million is an "agreement made in connection with the proposal." While Rule 23(e)(3) appears to only require the *filing* of such a statement with *the Court*, absolving class counsel of any responsibility to give *the class* notice of a fee agreement such as the one with Chargois and placing that burden only upon the Court to do so seems to stand common sense and the realities of class action litigation upon its head.

Courts can only know what they are told by the class attorneys, and to reverse the burden and put it on the Court to ask the lawyers seems not only a direct contravention of the plain language of Rule 23(e)(3), but also a misapprehension of the responsibilities of the respective players in the class action process. It is the lawyers who

### b. Ethical Obligations

However, the presumed procedural mandates of Rule 23 do not in any way diminish Labaton's ethical duties toward members of the class (and the Court). The Massachusetts Rules of Professional Conduct make it clear that an attorney must provide the client with "sufficient information" to participate intelligently in decisions concerning the objectives of the representation. *See generally* Mass. R. Prof. C. 1.2, 1.4 (and cmt. [5]). The class members' decisions whether to accept or object to the *State Street* settlement and/or the proposed award of attorneys' fees falls within the scope of those ethical rules governing any attorney-client relationship.

It cannot be disputed that at least as of August 8, 2016, when the Court certified the Settlement Class, Labaton's client was no longer only ATRS; as of that point the ERISA class members were also Labaton' clients. This is abundantly evident in the Notice that Labaton prepared and then sent to the class members, including the ERISA Plaintiffs.[232]  *See* Notice, Dkt. # 95-3.  [EX. 81].

---

are requesting fees from class funds and know of all the agreements between counsel as to these fees. It is surely not asking too much of class counsel to require them to tell the class of such agreements so that class members -- their clients -- can make an informed decision, rather than requiring the Court to ask.

     Even Professor Rubenstein acknowledges that "some agreements among counsel would impact settlement terms and hence should be disclosed to the class."  5 *Newberg on Class Actions*, § 15:12 (emphasis added).  [EX. 236].  The Special Master recommends that courts and academics consider revisiting and reallocating this responsibility under the Federal Rules of Civil Procedure.

[232] Customer Class Counsel, in fact, recognized the ERISA plaintiffs as their clients even before the class was certified.  *See* Chiplock 9/8/17 Dep. pp. 97:3- 10 ("I felt that customer class counsel had a responsibility to the entire customer class with no distinctions. We didn't discriminate in our class definition. We didn't see the need to when we filed our case."); Goldsmith 9/20/17 Dep., pp. 42:11-14 ("[W]e did not assert an ERISA claim in our complaint, but we did allege a class which was broad enough to encompass ERISA governed assets."); 61:11-14 (How much of the settlement would go to ERISA clients "was something that [DOL] were focused on. Of course, we were focused on it as well because they were our clients").  *See also* 11/15/12 Lobby Conference:

In *Fulco v. Continental Cable Vision, Inc.*, 789 F.Supp. at 47, the Court recognized that an attorney-client relationship is formed between class counsel and the class after the class is certified. "While this is apparently a case of first impression in the First Circuit, I agree with courts which have held that 'once the court enters an order certifying a class, an attorney-client relationship arises between all members of the class and class counsel.'" *Id*. Unquestionably, the attorney-client relationship is a fiduciary one. *See Washington Legal Foundation v. Massachusetts Bar Foundation*, 993 F.2d 962, 974 (1st Cir. 1993) ("The relationship between lawyer and client in Massachusetts is fiduciary as a matter of law.") Courts have acknowledged that the attorney-client relationship imposes on class counsel a fiduciary responsibility with regard to the members of the class. *See Piambino v. Bailey*, 757 F.2d 1112, 1139 (11th Cir. 1985) ("The lawyers who bring these [Rule 23] cases have a heavy fiduciary responsibility to their clients -- especially those who are absent and those in the minority whose interests are at odds with the named plaintiffs and their group -- to the trial judge and to the people who provide the forums and governmental resources for these suits."); *Singer v. AT&T*

---

MICHAEL THORNTON:  I just want to clarify one thing of Mr. Rudman's [State Street's attorney's] excellent summary that we might differ on. There are two clear ERISA cases, *Henriquez* and *Andover*, and in the third case, *Arkansas*, um, the ERISA claims are included in the class definition.  So we also have a claim.
                  ***
ROBERT LIEFF:  . . . There is an overlap, that's all we're trying to say.  We represent the same people.

THE COURT: You do represent the same people?

MR. LIEFF: Yes.

11/15/12 Lobby Conference Tr., pp. 16-17, Dkt. # 64.  [EX. 22].

*Corp.*, 185 F.R.D. 681, 690 (S.D. Fla. 1998) ("The class attorney has a fiduciary duty to the court as well as to each member of the class.").

However, due to the practical challenges of communicating with every class member and the unique posture of class members in class action cases, the scope of the fiduciary duties owed in this circumstance is something less than that owed to an individual client.

In this attorney-client-type relationship, class members are considered "clients" for some purposes but not others. For example, individual class members are considered clients for purposes of bringing their communications within the protection of the attorney-client privilege, effectively barring defense counsel from communicating directly with current or potential class members. *See e.g., Dodona I, LLC v. Goldman, Sachs & Co*., 300 F.R.D. 182, 187 (S.D.N.Y. 2010); *Tedesco v. Mishkin*, 629 F. Supp. 1474, 1483 (S.D.N.Y. 1986); *In re School Asbestos Litig.*, 842 F.2d 671, 683 (3d Cir. 1988); *Bower v. Bunker Hill Co.*, 689 F. Supp. 1032, 1033 (E.D. Wash. 1985); *see also* Rubenstein Dep. p. 147. On the other hand, conflict rules are far more relaxed in the class action context than in the traditional sense. *See e.g., Radcliffe v. Hernandez*, 818 F.3d 537, 545-46 (9th Cir. 2016); *Lazy Oil Co. v. Witco Corp*, 166 F.3d 581, 590 (3d Cir. 1999); *In re Agent Orange Prod. Liab. Litig.,* 800 F.2d 14, 19 (2d. Cir. 1986); *see also* Rubenstein Dep. pp. 148-49. Moreover, individual class members cannot bring suits against class counsel for legal malpractice, *see id.*, nor can the reasonable communication expectations articulated in Mass. R. Prof. C. 1.2 and 1.4 be "transferred one to one with

class members."  Dacey Dep., p. 44 (analogizing attorney-client communication to publishing notice in the newspaper).

Thus, the class is not a client for all purposes.

While courts have found that the fiduciary duty imposed on class counsel vis-à-vis the individual members of a large class (such as the approximate 1,900[233] members of the consolidated class in this case) is lessened, principally due to the burdens inherent in dealing with a large number of individual "clients," we find a heightened duty to class members in the *State Street* case because the Settlement Class here was atypical; it was a "hybrid" class that included not only Customer Class members -- of which ATRS, Labaton's direct client, was one -- but also separate ERISA plan and group trust members.  Our view is informed by Professor Gillers' observation that those special circumstances -- "few and tailored" -- that require a less stringent application of the Rules of Professional Conduct are exceptions, not the rule, and do not support the purported notion that class actions operate entirely outside the traditional bounds of the attorney-client privilege.  Gillers Supp. Report, pp. 101-102.  [EX. 233].  To require disclosure of the Chargois Arrangement to unnamed class members here would not impose the same undue burdens on class counsel which led courts to originally place limitations on the attorney-client relationship in conflicts situations.

Here, it would be no great burden at all for Labaton to disclose the Chargois Arrangement to the handful of named ERISA class representatives, i.e., the named

---

[233] *See* Declaration of Eric J. Miller, A.B. Data. Dkt # 104-13.  [EX. 256].

plaintiffs in the *Henriquez* and *Andover* actions -- Arnold Henriquez, Michael Cohn, William Taylor, Richard Sutherland, the Andover Companies (through Janet Wallace and/or Alan Kober), and James Pehoushek-Stangeland.[234] Since informing this significantly smaller number of "clients" is not a great imposition, we find that the attorney-client relationship imposed a duty on Labaton to ensure that the Chargois Arrangement was disclosed at least to these named plaintiffs/class representatives.[235] As Professor Rubenstein noted, these class representatives "play[] the function of being the client for the absent class members, stand[ing] in as the client to the lawyer for the absent class members." Rubenstein 4/9/18 Dep., p. 141:9-13. [EX. 235].

Indeed, to meet its ethical duty under the Rules of Professional Conduct to provide these ERISA clients with sufficient information to enable them to make intelligent decisions about accepting or objecting to the Settlement and the application for attorneys' fees here,[236] it would have been even less burdensome as the ERISA plaintiffs had their own attorneys, who were active participants in the mediation and settlement process.

---

[234] Though no separate ERISA sub-class was ever designated by the Court, no one disputes that these named ERISA Plaintiffs were the designated representatives for the classes identified in the *Henriquez* and *Andover* complaints, which were consolidated with the ATRS action for settlement purposes.

[235] And as Professor Gillers points out, Labaton could easily have included a basic description of the Chargois Arrangement in the Notice sent to *all* class members, thereby discharging their fiduciary duties to inform the class and allowing the class to decide whether to object to the fee award as proffered. *See* Gillers Supp. Report, pp. 98-99. [EX. 233].

[236] This ethical duty is highlighted in several of the Massachusetts Rules of Professional Conduct. For example, Mass. R. Prof. C. 1.4(a)(1) provides that "[a] lawyer shall promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f) is required by these Rules." Rule 1.0(f) states that "'[i]nformed consent' denotes the agreement by a person to a proposed course of conduct *after the lawyer has communicated adequate information and explanation* about the material risks of and reasonably available alternatives to the proposed course of conduct" (emphasis added). Similarly, Mass. R. Prof. C. 1.4(b) requires that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." *See also* Mass. R. Prof. C. 1.2(a) ("A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter.")

As Professor Gillers points out, to fulfill its ethical obligation to provide all of its clients all of the information necessary to make informed decisions concerning the settlement and fee award, Labaton needed only inform ERISA Counsel of the Chargois Arrangement, who, in turn, would be obligated to communicate the information to their individual clients. *See* Gillers Supp. Report, pp. 99-100 & n.91. [EX. 233]. As Lynn Sarko, counsel for the *Andover* Plaintiffs, testified, knowledge of the Chargois Arrangement would have affected the advice he gave to his clients, and he believed they would not have agreed to the Chargois payment. Sarko 9/8/17 Dep., p. 75:18-22. [EX. 37]. However, as indicated above, Labaton did not disclose the Chargois Arrangement to ERISA Counsel. *See* Findings of Fact, Section II(K)(6), *supra*.

Here, class members were told their "legal rights," which included their right to object to the anticipated fee application, but they were not given information that could reasonably have prompted an objection. *See* Gillers Supp. Report, p. 103. [EX. 233]. Such an omission undermines the purpose of the Notice, because, as Professor Gillers opines, the central purpose of the Notice is to present the class with information upon which it can decide whether to settle its legal rights. *Id*.

In the context of this case, we conclude that Labaton's failure to disclose the Chargois Arrangement to members of the consolidated Settlement Class was in derogation of its ethical duties under Mass. R. Prof. C. 1.2 and 1.4 to provide its clients with information necessary to make informed decisions with regard to the settlement.[237]

---

[237] Remedies for this derogation of Labaton's ethical duties are discussed, *infra*.

3.    **DUTIES TO CO-COUNSEL**

The ultimate responsibility for not disclosing the Chargois Arrangement falls on Labaton alone.  Labaton's disregard of its duties to its client, to class members, and to the Court is compounded by the firm's neglect of its important duties to its co-counsel in the *State Street* litigation.  These duties were rooted both in Labaton's status as Lead Counsel appointed by the Court (and the attendant expectations that accompany that important designation in the class action context) and in the firm's contractual relationships with both Customer Class Counsel and ERISA Counsel.  These duties of disclosure to co-counsel are particularly enhanced here as to the Chargois payment because the Chargois obligation had nothing to do with the *State Street* case -- and indeed, it preceded the case by several years -- and no value to the class or counsel was derived from it.  Rather, the obligation was Labaton's and Labaton's alone.  By paying Chargois from class funds, and having Lieff and Thornton share in the payment, Labaton shifted its own obligation onto the class and co-counsel.

Though the parties and their experts disagree on the exact disclosure requirements carried by Labaton in this case,[238] the weight of the testimony in the investigation makes

---

[238] Expert testimony that implicated the disclosure obligations among co-counsel (in relation the Chargois Arrangement or to fee allocations generally) varied, and rested on different sources of authority.  *See, e.g.*, Wendel 4/3/18 Dep., pp. 170: 3 -172: 12 (Massachusetts Rules of Professional Conduct did not govern Labaton's duty to disclose the Chargois Arrangement to ERISA counsel or to fully inform Lieff and Thornton as to the nature of the Chargois Role) [EX. 229]; Green 4/4/18 Dep., at pp. 167: 23 –169: 13 (Massachusetts Rules of Professional Conduct do not govern fairness in the division of fees amongst attorneys, though principles of contract law may) [EX. 230]; Joy 4/3/18 Dep., pp. 112: 4- 114:5 (testimony from ERISA counsel regarding the effect of nondisclosure on ERISA counsel's conduct does not impact expert's opinion that notice of the Chargois Arrangement to class members, and specifically ERISA class members, was not required) [EX. 227].

Regarding whether there was an obligation for Labaton to provide material information about the Chargois Arrangement to co-counsel, Professor Rubenstein testified, 4/9/18 Dep., p. 47:13-15, "I'm breaking it down into a legal obligation.  I don't know anything in class action law that addresses this directly."  [EX. 235]  He testified further:

apparent that the nondisclosure had a rippling effect throughout the case. Counsel from all firms have testified at length about the nondisclosure, or incomplete disclosure, to co-counsel firms during the litigation and settlement process. As set forth in the Findings of Fact, § II(K)(6) *supra*, ERISA counsel testified that, had they been told about the Chargois Arrangement, they would have proceeded differently in multiple material respects -- from disclosing the Arrangement to their clients to considering the arrangement in their own fee negotiations. Co-counsel Bob Lieff also testified that Lieff would not have agreed to share in the Chargois payment had he known the true nature of Chargois' role, rather than being led to believe by Labaton that Chargois was serving as local counsel. *See* § II(K)(5), *supra*. Bob Lieff also testified that he would have

---

THE WITNESS: I think what you're asking, if I understand it correctly, is you're using Mr. Lieff's testimony to say that this is a material fact.

THE SPECIAL MASTER: Correct.

THE WITNESS: Yeah.

THE SPECIAL MASTER: At least it was material to him.

THE WITNESS: Yeah. And given that it's a material fact, does that increase their duty to disclose it?

THE SPECIAL MASTER: Obligation.

THE WITNESS: Obligation. And, again, I -- I go back to the same answer I had before. If the Court is involved and the Court asks, absolutely. If you're talking about a private agreement among them, I don't know any law on the subject. It would be my testimony that if I were wanting to be lead counsel repeatedly, I'd be as forthright as possible in these circumstances.

THE SPECIAL MASTER: So more in the nature of a best practice than an obligation?

THE WITNESS: I think that sounds right. But again it's not... It's not something I prepared, I think, to testify on that point specifically and I've thought a lot about. As I'm right here, most judges leave this to the lawyers. I think a lot of the allocation stuff goes to the lawyers' reputational interests and trust that they build up with other lawyers in these cases."

*Id.*, pp. 49:17:8-51:1. [EX. 235].

encouraged Labaton to disclose the Chargois Arrangement to the Court.  Lieff 9/11/17

Dep., p. 97:13-16.  [EX. 139].

Labaton has maintained that it had no obligation to disclose the Chargois

Arrangement to ERISA Counsel because the agreement had no impact on ERISA

Counsel's fee, and had no duty to disclose further details to Lieff and Thornton because

those firms had a sufficiently detailed understanding of the agreement.  *See e.g.*, 11/3/17

Response by Labaton to Special Master's 9/7/17 Request for Supp. Submission, pp. 29-

30, 35-36 [EX. 238]; 4/12/18 Rebuttal Response by Labaton, pp. 34-35. [EX. 161].

Because Labaton's position ignores the important duties the firm owed to its co-counsel

firms, the Special Master credits neither of these arguments.

Labaton's evasion of its disclosure obligations materially affected both its fellow

Customer Class Counsel and ERISA Counsel -- each of whom relied significantly on

Labaton in its role as Lead Counsel -- by preventing them from executing their *own*

duties to the Court, to their clients, and to the class. Moreover, Labaton's failure in its

duties as Lead Counsel, and its conscious effort to conceal the existence or true nature of

the Chargois obligation, prevented the co-counsel firms from being fully informed as to

the fee-allocation arrangements to which they consented based on misinformation or

outright material omissions.  Labaton's failures thus prevented its co-counsel from

carrying out their own obligations in the litigation, and also call into serious question the

validity of the multiple fee agreements reached between the firms.

### a. Governing Principles of Fairness and Transparency

Though perhaps falling short of imposing a true *fiduciary* duty on Labaton in its relationship with its class action co-counsel, general principles of fairness and professional responsibility toward co-counsel, and toward the Court, strongly suggest that Labaton was required to disclose the Chargois agreement. *See In re San Juan Dupont Plaza Hotel Fire Litigation*, 111 F.3d 220, 234 (1st Cir. 1997) (noting that the *Manual for Complex Litigation* counsels courts to remind lead attorneys of "their responsibility to the court and their obligation to act fairly, efficiently, and economically in the interests of all parties and their counsel"); *see also Bartle v. Berry*, 80 Mass. App. Ct. 372, 378 (2011), quoting *Lamare v. Basbanes,* 418 Mass. 274, 276 (1994) ("In the absence of an attorney-client relationship, an attorney has a duty of reasonable care to a nonclient if the attorney knows or has reason to know the nonclient is relying on the attorney's services. 'However, the court will not impose a duty of reasonable care on an attorney if such an independent duty would potentially conflict with the duty the attorney owes to his or her client.'"). [239]

---

[239] We recognize that a number of state and federal courts have declined to find fiduciary duties *between* co-counsel, on public policy grounds, because such duties could create potential conflicts with respect to each counsel's undivided loyalty to its client. *See*, *e.g.*, *Skepnek v. Roper & Twardowsky, LLC*, No. 11–CV–4102–DDC–JPO, 2015 WL 4496301, at *23 (D. Kan. July 23, 2015) (discussing decisions in California, Louisiana, and Washington, and "predict[ing] that the Supreme Court of New Jersey would hold, as a matter of public policy, that no fiduciary duties exist between co-counsel for lost prospective fees."); *Appel v. Schoeman Updike Kaufman Stern & Ascher L.L.P.*, 2015 WL 13654007, at *23, n. 9 (S.D.N.Y. Mar. 26, 2015) (citing state cases and rejecting breach of fiduciary duty claim on an additional basis that "co-counsel generally do not owe each other a fiduciary duty"). Some courts, usually in the context of a fee dispute between counsel, have dismissed the concept of counsel's fiduciary duty to co-counsel with respect to ensuring and protecting co-counsel's expected fees. *See*, *e.g.*, *Bartle*, 80 Mass. App. Ct. at 379 (collecting cases from jurisdictions that have rejected a duty of care owed by one attorney to another to protect an interest in a fee); *Beck v. Wecht*, 28 Cal. 4th 289, 298 (2002) ("The better approach… is a bright-line rule refusing to recognize [ ] a fiduciary duty" to conduct joint representations in a way that doesn't diminish expected fees).

