## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**ARKANSAS TEACHER RETIREMENT SYSTEM,**
**on behalf of itself and all others similarly situated,**

              **Plaintiff,**            **No. 11-cv-10230-MLW**
                                          **Hon. Mark L. Wolf**

**vs.**

**STATE STREET BANK AND TRUST COMPANY,**

              **Defendant.**
_____/

**ARNOLD HENRIQUEZ, MICHAEL T. COHN,**
**WILLIAM R. TAYLOR, RICHARD A.**
**SUTHERLAND, and those similarly situated,**

              **Plaintiffs,**            **No. 11-cv-12049-MLW**

**vs.**

**STATE STREET BANK AND TRUST COMPANY,**

              **Defendant.**
_____/

**THE ANDOVER COMPANIES EMPLOYEE**
**SAVINGS AND PROFIT SHARING PLAN, on**
**Behalf of itself, and JAMES PEHOUSHEK-**
**STANGELAND and all others similarly situated,**

              **Plaintiffs,**            **No. 12-cv-11698-MLW**

**STATE STREET BANK AND TRUST COMPANY,**

               **Defendant.**
_____/

## EXECUTIVE SUMMARY

## SPECIAL MASTER'S REPORT AND RECOMMENDATIONS

## **Introduction**

This investigation, conducted in the post-settlement phase of the case, has raised a number of significant issues that are important to the conduct and administration of large class actions generally and this case in particular. Among these issues are the appropriate rules and policies governing attorney fee petitions, the approach plaintiffs' counsel use in their fee petitions -- including appropriate billing rates -- and the obligations of lead counsel to act with candor and transparency toward their clients, the class, the Court, and co-counsel, in general, and as to any financial obligation that will be paid from class funds in particular. After a lengthy investigation, the Special Master finds that in several significant areas, the Court was not provided accurate and reliable information in the fee petitions and at the fairness hearing and, unfortunately, these failings had profound and adverse ramifications throughout the fee approval process. The redress the Special Master recommends at the conclusion of the Report is intended, to the extent possible, to remedy these failings.

At the outset, the Special Master makes two observations. First, the Special Master recognizes the important role class actions and plaintiffs' class action attorneys play in protecting and enforcing the rights of consumers, injured parties and the public in general. To adequately fulfill this role, class action plaintiffs require sophisticated, well-resourced attorneys who should be compensated at rates comparable to those of the large, sophisticated, well-resourced defense firms who will in the vast majority of cases be opposing them. Second, an equally important part of the class action framework is ensuring the integrity of the fee petition process. Because the fee petition process is often

2

non-adversarial, as it was in this case, for the system to work properly, honesty, reliability and transparency are essential to enable the Court to adequately fulfill its assigned gatekeeping and fiduciary responsibilities to class members. This case and the evidence adduced during the Special Master's investigation fully exemplifies the importance of both of these policy objectives.

The underlying case here was a class action alleging unfair and deceptive practices in conducting complex foreign exchange transactions and required highly skilled and sophisticated counsel. After much work, dedication and exceptional effort in the discovery and mediation process, the parties ultimately reached a $300 million settlement. Given the risks, complexities and legal challenges inherent in the litigation, it must be said that the $300 million settlement, procured by skilled and dedicated plaintiffs' counsel, was an excellent result for the class. The Court approved the settlement on November 2, 2016. Of the $300 million, plaintiffs' counsel were awarded $74,541,250.00 in attorneys' fees and $1,257,699.94 for expenses. By itself, this attorneys' fee award was not disproportionate or unsupportable when measured against the positive result for the class and the attorneys' effort and skill that was required to achieve it. Indeed, all other things being equal, the attorneys' fee award was fair, reasonable and deserved.

Unfortunately, this investigation has shown that all other things were not equal. Almost immediately after approval of the settlement, the laudable result obtained for the class became tainted when questions began to arise as a result of media inquiries concerning the fee award which, in turn, caused the Court to appoint a Special Master to

3

investigate and prepare a Report and Recommendations concerning all issues relating to the attorneys' fees, expenses and service awards the Court had approved in the case. The Special Master's investigation has spanned a period of some fourteen months and encompassed written discovery, the production of approximately 200,000 pages of documents, 34 witness interviews and 63 depositions. Beyond this, the law firms that were the subject of the investigation were given extensive opportunities to contribute to the legal and factual record through briefing, providing expert opinions and oral argument, input which was helpful to the Special Master in obtaining a more complete view of the factual, legal and ethical issues raised in the investigation.

The investigation is now complete. The Special Master's Report and Recommendations detail a mixed narrative of good intentions, great talent, and undeniable accomplishment and result, undermined by serious albeit inadvertent mistakes compounded by a troubling disdain for candor and transparency that at times crossed the line into outright concealment of important material facts, including the payment of an enormous amount of money from class funds to a lawyer who never appeared in the case, did no work on the case, and whose identity was intentionally hidden from the clients, the class, co-counsel and the Court.

Exacerbating matters is the fact that this payment grew out of an obligation that long pre-dated the *State Street* case and was the sole obligation of one law firm -- an obligation that this law firm shifted to the class and to its co-counsel.

In short, this Report chronicles a lamentable and dismaying tale of a great result achieved by fine and highly effective lawyering that became tainted and entangled in a

4

web of concealment and highly questionable ethical practices by experienced attorneys who should have known better.

Having heard and considered the testimony of the witnesses, many of whom were designated as experts, and the arguments of counsel, and having reviewed and considered the parties' interrogatory responses, the documents they produced, and their supplemental submissions, the Special Master makes his Findings of Fact, Conclusions of Law, and Recommendations to the Court. To the extent that any Findings of Fact constitute Conclusions of Law, they are adopted as such. To the extent that any Conclusions of Law constitute Findings of Fact, they are so adopted.

## <u>Overview of the Procedural Background</u>

The underlying complex class action began as three separately-filed class action complaints against State Street Bank and Trust Company ("State Street") that were subsequently consolidated for pretrial purposes. Each of the actions alleged that State Street, as the custodian to individual institutional investors and pension fund accounts, engaged in unfair and deceptive practices in conducting "indirect" or "standing instruction" foreign currency exchange ("FX") transactions on behalf of its customers, without disclosure to its clients that these trades generated mark-ups that inured to the benefit of State Street. Following extensive discovery, resulting in document review of millions of pages of materials, coordinated with a protracted mediation process, all parties, including the governmental agencies, reached a global settlement of $300 million.

At the preliminary approval hearing on August 8, 2016, the Court certified a class for settlement purposes. The settlement class consisted of both institutional investors

who had accounts with Defendant State Street, the class representative of which was the Arkansas Teachers Retirement System ("ATRS"), (the so-called "customer class"),  as well as institutional accounts representing ERISA pension plans whose accounts were held for investment by State Street, the class representatives of which were Andover Trust and four individuals, (the so-called "ERISA" class).[1]  The Court had previously consolidated these separate actions for pretrial purposes, including discovery conducted concurrently with mediation (the "Hybrid Mediation"), which contributed greatly to the global settlement.  In addition to the class members, the global settlement included several governmental agencies which had become involved with, although never formally intervened in, the *State Street* case, including the Department of Labor ("DOL"), the Securities and Exchange Commission ("SEC") and the Department of Justice ("DOJ"). Labaton, Sucharow LLP ("Labaton") had previously been designated Lead Class Counsel; separate lead counsel was not named for the ERISA portion of the settlement class, although in important ways, three law firms – Keller Rohrback, Zuckerman Spaeder, and McTigue Law -- performed what were essentially lead counsel functions for the ERISA "class."

At the November 2, 2016 fairness hearing, the Court approved the $300 million settlement for class members, as well as an award to all Plaintiffs' counsel of attorneys' fees.  The attorneys fee award was based upon a Fee Petition submitted to the Court and

---

[1] The parties have at times colloquially referred to these two groups as the "Customer Class" and the "ERISA Class," and they had separate counsel representing them.  However, they were never formally divided into separate classes or sub-classes, and were combined into a single settlement class for purposes of the fairness hearing and approval of the settlement and attorneys' fees.

supported by separate sworn declarations for all Class Counsel.   The lodestar petition

submitted by Plaintiffs' counsel claimed a total of 86,113 hours for nine law firms, and

set out a lodestar claim of $41.3 million at the fairness hearing.   Based upon

representations made in the Fee Petition and at the fairness hearing, the Court awarded

approximately $74.5 million in attorneys' fees, finding that award to be fair and

reasonable using the percentage of fund method and cross-checking it against the lodestar

value. The fee represented 24.8% of the total $300 million settlement fund.  The total fee

reflected a multiplier of 1.8 times lodestar, which the Court specifically found to be

reasonable.  The Court also awarded expenses of $1.2 million, including service awards

to the plaintiff class representatives in an amount totaling $85,000.

By all accounts, the class settlement provided an excellent result for the class

members and was a product of the highly dedicated and professionally skilled work of the

class' law firms, a view with which the Special Master wholly agrees.  Unfortunately,

this laudable result for the class became tarnished when reports of irregularities in the

attorneys' fee petitions began to surface shortly after approval.  Following media

inquiries to Plaintiffs' Counsel, on November 10, 2016, the Court received

correspondence signed by Attorney David Goldsmith ("Goldsmith") of Labaton on behalf

of the plaintiffs firms which revealed that the Fee Petition and accompanying

submissions of a number of Customer Class Counsel law firms, contained "certain

quantitative inaccuracies," essentially double-counting more than 9,300 hours of "staff

attorneys'" ("SA's") time totaling over $4 million in lodestar fees for attorneys involved

in the document review process.  This occurred because the same hours for the same staff

7

attorneys were claimed on the lodestar reports of Customer Class firms Thornton Law Firm ("Thornton"), on the one hand, and either Labaton or Lieff Cabraser ("Lieff"), on the other hand.   Goldsmith indicated in his letter to the Court that these inaccuracies were discovered "in the course of internal reviews conducted in response to a media inquiry," and that this double-counting was inadvertent.[2]   Goldsmith Ltr Nov 10, 2016 to Hon. Mark L. Wolf.

