UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br>    Plaintiff<br><br>        v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) C.A. No. 11-10230-MLW<br>)<br>)<br>)<br>)<br>) |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN,WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated,<br>    Plaintiff<br><br>        v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 11-12049-MLW<br>)<br>)<br>) |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND and all others similarly situated,<br>    Plaintiff<br><br>        v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. 12-11698-MLW<br>)<br>)<br>) |

MEMORANDUM AND ORDER

WOLF, D.J.                                                    June 28, 2018

On June 21, 2018, I issued an Order stating that, "[f]or the reasons that will be explained in a forthcoming Memorandum and Order, Labaton Sucharow, LLP's motion seeking my recusal pursuant

1

to 28 U.S.C. §455(a) is hereby DENIED because a reasonable person could not question my impartiality." Docket No. 315. The reasons for that decision are described in this Memorandum.[1]

I. SUMMARY

I have been presiding in this class action since 2011. In 2016, I approved a settlement of the case and awarded Lead Counsel Labaton Sucharow LLP ("Labaton") and other law firms that represented the class $75,000,000 in attorneys' fees. A subsequent letter from Labaton informed me of what were characterized as "inadvertent errors" in the fee petition and affidavits Labaton had filed. A Boston Globe article raised further questions about the reliability of the representations that were made in the fee petition.

In 2017, with the agreement of Labaton and the other law firms representing the class, I took the evidently then unprecedented step of appointing a Master to investigate whether false and misleading statements had been made in the petition for fees and related issues. I directed the Master, Retired United

---

[1] I issued the Order in advance of this Memorandum because I wanted to eliminate any doubt about my authority to conduct the previously scheduled June 22, 2018 hearing on proposed redactions to the Master's Report and Recommendation. This also provided the proper sequence for deciding whether to make public some information Labaton had requested remain sealed that is necessary to discuss in this Memorandum. In view of the tight time frame for deciding the underlying questions of redaction, I also needed more time to complete drafting this Memorandum.

States District Judge Gerald Rosen, to report the results of his investigation and to make recommendations concerning whether the fee award should be reduced and whether sanctions should be imposed on any of the attorneys.

In May 2018, the Master submitted his Report and Recommendation (the "Report") under seal to permit the law firms to propose redactions.[2]  The Master has recommended, among other things, that Labaton and some of the firms associated with it be ordered to disgorge more than $10,000,000.  The Master also found that Garrett Bradley of the Thornton Law Firm ("Thornton"), and of Counsel to Labaton, included statements that he knew were false in his affidavit in support of the fee petition.  The Master recommends that I find Garrett Bradley violated Federal Rule of Civil Procedure 11, impose a sanction on Thornton of $400,000 to $1,000,000, and refer Garrett Bradley to the Massachusetts Board of Bar Overseers for disciplinary action.

The law firms have an opportunity to object to the Master's findings and recommendations.  The presiding judge must decide any objections de novo. As Labaton wrote in requesting my recusal, the decisions on objections could have "serious and far reaching adverse ramifications for at least some of the law firms." Docket No. 216-1 at 2.

---

[2] On June 28, 2018, the Report was ordered unsealed, with limited redactions not referenced in this Memorandum. See Docket No. 357.

Labaton has filed a motion asserting that the Master's appointment should be deemed concluded. That motion is not yet fully briefed and remains to be decided. However, if it is granted the Master would not have the opportunity to respond to objections to his recommendations.

Labaton has also moved for my disqualification pursuant to 28 U.S.C. §455(a). Labaton's motion relies primarily on a colloquy at sidebar during a May 30, 2018 hearing that included questioning of George Hopkins, the Executive Director of class representative Arkansas Teacher Retirement System ("ATRS").

In a class action, the presiding judge has a duty to assure that the class is represented by an entity or individual whose interests are typical of those of the members of the class and who will vigorously advocate the interests of the class through qualified counsel. This means, among other things, that the presiding judge should examine the adequacy of representation at all stages of the litigation, particularly if there has been a material change in circumstances. My questioning of Hopkins in open court was intended to obtain information relevant to determining whether ATRS continues to be an adequate representative of the class.

My questions to Hopkins were based, in meaningful measure, on a concern that ATRS' long and continuing relationship with Labaton might keep it from vigorously advocating the interests of

4

the class concerning whether Labaton and other firms should be ordered to disgorge more than $7,400,000 for the benefit of the class, and whether Labaton should be required to disgorge an additional $4,100,000 as well. The Master's Report revealed that $4,100,000 of the $75,000,000 fee award had been paid to Damon Chargois, a lawyer in Texas who had done no work on the case, and whose name was not disclosed to ATRS, the class, or the court. That payment reportedly resulted from the efforts of Chargois and his partner in Arkansas, Tim Herron, in introducing Labaton to ATRS.   Chargois described that role in a message to Labaton, stating:

> We got you ATRS as a client after considerable favors, political activity, money spent and time dedicated in Arkansas, and Labaton would use ATRS to seek lead counsel appointments in institutional        investor        fraud        and misrepresentation cases. Where Labaton is successful in getting appointed lead counsel and obtains a settlement or judgment award, we split Labaton's attorney fee award 80/20 period.

Report (Docket No. 224) at 125 n.111.

Hopkins stated to the Master that he did not believe that the fee to Chargois should have been disclosed to ATRS or the class. This prompted the Master to write that, "[w]e cannot see how, in light of a clear dereliction of his fiduciary duties to the class, Hopkins can fairly and adequately represent the class moving forward." Id. at 258, n.207.

While the merits of the Master's views remain to be decided, on May 30, 2018 I anticipated that the conduct of Hopkins on behalf of ATRS would become an issue in these proceedings, and that ATRS' interests might be aligned with Labaton's interests, which now conflict with the financial interests of the class. In addition, the Boston Globe had investigated and reported on campaign contributions to a Massachusetts county treasurer and the state treasurer by Labaton and Thornton before receiving lucrative contracts to represent funds chaired by those officials in class actions. It also reported that federal prosecutors were investigating Thornton's political campaign contributions. The Master in seeking instruction had told me that federal prosecutors were investigating whether Thornton had made an illegal payment to a pension fund official and asked him to provide information obtained in his investigation.[3] The Boston Globe article and the criminal investigation caused me to expect that there would be questions by the media at least about the origins of Labaton's relationship with ATRS when the Master's Report was unsealed. Each of these matters is relevant to whether ATRS remains a typical and adequate class representative.

In response to my questions on May 30, 2018, Hopkins testified that he did not believe that ATRS should take a position

---

[3] I instructed the Master not to provide information to the prosecutors voluntarily.

6

on whether Labaton and other lawyers should be ordered to return some of the fees awarded to the class. He also said ATRS was not, as class representative, receiving legal advice from anyone other than Labaton.

Without being asked, Hopkins also stated that, when he became Executive Director of ATRS, Labaton was one of several firms retained to monitor ATRS' investments and possibly represent ATRS in class actions, and that "political leaders" had persuaded Hopkins to give high priority to such cases. In response to questions about this, Hopkins said that he had over the years discussed class actions, Labaton, and this case with Stephen Faris. According to Master's Report, Faris, as an Arkansas State Senator, had introduced Labaton to ATRS. Hopkins also testified that he had met with Faris on May 28, 2018 -- Memorial Day -- and discussed the May 30, 2018 hearing with him.

After questioning Hopkins, I summarized my concerns about whether ATRS remained a typical and adequate class representative. I noted that the Master's Report raised questions, which were only questions, about the origins of Labaton's relationship with ATRS, and expressed concern that such an issue might diminish ATRS' incentive to represent the class vigorously. I concluded by saying that my paramount responsibility is to assure that the class is represented by a lead plaintiff whose role is not complicated by unique issues and potential conflicts of interest.

I provided Hopkins a week to report on whether ATRS wished to continue as a class representative and, if so, whether it intended to continue to get advice from Labaton or to obtain new counsel.

Counsel for Labaton then requested a sidebar conference, which was not public. I explained the reasons for my questions to Hopkins about Chargois and Faris. I said that while they may not be questions to be resolved in this case, I believed it was foreseeable that when the Report became public, there would be questions about the origins of the relationship between Labaton and ATRS, and whether "all of those millions of dollars stopped with Mr. Chargois." May 30, 2018 Tr. at 2. I expressed concern that such questions could affect ATRS' adequacy as class representative. In response to questions from Labaton's counsel, I stated that I had not formed the opinion that money was going to Faris or anyone else, or that public corruption had occurred. I reiterated that I was concerned that when the Report was made public ATRS would become part of the controversy, and that caused me to question whether ATRS remained an appropriate representative of the class. I said: "[R]emember what this is about. Who is representing the class?" Id. at 8.

Labaton has moved for my disqualification based primarily on the colloquy at sidebar. Labaton does not contend that I am actually biased or prejudiced, or claim that I actually have personal -- meaning extrajudicial -- knowledge of any disputed

8

evidentiary fact. Therefore, it does not seek my disqualification pursuant to 28 U.S.C. §455(b)(1).

Instead, Labaton suggests that a reasonable person could believe I am biased or prejudiced, or that I have personal knowledge of disputed facts. Therefore, Labaton seeks my recusal pursuant to 28 U.S.C. §455(a), which requires disqualification if the judge's impartiality might reasonably be questioned.

As the First Circuit has written, §455(a) "seeks to balance two competing policy considerations: first, that courts must not only be, but seem to be, free of bias or prejudice; and second, the fear that recusal on demand would provide litigants with a veto against unwanted judges." In re: Boston's Children First, 244 F.3d 164, 167 (1st Cir. 2001) (internal citations and quotations omitted).

A motion for disqualification under §455(a) must be decided from the perspective of a fully informed, reasonable person. "[U]nder §455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute." Liteky v. United States, 510 U.S. 540, 558 (1994) (Kennedy, J., concurring in judgment); United States v. Snyder, 235 F.3d 42, 48 (1st Cir. 2000) (quoting Liteky); In re United States, 158 F.3d 26, 34 (1st Cir. 1998) (same).

9

Almost always, an extrajudicial source is required to justify recusal under §455(a). See Liteky, 510 U.S. at 551. An extrajudicial source typically involves ex parte communications in which "a judge receives information that does not enter the record, the reliability of [which] may not be tested through the adversary process." United States v. Craven, 239 F.3d 91, 103 (1st Cir. 2001). As I explained would occur at the March 7, 2017 hearing at which the Master was appointed, I had periodic ex parte communications with the Master to discharge my administrative duties, under Federal Rule of Civil Procedure 53(a)(3), to protect against unreasonable expense and delay in these proceedings. In that process I was told about the existence of the $4,100,000 payment to a lawyer who did not work on this case. This information was provided to me so I could determine whether to authorize the Master to retain an advisor on the ethical issues that payment raised and decide whether to grant extensions of the deadline for submission of the Master's Report. I did not discuss with the Master the substance or merits of the ethical issues, which are addressed at length in his 377-page Report, or the substance or merits of any other issues.

