**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW <br><br> **REDACTED COPY** |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

**THORNTON LAW FIRM LLP'S OBJECTIONS TO**
**THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................ 1

    A.      Double Counting ......................................................................................... 1

    B.      Intent ............................................................................................................ 4

    C.      The Boilerplate Affidavit ......................................................................... 7

    D.      Michael Bradley ......................................................................................... 9

    E.      Contract Attorneys ................................................................................... 9

ARGUMENT ............................................................................................................... 11

I.      The Double Counting Error Was Inadvertent And The Special Master's
Recommendation Of $4 Million Disgorgement Is Unjustified ......................... 11

    A.      The Double Counting of Staff Attorney Hours Was Inadvertent And Not
Thornton's Fault ..................................................................................... 13

    B.      The Proposed "Disgorgement" of $4,058,000 Is Unjustified And
Misapprehends the Function of the Lodestar Cross-Check ................... 13

    C.      Thornton Is Not Responsible For The Inadvertent Double Counting ................... 17

    D.      The $425 Per Hour Rate Used By Thornton For Staff Attorney Work Is
Reasonable And Justified ....................................................................... 22

II.     Garrett Bradley Did Not Intentionally File A False Declaration ...................... 26

    A.      There Was No Motivation To Deceive Co-Counsel .............................. 26

    B.      There Was No Motivation To Deceive The Court ................................. 35

    C.      The Special Master's Assertion That Garrett Bradley Did, In Fact, Closely
Review The Declaration Prior To Submission Is Based On A Blatant
Misrepresentation Of The Evidence ...................................................... 37

    D.      The Special Master's Assertion That Garrett Bradley Had The
"Opportunity" To Give The Declaration A "Close Read" Is
Unobjectionable, But Does Not Prove Bradley Intentionally Filed A False
Declaration .............................................................................................. 39

    E.      The Special Master's Finding Of Intentional Misrepresentation Is Belied
By His Inability To Decide Whether Or Not Garrett Bradley Actually
Read The Declaration ............................................................................. 40

    F.      The Special Master's Assertion That Garrett Bradley Admitted He
Intentionally Lied To The Court Grossly Mischaracterizes The Evidence .......... 41

    G.      In Fact, Garrett Bradley Made A Mistake And Corrected The Mistake At
the Appropriate Time ............................................................................. 42

III.    The Thornton Law Firm Did Not Violate Rule 11 .......................................... 44

    A.      Isolated Factual Errors Cannot Serve As The Basis For Rule 11 Sanctions ........ 44

    B.      The Statements In The Affidavit Do Not Support Rule 11 Sanctions .................. 46

# TABLE OF CONTENTS

**Page**

|   |   |   |   |   |
|---|---|---|---|---|
|   |   | i. | Staff Attorneys As Employees | 46 |
|   |   | ii. | Time Records | 48 |
|   |   | iii. | Rates Accepted In Other Actions | 50 |
|   |   | iv. | Current And Regular Rates | 53 |

C.  Double Counting ................................................................ 57

D.  Materiality And Intent ........................................................ 58

IV.  The Recommended Sanctions Are Incompatible With Rule 11 ..................... 59

    A.  The Recommended Sanction Exceeds What Is Necessary For Deterrence .......... 60

    B.  The Recommended Sanction Is Extraordinary When Compared With First Circuit Precedent ................................................................ 62

        i.  *In re Nosek* ................................................................ 63

        ii.  *In re 1095 Commonwealth Corp.* .................................... 64

        iii.  *Sanchez v. Esso Standard Oil de Puerto Rico* .................... 65

    C.  The Special Master Has Ignored Rule 11's Prohibition On Imposition Of Monetary Sanctions Post-Settlement ..................................... 66

V.  Garrett Bradley Should Not Be Referred To The Board of Bar Overseers ........ 67

    A.  The Conduct At Issue Affects All Firms Yet The Special Master Unfairly Recommends Only Garrett Bradley For Discipline ........................... 67

    B.  The Special Master's Reliance On *Matter of Schiff* Is Clearly Wrong ......... 67

    C.  Garrett Bradley Did Not Violate MRPC 3.3 or 8.4 ............................ 72

VI.  The Customer Class Law Firms Properly Listed Contract Attorneys On The Lodestars ................................................................ 78

VII.  The Special Master's Proposed 50% Reduction In Rate For Michael Bradley's Work Is Unjustified ................................................................ 83

    A.  Any Reduction In Michael Bradley's Rate Is Immaterial To The Fee Award ................................................................ 89

VIII.  The Recommended Payment Of $3.4 Million To ERISA Counsel Is Unjustified And Based On Erroneous Findings ........................................... 92

    A.  The Special Master's Conclusion That The ERISA Trading Volume Was "Actually 12-15%" Is Wrong .................................................. 93

    B.  The Special Master's Finding That The $10.9 Million "Fee Cap" Applied To ERISA Counsel's Fees Only Is Wrong ..................................... 100

## TABLE OF CONTENTS

**Page**

C.      The Special Master Wrongly Concludes That Customer Class Counsel
        Sought To Prevent ERISA Counsel From Reviewing Documents And
        Omits Testimony From ERISA Counsel That Directly Contradicts This
        Erroneous Finding............................................................................................. 103

IX.     The Recommendation That A Monitor Be Appointed Is Baseless................................ 108

CONCLUSION.......................................................................................................................... 110

CERTIFICATE OF SERVICE .................................................................................................. 111

## TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*In re 1095 Commonwealth Ave. Corp.*,
    204 B.R. 284 (Bankr. D. Mass. 1997) ...................................................................64

*In re 1095 Commonwealth Corp.*,
    236 B.R. 530 (D. Mass. 1999) ......................................................................64, 65

*Anderson v. Beatrice Foods Co.*,
    900 F.2d 388 (1st Cir. 1990) ..............................................................................62

*In re AOL Time Warner S'holder Derivative Litig.*,
    No. 02 CIV. 6302 (CM), 2010 WL 363113 (S.D.N.Y. Feb. 1, 2010) ...............79, 81

*In re Auerhahn*,
    No. 09-10206, 2011 WL 4352350 (D. Mass. Sept. 15, 2011) ..........................77, 78

*Awkal v. Mitchell*,
    613 F.3d 629 (6th Cir. 2010) ..............................................................................37

*Balerna v. Gilberti*,
    281 F.R.D. 63 (D. Mass. 2012) ...........................................................................62

*In re Beacon Assocs. Litig.*,
    No. 09 CIV 3907 (CM), 2013 WL 2450960 (S.D.N.Y. May 9, 2013) ....................82

*Blake v. NSTAR Elec. Corp.*,
    No. 09-10955, 2013 WL 5348561 (D. Mass. Sept. 20, 2013) ...............................72

*Carlson v. Xerox Corp.*,
    596 F. Supp. 2d 400 (D. Conn. 2009) .......................................................15, 78, 80

*Carrieri v. Liberty Life Ins. Co.*,
    No. 09-12071-RWZ, 2012 WL 664746 (D. Mass. Feb. 28, 2012) .........................60

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
    No. 1917, 2016 WL 4126533 (N.D. Cal. Aug. 3, 2016)...................................14, 91

*In re Citigroup Inc. Bond Litig.*,
    988 F. Supp. 2d 371 (S.D.N.Y. 2013)......................................................10, 14, 78

*In re Citigroup Inc. Sec. Litig.*,
    965 F. Supp. 2d 369 (S.D.N.Y. 2013)......................................................10, 78, 81

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
   954 F. Supp. 2d 276 (S.D.N.Y. 2013) .....................................................................78

*Cooter & Gell v. Hartmarx Corp.*,
   496 U.S. 384 (1990) .............................................................................................40

*Dial Corp. v. News Corp.*,
   317 F.R.D. 426 (S.D.N.Y. 2016) .........................................................................79

*Eldridge v. Gordon Bros. Grp., L.L.C.*,
   863 F.3d 66 (1st Cir. 2017) .................................................................................44

*In re Enron Corp. Sec., Derivative & ERISA Litig.*,
   586 F. Supp. 2d 732 (S.D. Tex. 2008) ................................................................78

*Figueroa-Olmo v. Westinghouse Elec. Corp.*,
   616 F. Supp. 1445 (D.P.R. 1985) ........................................................................75

*Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n*,
   831 F.2d 1238 (4th Cir. 1987) .............................................................................45

*Garbowski v. Tokai Pharm., Inc.*,
   No. 16-CV-11963, 2018 WL 1370522 (D. Mass. Mar. 16, 2018).........................59

*Gonsalves v. City of New Bedford*,
   168 F.R.D. 102 (D. Mass. 1996) .........................................................................72

*Grievance Comm. For S. Dist. of New York v. Simels*,
   48 F.3d 640 (2d Cir. 1995).................................................................................75

*In re: Initial Public Offering Securities Litigation*,
   174 F. Supp. 2d 61 (S.D.N.Y. 2001)....................................................................35

*Lamboy-Ortiz v. Ortiz-Velez*,
   630 F.3d 228 (1st Cir. 2010) .........................................................................60, 62

*Matter of Larsen*,
   379 P.3d 1209 (Utah 2016) .................................................................................75

*Martin v. Franklin Capital Corp.*,
   546 U.S. 132 (2005) .............................................................................................67

*McGee v. Town of Rockland*,
   No. 11-CV-10523-RGS, 2012 WL 6644781 (D. Mass. Dec. 20, 2012)..................44

*Medina v. Gridley Union High Sch. Dist.*,
   172 F.3d 57 (9th Cir. 1999) .................................................................................62

*Meredith Corp. v. SESAC, LLC*,
    87 F. Supp. 3d 650 (S.D.N.Y. 2016)................................................................79

*Navarro-Ayala v. Hernandez-Colon*,
    3 F.3d 464 (1st Cir. 1993) ........................................................45, 58, 62

*In re Neurontin Mktg. & Sales Practices Litig.*,
    58 F. Supp. 3d 167 (D. Mass. 2014) ................................................83

*In re Nosek*,
    386 B.R. 374 (Bankr. D. Mass. 2008) ..................................................63

*In re Nosek*,
    406 B.R. 434 (D. Mass. 2009) ................................................63, 64

*In re Nosek*,
    609 F.3d 6 (1st Cir. 2010) ......................................................64

*Nw. Bypass Grp. v. U.S. Army Corps of Engineers*,
    No. 06-CV-00258-JAW, 2008 WL 2679630 (D.N.H. June 26, 2008) ....................................62

*Obert v. Republic W. Ins. Co.*,
    398 F.3d 138 (1st Cir. 2005)................................................45, 48, 77

*In re Polyurethane Foam Antitrust Litig.*,
    168 F. Supp. 3d at 1013 (7th Cir. 1999) ............................................14

*Pontarelli v. Stone*,
    781 F. Supp. 114 (D.R.I. 1992)................................................68, 69

*Pontarelli v. Stone*,
    930 F.2d 104 (1st Cir. 1991) ......................................................68

*Pontarelli v. Stone*,
    978 F.2d 773 (1st Cir. 1992)......................................................68

*Reed v. Cleveland Bd. Of Ed.*,
    607 F.2d 737 (6th Cir. 1979) ......................................................34

*Rivera v. Lohnes*,
    No. 10-2114, 2012 U.S. Dist. LEXIS 29441 (D.P.R. March 5, 2012) ....................................63

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
    No. CIV.A. 04-374 JAP, 2008 WL 9447623 (D.N.J. Dec. 9, 2008) ....................................15

*Sanchez v. Esso Standard Oil de Puerto Rico, Inc.*,
    No. CIV 08-2151, 2010 WL 3809990 (D.P.R. Sept. 29, 2010)............................................65

*Sheppard v. River Valley Fitness One, L.P.*,
　428 F.3d 1 (1st Cir. 2005) .................................................................................... 76

*Shire LLC v. Abhai LLC*,
　No. 15-13909, 2018 U.S. Dist. LEXIS 46946 (D. Mass. Mar. 22, 2018) ............... 63

*Silva v. Witschen*,
　19 F.3d 725 (1st Cir. 1994) .................................................................................. 60

*Steeger v. JMS Cleaning Servs.*,
　No. 17CV8013, 2018 WL 1363497 (S.D.N.Y. Mar. 15, 2018) .............................. 66

*In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*,
　56 F.3d 295 (1st Cir. 1995) .................................................................................. 14

*Thompson v. Bell*,
　373 F.3d 688 (6th Cir. 2004) ............................................................................... 37

*In re Tyco Int'l, Ltd. Multidistrict Litig.*,
　535 F. Supp. 2d 249 (D.N.H. 2007) ................................................................ 79, 80

*Ultra-Temp Corp. v. Advanced Vacuum Sys., Inc.*,
　194 F.R.D. 378 (D. Mass. 2000) .......................................................................... 60

*United States v. Jones*,
　686 F. Supp. 2d 147 (D. Mass. 2010) ................................................................... 59

*Vollmer v. Selden*,
　350 F.3d 656 (7th Cir. 2003) ............................................................................... 44

*Whitehouse v. U.S. Dist. Court for the Dist. of Rhode Island*,
　53 F.3d 1349 (1st Cir. 1995) ................................................................................ 75

*Wohllaib v. U.S. Dist. Court for the W. Dist. of Washington, Seattle*,
　401 F. App'x 173 (9th Cir. 2010) ......................................................................... 66

*Young v. City of Providence ex rel. Napolitano*,
　404 F.3d 33 (1st Cir. 2005) ...................................................................... 44, 45, 58

**State Cases**

*Clark v. Beverly Health and Rehab. Servs., Inc.*,
　440 Mass. 270 (2003) .......................................................................................... 75

*In re Discipline of an Attorney*,
　448 Mass. 819 (2007) .......................................................................................... 74

*In re Diviacchi*,
　475 Mass. 1013 (2016) ................................................................................... 74, 75

*Fishman v. Brooks*,
  396 Mass. 643 (1986) ...................................................................................35

*In re Hilson*,
  448 Mass. 603 (2007) ...................................................................................73

*In re Murray*,
  455 Mass. 872 (2010) ...................................................................................73

*Matter of Schiff*,
  677 A.2d 422 (R.I. 1996) ........................................................................ *passim*

*Matter of Schiff*,
  684 A.2d 1126 (R.I. 1996) ...............................................................68, 69, 70

*Matter of Zak*,
  476 Mass. 1034 (2017) ...................................................................................74

**Statutes**

35 U.S.C. § 285 .................................................................................................63

42 U.S.C. § 1988 .........................................................................................68, 69

28 USC § 1927 .................................................................................................65

**Rules**

Fed. R. Civ. P. 5 ...............................................................................................59

Fed. R. Civ. P. 11 ..................................................................................... *passim*

Fed. R. Civ. P. 37 .............................................................................................63

L.R. 83.6.5 .................................................................................................72, 77

Mass. R. of Prof. Conduct 3.3 ................................................................. *passim*

Mass. R. of Prof. Conduct 8.4 ......................................................................73, 74

**Other Authorities**

ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 00-420 (2000) ................79, 80, 81

Benjamin Weiser, *Tobacco's Trials*, WASHINGTON POST (Dec. 8, 1996) .....................................34

5A FED. PRAC. & PROC. CIV. § 1336.3 (3d ed.) ...................................................60, 67

MOORE'S FEDERAL PRACTICE, § 11.22(2)(b) (3d ed.) ................................................67

Rutherford B. Campbell, Jr. & Eugene R. Gaetke, *The Ethical Obligation of Transactional Lawyers to Act As Gatekeepers*, 56 RUTGERS L. REV. 9, 51 (2003) ..................................................................................................................73

Summation of John Adams, *Rex v. Wemms* (Suffolk Superior Court, 1770) ...............................................................................4

W. Bradley Wendel, *Monroe Freedman: The Ethicist of the Non-Ideal,* 44 HOFSTRA L. REV. 671, 680 n.8 (2016) ...................................................................73

## INTRODUCTION

Following a sixteen-month, $3.8 million investigation, the Special Master has produced a Report and Recommendations (and Executive Summary) that is riddled with factual and legal errors and mischaracterizations of the record, not to mention internal contradictions.  Ironically, and disturbingly, in a case in which the Special Master recommends a draconian sanction based on Garrett Bradley's role in "causing" an inadvertent mistake, the number of clear factual and legal mistakes in this Report is stunning.  Indeed, if this Report were subjected to the same extreme, misguided analysis being applied to Garrett Bradley's mistakes, the submission of the Report itself would be sanctionable conduct.  The Report repeatedly mischaracterizes the applicable law and actual facts of this matter.

Even though the Report concludes that "the $300 million settlement reflected an excellent result for the class members and was the product of the highly professional and skilled work of the class's law firms," R&R at 125, the Special Master goes on to malign the hard-earned reputations of the lawyers who achieved this result with novel theories of ethical improprieties and sanctionable conduct that are unprecedented, unreasonable, and unsupported by evidence. This Court must conduct a thorough *de novo* review and ensure that the facts are all weighed carefully and accurately, and that the law is applied consistently and dispassionately.  The Thornton Law Firm is confident that this *de novo* review will reveal what has been evident all along: that Thornton's efforts were instrumental to the excellent result in this case, and that it should not be penalized any more than it already has been for mistakes that are deeply regrettable but inadvertent and immaterial to the attorneys' fee award.

### A.    Double Counting

This case began after a media inquiry prompted the self-disclosure of inadvertent double counting of certain staff attorneys on the lodestars of the Thornton Law Firm, Lieff Cabraser,

and Labaton Sucharow (collectively, "Customer Class Counsel").  The Special Master's investigation found, as Customer Class Counsel asserted from the very beginning, that the double counting error was an inadvertent mistake.  Moreover—and as the Special Master fails to acknowledge—this error has **no effect** on the objective reasonableness of the flat percentage of fund attorneys' fee award.  It is important to remember that neither Thornton Law Firm nor any firm in this case was awarded fees for hours worked.  The attorneys' fee in this case was, like other cases in this district, a simple percentage of the class recovery amount, 25%.  The firms provided hours worked and rates (in lodestars) to the Court not for the purpose of seeking fees for hours worked, but only as a **cross-check** to ensure that the percentage award was reasonable.  Of course, this is not to say that firms receiving percentage of fund awards are excused from ensuring that information they submit to the Court is accurate.  But the limited function of the lodestar here cannot be ignored.  In undertaking a lodestar cross-check, courts look to the "multiplier" (*i.e.,* total lodestar divided by fee award) as the touchstone of their inquiry.  If the multiplier is reasonable, the lodestar cross-check is satisfied.  Harvard Law School Professor William B. Rubenstein, the author of the leading treatise on class actions, testified in this investigation that multipliers much higher than the one here—indeed, up to 4—are reasonable in cases like this.  Rubenstein Dep., 4/19/18, at 216:1-218:4 (SM Ex. 235).  In this case, removing the double-counted attorney time from the firms' lodestars increases the multiplier from 1.8 to 2.01.  Rubenstein Decl., 7/31/17, at ¶¶ 18, 39-45 (TLF Ex. 1).  In other words, although certainly unfortunate, the double counting had no material effect on the fee award.  The Special Master himself concedes that "all other things being equal, the attorneys' fee award was fair, reasonable, and deserved."  R&R at 6.

As described in further detail herein, the double counting was the result of a very basic error. Customer Class Counsel were prosecuting an extremely complex case that included the review of millions of pages produced by their opponent. As co-counsel, they came to an agreement to share both the costs of this work and the work itself, which also had the effect of spreading the risk should the case never produce a monetary settlement. The Thornton Law Firm, which is smaller than both Labaton and Lieff, does not have document review attorneys. Accordingly, after all three firms agreed to split the cost of the document review work, it paid for its share of the work by reimbursing Lieff and Labaton for staff attorneys housed at their firms or, in some cases, by directly paying legal staffing agencies that supplied the staff attorneys. When the time came to submit lodestars to the Court for purposes of the cross-check, through administrative errors and miscommunication, some of the Thornton Law Firm's staff attorneys' time was included on the other firms' lodestars.

Despite finding that the double-counting was "inadvertent," R&R at 363, the Special Master recommends that the three firms "disgorge" the amount of the double counted time—$4,058,000—such that it can be "returned" to the class. This is the first of many logical fallacies in the Report. In urging "disgorgement" of monies, the Special Master **confuses the function of the lodestar cross-check with a lodestar-based fee**. When, as here, the lodestar is used as a cross-check of a percentage award (which the Special Master does not dispute is how the Court awarded the fee), the proper course, taken by numerous courts in similar circumstances, is for the Court to recalculate the multiplier and reassess whether the higher multiplier is reasonable. Because the attorneys' fees were not awarded on a one-to-one basis, "disgorgement" of an amount that was, in actuality, a piece of a piece of a cross-check, is nonsensical. The Special Master did not attempt to calculate an adjusted multiplier (for this or any other of his

recommendations), perhaps because he recognized that the multiplier would still be well within the realm of reasonableness, and therefore there would be no basis for "disgorgement" of any money relating to the double counting error.

### B.    Intent

The Special Master's most outlandish finding in his Report is that Garrett Bradley intentionally included staff attorneys on Thornton's lodestar—staff attorneys for whom it paid, but who were housed at, and in some cases employed by, Lieff and Labaton— to deceive Thornton's own co-counsel and the Court.  The alleged purpose was either to convince co-counsel to give the Thornton Law Firm a greater share of the aggregate fee award, or to mislead the Court into approving the fee award.  Indeed, the Special Master's allegation of intentionality is particularly unbelievable because, as he himself concludes, a simple side-by-side comparison would have revealed (and did ultimately reveal) that the same attorneys were incorrectly listed on more than one lodestar.

Unfortunately for the Special Master, "Facts are stubborn things."[1]  Here, the facts show that: (1) Customer Class Counsel jointly developed the plan to share the cost of staff attorney work and the risk of failure, and neither Lieff nor Labaton has ever stated they were deceived; (2) the final fee agreement among counsel was executed **before** the fee declarations submitted to the Court ever existed, thereby negating any possibility that the submitted lodestars had any bearing whatsoever on the fee split among counsel; and (3) the fee agreement was the result of a negotiation among sophisticated and experienced counsel who had expressly agreed to split the risk of jointly funding the staff attorneys.  More to the point, the Special Master's finding that Thornton intentionally included staff attorneys on its lodestar in order to deceive co-counsel is

---

[1] Summation of John Adams, *Rex v. Wemms* (Suffolk Superior Court, 1770).

flatly contradicted by his finding that there was an understanding among some of the attorneys at all three firms that Thornton would include the staff attorneys on its lodestar.  *See* R&R at 45 n.27, 363.  As all firms had attorneys who understood that Thornton would include the staff attorneys on its lodestar, it is impossible that Thornton was attempting to deceive—or ever could have deceived—Lieff or Labaton.

In terms of any alleged deception of the Court, there was simply no motivation to increase the lodestar submitted to the Court in order to generate a larger fee or to get a greater share of the aggregate fee.  The Special Master chooses to ignore a basic fact: by the time the lodestar was submitted to Court in September 2016, all of the lawyers had already agreed that they would seek no more than an aggregate 25% fee[2] and the Thornton Law Firm had already agreed to a final fee split agreement with Lieff and Labaton.  Additional lodestar would not have generated any additional fee award for the Thornton Law Firm.  The only possible motivation would have been to decrease the aggregate multiplier, which is highly implausible for at least two reasons: (1) the multiplier was already well within the range of reasonableness; and (2) the Thornton Law Firm accounted for only 18% of the total lodestar submitted to the Court, so it would not have been able to "move the needle" on the aggregate multiplier.  These are important facts that the Special Master ignores.  Further, the Special Master insinuates that there was something wrong about the fact that staff attorneys accounted for "71.5% of all Thornton hours reported."  *See* R&R at 45.  In fact, Lieff's and Labaton's percentage of hours worked by staff or contract attorneys (83.4% and 81.5%, respectively) significantly exceed Thornton's percentage.[3]

---

[2]   In fact, the Court remarked during the pre-filing hearing on June 23, 2016 that it "usually start[s] with 25 percent in mind" as the percentage award.  6/23/16 Hr'g Tr. at 15:18-16:2 (Dkt. 85).

[3]   In addition, the Special Master has made a mathematical error.  The Thornton staff attorney percentage was 68.9% of all Thornton hours reported, not 71.5%.  These calculations were made using the lodestars submitted to the Court in September 2016.

In a transparent attempt to generate a soundbite, the Special Master and his counsel quote repeatedly (and entirely out of context) an email in which Garrett Bradley states that paying for additional staff attorneys is the "best way to jack up the loadstar [sic]."  The Special Master knows that there is nothing wrong with the concept expressed in the email, which is from February 2015 (well over a year before the fee declaration or lodestar was filed with the Court) and contains an invoice for staff attorneys *from Labaton*.  The concept was that if the Thornton Law Firm bore more risk by investing in additional staff attorneys vis-à-vis the other law firms (and pursuant to their agreement), Thornton would eventually be able to pursue a greater share of the fee vis-à-vis co-counsel.  This would in no way increase the total lodestar submitted to the Court or the amount of fees the class paid to its attorneys.  There was always only a finite number of documents to be reviewed and reviewers who could review those documents; the only difference was, for purposes of spreading the internal risk among the firms, which firm would be financially responsible for which staff attorneys.  In other words, as is clear from the context, Bradley uses "lodestar" as shorthand for the number of hours worked and resources expended *among counsel* for purposes of dividing the fee *among counsel.*  It is typical of the Special Master and his counsel's approach that they choose to ignore this context (which is clear from the record) in order to generate a catchy—albeit totally misleading—soundbite.

Ultimately, the Special Master is left with a strained theory by which the Thornton Law Firm deceived co-counsel and the Court not by inflating hours worked—the Special Master found all of the hours worked by Thornton Law Firm attorneys reasonable and sufficiently supported—but by correctly listing on its lodestar staff attorneys that the Thornton Law Firm paid for pursuant to an agreement among co-counsel.  As the Special Master acknowledges, names of the staff attorneys were listed on the lodestars such that anyone who placed the

lodestars side by side would immediately realize that certain attorneys' time had been double counted. The idea that this could be intentional deception—an idea which the Special Master advocates —is ludicrous.

## C.     The Boilerplate Affidavit

Failing to find any true evidence of deception—because there was none— the Special Master rests his case for Rule 11 sanctions and professional misconduct on immaterial misstatements in a boilerplate affidavit that was provided to all counsel by Labaton. Bizarrely, the Special Master recommends sanctions only for Garrett Bradley even though almost every law firm in this matter used an identical boilerplate affidavit and therefore could be held responsible—under the Special Master's dubious theories—for similar misstatements. Even stranger, after characterizing the Chargois matter as "[t]he most troubling issue in this case," R&R at 303, the Special Master declines to recommend any sanctions or disciplinary action related to Chargois, but recommends a massive sanction of Garrett Bradley for his role in an inadvertent error that was obvious to anyone who closely read the submissions to the Court.

Garrett Bradley's statements are described in further detail herein, but as an example, the Special Master faults the Thornton Law Firm for stating the rates in the lodestar "have been accepted in other complex class actions." The Special Master's criticism is that the rates for the *individual* staff attorneys listed in the Thornton Law Firm's declaration had not previously been accepted in class actions for those *individual* staff attorneys. Of course, the sentence is intended to convey that the rates for the staff attorney *role* had been accepted in other class actions— which is true— and not that particular staff attorneys had previously performed document review for those same rates in other class actions. The Special Master alleges "deception" with respect to Garrett Bradley, but his investigation made no attempt to inquire whether each of the 20 staff attorneys listed in Lieff's affidavit and each of the 35 staff attorneys listed on the Labaton

affidavit (as well as all of the attorneys in the ERISA firms' declarations) had ever been listed on a lodestar at the same rate.

