## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

**TRANSMITTAL DECLARATION OF JUSTIN J. WOLOSZ IN SUPPORT OF
LABATON SUCHAROW LLP'S OBJECTIONS TO
SPECIAL MASTER'S REPORT AND RECOMMENDATIONS**

I, Justin J. Wolosz, on oath, depose and say as follows:

1.      I am an attorney at Choate, Hall & Stewart, LLP.  I am one of the counsel of record representing Labaton Sucharow LLP in this matter.

2.      I submit this declaration for the sole purpose of transmitting true and accurate copies of documents in support of Labaton Sucharow LLP's Objections to Special Master's Report and Recommendations.  I have personal knowledge of the facts set forth in this declaration.

3.      Attached hereto as Exhibit A is a true and correct copy of an email from Lawrence Sucharow to Lynn Sarko dated August 28, 2015 (TLF-SST-O43022 – 043024).

4.      Attached hereto as Exhibit B is a true and correct copy of the Special Master Honorable Gerald E. Rosen's (Ret.) First Request for the Production of Documents to Labaton Sucharow LLP dated May 18, 2017. Attached hereto as Exhibit C is a true and correct copy of the Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP dated May 18, 2017. Both of these documents were served by email on May 18, 2017.

5.      Attached hereto as Exhibit D is a true and correct copy of a list of document requests and interrogatories that the Special Master struck in their entirety. One of the Special Master's attorneys handed this document to counsel for Labaton at a meeting on May 22, 2017.

6.      Attached hereto as Exhibit E is a true and correct copy of the Board of Bar Overseers, *Massachusetts Legal Ethic: Substance and Practice* (2017).

7.      Attached hereto as Exhibit F is a true and correct copy of *The New Massachusetts Rules of Professional Conduct: An Overview*, 82 Mass. L. Rev. 261 (1997), by Chief Justice Herbert P. Wilkins.

8.      Attached hereto as Exhibit G is a true and correct copy of the deposition transcript of Camille R. Sarrouf dated March 24, 2018.

9.      Attached hereto as Exhibit H is a true and correct copy of the fourth edition of *Ethical Lawyering in Massachusetts* § 1.1, MCLE, by James S. Bolan.

10.     Attached hereto as Exhibit I is a true and correct copy of *Attorney Fee Rules Undergo Revisions in Massachusetts* by Christina Pazzanese, published in Massachusetts Lawyers Weekly on January 12, 2011.

11.     Attached hereto as Exhibit J is a true and correct copy of a December 22, 2010 Order of the Supreme Judicial Court regarding SJC Rule 3:07.

12.     Attached hereto as Exhibit K is a true and correct copy of excerpts of the deposition of Professor Stephen Gillers, dated March 21, 2018.

13.     Attached hereto as Exhibit L is a true and correct copy of excerpts from the fifth edition of *Newberg on Class Actions*, Volume 5, chapters 15-17.

14.     Attached hereto as Exhibit M is a true and correct copy of 10-54 *Moore's Federal Practice - Civil* § 54,154 (2018).

15.     Attached hereto as Exhibit N is a true and correct copy of the Settlement Agreement in *In re: Heartland Payment Sys. Inc. Customer Data Security Breach Litigation*, No. 4:09-MD-2046, ECF 57 (S. D. Tex.) filed on December, 18, 2009.

16.     Attached hereto as Exhibit O is a true and correct copy of the Stipulation of Settlement in *Hartless v. Clorox Company*, No. 06-CV-02705, ECF 77 (S.D. Cal.) filed on May 21, 2010.

17.     Attached hereto as Exhibit P is a true and correct copy of the USCS Federal Rules of Civil Procedure Rule 23, including the 2018 Advisory Notes.

18.     Attached hereto as Exhibit Q is a true and correct copy of excerpts of the Advisory Committee on Civil Rules dated April 10, 2018.

19.     Attached hereto as Exhibit R is a true and correct copy of excerpts of the transcript of a hearing in the case *Arkansas Teacher Retirement System v. Insulet Corp.*, 1:15-cv-12345, ECF 120, before the Honorable Mark L. Wolf dated March 9, 2018.

20.     Attached hereto as Exhibit S is a true and correct copy of the Declaration of Peter Joy dated June 28, 2018.

21.     Attached hereto as Exhibit T is a true and correct copy of excerpts of the fifth edition of *Newberg on Class Actions*, Volume 5, Chapters 7-10.

22.     Attached hereto as Exhibit U is a true and correct copy of excerpts of the transcript of a hearing in the case *Arkansas Teacher Retirement System v. State Street Corp.,* before the Honorable Mark L. Wolf dated May 30, 2018.

23.     Attached hereto as Exhibit V is a true and correct copy of McTigue Law LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Second Supplemental Interrogatories dated October 6, 2017.

24.     Attached hereto as Exhibit W is a true and correct copy of Zuckerman Spaeder LLP's Answers to Special Master's Second Supplemental Interrogatories dated August 6, 2017.

25.     Attached hereto as Exhibit X is a true and correct copy of an email from Christopher Keller to Garrett Bradley dated May 23, 2011 (TLF-SST-033910 – 033913).

26.     Attached hereto as Exhibit Y is a true and correct copy of the Consolidated Response by Labaton Sucharow LLP, Lieff Cabraser Heimann & Bernstein LLP, and Thorton Law Firm LLP to Special Master's July 5, 2017 Request for Supplemental Submission dated July 31, 2017.

Signed under the penalties of perjury this 28th day of June 2018.

/s/ Justin J. Wolosz
Justin J. Wolosz

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to all counsel of record on June 28, 2018

/s/ Joan A. Lukey
Joan A. Lukey

# Exhibit A

# Redacted

# Exhibit B
# Redacted

# Exhibit C
# Redacted

# Exhibit D
# Redacted

# Exhibit E

# Massachusetts Legal Ethics: Substance and Practice

Draft:  December 2017

Copyright 2017, Massachusetts Board of Bar Overseers

The Board's goal in preparing this treatise is to make Massachusetts legal ethics and the disciplinary system readily accessible to members of the bar and to the public.  To this end, it has assembled the law on these topics in a single-volume reference work.

This PDF document is a draft of the treatise.  The Board is posting it on its web site at this time to make it available as it finalizes the volume.  The Board anticipates that a final version of the treatise will be published during 2018 in hard copy and as an e-book. Annual updates will keep this volume current.

This document is owned by the Board of Bar Overseers and intended for the education of the public.  Any reproduction or sale of this document without the express permission of the BBO is prohibited.

## Table of Contents

**Chapter 1:  A Brief History of Bar Discipline in Massachusetts** ………... 4

**Chapter 2:  The Actors in and the Structure of the Disciplinary System in Massachusetts** ……………………………………………………………10

**Chapter 3:  The Structure of the Disciplinary Process** …………..……….. 18

**Chapter 4:   Discipline: Grounds and Types**……………………………... 31

**Chapter 5:  Complaints, ACAP, Investigation, Stipulations**……………..55

**Chapter 6:  Adjudicative Proceedings Before the Board of Bar Overseers** ……………………………………………………………… 67

**Chapter 7:  Misconduct and Typical Sanctions** ....................................... 95

**Problems of Competence: Poor Work, Neglect, and Failure to Communicate with a Client (Rules 1.1, 1.2(a) and (c), 1.3, and 1.4)** …………………………… 95

**Problems of Confidentiality (Rules 1.6 and 1.9(c))** …………………………………………….. 115

**Allocation of Roles and Authority in the Attorney-Client Relationship (Rules 1.2, 1.4, 1.13, 1.14)** …………………………………………131

**Problems of Conflicts of Interest: Concurrent Conflicts, Successive Conflicts, and Business Transactions (Rules 1.7, 1.8, 1.9(a) and (b), and 1.10)** …………………………153

**Other People's Money (Rules 1.5, 1.15)** …………………………………………….. 181

**Candor to the Court and Third Parties (Rules 3.3, 4.1(a), 8.4(c))** ............................................................ 216

**Other Limits on Zealous Advocacy (Rules 1.2(d), 3.1, 3.2, 3.4, 3.5, 4.2, and 4.3)** ……………………. 242

**Law Practice Management**

**(Rule 1.17; Rules 5.1 through 5.7)** ………………………………… 270

**Advertising and Solicitation**
**(Rules 7.1 through 7.5)** ………………………………………….. 294

**Prosecutor Duties**
**(Rules 3.8, 4.2, and 4.3)** ………………………………………… 309

**Special Advocacy Duties**
**(Rules 3.6, 3.7, and 3.9)** ………………………………………… 319

**Chapter 8:  Mitigating and Aggravating Factors** ……………………. 326

**Chapter 9:  Post-Hearing Review** ………………………………… 344

**Chapter 10:  Reciprocal Discipline** ………………………………… 355

**Chapter 11:  Resignation and Disability Inactive Status** …………….. 366

**Chapter 12: Duties and Restrictions After Suspension**
**or Disbarment** …………………………………………………... 376

**Chapter 13:  Reinstatement: Standards and Procedures** ……………. 390

**Chapter 14:  Attorney Registration, Trust Accounts, and the Clients'**
**Security Board** ………………………………………………… 409

**Appendices:** ………………………………………………… 426

### A.    The Basics of Rule 1.5

Rule 1.5 expresses a straightforward obligation whose practical application can be remarkably ambiguous.  The rule provides that a lawyer's fees must not be clearly excessive or illegal.  It lists eight nonexclusive factors that help determine whether a fee is excessive or illegal.  Those factors primarily require that a lawyer's fees must not exceed the prevailing market for the kind of work the lawyer provides, but also take into consideration the lawyer's skill level, the nature of the tasks the lawyer must perform (including how long the work will take), the demands and particular needs of the client (including how urgent the matter is), and, significantly, whether the fee is fixed or contingent.[353]  Because those factors are not exclusive, other considerations may affect whether any given fee is permitted under the rule.  Rule 1.5 also regulates contingent fees with great specificity, as described in a later section.  The rule also prohibits a lawyer from "collect[ing] an unreasonable amount for expenses."[354]

Massachusetts requires that all fee arrangements as well as the scope of the representation be communicated to the client in writing, "except when the lawyer will charge a regularly represented client on the same basis or rate,"[355] or in single-meeting consultation, or when the engagement is for a total fee not exceeding $500.[356]  The writing requirement, promulgated in 2012, is different from the practice in most jurisdictions,[357] and a signature of the client is not required unless the arrangement is for a contingent fee.  Inclusion of the scope of the representation is not only required by the rule, but is essential for both parties' understanding of what the lawyer will address, and what she will not address, during the representation.  Recall that Rule 1.2(c) requires the client's informed consent if the objectives of the representation are to be limited.  The exception to the writing requirement for regular, repeated representation "on the same basis" most likely refers to arrangements where the lawyer offers services for a flat fee, discussed below.

One further aspect of Rule 1.5 deserves mention, because it is quintessentially a Massachusetts practice and tradition.  Unlike almost every other jurisdiction in the nation, Massachusetts permits an attorney's fee to be divided with a lawyer who does not practice in the firm of the primary lawyer (i.e., a referral fee), even if the referring lawyer does nothing more than refer the matter.[358]  The rules in most jurisdictions, however, provide that a lawyer may not pay a referring lawyer any fee unless the latter lawyer works on the matter or accepts responsibility for the representation, and even then the fee must be divided proportionately.[359]  The Massachusetts rule permits a pure referral fee, as long as the client knows in advance that the fee will be divided with the referring lawyer

---

[353]  Massachusetts Rules Prof. Conduct 1.5(a)(1)–(8).
[354]  Rule 1.5(a).
[355]  Rule 1.5(b)(1).
[356]  Rule 1.5(b)(2) ("The requirement of a writing shall not apply to a single-session legal consultation or where the lawyer reasonably expects the total fee to be charged to the client to be less than $500.").
[357]  The ABA's Model Rule, which most jurisdictions follow, states that the fee basis shall be communicated "preferably in writing."  *See* Model Rules of Prof. Conduct 1.5(b).
[358]  Rule 1.5(e).
[359]  *See* Model Rules of Prof. Conduct 1.5(e).

and the client consents to the joint participation in writing, and as long as the total fee charged to the client is reasonable.

While a discussion of the provisions of Rule 1.5 as it pertains to the requirements of contingency fee agreements is beyond the scope of this treatise, the Office of the Bar Counsel has written several articles on fee agreements in general and contingency fee agreements in particular, which are available on its website.[360]

Other topics of interest to lawyers arising from Rule 1.5 concern payments in kind, and measures taken by lawyers to secure payments due in the future. These issues will be addressed in Part II.C.(4) below, along with more in-depth discussion of the requirements of a reasonable fee and a proper contingent fee.

### B.   Discipline for Violation of Rule 1.5

> **You Should Know**
>
> A lawyer who charges a client a clearly excessive fee typically receives a public reprimand. The discipline for a lawyer who charges a clearly excessive fee while misleading the client is a term suspension. On occasion, when a lawyer has refunded the excess fees and the client suffers little harm, the lawyer may receive an admonition. Disbarment has not been imposed for violation of Rule 1.5 alone.

### 1)   Disbarment

If a lawyer intentionally charges or collects fees for work not actually performed it may be viewed as equivalent to misappropriation, or theft, of a client's funds. The presumptive sanction for misappropriation of client money is disbarment or indefinite suspension.[361] Ordinarily, charging a client a clearly excessive fee is not treated in the disciplinary reports in the same fashion as misappropriation of client funds or property.

> **You Should Know**
>
> In *Matter of Schoepfer*, the SJC established the following presumptive sanctions for misappropriation of client funds, which an excessive fee might represent:
>
>      If . . . an attorney intended to deprive the client of funds, permanently

---

[360]  *See, e.g.,* Nancy E. Kaufman & Constance V. Vecchione, *The Ethics of Charging and Collecting Fees*, https://bbopublic.blob.core.windows.net/web/f/ethicsfees.pdf (2015); Constance V. Vecchione, *FAQs: Mass. R. Prof. C. 1.5(b) and Written Fee Arrangements*, https://bbopublic.blob.core.windows.net/web/f/FAQs%201.5(b).pdf (2013); Constance V. Vecchione, *Write It Up, Write It Down: Amendments to Mass. R. Prof. C. 1.5 Require Fee Arrangements to Be in Writing* https://bbopublic.blob.core.windows.net/web/f/WriteItUp.pdf (2012); Constance V. Vecchione, *Fees and Feasibility: Amendments To Mass. R. Prof. C. 1.5 on Fees*, https://bbopublic.blob.core.windows.net/web/f/Fees2011.pdf (2011).
[361]  Matter of Schoepfer, 426 Mass. 183, 185-188 & n.2, 13 Mass. Att'y Disc. R. 679 (1997).

> or temporarily, or if the client was deprived of funds (no matter what the attorney intended), the standard discipline is disbarment or indefinite suspension.[362]

In *Matter of Goldstone*,[363] the attorney charged and collected an excessive fee from his client, a national retailer, by intentionally and in bad faith charging fees to which he was not entitled.  The corporation sued the lawyer for breach of contract and won a judgment against him.[364]  Relying on the facts established conclusively in the civil action, the SJC disbarred the lawyer.  The Court wrote, "[The respondent] intentionally overbilled and collected from his client hundreds of thousands of dollars in fees and costs to which he was not entitled, on both closed and active cases.  Where an attorney lacks a good faith belief that he has earned and is entitled to the monies, such conduct constitutes conversion and misappropriation of client funds."[365]  In *Matter of Smith*,[366] decided soon after *Goldstone*, an attorney filed an affidavit of resignation after Bar Counsel charged him with charging his client excessive fees.  The attorney charged a widowed, elderly client a total of $60,000 for services that had a maximum value of $7,500.  The single justice accepted his resignation.  While many lawyers have been disbarred for intentional misappropriation of client funds held by the lawyers, *Goldstone* and *Smith* represent disciplinary matters where the bad faith charging of an excessive fee led to a disbarment.[367]

On other occasions, lawyers have been disbarred for misconduct involving excessive fees, although always with other serious misconduct as well.  In *Matter of Pepyne*,[368] the single justice accepted the respondent's affidavit of resignation after reviewing six separate instances of misconduct, several of which involved the lawyer's imposing liens or accepting fees to which he was not entitled.  He also neglected matters, was held in contempt of court, and was convicted of an unrelated crime.  In *Matter of O'Connor*,[369] the single justice disbarred a lawyer for misconduct involving his collecting a higher fee in a worker's compensation matter than that provided for in the settlement and misleading his client about the true fee.  He also engaged in separate misconduct where he neglected a matter and lied to his client about his carelessness.

---

[362] 426 Mass. at 185–188 & n.2 (*citing* Matter of the Discipline of an Attorney, 392 Mass. 827, 836-837 (1984)).

[363] 445 Mass. 551, 21 Mass. Att'y Disc. R. 288 (2005).

[364] *See* Sears, Roebuck & Co. v. Goldstone & Sudalter, P.C., 128 F. 3d 10 (1st Cir. 1997) (confirming that the attorney bears the burden of proof in a controversy with a client to establish that his fees were reasonable).

[365] 455 Mass. at 566.

[366] 21 Mass. Att'y Disc. R. 609 (2005).

[367] In Matter of Pomeroy, 26 Mass. Att'y Disc. R. 515 (2010), the respondent was retained by an elderly client to liquidate several bank accounts and turn the proceeds over to him.  The lawyer converted over $812,000.  When her conduct was discovered, she initially claimed this represented a contingent fee she was owed for these services.  She later fabricated documents to conceal her activities.  Ultimately the respondent submitted an affidavit of resignation and was disbarred.  *See* Matter of Pomeroy, and 25 Mass. Att'y Disc. R. 507 (2009) (temporary suspension).

[368] 26 Mass. Att'y Disc. R. 502 (2010).

[369] 26 Mass. Att'y Disc. R. 458 (2010).

**You Should Know**

There is a difference between a *clearly excessive* fee and an *illegal* fee.  An illegal fee is a fee not allowed by the contractual or regulatory terms under which the lawyer is to be paid, even if the actual amounts charged would not be deemed "clearly excessive."  Lawyers have been disciplined under Rule 1.5 for charging an illegal fee in a workers' compensation matter[370] and a criminal defense matter,[371] among others.

## 2)      Suspension

The lawyers who have been suspended for violating Rule 1.5 typically have overcharged a client intentionally, with some misrepresentation about the fee.  For instance, in *Matter of Beaulieu*,[372] an attorney was suspended for four years and had to make restitution before submitting an application for reinstatement.  The attorney billed the Committee for Public Counsel Services for his legal services and violated Rule 1.5(a) by submitting inaccurate and grossly inflated reports of his hours.  In a recent disposition that ought to be of considerable interest to many private firm lawyers, *Matter of Murphy*,[373] an attorney was suspended for a year and a day where, in order to increase his billable hours, he knowingly spent more time on client matters than necessary.  The attorney, an associate in a law firm, earned an annual salary with a bonus tied to his billings.  The attorney billed his clients for extra hours when he should have delegated tasks to lawyers of lesser seniority, and for tasks that were duplicated and billed by others in his firm.[374]

In *Matter of Rafferty*,[375] the single justice imposed a four-month suspension on an attorney, with reinstatement conditioned on his passing the MPRE and making restitution, after he intentionally complied with the questionable instructions of his wealthy and overzealous client, litigating her matter excessively and collecting from her fees of $700,000.  The fees were far in excess of any amount she could reasonably hope to win in the lawsuit.  Because the lawyer collected an excessive fee through his failure to restrain his client's unreasonable litigation desires, the single justice determined that his

---

[370] *O'Connor, supra.*

[371] Matter of Serpa, 30 Mass. Att'y Disc. R. 358 (2014).

[372] 29 Mass. Att'y Disc. R. 33 (2013).

[373] 28 Mass. Att'y Disc. R. 643 (2012).

[374] The misconduct present in *Matter of Murphy* has been, by many accounts, a very common phenomenon within competitive firm law practice, where associates experience intense pressure to meet billable hour quotas and partners encounter similar incentives to report high hours.  For a discussion of this problem, see, e.g., Susan Saab Fortney, *Soul for Sale: An Empirical Study of Satisfaction, Law Firm Culture, and the Effects of Billable Hour Requirements*, 69 UMKC L. REV. 239 (2000); Lisa G. Lerman, *Blue-Chip Bilking: Regulation of Billing and Expense Fraud by Lawyers*, 12 GEO. J. LEGAL ETHICS 205 (1999); Christine Parker & David Ruschena, *The Pressures of Billable Hours: Lessons From a Survey of Billing Practices Inside Law Firms*, 9 U. ST. THOMAS L.J. 619 (2011); William G. Ross, *Kicking the Unethical Billing Habit*, 50 RUTGERS L. REV. 2199 (1998).

[375] 26 Mass. Att'y Disc. R. 538 (2010).

sanction ought to be higher than the presumptive sanction for charging excessive fees, which would have been a public reprimand.

In *Matter of Beatrice*,[376] the respondent was suspended for two years for several instances of misconduct, including entering into and collecting a contingent fee in a criminal case. And in *Matter of Landry*,[377] the respondent was suspended for nine months after charging, and suing to collect, an excessive contingent fee for representation regarding the sale of corporate stock. The respondent also misled his client about the propriety of a contingent fee arrangement in that type of representation.[378]

### 3)   Public Reprimand

"The typical sanction for charging an excessive fee is a public reprimand."[379] Many lawyers have received public reprimands for violating Rule 1.5, either after charging an hourly fee or where the arrangement involved a contingent fee arrangement. The most prominent SJC treatment of the discipline for an excessive fee has been *Matter of Fordham*,[380] discussed in more detail below. In *Fordham*, the SJC imposed a public reprimand for the respondent's having charged his unsophisticated client a clearly excessive fee (despite providing very high quality, and successful, legal services, and despite the fact that the excessive fee was not actually collected).

Other recent matters in which the lawyer received a public reprimand for violating Rule 1.5 include *Matter of Henry*,[381] where an attorney was reprimanded after representing a husband and wife in their petition to partition a two-family duplex. The attorney charged the clients more than $91,000, while the total reasonable amount, according to the Fee Arbitration Board, was $35,000. In *Matter of Tierney*,[382] an attorney received a public reprimand because the fees she charged and collected were disproportionate to the size and value of the estate on which she worked. The net proceeds from the real estate in question amounted to less than $98,000, and the attorney charged $22,500 for her work on the estate, which the Board concluded was clearly excessive under the circumstances.

---

[376] 14 Mass. Att'y Disc. R. 56 (1998).

[377] 31 Mass. Att'y Disc. R. ___, 2015 WL 10322929 (2015).

[378] *See also* Matter of Gibson, 27 Mass. Att'y Disc. R. 396 (2011) (single justice order suspending the respondent indefinitely, without reference to Rule 1.5, after the respondent entered into a grossly unfair contingent fee agreement, and misappropriated the funds held).

[379] Matter of Rafferty, 26 Mass. Att'y Disc. R. 538, (2010). The ABA model standards for discipline apply a more flexible approach. Those standards recommend varying sanctions for "unreasonable or improper fees," depending on the mental state of the lawyer and the harm caused to the client. *See* ABA MODEL STANDARDS FOR IMPOSING LAWYER SANCTIONS § 7.0 – 7.4 (2012).

[380] 423 Mass. 481, 12 Mass. Att'y Disc. R. 161 (1996), cert. denied, 519 U.S. 1149 (1997). Fordham charged but did not actually collect a clearly excessive fee. However, since then Bar Counsel has stipulated to public reprimands in cases where lawyers have both charged and actually collected clearly excessive fees, when the lawyer has made restitution. *See, e.g.,* Matter of Chignola, 25 Mass. Att'y Disc. R. 112 (2009) (restitution and other factors in mitigation); Matter of Olchowski, 24 Mass. Att'y Disc. R. 520 (2009) (restitution).

[381] 28 Mass. Att'y Disc. R. 450 (2012).

[382] 28 Mass. Att'y Disc. R. 850 (2012).

Lawyers who have failed to document a contingent fee in writing have usually received admonitions, as discussed below.  There have been instances when the lawyers have received public reprimands, but in each case the lawyer also committed separate misconduct.  (Indeed, in each case Bar Counsel seemingly would not have known of the absence of a written agreement but for the separate misconduct.)  For example, in *Matter of Carroll*,[383] the respondent neglected a contingent-fee matter for which there was no written fee agreement, and caused the client's case to be time-barred through his lack of diligence, among other things. He received a public reprimand.  In *Matter of Kelleher*,[384] the attorney ignored a previous lawyer's claim to a share of contingent-fee proceeds, and also did not prepare a written contingent fee agreement.  In *Matter of Faria*,[385] the lawyer received a public reprimand after he entered into an oral contingent fee agreement, neglected the matter, and was responsible for the dismissal of the client's case.  He had previously received an admonition for neglect, including missing a statute of limitations.[386]

### 4)      Admonition

On occasion, lawyers who charged excessive fees or otherwise violated Rule 1.5 have received only an admonition.  The admonitions tend to appear where the misconduct was not intentional and the client suffered little or no harm.  For example, in AD 00-78,[387] the respondent charged his client, an elderly woman for whom he served as trustee, legal services rates for assistance that did not require legal skills.  Because the lawyer "ha[d] also taken very good care of the client over the years that he has been her trustee" and made restitution to the trust, he received only an admonition.  In AD 09-02,[388] an attorney failed to execute a written contingent-fee agreement with the client, leading to disagreement about its terms.  The lawyer also offered less-than-competent services to the client, but made full amends to remedy any potential harm.[389]  In AD 06-02,[390] the attorney charged his client for services that were unnecessary and redundant.  He made

---

[383]  28 Mass. Att'y Disc. R. 130 (2012). *See also* Matter of Kelleher, 26 Mass. Att'y Disc. R. 281 (2010) (attorney also faced public reprima*nded* for *conduct including* not having a written contingent fee agreement); Matter of Foley, 25 Mass. Att'y Disc. R. 207 (2009) (attorney faced three-month suspension, stayed for one year under probationary conditions, for, among other violations, entering into a contingent fee agreement without a written fee agreement).

[384]  26 Mass. Att'y Disc. R. 281 (2010).

[385]  25 Mass. Att'y Disc. R. 201 (2009).

[386]  *See also* Matter of Neal, 19 Mass. Att'y Disc. R. 330 (2003) (public reprimand for misconduct including failing to maintain a copy of the contingent fee agreement).

[387]  17 Mass. Att'y Disc. R. 563 (2000).

[388]  25 Mass. Att'y Disc. R. 655 (2009).

[389]  For a similar, if perhaps more surprising, example, see AD 08-18, 24 Mass. Att'y Disc. R. 895 (2008) (no written contingent fee agreement, plus neglect leading to dismissal of client's case; successor counsel obtained reversal of the dismissal, so ultimately no substantial harm to the client).  *Compare* AD 00-12, 16 Mass. Att'y Disc. R. 467 (2000) (admonition solely for failure to have contingent fee agreement in writing).

[390]  22 Mass. Att'y Disc. R. 848 (2006).

restitution of the fees to which he was not entitled.  In AD 04-05,[391] the attorney received an admonition after calculating his contingent fee on amounts (personal injury protection (PIP) benefits) that were not contingent at all.  The attorney refunded that portion of his fee after his client filed a complaint with the Office of the Bar Counsel.  Other examples of a similar nature exist in the disciplinary reports.[392]

In AD 99-58,[393] a lawyer received an admonition for failing to disclose to a client his receipt of a referral fee, in violation of DR 2-107(A)(1), the predecessor to Rule 1.5(e).  The lawyer had referred a matter, received a contingent fee, but neither he nor the lawyer to whom he referred the matter disclosed the arrangement to the client.

In *Matter of the Discipline of an Attorney*,[394] the Supreme Judicial Court declined to admonish a lawyer for including in his contingent-fee agreement a provision stating that if the attorney were discharged prior to the conclusion of the representation, the attorney would be compensated for the fair value of his services or one third of any settlement offer that had been made at the time of discharge, whichever was greater. Because this specific provision could result in fee that exceeded the fair value of the work and could discourage the client from discharging the lawyer, the Court doubted whether a contingent-fee agreement should contain any such provision.  But because the respondent had neither charged nor collected an unreasonable fee based upon that contract, the Court concluded that discipline was not warranted.  (Because the respondent's conduct was not expressly prohibited by Rule 1.5, after that opinion the Court amended Rule 1.5 and included clause (6) of both versions of the Model Fee Agreement to limit such fees.) However, the SJC did admonish the lawyer for knowingly misrepresenting to insurers on several occasions the existence of a statutory lien in his favor, and for failing to notify his client promptly about his receipt of funds payable to the client.

## C.   Other Fee Issues

### 1)   Determining Whether a Fee Is Clearly Excessive

Whether a lawyer's fee is "clearly excessive" cannot be determined formulaically. That determination calls for careful and nuanced judgment based on the many factors set forth in Rule 1.5(a).  Most discussions use *Matter of Fordham*,[395] described earlier in Section B.3, as a benchmark for that assessment.  In *Fordham*, an experienced and well-respected member of the Massachusetts bar with no history of any previous discipline received a public reprimand for charging a client an excessive fee for representation of a young man in a driving under the influence (DUI) criminal matter.  The lawyer succeeded in the goal of the representation, achieving an acquittal for the client.  The

---

[391]  20 Mass. Att'y Disc. R. 668 (2004).
[392]  *See* AD 06-06, 22 Mass. Att'y Disc. R. 855 (2006); AD 05-17, 21 Mass. Att'y Disc. R. 706 (2005); AD 03-32, 19 Mass. Att'y Disc. R. 577 (2003); AD 02-55, 18 Mass. Att'y Disc. R. 745 (2002); AD 02-50, 18 Mass. Att'y Disc. R. 732 (2002); AD 00-34, 16 Mass. Att'y Disc. R. 501 (2000).
[393]  AD 99-58, 15 Mass. Att'y Disc. R. 759 (1999).
[394]  451 Mass. 131, 24 Mass. Att'y Disc. R. 824 (2008).
[395]  423 Mass. 481, 12 Mass. Att'y Disc. R. 161 (1996) (public reprimand), cert. denied, 519 U.S. 1149 (1997).

parties stipulated that the lawyer had worked diligently every hour he billed, and had billed the client at an acceptable hourly rate.  However, the fee the lawyer charged (close to $50,000) was so far beyond what a typical DUI defense lawyer charged similar clients (almost never more than $10,000, according to even respondent's own experts) that it qualified as "clearly excessive."  The Court was also critical of the fact that the lawyer had charged his client for the time he spent learning an area of the law he did not previously know.  The Court wrote, "A client 'should not be expected to pay for the education of a lawyer when he spends excessive amounts of time on tasks which, with reasonable experience, become matters of routine.'"[396]

*Fordham* emphasizes the importance of the prevailing practices among lawyers in similar settings offering comparable services.  *Fordham* also makes clear that a lawyer may not charge a client for the lawyer's own education in the law if that extra effort results in an excessive fee.  In fact, however, in most of the discipline for violation of Rule 1.5, aside from contingent-fee matters, the lawyer charged fees for work that the lawyer never performed or performed poorly.

### 2)   Contingent Fees

Rule 1.5(c) addresses the topic of contingent fees with great specificity.  It is beyond the scope of this treatise to review in detail the logistics of charging and collecting a reasonable contingent fee.  Useful resources exist for Massachusetts lawyers who charge contingent fees.[397]  The requirements for continent fee agreements in Massachusetts are set forth in Rules 1.5(c) and (f), and Comments [3] and [3A]-[3D].  With few exceptions, a lawyer who charges a contingent fee in Massachusetts must enter into a written agreement signed by the lawyer and the client.  The agreement must contain several mandated provisions.  It must identify the contingency on which the fee award will be based, the rate used, whether the rate is based on the gross proceeds or the net proceeds after litigation expenses have been deducted, and whether the lawyer or the client will be responsible for those expenses.  In addition, in a relatively new provision, the agreement must address the question of how the lawyer will be paid, if at all, should the representation end before the matter resolves.  If the lawyer is a successor lawyer to a previous lawyer with a contingent-fee agreement who performed some work on the matter, the agreement must address who will pay the previous lawyer.[398]  If the agreement is silent, the successor lawyer will be responsible for the previous lawyer's fees.

The revised Massachusetts rule offers lawyers two template versions of a contingent-fee agreement, Form A, which has standard, default provisions, and Form B,

---

[396]  423 Mass. at 490 (quoting Matter of the Estate of Larson, 103 Wash.2d 517, 531, 694 P.2d 1051 (1985)).

[397]  *See, e.g.,* Timothy Dacey III, *Fee Agreements*, in ETHICAL LAWYERING IN MASSACHUSETTS, Chapter 5 (James Boland ed. 2009 and 2013 Supp.); Nancy E. Kaufman & Constance V. Vecchione, *The Ethics of Charging and Collecting Fees, at* h https://bbopublic.blob.core.windows.net/web/f/ethicsfees.pdf (2012).

[398]  The Supreme Judicial Court in 2009 sought comments on the question of how to allocate the responsibility for paying the discharged lawyer in a successful contingent fee matter, responding to an issue decided by the SJC a few years before.  *See* Malonis v. Harrington, 442 Mass. 692 (2004).

which offers elections for the lawyer to choose among certain provisions.  Lawyers are not required to use those template forms, but if they choose to proceed with a different agreement, the lawyers "shall explain those different or added provisions or options to the client and obtain the client's informed consent confirmed in writing."[399]  In *Matter of Diviacchi*,[400] the lawyer was suspended for twenty-seven months for using a non-conforming contingent fee agreement and not explaining its terms to the client, among much other misconduct.

Several SJC decisions articulated the principles to be applied when a client discharges a contingent-fee lawyer before the final resolution of the matter.  In *Salem Realty v. Matera*,[401] the SJC affirmed the Appeals Court determination that a discharged lawyer may not rely on the contingent fee agreement for his fees, but should be compensated on a *quantum meruit* basis for the value his work produced.  In *Malonis v. Harrington*,[402] the SJC decided on the facts before it that the successor lawyer was responsible to pay for the discharged lawyer's fees.  That decision triggered the ultimate revision to Rule 1.5 addressing the question of who will pay the discharged lawyer.  In *Liss v. Studeny*,[403] the Court rejected a lawyer's effort to collect a *quantum meruit* fee in a contingent fee matter after he withdrew from the case before it was concluded, and after the former client had lost at trial.  In so doing, the Court announced the general rule that there will be no *quantum meruit* recovery under contingent fee agreements when the contingency has not occurred, i.e., when the client has not obtained a recovery.[404]

### 3)      Changing the Fee Agreement with a Client

A lawyer may alter an existing fee agreement with a client by giving the client notice of such changes in writing.[405]  Most authorities agree that a lawyer may increase an hourly fee prospectively, or make comparable adjustments to the fee agreement, as time passes, as long as the client has received adequate notice of the change and the changes are reasonable and the fee agreement provides that the rates may be increased.[406]

---

[399]  Rule 1.5(f)(3).

[400]  475 Mass. 1013 (2016).

[401]  10 Mass.App.Ct. 571 (1980), *aff'd* 384 Mass. 803 (1981).

[402]  442 Mass. 692 (2004).

[403]  450 Mass. 473 (2008).

[404]  450 Mass. at 480–481.  The Court noted, however that it was not categorically prohibiting *quantum meruit* recovery where the contingency does not occur; particularly compelling circumstances might permit recovery.  The Court provided some indication of what such circumstances might be:  "[T]here is no evidence that Studeny used Liss's services without intending that the contingency occur.  That is, Studeny did not defeat Liss's reasonable expectation that he was using Liss's services to bring about the contingency on which Liss might be compensated."  *Id.* at 481.

[405]  Rule 1.5(b)(1) ("Any changes in the basis or rate of the fee or expenses shall also be communicated in writing to the client.").

[406]  *See* Restatement (Third) of the Law Governing Lawyers § 18(1)(a) (2000) (if a fee agreement or modification "is made beyond a reasonable time after the lawyer has begun to represent the client in the matter . . . the client may avoid it unless the lawyer shows that the contract and the circumstances of its formation were fair and reasonable to the client").  *See also* Restatement (Second) of Contracts § 89(a) (1981) (modification of an existing contract is enforceable without additional consideration only upon an unanticipated change of circumstances making a contractual task more onerous or more valuable, and the modification is fair and equitable).

In some circumstances, a material change to an existing contract might qualify as a business transaction between a lawyer and a client, triggering the requirements of Rule 1.8(a).[407]  For example, in *Matter of Weisman*,[408] an attorney renegotiated his fee agreement with his organizational client in the middle of the representation in a manner that the hearing committee found was neither fair nor was preceded by sufficient informed consent of the client.  That modification represented a business transaction with the client, and the respondent did not comply with Rule 1.8.  For that misconduct, and his mishandling of the fees he received, he was suspended for one year.

### 4)      Payment in Kind and Liens for Fees

Lawyers typically receive their compensation in the form of money, by cash, check, or credit card payment.  However a lawyer may receive payment in kind, subject to some restrictions.  As the Office of Bar Counsel has advised, "A lawyer may accept property instead of money as a fee, so long as the lawyer is not acquiring a proprietary interest in the subject matter of the litigation in violation of Mass. R. Prof. C. 1.8(j).  A fee paid in property may constitute a business transaction with a client and be subject to Mass. R. Prof. C. 1.8(a)."[409]  The ban on acquiring a "proprietary interest" in litigation means that a lawyer cannot accept ownership, aside from a contingent fee interest, in the property or matter that is the subject matter of the litigation for which the lawyer represents the client.  In the words of one authority, "the lawyer's interest in the case cannot be that of a co-plaintiff."[410]

In some settings, accepting property as a fee will qualify as a business transaction between the lawyer and her client, triggering the strict requirements of Rule 1.8(a).[411]  One common example of an attorney's fee being subject to the Rule 1.8(a) requirements

---

[407]  Note that while Rule 1.8(a), concerning business transactions between attorney and client, generally does not apply to the original fee agreement, *see* Matter of an Attorney, 451 Mass. 131, 139–140, 24 Mass. Att'y Disc. R. 824, 832-835 (2008), amendments to the fee agreement might fall within that rule.  *See* Kaufman & Vecchione, *supra* note 397, at 7 ("If an attorney . . . changes the fee agreement, this is a business transaction with a client and the lawyer must comply with the requirements of Mass. R. Prof. Conduct 1.8(a), including that the transaction must be fair and reasonable and understood by the client, the client must be given an opportunity to consult independent counsel, and the client must consent in writing.").  While this advice from the Office of Bar Counsel seems to indicate that *all* changes in a fee agreement require the protections of Rule 1.8(a), it seems very unlikely that a regular adjustment of an hourly fee rate made after a significant period of time would quality as a business transaction between a lawyer and her client, or that Bar Counsel would consider it as such.  *See also* Matter of Murray, 24 Mass. Att'y Disc. R. 483 (2008) (respondent charged with violation of Rule 1.8(a) after demanding changes to a contingent fee agreement; that count rejected by the hearing committee and the board).

[408]  30 Mass. Att'y Disc. R. 440 (2014).

[409]  Kaufman & Vecchione, *supra* note 397, at 7.

[410]  RONALD D. ROTUNDA & JOHN S. DZIENKOWSKI, LEGAL ETHICS: THE LAWYER'S DESKBOOK ON PROFESSIONAL RESPONSIBILITY § 1.8-10 (2012-2013 ed.) ("In other words, the client may not assign to the attorney part of his cause of action in a way that would allow the lawyer to prevent settlement.  The client cannot waive his right to decide when to settle litigation.").

[411]  According to Rule 1.8(a), a business transaction between an attorney and a client must be objectively fair, with all terms disclosed in writing, and the client must have the opportunity to consult with separate counsel, and must consent in writing to the transaction.

is when a lawyer accepts, as his fee, an award of stock in a corporate client.[412]  Lawyers may accept such an equity interest in the client as the fee,[413] but, in addition to complying with Rule 1.8(a), the lawyer must ensure that the resulting fee is reasonable.  In making that determination, the focus must be on the value of the stock at the time the transfer is made, not at a later time when the stock's value may be very different from what the parties had earlier predicted.[414]  The sanctions for violations of Rule 1.8 are discussed in Part IV Section II.D.

If a client does not pay a lawyer the fees owed for the work the lawyer performed in a matter that goes to litigation, the lawyer is entitled to a lien on the claim or the proceeds of the claim, pursuant to a Massachusetts statute,[415] a device sometimes known as an "attorney's lien"[416] or a "charging lien"[417]  If the relationship ends by the lawyer's withdrawing as counsel before final judgment, "[w]hether withdrawal works a waiver of the attorney's lien depends on whether the attorney had good cause to withdraw."[418]  A lawyer may not withhold a client's papers and other materials in order to collect a fee,[419] but in a matter that is not a contingency-fee case, may properly withhold work product for which the client has not yet paid the lawyer,[420] except when doing so "would prejudice the client unfairly."[421]

> **Practice Tip**
>
> The Office of Bar Counsel hears often from clients whose former lawyers refuse to return or transfer the client's file.  Most often, these matters resolve without formal proceedings through the intervention of Bar Counsel's Attorney and Consumer Assistance Program (ACAP).  The resolution inevitably includes the attorney's return of the file to the former client.

---

[412] *See, e.g.,* Rubin v. Murray, 79 Mass. App. Ct. 64 (2011).  For commentary about that practice, see John S. Dzienkowski & Robert J. Peroni, *The Decline in Lawyer Independence: Lawyer Equity Investments in Clients*, 81 TEX. L. REV. 405 (2002); Jason M. Klein, *No Fool for a Client: The Finance and Incentives Behind Stock-Based Compensation for Corporate Attorneys*, 1999 COLUM. BUS. L. REV. 330; Donald C. Langevoort, *When Lawyers and Law Firms Invest in Their Corporate Clients' Stock*, 80 WASH. U. L.Q. 569 (2010); Therese Maynard, *Ethics for Business Lawyers Representing Start-Up Companies*, 11 WAKE FOREST J. BUS. & INTELL. PROP. L. 401 (2011).
[413] Rubin v. Murray, 79 Mass. App. Ct. 64 (2011).
[414] *Id*., 79 Mass. App. Ct. at 75.
[415] G.L. c. 221 § 50.
[416] *See, e.g.,* Matter of King, 23 Mass. Att'y Disc. R. 352 (2007).
[417] *See, e.g.,* Boswell v. Zephyr Lines, Inc., 414 Mass. 241, 244 (1993).
[418] Phelps Steel, Inc. v. Von Deak, 24 Mass. App. Ct. 592, 594 (1987).  "A withdrawal occasioned by a breakdown in the lawyer-client relationship is sufficient reason for an attorney to remove himself from the case, and will leave the attorney's lien intact."  Bartermax, Inc. v. Discover Boston Multi-Lingual Trolley Tours, Inc., 71 Mass. App. Ct. 1107 (2008) (unpublished opinion).
[419] Rule 1.16(e).
[420] Kaufman & Vecchione, *supra* note 397, at 7; *see* Rule 1.16(e)(4) and (6).
[421] Rule 1.16(e)(7).

# Exhibit F

# The New Massachusetts Rules of Professional Conduct: An Overview

### BY CHIEF JUSTICE HERBERT P. WILKINS



*Herbert P. Wilkins is Chief Justice of the Massachusetts Supreme Judicial Court.*

On Jan. 1, 1998, the new Massachusetts Rules of Professional Conduct (Mass. R. Prof. C.) will become effective, replacing SJC Rule 3:07, the Code of Professional Responsibility (Code), that has been in effect since Oct. 2, 1972. The new rules, slow in coming, are the product of extensive discussion and comment by bar associations, lawyers' groups with interests in specific areas of practice, individual lawyers, the justices' Committee on the Rules of Professional Conduct (committee), and the justices themselves. Although the new rules have been adopted within the framework of the American Bar Association's Model Rules of Professional Conduct (rules), the new rules depart in significant respects from the model rules. In some instances, the new rules preserve language that appeared in the ABA Code of Professional Responsibility but the ABA eliminated in the model rules. In others, special Massachusetts provisions are included, some from the code as Massachusetts adopted it and others newly drafted.

## Background

It is an historical accident that Massachusetts came so late, compared to other states, to adopting its variation of the ABA model rules. It need not have been so, but an attempt more than ten years ago to have the justices proceed with the development of a Massachusetts version of the model rules foundered on a dispute over a seemingly innocuous provision in the model rules, a dispute that dominated the analysis. On Dec. 18, 1986, the Boston Bar Association petitioned the justices to amend SJC Rule 3:07 (Code) by substituting the ABA model rules. Among the model rules, in seeming innocence, was Rule 1.5 (e) which allows lawyers, not in the same firm to divide a reasonable fee only if (a) the client is advised and does not object or (b) the division of the fee is in proportion to

the services to be performed by each lawyer or, with the client's written agreement, each lawyer assumes joint responsibility for the representation. This provision differs considerably from the special Massachusetts code provision on the division of fees then in effect. That provision, DR 2-107 (A), permits the division of fees between or among lawyers not in the same law office, if the total fee is reasonable and if the client "consents to the employment of the other lawyer after a full disclosure that a division of fees will be made." The new Massachusetts rule does not explicitly require disclosure of the proportionate share of the fee to be taken by each lawyer.

The Massachusetts Bar Association and various other groups of lawyers expressed strong disagreement with the change that ABA Model Rule 1.5(e) would make. The major portion of many written comments submitted to the justices on the BBA proposal dealt solely with the division of fees issue. If the BBA had proposed continuation of DR 2-107 (A) in substitution for ABA Rule 1.5(e), the focus of discussion would have been different, and perhaps the justices would have appointed a committee in 1987 to recommend Massachusetts rules based in large measure on the ABA model rules.

On Feb. 29, 1988, after the justices had received numerous written submissions, a majority of the justices (Liacos, Abrams, Nolan, Lynch and O'Connor) denied both the BBA's request for an evidentiary hearing and the BBA petition itself. They concluded that it does not "seem likely the expenditure of time and effort involved in evidentiary and other proceedings to consider the model rules would result in any significant gain in the standards regulating the conduct of the Bar." At that time only 16 states had adopted rules based on the ABA model rules.

In disagreement, Chief Justice Hennessey and the author of this article saw "no reasonable basis for foreclosing further, intensive analysis of the model rules at this time." He and I noted that ABA Model Rule 1.5(e) had moved toward the Massachusetts position (DR 2-107 [A]) from the position stated in the ABA code. We suggested that the justices could simply stand by their present rule. We also noted that the format of the model rules was superior to that of the code and that there were "numerous areas covered by the model rules, not touched by the Code, that would

provide guidance to the bar, bar counsel and the Board of Bar Overseers." We predicted that a majority of the justices will remain opposed even to a detailed study of the rules, unless bar associations were to express an interest in moving toward adoption of the model rules.

There the subject stood for many years, in spite of the efforts to reopen the issue by the late Robert W. Meserve, former president of the ABA and the BBA, who had succeeded Robert J. Kutak as chairman of the Kutak Commission. The Kutak Commission had proposed the original draft of the model rules to the ABA. Meserve thought it ironic that his own state was unwilling even to consider the model rules that had been adopted, with modifications, in over forty jurisdictions.

Finally, in 1994, the justices changed their position. The Board of Bar Overseers requested that the justices adopt the model rules with Massachusetts amendments. The Board of Bar Examiners advised the justices that soon the multistate professional responsibility examination, taken by bar applicants, would be based solely on the model rules, ignoring the Code. The justices inquired of the MBA as to its position, indicating that the justices would agree in advance that they would make no substantive change in the rule governing the division of fees. The MBA agreed. By 1994 more than forty jurisdictions had adopted rules based on the ABA model rules.

After considerable delay and discussion, the study project, rejected in 1986, began in 1994 with the appointment of the Supreme Judicial Court's Committee on the Rules of Professional Conduct. The glacial reluctance of a majority of the justices to recognize the merits of the adoption of new professional conduct rules was, I thought, embarrassing. One benefit from the delay in the adoption of the ABA model rules, however, is that the committee was able to take advantage of accumulated comments on and criticisms of the ABA model rules.

## The Committee's Work

The committee was hardworking and meticulous. I had never served on a committee of such intellectual strength and sound judgment (except, of course, one made up exclusively of justices of my court). The committee had the practical experience of practicing lawyers, experience of persons dealing every day with disciplinary matters and an overview and independence of judgment from three nationally recognized legal scholars in the field of legal ethics. The MBA designated Elaine M. Epstein and Jeffrey L. McCormick as members. Until she was appointed to the United States Court of Appeals for the First Circuit, Sandra L. Lynch served as a BBA designated member. Thereafter, the Boston Bar Association was represented by Henry C. Dinger and John L. Whitlock, each of whom has an article in this edition of the *Massachusetts Law Review*. The justices also appointed Robert J. Muldoon Jr., who had had a major role on behalf of the BBA in

the abortive proposal to adopt the model rules ten years earlier. Michael Fredrickson, general counsel to the Board of Bar Overseers and Arnold R. Rosenfeld, bar counsel, added to the committee the experience of disciplinary enforcement. From law schools were Daniel R. Coquillette of Boston College Law School, Andrew L. Kaufman of Harvard Law School and Susan Koniak of Boston University School of Law. Justice Abrams was an ex officio member of the committee. In the last phase of the committee's work, Justice Lynch and Justice Abrams who, with me, then constituted the rules committee of the court attended all meetings of the committee.

Notably, and unavoidably, absent from the committee was a representative of the consumer. My sense, self-serving as it may be, is that the committee was particularly alert to the public interest when an issue involved tension between the interests of lawyers and the interests of clients or the public in general. Many controversial issues fell squarely in this area of tension.

The committee commenced its task with the careful consideration of each ABA model rule with the view toward the publication of disciplinary rules adapted to Massachusetts needs and preferences. The committee occasionally concluded that the language of an ABA model rule was not as good as it might be, but the merits of uniformity among jurisdictions was a major factor in the committee's decision making. The tendency to favor uniformity, known as the Coquillette rule (after the committee member who first articulated it), placed the burden of persuasion on any exponent of a departure from the rules, except as to provisions that were already in considerable disagreement among other jurisdictions.

The committee completed its task in the latter part of 1994 and submitted its report to the justices. In Feb., 1995, the rules were published for comment. The time for comment was criticized by some as being too short. However, the justices allowed more than four months for comments.

I could not be more proud of the response of the bar of the commonwealth. The quality of the comments that the justices received was outstanding. Committees of the MBA and BBA prepared comprehensive comment on the rules, made concrete proposals for changes and advanced reasoning on various rules that was new and helpful. Not surprisingly, uniformity within and among bar groups was not attained. Many issues were controversial.

Once the comments were received from the public (which was in fact comment from lawyers and lawyers' groups), the justices referred the comments to the committee. From Sept., 1995, through April, 1996, the committee met more often than monthly, reviewing each controversial or questioned point. At one stage, Professor Kaufman persuaded the committee that the introductory material to and comments on the ABA model rules could not be ignored. Much credit is due to a hardworking drafting subcommittee

on comments, consisting of Professor Kaufman, John Whitlock and Michael Fredrickson, that reworked the ABA comments and drafted special Massachusetts comments. In May, 1996, the committee delivered its second report to the justices containing the rules as further revised and the new comment sections. The committee pointed to (a) areas that required the particular attention of the justices, (b) subjects for a recommended public hearing, and (c) topics that required further attention. Because of the revisions, the justices once again put the committee's recommendations out for public comment and announced that there would be a public hearing on certain of the rules.

The committee had not been of one mind on several issues. The committee by a wide majority preferred ABA Model Rule 1.5(e), concerning the division of fees among counsel, over the rule in effect and continued in substance in new Rule 1.5(e). Professor Kaufman wrote forcefully to that effect in dissent to the adoption of new Rule 1.5(e). In varying degrees, the committee's practicing lawyer members were unhappy with limitations of Rule 1.10 screening procedures when a lawyer, personally disqualified, joins a law firm. The committee, by a majority, excluded screening as a permissible device when the personally disqualified (moving) lawyer had substantial involvement or substantial material information relating to the matter in which the new firm seeks to become an adversary of the former client. The sense was that a former client would not feel assured that its confidences would be protected in such a situation.

## The Hearing

The justices selected rules in four areas for comment at a hearir g on April 2, 1997. Because they were acting in an administrative capacity as justices, and not in an adjudicative one as a court, they did not wear robes at the hearing. For the same reason, I refer to rules action as taken by the justices and not by the court. The oral presentations were of a high quality, focused on intellectual concerns and not on emotional ones.

Rules were selected for the hearing if they concerned subjects as to which there was considerable controversy and as to which the justices were in doubt. A number of controversial provisions were not included on the agenda. For example, Rule 3.3(c) deals with the rare but difficult problem of what a criminal defense lawyer is to do when the lawyer knows that the client intends to testify falsely. There is no perfect answer to this problem. The committee was unanimous, however, in concluding that Rule 3.3(e), as ultimately drafted, was the best choice available. The justices agreed and decided that oral argument on the issue would not be beneficial.

I turn now to those rules that were the subject of the public hearing.

### Rules 1.6, 3.3 and 4.1.

Probably the most challenging and controversial subject the committee, and then the justices, faced was the treatment of the confidentiality of information received from a client. The debate centered on which client confidences a lawyer may disclose, must disclose and may not disclose. The relevant ABA model rules governing the disclosure of client confidences are stated in the three separate Rules — 1.6, 3.3 and 4.1. The committee resisted the temptation to consolidate all relevant confidentiality provisions in one rule and followed the format of the model rules.

Rules 3.3 and 4.1 contain mandates to disclose confidential client information. Rule 3.3 concerns a lawyer's duty to take remedial measures when material evidence that the lawyer knows to be false has been presented to a tribunal by a client, a witness on behalf of a client or the lawyer. This obligation is universal without regard to the content of the confidential information, except in the case of a criminal defense lawyer who is guided by Rule 3.3(e) when the lawyer knows that the client intends to lie or has lied.

The debate concerning Rule 1.6, the rule permitting disclosure in certain circumstances, centered on the expansion of a lawyer's right to disclose confidential information relating to the representation of a client without the client's informed consent. DR 4-101 (C) (3) allows a lawyer to reveal a client's intention "to commit a crime and the information necessary to prevent the crime," any crime. It is this provision on which the lawyer relied to disclose a client's intention to commit a crime that led to *Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109, 111 (1997). Rule 1.6(b) of the ABA model rules, however, limits the scope of the permissible disclosure to reasonably expected criminal conduct that is likely to result in death or substantial injury. This is the respect in which ABA Model Rule 1.6 is clearly more limited than DR 4-101 (C).

Under the new Massachusetts Rule 1.6(b), a lawyer's discretionary right to disclose confidential information is otherwise expanded beyond DR 4-101 (C). Rule 1.6(b)(1) allows the disclosure of confidential information to prevent reasonably anticipated fraudulent (as well as criminal) conduct that is likely to cause substantial injury to the property of another or to prevent the wrongful execution or incarceration of another. Rule 1.6(b)(3) allows a lawyer to reveal confidential information that the lawyer reasonably believes necessary "to rectify client fraud in which the lawyer's services have been used."

It was argued that these expansions of a lawyer's discretionary right to disclose confidential information would chill the relationship between lawyer and client. Clients, it was claimed, would be unwilling to reveal information for fear of its disclosure and lawyers would consequently not have all the information nec-

essary to give proper legal advice. A client who has used a lawyer to commit fraud (Rule 1.6[b][3]) hardly should be heard to complain if the lawyer undertakes to protect himself or herself from a charge of his or her culpatory involvement, or at least undertakes to limit any harm caused by the fraud. The addition to the list of wrongs threatened by a client that a lawyer may reveal serves the public interest and seems to be a modest addition to the right under DR 4-101 (C) (3) to reveal the reasonable likelihood that the client will commit a crime. In practical terms, the apparent expansion of the right to disclose that Rule 1.6(b) sets forth adds few circumstances to the previously authorized right to disclose reasonably expected future criminal conduct. The lawyer's right to disclose expected noncriminal fraud is a modest intrusion on lawyer-client relations that most clients would not perceive as significant. It would be difficult to defend to the public a professional rule that barred, or at least inhibited, the disclosure of the kind of expected or past conduct that Rule 1.6 permits.

## Rule 3.4.

The Code provided in DR 7-105 is that "[a] lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter." The ABA rules did not retain this provision, and the committee, after discussion and in disagreement, decided not to carry that prohibition over into the new rules. Proof that someone acted "solely" to obtain an advantage seemed problematic. The principle stated, however, is sound, except as it might apply to a government lawyer who has both criminal and civil weapons in his or her arsenal.

The justices received strong requests for the preservation of the substance of DR 7-105. The attorney general opposed retention. After hearing both sides, the justices largely, but perhaps not entirely, allayed the concerns of the attorney general and other government lawyers when they re-established the substance of DR 7-105 but provided in Rule 3.4(h) that the advantage that may not be improperly sought is one in a *private* civil matter.

Rule 3.4(h) expands on DR 7-105 by prohibiting filing or threatening to file disciplinary charges, as well as criminal charges, solely to obtain an advantage in a private civil matter.

## Rule 3.5(d).

Rule 3.5(d) is uniquely Massachusetts. It is carried over from DR 7-108 (D). The rule restricts lawyer access to a discharged juror, in a case with which the lawyer was connected, "without leave of court granted for good cause shown." It is ironic that the justices' decision in 1991 to adopt DR 7-108 (D) was made shortly after a case in which a lawyer's posttrial communication with a juror led to evidence that resulted

in a new trial for a convicted defendant. *See Commonwealth v. Solis*, 407 Mass. 398 (1990). The lawyer's communication with the juror would have violated our special DR 7-108 (D), if that disciplinary rule had then been in effect.

Chief Justice Liacos and I opposed the adoption of special Rule 3.5(d). The ABA Code provision (*See Commonwealth v. Solis, supra* at 403) barring communications merely to harass or embarrass a juror or to influence the juror's actions in future jury service, was in effect in Massachusetts at the time of the *Solis* opinion. That seemed to us adequate protection against a problem that had not been shown to exist. There are, however, arguments for such a rule. *Id.* at 403-404. Some Federal District Courts have (but, as far as I know, no state court has) adopted a rule similar to our Rule 3.5(d).

The committee was unanimously opposed to rule 3.5(d). No member of the practicing bar or a bar organization advised the justices of support for Rule 3.5(d). District attorneys and some judges favored it. All my colleagues favored it, and, with no dissenting vote recorded on any other rule, I decided not to repeat my objections. I remain concerned, however, that, in particular circumstances, Rule 3.5(d) may contravene the rights, perhaps even the constitutional rights, of people like Daniel Solis.

## Rule 4.2.

This rule, concerning communications with a person represented by another lawyer, is indefinite and has been an understandably controversial topic, in both criminal and civil matters. The justices tentatively included the ABA Model Rule 4.2 with modest additions to the ABA comment to that rule. The idea that a lawyer may not communicate with one known to be represented by another lawyer in the matter, except with the consent of the other lawyer and on occasions in which the law authorizes the communication, seems to reach too far.

Criminal prosecutors are concerned about limitations on their investigative activities, including undercover investigations, and in various postcharge communications, such as voluntary and knowing communications after Miranda rights have been given. Federal prosecutors also assert that a regulation of the attorney general allowing communications preempts any contrary state court disciplinary rule. That issue is on appeal to the United States Court of Appeals for the Eighth Circuit from a decision adverse to the attorney general's position in United States ex rel. O'Keefe v. McDonnell Douglas Corp., 961 F. Supp. 1288, 1294 (E.D Mo. 1997).

The tension between the United States Department of Justice and the Massachusetts Rules of Professional Conduct is more than simply a disagreement over Rule 4.2. The justices have included language in Rule 3.8(f)(2) that requires judicial approval, after an opportunity for an adversarial pro-

ceeding, before a prosecutor may subpoena a lawyer to a grand jury or criminal proceeding to present evidence about a client. The ABA once had but repealed such a rule. That principle was expressed in SJC Rule 3:08, Prosecution Function (PF) 15, which is repealed on the effective date of the new rules. PF 15 was the subject of United States v. Klubock, 832 F.2d 649 (1st Cir. 1986), aff'd en banc by an equally divided court, 832 F.2d 664 (1st Cir. 1987).

The Conference of Chief Justices and the attorney general have had discussions concerning the resolution of their disagreement on Rule 4.2, and a tentative working draft has been prepared but not approved. Even if the matter of prosecutors' rights and obligations is resolved, the propriety of Rule 4.2 will remain as to civil litigants, particularly lawyers with claims or potential claims against an entity such as a corporation. I understand that the modification of Rule 4.2, tentatively agreed on in the working draft, has not been considered in its application to private civil actions (or by the ABA). A careful description is needed of just which employees of an entity are or are not out of bounds. A reasonable rule might provide that a lawyer may have contact with nonmanagerial corporate employees other than those who may be personally liable and those whose conduct is chargeable to the entity (and with former employees), but a lawyer may not inquire into attorney-client confidential communication with a corporation's lawyer.

## Rule 8.3 – Reporting Disciplinary Violations

Under the code, adopted by the justices in 1972, no obligation, or even a statement of appropriateness, appeared concerning the disclosure to disciplinary authorities of a violation of a rule of professional conduct by another lawyer. ABA Rule 8.3(a) requires disclosure, that is, it is a disciplinary violation for a lawyer not to disclose knowledge that another lawyer has committed a rules violation that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects. The committee was sorely divided as to whether the rule should state that a lawyer "should" or "shall" make such a disclosure, and put the point to the justices. They favored "shall," although the committee submitted the rule and it was published with the word "should." The justices were inclined to reject arguments for "should" but did not include Rule 8.3(a) for discussion at the April, 1997, hearing. Because there was strong protest from bar associations against a mandatory rule, the Justices heard oral argument on Rule 8.3(a) on Sept. 9, 1997. As I write, the justices have not made a decision on the question.

## Professional Rules and Professional Liability

One concern in disciplinary rule making is the extent to which a disciplinary rule may, in effect, amount to a rule of substantive law and thereby affect the rights and obligations of clients, lawyers and perhaps others. Paragraph [6] of the preliminary scope section of the new rules rejected the statement in paragraph [18] of the scope section of the ABA model rules that a rule violation does not give rise to liability or a presumption that a legal duty had been violated. In Fishman v. Brooks, 396 Mass. 643 (1986), the court agreed that a violation of a disciplinary rule was not itself an actionable breach of duty to a client. If, however, a disciplinary rule was intended to protect a person in a client's position, scope paragraph 6 and Fishman v. Brooks, supra at 649, state that "a violation of that rule may be some evidence of the attorney's negligence."

How far then will conformity to a disciplinary rule protect a lawyer from liability? A lawyer who conforms to a disciplinary rule might, of course, be subject to adverse consequences other than professional discipline. But a disciplinary rule must on occasion have a significant effect on substantive law. For example, by their rule allowing contingent fee agreements the justices have obviously intended to bar a client from successfully asserting that a rule-conforming contingent fee agreement is unenforceable as champertous. There is, however, a clear distinction between the disciplinary standard concerning the level of legal fees and the substantive rule of law concerning proper legal fees. Rule 1.5 states, as DR 2-106 (A) did, that it is improper for a lawyer to enter into an agreement for, charge, or collect a clearly excessive fee. As comment [1A] to Rule 1.5 states, the stricter substantive law is "that fees must be reasonable to be enforceable against the client." In my view, that means that a lawyer may not collect an agreed-on contingent fee if that fee, although not clearly excessive, is unreasonable in the circumstances.

If a rule requires a lawyer to act, such as compelling disclosure of a client's confidential information (client perjury, for example), it would seem appropriate to conclude that the lawyer is not liable for harm caused to the client by the lawyer's rule-mandated conduct. Where, however, a disciplinary rule permits, but does not compel, the attorney to act in a particular way, it is less clear that the discretionary rule will protect the lawyer against liability. If a course of conduct is permissible under the rules, taking that permitted action should be at least evidence of the reasonableness of the lawyer's conduct (cf. Fishman v. Brooks, supra) and perhaps should be an absolute defense. If public policy considerations justify authorizing the disclosure that a client intends to commit a serious crime, it is not likely that liability would be placed on a lawyer who reveals the client's proposed conduct. To do so would chill the very disclosure that the disciplinary rule was designed to permit, if not encourage. On the other side of the coin, might a lawyer permitted, but not required, to reveal a client's confidential information be liable for failing to do so? It was not the function of the committee or of the justices in their rule making capacity to resolve these substantive law issues.

The committee declined to recommend detailed commentary that would have spelled out specifically permitted practices in the joint representation of clients by lawyers engaged in estate and trust practice. A respected group of lawyers engaged in estate and trust practice recommended language that, for example, would have defined acceptable conduct of a lawyer representing a husband and wife in preparing their wills or in dealing collectively with people having interests under a decedent's will. The committee and the justices deleted ABA Rule 2.2 concerning a lawyer acting as an intermediary between clients, concluding that a lawyer representing more than one client should be governed by the conflict of interest principles stated in Rule 1.7 and guided by [12F] to Rule 1.7. *See* Rule 2.2 cmt. [1]. Comment [12F] should be of assistance to lawyers engaged in estate and trust practice, although neither Rule 1.7 nor the special comment creates a safe harbor against liability for a lawyer engaging in a joint representation, absent client consent. The propriety of the joint representation of clients is a highly fact-oriented issue that requires case-by-case analysis.

## Unfinished Business

Adoption of the rules in their present form is not the end of the matter. There is unfinished business, in addition to the already mentioned further attention that Rule 4.2 will require.

The treatment of lawyer advertising was deferred until the rules in other respects were largely in place. Restraints on lawyer advertising are controversial, and the permissible range of restraints is significantly limited by free speech considerations. The justices have appointed a committee to recommend what changes, if any, should be made in the current rules. The justices included ABA Model Rule 7.2 on advertising in the new rules without substantial change; former DR 2-103 on solicitation of professional employment as Rule 7.3; and former DR 2-105 on communication of fields of practice as Rule 7.4. The rule on the solicitation of clients (DR 2-103) was the product of the efforts of an able special committee. It is unlikely that the committee on advertising will make a unanimous recommendation to the justices, but rather, I suspect, it will offer arguments for various alternatives from among which the justices will have to make choices. In the areas of advertising and solicitation, the interests of the public, the prospective clients, are extremely important. Information on access to legal assistance that is informative, fair, and not overreaching should be encouraged. The difficulty lies in the effective implementation of this broad standard. I am inclined to agree that a sophisticated prospective client does not need the same protection as other prospective clients. The problem is whether there is a sound way of identifying sophistication in rule language.

Other unfinished business includes the upcoming appointment of a committee to consider the special circumstances of government lawyers. There may be good reason to state specific exceptions and provisions for government lawyers. The District of Columbia, which has a plethora of government lawyers, has adopted special rules which may or may not be appropriate for our disciplinary rules. The scope section of the introductory material to the rules, in paragraph [4], recognizes the substantive statutory and constitutional authority of the attorney general to control litigation and to make decisions that are contrary to the authority of a private lawyer. Comment [8A] to Rule 1.7 acknowledges that public policy considerations may permit a government lawyer to represent conflicting interests. More may be needed, or at least desirable, concerning government lawyers.

Also open for further consideration is the question whether the justices should adopt a rule concerning pro bono services. The new rules omit ABA Model Rule 6.1 that states an aspirational goal of voluntary pro bono services for every lawyer. The justices have appointed a committee to study the subject of voluntary pro bono services. There appears to be little sentiment for mandating the furnishing of free services to indigent individuals. Whether any benefit would flow from the adoption of a precatory rule remains an open question.

Rule 3.8 states special responsibilities of a prosecutor. There is no parallel new rule stating special responsibilities of criminal defense counsel. Perhaps there should be. There is also a question whether the justices should preserve their separate rules concerning the prosecution and defense functions. Those rules could be incorporated into the disciplinary rules. The justices have referred these issues for comment to their Standing Advisory Committee on the Rules of Criminal Procedure.

Finally, on the subject of unfinished business, there is the matter of the operation and soundness of the new rules themselves. It is likely that adjustments and clarifications will be needed. New problems will arise. The ABA itself is revisiting its rules. Requests for changes and additions are likely. For these reasons, the justices will establish a Standing Advisory Committee on the Rules of Professional Conduct.

## Conclusion

The new rules were long in coming. They will serve the bar and the public better than the old Code of Professional Responsibility. They are a credit to the hardworking committee, to Robert Bloom, Esquire, of the staff of the court, to Justices Abrams and Lynch of the Rules Committee, and to all participants in the process.

# Exhibit G
# Redacted

# Exhibit H

1920281B00
4th Edition 2015
2160266B04

This revised edition replaces the pages of the
2009 edition and all subsequent supplements in their entirety.

# Ethical Lawyering
# in Massachusetts

EDITED BY

James S. Bolan



CHAPTER 1

# Sources of Ethical Authority in Massachusetts

**Gilda Tuoni Russell, Esq.**
*Studio City, CA*

## Scope Note

This chapter provides a historical perspective on the sources for ethical authority in the Commonwealth of Massachusetts. Beginning with the nature and origin of self-regulation within the legal community, the chapter goes on to acquaint the reader with the organization and scope of the Massachusetts Rules of Professional Conduct.

## § 1.1   SELF-REGULATION AND THE ROLE OF THE SUPREME JUDICIAL COURT

The legal profession in the United States is largely self-regulated. *See* C. Wolfram, *Modern Legal Ethics* 20–21 (West 1986). In Massachusetts, the ultimate authority in this self-regulated process is the Supreme Judicial Court. In this role, the court has promulgated rules regulating lawyer admission and conduct and is also the final adjudicator in cases of lawyer misconduct and discipline.

The exercise of the Supreme Judicial Court's regulatory power over the bar is said to be "inherent" and "exclusive." The court itself has described this power:

> It is inherent in the judicial department of government under the Constitution to control the practice of law, the admission to the bar of persons found qualified to act as attorneys at law and the removal from that position of those once admitted and found to be unfaithful to their trust.

*Opinion of the Justices*, 289 Mass. 607, 612 (1935). Further, the court has stated: "Permission to practise law is within the exclusive cognizance of the judicial department." *Opinion of the Justices*, 289 Mass. at 613.

The history of Supreme Judicial Court power in this area is substantial. More than seventy years ago, the court held that "[t]he determination by the judicial department of the appropriate procedure to be followed in review in proceedings for disbarment or in proceedings for admission to the bar necessarily must be made by the Supreme Judicial Court." *In re Keenan*, 313 Mass. 186, 207 (1943). The court has opined that such determinations "naturally must be made by the court that, under the Constitution, is the 'supreme' court, and that, by a statute of long standing, has general supervisory powers over other courts—so far as that court sees fit to make such determination. G.L. (Ter. Ed.), c. 211, § 3." *In re Keenan*, 313 Mass. at 208 (quoting *In re Keenan*, 310 Mass. 166, 182 (1941)).

Unlike the Supreme Judicial Court's superintendency power, the role of the Massachusetts legislature—the general court—in matters regarding the bar is limited. The court has pronounced as follows:

> Control of membership in the bar of the courts of the Commonwealth, both of admission thereto and removal therefrom, is exclusively in the judicial department of the government of the Commonwealth. Interference therewith by the legislative department would conflict with the provision of art. 30 of the Declaration of Rights that "the legislative department shall never exercise the executive and judicial powers, of either of them."

*In re Keenan*, 310 Mass. at 171. However, the legislature is empowered to enact statutes that "aid in the performance of" judicial department duties. One such statute was G.L. c. 221, § 37, which conferred jurisdiction for admission to the bar in the Superior Court as well as the Supreme Judicial Court. In *In re Keenan*, the court held that such enactment was not legislative interference with its constitutional power. *In re Keenan*, 310 Mass. at 173. Rather, the court interpreted the statute as "making provision in aid of the judicial department in reaching a proper selection of those qualified for admission as attorneys to practice in the courts." *In re Keenan*, 310 Mass. at 173 (quoting *Opinion of the Justices*, 279 Mass. 607, 610 (1932)). The court held further that it had not, through its rules, specifically excluded the Superior Court from jurisdiction in these matters. *In re Keenan*, 310 Mass. at 182–85.

However, it should be noted that, while G.L. c. 221, §§ 37 and 40 gave the Superior Court concurrent jurisdiction in bar admission and disciplinary matters and have not, as of this date, been explicitly repealed, it appears that the Supreme Judicial Court has now, by its own rules, given itself exclusive jurisdiction in these matters. *See Strigler v. Bd. of Bar Exam'rs*, 448 Mass. 1027 (2007) (finding that the Supreme Judicial Court retains the ultimate authority of an individual to

practice law); 1976 amendment of SJC Rule 3:01, *Opinion of the Justices*, 370 Mass. 895 (1976) (bar admission); 1974 adoption of SJC Rule 4:01, *Opinion of the Justices*, 365 Mass. 681 (1974) (bar discipline). Similarly, while other legislative enactments concern bar admission, discipline, and related matters, *see* G.L. c. 221, §§ 36, 38, 41–52, under the decisional authority discussed above, the Supreme Judicial Court rules that specifically cover the same areas would appear to be controlling.

The Supreme Judicial Court has adopted many such rules that govern attorneys in the Commonwealth. They can be characterized as "substantive" rules, which regulate conduct, and "procedural" rules, which regulate process. The substantive rules are contained within Chapter 3 of the Supreme Judicial Court Rules, entitled "Ethical Requirements and Rules Concerning the Practice of Law." They are as follows:

- Rule 3:01 concerns, among other things, petitions for bar admissions, petitions for admission by motion, qualifications for taking the bar examination, and qualifications for admission.

- Rule 3:02, entitled "Administration of Justice," concerns prohibitions against a disbarred attorney representing a corporation or association and against clerks of court, registers of probate, and the Land Court recorder, assistants, and employees practicing law.

- Rule 3:03 allows supervised senior law student practice on behalf of indigents and/or for the Commonwealth and its subdivisions in certain situations.

- Rule 3:04 allows attorneys from other jurisdictions who are engaged in certain graduate law studies or programs of legal assistance to practice within the context of such law studies or programs.

- Rule 3:05 addresses licensing of foreign legal consultants.

- Rule 3:06 concerns provisions regarding lawyers practicing in professional corporations, limited liability companies, or limited liability partnerships and requirements applicable to such entities.

- Rule 3:07 contains the Massachusetts Rules of Professional Conduct and comments.

- Rule 3:08 (which previously covered the special "Disciplinary Rule Applicable to Practice as a Prosecutor or as a Defense Lawyer") was stricken, effective January 1, 1999.

- Rule 3:09 contains the Code of Judicial Conduct.

- Rule 3:10 concerns the assignment of counsel.

- Rule 3:11 concerns the Committee of Judicial Ethics.

- Rule 3:12 contains the Code of Professional Responsibility for clerks of court.

- Rule 3:13 concerns the Committee on Professional Responsibility for clerks of court.

- Rule 3:14 concerns the Advisory Committee on Ethical Opinions for clerks of court.

- Rule 3:15 concerns the pro hac vice registration fee.

- Rule 3:16 establishes a mandatory one-day course on professionalism for attorneys newly admitted to the bar.

The procedural rules promulgated by the court are found in Chapter 4 of the Supreme Judicial Court Rules, entitled "Bar Discipline and Clients' Security Protection." They are as follows:

- Rule 4:01 concerns bar discipline.

- Rule 4:02 concerns periodic registration of attorneys.

- Rule 4:03 concerns periodic assessment of attorney registration fees.

- Rule 4:04 concerns the Clients' Security Board and Fund.

- Rule 4:05 concerns claims by clients to the Clients' Security Board for reimbursement of losses.

- Rule 4:06 concerns the miscellaneous powers and duties of the Clients' Security Board.

- Rule 4:07 concerns the Lawyers Concerned for Lawyers Fund and Oversight Committee.

- Rule 4:08 concerns the allowance of the Board of Bar Overseers and the Clients' Security Board to request interpretation, advice, and instruction from the Supreme Judicial Court—as well as to make suggestions or proposals to the court—concerning the rules included in Chapter 4.

- Rule 4:09 concerns the court's ability to amend, modify, or repeal Chapter 4 and provide for the dissolution and winding up of the Clients' Security Fund.

The primary focus of this chapter of *Ethical Lawyering in Massachusetts* is Rule 3:07 of the Supreme Judicial Court Rules—the Massachusetts Rules of Professional Conduct and comments ("Rules of Professional Conduct"). The Rules of Professional Conduct were adopted by the Supreme Judicial Court in June 1997, became effective January 1, 1998, and have been amended in part thereafter. They set forth the standards of professional conduct for members of the Massachusetts bar and serve as the basis for professional discipline. In order for readers to more effectively understand the Massachusetts Rules of Professional Conduct, the organizational framework and scope of the rules—as well as a brief history of the predecessor rules that were operative in the Commonwealth for many years and the reasons for the change from them—are discussed below.

# § 1.2    THE MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT— ORGANIZATION AND SCOPE

The Massachusetts Rules of Professional Conduct finally came into operation in the Commonwealth on January 1, 1998, replacing the Massachusetts Canons of Ethics and Disciplinary Rules, which had been in effect for a quarter of a century. The term "finally" is used because Massachusetts, the forty-fourth state to adopt the Rules of Professional Conduct, did so some fifteen years after the rules' promulgation by the American Bar Association. See § 1.3, below, for a discussion of the history of the Supreme Judicial Court's adoption of the rules.

Recently, the Supreme Judicial Court amended the Rules of Professional Conduct, effective July 1, 2015. As amended, the rules begin with a preamble and scope section designed to provide general orientation to the rules. The preamble outlines the various responsibilities that a lawyer may take on and the functions that a lawyer may perform. Such responsibilities include being a representative of clients, an officer of the legal system, and a public citizen having special responsibility for the quality of justice. A lawyer's functions may include that of advisor, advocate, negotiator, and evaluator. The preamble articulates the lawyer's role in upholding the legal process and conforming the lawyer's behavior to the requirements of the law. The lawyer's duties as a public citizen to seek improvement of the law, the administration of justice, and the quality of legal services are also set forth. The preamble further attempts to acknowledge lawyers' conflicting responsibilities and the prescription by the Rules of Professional Conduct of terms for resolving such conflicts. The preamble also notes the

# Exhibit I

## *Attorney fee rules undergo revisions in Massachusetts*

Massachusetts Lawyers Weekly

January 12, 2011 Wednesday

Copyright 2011 Dolan Media Newswires All Rights Reserved

**Section:** NEWS

**Length:** 1856 words

**Byline:** Christina Pazzanese

# Body

The Supreme Judicial Court has approved sweeping and expansive changes to the way attorneys disclose and collect client fees and expenses, a move that has garnered strong support from bar leaders.

Under the revisions to Rule 1.5 of the Rules of Professional Conduct, which take effect March 15, lawyers will need to be far more specific than before about the fees and expenses they charge clients and how those charges are calculated.

The amended rule requires lawyers to get a client's consent about all fee-related issues before or at the very outset of the attorney-client relationship, not as a case unfolds or after a client terminates the engagement.

Lawyers in contingent-fee cases, whom many of the changes will most directly affect, must also now secure their clients' written consent about who will pay for accrued legal fees and expenses in the event they are discharged and succeeding counsel is hired before a case concludes.

Additionally, the SJC has established two new model fee-agreement forms for lawyers to use with clients, though the court will still allow attorneys to draft their own agreements provided they adhere to the rule and explain any material differences to clients.

Bar leaders say the new amendments represent a reasonable compromise in several areas that had sparked heated debate in the five years since the SJC called for a formal revision.

Ellen J. Messing, a Boston employment attorney who served on the Boston Bar Association subcommittee that reviewed previous draft changes to the rule, said she is pleased the court took many of the BBA's concerns into account.

"They were going to do a bunch of changes that would have been a disaster for solo practitioners and small firms," Messing said of a draft issued last spring, which included only one model form agreement that did not permit lawyers to require that clients pay the fees and expenses of prior counsel involved in a case.

"It does not make a lawyer unethical for making a reasonable choice that arises every day. That is really exciting," she said.

Attorney fee rules undergo revisions in Massachusetts

Jeffrey N. Catalano, vice president of the Massachusetts Bar Association, worked on the MBA subcommittee that evaluated the draft changes. He said the revisions are fair for both clients and lawyers and represent "a big step in the right direction. "

Catalano, a personal injury attorney at Todd & Weld in Boston, said the SJC's decision to give lawyers two model agreement options, as well as the freedom to use their own form provided it complies with the rule, makes for better transparency, helps reduce potential friction should things sour, and goes a long way to ensure the attorney-client relationship "begins on fair footing. "

"We don't want attorneys to have an unfair advantage, nor do we want the client to have an unfair advantage," he said.

Requiring clients and lawyers to sit down at the outset of a case and clarify how fees and costs will be paid during and after the relationship ends does put new burdens on lawyers, Catalano said, but it is "nothing insurmountable or unachievable. "

Boston trial attorney Elizabeth N. Mulvey, a member of the SJC's Standing Advisory Committee on Rules for Professional Conduct who pushed for greater clarity for clients on the model agreement, said though the panel "struggled" to find common ground on the issue, she is satisfied with the final result.

"It protects clients and lawyers," she said. "Lawyers are still free to propose fees, and clients are still entitled to know what they're agreeing to. "

Catching up to caselaw

Bar Counsel Constance V. Vecchione said the standing advisory committee initiated the rule changes in 2005 at the court's request following its ruling in Malonis v. Harrington in 2004. That case was followed by three others: Saggese v. Kelley in 2005, and Liss v. Studeny and In the Matter of the Discipline of an Attorney in 2008.

The amendments, which are now consistent with the American Bar Association rules, are simply "catching up" Rule 1.5 to the existing caselaw, said Vecchione, who serves on the committee.

In Malonis, the SJC had ruled that a contingency-fee attorney who had been discharged was entitled to be paid under a quantum meruit theory and that his fee ought to come from the successor counsel's contingent fee, not the plaintiff's recovery.

Recognizing the importance to lawyers of the broader question about who should be held responsible for legal fees under similar circumstances, the court asked the committee to study the matter and recommend whether rule changes ought to be instituted.

John L. Whitlock, the committee's chairman, said key issues surrounding fees and fee disclosures that were raised and decided in the four cases were not, until now, reflected in Massachusetts' professional conduct rules.

"Before these rules were adopted, there were not such clear guidelines as to what had to be done," said Whitlock, a lawyer at Edwards, Angell, Palmer & Dodge in Boston.

Messing said the rule changes will require the bar to do some broad educational outreach, particularly to ensure lawyers are not using improperly worded fee agreements.

Attorney fee rules undergo revisions in Massachusetts

'Very major undertaking'

The five-year effort to produce the rule changes was the committee's longest-running project and reflected a "very major undertaking that was complex and took much discussion," Whitlock said. "And as with many compromises, no one was entirely happy. "

At times during the drafting process, he said, various bar association members as well as the committee itself were sharply divided over the language to include in the model form fee agreement. Some, like Mulvey, argued that the agreement did not do enough to protect clients, while others railed that it went too far in restricting how lawyers conduct business, Whitlock said.

The bar associations voiced opposition to earlier proposed changes

to Rule 1.5 (c) concerning the payment of fees to prior counsel, calling them draconian and arbitrarily unfair to successor counsel.

In formal comments made by the BBA to the advisory committee in January 2009, then-President Kathy B. Weinman expressed concern over a default provision that, in the absence of an allocation clause in fee agreements, successor counsel's entire fee and costs could be at risk in the event of a fee dispute with predecessor counsel.

Weinman called the rule "far too harsh and arbitrarily unfair," especially given that no similar penalty for nondisclosure is imposed on predecessor counsel. The BBA recommended making nondisclosure a "significant factor" rather than a default measure in determining how such fees get paid.

Even the mere possibility that successor counsel could be responsible for predecessor counsel's fees, Weinman wrote, would unfairly require the second lawyer to "bear the entire burden of ensuring that a client is fully informed" and would "inevitably hinder" the ability of the client to engage successor counsel.

Writing on behalf of the MBA, general counsel Martin W. Healy commented in January 2009 that there are many legitimate reasons why successor counsel might omit informing a client of his obligation to pay predecessor counsel. Those reasons include being unaware of prior counsel, being told that there would be no claim by prior counsel, or simply leaving it out of the written document because the client and attorney had reached a verbal agreement.

Both the BBA and MBA had criticized the draft model fee agreement as insufficient to address the rich variety and complexity of today's contingency-fee work.

New changes to fee disclosure and collection rule

Under new revisions to Rule 1.5 of the Rules of Professional Conduct, which go into effect March 15, lawyers must now delineate at the onset of the attorney-client relationship how fees and expenses will be charged, how such fees and expenses will be calculated, and whether the client or successor counsel must pay should the lawyer be terminated before a case ends.

While the rule applies to all attorneys in every engagement, it is likely to affect lawyers in contingency-fee cases most acutely. Among the key changes:

* Rule 1.5(a), which prohibits all lawyers from charging an "illegal or clearly excessive fee," has now been expanded to prohibit "collecting an unreasonable amount for expenses. "

* Rule 1.5(b) now provides that in addition to the rate or basis of fees, a lawyer must communicate the scope of representation and the basis or rate of expenses to the client before or within a reasonable time after engagement. For a lawyer who has "regularly represented" a client, the lawyer must now disclose to the client any change in the basis or rate of fee or expenses.

* Rule 1.5(c) requires that at any time prior to the occurrence of contingency, if a lawyer is terminated or if the client requests, a lawyer must provide a written itemization of services and expenses within 20 days unless the lawyer informs the client in writing that he does not intend to make a claim for fees or expenses if terminated.

* Rule 1.5(c)(4) requires that a contingent-fee agreement contain language informing a client at the onset of representation if there is a possibility that a legal fee may be owed under other circumstances or on another basis.

* Rule 1.5(c)(6) requires such agreements to inform a client of the method by which expenses will be calculated and paid or reimbursed.

Section (c) includes the following two new subparagraphs:

* In Rule 1.5(c)(7), the contingent-fee agreement must state the basis on which fees and expenses will be claimed and the method by which they will be calculated if the lawyer intends to pursue a claim against the client for expenses or fees if the relationship is terminated before the conclusion of a contingent-fee case.

* In Rule 1.5(c)(8), if a lawyer is successor to counsel whose representation was terminated before the case concludes, the fee agreement must state whether the client or successor counsel is liable for any fees or expenses owed to predecessor counsel.

* Rule 1.5(e), regarding the division of fees between lawyers in different firms, now explicitly includes referral fees and requires the client to be notified and to consent in writing to the fee division at or before the client enters into a fee agreement.

* Rule 1.5(f) now contains two form fee agreements. Form A may be used without any special instructions or explanation to the client. Form B contains various options regarding out-of-pocket costs and expenses and former counsel's fees and expenses that require a lawyer to show and explain alternatives to the client and to get consent in writing as to the option selected. Both forms demand that a lawyer who intends to seek fees and expenses if the relationship is terminated before the case concludes to include a provision noting that possibility and to explain how that amount depends on the services performed, along with the timing and circumstances of the termination.

* Rule 1.5(f)(3) allows a lawyer to use an alternative form agreement provided it is consistent with Rule 1.5. Forms that differ dramatically from the approved Forms A and B must be explained to the client, and a lawyer must obtain the client's consent in writing.

**Load-Date:** January 19, 2011

**End of Document**

# Exhibit J

COMMONWEALTH OF MASSACHUSETTS

At the Supreme Judicial Court holden at Boston within and for said Commonwealth on the twenty-second day of December, in the year two thousand and ten: present,

| | | |
|---|---|---|
| HON. RODERICK L. IRELAND | ) | |
| | ) | |
| HON. FRANCIS X. SPINA | ) | Justices |
| | ) | |
| HON. JUDITH A. COWIN | ) | |
| | ) | |
| HON. ROBERT J. CORDY | ) | |
| | ) | |
| HON. MARGOT BOTSFORD | ) | |
| | ) | |
| HON. RALPH D. GANTS | ) | |

ORDERED:   That Chapter Three of the Rules of the Supreme Judicial Court is hereby amended as follows:

Rule 3:07:                                By striking out Mass. R. Prof. C. 1.5 and inserting in lieu thereof the new Rule 1.5 attached hereto.

The amendment accomplished by this order shall take effect on March 15 , 2011.

   __RODERICK L. IRELAND__   ) Chief Justice
   )
   )
   __FRANCIS X. SPINA__   )
   ) Justices
   )
   __JUDITH A. COWIN__   )
   )
   )
   __ROBERT J. CORDY__   )
   )
   )
   __MARGOT BOTSFORD__   )
   )
   )
   __RALPH D. GANTS__   )

MASS.R. PROF. C. 1.5

## RULE 1.5 FEES

(a) A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly excessive fee or collect an unreasonable amount for expenses. The factors to be considered in determining whether a fee is clearly excessive include the following:

   (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

   (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

   (3) the fee customarily charged in the locality for similar legal services;

   (4) the amount involved and the results obtained;

   (5) the time limitations imposed by the client or by the circumstances;

   (6) the nature and length of the professional relationship with the client;

   (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

   (8) whether the fee is fixed or contingent.

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. Except for contingent fee arrangements concerning the collection of commercial accounts and of insurance company subrogation claims, a contingent fee agreement shall be in writing and signed in duplicate by both the lawyer and the client within a reasonable time after the making of the agreement. One such copy (and proof that the duplicate copy has been delivered or mailed to the client) shall be retained by the lawyer for a period of seven years after the conclusion of the contingent fee matter. The writing shall state the following:

   (1) the name and address of each client;

(2) the name and address of the lawyer or lawyers to be retained;

(3) the nature of the claim, controversy, and other matters with reference to which the services are to be performed;

(4) the contingency upon which compensation will be paid, whether and to what extent the client is to be liable to pay compensation otherwise than from amounts collected for him or her by the lawyer, and if the lawyer is to be paid any fee for the representation that will not be determined on a contingency, the method by which this fee will be determined;

(5) the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer out of amounts collected, and unless the parties otherwise agree in writing, that the lawyer shall be entitled to the greater of (i) the amount of any attorney's fees awarded by the court and included in the settlement or (ii) the amount determined by application of the percentage or other formula to the recovery amount not including such attorney's fees;

(6) the method by which litigation and other expenses are to be calculated and paid or reimbursed, whether expenses are to be paid or reimbursed only from the recovery, and whether such expenses are to be deducted from the recovery before or after the contingent fee is calculated;

(7) if the lawyer intends to pursue such a claim, the client's potential liability for expenses and reasonable attorney's fees if the attorney-client relationship is terminated before the conclusion of the case for any reason, including a statement of the basis on which such expenses and fees will be claimed, and, if applicable, the method by which such expenses and fees will be calculated; and

(8) if the lawyer is the successor to a lawyer whose representation has terminated before the conclusion of the case, whether the client or the successor lawyer is to be responsible for payment of former counsel's attorney's fees and expenses, if any such payment is due.

Upon conclusion of a contingent fee matter for which a writing is required under this paragraph, the lawyer shall provide the client with a written statement explaining the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.   At any time prior to the occurrence of the contingency, the lawyer shall, within twenty days after either 1) the termination of the attorney-client relationship or 2) receipt of a written request from the client when the relationship has not terminated, provide the client with a written itemized statement of services rendered and expenses incurred; except, however, that the lawyer shall not be required to provide the statement if the lawyer informs the client in writing that he or she does not intend to claim entitlement to a fee or expenses in the event the relationship is terminated before the conclusion of the contingent fee matter.

(d) A lawyer shall not enter into an arrangement for, charge, or collect:

    (1) any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or upon the amount of alimony or support, or property settlement in lieu thereof; or

    (2) a contingent fee for representing a defendant in a criminal case.

(e) A division of a fee (including a referral fee) between lawyers who are not in the same firm may be made only if the client is notified before or at the time the client enters into a fee agreement for the matter that a division of fees will be made and consents to the joint participation in writing and the total fee is reasonable. This limitation does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement.

(f) (1) The following forms of contingent fee agreement may be used to satisfy the requirements of paragraphs (c) and (e) if they accurately and fully reflect the terms of the engagement.

(2) A lawyer who uses Form A does not need to provide any additional explanation to a client beyond that otherwise required by this rule. The form contingent fee agreement identified as Form B includes two alternative provisions in paragraphs (3) and (7). A lawyer who uses Form B shall show and explain these options to the client, and obtain the client's informed consent confirmed in writing to each selected option. A client's initialing next to the selected option meets the "confirmed in writing" requirement.

(3) The authorization of Forms A and B shall not prevent the use of other forms consistent with this rule. A lawyer who uses a form of contingent fee agreement that contains provisions that materially differ from or add to those contained in Forms A or B shall explain those different or added provisions or options to the client and obtain the client's informed consent confirmed in writing. For purposes of this rule, a fee agreement that omits option (i) in paragraph (3), and, where applicable, option (i) in paragraph (7) of Form B is an agreement that materially differs from the model forms. A fee agreement containing a statement in which the client specifically confirms with his or her signature that the lawyer has explained that there are provisions of the fee agreement, clearly identified by the lawyer, that materially differ from, or add to, those contained in Forms A or B meets the "confirmed in writing" requirement.

(4) The requirements of paragraphs (f)(1) – (3) shall not apply when the client is an organization, including a non-profit or governmental entity.

## CONTINGENT FEE AGREEMENT, FORM A

To be Executed in Duplicate

Date:_____, 20__

The Client _____
(Name) (Street & Number) (City or Town)
retains the Lawyer_____
(Name) (Street & Number) (City or Town)
to perform the legal services mentioned in paragraph (1) below. The lawyer agrees to
perform them faithfully and with due diligence.

(1) The claim, controversy, and other matters with reference to which the services are
to be performed are:

(2) The contingency upon which compensation is to be paid is recovery of damages,
whether by settlement, judgment or otherwise.

(3) The lawyer agrees to advance, on behalf of the client, all out-of-pocket costs and
expenses. The client is not to be liable to pay court costs and expenses of
litigation, other than from amounts collected for the client by the lawyer.

(4) Compensation (including that of any associated counsel) to be paid to the lawyer
by the client on the foregoing contingency shall be the following percentage of
the (gross) (net) [indicate which] amount collected. [Here insert the percentages to
be charged in the event of collection. These may be on a flat rate basis or in a
descending or ascending scale in relation to the amount collected.] The percentage
shall be applied to the amount of the recovery not including any attorney's fees
awarded by a court or included in a settlement. The lawyer's compensation shall
be such attorney's fees or the amount determined by the percentage calculation
described above, whichever is greater.

(5) [IF APPLICABLE] The client understands that a portion of the compensation
payable to the lawyer pursuant to paragraph 4 above shall be paid to [Name of
Attorney entitled to a share of compensation] and consents to this division of fees.

(6) [IF APPLICABLE] If the attorney-client relationship is terminated before the
conclusion of the case for any reason, the attorney may seek payment for the work
done and expenses advanced before the termination. Whether the lawyer will
receive any payment for the work done before the termination, and the amount of
any payment, will depend on the benefit to the client of the services performed by
the lawyer as well as the timing and circumstances of the termination. Such
payment shall not exceed the lesser of (i) the fair value of the legal services
rendered by the lawyer, or (ii) the contingent fee to which the lawyer would have
been entitled upon the occurrence of the contingency. This paragraph does not
give the lawyer any rights to payment beyond those conferred by existing law.

(7) [USE IF LAWYER IS SUCCESSOR COUNSEL] The lawyer is responsible for
payment of former counsel's reasonable attorney's fees and expenses and the cost
of resolving any dispute between the client and prior counsel over fees or
expenses.

This agreement and its performance are subject to Rule 1.5 of the Rules of Professional Conduct adopted by the Massachusetts Supreme Judicial Court.

WE EACH HAVE READ THE ABOVE AGREEMENT BEFORE SIGNING IT.

Witnesses to signatures      Signatures of client and lawyer

(To client) _____

_____
(Signature of client)

(To lawyer) _____

_____
(Signature of lawyer)


## CONTINGENT FEE AGREEMENT, FORM B

To be Executed in Duplicate

Date:_____, 20__

The Client _____
(Name) (Street & Number) (City or Town)
retains the Lawyer_____
(Name) (Street & Number) (City or Town)
to perform the legal services mentioned in paragraph (1) below. The lawyer agrees to perform them faithfully and with due diligence.

(1) The claim, controversy, and other matters with reference to which the services are to be performed are:

(2) The contingency upon which compensation is to be paid is:

(3) Costs and Expenses. The client should initial next to the option selected.

    (i)    The lawyer agrees to advance, on behalf of the client, all out-of-pocket costs and expenses. The client is not to be liable to pay court costs and expenses of litigation, other than from amounts collected for the client by the lawyer; or

    (ii)    The client is not to be liable to pay compensation or court costs and expenses of litigation otherwise than from amounts collected for the client by the lawyer, except as follows:

(4) Compensation (including that of any associated counsel) to be paid to the lawyer by the client on the foregoing contingency shall be the following percentage of the (gross) (net) [indicate which] amount collected. [Here insert the percentages to be charged in the event of collection. These may be on a flat rate basis or in a

descending or ascending scale in relation to the amount collected.] The percentage shall be applied to the amount of the recovery not including any attorney's fees awarded by a court or included in a settlement. The lawyer's compensation shall be such attorney's fees or the amount determined by the percentage calculation described above, whichever is greater. [Modify the last two sentences as appropriate if the parties agree on some other basis for calculation.]

(5) [IF APPLICABLE] The client understands that a portion of the compensation payable to the lawyer pursuant to paragraph 4 above shall be paid to [Name of Attorney entitled to a share of compensation] and consents to this division of fees.

(6) [IF APPLICABLE] If the attorney-client relationship is terminated before the conclusion of the case for any reason, the attorney may seek payment for the work done and expenses advanced before the termination. Whether the lawyer will be entitled to receive any payment for the work done before the termination, and the amount of any payment, will depend on the benefit to the client of the services performed by the lawyer as well as the timing and circumstances of the termination. Such payment shall not exceed the lesser of (i) the fair value of the legal services rendered by the lawyer, or (ii) the contingent fee to which the lawyer would have been entitled upon the occurrence of the contingency. This paragraph does not give the lawyer any rights to payment beyond those conferred by existing law.

(7) [USE IF LAWYER IS SUCCESSOR COUNSEL] Payment of any fees owed to former counsel. The client should initial next to the option selected.

    (i) The lawyer is responsible for payment of former counsel's reasonable attorney's fees and expenses and the cost of resolving any dispute between the client and prior counsel over fees or expenses; or

    (ii) The client is responsible for payment of former counsel's reasonable attorney's fees and expenses and the cost of resolving any dispute between the client and prior counsel over fees or expenses.

This agreement and its performance are subject to Rule 1.5 of the Rules of Professional Conduct adopted by the Massachusetts Supreme Judicial Court.

WE EACH HAVE READ THE ABOVE AGREEMENT BEFORE SIGNING IT.

Witnesses to signatures    Signatures of client and lawyer

(To client) _____    _____
                       (Signature of client)

(To lawyer) _____    _____
                       (Signature of lawyer)

**Comment**

*Basis or Rate of Fee*

[1] When the lawyer has regularly represented a client, they ordinarily will have evolved an understanding concerning the basis or rate of the fee and the expenses for which the client will be responsible. In a new client-lawyer relationship, however, an understanding as to fees and expenses must be promptly established. It is not necessary to recite all the factors that underlie the basis of the fee, but only those that are directly involved in its computation. It is sufficient, for example, to state that the basic rate is an hourly charge or a fixed amount or an estimated amount, or to identify the factors that may be taken into account in finally fixing the fee. When developments occur during the representation that render an earlier estimate substantially inaccurate, a revised estimate should be provided to the client. A written statement concerning the fee reduces the possibility of misunderstanding. Furnishing the client with a simple memorandum or a copy of the lawyer's customary fee schedule is sufficient if the basis or rate of the fee is set forth.

[1A] Rule 1.5(a) departs from Model Rule 1.5(a) by retaining the standard of former DR 2-106(A) that a fee must be illegal or clearly excessive to constitute a violation of paragraph (a) of the rule. However, it does not affect the substantive law that fees must be reasonable to be enforceable against the client.

[1B] Paragraph (a) also requires that expenses for which the client will be charged must be reasonable. As such, the standard differs from that for fees, as described in Comment 1A. A lawyer may seek reimbursement for the cost of services performed in-house, such as telephone charges, either by charging a reasonable amount to which the client has agreed in advance or by charging an amount that reasonably reflects the cost incurred by the lawyer.

[2] Rule 1.5(b) states, as the ABA Model Rule does, that the basis or rate of a fee shall be communicated "preferably in writing." Appropriate caution and ease of proof of compliance with Rule 1.5(b) indicate that the presentation of a fee agreement to the client in writing is desirable.

[3] Contingent fees, like any other fees, are subject to the not-clearly-excessive standard of paragraph (a) of this rule. In determining whether a particular contingent fee is clearly excessive, or whether it is reasonable to charge any form of contingent fee, a lawyer must consider the factors that are relevant under the circumstances. Applicable law may impose limitations on contingent fees, such as a ceiling on the percentage allowable, or may require a lawyer to offer clients an alternative basis for the fee. Applicable law also may apply to situations other than a contingent fee, for example, government regulations regarding fees in certain matters. When there is doubt whether a contingent fee is consistent with the client's best interest, the lawyer should inform the client of alternative bases for the fee and explain their implications.

[3A] A lawyer must inform the client at the time representation is undertaken if there is a possibility that a legal fee or other payments will be owed under other circumstances.  A lawyer may pursue a quantum meruit recovery or payment for expenses advanced only if the contingent fee agreement so provides.

[3B] The "fair value" of the legal services rendered by the attorney before the occurrence of a contingency in a contingent fee case is an equitable determination designed to prevent a client from being unjustly enriched if no fee is paid to the attorney.  Because a contingent fee case does not require any certain amount of labor or hours worked to achieve its desired goal, a lodestar method of fee calculation is of limited use in assessing a quantum meruit fee.  A quantum meruit award should take into account the benefit actually conferred on the client.  Other factors relevant to determining "fair value" in any particular situation may include those set forth in Rule 1.5(a), as well as the circumstances of the discharge or withdrawal, the amount of legal work required to bring the case to conclusion after the discharge or withdrawal, and the contingent fee to which the lawyer would have been entitled upon the occurrence of the contingency.  Unless otherwise agreed in writing, the lawyer will ordinarily not be entitled to receive a fee unless the contingency has occurred.  Nothing in this Rule is intended to create a presumption that a lawyer is entitled to a quantum meruit award when the representation is terminated before the contingency occurs.

[3C] When the attorney-client relationship in a contingent fee case terminates before completion, and the lawyer makes a claim for fees or expenses, the lawyer is required to state in writing the fee claimed and to enumerate the expenses incurred, providing supporting justification if requested.  In circumstances where the lawyer is unable to identify the precise amount of the fee claimed because the matter has not been resolved, the lawyer is required to identify the amount of work performed and the basis employed for calculating the fee due.  This statement of claim will help the client and any successor attorney to assess the financial consequences of a change in representation.

[3D] A lawyer who does not intend to make a claim for fees in the event the representation is terminated before the occurrence of the contingency entitling the lawyer to a fee under the terms of a contingent fee agreement would not be required to use paragraph (6) of the model forms of contingent fee agreement specified in Rule 1.5(f)(1) and (2).  However, if a lawyer expects to make a claim for fees if the representation is terminated before the occurrence of the contingency, the lawyer must advise the client of his or her intention to retain the option to make a claim by including the substance of paragraph (6) of the model form of contingent fee agreement in the engagement agreement and would be expected to be able to provide records of work performed sufficient to support such a claim.

### Terms of Payment

[4] A lawyer may require advance payment of a fee, but is obliged to return any unearned portion. See Rule 1.16(d). A lawyer may accept property in payment for services, such as an ownership interest in an enterprise, providing this does not involve acquisition of a proprietary interest in the cause of action or subject matter of the litigation contrary to Rule 1.8(j). However, a fee paid in property instead of money may be subject to the requirements of Rule 1.8(a) because such fees often have the essential qualities of a business transaction with the client.

[5] An agreement may not be made whose terms might induce the lawyer improperly to curtail services for the client or perform them in a way contrary to the client's interest. For example, a lawyer should not enter into an agreement whereby services are to be provided only up to a stated amount when it is foreseeable that more extensive services probably will be required, unless the situation is adequately explained to the client. Otherwise, the client might have to bargain for further assistance in the midst of a proceeding or transaction. However, it is proper to define the extent of services in light of the client's ability to pay. A lawyer should not exploit a fee arrangement based primarily on hourly charges by using wasteful procedures.

### Prohibited Contingent Fees

[6] Paragraph (d) prohibits a lawyer from charging a contingent fee in a domestic relations matter when payment is contingent upon the securing of a divorce or upon the amount of alimony or support or property settlement to be obtained. This provision does not preclude a contract for a contingent fee for legal representation in connection with the recovery of post-judgment balances due under support, alimony or other financial orders because such contracts do not implicate the same policy concerns.

### Division of Fee

[7] A division of fee is a single billing to a client covering the fee of two or more lawyers who are not in the same firm. A division of fee facilitates association of more than one lawyer in a matter in which neither alone could serve the client as well, and most often is used when the fee is contingent and the division is between a referring lawyer and a trial specialist. Paragraph (e) permits the lawyers to divide a fee if the client has been informed that a division of fees will be made and consents in writing. A lawyer should only refer a matter to a lawyer whom the referring lawyer reasonably believes is competent to handle the matter. See Rule 1.1.

[7A] Paragraph (e), unlike ABA Model Rule 1.5(e), does not require that the division of fees be in proportion to the services performed by each lawyer unless, with a client's written consent, each lawyer assumes joint responsibility for the representation. The Massachusetts rule does not require disclosure of the fee

division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer.

[8] Paragraph (e) does not prohibit or regulate division of fees to be received in the future for work done when lawyers were previously associated in a law firm.

*Disputes over Fees*

[9] In the event of a fee dispute not otherwise subject to arbitration, the lawyer should conscientiously consider submitting to mediation or an established fee arbitration service. If such procedure is required by law or agreement, the lawyer shall comply with such requirement. Law may prescribe a procedure for determining a lawyer's fee, for example, in representation of an executor or administrator, a class or a person entitled to a reasonable fee as part of the measure of damages. The lawyer entitled to such a fee and a lawyer representing another party concerned with the fee should comply with the prescribed procedure. For purposes of paragraph 1.5(f)(3), a provision requiring that fee disputes be resolved by arbitration is a provision that differs materially from the forms of contingent fee agreement set forth in this rule and is subject to the prerequisite that the lawyer explain the provision and obtain the client's consent, confirmed in writing.

*Form of Fee Agreement*

[10] Paragraph (f) provides model forms of contingent fee agreements and identifies explanations that a lawyer must provide to a client, except where the client is an organization, including a non-profit or governmental entity.

[11] Paragraphs (f)(1) and (f)(2) provide two forms of contingent fee agreement that may be used. Because paragraphs (3) and (7) of Form A do not contain alternative provisions, a lawyer who uses Form A does not need to provide any special explanation to the client. Paragraphs (2), (3), and (7) of Form B differ from Form A. While in most contingency cases, the contingency upon which compensation will be paid is recovery of damages, paragraph (2) of Form B permits lawyers and clients to agree to other lawful contingencies. A lawyer is not required to provide any special explanation when using paragraph (2). Paragraphs (3) and (7) of Form B allow options for the payment of costs and expenses and the payment of reasonable attorney's fees and expenses to former counsel. To ensure that a client gives informed consent to the agreed-upon option, a lawyer who uses Form B must retain in the form both options contained in paragraphs (3) and, where applicable, paragraph (7); show and explain these options to the client; and obtain the client's informed consent confirmed in writing to the selected option.

[12] Paragraph (f)(3) permits the lawyer and client to agree to modifications to Forms A and B, including modifications which are more favorable to the lawyer, to the extent permitted by this rule. However, a lawyer using a modified form of

24

fee agreement must explain to the client any provisions that materially differ from or add to those contained in Forms A and B, and obtain the client's informed written consent.  For purposes of this rule, an agreement that does not contain option (i) in paragraph (3) and, where applicable, option (i) in paragraph (7) of Form B is materially different, and a lawyer must explain those different or added provisions to the client, and obtain the client's informed written consent.

[13] When attorney's fees are awarded by a court or included in a settlement, a question arises as to the proper method of calculating a contingent fee. Rule 1.5(c)(5) and paragraph (4) of the form agreements contained in Rule 1.5(f) state the default rule, but the parties may agree on a different basis for such calculation, such as applying the percentage to the total recovery, including attorney's fees.

# Exhibit K
# Redacted

# Exhibit L

# NEWBERG
## ON CLASS ACTIONS

### FIFTH EDITION

### Volume 5
### Chapters 15 to 17

**William B. Rubenstein**
Sidley Austin Professor of Law
Harvard Law School




THOMSON REUTERS™

*For Customer Assistance Call 1-800-328-4880*

Mat #41621726

# Table of Contents

## CHAPTER 15.   ATTORNEY'S FEES

## I.   ATTORNEY'S FEES—INTRODUCTION

§ 15:1    Attorney's fees in class action lawsuits
§ 15:2    Choice of law principles

## II.   CLASS ACTION FEE PROCEDURES

§ 15:3    Class action fee procedures—Generally
§ 15:4    Fee issues at a class action's outset—Generally
§ 15:5    —*Ex ante* fee management
§ 15:6    —Timekeeping requirements
§ 15:7    —*Ex ante* fee setting
§ 15:8    Interim fee awards
§ 15:9    Fee procedures at a class action's conclusion—
          Generally
§ 15:10   —Motion requirement
§ 15:11   —Content requirement
§ 15:12   —Disclosure of fee-related agreements
          requirement
§ 15:13   —Timing requirement
§ 15:14   —Notice requirement
§ 15:15   —Objections by class members
§ 15:16   —Hearing
§ 15:17   —Delegation
§ 15:18   —Judicial findings requirement
§ 15:19   —Appeal
§ 15:20   —Automatic stay prior to payment
§ 15:21   —Deferral of payment
§ 15:22   —Fee motions by parties other than class
          counsel
§ 15:23   Fee allocation procedures in class actions
§ 15:24   Procedures governing common benefit fees in
          MDLs

## III. STATUTORY FEE-SHIFTING

### A. ENTITLEMENT TO STATUTORY FEES

§ 15:25   Fee-shifting defined
§ 15:26   Federal fee-shifting statutes
§ 15:27   Timely request
§ 15:28   Standing to seek fees
§ 15:29   Liable party
§ 15:30   Entitlement to a fee—Prevailing party
§ 15:31   —Prevailing plaintiffs
§ 15:32   —Prevailing defendants
§ 15:33   —Prevailing intervenors
§ 15:34   —Prevailing *pro se* litigants
§ 15:35   —Prevailing *amici curiae*
§ 15:36   Special circumstances militating against an award
§ 15:37   Fee waivers

### B. CALCULATION OF STATUTORY FEES

§ 15:38   Lodestar method—Explained
§ 15:39   Reasonable rate calculation—Generally
§ 15:40   —Establishing the market rate
§ 15:41   —Market rates for lawyers paid non-market rates
§ 15:42   —Defining the market
§ 15:43   —*Laffey* matrix
§ 15:44   Reasonable hours calculation—Generally
§ 15:45   —Compensable time
§ 15:46   —Partial success
§ 15:47   —Documentation requirement
§ 15:48   —Padding
§ 15:49   Lodestar adjustment—Generally
§ 15:50   —Upward adjustment
§ 15:51   —Downward adjustment
§ 15:52   Percentage cross-check

## IV. COMMON FUND FEES

### A. ENTITLEMENT TO COMMON FUND FEES

§ 15:53   Common fund doctrine
§ 15:54   Entitlement to a common fund fee—Generally
§ 15:55   Threshold requirements—Generally

TABLE OF CONTENTS

§ 15:56   —Presence of a common fund
§ 15:57   —Fund under court's supervision
§ 15:58   Entitlement rule: creation, preservation, or
           enhancement of common fund—Generally
§ 15:59   —Collateral work by class counsel
§ 15:60   —Work by collateral counsel including objectors'
           counsel
§ 15:61   Elements of unjust enrichment

## B.   CALCULATION OF COMMON FUND FEES

§ 15:62   Common fund fee methods
§ 15:63   Lodestar or percentage method—Generally
§ 15:64   —History
§ 15:65   —Costs and benefits of each method
§ 15:66   —Summary of circuits' approaches to lodestar/
           percentage choice
§ 15:67   —Empirical data on lodestar/percentage choice
§ 15:68   Applying the percentage method—Generally
§ 15:69   —Value of fund—Generally
§ 15:70   — —Valuing reversionary and claims-made
           funds
§ 15:71   — —Valuing coupons under the Class Action
           Fairness Act (CAFA)
§ 15:72   —Reasonableness of percentage—Generally
§ 15:73   — —Policy concerns
§ 15:74   — —Pertinence of individual contingent fee
           agreement with named plaintiff
§ 15:75   — —Pertinence of institutional fee agreement
           in PSLRA and other cases
§ 15:76   — —Pertinence of fee agreement with
           defendant
§ 15:77   — —Multifactor test approach
§ 15:78   — —Benchmark approach
§ 15:79   — —Market approach
§ 15:80   — —Sliding scale approach
§ 15:81   — —Mega-fund approach
§ 15:82   — —Summary of circuits' approaches to
           percentage review
§ 15:83   — —Empirical data on percentages awarded
§ 15:84   —Lodestar cross-check—Generally
§ 15:85   — —Explained
§ 15:86   —Lodestar cross check—Costs and benefits

§ 15:87      — —Assessing the reasonableness of the
             resulting multiplier
§ 15:88      — — Summary of circuits' approaches to
             lodestar cross-check
§ 15:89      —Lodestar cross-check—Empirical data on
             cross-checks and multipliers
§ 15:90      Applying the lodestar method in common fund
             cases—Generally
§ 15:91      —Multipliers in common fund vs. fee-shifting
             cases
§ 15:92      —Percentage cross-checks
§ 15:93      —Time spent advocating for fees ("fees-on
             fees")
§ 15:94      Calculating objector's fees
§ 15:95      Common fund fee calculation rules by circuit—
             Generally
§ 15:96      —First Circuit
§ 15:97      —Second Circuit
§ 15:98      —Third Circuit
§ 15:99      —Fourth Circuit
§ 15:100     —Fifth Circuit
§ 15:101     —Sixth Circuit
§ 15:102     —Seventh Circuit
§ 15:103     —Eighth Circuit
§ 15:104     —Ninth Circuit
§ 15:105     —Tenth Circuit
§ 15:106     —Eleventh Circuit
§ 15:107     —District of Columbia Circuit

## V.   SUBSTANTIAL BENEFIT DOCTRINE

§ 15:108     Substantial benefit doctrine—Defined
§ 15:109     —History
§ 15:110     —Doctrinal requirements
§ 15:111     —Calculation method

## VI.   COMMON BENEFIT FEES

§ 15:112     Common benefit fees—Generally
§ 15:113     —Arguments for and against
§ 15:114     —Legal basis
§ 15:115     —Procedures governing assessment and award
§ 15:116     —Calculation method
§ 15:117     —Empirical data on frequency and size

Table of Contents

# CHAPTER 16.  COSTS

§ 16:1    Costs and expenses—Generally
§ 16:2    Taxable costs—Definition of taxable costs
§ 16:3    —Procedures for the recovery of taxable costs
§ 16:4    —Standards governing the recovery of taxable costs
§ 16:5    Nontaxable costs—Definition of nontaxable costs
§ 16:6    —Procedures for the recovery of nontaxable costs—Generally
§ 16:7    — —*Ex ante* cost guidelines
§ 16:8    — —Interim cost recovery
§ 16:9    — —Final judgment
§ 16:10   —Standards governing the recovery of nontaxable costs
§ 16:11   Appellate review of cost decisions

# CHAPTER 17.  INCENTIVE AWARDS

§ 17:1    Incentive awards—Generally
§ 17:2    History and nomenclature of incentive awards
§ 17:3    Rationale for incentive awards
§ 17:4    Legal basis for incentive awards
§ 17:5    Source of incentive awards
§ 17:6    Eligibility for incentive awards
§ 17:7    Frequency of incentive awards
§ 17:8    Size of incentive awards
§ 17:9    Judicial review—Generally
§ 17:10   —Timing of motion
§ 17:11   —Burden of proof
§ 17:12   —Documentation requirement
§ 17:13   —Standards of assessment
§ 17:14   —Disfavored practices—Generally
§ 17:15   — —Conditional awards
§ 17:16   — —Percentage-based awards
§ 17:17   — —*Ex ante* incentive award agreements
§ 17:18   — —Excessive awards
§ 17:19   Incentive awards in securities class actions under the PSLRA
§ 17:20   Incentive awards for objectors
§ 17:21   Appellate review of incentive awards

damages."[3]

The normal practice is that class counsel files a motion for the award of attorney's fees in conjunction with moving for final approval of a proposed class action settlement.[4] That motion will often also encompass requests for costs and for incentive awards for the class representatives. If multiple counsel expect to file fee motions in the same case, they are encouraged to resolve disputes and coordinate the contents of their filings before submission.[5]

The succeeding sections discuss the required contents of a fee motion,[6] as well as the disclosure of fee-related agreements in the fee filings,[7] the timing of the filing,[8] and the notice that must accompany it.[9]

## § 15:11    Fee procedures at a class action's conclusion—Content requirement

Rule 23(h) governs fee petitions in class action lawsuits and that Rule, in turn, adopts the procedures of Rule 54(d)(2), as applicable.[1] Both Rule 23[2] and Rule 54[3] require a fee claim to be made by motion.[4]

Rule 54(d)(2)(B) sets forth the required content of a fee

---

[3]Fed. R. Civ. P. 54(d)(2)(A).

[4]On the settlement approval process, *see* Rubenstein, 4 **Newberg on Class Actions** §§ 13:10 to 13:61 (5th ed.).

[5]Manual for Complex Litigation, Fourth, § 14.221 ("Where multiple counsel in the case expect to submit separate fee motions, consider requiring them to coordinate their submissions, avoid duplication, and perhaps attempt to resolve disputes among themselves before submission.").

[6]*See* Rubenstein, 5 **Newberg on Class Actions** § 15:11 (5th ed.).

[7]*See* Rubenstein, 5 **Newberg on Class Actions** § 15:12 (5th ed.).

[8]*See* Rubenstein, 5 **Newberg on Class Actions** § 15:13 (5th ed.).

[9]*See* Rubenstein, 5 **Newberg on Class Actions** § 15:14 (5th ed.).

**[Section 15:11]**

[1]Fed. R. Civ. P. 23(h)(1) ("A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets.").

[2]Fed. R. Civ. P. 23(h)(1) ("A claim for an award must be made by motion under Rule 54(d)(2) . . .").

[3]Fed. R. Civ. P. 54(d)(2)(A) ("A claim for attorney's fees . . . must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.").

[4]*See* Rubenstein, 5 **Newberg on Class Actions** § 15:10 (5th ed.).

motion, stating that it must:

- specify the judgment and the statute, rule, or other grounds entitling the movant to the award;[5]
- state the amount sought or provide a fair estimate of it;[6] and
- disclose, if the court so orders, the terms of any agreement about fees for the services for which the claim is made.[7]

The Rule's requirements are already fairly limited[8] and courts have used their discretion to excuse failures to meet even those limited requirements in certain circumstances.[9]

The first requirement—that the motion identify the legal basis for a fee[10]—is straightforward and non-controversial.

The second requirement—that the motion identify the amount sought[11]—raises a question of what level of detail is required in the fee motion. The best practice is for counsel to submit their time records and hourly rates—that is, their lodestar information[12]—via an affidavit accompanying the fee motion. Such documentation is required to be submitted at some point for any lodestar-based fee award and is generally helpful to a court in assessing a percentage-based fee award as it enables the court to undertake a lodestar cross-

---

[5]Fed. R. Civ. P. 54(d)(2)(B)(ii).

[6]Fed. R. Civ. P. 54(d)(2)(B)(iii).

[7]Fed. R. Civ. P. 54(d)(2)(B)(iv).

[8]Wright and Miller's Federal Practice and Procedure, Civil § 2680 ("Because of the early filing deadline for fees, the rule does not require that the motion be fully supported at the time of filing by all of the evidentiary material bearing on fees.").

[9]Morris v. Arizona Beverage Co., L.L.C., 2005 WL 5544961, *9 (S.D. Fla. 2005) (excusing noncompliance with a local rule analogous to Rule 54 because, *inter alia*, the plaintiff did not allege that the defendant's noncompliance prejudiced him in any way).

DeShiro v. Branch, 183 F.R.D. 281, 285, 76 Empl. Prac. Dec. (CCH) P 46028 (M.D. Fla. 1998) (excusing failure to state or estimate the amount of fee being sought in the motion because the moving party alerted its opponents to a rough estimate in another piece of correspondence).

[10]Fed. R. Civ. P. 54(d)(2)(B)(ii).

[11]Fed. R. Civ. P. 54(d)(2)(B)(iii).

[12]For a discussion of the lodestar concept, *see* Rubenstein, 5 **Newberg on Class Actions** § 15:38 (5th ed.).

check.[13] The *Manual for Complex Litigation* states that if counsel's time and expense records are not submitted with the motion, they should be submitted "[i]n advance of any fee-award hearing"[14] and "in manageable and comprehensible form."[15] As class members have a right to review and object to a fee petition, this information is critical in that analysis and ought therefore to be disclosed in conjunction with the filing of the motion and dissemination of fee notice to the class.

The third prong of Rule 54(d)(2)'s motion requirement—concerning disclosure of fee agreements[16]—is discretionary with the court. It raises a host of particular issues in the class action context, which are the subject of the succeeding section.[17]

## § 15:12   Fee procedures at a class action's conclusion—Disclosure of fee-related agreements requirement

Rule 23(h) governs fee petitions in class action lawsuits and that Rule, in turn, adopts the procedures of Rule 54(d)(2), as applicable.[1] Both Rule 23[2] and Rule 54[3] require a fee claim to be made by motion. Rule 54(d)(2)(B) sets forth the required content of a fee motion,[4] including the requirement that the motion must "disclose, if the court so orders, the terms of any agreement about fees for the services for

---

[13]For a discussion of the lodestar cross-check concept, *see* Rubenstein, 5 **Newberg on Class Actions** § 15:84 (5th ed.).

[14]Manual for Complex Litigation, Fourth, § 14.223.

[15]Manual for Complex Litigation, Fourth, § 14.223.

[16]Fed. R. Civ. P. 54(d)(2)(B)(iv).

[17]*See* Rubenstein, 5 **Newberg on Class Actions** § 15:12 (5th ed.).

**[Section 15:12]**

[1]Fed. R. Civ. P. 23(h)(1) ("A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets.").

[2]Fed. R. Civ. P. 23(h)(1) ("[A] claim for an award must be made by motion under Rule 54(d)(2) . . .").

[3]Fed. R. Civ. P. 54(d)(2)(A) ("A claim for attorney's fees . . . must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.").

[4]For an overview of the Rule's requirements, *see* Rubenstein 5 **Newberg on Class Actions** § 15:11 (5th ed.).

which the claim is made."[5] Relatedly, Rule 23(e), governing class action settlement approval, states that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the [settlement] proposal."[6]

The parties to the suit and their counsel may have a range of private agreements concerning fees. Such agreements might include:

- a retainer agreement between the class representatives and class counsel;
- a retainer agreement between individual class members and their counsel, including objectors and objectors' counsel;
- an agreement between class counsel and the defendant—often embedded in the settlement agreement—whereby the defendant agrees to pay, or not to contest, a certain fee request by class counsel;[7]
- agreements among class counsel about the allocation of fees; and
- agreements between class counsel and non-class counsel about the allocation of fees, such as payment to counsel who helped fund the case but may not have played a material role in litigating it.

While Rule 54(d)(2)(B)(iv) makes disclosure of such agreements dependent on a judicial order, there are at least two reasons that courts should regularly order disclosure. *First,* given that the court is acting as a fiduciary for absent class members in overseeing the settlement approval and fee process,[8] there is a strong argument that requiring transparency as to the fees is in the class's interest and hence a court

---

[5]Fed. R. Civ. P. 54(d)(2)(B)(iv).

[6]Fed. R. Civ. P. 23(e)(3).

[7]This is referred to as a "clear sailing agreement." For a discussion, *see* Rubenstein, 4 **Newberg on Class Actions** § 13:9 (5th ed.).

[8]In re High Sulfur Content Gasoline Products Liability Litigation, 517 F.3d 220, 228, 69 Fed. R. Serv. 3d 1516 (5th Cir. 2008) ("The district court's close scrutiny of fee awards serves to 'protect the nonparty members of the class from unjust or unfair settlements affecting their rights as well as to minimize conflicts that may arise between the attorney and the class, between the named plaintiffs and the absentees, and between various subclasses.' The court's review also 'guards against the public perception that attorneys exploit the class action device to obtain large fees at the expense of the class.' " (quoting Strong v. BellSouth

should so order their disclosure.[9] The Fifth Circuit has put the argument in these terms, writing in a case concerning the allocation of fees among counsel:

> On a broad public level, fee disputes, like other litigation with millions at stake, ought to be litigated openly. Attorneys' fees, after all, are not state secrets that will jeopardize national security if they are released to the public . . . From the perspective of class welfare, publicizing the process leading to attorneys' fee allocation may discourage favoritism and unsavory dealings among attorneys even as it enables the court better to conduct oversight of the fees. If the attorneys are inclined to squabble over the generous fee award, they are well positioned to comment—publicly—on each other's relative contribution to the litigation.[10]

Some courts may require disclosure of fee agreements by an initial case management order; others may do so at the conclusion of the case.

*Second*, in evaluating the merits of the fee petition, courts have "given weight to agreements among the parties regarding the fee motion, and to agreements between class counsel and others about the fees claimed by the motion."[11] As the Advisory Committee that adopted Rule 23's fee provision states, "[t]he agreement by a settling party not to oppose a fee application up to a certain amount, for example, is worthy of consideration, but the court remains responsible to determine a reasonable fee. 'Side agreements' regarding fees provide at least perspective pertinent to an appropriate fee award."[12] Moreover, the Committee noted that "[i]n some circumstances individual fee agreements between class counsel and class members might have provisions inconsistent with

---

Telecommunications, Inc., 137 F.3d 844, 849, 1998-1 Trade Cas. (CCH) ¶ 72098, 40 Fed. R. Serv. 3d 462 (5th Cir. 1998))).

For a discussion of this fiduciary duty, *see* Rubenstein, 4 **Newberg on Class Actions** § 13:40 (5th ed.).

[9]In re High Sulfur Content Gasoline Products Liability Litigation, 517 F.3d 220, 229, 69 Fed. R. Serv. 3d 1516 (5th Cir. 2008) (concluding that a "lack of transparency [in fee allocation process] supports a perception that many of these attorneys were more interested in accommodating themselves than the people they represent").

[10]In re High Sulfur Content Gasoline Products Liability Litigation, 517 F.3d 220, 230, 69 Fed. R. Serv. 3d 1516 (5th Cir. 2008).

[11]Fed. R. Civ. P. 23(h) advisory committee's note (2003).

[12]Fed. R. Civ. P. 23(h) advisory committee's note (2003).

th[e] goals [of ensuring an overall fee that is fair for counsel and equitable within the class], and the court might determine that adjustments in the class fee award were necessary as a result."[13] These passages suggest the relevance of fee agreements, another factor suggesting that courts should routinely order their disclosure.

Finally, as noted above, in addition to Rule 54's disclosure requirements, Rule 23(e), governing class action *settlement*—not *fee*—approval, states that "[t]he parties seeking approval must file a statement identifying any agreement made in connection with the [settlement] proposal."[14] This generally references the settlement agreement itself, but, given the broader language covering agreements "made in connection with the [settlement] proposal," agreements beyond the settlement agreement itself—such as any agreements about fees—may also fall within the purview of Rule 23(e). Courts generally do not read Rule 23(e)'s disclosure requirement as requiring disclosure of fee agreements among counsel on the ground that such agreements do not necessarily affect the class's interests.[15] There may be some cases where this reasoning is incorrect, as some agreements among counsel would impact settlement terms and hence should be disclosed to the class. For example, if one set of counsel's fee allocation was capped at a certain amount, that counsel would have less interest in pushing further on behalf of the class once her cap was met. Moreover, there is little obvious downside from transparency so not only should courts order disclosure of fee agreements under Rule 54(d)(2), but settling parties should also readily provide them under Rule 23(e) in any case.

## § 15:13   Fee procedures at a class action's conclusion—Timing requirement

Rule 23(h) governs fee petitions in class action lawsuits and that Rule, in turn, adopts the procedures of Rule

---

[13]Fed. R. Civ. P. 23(h) advisory committee's note (2003).

[14]Fed. R. Civ. P. 23(e)(3).

[15]Hartless v. Clorox Co., 273 F.R.D. 630, 646 (S.D. Cal. 2011), aff'd in part, 473 Fed. Appx. 716 (9th Cir. 2012) ("The allocation of . . . fees amongst class counsel does not affect the monetary benefit to class members.").

# Exhibit M

# MOORE'S FEDERAL PRACTICE®
# THIRD EDITION

## VOLUME 10

*JAMES WM. MOORE*

**BOARD OF EDITORS**
*Daniel R. Coquillette*
J. Donald Monan, S.J.,
University Professor of Law, Boston College
and Charles Warren Visiting Professor of American Legal History
Harvard Law School

*Gregory P. Joseph*
Joseph Hage Aaronson LLC
New York

*Georgene M. Vairo*
David P. Leonard Professor of Law
Loyola Law School
Los Angeles

*Chilton Davis Varner*
King & Spalding
Atlanta

2018

 LexisNexis®

# *Volume 10 Table of Contents*

A COMPLETE SYNOPSIS FOR EACH CHAPTER APPEARS AT
THE BEGINNING OF THE CHAPTER

**FEDERAL RULES OF CIVIL PROCEDURE** (*continued*)

**TITLE VII.**       **JUDGMENT**

**CHAPTER 54.**       **JUDGMENT; COSTS**

PART A.   Definition and Form of Judgment
54.01                 Text of Civil Rule 54
54.02                 Definition of Judgment
54.03                 Form of Judgment
54.04–54.19   [Reserved]

PART B.   Judgment on Multiple Claims or Multiple Parties
54.20                 Validity of Rule 54(b)
54.21                 Purpose of Rule 54(b)
54.22                 Power of Court to Enter Judgment Under Rule 54(b)
54.23                 Discretion of Court to Enter Judgment Under Rule 54(b)
54.24                 Practice Under Rule 54(b)
54.25                 "Negative Effect" of Absence of Rule 54(b) Certification
54.26                 Rule 54(b) Judgment Is Judgment for All Purposes
54.27                 Effect of Rule 54(b) on Appellate Jurisdiction
54.28                 Appeal of District Court's Entry of Judgment Under Rule 54(b)
54.29                 Application of Rule 54(b) in Specific Multi-Claim and Multi-Party
                      Actions
54.30–54.69   [Reserved]

PART C.   Demand for Judgment
54.70                 Relation of Rule 54(c) to Other Rules
54.71                 Default Judgment
54.72                 Judgments Other Than by Default
54.73–54.99   [Reserved]

PART D.   Costs Under Rule 54(d)
54.100                Procedure for Obtaining Costs
54.101                Costs Generally Recoverable by "Prevailing Party"
54.102                Federal Statutes and Rules Authorizing Award of Costs to One Other
                      Than Prevailing Party
54.103                Costs Recoverable
54.104                Costs for and Against Particular Persons
54.105                Security for Costs Generally Not Required

## *Volume 10 Table of Contents*

54.106–54.149   [Reserved]

    PART E.   Attorneys' Fees Under Rule 54(d)

      1.   Procedure for Obtaining Fees

54.150   Applicability of Rule 54(d)(2)
54.151   Time for Filing Fee Motion
54.152   Notice of Fee Motion
54.153   Effect of Fee Motion on Time to Appeal
54.154   Fee Motion Must State Basis for Fee Award and Estimate Amount Sought
54.155   Evidentiary Submissions Supporting and Opposing Fee Motion
54.156   Discovery on Issues Related to Fee Motion May Be Granted to Resolve Disputed Factual Issues
54.157   Resolution of Fee Motion by District Court
54.158   Appeal and Execution of Fee Award
54.159–54.169   [Reserved]

      2.   Bases for Recovery of Attorneys' Fees

54.170   "American Rule" Generally Prohibits Recovery of Attorney's Fees
54.171   Exceptions to American Rule
54.172   Recovery of Attorney's Fees From Governmental Entities
54.173   Fees For and Against Particular Litigants Under Fee-Shifting Statutes
54.174   Effect of Presence or Absence of Fee Contract
54.175–54.189   [Reserved]

      3.   Determination of Reasonable Fee Amount

54.190   Lodestar Method of Fee Calculation
54.191   Percentage of Recovery Method of Fee Calculation

## Historical Appendix

    PART A.   Legislative History for Rule 54
54App.01   Original Rule 54
54App.02   1946 Amendment to Rule 54
54App.03   1955 Proposed but Unadopted Amendment to Rule 54
54App.04   1961 Amendment to Rule 54
54App.05   1987 Amendment to Rule 54
54App.06   1993 Amendment to Rule 54
54App.07   2002 Amendment to Rule 54
54App.08   2003 Amendment to Rule 54
54App.09   2007 Amendment to Rule 54
54App.10   2009 Amendment to Rule 54

(Rel. 188-12/2015   Pub.410)

## *Volume 10 Table of Contents*

54App.11–54App.99    [Reserved]

PART B.    Historical Analysis of Rule 54
54App.100              Summary of Amendments to Rule 54
54App.101              Final Judgment Rule and Single Judicial Unit Theory
54App.102              History of Rule 54(b) and Its Amendments
54App.103              History of Assessment of Costs Against United States

## CHAPTER 55.        DEFAULT; DEFAULT JUDGMENT

PART A.    Rule and Its Context
55.01                 Text of Rule
55.02                 Historically, Courts Have Disfavored Default Judgments
55.03                 Other Procedures Compared
55.04–55.09    [Reserved]

PART B.    Entry of Default
55.10                 Entry of Default Is First Step in Obtaining Default Judgment
55.11                 Prerequisites to Entry of Default
55.12                 When Prerequisites Are Satisfied, Clerk Enters Default
55.13                 Entry of Default Is Interlocutory and Not Subject to Immediate Appeal
55.14–55.19    [Reserved]

PART C.    Default Judgment

   1.   Judgment Entered by Clerk

55.20                 After Default, Clerk Enters Judgment for Claimant When Damages Are
                      Certain
55.21                 Clerk May Not Enter Judgment If Defaulting Party Has Appeared in
                      Action
55.22                 Clerk May Not Enter Judgment Against Defaulting Party Who Is Minor
                      or Incompetent
55.23                 Clerk May Not Enter Judgment Against U.S. Government, Officers, or
                      Agencies
55.24                 Clerk May Not Enter Final Judgment With Respect to Some Claims or
                      Parties When Other Claims Remain Pending
55.25                 Party Seeking Default Judgment by Clerk Must Make Request
55.26–55.29    [Reserved]

   2.   Judgment Rendered by Court

55.30    Party Seeking Default Judgment in All Cases in Which Clerk May Not Enter
         Judgment Must Seek Judgment From Court
55.31    Court Has Discretion Whether to Render Default Judgment
55.32    Court Must Determine Amount of Damages to Be Awarded

(Rel. 188-12/2015   Pub.410)

## *Volume 10 Table of Contents*

55.33   Parties Who Have Appeared Are Entitled to Notice of Hearing

55.34   Rule 54(c) Limits Nature and Amount of Default Judgment

55.35   Default Judgment Against Minor or Incompetent Possible Only If Representative Appears

55.36   Special Treatment May Apply in Cases Involving Multiple Claims or Multiple Parties

55.37   Court Must Have Subject-Matter and Personal Jurisdiction

55.38–55.49   [Reserved]

   3.   Judgments Against Governments and Governmental Entities

55.50   Default Against United States, Agencies, or Officers Has Limited Effect

55.51   Default by Foreign Government or Agency of Foreign Government Has Limited Effect

55.52–55.59   [Reserved]

   4.   Appeal of Default Judgments

55.60   Scope of Appeal of Default Judgments Is Limited

55.61–55.69   [Reserved]

PART D.   Setting Aside Defaults and Default Judgments

   1.   Setting Aside Default

55.70   Court May Set Aside Entry of Default for "Good Cause"

55.71   Rule 55 Does Not Create Specific Procedures for Motion to Set Aside Entry of Default

55.72–55.79   [Reserved]

   2.   Setting Aside Default Judgment

55.80   Rule 60(b) Sets Standards and Procedures for Motion to Set Aside Final Default Judgments

55.81   Default Judgments Are Disfavored, so That Grant of Relief Is More Likely Than Denial

55.82   Court May Set Aside Default Judgment When Failure to Answer Was Result of Excusable Neglect

55.83   Default Judgments Are Final and Have Preclusive Effect

55.84   Collateral Attack on Judgment Possible for Lack of Jurisdiction

55.85–55.89   [Reserved]

PART E.   Servicemembers Civil Relief Act

55.90   Service members Civil Relief Act Provides Protection Against Default Judgment for Member of Armed Service on Active Duty

55.91   Servicemembers Civil Relief Act Provides Special Procedures for Setting Aside Default Judgments Against Servicemember

(Rel. 188-12/2015   Pub.410)

## *Volume 10 Table of Contents*

### Historical Appendix

PART A.   Legislative History for Rule 55
55App.01                Original Committee Note of 1937
55App.02                Supplementary Committee Note of 1946
55App.03                1987 Amendments to Rule 55
55App.04                2007 Amendment to Rule 55
55App.05                2009 Amendment to Rule 55
55App.06                2015 Amendment to Rule 55
55App.07–55App.99   [Reserved]

PART B.   Historical Analysis of Rule 55
55App.100               General History of Rule 55

(Rel. 188-12/2015   Pub.410)

The district court may suspend the finality of the merits judgment only prior to the filing of an effective notice of appeal.[10] If the fee opponent files an effective notice of appeal before the filing of the fee motion, the court is no longer in a position to suspend the finality of the merits judgment (*see generally* Ch. 58, *Entering Judgment*).

## § 54.154    Fee Motion Must State Basis for Fee Award and Estimate Amount Sought

As to the content of a motion for fees, Rule 54(d)(2)(B) is not demanding. The motion must:

- Specify the judgment entitling the movant to fees;[1]

- Specify the grounds for the fee award, i.e., identify the statutory,[2] equitable, or other basis for the award; and

- State or estimate the amount of the fee sought.[3]

The statute authorizing fees may impose additional requirements for the motion. For example, an applicant for a fee award against the federal government under the Equal Access to Justice Act (EAJA) must submit an application that (1) shows the applicant was the prevailing party, (2) shows the applicant is eligible to receive an award of fees, (3) shows the amount sought, and (4) alleges that the position of government in the case was not substantially justified (*see* § 54.172[1][b]).[4]

A fee movant need not, and indeed should not, submit copious evidentiary materials designed to prove the right to a fee or the amount of the fee. Those evidentiary materials should be submitted only as directed by the court (*see* § 54.155).

If the court so directs, the fee motion must also disclose the terms of any fee agreement with respect to the services implicated by the motion.[5] This authorization is broad enough to include not only the fee agreement between the fee movant and counsel, but also agreements between counsel splitting a fee to be awarded, or between adversaries settling a dispute when the dispute requires court approval, such as a class action suit or shareholder derivative action.[6] The compelled disclosure of such fee

---

plaintiff's requests for prejudgment interest and for refund of payments made to defendant extends time to appeal).

[10]  Fed. R. Civ. P. 58.

[1]  Fed. R. Civ. P. 54(d)(2)(B)(ii).

[2]  Fed. R. Civ. P. 54(d)(2)(B)(ii).

[3]  Fed. R. Civ. P. 54(d)(2)(B)(iii).

[4]  **Requirements for fee application under EAJA.** 28 U.S.C. § 2412(d)(1)(B); *see* Scarborough v. Principi, 319 F.3d 1346, 1348–1355 (Fed. Cir. 2003) (if fee applicant does not supply all required elements prior to expiration of EAJA's 30-day application deadline, trial court will lack jurisdiction to award fees under EAJA).

[5]  Fed. R. Civ. P. 54(d)(2)(B)(iv). Pierce v. Barnhart, 440 F.3d 657, 664–665 (5th Cir. 2006) (motion for attorney's fees need not include terms of applicable fee agreement unless directed by court or required by local court rules).

[6]  *See* Committee Note of 1993 to Amendment to Rule 54 (reproduced verbatim at § 54App.06[2]).

# **Exhibit N**

## THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS

In Re: Heartland Payment §
Systems, Inc. Customer Data §
Security Breach Litigation §
_____ §     Civil Action No. 4:09-MD-2046
 §
This filing relates to: §
 §
CONSUMER TRACK ACTIONS §

## SETTLEMENT AGREEMENT

This Settlement Agreement, dated as of December 18, 2009, is made and entered into by and among the following Settling Parties (as defined below) to the above-captioned consolidated action: (i) Julie Barrett, Mark Hilliard, Derek Hoven, Talal Kaissi, Loretta A. Sansom, Scott Swenka, and Phillip Brown ("Representative Consumer Plaintiffs"), individually and on behalf of the Settlement Class (as defined below), by and through Ben Barnow, Barnow and Associates, P.C.; Lance A. Harke, Harke & Clasby LLP; and Burton H. Finkelstein, Finkelstein Thompson LLP (together, "Co-Lead Settlement Class Counsel"); and (ii) Heartland Payment Systems, Inc. ("Heartland"), by and through its counsel of record, Harvey J. Wolkoff and Mark P. Szpak, Ropes & Gray LLP. The Settlement Agreement is intended by the Settling Parties fully, finally, and forever to resolve, discharge, and settle the Released Claims (as defined below), upon and subject to the terms and conditions hereof.

## I. THE LITIGATION

On January 20, 2009, Heartland issued a press release, stating that its processing system had incurred an unauthorized intrusion sometime in 2008 (the "Heartland Intrusion"), and that names, credit/debit card numbers, expiration dates, and other information on certain payment cards processed through Heartland ("Personal Financial Information") appeared to have been accessed as a result of the unauthorized intrusion. According to Heartland, its internal investigation revealed that

the hacker(s) had hidden malicious software in its payment processing system that allowed access to this sensitive consumer data.

The first consumer class action complaint in the nation related to the Heartland Intrusion was filed on January 23, 2009, on behalf of a putative nationwide class of consumers whose Personal Financial Information was alleged to have been negligently, willfully, and/or recklessly allowed to be stolen from Heartland.[1] A number of other consumer class action lawsuits were filed shortly thereafter.[2] The lawsuits collectively alleged, *inter alia*, that Heartland's failure to adequately protect consumers' Personal Financial Information violated the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et. seq.* ("FCRA"), was negligent, constituted a breach of express and implied contract, and violated various states' data breach notification statutes and consumer fraud and deceptive and unfair trade practices acts. The lawsuits sought statutory damages, compensatory damages, and injunctive relief stemming from the Heartland Intrusion.

On August 17, 2009, several individuals (the "Hackers") were indicted for hacking into the computer systems of various corporations, including Heartland. According to the Indictment, beginning on or about December 26, 2007, Heartland was the victim of an attack by the Hackers on its corporate computer network that resulted in malware being hidden in its payment processing

---

[1] *Sansom, et al. v. Heartland Payment Systems, Inc.*, No. 3:09cv335 (D.N.J.).

[2] *Brown, et al. v. Heartland Payment Systems, Inc.*, No. 2:09cv86 (M.D. Ala.); *Swenka v. Heartland Payment Systems, Inc.*, No. 2:09cv179 (D. Ariz.); *Brown, et al. v. Heartland Payment Systems, Inc.* No. 4:09cv384 (E.D. Ark.); *Hilliard v. Heartland Payment Systems, Inc.*, No. 1:09cv219 (E.D. Cal.); *Mata v. Heartland Payment Systems, Inc.*, No. 3:09cv376 (S.D. Cal.); *Read v. Heartland Payment Systems, Inc.*, No. 3:09cv35 (N.D. Fla.); *Balloveras v. Heartland Payment Systems, Inc.*, No. 1:09cv2032 (S.D. Fla.); *Leavell v. Heartland Payment Systems, Inc.*, No. 3:09cv270 (S.D. Ill.); *Barrett, et al. v. Heartland Payment Systems, Inc.*, No. 2:09cv2053 (D. Kan.); *McLaughlin v. Heartland Payment Systems, Inc.*, No. 6:09cv3069 (W.D. Mo.); *Merino v. Heartland Payment Systems, Inc.*, No. 3:09cv439 (D.N.J.); *Kaissi v. Heartland Payment Systems, Inc.*, No. 3:09cv540 (D.N.J.); *Rose v. Heartland Payment Systems, Inc.*, No. 3:09cv917 (D.N.J.); *McGinty, et al. v. Heartland Payment Systems, Inc.*, No. 1:09cv244 (N.D. Ohio); *Watson v. Heartland Payment Systems, Inc.*, No. 4:09cv325 (S.D. Tex.); *Anderson, et al. v. Heartland Payment Systems, Inc.*, No. 2:09cv113 (E.D. Wis.).

system, allegedly resulting in the theft of approximately 130 million credit and debit card numbers and corresponding personal information.

Pursuant to the order of the Judicial Panel on Multidistrict Litigation ("JPML") dated June 23, 2009, the JPML transferred all related actions to the United States District Court for the Southern District of Texas ("the Court"). The actions were divided into a "consumer track," consisting of the actions asserting putative class claims on behalf of consumers, and a "financial institution track," consisting of the actions asserting putative class claims on behalf of financial institutions.[3]

Pursuant to the terms set out below, this Settlement Agreement resolves all actions and proceedings asserted or that could have been asserted against Heartland in relation to the Heartland Intrusion by and on behalf of Representative Consumer Plaintiffs and Settlement Class Members (as defined below) in the United States (including the District of Columbia), and any other such actions by and on behalf of putative classes of consumers originating or that may originate in jurisdictions in the United States (including the District of Columbia) against Heartland related to the Heartland Intrusion (collectively, "the Litigation").

## II. CLAIMS OF THE REPRESENTATIVE CONSUMER PLAINTIFFS AND BENEFITS OF SETTLEMENT

Representative Consumer Plaintiffs believe that the claims asserted in the Litigation, as set forth in the various complaints, have merit. Representative Consumer Plaintiffs and Co-Lead

---

[3] The actions asserting putative class claims on behalf of financial institutions are as follows: *PBC Credit Union, et al. v. Heartland Payment Systems, Inc.*, No. 9:09cv80481 (S.D. Fla.); *Lone Summit Bank v. Heartland Payment Systems, Inc.*, No. 3:09cv581 (D.N.J.); *Tricentury Bank, et al. v. Heartland Payment Systems, Inc.*, No. 3:09cv697 (D.N.J.); *Amalgamated Bank, et al. v. Heartland Payment Systems, Inc.*, No. 3:09cv776 (D.N.J.); *Lone Star National Bank NA v. Heartland Payment Systems, Inc.*, No. 7:09cv64 (S.D. Tex.); *First Bankers Trust Company, National Bank Association v. Heartland Payment Systems, Inc.*, No. H-09-925 (S.D. Tex.); *Community West Credit Union v. Heartland Payment Systems, Inc.*, No. H-09-1201 (S.D. Tex.); *The Eden State Bank v. Heartland Payment Systems, Inc.*, No. H-09-1203 (S.D. Tex.); *Heritage Trust Federal Credit Union v. Heartland Payment Systems, Inc.*, No. H-09-1284 (S.D. Tex.); *Pennsylvania State Employees Credit Union v. Heartland Payment Systems, Inc.*, No. H-09-1330 (S.D. Tex.).

Settlement Class Counsel, however, recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Litigation against Heartland through motion practice, trial, and potential appeals.  Co-Lead Settlement Class Counsel also have taken into account the uncertain outcome and the risk of further litigation, as well as the difficulties and delays inherent in such litigation.  Co-Lead Settlement Class Counsel are also mindful of the inherent problems of proof and possible defenses to the claims asserted in the Litigation.  Co-Lead Settlement Class Counsel believe that the settlement set forth in this Settlement Agreement confers substantial benefits upon the Settlement Class (as defined below).  Co-Lead Settlement Class Counsel have determined that the settlement set forth in this Settlement Agreement is fair, reasonable, and adequate, and in the best interests of the Settlement Class.

## III.  DENIAL OF WRONGDOING AND LIABILITY

Heartland denies each and all of the claims and contentions alleged against it in the Litigation, and believes that these claims and contentions are totally without merit.  Specifically, Heartland denies all charges of wrongdoing or liability as alleged against it in the Litigation.  Nonetheless, Heartland has concluded that further conduct of the Litigation as it relates to the consumer track would be protracted and expensive, and that it is desirable that the Litigation be fully and finally settled in the manner and upon the terms and conditions set forth in this Settlement Agreement.  Heartland also has taken into account the uncertainty and risks inherent in any litigation.  Heartland has, therefore, determined that it is desirable and beneficial that the Litigation as it relates to the consumer track be settled in the manner and upon the terms and conditions set forth in this Settlement Agreement.

## IV.  TERMS OF SETTLEMENT

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, by and among Representative Consumer Plaintiffs, individually and on behalf of the Settlement Class, by and

through Co-Lead Settlement Class Counsel, and Heartland that, subject to the approval of the Court, the Litigation and the Released Claims shall be finally and fully compromised, settled, and released, and the Litigation shall be dismissed with prejudice as to all Settling Parties, upon and subject to the terms and conditions of this Settlement Agreement, as follows.

**1.     Definitions**

As used in the Settlement Agreement, the following terms have the meanings specified below:

1.1    "Claims" means known claims and Unknown Claims (as defined in ¶ 1.23), actions, allegations, demands, rights, liabilities, and causes of action of every nature and description whatsoever, whether contingent or non-contingent, and whether at law or equity.

1.2    "Claims Administration" means the processing of claims received from Settlement Class Members by the Claims Administrator.

1.3    "Claims Administrator" means such claims administrator as may be selected by Heartland and agreed to by Co-Lead Settlement Class Counsel.

1.4    "Co-Lead Settlement Class Counsel" means Ben Barnow, Barnow and Associates, P.C.; Lance A. Harke, Harke & Clasby LLP; and Burton H. Finkelstein, Finkelstein Thompson, LLP.

1.5    "Costs of Claims Administration" means all actual costs associated with or arising from Claims Administration.

1.6     "Effective Date" means the first date by which all of the events and conditions specified in ¶ 9.1 hereof have occurred and have been met.

1.7    "Eligible Payment Card Account" means an account used to make a transaction that was processed by Heartland between and including December 26, 2007 and December 31, 2008 (the "Settlement Class Period").

1.8    "Final" means the occurrence of all of the following events: (i) the settlement pursuant to this Settlement Agreement is approved by the Court; (ii) the Court has entered a Judgment (as that term is defined herein); (iii) the time to appeal or seek permission to appeal from the Judgment has expired or, if appealed, the appeal has been dismissed in its entirety, or the Judgment has been affirmed in its entirety by the court of last resort to which such appeal may be taken, and such dismissal or affirmance has become no longer subject to further appeal or review.  Notwithstanding the above, any order modifying or reversing any attorneys' fee award made in this case shall not affect whether the Judgment is "Final" as defined in the preceding sentence, or any other aspect of the Judgment.

1.9    "Judgment" means a judgment rendered by the Court, in the form attached hereto as Exhibit E, or a judgment substantially similar to such form in both terms and cost.

1.10    "Named Plaintiff" means each Person (as defined in ¶ 1.13 herein) who is named as a plaintiff in any pending case in the Litigation and who, prior to the execution of the Settlement Agreement by Co-Lead Settlement Class Counsel, joins in this settlement by affirming in a writing (which will be filed with the Court by the Settling Parties) that he or she, or his or her counsel, approve and join in this settlement.

1.11    "Notice Specialist" means Hilsoft Notifications, Souderton, Pennsylvania, or such other notice specialist as may be jointly agreed upon by the Settling Parties and approved by the Court.

1.12    "Opt-Out Date" means the date by which members of the Settlement Class must mail their requests to be excluded from the Settlement Class in order for that request to be effective.  The postmark date shall constitute the date of mailing for these purposes.

1.13    "Person" means an individual, corporation, partnership, limited partnership, limited liability company or partnership, association, joint stock company, estate, legal

representative, trust, unincorporated association, government or any political subdivision or agency thereof, and any business or legal entity, and their respective spouses, heirs, predecessors, successors, representatives, or assignees.

    1.14    "Plaintiffs' Counsel" means Co-Lead Settlement Class Counsel and all other attorneys who represent Named Plaintiffs who have joined in this settlement.

    1.15    "Related Parties" means an entity's past or present directors, officers, employees, principals, agents, attorneys, predecessors, successors, parents, subsidiaries, divisions and related or affiliated entities, and includes, without limitation, any Person related to such entity who is, was or could have been named as a defendant in any of the actions in the Litigation.

    1.16    "Released Sponsoring Banks" means KeyBank National Association and Heartland Bank.

    1.17    "Released Claims" shall collectively mean any and all Claims for Losses (as defined herein), including without limitation those arising under state or federal law of the United States (including, without limitation, any causes of action under the California Business & Professional Code § 17200 et seq., California Civil Code § 1798.80 – 84 et seq., California Civil Code § 1798.53, Tex. Bus. & Com. § 48.001 et seq., Georgia Code § 10-1-910 et seq., and any similar statutes in effect in any states in the United States; the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et. seq.*; the various states' data breach notification statutes; negligence; negligence *per se*; breach of contract; breach of fiduciary duty; breach of confidence; misrepresentation (whether fraudulent, negligent or innocent); unjust enrichment; and bailment), and also including, but not limited to, any and all claims in any state or federal court of the United States for damages, injunctive relief, disgorgement, declaratory relief, equitable relief, attorneys' fees and expenses, pre-judgment interest, credit monitoring services, the creation of a fund for future damages, statutory penalties, restitution, the appointment of a receiver, and any

other form of relief, that either have been asserted or could have been asserted by any Settlement Class Member against any of the Released Persons or any of the Indemnified Persons (as defined below) based on, relating to, concerning or arising out of the allegations, facts, or circumstances alleged in the Litigation or any other allegations, facts or circumstances with respect to the Heartland Intrusion. Without limitation of the foregoing, Released Claims specifically include Claims for Losses (as defined herein) stemming from the Heartland Intrusion that may have been or could have been asserted by any Settlement Class Member against any person or entity (such as, for example and without limitation, any entity that issued credit or debit cards to Settlement Class Members) (collectively, the "Indemnified Persons") that could seek indemnification or contribution from any of the Released Persons in respect of such Claim, except that Released Claims shall not include Claims by any individual Settlement Class Member against any card-issuing financial institution brought on an individual, case-by-case basis for reimbursement or waiver of purportedly fraudulent card charges (or other charges by the card-issuing financial institution in connection with purportedly fraudulent card charges) that such card-issuing financial institution assertedly should have reimbursed or waived but has refused to reimburse or waive. Released Claims shall not include the right of any Settlement Class Member or any Released Person or any Indemnified Person to enforce the terms of the settlement contained in the Settlement Agreement.

1.18    "Released Persons" means Heartland and its Related Parties and the Released Sponsoring Banks and their respective Related Parties.

1.19    "Representative Consumer Plaintiffs" means Julie Barrett, Mark Hilliard, Derek Hoven, Talal Kaissi, Loretta A. Sansom, Scott Swenka, and Phillip Brown.

1.20    "Settlement Class" means all Persons in the United States who had or have a payment card that was used in the United States between and including December 26, 2007 and

December 31, 2008 (the "Settlement Class Period"), and who allege or may allege that they have suffered any of the Losses defined herein. Excluded from the definition of Settlement Class are Heartland and its officers and directors, and those Persons who timely and validly request exclusion from the Settlement Class.

1.21 "Settlement Class Member(s)" means a Person(s) who falls within the definition of the Settlement Class.

1.22 "Settling Parties" means, collectively, Heartland and Representative Consumer Plaintiffs, individually and on behalf of the Settlement Class.

1.23 "Unknown Claims" means any of the Released Claims that any Settlement Class Member, including any Representative Consumer Plaintiff, does not know or suspect to exist in his favor at the time of the release of the Released Persons that, if known by him or her, might have affected his or her settlement with and release of the Released Persons, or might have affected his or her decision not to object to and/or to participate in this settlement. With respect to any and all Released Claims, the Settling Parties stipulate and agree that, upon the Effective Date, Representative Consumer Plaintiffs expressly shall have, and each of the other Settlement Class Members shall be deemed to have, and by operation of the Judgment shall have, waived the provisions, rights, and benefits conferred by California Civil Code § 1542, and also any and all provisions, rights, and benefits conferred by any law of any state, province or territory of the United States (including, without limitation, Montana Code Ann. § 28-1-1602; North Dakota Cent. Code § 9-13-02; and South Dakota Codified Laws § 20-7-11), which is similar, comparable, or equivalent to California Civil Code §1542, which provides:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Settlement Class Members, including Representative Consumer Plaintiffs, and any of them, may hereafter discover facts in addition to or different from those that they, and any of them, now know or believe to be true with respect to the subject matter of the Released Claims, but Representative Consumer Plaintiffs expressly shall have, and each other Settlement Class Member shall be deemed to have, and by operation of the Judgment shall have, upon the Effective Date, fully, finally, and forever settled and released any and all Released Claims. The Settling Parties acknowledge, and Settlement Class Members shall be deemed by operation of the Judgment to have acknowledged, that the foregoing waiver is a material element of the settlement of which this release is a part.

1.24  "United States" as used in this Settlement Agreement includes the District of Columbia.

## 2.  The Settlement

2.1  <u>Actual Damages Fund:</u>  Within ten (10) days following preliminary approval of the settlement, Heartland will place the principal amount of $1,000,000 (the "Initial Funding") into an interest-bearing, escrow account (the "Actual Damages Fund"). The Initial Funding will be used to reimburse Settlement Class Members who are determined to have submitted Valid Claims (as defined and described pursuant to ¶ 2.2). Interest on the Initial Funding will inure to the benefit of Settlement Class Members as and to the extent provided below.

(a)  In the event the Initial Funding and any interest accrued thereon is exceeded by the aggregate amount to be paid on approved Valid Claims pursuant to ¶ 2.2, Heartland will promptly replenish the Actual Damages Fund initially in the amount of $500,000, and in the event that the Actual Damages Fund is again so exceeded, Heartland will replenish it with an additional $500,000; and in the event that the Actual Damages Fund is again so exceeded, Heartland will replenish it with an additional $400,000, as advances for amounts needed to pay any additional Valid

Claims (the "Replenishment Fundings" and, jointly with the Initial Funding, the "Fundings"). In no event shall the Replenishment Fundings exceed a total of $1,400,000 in the aggregate, i.e., up to but not more than a total of $2,400,000 shall be placed cumulatively in the Actual Damages Fund by means of the Fundings.

(b) In the event the Initial Funding and any interest accrued thereon is not entirely depleted by the payment of Valid Claims pursuant to ¶ 2.2, the unpaid balance of the Initial Funding and any interest accrued thereon will be transferred to a non-profit organization(s) dedicated to the protection of consumers' privacy rights, with emphasis on advancing the implementation of end-to-end encryption of payment card authorization transactions or similar security enhancements. This *cy pres* provision shall not apply, however, to the Replenishment Fundings, and any unused balance of the Replenishment Fundings shall be returned promptly to Heartland, with the interest accrued thereon. The organization(s) referred to herein will be designated by Heartland and shall be subject to approval by Co-Lead Settlement Class Counsel, which approval shall not be unreasonably withheld.

2.2     Reimbursement of Valid Claims:  Reimbursements to Settlement Class Members from the Actual Damages Fund will be made only for "Valid Claims."  A Valid Claim shall consist of only those "Losses" (as defined in ¶ 2.2 (b)) that a Settlement Class Member claims in accordance with Paragraph 2.2(a) below, and proves by a preponderance of the evidence (i.e., more likely than not to be true), to have directly and proximately resulted from information relative to an Eligible Payment Card Account of such Settlement Class Member having been stolen or placed at risk of being stolen as a result of the Heartland Intrusion, as determined either by the Claims Administrator or, in the event the Claims Administrator's determination is reviewed pursuant to ¶ 2.2(d) below, by the dispute resolution firm appointed pursuant thereto.

(a)     To be eligible for determination as a Valid Claim, a Settlement Class Member's claim for reimbursement of a Loss or Losses (a "Reimbursement Claim") must be submitted by mail on a written form agreed to by the parties and must be supported by documentation showing by a preponderance of the evidence, and a sworn certification attesting, that the claimant is a Settlement Class Member and that his or her or its claim is a Valid Claim. On the claim form, the Settlement Class Member must provide the number and expiration date of the payment card account that is the basis for such claim, for verification by Heartland and/or the Claims Administrator and/or the dispute resolution firm that such account is an Eligible Payment Card Account and evaluation of the claim, and such information shall be deemed confidential and protected as such by Heartland and/or the Claims Administrator and/or the dispute resolution firm, as appropriate.

(b)     A "Loss" or "Losses" shall consist only of: (i) reasonable, unreimbursed, out-of-pocket expenses (specifically, telephone or postage costs, other third-party charges resulting from card cancellations or replacements, unauthorized and unreimbursed account charges, or Identity-Theft-Related Charges (as defined below)) actually incurred by the Settlement Class Member; and, (ii) whether or not the Settlement Class Member has incurred any out-of-pocket expenses as referenced in 2.2(b)(i) above, a reasonable amount for time (calculated at $10 per hour up to five (5) hours) actually expended by the Settlement Class Member to address such a card cancellation, card replacement, unauthorized account charge, or Identity-Theft-Related Charge.  Losses shall in no event include credit monitoring or insurance costs incurred by Settlement Class Members, attorneys' fees, attorneys' costs or attorneys' expenses incurred by Settlement Class Members, or losses resulting from any information having been stolen or placed at risk of being stolen from an entity other than from Heartland.  For purposes of the definition of Losses, an "Identity-Theft-Related Charge" shall mean a charge, other than a charge to the Eligible Payment Card Account of

the Settlement Class Member, incurred as a result of someone's assuming the Settlement Class Member's identity and taking out and using credit or otherwise obtaining monies and other things of value fraudulently in the name of the Settlement Class Member. Valid Claims shall be limited to $175 per Settlement Class Member, with no more than two Valid Claims allowed per household. However, in the event that the Losses in a Settlement Class Member's Valid Claim include Identity-Theft-Related Charges, up to $10,000 in such Identity-Theft Related-Charges may be included in such Settlement Class Member's Valid Claim, but in no event shall the Settlement Class Member's reimbursement for a Valid Claim exceed $10,000. All allowable amounts of Valid Claims are subject to the limit on the Actual Damages Fund as set forth in ¶ 2.1. Losses shall be net of and not include any other recovery by or reimbursement of the Settlement Class Member of the expense in question and shall not include any other type of alleged damage or expense, including, without limitation, exemplary or punitive damages or any alleged losses by reason of alleged mental anguish, emotional distress, or any claimed physical injury.

(c)     In order to be eligible to have a Valid Claim, any Reimbursement Claim must be submitted to the Claims Administrator during the period beginning upon publication of the notice of settlement following preliminary approval and ending August 1, 2011 (the "Final Claim Date"), which is two and a half years from the date of the announcement of the Heartland Intrusion. Losses must have been incurred prior to the Final Claim Date. The Claims Administrator's review of Reimbursement Claims, including all requests for review of the denial of Reimbursement Claims, shall commence within sixty (60) days of the Effective Date, and proceed in order of the Claims Administration's receipt of completed claims, as determined by the Claims Administrator. Payment of Valid Claims shall commence no later than 120 days after all Reimbursement Claims have been finally decided, including any review of Reimbursement Claims and any reimbursement determinations pursuant to pursuant to ¶ 2.2(d), and shall be subject

- 13 -

to pro-rata reduction in the event such amounts together would otherwise exceed the Actual Damages Fund. However, in the event that the total Reimbursement Claims received and any amounts payable under § 2.2(d) can be calculated and would not exceed $2,400,000, then payment of Valid Claims may commence without awaiting all Reimbursed Claims to have been finally decided, if so requested in writing by Co-Lead Settlement Counsel and approved by Heartland, which approval shall not be unreasonably withheld.

(d)  Any Settlement Class Member whose Reimbursement Claim is denied by the Claims Administrator may request review of the denial and resolution of the Reimbursement Claim through a dispute resolution firm to be agreed upon by the parties, such as JAMS. Similarly, Heartland shall have the right to request review of the allowance of a Reimbursement Claim through the same dispute resolution process. Heartland shall bear the costs of the dispute resolution firm, separate and apart from the Fundings, up to a total of $200,000, and Heartland shall contract to do so, so as to provide for dispute resolution for all such requests for review hereunder. Resolution of any Reimbursement Claim by the dispute resolution firm will commence only after the Final Claim Date and shall be based on the dispute resolution firm's review of the Reimbursement Claim file and any response by Heartland or the Settlement Class Member (as the case may be), and, in those cases in which the dispute resolution firm deems it necessary and appropriate, an oral hearing on the Reimbursement Claim (which shall be by telephone or in person, at the Settlement Class Member's election). There will be no recovery by any Settlement Class Member for exemplary or punitive damages, or for (except as may be provided for below in this paragraph) attorneys' fees, costs or expenses, or for any other amount that does not constitute a Valid Claim as defined above, provided, however, that in the event the Losses included in a Valid Claim as sustained by the dispute resolution firm include Identity-Theft-Related Charges, Heartland shall reimburse the Settlement Class Member for the reasonable attorneys' fees and costs (not including expert fees) incurred

by the Settlement Class Member in connection with such dispute resolution, not to exceed an amount equal to 25 percent of the amount of the Identity-Theft-Related Charges included in such Valid Claim, all subject to the limit on the Actual Damages Fund as set forth in ¶ 2.1 above. Reimbursement Claim determinations by the dispute resolution firm shall be final and not subject to further review.

(e) Reimbursement Claims shall be submitted to, and reimbursements shall be paid by, the Claims Administrator from the Actual Damages Fund, subject to the terms and conditions set forth herein.

2.3 Within thirty (30) days of the execution of the Settlement Agreement (or such later time as may be agreed to between Heartland and Co-Lead Settlement Class Counsel), an independent expert retained by Heartland will generate a written report setting forth any actions taken or planned to be taken by Heartland since January 20, 2009 to enhance the security of Heartland's computer system ("the Enhancement Actions"). Heartland will permit Representative Consumer Plaintiffs' designated independent expert to review the report. In the alternative, Heartland may, in its discretion, permit Representative Consumer Plaintiffs' designated independent expert to review a copy of Heartland's most recent Payment Card Industry Report on Compliance ("ROC"). Representative Consumer Plaintiffs' designated independent expert shall promptly provide a responsive letter to Co-Lead Settlement Class Counsel stating whether the Enhancement Actions (or the information reflected in ROC, as the case may be) are, in the judgment of Representative Consumer Plaintiffs' designated independent expert, a prudent and good faith attempt by Heartland to minimize the likelihood of intrusion in the future. Within fifteen (15) days thereafter, Co-Lead Settlement Class Counsel shall provide Heartland with a letter indicating whether they accept the report, or do not accept it; failure to provide such a letter to Heartland shall be deemed acceptance. The settlement is contingent upon Co-Lead Settlement Class Counsel's

acceptance of the report, which acceptance shall not be unreasonably withheld. The foregoing terms of this Paragraph shall be completed prior to any hearing on final approval of the settlement, and subject to such confidentiality restrictions as Heartland may reasonably require to protect the security of its computer system, the confidentiality of the ROC or other written report referenced above, or other proprietary information.

2.4     All costs associated with notice to the Settlement Class as required herein and Costs of Claims Administration shall be paid by Heartland. To the extent that such notice costs exceed $1,500,000.00, however, Heartland shall have the option, in its sole discretion, of rescinding the Settlement Agreement.

2.5     The Settling Parties agree, for purposes of this settlement only, to the certification of the Settlement Class. If the settlement set forth in this Settlement Agreement is not approved by the Court, or if the settlement is terminated or cancelled pursuant to the terms of this Settlement Agreement, then this Settlement Agreement, and the certification of the Settlement Class provided for herein, will be vacated and the Litigation shall proceed as though the Settlement Class had never been certified, without prejudice to any party's position on the issue of class certification or any other issue. The Settling Parties' agreement to the certification of the Settlement Class is also without prejudice to any position asserted by the Settling Parties in any other proceeding, case or action including, without limitation, the "financial institutions track" proceedings otherwise consolidated with the Litigation in the above-captioned civil action, as to which all of their rights are specifically preserved.

2.6     Heartland agrees that the time for Co-Lead Settlement Class Counsel to file a Master Amended Complaint related to the consumer track plaintiffs shall be treated by them as extended without date.

### 3. Order of Preliminary Approval and Publishing of Notice of a Final Fairness Hearing

3.1     As soon as practicable after the execution of the Settlement Agreement, Co-Lead Settlement Class Counsel and counsel for Heartland shall jointly submit this Settlement Agreement to the Court, and, within 7 calendar days after the period for any termination of the Settlement Agreement pursuant to ¶¶ 2.3 [has expired without Co-Lead Settlement Class Counsel having taken such action, Co-Lead Settlement Class Counsel shall file a motion for preliminary approval of the settlement with the Court and apply for entry of an order (the "Order of Preliminary Approval and Publishing of Notice of a Final Fairness Hearing"), in the form attached hereto as Exhibit A, or an order substantially similar to such form in both terms and cost, requesting, *inter alia*,

(a)     certification of the Settlement Class for settlement purposes only pursuant to ¶ 2.5;

(b)     preliminary approval of the settlement as set forth herein;

(c)     approval of the publication of a customary form of summary notice (the "Summary Notice") in a form substantially similar to the one attached hereto as Exhibit B (in a manner certified by the Notice Specialist to have a reach of not less than approximately 80% of the putative class, targeted to adults with credit or debit cards over 18 years of age, in the United States), and a customary long form of notice ("Notice") in a form substantially similar to the one attached hereto as Exhibit C, which together shall include a fair summary of the parties' respective litigation positions, the general terms of the settlement set forth in the Settlement Agreement, instructions for how to object to or opt-out of the settlement, the process and instructions for making

claims to the extent contemplated herein, and the date, time, and place of the Final Fairness Hearing;

(d)      appointment of Hilsoft Notifications as Notice Specialist (or such other provider of class action notification service, as may be jointly agreed to);

(e)      appointment of Epiq Systems, Inc. as Claims Administrator; (or such other provider of claims administrative service, as may be jointly agreed to); and

(f)      approval of a Claim Form in a form substantially similar to the one attached hereto as Exhibit D.

The forms of Summary Notice, Notice and Claim Form attached hereto as Exhibits B, C, and D shall be reviewed by the proposed Notice Specialist and Claims Administrator and may be revised as agreed upon by the Settling Parties prior to such submission to the Court for approval.

3.2      Heartland shall pay for and shall assume the administrative responsibility of providing notice to the Settlement Class in accordance with the Order of Preliminary Approval and Publishing of Notice of a Final Fairness Hearing, and the costs of such notice, together with the Costs of Claims Administration, shall be paid by Heartland, subject to the terms set forth herein. Notice shall be provided to Settlement Class Members by publication in print and shall be designed to have a reach of not less than approximately 80% of the putative class, targeted to adults with credit or debit cards over 18 years of age, in the United States through publication of the Summary Notice, and which publication shall run, if approved by the Court, in a range of consumer magazines, newspapers, and/or newspaper supplements to be designated by the Notice Specialist and approved by the Court. The Claims Administrator shall establish a dedicated settlement website, and shall maintain and update the website throughout the Claim Period, with the forms of Summary Notice, Notice, and Claim Forms approved by the Court, as well as this Settlement Agreement. The Claims Administrator also will provide copies of the forms of Summary Notice, Notice, and Claim Forms

approved by the Court, as well as this Settlement Agreement, upon request. Prior to the Final Fairness Hearing, Co-Lead Settlement Class Counsel and Heartland shall cause to be filed with the Court an appropriate affidavit or declaration with respect to complying with this provision of notice. Notice shall be provided in English and/or Spanish, as appropriate. The forms of Summary Notice, Notice and Claim Form approved by the Court may be adjusted by the Notice Specialist and/or Claims Administrator, respectively, in consultation and agreement with the Settling Parties, as may be reasonable and not inconsistent with such approval.

3.3     Co-Lead Settlement Class Counsel and Heartland shall request that after notice is given, the Court hold a hearing (the "Final Fairness Hearing") and grant final approval of the settlement set forth herein.

3.4     Co-Lead Settlement Class Counsel and Heartland further agree that the proposed Order of Preliminary Approval and Publishing of Notice of a Final Fairness Hearing shall provide, subject to Court approval, that, pending the final determination of the fairness, reasonableness, and adequacy of the settlement set forth in the Settlement Agreement, no Settlement Class Member, either directly, representatively, or in any other capacity, shall institute, commence, or prosecute against Heartland any of the Released Claims in any action or proceeding in any court or tribunal.

**4.     Opt-Out Procedures**

4.1     Each Person wishing to opt out of the Settlement Class shall individually sign and timely submit written notice of such intent to the designated Post Office box established by the Claims Administrator. The written notice must clearly manifest an intent to be excluded from the Settlement Class. To be effective, written notice must be postmarked at least twenty-one (21) days prior to the date set in the Notice for the Final Fairness Hearing.

4.2     All Persons who submit valid and timely notices of their intent to be excluded from the Settlement Class, as set forth in ¶ 4.1 above, referred to herein as "Opt-Outs," shall neither

receive any benefits of nor be bound by the terms of this Settlement Agreement. All Persons falling within the definition of the Settlement Class who do not request to be excluded from the Settlement Class in the manner set forth in ¶ 4.1 above shall be bound by the terms of this Settlement Agreement and Judgment entered thereon.

### 5. Objection Procedures

5.1 Each Settlement Class Member desiring to object to the settlement shall submit a timely written notice of his or her objection. Such notice shall state: (i) the objector's full name, address, telephone number, and e-mail address; (ii) information identifying the objector as a Settlement Class Member, including (a) proof that they are a member of the Settlement Class (e.g., a letter from their financial institution indicating that their Personal Financial Information had been compromised in the Heartland Intrusion), including documentation of any Losses they claim to have suffered as a result of the alleged theft of their Personal Financial Information, if any, if they are objecting to any portion of the settlement dealing with reimbursement of Losses and for which they believe they would have an existing claim, or (b) an affidavit setting forth, in as much detail as the objector can reasonably provide, that they received a letter from their financial institution indicating that their Personal Financial Information had been compromised in the Heartland Intrusion, including the approximate date of said receipt; (iii) a written statement of all grounds for the objection, accompanied by any legal support for the objection; (iv) the identity of all counsel representing the objector; (v) the identity of all counsel representing the objector who will appear at the Final Fairness Hearing; (vi) a list of all persons who will be called to testify at the Final Fairness Hearing in support of the objection; (vii) a statement confirming whether the objector intends to personally appear and/or testify at the Final Fairness Hearing; and (viii) the objector's signature or the signature of the objector's duly authorized attorney or other duly authorized representative (along with documentation setting forth such representation). In order to be an effective objection, such

notice shall also identify, by case name, court, and docket number, all other cases in which the objector (directly or through counsel) or the objector's counsel (on behalf of any person or entity) has filed an objection to any proposed class action settlement, or has been a named plaintiff in any class action or served as lead plaintiff class counsel. To be timely, written notice of an objection in appropriate form must be filed with the Clerk of the United States District Court for the Southern District of Texas, P.O. Box 61010, Houston, TX 77208, twenty-one (21) days prior to the date set in the Notice for the Final Fairness Hearing, and served concurrently therewith upon one of Co-Lead Settlement Class Counsel (Ben Barnow, Barnow and Associates, P.C., One North LaSalle Street, Suite 4600, Chicago, IL 60602), and counsel for Heartland (Harvey J. Wolkoff, Ropes & Gray LLP, One International Place, Boston, MA, 02110). Counsel for Heartland may request that the objector's payment card number and expiration date be provided to the Claims Administrator, for the purposes described in Paragraph 2.2(a) above, with notice to Co-Lead Settlement Class Counsel of such request.

### 6. Releases

6.1     Upon the Effective Date, each Settlement Class Member, including Representative Consumer Plaintiffs, shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged all Released Claims. Further, upon the Effective Date, and to the fullest extent permitted by law, each Settlement Class Member, including Representative Consumer Plaintiffs, shall, either directly, indirectly, representatively, as a member of or on behalf of the general public, or in any capacity, be permanently barred and enjoined from commencing, prosecuting, or participating in any recovery in, any action in this or any other forum (other than participation in the settlement as provided herein) in which any of the Released Claims is asserted.

6.2     Upon the Effective Date, Heartland shall be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, relinquished, and discharged, Representative Consumer Plaintiffs, each and all of the Settlement Class Members, Co-Lead Settlement Class Counsel, and all other Plaintiffs' Counsel who have consented to and joined in the settlement, from all claims, including Unknown Claims, based upon or arising out of the institution, prosecution, assertion, settlement or resolution of the Litigation or the Released Claims, except for enforcement of the Settlement Agreement.  Any other Claims or defenses Heartland may have against such Persons, including without limitation any Claims based upon or arising out of any retail, banking, debtor-creditor, contractual or other business relationship with such Persons, that are not based upon or do not arise out of the institution, prosecution, assertion, settlement or resolution of the Litigation or the Released Claims, are specifically preserved and shall not be affected by the preceding sentence.

6.3     Notwithstanding any term herein, Heartland does not, by operation of this settlement, release any Claims it or its Related Parties may have based upon or arising out of the institution, prosecution, assertion, settlement or resolution of the Claims asserted against it in the "financial institution track" of the consolidated proceedings in the United States District Court for the Southern District of Texas, Claims based on its rights and duties under existing contracts with respect to fees, charges, penalties, assessments, fines, and allocations of loss by and all other obligations to payment card associations, and Claims based upon or arising out of any precompliance or compliance or noncompliance proceedings or any other proceedings under payment card association rules.

6.4     Notwithstanding any term herein, Heartland shall not have, or been deemed to have, released, relinquished, or discharged any Representative Consumer Plaintiff, Settlement Class Member, or Plaintiffs' Counsel who has consented to and joined in the settlement, from any claim

based on or arising out of any act of fraud, misrepresentation, or other misconduct in connection with the submission of any claim pursuant to the settlement set forth in this Settlement Agreement, or any claim against any of them based on or arising out of any failure to abide by the terms of the Settlement Agreement.

6.5      Notwithstanding any term herein, neither Heartland nor its Related Parties shall have or shall be deemed to have released, relinquished or discharged any Claim or defense against any Person other than Representative Consumer Plaintiffs, each and all of the Settlement Class Members, Co-Lead Settlement Class Counsel, and all other Plaintiffs' Counsel who have consented to and joined in the settlement. Persons not released by Heartland or its subsidiaries, divisions or affiliates of any Claim or defense include, without limitation, the Released Sponsoring Banks and their respective Related Parties.

**7.      Plaintiffs' Counsel's Attorneys' Fees, Costs, and Expenses, and Incentive Awards to Representative Consumer Plaintiffs and Named Plaintiffs**

7.1      The Settling Parties did not discuss attorneys' fees, costs, and expenses, or incentive awards to Representative Consumer Plaintiffs and Named Plaintiffs, as provided for in ¶¶ 7.2 and 7.3, until after the substantive terms of the settlement had been agreed upon, other than that Heartland would pay reasonable attorneys' fees, costs, and expenses, and incentive awards to Representative Consumer Plaintiffs and Named Plaintiffs as may be agreed to by Heartland and Co-Lead Settlement Class Counsel, and/or as ordered by the Court, or in the event of no agreement, then as ordered by the Court. Heartland and Co-Lead Settlement Class Counsel then negotiated and agreed as follows:

7.2      Heartland has agreed to pay, subject to Court approval, up to the amount of $725,000.00 to Co-Lead Settlement Class Counsel for attorneys' fees, and up to $35,000.00 to Co-Lead Settlement Class Counsel for reasonable costs and expenses, subject to reasonable

documentation. Co-Lead Settlement Class Counsel, in their sole discretion, to be exercised reasonably, shall allocate and distribute the amount of attorneys' fees, costs, and expenses awarded by the Court among Plaintiffs' Counsel. If any Plaintiff's Counsel disagrees with the allocation of fees and/or costs he or she has been awarded, they may, after fourteen (14) days of the receipt of said award, file a motion with the Court seeking an adjustment in said award. Co-Lead Settlement Class Counsel shall have fourteen (14) days to file a response to any such motion.

7.3    Heartland has agreed to pay incentive awards, subject to Court approval, up to the amount of $200.00 for each Representative Consumer Plaintiff, and $100.00 for each of the other Named Plaintiffs.

7.4    Within twenty (20) days of the Effective Date, Heartland shall pay the attorneys' fees, costs, and expenses, and incentive awards to Representative Consumer Plaintiffs and Named Plaintiffs, as set forth above in ¶¶ 7.2 and 7.3, to an account established by Co-Lead Settlement Class Counsel. Co-Lead Settlement Class Counsel shall thereafter distribute the award of attorneys' fees, costs, and expenses to Representative Consumer Plaintiffs and Named Plaintiffs consistent with ¶¶ 7.2 and 7.3.

7.5    The amount(s) of any award of attorneys' fees, costs, and expenses, and incentive awards to Representative Consumer Plaintiffs and Named Plaintiffs, is intended to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of the settlement. No order of the Court or modification or reversal or appeal of any order of the Court concerning the amount(s) of any attorneys' fees, costs, or expenses, and incentive awards to Representative Consumer Plaintiffs and Named Plaintiffs awarded by the Court to Co-Lead Settlement Class Counsel shall affect whether the Judgment is Final or constitute grounds for cancellation or termination of this Settlement Agreement.

8.    **Administration of Claims**

8.1       The Claims Administrator shall administer and calculate the claims submitted by Settlement Class Members under ¶ 2.2.  Co-Lead Settlement Class Counsel and Heartland shall be given reports as to both claims and distribution, and have the right to review and obtain supporting documentation and challenge such reports if they believe them to be inaccurate or inadequate.  The Claims Administrator's determination of the validity or invalidity of any such claims shall be binding, subject to the dispute resolution process set forth in ¶ 2.2(d).

8.2       Except as otherwise ordered by the Court, all Settlement Class Members who fail to timely submit a claim for any benefits hereunder within the time frames set forth herein, or such other period as may be ordered by the Court, or otherwise allowed, shall be forever barred from receiving any payments or benefits pursuant to the settlement set forth herein, but will in all other respects be subject to and bound by the provisions of the Settlement Agreement, the releases contained herein, and the Judgment.

8.3       No Person shall have any claim against the Claims Administrator, Heartland, or Co-Lead Settlement Class Counsel based on distributions of benefits made substantially in accordance with the Settlement Agreement and the settlement contained herein, or further order(s) of the Court.

9.    **Conditions of Settlement, Effect of Disapproval, Cancellation or Termination**

9.1       The Effective Date of the settlement shall be conditioned on the occurrence of all of the following events:

(a)       the Court has entered the Order of Preliminary Approval and Publishing of Notice of a Final Fairness Hearing, as required by ¶ 3.1, hereof;

(b)     Heartland has not exercised its option to terminate the Settlement Agreement pursuant to ¶ 9.3 hereof;

(c)     the Court has entered the Judgment granting final approval to the settlement as set forth herein; and

(d)     the Judgment has become Final, as defined in ¶ 1.8, hereof.

9.2     If all of the conditions specified in ¶ 9.1 hereof are not satisfied, then the Settlement Agreement shall be canceled and terminated subject to ¶ 9.4 hereof, unless Co-Lead Settlement Class Counsel and counsel for Heartland mutually agree in writing to proceed with the Settlement Agreement.

9.3     Within seven (7) days after the deadline established by the Court for Persons to request exclusion from the Settlement Class, Co-Lead Settlement Class Counsel shall furnish to counsel for Heartland a complete list of all timely and valid requests for exclusion (the "Opt-Out List").  Heartland, in its sole discretion, shall have the option to terminate this Settlement Agreement if the aggregate number of Persons who submit valid and timely requests for exclusion from the Settlement Class exceeds 2,500 Persons eligible to be Settlement Class Members.

9.4     In the event that the Settlement Agreement is not approved by the Court or the settlement set forth in the Settlement Agreement is terminated in accordance with its terms, (a) the Settling Parties shall be restored to their respective positions in the Litigation, and shall jointly request that all scheduled litigation deadlines shall be reasonably extended by the Court so as to avoid prejudice to any Settling Party or litigant, which extension shall be subject to the decision of the Court, and (b) the terms and provisions of the Settlement Agreement shall have no further force and effect with respect to the Settling Parties and shall not be used in the Litigation or in any other proceeding for any purpose, and any judgment or order entered by the Court in accordance with the terms of the Settlement Agreement shall be treated as vacated, *nunc pro tunc*.  Notwithstanding any

statement in this Settlement Agreement to the contrary, no order of the Court or modification or reversal on appeal of any order reducing the amount of attorneys' fees, costs, and expenses awarded to Co-Lead Settlement Class Counsel shall constitute grounds for cancellation or termination of the Settlement Agreement.

### 10. Miscellaneous Provisions

10.1     The Settling Parties:  (a) acknowledge that it is their intent to consummate this agreement; and (b) agree to cooperate to the extent reasonably necessary to effectuate and implement all terms and conditions of this Settlement Agreement, and any applicable requirements under the Class Action Fairness Act of 2005, and to exercise their best efforts to accomplish the terms and conditions of this Settlement Agreement.

10.2     The parties intend this settlement to be a final and complete resolution of all disputes between them with respect to the Litigation.  The settlement compromises claims which are contested and shall not be deemed an admission by any Settling Party as to the merits of any claim or defense.  The Settling Parties each agree that the settlement was negotiated in good faith by the Settling Parties, and reflects a settlement that was reached voluntarily after consultation with competent legal counsel.  The Settling Parties reserve their right to rebut, in a manner that such party determines to be appropriate, any contention made in any public forum that the Litigation was brought or defended in bad faith or without a reasonable basis.

10.3     Neither the Settlement Agreement nor the settlement contained therein, nor any act performed or document executed pursuant to or in furtherance of the Settlement Agreement or the settlement: (a) is or may be deemed to be or may be used as an admission of, or evidence of, the validity or lack thereof of any Released Claim, or of any wrongdoing or liability of any of the Released Persons; or (b) is or may be deemed to be or may be used as an admission of, or evidence of, any fault or omission of any of the Released Persons, in any civil, criminal, or administrative

proceeding in any court, administrative agency, or other tribunal. Any of the Released Persons may file the Settlement Agreement and/or the Judgment in any action that may be brought against them or any of them in order to support a defense or counterclaim based on principles of *res judicata*, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

10.4     Representative Consumer Plaintiffs shall be entitled to reasonable confirmatory discovery from Heartland to be conducted by Co-Lead Settlement Class Counsel. The period for confirmatory discovery shall begin no sooner than, and completed within ninety (90) days after, the date of preliminary approval of the settlement. Heartland shall cooperate in good faith to make such confirmatory discovery possible. At the conclusion of confirmatory discovery, Co-Lead Settlement Class Counsel shall, based upon all facts known to them, determine in good faith whether in their opinion the settlement is fair, reasonable and adequate. If Co-Lead Settlement Class Counsel determine that the settlement is not in their opinion fair, reasonable and adequate, Co-Lead Settlement Class Counsel shall terminate the Settlement and give notice to Heartland of such termination within ten (10) days after confirmatory discovery concludes. In such case, the settlement shall be null and void, and the parties shall return to their original positions. Heartland may defer incurring costs for notice under ¶ 3.2, and/or providing such notice under ¶ 3.2, until the period for Co-Lead Settlement Class Counsel to terminate the settlement pursuant to this paragraph has expired without Co-Lead Settlement Class Counsel taking such action.

10.5     All documents and materials provided by Heartland in confirmatory discovery shall be treated as confidential and returned to Heartland within sixty (60) days of the Effective Date.

10.6     The Settlement Agreement may be amended or modified only by a written instrument signed by or on behalf of all Settling Parties or their respective successors-in-interest.

10.7     This Settlement Agreement, together with the Exhibits attached hereto, constitutes the entire agreement among the parties hereto, and no representations, warranties, or inducements have been made to any party concerning the Settlement Agreement other than the representations, warranties, and covenants contained and memorialized in such document.  Except as otherwise provided herein, each party shall bear its own costs.

10.8     Co-Lead Settlement Class Counsel, on behalf of the Settlement Class, are expressly authorized by the Representative Consumer Plaintiffs to take all appropriate actions required or permitted to be taken by the Settlement Class pursuant to the Settlement Agreement to effectuate its terms and also are expressly authorized to enter into any modifications or amendments to the Settlement Agreement on behalf of the Settlement Class which they deem appropriate.

10.9     Each counsel or other Person executing the Settlement Agreement on behalf of any party hereto hereby warrants that such Person has the full authority to do so.

10.10    The Settlement Agreement may be executed in one or more counterparts.  All executed counterparts and each of them shall be deemed to be one and the same instrument.  A complete set of original executed counterparts shall be filed with the Court.

10.11    The Settlement Agreement shall be binding upon, and inure to the benefit of, the successors and assigns of the parties hereto.

10.12    The Court shall retain jurisdiction with respect to implementation and enforcement of the terms of the Settlement Agreement, and all parties hereto submit to the jurisdiction of the Court for purposes of implementing and enforcing the settlement embodied in the Settlement Agreement.

10.13    This Settlement Agreement shall be considered to have been negotiated, executed and delivered, and to be wholly performed, in the State of Texas, and the rights and obligations of the parties to the Settlement Agreement shall be construed and enforced in accordance with, and

governed by, the internal, substantive laws of the State of Texas without giving effect to that State's choice of law principles.

10.14    As used herein, "he" means "he, she, or it;" "his" means "his, hers, or its," and "him" means "him, her, or it."

10.15    All dollar amounts are in United States dollars.

10.16    All agreements made and orders entered during the course of the Litigation relating to the confidentiality of information shall survive this Settlement Agreement.

IN WITNESS WHEREOF, the parties hereto have caused the Settlement Agreement to be executed, by their duly authorized attorneys.

*Counsel for Heartland Payment Systems, Inc.*          *Co-Lead Settlement Class Counsel*

_____          _____
Harvey J. Wolkoff                    Ben Barnow
Mark P. Szpak                        Barnow and Associates, P.C.
Ropes & Gray LLP                     1 North LaSalle, Suite 4600
One International Place              Chicago, IL 60602
Boston, MA 02110-2624               Telephone: (312) 621-2000
Telephone: (617) 951-7000           b.barnow@barnowlaw.com
hwolkoff@ropesgray.com
mszpak@ropesgray.com

                                     _____
                                     Lance A. Harke
                                     Harke & Clasby LLP
                                     155 South Miami Ave., Suite 600
                                     Miami, FL 33130
                                     Telephone: (305) 536-8220
                                     lharke@harkeclasby.com

                                     _____
                                     Burton H. Finkelstein
                                     Finkelstein Thompson LLP
                                     1050 30th Street, N.W.
                                     Washington, D.C. 20007
                                     Telephone: (202) 337-8000
                                     bfinkelstein@finkelsteinthompson.com

IN WITNESS WHEREOF, the parties hereto have caused the Settlement Agreement to be executed, by their duly authorized attorneys.

*Counsel for Heartland Payment Systems, Inc.*

_____

Harvey J. Wolkoff
Mark P. Szpak
Ropes & Gray LLP
One International Place
Boston, MA 02110-2624
Telephone: (617) 951-7000
hwolkoff@ropesgray.com
mszpak@ropesgray.com

*Co-Lead Settlement Class Counsel*

_____

Ben Barnow
Barnow and Associates, P.C.
1 North LaSalle, Suite 4600
Chicago, IL 60602
Telephone: (312) 621-2000
b.barnow@barnowlaw.com

_____

Lance A. Harke
Harke & Clasby LLP
155 South Miami Ave., Suite 600
Miami, FL 33130
Telephone: (305) 536-8220
lharke@harkeclasby.com

_____

Burton H. Finkelstein
Finkelstein Thompson LLP
1050 30th Street, N.W.
Washington, D.C. 20007
Telephone: (202) 337-8000
bfinkelstein@finkelsteinthompson.com

# Exhibit O

1  BLOOD HURST & O'REARDON, LLP
   TIMOTHY G. BLOOD (149343)
2  LESLIE E. HURST (178432)
   600 B Street, Suite 1550
3  San Diego, CA 92101
   Telephone: 619-338-1100
4  Facsimile: 619-338-1101
   tblood@bholaw.com
5  lhurst@bholaw.com

6  BONNETT, FAIRBOURN, FRIEDMAN
      & BALINT, P.C.
7  ANDREW S. FRIEDMAN
   ELAINE A. RYAN
8  PATRICIA N. SYVERSON
   2901 N. Central Avenue, Suite 1000
9  Phoenix, AZ 85012
   Telephone: 602-274-1100
10 Facsimile: 602-274-1199
   afriedman@bffb.com
11 eryan@bffb.com
   psyverson@bffb.com
12
   Attorneys for Plaintiff Shawndee Hartless
13
                UNITED STATES DISTRICT COURT
14
              SOUTHERN DISTRICT OF CALIFORNIA
15
16 SHAWNDEE HARTLESS, on Behalf of     )  No. 06-CV-02705-CAB
   Herself and All Others Similarly Situated and )
17 the General Public,                  )  CLASS ACTION
                                        )
18              Plaintiff,              )
                                        )
19        vs.                          )
                                        )  STIPULATION OF SETTLEMENT
19 CLOROX COMPANY,                     )
                                        )
20              Defendant.             )
                                        )
21 _____)

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.    DEFINITIONS ................................................................................................1

II.   RECITALS ...................................................................................................5

III.  SETTLEMENT RELIEF ...............................................................................7

     A.    Prospective Relief ...................................................................................8

     B.    Retrospective Relief ................................................................................8

IV.  RELEASES ..................................................................................................10

V.   CLASS CERTIFICATION FOR SETTLEMENT PURPOSES ONLY ...........12

VI.  CLASS NOTICE AND COURT APPROVAL .................................................12

     A.    Notice Order; Preliminary Approval .......................................................12

     B.    The Notice Program ...............................................................................13

          1.     Publication Notice .......................................................................13

          2.     Class Notice Package ...................................................................13

          3.     Notice of Deadlines .....................................................................14

     C.    Final Approval Hearing ..........................................................................14

     D.    Requests for Exclusion ...........................................................................14

     E.    The *Hartless* State Court Action and the *Wachowski* Action ................14

VII.  CONDITIONS; TERMINATION ..................................................................15

VIII. COSTS, FEES AND EXPENSES ..................................................................16

     A.    Attorneys' Fees and Expenses ................................................................16

     B.    Class Representative Award ....................................................................16

     C.    Claim Administration Costs ....................................................................16

     D.    Costs of Class Notice .............................................................................17

IX.  COVENANTS AND WARRANTIES .............................................................17

     A.    Authority to Enter Agreement .................................................................17

     B.    Represented by Counsel ..........................................................................17

     C.    No Other Actions ...................................................................................17

1

2                                                                                        **Page**

3    X.    MISCELLANEOUS ..........................................................................................................17

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    This Stipulation of Settlement is made and entered into by plaintiff Shawndee Hartless, on
2 behalf of herself, the general public, and all others similarly situated and defendant The Clorox
3 Company.

4 **I.    DEFINITIONS**

5    A.    As used in this Stipulation the following capitalized terms have the meanings
6 specified below:

7    1.    "Action" means the case entitled *Hartless v. Clorox Company*, filed on December 13,
8 2006, in the U.S. District Court for the Southern District of California and assigned Case No. 06-
9 CV-2705-CAB.

10    2.    "Approved Claim(s)" means the claims approved by the Claim Administrator
11 according to the claims criteria in Exhibit A.

12    3.    "Claim Administrator" means the independent company agreed upon by the Parties to
13 provide the Class and Publication Notice and administer the claims process. The Parties agree that
14 The Garden City Group, Inc. will be retained as the Claim Administrator.

15    4.    "Claims Cost Estimate" is the Claim Administrator's good faith best estimate of all
16 the expenses to be incurred in the claims process.

17    5.    "Claim Forms" mean the forms that are substantially in the form of Exhibit F hereto.
18 The "Claim Form 1" is Exhibit F(1) hereto; the "Claim Form 2" is Exhibit F(2) hereto.

19    6.    "Claim Fund" means the fund for payment of Class Members' claims, certain notice
20 and administration costs, and expenses related to maintaining the fund (including taxes that may be
21 owed by the Claim Fund), if any.

22    7.    "Claim Fund Balance" means the balance at the end of the Claim Review Period,
23 consisting of: (a) the first $7 million paid into the Claim Fund; and (b) additional amounts, if any, up
24 to $1 million, paid into the Claim Fund as necessary to pay Class Members' claims, minus (i) the
25 total amount paid to Class Members who submit Approved Claims; (ii) $750,000 paid to the Claim
26 Administrator toward notice and claim administration costs; and (iii) expenses associated with
27 maintaining the Claim Fund (including taxes that may be owed by the Claim Fund), if any.

28

1    8.    "Claim Review Period" means the three month period beginning no later than 10 days

2 after the Effective Date.

3    9.    "Claim Submission Period" means the period beginning on the date notice to the

4 Class is first published, and continuing until 30 days after the date of the Final Approval Hearing.

5    10.    "Class" and/or "Class Members" means all persons or entities in the United States

6 who purchased, used, or suffered any property damage from the use of Clorox Automatic Toilet

7 Bowl Cleaner with Bleach ("CATBC") during the Class Period. Specifically excluded from the

8 Class are: (a) all federal court judges who have presided over this Action and their immediate

9 family; (b) all persons who have submitted a valid request for exclusion from the Class; (c)

10 Defendant's employees, officers, directors, agents, and representatives and their family members;

11 and (d) those who purchased CATBC for the purpose of re-sale.

12    11.    "Class Counsel" means the attorneys of record for plaintiffs in the Clorox Lawsuits.

13    12.    "Co-Lead Counsel" means the law firm of Blood Hurst & O'Reardon LLP and the

14 law firm of Bonnett, Fairbourn, Friedman & Balint, P.C.

15    13.    "Class Notice" means the "Notice of Class Action Settlement" substantially in the

16 same form as Exhibit E attached hereto.

17    14.    "Class Notice Package" means the information as approved in form and content by

18 Class Counsel and Defendant's Counsel and to be approved by the Court. Class Notice Packages

19 will include: (a) the Class Notice; and (b) the Claim Forms. The Class Notice Package will also be

20 available in Spanish.

21    15.    "Class Period" is from December 13, 2002 to the date notice to the Class is first

22 published.

23    16.    "Clorox Lawsuits" means the following cases:

24        (a)    *Hartless v. The Clorox Co.*, No. 37-2009-93810-CU-BT-CTL (San Diego

25 Superior Court);

26        (b)    *Hartless v. Clorox Company*, Case No. 06-CV-2705-CAB (Southern District

27 of California); and

28

1          (c)     *Wachowski v. Clorox Company*, Case No. CV-09-138-CAB (Southern District

2 of California).

3      17.    "Court" means the U.S. District Court for the Southern District of California.

4      18.    "Defendant" means The Clorox Company, also referred to herein as "Clorox."

5      19.    "Defendant's Counsel" means the law firm of O'Melveny & Myers LLP.

6      20.    "Distribution Plan" means a written final accounting and plan of distribution prepared

7 by the Claim Administrator, identifying: (a) each claimant whose claim was approved, including the

8 dollar amount of the payment awarded to each such claimant, and the dollar amount of any pro rata

9 reduction required by ¶III.B.2(e); (b) each claimant whose claim was rejected; (c) the dollar amount

10 of the Claim Fund Balance to be disbursed to the recipient(s) selected by the Court as provided in

11 ¶III.B.2(d); and (d) a final accounting of all administration fees and expenses incurred by the Claim

12 Administrator.

13      21.    "Effective Date" means the date described in ¶VII.A.

14      22.    "Final Approval Hearing" means the hearing to be held by the Court to consider and

15 determine whether the proposed settlement of the Action as contained in this Stipulation should be

16 approved as fair, reasonable, and adequate, and whether the Final Settlement Order and Judgment

17 approving the settlement contained in this Stipulation should be entered.

18      23.    "Final Settlement Order and Judgment" means an order and judgment entered by the

19 Court:

20          (a)     Giving final approval to the terms of this Stipulation as fair, adequate, and

21 reasonable;

22          (b)     Providing for the orderly performance and enforcement of the terms and

23 conditions of the Stipulation;

24          (c)     Dismissing the Action with prejudice;

25          (d)     Discharging the Released Parties of and from all further liability for the

26 Released Claims to the Releasing Parties; and

27          (e)     Permanently barring and enjoining the Releasing Parties from instituting,

28 filing, commencing, prosecuting, maintaining, continuing to prosecute, directly or indirectly, as an

1  individual or collectively, representatively, derivatively, or on behalf of them, or in any other

2  capacity of any kind whatsoever, any action in the California Superior Courts, any other state court,

3  any federal court, before any regulatory authority, or in any other tribunal, forum, or proceeding of

4  any kind, against the Released Parties that asserts any Released Claims that would be released and

5  discharged upon final approval of the Settlement as provided in ¶¶IV.A and B of this Stipulation.

6      (f)    The actual form of the Final Settlement Order and Judgment entered by the

7  Court may include additional provisions as the Court may direct that are not inconsistent with this

8  Stipulation, and will be substantially in the form attached hereto as Exhibit G.

9      24.    "Notice Plan" or "Notice Program" means the plan for dissemination of the

10  Publication Notice and Class Notice Package as described in ¶VI.

11      25.    "Fund Institution" means a third party institution which the Parties will approve and

12  to which Clorox shall pay $7 million in trust to a fund, and shall pay up to an additional $1 million if

13  needed to pay class member claims as described in ¶III.B.1.

14      26.    "Parties" means the Plaintiff and the Defendant.

15      27.    "Plaintiff" means Shawndee Hartless.

16      28.    "Preliminary Approval Order" means the "Order re: Preliminary Approval of Class

17  Action Settlement," substantially in the form of Exhibit B.

18      29.    "Publication Notice" means information as approved in form and content by Co-Lead

19  Counsel and Defendant's Counsel and to be approved by the Court, substantially in the same form as

20  Exhibit C attached hereto. The Publication Notice will be translated into Spanish for dissemination

21  in Spanish publications pursuant to the Notice Plan.

22      30.    "Rejected Claims" means all claims rejected according to the claims criteria in

23  Exhibit A.

24      31.    "Released Claims" means those claims released pursuant to ¶¶IV.A and B of this

25  Stipulation.

26      32.    "Released Parties" means Defendant and each of its parent, affiliated and subsidiary

27  corporations and all of their agents, employees, partners, predecessors, successors, assigns, insurers,

28  attorneys, officers and directors.

1      33.    "Releasing Parties" means the named plaintiffs in the Clorox Lawsuits, individually

2 and as representatives of the general public, and the Class Members.

3      34.    "Settlement Website" means the website established by the Claim Administrator that

4 will contain documents relevant to the settlement including the Class Notice Package in English and

5 Spanish. Claim Forms may be submitted by Class Members via the Settlement Website.

6      35.    "Stipulation of Settlement" and/or "Stipulation" means this Stipulation of Settlement,

7 including its attached exhibits (which are incorporated herein by reference), duly executed by

8 plaintiffs of record in the Clorox Lawsuits, Class Counsel, Defendant and Defendant's Counsel.

9      B.    Capitalized terms used in this Stipulation, but not defined above, shall have the

10 meaning ascribed to them in this Stipulation and the exhibits attached hereto.

11 **II.    RECITALS**

12      A.    On December 13, 2006, plaintiff Hartless filed a complaint against Defendant in the

13 U.S. District Court for the Southern District of California. The complaint alleged: (1) violation of

14 the Consumers Legal Remedies Act ("CLRA"), California Civil Code ("Civil Code") §1750 *et seq.*;

15 (2) breach of the Implied Warranty of Merchantability; and (3) violation of California's Unfair

16 Competition Law ("UCL"), California Business & Professions Code ("Bus. & Prof. Code") §17200

17 *et seq.*

18      B.    On March 19, 2007, Clorox's motion to dismiss was granted in part and denied in

19 part and plaintiff Hartless was given leave to file an amended complaint.

20      C.    On November 28, 2007, plaintiff Hartless filed her First Amended Complaint alleging

21 causes of action for: (1) violation of the CLRA; and (2) violation of the UCL.

22      D.    The *Hartless* complaint alleges that on each package of its Automatic Toilet Bowl

23 Cleaner with Bleach ("CATBC" or "Drop-In Tablets"), Clorox falsely and deceptively states that the

24 CATBC "Does not harm plumbing." Plaintiff alleges that the chemicals in the Drop-In Tablets are

25 highly corrosive and attack the toilet tank components, in particular causing the rubber and plastic

26 parts to deteriorate until the components fail or no longer seal properly, and that Plaintiff suffered

27 such property damage. Plaintiff also claims that Clorox – based on its own tests as well as

28 independent testing – knew or should have known that the Drop-In Tablets would deteriorate the

1 toilet tank parts, and yet sold the product by telling its customers that the CATBC would not harm
2 plumbing. The complaint seeks monetary damages and restitutionary relief. The allegations of the
3 complaint are incorporated herein for reference.

4      E.     Clorox denies Plaintiff's allegations, and on December 17, 2007 Clorox filed its
5 answer to the *Hartless* complaint.

6      F.     On November 20, 2008, Peter Wachowski independently filed a complaint against
7 Clorox in the U.S. District Court for the Northern District of California, asserting substantially
8 similar allegations. On January 22, 2009, the *Wachowski* action was transferred to the U.S. District
9 Court for the Southern District of California and deemed a related action to the *Hartless* case.

10      G.     On July 10, 2009, Shawndee Hartless filed a claim in Superior Court of the State of
11 California, County of San Diego ("*Hartless II*"). The state court complaint seeks injunctive and
12 declatory relief.

13      H.     Before commencing the respective actions, counsel for plaintiff Hartless and counsel
14 for plaintiff Wachowski affirm that each conducted separate examinations and evaluations of the
15 relevant law and facts to assess the merits of their respective plaintiff's claims and to determine how
16 to best serve the interests of the members of the proposed classes. After instituting her action,
17 plaintiff Hartless served formal written discovery requests on Clorox in the form of: Requests for
18 Production of Documents; First and Second Sets of Interrogatories; and First and Second sets of
19 Requests for Admissions. Clorox provided written responses to each set of requests and, in some
20 cases, supplemental responses after the parties met and conferred. Plaintiff Hartless also served
21 document subpoenas on five of the companies involved in marketing and advertising for Clorox and
22 received responsive documents from some of them.

23      I.     In response to the document requests, Clorox produced approximately 42,400 pages
24 of documents. By the fall of 2009, Hartless' Counsel completed their review of the Clorox
25 documents. In further preparation for class certification and trial, Hartless served a Fed. R. Civ. P.
26 30(b)(6) notice of deposition on Clorox and an individual deposition notice of a Clorox employee.
27 In addition, Hartless served a deposition subpoena on a former employee of Clorox who was
28 responsible for some testing of Clorox's CATBC. The depositions were scheduled for November

1   2009. In addition, Hartless' Counsel conducted an informal interview of a former Clorox employee
2   and worked with consultants to review and analyze the CATBC testing documents produced by
3   Clorox. Plaintiffs' motions for class certification were due to be filed in the federal actions on
4   December 7, 2009.

5       J.      On October 27, 2009, Class Counsel and Clorox and its counsel participated in a
6   settlement mediation with the Honorable Gary Taylor (Retired). Based upon Plaintiff's investigation
7   and evaluation of the facts and law relating to the matters alleged in the pleadings, Plaintiff and
8   Class Counsel agreed to settle the Action pursuant to the provisions of this Stipulation after
9   considering, among other things: (1) the substantial benefits available to the Class under the terms of
10  this Stipulation; (2) the attendant risks and uncertainty of litigation, especially in complex actions
11  such as this, as well as the difficulties and delays inherent in such litigation; and (3) the desirability
12  of consummating this Stipulation promptly to provide effective relief to plaintiffs and the Class.

13      K.      Clorox has denied and continues to deny each and all of the claims and contentions
14  alleged by plaintiffs. Clorox has expressly denied and continues to deny all charges of wrongdoing
15  or liability against it arising out of any of the conduct, statements, acts or omissions alleged, or that
16  could have been alleged, in the Action and states that its CATBC is a safe product when used as
17  directed. Clorox also has denied and continues to deny that its CATBC label was false or
18  misleading.

19      L.      Nonetheless, Clorox has concluded that further defense of the Action would be
20  protracted and expensive, and that it is desirable that the Action be fully and finally settled in the
21  manner and upon the terms and conditions set forth in the Stipulation. Defendant also has taken into
22  account the uncertainty and risks inherent in any litigation. Clorox, therefore, has determined that it
23  is desirable and beneficial to it that the Action be settled in the manner and upon the terms and
24  conditions set forth in the Stipulation.

25  **III.    SETTLEMENT RELIEF**

26      In consideration of the covenants set forth herein, the Parties agree as follows:

27

28

**A.** **Prospective Relief**

Clorox will do the following:

1. Clorox will cease using the language "Does not harm plumbing" or substantially similar language that reasonably conveys the same meaning on future CATBC labels and packages, promotional materials, and/or advertisements.

**B.** **Retrospective Relief**

Clorox does not sell the CATBC directly to consumers and thus has no way to identify individual Class Members. Additionally, an individual Class Member's recovery may be too small to make traditional methods of proof economically feasible. Further, Class Members are not likely to retain records of small purchases or repairs for long periods of time. In order to assure that Class Members have access to the proceeds of this settlement, a Claim Fund will be established and administered as follows:

1. Clorox shall pay up to $8 million to the Fund Institution to establish the Claim Fund for payment of Class Member claims for alleged property damage (which damages may be measured by the purchase price) resulting from the purchase and/or use of CATBC, and for the payment of certain notice and administration costs and expenses, as follows:

    (a) Not more than 30 days after the Court's order granting Preliminary Approval, Clorox shall pay $760,000 to the Fund Institution.

    (b) Within 30 days after the Effective Date, Clorox shall pay $6,240,000 in trust to the Fund Institution.

    (c) If, and only if, amounts to be paid from the Claim Fund under ¶¶III.B.2(a), (b) and (c) exceed $7 million, Clorox shall pay up to an additional $1 million into the Claim Fund as needed to pay Class Members' Approved Claims.

2. The Claim Fund shall be applied as follows:

    (a) To reimburse or pay $750,000 of the total costs reasonably and actually incurred by the Claim Administrator in connection with providing notice to and administering claims submitted by the Class. All costs incurred by the Claim Administrator and/or Clorox in

1 connection with providing notice to and administering claims for the Class in excess of $750,000,

2 shall be paid separately by Clorox and shall not be paid out of the Claim Fund;

3         (b)     To distribute to Class Members who submit Approved Claims to the Claim

4 Administrator and to pay class representative service awards;

5         (c)     To pay for expenses associated with maintaining the Claim Fund (including

6 taxes that may be owed by the Claim Fund), if any;

7         (d)     If the amounts to be paid from the Claim Fund under ¶¶III.B.2(a), (b) and (c)

8 do not exceed $7 million, the remainder of the Claim Fund (the "Claim Fund Balance") shall be

9 distributed to an appropriate non-profit or civic entity(ies) agreed to by the Parties and approved by

10 the Court for use in a manner that the Court shall determine will be an appropriate vehicle to provide

11 the next best use of compensation to Class Members arising out of claims that have been made by

12 Plaintiff in this Action and as consideration for the extinguishment of those claims;

13         (e)     If the amounts to be paid from the Claim Fund under ¶¶III.B.2(a), (b) and (c)

14 above exceed $8 million, all Approved Claims will be reduced pro rata, based on the respective

15 dollar amounts of the Approved Claims, until the total aggregate of Approved Claims, $750,000 paid

16 in notice and/or claim administration costs, and expenses associated with maintaining the Claim

17 Fund, if any, equals $8 million.

18     3.     Class Members shall have the opportunity to submit a claim to the Claim

19 Administrator during the Claim Submission Period.

20     4.     The claim process will be administered by a Claim Administrator, according to the

21 criteria set forth in Exhibit A, and neither Class Counsel nor Clorox shall participate in resolution of

22 such claims.

23     5.     The decision of the Claim Administrator shall be final and binding on Clorox and all

24 Class Members submitting Claims, and neither Clorox nor such Class Members shall have the right

25 to challenge or appeal the Claim Administrator's decision.

26     6.     All expenses of the Claim Administrator shall be paid as provided in ¶III.B.2(a).

27     7.     The Claim Administrator shall approve or reject all claims according to the claims

28 criteria in Exhibit A. The determination of claims shall occur during the Claim Review Period.

8. Within 15 days after conclusion of the Claim Review Period, the Claim Administrator shall provide to Clorox and Co-Lead Counsel a written final accounting and Distribution Plan identifying: (a) each claimant whose claim was approved, including the dollar amount of the payment awarded to each such claimant, and the dollar amount of any pro rata reduction required by ¶III.B.2(e); (b) each claimant whose claim was rejected; (c) the dollar amount of the Claim Fund Balance to be disbursed to the recipient(s) ordered by the Court as provided in ¶III.B.2(d); and (d) a final accounting of all administration fees and expenses incurred by the Claim Administrator. No sooner than 20 days, but not later than 45 days after delivering the Distribution Plan, the Claim Administrator shall disburse the remaining amounts in the Claim Fund according to the Distribution Plan and mail letters to all claimants with Rejected Claims explaining the rejection. In no event shall a Class Member's claim be paid until the conclusion of the Claim Review Period.

9. If any distribution checks mailed to Class Members are returned as non-deliverable, or are not cashed within 180 days, or are otherwise not payable, any such funds shall be disbursed to the recipients ordered by the Court as provided in ¶III.B.2(d).

## IV. RELEASES

A. As of the Effective Date, in consideration of the settlement obligations set forth herein, any and all claims, demands, rights, causes of action, suits, petitions, complaints, damages of any kind, liabilities, debts, punitive or statutory damages, penalties, losses and issues of any kind or nature whatsoever, asserted or unasserted, known or unknown (including, but not limited to, any and all claims relating to or alleging deceptive or unfair business practices, false or misleading advertising, intentional or negligent misrepresentation, negligence, concealment, omission, unfair competition, promise without intent to perform, unsuitability, unjust enrichment, and any and all claims or causes of action arising under or based upon any statute, act, ordinance, or regulation governing or applying to business practices generally, including, but not limited to, any and all claims relating to or alleging violation of Bus. & Prof. Code §§17200-17209 and §17500, the CLRA (Civil Code §§1750-1784), or any and all other federal, state, and /or local statutes analogous or similar to the California statutes cited herein), arising out of or related to the Clorox Lawsuits, that were asserted or reasonably could have been asserted in the Clorox Lawsuits by or on behalf of all

1  Releasing Parties, whether individual, class, representative, legal, equitable, administrative, direct or

2  indirect, or any other type or in any other capacity, against any Released Party ("Released Claims")

3  shall be finally and irrevocably compromised, settled, released, and discharged with prejudice.

4          B.       Each of the Releasing Parties hereby waives any and all rights and benefits arising out

5  of the facts alleged in the Clorox Lawsuits by virtue of the provisions of Civil Code §1542, or any

6  other provision in the law of the United States, or any state or territory of the United States, or

7  principle of common law or equity that is similar, comparable or equivalent to Civil Code §1542,

8  with respect to this release.  The Releasing Parties are aware that Civil Code §1542 provides as

9  follows:

10          ***A general release does not extend to claims which the creditor does not know or***

        ***suspect to exist in his favor at the time of executing the release, which if known by***

11          ***him must have materially affected his settlement with the debtor.***

12  The Releasing Parties expressly acknowledge that they may hereafter discover facts in addition to or

13  different from those which they now know or believe to be true with respect to the subject matter of

14  the Released Claims, but the Releasing Parties, upon the Effective Date, shall be deemed to have,

15  and by operation of law shall have, fully, finally and forever settled, released, and discharged any

16  and all Released Claims, known or unknown, suspected or unsuspected, whether or not concealed or

17  hidden, that now exist or heretofore have existed upon any theory of law or equity, including but not

18  limited to, Released Claims based on conduct that is negligent, reckless, intentional, with or without

19  malice, or a breach of any duty, law or rule, without regard to the subsequent discovery or existence

20  of such different or additional facts.  The Parties agree that the Released Claims constitute a specific

21  and not a general release.

22          C.       The Releasing Parties shall be deemed to have agreed that the release set forth in

23  ¶¶IV.A and B (the "Release") will be and may be raised as a complete defense to and will preclude

24  any action or proceeding based on the Released Claims.

25          D.       As of the Effective Date, by operation of entry of judgment, the Released Parties shall

26  be deemed to have fully released and forever discharged Plaintiff, all other Class Members and Class

27  Counsel from any and all claims of abuse of process, malicious prosecution, or any other claims

28  arising out of the initiation, prosecution or resolution of the Clorox Lawsuits including, but not

1  limited to, claims for attorneys' fees, costs of suit or sanctions of any kind, or any claims arising out
2  of the allocation or distribution of any of the consideration distributed pursuant to this Stipulation of
3  Settlement.

4  **V.    CLASS CERTIFICATION FOR SETTLEMENT PURPOSES ONLY**

5          Solely for the purposes of the settlement of this Action, the Parties agree to the certification
6  of a Class of all persons or entities in the United States who purchased, used, or suffered any
7  property damage from the use of Clorox Automatic Toilet Bowl Cleaner from December 13, 2002,
8  to the date notice to the Class is to be published. Plaintiff Shawndee Hartless shall make this request
9  for certification to the U.S. District Court for the Southern District of California, currently assigned
10 to the Honorable Cathy Ann Bencivengo; and Co-Lead Counsel shall request the Court to enter an
11 order, which, among other things, certifies the Class for settlement purposes, as set forth in this
12 paragraph. Defendant contends that certification of the alleged class (other than on a settlement
13 basis) would not be possible absent this settlement because individual issues would predominate.

14         In the event this Stipulation of Settlement and the settlement proposed herein is not finally
15 approved, or is terminated, cancelled, or fails to become effective for any reason whatsoever, this
16 class certification, to which the parties have stipulated solely for the purpose of the settlement of the
17 Action, shall be null and void and the Parties will revert to their respective positions immediately
18 prior to the execution of this Stipulation of Settlement. Under no circumstances may this Stipulation
19 of Settlement be used as an admission or as evidence concerning the appropriateness of class
20 certification in these or any other actions against Clorox.

21 **VI.   CLASS NOTICE AND COURT APPROVAL**

22         **A.    Notice Order; Preliminary Approval**

23         Within 30 days after the execution of the Stipulation of Settlement, the Parties shall apply to
24 the Court for a Preliminary Approval Order substantially in the form and content of Exhibit B,
25 conditionally certifying the Class for settlement purposes as defined in ¶V, for preliminary approval
26 of the settlement, for scheduling a final approval hearing, and for approving the contents and method
27 of dissemination of the proposed Publication Notice and Class Notice Package.

28

**B.     The Notice Program**

The notice program shall consist of notice by publication (the Publication Notice, attached hereto as Exhibit C) which generally describes the settlement and directs all interested parties to a detailed Class Notice available on the Settlement Website and, at the request of interested parties, by U.S. Mail.  Co-Lead Counsel shall also place a link to the Settlement Website on the websites of Blood Hurst & O'Reardon, LLP and Bonnett, Fairbourn, Friedman & Balint, P.C. for a period starting from the date the Publication Notice is published, and continuing no longer than the end of the Claim Submission Period.  Clorox shall pay the cost associated with the Publication Notice and Class Notice Package, except those costs associated with posting and maintaining notice on Plaintiffs' Counsel's Internet websites.

### 1.     Publication Notice

Commencing at least 105 days before the Final Approval Hearing or some other date as set by the Court, Clorox shall cause to be published the Publication Notice substantially in the form and content of Exhibit C pursuant to the Notice Plan described in Exhibit D.  The Publication Notice as shown in Exhibit C shall incorporate Claim Form 1.  The Notice Plan shall include dissemination of the Publication Notice translated into Spanish and published in Spanish.

### 2.     Class Notice Package

The Class Notice Package shall be available in electronic format on the Settlement Website and mailed as a hard copy by the Claim Administrator upon request.  In addition, Clorox shall direct the Claim Administrator to mail the Class Notice Package to counsel for the plaintiff(s) in any pending litigation that concerns property damage or false advertising related to CATBC against Defendant.  To the extent that Clorox has an address for any persons who complained to or inquired of Clorox concerning CATBC during the Class Period, Clorox shall also direct the Claim Administrator to mail the Class Notice Package to the last known address of each such person.

Each Class Notice Package shall contain a Class Notice substantially in the form of Exhibit E and the Claim Forms substantially in the forms of Exhibits F(1) and F(2).

**3. Notice of Deadlines**

Both the Publication Notice and the Class Notice shall inform Class Members of the dates by which they must file any objections, requests for exclusions, and submit a Claim Form. Class Members shall have 45 days from the date notice to the Class is to be last published to file objections, to file notices of intent to appear at the Final Approval Hearing, or to submit exclusion requests. Class Members will have the opportunity to submit a Claim Form during the period beginning on the date notice to the Class is first published, and continuing until 30 days after the date of the Final Approval Hearing.

**C. Final Approval Hearing**

The Parties shall request that after notice is given, the Court hold a Final Approval Hearing for the purpose of determining whether final approval of the settlement of the Action as set forth herein is fair, adequate, and reasonable to the Class Members, and enter a Final Settlement Order and Judgment dismissing the Action with prejudice substantially in the form and content of Exhibit G.

**D. Requests for Exclusion**

If prior to the Final Approval Hearing, the number of putative Class Members who timely request exclusion from the class in accordance with the provisions of the Preliminary Approval Order exceeds 2,000, Clorox shall have the right, but not the obligation, to terminate this Stipulation of Settlement or to seek appropriate modifications to this Stipulation of Settlement that adequately protect the Parties. Copies of all Requests for Exclusion received by the Claim Administrator, together with copies of all written revocations of Requests for Exclusion received, shall be delivered to the Parties' counsel no later than 8 days after the Class Members' deadline to submit such exclusion requests, or at such other time as the Parties may mutually agree in writing.

**E. The *Hartless* State Court Action and the *Wachowski* Action**

1. Upon execution of the Stipulation of Settlement by all signatories, Co-Lead Counsel shall notify the San Diego Superior Court in which the injunctive relief action captioned *Hartless v. The Clorox Co.*, No. 37-2009-93810-CU-BT-CTL ("*Hartless II*"), is pending of the intent to settle that action through this Stipulation of Settlement and request a stay of the state court action during the settlement process. Once the events and conditions set forth in ¶¶VII.A 1, 2, and 5 have been

1    met or have occurred, Co-Lead Counsel shall request that the *Hartless II* state court action be

2    dismissed with prejudice.

3        2.      Upon execution of the Stipulation of Settlement by all signatories, counsel for

4    plaintiff Peter Wachowski shall notify the Court of the intent to settle the *Wachowski* action through

5    this Stipulation of Settlement and request a stay of his action during the settlement process. Once

6    the events and conditions set forth in ¶¶VII.A 1, 2, and 5 have been met or have occurred, counsel

7    for Wachowski shall request that his action be dismissed with prejudice.

8    **VII.     CONDITIONS; TERMINATION**

9        A.      This Settlement shall become final on the first date after which all of the following

10    events and conditions have been met or have occurred (the "Effective Date"):

11        1.      The Court has preliminarily approved this Stipulation (including all

12    attachments), the settlement set forth herein and the method for providing notice to the Class;

13        2.      The Court has entered a Final Settlement Order and Judgment in the Action;

14        3.      The San Diego Superior Court has entered an order dismissing *Hartless v. The*

15    *Clorox Co.*, No. 37-2009-93810-CU-BT-CTL, with prejudice;

16        4.      The U.S. District Court for the Southern District of California has entered an

17    order dismissing *Wachowski v. Clorox Co.*, No. CV-09-138-CAB, with prejudice; and

18        5.      One of the following has occurred:

19            (a)      The time to appeal from such orders has expired and no appeals have

20    been timely filed;

21            (b)      If any such appeal has been filed, it has finally been resolved and the

22    appeal has resulted in an affirmation of the Final Settlement Order and Judgment; or

23            (c)      The Court, following the resolution of any such appeals, has entered a

24    further order or orders approving the Settlement of the Action on the terms set forth in this

25    Stipulation of Settlement, and either no further appeal has been taken from such order(s) or any such

26    appeal has resulted in affirmation of the settlement order.

27        B.      If the Settlement is not made final (per the provisions of ¶VII.A.), this entire

28    Stipulation shall become null and void as set forth in ¶V of this Stipulation, except that the Parties

1    shall have the option to agree in writing to waive the event or condition and proceed with this
2    settlement, in which event the Stipulation of Settlement shall be deemed to have become final on the
3    date of such written agreement. In the event the Stipulation becomes null and void, Clorox shall be
4    responsible for all administrative and notice costs incurred as of the date the Stipulation becomes
5    null and void, including the costs of notifying the Class and any claim administration costs.

6    **VIII.   COSTS, FEES AND EXPENSES**

7            **A.    Attorneys' Fees and Expenses**

8            1.    The Parties agree that an award of attorneys' fees and expenses to Class
9    Counsel will be in addition to the consideration to Plaintiff, the Class Members and the general
10   public, and shall in no way reduce the settlement consideration.

11           2.    Co-Lead Counsel shall make, and Clorox agrees not to oppose, an application
12   for an award of attorneys' fees and expenses not to exceed a total of $2,250,000. Defendant shall
13   make all reasonable efforts to pay the award of Class Counsels' fees and expenses within 15 days
14   and in no event later than 30 days after the Effective Date or after the issuance of an order awarding
15   such amount, whichever is later.

16           3.    Class Counsel, in their sole discretion, shall allocate and distribute the award
17   of attorneys' fees and expenses among Class Counsel.

18           **B.    Class Representative Award**

19           Defendant agrees not to oppose an application for class representative service awards to be
20   paid out of the Claim Fund to the named plaintiffs in the Clorox Lawsuits in an amount not to exceed
21   $4,000 for Hartless and $2,000 for Wachowski. Such awards shall be paid within 30 days after the
22   Effective Date or within 30 days after the issuance of an order awarding such amount, whichever is
23   later. In the event that a Class Member appeals the award of attorneys' fees and costs, or the class
24   representative service awards, Defendant shall not take a position contrary to this Stipulation.

25           **C.    Claim Administration Costs**

26           Clorox shall bear the costs associated with administering the claim process, and
27   implementing the prospective relief, as provided in ¶III.

28

**D.**     **Costs of Class Notice**

Clorox shall bear the costs of notifying the Class of this proposed settlement, as provided in ¶III.B.2(a).

**IX.**     **COVENANTS AND WARRANTIES**

**A.**     **Authority to Enter Agreement**

Plaintiff and Defendant each covenants and warrants that she/it has the full power and authority to enter into this Stipulation of Settlement and to carry out its terms, and that they have not previously assigned, sold, or otherwise pledged or encumbered any right, title or interest in the claims released herein or their right, power and authority to enter into this Stipulation of Settlement. Any person signing this Stipulation of Settlement on behalf of any other person or entity represents and warrants that he or she has full power and authority to do so and that said other person or entity is bound hereby.

**B.**     **Represented by Counsel**

In entering into this Stipulation of Settlement, the Parties represent they have relied upon the advice of attorneys, who are the attorneys of their own choice, concerning the legal consequences of this Stipulation of Settlement; that the terms of this Stipulation of Settlement have been explained to them by their attorneys; and that the terms of this Stipulation of Settlement are fully understood and voluntarily accepted by the Parties.

**C.**     **No Other Actions**

As of the date of executing this Stipulation, aside from lawsuits identified in documents produced in this Action, Plaintiff and Co-Lead Counsel represent and warrant that they are not aware of any action or potential action other than the Clorox Lawsuits that: (1) raises allegations similar to those asserted in the Clorox Lawsuits; and (2) is pending or is expected to be filed in any forum by any person or entity against Clorox. Until the Effective Date, Plaintiff and her Counsel shall have a continuing duty to notify Clorox if Plaintiffs or Plaintiffs' Counsel become aware of any such action.

**X.**     **MISCELLANEOUS**

A.     Governing Law. The interpretation and construction of this Stipulation of Settlement shall be governed by the laws of the State of California.

1        B.     Counterparts. This Stipulation of Settlement may be executed in counterparts. All

2 counterparts so executed shall constitute one agreement binding on all of the Parties hereto,

3 notwithstanding that all Parties are not signatories to the original or the same counterpart.

4        C.     No Drafting Party. Any statute or rule of construction that ambiguities are to be

5 resolved against the drafting party shall not be employed in the interpretation of this Stipulation of

6 Settlement and the Parties agree that the drafting of this Stipulation has been a mutual undertaking.

7        D.     Entire Agreement. All agreements, covenants, representations and warranties,

8 express or implied, written or oral, of the Parties hereto concerning the subject matter hereof are

9 contained in this Stipulation of Settlement and the exhibits hereto. Any and all prior or

10 contemporaneous conversations, negotiations, drafts, terms sheets, possible or alleged agreements,

11 covenants, representations and warranties concerning the subject matter of this Stipulation of

12 Settlement are waived, merged herein and superseded hereby.

13        E.     Retained Jurisdiction. The Court shall retain jurisdiction with respect to the

14 implementation and enforcement of the terms of this Stipulation, and all Parties hereto submit to the

15 jurisdiction of the Court for purposes of implementing and enforcing the settlement embodied in this

16 Stipulation.

17        F.     Cooperation. Each of the Parties hereto shall execute such additional pleadings and

18 other documents and take such additional actions as are reasonably necessary to effectuate the

19 purposes of this Stipulation of Settlement.

20        G.     Amendments in Writing. This Stipulation of Settlement may only be amended in

21 writing signed by Co-Lead Counsel and Defendant's Counsel.

22        H.     Binding Effect; Successors and Assigns. This Stipulation of Settlement shall inure to

23 the benefit of, and shall be binding upon, the Parties hereto as well as the legal successors and

24 assigns of the Parties hereto and each of them.

25        I.     Construction. As used in this Stipulation of Settlement, the terms "herein" and

26 "hereof" shall render to this Stipulation in its entirety, including all exhibits and attachments, and not

27 limited to any specific sections. Whenever appropriate in this Stipulation of Settlement, the singular

28

1 shall be deemed to refer to the plural, and the plural to the singular, and pronouns of any gender shall

2 be deemed to include both genders.

3      J.      Waiver in Writing. No waiver of any right under this Stipulation of Settlement shall

4 be valid unless in writing.

5      K.      Computation of Time. All time periods set forth herein shall be computed in business

6 days if seven days or less and calendar days if eight days or more unless otherwise expressly

7 provided. In computing any period of time prescribed or allowed by this Stipulation or by order of

8 the Court, the day of the act, event or default from which the designated period of time begins to run

9 shall not be included. The last day of the period so computed shall be included, unless it is a

10 Saturday, a Sunday or a legal or court holiday, or, when the act to be done is the filing of a paper in

11 Court, a day in which weather or other conditions have made the office of the clerk of the Court

12 inaccessible, in which event the period shall run until the end of the next day as not one of the

13 aforementioned days. As used in this subsection, "legal or court holiday" includes New Year's Day,

14 Martin Luther King Jr. Day, Presidents' Day, Memorial Day, Independent Day, Labor Day,

15 Columbus Day, Veterans' Day, Thanksgiving Day, Christmas Day and any other day appointed as a

16 holiday by the President or the Congress of the United States or by the State of California.

17      L.      No Admission of Liability. Each of the Parties understands and agrees that he, she or

18 it has entered into this Stipulation of Settlement for purpose of purchasing peace and preventing the

19 risks and costs of any further litigation or dispute. This settlement involves disputed claims;

20 specifically, Clorox denies any wrongdoing, and the Parties understand and agree that neither this

21 Stipulation of Settlement, nor the fact of this settlement, may be used as evidence or admission of

22 any wrongdoing by Clorox.

23      M.      Notice. Any notice to the Parties required by this Stipulation of Settlement shall be

24 given in writing by first class US Mail and e-mail to:

25

26

27

28

00018379                                    - 19 -                          06-CV-02705-CAB

1    For Plaintiff:

2              Timothy G. Blood
              Leslie E. Hurst
3              Blood Hurst & O'Reardon, LLP
              600 B Street, Suite 1550
4              San Diego, CA 92101
              Telephone: (619) 338-1100
5              tblood@bholaw.com
              lhurst@bholaw.com
6
      For Defendant:
7
              Sabrina H. Strong
8              Adam G. Levine
              O'Melveny & Myers LLP
9              400 South Hope Street, Suite 1060
              Los Angeles, CA 90071-2899
10              Telephone: (213) 430-6000
              sstrong@omm.com
11              alevine@omm.com

12    IN WITNESS WHEREOF, the parties hereto have executed this Stipulation of Settlement as

13    of the dates set forth below.

14

15    DATED: May       , 2010

16                                         SHAWNDEE HARTLESS

17

18
      DATED: May       , 2010
19                                         PETER WACHOWSKI

20

21    DATED: May _____, 2010          THE CLOROX COMPANY

22    .

23    _____

24                                         BY: _____

25                                         TITLE: _____

26

27

28

00018379                          - 20 -                  06-CV-02705-CAB
                                                          TOTAL P.02

1    For Plaintiff:

2           Timothy G. Blood
           Leslie E. Hurst
3           Blood Hurst & O'Reardon, LLP
           600 B Street, Suite 1550
4           San Diego, CA 92101
           Telephone: (619) 338-1100
5           tblood@bholaw.com
           lhurst@bholaw.com
6

   For Defendant:
7

8           Sabrina H. Strong
           Adam G. Levine
           O'Melveny & Myers LLP
9           400 South Hope Street, Suite 1060
           Los Angeles, CA 90071-2899
10          Telephone: (213) 430-6000
           sstrong@omm.com
11          alevine@omm.com

12       IN WITNESS WHEREOF, the parties hereto have executed this Stipulation of Settlement as

13 of the dates set forth below.

14

15 DATED: May    , 2010

                               SHAWNDEE HARTLESS
16

17

18 DATED: May 17, 2010

19                             PETER WACHOWSKI

20

21 DATED: May _____, 2010         THE CLOROX COMPANY

22

23

24                      BY:_____

25                      TITLE:_____

26

27

28

00018379                      - 20 -                  06-CV-02705-CAB

For Plaintiff:

> Timothy G. Blood
> Leslie E. Hurst
> Blood Hurst & O'Reardon, LLP
> 600 B Street, Suite 1550
> San Diego, CA 92101
> Telephone: (619) 338-1100
> tblood@bholaw.com
> lhurst@bholaw.com

For Defendant:

> Sabrina H. Strong
> Adam G. Levine
> O'Melveny & Myers LLP
> 400 South Hope Street, Suite 1060
> Los Angeles, CA 90071-2899
> Telephone: (213) 430-6000
> sstrong@omm.com
> alevine@omm.com

IN WITNESS WHEREOF, the parties hereto have executed this Stipulation of Settlement as of the dates set forth below.

DATED: May _____, 2010          _____
                                        SHAWNDEE HARTLESS

DATED: May _____, 2010          _____
                                        PETER WACHOWSKI

DATED: May 21, 2010             THE CLOROX COMPANY

                                _____

                                BY: LAURA STEIN

                                TITLE: SENIOR VICE PRESIDENT—
                                       GENERAL COUNSEL

00018379                          - 20 -                    06-CV-02705-CAB

DATED: May 19, 2010

BLOOD HURST & O'REARDON, LLP
TIMOTHY G. BLOOD
LESLIE E. HURST

_Leslie Hurst_
LESLIE E. HURST

600 B Street, Suite 1550
San Diego, CA 92101
Telephone: 619/338-1100
619/338-1101 (fax)

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
ANDREW S. FRIEDMAN
ELAINE A. RYAN
PATRICIA N. SYVERSON
2901 N. Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone: 602/274-1100
602/274-1199 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
JOHN J. STOIA, JR.
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)

Attorneys for Plaintiff

DATED: May 19, 2010

BOCK HATCH, LLC
RICHARD J. DOHERTY

RICHARD J. DOHERTY

134 N. LaSalle, Suite 1000
Chicago, IL 60602
Telephone: 312/658-5500
312/658-5555 (fax)

00018379

- 21 -

06-CV-02705-CAB

1
2  THE LAKIN LAW FIRM, P.C.
   ROBERT W. SCHMEIDER, II
   301 Evans Avenue, P.O. Box 27
3  Wood River, IL  62095
   Telephone:  618/254-1127
   618/254-0193 (fax)
4
5  WATERS & KRAUS LLP
   INGRID M. EVANS
6  601 Van Ness Avenue, Suite 2080
   San Francisco, CA  94102
   Telephone:  800/226-9880
7  214/777-0470 (fax)

8  Attorneys for Peter Wachowski

9  DATED: May 21 , 2010  O'MELVENY & MYERS LLP
                          SABRINA H. STRONG
10                        ADAM LEVINE

11

12         *Sabrina H. Strong* by cause

13         ————————————————————————
           SABRINA H. STRONG

14  400 South Hope Street, Suite 1060
    Los Angeles, CA  90071-2899
15  Telephone: 213/430-6000
    213/430-6407 (fax)

16  Attorneys for Defendant

17

18

19

20

21

22

23

24

25

26

27

28

00018379                    - 22 -              06-CV-02705-CAB

1 **LIST OF EXHIBITS**

2 A. Claims Administration Protocols

3 B. Order re: Preliminary Approval of Class Action Settlement

4 C. Publication Notice

5 D. Notice Plan

6 E. Notice of Class Action Settlement

7 F(1). Claim Form 1

8 F(2). Claim Form 2

9 G. Final Settlement Order and Judgment

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

06-CV-02705-CAB

CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CF/ECF participants indicated on the Electronic Mail Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 21, 2010.

s/Leslie E. Hurst
LESLIE E. HURST

BLOOD HURST & O'REARDON, LLP
600 B Street, Suite 1550
San Diego, CA 92101
Telephone: 619/338-1100
619/338-1101 (fax)
toreardon@bholaw.com

00018379

06-CV-02705-CAB

# Exhibit P

# USCS Fed Rules Civ Proc R 23, Part 1 of 9

Current through changes received May 14, 2018.

*USCS Court Rules  >  Federal Rules of Civil Procedure  >  Title IV. Parties*

## Rule 23. Class Actions [Effective until December 1, 2018]

**(a) Prerequisites.**One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

**(1)**the class is so numerous that joinder of all members is impracticable;

**(2)**there are questions of law or fact common to the class;

**(3)**the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

**(4)**the representative parties will fairly and adequately protect the interests of the class.

**(b) Types of Class Actions.**A class action may be maintained if Rule 23(a) is satisfied and if:

**(1)**prosecuting separate actions by or against individual class members would create a risk of:

**(A)**inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or

**(B)**adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

**(2)**the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

**(3)**the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

**(A)**the class members' interests in individually controlling the prosecution or defense of separate actions;

**(B)**the extent and nature of any litigation concerning the controversy already begun by or against class members;

**(C)**the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)**the likely difficulties in managing a class action.

**(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.**

**(1)***Certification Order.*

**(A)**Time to Issue. At an early practicable time after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action.

**(B)**Defining the Class; Appointing Class Counsel. An order that certifies a class action must define the class and the class claims, issues, or defenses, and must appoint class counsel under Rule 23(g).

**(C)**Altering or Amending the Order. An order that grants or denies class certification may be altered or amended before final judgment.

**(2)***Notice.*

**(A)**For (b)(1) or (b)(2) Classes. For any class certified under Rule 23(b)(1) or (b)(2), the court may direct appropriate notice to the class.

**(B)**For (b)(3) Classes. For any class certified under Rule 23(b)(3), the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice must clearly and concisely state in plain, easily understood language:

**(i)**the nature of the action;

**(ii)**the definition of the class certified;

**(iii)**the class claims, issues, or defenses;

**(iv)**that a class member may enter an appearance through an attorney if the member so desires;

**(v)**that the court will exclude from the class any member who requests exclusion;

**(vi)**the time and manner for requesting exclusion; and

**(vii)**the binding effect of a class judgment on members under Rule 23(c)(3).

**(3)***Judgment.* Whether or not favorable to the class, the judgment in a class action must:

**(A)**for any class certified under Rule 23(b)(1) or (b)(2), include and describe those whom the court finds to be class members; and

**(B)**for any class certified under Rule 23(b)(3), include and specify or describe those to whom the Rule 23(c)(2) notice was directed, who have not requested exclusion, and whom the court finds to be class members.

**(4)***Particular Issues.* When appropriate, an action may be maintained as a class action with respect to particular issues.

**(5)***Subclasses.* When appropriate, a class may be divided into subclasses that are each treated as a class under this rule.

**(d) Conducting the Action.**

**(1)***In General.* In conducting an action under this rule, the court may issue orders that:

**(A)**determine the course of proceedings or prescribe measures to prevent undue repetition or complication in presenting evidence or argument;

**(B)**require—to protect class members and fairly conduct the action—giving appropriate notice to some or all class members of:

**(i)**any step in the action;

**(ii)**the proposed extent of the judgment; or

**(iii)**the members' opportunity to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or to otherwise come into the action;

**(C)**impose conditions on the representative parties or on intervenors;

**(D)**require that the pleadings be amended to eliminate allegations about representation of absent persons and that the action proceed accordingly; or

**(E)**deal with similar procedural matters.

**(2)***Combining and Amending Orders.* An order under Rule 23(d)(1) may be altered or amended from time to time and may be combined with an order under Rule 16.

**(e) Settlement, Voluntary Dismissal, or Compromise.**The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

**(1)**The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

**(2)**If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

**(3)**The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

**(4)**If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

**(5)**Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

**(f) Appeals.**A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule if a petition for permission to appeal is filed with the circuit clerk within 14 days after the order is entered. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

**(g) Class Counsel.**

**(1)***Appointing Class Counsel.* Unless a statute provides otherwise, a court that certifies a class must appoint class counsel. In appointing class counsel, the court:

**(A)**must consider:

**(i)**the work counsel has done in identifying or investigating potential claims in the action;

**(ii)**counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;

**(iii)**counsel's knowledge of the applicable law; and

**(iv)**the resources that counsel will commit to representing the class;

**(B)**may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

**(C)**may order potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney's fees and nontaxable costs;

**(D)**may include in the appointing order provisions about the award of attorney's fees or nontaxable costs under Rule 23(h); and

**(E)**may make further orders in connection with the appointment.

**(2)***Standard for Appointing Class Counsel.* When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1) and (4). If more than one adequate applicant seeks appointment, the court must appoint the applicant best able to represent the interests of the class.

**(3)** *Interim Counsel.* The court may designate interim counsel to act on behalf of a putative class before determining whether to certify the action as a class action.

**(4)** *Duty of Class Counsel.* Class counsel must fairly and adequately represent the interests of the class.

**(h) Attorney's Fees and Nontaxable Costs.** In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement. The following procedures apply:

**(1)** A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets. Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner.

**(2)** A class member, or a party from whom payment is sought, may object to the motion.

**(3)** The court may hold a hearing and must find the facts and state its legal conclusions under Rule 52(a).

**(4)** The court may refer issues related to the amount of the award to a special master or a magistrate judge, as provided in Rule 54(d)(2)(D).

# History

Amended Feb. 28, 1966, eff. July 1, 1966; March 2, 1987, eff. Aug. 1, 1987; April 24, 1998, eff. Dec. 1, 1998; March 27, 2003, eff. Dec. 1, 2003; April 30, 2007, eff. Dec. 1, 2007; March 26, 2009, eff. Dec. 1, 2009; Apr. 26, 2018, eff. Dec. 1, 2018.

Annotations

# Notes

**HISTORY; ANCILLARY LAWS AND DIRECTIVES**

**Other provisions:**

**Prospective amendments:**

**Other provisions:**

**Notes of Advisory Committee on Rules.** *Note to Subdivision (a).* This is a substantial restatement of former Equity Rule 38 (Representatives of Class) as that rule has been construed. It applies to all actions, whether formerly denominated legal or equitable. For a general analysis of class actions, effect of judgment, and requisites of jurisdiction see Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft*, 25 Georgetown L J 551, 570 et seq. (1937); Moore and Cohn, *Federal Class Actions*, 32 Ill L Rev 307 (1937); Moore and Cohn, *Federal Class Actions—Jurisdiction and Effect of Judgment*, 32 Ill L Rev 555–567 (1938); Lesar, *Class Suits and the Federal Rules*, 22 Minn L Rev 34 (1937); cf. Arnold and James, *Cases on Trials, Judgments and Appeals* (1936) 175; and see Blume, *Jurisdictional Amount in Representative Suits*, 15 Minn L Rev 501 (1931).

The general test of former Equity Rule 38 (Representatives of Class) that the question should be "one of common or general interest to many persons constituting a class so numerous as to make it impracticable to bring them all before the court," is a common test. For states which require the two elements of a common or general interest and numerous persons, as provided for in former Equity Rule 38, see Del Ch Rule 113; Fla Comp Gen Laws Ann (Supp, 1936) § 4918(7);   Georgia Code (1933) § 37-1002, and see *English Rules Under the Judicature Act* (The Annual

Practice, 1937) O. 16, r. 9. For statutory provisions providing for class actions when the question is one of common or general interest or when the parties are numerous, see Ala Code Ann (Michie, 1928) § 5701; 2 Ind Stat Ann (Burns, 1933) § 2-220; NYCPA (1937) § 195;  Wis Stat (1935) § 260.12. These statutes have, however, been uniformly construed as though phrased in the conjunctive. See  *Garfein v Stiglitz*, 260 Ky 430, 86 SW2d 155 (1935). The rule adopts the test of former Equity Rule 38, but defines what constitutes a "common or general interest". Compare with code provisions which make the action dependent upon the propriety of joinder of the parties. See Blume,  *The "Common Questions" Principle in the Code Provision for Representative Suits*,  30 Mich L Rev 878 (1932). For discussion of what constitutes "numerous persons" see Wheaton,  *Representative Suits Involving Numerous Litigants*, 19 Corn L Q 399 (1934); Note,  36 Harv L Rev 89 (1922).

*Clause (1), Joint, Common, or Secondary Right.* This clause is illustrated in actions brought by or against representatives of an unincorporated association. See  *Oster v Brotherhood of Locomotive Firemen and Enginemen*, 271 Pa 419, 114 A 377 (1921);  *Pickett v Walsh*, 192 Mass 572, 78 NE 753, 6 LRA NS 1067 (1906); *Colt v Hicks*, 97 Ind App 177, 179 NE 335 (1932). Compare Rule 17(b) as to when an unincorporated association has capacity to sue or be sued in its common name;  *United Mine Workers of America v Coronado Coal Co.*, 259 US 344, 66 L Ed 975, 42 S Ct 570, 27 ALR 762 (1922) (an unincorporated association was sued as an entity for the purpose of enforcing against it a federal substantive right); Moore, Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft,  25 Georgetown L J 551, 566 (for discussion of jurisdictional requisites when an unincorporated association sues or is sued in its common name and jurisdiction is founded upon diversity of citizenship). For an action brought by representatives of one group against representatives of another group for distribution of a fund held by an unincorporated association, see  *Smith v Swormstedt*, 16 How 288, 14 L Ed 942 (US 1853). Compare  *Christopher et al. v Brusselback*, 302 US 500, 82 L Ed 388, 58 S Ct 350 (1938).

For an action to enforce rights held in common by policyholders against the corporate issuer of the policies, see *Supreme Tribe of Ben Hur v Cauble*, 255 US 356, 41 S Ct 338, 65 L Ed 673 (1921). See also  *Terry v Little*, 101 US 216, 25 L Ed 864 (1880);  *John A. Roebling's Sons Co. v Kinnicutt*, 248 F 596 (DC NY, 1917) dealing with the right held in common by creditors to enforce the statutory liability of stockholders.

Typical of a secondary action is a suit by stockholders to enforce a corporate right. For discussion of the general nature of these actions see  *Ashwander v Tennessee Valley Authority*, 297 US 288, 80 L Ed 688, 56 S Ct 466 (1936); Glenn,  *The Stockholder's Suit—Corporate and Individual Grievances*,  33 Yale L J 580 (1924); McLaughlin, *Capacity of Plaintiff-Stockholder to Terminate a Stockholder's Suit*,  46 Yale L J 421 (1937). See also  *Subdivision (b)* of this rule which deals with Shareholder's Action; Note,  15 Minn L Rev 453 (1931).

*Clause (2).* A creditor's action for liquidation or reorganization of a corporation is illustrative of this clause. An action by a stockholder against certain named defendants as representatives of numerous claimants presents a situation converse to the creditor's action.

*Clause (3).* See  *Everglades Drainage League v Napoleon Broward Drainage Dist.*, 253 F 246 (DC Fla, 1918); *Gramling v Maxwell*, 52 F2d 256 (DC NC, 1931), approved in  30 Mich L Rev 624 (1932);  *Skinner v Mitchell*, 108 Kan 861, 197 P 569 (1921);  *Duke of Bedford v Ellis* (1901) AC 1, for class actions when there were numerous persons and there was only a question of law or fact common to them; and see Blume,  *The "Common Questions" Principle in the Code Provision for Representative Suits*,  30 Mich L Rev 878 (1932).

*Note to Subdivision (b).* This is former Equity Rule 27 (Stockholder's Bill) with verbal changes. See also  *Hawes v Oakland*, 104 US 450, 26 L Ed 827 (1882) and former Equity Rule 94, promulgated January 23, 1882, 104 US IX.

*Note to Subdivision (c).* See McLaughlin,  *Capacity of Plaintiff-Stockholder to Terminate a Stockholder's Suit*,  46 Yale L J 421 (1937).

**Notes of Advisory Committee on 1966 Amendment.** *Note to Subdivision (b).* Subdivision (b), relating to secondary actions by shareholders, provides among other things, that in such an action the complainant "shall aver (1) that the plaintiff was a shareholder at the time of the transaction of which he complains or that his share thereafter devolved on him by operation of law . . ."

As a result of the decision in *Erie R. Co. v Tompkins*, 304 US 64, 82 L Ed 1188, 58 S Ct 817, 114 ALR 1487 (decided April 25, 1938, after this rule was promulgated by the Supreme Court, though before it took effect) a question has arisen as to whether the provision above quoted deals with a matter of substantive right or is a matter of procedure. If it is a matter of substantive law or right, then under *Erie R. Co. v Tompkins*, clause (1) may not be validly applied in cases pending in states whose local law permits a shareholder to maintain such actions, although not a shareholder at the time of the transactions complained of. The Advisory Committee, believing the question should be settled in the Courts, proposes no change in Rule 23 but thinks rather that the situation should be explained in an appropriate note.

The rule has a long history. In *Hawes v Oakland*, 1882, 104 US 450, 26 L Ed 827, the Court held that a shareholder could not maintain such an action unless he owned shares at the time of the transactions complained of, or unless they devolved on him by operation of law. At that time the decision in *Swift v Tyson*, 1842, 16 Peters 1, 10 L Ed 865, was the law, and the federal courts considered themselves free to establish their own principles of equity jurisprudence, so the Court was not in 1882 and has not been, until *Erie R. Co. v Tompkins* in 1938, concerned with the question whether *Hawes v Oakland* dealt with substantive right or procedure.

Following the decision in *Hawes v Oakland*, and at the same term, the Court, to implement its decision, adopted former Equity Rule 94, which contained the same provision above quoted from Rule 23 FRCP. The provision in former Equity Rule 94 was later embodied in former Equity Rule 27, of which the present Rule 23 is substantially a copy.

In *City of Quincy v Steel*, 1887, 120 US 241,  245, 30 L Ed 624, 7 S Ct 520, the Court referring to *Hawes v Oakland* said: "In order to give effect to the principles there laid down, this Court at that term adopted Rule 94 of the rules of practice for courts of equity of the United States."

Some other cases dealing with former Equity Rules 94 or 27 prior to the decision in *Erie R. Co. v Tompkins* are *Dimpfel v Ohio & Miss. R.R.* (1884), 110 US 209, 28 L Ed 121, 3 S Ct 573; *Illinois Central R. Co. v Adams*, 1901, 180 US 28,  34, 45 L Ed 410, 21 S Ct 251; *Venner v Great Northern Ry.* (1908), 209 US 24,  30, 52 L Ed 666, 28 S Ct 328; *Jacobson v General Motors Corp.*, SD NY 1938, 22 F Supp 255, 257. These cases generally treat *Hawes v Oakland* as establishing a "principle" of equity, or as dealing not with jurisdiction but with the "right" to maintain an action, or have said that the defense under the equity rule is analogous to the defense that the plaintiff has no "title" and results in a dismissal "for want of equity."

Those state decisions which held that a shareholder acquiring stock after the event may maintain a derivative action are founded on the view that it is a right belonging to the shareholder at the time of the transaction and which passes as a right to the subsequent purchaser. See *Pollitz v Gould*, 1911, 202 NY 11, 94 NE 1088.

The first case arising after the decision in *Erie R. Co. v Tompkins*, in which this problem was involved, was *Summers v Hearst*, SD NY 1938, 23 F Supp 986. It concerned former Equity Rule 27, as Federal Rule 23 was not then in effect. In a well considered opinion Judge Leibell reviewed the decisions and said: "The federal cases that discuss this section of Rule 27 support the view that it states a principle of substantive law." He quoted *Pollitz v Gould* (1911), 202 NY 11, 94 NE 1088, as saying that the United States Supreme Court "seems to have been more concerned with establishing this rule as one of practice than of substantive law" but that "whether it be regarded as establishing a principle of law or a rule of practice, this authority has been subsequently followed in the United States courts."

He then concluded that, although the federal decisions treat the equity rule as "stating a principle of substantive law", if former "Equity Rule 27 is to be modified or revoked in view of *Erie R. Co. v Tompkins*, it is not the province of this Court to suggest it, much less impliedly to follow that course by disregarding the mandatory provisions of the Rule."

Some other federal decisions since 1938 touch the question.

In *Picard v Sperry Corporation*, SD NY 1941, 36 F Supp 1006, 1009–10, affirmed without opinion, CCA 2d, 1941, 120 F2d 328, a shareholder, not such at the time of the transactions complained of, sought to intervene. The court

held an intervenor was as much subject to Rule 23 as an original plaintiff; and that the requirement of Rule 23(b) was "a matter of practice," not substance, and applied in New York where the state law was otherwise, despite *Erie R. Co. v Tompkins*. In *York v Guaranty Trust Co. of New York*, CCA 2d, 1944, 143 F2d 503, rev'd on other grounds, 1945, 89 L Ed 2079, 65 S Ct 1464, 160 ALR 1231, the court said: "Restrictions on the bringing of stockholders' actions, such as those imposed by FRCP 23(b) or other state statutes are procedural," citing the Picard and other cases.

In *Gallup v Caldwell*, CCA 3d, 1941, 120 F2d 90, 95, arising in New Jersey, the point was raised but not decided, the court saying that it was not satisfied that the New Jersey rule differed from Rule 23(b), and that "under the circumstances the proper course was to follow Rule 23(b)."

In *Mullins v DeSoto Securities Co.*, WD La 1942, 45 F Supp 871, 878, the point was not decided, because the court found the Louisiana rule to be the same as that stated in Rule 23(b).

In *Toebelman v Missouri-Kansas Pipe Line Co.*, D Del 1941, 41 F Supp 334, 340, the court dealt only with another part of Rule 23(b), relating to prior demands on the stockholders and did not discuss *Erie R. Co. v Tompkins*, or its effect on the rule.

In *Perrott v United States Banking Corp.*, D Del 1944, 53 F Supp 953, it appeared that the Delaware law does not require the plaintiff to have owned shares at the time of the transaction complained of. The court sustained Rule 23(b), after discussion of the authorities, saying:

"It seems to me the rule does not go beyond procedure. . . . Simply because a particular plaintiff cannot qualify as a proper party to maintain such an action does not destroy or even whittle at the cause of action. The cause of action exists until a qualified plaintiff can get it started in a federal court."

In *Bankers Nat. Corp. v Barr*, SD NY 1945, 9 Fed Rules Serv 23b 11, Case 1, the court held Rule 23(b) to be one of procedure, but that whether the plaintiff was a stockholder was a substantive question to be settled by state law.

The New York rule, as stated in *Pollitz v Gould*, supra, has been altered by an act of the New York Legislature, Chapter 667, Laws of 1944, effective April 9, 1944, General Corporation Law, § 61, which provides that "in any action brought by a shareholder in the right of a . . . corporation, it must appear that the plaintiff was a stockholder at the time of the transaction of which he complains, or that his stock thereafter devolved upon him by operation of law." At the same time a further and separate provision was enacted, requiring under certain circumstances the giving of security for reasonable expenses and attorney's fees, to which security the corporation in whose right the action is brought and the defendants therein may have recourse. (Chapter 668, Laws of 1944, effective April 9, 1944, General Corporation Law, § 61-b). These provisions are aimed at so-called "strike" stockholders' suits and their attendant abuses. *Shielcrawt v Moffett*, Ct App 1945, 294 NY 180, 61 NE 2d 435, revg 51 NYS 2d 188, affg 49 NYS 2d 64; *Noel Associates, Inc. v Merrill*, Sup Ct 1944, 184 Misc 646, 63 NYS 2d 143.

Insofar as § 61 is concerned, it has been held that the section is procedural in nature. *Klum v Clinton Trust Co.*, Sup Ct 1944, 183 Misc 340, 48 NYS 2d 267; *Noel Associates, Inc. v Merrill*, supra. In the latter case the court pointed out that "The 1944 amendment to Section 61 rejected the rule laid down in the Pollitz case and substituted, in place thereof, in its precise language, the rule which has long prevailed in the Federal Courts and which is now Rule 23(b) . . ." There is, nevertheless, a difference of opinion regarding the application of the statute to pending actions. See *Klum v Clinton Trust Co.*, supra (applicable); *Noel Associates, Inc. v Merrill*, supra (inapplicable).

With respect to § 61-b, which may be regarded as a separate problem, *Noel Associates, Inc. v Merrill*, supra, it has been held that even though the statute is procedural in nature—a matter not definitely decided—the Legislature evinced no intent that the provision should apply to actions pending when it became effective. *Shielcrawt v Moffett*, supra. As to actions instituted after the effective date of the legislation, the constitutionality of § 61-b is in dispute. See *Wolf v Atkinson*, Sup Ct 1944, 182 Misc 675, 49 NYS 2d 703 (constitutional); *Citron v Mangel Stores Corp.*, Sup Ct 1944, 50 NYS 2d 416 (unconstitutional); Zlinkoff, *The American Investor and the Constitutionality of Section 61-B of the New York General Corporation Law*, 1945, 54 Yale LJ 352.

New Jersey also enacted a statute, similar to Chapters 667 and 668 of the New York law. See P. L. 1945, Ch 131, R S Cum Supp 14:3-15. The New Jersey provision similar to Chapter 668, § 61-b, differs, however, in that it specifically applies retroactively. It has been held that this provision is procedural and hence will not govern a pending action brought against a New Jersey corporation in the New York courts. *Shielcrawt v Moffett*, Sup Ct NY 1945, 184 Misc 1074, 56 NYS 2d 134.

See also generally, 2 *Moore's Federal Practice*, 1938, 2250–2253, and Cum. Supplement § 23.05.

The decisions here discussed show that the question is a debatable one, and that there is respectable authority for either view, with a recent trend towards the view that Rule 23(b)(1) is procedural. There is reason to say that the question is one which should not be decided by the Supreme Court ex parte, but left to await a judicial decision in a litigated case, and that in the light of the material in this note, the only inference to be drawn from a failure to amend Rule 23(b) would be that the question is postponed to await a litigated case.

The Advisory Committee is unanimously of the opinion that this course should be followed.

If, however, the final conclusion is that the rule deals with a matter of substantive right, then the rule should be amended by adding a provision that Rule 23(b)(1) does not apply in jurisdictions where state law permits a shareholder to maintain a secondary action, although he was not a shareholder at the time of the transactions of which he complains.

 **Notes of Advisory Committee on 1966 amendments.** Difficulties with the original rule. The categories of class actions in the original rule were defined in terms of the abstract nature of the rights involved: the so-called "true" category was defined as involving "joint, common, or secondary rights"; the "hybrid" category, as involving "several" rights related to "specific property"; the "spurious" category, as involving "several" rights affected by a common question and related to common relief. It was thought that the definitions accurately described the situations amenable to the class-suit device, and also would indicate the proper extent of the judgment in each category, which would in turn help to determine the res judicata effect of the judgment if questioned in a later action. Thus the judgments in "true" and "hybrid" class actions would extend to the class (although in somewhat different ways); the judgment in a "spurious" class action would extend only to the parties including intervenors. See Moore, *Federal Rules of Civil Procedure: Some Problems Raised by the Preliminary Draft*, 25 Geo LJ 551, 570–76 (1937).

In practice the terms "joint," "common," etc., which were used as the basis of the Rule 23 classification proved obscure and uncertain. See Chafee, *Some Problems of Equity*, 245–46, 256–57 (1950); Kalven & Rosenfield, *The Contemporary Function of the Class Suit*, 8 U of Chi L Rev 684, 707 & n 73 (1941); Keeffe, Levy & Donovan, *Lee Defeats Ben Hur*, 33 Corn LQ 327, 329–36 (1948); *Developments in the Law: Multiparty Litigation in the Federal Courts*, 71 Harv L Rev 874, 931 (1958); Advisory Committee's Note to Rule 19, as amended. The courts had considerable difficulty with these terms. See, e.g., *Gullo v Veterans' Coop. H. Assn.*, 13 FRD 11 (DDC 1952); *Shipley v Pittsburgh & L.E.R. Co.*, 70 F Supp 870 (WD Pa 1947); *Deckert v Independence Shares Corp.*, 27 F Supp 763 (ED Pa 1939), revd, 108 F2d 51 (3d Cir 1939), revd 311 US 282, 85 L Ed 189, 61 S Ct 229 (1940), on remand, 39 F Supp 592 (ED Pa 1941), revd sub nom *Pennsylvania Co. for Ins. on Lives v Deckert*, 123 F2d 979 (3d Cir 1941) (see Chafee, supra, at 264–65).

Nor did the rule provide an adequate guide to the proper extent of the judgments in class actions. First, we find instances of the courts classifying actions as "true" or intimating that the judgments would be decisive for the class where these results seemed appropriate but were reached by dint of depriving the word "several" of coherent meaning. See, e.g., *System Federation No. 91 v Reed*, 180 F2d 991 (6th Cir 1950); *Wilson v City of Paducah*, 100 F Supp 116 (WD Ky 1951); *Citizens Banking Co. v Monticello State Bank*, 143 F2d 261 (8th Cir 1944); *Redmond v Commerce Trust Co.*, 144 F2d 140 (8th Cir 1944), cert den 323 US 776, 89 L Ed 620, 65 S Ct 188 (1944); *United States v American Optical Co.*, 97 F Supp 66 (ND Ill 1951); *National Hairdressers' & C. Assn. v Philad Co.*, 34 F Supp 264 (D Del 1940), 41 F Supp 701 (D Del 1940), affd mem, 129 F2d 1020 (3d Cir 1942). Second, we find cases classified by the courts as "spurious" in which, on a realistic view, it would seem fitting for the judgments to extend to the class. See, e.g., *Knapp v Bankers Sec. Corp.*, 17 FRD 245 (ED Pa 1954), affd 230 F2d 717 (3d Cir 1956); *Giesecke v Denver Tramway Corp.*, 81 F Supp 957 (D Del 1949); *York v Guaranty Trust*

*Co.*, 143 F2d 503 (2d Cir 1944), revd on grounds not here relevant, 326 US 99, 89 L Ed 2079, 65 S Ct 1464, 160 ALR 1231, reh den 326 US 806, 90 L Ed 491, 66 S Ct 7 (1945) (see   Chafee, supra, at 208); cf.   *Webster Eisenlohr, Inc. v Kalodner*, 145 F2d 316, 320 (3d Cir 1944), cert den 325 US 867, 89 L Ed 1986, 65 S Ct 1404 (1945). But cf. the early decisions,   *Duke of Bedford v Ellis*, [1901] AC 1;   *Sheffield Waterworks v Yeomans*, LR 2 Ch App 8 (1866);   *Brown v Vermuden*, 1 Ch Cas 272,   22 Eng Rep 796 (1866).

The "spurious" action envisaged by original Rule 23 was in any event an anomaly because, although denominated a "class" action and pleaded as such, it was supposed not to adjudicate the rights or liabilities of any person not a party. It was believed to be an advantage of the "spurious" category that it would invite decisions that a member of the "class" could, like a member of the class in a "true" or "hybrid" action, intervene on an ancillary basis without being required to show an independent basis of Federal jurisdiction, and have the benefit of the date of the commencement of the action for purposes of the statute of limitations. See 3  *Moore's Federal Practice*, pars 23.10 [1], 23.12 (2d ed 1963). These results were attained in some instances but not in others. On the statute of limitations, see  *Union Carbide & Carbon Corp. v Nisley*, 300 F2d 561 (10th Cir 1961), pet cert dism 371 US 801, 9 L Ed 2d 46, 83 S Ct 13 (1963); but cf.  *P. W. Husserl, Inc. v Newman*, 25 FRD 264 (SD NY 1960);  *Athas v Day*, 161 F Supp 916 (D Colo 1958). On ancillary intervention, see  *Amen v Black*, 234 F2d 12 (10th Cir 1956), cert granted 352 US 888, 1 L Ed 2d 84, 77 S Ct 127 (1956), dism on stip  355 US 600, 2 L Ed 2d 523, 78 S Ct 530 (1958); but cf.  *Wagner v Kemper*, 13 FRD 128 (WD Mo 1952). The results, however, can hardly depend upon the mere appearance of a "spurious" category in the rule; they should turn on more basic considerations. See discussion of subdivision (c)(1) below.

Finally, the original rule did not squarely address itself to the question of the measures that might be taken during the course of the action to assure procedural fairness, particularly giving notice to members of the class, which may in turn be related in some instances to the extension of the judgment to the class. See  Chafee, supra, at 230–31; Keeffe, Levy & Donovan, supra;  Developments in the Law, supra,  71 Harv L Rev at 937–38; Note, Binding Effect of Class Actions,  67 Harv L Rev 1059, 1062–65 (1954); Note, Federal Class Actions: A Suggested Revision of Rule 23,  46 Colum L Rev 818, 833–36 (1946); Mich Gen Court R 208.4 (effective Jan. 1, 1963); Idaho R Civ P 23 (d); Minn R Civ P 23.04; N Dak R Civ P 23(d).

The amended rule describes in more practical terms the occasions for maintaining class actions; provides that all class actions maintained to the end as such will result in judgments including those whom the court finds to be members of the class, whether or not the judgment is favorable to the class; and refers to the measures which can be taken to assure the fair conduct of these actions.

 *Subdivision (a)* states the prerequisites for maintaining any class action in terms of the numerousness of the class making joinder of the members impracticable, the existence of questions common to the class, and the desired qualifications of the representative parties. See Weinstein,  *Revision of Procedure: Some Problems in Class Actions*,  9 Buffalo L Rev 433, 458–59 (1960); 2 Barron & Holtzoff,  *Federal Practice & Procedure* § 562, at 265, § 572, at 351–52 (Wright ed 1961). These are necessary but not sufficient conditions for a class action. See, e.g., *Giordano v Radio Corp. of Am.*, 183 F2d 558, 560 (3d Cir 1950);  *Zachman v Erwin*, 186 F Supp 681 (SD Tex 1959);  *Baim & Blank, Inc. v Warren-Connelly Co., Inc.*, 19 FRD 108 (SD NY 1956). Subdivision (b) describes the additional elements which in varying situations justify the use of a class action.

 *Note to Subdivision (b)(1).* The difficulties which would be likely to arise if resort were had to separate actions by or against the individual members of the class here furnish the reasons for, and the principal key to, the propriety and value of utilizing the class-action device. The considerations stated under clauses (A) and (B) are comparable to certain of the elements which define the persons whose joinder in an action is desirable as stated in Rule 19(a), as amended. See amended Rule 19(a)(2) (i) and (ii), and the Advisory Committee's Note thereto; Hazard, *Indispensable Party: The Historical Origin of a Procedural Phantom*,  61 Colum L Rev 1254, 1259–60 (1961); cf.  3 *Moore*, supra, par  23.08, at 3435.

 *Clause (A)*: One person may have rights against, or be under duties toward, numerous persons constituting a class, and be so positioned that conflicting or varying adjudications in lawsuits with individual members of the class might establish incompatible standards to govern his conduct. The class action device can be used effectively to

obviate the actual or virtual dilemma which would thus confront the party opposing the class. The matter has been stated thus: "The felt necessity for a class action is greatest when the courts are called upon to order or sanction the alteration of the status quo in circumstances such that a large number of persons are in a position to call on a single person to alter the status quo, or to complain if it is altered, and the possibility exists that [the] actor might be called upon to act in inconsistent ways." Louisell & Hazard, *Pleading and Procedure: State and Federal* 719 (1962); see *Supreme Tribe of Ben-Hur v Cauble*, 255 US 356,  366–67, 65 L Ed 673, 41 S Ct 338 (1921). To illustrate: Separate actions by individuals against a municipality to declare a bond issue invalid or condition or limit it, to prevent or limit the making of a particular appropriation or to compel or invalidate an assessment, might create a risk of inconsistent or varying determinations. In the same way, individual litigations of the rights and duties of riparian owners, or of landowners' rights and duties respecting a claimed nuisance, could create a possibility of incompatible adjudications. Actions by or against a class provide a ready and fair means of achieving unitary adjudication. See *Maricopa County Mun. Water Con. Dist. v Looney*, 219 F2d 529 (9th Cir 1955);  *Rank v Krug*, 142 F Supp 1, 154–59 (SD Calif 1956), on app, *State of California v Rank*, 293 F2d 340, 348 (9th Cir 1961);  *Gart v Cole*, 263 F2d 244 (2d Cir 1959), cert den 359 US 978, 3 L Ed 2d 929, 79 S Ct 898 (1959); cf. *Martinez v Maverick Cty. Water Con. & Imp. Dist.*, 219 F2d 666 (5th Cir 1955);  3 Moore, supra, par 23.11 [2], at 3458–59.

 *Clause (B)*: This clause takes in situations where the judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter. The vice of an individual action would lie in the fact that the other members of the class, thus practically concluded, would have had no representation in the lawsuit. In an action by policy holders against a fraternal benefit association attacking a financial reorganization of the society, it would hardly have been practical, if indeed it would have been possible, to confine the effects of a validation of the reorganization to the individual plaintiffs. Consequently a class action was called for with adequate representation of all members of the class. See *Supreme Tribe of Ben-Hur v Cauble*, 255 US 356, 65 L Ed 673, 41 S Ct 338 (1921);  *Waybright v Columbian Mut. Life Ins. Co.*, 30 F Supp 885 (WD Tenn 1939); cf. *Smith v Swormstedt*, 16 How 288, 14 L Ed 942 (US, 1853). For much the same reason actions by shareholders to compel the declaration of a dividend, the proper recognition and handling of redemption or pre-emption rights, or the like (or actions by the corporation for corresponding declarations of rights), should ordinarily be conducted as class actions, although the matter has been much obscured by the insistence that each shareholder has an individual claim. See *Knapp v Bankers Securities Corp.*, 17 FRD 245 (ED Pa 1954), affd, 230 F2d 717 (3d Cir 1956);  *Giesecke v Denver Tramway Corp.*, 81 F Supp 957 (D Del 1949);  *Zahn v Transamerica Corp.*, 162 F2d 36 (3d Cir 1947);  *Speed v Transamerica Corp.*, 100 F Supp 461 (D Del 1951);  *Sobel v Whittier Corp.*, 95 F Supp 643 (ED Mich 1951), app dism,  195 F2d 361 (6th Cir 1952);  *Goldberg v Whittier Corp.*, 111 F Supp 382 (ED Mich 1953);  *Dann v Studebaker-Packard Corp.*, 288 F2d 201 (6th Cir 1961);  *Edgerton v Armour & Co.*, 94 F Supp 549 (SD Calif 1950);  *Ames v Mengel Co.*, 190 F2d 344 (2d Cir 1951). (These shareholders' actions are to be distinguished from derivative actions by shareholders dealt with in new Rule 23.1). The same reasoning applies to an action which charges a breach of trust by an indenture trustee or other fiduciary similarly affecting the members of a large class of security holders or other beneficiaries, and which requires an accounting or like measures to restore the subject of the trust. See *Boesenberg v Chicago T. & T. Co.*, 128 F2d 245 (7th Cir 1942);  *Citizens Banking Co. v Monticello State Bank*, 143 F2d 261 (8th Cir 1944);  *Redmond v Commerce Trust Co.*, 144 F2d 140 (8th Cir 1944), cert den 323 US 776, 89 L Ed 620, 65 S Ct 187 (1944); cf. *York v Guaranty Trust Co.*, 143 F2d 503 (2d Cir 1944), revd on grounds not here relevant, 326 US 99, 89 L Ed 2079, 65 S Ct 1464, 160 ALR 1231 (1945).

In various situations an adjudication as to one or more members of the class will necessarily or probably have an adverse practical effect on the interests of other members who should therefore be represented in the lawsuit. This is plainly the case when claims are made by numerous persons against a fund insufficient to satisfy all claims. A class action by or against representative members to settle the validity of the claims as a whole, or in groups, followed by separate proof of the amount of each valid claim and proportionate distribution of the fund, meets the problem. Cf. *Dickinson v Burnham*, 197 F2d 973 (2d Cir 1952), cert den 344 US 875, 97 L Ed 678, 73 S Ct 169 (1952);  3 Moore, supra, at par 23.09. The same reasoning applies to an action by a creditor to set aside a fraudulent conveyance by the debtor and to appropriate the property to his claim, when the debtor's assets are insufficient to pay all creditors' claims. See *Heffernan v Bennett & Armour*, 110 Cal App 2d 564, 243 P2d 846 (1952); cf. *City & County of San Francisco v Market Street Ry.*, 95 Cal App 2d 648, 213 P2d 780 (1950). Similar

problems, however, can arise in the absence of a fund either present or potential. A negative or mandatory injunction secured by one of a numerous class may disable the opposing party from performing claimed duties toward the other members of the class or materially affect his ability to do so. An adjudication as to movie "clearances and runs" nominally affecting only one exhibitor would often have practical effects on all the exhibitors in the same territorial area.  Cf.  *United States v Paramount Pictures, Inc.*, 66 F Supp 323, 341–46 (SD NY 1946); 334 US 131,  144–48, 92 L Ed 1260, 68 S Ct 915 (1948). Assuming a sufficiently numerous class of exhibitors, a class action would be advisable. (Here representation of subclasses of exhibitors could become necessary; see subdivision (c)(3)(B).).

 *Note to Subdivision (b)(2)*. This subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate. Declaratory relief "corresponds" to injunctive relief when as a practical matter it affords injunctive relief or serves as a basis for later injunctive relief. The subdivision does not extend to cases in which the appropriate final relief relates exclusively or predominantly to money damages. Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.

Illustrative are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration. See  *Potts v Flax*, 313 F2d 284 (5th Cir 1963);  *Bailey v Patterson*, 323 F2d 201 (5th Cir 1963), cert den 376 US 910, 11 L Ed 2d 609, 84 S Ct 666 (1964); *Brunson v Board of Trustees of School District No. 1, Clarendon Cty.*, S.C., 311 F2d 107 (4th Cir 1962), cert den 373 US 933, 10 L Ed 2d 690, 83 S Ct 1538 (1963);  *Green v School Bd. of Roanoke, Va.*, 304 F2d 118 (4th Cir 1962);  *Orleans Parish School Bd. v Bush*, 242 F2d 156 (5th Cir 1957), cert den 354 US 921, 1 L Ed 2d 1436, 77 S Ct 1380 (1957);  *Mannings v Board of Public Inst. of Hillsborough County, Fla.*, 277 F2d 370 (5th Cir 1960); *Northcross v Board of Ed. of City of Memphis*, 302 F2d 818 (6th Cir 1962), cert den 370 US 944, 8 L Ed 2d 810, 82 S Ct 1586 (1962);  *Frasier v Board of Trustees of Univ. of N.C.*, 134 F Supp 589 (MD NC 1955, 3-judge court), affd, 350 US 979, 100 L Ed 848, 76 S Ct 467 (1956). Subdivision (b)(2) is not limited to civil-rights cases. Thus an action looking to specific or declaratory relief could be brought by a numerous class of purchasers, say retailers of a given description, against a seller alleged to have undertaken to sell to that class at prices higher than those set for other purchasers, say retailers of another description, when the applicable law forbids such a pricing differential. So also a patentee of a machine, charged with selling or licensing the machine on condition that purchasers or licensees also purchase or obtain licenses to use an ancillary unpatented machine, could be sued on a class basis by a numerous group of purchasers or licensees, or by a numerous group of competing sellers or licensors of the unpatented machine, to test the legality of the "tying" condition.

 *Note to Subdivision (b)(3)*. In the situations to which this subdivision relates, class-action treatment is not as clearly called for as in those described above, but it may nevertheless be convenient and desirable depending upon the particular facts. Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results. Cf.  Chafee, supra, at 201.

The court is required to find, as a condition of holding that a class action may be maintained under this subdivision, that the questions common to the class predominate over the questions affecting individual members. It is only where this predominance exists that economies can be achieved by means of the class-action device. In this view, a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class. On the other hand, although having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed. See  *Oppenheimer v F. J. Young & Co., Inc.*, 144 F2d 387 (2d Cir 1944);  *Miller v National City Bank of N. Y.*, 166 F2d 723 (2d Cir 1948); and for like problems in other contexts, see  *Hughes v Encyclopaedia Britannica*, 199 F2d 295 (7th Cir 1952);  *Sturgeon v Great Lakes Steel Corp.*, 143 F2d 819 (6th Cir 1944). A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages

but of liability and defenses to liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried. See *Pennsylvania R.R. v United States*, 111 F Supp 80 (DNJ 1953); cf. Weinstein, supra, 9 Buffalo L Rev at 469. Private damage claims by numerous individuals arising out of concerted antitrust violations may or may not involve predominating common questions. See *Union Carbide & Carbon Corp. v Nisley*, 300 F2d 561 (10th Cir 1961), pet cert dism, 371 US 801, 9 L Ed 2d 46, 83 S Ct 13 (1963); cf. *Weeks v Bareco Oil Co.*, 125 F2d 84 (7th Cir 1941); *Kainz v Anheuser-Busch, Inc.*, 194 F2d 737 (7th Cir 1952); *Hess v Anderson, Clayton & Co.*, 20 FRD 466 (SD Calif 1957).

That common questions predominate is not itself sufficient to justify a class action under subdivision (b)(3), for another method of handling the litigious situation may be available which has greater practical advantages. Thus one or more actions agreed to by the parties as test or model actions may be preferable to a class action; or it may prove feasible and preferable to consolidate actions. Cf. Weinstein, supra, 9 Buffalo L Rev at 438–54. Even when a number of separate actions are proceeding simultaneously, experience shows that the burdens on the parties and the courts can sometimes be reduced by arrangements for avoiding repetitious discovery or the like. Currently the Coordinating Committee on Multiple Litigation in the United States District Courts (a subcommittee of the Committee on Trial Practice and Technique of the Judicial Conference of the United States) is charged with developing methods for expediting such massive litigation. To reinforce the point that the court with the aid of the parties ought to assess the relative advantages of alternative procedures for handling the total controversy, subdivision (b)(3) requires, as a further condition of maintaining the class action, that the court shall find that that procedure is "superior" to the others in the particular circumstances.

Factors (A)–(D) are listed, non-exhaustively, as pertinent to the findings. The court is to consider the interests of individual members of the class in controlling their own litigations and carrying them on as they see fit. See *Weeks v Bareco Oil Co.*, 125 F2d 84, 88–90, 93–94 (7th Cir 1941) (anti-trust action); see also *Pentland v Dravo Corp.*, 152 F2d 851 (3d Cir 1945), and Chafee, supra, at 273–75, regarding policy of Fair Labor Standards Act of 1938, § 16(b), 29 USC § 216(b), prior to amendment by Portal-to-Portal Act of 1947, § 5(a). [The present provisions of 29 USC § 216(b) are not intended to be affected by Rule 23, as amended.]

In this connection the court should inform itself of any litigation actually pending by or against the individuals. The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretical rather than practical: the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable. The burden that separate suits would impose on the party opposing the class, or upon the court calendars, may also fairly be considered. (See the discussion, under subdivision (c)(2) below, of the right of members to be excluded from the class upon their request.).

Also pertinent is the question of the desirability of concentrating the trial of the claims in the particular forum by means of a class action, in contrast to allowing the claims to be litigated separately in forums to which they would ordinarily be brought. Finally, the court should consider the problems of management which are likely to arise in the conduct of a class action.

*Note to Subdivision (c)(1).* In order to give clear definition to the action, this provision requires the court to determine, as early in the proceedings as may be practicable, whether an action brought as a class action is to be so maintained. The determination depends in each case on satisfaction of the terms of subdivision (a) and the relevant provisions of subdivision (b).

An order embodying a determination can be conditional; the court may rule, for example, that a class action may be maintained only if the representation is improved through intervention of additional parties of a stated type. A determination once made can be altered or amended before the decision on the merits if, upon fuller development of the facts, the original determination appears unsound. A negative determination means that the action should be stripped of its character as a class action. See subdivision (d)(4). Although an action thus becomes a nonclass action, the court may still be receptive to interventions before the decision on the merits so that the litigation may

cover as many interests as can be conveniently handled; the questions whether the intervenors in the nonclass action shall be permitted to claim "ancillary" jurisdiction or the benefit of the date of the commencement of the action for purposes of the statute of limitations are to be decided by reference to the laws governing jurisdiction and limitations as they apply in particular contexts.

Whether the court should require notice to be given to members of the class of its intention to make a determination, or of the order embodying it, is left to the court's discretion under subdivision (d)(2).

 *Subdivision (c)(2)* makes special provision for class actions maintained under subdivision (b)(3). As noted in the discussion of the latter subdivision, the interests of the individuals in pursuing their own litigations may be so strong here as to warrant denial of a class action altogether. Even when a class action is maintained under subdivision (b)(3), this individual interest is respected. Thus the court is required to direct notice to the members of the class of the right of each member to be excluded from the class upon his request. A member who does not request exclusion may, if he wishes, enter an appearance in the action through his counsel; whether or not he does so, the judgment in the action will embrace him.

The notice, setting forth the alternatives open to the members of the class, is to be the best practicable under the circumstances, and shall include individual notice to the members who can be identified through reasonable effort. (For further discussion of this notice, see the statement under subdivision (d)(2) below.).

 *Note to Subdivision (c)(3).* The judgment in a class action maintained as such to the end will embrace the class, that is, in a class action under subdivision (b)(1) or (b)(2), those found by the court to be class members; in a class action under subdivision (b)(3), those to whom the notice prescribed by subdivision (c)(2) was directed, excepting those who requested exclusion or who are ultimately found by the court not to be members of the class. The judgment has this scope whether it is favorable or unfavorable to the class. In a (b)(1) or (b)(2) action the judgment "describes" the members of the class, but need not specify the individual members; in a (b)(3) action the judgment "specifies" the individual members who have been identified and describes the others.

Compare subdivision (c)(4) as to actions conducted as class actions only with respect to particular issues. Where the class-action character of the lawsuit is based solely on the existence of a "limited fund," the judgment, while extending to all claims of class members against the debtor. See ordinarily left unaffected the personal claims of nonappearing members against the debtor. See  3 Moore, supra, par 23.11 [4].

Hitherto, in a few actions conducted as "spurious" class actions and thus nominally designed to extend only to parties and others intervening before the determination of liability, courts have held or intimated that class members might be permitted to intervene after a decision on the merits favorable to their interests, in order to secure the benefits of the decision for themselves, although they would presumably be unaffected by an unfavorable decision. See, as to the propriety of this so-called "one-way" intervention in "spurious" actions, the conflicting views expressed in  *Union Carbide & Carbon Corp. v Nisley*, 300 F2d 561 (10th Cir 1961), pet cert dism, 371 US 801, 9 L Ed 2d 46, 83 S Ct 13 (1963);  *York v Guaranty Trust Co.*, 143 F2d 503, 529 (2d Cir 1944), revd on grounds not here relevant, 326 US 99, 89 L Ed 2079, 65 S Ct 1464, 160 ALR 1231 (1945);  *Pentland v Dravo Corp.*, 152 F2d 851, 856 (3d Cir 1945);  *Speed v Transamerica Corp.*, 100 F Supp 461, 463 (D Del 1951);  *State Wholesale Grocers v Great Atl. & Pac. Tea Co.*, 24 FRD 510 (ND Ill 1959);  *Alabama Ind. Serv. Stat. Assn. v Shell Pet. Corp.*, 28 F Supp 386, 390 (ND Ala 1939);  *Tolliver v Cudahy Packing Co.*, 39 F Supp 337, 339 (ED Tenn 1941);  *Kalven & Rosenfield*, supra,  8 U of Chi L Rev 684 (1941);  Comment, 53 Nw UL Rev 627, 632–33 (1958);  *Developments in the Law*, supra,  71 Harv L Rev at 935;  2 Barron & Holtzoff, supra, § 568; but cf.  *Lockwood v Hercules Powder Co.*, 7 FRD 24, 28–29 (WD Mo 1947);  *Abram v Sam Joaquin Cotton Oil Co.*, 46 F Supp 969, 976–77 (SD Calif 1942);  Chafee, supra, at 280, 285;  3 Moore, supra, par  23.12, at 3476. Under proposed subdivision (c)(3), one-way intervention is excluded; the action will have been early determined to be a class or nonclass action, and in the former case the judgment, whether or not favorable, will include the class, as above stated.

Although thus declaring that the judgment in a class action includes the class, as defined, subdivision (c)(3) does not disturb the recognized principle that the court conducting the action cannot predetermine the  *res judicata* effect of the judgment; this can be tested only in a subsequent action. See Restatement,  *Judgments* § 86, comment (h), §

116 (1942). The court, however, in framing the judgment in any suit brought as a class action, must decide what its extent or coverage shall be, and if the matter is carefully considered, questions of *res judicata* are less likely to be raised at a later time and if raised will be more satisfactorily answered. See  Chafee, supra, at 294;  Weinstein, supra,  9 Buffalo L Rev at 460.

 *Note to Subdivision (c)(4).* This provision recognizes that an action may be maintained as a class action as to particular issues only. For example, in a fraud or similar case the action may retain its "class" character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims.

Two or more classes may be represented in a single action. Where a class is found to include subclasses divergent in interest, the class may be divided correspondingly, and each subclass treated as a class.

 *Subdivision (d)* is concerned with the fair and efficient conduct of the action and lists some types of orders which may be appropriate.

The court should consider how the proceedings are to be arranged in sequence, and what measures should be taken to simplify the proof and argument. See subdivision (d)(1). The orders resulting from this consideration, like the others referred to in subdivision (d), may be combined with a pretrial order under Rule 16, and are subject to modification as the case proceeds.

Subdivision (d)(2) sets out a non-exhaustive list of possible occasions for orders requiring notice to the class. Such notice is not a novel conception. For example, in "limited fund" cases, members of the class have been notified to present individual claims after the basic class decision. Notice has gone to members of a class so that they might express any opposition to the representation, see  *United States v American Optical Co.*, 97 F Supp 66 (ND Ill 1951), and  1950–51 CCH Trade Cases 64573–74 (par 62869); cf.  *Weeks v Bareco Oil Co.*, 125 F2d 84, 94 (7th Cir 1941), and notice may encourage interventions to improve the representation of the class. Cf.  *Oppenheimer v F. J. Young & Co.*, 144 F2d 387 (2d Cir 1944). Notice has been used to poll members on a proposed modification of a consent decree. See record in  *Sam Fox Publishing Co. v United States*, 366 US 683, 6 L Ed 2d 604, 81 S Ct 1309 (1961).

Subdivision (d)(2) does not require notice at any stage, but rather calls attention to its availability and invokes the court's discretion. In the degree that there is cohesiveness or unity in the class and the representation is effective, the need for notice to the class will tend toward a minimum. These indicators suggest that notice under subdivision (d)(2) may be particularly useful and advisable in certain class actions maintained under subdivision (b)(3), for example, to permit members of the class to object to the representation. Indeed, under subdivision (c)(2), notice must be ordered, and is not merely discretionary, to give the members in a subdivision (b)(3) class action an opportunity to secure exclusion from the class. This mandatory notice pursuant to subdivision (c)(2), together with any discretionary notice which the court may find it advisable to give under subdivision (d)(2), is designed to fulfill requirements of due process to which the class action procedure is of course subject. See  *Hansberry v Lee*, 311 US 32, 85 L Ed 22, 61 S Ct 115, 132 ALR 741 (1940);  *Mullane v Central Hanover Bank & Trust Co.*, 339 US 306, 94 L Ed 865, 70 S Ct 652 (1950); cf.  *Dickinson v Burnham*, 197 F2d 973, 979 (2d Cir 1952), and studies cited at 979 n 4; see also  *All American Airways, Inc. v Elderd*, 209 F2d 247, 249 (2d Cir 1954);  *Gart v Cole*, 263 F2d 244, 248–49 (2d Cir 1959), cert den 359 US 978, 3 L Ed 2d 929, 79 S Ct 898 (1959).

Notice to members of the class, whenever employed under amended Rule 23, should be accommodated to the particular purpose but need not comply with the formalities for service of process. See  Chafee, supra, at 230–31;  *Brendle v Smith*, 7 FRD 119 (SD NY 1946). The fact that notice is given at one stage of the action does not mean that it must be given at subsequent stages. Notice is available fundamentally "for the protection of the members of the class or otherwise for the fair conduct of the action" and should not be used merely as a device for the undesirable solicitation of claims. See the discussion in  *Cherner v Transitron Electronic Corp.*, 201 F Supp 934 (D Mass 1962);  *Hormel v United States*, 17 FRD 303 (SD NY 1955).

In appropriate cases the court should notify interested government agencies of the pendency of the action or of particular steps therein.

Subdivision (d)(3) reflects the possibility of conditioning the maintenance of a class action, e.g., on the strengthening of the representation, see subdivision (c) (1) above; and recognizes that the imposition of conditions on intervenors may be required for the proper and efficient conduct of the action.

As to orders under subdivision (d)(4), see subdivision (c)(1) above.

Subdivision (e) requires approval of the court, after notice, for the dismissal or compromise of any class action.

**Notes of Advisory Committee on 1998 amendments.**  *Note to Subdivision (f).* This permissive interlocutory appeal provision is adopted under the power conferred by  28 U.S.C. § 1292(e). Appeal from an order granting or denying class certification is permitted in the sole discretion of the court of appeals. No other type of Rule 23 order is covered by this provision. The court of appeals is given unfettered discretion whether to permit the appeal, akin to the discretion exercised by the Supreme Court in acting on a petition for certiorari. This discretion suggests an analogy to the provision in  28 U.S.C. § 1292(b) for permissive appeal on certification by a district court. Subdivision (f), however, departs from the § 1292(b) model in two significant ways. It does not require that the district court certify the certification ruling for appeal, although the district court often can assist the parties and court of appeals by offering advice on the desirability of appeal. And it does not include the potentially limiting requirements of § 1292(b) that the district court order "involve a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation."

The courts of appeals will develop standards for granting review that reflect the changing areas of uncertainty in class litigation. The Federal Judicial Center study supports the view that many suits with class-action allegations present familiar and almost routine issues that are no more worthy of immediate appeal than many other interlocutory rulings. Yet several concerns justify expansion of present opportunities to appeal. An order denying certification may confront the plaintiff with a situation in which the only sure path to appellate review is by proceeding to final judgment on the merits of an individual claim that, standing alone, is far smaller than the costs of litigation. An order granting certification, on the other hand, may force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability. These concerns can be met at low cost by establishing in the court of appeals a discretionary power to grant interlocutory review in cases that show appeal-worthy certification issues.

Permission to appeal may be granted or denied on the basis of any consideration that the court of appeals finds persuasive. Permission is most likely to be granted when the certification decision turns on a novel or unsettled question of law, or when, as a practical matter, the decision on certification is likely dispositive of the litigation.

The district court, having worked through the certification decision, often will be able to provide cogent advice on the factors that bear on the decision whether to permit appeal. This advice can be particularly valuable if the certification decision is tentative. Even as to a firm certification decision, a statement of reasons bearing on the probable benefits and costs of immediate appeal can help focus the court of appeals decision, and may persuade the disappointed party that an attempt to appeal would be fruitless.

The 10-day period for seeking permission to appeal is designed to reduce the risk that attempted appeals will disrupt continuing proceedings. It is expected that the courts of appeals will act quickly in making the preliminary determination whether to permit appeal. Permission to appeal does not stay trial court proceedings. A stay should be sought first from the trial court. If the trial court refuses a stay, its action and any explanation of its reasons should weigh heavily with the court of appeals.

Appellate Rule 5 has been modified to establish the procedure for petitioning for leave to appeal under subdivision (f).

*Changes Made after Publication (GAP Report).* No changes were made in the text of Rule 23(f) as published.

Several changes were made in the published Committee Note. (1) References to  28 U.S.C. § 1292(b) interlocutory appeals were revised to dispel any implication that the restrictive elements of § 1292(b) should be read in to Rule

23(f). New emphasis was placed on court of appeals discretion by making explicit the analogy to certiorari discretion. (2) Suggestions that the new procedure is a "modest" expansion of appeal opportunities, to be applied with "restraint," and that permission "almost always will be denied when the certification decision turns on case-specific matters of fact and district court discretion," were deleted. It was thought better simply to observe that courts of appeals will develop standards "that reflect the changing areas of uncertainty in class litigation."

**Notes of Advisory Committee on 2003 amendments.** *Note to Subdivision (c).* Subdivision (c) is amended in several respects. The requirement that the court determine whether to certify a class "as soon as practicable after commencement of an action" is replaced by requiring determination "at an early practicable time." The notice provisions are substantially revised.

*Paragraph (1).* Subdivision (c)(1)(A) is changed to require that the determination whether to certify a class be made "at an early practicable time." The "as soon as practicable" exaction neither reflects prevailing practice nor captures the many valid reasons that may justify deferring the initial certification decision. See Willging, Hooper & Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules 26–36* (Federal Judicial Center 1996).

Time may be needed to gather information necessary to make the certification decision. Although an evaluation of the probable outcome on the merits is not properly part of the certification decision, discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial. In this sense it is appropriate to conduct controlled discovery into the "merits," limited to those aspects relevant to making the certification decision on an informed basis. Active judicial supervision may be required to achieve the most effective balance that expedites an informed certification determination without forcing an artificial and ultimately wasteful division between "certification discovery" and "merits discovery." A critical need is to determine how the case will be tried. An increasing number of courts require a party requesting class certification to present a "trial plan" that describes the issues likely to be presented at trial and tests whether they are susceptible of class-wide proof. See Manual For Complex Litigation Third, § 21.213, p. 44; § 30.11, p. 214; § 30.12, p. 215.

Other considerations may affect the timing of the certification decision. The party opposing the class may prefer to win dismissal or summary judgment as to the individual plaintiffs without certification and without binding the class that might have been certified. Time may be needed to explore designation of counsel under Rule 23(g), recognizing that in many cases the need to progress toward the certification determination may require designation of interim class counsel under Rule 23(g)(2)(A).

Although many circumstances may justify deferring the certification decision, active management may be necessary to ensure that the certification decision is not unjustifiably delayed.

Subdivision (c)(1)(C) reflects two amendments. The provision that a class certification "may be conditional" is deleted. A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met. The provision that permits alteration or amendment of an order granting or denying class certification is amended to set the cut-off point at final judgment rather than "the decision on the merits." This change avoids the possible ambiguity in referring to "the decision on the merits." Following a determination of liability, for example, proceedings to define the remedy may demonstrate the need to amend the class definition or subdivide the class. In this setting the final judgment concept is pragmatic. It is not the same as the concept used for appeal purposes, but it should be, particularly in protracted litigation.

The authority to amend an order under Rule 23(c)(1) before final judgment does not restore the practice of "one-way intervention" that was rejected by the 1966 revision of Rule 23. A determination of liability after certification, however, may show a need to amend the class definition. Decertification may be warranted after further proceedings.

If the definition of a class certified under Rule 23(b)(3) is altered to include members who have not been afforded notice and an opportunity to request exclusion, notice — including an opportunity to request exclusion — must be directed to the new class members under Rule 23(c)(2)(B).

*Paragraph (2).* The first change made in Rule 23(c)(2) is to call attention to the court's authority — already established in part by Rule 23(d)(2) — to direct notice of certification to a Rule 23(b)(1) or (b)(2) class. The present rule expressly requires notice only in actions certified under Rule 23(b)(3). Members of classes certified under Rules 23(b)(1) or (b)(2) have interests that may deserve protection by notice.

The authority to direct notice to class members in a (b)(1) or (b)(2) class action should be exercised with care. For several reasons, there may be less need for notice than in a (b)(3) class action. There is no right to request exclusion from a (b)(1) or (b)(2) class. The characteristics of the class may reduce the need for formal notice. The cost of providing notice, moreover, could easily cripple actions that do not seek damages. The court may decide not to direct notice after balancing the risk that notice costs may deter the pursuit of class relief against the benefits of notice.

When the court does direct certification notice in a (b)(1) or (b)(2) class action, the discretion and flexibility established by subdivision (c)(2)(A) extend to the method of giving notice. Notice facilitates the opportunity to participate. Notice calculated to reach a significant number of class members often will protect the interests of all. Informal methods may prove effective. A simple posting in a place visited by many class members, directing attention to a source of more detailed information, may suffice. The court should consider the costs of notice in relation to the probable reach of inexpensive methods.

If a Rule 23(b)(3) class is certified in conjunction with a (b)(2) class, the (c)(2)(B) notice requirements must be satisfied as to the (b)(3) class.

The direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members. It is difficult to provide information about most class actions that is both accurate and easily understood by class members who are not themselves lawyers. Factual uncertainty, legal complexity, and the complication of class-action procedure raise the barriers high. The Federal Judicial Center has created illustrative clear-notice forms that provide a helpful starting point for actions similar to those described in the forms.

*Note to Subdivision (e).* Subdivision (e) is amended to strengthen the process of reviewing proposed class-action settlements. Settlement may be a desirable means of resolving a class action. But court review and approval are essential to assure adequate representation of class members who have not participated in shaping the settlement.

*Paragraph (1).* Subdivision (e)(1)(A) expressly recognizes the power of a class representative to settle class claims, issues, or defenses.

Rule 23(e)(1)(A) resolves the ambiguity in former Rule 23(e)'s reference to dismissal or compromise of "a class action." That language could be — and at times was — read to require court approval of settlements with putative class representatives that resolved only individual claims. See Manual for Complex Litigation Third, § 30.41. The new rule requires approval only if the claims, issues, or defenses of a certified class are resolved by a settlement, voluntary dismissal, or compromise.

Subdivision (e)(1)(B) carries forward the notice requirement of present Rule 23(e) when the settlement binds the class through claim or issue preclusion; notice is not required when the settlement binds only the individual class representatives. Notice of a settlement binding on the class is required either when the settlement follows class certification or when the decisions on certification and settlement proceed simultaneously.

Reasonable settlement notice may require individual notice in the manner required by Rule 23(c)(2)(B) for certification notice to a Rule 23(b)(3) class. Individual notice is appropriate, for example, if class members are required to take action — such as filing claims — to participate in the judgment, or if the court orders a settlement opt-out opportunity under Rule 23(e)(3).

Subdivision (e)(1)(C) confirms and mandates the already common practice of holding hearings as part of the process of approving settlement, voluntary dismissal, or compromise that would bind members of a class.

Subdivision (e)(1)(C) states the standard for approving a proposed settlement that would bind class members. The settlement must be fair, reasonable, and adequate. A helpful review of many factors that may deserve consideration is provided by *In re: Prudential Ins. Co. America Sales Practice Litigation Agent Actions*, 148 F.3d 283, 316–324 (3d Cir. 1998). Further guidance can be found in the Manual for Complex Litigation.

The court must make findings that support the conclusion that the settlement is fair, reasonable, and adequate. The findings must be set out in sufficient detail to explain to class members and the appellate court the factors that bear on applying the standard.

Settlement review also may provide an occasion to review the cogency of the initial class definition. The terms of the settlement themselves, or objections, may reveal divergent interests of class members and demonstrate the need to redefine the class or to designate subclasses. Redefinition of a class certified under Rule 23(b)(3) may require notice to new class members under Rule 23(c)(2)(B). See Rule 23(c)(1)(C).

*Paragraph (2).* Subdivision (e)(2) requires parties seeking approval of a settlement, voluntary dismissal, or compromise under Rule 23(e)(1) to file a statement identifying any agreement made in connection with the settlement. This provision does not change the basic requirement that the parties disclose all terms of the settlement or compromise that the court must approve under Rule 23(e)(1). It aims instead at related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others. Doubts should be resolved in favor of identification.

Further inquiry into the agreements identified by the parties should not become the occasion for discovery by the parties or objectors. The court may direct the parties to provide to the court or other parties a summary or copy of the full terms of any agreement identified by the parties. The court also may direct the parties to provide a summary or copy of any agreement not identified by the parties that the court considers relevant to its review of a proposed settlement. In exercising discretion under this rule, the court may act in steps, calling first for a summary of any agreement that may have affected the settlement and then for a complete version if the summary does not provide an adequate basis for review. A direction to disclose a summary or copy of an agreement may raise concerns of confidentiality. Some agreements may include information that merits protection against general disclosure. And the court must provide an opportunity to claim work-product or other protections.

*Paragraph (3).* Subdivision (e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords class members a new opportunity to request exclusion from a class certified under Rule 23(b)(3) after settlement terms are known. An agreement by the parties themselves to permit class members to elect exclusion at this point by the settlement agreement may be one factor supporting approval of the settlement. Often there is an opportunity to opt out at this point because the class is certified and settlement is reached in circumstances that lead to simultaneous notice of certification and notice of settlement. In these cases, the basic opportunity to elect exclusion applies without further complication. In some cases, particularly if settlement appears imminent at the time of certification, it may be possible to achieve equivalent protection by deferring notice and the opportunity to elect exclusion until actual settlement terms are known. This approach avoids the cost and potential confusion of providing two notices and makes the single notice more meaningful. But notice should not be delayed unduly after certification in the hope of settlement.

Rule 23 (e)(3) authorizes the court to refuse to approve a settlement unless the settlement affords a new opportunity to elect exclusion in a case that settles after a certification decision if the earlier opportunity to elect exclusion provided with the certification notice has expired by the time of the settlement notice. A decision to remain in the class is likely to be more carefully considered and is better informed when settlement terms are known.

The opportunity to request exclusion from a proposed settlement is limited to members of a (b)(3) class. Exclusion may be requested only by individual class members; no class member may purport to opt out other class members by way of another class action.

The decision whether to approve a settlement that does not allow a new opportunity to elect exclusion is confided to the court's discretion. The court may make this decision before directing notice to the class under Rule 23(e)(1)(B) or after the Rule 23(e)(1)(C) hearing. Many factors may influence the court's decision. Among these are changes in

the information available to class members since expiration of the first opportunity to request exclusion, and the nature of the individual class members' claims.

The terms set for permitting a new opportunity to elect exclusion from the proposed settlement of a Rule 23(b)(3) class action may address concerns of potential misuse. The court might direct, for example, that class members who elect exclusion are bound by rulings on the merits made before the settlement was proposed for approval. Still other terms or conditions may be appropriate.

*Paragraph (4).* Subdivision (e)(4) confirms the right of class members to object to a proposed settlement, voluntary dismissal, or compromise. The right is defined in relation to a disposition that, because it would bind the class, requires court approval under subdivision (e)(1)(C).

Subdivision (e)(4)(B) requires court approval for withdrawal of objections made under subdivision (e)(4)(A). Review follows automatically if the objections are withdrawn on terms that lead to modification of the settlement with the class. Review also is required if the objector formally withdraws the objections. If the objector simply abandons pursuit of the objection, the court may inquire into the circumstances.

Approval under paragraph (4)(B) may be given or denied with little need for further inquiry if the objection and the disposition go only to a protest that the individual treatment afforded the objector under the proposed settlement is unfair because of factors that distinguish the objector from other class members. Different considerations may apply if the objector has protested that the proposed settlement is not fair, reasonable, or adequate on grounds that apply generally to a class or subclass. Such objections, which purport to represent class-wide interests, may augment the opportunity for obstruction or delay. If such objections are surrendered on terms that do not affect the class settlement or the objector's participation in the class settlement, the court often can approve withdrawal of the objections without elaborate inquiry.

Once an objector appeals, control of the proceeding lies in the court of appeals. The court of appeals may undertake review and approval of a settlement with the objector, perhaps as part of appellate settlement procedures, or may remand to the district court to take advantage of the district court's familiarity with the action and settlement.

*Note to Subdivision (g).* Subdivision (g) is new. It responds to the reality that the selection and activity of class counsel are often critically important to the successful handling of a class action. Until now, courts have scrutinized proposed class counsel as well as the class representative under Rule 23(a)(4). This experience has recognized the importance of judicial evaluation of the proposed lawyer for the class, and this new subdivision builds on that experience rather than introducing an entirely new element into the class certification process. Rule 23(a)(4) will continue to call for scrutiny of the proposed class representative, while this subdivision will guide the court in assessing proposed class counsel as part of the certification decision. This subdivision recognizes the importance of class counsel, states the obligation to represent the interests of the class, and provides a framework for selection of class counsel. The procedure and standards for appointment vary depending on whether there are multiple applicants to be class counsel. The new subdivision also provides a method by which the court may make directions from the outset about the potential fee award to class counsel in the event the action is successful.

*Paragraph (1)* sets out the basic requirement that class counsel be appointed if a class is certified and articulates the obligation of class counsel to represent the interests of the class, as opposed to the potentially conflicting interests of individual class members. It also sets out the factors the court should consider in assessing proposed class counsel.

*Paragraph (1)(A)* requires that the court appoint class counsel to represent the class. Class counsel must be appointed for all classes, including each subclass that the court certifies to represent divergent interests.

*Paragraph (1)(A)* does not apply if "a statute provides otherwise." This recognizes that provisions of the Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995) (codified in various sections of 15 U.S.C.), contain directives that bear on selection of a lead plaintiff and the retention of counsel. This subdivision does not purport to supersede or to affect the interpretation of those provisions, or any similar provisions of other legislation.

*Paragraph 1(B)* recognizes that the primary responsibility of class counsel, resulting from appointment as class counsel, is to represent the best interests of the class. The rule thus establishes the obligation of class counsel, an obligation that may be different from the customary obligations of counsel to individual clients. Appointment as class counsel means that the primary obligation of counsel is to the class rather than to any individual members of it. The class representatives do not have an unfettered right to "fire" class counsel. In the same vein, the class representatives cannot command class counsel to accept or reject a settlement proposal. To the contrary, class counsel must determine whether seeking the court's approval of a settlement would be in the best interests of the class as a whole.

*Paragraph (1)(C)* articulates the basic responsibility of the court to appoint class counsel who will provide the adequate representation called for by paragraph (1)(B). It identifies criteria that must be considered and invites the court to consider any other pertinent matters. Although couched in terms of the court's duty, the listing also informs counsel seeking appointment about the topics that should be addressed in an application for appointment or in the motion for class certification.

The court may direct potential class counsel to provide additional information about the topics mentioned in paragraph (1)(C) or about any other relevant topic. For example, the court may direct applicants to inform the court concerning any agreements about a prospective award of attorney fees or nontaxable costs, as such agreements may sometimes be significant in the selection of class counsel. The court might also direct that potential class counsel indicate how parallel litigation might be coordinated or consolidated with the action before the court.

The court may also direct counsel to propose terms for a potential award of attorney fees and nontaxable costs. Attorney fee awards are an important feature of class action practice, and attention to this subject from the outset may often be a productive technique. Paragraph (2)(C) therefore authorizes the court to provide directions about attorney fees and costs when appointing class counsel. Because there will be numerous class actions in which this information is not likely to be useful, the court need not consider it in all class actions.

Some information relevant to class counsel appointment may involve matters that include adversary preparation in a way that should be shielded from disclosure to other parties. An appropriate protective order may be necessary to preserve confidentiality.

In evaluating prospective class counsel, the court should weigh all pertinent factors. No single factor should necessarily be determinative in a given case. For example, the resources counsel will commit to the case must be appropriate to its needs, but the court should be careful not to limit consideration to lawyers with the greatest resources.

If, after review of all applicants, the court concludes that none would be satisfactory class counsel, it may deny class certification, reject all applications, recommend that an application be modified, invite new applications, or make any other appropriate order regarding selection and appointment of class counsel.

*Paragraph (2).* This paragraph sets out the procedure that should be followed in appointing class counsel. Although it affords substantial flexibility, it provides the framework for appointment of class counsel in all class actions. For counsel who filed the action, the materials submitted in support of the motion for class certification may suffice to justify appointment so long as the information described in paragraph (g)(1)(C) is included. If there are other applicants, they ordinarily would file a formal application detailing their suitability for the position.

In a plaintiff class action the court usually would appoint as class counsel only an attorney or attorneys who have sought appointment. Different considerations may apply in defendant class actions.

The rule states that the court should appoint "class counsel." In many instances, the applicant will be an individual attorney. In other cases, however, an entire firm, or perhaps of numerous attorneys who are not otherwise affiliated but are collaborating on the action will apply. No rule of thumb exists to determine when such arrangements are appropriate; the court should be alert to the need for adequate staffing of the case, but also to the risk of overstaffing or an ungainly counsel structure.

*Paragraph (2)(A)* authorizes the court to designate interim counsel during the pre-certification period if necessary to protect the interests of the putative class. Rule 23(c)(1)(B) directs that the order certifying the class include appointment of class counsel. Before class certification, however, it will usually be important for an attorney to take action to prepare for the certification decision. The amendment to Rule 23(c)(1) recognizes that some discovery is often necessary for that determination. It also may be important to make or respond to motions before certification. Settlement may be discussed before certification. Ordinarily, such work is handled by the lawyer who filed the action. In some cases, however, there may be rivalry or uncertainty that makes formal designation of interim counsel appropriate. Rule 23(g)(2)(A) authorizes the court to designate interim counsel to act on behalf of the putative class before the certification decision is made. Failure to make the formal designation does not prevent the attorney who filed the action from proceeding in it. Whether or not formally designated interim counsel, an attorney who acts on behalf of the class before certification must act in the best interests of the class as a whole. For example, an attorney who negotiates a pre-certification settlement must seek a settlement that is fair, reasonable, and adequate for the class.

Rule 23(c)(1) provides that the court should decide whether to certify the class "at an early practicable time," and directs that class counsel should be appointed in the order certifying the class. In some cases, it may be appropriate for the court to allow a reasonable period after commencement of the action for filing applications to serve as class counsel. The primary ground for deferring appointment would be that there is reason to anticipate competing applications to serve as class counsel. Examples might include instances in which more than one class action has been filed, or in which other attorneys have filed individual actions on behalf of putative class members. The purpose of facilitating competing applications in such a case is to afford the best possible representation for the class. Another possible reason for deferring appointment would be that the initial applicant was found inadequate, but it seems appropriate to permit additional applications rather than deny class certification.

*Paragraph (2)(B)* states the basic standard the court should use in deciding whether to certify the class and appoint class counsel in the single applicant situation — that the applicant be able to provide the representation called for by paragraph (1)(B) in light of the factors identified in paragraph (1)(C).

If there are multiple adequate applicants, paragraph (2)(B) directs the court to select the class counsel best able to represent the interests of the class. This decision should also be made using the factors outlined in paragraph (1)(C), but in the multiple applicant situation the court is to go beyond scrutinizing the adequacy of counsel and make a comparison of the strengths of the various applicants. As with the decision whether to appoint the sole applicant for the position, no single factor should be dispositive in selecting class counsel in cases in which there are multiple applicants. The fact that a given attorney filed the instant action, for example, might not weigh heavily in the decision if that lawyer had not done significant work identifying or investigating claims. Depending on the nature of the case, one important consideration might be the applicant's existing attorney-client relationship with the proposed class representative.

*Paragraph (2)(C)* builds on the appointment process by authorizing the court to include provisions regarding attorney fees in the order appointing class counsel. Courts may find it desirable to adopt guidelines for fees or nontaxable costs, or to direct class counsel to report to the court at regular intervals on the efforts undertaken in the action, to facilitate the court's later determination of a reasonable attorney fee.

*Note to Subdivision (h).* Subdivision (h) is new. Fee awards are a powerful influence on the way attorneys initiate, develop, and conclude class actions. Class action attorney fee awards have heretofore been handled, along with all other attorney fee awards, under Rule 54(d)(2), but that rule is not addressed to the particular concerns of class actions. This subdivision is designed to work in tandem with new subdivision (g) on appointment of class counsel, which may afford an opportunity for the court to provide an early framework for an eventual fee award, or for monitoring the work of class counsel during the pendency of the action.

Subdivision (h) applies to "an action certified as a class action." This includes cases in which there is a simultaneous proposal for class certification and settlement even though technically the class may not be certified unless the court approves the settlement pursuant to review under Rule 23(e). When a settlement is proposed for

Rule 23(e) approval, either after certification or with a request for certification, notice to class members about class counsel's fee motion would ordinarily accompany the notice to the class about the settlement proposal itself.

This subdivision does not undertake to create new grounds for an award of attorney fees or nontaxable costs. Instead, it applies when such awards are authorized by law or by agreement of the parties. Against that background, it provides a format for all awards of attorney fees and nontaxable costs in connection with a class action, not only the award to class counsel. In some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel. Other situations in which fee awards are authorized by law or by agreement of the parties may exist.

This subdivision authorizes an award of "reasonable" attorney fees and nontaxable costs. This is the customary term for measurement of fee awards in cases in which counsel may obtain an award of fees under the "common fund" theory that applies in many class actions, and is used in many fee-shifting statutes. Depending on the circumstances, courts have approached the determination of what is reasonable in different ways. In particular, there is some variation among courts about whether in "common fund" cases the court should use the lodestar or a percentage method of determining what fee is reasonable. The rule does not attempt to resolve the question whether the lodestar or percentage approach should be viewed as preferable.

Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process. Continued reliance on caselaw development of fee-award measures does not diminish the court's responsibility. In a class action, the district court must ensure that the amount and mode of payment of attorney fees are fair and proper whether the fees come from a common fund or are otherwise paid. Even in the absence of objections, the court bears this responsibility.

Courts discharging this responsibility have looked to a variety of factors. One fundamental focus is the result actually achieved for class members, a basic consideration in any case in which fees are sought on the basis of a benefit achieved for class members. The Private Securities Litigation Reform Act of 1995 explicitly makes this factor a cap for a fee award in actions to which it applies. See 15 U.S.C. §§ 77z-1(a)(6); 78u-4(a)(6) (fee award should not exceed a "reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class"). For a percentage approach to fee measurement, results achieved is the basic starting point.

In many instances, the court may need to proceed with care in assessing the value conferred on class members. Settlement regimes that provide for future payments, for example, may not result in significant actual payments to class members. In this connection, the court may need to scrutinize the manner and operation of any applicable claims procedure. In some cases, it may be appropriate to defer some portion of the fee award until actual payouts to class members are known. Settlements involving nonmonetary provisions for class members also deserve careful scrutiny to ensure that these provisions have actual value to the class. On occasion the court's Rule 23(e) review will provide a solid basis for this sort of evaluation, but in any event it is also important to assessing the fee award for the class.

At the same time, it is important to recognize that in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award. Cf. *Blanchard v. Bergeron*, 489 U.S. 87, 95 [103 L. Ed. 2d 67, 76] (1989) (cautioning in an individual case against an "undesirable emphasis" on "the importance of the recovery of damages in civil rights litigation" that might "shortchange efforts to seek effective injunctive or declaratory relief").

Any directions or orders made by the court in connection with appointing class counsel under Rule 23(g) should weigh heavily in making a fee award under this subdivision.

Courts have also given weight to agreements among the parties regarding the fee motion, and to agreements between class counsel and others about the fees claimed by the motion. Rule 54(d)(2)(B) provides: "If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made." The agreement by a settling party not to oppose a fee application up to a certain amount,

for example, is worthy of consideration, but the court remains responsible to determine a reasonable fee. "Side agreements" regarding fees provide at least perspective pertinent to an appropriate fee award.

In addition, courts may take account of the fees charged by class counsel or other attorneys for representing individual claimants or objectors in the case. In determining a fee for class counsel, the court's objective is to ensure an overall fee that is fair for counsel and equitable within the class. In some circumstances individual fee agreements between class counsel and class members might have provisions inconsistent with those goals, and the court might determine that adjustments in the class fee award were necessary as a result.

Finally, it is important to scrutinize separately the application for an award covering nontaxable costs. If costs were addressed in the order appointing class counsel, those directives should be a presumptive starting point in determining what is an appropriate award.

*Paragraph (1)*. Any claim for an award of attorney fees must be sought by motion under Rule 54(d)(2), which invokes the provisions for timing of appeal in Rule 58 and Appellate Rule 4. Owing to the distinctive features of class action fee motions, however, the provisions of this subdivision control disposition of fee motions in class actions, while Rule 54(d)(2) applies to matters not addressed in this subdivision.

The court should direct when the fee motion must be filed. For motions by class counsel in cases subject to court review of a proposed settlement under Rule 23(e), it would be important to require the filing of at least the initial motion in time for inclusion of information about the motion in the notice to the class about the proposed settlement that is required by Rule 23(e). In cases litigated to judgment, the court might also order class counsel's motion to be filed promptly so that notice to the class under this subdivision (h) can be given.

Besides service of the motion on all parties, notice of class counsel's motion for attorney fees must be "directed to the class in a reasonable manner." Because members of the class have an interest in the arrangements for payment of class counsel whether that payment comes from the class fund or is made directly by another party, notice is required in all instances. In cases in which settlement approval is contemplated under Rule 23(e), notice of class counsel's fee motion should be combined with notice of the proposed settlement, and the provision regarding notice to the class is parallel to the requirements for notice under Rule 23(e). In adjudicated class actions, the court may calibrate the notice to avoid undue expense.

*Paragraph (2)*. A class member and any party from whom payment is sought may object to the fee motion. Other parties — for example, nonsettling defendants — may not object because they lack a sufficient interest in the amount the court awards. The rule does not specify a time limit for making an objection. In setting the date objections are due, the court should provide sufficient time after the full fee motion is on file to enable potential objectors to examine the motion.

The court may allow an objector discovery relevant to the objections. In determining whether to allow discovery, the court should weigh the need for the information against the cost and delay that would attend discovery. See Rule 26(b)(2). One factor in determining whether to authorize discovery is the completeness of the material submitted in support of the fee motion, which depends in part on the fee measurement standard applicable to the case. If the motion provides thorough information, the burden should be on the objector to justify discovery to obtain further information.

*Paragraph (3)*. Whether or not there are formal objections, the court must determine whether a fee award is justified and, if so, set a reasonable fee. The rule does not require a formal hearing in all cases. The form and extent of a hearing depend on the circumstances of the case. The rule does require findings and conclusions under Rule 52(a).

*Paragraph (4)*. By incorporating Rule 54(d)(2), this provision gives the court broad authority to obtain assistance in determining the appropriate amount to award. In deciding whether to direct submission of such questions to a special master or magistrate judge, the court should give appropriate consideration to the cost and delay that such a process might entail.

*Changes Made After Publication and Comment.* Rule 23(c)(1)(B) is changed to incorporate the counsel-appointment provisions of Rule 23(g). The statement of the method and time for requesting exclusion from a (b)(3) class has been moved to the notice of certification provision in Rule 23(c)(2)(B).

Rule 23(c)(1)(C) is changed by deleting all references to "conditional" certification.

Rule 23(c)(2)(A) is changed by deleting the requirement that class members be notified of certification of a (b)(1) or (b)(2) class. The new version provides only that the court may direct appropriate notice to the class.

Rule 23(c)(2)(B) is revised to require that the notice of class certification define the certified class in terms identical to the terms used in (c)(1)(B), and to incorporate the statement transferred from (c)(1)(B) on "when and how members may elect to be excluded."

Rule 23(e)(1) is revised to delete the requirement that the parties must win court approval for a precertification dismissal or settlement.

Rule 23(e)(2) is revised to change the provision that the court may direct the parties to file a copy or summary of any agreement or understanding made in connection with a proposed settlement. The new provision directs the parties to a proposed settlement to identify any agreement made in connection with the settlement.

Rule 23(e)(3) is proposed in a restyled form of the second version proposed for publication.

Rule 23(e)(4)(B) is restyled.

Rule 23(g)(1)(C) is a transposition of criteria for appointing class counsel that was published as Rule 23(g)(2)(B). The criteria are rearranged, and expanded to include consideration of experience in handling claims of the type asserted in the action and of counsel's knowledge of the applicable law.

Rule 23(g)(2)(A) is a new provision for designation of interim counsel to act on behalf of a putative class before a certification determination is made.

Rule 23(g)(2)(B) is revised to point up the differences between appointment of class counsel when there is only one applicant and when there are competing applicants. When there is only one applicant the court must determine that the applicant is able to fairly and adequately represent class interests. When there is more than one applicant the court must appoint the applicant best able to represent class interests.

Rule 23(h) is changed to require that notice of an attorney-fee motion by class counsel be "directed to class members," rather than "given to all class members."

**Notes of Advisory Committee on 2007 amendments.** The language of Rule 23 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Amended Rule 23(d)(2) carries forward the provisions of former Rule 23(d) that recognize two separate propositions. First, a Rule 23(d) order may be combined with a pretrial order under Rule 16. Second, the standard for amending the Rule 23(d) order continues to be the more open-ended standard for amending Rule 23(d) orders, not the more exacting standard for amending Rule 16 orders.

As part of the general restyling, intensifiers that provide emphasis but add no meaning are consistently deleted. Amended Rule 23(f) omits as redundant the explicit reference to court of appeals discretion in deciding whether to permit an interlocutory appeal. The omission does not in any way limit the unfettered discretion established by the original rule.

**Notes of Advisory Committee on 1966 amendments.** A derivative action by a shareholder of a corporation or by a member of an unincorporated association has distinctive aspects which require the special provisions set forth in the new rule. The next-to-the-last sentence recognizes that the question of adequacy of representation may arise

when the plaintiff is one of a group of shareholders or members. Cf. 3 Moore's Federal Practice, par 23.08 (2d ed 1963).

The court has inherent power to provide for the conduct of the proceedings in a derivative action, including the power to determine the course of the proceedings and require that any appropriate notice be given to shareholders or members.

**Notes of Advisory Committee on 2007 amendments.** The language of Rule 23.1 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

**Notes of Advisory Committee on 2009 amendments.** The time set in the former rule at 10 days has been revised to 14 days. See the Note to Rule 6.

**Notes of Advisory Committee on 2018 Amendments.** Rule 23 is amended mainly to address issues related to settlement, and also to take account of issues that have emerged since the rule was last amended in 2003.

*Subdivision (c)(2).* As amended, Rule 23(e)(1) provides that the court must direct notice to the class regarding a proposed class-action settlement only after determining that the prospect of class certification and approval of the proposed settlement justifies giving notice. This decision has been called "preliminary approval" of the proposed class certification in Rule 23(b)(3) actions. It is common to send notice to the class simultaneously under both Rule 23(e)(1) and Rule 23(c)(2)(B), including a provision for class members to decide by a certain date whether to opt out. This amendment recognizes the propriety of this combined notice practice.

Subdivision (c)(2) is also amended to recognize contemporary methods of giving notice to class members. Since Eisen v. Carlisle &amp; Jacquelin, 417 U.S. 156 (1974), interpreted the individual notice requirement for class members in Rule 23(b)(3) class actions, many courts have read the rule to require notice by first class mail in every case. But technological change since 1974 has introduced other means of communication that may sometimes provide a reliable additional or alternative method for giving notice. Although first class mail may often be the preferred primary method of giving notice, courts and counsel have begun to employ new technology to make notice more effective. Because there is no reason to expect that technological change will cease, when selecting a method or methods of giving notice courts should consider the capacity and limits of current technology, including class members' likely access to such technology.

Rule 23(c)(2)(B) is amended to take account of these changes. The rule continues to call for giving class members "the best notice that is practicable." It does not specify any particular means as preferred. Although it may sometimes be true that electronic methods of notice, for example email, are the most promising, it is important to keep in mind that a significant portion of class members in certain cases may have limited or no access to email or the Internet.

Instead of preferring any one means of notice, therefore, the amended rule relies on courts and counsel to focus on the means or combination of means most likely to be effective in the case before the court. The court should exercise its discretion to select appropriate means of giving notice. In providing the court with sufficient information to enable it to decide whether to give notice to the class of a proposed class-action settlement under Rule 23(e)(1), it would ordinarily be important to include details about the proposed method of giving notice and to provide the court with a copy of each notice the parties propose to use.

In determining whether the proposed means of giving notice is appropriate, the court should also give careful attention to the content and format of the notice and, if notice is given under both Rule 23(e)(1) and Rule 23(c)(2)(B), any claim form class members must submit to obtain relief.

Counsel should consider which method or methods of giving notice will be most effective; simply assuming that the "traditional" methods are best may disregard contemporary communication realities. The ultimate goal of giving notice is to enable class members to make informed decisions about whether to opt out or, in instances where a proposed settlement is involved, to object or to make claims. Rule 23(c)(2)(B) directs that the notice be "in plain,

easily understood language." Means, format, and content that would be appropriate for class members likely to be sophisticated, for example in a securities fraud class action, might not be appropriate for a class having many members likely to be less sophisticated. The court and counsel may wish to consider the use of class notice experts or professional claims administrators.

Attention should focus also on the method of opting out provided in the notice. The proposed method should be as convenient as possible, while protecting against unauthorized opt-out notices.

*Subdivision (e).* The introductory paragraph of Rule 23(e) is amended to make explicit that its procedural requirements apply in instances in which the court has not certified a class at the time that a proposed settlement is presented to the court. The notice required under Rule 23(e)(1) then should also satisfy the notice requirements of amended Rule 23(c)(2)(B) for a class to be certified under Rule 23(b)(3), and trigger the class members' time to request exclusion. Information about the opt-out rate could then be available to the court when it considers final approval of the proposed settlement.

*Subdivision (e)(1).* The decision to give notice of a proposed settlement to the class is an important event. It should be based on a solid record supporting the conclusion Subdivision (e)(1). The decision to give notice of a proposed settlement to the class is an important event. It should be based on a solid record supporting the conclusion that the proposed settlement will likely earn final approval after notice and an opportunity to object. The parties must provide the court with information sufficient to determine whether notice should be sent. At the time they seek notice to the class, the proponents of the settlement should ordinarily provide the court with all available materials they intend to submit to support approval under Rule 23(e)(2) and that they intend to make available to class members. The amended rule also specifies the standard the court should use in deciding whether to send notice—that it likely will be able both to approve the settlement proposal under Rule 23(e)(2) and, if it has not previously certified a class, to certify the class for purposes of judgment on the proposal.

The subjects to be addressed depend on the specifics of the particular class action and proposed settlement. But some general observations can be made.

One key element is class certification. If the court has already certified a class, the only information ordinarily necessary is whether the proposed settlement calls for any change in the class certified, or of the claims, defenses, or issues regarding which certification was granted. But if a class has not been certified, the parties must ensure that the court has a basis for concluding that it likely will be able, after the final hearing, to certify the class. Although the standards for certification differ for settlement and litigation purposes, the court cannot make the decision regarding the prospects for certification without a suitable basis in the record. The ultimate decision to certify the class for purposes of settlement cannot be made until the hearing on final approval of the proposed settlement. If the settlement is not approved, the parties' positions regarding certification for settlement should not be considered if certification is later sought for purposes of litigation.

Regarding the proposed settlement, many types of information might appropriately be provided to the court. A basic focus is the extent and type of benefits that the settlement will confer on the members of the class. Depending on the nature of the proposed relief, that showing may include details of the contemplated claims process and the anticipated rate of claims by class members. Because some funds are frequently left unclaimed, the settlement agreement ordinarily should address the distribution of those funds.

The parties should also supply the court with information about the likely range of litigated outcomes, and about the risks that might attend full litigation. Information about the extent of discovery completed in the litigation or in parallel actions may often be important. In addition, as suggested by Rule 23(b)(3)(B), the parties should provide information about the existence of other pending or anticipated litigation on behalf of class members involving claims that would be released under the proposal.

The proposed handling of an award of attorney's fees under Rule 23(h) ordinarily should be addressed in the parties' submission to the court. In some cases, it will be important to relate the amount of an award of attorney's fees to the expected benefits to the class. One way to address this issue is to defer some or all of the award of attorney's fees until the court is advised of the actual claims rate and results.

Another topic that normally should be considered is any agreement that must be identified under Rule 23(e)(3).

The parties may supply information to the court on any other topic that they regard as pertinent to the determination whether the proposal is fair, reasonable, and adequate. The court may direct the parties to supply further information about the topics they do address, or to supply information on topics they do not address. The court should not direct notice to the class until the parties' submissions show it is likely that the court will be able to approve the proposal after notice to the class and a final approval hearing.

 *Subdivision (e)(2).* The central concern in reviewing a proposed class-action settlement is that it be fair, reasonable, and adequate. Courts have generated lists of factors to shed light on this concern. Overall, these factors focus on comparable considerations, but each circuit has developed its own vocabulary for expressing these concerns. In some circuits, these lists have remained essentially unchanged for thirty or forty years. The goal of this amendment is not to displace any factor, but rather to focus the court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal.

A lengthy list of factors can take on an independent life, potentially distracting attention from the central concerns that inform the settlement-review process. A circuit's list might include a dozen or more separately articulated factors. Some of those factors—perhaps many—may not be relevant to a particular case or settlement proposal. Those that are relevant may be more or less important to the particular case. Yet counsel and courts may feel it necessary to address every factor on a given circuit's list in every case. The sheer number of factors can distract both the court and the parties from the central concerns that bear on review under Rule 23(e)(2).

This amendment therefore directs the parties to present the settlement to the court in terms of a shorter list of core concerns, by focusing on the primary procedural considerations and substantive qualities that should always matter to the decision whether to approve the proposal.

Approval under Rule 23(e)(2) is required only when class members would be bound under Rule 23(c)(3). Accordingly, in addition to evaluating the proposal itself, the court must determine whether it can certify the class under the standards of Rule 23(a) and (b) for purposes of judgment based on the proposal.

 *Paragraphs (A) and (B).* These paragraphs identify matters that might be described as "procedural" concerns, looking to the conduct of the litigation and of the negotiations leading up to the proposed settlement. Attention to these matters is an important foundation for scrutinizing the substance of the proposed settlement. If the court has appointed class counsel or interim class counsel, it will have made an initial evaluation of counsel's capacities and experience. But the focus at this point is on the actual performance of counsel acting on behalf of the class.

The information submitted under Rule 23(e)(1) may provide a useful starting point in assessing these topics. For example, the nature and amount of discovery in this or other cases, or the actual outcomes of other cases, may indicate whether counsel negotiating on behalf of the class had an adequate information base. The pendency of other litigation about the same general subject on behalf of class members may also be pertinent. The conduct of the negotiations may be important as well. For example, the involvement of a neutral or court-affiliated mediator or facilitator in those negotiations may bear on whether they were conducted in a manner that would protect and further the class interests. Particular attention might focus on the treatment of any award of attorney's fees, with respect to both the manner of negotiating the fee award and its terms.

 *Paragraphs (C) and (D).* These paragraphs focus on what might be called a "substantive" review of the terms of the proposed settlement. The relief that the settlement is expected to provide to class members is a central concern. Measuring the proposed relief may require evaluation of any proposed claims process; directing that the parties report back to the court about actual claims experience may be important. The contents of any agreement identified under Rule 23(e)(3) may also bear on the adequacy of the proposed relief, particularly regarding the equitable treatment of all members of the class.

Another central concern will relate to the cost and risk involved in pursuing a litigated outcome. Often, courts may need to forecast the likely range of possible classwide recoveries and the likelihood of success in obtaining such

results. That forecast cannot be done with arithmetic accuracy, but it can provide a benchmark for comparison with the settlement figure.

If the class has not yet been certified for trial, the court may consider whether certification for litigation would be granted were the settlement not approved.

Examination of the attorney-fee provisions may also be valuable in assessing the fairness of the proposed settlement. Ultimately, any award of attorney's fees must be evaluated under Rule 23(h), and no rigid limits exist for such awards. Nonetheless, the relief actually delivered to the class can be a significant factor in determining the appropriate fee award.

Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims. A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding.

Paragraph (D) calls attention to a concern that may apply to some class action settlements—inequitable treatment of some class members vis-a-vis others. Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief.

*Subdivisions (e)(3) and (e)(4).* Headings are added to subdivisions (e)(3) and (e)(4) in accord with style conventions. These additions are intended to be stylistic only.

*Subdivision (e)(5).* The submissions required by Rule 23(e)(1) may provide information critical to decisions whether to object or opt out. Objections by class members can provide the court with important information bearing on its determination under Rule 23(e)(2) whether to approve the proposal.

*Subdivision (e)(5)(A).* The rule is amended to remove the requirement of court approval for every withdrawal of an objection. An objector should be free to withdraw on concluding that an objection is not justified. But Rule 23(e)(5)(B)(i) requires court approval of any payment or other consideration in connection with withdrawing the objection.

The rule is also amended to clarify that objections must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them. One feature required of objections is specification whether the objection asserts interests of only the objector, or of some subset of the class, or of all class members. Beyond that, the rule directs that the objection state its grounds "with specificity." Failure to provide needed specificity may be a basis for rejecting an objection. Courts should take care, however, to avoid unduly burdening class members who wish to object, and to recognize that a class member who is not represented by counsel may present objections that do not adhere to technical legal standards.

*Subdivision (e)(5)(B).* Good-faith objections can assist the court in evaluating a proposal under Rule 23(e)(2). It is legitimate for an objector to seek payment for providing such assistance under Rule 23(h).

But some objectors may be seeking only personal gain, and using objections to obtain benefits for themselves rather than assisting in the settlement-review process. At least in some instances, it seems that objectors—or their counsel—have sought to obtain consideration for withdrawing their objections or dismissing appeals from judgments approving class settlements. And class counsel sometimes may feel that avoiding the delay produced by an appeal justifies providing payment or other consideration to these objectors. Although the payment may advance class interests in a particular case, allowing payment perpetuates a system that can encourage objections advanced for improper purposes.

The court-approval requirement currently in Rule 23(e)(5) partly addresses this concern. Because the concern only applies when consideration is given in connection with withdrawal of an objection, however, the amendment requires approval under Rule 23(e)(5)(B)(i) only when consideration is involved. Although such payment is usually made to objectors or their counsel, the rule also requires court approval if a payment in connection with forgoing or

withdrawing an objection or appeal is instead to another recipient. The term "consideration" should be broadly interpreted, particularly when the withdrawal includes some arrangements beneficial to objector counsel. If the consideration involves a payment to counsel for an objector, the proper procedure is by motion under Rule 23(h) for an award of fees.

Rule 23(e)(5)(B)(ii) applies to consideration in connection with forgoing, dismissing, or abandoning an appeal from a judgment approving the proposal. Because an appeal by a class-action objector may produce much longer delay than an objection before the district court, it is important to extend the court-approval requirement to apply in the appellate context. The district court is best positioned to determine whether to approve such arrangements; hence, the rule requires that the motion seeking approval be made to the district court.

Until the appeal is docketed by the circuit clerk, the district court may dismiss the appeal on stipulation of the parties or on the appellant's motion. See Fed. R. App. P. 42(a). Thereafter, the court of appeals has authority to decide whether to dismiss the appeal. This rule's requirement of district court approval of any consideration in connection with such dismissal by the court of appeals has no effect on the authority of the court of appeals to decide whether to dismiss the appeal. It is, instead, a requirement that applies only to providing consideration in connection with forgoing, dismissing, or abandoning an appeal.

*Subdivision (e)(5)(C).* Because the court of appeals has jurisdiction over an objector's appeal from the time that it is docketed in the court of appeals, the procedure of Rule 62.1 applies. That procedure does not apply after the court of appeals' mandate returns the case to the district court.

*Subdivision (f).* As amended, Rule 23(e)(1) provides that the court must direct notice to the class regarding a proposed class-action settlement only after determining that the prospect of eventual class certification justifies giving notice. But this decision does not grant or deny class certification, and review under Rule 23(f) would be premature. This amendment makes it clear that an appeal under this rule is not permitted until the district court decides whether to certify the class.

The rule is also amended to extend the time to file a petition for review of a class-action certification order to 45 days whenever a party is the United States, one of its agencies, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. In such case, the extension applies to a petition for permission to appeal by any party. The extension recognizes—as under Rules 4(i) and 12(a) and Appellate Rules 4(a)(1)(B) and 40(a)(1)—that the United States has a special need for additional time in regard to these matters. It applies whether the officer or employee is sued in an official capacity or an individual capacity. An action against a former officer or employee of the United States is covered by this provision in the same way as an action against a present officer or employee. Termination of the relationship between the individual defendant and the United States does not reduce the need for additional time.

**Prospective amendments:**

By order dated April 26, 2018, the Supreme Court of the United States approved the following amendments to Rule 23, effective Dec. 1, 2018, and authorized their transmission to Congress in accordance with   28 USCS § 2074:

**Rule 23. Class Actions**

* * * * *

**(c) Certification Order; Notice to Class Members; Judgment; Issues Classes; Subclasses.**

* * * * *

(2)  *Notice.*

* * * * *

(B)  *For (b)(3) Classes.* For any class certified under Rule 23(b)(3)—or upon ordering notice under Rule 23(e)(1) to a class proposed to be certified for purposes of settlement under Rule 23(b)(3)—the court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means. The notice must clearly and concisely state in plain, easily understood language:

* * * * *

**(e) Settlement, Voluntary Dismissal, or Compromise.** The claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise:

(1)  *Notice to the Class.*

(A)  *Information That Parties Must Provide to the Court.* The parties must provide the court with information sufficient to enable it to determine whether to give notice of the proposal to the class.

(B)  *Grounds for a Decision to Give Notice.* The court must direct notice in a reasonable manner to all class members who would be bound by the proposal if giving notice is justified by the parties' showing that the court will likely be able to:

(i) approve the proposal under Rule 23(e)(2); and

(ii) certify the class for purposes of judgment on the proposal.

(2)  *Approval of the Proposal.* If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

(3)  *Identifying Agreements.* The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

(4)  *New Opportunity to Be Excluded.* If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so.

(5)  *Class-Member Objections.*

(A)  *In General.* Any class member may object to the proposal if it requires court approval under this subdivision (e). The objection must state whether it applies only to the objector, to a specific subset of the class, or to the entire class, and also state with specificity the grounds for the objection.

(B)  *Court Approval Required for Payment in Connection with an Objection.* Unless approved by the court after a hearing, no payment or other consideration may be provided in connection with:

(i) forgoing or withdrawing an objection, or

(ii) foregoing, dismissing, or abandoning an appeal from a judgment approving the proposal.

(C) *Procedure for Approval After an Appeal.* If approval under Rule 23(e)(5)(B) has not been obtained before an appeal is docketed in the court of appeals, the procedure of Rule 62.1 applies while the appeal remains pending.

**(f) Appeals.** A court of appeals may permit an appeal from an order granting or denying class-action certification under this rule, but not from an order under Rule 23(e)(1). A party must file a petition for permission to appeal with the circuit clerk within 14 days after the order is entered, or within 45 days after the order is entered if any party is the United States, a United States agency, or a United States officer or employee sued for an act or omission occurring in connection with duties performed on the United States' behalf. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

* * * * *

# INTERPRETIVE NOTES AND DECISIONS

**I.IN GENERAL**

**1.Generally**

**2.Liberal construction**

**3.—Discretion of court**

**4.—Particular cases**

**5.Validity of Rule**

**6.Procedural characterization of Rule**

**7.Amendments of 1966**

**8.—Retroactivity**

**9.— —Discretion of court**

**10.—Binding effect of judgment**

**11.—Intervention**

**12.—Res judicata**

**13.Nature of class action**

**14.—Semi-public remedy**

**15.Substantive rights and effect thereon**

**16.Relationship to other federal rules**

**17.—Discovery rules**

**18.—Local court rules**

**19.—FRCP 12**

# Exhibit Q

**ADVISORY COMMITTEE**
**ON**
**CIVIL RULES**

**Philadelphia, PA**
**April 10, 2018**

## TABLE OF CONTENTS

MEETING AGENDA ..................................................................................................7

TAB 1      OPENING BUSINESS

      A.      Information Item:  Draft Minutes of the January 4, 2018
          Meeting of the Committee on Rules of Practice and Procedure..........21

      B.      Information Item:  March 2018 Report of the Committee on
          Rules of Practice and Procedure to the Judicial Conference of
          the United States .....................................................................................39

      C.      Information Item:  Chart Tracking Proposed Rules Amendments ....59

TAB 2      ACTION ITEM:  APPROVAL OF MINUTES

      Draft Minutes of the November 7, 2017 Meeting of the Advisory
      Committee on Civil Rules.....................................................................................67

TAB 3      INFORMATION ITEM:  PENDING LEGISLATION...................................................103

TAB 4      ACTION ITEM:  REPORT OF THE RULE 30(b)(6) SUBCOMMITTEE

      A.      Subcommittee Report .........................................................................113

      B.      Supporting Materials

          &bull;   Notes of January 19, 2018 Conference Call............................123

          &bull;   Notes of November 28, 2017 Conference Call .........................129

          &bull;   Suggestion 18-CV-C (American Association for Justice).......135

          &bull;   Suggestion 17-CV-HHHHHH (Lawyers for Civil
             Justice) ......................................................................................139

TAB 5      INFORMATION ITEM:  MDL SUBCOMMITTEE REPORT

      A.      Subcommittee Report .........................................................................147

      B.      Supporting Materials

          &bull;   Notes of February 28, 2018 Conference Call............................157

          &bull;   Notes of January 16, 2018 Conference Call..............................169

- **Judge Sarah S. Vance, JPML Chair, Remarks at the Duke Law Mass Tort MDL Program for Judicial Conference Committees (October 8, 2015)**...............................**179**

- **Suggestion 18-CV-I (American Association for Justice)**........**205**

- **Memorandum from Patrick A. Tighe, Rules Law Clerk, Regarding Survey of Federal and State Disclosure Rules Regarding Litigation Funding (February 7, 2018)**................**209**

   - **Appendix A: Local Circuit Court Rules**......................**219**

   - **Appendix B: Local District Court Rules**......................**223**

- **Suggestion 18-CV-B (American Association for Justice)**........**231**

**TAB 6**      **INFORMATION ITEM:  SOCIAL SECURITY REVIEW SUBCOMMITTEE REPORT**

**A.**    **Subcommittee Report** ...........................................................**243**

**B.**    **Supporting Materials**

- **Draft Rules with Committee Notes**............................................**249**

- **Draft Rules with Footnotes** ......................................................**253**

- **"Clean" Version of Draft Rules**................................................**261**

- **Notes of March 9, 2018 Conference Call** ..................................**263**

- **Excerpt from the November 7, 2017 Meeting of the Advisory Committee on Civil Rules** .........................................**269**

- **Social Security Administration Draft Model Rules**................**275**

- **Subcommittee's Survey Request and Invitation to Comment**....................................................................................**285**

- **Comments of the American Association for Justice (January 17, 2018)**......................................................................**291**

- **Survey Response from the American Association for Justice (February 16, 2018)**.......................................................**299**

- **Comments of the Social Security Administration (February 16, 2018)**..................................................................**307**

- **Email from the National Organization of Social Security Claimants' Representatives Regarding Survey Responses (February 16, 2018)**.................................**311**

- **EOUSA Proposed SSA Protocol**..................................**313**

**TAB 7**   **ACTION ITEM:  RULE 71.1(D)(3)(B)(I) – NEWSPAPER NOTICE IN CONDEMNATION PROCEEDINGS**

    A.   **Reporter's Memorandum** ......................................................**319**

    B.   **Supporting Materials**

- **Excerpt from the November 7, 2017 Meeting of the Advisory Committee on Civil Rules** ..........................................**323**

- **Suggestion 17-CV-WWWWW (John P. Burton)**...................**327**

**TAB 8**   **INFORMATION ITEM:  RULE 4(K) – EXPANDED NATIONAL CONTACTS JURISDICTION**

    A.   **Reporter's Memorandum** .......................................................**335**

    B.   **Supporting Materials**

- **Suggestion 18-CV-E (Patrick J. Borchers)** ..............................**347**

- **Letter from Professor A. Benjamin Spencer to Judge John D. Bates (March 9, 2018)**.................................................**367**

- **A. Benjamin Spencer, *Nationwide Personal Jurisdiction for our Federal Courts*, 87 Denver L. Rev. 325 (2010)** ...........**369**

**TAB 9**   **INFORMATION ITEM:  RULE 73(B)(1), (2) – CONSENT TO TRIAL BEFORE A MAGISTRATE JUDGE**

    A.   **Reporter's Memorandum** .......................................................**383**

    B.   **Supporting Materials**

- **Suggestion 18-CV-H (Maggie Malloy)** ......................................**389**

- **Notice, Consent, and Reference of a Civil Action to a Magistrate Judge (AO 85 as Modified by the Southern District of Indiana)**.................................................................**391**

**TAB 10**      **INFORMATION ITEM:  OTHER DOCKET MATTERS**

A.      **Rule 5(b)(2)(C):  Return Receipt** ........................................**397**

- **Suggestion 17-CV-EEEEEE (Martin Monica)**.......................**399**

B.      **Rule 55(a):  Duty to Enter Default** ........................................**403**

- **Suggestion 18-CV-A (Bharani Padmanabhan)** ......................**405**

C.      **Rule 8:  Simplified Complaints** ............................................**409**

- **Suggestion 18-CV-G (Thomas Jones)**......................................**411**

**AGENDA**

**Meeting of the Advisory Committee on Civil Rules
April 10, 2018**

1.  Opening Business

    A.    Report on the January 2018 Meeting of the Committee on
          Rules of Practice and Procedure

    B.    Report on the March Meeting of the Judicial Conference of
          the United States

2.  **ACTION ITEM:** Approve Minutes of the November 2017 meeting of
    the Advisory Committee on Civil Rules

3.  **Information Item:** Legislation

    A.    Class-Action, MDL Legislation

    B.    Other Legislation

4.  **ACTION ITEM: Rule 30(b)(6)** Subcommittee Report

5.  **Information Item: MDL** Subcommittee Report

6.  **Information Item: Social Security Review** Subcommittee Report

7.  **ACTION ITEM: Rule 71.1(d)(3)(B)(i)** Newspaper Publication

8.  **Information Item: Rule 4(k)** Expanded National Contacts
    Jurisdiction

9.  **Information Item: Rule 73(b)(1), (2):** Consent to Magistrate
    Judge Trial

10. **Information/ACTION Items: Other Docket Matters**

    A.    Rule 5(b)(2)(C): Return Receipt

    B.    Rule 55(a): Duty to Enter Default

    C.    Rule 8: Simplified Complaints

**THIS PAGE INTENTIONALLY BLANK**

## ADVISORY COMMITTEE ON CIVIL RULES

| | |
|---|---|
| **Chair, Advisory Committee on Civil Rules** | **Honorable John D. Bates**<br>United States District Court<br>E. Barrett Prettyman United States Courthouse<br>333 Constitution Avenue, N.W., Room 4114<br>Washington, DC  20001 |
| **Reporter, Advisory Committee on Civil Rules** | **Professor Edward H. Cooper**<br>University of Michigan Law School<br>312 Hutchins Hall<br>Ann Arbor, MI  48109-1215 |
| **Associate Reporter, Advisory Committee on Civil Rules** | **Professor Richard L. Marcus**<br>University of California<br>Hastings College of the Law<br>200 McAllister Street<br>San Francisco, CA  94102-4978 |
| **Members, Advisory Committee on Civil Rules** | **John M. Barkett, Esq.**<br>Shook, Hardy & Bacon L.L.P.<br>3200 Miami Center<br>201 S. Biscayne Blvd.<br>Miami, Florida 33131<br><br>**Honorable Robert Michael Dow, Jr.**<br>United States District Court<br>Everett McKinley Dirksen U.S. Courthouse<br>219 South Dearborn Street, Room 1978<br>Chicago, IL 60604<br><br>**Honorable Joan N. Ericksen**<br>United States District Court<br>United States Courthouse<br>300 South Fourth Street, Room 12W<br>Minneapolis, MN  55415<br><br>**Parker C. Folse, Esq.**<br>Susman Godfrey LLP<br>1201 Third Avenue, Suite 3800<br>Seattle, WA  98101<br><br>**Honorable Sara Lioi**<br>United States District Court<br>John F. Seiberling Federal Building and<br>  United States Courthouse<br>Two South Main Street, Room 526<br>Akron, OH 44308 |

| | |
|---|---|
| **Members, Advisory Committee on Civil Rules**<br>    (*cont'd*) | **Honorable Scott M. Matheson, Jr.**<br>United States Court of Appeals<br>Wallace F. Bennett Federal Building<br>125 South State Street, Room 5402<br>Salt Lake City, UT 84138<br><br>**Honorable Brian Morris**<br>United States District Court<br>Missouri River Courthouse<br>125 Central Avenue West, Suite 301<br>Great Falls, MT  59404<br><br>**Honorable David E. Nahmias**<br>Supreme Court of Georgia<br>Room 512, State Judicial Building<br>Atlanta, GA  30334<br><br>**Honorable Chad A. Readler**<br>Acting Assistant Attorney General (ex officio)<br>United States Department of Justice, Civil Division<br>950 Pennsylvania Ave., N.W., Suite 3601<br>Washington, DC 20530<br><br>**Virginia A. Seitz, Esq.**<br>Sidley Austin LLP<br>1501 K Street, N.W.<br>Washington DC  20005<br><br>**Honorable Craig B. Shaffer**<br>United States District Court<br>Alfred A. Arraj United States Courthouse<br>901 19th Street, 4th Floor<br>Denver, CO  80294<br><br>**A. Benjamin Spencer**<br>Earle K. Shawe Professor of Law<br>University of Virginia Law School<br>580 Massie Road<br>Charlottesville, VA  22903<br><br>**Ariana J. Tadler, Esq.**<br>Milberg LLP<br>One Pennsylvania Plaza, 50th Floor<br>New York, NY  10119 |
| **Liaison Members, Advisory Committee**<br>    **on Civil Rules** | **Peter D. Keisler, Esq.**              *(Standing)*<br>Sidley Austin, LLP<br>1501 K Street, N.W.<br>Washington DC  20005 |

| | |
|---|---|
| **Liaison Members, Advisory Committee on Civil Rules** *(cont'd)* | **Honorable A. Benjamin Goldgar**   *(Bankruptcy)*<br>United States Bankruptcy Court<br>Everett McKinley Dirksen<br>   United States Courthouse<br>219 South Dearborn Street, Room 638<br>Chicago, IL  60604 |
| **Clerk of Court Representative, Advisory Committee on Civil Rules** | **Laura A. Briggs**<br>Clerk of Court<br>United States District Court<br>105 Birch Bayh Federal Building and U.S.<br>   Courthouse<br>46 East Ohio Street<br>Indianapolis, IN 46204 |
| **Secretary, Standing Committee and Rules Committee Chief Counsel** | **Rebecca A. Womeldorf**<br>Secretary, Committee on Rules of Practice &<br>   Procedure and Rules Committee Chief Counsel<br>Thurgood Marshall Federal Judiciary Building<br>One Columbus Circle, N.E., Room 7-240<br>Washington, DC 20544<br>Phone   202-502-1820<br>Fax       202-502-1755<br>Rebecca_Womeldorf@ao.uscourts.gov |

## ADVISORY COMMITTEE ON CIVIL RULES

| | | | | Start Date | End Date |
|---|---|---|---|---|---|
| John D. Bates | D | District of Columbia | Member: | ---- | ---- |
| Chair | | | Chair: | 2015 | 2018 |
| | | | | | |
| John M. Barkett | ESQ | Florida | | 2012 | 2018 |
| Robert Michael Dow, Jr. | D | Illinois (Northern) | | 2013 | 2019 |
| Joan N. Ericksen | D | Minnesota | | 2015 | 2018 |
| Parker C. Folse | ESQ | Washington | | 2012 | 2018 |
| Sara E. Lioi | D | Ohio (Northern) | | 2016 | 2019 |
| Scott M. Matheson, Jr. | C | Tenth Circuit | | 2012 | 2018 |
| Brian Morris | D | Montana | | 2015 | 2018 |
| David E. Nahmias | JUST | Georgia | | 2012 | 2018 |
| Chad A. Readler* | DOJ | Washington, DC | | N/A | N/A |
| Virginia A. Seitz | ESQ | Washington, DC | | 2014 | 2020 |
| Craig B. Shaffer | M | Colorado | | 2014 | 2020 |
| A. Benjamin Spencer | ACAD | Virginia | | 2017 | 2020 |
| Ariana J. Tadler | ESQ | New York | | 2017 | 2020 |
| | | | | | |
| Edward H. Cooper | ACAD | Michigan | | 1992 | Open |
| Reporter | | | | | |
| Richard Marcus | ACAD | California | | 1996 | Open |
| Associate Reporter | | | | | |

Principal Staff:        Rebecca Womeldorf  (202) 502-1820

_____

\* Ex-officio - Acting Assistant Attorney General, Civil Division

## RULES COMMITTEE LIAISON MEMBERS

| | | |
|---|---|---|
| **Liaisons for the Advisory Committee on Appellate Rules** | **Judge Frank Mays Hull** | *(Standing)* |
| | **Judge Pamela Pepper** | *(Bankruptcy)* |
| **Liaison for the Advisory Committee on Bankruptcy Rules** | **Judge Susan P. Graber** | *(Standing)* |
| **Liaisons for the Advisory Committee on Civil Rules** | **Peter D. Keisler, Esq.** | *(Standing)* |
| | **Judge A. Benjamin Goldgar** | *(Bankruptcy)* |
| **Liaison for the Advisory Committee on Criminal Rules** | **Judge Amy J. St. Eve** | *(Standing)* |
| **Liaisons for the Advisory Committee on Evidence Rules** | **Judge Jesse Furman** | *(Standing)* |
| | **Judge Sara Lioi** | *(Civil)* |
| | **Judge James C. Dever III** | *(Criminal)* |

# ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS

**Rebecca A. Womeldorf**
Secretary, Committee on Rules of Practice &
  Procedure and Rules Committee Chief Counsel
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E., Room 7-240
Washington, DC 20544
Phone  202-502-1820       Fax     202-502-1755
Rebecca_Womeldorf@ao.uscourts.gov

**Julie Wilson**
Attorney Advisor
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E., Room 7-240
Washington, DC 20544
Phone  202-502-3678       Fax     202-502-1755
Julie_Wilson@ao.uscourts.gov

**Scott Myers**
Attorney Advisor (Bankruptcy)
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E., Room 7-240
Washington, DC  20544
Phone  202-502-1913       Fax     202-502-1755
Scott_Myers@ao.uscourts.gov

**Bridget M. Healy**
Attorney Advisor
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E., Room 4-240
Washington, DC  20544
Phone  202-502-1313       Fax     202-502-1755
Bridget_Healy@ao.uscourts.gov

**Shelly Cox**
Administrative Specialist
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E., Room 7-240
Washington, DC 20544
Phone  202-502-4487       Fax     202-502-1755
Shelly_Cox@ao.uscourts.gov

**Frances F. Skillman**
Paralegal Specialist
Thurgood Marshall Federal Judiciary Building
One Columbus Circle, N.E., Room 7-240
Washington, DC 20544
Phone  202-502-3945       Fax     202-502-1755
Frances_Skillman@ao.uscourts.gov

# FEDERAL JUDICIAL CENTER LIAISONS

| | |
|---|---|
| **Honorable Jeremy D. Fogel**<br>Director<br>Federal Judicial Center<br>Thurgood Marshall Federal Judiciary Building<br>One Columbus Circle, N.E., Room 6-100<br>Washington, DC 20002<br>Phone  202-502-4160<br>Fax  202-502-4099 | |
| **Tim Reagan**<br>*(Rules of Practice & Procedure)*<br>Senior Research Associate<br>Federal Judicial Center<br>Thurgood Marshall Federal<br>  Judiciary Building<br>One Columbus Circle, N.E., Room 6-436<br>Washington, DC 20002<br>Phone   202-502-4097<br>Fax       202-502-4199 | **Marie Leary**<br>*(Appellate Rules Committee)*<br>Senior Research Associate<br>Research Division<br>Thurgood Marshall Federal Judiciary Building<br>One Columbus Circle, N.E.<br>Washington, DC 20002-8003<br>Phone   202-502-4069<br>Fax       202-502-4199<br>mleary@fjc.gov |
| **Molly T. Johnson**<br>*(Bankruptcy Rules Committee)*<br>Senior Research Associate<br>Research Division<br>Thurgood Marshall Federal Judiciary Building<br>One Columbus Circle, N.E.<br>Washington, DC 20002-8003<br>Phone  315-824-4945<br>mjohnson@fjc.gov | **Emery G. Lee**<br>*(Civil Rules Committee)*<br>Senior Research Associate<br>Research Division<br>Thurgood Marshall Federal Judiciary Building<br>One Columbus Circle, N.E.<br>Washington, DC 20002-8003<br>Phone   202-502-4078<br>Fax       202-502-4199<br>elee@fjc.gov |
| **Laural L. Hooper**<br>*(Criminal Rules Committee)*<br>Senior Research Associate<br>Research Division<br>Thurgood Marshall Federal Judiciary Building<br>One Columbus Circle, N.E.<br>Washington, DC 20002-8003<br>Phone   202-502-4093<br>Fax       202-502-4199<br>lhooper@fjc.gov | **Timothy T. Lau**<br>*(Evidence Rules Committee)*<br>Research Associate<br>Research Division<br>Thurgood Marshall Federal Judiciary Building<br>One Columbus Circle, N.E.<br>Washington, DC 20002-8003<br>Phone   202-502-4089<br>Fax       202-502-4199<br>tlau@fjc.gov |

# Exhibit R

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT      )
SYSTEM, THE CITY OF BRISTOL      )
PENSION FUND, and THE CITY OF    )
OMAHA POLICE AND FIRE            )
RETIREMENT SYSTEM, on behalf     )
of themselves and all           )
others similarly situated,       )
                                 )
          Plaintiffs,            )
                                 )   Civil Action
v.                               )   No. 15-12345-MLW
                                 )
INSULET CORPORATION, DUANE       )
DESISTO, ALLISON DORVAL,         )
BRIAN ROBERTS, and               )
CHARLES LIAMOS,                  )
                                 )
          Defendants.            )
                                 )


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE

HEARING


March 9, 2018
4:19 p.m.


John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210


Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    Counsel for Plaintiff:
      James A. Harrod
 3    Bernstein Litowitz Berger & Grossman LLP
      44th Floor
 4    1251 Avenue of the Americas
      New York, NY 10020
 5    212-554-1502
      jim.harrod@blbglaw.com
 6
      William C. Fredericks
 7    Scott & Scott, LLP
      The Helmsley Building
 8    230 Park Avenue, 17th Floor
      New York, NY 10169
 9    212-223-6444
      wfredericks@scott-scott.com
10
      Counsel for Defendants:
11    Deborah S. Birnbach
      Goodwin Procter, LLP
12    100 Northern Avenue
      Boston, MA 02210
13    617-570-1339
      dbirnbach@goodwinlaw.com
14
      Caroline T. Bullerjahn
15    Goodwin Procter, LLP
      100 Northern Avenue
16    Boston, MA 02210
      617-570-1359
17    cbullerjahn@goodwinlaw.com

18

19

20

21

22

23

24

25
```

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | P R O C E E D I N G S                                        |
| 2  | THE COURT:  Good afternoon.  Would counsel please           |
| 3  | identify themselves for the court and for the record.       |
| 4  | MR. HARROD:  Good afternoon, Your Honor.  James             |
| 5  | Harrod, Bernstein, Litowitz, Berger & Grossman, for the     |
| 6  | plaintiffs.                                                  |
| 7  | MR. FREDERICKS:  William Fredericks, Scott & Scott,         |
| 8  | Attorneys At Law, LLP, also for lead plaintiffs.            |
| 9  | MS. BULLERJAHN:  Good afternoon, Your Honor.  Caroline      |
| 04:18 10 | Bullerjahn of Goodwin Procter on behalf of defendants.  |
| 11 | MS. BIRNBACH:  Deborah Birnbach from Goodwin for           |
| 12 | defendants.                                                  |
| 13 | THE COURT:  Okay.  We're here today in connection with     |
| 14 | the motion for preliminary approval of the class action     |
| 15 | settlement.  I've read the memo and, with some distractions, |
| 16 | examined the proposed order of notice.  I'm interested in    |
| 17 | hearing you on the request for preliminary approval, and then |
| 18 | if I allow or am inclined to allow it, we can focus on the   |
| 19 | documents.                                                   |
| 04:19 20 | MR. HARROD:  Okay.  Thank you, Your Honor.              |
| 21 | I'd initially like to thank you.  I had asked you to        |
| 22 | move this hearing from Monday, so I greatly appreciate you were |
| 23 | able to do so.                                               |
| 24 | THE COURT:  It's turned out to be a busy day, as you       |
| 25 | saw, and I'm sorry you had to wait.                          |

1          MR. HARROD:  It's quite all right.  It was actually

2     quite interesting I think for us to see that.

3          THE COURT:  Actually, as you say, good for you.  I

4     also think it's good for the administration of justice.  We

5     don't have a lot of time to philosophize.  But the bar has

6     become so specialized.  If you wonder why it takes time to get

7     into court on a class action matter, you know, if you see the

8     end of a criminal case like that one, it gives you some idea of

9     the range of things that are done in the court, and I think

04:20 10    that's in the interests of the administration of justice.  But

11    go ahead.

12          MR. HARROD:  So thank you.  And so it's a $19.5

13    million settlement we're here to seek preliminary approval for.

14    We view preliminary approval as does the law, which is I think

15    stated fairly well in our memo, as this is a two-step process

16    and this is the first step.  The primary objective of obtaining

17    preliminary approval is so that we can send out notice to the

18    class and schedule a final approval hearing so that the class

19    and the court will have the opportunity to sort of look at a

04:20 20    more complete record in support of the various things that

21    we're going to be requesting at that point.

22          I think readily this case meets the standard for

23    preliminary approval, both from a procedural and substantive

24    perspective.  The recovery itself is excellent in --

25          THE COURT:  Well -- I'm sorry.  Go ahead.  It's

1    excellent because of what?

2         MR. HARROD:  Well, I think principally it's excellent

3    because there were very significant risks in this case that I

4    think always existed but became more acute and apparent to us

5    as the discovery proceeded.  The risks included principally

6    proof on the allegation that the product problems that were the

7    core allegation in the case were pervasive.  Defendants were

8    able to put forward evidence which we disputed but which

9    provided a viewpoint that not only were the product problems

04:21 10   cabined off, but they were within the company's internal

11   tolerances, which, even if you disagree with, would have

12   undermined potentially arguments about falsity but also

13   arguments about scienter.  There was evidence which

14   contradicted that, but we felt that that was a significant risk

15   that we would have to overcome to win at trial.

16         THE COURT:  So the $19.5 million you estimated I think

17   would be 47 percent per share recovery to the class?

18         MR. HARROD:  So yeah.  Well, so can I break that down

19   a little bit for you, Your Honor?

04:22 20         THE COURT:  Well, let me ask you a couple of questions

21   to make sure you include this in your answers.  One, is that

22   before or after the award of attorney's fees, the 47 cents?

23         MR. HARROD:  Right.  So 47 cents is a number that's

24   required for us to include in the notice.  Under the Reform

25   Act, one of the statutory items is the recovery on a per-share

basis.  I don't -- I obviously don't know and I can give you

some other information about that.  47 cents is the number

before fees and expenses.  There's a latter paragraph in the

notice that says that the fees and expenses I think, if granted

at the levels that are set forth in the notice now, would be 13

cents per share.

THE COURT:  I may have missed that.

MR. HARROD:  Okay.

THE COURT:  And what I didn't see in your memo and I

04:23 don't think it's in the notice but I'll give you a chance to

correct any misunderstanding I may have about the notice, what

do your damage experts say are the estimated losses?

MR. HARROD:  So let me -- I want to answer that

question, and I'm very prepared to do that, but I just wanted

to give you one clarification on the 47 cents number.

THE COURT:  Actually, I still don't know.  Where did

the 47 cents --

MR. HARROD:  So the 47 cents, what it does is it

assumes everyone in the class has the same amount of injury,

04:24 and it assumes every single share that was in the class, which

I think our expert said was 48 million shares, is injured in

the exact same amount and that they all file claims.  And in

our experience, those numbers, while required under the

statute, don't necessarily reflect the reality of either what

the settlement achieved or what class members actually get.

 1    But we have not discerned a better way of doing it, nor has

 2    congress allowed us to do it a different way.  So the that's

 3    the answer to the 47 cents.

 4           THE COURT:  But basically, so it's, what, $19.5

 5    million divided by the number of shares before attorney's fees

 6    expenses are taken out.

 7           MR. HARROD:  Correct, yes.

 8           THE COURT:  If somebody had 100 shares, $47?

 9           MR. HARROD:  Well, yeah.  But that's not actually

04:25 10    how -- that's not actually how the money gets distributed.

11    That's the way the statute says we have to.

12           THE COURT:  Well --

13           MR. HARROD:  Right.  I don't -- yeah.  Let me answer

14    your other question because I think that will provide better

15    context for what I think you're really getting at is what is

16    the quantum of what we got here.

17           So to preface that I would say the damage and loss

18    causation issues were hugely disputed.

19           THE COURT:  I know, I know.  They can be discounted.

04:25 20    And a settlement might be reasonable even if it provides a

21    fraction, small fraction of alleged or actual losses.  But I

22    want to know.  Because it was notably absent from your

23    memorandum, and the case you saw me end started on Monday and

24    we missed one day because of the snow.

25           MR. HARROD:  Okay.

1          THE COURT:  So I've been doing other things this week,

2     but I did read your memorandum, and I thought I would see, and

3     in fact I believe the PSLRA requires that it be in the notice.

4     And I'm not -- I don't think it's in the notice.  What does

5     your expert say are the amount of damages that should be

6     awarded if you prevail?

7          MR. HARROD:  If we won on all of our claims and you

8     attribute the entire amount of the loss to each of those

9     disclosures, which I think would probably not be the case, but

04:26 10   the best estimate I have for that is 151 million to 226

11    million.

12         THE COURT:  151 million to what?

13         MR. HARROD:  226 million.

14         THE COURT:  So 19 million is what percentage of that?

15         MR. HARROD:  At the top end of the damages, it's about

16    nine percent.

17         THE COURT:  Nine percent?

18         MR. HARROD:  Yeah.

19         THE COURT:  Nine percent of the 226?

04:27 20   MR. HARROD:  Correct.

21         THE COURT:  Okay.

22         MR. HARROD:  Does that -- I can elaborate on that.  I

23    don't think I'm at liberty -- defendants obviously had a

24    different number.

25         THE COURT:  Well, I mean, that contributes to the

1    reasonableness.  I should know that, too.  And in fact, doesn't

2    the PLSRA section 78u-4-7(B)(ii) require that the notice have a

3    statement from each party concerning the issue or issues, if

4    the parties do not agree on the average amount of damages -- in

5    other words, I don't know why I can't be told, I think the

6    notice is supposed to tell the class, you know, plaintiffs say

7    the damages are up to 226 million.  The defendants say it would

8    be this.

9         MR. HARROD:  I read that as saying that the notice has

04:28 10   to disclose that there was a disagreement about damages but

11   that it doesn't require you to disclose what the amounts of

12   that are.

13        THE COURT:  Well, look, the adversary system doesn't

14   work here because now you both want me to approve the

15   settlement, and the first named plaintiff here is Arkansas

16   Teacher, right?

17        MR. HARROD:  Mm-hmm.

18        THE COURT:  And they've been supervising this

19   litigation?

04:28 20       MR. HARROD:  They and the other lead plaintiffs, yes.

21        THE COURT:  And have you seen the documents I finally

22   approved after requiring revisions of the Arkansas Teacher V.

23   State Street Bank litigation?

24        MR. HARROD:  I'm not -- I'm generally familiar with

25   that.  I'm not sure I'm specifically familiar with what you're

1    referring to.

2         THE COURT:  Well, in several class actions in the last

3    couple of years, while I've preliminarily approved them, I

4    found the notices were inadequate, and I ordered that they be

5    revised.  And my present sense is that your notice

6    substantively in what's covered is inadequate, so you're not

7    going to go home with a signed order today at best.  So you

8    haven't looked at those?

9         MR. HARROD:  No, I can't say that I have looked at

04:29 10    those.

11         THE COURT:  Who drafted the notice that I was given,

12    you?

13         MR. HARROD:  My firm, yes.

14         THE COURT:  Was your firm in the Aegerion case?

15         MR. HARROD:  No.

16         THE COURT:  You haven't seen the notice in that case

17    either.

18         MR. HARROD:  I have not.

19         THE COURT:  These are two cases in which I've ordered

04:29 20    counsel to re-write the notices after finding preliminary

21    approval is appropriate.  But anyway, keep going.

22         MR. HARROD:  So --

23         THE COURT:  Well, don't keep going.  What's the

24    defendant's estimate of damages?

25         MS. BULLERJAHN:  Your Honor, our damages expert

1    determined that the greatest number of damages would be

2    approximately 106 million.  There were six alleged corrective

3    disclosures in the case.  And in our view, which is somewhat

4    set forth in our class certification opposition, there were not

5    statistically significant drops in stock prices for some of

6    those, so damages should not be attributed to those.  So 106

7    million was the maximum recoverable damages, and that's a

8    plaintiff-style estimate.

9         THE COURT:  All right.  So that would be, 19.5 million

04:30 10   would be maybe --

11        MS. BULLERJAHN:  About 18.4 percent, to be precise,

12   Your Honor.

13        THE COURT:  About.

14        MS. BULLERJAHN:  Just off the top of my head.

15        THE COURT:  All right.  That's not bad.  Why don't you

16   keep going.

17        MR. HARROD:  All right.  Thank you, Your Honor.  So on

18   the basis of the risks in the case and on the basis -- which I

19   can talk more about.  I'm not sure if Your Honor is interested

04:31 20   in that or not.

21        THE COURT:  No.  I studied it.  Look, you reached this

22   proposed settlement after substantial discovery following my

23   denial of the motion to dismiss.  So my understanding is it's

24   presumptively reasonable.  We have arm's length bargaining

25   between, as far as I know, experienced counsel.  There was a

1  significant effort to mediate and then further efforts to

2  settle.  Did you discuss attorney's fees as part of agreeing on

3  the amount of the settlement?

4         MR. HARROD:  We -- that was not part of the

5  negotiation with the defendant.

6         THE COURT:  You know, these are indicia of

7  reasonableness.  With regard to the attorney's fees, the notice

8  says now that you may ask for up to 25 percent; is that

9  correct?

04:32 10         MR. HARROD:  Yes.

11         THE COURT:  Is it your intention to actually ask for

12  25 percent?

13         MR. HARROD:  This is a completely honest answer.  My

14  expectation is that's what we will ask for.

15         THE COURT:  I hope every answer you give is honest.

16  Right.  So the notice -- I mean, recently required that it say

17  that.  If it's your intention to ask for 25 percent, all you

18  have to say is the lawyer is going to ask for 25 percent.

19         MR. HARROD:  I'm sorry.  The only caveat I would make

04:32 20  there is there's a process where our clients would have the

21  opportunity to review, you know, a more complete record in

22  support of final approval.  And I have had a conversation with

23  them about it, but they have not said yes, you can do that.

24         THE COURT:  Well, it's your intention to seek it.  I

25  don't think anybody will complain if it's less.

```
 1              MR. HARROD:  Correct.

 2              THE COURT:  And your clients are supposed to

 3      scrutinize that.

 4              MR. HARROD:  Right.

 5              THE COURT:  So you'd get 25 percent of attorney's fees

 6      plus expenses?

 7              MR. HARROD:  Correct.

 8              THE COURT:  How much are the expenses?

 9              MR. HARROD:  The expenses that we've capped at

10      $600,000, I expect that it would be less than that.  The

11      expenses currently right now paid and incurred are about

12      $350,000.

13              THE COURT:  25 percent of 19.5 million is how much,

14      approximately?

15              MR. HARROD:  I have it right here, but I can't find --

16      oh, 4.875 million.

17              THE COURT:  And what do you say your lodestar is?

18      Because that's a benchmark.

19              MR. HARROD:  The lodestar is 4.3 -- about 4,350,000.

20              THE COURT:  So there's virtually no multiplier.

21              MR. HARROD:  The multiple on that would be 1.12,

22      assuming a 25 percent fee is granted and requested.

23              THE COURT:  Are you familiar with the issues that

24      prompted me to appoint a special master to review the award of

25      attorney's fees in the Arkansas Teacher v. State Street case?
```

```
 1              MR. HARROD:  Yes, Your Honor.

 2              THE COURT:  How many law firms are there who have

 3    appeared for lead counsel in this case, three?

 4              MR. HARROD:  There are two lead counsel firms.  There

 5    are two other firms who have done work on the case who would be

 6    included in that, and there's some attorney's fees that will be

 7    treated as expenses.

 8              THE COURT:  Some attorney's fees that --

 9              MR. HARROD:  That are not part of --

04:35 10          THE COURT:  Who are the four firms who have a

11    appearances?

12              MR. HARROD:  My firm, Bernstein, Litowitz, Berger &

13    Grossman; Mr. Frederick's firm, Scott & Scott.  We are the two

14    co-lead counsel firms.  The third firm is Berman Tabacco.

15              THE COURT:  The Bernstein firm, what's the second

16    firm?

17              MR. HARROD:  Scott & Scott.

18              THE COURT:  All right.  The third firm?

19              MR. HARROD:  The third firm is Berman Tabacco, which

04:35 20    is formerly Berman DeValerio.

21              THE COURT:  That's Berman DeValerio?

22              MR. HARROD:  Yeah, that's what they used to be called.

23              THE COURT:  Are they --

24              MR. HARROD:  They're the Boston liaison.

25              THE COURT:  Local counsel?
```

1           MR. HARROD:  Yes.

2           THE COURT:  And what's the fourth?

3           MR. HARROD:  The fourth firm is Glancy Promgay &

4    Murray, who actually filed the first two complaints that were

5    filed in this action.

6           THE COURT:  Okay.  And they've all worked on this

7    case?

8           MR. HARROD:  Yes.

9           THE COURT:  And did you say there are other attorneys

04:36 10   who haven't filed an appearance that would share in the

11   settlement?

12          MR. HARROD:  They have not appeared in this case or

13   represented plaintiffs in the case, so they're not included in

14   the application for plaintiff's fees.

15          THE COURT:  But they would be in expenses?  What are

16   the names of those firms?

17          MR. HARROD:  The names of those two firms, one is

18   Shapiro Haber & Urmy, which is a firm based in Boston.  They

19   have a small bill.

04:36 20         THE COURT:  What's the other firm?

21          MR. HARROD:  The other firm is -- I'm not going to

22   pronounce the names right -- Hach, H-a-c-h, Rose -- rose like

23   the flower.  They were -- my client, Arkansas Teacher, had an

24   outside investment visitor that they were retained to represent

25   as part of the discovery process.  So ostensibly an expense

 1  that the class bore to represent a third party.

 2          THE COURT:  What do you mean, your firm had an

 3  investment advisor?

 4          MR. HARROD:  Not my firm.  My client.  So my client,

 5  Arkansas Teacher, has investment advisors that make investment

 6  decisions for them, that monitor and make investments in the

 7  portfolio that they've, you know, maintained for the teachers

 8  retirement.  And their outside investment advisor was

 9  subpoenaed by defendants in this case, and there was a

04:37 10 significant amount of discovery involving that firm.  They did

11  not have in-house counsel and did not have outside counsel.

12          THE COURT:  Is there one or more other attorneys that

13  would benefit, get money from the settlement of this case?

14          MR. HARROD:  No.

15          THE COURT:  Are you going to be seeking service awards

16  for the named plaintiffs?

17          MR. HARROD:  We will, Your Honor.  I don't know the

18  amounts of those.

19          THE COURT:  Is that in the memo?

04:38 20         MR. HARROD:  No.  I mean, it's embodied in the

21  $600,000, but it is not addressed specifically in the memo.

22  It's something we would address at the final approval stage.

23          THE COURT:  Is it in the notice?

24          MR. HARROD:  Yes, it's referred to in the notice.  The

25  amounts are not specifically set forth.  But the way that that

1    would work, ideally is that the notice would go out, it would

2    direct the class to the settlement website where we will file

3    our final approval papers, and those papers will set forth all

4    the detail regarding these matters.

5         THE COURT:  Why wouldn't you put the amount of the --

6    do you know how much you intend to seek in service awards for

7    each of the named plaintiffs?

8         MR. HARROD:  We do not.  We know in a ballpark sense.

9    I think we've decided for estimating the expenses that they

04:39 10   would be no more than $30,000.

11        MR. FREDERICKS:  In the aggregate.

12        MR. HARROD:  Per, per, $90,000.  I don't know that

13   there will be that much, Your Honor.

14        THE COURT:  Well, you're going to have to put that in

15   the service award -- in the notice.  Have you already received

16   the $19.5 million?

17        MR. HARROD:  We have not.

18        MR. FREDERICKS:  Your Honor, I believe that the

19   defendant's obligation to deposit the money runs from such date

04:40 20   as the court may grant preliminary approval.

21        THE COURT:  Okay.  And where are you going to put the

22   money?

23        MR. FREDERICKS:  Your Honor, Huntington National Bank

24   has been designated the escrow agent in the settlement papers.

25   They have a long record of handling similar escrow accounts in

1   other matters, and they've waived all their fees in this case.

2          THE COURT:  And there will be a separate account for

3   this?

4          MR. FREDERICKS:  There will be a separate escrow

5   account.  We've negotiated an arrangement whereby they are not

6   charging us fees for their investment services.

7          THE COURT:  How are they getting compensated?

8          MR. FREDERICKS:  I believe it benefits the bank simply

9   for their capital requirements to have deposits on account.  So

04:41 10   they're happy to have the money without charging a retail rate,

11   shall we say.

12          THE COURT:  All right.  So what else should I know?

13          MR. HARROD:  So the process would be, if Your Honor

14   were to sign the preliminary approval order, if you find that

15   that's appropriate, that the order would provide for the notice

16   to be mailed to the class within 20 business days of that

17   order.  The defendants are required under the stipulation and

18   under the preliminary approval order to provide us with a list

19   of record holders of the Insulet company's shares.

04:41 20          The claims administrator also has a list it maintains

21   of nominees, these are the banks who hold securities in what's

22   called street name, meaning like most people and most investors

23   have the shares held in a custodial bank or investment advisor,

24   and so those people will receive the notice.  They are required

25   within seven days to either request notices so that they can

1   mail them to their clients or to send a file with the names and

2   addresses of their clients to the claims administrator, who

3   will then send them out.

4            THE COURT:  They have to do it within seven days?

5            MR. HARROD:  They have to -- they have to either

6   request or send the file within seven days.  If they request

7   the notices themselves, they have seven days from the time that

8   they receive the notices to mail them out to their customers.

9   I don't know, standing here today, what the balance of that is.

04:42 10  I think most nominees send labels or files to the claims

11  administrator so they handle the mailing and it goes out

12  promptly.

13           THE COURT:  And then what happened next?

14           MR. HARROD:  So the next thing that happens is that

15  the one blank in the preliminary approval order, were you to

16  sign it, would be to set a date for a final approval hearing.

17  All the other events are keyed off of that date.

18           THE COURT:  But assume I've set the final approval

19  hearing -- roughly, what's the date if I sign the order today?

04:43 20           MR. HARROD:  If you sign the order today, the earliest

21  date that we could do it is Monday, June 18.

22           THE COURT:  Okay.  So that's June 18.  And when would

23  exclusions and opt-outs have to be filed?

24           MR. HARROD:  They would be due, under that scenario,

25  21 days before, so I think that's May 29.

1      THE COURT:  Right.  And how much after your motion for

2  final approval papers and requests for attorney's fees are

3  filed?

4      MR. HARROD:  So the final approval papers are to be

5  filed 35 days, so there's 14 days between --

6      THE COURT:  That's the way I read it.  So people are

7  supposed to get this and in two weeks decide, you know, maybe I

8  want to consult a lawyer, figure out what's going on, collect

9  all their papers to show they're members of the class?  That's

04:44 10  one of the things your proposed order requires, right?

11      MR. HARROD:  Well, the notice starts going out, would

12  need to be mailed by April 20.  So they would have from April

13  20 until May 29 to make a decision about opt-out or objections.

14      THE COURT:  Well, I think in the other Arkansas

15  Teacher case I required that they have not two weeks but 30

16  days.  I mean, it just struck me, looking at the notice and the

17  terms, that everything is calculated to make it very difficult

18  for somebody to object or opt out.  I mean, they have to serve

19  you, right?

04:44 20      MR. HARROD:  They have to -- objections have to be

21  served and filed.  Opt-outs --

22      THE COURT:  Right, but if the objections are filed,

23  you would get notice of it through ECF?

24      MR. HARROD:  Correct, yes.

25      THE COURT:  And then you're going to send notice to

1  people that you and the claims administrator believe are

2  members of the class, right?

3          MR. HARROD:  I mean, I can't say 100 percent, but I

4  think that the notice process that's being employed here, which

5  is used in most securities cases, is pretty good in the sense

6  that because the nominees have records of who traded the stock

7  during the class period, I can't say it's 100 percent, but it's

8  more effective than in most other class actions.

9          THE COURT:  Right.  Then why does somebody who wants

04:45 10  to object have to submit all of those documents that your

11  proposal suggests they submit to show they're members of the

12  class?

13          MR. HARROD:  Well, those requirements apply to

14  different things differently.  I understand what you're saying.

15  We want to be sure that -- anybody can get on a website and

16  print off a copy of the notice.  So we have to have some

17  process for verifying that the people who purport to be in the

18  class are in the class, given that there's money at stake and

19  whatever money we distribute reduces whatever everyone else

04:46 20  gets.  So those requirements exist for that purpose.  And just

21  because somebody held shares during the class period doesn't

22  mean that they're a class member.  They could have not have

23  purchased any.

24          THE COURT:  But isn't that equally true for anybody

25  who doesn't opt out?  They just file a claim?

1          MR. HARROD:  No.  They have to provide documentation

2     to get paid.  Your Honor, should I keep going?  Are there

3     things that you would like me to address or focus on?

4          THE COURT:  You can keep going.

5          MR. HARROD:  So 35 days under the plan that we

6     proposed, the final approval papers would get filed.  And Your

7     Honor is correct that 14 days after that opt-outs and

8     objections would be due.  We would have seven days after the

9     opt-outs and objections are due, which is seven days prior to

04:46 10    the final approval hearing, to put in replies in response to

11    any of that information.

12         The final approval hearing would happen, and with all

13    hope there would be, you know, you would find that the

14    settlement is approvable and approve it and enter a judgment.

15    I think, you know, I've addressed and Your Honor has addressed

16    and noted that the settlement based on the risks and the

17    recovery is adequate and certainly more than acceptable for

18    this stage of approval.

19         THE COURT:  What does the defendant say about all of

04:47 20    this?

21         MS. BULLERJAHN:  Your Honor, defendants agree with

22    plaintiffs that the settlement is adequate and preliminary

23    approval is appropriate.  I can personally attest that this was

24    hotly litigated, as plaintiffs' counsel said in a memo, and

25    certain the terms of the settlement were very carefully

1    negotiated at arm's length.

2         The only other thing I would like to add on behalf of

3    defendants is that as set forth in the settlement stipulation,

4    defendants are entering into this settlement, by doing so are

5    not conceding any liability or the merits of the claims

6    asserted by plaintiffs.  Rather they are entering the

7    settlement or have entered the settlement to avoid future

8    costs, burden and uncertainty associated with litigating the

9    case.

04:48  10         THE COURT:  Okay.

11         MS. BULLERJAHN:  Thank you.

12         THE COURT:  And did you have any discussion about the

13    plaintiffs' attorney's fees before you agreed on the settlement

14    amount?

15         MS. BULLERJAHN:  We did not, Your Honor.  The

16    settlement amount was agreed to first.  We actually had no

17    negotiations whatsoever about the plaintiff fees or about the

18    25 percent that was set forth.

19         THE COURT:  You're indifferent to where the money

04:48  20    goes.  You'll pay 19.5 million and don't have an interest in

21    who gets it.

22         MS. BULLERJAHN:  The only thing I will add to that,

23    Your Honor, is that it's very clearly set forth in the

24    stipulation that the determination with respect to attorney's

25    fees is completely separate from the approval of the settlement

1   and should not hold up the approval of the settlement if the

2   court deems the attorney's fees to not be reasonable.

3           THE COURT:  And what else should I know to make an

4   informed decision on the motion for preliminary approval?

5           MS. BULLERJAHN:  From our perspective, Your Honor, I

6   think Mr. Harrod covered it.  I don't think there's anything

7   else from defendants' perspective that we need to add.

8           THE COURT:  All right.  Well, I'll probably prove to

9   be satisfied that the settlement -- you know, that I should

04:49 10  certify a class for settlement purposes and the settlement is

11  within the range of being fair, reasonable and adequate, that

12  it should be considered through a fair process by properly

13  informed class members.

14          I do have some concerns about the schedule and the

15  notice.  I didn't have as much time to study this as I had

16  intended.  I'm looking at your proposed order and the

17  settlement that's as part of -- I think Exhibit 1, right?

18          MR. HARROD:  Your Honor, it's Exhibit 1 to the motion

19  for preliminary approval.  It's also an exhibit to the

04:50 20  stipulation settlement, but I think for ease, it's --

21          THE COURT:  It's attached to the proposed order?

22          MR. HARROD:  It's attached to the motion.  It's docket

23  entry 108-1.

24          THE COURT:  Correct.  Is there a cover page

25  summarizing the information contained in the final settlement

```
 1   agreement?
 2           MR. HARROD:  You're referring to the notice?
 3           THE COURT:  Yes.
 4           MR. HARROD:  Yes.
 5           THE COURT:  I don't think so.
 6           MR. HARROD:  Some of this may be a function of the way
 7   the document is typeset here, because when they typeset it for
 8   actual mailing, it does get condensed a little bit.  So the
 9   summary is what we would typically refer to as paragraphs 1
10   through 7 of the notice, and there's a preamble to that that's
11   even shorter, and it says basically who the parties are and
12   that this is a notice of settlement issued by the court.  If I
13   can just direct you, it's at the top of the ECF stamp, it's
14   page 18 of 55 is where that starts.
15           THE COURT:  Hold on just one second.  I'm sorry to
16   jump around on you.  Is there anything that expresses the
17   authority that I have and always require be included that I can
18   alter or excuse any deadline or requirement for good cause
19   shown?
20           MR. HARROD:  You mean deadlines under -- there's a
21   specific provision in the preliminary approval order that says
22   you can change the date of the final approval hearing.
23           THE COURT:  I'm talking about anything.  If somebody
24   files an objection a day or two late, I have the authority to
25   consider it if I think it's justified.  I want --
```

1         MR. HARROD:  Your Honor --

2         THE COURT:  -- there to be notice of that.

3         MR. HARROD:  Your Honor, I don't believe that there is

4    any such provision on either the preliminary approval or to the

5    notice, but I would just say to you I'm not sure that's

6    required because I think it's inherently --

7         THE COURT:  I think people should know it because they

8    might look at it and say, "I missed the deadline and I'm out of

9    luck."

04:54 10        So let's see.  In Arkansas Teacher v. State Street and

11   in the Aegerion case, I believe I required a different kind of

12   summary, especially in Aegerion.  Aegerion is 114-10105 and

13   Arkansas Teacher is 11-10230.  In Aegerion you would look at

14   docket number 145.2.  In State Street you would look at docket

15   numbers 95.1, 3 and 5.  Five is the summary notice.

16        MR. HARROD:  Your Honor, those are the documents as

17   revised per your instructions to counsel.

18        THE COURT:  Right.  I'm going to give you a chance to

19   basically bring me something that looks like that and has the

04:55 20   same kind of timeframes.  I went through this a couple of times

21   to figure out what I believe was reasonable, and, you know,

22   give meaningful opportunities to object and all that.

23        So let's see.  One, you would look at the cover page

24   summaries of those two cases.  They're not the same format, but

25   they have the information that I think should be there at the

1  outset.  Here you have -- do you have the statement of

2  potential outcome of the case?

3        MR. HARROD:  I don't think we have something that's

4  captioned that way.  We have -- in the last paragraph of that

5  section as 7 is Reasons For Settlement, which I think

6  encompasses the same idea.

7        THE COURT:  Okay.

8        MR. HARROD:  And Your Honor, just trying to find the

9  right page.

04:57 10        THE COURT:  Page of?

11        MR. HARROD:  The notice.  Paragraph 30 of the notice

12  is under the caption What Might Happen If There Were No

13  Settlement.

14        THE COURT:  This is the type of information that I

15  think should be in the summary.  It really summarizes the key

16  things.  These are our claims.  They have defenses.  We think

17  we would win.  But we might lose.  We think if we win, we'd get

18  $220 million.  They think at most we would get 106 and argue

19  that the damages would be much less.  You'll see what I

04:58 20  approved in other instances, but I think that the summary

21  requires that it really all be up front.

22        As I say, nobody will complain if you're going to ask

23  for less, but I think you'll find in these that what I approved

24  said, you know, the attorneys are going to see 25 percent, not

25  up to 25 percent, which is what was originally proposed.  If

1   your clients change their mind and tell you you can't seek 25

2   percent, that's okay.

3           MR. HARROD:  Fair enough.

4           THE COURT:  That's okay.  If you're going to seek

5   service awards, I think this is important to shareholders, or

6   the lead plaintiffs representing us or somebody might think

7   $30,000 is a lot of money, they're getting $30,000 we're not

8   getting, and maybe I ought to scrutinize things more carefully

9   because they're going to get another $30,000.  Is that all the

04:59 10  named plaintiffs get?

11          MR. HARROD:  Well, they get whatever they're entitled

12  to under the claims process.

13          THE COURT:  Right, yes.

14          MR. HARROD:  That would be the only two sources.

15          THE COURT:  Except for that service award, they're

16  treated the same as every other class member?

17          MR. HARROD:  Yes.  Let me just amend that to make one

18  clarification which I'm not sure will happen in this case.  If

19  they had out-of-pocket expenses, it would be included in the

04:59 20  award.  So if they had, you know, travel costs or whatever,

21  then that, but I'm not sure that's the case here.

22          THE COURT:  And how do you propose to determine how

23  much of a service award they should each get?

24          MR. HARROD:  I will speak for my client because I have

25  had the conversation with them about it and we've done it in

1  the past for them, and I think Your Honor might have approved

2  one in State Street, subject to the review process that's going

3  on there.  But we do it as basically a lost wages sort of

4  calculation, the hours that they expended on the litigation,

5  times a reasonable hourly rate.  And I think for Arkansas

6  Teacher employees there's a statutory formula for that.

7          THE COURT:  Okay.  It's going to be tied to the effort

8  invested in this case.

9          MR. HARROD:  For ATRS I can explicitly say that's the

05:00 10  case.

11          MR. FREDERICKS:  That would be similar for City of

12  Bristol and Omaha Police and Fire.  And I think, as with ATRS,

13  they're both in-house counsel as well as professionals who are

14  involved in the litigation.

15          THE COURT:  Well, it's 5:00.  I wish I could be more

16  precise for you, but I'm not going to decide this matter today,

17  but I am inclined to preliminarily approve the settlement for

18  distribution.  I think the requirements of Rule 23 are met, and

19  it seems to me that, given the risks of litigation as you

05:01 20  described it and the procedural integrity of the process that

21  led to the settlement, it seems within the range of reason.

22          I just want to make sure the notice complies with the

23  PLSRA as I've been coming to understand and apply it and that

24  it's fair to the class members if they want to take a different

25  view, if they want to opt out, if they want to object.  So if

```
 1    you look at the -- and I haven't compared the time limits in
 2    Arkansas Teacher v. State Street and Aegerion, which are the
 3    two templates I'm using.  But as I said, I think I've been
 4    giving people like 30 days to decide what they want to do, not
 5    14 days.  And, you know, if that means the approval has to go
 6    out another couple of weeks, I don't think that's nearly as
 7    important.  And the order has to clearly say the court retains
 8    the discretion to --
 9              MR. HARROD:  Extend.
10              THE COURT:  -- extend any deadlines for good cause
11    shown.
12              MR. HARROD:  Just so I'm clear, you want that in the
13    notice that the class understands that as well?
14              THE COURT:  Yes, exactly.
15              MR. HARROD:  Correct.  Okay.  Your Honor, just to sort
16    of logistically propose a way forward, what I think we should
17    do is, we will certainly go back and look at those notices.
18    There's one sort of point that I would make.  My understanding
19    is that State Street is not a PSLRA case because it was a
20    consumer and contract type claim.
21              THE COURT:  Yes.
22              MR. HARROD:  So I will --
23              THE COURT:  That's a good point, but Aegerion is a
24    PSLRA case.
25              MR. HARROD:  Right.  We will look at that, and we'll
```

05:02 (line 10)
05:03 (line 20)

1    make every effort to revise the notice.  We'll of course need

2    to show that to the defendants because it is an exhibit to the

3    stipulation.  I don't anticipate that they will have any

4    significant issues with that.

5          THE COURT:  Do the defendants anticipate any problem

6    with issues that I've been raising?

7          MS. BULLERJAHN:  No, Your Honor.

8          THE COURT:  All right.  What's the minimum reasonable

9    time to give me, you know, a new proposed order, documents and

05:04 10    a memorandum describing what you've done?

11          MR. HARROD:  Yeah.  For those items, I think it's safe

12    to say we could do it by next Friday.  Is that acceptable to

13    the court?

14          THE COURT:  It's not too long.  Let me see your book.

15    Are you sure it's enough?

16          MR. HARROD:  I'm trying to think --

17          THE COURT:  You can do this, and I know I'm old, but

18    it used to be we had to mail things to people.  And then they

19    could go home for a couple of days or do something else, but

05:04 20    now everything goes at such breakneck speed.  I don't object to

21    getting it next Friday, and I'd like to keep this moving along.

22    But I don't see that this is -- but it really does need to

23    match up, and you're going to have to explain to me, you know,

24    what you've changed, and I expect it's going to look quite

25    different.  So I don't know that a redline version is going to

1   be quite right, but if you're just making edits, send me a

2   redline version, but I'd rather give you a deadline that's

3   reasonable and realistic.

4        MR. HARROD:  Well, why don't you give us then 14 days

5   from today, and we can, you know, unless there's something --

6        THE COURT:  I think that's the way to do it, and then

7   if you can get it done sooner --

8        MR. HARROD:  Earlier.

9        THE COURT:  -- fine.  And I'll ask the deputy clerk,

05:05 10   my law clerk, to let me know promptly when it comes in, because

11   we do have a lot going on, so the easiest thing to do would be

12   to approve what you gave me, but I'm not comfortable with it.

13   All right?

14        MR. FREDERICKS:  Logistically, would Your Honor like

15   us to come back for a hearing?

16        THE COURT:  I'll let you know if you need to come

17   back.  It may not be necessary, if you satisfy me.  I would

18   like you to give me a disk, though, with whatever you send.

19        MR. HARROD:  We can -- we can email the files if

05:06 20   that's easier.

21        THE COURT:  Whatever it is.

22        MR. HARROD:  You want electronic versions?

23        THE COURT:  I don't understand the technology.  I want

24   to be able to edit it.

25        MR. HARROD:  We can certainly make that available,

```
 1   Your Honor.
 2          MR. FREDERICKS:  I think logistically, if we don't
 3   have a hearing, we may also suggest some dates for a final
 4   approval hearing.
 5          THE COURT:  Exactly, exactly.  Suggest some dates, and
 6   say, you know, if I approve this one week after you submit it,
 7   these would be the dates.  Don't schedule a hearing in July.  I
 8   won't be here.  And actually, I may have to move -- I'll deal
 9   with the hearing date, but I'm doing some international travel,
10   law-related, so there's times that I'm not here.  All right.
11          MR. HARROD:  Before we submit that, would it be
12   helpful if we confer with your deputy to talk about dates to
13   make sure we're not shooting in the dark about possible dates?
14          THE COURT:  Yeah, you can do that.  With regard to
15   August -- I'm going to be out almost all of July.  I'll be out
16   one week in August, which is --
17          COURTROOM CLERK:  The week of the 13th.
18          (Discussion off the record.)
19          THE COURT:  Don't schedule the week of the 13th, and
20   then as of now, much of August I'm going to be here in a
21   multibillion dollar patent case getting ready to try or trying
22   it.  But if you do this right, the final approval hearing
23   shouldn't take long.  All right?
24          MR. HARROD:  That's our hope, Your Honor.
25          THE COURT:  It's your hope.  You're going to get
```

05:07 10

05:08 20

1    almost $5 million.  That will be considerably more than I made

2    in my 33-year career as a judge, so we've got to get it right.

3    All right.  Court is in recess.

4                (Adjourned, 5:08 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Kelly Mortellite, Registered Merit Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that pursuant to Section 753, Title 28, United States

 7    Code that the foregoing is a true and correct transcript of the

 8    stenographically reported proceedings held in the

 9    above-entitled matter and that the transcript page format is in

10    conformance with the regulations of the Judicial Conference of

11    the United States.

12                        Dated this 18th day of March, 2018.

13

14              /s/ Kelly Mortellite

15              _____

16              Kelly Mortellite, RMR, CRR

17              Official Court Reporter

18

19

10:33 20

21

22

23

24

25
```

# Exhibit S
# Redacted

# Exhibit T

# NEWBERG

## ON CLASS ACTIONS

### FIFTH EDITION

### Volume 3
### Chapters 7 to 10

## William B. Rubenstein

Sidley Austin Professor of Law
Harvard Law School




THOMSON REUTERS™

*For Customer Assistance Call 1-800-328-4880*

Mat #41196223

© 2013 Thomson Reuters

For authorization to photocopy, please contact the **Copyright Clearance Center** at 222 Rosewood Drive, Danvers, MA 01923, USA (978) 750-8400; fax (978) 646-8600 or **West's Copyright Services** at 610 Opperman Drive, Eagan, MN 55123, fax (651) 687-7551. Please outline the specific material involved, the number of copies you wish to distribute and the purpose or format of the use.

This publication was created to provide you with accurate and authoritative information concerning the subject matter covered; however, this publication was not necessarily prepared by persons licensed to practice law in a particular jurisdiction. The publisher is not engaged in rendering legal or other professional advice and this publication is not a substitute for the advice of an attorney. If you require legal or other expert advice, you should seek the services of a competent attorney or other professional.

Nothing contained herein is intended or written to be used for the purposes of 1) avoiding penalties imposed under the federal Internal Revenue Code, or 2) promoting, marketing or recommending to another party any transaction or matter addressed herein.

settlement.[8] CAFA's settlement notice criteria are discussed in depth elsewhere in the Treatise.[9]

## § 8:17   Settlement notice content

Rule 23(e)(1) requires that a court considering a proposed class action settlement "direct notice in a reasonable manner to all class members who would be bound by the proposal."[1] Yet other than requiring that the notice be made "in a reasonable manner," Rule 23 does not dictate that the notice contain any specific content, with one caveat: if a class is certified at the same time that a settlement is reached, the court must issue notice that complies with both 23(c)(2)(B)'s certification notice requirements (that do require specific content)[2] and 23(e)'s settlement notice requirement (which does not).[3] Aside from that scenario, the content of the settlement notice itself is dictated by two other aspects of Rule 23(e): the requirement that the settlement be fair, reasonable, and adequate[4] and the guarantee that class members have the right to object to the settlement if, in their opinion, it does not hit this mark.[5] To safeguard class members' opportunity to object, notice must be sufficiently clear and informative to make those opportunities meaningful.

The content of settlement notice is committed to the discre-

---

[8]28 U.S.C.A. § 1715(b).

[9]*See* Rubenstein, 3 **Newberg on Class Actions** §§ 8:18 to 8:21 (5th ed.).

**[Section 8:17]**

[1]Fed. R. Civ. P. 23(e)(2).

[2]*See* Fed. R. Civ. P. 23(c)(2)(B) (enumerating seven items that must be contained in certification notice). For a discussion, *see* Rubenstein, 3 **Newberg on Class Actions** § 8:12 (5th ed.).

[3]*See* Fed. R. Civ. P. 23(e)(1) (requiring that notice be sent "in a reasonable manner").

On the requirement that both types of notice need to be sent in a settlement class action situation, *see, e.g.,* In re Prudential Ins. Co. of America Sales Practices Litigation, 962 F. Supp. 450, 526 (D.N.J. 1997), aff'd, 148 F.3d 283, 41 Fed. R. Serv. 3d 596 (3d Cir. 1998) ("The combined Class Notice must meet the requirements of both Rule 23(c)(2) and Rule 23(e).")

[4]Fed. R. Civ. P. 23(e)(2).

[5]Fed. R. Civ. P. 23(e)(5).

tion of the trial judge.[6] Indeed, courts have interpreted Rule 23(e)'s absence of specific guidance, and its use only of the "reasonable manner" standard, as creating greater discretion for judges than the discretion afforded by Rule 23(c)(2)(B), which enumerates specific items to be contained in certification notice.[7] The *Manual for Complex Litigation* has attempted to fill Rule 23(e)(1)'s content void by stating that settlement notice should:

- define the class and any subclasses;
- describe clearly the options open to the class members and the deadlines for taking action;
- describe the essential terms of the proposed settlement;
- disclose any special benefits provided to the class representatives;

---

[6]**Second Circuit**

Masters v. Wilhelmina Model Agency, Inc., 473 F.3d 423, 438, 2007-1 Trade Cas. (CCH) ¶ 75542 (2d Cir. 2007) (stating, in a discussion of 23(e) notice, that "a district court's decision regarding the form and content of notices sent to class members is reviewed only for an abuse of discretion" (citing In re Agent Orange Product Liability Litigation MDL No. 381, 818 F.2d 145, 168 (2d Cir. 1987))).

**Third Circuit (District Court)**

In re Prudential Ins. Co. of America Sales Practices Litigation, 962 F. Supp. 450, 527 (D.N.J. 1997), aff'd, 148 F.3d 283, 41 Fed. R. Serv. 3d 596 (3d Cir. 1998) ("The nature and extent of Rule 23(e) class notice of a proposed settlement lies squarely within the discretion of the trial judge.").

**Seventh Circuit (District Court)**

Kaufman v. American Exp. Travel Related Services, Inc., 283 F.R.D. 404, 406 (N.D. Ill. 2012) ("The court also has nearly complete discretion to determine the form and content of notice to class members.").

Mangone v. First USA Bank, 206 F.R.D. 222, 231 (S.D. Ill. 2001) ("[T]he form and content of the class notice are committed to the sound discretion of the court . . ." (citing In re Prudential Ins. Co. America Sales Practice Litigation Agent Actions, 148 F.3d 283, 299, 41 Fed. R. Serv. 3d 596 (3d Cir. 1998))).

[7]In re Motor Fuel Temperature Sales Practices Litigation, 271 F.R.D. 263, 295 (D. Kan. 2010) ("Regarding notice of class certification, subsection (c)(2) imposes more stringent requirements than subsection (e) imposes with regard to class settlement. With respect to a proposed class settlement, subsection (e) requires only that the Court direct notice 'in a reasonable manner to all class members who would be bound by the proposal.'" (internal citations omitted)).

- provide information regarding attorney's fees;[8]
- indicate the time and place of the hearing to consider approval of the settlement;
- describe the method for objecting to (or, if permitted, for opting out of) the settlement;
- explain the procedures for allocating and distributing settlement funds, and, if the settlement provides different kinds of relief for different categories of class members, clearly set forth those variations;
- explain the basis for valuation of nonmonetary benefits if the settlement includes them;
- provide information that will enable class members to calculate or at least estimate their individual recoveries, including estimates of the size of the class and any subclasses;
- and prominently display the address and phone number of class counsel and how to make inquiries.[9]

The *Manual's* list is, of course, not binding, and courts have found certification notice to be sufficient if it simply informs the class members of the nature of the pending action, the general terms of the settlement, that complete and detailed information is available from the court files, and that any class member may appear and be heard at the hearing.[10] Courts have similarly held that notice is sufficient if it "fairly apprises" class members of the action and their

---

[8]Rule 23 now independently requires this disclosure in Rule 23(h)(1). *See* Rubenstein, 3 **Newberg on Class Actions** §§ 8:22 to 8:25 (5th ed.).

[9]*See* Manual for Complex Litigation, Fourth, § 21.312.

[10]Gooch v. Life Investors Ins. Co. of America, 672 F.3d 402, 423, 81 Fed. R. Serv. 3d 832 (6th Cir. 2012) ("When a class has settled its claims, '[t]he contents of a . . . notice are sufficient if they inform the class members of the nature of the pending action, the general terms of the settlement, that complete and detailed information is available from the court files, . . . that any class member may appear and be heard at the hearing . . .'" (quoting **Newberg on Class Actions**)).

In re Packaged Ice Antitrust Litigation, 2011-2 Trade Cas. (CCH) ¶ 77727, 2011 WL 6209188, *5 (E.D. Mich. 2011) ("The contents of a Rule 23(e) notice are sufficient if they inform the class members of the nature of the pending action, the general terms of the settlement, that complete and detailed information is available from the court files, and that any class member may appear and be heard at the hearing." (quoting **Newberg on Class Actions**)).

In re AT & T Mobility Wireless Data Services Sales Litigation, 270 F.R.D. 330, 351 (N.D. Ill. 2010) ("The contents of a Rule 23(e) notice are

rights.[11] There is some flexibility built into this standard, however: notice need not be overly long and stuffed with every relevant bit of information,[12] and parties are not always strictly bound to the language approved by the court.[13]

---

sufficient if they inform the class members of the nature of the pending action, the general terms of the settlement, that complete and detailed information is available from the court files, and that any class member may appear and be heard at the hearing." (quoting **Newberg on Class Actions**)).

[11]In re Integra Realty Resources, Inc., 262 F.3d 1089, 1111, 50 Fed. R. Serv. 3d 900 (10th Cir. 2001) ("The standard for the settlement notice under Rule 23(e) is that it must 'fairly apprise' the class members of the terms of the proposed settlement and of their options.").

Thompson v. Metropolitan Life Ins. Co., 216 F.R.D. 55, 67 (S.D. N.Y. 2003) ("Although no rigid standards govern the contents of notice to class members, the notice must fairly apprise the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with [the] proceedings." (quoting Weinberger v. Kendrick, 698 F.2d 61, 70, Fed. Sec. L. Rep. (CCH) P 98755, Fed. Sec. L. Rep. (CCH) P 99074, 34 Fed. R. Serv. 2d 450 (2d Cir. 1982) (internal quotation marks omitted))).

*See also* In re Katrina Canal Breaches Litigation, 628 F.3d 185, 197, 78 Fed. R. Serv. 3d 294 (5th Cir. 2010) (citing **Newberg on Class Actions**) ("Notice of a mandatory class settlement, which will deprive class members of their claims, therefore requires that class members be given *information reasonably necessary for them to make a decision* whether to object to the settlement." (emphasis added)).

[12]Kagan v. Wachovia Securities, L.L.C., 2012 WL 1109987, *10 (N.D. Cal. 2012) ("[The proposed notice] is simply too long. The Court is concerned that few class members will read a fifteen-page, single-spaced Class Notice . . . The parties should provide an industry-standard short-form notice that directs them to the long-form notice for details.").

Manual for Complex Litigation, Fourth, § 21.312 ("In most instances, the notice does not include the full text of the proposed settlement. If the agreement itself is not distributed, however, the notice must contain a clear, accurate description of the key terms of the settlement and inform class members where they can examine or obtain a copy, such as from the Internet, the clerk's office, class counsel, or another readily accessible source.").

Wright and Miller's Federal Practice and Procedure, Civil § 1797.6 ("[C]ourts have approved notices that did not contain some of the precise details of the settlement, such as the distribution or allocation plan, or the amount of attorney fees to be taken out, as long as sufficient contact information is provided to allow the class members to obtain more detailed information about those matters.").

[13]*See* Casey v. Coventry Healthcare of Kansas, Inc., 53 Employee Benefits Cas. (BNA) 1381, 2011 WL 8007035, *3 (W.D. Mo. 2011),

As important as the specific content is the guideline that the notice be written in simple, straightforward language. The 2003 Advisory Committee notes emphasized this goal with respect to certification notice, writing

> The direction that class-certification notice be couched in plain, easily understood language is a reminder of the need to work unremittingly at the difficult task of communicating with class members. It is difficult to provide information about most class actions that is both accurate and easily understood by class members who are not themselves lawyers. Factual uncertainty, legal complexity, and the complication of class-action procedure raise the barriers high. The Federal Judicial Center has created illustrative clear-notice forms that provide a helpful starting point for actions similar to those described in the forms.[14]

It is equally—if not more—important that settlement notice serve the same goals.[15]

Elsewhere,[16] the Treatise's author has argued that the practice of settlement notice would be more transparent and meaningful if the text of the settlement notice was accompanied by a simple table like the FDA's nutrition label, especially if such a label was used repeatedly and hence made familiar to the public assessing the value of a settlement:

---

subsequent determination, 2012 WL 860395 (W.D. Mo. 2012) ("The parties may make minor changes to the proposed notice, by agreement, without further approval of the Court.").

[14]Fed. R. Civ. P. 23 advisory committee's note (2003).

[15]*See* Wright and Miller's Federal Practice and Procedure, Civil § 1797.6 ("The 2003 amendment to Rule 23(c)(2)(B) added an express requirement to class certification that class-action notices be written in 'plain, easily understood language.' This same requirement appears equally justifiable in the settlement-notice context.").

[16]William B. Rubenstein, *The Fairness Hearing: Adversarial and Regulatory Approaches*, 53 U.C.L.A. L. Rev. 1435 (2006).

# Exhibit U

```
 1                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2

 3       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
        *ARKANSAS TEACHER RETIREMENT        *
 4       SYSTEM, on behalf of itself and    *
        all others similarly situated       *
 5               Plaintiffs                  *    CIVIL ACTION
                     vs.                     *    No. 11-10230-MLW
 6                                           *
        *STATE STREET CORPORATION,           *
 7       STATE STREET BANK AND TRUST         *
        COMPANY, AND STATE STREET GLOBAL     *
 8       MARKETS, LLC,                       *
                 Defendants                  *
 9       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

10

11                          Related cases: 11-cv-12049-MLW
                                           12-cv-11698-MLW
12

13

14              BEFORE THE HONORABLE MARK L. WOLF
                   UNITED STATES DISTRICT JUDGE
15                            HEARING
                            May 30, 2018
16

17

18

19
                               Courtroom No. 10
20                             1 Courthouse Way
                               Boston, Massachusetts 02210
21

22                  JAMES P. GIBBONS, RPR/RMR
                      Official Court Reporter
23                 1 Courthouse Way, Suite 7205
                   Boston, Massachusetts  02210
24                    jmsgibbons@yahoo.com

25
```

APPEARANCES:

     DONOGHUE BARRETT & SINGAL, (By William F. Sinnott, Esq., and Amy McEvoy, Esq. ), One Beacon Street, Suite 1320, Boston, Massachusetts  02108-3106, on behalf of the Hon. Gerald E. Rosen, Special Master

     CHOATE, HALL & STEWART, LLP, (By Joan A. Lukey, Esq., and Justin J. Wolosz, Esq.), 100-150 Oliver Street, Boston, Massachusetts 02110, on behalf of Labaton Sucharow, LLP

     NIXON PEABODY, LLP, (By Brian T. Kelly, Esq.), 100 Summer Street, Boston, Massachusetts  02110, on behalf of the Thornton Law Firm, LLP

     LIEFF CABRASER HEIMANN & BERNSTEIN, (By Richard M. Heimann, Esq.), 275 Battery Street, 30th Floor, San Francisco, California 94111-3339, on behalf of Plaintiffs

     WILMER HALE, LLP, (By William H. Paine, Esq., and Daniel W. Halston, Esq.), 60 State Street, Boston, Massachusetts   02109, on behalf of Defendants

     McTIGUE LAW, LLP, (By J. Brian McTigue, Esq.), 4530 Wisconsin Ave., N.W., Washington, D.C. 20016, on behalf of various ERISA Funds

     ZUCKERMAN SPAEDER, LLP, (By Carl S. Kravitz, Esq.), 1800 M Street, N.W., Washington, D.C.   20036, on behalf of various ERISA Funds

     KELLER ROHRBACK, LLP, (By Laura R. Gerber, Esq., via phone), 1201 Third Avenue, Suite 3200, Seattle, Washington 98101, on behalf of The Andover Companies and James Pehoushek-Stangeland

ALSO PRESENT:   George Hopkins

```
1                     P R O C E E D I N G S
2              THE CLERK:  All rise for this Honorable Court.
3              (Whereupon, the Court entered the courtroom.)
4              THE CLERK:  This is Civil Action No. 11-10230,
5     Arkansas Teacher Retirement System versus State Street
6     Corporation.
7          Court is open.  You may be seated.
8              THE COURT:  Good afternoon.
9          There's Mr. Sinnott.
10             MR. SINNOTT:  You may not have recognized me.
11             THE COURT:  Would counsel please identify
12    themselves for the record.
13             MR. SINNOTT:  Good afternoon, your Honor.  My name
14    is William Sinnott, and I'm counsel to the Special Master.
15             MS. McEVOY:  Good afternoon, your Honor.  Elizabeth
16    McEvoy, also counsel to the Special Master.
17             MR. KELLY:  Good afternoon, your Honor.  Brian
18    Kelly on behalf of the Thornton Law Firm.
19             MR. WOLOSZ:  Good afternoon, your Honor.  Justin
20    Wolosz on behalf of Labaton Sucharow.
21             MS. LUKEY:  Good afternoon, your Honor.  Joan
22    Lukey, also on behalf of Labaton Sucharow.
23             MR. HEIMANN:  Good afternoon, your Honor.  Richard
24    Heimann, on behalf of Lieff Cabraser Heimann & Bernstein.
25             MR. PAINE:  Bill Paine and Dan Halson from Wilmer
```

```
 1    Hale for State Street.
 2              THE COURT:  Okay.
 3              MR. KRAVITZ:  Your Honor, Carl Kravitz, one of the
 4    ERISA counsel for the amicus plaintiffs.
 5              THE COURT:  You can come in.  What are you doing
 6    out there?
 7              MR. KRAVITZ:  I don't know.
 8         (Laughter.)
 9              THE COURT:  Who just came into the enclosure?
10              MR. McTIGUE:  Brian McTigue, representing several
11    of the ERISA plaintiffs.
12              THE COURT:  And Mr. Kravitz also for the some ERISA
13    plaintiffs?
14              MR. KRAVITZ:  Yes, your Honor.
15              THE COURT:  And who is on the phone, please?
16              MS. GERBER:  Good afternoon.  This is Laura Gerber
17    at Keller Rohrback for the Andover Companies, and James
18    Pehoushek-Stangeland.
19              THE COURT:  All right.
20         I apologize for the delay in starting.  I wanted to get
21    a little further organized.
22         Is Mr. Hopkins here from Arkansas Teachers?
23              MR. HOPKINS:  Yes, your Honor.
24              THE COURT:  Why don't you come in, and you can sit
25    in the jury box.
```

```
1         Do you have anybody else from Arkansas Teachers with
2     you?
3              MR. HOPKINS:  No, your Honor.
4         (Whereupon, Mr. Hopkins moves to the jury box.)
5              THE COURT:  I would like to try to assure that we
6     have a clear and common sense of where we are at the moment.
7         On March 8, 2017, I appointed retired Judge Gerry Rosen
8     to serve as Master in connection with investigating and
9     providing a Report and Recommendation on issues relating to
10    the $75 million in attorney's fees that I awarded in this
11    class action.
12        On May 14, 2018, the Master filed his Report and
13    Recommendations and an executive summary temporarily under
14    seal to permit the interested parties to propose redactions.
15        On May 16, I issued an order relating to a process for
16    presenting proposed redactions.  I described the applicable
17    standards as I understand them.  Essentially, judicial
18    records, or records on which judicial decisions are based,
19    are, presumptively, public.  In some circumstances
20    redactions may be justified, and I mentioned properly
21    invoked attorney-client privilege and certain privacy
22    interests.
23        I ordered the parties to file any motions for
24    redactions, memos, and affidavits by May 31 under seal, and
25    I directed that redacted copies of those submissions be made
```

1    for the public record.

2         Labaton, Thornton, and Lieff, who I will refer to as

3    "the Lawyers" with a capital L, filed a motion for

4    clarification regarding what should be included in the

5    record to be filed in support of the Report and

6    Recommendation.

7         I ordered the parties to confer and report by May 24 on

8    that issue.

9         On May 24, the Lawyers filed a motion for a revised

10   schedule regarding redactions and unsealing of the Report

11   and Recommendation.

12        On May 25, I issued an order scheduling today's hearing

13   to address issues relating to redactions, to unsealing, to

14   the record to be filed by the Master, and to discuss whether

15   Arkansas Teacher should be replaced as lead plaintiff based

16   on the information in the Report and Recommendation; whether

17   there is now a conflict of interest between the Customer

18   Class counsel, Labaton, Thornton, and Lieff, and the class;

19   and whether new class counsel should be appointed to provide

20   independent advice to the lead plaintiff regardless whether

21   Arkansas Teacher continues in that role.

22        The Lawyers had asked for an extension of time to make

23   their submissions concerning redactions to June 11.  In my

24   order I provide an extension to June 5 without prejudice to

25   granting a further extension to June 11 as requested.

 1          So it is my intention to discuss these matters today.

 2     Is there anything else that should be on the agenda?

 3               MS. LUKEY:  I don't believe so from our

 4     perspective, your Honor.

 5               MR. SINNOTT:  Nothing from the Special Master, your

 6     Honor.

 7               THE COURT:  All right.

 8          I would like to start by telling you what my general

 9     interests are and then hearing what yours are before we get

10     to the specifics.

11          My interests are in resolving the issues presented by

12     the Report and Recommendation fairly and as expeditiously as

13     reasonably possible.

14          I have an interest in recognizing the presumption of

15     public access to judicial records and proceedings.  I think

16     it's particularly pronounced or important in this case that

17     there be maximum appropriate public access.  This case

18     essentially was triggered by media interest, and

19     investigations and the adversary process did not work

20     previously.  Now there is somewhat of an adversary process

21     with the Special Master, perhaps, but there may be relevant

22     information that should be brought to the Court's attention

23     that is known to members of the public or others who might

24     be interested that has not been presented.  And I want to

25     use a fair process to make informed decisions concerning

1    whether any exceptions to the presumption of public access

2    to judicial records and proceedings are justified.

3         I also want to ensure that the interests of the class

4    are properly represented by a lead plaintiff who at this

5    point, as the case has evolved, satisfies the Rule 23

6    requirements of typicality and adequacy, and will vigorously

7    represent the interests of the class, and I want to make

8    sure that there is suitable counsel for the lead plaintiff.

9         So those are essentially my interests, my goals.

10        Perhaps we start with Labaton, since it seems to have

11   taken a leading role in some of the submissions to me.  What

12   are Labaton's interests at this point?

13        MS. LUKEY:  Your Honor, I would say that our

14   interests do not differ materially, but we do wish to be

15   sure that you understand certain context as we go forward.

16        First, I would like to be sure that you are aware that

17   the -- that many of the findings recommended, the findings

18   of fact and rulings of law, are very vigorously disputed.

19   Your Honor, of course, will be obligated to make *de novo*

20   decisions on these matters, and we do not want to go forward

21   with you thinking that the findings, or suggested findings,

22   set forth are undisputed or that there was not contrary

23   evidence on many of them; indeed there was.

24        But, more significantly, we wish to draw to your

25   attention some material disputes as to the law.  Your Honor

1    has probably not, at this point in time, had the opportunity

2    to pore through all of it.  The Report and Recommendation,

3    with its exhibits is 10,000 pages long, unless the ERISA

4    counsel submitted something, which we wouldn't know, and

5    then it's even longer.  So it is very weighty matter to get

6    through.  And we would suggest to the Court that you will

7    quickly come to realize that each of the proposed rulings of

8    law forming the basis for recommendations is novel; that is,

9    there is no case support for any of the rules which are

10   suggestive as forming a basis for remedies, although

11   generally not sanctions, since, for the most part, the

12   recommendations are not sanctions.

13       So we do want to be sure that as you proceed today,

14   particularly with regard to Arkansas and Mr. Hopkins, but

15   also as to the class counsel issues, that you have only seen

16   one side of a very, very hotly disputed story.  It looks

17   like you're reading two different books, if you put them

18   side by side.

19       So, respectfully, we would suggest that it is very much

20   premature to suggest that this would be a time, on the basis

21   of the recommend finding and rulings, to replace Arkansas,

22   or certainly Mr. Hopkins, who has done what can only be

23   described as a phenomenal job as class rep.

24       And on a point --

25           THE COURT:  Mr. Hopkins, have are you read the

1    Report and Recommendation?

2              MR. HOPKINS:  Yes, your Honor, I have.

3              THE COURT:  Okay.  Thank you.

4              MS. LUKEY:  On a point of special privilege here, I

5    would like to point out that when your Honor issued the

6    order on Friday requiring Mr. Hopkins' presence, it

7    generated, as unfortunately often occurs, some pretty

8    extraordinary and inflammatory online media reactions,

9    including language such as Mr. Hopkins must have done

10   something explosive, or there must have been shenanigans.

11       If I may, without violating the seal, I would simply

12   like, since I know the room is full of reporters, to be

13   clear, that the issue here was whether Mr. Hopkins should

14   have taken a role in the fee allocation process after the

15   award of fees and chose not to do so at any point.

16             THE COURT:  And I have not studied the Report and

17   Recommendation or the exhibits as deeply as I will.

18       I would say that is not the only issue with regard to

19   Mr. Hopkins and Arkansas Teacher, in my mind, and I will

20   also say the following.

21       I regretted issuing that order on Friday afternoon.

22   This was going very fast.  I do, and I think you do, too,

23   want to get to the point where what should be public is

24   public, and the Master's Report and Recommendations will be

25   known, and then, by my schedule, no later than seven days

1   later the response will be known, and then we can get to the

2   merits of the case.

3        And this is not the only matter, let alone the only

4   particularly consequential matter I am dealing with this

5   month.  So looking at my schedule, and the schedule I have

6   given you, I wanted to get you in quickly, and I am pleased

7   that people, even on the eve of Memorial Day weekend, were

8   able to arrange their schedules to be here.  So that's good.

9             MS. LUKEY:  I'm sorry.

10            THE COURT:  No, and we will go through the

11   specifics, and I -- I mean, we will go through some of the

12   motions.

13        And I may have some thoughts for Mr. Hopkins -- well,

14   I'm interested in his responses to certain questions I will

15   have for him, and this may be part of a continuing colloquy.

16            MS. LUKEY:  I am hoping that the impression would

17   not be left that Mr. Hopkins has somehow taken a personal

18   benefit in any way from this process, since he has himself

19   received nothing.

20            THE COURT:  You have evidently read more than I

21   have.

22        Anyway, Mr. Kelly, what are Thornton's interests at

23   this point?

24            MR. KELLY:  Well, your Honor, we would echo much of

25   what Ms. Lukey says, and we agree that to date the Court's

1    only heard one side of the story, and there is a second side

2    of the story, and we do intend to object to both the

3    accuracy of the facts and the accuracy of the law as

4    portrayed in this Report.

5            We also believe at this juncture it may be premature

6    for the Court to take action on the issues listed in Part 3

7    of the Court's order because it has, in fact, only heard one

8    side of the story and it may be best for the Court to hear

9    the rest of the story when we make or submissions.

10           THE COURT:  I have to go look.

11           MR. KELLY:  Part 3 would be a series of issues you

12   suggested could lead to action by the Court, vis-a-vis

13   Mr. Hopkins, and Customer Class counsel, and I would

14   respectfully suggest the Court should hear the rest of the

15   story before it take actions on those issues outlined there.

16           So that's how we would view Part 3.

17           Part 4 is the question of the 230,000 pages of

18   discovery, and we strongly urge the Court not to make those

19   public for a couple of reasons.  First of all, there is no

20   doubt that they are discovery materials.  The Special

21   Master's Report itself refers to these documents 19

22   different times as "discovery."

23           THE COURT:  We're going to do these one at a time.

24           Let me tell you, and tell anybody else who might have a

25   different view, at the moment I regard your proposal as

 1    reasonable as to what should be in the record, but we will

 2    get to that.

 3         So you are concerned about the dimensions -- why are

 4    you concerned about the dimensions of --

 5              MR. KELLY:   A couple of reasons.

 6         First of all, as the Court has given us the opportunity

 7    to do, we are going to make some proposed redactions to the

 8    Court.   And there are some legitimate legal redactions that

 9    must be made to the submission that went to the Court.   That

10    takes time, and we have to put eyes on these documents and

11    make the proposal to the Court as to what should be

12    redacted.

13         The Special Master's Report itself, as indicated by

14    Ms. Lukey, with exhibits is already 10,000 pages.   So, as a

15    practical matter, to also put eyes on the additional 230,000

16    pages is going to take a long, long time.   And I'm not sure

17    that's in anyone's interest here.   But, more importantly,

18    unlike what has been suggested, Rule 53 on Civil Procedures

19    does not require it to be made part of the public record;

20    and, secondly, they are discovery documents, and the law is

21    clear in the First Circuit that discovery documents, there's

22    no presumption of public access.   This Court ruled on this

23    same issue over 20 years ago in the Salemme case.   It said

24    the exact same thing, discovery documents are not subject --

25              THE COURT:   September 10, 1997, and earlier in May,

1   but who remembers.

2        (Laughter.)

3             MR. KELLY:  But the principle remains valid today,

4   and so we do not think we should have to --

5             THE COURT:  Actually, it was June.  It was about 21

6   years ago.

7             MR. KELLY:  So I think, your Honor, there's

8   multiple reasons we don't want to have to spend the time to

9   go through 230,000 pages of discovery, A, because we're not

10  required to under either Rule 53 or existing case law in the

11  First Circuit and this Court.  And, C, it would be an

12  enormous undertaking to go through all those pages and

13  redact them and then present to the Court our various

14  redactions.

15       Thornton may have some redactions.  Labaton may have

16  some redactions.  Lieff may have some other redactions.  So

17  we'll be here next year at this time arguing about

18  redactions if we have to go through those 200,000 pages.

19       So I would respectfully suggest that we don't have to

20  do that.

21       And the other issue the Court touched upon is the

22  timing of our filing.  We had asked for June 11.  The Court

23  gave us until June 5 but without prejudice to ask again, and

24  we're asking again on behalf --

25             THE COURT:  I've got a thought on that as I'll

1    explain to you.

2         I really want to, and I think you want to, get these

3    redaction issues resolved as soon as they reasonably can on

4    an informed basis, and then, you know, get on to the

5    substance.

6         I am going be to emersed in a multi-billion-dollar

7    patent case the week of June 11, so that's one of our

8    considerations, but I have a thought on that, or how to deal

9    with that.

10        What are Lieff's particular interests at this point?

11             MR. HEIMANN:  I don't think I have anything to add,

12   your Honor, to what's been said at this point.

13             THE COURT:  And do counsel for the ERISA plaintiffs

14   want to tell me what their interests are?

15             MR. KRAVITZ:  I don't think we have anything to add

16   right now.  We'll just see how things play out.

17             MS. GERBER:  This is Laura Gerber.  Your Honor, we

18   share the interests that you have already articulated

19   regarding the matters today.

20             MR. McTIGUE:  Your Honor, it's Brian McTigue.  I

21   share your Honor's interests.  And I must say that before I

22   practiced law, I was a journalist, and an investigative

23   journalist, so I can appreciate the interest of the public

24   in the proceedings as well, but I am not here in that role.

25             MR. PAINE:  For State Street, really our interests

1     are exclusively the privacy interests of State Street and

2     its customers.

3          And in that regard, really, all that we're looking for

4     is to echo the idea that we need a little more time.  We

5     first got a gander at this stuff late last Friday, and it's

6     hard to wade through.

7          Secondly, with respect to the expansive record, we

8     haven't seen it, and just as soon never see it.  That being

9     said, we understand that it might have a lot of our stuff in

10    there.  So, to the extent that that's the case, then we also

11    would be wading through a big pile, and that would be

12    expensive and inconsistent with what we've tried to achieve

13    at your suggestion with the whole mediation process.  We

14    forewent formal discovery and active litigation and engaged

15    in a process that cooperatively led to an agreement that

16    hived off these issues from State Street.  And we'd just as

17    soon not be, you know, engaging in a process of trying to

18    figure out whether we or our clients are going to be

19    disadvantaged by the bigger pile if, in fact, it's going to

20    be filed.

21               THE COURT:  Okay.

22          And what are the Master's interests at this point?

23               MR. SINNOTT:  Your Honor, on behalf of the Master,

24    who, as the Court is aware, is not present here, there are

25    two priorities, and those two priorities are protection of

1    the class and the public interest in information.

2         Now, with respect to those two priorities, I would just

3    note -- and I'm disappointed to hear that there has been

4    press or blogging about Mr. Hopkins' role and allegations

5    that he did anything illegal or nefarious.

6         I would note with respect to the case, and I won't

7    elaborate on the contents of our Report unless the Court

8    requests it, but Mr. Hopkins did an admirable job in pushing

9    this case and proactively representing his members during

10   the life of the case itself.  I don't think it's a reach to

11   say that he was instrumental -- and I don't think that my

12   brother's representing State Street would argue with this,

13   let alone counsel for the plaintiffs -- he was instrumental

14   in securing the settlement in this case.

15        But, having said that, I would note, as the Court has

16   seen in our Report, that beyond the allegations that were

17   raised in the press that precipitated this second look at

18   this case, a declaration was filed, and there was testimony

19   by Mr. Hopkins that was very troubling.  And not for

20   nefarious reasons, but with respect to what he saw as his

21   role with respect to the class and the members.

22        And this being an open hearing, I'll leave it at that.

23   But I just wanted to provide some balance on that particular

24   issue.

25        With respect to the public interest in access, the

1     Special Master finds that that is a priority because this

2     case at its core involves issues of nondisclosure, and the

3     Special Master, to the greatest extent possible, would ask

4     that the Court keep that in mind.  He understands that there

5     are very valid issues, and the Court has alluded to those

6     with respect to attorney-client privilege, with respect

7     to --

8              THE COURT:  Well, if there is anything in the

9     Report that is privileged, but we'll get to that.

10             MR. SINNOTT:  And other issues, personal issues,

11    proprietary issues potentially.  But those are his

12    priorities.  Those are his interests moving forward.

13             THE COURT:  Thank you.

14        Well, let's go over some of the procedural issues, and

15    then we'll get to Mr. Hopkins.

16        So, I provided the parties, I'll call them "the

17    Lawyers," an opportunity to propose redactions, and I had

18    indicated earlier I would do that in my orders.  But what

19    are the categories?  I actually did not anticipate that this

20    would be a major challenge.  What are the categories of

21    proposed redactions?

22        When I say, "the Lawyers" -- I did this in my order --

23    as I may have already said, I am thinking of Labaton,

24    Thornton, and Lieff.

25        What are the categories of redactions you anticipate

1    proposing?

2         MS. LUKEY:  Earlier you had asked about the fact

3    that Labaton was taking the lead.  You actually had

4    appointed me as liaison counsel at the same time that you

5    appointed the Special Master.  That's the reason that I have

6    taken the lead.

7         The categories, we assume, are to be tracked from the

8    order as you provided them.  And, as I recall them, that, of

9    course, includes attorney-client privilege information, any

10   personal information.  There actually is, by the way, as I

11   understand it, included in there all the W-2s and W-9s

12   involved --

13        THE COURT:  I'm not talking about the record now.

14        MS. LUKEY:  Oh, okay.

15        THE COURT:  The record I have put aside.

16   My approach to this is once I decide what information

17   can properly be redacted from the Report and Recommendation

18   and the Executive Summary, we would get the record, however

19   it ends up being defined later, and the redactions,

20   consistent with my earlier rulings, would be made on the

21   records.

22        So right now you do not have the record, to my

23   knowledge.  I do not have the record.  All we have is the

24   Report and Recommendation, which admittedly, is lengthy, and

25   an Executive Summary.

1          So in the Report and Recommendation, which is, of

2     course, more complete than the Executive Summary, what are

3     the categories of information that you expect you would ask

4     be redacted?

5          MS. LUKEY:  Are you including within that request

6     the 10,000 pages of exhibits?

7          THE COURT:  Yes.  In what categories?

8          MS. LUKEY:  The categories are attorney-client

9     privilege, personal information, and I think that does

10    extend to some of what I was starting to reference, that

11    there may be some personal identifying information and

12    personal documents, and proprietary information.

13         In the latter category, that would be, I assume,

14    firm-specific as to what they consider to be proprietary.

15         At least as far as I am aware, no counsel anticipates

16    attempting to redact information on the basis that they

17    disagree with the findings, for example.

18         I believe you will be seeing a separate motion from

19    Labaton that asks you to consider striking a specific phrase

20    that appears six times and that we think is an inappropriate

21    and inflammatory phrase.  It's a simple three- or four-word

22    phrase, but there is no intention on our part to -- there is

23    no intent on our part, as far as I know on the part of

24    either firm, to keep the public from understanding what the

25    issue or issues is or are and proceeding.

1          The problem is when you're going into -- it's not so

2     much the Report -- although it's, what, 375 pages, I

3     think -- it's the exhibits.  When you're going into the

4     exhibits to do the redactions, it takes a lot of time.

5               THE COURT:  Let me ask this.  With regard to the

6     Report, other than the exhibits, and this is not a

7     rhetorical question, is there something in here that you or

8     your colleagues claim is covered by an attorney-client

9     privilege?

10              MS. LUKEY:  In the Report itself?

11              THE COURT:  Yes.

12              MS. LUKEY:  Honestly, your Honor, I can't recall at

13    the moment.

14         The attorney-client privilege issues are not to this

15    case.  The attorney-client privilege issues that we're

16    talking about are generally, at least on Labaton's part,

17    related to the identification of other clients, for example,

18    or information --

19              THE COURT:  Is that privileged?  The existence of

20    an attorney-client relationship I don't think is privileged.

21              MS. LUKEY:  In those instances where we feel it is

22    appropriate and privileged, we will make a claim of

23    redaction -- your Honor will see the whole thing -- but it

24    is often a difficult line to draw.  But if you're talking

25    about having discussed the same issue with other clients,

1   for example, and then you identify the clients, that,

2   arguably, infringes their privilege and actually has nothing

3   to do with this case.

4        More difficult, frankly --

5            THE COURT:  Frequently I know the answers to the

6   questions.  I think I know the answers to the questions -- I

7   am asking this time.  I'm familiar with the Report and

8   Recommendation, but I have not studied all of it, I have

9   studied parts of it, and I haven't read all the exhibits.

10  But, I mean, is there that type of information in the Report

11  and Recommendation?

12           MS. LUKEY:  As I indicated, your Honor, I can't

13  recall and say to you off the top of my head that there is.

14       I have not separated -- in my consideration, I didn't

15  separate the exhibits.  I treated them as if they had been

16  incorporated into the Report.  So I apologize, but I can't

17  make that distinction.

18       It may be that on the language we'll face in the Report

19  the same issue doesn't exist, but since I take the exhibit

20  and go to it in order to read it to make the determination,

21  I can't give you that answer.

22           THE COURT:  Because one of the things I could do,

23  if there are no appropriate redactions or they're easily

24  identifiable, is make the Report available with appropriate

25  redactions before the exhibits are available.

1          MS. LUKEY:  We could, your Honor, but the problem I

2    have with that is, as I told you at the very beginning,

3    there is a serious difference of opinion between counsel and

4    the Master on the meaning of certain exhibits and what he

5    says.

6          THE COURT:  That's a different point.

7          MS. LUKEY:  No, no, but it's not, your Honor,

8    because this is the point.  We don't want the Report

9    released without the exhibits.

10          THE COURT:  I know, and all of these are

11    synergistic.  I know you don't.

12       I doubt you are going to persuade me -- well, I want to

13    go -- well, you may persuade me.

14       I want to go step by step.  I want to know what the

15    redactions are going to be, and then you should be working

16    assiduously, all of you, on your objections because the

17    rules give you -- Mr. Paine, have a seat.  The rules give

18    you 21 days to formulate your objections unless otherwise

19    ordered.  As a practical matter, you are going to get longer

20    than that.

21       But the issue is I am going to decide the redactions at

22    some point, and either the Report, as would ordinarily be

23    the case, in redacted form immediately becomes part of the

24    public record, and seven days later your objections are

25    filed; or, as you have requested, I keep the Report sealed

1    seven days until your objections, your side of the story, is

2    released simultaneously.

3         My intention is to go step by step on that.  We'll see.

4         But you really want to be working to get your

5    objections prepared because they are really independent, I

6    think, of the redactions.

7              MS. LUKEY:  I think they are.

8              THE COURT:  As I said, we'll see -- the Master has

9    a different view -- but we're not there yet.  I want to have

10   a document that I can properly make part of the public

11   record either before you file your objections a week later

12   or a week later.  That's the present goal.

13             MS. LUKEY:  I understand, your Honor.

14        What I am saying to you is, because the exhibits are

15   incorporated into the Report, all we are asking for is what

16   would be six additional days, which happens to include a

17   weekend, so it's not very many business days.

18        We would like to see the Report and the exhibit

19   redactions come in at the same time, so that steps you're

20   talking about, the process to be followed, includes the

21   incorporated materials.  That's very important to us.

22             THE COURT:  All right, then -- because one of the

23   things I am thinking about, and tell me if this is feasible,

24   is that you file your memos regarding the law relating to

25   redactions.  Say, We want to redact everything that's

1     attorney-client privilege.  This is what is attorney-client

2     privilege.  You know, This is what's subject to the

3     attorney-client privilege.

4          We want to redact proprietary information, and maybe

5     give me an example or two.

6          And we want to redact personal information, like

7     somebody's home address, which could be in a deposition

8     transcript, theoretically.

9          And then you can spend another six days making the

10    redactions, but not actually giving me the specific

11    redactions.

12         Because I'm anxious to get to work on this when I'm not

13    absorbed in something else.

14         Would that be feasible?

15         MS. LUKEY:  If I'm understanding you, your Honor,

16    you're suggesting that we tell you -- we go to the Report

17    with its exhibits which we want to consider at the same

18    time, and tell you, Here are the categories that we're going

19    to be redacting, which, I could be wrong, it could go beyond

20    or be different from or not include privilege, proprietary

21    information, or personal information.  You want us to give

22    you that by the 5th and then give you the actual redactions

23    by the 11th?

24         THE COURT:  Correct.

25         MS. LUKEY:  I believe that would be feasible for

1    Labaton and feasible for Lieff.

2              MR. HEIMANN:  That's fine.

3              MR. KELLY:  Yes, we can do that, your Honor.

4              THE COURT:  Kind of give me a preview of coming

5    attractions.

6              MS. LUKEY:  Yes.

7              THE COURT:  Because once there's a framework, it

8    can be applied to the particular proposed redactions.

9              MS. LUKEY:  We can do that, your Honor.

10             THE COURT:  And then, in my tentative view -- and I

11   will let the Master be heard on this, too, because I think

12   he may want an opportunity to respond -- I would have you

13   file those memos -- so it would be a motion, a memo, and

14   affidavits under seal.

15        I would have you prepare redacted versions of those,

16   also to be filed under seal temporarily by me.  Because this

17   is going to become, I think -- we're developing a protocol

18   that will probably be applied in other areas.  So there are

19   certain things -- I ordered what I almost always order when

20   there are sealed documents, that redacted versions be filed

21   for the public record.  That means simultaneously.  But if

22   you think there is a good reason for me to take the redacted

23   version under seal and you want to make an argument why even

24   the redacted version shouldn't be made public, I'll consider

25   it.  However, in view of the strong presumption of public

1    access to judicial records, you have to recognize the

2    substantial risk that I will make the redacted version part

3    of the public record promptly, and it would be even better

4    if, on reflection, you just filed it.  But if you want to

5    ask me to -- you know, you want to make a special argument

6    for the redacted version held under seal, I'll seriously

7    consider it.

8         MS. LUKEY:  Well, the first problem we would have

9    is if each of us is filing our proposed redactions under

10   seal, and that would include, of course, ERISA counsel and

11   State Street, as well as the three separate Customer Class

12   counsel, the redactions may differ.

13        THE COURT:  Yes, I saw that.

14   Here, let me do it this way.

15   Right now I am talking about the memo you are going to

16   file next week.  So you have a June 5 date, and now I may

17   give you to until June 11 to file the actual proposed

18   redactions.

19        MS. LUKEY:  Yes.

20        THE COURT:  But what I am talking about is on

21   June 5 you are going to file a memo and say, We intend to

22   assert attorney-client privilege with regard to certain

23   information in the Report or, not in the report, in some of

24   the exhibits, and then, you know, Here is the law on

25   attorney-client privilege.

1          And it is axiomatic that the privilege has to be

2     asserted by the client, not the lawyer.  So at the moment,

3     Mr. Hopkins is the personification of a client.

4          Do you disagree with anything I've said so far?

5               MS. LUKEY:  No, your Honor.

6               THE COURT:  All right.  So he would have to decide

7     if there's anything as to which he thinks privilege should

8     be asserted, if it is still him, and, therefore, the class

9     and the public won't know that particular piece of

10    information.

11              MS. LUKEY:  I understand that, your Honor.  That

12    goes into the memo.

13         The issue was if we're each filing -- even if --

14    whether it's under seal or it's going to be made public

15    immediately or later, they have to be consolidated.

16              THE COURT:  They will be.  I am going to tell you

17    how we will do that.

18              MS. LUKEY:  They can't be filed if you're going to

19    turn them around at some point and make them public.

20              THE COURT:  Yes, they can.

21         I thought there was one thing before that.

22         This relates, I think, to your request for a hearing on

23    the proposed redactions.  I want to see the submissions

24    before I decide whether a hearing is necessary.  I may well

25    give you a hearing if you want a hearing.  And I think that

1    hearing would have to be closed to the public because you

2    want to discuss the redactions right --

3              MS. LUKEY:  Yes, your Honor.

4              THE COURT:  -- that's your position.

5         And the transcript would be made, and then the

6    transcript, or a redacted version of the transcript, would

7    be made public once I decide what redactions are appropriate

8    or could be made public.

9         And do you anticipate that the Master would participate

10   in this proceeding -- I do -- with regard to redactions?

11             MS. LUKEY:  Well, I would assume he's not going to

12   be making any redactions.

13             THE COURT:  No, he can oppose the redactions.

14             MS. LUKEY:  In opposing the redactions?

15        Well, we have had an issue whether the role should be

16   as adversarial as it is if we're paying for it, but I would

17   have to think about it.

18             THE COURT:  This case -- let's go back to basics.

19        I said when I granted that $75 million in attorney's

20   fees that the adversarial process didn't work, and this --

21   okay, so that's a concern I have.

22        I do not want to do anything without a genuine

23   adversarial process, and this is part of my concern about

24   Mr. Hopkins continuing in this role.

25             MS. LUKEY:  We are not suggesting the absence of an

 1    adversarial process --

 2            THE COURT:  Who is going to be your adversary with

 3    regard to redactions?

 4            MS. LUKEY:  More typically, your Honor, as you

 5    know, it would be done by a magistrate judge without the

 6    costs.

 7            THE COURT:  The magistrate judge, no.  The

 8    magistrate judge would be a substitute for me, and right now

 9    you're dealing with me.  Maybe at some point the magistrate

10    judge will get delegated a slice of this.

11        No, the magistrate judge is not adversarial.  The

12    magistrate -- I mean, this is fundamental.

13        I think it's appropriate to remember the case started

14    with allegations that State Street did not disclose what it

15    should have to its clients on foreign currency exchange

16    transactions, right.  And plaintiffs' counsel artfully

17    argued that.  And there was a global settlement, and the

18    Department of Labor agreed to it.  I think the SEC and the

19    Justice Department agreed to it, and I was the last piece,

20    and I agreed to it.  And then I awarded $75 million in

21    attorney's fees, and I noted that the adversary process did

22    not work at that time.

23        And so now, we've got a report about alleged failures

24    to disclose things that allegedly should have should have

25    been disclosed and that goes beyond the original questions I

1    put to the Special Master, but which were in the parameters

2    of my general directions to him, and apparently you're going

3    to want certain things redacted.

4              MS. LUKEY:  Right.

5              THE COURT:  If the Master wants to be heard on it,

6    I would be interested in having the Master heard.

7              MS. LUKEY:  Let's take that as a given then, your

8    Honor.

9         The question that I had and what I was going to suggest

10   to the Court is if we're going to end up so that you can

11   see, or the Master can see, whoever is looking at it, which

12   party is requesting which redaction --

13             THE COURT:  There is a way to do that.

14        I've thought about this, not that deeply, but there

15   would be two documents, two sets of documents.  Each party

16   files its own redactions, and then you make up a master that

17   includes everybody's redactions and in some way identifies

18   which firm wants that redaction.  So you essentially

19   consolidate it.  But I do think I want to know the

20   particular positions of the particular firms.

21             MS. LUKEY:  Well, I had proposed to my colleagues,

22   including ERISA colleagues, that Labaton -- that we would

23   take on the role -- Choate Hall -- would take on the role of

24   consolidating.

25        What I was going to suggest to the Court is if there is

1    anything that is going to be filed at that point --

2         (Whereupon, Mr. Hopkins rises to exit the jury box.)

3              THE COURT:  Mr. Hopkins, where are you going?

4              MR. HOPKINS:  I was going to ask a question of one

5    of my attorneys, your Honor.

6              THE COURT:  I asked if anybody -- one of your

7    attorneys?

8              MS. LUKEY:  Well, Labaton is his counsel, your

9    Honor.

10             MR. HOPKINS:  I'm sorry, your Honor.  I'll sit back

11   down.

12             THE COURT:  Yes, sit down.

13        I'm sorry, who are you referring to when you said one

14   of your attorneys?

15             MR. HOPKINS:  Eric Belfi.

16             THE COURT:  Mr. Belfi?

17             MR. HOPKINS:  Yes.

18             THE COURT:  From Labaton?

19             MR. HOPKINS:  Correct.

20             THE COURT:  Have you consulted anybody but a lawyer

21   from Labaton for advice regarding this matter since I

22   appointed the Special Master?

23             MR. HOPKINS:  For legal advice for me?

24             THE COURT:  For Arkansas Teacher.

25             MR. HOPKINS:  Well, they represent Arkansas Teacher

1   Retirement.

2         In terms of legal advice on how we need to proceed to

3   make sure we comply with the Court's order and things like

4   that, sure, your Honor.  But for legal advice on how to

5   protect Arkansas Teacher Retirement in terms of the global

6   issue here, no.

7               THE COURT:  Okay, thank you.

8               MS. LUKEY:  I'm not sure -- I think what I was

9   going to say, your Honor, is if anything is going to be

10  filed on the public record at that point, if we would just

11  do the consolidated version --

12              THE COURT:  That may make sense.

13              MS. LUKEY:  -- with the others going in?  If you

14  wish to still have separate versions coming in --

15              THE COURT:  I'm going to want separate versions,

16  and then if there's a consolidated version and there is a

17  good reason not to unseal every version, I will consider it.

18        But, again, step by step.

19              MS. LUKEY:  But someone, either you or, apparently,

20  Judge Rosen, would be reviewing the redactions and making a

21  decision?

22              THE COURT:  My present intention, I wrote this, is

23  to do it myself.  If I -- I mean, I could appoint another

24  lawyer to create an adversarial, you know, sort of an *amicus*

25  on this, and then you will have to pay for that.

1          MS. LUKEY:  We do not.

2          THE COURT:  It will come out of the fund.

3      No, but this may be a point I should think about.  I

4  mean, the Master has made a recommendation, and you are

5  going to have objections to the Recommendation, the findings

6  of fact, the conclusions of law, the recommendations, and

7  I'm going to consider them *de novo*.

8      It may have been imprecise to call it "adversarial."

9  In other words, I'm interested in hearing from everybody

10  who's got an interest in the Report and Recommendation as to

11  what should be on the public record.  The Master may agree

12  with you on all of it, or the Master may think you've drawn

13  the line in the wrong place.  And then I want to consider

14  everybody's views.  Not all the lawyers may agree on every

15  issue.  I mean, not all the lawyers for the class or the

16  different classes, subclass.

17      So adversarial -- my point is I'm interested in hearing

18  from the Master as well as from the lawyers as to what ought

19  to be redacted.

20          MS. LUKEY:  Perhaps we can cross the bridge later

21  then when you see it, and we see whether there are

22  differences of opinion or not as to what happens next.

23          THE COURT:  Differences of opinion between?

24          MS. LUKEY:  The Master and --

25          THE COURT:  Precisely.  That's what I want to do.

```
1    Step by step.
2                MS. LUKEY:  So we would then be filing on the
3    record what we will consolidate on behalf of all counsel.
4        If we're consolidating, way may need an extra day or
5    two so that the individual filings come in, and then we have
6    time to do the consolidation.  If we can have to the 11th
7    for everybody to get their individual filings in, and we
8    can --
9                THE COURT:  That's fine.  They can file them with
10   me on the 11th.  If you want another day or two to
11   consolidate them, you can do it.
12               MS. LUKEY:  I will need to -- yes.
13       They would file with you, and then we'll consolidate
14   when everybody's is in and try to get them to you on the
15   13th.
16       And that would be, as I understand it, a public filing.
17   So it's everybody's redactions.
18               THE COURT:  I hope it's a public filing.
19               MS. LUKEY:  But you're suggesting --
20               THE COURT:  I'm saying, if you want to make an
21   argument that it should remain sealed until I decide which
22   redactions are appropriate, I will probably let you -- you
23   know, you have to file a motion, you can file it temporarily
24   under seal, and tell me why it should be maintained under
25   seal, and if the Master disagrees, he can tell me why he
```

1      thinks it shouldn't be maintained under seal.

2              MS. LUKEY:  What is the date for us to do that,

3      your Honor, because it would clearly be our preference that

4      until you have ruled on what should be redacted --

5              THE COURT:  I'm ordering that you file the motion,

6      the affidavits, and the memos on categories of redactions by

7      next Tuesday, June 5.  And you can file that under seal with

8      redacted versions that I will make public, unless you

9      persuade me that they shouldn't be.

10          Then the individual filings shall be made by June 11

11     under seal, and those are going to be redacted versions, and

12     your consolidated version can be filed June 13.

13             MS. LUKEY:  Under seal until you review it?

14             THE COURT:  Under seal.

15             MS. LUKEY:  We will take care of that, your Honor

16     correct.

17             MR. KELLY:  Excuse, your Honor.

18          Maybe I'm misunderstanding this, but on June 5 we

19     submit to the Court examples of what we think are legal

20     bases to redact, not our actual proposed redactions on

21     June 5?

22             THE COURT:  Yes.  You may want -- you don't even

23     have to necessarily illustrate it with examples, although it

24     may be more intelligible if you do, and you might want to

25     redact the examples.  But, like I said, "attorney-client

1    privilege."  Here's and affidavit on behalf of the client,

2    the class.

3        Or -- I haven't thought of this -- maybe it's a client

4    in another case, but it has to be a asserted by the client,

5    not by the lawyer.

6        Then you say, This is why it's privileged.  Here's the

7    lawyer concerning attorney-client privilege.

8        If I agree that's the law, I will say, Well, if you get

9    an assertion by the client, if you have that, you will have

10   that next Tuesday.

11       If Mr. Hopkins still has this role, or wants it, he'll

12   say, I'm asserting attorney-client privilege regarding

13   everything that qualifies with regard to Labaton.  And then

14   on the 11th I'll see what you think that is.  But it will

15   give my head start on law.

16            MR. KELLY:  I really think the volume of redactions

17   is not going to be large.  It's just the volume of work

18   needed to get there is large.

19            THE COURT:  All right, but you told me you could do

20   it by June 11?

21            MR. KELLY:  Yeah, I'm not quibbling with you.

22            THE COURT:  So I'm giving you to June 11.

23       But I'm glad to hear you say that you don't expect the

24   volume of redactions to be large, because I don't either.

25       You know, I want to be careful and I want to be fair,

1   but I don't want this to be become a ponderous, protracted

2   process.

3          MS. LUKEY:  So that takes us through the Report and

4   Recommendation, I think, right?  We've done our redactions

5   for that part of the --

6          THE COURT:  Right, and once I see what it is, I'll

7   decide whether a hearing is necessary, and if I think -- if

8   you ask for one and I think it will be helpful to my

9   decision-making, I'll give it to you.

10         MS. LUKEY:  Thank you.

11         THE COURT:  And it will probably have to be a

12   closed hearing because we'll be discussing matters about

13   whether certain things should continue to be under seal.

14       And then after I decide the redactions -- and this

15   relates to something else I ordered you to do.

16       Talk with Mr. Sinnott about the categories of

17   redactions that you are going to propose and the authority

18   for it, because I suppose until the Master sees the proposed

19   redactions, he can't -- well, I don't know.  He can't really

20   respond whether these are appropriate categories or not.

21   How should we deal with this?

22         MR. SINNOTT:  And, your Honor, I was going raise

23   that issue.  At some point, either after the June 5 filing

24   under seal, or the June 11 filing, can I assume the Court

25   will wish to hear the Special Master's position on what's

1    been proposed by counsel?

2              THE COURT:  Yes.

3              MR. SINNOTT:  And what is the timetable for that,

4    your Honor?

5              THE COURT:  With regard to the categories, if

6    possible, and if you confer, you should know what these are

7    starting after this hearing, you should see if you can get

8    me a memo by June 8.   Then I'll have it.  And if that

9    proves not to be possible, you can ask me for a little more

10   time.   Then they'll make their filing on the 11th, and you

11   should read it quickly, and tell me the minimum reasonable

12   amount much of time you want to respond, if you want to

13   respond.

14             MS. LUKEY:  I suspect we're tracking the categories

15   that you put in your order, your Honor, so I don't

16   anticipate that the categories will be disputed.

17             THE COURT:  Mr. Paine, does State Street have a

18   particular concern here?

19             MR. PAINE:  Yes.  We've got one extra category,

20   which is the mediation privilege.  I just didn't want that

21   to get lost in the shuffle, since I don't think it's in your

22   order, and it hasn't been mentioned yet today.

23             THE COURT:  Have you read the Report and

24   Recommendation yet?

25             MR. PAINE:  I read the summary in detail, and I've

1     read some of the Report, your Honor.

2          THE COURT:  Did you see anything in there that you

3     think is subject to the mediation privilege?

4          MR. PAINE:  Definitely in the exhibits.  I'm not

5     sure with respect to the Report because I haven't made my

6     way all the way through.

7          THE COURT:  I keep forgetting about you, which is

8     why I put out that order without giving notice to -- I

9     hadn't thought it was your information in there, State

10    Street's information.  So you've got to operate on this

11    schedule that I've ordered, too.

12         MR. PAINE:  Got it.  Thank you.

13         THE COURT:  And you need to talk to the Master

14    about it.

15      All right, so at some point, hopefully relatively soon,

16    I will decide what redactions are justified, and the

17    redacted version will be made part of the public record.

18    Then -- well, there's going to be a redacted version.

19      Then the lawyers want me to decide whether to make it

20    immediately part of the public record, which ordinarily

21    would occur, or make it part of the public record when they

22    file their objections, so it -- both sides -- I mean, you

23    asked me in your written submission to keep the Report

24    sealed until I rule on the objections.

25      I think it's going to be very hard for you to persuade

1    me to do that.  The ruling on the objections are judicial

2    decisions.  I think this is in the heart of what's supposed

3    to be public.  So people are supposed to be able to absorb

4    in real time the decisions I am making.  It's a way of

5    holding the Court accountable, among other things.

6         But do you want to advocate now that I keep the Report

7    sealed until I rule on the objection?

8              MS. LUKEY:  Well, that would certainly be our

9    preference, your Honor, because we think there are some

10   items that, when you rule on the objections, you will -- you

11   may decide to take out, and they are extremely injurious to

12   the reputations of the three firms.  And if you agree with

13   us that they are -- that there are statements that are in

14   the Report that are based on, in the first instance, errors

15   of law as to what the Massachusetts law is on the subject at

16   issue, and you recognize that this could have very

17   substantial and existential, even, effect on these firms and

18   perhaps others in the plaintiffs' class action bar, then it

19   would seem to be the more prudent course, because the time

20   period is not very long, to keep the seal in place.

21        That is our strong preference because we do believe so

22   strongly there are issues that will come out and that the

23   damage will -- that is, you will take out of the Report or

24   not accept, but that will leave the injury to the firms, and

25   it will be irreparable.

```
1          And if I may defer to Mr. Heimann.

2             MR. HEIMANN:  I do need to speak.

3          Given the fact that the press is here, I can't let this

4    go past.

5          We don't think there's anything in the Report that

6    would be injurious to the reputation of Lieff Cabraser

7    Heimann & Bernstein, but we do take issues with --

8    particularly take issues with certain of the recommendations

9    about, particularly, financial matters that are in the

10   Report.

11            THE COURT:  Okay.

12         Well, this is not ripe for a decision by me, and you

13   can -- this will become more concrete as we go step by step.

14   I don't know what the proposed redactions are.  I don't know

15   what the foreseeable objections exactly are.

16         So if you want to advocate that the Report not become

17   public until I rule on the objections, you make whatever

18   arguments you want in proper form.  But, as I said, it would

19   be hard, in view of the jurisprudence, to persuade me that's

20   appropriate, but I haven't studied the issue in the context

21   of this case.

22         But basically what does remain open is whether I

23   make -- once I decide the redactions, the redacted version

24   of the Report and Recommendations and Executive Summary

25   becomes public, and then the response become public when
```

1     it's filed.

2          You know, part of the reason it's important to -- and I

3     don't need any more litigants, particularly this month with

4     everything that I'm juggling, but sometimes in cases like

5     this somebody moves to intervene -- the media moves to

6     intervene, somebody else moves to intervene.  Now, because

7     we're doing this in public proceeding, it's known what the

8     range of options are, and if somebody who's not a party

9     thinks they have an interest and a right to be heard on the

10    issue, they know it's an issue, okay.

11         Let's go to the motion regarding what should be in the

12    record.

13              MS. LUKEY:  Your Honor, on that --

14              THE COURT:  Hold on just one second.  I'm trying to

15    find the  --

16         So your motion was Docket No. 222, and it generated a

17    number of filings, including a memorandum by you.

18         And if I understand it correctly, the lawyers' proposal

19    is that everything the Special Master has be preserved in

20    case, in the course of litigating this or on appeal, there

21    is some perceived, or at least in the course of litigating

22    it at this level, there's some perceived need for more, but

23    that your proposal is that the record to be filed in the

24    court and public, subject to appropriate redactions, would

25    be the exhibits to the Report and Recommendation, any

1    additional documents the Master wants to provide for the

2    record, documents he regards as relevant, perhaps relied

3    upon by him, additional documents the parties want to offer,

4    and anything the Court requests.

5             MS. LUKEY:  Correct.  We're not -- we want

6    everybody to be able to take what they want.  We're trying

7    to avoid the 236,000 pages from being part of the record.

8             THE COURT:  Okay.

9             MS. LUKEY:  And that would be a lot of redacting,

10   because then you've got the W-2 and W-9 issue and so forth.

11            THE COURT:  Well, we'll have to see what the

12   Master -- I am not sure, at quick glance, that some of those

13   might be -- they might be relevant.  One of the original

14   triggers for this case was that it was represented to me

15   that the regular hourly rates of certain people were about

16   400, 450 dollars an hour.  I know what somebody gets paid is

17   not necessarily what a client gets charged, or is not what a

18   client -- well, may not be what a client gets charged, but

19   it may be evidence of an hourly rate.

20        But, in any event, those are the four categories.

21        And the Special Master felt constrained by my order to

22   preserve and file everything, but now this issue is coming

23   into sharper focus.

24        Have you had an opportunity to think about the Master's

25   view as to what ought to be in the record filed?

1          MR. SINNOTT:  Your Honor, unlike the Report and the

2     exhibits, which we feel were vetted by the Special Master,

3     and, we feel everything in there is necessary to the Court's

4     consideration, we do not take that strict view of the record

5     as a whole.  And at this point the Special Master looks upon

6     his role as carrying out the will of the Court.

7          With respect to that great, massive 237,000 pages that

8     Mr. Kelly talked about, we will review and we will vet, as

9     deemed appropriate.  The original order by the Court we felt

10    was not ambiguous, so to that extent we would stand by that,

11    but we will do as that Court desires.

12         THE COURT:  Well, I would expect you would look and

13    see if there were things that you did not make exhibits

14    that, nevertheless, are relevant, potentially important.

15         I may have overlooked it, but, for example, if I had to

16    I will request it, but it would help if you sort of

17    anticipate what the Court would be likely -- there's a

18    reference in there that there were a relatively small number

19    of emails from Michael Bradley evidencing work that he did,

20    but I don't think they were made exhibits to the Report.

21         I'm interested in those.

22         MR. SINNOTT:  Let me make it clear, Judge, that, as

23    I said before, one of the priorities of the Special Master

24    is the public interest in information.

25         I'm just saying that there may be a different standard

1    with respect to how flexible the Special Master is, subject

2    to the Court's direction, with respect to those things.  But

3    the Special Master is very much adamant that there is a

4    public interest in much of what's in that broad file.

5              THE COURT:  I would expect.  I just use that as an

6    example that quickly came to mind.

7         You know, what else do you think should be in the

8    record, and then it can be supplemented during the period of

9    *de novo* review.

10             MS. LUKEY:  Right, at any time.

11             THE COURT:  If we're having hearings, and there is

12   a dispute about whether the work was done and it turns out

13   that there are documents that are relevant that weren't

14   included in the record, the record could be supplemented, as

15   I understand it.  Because anything I order -- I mean, I make

16   that clear in my order.  But anything I order -- any order I

17   issue I can revise.  But it seems to me that this was a

18   reasonable approach.

19             MS. LUKEY:  I thought it wouldn't even be by

20   motion.  If the Court were amenable to it, it would just be

21   a notice of supplementation of some kind, and whoever needs

22   to add, adds.

23             MR. SINNOTT:  I think the trick is going to be in

24   defining what's relevant.

25             THE COURT:  But I can't do that.  I don't know what

1     you have, and I don't know what you thought, you know, had

2     some value, was helpful to you, but --

3              MR. SINNOTT:  Understood, your Honor.  I think

4     we're --

5              THE COURT:  What we're doing here is setting up a

6     process or different processes for different things, and it

7     will work.

8         All right, now I have a few questions for Mr. Hopkins.

9     But, Mr. Hopkins, if I'm going to ask you some questions,

10    you've got to go in the witness box and be sworn.

11             MR. HOPKINS:  Thank you, your Honor.

12                    **GEORGE HOPKINS, sworn**

13             THE COURT:  Would you please state your name for

14    the record.

15             MR. HOPKINS:  Your Honor, my name is George

16    Hopkins.

17             THE COURT:  And what is your position?

18             MR. HOPKINS:  I am the Executive Director of the

19    Arkansas Teacher Retirement System.

20             THE COURT:  How long have you served in that

21    position?

22             MR. HOPKINS:  Approximately nine-and-a-half years.

23             THE COURT:  Who was your predecessor?

24             MR. HOPKINS:  Paul -- well, my direct predecessor

25    was Gail Bolden, who was interim Executive Director.

```
 1              THE COURT:  How do you spell her name?

 2              MR. HOPKINS:  G-A-I-L.  Last name, Bolden,

 3    B-O-L-D-E-N.

 4              THE COURT:  And who was her predecessor?

 5              MR. HOPKINS:  Paul Doane.

 6              THE COURT:  D-O-A-N-E?

 7              MR. HOPKINS:  I think so.

 8              THE COURT:  Have you read the Special Master's

 9    Report and Recommendation and Executive Summary to it?

10              MR. HOPKINS:  I have.  Some parts more thoroughly

11    than others.  You know, it's a long report.  I've been doing

12    school-hall meetings across Arkansas, and retirees.  I've

13    been meeting with actuaries, but in my time in between

14    those, I have.  Some parts more skimming, other parts very

15    directly.

16              THE COURT:  What parts have you read particularly

17    carefully?

18              MR. HOPKINS:  Well, the parts that applied to the

19    issues about the law firms, and basically the findings, any

20    issue about Arkansas Teacher Retirement and the Class

21    concerns that existed.

22         You know, other parts that was more factual about how

23    the attorneys interacted with each other during that part,

24    you know, I read through it to see if there was anything

25    that would catch my attention, but lists or, you know, word
```

1    for word, the total basis, as most attorneys would do.

2           THE COURT:  Have you read carefully the parts about

3    the origins and evolution of Labaton's relationship with

4    Arkansas Teacher?

5           MR. HOPKINS:  I have.

6           THE COURT:  And in my order directing you to be

7    here, I cited my March 16, 2018 decision in the Garbowski

8    case.

9        Did you read that decision, by any chance?

10          MR. HOPKINS:  No, but Ms. Lukey summarized it for

11   me.

12          THE COURT:  Do you want, on behalf of Arkansas

13   Teacher, to continue as lead plaintiff in this case?

14          MR. HOPKINS:  I do, your Honor, to protect the

15   class.  I sure do.

16          THE COURT:  Why do you think it's important to

17   protect the class at this point, or for you to protect the

18   class at this point?

19          MR. HOPKINS:  Can I give you a little history about

20   my views on that?

21          THE COURT:  Okay.

22          MR. HOPKINS:  Your Honor, when I got to Arkansas

23   Teacher Retirement, I didn't think these cases were

24   important, and I was more busy trying to take care of a

25   retirement system in the middle of a financial crisis.

1        And when Arkansas leaders told me I needed to do this,

2   one thing I learned was there was no instruction manual on

3   how to be a good class representative.

4        Thankfully, as a practicing attorney, I've been in some

5   national class actions at a very small level, both on the

6   defense and plaintiffs' side of that.

7        And I used the skills I learned working in the log

8   woods, watching my parents, which is, You do the best you

9   can every day.

10       You -- as a fiduciary you give, essentially, all that

11   you have and surrender that and take care of the people you

12   have a duty to take care of it.

13       And, you know, in the mediations about mid points, and

14   insurance, and how the insurance tower is developed, and all

15   the issues about scienter, and all the different parts, you

16   know, coming to court hearings, you know, I wanted to be,

17   and I always tried to be, the best I can.  Not for a ATRS,

18   the Arkansas Teacher Retirement, but for the class.

19       And, you know, I have never -- I have never asked a law

20   firm to hire some attorney.  I have never asked a law firm

21   to make a political contribution.  And I have done

22   everything I can to focus for the class.

23       I can give you two examples.

24       You know, when there was a circumstance that it

25   appeared that the class period needed to be extended, which

```
 1    would greatly reduce ATRS's financial interest in the class
 2    later on, I told the attorneys, Do not -- do what's right
 3    for the class.  Don't try to preserve some class period that
 4    doesn't makes sense.
 5         And a more recent case, where there was silos of
 6    recovery based upon knowledge of investment managers, and it
 7    became sort of an issue of what silo we should be in, I
 8    said, Put ATRS in the lowest silo, because I always want to
 9    represent the class interest.
10         And in this case, you know -- you know -- and I don't
11    know what I'm allowed to say, because this is under seal.
12    But I think what Judge Rosen, if you read his Report about
13    how I acted in the class, what Mr. Sinnott said -- and I
14    will tell you, you know -- I was always told not to brag
15    growing up, you know.  But I will brag.  I'm the one who
16    found this case.  I'm the one who helped develop this case
17    over several months before it was ever filed.  I chose the
18    law firm that would proceed in this case, because I
19    interviewed several.  I went to Chicago to meet --
20         THE COURT:  This really isn't so much about you
21    personally, but let me ask you this.
22         When you became Executive Director of Arkansas Teacher
23    about nine years ago, did you say?
24         MR. HOPKINS:  Nine-and-a-half years ago.
25         THE COURT:  Did it have a contractual relationship
```

1    with Labaton?

2              MR. HOPKINS:  It did.

3              THE COURT:  And has it had a contractual

4    relationship with Labaton ever since?

5              MR. HOPKINS:  Continuously, your Honor.

6              THE COURT:  What has Labaton's role been?  What

7    have its roles been in those nine years?

8              MR. HOPKINS:  Well, as I said, when I first got

9    there, I didn't move on the cases originally.  Then our

10   political leaders in Arkansas convinced me that I should.

11             THE COURT:  The political leaders --

12             MR. HOPKINS:  Well --

13             THE COURT:  I'm sorry, what did you say?  The

14   political leaders convinced you that you should be

15   interested in these class actions?

16             MR. HOPKINS:  Right, because I was really -- as a

17   new Executive Director with the Retirement System that was

18   going into -- when I got to ATRS, two weeks after I got to

19   ATRS, we started a legislative session that I had a -- about

20   a 22-bill package to try to pass in the Legislature, and I

21   passed every one of them.

22        I had to redraft a lot of legislation.  So I was not

23   focused on trying to do these cases.

24             THE COURT:  But you said -- is Arkansas Teacher

25   regulated in the some way by the government of Arkansas?

```
 1              MR. HOPKINS:  Absolutely, your Honor.

 2         Can I explain to you how that works?

 3              THE COURT:  No.  Listen to my questions.  Say

 4    what's necessary to answer fully, and then I may give the

 5    lawyers a chance to --

 6              MR. HOPKINS:  And let me say this.  If I don't get

 7    to say all I want, I would like -- after this hearing is

 8    over, I would like to proffer some things in the record if

 9    necessary.

10              THE COURT:  Well, if we don't resolve this today --

11    I'm going to give you some time to think about what we're

12    discussing, okay?

13              MR. HOPKINS:  Yes, your Honor.

14              THE COURT:  I would like to make informed

15    decisions, too, and sometimes it takes a little while, but

16    you have to start a process.

17         But okay.

18         So you said that political leaders persuaded you that

19    you should give some priority to class action lawsuits,

20    correct?

21              MR. HOPKINS:  Yes, your Honor.

22              THE COURT:  Who were those political leaders?

23              MR. HOPKINS:  Well, a person I served with in the

24    State Senate who had been a former Executive Director at

25    Arkansas Teacher Retirement, David Malone.
```

```
 1              I talked to several legislators.

 2              I talked to people at the Governor's staff, and

 3     generally people in the Department of Finance Administration

 4     of Arkansas who suggested that these were important cases,

 5     and that they -- Arkansas Teacher Retirement had gone from

 6     one securities monitoring firm to five very recently before

 7     I got there, and I think the purpose of that --

 8              THE COURT:  One at a time.

 9          So you spoke to David Malone --

10              MR. HOPKINS:  Right.

11              THE COURT:  Who was one of you predecessors, right?

12              MR. HOPKINS:  -- right, yes.

13              THE COURT:  Do you know the name Steve Faris?

14              MR. HOPKINS:  I never spoke to Steve Faris about

15     that, your Honor.

16              THE COURT:  I didn't ask you that.

17              MR. HOPKINS:  Okay.

18              THE COURT:  Do you know the name -- do you know a

19     man named Steve Faris?

20              MR. HOPKINS:  I do, your Honor.

21              THE COURT:  Who, in two thousand -- who was Steve

22     Faris back at the time you became Executive Director?

23              MR. HOPKINS:  He was a state senator.

24              THE COURT:  And did he have any involvement with

25     Arkansas Teacher in that capacity?
```

1          MR. HOPKINS:  Not directly.

2          THE COURT:  Did he have some involvement

3     indirectly?

4          MR. HOPKINS:  Yes.  He was a member of the Arkansas

5     General Assembly.  The General Assembly, you know, has

6     indirect supervision of ATRS because they adopt all the laws

7     by which we operate, you know, how our board is configured,

8     how benefits are paid, how we proceed with investments, the

9     type of investment rules that we have, and Mr. Faris was a

10    member of the General Assembly.  So indirectly, yes.

11         THE COURT:  Have you ever had any conversations

12    with Mr. Faris about class action lawsuits?

13         MR. HOPKINS:  At any time?

14         THE COURT:  Yes.

15         MR. HOPKINS:  Sure.

16         THE COURT:  Did you say "yes"?

17         MR. HOPKINS:  Yes, your Honor.

18         THE COURT:  Once, or more than once?

19         MR. HOPKINS:  More than once.

20         THE COURT:  Have you ever had any discussions with

21    him about law firms that might participate in either

22    monitoring the market for possible class action lawsuits or

23    represent Arkansas Teacher?

24         MR. HOPKINS:  I don't think I have in that context.

25    You know, I know Mr. Faris, and I told him that we were

1    doing cases, and I talked him over coffee, or whatever, to

2    say that, you know, We're involved in this case or that case

3    and that type of thing.

4              THE COURT:  Have you ever discussed this State

5    Street case with him or the aftermath of it?

6              MR. HOPKINS:  Yes, your Honor.

7              THE COURT:  When was that?

8              MR. HOPKINS:  I probably -- again, I think he left

9    the State Senate in 2013 -- 2011 or '13, I'm not sure,

10   somewhere in that time period.  But I remember talking to

11   him about this -- you know, I've talked to several people

12   about this case because it was sort of known in Arkansas.

13   And I don't remember the specifics, but generally that we

14   were doing this lawsuit, and it was very interesting, and

15   that we were proceeding forward.

16             THE COURT:  Have you talked to Mr. Faris since the

17   issues arose that prompted the appointment of the Special

18   Master?

19             MR. HOPKINS:  I have.

20             THE COURT:  You have or have not?

21             MR. HOPKINS:  I have, your Honor.

22             THE COURT:  Once, or more than once?

23             MR. HOPKINS:  More than once ones.

24             THE COURT:  When was the first time?

25             MR. HOPKINS:  The first time after the appointment

1    of the Special Master?

2           THE COURT:  Or after the issues arose concerning

3    the propriety of the attorney's fees that led to the

4    appointment of the Special Master.

5         So let's take it back to about November 2016.

6           MR. HOPKINS:  I don't recall when the first time I

7    talked to him after that, you know, but I am positive I

8    talked to him and said, you know, there is -- you know, the

9    attorney fee thing sort of blew up, and I've got to deal

10   with it, but I don't recall any particulars or even the

11   exact date.

12          THE COURT:  Did you contact him to have that

13   communication?

14          MR. HOPKINS:  Well, let me try to put it in better

15   context.

16        I've known Steve Faris since 1980.  We went to the same

17   college.

18        When I was the Senate Co-Chair of the Public Retirement

19   Committee, he was House Co-Chair.  And I'd see him -- you

20   know, we grew up in the same hometown, so -- well, I

21   actually grew up in Donaldson, he grew up in Malvern, but

22   same county, I should say.

23        But I see him very often in circumstances, and he will

24   ask me about my children.  I'll ask him about his Godson,

25   and talk about a lot of things.

1       But he's always -- he's always asking about, What's

2   going on with Arkansas Teacher Retirement?  What benefit

3   changes are we making?  What are doing?

4       And this has been a pretty prominent part of what I had

5   to deal with, and I'm sure I mentioned it to him, but not in

6   the context -- just in the context of general discussion.

7           THE COURT:  Did you ever speak with Mr. Doane --

8   well, when did, as you understand it, Labaton become --

9   well, begin working with Arkansas Teacher?

10          MR. HOPKINS:  I think the procurement for the

11  contract association with Labaton probably was finalized in

12  the summer of 2008, but I don't know the exact date.

13          THE COURT:  Did anybody ever tell you how Labaton

14  came to be one of the lawyers for Arkansas Teacher?

15          MR. HOPKINS:  Yes, through the Special Master.

16          THE COURT:  Put aside the Special Master's Report.

17          MR. HOPKINS:  No, I never knew.

18          THE COURT:  Did you ever discuss that issue with

19  Mr. Doane?

20          MR. HOPKINS:  No.  I've had very few discussions

21  with Mr. Doane.  The first time I talked to Mr. Doane was

22  probably two years after I was ATR's Executive Director.

23          THE COURT:  Did you ever discuss with Mr. Faris

24  about -- well, did you ever discuss Labaton with Mr. Faris?

25          MR. HOPKINS:  I've already told you I had.

```
1            THE COURT:  But tell me again.  I've heard a lot of

2    things.

3            MR. HOPKINS:  Okay.

4        I discussed with -- I discussed with Mr. Faris Labaton.

5    You know, sometimes we'd get an interesting case, and I

6    would tell him, Here's this case and Labaton represents us.

7    The same with Bernstein Litowitz; same with Kessler Topay;

8    same with Nix Patterson; some with Kaplan Fox.

9            THE COURT:  Did Mr. Faris ever say anything to you

10   about Labaton?

11           MR. HOPKINS:  No, not -- other than, Sounds like

12   they're a good law firm, but, not -- I think in the context

13   you're asking, which is did he encourage me to use them in

14   any case or -- no, no, your Honor.

15           THE COURT:  Did he ever tell you that he had a role

16   in introducing Labaton to Arkansas Teacher?

17           MR. HOPKINS:  No, he never told me that.

18       Well, let me say, until after the Special Master --

19           THE COURT:  Leave that.

20       Have you discussed this with him since the Special

21   Master's Report?

22           MR. HOPKINS:  Just very -- just very briefly.

23   Because I just said, "I didn't know you had anything to do

24   with Labaton.  You've been there."

25       And he said, "Well, it was a long time ago," and that
```

```
1    he had met a couple of Labaton attorneys and met --

2    introduced Mr. Doane.  And as far as he -- as far as how he

3    remembered, he just said "introduced them," because he

4    introduced some attorneys that he knew, and sort of rolled

5    out of the room.

6        That's, sort of, how he presented it to me.

7            THE COURT:  You know an attorney in Arkansas named

8    "Herron"?

9            MR. HOPKINS:  I have never -- as I told the Special

10   Master, I've heard the name, but, as far as I know, I've

11   never met him.

12           THE COURT:  Did Mr. Doane ever mention Mr. Herron

13   to you?

14           MR. HOPKINS:  No.

15       Mr. Doane in conversations with me was very general

16   about, you know, being a former Executive Director of

17   Arkansas Teacher Retirement when he was at St. Paul

18   Teachers'.

19           THE COURT:  I'm sorry.  I misspoke.

20       Have you ever talked with Mr. Faris -- I want to make

21   sure I did not confuse Mr. Doane with Mr. Faris.  These

22   names are new to me.

23       Did you discuss Labaton with Mr. Faris?

24           MR. HOPKINS:  Back, at the -- after -- you know, as

25   I told you, Mr. Faris, a former state senator I knew real
```

1    well, I'm sure I discussed Labaton, like all the other

2    securities firms.

3           THE COURT:  Did he tell you, or discuss with you,

4    that he had introduced Arkansas Teacher to Labaton?

5           MR. HOPKINS:  No, not until -- I didn't discuss

6    that with him until after I learned it through this process.

7           THE COURT:  When did you have that discussion?

8        Well, was it one discussion or more than one

9    discussion?

10          MR. HOPKINS:  It may be -- maybe two, but, I mean,

11   it was more casual, just --

12          THE COURT:  No.  Just when?

13       So when was the first of the two?

14          MR. HOPKINS:  I'm trying to remember the context of

15   when.

16       It was probably when I saw doc -- it was probably

17   after -- probably right after my deposition here on the day

18   after Labor Day, because I think that's when I saw documents

19   that Ms. Lukey had that had been provided by the Special

20   Master.

21          THE COURT:  And did you have that conversation with

22   Mr. Faris in person or by telephone?

23          MR. HOPKINS:  I honestly don't remember, your

24   Honor.

25          THE COURT:  What, to the best of your memory, did

1    you say and what did he say?

2         MR. HOPKINS:  Well, to the best of my memory, it

3    was something more like, I didn't know that you had

4    introduced Labaton to Teacher Retirement.  And he -- and it

5    was like it was a distant memory to him, and he said, Yeah,

6    I think I did.

7         He said, I think I remember they came into town.  I,

8    you know, introduced Paul Doane to them, and sort of left

9    them to discuss the matter.

10        THE COURT:  When did you have the second

11   conversation with him?

12        MR. HOPKINS:  Well, I don't know.  It could have

13   been a couple of days later.  But, as I said, it was more of

14   a passing deal, not in terms of a, you know, some kind of a

15   -- you know, I wasn't trying to interrogate him, let's put

16   it that way.

17        THE COURT:  Have you talked to him, or otherwise

18   communicated with him, since you received the Report, the

19   Master's Report and Recommendation last week?

20        MR. HOPKINS:  Well, he actually -- I work every

21   Memorial Day, because it's sort of the end of our retirement

22   season, and we have a crew there.  And he actually drove by

23   my office, and -- to get a cup of coffee about nine o'clock

24   on Monday morning.

25        And he said, What do you have this week?

1          And I said, I got to go up there.

2          And he said, Why?

3          And I said, Because there is a hearing on, you know

4     about the -- you know, about the State Street case.

5          And that was sort of the extent of it.

6               THE COURT:  What did he say?

7               MR. HOPKINS:  He said, I thought that was probably

8     already going to be over?

9          And I said, No, it's still going on.

10         And, you know, I -- you know -- you know -- I don't

11    go -- I don't try to go around, your Honor, talking about

12    all -- you know, I have plenty -- you know, it takes 15

13    minutes -- it take 15 minutes to even start explaining

14    what's going on in State Street, and if I did that to

15    everybody who wanted to find out what I was doing --

16              THE COURT:  I asked you what he said.

17              MR. HOPKINS:  Oh, okay.

18         I -- I -- I think he said, basically, Enjoy Boston and,

19    good luck, kind of deal.

20         Then he asked me what my son was doing.

21              THE COURT:  Had he ever come to see you on Memorial

22    Day before?

23              MR. HOPKINS:  I don't remember, but he comes by my

24    office pretty regularly.

25         I mean, he's an old political guy who, you know, shows

1     up and has coffee with a lot of people I guess.

2              THE COURT:  He's left the state Legislature?

3              MR. HOPKINS:  Yes.  He's a retiree that acts like

4     he is retired.

5              THE COURT:  What does that mean?

6              MR. HOPKINS:  It means that, you know, that he

7     shows up at the worst times, when I'm the most busy.

8     Because on Monday I have an ATRS board meeting, and I was

9     working on executive summaries and trying to develop

10    resolutions, and he showed up in my office while I was

11    wanting to be very busy, not talking to him.

12             THE COURT:  I was here all day Monday, too.  I know

13    the --

14             MR. HOPKINS:  We're laudable folks.

15             THE COURT:  And the Internal Revenue Service thinks

16    I'm retired.

17        All right.

18        Is Christa Clark still the chief counsel of Arkansas

19    Teacher?

20             MR. HOPKINS:  No, your Honor, she's not.

21             THE COURT:  Do you know if she's still alive?

22             MR. HOPKINS:  As far as I know.

23             THE COURT:  If Arkansas Teacher continues as lead

24    plaintiff in this case, how do you intend to discharge the

25    lead plaintiffs' duties to the class.

  1              MR. HOPKINS:  Number one, to the best of my

  2    ability.

  3          Secondly, selflessly as to myself and ATRS.

  4          And, third, I would say that I will do some of the

  5    things I've already done and will continue to do concerning,

  6    you know, I'll call it the Customer Class and the others,

  7    and that is to try to do everything I can to make sure that,

  8    you know, once you decide what the attorney fees are, which

  9    is your role, not mine, that I will try to make sure that

 10    the administrator makes all the appropriate decisions.

 11          If there's is some issue that comes up about how that

 12    administrator should divide up the funds that go back to the

 13    class, I will be highly involved and make sure it's fair and

 14    reasonable.

 15          If there's any issue, as I told you before, about what

 16    silo ATRS would involved in there, I will defer.

 17          And I will -- I will -- I will die honoring my father's

 18    instructions when he was dying when I was a teenager, and

 19    that is, you know, Do everything to the best of your

 20    ability.  Learn from others, but do it -- do it in a way

 21    that would make me proud.

 22              THE COURT:  Let me ask you this, do you remember

 23    that you filed a declaration and affidavit with the Special

 24    Master on about March 15, 2018?

 25              MR. HOPKINS:  Is that the declaration about the

1   ratification of the referral fees?

2             THE COURT:  Yes.

3             MR. HOPKINS:  Yes, your Honor, I remember.

4             THE COURT:  Who drafted that document?

5             MR. HOPKINS:  Well, Ms. Lukey partly drafted it, I

6   think.  I think ms. Lukey sent it to me, I discussed it with

7   her, and I think I -- I think I -- I almost never take a

8   draft of something that somebody gives me and leave it

9   alone.  It's just not my nature.  And I think part of that's

10  what she put in, and part of it what I put in, and I don't

11  know who helped her.

12            THE COURT:  Are you still getting legal advice from

13  Labaton or lawyers they've hired, like Ms. Lukey, in

14  connection with this case?

15            MR. HOPKINS:  I'm not sure what I had was legal

16  advice from her.  I -- you follow what I'm saying?

17       She asked me, you know, would you -- would you consider

18  filing a declaration, and explained to me what it was.

19       And I said I would consider that.

20       I don't think I was seeking legal advice from her or

21  obtaining it.

22            THE COURT:  With regard to your role -- Arkansas

23  Teacher's role as lead plaintiff, are you getting legal

24  advice from anybody?

25            MR. HOPKINS:  No.

1          THE COURT:  In the course of the case have you

2    received --

3          MR. HOPKINS:  Well, maybe I don't understand the

4    context.

5          THE COURT:  Do you remember I appointed you the

6    lead plaintiff in this case?

7          MR. HOPKINS:  Yes, your Honor.

8          THE COURT:  And do you recall that I approved your

9    selection of Labaton, among others, as counsel to the lead

10   plaintiff, counsel to the class?

11         MR. HOPKINS:  Yes, your Honor.

12         THE COURT:  And without telling me what it was,

13   while you were the personification of the lead plaintiff

14   representing the class, did you get advice in this case from

15   Labaton?

16         MR. HOPKINS:  Constantly, your Honor, from before

17   the time the complaint was filed.

18         THE COURT:  All right.

19       And are you now getting any legal advice from anybody,

20   other than Labaton and other lawyers they've hired or

21   lawyers working with them?

22         MR. HOPKINS:  No.

23         THE COURT:  Did you hear me have some discussion

24   with Ms. Lukey and Mr. Kelly about the attorney-client

25   privilege?

1          MR. HOPKINS:  I did, and I'm sitting -- my

2   mind's -- I'm sitting here filtering that out, if you're

3   continuing to question me.  But, as far as I'm concerned, I

4   guess to this point I have waived the attorney-client

5   privilege on anything I've had discussions with my client so

6   far for any question I've answered to you.

7          THE COURT:  Well, I don't -- I wasn't trying -- I

8   don't know about -- well, I don't know.

9       But what I wanted to know is, if you're the lead

10  plaintiff and the representative of the class, you will have

11  to decide whether to assert attorney-client privilege with

12  regard to any information that the Special Master receives;

13  do you understand that?

14         MR. HOPKINS:  Well, if you tell me that's the

15  standard I have, I will.

16      I haven't researched that issue, but I will.  If you

17  tell me that's the standard, I will assume it's the

18  standard, your Honor, and I will faithfully discharge that.

19      You have to understand, I live in a glass bowl, too.

20  Arkansas has all -- is a freedom of information state.  So,

21  you know, I understand the press and all those things, and

22  will do the best of my ability to ensure that an

23  attorney-client-privilege assertion is appropriate to

24  protect some viable interest and not to cover somebody's

25  circumstance, I'll say.

1            That's to go back to my sawmill days.  I'm sorry.

2            But I will say this, your Honor, I will err on the side

3     of not asserting the privilege on anything associated with

4     Arkansas Teacher Retirement, because that's how I handle all

5     my duties.

6            THE COURT:  The lawyers made some reference to

7     what's in the Report and Recommendation, you have, too.  And

8     just answer this, I think, "yes" or "no."

9            Are you aware that the Special Master has recommended

10    that Labaton and other lawyers be ordered by me to repay or

11    return some of the fees they received, and that if I issue

12    that order, they recommend that a lot of that money go to

13    the class?

14            MR. HOPKINS:  Yes, your Honor.

15            THE COURT:  Do you understand, therefore, that I

16    have a concern that there may be a conflict at this point

17    between the interests of Labaton and the other Lawyers, who

18    want to vindicate the propriety of everything they did and

19    keep the money, and the class that would benefit if I

20    ordered some of that money paid back?

21            MR. HOPKINS:  You want a "yes" or "no"?

22            THE COURT:  You don't have to answer that --

23            MR. HOPKINS:  I would like to, if you would let me.

24            THE COURT:  I was going to say, You don't have to

25    answer it "yes" or "no."

1          MR. HOPKINS:  I don't want to answer it "yes" or

2    "no."

3          THE COURT:  I didn't think you wanted to answer it

4    "yes" or "no."

5          MR. HOPKINS:  I'm totally aware of that, your

6    Honor.

7          But let me tell you, I've been involved in a lot of

8    these cases now, and I've been involved with a lot of

9    co-counsel or our co-leads.  And since this happened, not

10    only have I talked to Mr. Faris, I've talked to other, you

11    know, funds that are very active in this area, and -- along

12    with Professor Joy in the back, and another professor.

13          And that's why I was going back to ask Mr. Belfi.  I'm

14    terrible with names, and I was going to ask the name of this

15    professor, I think from Harvard, that's in that Report, too,

16    that essentially says, Your job is to award attorney fees

17    and potentially to take them back.

18          My job is to tell you whether I think that the

19    aggregate awarded fee is fair and reasonable.

20          And if you want to take fees from these attorneys and

21    return them to the class, that's -- you know, I will -- I

22    understand my role, and I always try to understand my role.

23    And I don't try to be an attorney in these case.  And I

24    don't try to be a judge, because you wouldn't let me anyway.

25          And I think the precedent -- in fact, Federal Rule of

1     Civil Procedure Rule 23 essentially says that it's the judge

2     who awards the attorney fees.

3          And, by the way, I expect to see you August 2.

4          And I did notice in your order on <u>Insulet</u> that you

5     ordered the attorneys to reveal referral fees.  And I think

6     that's great, because that's -- I think that's not my job to

7     ferret that out, that's your job.  And if they were paid

8     referral fees, and you wanted them not to pay it, I'm happy

9     with it.  And if you say to them to give up referral fees

10    and -- whatever you do about the attorney fees, I'm happy

11    because you --

12         THE COURT:  You're talking about another case

13    before me, <u>Arkansas Teacher v. Insulet</u>.

14         MR. HOPKINS:  Right, but I'm also saying in this

15    case, whatever you do about the attorney fees, I'm not going

16    to argue with you, because that's -- that's -- when I

17    originally file a declaration saying I supported the

18    attorney fees that you originally awarded, you know, I left

19    it --

20        I always have tried to leave it up to the federal judge

21    to say what's fair and reasonable, and if you think

22    something else is fair and reasonable, you know, they may

23    object, but I don't.

24         THE COURT:  Have you thought about the fact that if

25    I find there was -- well, Arkansas Teacher, you, chose

1    Labaton for this case, right?  You chose them to

2    represent -- did you choose them?

3            MR. HOPKINS:  I sure did.  I interviewed two or

4    three firms.  I --

5            THE COURT:  Okay.  Okay.

6        Now, you know -- putting aside what's even in the

7    Report and Recommendation -- that they have been accused of

8    misconduct.

9            MR. HOPKINS:  I don't think so.

10           THE COURT:  You don't think they've been accused of

11   misconduct?

12           MR. HOPKINS:  First of all, let me say this.  I

13   think if you read the order, you know they say -- and again,

14   a sanction versus -- I don't think they did -- I think the

15   recommendation is they've not done anything that was --

16   subjected them to a sanction of the court.

17       There is a reallocation remedy based upon one

18   professor's position.  Two other professors have a different

19   one.  But my point is, I don't think -- I don't think that

20   they're accused of misconduct.

21           THE COURT:  Oh, you don't think failure, if it's

22   proven, to be candid with the Court is misconduct?

23           MR. HOPKINS:  Well, I think -- I think this, your

24   Honor.  And without trying to inflame you, I think what you

25   should have done in this case is what experience taught you

1    to do in _Insulet_, which is, if want to take a referral fee,

2    ask.

3                    THE COURT:  I know.  I was educated by this case.

4                    MR. HOPKINS:  And I'm educated by this case, too.

5                    THE COURT:  Stop.

6        Have you thought -- you picked Labaton to represent the

7    class in this case.  Have you thought about whether it would

8    injure the reputation of Arkansas Teacher, and perhaps its

9    opportunities to serve as lead plaintiff in future cases, if

10   the Court finds Labaton engaged in misconduct?

11                   MR. HOPKINS:  No.

12       Well, to say I thought about -- you know, I thought

13   about a lot of things.  But, you know, I have not thought

14   about it in a way that would motivate me to do anything

15   differently than what I would otherwise, I think was the

16   question you were asking.

17                   THE COURT:  No.  They're two separate questions.

18       So, if I can parse out what you just said to me, it has

19   occurred to you that this case, particularly if I find that

20   Labaton engaged in misconduct, could also be harmful to

21   Arkansas Teacher's reputation?

22                   MR. HOPKINS:  Well, I'm not -- well, let me answer

23   it this way.

24       I have not thought about it the way you've presented

25   it.

1        You know, any time you're in a case that blows up, you

2    know, the impact of it affects everybody in the case.  So,

3    sure, we're impacted to a slight amount.

4        But I don't think you can impute any kind of misconduct

5    finding you would make to me about what happened, and I

6    wouldn't worry about ATRS.

7        Because, you know, your Honor, I think if you asked any

8    of the main mediators -- Layn Phillips, Judge Weinstein, and

9    all those others -- I think I will just be as effective.

10        But I will also say that this has taken up a lot of my

11    time.  And there may be times where I say, I would be less

12    active just because, you know -- you know, I'm over 60, and

13    there's a lot to be done at home, but not because of

14    Labaton.

15        And I think you ought to do what's right as to all

16    these attorneys and let the chips fall where they may.

17        But I'll say this --

18        THE COURT:  Do you intend to, on behalf of the

19    class, take a position on what the Court should do?

20        MR. HOPKINS:  If you ask me, your Honor, I would.

21        But I don't think -- let me tell you two or three

22    things.  Can I tell you my view?

23        Number one, a class rep should be very cautious about

24    trying to allocate attorney fees between law firms and a

25    class.

1          But please give me -- let me have my -- explain my

2    view.

3          Because, first of all, I've been in cases where -- not

4    as a class rep but in other areas -- where everybody tried

5    to impress me how great an attorney they were versus trying

6    to do attorney work.

7          I don't want to be the judge in a beauty contest, and I

8    don't see what happens in the trenches and between these law

9    firms about which ones really have that staff really pulling

10   together and doing great work, which ones were, you know,

11   following in the wake of the others.

12         You know, I had great contact with all of them, but I

13   was at the point of the spear in terms of what firms really,

14   you know, pulled the load more and which ones sort of

15   followed in behind.  I don't know.

16         You know, if you look at all the time the Special

17   Master has spent doing that, I -- I think that's beyond the

18   scope of a class representative.  But if you asked me to do

19   it, I would give you an opinion, but I think -- I think it

20   would be -- if you followed my opinion, you would probably

21   be following the least-quality opinion that you should

22   follow in terms of your ultimate decision.

23              THE COURT:  Well, this all goes back to the

24   decision I had to make without the benefit of the adversary

25   process as to what would be fair to the class.  I mean,

1    that's what's I was doing when I approved the settlement,

2    and then I approved the requested attorney's fees.

3         And I think you just told me that you don't view it as

4    your role at this point to tell me what would be most fair

5    to the class.

6         MR. HOPKINS:  Well, what I said was, you know,

7    without doing the extensive investigation about who all

8    pulled their weight, you know, that -- your realliance on

9    me -- if you ask me to, I will.

10        No judge has ever asked me to opine on how to divide

11   the attorney fees to the class, ever.  And I know of no

12   class rep who -- that I've talked to or I've been in a case

13   with who has ever done it either.

14        But, if that's -- if that is a new role that I should

15   have in this case or any other, I will do it.

16        THE COURT:  Have you ever been in a case where a

17   judge appointed a Special Master to investigate the conduct

18   of the lawyer that you picked to represent the class before?

19        MR. HOPKINS:  No, your Honor.

20        THE COURT:  Have you ever heard of a case where

21   there was a 376-page Report and Recommendation regarding the

22   conduct of the attorneys that you selected?

23        MR. HOPKINS:  No, your Honor.

24        But -- but, again, let me say, if you all ask me to

25   make a recommendation and you give me -- if you give me a

1    short deadline, I will make one.

2         THE COURT:  It depends on what the question is.

3    I'm talking about your role here.

4         Today is Wednesday.  I'm ordering that you file a

5    report, that you write, where you tell me -- I mean, you can

6    talk to whoever you want to talk to -- as to whether, on

7    reflection, you want to continue to have Arkansas Teacher,

8    personified by you, serve as lead plaintiff.

9         Based on what I know now, I continue to be satisfied

10   that, you know, in negotiating the settlement, Arkansas

11   Teacher, particularly you, did a good job.  And this isn't

12   really about you personally.

13        But when the case started, I found that Arkansas

14   Teacher had a big stake, and that its interest was typical,

15   it was not different in any possibly material way from the

16   other investors, and that it was adequate, that it would

17   vigorously litigate on behalf of the class.  I expected that

18   it would direct the attorneys and -- that's what I expected.

19        But now -- here's the reasons for my concern, and this

20   is why I want -- I know you take this seriously.

21        Think about this, and, as I say, it's not a question of

22   whether I made the right decision in finding Arkansas

23   Teacher would be a good lead plaintiff originally.

24        But now Arkansas Teacher has one, or more than one, way

25   in which it is not typical of the class members.

1          The conduct of Labaton and the other lawyers you

2     selected has been called into question.  The Special Master,

3     as you know, recommends that what, by my standards, is a

4     significant amount of money be returned by those lawyers and

5     distributed to the class.

6          Arkansas Teacher has a relationship with those lawyers

7     and is still getting legal advice from them.

8          You haven't thought in these circumstances to go to

9     another lawyer who doesn't have a dog in this fight to

10     advise you as to what would be in the best interest of the

11     class that you personify, represent, at the moment.

12          And, I don't want to get into more detail about this,

13     but you know that questions have been raised by the Report

14     and Recommendation about the origins of Labaton's

15     relationship with Arkansas Teacher, and they're just

16     questions.  But to the extent that those issues are

17     litigated in this case, they could be at least embarrassing

18     to Arkansas Teacher.

19          And that may give you an incentive, even if you're

20     confident that you would resist it, to not vigorously

21     represent the class the way somebody who did not have this

22     historic relationship in these issues would.

23          So being as transparent as possible because I think you

24     will think about this --

25          MR. HOPKINS:  Well --

```
 1                THE COURT:  Let me just finish, because I --
 2                MR. HOPKINS:  I'm sorry.
 3                THE COURT:  My intention was to send you home so
 4      you can think about it.
 5           So these are my concerns.
 6           And my paramount responsibility is to the class and to
 7      make sure -- try to assure that at this point it's
 8      represented by a lead plaintiff who's typical and adequate,
 9      and will not have its or his role representing the class
10      complicated by unique issues and potential conflicts of
11      interest.
12           That's my concern.  I would like you to think about
13      that.
14                MR. HOPKINS:  Can I respond?  First, because I
15      think you said some things that -- that I -- things right
16      now I would like to respond to.
17           Please, your Honor?
18                THE COURT:  Go ahead.
19                MR. HOPKINS:  Number one, you know -- you know,
20      again, your whole position assumes that the class rep should
21      be -- the class representative should be involved in the
22      decision about the distribution of an aggregate fee award,
23      and I don't think that's the law.  I don't think that's in
24      compliance with Rule --
25                THE COURT:  And I will tell you, that's not the
```

1    only issue, and the fact that you apparently can't

2    understand that that's not the only issue is magnifying my

3    concerns.

4             MR. HOPKINS:  But that wasn't the only one, your

5    Honor.

6        The other one is you seem to assume that, you know, how

7    Labaton became associated with ATRS was in some way

8    improper, illegal, or untoward, and I don't think the record

9    shows that.

10       In fact, the record specifically says they didn't even

11   inquire into that area.

12       That's just for the record.

13            THE COURT:  I have not assumed anything.

14       What I told you is that it raises questions.  And you

15   uniquely, among all the investors, have a vested interest --

16   "you," Arkansas Teachers -- in the answers to those

17   questions.

18            MR. HOPKINS:  Thank you, your Honor.

19            THE COURT:  I am ordering that the parties order

20   the transcript on an expedited basis.

21       I am ordering that you read this when you get it, my

22   questioning of you, and I am ordering that you think about

23   it, because I think you're a thoughtful man.

24       And do not take this personally, but just think that,

25   you know, at this point do you want to require that I decide

1    whether Arkansas Teacher should be allowed to continue as

2    lead plaintiff?

3        And the second question is the other one I identified:

4    If I do, tell me whether you would continue to get legal

5    advice from the people who have given you legal advice up to

6    now in this case or do something else?

7        Those are the questions.

8        So you think about them.  If, on reflection, you do not

9    feel you have done anything wrong but you think the class

10   would be better served, Arkansas Teacher would be better

11   served, by somebody else being lead plaintiff, I will expect

12   to appoint somebody else, and if that is not your

13   judgment -- and you are correct, this is the Judge's

14   decision, and anything I have ordered I can reconsider.  So

15   I ordered something based upon what I knew when I appointed

16   Arkansas Teachers; now I know something else.

17       If you would like to continue to be lead plaintiff, I

18   will continue to consider this seriously, and we will see.

19   All right?

20       You can take your seat.

21       (Whereupon, Mr. Hopkins stepped down.)

22           THE COURT:  Okay.  We have gone through my agenda

23   for today.

24       Is there anything further?

25           MS. LUKEY:  Your Honor, respectfully, I have a real

 1    concern that in your comments just now to Mr. Hopkins, you

 2    made some statements that revealed items that are under

 3    seal.

 4             THE COURT:  Yes, the same -- just as you did

 5    earlier.

 6             MS. LUKEY:  We would like the opportunity for the

 7    public to know right now the nature, just a nugget, not all

 8    of the language, nothing else, of what you have

 9    characterized as "misconduct," because I fear, again, as

10    happened over the weekend with Mr. Hopkins, there will be

11    assumptions of nefarious conduct.  I would request leave

12    that we have a brief opportunity to speak with you at the

13    bench and to make a brief statement as to the nature of what

14    is at issue so people aren't sitting there --

15             THE COURT:  That's fine.  Okay.

16        Everybody.

17        (Transcript of sidebar conference sealed per order of

18    the Court.)

19             THE COURT:  Ms. Lukey, is there something you would

20    like to say.

21        MS. LUKEY:  Yes.  Thank you, your Honor.

22        We wish to make it clear that the nature of the

23    misconduct which is asserted relates to the existence of a

24    so-called bare referral or origination or forwarding fee, as

25    permitted under Massachusetts Rules of Professional Conduct,

1    which was not disclosed to the Court under the premises of

2    Rule 54(d)(2), and which the Master feels was

3    inappropriately withheld from the court.

4         I did not wish anyone publicly present to be left with

5    the impression that there was anything more nefarious than

6    that.

7         Thank you for the opportunity to speak.

8              THE COURT:  Mr. Sinnott?

9              MR. SINNOTT:  Thank you, your Honor.

10        Just to respond to my sister.  This was not a referral

11   fee.  This was a finder's fee.  And, more importantly, this

12   was a finder's fee that was not disclosed to the client, to

13   the class, to co-counsel, nor to the Court.

14        And that is why it is so important this the Court

15   conduct the inquiry that it has conducted today, because it

16   is very important that, faced with the decisions that the

17   Court is making in this case, and the answers, and the

18   inquiry that the Court directed the Special Master to make,

19   that the Court be assured that the representative of the

20   class, which has an ongoing stake in this matter and for

21   whom there could be, to use the Court's characterization,

22   "significant implications" in the future with respect to the

23   monies that the class may be entitled to, that that

24   representative be a representative that's not conflicted,

25   and that the firm also not be conflicted within that

1      relationship or by the circumstances described in the

2      Special Master's Report.

3              Thank you.

4              THE COURT:  Thank you.

5              Those statements are helpful.

6              I don't have any answers to any of these issues now,

7      but I did put to Mr. Hopkins questions that I think are

8      important in the discharge of my duty to try to ensure that

9      the class is properly represented and to try to get these

10     issues resolved sooner rather than later so the Court can

11     get the benefit of views of the class.  And we'll go step by

12     step.

13             I've given Mr. Hopkins a week to let me know whether he

14     wants to continue to have Arkansas Teacher serve as class

15     representative, and if the issue does not become moot, I

16     think at the sidebar you have raised some questions that I

17     will give you a chance to address.

18             MS. LUKEY:  Thank you, your Honor.

19             THE COURT:  All right.

20             I'll see counsel briefly in the lobby before I send you

21     home.

22             THE CLERK:  All rise for the Honorable Court.

23             (Transcript of lobby conference sealed per order of the

24     Court.)

25             (Proceedings adjourned.)

# **C E R T I F I C A T E**

I, James P. Gibbons, Official Court Reporter for the United States District Court for the District of Massachusetts, do hereby certify that the foregoing pages are a true and accurate transcription of my shorthand notes taken in the aforementioned matter to the best of my skill and ability.

/s/James P. Gibbons                June 1, 2018
   James P. Gibbons

JAMES P. GIBBONS, CSR, RPR, RMR
Official Court Reporter
1 Courthouse Way, Suite 7205
Boston, Massachusetts 02210
jmsgibbons@yahoo.com

# Exhibit V
# Redacted

# Exhibit W
# Redacted

# Exhibit X
# Redacted

# Exhibit Y
# Redacted