**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) | No. 11-cv-10230 MLW |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) ) | |
| Defendant. | ) ) | |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, | ) ) ) ) | No. 11-cv-12049 MLW |
| v. | ) ) ) | |
| STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, | ) ) ) ) | |
| Defendants. | ) ) | |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, | ) ) ) ) ) | No. 12-cv-11698 MLW |
| v. | ) ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) ) | |
| Defendant. | ) ) | |

**RESPONSE AND OBJECTIONS OF LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
TO THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS**

## TABLE OF CONTENTS

I.    Introduction ........................................................................................................... 1

II.   Statement of Facts ................................................................................................ 9

    A.   Lieff Cabraser's Relevant Business Practices, Including How the Firm
        Manages Complex Litigation, Uses Staff Attorneys, and Sets Hourly
        Rates ..................................................................................................................... 9

        1.   Lieff Cabraser's Complex Litigation Practice Involves Large Scale
            Document Review and Analysis. ............................................................... 9

        2.   Lieff Cabraser's General Use of Staff Attorneys. .................................... 11

        3.   Lieff Cabraser's Hourly Rates, Including for Staff Attorneys,  Are
            Market Driven and Routinely Approved. ................................................. 13

    B.   The Background of Lieff Cabraser's Involvement in the State Street
        Action. ............................................................................................................... 15

        1.   Lieff Cabraser's Role in the California *Qui Tam* Action. ......................... 15

        2.   Lieff Cabraser's Role in the BNY Mellon Action. ................................... 16

        3.   Lieff Cabraser's Inclusion in the State Street Action. ............................. 18

    C.   The State Street Action ..................................................................................... 19

        1.   Plaintiffs' Underlying Allegations and Claims against State Street. ........ 19

        2.   Procedural Litigation and Mediation History of the Litigation. ............... 20

        3.   Lieff Cabraser's Specific Tasks in the State Street Action. ...................... 20

    D.   The Role Of Lieff Cabraser's Staff Attorneys In The State Street Action. ......... 22

        1.   The Training of and Work Performed By Lieff Cabraser's Staff
            Attorneys. ................................................................................................ 22

        2.   Lieff Cabraser's Staff Attorneys Were/Are Well-Educated,
            Professionally Experienced and Skilled Lawyers. ................................... 24

        3.   Lieff Cabraser Shared and Hosted Staff Attorneys Paid For By
            Thornton. ................................................................................................. 28

    E.   The Settlement And Attorneys' Fees Approval Process. ..................................... 31

        1.   The Resolution of the State Street Action. ............................................... 31

2.     Notice to the Class. ................................................... 32

3.     The Final Settlement Approval Papers and Request for Payment of Attorneys' Fees. ................................................. 32

4.     The Court's Approval of the Settlement and the Attorneys' Fees Request. ........................................................ 34

F.     The Inadvertent Double-Counting Of Certain Staff Attorney Time.................... 36

    1.     Lieff Cabraser's Discovery and Response to the Inadvertent Double-Counting of Some of Their Staff Attorneys' Hours. .................. 36

    2.     The November 10, 2016 Goldsmith Letter. .............................. 39

G.     The "Clawback" Agreement and Distribution of Attorneys' Fees. ...................... 40

H.     The Attorneys' Fees Investigation By The Special Master. ........................... 41

    1.     Order Appointing the Special Master. ................................... 41

    2.     The "Informal" Phase of the Investigation. .............................. 43

    3.     The "Formal" Phase of the Investigation................................. 45

    4.     The "Chargois" Investigation. ......................................... 49

    5.     The Final Hearing Before the Special Master............................. 56

I.     The Special Master's Report And Findings Relevant and Specific To Lieff Cabraser. ......................................................... 57

J.     The Actual and Potential Costs To Lieff Cabraser Of The Special Master's Investigation................................................. 64

III.     Argument In Support Of Lieff Cabraser's Objections To The Special Master's Report........................................................... 67

A.     The Court Must Review Objections To The Special Master's Findings, Conclusions, And Recommendations *De Novo*. ................................. 67

B.     Lieff Cabraser Should Not Be Required To Disgorge Any Portion Of The Firm's Inadvertently Double-Counted Lodestar. ............................. 67

    1.     The Double-Counting of Certain Staff Attorney Time Was Inadvertent. ........................................................ 68

2.     The Special Master's Recommendation Miscomprehends or Ignores the Limited "Cross-Check" Purpose of the Submission and Use of Lodestar in this Action. ................................................. 68

3.     In Recommending "Return" of the Double-Counted Lodestar to the Class, the Special Master Identifies No Harm to the Class that Justifies Such a "Remedy". ......................................................... 73

4.     Customer Class Counsel, Including Lieff Cabraser, Has Already Suffered Financially as a Consequence of the Inadvertent Double-Counting. ....................................................................................... 74

C.    In The Event The Court Requires Lieff Cabraser To Disgorge Any Portion Of The Firm's Inadvertently Double-Counted Lodestar, That Disgorgement Should Be Commensurate With The Firm's "Relative" Role In The Double-Counting. ..................................................................... 75

D.    Lieff Cabraser Should Not Retroactively Be Required To Treat the Firm's Staff Attorneys Compensated By An Agency As A "Cost" Instead Of Including Them In Its Lodestar As Part Of The Aggregate Lodestar Cross-Check. ........................................................................................................ 77

1.     The Case Law Does Not Support, and Indeed Contradicts, the Special Master's Recommendation The Time of the Firm's "Agency" Lawyers Be Treated as a Cost. .................................................. 79

2.     The "Factual" Distinctions the Special Master Attempts to Draw Between the Firm's Staff Attorneys on Payroll and Those Paid By an Agency Do Not Support the Master's Recommendation. ................... 86

E.    Even If The Court Agrees That The Firm's Agency Lawyers Should Be Treated Differently Than The Staff Attorneys On Firm Payroll For Purposes Of The Lodestar Cross-Check, The Special Master's Recommended Disgorgement Remedy Should Be Rejected. ........................... 90

1.     The Special Master's Recommendation Again Miscomprehends or Ignores the "Cross-Check" Purpose for Which Lodestar Was Submitted and Used in the State Street Action. ....................................... 91

2.     The Inclusion of Lieff Cabraser's Agency Lawyers in the Cross-Check Causes No Harm to the Class. ....................................... 94

3.     Penalizing Lieff Cabraser for Adhering to Controlling Legal Principles and Having Committed No Violation of Law or Ethics is Unjust. ............................................................................................ 95

F.    Lieff Cabraser Should Be Reimbursed For The Amount Of Money It Has Spent Responding To The Chargois Investigation. ............................................. 96

IV.     Conclusion – The Financial Impact Of The Special Master's Disgorgement
        Recommendations On Lieff Cabraser Are Unjust And Entirely Disproportionate
        To The Firm's True Conduct And The Absence Of Harm It Has Caused To The
        Class. ........................................................................................................................ 98

# **TABLE OF AUTHORITIES**

**Cases**

*Carlson v. Xerox Corp.*,
 596 F.Supp.2d 400 (D. Conn. 2009), *aff'd*, 355 Fed.App. 523 (2d Cir.) .................... 80, 84, 92

*Charlebois v. Angels Baseball, LP*,
 993 F.Supp.2d 1109 (C.D.Cal. 2012) .................................................................................. 81

*Chevron Corporation v. Donziger*
 11-CIV-0691 (LAK), 2017 WL 6729360 (S.D.N.Y. Dec. 8, 2017) ....................................... 97

*City of Potomac General Employees' Retirement System v. Lockheed Martin Corp.*,
 954 F.Supp.2d 276 (S.D.N.Y. 2013) .................................................................................... 84

*Dial Corporation v. News Corporation*,
 317 F.R.D. 426 (S.D.N.Y. 2016) ........................................................................................... 82

*Grendel's Den, Inc. v. Larkin*,
 749 F.2d 945 (1st Cir. 1984) .................................................................................................. 80

*Hutchinson ex rel. v. Patrick*,
 636 F.3d 1 (1st Cir. 2011) ...................................................................................................... 79

*In re AOL Time Warner Shareholder Derivative Litig.*,
 No. 02-CIV-6302 (CM), 2010 WL 363113  (S.D.N.Y. Feb. 1 , 2010) ............................. 81, 84

*In re Cathode Ray Tube (CRT) Antitrust Litigation*,
 No. 07-CIV-5944 (JST), 2016 WL 4126533 (N.D.Cal. August 3, 2016) ............................... 92

*In re Citigroup, Inc. Securities Litigation*,
 965 F.Supp.2d 369 (S.D.N.Y. 2013) ............................................................................... passim

*In re Enron Corp. Securities, Derivative and ERISA Litigation*,
 586 F.Supp.2d 732 (S.D.Tex. 2008) ...................................................................................... 81

*In re Petrobras Securities Litigation*
 No. 14-CIV-9662 (JSR) (S.D.N.Y. June 25, 2018) ............................................................... 84

*In re Tyco Intern. Ltd. Multidistrict Litigation*,
 535 F.Supp.2d 249 (D.N.H. 2007) ............................................................................. 69, 70, 80

*Meredith Corp. v. SESAC, LLC*,
 87 F.Supp.3d 650 (S.D.N.Y. 2015) ....................................................................................... 83

*New England Carpenters Health Benefits Fund v. First DataBank, Inc.*,
 No. 05-CIV-11148 (PBS), 2009 WL 3418628 (D.Mass. October 20, 2009) ......................... 70

*U.S. v. One Star Class Sloop*,
 546 F.3d 26 (1st Cir. 2008) .................................................................................................... 79

**Other Authorities**
William B. Rubenstein, Newberg on Class Actions (5th ed.) (2015) ..................................... 70, 79

**Rules**

Federal Rules of Civil Procedure, Rule 53 ................................................................ 42, 67, 97, 98

Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") respectfully submits this Response and Objections to the Special Master's Report and Recommendations ("Report"), and Executive Summary thereof ("Executive Summary"), dated May 16, 2018.[1]

## I.  **INTRODUCTION**

In his Report and Executive Summary, the Special Master Honorable Gerald E. Rosen (Ret.) (the "Special Master"), makes the following findings and conclusions with which Lieff Cabraser concurs:

- The Special Master acknowledges the risks, difficulties and challenges of the State Street Action, the skill and dedication of plaintiffs' counsel, including Lieff Cabraser, and the outstanding accomplishment of the $300 million settlement in the captioned action (the "State Street Action");

- The Special Master finds the roughly 25% fee awarded to plaintiffs' counsel was appropriate based solely on the work performed and the result achieved;

- The Special Master concludes that the hourly rates for, and the number of hours worked by, Lieff Cabraser's attorneys, including its staff attorneys (whose work the Master compared favorably to junior to mid-level associates), were reasonable;[2]

- The Special Master finds the contemporaneous time records of Lieff Cabraser's attorneys, including its 18 staff attorneys, to be sufficiently and reliably detailed;

- The Special Master concludes that Lieff Cabraser's role in the double-counting of any lodestar for staff attorneys was "inadvertent," and as between the three Customer Class Counsel, Lieff Cabraser bears the least responsibility for that error;

---

[1] All references herein to the Report, or the Executive Summary, are to ECF No. 357 and 357-1.

[2] Lieff Cabraser uses the term "staff attorneys" to refer to those licensed attorneys with relevant experience who work for the firm conducting document review, coding, and analysis, and who write related issue and/or witness memoranda (as necessary), in the many of the firm's large, complex cases.  Their specific tasks generally, and in the State Street Action specifically, are described in detail herein.  The term "staff attorneys" includes personnel paid directly by the firm and lawyers paid by an outside agency (which in turn bills the firm for those lawyers' services).

- The Special Master finds that Lieff Cabraser was not aware of the origins or details of the relationship between lead counsel, Labaton Sucharow ("Labaton"), and attorney Damon Chargois, and justifiably believed Chargois to be "local counsel" for Labaton and the named plaintiff, and therefore bears no responsibility for Chargois' involvement (or lack thereof) in the State Street Action; and,

- The Special Master concludes that Lieff Cabraser should be "relieved of its obligations to Labaton under the claw-back letter as to Chargois."

Lieff Cabraser objects, however, to the following of the Special Master's findings, conclusions, and recommendations:

- The Special Master recommends that Lieff Cabraser "disgorge" one-third of the aggregate amount of inadvertently double-counted staff attorney lodestar, and that this money be "returned" to the class;

- The Special Master recommends that the time of Lieff Cabraser's seven staff attorneys who were paid, at least in part, by an agency (which in turn billed Lieff Cabraser) be treated as a cost, instead of including that time in the firm's lodestar;

- The Special Master recommends that Lieff Cabraser "disgorge" the difference between: (a) the total of the firm's "agency" attorneys' lodestar, multiplied by 1.8; and, (b) $50 per hour for the agency lawyers' time; and,

- The Special Master concludes that even after the "imposition of the monetary remedies recommended here" Lieff Cabraser "will still be left with not only their base lodestar claim, but a substantial multiplier."

Based on the required *de novo* review of the factual record and controlling case law, for the reasons summarized below, the Court should sustain Lieff Cabraser's objections and grant the relief it seeks.

***Lieff Cabraser should not be required to disgorge any portion of the firm's inadvertently double-counted lodestar***.  The Special Master recommends that Labaton, Thornton Law Firm ("Thornton"), and Lieff Cabraser (together "Customer Class Counsel"), disgorge and "return" to the class the $4,058,000 in double-counted staff attorney time.  Lieff Cabraser objects to this recommendation by the Special Master, and urges the Court to reject it, for the following reasons: (1) the double-counting of lodestar (which, in the case of Lieff Cabraser, concerned only

four staff attorneys for two-three months) was found by the Master to be "inadvertent"; (2) the Special Master's recommendation is contrary to controlling law in that it miscomprehends or ignores the limited "cross-check" purpose for which lodestar was submitted and used in the State Street Action; (3) the inadvertent double-counting caused no harm to the class; and, (4) Customer Class Counsel, including Lieff Cabraser, have already been penalized for the accidental double-counting.  Contrary to the Special Master's recommendation, the proper way to address the double-counting issue is simply to remove the double-counted lodestar from the aggregate lodestar used in the cross-check of the 25% fee award, and then determine whether the resulting aggregate multiplier of 2.0 (and Lieff Cabraser's resulting individual multiplier of 1.69) is appropriate.  Lieff Cabraser submits that it is.

*In the event the Court requires Lieff Cabraser to disgorge any portion of the firm's double-counted lodestar, that disgorgement should be commensurate with the firm's "relative" role in the double-counting.*  In the event the Court overrules Lieff Cabraser's objection to the imposition of any "remedy" for the double-counting, the firm objects to the Special Master's recommendation that the appropriate result is "disgorgement by all three firms in equal amounts" of the $4,058,000 in inadvertently double-counted time (i.e., $1,352,667 each).  Lieff Cabraser objects to this recommendation because such an outcome is inconsistent with the factual record and the Special Master's own substantive findings.  Based on the firm's limited fee interest in the State Street Action (24% among Customer Class Counsel and 20.3% among all plaintiffs' counsel), the actual amount of the lodestar the firm inadvertently double-counted ($868,417), the relatively small percentage of the total double-counted amount that can be attributed to Lieff Cabraser (21%), and given the Special Master's findings that the firm was least responsible for failing to catch and correct the inadvertent double-counting, if the Court requires any

- 3 -

disgorgement (an outcome not supported by the law or the facts), the firm should be obliged to pay significantly less than an "equal share" of the total double-counted lodestar (i.e., not 33 1/3%).

***Lieff Cabraser should not retroactively be required to treat the firm's staff attorneys paid by an agency as a "cost" instead of including them as part of the aggregate lodestar for cross-check purposes.***  The Special Master recommends that the time of Lieff Cabraser's seven staff attorneys who were paid, at least in part, by an agency be treated as a cost, and not as a component of lodestar for cross-check purposes.  Lieff Cabraser objects to this recommendation on the following grounds: (1) the controlling and relevant case law, including from within the First Circuit, expressly *rejects* the Special Master's recommendation that the time of the firm's agency lawyers be treated as a cost; and (2) the purported "factual" distinctions the Special Master attempts to draw between the firm's staff attorneys on payroll and those paid by an agency are either insignificant or not supported by a fair reading of the record.  No matter what the Special Master's academic views on best practices may be with respect to the treatment of agency (contract) attorneys in the context of class action fee applications, those views should not displace the controlling law or the relevant facts.

***Even if the Court agrees that the firm's agency lawyers should be treated differently than the staff attorneys on firm payroll for purposes of the lodestar cross-check, the Special Master's recommended disgorgement remedy should be rejected.***  The Special Master recommends that Lieff Cabraser "disgorge" and "return" to the class the difference between: (a) the total of the firm's agency attorneys' lodestar, multiplied by 1.8, and (b) $50 per hour for the

agency lawyers' time ($2,241,098.40)[3].  Lieff Cabraser objects to this recommendation by the
Special Master for the following reasons: (1) the Special Master's recommendation is contrary to
controlling law in that it miscomprehends or ignores the limited "cross-check" purpose for which
lodestar was submitted and used in the State Street Action; (2) the inclusion of Lieff Cabraser's
agency lawyers in the cross-check caused no harm to the class; and (3) penalizing Lieff Cabraser
for adhering to controlling legal principles and having committed no violation of law or ethics is
blatantly unjust.  In the event the Court agrees to treat the time of the firm's agency attorneys as
a cost, the proper way to address the matter would be to remove those attorneys' lodestar (along
with the double-counted lodestar) from the aggregate lodestar used in the cross-check of the 25%
fee award, and then determine whether the resulting aggregate multiplier of 2.07 (and resulting
individual multiplier of 1.99 for Lieff Cabraser) is appropriate.  Lieff Cabraser submits that it is.

     ***Lieff Cabraser should be reimbursed for the amount of money it has spent responding***
***to the Chargois investigation***.  The Special Master finds that Lieff Cabraser has no responsibility
for Chargois' involvement (or lack thereof) in the State Street Action.  The Special Master also
concludes that the firm should be relieved of any obligation to contribute to the $4.1 million the
Master recommends Labaton disgorge as a "remedy" for the "non-disclosure" of the Chargois
payment.  When invited by the Special Master near the close of his investigation, the firm
declined to seek reimbursement from Labaton and/or Thornton of the approximately $1 million
the firm effectively contributed toward Chargois' $4.1 million fee.  Lieff Cabraser will abide by
that position now.  However, the firm does seek reimbursement from Labaton and/or Thornton of
the amount Lieff Cabraser has spent responding to the Chargois investigation, an exercise for

---

[3] For this calculation, the firm is using the correct total hours worked by agency (contract)
lawyers, based on Lieff Cabraser's time records, of 2899.2.  The Special Master uses different
hour totals (i.e., 2949.5 or 2833.5) for these attorneys at various places in his Executive
Summary and Report.  *See, e.g.,* Executive Summary at 50, Report at 367.

which the firm was not responsible.  The firm seeks repayment of the amount it has contributed

to the Special Master's fees and expenses that are attributable to the Chargois investigation, as

well as the amount of costs and lodestar expended by the firm in addressing the Special Master's

Chargois-related inquiries.

**Contrary to the Special Master's "calculations," after the imposition of the**

**recommended monetary "remedies" against Lieff Cabraser, along with the costs of the**

**investigation already incurred by the firm, the firm will not receive its "base lodestar" plus a**

**"substantial multiplier."  Far from it.**  Having found that Lieff Cabraser engaged in no

intentional or professional misconduct and violated no rule of law or ethics, the Special Master

seeks to justify (or rationalize) the "imposition of the monetary remedies recommended here," by

incorrectly claiming that "even after the allocation of all monetary amounts, and the cost of the

investigation, [Lieff Cabraser] will still receive its base lodestar plus a significant multiplier."

To be clear, the Special Master recommends that the firm disgorge $3,593,765 – or roughly 24%

of the $15,116,965.50 in fees Lieff Cabraser actually received – *in addition* to (a) the $912,000

the firm has already spent to fund its share of the Special Master's investigation, and (b) the

$2.39 million the firm has spent in time and costs since February 6, 2017 responding to the

investigation, a combined $3.3 million.  Altogether, this would mean a total reduction in Lieff

Cabraser's fee of $6,897,590.  Contrary to the Special Master's arithmetic, "after the allocation

of all monetary amounts, and the cost of the investigation," Lieff Cabraser would receive *less*

than its "base lodestar" and, in fact, a *negative* individual multiplier (0.92) for its exemplary

service to the class in the State Street Action.

**The financial impact on Lieff Cabraser of the Special Master's disgorgement**

**recommendations is unjust and entirely disproportionate to the firm's conduct and the**

1568825.1

***absence of harm to the class.*** The Special Master claims that the "intent here has been to identify true and unmistakable professional misconduct, to remedy wrongs and to put the law firms and the class roughly in a position that is proportionate to the conduct and the harm." Yet, with respect to Lieff Cabraser, the Special Master does not "identify" *any* "true and unmistakable professional misconduct," concludes that the firm bears the least responsibility for the inadvertent double-counting error, and finds that it contributed to a laudable result for the class with stellar work by the firm's attorneys (including its staff attorneys).

Despite these findings, and without support of any controlling or relevant case law, the Special Master's recommendations would impose the harshest financial penalty on Lieff Cabraser (as a percentage of individual fees paid) of any firm in these proceedings. The financial impact that would be inflicted on Lieff Cabraser by the Special Master's disgorgement recommendations is entirely disproportionate to the firm's role in the events giving rise to this investigation and the absence of harm suffered by the class.

Lieff Cabraser submits that the firm has already been excessively penalized for inadvertently double-counting $868,417 in lodestar for four staff attorneys (for two to three months' work) by paying 24% ($912,000) of the Special Master's $3.8 million investigation (to date), plus $2.39 million in time and costs spent responding to the investigation. This aggregate expense of $3.3 million is wildly disproportionate to the firm's double-counting mistake and the wholly appropriate manner in which it included its agency attorneys in the firm's submission of lodestar for cross-check purposes.

The essential facts concerning Lieff Cabraser's inadvertent double-counting of the lodestar of just four staff attorneys for a limited time-frame, and the propriety of the number of hours and the hourly rates of the firm's attorneys, including its 18 staff attorneys, who worked on

the State Street Action, were communicated to the Special Master within the first month of his appointment.  Nevertheless, the firm was obliged to respond to the same inquiries about these topics (and other topics that were mostly irrelevant to the investigation) through the production of thousands of pages of documents, responses to dozens of interrogatories and other written submissions, and in numerous depositions attended by the Special Master and as many as four other members of his team.  All of this time and effort was devoted to questions that were simple and uncomplicated, the answers to which did not change from the firm's first engagement with the Special Master in April 2017 through the filing of the Master's Report more than 11 months later in May 2018.

Moreover, the costs incurred by the firm were and continue to be occasioned by dramatic changes in the scope of the Special Master's investigation.  As the Special Master finds, Lieff Cabraser has no responsibility for Chargois' involvement (or lack thereof) in the State Street Action.  Nevertheless, the firm was required to respond to multiple, duplicative discovery requests, appear for two depositions, and submit expert testimony, all to repeat the same basic facts – that the firm agreed to pay its share (24%) for the services of an attorney the firm believed to be Labaton's local counsel in Arkansas; that the firm was told and understood that this lawyer, Chargois, had performed valuable services for Labaton and its client; that based on the firm's experience, there was nothing unusual in such a local counsel arrangement for a public pension fund in a financial fraud case; and, that the firm knew nothing about the origins or the actual details of the relationship between Labaton and Chargois.

Finally, the Special Master states in his Report that the "intent" of the investigation was, among other things, to "put the law firms and the class roughly in a position that is proportionate to the conduct and the harm."  The Master sums up his efforts by touting the possible "return" of

"between $7.4 and $8.1 million to the class." But, there is no factual, legal or policy basis for the firm to be required to "return" approximately one quarter of its well-earned fees to the class. Indeed, it would appear the Special Master does not entirely believe that it was the "intent" of his investigation to "put the law firms and the class roughly in a position that is proportionate to the conduct and the harm," as the Master recommends that $3.4 million of the $4.1 million paid to Chargois should now be redirected to counsel for ERISA plaintiffs and not "returned" to the class. In any event, the firm has now expended additional resources to address the Special Master's recommended "remedies" against Lieff Cabraser. The firm should have to pay no more.

## II.   STATEMENT OF FACTS

### A.   Lieff Cabraser's Relevant Business Practices, Including How the Firm Manages Complex Litigation, Uses Staff Attorneys, and Sets Hourly Rates.

#### 1.   Lieff Cabraser's Complex Litigation Practice Involves Large Scale Document Review and Analysis.

Lieff Cabraser is a plaintiff-side litigation firm founded in 1972, based in San Francisco, with additional offices in New York, Nashville, and Seattle.[4] More than 100 attorneys, including partners, associates, and staff attorneys currently work for the firm.[5] Lieff Cabraser engages in predominantly contingent fee practice for plaintiff classes, groups and individuals, on behalf of public and private institutional investors, small business, shareholders, consumers and

---

[4] *See* April 5, 2017 Presentation to the Special Master, LCHB 0000001 - 0067, attached as Exhibit ("Ex.") A to the Declaration of Steven E. Fineman in Support of the Response and Objections of Lieff Cabraser Heimann & Bernstein, LLLP to the Special Master's Report and Recommendations ("Fineman Declaration"), filed herewith. *See also* Lieff Cabraser resume, LCHB 0049987 – 50109, earlier filed as ECF No. 104-17 (Ex. C). Documents and pleadings produced or provided to the Special Master by Lieff Cabraser in this proceeding that are referenced herein, but are not exhibits to the Master's Report or are not already in the public docket, are attached to the Fineman Declaration. *See also* Fineman Declaration at ¶ 19.

[5] Ex. A to Fineman Declaration at 4; ECF No. 104-17 (Ex. C); Ex. 57 to Report at 2-3; Fineman Declaration at 19.

employees.[6]  The firm also occasionally represents plaintiffs on an hourly basis.[7]  Lieff Cabraser

is "considered by many to be one of the preeminent plaintiffs' class action firms in the nation."[8]

Lieff Cabraser has litigated and resolved hundreds of class action lawsuits and thousands

of group and individual cases (many in the context of multi-district litigation ("MDL")

proceedings), including in the fields of securities and financial fraud.[9]  Most of the firm's cases

involve major corporate defendants (e.g., banks and other financial institutions, pharmaceutical

and medical device companies, oil and energy companies, technology corporations, and

consumer product manufacturers).[10]  These kinds of defendants are represented by the largest

and most sophisticated law firms in the world.[11]  Most of the firm's large, complex cases involve

production by defendants of enormous numbers of pages of documents (frequently in the

millions).[12]

Lieff Cabraser staffs its complex cases to maximize effectiveness and efficiency in light

of the defendants' typically significant advantage in economic and personnel resources.[13]  The

firm's complex cases are normally supervised by a senior partner, and staffed with an additional

senior partner and one or more junior partners, and the appropriate number of associates, staff

attorneys and litigation support personnel (e.g., paralegals, financial analysts, investigators, and

---

[6] *Id.*

[7] *Id.*; Ex. 175 to Report at 8.

[8] Report at 16.

[9] Ex. A to Fineman Declaration at 5; ECF No. 104-17 (Ex. C); Fineman Declaration at ¶ 20; Ex. 57 to Report at 2-3.

