# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated | ) ) | |
| | ) | No. 11-cv-10230 MLW |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant | ) ) | |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND and those similarly situated, | ) ) ) | No. 11-cv-12049 MLW |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20 | ) ) ) ) | |
| Defendants. | ) ) | |
| THE ANDOVER COMPANIES EMPLOYEES SAVINGS AND PROFIT SHARING PLAN, on behalf of itself and JAMES PEHOUSHEK-STRANGELAND, and all others similarly situated, | ) ) ) ) | |
| | ) | No. 11-cv-11698 MLW |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, | ) ) | |
| Defendant. | ) ) | |

**DECLARATION OF WILLIAM B. RUBENSTEIN IN SUPPORT OF
LIEFF CABRASER HEIMANN & BERNSTEIN, LLP'S
RESPONSE AND OBJECTIONS TO
THE SPECIAL MASTER'S REPORT AND RECOMMENDATIONS**

1.      I am the Sidley Austin Professor of Law at Harvard Law School and a leading national expert on class action law generally and class action fees in particular.  In the spring of 2017, the law firm Lieff Cabraser Heimann & Bernstein, LLP ("LCHB") retained me to provide my expert opinion on several aspects of these proceedings.  Since that time:

- I submitted an initial declaration, dated July 31, 2017, that addressed, among other issues, the proper manner for billing non-partnership track attorneys and the relevance, for lodestar cross-check purposes, of the inadvertent double counting of staff or contract attorney lodestar.[1]

- I submitted a report, dated March 26, 2018, as a rebuttal witness, that responded to the class action aspects of Professor Stephen Gillers's February 23, 2018 expert report.[2]

- I sat for a deposition by the Special Master and his Counsel for about six hours on April 9, 2018.

The Special Master's Report[3] failed to include or address my July 31, 2017 Fee Declaration, but referenced and discussed my March 26, 2018 Rebuttal Report and April 9, 2018 deposition testimony at some length.  I submit this Declaration (1) to respond to the characterizations of my testimony in the Special Master's Report, particularly as to counsel's responsibilities under Rule 23(e)(3) (Part I, *infra*); (2) to address what I believe are errors in the treatment of contract attorneys in the Special Master's Report (Part II, *infra*); and (3) to address what I regard as the

---

[1] Expert Declaration of William B. Rubenstein (July 31, 2017) (hereafter "Rubenstein Fee Declaration").   Because, as noted below, the Special Master did not include this document in the record of the case, I have attached it hereto as Exhibit A.  The Court will note that it contains a fuller exposition of my credentials (¶¶2–7), disclosure of my prior relationships to the firms in the case (¶8), and a full copy of my c.v. (Exhibit A).

[2] Expert Report of William B. Rubenstein (Mar. 26, 2018) (hereafter "Rubenstein Rebuttal Report").

[3] Special Master's Report and Recommendations (May 14, 2018) (hereafter "Special Master's Report").

Special Master's Report's failure to properly acknowledge the distinction between a lodestar cross-check submission and a lodestar-based fee request, an error that resulted in the illogical recommendation that LCHB "repay" more than $2 million in "lodestar" to the class (Part III, *infra*).[4]

I.

<u>The Special Master's Report and Executive Summary Misstate and Misapply the Law
Regarding Agreements Made in Connection with Class Action Settlement Proposals and
Erroneously Characterize My Testimony in Several Other Respects</u>

2.　　　On February 23, 2018, Professor Stephen Gillers filed a report herein discussing, *inter alia*, the application of Rule 23's fee provisions – Rule 23(h) and cross-referenced Rule 54 – to the facts of this case.[5]

3.　　　On March 26, 2018, in partial response to the Gillers Report, LCHB submitted a report entitled, "Expert Report of William B. Rubenstein."　The first paragraph explained that this was my expert opinion "in response to the class action aspects of Professor Stephen Gillers's Ethical Report for Special Master Gerald E. Rosen."[6]　The content emphasized that Rule 23(h), cross-referencing Rule 54(b), requires the disclosure of fee agreements only upon court order.

4.　　　On April 9, 2018, the Special Master and his Counsel, with Professor Gillers

---

[4] These responses to the Special Master's Report apply as well to the corresponding sections of the Report's Executive Summary.

[5] Professor Stephen Gillers, Ethical Report for Special Master Gerald E. Rosen 66–71 (Feb. 23, 2018) (hereafter "Gillers Report").

[6] Rubenstein Rebuttal Report at ¶ 1.

2

seated next to them, deposed me – as a rebuttal witness[7] – for nearly six hours about the opinions expressed in the Rubenstein Rebuttal Report.

5.      On May 8, 2018, Professor Gillers filed a supplemental report in which he explicitly renounced his reliance on Rule 23(h)/Rule 54[8] and reported that he accepted my interpretation of these provisions.[9]

6.      On May 19, 2018, the Special Master filed his report with the Court.  In that Report, he too accepts my interpretation of Rule 23(h)/Rule 54, writing:

> Although Professor Rubenstein is in agreement with the Special Master and advocates that, in the interest of transparency, fee allocation agreements should be made known to the class, *see* Rubenstein, *5 Newberg on Class Actions*, at § 15:12, ***as nothing in Rule 23 requires disclosure of fee agreements absent a court order***, the Special Master cannot conclude with certainty that as a matter of law the nondisclosure of the Chargois Agreement in the Notice provided to the class members violated any Rule of Civil Procedure.[10]

7.      Despite the broad language of the underscored passage above, elsewhere in his Report the Special Master newly relies on the settlement – not fee – provision of Rule 23, contained in Rule 23(e), to argue that Lead Counsel should have disclosed its financial commitment to Damon Chargois to the Court in conjunction with submitting the settlement for

---

[7] Rubenstein Dep. at 35:10–12 ("THE WITNESS: All right. So I'm here as a rebuttal witness, and I haven't prepared -- THE SPECIAL MASTER: I understand."); *see also id.* at 150:13–14 ("I'm here as a rebuttal witness . . . .").

[8] Supplemental Ethical Report for Special Master Gerald E. Rosen at 78 ("I do not rely on Rules 23 and 54 for my opinion.") (hereafter "Supplemental Gillers Report").

[9] *Id.* at 92 ("Professor Rubenstein testified that his opinion was limited to duties under Rules 23 and 54.  Rubenstein 4/9/18 Dep., p. 198: 21-24.  He offered no opinion on duties that have their source elsewhere.   I accept Professor Rubenstein's interpretation of the Rules of Civil Procedure.").

[10] Special Master's Report at 280 (emphasis added).

approval.[11]   In doing so, the Special Master's Report explicitly states that it is relying upon the interpretation of that provision I provide in the class action treatise that I author (*Newberg on Class Actions*).[12]   I cited and discussed this section in my report rebutting Professor Gillers's Report,[13] and, although the Special Master and his Counsel read from this short section at my deposition,[14] neither asked me about their proposed interpretation of Rule 23(e)(3).   Accordingly, I have not had the opportunity to review and respond to it.   I write now to do so and to ensure that my views are properly set forth in the record.

8.   Rule 23(e)(3) states that "parties seeking approval [of a class action settlement] must file a statement identifying any agreement made in connection with the proposal."[15]   In the *Newberg* Treatise (a) I first report that courts have not applied this provision to fee allocation agreements;[16] and (b) I then argue that they should consider doing so because "some agreements among counsel would impact settlement *terms* and hence should be disclosed to the class."[17]   In the *Newberg* Treatise, I provide as an example a situation whereby "one set of counsel's fee

---

[11] *Id*. at 305–09.

[12] *Id.* (discussing William B. Rubenstein, 5 *Newberg on Class Actions* § 15:12 (5th ed.)) (hereafter "Rubenstein, *Newberg on Class Actions*").

[13] Rubenstein Rebuttal Report at 4 & n.6; *see also id.* at 7 & n.20; *id.* at 29 & n.94; *id.* at 30 & n.100.

[14] *See, e.g.*, Rubenstein Dep. at 53:19–54:19.

[15] Fed. R. Civ. P. 23(e)(3).

[16] Rubenstein, 5 *Newberg on Class Actions, supra* note 12, at § 15:12 ("Courts generally do not read Rule 23(e)'s disclosure requirement as requiring disclosure of fee agreements among counsel on the ground that such agreements do not necessarily affect the class's interests.") (citing *Hartless v. Clorox Co.*, 273 F.R.D. 630, 646 (S.D. Cal. 2011), aff'd in part, 473 Fed. Appx. 716 (9th Cir. 2012) ("The allocation of . . . fees amongst class counsel does not affect the monetary benefit to class members.")).

[17] *Id.* (emphasis added).

allocation was capped at a certain amount, [such] that counsel would have less interest in pushing further on behalf of the class once her cap was met."[18]

9.       The Special Master's Report embraces my approach and, applying it, concludes (a) that Rule 23(e)(3) should legally govern Lead Counsel's actions in 2016[19] and (b) that the Rule factually applies to Lead Counsel's "pre-existing agreement to pay Chargois."[20]

10.       The Report's application of Rule 23(e)(3) to the facts of this case embodies what I see as three separate errors, two of law, one of fact:

- *Not Law.*  No court has ever read Rule 23(e)(3) to apply to fee allocation agreements, to the best of my knowledge.  In the *Newberg* Treatise I cite the only reported case that I found on the topic, a case holding that the provision did ___**not**___ entail disclosure of the fee allocation agreements.[21]  The Special Master's Report cites to no authority other than my Treatise section referencing this single case that does not support its reading of the law.

- *Not Appropriate Legal Standard.*  No court or other authority has ever articulated the standard that the Special Master's Report utilizes in applying Rule 23(e)(3).  In the *Newberg* Treatise, I argue that 23(e)(3)'s requirement that counsel disclose *settlement*-related agreements should be read to apply to *fee* agreements that "___**impact settlement terms**___."[22]  I adopted that language from the Advisory Committee Notes, which state that Rule 23(e)(3) is meant to apply to agreements that, "although seemingly separate, may have influenced ___**the terms of the settlement**___ by trading away possible advantages for the class in return for advantages for others."[23]  The *Manual for Complex Litigation* similarly states that:  "The spirit of Rule 23(e)(2) is to compel identification of any agreement or

---

[18] *Id*.

[19] Special Master's Report at 306–09.  Lead Counsel submitted the proposed settlement agreement for preliminary judicial approval on July 26, 2016.  ECF No. 91.

[20] Special Master's Report at 309.

[21] *Id*. (discussing *Hartless v. Clorox Co.*, 273 F.R.D. 630, 646 (S.D. Cal. 2011), aff'd in part, 473 Fed. Appx. 716 (9th Cir. 2012) ("The allocation of … fees amongst class counsel does not affect the monetary benefit to class members.")).

[22] Rubenstein, 5 *Newberg on Class Actions, supra* note 12, at § 15:12 (emphasis added).

[23]  Fed. R. Civ. P. 23(e)(2) advisory committee's note to 2003 amendment (emphasis added).

understanding that might have affected the interests of class members by altering what they may be receiving or foregoing.  Side agreements might indicate, for example, that ___the settlement is not reasonable___ because they may reveal additional funds that might have been paid to the class that are instead paid to selected claimants or their attorneys."[24]  The Special Master's Report employs a standard (using quotation marks) that Rule 23(e)(3) applies where an agreement "allocates money that the class members may have received elsewhere."[25]  Although the source of the quoted language is not provided, it appears to come from the *Hartless* case, which explicitly held that Rule 23(e)(3) does not apply to fee allocation agreements.[26]  Moreover, the Report's standard is completely untethered from any connection to the ___settlement terms___, which is the subject of Rule 23(e)(3), and it is therefore so overbroad that it lacks meaning.  All attorneys' fees in a common fund case come out of the class's recovery and are monies that "could otherwise be allocated to the class members."  The purpose of Rule 23(e)(3) is to identify the sub-set of fee agreements that may have impacted the ___settlement's terms___, such as the agreements in the *Agent Orange* case that created conflicts between class counsel and the class.

- *Absence of supporting facts*.  Because I advocate for application of Rule 23(e)(3)'s disclosure requirement to situations where fee agreements have impacted ___settlement terms___, at my deposition I repeatedly, and at length, testified that, to me, the key question about the Chargois Arrangement was whether it had in fact impacted the class's interests.[27]  I suggested that the fact-finder consider

---

[24] Federal Judicial Center, *Manual for Complex Litigation, Fourth* § 21.631 (2004).

[25] Special Master's Report at 308; *see also id.* at 356.  The Report elsewhere employs a similar locution without quotation marks.  *Id.* at 278, 307, 355.

[26] The *Hartless* court wrote:  "As explained in the Manual of Complex Litigation, [Rule 23(e)(3)] requires disclosure of agreements that may affect the interests of the class members *by allocating money that they may have received elsewhere. . . .*"  *Hartless*, 273 F.R.D. at 646 (emphasis added).  But in applying that language, *Hartless* held that Rule 23(e)(3) did ___not___ apply to fee allocation agreements because "[t]he allocation of [aggregate] fees amongst class counsel does not affect the monetary benefit to class members."  *Id.*

[27] The following six passages are exemplary:

Rubenstein Dep. at 53:10–13 ("[F]ee agreements should be disclosed in part to make sure that the class hasn't been harmed by some agreements that have been made with respect to fees.").

*Id.* at 58:13–14 (characterizing the "class' interest" as "the most important thing at the end of the day").

*Id.* at 75:21–76:5 ("[W]hen you discovered the Chargois payment, I think you did discover something about the allocation.  I nonetheless, like you, asked myself do I think this harmed the

such questions as (a) whether the Chargois Arrangement impacted the manner in which the lawyers litigated and settled the class's claims; (b) whether the Chargois Arrangement impacted the level of fees that the lawyers sought to impose on the class; and (c) whether the Arrangement embodied an inherent conflict of interest between counsel and the class,[28] as in the *Agent Orange* case upon which Professor Gillers extensively relied.[29]  Subsequently, (a) the Special Master's Report characterized the class's relief in this case as "an excellent result;"[30] (b) the Special Master's Report concluded that the attorney's fee award was "not disproportionate or unsupportable when measured against the positive result for the class and the attorneys' effort and skill that was required to achieve it;"[31] and (c) Professor Gillers concluded that "the particular fee agreement in *Agent Orange* created potential conflicts that the Chargois Arrangement did not."[32]  The Special Master's Report nonetheless concludes that Rule 23(e)(3) compelled Lead Counsel to disclose the allocation of fees to Damon Chargois because that money could have gone to the class.[33]  This is neither an application of Rule 23(e)(3)'s settlement-impact standard nor a finding of fact (nothing in the

---

class in the way the second circuit asked in the Agent Orange case.  Were the fee agreements such that it changed the mechanics of the litigation in ways that upset the class' interests?").

*Id.* at 77:18–23 ("The reason to disclose the fees is to make sure the class' interests weren't undercut in any way by the agreements that were made.  And so the transparency and disclosure is a means to an end, and the end is making sure the class' interests weren't sold out in some ways.").

*Id.* at 181:23–182:4 ("[W]hen I look at the allocation from your point of view, the questions I'd ask – which I said earlier – are did the Chargois Arrangement – did the allocational arrangements pervert the incentives in representing the class.").

*Id* at 184:19–23 ("[W]hen I'm reverse engineering looking back from the end of the case, the questions I ask are similar to what I see the second circuit asking in Agent Orange.  Did this pervert the incentives of the lawyers to the detriment of the class?").

[28] *See id.* at 55:10–58:14; *id* at 75:20–76:11; *id.* at 99:13–100:22; *id.* at 181:23–182:7;  *id.* at 182:18–184:9; *id.* at 184:19–185:6.

[29] *See, e.g.*, Gillers Report at 69 (quoting *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 223 (2nd Cir. 1987)).

[30] Special Master's Report at 6.

[31] *Id*.

[32] *See* Gillers Supplemental Report at 82 n.87 ("I also agree that the particular fee agreement in *Agent Orange* created potential conflicts that the Chargois Arrangement did not.").

[33] Special Master's Report at 309 ("Here we have an *un*disclosed agreement to pay $4.1 million out of the settlement funds -- ***funds that could otherwise be allocated to the class members*** -- to an attorney who did no work on the case whatsoever.") (emphasis added); *id.* at 356 (same).

record is cited in support of it).  Most notably, the Special Master's Report does not even stand behind it:  remedially, the Report proposes to make Lead Counsel pay an amount equal to more than 80% of the Chargois money **_to other lawyers_** and only $700,000 – or less than one quarter of one percent of the $300 million settlement – to the class.

11.     In sum, Rule 23(e)(3) leaves to class counsel the decision whether to disclose agreements "made in connection with the [settlement] proposal" to the Court.  Here, the Special Master's Report concludes that Lead Counsel derogated its duties because it did not interpret that provision (a) in a way no court has ever before interpreted it (b) according to a standard unmoored from the Rule's purpose (c) on a factual record lacking any evidence that the payment impacted the settlement's terms (d) in a circumstance where the class's interest in the payment was, according to the Report's own conclusions, equivalent to about 0.23% of the settlement's value.

12.     At several places, the Special Master's Report characterizes my testimony in more specific ways that I think bear correction:

- The Special Master's Report states that I find the rule requiring a Court to order disclosure of fee agreements to be "peculiarly written,"[34] but that was not my testimony.  I testified that Rule 23(h)(2) could not be more clearly written.[35]  I used the word "peculiar" in refer to the *notice* provisions of Rule 23.[36]  I did so because there are two notice provisions (one for settlements, one for fees) that utilize different linguistic formulations:  Rule 23(e)(1) states, as to settlements, that, "The court must direct notice in a reasonable manner to all class members

---

[34] *Id.* at 278 ("Although he admits that Rule 23 is 'peculiarly written,' relying on the plain language of Rule 23(h)(2)(B)(iv), Professor Rubenstein -- as he does with the duty to disclose to the Court itself -- contends that Labaton was under no duty to disclose the Chargois Arrangement to the class absent an order from the Court directing it to do so.") (footnote omitted).

[35] Rubenstein Rebuttal Report at 26 ("[T]he rule structure could not be clearer in setting forth precisely what a court needs to do should it desire to review underlying fee agreements: ask.").

[36] Rubenstein Dep. at 119:7–10 ("Rule 23 is actually peculiarly written, and it's different than the phrasing of who has the duty to give notice, whether it's the Court or the lawyers.").

who would be bound by the proposal,"[37] while Rule 23(h)(1), regarding fees, states, in a passive voice without reference to who shoulders this obligation, "Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner."[38]

- I testified that Rule 23(h)(2) places the burden on the Court to order the parties to disclose fee allocation agreements.  The Special Master's Report states that I "conceded this is a lot to ask of the judge," and quotes a lengthy passage of my deposition in support of that statement.[39]  In that passage, I testified that asking a court to be a fiduciary for absent class members is a heavy burden.  By contrast, my testimony is clear that the more specific responsibility explicitly delegated to a court by Rule 23(h)(2) – to ask counsel to disclose fee agreements – is not difficult at all.  In my Rebuttal Report I stated:  "Absent Professor Gillers's tortured approach, it is really not much of an imposition for a court to ask, 'How are the fees being allocated?' as Rule 54(d)(2) proposes."[40]

- While I reported that Rule 23(h)(2) requires a Court to ask counsel to disclose fee agreements, the Special Master's Report states (several times) that I "place the entire blame for the nondisclosure of the Chargois payment in this case upon the Court."[41]  I never once use the word "blame" in my Rebuttal Report or deposition.  I do believe that the goal of transparency would have been served had the Court asked counsel to disclose their fee agreements.  Thus, if the Court concludes that the absence of transparency caused harm to the class members, it is my testimony that such harm might have been avoided had the Court required disclosure of all fee agreements.

## II.

### The Special Master's Report Misreports and Misapplies the Law Regarding Contract Attorneys

13.     In my July 31, 2017 Fee Declaration I (a) labeled so-called "staff attorneys" or "contract attorneys" as "non-partnership track attorneys" and opined that those employed in this case (b) were skilled attorneys (c) assigned billing rates comparable with those approved by

---

[37] Fed. R. Civ. P. 23(e)(1).

[38] Fed. R. Civ. P. 23(h)(1).

[39] Special Master's Report at 279–80.

[40] Rubenstein Rebuttal Report at 12.

[41] Special Master's Report at 306; *id.* at 355.

courts in a comparison set of other class action cases and (d) appropriately treated as attorneys in a lodestar cross-check submission, rather than as expense.[42]

14.     With one important caveat noted in the succeeding paragraph, the Special Master's Report concurs with all four of these conclusions, stating (a) that "[r]ather than referring to them as staff attorneys, it would be more accurate to refer to them as 'non-partnership-track' attorneys;"[43] (b) that "these staff attorneys did much more than 'low-level' document review;"[44] (c) that the "staff attorney billing rates in the lodestar fee petition are generally reasonable;"[45] and (d) that "there is nothing impermissible about marking up an attorney's billing rate above 'cost' so long as the rate at which the attorney is billed is reasonable and commensurate with experience and the value of the work performed."[46]

15.     The only exception to the Special Master's Report's full adherence to the position I articulated in my Fee Declaration is that it distinguishes between non-partnership *staff* attorneys and non-partnership *contract* attorneys, enabling the former to be treated as attorneys but the latter only as costs.[47]   The Special Master's Report concedes that there was no distinction

---

[42] Rubenstein Fee Declaration at ¶¶ 34-38.

[43] Special Master's Report at 177.

[44] *Id.* at 177–78.

[45] *Id.* at 180.

[46] *Id.* at 177; *see also id.* at 182 ("[T]here is nothing disingenuous about billing clients at market rates for work performed by attorneys, whether traditional or non-partnership-track.  That one attorney is on a partnership track while another is not is, in this context, a distinction without a difference.  Quite simply, similar work justifies similar rates.") (citation omitted).

[47] *Id.* at 181–88.  To respond to the Special Master's Report's distinction between these two types of lawyers, I employ its usage of the term "contract attorney" to apply to attorneys who perform the same work as "staff attorneys" but who are employed through agencies rather than directly by a law firm.  *Id.* at 181 ("Included within the staff attorneys listed on Lieff's and

between staff attorneys and contract attorneys as to the work performed – each provided the same valuable service to the class.[48]   As such, there is no obvious reason to distinguish their billing rates for lodestar cross-check purposes, much less to bill the former as attorneys and the latter as costs.   The Special Master's Report premises its approach on its factual assumption that firms face *categorically* different costs in compensating the two types of lawyers and on its legal conclusion that a firm's entitlement to attorney's fees should turn on that distinction.   The Report's approach embodies at least five errors of law and fact:

- *Not Law*.  The Special Master's Report states that "legal and ethical rulings have not provided definitive guidance on [the] interesting issue . . . of whether contract attorneys should be passed along as a reimbursable expense rather than as a marked-up profit center."[49]   That statement is inaccurate.   Courts *have* provided definitive guidance:  they are unanimously opposed to the Special Master's Report's approach.   Numerous courts have explicitly rejected the argument that contract attorneys must be billed as a cost[50] and many other courts – far too

_____

[48] *Id.* at 183 ("[T]here is no intent to pass judgment on the merits of the work performed by those contract attorneys or their professional qualifications.  Quite the contrary.").

