# EX. 2

JAMS, INC.

Volume: 1

Pages: 1-109

Ref. No. 1345000011

Exhibits: 0

---

In Re: STATE STREET ATTORNEYS FEES

---

Before: SPECIAL MASTER HONORABLE GERALD ROSEN,
UNITED STATES DISTRICT COURT, RETIRED

Date: June 19, 2017

Time: 11:17 a.m.-2:10 p.m.

Deposition of MICHAEL P. THORNTON, taken by counsel to the Special Master held at JAMS, Inc., One Beacon Street, Boston, Massachusetts before Cynthia Stutz, CPR, Notary Public of the Commonwealth of Massachusetts.

Page 14

Page 16

Page 15

Q. And did the focus of the firm shift to Boston?

**A. As far as my work did. Bill Mulvey, who is a very fine lawyer and still a fine lawyer and a friend, he was from Portsmouth. He grew up there. And he wasn't sure that the asbestos thing was going to be that good of a deal and he, he wanted to focus on Portsmouth. So we mutually agreed that we would separate the offices and he would no longer have an interest in the one in Boston and I would no longer have an interest in the one in Portsmouth.**

Q. So what was the name in firm in Boston now that you had the interest in?

**A. It was probably Thornton and Thornton Early. And for a while it was Motley. Ron Motley was a very well known litigator that did, was really a real pioneer in the asbestos litigation. His home base was South Carolina, but he was rarely there. He traveled the country. And he and I had been working on these cases beginning -- We first met in December of 1977 when I was actually still at the Burns office and it was from him that I found out that there was going to be such a thing as asbestos litigation. I mean, I knew it was a mineral before**

Page 17

Page 30

[redacted]

Page 32

because it morphed from just the semiconductor plants to we now also represent families who were exposed to teratogenic pesticides in fields as farm workers. So our stuff is mostly in California now in the central valley and southern California. And that's gotten enormously complicated, for a number of reasons. They're harder cases, because people outdoors are not inside in terms of proving exposure, quantifying exposure and, in accordance with that, causation. But we, we believe in it. It's the kind of stuff that suits our firm well. We feel good about the cases.

Q. Do you have an office in California?

A. No.

THE SPECIAL MASTER: How many lawyers do you have now?

THE WITNESS: I think we've got eighteen. We're a small firm. We're large for a plaintiffs' firm, but, you know, eighteen is a very small law firm. We have almost fifty employees beyond that.

Q. What's your role in the firm currently?

THE SPECIAL MASTER: Of the fifty employees, you have eighteen attorneys?

Page 31

[redacted]

Page 33

[redacted]

**And it's very depressing, you know. Some parts of the business, when you read about the last admission to the hospital of somebody, particularly somebody you knew. I used to know all the clients. I don't any more, but I can certainly sympathize with their plight. But I am -- I don't try cases any more. I don't do depositions any more, this one notwithstanding.**

**THE SPECIAL MASTER:** Are you effectively CEO of the firm, then?

**THE WITNESS:** Yeah, yes.

**THE SPECIAL MASTER:** Spend a lot of time administering and running the firm?

**THE WITNESS:** Yes, I do, although a lot less since Garrett became -- I relinquished the role of managing partner last year, summer, and Garrett Bradley has been doing that since. He still knocks on my door too often to ask me, because I don't miss the administrative stuff at all. I like, I still like the practicing law. I enjoy it, but I do a lot less of that now. Almost none.

Q. Let's move a little bit forward, Mike, to the time period just prior to the State Street case. Had you and the firm worked in any foreign exchange

matters before State Street?

A. **Yes.**

Q. Could you tell us about that and how they came about?

A. **We had worked -- Referring to the State Street class action, I think?**

Q. Yes.

A. **Is that correct? We had filed prior, well prior to filing the State Street class action, our first whistle blower Qui Tam case against State Street on behalf of California pension funds in California, along with the law firm of Lief Cabraser, Heimann and Bernstein. So that was our first foreign exchange venture.**

Q. And how did you come to be aligned with Lieff Cabraser in that matter?

A. **Well, we've known them for a long time. I can't tell you exactly where we started. I've known Bob Lieff. I've known Richard Heimann for a long time. From, I'd say maybe the eighties and we got to know each other better because they were heavily involved in the tobacco litigation in the nineties. Unlike us, they represented several states, so they were known. And I had an opportunity to work with**

**and become friends with Bob Lieff and Richard Heimann and Elizabeth Cabraser. And I thought, I know they're very good lawyers and they're nice people, people to work with.**

