# EX. 4

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Case No. 11-cv-10230 MLW

- - - - - - - - - - - - - - - - - - - - -x

ARKANSAS TEACHER RETIREMENT SYSTEM, et al.,

Plaintiffs,

-against-

STATE STREET BANK AND TRUST COMPANY,

Defendant.

- - - - - - - - - - - - - - - - - - - - -x

JAMS
Reference No. 1345000011

- - - - - - - - - - - - - - - - - - - - -x

In Re: STATE STREET ATTORNEYS' FEES

- - - - - - - - - - - - - - - - - - - - -x

June 14, 2017
9:59 a.m.

B e f o r e :

SPECIAL MASTER HON. GERALD ROSEN
United States District Court (Retired)

Deposition of GEORGE HOPKINS, taken by Counsel to the Special Master, held at the offices of JAMS, 620 Eighth Avenue, New York, New York, before Helen Mitchell, a Registered Professional Reporter and Notary Public.

Page 10

Hopkins

did after law school.

A Well, I might want to start in the middle of law school.

When I was in my second year of law school, I dropped out of law school in my third -- in my fourth semester of law school to run for State Senate. I was elected, so I finished out law school as an Arkansas state senator. And then I continued being a state senator for 14 years, and simultaneously, after I passed the bar in July of 1987, I practiced law and was a state senator.

After I was term limited and left the State Senate in December of 2000, I just continued practicing law for eight years, and after -- at the conclusion of those eight years, in December of 2008, the Arkansas Teacher Retirement System Board hired me as the executive director, and I've been executive director since December 29th, 2008.

Q All right. Thank you, sir.

And, sir, could you tell us something about the ARTRS --

JUDGE ROSEN: Bill, before we

Page 11

Hopkins

get to that --

MR. SINNOTT: Sure.

JUDGE ROSEN: -- you've had some -- I remember from our interview, you had some relevant background during your service as a state senator. You worked on the retirement committee, and then you were chair of that committee?

THE WITNESS: Yes. I was on -- I was on the retirement committee I think ten of the 14 years I was in the State Senate. For six of those years, I was the Senate co-chair.

That committee's a joint committee, has a Senate and a House co-chair, and during that six years I was the Senate co-chair, I had three different House co-chairs, and a lot of the responsibility for ensuring that retirement benefit legislation was properly drafted and went through appropriate study fell on me. I think in my last session, I probably handled 55 bills, which is a pretty major load,

Page 12

Page 13

Hopkins

just wanted to get that relevant history and background on the record.

MR. SINNOTT: Thank you, Judge.

BY MR. SINNOTT:

Q And, sir, you were appointed as executive director of the Arkansas Teacher Retirement System in 2009?

A December -- almost 2009. December 29th, 2008.

Q And could you tell us something about the Arkansas Teacher Retirement System, as far as the number of members, the portfolio, and the average monthly benefit, anything like that that you can tell us.

A The Arkansas Teacher Retirement System was created in 1937, it's 80 years old. It currently has 45,000 retirees. We're paying out about $85 million per month. That number's probably about to be -- when we get to July will turn to probably 87 or $88 million per month.

Our average benefit is just under $23,000 per year for those 45,000 retirees, that we continue to pay a lump sum death benefit to. Out of those 45,000, probably



Page 26

[redacted]

Page 27

[redacted]

Page 28

[redacted]

Page 29

Hopkins
we had four firms that I will call on monitoring agreement retainer that looks at our entire portfolio -- all of our stocks, all of our bonds, all -- all the things that we were invested in, which, you know, there might be national news.

So what we expect them to do, and our agreement with them is, they will monitor our trust fund investments, and if they see an issue where we have a loss, or an issue that they see within our holdings in which they think that there may be a case that we need representation on in order to recover losses, or lack of gains that we should have gotten, however you want to phrase that, we have a monetary difference of what we have now versus what we should have had, then they will contact us.

They also give a weekly report of, like, new cases that are filed, whether we have a loss in those cases

Page 30

Hopkins

or not.

We have -- after I got there, we added a fifth firm, so we have five firms doing that.

BY MR. SINNOTT:

Q And who are those five firms?

A The first is Labaton, the firm I'm here with today; Bernstein Litowitz, a firm based here in New York; we have Kaplan Fox -- with a K, Kaplan Fox -- based here in New York; we have Kessler Topaz, T-o-p-a-z, based in -- I'll just say Philadelphia -- they may be in a suburb of Philadelphia -- and then we have Nix Patterson out of Texas. I think they have three or four Texas offices.

I hope that was five.

Q I think it was.

And you do not pay a retainer to those firms?

A We never pay these firms anything.