One Court in the District of Massachusetts, citing the *Manual for Complex Litigation*, has elaborated on the duties of courts and litigants in complex multi-district litigation:

> In complex multi-district litigation, courts are encouraged to:
>
> invite submissions and suggestions from all counsel and conduct an independent review (usually a hearing is advisable) to ensure that counsel appointed to leading roles are qualified and responsible, that they will fairly and adequately represent all of the parties on their side, and that their charges will be reasonable. Counsel designated by the court also assume a responsibility to the court and an obligation to act fairly, efficiently, and economically in the interests of all parties and parties' counsel.

*Manual for Complex Litigation*, § 10.22. [EX. 248].

> Complex litigation requires particularly professional conduct from attorneys, as judges are especially dependent on the assistance of counsel. *Id.* § 10.21, at 22–23. "Counsel need to fulfill their obligations as advocates in a manner that will foster and sustain good working relations among fellow counsel and with the court." *Id.* at 23. In a class action, lead counsel must meet a demanding standard of trustworthiness because the Court must rely on representations made by counsel. *See, e.g., In re Vitamins Antitrust Litig.,* 398 F.Supp.2d 209, 237 (D.D.C.2005); *In re Organogenesis Sec. Litig.,* 241 F.R.D. 397, 408 (D.Mass. 2007) ("to understand the facts and issues presented to it in any case, including a class action, the court must employ and to some extent rely on representations made to it by counsel.")

*In re Pharm. Indus. Average Wholesale Price Litig.* 2008 WL 53278, at *1–2 (D. Mass. Jan. 3, 2008).

Thus, while a firm's appointment as lead counsel does not create a true fiduciary obligation to co-counsel, the relationship created is one rooted in trust, and co-counsel may reasonably rely upon a level of candor and trustworthiness from appointed lead counsel.

Similar notions of fairness and responsibility underlie a court's execution of "well-established class action principles and basic judicial standards of transparency and fairness" that require a court's scrutiny of the accuracy, fairness, and equitable implications of a proposed fee allocation among counsel -- a fundamental function that disclosure of the Chargois Arrangement would have permitted the Court to carry out in the *State Street* litigation. *See In re: High Sulfur Content Gasoline Products Liability Litigation*, 517 F.3d 220, 227 (5th Cir. 2008) (noting the need for sufficient procedures and oversight so as to determine the accuracy and reasonableness of a proposed fee allocation in a class action settlement for which district court had appointed fee committee to propose allocation affecting all other counsel); *see also*, *e.g.*, Rubenstein Dep., at pp. 35-54 (citing *In Re: High Sulfur* and discussing notions of transparency in disclosures amongst co-counsel in relation to fee allocation); *In re Nortel Networks Corp.*, 2002 WL 1492116, at *2 (S.D.N.Y. Feb. 4, 2002) ("the Court is aware of the importance of controlling attorneys' fees and the need to adopt appropriate procedures to that end"). As noted *supra*, while Labaton's failure to disclose the Chargois obligation directly to the Court prevented the Court from executing its gatekeeper role as a fiduciary to the class and from properly examining the equity of the fee allocation, the firm's concealment from co-counsel, despite its obligation of candor toward all parties and parties' counsel, further ensured that the Court would be constrained from doing so.

### b. Interference with Co-Counsel's Duties to Class Members

Perhaps the most significant ramification of Labaton's non-disclosure (to ERISA Counsel) and limited disclosure (to Lieff and Thornton) is the preclusion of these

attorneys from fulfilling their own fiduciary duties to their individual clients and to absent class members. Courts have long recognized the existence of fiduciary duties (if not yet a full attorney-client relationship) owed by class counsel to the class prior to the point of class certification.[240] Beyond this, it is widely accepted that "once the court enters an order certifying a class, an attorney-client relationship arises between all members of the class and class counsel." *See Fulco*, 789 F. Supp. at 47, quoting *Bower*, 689 F.Supp. at 1033.[241] Customer Class and ERISA Counsel owed fiduciary duties to class members by the time of preliminary settlement approval in August 2016 or, at the latest, class certification and ultimate settlement approval. "It is well-settled law, regardless of jurisdiction, that attorneys owe their clients a fiduciary duty" which "includes undivided loyalty, candor, and provision of material information." *Huber v. Taylor*, 469 F.3d 67, 81 (3d Cir. 2006) (suit by putative class against class action plaintiffs' attorneys for breach of fiduciary duty and related counts, on basis of undisclosed conflict of interest and improper disclosure of full terms of settlement offers).

As previously noted, co-counsel in large class action litigation *share* responsibilities to the clients and the class. Here, the co-counsel firms relied heavily on

---

[240] *See, e.g.*, *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 801 (3d Cir. 1995) ("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed."); *Schick v. Berg*, 2004 WL 856298, at *5 (S.D.N.Y. Apr. 20, 2004), *aff'd*, 430 F.3d 112 (2d Cir. 2005) ("[A]t least some fiduciary duties attach prior to class certification, at the time the class action is filed.").

[241] The precise contours of the relationship in the class action context differ in some respects from a traditional attorney-client relationship. S*ee In re Cmty. Bank of N. Virginia*, 418 F.3d 277, 313 (3d Cir. 2005); *see also* Joy Dep., at pp. 110-14 ("Labaton had certain duties to the class as a whole, but they weren't a client like an individual client is.").

Labaton to enable them to effectively carry out their own duties to each of these groups. Whatever the allocation of duties and responsibilities between attorneys or firms involved in a co-counsel representation, each counsel's duty of loyalty to the client is, inherently, a non-delegable duty. *Id.* at 82, and n.18. Whatever its scope, class counsel owe a fiduciary duty to the class, which requires class counsel to "refrain from misconduct and prosecute the case with loyalty to the class." *In Re: Sw. Airlines Voucher Litig.*, 2016 WL 3418565, at *2 (N.D. Ill. June 22, 2016), *appeal dismissed sub nom. In re Sw. Airlines Voucher Litig.*, 2017 WL 5485463 (7th Cir. Feb. 2, 2017). To the extent that Labaton's incomplete disclosures, or complete nondisclosures, affected the ability of other firms to carry out their duties to the class, Labaton failed in its responsibility as Lead Counsel to act fairly and in the interests of all parties and all counsel, exacerbating the firm's failure to fulfill its own obligations to the class.

The significant and malignant impact of Labaton's nondisclosure can be seen in its intentional decision to not tell the ERISA attorneys about the Chargois Arrangement, in general, and the proposed payment of $4.1 million to Chargois. First and foremost, failure to share this information prevented the ERISA attorneys from disclosing the payment to their class representative clients and advising them about it. Lynn Sarko testified that, had he known about the Arrangement, he "absolutely" would have felt an obligation to disclose it to the ERISA class representatives and advise them about it, and would have felt that the arrangement could not have been carried out without their consent. Sarko 9/8/17 Dep., p. 91:4-15. [EX. 37]. Sarko also testified that, had he known of the Arrangement, he would not have agreed to file a joint fee petition because

294

he "would have had to get approval from the named plaintiffs who would not have agreed." *Id*., pp. 75:2-22.

Just a half-step removed in importance from this impact is that the nondisclosure to the ERISA attorneys ensured that the DOL was kept in the dark. As noted elsewhere, State Street was insistent upon a fully global settlement, a critical piece of which was DOL's agreement to the settlement. As all agree, Lynn Sarko, who had DOL's confidence, was the primary attorney negotiating with the Department. Sarko testified that had he been told of the proposed Chargois payment, he would have been obligated to tell the DOL about Chargois and his Arrangement with Labaton; that the DOL likely would have had questions about the Arrangement; and that the entire settlement may have "blown [] up" if those questions affected the DOL's approval, which was necessary for the global settlement. *Id*., pp. 76:14-22; 84:3-5.

Thus, the full impact of not telling the ERISA lawyers about Chargois is not theoretical or attenuated. This non-disclosure had a direct and profound impact upon other important actors in the class action.

### c. *Contractual Implications of Nondisclosure*

Apart from principles of fairness and transparency that should govern conduct between co-counsel, courts have recognized that contract principles may also impose duties within a co-counsel relationship (frequently in the context of fee disputes).[242] *See*,

---

[242] For example, to succeed on a breach of contract claim, one must prove (1) that the parties reached a valid and binding agreement; (2) that one party breached the terms of the agreement; and (3) that breach caused the other party to suffer damages. *Michelson v. Digital Fin. Servs.*, 167 F.3d 715, 720 (1st Cir. 1999).

*e.g.*, *Sobran v. Millstein*, 148 F. Supp. 3d 71, 72 (D. Mass. 2015) (in dispute over division of fees in a large class action settlement, dismissing counts of breach of contract, breach of fiduciary duty and quantum meruit, but allowing promissory estoppel claim to advance); *Vita v. Berman, Devalerio & Pease, LLP*, 81 Mass. App. Ct. 748, 748–49 (2012) (affirming jury award for breach of contract claim stemming from an unpaid referral fee); *Marks v. Swartz*, 174 Ohio App. 3d 450, 460 (2007) (local counsel's breach of contract action against co-counsel); *Parker & Waichman v. Napoli*, 815 N.Y.S.2d 71, 74 (2006) (breach of contract related to fee splitting agreement).

Here, contract principles are most relevant to the enforceability, or voidability, of the fee-sharing agreement among Customer Class Counsel and the agreement between the Customer Class Counsel and ERISA Counsel. "The load-bearing element of a contract is the mutual assent of the parties to the essential terms of the agreement, the so-called meeting of the minds." *Enos v. Union Stone, Inc.*, 732 F.3d 45, 48 (1st Cir. 2013) (quotation omitted). Cognizant of the limitations of contract principles in this particular context -- outside a typical dispute between bargaining parties -- contract principles nevertheless further inform the Special Master's assessment of the equitable implications of the nondisclosure to co-counsel, and consideration of a court's fiduciary duty to safeguard class settlement funds and its equitable authority to modify an unfair and unreasonable fee allocation among class counsel.[243]

---

[243] While the Special Master recognizes that a contract is rendered void *ab initio* in limited circumstances, a court may, on equitable grounds, set aside a contract invalidated by omission. *See*, *e.g.*, *Cathcart v. Robinson*, 30 U.S. 264, 266 (1831) ("The difference between that degree of unfairness which will induce a court of equity to interfere actively by setting aside a contract, and that which will induce a court to withhold its aid, is well settled. It is said that the plaintiff must come into court with clean hands, and that a defendant may resist a bill for specific

###### i.      *Misrepresentations and Material Omissions*

"A contract is voidable (and thus unenforceable) if 'a party's manifestation of assent is induced by either a fraudulent or material misrepresentation by the other party upon which the recipient is justified in relying.'" *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 20 (1st Cir. 2009), quoting *Restatement (Second) of Contracts*, § 164 (1979).[244]  "Massachusetts law regarding fraud in the inducement follows the widely-accepted model set forth in [the *Restatement].*" *Nash v. Trustees of Boston Univ.*, 946 F.2d 960, 967 (1st Cir. 1991).  To establish fraud in the inducement, and thereby be relieved of the effect of a contract, a party must establish the elements of common law deceit, which include "misrepresentation of a material fact, made to induce action, and reasonable reliance on the false statement to the detriment of the person relying." *Commerce Bank & Tr. Co. v. Hayeck*, 46 Mass. App. Ct. 687, 692 (1999), quoting *Hogan v. Riemer,* 35 Mass. App. Ct. 360, 365 (1993).

In considering the validity of the fee-sharing agreement between Customer Class Counsel and ERISA Counsel, the Special Master considers evidence of

---

performance by showing that under the circumstances the plaintiff is not entitled to the relief he asks.  Omission or mistake in the agreement; or that it is unconscientious or unreasonable; or that there has been concealment, misrepresentation or any unfairness; are enumerated among the causes which will induce the court to refuse its aid.").

[244] *See also Wamester v. Karl*, No. 13–P–389, 85 Mass. App. Ct. 1106 (March 14, 2014) ("To be sure, a contract can be avoided by showing it was procured by fraud."); *NPS, LLC v. Ambac Assur. Corp.*, 706 F. Supp. 2d 162, 169 (D. Mass. 2010) ("Massachusetts law follows the Restatement's model for fraud in the inducement: 'If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.'") (quoting *Nash v. Trustees of Boston Univ.,* 946 F.2d 960, 967 (1st Cir.1991). "In obedience to the demands of a larger public policy the law long ago abandoned the position that a contract must be held sacred regardless of the fraud of one of the parties in procuring it."  *Bates v. Southgate*, 308 Mass. 170, 182 (1941).

misrepresentations actually made to ERISA Counsel such that the fee agreement could be subject to rescission. "Mere nondisclosure, absent a duty to speak such as with a misleading partial disclosure, generally will not support any cause of action for misrepresentation." *Davis v. Dawson, Inc.*, 15 F. Supp. 2d 64, 137 (D. Mass. 1998) (alterations and internal quotations omitted). However, "[a]lthough mere silence or nondisclosure does not constitute fraud in the absence of a duty to speak… silence may be actionable where the relationship of the parties creates a particular legal or equitable obligation to communicate all facts." *DeMarco v. Granite Sav. Bank*, 1993 Mass. App. Div. 122, *2 (Dist. Ct. 1993) (citations omitted).[245]

The existence of the Chargois Arrangement was undoubtedly information material to class members, upon which class members could base decisions to object to or opt out of the proposed settlement. But it was also material to Labaton's co-counsel in the litigation, both because this information would have enabled those firms to discharge

---

[245] Here, while the relationship between co-counsel falls short of a fiduciary one, Lead Counsel is held to a "demanding standard of trustworthiness" required in its relationship with co-counsel and the court, and co-counsel can reasonably expect appropriate candor and trustworthiness from lead-counsel. *See In re Pharm. Indus. Average Wholesale Price Litig.*, 2008 WL 53278, at *1–2. Further illuminating expectations of trustworthiness in this context -- to the extent that a sufficiently important relationship of trust can be recognized between co-counsel -- are principles recognized in the *Restatement of Contracts* and *Restatement of Torts* suggesting that a material omission can equate with of a false assertion between certain parties in limited circumstances. "A person's nondisclosure of a fact known to him is equivalent to an assertion that the fact does not exist… where the other person is entitled to know the fact because of a relation of trust and confidence between them." *Restatement (Second) of Contracts* § 161(d) (1981). "Even where a party is not, strictly speaking, a fiduciary, he may stand in such a relation of trust and confidence to the other as to give the other the right to expect disclosure." *Id.*, comment (f). "One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question. *Restatement (Second) of Torts* § 551(1) (1977). "One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated… matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." *Id.*, subsection (2)(a).

their fiduciary duties toward the class and because it would have affected the negotiation of the fee-allocation agreements among counsel.

Here, it bears re-emphasizing that the Chargois payment grew out of a pre-existing obligation that was Labaton's alone, and that by satisfying this obligation from class funds, Labaton was effectively having the class and its co-counsel shoulder a share of its own separate obligation. This fact alone creates an enhanced duty upon Labaton not only to disclose the Chargois Arrangement and payment to co-counsel but to ensure its disclosure to the class, the client and the Court. This goes to the heart of Labaton's obligations as Lead Counsel.

Labaton was Lead Counsel, and other counsel could be expected to rely upon its attorneys to fully disclose all material facts necessary for co-counsel to make an informed decision on issues relating to the fee-allocation agreements. Though lacking a fiduciary relationship, the expectation of trust and confidence between co-counsel rendered the fee-allocation negotiations distinct from traditional arm's-length bargaining between contracting parties. The existence of the $4.1 million payment, based upon a pre-existing obligation to a lawyer who never appeared in the case, did no work on the case, and was hidden from the Court and all participants in the case, was a material fact that would clearly have informed ERISA Counsel's decision about the fee-allocation agreement. Labaton knew that ERISA Counsel was uninformed about the Chargois Arrangement, and Labaton was aware that the information would be material to ERISA Counsel even long after the initial fee-allocation agreement, as evidenced by Larry Sucharow's November 2016 email correspondence in which he ordered that two separate claw-back

letters be sent to class co-counsel and to ERISA Counsel, noting, "[i]n short, no reason

for ERISA to see Damon's split. They only need to see their 10 percent and then split

three ways." TLF-SST-012272 – 2274 (11/22/16 Sucharow email to Goldsmith, G.

Bradley, Keller, Belfi).[246]  [EX. 160].

       Rendering the materiality of the Chargois payment to ERISA Counsel even clearer

is the brute fact that Chargois' $4.1 million payment is more than any ERISA firm

received -- and significantly more. The Keller Rohrback firm received total fees and

expenses of $2,829,160.22, the Zuckerman Spaeder firm received total fees and expenses

of $2,525,063.88, and the McTigue law firm received total fees and expenses of

$2,536,569.99; other smaller firms received far less. That Chargois was receiving a

payment in an amount of $1.2 to $1.6 million *more* than any of the primary ERISA firms

makes the Chargois Arrangement a material fact. Lynn Sarko, Carl Karvitz and Brian

McTigue each testified that, had they known of the Arrangement prior to signing the fee-

allocation agreement in 2013, each of them would not have agreed to the sign the

agreement as negotiated at that time. Sarko 9/8/17 Dep., pp.75:2-22, 78:19-79:4 [EX.

37]; McTigue 9/8/17 Dep. p. 21:15-24 [EX. 159]; Kravitz 9/11/17 Dep., pp. 83:3-20.

[EX. 117]. Moreover, as late as June 2016, Labaton's Of Counsel, Garrett Bradley, who

spearheaded Labaton's negotiation with Chargois concerning his fee percentage in the

*State Street* case, ostensibly understood that the agreement with ERISA Counsel was by

---

[246] *See also* LBS039936 – 9937 (7/8/16 G. Bradley email to Lieff, Thornton, Sucharow, Chiplock, Keller, Belfi, and
Chargois) (discussing fee allocation among customer class attorneys, ERISA attorneys and Damon Chargois, and
noting that "[g]iven that [the Chargois percentage] is off the total number their [sic] is no need to add the ERISA
counsel to this email chain.") [EX. 157].

no means a done deal. That the ERISA fee negotiation remained ongoing until the end of

settlement discussions in the case underscores the continuing materiality to ERISA

Counsel. *See* TLF-SST-060973 (6/21/16 Bradley email to Chargois regarding proposed

5% fee to Chargois, noting that "The fee we will apply for is $70,9000,000, This will be

for Lief [*sic*], Thornton, Labaton, you and now three Erisa [*sic*] firms. We are attempting

to hold the Erisa [*sic*] firms to 10% because that is what they agreed to several years ago,

but the Erisa [*sic*] part of the settlement is now 20%. I think we can hold them to

10%..."). [EX. 260].