Shortly thereafter, the *Boston Globe* reported on the "double-counting" issue addressed by Goldsmith, but also raised additional questions about the accuracy and reliability of the attorneys' fees, including issues regarding the rates charged for the staff attorneys and the "contract attorneys" (or attorneys booked through private agencies (referred to herein as "agency attorneys") as well as the  work in the case by the brother of Thornton managing partner Garrett Bradley, Michael Bradley -- who was not employed by Thornton -- including the $500 per hour rate at which Michael Bradley's work was included in Thornton's lodestar.

On February 6, 2017, the Court responded by issuing an Order indicating it was considering the appointment of a Special Master to inquire into these reports.  Following a hearing on March 7, 2017, the Order entered on March 8, 2017 appointing retired

---

[2] The letter did not attempt to explain how or why the double-counting had occurred -- only that it had occurred and that it was inadvertent.

federal judge Gerald Rosen as Special Master[3] to investigate and prepare a Report and

Recommendations as to:

> the accuracy and reliability of counsels' fee petitions;  (2)  the accuracy
> and reliability of representations made in David Goldsmith's November
> 10, 2016 letter to the Court; (3) the accuracy and reliability of
> representations made by parties requesting service awards; (4) the
> reasonableness of attorneys' fees, expenses, service awards previously
> ordered and whether any of them should be reduced; and (5) whether
> any misconduct occurred in connection with the award of attorneys'
> fees, and if so, whether such misconduct should be sanctioned.  Court's
> March 8, 2017 Order, pp. 2-3.

The Special Master has conducted his investigation consistent with the March 8th

Order and with the Court's mandate firmly in mind.  The investigation has consisted of

discovery interrogatories, reviewing approximately 200,000 documents relating to the

attorney fees petitions, conducting 34 witness interviews and 63 depositions of Class

Counsel, class representatives, staff attorneys, expert witnesses and others involved in

this matter.  Pursuant to the authority of the Court's Order, the Special Master engaged

William F. Sinnott of the firm of Barrett & Singal as his counsel, attorney John

Toothman as a technical advisor and ethics expert Professor Stephen Gillers.

Unfortunately, the Special Master's investigation revealed additional serious

issues beyond the double-counting disclosed to the Court by the Goldsmith letter and

those raised by the *Boston Globe*, but which clearly fall within the scope of investigating

the reasonableness of the award of attorneys' fees and the accuracy and reliability of the

fee petitions, and are therefore included in this Report.  The most significant of these

---

[3] Judge Rosen was appointed without objection by any of the law firms.  One firm, the McTigue Law Firm, initially filed an objection to the appointment of Judge Rosen as Special Master, but withdrew the objection at the March 7, 2017 hearing.

9

issues, as will be discussed later in this summary, arises out of the nondisclosure of a $4.1 million payment made to a lawyer in Texas who never appeared in any way in the *State Street* docket and performed no work whatsoever on the case. The discovery of this concealed financial obligation, several months into the investigation, drove much of the remaining investigation and culminated in expert reports and testimony[4] implicating very serious questions of class action law, ethical obligations owed both among counsel and to the Court, and fundamental concerns about how Courts should be assisted by class counsel in fulfilling their fiduciary obligations to the class.

The overall investigation has revealed that the above-referenced inaccuracies, mis-statements and omissions of material facts were, in varying degrees, the responsibility of particular Customer Class firms and counsel, with some counsel -- particularly the ERISA lawyers -- bearing no responsibility for any of the inaccuracies, misstatements or omissions to the Court. Because each of the three Customer Class law firms bears widely varying degrees of responsibility for these deficiencies, the relative culpability of the Customer Class Counsel is addressed separately below. This summary next provides an overview of the Findings of Facts, Conclusions of Law and the Special Master's Recommendations, all of which are discussed in detail in the body of this Report.

### Summary of the Special Master's Findings, Conclusions and Recommendations

As a starting point, the Special Master finds that, unfortunately, the Court was not provided accurate and reliable information in the Fee Petition and at the fairness hearing

---

[4] Reports and testimony were submitted by one expert retained by counsel for the Special Master and by eight experts retained by counsel for the customer class law firms.

in several key areas with respect to the attorneys' fees. As this was a fully consensual settlement with no objectors and with the defendants playing no adversarial role, the accuracy, reliability and completeness of the information provided to the Court in the fee petitions and at the fairness hearing was absolutely essential in order for the Court to properly and fully exercise its gatekeeper function to protect the class members, to whom the Court owes fiduciary duties under established law. *See Bezdek v Vibram, USA,* 809 F. 3d 78 (1st Cir. 2015). In this context, the Special Master's Findings and Conclusions are made more complicated and nuanced because, in varying degrees, the assorted categories of inaccuracies, misstatements and omissions were the responsibility of different Class Counsel firms.

As noted, some Class Counsel, including the ERISA counsel, bear no responsibility whatsoever for any of the inaccuracies, misstatements or omissions – and, indeed, were themselves the unknowing object of certain omissions -- while other firms bear different levels of responsibility for different aspects of the inaccuracies, misstatements and omissions. For example, Labaton, in its role as Lead Class Counsel, must bear particular responsibility for the misstatements as to the double-counting, although its responsibility on this issue is somewhat mitigated by the fact that the double-counting was unintentional and inadvertent, as Labaton's error was largely limited to failing to catch the duplication of the hours in the lodestar petitions of Labaton, Thornton and Lieff. Having said this, Labaton cannot be absolved of primary responsibility as it was Labaton's responsibility to ensure the accuracy of its Declaration and of the contributing declarations of the other firms in its role as Lead Counsel.

11

However, and much more troubling, Labaton failed to disclose to its client, to the class, to the Court, to the ERISA clients and counsel, and to the government regulatory agencies, that a significant portion of the attorneys fee award from the settlement fund would be paid to a lawyer in Texas who never appeared in the case, performed no legal services whatsoever, and whose existence was unknown to anyone beyond a few lawyers with the three customer class firms.[5]  This payment derived from a contractual obligation Labaton incurred to this lawyer years before the *State Street* litigation commenced, an obligation which had nothing to do with the *State Street* case and which provided no value to the class or co-counsel.  This obligation, which the three Customer Class firms later agreed would "come off the top" of the attorneys' fee award, along with the payments to the ERISA law firms and, would be shared equally among them upon settlement of the *State Street* case, resulted in this attorney, Damon Chargois, receiving 5.5 percent of the entire attorneys' fee award, totaling $4.1 million.  It also resulted in Labaton being able to deflect its own obligation onto the class and co-counsel.

Before delving deeper into the various inaccuracies, misstatements and omissions and the relative responsibility for them, it bears repeating that together Class Counsel achieved an excellent settlement for the class for the reasons the Court recognized at the fairness hearing, including that the legal theory of the case was novel, the risks were great

---

[5] It appears that Labaton did not even fully inform the other Customer Class firms of the true nature of the obligation to this Texas lawyer, as several attorneys from Thornton and Lieff testified that they were led to believe that this attorney was serving as "local counsel" and had some active role in the *State Street* case.  This, despite the fact that they had agreed to share in the payment to him.  One of the attorneys from Lieff testified that, had he known of the true nature of the relationship, he would not have agreed to share in the $4.1 million payment, and would have encouraged Labaton to inform the Court of the obligation.

12

and counsel had successfully condensed combined document discovery and mediation in a truncated process and negotiated with counsel for State Street and with the government regulators to create a sizeable fund for the class.

Perhaps the most lamentable and dismaying aspect of this investigation is that this laudable result, achieved by fine lawyering, became entangled in a web of concealment, inaccuracies, and questionable ethical practices by experienced attorneys who should have known better. The very positive outcome achieved for the class cannot excuse the failings of the customer class law firms in discharging their duties of full candor and disclosure to the Court, to the class, to other counsel, and even to their own clients.

### The Relative Responsibility of the Law Firms for the Double-Counting

As Labaton has conceded, the Fee Petition included double-counting of staff attorneys' hours by several firms; specifically, the same hours for the same lawyers -- largely at higher rates -- for the same work appeared in the Thornton lodestar, on the one hand, and in either the Lieff or Labaton lodestar reports, on the other hand.  The explanation for this "oversight" begins with Thornton's inclusion of hours of staff attorneys (and several agency attorneys) who were employees of Labaton and Lieff and "loaned" to Thornton for document review purposes so as to spread the cost burden of the case across the three firms.  In fact, the term "loaned" to describe the arrangement is itself a misnomer, as these attorneys were never in any sense working directly for Thornton. Rather, they were at all times supervised and housed at Labaton and Lieff.  Thornton was

simply billed for the actual cost of these attorneys at periodic intervals, and paid these invoices.[6]

While there was never an explicit agreement among the three firms that Thornton would claim these hours on its lodestar, there was an apparent understanding among some (but not all) Labaton and Lieff partners to that effect. Each of the three firms bears different degrees of responsibility for the double-counting and, accordingly, the firms' respective roles are addressed *seriatim* here.