As indicated earlier, the Master also informed me that federal prosecutors in Massachusetts had asked him for information in connection with their investigation of Thornton. He did so to seek instruction on how to respond to the request. I directed

10

the Master to tell the prosecutors that he was not authorized to provide them documents or information; rather, if they wanted to pursue the matter, they would have to file a motion to be decided by me or issue a grand jury subpoena. The prosecutors have done neither.

For the reasons described in detail in this Memorandum, a fully informed, reasonable person could not question my impartiality. Therefore, my recusal under §455(a) is not justified. Accordingly, I have a duty to continue to preside in this case, in part to avoid encouraging the perception that litigants can manipulate the system to jettison an impartial judge in the hope of getting another more to their liking. See In re: Allied Signal, 891 F.2d 967, 970 (1st Cir. 1989) (Breyer, J.). Therefore, on June 21, 2018 I issued an order denying Labaton's motion for my recusal.

## II.  THE MOTION AND THE APPLICABLE STANDARDS

Labaton filed a motion asking me to decide whether my disqualification is mandated by §455(a), which requires recusal if in this case my "impartiality might reasonably be questioned."[4] Labaton did not contend that I am actually biased or prejudiced,

---

[4] No other law firm joined Labaton's motion seeking my recusal. Labaton did not request discovery concerning its motion. Nor did Labaton request a hearing on it as required by Rule 7.1(d) of the Local Rules of the United States District Court for the District of Massachusetts if a party "wishes to be heard." I found, in any event, that a hearing on the motion was not necessary.

or that I have personal, meaning extrajudicial, knowledge of disputed evidentiary facts, any of which would require my recusal under 28 U.S.C. 455(b)(1). Nevertheless, Labaton suggested that I decide whether a reasonable person might question my impartiality. See In re Bulger, 710 F.3d 42, 46 (1st Cir. 2013) (in some circumstances, "a reasonable person may question impartiality without the presence of any evidence the judge is subjectively biased").

Labaton stated that its motion was primarily based on the colloquy at sidebar following my questioning George Hopkins, the Executive Director of ATRS. See Docket Nos. 275 at 2, 276 at 2. It wrote that the motion "secondarily relate[d]" to whether the court's impartiality could reasonably be questioned concerning challenges Labaton intended to make to the cost and the performance of the Master. Docket No. 275 at 2; see also Docket No. 276 at 1. On June 19, 2018, Labaton has filed a motion seeking, among other things, a ruling that the Master's role in this case has ended. See Docket No. 302.

It is the duty of the presiding judge, rather than another judge, to decide whether his disqualification is required by §455(a). See In re Martinez-Catala, 129 F.3d 213, 220 (1st Cir. 1997). As the First Circuit has explained:

> It might seem odd that recusal issues should
> be decided by the very judge whose recusal is
> in question. But there are other

12

considerations at work, including desire for
expedition and a concern to discourage judge
shopping.

Id.

In 1989, then-Judge Stephen Breyer wrote with regard to a

motion to disqualify under §455(a) that:

We draw our legal standards for review of a
district judge's decision not to disqualify
himself from [] In re United States, 666 F.2d
[690]. We there held (1) that "a charge of
partiality must be supported by a factual
basis," (2) that "disqualification is
appropriate only if the facts provide what an
objective, knowledgeable member of the public
would find to be a reasonable basis for
doubting the judge's impartiality," and (3)
that this court of appeals will allow the
district judge "a range of discretion" in
making these determinations. Id. at
695 (emphasis in original). Only if the
district court's decision to sit "cannot be
defended as a rational conclusion supported
by reasonable reading of the record" will we
insist upon disqualification. Id. (emphasis
added).

In re Allied-Signal, 891 F.2d 967, 970 (1st Cir. 1989) (emphasis in

original).

The standard for determining a motion for disqualification

under §455(a) is "[w]hether the charge of lack of impartiality is

grounded on facts that would create a reasonable doubt concerning

the judge's impartiality, not in the mind of the judge himself or

even necessarily in the mind of the litigant filing the motion

under 28 U.S.C. §455, but rather in the mind of the reasonable

man." United States v. Voccola, 99 F.3d 37, 42 (1st Cir.

13

1996) (quoting United States v. Cowden, 545 F.2d 257, 265 (1st Cir. 1976)). Therefore, the disqualification issues must be analyzed from the perspective of "an objective, knowledgeable member of the public," rather than from the perspective of a person involved in, or directly affected by, the case. El Fenix de Puerto Rico v. M/Y JOHANNY, 36 F.3d 136, 141 (1st Cir. 1994) (quoting In re United States, 666 F.2d at 695)).

This test asks "whether a reasonable person, fully informed of all the facts, would doubt [the judge's] impartiality." In re United States, 158 F.3d at 31 (emphasis added); see also United States v. Vazquez-Botet, 532 F.3d 37, 48 (1st Cir. 2008); El Fenix de Puerto Rico, 36 F.3d at 141; Home Placement Serv., Inc. v. Providence Journal Co., 739 F.2d 671, 676 (1st Cir. 1984). The proper perspective has been described as that of "the reasonable man on the street ... who knows the full facts even if those facts are not known on the street." Ricci v. Key Bancshares of Maine, Inc., 111 F.R.D. 369, 374 (D. Me. 1986) (Aldrich, J., sitting by designation).

The conduct that has prompted the motion for recusal is not to be considered in isolation. Rather, the record as a whole must be considered. See In re Cargill, Inc., 66 F.3d 1256, 1260 (1st Cir. 1995) (reviewing recusal in light of "careful perscrutation of the record"); In re Allied-Signal, 891 F.2d at 972 (considering that law clerks whose brothers were plaintiffs' counsel had worked

14

on the complex case since it began and were unusually useful "in bringing Phase One [of the case] to trial"); cf. United States v. Ayala-Vazquez, 751 F.3d 1, 23 (1st Cir. 2014) ("[W]hen a defendant claims he has been prejudiced through a trial judge's interventions at trial, '[c]harges of partiality should be judged not on an isolated comment or two, but on the record as a whole[.]'") (quoting United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1998))).

In deciding a motion to recuse under §455(a), "the district court is not to use the standard of 'Caesar's wife,' the standard of mere suspicion." In re Allied-Signal, 891 F.2d at 970; see also In re Bulger, 710 F.3d at 47 (same); Cigna Fire Underwriters Co. v. MacDonald & Johnson, Inc., 86 F.3d 1260, 1271 (1st Cir. 1996) (same). Rather, as Justice Anthony Kennedy has written, and the First Circuit has reiterated:

> [Section] 455(a) is triggered by an attitude or state of mind so resistant to fair and dispassionate inquiry as to cause a party, the public, or a reviewing court to have reasonable grounds to question the neutral and objective character of a judge's rulings or findings. I think all would agree that a high threshold is required to satisfy this standard. Thus, under §455(a), a judge should be disqualified only if it appears that he or she harbors an aversion, hostility or disposition of a kind that a fair-minded person could not set aside when judging the dispute.

Liteky, 510 U.S. at 557-58,   (Kennedy, J., concurring in the judgment) (emphasis added); see also Snyder, 235 F.3d at 48 (quoting Liteky, 510 U.S. at 557-58); In re United States, 158 F.3d at 34 (same). In essence, "the presumption is that a judge will put personal beliefs aside and rule according to the laws as enacted, as required by his or her oath." In re Aguinda, 241 F.3d 194, 204 (2d Cir. 2001).[5] However, the First Circuit has explained that "doubts ordinarily should be resolved in favor of recusal." In re United States, 158 F.3d at 30.

In Liteky, the Supreme Court wrote that for the purpose of §455(a) analysis:

> [I]t may not be too far off the mark as a practical matter, to suggest that "extrajudicial source" is the only basis for establishing disqualifying bias or prejudice. It is the only common basis, but not the exclusive one . . . .

510 U.S. at 551 (emphasis in original). A disqualifying appearance of bias or prejudice under §455(a) can be based on information the judge acquires in the litigation, but only if "it is so extreme as to display clear inability to render fair judgment." Id.

The "high threshold" required for recusal under §455(a) recognizes certain realities. In re United States,

---

5 See also First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler, 210 F.3d 983, 988 (9th Cir. 2000) ("[J]udges are presumed to be impartial and to discharge their ethical duties faithfully so as to avoid the appearance of impropriety.").

158 F.3d at 34 (quoting Liteky, 510 U.S. at 557-58). As the First Circuit has explained, "[i]n the real world, recusal motions are sometimes driven more by litigation strategies than by ethical concerns . . . . [C]ourts cannot afford to spawn a public perception that lawyers and litigants will benefit by undertaking such machinations." In re Cargill, 66 F.3d at 1262-63. Therefore, again, as then-Judge Breyer wrote:

> [W]hen considering disqualification, the district court is not to use the standard of Caesar's wife, the standard of mere suspicion. This is because "the disqualification decision must reflect not only the need to secure public confidence through proceedings that appear to be impartial, but also the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking.

In re Allied-Signal, 891 F.2d at 967; see also In re Bulger, 710 F.3d at 47; In re United States, 441 F.3d 44, 67 (1st Cir. 2006) (same); Cigna Fire Underwriters Co., 86 F.3d at 1270 (same). This is because §455(a) "seeks to balance two competing concerns: first, the courts must not only be, but seem to be, free of bias and prejudice, and second the fear that recusal on demand would provide litigants with a veto against judges." In re: Boston's Children First, 244 F.3d at 167 (internal citations and quotations omitted).

In addition, because "litigants have an incentive to judge-shop, [ ] a judge should not grant a recusal motion simply because a claim of partiality has been given wide-spread publicity." In re Aguinda, 241 F.3d at 206; see also In re Drexel Burnham Lambert, Inc., 861 F.2d 1307, 1309 (2d Cir. 1988). Because it is important not to allow, or appear to allow:

> litigants or third parties [the power] to exercise a negative veto over the assignment of judges ... [the] inquiry cannot stop with the questions [such as] . . . would the judge have avoided controversy and the need for appellate review if he had stepped aside?

In re United States, 666 F.2d at 694-95.

Moreover, §455(a) "should not be used by judges to avoid sitting on difficult or controversial cases." Snyder, 235 F.3d at 45 (quoting H.R. Rep. No. 1453, 93d Cong., 2d Sess., 1974 U.S. Code Congr. & Admin. News 6351, 6355); see also United States v. Salemme, 164 F. Supp. 2d 86, 94 (D. Mass. 1998).[6]

---

[6] Where, as here, the only basis for a motion for disqualification is §455(a), the parties agree that the judge is actually impartial and the only issue is one of perception. Therefore, after full disclosure of the facts by the judge, on the record, the parties are permitted to waive a §455(a) ground for recusal under 28 U.S.C. §455(e), but not a ground under §455(b), which addresses actual impediments to the judge's ability to preside impartially. See, e.g., In re Cargill, 66 F.3d at 1261 ("The relevant statute, 28 U.S.C. §455(e), plainly contemplates that a party may waive an appearance-of-impropriety ground for disqualification."); Salemme, 164 F. Supp. 2d at 93-94. Such waivers permit a case to proceed without interruption or delay.