The fact of the matter is that the rates for Thornton Law Firm staff attorneys—which ranged from $425 to $500 with a weighted average (overall fees divided by overall hours) of $428— was **lower** than both the range and weighted average of the Lieff staff attorneys, $415 to $515, and $438, respectively.  As Prof. Rubenstein testified, rates of up to $550 have been accepted for staff attorneys in class actions.  Rubenstein Decl., 7/31/17, at ¶ 36 (TLF Ex. 1). What is more, the Special Master himself found that the staff attorneys' rates in this matter— which for Lieff ranged up to $515—were reasonable.  *See* R&R at 176-81.

In what appears to be the crux of his case against Garrett Bradley, the Special Master presents the Court with an opinion from the Rhode Island Supreme Court, *In re Schiff,* which he claims is "eerily similar" to the case at bar.  *See* R&R at 244.  Nothing can be further from the truth.  In *Schiff*, there were not immaterial misstatements in a boilerplate affidavit, but a "grossly inflated" lodestar in a fee-shifting case.  The attorney in *Schiff* sought costs and fees 47 times greater than amount of her client's recovery—4,000 billable hours for a case that was "based on a relatively simple sequence of events occurring over a limited period of time."  The Court found that "The billing sheets submitted by respondent sought reimbursement for work unrelated to the case [and] *sought payment for time not worked*." *Matter of Schiff*, 677 A.2d 422, 423 (R.I. 1996) (emphasis added).  In this case, however, the Special Master has made no finding whatsoever of false or unreasonable billings—indeed, to the contrary, he has concluded that "the total hours expended by each of the Thornton lawyers were reasonable and sufficiently reliable."  R&R at 216.  The extensive reliance on *Schiff* is indicative of the fact that the Special Master and his

counsel have acted, and are acting, as overly-aggressive litigants who are accusing their perceived adversaries of not being candid with the Court.[4]

### D.    Michael Bradley

The Special Master finds that "the total time Michael Bradley spent working on the *State Street* document review, 406.4 hours, was reasonable," R&R 217, and that such time "is supported by reasonably reliable contemporaneous time records."  R&R at 366.  The Special Master's concern is not with hours, but with Michael Bradley's rate as listed on the lodestar ($500 per hour), because Bradley's work "most closely resembles that of a junior level associate."  R&R at 196.  Yet the reduced rate that he argues should apply to Michael Bradley's work—$250 per hour—is less than the rate used for *any* associate in this case, by *any* of the nine law firms that submitted fee declarations.  It also is less than the lowest end of the range of rates for associate work that the Special Master himself concludes to be reasonable elsewhere in the Report ($325 to $725 per hour).  R&R at 164.  Moreover, it is substantially less than the $415 per hour rate of another staff attorney who performed exactly the same work and, like Michael Bradley, performed it remotely.  There is no basis for reducing Michael Bradley's rate by 50% when the Special Master himself found that staff attorney rates of up to $515 were reasonable in this very case.  *See infra* § VII.  Even if Michael Bradley's rate is reduced (whether to the rate of the other Thornton Law Firm staff attorneys, or to the $415 per hour rate of the staff attorney who performed exactly the same work, or to the Special Master's arbitrary $250 per hour), the effect on the lodestar and multiplier, as discussed herein, is completely immaterial to the attorneys' fee award.

### E.    Contract Attorneys

---

[4]      As further detailed herein, the Report and Recommendations is replete with mischaracterizations of the record and propositions that unreasonably stretch the meaning of their purported supporting authorities.

The Special Master recommends that the time agency/contract attorneys expended reviewing State Street's documents—the same work performed by staff attorneys—should be listed as a "cost" rather than as a legal service on Customer Class Counsel's lodestars. The Special Master has **failed to identify a single case** holding that contract attorneys must be charged as expenses. When Customer Class Counsel provided the Special Master with various case law demonstrating that agency/contract attorneys—who are, in terms of work performed and qualifications, entirely indistinguishable from firm-hired staff attorneys—are properly included in fee applications at an hourly rate, the Special Master said that he would simply agree to disagree with those courts. But he has done more here, for he falsely asserts that "legal and ethical rulings have not provided definitive guidance on this interesting issue," R&R at 187, which **is simply not true**. Case law and ethics opinions strongly suggest that it is not only permissible, but common practice, to include contract attorneys in the lodestar. *See infra* § VI. The Special Master cites a particular case, *In re Citigroup,* in support of his statement that courts "that have previously weighed in on this issue have not drawn a clear distinction between temporary attorneys and partnership-track associates." R&R at 183. In fact, *Citigroup* specifically *drew* this distinction, recognizing that "a contract attorney's status as a contract attorney—rather than being a firm associate—affects his **market rate**." 965 F. Supp. 2d at 395 (emphasis added). Whatever the Special Master's personal policy preference may be in terms of how work performed by contract attorneys should be accounted for, it is clear that there is no legal or factual basis for his recommendation to this Court that contract attorney work be charged as a cost.

Accordingly, for the reasons set forth more fully below, this Court should reject the Special Master's recommendations. His Report, which relies in large part on the ever-changing

musings of a self-proclaimed "legal expert" from NYU Law School, is replete with clearly erroneous legal and factual findings and should not be the basis for taking any further action against the attorneys in this case. Besides the substantial expense of the investigation itself (as well as lost opportunity costs), the attorneys have already suffered serious reputational harm, and there is simply no fair or legally sensible reason to continue punishing attorneys who achieved such an excellent result for the class.

## ARGUMENT

### I.    The Double Counting Error Was Inadvertent And The Special Master's Recommendation Of $4 Million Disgorgement Is Unjustified

Although the parties to this investigation dispute many issues, one thing on which everyone agrees is that counsel achieved an outstanding result for the class. *See* Exec. Summ. at 7 ("By all accounts, the class settlement provided an excellent result for the class members and was a product of the highly dedicated and professionally skilled work of the class' law firms, a view with which the Special Master wholly agrees.").

Through their diligent and hard-fought prosecution of this matter, Plaintiffs' counsel ensured the return of hundreds of millions of dollars to pension funds subjected to State Street Bank and Trust's standing instruction foreign exchange ("FX") trading practices. The Thornton Law Firm, which brought the first cases involving standing instruction FX trading, played a critical role in this case from inception to resolution, bringing to bear substantial expertise in the subject matter as well as developing the damages theory for the case.

The Thornton Law Firm and its co-counsel also incurred substantial risk in bringing suit against a large, well-funded bank with no guarantee of any recovery. In approving the 25% fee at a hearing on November 2, 2016, the Court remarked:

> [I]n this case the plaintiffs' lawyers took on a contingent basis a novel, risky case. The result at the outset was uncertain, and it remained, until there was a settlement, uncertain.
>
> The plaintiffs' counsel were required to develop a novel case. This is not a situation where they piggybacked on the work of a public agency that had made certain findings. They were required to be pioneers to a certain extent. They were required to engage in substantial discovery that included production of nine million documents. They engaged in arduous arm's length negotiation that included 19 mediation sessions. They had to stand up on behalf of the class to experienced, able, energetic, formidable adversaries. They did that.

11/2/16 Hr'g Tr. at 36:2-14 (SM Ex. 78).

In its ruling on November 2, 2016, the Court identified the factors it considered in approving a 25% fee: (1) the reasonableness of the multiplier produced by the lodestar cross-check (1.8); (2) the Court's tendency to award between 20% and 30% in class action common fund cases; and (3) consideration of awards in comparable cases, and, in particular, the reasonableness of the percentage in the context of other First Circuit cases with comparable settlements (*i.e.,* settlements in the $250 million to $500 million range). *Id.* at 35:3-36:2. The Court's approval of the 25% fee was consistent with its initial remarks during the pre-filing hearing on June 23, 2016, at which the Court stated that it "usually start[s] with 25 percent in mind" as the percentage award. 6/23/16 Hr'g Tr. at 15:18-16:2 (Dkt. 85).

Throughout the investigation and in his Report, the Special Master likewise recognizes the tremendous efforts of counsel that produced this substantial settlement. Noting the "risks, complexities and legal challenges inherent in the litigation," the Special Master concludes in his Report that the skill and dedication of counsel produced "an excellent result for the class," and was an "undeniable accomplishment" by counsel engaged in "fine and highly effective lawyering." R&R at 6-7. Specifically as to Thornton, the Special Master finds that the rates listed for Thornton partners and associates were justified and reasonable in light of the complexity of the case, R&R at 175; that the number of hours listed for Thornton partners and

- 12 -

associates was justified and reasonable, R&R at 216 ("[T]he total hours expended by each of the Thornton lawyers were reasonable and sufficiently reliable"); and that the number of hours listed for Michael Bradley also was reasonable.  R&R at 217 ("[T]he total time Michael Bradley spent working on the *State Street* document review, 406.4 hours, was reasonable").

A. **The Double Counting of Staff Attorney Hours Was Inadvertent And Not Thornton's Fault**

As the Special Master concludes, and as all firms confirmed numerous times during the investigation, the double counting errors made in the fee declarations submitted to the Court were inadvertent.  R&R at 7, 352, 363.  Without question, the mistakes in the fee declarations should have been caught before filing.  But the failure to do so was just that: a mistake.  Within two days of realizing the double counting, counsel submitted a letter to the Court alerting it to the errors.  Goldsmith Ltr. to Ct., 11/10/16 (SM Ex. 178).  As explained below, these inadvertent errors in the lodestar calculation, while unfortunate and regrettable, have no impact on the reasonableness of the attorneys' fees awarded pursuant to the percentage of fund method in this case.  The impact of these mistakes on Customer Class Counsel already has proven significant, costly, and lasting.  Further redress for these inadvertent errors would be needlessly punitive, and is unwarranted.

B. **The Proposed "Disgorgement" of $4,058,000 Is Unjustified And Misapprehends the Function of the Lodestar Cross-Check**

Despite expressly finding that the errors in the fee declarations were inadvertent, the Special Master asserts that the three firms must "disgorge[]," in equal shares, the amount at issue ($4,058,000),[5] and that the amount should be "returned" to the class.  R&R at 364.  The Special

---

[5]   The exact amount at issue as a result of the double counting error is $4,058,654.50.  *See* Goldsmith Ltr. to Ct., 11/10/16 (SM Ex. 178).  However, the Special Master uses a rounded amount ($4,058,000) throughout his Report.  Accordingly, undersigned counsel uses the rounded figure ($4,058,000) herein.

Master's terminology reveals the logical fallacy that underlies his conclusion.  The attorneys
were not paid $4,058,000 that otherwise would have gone to the class.  The Special Master's
recommendation that Customer Class Counsel "disgorge[]" this amount is based on a
fundamental misunderstanding of how attorneys' fees were awarded in this case, and specifically
of the function of the lodestar cross-check.

As the Court knows, and as the Special Master acknowledges, R&R at 143-46, the
attorneys' fee award in this case was calculated using the percentage of fund method (also called
the "common fund" method), which is typically used in cases in the First Circuit.[6]  Under the
percentage of fund method employed by the Court in this case, the lodestar numbers submitted
by counsel **are not the basis for counsel's fee award**; the percentage granted by the court is.
*See* Rubenstein Decl., 7/31/17, at ¶¶ 13, 17, 18 (TLF Ex. 1); Rubenstein Decl., 6/20/18, at ¶¶ 18-
19.  The lodestar cross-check is used **only** as a means of verifying the reasonableness of the
percentage of the recovery being awarded to the attorneys.  Rubenstein Decl., 6/20/18, at ¶ 18-
19.  If there are errors in the lodestar, the only inquiry the court must perform is to analyze the
revised lodestar number and its impact on the multiplier.  Rubenstein Decl., 6/20/18, at ¶¶ 19-
20;[7] *see also* Rubenstein Decl., 7/31/17, at ¶ 15 (TLF Ex. 1) ("[U]sing a lodestar cross-check

---

[6]   *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295 (1st Cir. 1995)
(cited in the Report at p. 144); Rubenstein Decl., 7/31/17, at ¶¶ 13, 17 (TLF Ex. 1).

[7]   Professor Rubenstein explains the relevant authority as follows: *In re Polyurethane Foam Antitrust Litig.,* 168
F. Supp. 3d at 1013 (reducing lodestar in cross-check in part because of contract attorney rate and then re-
assessing acceptability of new multiplier); *In re: Cathode Ray Tube (CRT) Antitrust Litig.,* No. 1917, 2016 WL
4126533, at *9 (N.D. Cal. Aug. 3, 2016) ("[E]ven if the Court were to reduce the Plaintiffs' lodestar to reflect
the contract attorneys' lower billing rates, the multiplier that would result would still be well within an
acceptable range. . . . A lodestar reduction is unnecessary when the effect on the multiplier is not material."); *In
re Citigroup Inc. Bond Litig.,* 988 F. Supp. 2d 371, 378 (S.D.N.Y. 2013) ("If the Court reduces the blended
hourly rate for staff attorneys to $300—a rate that appears to be either appropriate or slightly high—the
modified lodestar is approximately $73.5 million. Such a reduction would make the multiplier closer to 1.59.
Assuming even a blended hourly rate for staff attorneys of $250—perhaps somewhat on the low end—the
result is a modified lodestar of approximately $65 million and a multiplier of nearly 1.8. All of these figures
are within the range of reasonableness. The lodestar cross-check has therefore performed its function,
satisfying the Court that an award of 16%—which it has already determined represents a reasonable percentage
of the settlement fund—adequately compensates plaintiffs' counsel for their time and effort based on

enables a court to make a rough estimate of counsel's lodestar for the sole purpose of ensuring against a windfall.").  Errors in the lodestar—and particularly if they are inadvertent and self-disclosed—do not warrant return of monies to the class as long as they do not have a material effect on the multiplier and the multiplier is still reasonable.  Rubenstein Decl., 6/20/18, at ¶¶ 19-20.  The Special Master does not seem to understand this concept.  The First Circuit is **not** a lodestar-based jurisdiction, where fees are awarded solely on the attorney's hours and rates.  Yet the amount the Special Master recommends be "disgorged" is the amount of the **lodestar** that was inadvertently double counted.  When the fee is *percentage-based*, as it was here—which the Special Master does not dispute (Exec. Summ. at 7)—it is black-letter law that the attorneys are not paid dollar-for-dollar for time they submit to the Court.  Instead they are paid a percentage of the recovery in the case, with lodestar information only supplied to cross-check the reasonableness of that percentage. As long as the percentage remains reasonable, the fee is reasonable.  The Special Master repeatedly admitted that the fee in this case was reasonable and therefore he has no basis—nor is there basis in logic or case law—to recommend "disgorgement" of monies based on inaccurate lodestar numbers.

Indeed, the Special Master's recommendation that the firms "disgorge[]" an amount corresponding to errors in their lodestar submissions is incomprehensible given the role of the lodestar in the fee award in this case.  To properly measure the effect of the lodestar mistake, it is only necessary to revisit the two-step lodestar cross-check inquiry.  This means reducing the raw

---

estimations of reasonable market rates and factoring in an appropriate multiplier."); *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 409 (D. Conn. 2009) ("[I]f the charges for the contract attorney time were decreased, the multiplier in this case would still be a reasonable multiplier."); *In re Royal Dutch/Shell Transp. Sec. Litig.,* No. CIV.A. 04-374 JAP, 2008 WL 9447623, at *32 (D.N.J. Dec. 9, 2008) ("Even if Lead Counsel reduces plaintiffs' counsel's total lodestar by $7,287,396.25 (the lodestar of the discovery attorneys employed by Lead Counsel)—from $56,891,317.50 to $49,603,921.25—that reduction increases the multiplier only from 1.002 (based upon the total fee of $57 million) to 1.15, an immaterial difference.").

lodestar to account for the errors, recalculating the multiplier, and then reassessing whether that

multiplier is still reasonable in the context of the percentage award.  Numerous courts in cases in

which lodestars have been adjusted post-filing have addressed the issue this way.[8]

       This reassessment, as applied to the attorneys' fee award in this case, undeniably shows

that, even assuming *arguendo* that *all* of the Special Master's proposed reductions to the overall

lodestar should be made, the 25% fee award remains reasonable and entirely justified by the

lodestar cross-check:

- Reducing the lodestar by the double counted time ($4,058,000) results in a multiplier increase from 1.8 to **2.01**.  Rubenstein Decl., 7/31/17, at ¶¶ 18, 39-45 (TLF Ex. 1).

- Reducing the lodestar by (1) removing the double counted time and (2) adjusting the lodestar to reflect contract attorney time as an expense results in a multiplier increase from 1.8 to **2.07.**  Rubenstein Decl., 6/20/18, at ¶ 19.

- Reducing the lodestar by (1) removing the double counted time, (2) adjusting the lodestar to reflect contract attorney time as an expense, and (3) adjusting Michael Bradley's hourly rate to $250 results in a multiplier increase from 1.8 to **2.07.**[9]

Every one of these hypothetical multipliers is well within the range of reasonableness for a class

action case of this size, duration, and complexity.  Lodestar cross-check multipliers as high as 4

have been accepted in similar cases.  *See* Rubenstein Decl., 7/31/17, at ¶¶ 39-45 (TLF Ex. 1)

(concluding that a multiplier of 2.01 "falls securely within the range of multipliers that courts

have approved in appropriate circumstances in the past" and "fully supports the reasonableness

of the fee the Court awarded Counsel in this matter"); *see also* Rubenstein Dep., 4/9/18, at

56:24-57:2, 216:1-218:4 (SM Ex. 235) (concluding that "for what the attorneys accomplished

here a two multiplier is a perfectly reasonable—in fact, quite a modest fee for them," describing

---

[8]    *See supra* footnote 7.

[9]    The value of the double counted time is taken from the Goldsmith Ltr. to Ct., 11/10/16 (SM Ex. 178).  The contract attorney adjustment is taken from the Report and Recommendations at 367.

the factors underscoring the multiplier in this case, and opining that "**I wouldn't have been surprised in a 300-milllion-dollar settlement to see a three or a four multiplier.**  I should add multipliers are often higher the higher the settlement.  And so I wouldn't have been surprised, and I think it would have been justified to see a three or four.") (emphasis added); Rubenstein Decl., 6/20/18, at ¶ 19 (finding that a 2.07 multiplier, which results if double-counted and contract attorney time are removed, is "fully reasonable, indeed modest").

The Special Master's proposed disgorgement of the lodestar cross-check errors misapplies the applicable law and would result in an unfair and unsupportable result.  The inadvertent lodestar errors simply do not materially affect the result of the lodestar cross-check and, therefore, do not affect the reasonableness of the fee.

### C.    Thornton Is Not Responsible For The Inadvertent Double Counting

The Special Master concludes that Labaton bears "ultimate responsibility" for the double counting because, as lead counsel, it had a duty to cross-check the individual fee petitions of the firms, but failed to do so.  Exec. Summ. at 18-19.

Despite concluding that Labaton bears ultimate responsibility for the inadvertent double counting errors, the Special Master recommends that Labaton, Lieff, and Thornton should equally share the remedy he proposes to address the errors, *i.e.,* the "disgorgement" of $4,058,000.  As discussed above, disgorgement is unjustified and misapprehends the function of the lodestar cross-check.  The double counting errors simply have no material effect on the cross-check, and the multiplier that results when those hours are excluded is well within the range of reasonableness.

The Special Master contends that a remedy is necessary to address the inadvertent double counting, but imposing that remedy on Thornton would be unjustified for reasons additional to the ones stated above.  The Special Master attributes the double counting mistakes in the fee

- 17 -

declarations to two core failures: (1) Labaton's failure to inform its partner preparing the omnibus fee declaration, Nicole Zeiss, of the firms' agreement to share the cost of staff attorneys; and (2) the failure of the firms to reduce their agreement regarding the staff attorneys to writing.  R&R at 363.

The Special Master also concludes that, as to the firms' agreement to share the cost of staff attorneys, Thornton reasonably understood that it would list the staff attorneys for whose work it paid in its lodestar, and that "at least some of the lawyers at each of the three customer class law firms anticipated that Thornton would put the staff attorneys on its lodestar, and lawyers from each firm thought this was appropriate[.]" *See also id.* at 220-21, 363 (Special Master concluding "there is sufficient evidence in the record to find that at least some attorneys at both Labaton and Lieff believed that the staff attorneys paid for and allocated to Thornton would be included on Thornton's lodestar petition.").[10]

The Special Master further notes that correspondence contemporaneous with the drafting of the November 10, 2016 letter to the Court, and the November 10, 2016 letter itself, showed Labaton and Lieff acknowledging that the inadvertent double counting was in **their** lodestars, not Thornton's.  R&R at 220-21, n.174 (citing contemporaneous email correspondence from Chiplock to Goldsmith, 11/9/16 (SM Ex. 261) and Goldsmith Ltr. to Ct., 11/10/16 (SM Ex. 178)).

Despite these findings, the Special Master concludes that Thornton shares in the "responsibility" for the double counting errors because Garrett Bradley did not adequately describe the firms' staff attorney agreement in his declaration.  Exec. Summ. at 15-16.  The

---

[10] ██████████████████████████████████████████████████
████████████████████████████████████████

statements in Garrett Bradley's declaration are discussed in detail elsewhere in this response. *See infra* § III(B).  The Special Master concludes that Thornton shares responsibility for the "administrative confusion" that led to the double counting because it did not modify the boilerplate language in the Labaton-prepared template declaration.  Exec. Summ. at 19.  This conclusion is wholly speculative, without any basis in the Record, and logically inconsistent.

The Special Master concludes, without **<u>any</u>** supporting evidence, that "[i]t is probable that, had Thornton's petition contained fully truthful and accurate statements describing the actual affiliation and rates of the loaned staff attorneys and agency attorneys, Labaton Settlement Attorney Nicole Zeiss, or the Court, would have been alerted that something was amiss and thereby have detected the double-counted hours."  Exec. Summ. at 16.  The Special Master drew this conclusion (and went so far as to deem it "probable") despite having never asked Nicole Zeiss—who sat for two depositions in this investigation—what would have happened if Thornton had modified the boilerplate language.

Moreover, this wholly speculative assertion is contradicted by the Special Master's own conclusion that Labaton "fail[ed] to perform a side-by-side comparison" of the declarations. R&R at 56 n.39.  It is difficult to imagine, and impossible to conclude based on any fact, that modified boilerplate language would have led to a different result when a basic side-by-side comparison was not done.[11]  If a simple comparison of the fee declarations would have revealed the double counting, as the Special Master concludes, it was Labaton that should have, but did not, perform this comparison.  *See* Exec. Summ. at 19.

---

[11]   Indeed, Nicole Zeiss testified that, while some firms changed the language in their fee declarations, she did not discuss any changes with any firm, and does not recall whether she noticed the changes before filing, or only after the fact.  Zeiss Dep., 6/14/17, at 42:22-43:14 (SM Ex. 79).

The Special Master also concludes that because Labaton did not circulate the individual declarations among the group, the other law firms were not in a position to notice and rectify the double counting.[12]  *See* R&R at 224.  Though the Special Master mentions only Lieff and ERISA Counsel, the record is clear that Thornton also did not see any other firm's fee declaration before Labaton filed the omnibus fee declaration—and therefore Thornton, like Lieff and ERISA Counsel, did not have an opportunity to identify the double counted time before filing.  Evan Hoffman of Thornton confirmed this in response to the Special Master's explicit inquiry during his deposition:

> THE WITNESS: And then it was sent back to Labaton for their review and maybe an edit or two and that was the last we saw of it until it was submitted on ECF for the final, when it was actually given to the judge.
>
> JUDGE ROSEN: You never saw Labaton's fees or Lieff's fees in the declaration?
>
> THE WITNESS: Correct.
>
> JUDGE ROSEN: In the actual fee declaration, did you ever see their fees?
>
> THE WITNESS: No, not until it was already filed.
>
> JUDGE ROSEN: Not until it was filed?
>
> THE WITNESS: Correct.

Hoffman Dep., 6/5/17, at 94:18-95:10 (SM Ex. 63).[13]

The inadvertent double counting of staff attorney time was undoubtedly a regrettable mistake.  The evidence in the record, however, does not support holding Thornton accountable

---

[12]   The Special Master uses the term "double-billing," not "double counting," here.  R&R at 224.  To be clear, there was no "billing" in this case.   This repeated wording is a conscious choice of the Special Master and further demonstrates his fundamental misunderstanding of the purpose of the lodestar cross-check in a percentage of fund scenario.  Rather, as described in detail *infra,* the submission of fee declarations showing the time spent on the case was made in conjunction with the lodestar cross-check that was used to support, **not replace**, the percentage of fund method by which attorneys' fees were awarded.

[13]   The Special Master does not mention this piece of relevant testimony in the Report, wrongly inferring, and suggesting that the Court infer, that Thornton had an opportunity to review the other firms' fee declarations prior to filing.

for these errors.  To the contrary, Thornton acted consistent with the firms' agreement regarding

staff attorneys.  Even if there was imperfect knowledge of this agreement within the other law

firms, due to compartmentalization or other issues, it does not mean that Thornton acted

unreasonably.  As the November 10, 2016 letter to the Court and contemporaneous

correspondence stated, the inadvertent double listing of these staff attorneys' time occurred on

the Labaton and Lieff lodestars, not on Thornton's.  R&R at 220-21, n.174 (citing

contemporaneous email correspondence from Chiplock to Goldsmith, 11/9/16 (SM Ex. 261) and

Goldsmith Ltr. to Ct., 11/10/16 (SM Ex. 178)).  And as the Special Master also concludes, the

duty to review and cross-check the individual petitions belonged to Labaton, which, as lead

counsel, was responsible for drafting and submitting the omnibus fee declaration to the Court.  It

is notable and illogical that, unlike his suggestion for Thornton and Garrett Bradley, the Special

Master proposes no Rule 11 sanction for Labaton despite finding that Labaton "was ultimately

responsible for preparing an accurate and reliable fee petition that the Court could rely upon" and

failed in its responsibility to ensure the accuracy of the papers it filed with the Court.  Exec.

Summ. at 19.[14]

As a result of the double counting mistake and this ensuing investigation, the law firms,

Thornton included, have no doubt identified areas where there is room for improvement.  To that

end, the firms jointly proposed a number of best practices recommendations in a submission to

the Special Master that, for reason unknown, the Special Master does not include as an exhibit to

the Report.  ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[14] Such sanction would, of course, be unjustified.

████████████████████████████████████████████████████████

████████████████████████████████████████   That did not happen here, and

is deeply unfortunate.  But hindsight is 20/20, and in light of the record evidence demonstrating

that Thornton is not responsible for the double counting, any disgorgement is unjustified.

> **D.      The $425 Per Hour Rate Used By Thornton For Staff Attorney Work Is Reasonable And Justified**

The Special Master's Report endorses, with two exceptions, the hours and rates in the

firms' fee declarations.  The Special Master concludes that, with two exceptions, "the hours and

rates of the attorneys of each of the law firms for whom lodestar reports were submitted to the

Court are reasonable and accurate, and consistent with applicable market rates for comparable

attorneys in comparable markets for comparable work."  Exec. Summ. at 21-22; R&R at 365-67.

The two exceptions are the rate of Michael Bradley and the rate of the agency-employed

"contract" attorneys, both of which are addressed *infra* at sections VI and VII.

The Recommendations section of the Report does not recommend any adjustment to the

$425 per hour rate assigned to the staff attorneys in Thornton's fee declaration, and none should

be applied.  However, in the narrative section of the Report, the Special Master states: "Although

the Special Master finds nothing unreasonable *per se* in the staff attorney rates billed by the

Customer Class law firms, an adjustment of the amounts billed in Thornton's lodestar for staff

attorneys will be required."[15]  R&R at 181. This sentence is accompanied by a footnote that

reads: "Fees for these staff attorneys will be calculated at the same rate as they were billed on the

Labaton and Lieff petitions."  *Id.* at n.150.

---

[15]     The terminology used here—"billed in Thornton's lodestar"—demonstrates the Special Master's continued confusion of lodestar as the basis of a percentage award cross-check with lodestar as the direct basis for a fee.