[10] *Id.*

[11] *Id.*

[12] *Id.*

[13] Ex. A to Fineman Declaration at 6-7; Fineman Declaration at ¶ 21.

the like).[14]  Investigations, pleadings, briefs, written discovery, depositions, court appearances,

trial and settlement are handled by partners and associates depending on the level of experience

required.[15]  Document review, analysis, issue memoranda and witness kits (for deposition and

trial) are conducted or prepared by a combination of junior partners, associates, and staff

attorneys.[16]

### 2.     Lieff Cabraser's General Use of Staff Attorneys.

As stated above, Lieff Cabraser, like most plaintiff-side litigation firms that handle large,

complex cases, uses staff attorneys to support the firm's organization, reading, coding and

analysis of the vast number of documents produced in these cases.[17]  In addition, Lieff Cabraser

staff attorneys support all aspects of the firm's complex cases by identifying documents and

frequently drafting issue, witness, and liability memoranda.[18]  The work product generated by

the firm's staff attorneys is used, for example, in support of class certification, in preparation for

the conduct of fact and expert depositions, in opposition to motions for summary judgment, for

settlement negotiations, and in other pre-trial and trial proceedings.[19]

As described more fully below with respect to the staff attorneys who worked on the

State Street Action, the firm's staff attorneys come from solid to excellent law schools, generally

have years of experience in civil litigation and in document review and analysis in complex

cases, and have made the lifestyle and career choice to work a more limited number of hours

---

[14] *Id.*

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] Fineman Declaration at ¶ 22.

than do traditional law firm partners and associates.[20]   Many of the firm's staff attorneys are paid

directly by the firm and receive benefits provided by the firm.[21]   Other firm staff attorneys work

at the firm's direction, but are paid directly by agencies that bill the firm for those lawyers'

services.[22]

       During and since the State Street Action, Lieff Cabraser has employed as many as 30

staff attorneys at one time who are paid directly by the firm.[23]   Given the number of large

complex cases the firm handles at one time, Lieff Cabraser sometimes has need for attorney

document review and analysis support beyond the firm's available staffing (for example, the firm

may just need additional attorneys, or may require lawyers with specific subject experience or

language expertise).[24]   When such a need arises, the firm seeks and receives resumes from

"preferred" agencies:   preferred because those agencies have long-standing relationships with the

firm and understand the lawyer qualifications and experience the firm requires.[25]   Frequently, as

was the case for four of the staff attorneys who worked on the State Street Action, staff attorneys

who start working for the firm while paid by an agency transition to direct employment by the

firm.[26]

       Whether on Lieff Cabraser's payroll or paid via an agency, all firm staff attorneys have

comparable educational backgrounds and work experiences, and all perform substantially the

same document review and analysis functions.[27]   And, all utilize, to varying degrees, the firm's

---

[20] *Id.* at ¶ 23; Appendices A and B.

[21] *Id.*

[22] *Id.*

[23] Fineman Declaration at ¶ 24.

[24] *Id.*; Ex. 18 to Report at 31-32.

[25] Fineman Declaration at ¶ 24.

[26] *Id.*; Appendices A and B.

[27] *Id.*; Ex. 10 to Report at 113-116.

1568825.1

infrastructure and resources, including physical office space (for the majority working in firm offices instead of remotely); information technology support (both in the office and remotely); administrative support (e.g., human resources, accounting, and word processing); assistance from the firm's litigation support department; supervision from firm partners and senior associates; and the cost to the firm for the staff attorneys' services.[28]

### 3. Lieff Cabraser's Hourly Rates, Including for Staff Attorneys, Are Market Driven and Routinely Approved.

Although the firm is compensated predominantly on a contingent fee basis, Lieff Cabraser's attorneys and litigation staff maintain contemporaneous time records that identify specific tasks performed and the amount of time devoted to those tasks.[29]  The firm's contemporaneously recorded time, when multiplied by applicable hourly rates, generates what is known as "lodestar."[30]  In certain class actions handled by the firm, aggregate lodestar is used as a "cross-check" to assure that the firm's fee in a "percentage-of-the-recovery" context is appropriate (i.e., that the multiplier on the lodestar is not excessive).[31]  In other class actions the firm is compensated based on its lodestar plus an appropriate multiplier.[32]  The firm also uses its lodestar figures in cases for hourly rate paying clients.[33]

---

[28] Fineman Declaration at ¶ 25; Ex. 18 to Report at 49.

[29] Fineman Declaration at ¶ 27; Exs. 206 and 247 to Report.

[30] Fineman Declaration at ¶ 27; Ex. A to Fineman Declaration at 60; Ex. 175 to Report at 8-9.

[31] *Id*

[32] *Id.*

[33] Both prior to and in the early stages of the Special Master's investigation, there was a question about whether Customer Class Counsel have bill-paying clients (in addition to contingent fee clients) who pay the firms' hourly rates.  Lieff Cabraser has consistently and correctly reported to the Court and the Special Master that it periodically has bill-paying clients who pay the firm's hourly rates.  *See* Fineman Declaration at ¶ 27; Ex. A to Fineman Declaration at 55-59; Ex. B to Fineman Declaration at 20-21; Ex. 89 to Report, ECF No. 104-17, at 3; Ex. 175 to Report at 7-10 and 16; ECF No. 176 at 92-93.

All Lieff Cabraser hourly rates, including those for staff attorneys (whether employed directly by the firm or through an agency) are set based on the firm's understanding of the appropriate market rates for a lawyer's services, primarily in the San Francisco and New York market places.[34]  The firm's management evaluates and adjusts hourly rates on an annual basis, based on the firm's historical rates at the time, publically available fee applications during the preceding year, developments in the case law during the preceding year, fee awards and hourly rates paid to the firm during the preceding year, and publically available salary surveys. Consistent with our experience and the applicable law, the firm does not set hourly rates for any attorney, including staff attorneys (whether on the firm's payroll or employed through an agency), based on what the firm pays them (or for them).[35]  Again, firm hourly rates are based on what is reasonable in the applicable market places for our services.[36]

For a number of years prior to 2016, hourly rates of the firm's staff attorneys were set to be consistent with the rates of "on-track" firm attorneys with the same or comparable levels of experience.  However, as the firm's staff attorneys (payroll and agency) became increasingly experienced and senior, that approach began to result in rates the firm believed were too high.[37] Therefore, beginning in 2016, with limited exceptions, all firm staff attorneys were assigned an hourly rate of $415 per hour (then the equivalent of a fourth year "on-track" associate).[38]  This rate was determined based on the firm's understanding of the market for staff attorneys performing document review, coding and analysis, and the preparation of issue and witness

---

[34] Fineman Declaration at ¶ 28; Ex. A to Fineman Declaration at 8-9; Ex. 175 to Report at 5-9; Ex. 18 to Report at 57-62.

[35] *Id.*

[36] *Id.*

[37] Fineman Declaration at ¶ 29; Ex. A to Fineman Declaration at 8-9; Ex. 176 to Report at 5-9.

[38] *Id.*; *see also* Appendices A and B.

- 14 -

memoranda in the kind of large complex cases handled by Lieff Cabraser.  The firm determined

this to be a fair and appropriate rate, even though Lieff Cabraser's staff attorneys, by and large,

have many more than four years of relevant experience.[39]

The vast majority of fee awards in the firm's class action cases over the years have been

awarded on a percentage of the recovery basis.[40]  In recent years, however, courts have

increasingly conducted a lodestar cross-check to determine that the percentage of the recovery

award is not excessive.[41]  And, in rare cases, courts have determined our class action fees on a

lodestar basis.[42]  In both the lodestar cross-check and lodestar fee award context, Lieff

Cabraser's hourly rates, including the firm's staff attorney rates, have routinely been approved.[43]

In addition, in those infrequent instances when Lieff Cabraser has represented plaintiffs on an

hourly basis, the firm has been paid the applicable hourly rates for its attorneys, including its

staff attorneys.[44]

### B.     The Background of Lieff Cabraser's Involvement in the State Street Action.

### 1.     Lieff Cabraser's Role in the California *Qui Tam* Action.

Lieff Cabraser began investigating and pursuing claims of alleged deceptive practices and

overcharges by State Street related to foreign currency exchange ("FX") products and services in

2008.[45]  Along with Thornton, Lieff Cabraser was co-counsel of record in a *qui tam* FX lawsuit

filed against State Street under seal in California on April 14, 2008 (the "California Action").[46]

---

[39] *Id.*

[40] Ex. A to Fineman Declaration at 60; Ex. 175 to Report at 8.

[41] *Id.*

[42] *Id.*

[43] Ex. A to Fineman Declaration 61-67; Ex. 175 to Report at 9, 16-18; Ex. 18 to Report at 62.

[44] *See* note 33, *supra*.

[45] Ex. A to Fineman Declaration at 10; Ex. 57 to Report at 3-4.

[46] *Id.*

The California Attorney General intervened in the California Action in October 2009, making the FX scheme public.[47]  The attendant publicity caused a number of custodial clients to question whether they had been overcharged on FX trades in a similar manner.  The questions were not restricted to State Street; BNY Mellon faced similar allegations in *qui tam* lawsuits that were unsealed in early 2011.[48]

### 2.      Lieff Cabraser's Role in the BNY Mellon Action.

In July 2011, Lieff Cabraser filed, with co-counsel (including Thornton), a class action suit against BNY Mellon in the United States District Court for the Northern District of California on behalf of custodial customers of BNY Mellon who were wrongly overcharged on FX trades (the "BNY Mellon Action").  That complaint was subsequently amended and BNY Mellon's motion to dismiss was denied in February 2012.  The case was put on an aggressive schedule by Judge William Alsup, resulting in the plaintiff filing its opening brief on class certification in April 2012.[49]

Shortly after the plaintiff filed its class certification motion, however, in April 2012, the case was transferred to Judge Lewis A. Kaplan of the Southern District of New York and consolidated with several other customer, ERISA, and securities fraud cases all alleging the same underlying facts about BNY Mellon's custodial FX practices.  These cases (now part of an MDL) were in turn coordinated for discovery purposes with a later-filed civil suits brought by the United States Department of Justice ("DOJ") and the New York State Attorney General ("NYAG").[50]

---

[47] Ex. A to Fineman Declaration at 10; Ex. 57 to Report at 4.

[48] Ex. 57 to Report at 4.

[49] *Id.*

[50] Ex. 57 to Report at 4-5; Ex. 10 to Report at 24-26.

Once before Judge Kaplan, Lieff Cabraser was appointed co-lead counsel for the proposed class of custodial customers affected by the BNY Mellon FX scheme.  In addition, the firm was appointed to the three-member executive committee overseeing all plaintiffs in the MDL.[51]  Between 2012 and early 2015, BNY Mellon aggressively defended the actions, taking 57 depositions of the plaintiffs, absent class members, or third parties, and filing counterclaims against the named customer plaintiffs and absent class members.[52]  The plaintiffs in the MDL and the DOJ took more than 50 depositions of BNY Mellon.[53]  BNY Mellon produced more than 29 million pages of documents.[54]

Lieff Cabraser, working closely with its co-counsel and the DOJ, reviewed and analyzed these documents with the aid of 13 Lieff Cabraser staff attorneys (including six "agency" lawyers), most of whom later went on to work on the State Street Action.[55]  In addition to reviewing, analyzing and coding documents, Lieff Cabraser's staff attorneys, who individually averaged nearly 2,200 hours on the BNY Mellon Action, prepared highly detailed witness kits and issue memoranda to assist the lead attorneys in preparing for depositions.[56]

In January 2015, fact discovery closed in the BNY Mellon action and settlement discussions began, which resulted in a global resolution in March 2015.  The settlement, approved by Judge Kaplan in September 2015, provided $504 million for the benefit of BNY Mellon customers, with $335 million attributed to resolution of the customer class case co-lead

---

[51] *Id.*

[52] Ex. 57 to Report at 5.

[53] *Id.*

[54] *Id.*

[55] Ex. A to Fineman Declaration at 18-20; Ex. 57 to Report at 15; Appendices A and B.

[56] *Id.*

by Lieff Cabraser (the settlement also resolved claims by the DOJ and NYAG, and the United States Department of Labor).[57]

### 3.    Lieff Cabraser's Inclusion in the State Street Action.

During its involvement in the California Action and throughout its early work on the BNY Mellon Action, Lieff Cabraser investigated possible claims to be brought on a class basis for the benefit of custodial customers of State Street.[58]  In that regard, the firm discussed with several institutional investors the possibility that they would serve as class representatives in a customer class action against State Street.  The firm however, was not retained by any State Street client for that purpose.[59]

As noted above, Lieff Cabraser worked with Thornton on the California and the BNY Mellon Actions.  Based on Lieff Cabraser's prior working relationship with Thornton and the firm's expertise and institutional knowledge concerning custodial FX pricing practices, the firm was invited to participate in the State Street Action by Thornton and Labaton, after Labaton's client, the Arkansas Teacher Retirement System ("ATRS"), decided to proceed with the filing of a class action against State Street in the District of Massachusetts.[60]

Throughout the State Street Action, Labaton served as lead counsel for ATRS and the putative and settlement class; Thornton served as liaison counsel for ATRS and the putative and settlement class; and, Lieff Cabraser served as "additional counsel" for ATRS and the putative and settlement class.[61]  Lieff Cabraser had no formal attorney client relationship with ATRS during the State Street Action, and has not represented ATRS before or after the State Street

---

[57] Ex. A to Fineman Declaration at 12-13; Ex. B to Fineman Declaration at 7-8.
[58] Ex. 18 to Report at 9-10, 13; Ex. 19 to Report at 12-13.
[59] *Id.*
[60] Ex. A to Fineman Declaration at 11; Ex. 57 to Report at 7.
[61] ECF No. 28; Ex. 113 to Report, ECF No. 110, at ¶ 4.

- 18 -

Action. [62]   Prior to and during the pendency of the State Street Action, Lieff Cabraser had no

direct substantive communication with ATRS. [63]

During the course of the State Street Action, Labaton, Thornton and Lieff Cabraser

asserted claims on behalf of all eligible custody clients of State Street (including plans eligible

under the Employee Retirement Income Security Act of 1974 ("ERISA")), and were known, and

are collectively referred to herein, as "Customer Class Counsel."  Other attorneys ("ERISA

Counsel") filed cases asserting strictly ERISA-based claims solely for the benefit of ERISA plan

custody clients of State Street. [64]   Customer Class Counsel and ERISA Counsel are collectively

referred to herein as "Plaintiffs' Counsel."

**C.**     **The State Street Action**

**1.**     **Plaintiffs' Underlying Allegations and Claims against State Street.**

Lieff Cabraser assumes the Court's familiarity with State Street's allegedly unfair and

deceptive practice of charging its custody and trust customers excessive rates and spreads in

connection with certain FX transactions, in alleged violation of State Street's statutory, common

law, contractual and fiduciary obligations. [65]   Therefore, the firm does not restate here those

allegations and claims.  It does bear noting, however, that both this Court and the Special Master

have acknowledged the complexity, difficulty and challenges of the State Street Action. [66]

---

[62] Ex. 10 to Report at 45-47.

[63] Ex. 57 to Report at 7.

[64]  Those attorneys include Keller Rohrback, LLP ("Keller Rohrback"), McTigue Law, LLP ("McTigue Law"), and Zuckerman Spaeder, LLP ("Zuckerman Spaeder") (collectively, "ERISA Counsel").  *See* Exs. 23, 24, and 29 to Report.

[65] Ex. 7 to Report, ECF No. 10.

[66] Ex. 78 to Report, ECF No. 114, at 19-20, 36, 38; Ex. 113 to Report, ECF No. 110, at 5; ECF No. 110 at 4; Executive Summary at 3; Report at 6, 29-33, 152-156.  *See also* Ex. 57 to Report at 12-13 (risk factors identified by Lieff Cabraser at the outset of the State Street Action).

### 2.      Procedural Litigation and Mediation History of the Litigation.

Lieff Cabraser assumes the Courts' knowledge of the procedural, litigation and mediation history of the State Street Action from its inception in February 2011 to the execution and filing of the final settlement agreement in July 2016. For the Court's reference, a detailed history of the litigation can be found in the Declaration of Lawrence A. Sucharow in Support of Plaintiffs' Assented-To Motion for Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class, etc., filed September 15, 2016 ("Omnibus Declaration").[67]

### 3.      Lieff Cabraser's Specific Tasks in the State Street Action.

Lieff Cabraser worked closely from the outset of the State Street Action with Labaton and Thornton on, among other things: (a) researching potential causes of action against State Street for overcharging custodial customers on FX trades; (b) drafting both the complaint and amended complaint; (c) briefing plaintiff's opposition to defendants' motion to dismiss (with particular responsibility for (i) countering defendants' statutes of limitations arguments and (ii) supporting plaintiff's claims under M.G.L. ch. 93A); (d) researching and drafting memoranda on the viability of class certification (particularly as applied to M.G.L. ch. 93A); and, (e) drafting plaintiffs' final settlement approval memorandum.[68]

Lieff Cabraser was principally responsible for developing the M.G.L. ch. 93A theory of liability, which was particularly valuable since it allowed for double or treble damages (plus prejudgment interest), and (as directed against a Massachusetts-based company and conduct) provided a potentially more readily-certifiable class claim for State Street custodial customers

---

[67] Ex. 3 to Report, ECF No. 104, at ¶¶ 39-106. The Report refers to Sucharow's September 15, 2016 Declaration as the "Omnibus Declaration," and Lieff Cabraser therefore adopts that same definition here. Report at 54-55.

[68] Ex. A to Fineman Declaration at 11; Ex. 57 to Report at 8-9.

from across the country.[69]  During the parties' numerous mediation sessions, Lieff Cabraser took

the lead in researching and presenting on the viability of class certification under M.G.L. ch. 93A

in particular, as well as the availability of double or treble damages and the elements and

standards of proof necessary to achieve those results.[70]  Lieff Cabraser attorneys attended and

participated in every mediation session and in all related plaintiff-side meetings.[71]

In addition, Lieff Cabraser participated in the review and analysis of more than nine

million pages of documents produced by State Street.[72]  State Street's productions largely took

place between December 2012 and November/December 2013.[73]  The initial production (in

December 2012) of more than 300 CDs and a hard drive consisted principally of materials

gathered and produced by State Street in the California Action, and totaled more than 260,000

documents.[74]  The latter productions (bringing the total number of documents to be reviewed in

the database to more than 750,000 [including 84,000 native Excel files], and more than nine

million pages or 500 gigabytes) included documents produced by State Street in *Hill v. State

Street Corporation*, No. 09-cv-12146-GAO (D. Mass.) (a securities fraud lawsuit filed in the

wake of the disclosure of the California Action which contained overlapping allegations of unfair

or deceptive custodial FX pricing practices by State Street).[75]

The State Street productions contained, among other things, internal and external email

correspondence, custodial contracts and fee schedules, marketing materials, internal compliance

and training manuals, investment manager guides, internal and external presentations, analyst

---

[69] Ex. 10 to Report at 15-19, 55-58, 68, 70-74.

[70] Ex. A to Fineman Declaration at 11; Ex. 10 to Report at 15-19, 55-58, 68, 70-74.

[71] *Id.*

[72] Ex. A to Fineman Declaration at 11; Ex. 57 to Report at 13-14.

[73] Ex. 57 to Report at 13-14.

[74] *Id.*

[75] *Id.*

reports, customer surveys, codes of conduct, competitive analyses, and FX revenue/profit and loss reports.[76] All of these documents and materials were uploaded to a Catalyst e-discovery database hosted and chiefly administered by Lieff Cabraser in the firm's San Francisco office.[77] As explained below, most of the review, reading and analysis of the documents produced by State Street were performed by staff attorneys working for Customer Class Counsel, including Lieff Cabraser.

### D.     The Role Of Lieff Cabraser's Staff Attorneys In The State Street Action.

#### 1.     The Training of and Work Performed By Lieff Cabraser's Staff Attorneys.

As explained above, State Street produced more than nine million pages of documents potentially relevant to the issues and claims in the State Street Action. Consistent with Lieff Cabraser's practice in complex litigation document review (*see* discussion, *supra*, at 11, the firm's staff attorneys, along with staff attorneys from Labaton and staff attorneys paid for by Thornton, reviewed, issue-coded, analyzed, and completed issue memoranda concerning State Street's documents. The scope of that effort is described below.

All staff attorneys had access to the Catalyst document database hosted by Lieff Cabraser.[78] Online technical training on how to the use the database was provided by Lieff Cabraser's litigation support department Manager, Kirti Dugar, in conjunction with the staff at Catalyst.[79] The documents maintained in the Catalyst database consisted of all those documents produced by the parties in the State Street Action.[80]

---

[76] *Id.*

[77] *Id.* at 16-17.

[78] *Id.* at 16; Ex. B to Fineman Declaration at 17-18.

[79] *Id.*

[80] *Id.*

Before the staff attorneys began their review and analysis of the documents, they were instructed to review relevant pleadings in the State Street Action, including the operative class action complaint and plaintiffs' memorandum in opposition to State Street's motion to dismiss.[81] In addition, each staff attorney was provided with and expected to read and understand the State Street Document Review Protocol, including the Document Review Coding Fields Quick Reference Guide, in which issue codes were listed, followed by descriptions of their relevance to the case.[82] In addition to these materials, emails from supervising attorneys communicating assignments on proposed topics for the factual, legal and/or discursive memoranda to be prepared by staff attorneys (discussed further below) contained descriptions, context and/or explanations for the topics assigned.[83]

The staff attorneys' job responsibilities and tasks included reviewing and coding of all documents produced by State Street for relevance and/or strength or weakness in support of plaintiffs' theory of the case.[84] In addition, the staff attorneys identified specific issues and topics addressed by each of the documents so they could be sorted and searched by subject matter or issue at a later date.[85] Staff attorneys also had the ability to enter attorney notes to explain or clarify the decision behind their coding determinations.[86] There were more than 30 different issue or document type codes available for assignment by staff attorneys to the

---

[81] *Id.* at 18.

[82] Ex. A to Fineman Declaration at 43-47; Ex. 57 to Report at 18.

[83] Ex. 57 to Report at 18.

[84] Ex. A to Fineman Declaration at 41; Ex. 57 to Report at 15-16.

[85] Ex. 57 to Report at 21.

[86] *Id.*

- 23 -

documents they reviewed.[87]  The staff attorneys received appropriate supervision from Lieff

Cabraser partners and senior staff to assure the quality of their work.[88]

The review and coding of State Street's documents was largely completed by the end of

April 2015, after which the staff attorneys were tasked with preparing detailed memoranda on

approximately 18 selected themes, issues or witnesses to be further developed in depositions and

follow-up discovery.[89]  Each memorandum prepared by the staff attorneys contained hyperlinks

to supporting documents from State Street's productions, with some of the memoranda

exceeding 100 pages.[90]  The memoranda were circulated to the supervising attorneys on a rolling

basis as they were completed.[91]  Had the mediation ended without resolution of the State Street

Action, the memoranda and included documents would have formed the principal repository of

knowledge for the supervising attorneys as they prepared for depositions and pretrial litigation.[92]

### 2. Lieff Cabraser's Staff Attorneys Were/Are Well-Educated, Professionally Experienced and Skilled Lawyers.

Attached as Appendix A is narrative biographical information about each of Lieff

Cabraser's 18 staff attorneys (with citations to the factual record), who worked on the State

Street Action.  Attached as Appendix B is a chart summarizing key information about each of

these firm staff attorneys (with citations to the factual record).[93]  The 18 Lieff Cabraser staff

---

[87] Ex. A to Fineman Declaration at 41; Ex. 57 to Report at 21.

[88] *Id.*  These memoranda were all produced to the Special Master at.

[89] Ex. A to Fineman Declaration at 41-42; Ex. 57 to Report at 21-22.

[90] *Id.*

[91] Ex. 57 to Report at 22-23.

[92] *Id.*

[93] All of the specific information about Lieff Cabraser's staff attorneys presented herein can be found in Ex. A to the Fineman Declaration at 18-40, and in Lieff Cabraser's Responses to Special Master Hon. Gerald E. Rosen's (Ret.) First Set of Interrogatories Due on July 10, 2017, dated July 10, 2017, particularly in the firm's responses to Interrogatory Nos. 24 and 25.  This

attorneys who worked on the State Street Action were, in alphabetical order (with the number of

hours each worked for Lieff Cabraser on the Action noted parenthetically): Tanya Ashur

(843.50); Joshua Bloomfield (2,033.20); Elizabeth Brehm (1,682.90); Jade Butman (24.00);

James Gilyard (882.00); Kelly Gralewski (1,475.90); Christopher Jordan (539.90); Jason Kim

(904.00); James Leggett (893.00); Coleen Liebmann (24.00); Andrew McClelland (58.00); Scott

Miloro (658.80); Leah Nutting (1,940.10); Marissa Oh (800.30); Peter Roos (780.00); Ryan

Sturtevant (796.00); Virginia Weiss (473.50); and Jonathan Zaul (495.20).

The Lieff Cabraser staff attorneys who worked on the State Street Action each attended

good to excellent colleges and law schools.[94]  They each had years of experience in civil

litigation and in document review and analysis in complex cases for major American law firms.[95]

For example, as of 2016, five of the staff attorneys who worked on the State Street Action had

more than 15 years of experience, six had between 10 and 15 years of experience, and six had

between five and 10 years of experience.[96]

Lieff Cabraser's staff attorneys who worked on the State Street Action were selected in

large part from the pool of staff attorneys who had worked previously or simultaneously on the

BNY Mellon Action, and who had acquired substantial relevant experience concerning custodial

FX trading, pricing, and marketing.[97]  The thirteen Lieff Cabraser staff attorneys who worked on

the BNY Mellon Action before and/or during the State Street Action were (with the number of

hours each worked on that Action noted parenthetically): Ashur (2,414.50); Bloomfield (2,183);

Gilyard (2,614.50); Gralewski (301.50); Jordan (1,572.90); Kim (2,659); Leggett (2,476.20);

set of discovery Responses is not included as an exhibit to the Special Master's Report.  The
Responses are therefore attached as Ex. B to the Fineman Declaration.

[94] Appendices A and B.

[95] *Id.*

[96] *Id.*

[97] Ex. A to Fineman Declaration at 18; Ex. 57 to Report at 16.

McClelland (1,799); Miloro (3,146.80); Nutting (3,128.40); Oh (2,576.70); Weiss (1,445.80); and Zaul (2,197.90).[98]

Five other Lieff Cabraser staff attorneys who were assigned to the State Street Action did not work on the BNY Mellon Action.  Of these, attorneys Brehm, Roos and Sturtevant brought significant relevant litigation experience to their contributions to the State Street Action, including: a background in document review analysis in financial fraud cases for plaintiff-side litigation firms (Brehm); extensive experience in financial and corporate transactions and documentation during an 18 year career with Baker & MacKenzie (Roos); and, significant experience in securities and financial fraud class actions while working for numerous major American law firms (Sturtevant).[99]  Staff attorneys Butman and Liebmann also had meaningful prior experience in document review and analysis, but devoted only 24 hours each to the State Street Action.[100]

Of the 18 Lieff Cabraser staff attorneys who worked on the State Street Action, the following 11 were compensated directly by the firm during the time they worked on the Action: Ashur, Brehm, Gilyard, Gralewski, Jordan, Kim, Liebmann, Miloro, Oh, Roos, and Zaul.[101]  The following four Lieff Cabraser staff attorneys were compensated initially by an agency (which billed the firm directly for their services), but became payroll employees of the firm in January 2015, during the pendency of the State Street Action: Bloomfield, Leggett, Nutting, and Sturtevant.[102]  The following three Lieff Cabraser staff attorneys were compensated by an

---

[98] Appendices A and B.