[49] *Id.* at 187.

[50] *See* Rubenstein, *Newberg on Class Actions*, *supra* note 12, at § 15:41 n.5 (listing six exemplary cases); *see also City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 954 F. Supp. 2d 276, 280 (S.D.N.Y. 2013) ("[I]t is beyond cavil that law firms may charge more for contract attorneys' services than these services directly cost the law firm . . . ."); *In re Apollo Grp. Inc. Sec. Litig.*, No. CV 04-2147-PHX-JAT, 2012 WL 1378677, at *7 n.2 (D. Ariz. Apr. 20, 2012) (rejecting an objection to the inclusion of contract attorneys in a lodestar cross-check and stating that "Class Counsel may recover fees paid to contract attorneys"); *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 264–65 (E.D. Va. 2009) (rejecting an objector's argument that contract attorneys should not be included in a lodestar for cross-check purposes and stating that "the Court has absolutely no trouble finding that the contract attorneys should be billed at market versus cost.  They are part of the team brought in to benefit the class.  Their contributions are of a similar nature to the attorneys who are in the firms retained by plaintiffs, and they should be compensated in that manner."); *cf. In re Gen. Motors ERISA Litig.*, No. 05-71085, 2008 WL 11399729, at *2 (E.D. Mich. Sept. 15, 2008) (reporting that court had previously rejected objectors' argument "that Class Counsel's use of contract attorneys was somehow improper, and, as a result, their hours should be excluded under the lodestar cross-check").

numerous to enumerate – have approved fee petitions that include contract attorneys in counsel's lodestar or lodestar cross-check submission.[51]  By contrast, I am not aware of a single court in the United States that has ever held that contract attorneys must be billed to the client as a cost rather than included in the lodestar at the attorney's market rate.[52]  The Special Master's Report cites only two cases in support of its approach – *Dial* and *Meredith*[53] – but when probed, neither actually supports that approach.  In *Dial*, the lawyers voluntarily sought repayment for contract attorney time as a cost; the court did not require that they do so.  In applauding the lawyers for doing so, the Court noted that this choice had relieved the Court of having to ascertain a proper billing rate for these attorneys.[54]  What this means is that absent the lawyers' voluntary decision, the *Dial* Court would have treated these attorneys as <u>lawyers</u>, not as an expense.  In *Meredith*, a large New York law firm (Weil, Gotshal & Manges LLP) represented the plaintiff class in an antitrust action.  It too voluntarily sought reimbursement

---

A number of these decisions rejecting the argument that contract attorneys may only be billed at cost explicitly reference the fact that class counsel retained the contract attorneys at issue from an agency, *e.g.*, *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 394 (S.D.N.Y. 2013); *In re AOL Time Warner S'holder Derivative Litig.*, No. 02 CIV. 6302 (CM), 2010 WL 363113, at *25 (S.D.N.Y. Feb. 1, 2010), while in many of the other cases that fact was made known to, or was likely known by, the court.  In other words, counsel's retention of contract attorneys from an outside agency does not distinguish this case from this vast body of pertinent authority.

[51] *See, e.g.*, Rubenstein Fee Declaration at Ex. F (analyzing court-approved billing rates for contract attorneys in a dozen cases decided in two year period).

[52] To confirm the accuracy of this statement, my research assistants and I read through several hundred state and federal cases that are identified through Westlaw searches for the term "contract attorney!" in class action and non-class action fee petitions.  We found none that require counsel to treat contract attorneys as an expense.

 In the *Newberg* Treatise, I note that several courts have limited attorney's fees generally (not contract attorneys specifically) to costs in fee-shifting cases where the relevant fee statute utilizes cost-like language.  Rubenstein, *Newberg on Class Actions*, *supra* note 12, at § 15:41 & n.4 ("[S]ome courts have suggested that when a statute provides for recovery of 'actual' expenses or expenses 'incurred,' attorneys should bill based on their actual rates, rather than the market rates.").  This statutory limitation is not relevant in common fund fee cases decided under common law principles, such as this case.

[53] Special Master's Report at 187–88 (citing *Meredith Corp. v. SESAC, LLC*, 87 F. Supp. 3d 650, 671 (S.D.N.Y. 2015); *Dial Corp. v. News Corp.*, 317 F.R.D. 426, 437 (S.D.N.Y. 2016)).

[54] *Dial*, 317 F.R.D. at 438 ("[T]his Court appreciates Counsel's decision to treat these contractor fees as an expense.  It saves the Court from having to determine a correct spread between the contract attorney's cost and his or her hourly rate and his or her salary.").

for contract attorneys at cost,[55] but in doing so, it was careful to explain to the Court that this was a deviation from the firm's usual practice.[56]  What this means is that absent the lawyers' voluntary decision, the large corporate firm in *Meredith* would have treated these attorneys as <u>lawyers</u>, not as an expense.  Accordingly, *Meredith* actually provides a data point showing that in the private market Weil Gotshal serves, contract attorneys are normally charged as lawyers, not costs, to paying clients.

- *Not Appropriate Legal Standard.*  Courts have never premised the right to attorney's fees on the level of an attorney's employment benefits and it would be bad public policy to begin to do so, particularly in the context of an informal lodestar cross-check.[57]  Such an approach would involve courts in innumerable line-drawing questions – How many benefits are enough? Which ones? Why those? – all about employment indicia that are irrelevant.  These indicia are irrelevant because it is not the presence or absence of employment benefits that

---

[55] The firm attributed the limitation to, *inter alia,* the non-profit nature of its named plaintiff in the case and to the plaintiff's concurrent agreement to pay it "additional compensation" upon a favorable settlement, which turned out to be $1 million over and above the fees billed to the class.  *See* Declaration of R. Bruce Rich in Support of Class Counsel's Motion for Award of Attorney's Fees and Expenses, ECF No. 209 at ¶¶ 4–6, *Meredith Corp. v. SESAC, LLC*, Case No. 1:09-cv-09177-PAE (S.D.N.Y. filed November 20, 2014).

[56] *See* Memorandum of Law in Support of Class Counsel's Motion for Award of Attorney's Fees and Expenses, ECF No. 208 at 14 & n.11, *Meredith Corp. v. SESAC, LLC*, Case No. 1:09-cv-09177-PAE (S.D.N.Y. filed November 20, 2014) (noting that "[b]ased on the normal rates that Class Counsel would have charged absent the fee accommodations made to the [lead plaintiff]" its lodestar would have been $17.4 million, but with the "fee accommodations" it was $11.8 million, and describing one of four fee accommodations as the fact that "the lodestar does not include the time of third-party contract attorneys performing document review analysis for discovery under the supervision of Class Counsel," thus implying that absent this accommodation, the firm would have "normally" included contract attorney time in normal bill to client) (citing *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d 369, 394-95 (S.D.N.Y. 2013) (courts "regularly appl[y] a lodestar multiplier to contract attorneys' hours") (citing *Carlson v. Xerox Corp.*, 596 F. Supp. 2d 400, 409 (D. Conn. 2009), *aff 'd*, 355 F. Appx. 523 (2d Cir. Dec. 9, 2009))).

[57] As I noted in my Fee Declaration, "Courts in nearly every Circuit have noted the summary nature of the lodestar cross-check.  *See* [Rubenstein, *Newberg on Class Actions, supra* note 12, at § 15:86 n.13] (collecting cases, including cases from within this Circuit) (citing, *inter alia*, *In re Tyco Intern., Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 273 (D.N.H. 2007) ("'The lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.'" (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306 (3d Cir. 2005), as amended, (Feb. 25, 2005)))."  Rubenstein Fee Declaration at 10 n.12.

13

makes a lawyer a lawyer:  it is the work that is being performed.[58]  Here, there is no question that the contract attorneys provided meaningful legal services to the class.

- *Modest – and Irrelevant – Factual Distinction.*  Contract attorneys may be less distinct from full-time employees than the Report suggests.  A firm may well house contract attorneys on-site during the duration of their work, hence paying (often expensive) real estate overhead – and related workplace benefits such as on-site food – for such lawyers.  The law may require firms to provide overtime pay[59] and unemployment benefits[60] to contract attorneys, and of course firms must abide by federal and local laws prohibiting discrimination in retaining and working with contract attorneys.[61]  Moreover, as contract attorneys likely form an attorney-client relationship with the underlying client,[62] the firm's retention of them may just as likely impact malpractice insurance costs.  Contract attorneys are a good data point in support of the adage that there is no such thing as a free lunch.  Conversely, in today's current legal practice, firms have entered into far more flexible arrangements with associates and staff attorneys:  for instance, partnership track attorneys often work reduced hours (perhaps thereby removing themselves from certain benefits or legal requirements) and/or work off-site or without permanent office space.  To the best of my knowledge, private firms

---

[58] *In re Tyco*, 535 F. Supp. 2d at 272 ("An attorney, regardless of whether she is an associate with steady employment or a contract attorney whose job ends upon completion of a particular document review project, is still an attorney.  It is therefore appropriate to bill a contract attorney's time at market rates and count these time charges toward the lodestar."); *Andrews v. Lawrence Livermore Nat. Sec., LLC*, No. C 11-3930 CW, 2012 WL 160117, at *2 (N.D. Cal. Jan. 18, 2012) ("Defendants provide no authority for the proposition that, for purposes of determining reasonable hourly rates, an attorney's status as a contract attorney, as opposed to his or her employment as an associate, is a proper substitute for evaluating an attorney's actual experience or skills.").

[59] *See, e.g.*, *Henig v. Quinn Emanuel Urquhart & Sullivan, LLP*, 151 F. Supp. 3d 460, 471 (S.D.N.Y. 2015) (rejecting argument that contract attorney was entitled to overtime pay pursuant to Fair Labor Standards Act and particular state labor law based on facts of case).

[60] *See, e.g.*, *In re Singhal*, 128 A.D.3d 1308 (N.Y. App. Div. 2015) (requiring class action firm to pay unemployment benefits for contract attorney).

[61] *See, e.g.*, *Simmons-Grant v. Quinn Emanuel Urquhart & Sullivan, LLP*, 915 F. Supp. 2d 498 (S.D.N.Y. 2013) (rejecting contract attorney's race discrimination case based on facts of case).

[62] *Abrams v. Se. Mun. Bonds Inc.*, 138 F. App'x 88, 98 (10th Cir. 2005) ("The general rule is that a temporary or contract lawyer 'who performs legal services for or on behalf of clients of the firm is subject to duties to the firm's clients similar to those of lawyers generally, such as those of competence and diligence . . . and confidentiality. . . .'") (quoting Restatement (Third) of the Law Governing Lawyers § 9, comment g (2000)).

14

nonetheless continue to bill these attorneys at market rates, not as costs.  Firms similarly bill summer law students – for whom they generally do not pay health care and retirement benefits – to their clients at market rates.  These factual questions are complex and involve a court in inquiries irrelevant to the key concern – whether or not legal services are being provided to the client.

- *Modest – and Irrelevant – Financial Distinction.*  Contract attorneys may be less costly than full-time employees, but in a more modest (and irrelevant) manner than the Report suggests.[63]  The Special Master's Report states that "the vast majority of the ***staff*** attorneys were paid in the range of $40-$60 an hour, plus benefits,"[64] while it further found that "a firm . . . pays only a modest hourly fee for ***contract*** attorneys, sometimes less than $50 per hour."[65]  In other words, the rates appear completely indistinguishable, but for the benefits.  The Department of Labor reports that, with employment benefits, an employer pays an employee about 1.5 times the employee's base salary.[66]  That means that the $50/hour ***staff*** attorney costs the firm about $75/hour, while the $50/hour ***contract*** attorney costs the firm, say, $55/hour[67] for the reasons outlined in the prior bullet point.  It is not immediately obvious what the major distinction is between two employees doing the same work, one at $55/hour and the other at $75/hour, that requires the former to be charged as a <u>cost</u> while the latter is charged at a <u>lawyer's market rate</u>.  It cannot be the pure number alone:  the Supreme Court has long held that paralegals may be billed to a client as legal professionals at their market rate and

---

[63] Special Master's Report at 185 ("While an inherent markup on attorneys' fees may apply to non-partnership track attorneys who are employees of a firm, such a markup *grossly distorts* the financial burdens of hiring true 'temporary' or contract attorneys.") (emphasis added); *see also id.* at 184 ("Given the *considerable* economic benefits realized by those firms that hire contract attorneys in a large class action case, such as *State Street*, law firms that realize such a benefit should distinguish the costs of contract attorneys from those of staff attorneys who perform the same or similar work on a matter when seeking reimbursement of fees and expenses.") (emphasis added).

[64] *Id.* at 177 (emphasis added).

[65] *Id.* at 187 (emphasis added).

[66] *See* U.S. Department of Labor, Bureau of Labor Statistics, *Employer Costs for Employee Compensation – March 2018*, available at   https://www.bls.gov/news.release/pdf/ecec.pdf (reporting that wages and salaries averaged $24.77 per hour worked, while benefits averaged $11.55, for an average employee compensation of $36.32; meaning that the full package ($36.32) was 1.4663 times the wages ($24.77)).

[67] The $55/hour estimate is less than 1.1111 times the $50/cost, or about ¼ of the (1.4663) markup of the staff attorney.

need not simply be passed on as costs,[68] yet, paralegal hourly rates are, of course, lower than those of contract attorneys.  For this reason, those courts that have expressed concerns about class counsel's handling of contract attorneys have treated the question as of one of degree not type, adjusting the pertinent hourly rate but rejecting the argument that the contract attorneys be passed through as a cost.[69]

- *Distinct from Multiplier Analysis.*  The Special Master's Report misconceives the purpose of a lodestar cross-check submission in arguing that "if a firm pays an agency $40/hour for a contract attorney but claims $400/hour for that contract attorney on its lodestar, and then obtains a 2.0 multiplier, the actual recovery rate for this contract attorney is $800/hour -- or twenty times what the firm paid for the attorney."[70]  The Court in this case awarded class counsel 25% of the common fund; counsel's lodestar was submitted solely for cross-check, or verification purposes, and showed that the 25% award was about twice counsel's lodestar.  This enabled the Court to ascertain whether a 1.8 multiplier was appropriate given the risks counsel took and the rewards it obtained for the class.  The Court's conclusion that the 1.8 multiplier was justified did not mean that class counsel

---

[68] *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 285–87 (1989) (holding that the primary federal fee-shifting statute enables recovery for paralegal time at market rates because when "the prevailing practice in a given community [is] to bill paralegal time separately at market rates," a reasonable attorney's fee should include compensation for those hours at those market rates).

[69] *See, e.g.*, *In re Polyurethane Foam Antitrust Litig.,* 168 F. Supp. 3d 985, 1013 (N.D. Ohio 2016) (accepting the argument that contract attorneys could be billed as lawyers, rather than cost, but reducing their billing rate); *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 27 (S.D.N.Y. 2016) (expressing concern about contract attorney rates and concluding that "[c]onsidering all the circumstances, the simplest resolution is to reduce the lodestar multiplier from 1.5 to 1.2"); *In re Citigroup Inc. Sec. Litig.,* 965 F. Supp. 2d at, 394–95 (rejecting the argument that contract attorneys should be treated as cost but reducing their hourly rate to $200 for lodestar cross-check purposes); *City of Pontiac,* 954 F. Supp. 2d at 280 (rejecting an argument that contract attorneys should be treated as cost but reducing the total fee award based in part on the argument that a private client would have negotiated a lower billing rate for contract attorneys); *In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1105 (D. Minn. 2009) (rejecting objections to the use of contract lawyers but applying a reduced rate to their work for lodestar cross-check purposes)*In re Polaroid*, No. 03 CIV. 8335 (WHP), 2007 WL 2116398, at *3 (S.D.N.Y. July 19, 2007) (approving lodestar multiplier computed after adjusting contract attorney rates to paralegal levels).  *Cf. In re Beacon Assocs. Litig.*, No. 09 CIV. 3907 CM, 2013 WL 2450960, at *18–19 (S.D.N.Y. May 9, 2013) (noting that, while low-cost contract attorneys should perform document review, their pay should not be marked up "ten times," but declining to reduce rates counsel employed in lodestar cross-check because it would be "unfair to impose such a rule *ex post facto*").

[70] Special Master's Report at 188.

received $800/hour for contract attorneys.  It meant that the 25% fee was justified.
The two parts of the lodestar cross-check analysis are independent of one another:
the first aims to ascertain the proper lodestar so as to gauge the extent to which
the proposed percentage award embodies a multiplier, and the second aims to
assess whether that particular multiplier is appropriate in the circumstances of the
given case.  Understanding this distinction, courts have explicitly rejected the
argument that contract attorney time cannot be multiplied.[71]

16.     In sum, it is my expert opinion that (a) no court has ever required class counsel to

bill contract attorneys at cost rather than as lawyers; (b) it would be bad public policy to premise

the right to an attorney's fee on the indicia of the employment relationship rather than on the

services being provided to the client; this is especially true in that the (c) factual and (d) financial

distinctions between the contract and non-contract attorneys are differences in degree, not

differences in kind; and (e) treating contract attorneys as lawyers does not produce a windfall for

class counsel so long as the multiplier is consistent with the normal range of multipliers.

III.
The Special Master's Report Miscomprehends the Nature of a Lodestar Cross-Check and
Errantly Proposes That LCHB "Repay" Monies They Were Never "Paid"

17.     The Special Master's Report identifies two issues with the lodestar cross-check

submission – the double-counting issue and the contract attorney issue – and for each it

---

[71] *See, e.g.*, *In re Citigroup Inc. Sec. Litig.*, 965 F. Supp. 2d at 394 ("[Objector] contends (1) that
the contract attorneys should be treated as a litigation cost and not included in the lodestar at all,
and (2) that, if included, a lodestar multiplier cannot be applied to their work because to do so
permits too high a markup.  Neither argument prevails."); *Carlson v. Xerox Corp.*, 596 F. Supp.
2d 400, 409 (D. Conn. 2009), judgment aff'd, 355 Fed. Appx. 523 (2d Cir. 2009) ("[T]he court
concludes that it is not objectionable per se in this case to apply a multiplier to a lodestar that
includes work performed by contract attorneys, even though the profit margin for the firms
employing them was greater than the profit margin the firms would have had for work done by
full-time employees."); *In re WorldCom, Inc. Sec. Litig.*, No. 02 CIV 3288(DLC), 2004 WL
2591402, at *21 (S.D.N.Y. Nov. 12, 2004) (rejecting objector's argument that "no multiplier is
appropriate for certain work such as document review work done by contract attorneys").

17

recommends "disgorgement" of the amounts at issue:  $4,058,000 for the double-counting[72] and $2,244,383 for the contract attorneys.[73]  The Special Master's Report errs in recommending these remedies as it confuses the nature of a lodestar cross-check, applied in this case, with a lodestar based fee, not at issue here.

18.     As I explained in my Fee Declaration,[74] and at my deposition,[75] courts employ one of two methods in awarding fees in class action lawsuits:  a percentage method or a lodestar method.   According to the former, counsel are awarded some portion of the class's recovery; according to the latter, counsel are paid for their time, with a court assessing the number of hours they worked and the rates attributable to those hours.  Since the early 1990s, most courts have used the percentage method in large common fund cases like this one, although about half the courts that do so ensure that the percentage that is awarded is not too great by "cross-checking" it

---

[72] *Id.* at 364 ("The remedy for this is the disgorgement by all three firms in equal amounts of the entire approximately $4,058,000 in double-counted time. It is recommended that this entire amount be returned to the class.").

[73] *Id.* at 367–68 ("The seven contract attorneys, all retained by Lieff, recorded 2833.5 hours in this role, at rates varying between $415 and $515.  The total billings for contract attorneys was approximately $1.3 million ($1,325,588).  In addition, a multiplier of 1.8 was added to their hours and rates, yielding a total award of $2.4 million ($2,386,058) for the time of the contract attorneys.  This amount should be disgorged and returned to the class. The Customer Class is, however, entitled to claim the contract attorneys as an expense calculated at a more reasonable rate of $50/hour.  The Special Master recommends that the difference between these two figures also be awarded to the class.").

I literally do not know what this passage means.  It appears to intend to require payment of $2,386,058 to the class, but then to permit the class to be taxed $141,675 (or 2833.5 hours x $50 hour) as an expense, meaning the disgorgement would be $2,244,383 (or $2,386,058 less $141,675).  But it concludes that this difference should "*also* be awarded *to the* class," *id.* at 368 (emphasis added), without it being at all clear what the "also" means.  Regardless, as explained in the text, the whole approach is so erroneous these calculations are immaterial.

[74] Rubenstein Fee Declaration at ¶¶ 12–18.

[75] *See, e.g.,* Rubenstein Dep. at 188:22–194:7.

against counsel's lodestar. The lodestar cross-check enables a court to see how the percentage method's award compares to the time counsel have worked on the case, with a percentage award above the lodestar said to embody a positive multiplier and one below embodying a negative multiplier.

19. Because Counsel submitted their lodestar for cross-check purposes, not for the purposes of setting an exact fee based on the lodestar, any error in their lodestar calculation does not mean that the fee awarded was necessarily in error: the lodestar is a means not an end. The critical question is the effect that the lodestar error had on the cross-check. Specifically, reducing class counsel's lodestar (by, for example, fixing the double-counting and or removing the contract attorneys' time) will mean that the 25% fee award embodies a higher lodestar multiplier, which the Court will have to ensure is still reasonable. As I noted in my initial Declaration, correcting the double-counting issue by reducing counsel's lodestar adjusted their multiplier from 1.8 to 2.01, which in the context of this case was insignificant.[76] Here, if both the double-counted and the contract attorney hours are removed from counsel's lodestar, the 1.8 multiplier that the Court approved now becomes a 2.07 multiplier.[77] For the reasons I discussed at length in my Fee Declaration – utilizing empirical evidence of court-approved multipliers – this difference in the context of this case is not significant.[78] Put differently, given the remarkable success that Class Counsel achieved for the class – an accomplishment that the

---

[76] Rubenstein Fee Declaration at ¶18, ¶¶39–45.

[77] Counsel originally reported a $41.32 million total lodestar and then reported that deducting the double-counted hours resulting in a total lodestar of $37,265,241.25. ECF No. 116 at 3. If the contract attorney lodestar ($1,325,588) is further removed, the total lodestar becomes $35,939,653.25, and the $74,541,250 percentage award thus embodies a multiplier of 2.07.