**So when we were filing something in California, we obviously needed California counsel. None of my firm were members of the California bar, and we asked if they would join us and they did.**

Q. And was the whistle blower in that case yours or someone else's?

A. **The whistle blowers were ours.**

Q. Okay. And how did the whistle blowers come to you, just in general terms?

A. **They were referred to us by someone -- It's a little involved. Harry Markopolos -- I don't know if you're familiar with him or not.**

Q. Of Madoff?

A. **Of Madoff fame, in a not totally direct, but a pretty direct way, he makes his living by referring whistle blowers to law firms to bring actions. And Harry gave me, through Mike Lesser, who was head of our Qui Tam department, and he knew of Mike because Mike had done some good work in New York, he and a lawyer he worked with there. He gave**

Page 38

[redacted]

Page 39

[redacted]

Page 40

[redacted]

Page 41

Q. Was Markopolos the referral for all of those relaters?
**A. Yeah. Well, in one way or the other, he was.**
Q. How was he compensated for these referrals?
**A. He gets a portion of this. The relaters pay him. We can't.**
Q. I see. Is he an attorney?
**A. No.**
Q. Was there any competition, Mike, as far as other firms besides you and Lieff that were interested in doing foreign exchange cases?
**A. Not early on, because nobody else knew about it. There had never been a case brought like it, that I know of, or I think I probably would have known of it involving foreign exchange. I mean, the rest of the attorneys in America were as dumb as I was in terms of, you know, what goes on in banks, you know, sometimes. Some banks in some areas.**
Q. At some point around this time, you know, post the intervention of the Attorney General, did you develop an association with the Labaton law firm?

Page 42

[redacted]

Page 43

**started.**
Q. And what was the first partnership along those lines with Labaton?
**A. I can't recall. I can't remember what the first one was.**
Q. Did they come on board in the California case?
**A. No.**
Q. And with respect to the instant case, the State Street case?
**A. Right.**
Q. What was their first involvement in that?
[redacted]
**to them all the time. So he wanted to look into it further to see if he could, if there had been**

Page 44

**anything wrong done regarding State Street and**
[redacted]
Q. And that was Mr. Hopkins?
**A. That was Mr. Hopkins.**
Q. And is it fair to say he proved to be a valuable client?
**A. Well, he was a good client. I mean, he was, he was -- He had guts, because it takes -- You know, most pension funds don't want to, they don't want to screw around with their custodians. Custodians are very important to them. They provide a lot of valuable services. They've got relationship managers and if you have ever talked to a relationship manager at one of these banks, I wish to Christ we could get someone like that working for us. They were very talented people. They make the relationships go. And funds don't want to -- They're very reluctant to part ways or certainly get involved in litigation with their custodial bank. George, George Hopkins didn't want to either.**
**We went to Chicago at EnnisKnupp, which is one of their advisors, Arkansas advisors,**

Page 45

[redacted]



Page 54

Page 56

Page 55

Page 57

Q. And how much was discussed, at least initially?
A. Bob Lieff, who'd been down this road before with multiple firms in class litigation, I think, determined that it would be a lot, it would be well for us to come to an agreement beforehand, well beforehand on what the fee breakdown would be between ERISA and consumer class. He knew the factors involved and I think he negotiated primarily with Lynn Sarko on that, but I'm sure he talked to the others. He would have had to, because unanimous consent. And he came to us at one point. I think he had already pretty much worked out, pending our approval, that the fair thing would be for ERISA attorneys to get 9% of the attorneys' fee and that would probably be off the top.
Q. At some point did that percentage change?
A. It did.
Q. And when did that happen?
A. It's right toward the end. And Larry Sucharow and probably Bob Lieff thought that they deserved, for what they had done or for whatever might have been the amount of funds they had, they were going to get an additional 1%, and so we agreed

Page 58

**to raise it to 10%.**
Q. Did you have my misgivings or objections to that?
**A. No.**
Q. The firm didn't?
**A. No.**
Q. And we talked earlier about Mr. Hopkins, George Hopkins. What was your and the firm's contact with him during the mediation process?
**A. He came to a number of the mediations and he would speak at the mediations. I mean, he's not a wilting flower.**
**THE SPECIAL MASTER:** He's not a potted plant.
**THE WITNESS:** No, he's not a potted plant. He has his views and there is --
Q. He's not shy, is he?
**A. He's not shy and he spoke up and he had his own ideas of how things should be going. And so we saw a lot of him in the mediations. And we see him occasionally other times, we'd get together and talk about how things were going and where we were.**
Q. He was a very active participant in the life of this case?