Q Do you have to secure approval, as you do with the local firms, or the retirement-based firms that you were describing

Page 32

Hopkins

There was a great deal of pressure on us to do another -- what we call an RFP, because a firm that got looked over accidentally wasn't sent notice that we were doing the RFP, the legislature really wanted us to do another one, and we did, and that's how we added a fifth firm, which was Kessler Topaz.

Q Now, since you became executive director in late 2008-early 2009, in how many cases has ARTRS acted as a class representative?

A I haven't added that up. I would probably say 30.

Q And typically the work has been among those five firms?

A Yes. There's only five firms that we have doing that.

Q How many of those cases have involved foreign exchange transactions?

A One.

Q What was that case?

A Arkansas Teacher Retirement versus State Street.

Q And we'll talk about that in just a moment, but was there also a case

Page 31

Page 33



Page 34

Hopkins

Q What's the nature of that case, and then ARTRS's role in it?

A That's a currently active case in which I think we have a mediation coming up in August.

Q And where is that case?

A I believe that's in front of Judge Wolf.

Q In the District of Massachusetts?

A Right.

These cases are typically tied based upon the home location of the corporate headquarters of these entities.

Q And is your system the lead plaintiff in this matter?

A Yes.

Q Now, in addition to your experience as executive director in class actions, have you had professional experience as a practitioner?

A I was a practicing attorney in an office in Malvern, Arkansas for over 20 years, yes.

Page 35

Hopkins

Q And could you just briefly describe your experience in class action matters?

A Well, for whatever reason, in our area of Arkansas, there were a lot of class actions filed, and the outside firms and firms that weren't really familiar with the judges would often, you know, come and hire local attorneys to be just that, local attorneys, to sort of -- if something had to be -- back in the day, before electronic filing, which is a fairly new advent, there would be documents delivered, had to be made sure filed in court on a certain day, that kind of thing, and just what I'll call -- more of an administrative attorney than, you know, the guts and doing all the research.

It wasn't uncommon that I would be hired as an attorney to work in those cases.

Examples of those cases was a case -- and I don't remember the name of it -- concerning animal -- animal vitamins, and overcharges on that. I was -- I represented, as local counsel, the Bridgestone Tire in the Bronco rollover that had an issue filed there

Page 36

Hopkins

about, you know, the cost of people having to wait to get their cars fixed and that kind of thing, but over time I was probably involved in four or five class action lawsuits, and actually I represented some attorneys who got in a fee dispute over a class action lawsuit over these check cashing places.

Q Do you think that your experience professionally as a legal practitioner has been an advantage to you in your current role?

A I will say this: Yes, absolutely.

Q How so?

A Well, first of all, I sort of saw how these cases were, you know, brought from the ground up, all the interactions of the attorneys, you know -- and having been in court -- you know, I tried capital murder cases; whatever you name, I tried. I tried jury trials, I did a little bit of everything, and doing all those cases, and especially the securities cases, you sort of see what's puffery, what's real, what's not real, what

Page 37

Hopkins

attorneys are ready to go to trial, what attorneys are desperate to settle because they could never go to trial because they'd never be ready. To an extent, doing what I did, you can separate the wheat from the chaff.

Q Thank you.

Let's talk about the State Street case.

A Okay.

Q And tell us, Mr. Hopkins, how you first got involved in this matter.

A Well, just like I got up about 5 o'clock this morning, and I started looking at all the financial markets and news, and somewhere in -- you could probably look about the time, and I don't know exactly what time that was where the State of California's qui tam cases against State Street were unsealed about the State of California planning to file a lawsuit, or had a lawsuit filed claiming that State Street had -- that State Street, you know, had overcharged California pension plans on FX charges.

I noted that lawsuit, and got a

Hopkins

little curious, but I thought -- you know, I'm not saying anything against California people, but sometimes they think about things differently than some of the rest of us do, so I didn't get two excited.

Then it wasn't long thereafter I saw that the State of Washington had settled a multi-million dollar claim with State Street over FX charges.

And, you know, once may be an anomaly. When you have two, I started looking.

So I had -- we had entered into a custodial -- State Street's been our custodial bank a long time. But remember that seven-year rule? Right at the time I got there, they had already done an RFP, so State Street, right -- you know, probably in early 2009, that contract with State Street was started for another seven-year run, and I was just doing good trying to find where all the bathrooms were and trying to deal with all the issues I had just to learn about a system that had all those bells and whistles on it, and focus on a custodial contract really wasn't my focus. So I really

Hopkins

hadn't -- I read over it, but I really didn't even know what some of the things they did for us were at the time when I first got started.

But I pulled the contract back out and read it with great interest, especially in the FX area, and then I started asking, you know, staff that had been there for a while, "What do we do on FX," and they really didn't know either. Because we really don't trade -- Arkansas Teacher Retirement, we do not have a trading desk, we do not trade stocks or bonds. We have outside managers do that, we do not do it internally. So we really don't focus on that. We hire good managers we expect to focus on it. But my focus was there, and so reading that contract, it seemed to me that I didn't see where they could charge us for FX, except in certain very limited positions.