Beyond this, the incomplete disclosure to Lieff and Thornton was also material

and impactful. The non-disclosure to Lieff, in particular, is significant. Bob Lieff and

Dan Chiplock testified that they were led to believe that Chargois was performing some

of the work and services local counsel routinely do, assisting the ATRS client locally in

Arkansas. *See* Lieff 9/11/17 Dep., pp. 58-80 [EX. 139]; Chiplock 9/8/17 Dep., pp. 101-

116. [EX. 41]. Bob Lieff in particular testified that had he known that Chargois actually

did no work, and provided no value to the case, he would not have agreed to his firm

sharing in the Chargois $4.1 million payment obligation. Lieff 9/11/17 Dep., p. 97:13-

16. [EX. 139]. Lieff also testified that he would have encouraged Labaton to disclose

the Chargois payment to the Court. *Id*., p. 97:13-16. [EX. 139].

Supporting Lieff's testimony that he was misled is the fact that in all the emails

between Labaton, Lieff, and Thornton, Chargois was always referred to as "local

counsel" or "the local" or a similar variant. *See*, *e.g.*, LBS025771 (4/24/13 "Dublin

email," in which Garrett Bradley referred to Chargois as "the local counsel who assists

Labaton in matters involving Arkansas Teachers Retirement System") [EX. 140]; TLF-

SST-040617-0618 (8/6/15 Bradley email to Lieff and Thornton regarding *BONY Mellon*

and *State Street* fee discussions, with reference to "arkansas local") [EX. 147]; TLF-SST-

038574-8579 (8/28/15 Lieff email to Bradley and Thornton referring to Arkansas local

counsel) [EX. 150]; TLF-SST-053117-3126 (8/28/15 Chiplock email to Sucharow,

Bradley and Thornton regarding fee allocation among the firms, and referencing

payments to ERISA counsel and "local Arkansas counsel" in relation to the distribution

of Customer Class Counsel fees) [EX. 151]; LBS039936 – 9937 (7/8/16 G. Bradley email

to Lieff, Thornton, Sucharow, Chiplock, Keller, Belfi, and Chargois referencing fee to

"Damon Chargois, the local attorney in this matter who has played an important role").

[EX. 157].

It is significant that Labaton never corrected these characterizations. The

mischaracterization, made in the context of persuading co-counsel to share Labaton's

separate and independent $4.1 million obligation, clearly constitutes a materially

misleading misrepresentation of the true and complete story behind the Chargois

payment.[247]

The redress and remedies for Labaton's conduct vis-à-vis its various co-counsel

will be discussed in the Recommendations section, *infra*. The duties owed between co-

---

[247] The situation with Thornton is more complex and nuanced. As noted, there is no evidence that Michael Thornton knew the complete story behind the Chargois payment, and he testified that he did not know. *See* Findings of Fact, § II(K)(5) *supra*. "Thornton's Knowledge of the Chargois Arrangement"). However, as noted elsewhere, the Special Master believes that Thornton's managing partner (and Labaton's Of Counsel) Garrett Bradley surely did know all about Chargois. We will not repeat here all of the reasons why the Special Master finds that Garrett Bradley was fully apprised of the Chargois Arrangement. Suffice it to say that Garrett Bradley's testimony that he believed Chargois was performing local counsel work on the case, *see id.*, is simply not credible.

counsel in class action litigation, and the related and instructive contract and equitable

principles, inform the Special Master's analysis of recommendations to the Court.

4. **DUTIES TO THE COURT**

The most troubling issue in this case is Labaton's failure to disclose to the Court

the $4.1 million payment to Chargois. At the settlement approval stage, the Court stands

as the final gatekeeper to protect the class, and in that role, is the fiduciary of the class.

Class counsel must assist the Court in performing that obligation to the class by providing

it with all the information necessary to discharge its fiduciary responsibilities. As Lead

Counsel here, Labaton had a legal and ethical duty to provide the Court with all

information it needed to make an informed decision as to the award of attorneys' fees out

of the *State Street* settlement fund. This included disclosure of the identity of all

attorneys -- including Damon Chargois -- who would be sharing in the award and what

the share of each attorney would be.

Case law, much of which is quoted in greater detail by Professor Gillers (pp. 79-

83) -- including cases from within the District of Massachusetts -- recognizes the Court's

responsibility to protect the class and the class's interests, and the Court's reliance on

counsel to be forthcoming with the information needed in order to do so. *See, e.g., In re*

*Relafen Antitrust Litig.*, 360 F. Supp. 2d 166, 193 (D. Mass. 2005) ("We and

other courts have gone so far as to term the district judge in the settlement phase of a

class action suit a fiduciary of the class, who is subject therefore to the high duty of care

that the law requires of fiduciaries.") (quoting *Reynolds v. Beneficial Nat'l Bank,* 288

F.3d 277, 279-80 (7th Cir. 2002) (Posner, J.)); *In re Lupron Marketing and Sales*

*Practices Litig.,* 228 F.R.D. 75, 93 (D. Mass. 2005) ("[T]he court has a fiduciary duty to

absent members of the class in light of the potential for conflicts of interest among class

representatives and class counsel and the absent members," citing *In re General Motors*

*Corp. Pick-Up Truck Fuel Tank Prods.*, 55 F.3d at 805 ("Rule 23(e) imposes on the trial

judge the duty of protecting absentees. . . .")); *In re Volkswagen and Audi Warranty*

*Extension Litig.,* 89 F. Supp. 3d 155, 183 (D. Mass. 2015) ("While fee sharing

agreements among counsel may be respected . . . [m]ore important than the terms of a

private agreement are the actual contributions each firm made to the prosecution of th[e]

case and the interests of the class." (citations omitted)); *see also In re Agent Orange*

*Prod. Liab. Litig.,* 818 F.2d at 223 (rejecting authority that "allows counsel to divide the

award among themselves in any manner they deem satisfactory under a private fee

sharing agreement.  Such a division overlooks the district court's role as protector of

class interests under Fed. R. Civ. P. 23(e)… In addition, this approach overlooks the class

attorneys' duty. . . to be sure that the court, in passing on [the] fee application, has all the

facts" as well as their "fiduciary duty to the . . . class not to overreach" (quoting *Lewis v.*

*Teleprompter Corp.,* 88 F.R.D. 11, 18 (S.D.N.Y. 1980) (internal citations omitted))).[248]

As a significant element in analyzing this section, it must be borne in mind that the

obligation to Chargois was Labaton's and Labaton's alone, and the payment to him

without disclosing it to the Court significantly and adversely impacted the Court's ability

to protect the class from an enormous payment for which the class received no value and

---

[248] We agree with Professor Gillers that, in total, federal case law makes clear that counsel must be transparent in providing the court all available information when seeking a fee award in class action cases.  *See* Gillers Supp. Report, p. 82.  [EX. 233].

of which the class representatives were never informed. In a very real sense this created a potential conflict between Labaton and the class, a conflict the Court could not protect the class against because it was hidden from the Court.

As a significant element in analyzing this section, it must be borne in mind that the obligation to Chargois was Labaton's and Labaton's alone, and the payment to him without disclosing it to the Court significantly and adversely impacted the Court's ability to protect the class from an enormous payment for which the class received no value and of which the class representatives were never informed. In a very real sense this created a potential conflict between Labaton and the class, a conflict the Court could not protect the class against because it was hidden from the Court.

### a. Rule 23 Requirements

We begin with the fact that full and accurate disclosure to the court is the underpinning of Fed. R. Civ. P. 23(e)'s requirement that the settlement be "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), and the guarantee that class members have the right to object to the settlement and any attendant fee petition under Fed. R. Civ. P. 23(e)(5) and (h)(2). As with the right to object to the settlement itself, the right to object to a fee motion also means that class members must be given sufficient information to do so. *See* Rubenstein Report, p. 30. Unfortunately, by not disclosing to the Court that $4.1 million of the settlement funds would be paid to an attorney who did no work on the *State Street* case, Labaton deprived the Court information it needed to discharge its fiduciary obligations to protect the class's interests.

305

As indicated above, Professor William Rubenstein places the entire blame for the nondisclosure of the Chargois payment in this case upon the Court. He has opined that Rule 23(h), by its incorporation of the procedures for making a claim for attorneys' fees under Fed. R. Civ. P. 54, places the burden on the Court to order disclosure of a fee agreement or payment such as the $4.1 million payment to Chargois out of the class funds in this case, and, absent such a court order -- or the court specifically asking -- disclosure is not required:

> THE SPECIAL MASTER: [W]hat you're saying here again is that the burden is on the Court at the notice stage to make sure that fee-allocation agreements are in the class notice?
>
> THE WITNESS [Rubenstein]: I'm saying Rule 23 puts that burden on the Court, that's correct. I'm not saying it's the burden. I'm saying Rule 23 says that the burden's on the Court. . . .
>
> THE SPECIAL MASTER: And the obligation under Rule 23(h)(2) that class members be given sufficient information to do so, meaning to object to a fee petition, is an obligation -- as to fee agreements and allocation agreements that is on the Court? . . .
>
> THE WITNESS: Yes. . . .
>
> THE SPECIAL MASTER: And the obligation to provide sufficient information for the class means that as to fee-allocation agreements the Court has to ask? Yes?
>
> THE WITNESS: Yes. That's what Rule 23 says. That's correct. . . .

Rubenstein Dep., pp. 121:6 – 122:22.[249]

However, separate and apart from Rule 23(h) and its incorporation of the Rule 54 procedures for making a claim for attorneys' fees, Fed. R. Civ. P. 23(e)(3) requires that

---

[249] Professor Rubenstein's deposition testimony regarding it being the Court's obligation to inquire about and order disclosure of any fee-allocation agreements is further detailed in discussion, *supra*.

"parties seeking approval of a class action settlement must file a statement identifying any agreement made in connection with the proposal."  As explained in the *Manual of Complex Litigation*, this provision requires disclosure of agreements that may affect the interests of the class members by allocating money that they may have received elsewhere.  *Manual of Complex Litigation*, § 21.631. [EX. 248].

In his treatise, Professor Rubenstein himself recognized counsel's independent obligation of disclosure under Rule 23(e)(3).  Section 15.12 of *Rubenstein and Newberg on Class Actions*, entitled "Fee procedures at a class action's conclusion -- Disclosure of fee-related agreements requirement," first speaks to the Rule 23(h) and Rule 54(d)(2)(B) requirement to disclose any agreements as to fees when so ordered by the court.  The Section goes on to recognize, however:

> [I]n addition to Rule 54's disclosure requirements, Rule 23(e), governing class action settlement -- not fee -- approval, states that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the [settlement] proposal."  This generally references the settlement agreement itself, but, *given the broader language covering agreements "made in connection with the [settlement] proposal," agreements beyond the settlement agreement itself -- such as any agreements about fees -- may also fall within the purview of Rule 23(e).  Courts generally do not read Rule 23(e)'s disclosure requirement as requiring disclosure of fee agreements among counsel on the ground that such agreements do not necessarily affect the class's interests.  There may be some cases where this reasoning is incorrect, as some agreements among counsel would impact settlement terms and hence should be disclosed to the class. . . . Moreover, there is little obvious downside from transparency so not only should courts order disclosure of fee agreements under Rule 54(d)(2), but settling parties should also readily provide them under Rule 23(e) in any case.* [250]

---

[250] Professor Rubenstein's deposition testimony and Report are curious in light of the position he has taken in his treatise, particularly as emphasized in this quote.  Beyond this, at his deposition, Professor Rubenstein continually professed to be a "strong advocate" for transparency to the class and the Court.  *See e.g.,* Rubenstein Dep., pp. 35:19 – 36 :4; 169:20 – 170:1; 178:8-9. [EX. 235].  These protestations, however, ring hollow given the positions he has taken in this case, particularly his position that the burden of ensuring disclosure to the class is the Court's and the Court's alone.

http

5 *Newberg on Class Actions,* § 15.12 (5th ed.) (footnotes omitted; emphasis added).  [EX. 236].

      As Professor Rubenstein observed, the broad language of Rule 23(e)(3) itself requires disclosure to the Court of "*any* agreement made in connection with the [settlement] proposal."  Certainly, the agreement to pay Chargois $4.1 million was an "agreement made in connection with the proposal," and Rule 23(e)(3) required that the agreement be disclosed to the Court.  While Rubenstein notes that "courts generally do not read Rule 23(e)'s disclosure requirement as requiring disclosure of fee agreements among counsel on the ground that such agreements do not necessarily affect the class's interests,"[251] he acknowledges that there may be cases where agreements would impact the class's interests, in which case disclosure would be required.  *Newberg*, § 15.12. [EX. 236].   Labaton's obligation -- which pre-existed the case and was Labaton's alone -- to pay Chargois $4.1 million out of the settlement fund for contributing no value to the class is one such agreement impacting the class's interests, as it "allocates money that the class members may have received elsewhere," *i.e.*, to Damon Chargois.  *See Manual on Complex Litigation,* § 21.631.  [EX. 248].  Indeed, the payment to Chargois not only

---

[251] By way of example, Rubenstein cites *Hartless v. Clorox Co.*, 273 F.R.D. 630 (S.D. Cal. 2011), *aff'd in part*, 473 F. App'x 716 (9th Cir. 2012).  In *Hartless*, the parties identified the agreement for attorneys' fees and the defendant, Clorox, agreed not to oppose a request for attorneys' fees and costs not to exceed $2.25 million.  The court found that "the agreement as to the amount of attorneys' fees could affect the class members [but] [t]he allocation of those fees amongst class counsel does not affect the monetary benefit to class members."  *Id.*, p. 946.

allocates money elsewhere, it allocates its own private obligation elsewhere -- to the class (and co-counsel).

Here we have an *un*disclosed agreement to pay $4.1 million out of the settlement funds -- funds that could otherwise be allocated to the class members -- to an attorney who did no work on the case whatsoever. In order to assist the Court in performing its fiduciary function to protect the interests of the class, Labaton was obligated to disclose to the Court its pre-existing agreement to pay Chargois this substantial amount of the settlement fund.[252] Labaton's failure to do so was in derogation of the duties imposed upon it by Fed. R. Civ. P. 23(e)(3).

### b. Failure to Disclose the Chargois Agreement in the Fee Petition

### i. Sucharow's and Labaton's Obligations Under Fed. R. Civ. P. 11

---

[252] On April 26, 2018, the Supreme Court adopted amendments to Fed. R. Civ. P. 23(e), to take effect December 1, 2018. Among the amendments is a new subsection 2 which specifically requires the court, in determining whether a proposed settlement is fair, reasonable, and adequate to take into account "any agreement required to be identified under Rule 23(e)(3)." The amended Rule 23(e)(2) provides:

(2) Approval of the Proposal. If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;
(B) the proposal was negotiated at arm's length;
(C) the relief provided for the class is adequate, taking into account:
    (i) the costs, risks, and delay of trial and appeal;
    (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
    (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
    *(iv) any agreement required to be identified under Rule 23(e)(3);* and
    (D) the proposal treats class members equitably relative to each other.

*See* 2018 US Order 0020.

That the Supreme Court saw fit to make it explicit that courts are to consider all agreements made in connection with a proposed settlement reaffirms that the Chargois Agreement should have been disclosed to the court in this case.

As part of its Lead Counsel obligation in this case, Labaton submitted to the Court the "Declaration of Lawrence A. Sucharow in Support of Plaintiff's Assented-To Motion for Final Approval of the Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and Lead Counsel's Motion for Award of Attorney Fees" (the "Omnibus Declaration").  *See* Dkt. No 104.  [EX. 3].  In two separate places in the Omnibus Declaration, at footnotes 2 and 6, Sucharow purports to identify all "Plaintiffs' Counsel." *Id.* These footnotes identify all attorneys receiving fees from class funds – except one:  Chargois.

In footnote 2, Sucharow identifies as "Plaintiffs' Counsel" his own firm, Labaton Sucharow, and "the Thornton Law Firm LLP ('TLF'), Lieff Cabraser Heimann & Bernstein LLP ('Lieff Cabraser'), Keller Rohrback L.L.P. ('Keller Rohrback'), McTigue Law LLP ('McTigue Law'), and Zuckerman Spaeder LLP ('Zuckerman Spaeder')," *Id.,* note 2, p. 1.  In footnote 6, Sucharow identifies Labaton Sucharow, Thornton, Lieff Cabraser, Keller Rohrback, McTigue Law, Zuckerman Spaeder, and Beins, Axelrod, P.C. (which partnered with McTigue Law and Zuckerman Spaeder in representing the *Henriquez* plaintiffs); Richardson, Patrick, Westbrook & Brickman, LLC (former co-counsel for the *Henriquez* plaintiffs); and Feinberg, Campbell & Zack, P.C. (local counsel for McTigue Law in the *Henriquez* action) as Plaintiffs' Counsel who submitted individual fee petitions.  *Id.*, note 6, p. 41.[253]  Within Labaton's lodestar report attached as

---

[253] In Lynn Sarko's Declaration in support of Keller Rohrback's individual fee petition, Sarko identified fees to be paid to Theodore Hess-Mahan of the Massachusetts firm of Hutchings Barsamian Mendelcorn LLP, which served as local counsel for Keller Rohrback in the *Andover* matter.  *See* Dkt. No. 104-18.  Because Hess-Mahan's lodestar and expenses were not significant, Labaton requested that Hess-Mahan not submit an individual fee declaration.  *See* KR00001192-1198 ("8/31/16 Zeiss email to Keller Rohrback).  [EX. 97].  Sarko complied with that request and

Exhibit A to Labaton's individual fee declaration at Dkt. No. 104-15, Sucharow further identifies fees paid to a non-Labaton "of counsel" attorney, P. Scarlato (Paul Scarlato of Goldman Scarlato, a Pennsylvania law firm).[254]

On the surface, these Declaration statements could reasonably lead the Court to believe that these were all the lawyers being paid from class funds. However, by a calculated omission, only Chargois, who was also paid from class funds, is not mentioned anywhere in Sucharow's Omnibus Declaration or in Labaton's individual fee declaration -- which was also signed by Lawrence Sucharow -- or on Labaton's lodestar reports annexed thereto.

This omission is striking. It is true, strictly speaking, that Chargois is not "Plaintiffs' Counsel." But this description seems an artifice that, while technically accurate, created a subterfuge to camouflage the fact that Chargois received $4.1 million from class funds and that this payment was not being disclosed.

Sucharow admitted that he knew of Chargois and Labaton's fee arrangement, and that Chargois would receive a portion of the fees in the *State Street* case *before* he filed the *State Street* fee declarations. The Omnibus Declaration, along with all the individual fee declarations appended thereto, was filed on September 15, 2016. Sucharow testified:

> Q: And when did you become aware that Damon Chargois had as a referring attorney -- a significant stake in this case?

---

included Hess-Mahan's fees within Keller Rohrback's lodestar. *See* Keller Rohrback's 10/6/17 Responses to Special Master's Second Supplemental Interrogatories, Response No. 4.

[254] *See* Zeiss 9/14/17 Dep., p. 43:3-4 [EX. 115]; Politano 6/14/17 Dep., pp. 69:25 – 70:12 [EX. 98]; Keller 10/25/17 Dep., p. 466:9-10. [EX. 83].

A [by Sucharow]:  At some point -- I'm trying to think what year; 2015 -- I happened to be speaking with Garrett, and he mentioned that there was an obligation that had to be dealt with, and Eric confirmed that to me.  So I knew there was an obligation.  It was not described to me in any further detail.

Q:      And by obligation you mean that he was owed a piece of any settlement or --

A:      No.