### Lieff

Lieff, during the deposition of partner Dan Chiplock, has acknowledged that it made a mistake in claiming the hours of the staff attorneys and agency attorneys loaned to Thornton on its lodestar. Contemporaneous evidence also indicates that Lieff anticipated that its staff attorneys would be included on Thornton's petition. Notwithstanding this error, Lieff's responsibility for the actual double-counting is somewhat mitigated because it never saw the lodestar reports of Thornton or Labaton in order to be able to compare, and possibly catch, the double-counting. Lieff had, early in this litigation, agreed to the "loaning" of its staff attorneys and agency attorneys to Thornton as a means of sharing the costs and risks of employing these attorneys and the litigation as a whole. While the agreement to "loan" the staff and agency attorneys to Thornton was, perhaps, an ill-considered judgement since the cost-sharing of this case could have been achieved easily in other ways, it cannot be said that the agreement to

---

[6] The evidence indicates that Thornton lawyers never supervised or even met these staff attorneys and agency lawyers, as they worked in other cities, largely New York and San Francisco, while Thornton was based in Boston.

share costs through this mechanism was a significant cause of the double-counting. Thus, while Lieff bears some responsibility for the double-counting misstatements, and thereby the attendant cost of the Special Master's investigation, its conduct was inadvertent. [7]

### **Thornton**

Thornton bears significant responsibility for the double-counting of hours and for the misstatements which contributed to these errors. The Thornton declaration, signed and sworn by attorney Garrett Bradley and filed in support of its fees, contains statements that are palpably false.[8] The assertions in the Bradley Declaration as to the staff attorneys and the agency attorneys are misrepresentations, since the attorneys that are the subject of the double-counting were neither employed by Thornton (unlike Labaton and Lieff ) nor were the rates claimed "the same as …my firm's regular rates charged for their services," as represented to the Court in the Fee Petition. Nor were the hourly rates claimed in the lodestar, and the resulting lodestar calculations "based on their current billing rates." Bradley Declaration, ¶ 4. Indeed, they hardly could have been, since the staff and agency

---

[7] It bears emphasis here that none of the ERISA law firms knew anything about the agreement among the customer class law firms to "loan" the staff attorneys to Thornton, nor did they know of the cost-sharing arrangement, and certainly were not in any position to catch the double-counting of the staff attorneys time. The ERISA firms bear no responsibility for the double-counting.

[8] The Thornton declaration states under oath in paragraphs 3 and 4:

3. The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by each attorney and professional support staff-member of my firm who was involved in the prosecution of the Class Actions, and the lodestar calculation is based on my firm's current billing rates. For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court. Time expended in preparing this application for fees and payment of expenses has not been included in this request.
4. The hourly rate for attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions.

attorneys did not work for Thornton and could not have "regular rates" or "current billing rates" with that firm. The same is true of Michael Bradley, who was similarly not employed by Thornton and had no "regular rate" with that firm. Thus, to this extent, there is nothing "inadvertent" about these sworn statements to the Court; they are simply blatant falsehoods.

While Thornton reasonably asserts that Labaton and Lieff, not Thornton, mistakenly claimed the loaned staff attorneys' and agency attorneys' hours in their lodestars, its misleading Declaration contributed to this substantial billing error. It is probable that, had Thornton's petition contained fully truthful and accurate statements describing the actual affiliation and rates of the loaned staff attorneys and agency attorneys, Labaton Settlement Attorney Nicole Zeiss, or the Court, would have been alerted that something was amiss and thereby have detected the double-counted hours.

Notwithstanding the apparent informal agreement among the customer class firms to allow Thornton to claim the subject hours in its lodestar, this arrangement was ripe for confusion, error and abuse, and the three firms must share responsibility for agreeing to it. Indeed, the manner in which Thornton implemented this agreement appears designed from the inception to exaggerate its lodestar. Thornton specifically reimbursed the other two firms for the staff attorneys and agency lawyers "loaned" to them on a straight cost-only basis yet subsequently claimed them on its own lodestar report at rates much higher than Thornton had actually paid the two firms in cost reimbursement, and even higher hourly rates than Labaton and Lieff claimed for most of these same staff attorneys on their own reports. Moreover, discovery and deposition testimony reflects that Thornton

16

attorneys, particularly Garrett Bradley, were hyper-focused on attempting to increase, or "jack up," the Thornton lodestar in this case as a means of increasing the firm's ultimate claim for attorneys' fees.[9]

Additionally, Thornton bears further, and sole, responsibility for the inclusion of Michael Bradley's substantial time--over 400 hours at a rate of $500 per hour for a total cost of $203,200 in its lodestar petition. Michael Bradley's time is simply not supported by the declaration that his time was "the same as regular rates charged for [his] services." Not only was Michael Bradley not employed by Thornton and had no regular rate with that firm, his work is largely unverifiable as it was done in his free time at his office, not at Lieff or Labaton with all the other staff attorneys, and was done at irregular intervals, such as ten hours a week over several years when he had time to fit the work in. Further, unlike the Labaton and Lieff staff attorneys, Michael Bradley prepared no legal memoranda or deposition preparation files concerning issues in the case. Further, Michael Bradley lacked the relevant experience and expertise in massive document review that the Lieff and Labaton staff attorneys had, and it is not clear that he participated in the extensive case training provided to the staff attorneys from Labaton and Lieff. These facts, taken together, raise serious questions as to the level of any substantive contribution to the case on his part. In addition, although Bradley did perform the work on a contingency basis—and he accepted the risk that he would not be

---

[9] Other evidence received by the Special Master directly reflects a concern on the part of Bradley and Thornton to inflate their lodestar in this case, a result in part of a belief on Bradley's part that Thornton's lodestar was undervalued in the earlier-settled Bank of New York Mellon case, a similar foreign exchange trading fraud case in which both Thornton and Lieff were involved at the same time this matter was pending, and that he wanted to make up for this in the *State Street* case.

paid if there was no recovery--the fact that most of the matters he had been retained for in his practice were in the $55 to $250/hour range makes his $500/hour rate particularly unwarranted.

### Labaton

Finally, as to allocation of responsibility for the double-counting, Labaton must bear ultimate responsibility. The Labaton lawyer with primary responsibility for preparing the fee petition, Nicole Zeiss, knew nothing of the agreement among the three firms to share costs through the invoicing to Thornton of the costs of the staff and agency attorneys because she was never told anything. To this extent, Zeiss had no advance knowledge of the arrangement such that she would have been on alert to scrutinize the petitions of the firms to ensure that there was no double-counting of staff attorneys' or agency attorneys' time on multiple lodestar reports.

Beyond this, as noted, there was never an explicit or written agreement by Labaton and Lieff to allow Thornton to claim the time for these attorneys on its lodestar, much less at the enhanced rates it claimed them. David Goldsmith, one of the lead Labaton lawyers responsible for prosecuting the substantive case and who also worked with Zeiss on the fee petition, testified that although he knew of some general agreement to "sponsor" the staff and agency attorneys to Thornton as a means of sharing the costs of the case, as far as he knew, there was never an agreement to allow Thornton to claim these lawyers on its lodestar report.

18

Thus, to the extent that the two Labaton lawyers most responsible for preparing the Fee Petition to the Court had no knowledge that Thornton might include the lawyers on its lodestar, the double-counting was "inadvertent" as to Labaton in this sense.

However, this only insulates Labaton from a finding of intentional misrepresentation or misstatement -- it does not ultimately excuse Labaton from responsibility for the double-counting. Labaton was Lead Class Counsel and as such was ultimately responsible for preparing an accurate and reliable fee petition that the Court could rely upon to perform its gatekeeping function and discharge its fiduciary duties to the class. This responsibility would surely encompass catching and rectifying any mistakes or misstatements -- and certainly those of the magnitude of 9300 double-counted hours totaling more than $4 million in lodestar. A careful cross-checking of the lodestar petitions of the firms would have revealed the double-counting. This was Labaton's responsibility as Lead Counsel, and it did not meet this responsibility. Thus, although the double-counting and resultant misstatements to the Court as to the total lodestar were not intentional, and the misrepresentations in the Thornton declaration likely contributed to the administrative confusion, it was, nevertheless, a serious mistake for which Labaton must bear ultimate responsibility.[10]

---

[10] As noted elsewhere, Labaton's responsibility is enhanced because, in a very real sense, its secrecy and compartmentalized approach to all aspects of its practice contributed greatly to the double-counting errors. As manifested here, the lawyer ultimately responsible for preparing all of the settlement documents, including the fee petition, was walled off from important aspects of the substantive prosecution and administration of the case; in the context of the administration of the case, Nicole Zeiss knew nothing about the arrangement between the three customer class law firms to share the costs of the case through the allocation of the staff attorneys and agency lawyers. This compartmentalization clearly contributed to the double-counting errors, as it did to other problems discussed elsewhere in this report.

**Hours and Rates.**

The Court has called upon the Special Master to determine the accuracy and reliability of representations made to the Court in connection with the fee petition and the reasonableness of the fees previously ordered.[11]   In concluding that the amount of fees requested was reasonable, the Court reviewed in detail the relevant factors to determine reasonableness outlined in *Johnson v. Georgia Hwy. Express*, 488 F.2d 714 (5th Cir. 1974) and *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541 (1984), highlighting the submission of the number of hours spent, the result achieved for the class, the novel theory pursued, the potential difficulty of achieving class certification, the global settlement reached with the ERISA class, the arduous discovery and mediation processes that proceeded in tandem, and the involvement and agreement of the regulatory bodies involved, namely the DOL, the SEC, and the DOJ.

But beyond these factors, including those used to guide the application of the percentage of fund and lodestar cross-check, any determination of the reasonableness of attorneys' fees depends entirely in the first instance on the accuracy and reliability of rates and hours submitted to the Court in the lodestar reports of the parties.  As detailed in the Report, the Special Master conducted a comprehensive review of the billing hours submitted in the *State Street* case and the rates of the attorneys associated with the billings.

---

[11]   The transcript of the November 2, 2016 Hearing bears out that the Court accepted Class Counsel's calculation of fees and expenses, including service awards to the plaintiff representatives, as 25.27% of the gross settlement fund. See 11/2/16 Hearing Tr., pp. 23-24; 35-36.  The Court also applied the lodestar cross-check to the fees, and found the fees reasonable. Id. at 35-36.

The Special Master agreed with counsel that for a number of compelling reasons, including the complexity of FX trading claims, the need for counsel experienced in securities class action matters, and the inclusion of ERISA claims, national billing rates should apply to the work performed in the *State Street* case.