III. THE RELEVANT FACTS

A fully informed, reasonable person would know the following facts.

A.   The Appointment of the Master

After a hearing on November 2, 2016, I approved a $300,000,000 settlement in this class action alleging that defendant State Street Bank overcharged its customers in connection with certain foreign exchange transactions. I employed the "common fund" method to determine the amount of attorneys' fees to award, meaning that I "shape[d] the counsel fee based on what [I] determined [was] a reasonable percentage of the fund recovered for [the class]." In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 305 (1st Cir. 1995). I found to be reasonable a requested award to class counsel of $74,541,250 in attorneys' fees and $1,257,697.94 in expenses. That award represented about 25% of the common fund.

Like many judges, and consistent with my longstanding practice, I tested the reasonableness of the requested award, in part, by measuring it against what the nine law firms representing plaintiffs stated was their total "lodestar" of $41,323,895.75. See Nov. 2, 2016 Transcript ("Tr.") at 30-31, 34; see also Manual for Complex Litigation (Fourth) §14.122 (2004) ("the lodestar is ... useful as a cross-check on the percentage method" of determining reasonable attorneys'

fees); Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050 (9th Cir. 2002)("[T]he lodestar may provide a useful perspective on the reasonableness of a given percentage award."). Plaintiffs' counsel represented that the total requested award involved a multiplier of 1.8 of their lodestar, which they argued was reasonable in view of the risk they undertook in taking this case on a contingent fee. See Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees (Docket No. 103-1) at 24-25 (the "Fees Award Memo").

A lodestar is properly calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. See Blum v. Stenson, 465 U.S. 886, 889, 891 (1984). The Supreme Court has instructed that "[r]easonable fees ... are to be calculated according to the prevailing rates in the relevant community." Id. at 895. "[T]he rate that private counsel actually charges for her services, while not conclusive, is a reliable indicum of market value." United States v. One Star Class Sloop Sailboat, 546 F.3d 26, 40 (1st Cir. 2008) (emphasis added). The First Circuit cited a common fund case, In re Cont'l Ill. Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992), for this proposition. Id.

In the memorandum in support of the fee request, Labaton represented that to calculate the lodestar counsel had used "current rather than historical billing rates," for attorneys

working on this case. Fees Award Memo. at 24. Similarly, in the
related affidavits filed on behalf of each law firm counsel stated
that "the hourly rates for the attorneys and professional support
staff in my firm ... are the same as my firm's regular rates
charged for their services...." For example, Garett Bradley made
this statement under oath in his affidavit on behalf of Thornton.
See Docket No. 104-16 at ¶4. Lawrence Sucharow made the same
statement under oath in his affidavit on behalf of Labaton. See
Docket No. 104-15 at ¶7. The affidavits on behalf of each law
firm, including Bradley's for Thornton, stated that the
calculations were based on contemporaneous time records, which
were available to be reviewed by me. See Bradley Aff. (Docket No.
104-16) at ¶3. In view of the well-established jurisprudence and
the representations of counsel, I understood that in calculating
the lodestar plaintiffs' law firms had used the rates they each
customarily actually charged paying clients for the services of
each attorney, and were representing that those rates were
comparable to the rates actually charged by other attorneys to
their clients for similar services in their community.

On November 10, 2016, David J. Goldsmith of Labaton, on behalf
of plaintiffs' counsel, sent me a letter. See Docket No. 116.
Goldsmith noted that I had used the lodestar calculated by counsel
as a check concerning the reasonableness of the percentage of the
common fund requested for attorneys' fees. Id. at 3, n.4. He stated

that as a result of an "inquiry from the media" "inadvertent errors [had] just been discovered in certain written submissions from Labaton Sucharow LLP, Thornton, and Lieff Cabraser Heiman & Bernstein LLP supporting Lead Counsel's motion for attorneys' fees...." Id. at 1. Goldsmith reported that the hours of certain staff attorneys, who were paid by the hour primarily to review documents, had been included in the lodestar reports of more than one firm. Id. at 1-2. More specifically, the letter stated that lawyers located at Labaton's and Lieff's offices were counted by Thornton and should have been included only in Thornton's lodestar. Id. at 2. Goldsmith also wrote that in some cases different billing rates had been attributed to particular staff attorneys by different firms. Id. at 3.

This double-counting resulted in inflating the number of hours worked by more than 9,300 and inflating the total lodestar by more than $4,000,000. Id. at 2-3. As a result, Goldsmith stated a multiplier of 2, rather than 1.8, should have been used to test the reasonableness of the request for an award of $74,541,250 in attorneys' fees. Id. at 3. He asserted that the award nevertheless remained reasonable and should not be reduced. Id.

The letter did not indicate that the reported lodestar was not based on what plaintiffs' counsel, or others in their community, actually customarily charged paying clients for the type of work done by the staff attorneys in this case. Nor did the

letter raise any question concerning the reliability of the representations concerning the number of hours each attorney reportedly worked on this case.

Such questions, among others, were raised by a December 17, 2016 Boston Globe article headlined "Critics hit law firms' bills after class action lawsuits." See Docket No. 117, Ex. B. For example, the article reported that the staff attorneys involved in this case were typically paid $25-$40 an hour. In calculating the lodestar, it was represented to the court that the regular hourly billing rates for the staff attorneys were much higher—for example, $425 for Thornton, see Docket No. 104-15 at 7-8 of 14, and $325-440 for Labaton, see Docket No. 104-15 at 7-8 of 52. A representative of Labaton reportedly confirmed the accuracy of the article in this respect. See Docket No. 117, Ex. B at 3.

The Boston Globe also published a January 28, 2017 article headlined "Firms profit from Garret Bradley's ties," which is relevant to the Labaton's request for my recusal. The article stated that the Plymouth County Treasurer Thomas J. O'Brien was:

> an unlikely magnet for campaign contributions from high powered attorneys in Manhattan and downtown Boston. Yet, since 2007, lawyers from the Thornton Law Firm in Boston and Labaton Sucharow have given $100,000 to O'Brien's political campaigns, accounting for almost half of all of the contributions he's received over the decade.

Andrea Estes, "Firms profited from Garrett Bradley's ties," <u>Boston</u>
<u>Globe</u> (Jan. 28, 2017).[7] The article further reported that,
"[f]ourteen times in the past decade, the Plymouth County
retirement system has filed [class action] lawsuits on the advice
of lawyers from Labaton and Thornton." <u>Id.</u> Reportedly, "[c]ourt
records show that the retirement fund has collected a grand total
of $40,035 from all lawsuits combined while the lawyers had
received 1,000 times that amount: $41.4 million." <u>Id.</u>

The article also states that "in Massachusetts, no one is
better at persuading investors to join class action lawsuits than
O'Brien's friend, [Garrett] Bradley, the managing partner of the
Thornton Law Firm and, until his sudden departure a few months
ago, assistant majority leader in the state House of
Representatives." <u>Id.</u> Thornton's lawyer explained that Bradley's
role was to "drum up business," for Thornton and Labaton. <u>Id.</u>
"O'Brien said his county's decision to join so many Labaton
lawsuits has nothing to do with <u>political favors</u>." <u>Id.</u> (emphasis
added).[8]

---

[7] The <u>Boston Globe</u> article is not cited for the truth of the
statements in it. It is quoted because the information it contains
is relevant to what a fully informed person would know, and to
whether the statements in the sidebar conference on May 30, 2018
on which Labaton primarily relies in seeking my recusal could cause
a knowledgeable, reasonable person to doubt my impartiality.

[8] The Master's Report at 125, n.111, states that Chargois, the
attorney in Texas who received more than $4,000,000 of the

The January 28, 2017 Boston Globe article also raised
questions about more than $30,000 in campaign contributions
Thornton and Labaton made to Massachusetts Treasurer Timothy
Cahill. Reportedly, several months after those contributions, the
state pension fund Cahill chaired hired Labaton. Andrea Estes,
"Firms profited from Garrett Bradley's ties," Boston Globe (Jan.
28, 2017). Labaton reportedly subsequently filed two successful
class action lawsuits for the pension fund.   Id. As a result,
Labaton reportedly received $60,000,000, and shared $9,000,000
with Thornton, while the pension fund collected $681,763. Id. The
article also reported that after the Boston Globe began asking
questions about Bradley's work with the pension fund, "he took the
drastic step [of] . . . abruptly resign[ing] from the state
Legislature . . . ." Id.[9]

---

attorneys' fees I awarded although he did no work on this case,
wrote in a 2014 email to Labaton that:

> Our deal with Labaton is straightforward. We
> got you ATRS after considerable favors,
> political activity, money spent and time
> dedicated in Arkansas and Labaton would use
> ATRS to seek lead counsel appointments in
> institutional fraud and misrepresentation
> cases. When Labaton is successful in getting
> a settlement or judgment award, we split
> Labaton's attorney fee award 80/20 period.

[9] The Boston Globe subsequently published another article that
reiterated and amplified its report concerning Thornton and
Labaton campaign contributions to Plymouth County Treasurer
O'Brien and Massachusetts Treasurer Cahill before being hired to
conduct class action litigation that was lucrative for the lawyers.

In addition, the January 28, 2017 Boston Globe article stated that:

> Bradley and his Thornton colleagues are now facing a federal criminal investigation into their firm's massive political donations program.   The US attorney wants to know whether the law firm illegally reimbursed the firm's attorneys for donations, including those to politicians who oversee pension funds.

Id.

In a February, 2017 Memorandum and Order, I wrote that the December 17, 2016 Boston Globe article raised questions concerning whether the hourly rates plaintiffs' counsel attributed to the staff attorneys in calculating the lodestar were, as represented, what these firms actually charged for their services or what other lawyers in their community charge paying clients for similar services. Docket No. 117. This concern was enhanced by the fact that different firms represented that they customarily charged clients for the same lawyer at different rates. In general, I questioned whether paying clients customarily agreed to pay, and actually paid, an hourly rate for staff attorneys that is about

---

See Andrea Estes, "Former top Mass. lawmaker often helped his business, family," Boston Globe (May 30, 2017).   That article stated that "[a] federal grand jury is now looking into millions of dollars in reimbursements for campaign contributions, which may violate laws that require political donations be made in the name of the actual donors." Id.

ten times more than the hourly cost, before overhead, to the law firms representing plaintiffs.

In addition, I noted that the article raised questions concerning whether the hours reportedly worked by plaintiffs' attorneys were actually worked. Id. Most prominently, the article accurately stated that Michael Bradley, the brother of Thornton Managing Partner Garrett Bradley, was represented to me to be a staff attorney employed by Thornton who worked 406.40 hours on this case. See Docket No. 104-15 at 7. Garrett Bradley also represented that the regular rate Thornton charged for his brother's services was $500 an hour. Id. However the article stated, without reported contradiction, that "Michael Bradley ... normally works alone, often making $53 an hour as a court appointed defender in [the] Quincy [Massachusetts] District Court." Docket No. 117, Ex. B. These statements caused me to express concern about whether Michael Bradley actually worked more than 400 hours on this case and about whether Thornton actually regularly charged paying clients $500 an hour for his services.