Although the Special Master does not ultimately recommend any adjustment to the lodestar on this basis, because his earlier remarks in the narrative section of the Report may be read to call for a reduction, Thornton addresses the reasonableness of the $425 per hour rate as follows.

*First,* the $425 per hour rate assigned to staff attorney hours by Thornton is an empirically reasonable rate, within the range of court-accepted rates for staff attorney work.  In his expert declaration submitted to the Special Master with the Law Firms' Consolidated Submission on August 1, 2017, Harvard Law School Professor William Rubenstein cites empirical research showing that courts have accepted staff attorney rates in the range of $250-$550 per hour in a dozen class action cases decided since 2013. *See* Rubenstein Decl., 7/31/17, at ¶ 36 (TLF Ex. 1); *see generally id.* at ¶¶ 34-38.

Moreover, contrary to the Special Master's assertion that this rate evidenced the "unempirical nature" of the rates used by Thornton, R&R at 70, the Southern District of New York accepted $425 per hour as a rate for staff attorney work in **another FX trading class action case**, *In re Bank of New York Mellon Corp. Forex Transactions Litigation*,[16] a year before the fee declaration filings in this case.

*Second,* Thornton's use of a $425 per hour rate was reasonable under the circumstances here, and was based on its understanding of previously accepted rates in other litigation and its discussions with co-counsel.[17]  Specifically, the Special Master finds that Thornton understood, at the time of the filing of the State Street fee application, that the $425 per hour rate had been

---

[16]   Referred to herein as *BNY Mellon*.

[17]   *See also* Hoffman Dep., 6/5/17, at 59:5-12 (SM Ex. 63) ("It was suggested by Dan Chiplock of Lieff and Mike Rogers of Labaton, that we should use for purposes of fee petition rates that had been approved by Judge Kaplan in the Mellon case for the reviewers, which was $425 an hour and that was what was put in on Thornton's end.").

used by Lieff and had been accepted by the Court in the *BNY Mellon* case. R&R at 70. The

Special Master further finds that Thornton believed Lieff to be suggesting this rate in the State

Street case, R&R at 180 n.146, as Lieff itself surmised in deposition testimony referencing an

email exchange between Lieff, Labaton, and Thornton after the staff attorney work was

completed:

> And so Thornton I think by and large used 425, perhaps thanks to this e-mail from
> fall of 2015, where I said, 'in Bank of New York Mellon I think we used 425,'
> which I think we did, because Thornton was involved in that case, too. So they used
> 425.

Chiplock Dep., 6/16/17, at 184:20-25 (SM Ex. 10) (discussing 9/11/15 Email, LCHB-0052627

(SM Ex. 192)).[18]

Without any other basis, the Special Master unreasonably suggests that the passage of

time between this email (September 2015) and the filing of fee declaration (September 2016)

makes the email less reliable. Such a conclusion ignores the fact that the staff attorneys' work on

the case was fully completed as of July 2015, when the parties reached an agreement in principle

to settle the case. Although it took more than a year for the parties to finalize the settlement and

appear before the Court, the agreement in principle and thus the conclusion of substantive work

on the matter, including the document review, was reached in the summer of 2015. Accordingly,

it is neither surprising that counsel were discussing their eventual lodestar petitions at this time in

2015, nor is it unreasonable for Thornton to have relied on this information in preparing its fee

declaration. Because Labaton did not circulate the fee declarations among the parties before

filing, R&R at 224, Thornton did not know that Labaton and Lieff were applying staff attorney

rates different from $425 per hour. While perhaps a more perfect practice would have been to

---

[18] For unknown reasons, the Special Master does not cite this deposition testimony in his discussion of the issue, but it immediately follows the portion of Mr. Chiplock's testimony he does cite. *See* R&R at 180 n.146 (citing to Chiplock Dep., 6/16/17, at 182:5-183:5 (SM Ex. 10)).

exchange this information prior to filing, Thornton reasonably relied on an established, court-accepted hourly rate. It did not simply pluck $425 per hour out of thin air.

*Third,* applying the Special Master's proposed formula for adjusting the $425 per hour rate (*i.e.,* that the rates on the Labaton and Lieff petitions should be used instead (R&R at 181 n.150)) would not result in any material difference to Thornton's lodestar, much less the overall lodestar or the multiplier resulting from the cross-check. As to staff attorneys overlapping with Labaton, reducing their rates on Thornton's position would result in a cumulative reduction of $412,627 from Thornton's lodestar (5.5% of the Thornton lodestar submitted to the Court, and less than 1% of the overall lodestar submitted to the Court). As to staff attorneys overlapping with Lieff, using Lieff's rates for the staff attorneys on Thornton's lodestar would result in no reduction.[19]

*Finally,* reducing Thornton's lodestar to adjust the rates as suggested by the Special Master would result in an unjustified double reduction, as overlapping time billed at a higher rate was already accounted for in the double counting reduction. In the November 10, 2016 letter to the Court alerting it to the double counting errors, David Goldsmith of Labaton explained that, "[w]hen a given SA [staff attorney] had different hourly billing rates, we removed the time billed at the higher rate." Goldsmith Ltr. to Ct., 11/10/16, at 3 (SM Ex. 178). This approach was not taken because the firms believed that the time on Thornton's lodestar was less legitimate—to the contrary, at least "some attorneys at Labaton, Lieff and Thornton independently assumed that Thornton would claim the SA time on its lodestar." R&R at 220. Rather, the firms took a lowest-rate approach to reducing the overlapping time as a conservative measure.

---

[19]   This is because, as the Special Master notes, Lieff billed two of the overlapping staff attorneys at a rate of $515 per hour. R&R at 180 n.147.

The Special Master at one point suggests that Thornton's use of a rate of $425 per hour for staff attorneys was so unreasonable as to warrant "adjustment" of Thornton's lodestar. Ultimately, perhaps in recognition of the empirical evidence and record evidence that $425 per hour was a reasonable rate, or perhaps having calculated the *de minimis* effect such adjustment would have—or perhaps both—the Special Master does not recommend any reduction to Thornton's lodestar on this basis. Indeed, the Special Master concludes that the hours and rates in Thornton's lodestar (excepting the rates for Michael Bradley and contract attorneys) are "reasonable and accurate." Exec. Summ. at 21-22; R&R at 365-67.

## II. Garrett Bradley Did Not Intentionally File A False Declaration

The Special Master's erroneous conclusion that Garrett Bradley intentionally lied to the Court relies on a blatant mischaracterization of the factual record and a fundamental misunderstanding of the fee allocation among counsel.

### A. There Was No Motivation To Deceive Co-Counsel

The Special Master's primary "support" for the proposition that Garrett Bradley intentionally lied to the Court is what he perceives as evidence of motivation. In particular, the Special Master finds:

> [T]he statements were false, and the false statements were not due to simple negligence, but rather Bradley intentionally and willfully identified the SAs in his Declaration as members of his firm and that their hourly rates were the same as the firm's regular rates charged for their services. Bradley's motivation for making the false statements is clear and well supported by the record. The record evidence shows that Bradley intentionally sought to "jack up" Thornton's individual firm lodestar vis-à-vis the other Customer Class firms, and representing the SAs as members of Thornton with billing rates of $425 an hour ($500 an hour, in the case of Michael Bradley) was the way to do it.

> R&R at 233.

> **

> [T]he Special Master concludes that Bradley deliberately and intentionally misrepresented the make-up of Thornton's professional staff and their hourly rates so that Thornton's lodestar petition would be grossly inflated.

R&R at 234-35.

**

> [T]he Special Master has found that Garrett Bradley's statements in his sworn declaration that accompanied the Thornton fee petition were knowingly false, and that they were motivated by a desire to greatly enhance the Thornton lodestar and thereby justify a larger fee award . . . .

R&R at 364.

In short, the Special Master has concocted a story in which the Thornton Law Firm claimed staff attorneys as employees in order to deceive co-counsel into paying more of the aggregate fee to Thornton. This is wrong on many levels: (1) Lieff, Labaton, and Thornton jointly developed a plan to perform the necessary review of the millions of pages of State Street documents— neither Lieff nor Labaton ever stated they were deceived; (2) the boilerplate affidavit signed by Garrett Bradley was provided by Labaton; (3) the Special Master found that attorneys at all three firms understood that staff attorneys for which Thornton paid would be included on Thornton's lodestar; (4) the final fee agreement among the firms was executed *before* the fee declarations submitted to the Court even existed; (5) the fee agreement between the firms was not directly dependent upon each firm's lodestar; and (6) the fee agreement was a negotiation among sophisticated and experienced parties who had agreed to split the risk—and therefore the reward—of jointly funding the staff attorneys.

The idea that Garrett Bradley intentionally lied by signing an inaccurate boilerplate fee declaration (that he did not draft) in order to deceive co-counsel defies logic. The Special Master's conclusion is squarely contradicted by the fact that, in the course of a $3.8 million investigation, the Special Master did not uncover a shred of evidence that co-counsel was or felt

that it was deceived.  There is no citation anywhere in the Report and Recommendations for this proposition because there is no such evidence; not a single Lieff or Labaton witness stated that the firms were in any way deceived by the Thornton Law Firm's fee declaration or lodestar.[20] The Special Master's motivation argument further hinges on the dubious claim that Garrett Bradley deceived co-counsel by signing (and not modifying) a boilerplate affidavit that co-counsel itself (Labaton) provided to the Thornton Law Firm.  It simply does not make sense that Garrett Bradley would try to fool co-counsel by signing a declaration with language prepared by co-counsel.

The Special Master's conclusion that the Thornton Law Firm included staff attorneys on its lodestar in order to deceive co-counsel also **directly contradicts** the Special Master's finding that there was an understanding among attorneys at all three firms that Thornton would include staff attorneys on its lodestar.  *See* R&R at 45 n.27 ("Some of the attorneys from Labaton, Lieff, and Thornton, however, independently made assumptions based on the circumstances that Thornton would claim those staff attorneys' time on its lodestar."); *id.* at 363 ("[C]ontemporary email traffic, the billing practices and deposition testimony all bear out that at least some of the lawyers at each of the three customer class law firms anticipated that Thornton would put the staff attorneys on its lodestar, and lawyers from each firm thought this was appropriate . . . ."). *See also* Lieff's Resp. to Interrog. No. 34, 6/1/17 (SM Ex. 57) ("[I]t was the Firm's understanding that Thornton would include in its lodestar total (to be reported in any Fee Petition submitted by Thornton) any hours worked by Staff Attorneys for which Thornton had borne

---

[20]   Strangely, the Special Master insinuates that there was something nefarious about the fact that staff attorneys accounted for "71.5% of all Thornton hours reported."  *See* R&R at 45.  Yet Lieff's and Labaton's percentage of hours worked by staff or contract attorneys (83.4% and 81.5%, respectively) significantly exceed Thornton's percentage.  In addition, the Special Master has made a mathematical error.  The Thornton staff attorney percentage was 68.9% of all Thornton hours reported, not 71.5%.

financial responsibility.");  ██████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████

If attorneys at all three firms understood that Thornton would list the staff attorneys on its lodestar, it is unclear what possible motive there could have been to deceive, as all firms were operating under the same assumption.  The Special Master also concluded that the double counting error was "largely inadvertent and the result of a combination of Labaton's internal compartmentalization . . . and a lack of any formal agreement."  R&R at 363.  It therefore makes no sense to suggest that Garrett Bradley could have *intentionally* caused an *inadvertent* error by signing a boilerplate affidavit.

In finding that Garrett Bradley was motivated to lie on the fee declaration to deceive co-counsel, the Special Master glosses over the incontrovertible chronology of the case.  By the time the fee declaration was submitted to the Court, Customer Class Counsel had already decided upon a final division of fees.  **There was no way in which the fee declaration submitted to the Court could have affected the proportion of the overall fee which Thornton would receive.**  Here, some background is necessary.  As the Special Master concedes, in 2011, "[a]t the inception of the case, Customer Class Counsel had agreed to a fee sharing arrangement pursuant to which Labaton, Lieff, and Thornton would each be entitled to 20% of any fee award, with the remaining 40% to be distributed at the end of the litigation . . . ." R&R at 51.

The Special Master does not explicitly say so but appears to believe that the remaining 40% was to be divided up among Labaton, Lieff, and Thornton based on the firms' lodestars

submitted to the Court on September 15, 2016.  This was not the case.  The final fee agreement

among the firms was executed in August 2016, **prior to** the existence of the fee declarations or

lodestars submitted to the Court in September 2016.  *See* Chiplock Dep., 9/8/17, at 135:7-9 (SM

Ex. 41) ("[T]he fee allocation agreement was reached in late August of 2016 . . . ."); Chiplock

Dep., 6/16/17, at 131:5-9 (SM Ex. 10) ("So that was divvied up formally before we actually

submitted the fee petition."); G. Bradley Dep., 6/19/17, at 46:24-47:2 (SM Ex. 43) ("[T]he fact

of the matter is we had a fee agreement in place in August of '16 before we filed the fee

application."); ██████████████████████████████████████████████

███████████████████████████████████.  Not surprisingly, this important piece of the

chronology is absent from the Report.

████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████████.  As demonstrated by the

below chart, the fee agreement did **not** track the final lodestar agreement. Although Thornton's

lodestar was smaller than Lieff's, Thornton received a larger portion of the fee split than Lieff

did:

|  | ██████████ | Percentage of Customer Class Counsel Total Lodestar (September 2016) |
|---|---|---|
| Labaton | ██ | 50% |
| Thornton | ██ | 22% |
| Lieff | ██ | 28% |

This is illustrative of a broader point: which staff attorneys were on which lodestar did not at all

control the allocation of the fee among counsel.  All of the staff attorneys could have been listed

on Lieff's or Labaton's lodestar, or all of the staff attorneys could have been listed on Thornton's

lodestar—no matter who was on which lodestar, the fee allocation among counsel had already

been determined by negotiations among the three firms.[21]  The purpose of the lodestars

submitted to the Court on September 15, 2016 was not to set an allocation among counsel but

simply to provide backup so that the Court could engage in a "cross-check" and determine

whether the aggregate fee of 25% was reasonable.  The Special Master refuses to acknowledge

this important point.

In terms of rates, the Special Master ignores that some of Lieff's staff attorneys were

actually billed at $515[22] and that **the weighted rate (i.e., total fees divided by total hours) for**

**Thornton staff attorneys ($428) was actually lower than the weighted rate for Lieff staff**

**attorneys ($438).**  If the weighted rate is limited to the "double counted hours," **the Lieff**

**weighted rate is $50 per hour greater than the Thornton weighted rate.**[23]  It's difficult to see

---

[21]   The Special Master finds something troubling in the fact that there was "intertwining of the fee negotiations in the two cases [*BNY Mellon* and the State Street litigation]" as between Lieff and Thornton.  *See* R&R at 52-53. The Special Master's "view [of Bradley intentionally making false statements in Thornton's fee declaration] is informed by the email exchanges between Bradley and Chiplock in which Bradley conveys his belief that Thornton did not receive a fair share of the *BONY Mellon* fee, in part because its lodestar was too low." R&R at 233 n.179.  The fee agreement, which was finalized prior to the submission of the lodestars, was negotiated by sophisticated counsel who had entered into a cost-sharing agreement at the beginning of the litigation and who had finalized the fee division prior to submission of the lodestar.  It would have been unremarkable (and certainly not cause for any kind of concern) if the fee allocation in the *BNY Mellon* case informed the negotiations among counsel in the State Street matter.  The fee allocation among counsel would have **no effect** on the overall amount of attorneys' fees the class would pay to its attorneys.

[22]   There are misrepresentations in the Special Master's report with respect to the staff attorney rates.  At footnote 134 on page 169, the Special Master states that "Lieff Cabraser staff attorneys were billed at $415, except for two staff attorneys (Joshua Bloomfield and Marissa Oh) who were charged at $515." At page 169 in the text, he states "With the exception of two Lieff staff attorneys, those [staff attorney] rates landed mainly between $335 and $440."  Both of these statements are false.  Five Lieff staff attorneys were billed at $515, not two. *See* Lieff Decl., 9/14/16, Ex. A (SM Ex. 89).  The Special Master himself acknowledges this in another part of his report on page 176: "Lieff's report listed twenty staff attorneys, five of whom were billed at $515 per hour . . . ." There is another misrepresentation on page 181. There, referring to the double counted staff attorneys, the Special Master states "The attorneys were billed by Labaton at Lieff at hourly rates ranging from $335 to $415." Again, this is false.  As the Special Master acknowledges in footnote 147 on page 180, "Lieff billed two [double counted] staff attorneys – Ann Ten Eyck and Rachel Wintterle – at $515 per hour."  In any case, there is no material difference between the Thornton billing rate for staff attorneys, $425, and the rate at which Lieff billed most of its staff attorneys, $415.

[23]   Calculated according to the double-counted hours set forth in 11/9/16 Email, TLF-SST-032267 (SM Ex. 261). According to that email, no hours were double counted for McClelland and Weiss.  To be conservative, double-counted hours for Wintterle and Ten Eyck are the lower of the hours on either the Lieff or the Thornton lodestar since "Rachel Wintterle and Ann Ten Eyck should not have been included in LCHB's lodestar at all,"

how Thornton could deceive Lieff when Lieff's effective staff attorney rate was higher than

Thornton's.  More broadly, the Special Master's laser focus on the $425 per hour rate[24] blinds

him to the fact that by almost every metric, Thornton's rates were lower than one or both of co-

counsel:

| **RATES** | Average Partner | Weighted Partner | Average Staff Atty | Weighted Staff Atty |
|---|---|---|---|---|
| Labaton | $905.00 | $861.13 | $380.42 | $376.59 |
| Lieff | $765.50 | $690.73 | $440.00 | $438.02 |
| Thornton | $721.25 | $694.36 | $428.13 | $427.87 |

Particularly noticeable is that both the average partner rate and weighted partner rate is more

than $150 higher for Labaton than for Thornton.  In none of the four categories listed above is

Thornton the rate leader.  This is hardly demonstrative of a law firm that is trying to inflate rates

to deceive co-counsel (or the Court).[25]

Even if the fee agreement was based on the lodestar submitted to the Court (which it was

not), the Thornton Law Firm's seeking credit for staff attorneys for which it paid could not

possibly have deceived co-counsel—especially when the entire effort related to document review

---

but Wintterle's hours were slightly lower on the Thornton lodestar and Ten Eyck's hours were slightly lower on the Lieff lodestar.

[24]   As discussed *infra* at Section III(B)(iii), the $425 rate was used for Thornton staff attorneys because it was approved by the Court for Lieff staff attorneys in the most analogous case, *BNY Mellon*.  Dan Chiplock had expressly suggested that the $425 rate be used in the State Street litigation.  *See* note 34.

[25]   One statement the Special Master makes with respect to rates is particularly misleading.  He notes in the Executive Summary at page 16, "Indeed, the manner in which Thornton implemented this [cost sharing] agreement appears designed from the inception to exaggerate its lodestar.  Thornton specifically reimbursed the other two firms for the staff attorneys and agency lawyers 'loaned' to them on a straight cost-only basis yet subsequently claimed them on its own lodestar report at rates much higher than Thornton had actually paid the two firms in cost reimbursement, and even higher hourly rates than Labaton and Lieff claimed for most of these same staff attorneys on their own reports."  Here, the Special Master is concerned about the entirely unobjectionable proposition of billing attorneys above cost.  Yet elsewhere in the R&R, the Special Master admits, "[T]here is nothing impermissible about marking up an attorney's billing rate above 'cost' so long as the rate at which the attorney is billed is reasonable and commensurate with experience and the value of the work performed," R&R at 177.  And the Special Master later finds that the billable rate for the staff attorneys was reasonable.  R&R at 172, 180.

and subsequent work was jointly planned and executed by the three customer class firms.  The

Special Master found that "Labaton, Lieff, and Thornton entered into a fee agreement to

'allocate' the costs of certain staff attorneys employed by and working at Labaton and Lieff's

offices to Thornton. . . . The purpose of the cost-sharing agreement was to share the cost and risk

burdens of the litigation among the three Customer Class firms."  R&R at 43.  Lieff and Labaton

are sophisticated parties.  They did not think that Thornton should have borne the risk of paying

for staff attorneys during the pendency of the litigation if it was not going to be rewarded for

taking on such risk if the litigation was successful.  And Lieff and Labaton would not have

themselves agreed to the cost-sharing agreement if it was not in their best interest to distribute

some of the risk—and therefore some of the reward—to Thornton.  *See, e.g.*, Chiplock Dep.,

6/16/17, at 129:6-13 (SM Ex. 10); Belfi Dep., 6/14/17 at 51:8-13 (SM Ex. 17); Rogers Dep.,

6/16/17, at 91:18-92:16 (SM Ex. 54).

This Court should understand the context of what the Special Master perceives as the

"smoking gun"—an email in which Garrett Bradley receives an invoice *from Labaton* for staff

attorneys and writes to Michael Thornton and Michael Lesser, "First month bill. . . . This is the

best way to jack up the loadstar [sic] . . . ."  3/11/15 Email, TLF-SST-011124 (SM Ex. 64).[26]

This email was sent in __February 2015__—more than a year before the fee declaration or lodestar

was filed with the Court.  What Garrett Bradley is referring to is the fact that if Thornton bore

more risk by investing in additional staff attorneys over the course of the litigation in relation to

the other firms (and pursuant to the firms' agreement), Thornton would reap a greater reward __in__

__the fee split among counsel__ if the litigation was successful.  __This would in no way increase the__

__aggregate lodestar submitted to the Court or the amount of fees the class would pay its__

---

[26] This email is a long thread that continues into March, but the cited email was sent in February.

**lawyers.**  In fact, Bradley is not referring to the aggregate lodestar, but is using shorthand for the number of hours worked and resources expended *among counsel* for purposes of dividing the fee *among counsel.*  Although the Special Master or his counsel may think "jacking up" serves as a great soundbite, the concept is entirely proper and unobjectionable.

It is worth noting that the very same document demonstrates the Thornton Law Firm's attentiveness to avoiding any inaccuracies in the lodestar.  Michael Lesser later writes, "Just following up on the doc review recordkeeping.  The attached invoice is dated 2/6/2015 (and was sent by email on 2/6 as well) but includes billables through 2/28.  Can you ask them to confirm whether these hours billed were for 2/6 – 2/28?  **I don't want us to double-count anything**." 3/11/15 Email, TLF-SST-011124 (SM Ex. 64) (emphasis added).

Perhaps what the Special Master really finds objectionable, as his so-called expert witness certainly does, is that plaintiffs' lawyers are interested in their fees.  *See* Benjamin Weiser, *Tobacco's Trials*, WASHINGTON POST (Dec. 8, 1996) ("'The plaintiffs' bar is peopled by lawyers who are permanently hungry,' says Stephen Gillers, professor of legal ethics at New York University.  'They're like red ants at a picnic.  There are an unlimited number of them, and if the food is good, they'll keep coming at you.'"); Stephanie Clifford and Benjamin Weiser, *In Shift, New York City Is Quickly Settling Big Civil Rights Lawsuits*, N.Y. TIMES (July 24, 2014) ("'It's like ants at a picnic,' said Stephen Gillers, an expert in ethics and the legal profession at New York University School of Law.  'All of a sudden the food's on the table and here they come.'").[27]

---

[27]  The Thornton Law Firm objects to Prof. Gillers' participation in these proceeding as a "legal expert."  *See* Supplemental Ethical Report for Special Master Gerald E. Rosen at 2 (SM Ex. 233) (stating "I understand that I am the equivalent of a court appointed expert" and noting "the District Court in Massachusetts has recognized legal ethics experts.").  The Court should not permit Prof. Gillers to assume the imprimatur of the Court as an expert on the law.  *See Reed v. Cleveland Bd. Of Ed.*, 607 F.2d 737, 747 (6th Cir. 1979) ("[W]e do not approve the practice of appointing legal advisors to a master or the court.  To the extent that the master was not qualified to make recommendations to the court because of a lack of experience in constitutional law, he

### B.      There Was No Motivation To Deceive The Court

It is telling that the Special Master appears to find only that, in signing the boilerplate

declaration, the Thornton Law Firm was motivated to deceive co-counsel, and not the Court.

Again, in a percentage fee jurisdiction, additional lodestar simply does not provide additional

funds to attorneys seeking a fee award—the lodestar is only used as a cross-check to ensure that

the aggregate fee amount is reasonable.  *See* Rubenstein Decl., 6/20/18, at ¶¶ 19-20; Rubenstein

Decl., 7/31/17, at ¶¶ 14-18 (TLF Ex. 1).  █████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████  The

25% figure was represented to the Court in June 2016, three months before the lodestars were

filed, *see* 6/23/16 Hr'g Tr. at 15:5-16:2 (Dkt. 85), and was published in the Notice of Pendency

dated August 22, 2016.  By the time the lodestars were submitted to the Court in mid-September

2016, the attorneys could not have asked for anything beyond 25%.  It is not as if, for instance,

the Thornton Law Firm could have showed its co-counsel a particularly large lodestar and

convinced them to seek leave to request 27% or 30%**.  The aggregate fee request was already**

**set and, no matter how large their lodestar, there was zero possibility that Thornton could**

**receive more than their agreed upon share (29% of Customer Class Counsel allocation) of**

**the 25% fee request.**

---

should have submitted such legal issues to the court."); *Fishman v. Brooks*, 396 Mass. 643, 650 (1986)
("Expert testimony concerning the fact of an ethical violation is not appropriate, any more than expert
testimony is appropriate concerning the violation of, for example, a municipal building code."); *In re: Initial
Public Offering Securities Litigation,* 174 F. Supp. 2d 61, 69 n. 11 (S.D.N.Y. 2001) ("Each courtroom comes
equipped with a 'legal expert,' called a judge.") (quoting *Burkhart v. Washington Metro. Area Trans. Auth.*,
112 F.3d 1207 (D.C. Cir. 1997)).  The Thornton Law Firm also objects to Prof. Gillers's report on the basis
that the factual background section of the report (which, at 58 pages, is the more than half of the report) is
replete with mischaracterizations and omissions of record evidence.  This is not surprising, as Prof. Gillers
acknowledges that the Special Master and his counsel drafted the factual background section of his report,
Gillers Supp. Report, 5/8/18, at 2, and as those mischaracterizations and omissions are repeated in the R&R.

Perhaps the Special Master will next speculate that the Thornton Law Firm might have been motivated to increase its lodestar to provide further support for the Court's cross-check in support of the 25% award. In other words, the higher the lodestar, the lower the multiplier, and the more likely that the Court would find the fee award reasonable. But this is not a realistic motivation for at least two obvious reasons. First, the aggregate fee multiplier in this case was modest and well within the range of what courts find acceptable in awarding fees. *See* Rubenstein Decl., 7/31/17, at ¶¶ 39-45 (TLF Ex. 1); Rubenstein Decl., 6/20/18. There was therefore no need to decrease the multiplier to ensure the Court would approve the award. And second, it would be incredibly difficult for any one firm, especially Thornton, to "move the needle" on the multiplier. Thornton's lodestar represented just 18% of the overall lodestar submitted to the Court. Even if there were an additional $1 million on Thornton's lodestar which was removed, it would have only moved the overall multiplier from 1.804 to 1.849, which is negligible. Indeed, even if Thornton billed all of its staff attorneys at $300 per hour rather than $425 or $500 per hour and the difference was removed, the overall multiplier would have only moved to 1.865, which is also negligible.