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

agency throughout their work for the firm on the State Street Action: Butman, McClelland, and Weiss.[103]

The following Lieff Cabraser staff attorneys physically worked on the State Street Action in the firm's San Francisco offices: Ashur, Butman, Gilyard, Kim, Leggett, Liebmann, McClelland, Oh, Roos, and Sturtevant.  Miloro worked in Lieff Cabraser's New York office.[104] The following Lieff Cabraser staff attorneys worked remotely on the State Street Action (with their remote work locations noted parenthetically): Bloomfield (San Francisco, California); Brehm (Shoreham, New York); Gralewski (San Diego, California); Jordon (Houston, Texas and Atlanta, Georgia); Nutting (San Francisco, California); Weiss (Rochester, Minnesota and Sacramento, California); and Zaul (San Francisco, California).[105]

The following 13 Lieff Cabraser staff attorneys who worked on the State Street Action are still employed by or are working on behalf of the firm (with the total number of years worked for Lieff Cabraser, as of June 2018, noted parenthetically): Ashur (5 years), Gralewski (9 years), Jordan (6 years), Kim (7 years), Leggett (5 years), Liebmann (4 years), Miloro (7 years), Nutting (6 years), Oh (5 years), Roos (6 years), Sturtevant (6 years), and Zaul (6 years).[106]  Five of the Lieff Cabraser staff attorneys who worked on the State Street Action are no longer with the firm: Bloomfield, Brehm, Butman, Gilyard and McClelland.[107]

Consistent with the firm's rate setting policies (*see* discussion *supra* at 13-15), with the exceptions noted below, all of the Lieff Cabraser staff attorneys who worked on the State Street

---

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] *Id.*

Action (payroll and agency) were billed at an hourly rate of $415.[108]  That hourly rate was

consistent with the rate of a fourth year associate at the firm in 2016.  *See* discussion *supra* at 14.

Staff attorneys Bloomfield (class of 2000) and Butman (class of 1997) had an hourly rate of $515

per hour, which was equivalent to the hourly rate of a firm attorney in the class 2008.[109]  The

hourly rates used for these two attorneys were their rates in 2015, the year in which they left the

firm and the year before the firm set all staff attorney rates at $415 per hour.[110]  Staff Attorney

Oh also had a billing rate of $515 per hour (equivalent to a Lieff Cabraser attorney in the class of

2008).[111]  This rate was deemed appropriate by firm management in light of Oh's educational

background (Stanford Law School), her graduation year (2004) and her extensive experience as a

partner-track attorney at major law firms.[112]

### 3.     Lieff Cabraser Shared and Hosted Staff Attorneys Paid For By Thornton.

By January 2015, more than half of the documents produced by State Street remained to

be analyzed and coded.[113]  The global settlement in the BNY Mellon Action and that

settlement's attendant publicity created a pivotal moment in the State Street Action mediation.

The parties needed to be prepared to proceed quickly to class certification, depositions and trial

preparation should resolution not be achieved.  Therefore, the parties agreed that the mediation

should/would not extend past mid-2015.[114]  Customer Class Counsel, including Lieff Cabraser,

---

[108] *Id.*

[109] *Id.*

[110] *See* Appendices A and B; Ex. A to Fineman Declaration at 48.; Ex. 89 to Report, ECF No. 104-17, at 4.

[111] *Id.*

[112] Appendices A and B; Ex. A to Fineman Declaration at 48.

[113] Ex. A to Fineman Declaration at 49; Ex. B to Fineman Declaration at 7-8.

[114] Ex. A to Fineman Declaration at 13 and 49; Ex. B to Fineman Declaration at 7-8.

1568825.1

ramped up their document review accordingly in order to prepare the detailed issue, witness and liability memoranda described above.[115]

In early 2015, Lieff Cabraser agreed to share and/or host approximately five staff attorneys that would be partially or fully paid for by Thornton.[116]  Labaton similarly agreed to share and/or host a number of staff attorneys that would be compensated, in whole or in part, by Thornton.[117]  This arrangement was used due to Thornton's limited physical facilities and so that Thornton could bear an appropriate share of the cost of the document review and analysis.[118]  It was also understood by Lieff Cabraser that Thornton would include the lodestar of the staff attorneys it paid for in any later fee request.[119]

Two of the staff attorneys Lieff Cabraser "shared" with Thornton were Jordan and Zaul.[120]  As noted above, Jordon and Zaul both worked extensively for Lieff Cabraser on the BNY Mellon Action, both were on Lieff Cabraser's payroll, and both continue to work for Lieff Cabraser to this day.[121]  For roughly a nine-week period between February and April 2015, Lieff Cabraser invoiced Thornton, and Thornton paid Lieff Cabraser, for the work performed by Jordan and Zaul.[122]  For all other time periods during the State Street Action, Lieff Cabraser compensated Jordan and Zaul directly for any work they performed, without reimbursement from Thornton.[123]

---

[115] Ex. A to Fineman Declaration at 49; Ex. B to Fineman Declaration at 7-8.

[116] Ex. A to Fineman Declaration at 50; Ex. 57 to Report at 23.

[117] Ex. 57 to Report at 23; Ex. 178 to Report, ECF No. 116.

[118] Ex. A to Fineman Declaration at 50; Ex. 57 to Report at 24; Ex. 175 to Report at 3.

[119] Ex. 57 to Report at 24; Ex. B to Fineman Declaration at 19; Ex. 10 to Report at 136-37.

[120] Appendices A and B; Ex. B to Fineman Declaration at 12, 18.

[121] Appendices A and B.

[122] Ex. 57 to Report at 25; Ex. B to Fineman Declaration at 18; Ex. 10 to Report at 156, 172.

[123] Appendices A and B; Ex. B to Fineman Declaration at 18; Ex. 10 to Report at 172.

Two other of these staff attorneys, McClelland and Weiss, had also worked extensively on the BNY Mellon Action for Lieff Cabraser. [124]  Throughout their time with Lieff Cabraser, both of these attorneys were paid by an agency. [125]  McClelland, who worked in Lieff Cabraser's San Francisco office, spent only 58 hours for Lieff Cabraser on the State Street Action (the bulk of his remaining hours were correctly allocated to Thornton, without duplication). [126]  Weiss, who worked remotely, put in 473.50 hours on behalf of Lieff Cabraser in the State Street Action (with some additional hours also being correctly allocated to Thornton, without duplication). [127]  Ms. Weiss continues to perform work for Lieff Cabraser today. [128]  From February to mid-April, 2015, Thornton paid an agency directly for the legal services of McClelland and Weiss. [129]

Two additional staff attorneys – Ann Ten Eyck and Rachel Wintterle – were hired through and paid by an agency, which in turn was paid directly by Thornton. [130]  These two staff attorneys worked physically in Lieff Cabraser's San Francisco office between February and June, 2015. [131]  Neither Ten Eyck nor Wintterle had a prior or subsequent relationship with Lieff Cabraser. [132]

---

[124] Appendices A and B.

[125] *Id.*

[126] Ex. 10 to Report at 151-152, 154; Ex. 41 to Report at 61.

[127] *Id.*; Appendices A and B.

[128] Appendices A and B.

[129] *Id.*; Ex. 57 to Report at 27; Ex. 10 to Report at 151-152, 154.

[130] Ex. A to Fineman Declaration at 50; Ex. B to Fineman Declaration at 11 and 18.

[131] *Id.*

[132] *Id.*

### E.   The Settlement And Attorneys' Fees Approval Process.

#### 1.   The Resolution of the State Street Action.

The parties in the State Street Action reached an agreement in principle to resolve the Action for $300 million on June 30, 2015.[133]  The settlement term sheet, however, was not executed until September 2015, during which time the parties continued to negotiate a plan of allocation.[134]  Almost nine months passed after the term sheet was executed, while State Street negotiated separate settlements with the DOJ and the Securities and Exchange Commission.[135]  At a status conference on June 23, 2016, the parties notified the Court of the pending settlement and plans to submit it for preliminary approval.[136]  At that hearing, the Court opined both on the likely fairness of the settlement, as well as the seeming reasonableness of Plaintiffs' Counsel's anticipated 25% attorneys' fee request.[137]

On July 26, 2016, Plaintiffs' Counsel filed a fully executed settlement agreement, along with a motion for preliminary approval of the settlement which included proposed forms of class notice.[138]  Following a hearing held on August 8, 2016, on August 11, 2016, the Court issued a preliminary approval order which, among other things: preliminarily found the settlement to be fair, reasonable and adequate; preliminarily certified the settlement class; appointed Labaton as lead counsel, Thornton as liaison counsel, and Lieff Cabraser as additional counsel for the settlement class; approved the forms, substance and method of dissemination of the class notice; set deadlines and procedures for the serving and filing of objections to the settlement and/or

---

[133] Ex. A to Fineman Declaration at 15; Ex. 3 to Report, ECF No. 104, at 20-24.

[134] *Id.*

[135] Ex. A to Fineman Declaration at 16; Ex. 3 to Report, ECF No. 104, at 20-24.

[136] *Id.*; ECF No. 85.

[137] *Id.*

[138] Ex. 75 to Report, ECF No. 89; ECF Nos. 90-92.

attorneys' fee request; set deadlines and procedures for requesting exclusion from the settlement class; and set a final approval hearing for November 2, 2016.[139]

### 2.     Notice to the Class.

On August 22, 2016, notice of the settlement was provided to the class via direct mail and publication.[140]  The notice advised class members of the factual background of the State Street Action; summarized the class settlement, the benefits available to class members, the plan of allocation of settlement proceeds, and Plaintiffs' Counsel's request for attorneys' fees and reimbursement of expenses; described the method and timing for opting out or objecting to the settlement; and provided the date for final settlement approval.[141]

With respect to attorneys' fees, the notice advised class members: "Lead counsel, on behalf of ERISA and Customer Counsel, will apply to the Court awarding attorneys' fees in an amount not to exceed $74,541,250.00 [approximately 25% of the settlement fund] and payment of Litigation Expenses in an amount not to exceed $1,750,000.00, plus interest earned on these amounts."[142]

### 3.     The Final Settlement Approval Papers and Request for Payment of Attorneys' Fees.

On September 15, 2016, all plaintiffs (ATRS and the ERISA plaintiffs) filed their motion and legal memorandum in support of final settlement approval.[143]  Also on September 15, 2016, Labaton, as lead counsel acting on behalf of all Plaintiffs' Counsel, filed a motion and

---

[139] Exs. 111 and 112 to Report, ECF Nos. 93 and 97.

[140] Ex. 81 to Report.

[141] *Id.*

[142] *Id.* at 4.  The notice further advised class members that they could obtain copies of the settlement agreement, as well as other litigation and settlement-related documents at www.statestreetindirectfxclasssettlement.com, or by contacting Labaton (as lead counsel) or the claims administrator.  *Id.* at 15.

[143] ECF No. 101-1.

memorandum for an award of attorneys' fees, payment of expenses, and payment of service awards, along with the Omnibus Declaration and exhibits.[144]   Among the exhibits attached to the Omnibus Declaration were individual firm declarations and lodestar reports from Plaintiffs' Counsel (showing those firms' timekeepers and their individual and aggregate hours worked and hourly rates).[145]   Labaton, as lead counsel, took primary responsibility for the preparation of the attorneys' fee and expenses request, drafting the memorandum and the Omnibus Declaration.[146] Lieff Cabraser provided Labaton with editorial comments on both of those documents.[147]   Lieff Cabraser did not, however, see the individual lodestar reports of Labaton, Thornton or ERISA Counsel before they were filed with the Court as exhibits to the Omnibus Declaration.[148]

Lieff Cabraser partner Daniel P. Chiplock prepared a declaration on behalf of the firm in support of the motion for award of attorneys' fees and expenses (the "Chiplock Declaration"), which was filed as an exhibit to the Omnibus Declaration.[149]   The Chiplock Declaration summarized the history of the firm's involvement in the California Action, the specific tasks performed by the firm in the State Street Action, and attached a "Lodestar Report"

> indicating the amount of time spent by each attorney and professional support staff-member of my firm who was involved in the prosecution of the Class Actions, and the lodestar calculation based on my firm's current billing rates.  For personnel who are no longer employed by my firm, the lodestar calculation is based on the billing rates for each such personnel in his or her final year of employment by my firm.  The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court.[150]

---

[144] Exs. 3 and 110 to Report, ECF Nos. 103-1 and 104.

[145] Ex. 3, 66, 88-95 and 100 to Report.

[146] Ex. A to Fineman Declaration at 17; Ex. 175 to Report at 9-13.

[147] *Id.*

[148] *Id.*

[149] Ex. 89 to Report, ECF No. 104-17 at 1-3 and Exhibit "A"; Ex. 175 to Report at 9-10.

[150] *Id.* at 2-3.

Among other things, the Lieff Cabraser Lodestar Report specified which firm timekeepers were partners, associates and staff attorneys.[151]  In total, Lieff Cabraser reported 20,458.5 hours worked for a total lodestar of $9,800,487.50.[152]

Labaton, on behalf of all Plaintiffs' Counsel, requested a percentage-of-the-recovery fee award of roughly 25% of the total settlement fund of $300 million based on the factors commonly considered by courts within the First Circuit and in typical contingent fee percentages awarded in complex class cases such as the State Street Action.[153]  The reasonableness of the fee request was bolstered by the Court's comments during the June 23, 2016 status conference during which the Court stated that a 25% fee percentage was "great" and was the level at which the Court "start[ed] ordinarily."[154]  The lodestar of each of the Plaintiffs' Counsel firms, including Lieff Cabraser, was submitted to the Court solely for "cross-check" purposes in order to assist the Court in determining whether a 25% fee was appropriate in light of the work performed and risks undertaken.[155]

### 4. The Court's Approval of the Settlement and the Attorneys' Fees Request.

The final fairness hearing of the settlement of the State Street Action occurred on November 2, 2016.[156]  During that hearing, the Court announced that it did not believe "either the question of class certification or the question of whether the settlement is fair, reasonable and adequate is a close question.  I think the answer to both is yes."[157]  Observing that the class

---

[151] *Id.*, Ex. A.

[152] *Id.*

[153] Ex. 110 to Report, ECF No. 103-1 at 3-24; Ex. B to Fineman Declaration at 25-26.

[154] ECF No. 85; Ex. A to Fineman Declaration at 16; Ex. B to Fineman Declaration at 25-26.

[155] Exs. 3, 66, 88-95 and 110 to Report.

[156] Ex. 78 to Report, ECF No. 114.

[157] *Id.* at 18.

members were sophisticated institutional investors, the Court found that the "settlement of $300

million is fair, reasonable and adequate, again essentially for the reasons stated on August 8,

2016 [at the preliminary approval hearing] and the additional facts that no class member has

objected, no class member has opted out."[158]

In considering the attorneys' fee request, the Court found Plaintiffs' Counsel's request for

$74,541,250 in fees and $1,257,699.94 in expenses was reasonable.[159]  The Court stated that it is

"appropriate in this case to use the percentage of the common fund approach in determining the

amount of attorneys' fees that should be awarded."[160]  The Court went on to state:

> I have used the percentage of common fund method.  I have used the
> reasonable lodestar to check on that I've also considered the awards in
> comparable cases.  The $74,500,000 plus is about – well, is 24.48 percent
> of the settlement fund.  Adding in litigation expenses brings it to 25.27
> percent of the settlement fund.  Adding the service awards makes it a little
> higher.  This is in the 20 to 30 percent range usually awarded by me in
> class action common fund cases and in many cases with settlements in the
> First Circuit and in many cases where the settlements are [in] a $250
> million to $500 million range.[161]

The Court also used the "reasonable lodestar" of $41.3 million to determine that the

approximately 25% percentage-of-the-recovery fee request was appropriate:  "The amount

awarded is about 1.8 times the lodestar.  The lodestar is about $41 million.  This is reasonable.

In this case the plaintiffs' lawyers took on a contingent basis a novel, risky case.  The result at

the outset was uncertain, and it remained, until there was a settlement, uncertain."[162]

On the same day as the final fairness hearing, November 2, 2016, the Court entered

orders finally approving the settlement and the plan of allocation, as well the award of attorneys'

---

[158] *Id*. at 18-19.

[159] *Id*. at 35.

[160] *Id*. at 22-23.

[161] *Id*. at 35.

[162] *Id*. at 36.

fees "in the amount of $74,541,250.00, plus any accrued interest, which was approximately 25% of the Class Settlement Fund, along with payment of expenses in the amount of $1,257,697.94,..."[163]   The Court specifically found that the "amount of attorneys' fees awarded is fair and reasonable and consistent with fee awards approved in cases within the First Circuit and other Circuits with similar recoveries."[164]

      **F.**      **The Inadvertent Double-Counting Of Certain Staff Attorney Time.**

           **1.**      **Lieff Cabraser's Discovery and Response to the Inadvertent Double-Counting of Some of Their Staff Attorneys' Hours.**

On November 8, 2016, David J. Goldsmith of Labaton informed Chiplock of Lieff Cabraser that a reporter from the Boston Globe had inquired about the appearance of certain attorneys on more than one of Customer Class Counsel's lodestar reports.[165]   Upon learning of that inquiry, Lieff Cabraser, through Chiplock, promptly identified time and lodestar included in the firm's Lodestar Report that was also included as part of the Thornton fee submission (the latter of which had not been shared with Lieff Cabraser before it had been filed with the Court).[166]   Chiplock identified these duplicative time entries: (a) by reviewing prior email correspondence between and among Lieff Cabraser and the other Customer Class Counsel during the early to mid-2015 timeframe; (b) through confirmatory emails by and between personnel at Lieff Cabraser and Thornton; (c) by reviewing the detailed time reports for the staff attorneys Lieff Cabraser shared with or hosted for Thornton; and, (d) by reviewing Thornton's fee submission (which, again, the firm had not seen prior to its filing with the Court).[167]

---

[163] ECF Nos. 110, 111 at ¶4, and 112.

[164] ECF No. 111 at ¶6(a).

[165] Ex. 175 to Report at 19.

[166] Ex. A to Fineman Declaration at 51-53; Ex. 175 to Report at 20; Ex. B to Fineman Declaration at 27-28.

[167] *Id.*

Lieff Cabraser's internal review showed that two of the staff attorneys who split time performing work for both Lieff Cabraser and Thornton – McClelland and Weiss (*see* discussion *supra* at 30) – showed no duplicative time in Lieff Cabraser's or Thornton's reports.  In other words, the reported hours for McClelland and Weiss were correctly allocated between Lieff Cabraser and Thornton, and there was no error to report for them.[168]

Two other staff attorneys who split time between Lieff Cabraser and Thornton, however – Jordan and Zaul (*see* discussion *supra* at 29) – did have time that was inadvertently duplicated in Lieff Cabraser's Lodestar Report.[169]  As explained above, Jordan and Zaul worked for Lieff Cabraser and were paid directly by the firm before, during, and after their brief stints for Thornton, and were therefore accustomed to submitting their contemporaneous time records to the firm on a daily basis.[170]  The inadvertent duplication of their time in Lieff Cabraser's Lodestar Report occurred because the time these two attorneys spent reviewing documents assigned to Thornton between February 9, 2015 and April 14, 2015 was mistakenly not removed from Lieff Cabraser's timekeeping records after the firm's accounting department invoiced and received payment for those hours from Thornton.[171]  This was an inadvertent bookkeeping error.[172]

The two other staff attorneys whose time was incorrectly included in Lieff Cabraser's Lodestar Report – Ten Eyck and Wintterle – were hired through an agency that was paid directly by Thornton.  *See* discussion *supra* at 30.[173]  Those attorneys should not have entered any time

---

[168] *Id.*

[169] *Id.*

[170] *Id.*

[171] *Id.*

[172] Ex. 175 to Report at 20; Ex. B to Fineman Declaration at 27-28; Ex. 10 to Report at 152-157.

[173] *Id.*

summaries into the Lieff Cabraser timekeeping system.[174]  However, they did so throughout the

three to four months they worked in Lieff Cabraser's San Francisco office (March – June 2015),

by emailing their time summaries directly to the firm's word processing department (consistent

with typical staff attorney practice) while also reporting their time to both their employing

agency and to Thornton, unbeknownst to the attorneys and staff overseeing the case.[175]  This was

an inadvertent oversight in their training in San Francisco.[176]

After these errors were discovered on November 9, 2016, Chiplock instructed Lieff

Cabraser's accounting department to remove all of the erroneously recorded hours that in fact

had been Thornton's financial responsibility from Lieff Cabraser's timekeeping records.[177]  This

resulted in Lieff Cabraser correcting its lodestar as follows: [178]

| Originally Reported Hours and Lodestar | |
|---|---|
| Hours | Lodestar |
| 20,458.50 | $9,800,487.50 |
| Corrected Hours and Lodestar | |
| Hours | Lodestar |
| 18,696.70 | $8,932,070.50 |
| Difference | |
| Hours | Lodestar |
| 1,761.80 (8.6%) | $868,417.00 (8.8%) |

Lieff Cabraser provided its "corrected lodestar" figures to Labaton and assisted in the drafting of

the November 10, 2016 corrective letter from Goldsmith to the Court.[179]

---

[174] *Id.*

[175] *Id.*

[176] *Id.*

[177] Ex. 57 to Report at 26.

[178] Ex. A to Fineman Declaration at 53.

[179] Ex. 175 to Report at 21; Ex. 10 to Report at 184-189.

## 2.      The November 10, 2016 Goldsmith Letter.

On November 10, 2016, Goldsmith, writing on behalf of Customer Class Counsel, informed the Court of the inadvertent double counting of certain staff attorneys shared with or hosted by Labaton and Lieff Cabraser on behalf of Thornton (the "Goldsmith Letter").[180] Goldsmith explained that because of these "inadvertent errors, Plaintiffs' Counsel's reported combined lodestar of $41,323,895.75, and reported combined time of 86,113.70 hours were overstated."[181]  Goldsmith explained that deducting the "duplicative time from the $41.32 million reported combined lodestar results in a reduced combined lodestar of $37,265,241.25, and reduced combined time of 76,790.80 hours."[182]

Goldsmith went on to point out that "[c]ross-checking the $37.27 million in reduced combined lodestar against the $74,541,250 percentage-based fee awarded by the Court yields a lodestar multiplier of 2.00.  [Footnote omitted.]  This is higher than the 1.8 multiplier we proffered in our submissions and during the hearing."[183]  Goldsmith, on behalf of Plaintiffs' Counsel, then respectfully submitted that a "2.00 multiplier remains reasonable and well-within the range of multipliers found reasonable for cross-check purposes in common fund cases within the First Circuit…," and requested that the Court "adhere" to its prior ruling on attorneys' fees notwithstanding the reduced lodestar."[184]

Goldsmith concluded the letter by apologizing to the Court for the "inadvertent errors in our written submissions and presentation during the hearing," and advised the Court that counsel

---

[180] Ex. 178 to Report, ECF No. 116.

[181] *Id*. at 2.

[182] *Id*. at 3.

[183] *Id*.

[184] *Id*.

- 39 -

was "available to respond to any questions or concerns the Court may have."[185]  The Court did

not hold a hearing or otherwise communicate with Plaintiffs' Counsel about this matter until

almost three months later.[186]

### G.      The "Clawback" Agreement and Distribution of Attorneys' Fees.

In a letter to Plaintiffs' Counsel dated November 21, 2016, Sucharow of Labaton noted

that the settlement of the State Street Action would become effective on December 7, 2016, and

that because there were no objections to the settlement or requested fees, no class member had

standing to appeal.[187]  Sucharow observed that the Court had not yet responded to the Goldsmith

Letter, and stated that if the "Court remains silent as of close of business on December 7, 2016,

we [Labaton, as lead counsel] will begin the process of withdrawing the approved fees, expenses

and service awards from the Lead Counsel Escrow Account for prompt distribution to your

respective firms pursuant to our agreements."[188]

Sucharow continued by acknowledging that it remained "possible, however, that the

Court, on or after December 8, 2016, will respond adversely to the [Goldsmith Letter] and

ultimately reduce the fee award… after the fees, expenses and service awards have been

distributed to your respective firms (and to the other ERISA counsel)."[189]  Accordingly, Labaton

required that before fees and expenses be distributed, "we will require an undertaking, evidenced

by your signature below, confirming your agreement to refund to us within five (5) business

days, for redeposit into the Lead Counsel Escrow Account, your *pro rata* share of any Court-

---

[185] *Id.*

[186] Ex. 180 to Report, ECF No. 117.

[187] Ex. 179 to Report, ECF No. 116.

[188] *Id.*

[189] *Id.*

ordered reduction of fees, expenses, and/or service awards."[190]  Plaintiffs' Counsel, including

Lieff Cabraser, consented to this "clawback" agreement.[191]

Pursuant to a written agreement entered into on August 30, 2016, Lieff Cabraser was

entitled to 24% of the attorneys' fees allocated to Customer Class Counsel, which received

84.5% of the total fee award, with 10% of the balance going to ERISA Counsel and 5.5% of the

total going to "Labaton Sucharow's local counsel."[192]  This meant that Lieff Cabraser was

entitled to 20.3% of the total attorneys' fee award, along with reimbursement of the firm's

expenses.[193]  On December 7, 2016, Labaton distributed to Lieff Cabraser its share of the

awarded attorneys' fee, $15,116,965.50, along with $271,944.53 in expenses.[194]  Using Lieff

Cabraser's corrected lodestar total of $8,932,070.50, the corrected and actual lodestar multiplier

for Lieff Cabraser was at that time 1.69, below the aggregate corrected lodestar multiplier of 2.0

(and, indeed, below the original uncorrected aggregate reported lodestar multiplier of 1.8).[195]

### H.    The Attorneys' Fees Investigation By The Special Master.

#### 1.    Order Appointing the Special Master.

On December 17, 2016, the Boston Globe published an article, "Critics hit law firms'

bills after class-action lawsuits."[196]  That article addressed, among other things, the double-

counting of certain staff attorney time, the position asserted in the Goldsmith Letter that the

Court's fee award remained appropriate after deducting the incorrectly included lodestar, and

---

[190] *Id.*

[191] *Id.*

[192] Ex. I to Fineman Declaration at 3-4; Report at 86-88.

[193] *Id.*

[194] *Id.*

[195] Ex. A to Fineman Declaration at 54; Ex. B to Fineman Declaration at 26.

[196] ECF No. 117.

new questions about whether the hourly rates attributed to the staff attorneys who worked on the State Street Action were justified.[197]

Referring to the Goldsmith Letter and the Boston Globe article, in a Memorandum and Order dated February 6, 2017, the Court proposed to appoint former United States District Judge Gerald E. Rosen as a special master to investigate issues that "have arisen with regard to the accuracy and reliability of information submitted by plaintiffs' counsel on which the court relied, among other things, in deciding that it was reasonable to award them almost $75,000,000 in attorneys' fees and more than $1,250,000 in expenses."[198]

Following written responses from Plaintiffs' Counsel, including Lieff Cabraser, and after a March 7, 2017 hearing, in a Memorandum and Order dated March 8, 2017, the Court appointed Judge Rosen as Special Master pursuant to Rule 53 of the Federal Rules of Civil Procedure ("Federal Rules"), and directed that Judge Rosen investigate and prepare a report and recommendation concerning, among other issues:

> (a) the accuracy and reliability of the representations made by the parties in their requests for awards of attorneys' fees and expenses, including but not limited to whether counsel employed the correct legal standards and had a proper factual basis for what was represented to be the lodestar for each firm; (b) the accuracy and reliability of the representations made in the November 10, 2016 Letter from David Goldsmith, Esq. of Labaton Sucharow, LLP to the Court (Docket No. 116); (c) the accuracy and reliability of the representations made by the parties requesting service awards; (d) the reasonableness of the amounts of attorneys' fees, expenses, and service awards previously ordered, and whether any or all of them should be reduced; (e) whether any misconduct occurred in connection with such awards; and, if so, (f) whether it should be sanctioned, *see e.g.,*

---

[197] *Id.*  Although mentioned briefly in the Boston Globe article, Lieff Cabraser was not contacted for comment nor given the opportunity to respond to the class action "critics" cited liberally in the piece.