[78] Rubenstein Fee Declaration at ¶18, ¶¶39-45.

Special Master recognizes[79] – a 25% fee award embodying a 2.07 multiplier is fully reasonable, indeed modest.

20.     In suggesting that the lodestar errors be "disgorged" the Special Master's Report confuses information supplied for verification purposes with information supplied for payment purposes.  In a case where a court employs the lodestar method to determine class counsel's fee, class counsel's submission of an hour of work at $500 means, if the court approves, that she will be paid $500 for that hour of work.  If for some reason that hour is later disallowed, the $500 might properly be remanded.  In a case where a court employs the percentage method to determine class counsel's fee, and uses the lodestar only for cross-check purposes, the reduction of an hour of time recalibrates the lodestar multiplier and requires further analysis of whether that lower amount can continue to sustain the requested percentage award.   But it does not require the "repayment" of that hour of time since counsel was never "paid" for that hour of time; counsel were paid a percentage of the recovery.   Numerous legal decisions have understood this distinction and, after adjusting a lodestar used for cross-check purposes downward, simply re-assessed whether the resulting higher multiplier remained reasonable.[80]

---

[79] Special Master's Report at 6 (characterizing the class's recovery as "an excellent result").

[80] *See, e.g.*, *In re Polyurethane Foam Antitrust Litig.,* 168 F. Supp. 3d at 1013 (reducing lodestar in cross-check in part because of a contract attorney rate and then reassessing the appropriateness of the new multiplier); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 4126533, at *9 (N.D. Cal. Aug. 3, 2016) ("[E]ven if the Court were to reduce the Plaintiffs' lodestar to reflect the contract attorneys' lower billing rates, the multiplier that would result would still be well within an acceptable range. . . . A lodestar reduction is unnecessary when the effect on the multiplier is not material."); *In re Citigroup Inc. Bond Litig.*, 988 F. Supp. 2d 371, 378 (S.D.N.Y. 2013) ("If the Court reduces the blended hourly rate for staff attorneys to $300—a rate that appears to be either appropriate or slightly high—the modified lodestar is approximately $73.5 million. Such a reduction would make the multiplier closer to 1.59. Assuming even a blended hourly rate for staff attorneys of $250—perhaps somewhat on the low end—the result is a modified lodestar of approximately $65 million and a multiplier of nearly 1.8.  All of these

21.     Given that the lodestar was submitted for cross-check purposes, there is simply no logic in the Special Master's Report's suggestion that class counsel "disgorge" roughly $4 million for the double-counting issue or that LCHB "disgorge" roughly $2.2 million for the contract attorney issue.

\* \* \*

22.     The Special Master's Report states that its intent "has been to identify true and unmistakable professional misconduct."[81]   It is my testimony that this mark has not been met as to three pertinent findings:   (1) that Rule 23(e)(3) required counsel to disclose the Chargois Arrangement upon submission of the settlement proposal; (2) that contract attorneys must be billed as costs not as lawyers in the lodestar cross-check submission; and (3) that counsel must "disgorge" monies when a court adjusts rates or hours in a lodestar cross-check submission.   No law supports any of these three conclusions.

June 20, 2018                                    _____
                                                     William B. Rubenstein

---

figures are within the range of reasonableness.  The lodestar cross-check has therefore performed its function, satisfying the Court that an award of 16%—which it has already determined represents a reasonable percentage of the settlement fund—adequately compensates plaintiffs' counsel for their time and effort based on estimations of reasonable market rates and factoring in an appropriate multiplier."); *Carlson*, 596 F. Supp. 2d at 409 ("[I]f the charges for the contract attorney time were decreased, the multiplier in this case would still be a reasonable multiplier."); *In re Royal Dutch/Shell Transp. Sec. Litig.*, No. CIV.A. 04-374 JAP, 2008 WL 9447623, at \*32 (D.N.J. Dec. 9, 2008) ("Even if Lead Counsel reduces plaintiffs' counsel's total lodestar by $7,287,396.25 (the lodestar of the discovery attorneys employed by Lead Counsel)—from $56,891,317.50 to $49,603,921.25—that reduction increases the multiplier only from 1.002 (based upon the total fee of $57 million) to 1.15, an immaterial difference.").

[81] *Id.* at 376 ("[T]he Special Master would point out that the intent here has been to identify true and unmistakable professional misconduct . . . .").

21

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant | )<br>)<br>) No. 11-cv-10230 MLW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND and those similarly situated,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20<br><br>Defendants. | )<br>)<br>) No. 11-cv-12049 MLW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| THE ANDOVER COMPANIES EMPLOYEES SAVINGS AND PROFIT SHARING PLAN, on behalf of itself and JAMES PEHOUSHEK-STRANGELAND, and all others similarly situated,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>) No. 11-cv-11698 MLW<br>)<br>)<br>)<br>)<br>)<br>) |

# EXPERT DECLARATION OF WILLIAM B. RUBENSTEIN

1.     I am the Sidley Austin Professor of Law at Harvard Law School and a leading

national expert on class action law generally and class action fees in particular.   The law firm

Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") has retained me to provide my

expert opinion on several aspects of the fee petition that Counsel[1] submitted in this matter in

September 2016, as corrected for the subsequently-found accounting errors.   After setting forth

my qualifications to serve as an expert and disclosing my prior relationship to this case and these

firms (Part I, *infra*),[2] I provide the Special Master with empirical data and policy analysis to

support the following four opinions relevant to analysis of the reasonableness of Counsel's 2016

fee request:

- ***Counsel's fee approach is the most widely used.***  (Part II, *infra*).   Counsel's fee petition employed a percentage approach, provided the Court with information about their lodestar for cross-check purposes, and addressed a series of factors that courts have deemed relevant to the reasonableness inquiry.   The percentage approach with a lodestar cross-check is the approach that courts most frequently use to assess the reasonableness of fee requests in common fund class action cases.   It improves on the percentage approach standing alone (which could lead to a windfall for counsel) by making a rough comparison of the fee sought to

---

[1] Lead Counsel Labaton Sucharow LLP ("Labaton Sucharow") filed the fee petition for all the firms in the case.   *See* Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs (ECF No. 102) at 2.   In the accompanying brief, Lead Counsel specifies that, in addition to its firm, the term "Plaintiffs' Counsel" encompassed five other firms.   *See* Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs (ECF No. 103-1) at 8 n.2.   The total lodestar in the case, however, encompasses work from three additional firms, or nine in all.   *See* Declaration of Lawrence A. Sucharow in Support of (A) Plaintiffs' Assented-To Motion for Final Approval of Class Settlement and Plan of Allocation and Final Certification of Settlement Class and (B) Lead Counsel's Motion for An Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, Ex. 24 (ECF No. 104-24) at 2 (Master Chart of Lodestars, Litigation Expenses, and Plaintiffs' Service Awards).   This Declaration uses the term "Counsel" as a short-hand reference to all of these firms.

[2] I typically provide a short synopsis of the litigation in my expert reports, but given the post-hoc nature of this report, I have not done so here.

1

counsel's time in the case.  Simultaneously, it improves on the lodestar approach standing alone (which could bog the court down in review of counsel's time records) by enabling a check on the percentage approach without requiring an extensive audit of counsel's hours and rates.

- ***Counsel's billing rates were reasonable.***  (Part III, *infra*).  Counsel's fee petition supplied the Court with billing rates for all professional time-keepers.  Three sets of comparison data support the conclusion that the rates employed were reasonable:  *first*, the rates are consistent with rates that courts in this community have awarded in approving class action fee petitions in recent years; *second*, Counsel's rates fall far below the court-approved rates charged by large corporate firms in bankruptcy cases in this market; and *third,* the blended billing rate for the entire case is consistent with blended billing rates in court-approved fee petitions in class action settlements in this community and in $100-$500 million cases throughout the country.

- ***Counsel appropriately billed non-partnership-track attorneys at market rates and the billing rates employed were reasonable.***  (Part IV, *infra*).  Counsel employed non-partnership track attorneys to perform work such as document review and analysis.  An empirical analysis of 12 recent cases in which courts have approved fee petitions containing rates for "contract" or "staff" attorneys shows that Counsel's rates for these non-partnership track attorneys are unexceptional:  Counsel's blended rate is within pennies of the comparison set's average rate.  Public policy also supports Counsel's billing of these non-partnership track attorneys at market rates, not cost, as empirical evidence shows that these attorneys were well-qualified for the legal work that they undertook and as billing at market rates is consistent with how law firms in the private market bill such attorneys, complies with the ABA's suggested ethical approach, and provides the right incentives for plaintiff firms.

- ***Counsel's fee was reasonable, as evidenced by the modest size of the lodestar multiplier***. (Part V, *infra*).  The Court-awarded fee embodied a lodestar multiplier (based on Counsel's corrected lodestar) of 2.01.  Three sets of data support the reasonableness of a fee that is roughly 2 times greater than Counsel's lodestar:  it is below the mean for settlements of this size reported in the leading empirical analyses of class action fee awards, it is below the mean of a comparison group of $100-$500 million settlements, and it is fully consistent with the Court's characterization of the risks Counsel shouldered and the results that they achieved for the class herein.

I am aware of the fact that the fee petition in this case initially contained errors with regard to the lodestar cross-check information submitted to the Court.  While those accounting errors were of

course unfortunate, their impact on the lodestar cross-check submission was relatively negligible and did not undermine the reasonableness of the fee Counsel proposed.

## I.
## BACKGROUND AND QUALIFICATIONS[3]

2.      I am the Sidley Austin Professor of Law at Harvard Law School.  I graduated from Yale College, *magna cum laude*, in 1982 and from Harvard Law School, *magna cum laude*, in 1986.  I clerked for the Hon. Stanley Sporkin in the U.S. District Court for the District of Columbia following my graduation from law school.  Before joining the Harvard faculty as a tenured professor in 2007, I was a law professor at UCLA School of Law for a decade, and an adjunct faculty member at Harvard, Stanford, and Yale Law Schools while a litigator in private practice during the preceding decade.  I am admitted to practice law in the Commonwealth of Massachusetts, the State of California, the Commonwealth of Pennsylvania (inactive), the District of Columbia (inactive), the U.S. Supreme Court, six U.S. Courts of Appeals, and four U.S. District Courts.

3.      My principal area of scholarship is complex civil litigation, with a special emphasis on class action law.  I am the author, co-author, or editor of five books and more than a dozen scholarly articles, as well as many shorter publications (a fuller bibliography appears in my c.v., which is attached as Exhibit A).  Much of this work concerns various aspects of class action law.  Since 2008, I have been the sole author of the leading national treatise on class action law, *Newberg on Class Actions*, and as of this summer, I have re-written from scratch the entire 10-volume treatise.  In 2015, I wrote and published a 600-page volume (volume 5) of the Treatise on attorney's fees, costs, and incentive awards; this volume has already been cited in

---

[3] My full c.v. is attached as Exhibit A.

numerous federal court fee decisions.  For five years (2007–2011), I published a regular column entitled "Expert's Corner" in the publication *Class Action Attorney Fee Digest*.  My work has been excerpted in casebooks on complex litigation, as noted on my c.v.

4.      My expertise in complex litigation has been recognized by judges, scholars, and lawyers in private practice throughout the country for whom I regularly provide consulting advice and educational training programs.  For this and the past seven years, the Judicial Panel on Multidistrict Litigation has invited me to give a presentation on the current state of class action law at the annual MDL Transferee Judges Conference.  The Ninth Circuit invited me to moderate a panel on class action law at the 2015 Ninth Circuit/Federal Judicial Center Mid-Winter Workshop.  The American Law Institute selected me to serve as an Adviser on a Restatement-like project developing the *Principles of the Law of Aggregate Litigation*.  In 2007, I was the co-chair of the Class Action Subcommittee of the Mass Torts Committee of the ABA's Litigation Section.  I am on the Advisory Board of the publication *Class Action Law Monitor*.  I have often presented continuing legal education programs on class action law at law firms and conferences.

5.      My teaching focuses on procedure and complex litigation.  I regularly teach the basic civil procedure course to first-year law students, and I have taught a variety of advanced courses on complex litigation, remedies, and federal litigation.  I have received honors for my teaching activities, including:   the Albert M. Sacks-Paul A. Freund Award for Teaching Excellence, as the best teacher at Harvard Law School during the 2011–2012 school year; the Rutter Award for Excellence in Teaching, as the best teacher at UCLA School of Law during the

2001–2002 school year; and the John Bingham Hurlbut Award for Excellence in Teaching, as the best teacher at Stanford Law School during the 1996–1997 school year.

6.      My academic work on class action law follows a significant career as a litigator. For nearly eight years, I worked as a staff attorney and project director at the national office of the American Civil Liberties Union in New York City.  In those capacities, I litigated dozens of cases on behalf of plaintiffs pursuing civil rights matters in state and federal courts throughout the United States.  I also oversaw and coordinated hundreds of additional cases being litigated by ACLU affiliates and cooperating attorneys in courts around the country.  I therefore have personally initiated and pursued complex litigation, including class actions.

7.      I have been retained as an expert witness in roughly 70 cases and as an expert consultant in about another 25 cases.  These cases have been in state and federal courts throughout the United States, most have been complex class action cases, and many have been MDL proceedings.  I have been retained to testify as an expert witness on issues ranging from the propriety of class certification to the reasonableness of settlements and fees.  I have been retained by counsel for plaintiffs, for defendants, for objectors, and by the judiciary:  in 2015, the United States Court of Appeals for the Second Circuit appointed me to brief and argue for affirmance of a district court order that significantly reduced class counsel's fee request in a large, complex securities class action, a task I completed successfully when the Circuit summarily affirmed the decision on appeal.  *See In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom. Berman DeValerio v. Olinsky*, 673 F. App'x 87 (2d Cir. 2016).

8.      My past work encompasses prior *expert witness* work for and against a number of firms involved in this matter and current and past *legal work* on behalf of the Thornton Law Firm LLP (the "Thornton Fim"), including on an issue at the inception of this case.  Specifically, in 2011, the Thornton Firm retained me to advise it on the representation of the class in this matter and the separate representation of the *qui tam* relators in actions against State Street and I worked with the firm in that capacity between February 24, 2011 and June 6, 2011.  I am also currently assisting the Thornton Firm in a different complex litigation context, again on issues arising out of the representation of multiple parties that are un-related to the billing issues before the Special Master.  Until Lieff Cabraser contacted me in March 2017 about the present retention, I had no other involvement in (or even knowledge of the progress of) this fee-related matter.  The Thornton Firm has informed me that it has no objection to my appearing as an expert witness on the fee-related issues presently before the Special Master.  I similarly believe that my duties to the Thornton Firm arising out of the unrelated 2011work on this case and my present work on an unrelated collateral matter do not interfere with my ability to provide my own independent expert opinions on the present fee-related matter, but I make this disclosure so that the Special Master has full information.  Finally, as is more readily evident from the cases listed on my resume, Labaton Sucharow, Lieff Cabraser, and Keller Rohrback LLP ("Keller Rohrback") have each previously retained me as an expert witness in class action cases.  I have also been retained as an expert witness by parties adverse to the Lieff Cabraser firm, or to Plaintiffs' Steering Committees on which it served, or to its clients in about five cases and I worked as court-appointed counsel against a group of plaintiffs' firms, including Lieff Cabraser, arguing for affirmance of a reduced fee award in the Second Circuit, as referenced in the prior paragraph.

9.      I have been retained in this case to provide an opinion concerning the issues set forth in the first paragraph, above.  I am being compensated for providing this expert opinion.  I was paid a flat fee in advance of rendering my opinion, so my compensation was in no way contingent upon the content of my opinion.

10.      In analyzing these issues, I have discussed the case with the counsel who retained me.  I have also reviewed documents from this and related litigations, a list of which is attached as Exhibit B.  I have also reviewed the applicable case law and scholarship on the topics of this Declaration.

11.      Additionally, my research assistants, under my direction, have compiled four sets of data relevant to my analysis and ultimate opinions:

- a data set of 20 cases reflecting billing rates that judges in the District of Massachusetts – and in Massachusetts state courts –  have approved in ruling on class action fee requests in the past dozen years (Exhibit C);

- a data set of six fee petitions containing 169 rates utilized by corporate firms in bankruptcy cases that Massachusetts bankruptcy courts have approved in recent years (Exhibit D);

- a data set of 20 class action settlements with aggregate settlement values of $100-$500 million (Exhibit E);

- a data set of 12 class action cases in which courts throughout the country have approved fee petitions that contain billing rates for "contract lawyers" or "staff attorneys" in recent years (Exhibit F).

## II.
## COUNSEL'S FEE APPROACH IS THE MOST WIDELY USED
## APPROACH TO FEES IN COMMON FUND CLASS ACITONS

12.      Counsel sought a fee of approximately $74.5 million (ECF No. 102 at 2) and they demonstrated the reasonableness of that request according to a percentage approach (with

multiple factors) and a lodestar cross-check.  (ECF No. 103-1).  Empirical evidence shows that this is the most common approach courts take to fees.[4]

13.    Specifically, the most fine-grained data of fee awards demonstrates that courts use a pure lodestar approach in 9.6% of cases, a pure percentage approach in 37.8% of cases, and a mix of the two (typically, a percentage approach with a lodestar cross-check) in 42.8% of cases, with another 9.8% of cases employing some other method or not specifying which method.[5]

14.    I explain in the *Newberg* treatise how these current practices developed.[6]  After adoption of the current class action rule in 1966, courts tended to employ a percentage approach to fees, but a 1973 decision of the Third Circuit endorsed an hourly approach, labeling it the

---

[4] It is also consistent with the law in the First Circuit.  In reporting on First Circuit law in the *Newberg* treatise, I wrote:

1. *Percentage or lodestar fee method.*  The First Circuit gives its district courts discretion as to whether to use a percentage or lodestar method.

2. *Reasonableness review criteria.*  The First Circuit has not identified any particular list of factors for assessing the reasonableness of proposed percentage awards in common fund cases, instead holding that the district courts—when employing the percentage method— should award fees on an individualized, case-by-case basis.  District courts in the First Circuit have sometimes utilized the multifactor tests used in the Second and Third Circuits and at other times have employed the Seventh Circuit's market mimicking approach.

3. *Lodestar cross-check.*  The First Circuit has held that a lodestar cross-check is entirely discretionary.

5 William B. Rubenstein, Newberg on Class Actions § 15:96 (5th ed.) (2015) (footnotes omitted) (hereafter *Newberg on Class Actions*).

[5] *See* 5 *Newberg on Class Actions, supra* note 4, at § 15:67 (reporting on data from Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 272 (2010) (hereafter "Eisenberg and Miller II")).

[6] 5 *Newberg on Class Actions, supra* note 4, at § 15:64.

"lodestar" method,[7] and many courts began to utilize that method. In response to concerns engendered by the lodestar method, the Third Circuit convened a Task Force consisting of a cross-section of lawyers, judges, and scholars, all with expertise in the area of class action attorney's fees, to develop – in a neutral, non-investigatory setting – a set of best practices.[8] The Task Force concluded that a (negotiated) percentage method was the preferable approach for fee awards in common fund cases and many courts subsequently moved toward a percentage approach to awarding fees in common fund cases. By 2004, the *Manual for Complex Litigation* stated that "[a]fter a period of experimentation with the lodestar method … the vast majority of courts of appeals now permit or direct district courts to use the percentage-fee method in common-fund cases."[9] Yet, since the *Manual* made that statement, empirical evidence demonstrates that courts have moved to something of a hybrid: a percentage approach with a lodestar cross-check. Thus, in cases from 1993–2002, 56.4% of courts used the pure percentage, while in cases from 2003–2008 cases, only 37.8% did.[10] This is about a one-third decrease in the use of the pure percentage approach. The big gain was in courts' use of the mixed approach – it shot up about 75% from the first period to the second, growing from 24.3% of cases to 42.8% of cases.

---

[7] *Lindy Bros. Builders, Inc. of Phila. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 168-69 (3d Cir. 1973).

[8] For a description of the Task Force's membership and methodology, see Report of the Third Circuit Task Force, *Court Awarded Attorney Fees*, 108 F.R.D. 237, 253-54 (1985).

[9] Federal Judicial Center, *Manual for Complex Litigation, Fourth*, § 14.121 (2004) (citations omitted).

[10] *See* 5 *Newberg on Class Actions, supra* note 4, at § 15:67 (reporting on data from Eisenberg and Miller II, supra note 5, and Theodore Eisenberg & Geoffrey P. Miller, Attorney Fees in Class Action Settlements: An Empirical Study, 1 J. Empirical Legal Stud. 27, 52 (2004) (hereafter "Eisenberg and Miller I")).

15.     This approach is favored because it improves on either approach standing alone.[11]
The percentage approach without a lodestar cross-check could lead to counsel securing a
windfall.  A lodestar approach standing alone could engross the court in an unnecessary audit of
counsel's hours and rates, as the entire fee turns on the specific time billed.  By contrast, using a
lodestar cross-check enables a court to make a rough estimate of counsel's lodestar for the sole
purpose of ensuring against a windfall.[12]  A review of counsel's lodestar is appropriate, but over-
emphasis on it – especially in a case of this magnitude, involving so many lawyers throughout
the country – could bog the court down in unnecessary detail.

16.     In a recent case in the California Supreme Court, I submitted my own *amicus*
brief advocating for the Court to encourage the use of a lodestar cross-check.   The Court
embraced my brief, writing the following:

> The utility of a lodestar cross-check has been questioned on the ground it tends to
> reintroduce the drawbacks the 1985 Task Force Report identified in primary use of the
> lodestar method, especially the undue consumption of judicial resources and the creation
> of an incentive to prolong the litigation.  We tend to agree with the amicus curiae brief of
> Professor William B. Rubenstein that these concerns are likely overstated and the
> benefits of having the lodestar cross-check available as a tool outweigh the problems its
> use could cause in individual cases.
>
> With regard to expenditure of judicial resources, we note that trial courts
> conducting lodestar cross-checks have generally not been required to closely scrutinize
> each claimed attorney-hour, but have instead used information on attorney time spent to
> "focus on the general question of whether the fee award appropriately reflects the degree

---

[11] For a defense of the lodestar cross-check method, and a discussion of the points in this
paragraph, see 5 *Newberg on Class Actions, supra* note 4, at § 15:86.