Page 59

Page 60

Page 61



Page 78

Page 80

document review hours were accounted for?
A. **I think Evan Hoffman was monitoring him.**
Q. And did his hours ever come to your attention for any reason, good, bad, indifferent?
A. **No.**
Q. And as of early 2015, Mike, what was your understanding of how the cost sharing arrangement with Labaton and Lieff would be represented in a fee petition?
**MR. KELLY:** I'm sorry, as of what date, Bill?
**MR. SINNOTT:** As of early 2015.
A. **We had, as of that date, I think what we had agreed that we would, each of the three firms would receive 20% of the fee. This is, this is after ERISA attorneys were paid, so I think that came off of the top. I'm pretty sure that it did. And that the remaining 40% would be negotiated between the three firms when we got closer to really meaning something, which we still weren't at at that point.**
Q. Was there any understanding at that time as far as who would claim what staff attorney hours?
**THE SPECIAL MASTER:** For purposes of

Page 79

Page 81

the fee petition?
**MR. SINNOTT:** Yes.
A. **Yeah, I think. I mean, it was my understanding that if you paid for it, if you paid for the staff attorney, you'd get the hours.**
Q. Was anybody in particular responsible for insuring that that would happen?
A. **There was no one individual responsible for monitoring that. I mean, it's like, you know, I guess there's a spreadsheet someplace. It is what it is. You know, they worked and did you pay for this person, you know, and if you did, put the hours that they work, that's the way it would work.**
Q. Who handled the fee petition or prepared the fee petition on behalf of Thornton?
A. **That would be Mike Lesser, Garrett Bradley and probably Evan Hoffman.**
Q. And did you ever review Thornton attorney hours in that fee petition?
A. **I reviewed my own hours. I didn't review any other hours. I saw what they, totals and stuff, but I was mainly concerned about my own hours.**
Q. You didn't review staff attorney hours?
A. **No.**

Page 82

Q. In Larry Sucharow's affidavit there's language in Paragraph 7 -- And could I have that, please? Let me strike that.
Let me first ask you if you reviewed Garrett Bradlee's Declaration in Support of Lead Counsel's Motion for Award of Attorneys' Fees and Payment of Expenses, do you remember reading that?
**A. Yes.**
Q. And, Mike, let me show you Paragraph 4.
**A. I'm familiar with Paragraph 4.**
Q. Okay. I bet you are. Paragraph 4 reads, The hourly rates of the attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services which have been accepted in other complex class actions.
Do you agree with that language?
**A. It's true, but it's not clear and it's poorly worded.**
Q. Okay. Explain that.
**A. Because we are a contingent fee firm, we never, virtually never charge anybody by the hour. So it would have been, it would have been more -- I think most people know we're a contingent firm.**

Page 83

o

Page 84

Page 85

Q. Sure, yeah.
(Document handed to the witness.)
**A. Yeah, it's the same. Thank you.**
Q. So does that make you think that that language tracked, your language or Garrett's language tracked?
**A. Yes.**
Q. Labaton's language?
**A. Yes.**
Q. Okay.
**THE SPECIAL MASTER:** Your firm, had your firm done fee petitions in other complex class actions?
**THE WITNESS:** I'm trying to think back to the tobacco litigation, if that was, if it was actually a petition that was done or if it was done differently. I don't recall.
**THE SPECIAL MASTER:** Was your firm involved in the B-O-N-Y, the BNY Mellon case?
**THE WITNESS:** Yes. And we did have an individual. Thank you.
**THE SPECIAL MASTER:** And did you do a fee petition in that, if you remember?
**THE WITNESS:** I imagine we did,

[redacted]

**he told me about the $500 an hour, I had a conversation with him about that, because I wanted to know what the other document reviewers -- But, you know, like I say, he took it on a contingency basis and it wasn't that much more than what everyone else was getting. And the fact that we didn't have to pay him for a couple years and we didn't have to pay him never if the thing didn't work out made it seem ballpark fair to me.**

Q. Let me, once again, bring you to November of 2016 and ask you how you learned about the billing hours in the fee petition?

**A. We found out from our counsel that there had been a duplicate billing, inadvertent, but duplicate on some of the hours that we had for our, the lawyers that we were paying for that they were also claimed on the other two firms.**

Q. And when did you learn that, as best you remember?

**A. It was in November of 2016.**

Q. And was this before or after the Boston Globe had inquired of the firm?

**A. Right after.**

Q. And what was your reaction when you

[redacted]

[redacted]