So I -- as I had done a few times before, I started contacting the outside attorneys to say, "Do you know anything about these cases? Do you know anything about FX?"

And I really don't call Nix Patterson because they're a Texas law firm and

Hopkins

they do what they do. I did not call Kaplan Fox, because they're smaller, and I knew that would not be an area that they would have focused on. But I talked to Bernstein Litowitz and I talked to Labaton, and Labaton quickly said, "Hey, if you think there's an issue there, we'll look at it."

So I said -- so I sent them our contract. And by then I'd also tried -- I had gotten from some of our managers what I call the trading sheets, you know, for the repatriation of FX, because -- and I sent that to Labaton, and very quickly learned that Labaton had hired an outside group that had -- they had concerns about whether we were -- whether what we were being charged was proper.

Q In addition to Labaton, did you consult with any economic consulting firms, non-lawyers?

A Not at -- not at -- well, I probably...

With our general financial consultant, which at the time was Ennis Kannup, that is now Aon Hewitt, our contact there, PJ



Page 42

Page 44

Page 43

Page 45

Hopkins

with State Street through their index fund process, securities lending programs, a lot of --

JUDGE ROSEN: So is State Street still your custodial bank?

THE WITNESS: State Street is our custodial bank.

Q So what did FX Transparencies and Labaton, and I guess your consulting firm, even though they cautioned against it, what did they tell you was going on, or what did you come to learn was happening with State Street foreign exchanges?

A That -- you know, that -- that often our trades were never -- you know, you would think on average, if you're sitting there flipping a quarter, on average you're going to get about half heads, half tails; you know, sometimes you have a bad trade, sometimes you have a good. We were always on the wrong side, and sometimes we were outside what's called the range of the day on trades. Meaning that if you have -- and FX is different from stock, but I'll give a stock example.

Page 62

Hopkins

our custodial bank, so I went back and got authorized from them to file this lawsuit.

Q And tell us about the filing of the lawsuit, what your participation was in it.

A Well, I had already learned a lot about what was happening, but I've always been a curious person, and I've -- if I have a responsibility, I like to take it, so we -- I started looking at drafts of the complaint, and, you know, saying "What about this? What about that?"

So I won't say I helped draft the complaint. I helped -- what would you say -- tweak it occasionally.

And then, after the complaint was filed, of course there was a motion to dismiss filed by State Street, and then there was a response to the motion to dismiss.

I went to the -- I felt like -- I wanted to see how State Street treated this in court, and so I went to the motion to dismiss hearing and listened to all the arguments.

Judge Wolf at the conclusion of it essentially indicated he was going to let it

Page 63

Hopkins

go forward, but then he asked the parties to come back into his chamber area. And at that point Judge Wolf suggested that, you know, this might be a good case to settle early, and wanted to know if I was willing to settle with State Street. I said "Sure, I am."

Of course, you know -- I didn't even ask Labaton. Of course, by then I know they had already spent a lot of money and time and effort trying to put together this case, and had already started putting together information from us, had already hired experts, but at that -- you know what, that's what they sign on for when they sign on with us; sometimes they may spend a lot of money -- we don't -- we don't pay it, so we sit down, and I told them I wanted -- I didn't even ask them, I just said I wanted to try to settle with State Street. And so I think the judge gave us two or three months to come back and report whether we had had any success.

We -- the State Street, by the time we had that meeting, just really didn't show much indication they wanted to settle

Page 64

Page 65

Hopkins

were our custodial bank, we still had to have lines of communication, I didn't want to be going through a law firm, so we had a very informal discovery process. And we continued telling Judge Wolf that -- you know, that we continued trying to find middle ground.

We did informal discovery, very massive discovery, but not more of that in-your-face kind of stuff that Judge Rosen as a judge had to mediate that -- you know, the people acting like third graders, you know, fighting over a toy.

And it was done very professionally on both sides, but very aggressively, and we continued going to mediation.

I don't know how many mediations I went to, but I'd say it was at least half a dozen; some here, some in Boston. I didn't suggest one in Little Rock -- they probably wouldn't have come anyway.