Q:      -- judgment?

A:      A piece of our attorneys' fees.

Sucharow 9/1/17 Dep., p. 18:17 – 19:6. [EX. 38].

Sucharow knew of the obligation to pay Chargois a portion of the *State Street* fee award more than a year before he filed the Fee Petition.  Yet Chargois is conspicuously not even mentioned in the Sucharow's Omnibus Declaration, Labaton's individual fee declaration, or anywhere else in the Fee Petition.

Sucharow further admitted that he knew or assumed that Chargois did no work on the case that would support a payment of a portion of the attorneys' fees award to him:

Q:  It's fair to say though, Larry, that Chargois other than that original referral played absolutely no role in this case?

A:  That would be an assumption I would make.  I only saw what I saw…. No application was submitted for time and work on the case.  So you can draw a conclusion from that.
        And I never called upon him to do any work when I was -- I think I described myself as the lead negotiator and lead strategist. . . .

Q:      He never entered an appearance in this case, correct?

A:      Matter of record. I would doubt it.

*Id.,* pp. 86:15 – 87:6.

312

Labaton contends that the Court had no interest in the $4.1 million Chargois payment because Customer Class Counsel was paying it out of their own fee award, so there was no need to disclose it. This argument is legally and factually wrong. Labaton's and the other Customer Class Counsel's fee did not, and would not, exist unless and until the Court awarded it. Labaton itself recognized as much in the Notice. The Notice states, "Lead Counsel *will apply* to the Court for an order awarding attorneys' fees…." Dkt. No. 95-3, p. 4. [EX. 81]. *See also* page 9 of the Notice ("*If* the Court awards fees" at a particular rate….) (emphasis added). *Id.*

In deciding the amount of fees to award class counsel -- and to whom to award it -- the Court, as a fiduciary for the class, including unnamed class members, needed *first* to know -- and Labaton had a duty to tell it -- who would be participating in any fee the Court in its discretion might award from the class recovery, and the basis for the claim. By not disclosing the intended payment of $4.1 million to Chargois, Labaton kept the Court in the dark and denied it the very information it needed in order to decide how much of the settlement funds should go to counsel, and which counsel, and how much should go to the class. As Professor Gillers observed, "Quite simply, until the Court made that decision, *there was no fee to divide.*" Gillers Supp. Report, p. 97. [EX. 233]. The Court had the authority, as an exercise of its equitable power and fiduciary duty to the class, to deny any part of the recovery to Chargois, who never appeared, did no work, and made no contribution whatsoever to the success of the *State Street* litigation, and instead to direct that the money intended for Chargois should instead go to the class. The

Court, however, never had an opportunity to make that decision because of the material omission of Chargois from Sucharow's Declaration.

### 1. Omission of a Material Fact is Sanctionable under Fed. R. Civ. P. 11.

Rule 11 applies both to disclosures and omissions. *See In re Ronco, Inc.*, 838 F.2d 212, 218 (7th Cir. 1988) (cautioning that the omission of facts is "highly relevant to an accurate characterization of the facts stated" and can be "just as misleading, sometimes more misleading, than an absolutely false representation."); *see also Gurman v. Metro Housing and Redevelopment Auth.,* 842 F. Supp. 2d 1151, 1154 (D. Minn. 2011) ("[A]s required by Rule 11(b)(3), plaintiffs' factual contentions must 'have evidentiary support' and must not be misleading by omission.") "'[O]nly those factual omissions that are material' ... may warrant Rule 11 sanctions." *Campmor, Inc. v. Brulant, LLC*, Civ. No. 2:09-cv-05465 (WHW) (CLW), 2014 WL 5392036, at *7 (D.N.J. Oct. 21, 2014) (quoting *In re Kouterick*, 167 B.R. 353, 364 (Bankr. D.N.J. 1994)).  The intentional omission of material facts in a pleading constitutes a falsehood and may result in the imposition of sanctions under Rule 11.  *Lamon v. Armheigh,* No. 1:12–cv–00296–AWI–GSA–PC, 2014 WL 3940286, at *6, n.1 (E.D. Cal. August 12, 2014).

Rule 11(b)(3) required that before submitting his Declaration, Sucharow have conducted "an inquiry reasonable under the circumstances" to ascertain that all factual contentions contained therein had evidentiary support and were not misleading by omission.  Here, Sucharow's Declaration could reasonably have led the Court to believe that all the attorneys who would be sharing in the *State Street* fee award were identified

therein.  Damon Chargois and his firm, Chargois & Herron, are not identified in the Declaration.

As noted *supra*, whether a litigant breaches his or her duty under Rule 11 to conduct a "reasonable inquiry" into the facts or the law depends on the objective reasonableness of the litigant's conduct under the totality of the circumstances.  *See Aronson*, 972 F. Supp. 2d at 139.  Several considerations for courts to consider are delineated in the Advisory Committee Notes to the 1993 Amendment to Rule 11.  The Special Master finds that several of these considerations weigh in favor of finding Sucharow's conduct sanctionable.

The factors delineated in the Advisory Committee Notes include:  "[w]hether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; and whether the responsible person is trained in the law."  Fed. R. Civ. P. 11, Advisory Committee Notes, 1993 Amendment.

Courts have also examined factors to be considered, including "the complexity of the subject matter, the party's familiarity with it, the time available for inquiry, and the ease (or difficulty) of access to the requisite information."  *CQ Int'l Co*., 659 F.3d at 62–63 (quoting *Navarro–Ayala*, 968 F.2d at 1425).

Sucharow admitted that he knew about Chargois and his arrangement to share in the fees to be awarded in the *State Street* case a year before he submitted his Declaration.

315

A reading of his Declaration before signing it would have disclosed to Sucharow that there was no mention of Chargois anywhere in it.  Granted, Sucharow's Declaration was lengthy and covered numerous issues.  But the information as to which firms were sharing in the fee award was readily accessible to him, and the completeness of his listing of firms sharing in the *State Street* fee award was readily discernable.

While the evidence here shows that Sucharow did not draft the declaration -- Labaton's Settlement Counsel, Nicole Zeiss, and Chief Litigator, David Goldsmith, did, *see* Zeiss 6/14/17 Dep., pp. 15:25 – 16:6  [EX. 79] -- Sucharow admitted, "I was presented with drafts [of the declaration], I reviewed and made corrections where I thought corrections were appropriate, and then executed it."  Sucharow 6/14/17 Dep., p. 45:2-5.  [EX. 16].  Mr. Sucharow is trained in the law and well versed in federal practice and hence should be well aware of his Rule 11 obligations.

Also weighing in favor of finding Sucharow's conduct sanctionable is that the nondisclosure of Chargois in Sucharow's Declaration is a part of a pattern of activity to keep Chargois' identity and his fee arrangement with Labaton concealed from all participants in the *State Street* case, including the Court.  Sucharow himself actively engaged in this pattern of concealment by intentionally hiding Chargois' identity and his sharing of the *State Street* fee award from ERISA counsel -- Sucharow, in fact, personally directed that a separate claw-back letter be sent to Chargois (rather than copying him along with all the other *State Street* counsel) because there was "no reason for ERISA to see Damon's split."  TLF-SST-012272-12274 (Sucharow response to G. Bradley email

316

regarding proposed claw-back letter) [EX. 160]; *see also* LBS039936-39937 (Sucharow

email to Goldsmith, G. Bradley, Keller, and Belfi).  [EX. 157].

Beyond this, Labaton did not disclose payments to Chargois to courts in eight

other cases.  This is similarly indicative of a pattern of material omissions.[255]

For the foregoing reasons, the Special Master concludes that the nondisclosure of

the payment to Chargois was a material and intentional omission from Sucharow's

Declaration.

However, whether to impose sanctions for the apparent violation of Rule 11 gives

the Special Master pause because there is no First Circuit case, either appellate or district,

holding that a material omission warrants the imposition of Rule 11 sanctions.

Furthermore, while the Special Master believes that Sucharow's firm, Labaton Sucharow,

violated Fed. R. Civ. P. 23(e)(3) by failing to disclose the Chargois agreement to the

Court during the settlement and fee-petition process, he is cognizant that courts generally

do not read Rule 23(e)(3)'s disclosure requirement as requiring disclosure of fee

agreements among counsel, and we have found no First Circuit cases squarely holding

that disclosure is required under that Rule.[256]

---

[255] In these eight other cases, Labaton was either lead or co-lead counsel and ATRS was lead or co-lead plaintiff. Chargois was not disclosed in any of these cases.  Although Sucharow did not file declarations in any of these cases, this nonetheless shows a pattern of nondisclosure on the part of Labaton.

[256] On May 2, 2018, Labaton submitted to the Special Master a "Memorandum of Labaton Sucharow LLP Regarding Rule 11," in which Labaton argues that because it acted in accordance with the directives of Fed. R. Civ. P. 23(h) and 54(d)(2), which do not require disclosure of fee agreements absent an order of the Court, the Special Master cannot find that the nondisclosure to the Court of the Chargois Arrangement violated Rule 11.  [EX. 262]. Labaton posits that if complying with Rules 23(h) and 54(d)(2) simultaneously constitutes a nondisclosure that violates Rule 11, "the Federal Rules of Civil Procedure are internally inconsistent and directly contradict each other."  5/2/18 Memorandum, p. 8.  [EX. 262]. Labaton, however, does not mention, let alone discuss in its Memorandum, the separate and independent obligation imposed on Labaton by Rule 23(e)(3) to "file a statement identifying any agreement made in connection with the [settlement] proposal."  It is in the context of this separate

For these reasons, the Special Master believes that, although the omission of the $4.1 million payment from the Declaration is both material and intentional, it presents a close case as to whether it merits Rule 11 sanctions. On balance, the imposition of Rule 11 sanctions, although certainly supportable, is unnecessary in view of the finding below of violations of the Rules of Professional Conduct which are sufficient to address the conduct here.

### ii. Violation of Mass. R. Prof. C. 3.3

Separate and apart from any of the imperatives of the Federal Rules of Civil Procedure, the Massachusetts Rules of Professional Conduct required disclosure of the Chargois Arrangement to the Court. Mass. R. Prof. C. 3.3 imposes upon attorneys practicing in Massachusetts a "duty of candor toward the tribunal." Rule 3.3(a) provides in relevant part:

(a) A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including if necessary, disclosure to the tribunal.

---

obligation the Special Master finds a material omission in the Sucharow Declaration. However, as noted, the Special Master acknowledges that the imposition of Rule 11 sanctions for this material omission presents a close question and one on which the First Circuit has not spoken. Accordingly, the Special Master is not recommending Rule 11 sanctions. Therefore, it need not further address the eleventh-hour arguments raised in Labaton's May 2, 2018 Memorandum.

Mass. R. Prof. C. 3.3(a).

Comment 3 to Rule 3.3 makes clear that an attorney's failure to make a disclosure in an affidavit or in open court can be the equivalent of a misrepresentation within the purview of Rule 3.3(a). *Cf*., Mass. R. Prof. C. 8.4(c) ("It is professional misconduct for a lawyer to engage in conduct involving… misrepresentation").

As Professor Gillers points out, several decisions of the Massachusetts State Bar Disciplinary Board further make clear that a true statement can violate these rules through omission. *See e.g., In re O'Toole*, 2015 WL 9309021, at *5 (Mass. St. Disp. Bd. 2015) ("'[H]alf-truths may be actionable as whole lies.'. . . Statements that are 'technically accurate' or 'literally true,' but nevertheless are 'clearly intended to mislead' or 'beg[] [a] false inference' amount, in appropriate cases to false statements within the meaning of Rules 3.3(a)(1) and 4.1(a)"); *In the Matter of An Attorney*, 2007 WL 4284758, at *4 (Mass. St. Disp. Bd. 2007) ("It is not a defense to these charges that the individual statements made in the letter could be read as literally true. Literal truth may be a defense to a criminal charge of perjury, [b]ut Rule 8.4(c) prohibits more than outright perjury") (citations and some internal punctuation omitted); *see also Matter of Harlow*, 20 Mass. Att'y Disc. R. 212, 216-218 (2004) (misleading partial disclosure violated Rule 8.4(c)).

Compliance with Rules 3.3(a) and 8.4(c) required Sucharow to disclose Chargois and his fee arrangement with Labaton in his Omnibus Declaration and/or his "small fee" declaration in support of the *State Street* fee petition. As noted, that information was highly relevant to the Court's exercise of its fiduciary duty to protect the class because

319

the Court could find that the class had no interest in paying Chargois for his introduction

of Labaton to ATRS years before the *State Street* litigation even commenced. In fact, as

also noted, the Court may have found this an inherent conflict. Given these

considerations, the court may well have decided that, given the size of Chargois' share of

the fees, the $4.1 million should be in whole or in part redirected to the class.

That Sucharow had a duty to disclose the Chargois Arrangement to the Court is

further made clear by Comment 14A to Rule 3.3, which provides:

> When adversaries present a joint petition to a tribunal, such as a joint petition to
> approve the settlement of a class action suit . . . the proceeding loses its
> adversarial character and in some respects takes on the form of an ex parte
> proceeding. The lawyers presenting such a joint petition thus have the same duties
> of candor to the tribunal as lawyers in ex parte proceedings and should be guided
> by Rule 3.3(d).

Mass. R. Prof. C. 3.3, cmt. [14A].

Rule 3.3(d) provides:

> (d) In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material
> facts known to the lawyer that will enable the tribunal to make an informed
> decision, whether or not the facts are adverse.

Mass. R. Prof. C. 3.3(d).[257]

---

[257] Labaton and its expert, Professor Peter Joy, contend that Comment 14A and Rule 3.3(d) do not apply here
because the fee petition was not presented jointly by true adversaries, i.e., the Plaintiff class and the Defendant, State
Street; it was only presented by the various members of the Plaintiff class. *See* Joy 4/3/18 Dep., pp. 187:19 – 188:20
[EX. 227]; 4/13/18 Oral Argument Tr., pp. 187:19 – 188:20. [EX. 162]. Professor Gillers maintains that at the fee
determination stage, the interests of class counsel and the class are adverse. The fee will come out of the class
recovery. Consequently, although class counsel remains counsel for the certified class, with the fiduciary duties that
lawyers owe clients, they are understood to be advocating their own interests, not the class's interests. Since the
class interests are not represented when lawyers petition for a fee, the proceeding is properly understood to be *ex
parte*. *See* Gillers Supp. Report, p. 91. [EX. 233]. This is particularly true here, given the aforementioned potential
for conflict between the class and Labaton and the underlying factors.

In any event, there *is* evidence indicating that lawyers viewed this as a non-adversarial, *ex parte*
proceeding. In an email exchange between Garrett Bradley, Lawrence Sucharow and David Goldsmith dated
August 17, 2016, Customer Class Counsel discussed Bill Paine's (State Street's counsel's) support of the fee
petition. The topic arose out of a discussion about the appropriate time to file a different lawsuit on behalf of a
different plaintiff (Swift) against State Street. The concern in filing the Swift litigation was that it might prompt Bill
Paine not to support the Customer Class's fee request at the final approval hearing. In that email exchange, counsel

As Professor Gillers observed, Comment 14[A] "recognizes that when there is no adverse party, the Court is denied the benefit of an adversary proceeding. There is no opponent who can bring to the Court's attention facts or legal authorities that challenge the contentions or citations of the lawyer appearing before the court." Gillers Supp. Report, p. 89. [EX. 233]. Hence, it is incumbent on the lawyer, given the duty of candor owed to the tribunal, to bring all facts, including adverse facts, to the Court's attention.

Sucharow violated these Rules of Professional Conduct by failing to disclose the Chargois Arrangement in his Omnibus Declaration and small fee declaration in support of the Fee Petition. By not disclosing the intended payment of $4.1 million to Chargois, the Court was denied information it needed in order to decide how much of the settlement funds should go to counsel, and which counsel, and how much should go to the class. The Court had the authority, as an exercise of its equitable power and fiduciary duty to the class, to deny any part of the recovery to Chargois, who never appeared, did no work, and made no contribution whatsoever to the success of the *State Street* litigation, and instead to direct that the money intended for Chargois should go to the class. But the Court was never afforded an opportunity to make any such decision because of Sucharow's failure to disclose the payment to Chargois.

---

discussed the possibility of Paine filing an affidavit in support of the *State Street* Fee Petition. Goldsmith expressed concern that Paine filing an affidavit stating State Street's approval of the fee request "could draw a big objection and suggest collusion," and it could draw the attention of Judge Wolf who had specifically noted his concern about the adversary system breaking down in the fee context at the preliminary approval hearing. TLF-SST-032617-2618 (8/17/16 email exchange between Garrett Bradley, David Goldsmith, Michael Sucharow, and others at the Thornton and Labaton firms). [EX. 203].

Moreover, as Professor Gillers notes, this is not a situation where disclosure to the Court would have harmed a client or waived a privilege. If it were, a lawyer might sometimes be able credibly to resolve real doubts as to disclosure in favor of the client. Here, "disclosure could only *benefit* the client, the class, by giving the Court (and the class members) the opportunity to consider the Chargois Arrangement. Indeed, it is hard to understand what countervailing interests could have justified nondisclosure. To whom did Labaton owe a competing duty not to disclose?" Gillers Supp. Report, p. 88. [EX. 233].

For all of these reasons, the Special Master concludes that Sucharow deliberately concealed the Chargois Arrangement from the Court and thereby denied the Court the opportunity to meaningfully carry out its fiduciary role and gatekeeping function to protect the interests of the class. Sucharow's concealment of this very relevant information violated Massachusetts Rule of Professional Conduct 3.3.

### iii. *Violation of the General Duty of Candor to the Court*

As Professor Gillers notes, in arguing that Rules 23 and 54 were the sole sources of its duty to the Court and that Comment 14A does not literally apply, Labaton subordinates any duty its lawyers may have had as officers of the Court. While "the phrase 'candor to the Court' is not an unbounded source of duty, entirely untethered to rules, custom, or case law. . . the word 'candor' should at least guide a lawyer's understanding of his or her duties as officers of the court." Gillers' Supp. Report, p. 88. [EX. 233]. This broad duty of candor was recognized by the First Circuit in *Pearson v. First NH Mtg. Corp.*, 200 F.3d 30, 38 (1st Cir. 1999). In addition to finding that the

attorney in that case violated New Hampshire's version of Rule 3.3(a)(1), the *Pearson* court found he also violated his general duty of candor to the court that exists in connection with an attorney's role as an officer of the court:

> Here, Attorney Gannon made an affirmative misrepresentation to the court, which did not comport with his duty of candor. *See, e.g.,* NHRPC 3.3(a)(1), comment ("There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."); *In re Tri–Cran,* 98 B.R. at 616 ("'Since attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court.'") (citation omitted); *cf. Burns v. Windsor Ins. Co.,* 31 F.3d 1092, 1095 (11th Cir.1994) ("Every lawyer is an officer of the court ... [and] he always has a duty of candor to the tribunal"; *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 457 (4th Cir.1993) ("[A] general duty of candor to the court exists in connection with an attorney's role as an officer of the court"); *cf. also Erickson v. Newmar Corp.,* 87 F.3d 298, 303 (9th Cir.1996) ("[I]t is th[e] court which is authorized to supervise the conduct of the members of its bar ... [and has] a responsibility to maintain public confidence in the legal profession").