In determining whether the appropriate national rate was used in the *State Street* case, the Special Master considered that such national rates must be consistent with the rates typically charged by counsel practicing in the subject matter -- here complex securities/financial fraud litigation -- in those geographic markets where securities and financial fraud litigation are typically brought. Like regional rates, national rates should be commensurate with the legal rates for attorneys of comparable skill, experience, and reputation litigating substantially similar matters. Employing a variety of resources and considering a variety of indicia, the Special Master compared the rates charged in the *State Street* case for partners, associates, staff attorneys and contract attorneys with those charged in similar matters. In reviewing comparable rates and determining appropriate billing rates in this matter, the Special Master examined national surveys focused on the four major cities associated with the firms in this case: New York City, San Francisco, Washington, D.C. and Boston, and also received rate information from WilmerHale, which represented State Street in the litigation.

The Special Master recommends that, for the reasons summarized above and set forth in great detail in the Report, with the minor exceptions noted herein, the Court find that the hours and rates of the attorneys of each of the law firms for whom lodestar reports were submitted to the Court are reasonable and accurate, and consistent with

applicable market rates for comparable attorneys in comparable markets for comparable

work.  This includes the hours and rates for the excellent work performed by the staff

attorneys employed by Labaton and Lieff.

Contrary to the picture painted in the Boston Globe article, with the exception of

Michael Bradley, whose work is discussed below, these staff attorneys did much more

than "low level" document review.  As noted, they all were attorneys with years of

experience, and the majority of them had specialized knowledge or skills in FX/securities

areas.  A number of them had worked on BONY Mellon which raised similar issues to

those in the *State Street* case.  They all made substantive contributions to the case.  They

did not simply do first-level document review; they also digested complex information

and prepared topical memoranda and witness memoranda for depositions -- the same kind

of work done by associates at large firms.  Rather than referring to them as staff

attorneys, it would be more accurate to refer to them as "non-partnership-track"

attorneys.

Adjustments should, however, be made to the following:

**Michael Bradley**, whose submitted rate of $500/hour is not supportable by his

experience, the work he did on the case, or the value he contributed to the case,

particularly in relation to the other staff attorneys.

**Contract Attorneys**: The law firms should not be permitted to be compensated

for these attorneys at market rates and no multiplier should be granted on their hours and

rates (if a multiplier is granted).  Rather, the costs of the contract attorneys should be

reimbursed to law firms as an expense, and the firms compensated for that expense dollar-for-dollar.

### Marking Up of Staff/Agency Attorneys' Lodestar Hours

Finally, no explanation is offered for the different hourly rates at which the staff attorneys and agency attorneys were billed in the respective lodestars, or the discrepancy of those rates with the representations in the various Customer Class Counsel declarations to the Court. For example, the Declaration of Labaton's Larry Sucharow contained representations to the Court that "the lodestar calculations [are] based … on their current billing rates." Sucharow Dec. Par. 176. These same representations are made in the Lieff and Thornton declarations as well. These staff attorneys were paid an average of $55, and included some agency (contract) attorneys, contracted with an outside agency for between $35 and $55 per hour. While strong arguments support marking up staff attorneys who are full-time employees of a law firm and similarly situated in relation to the qualifications of and the work product output of law firm's partnership-track associates -- who, of course, are routinely marked up -- there is not nearly the same justification for marking up outside lawyers who are employed by an agency and "rented" to a law firm for a specific task. As noted above, these agency lawyers are more in the nature of an expense and should be treated as such.[12]

---

[12] It is true that some courts have approved mark-ups for such agency attorneys, although largely without analysis or detailed discussion. This does not seem to be a sound approach-- particularly when marked up again by a multiplier of almost 2.0, as was done here--and is fully discussed in the Report and Recommendations.

**Service Fees**

Not everything about the Fee Petition was tainted. The Special Master specifically finds that the service awards to the class representatives were fully justified based on their participation in the preparation of the case, specifically in the discovery and in the mediation sessions and that the class representatives, and particularly ATRS Executive Director George Hopkins, added great value to the case and the eventual excellent result.

**A Breakdown in the Role of Lead Class Counsel**

Many of the problems in this case stem from the way in which Labaton internally divides and manages its work in cases in which it serves as lead class counsel. In exercising its role as Lead Counsel, Labaton compartmentalized the roles of its lawyers working on this matter, which led to an overall lack of oversight by Lead Counsel for the class -- a repeated pattern of one hand not knowing what the other hand was doing. The example of Nicole Zeiss, who acted as "settlement counsel," having a complete lack of knowledge of the cost-sharing arrangement with Thornton as to the staff attorneys and the agency lawyers has already been noted. That she did not have all the facts she needed in order to have the necessary awareness of the full picture during her review of the various Fee Petition documents to check for the possibility of such double-billing is a serious systemic fault of Labaton.

The case could be made that Zeiss and her team should nevertheless have caught the double-counting errors -- Labaton as lead counsel ultimately bears full responsibility for this error -- but Zeiss' job was made considerably more difficult by not having been told of the "loaning" arrangement in advance of preparing the Class Counsel Fee Petition.

24

While the problem was potentially exacerbated by the false statements in the Thornton

declaration, which did not alert Zeiss (or the Court) that Labaton and Lieff's employees

were being included on Thornton's lodestar, such compartmentalization clearly

contributed to no Labaton lawyer catching the double-counting problem once another

firm claimed those attorneys in its report.  This separation of functions resulted in the

firm providing little effective oversight as Lead Counsel.  Rather, it is clear that at critical

times in the litigation, the knowledge of one Labaton partner on a range of significant

issues was never conveyed to other Labaton partners representing the class.  Certainly,

Lead Counsel must exercise greater diligence in their role to eliminate the possibilities

for such oversights and to safeguard the class they represent.[13]

### The Chargois Arrangement

Beyond the double-counting and lodestar misstatement matters discussed above, a

more serious issue was discovered during the Special Master's investigation:   Labaton

had a pre-existing agreement with a Texas lawyer, Damon Chargois ("Chargois"), who

years earlier had facilitated an introduction to ATRS for Labaton.  In return, Labaton had

promised Chargois 20 percent of all legal fees awarded Labaton for any case in which

Labaton was lead, or co-lead, counsel, and ATRS was a lead plaintiff (the "Chargois

Arrangement").  In this case, that previously existing agreement resulted in Chargois—

who made no appearance, did no work, and did not participate in the case in any way,

---

[13] Another prominent example of Labaton's compartmentalization and secrecy involved the Chargois Arrangement, which will be discussed in the following section: Labaton lawyers claim to have left the Chargois Arrangement to Eric Belfi and Chris Keller as "relationship counsel." But, other attorneys such as David Goldsmith who were responsible for the substantive work on the case, were told nothing about the Chargois Arrangement.

receiving 5.5% of the total award of attorneys' fees, or $4.1 million, from the class settlement fund.  As noted above, this previous agreement was derived from a contractual obligation which Labaton had incurred to this lawyer years before the *State Street* litigation commenced. This obligation had nothing to do with the *State Street* case and provided no value to the class or co-counsel.  Rather, Labaton shifted this long-standing obligation onto the State Street class and its State Street co-counsel.

The investigation revealed that Labaton engaged in consistent, conscious, and calculated efforts to conceal Chargois from almost all participants in the *State Street* litigation: its client, the class, ERISA counsel, and most importantly, the Court, who assumed a fiduciary role to protect absent class members. Labaton even failed to fully inform its Customer Class co-counsel, who were sharing equally in the $4.1 million payment to Chargois, of Chargois' actual role (or lack of a role) in the *State Street* case.

The three Customer Class law firms did agree to share this obligation, one-third each, and agreed it would come "off the top" of the total award of attorneys' fees, along with the fees for ERISA counsel, from the common fund. Further, the Customer Class Counsel specifically agreed that the Court need not be told of the allocation of fees, which meant that the Court would not be told of the Chargois Arrangement, notwithstanding that the Court specifically asked about attorneys' fees at the fairness hearing, albeit not specifically the allocation itself.

The Customer Class Counsel further agreed that the ERISA Counsel -- and, therefore, the ERISA party representatives -- should also not be told of the Chargois Arrangement or the payment of class settlement funds to Chargois.  This is significant

because ERISA Counsel testified that had they known of the Chargois payment and its history, they would have been obligated to tell their clients and they believe their clients would not have agreed. They also testified that had they known of the Chargois Arrangement and payment, the ERISA Attorneys would not have agreed to the fee allocation that provided them 9% (later 10%) of the total attorneys' fee award, in amounts that meant Chargois would receive considerably more than any ERISA law firm that worked on the case and contributed great value to the class.

Beyond this, because ERISA Counsel Lynn Sarko was the lawyer responsible for dealing with the DOL, the decision not to tell ERISA counsel about Chargois also meant that DOL would not be told of the Chargois payment. This was a particularly critical omission, with far-reaching ramifications. ERISA Counsel, and the DOL, were instrumental in effectuating the global settlement reached in this case. ERISA Counsel have uniformly testified that if they had known that $4.1 million of the settlement funds would be paid to a lawyer who performed no work on this case, not only would they not have settled the matter, they would have told the DOL of the agreement with Chargois, and they believe the DOL would not have agreed to settle. This fact is important because State Street was insisting on a global settlement, including with the ERISA claimants and the government agencies, and State Street would not have been willing to settle without these government agencies', and especially DOL's, agreement to the terms.

While Labaton attempts to justify the payment to Chargois as arising from Chargois' introduction of a Labaton attorney to an ATRS official in 2008, and hence in the nature of a "referral fee," the Chargois payment fits none of the elements of a referral

fee.  First, the Chargois obligation was not disclosed to the ATRS client -- nor to the

ERISA parties -- and cannot be justified as anything other than what it was:  an

undisclosed obligation of Labaton in the nature of a continuing "finder's fee" to use class

funds to satisfy its own pre-existing obligation.  In addition to not disclosing the Chargois

Arrangement to George Hopkins, the ATRS Executive Director and class representative

of Labatons's client, ATRS, Labaton further failed to disclose that ATRS specifically

declined to accept Chargois in a joint-bid made with Labaton to be monitoring counsel

for ATRS, making the Chargois Arrangement even more material.