I also stated that the acknowledged double-counting of hours of staff attorneys and the matters discussed in the December 17, 2016 Boston Globe article raised broader questions about the accuracy and reliability of the representations plaintiffs' counsel made in their calculation of the lodestar generally. These questions -- which I said were only questions -- caused me to

27

express concern about whether the award of almost $75,000,000 in attorneys' fees was reasonable.  Therefore, I informed the parties that I proposed to appoint Retired United States District Judge Gerald Rosen as a Master to investigate and provide a Report and Recommendation on all issues relating to the award of attorneys' fees in this case.

On March 7, 2017, pursuant to the February 6, 2018 Order, I held a hearing concerning my proposed appointment of Judge Rosen as Master and related issues.  The hearing began with argument concerning the motion filed by Ted Frank of the Competitive Enterprise Institute to participate in these proceedings, including as a guardian ad litem for the class with the authority to serve as an adversary to the plaintiffs' law firms in any proceedings before the proposed Master.  In successfully opposing this request, counsel for Labaton, Joan Lukey, argued that Judge Rosen could retain someone "to ask cross-examination questions in an adversarial or quasi-adversarial model," and, therefore, neither the class nor the Master would need Frank's assistance. Mar. 7, 2017 Tr. at 40.  Lukey added that Judge Rosen was "obviously very skilled and has been in the role of a judge for many, many years."  Id.  She expressed appreciation for "the opportunity to present to a special master of his qualifications."  Id. at 41. Therefore, Labaton had "no objection to Judge Rosen" being

appointed as Master.  Id. at 41, 43.  Nor did anyone else object to Judge Rosen's appointment.  Id.

Labaton also agreed to my proposal that it return $2,000,000 to the District Court so that I could review bills and authorize payment of the reasonable cost of the Master and those he employed. Id. at 44, 65.  I told the law firms that if more than $2,000,000 was needed, I would give notice and provide an opportunity for them to be heard concerning where the funds should come from.  Id. at 65.

Federal Rule of Civil Procedure 53(a)(3) provides, in part, that in appointing a master the court must "protect against unreasonable expenses or delay."  Therefore, on March 7, 2017, I informed the parties that "I [would] monitor who is being employed [by the Master] and what the proposed rates are."  Id.

I also told the parties that I anticipated that it would be necessary for me to have some ex parte communications with the Master.  Id. at 68.  I explained, however, that:

> I want to minimize any ex parte communications with me because I'll need to decide objections to [the Master's] report and recommendation. So, I intend to limit ex parte communications to what I call administrative matters at this point, fee requests or procedural matters, if there are any.

Federal Rule of Civil Procedure 53(b)(2)(B) requires that an order appointing a master state "the circumstances, if any, in which the master may communicate ex parte with the court or a party."

Therefore, my Order appointing the Master addressed this issue, stating, in pertinent part, that:

> The Master may communicate ex parte with the court on administrative matters. The Master may also, ex parte, request permission to communicate with the court ex parte on particular substantive matters. Requests for ex parte communications with the court on substantive matters should be minimized. See Fed. R. Civ. P. 53(b)(2)(B).

Docket No. 173, ¶6. As explained below, my ex parte communications with the Master have involved only administrative matters.

The March 7, 2017 hearing also included discussion of some of the issues that prompted the appointment of the Master. Counsel for Thornton, Brian Kelly, stated that my concerns about the representations that had been made in the requests for attorneys' fees were "justifiable." Mar. 7, 2017 Tr. at 71. He represented that Michael Bradley had actually worked more than the number of hours attributed to him in the fee petition, but did not have conventional time sheets to document his time. Id. at 72. Kelly and Michael Bradley each also stated that Michael Bradley was not an employee of Thornton, and that neither the firm nor Michael Bradley had, as represented under oath in Garrett Bradley's affidavit in support of the fee petition, ever billed for his time at the rate of $500 per hour. Id. at 73-74. Although he claimed that Thornton's regular rate for Michael Bradley was $500 an hour, Garrett Bradley could not identify any case in which a client had

been charged that rate, and identified only one Thornton case in which his brother was billed at a rate of as much as $300 an hour. Id. at 88-90.

As indicated earlier, Sucharow of Labaton had stated in his sworn affidavit in support of the request for attorneys' fees that: "[t]he hourly rates for attorneys and professionals in [Labaton], included in Exhibit A [to my affidavit] are the same as my firm's regular rates charged for their services which have been accepted in other complex class actions." Sucharow Aff. (Docket No. 104-15), ¶7; Mar. 7, 2017 Tr. at 79. At the March 7, 2017 hearing, however, Sucharow acknowledged that the rates characterized as Labaton's "regular rates charged for [the] services" of the attorneys who worked on this case had never been charged to paying clients because his firm always worked on a contingency fee basis and had no "billable clients." Mar. 7, 2017 Tr. at 79.

Similarly, Garrett Bradley acknowledged that Thornton had never billed a paying client $425 an hour for a staff attorney and, indeed, the staff attorneys he had represented in his affidavit worked for Thornton actually worked at, and were paid by, Labaton and Lieff. Id. at 88.

Although I did not say so at the time, the statements of Sucharow and Garrett Bradley heightened my concern about whether false and misleading statements had been made under oath.

I did, however, note at the March 7, 2017 hearing that the propriety of the hourly rates attributed to "staff" and "contract" attorneys for the purpose of calculating lodestars for use in class actions had become the subject of litigation recently in several cases in the Southern District of New York and mentioned several of them. Mar. 7, 2017 Tr. at 94; In re Weatherford Int'l Sec. Litig., 2015 WL 127847, at *1 (S.D.N.Y. 2015); In re Citigroup Inc. Sec. Litig., 965 F. Supp. 2d 369 (S.D.N.Y. 2013); In re Citigroup Inc. Bond Litig., 988 F. Supp. 2d 371 (S.D.N.Y. 2013); In re Beacon Assocs. Litig., 2013 WL 2450960 (S.D.N.Y. 2013); City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp., 954 F. Supp. 2d 276 (S.D.N.Y. 2013). In one case, which involved a firm involved in the instant case, Keller, Rohrbach, the court wrote:

> There is little excuse in this day and age for delegating document review (particularly primary review or first pass review) to anyone other than extremely low-cost, low-overhead temporary employees (read, contract attorneys) – and there is absolutely no excuse for paying those temporary, low-overhead employees $40 or $50 an hour and then marking up their pay ten times for billing purposes.

Beacon Assocs., 2013 WL 2450960, at *18.

The lodestars and requested fee awards were reduced in some of the cases in the Southern District of New York. See, e.g., In re Weatherford Int'l Sec. Litig., 2015 WL 127847, at *2; In re Citigroup Inc. Sec. Litig., 965 F. Supp. 2d at 373-74. However,

none of those cases resulted in the appointment of a master to investigate the veracity of the fee applications and related matters, including possible sanctions. I am evidently the first judge to have done that.

B.  Communications After the Appointment of the Master

As discussed at the March 7, 2017 hearing and authorized by the March 8, 2017 Order appointing the Master, I had periodic ex parte communications with the Master about administrative matters.[10] Some of these discussions concerned the bills of the Master and those he had been authorized to employ. They also included discussion of additional individuals or organizations the Master proposed to employ and the justification for doing so. These discussions at times included identification of the issues that in the Master's view justified the retention, but not the substance or merits of those issues. The existence of certain issues, but not their merits, were also discussed in connection with the Master's several requests for extensions of the original October 10, 2017 deadline. Oct. 2, 2017 Order, Ex. A (Docket No. 207-1); Dec. 14, 2017 Order, Ex. A (Docket No. 214-1); Mar. 1, 2018 Order, Ex. A (Docket No. 216-1); Apr. 23, 2018 Order, Ex. A.

---

[10] Some of the discussions with the Master included his counsel, William Sinnott. References in this Memorandum to communications with the Master include some communications with both the Master and Sinnott.

More specifically, the court periodically discussed with the Master issues concerning the bills for his fees and expenses. The most significant such discussion was disclosed in a May 25, 2017 Memorandum and Order in which I approved an increase in the Master's hourly rate from $800 to $900. See Docket No. 206. In that Order, I wrote:

> The court did not give plaintiffs' counsel prior notice of this issue and the Special Master's request because doing so would involve disclosing his bills and, therefore, injure the confidentiality of the Special Master's investigation, which is the reason for the ex parte submissions of those bills. However, if plaintiffs' counsel object promptly to the Special Master's rate being raised to $900 an hour or to the process by which the decision to do so has been made they may file a motion requesting that the court reconsider its approval of the increased rate.

Id. at 2-3.

On October 24, 2017, I issued an order requiring Labaton to return an additional $1,000,000 to the court for the cost of the Master. See Docket No. 208. On April 23, 2018, I ordered Labaton to return another $800,000 more to fund the Master's foreseeable future fees and expenses. See Docket No. 217. For the reasons explained in the May 25, 2017 Order raising the Master's hourly rate, I did not give Labaton prior notice and an opportunity to be

heard concerning the additional payments.[11]  I did, however, order that "any request for reconsideration" of the October 24, 2017 Order requiring the $1,000,000 payment "shall be filed by October 31, 2017." Docket No. 208 at 4, ¶3. No objection was then filed. I did not include a similar provision in the April 23, 2018 Order. However, it is evident Labaton understood that it could object as it made the $800,000 payment under a reservation of rights to contest that payment, see Docket No. 222, and on June 19, 2018 it did so.  See Docket No. 302.

I also had discussions with the Master in which he identified issues that had emerged that would impede his ability to file his Report by the original October 10, 2017 deadline, and later extensions of the deadline.  Those discussions also involved the Master's request for authorization to retain Professor Stephen Gillers to advise him on the issues relating to Chargois.  As indicated earlier these discussions did not include the merits of the issues that were identified.

---

[11] I now realize that Federal Rule of Civil Procedure 53(b)(4) requires that the court give the parties notice and an opportunity to be heard before amending an order appointing a Master.  The better practice would have been to devise a way to give the law firm prior notice of the additional payments I was considering ordering in some fashion that would have maintained the confidentiality of the Master's investigation.  I do not believe, however, that the fact that I did not give the law firms prior notice, when they knew they could seek reconsideration of my orders, would cause, or contribute to causing, a reasonable person to question my impartiality.

More specifically, in August 2017, the Master told me that after depositions had been completed his team had found emails regarding a lawyer in Texas that would require reopening some depositions and additional discovery, which he expected the law firms would oppose. Therefore, the Master anticipated requesting an extension of the October 10, 2017 deadline for filing his Report.

In September 2017, the Master told me that he did indeed need such an extension and that the parties had agreed to it. To justify his request, the Master explained that the Texas lawyer had been paid 5.5% of the approximately $75,000,000 in attorneys' fees I had awarded, and that the payment had not been disclosed all of plaintiffs' lawyers or to me. I told the Master I wanted him to conduct a thorough investigation and to complete it as soon as reasonably possible. I agreed to extend the deadline for his Report to December 15, 2017, and directed the Master to send me a letter concerning his request. He did so and I made the letter part of the public record in granting the requested extension to December 15, 2017. See Docket Nos. 207 and 207-1.