It is important to recall the manner in which the Special Master believes the Court was supposedly intentionally deceived. The manner of deception was not falsely increasing hours worked, which would have been very difficult for the Court or anyone else to detect. In fact, the Special Master found that all of the Thornton Law Firm hours were reasonable. R&R at 216-17. The supposed manner of deception was instead signing a boilerplate affidavit (which the Thornton Law Firm did not even draft) and correctly listing on the Thornton's Law Firm's lodestar those staff attorneys which the Thornton Law Firm paid for pursuant to an agreement among co-counsel. The names of the staff attorneys were explicitly listed on the lodestars such

that **<u>anyone</u>** who placed the lodestars side by side would immediately realize that certain

attorneys' time had been double counted.  It is ludicrous to suggest such an obvious and basic

mistake was intentional deception—indeed, it would be perhaps the lamest attempt at deception

in the history of the federal courts.  *Cf. Awkal v. Mitchell*, 613 F.3d 629, 655 (6th Cir. 2010)

(Martin, J., dissenting) ("At some point, Ockham's Razor [sic] must apply—the simplest answer

is usually the correct one."); *Thompson v. Bell*, 373 F.3d 688, 690 (6th Cir. 2004) ("Applying the

principle of Occam's razor, we conclude that more than likely, a genuine mistake was made

. . . .").

### C.    The Special Master's Assertion That Garrett Bradley Did, In Fact, Closely Review The Declaration Prior To Submission Is Based On A Blatant Misrepresentation Of The Evidence

With no true evidence of motivation, the Special Master next finds intentionality based

on "evidence" that Garrett Bradley closely read the boilerplate declaration before singing it and

therefore was aware of his misstatements.  The Special Master states:

> Emails among Garrett Bradley, Mike Lesser and Evan Hoffman show that drafts of the declaration were circulated among these Thornton attorneys for their review. This is confirmed by the testimony of Evan Hoffman: "[w]e put in all the hours that we had kept track of, I along with our accounting department and Anasthasia put in the expenses and then **mostly Mike Lesser and then Garrett Bradley, Mike Thornton and myself all reviewed**" the declaration before Bradley signed it. Hoffman 6/5/17 Dep., p. 94:9-15.

R&R at 229 (emphasis in Special Master's R&R).[28]

Although the Special Master's description makes it seem that he has found another

"smoking gun," the Court's attention should always be piqued when a litigant replaces the

material words of a quotation with his own characterization, and this instance is no different.  In

fact, Mr. Hoffman **does not** say at lines 9 through 15 of page 94 that Messrs. Lesser, Bradley,

---

[28]    The Special Master uses the same quote in his R&R at 59.

and Thornton reviewed the entire boilerplate declaration prior to Mr. Bradley signing it.  Mr.

Hoffman instead explained:

> [T]here was a section on fill in what your hours are, fill in what your expenses are, fill in what your lodestar is, fill in what your specific contributions were to the case, and the rest of the language was sort of, it was called a model fee declaration.  And so that's what we did, he put in all the hours that we had kept track of, I along with our accounting department and Anasthasia put in the expenses and then mostly Mike Lesser and then Garrett Bradley, Mike Thornton and myself all reviewed **the sort of narrative about the firm's contribution, which I believe mostly Mike Lesser drafted**.

Hoffman Dep., 6/5/17, at 94:1-17 (SM Ex. 63) (emphasis added—the emphasized portion was

omitted from the Special Master's quotation of this deposition).

This is perhaps the most egregious example of the Report's overreaching to identify non-

existent misconduct.  The Special Master or his counsel have lifted a partial quote, omitted the

most material aspect of the quote, and substituted their own words to create an entirely different

meaning.  Mr. Hoffman **did not** testify that Mr. Bradley reviewed "the declaration" as a whole,

but only that he reviewed the "narrative about the firm's contribution."  *Id.*  For the Special

Master to find otherwise—and to use it as purported evidence to impose severe sanctions—is

disingenuous and highly misleading.  As the Court is aware, the boilerplate Labaton declaration

was a "fill-in-the-blank" document.  *See* Hoffman Dep., 6/5/17, at 93:14-22 (SM Ex. 63).  ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████.  The

rest of the declaration was Labaton's boilerplate and, as the Special Master concluded, the

majority of the firms did not modify the boilerplate section at issue in these proceedings.  *See*

R&R at 57.  Like the other firms, the Thornton Law Firm carefully drafted a narrative of its

particular contributions and submitted the narrative to the Court as paragraph 2 of its declaration. This is the "narrative" to which Mr. Hoffman is referring as being reviewed by Mike Lesser, Mike Thornton, and Garrett Bradley.  It makes sense that the Thornton Law Firm partners carefully reviewed the customized section of the fee declaration, but in no way does this prove that Garrett Bradley must have also carefully reviewed the entire boilerplate portion of the fee declaration.  The Special Master's (or his counsel's) decision to replace the content of sworn deposition testimony with their own words was obviously not done as a matter of summarization or for ease of reading: one can only conclude it was intended to change the meaning of the testimony in order to advance a false narrative.

**D.** **The Special Master's Assertion That Garrett Bradley Had The "Opportunity" To Give The Declaration A "Close Read" Is Unobjectionable, But Does Not Prove Bradley Intentionally Filed A False Declaration**

Without proper evidence of motivation or that Garrett Bradley in fact closely reviewed the boilerplate portions of the fee declaration, the Special Master also tries to prove that Garrett Bradley made intentional misrepresentations based on the fact that Bradley had the **opportunity** to scrutinize the boilerplate declaration.  *See* R&R at 229 ("Though Bradley testified that he only looked at his declaration before it was filed . . . the record shows that Bradley had ample opportunity to give the declaration the 'close read' that was required.").  This is, of course, a classic strawman argument.  No party in these proceedings has ever contended that Garrett Bradley did not have the "opportunity" to closely read the declaration prior to signing it.  Garrett Bradley himself has certainly never made this argument.  *See* G. Bradley Dep., 6/19/17, 84:22-85:1 (SM Ex. 43) ("I saw the final.  Evan brought it in.  I gave it, obviously, not a close read and then I signed it.  I'm sure I was on e-mail traffic for the draft form, as well.").  Quite simply, the fact that Garrett Bradley had the opportunity to closely review the boilerplate sections of the declaration does not mean that he actually did so, and therefore that he knowingly and

intentionally made misrepresentations to the Court.  Certainly Labaton, whose attorneys had the

opportunity (and indeed, whose job it was as lead counsel) to review all fee declarations side by

side and scrutinize them for inaccuracies, did not do so.  The fact that Labaton had the

opportunity to correct the inaccuracies but did not do so does not mean that they made

intentional misrepresentations any more so than the fact that Garrett Bradley had the opportunity

to review the affidavit means he made intentional misrepresentations.

### E. The Special Master's Finding Of Intentional Misrepresentation Is Belied By His Inability To Decide Whether Or Not Garrett Bradley Actually Read The Declaration

It is emblematic of the Special Master's scattershot approach and ever-changing theories

that, in one section of the Report (discussed above) he presents what he believes is hard evidence

that Garrett Bradley carefully reviewed the declaration before it was filed and in the next section

he alleges that "Garrett Bradley did not read the narrative section at all."   In particular, the

Special Master writes:

> Bradley admits that he did not take the time to "closely read" the Declaration before signing it.  **The Special Master believes Bradley did not read the narrative section at all** or if he did, even in a cursory fashion, he turned a blind eye to the falsity of the statements, ignoring the ethical obligations imposed by Rule 11 and the potential impact of the false statements upon the attorney fees approval process.

R&R at 231 (emphasis added).

But the Special Master cannot have it both ways.  The argument is ridiculous on its

face—the Special Master cannot find both that Garrett Bradley read the declaration, knew it was

false, and signed it anyway, and that he signed the declaration without reading it at all.  When

considering the imposition of sanctions, it is the factfinder's job to "marshal the pertinent facts

and apply the fact-dependent legal standard mandated by Rule 11."  *See Cooter & Gell v.*

*Hartmarx Corp.,* 496 U.S. 384, 402 (1990).  Here, the Special Master's own factual

determinations flatly contradict themselves; he therefore could not have properly applied the "fact-dependent" legal standard required by Rule 11.

>    **F.    The Special Master's Assertion That Garrett Bradley Admitted He Intentionally Lied To The Court Grossly Mischaracterizes The Evidence**

Lacking any support for the propositions that Garrett Bradley (1) had motivation to lie to the Court; (2) closely read the boilerplate sections of the affidavit prior to signing and therefore intentionally lied to the court; or (3) had the *opportunity* to closely read the boilerplate sections of the affidavit prior to signing and therefore intentionally lied to the court, the Special Master's final argument is that Garrett Bradley simply admitted that he lied to the Court: "At numerous times during the March 7 hearing, Bradley acknowledged that he knew his Declaration contained inaccurate information but he signed it anyway." This statement appears twice in the Special Master's Report. *See* R&R at 60, 229. The problem of course is that Bradley **did not** acknowledge during the hearing that "he knew his Declaration contained inaccurate information but he signed it anyway." The citations for this "fact" are: "3/7/17 Hearing Tr. P. 87:13-14; 88:2-9; 14-18 [sic]; 91:5-7; 92:3-8." Below is the transcript of the cited portions of the March 7, 2017 hearing:

87:13-14:

|                    |                                              |
|--------------------|----------------------------------------------|
| The Court:         | Well, you signed the affidavit.              |
| Mr. G. Bradley:    | I did, your honor and within that . . . .    |

88:2-9:

|                    |                                                                           |
|--------------------|---------------------------------------------------------------------------|
| The Court:         | The Court was told that was their billing rate.                           |
| Mr. G. Bradley:    | That is what the rate was that the Court approved in that case.           |
| The Court:         | Had you ever charged any of those individuals, paying client, at $425 an hour? |
| Mr. G. Bradley:    | We don't have paying clients, your . . . .                                |

- 41 -

88:14-18:

| | |
|---|---|
| Mr. G. Bradley: | The staff attorneys that were listed on there that under – paragraph 4 in my affidavit where it says that we paid them is a mistake, your Honor.   Those individuals were actually housed at Labaton Sucharow or Lieff Cabraser.  We had not used those before.  That paragraph, quite frankly, should . . . . |

91:5-7:

| | |
|---|---|
| Mr. G. Bradley: | [A]dmittedly, your Honor, the language here, we should have been clearer in this and that fault lies with me in that particular paragraph. |

92:3-8:

| | |
|---|---|
| Mr. G. Bradley: | There was a discussion at the time as to what to use, and then our firm and, I believe, the Lieff firm used the same rates that were used within the *Mellon* case, but everybody understood that those were the rates that were going to be applied to the type of work being done by that group of people. |

In no way do these cited statements show that Bradley "knew his Declaration contained inaccurate information but he signed it anyway."  Mr. Bradley simply did not say so.  What these excerpts instead show is that Garrett Bradley made a basic and very unfortunate mistake.  The Special Master has mischaracterized the record here in the manner one would expect of an overly-aggressive litigant, not a supposed neutral court-appointed factfinder.

### G.     In Fact, Garrett Bradley Made A Mistake And Corrected The Mistake At the Appropriate Time

As demonstrated above, none of the Special Master's evidence even suggests that Garrett Bradley intentionally misled the Court.  Although the Special Master may think he is obligated to justify his $3.8 million investigation by finding some form of intentional misconduct, in actuality, the root of the case is a basic and unfortunate inadvertent error—or in more simple terms, a mistake.  The fact of the matter is that Labaton sent all firms a boilerplate, fill-in-the blank fee declaration with customizable sections for fees, expenses, and a narrative for each firm's unique contribution to the litigation.  *See* Hoffman Dep., 6/5/17, at 93:14-94:8 (SM Ex.

- 42 -

63); ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.  Thornton Law Firm attorneys drafted the

fees, expenses, and firm contribution section and Messrs. Lesser, Bradley, Hoffman, and

Thornton reviewed the firm contribution section.  Hoffman Dep., 6/5/17, at 94:9-17 (SM Ex. 63).

The Thornton Law Firm did not modify the boilerplate portion of the fee declaration at issue here

but neither, as the Special Master found, did six of the nine firms who submitted fee declarations.

*See* R&R at 57.

As Garrett Bradley testified in his deposition, when he signed the boilerplate declaration

he "gave it, obviously, not a close read."  G. Bradley Dep., 6/19/17, at 84:22-23 (SM Ex. 43).  In

other words, he did not scrutinize the boilerplate portion of the declaration to the extent

necessary to have realized that some of its statements were incorrect, or at the very least, unclear.

The errors in the affidavit, although unintentional and, as set forth below, immaterial, are "messy

and . . . embarrassing." G. Bradley Dep., 6/19/17, at 82:20-21 (SM Ex. 43).  Bradley admitted

this mistake to the Court during the March 7, 2017 hearing, noting: "That paragraph, quite

frankly, should have been clarified by me at that time.  It was not," 3/7/17 Hr'g Tr. at 88:18-19

(SM Ex. 96), and "[A]dmittedly, your Honor, the language here, we should have been clearer in

this and that fault lies with me in that particular paragraph," *id*. at 91:5-7.

The double counting, which (as discussed above) was not the Thornton Law Firm's error,

was immediately disclosed to the Court by Customer Class Counsel after a media inquiry alerted

the law firms to the issue.  As the Special Master found, on November 8, 2016, Garrett Bradley

learned from counsel that the *Boston Globe* identified potential double counting on Customer

Class Counsel's lodestar.  *See* R&R at 126-27.  The same day, Bradley contacted Lieff and

Labaton, and all three firms worked diligently to determine the extent of the error and to prepare

a revised and corrected lodestar figure.  *Id*.  A letter informing the Court was filed on November

10, 2016.  The letter, which was signed by Labaton attorney David Goldsmith, noted that counsel

"sincerely apologize[s] to the Court for the inadvertent errors in our written submissions and

presentation during the hearing" and that counsel was "available to respond to any questions or

concerns the Court may have." Goldsmith Ltr. to Ct., 11/10/16, at 3 (SM Ex. 178).

## III.     The Thornton Law Firm Did Not Violate Rule 11

### A.     Isolated Factual Errors Cannot Serve As The Basis For Rule 11 Sanctions

Sanctioning a lawyer or law firm pursuant to Federal Rule of Civil Procedure 11 is a

severe penalty that should not be imposed broadly.  "Rule 11 sanctions should be reserved for

only the most egregious of lawyerly missteps." *McGee v. Town of Rockland*, No. 11-CV-10523-

RGS, 2012 WL 6644781, at *1 n.2 (D. Mass. Dec. 20, 2012).  As the First Circuit noted in

reversing a district court's imposition of sanctions, "[c]ourts ought not to invoke Rule 11 for

slight cause; the wheels of justice would grind to a halt if lawyers everywhere were sanctioned

every time they made unfounded objections, weak arguments, and dubious factual claims."

*Young v. City of Providence ex rel. Napolitano*, 404 F.3d 33, 39-40 (1st Cir. 2005).  This is

especially so where sanctions are imposed *sua sponte* and counsel are not able to avail

themselves of the Rule's safe-harbor provision when they realize they have erred and may

withdraw a pleading without penalty. *Young*, 404 F.3d at 40 (noting that, when imposed *sua

sponte*, Rule 11 sanctions are reserved for instances of "serious misconduct"); *Vollmer v. Selden*,

350 F.3d 656, 663 (7th Cir. 2003) ("Absent extraordinary circumstances not shown here, *sua

sponte* sanctions are generally limited to several thousand dollars."); Fed. R. Civ. P. 11 advisory

committee's note ("[S]how cause orders will ordinarily be issued only in situations that are akin

to a contempt of court.").  *See generally* Vairo Decl., 3/26/18 (TLF Ex. 10).

In this proceeding, it is vital to heed the First Circuit's warning that "Civil Rule 11 is not

a strict liability provision."  *Eldridge v. Gordon Bros. Grp., L.L.C.*, 863 F.3d 66, 88 (1st Cir.

2017) (internal quotation marks omitted).  Statements that are "literally inaccurate" may not be sanctionable because "Rule 11 neither penalizes overstatement nor authorizes an overly literal reading of each factual statement."  *Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 467 (1st Cir. 1993) (Breyer, J.).[29]  *See also Young*, 404 F.3d at 41 (reversing sanctions imposed by district court where "memorandum may otherwise have been misleading or inaccurate in certain of its detail"); *Forrest Creek Assocs., Ltd. v. McLean Sav. & Loan Ass'n*, 831 F.2d 1238, 1245 (4th Cir. 1987) ("[Rule 11] does not extend to isolated factual errors, committed in good faith, so long as the pleading as a whole remains 'well grounded in fact.'").

The case at bar is on all fours with *Navarro-Ayala*.  There, the First Circuit reversed the district court's finding of sanctions because "the motion, **read fairly and as a whole**, contain[ed] **no significant false statement** that **significantly harmed** the other side."  *Navarro-Ayala*, 3 F.3d at 467 (emphasis added).  In so holding, the First Circuit noted that "We emphasize the word 'significant' because the district court found one sentence literally false," and further explained that, "the district court, at most, could have found a few isolated instances of noncritical statements that further inquiry might have shown to be inaccurate or overstated.  That further inquiry would not have shown the motion's requests to have been baseless."  *Id.* at 467-68.  *See also Obert v. Republic W. Ins. Co.*, 398 F.3d 138, 143 (1st Cir. 2005) (reversing Rule 11 sanctions where "the affidavit was not knowingly false as to any material fact, although one of the statements may well have been factually inaccurate and another was a dubious and unattractive piece of lawyer characterization" and describing the affidavit as "an unsound piece of lawyer advocacy rather than a lie about a fact").

---

[29]    Although this case construed the pre-1993 version of Rule 11, the 1993 amendments are immaterial to the First Circuit's analysis.

### B.    The Statements In The Affidavit Do Not Support Rule 11 Sanctions

The Special Master identifies what he believes are six discrete "false statements" in Garrett Bradley's affidavit.  Upon closer examination, it is clear that none of the "false statements" can serve as a proper basis for imposing Rule 11 sanctions.  *See* Vairo Dep., 4/10/18, at 47:23-48:8 (SM Ex. 202).

### i.    Staff Attorneys As Employees

The first two alleged "false statements" are variations on the same criticism—that the attorneys listed on Thornton's lodestar were not technically "employed" by the Thornton Law Firm.  Specifically, the Special Master identifies as false: (1) the statement that the lodestar summarized "time spent by each attorney and professional support staff-member *of my firm* who was involved in the prosecution of the Class Actions"; and (2) the statement that "[f]or personnel who are no longer *employed* by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of *employment* by my firm."  R&R at 227 (emphasis added).  Of course, both statements are true with respect to the four partners, one associate, and one paralegal listed on the affidavit.  These attorneys and the paralegal were bona fide employees of the Thornton Law Firm.  With respect to the staff attorneys, the statement is literally incorrect in the sense that the staff attorneys were not technically, as a legal matter, employees of the Thornton Law Firm.  It is not, however, as if the staff attorneys had no relationship with Thornton.  In fact, it is undisputed that Thornton paid for all of the staff attorneys listed on its lodestar, whether directly through a staffing agency, or through co-counsel.  And the Special Master has conceded that attorneys at all three law firms understood that the Thornton Law Firm would include the staff attorneys for which it was paying on the Thornton lodestar.  *See supra* § II(A).

The error of including the word "employed" with respect to the staff attorneys was introduced only because Thornton used the boilerplate template of Labaton, a larger firm which predominantly and regularly brings class action cases and has the capacity to employ its own staff attorneys. Most crucially, by its nature, the error had absolutely no effect on the lodestar figure. The purpose of the lodestar is to show hours worked—not employment status. There is no question that the attorneys listed actually worked the hours included on the lodestar, as the Special Master concedes the hours were reasonable. R&R at 210.[30] Instead, the Special Master raises only the technical question of whether all attorneys were described properly as "employees."

If the Special Master believes that the reference to staff attorneys (housed at co-counsel but paid for by the Thornton Law Firm) as "employed" is false and sanctionable, it is curious that the Special Master does not recommend Rule 11 sanctions for Lieff and Labaton, both of whom used the **exact same boilerplate** the Special Master finds objectionable as to Thornton. The Lieff and Labaton affidavits, under the Special Master's hyper-technical reading, also appear to be false. The Lieff affidavit, for instance, lists as Lieff Cabraser "employees" attorneys who were actually "contract" or "agency" attorneys with whom Lieff Cabraser did not have an employer-employee relationship.[31] *Compare* Chiplock Decl., 9/14/16 (SM Ex. 89) (referring to

---

[30]   The Special Master does not question any of the hours expended by any of the attorneys in this matter.

[31]   In fact, it seems to be a fairly common practice to list contract attorneys as "employees" or attorneys "of the firm" on lodestars, even though such attorneys are technically not employees. *Compare* Friedman Decl., Dkt. 916-29, *In re Anthem, Inc. Data Breach Litigation*, No. 5:15-md-02617 (N.D. Cal. Dec. 1, 2017) (noting lodestar contains "detailed summaries of the amount of time spent by my firm's partners, attorneys, and professional support staff") (TLF Ex. 11), *with* Ex. 1, Dkt. 916-10, *Anthem* (listing 15 contract attorneys alongside partners, associates and staff in the firm's lodestar) (TLF Ex. 12); Shuman Decl., Dkt. 506-7, *In re: Oppenheimer Rochester Funds Group Securities Litigation*, No. 1:09-md-02063-JLK-KMT (D. Colo. June 6, 2014) (stating that the lodestar calculation is based on "my firm's current billing rates" or on billing rates "in his or her final year of employment by my firm" for "personnel who are no longer employed at my firm" and attaching a lodestar report that includes a "contract attorney") (TLF Ex. 13).

all attorneys in same manner as Bradley Declaration) *with* ██████████████

████████████████████████████████████████████████████.  The

Labaton affidavit is similarly "flawed" because it lists as "employees" those attorneys who were

paid by Thornton pursuant to the cost-sharing agreement.  *Compare* Sucharow Decl., 9/15/16

(SM Ex. 88), *with* ████████████████████████████████████

███████████████████████████████.  By listing staff attorneys as "employees,"

the Labaton affidavit implies that Labaton paid for all such attorneys when in fact it did not.

This is certainly not to say that Lieff and Labaton should be sanctioned for these misstatements,

but to emphasize that such misstatements are not sanctionable for any of the three firms.  *See

Obert*, 398 F.3d at 143 (attorneys should not be sanctioned for erroneously describing a

chambers conference as a "hearing").

      ii.      **Time Records**

     The Special Master next contends that the Thornton Law Firm should be sanctioned

because the Bradley affidavit states that the lodestar "was prepared from contemporaneous daily

time records regularly prepared and maintained by my firm, which are available at the request of

the Court."  Here it is worth noting that the Special Master finds this statement sanctionable

because it is "untrue" on pages 227-28 of his R&R, but on page 59 of his R&R **declines to find

that the exact same statement untrue**. R&R at 59 n.46 ("The Special Master, however is

unable to conclude that this statement is untrue.").  Putting aside the obvious irony of such a

clear error in the context of this case, this demonstrates that the "time records" statement is not,

as the Special Master contends on pages 227-28, actually false.

     If the Court is inclined to accept the Special Master's finding on pages 227-28 rather than

the exact opposite finding on page 59, it is important to note the Special Master finds this

statement false and sanctionable (on pages 227-28, at least) for two reasons.  The first reason is

- 48 -

that "Thornton did not prepare or maintain daily time records of the hours worked by the SAs listed on its lodestar."  R&R at 227-28.

The Special Master's quibble is simply that co-counsel, rather than the Thornton Law Firm, and in some cases perhaps staffing agencies, *prepared and maintained* time records for certain staff attorneys listed on the lodestar.[32]  Again, there is no allegation that the hours were not actually worked, only that the Thornton Law Firm did not state with adequate precision who *prepared* and *maintained* the records.  But the Special Master ignored (at least in this section of the report) evidence that the Thornton Law Firm did, in many cases, *maintain* the time records of staff attorneys for whom it paid, including lawyers at Lieff and Labaton, and Michael Bradley. *See, e.g.*, R&R at 44 (describing how Thornton partner Evan Hoffman kept track of staff attorney time).  Even if the Thornton Law Firm did not maintain or prepare any of the time records, it is certainly a stretch to say a technical error in who *prepared* and *maintained* the time records warrants Rule 11 sanctions.

The Special Master's second criticism is that the clause "was prepared from contemporaneous daily time records regularly prepared and maintained by my firm" is false because "Thornton [did not] maintain *sufficiently reliable* contemporaneous time records for all of the attorneys working on the State Street case."  R&R at 227-28 (emphasis added).  But the Special Master specifically found that Thornton Law Firm partners Michael Lesser and Evan Hoffman *did* maintain sufficiently contemporaneous time records, R&R at 205, and does not appear to take any issue with the timekeeping of the staff attorneys.  The Special Master has only criticized the timekeeping of Garrett Bradley and Michael Thornton.  R&R at 208-09.  In other

---

[32]     Regardless, however, of the Special Master's criticism, for the partners, associate, and paralegal listed on Thornton's lodestar, all time records *were* prepared and maintained by the Thornton Law Firm.

words, the Special Master takes issue with the timekeeping of *two out of the thirty* timekeepers listed on the Thornton Law Firm's lodestar. Crucially, he does not conclude that the time records of these two attorneys were **not** contemporaneous, but that "**it is questionable** whether the handwritten notes and calendars of Garrett Bradley and Michael Thornton are sufficiently reliable to constitute contemporaneous records of their time." R&R at 228 n.178. Despite his questions as to whether the time records of two attorneys are sufficiently contemporaneous, he nonetheless concludes that "the total hours expended by each of the Thornton lawyers were **reasonable** and **sufficiently reliable**." R&R at 216 (emphasis added). The finding that a small number of time records *may not* have been contemporaneous (at least in one section of the R&R, which is flatly contradicted by another), but that nonetheless the time was reasonable, the records were reliable, and the hours were actually worked, clearly does not support a Rule 11 violation.

### iii. Rates Accepted In Other Actions

The Special Master finds the statement that lodestar rates "have been accepted in other complex class actions" false because "[w]ith the exception of 4 staff attorneys, the $425 rate charged for the remaining staff attorneys listed on the lodestar, including Michael Bradley, had not been accepted in other complex class actions." R&R at 228. The Special Master appears to read the statement as an attestation that each *individual* staff attorney had previously been listed on an approved lodestar petition at the same rate. If the Special Master is correct in the meaning of this phrase, then he would have been obligated to inquire whether each of the 20 staff attorneys listed on the Lieff affidavit and each of the 35 staff attorneys on the Labaton affidavit (as well as, for that matter, all of the attorneys on Customer Class Counsel and the ERISA firms' declarations) had actually been listed on an approved lodestar petition at the relevant rate, or whether, for instance, some were recent law school graduates who had never previously

appeared on a lodestar.[33]  That the Special Master does not appear to have undertaken this

exercise undermines his interpretation of this phrase.  Clearly the statement that certain "rates"

have been accepted refers to rates for attorney **positions** (such as the staff attorney position), not

rates for **individual** staff attorneys themselves.  This reading is the only one that makes sense

because staff attorneys are often temporary employees who move from firm to firm and

document review to document review and whose rates are often not determined on an individual

basis.

In any event, the rate of $425 per hour, which Thornton charged for its staff attorneys in

this case, **was accepted** by the court in the *BNY Mellon* litigation for the staff attorneys listed on

Lieff's lodestar.  *Compare* Chiplock Decl., Ex. B, Dkt. 622-1, *In re Bank of New York Mellon*

*Corp. Forex Trans. Lit.*, No. 12-MD-2335 (LAK) (JLC) (S.D.N.Y. Aug. 17, 2015) (SM Ex. 186)

(listing $425 as the rate for nine contract attorneys on Lieff's lodestar) *with* Order Awarding

Attorneys' Fees, Service Awards, and Reimbursement of Litigation Expenses, Dkt. 637, *In re*

*Bank of New York Mellon Corp. Forex Trans. Lit.*, No. 12-MD-2335 (LAK) (JLC) (S.D.N.Y.