[198] Ex. 180 to Report, ECF No. 117, at 1-2.

- 42 -

Fed.R.Civ.P. 11(b)(3) & (c); Massachusetts Supreme Judicial Court Rule of Professional Conduct 3.3(a)(1) & (3).[199]

The Court's March 8, 2017 Order further directed Customer Class Counsel to pay $2 million into a fund to be used by the Special Master for purposes of his investigation.[200] The Court ordered that that fund would be used to "pay the reasonable fees and the expenses of the Master and any firm, organization, or individual he may retain to assist him."[201] In subsequent orders dated October 24, 2017 and April 23, 2018, the Court further instructed Customer Class Counsel to pay an additional $1.8 million toward the Special Master's fees and expenses.[202] To date, Customer Class Counsel has collectively paid $3.8 million for the fees and expenses of the Special Master and his team. The economic impact on Lieff Cabraser from funding its share of the Special Master's investigation, and all other aspects of the investigation, is described below. *See* discussion *infra* at 64-66.

## 2. The "Informal" Phase of the Investigation.

The Special Master's investigation began with an "informal" phase. After providing the Special Master with all settlement approval and fee request documentation, the Master invited each of the Plaintiffs' Counsel firms to meet with him in non-sworn, informal fact-gathering sessions. Lieff Cabraser, through the firm's general counsel and senior partner, Richard M. Heimann, the firm's managing partner, Steven E. Fineman, and Chiplock, met with the Special

---

[199] Ex. 163 to Report, ECF No. 173, at 2-3.

[200] *Id*. at 6.

[201] *Id.* In total, the Special Master's team included William Sinnott, Elizabeth McEvoy and Brian Mulcahy, of Barrett & Singal, P.C. (collectively referred to herein as "counsel" for the Special Master); Linda Hylenski, a former law clerk for Judge Rosen and currently a research attorney with JAMS; the Hon. Mary Beth Kelly, a former justice of the Michigan Supreme Court, currently a JAMS mediator and arbitrator; John Toothman, an attorney and purported authority on legal fees; and, Professor Stephen Gillers, a proffered expert on ethical and professional conduct issues. Report at 137.

[202] ECF Nos. 208 and 217.

Master, his assistant, Hylenski, his counsel, Sinnott and McEvoy, and the Special Master's

attorneys' fee consultant, Toothman, on April 5, 2017 at the New York offices of JAMS.[203]

During Lieff Cabraser's April 5, 2017 meeting with the Special Master and his team, the

firm provided the Master with a 67 page written presentation which framed and guided much of

that multi-hour interview ("Presentation").[204]  That Presentation addressed the following topics:

- About Lieff Cabraser
- How Lieff Cabraser staffs large complex cases
- How Lieff Cabraser sets hourly rates, including for staff attorneys
- Involvement in the *State Street* case
- Involvement in the *BNYM FX* case
- Resolution of the *BNYM* and *State Street* cases
- Fee application process in *State Street*
- Background of Lieff Cabraser staff attorneys who worked on *State Street*
- Role of Lieff Cabraser staff attorneys in *State Street*
- *State Street* Document Review Protocol
- Hourly rates applied to Lieff Cabraser staff attorneys in *State Street*
- Coordination of staff attorneys with Labaton and Thornton firms
- Lieff Cabraser's hourly duplication mistake explained
- Lieff Cabraser's fee and corrected lodestar in *State Street*
- Hourly rates of Lieff Cabraser staff attorneys paid by clients
- Lieff Cabraser staff attorneys are routinely included in and approved in class action fee awards[205]

The essential facts as they relate to Lieff Cabraser, including the firm's inadvertent

double counting of time of four staff attorneys, and the propriety of the hourly rates applied to

Lieff Cabraser's attorneys (including its staff attorneys), were included in the firm's April 5,

2017 Presentation, discussed during that meeting with the Special Master, and were later

---

[203] Throughout the Special Master's investigation, Lieff Cabraser has represented itself through Messrs. Heimann, Fineman and Chiplock.

[204] Ex. A to Fineman Declaration.

[205] *Id.*

reiterated through formal written and deposition discovery.[206]

### 3.      The "Formal" Phase of the Investigation.

On May 18, 2017, the Special Master, through his counsel, propounded on Lieff Cabraser

53 document requests and 77 interrogatories.[207]  Similar discovery was served on Labaton and

Thornton.  On May 23, 2017 the Special Master, through his counsel, propounded annotated and

revised written discovery on Lieff Cabraser (and Labaton and Thornton), reducing the number of

document requests and interrogatories that would require responses from the firm to 35 and 64,

respectively, and modified the schedule for responding to the discovery to three dates (June 1,

June 9, and July 10, 2017).[208]  Lieff Cabraser responded to the Special Master's written

discovery as follows:

- May 26, 2017 – Lieff Cabraser Heimann & Bernstein, LLP's Responses to
  Special Master Honorable Gerald E. Rosen's (Ret.) First Request for the
  Production of Documents (written responses to 35 document requests).[209]

- June 1, 2017 – Lieff Cabraser Heimann & Bernstein, LLP's Responses to
  Special Master Honorable Gerald E. Rosen's (Ret.) First Set of
  Interrogatories Due on June 1, 2017 (responses and objections to 20
  interrogatories).[210]

- June 1, 2017 – Lieff Cabraser's production of documents responsive to the
  Special Master's request for production due June 1, 2017 via link to
  LCHB's file-share system.

- June 2, 2017 – Lieff Cabraser's production of documents responsive to the
  Special Master's request for production due June 1, 2017 via link to
  LCHB's file-share system.

---

[206] In addition to providing the Presentation to the Special Master and his counsel at the time
of the informal meeting, it was later produced to the Special Master during the formal phase of
the investigation.  *See* note 4, *supra*.  The Presentation is not included among the exhibits to the
Special Master's Report

[207] Ex. C to Fineman Declaration.

[208] Ex. D to Fineman Declaration.

[209] Ex. E to Fineman Declaration.

[210] Ex. 57 to Report.

- June 9, 2017 – Lieff Cabraser Heimann & Bernstein, LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories due on June 9, 2017 (written responses and objections to 22 interrogatories).[211]

- June 9, 2017 – Lieff Cabraser's production of documents responsive to the Special Master's request for production due June 9, 2017 via link to LCHB's file-share system.

- July 10, 2017 – Lieff Cabraser Heimann & Bernstein, LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories Due on July 10, 2017 (written responses and objections to 22 interrogatories).[212]

- July 10, 2017 – Lieff Cabraser's production of documents responsive to the Special Master's request for production due July 10, 2017 via link to LCHB's file-share system.

Between June 5, 2017 and July 17, 2017, the Special Master took 39 depositions of personnel from the Plaintiffs' Counsel firms.[213]  Attached as Appendix C is a chart identifying each deponent, the date of deposition, the number of pages of testimony, the total deposition time, and the Special Master's personnel in attendance at the deposition.

The Special Master, and his counsel, took depositions of nine representatives from Lieff Cabraser, including firm partners Heimann, Fineman, and Chiplock; staff attorneys Ashur, Gralewski, Jordan, Oh, and Zaul; and, the firm's litigation support manager, Dugar.[214]  The deposition testimony of Lieff Cabraser's attorneys and staff reiterated the information provided

---

[211] Ex. 175 to Report.

[212] Ex. B to Fineman Declaration.

[213] The firm uses the phrase the "Special Master and as counsel" because typically both the Master and his counsel, Sinnott, alternated asking questions of the witnesses, frequently covering the same ground, and in the case of the Special Master, periodically offering his views on the topic being covered.

[214] Exs. 10, 18, 19, 55, 59, 61, 101, 104 and 106 to Report.

by the firm in the November 10, 2016 Goldsmith Letter, the April 5, 2017 Presentation, and its responses to the Special Master's written discovery, and is further reflected in this Response and Objections.[215]

On July 5, 2017, the Special Master made a request for a supplemental submission from Customer Class Counsel, inviting Counsel to "provide any information they should find relevant, as such information will inform the Special Master's findings, conclusions, and recommendations presented in his final Report and Recommendation."[216]  In particular, the Special Master asked Customer Class Counsel to address the issues relating to the "areas of concern" identified in the Court's March 8, 2017 Memorandum and Order, and to provide input on additional "topics which have arisen during the course of the Special Master's investigation and are related to his mandate from Judge Wolf."[217]

On August 1, 2017, Customer Class Counsel submitted a Consolidated Response to the Special Master's July 5, 2017 request.  In its Response, Customer Class Counsel specifically addressed the areas of concern raised by the Court and the specific topics identified by the Special Master, all with citations to the written discovery responses and deposition testimony to date.  The Response was augmented by an accompanying July 31, 2017 Expert Declaration of William B. Rubenstein, the Sidley Austin Professor of Law at Harvard Law School and a leading national expert on class action law generally and class action fees in particular ("Rubenstein Declaration I").[218]

In their Consolidated Response, Customer Class Counsel stated:

---

[215] *Id.*

[216] Ex. F to Fineman Declaration.

[217] *Id.*

[218]  Neither the Consolidated Response nor Rubenstein Declaration I are exhibits to the Special Master's Report, and therefore are attached as Exs. G and H to the Fineman Declaration.

- Counsel employed the correct legal standards in their request for an award of attorneys' fees and expenses;

- Except for the inadvertent double-counting of certain staff attorneys' time, as reported in the November 20, 2016 Goldsmith Letter, the representations made by counsel in their request for awards of attorneys' fees and expenses were accurate and reliable.

- The attorneys' fees and expenses awarded to Plaintiffs' Counsel were reasonable when made, and should not be reduced beyond the $2 million already contributed to the cost of the Special Master's investigation; and

- The billing rates for staff attorneys who worked on the State Street Action were based on the firms' understanding of appropriate market rates for the legal services rendered, and that based on the work performed by those staff attorneys, the hourly rates submitted as part of the lodestar cross-check against the percentage of the fee recovery were appropriate.[219]

In the Consolidated Response, Lieff Cabraser specifically addressed questions raised by the Special Master about whether it was appropriate to assign the same hourly rates to staff attorneys paid directly by the firm and those paid by an agency, and whether such agency attorneys should be treated as a cost instead accounting for their time as part of the firm's lodestar.[220]  With reference to the factual record and the Rubenstein Declaration I, Lieff Cabraser made the following points on this topic:

- Some staff attorneys began their work on the litigation as agency attorneys before being hired directly by the firm;

- By the time the staff attorneys were working on the detailed issue memoranda only one Lieff Cabraser staff attorney was still being paid through an agency (Weiss);

- Staff attorneys and agency attorneys were given the same type of assignments, supervised in the same manner, and were expected to produce the same quality of work (Weiss, for example, authored detailed issue memoranda just like the others);

---

[219] Ex. G to Fineman Declaration at 2-5.

[220] *Id.* at 4-5.

- Ten Eyck and Wintterle, agency lawyers paid by Thornton but working in Lieff Cabraser's offices, also prepared issue memoranda just like the others;

- Billing rates for all firm staff lawyers, including those from an agency, were set based on the firm's understanding of the appropriate market rates for similar legal services; and,

- The amount paid by the firm to an agency for an agency attorney's work on an hourly basis was comparable to the hourly pay for staff attorneys paid directly by the firm.[221]

With the submission of the August 1, 2017 Consolidated Response, Lieff Cabraser assumed the Special Master's investigation was complete and that the Master would proceed to prepare a final report and recommendation. As explained below, however, the Special Master's investigation took, what was for Lieff Cabraser at least, an unexpected turn.

### 4.    The "Chargois" Investigation.

During the course of its investigation, the Special Master learned that 5.5% (or $4.1 million) of the attorneys' fee awarded by the Court in the State Street Action was allocated to attorney Damon Chargois, at all times understood by Lieff Cabraser to be Labaton's "local counsel" in Arkansas.[222] According to the Special Master, because Chargois had not appeared on any of the pleadings in the State Street Action and had not been identified to the Court as a prospective recipient of attorneys' fees, the Master commenced an investigation into the relationship between Chargois and Customer Class Counsel and the basis upon which Chargois was compensated.[223]

---

[221] *Id.* In his June 6, 2017 deposition testimony, Lieff Cabraser managing partner Fineman made many of these same points, and emphasized to the Special Master that the firm incurs "overhead" expenses in connection with all of its staff attorneys, including those paid directly by an agency. Ex. 18 to Report at 47-55.

[222] Report at 87.

[223] *Id.*

a.     **August 11, 2017 Written Discovery Responses.**

The Chargois investigation commenced with written discovery propounded on Lieff Cabraser (and on the other Plaintiffs' Counsel) on August 7, 2017.  Lieff Cabraser responded as follows:

- August 11, 2017 – Lieff Cabraser Heimann & Bernstein, LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Supplemental Interrogatories Due on August 11, 2017 (responses and objections responding to one multi-part interrogatory);[224] and,

- Lieff Cabraser Heimann & Bernstein, LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Supplemental Request for the Production of Documents (responses and objections to one request for all documents in the firm's possession concerning Chargois).[225]

In Lieff Cabraser's August 11, 2017 interrogatory responses, the firm informed the Special Master of its limited knowledge of and complete lack of contact with Chargois.  In particular, Lieff Cabraser advised the Special Master that the firm had no contact with Chargois in the State Street Action other than several emails on which Lieff Cabraser attorneys were copied, and that no Lieff Cabraser attorney had ever met or spoken with Chargois.[226]  Lieff Cabraser explained to the Special Master that the firm was informed and understood at all times that Chargois was "local counsel" in Arkansas (the location of the lead plaintiff ATRS); that Labaton owed Chargois 20% of its share of any fee award in the State Street Action; and, that at the request of Labaton and Thornton, the firm agreed that 5.5% of the aggregate fee award in the Action (an amount estimated to equal Labaton's 20% obligation) would be paid to Chargois for his services.[227]

---

[224] Ex. I to Fineman Declaration.

[225] Ex. J to Fineman Declaration.

[226] Ex. I to Fineman Declaration.

[227] *Id.*  In their August 11, 2017 interrogatory responses, Lieff Cabraser also responded to the Special Master's inquiry why the firm had not previously produced the fee allocation

### b.      September/October 2017 Depositions.

Between September 1, 2017 and October 25, 2017, the Special Master, through his

counsel, conducted 15 depositions concerning the Chargois investigation.[228]  Only two of those

deponents – Chiplock and Robert L. Lieff – were from Lieff Cabraser.  *Id.*[229]  During their

depositions, Chiplock and Lieff confirmed that Chargois was repeatedly described and

represented to the firm as "local counsel" for Labaton and/or ATRS; that they were informed that

Chargois had played an "important" role in the litigation and had provided legal services that

were of value to the client and therefore to the class; that they were familiar with the role of local

counsel in large financial fraud cases (particularly those led by public pension fund clients); that

they appreciated that Chargois' role was similar to that of the local counsel for the firm's public

pension fund client in the BNY Mellon Action; and, that based on their past experience, they did

not believe that fees of approximately 5% to local counsel were unreasonable in view of what

they understood about Chargois' role in the case.[230]

Further, it was not until certain deposition testimony in September and October 2017, that

Lieff Cabraser first learned that Labaton had an agreement in place to pay Chargois (or his law

firm) up to 20% of attorneys' fees received by Labaton in any litigation involving an institutional

---

agreement or related emails showing that 5.5% of any aggregate fee award would be paid to
"Labaton Sucharow's local counsel."  *Id.*  Lieff Cabraser explained to the Special Master that the
firm "simply in good faith did not understand [the fee allocation agreement or related emails] to
be responsive to the Master's prior discovery requests," pointing out that the originally
propounded document request seeking such information had been specifically withdrawn by the
Master's counsel and that no interrogatory sought the specific fee allocation by and among
Plaintiffs' Counsel.  *Id.*  When the Special Master asked for the fee allocation agreement and
related email correspondence, Lieff Cabraser promptly and thoroughly complied.  *See* LCHB-
0053483 – LCHB-0053569.  In his Report, the Special Master notes that he "does not conclude
that the non-disclosure constitutes discovery misconduct."  Report at 119, n. 98.

[228] *See* Appendix C.

[229] *Id.*; Exs. 41 and 139 to Report.

[230] Ex. 41 to Report at 100-105, 109-111, 115-118, 150-152; Ex. 139 to Report at 57-68, 72-
97.

investor for whom Chargois had facilitated the introduction, including ATRS, or that this arrangement dated back to approximately 2007.[231]  Moreover, it was not until conduct of the depositions in September and October 2017 that Lieff Cabraser first learned that Chargois had not served as local counsel for Labaton and/or ATRS in the State Street Action, had performed no work in the Action, and was not known to the client representative for ATRS.[232]  Lieff himself testified that had he known of the true nature of the Chargois arrangement he would not have agreed that the firm share in the payment of fees to Chargois.[233]

c.  **November 3, 2017 Submission.**

On September 7, 2017 the Special Master propounded on Lieff Cabraser a request for a supplemental submission concerning "the circumstances of the monies paid to attorney Damon Chargois in the State Street case for his role as a referring attorney and the implications of that payment and circumstances in addressing the charge of Judge Wolf in paragraph 2 of his March 8, 2017 Order."[234]  The date for responding to this request was extended to November 3, 2017 to accommodate the completion of the deposition schedule.

In its November 3, 2017 Response, Lieff Cabraser again, with reference to the firm's interrogatory responses, internal documents, and deposition testimony, advised the Special Master that the firm understood Chargois to be local Arkansas counsel who played an important role in the State Street Action, a role with which the firm was generally familiar from prior experience, including in the BNY Mellon Action (on which Lieff Cabraser was lead counsel).[235] Lieff Cabraser also reminded the Special Master that it did not learn that Chargois had not served

---

[231] *Id.*

[232] *Id.*

[233] Ex. 139 to Report at 95-97.

[234] Ex. K to Fineman Declaration.

[235] Ex. L to Fineman Declaration.

as local counsel, had performed no work in the State Street Action, and was not known to the

client representative for ATRS until those facts came out during the depositions in September

and October 2017.[236]   Finally, the firm stated that at no time did Lieff Cabraser agree to

"conceal" the existence of Chargois from anyone, including the Court, class members, or ERISA

Counsel, either before or after the November 2016 final approval hearing.[237]

### d.      Expert Testimony.

On February 23, 2018 Lieff Cabraser, along with the other Plaintiffs' Counsel, received

an Ethical Report for Special Master Gerald E. Rosen, prepared by Professor Gillers ("Gillers

Report I").[238]   In his Report I, Gillers concluded that the "Chargois Arrangement," defined by

Gillers (and the Special Master) as Labaton's agreement to pay Chargois up to 20% of any

attorneys' fees received by Labaton in any litigation involving an institutional investor for whom

Chargois had facilitated the introduction, including ATRS, without regard to substantive work

performed in a particular case, was "unethical payment for the recommendation of a client, not a

valid division of [a] fee agreement."[239]   Gillers went on to opine that even if the "Chargois

Arrangement" could be deemed a valid division of a fee agreement, and not an improper

payment for recommending a client, Labaton, Thornton and Lieff Cabraser were ethically

---

[236] *Id.*

[237] *Id.*; *see also* Ex. 41 to Report at 104-105, 115-117, 119-120, 140-141.  In his Executive Summary, the Special Master states, without citation to the record, that, "the Customer Class Counsel specifically agreed that the Court not be told of the allocation of fees, which meant that the Court would not be told of the Chargois arrangement,…."  Executive Summary at 26.  To be sure, there is no agreement, email, or any other document or testimony, in which Lieff Cabraser "specifically agreed that the Court need not be told of the allocation of fees," or that Chargois would be receiving a fee.

[238] Ex. 232 to Report.

[239] *Id.* at 33 and 58.

obligated to disclose the Arrangement to the Court and to the class under Massachusetts ethical rules.[240]

However, when confronted at his March 20 and 21, 2018 deposition with the fact that Lieff Cabraser did not know of the Chargois Arrangement until recently (*see* discussion *supra* at 49-53), Gillers recanted his opinion that Lieff Cabraser had violated any ethical rules.[241]  Indeed, in his Supplemental Ethical Report for Special Master Gerald E. Rosen, dated March 8, 2018 ("Gillers Report II"), Gillers eliminated all reference to Lieff Cabraser having violated any ethical rules as to any matter under consideration by the Special Master, including concerning Chargois or the Chargois Arrangement.[242]

In response to Gillers Report I, on March 26, 2018, Lieff Cabraser offered expert reports from Professor Rubenstein and an experienced Boston, Massachusetts based attorney, Timothy Dacey, in support of the firm's position that it violated no legal or ethical rules in connection with the Chargois payment or the Chargois Arrangement.[243]  In the Expert Report of William B. Rubenstein ("Rubenstein Report"), Rubenstein expressed three primary opinions: (1) Rules 23 and 54 of the Federal Rules do not require disclosure of fee allocation agreements absence judicial order, courts rarely order disclosure or involve themselves in fee allocation, and the Court in this case issued no such order; (2) Professor Gillers's attempts to advocate around the text of Rules 23 and 54 are not supported by the law; and (3) Rule 23 does not require disclosure of fee allocation agreements in the class notice.[244]

---

[240] *Id.* at 66, et seq.

[241] Ex. 253 to Report at 219-222, 239-240, and 248-254.

[242] Ex. 233 to Report.

[243] Exs. 234 and 254 to Report.

[244] Ex. 234 to Report.  Professor Rubenstein's extensive experience and qualifications as one of the nation's leading experts in complex class action practice are set forth in Ex. H to the

Lieff Cabraser's other expert, Dacey, is a longtime Boston trial lawyer and expert on Massachusetts ethical rules.[245]  In the Expert Report of Timothy Dacey ("Dacey Report"), Dacey concluded that, based on the factual record described above, "Lieff Cabraser attorneys did not violate the Massachusetts Rules of Professional Conduct."[246]  According to Dacey, to violate the duties of candor imposed by the Massachusetts ethical rules, "a lawyer must have actual knowledge that his or her statements are false or misleading.  Based on the facts as I understand them, the lawyers at Lieff Cabraser lacked the requisite state of mind to establish a violation of these Rules."[247]

Between March 20 and April 20, 2018, nine expert witnesses proffered by the parties, including Gillers, Rubenstein and Dacey, were deposed.[248]  Rubenstein and Dacey were deposed on April 9, 2018.[249]  Their testimony was in all material respects consistent with their expert reports.[250]

### e.      April 5, 2018 Submission.

On March 25, 2018, the Special Master requested from Lieff Cabraser "any evidence… identif[ied] in the record, or evidence… not currently in the record" relating to Lieff Cabraser's "state of mind" as to the issue of [Chargois's] role in the State Street litigation prior to

---

Fineman Declaration at 3-7, and A1-A18.  Rubenstein is the author of the definitive text on class action practice, *Newberg on Class Actions* (5th ed.)(2015).

[245] Dacey, who has practiced for 48 years at the Boston firms of Hill & Barlow, LLP and Goulston & Storrs, P.C., has been a member of the Committee on Professional Ethics of the Massachusetts Bar Association since 1984 and Vice-Chair of the Committee since 1991.  In addition, since 2012, Dacey has been a member of the Massachusetts Advisory Committee on the Rules of Professional Conduct, and a lecturer at Harvard Law School where he teaches a course that focuses on the rules of professional conduct.  Ex. 244 to Report.

[246] *Id.* at 18.

[247] *Id.* at 1.

[248] *See* Appendix C.

[249] Exs. 235 and 237 to Report.

[250] Exs. 234, 235, 237 and 244 to Report.

- 55 -

September 7, 2017.[251]  Even though the record was already full of evidence of the firm's "state

of mind" regarding Chargois, on April 5, 2018, Lieff Cabraser submitted a Response to the

Special Master's March 25 request.[252]  That Response included specific references to the

deposition testimony of Lieff and Chiplock concerning their understanding that Chargois was

local Arkansas counsel for Labaton and ATRS; that Chargois had played an important role in the

litigation; that they assumed his role as local counsel was comparable to the role played by local

counsel in the BNY Mellon Action; and, that there was nothing unreasonable or unusual about

local counsel receiving approximately 5% of an aggregate fee in a large financial fraud case.[253]

Along with the Response were original declarations from Chiplock and Lieff again confirming

their, and the firm's, understanding of Chargois' role in the State Street Action.[254]

### 5.    The Final Hearing Before the Special Master.

On April 13, 2018, at the JAMS office in Boston, the Special Master conducted a full-day

hearing and oral argument concerning his investigation ("Final Hearing").[255]  Lieff Cabraser's

presentation at the final hearing was consistent with the facts set forth in this Response and

Objections.[256]

During the hearing, the Special Master inquired of Lieff Cabraser's Heimann whether the

firm wished for the Master to recommend "remedial action" in the nature of payment (or

repayment) from Labaton and/or Thornton to Lieff Cabraser because the firm was not fully and

---

[251] Ex. M to Fineman Declaration.

[252] Ex. N to Fineman Declaration.

[253] *Id.*

[254] *Id.*

[255] Ex. 162 to Report.

[256] *Id.* at 219-307.

accurately apprised of the Chargois Arrangement by its colleagues.[257]  Heimann responded that although the firm was "not happy that we weren't fully informed in real-time about the Chargois [Arrangement] and that we ended up paying a very large sum of money to him that we probably would have had some serious questions about had we been fully informed," in light of the firms' longstanding "good relationship" with Labaton and Thornton, and because Lieff Cabraser did not agree with the apparent position of the Special Master regarding Labaton's failure to disclose the payment to Chargois to the Court or the class, the firm declined to request such payment (or repayment).[258]

## I.   The Special Master's Report And Findings Relevant and Specific To Lieff Cabraser.

On May 14, 2018, the Special Master filed under seal and served on Plaintiffs' Counsel, including Lieff Cabraser, a 54 page Executive Summary, and a 377 page Report.  After hearing from the parties on proposed redactions to the Report, the Court put the Executive Summary and Report in the public docket on June 28, 2018.[259]

The Special Master's key findings in the Report relevant or specific to Lieff Cabraser are as follows:

- *The Special Master acknowledges the risks, difficulties and challenges of the State Street Action, the skill and dedication of Plaintiffs' Counsel, and the outstanding accomplishment of the settlement:*

> After much work, dedication and exceptional effort in the discovery and mediation process, the parties ultimately reached a $300 million settlement.  Given the risks, complexities and legal challenges inherent in the litigation, it must be said that the $300 million settlement, procured by

---

[257] *Id.* at 271-272.

[258] *Id.* at 272-274.

[259] ECF No. 357 and 357-1.

skilled and dedicated plaintiffs' counsel, was an excellent result for the class.[260]

* * *

By all accounts, the class settlement provided an excellent result for the class members and was a product of the highly dedicated and professionally skilled work of the class'[s] law firms, a view with which the Special Master fully agrees.[261]

- *The Special Master finds the fee awarded to Plaintiffs' Counsel was appropriate based on the work performed and the result achieved:*

The Court approved the settlement on November 2, 2016. Of the $300 million, plaintiffs' counsel were awarded $74,541,250.00 in attorneys' fees and $1,257,699.94 for expenses. By itself, this attorney fee award was not disproportionate or unsupportable when measured against the positive result for the class and the attorneys' effort and skill that was required to achieve it. Indeed, all other things being equal, the attorneys' fee award was fair, reasonable and deserved.[262]

- *The Special Master concludes that the hourly rates for, and the number of hours worked by, Lieff Cabraser's attorneys, including its staff attorneys, were reasonable and accurate:*

The lodestar reports of Plaintiffs' Counsel charged partners at hourly rates ranging from $535 to $1000, and associates at hourly rates of $325 to $725 [footnote omitted]. As discussed below, we conclude that these rates are commensurate with partner and associate rates charged and approved in similarly complex class actions, and therefore are reasonable.[263]

* * *

The Special Master recommends that, for the reasons summarized above and set forth in great detail in the Report, with the minor exceptions noted herein, the Court find that the hours and rates of the attorneys of each of the law firms for whom lodestar reports were submitted to the Court are reasonable and accurate, and consistent with applicable market rates for comparable attorneys in comparable markets for comparable work. This

---

[260] Executive Summary at 3, Report at 6.