[12] Courts in nearly every Circuit have noted the summary nature of the lodestar cross-check.  *See
id.* at n.13 (collecting cases, including cases from within this Circuit) (citing, *inter alia*, *In re
Tyco Intern., Ltd. Multidistrict Litigation*, 535 F. Supp. 2d 249, 273 (D.N.H. 2007) ("'The
lodestar cross-check calculation need entail neither mathematical precision nor bean-counting.'"
(quoting *In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 306, 60 Fed. R. Serv. 3d 851
(3d Cir. 2005), as amended, (Feb. 25, 2005))).

of time and effort expended by the attorneys." 5 Newberg on Class Actions, supra, § 15:86, p. 331. . . The trial court in the present case exercised its discretion in this manner, performing the cross-check using counsel declarations summarizing overall time spent, rather than demanding and scrutinizing daily time sheets in which the work performed was broken down by individual task. Of course, trial courts retain the discretion to consider detailed time sheets as part of a lodestar calculation, even when performed as a cross-check on a percentage calculation.

As to the incentives a lodestar cross-check might create for class counsel, we emphasize the lodestar calculation, when used in this manner, does not override the trial court's primary determination of the fee as a percentage of the common fund and thus does not impose an absolute maximum or minimum on the potential fee award. If the multiplier calculated by means of a lodestar cross-check is extraordinarily high or low, the trial court should consider whether the percentage used should be adjusted so as to bring the imputed multiplier within a justifiable range, but the court is not necessarily required to make such an adjustment. Courts using the percentage method have generally weighed the time counsel spent on the case as an important factor in choosing a reasonable percentage to apply. (5 Newberg on Class Actions, supra, § 15:86, pp. 332–333. . .). A lodestar cross-check is simply a quantitative method for bringing a measure of the time spent by counsel into the trial court's reasonableness determination; as such, it is not likely to radically alter the incentives created by a court's use of the percentage method.[13]

17.    In sum, the percentage approach with a lodestar cross-check is, empirically speaking, the fee method courts utilize most often in common fund cases, and they do so for sound policy reasons.  The approach Counsel took in its fee petition in this case was therefore fully consistent with normal practice in common fund class actions.

18.    Because Counsel submitted their lodestar for cross-check purposes, not for the purposes of setting an exact fee based on the lodestar, the error in their lodestar calculation does not mean that the fee awarded was necessarily in error:  the lodestar was a means not an end. The critical question is the effect that the lodestar error had on the cross-check.  As Counsel reported in correcting it, the lodestar error meant that their multiplier in the case was approximately 2 rather than 1.8 (ECF No. 116 at 3).  As I discuss below, utilizing empirical

---

[13] *Laffitte v. Robert Half Intern. Inc.*, 376 P.3d 672, 687-88 (Cal. 2016) (some citations omitted).

evidence of multipliers, this difference in the context of this case was not significant (Part V, *infra*).  This is not, of course, to excuse the mistake.  It is, rather, to place the mistake in its proper context.

## III.
### COUNSEL'S BILLING RATES WERE REASONABLE

19.    To investigate the reasonableness of Counsel's billing rates, I utilize empirical evidence to generate three independent comparison sets:

- I compare the hourly rates for each timekeeper in this case to hourly rates that courts in this District (and in Massachusetts state court) have awarded in approving class action fee petitions in recent years.

- I compare the hourly rates for each timekeeper in this case to the hourly rates that defense firms charge for similar work in this market, as evidenced by rates Massachusetts bankruptcy courts have approved in recent years.

- I compare the blended billing rate for this case to the blended billing rate of other class action cases in this District and to other class action cases involving $100-$500 million settlement funds.

20.    I have chosen to compare Counsel's billing rates to rates other class action (and bankruptcy) courts have approved because it is my expert opinion that such court-sanctioned rates provide the best comparison group.  The primary reason they are the best comparable evidence is that class action attorneys make a living getting paid by their clients through court-approved fee petitions;[14] thus the "market" rates for their services are generally the rates that

---

[14] Given this fact, I found unambiguous the statements in this case's fee declarations that the "hourly rates for the attorneys and professional support staff in my firm . . . are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions."  *E.g.*, Declaration of Lawrence A. Sucharow on Behalf of Labaton Sucharow LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-15 at ¶ 7 (Sept. 15, 2016).  I read "regular rates charged" as meaning that these were rates submitted in class action fee petitions, a reading confirmed by the succeeding clause's statement that the rates had been "accepted [by courts] in other complex class actions."

courts approve for their services.[15]   Other ways of assessing the reasonableness of the hourly

rates in cross-check submissions include the following:

- Occasionally, lawyers will submit, and courts rely on, affidavits from other lawyers in the community about prevailing rates.[16]   Such affidavits have the benefit of being sworn to under penalty of perjury, and therefore likely provide accurate reporting on the rates included in them, but they may not represent a fair cross-section of evidence given the manner in which they are produced.[17]

- Occasionally lawyers will present evidence collected from surveys such as the *National Law Journal* survey.  A few courts have deemed survey evidence sufficient for lodestar cross-check purposes because the cross-check "does not involve bean counting or mathematical precision."[18]   Nonetheless, survey evidence is notoriously unreliable for multiple reasons:  (a) the survey drafters can skew answers – even inadvertently – simply in the way questions are drafted; (b) results are often reported by attorney type (junior associate, senior partner, etc.) and with bands of rates so that tailored comparisons are impossible; (c) survey respondents, unlike lawyers filing fee petitions, do not sign survey responses under the penalty of perjury; and (d) most problematically, surveys embody a selection bias in that they may neither be sent to nor responded to by an appropriate comparison group; this is particularly a problem in that (e) the nature, legitimacy, and transparency of the organization undertaking the survey – and the context in which the survey is taken – will have a significant effect

---

[15] For this reason, the Second and Ninth Circuit have criticized the Seventh Circuit's belief that there is some other market approach to class action attorney's fees.  *See* 5 *Newberg on Class Actions*, *supra* note 4, at § 15:79 ("'[T]o the extent that a market analogy is on point, in most cases it may be more appropriate to examine lawyers' reasonable expectations, which are based on the circumstances of the case and the range of fee awards out of common funds of comparable size.'") (quoting *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1049–50 (9th Cir. 2002)).

[16] *See, e.g., Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 262 (N.D. Cal. 2015) ("[E]vidence of prevailing market rates may include affidavits from other area attorneys.").

[17] *Cotton v. City of Eureka*, 889 F. Supp. 2d 1154, 1167 (N.D. Cal. 2012) (finding declarations from other attorneys unhelpful for being too general); *Wilhelm v. TLC Lawn Care, Inc.*, No. CIV. A. 07-2465-KHV, 2009 WL 57133, at *5 (D. Kan. Jan. 8, 2009) (agreeing with defendant's contention that "the affidavits of other plaintiffs' attorneys should be disregarded because they are self-serving" and "contradict plaintiffs' other evidence").

[18] *In re Schering-Plough Corp.*, No. CV 08-397 (DMC)(JAD), 2013 WL 12174570, at *28 n. 27 (D.N.J. Aug. 28, 2013), report and recommendation adopted sub nom. *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. CIV.A. 08-2177 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013).

13

on who responds to the survey and how.  Accordingly, courts are often quite skeptical of such evidence.[19]

- Occasionally courts rely on something called the *Laffey* Matrix[20] – particularly in fee-shifting cases in the District of Columbia – but this is a disfavored approach and one that I am quite critical of for a host of reasons.[21]

In short, as the goal of this endeavor is to ascertain proper billing rates for lawyers pursuing class action lawsuits, I agree with the many courts that have found that the best comparable evidence are rates that other courts have approved for class action work.[22]

---

[19] *See In re: Sears, Roebuck & Co. Front-loading Washer Prod. Liab. Litig.*, No. 06 C 7023, 2016 WL 4765679, at *14 (N.D. Ill. Sept. 13, 2016) (noting "skepticism" amongst courts about applying survey rates that fail to differentiate large and small firms);  *Forkum v. Co-Operative Adjustment Bureau, Inc.*, No. C 13-0811 SBA, 2014 WL 3101784, at *4 (N.D. Cal. July 3, 2014) (finding a fee survey "largely unhelpful in determining the reasonable hourly rates for the attorneys that worked on this case" because it is "not [a] reliable measure[] of rates in [the court's District] because [it] provide[s] no data on the prevailing hourly rates charged in this District"); *Lorik v. Accounts Recovery Bureau, Inc.*, No. 1:13-CV-00314-SEB, 2014 WL 1256013, at *2–3 (S.D. Ind. Mar. 26, 2014) (criticizing the "fairly obvious facial weaknesses" in a fee survey, such as insufficient sample size, lack of detailed geographical differentiation, and response bias, and finding "[t]he customary and judicially preferred standard by which the reasonableness of hourly rates is measured ordinarily comes from [evidence of rates charges by] . . . other lawyers who regularly practice in a particular geographical area and who provide similar or comparable legal services"); *California Durham v. Cont'l Cent. Credit*, No. 07CV1763 BTM WMC, 2011 WL 6783193, at *2 n.1 (S.D. Cal. Dec. 27, 2011) (finding a fee survey "is of limited usefulness because [it] does not beak down the hourly rates by region within California").

[20] The matrix originated in *Laffey v. Northwest Airlines, Inc.*, 572 F. Supp. 354 (D.D.C. 1983).

[21] *See* 5 *Newberg on Class Actions*, supra note 4, at § 15:43.

[22] *See, e.g., Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 498–99 (6th Cir. 2011) (noting that courts should determine reasonable hourly rates by looking to, *inter alia*, the rates used in analogous cases); *Plyler v. Evatt*, 902 F.2d 273, 277 & n.2 (4th Cir. 1990) (noting courts should weigh a fee applicant's hourly rates against the prevailing market rates in the relevant community, which looks to, *inter alia*, "attorneys' fee awards in similar cases"); *Bellinghausen v. Tractor Supply Co*., 306 F.R.D. 245, 262 (N.D. Cal. 2015) (noting evidence of prevailing market rates includes affidavits from area attorneys and "examples of rates awarded to counsel in previous cases"); *In re Enron Corp. Sec., Derivative & ERISA Litig*., 586 F. Supp. 2d 732, 756 (S.D. Tex. 2008) (noting Fifth Circuit courts determine whether an hourly rate is reasonable by looking to affidavits from other attorneys in the community and "rates actually

14

### *Court-approved rates in Massachusetts class action cases*

21.    For purposes of this Declaration, I utilized a database of 481 fee rates contained in 20 class action fee petitions approved by federal and state courts in Massachusetts in recent years.[23]   A list of these cases is attached as Exhibit C.   For each timekeeper, my research assistants identified the timekeeper's initial year of admission to the bar either by using the information in the fee petition or, if the information was not listed therein, by examining the firm's website and/or the relevant state bar website.   As the fee petition herein was submitted in 2016, we adjusted all hourly rates in prior cases to 2016 dollars using the U.S. Bureau of Labor CPI Inflation Calculator.[24]   Once each timekeeper's experience level had been identified and all of the dollar amounts had been set at 2016 levels, we plotted the rates on an x-y axis, with the x-

---

billed and paid in similar lawsuits"); *Faircloth v. Certified Fin. Inc.*, No. CIV. A. 99-3097, 2001 WL 527489, at *10 (E.D. La. May 16, 2001) (looking to "decisions of other courts in this jurisdiction" to determine a proposed hourly rate was reasonable).

[23] I originally compiled this dataset for my 2016 work as an expert witness on attorney's fees in a case entitled, *Geanacopoulos v. Philip Morris USA Inc.*, No. 98-6002-BLS1 (Mass. Super.).   To do so, I searched for reported fee decisions of Massachusetts courts (state and federal) in class action cases.   Employing a neutral search sequence on Westlaw, I identified a total of 54 decisions since January 1, 2005.   I read through all 54 decisions; some were not class action cases, some were not fee decisions, and some did not enable a review of the utilized hourly rates. A total of 18 of the cases met all these criteria and became the baseline for my rate study.   In some of these 18 cases, counsel sought an award lower than their total lodestar and/or the court made an award lower than the total lodestar.   So long as the court did not express concern about counsel's proposed billing rates in affirming the fee request, I coded these rates as affirmed, or judicially-approved, rates and included them in the data set.   If a court explicitly lowered a specific billing rate, I utilized the lower rate in the data set.   For purposes of this Declaration, my research assistants updated that dataset in two ways:   we added the rates employed in that prior case as the court approved that fee petition and we searched for newer cases using the same criteria and identified one such case to add to the database.

[24] This calculator can be found at this hyperlink:   http://data.bls.gov/cgi-bin/cpicalc.pl.   For each year prior to 2016, we calculated the differential between $1,000 in that prior year and $1,000 in 2016.   We then used that differential to calculate the 2016 rate for the prior year.   For example, the calculator showed that $1,000.00 in January of 2015 was equivalent to $1,013.73 in January of 2016.   Accordingly, we multiplied all 2015 rates by 1.01373 to adjust them to 2016 values.

axis representing the years since the timekeeper's admission to the bar and the y-axis representing the timekeeper's hourly rate.  The resulting scatter plot, set forth below in Graph 1, provides a snapshot of hourly rates in judicially-approved fee applications in Massachusetts; the blue logarithmic trend line sketches the trend of these rates across experience levels.

### GRAPH 1
### HOURLY RATES IN JUDICIALLY-APPROVED FEE APPLICATIONS IN MASSACHUSETTS CLASS ACTION CASES



22.     My research assistant next plotted the rates utilized by Counsel in this matter.  Counsel supplied us with corrected lodestar data for three firms,[25] containing billing rates[26] for 103 lawyers.  For the remaining six firms, we used the submissions they made at the time of the

---

[25] These are:  Labaton Sucharow; Lieff Cabraser; and the Thornton Firm.

[26] Counsel utilize their current rates for all time spent in the litigation.  The law supports using current rates as "an appropriate adjustment for delay in payment," *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989).  In my experience, this is typically how this issue is handled.  It is my opinion that it is reasonable for Counsel, who had not been paid in the nearly six years that this case was pending, to use current hourly rates as an adjustment for the delay in payment.

fee petition, which contained rates for 38 lawyers, bringing the total number in this data set to 141. After identifying the year of admission to the bar for each such timekeeper, we plotted these rates onto the same type of x-y axis that we had employed for the Massachusetts comparison set. The resulting scatter plot, set forth below in Graph 2, provides a snapshot of Counsel's billing rates, with the red logarithmic trend line sketching the trend of Counsel's rates across experience levels.

**GRAPH 2**
**COUNSEL'S HOURLY RATES**



23.     Finally, we aggregated the data from Graphs 1 and 2 onto a single scatter plot that indicates the judicially-approved rates in Massachusetts with blue dots and a blue logarithmic line and Counsel's proposed rates with red dots and a red logarithmic line. These data appear in Graph 3, below.

17

**GRAPH 3**
**COUNSEL'S HOURLY RATES COMPARED TO**
**HOURLY RATES IN JUDICIALLY-APPROVED FEE APPLICATIONS**
**IN MASSACHUSETTS CLASS ACTIONS**



24.     As Graph 3 demonstrates, the two logarithmic trend lines track one another closely.  For lawyers with fewer than about 11 years of experience, Counsel's trend line lies below the trend line for rates in approved Massachusetts class action fee petitions, and then among more senior lawyers, Counsel's trend line rises slightly above the trend line of the comparison group.  The proposed rates for 76 of Counsel's 141 lawyers (53.9%) are below the Massachusetts trend line.  When the differences between the trend lines are compared at all 141 points, Counsel's trend line is, on average, 1.01% above the trend line for rates in approved Massachusetts class action fee petitions.  This means that Counsel's proposed rates are, across the board, virtually identical to the rates that judges in Massachusetts have approved for similar work – other class action litigation – by similarly experienced attorneys.

25.     The portion of Counsel's trend line that is above the comparison trend line exceeds the comparison by an average of 6.32%.  That Counsel's trend line across their senior lawyers in this case is roughly 6% above the average lawyers' trend line makes perfect sense for two inter-related reasons.  *First*, Labaton Sucharow, Lieff Cabraser, and Keller Rohrback are three of the leading class action firms in the United States, and the Thornton Firm is a premier firm in this market with a similar high profile throughout the country.  The lawyers at these firms possess years of remarkable experience, have track records of superb achievement, and can be counted among the elite of the profession generally and this area of law specifically.  As the comparison set picks up a range of approved class action cases in this community, it encompasses lawyers with far less expertise undertaking far more mundane matters.  Indeed, *second*, one would expect higher than average billing rates in a case of this magnitude – a $300 million class action against one of the largest banks in the United States[27] and defended by one of the largest law firms in the United States.[28]  Accordingly, if there is any surprise in the data it is only that the trend line across these senior lawyers is but 6% above the trend line of the wide swath of lawyers with different skill levels who are represented in the comparison group.

26.     In comparing Counsel's rates to Boston rates, I have not adjusted the rates from the non-Boston firms in this case to Boston levels.  I have not done so because this is a level of detail generally beyond what is undertaken for lodestar cross-check purposes.[29]  In lodestar cross-check cases, courts occasionally cite the standard, borrowed from fee-shifting

---

[27] State Street Bank is #271 on the Fortune 500 in 2017.  This data point is available at hyperlink: http://fortune.com/fortune500/state-street-corp/.

[28] Wilmer Hale is the 26th largest large firm by revenue in the United States.  This data point is available at hyperlink:  https://en.wikipedia.org/wiki/List_of_largest_law_firms_by_revenue.

[29] *See* note 12, *supra*.

jurisprudence, that rates should be "those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."[30]   I am not aware of any appellate decisions mandating this approach for lodestar cross-check purposes in common fund cases, and it is a step rarely undertaken.[31]   Nonetheless, if I were to do so, the rates for most timekeepers would decrease:  application of a judicially-endorsed approach to adjusting lawyer rates by geographic market[32] would require decreasing the San Francisco rates (Lieff Cabraser) by 8.3%, the New York rates (Labaton Sucharow) by 3.4%, and the Washington, D.C. rates (McTigue Law LLP, Zuckerman Spaeder LLP, Beins Axelrod PC) by 0.3%, while increasing the

---

[30]   *Martinez-Velez v. Rey-Hernandez*, 506 F.3d 32, 47 (1st Cir. 2007) ("Part of the fees calculation is the selection of an appropriate hourly rate for each attorney.  Rates should be 'those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation.'" (quoting *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984))).

[31]   A search for the term "lodestar cross-check" in all federal cases returns 732 cases, while adding the phrase "and prevailing in the community for similar services" to the search returns a total of 51 cases.  Of those 51 cases, only 11 involve a court holding that counsel should use local rates for purposes of a lodestar cross-check; nine of these 11 cases involve courts in the Eastern District of California insisting that lawyers from Los Angeles or San Francisco utilize Fresno rates.  This means that outside of Fresno, a total of three of 732 reported cases (or .27%) in this search string insist upon geographic adjustment in the lodestar cross-check context (1.5% if Fresno is included).  Even that miniscule percentage is likely exaggerated because there are thousands of lodestar cross-check decisions not reported on Westlaw and the reported cases likely select for aberrations of this type.

[32]   I utilize the federal government's judicial differential methodology to adjust rates between different geographic markets, as set forth in *In re HPL Techs., Inc. Sec. Litig.*, 366 F. Supp. 2d 912, 921 (N.D. Cal. 2005).  The federal government rates can be found at this hyperlink: http://www.uscourts.gov/careers/compensation/judiciary-salary-plan-pay-rates.   The federal government increases the base rate by 26.73% for the Boston market, by 31.22% for the New York market, by 38.17% for the San Francisco market, by 27.10% for the D.C. market, by 24.24% for the Seattle market, and by 15.65% for the North/South Carolina market.  This means that a base hourly rate of, say, $350/hour would be worth $443.56 in Boston ($350 x 1.2673) and $459.27 in New York ($350 x 1.3122).  Therefore, one would have to multiply New York billing rates by 0.96579 ($459.27 x 0.96579=$443.56) to bring them down to Boston levels.  The same conclusion can be achieved by the formula:  <1-(1.2673/1.3122)>.  I apply this approach for each market.

Seattle (Keller Rohrback) and South Carolina (Richardson Patrick Westbrook & Brickman LLC) rates by 2.0% and 9.6%, respectively.   In Graph 4, below, these new geographically-adjusted rates are added to the prior graph:  the Massachusetts-approved rates remain in blue, Counsel's unadjusted rates remain in red, and Counsel's rates adjusted to the Boston market appear in Celtic green.   There is also a new green trend line for the geographically adjusted rates, but overall the rates drop so slightly that it is difficult to see the deviation of the green line's adjusted rates from the red line's unadjusted rates.

**GRAPH 4**
**COUNSEL'S HOURLY RATES ADJUSTED TO BOSTON MARKET COMPARED TO COUNSEL'S UNADJUSTED HOURLY RATES AND HOURLY RATES IN JUDICIALLY-APPROVED FEE APPLICATIONS IN MASSACHUSETTS CLASS ACTIONS**



Put most simply, adjusting for geography, Counsel's overall lodestar decreases by a total of 3.18%.   While this means that Counsel's lodestar multiplier simultaneously increases, the increase is so small – from 2.01 to 2.07 – that the multiplier remains well within the range of reasonableness, as discussed below.[33]   The small and immaterial effect of all this (geographic-

---

[33] *See* Part V, *infra.*

correction) work is precisely the reason that courts do not demand that it be undertaken in the cross-check setting.

27.     In sum, the prior paragraphs demonstrate empirically that the rates that Counsel utilized in their lodestar cross-check submission in September 2016 were fully consistent with rates courts in Boston had explicitly or implicitly approved in awarding fees in class action cases.

### Defense Firm Rates

28.     Another relevant set of data concerning rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation,"[34] is the set of rates charged by large corporate defense firms.  It is these large corporate firms – like Wilmer Hale in this case – that defend significant class action cases like this one; these firms therefore provide the services most comparable to the services that the plaintiffs' lawyers provide in these cases, utilizing reasonably comparable skills and calling on reasonably comparable experience.[35]  Since corporate firms typically have private fee arrangements with their clients, the most public – and reliable – evidence of the rates that these firms charge appears in fee petitions submitted by them in bankruptcy cases.[36]  For purposes of this Declaration, I

---

[34] *Martinez-Velez*, 506 F.3d at 47.

[35] There are of course some differences between plaintiff firms running large complex class actions and defendant firms defending such cases, but what is not different is that the two sets of firms are litigating the same cases against one another.

[36] I find these rates the most reliably comparable for four independent reasons.  *First*, unlike rates reported in publications like the *National Law Journal*, these rates are provided lawyer-by-lawyer, not in ranges based on job types (like junior associates, or senior associates).  *Second*, counsel seeking court approval for these rates swear to their accuracy.  *Third*, in the bankruptcy context, the petitioning lawyers specifically represent that the rates they are using are the same rates that they use outside of the bankruptcy context.  *See* 11 U.S.C. § 330(a)(3) (directing bankruptcy courts awarding attorneys' fees to take into account "all relevant factors, including . . . whether compensation is reasonable based on the customary compensation charged by

utilized a database of 169 fee rates contained in six fee petitions approved by bankruptcy courts in Massachusetts in five cases in recent years.[37]   A list of those cases is attached as Exhibit D. Using orange dots and an orange logarithmic trend line, we plotted these rates (adjusted to 2016 dollars) onto the same x-y axis that contained the Massachusetts approved rates (in blue) and Counsel's rates (in red).  The results are reflected in Graph 5, below.