But I continued to read things, and since I -- and honestly, you know, there were arguments they were making about whether

Page 66

Hopkins
they were fiduciaries, you know.
And, of course, even Judge Wolf at one of those hearings said, "Well, why -- if you have all these problems with them, why are they still your custodial bank?" And the fair answer to that on the record is, "You know, after seeing -- after talking to my financial consultants and reading all I had, you know, I think all these banks, all this is a money center that nobody's paying attention to, it's sort of gouged, and State Street was probably not as bad, you know, as some of the rest of them."
I mean, it's just a question of -- they had all -- they had all acted inappropriately, in my mind, but during this process I realized that there's probably a culture at State Street that probably internally frowned on this once it was uncovered. And I like State Street, you know.
Mr. Carp, that I ended up having a lot of one-on-one dealings with --
JUDGE ROSEN: Was he the one you had the first meeting with?

Page 67

Hopkins
THE WITNESS: No. No, he was not.
For whatever reason, I don't think that guy showed up after that first mediation.
A But Mr. Carp was an internal attorney, and he and I actually started having discussions, at my request, at these mediations.
Q And that's Jeffrey Karp, K-a-r-p?
MS. LUKEY: C-a-r-p.
A [redacted]
He was a good man, and I got the clear idea that they wanted to do right by us, and those others, and at the same time they weren't going to pay us a penny more than what they thought they had to.
Q But you felt like you and

Page 68

Hopkins
Mr. Carp had a rapport?
A We did.
JUDGE ROSEN: Could I ask, there had been a previous settlement with Washington State. Did that provide any kind of a template or model for the parties to work off of in settling this case?
THE WITNESS: Not at all. And I'll tell you why. First of all, it was a one-off settlement. And apparently -- ultimately, Mr. Paine, he wasn't -- he was at, I think, all of them -- he became lead later.
I'm trying to think of the older attorney who's the scholar.
Q Mr. Rudman?
A Mr. Rudman.
I could tell I was outclassed when I said two sentences of a Rudyard Kipling quote and then he went off for five minutes finishing the whole rest of the chapter without looking down.
JUDGE ROSEN: Gunga Din.

Page 69

[redacted]

Page 82

Page 84

21

Page 83

Page 85

Hopkins

So class certification's always an issue, especially in a diverse area where you have so many different entities with different contracts and different circumstances.

JUDGE ROSEN: Okay.

BY MR. SINNOTT:

Q Mr. Hopkins, you were a class representative in this case. And you had been a class representative previously?

A Yes. Not in an FX case, but in all these other securities cases.

Q What were your duties as a class representative in the State Street case?

A My duties were you to, first of all, to oversee the litigation, to oversee the attorneys, to ensure that all our attorneys were appropriately taking all action necessary, to be prepared in the mediations, to be prepared to do all the discovery, to respond to all the motions, and to comply with all the judge's orders. And ultimately my duty is to ensure that the class got as good an outcome as they could under the circumstances presented to us.



Page 98

[redacted]

Page 100

Hopkins

JUDGE ROSEN: From your comments in court the very first day of my appointment, it sounded like you were pleased with Labaton's representation of the Arkansas Teachers?

THE WITNESS: I don't think another law firm could have gotten the outcome they did.

I'll attribute it to a lot of hard work, being experienced, clever, maybe even a little lucky at times. Luck always comes in these cases a little bit.

JUDGE ROSEN: The harder you work, the luckier you get.

THE WITNESS: You know, they -- and Lawrence -- I call him Larry -- you know, an old dog fought a good -- led a team in a great way. I think he had a vision of how this thing was going to go from day one, and pulled it off, and my hat's off to him.

JUDGE ROSEN: And what about

Page 99

[redacted]

Page 101

[redacted]

Page 102

Hopkins

Fierce, but also timely.

JUDGE ROSEN: And speaking of work and hours spent, are you able to estimate how much time you put into it personally?

THE WITNESS: A lot.

You know, when -- when I -- when they asked me to prepare the documents for the service fee, I tried to be conservative. In terms of the -- I'm trying to think in terms of the hours.

I'd have to say, when you really got down to it, and sometimes the calls at night and meetings, and the mediations, and not necessarily including just think time, but several hundred hours.

JUDGE ROSEN: Just guessing, on these calls my guess is most of them were not short, brief calls?

THE WITNESS: I can't be short, if you've already figured that out, Your Honor. My attorney --

Page 103

[redacted]

Page 104

Hopkins

Q And you felt that was fair and reasonable?

A Right.

Let me go back to service fee for one second.

I wasn't the only one at ATRS who was involved in this case. We hired a temporary person, who sat there for several months in front of a scanner, scanning in all these documents. Also had other -- you know, we had IT staff preparing all the electronic things, and I have people I regularly involve, like Rod Graves, who helps me think through and talk about this and review documents.

So when the service fee -- by the way, that service fee was not a George Hopkins service fee, I did not get a penny of that. It all -- that $25,000 went into our trust fund to pay member benefits.

JUDGE ROSEN: How did you find out that there was the possibility of a service fee, that that was going to be proposed to Judge Wolf?

THE WITNESS: Well, you know,

Page 105

[redacted]