200 F.3d at 38.

As indicated, *Pearson* cites, among other cases, the Fourth Circuit's decision in *Shaffer Equipment* to recognize a "general duty of candor to the court."  In *Schaffer,* the government failed to disclose false testimony at the deposition of its expert witness in a civil environmental case, and then moved for summary judgment without relying on his opinion.  The government claimed that it had not violated the terms of West Virginia's Rule 3.3.  The District Court dismissed the government's case because of its nondisclosure, citing both Rule 3.3 and the general duty of candor to the Court.  The government appealed.  The Fourth Circuit wrote that the professional conduct rules are not the sole source of a lawyer's duty of candor:

> It appears that the district court, in finding that the government's attorneys violated a duty of candor to the court, applied the general duty of candor imposed

on all attorneys as officers of the court, as well as the duty of candor defined by Rule 3.3. Although the court referred to Rule 3.3, it also described the duty of candor more broadly as that duty attendant to the attorney's role as an officer of the court with a "continuing duty to inform the Court of any development which may conceivably affect the outcome of litigation." It concluded, "Thus, attorneys are expected to bring directly before the Court all those conditions and circumstances which are relevant in a given case." In its brief, the government did not address the existence, nature, and scope of any general duty of candor and whether its attorneys violated that duty. Nevertheless, we are confident that a general duty of candor to the court exists in connection with an attorney's role as an officer of the court.

> Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions -- all directed with unwavering effort to what, in good faith, is believed to be true on matters material to the disposition. Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where honesty is preeminent. (internal citations omitted.)[258]

*United States v. Shaffer Equip. Co.,* 11 F.3d 450, 457 (4th Cir. 1993).

As Professor Gillers observed, these cases establish that lawyers have a duty of candor to the court that goes beyond the text of Rule 3.3. Gillers Supp. Report, p. 92. The Special Master agrees. Further, it is not only Mr. Sucharow that owed a duty of candor to the Court. Rather, all other Class Counsel who knew about Labaton's agreement to pay Damon Chargois $4.1 million out of class funds for doing no work on

---

[258] Further distinguishing duties under Rule 3.3 from the duty of candor, the *Shaffer* court wrote: "While Rule 3.3 articulates the duty of candor to the tribunal as a necessary protection of the decision-making process, and Rule 3.4 articulates an analogous duty to opposing lawyers, neither of these rules nor the entire Code of Professional Responsibility displaces the broader general duty of candor and good faith required to protect the integrity of the entire judicial process." *Shaffer Equipment*, 11 F.3d at 458 (internal citation omitted).

the *State Street* case had a duty to disclose that arrangement to the Court to ensure that the Court met its fiduciary obligations to the class.

At the November 2, 2016 hearing on the Motion for Final Approval of Settlement and Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Service Awards, David Goldsmith of Labaton, accompanied by Nicole Zeiss, Labaton's Settlement Counsel, represented the "plaintiffs and the settlement class." 11/2/16 Hearing Tr., Dkt. # 114, pp. 3:7-9, 10-11. [EX. 78]. Goldsmith argued the motions before Judge Wolf. Dan Chiplock of Lieff Cabraser and Carl Kravitz of Zuckerman Spaeder also attended the hearing. *See id*., pp. 2-3. Garrett Bradley and Michael Thornton of Thornton also were in attendance. *See* G. Bradley 9/14/17 Dep., pp. 152:19 – 153:11.

The hearing presented another opportunity to inform the Court of the intended Chargois payment. Unfortunately, that opportunity was not taken. At the conclusion of the hearing, stating that he was "relying heavily on the submissions and what's been said today," Judge Wolf approved the $300 million gross settlement and approved a 25% award of attorneys' fees in the amount of $74,541,250.00 plus expenses in the amount of $1,257,699.94. *Id.* p. 35:7-8. But as indicated above, the written submissions and what was said by Goldsmith at the hearing did not inform the Court of all material facts needed to make a fully informed decision.

Goldsmith testified he personally did not learn of his firm's fee arrangement with Chargois until November 21, 2016 – more than two weeks after the Final Approval Hearing. *See* Goldsmith 9/20/17 Dep., pp. 108:24 – 109:3. [EX. 42]. No evidence was

presented that would discredit Goldsmith on this. Due to the compartmentalization of its practice, knowledge of the Chargois Arrangement within the Labaton firm was largely limited to Sucharow and the firm's "relationship partners," Eric Belfi and Christopher Keller; Goldsmith, who was not a "relationship partner" but rather a litigator, was not informed about Chargois or the Chargois Arrangement. Nor did Nicole Zeiss, the settlement attorney from Labaton who accompanied Goldsmith at the hearing, have information concerning the Chargois Arrangement. Zeiss 9/14/17 Dep., pp. 19:17-22; 25:24 – 26:6. [EX. 115].

Carl Kravitz, one of the ERISA Counsel, attended the hearing but, as discussed in the previous section, did not know about Chargois. Dan Chiplock of Lieff Cabraser knew of the Chargois Arrangement but was led to believe that Chargois served as "local counsel," not that he was being paid for doing no work on the case.[259]

For all the foregoing reasons, the Special Master concludes that Labaton, through Sucharow, intentionally concealed the $4.1 million Chargois Arrangement from the Court and thereby denied the Court the opportunity to meaningfully carry out its fiduciary role and gatekeeping function.

---

[259] The Special Master has found that Garrett Bradley of the Thornton firm, who attended the Final Settlement and Fee Approval Hearing, did know the full Chargois story. The Special Master does not credit Bradley's testimony to the contrary on this point, for all of the reasons set forth, *supra*. (See discussion of Garrett Bradley's knowledge in the Findings of Fact, § II(K)(5) and Conclusions of Law, § III(C), *supra*. He, like all the other counsel, was provided with copies of Sucharow's Omnibus Declaration and all the other small fee declarations and exhibits, and should have known upon reading it that the payment of $4.1 million to Chargois was not mentioned in any of the fee petition documents. While certainly the obligation to disclose the Chargois Arrangement fell primarily upon Labaton, the opportunity was presented for Bradley, who at this time was also Of Counsel to Labaton, to exercise his duty of candor as an officer of the Court to bring this omission to the Court's attention, but he did not do so. However, it seems somewhat of a stretch to hold Bradley responsible for violating a duty of candor to the Court for not speaking up about an omission in another lawyer's declaration.

The remedies for this conduct are addressed in the Recommendations section

below.

## IV.  SPECIAL MASTER'S RECOMMENDATIONS

### Introduction

Beyond the investigation and analysis of the myriad irregularities in the attorneys'

fees petitions and the fee approval process outlined in the previous sections, the most

challenging yet important aspect of this assignment has been to determine for

recommendation to the Court appropriate and proportionate remedies and sanctions that

fairly but adequately balance the interests of the class, the law firms, the legal profession,

the public and the institutional needs of the Judiciary to enable judges to perform their

critical fiduciary obligations in class actions.  Arriving at appropriate redress is not a

simple or straight-forward task, both because the law in a number of the relevant areas is

not entirely clear and precise -- with, at times, arguably conflicting requirements of the

Federal Rules of Civil Procedure, the Massachusetts Rules of Professional Conduct and

state and federal case law – and the fact that the questionable conduct of some, but not

all, of the lawyers and law firms spans the spectrum from clear and unquestionable

misconduct, on the one hand, to "grey area" activity that skates along the edges of

misconduct and raises the specter of at least sharp practice, but is perhaps not clearly

defined as outside the bounds of the rules and the law.

Complicating this piece of the assignment is the need to weigh in the balance of

appropriate and proportionate redress, the truly laudable result achieved by the lawyers

for their clients, the class members, through their dedicated and highly skilled hard work

and professional acumen in a case which posed real risks and the uncertainty of perhaps

never achieving any award for the class or any fee at all for themselves.  As noted in this

Report's Introduction, perhaps the most lamentable aspect of this investigation is that the

outstanding result achieved for the class has become tainted by the questionable conduct

described in these pages.

In recommending appropriate remedies and redress for the various shades of

conduct discovered in this investigation, the Special Master has attempted to strike a

balance that recognizes and addresses both the serious and sustained ethical violations

and quasi-violations raised by the conduct of some of the lawyers with the excellent

result achieved that not only provided a substantial recovery to the class for the

troublesome conduct of the defendant in the main case, but which in the process also

shined a light upon a heretofore hidden corner of abuses in the trading world which will

likely benefit the general trading public.

While others may disagree, the Special Master believes that the remedies and

sanctions recommended here effect, to the extent possible, a fair, legal, and equitable

balance of the sometimes-conflicting law and interests discussed in these pages.

After a brief overview, the recommendations for legal findings, remedies and

sanctions in this section are set out as they relate to the various duties and obligations the

lawyers in this case had to their clients, to the class, to other counsel in the case, and last,

but by no means least, to the Court.  This section ends with a brief discussion of lessons

which can be learned from this investigation and "best practices" going forward for

lawyers and courts in large, complex class actions.

## **Recommended Legal Findings**

As described in some detail in the body of this Report, the questionable conduct breaks down roughly into two separate but broadly related areas, all under the larger rubric of what should have been included in the fee petitions and disclosed to the clients, the class, co-counsel and the Court – the Chargois Arrangement and payment – and what should not have been included in the fee petitions of Labaton, Lieff and Thornton – the double-counted hours of the staff attorneys and the contract attorneys. Because there has already been extensive discussion of the underlying factual record and applicable law in the previous sections of this Report along with the attendant findings and conclusions, these areas will be revisited only in summary fashion as necessary to provide context for the recommendations of legal findings, remedies and/or sanctions.

As a broad proposition, where violations are minor or close calls under the law or applicable rules of professional conduct, the Special Master recommends that these be addressed with remedies, as opposed to formal disciplinary sanctions or other action. The caveat to this is that because some of the conduct that may have presented close legal questions or resulted from true inadvertence or sloppiness nonetheless had a profound impact upon the class or other counsel, and the Court's ability to perform its fiduciary obligations to the class, the redress recommended, although intended to be remedial in nature, is nonetheless substantial. As to these categories of conduct, although professional discipline is not warranted, some of the remedies recommended will be strong medicine for the subject law firms.

329

Another class of conduct that is both intentional and a clear violation of the law and rules of professional conduct, as well as impactful, requires more rigorous redress, including a recommendation of professional discipline.

Finally, as to two law firms, Labaton and Thornton, because the conduct discovered in this investigation was endemic and the result of pervasive practices within the respective firms, a remedy more prophylactic and future-leaning in nature is appropriate.

### Recommended Legal Findings for Breach of Duties to the Client (ATRS)

It is established without contest that after attorney Damon Chargois helped Labaton secure ATRS as a client (initially to help monitor ATRS' portfolio) sometime in 2007 or 2008, well before the inception of the State Street case, Labaton agreed to pay attorney Chargois twenty percent of every fee Labaton received for cases in which Labaton served as lead (or co-lead) class counsel and ATRS served as a class representative. Although this agreement was never successfully reduced to a signed writing, it is also undisputed that Labaton never informed anyone at ATRS about this obligation to Chargois in the State Street litigation, or at any other time, including in the eight other cases in which Chargois was paid. In fact, as discussed in the Findings of Facts and Conclusions of Law sections, lawyers at Labaton were at pains to ensure that George Hopkins, Executive Director of ATRS, did not find out about the Chargois Arrangement, and intentionally kept this information from him.

The most disturbing aspect of what was learned during the entire investigation is the pervasive secrecy and concealment that attended Labaton's relationship with

Chargois. As discussed in detail in the other sections of this report and below in this section, not only did Labaton not tell the client, in its role as Lead Counsel, it did not tell the class, the ERISA attorneys or the Court anything about the Chargois Arrangement. Beyond this, when they sought to have Lieff and Thornton share in the obligation to Chargois by splitting equally the $4.1 million payment to him, they told them only a portion of the story, leading them to believe that Chargois was local counsel and performing work of value in the case. (However, for the reasons set out in the previous sections, the Special Master believes that Garrett Bradley – who was wearing the two hats of managing partner at Thornton and Of Counsel at Labaton -- knew at least the most important parts of the whole story of the Chargois Arrangement, and that Bradley's testimony to the contrary is simply not credible.)

Despite all of this, however, the Massachusetts Rules of Professional Conduct regarding what must be disclosed to a client -- and how and when -- as they apply to these facts, are not as clear as one might hope. As set out in the Conclusions of Law above, the Special Master has found that the Labaton lawyers technically violated Rule 1.5(e) of the Massachusetts Rules of Professional Conduct, as it existed at the time of the retention letter in this case and informed by a Massachusetts Supreme Judicial Court decision, *Saggese v. Kelly*, 445 Mass. 434, 443 (2005) (requiring disclosure of a fee-sharing agreement to the client before the referral is made and obtaining the client's consent in writing). The SJC's decision was, of course, the law of the jurisdiction, and it is axiomatic that lawyers are held to know the law. However, the rule announced in *Saggese* was not enacted into the Rules of Professional Conduct until March 15, 2011,

just after the retention letter in this case was signed, and even the decision in *Saggese* and

the amended Rule, do not make clear the degree of information that lawyers must provide

to clients concerning a fee-sharing agreement so that the client may make an informed

decision before giving consent.

The retention letter signed February 8, 2011 in this case permitted Labaton to

allocate fees to other attorneys "who serve as local or liaison counsel, as referral fees, or

for other services performed in connection with the litigation." This was the only notice

to ATRS that there might be a referral fee in the State Street case, although Hopkins was

told about the division of fees with Lieff and Thornton. Labaton's experts on this point

(Professors Green, Joy and Wendel) both in their reports and in their depositions say that

this was sufficient notice to the client – that the Rule requires only that ATRS have been

told that a division of fee may be made, with no obligation whatsoever to disclose details

or the identity of who was receiving the fee or how much it would be. In making this

point, they observe that Massachusetts has a more lenient division-of-fee rule than most

other states, including that it permits "bare referrals" to be paid to lawyers who perform

no work on a case and never appear in the case. They also argue that neither *Sagesse*, nor

the rule in effect at the time, nor the subsequent rule specify the nature or amount of

information a client must be given about a fee division, nor is the nature of the consent

required from the client spelled out. They also point out that Hopkins instructed

Labaton's Eric Belfi that he did not want to know about any division of fees, and that if

he wanted to know about a division of fees, he would ask. Labaton's experts also point

out that even if there was a technical failure to comply with Rule 1.5(e), there was at least

an effort to comply through the retention letter and such "imperfect compliance" does not merit a finding of a violation of the Rule. As to any differences between the compliance required under *Sagesse* and the Rule in effect at the time of the retention letter, Labaton's experts point out that a lawyer in Massachusetts has never been disciplined for not following an SJC decision that has not been codified in the Rules of Professional Conduct.

The Special Master's expert, Professor Gillers, disagrees with Labaton's experts, pointing to a raft of other evidence indicating Labaton never intended to comply with the Rule, that the Chargois Arrangement was not a true division of fee agreement because it was never formalized and did not comply with the division of fee rules in every jurisdiction ATRS and Labaton did business and that, under the circumstances, the fact that the client was told nothing about the Chargois Arrangement meant that the client had insufficient information upon which to give consent in this case – the troubling position of the class representative's Executive Director, George Hopkins, that he instructed Labaton attorneys that he did not want to know about fee allocations among counsel to the contrary notwithstanding.

As described in the Conclusions of Law, the Special Master believes that the requirements of Rule 1.5(e) were not complied with and that given all of the circumstances here, particularly that ATRS would be acting as class representative -- with all of the obligations to the class that would entail -- Labaton should have at least informed Hopkins and ATRS of the agreement it had with Chargois and the fact that if there was a successful result, he would be receiving a substantial portion of the fee.

Beyond this, it is significant that the "fee" owed to Chargois was Labaton's own obligation that arose out of a pre-existing agreement with Chargois. It was unrelated to the *State Street* case. In this sense, the payment to Chargois can hardly be said to be a "referral fee."

Nevertheless, the Special Master acknowledges that, given Massachusetts' unique rules and history on fee division, and the fact that Hopkins told Belfi he did not want to know about fee divisions, this is a close case, made closer by the fact that apparently lawyers in Massachusetts are not disciplined for not complying with rules announced by courts but not codified into the Rules of Professional Conduct.

Although the Special Master believes that Labaton had a professional obligation to tell its client ATRS, a class representative, the salient details of the Chargois Arrangement so that the client could make an informed determination of whether to give consent, and how this might impact its obligations as class representative -- rather than intentionally keeping the information from the client -- the intersection of the law and the facts here do not rise to the level of requiring disciplinary action. The obligations to the client, and the timing of them, were simply too unclear at the time to merit the imposition of professional discipline or any kind of disciplinary sanction.

Closely related to the issues surrounding Rule 1.5(e) are questions of whether Labaton violated Rule 7.2(b), the rule forbidding a lawyer from giving "anything of value to a person for recommending the lawyer's services." The reason Rule 1.5(e) is implicated in this discussion is that subsection (5) of Rule 7.2(b) includes an exception to the prohibition of paid recommendations for valid division-of-fee agreements under Rule

334

1.5(e). Rule 7.2(b)(5). In other words, if there is a valid division-of-fee award under Rule 1.5(e), it is permissible to pay a lawyer for recommending another lawyer without implicating Rule 7.2(b)'s proscriptions.

As noted, Professor Gillers believes that there was not compliance with Rule 1.5(e) and, therefore, goes on to analyze whether the Chargois Arrangement, and the history of how the Arrangement began, constitute a violation of Rule 7.2 (b). He believes that there was a violation. Contrary to the opinions of two of Labaton's experts (Wendel and Lieberman) -- who believe that Rule 7.2(b) does not apply to lawyers at all because a lawyer is not a "person" for purposes of the Rule -- Professor Gillers opines that payments by a lawyer to another lawyer for recommendations that do not comply with Rule 1.5(e) are within the proscriptions of Rule 7.2(b). In other words, Professor Gillers believes that a lawyer is a "person" under the Rule. Professor Gillers, commonsensically, points out that if the word "person" was intended to exclude lawyers from its ambit, there would be no need for the exception in Rule 7.2(b)(5) for fee agreements that divide fees between *lawyers*. Beyond this, the Rule or its comment use the word "non-lawyer" five times, and if the drafters of the Rule wished to limit the category of covered persons to non-lawyers, they would have used the word non-lawyer, rather than person. Thus, the purpose of using the word "person" was to make clear the Rule covered both lawyers and non-lawyers.

Further, Labaton's experts say that the entire history of the Rule was directed toward advertising and solicitation for lawyers by touts, taxi drivers and other non-lawyers, and was not intended to cover recommendations by a lawyer to others for the

335

services of another lawyer. Therefore, as noted, they reason, a lawyer is not a "person" within the meaning of the Rule. Two experts (Joy and Green) opine further that because the Rule covers only the "recommending" of a lawyer's services, and what Chargois did was to introduce Labaton to ATRS and facilitate a relationship, the Chargois Arrangement is not the product of a "recommendation" and, therefore, covered under the Rule. Finally, and more persuasively, at least one of Labaton's experts (Professor Green) pointed out that a lawyer has never been disciplined in Massachusetts under Rule 7.2(b) and there are no cases in Massachusetts -- or in fact in any jurisdiction in the country -- that have ever been brought against a lawyer for a violation of Rule 7.2(b).