   In fact, Labaton has paid fees to Chargois in nine other class action cases in which

it served as lead counsel, not disclosing to ATRS the payments in eight of the cases.  In

only one such matter did Chargois file an appearance; in each of the others, his role was

the same as in this case -- he filed no appearance, was unknown to the client, did no work

in the case and, even though the settlement fund was used to pay his fee, his payment was

not disclosed to the Court.

   This Arrangement, and the failure to disclose it and the $4.1 million payment from

class funds, to the Court, to the class, to the clients, to the government regulatory

agencies and to ERISA counsel, is the most troubling aspect of this investigation and

raises serious and profound questions about the accuracy and reliability of the Fee

Petition and the individual declarations supporting it, as well as the reliability of

Labaton's November 10, 2016, letter to the Court, in which Labaton again did not

disclose to the Court the Chargois relationship and payment, despite that the November

10th letter provided a natural opportunity to advise the Court of any additional irregular or unusual aspects to the Fee Petition beyond the inadvertent double-counting of hours.

The Special Master believes that if the Court had been fully apprised of the obligation and all the attendant facts, including the lack of participation of Chargois and the nondisclosure to the client, the class and the ERISA parties, the Court would have raised serious questions about the Chargois payment and would have had deep reservations about approving it.  At a minimum, the Special Master believes that the Court would have insisted that the class members be informed and given the opportunity to object.

What follows is a summary overview of the legal and ethical framework that informs the findings set out in this Report that Labaton failed in its duties to inform its client, the class, co-counsel/ERISA counsel, and the Court.

### Duty to Inform the Client

We begin with Labaton's duties to its direct client, ATRS.  As with any client, Labaton had a fundamental duty to keep ATRS reasonably informed about the status of the *State Street* matter. Mass. R. Prof. C. 1.4(a)(1)(3).  In the context of a class action case, a class representative, like ATRS, must be given the information it needs to adequately perform its fiduciary duties to the class. Fed. R. Civ. P. 23(a)(4).  This includes who will receive a portion of the final settlement award funding the common fund. Thus, Labaton had a duty to inform ATRS as its client, and even more so as a representative for the class, that Chargois would receive 20% of Labaton's share of the total fee award. Massachusetts Rule 1.5(e), governing attorney conduct as to fees, speaks

directly to this issue and imposes an unequivocal duty to secure client consent before dividing fees with lawyers outside the firm. By failing to fully inform Hopkins or ATRS of the Chargois Arrangement, in detail, Labaton breached its duty to inform its client, ATRS, as set forth in Rule 1.5(e). For reasons detailed fully in the body of this Report, the Special Master rejects Labaton's experts' strained explanation that Labaton satisfied, if only imperfectly, the Rule as written in 2011, through its piecemeal notice to the client in 2007-2008[14]or through the vague and generic language of its February 8, 2011, engagement letter with ATRS.

Nor are we persuaded that George Hopkins' statement to Belfi that he did "not want to know" (or otherwise be involved with the specifics of Labaton's fee agreements) relieved Labaton of its ethical obligation to inform ATRS about Chargois. A client's request not to be informed does not constitute consent under Rule 1.5(e). Even Labaton's experts acknowledged that a client's desire, however explicit, not to know certain facts does not relieve lawyers of their ethical duty to inform that client of fee-sharing. Such burden-shifting is especially inappropriate where the client is serving in a fiduciary role and owes ethical duties of his own to the class he represents. In that sense, a client like Hopkins speaks not only for himself but for the absentee class members, a duty that the record shows Hopkins took very seriously. Labaton, therefore, had a clear obligation to affirmatively inform Hopkins of the critical details of the Chargois Arrangement -- that Chargois would receive considerable payment if Labaton successfully recovered fees,

---

[14] The Chargois and Heron law firm appeared with Labaton on a joint application to be one of a ATRS' monitoring counsel. Labaton was accepted; Chargois and Heron was not.

though he had no obligation to work on the case -- and secure his written consent. Hopkins' instruction to Belfi did not waive that critical duty, much less rise to the level of informed consent contemplated by Rule 1.5(e).[15]

Although the Special Master believes that Labaton had a professional obligation to tell its client ATRS, a class representative, the salient details of the Chargois Arrangement so that the client could make an informed determination as to whether to give consent and as to how this might impact its obligations as class representative, rather than taking measures to keep the information from the client, the intersection of the law and the facts in this matter does not rise to the level of requiring disciplinary action. The obligations to the client, and the timing of them, were simply too unclear at the time to merit the imposition of professional discipline or any kind of disciplinary sanction.

Closely related to the issues surrounding Rule 1.5(e) are questions of whether Labaton violated Rule 7.2(b), the rule forbidding a lawyer from giving "anything of value to a person for recommending the lawyer's services." The reason Rule 1.5(e) is implicated in this discussion is that subsection (5) of Rule 7.2(b) includes an exception to the prohibition of paid recommendations for valid division-of-fee agreements under Rule 1.5(e). Rule 7.2(b)(5). In other words, if there is a valid division-of-fee award under Rule 1.5(e), it is permissible to pay a lawyer for recommending another lawyer without implicating Rule 7.2(b)'s proscriptions.

---

[15] A Declaration filed by Hopkins at the end of the investigation reporting that he had told Eric Belfi not to inform him of fee allocations and purporting to ratify on behalf of ATRS the Chargois payment, does not cure the problem and it obviously cannot speak for the class.

As noted, Professor Gillers believes that there was not compliance with Rule 1.5(e) and, therefore, goes on to analyze whether the Chargois Arrangement, and the history of how the Arrangement began, constitute a violation of Rule 7.2 (b). He believes that there was a violation. Contrary to the opinions of two of Labaton's experts (Wendel and Lieberman) -- who believe that Rule 7.2(b) does not apply to lawyers at all because a lawyer is not a "person" for purposes of the Rule -- Professor Gillers opines that payments by a lawyer to another lawyer for recommendations that do not comply with Rule 1.5(e) are within the proscriptions of Rule 7.2(b). In other words, Professor Gillers believes that a lawyer is a "person" under the Rule. Professor Gillers, commonsensically, points out that if the word "person" was intended to exclude lawyers from its ambit, there would be no need for the exception in Rule 7.2(b)(5) for fee agreements that divide fees between lawyers. Beyond this, the Rule or its comment use the word "non-lawyer" five times, and if the drafters of the Rule wished to limit the category of covered persons to non-lawyers, they would have used the word non-lawyer, rather than "person." Thus, the purpose of using the word "person" was to make clear the Rule covered both lawyers and non-lawyers.

Further, Labaton's experts say that the entire history of the Rule was directed toward advertising and solicitation for lawyers by touts, taxi drivers and other non-lawyers, and was not intended to cover recommendations by a lawyer to others for the services of another lawyer. Therefore, as noted, they reason, a lawyer is not a "person" within the meaning of the Rule. Two experts (Joy and Green) opine further that because the Rule covers only the "recommending" of a lawyer's services, and what Chargois did

was to introduce Labaton to ATRS and facilitate a relationship, the Chargois Arrangement is not the product of a "recommendation" and, therefore, not covered under the Rule. Finally, and more persuasively, two of Labaton's experts (Green and Lieberman) pointed out that a lawyer has never been disciplined in Massachusetts under Rule 7.2(b) for paying another lawyer for "recommending" that lawyer and there are no cases in Massachusetts -- or in fact in any jurisdiction in the country -- that have ever been brought against a lawyer for this type of a violation of Rule 7.2(b).

In the Conclusions of Law section, the Special Master finds that Professor Gillers has the stronger argument on this point as a strict matter of law and statutory construction.  In reaching this decision, it resonates with the Special Master that the Rule creates a specific exception for valid fee divisions between lawyers and if lawyers were not intended to be covered by the Rule, this exception would be unnecessary. When one of Labaton's experts (Professor Green) was questioned about this, he simply said the language was "surplusage"; another expert (Mr. Lieberman) said it was "redundant" drafting.  The Special Master cannot accept these rather facile explanations -- one must presume that drafters of laws mean what they say and do not adorn statutes, regulations and rules with unnecessary language -- and finds that Rule 7.2(b) covers recommendations made by lawyers for the services of other lawyers, unless there is compliance with Rule 1.5(e). Further, after a careful review of the record, the Special Master is persuaded that the entire origin and nature of the Chargois Arrangement fit easily within the ambit of Rule 7.2(b) and, therefore, the payments by Labaton to Chargois for his recommending of Labaton at the inception of the Labaton/ATRS

33

relationship falls within Rule 7.2(b)'s proscriptions. Therefore, because, as discussed, the fee division agreement did not comply with Rule 1.5(e), the entire Chargois Arrangement violated Rule 7.2(b).

However, this does not end the discussion, as it begs the question of whether professional discipline is merited to address the conduct. The Special Master concludes that it does not, for several reasons. First, as noted, the question of compliance with Rule 1.5(e) is a very close question upon which reasonable experts and lawyers may differ and if there was compliance with that Rule, there was no violation of Rule 7.2(b). Because the violation of Rule 1.5(e) found here does not merit professional discipline, it would be hard to say that the connected violation of Rule 7.2(b) merited discipline. Beyond this, the Special Master is struck by the fact that apparently no disciplinary body or court in Massachusetts or, indeed, in the rest of the country has ever imposed discipline or sanctions upon a lawyer under Rule 7.2(b) for paying another lawyer for a "recommendation." Although Professor Gillers analysis and opinion makes absolute sense, this goes to the question of notice to the practicing bar. Perhaps going forward, if the Court adopts Professor Gillers' and the Special Master's views on this Rule, the practicing profession will be on notice that bare recommendations that are not made pursuant to a valid division-of-fee agreement under Rule 1.5(e) could subject lawyers to discipline under Rule 7.2(b). But, because this appears to be an issue of first impression and not one of which the profession might have been well- advised in advance, it would not be appropriate to impose professional discipline in these circumstances. Accordingly, no professional discipline or sanctions is warranted here and none is recommended.