In October 2017, the Master informed me that he had entered a Protective Order that, among other things, provided the parties an opportunity to request that parts of his Report be sealed. I agreed to revise the Order appointing the Master to provide such an opportunity and did so. See Docket No 208.

The Master subsequently requested authorization to retain Gillers, an expert in legal ethics, at the rate of $900 an hour, although his retention would further delay the submission of the Master's Report because of Gillers' limited availability. In support of his request, the Master explained that Labaton had retained two experts, including Harvard Law School professor William Rubenstein,[12] who opined that the payment to the Texas lawyer was an ethically permissible "referral fee" which was not required to be disclosed to the court. Gillers, I was told, would provide a contrary opinion that the Master believed was important to present. The reasons for the conflicting expert opinions were not disclosed or discussed. I authorized the retention of Gillers.

The Master subsequently informed me that he had told the law firms that he had retained Gillers. He also said that he agreed to allow Labaton to take Gillers' deposition and to present argument concerning Gillers' opinions to the Master. He explained that while this would take time, the issues were threatening to Labaton and he wanted to consider its views fully before submitting his Report. I directed the Master to send me a letter memorializing his request. He did so. On December 14, 2017, I issued an order

---

[12] I have a vague memory that, sometime after the Master was appointed, I received an email or letter from Rubenstein inviting me and, I believe, other judges to an event, possibly at his home. I cannot find the email or letter and may be mistaken about whether it came from Rubenstein. However, any such message did not mention his involvement in this case.

extending the deadline for the Master's Report to March 15, 2018, and attached his letter to it. See Docket No. 214, 214-1.

In late February 2018, the Master told me that he had provided Gillers' report to the law firms, which were shocked by his opinions and wanted eight more weeks to respond to them. However, I expressed my reluctance to extend the deadline for the Masters Report beyond March 15, 2018, which was six months later than the original deadline. I noted that, under Federal Rule of Evidence 53(f)(1), I have the authority to take evidence concerning an objection, and that was an alternative to law firms presenting additional evidence and argument to the Master. Nevertheless, I agreed to the Master's request for an extension to April 23, 2018, and directed him to submit a letter memorializing it. He did so. I issued an order granting the request, appending the Master's letter to it. See Docket Nos. 216, 216-1.

I subsequently had several discussions with the Master concerning the mechanics of preparing his Report, and the record of his activities, and submitting at least the Report in electronic form. This resulted in my issuing an Order extending the deadline for filing the Report to May 14, 2018, and attaching the Master's letter requesting the extension to it. See Docket Nos. 217, 217-1.

I also had limited discussions with the Master on another subject. In January 2018, he informed me that he had been

38

contacted by prosecutors in the Office of the United States Attorney for the District of Massachusetts. The Master said that the prosecutors were investigating Thornton, including whether a possible illegal payment had been made to an official of a pension fund. They wanted to obtain information from the Master. The Master said that he did not provide the prosecutors any information beyond telling them that his Report was then due on March 15, 2018. He said he had told the prosecutors that he would consult me about their request.

The Master and I noted that prosecutors' investigation suggested questions about whether any of the money paid to the Chargois had been used to make political contributions or other payments, and the potential for the criminal investigation to expand to include Chargois. I told the Master that I was reluctant to authorize any informal cooperation with the prosecutors. I directed the Master to tell them to send him a letter so I could consider a specific request.

The prosecutors sent the Master a letter requesting that they be given immediately copies of the depositions and witness statements he had, and that they be provided any other relevant documents after his Report was filed. The Master sent the letter to me. I then instructed the Master to tell the prosecutors that he was not authorized to provide them information or documents voluntarily. Rather, if they wanted any documents or information

39

before his Report became public they would have to issue a grand jury subpoena or file a motion to be decided by me. The prosecutors have done neither.

After it was publicly reported that the Master's Report had been filed under seal, one of the prosecutors told a member of my staff that she would like to speak with me. She did not identify the matter she wanted to discuss. I instructed that member of my staff to tell the prosecutor that if the requested discussion related to this case, I would not speak to her. I have not heard further from the prosecutor.

In addition, in August 2017, I received an email from the National Association of Legal Fees Analysis inviting me to participate, with other judges, in a CLE webinar, "View from the Bench: Awarding Attorneys' Fees in Federal Litigation." I responded, "[t]hank you for this invitation, which I am unable to accept."

   C.   Events Following the Submission
        of the Master's Report

On May 14, 2018, the Master filed his Report and Recommendation, an Executive Summary of it, and Exhibits. See Docket No. 224 (under seal). I allowed that submission to be submitted temporarily under seal so the lawyers could propose redactions and I could decide which, if any, were justified. See Docket No. 220.

40

On May 16, 2018, I directed the Master to provide the plaintiffs' law firms the sealed submissions and ordered that any proposed redactions be submitted under seal by May 31, 2018. See Docket No. 223. In my Memorandum and Order, I provided a framework for proposing redactions which included, but was not limited to, the following principles. The public has a right documents and information on which a judge relies in making judicial decisions. Id. at 3 (quoting F.T.C. v. Standard Fin. Mgmt. Corp., 830 F.2d 404, 408 (1st Cir. 1987)). The public's right to inspect such records is not absolute, but only the most compelling reasons can justify non-disclosure of judicial records. Id. I noted that "[a] properly invoked attorney-client privilege may be sufficient to overcome the presumption of public access. Id. at 4 (citing Seidle v. Putnam Inv., Inc., 147 F.3d 7, 9-10 (1st Cir. 1998)) (emphasis added). Although not explained in the Memorandum, the attorney-client privilege belongs to the client, not the attorney, and, therefore, the client must invoke it. See Cavallaro v. United States, 284 F.3d 236, 245 (1st Cir. 2002); United States v. Mass. Inst. of Tech., 129 F.3d 681, 684 (1st Cir. 1997).

On May 16, 2018, the Master informed me that State Street should also be provided the sealed submissions and an opportunity to propose redactions. On May 17, 2018, I issued an order authorizing both. See Docket No. 225. The same day, Labaton filed an objection to State Street receiving the unredacted Report and

41

related documents. See Docket No. 227. I immediately vacated my earlier Order, and directed the parties to discuss their interests and recommend a means of accommodating them. See Docket No. 228.

Labaton also raised issues concerning the scope of the record to be filed by the Master. I directed the law firms to discuss these issues with the Master. See Docket Nos. 222, 226.

On May 24, 2018, several of the law firms, including Labaton, filed a motion requesting that the deadline for their proposed redactions be extended to June 11, 2018. On May 25, 2018, the Friday before Memorial Day, I issued an Order extending the deadline for proposed redactions to June 5, 2018, without prejudice to a possible further extension to June 11, 2018. See Docket No. 223. I scheduled a hearing on the motion for May 30, 2018. The Order also stated, in part, that:

> George Hopkins, Executive Director of Arkansas Teacher Retirement System ("ATRS"), and anyone else required to act for ATRS in this case shall attend [the hearing]. The Master's Report and Recommendation (Docket No. 224 under seal), including pages 89 to 124 and 368 to 371, and Executive Summary (Docket No. 224-1 under seal), including pages 25 to 29 and 50 to 51, raise questions concerning: whether ATRS properly discharged its duties as Lead Plaintiff, see, e.g., Garbowski v. Tokai Pharma., Inc., 2018 WL 1370522 (D. Mass. 2018)(Wolf, D.J.); whether ATRS should be replaced as Lead Plaintiff; whether there is now a conflict between the interests of [Labaton, Lieff, and Thornton] and the class; and whether new class counsel should be appointed to provide independent advice to the class whether or not ATRS continues as Lead

42

> Plaintiff. Mr. Hopkins and any other
> representatives of ATRS shall be prepared to
> discuss these issues at the May 30, 2018
> hearing.

Id. at 2-3.

In Garbowski, I had recently described the duties of a lead plaintiff in a Private Securities Litigation Reform Act case, which I understand to be comparable to the duties of a class representative in any federal class action. As required by Federal Rule of Civil Procedure 23(a)(3), a class representative's interests must be typical of those of the class. See Garbowski v. Tokai Pharms., Inc., 302 F. Supp. 3d 441 at *4 (D. Mass. 2016). In addition, a class representative must fairly and adequately protect the interests of the class. See Fed. R. Civ. P. 23(a)(4); Garbowski, 302 F. Supp. 3d at *3.

As the D.C. Circuit has explained:

> Basic consideration of fairness require that
> a court undertake a stringent and continuing
> examination of the adequacy of representation
> by the named class representatives at all
> stages of the litigation where absent members
> will be bound by the court's judgment. Two
> criteria for determining the adequacy of
> representation are generally recognized: 1)
> the named representative must not have
> antagonistic or conflicting interests with
> the unnamed members of the class, and 2) the
> representative must appear able to vigorously
> prosecute the interests of the class through
> qualified counsel. Senter v. General Motors
> Corp., 532 F.2d 511, 524-25 (6th Cir. 1976).

Nat. Ass'n of Regional Medical Programs, Inc. v. Mathews, 551 F.2d 340, 345 (D.C. Cir. 1976); see also 7A Wright & Miller, Fed. Prac. & Proc. §§1765, 1768 (3d ed. 2018).

Therefore, as I wrote in Garbowski, in assessing adequacy, "the court must [] consider whether the proposed lead plaintiff 'has the ability and incentive to represent the interests of the class vigorously, [whether he] has obtained adequate counsel, and [whether] there is a conflict between [lead plaintiff's] claims and those asserted on behalf of the class.'" Garbowski, 302 F. Supp. 3d at *4 (quoting In re Cendant Corp., 264 F.3d 201, 263 (3rd Cir. 2001)). Among other things, an adequate class "representative must be able to ensure that counsel do not 'litigate with a view toward ensuring payment for their services without sufficient regard to whether their clients are receiving adequate compensation in light of evidence of wrong doing." Id. (quoting S. Rep. 104-98 (1995) at 6) (citing In re Cendant Corp., 264 F.3d at 255).

I was concerned about whether ATRS and Hopkins now satisfy the typicality and adequacy requirements to continue to serve as lead plaintiff. The matters that prompted the appointment of the Master raised serious questions about the veracity, and possibly the legality, of statements made by Labaton and Thornton, among others, in connection with the fee petition. In his Report the Master recommends that Labaton, Thornton, and Lieff be ordered to

return to the class the more than $4,000,000 in the claimed lodestar that resulted from double counting the hours of contract attorneys. The Master also recommends that those firms be directed to return to the class approximately $2,300,000 because of what he characterizes as improperly inflated rates attributed to the contract attorneys. In addition, the Master recommends that Labaton be ordered to disgorge the $4,100,000 paid Chargois, with $3,400,000 going to the attorneys for the ERISA class and the balance to the class.[13]

The court understands that Labaton, at least, will object to the Master's recommendations. The court will be open-minded concerning the merits of those objections. However, there is now a conflict between the interests of the class and the interests of its Lead Counsel, Labaton. This makes it particularly important that any class representative have interests that do not conflict with the interests of the other class members, and have the ability and incentive to represent the class vigorously with regard to whether Labaton and the other law firms should be required to disgorge funds for the benefit of the class.