Sept. 24, 2015) (SM Ex. 9) (allocating attorneys' fees "based on the multipliers applied to each

firm's lodestar . . . which are adopted by the Court").  Although Michael Bradley's rate ($500)

was not the rate for staff attorneys in the *BNY Mellon* litigation, the affidavit was not limited to

that litigation, but rather cited "other complex class actions."  G. Bradley Decl., 9/14/16, at ¶ 4

(SM Ex. 66).  As Professor Rubenstein explained in his expert report, rates of up to **$550** per

hour have been accepted in class action litigation for staff attorneys.  *See* Rubenstein Decl.,

---

[33]  For instance, is doubtful that Ann Ten Eyck and Rachel Wintterle, two contract attorneys, had ever been billed on an approved lodestar at $515 per hour.  Lieff intended all staff attorneys to be billed at $415 per hour.  The $515 rate was likely unintentional.  Heimann Dep., 7/17/17, at 109:6-12 (SM Ex. 19).  That is not to say that the $515 rate was not reasonable or that it had not been approved for staff attorneys in other actions, only that it may not have been previously approved for Attorneys Ten Eyck and Wintterle as individuals.

7/31/17, at ¶ 36 (TLF Ex. 1).  Even in this case (the instant State Street litigation), the Court

approved Lieff's lodestar, which listed the rates of five staff attorneys as **$515** per hour, and the

Special Master accepted these rates as well.  *See* R&R at 180-81 (noting "the Special Master

finds noting unreasonable *per se* in the staff attorney rates billed by the Customer Class law

firms . . . .").  ████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████.  The statement regarding rates "accepted in other

complex class actions" is therefore true and cannot be the basis for Rule 11 sanctions.

Here, it is worth noting that the Special Master implies that it was somehow untoward for

the Thornton Law Firm to use the $425 rate for staff attorneys because he has concluded that

Lieff and Labaton suggested that $425 serve as a cap, not that Thornton actually charge $425 for

its Staff Attorneys.[34]  *See* R&R at 225.  Regardless of the Special Master's insinuations, it is

undisputed that the $425 rate was accepted in the *BNY Mellon* litigation.  It is unclear why it

would be inappropriate for the Thornton Law Firm to use the rate its co-counsel used (and the

court approved) in the case most analogous to the one at bar.  *See* Chiplock Dep., 6/16/17, at

184:20-25; 227:2-4 (SM Ex. 10) ("And so Thornton I think by and large used 425, perhaps

thanks to this e-mail from fall of 2015, where I said, 'in Bank of New York Mellon I think we

used 425,' which I think we did, because Thornton was involved in that case, too.  So they used

425," and "[t]hey [*BNY Mellon* rates] were generally 425, which is the guidance that Thornton

used when they submitted their declarations.").  Moreover, there is hardly any difference

between the rate Lieff set for most of its staff attorneys in the State Street matter (generally $415,

---

[34]   The Special Master's comment that $425 was a "cap" is also inconsistent with the record testimony, which was
ignored by the Special Master.  *See* Chiplock Dep., 9/8/17, at 52:2-5 (SM Ex. 41) (with respect to same email
Special Master discusses, stating "It was my expectation that the three firms would be billing their document
reviewers at comparable rates.  And perhaps the same rate as I'm suggesting here.").

but going up to $515) and Thornton's rate.  As set forth *supra* at section II(A), the average

weighted rate for Lieff staff attorneys was actually higher than the average weighted rate for

Thornton staff attorneys.

### iv.    Current And Regular Rates

The final two errors identified by the Special Master are that the lodestar was "based on

my firm's current billing rates" and that the rates "are the same as my firm's regular rates

charged for their services, which have been accepted in other complex class actions."  It is

understandable that the Court interpreted the phrases "current billing rates" and "charged for

their services" to mean that each firm had paying clients who actually compensated the firms at

the hourly rates listed in the lodestars.  But the message perhaps intended by Labaton's

boilerplate template—albeit unclear and with a poor choice of words—was that these are the

regular rates of the firms which are charged against the common fund in class actions.[35]  This is a

plausible meaning if one understands that plaintiffs' firms, as evidenced by this case, usually do

not have clients who actually pay by the hour.  A simple modifying clause such as "in contingent

fee matters" would have made the matter much more clear for the Court.  Although the

misunderstanding is regrettable, when considered with lack of both intent and materiality, the

statement does not support Rule 11 sanctions.

It is of paramount importance that, although the Special Master has decided to single out

the Thornton Law Firm with respect to the statements "based on my firm's current billing rates"

and "the same as my firm's regular rates charged for their services," **__identical phrases__** appear in

the Lieff and Labaton fee declarations.  At the March 7, 2017 hearing, all three firms

---

[35]    *See, e.g.*, Labaton Resp. to Interrog. 61, 6/9/17 (SM Ex. 174) ("The intent of the statement used by Labaton, as set forth above, was to convey to the Court that the rates in Exhibit A are the firm's regular standard rates, which are not applied for a specific case or depending on the nature of the work performed, **and that other Courts had found them reasonable when charged to a class in other litigation.**") (emphasis added).

acknowledged that, generally, they do not have clients who pay by the hour. *See, e.g.*, 3/7/17 Hr'g Tr. at 79:9-22; 88:8-9; 93:11-21 (SM Ex. 96). Further, the law firm of Richardson Patrick also submitted a fee declaration containing the **exact same** boilerplate language, SM Ex. 95 at ¶ 4, even though the Special Master found that Richardson Patrick is "a 100% contingent fee firm," R&R at 68. The McTigue Law Firm has "very few" clients who pay hourly rates, McTigue Dep., 7/7/17, at 83:19-84:3 (SM Ex. 11), yet also used nearly the same boilerplate language.[36]

There is no principled basis by which the Special Master can recommend that the Thornton Law Firm should be sanctioned for these misstatements when Lieff, Labaton, Richardson Patrick, and the McTigue Law Firm committed the same non-material error. This is not to say that all five firms should be sanctioned, but that the error itself is not the proper basis for sanctions. In fact, the types of phrases about which the Special Master is concerned, although admittedly confusing, appear to be quite common in fee declarations. For instance, in response to the Special Master's interrogatories, Labaton identified ten cases in which it submitted fee declarations with identical or similar language. *See* Labaton Resp. to Interrog. 61, 6/9/17 (SM Ex. 174). *See also* Labaton Resp. to Interrog. 71, 6/9/17 (SM Ex. 174) (stating that such language "has appeared in Labaton Sucharow's fee petitions for several years."). The leading treatise in this area, *Newberg on Class Actions*, includes in its appendix a sample "Declaration of lead counsel in support of motion for attorney's fees from common fund"

---

[36] The McTigue Law Firm's declaration used slightly different language. As relevant here, the declaration stated, "The hourly rates for the attorneys and professional support staff in my Firm included in Exhibit A are the same as my Firm's regular rates otherwise charged for their services, which have been accepted in other complex class actions my firm has been involved in." McTigue Decl., 9/13/16, at ¶ 20 (SM Ex. 91). In his deposition, when asked whether the language "might lead a judge to believe that the references to amounts that were actually charged to a paying client," Mr. McTigue responded, "I think it could. And I'm learning." McTigue Dep., 7/7/17, at 87:9-12 (SM Ex. 11).

(Appendix XV-B) and "Declaration of lead counsel in support of motion for attorney's fees" (Appendix XVI-C). 9 NEWBERG ON CLASS ACTIONS (5th ed.). Those two sample declarations contain language, respectively, that the "lodestar is calculated based on the current hourly rates of the firm" and that "[b]ased upon hourly rates historically charged to my firm's clients, the total lodestar value of this billable time is . . . ."[37] This is not to say that the language should not be clarified in the future for all plaintiffs' firms, but to suggest that singling out one firm for Rule 11 sanctions is not the appropriate means of doing so.

With respect to the phrase "regular rates," in particular, to the extent plaintiffs' attorneys (who generally do not charge by the hour) have "regular rates," they can only be the rates that they have charged in past actions. The testimony of Keller Rohrback managing partner Lynn Sarko is particularly illuminating on this point. Mr. Sarko testified:

> I know in this litigation there's been some questioning about what does the term "regular rates" mean. And I guess, to me, that is a common term that's used in class actions by judges. And what it means is your standard listed rate. And if you're a firm that has all contingent fee work, that's your listed rate that you submit your time at, that isn't made up for this case, isn't made up, isn't higher, isn't raised or ballooned or anything, but that's the rate that you offer your services at . . . . [I]n the cases that I regularly appear in and judges that actually have you have fee orders at the beginning, regular rates, at least to me in the industry that I've seen, are the regular rate, posted rates, whether or not – doesn't mean and charged to individual clients because most firms – many of the firms don't have that.

Sarko Dep., 7/6/17, at 90:1-11, 98:23-99:5 (SM Ex. 28).

Here, Thornton's rates were similar or identical to the approved lodestar rates in the most analogous case the Thornton Law Firm handled, the *BNY Mellon* litigation. The rates for Michael Thornton and Garrett Bradley were identical to the rates approved in the *BNY Mellon*

---

[37] The Thornton Law Firm does not know whether the law firms who drafted these declarations work solely on a contingency basis. The mere fact, however, that these are the sample declarations in the treatise regularly consulted by contingent plaintiffs' attorneys suggests that this type of language is widely used by contingent firms.

litigation.  The rates for both Evan Hoffman and Michael Lesser were $50 greater than in the *BNY Mellon* litigation to reflect that Hoffman had become a partner and that Lesser had gained valuable expertise in FX litigation from the *BNY Mellon* case.  The rate for associate Jotham Kinder was $30 greater than in the *BNY Mellon* litigation.  The paralegal rate, $210, was identical to the *BNY Mellon* rate.  As discussed above, Thornton is a small firm that had not previously listed staff attorneys on its lodestars, so Thornton used the exact same "regular rate" that Thornton's co-counsel, Lieff, had used (and the court approved) for the staff attorney position in the *BNY Mellon* litigation.

But regardless of whether they were "regular" or not, the Special Master found the rates of the Thornton attorneys reasonable.  "[G]iven that the rates at which Thornton partners and associates were billed were comparable to (and indeed generally less than) Labaton's and Lieff's billing rates, and given the intricacies and difficulties of this case, on the whole the Special Master finds the hourly rates at which Thornton billed its partners and associates on its lodestar report were within the realm of reasonableness.  The Special Master is particularly persuaded that Thornton's billing rates here . . . are reasonable because rates in this range were previously approved for Thornton by the Court in the *BONY Mellon* case."  R&R at 175.

If one ignores the fact that Michael Bradley was working on a purely contingent basis, perhaps it could be argued that his rate should have been listed as $425 per hour to reflect that he was a staff attorney and to match the "regular rate" that Thornton's co-counsel had listed for the staff attorney position in the *BNY Mellon* litigation.[38]  $500 was still well within the range of

---

[38]   There may have been exceptions on the Lieff declaration as well.  For instance, the $515 rate at which certain staff attorneys were billed was likely an error since Lieff had made a decision to generally charge staff attorneys at $415.  *See* Heimann Dep., 7/17/17, at 109:6-12 (SM Ex. 19).  That is not to say that the rates were not reasonable, only that they may not have been regular, and that Thornton should not be sanctioned for a single $500 rate any more than Lieff should be sanctioned for the $515 rates.

rates which have been accepted for the staff attorney position in other class actions, *see* Rubenstein Decl., 7/31/17, at ¶ 36 (TLF Ex. 1), but it may well have been an error to describe it as a "regular rate" for the staff attorney position in this matter. As a mitigating consideration, it is important to note that if Thornton had listed the staff attorney "regular rate" of $425 rather than $500 for Michael Bradley, Thornton's lodestar would have decreased by only $30,480, which represents less than one half of one percent of the Thornton lodestar, and .0007 of the overall lodestar.[39]  Moreover, as discussed above, even when Michael Bradley's rate is included, the weighted average rate for the Thornton Law Firm staff attorneys ($428) was actually lower than the weighted average rate for the Lieff staff attorneys ($438).[40]

## C.    Double Counting

Although the Special Master does not identify the double counting error as a basis for Rule 11 sanctions, it is clear that this error colors his view of the misstatements he identified in the affidavit. The Special Master, however, has found that the double counting "was simply a mistake that grew out of combination of different circumstances," R&R at 221, and that it was "inadvertent," R&R at 363. Moreover, as demonstrated above, Thornton cannot be held responsible for the double counting errors, as it is clear that the staff attorneys were double counted on Lieff's and Labaton's lodestars, not on Thornton's. *See supra* § I(C). If there is any sanction based upon the double counting issue (which the Special Master does not recommend

---

[39]   Calculated from the overall lodestar figure as submitted to the Court in September 2016. As noted elsewhere, Michael Bradley's rate was higher than the other staff attorneys, in part, because he was compensated on a contingent basis. That is, if the class action against State Street did not succeed, Michael Bradley would have been paid absolutely nothing for the over 400 hours of document review he performed.

[40]   It is worth noting that an inadvertent error in Labaton's fee declaration resulted in an overstatement of over $80,000 but that the Special Master did not find this sanctionable or even worthy of mentioning in his Report and Recommendations. Lawrence Sucharow executed the Fee Declaration in this matter stating that the "[t]ime expended in preparing this application for fees and payment of expenses has not been included in this [fee] request." Later, it came to light that over 100 hours of time totaling $80,330 related to fee applications was mistakenly included in Labaton's lodestar submitted to the Court. *See* Labaton Resp. to Interrog. 71, 6/9/17 (SM Ex. 174).

- 57 -

and which would, in any case, be unwarranted), there would be no principled legal basis to simply levy the sanction on Thornton.

### D.    Materiality And Intent

Given the nature of the statements that the Special Master identifies as "false," it is highly relevant that: (1) the "false" statements were immaterial to the overall motion; and (2) Garrett Bradley did not have any intent to deceive the Court.  In terms of materiality, none of the statements in the affidavit affected the overall lodestar amount, which was the purpose of the motion.  *See Navarro-Ayala*, 3 F.3d at 467 (reversing district court's finding of sanctions because "the motion, read fairly and as a whole, contain[ed] no significant false statement that significantly harmed the other side.").  In terms of intent, section II, *supra*, explains why the Thornton Law Firm's fee declaration was not intentionally deceptive but rather the result of inattention.  This fact is crucial.  *See Young*, 404 F.3d at 41 ("We are not suggesting that a deliberate lie would be immune to sanction merely because corrective language can be found buried somewhere else in the document.  But here the trial judge did not find, and in these circumstances could not have found, that plaintiff's counsel had intended to deceive.").  *See also* Vairo Dep., 4/10/18, at 35:17-22, 36:6-7 (SM Ex. 202).

Seen in context, Bradley's affidavit was an isolated instance of inattentiveness due to reliance on a boilerplate affidavit that Bradley knew was prepared by experienced counsel.  *See* Vairo Dep., 4/10/18, at 61:7-12; 78:2-3 (SM Ex. 202) ("Garrett Bradley made a mistake by not taking a closer look at the template before he submitted it to the Court.  But that does not mean he violated Rule 11," and "[t]his is not the type of misstatement that should give rise to Rule 11 sanctions.").  With respect to the double counting, Bradley immediately contacted co-counsel once alerted to the issue and ensured that within two days the Court was informed of the errors. R&R at 126-28. With respect to the additional statements in the affidavit, Bradley took

responsibility for the errors when he acknowledged, during the March 2017 hearing, that certain

aspects of his affidavit were factually incorrect.  3/7/17 Hr'g Tr. at 88:8-21 (SM Ex. 96).  Clearly

sanctions are not warranted in these circumstances.  *Cf. United States v. Jones*, 686 F. Supp. 2d

147, 156 (D. Mass. 2010) (Wolf, J.) (in criminal context, imposing no sanctions against

prosecutor who, due to "inexcusable and inexplicable" errors, inadvertently neglected to disclose

important exculpatory material to defendant).  *See also Garbowski v. Tokai Pharm., Inc.*, No. 16-

CV-11963, 2018 WL 1370522, at *8 n.5, *11 n.7 (D. Mass. Mar. 16, 2018) (Wolf, J.) (no

discussion of sanctions for attorneys who "filed . . . documents in a manner that misrepresented

the contents of the Certification" and filed an inaccurate declaration).[41]

## IV.    The Recommended Sanctions Are Incompatible With Rule 11

If the Court were to find that the Thornton Law Firm did violate Rule 11, a conclusion

with which the Thornton Law Firm strenuously objects, the Court should not accept the Special

Master's proposed sanction of $400,000 to $1 million for three reasons: (1) Rule 11 requires that

---

[41]    Immaterial (or even material) errors, when not committed with ill intent, should not generate Rule 11
sanctions.  In this very case, for example, the Special Master has made misstatements to the Court.  In a letter
to the Court dated April 23, 2018, the Special Master requested a delay in the submission of his Report and
Recommendations.  He stated that "[w]e were prepared to file under seal with the Court by today a hard copy
of the Report and Recommendations, together with all exhibits" but noted that certain technical delays in
creating a searchable disk with hyperlinks to exhibits necessitated a request for an extension.  (Dkt. 217-1).  It
is clear, however, that the Report and Recommendations was not finalized by April 23, 2018, as the Special
Master erroneously represented to the Court.  Included as an exhibit to the Report and Recommendations is a
"Supplemental Ethical Report for Special Master Gerald E. Rosen" dated **May 8, 2018** (totaling, with exhibits,
over 700 pages) (SM Ex. 233), which the Special Master cites throughout the Report and Recommendations.

Also worth noting is that on June 7, 2018, the Special Master filed "Special Master's Responses (Under Seal)
to Various Motions of Plaintiffs' Counsel On Redaction and Related Issues" but did not serve the filing on all
counsel.  On June 9, this Court issued an order citing the Special Master's submission.  Once alerted to the
existence of the Special Master's submission, counsel inquired of the Special Master's counsel why the Special
Master filed an *ex parte* motion with the Court.  In response, the Special Master's counsel acknowledged the
error and provided all parties with the filing.  The copy of the filing provided did not include a certificate of
service, which means either that the filing did not conform to Federal Rule of Civil Procedure 5 or that there
was a certification on the copy submitted to the Court but that such certification was false because the parties
were not actually served.  This is not to say that the error was anything other than inadvertent or that the
inadvertent error should subject any firm to sanctions, but to highlight the absurdity of the Special Master's
hyper-technical reading of the Rules.

sanctions must be "limited to deter repetition of the conduct or comparable conduct of others similarly situated"; (2) the dollar amount of the sanction sought is wildly out of proportion with other sanctions imposed in the First Circuit; and (3) monetary sanctions may not be imposed *sua sponte* if there has been a settlement of the underlying litigation.

### A.      The Recommended Sanction Exceeds What Is Necessary For Deterrence

As an initial matter, it is axiomatic that the central purpose of Rule 11 sanctions is deterrence. *See Lamboy-Ortiz v. Ortiz-Velez*, 630 F.3d 228, 247 (1st Cir. 2010) ("Rule 11 . . . finds its justification exclusively in deterrence."); *Carrieri v. Liberty Life Ins. Co.,* No. 09-12071-RWZ, 2012 WL 664746, at *5 (D. Mass. Feb. 28, 2012) ("It is well established that the purpose of Rule 11 sanctions is to deter rather than to compensate.") (internal quotation marks omitted); *Ultra-Temp Corp. v. Advanced Vacuum Sys., Inc.*, 194 F.R.D. 378, 384 (D. Mass. 2000) ("[U]nder the amended version [of Rule 11], sanctions should be imposed for the purpose of deterrence rather than to compensate the opposing party.").  The Rule explicitly states that any sanction imposed "**must be limited** to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated."  Fed. R. Civ. P. 11(c)(4) (emphasis added).[42]

Here, there is no plausible argument that a sanction of between $400,000 and $1 million is needed to deter an inadvertent error in a boilerplate affidavit prepared by another law firm.[43]

---

[42]     Rule 11 was amended in 1993.  The Rule may well have had compensatory purposes prior to the amendment, but it is clear that the current version of Rule 11 finds its purpose in deterrence.  *See Silva v. Witschen*, 19 F.3d 725, 729 n.5 (1st Cir. 1994) ("Under amended Rule 11, however, 'the purpose . . . of sanctions is to deter *rather* than to compensate.'") (quoting Fed. R. Civ. P. 11 advisory committee's notes) (emphasis added by *Silva*); 5A FED. PRAC. & PROC. CIV. § 1336.3 (3d ed.) ("[T]he 1993 revision makes it clear that the main purpose of Rule 11 is to deter improper behavior, not to compensate the victims of it or punish the offender."). Unfortunately, some courts erroneously cite pre-amendment cases for the proposition that today's Rule 11 serves a compensatory purpose.

[43]     The Special Master has set sanctions at 10% to 25% of the double counting error.  As explained above, the disgorgement of the double counting error is unjustified because the lodestar figure served only as a cross-check and not a dollar-for-dollar fee request.  **If the correct disgorgement is $0, Rule 11 sanctions, to the extent any should be imposed, should also be $0.**

Both the monetary and reputational impact of this case on the Thornton Law Firm have already been severe.  In monetary terms, the Thornton Law Firm (and its co-counsel Lieff and Labaton) have **already** funded the Special Master's $3.8 million investigation.  As the exclusive purpose of Rule 11 is deterrence, it is of no moment where the $3.8 million went— the point is that the Thornton Law Firm has already been sufficiently deterred by paying its ratable share of the investigation, as well as paying for counsel to represent it during the investigation, and by the attendant reputational consequences.  It goes without saying that in a typical Rule 11 case, counsel would not have been charged millions of dollars for the investigation of its own conduct. The Court therefore must consider the deterrent effect of the funds the law firms have spent on the investigation in the context of any additional deterrent purposes served by Rule 11 sanctions.

In terms of general deterrence, the $3.8 million investigation as well as the Special Master's recommendation that the three law firms be disgorged of an additional $6 million has sufficiently deterred other lawyers who may otherwise sign boilerplate documents without a sufficiently careful review.  This proceeding and the Special Master's investigation have been widely covered in the legal press, ensuring that lawyers in this jurisdiction and others are aware that they introduce errors into fee declarations at their own peril.  It is not a stretch to imagine that, in light of the extensive coverage of this case, class action attorneys will significantly revise their boilerplate fee declarations to ensure that all possible ambiguity is removed from their representations to the court.

It appears that the Special Master's recommendation of a Rule 11 sanction of $400,000 to $1 million is tainted by his opinion that the sanction should serve a compensatory purpose rather than a deterrent purpose.  Rule 11 states that sanctions are limited to "nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion . . . an order directing payment to the

movant of part or all of the reasonable attorney's fees and other expenses directly resulting from

the violation." Fed. R. Civ. P. 11. The Advisory Committee Notes further note that "a monetary

sanction imposed after a court-initiated show cause order [is] limited to a penalty payable to the

court." The Special Master has ignored the Rule, instead crafting his own remedy "that the

monetary sanctions should be awarded to the class." R&R at 365. This is clear legal error. *See*

*Lamboy-Ortiz,* 630 F.3d at 244 n.27 ("[A]ny monetary sanction imposed by the court *sua sponte*

must be payable to the court alone."); *Medina v. Gridley Union High Sch. Dist.*, 172 F.3d 57 (9th

Cir. 1999) (table decision) (vacating order to pay *sua sponte* Rule 11 sanctions to party rather

than to the court); *Nw. Bypass Grp. v. U.S. Army Corps of Engineers*, No. 06-CV-00258-JAW,

2008 WL 2679630, at *2 (D.N.H. June 26, 2008) (on reconsideration, vacating award of Rule 11

sanctions to party, and noting, "[t]he only monetary sanction a court may order on its own

initiative is a penalty to the court itself."); *Balerna v. Gilberti*, 281 F.R.D. 63, 71 (D. Mass.

2012). The Special Master's proposed remedy suggests that he views Rule 11 as compensatory

and has disregarded the deterrent effect of the Thornton Law Firm's funding of his $3.8 million

investigation.

## B. The Recommended Sanction Is Extraordinary When Compared With First Circuit Precedent

The First Circuit has warned that "the power to impose sanctions is a potent weapon and

should, therefore, be used in a balanced manner." *Navarro-Ayala*, 968 F.2d at 1426-27. Courts

"take pains [not] to use an elephant gun to slay a mouse." *Anderson v. Beatrice Foods Co.*, 900

F.2d 388, 395 (1st Cir. 1990). The sanction recommended by the Special Master here is truly

extraordinary. Undersigned counsel has searched for Rule 11 opinions in all courts in the First

Circuit in the last twenty years. The sanction proposed by the Special Master is wildly

inconsistent with the sanctions generally imposed in the First Circuit. Undersigned counsel has

identified only **three** cases in the last twenty years where courts in the First Circuit have imposed

sanctions of over $100,000.[44]   These cases are particularly instructive because they show the type

of conduct that does—and does not—qualify for severe Rule 11 sanctions.   Notably, in one of

the cases, the First Circuit reduced a sanction of $250,000 to only $5,000.

### i.     *In re Nosek*

In 2008, the bankruptcy court issued a $250,000 *sua sponte* sanction against a mortgage

company because the company represented to the court on multiple occasions that it held a

certain mortgage when, in fact, it did not hold the mortgage.[45]   *In re Nosek*, 386 B.R. 374

(Bankr. D. Mass. 2008).   As later explained by the district court:

> Despite the fact that it had not held the loan since 1997 or serviced it since early
> 2005, Ameriquest and its attorneys made contrary representations.   It filed a proof
> of claim and an amended proof of claim in 2002 and 2003 . . . listing itself as
> creditor without any reference to the assignment of the loan and without attaching
> a copy of the power of attorney.   It filed pleadings signed by [its] attorneys in 2003
> stating that it 'is the holder of the first mortgage . . . .' It filed an Answer signed by
> [its] attorneys in 2005 admitting the allegation that it is the holder of the first
> mortgage.     It conducted an eight-day adversary proceeding in 2006, with
> representation by [its attorney], without ever notifying the Bankruptcy Court that it
> was neither the holder nor the servicer of the note and mortgage.

---

[44]   There are occasionally matters where the district court or the bankruptcy court orders sanctions in the amount of costs or fees and the amount of costs or fees does not appear in the opinion.   *See, e.g.*, *Rivera v. Lohnes*, No. 10-2114, 2012 U.S. Dist. LEXIS 29441 (D.P.R. March 5, 2012).   Although it is quite difficult to verify, even in these cases undersigned counsel is not aware of any case in which the amount of costs or fees is or exceeds $100,000.   *See, e.g.*, Judgment, Dkt. 62, *Ruiz-Rivera v. Lohnes*, No. 12-1520 (1st Cir. Jan 8, 2014) (noting that "the district court never set the amount of attorneys' fees that appellant would be required to pay" and that "even if the sanction order were before this court, we could not affirm it.") (TLF Ex. 15).   In a recent opinion, Judge Young discussed Rule 11 and ordered a party to submit a claim for attorneys' fees and costs.   *Shire LLC v. Abhai LLC*, No. 15-13909, 2018 U.S. Dist. LEXIS 46946 (D. Mass. Mar. 22, 2018).   The party's revised motion for fees seeks over $2 million but makes clear that the fees sought are pursuant to Fed. R. Civ. P. 37, the court's inherent power, and 35 U.S.C. § 285 (not, in other words, pursuant to Rule 11).   *See* Plaintiff's Application for Reasonable Attorneys Fees and Expenses, Dkt. 342, *Shire LLC v. Abhai LLC*, No. 1:15-cv-13909 (D. Mass. Apr. 19, 2018) (TLF Ex. 16).

[45]   Sanctions were imposed under the bankruptcy analogue to Rule 11.   In addition to Ameriquest, additional sanctions were imposed on two law firms, an attorney, and another financial services company.   The individual attorney's sanction was vacated on reconsideration by the bankruptcy court.   The other sanctions were vacated by the district court, with the exception of a $25,000 sanction on one of the law firms.   *See In re Nosek*, 406 B.R. 434, 436 (D. Mass. 2009).