[261] Executive Summary at 7, Report at 125; *see also*, Report at 151-156 (discussing the complexity and challenges plaintiffs' counsel faced and the experience required to successfully assert the FX trading claims alleged in the State Street Action).

[262] Executive Summary at 3, Report at 6.

[263] Report at 164 and 176.

includes the hours and rates for the excellent work performed by the staff attorneys employed by Labaton and Lieff.[264]

* * *

The fact that they were designated as "staff attorneys" or that they were tasked with "document review" should not indicate the work they did was routine or "paralegal" in nature.  Both the work they performed and their professional qualifications and experience established them as more akin to lower-level and mid-level associates.[265]

* * *

The staff attorneys at the Labaton and Lieff firms did much more than "low-level" document review.  The staff attorneys not only did first-level document review; they also digested complex information and prepared very detailed, substantive legal memoranda on issues that Customer Class Counsel wanted to explore in depositions once witnesses were identified and also on areas that would require follow-up discovery and document discovery if the mediation were to end without a resolution.[266]

* * *

Contrary to the picture painted in the *Boston Globe* article, with the exception of Michael Bradley, whose work is discussed below, these staff attorneys did much more than "low level" document review.  As noted, they all were attorneys with years of experience, and the majority of them had specialized knowledge or skills in FX/securities areas.  A number of them had worked on BONY Mellon which raised similar issues to those in the *State Street* case.  They all made substantive contributions to the case. They did not simply do first-level document review; they also digested complex information and prepared topical memoranda and witness memoranda for depositions – the same kind of work done by associates at large firms.  Rather than referring to them as staff attorneys, it would be more accurate to refer to them as "non-partnership-track" attorneys.[267]

The *Boston Globe* article also took issue with the staff attorneys' billing rates as compared to what the staff attorneys were actually *paid*.  The article reported that these attorneys were paid only $25 to $40 an hour.  In fact, the vast majority of the staff attorneys were paid in the range of $40-$60 an hour, plus benefits.  More importantly, there is nothing impermissible about marking up an attorney's billing rate above "cost" so

---

[264] Executive Summary at 21-22 and 49-50, Report at 365-366.

[265] Report at 70-71.

[266] Report at 72.

[267] Executive Summary at 22, Report at 176-177.

long as the rate at which the attorney is billed is reasonable and commensurate with experience and the value of the work performed.[268]

\* \* \*

The Special Master concludes the staff attorney billing rates in the lodestar fee petition are generally reasonable given that the staff attorneys were responsible for some 70% of the work billed on the case. These rates are particularly reasonable when compared to the relatively low number of hours billed by associates for the three Customer Class law firms (less than 2% of the total time billed). This can be attributed to the fact that the staff attorneys effectively did the work of lower- to mid-level associates. Thus, for purposes of the analysis here, the Special Master views the staff attorney work as associate-level work.[269]

- *The Special Master finds contemporaneous time records of Lieff Cabraser's attorneys, including its staff attorneys, to be sufficiently and reliably detailed:*

Lieff used a comparable electronic time keeping system to maintain accurate and contemporaneous time records for its attorneys.[270]

\* \* \*

As described below, based on our review of the individual as well as firm-wide time entries recorded in this case, the time records produced by the firms participating in the *State Street* case sufficiently and reliably detail the firms' substantive, legal contributions to that case.[271]

\* \* \*

Aside from the reasonableness of the aggregate tally, we conclude that the hours presented on the Fee Petition are reasonable for three additional reasons. First, the firms appropriately staffed the case, assigning lawyers to specific tasks commensurate with their experience and capabilities with a sensitivity to the costs ultimately passed on to the client, the class, through the common fund. Thus, the hours expended by each individual attorney accurately reflect the nature of the work assigned to him or her. Second, the narratives in the time records themselves capture the precise nature of these substantive contributions in detailed – and in some

---

[268] Report at 177.

[269] Report at 180.

[270] Report at 203.

[271] Report at 209.

instances highly detailed – descriptions of the legal work performed within the individual records.[272]

\* \* \*

Billing entries of Lieff attorneys, moreover, sufficiently conveyed the nature of the work – whether emails, meetings, drafting or reviewing – along with the salient details, such as with whom and the basic substance of each task.[273]

\* \* \*

While we recognize the danger that Lieff, as Co-Lead Counsel in the *BONY Mellon* case, could include hours in the *State Street* lodestar expended in litigating the *BONY Mellon* case or other FX matters, we conclude that Lieff did not do so here.  All the hours submitted by Lieff in its *State Street* hours bear, directly or indirectly, on the legal issues presented in the *State Street* case.[274]

- *The Special Master finds Plaintiffs' Counsel's aggregate lodestar multiplier of 1.8 to be "certainly within the reasonable range" for purposes of a lodestar cross-check:*

In performing a lodestar cross-check on a proposed percentage-of-fund fee award, a lodestar multiplier is used.  A lodestar multiplier is determined by dividing the proposed percentage-of-fund award by the total lodestar [citation omitted].  In the instant matter, plaintiffs' counsel's combined lodestar was $41,323,895.75.  Dividing the proposed fee of 25% of the total fund, $300,000,000.00, by the lodestar yields a multiplier of 1.8.

A 1.8 multiplier is certainly within the reasonable range [citing cases that supported multipliers of 2.02, 3.0, 1.987, 2.7, 3.5 and up to 4.0].[275]

- *The Special Master concludes that Lieff Cabraser's double-counting was "inadvertent," and that Lieff Cabraser's conduct was a lesser part of the cause of the investigation:*

Each of the three firms bears different degrees of responsibility for the double-counting and, accordingly, the firms' respective roles are addressed *seriatim* here.

Lieff… has acknowledged that it made a mistake in claiming the hours of the staff attorneys and agency attorneys loaned to Thornton on its lodestar.

---

[272] Report at 210.

[273] Report at 211.

[274] Report at 212.

[275] Report at 245-246.

Contemporaneous evidence also indicates that Lieff anticipated that
[certain of] its staff attorneys would be included on Thornton's petition.
Notwithstanding this error, Lieff's responsibility for the actual double-
counting is somewhat mitigated because it never saw the lodestar reports
of Thornton or Labaton in order to be able to compare, and possibly catch,
the double-counting.  Lieff had, early in this litigation, agreed to the
"loaning" of [certain of] its staff attorneys and agency attorneys to
Thornton as a means of sharing the costs and risks of employing these
attorneys and the litigation as a whole.  While the agreement to "loan" the
staff and agency attorneys to Thornton was, perhaps, an ill-considered
judgment since the cost-sharing of this case could have been achieved in
other ways, it cannot be said that the agreement to share costs through this
mechanism was a significant cause of the double-counting.  Thus, while
Lieff bears some responsibility for the double-counting misstatements, and
thereby the attendant cost of the Special Master's investigation, its
conduct was inadvertent.[276]

•     *The Special Master recommends that Lieff Cabraser "disgorge" one-third of the
total double-counted staff attorney lodestar and that the money be "returned" to the class:*

All three customer class firms will share responsibility.  The remedy for
this is the disgorgement in equal amounts of the entire $4,058,000 in
double-counted time.  It is recommended that this entire amount be
returned to the class.[277]

•     *The Special Master recommends that the time of Lieff Cabraser's staff attorneys
paid by an agency be treated as a cost item, instead of including that time in the firm's aggregate
lodestar:*

The law firms should not be permitted to be compensated for these
attorneys at market rates and no multiplier should be granted on their
hours and rates (if a multiplier is granted).  Rather, the costs of the
contract attorneys should be reimbursed to the law firms as an expense,
and the firms compensated for that expense dollar-for-dollar.[278]

•     *The Special Master recommends that Lieff Cabraser "disgorge" the difference
between (a) the total of the firm's "agency" attorneys' lodestar, times 1.8, and (b) $50 per hour
for the agency lawyers' time:*

---

[276] Executive Summary at 14-15; Report at 363.

[277] Executive Summary at 49, Report at 364.  Lieff Cabraser's objection to this
recommendation by the Special Master is presented *infra* at 67-77.

[278] Executive Summary at 22-23 and 50, Report at 367; *see also*, Report at 181-189.  Lieff
Cabraser's objection to this recommendation by the Special Master is presented *infra* at 77-90.

- 62 -

The seven contract attorneys, all retained by Lieff, recorded 2,833.5[279] hours in this role at rates varying between $415 and $515. The total billings for contract attorneys was approximately $1.3 million ($1,325,588). In addition, a multiplier of 1.8 was added to their hours and rates, yielding a total award of $2.4 million ($2,386,058) for the time of the contract attorneys. This amount should be disgorged and returned to the class. The Customer Class Counsel is, however, entitled to claim the contract attorneys as an expense calculated at a more reasonable more rate of $50/hour. The Special Master recommends the difference between these two figures also be awarded to the class.[280]

- *The Special Master finds that Lieff Cabraser was not aware of the Chargois Arrangement, and justifiably believed Chargois to be Labaton's local counsel, and therefore bears no responsibility for the Chargois episode and recommends the firm be relieved from any further responsibility relating to Chargois under of the claw-back agreement:*

> Labaton even failed to fully inform its Customer Class co-counsel [including Lieff Cabraser], who were sharing equally in the $4.1 million payment to Chargois, of Chargois' actual role (or lack of a role) in the *State Street* case.[281]
>
> \* \* \*
>
> Lieff and Thornton were not privy to the origins of the Chargois Arrangement or the details of Labaton's obligation to pay Chargois in all cases in which ATRS was a co-lead counsel.[282]
>
> \* \* \*
>
> Beyond this, when [Labaton] sought to have Lieff and Thornton share in the obligation to Chargois by splitting equally the $4.1 million payment to him, they told them only a portion of the story, leading them to believe that Chargois was local counsel and performing work of value in the case.[283]

---

[279] As noted above, this correct number would appear to be 2899.2.

[280] Report at 367-368. A similar recommendation is contained in the Special Master's Executive Summary, but certain of the dollar figures cited there are different than those cited in the Report and are incorrect. Executive Summary at 50. Lieff Cabraser's objection to this recommendation by the Special Master is presented *infra* at 90-96.

[281] Executive Summary at 26.

[282] Report at 106, 287-289, 301-302.

[283] Report at 331; *see also* Report at 350-351; Report at 109-113 (summarizing Lieff Cabraser's lack of knowledge of the Chargois Arrangement, and its justifiable belief that Chargois was serving at local Arkansas counsel for Labaton on behalf of ATRS).

*   *   *

On the one hand, Lieff agreed to share in the Chargois payment and at
least knew about Chargois, albeit not the full state of affairs.  On the other
hand, the Special Master believes that Lieff was misled into agreeing to
share in the Chargois payment.  Ordinarily, some recompense would be in
order for this.  However, at oral argument, Lieff's counsel (and the firms'
General Counsel), Richard Heimann, when asked what if any relief he was
seeking, indicated he was not looking for any repayment….  In view of all
these factors, the Special Master believes that the fairest result for the
Lieff firm would be for it to be relieved of its obligations to Labaton under
the claw-back letter as to Chargois, but no more.[284]

- *The Special Master concludes that even after his recommended monetary
"remedies" are imposed on Lieff Cabraser, the firm will still have received as a fee its base
lodestar plus a significant multiplier*:

> [E]ven after the imposition of the monetary remedies recommended
> here… Lieff… will still be left with not only their base lodestar claim, but
> a substantial multiplier.  The Special Master calculates that even after the
> allocation all monetary amounts, and the cost of the investigation, the
> Customer Class Firms will still receive its [sic] base lodestar plus a
> significant multiplier.[285]

**J.   The Actual and Potential Costs To Lieff Cabraser Of The Special Master's
Investigation.**

Consistent with the firm's fee interest in the State Street Action relative to the other

Customer Class Counsel, Lieff Cabraser has borne 24% of the direct costs of the Special

Master's investigation.  *See* discussion *supra* at 41.  In other words, Customer Class Counsel

have paid a total of $3,800,000 to fund the Special Master's investigation ($500,000 of which

has been paid for future work, if any, by the Special Master and his counsel and/or advisors), and

Lieff Cabraser's 24% share of that total paid is $912,000.

In addition to the amount of money it has paid to finance the Special Master's

investigation, Lieff Cabraser has also incurred an additional $428,715 in costs to represent and

---

[284] Report at 352.  Lieff Cabraser's response to this recommendation by the Special Master
is presented *infra* at 96-98.

[285] Report at 376.  Lieff Cabraser's objection to this finding by the Special Master is
presented *supra* at 6, *infra* at 64-66, and 99.

- 64 -

defend itself during the investigation.  This figure includes the costs of three expert reports from Rubenstein; one expert report from Dacey; frequent air travel from San Francisco to New York and Boston for Heimann, and his attendant accommodation expenses; travel from New York to Boston and related accommodation expenses for Chiplock; travel from San Francisco to New York of five Lieff Cabraser staff attorneys (for their depositions), along with related hotel expenses; and miscellaneous other related litigation costs.[286]

Lieff Cabraser's representation of itself during the Special Master's investigation has involved a substantial amount of time from firm partners Heimann, Fineman and Chiplock, along with additional time from Lieff Cabraser support staff.  The aggregate lodestar devoted to the Special Master's investigation, from February 6, 2017 through the date of this Response and Objections, is $1,963,110 (calculated at 2018 hourly rates).[287]  Therefore, the total cost to the firm resulting from the Master's investigation (to date) is $3.30 million.

In addition to that extraordinary figure, the Special Master now recommends that Lieff Cabraser "disgorge" from its fee award an additional $3,593,765, reflecting (i) an equal share of Customer Class Counsel's aggregate inadvertently double-counted lodestar ($1,352,667), plus (ii) the difference between (a) the lodestar attributed (for cross-check purposes) to Lieff Cabraser's "agency" staff attorneys, plus a 1.8 multiplier on that lodestar, and (b) $50 per hour for each hour[288] worked by those "agency" attorneys, or $2,241,098.40.

As noted above, the firm received $15,116,965.50 in attorneys' fees (reflecting its 24% interest in fees allocated to Customer Class Counsel and 20.3% of the total fee awarded to Plaintiffs' Counsel).  *See* discussion *supra* at 41.  Based on its corrected lodestar figures (i.e.,

---

[286] *See* Exhibit O to Fineman Declaration.

[287] *See* Fineman Declaration at ¶ 18.

[288] Again, as noted above, the firm uses the correct contract attorney hourly total of 2899.2 for this calculation.

- 65 -

subtracting $868,417.00 in inadvertently double-counted staff attorney lodestar, resulting in a total lodestar of $8,932,070.50), Lieff Cabraser's *corrected* effective multiplier on its individual fee was 1.69 – substantially less than the aggregate multiplier averaged across all counsel, and indeed less than the 1.8 aggregate lodestar multiplier that the Court *originally found to be reasonable.  See* discussion *supra* at 35.

When subtracting from the firm's fee award the $912,000.00 it has paid to date toward the Special Master's investigation, the firm's award is reduced to $14,204,965.50, resulting in a lowered effective multiplier of just 1.59 on the firm's corrected lodestar.  And after deducting from the firm's fee award the additional costs and lodestar the firm has spent on the investigation, Lieff Cabraser's effective fee award is reduced to $11,813,140.50, for a reduced multiplier of just 1.32.  If, after all of that, the Special Master's recommendations for the "disgorgement" of $3,593,765 of Lieff Cabraser's fees is also implemented, the firm's fee award would be further reduced to $8,219,375.50, for an end multiplier of *0.92* – i.e., a *negative multiplier*, meaning that Lieff Cabraser would not even be recovering what it has put into the litigation.[289]

As argued below, the financial impact on Lieff Cabraser of the Special Master's recommendations is entirely unjust in light of the factual record, the Special Master's actual substantive findings, and the application of controlling legal principles.

---

[289] According to the firm's calculations, Lieff Cabraser would be alone, among all of the firms involved in the litigation, in obtaining a negative effective multiplier if the Special Master's recommendations were fully adopted.  On the other end of the spectrum, one of the ERISA Counsel (Zuckerman Spaeder) would obtain an effective individual multiplier of more than 3.0 if the Special Master's recommendations were fully adopted.

## III.   ARGUMENT IN SUPPORT OF LIEFF CABRASER'S OBJECTIONS TO THE SPECIAL MASTER'S REPORT.

### A.   The Court Must Review Objections To The Special Master's Findings, Conclusions, And Recommendations *De Novo*.

The Special Master was appointed pursuant to Rule 53 of the Federal Rules.  Under Rule 53(f)(3) and (4), a court must decide *de novo* all objections to findings of fact and/or conclusions of law made or recommended by a master.  Accordingly, this Court will review objections to the Special Master's findings, conclusions and recommendations *de novo*.[290]  Based on an independent review of the factual record and controlling case law, the Court should sustain Lieff Cabraser's following objections to the Special Master's findings, conclusions, and recommendations.

### B.   Lieff Cabraser Should Not Be Required To Disgorge Any Portion Of The Firm's Inadvertently Double-Counted Lodestar.

The Special Master recommends that Customer Class Counsel, including Lieff Cabraser, disgorge and "return" to the class in equal amounts the $4,058,000 in double-counted staff attorney time.[291]  Lieff Cabraser objects to this recommendation by the Special Master, and urges the Court to reject it, for the following reasons: (1) the double-counting of certain staff attorney time was inadvertent; (2) the Special Master's recommendation miscomprehends or ignores the limited "cross-check" purpose for which lodestar was submitted and used in the State Street Action; (3) the inadvertent double-counting caused no harm to the class; and, (4) Customer Class Counsel, including Lieff Cabraser, has already been penalized for the double-counting.

---

[290] Ex. 163 to Report, ECF No. 173, at 12 (this Court stating that it will review *de novo* any recommended findings of facts and conclusions of law as to which Plaintiffs' Counsel object).

[291] Executive Summary at 49, Report at 364.

1.       **The Double-Counting of Certain Staff Attorney Time Was Inadvertent.**

As the Special Master notes, the "hot button issue" that triggered the Special Master's investigation was the discovery of the double-counting of certain staff attorney lodestar.[292] Indeed, a substantial portion of the pre-Chargois investigation by the Special Master addressed the double-counting issue.  *See* discussion *supra* at 43-49.  After they explained the accidental nature of the double-counting in numerous interrogatory responses, through thousands of pages of produced internal documents, and in informal interviews and sworn depositions, the Special Master agreed with Customer Class Counsel, including Lieff Cabraser, that the double-counting was "inadvertent."[293]

2.       **The Special Master's Recommendation Miscomprehends or Ignores the Limited "Cross-Check" Purpose of the Submission and Use of Lodestar in this Action.**

Despite the inadvertence of the double-counting, the Special Master recommends that Customer Class Counsel "return the $4,058,000 in double-counted time to the class."[294]  As explained below, there is no "time" or lodestar to "return" to the class.  Plaintiffs' Counsel, including Lieff Cabraser, were not paid by the class on an hourly basis, and did not somehow charge for work that was not performed.  Rather, Plaintiffs' Counsel were compensated on a percentage-of-the-fund basis with Counsel's lodestar submitted solely for cross-check purposes. The Special Master's proposed "remedy" belies either a miscomprehension or a disregard of the purpose of the use of lodestar in the State Street Action.

As the Court ruled, and as the Special Master acknowledges, Plaintiffs' Counsel's fees in the Action were awarded on a percentage-of-the-fund basis, with a lodestar cross-check.  *See*

---

[292] Report at 219.

[293] Executive Summary at 14-15, Report at 363.

[294] Executive Summary at 49, Report at 364.

discussion *supra* at 34-36, 57-61.  The Court ruled that a percentage-of-the-fund fee of approximately 25% was consistent with First Circuit authority and the Court's own practices in large complex cases.  *See* discussion *supra* at 34-36.  The Special Master acknowledges the propriety of a 25% contingent fee, subject to a lodestar cross-check, and acknowledges the reasonableness of the aggregate fee award to Plaintiffs' Counsel.  *See* discussion *supra* at 57-61.

Plaintiffs' Counsel did not seek, and the Court did not award Counsel's fees, based on the very different lodestar-multiplier method.  *See* Declaration of William B. Rubenstein in Support of Lieff Cabraser Heimann & Bernstein, LLP's Responses and Objections to the Special Master's Report and Recommendations, dated June 20, 2018 and filed herewith ("Rubenstein Declaration II"), at 18 ("The Special Master's Report errs in recommending these remedies as it confused the nature of a lodestar cross-check, applied in this case, with a lodestar-based fee, not at issue here."); *see also* Rubenstein Declaration I at 7-12[295] and Rubenstein Declaration II at 19-20 (describing the difference between the percentage method and the lodestar method of awarding attorney's fees in class actions).

The purpose of a lodestar cross-check against a percentage-of-the-fund fee request is clear – a lodestar cross-check is performed solely for the purpose of determining that a percentage-of-the-fee award is reasonable and not excessive.  *See e.g.*, *In re Tyco Intern. Ltd. Multidistrict Litigation*, 535 F.Supp.2d 249, 270 (D.N.H. 2007) (lodestar cross-check used to determine whether the percentage of the fund fee award is "reasonable," and whether the "fee award appropriately reflects the degree of time and effort expended by the attorneys"); *In re Citigroup, Inc. Securities Litigation*, 965 F.Supp.2d 369, 388 (S.D.N.Y. 2013) ("Part of the reasonableness inquiry is a comparison of the lodestar to the fees awarded pursuant to the

---

[295] Ex. H to Fineman Declaration.

- 69 -

percentage of the fund method [as a cross-check]"); *see also* Rubenstein Declaration I at 10

("[U]sing a lodestar cross-check enables a court to make a rough estimate of counsel's lodestar

for the sole purpose of ensuring against a windfall")[296]; Rubenstein Declaration II at 19 ("Since

the early 1990s, most courts have used the percentage method in large common fund cases like

this one, although about half the courts that do so ensure that the percentage that is awarded is

not too great by 'cross-checking' it against counsel's lodestar").

      Unlike the level of detail required to support a lodestar-based fee, however, a lodestar

cross-check is more summary in nature.  *See e.g., Tyco*, 535 F.Supp.2d at 273 ("'The lodestar

cross-check calculation need entail neither mathematical precision nor bean-counting.'" (quoting

*In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 306 (3rd Cir. 2005), as amended (Feb.

25, 2005))); *New England Carpenters Health Benefits Fund v. First DataBank, Inc.*, No. 05-

CIV-11148 (PBS), 2009 WL 3418628, at *1 (D.Mass. October 20, 2009) (determining that

lodestar is enough of a cross-check on the percentage method; a full audit of all attorneys' fees

and costs is too "cumbersome, time-consuming and resource intensive"); William B. Rubenstein,

Newberg on Class Actions (5th ed.) (2015) at §15:86 (collecting cases, including from the First

Circuit, for the summary nature of the lodestar cross-check).

      In the State Street Action, Plaintiffs' Counsel submitted lodestar reports for the purpose

of allowing the Court to conduct a lodestar cross-check against a percentage-of-the-fee award.

*See* discussion *supra* at 32-34.  The combined lodestar submitted by Plaintiffs' Counsel in

connection with their fee application was $41,323,895.75 based on 86,113.70 hours worked.  *See*

*Id*.  In cross-checking Plaintiffs' Counsel's aggregate lodestar against an approximately 25%

contingent fee of $74,541,250.00, the Court found, and the Special Master later agreed, that the

---

[296] Ex. H to Fineman Declaration.

aggregate multiplier of 1.8 was well within the range of what is reasonable under applicable legal authority.  *See* discussion *supra* at 34-36, 57-61.

In the November 10, 2016 Goldsmith Letter, Customer Class Counsel acknowledged the inadvertent double-counting error and advised the Court that approximately $4.06 million of lodestar should be removed from the aggregate lodestar the Court used to perform a cross-check against the 25% percentage-of-the-fund fee award.  *See* discussion *supra* at 39.  The aggregate corrected lodestar figure was accurately reported in the Goldsmith Letter, and is the number that has been adopted by the Special Master in his Report.  *See* discussion *supra* at 39, 48.  In the Goldsmith Letter and throughout the investigation, Customer Class Counsel has pointed out to the Special Master that: removing the double-counted lodestar from the aggregate lodestar of $41,323,895.75, results in a corrected aggregate lodestar of $37,265,241.25; that applying the corrected lodestar as a cross-check against the aggregate fee awarded ($74,541,250) results in a 2.0 multiplier; and, that such a multiplier, used for lodestar cross-check purposes, is reasonable under controlling legal authority.  *See* discussion *supra* at 41-49, 64-66.

In his Report, the Special Master found the aggregate lodestar multiplier of 1.8 (the lodestar multiplier based on the original fee submissions) to be "certainly within the reasonable range," and cited as support for that statement cases that applied multipliers of 2.02, 3.0, 1.987, 2.7, 3.5 and up to 4.0.  *See* discussion *supra* at 61.  The Special Master does not attempt to explain why a 1.8 multiplier is clearly reasonable, but a 2.0 multiplier is not.  That is because he cannot.

Controlling case law clearly supports multipliers of 2.0 or more as well within the range of reasonableness for lodestar cross-check purposes.  *See* Ex. 110 to Report, ECF No. 103-1, at 24-25 (collecting and reporting to the Court First Circuit "megafund" settlements in which

lodestar multipliers in a range of 2.7 to 8.3 were approved for cross-check purposes); Rubenstein

Declaration I at 30 ("Quantitatively, a 2 multiplier is consistent with multipliers that courts have

previously approved in similar circumstances"), and 33 ("Nothing about the unfortunate

miscalculation in Counsel's time-keeping displaces this conclusion [that a 2.0 multiplier is

appropriate], as the change in the proposed multiplier is simply from 1.8 to 2.")[297]; Rubenstein

Declaration II at 19-20 ("[C]orrecting the double-counting issue by reducing counsels' lodestar

adjusted their multiplier from 1.8 to 2.01, which in the context of this case was insignificant.").

The Special Master cites no case law, or any other legal principle, to support his proposed

remedy that Customer Class Counsel, including Lieff Cabraser, "return" the amount of the

inadvertently double-counted lodestar to the class.  That is because none exists.  Indeed, as

Professor Rubenstein observes: "In a case where a court employs the percentage method to

determine class counsels' fee, and used the lodestar only for cross-check purposes, the reduction

of an hour of time recalibrates the lodestar multiplier and requires further analysis of whether

that lower amount can continue to sustain the requested percentage award.  But it does not

require the 'repayment' of that hour of time since counsel was never 'paid' for that hour of time;

counsel were paid a percentage of the recovery."  *See* Rubenstein Declaration II at 20-21 (also

citing "[numerous] legal decisions [that] have understood this distinction, after adjusting the

lodestar used for cross-check purposes downward, simply re-assessed whether the resulting

higher multiplier remained reasonable).

Given the purpose of the consideration of lodestar for cross-check purposes, and in light

of the inadvertent nature of Customer Class Counsel's double-counting of certain staff attorney

time, the proper way to address the double-counting issue is simply to remove the double-

---

[297] Ex. H to Fineman Declaration.