**GRAPH 5**
**CORPORATE FIRM RATES COMPARED TO BOTH**
**HOURLY RATES IN JUDICIALLY-APPROVED FEE APPLICATIONS**
**IN MASSACHUSETTS CLASS ACTIONS AND**
**TO COUNSEL'S HOURLY RATES**



comparably skilled practitioners in cases other than cases under this title").  *Fourth*, the type of work – providing legal services to a group of absent creditors in a piece of complex litigation – is generally analogous to what class action attorneys do.

[37] My research assistants consulted Chambers and Partners rankings to create a list of leading corporate firms.  They then searched for these firms by name on Westlaw, filtering for cases in Bankruptcy Courts in the District of Massachusetts after 2009.  When one of the firms on the Chambers list was named as counsel for one of the parties in a Westlaw case, my research assistants searched PACER for a fee petition filed by that firm.  Four cases yielded five usable fee petitions; a fifth case, the Houghton Mifflin Harcourt bankruptcy, was found by searching for large bankruptcies in Massachusetts.  My research assistants utilized every petition they found meeting these criteria.

As is visually evident, judicially-approved defense firm rates are significantly higher than the rates in judicially-approved fee applications for class action attorneys in Massachusetts and similarly far higher than Counsel's rates herein.  Indeed, when the differences between the trend lines are compared at all 141 points in Counsel's fee petition, the defense firm rates are, on average, 37.53% above the trend line for Counsel's rates.

### *Blended Rate*

29.     Counsel's blended billing rate[38] for the entire case – utilizing the corrected lodestars of the Labaton, Lieff Cabraser, and Thornton firms – is $484.70.[39]  A quantitative analysis of this blended billing rate confirms its reasonableness.

30.     To assess the reasonableness of the blended billing rate, I directed my research assistants to extract the blended billing rate from the 20 Massachusetts federal and state class action fee approvals that we had collected for this rate study. The blended billing rate (again adjusted to 2016 dollars) in these cases ranged from a low of $227.51/hour to a high of $683.24/hour.  The mean rate for these 20 cases is $484.05. The complete range of blended billing rates is reflected in Graph 6, below, with the blended billing rate in this case highlighted in red.  As the Court can see, the blended billing rate in this case ($484.70) is just at the median of the graph and 65 cents, or 0.13%, above the mean, demonstrating its normalcy.

---

[38] A blended billing rate is captured by simply dividing the total lodestar by the total number of hours worked, thus providing the average hourly billing rate for the case across all timekeepers ranging from high-end partners to paralegals.

[39] If the rates are adjusted for geographic markets, *see supra* ¶ 26, the blended rate for this case falls to $469.29.

**GRAPH 6**
**COUNSEL'S BLENDED BILLING RATES COMPARED TO**
**BLENDED BILLING RATES IN RECENT**
**MASSACHUSETTS CLASS ACTION FEE APPROVALS**



31.     Because the blended billing rates in the Massachusetts cases tend to have emerged from smaller settlements (this is one of the largest settlements in Massachusetts history), I also compared the blended billing rate in this $300 million settlement to blended billing rates in 20 other settlements of comparable size ($100-$500 million).   A list of those cases is attached as Exhibit E.[40]   The blended billing rate (again adjusted to 2016 dollars) in these cases ranged from a low of $338.07/hour to a high of $637.67/hour.   The mean rate for these 20 cases is $484.67.   The complete range of blended billing rates is reflected in Graph 7, below, with the blended billing rate in this case highlighted in red.

---

[40] My research assistants compiled this list by searching on Westlaw for fee decisions in cases with settlement funds of this size that contained information about counsel's lodestar.   Thus, they used search terms like "megafund" or "hundred million" to capture fund size and search terms like "lodestar" or "hours" to capture decisions that contained rate information.   If the case had a fund of the right size, but the reported decision did not contain enough information about the fee petition, they tracked that down on PACER.   No cases of the relevant size enabling reference to counsel's lodestar information were rejected.

**GRAPH 7**
**COUNSEL'S BLENDED BILLING RATES COMPARED TO**
**BLENDED BILLING RATES IN**
**$100-$500 MILLION CLASS ACTION SETTLEMENTS**



As is visually evident, the blended billing rate in this case ($484.70) is in the middle of the pack – right at the median in the graph – and but three cents above the mean, demonstrating its normalcy.

32.     The reasonableness of Counsel's blended billing rate supports several further conclusions.  The blended billing rate reflects the distribution of time between partners, associates, and paralegals.  If only partners did this work, the blended billing rate would be very high, whereas if only paralegals billed, the blended billing rate would be very low.  The fact that the blended billing rate in this case is at or below average across two comparison sets means that Lead Counsel distributed work among partners, associates, non-partnership track attorneys, and paralegals in an appropriate fashion.  Given the slightly above-average rates of the most senior attorneys in this case noted above, it is a sign of good leadership that Lead Counsel was able to bring the blended rate in at this mean.

26

33.     In sum, three separate empirical analyses (one with two sub-parts) support the conclusion that Counsel's rates are entirely normal:  they are consistent with the mean for rates approved by courts in awarding fees in class actions in this community; they are below the rates charged by the defendant's firm to its paying clients for similar work; and the blended rate is consistent with rates in this community and for comparably-sized settlements.

## IV.
## COUNSEL APPROPRIATELY BILLED NON-PARTNER TRACK ATTORNEYS AT MARKET RATES AND THE RATES EMPLOYED WERE REASONABLE

34.     Counsel employed non-partnership track attorneys to undertake some aspects of the class's legal work, particularly the review of documents.  I have reviewed the rates at which these non-partnership track attorneys are included in the lodestar for cross-check purposes and make three factual observations about those rates, two empirical, one policy-oriented.

35.     *First,* these are skilled attorneys.  They are referred to as "contract" or "staff" attorneys solely by virtue of the fact that they are not on a partnership track at the relevant law firms, but are hired on more of an ad hoc basis.[41]  The fact that these lawyers are not on a partnership track, standing alone, says nothing about their qualifications or about the type of work that they undertook.  For purposes of this report, I reviewed Lieff Cabraser's slide presentation to the Special Master, which, as the Court knows, reflects the backgrounds and experiences of many of the non-partnership track attorneys who worked on this case.  It appeared clear to me that these attorneys were very well qualified:  they typically graduated from good law schools; have significant experience, including at the tasks to which they are assigned; and often

---

[41] While different firms call these attorneys different names – e.g., "contract attorneys" or "staff attorneys" – the defining characteristic of them is that they are not on a partnership track. Commentators often make the incorrect assumption that these attorneys are necessarily "temps." Many are salaried employees of the firms and work at these firms over many years.

27

work on a non-partnership track as a personal choice about how they wish their careers to proceed, not because they are unqualified for partnership track jobs.  Moreover, the firms have convincingly attested that these attorneys did meaningful work.

36.    *Second*, the rates at which counsel included non-partnership track attorneys in their lodestar for cross-check purposes are consistent with 57 rates that courts have explicitly or implicitly affirmed in approving fee petitions in 12 class action cases decided since 2013.[42]  A list of those cases is attached as Exhibit F.  The rates in those cases ranged from $250.00 to $550.00, with a mean (in 2016 dollars) of $379.53.[43]  The blended rate for non-partnership attorneys in this case was $379.31.  Thus the rate in this case is 22 cents, or 0.06%, below the mean of the comparison group.[44]  Put simply, the billing rate for non-partnership track attorneys in this case is entirely normal.

---

[42] My research assistants compiled this list by searching for recent fee decisions involving staff or contract attorney rates, using a neutral search string in Westlaw.  The search returned 29 cases.  I read through all 29 cases.  We then used the rates from any case with court-approved billing rates for contract or staff attorneys, accounting for experience, except for one case in which the contract attorneys simply staffed a calling center.  This yielded 12 usable cases with 57 data points.

[43] Using a different data set, I recently reported a very similar numerical result in the Volkswagen "Clean Diesel" MDL.  There, a set of 13 cases with 138 data points yielded an average contract attorney rate of $386.75 in 2017 dollars.  *See* Declaration of William B. Rubenstein in Support of Plaintiffs' Motion for 3.0-Liter Attorneys' Fees and Costs at 21, *In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, Case 3:15-md-02672-CRB (N.D. Cal.) (ECF No. 3396-2, Ex. B, filed June 30, 2017).  Here, my 12 case data set's norm of $379.53 in 2016 dollars is the equivalent of $389.02 in 2017 dollars, which is virtually equivalent to the $386.75 I reported in VW (0.59% higher).  Hence the two data sets reinforce one another.

[44] I removed Michael Bradley from this portion of my rate study since his hourly rate was set on a contingent basis, unlike the other non-partnership track attorneys.  If he is included, the total for this case rises from $379.31 to $382.94, which is 0.90% above the mean of the comparison group.

37.    *Third*,[45] the policy question of how to bill non-partnership track attorneys has arisen regularly in class suits as class counsel will often hire such lawyers to perform discrete functions in a particular case.   Class counsel typically pay these attorneys at a lower hourly rate than the hourly rate they assign to them in the lodestar analysis in their fee petitions.   To put numbers on this idea:   the firms herein hired non-partnership track attorneys at rates ranging from $30 to $60/hour, then assigned these attorneys rates ranging from $335 to $440/hour[46] for purposes of the lodestar cross-check calculation based, for example, on the attorneys' number of years out of law school, their experience, and the type of work they performed.   It is my expert opinion that several policy arguments support this approach:

- This is precisely the way in which firms bill legal services – including those of partners, associates, paralegals, and contract attorneys – to clients in the private market.   For instance, a firm may pay a first-year associate a $150,000 annual salary and expect 2,000 hours of billable time in return.   That means that the associate's salary breaks down to $75/hour.   The associate likely costs the firm more than $75/hour because the firm has spent time recruiting and training the associate and because it pays for overhead, perhaps benefits, and other expenses associated with her work.   Consequently, the associate who is receiving a $75/hour salary may actually cost the firm, say, $100/hour.   But the firm then bills its clients, maybe, $375/hour for that associate's time, realizing a $275/hour, or 275%, profit for the associate's work. Regardless of the precise numbers that attach to the practice, the point is that law firms are in the business of making their partners a profit by having the partners bill the work done by their associates and paralegals to their clients at higher rates than they pay them.   So long as a contract attorney is providing legal services to a client, a firm is entitled to bill her time to the client in the same manner.

- The ABA reached this conclusion nearly two decades ago, *see* ABA Formal Opinion 00-420, and I note as a matter of policy that courts have often cited to the ABA's guidance in concluding that class action firms "may charge a markup to cover overhead *and profit* if the contract attorney charges are billed as fees for legal services.[47]   It makes sense that courts have so held because a contingent fee class action firm's lodestar operates in the same way as a private law firm's bill to its

---

[45] The language and citations in this and the following paragraphs are taken from 5 *Newberg on Class Actions*, supra note 4, at § 15:41.

[46] These ranges do not encompass Michael Bradley, as noted above.  *See* note 44, *supra.*

[47] *In re AOL Time Warner S'holder Derivative Litig.,* No. 02 Civ. 6302(CM), 2010 WL 363113, at *26 (S.D.N.Y. Feb. 1, 2010) (emphasis added).

client:  it embodies this basic profit for its partners and, in doing so, brings the lodestar in line with market rates.[48]

- Permitting class counsel to bill non-partnership track attorneys at market rates is cost-efficient:  it encourages the firms to delegate work to attorneys who are likely billed at lower costs than are associates or partners.  If class action firms could only bill non-partnership track attorneys at cost, they would likely transfer the work required to associates.

38.    In sum, quantitative analysis of the rates paid non-partnership track attorneys shows that these rates are indistinguishable from the rates regularly approved by courts for such work and public policy strongly supports the manner in which Counsel billed non-partnership track attorneys.

## V.
## COUNSEL'S FEE WAS REASONABLE

39.    Under the lodestar cross-check method, the measuring stick of the reasonableness of counsel's fee is the level of multiplier that it represents over the time they invested in the case. Counsel's fee embodied a lodestar multiplier of 2.01, or approximately 2.[49]  Quantitatively, a 2

---

[48] The lodestar *multiplier* is meant to reward the class action firm over and above the market rate for undertaking a case on a contingency fee basis.  Without such a multiplier, no firm would undertake contingent cases, as it would be far safer to simply reap the normal profit embodied in the lodestar but reflected, in a non-contingent case, in the bill to the client.  *See, e.g.*, *Ketchum v. Moses* 17 P.3d 735, 742 (Cal. 2001) ("A contingent fee must be higher than a fee for the same legal services paid as they are performed.  The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services.  The implicit interest rate on such a loan is higher because the risk of default (the loss of the case, which cancels the debt of the client to the lawyer) is much higher than that of conventional loans. . . . A lawyer who both bears the risk of not being paid and provides legal services is not receiving the fair market value of his work if he is paid only for the second of these functions.  If he is paid no more, competent counsel will be reluctant to accept fee award cases." (internal quotation marks and citations omitted)).

[49] This is the multiplier for the full fee award to all counsel in the case divided by the hours of all counsel in the case.  As noted above, *see supra* ¶ 26, if all hourly rates are adjusted to Boston rates, the multiplier rises to 2.07.

multiplier is consistent with multipliers that courts have previously approved in similar circumstances.

40.     Three leading empirical studies of class action attorney's fees found the mean multipliers in all cases to be 1.42,[50] 1.65, [51] and 1.81,[52] while an older study found the mean multiplier to be 4.97.[53]

41.     These studies also show that multipliers are higher in cases with larger returns, with the mean multipliers rising to 2.39 (in cases with recoveries over $44.6 million) in one study;[54] to 3.18 (in cases with recoveries over $175.5 million) in another study;[55] and to 4.5 (in cases with recoveries over $100 million) in a third study.[56]

42.     In the set of 20 $100-$500 million settlements my research assistants assembled for purposes of this Declaration, the approved multipliers ranged from 0.92 to 8.3, with the average being 2.28.   The 2.01 multiplier in this case is therefore 12% below the mean for

---

[50] 5 *Newberg on Class Actions, supra* note 4, at § 15:89 (reporting on data from William B. Rubenstein and Rajat Krishna, *Class Action Fee Awards: A Comprehensive Empirical Study* (draft on file with author)).

[51] Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and Their Fee Awards*, 7 J. Empirical Legal Stud. 811, 833-34 (2010).

[52] Eisenberg & Miller II, *supra* note 5, at 272.

[53] Stuart J. Logan, Beverly C. Moore & Jack Moshman, *Attorney Fee Awards in Common Fund Class Actions*, 24 Class Action Rep. 167, 169 (2003) (hereafter "Logan").

[54] 5 *Newberg on Class Actions, supra* note 4, at § 15:89 (reporting on data from William B. Rubenstein and Rajat Krishna, *Class Action Fee Awards: A Comprehensive Empirical Study* (draft on file with author)).

[55] Eisenberg & Miller II*, supra* note 5, at 274.

[56] Logan, *supra* note 53, at 167.

settlements of comparable size;[57] it appears a few cases higher than the median in Graph 8,

below, but the only cases between this case and the median case have multiplier values of 2.0

rather than 2.01.

### GRAPH 8
### COURT-APPROVED MULTIPLIERS IN
### $100-$500 MILLION-DOLLAR CASES



43.     Beyond these bare statistics, case reports demonstrate that, in appropriate

circumstances, courts have often approved percentage awards embodying lodestar multipliers far

above the multiplier of 2 at issue here.   In the leading Ninth Circuit opinion on point, for

example, the Court established 25% as the benchmark percentage fee and approved a multiplier

of 3.65, writing that this number "was within the range of multipliers applied in common fund

cases"[58] and appending a list of such cases to its decision.   Similarly, in Exhibit G, I provide a

---

[57] If Counsel's rates are adjusted to the Boston market and a 2.07 multiplier is employed, *see* ¶ 26, *supra,* that multiplier is 9.3% below the mean of the comparison set.

[58] *Vizcaino*, 290 F.3d at 1051; *see also Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014) ("A 2.83 multiplier falls within the Ninth Circuit's presumptively acceptable range of 1.0–4.0. Given the complexity and duration of this litigation, the results obtained for the class, and the risk counsel faced in bringing the litigation, the Court finds the 2.83 multiplier appropriate." (citation omitted)).

list of 54 cases with multipliers over 3.5, 48 of which have multipliers of 4.00 or higher, and 31 of which have multipliers of 5.00 or higher.   This list is not meant to be either exhaustive or representative of all multipliers.   Rather, it demonstrates that courts approve percentage awards that embody multipliers well above the multiplier sought here in appropriate circumstances.

44.     That such circumstances exist in this case is evident from this Court's conclusions at the fairness hearing:

> The amount awarded is about 1.8 times the lodestar.  The lodestar is about $41 million. This is reasonable. In this case the plaintiffs' lawyers took on a contingent basis a novel, risky case.  The result at the outset was uncertain, and it remained, until there was a settlement, uncertain.  The plaintiffs' counsel were required to develop a novel case. This is not a situation where they piggybacked on the work of a public agency that had made certain findings.  They were required to be pioneers to a certain extent.  They were required to engage in substantial discovery that included production of nine million documents.  They engaged in arduous arm's length negotiation that included 19 mediation sessions.  They had to stand up on behalf of the class to experienced, able, energetic, formidable adversaries.  They did that.  And as I said, they generated a fair and reasonable return for the class, $300 million.[59]

The Court's finding regarding the risks that Counsel took and the results that they achieved are precisely the factors that support a multiplied fee award.[60]   Nothing about the unfortunate miscalculation in Counsel's time-keeping displaces this conclusion, as the change in the proposed multiplier is simply from 1.8 to 2.

45.     In sum, the requested multiplier is therefore above the mean for *all* cases but below the mean for *large* cases, it falls securely within the range of multipliers that courts have approved in appropriate circumstances in the past, and such circumstances existed in this case. As the purpose of the lodestar cross-check is to generate a multiplier enabling an assessment of

---

[59] Hearing Transcript, Nov. 2, 2016 (ECF No. 114) at 36.

[60] 5 *Newberg on Class Actions, supra* note 4, at § 15:87.

the reasonableness of the percentage award, a multiplier at this level fully supports the reasonableness of the fee the Court awarded Counsel in this matter.

* * *

46.    I have testified that:

- Counsel's **approach** to its fee – presenting the Court with a requested percentage, providing information to enable a lodestar cross-check, and addressing a series of relevant factors – is the most common fee method and one normally used in large common fund cases like this one.

- Counsel's hourly **billing rates** are consistent with rates in class action cases in this community; lower than the rates charged by corporate firms in this market for similar work; and within pennies of the average blended hourly billing rates approved in other class action settlements in this community and in comparably-sized settlements.

- Counsel's approach to **billing non-partnership track attorneys** is consistent with prevailing law, policy, and ethical norms and the rates at which they bill these attorneys are fully consistent with the rates at which courts have approved contract and staff attorney work in other class action settlements.

- Counsel's **multiplier** of approximately 2 is below the mean for settlements of $100-$500 million and entirely reasonable given the unique risks that it shouldered and the superb results that it achieved for the class.

Executed this 31st day of July, 2017, in Los Angeles, California.

_____

William B. Rubenstein

# EXHIBIT A

# PROFESSOR WILLIAM B. RUBENSTEIN

Harvard Law School - AR323                                      (617) 496-7320
1545 Massachusetts Avenue                              rubenstein@law.harvard.edu
Cambridge, MA 02138

## ACADEMIC EMPLOYMENT

HARVARD LAW SCHOOL, CAMBRIDGE MA
    Sidley Austin Professor of Law                                2011-present
    Professor of Law                                              2007-2011
    Bruce Bromley Visiting Professor of Law                       2006-2007
    Visiting Professor of Law                          2003-2004, 2005-2006
    Lecturer in Law                                               1990-1996
        *Courses:*    Civil Procedure; Class Action Law; Remedies
        *Awards*:    2012 Albert M. Sacks-Paul A. Freund Award for Teaching Excellence
        *Membership:*    American Law Institute; American Bar Foundation Fellow

UCLA SCHOOL OF LAW, LOS ANGELES CA
    Professor of Law                                              2002-2007
    Acting Professor of Law                                       1997-2002
        *Courses*:    Civil Procedure; Complex Litigation; Remedies
        *Awards*:    2002 Rutter Award for Excellence in Teaching
            Top 20 California Lawyers Under 40, *Calif. Law Business* (2000)

STANFORD LAW SCHOOL, STANFORD CA
    Acting Associate Professor of Law                             1995-1997
        *Courses*:    Civil Procedure; Federal Litigation
        *Awards*:    1997 John Bingham Hurlbut Award for Excellence in Teaching

YALE LAW SCHOOL, NEW HAVEN CT
    Lecturer in Law                                               1994, 1995

BENJAMIN N. CARDOZO SCHOOL OF LAW, NEW YORK NY
    Visiting Professor                                            Summer 2005

## LITIGATION-RELATED EMPLOYMENT

AMERICAN CIVIL LIBERTIES UNION, NATIONAL OFFICE, NEW YORK NY
    Project Director and Staff Counsel                            1987-1995

    Litigated impact cases in federal and state courts throughout the US.   Supervised a staff of attorneys at the national office, oversaw work of ACLU attorneys around the country, and coordinated work with private cooperating counsel nationwide.   Significant experience in complex litigation practice and procedural issues; appellate litigation; litigation coordination, planning and oversight.