In the Conclusions of Law section, the Special Master finds that Professor Gillers has the stronger argument on this point as a strict matter of law and statutory construction. In reaching this decision, it resonates with the Special Master that the Rule creates a specific exception for valid fee divisions between lawyers and if lawyers were not intended to be covered by the Rule, this exception would be unnecessary. When one of Labaton's experts (Green) was questioned about this, he simply said the language was "surplusage"; another expert (Lieberman) said it was "redundant." The Special Master cannot accept these rather facile explanations -- one must presume that drafters of laws mean what they say and do not adorn statutes, regulations and rules with unnecessary language -- and finds that Rule 7.2(b) covers recommendations made by lawyers for the services of other lawyers, unless there is compliance with Rule 1.5(e). Further, after a careful review of the record, the Special Master is persuaded that the entire origin and nature of the Chargois Arrangement fit easily within the ambit of Rule 7.2(b) and,

336

therefore, the payments by Labaton to Chargois for his recommending of Labaton at the

inception of the Labaton/ATRS relationship falls within Rule 7.2(b)'s proscriptions.

Therefore, because, as discussed, the fee division agreement did not comply with Rule

1.5(e), the entire Chargois Arrangement violated Rule 7.2(b).

However, this does not end the discussion, as it begs the question of whether

professional discipline is merited to address the conduct. The Special Master concludes

that it does not, for several reasons. First, as noted, the question of compliance with Rule

1.5(e) is a close question upon which reasonable experts and lawyers may differ and if

there was compliance with that Rule, there was no violation of Rule 7.2(b). Because the

violation of Rule 1.5(e) found here does not merit professional discipline, it would be

hard to say that the connected violation of Rule 7.2(b) merited discipline. Beyond this,

the Special Master is struck by the fact that apparently no disciplinary body or court in

Massachusetts or, indeed, in the rest of the country has ever imposed discipline or

sanctions upon a lawyer for paying another lawyer under Rule 7.2(b).

Although Professor Gillers analysis and opinion makes absolute sense, this goes to

the question of notice to the practicing bar. Perhaps going forward, if the Court adopts

Professor Gillers' and the Special Master's views on this Rule, the practicing profession

will be on notice that bare recommendations that are not made pursuant to a valid

division-of-fee agreement under Rule 1.5(e) could subject lawyers to discipline under

Rule 7.2(b). But, because this appears to be an issue of first impression and not one of

which the profession might have been well- advised in advance, it would not be

appropriate to impose professional discipline in these circumstances.  Accordingly, no professional discipline or sanctions is warranted here and none is recommended.

But even this does not end the matter.  Whether the conduct here merits professional discipline or sanction under the Rules of Professional Conduct, it is nonetheless sharp practice and requires redress and remedial action.  The intentional and pervasive withholding of the history and details of the Chargois Arrangement from George Hopkins and ATRS (and every other actor in the case), combined with the blatantly commercial nature of the relationship at the inception of the relationship, and the continuing payments to Chargois -- apparently in perpetuity -- without ever telling the client, seems more like the payment of a finder's fee with a resulting floating lien on all subsequent cases than a true professional relationship intended for the good of the client, or for that matter, the public. The secretiveness that surrounded the Chargois Arrangement only exacerbates its unseemliness.

Labaton's conduct in not disclosing the Chargois Arrangement to the client and obtaining effective consent merits some remedial action.  This remedy will be imposed as part of the larger remedy for Labaton's nondisclosure to other important actors here from whom the Chargois Arrangement was intentionally hidden, including the ERISA lawyers, the class (who, as discussed, are also Labaton's clients), and the Court, and will be discussed separately.

### Recommended Legal Findings as to Breaches of Duties to the Class

Before moving to a specific discussion of the implications of Labaton's failure to provide information and notice to the class about the Chargois Arrangement and $4.1

million payment, it bears noting that in all of Labaton's legalistic arguments against any notice requirement, it never even gives a nod to what would be in the best interests of the class members, nor does it in any way acknowledge that in keeping this information from the class, Labaton in its role as Lead Counsel may have deprived the class members of their fundamental right to control the outcome of their case by exercising rights that can only have real meaning if they are informed of the necessary information upon which to make a decision. This reliance on formalistic and legalistic defenses to their conduct, although it is certainly Labaton's right to do so, is a troubling response from one of the nation's leading plaintiffs class action law firms in whom countless class members have placed their trust and confidence.

In addition to not disclosing the Chargois Arrangement to ATRS, the class representative, Labaton did not disclose it to the class itself in the Notice of Pendency of Class Action after the class was certified in August of 2016, or on its class action website where the fee petition was posted in September, nor at any other time. This fact raises one of the most challenging and tangled mixed questions of law and fact in the investigation, as the issue of whether Labaton had a duty to disclose the Chargois Arrangement and resulting payment to the class, at least as of the time the class was certified, is the subject of much uncertainty among courts, lawyers and academics and both the governing Federal Rules of Civil Procedure and ethics rules again provide no clear answer on the facts here. Among other reasons for this complexity are the facts that the certified class not only has rights to notice of a motion for award of attorney fees, and an opportunity to object to the fees, under Rule 23(h)(1) and (2), and also agreements that

affect settlement under Rule 23(e)(3), but also that the certified class is a client (at least

for some purposes) and class counsel have fiduciary obligations to the class as a client.

Beyond this, the nature of the certified class here presents further factual and legal

nuances because the certified class included class members which overlapped between

the classes alleged in the original "customer class" complaint and those in the two ERISA

cases that were consolidated by the court for pretrial purposes, *see* 11/19/12 Stipulation

and Motion to Stay, and Order, Dkt. # 62 [EX. 51], and each of the complaints proposed

different sets of class representatives.  While these three cases may have had overlapping

membership, the legal claims brought in the customer class case were grounded in state

law and were distinct from those in the two ERISA cases, which were grounded in that

federal statute.

In at least one instance, the court was reassured by class counsel that all of the

class members were their clients.  11/15/12 Lobby Conference Tr., Dkt. No. 64 [EX. 22].

In addition, during depositions, class counsel indicated that they viewed the ERISA class

members as their clients. *See* Chiplock 9/8/17 Dep. pp. 93:24 – 94:2 ("We had a

responsibility as class counsel to the class. And that included ERISA plans.") [EX. 41];

Goldsmith 9/20/17 Dep., p. 61:11-14 (How much of the settlement would go to ERISA

clients "was something that [DOL] were focused on. Of course, we were focused on it as

well because they were our clients.") [EX. 42].

The potential divergence of interests arising out of these facts, and others, are

myriad.  First, ATRS was formally the class representative for the entire certified

settlement class, while the ERISA class representatives had no specific standing as to the

certified settlement class. As noted, ATRS Executive Director George Hopkins was not told of the Chargois Arrangement or payment, so it cannot be said that the class had notice of it through him, even if he had authority to speak for the class on this issue, which is doubtful. But, he both testified in his deposition that he told Eric Belfi that he did not want to know about specific allocation of fees to other counsel and filed a declaration toward the end of the investigation both reiterating that he had told Belfi this and purporting to ratify post-hoc the $4.1 million payment to Chargois. *See* Hopkins 3/15/18 Declaration. [EX. 130]. (As discussed in the Conclusions of Law section, this raises some serious questions as to Hopkins' adequacy to serve as a class representative.)

However, the ERISA lawyers were not told anything about the Chargois Arrangement or payment either, and the potential for conflict here arises because a number of the counsel for the ERISA class members raised serious questions about the Chargois Arrangement and payment once they learned of it during this investigation. Lynn Sarko, counsel for the *Andover* class, said had he known of the Chargois Arrangement, he would have had to advise his ERISA clients and he believed they would have objected to it. Sarko 9/8/17 Dep., p. 75:18-19 [EX. 37]; Kravitz 9/11/17 Dep., p. 85:1-17. [EX. 117].

So, the question fairly arises as to what obligations Labaton, which knew the entire Chargois story and was class counsel, had to disclose it to the certified settlement class. Not surprisingly, the experts differ dramatically in their testimony. One expert, Professor Rubenstein, testified that Fed. R. Civ. Pro. 23(h) -- the Rule governing notice to the class of proposed attorneys' fees -- does not require disclosure to the class of the

341

Chargois Arrangement or payment in the class notice, and that the only information that must be provided to the class is the total aggregate fee award to the lawyers. Rubenstein 4/9/18 Dep., p. 181:7-13. [EX. 235]. Professor Rubenstein testified that the obligation to inform the class falls exclusively upon the Court, and not the class attorneys, because Rule 23(h) incorporates Rule 54(d)(2), and that Rule puts the entire burden of finding out about fee allocations upon the court because the obligation to tell the Court about fee allocations only arises, in Rubenstein's view, if the Court orders disclosure or specifically asks about them. Here, Professor Rubenstein opines that because the Court did not specifically ask the lawyers about the allocation of fees, there was no obligation under Rules 23(h) of 54(d)(2) to tell the court, and because of this, no obligation to provide notice to the class of the Chargois payment. *Id.,* p. 70:13-19.

In this context, Professor Rubenstein believes that the Court's specific statement in approving the settlement and the attorneys' fees that it was "Relying heavily the submissions and what's been said today," 11/2/16 Hearing Tr., Dkt. # 114, p. 35, is not sufficient to trigger the obligation to tell the Court anything about the Chargois payment. [EX. 78]. In the Conclusions of Law section, the Special Master has expressed his concern and frustration that Rule 23(e)(3), which requires that parties seeking approval of a settlement "must file a statement identifying any agreement made in connection with the proposal," and Rule 23(h), either taken separately or together, are apparently not sufficient to trigger a duty to disclose the Chargois payment, at least in the circumstances here, to the class, and that putting the entire burden on the court by requiring it to ask about fee allocation agreements is unsatisfactory and ignores the realities of class action

litigation. (The question of whether the attorneys had an obligation to tell the Court about the Chargois Arrangement and payment is the subject of discussion in the Conclusions of Law section and in the section below on class counsel's duties of disclosure to the Court.)

Beyond any obligations imposed under the Federal Rules of Civil Procedure, Labaton's other experts testified that class counsel had limited ethical duties to the class as a client, and that class counsel did not have an ethical duty to inform the class of the Chargois Arrangement or payment. Wendel 4/3/18 Dep., pp. 131:18 – 132:5. [EX. 229]. Another Labaton expert, Professor Peter Joy, testified that the disclosure and consent requirements of Rule 1.5(e) did not apply to "every individual class member ... Labaton had a fiduciary duty but not one that encompasses the fee-sharing arrangement." Joy 4/3/18 Dep., pp. 136:7-8, 154:12-14. [EX. 227]. Joy testified that this lack of duty applied equally to the ERISA class members to whom they owed no duty beyond the generalized duty owed to all class members to receive fair and equitable fees. *Id.*, pp. 178:24 – 179:12. This, of course, raises the question of whether in this context the Chargois payment was a fair and equitable fee.

Professor Gillers again disagrees. Although he does not find a duty to provide notice of the Chargois Arrangement or payment under the Federal Rules of Civil Procedure, he opines that the class members are clients (at least as of the class' certification in August 2016), and that counsel have fiduciary duties. He notes that class members were provided in the Notice information only that counsel would apply for fees not to exceed $74,541,250, that of this, fees for ERISA counsel will not exceed $10.9

million, and how fees for other counsel would be computed if the court awards the

requested amount. The class members were also told that additional fee information

would be posted on the case website (with the website address) as well as Labaton's

phone number, website and email address. Professor Gillers notes that the notice tells

class members they have a right to opt out or to object, and how to do so -- in fact, he

points out, at the August 8, 2016 hearing on preliminary approval, the Court specifically

said "As I understand it, counsel will seek up to 25 percent, roughly $76 million dollars,

of the common fund. The class members will have an opportunity to be heard on the

propriety of that." Gillers Supp. Report, p. 100 (quoting 8/8/16 Hearing. Tr., pp. 24:23 –

25:1). [EX. 233].

Professor Gillers points out that counsel's relationship to the class carried with it

heavy fiduciary duties to the class as clients under various Rules, and that these duties

included the duty to give their clients information relevant to a decision as to whether to

accept the settlement, or to object, or to opt out. Professor Gillers further observes that

while class actions do not always fit within the framework of ethical rules, these

situations are few and tailored, and also tend to be situations in which doing so favor the

class or a segment of it. He opines that these situations are not a reason to relieve class

action lawyers from ethical obligations that would benefit the class and supplement, not

contradict, duties to clients under Rule 23.

In finding duties to the class members as clients, Professor Gillers notes that class

counsel are fiduciaries for their clients as a matter of law, and as such, class counsel had a

duty to give their clients information relevant to decisions that belong to the client – and

344

that one of these decisions is whether or not to settle the case. In particular, Professor

Gillers finds instructive Rule1.4(a), which requires the lawyer to promptly inform the

client of any circumstance with respect to which the client's informed consent (as defined

in Rule 1.0(f)) is required. Rule 1.0(f) defines informed consent to be such information

from the lawyer that "communicated adequate information and explanation about the

material risks of and reasonably available alternatives to the proposed course of conduct."

Professor Gillers opines that the extraordinary circumstances of the Chargois

Arrangement and $4.1 million payment to Chargois triggered the legal rights of the class

members to object to the anticipated fee application, and that the class could rely upon

ATRS, as the class representative, and Labaton, as class counsel, to fulfill their fiduciary

duties to the class and protect their interests.

But, ATRS did not know about Chargois because Labaton did not tell it, and

Labaton did not independently put the Chargois payment information in the class notice

or on its class website. Nor did Labaton disclose to the ERISA Counsel anything about

Chargois so that they could inform their class representative clients, and Labaton did not

fully disclose the Chargois Arrangement and resulting payment to the other customer

class lawyers, Lieff and Thornton, so that they could have weighed in on the question of

whether to provide notice to the class members.

Given the true and complete circumstances here, the Special Master finds that the

Chargois payment would have been material information upon which at least some of the

class members may have based a decision to either object or opt out. In not disclosing the

information to the class members, or at least to all of the class counsel and class

representatives, the Special Master finds that Labaton as Lead Counsel for the class failed to meet its fiduciary duties to the class members as clients. In reaching this finding, the Special Master considers particularly significant not simply the size of the Chargois payment itself, or even the facts that Chargois did no work and contributed no value to the case, but also that the Chargois payment obligation preceded the *State Street* case and was Labaton's obligation alone and had no connection to the result achieved in the case.

However, given the lack of clarity and differences of opinion -- and the possible conflicts between class counsel's legal obligations under the Federal Rules of Civil Procedure and the applicable Massachusetts Rules of Professional Conduct -- the Special Master must again stop short of recommending to the Court that professional disciplinary sanctions or other formal action be imposed upon Labaton attorneys. Although the Special Master believes that Labaton breached its fiduciary duty to the class, the questions are simply too close to merit formal discipline, with all of the potentially harsh professional ramifications and consequences that may attend to such action. However, the fact remains that the class members were deprived of important and material information, and the Special Master finds that the failure to provide sufficient information to the class such that class members could make an informed decision about whether to agree to the payment to Chargois, or to object, or to opt out of the settlement, requires significant remedial measures to correct this serious flaw in the notice process.

The appropriate remedies for this conduct will be addressed separately.

### Recommended Legal Findings for Breach of Duties to Co-Counsel

In its role as Lead Counsel, Labaton failed in its duties of fairness, trustworthiness and transparency to its co-counsel, and this failure had serious and wide-ranging adverse ramifications for its co-counsel and class members.

The breaches of duty to its co-counsel spring from two separate but related sources. First, in its role as Lead Counsel, Labaton had a duty to act fairly, efficiently, and economically in the interests of all parties and parties' counsel. *In re Pharm. Indus. Average Wholesale List Price Litig.,* 2008 WL 53278, at *1-2 (quoting *Manual for Complex Litigation*, § 10.22, at 24 (4th ed.)) Although courts generally do not find a fiduciary duty between lead counsel and co-counsel, "lead counsel must meet a demanding standard of trustworthiness because the Court must rely on representations made by counsel." *Id.* By this responsibility, lead counsel should be expected to deal forthrightly and honestly with its co-counsel so that all counsel can discharge their responsibilities to class members and be fully informed themselves as they make decisions about their own fee allocations. By failing to disclose the Chargois Arrangement and payment to ERISA counsel, Labaton failed to provide sufficient information upon which ERISA counsel could act in the best interests of their clients, the ERISA class representatives, and in their own interest in negotiating their fees with Labaton and the other customer class counsel.

A second but related failure arises under settled principles of contract law. Apart from the principles of fairness and trustworthiness that accompanied Labaton's role as Lead Counsel, courts have recognized that contract principles also impose duties within a co-counsel relationship. *See, e.g., Sobran*, 148 F. Supp. 3d at 72; *Vita*, Mass. App. Ct. at

347

748-49; *Marks*, 174 Ohio App. 3d at 460; *Parker & Waichman*, 815 N.Y.S. 2d at 74. A basic element of contract law is the mutual assent of the parties to the essential terms of an agreement. *Enos*, 732 F.3d at 48-49. Although mere nondisclosure or silence by itself will generally not support a breach of contract action, where a party's assent to an agreement is induced by a material omission, a contract may be voidable where the parties' relationship creates legal or equitable obligations to communicate all relevant facts. *DeMarco*, 1993 Mass. App. Div. at *2. Here, as noted, Labaton was serving as Lead Counsel and the ERISA attorneys were not only co-counsel, but had their own clients to whom they owed obligations. In the context of this relationship, ERISA counsel were entitled to rely upon the forthrightness and fair-dealing of its Lead Counsel, Labaton. In not telling ERISA counsel about the Chargois payment, Labaton not only precluded ERISA counsel from fully informing their clients, it prevented them from making fully informed decisions about their own fee allocations in their negotiations with the customer class counsel. Here, context is important. The $4.1 million payment to Chargois -- who performed no work and never appeared in the case -- was considerably more than any ERISA law firm received.

That this omission by Labaton was material is borne out by Lynn Sarko's testimony that had he known of the Chargois payment, (1) he would have had to advise his client representatives, and he believes they would not have agreed to it, Sarko 9/8/17 Dep., p. 75:18-19; and (2) he would not have agreed to the fee allocation agreement limiting the ERISA attorneys to 9% (later 10%) of the total fee. [EX. 37]. Beyond this, Labaton knew that the payment to Chargois would be material to the ERISA attorneys.

Even long after the fee allocation agreement between the customer class and ERISA attorneys was made, Labaton was at pains to make sure the ERISA attorneys still did not know about the Chargois payment. In an email about the claw-back letter in November 2016, Larry Sucharow directed that separate letters be sent to customer class counsel and ERISA counsel, saying "Need two letters with breakdown, ERISA just gets sent to ERISA counsel with 10 percent off the top and then a third each.  Class co-counsel get one with ERISA 10 percent off the top, Damon's percentage also off the top, and each of class co-counsel split with the percentages agreed to.  *In short, no reason for ERISA to see Damon's split.  They only need to see their 10 percent and then split three ways.*" TLF-SST-012272 – 2274 (11/22/16 Sucharow email to Goldsmith, G. Bradley, Keller and Belfi). [EX. 160]. This reflects Labaton's own knowledge that the $4.1 million payment to Chargois would be significant to the ERISA attorneys as to their own fees.