34

## Duty to Inform the Class

Labaton was Lead Counsel for the class and therefore owed a fiduciary duty to inform the unnamed customer and ERISA members of the class, whom they represented after the Court certified the class for settlement purposes on August 8, 2016, of the existence of the Chargois Arrangement and its terms, including that an attorney who did no work on the case would receive $4.1 million from the settlement fund.  The unnamed members of the certified class were entitled to know about the Chargois Arrangement before they were called upon to decide, with the benefit of legal advice if they desired, whether to opt out or object to the settlement or to the fee request made by Customer Class Counsel. Both decisions would precede the Court's decision on any fee award.

On August 8, 2016, David Goldsmith of Labaton appeared before Judge Wolf for the "plaintiffs and the settlement class." Michael Thornton of Thornton and Daniel Chiplock of Lieff Cabraser appeared for the same clients. "We are here," the Court said, "with regard to the motion for preliminary certification of class action and preliminary approval of the proposed class settlement." The Court concluded that it was "appropriate to certify a class for settlement purposes." It then certified "the proposed class for settlement purposes only."

Previously, in January 2012, the Court had appointed Labaton as "interim lead counsel to act on behalf of all plaintiffs and the proposed class," and had appointed Thornton as "liaison counsel for plaintiff and the proposed class" and Lieff Cabraser to "serve as additional attorney for the plaintiff and the proposed class." When the Court

35

certified the settlement class on August 8, 2016, the firms continued to hold these positions.

Once the class was certified (if not before), there was an attorney-client relationship between class counsel and the absent class members; at least as of August 8, 2016, Class Counsel Labaton, Lieff, and Thornton had attorney-client relationships with the certified settlement class and its members.

As fiduciaries and lawyers for the unnamed certified class members -- and lawyers are fiduciaries for their clients as a matter of law -- customer class counsel had a duty to give their clients information relevant to decisions that belonged to the client. One of the most significant decisions that belongs to a client is whether or not to settle a case. This is the very decision the Notice of Pendency presented to the recipients -- i.e., whether to settle on the terms in the Notice or to object. Under Fed R. Civ. P. 23(e)(2), the settlement must be "fair, reasonable and adequate," and under Fed. R. Civ. P. 23(e)(5), class members must have the right to object to the settlement. According to Lieff's expert Prof. Rubenstein, "notice must be sufficiently clear and informative to make those opportunities meaningful."[16]

The right of class members to make an informed decision on whether to object to a fee award is not simply a procedural safeguard. Rather, and significantly, it is grounded in counsels' ethical duties under the Rules of Professional Conduct.  Mass. R. Prof. C. 1.2(a) provides in part: "A lawyer shall abide by a client's decision whether to accept an

---

[16] Counsel's independent obligation of disclosure under Rule 23(e)(3) is discussed in this summary *infra* under Duties to Inform the Court.

offer of settlement of a matter." Mass. R. Prof. C. 1.4(a)(1) provides: "A lawyer shall promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f) is required by these Rules." Mass. R. Prof. C. 1.4(b) provides: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Rule 1.0(f) provides: "'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." *See also Restatement (Third) of Law Governing Lawyers* (2000), §§ 20(3) and 22(1).

Here, class members were told their "legal rights," which included their right to object to the anticipated fee application, but they were not given material information that could reasonably have prompted an objection.[17] The class members could assume that ATRS was fulfilling its fiduciary duties to the class but ATRS did not know about the Chargois Arrangement. The Notice told them that the Court had appointed Labaton Sucharow for the Settlement Class, of which they were told they were members. They could rightfully assume that Labaton was protecting their interests as its clients. However, Labaton had chosen to withhold important information that might have prompted objections. Labaton's decision to do so placed its own interest in discharging the pre-existing obligation to Chargois ahead of its client's (the class's), and thereby

---

[17] Supporting the fact that the Chargois payment was material is the testimony of ERISA counsel Lynn Sarko that, had he known of it, he would have had to tell his class representative clients and that he believes they would not have agreed to the payment.

deprived its client the class members of a meaningful opportunity to be informed and potentially to object.  In this, Labaton failed in its duty to the class, and shifted its own obligation to Chargois – which contributed no value to the class – onto the class.

### Duty to Inform Co-Counsel

Labaton's evasion of is disclosure obligations extended to and materially affected both its fellow customer class counsel and the ERISA counsel -- all of whom relied significantly on Labaton in its role as court-appointed Lead Counsel-- by preventing the Co-Counsel firms from executing their own duties to the Court, to their clients and to the class. Moreover, Labaton's neglect of its duties as Lead Counsel, and its conscious effort to conceal the existence, or true nature, of the Chargois obligation, prevented the Co-Counsel firms from meaningfully assenting to the fee allocation arrangements to which they ultimately consented on the basis of misinformation or outright omission. Labaton's failures in its duties as thus prevented its co-counsel from carrying out their own obligations in the *State Street* litigation, and call into serious question the validity of multiple fee agreements reached between the firms.

Testimony provided during the investigation confirms that that the nondisclosure or incomplete disclosure was also significant to Labaton's co-counsel. Attorney Robert Lieff, for example, testified that he would not have agreed to share in the Chargois' payment had he known that Chargois was providing no legal services and adding no value, in the *State Street* case.  Lieff also testified that "it would have been appropriate to convince Larry [Sucharow] or his firm to go to the Court and tell the Court what we have here."  As noted, ERISA Counsel testified that they would have proceeded differently in

38

multiple material respects – including disclosing the Arrangement to their clients and to

government agencies had they been aware of it, as well as not agreeing to the 9% (later

10%) allocation of fees to ERISA Counsel.

In response, Labaton has maintained that it had no obligation to disclose the

Chargois Arrangement to ERISA Counsel because the agreement had no impact on

ERISA Counsel's fee, and that it had no duty to disclose further details to Lieff and

Thornton because those firms had a sufficiently detailed understanding of the agreement.

Here, Labaton's position is circular and ignores the important duties the firm owed to its

co-counsel firms. The only reason Labaton's nondisclosure may not have impacted

ERISA Counsel's fees is the fee agreement -- but that agreement was reached in the

absence of knowledge of the Chargois payment.

General principles of fairness and professional responsibility toward co-counsel,

and toward the Court, suggest that Labaton was required to disclose the Chargois

Arrangement to co-counsel, as do contract and equitable principles.  Co-counsel in a

large class action litigation share responsibility to the clients and to the class. The co-

counsel firms here relied heavily on Labaton to effectively carry out their own duties to

each of these groups. To the extent that Labaton's nondisclosures affected the ability of

other firms to carry out their duties to the class, and, in the case of the ERISA Attorneys,

to their clients the ERISA class representatives, Labaton failed in its responsibility as

Lead-Counsel to act fairly and in the interests of all parties and their counsel.

Contract and equitable principles may also be applicable to the enforceability, or

voidability, of the fee sharing agreement among Customer Class Counsel, and the

agreement between the Customer Class Counsel and ERISA counsel. This may be especially apt in circumstances where, as here, Co-Counsel relied upon Lead Counsel to provide timely and accurate information in negotiating their fee agreement, and the failure to fully inform Co-Counsel of the Chargois Arrangement and payment was a material omission.

Finally, Labaton's calculated concealment of the Chargois Arrangement from ERISA Counsel also put counsel in a risky and untenable situation with respect to DOL and the other two government agencies who participated in this settlement. By its material omissions, Labaton failed in its duty to inform co-counsel of the Chargois Arrangement.

### Duty to Inform the Court

Perhaps most importantly, Labaton had a duty under the Federal Rules of Civil Procedure and the Massachusetts Rules of Professional Conduct, as well as under federal case law, to fully disclose the Chargois Arrangement to the Court. Labaton's failure to disclose the Chargois Agreement to the Court is perhaps the most serious and far-reaching of all the breaches of duty. Courts serve as the final backstop and gatekeeper in protecting class members and in our class action system; this is a fiduciary duty of the Court to the class members.

Full and accurate disclosure to the Court is the underpinning of Fed. R. Civ. P. 23(e)'s requirement that the settlement be "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2), and the guarantee that class members have the right to object to the settlement and any attendant fee petition, Fed. R. Civ. P. 23(e)(5) and (h)(2). As with the

right to object to the settlement itself, the right to object to a fee motion also means that class members must be given sufficient information to do so. Unfortunately, by not disclosing to the Court that $4.1 million of the settlement funds would be paid to an attorney who did no work on the *State Street* case, on account of a pre-existing obligation of the class's lead counsel -- an obligation which provided no value to the class -- Labaton deprived the Court of information it needed to discharge its fiduciary obligations to protect the class's interests.

Professor William Rubenstein has opined in this case that the failure of the class to be informed of the Chargois payment is entirely the Court's responsibility. This is because Rule 23(h), by its incorporation of the procedures for making a claim for attorneys' fees under Fed. R. Civ. P. 54, places the entire burden on the Court to order disclosure of a fee agreement such as the Chargois agreement in this case, and, absent such a court order, disclosure is not required. In other words, it is Professor Rubenstein's position that the Court must order disclosure, or at least ask the attorneys about fee allocations, and if it does not order or ask, class counsel have no duty to disclose such payments. However, separate and apart from Rule 23(h) and its incorporation of Rule 54 procedures for making a claim for attorneys' fees, Fed. R. Civ. P. 23(e)(3) requires that "parties seeking approval of a class action settlement must file a statement identifying any agreement made in connection with the proposal." As explained in the *Manual of Complex Litigation*, this provision requires disclosure of agreements that may affect the interests of the class members by allocating money that they may have received elsewhere. *Manual of Complex Litigation* (4th ed.) § 21.631.

41

In his treatise, Professor Rubenstein also recognized counsel's independent

obligation of disclosure under Rule 23(e)(3).  Section 15.12 of *Rubenstein and Newberg*

*on Class Actions*, entitled, "Fee procedures at a class action's conclusion -- Disclosure of

fee-related agreements requirement," first speaks to the (obvious) requirement to disclose

any agreements as to fees when so ordered by the court.  The Section goes on to

recognize, however:

> [I]n addition to Rule 54's disclosure requirements, Rule 23(e) governing class
> action settlement -- not fee -- approval states that "[t]he parties seeking approval
> must file a statement identifying any agreement made in connection with the
> [settlement] proposal."