---

[13] The Master also recommends that a sanction of between $400,000 and $1,000,000 be imposed on Thornton, that Garrett Bradley be referred to the Massachusetts Board of Bar Overseers for disciplinary action, and that Thornton be required to disgorge for the benefit of the class about $188,000 because Michael Bradley was included in Thornton's lodestar at an improperly inflated rate of $500 an hour.

ATRS has employed Labaton since 2008. It has a contract to continue to do so. This relationship alone raises questions about whether ATRS is typical and will vigorously represent the interests of the class, uninfluenced by the competing interest of Labaton in the Master's recommendation that Labaton, Lieff, and Thornton be required to disgorge more than $10,000,000.

These questions are magnified by the Master's recommendation that the court find that Labaton, Thornton, and Lieff had a duty to disclose to ATRS, the class, and the court the $4,100,000 paid to Chargois in connection with this case. Hopkins has stated that he did not expect to be told of this payment and had no responsibility to learn of it. See Report at 257, n.7. This may or may not prove to be correct. However, Hopkins' position prompted the Master to write that:

> The class had a right to know that Lead Counsel intended to, and did, pay $4.1 million out of settlement funds to a person who performed no work in this case, as a result of Lead Counsel's own pre-existing obligation, whether or not the payment itself was permitted under Massachusetts ethical rules. We cannot see how, in light of a clear dereliction of his fiduciary duties to the class, Hopkins can fairly and adequately protect the class's interests moving forward.

Id.; see also May 30, 2018 Tr. at 17 (Mr. Sinnott stating, "there was testimony by Mr. Hopkins that was very troubling . . . with respect to what he saw as his role with respect to the class and the members."). Therefore, it is foreseeable that the conduct of

46

Hopkins on behalf of ATRS will be an issue in future proceedings and that, to some extent, his interests will be aligned with Labaton's interests, which now conflict with the financial interests of the class.

When, on May 25, 2018, I ordered Hopkins to participate in the May 30, 2018 hearing, I also anticipated that the Master's Report would raise questions concerning the origins of the relationship between Labaton and ATRS. As explained earlier, the Boston Globe had published several articles suggesting that campaign contributions and use of Garrett Bradley's political connections had generated class actions brought by pension funds overseen by the Massachusetts and Plymouth County Treasurers, which resulted in more than $100,000,000 in fees for Labaton, and many millions of dollars were reportedly given to Thornton. Those articles mentioned this case and the Master's investigation.

The Master's Report includes similar information with regard to Labaton's relationship with Chargois concerning ATRS. According to the Master, Labaton had agreed to pay Chargois 20% of any fee it earned from representing ATRS as lead counsel in any class action. See Report at 125. Labaton reportedly had a similar agreement with Thornton. See id. at 93 & n.76. As indicated earlier, the Report includes a message Chargois reportedly wrote to Labaton on October 18, 2014, stating:

> Our deal with Labaton is straightforward. We got you ATRS as a client after considerable favors, political activity, money spent and time dedicated in Arkansas, and Labaton would use ATRS to seek lead counsel appointments in institutional investor fraud and misrepresentation cases. Where Labaton is successful in getting appointed lead counsel and obtains a settlement or judgment award, we split Labaton's attorney fee award 80/20 period.

Id. at 125, n.111 (emphasis added). The Special Master stated that he "did not investigate further into the background facts alleged by Chargois in this email as to how to Chargois/Labaton/ATRS relationship was originated and developed" because, in his view, "[t]his subject [was] beyond the scope of the Special Master's assignment from the Court." Id.

The truth of Chargois' statements may be disputed by Labaton. I will open-mindedly decide any objection to them de novo.

However, the substantial interest of the media in the origins of Labaton and Thornton's relationship with pension fund clients, and the Department of Justice investigation of Thornton caused me to expect that when the Master's Report is unsealed, questions will be raised about the origins of ATRS' relationship with Labaton.[14]   Regardless of their merit, such questions would

---

[14] A statement made at the May 30, 2018 hearing by Lukey indicates that my prediction would, without the motion for recusal, have proven to be correct. She said that after I "issued the [May 25, 2018] order requiring Hopkins presence, it generated, as unfortunately often occurs, some pretty extraordinary and inflammatory online media reactions, including language such as

contribute to making ATRS atypical of the class and possibly an inadequate class representative.

At the May 30, 2018 hearing, I developed a process and schedule for briefing proposed redactions in stages and granted the earlier motion to extend to June 11, 2018 the deadline for submitting proposed redactions. See Docket No. 237. I also scheduled a June 22, 2018 hearing to address the proposed redactions that would be closed to the public. Id.

I concluded the May 30, 2018 hearing with questions to Hopkins. Having listened to the previous colloquy, Hopkins stated that he was "totally aware" that there now "may be a conflict between the interests of Labaton and the other lawyers, who want to vindicate the propriety of everything they did and keep the money, and the class that would benefit if [the Judge] ordered some of that money paid back." May 30, 2018 Tr. at 69-70. He also stated that as class representative, he was not then getting legal advice from anyone other than Labaton. Id. at 67. He did not think that he was receiving legal advice from Lukey. Id. at 66. In any event, he stated that he understood that the client would have to

---

Hopkins must have done something explosive or there must have been shenanigans." May 30, 2018 Tr. at 10. Similarly, in one of Labaton's memos in support of its proposed redactions it wrote that "[t]he press has paid considerable attention to this case, has scrutinized public filings, and has investigated information disclosed in this public filings." See Docket No. 254-1 (under seal) (emphasis added).

assert any attorney-client privilege, and that he would do so only to protect some "viable interest" and not to cover-up for anyone. Id. at 68.

With regard to ATRS role, Hopkins testified that a class representative "should be very cautious about trying to allocate attorneys' fees between law firms and a class." Id. at 74. More specifically, he did not believe that ATRS should take a position on whether Labaton and other lawyers should be ordered to return some of the fees awarded to the class. Id. at 70.

In addition, Hopkins said that he did not believe that as class representative he had a responsibility to inquire about how the attorneys divided a fee award, including whether any referral fees were being paid. Id. at 71. He stated that it was the court's duty to do so, and that I had subsequently ordered disclosure of such information in another case in which ATRS is lead plaintiff, ATRS v. Insulet Corp., C.A. No. 15-12345. Id. at 73.[15]

In response to my question about why Hopkins wanted ATRS to continue to serve as class representative, Hopkins asked for and

---

[15] As explained earlier, in 2017, I had been informed of the payment to Chargois by the Master in connection with his requests for more time to complete his work and to retain Gillers. This educated me to understand that there may be substantial fees shared with lawyers in class actions that are not disclosed to the court in a request for an award of attorneys' fees. Therefore, at the March 9, 2018 hearing for preliminary approval of the proposed settlement in Insulet, I asked if there were attorneys who had not filed an appearance that would share in the fee award. See C.A. No. 15-12345, Docket No. 15 at 15.

received opportunity to provide "a little history." May 30, 2018 Tr. at 50. He said he became Executive Director of ATRS in 2009, after serving in the State Senate. Id. Labaton already had a contract with ATRS. Id. at 52. When he took office, Hopkins did not think that he should give priority to class action law suits. Id. at 52, 53. However, "political leaders" persuaded him to do that. Id.

When asked who those political leaders were, Hopkins said David Malone, a former Executive Director of ATRS with whom he had served in the Senate, several legislators, members of the Governor's staff, and officials in the Department of Finance Administration of Arkansas. Id. at 53-54. In response to my question, Hopkins said he knew Faris, who the Master reports was prompted by Chargois and his partner Herron to introduce ATRS to Labaton, earning Chargois $4,100,000 in this case and, according to Chargois, a right to 20% of Labaton's fees in all other ATRS' cases in which Labaton represented ATRS. Report at 91-94. Hopkins stated that: Faris was a State Senator when he became Executive Director of ATRS; the Senate indirectly supervised ATRS; Hopkins had discussed class action lawsuits, including the State Street case, with Faris; but Faris was not one of the legislators who convinced Hopkins to give high priority to class actions. May 30, 2018 Tr. at 53-56, 61. Hopkins said that he had discussed Labaton, and other firms, with Faris. Id. at 59.

However, until Hopkins learned it from the Master's investigation, he did not know that Faris had introduced Labaton to ATRS. Id. at 58, 61. The Master's Report prompted Hopkins to speak to Faris about his introduction of Labaton to ATRS and Faris confirmed he had done so. Id. at 59-60. However, Faris never mentioned Herron to Hopkins. Id. at 60.

In response to further questioning, Hopkins testified that he spoke to Faris about his introducing Labaton to ATRS right after Hopkins' deposition in the Master's proceedings. Id. at 61. Hopkins also said that, after I had on May 25, 2018 ordered him to appear at the May 30, 2018 hearing, Hopkins met in his office with Faris at 9:00 a.m. on Memorial Day, May 28, 2018 and they discussed the hearing. Id. at 62-63.

I concluded my colloquy with Hopkins by raising questions to be considered by ATRS and, if necessary, further by me concerning whether ATRS should be allowed to continue as class representative. They included questions about whether it would injure ATRS' reputation, and possibly its opportunities to serve as lead plaintiff in other cases, if I found Labaton engaged in misconduct. Id. at 73. Hopkins said he had not considered these issues. Id.

I subsequently summarized my concerns about whether ATRS should continue as class representative and told Hopkins I would give him an opportunity to consider whether it wished to do so. Id. at 78. I noted that: ATRS selected Labaton and other lawyers

whose conduct had been called into question; the Master recommended
that I order those lawyers to return to the class a significant
amount of money; ATRS had a continuing relationship with those
lawyers and is still getting advice from them; and ATRS has not
consulted any lawyer who does not have a stake in these proceedings
about what would be in the best interest of the class ATRS
represents.   I also said:

> I don't want to get into more detail about
> this, but you know that questions have been
> raised by the Report and Recommendation about
> the origins of Labaton's relationship with
> Arkansas Teacher, and they're just questions.
> But to the extent that those issues are
> litigated in this case, they could be at least
> embarrassing to Arkansas Teacher.
>
> And that may give you an incentive, even if
> you're confident that you would resist it, to
> not vigorously represent the class the way
> somebody who did not have this historic
> relationship in these issues would.

Id. at 79.  I concluded by saying:

> [M]y paramount responsibility is to the class
> and to make sure – try to assure that at this
> point it's represented by a lead plaintiff
> who's typical and adequate, and will not have
> its or his role representing the class
> complicated by unique issues and potential
> conflicts of interest. That's my concern.  I
> would like you to think about that.

Id.   Therefore, I ordered Hopkins to report, by June 6, 2018,
whether ATRS wished to continue to get advice from Labaton or from
other counsel.   Id. at 81; Docket No. 237.