*In re Nosek*, 406 B.R. 434, 437 (D. Mass. 2009).

On appeal, the mortgage company admitted that it had misrepresented the status of the mortgage, but argued that the sanction imposed was unreasonable. In reducing sanctions from $250,000 to $5,000, the First Circuit held that, "accuracy of representations is an objective matter, as is the reasonableness of any inquiry actually made. But subjective intent can bear on whether to impose a sanction and what amount to fix. Even a dog, said Holmes, distinguishes between being kicked and being stumbled over." *In re Nosek*, 609 F.3d 6, 9-10 (1st Cir. 2010) (citing O.W. HOLMES, JR., THE COMMON LAW 3 (1881)) (additional citations omitted).

### ii.    *In re 1095 Commonwealth Corp.*

The bankruptcy court imposed an approximately $143,000 sanction on Citizens Bank under the bankruptcy analogue to Rule 11 for substantial misrepresentations regarding the amount of attorneys' fees sought. *In re 1095 Commonwealth Ave. Corp.*, 204 B.R. 284 (Bankr. D. Mass. 1997).[46] Specifically, in support of a motion for attorneys' fees, Citizens Bank filed an affidavit in which it stated that it had "incurred" legal fees in the amount of $262,419.40 and had paid such fees to its law firm. In fact, the law firm had an arrangement whereby it charged Citizens a special negotiated rate for fees actually paid by Citizens, but "in the event that [the bankrupt party] should ultimately be responsible to Citizens for fees, Brown Rudnick would charge Citizens the standard, generally higher hourly attorney rates. In effect, the higher fees would only be charged if Citizens was not going to pay the fees." *In re 1095 Commonwealth Corp.*, 236 B.R. 530, 533 (D. Mass. 1999). After the dual-fee arrangement was uncovered, one of the lawyers for Citizens "continued his attempt to conceal from the Court and the Debtors the nature of the agreement." *In re 1095 Commonwealth Ave. Corp.*, 204 B.R. at 299. In affirming

---

[46]    The sanction was imposed over twenty years ago, in 1997, but undersigned counsel includes this case because the affirmance by the district court occurred in 1999.

the imposition of $143,000 in sanctions, the district court noted that the bankruptcy court "found that the intentional nondisclosure of the fee agreement was the equivalent of fraud." *In re 1095 Commonwealth Corp.*, 236 B.R. at 533. The amount of the sanction (imposed on motion, not *sua sponte*) was equivalent to the attorneys' fees and expenses the bankrupt party incurred in opposing Citizen's fee petition.[47]

### iii.   *Sanchez v. Esso Standard Oil de Puerto Rico*

The District of Puerto Rico sanctioned plaintiffs approximately $513,000, which represented certain costs incurred by defendant defending environmental litigation which was "frivolous, unreasonable, and lacking a factual foundation" and in which plaintiffs "wrongfully procured injunctive relief based upon false testimony." *Sanchez v. Esso Standard Oil de Puerto Rico, Inc.*, No. CIV 08-2151, 2010 WL 3809990, at *10, *14 (D.P.R. Sept. 29, 2010). The court noted that the plaintiffs' attorneys "acted in bad faith by . . . attempting to deceive this court . . . and dragging out the expensive litigation for over a year without factual support and without any reasonable hope of prevailing on the merits." *Id.* at *18 (internal quotations omitted). The court also ordered that plaintiffs and their attorney pay the defendants' attorney's fees for part of the litigation. Although undersigned counsel is including this case among the three First Circuit cases in the last twenty years where Rule 11 sanctions exceeded $100,000, it should be noted that the sanction was imposed in the first instance under 28 USC § 1927 and in the alternative under Rule 11, the court's inherent sanction power, or the fee-shifting section of the statute pursuant to which the underlying action was brought. The sanction was unusual in that the court appears to

---

[47]   For sanctions imposed on motion, "under unusual circumstances . . . deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation. Accordingly, the rule authorizes the court, if requested in a motion and if so warranted, to award attorney's fees to another party." Fed. R. Civ. P. 11 advisory committee's note.

have approved a settlement between the parties in which plaintiffs paid defendant $315,000 to

settle all claims, including any costs and fees pursuant to the court-ordered sanction.[48]  *See*

Agreed Final Judgement, Dkt. 513, *Sanchez v. Esso Std. Oil Co.*, No 3:08-cv-02151 (D.P.R. Apr.

13, 2011) (TLF Ex. 17).

      **C.**    **The Special Master Has Ignored Rule 11's Prohibition On Imposition Of Monetary Sanctions Post-Settlement**

      In recommending a significant monetary sanction, the Special Master has wholly ignored

section 5 of Rule 11, titled "Limitations on Monetary Sanctions," and thereby committed another

serious legal error.  That section states that "The court must not impose a monetary sanction . . .

on its own, unless it used the show-cause order under Rule 11(c)(3) before voluntary dismissal or

settlement of the claims made by or against the party that is, or whose attorneys are, to be

sanctioned."  Here, the Court entered its Order and Final Judgment approving the settlement

between State Street and the Class (i.e., the "settlement of the claims made by or against the

party") on November 2, 2016.  *See* Order and Final Judgment, 11/2/16 (SM Ex 113).  The Court

has not issued a show-cause order contemplated by Rule 11(c)(3).  Even if one were to interpret

the Court's February 6, 2017 Order as a Rule 11(c)(3) show-cause order, it was still issued after

the settlement.  The Special Master's failure to even consider this strict requirement is another

example of his and his counsel's inattention to the law and to the facts.  *See, e.g.*, *Wohllaib v.

U.S. Dist. Court for the W. Dist. of Washington, Seattle*, 401 F. App'x 173 (9th Cir. 2010)

(reversing *sua sponte* monetary sanction and noting "Rule 11 clearly prohibits a district court

from *sua sponte* issuing an order to show cause why the court should not impose a monetary

sanction if the parties have already settled a case."); *Steeger v. JMS Cleaning Servs.*, No.

---

[48]    The court also agreed that plaintiffs' attorney could pay defendant $10,000 in lieu of court-ordered sanctions.

17CV8013, 2018 WL 1363497 (S.D.N.Y. Mar. 15, 2018) (on reconsideration, vacating monetary

sanctions imposed *sua sponte*).  *See also* 5A Fed. Prac. & Proc. Civ. § 1336.3 (3d ed.);

Moore's Federal Practice, § 11.22(2)(b) (3d ed.).

**V.    Garrett Bradley Should Not Be Referred To The Board of Bar Overseers**

> **A.    The Conduct At Issue Affects All Firms Yet The Special Master Unfairly Recommends Only Garrett Bradley For Discipline**

As an initial matter, the Special Master's recommendation that Garrett Bradley be

referred to the Board of Bar Overseers for inadvertent misstatements in a boilerplate affidavit

contradicts "the basic principle of justice that like cases should be decided alike."  *Martin v.*

*Franklin Capital Corp.*, 546 U.S. 132, 139 (2005).  As demonstrated above, nearly identical

misstatements were made by lawyers from the other law firms involved in this litigation—the

majority of whom used the same boilerplate affidavit— yet the Special Master recommends

discipline only for Garrett Bradley.  Further, with respect to the Chargois arrangement

(supposedly "the most disturbing aspect of what was learned during the entire investigation,"

R&R at 330), the Special Master found violations of multiple ethical rules, *see* R&R at 250, 255,

286, 322, 326, yet recommends "no professional disciplinary action be taken," *id.* at 371.  This is

not to say all firms should be referred for professional discipline, but to note that Garrett

Bradley's conduct does not warrant professional discipline for him or his firm, particularly with

respect to the technical and immaterial misstatements in the fee declaration.  *Cf.*  Lieberman

Dep., 4/4/18, at 91:21-92:6 (SM Ex. 228).

> **B.    The Special Master's Reliance On *Matter of Schiff* Is Clearly Wrong**

As further evidence of the serious flaws in the Special Master's Report and

Recommendations, the Court need look no further than the Special Master's primary authority

for the proposition that Garrett Bradley should be referred to the BBO—*Matter of Schiff*.  The

Special Master writes of this case, "The Rhode Island Court's handling of *Schiff* informs the Special Master with regard to Bradley's false Declaration in this matter." R&R at 241. But the *Schiff* case has absolutely no bearing on any potential discipline for Garrett Bradley or the other lawyers who signed boilerplate fee declarations. The Special Master's extensive discussion of this case—which takes up nearly three pages of his Report and Recommendations— suggests that the Special Master or his counsel are either: (1) disingenuous because they know the *Schiff* case has no relevance here but rely on it anyway; or (2) simply unable to understand the difference between two readily distinguishable cases. Both possibilities are cause for concern.

The procedural history underlying the *Schiff* case is "bizarre, not to say byzantine." *Pontarelli v. Stone*, 978 F.2d 773, 774 (1st Cir. 1992). Attorney Schiff represented a police fraternal organization and five police officers in an eight-count civil rights lawsuit against Rhode Island and four Rhode Island officials filed in June 1986. *Pontarelli v. Stone*, 930 F.2d 104, 107 (1st Cir. 1991). At the conclusion of the district court proceedings, all defendants prevailed against all plaintiffs except for three judgments on a single count of sex discrimination obtained by one plaintiff against Rhode Island ($2.00), and two officials ($10,002 and $5,002.). *See id; Pontarelli v. Stone*, 781 F. Supp. 114, 118 (D.R.I. 1992). Despite the relatively modest judgment, plaintiff moved for attorneys' fees of $511,951.00 and costs of $203,268.28 (in other words, over forty times greater than the recovery) pursuant to 42 U.S.C. § 1988. *Pontarelli*, 781 F. Supp. at 118. In connection with the fee petition, Attorney Schiff signed an affidavit stating that "the summaries of time and charges for my services attached hereto present an accurate statement of services performed in connection with this litigation and was prepared from contemporaneous time records, and with respect to sums for costs and expenses, from accounting records." *Matter of Schiff*, 684 A.2d 1126, 1140 (R.I. 1996). The district court found the

affidavit to be false and referred Schiff to the Rhode Island Supreme Court, which ultimately imposed an 18-month suspension.  *Id.* at 1127, 1138; *Matter of Schiff*, 677 A.2d 422, 425 (R.I. 1996).

There are two similarities between *Schiff* and the case at bar:  both are about attorneys' fees and both concern boilerplate statements in an affidavit.  The similarities end there.  The nature of the falsity in the *Schiff*—where the court found "**the fee claimed has been grossly inflated**" and the fee declaration was "**riddled with misrepresentations**"—is worlds apart from the nature of the alleged falsity in this case.[49]  *Schiff*, 684 A.2d at 1134, 1136 (emphasis added). In *Schiff*, the "**[t]he billing sheets submitted by respondent sought reimbursement for work unrelated to the case [and] sought payment for time not worked.**"  *Schiff*, 677 A.2d at 423 (emphasis added).  The records demonstrated a "lack of good faith effort to eliminate time expended on separate unsuccessful claims or on behalf of unsuccessful litigants or to exclude hours which [were] 'excessive, redundant, or otherwise unnecessary.'"[50]  *Pontarelli*, 781 F. Supp. at 121.  The Rhode Island Supreme Court found that the "misrepresentations to the court bear a close resemblance to an attempt to obtain money under false pretenses."  *Schiff*, 677 A.2d at 425.  The nature of the "grossly inflated" billing is astounding:

> For example, according to the records submitted, Ms. Schiff worked on this case for 25.7 hours on October 9, 1988, and 26.6 hours on October 10, 1988. While it may be possible to work around the clock for two consecutive days without respite, it clearly is impossible to do so for more than 24 hours in any one day.  The summary also indicates that on April 14, 1988, Ms. Schiff spent 8.9 hours travelling

---

[49]  As explained above, the lodestar was submitted in this case so that the Court could determine whether the 25% fee was reasonable (*i.e.*, the "cross-check").  Additional hours or fees on the lodestar would not have increased the fees paid to the plaintiffs' attorneys, but simply reduced the multiplier, making it more likely that the court would find the 25% fee reasonable.  This is wholly different from the fee petition Attorney Schiff filed pursuant to 42 U.S.C. § 1988, where the hours and fees listed on the declaration represented the actual funds sought from the defendants.

[50]  In addition to this malfeasance, the Court found Plaintiff engaged in "an effort to accomplish a goal completely unrelated to the stated purpose of litigation by making unsupportable claims against third persons." *Pontarelli*, 781 F. Supp. at 127.

to New York for a meeting. That was only two days after she wrote to the Court advising that she was unable to meet a filing deadline because of a totally incapacitating illness that would prevent her from engaging in normal activities for 7–10 days. Her incapacity was confirmed by another letter she sent to the Court on April 20 indicating that she had been hospitalized until April 19.

**

[C]ompensation is sought for more than 4,000 billable hours which represent more than two full years of a lawyer's billable time. However, despite the sweeping allegations contained in the complaint, the "plaintiffs'" claims were based on a relatively simple sequence of events occurring over a limited period of time. It is inconceivable that even the most vigorous advocacy of those claims required anywhere near the number of hours for which the "plaintiffs" seek recovery.

*Schiff*, 684 A.2d at 1133-35.

There were also serious allegations that Schiff inflated costs:

[T]hey assert that they have paid $22,510.17 for the services of three private investigators and approximately $40,000.00 in expert witness fees and expenses. However, they are unable to produce any bills or other documentation showing what services were performed, when they were rendered, how much time was involved, what rates were charged or what expenses are included in those sums.

**

A total of nearly $15,000.00 is claimed for "lodging" expenses. Of that amount, $4,800.00 is identified as "apartment rental" for the two out-of-state attorneys who participated in the trial. That sum, itself, seems excessive inasmuch as the trial lasted for only 17 days. The remaining $10,200.00 consists of hotel bills for unidentified "expert witnesses" who never testified and other individuals who were identified but whose roles in the case, if any, are unknown.

**

Superimposed on this complete absence of documentation is the same kind of misrepresentation that permeates the "plaintiffs'" requests for attorneys' fees. Thus, the plaintiffs seek reimbursement for very precise amounts allegedly expended for items such as office supplies ($479.50 and $877.75), postage ($548.40), and photocopying ($10,320.00, $550.00, $3,689.23). Those figures clearly convey, and presumably were intended to convey, the impression that they were derived from detailed records or exact measurement of the quantities of each item involved. However, on cross-examination, Ms. Schiff admitted that they were only "estimates" and that there is no documentation to support them.

*Id.* at 1135-36.

Contrast the findings in *Schiff* with the case at bar.  **Here, there is no evidence whatsoever of false, inflated, or unreasonable billings.**  Instead, the Special Master himself found that: (1) the total fees awarded to class counsel were justified and reasonable, *see* R&R at 6 ("By itself, this attorneys' fee award was not disproportionate or unsupportable when measured against the positive result for the class and the attorneys' effort and skill that was required to achieve it.  Indeed, all other things being equal, the attorneys' fee award was fair, reasonable and deserved."); (2) the rates listed for Thornton partners and associates were justified and reasonable, s*ee* R&R at 175 ("[G]iven the intricacies and difficulties of this case, on the whole the Special Master finds the hourly rates at which Thornton billed its partners and associates on its lodestar report were within the realm of reasonableness."); (3) with the exception of Michael Bradley and the contract attorneys, the rates listed for the staff attorneys were reasonable and justified, *see* R&R at 172, 180 ("[W]e find that the higher rates billed were justified in this instance" and "[t]he Special Master concludes that the staff attorney billing rates in the lodestar fee petition are generally reasonable . . . ."); and most importantly, (4) the Thornton attorneys actually worked the hours listed on the lodestar, and the number of hours worked was reasonable, *see* R&R at 216 ("[T]he total hours expended by each of the Thornton lawyers were reasonable and sufficiently reliable"); *id.* at 217 ("[T]he total time Michael Bradley spent working on the *State Street* document review, 406.4 hours, was reasonable.").

In short, the nature of the falsity in the *Schiff* case goes to the very essence of the fee request—the number of hours actually worked and the reasonableness of those hours—whereas the nature of the falsity alleged here relates to erroneous (or at the very least, ambiguous) and immaterial statements that did not affect the overall lodestar.  In *Schiff,* the declaration was false because—boilerplate or not— the attached statement of fees was not true and correct.  Here, the

declaration *language* itself contained errors regarding, for instance, the nature of the employee-employer relationship between the Thornton Law Firm and the staff attorneys for whom it paid; the Special Master found the accompanying hours and time to be reasonable and reliable. There simply is no comparison between the two and it is bizarre that the Special Master concludes that "[t]he facts in *Matter of Schiff* are **eerily similar** to those here."[51]  *See* R&R at 244 (emphasis added). Justice Holmes' axiom, cited above by the First Circuit, again seems particularly apt: "Even a dog knows the difference between being kicked and being stumbled over." O.W. HOLMES, JR., THE COMMON LAW 3 (1881).

### C.    Garrett Bradley Did Not Violate MRPC 3.3 or 8.4

If the Court were to consider referring Garrett Bradley to the BBO—a step which should be reserved for only serious misconduct—it would have no basis for doing so.[52]  In signing a boilerplate affidavit that contained inadvertent and immaterial errors, Bradley violated neither Massachusetts Rule of Professional Conduct 3.3(a)(1) nor 8.4 because he did not have actual knowledge of any false statement.

Rule 3.3(a)(1) states in relevant part that "[a] lawyer shall not **knowingly** make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law

---

[51]   *Compare* R&R at 244 ("Just like Schiff's affidavit, Garrett Bradley's Declaration here was a sworn statement designed to convince Judge Wolf that Thornton's fee petition was fair, reasonable, and accurate") *with* R&R at 6 ("[T]he attorneys' fee award was fair, reasonable, and deserved.").

[52]   The Court's Local Rules regarding disciplinary procedures and referrals were amended effective January 1, 2015. Pursuant to the new rules, there is now a question of whether the judicial officer presiding over the case should be the judicial officer who determines whether or not to refer attorneys to the Board of Bar Overseers. *Compare* L.R. 83.6.5 (effective Jan. 1, 2015) *with* L.R. 83.6.5(A) (version which appears to have been in effect prior to Jan. 1, 2015) ("When misconduct or allegations of misconduct that, if substantiated, would warrant discipline as to an attorney admitted to practice before this court, is brought to the attention of a judicial officer, whether by complaint or otherwise, and the applicable procedure is not otherwise mandated by these rules, the judicial officer may refer the matter to counsel for investigation, the prosecution of a formal disciplinary proceeding or the formulation of such other recommendation as may be appropriate."). *See Gonsalves v. City of New Bedford*, 168 F.R.D. 102, 107 n.100 (D. Mass. 1996) (Wolf, J.); *Blake v. NSTAR Elec. Corp.*, No. 09-10955, 2013 WL 5348561, at *1 n.1 (D. Mass. Sept. 20, 2013).

previously made to the tribunal by the lawyer." Mass. R. Prof. C. 3.3(a)(1) (emphasis added).

The Rules define "knowingly" as "**actual knowledge** of the fact in question." Mass. R. Prof. C.

1.0(g) (emphasis added). This intent standard does not reach negligent or inadvertent

misrepresentations. The drafters of the Rule knew how to employ a negligence standard but

affirmatively did not do so in the candor to the tribunal provision. *See* Mass. R. Prof. C. 4.3

(using the "[w]hen the lawyer knows or reasonably should know" standard for communications

with unrepresented parties); Mass. R. Prof. C. 8.2 (using the "knows to be false or with reckless

disregard as to its truth or falsity" standard for statements regarding integrity of judges).[53]

     Indeed, as the Special Master's own so-called expert acknowledged, the test for whether

an attorney violated Rule 3.3(a)(1) is **subjective**. Gillers Dep., 3/20/18, at 272:4-21 (SM Ex.

253). That is, in determining whether there has been a violation, the tribunal must ask not what

the reasonable attorney *would have known*, but what the attorney *actually knew* when he

presented facts to the Court. *See* W. Bradley Wendel, *Monroe Freedman: The Ethicist of the*

*Non-Ideal,* 44 HOFSTRA L. REV. 671, 680 n.8 (2016) ("Knowledge is defined in the *Model Rules*

as actual (that is, subjective) knowledge.") (citations omitted); Rutherford B. Campbell, Jr. &

Eugene R. Gaetke, *The Ethical Obligation of Transactional Lawyers to Act As Gatekeepers*, 56

RUTGERS L. REV. 9, 51 (2003) ("[T]he Model Rules eschew an objective standard . . . opting

instead to judge the propriety of the lawyer's conduct under a subjective, actual knowledge

standard.").

     As with violations of Rule 3.3, Rule 8.4(c) does not apply to mistakes. *See In re Murray*,

455 Mass. 872, 881 (2010) (upholding hearing committee's finding that attorney did not violate

---

[53]    In *In re Hilson*, 448 Mass. 603 (2007), the Supreme Judicial Court suggested, but did not hold, that Rule 3.3 could be violated by "reckless disregard for . . . truth or falsity."

Rule 8.4(c) where "no intent to mislead"); *Matter of McCabe*, 13 Mass. Att'y Disc. R. 501

(Appeal Panel Report, September 1997) ("[T]he conduct must be intentional, not merely

negligent."); *Matter of Thurston*, 13 Mass. Att'y Disc. R. 776 (Board Memorandum, May 12,

1997) (striking hearing committee's finding that attorney violated DR 1-102(A)(4) [predecessor

to 8.4(c)] and noting, "As Bar Counsel concedes, a negligent misrepresentation does not violate

DR 1-102(A)(4) because the rule prohibits only intentional conduct.").  Professor Gillers agrees

and stated in his deposition that the mental state required for a Rule 8.4 violation should not be

lower than the mental state required for a Rule 3.3 violation.  Gillers Dep., 3/20/18, at 275:9-21

(SM Ex. 253).[54]

The Supreme Judicial Court's *In re Diviacchi* opinion, which the Special Master cites, is

not to the contrary.  There, the attorney committed multiple ethical violations, including charging

excessive fees, and sued his client in both federal and state courts.  In one of the lawsuits, the

attorney alleged the client had a "standard habit" where she "hires an attorney, works him or her

until she stops paying the bills, fires that attorney and disputes the bill and files a [BBO]

complaint, and then gets another attorney and starts the process again."  *In re Diviacchi*, 475

Mass. 1013, 1017 (2016).  In fact, there was no evidence of such a pattern, and in particular,

there was no evidence of any BBO complaints.  In upholding the sanction, the Court cited a

comment to Rule 3.3 and rejected the attorney's argument that his statements "should be

---

[54]   The BBO has not always spoken with one voice.  In a few instances, particular fact summaries compiled by the BBO have suggested that a negligent misrepresentation may be sufficient for a violation of Rule 8.4.  For instance, in *In re Ged* (Public Reprimand 2004-17), the attorney received a public reprimand for erroneously including hours that he did not actually work on a fee petition.  The matter, however, was resolved by a stipulation which waived a hearing.  Similarly, in *In re Tiberii* (Public Reprimand 1996-4), the BBO imposed a public reprimand for negligent misrepresentations under both the predecessor to 8.4 and the predecessor to 3.3. *See also In re Paul J. Pezza* (No. BD-2013-116) (although the paucity of facts prevents the reader from understanding which intent standard was actually used).  The precedents cited above, and that of the Supreme Judicial Court, however, suggest that intentionality is required. *See In re Discipline of an Attorney*, 448 Mass. 819, 831 n.17 (2007); *Matter of Zak*, 476 Mass. 1034, 1038 (2017).

evaluated under a subjective, good faith basis standard" even though he could not provide any factual basis for them.  *Id.* at 1020.  *Diviacchi* did not alter the "actual knowledge" standard in Rule 3.3; the *Diviacchi* attorney was not merely inattentive in reviewing an affidavit, but intentionally concocted, and swore to the truth of, defamatory allegations about his client.

Nor could the "actual knowledge" standard be changed by a comment to a Rule.[55]  As the First Circuit has noted regarding the Rhode Island Rules of Professional Conduct, "[a] Comment cannot substantively change the text of [a] Rule."  *Whitehouse v. U.S. Dist. Court for the Dist. of Rhode Island*, 53 F.3d 1349, 1358 n.12 (1st Cir. 1995).  And the Rules themselves state, "Comments do not add obligations to the Rules. . . . The Comments are intended as guides to interpretation, but the text of each Rule is authoritative."[56]  Mass. R. Prof. C. Scope §§ 1,9.  *See also Clark v. Beverly Health and Rehab. Servs., Inc.*, 440 Mass. 270, 275 n.8 (2003) ("[A Comment] is an illustrative tool, not a bootstrap.  While it provides guidance to the practitioner in certain circumstances, it cannot enlarge, diminish, or in any way affect the scope of the . . . rule itself."); *Matter of Larsen*, 379 P.3d 1209, 1214 (Utah 2016) ("[Ou]r rules require proof of *actual knowledge*.  That concept is distinct from constructive knowledge or recklessness.  . . . [Rule 3.3], as written, does not lend itself to the interpretation that a false statement made

---

[55]   The Special Master believes Comment 3 to Rule 3.3 is applicable, which states "an assertion purporting to be on the lawyer's own knowledge, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry."  *See* R&R at 240; Mass. R. Prof. C. 3.3.

[56]   In any event, a federal court is not bound by a state's interpretation of disciplinary rules.  *See Grievance Comm. For S. Dist. of New York v. Simels*, 48 F.3d 640, 645 (2d Cir. 1995) ("[W]ell-established principles of federalism require that federal courts not be bound by either the interpretations of state courts or opinions of various bar association committees."); *Figueroa-Olmo v. Westinghouse Elec. Corp.*, 616 F. Supp. 1445, 1450 (D.P.R. 1985) ("The manner in which the Supreme Court of Puerto Rico applied its disciplinary code was, of course, useful precedent in our own interpretation of that code's application to a particular situation before us, but it is essential to understand that the primary responsibility for supervising the conduct of the attorneys who practice before this court lies precisely with this forum.").

without a 'reasonably diligent inquiry' is a *knowing* misstatement in violation of the rule. . . . We accordingly repudiate Comment 3 in the Advisory Committee Notes to rule 3.3.").

Here, as set forth above, there is no evidence that Garrett Bradley had "actual knowledge" that the affidavit submitted in September 2016 contained "false" information.[57] Bradley's admission of an inadvertent mistake does not lead to the conclusion that Bradley knowingly made false statements to the court. As even Professor Gillers acknowledged in his deposition, a careless mistake is not equivalent to a knowing misrepresentation. Gillers Dep., 3/20/18, at 269:5-7 (SM Ex. 253). And here, there is a question about the ambiguity, materiality, and import of the statements in the affidavit. *See Sheppard v. River Valley Fitness One, L.P.*, 428 F.3d 1, 8 (1st Cir. 2005) ("Anyway, it seems to us that a finding of ethical misconduct, so fraught with consequences for a lawyer's professional reputation, should not rest on such fine distinctions. If the court has trouble coming to an unqualified conclusion about the parties' settlement status, then [respondent] can hardly be charged with telling a knowing falsehood—the standard set forth by the Rules of Professional Conduct—under such circumstances.").

There is also no evidence to support the proposition that Garrett Bradley violated Rule 3.3(a) by failing to correct a false statement of material fact.[58] The Special Master is only able to conclude Bradley violated 3.3(a) in this manner because he assumes that, when Bradley submitted the Declaration in September 2016, Bradley had actual knowledge that his Declaration was false. *See* R&R at 233. If that assumption were correct, it may well follow that Rule 3.3(a) was violated from the moment Bradley submitted the Declaration until the moment the errors were disclosed to the Court in the March 2017 hearing. But, as noted, the "evidence" cited for

---

[57]   The nature of this "false" information is discussed *supra* § III(B).