- 72 -

counted lodestar from the aggregate amount of lodestar used in the cross-check of the 25%

percentage-of-the-recovery fee.  The Court can then determine whether or not the resulting

aggregate multiplier is appropriate.  Lieff Cabraser submits that it is, particularly in view of the

fact that its *individual* corrected multiplier – 1.69 – is lower even than the original, uncorrected

1.8 aggregate multiplier that both the Court and the Special Master found to be reasonable (and,

as explained *supra* at 64-66, the firm's post-investigation multiplier is substantially lower still).

> ### 3.   In Recommending "Return" of the Double-Counted Lodestar to the Class, the Special Master Identifies No Harm to the Class that Justifies Such a "Remedy".

Both the Court and the Special Master have found that the $300 million settlement

Plaintiffs' Counsel achieved on behalf of the class was an "excellent result," particularly in light

of the uniquely difficult risks and challenges presented by the novel legal theories advanced by

Plaintiffs' Counsel, and given the skill and resources of State Street's attorneys.  *See* discussion

*supra* at 34-36, 57-61.  The class therefore received exactly what it was notified it would receive,

and what it unanimously agreed to. The Special Master recognizes that the class received

significant economic benefits as a consequence of the "highly dedicated and professionally

skilled work of the class' law firms."  *See* discussion *supra* at 57-61.  Prior to final approval,

class members were informed of the financial benefits they would receive from the settlement,

and were told that class counsel would seek a fee up to approximately 25% of the amount

recovered.  *See* discussion *supra* at 32.  Not a single member of the highly sophisticated class of

institutional investors opted out of the certified settlement class or objected to the settlement or

to the proposed fee award.  *See* discussion *supra* at 34-36.

Based on Plaintiffs' Counsel's accomplishment for the benefit of the class, and applying

applicable First Circuit authority, the Court awarded approximately 25% of the recovery as fees.

*See* discussion *supra* at 34-36.  Having nothing whatsoever to do with the quality of Plaintiffs'

Counsel's lawyering or the results achieved for the class, Customer Class Counsel accidentally,

inadvertently, without intention, double-counted a small portion (9.8%) of the aggregate lodestar

submitted to the Court as part of the lodestar cross-check exercise.  The prompt correction of that

error resulted in the lodestar multiplier increasing from 1.8 to 2.0 – well within the range of

reasonableness measured against the 25% percentage-of-the-recovery fee awarded to Counsel.

Under these facts – and these are *the* facts – the class has suffered *no* harm as a

consequence of the inadvertent double-counting, and has received substantial benefits as a result

of the risks taken and the legal skills applied by their attorneys.  The Special Master identifies no

harm suffered by the class as a consequence of the double-counting that justifies his unnecessary

recommended "remedy."

4. **Customer Class Counsel, Including Lieff Cabraser, Has Already Suffered Financially as a Consequence of the Inadvertent Double-Counting.**

The Special Master states that "Lieff bears some responsibility for the double-counting

misstatements, and thereby the attendant cost of the Special Master's investigation,…"[298]

Indeed, Customer Class Counsel, including Lieff Cabraser, has already suffered a meaningful

financial burden as a consequence of their inadvertent double-counting of certain staff attorney

lodestar by paying for the "attendant cost of the Special Master's investigation."  *See* discussion

*supra*, at 64-66.  It would be entirely unjust for the Court to require Customer Class Counsel,

including Lieff Cabraser, to pay more than they already have for the inadvertently double-

counted lodestar.

---

[298] *See* Executive Summary at 15.

**C.**     **In The Event The Court Requires Lieff Cabraser To Disgorge Any Portion Of The Firm's Inadvertently Double-Counted Lodestar, That Disgorgement Should Be Commensurate With The Firm's "Relative" Role In The Double-Counting.**

As stated above, Lieff Cabraser objects to the Special Master's recommendation that Lieff Cabraser disgorge any portion of its inadvertently double-counted lodestar.  Such an outcome is not supported by the law or the facts.  However, in the event the Court overrules Lieff Cabraser's objection, the firm further objects to the Special Master's recommendation that the appropriate remedy is "disgorgement by all three firms in equal amounts" of the $4,058,000 in double-counted time.  Lieff Cabraser objects to the recommendation that it should pay one-third of that amount, $1,352,667, because such an outcome is inconsistent with the factual record and the Special Master's own substantive findings.

To the extent the Court entertains the Special Master's recommendation that Lieff Cabraser should disgorge some portion of that lodestar, the following facts must be recognized:

- Lieff Cabraser received 24% of the fee award allocated to Customer Class Counsel and has paid 24% of the court-ordered costs for the Special Master's investigation ($912,000 of $3.8 million).  *See* discussion *supra* at 64-66;

- the portion of the double-counted lodestar actually attributable to Lieff Cabraser was $868,417, or just 21% of the total double-counted lodestar (*see* discussion *supra* at 3, 38, 64-66); and,

- the portion of the double-counted lodestar attributable to Lieff Cabraser ($868,417), is only 2% of the total aggregate lodestar originally submitted to the Court (*see* discussion *supra* at 64-66).

Based just on these basic facts, Lieff Cabraser should not be obliged to disgorge 33-1/3% of the inadvertently double-counted time.  Rather, given the relatively modest amount of its double-counted lodestar, it should have to pay substantially less than that, subject to further reduction based on the Special Master's factual findings, described below.

- 75 -

The Special Master's recommendation that Lieff Cabraser disgorge an equal amount of the double-counted lodestar is inconsistent with the relevant findings in his Report.  The Special Master describes the "relative responsibility" of Lieff Cabraser, Thornton and Labaton for the double-counting, pointing out that "each of the three Customer Class law firms bears widely varying degrees of responsibility," and "[e]ach of the three firms bears different degrees of responsibility for the double-counting."[299]  The Special Master finds that "Lieff's responsibility for the actual double-counting is somewhat mitigated because it never saw the lodestar reports of Thornton or Labaton in order to be able to compare, and possibly catch, the double-counting."[300]  The Special Master also acknowledges that "it cannot be said that the agreement to share costs" through the sharing of certain staff attorneys with Thornton was a "significant cause of the double-counting."[301]  The Special Master concludes that "while Lieff bears *some* responsibility for the double-counting misstatements, and thereby the attendant cost of the Special Master's investigation, its conduct was inadvertent."  (Emphasis added.)[302]

The Special Master goes on to compare Lieff Cabraser's relatively minor (i.e., "some") share of responsibility for the double-counting with Thornton's "significant responsibility for the double-counting"[303] and Labaton's "ultimate responsibility" for the same.[304]  Despite weighing the relative roles of the firms in the inadvertent double-counting and finding Lieff Cabraser the least responsible, the Special Master nevertheless, and inconsistently, recommends

---

[299] Executive Summary at 10, 13 and 14.

[300] Executive Summary 14.

[301] Executive Summary at 14-15.

[302] Executive Summary at 15 (emphasis added).

[303] Executive Summary at 15-18.

[304] Executive Summary at 18-19.

"disgorgement in equal amounts" of the double-counted lodestar.[305]  The Special Master's recommendation that Lieff Cabraser disgorge an equal amount of the double-counted lodestar is fundamentally at odds with the Master's own findings and should be rejected.[306]

Based on the firm's limited financial stake in the State Street Action (24% among Customer Class Counsel and 20.3% among all Plaintiffs' Counsel), the modest dollar amount of Lieff Cabraser's inadvertent double-counting ($868,417), and given the Special Master's findings as to Lieff Cabraser's modest role in the double-counting, the firm submits that if the Court requires any disgorgement, it should be obliged to pay significantly less than an "equal share" of the total double-counted lodestar.

*   *   *

For the reasons stated above, Lieff Cabraser objects to the Special Master's recommendation that Lieff Cabraser disgorge any portion of the double-counted lodestar.  Such an outcome is inconsistent with the purposes of the lodestar cross-check in a percentage-of-the-fee recovery context, the class has suffered no harm as a result of the accidental double-counting, and the firm has already spent substantial sums to fund the investigation.

> **D.      Lieff Cabraser Should Not Retroactively Be Required To Treat the Firm's Staff Attorneys Compensated By An Agency As A "Cost" Instead Of Including Them In Its Lodestar As Part Of The Aggregate Lodestar Cross-Check.**

After his exhaustive investigation, the Special Master finds that the staff attorneys who worked on the State Street Action were highly qualified and skilled attorneys who made meaningful and valuable contributions to the success of the State Street Action by providing

---

[305] Executive Summary at 59.

[306] The Special Master's description in the Report of the double-counting issues makes clear that Lieff Cabraser's responsibility for the double-counting was less significant than that of its colleagues.  Report at 364.

quality legal services in the nature of complex document review and analysis, and the preparation of sophisticated memoranda. *See* discussion *supra* at 57-60. Finding that the staff attorneys performed at a level comparable to a junior to mid-level associate, the Special Master concludes that their hourly rates (mostly $415 per hour for Lieff Cabraser's staff attorneys) and hours worked were reasonable and appropriate. *See* discussion *supra* at 57-60.

Despite these entirely accurate findings, the Special Master carves out for separate treatment seven of Lieff Cabraser's staff attorneys who at one time or another during the State Street Action were paid by an agency, as opposed to the firm directly. Referring in the Report to the agency attorneys as "contract attorneys," the Special Master "recommends that law firms not be permitted to be compensated for these attorneys at market rates and no multiplier should be granted on their hours and rates (if a multiplier is granted). Rather, the costs of the contract [agency] attorneys should be reimbursed to law firms as an expense, and firms compensated for that expense dollar-for-dollar."[307]

Lieff Cabraser objects to this recommendation on the following grounds: (1) the case law does not support, and indeed flatly contradicts, the Special Master's recommendation that the time of the firm's contract/agency lawyers be treated as a cost; and (2) the "factual" distinctions the Special Master attempts to draw between the firm's staff attorneys on payroll and those paid by an agency do not support the Master's recommendation, and are at odds with a fair reading of the record. No matter what the Special Master's academic views are with respect to the treatment of contract/agency attorneys in the context of class action fee applications, those views should not displace the controlling law or the relevant facts.

---

[307] Executive Summary at 50, Report at 367.

1.    **The Case Law Does Not Support, and Indeed Contradicts, the Special Master's Recommendation The Time of the Firm's "Agency" Lawyers Be Treated as a Cost.**

The Special Master states that "[w]hile legal and ethical rulings have not provided definitive guidance on this interesting issue, the better, more common-sensical view is that the costs of contract attorneys should be passed along as a reimbursable expense rather than as a marked-up profit center."[308]   This statement is not accurate, and is contradicted by the very cases upon which the Special Master relies.

As Professor Rubenstein observes:

> Courts *have* provided definitive guidance: they are unanimously opposed to the Special Master's Report's approach.  Numerous courts have explicitly rejected the argument that contract attorneys must be billed as a cost [footnote omitted] and many other courts – far too numerous to enumerate – have approved fee petitions that include contract attorneys in counsels' lodestar or lodestar cross-check submission.  [Footnote omitted]  By contrast, I am not aware of a single court in the United States that has ever held that contract attorneys must be billed to the client as a cost rather than included in the lodestar at an attorney rate.  [Footnote omitted]

Rubenstein Declaration II at 12.  *See also* Rubenstein, *Newberg on Class Actions* at §15:41 n.5 (listing cases rejecting the argument that contracts attorneys must be billed as a cost).

It is well-settled in the First Circuit that when calculating lodestar, the determination of reasonable rates "will vary depending on the nature of the work, the locality in which it is performed, the qualifications of the lawyers and other criteria."  *Hutchinson ex rel. v. Patrick*, 636 F.3d 1, 16 (1st Cir. 2011).  Most important in determining the reasonableness of hourly rates for lodestar purposes is the "market value of counsel's services."  *U.S. v. One Star Class Sloop*, 546 F.3d 26, 40 (1st Cir. 2008); *see also*, *Hutchinson*, 636 F.3d at 16 ("[D]ata evidencing the prevailing market rate for counsel of comparable skill and experience provides helpful

---

[308] Report at 187.

guidance"); *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950-951, 955 (1st Cir. 1984)

(reasonable fees are calculated according to the prevailing market rates in the relevant

community for similar services by lawyers of comparable skill and experience).  When setting

forth these criteria, the First Circuit has never distinguished between different categories of

lawyers, e.g., partners, associates, or staff or contract (agency) lawyers.

Although the First Circuit has not expressly addressed the issue, one district court case in

the First Circuit has specifically rejected the argument that "contract" lawyers be treated as an

expense instead of being included as part of lodestar.  *Tyco*, 535 F.Supp.2d 249, involved a

securities class action settlement in which the court used the percentage-of-the-fund method with

a lodestar cross-check to evaluate the fee request.  Objectors argued that contract attorneys

should be treated as an expense rather than be included in the lodestar.  *Id.* at 271-273.  The court

rejected that argument as meritless:

> The objection lacks merit.  The lodestar calculation is intended not to
> reflect the costs incurred by the firm, but to approximate how much the
> firm would bill a paying client.  An attorney, regardless of whether she is
> an associate with steady employment or a contract attorney whose job
> ends upon completion of a particular document review project, is still an
> attorney.  It is therefore appropriate to bill a contract attorney's time at
> market rates and count these time charges toward the lodestar.

*Id.* at 272. [309]  This decision from a different court in the First Circuit is directly contrary to the

Special Master's recommendation.

A number of district courts from other circuits have expressly cited *Tyco* in rejecting the

notion of treating contract attorneys as an expense.  *See e.g., Carlson v. Xerox Corp.*, 596

F.Supp.2d 400, 409 (D. Conn. 2009) (citing *Tyco* in concluding the "objection unpersuasive"*,*

---

[309] In fact, Lieff Cabraser has had individual bill-paying clients that have paid the hourly
rates of firm staff attorneys who were paid by an agency.  *See* Ex. A to Fineman Declaration at
56-59.

*aff'd*, 355 Fed.App. 523 (2d Cir.); *Charlebois v. Angels Baseball, LP*, 993 F.Supp.2d. 1109, 1124 (C.D.Cal. 2012) (citing *Tyco* in finding that the hours of contract attorneys "merit inclusion in the lodestar hours"); *In re Enron* Corp. Securities, Derivative and ERISA Litigation, 586 F.Supp.2d 732, 784-785 (S.D. Tex. 2008) (citing *Tyco* in concluding that "prevailing counsel can recover fees for [contract attorneys] services at market rates rather than at their cost to the firm"). *See also* Rubenstein Declaration II at 12, n. 52 (citing additional cases rejecting the argument that contract attorneys must be billed as a cost).

Moreover, and importantly, some decisions rejecting the argument that contract attorneys may only be billed as a cost expressly refer to the fact that class counsel retained the contract attorneys at issue from an agency.  *See e.g.*, *Citigroup*, 965 F.Supp.2d at 394 (adjusting the hourly rates, but rejecting treating as a cost, "attorneys who are not permanent employees of the law firm, are hired largely from outside staffing agencies, are not listed on counsel's law firm website or resume, are paid by the hour, and are hired on a temporary basis to complete specific projects related to a particular action."); *In re AOL Time Warner Shareholder Derivative Litig.*, No. 02-CIV-6302 (CM), 2010 WL 363113 at *25 (S.D.N.Y. Feb. 1 , 2010) (rejecting an objector's argument that contract attorneys should be treated as an expense because the "firms seek a huge markup on the differential between their payment to the businesses referring the contract attorneys and the hourly rates sought" finding that the "contract attorneys here were not mere clerks, but exercised judgment typically reserved for lawyers, under the supervision of the firms' regular attorneys.").  *See also* Rubenstein Declaration II at 12, n. 52 ("In other words, counsel's retention of contact attorneys from an outside agency does not distinguish this case from this vast body of pertinent authority.").

Despite the unequivocal holding of these cases – including the leading case from within the First Circuit – that the time of contract (agency) attorneys may be properly included in counsel's lodestar – the Special Master determines that "those decisions that find contract attorneys indistinguishable from off-track associates are not acceptable for purposes of this Report."[310]  It is extraordinary that the Special Master would seek to impose a significant economic penalty on Lieff Cabraser by disregarding governing law and replacing it with his own personal views.  Equally problematic is that the two cases relied upon by the Special Master for his novel position do not in fact support his approach.  *See* Rubenstein Declaration II at 12-13 ("The Special Master's Report cites only two cases in support of its approach – *Dial* and *Meredith* [footnote omitted] – but when probed, neither actually supports that approach.").

In *Dial Corporation v. News Corporation*, 317 F.R.D. 426 (S.D.N.Y. 2016), lawyers for the plaintiffs *voluntarily* sought repayment for contract attorney time as a cost; the court did not require that they do so.  *Id*. at 438.  In *dicta,* the court in *Dial* expressed its appreciation for counsel's decision to treat the time of the contract lawyers in that case as an expense because it "save[d] the Court from having to 'determine a correct spread between the contract attorney's cost and his or her hourly rate and his or her salary.'" *Id*. at 138 (quoting *Citigroup*, 965 F.Supp.2d at 394 (in which the court rejected the argument that contract attorneys should be treated as a cost)).   The court in *Dial* thus acknowledged the prevailing law that contract attorney time may be included as part of lodestar.  "What this means is that absent the lawyers' voluntary decision, the *Dial* Court would have treated these attorneys as <u>lawyers</u>, not as an expense."  Rubenstein Declaration II at 13.

---

[310] Report at 184.

The other case relied upon by the Special Master is *Meredith Corp. v. SESAC, LLC*, 87 F.Supp.3d 650 (S.D.N.Y. 2015).  In *Meredith*, a large corporate defense firm represented a plaintiff class in an antitrust action.  The decision does not expressly address the lodestar/expense issue, but rather simply identifies contract attorney time as among the expenses for which plaintiff's counsel sought reimbursement.  *Id.* at 671.  "It [the law firm] too voluntarily sought reimbursement for contract attorneys as cost, [footnote omitted] but in doing so, it was careful to explain to the Court that this was a deviation from the firm's usual practice.  [Footnote omitted.]  What this means is that absent the lawyer's voluntary decision, the large corporate firm in *Meredith* would have treated these attorneys as <u>lawyers,</u> not as an expenses."  Rubenstein Declaration II at 13-14, and n. 58.  Neither *Dial* nor *Meredith* support the Special Master's recommendation that Lieff Cabraser's agency attorneys must be treated as a cost.

Although cases that have considered the issue have rejected the argument that contract attorneys (whether on a firm's payroll or hired through an agency) must be treated as a cost, some courts have determined that the market rates for contract attorneys should be lower than comparable full-time associates.  For example, in *Citigroup*, 965 F.Supp.2d at 393-399, the court rejected the argument that contract attorneys hired from outside staffing agencies should be treated as a cost, but based on the facts before it, reduced the hourly rates used by class counsel for those attorneys for purposes of a lodestar cross-check.  The court found class counsel's proposed blended hourly rate of $466 for the contract/agency attorneys in that case too high when compared with a $402 per hour rate for associates, given that the contract/agency attorneys provided their document review services *after* the settlement of the case was reached, and therefore reduced the contract/agency attorneys' rate to $200 per hour.  *Id.*; *see also City of Potomac General Employees' Retirement System v. Lockheed Martin Corp.*, 954 F.Supp.2d 276,

280 (S.D.N.Y. 2013) (acknowledging that "it is beyond cavil that law firms may charge more for contract attorneys' services than these services directly cost the law firm," but questioning the reasonableness of the hourly rates assigned to the contract attorneys in the case); *In re Petrobras Securities Litigation*, No. 14-CIV-9662 (JSR) (S.D.N.Y. June 25, 2018) at 32-35 (reducing the hourly rates of "staff and contract attorneys" of between $325 and $625 per hour by 20% in light of the "considerable time spent by these attorneys on low level document review").[311]  *See also* Rubenstein Declaration II at 16 (noting that "some courts have treated the questions as one of degree not type, adjusting the pertinent hourly rate but rejecting the argument that the contract attorneys be passed through as a cost") and n. 69 (citing cases in which courts reduced contract attorney billing rates for lodestar cross-check purposes).

Finally, those courts that have considered the issue have rejected the argument made by the Special Master here that the lodestar of contract attorneys (in this case agency attorneys) should not be multiplied as part of a lodestar cross-check analysis. *See e.g., In re Citigroup*, 965 F.Supp.2d at 394-395 (rejecting the argument that a lodestar multiplier cannot be applied to contract attorneys' time); *AOL TimeWarner*, 2010 WL 363113 at * 26 (rejecting an objection to allowing a multiplier on contract attorney time, concluding: "It is with respect to risk, in particular, that the objection loses its allure.  Counsel not only paid for the services of the contract lawyers, but also dedicated the time of their regular personnel to supervision.  Because the risk is ultimately financial, counsel's recoupment risk in employing contract attorneys is no less uncertain than relating to the salaries paid to their regular employees"); *Carlson*, 596 F.Supp.2d at 409 (rejecting the argument that contract attorneys' time should not be subject to a multiplier); *In re Petrobras Securities Litigation* at 35-38 (including staff attorney and contract

---

[311] Ex. P to Fineman Declaration.

lawyer lodestar in awarding class counsel a multiplier).[312]  *See also* Rubenstein Declaration II at 17 ("[C]ourts have explicitly rejected the argument that contract attorney time cannot be multiplied") and n. 71.

In disregarding the case law that allows multipliers on contract attorney time, the Special Master offers as a "final caution against allowing a market-rate mark up of contract attorneys," that when a multiplier is applied to market rates, "the actual realized rate on these contract attorneys can be twenty times as much as the firm actually paid the agency, or more."[313]  The Special Master goes on to state, as an example, that "if a firm pays an agency $40/hour for a contract attorney but claims $400/hour for that contract attorney on its lodestar, and then obtains a 2.0 multiplier, the actual recovery rate for this contract attorney is $800/hour – or twenty times what the firm paid for the attorney."[314]  With this arithmetic, the Special Master again misconceives or ignores the purpose of a lodestar cross-check.

The Court awarded Plaintiffs' Counsel 25% of the common fund.  Plaintiffs' Counsel submitted their lodestar solely for cross-check, or verification, purposes.  *See* discussion *supra* at 32-36.  The aggregate lodestar submission showed that the 25% award was about twice Counsel's lodestar.  *See Id.*  This enabled the Court to decide whether that multiplier was appropriate under the circumstances.  *See Id.*  "The Court's conclusion that the 1.8 multiplier was justified did not mean that class counsel received $800/hour for contract attorneys.  It meant that the 25% fee was justified."  Rubenstein Declaration II at 17.  Indeed, the class did not pay Plaintiffs' Counsel $400 per hour or $800 per hour for staff attorney time.

---

[312] *Id.*
[313] Report at 188.
[314] *Id.*

**2.    The "Factual" Distinctions the Special Master Attempts to Draw Between the Firm's Staff Attorneys on Payroll and Those Paid By an Agency Do Not Support the Master's Recommendation.**

The Special Master purports to distinguish between staff attorneys paid directly by the firm and those paid by an agency because: "the contract attorneys utilized in this case did not enjoy uninterrupted affiliation with the firm"; the firm did not offer "health insurance or provide other employment benefits" to agency attorneys; "the contract attorneys do not receive W-2s from the firm"; the firm's agency attorneys "did not bring with them the full panoply of federal and state employment law obligations that relate to employees of a business"; "Lieff did not face the same long-term financial obligations in securing contract attorneys as it did with its non-partnership-track staff attorneys"; and, "Lieff does not offer contract attorneys paid through an agency any additional monetary benefits".[315]

These distinctions between Lieff Cabraser's staff attorneys on payroll and those paid by an agency do not support the Special Master's recommendation that the time of the agency attorneys be treated as a cost for two reasons.  First, there is no case law, and the Master cites none, for the proposition that these "distinguishing" facts, or facts like them, support treating a contract/agency attorney as a cost.  *See* discussion *supra* at 79-85.

Second, a fair reading of the factual record concerning Lieff Cabraser's staff attorneys who worked on the State Street Action while paid by an agency highlights how insignificant, if not irrelevant, the Special Master's proposed factual distinctions actually are, and how they fail to justify his recommendation that the firm's agency lawyers be treated as a cost.  These facts can be summarized as follows:

> • The 18 Lieff Cabraser staff attorneys who worked on the State Street Action, including the seven who were at one time or for all times

---

[315] Report at 182-188.

employed by an agency, are described *supra* at 24-28, in Appendices A and B, and in Exhibit A to the Fineman Declaration.

- Throughout his Report, the Special Master recognizes the staff attorneys' stellar educational and professional backgrounds, and repeatedly praises the quality and value of their work in the State Street Action, without regard to which, if any of those staff attorneys, were paid by an agency. *See* discussion *supra* at 57-61.

- The Special Master concludes that the hourly rates for Lieff Cabraser's staff attorneys, mostly $415 per hour, were based on the nature and quality and the quality of their work, which the Master equates to that of a junior to mid-level associate, were therefore reasonable and appropriate. *See* discussion *supra* at 57-61.

- The Special Master concedes that there is no distinction between staff attorneys and agency attorneys as to the actual work performed for the benefit of the class – "[T]here is no intent to pass judgment on the merits of the work performed by those contract attorneys or their professional qualifications.  Quite the contrary."[316]

- Four of Lieff Cabraser's staff attorneys – Bloomfield, Leggett, Nutting and Sturtevant – were compensated initially by an agency (which billed the firm directly for their services), but became payroll employees of the firm in January 2015, during the pendency of the State Street Action.  Three of these attorneys – Bloomfield, Leggett and Nutting – put in substantial hours in both the BNY Mellon Action and the State Street Action.  Leggett and Sturtevant performed their tasks on the State Street Action while working in Lieff Cabraser's San Francisco offices; Bloomfield and Nutting worked remotely in San Francisco.  Leggett, Nutting and Sturtevent remain with the firm as full-time staff attorneys. *See* discussion *supra* at 24-28.

- Three of Lieff Cabraser's staff attorneys who worked on the State Street Action  – Butman, McClelland, and Weiss – were compensated by an agency throughout their work on the Action.  McClelland and Weiss both devoted substantial amount of time to the BNY Mellon Action.  Weiss, working remotely, also recorded hundreds of hours in the State Street Action (including producing sophisticated issue memoranda) and continues to work for the firm on an agency basis.  Butman and McClelland both worked in Lieff Cabraser's San Francisco office, but contributed only in modest hours to the State Street Action for the firm, 24 and 58, respectively (the bulk of McClelland's hours in the State Street Action were billed directly to Thornton and included in Thornton's lodestar). *See* discussion *supra* at 24-28.

---

[316] Report at 183.

- The firm incurs overhead expenses with respect to all of its staff attorneys, including its agency attorneys, including: the use of physical office space by Leggett, Sturtevant, Butman and McClelland; the use of information technology support for all seven, both in San Francisco and remotely; the use of firm administrative support (e.g., human resources on employment matters or dealing with an agency, accounting services, for payroll or interaction with an agency, and word processing for the submission of time records and the production of memoranda); assistance for all from the firm's litigation support department for training on Catalyst and as needed while performing their tasks; and, supervision of all by firm partners, senior associates and senior staff. *See* discussion *supra* at 12-13, 24-28.

- All attorneys that work for Lieff Cabraser, including those staff attorneys compensated by an agency, are covered by the firm's legal malpractice insurance policy. Of course, in the world of risk assessment, insurance companies focus on the nature of the work being performed and who it is being performed for, not on whether an attorney is receiving a W-2 or is temporary.