HON. STANLEY SPORKIN, U.S. DISTRICT COURT, WASHINGTON DC
    Law Clerk                                                     1986-87

PUBLIC CITIZEN LITIGATION GROUP,   WASHINGTON DC
    Intern                                                        Summer 1985

EDUCATION

HARVARD LAW SCHOOL, CAMBRIDGE MA
> J.D., 1986, *magna cum laude*

YALE COLLEGE, NEW HAVEN CT
> B.A., 1982, *magna cum laude*
> > Editor-in-Chief, YALE DAILY NEWS

SELECTED COMPLEX LITIGATION EXPERIENCE

*Professional Service and Highlighted Activities*

◇   *Author,* NEWBERG ON CLASS ACTIONS (sole author of Fourth Edition updates since 2008 and sole author of all content in the Fifth Edition)

◇   *Speaker,* Judicial Panel on Multidistrict Litigation, Multidistrict Litigation (MDL) Transferee Judges Conference, Palm Beach, Florida (invited to present to MDL judges on recent developments in class action law and related topics (2010, 2011, 2012, 2013, 2014 (invited), 2015, 2016, 2017)

◇   *Special counsel,* Appointed by the United States Court of Appeals for the Second Circuit to argue for affirmance of district court fee decision in complex securities class action, with result that the Court summarily affirmed the decision below (*In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom.*, *Berman DeValerio v. Olinsky*, No. 15-1310-cv, 2016 WL 7323980 (2d Cir. Dec. 16, 2017))

◇   *Author, Amicus* brief filed in the United States Supreme Court on behalf of civil procedure and complex litigation law professors concerning the importance of the class action lawsuit (*AT&T Mobility v. Concepcion,* No. 09-893, 131 S. Ct. 1740 (2011))

◇   *Amicus curiae, Amicus* brief filed in – and approvingly cited by – California Supreme Court on proper approach to attorney's fees in common fund cases (*Laffitte v. Robert Half Int'l Inc.*, 376 P.3d 672, 687 (Cal. 2016))

◇   *Adviser,* American Law Institute, *Project on the Principles of the Law of Aggregate Litigation,* Philadelphia, Pennsylvania

◇   *Advisory Board, Class Action Law Monitor* (Strafford Publications), 2008-

◇   *Co-Chair,* ABA Litigation Section, Mass Torts Committee, Class Action Sub-Committee, 2007

◇   *Planning Committee,* American Bar Association, Annual National Institute on Class Actions Conference, 2006, 2007

◇   "*Expert's Corner*" (Monthly Column)*, Class Action Attorney Fee Digest,* 2007-2011

**A-2**

*Expert Witness*

◇    Retained as an expert witness and submitted report explaining meaning of the denial of a motion to dismiss in American procedure to foreign tribunals (*In re Qualcomm Antitrust Matter,* declaration submitted to tribunals in Korea and Taiwan (2017))

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request in 3.0-liter settlement, referenced by court in awarding fees (*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation,* 2017 WL 3175924 (N.D. Cal. July 21, 2017))

◇    Retained as an expert witness concerning impracticability of joinder in antitrust class action (*In re Celebrex (Celecoxib) Antitrust Litigation,* Civ. Action No. 2-14-cv-00361 (E.D. Va. (2017))

◇    Submitted an expert witness declaration and deposed concerning impracticability of joinder in antitrust class action (*In re Modafinil Antitrust Litigation,* Civ. Action No. 2-06-cv-01797 (E.D. Pa. (2017))

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request in 2.0-liter settlement (*In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation,* 2017 WL 1047834 (N.D. Cal., March 17, 2017))

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*Aranda v. Caribbean Cruise Line, Inc.,* 2017 WL 1368741 (N.D. Ill., April 10, 2017))

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*McKinney v. United States Postal Service*, Civil Action No. 1:11-cv-00631 (D.D.C. (2016))

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Johnson v. Caremark RX, LLC,* Case No. 01-CV-2003-6630, Alabama Circuit Court, Jefferson County (2016))

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request in sealed fee mediation (2016)

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Geancopoulos v. Philip Morris USA Inc.,* Civil Action No. 98-6002-BLS1 (Mass. Superior Court, Suffolk County))

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request in sealed fee mediation (2016)

◇    Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Gates v. United Healthcare Insurance Company,* Case No. 11 Civ. 3487 (S.D.N.Y. 2015))

◇    Retained as an expert trial witness on class action procedures and deposed prior to trial in matter

that settled before trial (*Johnson v. Caremark RX, LLC,* Case No. 01-CV-2003-6630, Alabama Circuit Court, Jefferson County (2016))

◇      Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*In re High-Tech Employee Antitrust Litig.*, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015))

◇      Retained as an expert witness concerning adequacy of putative class representatives in securities class action (*Medoff v. CVS Caremark Corp.,* Case No. 1:09-cv-00554 (D.R.I. (2015))

◇      Submitted an expert witness declaration concerning reasonableness of proposed class action settlement, settlement class certification, attorney's fees, and incentive awards (*Fitzgerald Farms, LLC v. Chespeake Operating, L.L.C.,* Case No. CJ-2010-38, Dist. Ct., Beaver County, Oklahoma (2015))

◇      Submitted an expert witness declaration concerning reasonableness of attorney's fee request, referenced by court in awarding fees (*Asghari v. Volkswagen Grp. of Am., Inc.*, 2015 WL 12732462 (C.D. Cal. May 29, 2015))

◇      Submitted an expert witness declaration concerning propriety of severing individual cases from class action and resulting statute of repose ramifications (*In re: American International Group, Inc. 2008 Securities Litigation,* 08-CV-4772-LTS-DCF (S.D.N.Y. (2015))

◇      Retained by Fortune Global 100 Corporation as an expert witness on fee matter that settled before testimony (2015)

◇      Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*In re: Hyundai and Kia Fuel Economy Litigation,* MDL 13-02424 (C.D. Cal. (2014))

◇      Submitted an expert witness declaration concerning reasonableness of attorney's fee request (*Ammari Electronics v. Pacific Bell Directory*, Case No. RG0522096, California Superior Court, Alameda County (2014))

◇      Submitted an expert witness declaration and deposed concerning plaintiff class action practices under the Private Securities Litigation Reform Act of 1995 (PSLRA), as related to statute of limitations question (*Federal Home Loan Bank of San Francisco v. Deutsche Bank Securities, Inc.,* Case No. CGC-10-497839, California Superior Court, San Francisco County (2014))

◇      Submitted an expert witness declaration and deposed concerning plaintiff class action practices under the Private Securities Litigation Reform Act of 1995 (PSLRA), as related to statute of limitations question (*Federal Home Loan Bank of San Francisco v. Credit Suisse Securities (USA) LLC,* Case No. CGC-10-497840, California Superior Court, San Francisco County (2014))

◇      Retained as expert witness on proper level of common benefit fee in MDL (*In re Neurontin Marketing and Sales Practice Litigation,* Civil Action No. 04-10981, MDL 1629 (D. Mass. (2014))

◇      Submitted an expert witness declaration concerning Rule 23(g) selection of competing counsel,

referenced by court in deciding issue (*White v. Experian Information Solutions, Inc.,* 993 F. Supp. 2d 1154 (C.D. Cal. (2014))

◊    Submitted an expert witness declaration concerning proper approach to attorney's fees under California law in a statutory fee-shifting case (*Perrin v. Nabors Well Services Co.,* Case No. 1220037974, Judicial Arbitration and Mediation Services (JAMS) (2013))

◊    Submitted an expert witness declaration concerning fairness and adequacy of proposed nationwide class action settlement (*Verdejo v. Vanguard Piping Systems,* Case No. BC448383, California Superior Court, Los Angeles County (2013))

◊    Retained as an expert witness regarding fairness, adequacy, and reasonableness of proposed nationwide consumer class action settlement   (*Herke v. Merck,* No. 2:09-cv-07218, MDL Docket No. 1657 (*In re Vioxx Products Liability Litigation*) (E. D. La. (2013))

◊    Retained as an expert witness concerning ascertainability requirement for class certification and related issues (*Henderson v. Acxiom Risk Mitigation, Inc.,* Case No. 3:12-cv-00589-REP (E.D. Va. (2013))

◊    Submitted an expert witness declaration concerning reasonableness of class action settlement and performing analysis of "net expected value" of settlement benefits, relied on by court in approving settlement (*In re Navistar Diesel Engine Products Liab. Litig.,* 2013 WL 10545508 (N.D. Ill. July 3, 2013))

◊    Submitted an expert witness declaration concerning reasonableness of class action settlement and attorney's fee request (*Commonwealth Care All. v. Astrazeneca Pharm. L.P.,* 2013 WL 6268236 (Mass. Super. Aug. 5, 2013))

◊    Submitted an expert witness declaration concerning propriety of preliminary settlement approval in nationwide consumer class action settlement (*Anaya v. Quicktrim, LLC,* Case No.   CIVVS 120177, California Superior Court, San Bernardino County (2012))

◊    Submitted expert witness affidavit concerning fee issues in common fund class action (*Tuttle v. New Hampshire Med. Malpractice Joint Underwriting Assoc.,* Case No. 217-2010-CV-00294, New Hampshire Superior Court, Merrimack County (2012))

◊    Submitted expert witness declaration and deposed concerning class certification issues in nationwide fraud class action, relied upon by the court in affirming class certification order (*CVS Caremark Corp. v. Lauriello,* 175 So. 3d 596, 609-10 (Ala. 2014))

◊    Submitted expert witness declaration in securities class action concerning value of proxy disclosures achieved through settlement and appropriate level for fee award (*Rational Strategies Fund v. Jhung,* Case No. BC 460783, California Superior Court, Los Angeles County (2012))

◊    Submitted an expert witness report and deposed concerning legal malpractice in the defense of a class action lawsuit (*KB Home v. K&L Gates, LLP,* Case No. BC484090, California Superior Court, Los Angeles County (2011))

◊   Retained as expert witness on choice of law issues implicated by proposed nationwide class certification (*Simon v. Metropolitan Property and Cas. Co.,* Case No. CIV-2008-1008-W (W.D. Ok. (2011))

◊   Retained, deposed, and testified in court as expert witness in fee-related dispute (*Blue, et al. v. Hill,* Case No. 3:10-CV-02269-O-BK (N.D. Tex. (2011))

◊   Retained as an expert witness in fee-related dispute (*Furth v. Furth*, Case No. C11-00071-DMR (N.D. Cal. (2011))

◊   Submitted expert witness declaration concerning interim fee application in complex environmental class action (*DeLeo v. Bouchard Transportation,* Civil Action No. PLCV2004-01166-B, Massachusetts Superior Court (2010))

◊   Retained as an expert witness on common benefit fee issues in MDL proceeding in federal court (*In re Vioxx Products Liability Litigation*, MDL Docket No. 1657 (E.D. La. (2010))

◊   Submitted expert witness declaration concerning fee application in securities case, referenced by court in awarding fee (*In re AMICAS, Inc. Shareholder Litigation,* 27 Mass. L. Rptr. 568 (Mass. Sup. Ct. (2010))

◊   Submitted an expert witness declaration concerning fee entitlement and enhancement in non-common fund class action settlement, relied upon by the court in awarding fees (*Parkinson v. Hyundai Motor America*, 796 F.Supp.2d 1160, 1172-74 (C.D. Cal. 2010))

◊   Submitted an expert witness declaration concerning class action fee allocation among attorneys (*Salvas v. Wal-Mart*, Civil Action No. 01-03645, Massachusetts Superior Court (2010))

◊   Submitted an expert witness declaration concerning settlement approval and fee application in wage and hour class action settlement (*Salvas v. Wal-Mart*, Civil Action No. 01-03645, Massachusetts Superior Court (2010))

◊   Submitted an expert witness declaration concerning objectors' entitlement to attorney's fees (*Rodriguez v. West Publishing Corp.,* Case No. CV-05-3222 (C.D. Cal. (2010))

◊   Submitted an expert witness declaration concerning fairness of settlement provisions and processes, relied upon by the Ninth Circuit in reversing district court's approval of class action settlement (*Radcliffe v. Experian Inform. Solutions Inc.*, 715 F.3d 1157, 1166 (9th Cir. 2013))

◊   Submitted an expert witness declaration concerning attorney's fees in class action fee dispute, relied upon by the court in deciding fee issue (*Ellis v. Toshiba America Information Systems, Inc.*, 218 Cal. App. 4th 853, 871, 160 Cal. Rptr. 3d 557, 573 (2d Dist. 2013))

◊   Submitted an expert witness declaration concerning common benefit fee in MDL proceeding in federal court (*In re Genetically Modified Rice Litigation*, MDL Docket No. 1811 (E.D. Mo. (2009))

◊     Submitted an expert witness declaration concerning settlement approval and fee application in national MDL class action proceeding (*In re Wal-Mart Wage and Hour Employment Practices Litigation*, MDL Docket No.1735 (D. Nev. (2009))

◊     Submitted an expert witness declaration concerning fee application in national MDL class action proceeding, referenced by court in awarding fees (*In re Dept. of Veterans Affairs (VA) Data Theft Litigation*, 653 F. Supp.2d 58 (D.D.C. (2009))

◊     Submitted an expert witness declaration concerning common benefit fee in mass tort MDL proceeding in federal court (*In re Kugel Mesh Products Liability Litigation*, MDL Docket No. 1842 (D. R.I. (2009))

◊     Submitted an expert witness declaration and supplemental declaration concerning common benefit fee in consolidated mass tort proceedings in state court (*In re All Kugel Mesh Individual Cases*, Master Docket No. PC-2008-9999, Superior Court, State of Rhode Island (2009))

◊     Submitted an expert witness declaration concerning fee application in wage and hour class action (*Warner v. Experian Information Solutions, Inc.*, Case No.   BC362599, California Superior Court, Los Angeles County (2009))

◊     Submitted an expert witness declaration concerning process for selecting lead counsel in complex MDL antitrust class action (*In re Rail Freight Fuel Surcharge Antitrust Litigation*, MDL Docket No. 1869 (D. D.C. (2008))

◊     Retained, deposed, and testified in court as expert witness on procedural issues in complex class action (*Hoffman v. American Express*, Case No. 2001-022881, California Superior Court, Alameda County (2008))

◊     Submitted an expert witness declaration concerning fee application in wage and hour class action (*Salsgiver v. Yahoo! Inc.*, Case No. BC367430, California Superior Court, Los Angeles County (2008))

◊     Submitted an expert witness declaration concerning fee application in wage and hour class action (*Voight v. Cisco Systems, Inc.*, Case No. 106CV075705, California Superior Court, Santa Clara County (2008))

◊     Retained and deposed as expert witness on fee issues in attorney fee dispute (*Stock v. Hafif,* Case No.   KC034700, California Superior Court, Los Angeles County (2008))

◊     Submitted an expert witness declaration concerning fee application in consumer class action (*Nicholas v. Progressive Direct*, Civil Action No. 06-141-DLB (E.D. Ky. (2008))

◊     Submitted expert witness declaration concerning procedural aspects of national class action arbitration (*Johnson v. Gruma Corp.,* JAMS Arbitration No. 1220026252 (2007))

◊     Submitted expert witness declaration concerning fee application in securities case (*Drulias v. ADE Corp.,* Civil Action No. 06-11033 PBS (D. Mass. (2007))

**A-7**

◇      Submitted expert witness declaration concerning use of expert witness on complex litigation matters in criminal trial (*U.S. v. Gallion, et al.*, No. 07-39 (E. D. Ky. (2007))

◇      Retained as expert witness on fees matters (*Heger v. Attorneys' Title Guaranty Fund, Inc.,* No. 03-L-398, Illinois Circuit Court, Lake County, IL (2007))

◇      Retained as expert witness on certification in statewide insurance class action (*Wagner v. Travelers Property Casualty of America*, No. 06CV338, Colorado District Court, Boulder County, CO (2007))

◇      Testified as expert witness concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corporate Derivative Litigation*, Case No. 01098905, California Superior Court, Santa Barbara Cty, CA (2006))

◇      Submitted expert witness declaration concerning fee application in common fund shareholder derivative case (*In Re Tenet Health Care Corp. Corporate Derivative Litigation*, Case No. CV-03-11 RSWL (C.D. Cal. (2006))

◇      Retained as expert witness as to certification of class action (*Canova v. Imperial Irrigation District*, Case No. L-01273, California Superior Court, Imperial Cty, CA (2005))

◇      Retained as expert witness as to certification of nationwide class action (*Enriquez v. Edward D. Jones & Co.,* Missouri Circuit Court, St. Louis, MO (2005))

◇      Submitted expert witness declaration on procedural aspects of international contract litigation filed in court in Korea (*Estate of Wakefield v. Bishop Han & Jooan Methodist Church* (2002))

◇      Submitted expert witness declaration as to contested factual matters in case involving access to a public forum (*Cimarron Alliance Foundation v. The City of Oklahoma City,* Case No. Civ. 2001-1827-C (W.D. Ok. (2002))

◇      Submitted expert witness declaration concerning reasonableness of class certification, settlement, and fees (*Baird v. Thomson Elec. Co.*, Case No. 00-L-000761, Cir. Ct., Mad. Cty, IL (2001))

### *Expert Consultant*

◇      Provided expert consulting services to the ACLU on multi-district litigation issues arising out of various challenges to President Trump's travel ban and related policies (*In re American Civil Liberties Union Freedom of Information Act Requests Regarding Executive Order 13769*, Case Pending No. 28, Judicial Panel on Multidistrict Litigation (2017); *Darweesh v. Trump*, Case No. 1:17-cv-00480-CBA-LB (E.D.N.Y. (2017))

◇      Provided expert consulting services to law firm regarding billing practices and fee allocation issues in nationwide class action (2016)

**A-8**

◇     Provided expert consulting services to law firm regarding fee allocation issues in nationwide class action (2016)

◇     Provided expert consulting services to the ACLU of Southern California on class action and procedural issues arising out of challenges to municipality's treatment of homeless persons with disabilities (*Glover v. City of Laguna Beach*, Case No. 8:15-cv-01332-AG-DFM (C.D. Cal. (2016))

◇     Retained as an expert consultant on class certification issues (*In re: Facebook, Inc., IPO Securities and Derivative Litigation*, No. 1:12-md-2389 (S.D.N.Y. 2015))

◇     Provided expert consulting services to lead class counsel on class certification issues in nationwide class action (2015)

◇     Retained by a Fortune 100 Company as an expert consultant on class certification issues

◇     Retained as an expert consultant on class action and procedure related issues (*Lange et al v. WPX Energy Rocky Mountain LLC*, Case No. #: 2:13-cv-00074-ABJ (D. Wy. (2013))

◇     Retained as an expert consultant on class action and procedure related issues (*Flo & Eddie, Inc., v. Sirius XM Radio, Inc.*, Case No. CV 13-5693 (C.D. Cal. (2013))

◇     Served as an expert consultant on substantive and procedural issues in challenge to legality of credit card late and over-time fees (*In Re Late Fee and Over-Limit Fee Litigation*, 528 F.Supp.2d 953 (N.D. Cal. 2007), *aff'd*, 741 F.3d 1022 (9th Cir. 2014))

◇     Retained as an expert on Class Action Fairness Act (CAFA) removal issues and successfully briefed and argued remand motion based on local controversy exception (*Trevino, et al. v. Cummins, et al.*,No. 2:13-cv-00192-JAK-MRW (C. D. Cal. (2013))

◇     Retained as an expert consultant on class action related issues by consortium of business groups (*In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mexico on April 20, 2010*, MDL No. 2179 (E.D. La. (2012))

◇     Provided presentation on class certification issues in nationwide medical monitoring classes (*In re: National Football League Players' Concussion Injury Litigation,* MDL No. 2323, Case No. 2:12-md-02323-AB (E.D. Pa. (2012))

◇     Retained as an expert consultant on class action related issues in mutli-state MDL consumer class action (*In re Sony Corp. SXRD Rear Projection Television Marketing, Sales Practices & Prod. Liability Litig.*, MDL No. 2102 (S.D. N.Y. (2009))

◇     Retained as an expert consultant on class action certification, manageability, and related issues in mutli-state MDL consumer class action (*In re Teflon Prod. Liability Litig.*, MDL No. 1733 (S.D. Iowa (2008))

◇     Retained as an expert consultant/co-counsel on certification, manageability, and related issues in nationwide anti-trust class action (*Brantley v. NBC Universal*, No.- CV07-06101 (C.D. Cal.