Labaton's omission had another important ramification that speaks to its materiality. As noted, Sarko was the ERISA attorney principally liaising with DOL, the governmental agency that had oversight responsibility for ERISA plans. Carl Kravitz was also involved with negotiating with DOL.  Defendant State Street was insisting on a fully global settlement with all interested parties, including DOL.  By not telling the ERISA attorneys about the Chargois payment, Labaton prevented them from fully informing DOL.  Both Sarko and Kravitz testified that had they known about the Chargois payment, they would have had to have told DOL.  In Sarko's view, this could have "blown up" the entire settlement. Sarko 9/8/17 Dep., p. 84:5. [EX. 37].

349

Beyond this, as set out in the Findings of Fact, the Settlement Agreement anticipated a cap of $10.9 million for attorneys' fees out of the $60 million of recovery for the portion of the settlement allocated to ERISA class members.  However, the ERISA attorneys received only $7.5 million of this $10.9 million allocation of ERISA recovery related attorneys' fees.  The remaining $3.4 million went to the customer class attorneys.  Although this is not directly related to the material omissions related to the Chargois payment, it is a measure of what the ERISA attorneys might well have expected and negotiated for had they known of the Chargois payment.

Beyond its dealings with ERISA Counsel, Labaton was not fully forthright and transparent with its Customer Class co-counsel.  Bob Lieff, who was the participant from the Lieff firm involved in agreeing to share the Chargois obligation equally among the three customer class firms, testified that he was led to believe that Chargois was performing all of the work and services local counsel routinely do.  Lieff 9/11/17 Dep., p. 58:18-24. [EX. 139]. Lieff further testified that he did not know that the Chargois payment grew out of a pre-existing obligation that Labaton had to Chargois that pre-dated the State Street case.  *Id.*, pp. 73:14 – 74:3.  He further testified that had he known that Chargois did no work and provided no value to the case, he would not have agreed to share the $4.1 million payment. *Id.*, p. 97:13-16. Lieff also testified that if he had known the history of the Chargois payment, he would have encouraged Labaton to inform the Court. *Id.*, p. 97:14-16.

Lieff's testimony is supported by a significant amount of contemporaneous evidence the nature of emails between Labaton, Lieff and Thornton and other

correspondence in which Chargois is consistently referred to as "local counsel" or "the

local." *See e.g.,* LBS025771 (4/24/13 "Dublin email" referring to Chargois as "the local

counsel who assists Labaton in matter involving Arkansas Teachers Retirement System)

[EX. 140]; TLF-SST-040617-0618 (Bradley email to Lieff and Thornton regarding fee

discussions with reference to "Arkansas local") [EX. 147]; TLF-SST-053117-3126

(email referencing payments to ERISA Counsel and "local Arkansas counsel"). [EX.

151].  Labaton never corrected this mischaracterization, and given the fact that it was

consistently made in the context of persuading Lieff to share in the $4.1 million Chargois

obligation, this clearly constitutes a materially misleading misrepresentation of the true

and complete story behind the Chargois payment obligation.

In each of these instances of material omission and misrepresentation, contract

principles require that the respective agreements be voided and that the parties' rights be

adjusted. These contract principles not only stand on their own, but also inform a court's

equitable authority, and given the factual underlayment here, a court could be expected to

reform a contract to meet the parties' reasonable expectations.  Thus, to the extent pure

contract law principles may not supply a complete legal remedy, equitable principles do.

In order to achieve a just result, the Special Master recommends a three-fold

finding: (1) that in agreeing to the fee allocation, the ERISA attorneys were materially

misled by the omission of the Chargois payment (and its history) and that their share of

the fee award should be increased; (2) because it has been well established beyond any

question in this investigation that the ERISA attorneys bore no responsibility for either

the double-counting on the customer class firms' lodestar petitions or the payment to

351

Chargois -- and, in fact, were intentionally kept in the dark about the payment to

Chargois by Labaton --  the ERISA attorneys should receive reimbursement for having

been dragged into this investigation through no fault of their own; and (3) in view of all

of the history recounted herein, the Special Master recommends that any obligations the

ERISA attorneys may have had to Labaton under the claw-back letter be abrogated and

that the claw-back letter be declared void as to the ERISA attorneys.

As to Lieff, the appropriate resolution is more complicated.  On the one hand,

Lieff agreed to share in the Chargois payment and at least knew about Chargois, albeit

not the full state of affairs.  On the other hand, the Special Master believes that Lieff was

misled into agreeing to share in the Chargois payment.  Ordinarily, some recompense

would be in order for this.  However, at oral argument, Lieff's counsel (and the firm's

General Counsel), Richard Heimann, when asked what if any relief he was seeking,

indicated he was not looking for any repayment.  (However, Bob Lieff, who was present

at the oral argument, but apparently is no longer a member of the firm, thought there

should be a payment back to the Lieff firm.)  In view of all of these factors, the Special

Master believes that the fairest result for the Lieff firm would be for it to be relieved of its

obligations to Labaton under the claw-back letter as to Chargois, but no more.  However,

as addressed in the section on remedies for the double-counting, Lieff's own emails, and

the deposition testimony of its lawyers, indicate that Lieff shares responsibility for the

inadvertent mistake, and that part of the remedies will be dealt with separately.

The Thornton firm presents an even closer, more complicated, question.  Although

the evidence supports Mike Thornton's testimony that he, too, believed that Chargois was

serving as Labaton's local counsel and providing some service, Garrett Bradley's testimony to the same effect simply cannot be credited. As the Special Master has found elsewhere, and for the reasons set forth, Garrett Bradley knew most if not all of the history behind the Chargois payment and knew he performed no work on the case. But Garret Bradley was also serving as Of Counsel to Labaton.

In the end, the responsibility for Chargois must be Labaton's alone. They initiated the relationship with Chargois, benefitted from it over the years, and they made the decision to conceal it from the client, the class, co-counsel and the Court. Accordingly, they must bear the costs of the remedy occasioned by the non-disclosure of the Chargois Arrangement and payment.

The precise remedies for this conduct will be set forth separately.

### Recommended Legal Findings for Breach of Duties to the Court

Previous sections of these Recommendations have detailed Labaton's failures in informing its client ATRS, the class, and its co-counsel of the Chargois Arrangement. However, Labaton's failure to disclose the Chargois Arrangement and payment to the Court is perhaps the most serious and far-reaching of all of its breaches of duty. Within the framework of our class action system, Courts have a fiduciary duty to the class members and serve as the final guardians of class members' rights. Particularly at the settlement approval stage, class counsel must assist the Court in performing that obligation to the class by providing it with all of the information necessary to discharge its fiduciary responsibilities.

As Lead Counsel here, Labaton had a legal and ethical duty to provide the Court with all the information it needed to make an informed decision as to the award of attorneys' fees out of the State Street settlement fund. This included disclosure of the identity of all attorneys -- including Damon Chargois -- who would be sharing in the award and what the share of each attorney would be. Labaton had a duty under the Federal Rules of Civil Procedure and the Massachusetts Rules of Professional Conduct, as well as under federal case law, to allow the Court to conduct this essential role in protecting class members. In failing to disclose the Chargois Arrangement to the Court, Labaton breached this duty.

The Federal Rules of Civil Procedure mandate full and accurate disclosures to the Court, including Fed. R. Civ. P. 23(e)'s requirement that the settlement be "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), and the guarantee that class members have the right to object to the settlement and to a settlement-related fee petition, Fed. R. Civ. P. 23(e)(5) and (h)(2). As with the right to object to the settlement itself, the right to object to a fee motion also means that class members must be given sufficient information to do so. Unfortunately, by not disclosing to the Court that $4.1 million of the settlement funds would be paid to an attorney who did no work on the State Street case, Labaton deprived the Court of information it needed to discharge its fiduciary obligations to protect the class's interests.

Professor William Rubenstein has opined in this case that Rule 23(h), by its incorporation of the procedures for making a claim for attorneys' fees under Fed. R. Civ. P. 54, places the burden on the Court to order disclosure of a fee agreement such as the

354

Chargois Arrangement, and, absent such a court order, that disclosure is not required. Professor Rubenstein places the entire blame for the non-disclosure of the Chargois payment in this case upon the Court because it failed to specifically inquire about fee agreements underlying class counsel's claim for an award of fees.

However, separate and apart from Rule 23(h) and its incorporation of Rule 54 procedures for making a claim for attorneys' fees, Fed. R. Civ. P. 23(e)(3) requires that "parties seeking approval of a class action settlement must file a statement identifying any agreement made in connection with the proposal." As explained in the *Manual of Complex Litigation*, this provision requires disclosure of agreements that may affect the interests of the class members by allocating money that they may have received elsewhere. *Manual of Complex Litigation*, § 21.631. [EX. 248].

In his treatise, Professor Rubenstein also recognized counsel's independent obligation of disclosure under Rule 23(e)(3). Section 15.12 of *Rubenstein and Newberg on Class Actions*, entitled, "Fee procedures at a class action's conclusion -- Disclosure of fee-related agreements requirement," first speaks to the (obvious) requirement to disclose any agreements as to fees when so ordered by the court. The Section goes on to recognize, however:

> [I]n addition to Rule 54's disclosure requirements, Rule 23(e) governing class action *settlement* -- not *fee* -- approval states that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the [settlement] proposal." (emphasis in original; footnote omitted).

*Newberg on Class Actions*, § 15.12. [EX. 236].

Although Rule 23(e)(3) references the settlement agreement itself,

Professor Rubenstein himself observed that

> given the broader language covering agreements "made in connection with the [settlement] proposal," agreements beyond the settlement agreement itself -- such as any agreements about fees -- may also fall within the purview of Rule 23(e). Courts generally do not read Rule 23(e)'s disclosure requirement as requiring disclosure of fee agreements among counsel on the ground that such agreements do not necessarily affect the class's interests. *There may be some cases where this reasoning is incorrect, as some agreements among counsel would impact settlement terms and hence should be disclosed to the class…Moreover, there is little obvious downside from transparency so not only should courts order disclosure of fee agreements under Rule 54(d)(2), but settling parties should also readily provide them under Rule 23(e) in any case.* (emphasis added)

*Id.*

The Special Master recommends that the Court find that this was such a case.

With its burden-shifting of Labaton's own pre-existing financial obligation to Chargois to

the class and co-counsel, the Chargois Arrangement affected the class's interests in this

case as it "allocates money that the class members may have received elsewhere," i.e., to

Damon Chargois. There was an undisclosed agreement to pay $4.1 million out of the

settlement funds -- funds that could otherwise be allocated to the class members -- to an

attorney who did no work on the case whatsoever. As previously noted, the obligation to

Chargois was Labaton's and Labaton's alone, and the payment to him, without disclosing

it to the Court, significantly and adversely impacted the Court's ability to protect the

class from an enormous payment for which the class received no value and of which the

class representatives were never informed. This created a potential conflict between

Labaton and the class, a conflict the Court could not protect the class against because it

was hidden from the Court.

In order to assist the Court in performing its fiduciary function to protect the interests of the class, Labaton was obligated to disclose to the Court its pre-existing agreement to pay Chargois this substantial amount of the settlement fund. The Special Master finds that, given the facts here, Labaton's failure to do so was in derogation of the duties imposed upon it by Fed. R. Civ. P. 23(e)(3).

Beyond Labaton's failure to disclose the Chargois Arrangement to the Court, the Special Master is further troubled by what can only be construed as misleading statements in its declaration seeking a fee award. As part of his Lead Counsel obligation in this case, Lawrence Sucharow of Labaton filed a "Declaration in Support of Plaintiff's Assented-To Motion for Final Approval of the Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and Lead Counsel's Motion for Award of Attorney Fees." *See* Dkt. No 104. [EX. 3]. In that Omnibus Declaration, in two separate places, at footnotes 2 and 6, Sucharow purports to identify all of "Plaintiffs' Counsel." In footnote 2, Sucharow identifies as "Plaintiffs' Counsel," his own firm, Labaton Sucharow, and "the Thornton Law Firm LLP ("TLF"), Lieff Cabraser Heimann & Bernstein LLP ("Lieff Cabraser"), Keller Rohrback L.L.P. ("Keller Rohrback"), McTigue Law LLP ("McTigue Law"), and Zuckerman Spaeder LLP ("Zuckerman Spaeder")", *id.*, note 2, p. 1. In footnote 6, Sucharow identifies Labaton Sucharow, Thornton, Lieff Cabraser, Keller Rohrback, McTigue Law, Zuckerman Spaeder, as well as, Beins, Axelrod, P.C. (which partnered with McTigue Law and Zuckerman Spaeder in representing the Henriquez plaintiffs); Richardson, Patrick, Westbrook & Brickman, LLC (former co-counsel for Henriquez plaintiffs); and Feinberg, Campbell & Zack, P.C. (local

counsel for McTigue Law in the Andover action). *Id.*, note 6, p. 41.  In Keller Rohrback's Declaration, Theodore Hess-Mahan of the Massachusetts firm of Hutchings Barsamian Mendelcorn LLP is identified as Keller Rohrback's local counsel.  Within Labaton's lodestar report attached as Exhibit A to Labaton's individual fee declaration at Dkt. # 104-15, Sucharow further identifies fees paid to an "of counsel," P. Scarlato (Paul Scarlato of Goldman Scarlato, a Pennsylvania law firm). [EX. 88].

On the surface, these Declaration statements could lead the Court reasonably to believe that these are all of the lawyers being paid from class funds.  However, there is one lawyer who was paid from class funds who is not mentioned anywhere in Sucharow's Omnibus Declaration, in Labaton's individual fee declaration -- which was also signed by Lawrence Sucharow -- or in Labaton's lodestar and reports annexed thereto.  That one lawyer is Damon Chargois.

Sucharow has admitted that he knew of the obligation to pay Chargois a portion of the State Street fee award at least as of 2015; the fee petition was filed on September 15, 2016.  The Special Master finds that this nondisclosure was considered and deliberate.

In deciding the amount of fee to award class counsel -- and to whom to award it -- the Court, as a fiduciary for the class, including unnamed class members, needed first to know -- and Sucharow and Labaton had a duty to tell it -- who would be participating in any fee the Court in its discretion might award from the class recovery and the basis for the claim.  By not disclosing the intended payment of $4.1 million to Chargois, Sucharow and Labaton kept the Court in the dark and denied it the very information it needed in order to decide how much of the settlement funds should go to counsel, and which

counsel, and how much should go to the class. As Professor Gillers observed, "Quite simply, until the Court made that decision, there was no fee to divide." Gillers Supp. Report, p. 97. [EX. 233]. The Court had the authority, as an exercise of its equitable power and fiduciary duty to the class, to deny any part of the recovery to Chargois, who never appeared and who did no work, and made no contribution whatsoever to the success of the State Street litigation, whose Arrangement with Labaton preceded the State Street case by several years, and to direct that the money intended for Chargois should instead go to the class. The Court, however, never had an opportunity to make that decision because of the material omission of Chargois from Sucharow's Declaration.

Given this background, the Special Master considered at length whether to recommend that Labaton's failure to disclose Chargois' role and the agreement to pay him $4.1 million in the fee petition should be sanctioned under Fed. R. Civ. P. 11. While at least one court of appeals has found that Rule 11 applies both to disclosures and omissions, the First Circuit has not, and, having considered other persuasive arguments and factors raised by counsel to Labaton, the Special Master recommends that no violation of Rule 11 in Labaton's non-disclosure of the Chargois Arrangement be found.

However, beyond the imperative for disclosure in the Federal Rules of Civil Procedure, the Massachusetts Rules of Professional Conduct required disclosure to the Court. Massachusetts Rule 3.3 imposes upon attorneys practicing in Massachusetts a "duty of candor toward the tribunal." Rule 3.3(a) provides in relevant part:

(a) A lawyer shall not knowingly:

(1) make a false statement of fact or law to a tribunal or fail to correct a false

statement of material fact or law previously made to the tribunal by the lawyer;

(2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or

(3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including if necessary, disclosure to the tribunal.

Comment 3 to Rule 3.3 makes clear that an attorney's failure to make a disclosure in an affidavit or in open court can be the equivalent of a misrepresentation within the purview of Rule 3.3(a).

That Sucharow had a duty to disclose the Chargois Arrangement to the Court is made even more clear by Comment 14A to Rule 3.3, which provides:

When adversaries present a joint petition to a tribunal, such as a joint petition to approve the settlement of a class action suit . . . the proceeding loses its adversarial character and in some respects takes on the form of an *ex parte* proceeding. The lawyers presenting such a joint petition thus have the same duties of candor to the tribunal as lawyers in *ex parte* proceedings and should be guided by Rule 3.3(d).

Mass. R. Prof. C. 3.3, cmt. [14A].

Proceeding from Comment 14A takes us to Rule 3.3(d), which provides:

(d) In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse. The standard applied to *ex parte* proceedings is applicable in the context of a joint petition to approve a settlement of a class action. See Cmt. 14A to Mass. R. Prof. C. 3.3.

For all of these reasons, the Special Master recommends the Court find that Sucharow deliberately concealed the Chargois Arrangement from the Court and thereby

denied the Court the opportunity to meaningfully carry out its fiduciary role and gatekeeping function to protect the interests of the class. Accordingly, it is recommended the Court find that Sucharow's concealment of this very relevant information violated Massachusetts Rule of Professional Conduct 3.3.

In addition to Rule 3.3 of the Massachusetts Rules of Professional Conduct, there is an overriding general duty of candor owed by attorneys as officers of the court. As noted by Professor Gillers, while "the phrase 'candor to the Court' is not an unbounded source of duty, entirely untethered to rules, custom, or case law. . . the word 'candor' should at least guide a lawyer's understanding of his or her duties as officers of the court." Gillers' Supp. Report, p. 88. [EX. 233].

This broad duty of candor has been recognized by the First Circuit, which, in *Pearson*, 200 F.3d at 38, cited the Fourth Circuit in *Shaffer Equipment Co.,* 11 F.3d at 457. In that case the court said, "[T]ruth is the object of the system's process…of dispensing justice…Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process."

It is for all of these reasons that the Special Master recommends that through his failure to disclose the $4.1 million Chargois Arrangement, the Court find that Sucharow violated his duty of candor as an officer of the court, and thereby denied the Court the opportunity to meaningfully carry out its fiduciary role and gatekeeping function to protect the interests of the class.

As stated in previous recommended findings as to the client, the class and co-counsel, it is recommended that the Court find that Labaton and Sucharow must bear the

sole responsibility for the non-disclosure -- and, in fact, the concealment -- of the Chargois Arrangement from the Court. The remedies for this breach will be set forth separately.

## RECOMMENDED REMEDIES AND SANCTIONS

Before detailing the recommendations to provide remedies and redress for the conduct identified in this Report, it is appropriate to provide a preamble as context. One of the most troubling elements of the Chargois aspect of the investigation has been Labaton's response to the discovery of the conduct revealed in the investigation: Quite simply, it is inappropriate and insufficient to the severity and pervasiveness of the conduct. There has been no acceptance of responsibility for the calculating and secretive nature of the conduct and its adverse ramifications. There has been no expression of contrition. There has been no expression of remorse. And, there has been no expression of apology to the client, to the class members, to co-counsel or to the Court.