*Rubenstein and Newberg on Class Actions*, § 15.12 (5th ed.) (footnote omitted).

Although Rule 23(e)(3) references the settlement agreement itself, Professor

Rubenstein then goes on to observe that

> given the broader language covering agreements "made in connection with the
> [settlement] proposal," agreements beyond the settlement agreement itself -- such
> as any agreements about fees -- may also fall within the purview of Rule 23(e).
> Courts generally do not read Rule 23(e)'s disclosure requirement as requiring
> disclosure of fee agreements among counsel on the ground that such agreements
> do not necessarily affect the class's interests. There may be some cases where this
> reasoning is incorrect, as some agreements among counsel would impact
> settlement terms and hence should be disclosed to the class. . . . Moreover, there is
> little obvious downside from transparency so not only should courts order
> disclosure of fee agreements under Rule 54(d)(2), but settling parties should also
> readily provide them under Rule 23(e) in any case.

*Id.*

This was certainly such a case.  With its burden-shifting of a pre-existing

obligation of Labaton to the class, the Chargois Arrangement affected the class's interests

in this case as it "allocates money that the class members may have received elsewhere," i.e. to Damon Chargois.

Here, we have an undisclosed agreement to pay $4.1 million out of the settlement funds -- funds that could otherwise be allocated to the class members -- to an attorney who did no work on the case whatsoever. In order to assist the Court in performing its fiduciary function to protect the interests of the class, Labaton was obligated to disclose to the Court its pre-existing agreement to pay Chargois this substantial amount of the settlement fund. Labaton's failure to do so was in derogation of the duties imposed upon it by Fed. R. Civ. P. 23(e)(3).

The Special Master has considered at length whether Labaton's failure to disclose Chargois' role and the agreement to pay him $4.1 million in the fee petition should be sanctionable under Fed. R. Civ. P. 11. While at least one court of appeals has found that Rule 11 applies both to disclosures and material omissions, the First Circuit has not, nor has any district court in the First Circuit, and, together with other arguments and factors raised by counsel to Labaton, the Special Master finds it must stop short of finding a violation of Rule 11 in Labaton's nondisclosure of the Chargois Arrangement.

But this does not end the analysis of whether Labaton breached duties to the Court. As part of his Lead Counsel obligation in this case, Lawrence Sucharow of Labaton filed a "Declaration in Support of Plaintiff's Assented-To Motion for Final Approval of the Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and Lead Counsel's Motion for Award of Attorney Fees." *See* Dkt. No 104. In that Omnibus Declaration, in two separate places, at footnotes 2 and 6,

43

Sucharow purports to identify all of "Plaintiffs' Counsel." In footnote 2, Sucharow

identifies as "Plaintiffs' Counsel," his own firm, Labaton Sucharow, and "the Thornton

Law Firm LLP ("TLF"), Lieff Cabraser Heimann & Bernstein LLP ("Lieff Cabraser"),

Keller Rohrback L.L.P. ("Keller Rohrback"), McTigue Law LLP ("McTigue Law"), and

Zuckerman Spaeder LLP ("Zuckerman Spaeder")", *id*., n. 2, at p. 1.  In footnote 6,

Sucharow identifies Labaton Sucharow, TLF, Lieff Cabraser, Keller Rohrback, McTigue

Law, Zuckerman Spaeder, as well as, Beins, Axelrod, P.C. (which partnered with

McTigue Law and Zuckerman Spaeder in representing the Henriquez plaintiffs);

Richardson, Patrick, Westbrook & Brickman, LLC (former co-counsel for Henriquez

plaintiffs); and Feinberg, Campbell & Zack, P.C. (local counsel for McTigue Law in the

Andover action).  *Id.*, n. 6, at p. 41.  In Keller Rohrback's Declaration, Theodore Hess-

Mahan of the Massachusetts firm of Hutchings Barsamian Mendelcorn LLP is identified

as Keller Rohrback's local counsel.  Within Labaton's lodestar report attached as Exhibit

A to Labaton's individual fee declaration at Dkt. No. 104-15, Sucharow further identifies

fees paid to an "of counsel," P. Scarlato (Paul Scarlato of Goldman Scarlato, a

Pennsylvania law firm).

On the surface, these Declaration statements could lead the Court reasonably to

believe that these are all of the lawyers being paid from class funds.  However, there is

one lawyer who was paid from class funds who is not mentioned anywhere in

Sucharow's Omnibus Declaration, in Labaton's individual fee declaration -- which was

also signed by Lawrence Sucharow -- or in Labaton's lodestar and reports annexed

thereto.  That one lawyer is Damon Chargois.

Sucharow has admitted that he knew of the obligation to pay Chargois a portion of the *State Street* fee award at least as of 2015; the Fee Petition was filed on September 15, 2016. The Special Master finds that this nondisclosure was considered and deliberate.

In deciding the amount of fee to award Class Counsel -- and to whom to award it -- the Court, as a fiduciary for the class, including unnamed class members, needed first to know -- and Sucharow and Labaton had a duty to tell it -- who would be participating in any fee the Court in its discretion might award from the class recovery, and the basis for the claim. By not disclosing the intended payment of $4.1 million to Chargois, Sucharow and Labaton kept the Court in the dark and denied it the very information it needed to decide how much of the settlement funds should go to counsel, and which counsel, and how much should go to the class. As Professor Gillers observed, "[q]uite simply, until the Court made that decision, there was no fee to divide." Gillers Report at p. 73. The Court had the authority, as an exercise of its equitable power and fiduciary duty to the class, to deny any part of the class funds to Chargois, who never appeared and who did no work, made no contribution whatsoever to the success of the *State Street* litigation, and whose only connection to the case was through Labaton's own pre-existing obligation, and instead to direct that the money intended for Chargois should instead go to the class. The Court, however, never had an opportunity to make that decision because of the material omission of Chargois from Sucharow's Declaration.

Beyond any obligation for disclosure under the Federal Rules of Civil Procedure, the Massachusetts Rules of Professional Conduct required disclosure to the Court. Mass.

R. Prof. C. 3.3 imposes upon attorneys practicing in Massachusetts a "duty of candor

toward the tribunal." Rule 3.3(a) provides in relevant part:

> (a) A lawyer shall not knowingly:
>
> (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
>
> (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or
>
> (3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including if necessary, disclosure to the tribunal.

Comment [3] to Rule 3.3 makes clear that an attorney's failure to make a

disclosure in an affidavit or in open court can be the equivalent of a misrepresentation

within the purview of Rule 3.3(a).

That Sucharow had a duty to disclose the Chargois Arrangement to the Court is

made even more clear by Comment [14A] to Rule 3.3, which provides:

> When adversaries present a joint petition to a tribunal, such as a joint petition to approve the settlement of a class action suit . . . the proceeding loses its adversarial character and in some respects takes on the form of an ex parte proceeding. The lawyers presenting such a joint petition thus have the same duties of candor to the tribunal as lawyers in ex parte proceedings and should be guided by Rule 3.3(d).

Mass. R. Prof. C. 3.3, Cmt. [14A]. Proceeding from Comment [14A] takes us to Rule

3.3(d), which provides:

> (d) In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse.

In addition to Rule 3.3 of the Massachusetts Rules of Professional Conduct, there is also an overriding general duty of candor owed by attorneys as officers of the court. As noted by Professor Gillers, while "the phrase 'candor to the Court' is not an unbounded source of duty, entirely untethered to rules, custom, or case law. . . the word 'candor' should at least guide a lawyer's understanding of his or her duties as officers of the court." This broad duty of candor has been recognized by the First Circuit, which, in *Pearson v. First NH Mtg. Corp.*, 200 F.3d 30 (1st Cir. 1999) cited the Fourth Circuit in *United States v. Shaffer Equipment Co.*,11 F.3d 450, 457 (4th Cir. 1993), in which the court said, "[T]ruth is the object of the system's process…of dispensing justice…Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process."

It is for all of these reasons that the Special Master concludes that through his failure to disclose the $4.1 million Chargois Arrangement, Sucharow violated his duty of candor as an officer of the Court, and thereby denied the Court the opportunity to meaningfully carry out its fiduciary role and gatekeeping function to protect the interests of the class.

### Special Master's Recommendations

Before detailing the Special Master's recommendations to provide remedies and redress for the conduct identified in this Report, the Report provides a preamble as context. One of the most troubling elements of the Chargois aspect of the investigation has been Labaton's response to the discovery of the conduct revealed in the investigation. Quite simply, the response is inappropriate and insufficient in light of the severity and

pervasiveness of the conduct.  There has been no acceptance of responsibility for the

calculating and secretive nature of the conduct and its adverse ramifications. There has

been no expression of contrition. There has been no expression of remorse. And there has

been no expression of apology to the client, to the class members, to co-counsel or to the

Court.

Instead, Labaton has met the Special Master's inquiry into the Chargois

Arrangement and the $4.1 million payment with a phalanx of experts, who together with

Labaton, have erected a wall of legalistic and formalistic excuses and blame-shifting

(largely to the Court).  Although Labaton certainly has a right to present its best case --

and its arguments have been considered and, in some instances, used to inform the

Special Master's findings and recommendations to the Court -- some acknowledgement

of the potential harm this conduct has caused to class members, co-counsel and the Court

would have been not only appropriate, but expected.  Instead, Labaton and its experts

have taken positions that speak only to its legal defenses, and not to what is in the best

interests of class members. This approach is as disappointing as it is indicative of the

culture of compartmentalization and concealment at Labaton that led to the Chargois

Arrangement and its nondisclosure to the other participants in the case in the first place.

With this context in mind, the Report provides a comprehensive set of

Recommendations informed by the previously-delineated findings of fact and

conclusions of law.  In important respects, formulating these recommendations was the

most difficult and challenging undertaking of the Special Master because it required that

the interests of the class, the law firms, individual attorneys, the public and the judicial

process be weighed and in some respects, balanced, in order to recognize the valuable role of class action proceedings while addressing misconduct and questionable practices in an uncompromising fashion. The Special Master believes that his Recommendations achieve that balance and those objectives.