Lukey then requested the sidebar conference, which is the primary basis for the motion for my recusal.   At the sidebar I explained the reasons for some of my questioning of Hopkins.   I noted that according to the Master's Report: Labaton had asked Chargois to introduce it to institutional investors in Arkansas; Chargois did not know any institutional investors; Chargois did, however, ask his partner in Arkansas, Herron, who also did not know any institutional investors; Herron knew State Senator Faris; Faris introduced Labaton to ATRS; ever since Chargois has been entitled to 20% of Labaton's fees in ATRS cases despite not doing any work on them; and, there was an assiduous effort to keep that from counsel in this case and others.   May 30, 2018 Sidebar Tr. at 1.[16]

The following colloquy ensued:

> THE COURT: And I think that – and they may not
> be questions to be resolved in this case, but
> I think it is foreseeable that when the Report
> becomes   public,   there   are   going   to   be
> questions   about   the   origin   of   this

[16] As explained in my June 11, 2018 Order (Docket No. 240), the side bar conference was originally sealed because the colloquy did not relate to any pending motion to be decided by me.   That discussion became central to Labaton's sealed motion for recusal, which relates to respect for the legal system.   Therefore, the presumption of a public right to court records on which judicial decisions are based became relevant. See Standard Fin. Mgmt. Co., 830 F.2d at 408-09. Accordingly, I provided Labaton an opportunity to advocate for continued impoundment of the sidebar conference and the references to it in Labaton's submissions concerning recusal.   See Docket No. 280, ¶1.   Labaton instead stated that it did not object to unsealing the transcript and submissions.   See Docket No. 292.   I did so.   See Docket No. 300.

relationship and whether all those millions of dollars stopped with Mr. Chargois.

Mr. Kelly was a prosecutor, and Arkansas these days is -- ears may perk up.

But that was part of the motive [for some of my questions].

I don't know what Mr. Sinnott would say.

I do not object to you saying what you want to say, and future proceedings will be what they'll be, but --

MS. LUKEY: Your honor, are you suggesting there was impropriety involving Senator Faris with the monies being paid? Because there is nothing.  I mean nothing.

THE COURT: I'm suggesting that those questions -- yes those questions occurred to me when I read it.

I don't know that they will be resolved here, but I am concerned that when the relationship between Arkansas Teacher and Labaton is disclosed, and Arkansas Teacher's is going to be defending itself, and its interests are different than the interest of the class.

Id. at 2.  Lukey then said that she was "in shock" and "appalled" that I seemed to be suggesting "public corruption," and asserted that the Master in his Report "made no such suggestion."  Id. at 4-6.  Lukey then asked me if I had "formed the opinion that "some form of public corruption occurred," id. at 7, or "that money was going back to Senator Faris or somebody else," id. at 8.  I responded:

No.

But I've formed the opinion that those are questions that are raised, and they may well not be questions that would be resolved or could be resolved in this case. But I can foresee the reasonable likelihood that the conduct of Arkansas Teacher is going to become part of the controversy, and it causes me to have questions about whether it's an appropriate lead plaintiff.

Who is representing - remember what this is about. Who is representing the class?

Id. at 8.

After further colloquy relating to whether ATRS should continue as class representative, Lukey asked for an opportunity to say publicly that the alleged "misconduct" at issue in the Sealed Report and Recommendation related to whether Labaton had paid Chargois a permissible "referral or origination fee." Id. at 13. I authorized Lukey to make her public statement and said I would permit Sinnott to respond that the payment was an impermissible "finder's fee." Id. at 13-14.

They each did so. See May 30, 2018 Tr. at 82-84. I then stated, "I don't have answers to any of these questions now, but I did put to Mr. Hopkins questions that I think are important in the discharge of my duty to try to ensure that the class is properly represented and to try to get these issues resolved sooner rather than later -- so the Court can get the benefit of the views of the class." Id. at 84. This was followed by a brief lobby conference.

On June 6, 2018, Hopkins filed an affidavit stating that he had obtained advice from independent counsel, Thomas Hoopes, and that ATRS wished to continue as class representative, receiving continuing advice from Mr. Hoopes. See Docket No. 258. On June 8, 2018, Labaton filed its motion seeking my recusal under §455(a).

IV. ANALYSIS

As explained earlier, Labaton does not contend that I am actually biased or prejudiced, or that I actually have personal knowledge of disputed evidentiary facts, any of which would require my recusal under §455(b)(1). Rather, Labaton suggests that a reasonable person would doubt that I am not biased or prejudiced, or do not have personal knowledge of disputed evidentiary facts. Therefore, it argues that my recusal is required by §455(a). This issue must be decided from the perspective of a fully informed member of the public, rather than the perspective of a litigant or the judge. See Voccola, 99 F.3d at 14; El Felix de Puerto Rico, 36 F.3d at 141; In re United States, 660 F.2d at 695.

As noted earlier, I am required to "undertake a stringent and continuing examination of the adequacy of representation by the named class representatives at all stages of the litigation ...." Nat. Ass'n, 551 F.2d at 334. As the D.C. Circuit's statement indicates, an organization that is an adequate class representative at the outset of a case may be an inadequate representative as the case evolves. See also 7A Wright & Miller,

§1765 ("If later events demonstrate that representatives are not adequately protecting the absentee[] [class members], the court may take whatever steps it deems necessary under Rule 23(c) or 23(d) at that time."). Therefore, following the submission of the Master's Report I had a duty to consider whether ATRS now has "antagonistic or conflicting interests with unnamed members of the class" and whether ATRS still "appear[s] able to vigorously prosecute the interests of the class through qualified counsel." Nat. Ass'n, 551 F.2d at 345.

As also explained earlier, Labaton relies primarily on the colloquy at the then non-public May 30, 2018 sidebar conference in seeking my recusal. In open court I had asked Hopkins a series of questions relating to the issues identified in my May 25, 2018 Order, to obtain information relevant to whether ATRS continued to be a typical and adequate representative of the class. Without being asked, Hopkins stated that "political leaders" in Arkansas persuaded him to give high priority to bringing class action law suits. In view of its contract with ATRS, Labaton was positioned to become Lead Counsel in at least some of such suits and, as a result, receive millions of dollars. When asked about those political leaders, Hopkins identified one by name and others by office. As explained earlier, he did not mention then former State Senator Faris. Faris is the sole legislator named in the Master's Report. He was identified in the Report as the person that

Chargois' partner Herron had influenced to introduce Labaton to ATRS.  That introduction, according to the Master, resulted in an agreement that Chargois would receive 20% of all fees awarded to Labaton for serving as Lead Counsel in ATRS cases, including a payment of $4,100,000 relating to this case.  In response to further questions, Hopkins testified that he had over the years discussed with Faris class actions, Labaton, and questions relating to Labaton's conduct that had emerged in this case. Hopkins also revealed that after being ordered on May 25, 2018 to be prepared to testify at the May 30, 2018 hearing, he had met in his office with Faris on May 28, 2018 -- Memorial Day -- and discussed the hearing.

As I repeatedly explained in open court, my questions to Hopkins were intended to develop information concerning his understanding of ATRS' duties as a class representative in the present posture of this case, how ATRS would discharge its duties if allowed to continue as class representative, and whether ATRS is now a typical and adequate representative of the class.  The Boston Globe had publicly reported on its investigation of campaign contributions made by Thornton and Labaton, and on the alleged exploitation of Garrett Bradley's position in the Massachusetts House of Representatives to get Labaton and Thornton business that generated many millions of dollars in attorneys' fees from Massachusetts pension funds.  The Boston Globe has also reported

that federal prosecutors were investigating Thornton's campaign contributions. In addition, I had learned from that Master that federal prosecutors in Massachusetts were investigating whether Thornton had made an illegal payment to a pension fund official.[17] Therefore, I foresaw that it was likely that, when the Master's Report became public, questions would be raised by the media, at least, about the origins of ATRS' relationship with Labaton.   Any such questions would contribute to ATRS being unique, rather than typical of the class, and possibly an inadequate representative of the class in the current proceedings.

I explained and amplified this concern at the then confidential sidebar conference Lukey requested.   Having in mind the Boston Globe articles and the United States Attorney's investigation, I said it was foreseeable that when the Master's Report became public there would be questions about the origins of Labaton's relationship with ATRS, and whether all of the millions of dollars paid to Chargois had stopped with him.   I again explained that these issues related to whether ATRS remained a typical and adequate class representative.   In response to Lukey's questions, I stated I had not formed an opinion on whether money

---

[17] I knew that an official act by a public official as a quid pro quo -- meaning in explicit exchange for -- for an otherwise legitimate campaign contribution is a form of extortion in violation of 18 U.S.C. §1951.   See McCormick v. United States, 500 U.S. 257, 275 (1991); 18 U.S.C. §1951.

was going back to Faris or anyone else, or on whether public corruption had occurred.  I added again that I foresaw that such questions would be raised when the information in the Master's Report was unsealed. I stated that while they might not be questions that could be resolved in this case, such questions would make ATRS part of the controversy and, therefore, possibly no longer an appropriate class representative.

My information concerning the roles of Herron and Faris in the genesis of Labaton's relationship with ATRS came exclusively from the Master's Report.  In the process of deciding whether to extend the deadline for the submission of the Master's Report and whether to authorize him to employ Gillers, I did learn that more than $4,000,000 had been paid to Chargois.  This matter is, however, far more fully described in the Master's Report.

As explained earlier, in almost all cases a meritorious motion for recusal under §455(a) must be based on a judge's acquisition of information extra-judicially. See Liteky, 510 U.S. at 551. A disqualifying appearance of bias or prejudice can be based on information the judges acquires in the litigation, but only if "it is so extreme as to display clear inability to render fair judgment." See id.  Therefore, if the motion does not assert a judge has information from an extrajudicial source, a "high threshold" must be met to justify recusal.  Id. at 558 (Kennedy, J., concurring). More specifically, "under §455(a), a judge should

61

be disqualified only if it appears that he or she harbors an aversion, hostility, or disposition of a kind that a fair minded person could not put aside when judging the dispute." Id.; see also Snyder, 235 F.3d at 48 (quoting Liteky, 510 U.S. at 557-58); In re United States, 158 F.3d at 34 (same). A reasonable person could not believe that my statements at the May 30, 2018 hearing, in open court or at the sidebar, meet this standard.

The conclusion that a reasonable person could not question my impartiality is not qualified by Labaton's suggestion that such a person could believe that I had improper, ex parte communications with the Master. Labaton cites no case in which a judge's recusal has been required based on his interactions with a Master. Indeed, there does not appear to be any such reported case.

In re Brooks, 383 F.3d 1036 (D.C. Cir. 2004) is, however, an illuminating decision. As indicated earlier, pursuant to Federal Rule of Civil Procedure 53(a)(3), "in appointing a master, the court . . . must protect against unreasonable expense or delay." Fed. R. Civ. P. 53(a)(3).