[58]   The Thornton Law Firm objects to the characterization of the errors in the fee declaration as material. This is an additional reason why Garrett Bradley did not violate this provision of Rule 3.3.

the predicate proposition that Bradley had actual knowledge he submitted false evidence in September 2016 is spurious, and there is no other support offered for the violation. *See supra* § II. Nor could there be. All of the evidence, including Bradley's contrition and acceptance of responsibility for the mistakes, as well as the lack of any motive whatsoever to falsify any passages of his Declaration, suggest that Bradley first realized the inaccuracies when Judge Wolf issued the February 2017 order and further inquired during the March 2017 hearing.[59]

The case at bar is similar to those in which courts and other tribunals have found an attorney's mistakenly incorrect statement is not a violation of Rule 3.3 or analogous provisions. For instance, in *Obert v. Republic W. Ins. Co*, 398 F.3d 138, 143 (1st Cir. 2005), the First Circuit found there was no knowing violation of Rule 3.3(a)(1) even where "one of the statements may well have been factually inaccurate and another was a dubious and unattractive piece of lawyer characterization." Even in the much more egregious case of *In re Auerhahn*, No. 09-10206, 2011 WL 4352350, at *16 (D. Mass. Sept. 15, 2011),[60] a three judge panel of the District of Massachusetts found that an attorney who failed to turn over potentially exculpatory documents in a habeas proceeding did not "knowingly disobey an obligation under the rules of the tribunal" (a rule analogous to Rule 3.3 and requiring the same mental state). In that case, the court found

---

[59]    Contrary to the Special Master's insinuations, *see* R&R at 235-36, there is no evidence that Bradley became aware of the errors in the boilerplate affidavit prior to the Court's February 2017 order. The media inquiries which prompted the November 2016 letter to the Court focused on the double counting error, and counsel's efforts were directed at disclosing the error and submitting a revised and corrected lodestar as soon as possible. The February 2017 order, which raised the issue of "regular hourly billing rates" listed in the affidavit, set a date for a hearing on the matter. Memo. and Order, 2/6/17, at 6, 13 (SM Ex. 180). At that hearing Bradley addressed the inaccuracies in the declaration. The Special Master seems to suggest Bradley should have somehow addressed the inaccuracies after the February order but before the hearing. This would be contrary to common practice—when the Court sets a hearing date, attorneys address the issues raised by the Court at the hearing. Moreover, none of the other law firms notified the Court of any inaccuracies prior to the March 2017 hearing—even though, as discussed above, the fee declarations of all three law firms were inaccurate in certain respects.

[60]    Since the *Auerhahn* case, the District of Massachusetts has amended its Local Rules regarding the standard of proof in attorney discipline proceedings. *See* L.R. 83.6.5(i)(6).

the attorney was "lackadaisical at best" and conceded negligence.  *Id.*  But as the *Auerhahn* court

noted, "[n]egligence, however, is not enough here."  *Id.*  Surely if a prosecutor's "lackadaisical"

and negligent failure to turn over potentially exculpatory evidence did not violate the Rules of

Professional Conduct because it was not done "knowingly," Garrett Bradley cannot be

sanctioned for mistakenly submitting a boilerplate fee application containing inaccuracies.

## VI.   **The Customer Class Law Firms Properly Listed Contract Attorneys On The Lodestars**

In pages 181-89 of his Report, the Special Master expresses a strong personal policy

preference for listing contract attorneys' time as expenses rather than legal fees.  But his personal

preference is merely that: a personal preference.  The Special Master has **failed to identify a

single case which holds contract attorneys must be listed as expenses**.[61]  In fact, the Special

Master's Report cites a number of cases that actually support counsel's decision to include

contract attorneys in the lodestar.  *See Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 409 (D.

Conn. 2009), *aff'd*, 355 F. App'x 523 (2d Cir. 2009) (finding that contract attorneys were

properly included in the lodestar where contract attorneys' work was supervised by plaintiffs'

counsel); *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 394-95 (S.D.N.Y. 2013)

("[C]ourts have . . . regularly applied a lodestar multiplier to contract attorneys' hours.");[62] *City

of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 280

(S.D.N.Y. 2013) ("[I]t is beyond cavil that law firms may charge more for contract attorneys'

services than these services directly cost the law firm[.]"); *In re Enron Corp. Sec., Derivative &*

---

[61]   The Special Master asserts that "legal and ethical rulings have not provided definitive guidance on this interesting issue[.]" R&R at 187.  However, case law and ethics opinions strongly suggest that it is not only permissible, but common practice, to include contract attorneys in the lodestar.

[62]   The Special Master cites *Citigroup* in support of his statement that courts "that have previously weighed in on this issue have not drawn a clear distinction between temporary attorneys and partnership-track associates." R&R at 183.  In fact, *Citigroup* specifically drew this distinction, recognizing that "a contract attorney's status as a contract attorney—rather than being a firm associate—affects his market rate."  965 F. Supp. 2d at 395.

*ERISA Litig.*, 586 F. Supp. 2d 732, 784-85 (S.D. Tex. 2008) (allowing counsel to recover fees for contract attorney services at market rates rather than their cost to the firm); *In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 272 (D.N.H. 2007) ("It is therefore appropriate to bill a contract attorney's time at market rates and count these time charges toward the lodestar."); s*ee also In re AOL Time Warner S'holder Derivative Litig.*, No. 02 CIV. 6302 (CM), 2010 WL 363113, at *26 (S.D.N.Y. Feb. 1, 2010) ("The Court should no more attempt to determine a correct spread between the contract attorney's cost and his or her hourly rate than it should pass judgment on the differential between a regular associate's hourly rate and his or her salary.").

The only cited authorities that even come close to supporting the Special Master's preference that contract attorneys should be listed as expenses are cases in which counsel, on their own initiative, included contract attorneys as expenses and the court did not consider whether including them in the lodestar would have been appropriate.  *See Dial Corp. v. News Corp.*, 317 F.R.D. 426, 438 (S.D.N.Y. 2016) (noting counsel's decision to include contract attorneys as an expense despite the fact that it is permissible to "mark[]-up contract attorney fees"); *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 671 (S.D.N.Y. 2016) (approving request for expenses including expenses for document review by contract attorneys).

Further, the ABA Standing Committee on Ethics and Responsibility has advised that "a lawyer may, under the Model Rules, add a surcharge on amounts paid to a contract lawyer when services provided by the contract lawyer are billed as legal services."  ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 00-420 (2000).  Surprisingly, the Special Master cited ABA Formal Opinion 00-420, yet instead of acknowledging that it affirmatively answers the exact question he is posing, stated that it "leave[s] attorneys a wide degree of latitude to decide"

whether to bill contract attorney services as fees for legal services or as costs incurred by the firm.[63]  *See* R&R at 186.

The Special Master contends that decisions allowing contract attorneys to be included in lodestars at market rates are "not acceptable for purposes of this Report" because they are based on the "faulty premise" that "contract attorneys [are] indistinguishable from off-track associates[.]"  R&R at 184.  This assertion is based on a clear mischaracterization of the cases. In *Tyco*, the only decision from a court within the First Circuit cited by the Special Master, the court explicitly found that "[a]n attorney, regardless of whether she is an associate with steady employment or a contract attorney whose job ends upon completion of a particular document review project, is still an attorney."  535 F. Supp. 2d at 272.  The other decisions referenced by the Special Master also demonstrate a clear understanding that a contract attorney's work is temporary and often project-specific.  *See, e.g.*, *Carlson*, 596 F. Supp. 2d at 409 ("A contract attorney is one hired 'to work on a single matter or a number of different matters, depending upon the firm's staffing needs and whether the temporary attorney has special expertise not otherwise available to the firm.'") (quoting *Enron*, 586 F. Supp. 2d at 782).[64]  At no point do the decisions cited by the Special Master conflate a "contract attorney" with an "off-track associate" permanently employed by a firm.  The Special Master also claims that those courts including contract attorneys in lodestars "accepted, without discussion, the billing of contract attorney expenditures as legal fees rather than as a cost or expense."  R&R at 186.  This is simply

---

[63]  It is curious that the Special Master cites ABA Formal Opinion 00-420, which is directly on point, but did not include the full opinion as one of the 266 exhibits attached to his Report.

[64]  The Special Master cites *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400 (D. Conn. 2009) after acknowledging that "[s]everal courts, *including two within this Circuit*, have applied market rates without regard to the actual wages paid to a contract attorney."  R&R at 184 (emphasis added).  While *Carlson* does support the fact that firms may bill for contract attorneys at market rates, it is worth noting that *Carlson* is a decision out of the District of Connecticut, a court within the Second—not the First—Circuit.

incorrect.  *See Citigroup*, 965 F. Supp. 2d at 394 ("[C]ourts routinely reject claims that contract

attorney labor should be treated as a reimbursable litigation expense.").

The Special Master's policy-based arguments fare no better.  He claims that "the decision

to bill a contract attorney as an expense or as a legal service fee" is a matter of "professional

judgment" that should be "informed by the role of the contract attorney vis-à-vis the other

attorneys in the case."  R&R at 186.  According to the Special Master, the contract attorney's

role is determined not by the work performed, but by the financial obligations incurred by the

law firm.  He attempts to compare the cost of hiring contract attorneys with that of hiring a

stenographer, or with paying for transportation, meals, and lodging, since the firm does not face

"long-term financial obligations" with contract attorneys.[65]  Yet, the Special Master does not

explain, nor provide any authority for, the proposition that a firm's financial obligations should

have any bearing on whether to treat contract attorneys' work as legal fees.  Courts considering

the issue focus instead on the type of work performed by the contract attorneys.  *See AOL Time

Warner*, 2010 WL 363113, at *25 (allowing a multiplier on contract attorney fees where those

attorneys "were not mere clerks" but "exercised judgments typically reserved for lawyers, under

the supervision of the firms' regular attorneys").  The Special Master has offered no explanation

as to why the contract attorneys here—who were making legal judgments under the supervision

of the firms' regular attorneys—were more akin to stenographers than associates.  As the Special

Master recognized, "contract attorneys . . . perform work readily assigned to a first- or second-

---

[65]    The Special Master claims that the cost of contract attorneys is "most akin to a disbursement of funds passed
along to the client at face value."  R&R at 187 (citing ABA Comm. on Ethics and Prof'l Responsibility,
Formal Op. 93-379 (1993) (SM Ex. 193)).  According to ABA Formal Opinion 00-420, Formal Opinion 93-
379 was "made in the context of goods or services of non-lawyers," and "does not speak directly to the subject
of . . . contract lawyers, in the context of disbursements or expenses."  The principles laid out in Opinion 93-
379 are "applicable to surcharges for legal services provided by contract lawyers *when billed to the client as a
cost or expense*."  ABA Formal Opinion 00-420 (emphasis added).

year associate in a traditional law firm model." R&R at 183-84.  The contract attorneys in this

case provided valuable legal services.  They were doing the same work as the "staff attorneys"

who, as the Special Master himself admits, were appropriately included in the lodestar.[66]  *See*

R&R at 176-181.  And as the Special Master acknowledges, "similar work justifies similar

rates."  *Id.* at 182.

Even if the Court were to adopt the Special Master's personal policy preference for

listing contract attorneys as reimbursable expenses, it would be inappropriate to apply that

preference retroactively.  *See In re Beacon Assocs. Litig.*, No. 09 CIV 3907 (CM), 2013 WL

2450960, at *18-19 (S.D.N.Y. May 9, 2013) (the court expressed that if it had thought ahead it

"would have included in [its] order appointing Lead Counsel specific directives about how much

[it] was prepared to authorize in terms of an hourly rate for document reviewers," but having

failed to do so it was "unfair to impose such a rule *ex post facto*").  The attorneys agreed to take

this case on a contingency basis, believing that they would be paid appropriately.  Their belief

that they would be compensated at market rates for contract attorneys' time was not only

reasonable, but in line with common practice and supported by legal authority.  It would be

unfair to impose a retroactive rule reducing counsel's recovery for no reason other than to satisfy

the Special Master's personal preference, which has no basis in prevailing case law.

In any event, the Special Master's proposed remedy is improper.  Even if the firms were

required to list contract attorneys as expenses rather than legal fees—and according to every

---

[66]  *See* Heimann Dep., 7/17/17, at 51:18-52:15 (SM Ex. 19) ("There is no distinction that I am aware of between the work that's assigned to attorneys who are employed by the firm directly and those that are employed through an agency.  There is no difference between the expectations for the work to be performed by those lawyers.  There is no distinction with respect to the quality of the work that is expected to be performed by those lawyers.  There is no distinction between how those lawyers are trained to to [sic] their work.  There is no distinction between how they are supervised in connection with the work that they do.  They are one and the same.").

court to have considered the issue, they were not—the proper remedy would not be to disgorge that amount from the lodestar to the class, but to remove that value from the lodestar and then determine whether or not the multiplier was still reasonable. *See* Rubenstein Decl., 6/20/18. When the total contract attorney value is removed, the total lodestar comes to $35,940,307.75.[67] Comparing this against the total fee award, $74,541,250, results in a multiplier of 2.07. This is well within the reasonable range approved by courts in complex class-action litigation. *See, e.g.*, *In re Neurontin Mktg. & Sales Practices Litig.*, 58 F. Supp. 3d 167, 172 (D. Mass. 2014) (finding that a 28% fee award yielding a multiplier of 3.32 was "well within the range").

## VII.   The Special Master's Proposed 50% Reduction In Rate For Michael Bradley's Work Is Unjustified

The Special Master finds that Michael Bradley performed document review work on this case, on a contingency basis, between 2013 and 2015, R&R at 189-90, and that his work was supported by contemporaneous time records, R&R at 366. The Thornton Law Firm agrees with these findings. However, the Special Master's concern is not with the hours in the Thornton fee declaration attributed to Michael Bradley—indeed, he finds those hours to be supported by time records produced by Thornton, R&R at 217 n.171, 366—but, rather, he takes issue with the hourly rate applied to Mr. Bradley's work for purposes of the lodestar cross-check. The Special Master recommends that Michael Bradley's rate be reduced by 50%, and that the difference between the amount listed in the Thornton lodestar, multiplied by 1.8, and the amount calculated at the new rate, multiplied by 1.8, be "returned to the class." R&R at 366.

---

[67]   This number is calculated by reducing the original lodestar ($41,323,895.75) by the amount of double counted time ($4,058,000) and the Special Master's "original petition" "lodestar value" of "contract attorneys time" ($1,325,588.00).

In assessing the value of the work performed by Michael Bradley in this case, the Special Master finds that Mr. Bradley's work "most closely resembles that of a junior level associate."[68] R&R at 196.  For this and for other reasons, he recommends a reduction in the $500 hourly rate associated with Mr. Bradley's work.[69]  Yet the reduced rate that he argues should apply to Michael Bradley's work—$250 per hour—is less than the rate used for *any* associate in this case, by *any* of the nine law firms that submitted fee declarations.  It also is less than the lowest end of the range of rates for associate work that the Special Master himself concludes to be reasonable elsewhere in his report ($325 to $725 per hour).  R&R at 164.  Moreover, it is less than the $415 per hour rate used for at least one other staff attorney who performed exactly the same work (*i.e.,* document review, no drafting), and who also worked remotely.  *See* p. 86, *infra*.

The Special Master finds that Michael Bradley "had no experience relevant to the case and the work he performed was simple, straightforward, and unmonitored document review."

---

[68]   The Special Master makes this recommendation despite finding elsewhere in his report that Mr. Bradley had more than eight years of legal experience when he signed on to assist with the State Street matter—years that included serving as an Assistant District Attorney in Norfolk County, as the Executive Director of a Commonwealth Task Force dedicated to detecting fraud in the underground economy, and as a solo practitioner.  R&R at 190-91.

Regarding the work performed, the Special Master claims that Michael Bradley had no contact with the Thornton firm regarding this case beyond sending in his hours and raising "technical concerns about the software."  R&R at 193.  This finding clearly ignores record evidence that Michael Bradley contemporaneously raised substantive questions to Evan Hoffman regarding documents he was reviewing in the Catalyst database.  ████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████.

[69]   One of these reasons, apparently, is that Michael Bradley performed work "fully on his free time and when it was convenient for him to do so."  R&R at 366.  The Thornton Law Firm is aware of no authority stating that the time at which work is performed has a bearing on the rate at which that work can be charged.  Setting aside the fact that "free time" and "convenient" are surely subjective concepts, Mr. Bradley did not testify that he did work in his "free time" (or at "odd hours," as the Special Master asserts elsewhere (R&R at 196)).  To the contrary, Mr. Bradley testified that his practice was to work on the matter in the afternoons or evenings, when he had available time after attending to other client matters in the mornings, and that he tried to review for a consistent amount of time each week.  M. Bradley Dep., 6/19/17, at 51:14-52:8 (SM Ex. 67).  The fact that Mr. Bradley was performing this work in addition to other case matters, over a two-year period, makes him no different from any other associate or partner working on this case who also worked on matters for other clients during the years this case was pending.

R&R at 366.  These distinctions apply equally to some of the staff attorneys performing

document review for both Lieff and Labaton.  Yet, despite this similarity, only Michael

Bradley's rate is singled out for a 50% reduction.  The Special Master's asserted distinctions

based on "experience," the "simple and straightforward" nature of the work, and the

"unmonitored" nature of the work are unjustified and, more importantly, cannot be the basis for

the radically disparate treatment of cutting Michael Bradley's rate in half.

      The nature of contract or temporary case-by-case document review is such that lawyers

performing document review will seldom see the same fact patterns or underlying issues in their

work as they move from one case to the next.  While some staff attorneys in this case had

previously worked on a similar case involving another bank, BNY Mellon, not all did.  Indeed,

*none* of the 35 Labaton staff attorneys worked on the *BNY Mellon* case, as Labaton was not

counsel in that case.  This is not to suggest that they were unqualified to do the work.  But there

is no basis, in the record or anywhere else, to suggest that such staff attorneys' rates should

change from case to case based on their "relevant experience."[70]

      If the Special Master's recommendations on this point were followed, every lodestar

review would necessarily devolve into a detailed analysis of each staff attorney's professional

biography and educational background.  Michael Bradley is a gainfully employed attorney with

eight years of professional experience, including extensive litigation and trial work, who was

appointed to head a state fraud-detection task force.  His experience justified his lodestar rate in

this case.  Surely, the other staff attorneys' experience was not, collectively, so much more

---

[70]    Indeed, if a particularly knowledgeable staff attorney had a wealth of relevant experience, it might make better
sense, if the firm so chose, for such an individual to be hired full-time to take on a more senior role in the case.

"relevant" that it would justify listing them at lodestar rates that are nearly *double* what the Special Master would assign to Michael Bradley's work.

Further, to characterize Michael Bradley's document review work as "simple and straightforward" is to necessarily characterize ***all*** staff attorneys' document review work in this case as simple and straightforward.  There is nothing in the record to support the notion that any document review was substantively or materially different from any other.  Thus, the "simple and straightforward" nature of the work, even if true, cannot be a basis for cutting only Michael Bradley's lodestar rate.

The Special Master takes particular issue with Michael Bradley's "failure to produce any substantive memoranda or other work product," calling this the "perhaps most telling" basis for distinguishing him from other staff attorneys.  R&R at 192.  But the Special Master cites no evidence that every other staff attorney wrote memoranda.  Indeed, the evidence shows that <u>not</u> all staff attorneys wrote memoranda.  For example, Lieff staff attorney Kelly Gralewski testified in her deposition that she did not write any.  Gralewski Dep., 6/6/17, at 19:23-20:2 (SM Ex. 104) ("Q. Were you tasked with drafting any memoranda related to any specific topics in the case? A: No.").  The Special Master, who does not mention Ms. Gralewski's testimony in the Report, proposes no reduction to Ms. Gralewski's rate of $415 per hour, while urging that Michael Bradley's rate be reduced to $250 per hour <u>for the same work</u>.  Moreover, Ms. Gralewski—like Michael Bradley—performed all of her work remotely.  Gralewski Dep., 6/6/17, at 13:13-15 (SM Ex. 104); ███████████████████████.  Distinguishing Michael Bradley from other staff attorneys on the basis that he did not write memoranda—the "most telling" basis, according to the Special Master— is entirely unjustified.

███████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████. The firms did not apply different rates for different tasks; the staff attorneys who both

performed document review and drafted memoranda maintained the same lodestar hourly rates

for both tasks.  Appropriately, the Special Master does not propose different rates for the

different tasks performed.

In asserting that Michael Bradley's work was "distinctly limited" as compared to that of

other staff attorneys, the Special Master cites Michael Bradley's testimony that he recalls

recording comments on a "handful" of documents in the Catalyst system.  R&R at 192.  Of

course, the content of the review folders assigned to Michael Bradley, and how many documents

they contained that were worthy of comment, is entirely arbitrary and is no basis for judging the

quality of his work.  On that point, the Special Master notes that there is "no clear evidence" that

Michael Bradley made comments on any documents, despite Michael Bradley's testimony that

he did.  *Id.*  The negative inference here is obvious, but patently unfair.  The Catalyst system was

taken off-line after the document review ended, and, as a result, there is no ability to verify

*anyone's* work in Catalyst.  *See* Chiplock Dep., 6/16/17, at 212:6-213:8 (SM Ex. 10) (stating that

"[T]he Catalyst platform had been shut down for a year and a half at that point, and we had all of

the documents and the coding on a hard drive, but there was no way to audit any individual

user's work in retrospect by looking at that information," and noting that it is not possible "to do

an audit of any individual user's work from years prior, because I just don't think the system was built to capture that.").

In addition, while some staff attorneys certainly worked at a firm's brick-and-mortar location while under in-person supervision, not all did. 

; Jordan Dep., 6/6/17, at 16:11-22 (SM Ex. 101); Zaul Dep., 6/6/17, at 15:4-10 (SM Ex. 59).

. There is simply no basis for cutting only Michael Bradley's lodestar rate for working "unmonitored," when he was far from the only lawyer working remotely. Even if he were—and as the Special Master presumably recognized in not recommending any reduction to Lieff staff attorney rates based on remote work—document review technology allows for this work to be done from any computer, wherever located.

Finally, the sheer magnitude of the reduction proposed by the Special Master highlights its unfairness. The Special Master arbitrarily decides that Michael Bradley's rate should be reduced so that his rate is "more at the level of a paralegal, supplemented by the fact of his law degree and experience as a lawyer." R&R at 366. This proposed reduced rate of $250 per hour, while slightly higher than the rate for Thornton's sole paralegal in this case (Andrea Caruth, $210 per hour), is lower than the rate charged for paralegals by Labaton and Lieff in their fee declarations (Labaton listed its paralegals at rates ranging from $275 per hour to $340 per hour, with an average rate of $316 per hour; Lieff listed its paralegal at $270 per hour). Labaton Fee Decl., Ex. A, 9/15/16 (SM Ex. 88); Lieff Fee Decl., Ex. A, 9/14/16 (SM Ex. 89). Moreover, the

lowest rate for any associate in any fee petition submitted by a law firm in this case (both

Customer Class Counsel and ERISA Counsel) is $325 per hour.

In light of Mr. Bradley's experience as an attorney, the rates he has recently charged

other clients, and his willingness to perform the work in this case on a contingency basis, the

Special Master's proposed reduction to his rate is totally unwarranted.

### A.      Any Reduction In Michael Bradley's Rate Is Immaterial To The Fee Award

Most importantly, even if one accepts the Special Master's recommendation that Michael

Bradley's rate should be reduced by any amount, the result is entirely immaterial to the overall

attorneys' fee award, regardless of the amount of reduction.  At maximum, and even after the

removal of all double-counted staff attorney time, Michael Bradley's work accounts for less than

0.55% of the overall lodestar.[71]  Even if one were to remove all value associated with Michael

Bradley's work ($203,200)—which would be wildly unfair as even the Special Master

acknowledges that he performed work and that his time records support that work—it would

have no material effect on Thornton's lodestar or on the overall lodestar.  Indeed, the multiplier

applied to the overall lodestar without *any* of Michael Bradley's time would still be 2.01, well

within the range of reasonableness for a case of this size and complexity.  *See supra* § I (citing

and quoting portions of July 31, 2017 and June 20, 2018 Expert Declarations of Professor

William B. Rubenstein, and 4/9/18 Deposition Testimony of Professor Rubenstein, stating that

multiplier is "fully reasonable, indeed modest," and that "it would have been justified to see a

three or four [multiplier].").

---

[71]     The revised lodestar as stated in the November 2016 letter is $37,265,241.25.  Goldsmith Ltr. to Ct., 11/10/16 (SM Ex. 178)

As explained in the previous section regarding double counting, any discussion of lodestar must recognize its limited purpose in this case. In recommending that the difference between Michael Bradley's work at the $500 per hour rate (times 1.8 multiplier) and his work at the proposed reduced $250 per hour rate (times 1.8 multiplier) must be "returned to the class," R&R at 366, the Special Master appears to confuse the lodestar cross-check with the use of lodestar information to determine a *lodestar-based* award. On the one hand, the Special Master accurately concludes that the Court "reviewed the hours as part of a lodestar cross-check, rather than reimbursing . . . attorneys on a one-to-one basis." R&R at 206 n.106 (discussing Thornton hours specifically, but making a general point applicable to all hours).

But when it comes to Michael Bradley, the Special Master flatly contradicts himself, asserting that Thornton "sought reimbursement of fees" for Michael Bradley's work. R&R at 73, 189. This is plainly false and leads to an illogical result. The inclusion of the hours worked by Michael Bradley in the lodestar served the same purpose as the inclusion of all of the other hours in the lodestar—to demonstrate to the Court, *for purposes of the lodestar cross-check only*, the work put into the case, and the reasonableness of the percentage fee sought by counsel. Thornton neither sought nor was awarded "reimbursement" for any professional's hours (as the Special Master himself correctly states elsewhere in in the report, R&R at 206 n.106).

The Special Master compounds his error in asserting that "because of the 1.8 multiplier effect, Thornton received almost an additional $500 per hour on Michael Bradley's time, resulting in an additional almost $200,000 to the Thornton law firm. . . . Thornton's award must be reduced by the amount earned by applying this inflated hourly rate at an almost two-times multiplier." R&R at 197. The Special Master asserts that these ostensible 'earnings' should be returned to the class. R&R at 366. But Thornton clearly did not receive "an additional almost

$200,000" because of Michael Bradley's time.  It did not "earn[]" any amount as a result of Michael Bradley's rate.[72]  The lodestar containing Michael Bradley's hours was submitted only to help the Court verify that the percentage of the settlement fund it was awarding to counsel was reasonably supported by the work done on the case.[73]  And as demonstrated above, the value of Michael Bradley's hours—regardless of hourly rate—had a *de minimis* effect on Thornton's lodestar, an infinitesimal effect on the overall lodestar, and no effect whatsoever on the multiplier applied to the lodestar to verify the 25% percentage of fund award.  *See, e.g.*, *In re: Cathode Ray Tube (CRT) Antitrust Litig.,* No. 1917, 2016 WL 4126533, at *9 (N.D. Cal. Aug. 3, 2016) ("A lodestar reduction is unnecessary when the effect on the multiplier is not material.").