As these facts highlight, Lieff Cabraser's agency attorneys are "less distinct from full-time employees than the Report suggests." Rubenstein Declaration II at 14. Contrary to the Master's overbroad assumptions that the agency attorneys did not "enjoy uninterrupted affiliation with firm" and that the firm "did not face the same long-term financial obligations in securing contract attorneys as it did with its non-partnership-track staff attorneys," four of the firm's seven agency lawyers – Leggett, Nutting, Sturtevant and Weiss – began working for the firm between 2012 and 2014, and each remain with the firm today. *See* discussion *supra* at 24-28. And while it is true that the firm does not offer health insurance or certain other employment or monetary benefits to attorneys who are compensated by an agency, the firm offers a host of benefits and opportunities to agency attorneys, including, most obviously, actual employment and the resources to support that employment, and the chance to join Lieff Cabraser as payroll employees, as was the case with Bloomfield, Leggett, Nutting and Sturtevant. *See* discussion *supra* at 12-13, 24-28.

It is also true that not all federal and state employment laws that apply to the relationship between Lieff Cabraser and its employees apply to agency attorneys working under the firm's direction. Nevertheless, the firm expects its agency lawyers to abide by the firm's rules and practices, and agency attorneys are protected by state laws prohibiting harassment and discrimination in the workplace. The firm, through its human resources department, provides all personnel, whether employees of the firm, agency attorneys, or other contractors, with policies for behavioral conduct and on how to report misconduct of others.[317]

Finally, the Special Master's view that the differences he identifies between staff attorneys on the firm's payroll and those paid by an agency have any significance suggests an outdated view of the way the marketplace for legal services works today. As Rubenstein observes:

> [I]n today's current legal practice, firms have entered into far more flexible arrangements with associates and staff attorneys: for instance, many partnership-track attorneys work reduced hours (perhaps thereby removing themselves from certain benefits or legal requirements) and/or off-site or without permanent office space. To the best of my knowledge, private firms nonetheless continue to bill these attorneys at market rates, not as costs. Firms similarly bill summer law students – for whom they generally do not pay healthcare and retirement benefits – to their clients at market rates. These factual questions are complex and involve the court in inquiries irrelevant to the key concern – whether or not legal services are being provided to the client.

Rubenstein Declaration II at 15.

What matters here is not whether these seven attorneys performed their services while on the firm's payroll or being paid by an agency. What matters is the sophisticated nature and high quality of the services they rendered on behalf of the class. Nothing about their participation in the State Street Action warrants treating their time as a mere cost. *See Tyco*, 535 F.Supp.2d at

---

[317] Fineman Declaration at 26.

272 ("An attorney, regardless of whether she is an associate with steady employment or a contract attorney whose job ends upon completion of a particular document review project, is still an attorney [and] [i]t is therefore appropriate to bill a contract attorney's time at market rates and count these time charges toward the lodestar.").

    **E.**    **Even If The Court Agrees That The Firm's Agency Lawyers Should Be Treated Differently Than The Staff Attorneys On Firm Payroll For Purposes Of The Lodestar Cross-Check, The Special Master's Recommended Disgorgement Remedy Should Be Rejected.**

There is no legal or factual basis for treating any of Lieff Cabraser's agency (contract) attorneys as a cost. *See* discussion *supra* at 77-90. If, however, the Court overrules that objection, Lieff Cabraser further objects to the Special Master's proposed "remedy" that:

> The seven contract attorneys, all retained by Lieff, recorded 2,833.5 hours in this role, at rates varying between $415 and $515. The total billings for contract attorneys was approximately $1.3 million ($1,325,588). In addition, a multiplier of 1.8 was added to their hours and rates, yielding a total award of $2.4 million ($2,386,058) for the time of the contract attorneys. This amount should be disgorged in return to the Class. The Customer Class is, however, entitled to claim the contract attorneys as an expense calculated at a more reasonable rate of $50/hour. The Special Master recommends that the difference between these two figures also be awarded to the Class.[318]

Although made confusing by the last sentence, the firm understands the Special Master's recommendation to be that the firm should "disgorge" and "return" to the Class the difference between: a) the total of the firm's agency attorneys' lodestar, multiplied by 1.8; and b) $50 per hour for the agency lawyers' time. Assuming that is a correct reading of the recommendation, it would require that the firm pay $2,241,098.40 as a "remedy" for treating its agency attorneys as a cost ($1,325,5588 x 1.8 = $2,386,058, minus $144,960 (2899.2 hours x $50 per hour)).

---

[318] Report at 367-368. As noted above, the dollar figures and hours noted by the Special Master are misstated in the Executive Summary. Executive Summary at 50. And the hours are also misstated in the Report. We use the correct hourly total (2899.2) as the basis of the proposed cost reimbursement here.

Lieff Cabraser objects to this recommendation by the Special Master, and urges the Court to reject it, for the following reasons: (1) the Special Master's recommendation again miscomprehends or ignores the limited "cross-check" purpose for which lodestar was submitted and used in the State Street Action; (2) the inclusion of Lieff Cabraser's agency lawyers in the cross-check causes no harm to the class; and (3) penalizing Lieff Cabraser in a proposed amount of $2,241,098.40 for adhering to controlling legal principles and having committed no violation of law or ethics is blatantly unjust.

1.      **The Special Master's Recommendation Again Miscomprehends or Ignores the "Cross-Check" Purpose for Which Lodestar Was Submitted and Used in the State Street Action.**

As in the manner in which the Special Master addressed the inadvertent double accounting, the Master has again erred in recommending a disgorgement remedy by miscomprehending or ignoring the "cross-check" purpose for which the firm's lodestar was submitted in the State Street Action. *See* discussion *supra* at 34-36, 57-61, 68-72. "The Special Master's Report errs in recommending these remedies as it confuses the nature of a lodestar cross-check, applied in this case with a lodestar-based fee, not at issue here." Rubenstein Declaration II at 18. Indeed, the Special Master's reference to the "total billings" for Lieff Cabraser's agency attorneys suggests confusion between lodestar being used for cross-check purposes and constituting an actual bill or charge to the Class. Similarly, a "multiplier of 1.8" was *not* added to the firm's agency attorneys' "hours and rates," as though Lieff Cabraser had separately charged the class a multiplier on their time. Rather, the Court compared the 25% fee award ($74,541,250) with the *aggregate* lodestar submitted by *all* Plaintiffs' Counsel ($41,323,895.75), and determined that the resulting 1.8 multiplier on that aggregate lodestar was reasonable. *See* discussion *supra* at 34-36.

- 91 -

Accounting for Lieff Cabraser's agency attorneys' lodestar in the context of a cross-check (the only context that matters here) means that even if the Court agrees with the Special Master that the agency attorneys' time should be treated as a cost, then the only plausible outcome is the removal of the agency lawyers' lodestar ($1,325,588) from the aggregate total lodestar, merely resulting in a higher lodestar multiplier.  Rubenstein summarizes the circumstance as follows:

> Because Counsel submitted their lodestar for cross-check purposes, not for the purposes of setting an exact fee based on the lodestar, any error in their lodestar calculation does not mean that the fee awarded was necessarily an error: the lodestar is a means not an end.  The critical question is the effect that the lodestar error had on the cross-check.  Specifically, reducing class counsel's lodestar (by, for example, fixing the counting and/or removing the contract attorneys' time) will mean that the 25% fee award embodies a higher lodestar multiplier, which the Court will have to ensure is still reasonable.

Rubenstein Declaration II at 19.

This is the approach taken by those courts that have reduced the hourly rates of contract attorneys submitted for lodestar cross-check purposes.  Courts do not order disgorgement of the delta between the submitted and the approved lodestar; rather, they simply remove the unapproved lodestar resulting in an adjustment to the multiplier used for cross-check purposes. *See*, *e.g.*, *CitiGroup*, 965 F.Supp.2d at 401 (concluding that a 3.9 multiplier, "the multiplier based on the reduced lodestars calculated by the Court," was "above the norm in securities class action settlements of similar size," settling on a percentage fee that yielded a 2.8 multiplier); *Carlson*, 596 F.Supp.2d at 409 ("[If] the charges for the contract attorneys' time were decreased, the multiplier in this case would still be a reasonable multiplier"); *In re Cathode Ray Tube (CRT) Antitrust Litigation*, No. 07-CIV-5947 (JST), 2016 WL 4126533, at *8-9 (N.D.Cal. August 3, 2016) ("[E]ven if the Court were to reduce the plaintiffs' lodestar to reflect the contract attorneys' lower billing rates, the multiplier that would result would still be well within an

acceptable range… A lodestar reduction is unnecessary when the effect on the multiplier is not material.").

Here, if both the double counted and the agency attorney hours are removed from Plaintiffs' Counsel's aggregate lodestar, the 1.8 multiplier the Court approved becomes a 2.07 multiplier.[319]  As explained above, and as acknowledged by the Special Master, a 2.07 multiplier would be well within a reasonable range for cases like the State Street Action.  *See* discussion *supra* at 57-61.  As Rubenstein explains it, "utilizing empirical evidence of court-approved multipliers—this difference in the context of this case is not significant." [footnote omitted]).  "Put differently, given the remarkable success Class Counsel achieved for the Class—an accomplishment that the Special Master recognizes [footnote omitted]—a 25% fee award embodying a 2.07 multiplier is fully reasonable, indeed modest."  Rubenstein Declaration II at 19-20.

Given the purpose of the submission of lodestar for cross-check purposes, if the Court follows the Special Master's recommendation to treat Lieff Cabraser's agency attorneys as a cost, the proper way to address the matter is to remove those attorneys' lodestar from the aggregate lodestar used in the cross-check of the 25% fee.  *See* discussion *supra* at 68-74.  The Court can then determine whether or not the resulting aggregate multiplier is appropriate.  For the reasons stated above, Lieff Cabraser submits that it would be.

---

[319] The corrected aggregate lodestar, after deducting the inadvertently double accounted hours, is $37,265,241.25.  If the Lieff Cabraser agency attorneys' lodestar ($1,325,588) is also removed, the total lodestar becomes $35,939,653.25, and the $74,541,250 percentage award translates into a multiplier of 2.07.  *See* Rubenstein Declaration II at 19.

2.      **The Inclusion of Lieff Cabraser's Agency Lawyers in the Cross-Check Causes No Harm to the Class.**

In attempting to justify his recommended "remedy" for the inclusion of Lieff Cabraser's agency attorneys' time in the aggregate lodestar for cross-check purposes, the Special Master asserts that in "class actions, this is charged against class funds.  Quite simply, this is far too steep a price for class members to pay for what amounts to rented workers."[320]  This position is, quite simply, baseless.  As explained above, there is no case law support for this proposition, and Lieff Cabraser's staff attorneys who were paid one time or at all times by an agency were far more than "rented workers."  *See* discussion *supra* at 24-28, 57-61.  Moreover, the class has not in any way been harmed by the inclusion of the firm's agency attorneys in the lodestar for cross-check purposes.

As discussed above, both the Court and the Special Master found that the $300 million settlement in the State Street Action was an "excellent result," providing significant economic benefits for the class.  *See* discussion *supra* at 34-36, 57-61.  Class members were informed of those benefits in the class notice, and were advised that Plaintiffs' Counsel would seek a fee up to approximately 25% of the amount recovered.  *See* discussion *supra* at 32.  Not a single class member – sophisticated institutional investors – opted out or objected to the settlement.  *See* discussion *supra* at 34-36.

Based on Plaintiffs' Counsel's impressive achievement for the class, and applying controlling legal principles, the Court awarded the requested fees (and reimbursement of the requested expenses).  *See* discussion *supra* at 34-36.  Lieff Cabraser did not bill or charge the class and the class did not pay the firm for the hours worked by agency attorneys on the State Street Action.  And the firm certainly did not bill or charge the class and the class did not pay

---

[320] Report 188.

Lieff Cabraser an additional lodestar multiplier. As Rubenstein puts it, the "reduction of an hour or time recalibrates the lodestar multiplier," but it "does not require the 'repayment' of that hour of time since counsel was never 'paid' for that hour of time; counsel were paid a percentage of the recovery." Rubenstein Declaration II at 20.

In these circumstances, the Class has suffered *no* harm as a result of the inclusion of the lodestar of Lieff Cabraser attorneys who were paid by an agency. The aggregate lodestar used for cross-check purposes verified the reasonableness of the same percentage-based fee amount the class was informed of and did not object to, and was later approved by the Court. *See* discussion *supra* at 34-36. The Special Master identifies no harm suffered by the Class that justifies such an unnecessary "remedy."

### 3. Penalizing Lieff Cabraser for Adhering to Controlling Legal Principles and Having Committed No Violation of Law or Ethics is Unjust.

The Special Master proposes penalizing Lieff Cabraser $2,241,098 (separate from and in addition to any double-counting penalty) because Lieff Cabraser included the lodestar of its staff attorneys who are paid by an agency as part of Plaintiffs' Counsel's aggregate lodestar submitted to the Court for cross-check purposes. *See* discussion *supra* at 62-66, 90-92. The Special Master asks the Court to impose this "remedy" on the firm even though the firm acted in compliance with all controlling and relevant case law in accounting for the agency lawyers as it did, and even though the firm violated no legal or ethical rules, and even though the Special Master finds no difference in the academic or professional backgrounds of, or the quality or nature of the work performed, by those lawyers. *See* discussion *supra* at 57-61. Rather, the Special Master recommends that this Court assess the firm $2,241,098 because the Special Master does not like the state of the law and has a different view of how agency and contract lawyers should be treated in the context of class action fee applications. *See* discussion *supra* at 82. This is a

- 95 -

blatantly unfair and unjust basis upon which to extract such an extraordinary sum of money from the firm.  The Special Master's recommendation should be rejected.[321]

### F.   Lieff Cabraser Should Be Reimbursed For The Amount Of Money It Has Spent Responding To The Chargois Investigation.

The Special Master finds that Lieff Cabraser was not aware of the Chargois Arrangement, and justifiably believed Chargois to be Labaton's local counsel, and therefore bears no responsibility for the non-disclosure of the Chargois Arrangement or Chargois' involvement (or lack thereof) in the State Street Action.  *See* discussion *supra* at 63-64.  That conclusion is in all respects consistent with the factual record.  *See* discussion *supra* at 49-56.  The firm therefore respectfully requests that the Court adopt the Special Master's exclusion of Lieff Cabraser from any responsibility relating to Chargois.[322]

Based on his findings that the firm "was misled into agreeing to share in the Chargois payment" (24% of 5.5% of the total fee award ($4,099,768.75)), the Special Master states that "[o]rdinarily some recompense would be in order for this."[323]  The Special Master goes on to note, however, that when asked at the April 13, 2018 Final Hearing, "what if any relief" the firm was seeking for being misled, Lieff Cabraser's general counsel, Heimann, "indicated he was not looking for any repayment."[324]  The Special Master concluded therefore that the "fairest result for the Lieff firm would be for it to be relieved of its obligations to Labaton under the claw-back

---

[321] Of course, Lieff Cabraser's total lodestar, including that of its agency attorneys, benefited all Plaintiffs' Counsel, including ERISA Counsel, in that the Court's lodestar cross-check in support of the 25% fee award took into account all of the lodestar submitted.  Therefore, any reduction in the fee award as a result of the removal of agency attorney lodestar (or double-counted lodestar) must apply to all Plaintiffs' Counsel.

[322] Although it is unnecessary to address in this Response and Objections, in the course of the investigation Lieff Cabraser has challenged the views of the Special Master and Gillers on the applicable "disclosure" rules.  *See e.g.*, Ex. 234 to Report, Rubenstein Report; Ex. 244 to Report, Dacey Report; and, Rubenstein Declaration II at 2-9.

[323] Report at 352.

[324] *Id.*

letter as to Chargois, but no more."[325]   Lieff Cabraser respectfully requests that the Court adopt

the Special Master's recommendation that it be relieved of any further obligations to Labaton

under the claw-back agreement as to any prior or future financial obligations relating to

Chargois.

Although during the Final Hearing, Heimann, speaking for the firm, declined to seek

reimbursement from Labaton and/or Thornton of the approximately $1 million the firm

effectively contributed to Chargois' $4.1 million fee, and although Lieff Cabraser abides by that

position now, the firm *does* seek reimbursement from Labaton and/or Thornton of the costs the

firm has incurred in responding to the Chargois investigation, an exercise for which Lieff

Cabraser is in no way responsible.   The firm seeks repayment of the amount it has contributed to

the Special Master's fees and expenses that are attributable to the Chargois investigation, as well

as the amount of costs and lodestar expended by the firm in addressing the Special Master's

Chargois-related inquiries.

The Chargois investigation has resulted in significant expenditures of time and expense

by Lieff Cabraser.  The firm was drawn into the Chargois phase of the investigation through no

fault of its own.  *See* discussion *supra* at 49-56, 63-64.[326]   Under such circumstances,

reimbursement to Lieff Cabraser is appropriate under Rule 53 and the discretion of the Court.

*See* Rule 53(g)(3) of the Federal Rules ("The court must allocate payment among the parties

after considering the nature and amount of the controversy, the parties' means, and the extent to

which any party is more responsible than other parties for the reference to a master"); *Chevron*

---

[325] *Id*.

[326] The Special Master recommends directing $3.4 million of the $4.1 million Chargois
"remedy" to ERISA Counsel because "this investigation has resulted in great expenditures of
time and expense to the ERISA firms that have been drawn into it through no fault of their
own,…."  Report at 369.

*Corporation v. Donziger*, 11-CIV-0691 (LAK), 2017 WL 6729360, *6 (S.D.N.Y. Dec. 8, 2017)

(under Rule 53(g)(3) an "interim allocation may be amended to reflect a decision on the merits").

Because the firm does not at this time know how much of the $912,000 the firm has thus

far contributed to the Special Master's fees and expenses is attributable to the Chargois

investigation, Lieff Cabraser proposes that if the Court agrees that the firm should be reimbursed

for the amount of money it has spent responding to the Chargois investigation, it also direct the

Special Master to advise the firm of the total cost (either in aggregate dollars or on a percentage

of the $3.8 million) has been spent on the Chargois investigation.  The firm would then submit to

the Court that information, along with details supporting the firm's out-of-pocket costs and

lawyer time devoted to responding to the Chargois investigation as part of a specific request for

reimbursement.

## IV.   CONCLUSION – The Financial Impact Of The Special Master's Disgorgement Recommendations On Lieff Cabraser Are Unjust And Entirely Disproportionate To The Firm's True Conduct And The Absence Of Harm It Has Caused To The Class.

The Special Master's Final Thoughts on Remedies in the conclusion of his Report

underscores how unjust and entirely disproportionate the Special Master's recommended

punitive monetary remedies are as to Lieff Cabraser.  The Special Master claims that the "intent

here has been to identify true and unmistakable professional misconduct, to remedy wrongs and

to put the law firms and the class roughly in a position that is proportionate to the conduct and

the harm."[327]  Yet, the Special Master finds that Lieff Cabraser did not engage in *any*

professional misconduct, let alone any "true and unmistakable" conduct.  Further the Master

concludes that the firm bears the least amount of responsibility for the accidental, inadvertent

double-counting of the lodestar of four staff attorneys (an unintentional overstatement of

---

[327] Report at 376.

$868,417).  For that honest mistake, which caused no harm to the class, the Special Master recommends that Lieff Cabraser "return" to the class $1,352,667.  There is nothing proportionate about the Master's punitive recommendation in this regard.

Similarly, Lieff Cabraser has committed no "wrongs" that justify the Special Master's recommendation that Lieff Cabraser "return" $2,241,098 (the actual lodestar of $1,325,588 plus a punitive multiplier) to the class because the Master disagrees with the unequivocal and abundant case law that supports Lieff Cabraser including the lodestar of seven of its staff attorneys who were paid by an agency in the lodestar submitted for cross-check purposes.  There is nothing proportionate about imposing a $2,241,098 penalty on Lieff Cabraser for the firm faithfully following the law and having caused no harm to the class by doing so.

Having found Lieff Cabraser engaged in no intentional or professional misconduct and violated no rule of law or ethics, the Special Master seeks to justify the imposition of millions of dollars of monetary forfeiture by claiming that "even after the allocation of all monetary amounts, and the cost of the investigation, [Lieff Cabraser] will still receive its base lodestar plus a significant multiplier."[328]  Nothing could be further from the truth.  In fact, if the Court accepts the Special Master's recommendation that the firm disgorge $3,593,765 – or approximately 24% of the $15,116,965.50 in fees the firm received – in addition to (a) the $912,000 the firm has already paid to fund its share of the Special Master's investigation, and, (b) the $2.39 million the firm has spent in time and costs responding to the investigation, the firm will receive *less* than its "base lodestar" and, in fact, a *negative* multiplier (0.92%) for its exemplary service to the class in

---

[328] Report at 376.

the State Street Action.  There is nothing "proportionate" about the Master's recommendations concerning Lieff Cabraser's conduct in this case.

Dated:  June 29, 2018                                    Respectfully submitted,

Lieff Cabraser Heimann & Bernstein, LLP

By:     */s/ Richard M. Heimann*
        Richard M. Heimann (*pro hac vice*)
        Robert L. Lieff (*pro hac vice*)
        275 Battery Street, 29th Floor
        San Francisco, California  94111
        Tel:  (415) 956-1000
        Fax:  (415) 956-1008

        Steven E. Fineman
        Daniel P. Chiplock (*pro hac vice*)
        250 Hudson Street, 8th Floor
        New York, New York  10018
        Tel:  (212) 355-9500
        Fax:  (212) 355-9592

        *Counsel for Lieff Cabraser Heimann &*
        *Bernstein, LLP*

- 100 -

# APPENDIX A

## Arkansas Teacher Retirement System
v.
## State Street Bank and Trust Company
United States District Court
District of Massachusetts
No. 11-cv-10230 MLW

## Lieff Cabraser Heimann & Bernstein, LLP's
## State Street Action Staff Attorneys[1]

- **Tanya Ashur:** University of Illinois, Urbana, Illinois, B.A. 1997; Chicago-Kent College of Law, Chicago, Illinois, J.D. 2000. Admitted Illinois, 2000; California, 2002.

  Prior to working for Lieff Cabraser, Ms. Ashur worked as an associate for Deloitte & Touche, Adams Nye, and Gordon & Rees, all in San Francisco, California. Ms. Ashur had extensive document review and analysis experience in complex litigation matters for Latham Watkins, Orrick, Google, and Gibson Dunn.

  Ms. Ashur began working for Lieff Cabraser in 2013. From 2013 into 2015, Ms. Ashur worked extensively on the BONY Mellon Action (2,414.80 hours). In 2015, Ms. Ashur devoted 843.50 hours at $415 per hour to document review and analysis in the State Street Class Action. She worked in the firm's San Francisco office. Ms. Ashur is currently in her sixth year with the firm. Ms. Ashur was and is compensated directly by the firm.

- **Joshua Bloomfield:** University of Pennsylvania, Pennsylvania, Philadelphia, PA, B.A. 1996; UCLA School of Law, Los Angeles, CA, J.D. 2000. Admitted California, 2001.

  Mr. Bloomfield worked as an associate for Jeffer Mangels in Los Angeles, California and Holland & Knight in San Francisco, California, before starting his own civil and criminal litigation firm. Mr. Bloomfield had extensive document review and analysis experience in complex litigation matters for King & Spalding, Paul Hastings, Morrison Foerster, Gibson Dunn, Wilmer Hale, Orrick, Sidley Austin, Jones Day, DLA Piper, and Skadden.

---

[1] All of the information contained in this Appendix A about Lieff Cabraser's staff attorneys is found in Ex. A to the Fineman Declaration at 18-40, and in Ex. C to the Fineman Declaration in Response to Interrogatory Numbers 24 and 25.

Mr. Bloomfield began working for Lieff Cabraser in 2013.  From 2013 into 2015, Mr. Bloomfield worked extensively on the BONY Mellon Action (2,183.00 hours).  In 2013 and 2015, Mr. Bloomfield devoted 2,033.20 hours at $515 per hour to document review and analysis in the State Street Class Action.  He worked remotely in San Francisco, California.  Mr. Bloomfield left the firm in late 2015.  From 2013 through 2014, Mr. Bloomfield was compensated by an agency (which billed the firm for his services).  In 2015 Mr. Bloomfield was compensated directly by the firm.

- **Elizabeth Brehm:** Boston University, Boston, Mass, B.S. 2001; Hofstra University School of Law, Hempstead, NY, J.D., magna cum laude, 2008. Admitted New York, 2008.

  Prior to working for Lieff Cabraser, Ms. Brehm worked as an associate for Winston & Strawn and Kirby McInerney, both in New York, New York.  During her time at Kirby – a leading plaintiff-side litigation firm – Ms. Brehm focused on antitrust, securities and financial fraud cases, and gained relevant experience with numerous document review projects in financial fraud cases.

  Ms. Brehm began working for Lieff Cabraser in 2013.  From 2013 into early 2015, Ms. Brehm devoted 1,682.90 hours at $415 per hour to document review and analysis in the State Street Class Action.  She worked remotely in New York, New York.  Ms. Brehm left the firm in late 2015.  Ms. Brehm was compensated directly by the firm.

- **Jade Butman:** Dartmouth College, Hanover, NH, B.A. 1992; University of Pittsburgh School of Law, Pittsburgh, PA, J.D. 1997.  Admitted New Hampshire, 1997; New York, 1998; California, 2005.

  Prior to working for Lieff Cabraser, Ms. Butman worked as an associate for Constantine Cannon (antitrust) and Kaplan Landau (commercial litigation) in New York, New York, and for Keller Grover (consumer class cases) in San Francisco, California.  Ms. Butman had additional extensive and relevant document review in complex litigation matters for Viacom in New York, and Robbins Geller and Berman DeValerio (plaintiff-side class action firms) in San Francisco, California.

  Ms. Butman worked for Lieff Cabraser in 2014 and 2015.  In 2015, Ms. Butman devoted only 24.00 hours at $515 per hour to document review and analysis in the State Street Class Action.  She worked in the firm's San Francisco office.  Ms. Butman left the firm at the end of 2015.  Ms. Butman was compensated by an agency (which billed the firm for her services).

- **James Gilyard:** San Francisco State University, San Francisco, California, B.A. 1999; University of San Francisco School of Law, San Francisco, California, J.D. 2002.  Admitted California, 2002.

Prior to working for Lieff Cabraser, Mr. Gilyard worked as an associate for Robbins Geller (a plaintiff-side class action firm), in San Francisco, California, where, among other things, he gained extensive experience in document review and analysis. Mr. Gilyard had additional extensive document review and analysis experience in complex litigation matters for Bingham McCutchen, Morrison & Foerster, and Wilson Sonsini, among others.

Mr. Gilyard began working for Lieff Cabraser in 2013. From 2013 into 2015, Mr. Gilyard worked extensively on the BONY Mellon Action (2,614.50 hours). In 2015, Mr. Gilyard devoted 882 hours at $415 per hour to document review and analysis in the State Street Class Action. He worked in the firm's San Francisco office. Mr. Gilyard left Lieff Cabraser in late 2016. Mr. Gilyard was compensated directly by the firm.

- **Kelly Gralewski:** California State University, Chico, San Diego, California, B.S. and B.A. 1992; California Western School of Law, San Diego, California, J.D. 1997. Admitted California, 1998.

  Prior to working for Lieff Cabraser, Ms. Gralewski worked as an associate for Peterson & Price, a real estate, business law and dispute resolution firm in San Diego, California. While there, Ms. Gralewski gained experience in the review and analysis of corporate documents.

  Ms. Gralewski began working for Lieff Cabraser in 2009. Since then, and continuing to today, Ms. Gralewski has worked on a number of financial fraud cases at Lieff Cabraser. In 2012 and 2015, Ms. Gralewski worked on the BONY Mellon Action (301.50 hours). In 2013 and 2015, Ms. Gralewski devoted 1,478.90 hours at $415 per hour to document review and analysis in the State Street Class Action. She worked remotely in San Diego, California. Ms. Gralewski was and is compensated directly by the firm.

- **Christopher Jordan:** University of North Carolina, Chapel Hill, North Carolina, B.A. 2000; Stanford Law School, Stanford, California, J.D. 2004. Admitted California, 2011; Texas, 2012.