**A-9**

(2008))

◊       Retained as an expert consultant on class action issues in complex multi-jurisdictional construction dispute (*Antenucci, et al., v. Washington Assoc. Residential Partner, LLP, et al.,* Civil No. 8-04194 (E.D. Pa. (2008))

◊       Retained as an expert consultant on complex litigation issues in multi-jurisdictional class action litigation (*McGreevey v. Montana Power Company*, No. 08-35137, U.S. Court of Appeals for the Ninth Circuit (2008))

◊       Retained as an expert consultant on class action and attorney fee issues in nationwide consumer class action (*Figueroa v. Sharper Image*, 517 F.Supp.2d 1292 (S.D. Fla. 2007))

◊       Retained as an expert consultant on attorney's fees issue in complex class action case (*Natural Gas Anti-Trust Cases Coordinated Proceedings*, D049206, California Court of Appeals, Fourth District (2007))

◊       Retained as an expert consultant on remedies and procedural matters in complex class action (*Sunscreen Cases*, JCCP No. 4352, California Superior Court, Los Angeles County (2006))

◊       Retained as an expert consultant on complex preclusion questions in petition for review to California Supreme Court (*Mooney v. Caspari,* Supreme Court of California (2006))

◊       Retained as an expert consultant on attorney fee issues in complex common fund case (*In Re DietDrugs (Phen/Fen) Products Liability Litigation* (E. D. Pa. (2006))

◊       Retained as an expert consultant on procedural matters in series of complex construction lien cases (*In re Venetian Lien Litigation*, Supreme Court of the State of Nevada (2005-2006))

◊       Served as an expert consultant on class certification issues in countywide class action (*Beauchamp v. Los Angeles Cty. Metropolitan Transp. Authority*, (C.D. Cal. 2004))

◊       Served as an expert consultant on class certification issues in state-wide class action (*Williams v. State of California*, Case No. 312-236, Cal. Superior Court, San Francisco)

◊       Served as an exert consultant on procedural aspects of complex welfare litigation (*Allen v. Anderson*, 199 F.3d 1331 (9th Cir. 1999))

*Ethics Opinions*

◊       Retained to provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2017))

◊       Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2013))

◊       Provided expert opinion on issues of professional ethics in complex litigation matter (*In re*

       *Professional Responsibility Inquiries* (2011))

◇    Provided expert opinion on issues of professional ethics in implicated by nationwide class action practice (*In re Professional Responsibility Inquiries* (2010))

◇    Provided expert opinion on issues of professional ethics implicated by complex litigation matter (*In re Professional Responsibility Inquiries* (2010))

◇    Provided expert opinion on issues of professional ethics in complex litigation matter (*In re Professional Responsibility Inquiries* (2007))

*Publications on Class Actions & Procedure*

◇    NEWBERG ON CLASS ACTIONS (sole author of supplements to 4th edition since 2008 and of 5th edition (2011-2017))

◇    *Profit for Costs*, 63 DEPAUL L. REV. 587 (2014) (with Morris A. Ratner)

◇    *Procedure and Society: An Essay for Steve Yeazell,* 61 U.C.L.A. REV. DISC. 136 (2013)

◇    *Supreme Court Round-Up – Part II*, 5 CLASS ACTION ATTORNEY FEE DIGEST 331 (September 2011)

◇    *Supreme Court Round-Up – Part I*, 5 CLASS ACTION ATTORNEY FEE DIGEST 263 (July-August 2011)

◇    *Class Action Fee Award* Procedures, 5 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2011)

◇    *Benefits of Class Action Lawsuits*, 4 CLASS ACTION ATTORNEY FEE DIGEST 423 (November 2010)

◇    *Contingent Fees for Representing the Government: Developments in California Law*, 4 CLASS ACTION ATTORNEY FEE DIGEST 335 (September 2010)

◇    *Supreme Court Roundup*, 4 CLASS ACTION ATTORNEY FEE DIGEST 251 (July 2010)

◇    *SCOTUS Okays Performance Enhancements in Federal Fee Shifting Cases – At Least In Principle,* 4 CLASS ACTION ATTORNEY FEE DIGEST 135 (April 2010)

◇    *The Puzzling Persistence of the "Mega-Fund" Concept*, 4 CLASS ACTION ATTORNEY FEE DIGEST 39 (February 2010)

◇    *2009: Class Action Fee Awards Go Out With A Bang, Not A Whimper*, 3 CLASS ACTION ATTORNEY FEE DIGEST 483   (December 2009)

◇    *Privatizing Government Litigation: Do Campaign Contributors Have An Inside Track?*, 3 CLASS ACTION ATTORNEY FEE DIGEST 407   (October 2009)

**A-11**

◇     *Supreme Court Preview*, 3 CLASS ACTION ATTORNEY FEE DIGEST 307 (August 2009)

◇     *Supreme Court Roundup*, 3 CLASS ACTION ATTORNEY FEE DIGEST 259 (July 2009)

◇     *What We Now Know About How Lead Plaintiffs Select Lead Counsel (And Hence Who Gets Attorney's Fees!) in Securities Cases*, 3 CLASS ACTION ATTORNEY FEE DIGEST 219 (June 2009)

◇     *Beware Of Ex Ante Incentive Award Agreements*, 3 CLASS ACTION ATTORNEY FEE DIGEST 175 (May 2009)

◇     *On What a "Common Benefit Fee" Is, Is Not, and Should Be*, 3 CLASS ACTION ATTORNEY FEE DIGEST 87 (March 2009)

◇     *2009: Emerging Issues in Class Action Fee Awards*, 3 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2009)

◇     *2008: The Year in Class Action Fee Awards*, 2 CLASS ACTION ATTORNEY FEE DIGEST 465 (December 2008)

◇     *The Largest Fee Award – Ever!*, 2 CLASS ACTION ATTORNEY FEE DIGEST 337 (September 2008)

◇     *Why Are Fee Reductions Always 50%?: On The Imprecision of Sanctions for Imprecise Fee Submissions*, 2 CLASS ACTION ATTORNEY FEE DIGEST 295 (August 2008)

◇     *Supreme Court Round-Up,* 2 CLASS ACTION ATTORNEY FEE DIGEST 257 (July 2008)

◇     *Fee-Shifting For Wrongful Removals: A Developing Trend?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 177 (May 2008)

◇     *You Cut, I Choose: (Two Recent Decisions About) Allocating Fees Among Class Counsel,* 2 CLASS ACTION ATTORNEY FEE DIGEST 137 (April 2008)

◇     *Why The Percentage Method?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 93 (March 2008)

◇     *Reasonable Rates: Time To Reload The (*Laffey*) Matrix,* 2 CLASS ACTION ATTORNEY FEE DIGEST 47 (February 2008)

◇     *The "Lodestar Percentage:" A New Concept For Fee Decisions?,* 2 CLASS ACTION ATTORNEY FEE DIGEST 3 (January 2008)

◇     *Class Action Practice Today: An Overview, in* ABA SECTION OF LITIGATION, CLASS ACTIONS TODAY 4 (2008)

◇     *Shedding Light on Outcomes in Class Actions*, *in* CONFIDENTIALITY, TRANSPARENCY, AND THE U.S. CIVIL JUSTICE SYSTEM 20-59 (Joseph W. Doherty, Robert T. Reville, and Laura Zakaras eds. 2008) (with Nicholas M. Pace)

◇     *Finality in Class Action Litigation: Lessons From Habeas,* 82 N.Y.U. L. REV. 791 (2007)

◇     *The American Law Institute's New Approach to Class Action Objectors' Attorney's Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 347 (November 2007)

◇     *The American Law Institute's New Approach to Class Action Attorney's Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 307 (October 2007)

◇     *"The Lawyers Got More Than The Class Did!":  Is It Necessarily Problematic When Attorneys Fees Exceed Class Compensation?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 233 (August 2007)

◇     *Supreme Court Round-Up,* 1 CLASS ACTION ATTORNEY FEE DIGEST 201 (July 2007)

◇     *On The Difference Between Winning and Getting Fees,* 1 CLASS ACTION ATTORNEY FEE DIGEST 163 (June 2007)

◇     *Divvying Up The Pot: Who Divides Aggregate Fee Awards, How, and How Publicly?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 127 (May 2007)

◇     *On Plaintiff Incentive Payments,* 1 CLASS ACTION ATTORNEY FEE DIGEST 95 (April 2007)

◇     *Percentage of What?,* 1 CLASS ACTION ATTORNEY FEE DIGEST 63 (March 2007)

◇     *Lodestar v. Percentage: The Partial Success Wrinkle,* 1 CLASS ACTION ATTORNEY FEE DIGEST 31 (February 2007)(with Alan Hirsch)

◇     *The Fairness Hearing:  Adversarial and Regulatory Approaches*, 53 U.C.L.A. L. REV. 1435 (2006) (excerpted in THE LAW OF CLASS ACTIONS AND OTHER AGGREGATE LITIGATION 447-449 (Richard A. Nagareda ed., 2009))

◇     *Why Enable Litigation?  A Positive Externalities Theory of the Small Claims Class Action*, 74 U.M.K.C. L. REV. 709 (2006)

◇     *On What a "Private Attorney General" Is – And Why It Matters*,  57 VAND. L. REV.  2129(2004) (excerpted in COMPLEX LITIGATION 63-72 (Kevin R. Johnson, Catherine A. Rogers & John Valery White eds., 2009)).

◇     *The Concept of Equality in Civil Procedure*, 23 CARDOZO L. REV. 1865 (2002) (selected for the Stanford/Yale Junior Faculty Forum, June 2001)

◇     *A Transactional Model of Adjudication*, 89 GEORGETOWN  L.J. 371 (2000)

◇     *The Myth of Superiority*, 16 CONSTITUTIONAL COMMENTARY 599 (1999)

◇     *Divided We Litigate:  Addressing Disputes Among Clients and Lawyers in Civil Rights Campaigns*, 106 YALE L. J. 1623 (1997) *(*excerpted in COMPLEX LITIGATION 120-123 (1998))

## Selected Presentations

◇   *Class Action Update,* MDL Transferee Judges Conference, Palm Beach, Florida, November 1, 2017

◇   *Class Action Update,* MDL Transferee Judges Conference, Palm Beach, Florida, November 2, 2016

◇   *Judicial Power and its Limits in Multidistrict Litigation,* American Law Institute, Young Scholars Medal Conference, *The Future of Aggregate Litigation*, New York University School of Law, New York, New York, April 12, 2016

◇   *Class Action Update & Attorneys' Fees Issues Checklist,* MDL Transferee Judges Conference, Palm Beach, Florida, October 28, 2015

◇   *Class Action Law,* 2015 Ninth Circuit/Federal Judicial Center Mid-Winter Workshop, Tucson, Arizona, January 26, 2015

◇   *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 29, 2014

◇   *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 29, 2013

◇   *Class Action Remedies,* ABA 2013 National Institute on Class Actions, Boston, Massachusetts, October 23, 2013

◇   *The Public Life of the Private Law: The Logic and Experience of Mass Litigation* – *Conference in Honor of Richard Nagareda,* Vanderbilt Law School, Nashville, Tennessee, September 27-28, 2013

◇   *Brave New World: The Changing Face of Litigation and Law Firm Finance*, Clifford Symposium 2013, DePaul University College of Law, Chicago, Illinois, April 18-19, 2013

◇   *Twenty-First Century Litigation: Pathologies and Possibilities: A Symposium in Honor of Stephen Yeazell,* UCLA Law Review, UCLA School of Law, Los Angeles, California, January 24-25, 2013

◇   *Litigation's Mirror: The Procedural Consequences of Social Relationships,* Sidley Austin Professor of Law Chair Talk, Harvard Law School, Cambridge, Massachusetts, October 17, 2012

◇   *Alternative Litigation Funding (ALF) in the Class Action Context* – *Some Initial Thoughts*, Alternative Litigation Funding: A Roundtable Discussion Among Experts, George Washington University Law School, Washington, D.C., May 2, 2012

◇   *The Operation of Preclusion in Multidistrict Litigation (MDL) Cases*, Brooklyn Law School Faculty Workshop, Brooklyn, New York, April 2, 2012

◊    *The Operation of Preclusion in Multidistrict Litigation (MDL) Cases*, Loyola Law School Faculty Workshop, Los Angeles, California, February 2, 2012

◊    *Recent Developments in Class Action Law and Impact on MDL Cases,* MDL Transferee Judges Conference, Palm Beach, Florida, November 2, 2011

◊    *Recent Developments in Class Action Law,* MDL Transferee Judges Conference, Palm Beach, Florida, October 26, 2010

◊    *A General Theory of the Class Suit*, University of Houston Law Center Colloquium, Houston, Texas, February 3, 2010

◊    *Unpacking The "Rigorous Analysis" Standard,* ALI-ABA 12th Annual National Institute on Class Actions, New York, New York, November 7, 2008

◊    *The Public Role in Private Law Enforcement: Visions from CAFA*, University of California (Boalt Hall) School of Law Civil Justice Workshop, Berkeley, California, February 28, 2008

◊    *The Public Role in Private Law Enforcement: Visions from CAFA*, University of Pennsylvania Law Review Symposium, Philadelphia, Pennsylvania, Dec. 1, 2007

◊    *Current CAFA Consequences: Has Class Action Practice Changed?,* ALI-ABA 11th Annual National Institute on Class Actions, Chicago, Illinois, October 17, 2007

◊    *Using Law Professors as Expert Witnesses in Class Action Lawsuits,* ALI-ABA 10th Annual National
Institute on Class Actions, San Diego, California, October 6, 2006

◊    *Three Models for Transnational Class Actions*, Globalization of Class Action Panel, International Law Association 2006 Conference, Toronto, Canada, June 6, 2006

◊    *Why Create Litigation?: A Positive Externalities Theory of the Small Claims Class Action*, UMKC Law Review Symposium, Kansas City, Missouri, April 7, 2006

◊    *Marks, Bonds, and Labels: Three New Proposals for Private Oversight of Class Action Settlements*, UCLA Law Review Symposium, Los Angeles, California, January 26, 2006

◊    Class Action Fairness Act, Arnold & Porter, Los Angeles, California, December 6, 2005

◊    ALI-ABA 9th Annual National Institute on Class Actions, Chicago, Illinois, September 23, 2005

◊    Class Action Fairness Act, UCLA Alumni Assoc., Los Angeles, California, September 9, 2005

◊    Class Action Fairness Act, Thelen Reid & Priest, Los Angeles, California, May 12, 2005

◊    Class Action Fairness Act, Sidley Austin, Los Angeles, California, May 10, 2005

**A-15**

◇      Class Action Fairness Act, Munger, Tolles & Olson, Los Angeles, California, April 28, 2005

◇      Class Action Fairness Act, Akin Gump Strauss Hauer Feld, Century City, CA, April 20, 2005

SELECTED OTHER LITIGATION EXPERIENCE

*United States Supreme Court*

◇      Co-counsel on petition for writ of *certiorari* concerning application of the voluntary cessation doctrine to government defendants (*Rosebrock v. Hoffman*, 135 S. Ct.1893 (2015))

◇      Authored *amicus* brief filed on behalf of civil procedure and complex litigation law professors concerning the importance of the class action lawsuit (*AT&T Mobility v. Concepcion,* No. 09-893, 131 S. Ct. 1740 (2011))

◇      Co-counsel in constitutional challenge to display of Christian cross on federal land in California's Mojave preserve (*Salazar v. Buono*, 130 S. Ct. 1803 (2010))

◇      Co-authored *amicus* brief filed on behalf of constitutional law professors arguing against constitutionality of Texas criminal law (*Lawrence v. Texas*, 539 U.S. 558 (2003))

◇      Co-authored *amicus* brief on scope of *Miranda* (*Illinois v. Perkins*, 496 U.S. 292 (1990))

*Attorney's Fees*

◇      Appointed by the United States Court of Appeals for the Second Circuit to argue for affirmance of district court fee decision in complex securities class action, with result that the Court summarily affirmed the decision below (*In re Indymac Mortgage-Backed Securities Litigation*, 94 F.Supp.3d 517 (S.D.N.Y. 2015), *aff'd sub. nom.*, *Berman DeValerio v. Olinsky*, No. 15-1310-cv, 2016 WL 7323980 (2d Cir. Dec. 16, 2017))

◇      Served as *amicus curiae* and co-authored *amicus* brief on proper approach to attorney's fees in common fund cases, relied on by the court in *Laffitte v. Robert Half Int'l Inc.*, 1 Cal. 5th 480, 504, 376 P.3d 672, 687 (2016).

*Consumer Class Action*

◇      Co-counsel in challenge to antenna-related design defect in Apple's iPhone4 (*Dydyk v. Apple Inc.,* 5:10-cv-02897-HRL, U.S. Dist. Court, N.D. Cal.) (complaint filed June 30, 2010)

◇      Co-class counsel in $8.5 million nationwide class action settlement challenging privacy concerns raised by Google's Buzz social networking program (*In re Google Buzz Privacy Litigation,* 5:10-cv-00672-JW, U.S. Dist. Court, N.D. Cal.) (amended final judgment June 2, 2011)

**A-16**

### Disability

◇     Co-counsel in successful ADA challenge ($500,000 jury verdict) to the denial of health care in emergency room (*Howe v. Hull*, 874 F. Supp. 779, 873 F. Supp 72 (N.D. Ohio 1994))

### Employment

◇     Co-counsel in challenges to scope of family benefit programs (*Ross v. Denver Dept. of Health*, 883 P.2d 516 (Colo. App. 1994)); *(Phillips v. Wisc. Personnel Com'n*, 482 N.W.2d 121 (Wisc. 1992))

### Equal Protection

◇     Co-counsel in (state court phases of) successful challenge to constitutionality of a Colorado ballot initiative, Amendment 2 (*Evans v. Romer*, 882 P.2d 1335 (Colo. 1994))

◇     Co-counsel (and *amici*) in challenges to rules barring military service by gay people (*Able v. United States*, 44 F.3d 128 (2d Cir. 1995); *Steffan v. Perry*, 41 F.3d 677 (D.C. Cir. 1994) (en banc))

◇     Co-counsel in challenge to the constitutionality of the Attorney General of Georgia's firing of staff attorney (*Shahar v. Bowers*, 120 F.3d 211 (11th Cir. 1997))

### Fair Housing

◇     Co-counsel in successful Fair Housing Act case on behalf of group home (*Hogar Agua y Vida En el Desierto v. Suarez-Medina*, 36 F.3d 177 (1st Cir. 1994))

### Family Law

◇     Co-counsel in challenge to constitutionality of Florida law limiting adoption (*Cox v. Florida Dept. of Health and Rehab. Srvcs.*, 656 So.2d 902 (Fla. 1995))

◇     Co-authored *amicus* brief in successful challenge to Hawaii ban on same-sex marriages (*Baehr v. Lewin*, 852 P.2d 44 (Haw. 1993))

### First Amendment

◇     Co-counsel in successful challenge to constitutionality of Alabama law barring state funding foruniversity student groups (*GLBA v. Sessions*, 930 F.Supp. 1492 (M.D. Ala. 1996))

◇     Co-counsel in successful challenge to content restrictions on grants for AIDS education materials (*Gay Men's Health Crisis v. Sullivan*, 792 F.Supp. 278 (S.D.N.Y. 1992))

### Landlord / Tenant

◇     Lead counsel in successful challenge to rent control regulation (*Braschi v. Stahl Associates Co.*, 544 N.E.2d 49 (N.Y. 1989))

*Police*

◇      Co-counsel in case challenging DEA brutality (*Anderson v. Branen*, 27 F.3d 29 (2nd Cir. 1994))

*Racial Equality*

◇      Co-authored *amicus* brief for constitutional law professors challenging constitutionality of Proposition 209 *(Coalition for Economic Equity v. Wilson*, 110 F.3d 1431 (9th Cir. 1997))

SELECTED OTHER PUBLICATIONS

*Editorials*

◇    *Follow the Leaders*, NEW YORK TIMES, March 15, 2005
◇    *Play It Straight*, NEW YORK TIMES, October 16, 2004
◇    *Hiding Behind the Constitution*, NEW YORK TIMES, March 20, 2004
◇    *Toward More Perfect Unions,* NEW YORK TIMES, November 20, 2003 (with Brad Sears)
◇    *Don't Ask, Don't Tell. Don't Believe It*, NEW YORK TIMES, July 20, 1993
◇    *AIDS: Illness and Injustice*, WASH. POST, July 26, 1992 (with Nan D. Hunter)

BAR ADMISSIONS

◇    Massachusetts (2008)
◇    California (2004)
◇    District of Columbia (1987) (inactive)
◇    Pennsylvania (1986) (inactive)

◇    U.S. Supreme Court (1993)

◇    U.S. Court of Appeals for the First Circuit (2010)
◇    U.S. Court of Appeals for the Second Circuit (2015)
◇    U.S. Court of Appeals for the Fifth Circuit (1989)
◇    U.S. Court of Appeals for the Ninth Circuit (2004)
◇    U.S. Court of Appeals for the Eleventh Circuit (1993)
◇    U.S. Court of Appeals for the D.C. Circuit (1993)

◇    U.S. District Courts for the Central District of California (2004)
◇    U.S. District Court for the District of the District of Columbia (1989)
◇    U.S. District Court for the District of Massachusetts (2010)
◇    U.S. District Court for the Northern District of California (2010)

# EXHIBIT B

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

## EXHIBIT B
Partial List of Documents Reviewed by Professor Rubenstein
(other than case law and scholarship on the relevant issues)

1.  Class Action Complaint, ECF No. 1
2.  Amended Class Action Complaint, ECF No. 10
3.  Memorandum of Law in Support of Plaintiff's Assented-to Motion for Appointment of Interim Lead Counsel and Liaison Counsel for the Proposed Class, ECF No. 8
4.  Memorandum in Support of Defendant's Motion to Dismiss, ECF No. 19
5.  Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, ECF No. 22
6.  Reply Memorandum in Support of Defendant's Motion to Dismiss, ECF No. 29
7.  Order Granting in Part and Denying in Part Defendant's Motion to Dismiss, ECF No. 33
8.  Stipulation and Joint Motion to Continue Stay, ECF No. 66
9.  Stipulation and Joint Motion to Continue Stay, ECF No. 71
10. Stipulation and Joint Motion to Continue Stay, ECF No. 75
11. Stipulation and Agreement of Settlement, ECF No. 89
12. Memorandum of Law in Support of Plaintiffs' Assented-to Motion for Preliminary Approval of Proposed Class Settlement, Preliminary Certification of Settlement Class, and Approval of Proposed Form and Manner of Class Notice, ECF No. 91
13. Declaration of Lawrence A. Sucharow in Support of Plaintiffs' Assented-to Motion for Preliminary Approval of Proposed Class Settlement, Preliminary Certification of Settlement Class, and Approval of Proposed Form and Manner of Class Notice, ECF No. 92
14. Exhibit A: Letter Dated March 18, 2011, ECF No. 92-1
15. Exhibit B: Labaton Sucharow Firm Resume, ECF No. 92-2
16. Order Granting Preliminary Approval of Class Action Settlement, Approving Form and Manner of Notice, and Setting Date for Hearing on Final Approval of Settlement, ECF No. 97
17. Defendants' Memorandum in Support of Class Action Settlement, ECF No. 99
18. Plaintiffs' Assented-to Motion for Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class, ECF No. 100
19. Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses of Service Awards to Plaintiffs, ECF No. 102
20. [Proposed] Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, ECF No. 103-1
21. Declaration of Lawrence A. Sucharow in Support of (A) Plaintiffs' Assented-to Motion for Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and (B) Lead Counsel's Motion for an Award of

Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, ECF No. 104

22. Exhibit 1: Declaration of George Hopkins in Support of Final Approval of Class Settlement, Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Award to ARTRS, ECF No. 104-1

23. Exhibit 2: Letter Dates March 18, 2011, ECF No. 104-2

24. Exhibit 3: Motion to Dismiss, ECF No. 104-3

25. Exhibit 4: Lobby Conference Before Chief Judge Mark L. Wolf, ECF No. 104-4

26. Exhibit 5: Declaration of Jonathan B. Marks, ECF No. 104-5

27. Exhibit 15: Declaration of Lawrence A. Sucharow on Behalf of Labaton Sucharow LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-15

28. Exhibit 16: Declaration of Garrett J. Bradley, Esq. on Behalf of Thornton Law Firm, LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-16

29. Exhibit 17: Declaration of Daniel P. Chiplock on Behalf of Lieff Cabraser Heimann & Bernstein, LLP in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-17

30. Exhibit 18: Declaration of Lynn Sarko on Behalf of The Andover Companies Employee Savings and Profit Sharing Plan and James Pehoushek-Strangeland in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-18

31. Exhibit 19: Declaration of J. Brian McTigue in Support of Motion for Attorneys' fees, Reimbursement of Expenses, and Incentive Awards to Certain Class Representatives, ECF No. 104-19

32. Exhibit 20: Declaration of Carl S. Kravitz in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-20

33. Exhibit 21: Declaration of Catherine M. Campbell on Behalf of Feinberg, Campbell & Zack, PC in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-21

34. Exhibit 22: Declaration of Jonathan G. Axelrod on Behalf of Beins, Axelrod, PC in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Payment of Expenses, ECF No. 104-22

35. Exhibit 23: Declaration of Kimberly Keevers Palmer on Behalf of Richardson, Patrick, Westbrook & Brickman, LLC in Support of Lead Counsel's Motion for an Award of Attorneys' fees and Payment of Expenses, ECF No. 104-23

36. Exhibit 24: Master Chart of Lodestars, Litigation Expenses, and Plaintiffs' Service Awards, ECF No. 104-24

37. Exhibit 25: Rate Tables, ECF No. 104-25

38. Defendant's Statement of Reporting Status of Class Action Settlement, ECF No. 106

39. Reply Memorandum of Law in Further Support of (A) Plaintiffs' Assented-to Motion for Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and (B) Lead Counsel's Motion for an Award of Attorneys' fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, ECF No. 108