Rather, Labaton has met the Special Master's inquiry into the Chargois Arrangement and the $4.1 million payment with a phalanx of experts, who together with Labaton, have erected a wall of legalistic and formalistic excuses and blame-shifting (largely to the Court). Although Labaton certainly has a right to present its best case -- and its arguments have been considered and, in some instances, used to inform the Special Master's findings and recommendations to the Court -- some acknowledgement of the potential harm this conduct has caused to class members, co-counsel and the Court would have been not only appropriate, but expected. Instead, Labaton and its experts have taken positions that speak only to its legal defenses, and not to what is in the best

interests of class members and the ability of courts to discharge their fiduciary responsibilities to the class. This approach is as disappointing as it is indicative of the culture of compartmentalization and concealment at Labaton that led to the Chargois Arrangement and its nondisclosure to the other participants in the case in the first place.

The remedies and sanctions recommended here will be delineated as they relate to specific conduct and the law firms associated with that conduct, as well as where the allocated funds will go.

**Double-Counting on the Customer Class Firms' Lodestar Petitions ($4,058,000)**

As indicated, with the exception of Garrett Bradley's Declaration statements, the Special Master has found that the mistakes made were largely inadvertent and the result of a combination of Labaton's internal compartmentalization (e.g., settlement attorney Nicole Zeiss not knowing anything about the agreement to share costs) and a lack of any formal agreement. Although the contemporary email traffic, the billing practices and deposition testimony all bear out that at least some of the lawyers at each of the three customer class law firms anticipated that Thornton would put the staff attorneys on its lodestar, and lawyers from each firm thought this was appropriate, other lawyers at the firms were not aware at all of an agreement to allow Thornton to put the staff and contract attorneys on its lodestar, and no one ever attempted to memorialize this, even in an email.

Having said the double-counting was inadvertent does not end the need for a remedy, however. The notion of including the employees of one firm on the lodestar petition of another firm is fraught with the danger of miscounting and misrepresentation

363

to the court, just as happened here.  The same cost-sharing could easily have been

achieved by a simple agreement to share costs in some equitable way, rather than by the

artifice of putting one firm's employees on another firm's lodestar petition. Further,

careful preparation of the fee petition documents by comparing the lodestar petitions of

each firm should have caught the mistake.

In the end, all three Customer Class firms must share the blame.  The remedy for

this is the disgorgement by all three firms in equal amounts of the entire approximately

$4,058,000 in double-counted time.  It is recommended that this entire amount be

returned to the class.

## Garrett Bradley's Sworn Declaration Statements

The Special Master has found that Garrett Bradley's statements in his sworn

declaration that accompanied the Thornton fee petition were knowingly false, that they

were motivated by a desire to greatly enhance the Thornton lodestar and thereby justify a

larger fee award, and that Bradley did not attempt to correct these statements, despite

numerous opportunities to do so, until directly called upon by the Court at the March 7,

2017 hearing.  The Special Master has found that these sworn declaration statements

violated both Rule 11 of the Federal Rules of Civil Procedure and Bradley's duty of

candor to the Court under Rule 3.3 of the Massachusetts Rules of Professional Conduct.

The Special Master has further found that the sworn statements were material and

contributed to the double-counting errors because, had Bradley made fully truthful

statements describing the actual relationship of the staff attorneys to Thornton, rather

than representing to the Court that they were Thornton employees and that their rates

were Thornton's current rates for them, it is likely that either or both Nicole Zeiss and/or the Court would have been alerted that something was amiss and the double-counting would have been caught.

For the falsity of the sworn declaration statements, the failure to come forward and correct them, and the impact it had on the fee proceedings, the Special Master recommends that significant monetary sanctions, and professional discipline be levied. As to monetary sanctions imposed under Rule 11, they are imposed against the Thornton firm (as provided by Rule 11) in a range of $400,000 to $1 million, approximately ten to twenty-five percent of the cost of the double-counting. As to the sanctions under Rule 3.3 of the Massachusetts Rules of Professional Conduct, these are individual and the Special Master recommends that Garrett Bradley be referred the Massachusetts Board of Bar Overseers for appropriate disciplinary proceedings. No additional monetary sanctions beyond those recommended for the violations of Rule 11 are recommended for the violations of Rule 3.3.

It is recommended that the monetary sanctions should be awarded to the class.

## Hours and Rates

The Special Master recommends that, with the relatively minor exceptions noted herein, the Court find that the hours and rates of the attorneys of each of the law firms for whom lodestar petitions were submitted to the Court are reasonable and accurate, and consistent with applicable market rates for comparable attorneys in comparable markets for comparable work. This includes the hours and rates for the staff attorneys employed by Labaton and Lieff, who by virtue of their experience, work and level of contribution to

the case, merit the rates that were ascribed to them on the lodestar petitions. Therefore, other than as noted below, the Special Master recommends that no adjustment be made in hours and rates.

**Michael Bradley:** The first exception to this recommendation is to the rate of Michael Bradley. As noted, although the number of hours Bradley recorded is supported by reasonably reliable contemporaneous records, his submitted rate of $500/hour is not supportable by his experience, the work he did on the case, or the value he contributed to the case, particularly in relation to the other staff attorneys. Rather, he had no experience relevant to the case and the work he performed was simple, straightforward, and unmonitored document review. Further, although he undertook the work with no certainty of payment, he performed the work fully on his free time and when it was convenient for him to do so. Therefore, his rate should be more at the level of a paralegal, supplemented by the fact of his law degree and experience as a lawyer. The Special Master recommends that Bradley's rate be set at half of the submitted rate, or $250/hour. Bradley recorded roughly 406 hours, thus yielding a total lodestar of $101,500. In addition, Thornton received a 1.8 multiplier on the original fee. Thornton should not be entitled to this additional benefit calculated on the higher rate, and, thus, its lodestar, on which claimed Michael Bradley's hours, should be reduced accordingly and the difference between the original fee value ($ 365,760, after multiplier) and the amount reflective of a more appropriate hourly rate of $250 ($182,880, after multiplier) returned to the class. In making this calculation, we give equal weight, and apply the same multiplier, to Michael Bradley's hours as we do any other attorney who worked on the case.

366

| Petition and Adjustment | Timekeeper | Rate | Hours | Lodestar Value | Multiplier | Total Fees |
|---|---|---|---|---|---|---|
| Original Petition | Michael Bradley | $500 | 406.4 | $203,200.00 | 1.8 | $365,760.00 |
| Appropriate Adjustment | Michael Bradley | $250 | 406.4 | $101,600.00 | 1.8 | $182,880.00 |
| | | | | | | To class: $182, 880 |
| Original Petition | Contract attorneys | $415, $515 | 2949.5 | $1,325,588.00 | 1.8 | $2,386,058.40 |
| Appropriate Adjustment | Contract attorneys | $50 | 2949.5 | $147,475.00 | (at cost) | $147,475.00 |
| | | | | | | To class: $2,238,583.40 |

**Contract Attorneys:** The next exception is the rates of the so-called contract attorneys. For all of the reasons set forth in the Report, the Special Master recommends that law firms not be permitted to be compensated for these attorneys at market rates and no multiplier should be granted on their hours and rates (if a multiplier is granted). Rather, the costs of the contract attorneys should be reimbursed to law firms as an expense, and the firms compensated for that expense dollar-for-dollar. The seven contract attorneys, all retained by Lieff, recorded 2833.5 hours in this role, at rates varying between $415 and $515. The total billings for contract attorneys was approximately $1.3 million ($1,325,588). In addition, a multiplier of 1.8 was added to

367

their hours and rates, yielding a total award of $2.4 million ($2,386,058) for the time of

the contract attorneys. This amount should be disgorged and returned to the class. The

Customer Class is, however, entitled to claim the contract attorneys as an expense

calculated at a more reasonable rate of $50/hour. The Special Master recommends that

the difference between these two figures also be awarded to the class.

### The Chargois Payment ($4.1 million)

As set out in this Report, because the Chargois Arrangement was solely Labaton's

obligation and because Labaton has profited handsomely over the years from the ATRS

relationship Chargois helped facilitate, and because Labaton is solely responsible for the

non-disclosure of this relationship to ATRS, the class, ERISA counsel and the Court, the

Special Master recommends that the appropriate remedy for the Chargois payment be

disgorgement of entire $4.1 million Chargois amount, and that this disgorgement be

solely the responsibility of Labaton.

Because the non-disclosure of the Chargois payment fell disproportionately upon

the ERISA attorneys, who were told nothing about Chargois and who were required to

negotiate their fee allocation without the knowledge that an attorney who performed no

work on the case, bore no risk or client responsibility and never appeared in the case

would receive an amount considerably more than any ERISA firm, the Special Master

recommends that ERISA counsel should receive the bulk of this award. The Special

Master recommends that the appropriate remedy for the non-disclosure of the $4.1

million is $3.4 million, an amount which reflects the difference between the $10.9 million

368

that was allocated as a cap for ERISA attorneys in the Settlement Agreement and the $7.5 million which the ERISA attorneys actually received. This amount is also supportable because it is the amount that went instead to the customer class counsel.

As further support for this $3.4 million reallocation remedy to the ERISA attorneys, the Special Master recognizes that this investigation has resulted in great expenditures of time and expense to the ERISA firms that have been drawn into it through no fault of their own, either as to the double-counting or as to the Chargois Arrangement. Normally, the Special Master would recommend that the ERISA attorneys submit their time and expenses incurred in having to participate in the investigation and recommend that the firms be reimbursed dollar-for-dollar. However, this would be a lengthy, time-consuming, and additionally burdensome process that would likely result in additional expense for these firms. Instead, in fashioning this recommended award, the Special Master has taken into consideration the time and expense incurred by the ERISA attorneys in participating in the investigation and believes that the recommended $3.4 million is sufficient to include the costs and expenses incurred by the ERISA attorneys in the investigation. Finally, the Special Master recommends that the $3.4 million be allocated amongst the ERISA law firms in the same proportion and in the same manner as the original fee award was allocated.

The $3.4 million award to ERISA counsel still leaves a balance from the $4.1 million of $700,000. The Special Master recommends that this amount should be allocated back to the class, which was deprived of its ability to make a determination as to whether to agree to the settlement which included the Chargois payment. In making

this recommendation, the Special Master notes that with the additional reallocations to

the class recommended here, the class will receive well more than an additional $5.5

million to $6 million beyond that which it would receive under the original settlement.

One of the most difficult decisions in arriving at recommendations for appropriate

redress and remedies for the Chargois conduct has been whether to recommend

professional disciplinary sanctions for Labaton.  In trying to strike a balance here, the

Special Master recognizes that formal professional disciplinary sanctions for a firm like

Labaton, which often represents public institutional investors with elevated standards of

conduct for their outside counsel, could dramatically and adversely impact the firm's

ability to provide legal services in its area of expertise, services which benefit both their

class clients and often the broader public.  Indeed, formal disciplinary proceedings could

spell the end of the firm.  Furthermore, as discussed in this Report, although the conduct

here was of a serious and sustained nature and worthy of strong redress, the Special

Master has noted that a number of the ethical and legal questions related to the conduct,

particularly as to the Chargois payment, have been close calls and not always susceptible

of easy resolution.  Beyond this, the Special Master has noted that Labaton, as Lead

Counsel for the class, helped to achieve a very laudable result for the class.

In weighing all of this in the balance, the Special Master believes that the

monetary remedies recommended to address the Chargois conduct are proportionate and

sufficient, and the more extreme step of recommending professional disciplinary action

against Labaton and some of its lawyers is unnecessary to fulfill the objectives of what

punishment should be in any case, which is sufficient to provide a measure of punishment

for the conduct, deter future conduct by both Labaton and other law firms, and cure any

harm arising from the conduct, but not so extreme as to be disproportionate to the cause.

The Special Master believes that a recommendation of professional disciplinary action,

with its potential for bringing an end to the firm, would be a step too far. For these

reasons, the Special Master recommends that no professional disciplinary action be taken.

### Jurisdiction to Resolve Disputes Stemming from the Special Master's Recommendations

As between Labaton and Chargois, the Special Master takes no position as to how

Labaton and Chargois should adjust their rights in light of the Special Master's findings

and conclusions, and recommends that the Court not intervene.  Although the Special

Master believes that the underlying agreement between Chargois and the Labaton firm

was questionable from its inception and holds the possibility of problems in the future,

those issues should be left to be worked out, or adjudicated, among those parties.

The Special Master recommends that any disputes between the law firms or that

involve the class that may arise out of the Special Master's Report should be subject to

the continuing jurisdiction of this Court.  The reasons for this are clear.  The conduct that

is the subject of this investigation took place in a case before this Court and the

investigation and resulting Report and Recommendations of the Special Master was done

at this Court's initiative and under this Court's supervision. Beyond this, if any dispute

touches on the rights of members of the class, this Court has an ongoing fiduciary duty to

the protect the class's interests. Given the lengthy history of this case and these

considerations, this Court is in by far the best position to adjudicate any resulting disputes.

## Other Related Remedies and Issues

**Costs of the investigation:** Other than the allocation to the ERISA attorneys which is intended to include and cover their costs and fees incurred in this investigation, the customer class firms must each bear their own costs and fees for the investigation.

Although the Special Master is recommending that no professional disciplinary action be administered beyond Garrett Bradley, there nonetheless remains concern about future conduct by both Labaton and Thornton. The conduct uncovered in this investigation has not only been serious, it is endemic to the way these two firms have done business with their hyper-focus on business development and fee generation. In the case of Labaton, its almost obsessive secrecy and compartmentalization of responsibility -- with one part of the firm being completely in the dark about what another part of the firm is doing -- is in great measure what brought us to this investigation. Beyond this, its aggressive tactics in effectively hiring people to go out and solicit business, and paying them a finder's fee not only for a single case, but as a floating lien on all future cases, is disturbing in what it may portend for the practice of law. Further, although Labaton seems to have a competent General Counsel in Michael Canty (and, before him, Michael Stocker), they are not expert in the Rules of Professional Conduct. But, even if they were, Labaton attorneys apparently do not routinely consult with their General Counsel on ethics issues.

372

Thornton does not even have a General Counsel, much less an in-house lawyer well-grounded in the Rules of Professional Conduct. Further, Thornton has no established system or requirements for contemporaneous time-keeping so as to assure contemporaneous, accurate time-keeping. Nor does it have a process in place to evaluate, on a regular basis, and adjust if necessary, the firm's rates, unlike the other firms. As to its business development practices, Thornton lawyers appear to be largely unsupervised and unconstrained by the professional conduct norms. If Thornton is to continue to practice in large scale national class action cases, it needs to adopt policies and practices to ensure that it does not exceed professional conduct boundaries.

Going forward, both of these firms require someone from the outside to consult with them on professional conduct norms and to ensure that they comply with those norms. Whether the Court has the authority to order such a measure beyond this case is uncertain. However, both firms, and their clients, would greatly benefit from the imposition of on-going ethics supervision. The Special Master recommends that the two firms work with the Court to establish a consulting process that will ensure consistent ethical compliance. The Special Master notes that, according to a letter from counsel dated April 30, 2018, Labaton has already taken steps in this direction, and has taken additional steps to address the kinds of conduct that arose in this case. The Special Master recommends that Labaton continue its progress and take additional steps to build on these efforts.

## Lessons Learned and Best Practices for the Future

This investigation has been a laborious, protracted, and painful process for all involved. But, beyond the remedies recommended here, it will have been a worthwhile undertaking if several lessons can be learned from the investigation and principles established for best practices in large class action cases. The Special Master sets out a number here, which are not intended to be an exhaustive list.

First, it appears everyone agrees that the practice -- to the extent anyone else did it -- of sharing costs by allocating attorneys to other firms who are not their employers and putting employees from one firm on another firm's lodestar petition is a recipe for confusion and mischief. While the need to share costs and the concomitant risk according to some formula in these large and protracted class actions is apparent, there are myriad ways this can be accomplished, just as there are ways to fairly share fees without allocating another firm's attorneys to a different firm as a means of "jacking up" that firm's lodestar petition.

Next, the practice revealed in this case of retaining a person to open doors to clients and then paying that person a percentage of every future case, whether or not that person does any work on a case or performs any services for the client, is unseemly and a violation of ethical rules -- even if that person happens to have a law degree. As observed elsewhere, it amounts to paying a finder's fee and providing that finder a floating lien on every case. Hopefully, this investigation will make clear the dangers to

374

the profession in these types of arrangements and these will cease to be an acceptable part

of business development in our profession.

The Special Master here is admittedly an outsider to Massachusetts law practice

with its own unique history and traditions.  However, the practice of "bare referrals" –

permitting a lawyer to receive a referral fee for doing no work and having no attachment

to the case or the client -- seems to invite abuses such as the ones found here which blur

the lines between legitimate referrals that promote the retention of more competent

lawyers and those which cross the line to outright solicitation.  One step that might be

helpful would be if the Massachusetts Board of Bar Overseers and Massachusetts courts

were to make clear that Rule 7.2(b) applies to lawyers and that lawyers cannot receive

"fees" from other lawyers simply for recommending a lawyer, unless there were a valid

agreement under Rule 1.5(e) consented to in writing by the client after being fully

informed.

## Final Thoughts on Remedies

The Special Master recognizes that not everyone will agree with the remedies and

sanctions recommended here.  Some may say they were overly harsh, given the result in

the underlying case and that the conduct revealed here was largely only about how money

was to be divided up among lawyers in a successful case.  Further, the Special Master

anticipates that the law firms and lawyers most rigorously redressed will likely disagree

with at least some of the findings and recommended remedies.

375

On the other hand, the Special Master also recognizes that others may feel the recommended remedies do not go far enough to address some of the more egregious conduct. These people may criticize the recommendations by pointing out that even after the imposition of the monetary remedies recommended here, the Labaton, Lieff and Thornton law firms will still be left with not only their base lodestar claim, but a substantial multiplier. The Special Master calculates that even after the allocation of all monetary amounts, and the costs of the investigation, the customer class firms will still receive its base lodestar plus a significant multiplier. Beyond this, some will no doubt point out that even with all of the questionable conduct here, the total reduction in fees for the firms is only roughly 12%. To the man on the street, this may seem insufficient redress for the conduct identified. And, no doubt some observers will criticize the recommendations here for not recommending additional professional disciplinary action beyond that which is recommended here. These critics may well say that the Special Master has given a pass to some of the lawyers for some of the conduct by not recommending more extensive disciplinary action.

In response, the Special Master would point out that the intent here has been to identify true and unmistakable professional misconduct, to remedy wrongs and to put the law firms and the class roughly in a position that is proportionate to the conduct and the harm. In this context, the Special Master notes that the recommendations here, if followed, would return in a range of approximately $7.4 to $8.1 million to the class. Beyond this, the Special Master would remind critics that, despite the questionable conduct, the result achieved for the class was a very good one and that the lawyers

376

deserve great credit for that.  The fact that the customer class lawyers retain a multiplier on top of their lodestar is an appropriate measure of their work on the case and the result they achieved.

_____
Hon. Gerald E. Rosen (ret.),
Special Master

DATED:  May 14, 2018