After presenting recommended legal findings with respect to inaccuracies, misstatements and omissions of material facts, to include double-counting and the breaches of duty to the client, class, co-counsel and the Court arising from the Chargois Arrangement, the Special Master recommends remedies and sanctions to address these failings:

1. Double-Counting on the Customer Class Law Firms' Lodestar Petitions ($4,058,000).

   All three customer class firms will share responsibility. The remedy for this is the disgorgement in equal amounts of the entire $4,058,000 in double-counted time. It is recommended that this entire amount be returned to the class.

2. Garrett Bradley's Sworn Declaration Statements.

   The Special Master recommends that significant monetary and professional sanctions be levied. As to monetary sanctions imposed under Rule 11, they are imposed against the Thornton firm (as provided by Rule 11) in an amount within a range between $400,000 and $1 million, approximately ten to twenty-five percent of the value of the double-counting. As to the sanctions under Rule 3.3 of the Massachusetts Rules of Professional Responsibility, these are individual and the Special Master recommends that Garrett Bradley be referred the Massachusetts Board of Bar Overseers for appropriate disciplinary proceedings. The Special Master recommends that these monetary sanctions be awarded to the class.

3. Hours and Rates.

   The Special Master recommends that, for the reasons set forth in great detail in the Report, with the minor exceptions noted herein, the Court find that the hours and rates of the attorneys of each of the law firms for whom lodestar

petitions were submitted to the Court are reasonable and accurate, and consistent with applicable market rates for comparable attorneys in comparable markets for comparable work.  This includes the hours and rates for the excellent work performed by the staff attorneys employed by Labaton and Lieff.   Adjustments should, however, be made to the following:

- **Michael Bradley**: Michael Bradley, whose submitted rate of $500/hour is not supportable by his experience, the work he did on the case, or the minimal value he contributed to the case, particularly in relation to the other staff attorneys.  Bradley's rate should be set at half of the submitted rate, or $250/hour.  Bradley recorded roughly 406 hours, thus yielding a total of $101,500.  It is recommended that Thornton, which received a multiplier of roughly 1.8 on his original fees, be disgorged any monetary benefit afforded to it by applying an artificially inflated rate.  Thornton's lodestar on which it claimed Michael Bradley's hours should be reduced by $182,180, equal to the difference between the lodestar-generated marked-up hourly rate ($500) and the more appropriate hourly rate of $250.  In making this calculation, Special Master gives equal weight, and applies the same multiplier, to Michael Bradley's hours as to any other attorney who worked on the case.  The Special Master recommends that this overpayment amount be awarded to the class.

- **Contract Attorneys**: The law firms should not be permitted to be compensated for these attorneys at market rates and no multiplier should be granted on their hours and rates (if a multiplier is granted).  Rather, the costs of the contract attorneys should be reimbursed to law firms as an expense, and the firms compensated for that expense dollar-for-dollar.  The seven contract attorneys, all retained by Lieff, recorded 2833.5 hours at rates varying between $415 and $515.  The total billings for contract attorneys was $1,298,198, or approximately $1.3 million.  In addition, a multiplier of 1.8 was added to their hours and rates, yielding a total award of $2,336,756, or approximately $2.3 million for the time of the contract attorneys. It is recommended that this amount be disgorged and be returned to the class.  The Customer Class Counsel is, however, entitled to claim the contract attorneys as an expense calculated at a more reasonable rate of $50/hour.  The Special Master recommends that the difference between these two figures also be awarded to the class.

4. The Chargois Payment ($4.1 million).

Because the Chargois Arrangement was solely Labaton's obligation and because Labaton has profited handsomely over the years from the ATRS relationship Chargois helped facilitate, and because Labaton is solely responsible for the nondisclosure of this relationship to ATRS, the class, ERISA counsel and the Court, the Special Master recommends that the appropriate remedy for the Chargois payment be disgorgement of entire $4.1 million Chargois amount, and that this disgorgement be solely the responsibility of Labaton. The Special Master recommends that ERISA counsel should receive the bulk of this award, or $3.4 million, an amount which reflects the difference between the $10.9 million that was allocated as a cap for ERISA attorneys in the Settlement Agreement and the $7.5 million which the ERISA attorneys actually received. This amount is also the amount that went instead to the customer class counsel.

The Special Master, in making this recommendation, has also considered the significant value the ERISA attorneys added to the class recovery. Taking into consideration the considerable time and expense incurred by the ERISA attorneys in participating in the investigation, the Special Master believes that the recommended $3.4 million is sufficient to include the costs and expenses incurred by the ERISA attorneys in this investigation. Finally, the Special Master recommends that the $3.4 million be allocated amongst the ERISA law firms in the same proportion and in the same manner as the original fee award was allocated. The $3.4 million award to ERISA counsel still leaves a balance from the $4.1 million of $700,000. The Special Master recommends that this amount be allocated back to the class, which was deprived of its ability to make a determination as to whether to agree to the settlement which included the Chargois payment.

5. Guidance on Ethics Issues.

The Special Master believes there is a need for a mechanism to provide ethical guidance to Labaton and Thornton on ethical issues in the future, recognizing that formal professional disciplinary sanctions for a firm like Labaton, which often represents public institutional investors with elevated standards of conduct for their outside counsel, could dramatically and adversely impact the firm's ability to provide legal services in its area of expertise, services which benefit both their class clients and often the broader public. Indeed, the Special Master recognizes that professional disciplinary sanctions could be a death-knell to a firm like Labaton, and the Special Master believes that would be a disproportionate penalty here. Nevertheless, Labaton and Thornton require someone from the outside to consult with them on professional conduct norms and to ensure that they comply with those norms. The Special Master recommends that the two firms work with the Court to establish a consulting

51

process that will ensure consistent ethical compliance. The Special Master notes that, according to its April 30, 2018 letter, Labaton has already taken steps in this direction, and has taken additional steps to address the kinds of conduct that arose in this case. The Special Master recommends that Labaton continue its efforts in this direction and that Thornton adopt policies and comparable practices to ensure that, going forward, it does not exceed professional conduct boundaries.

## **Lessons Learned and Best Practices Recommendations**

During the course of the investigation, the Special Master invited the law firms to reflect upon lessons learned in this case and to offer recommendations as to best practices for their firms and for class action practice in general, a number of which the Special Master, in turn, presents to the Court for its review, including:

1.      Ceasing the practice of allocating attorneys to other firms who are not their employers and of putting employees from one firm on another firm's lodestar report. At least one of the firms has reported that it now prohibits the practice of allowing its staff attorneys to be reimbursed by another firm.

2.      Putting practices in place to eliminate the communication gaps and compartmentalization (or "silo-ing," as some firm attorneys referred to it) among law firm attorneys that contributed to failures in this case, including double-counting. In addition, lead counsel should begin discussions on preparing lodestar numbers immediately after the Court grants preliminary approval, should compare all lodestar numbers before submission, and should ensure that lodestar reporting protocol is followed.

3.      Implementing internal measures to ensure quality control of lodestar submissions (including removal of time spent preparing fee petition). Labaton reports that it has "expanded the checklist" for its settlement attorney in preparing fee petitions; it will also require its accounting office to directly identify staff attorney costs and will assign specific reviewers to track costs throughout the litigation.

4.      Implementing external measures to ensure quality control of lodestar submissions among firms in large class action cases, including

        •       Circulating draft declarations to co-counsel for close scrutiny;

- Replacing unclear language with new, model language;

- Lead counsel imposing semi-routine lodestar reporting requirements; and;

- Seeking interim data throughout the lifetime of the case.

5. Implementing better communication among firms on cost-sharing, including memorializing such agreements in-writing and including any cost-sharing arrangements in the individual declarations.

The firms offered additional meritorious recommendations for *the courts* to

implement, including:

6. Appointing an executive committee comprised of co-counsel;

7. Defining standards at the beginning of litigation detailing what is expected of counsel;

8. Providing necessary guidance as to critical criteria in the fee petition; and

9. Ordering periodic fee monitoring requirements such as those required by Judge David Proctor in the Northern District of Alabama.

In addition to the preceding best practices offered by counsel, the Special Master

recommends the following:

10. That firms report all fee allocation agreements among counsel to the Court— without being asked.

11. That lead counsel include sufficient information to a class of fee allocation agreements between counsel such that class members may make informed decisions as to whether to object or opt out of class settlements.

12. That firms no longer retain an individual to obtain introductions to clients and then pay that person a percentage of every future case, whether or not that person does any work on a case or performs any services for the client, even if that person happens to have a law degree.

13. That fee allocation agreements between class counsel be in writing and based upon full disclosure of all material terms, and that Lead Counsel be responsible for ensuring this.

14. That Massachusetts limit the practice of "bare referrals", i.e. permitting a lawyer to receive a referral fee for doing no work and having no attachment to the case or the client, which invites abuses such as those found here and which blurs the lines between legitimate referrals that promote the retention of more competent lawyers and those which cross the line to outright solicitation. One step that might be helpful would be if the Massachusetts Board of Bar Overseers and Massachusetts courts were to make clear that Rule 7.2(b) applies to lawyers and that lawyers cannot receive "fees" from other lawyers simply for recommending a lawyer, unless there were a valid agreement under Rule 1.5(e), consented to in writing by the client after being fully informed in the material terms of the fee-sharing agreement.

The Special Master concludes by stating that in the focus of this investigation has been to identify true professional misconduct, to remedy wrongs and to put the law firms and the class in a position that is proportionate to the conduct and the harm. In this context, the Special Master notes that the recommendations here, if followed, would return between $7.4 and $8.1 million to the class. Beyond this, the Special Master reiterates that, despite the questionable conduct, the result achieved for the class in this settlement was an excellent one and that the firms and their lawyers deserve great credit.

DATED: May 14, 2018

Hon. Gerald E. Rosen (ret.),
Special Master