In In re Brooks, the D.C. Circuit found that the district judge's recusal was not required under §§455(a) or (b)(1) because of his ex parte communications with a Master. The court noted that those provisions require a judge's recusal when he has "personal knowledge of disputed evidentiary facts" or when his "impartiality might reasonably be questioned." 383 F.3d at 1041. The movant

submitted time records "that reveal[ed] seven private meetings [between the Master, and] the Court for a total of approximately eight hours." Id. It alleged that the Master had impermissibly informed the court of the content of meetings the Master had with certain individuals involved in his investigation concerning federal officials' handling of monies held in trust for Native Americans.

However,

> [t]he district court stated: "[i]t is not only appropriate but necessary for the Court, as principal, to consult with its agents regarding the manner in which they are carrying out their assigned duties .... [T]hroughout these regular consultations, the Court discussed with the Master the general nature of the ongoing tasks that the Master was involved with, in order to ensure that the Master was responsibly carrying out the duties to which he was assigned." . . .

> "In the course of a typical meeting, for example, the [Master] might inform the Court that he planned to travel to New Mexico to meet with the Office of the Special Trustee, and receive a briefing about their role in the historical accounting process. Or he might explain that he traveled to Billings, Montana to meet with title records office personnel, examine their hard copy records, and review the pilot [Trust Asset and Accounting Management System]. Or he might inform the Court that he had been briefed by the Deputy Commissioner of the Bureau of Indian Affairs about the organization of their office." . . .

> "[T]he only reason that the Court knew anything about the ... meeting [in question], or the background relating to that meeting, is that the [Master] was compelled to 'present[] the facts surrounding the request of the Deputy Secretary' to hold the meeting, in order that the Court could make an informed decision about whether to authorize the [Master's] attendance at the meeting."

Id. at 1041-42 (citations omitted).

The D.C. Circuit wrote that "the district court reasonably explained that in referring to the "nature, extent, and substance of [the Master] meetings" with third parties, the court was concerned with the subject matter, not the actual content, of those meetings." Id. at 1043. It stated that:

> [M]oreover, it is not surprising that the district judge met many times with the Special Master and . . .; he had to oversee and to coordinate [the Master's] efforts on the court's behalf during four years of complicated and contentious litigation. Keeping a careful inventory of the tasks they had performed appears sensible, particularly in the light of the defendants' several challenges to [the Master's] requests for compensation.

Id. at 1043. The D.C. Circuit stressed that "the district judge has described the nature of the ex parte contacts, and stated unequivocally that those contacts were of a procedural and not a substantive nature." Id. at 1044. It concluded, therefore, that the judge's contacts with the Master had not given him "personal knowledge of disputed evidentiary facts" and that his impartiality could not reasonably be questioned. Id. at 1043.

The instant matter is, at most, analogous to In re Brooks. At the March 7, 2017 hearing, I informed the parties that I had a duty to protect against unreasonable expense or delay and, therefore, anticipated having ex parte communications with the Master. See Mar. 7, 2017 Tr. at 68. However, I expressed my intention to limit those communications to "administrative

64

matters." Id. The March 8, 2017 Order reiterated this. See Docket No. 173, ¶6 ("The Master may communicate with the court ex parte on administrative matters.").

My communications with the Master were limited to administrative matters. I was initially told about the payment of the $4,100,000 to Chargois, and the Master's request for authorization to retain Gillers to advise on issues relating to Chargois, in connection with the Master's request for an extension of time in which to file his Report. I was told about the existence of a dispute between Gillers and experts Labaton had retained in connection with the Master's requests for further extensions. Labaton has not asked that the references to the payment to Chargois concerning this case, or that he is entitled to up to 20% of Labaton's fee in each case for which ATRS is class representative and Labaton is Lead Counsel, be redacted from the public version of the Master's Report. I do not expect that Labaton will object to the accuracy of the claim the payment to Chargois concerning this case occurred. Labaton has stated, however, that it objects to Gillers' opinions concerning the ethical propriety of the payment. I did not discuss with the Master the substance or merits of Gillers' opinions or the law firms' experts' competing views.

In not moving for my recusal under §455(b)(1), Labaton implicitly acknowledges that the information I received ex parte

from the Master does not actually give me "personal knowledge of disputed evidentiary facts concerning the [current] proceeding." §455(b)(1). In any event, ex parte communications implicate §455(b)(1) only "when a judge receives information that does not enter the record [and] the reliability of that information may not be tested through the adversary process." Craven, 239 F.3d at 103 (citing Edgar v. K.L., 93 F.3d 256, 262 (7th Cir. 1996)). This is not such a case. The limited information I received about Chargois is included and amplified in the Master's Report. Labaton's view of the propriety of that payment will be presented fully with its objections, which I can and will decide with an open mind, de novo. In these circumstances, a knowledgeable, reasonable person could not believe that I received ex parte relevant information that is not, or will not be, in the record and, therefore, doubt my impartiality because of my communications with the Master.

Contrary to Labaton's contention, this case is not analogous to Edgar, 93 F.3d at 259-60. In Edgar, the Seventh Circuit found that recusal was required under §455(b)(1), and §455(a) as well, because the judge had, and reasonably appeared to have, "personal knowledge of disputed evidentiary facts," §455(b)(1), when he had ex parte discussions with court-appointed experts about the merits of their opinions and prohibited any attempt to reconstruct those conversations for the record. Id. In contrast, I had no communications with Gillers or, as explained earlier, any

discussion with the Master concerning the substance or merits of Gillers' opinions.[18]   Compare In re Faulkner, 856 F.2d 716, 720-21 (5th Cir. 1988) (recusal required under §§455(b)(1) and (a) where judge's relative was a major participant in transaction at issue and "communicated to the judge . . . material facts and her opinions and attitudes concerning those facts").

As explained earlier, it has been held that reasonable people presume that "a judge . . . will rule according to the laws, as enacted, as required by his or her oath." In re Aquinda, 241 F.3d at 204; see also First Interstate Bank of Arizona, 210 F.3d at 988.   In In re Brooks, 383 F.3d at 1043, the D.C. Circuit found that for the purposes of §455(b)(1), and §455(a) as well, there is "no reason for not accepting the judge's unequivocal" representation that he did not receive substantive information in his ex parte discussions with a Master. Similarly, in this case a reasonable person would not doubt my explanation that there were proper administrative reasons for my ex parte communications with the Master and that I did not receive from him any extra-judicial information concerning disputed evidentiary facts.

Nor would my communications with the Master concerning the federal prosecutors' request for information cause a reasonable

---

[18] Although not comparable to the facts in the instant case, the First Circuit has noted that even "[e]ngaging in ex parte communications with court-appointed experts need not inevitably require a judge's disqualification." Craven, 239 F.3d at 103.

person to question my impartiality. The fact that the United States Attorneys' office was investigating whether Thornton had made illegal campaign contributions had been previously reported by the Boston Globe. The Master consulted me in order to get instructions on how to respond to the prosecutors' request. He told me that the prosecutors said they were investigating Thornton, including whether a possible illegal payment had been made to an official of a pension fund. This information was comparable to the information that had been published by the Boston Globe. I instructed the Master not to provide information to the prosecutors voluntarily.

The information I received from the Master about the prosecutors' request for information did not give me personal knowledge of any evidentiary fact that is disputed in this proceeding. No reasonable person could believe that it did. Nor could a reasonable person believe that my knowledge that federal prosecutors were investigating Thornton would cause me to violate my oath to be impartial.

Labaton also suggests that a reasonable person could question my impartiality in deciding challenges it is making concerning the cost of the Master and the manner in which he performed because I appointed the Master and monitored his activities. Again, Labaton cites no analogous case in support of this contention.

In any event, this argument is unmeritorious. I did appoint the Master, monitor his fees and expenses, and received limited information about his activities in the process of deciding whether to authorize him to retain Gillers, among others, and to extend deadlines. A reasonable person would understand that I did this to discharge my duty to protect against unreasonable expense and delay. See Fed. R. Civ. P. 53(a)(3).

In the Order appointing the Master I stated that "[t]he court intends to disclose the cost of the Master at the conclusion of these proceedings." See Docket No. 173, ¶14. On June 19, 2018, Labaton, Lieff, and Thornton filed under seal a Motion for an Accounting and for Clarification that the Master's Role Has Concluded. See Docket No. 302. After this Motion is briefed, I will decide with an open mind whether the Master's involvement in these proceedings should be terminated and, in any event, whether the request for an immediate accounting should be granted.

Federal Rule of Civil Procedure 53 is premised on the principle that the judge who appointed the Master can and will decide objections to his performance or his recommendations de novo. A knowledgeable reasonable person would not doubt my ability to do that in this case.

In view of the foregoing, my recusal under §455(a) is not justified. Rather, recusal in the circumstances of this case would injure an important interest to be served by §455(a). As the First

Circuit has explained: "[t]his statute seeks to balance two competing policy considerations: first, that courts not only be, but seem to be, free of bias or prejudice, and second, the fear that recusal on demand would provide litigants with a veto against unwanted judges." In re Boston's Children First, 244 F.3d at 164 (internal citations and quotations omitted). Therefore, as the First Circuit has also stated, the recusal decision must, among other things, reflect "the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." In re Allied-Signal, 851 F.2d at 967.

In this case, a reasonable person would know that I am evidently the first judge to have appointed a Master to investigate the reliability of representations made by lawyers in seeking an award of attorneys' fees in a class action. The Master has recommended that Labaton and some of the other firms that represented the class be ordered to disgorge more than $10,000,000. The Master recommends that I sanction Garrett Bradley personally, refer him for possible discipline by the Massachusetts Board of Bar Overseers, and require additional disgorgement of up to $1,000,000 received by Thornton. The Master also recommended that I find that Sucharow, acting for Labaton, violated its legal and ethical obligations. In seeking my recusal, Labaton wrote that my

decisions on the Master's recommendations could result in "serious and far reaching adverse ramifications for at least some of the law firms, and even beyond this investigation for the practice of the Plaintiffs' class action bar . . . ." Docket No. 216-1 at 2. My disqualification would require the reassignment of this case to a judge who is not familiar with its long and complex history.

In these circumstances, my unjustified recusal under §455(a) could encourage the perception that litigants can manipulate the system to veto an unwanted judge. As the First Circuit has repeatedly reiterated, this would be damaging to public confidence in the administration of justice. See In re Allied-Signal, 891 F.2d at 967; In re Bulger, 710 F.3d at 47; In re Boston's Children First, 244 F.3d at 164; In re United States, 441 F.3d at 67; Cigna Fire Underwriters Co., 86 F.3d at 1270.

I am also mindful of the First Circuit's admonition that §455(a) "should not be used by judges to avoid sitting on difficult cases." Snyder, 235 F.3d at 45. It is evident that this will continue to be a demanding case. As careful consideration has persuaded me that my disqualification is not justified, recusal would be an abdication of professional responsibility, which judges have been urged to avoid.

V. ORDER

Therefore, in view of the foregoing, on June 21, 2018, I denied Labaton's motion for my recusal pursuant to §455(a). See Docket No. 315.

UNITED STATES DISTRICT JUDGE