The Special Master wrongly asserts (without acknowledging the other part of his report in which he concludes the opposite) that the rate charged for Michael Bradley's services has a one-to-one correspondence to the attorneys' fee awarded to Thornton, and that Thornton received an "additional benefit" based on Michael Bradley's rate.  R&R at 366.  The Special Master then uses this flawed logic as the basis to demand that Thornton disgorge this supposed "additional benefit" it received to the class.  *Id.*  Neither reason, nor math, nor precedent support such a demand.  As Professor Rubenstein states in his June 20, 2018 declaration:

> In a case where a court employs the percentage method to determine class counsel's fee, and uses the lodestar only for cross-check purposes, **the reduction of an hour**

---

[72] ███████████████████████████████████████████
████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

[73] *See* Rubenstein Decl., 6/20/18, at ¶¶ 18-20 (explaining that the purpose in a lodestar cross-check is to enable courts to ensure that the percentage awarded was reasonable when compared to the time counsel have worked on the case).

of time recalibrates the lodestar multiplier and requires further analysis of whether that lower amount can continue to sustain the requested percentage award. But it does not require the "repayment" of that hour of time since counsel was never "paid" for that hour of time; counsel were paid a percentage of the recovery. Numerous legal decisions have understood this distinction and, after adjusting a lodestar used for cross-check purposes downward, simply re-assessed whether the resulting higher multiplier remained reasonable.[78]

Rubenstein Decl., 6/20/18, at ¶ 20 n.80 (emphasis added) (citations omitted).

The Special Master's untenable (and internally inconsistent) position and related recommendation with respect to Michael Bradley's work, like his position and recommendation on the issue of the double counting mistake, contravene the purpose and function of the lodestar cross-check in this case.

## VIII.  The Recommended Payment Of $3.4 Million To ERISA Counsel Is Unjustified And Based On Erroneous Findings

Yet another blunder is the Special Master's conclusion that ERISA Counsel did not receive a fair amount of attorneys' fees in the case.  The Special Master calls for a "reallocation remedy" to ERISA Counsel in the amount of $3.4 million.  R&R at 369.  This recommended remedy is based on three findings made by the Special Master:

1. That, in December 2013, ERISA Counsel agreed to a 9%[74] fee based on the ERISA trading volume of 5-9% that was known at the time, but that "it was later learned" that the trading volume attributable to ERISA plans "was actually about 12-15% of the total trading volume."  R&R at 46;

2. That, per the Plan of Allocation and the Stipulated Settlement Agreement, ERISA Counsel were entitled to up to $10.9 million in fees, but received only $7.5 million pursuant to the fee agreement—thereby creating a delta of $3.4 million that was earmarked for ERISA Counsel, but that ERISA Counsel did not receive, Exec. Summ. at 51; R&R at 368-69;[75] and

3. That, owing to "internal tension" between Customer Class Counsel and ERISA Counsel, Customer Class Counsel restricted ERISA Counsel's access to documents,

---

[74] As the Special Master found, this amount was later increased to 10% at the suggestion of Customer Class Counsel, and ERISA Counsel received 10% of the overall fees.  R&R at 48, 85.

[75] These findings are repeated verbatim in the Supplemental Ethical Report submitted to the Special Master by Professor Stephen Gillers.  Gillers Supp. Report, 5/8/18, at 31, 100 n.91 (SM Ex. 233).

to wit, "ERISA Counsel were not provided with access to documents State Street had provided to the Customer Class," and that "[n]or were ERISA Counsel allowed access to the Customer Class's database."  R&R at 34.

All three of these findings are wrong.  None is a factually or legally supportable basis for the "reallocation" of fees to ERISA Counsel that the Special Master recommends.

### A.   The Special Master's Conclusion That The ERISA Trading Volume Was "Actually 12-15%" Is Wrong

The Special Master finds, accurately, that the fee agreement between ERISA Counsel and Customer Class Counsel, signed in 2013, was based on the known ERISA **trading volume** percentage at that time.  R&R at 46 ("Th[e] agreement—to allocate 9% of the total fee awarded (if successful) to ERISA Counsel—was based largely on the premise that the total ERISA case volume **comprised five to nine percent of the total FX trading volume**.") (emphasis added). This "five to nine percent" trading volume figure came from State Street, which supplied the trading data, and which conferred directly with ERISA Counsel about it.[76]

The ERISA trading volume percentage—meaning, the volume of affected ERISA FX transactions, expressed as a percentage of the total affected FX transactions—is fundamentally different from the ERISA *settlement* percentage, which is the amount of the settlement allocated

---

[76] ████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
██████████████████████████
████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████

to ERISA funds, expressed as a percentage of the total settlement amount.  The ERISA

settlement percentage was never the basis of any agreement among counsel.

As support for the conclusion that the ERISA trading volume was "actually about 12-

15% of the total trading volume," the Special Master cites **only** to the deposition testimony of

ERISA lawyers, who, naturally, stand to gain from the Special Master's faulty recommendation

to reallocate funds to them.  R&R at 46 (citing testimony of ERISA attorneys Lynn Sarko and

Carl Kravitz).  Notably, and as discussed further below, the Special Master does *not* mention

other deposition testimony, given by the lawyer actually assisting with the claims administration

process, that the volume is, in fact, approximately 9%.  Nor does he credit (or even mention in

the body of his Report) counsel's statements that verifiable data from the claims administrator

shows the volume to be approximately 9%, pending final resolution of the administration

process.  ███████████████████████████████

███████████████████████████████████

███████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

████████████████████████████

██████████████████

████████████████████████

When, in the course of the investigation, it became clear that the Special Master had

adopted the belief that the ERISA portion of the overall trading volume was "actually about 12-

15%," lawyers for Customer Class Counsel attempted to set this straight, both during the

deposition of Nicole Zeiss (the Labaton partner with responsibility for the claims administration

process) and during oral argument before the Special Master on April 13, 2018.  ████████
████████████████████████████; *see also* 4/13/18 Hr'g Tr. at 104:22-105:7 (SM Ex. 162)
([MS. LUKEY, Counsel for Labaton]: "Right now, as we have in the record, it appears it's going
to come out at 9 to 9.5 percent.  A.B. Data is trying to finish, but it needs to be able to get the last
data from the group trust which are a mixture of customer class and ERISA investors.  And it's
been unable to collect some of that.  But there is nothing to indicate, at least at this point, that it's
going to exceed the estimated 10 percent.  Looks like it'll come in a little under that.")

    In the Report, the Special Master acknowledges counsel's statements at oral argument in
a single-sentence footnote, but makes no mention of Nicole Zeiss's testimony there, or anywhere
else in the Report.  R&R at 46 n.28 ("During oral argument, counsel for Labaton indicated that
the trading volume for the ERISA funds was in a range of 9% to 10%.  However, the record
evidence on this point is incomplete.").  The omission of Ms. Zeiss's testimony is particularly
troubling, given that the Special Master questioned her himself about her knowledge of the
ERISA trading volume, ████████████████████████████████████████████████
██████████████████████████████████████.

    Presumably, the Special Master makes no mention of this testimony because it
contradicts his conclusion that ERISA Counsel got a raw deal in this case.  The Special Master's
selective reliance on deposition testimony is unjustifiable and, to use a phrase employed by the
Special Master elsewhere in the Report, "perhaps telling."  Setting aside the issue of selectively
quoting deposition testimony, relying on testimony as the sole support for a conclusion about
volume is unnecessary and inappropriate.  Determining the portion of the total trading volume
attributable to ERISA plans is an objective process that results in a definite number, and
therefore data, not personal recollection, is the best and most reliable evidence.

**But the Special Master did not seek documents regarding the ERISA trading**

**volume.** Although the Special Master's first requests for documents, served in May 2017, ████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████.[77] Even

after counsel specifically mentioned the claims administration process resulting in the actual

ERISA trading volume at oral argument on April 13, 2018, the Special Master did not pursue it.

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████

State Street—not Customer Class Counsel—supplied the FX trading volume data used in

this case.  *See* Omnibus Decl., 9/15/16, at ¶ 131 (SM Ex. 3) ("A.B. Data will calculate each

Settlement Class Member's Recognized Claim using information **supplied by State Street**")

(emphasis added), ¶ 132 ("The Plan is based on transaction data **maintained by State Street**")

(emphasis added), ¶ 133 ("The parties have relied on Indirect FX Trading Volume information

**provided by State Street** to develop this Plan of Allocation") (emphasis added); ████████

---

[77] █████████████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████

█████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████. Over the course of the

mediation process, State Street provided updated versions of their FX trading data to all parties.

As State Street refined its process, the data reflected incremental changes.

During the spring of 2015, while the parties were engaged in mediation and closing in on

settlement, State Street informed Customer Class Counsel and ERISA Counsel that the estimated

ERISA volume was approximately $79.8 billion—or approximately **9.11** % of the total trading

volume of $875.7 billion. ██████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██[79] Accordingly, when the parties reached an agreement in principle to settle this case at the

end of June 2015, ERISA Counsel knew that the ERISA trading volume was estimated to be

approximately **9.11**%.  With the data supplied by State Street in hand, ERISA Counsel made an

informed decision to enter into a settlement in principle.

At that time, the ERISA trading volume was still an estimate—albeit an estimate based

on hard data analyzed and supplied by State Street—because, as Labaton stated in the Omnibus

---

[78]    The email thread extends to June but the cited email was sent in March.  The term "SSH" used in this email stands for "Securities Settlement and Handling," and refers to Indirect FX transactions relating to purchases and sales of foreign securities.  "AIR" stands for "Automated Income Repatriation," and refers to Indirect FX Transactions to repatriate dividend and income payments.  Omnibus Decl., 9/15/16, at ¶ 20 (SM Ex. 3).

[79]    As noted above, the Special Master did not request documents concerning the ERISA trading volume during the investigation.  Thornton attaches exhibits here to clarify misinformation in the record.  Thornton provides these documents pursuant to all protective orders and confidentiality agreements applicable to the Special Master's investigation and to the underlying litigation.

Declaration filed with the fee petition, the Group Trusts' transaction volume attributable to

ERISA funds had yet to be determined.  *See* Omnibus Decl., 9/15/16, at ¶ 135 (SM Ex. 3)

("ERISA Plans and eligible Group Trusts represent approximately 9%-15% of the total Indirect

FX Trading Volume, **depending on what portion of the Group Trusts' volume actually falls**

**under ERISA**.") (emphasis added).[80]  The Omnibus Declaration explained the process by which

Labaton and third-party settlement administrator A.B. Data would seek this information about

the Group Trusts and make the final calculations.  *Id.* at ¶¶ 137-50.  This process included: (1)

requiring the Group Trusts to submit certifications detailing their ERISA fund percentages; and

(2) working with the Department of Labor, which has independent knowledge of certain Group

Trusts with ERISA volume, to ensure that Group Trusts that failed to provide certifications

would be included.  *Id.* at ¶¶147-49.

As of June 2018, this two-step process of determining the absolute final ERISA trading

volume is nearly complete.  The first step (obtaining certifications) was completed last year.

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████.[81]

The remaining work (obtaining confirmatory volume information from the Department of

Labor for Group Trusts that failed to submit mandatory certifications) is still ongoing.  While

this cleanup effort with the Department of Labor could cause an adjustment to the ERISA trading

volume, it is unlikely to have a significant effect, and certainly nowhere in the range of 3% to

---

[80] ████████████████████████████████████████████████████████████████████

████████████████████████████████

[81] The A.B. Data spreadsheet containing this information is subject to a non-disclosure agreement between A.B.
Data and State Street, which the Court may order State Street to disclose.

5%—the increase that would be necessary to bring the trading volume within the "actually 12-15%" figure on which the Special Master relies.  Contrary to the Special Master's assertion that the ERISA trading volume is between 12-15% of the overall trading volume, the volume is "actually" between 9% and 10%, which, if one compares percentage of volume to percentage of fees,[82] is *less than,* or at least very closely commensurate with, the percentage of attorneys' fees that ERISA Counsel received.  Accordingly, a "reallocation remedy" is not needed to bridge any gap between ERISA Counsel's fees and the ERISA trading volume, and such reallocation would be unjustified.

Finally, it is worth noting that the suggestion that ERISA Counsel would have agreed to (and agreed not to revisit) a 9% fee agreement when they believed the ERISA trading volume to be approximately 12-15% is difficult to square with their obligations to their clients.  ERISA Counsel's fees were derivative, directly or indirectly, of the result they helped achieve for their clients.  The $60 million share of the settlement recovery for ERISA plaintiffs was based on the ERISA trading volume.  The fact that the Department of Labor insisted on a premium that caused ERISA's share of the *settlement* to be 20% would not excuse ERISA Counsel's acceptance of a $60 million share if they truly thought the ERISA volume was higher.  If ERISA Counsel believed that the ERISA trading volume had increased over time by 33 to 60 percent (*i.e.,* from approximately 9% to 12-15%), surely they would have been obligated to demand additional settlement funds for the ERISA plaintiffs, even setting aside the issue of their own fees.

---

[82] This is in and of itself a problematic comparison, as it presumes that ERISA Counsel was solely responsible for the ERISA funds' recovery, and therefore entitled to attorneys' fees on a one-to-one basis.  To the contrary, the Customer Class Counsel's work on the case—including, of particular note, its development of the damages theory—contributed significantly to the result for the ERISA plans.  This also wrongly presumes that the Customer Class's claims did not cover ERISA funds, a question never resolved because the court never ruled on State Street's motions to dismiss the ERISA complaints.

**B.      The Special Master's Finding That The $10.9 Million "Fee Cap" Applied To ERISA Counsel's Fees Only Is Wrong**

In quantifying the "reallocation remedy" he asserts ERISA Counsel deserves, the Special Master references the $10.9 million "fee cap" imposed by the Department of Labor.  R&R at 85. In recommending that ERISA Counsel receive reallocated attorneys' fees, the Special Master concludes that those fees should be in the amount of $3.4 million because that number "reflects the difference between the $10.9 million that was allocated as a cap for ERISA attorneys in the Settlement Agreement and the $7.5 million which the ERISA attorneys actually received."  Exec. Summ. at 51; R&R at 368-69.  This is a faulty conclusion based on the Special Master's incorrect and unsupportable finding that "$10.9 million [] was allocated as a cap for ERISA attorneys in the Settlement Agreement."  *Id.*

Contrary to the Special Master's assertion, the purpose of the cap was to limit the amount that could be deducted from the ERISA portion of the settlement for attorneys' fees of any kind, not only ERISA Counsel's fees (the Department of Labor's intention being to limit deductions from the ERISA class's share of the recovery). [83]  As with the trading volume issue, discussed

---

[83]


above, attorneys for the Customer Class Counsel attempted to clear up the Special Master's

misunderstanding when it became clear during the investigation that the Special Master thought

ERISA Counsel received $7.5 million pursuant to the parties' agreement, but was entitled to up

to $10.9 million.  The Special Master's findings in the Report show that this misunderstanding

persists, and it now underpins the Special Master's conclusion that ERISA Counsel is entitled to

an additional $3.4 million in fees.

Documents filed with the Court both pre-and post-settlement confirm that the $10.9

million cap applied to *all plaintiffs' counsel's* fees, not just ERISA Counsel's fees.  The issue

was how much in attorneys' fees could be paid out of the **ERISA portion of the settlement**—

not how much money was going to Customer Class Counsel versus ERISA Counsel.[84]  Of note:

- The Stipulation and Agreement of Settlement filed with the Court on July 26, 2016 ("Settlement Stipulation"), which the Special Master includes as exhibit 75 to his Report makes this even more clear.  The Settlement Stipulation states: "Except with respect to the amount of **Plaintiffs' counsel's attorneys' fees chargeable to the ERISA Plans**,…." Settlement Stipulation, 7/26/16, at ¶ 24 (SM Ex. 75) (emphasis added).

- The Plan of Allocation, which is set forth in full in the Notice to the Class dated August 10, 2016, states that "[N]o more than $10,900,000 in fees can be paid out from the ERISA Settlement Allocation[.]"  Notice to Class, 8/10/16, at 11 (SM Ex. 81).  In the Report, the Special Master characterizes this portion of the Notice as follows: "**Recipients were also told that attorneys' fees for ERISA counsel would not exceed $10.9 million**, and they were told how fees for the other counsel would be computed 'if the Court awards the total amount of fees that Lead Counsel intends to request.'"  R&R at 277 (emphasis added).  This is plainly untrue; nowhere does the Notice inform recipients that attorneys' fees for ERISA Counsel would not exceed $10.9 million.

- The Omnibus Declaration filed by Labaton in support of the attorneys' fees motion on September 15, 2016 states that ERISA Plan and eligible Group Trusts class members will be allocated $60 million "minus," *inter alia,* "attorney's fees, if awarded by the Court, in

---

[84] ██████████████████████████████████████████
██████████████████████████████████████████████
██████████████████████████

an amount not to exceed $10,900,000."  *See* Omnibus Decl., 9/15/16, at ¶ 134 (SM Ex. 3).

If the above documents leave any room for confusion about which "attorneys' fees" the cap

pertains to, the Term Sheet, executed by all counsel in September 2015, ███████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████

      ██████████████████████████████████████

      ████████████████████████████████████████

      ████████████████████████████████████████

      ██████████████████████████████████

      ████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████  Therefore, "Plaintiffs' Counsel" logically means both Customer Class

Counsel and ERISA Counsel and, indeed, ████████████████████████████

█████████████████████████████

During his deposition, David Goldsmith, the Labaton attorney who presented the

settlement plan and request for attorneys' award to the Court, stated that the cap applied to "all

counsel's fees":

> Q [MR. HEIMANN]: The Department of Labor also negotiated a cap of some 10.9 million dollars on the fees to be charged against the 60-million-dollar amount that they had negotiated for the ERISA class members, correct?

> A [MR. GOLDSMITH]: Correct.

> Q. And did that negotiated fee apply only to the settlement being allocated to the ERISA plan -- excuse me. Let me begin again. **Did that cap on the fee apply only to the ERISA counsel's fees?**

> A. **No.**

> Q. **Did it apply to all counsel's fees?**

A. **Yes.**

Goldsmith Dep., 9/20/17, at 254:13-255:2 (SM Ex. 42) (emphasis added).

ERISA attorney Carl Kravitz also tried to clear up the Special Master's and his counsel's

misunderstanding on this point:



There is no support for the Special Master's conclusion that the $10.9 million cap on

"attorneys' fees" meant that ERISA Counsel had been "allocated" $10.9 million in fees, but was

constrained by its agreement with Customer Class Counsel and had to accept a lesser amount

($7.5 million).  Exec. Summ. at 51; R&R at 368.  To the contrary, the key settlement and fee

documents—including the Plan of Allocation, Term Sheet, Notice, and Omnibus Declaration—

all confirm that the cap applied to fees sought by plaintiffs' counsel generally, not only ERISA

Counsel.  The Special Master's recommendation that a $3.4 million "reallocation remedy" be

given to ERISA Counsel is based on his fundamental misunderstanding of the cap, and is wholly

unjustified.

C.     **The Special Master Wrongly Concludes That Customer Class Counsel
        Sought To Prevent ERISA Counsel From Reviewing Documents And Omits**

**Testimony From ERISA Counsel That Directly Contradicts This Erroneous Finding**

To buttress his ultimate conclusion that ERISA Counsel was treated unfairly, and to further justify his suggested award of an additional $3.4 million to ERISA Counsel, the Special Master erroneously concludes that Customer Class Counsel somehow prevented ERISA Counsel from accessing documents produced by State Street in the litigation.  The Special Master's reason for drawing this conclusion is obvious—it is further "evidence" of his belief that Customer Class Counsel sought to put ERISA Counsel at a disadvantage.  It is also summarily contradicted, however, by testimony taken by the Special Master that is conveniently ignored in the Report.

Specifically, the Special Master finds that "ERISA Counsel were not provided with access to documents State Street had provided to the Customer Class" and that "[n]or were ERISA Counsel allowed access to the Customer Class's database."  R&R at 34.  The Special Master finds that this lack of access was a "manifest[ation]" of "internal tension" between the Customer Class Counsel and ERISA Counsel, for which proposition he cites the testimony of ERISA attorney Carl Kravitz.  R&R at 34, 46 n.29.  Notably, the discussion makes no reference to testimony from numerous other attorneys, including ERISA attorney Lynn Sarko, ████

████████████████████████████████████████[85]  Ignoring contradictory

---

[85] ████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██

████████████████████████████████████

████████████████████████████████████

████████████████████

testimony about the relationships of Customer Class Counsel and ERISA Counsel that does not fit his desired narrative, the Special Master concludes that ERISA Counsel did not have access to documents produced by State Street because Customer Class Counsel did not want ERISA Counsel to have access.

As with numerous other conclusions the Special Master makes in the Report, this is flatly contradicted by other deposition testimony taken by the Special Master during the investigation. The testimony of ERISA attorney Lynn Sarko dispels the Special Master's conclusion that Customer Class Counsel prohibited ERISA Counsel from accessing documents.  First, as to the Special Master's finding that "[n]or were ERISA Counsel allowed access to the Customer Class's database"—the obvious inference being that Customer Class Counsel *denied* ERISA Counsel access to its database—Mr. Sarko testified that sharing a document database would have been "totally unrealistic" for confidentiality, workflow, and other reasons.  Sarko Dep., 7/6/17, at 65:10-19 (SM Ex 28).  He further testified that it is common in large cases consisting of groups with differing interests, where one group might settle while another does not, for those groups to have separate databases so they can preserve their ability to access documents regardless of another group's actions.  *Id.* at 65:5-66:7.  On that point, Mr. Sarko explained that, in this case, ERISA Counsel's having a separate database, and thus having the ability to pursue the case even if the Customer Class settled, was an important consideration weighed by the Department of Labor during settlement negotiations.  *Id.* at 66:8-18 ("[T]hat was a selling point to them for them to settle the case, thinking that we were not just, you know, trailing along.").  Thus, the Special Master's strange finding that ERISA Counsel was not "allowed" access to the database maintained by Customer Class Counsel is squarely contradicted by Mr. Sarko's testimony, which the Report does not cite.

Lynn Sarko's deposition testimony also squarely negates any finding, conclusion, or inference that Customer Counsel inhibited ERISA Counsel's access to documents produced by State Street.  *See* R&R at 34.  ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████[86]  ERISA Counsel also received other documents and information from State Street's counsel, including trading volume data and analysis.

---

[86]    Nor did the Special Master request documents from Thornton concerning ERISA Counsel's discovery negotiations with State Street.



In addition to ERISA Counsel's own dealings with State Street and their own analysis of State Street's documents, Customer Class Counsel also shared work product with ERISA Counsel and participated in joint collaborative discussions.  *See, e.g.*, Sarko Dep., 7/6/17, at 114:15-25 (SM Ex. 28) (recalling "all counsel" meeting at which counsel came together to share

views of the case, and at which Michael Lesser of Thornton presented a PowerPoint

presentation); Kravitz Dep., 9/11/17, at 11:7-8 (SM Ex. 117) ("As the case wore on, we did work

closely with the customer class"); Kravitz Dep., 7/6/17, at 78:4-23, 95:13-96:20 (SM Ex. 21)

(recalling presentation and substantive discussions among counsel).

      The Special Master's findings regarding ERISA Counsel's access to documents, and the

accompanying inference against Customer Class Counsel, are plainly contradicted by record

evidence.  There is no factual basis for the Special Master to conclude that Customer Class

Counsel was trying to inhibit ERISA Counsel's ability to obtain or review documents.  This is an

important correction not only because the Special Master saw fit to make this finding in his

Report, but also because it underpins his broader conclusion that ERISA Counsel got a raw deal

at the hands of Customer Class Counsel, and therefore should receive $3.4 million in

"reallocat[ed]" fees—a figure that, for the reasons explained above, is based on a fundamental

misunderstanding of the fee cap imposed by the Department of Labor.

## IX.     The Recommendation That A Monitor Be Appointed Is Baseless

      As a final salvo, the Special Master recommends that an ethical monitor be imposed on

the Thornton Law Firm "to consult with them on professional conduct norms and to ensure that

they comply with those norms."  R&R at 373.  This recommendation is absurd.  What could a

consultant do to ensure "consistent ethical compliance" when there have been only unintentional

mistakes?  The answer is: nothing.

      The recommendation that Thornton engage a monitor—no doubt at its own cost— is

primarily premised upon the Special Master's conclusion that "[a]s to its **business development**,

Thornton lawyers appear to be largely unsupervised and unconstrained by the professional

conduct norms" and that such conduct is "**endemic** to the way [the Thornton Law Firm does]

business with their hyper-focus on business development and fee generation."  *See* R&R at 372-

73 (emphasis added).  There is no significant discussion of the Thornton Law Firm's "business development practices" anywhere in the Report.  This is simply another instance where the Special Master or his counsel, for whatever reason, impugn the reputation of an entire law firm with no apparent reason.[87]

Ultimately, the only conduct that the Special Master has "uncovered" with respect to the Thornton Law Firm is: (1) immaterial misstatements in a boilerplate affidavit used as a cross-check for an aggregate fee award; and (2) a potential lack of contemporaneous time records of two attorneys where the Special Master found that the time recorded was nonetheless "reasonable and sufficiently reliable."  R&R at 216.[88]  This sixteen-month, $3.8 million investigation (with its attendant reputational effect and the additional significant cost to the firm of defending itself) has no doubt reminded all attorneys of their responsibility to scrupulously avoid inadvertent errors in submissions to the Court.  While the Special Master's recommendations that the Thornton Law Firm establish more consistent procedures for recording

---

[87]  Of course, this is not the only place where the Report and Recommendations unfairly impugns the reputation of the Thornton Law Firm and its attorneys.  As an additional example, page 54 of the Report quotes a lengthy email from co-counsel which the Special Master characterizes as "warning Bradley not to include unwarranted hours in Thornton's fee petition."  The underlying email states, "I heard third-hand that Mike [Thornton] recently said on a call (that I wasn't on) that Thornton Law Firm was showing $14 million . . . . I am hopeful that Mike T simply misspoke or was guessing when he said $14 million and that we are not going to suddenly see an additional 12,000 hours mysteriously appear on Thornton Law Firm's behalf."  In the response, which does not appear in the Report, Michael Thornton replies, "I did say something like that on the call, but preceded it by saying **it was a guess** and that I would have to ask Mike Lesser for the actual figure at that point which of course is not complete as with the other firms." 8/30/15 Email, TLF-SST-031166 (SM Ex. 87) (emphasis added).  Nor does the Special Master include a subsequent email, ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████.  This later email was identified for the Special Master, ████████████████████████████████████, as was deposition testimony from co-counsel that "I think Mike Thornton may have simply been mistaken because that's not the number they ultimately reported." *Id.* (citing Chiplock Dep., 9/8/17, at 64:16-18 (SM Ex. 41)).  The Special Master was either recklessly inattentive or chose to ignore this evidence, publishing innuendo with a complete disregard for injuring the reputation of a highly respected member of the bar.

[88]  As additional evidence of the Special Master or his counsel's inattention, in one section of the Report, the Special Master finds that he cannot say whether or not the time records were contemporaneous and in another section states that the time records were not contemporaneous.  *See supra* § III(B)(ii).

time and setting billing rates are not in and of themselves unreasonable, they certainly do not justify "on-going ethics supervision," R&R at 373, and in fact do not even concern legal ethics. Imposing an ethics monitor on the Thornton Law Firm is a draconian recommendation that should be rejected because it is unfair, unjustified, and needlessly punitive.

## CONCLUSION

For the foregoing reasons, the Thornton Law Firm objects to the Special Master's factual and legal findings identified above.

Respectfully submitted,

Brian T. Kelly (BBO No. 549566)
Joshua C. Sharp (BBO No. 681439)
NIXON PEABODY LLP
100 Summer Street
Boston, MA 02110
Telephone: (617) 345-1000
Facsimile: (844) 345-1300
bkelly@nixonpeabody.com
jsharp@nixonpeabody.com

Dated: June 28, 2018                    *Counsel for the Thornton Law Firm LLP*

110

## <u>CERTIFICATE OF SERVICE</u>

I certify that the foregoing document and its exhibits will be filed conventionally on June 29, 2018 when the Clerk's office opens, as the Clerk's office will be closed by the time we are able to file the foregoing document and its exhibits tonight.  The foregoing document and its exhibits will be served on all counsel by electronic means on June 28, 2018.  A redacted version will be filed on ECF on June 28, 2018 and thereby delivered by electronic means to all registered participants as identified on the Notice of Electronic Filing.

Joshua C. Sharp