  Prior to working for Lieff Cabraser, Mr. Jordan worked extensively in the management, supervision of, and execution of large scale document review and analysis projects in complex litigation matters for Debevoise & Plimpton in New York and Troutman Sanders in Atlanta, Georgia.

  Mr. Jordan began working for Lieff Cabraser in 2012. In 2014 and 2015, Mr. Jordan worked extensively on the BONY Mellon Action (1,572.90). In 2015, Mr. Jordan devoted 539.90 hours at $415 per hour to document review and analysis in the State Street Class Action for Lieff Cabraser. He worked additional hours in the State Street Class Action that were attributed to Thornton. He worked remotely in Houston, Texas and Atlanta, Georgia. Mr. Jordan remains engaged

by Lieff Cabraser on document review and analysis projects.  Mr. Jordan was and is compensated directly by the firm.

- **Jason Kim:** University of California at Davis, Davis, California, B.A. 2002; Thomas Jefferson School of Law, San Diego, California, J.D. 2009.  Admitted California, 2009.

  Prior to working for Lieff Cabraser, Mr. Kim worked as an associate for the full service litigation firm, Renchner Law Group in San Francisco, California, before starting his own civil litigation law firm in Santa Clara, California.  Mr. Kim had extensive document review and analysis experience in complex litigation matters for McDermott Will & Emory, Quinn Emmanuel, and Crowell Moring.

  Mr. Kim began working for Lieff Cabraser in 2011.  From 2013 into 2015, Mr. Kim worked extensively on the BONY Mellon Action (2,659.00).  In 2015, Mr. Kim devoted 904 hours at $415 per hour to document review and analysis in the State Street Class Action.  He worked in the firm's San Francisco office.  Mr. Kim is currently engaged by Lieff Cabraser on document review and analysis projects.  Mr. Kim was and is paid directly by the firm.

- **James Leggett:**  University of California, Davis, Davis, California, B.A. 2004; Santa Clara University School of Law, Santa Clara, California, J.D., cum laude, Order of the Coif, 2012.  Admitted California, 2012.

  Prior to law school, Mr. Leggett worked as a private banker at UMB Bank in Denver, Colorado for almost four years.  Immediately after law school, Mr. Leggett performed document review and analysis in financial fraud and employment cases at the plaintiff-side litigation firm Schneider Wallace in San Francisco, California.

  Mr. Leggett began working for Lieff Cabraser in 2013.  From 2013 into 2015, Mr. Leggett worked extensively on the BONY Mellon Action (2,476.20 hours).  In 2015, Mr. Leggett devoted 893 hours at $415 per hour to document review and analysis in the State Street Class Action.  He worked in the firm's San Francisco office.  Mr. Leggett is currently engaged by Lieff Cabraser on document review and analysis projects.  In 2013 and into 2015 Mr. Leggett was compensated by an agency (which billed the firm for his services).  Since the end of January 2015, Mr. Leggett has been compensated directly by the firm.

- **Coleen Liebmann:**  University of the Pacific, B.A. 1992; University of San Francisco School of Law, San Francisco, California, J.D. 2003.  Admitted California, 2006.

  Prior to working for Lieff Cabraser, Ms. Liebmann had more than 11 years of experience in document and privilege review and analysis in complex litigation matters for a number of the country's most prestigious law firms, including Williams & Connolly, Latham & Watkins, DLA Piper, Quinn Emmanuel,

Morrison Foerster, Perkins Coie, Wilmer Hale, O'Melveny & Myers, Jones Day, and Farella Braun & Martel.

Ms. Liebmann began working for Lieff Cabraser in 2014. In 2015, Ms. Liebmann devoted only 24 hours at $415 per hour to document review and analysis in the State Street Class Action. She worked in the firm's San Francisco office. Ms. Liebmann remains engaged by Lieff Cabraser on document review and analysis projects. Ms. Liebmann was and is compensated directly by the firm.

- **Andrew McClelland:** University of California, Davis, Davis, California, B.A. 2002; University of the Pacific, McGeorge School of Law, Sacramento, CA, J.D., Order of the Coif, 2008. Admitted California, 2008.

  Prior to working for Lieff Cabraser, Mr. McClelland worked as an associate for the construction defect litigation firm, Boornazian, Jensen & Garthe in Oakland, California, and as an associate for a similar firm, Lorber Greenfield & Polito, in San Francisco, California. At both firms, Mr. McClelland had extensive document review and analysis experience. In addition, Mr. McClelland conducted document review and analysis in complex litigation matters for Bingham and Smith Lillis Pitha, in San Francisco, California.

  Mr. McClelland began working for Lieff Cabraser in 2013. From 2013 into 2015, Mr. McClelland worked extensively on the BONY Mellon Action (1,799.00 hours). In 2015, Mr. McClelland devoted 58 hours at $415 per hour to document review and analysis in the State Street Class Action attributable to Lieff Cabraser. He worked additional hours in the State Street Class Action that were attributed to Thornton. He worked in the firm's San Francisco office. Mr. McClelland left Lieff Cabraser in 2015. Mr. McClelland was compensated by an agency (which billed the firm or Thornton for his services).

- **Scott Miloro:** Cornell University, Ithaca, New York, B.S. 1994; State University of New York at Buffalo, Buffalo, New York, M.S. 1996; Cardozo School of Law, New York, New York, J.D. 2006. Admitted New York, 2006; United States Patent and Trademark Office, 2006.

  Prior to working for Lieff Cabraser Mr. Miloro spent more than three years as an associate at the intellectual property firm of Ohlandt, Greely, Ruggiero & Perle in Stamford, Connecticut. In that capacity, Mr. Miloro gained extensive experience in reviewing and analyzing complex technical documents.

  Mr. Miloro began working for Lieff Cabraser in 2011. From 2012 into 2015, Mr. Miloro worked extensively on the BONY Mellon Action (3,146.80). In 2015, Mr. Miloro devoted 658.80 hours at $415 per hour to document review and analysis in the State Street Class Action. He worked in the firm's New York office. Mr. Miloro remains engaged by Lieff Cabraser on document review and analysis projects. Mr. Miloro was and is paid directly by the firm.

- **Leah Nutting:** University of California Berkeley, Berkeley, California, B.A. 1999; Harvard Law School, Cambridge, Massachusetts, J.D. 2002. Admitted California, 2002.

  Prior to working for Lieff Cabraser, Ms. Nutting was an associate in the securities litigation group at Clifford Chance, and then in the general litigation group at Orrick, both in San Francisco, California. During her four years at those two firms, Ms. Nutting had extensive experience in investigating complex financial fraud matters, including experience in document review and analysis. Ms. Nutting also engaged in extensive document review in complex litigation matters for Kilpatrick Townsend, Bloomberg, and Morrison Foerster.

  Ms. Nutting began working for Lieff Cabraser in 2012. From 2012 into 2015, Ms. Nutting worked extensively on the BONY Mellon Action (3,128.40 hours). In 2013 and 2015, Ms. Nutting devoted 1,940.10 hours at $415 per hour to document review and analysis in the State Street Class Action. She worked remotely in San Francisco, California. Ms. Nutting is currently engaged by Lieff Cabraser on document review and analysis projects. Through early 2016, Mr. Nutting was compensated by an agency (which billed the firm for her services). Since early 2015, Ms. Nutting has been paid directly by the firm.

- **Marissa Oh:** Rice University, Houston, Texas, B.A. 1999; Stanford Law School, Stanford, California, J.D. 2004. Admitted California, 2004.

  Prior to working for Lieff Cabraser, Ms. Oh (formerly Marissa Lackey) was an associate at Orrick in San Francisco, California, where she gained extensive experience in financial fraud litigation and where her responsibilities included coordination and supervision of document reviews. Ms. Oh also has extensive document review and analysis experience in complex litigation matters at various top tier law firms, including Keker & Van Nest and Morrison Foerster in San Francisco, California.

  Ms. Oh began working for Lieff Cabraser in 2013. From 2013 into 2015, Ms. Oh worked extensively on the BONY Mellon Action (2,575.70 hours). In 2015, Ms. Oh devoted 800.30 hours at $515 per hour to document review and analysis in the State Street Class Action. She worked in the firm's San Francisco office. Ms. Oh remains engaged by Lieff Cabraser on document review and analysis projects. Ms. Oh was and is compensated directly by the firm.

- **Peter Roos:** University of Limburg, Maastricht, The Netherlands, J.D. 1989; University of San Francisco School of Law, L.L.M. 2001. Admitted The Netherlands, 1989; California, 2002.

  Prior to working for Lieff Cabraser, for more than 18 years, Mr. Roos was an associate and then a partner at Baker & McKenzie in Amsterdam, The Netherlands, and in Palo Alto, California. During those years, Mr. Roos gained extensive experience in financial and corporate transactions and documentation.

In more recent years, Mr. Roos engaged in extensive document review and analysis in complex litigation matters for such major American law firms as Jeffer Mangels, Gibson Dunn, Morrison Foerster, Paul Hastings, and Hopkins & Carley, among others.

Mr. Roos began working for Lieff Cabraser in 2013.  In 2015, Mr. Roos devoted 780 hours at $415 per hour to document review and analysis in the State Street Class Action.  He worked in the firm's San Francisco office.  Mr. Roos remains engaged by Lieff Cabraser on document review and analysis projects.  Mr. Roos was and is compensated directly by the firm.

- **Ryan Sturtevant:** University of California, Santa Barbara, Santa Barbara, California, B.A. 2001; University of California, Santa Barbara, Santa Barbara, California, M.A. 2003; University of California, Hastings College of the Law, San Francisco, California, J.D. 2005.  Admitted California, 2006.

  Prior to working for Lieff Cabraser, Mr. Sturtevant gained extensive experience in document review and analysis in complex litigation matters for a number of major American law firms, including Bingham, Cooley, Morrison Foerster, Wilson Sonsini, O'Melveny & Myers, and Jones Day.  In particular, Mr. Sturtevant gained experience in securities and financial fraud class actions.

  Mr. Sturtevant began working for Lieff Cabraser in 2013.  In 2015, Mr. Sturtevant devoted 796 hours at $415 per hour to document review and analysis in the State Street Class Action.  He worked in the firm's San Francisco office.  Mr. Sturtevant is currently engaged by Lieff Cabraser on document review and analysis projects.  Until early 2015, Mr. Sturtevant was compensated by an agency (which billed the firm for his services).  From the end of January to this day Mr. Sturtevant has been paid directly by the firm.

- **Virginia Weiss:** University of Northern Iowa, B.A. 2004; University of Kansas School of Law, J.D. 2007.  Admitted Minnesota, 2007; California, 2010.

  Prior to working for Lieff Cabraser, Ms. Weiss dedicated more than 15 years to document review and analysis in complex litigation matters for numerous law firms and organizations, including Epstein Becker and Crowell and Moring, in San Francisco, California.

  Ms. Weiss began working for Lieff Cabraser in 2014.  In 2014 and into 2015, Ms. Weiss worked extensively on the BONY Mellon Action ((1,445.80 hours).  In 2015, Ms. Weiss devoted 473.50 hours at $415 per hour to document review and analysis in the State Street Class Action for Lieff Cabraser.  She spent additional time on the case in 2015 which was paid for by the Thornton firm.  She worked remotely in Rochester, Minnesota and Sacramento, California.  Ms. Weiss continues to work on document review and analysis projects for Lieff Cabraser.  Ms. Weiss was and is compensated by an agency (which bills the firm for her services).

- **Jonathan Zaul:** University of California, Berkeley, Berkeley, California, B.A. 2004; University of San Francisco School of Law, San Francisco, California, J.D. 2009.  Admitted California, 2009.

  Following law school and a judicial clerkship, Mr. Zaul opened his own transactional and civil litigation law firm where he served as the principal.

  Mr. Zaul began working for Lieff Cabraser in 2012.  From 2013 into 2015, Mr. Zaul worked extensively on the BONY Mellon Action (2,197.90.  In 2015, Mr. Zaul devoted 495.20 hours at $415 per hour to document review and analysis in the State Street Class Action for Lieff Cabraser.  Mr. Zaul worked additional hours on the State Street Class Action that were attributed to Thornton.  He worked remotely in San Francisco, California.  Mr. Zaul is currently engaged by Lieff Cabraser on document review and analysis projects.  Mr. Zaul was and is compensated directly by the firm.

APPENDIX B

## Arkansas Teacher Retirement System

v.

## State Street Bank and Trust Company

United States District Court
District of Massachusetts
No. 11-cv-10230 MLW

## Lieff Cabraser Heimann & Bernstein, LLP's State Street Action Staff Attorneys[1]

| Name | Undergrad | Law School | Grad. Year | Years in Practice as of 2016 (following first bar admission) | Tenure with Lieff Cabraser | Billing Rate in 2016 | Hours Worked on BONY Mellon | Hours Worked on State Street | LCHB Payroll or Agency | Worked in LCHB Office or Remotely in 2013-15 |
|------|-----------|------------|------------|-------------------------------------------------------------|----------------------------|----------------------|-----------------------------|------------------------------|------------------------|----------------------------------------------|
| **Tanya Ashur** | University of Illinois | Chicago-Kent College of Law | 2000 | 17+ | 2013 – present | $415 | 2,414.50 | 843.50 | Payroll | Office (SF) |
| **Joshua Bloomfield** | University Pennsylvania | UCLA School of Law | 2000 | 16+ | 2013 - 2015 | $515 | 2,183.00 | 2,033.20 | Agency; Payroll (Jan. 2015) | Remote (SF) |
| **Elizabeth Brehm** | Boston University | Hofstra University School of Law | 2008 | 9+ | 2013 – 2015 | $415 | None | 1,682.90 | Payroll | Remote (NY) |

[1] All of the information contained in this Appendix A about Lieff Cabraser's staff attorneys is found in Ex. A to the Fineman Declaration at 18-40, and in Ex. C to the Fineman Declaration in Response to Interrogatory Numbers 24 and 25.

| Name | Undergrad | Law School | Grad. Year | Years in Practice as of 2016 (following first bar admission) | Tenure with Lieff Cabraser | Billing Rate in 2016 | Hours Worked on BONY Mellon | Hours Worked on State Street | LCHB Payroll or Agency | Worked in LCHB Office or Remotely in 2013-15 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Jade Butman** | Dartmouth College | University of Pittsburgh School of Law | 1997 | 20+ | 2014 – 2015 | $515 | None | 24.00 | Agency | Office (SF) |
| **James Gilyrad** | San Francisco State University | University of San Francisco School of Law | 2002 | 15+ | 2013 – 2016 | $415 | 2,614.50 | 882.00 | Payroll | Office (SF) |
| **Kelly Gralewski** | California State University, Chico | California Western School of Law | 1997 | 19+ | 2009 – present | $415 | 301.50 | 1,475.90 | Payroll | Remote (San Diego, CA) |
| **Christopher Jordan** | University of North Carolina | Stanford Law School | 2004 | 6+ | 2012 – present | $415 | 1,572.90 | 539.90 | Payroll | Remote (Houston, TX and Atlanta, GA) |
| **Jason Kim** | University of California, Davis | Thomas Jefferson School of Law | 2009 | 8+ | 2016 – present | $415 | 2,659.00 | 904.00 | Payroll | Office (SF) |
| **James Leggett** | University of California, Davis | Santa Clara University School of Law | 2012 | 5+ | 2013 – present | $415 | 2,476.20 | 893.00 | Agency; Payroll (Jan. 2015) | Office (SF) |

| Name | Undergrad | Law School | Grad. Year | Years in Practice as of 2016 (following first bar admission) | Tenure with Lieff Cabraser | Billing Rate in 2016 | Hours Worked on BONY Mellon | Hours Worked on State Street | LCHB Payroll or Agency | Worked in LCHB Office or Remotely in 2013-15 |
|---|---|---|---|---|---|---|---|---|---|---|
| Coleen Liebmann | University of the Pacific | University of San Francisco School of Law | 2003 | 11+ | 2014 – present | $415 | None | 24.00 | Payroll | Office (SF) |
| Andrew McClelland | University of California, Davis | McGeorge School of Law | 2008 | 9+ | 2013 – 2015 | $415 | 1,799.00 | 58.00 | Agency | Office (SF) |
| Scott Miloro | Cornell University | Cardozo School of Law | 2006 | 11+ | 2011 – present | $415 | 3,146.80 | 658.80 | Payroll | Office (NY) |
| Leah Nutting | University of California, Berkeley | Harvard Law School | 2002 | 15+ | 2012 – present | $415 | 3,128.40 | 1,940.10 | Agency; Payroll (Jan. 2015) | Remote (SF) |
| Marissa Oh | Rice University | Stanford Law School | 2004 | 17+ | 2013 – present | $515 | 2,576.70 | 800.30 | Payroll | Office (SF) |
| Peter Roos | | University of Limburg J.D. University of San Francisco School of Law L.L.M. | 1989

2002 | 27+ (15+ in the U.S.) | 2013 – present | $415 | None | 780.00 | Payroll | Office (SF) |
| Ryan Sturtevant | University of California, Santa Barbara | University of California, Hastings College of the Law | 2005 | 11+ | 2012 – present | $415 | None | 796.00 | Agency; Payroll (Jan. 2015) | Office (SF) |

1568509.1

| Name | Undergrad | Law School | Grad. Year | Years in Practice as of 2016 (following first bar admission) | Tenure with Lieff Cabraser | Billing Rate in 2016 | Hours Worked on BONY Mellon | Hours Worked on State Street | LCHB Payroll or Agency | Worked in LCHB Office or Remotely in 2013-15 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Virginia Weiss** | University of Northern Iowa | University of Kansas School of Law | 2007 | 10+ | 2014 – present | $415 | 1,445.80 | 473.50 | Agency | Remote (Rochester, MN and Sacramento, CA) |
| **Jonathan Zaul** | University of California, Berkeley | University of San Francisco School of Law | 2009 | 8+ | 2012 – present | $415 | 2,197.90 | 495.20 | Payroll | Remote (SF) |

# APPENDIX C

## Arkansas Teacher Retirement System

v.

## State Street Bank and Trust Company

United States District Court
District of Massachusetts
No. 11-cv-10230 MLW

## Special Master Investigation – Deponents List

| Firm Name/Other | Deponent's Name | Date(s) Deposed | # of Pages of Testimony | Total Deposition Time | Special Master Personnel in Attendance |
|---|---|---|---|---|---|
| **Labaton** | Alpers, David | 6/5/17 | 62 | 70 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Bolano, Maritza | 6/5/17 | 32 | 45 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Greene, Tryphena | 6/5/17 | 30 | 32 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Thornton** | Hoffman, E. | 6/5/17 | 120 | 148 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Kussin, Todd | 6/5/17 | 77 | 78 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Orji, Comfort | 6/5/17 | 22 | 27 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **LCHB** | Ashur, T. | 6/6/17 | 48 | 65 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **LCHB** | Fineman, S. | 6/6/17 | 105 | 113 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **LCHB** | Gralewski, K. | 6/6/17 | 22 | 27 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |

| Firm Name/Other | Deponent's Name | Date(s) Deposed | # of Pages of Testimony | Total Deposition Time | Special Master Personnel in Attendance |
|---|---|---|---|---|---|
| **LCHB** | Jordan, C. | 6/6/17 | 39 | 52 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **LCHB** | Oh, M. | 6/6/17 | 38 | 44 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **LCHB** | Zaul, J. | 6/6/17 | 37 | 51 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Belfi, E. | 6/14/17 | 70 | 77 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Hopkins, G. | 6/14/17 | 119 | 126 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Politano, R. | 6/14/17 | 67 | 63 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Sucharow, L. | 6/14/17 | 73 | 78 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Zeiss, N. | 6/14/17 | 87 | 103 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **LCHB** | Chiplock, D. | 6/16/17 | 226 | 274 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **LCHB** | Dugar, K. | 6/16/17 | 115 | 116 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Rogers, M. | 6/16/17 | 103 | 95 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Thornton** | Bradley, G. | 6/19/17 | 92 | 105 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Thornton** | Bradley, M. | 6/19/17 | 68 | 81 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Thornton** | Lesser, M. | 6/19/17 | 84 | 106 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Thornton** | Thornton, M. | 6/19/17 | 101 | 173 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |

| Firm Name/Other | Deponent's Name | Date(s) Deposed | # of Pages of Testimony | Total Deposition Time | Special Master Personnel in Attendance |
|---|---|---|---|---|---|
| ERISA | Kober, Alan | 7/6/17 | 35 | 55 minutes | In Person: Hylenski, McEvoy, Sinnott, Toothman<br>Note- At the outset, Sinnott said that Rosen would be joining the deposition, but Rosen's appearance is not noted in the record. |
| ERISA | Kravitz, Carl | 7/6/17 | 128 | 212 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| ERISA | Sarko, Lynn | 7/6/17 | 120 | 166 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| ERISA | Strangeland, James | 7/6/17 | 25 | 41 minutes | In Person: Hylenski, McEvoy, Sinnott, Toothman |
| ERISA | Wallace, Janet | 7/6/17 | 19 | 27 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| ERISA | Axelrod, Jonathon | 7/7/17 | 56 | 80 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| ERISA | Brickman, Michael | 7/7/17 | 63 | 97 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| ERISA | Cohn, Michael | 7/7/17 | 29 | 42 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| ERISA | Henriquez, Arnold | 7/7/17 | 24 | 24 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| ERISA | McTigue, Brian | 7/7/17 | 104 | 153 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| ERISA | Taylor, William | 7/7/17 | 20 | 22 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| Labaton | Goldberg, Howard | 7/17/17 | 63 | 64 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| Labaton | Goldsmith, David | 7/17/17 | 177 | 300 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |

| Firm Name/Other | Deponent's Name | Date(s) Deposed | # of Pages of Testimony | Total Deposition Time | Special Master Personnel in Attendance |
|---|---|---|---|---|---|
| **LCHB** | Heimann, R. | 7/17/17 | 112 | 135 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Johnson, James | 7/17/17 | 57 | 62 minutes | In Person: Hylenski, McEvoy, Rosen, Sinnott, Toothman |
| **Labaton** | Sucharow, L. | 9/1/17 | 117 | 148 minutes | In Person: Kelly, McEvoy, Rosen, Sinnott<br><br>Phone: Hylenski, Toothman |
| **Thornton** | Thornton, M. | 9/1/17 | 160 | 227 minutes | In Person: Kelly, McEvoy, Rosen, Sinnott<br><br>Phone: Toothman |
| **Labaton** | Belfi, E. | 9/5/17 | 124 | 201 minutes | In Person: Kelly, Rosen, Sinnott<br><br>Phone: Hylenski, Toothman |
| **Labaton** | Hopkins, G. | 9/5/17 | 107 | 126 minutes | In Person: Kelly, Rosen, Sinnott<br><br>Phone: Hylenski, Toothman |
| **LCHB** | Chiplock, D. | 9/8/17 | 146 | 183 minutes | In Person: Kelly, Rosen, Sinnott<br><br>Phone: Hylenski, Toothman |
| **ERISA** | McTigue, Brian | 9/8/17 | 42 | 57 minutes | In Person: Rosen, Sinnott<br><br>Phone: Hylenski, Toothman |
| **ERISA** | Sarko, Lynn | 9/8/17 | 130 | 198 minutes | In Person: Kelly, Rosen, Sinnott<br><br>Phone: Hylenski, Toothman |
| **ERISA** | Kravitz, Carl | 9/11/17 | 115 | 159 minutes | In Person: Kelly, Rosen, Sinnott<br><br>Phone: Hylenski, Toothman |
| **LCHB** | Lieff, R. | 9/11/17 | 107 | 164 minutes | In Person: Kelly, Rosen, Sinnott<br><br>Phone: Hylenski, Toothman |

| Firm Name/Other | Deponent's Name | Date(s) Deposed | # of Pages of Testimony | Total Deposition Time | Special Master Personnel in Attendance |
|---|---|---|---|---|---|
| **Labaton** | Politano, R. | 9/11/17 | 24 | 29 minutes | In Person: Kelly, Rosen, Sinnott<br><br>Phone: Hylenski, Toothman |
| **Thornton** | Bradley, G. | 9/14/17 | 164 | 196 minutes | In Person: Kelly, Rosen, Sinnott,<br><br>Phone: Hylenski, McEvoy, Toothman |
| **Labaton** | Zeiss, N. | 9/14/17 | 159 | 243 minutes | In Person: Kelly, Rosen, Sinnott,<br><br>Phone: Hylenski, McEvoy, Toothman |
| **Labaton** | Goldsmith, David | 9/20/17 | 259 | 419 minutes | In Person: Kelly, Rosen, Sinnott,<br><br>Phone: Hylenski, McEvoy, Toothman |
| **Labaton** | Chargois, D. | 10/2/17 | 322 | 465 minutes | In Person: Kelly, McEvoy, Mulcahy, Rosen, Sinnott<br><br>Phone: Hylenski |
| **Labaton** | Keller, C. | 10/13/17 | 263 | 343 minutes | In Person: Kelly, Mulcahy, Rosen, Sinnott<br><br>Phone: McEvoy |
| **Labaton** | Keller, C. | 10/25/17 | 292 | 428 minutes | In Person: Hylenski, Kelly, Mulcahy, Rosen, Sinnott |
| **Experts** | Gillers | 3/20/18 | 363 | 567 minutes | In Person: Gillers, Lee, McEvoy, Rosen, Sinnott<br><br>Phone: Hylenski |
| **Experts** | Gillers | 3/21/18 | 70 | 100 minutes | In Person: Gillers, McEvoy, Rosen, Sinnott<br><br>Phone: Hylenski |

| Firm Name/Other | Deponent's Name | Date(s) Deposed | # of Pages of Testimony | Total Deposition Time | Special Master Personnel in Attendance |
|---|---|---|---|---|---|
| **Experts** | Sarrouf | 3/21/18 | 156 | 234 minutes | In Person: Gillers, McEvoy, Rosen, Sinnott<br><br>Phone: Hylenski |
| **Experts** | Sarrouf | 3/24/18 | 179 | 200 minutes | In Person: McEvoy, Rosen, Sinnott<br><br>Phone: Gillers |
| **Experts** | Joy, P. | 4/3/18 | 184 | 246 minutes | In Person: Gillers, Hylenski, McEvoy, Rosen, Sinnott |
| **Experts** | Wendel | 4/3/18 | 207 | 252 minutes | In Person: Gillers, Hylenski, McEvoy, Rosen, Sinnott |
| **Experts** | Green | 4/4/18 | 173 | 234 minutes | In Person: Gillers, McEvoy, Rosen, Sinnott<br><br>Phone: Hylenski |
| **Experts** | Lieberman | 4/4/18 | 128 | 155 minutes | In Person: Gillers, McEvoy, Rosen, Sinnott<br><br>Phone: Hylenski |
| **Experts** | Dacey | 4/9/18 | 86 | 126 minutes | In Person: Gillers, McEvoy, Rosen, Sinnott<br><br>Phone: Hylenski |
| **Experts** | Vairo, Georgene | 4/10/18 | 110 | 158 minutes | In Person: McEvoy, Rosen, Sinnott<br><br>Phone: Gillers |
| **Experts** | Rubenstein | 4/9/18 | 217 | 340 minutes | In Person: Gillers, McEvoy, Rosen, Sinnott<br><br>Phone: Hylenski |
| | | **Total Pages/Minutes** | **7,273** pages | **9,827** minutes | |

| Firm Name/Other | Deponent's Name | Date(s) Deposed | # of Pages of Testimony | Total Deposition Time | Special Master Personnel in Attendance |
|---|---|---|---|---|---|
|  |  |  |  | **163.78** hours |  |