40. Supplemental Declaration of Eric J. Miller on Behalf of A.B. Data, Ltd. Regarding Mailing of Notice to Settlement Class Members and Requests for Exclusion, ECF No. 109

41. Order and Final Judgment, ECF No. 110

42. Order Awarding Attorneys' fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, ECF No. 111

43. Order Approving Plan of Allocation, ECF No. 112

44. Hearing Transcript, ECF No. 114

45. Letter Dated November 10, 2016, ECF No. 116

46. Memorandum and Order, ECF No. 117

47. The Competitive Enterprise Institute's Center for Class Action Fairness's Memorandum in Support of Motion for Leave to File *Amicus Curiae* Response to Court's Order of February 6 and for Leave to Participate as *Guardian ad Litem* for Class or *Amicus* in Front of Special Master, ECF No. 127

48. Memorandum of Lieff Cabraser Heimann & Bernstein, LLP Consenting to Appointment of Special Master, ECF No. 128

49. Memorandum of Labaton Sucharow LLP Consenting to Appointment of Special Master and Proposing Appointment of Co-Special Master, ECF No. 129

50. Order Regarding Class Notice, ECF No. 172

51. Memorandum and Order Regarding Appointment of Judge Rosen as Special Master, ECF No. 173

52. The Competitive Enterprise Institute's Center for Class Action Fairness's *Amicus* Response to Court's Order of February 6 – Leave to File granted March 8, 2017 (Dkt. 172), ECF No. 174

53. Memorandum and Order Regarding Class Notice, ECF No. 187

54. Memorandum and Order Regarding Motion for Relief from Fee Order, ECF No. 192

55. Special Master's Order Regarding the Law Firms' Objection to Retention of John W. Toothman as Advisor to Counsel to the Special Master, ECF No. 193

56. Objection of Labaton Sucharow LLP, Lieff Cabraser Heimann & Bernstein, LLP, and Thornton Law Firm LLP to Proposed Appointment of John W. Toothman as Expert in Proceeding Before the Special Master, ECF No. 194

57. Objection Plaintiffs' Law Firms' Objection to Special Master's Order Regarding Retention of John W. Toothman, ECF No. 199

58. Memorandum and Order Regarding Emergency Motion, ECF No. 200

59. Exhibit A: Notice of Proceedings that Could Result in an Additional Award to Class Members Who Have Claims, ECF No. 200-1

60. Exhibit B: Notice of Proceedings that Could Result in an Additional award to Class Members Who Have Claims, ECF No. 200-2

61. Declaration of Eric J. Miller on Behalf of A.B. Data, Ltd. Regarding Mailing and Emailing of Supplemental Notice to Settlement Class Members and/or Their Counsel, ECF No. 202

62. Order Regarding Email Addresses, ECF No. 203

63. Memorandum and Order – Toothman Order, ECF No. 204

64. Labaton Sucharow's Response to the Court's April 26, 2017 Order, ECF No. 205

65. Exhibit A: Declaration of Nicole M. Zeiss in Response to the Court's April 26, 2017 Order, ECF No. 205-1

66. Exhibit B: Declaration of Eric J. Miller on Behalf of A.B. Data, Ltd. in Response to the Court's April 26, 2017 Order, ECF No. 205-2

67. Memorandum and Order Regarding Special Master Billing Rate, ECF No. 206

68. Labaton Sucharow LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP – June 1 Response

69. Lieff Cabraser Heimann & Bernstein LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories Due on June 1, 2017

70. Thornton Law Firm, LLP's June 1, 2017 Responses to Special master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories

71. Labaton Sucharow LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP – June 9 Response

72. Lieff Cabraser Heimann & Bernstein LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories Due on June 9, 2017

73. Thornton Law Firm, LLP's June 9, 2017 Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories

74. Lieff Cabraser Heimann & Bernstein LLP's Corrected Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Interrogatories Nos. 43 and 44

75. Labaton Sucharow LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories to Labaton Sucharow LLP – July 10 Response

76. Lieff Cabraser Heimann & Bernstein LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories Due on July 10, 2017

77. Thronton Law Firm, LLP's July 10, 2017 Responses to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories

# EXHIBIT C

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

## EXHIBIT C
Massachusetts Cases Affirming Class Action Fee Awards

1. *Allen v. Decision One Mortg. Co., LLC*, No. CIV.A. 07-11669-GAO, 2010 WL 1930148 (D. Mass. May 12, 2010)
2. *Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324 (D. Mass.), aff'd, 809 F.3d 78 (1st Cir. 2015)
3. *Commonwealth Care All. v. Astrazeneca Pharm. L.P.*, No. CIV.A. 05-0269 BLS 2, 2013 WL 6268236 (Mass. Super. Aug. 5, 2013)
4. *Davis v. Footbridge Eng'g Servs., LLC*, No. 09CV11133-NG, 2011 WL 3678928 (D. Mass. Aug. 22, 2011)
5. *Geanacopoulos v. Philip Morris USA Inc.*, No. 98-6002-BLS1, 2016 WL 757536 (Mass. Super. Feb. 24, 2016)
6. *Gov't Employees Hosp. Ass'n v. Serono Int'l, S.A.*, 246 F.R.D. 93 (D. Mass. 2007)
7. *Hill v. State St. Corp.*, No. CIV.A. 09-12146-GAO, 2015 WL 127728 (D. Mass. Jan. 8, 2015), appeal dismissed, 794 F.3d 227 (1st Cir. 2015)
8. *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, No. MDL 09-2067-NMG, 2014 WL 4446464 (D. Mass. Sept. 8, 2014)
9. *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, No. CIV.A. 08-11064-NMG, 2012 WL 6184269 (D. Mass. Dec. 10, 2012)
10. *In re JPMorgan Chase Mortg. Modification Litig.*, 18 F. Supp. 3d 62 (D. Mass. 2014)
11. *In re Prudential Ins. Co. of Am. SGLI/VGLI Contract Litig.*, No. 3:10-CV-30163-MAP, 2014 WL 6968424 (D. Mass. Dec. 9, 2014)
12. *In re Relafen Antitrust Litig.*, 231 F.R.D. 52 (D. Mass. 2005)
13. *In re TJX Companies Retail Sec. Breach Litig.*, 584 F. Supp. 2d 395 (D. Mass. 2008)
14. *Latorraca v. Centennial Techs. Inc.*, 834 F. Supp. 2d 25 (D. Mass. 2011)
15. *Mann & Co., PC v. C-Tech Indus., Inc.*, No. CIV.A.08-11312-RGS, 2010 WL 457572 (D. Mass. Feb. 5, 2010)
16. *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. CIV.A. 05-11148PBS, 2009 WL 2408560 (D. Mass. Aug. 3, 2009)
17. *Pietrantonio v. Ann Inc.*, No. 13-CV-12721-RGS, 2014 WL 3973995 (D. Mass. Aug. 14, 2014)
18. *Rudy v. City of Lowell*, 883 F. Supp. 2d 324 (D. Mass. 2012)
19. *Stokes v. Saga Int'l Holidays, Ltd.*, 376 F. Supp. 2d 86 (D. Mass. 2005)
20. *Tyler v. Michaels Stores, Inc.*, 150 F. Supp. 3d 53 (D. Mass. 2015)

# EXHIBIT D

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

## **EXHIBIT D**
Massachusetts Bankruptcy Cases Containing Corporate Firm Billing Rates

1.  *In re Houghton Mifflin Harcourt Publishing Company*, 12-BK-15610 (Bankr. D. Mass. 2012), ECF. No. 168
2.  *In re Lexington Jewelers Exch., Inc.*, No. 08-10042-WCH, 2013 WL 2338243 (Bankr. D. Mass. May 29, 2013), ECF. 439-1
3.  *In re McCabe Grp.*, 424 B.R. 1 (Bankr. D. Mass.), *aff'd in part, rev'd in part sub nom. McCabe v. Braunstein*, 439 B.R. 1 (D. Mass. 2010), ECF No. 404-8
4.  *In re Oscient Pharm. Corp.*, No. 09-16576-HJB, 2010 WL 6602493 (Bankr. D. Mass. June 29, 2010); ECF No. 485
5.  *In re Oscient Pharm. Corp.*, No. 09-16576-HJB, 2010 WL 6602493 (Bankr. D. Mass. June 29, 2010); ECF No. 487-6
6.  *In re The Educ. Res. Inst., Inc.*, 442 B.R. 20 (Bankr. D. Mass. 2010), ECF No. 1196-1

# EXHIBIT E

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

**EXHIBIT E**
Class Actions Settlements with Funds of $100-$500 Million

1.  *Dial Corp. v. News Corp.*, 317 F.R.D. 426 (S.D.N.Y. 2016)
2.  *Fleisher v. Phoenix Life Ins. Co.*, No. 11-CV-8405 (CM), 2015 WL 10847814 (S.D.N.Y. Sept. 9, 2015), ECF No. 310
3.  *In re Am. Int'l Grp., Inc. Sec. Litig.*, 293 F.R.D. 459 (S.D.N.Y. 2013), ECF No. 634-23
4.  *In re Comverse Tech., Inc. Sec. Litig.*, No. 06-CV-1825 (NGG), 2010 WL 2653354 (E.D.N.Y. June 24, 2010)
5.  *In re Currency Conversion Fee Antitrust Litig.*, 263 F.R.D. 110 (S.D.N.Y. 2009)
6.  *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015)
7.  *In re IndyMac Mortg.-Backed Sec. Litig.*, 94 F. Supp. 3d 517 (S.D.N.Y. 2015)
8.  *In re Lupron Mktg. & Sales Practices Litig.*, No. 01-CV-10861-RGS, 2005 WL 2006833 (D. Mass. Aug. 17, 2005)
9.  *In re Nortel Networks Corp.*, No. 01-CV-1855(RMB), 2002 WL 1492116 (S.D.N.Y. Feb. 4, 2002), ECF No. 194
10. *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. CIV.A. 08-2177 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013) ["Schering" settlement]
11. *In re Schering-Plough Corp. Enhance Sec. Litig.*, No. CIV.A. 08-2177 DMC, 2013 WL 5505744 (D.N.J. Oct. 1, 2013) ["Merck" settlement]
12. *In re Shop-Vac Mktg. & Sales Practices Litig.*, No. 2380, 2016 WL 7178421 (M.D. Pa. Dec. 9, 2016)
13. *In re The Mills Corp. Sec. Litig.*, 265 F.R.D. 246 (E.D. Va. 2009)
14. *In re Volkswagen & Audi Warranty Extension Litig.*, 89 F. Supp. 3d 155 (D. Mass. 2015)
15. *Kemp-DeLisser v. Saint Francis Hosp. & Med. Ctr.*, No. 15-CV-1113 (VAB), 2016 WL 6542707 (D. Conn. Nov. 3, 2016)
16. *N.Y. State Teachers' Ret. Sys. v. Gen. Motors Co.*, 315 F.R.D. 226 (E.D. Mich. 2016)
17. *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, No. CIV.A. 05-11148PBS, 2009 WL 2408560 (D. Mass. Aug. 3, 2009), ECF No. 769
18. *Nitsch v. DreamWorks Animation SKG Inc.*, No. 14-CV-04062-LHK, 2017 WL 2423161 (N.D. Cal. June 5, 2017)
19. *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 318 F.R.D. 19, 23 (S.D.N.Y. 2016)
20. *Shapiro v. JPMorgan Chase & Co.*, No. 11 CIV. 7961 CM, 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014)

# EXHIBIT F

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

**EXHIBIT F**
Reported Class Action Fee Decisions
Containing Billing Rates for Contract or Staff Attorneys

1. *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877 (C.D. Cal. 2016), *judgment entered*, No. SACV111733FMOMLGX, 2016 WL 5921765 (C.D. Cal. Oct. 11, 2016), ECF No. 218-8

2. *City of Providence v. Aeropostale, Inc.*, No. 11 CIV. 7132 CM GWG, 2014 WL 1883494 (S.D.N.Y. May 9, 2014), *aff'd sub nom. Arbuthnot v. Pierson*, 607 F. App'x 73 (2d Cir. 2015), ECF No. 61-4

3. *In re Am. Apparel, Inc. S'holder Litig..*, No. CV1006352MMMJCGX, 2014 WL 10212865 (C.D. Cal. July 28, 2014), ECF No. 188-3

4. *In re Animation Workers Antitrust Litig.*, No. 14-CV-4062-LHK, 2016 WL 6663005 (N.D. Cal. Nov. 11, 2016), ECF Nos. 331-2, 331-3, 331-4

5. *In re High-Tech Employee Antitrust Litig.*, No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015), ECF No. 1083-20

6. *In re Optical Disk Drive Prod. Antitrust Litig.*, No. 3:10-MD-2143 RS, 2016 WL 7364803 (N.D. Cal. Dec. 19, 2016), ECF No. 1963-1

7. *Long v. HSBC USA INC.*, No. 14 CIV. 6233 (HBP), 2016 WL 4764939 (S.D.N.Y. Sept. 13, 2016)

8. *McGreevy v. Life Alert Emergency Response, Inc.*, No. 14 CIV. 7457 (LGS), 2017 WL 1534452 (S.D.N.Y. Apr. 28, 2017)

9. *Mills v. Capital One, N.A.*, No. 14 CIV. 1937 HBP, 2015 WL 5730008 (S.D.N.Y. Sept. 30, 2015), ECF No. 52

10. *Phillips v. Triad Guar. Inc.*, No. 1:09CV71, 2016 WL 2636289 (M.D.N.C. May 9, 2016), ECF No. 145-1

11. *Rose v. Bank of Am. Corp.*, No. 5:11-CV-02390-EJD, 2014 WL 4273358 (N.D. Cal. Aug. 29, 2014)

12. *St. Louis Police Ret. Sys. v. Severson*, No. 12-CV-5086 YGR, 2014 WL 3945655 (N.D. Cal. Aug. 11, 2014)

# EXHIBIT G

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

## EXHIBIT G
List of Exemplary Cases With Multipliers Over 3.5

1.   In re Merry-Go-Round Enterprises, Inc., 244 B.R. 327 (Bankr. D. Md. 2000) (19.6 multiplier)

2.   Stop & Shop Supermarket Co. v. SmithKline Beecham Corp., NO. CIV.A. 03-457, 2005 WL 1213926, at *17-18 (E.D. Pa. May 19, 2005) (15.6 multiplier)

3.   Kuhnlein v. Department of Revenue, 662 So.2d 309, 315 (Fla. 1995) (15 multiplier reduced to 5)

4.   In re Doral Fin. Corp. Sec. Litig., No. 05-md-1706 (S. D. N.Y. July 17, 2007) (10.26 multiplier)

5.   Weiss v. Mercedes-Benz, 899 F. Supp. 1297 (D. N.J. 1995), aff'd, 66 F.3d 314 (3d Cir. 1995) (9.3 multiplier)

6.   Doty v. Costco Wholesale Corp., No. 05-3241 (C. D. Cal. May 14, 2007) (9 multiplier)

7.   Conley v. Sears, Roebuck & Co., 222 B.R. 181 (D. Mass. 1998) (8.9 multiplier)

8.   Cosgrove v. Sullivan, 759 F. Supp. 1667, 167 n.1 (S. D. N.Y. 1991) (8.74 multiplier)

9.   New England Carpenters Health Benefits Fund v. First Databank, Inc., Civil Action No. 05-11148-PBS, 2009 WL 2408560 (D. Mass. Aug. 3, 2009) (8.3 multiplier)

10.  Newman v. Caribiner Int"l, Inc., No. 99 Civ. 2271 (S.D. N.Y. Oct. 19, 2001) (7.7 multiplier)

11.  Hainey v. Parrott, No. 02-733 (S. D. Ohio Nov. 6, 2007) (7.47 effective multiplier)

12.  In re Rite Aid Corp. Sec. Litigation, 362 F. Supp. 2d 587, 589 (E.D. Pa. 2005) (6.96 multiplier)

13.  Steiner v. Amer. Broadcasting Co., Inc., 248 Fed. Appx. 780, 783 (9th Cir. 2007) (6.85 multiplier)

14.   In re UnitedHealth Group, Inc. PSLRA Litig., No. 06-1691 (D. Minn. Aug. 10, 2009) (6.49 multiplier)

15.   The Music Force, LLC v. Viacom, Inc., No. 04-8239 (C.D. Cal. Aug. 8, 2007) (6.43 multiplier)

16.   In re Boston and Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A., 778 F.2d 890 (1st Cir. 1985) (6 multiplier)

17.   In re Cardinal Health Inc. Securities Litigations, 528 F. Supp. 2d 752, 768 (S.D. Ohio 2007) (6 multiplier)

18.   In re Krispy Kreme Doughnuts, Inc. Sec. Litig., No. 04-416 (M.D. N.C. Feb. 15, 2007) (6 multiplier)

19.   In re RJR Nabisco, Inc. Securities Litigation, No. 88 Civ 7905(MBM), 1992 WL 210138, at *5-6 (S.D. N.Y. Aug. 14, 1992) (6 multiplier)

20.   Spartanburg Reg'l Health Servs. Dist., Inc. v. Hillenbrand Indus., Inc., No. 03-2141 (D. S.C. Aug. 15, 2006) (6 multiplier)

21.   In re Cardinal Health, Inc. Sec. Litig., No. 04-575, 2007 U.S. Dist. LEXIS 95127 (S. D. Ohio Dec. 31, 2007) (5.85 multiplier)

22.   Dutton v. D&K Healthcare Res., Inc., No. 04-147 (E. D. Mo. June 5, 2007) (5.6 multiplier)

23.   In re Charter Communications, Inc., Securities Litigation, No. MDL 1506, 2005 WL 4045741, at * 22 (E.D. Mo. June 30, 2005) (5.6 multiplier)

24.   Roberts v. Texaco, Inc., 979 F. Supp. 185, 198 (S.D. N.Y. 1997) (5.5 multiplier)

25.   Warner v. Experian Info. Solutions, Inc., No. BC362599 (Cal. Super. Ct. Los Angeles Co. Feb. 26, 2009) (5.48 multiplier)

26.   Davis v. J.P. Morgan Chase & Co., 827 F. Supp. 2d 172, 185 (W.D.N.Y. 2011) (5.3 multiplier)

27.   Di Giacomo v. Plains All American Pipeline, No. Civ.A.H-99-4137, 2001 WL 34633373, * at 11-12 (S.D. Tex. Dec. 19, 2001) (5.3 multiplier)

28.    Craft v. County of San Bernardino, 624 F. Supp. 2d 1113, 1123-25 (C.D. Cal. 2008) (5.2 multiplier)

29.    In re Enron Corp. Securities, Derivative & ERISA Litigation, 586 F. Supp. 2d 732, 803 (S.D. Tex. 2008) (5.2 multiplier)

30.    In re Beverly Hills Fire Litig., 639 F. Supp. 915, 924 (E. D. Ky. 1986) (5 multiplier to attorney who performed the bulk of work on the case)

31.    In re Fernald Litigation, No. C-1-85-149, 1989 WL 267038, at *4-5 (S.D. Ohio Sept. 29, 1989) (5 multiplier)

32.    In re Cendant Corp. Securities Litigation, 404 F.3d 173, 183 (3d Cir. 2005) (multiplier in "mid-single digits")

33.    In re United Rentals, Inc. Sec. Litig., No. 04-1615 (D. Conn. May 26, 2009) (4.79 multiplier)

34.    Castillo v. General Motors Corp., No. 07-2142 (E. D. Cal. April 19, 2009) (4.77 multiplier)

35.    Meijer, Inc. v. 3M, No. 04-5871, 2006 WL 2382718 (E. D. Pa. Aug. 14, 2006) (4.77 multiplier)

36.    In re Xcel Energy, Inc., Securities, Derivative & "ERISA" Litigation, 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (4.7 multiplier)

37.    Maley v. Del Global Technologies Corp., 186 F. Supp. 2d 358, 369 (S.D.N.Y. 2002) (4.65 multiplier)

38.    Teeter v. NCR Corp., No. 08-297 (C.D. Cal. Aug. 6, 2009) (4.61 multiplier)

39.    Holleran v. Rita Medical Sys., Inc., No. RG06302394 (Cal. Super. Ct. Alameda Co. Aug. 1, 2007) (4.57 multiplier)

40.    Rabin v. Concord Assets Group, Inc., No. 89 Civ. 6130, 1991 WL 275757 (S.D. N.Y. Dec. 19, 1991) (4.4 multiplier)

41.    Agofonova v. Nobu Corp., No. 07-6926 (S. D. N.Y. Feb. 6, 2009) (4.34 multiplier)

42.    Buccellato v. AT & T Operations, Inc., No. C10-00463-LHK, 2011 WL 3348055, at *2 (N.D. Cal. Jun. 30, 2011) (4.3 multiplier)

43.   In re AremisSoft Corp. Sec. Litig., 210 F.R.D. 109, 135 (D.N.J. 2002) (4.3 multiplier)

44.   Shannon v. Hidalgo County Board of Comm'r, No. 08-369 (D. N.M. June 4, 2009) (4.2 multiplier)

45.   Simmons v. Andarko Petroleum Corp., No. CJ-2004-57 (Okla. Dist. Ct. Caddo Co. Dec. 23, 2008) (4.17 multiplier)

46.   In re OSI Pharm., Inc. Sec. Litig., No. 04-5505 (E.D. N.Y. Aug. 22, 2008) (4.11 multiplier)

47.   Blackmoss Inv., Inc. v. Gravity Co., No. 05-4804 (S. D. N.Y. Nov. 20, 2007) (4.0 multiplier)

48.   In re WorldCom, Inc. Sec. Litig., 388 F. Supp. 2d 319, 359 (S.D.N.Y. 2003) (4.0 multiplier)

49.   In re NASDAQ Market-Makers Antitrust Litig., 187 F.R.D. 465, 489 (S.D. N.Y. 1998) (3.97 multiplier)

50.   Karpus v. Borelli (In re Interpublic Secs. Litig.), No. 02 Civ 6527, 2004 WL 2397190, at *12 (S.D. N.Y. Oct. 26, 2004 (3.96 multiplier)

51.   Vizcaino v. Microsoft Corp., 290 F.3d 1045, 1050-51 (9th Cir. 2002) (3.65 multiplier)

52.   Donkerbrook v. Title Guar. Escrow Servs., Inc., No. 10-00616 LEK-RLP, 2011 WL 3649539, at *10 (D. Haw. Aug. 18, 2011) (3.6 multiplier)

53.   Turner v. Murphy Oil USA, Inc., 472 F. Supp. 2d 830, 869 (E.D. La. 2007) (3.5 multiplier)

54.   Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 123 (2d Cir. 2005) (3.5 multiplier)