# EX. 10

1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Case No. 11-cv-10230 MLW
- - - - - - - - - - - - - - - - - - - -x
ARKANSAS TEACHER RETIREMENT SYSTEM,
et al.,

                        Plaintiffs,

          -against-

STATE STREET BANK AND TRUST COMPANY,

                        Defendant.

- - - - - - - - - - - - - - - - - - - -x

JAMS
Reference No. 1345000011
- - - - - - - - - - - - - - - - - - - -x

In Re:  STATE STREET ATTORNEYS' FEES

- - - - - - - - - - - - - - - - - - - -x

                    June 16, 2017
                    8:14 a.m.


B e f o r e :

          SPECIAL MASTER HON. GERALD ROSEN
          United States District Court, Retired

          Deposition of DANIEL P. CHIPLOCK, taken
by Counsel to the Special Master, held at the
offices of JAMS, 620 Eighth Avenue, New York,
New York, before Helen Mitchell, a Registered
Professional Reporter and Notary Public.



**6**

**8**

**7**

**9**

```
 1                 Chiplock
 2      reliability of the representations made
 3      in the November 10th, 2016 letter from
 4      David Goldsmith, Esq. of Labaton
 5      Sucharow to the court;
 6           "(c) the accuracy and
 7      reliability of the representations made
 8      by the parties requesting service
 9      awards;
10           "(d) the reasonableness of the
11      amounts of attorneys' fees, expenses
12      and service awards previously ordered,
13      and whether any or all of them should
14      be reduced;
15           "(e) whether any misconduct
16      occurred in connection with such
17      awards; and, if so,
18           "(f) whether it should be
19      sanctioned."
20           So that's why we're here today.
21      EXAMINATION
22      BY MR. SINNOTT:
23      Q      Dan, this will be a follow-up,
24      and seem very similar to the conversation that
25      we had approximately two months ago, but we are
```

**3 (Pages 6 to 9)**

10

```
 1              Chiplock
 2  charged with providing record evidence, and
 3  that's why we have a court reporter here, and,
 4  hence, the formalities as well.
 5       A    Understood.
 6       Q    So good morning, Dan.
 7            Could you tell us a little bit
 8  about your background, beginning with your
 9  education.
10       A    Sure.  My undergraduate
11  education was at Columbia University.  I
12  received my BA in anthropology in 1994.  I then
13  attended Stanford Law School, where I graduated
14  in 2000, and then I commenced work at Lieff
15  Cabraser in September of 2000, and have been at
16  the firm ever since.
17       Q    So your entire legal career,
18  practicing legal career, has been with Lieff?
19       A    That's correct.
20       Q    When did you become a partner
21  at Lieff?
22       A    I became what's known as a
23  non-equity or a junior partner in or about 2006,
24  and I became a full partner in or about 2012.
25       Q    And could you tell us, in very
```

11

```
 1              Chiplock
 2  brief terms, the course of your practice at
 3  Lieff Cabraser, what types of practice areas you
 4  are involved in?
 5       A    As far as practice areas go, I
 6  have predominantly worked in the securities and
 7  financial fraud practice area at the firm.  I've
 8  also done cases in the consumer practice area
 9  during my career at the firm.  I've also worked
10  on some mass torts cases during my career at the
11  firm.
12            Most of those cases have been
13  class cases.  However, I have worked on several
14  individual cases where the plaintiff was an
15  individual or collection of individuals.
16       Q    With respect to your experience
17  in recent years, have you had any experience in
18  foreign exchange cases?
19       A    A lot.  I would say since 2012
20  or 2011 the foreign exchange cases have been my
21  primary focus at the firm.
22       Q    Can you tell us the names of
23  the cases that you've worked on involving
24  foreign exchange?
25       A    There were essentially two
```

12

```
 1              Chiplock
 2  class cases.  The case that took the most amount
 3  of my time was the case we brought against the
 4  Bank of New York Mellon, which resolved in
 5  2015 -- yes, 2015 -- and then the case against
 6  State Street, which resolved in 2016.
 7       Q    You mentioned a moment ago,
 8  Dan, that you'd worked in mass torts --
 9       A    Um-hum.
10       Q    -- and personal injury and
11  consumer matters, I believe you said.  Could you
12  describe very briefly the types of mass tort and
13  consumer and PI cases that you've worked?
14       A    Yes.
15            As far as mass torts and PI
16  cases go, early on in my career -- or I should
17  say earlier in my career, I worked on several
18  cases where we represented individuals who had
19  been injured as a result of the fen-phen diet
20  drug combination.  I also had a number of
21  clients, individual clients, who were injured as
22  a result of taking the prescription painkiller
23  Vioxx.  I also worked on several cases involving
24  Baycol, which was a cholesterol lowering drug.
25            Those are the personal injury
```

13

```
 1              Chiplock
 2  cases that I remember off the top of my head.
 3            On a pro bono basis, I also
 4  represented two individuals who suffered injury
 5  on September 11th, 2001 at Ground Zero as part
 6  of the 9/11 Victims Compensation Fund cases.
 7            And then in the consumer field
 8  I worked early on in my career in a case
 9  involving Fleet Bank credit cards, and it had to
10  do with credit card overcharging.
11            I also, to a certain degree,
12  considered both the Bank of New York Mellon and
13  State Street cases to be consumer cases.  There
14  was some overlap in practice areas between the
15  consumer field and the financial fraud field
16  when it came to those two cases in particular.
17       Q    Thank you.
18            From an overview perspective,
19  could you tell us your role in the State Street
20  litigation, and what your duties were, in
21  general terms, in this case?
22       A    As far as State Street is
23  concerned, I would say I was basically the
24  partner in charge of the case as far as Lieff
25  Cabraser was concerned, as far as our
```

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

**14**

Chiplock
1    involvement was concerned.  So I attended all
2    the mediation sessions, I was involved in
3    crafting the allegations that were included in
4    both the first complaint we filed and in the
5    amended complaint that we filed.
6         (Mr. Toothman enters the room.)
7         A    I was heavily involved in
8    briefing on the motion to dismiss in that case.
9    I attended argument on the motion to dismiss, I
10   sat next to Mr. Goldsmith.
11        I attended all hearings in the
12   case.  There weren't that many, but I attended
13   the preliminary approval and final approval
14   hearings in the case.
15        I oversaw the general
16   litigation effort at the firm in that case,
17   which included coordinating with Kirti and the
18   document reviewers in the case.  So I
19   coordinated with Kirti and the document
20   reviewers in our case to handle all document
21   review assignments that were allocated to our
22   firm.  I also coordinated with my corollaries at
23   the other firms on the case, so at Labaton that
24   would have been principally David Goldsmith and

**15**

Chiplock
1    Mike Rogers, and at Thornton that would have
2    been principally Mike Lesser, and also Evan
3    Hoffman to a certain extent.
4         Q    So it would be fair to say you
5    had a significant role in this case both on
6    behalf of your firm, but also in partnership
7    with the other firms?
8         A    Yes.
9         Q    As part of your involvement in
10   the motion to dismiss briefing that you've
11   described in your coordination with the
12   attorneys at the other firms, did you develop a
13   theory of damages in this case, or did you
14   contribute to that development of theory, and
15   could you tell us about that?
16        A    My principal contribution was
17   developing the Chapter 93A theory, which it came
18   to us early on in the case, and I remembered it
19   because I spent my 2L summer working for a solo
20   practitioner in Somerville, Massachusetts, who
21   did employment cases and civil rights cases, and
22   in the course of my work there for him I did a
23   lot of legal research, and I came across the
24   statute, the Massachusetts Consumer Protection

**16**

Chiplock
1    Statute, and I remember being impressed at the
2    time that it was a very powerful -- it seemed to
3    be a very powerful statute for consumers,
4    somewhat unique under Massachusetts law.  And I
5    kind of filed it away.  And so when we were
6    looking at possible claims we could bring
7    against custody banks like Bank of New York
8    Mellon or State Street, one of the theories we
9    hit on was consumer protection.
10        In the Bank of New York case it
11   was a little bit complicated because there were
12   two banks and they came from different parts of
13   the country, one in Pennsylvania, one in New
14   York.
15        In State Street it was made a
16   little bit more simple because you had a
17   Massachusetts-based bank.  And I remember at
18   some point it dawned on me there was this
19   statute I remembered from my prior work as a 2L,
20   and I looked into it.  And the more I looked at
21   it, the more promising it looked as a possible
22   class-wide remedy.
23        Q    When did you first consider 93A
24   as being a potential avenue to pursue in this

**17**

Chiplock
1    case?
2         A    I think it would be late 2010
3    or early 2011.  So we filed the first complaint
4    in February of 2011, and I think I probably
5    would have hit upon the idea probably in late
6    2010.  And I remember evangelizing the concept.
7    And that -- that was true throughout the case,
8    too, that I was a constant advocate for that
9    claim in particular as being solid for a number
10   of reasons, both because it -- it was a great
11   avenue, a great vehicle for obtaining relief,
12   and it also seemed to present a very promising
13   vehicle for class certification.
14        Q    And what was it about 93A that
15   made it a great vehicle for relief?
16        A    Well, even the case law and
17   commentary in Massachusetts describes Chapter
18   93A as sui generis, it sort of stands on its
19   own, it's neither contract nor tort theory, it's
20   basically an all-encompassing theory that's
21   meant to address unfair or deceptive conduct,
22   and it applies not only to individual consumers,
23   but it can also apply to businesses who are
24   victimized, for lack of a better word, by that

**18**

Chiplock
2  type of conduct in their inter-business
3  dealings.  It offers double or treble damages if
4  the conduct is found to be willful or
5  intentional, and it also allows for prejudgment
6  interest, which I forget the exact number, but I
7  think it's fairly generous.  So it's a powerful
8  statute.
9        Q     In applying this statute, had
10  you had the opportunity to conduct a factual
11  review of some kind of records relative to State
12  Street Bank?
13        A     Well, we didn't have much by
14  way of anything in terms of internal
15  documentation at State Street.  What we did have
16  were the whistleblowers' allegations as to what
17  State Street had done.
18             There had been whistleblower
19  cases filed in California -- and elsewhere, but
20  the one in California was the one that was
21  unsealed and made public in October of 2009.  So
22  we had that, and we also had our own analyses,
23  which we had done by basically looking at the
24  mid-rate of foreign exchange trades for
25  particular clients over the course of years --

**19**

Chiplock
2  well, looking at the actual trading prices for
3  an individual client's trades, and then
4  comparing them to the mid-rate on
5  contemporaneous days, and looking at patterns.
6             And we were able to discern a
7  pattern in pretty much every case we looked at
8  that showed that prices tended to veer towards
9  the extremities of the range of the day, and
10  that they almost always worked against the
11  interest of the client.  So the client would
12  find themselves paying more on an everyday basis
13  for their foreign exchange trades than they
14  would otherwise had there been no unfair pricing
15  going on.
16        Q     And was that, at its essence,
17  what this case was about, the range of time
18  manipulation by State Street?
19        A     Yeah, essentially what the case
20  was about, we alleged that the bank consistently
21  overcharged for foreign exchange trades that
22  were done for its customers on an indirect
23  basis, or a custody basis as they called it.
24        Q     And we'll get back to that
25  later on, but as part of your overall duties in

**20**

Chiplock
2  the State Street case, did you participate in
3  preparing the fee petition?
4        A     What I participated in was
5  preparing my own fee declaration.  I do recall
6  submitting modest comments to the omnibus
7  declaration that Larry -- that Larry Sucharow
8  submitted.
9             As far as the fee brief goes,
10  and as far as everyone else's individual fee
11  declarations, I don't recall having input.
12             I definitely did not have input
13  into anyone else's individual fee declaration
14  because I didn't see them before they got filed.
15             The fee brief itself, it's
16  possible I might have had comments to that, but
17  I just don't recall.
18        Q     All right, thank you.
19             And also in the realm of
20  filing, of your involvement in this case, as far
21  as your responsibilities, did you participate in
22  the drafting of a letter on November 10th, 2016?
23        A     I did.
24        Q     And what was your role in that?
25        A     I reviewed drafts that were

**21**



Veritext Legal Solutions
212-267-6868         www.veritext.com         516-608-2400

**22**



**24**

1          Chiplock
2   was co-lead counsel for a nationwide class of
3   affected consumers in the Bank of New York
4   Mellon litigation.
5          We began by filing a class case
6   in California in federal court, in the Northern
7   District of California, before Judge Alsup.
8   That was a case that was brought on behalf of
9   pension funds that were unlawfully overcharged,
10  in our view, on their foreign exchange
11  transactions by the Bank of New York Mellon.
12         Another firm, called Kessler
13  Topaz, filed a similar nationwide class case in
14  the Eastern District of Pennsylvania.
15         These cases were both filed in
16  2011.
17         In addition to that, and
18  subsequent to both of those filings, the United
19  States District -- the United States Attorney
20  for the Southern District of New York filed a
21  case in late 2011 against the Bank of New York,
22  and they filed their case in the Southern
23  District of New York.
24         The New York Attorney General
25  filed a case either that same day or the day

**23**

1          Chiplock
2     Q     Did Mr. Lieff have any prior
3   history or contacts that Thornton found
4   valuable, based on your understanding of the
5   case?
6     A     I think so.  I think Bob had a
7   good relationship with the then attorney general
8   of California, and/or his staff.
9     Q     Would that be Jerry Brown?
10    A     Yes.
11    Q     What were the allegations in
12  the California case with respect to State
13  Street?
14    A     They were essentially similar
15  to what we alleged in the class case ultimately.
16         The California litigation
17  alleged that State Street had unlawfully
18  overcharged on foreign exchange transactions
19  that were done on a custody or indirect basis
20  for certain California funds.
21    Q     All right, thank you.
22         Now, let me move you forward to
23  the BoNY Mellon case and ask you what role Lieff
24  played in that particular litigation.
25    A     So ultimately Lieff Cabraser

**25**

1          Chiplock
2   before, also in the fall of 2011, against the
3   Bank of New York.  So there were a number of
4   cases on file.
5          The Bank of New York filed
6   what's known as a multi-district litigation
7   petition which sought to centralize all the
8   cases in the Southern District of New York.
9   That petition was granted in 2012, whereupon all
10  the cases were centralized in front of Judge
11  Kaplan in that district, and as part of that
12  centralization, Lieff Cabraser was appointed two
13  things:  We were appointed co-lead counsel for
14  the affected nationwide class of consumers, or
15  custodial customers of the bank; we also were
16  named to the executive committee overseeing the
17  entire litigation effort on behalf of plaintiffs
18  in that case.  And there were three firms on
19  that executive committee; Lieff Cabraser was
20  one, Kessler Topaz was another, and the firm of
21  Bernstein Litowitz Berger & Grossman was the
22  third.  They were the lead counsel in a
23  securities fraud lawsuit that had been brought
24  against Bank of New York.
25         So it was quite a massive

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

26

```
 1              Chiplock
 2   undertaking, and we were at the center of it
 3   all.
 4       Q       Describe the basic allegations
 5   against BoNY Mellon.
 6       A       The central allegations there
 7   were very similar to the allegations in the
 8   State Street case.  What we alleged was that the
 9   Bank of New York Mellon had consistently
10   overcharged its custody customers for foreign
11   exchange trades that they did on a standing
12   instructions basis, which, in State Street
13   lingo, would have been known as indirect FX or
14   custody FX.
15       Q       Were there any significant
16   differences between the --
17              MR. SINNOTT:  Strike that.
18       Q       With respect to the BoNY Mellon
19   case, you would agree that there were some
20   significant similarities with the State Street
21   case that we're here on today; correct?
22       A       Very much so.  What you had
23   were two custody banks who were essentially
24   accused of doing the same thing, which was to
25   basically price gouge their customers when doing
```

27

```
 1              Chiplock
 2   what they were referring to as sort of a
 3   courtesy service.  And in the process of
 4   assuring customers that they would be providing
 5   best execution, or using prices that were
 6   competitive, or based on interbank market prices
 7   at the time of the trade, instead of doing any
 8   of those things, they were basically charging as
 9   much as they thought they could get away with,
10   essentially.
11       Q       Would it be fair to say, Dan,
12   that Lieff's experience in the California
13   action, and especially in the Mellon action,
14   allowed it to develop a baseline of familiarity
15   and expertise that it brought to the State
16   Street case?
17       A       Absolutely.
18       Q       Were there any significant
19   differences between either or both of those
20   prior cases and the Massachusetts case?
21       A       When you say, "either or both
22   of the prior cases," you mean the California
23   State Street case and the Bank of New York
24   Mellon case?
25       Q       Yes.
```

28



29

```
 1              Chiplock
 2   Lieff Cabraser clients -- clients of ours and
 3   clients of our co-counsel's.
 4       Q       Were there retainer agreements
 5   with these clients and class representatives?
 6       A       Yes, there were retainer
 7   agreements.  Lieff Cabraser had individual
 8   retainer agreements with the Ohio funds.  With
 9   the Local 138 Fund, I believe the individual
10   retainer agreement would have been with one of
11   our co-counsel, Hach Rose Schirripa & Cheverie.
12       Q       Did those agreements address
13   attorneys' fees awarded if litigation was
14   successful?
15       A       With respect to the Ohio
16   agreement, I'm trying to remember if there was
17   an actual cap put on it, or if it basically
18   said, you know, we apply to the court and it
19   would be up to the court's discretion, with the
20   advice and input of the client.  I just don't
21   remember.
22       Q       Okay.  Thanks, Dan.
23              Now, the Mellon case involved
24   pretty intense discovery; is that a fair
25   statement?
```

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

30

```
1              Chiplock
2      A    It certainly did.
3      Q    Could you describe that for us?
4      A    The total number of depositions
5  that were taken in that case, I think at the end
6  of the day, were in excess of 120.  There were
7  something north of 20 million pages of documents
8  produced and reviewed in that case.
9          The bank itself actually
10 took -- noticed and/or took more than 60
11 depositions of -- many of them being of third
12 parties, but also a large number of them,
13 frankly, being of our clients and our clients'
14 associates.  It was a very, very hard-fought
15 litigation.
16     Q    And you described the document
17 review.  Can you tell us how that document
18 review compared in complexity or scope with the
19 document review in the instant case, the State
20 Street case?
21     A    I would say that the State
22 Street document review tracked very closely our
23 experience in the Bank of New York Mellon case
24 up until the point that the State Street case --
25 that the efforts in the State Street case ended
```

31

```
1              Chiplock
2  because we had reached an agreement in
3  principle.
4          So, in other words, in the Bank
5  of New York Mellon case, like the State Street
6  case, we started out by doing document-by-
7  document review, with experienced staff
8  attorneys looking for documents that will help
9  us to build our case, and also looking along the
10 way for any documents that we think State Street
11 might point to as supportive of its defense.
12         That was very similar to what
13 we did in the Bank of New York Mellon case, up
14 until the point where we dove into depositions.
15 Then once we dove into depositions in the Bank
16 of New York Mellon case, the effort got --
17 entered, I would say, a separate stage, which
18 was, I would say, preparation of the witness
19 kits for witnesses that were being deposed or
20 defended in that case.
21     Q    Are you able to say whether
22 that preparation for depositions that staff
23 attorneys were involved in in the Mellon case
24 was substantively different from the work that
25 they did in the non-depo preparation, the other
```

32

```
1              Chiplock
2  things that you've described?
3      A    Well, it was only different to
4  the extent that in the Bank of New York Mellon
5  case they were obviously focused on individuals,
6  and so when they were preparing a witness kit,
7  they're looking specifically for compelling or
8  helpful documents that that witness might
9  actually know about, so they would be e-mails
10 that the witness was copied on or documents that
11 that specific witness may have drafted.
12         In the State Street case, we
13 never got to the deposition phase, but what we
14 did do was to have the staff attorneys prepare
15 very detailed memoranda on issues, issues that
16 we would wish to explore in depositions once
17 witnesses were identified, and we also wanted
18 them to help us really home in on areas of
19 follow-up discovery and document discovery, if
20 the mediation were to end without a resolution,
21 and we were put into a posture where we had to
22 very quickly get the case ready so that we could
23 move to that next stage, which was depositions
24     Q    All right.  Thank you, Dan.
25         What was Lieff's involvement in
```

33

```
1              Chiplock
```



---

**34**

Chiplock

1
2      A      I would say that we did.  There
3   was no actual case as far as I understand it.
4   What I understand happened -- and Richard and
5   Kirti would be the primary authorities on this,
6   but what I understand happened is ████████
7   ██  ████ essentially reached a pre-filing
8   resolution with State Street and obtained what I
9   believe may have been a hundred percent of its
10  alleged losses as a result of the conduct that
11  we outlined for them.
12     Q      So would you agree that that
13  was a useful and valuable experience for the
14  firm?
15     A      Yes.
16     Q      Previously you referred to the
17  Mellon case and at some point Lieff being
18  appointed as co-lead counsel; is that correct?
19     A      Yes.
20     Q      Did that change Lieff's role in
21  the case, or the nature of its involvement in
22  the Mellon case?
23     A      I think it did, because when we
24  started out in the California litigation we were
25  one of three firms, we were all growing equally,

---

**35**

Chiplock

1
2   as it were, in the California litigation, so our
3   co-counsel were the Thornton Law Firm out of
4   Massachusetts, and also Hausfeld LLP;
5   predominantly they're lawyers based in San
6   Francisco.  So that was then.  That was in 2011
7   and early 2012.
8           Once the cases got centralized
9   in the Southern District of New York, Lieff
10  Cabraser, I guess, sort of emerged, along with
11  Kessler Topaz, who had brought the case in the
12  Eastern District of Pennsylvania, as one of two
13  law firms that was appointed to be co-lead for
14  all affected consumers.  And the Thornton Law
15  Firm and Hausfeld LLP continued to work on the
16  case, but my firm took on an additional
17  leadership role overseeing all of the cases, and
18  with that came more responsibility and more
19  authority.
20     Q      And who was Lieff's primary or
21  point person in that lead counsel role?
22     A      I was.
23          I was the principal day-to-day
24  point person on the case.  Elizabeth Cabraser
25  was the individual who was appointed to the

---

**36**

Chiplock

1
2   executive committee that oversaw the MDL.
3           So if you were to read the
4   executive committee appointment order, it would
5   name Elizabeth Cabraser of my firm, it would
6   name Joseph Meltzer of Kessler Topaz, and it
7   would name Steven Singer, who was then at
8   Bernstein Litowitz Berger & Grossman, as the
9   three-member executive committee, but
10  essentially what that meant was that the three
11  firms were overseeing the case, and so
12  functionally what that meant was I was the point
13  person in the Bank of New York Mellon case.
14     Q      And as point person, Dan, what
15  were your primary duties?
16     A      I would say everything that I
17  said with respect to State Street earlier.  So I
18  was principally responsible for coordinating our
19  efforts with co-counsel.  I also, unlike in
20  State Street, had a tremendous amount of contact
21  and communication with the U.S. attorneys who
22  worked on that case and who were very actively
23  litigating against the Bank of New York Mellon,
24  and we worked in pretty close partnership with
25  them, frankly, throughout that litigation.

---

**37**

Chiplock

1
2   So I had very active day-to-day
3   communications with all the attorneys in the
4   case, and the government attorneys, attending
5   all depositions, taking or defending many of
6   them, and working closely with our staff
7   attorneys and our -- the other attorneys doing
8   document review, to help develop the case and
9   theories that would push us forward.
10     Q      Did you also have
11  responsibilities ultimately with respect to a
12  fee petition or petitions?
13     A      Yes.
14     Q      If you could describe what
15  those were in the Mellon case.
16     A      So my principal cohort at
17  Kessler Topaz and I were primarily responsible
18  for drafting the fee petition in the Bank of New
19  York Mellon case.  I also had help, substantial
20  help, from attorneys in my office in drafting
21  those papers, as did my colleague at Kessler
22  Topaz, I'm sure.  But as co-lead counsel, we
23  were responsible for basically putting that
24  package together, and in collecting individual
25  fee declarations from our various colleagues in

---

Veritext Legal Solutions

212-267-6868            www.veritext.com            516-608-2400

38

1                    Chiplock
2    that case.
3        Q       And in collecting those
4    individual fee declarations, did you compare
5    them?
6        A       We looked at them closely, yes,
7    we did.
8        Q       What were you looking for as
9    you looked at them closely?
10       A       We were looking to make sure
11   that, to the best of our ability, that time that
12   related to things like the actual fee petition
13   were not included.  We also, I believe, asked
14   everyone to exclude timekeepers who had put in
15   less than ten hours on the case, I think.  I
16   think that was the cutoff that we used.
17              We also, in that case, asked
18   everyone to divide up their time into
19   categories.  I think we had ten categories of
20   time in that case, whether it be different types
21   of discovery or attendance at hearings, or
22   communications with colleagues and general
23   strategy time.  We broke out that time into
24   categories so that the judge could get a good
25   idea of what we had spent five years -- or

39

1                    Chiplock
2    whatever -- four years doing, and making sure
3    that nothing looked too out of kilter.
4        Q       In that case, Dan, was there
5    any sharing of document reviewers?
6        A       Not that I recall.
7        Q       As part of your role in
8    comparing the fee petitions, did you try to look
9    for duplication of hours?
10       A       Well, I certainly looked to
11   make sure that no hours were being duplicated on
12   our side, on the Lieff Cabraser side.
13              I think -- I'm not sure how
14   we -- since no individuals were crossed between
15   firms, or overlapped between firms, that wasn't
16   an issue in the Bank of New York Mellon case.
17   We did not share staff in the Bank of New York
18   Mellon case the way we did in State Street, so
19   that was not an issue.
20       Q       Would you agree that it's
21   reasonable to expect lead counsel in a matter to
22   ensure accuracy of fee petitions?
23       A       Yes.
24       Q       And this is more of a long-term
25   strategic question, but should lead counsel also

40

1                    Chiplock
2    be responsible in cases such as this for
3    periodically reviewing hours and fees spent by
4    other attorneys -- other firms, as well as its
5    own?
6        A       I would say it's good practice
7    to do so.
8              Often -- I know in the Bank of
9    New York Mellon case, I think it was actually
10   written into the order appointing us as lead
11   counsel that we would periodically do that.
12       Q       Now, Dan, earlier you talked
13   about how Lieff was able to build on its
14   valuable experiences in other cases to include
15   the California case and the Mellon case leading
16   up to the instant case.  How did Lieff avoid
17   duplication of effort on these cases?  Because
18   there was overlap; correct?
19       A       Overlap between the State
20   Street and Bank of New York Mellon cases?
21       Q       Yes.
22       A       How did we avoid duplication in
23   those two cases?
24       Q       Yes.
25       A       I'm not sure I understand how

41

1                    Chiplock
2    there would be duplication.  I think, if
3    anything, the efforts in Bank of New York Mellon
4    in particular very helpfully informed our
5    efforts in State Street, and if anything made
6    our efforts in State Street more efficient as a
7    result.
8        Q       And was there an effort to
9    segregate work that was done on one case from
10   being included in the billing of another case?
11       A       We did not include any effort
12   spent on the Bank of New York Mellon case in the
13   State Street fee application.
14       Q       And the same could be said for
15   work done on other cases as well?
16       A       Yes, that would be true.
17              I mean, I will say in very
18   early days, let's say in 2008 or 2009, we may
19   have looked at the behavior of custody banks
20   overall, and there may have been work that could
21   equally have applied to State Street versus Bank
22   of New York Mellon, because we were looking at
23   whether this was an industry-wide practice.  So
24   in early days, like 2008 or 2009, it's possible
25   that there was time that we devoted that would

42

Chiplock
1
2  have been helpful to either case, because we
3  were still developing this theory about -- about
4  the industry and what we suspected was a
5  practice that was common to participants in that
6  industry.
7       Q     Would that include expert
8  review of foreign exchanges and --
9       A     I believe we worked with
10  outside consultants, yes.
11      Q     And how would you determine to
12  which case such overlapping review or research
13  should be applied?
14      A     Whichever case it seemed more
15  applicable to.  I mean, it's -- I mean, I will
16  say this, we did not include the same time in
17  two different cases.  So the decision -- if we
18  were to look back to 2008, into really early
19  days, that time would be either allocated to one
20  case or the other; it wouldn't fall into more
21  than one bucket.
22           And so in early days we did
23  work with consultants, who were helping us to
24  look at pricing patterns, and Kirti Dugar
25  himself, at our firm, was able to also do work



43

Chiplock
1
2  on those types of analyses, with the help of
3  data that was supplied or shared with outside
4  consultants.
5           So -- now I'm forgetting what
6  the question was.
7       Q     I think you answered the
8  question.
9       A     All right.
10      Q     Let me follow that up, Dan.
11           Whose responsibility at Lieff
12  was it to ensure that document review or expert
13  work or research was assigned to the appropriate
14  case?
15      A     To State Street or Bank of New
16  York Mellon?
17      Q     Yes.
18      A     To be honest, I'm not sure I
19  understand the question.
20           The document review -- I guess
21  the responsibility for assigning out document
22  review principally was mine, in either case;
23  I'll say that.  But there wouldn't have been
24  overlap in document review in those two cases
25  because they were different cases, and the

44

45

Chiplock
1
2  ensuring that State Street document review
3  versus Bank of New York Mellon document review
4  was done correctly?
5       Q     Yes.
6       A     That would ultimately fall to
7  me.
8       Q     Let me bring you forward, Dan,
9  to Lieff's involvement in the State Street
10  litigation, and ask you how that came about.
11  How did Lieff come to be involved in the other
12  firms?
13      A     In the State Street case?
14      Q     Yes.
15      A     My understanding is that for
16  the class litigation we were associated -- Lieff
17  Cabraser was associated into that case, I would
18  say, in late 2010, after we were advised that
19  Labaton had a client who was interested in
20  proceeding as a proposed class representative in
21  that case.
22      Q     And who was that client?
23      A     The Arkansas Teachers
24  Retirement System.
25      Q     It's fair to say that Lieff did

**46**

1              Chiplock
2    not have a client; correct?
3         A      Not in the State Street class
4    litigation, no.
5         Q      Had you participated in other
6    class actions in which the firm didn't have a
7    client?
8         A      I'm sure my firm has.  I mean,
9    I'm sure my firm has been associated in class
10   litigation where the firm itself did not have
11   the individual client relationship.  I'm sure
12   that's happened.
13        Q      Is it fair to say that clients
14   are pretty valuable in cases such as this?
15        A      Yes.  I don't have a case
16   without a client.  And, also, I would say the
17   firm that has the client relationship usually
18   has --
19              (Brian McTigue joins the
20              conference call)
21              MR. SINNOTT:  Welcome, Brian.
22   We're about an hour into the
23   examination of Dan Chiplock.
24              MR. MCTIGUE:  All right.
25        A      So I think, as I was saying,

**47**

1              Chiplock
2    yeah, the firm that has the client, so to speak,
3    often has, you know, a certain cache, a certain
4    role in the case, that they might not otherwise
5    have.
6         Q      What did Lieff bring to the
7    table -- and I know some of this will be
8    redundant, but if you can tell us at the outset
9    of State Street and this partnership with the
10   other firms, what was Lieff bringing in the
11   absence of having a client?
12        A      I would say two or three
13   things.  We brought class action expertise,
14   which Labaton no doubt had also.  We also
15   brought resources, which Labaton also had.  We
16   also brought a deep institutional knowledge of
17   foreign exchange that we had obtained up to that
18   point by having worked on the whistleblower
19   investigations and in developing a companion
20   case against Bank of New York Mellon.
21              MR. MCTIGUE:  I can't hear
22              Dan's words.  If he could speak closer
23              to the microphone, or more directly
24              into it.
25              MR. SINNOTT:  All right.  If we

**48**

1              Chiplock
2    had a microphone, Brian, we'd
3    accommodate that, but I will move the
4    phone closer to the witness, and I'll
5    ask the witness to keep his voice up.
6    Okay?
7              MR. MCTIGUE:  Thank you.
8              MR. SINNOTT:  Sure.
9         Q      Were there any non-monetary
10   outcomes that Lieff was hoping to derive from
11   the State Street case?
12        A      Non-monetary outcomes?
13              I would say principally the
14   objective was to obtain reform in how custodial
15   banks conducted their business vis-a-vis their
16   customers.  I would say that would be the chief
17   non-monetary outcome that would have been
18   desired as a result of litigation.
19        Q      And earlier you had referred
20   to -- regarding the State Street case, as being
21   a consumer case in some respects.  Would that be
22   consistent with that objective?
23        A      I think of it that way, yes.
24        Q      And what skills or
25   institutional knowledge did Lieff bring to the

**49**

1              Chiplock
2    case that were most important, in your view?
3         A      I may be repeating myself, but
4    I think it would be the skills and knowledge
5    that we had developed over the course of, at
6    that point years, in developing the custodial
7    foreign exchange overpricing theory.
8              We also brought counsel who
9    were very experienced in class action litigation
10   practice.
11              We also brought a diversity of
12   practice areas -- experience in a diversity of
13   practice areas in our firm.  We didn't just do
14   financial fraud cases, we also did consumer
15   cases and other types of cases, and like I said
16   earlier, this case in particular was sort of a
17   hybrid, if you will.  It wasn't -- it wasn't a
18   securities fraud case, that's for sure, but it
19   was a case that largely involved large financial
20   institutions, and their relationship to what
21   were largely institutional clients, who also
22   tended to be somewhat sophisticated themselves.
23   So it wasn't your run-of-the-mill consumer case,
24   it was a -- it was sort of a hybrid of both
25   types of cases.

**13 (Pages 46 to 49)**

50

```
 1              Chiplock
 2       Q    All right, thank you.
 3             And beyond the experience that
 4  the firm as an entity brought into the State
 5  Street case, is it fair to say that many
 6  individual employees of Lieff who had worked on
 7  the California and ████████████ case and
 8  the Mellon case also worked on the State Street
 9  case?
10       A    Yes, that's fair to say.
11       Q    So they brought with them some
12  very useful and effective skills from their work
13  in the previous cases?
14       A    I would say that's true.  And
15  it became more and more true as the case wore
16  on, because the Bank of New York Mellon case was
17  being very actively litigated throughout the
18  2012 to 2015 time frame, and so that experience
19  only grew and grew, as we were actively
20  litigating that case while simultaneously
21  mediating the State Street case.
22       Q    Would it be fair to say also
23  that documents obtained in those earlier cases
24  would, in many cases, be relevant to the foreign
25  exchange case at State Street?
```

51

```
 1              Chiplock
 2       A    Yes.  In particular, in the
 3  State Street case we ultimately -- State Street
 4  agreed to essentially reproduce the documents it
 5  had produced in the California Attorney
 6  General's case to us -- and when I say "us," I
 7  mean the firms prosecuting the State Street
 8  class case -- so that we could review those
 9  documents.
10       Q    And I would imagine that was
11  extremely helpful?
12       A    It was helpful to have those
13  documents, that's for sure.
14       Q    So would you agree with me that
15  there was, because of the evolving nature of
16  litigations in these cases, there was an overlap
17  in experiences and in resources from those
18  earlier cases that were brought to bear in the
19  State Street case?
20       A    Yes.  The resources and
21  experience that we acquired in the Bank of New
22  York Mellon case certainly helped to inform our
23  efforts in the State Street case.
24       Q    All right.  Thank you, Dan.
25             Earlier you talked about the
```

52



53

```
 1              Chiplock
 2  universe, but substantive ones that were
 3  pondered or seriously considered?
 4       A    And this is where my
 5  experiences with Bank of New York Mellon might
 6  start to bleed over into State Street.
 7             I know in Bank of New York
 8  Mellon we asserted an unjust enrichment theory
 9  and a breach of the covenant of good faith and
10  fair dealing theory, both of which were
11  ultimately dismissed because there's law in many
12  jurisdictions that says if you have a contract,
13  you can't -- you either bring a contract claim
14  or you bring one of those claims; you can't
15  bring both.  And even if -- in some
16  jurisdictions you can't even bring them in the
17  alternative.  But I don't remember, frankly, in
```

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

**54**

1    Chiplock
2



**56**

1    Chiplock
2    street-type consumer, the individual consumer
3    who's been defrauded by an unfair or deceptive
4    trade practice.  Section 11 is the section
5    that's brought to bear on business-to-business
6    type dealings.  And, I'm sorry, but I can't
7    remember which one we asserted first.
8            We asserted one of them, and
9    then I believe for our amended complaint we
10    asserted both, because we felt there was a
11    colorable basis for doing so.
12        Q       So just trying to round out and
13    make it a more comprehensive allegation?
14        A       Yeah.  And I think the thinking
15    was, you know, Arkansas could be looked at two
16    different ways -- I'm talking about the Teachers
17    Retirement System, the plaintiff in the case.
18            They were a public pension
19    fund.  They were not a prototypical business
20    that was in the -- you know, in the business of
21    making money for itself.  And we identified some
22    case law that permitted non-profit entities,
23    which is what we were analogizing the pension
24    fund to, proceeding under Section 9 rather than
25    under Section 11.  And that was a good thing

**55**

1            Chiplock
2    some months subsequent to the filing of the
3    consumer case -- I'm calling it "the consumer
4    case" for lack of a better word.  There was no
5    contact with ERISA counsel before they filed
6    that case.
7            So the only quote-unquote
8    strategizing that would have taken place with
9    ERISA counsel would have been during the course
10    of the mediation that followed after the cases
11    were brought together.
12        Q       Now, you testified earlier
13    about the 93A analysis that was done.
14            Is it fair to say that Lieff
15    was the principal drafter of those claims?
16        A       I think so, yes.
17        Q       And is it fair also to state
18    that initially it was Section 9 of 93A that was
19    alleged?
20        A       I'm trying to remember which
21    came first.
22        Q       Okay.
23        A       So there are two sections,
24    there's Section 9 and there's Section 11.
25    Section 9 applies more to sort of the man on the

**57**

1            Chiplock
2    from a plaintiff's perspective because Section 9
3    was arguably more liberal, it presented a better
4    vehicle potentially for obtaining literally the
5    pleading burden -- the pleading and proof burden
6    was arguably lower under Section 9 than it was
7    for Section 11, although the law was a little
8    bit fuzzy on that.
9            I think Judge Saris had a
10    famous quote about Section 9 and Section 11,
11    saying that the difference between them was as
12    clear as mud.
13        Q       Well, thank you for making it
14    slightly clearer than mud with that explanation.
15    Substantively -- substantially clearer than mud,
16    I should say.
17            Were there concerns, Dan, at
18    this stage about your ability to certify as a
19    nationwide class under 93A?
20        A       There were because there aren't
21    a whole lot of cases out there -- I would say
22    there aren't very many cases out there where a
23    nationwide class has been certified under one
24    state's consumer protection law in federal
25    court.

Veritext Legal Solutions
212-267-6868        www.veritext.com        516-608-2400

58

```
1                 Chiplock
2          I always felt we had a fighting
3   shot, we had a good shot, under this statute;
4   that if any statute gave you the capacity to do
5   that, it was this one, and it was under these
6   facts, because State Street was a Boston-based
7   bank and all of the quote-unquote bad behavior
8   that we were alleging was centralized in Boston.
9   So that was the belief.
10         Q     And in addition to that
11  particular challenge that you just described
12  with certification, were there any potential
13  minefields, legal hurdles or weaknesses in the
14  case that you and the other firms were aware of
15  at the time?
16         A     Yes.
17         Q     Could you describe those?
18         A
```



Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



17 And with the ERISA firms
becoming involved, did that create any other
18 concerns for the life of the case?
19 A     Well, yeah, one potential
20 concern is that -- and I'm not an ERISA
21 specialist, but my understanding is that there
22 is at least an argument, and some case law on
23 this, that ERISA preempts other causes of
24 action, other claims for -- like, I don't think
25 you can bring a cause of action under ERISA to

66

Chiplock

1
2  seek a certain relief or to correct a certain
3  type of conduct and simultaneously do that under
4  other types of statutory regimens, or common law
5  regimens even.
6            I'm getting a little bit out of
7  my depth because I'm not an ERISA lawyer, but I
8  know that preemption is a possibility.  There
9  may have been instances where people have been
10 able to do both in a case, but I know preemption
11 is raised as a possibility once you bring ERISA
12 into the picture.
13     Q     Any other weaknesses or issues
14 that you can recall.
15     A     About ERISA claims?
16     Q     No, about the case as a whole.
17     A     About the class case as a
18 whole?
19     Q     Yes, and the allegations that
20 were being brought.
21     A     There may be more, but I've
22 told you a lot.
23     Q     And you've testified that
24 counsel for State Street was aware, by and
25 large, of these defenses?

67

Chiplock

1
2     A     They were very capable and
3  experienced counsel.
4     Q     And in light of counsel on the
5  other side and this -- the number of challenges
6  that you faced, let me ask you how these
7  factored into the litigation strategy and/or
8  mediation strategy that you pursued.
9     A     I'm sorry, can you repeat that?
10 I want to...



68

Chiplock

1
2

15     Q     What was the tenor of those
16 mediation sessions?
17     A     They were hard fought.  I would
18 say at times we grew frustrated over the course
19 of the mediation.
20            They remained collegial.  I
21 have to tip my hat to Wilmer Hale in particular
22 because I think they did a very good service for
23 their client.  And I know that because I lived
24 through Bank of New York Mellon.
25            What Wilmer Hale was able to do

69

Chiplock

1
2  was essentially to resolve those claims short of
3  the all-out roar that took place in BoNY Mellon,
4  and short of alienating custody customers, which
5  I believe happened in Bank of New York Mellon,
6  and spending what I'm sure must have been north
7  of a hundred million dollars worth of legal
8  expenses.  So -- I think Wilmer Hale did a good
9  job, and I have to tip my hat to them.
10            We fought with them hard during
11 the mediation, and I think the mediator himself
12 would -- would second that.
13     Q     Dan, let me just show you an
14 e-mail dated May 9th, 2014, from you to Jonathan
15 Marks.
16            And who was Jonathan Marks?
17     A     He was the mediator in our
18 case.
19     Q     And I see you've cc'd a number
20 of counsel, including Mike Rogers, Mike Lesser,
21 David Goldsmith, Larry Sucharow, Michael
22 Thornton and Lynn Sarko on this, and there may
23 be others that I've missed.
24            Could you take a look at this?
25     A     Sure.

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400



70

```
1                    Chiplock
2          Q     Just take your time, but
3    refresh your memory as to that.
4              (Pause)
5              MR. MCTIGUE:  Could you give me
6    the date of that e-mail?
7              MR. SINNOTT:  May 9th, 2014.
8              MR. MCTIGUE:  Thank you.
9          A    Yes, I've looked at it.
10         Q    Is it fair to say that you're
11   forwarding a PowerPoint presentation to Marks?
12         A    Yes, I believe that's what I
13   was doing here.
14         Q    Describe, if you would, the
15   substance
```

72

```
1                    Chiplock
2    that back.
3              And in addition to the treble
4    damages, Dan, that 93A can provide, would you
5    agree that 93A, statutorily at least, provides
6    for the potential inclusion of legal fees?
7          A
```

```
25         Q    Okay, thank you.  I'll take
```

74

1                  Chiplock
2

19         Q    Dan, you've already answered a
20  couple of questions on this, but let me just
21  talk about coordination with ERISA counsel in
22  this matter.
23         What was the general working
24  relationship that Lieff had with ERISA counsel?
25         A    What was it?

75

1                  Chiplock
2         Q    Yes.
3         A    So I would say my principal
4  contact on the ERISA side would have been Lynn
5  Sarko throughout both the Bank of New York
6  Mellon and the State Street cases.  And in State
7  Street I also had a fair amount of dealing with
8  Carl Kravitz, and I also dealt with Mr. McTigue.
9         Q    All right.
10         And were there conflicting
11  theories of recovery with the ERISA counsel?
12         A    I think ERISA just had its own
13  statutory regimen and its own -- its own damages
14  regimen, which I'm not that well versed in.
15         I don't think it provides for
16  double and treble damages.  I think it has its
17  own damages measure, but beyond that I'm not
18  really qualified to say.
19         Q    Were there any tensions between
20  Lieff/Labaton/Thornton on the one hand and ERISA
21  counsel on the other hand, either because of
22  differing theories of damages or personalities?
23         A    Personality-wise, I would say
24  by and large we all got along very well.  I
25  would say in particular with Lynn and Carl there

76

1                  Chiplock
2  were never any issues.
3         The -- as far as damages go, I
4  think I spoke earlier that ERISA at least
5  creates the possibility of preempting other
6  causes of action, and so from a personal
7  standpoint, from my own standpoint, I may have
8  felt some frustration at the outset that here we
9  had this great unifying theory that linked
10  together all affected custody customers at the
11  bank, which was 93A and breach of fiduciary
12  duty, but once you introduced ERISA you
13  potentially vulcanize and create a class of
14  customers that might not get the benefit of the
15  consumer law because they're now in this ERISA
16  bucket.
17         But that was, like, an initial
18  impression I had at the outset.  But once those
19  cases were filed and under way, and we were
20  essentially thrown together for purposes of
21  mediation, we knew we were in it together.  We
22  knew the ERISA cases were not going away unless,
23  you know, they lost on a motion to dismiss, you
24  know, which never got adjudicated, but as long
25  as they were there, we needed to work together,

77

1                  Chiplock
2  and that's what we did in crafting the
3  resolution that we did.
4         Q    Now, I believe earlier, Dan,
5  you made reference to informal discovery in the
6  State Street case.
7         Is that a fair
8  characterization, that the discovery was
9  informal as part of the mediation and attempt to
10  resolve this?
11         A    Yeah, we referred to it, I
12  guess, as information exchange.  So although I
13  believe the parties did exchange document
14  requests, what we got were productions that the
15  bank was willing to make because it had already
16  produced them in other cases.  And it was a
17  substantial amount of material, but these were
18  not productions that State Street had gone out
19  and collected and reviewed and made specifically
20  for us.  These were productions that they had
21  done in the California case, and also in another
22  federal case that was pending in the District of
23  Massachusetts, the Hill case, which was a
24  securities fraud case.  And I believe there may
25  have been some materials produced to regulators

78

```
1              Chiplock
2    also included in what they produced to us.  So
3    that was the universe of what we received.
4         Q     All right.
5              And did the ERISA firms play
6    any role in this informal discovery?
7         A     They were there during the
8    mediation sessions when it was negotiated that
9    we would get these documents to review.
10        Q     Do you recall ERISA client
11   contracts and RFP responses being included in
12   the informal discovery?
13        A     We definitely got numerous RFP
14   responses, and some of them would have been with
15   ERISA clients.
16        Q     Do you know who requested these
17   documents?
18        A     Who requested the ERISA
19   contracts?
20        Q     Yes.
21        A     The requests that we made were
22   for all custody contracts.  The fact that ERISA
23   contracts were included in what was produced to
24   us was not the result of any special request for
25   ERISA contracts that I can recall.
```

79

```
1              Chiplock
2         Q     Did you delegate any
3    substantive work to the ERISA firms?
4         A     I did not.  And I don't recall
5    any -- you mean document review work?
6         Q     For example, yes.
7         A     No, I'm not aware of any
8    document review being delegated to the ERISA
9    firms.
10        Q     How about research or
11   pleadings?
12        A     No pleadings.
13             No research that I can recall.
14             So essentially what I recall
15   the ERISA firms being principally responsible
16   for was advocating in the mediation context for
17   ERISA causes of action and the strength of ERISA
18   as a vehicle for certifying a class of ERISA
19   clients specifically, and obtaining relief for
20   ERISA clients.
21             The ERISA firms also liaised
22   with the Department of Labor to ameliorate any
23   concerns the Department of Labor may have with a
24   global deal that could implicate the interests
25   of ERISA clients of the bank.
```

80

```
1              Chiplock
2         Q     And was that another potential
3    weakness or challenge in the case, was the
4    Department of Labor's monitoring or oversight
5    and potential intervention?
6         A     I wouldn't call it a weakness
7    of the case other than it was an additional
8    layer of consideration that we collectively as a
9    group needed to take into account, that -- in
10   other words, there were state actors, there were
11   regulatory actors who had specific interests
12   that needed to be taken into account in order
13   for a global resolution to be put together, and
14   ultimately to succeed.
```



```
19             (Special Master Rosen enters
20        the room.)
21        A     So all of these cases are
22   intertwined, and State Street's been consistent
23   about that from the get-go, that for there to be
24   a resolution of any of the cases, they all need
25   to be resolved.
```

81

```
1              Chiplock
2         Q     All right, thank you.
3              Were there any legal
4    discussions with the ERISA firms before the
5    Henriquez complaint was filed in November 2011?
6         A     No, there were not.
7         Q     How about before the Andover
8    complaint was filed in 2012?
9         A     I was not part of any
10   conversation that I can recall.
11        Q     And was the --
12             MR. SINNOTT:  Strike that.
13        Q     What was the platform that was
14   used for document review in the State Street
15   case?
16        A     So the vendor that we used was
17   Catalyst, which is an outside vendor, and they
18   provide a document review platform, if you will,
19   for online document review.
20        Q     And was that database, Catalyst
21   database, hosted by your firm?
22        A     It was, in San Francisco.
23        Q     And was it shared with Labaton
24   and Thornton?
25        A     Yes, it was.
```

82

Chiplock

1
2      Q      Was it shared with the ERISA
3  firms?
4      A      I can't remember.  They may
5  have had user accounts, I just can't remember.
6  Kirti may know.
7      Q      Do you recall whether documents
8  were shared with the ERISA firms?
9      A      The documents produced by State
10  Street?
11      Q      Documents produced as a result
12  of document review.
13      A      Our work product, in other
14  words?
15      Q      Yes.
16      A      I don't believe so -- well,
17  only to the extent that documents were discussed
18  in the course of the mediation, where everybody
19  was present, then, yes.  But outside of that, we
20  did not really work with the ERISA firms on
21  document review.
22      Q      What was the role of ERISA
23  counsel in this case, as you would characterize
24  it?
25      A      So principally I would just go

83

Chiplock

1
2  back to what I said before, which is to advocate
3  for ERISA clients specifically as being the
4  beneficiaries of this ERISA regimen, and the
5  special fiduciary duties that inure to ERISA
6  clients under ERISA.
7          That would be one.  And the
8  other would be to liaise with the Department of
9  Labor, and to be sure that the Department of
10  Labor's concerns about any global deal were
11  adequately addressed to the department's
12  satisfaction.
13      Q      Did the ERISA firms play a role
14  in mediation?
15      A      Yes.
16      Q      And what was that role?
17      A      Principally what I just said.
18  I would just be repeating what I just said.
19      Q      All right.
20          Nothing beyond that?
21      A      Not really.
22      Q      Were the ERISA firms part of
23  the finalization of the term street?
24      A      I believe so.
25      Q      At some point was there a

84

Chiplock

1
2  discussion as to what percentage of fee award
3  the ERISA firms should receive?
4      A      Yes.
5      Q      And describe that.
6      A      So there was an agreement that
7  was entered into at a certain point of time --
8  now I'm forgetting what year it was -- that
9  allotted 9 percent of any total fee ultimately
10  awarded by the court to ERISA counsel.
11      Q      And do you recall what the
12  basis was for the 9 percent number?
13      A      The basis was what we -- it was
14  our best understanding of what we believed the
15  overall trading volumes, and in connection with
16  that the total estimated damages, that would
17  inure to ERISA plaintiffs -- or ERISA customers
18  as a percentage of the total group.
19      Q      At some point, Dan, close to
20  the final settlement of this case, was that
21  percentage changed?
22      A      Yes.  I believe we agreed
23  amongst the three firms -- the three principal
24  firms leading the consumer side of the case, we
25  agreed that ERISA counsel should get 10 percent,

85

Chiplock

1
2  rather than 9 percent.
3      Q      And what was the basis for that
4  increase?
5      A      I think -- the best of my
6  recollection is that Larry suggested it, and
7  that it was in recognition of the efforts that
8  Lynn Sarko in particular, but also Carl, had
9  made to work with the Department of Labor and
10  to -- and to answer their questions, because the
11  Department of Labor had many questions.  And
12  even if we felt that the overall universe of
13  affected customers was relatively small
14  vis-a-vis the whole, the department
15  understandably wanted to be sure that its
16  clientele, for lack of a better word, were
17  getting what they deserved under the settlement.
18  And Lynn in particular has a lot of experience
19  with the Department of Labor, and -- so we just
20  agreed to increase the percentage from 9 to 10.
21      Q      So that universe of customers,
22  as you describe it, or trade volume, did not
23  play a role in the increase?
24      A      It may have.  And the reason I
25  say "may have" is that our understanding of the

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

**86**

1         Chiplock
2 total trading volumes shifted over time.
3       I think early on in the case,
4 just based on discovery that was produced to us
5 by the bank, the total trading volume for ERISA
6 plans looked to be very small; it was like 3 to
7 4 percent.  And then if you factored in -- if
8 you factored in funds associated with group
9 trusts, it went up a little bit, but not that
10 much.
11       But then towards the tail end
12 of the case, State Street came back to us and I
13 think said they may have underestimated the
14 total volume of what would be considered ERISA
15 volume if you factor in all of the group trusts,
16 and I think the Department of Labor would argue
17 that if a group trust had one dollar of ERISA
18 money, then all of it should be considered part
19 of ERISA volume, or something like that, whereas
20 State Street had the contrary view, and then
21 there was something in the middle.
22       So the overall trading volume
23 that would be attributed to ERISA did go up from
24 what we previously estimated it to be, but it
25 still remained fairly small.

**87**

1         Chiplock
2     Q    Ultimately did you consider the
3 10 percent to be a fair allocation?
4     A    Yes.
5     Q    Let me talk about the document
6 production in this case.  And you've already
7 discussed this in some measure.  You discussed,
8 I believe, two major productions of documents in
9 the State Street case, one being from the
10 California action.  And do you recall what the
11 size of that production was, or the number of
12 documents?
13     A    Kirti would know better.  I
14 think there were something like 200 -- between
15 2 and 300,000 documents, or -- or I may be
16 confusing that with megabytes, I'm sorry.
17       The California production was
18 smaller than the subsequent production that we
19 received.  The subsequent production, just in
20 terms of memory size, was substantially larger
21 than the first production, as I recall.
22     Q    And do you recall when the
23 documents were received in the California case,
24 from the California case?
25     A    It would have been early 2013.

**88**

1         Chiplock
2     Q    And you mentioned a Hill
3 case --
4     A    Yes.
5     Q    -- as being a second production
6 of documents.
7     A    That was the second large
8 production.  Understand, there may have been --
9 there may have been some discrete productions of
10 data and documents apart from those, but those
11 were the two big productions I recall, and the
12 Hill production came in towards the end of 2013,
13 I believe.
14     Q    Do you remember how many
15 documents or pages were produced in that
16 particular case?
17     A    I'm having trouble
18 disaggregating the two productions in terms of
19 size.  I do know that the total universe, once
20 it was all in, was something around 9 million
21 pages.  And like I said before, I believe the
22 Hill production, just in terms of volume -- in
23 terms of the amount of space it took up on a
24 memory bank, was bigger.
25     Q    Did you also receive State

**89**



Veritext Legal Solutions
212-267-6868     www.veritext.com    516-608-2400



**94**

```
1            Chiplock
...
19    guns,
```

**95**

```
1            Chiplock
2
...
```

**96**

```
1            Chiplock
      externally.
3           Internally --
4           JUDGE ROSEN:  And internally?
5           THE WITNESS:  Internally, the
      awareness was much more sophisticated,
7     and that is the nice way to put it.
...
13          What we would argue in
14    opposition to that is we can -- we can
15    debate what "best execution" means, but
16    nobody would reasonably suspect that
17    "best execution" actually means worst
18    execution.
19          JUDGE ROSEN:  From the client's
20    perspective?
21          THE WITNESS:  Correct.
22          JUDGE ROSEN:  Thank you.
23          While I'm questioning, I wanted
24    to go back -- and if you covered this,
25    just go right past this.  When I came
```

**97**

```
1            Chiplock
2     in you were asking Dan about the ERISA
3     contributions -- contributions of the
4     ERISA law firms, and the role that they
5     played, and you talked about mediation.
6           Do you recall whether there was
7     a time initially that the ERISA firms
8     were going to be excluded from the
9     mediation process, and were told
10    specifically that -- Sarko was told
11    that the ERISA firms were not going to
12    be participating in the mediation?
13          THE WITNESS:  In the mediation
14    at all?
15          JUDGE ROSEN:  Yes.
16          THE WITNESS:  I don't recall
17    that.  I honestly do not recall that.
18          What I do recall is that by
19    2014-2015 we were definitely rowing
20    together, particularly with Lynn.
21          JUDGE ROSEN:  So you were not
22    part of any discussion moving toward a
23    decision by what would be the consumer
24    firms, principally the lead firm and
25    the Labaton firm and the Thornton firm,
```

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

98

Chiplock

1
2  to exclude the ERISA firms from the
3  mediation?
4        THE WITNESS:  I can't recall
5  that.
6        JUDGE ROSEN:  Do you have any
7  recollection of that at all?
8        THE WITNESS:  I don't recall
9  that.
10        All I can say is what I said
11  earlier, before you entered the room,
12  which was I can recall in early days in
13  the case there may have been some
14  tension, as it were, between a case
15  like ours, which sought to obtain
16  relief for everybody under a unitary
17  set of theories, versus this case that
18  was brought solely on behalf of ERISA
19  plans, which potentially could
20  interfere with those ERISA plans'
21  ability to recover under what we
22  thought to be a very generous statutory
23  scheme, which was the Massachusetts
24  consumer protection law.
25        I know I felt that tension.  I

99

Chiplock

1
2  did.
3        I'm not sure how strongly
4  others felt it, because I was a real
5  believer in the consumer statute.
6  Still am.
7        So I honestly don't remember if
8  at the outset -- we were told to
9  mediate by Judge Wolf early on, and
10  this was before the ERISA case had even
11  been filed -- I think.
12        Well, the ERISA case at least
13  had not gotten past the motion to
14  dismiss.
15        The ERISA case never got past
16  the motion to dismiss.  There was no
17  motion to dismiss ever adjudicated in
18  their case.  So after we got past the
19  motion to dismiss, we were ordered to
20  mediate by Judge Wolf.
21        It's possible the ERISA case
22  was pending, but nothing had happened
23  in it.
24        Afterwards, the ERISA case, the
25  parties there were ordered to mediate

100

Chiplock

1
2  also, I think, and to participate in
3  the global mediation, but I honestly do
4  not recall being part of a discussion
5  saying, "We're not including them."  I
6  mean, once it became clear that they
7  had to mediate, I don't recall being
8  part of that discussion.
9        If there are e-mails that say I
10  was, I just don't recall them.
11        JUDGE ROSEN:  I think, in
12  fairness, Lynn Sarko has a recollection
13  that initially, when he first showed up
14  for the mediation, he was told he would
15  not be --
16        Is Lynn on the line?
17        MR. SINNOTT:  He is.
18        JUDGE ROSEN:  Lynn, if I'm
19  mischaracterizing what you told us in
20  the interview, please jump in --
21        THE WITNESS:  I would defer to
22  Lynn.  Lynn probably has a better
23  memory of how he was treated.
24        JUDGE ROSEN:  Lynn's not under
25  oath here, but he will be.

101

Chiplock

1
2        MR. SARKO:  Your Honor, it's
3  Lynn Sarko, yes, I am on the line.
4        And there was actually
5  discussion, and the conversations were
6  from the mediator.
7        JUDGE ROSEN:  From the
8  mediator?  Okay.
9        MR. SARKO:  Yes.
10        JUDGE ROSEN:  You don't recall
11  whether the mediator derived it from
12  the parties?
13        MR. SARKO:  No, I was told that
14  the parties did not want the ERISA
15  counsel to be present.  I mean, we were
16  at the mediation, but -- to
17  participate, and that we were shuttled
18  to a side room, and that's where we
19  were to stay.  However, that soon
20  changed that morning.
21        THE WITNESS:  Yeah, I would say
22  that state of affairs did not last very
23  long at all.
24        JUDGE ROSEN:  Okay.
25        THE WITNESS:  Which is why I

26 (Pages 98 to 101)

**102**

```
 1              Chiplock
 2   don't recall it.
 3          JUDGE ROSEN:  Thank you, Lynn.
 4       You know, when we get -- when
 5   we do your dep, we'll drill down a
 6   little more on that.
 7          One of the issues in the
 8   case -- maybe not a direct issue,
 9   but -- was the relationship with the
10   ERISA plaintiffs, the consumer
11   plaintiffs, and how that played out
12   ultimately in the resolution -- where
13   it started, and how it played out.
14          THE WITNESS:  Under oath I will
15   say I get along with Lynn great, and I
16   think he's a very capable and effective
17   lawyer.
18          JUDGE ROSEN:  We all do.
19          MR. SINNOTT:  And he doesn't
20   have his fingers crossed, Lynn, just so
21   that you know.
22          Anything else, Judge?
23          JUDGE ROSEN:  No, I just wanted
24   to make sure we --
25          MR. SINNOTT:  That was helpful.
```

**103**

```
 1              Chiplock
 2          JUDGE ROSEN:  -- got Dan's view
 3   on this.
 4   BY MR. SINNOTT:
 5       Q     You described Judge Wolf's
 6   mediation order, and informal discovery exchange
 7   that took place in the context of that
 8   mediation.
 9       A     Um-hum.
10       Q     Was there a protective order --
11       A     Yes.
12       Q     -- that governed that informal
13   discovery?
14       A     Yes, a protective order was
15   entered in our case.
16       Q     And how did that come about, do
17   you recall?
18       A     I'm not sure who drafted it, I
19   can't remember.  I might have played a role in
20   drafting it.  But we put it together, with
21   comments from both sides, and it was submitted
22   to the court, and we entered it.
23       Q     Let me move into the staffing
24   of staff attorneys in the State Street case, and
25   ask you to describe the ebb and flow, or manning
```

**104**

```
 1              Chiplock
 2   levels, and the urgency, or lack of urgency,
 3   over the life of the State Street case.
 4          MR. HEIMANN:  If I may, we've
 5   been going for two hours.  Are you
 6   going to be concluding soon, or have we
 7   got another hour or so to go?
 8          MR. SINNOTT:  I think we've got
 9   probably 40 minutes.
10          MR. HEIMANN:  Take a break?
11          MR. SINNOTT:  You'd like to
12   take a break?
13          MR. HEIMANN:  Please.
14          MR. SINNOTT:  Of course.
15       I'm sure our court reporter
16   appreciates that suggestion.
17          (Recess taken)
18          (Mr. Axelrod joins the
19   conference call)
20          MR. SINNOTT:  Madam Court
21   Reporter, if you could read back the
22   question that was posed just before
23   Mr. Heimann, to the relief of all,
24   asked for a break.
25          THE WITNESS:  Can I add one
```

**105**

```
 1              Chiplock
 2   thing before we do that?  I want to go
 3   back and touch on one of the challenges
 4   of the case which I may have taken for
 5   granted all along, but I wanted to make
 6   sure I stated it on the record.
 7       Just the novelty of bringing
 8   litigation like this against one's
 9   custodian, this is not something that
10   was done generally.  Custody customers
11   generally like their custodian, they
12   have longstanding relationships with
13   them.  It is also not easy to change
14   custodians, you have to go through a
15   process, and it's not something that
16   pension funds in particular, who have
17   limited resources, relish doing.
18       So it was not easy to bring
19   people along to that theory, even if
20   they felt that they may have been
21   overcharged on some of their services.
22   So that was yet another challenge to
23   the case overall that I wanted to make
24   sure we put out there.
25          MR. SINNOTT:  All right, thank
```

27 (Pages 102 to 105)

106

1          Chiplock
2     you.
3          JUDGE ROSEN:  That challenge,
4     was that also manifested in any legal
5     issue challenges?
6          THE WITNESS:  It was, yes.
7          So the relationship between a
8     custodian and its customer was normally
9     considered one of a fiduciary and the
10    beneficiary of the fiduciary
11    relationship.  However, when it came to
12    ancillary services like foreign
13    exchange, custody foreign exchange,
14    standing instructions foreign exchange,
15    that relationship could become more
16    attenuated under the law and under the
17    various contracts in play.  So there
18    was a discussion that provoked much
19    debate.
20         JUDGE ROSEN:  As to whether the
21    custodian had fiduciary responsibility
22    for this kind of trading?
23         THE WITNESS:  Correct.
24         Sorry for the interruption.
25         MR. SINNOTT:  No, the

107

1          Chiplock
2     clarification was helpful.
3          Madam Court Reporter, if you
4     could read back the question that was
5     posed just before the break.
6          (The record was read back as
7     follows:
8          "Question:  Let me move into
9     the staffing of staff attorneys in the
10    State Street case, and ask you to
11    describe the ebb and flow, or manning
12    levels, and the urgency, or lack of
13    urgency, over the life of the State
14    Street case.")
15    A    So in early 2013, we get the
16    initial bid document production from State
17    Street.  We have the documents uploaded to the
18    Catalyst repository, and we bring on certain
19    document reviewers to help us with that review.
20         And at this point I'm only
21    talking about Lieff Cabraser, I'm not speaking
22    to what other firms did, because I'm most
23    qualified to speak to what Lieff Cabraser did.
24         So we staffed the initial
25    document review with, I believe, four to five

108

1          Chiplock
2     staff attorneys, document reviewers, in early
3     2013, who all were trained how to use Catalyst,
4     and were given a list of codes -- issue codes
5     and descriptions of what each issue code meant,
6     as well as copies of the operative pleadings in
7     the case for background, so that they could be
8     educated about the case as they began the
9     process.
10         So we had four to five
11    reviewers working on the document review at the
12    outset.
13         That ebbed a little bit over --
14    as 2013 and 2014 wore on, because some of those
15    reviewers were pulled onto the Bank of New York
16    Mellon case, I believe, which was very intense
17    at that point in time, we had received a lot of
18    documents, and it was being actively litigated
19    in the form of depositions taking place.  So I
20    think we took a few of the reviewers who had
21    started out doing document review on State
22    Street, pulled them into BoNY Mellon, and we
23    left a couple who were doing nothing but State
24    Street all through 2013 and 2014.
25         By the close of 2014, Kirti did

109

1          Chiplock
2     an analysis of how far along we were as a group
3     in our document review in State Street, and so
4     he was able to look and see -- because we had
5     tried to evenly allocate the documents between
6     the three primary firms, my firm, Thornton and
7     Labaton, and to the best of my recollection,
8     Kirti, by the end of 2014, was able to go in and
9     see how far along everybody was.
10         The conclusion was we still had
11    a ways to go, because that included not just the
12    California production, but also the Hill
13    production, that had come in at the end of 2013,
14    so there was a lot of material in there by that
15    point.
16         So January of 2015 comes
17    around, just shortly after Kirti has done this
18    analysis, and as it happens, the fact discovery
19    cutoff in the Bank of New York Mellon case is
20    January 2015, so right there I have something on
21    the order of a dozen more document reviewers who
22    have been through war in Bank of New York
23    Mellon, and who are extremely well-versed in the
24    issues, who are suddenly available.  And I said,
25    "Let's put them on State Street, let's get this

28 (Pages 106 to 109)

110

```
 1              Chiplock
 2  done."  Because at the same time --
 3              If this answer becomes too
 4  lengthy, cut me off.
 5              -- at the same time, early 2015
 6  is when things are starting to crystallize in
 7  the Bank of New York Mellon case in the way of
 8  mediation and possible resolution.
 9              We mediate the Bank of New York
10  Mellon case, I believe in February 2015, and we
11  reached an agreement in principle in March.
12              Staff attorneys already are
13  done working on Bank of New York Mellon,
14  because, like I said, they're done, they
15  finished that work.  The fact that we were close
16  to or had reached resolution in Bank of New York
17  Mellon lended an urgency to the mediation on
18  State Street because this resolution of a very
19  similar case against a competitor in the same
20  space was about to become public --
21              JUDGE ROSEN:  Did you view that
22  as potentially BoNY providing a
23  template for settlement of State
24  Street?
25              THE WITNESS:  I did, yes.  And
```

111

```
 1              Chiplock
 2      I think -- I think various government
 3  actors did also, frankly.  I think the
 4      ESC and the DOJ and the DOL looked to
 5      the BoNY settlement as a template.
 6              JUDGE ROSEN:  Okay.
 7      A       And so to complete my answer,
 8  all of these things coming together lent an
 9  urgency to the process in early 2015.  I think
10  the collective view was mediation had already
11  gone on for quite a long time, and it needed to
12  be resolved one way or another, either with us
13  settling the case or with us off to the races.
14      Q       And had Judge Wolf provided any
15  impetus to that view?
16      A       Well, I will say insofar as he
17  had set deadlines for the mediation.  So I
18  believe the mediation had -- the time for
19  completing the mediation and going back to him
20  and setting a pre-trial schedule had been
21  extended at least once or twice by that point,
22  and I believe we had had a deadline of end of
23  2014, which, with the way things were developing
24  in the Bank of New York case, we agreed to
25  extend for at least a modest amount of time, and
```

112

```
 1              Chiplock
 2  I think we extended it until April of 2015.  And
 3  I think that might have been the last official
 4  extension we obtained.
 5              I'm not sure if we -- even
 6  though the mediation kept going after that, by
 7  that point we were so far along, I think we
 8  understood we didn't need to keep going back to
 9  Judge Wolf to request formal extensions; I think
10  we figured he would understand.
11              JUDGE ROSEN:  So -- I just want
12      to go back to something, and I think
13      Bill is going to get into this further,
14      but you've been referring to the folks
15      who were doing the document reviews as
16      "the reviewers."
17              THE WITNESS:  Yeah.
18              JUDGE ROSEN:  You had
19      attorneys -- staff attorneys -- who
20      were actually employed by your firm
21      doing that; correct?
22              THE WITNESS:  Yes.
23              JUDGE ROSEN:  But at some point
24  you also engaged an outside agency to
25  provide attorneys to do document review
```

113

```
 1              Chiplock
 2  as well; correct?
 3              THE WITNESS:  Um-hum -- yes.
 4      There may have been more than one
 5      agency.
 6              JUDGE ROSEN:  Do you remember
 7      when that happened, when you brought
 8      the outside attorneys in?
 9              THE WITNESS:  You're referring
10      to attorneys who were paid by outside
11      agencies?
12              JUDGE ROSEN:  Correct, and
13      billed you on an invoice basis.
14              THE WITNESS:  I don't recall.
15      And the reason why is that that
16      distinction was never my focus, between
17      who was a so-called agency lawyer
18      versus who was on our payroll.
19              And the reason why -- and it
20      may sound corny -- is that these people
21      had all the same value in my eyes.
22      They were all doing the same kind of
23      work, they were all doing high-level
24      attorney work, in my view.  And to this
25      day I still couldn't recite from memory
```

29 (Pages 110 to 113)

114

1          Chiplock
2  who was a so-called agency lawyer
3  versus who was on our payroll because
4  they were all important to me.
5          JUDGE ROSEN:  But you don't
6  remember at what stage in the review
7  process the decision was made to bring
8  in the agency reviewers, as opposed to
9  the folks on -- the staff attorneys who
10  were doing it?
11          THE WITNESS:  Well, what I can
12  say -- I can talk to two specific
13  instances, which were Ann Ten Eyck and
14  Rachel Wintterle.  They were brought in
15  in March of 2015, they were agency
16  lawyers.  The reason I know that is
17  because they were lawyers that were
18  paid for by Thornton, but housed in our
19  San Francisco office, working side by
20  side with our staff attorneys in our
21  San Francisco office doing the same
22  work.
23          JUDGE ROSEN:  And I think Bill
24  will get into this in more detail, but
25  you said you didn't focus on any

115

1          Chiplock
2  difference between your staff attorneys
3  and the agency lawyers because they
4  were doing substantively the same work?
5          THE WITNESS:  Correct.
6          JUDGE ROSEN:  But your staff
7  attorneys were also doing memoranda,
8  and doing sort of overview memoranda,
9  deposition preparation memoranda and
10  those sorts of things.
11          Did the agency lawyers also do
12  that?
13          THE WITNESS:  Yes, they did.
14          JUDGE ROSEN:  They did?
15          THE WITNESS:  Well, nobody did
16  deposition prep memos because we -- we
17  didn't get that far.  Well, we didn't
18  do witness memos.
19          JUDGE ROSEN:  Issue?
20          THE WITNESS:  We did do issue
21  memos, and, yes, the agency lawyers did
22  issue memos, too.  I looked at one from
23  either Ann or Rachel.  And I think we
24  had other -- I think Virginia Weiss was
25  an agency lawyer -- she's another one

116

1          Chiplock
2  I'm remembering, she was an agency
3  lawyer.
4          JUDGE ROSEN:  Also allocated to
5  Thornton?
6          THE WITNESS:  Virginia was
7  allocated for a time to Thornton, and
8  then she came back to us.
9          But she did memos, too.  They
10  were all asked to do the same work.
11  BY MR. SINNOTT:
12      Q      Before I follow up on that, let
13  me just ask you while I'm looking of it, you've
14  described how the mediation took on some
15  urgency  Did the document review play any role
16  n your mediation or mediation strategy?
17      A      It did.  I can remember a
18  detailed presentation that was put together -- I
19  can't remember if it was 2013 or 2014 -- a
20  fairly lengthy liabilities and damages
21  presentation that was largely put together by
22  Mike Lesser of the Thornton firm, in which he
23  quoted from a number of documents that were
24  produced in our case, and they were summarized
25  n a very -- I should say entertaining

117

1          Chiplock
2  presentation, that was done very well.  And
3  there were some -- there were good documents in
4  there
5          So, yes, the document review
6  did inform the mediation process.  We felt good
7  about what was there.  We also knew that had the
8  mediation ended, we were going -- we were going
9  to go back and get some more, because these were
10  documents that had been produced in other cases
11  and had been handed over to us, and given that
12  we were seeing what we saw already, we knew
13  there had to be more, and we would be going out
14  and getting that material tout suite if the
15  mediation came to an end without a resolution
16          JUDGE ROSEN:  So just to dril
17  down on that, when you say they were
18  helpful, did they provide -- "they,"
19  the documents that had been produced by
20  the staff attorneys/document
21  reviewers -- did they provide you with
22  supporting material that you could use
23  against State Street in the mediation
24  to buttress your positions?
25          THE WITNESS:  Yes

30 (Pages 114 to 117)

**118**

```
 1              Chiplock
 2        JUDGE ROSEN:  Is that all you
 3  want to say about it?
 4        THE WITNESS:  Well, I'm giving
 5  a lot of long answers today.
 6        I would say yes.  I cataloged
 7  the types of documents we were
 8  reviewing earlier, and I can't remember
 9  if you were here, but --
10        JUDGE ROSEN:  Oh, I'm sorry if
11  you answered this before, but it seems
12  to me that you were at, what you
13  earlier described, an inflection
14  point --
15        THE WITNESS:  Yes.
16        JUDGE ROSEN:  -- in this spring
17  2015 period --
18        THE WITNESS:  Right.
19        JUDGE ROSEN:  -- and this was a
20  point at which you were going to put
21  the pedal to the metal in the
22  mediation.  Is that fair?
23        THE WITNESS:  From my
24  perspective, yes, that's fair.
25        JUDGE ROSEN:  And BoNY had
```

**119**

```
 1              Chiplock
 2  wound down --
 3        THE WITNESS:  Yup.
 4        JUDGE ROSEN:  -- and you knew
 5  what the template might be as a
 6  supplement --
 7        THE WITNESS:  Yep.
 8        JUDGE ROSEN:  -- so when you
 9  were planning your mediation
10  strategy --
11        THE WITNESS:  Yes.
12        JUDGE ROSEN:  -- did the
13  documents that staff attorneys and the
14  agency attorneys produced buttress your
15  strategic positions in the mediation
16  vis-a-vis State Street?
17        THE WITNESS:  From my
18  perspective, the answer is yes.
```



**120**

```
 1              Chiplock
16        JUDGE ROSEN:  So how did you
17  use this ammunition in the mediation?
18  Did you work it through the mediator,
19  or did you use it directly with State
20  Street, or both?
21        THE WITNESS:  I would say -- we
22  did not make any presentations to State
23  Street about what we were seeing in the
24  documents.
25        JUDGE ROSEN:  You didn't?
```

**121**

```
 1              Chiplock
 2        THE WITNESS:  We felt like we
 3  did not need to go there at that point
 4  in time --
 5        JUDGE ROSEN:  You didn't want
 6  to show your hand?
 7        THE WITNESS:  Well, that's
 8  kind -- that's true.  That's kind of
 9  where I'm going.
10        I mean, by April and May of
11  2015 there's still the possibility that
12  the mediation's going to fall apart,
13  and we're not going to say, "Here's our
14  best documents," you know, because we'd
15  rather surprise them at depositions
16  with our best documents, so we're not
17  going to do that.
18        And I don't recall, frankly,
19  educating the mediator on specifics
20  either, but I do recall having in our
21  minds the awareness that there was
22  information there to buttress our
23  claims, and that if we needed to go
24  forward we could.
25        So it was really more to inform
```

122

Chiplock

1
2     our hand, as it were, rather than
3     something we presented to them, like,
4     as any kind of gotcha moment.
5  BY MR. SINNOTT:
6     Q     Let me follow up on that, Dan.
7           Your firm has provided to us --
8  and this is designated Bates stamps 48762, 63,
9  64, 65 and 66 -- and the first page is an e-mail
10 from Kirti Dugar to BNY Mellon coders, Peter
11 Roos is cc'd, as is Ryan Sturtevant, and the
12 subject is "State Street Coding Guide," which is
13 the attachment to this.
14          Could you look at that --
15    A     Sure.
16    Q     -- and tell us if you've
17 seen --
18    A     Yeah.
19    Q     -- that document, particularly
20 the attachment, or whether you authored the
21 attachment, or participated in it.
22    A     I think I wrote it, or at least
23 I had a large hand in drafting this document
24 review guide.
25    Q     And that's a coding guide, in

123

Chiplock

1
2  essence, is it not?
3     A     Yup.
4     Q     And what was the purpose of
5  that, and how would you characterize that, the
6  substance of that document?
7     A     So this is a list of a series
8  of what we considered to be potentially
9  important issues in the case, along with a
10 description of each issue to guide our document
11 reviewers through the process of reviewing
12 these -- the documents that had been produced by
13 State Street in the case.  And we developed
14 these issues based on our experience -- our
15 years of experience at this point -- in
16 litigating foreign exchange cases, and what we
17 believed would be the most pertinent issues to
18 proving our case at trial.
19    Q     All right, thank you.
20          And we keep hearing the name
21 Kirti Dugar.  Was Kirti the supervisor of the
22 overall document review effort?
23    A     So he was the day-to-day
24 manager, I would call him, of the -- of our
25 document reviewers in San Francisco.

124

Chiplock

1
2           Kirti was on the floor, as it
3  were.  So we had a room where people worked, we
4  also had some people who worked remotely,
5  trusted reviewers who had put in thousands of
6  hours with us by that point, but Kirti was sort
7  of their go-to guy when they had questions about
8  the platform, questions about their assignments,
9  which had come down from me or my colleagues at
10 the other firms to Kirti and then to them.  So
11 he was -- he was the face that they saw every
12 day if they were in the office.
13    Q     Whether they were agency or --
14    A     Yes.
15    Q     -- staff?
16    A     Yes, that's correct.
17    Q     And earlier, Dan, you had said
18 that at some point prior to 2015 Kirti had done
19 a review of the status of document review, or a
20 review of the review --
21    A     Progress.
22    Q     Progress.
23          And you mentioned that it was
24 not just Lieff's progress, but it was the
25 progress of Labaton and Thornton; correct?

125

Chiplock

1
2     A     Yes.
3     Q     What was, if you know, his
4  assessment of the progress of Thornton's review
5  at that point?
6     A     It was -- they were -- they
7  were almost as far along as the rest of us were,
8  is the best of my recollection.
9           I think Kirti -- Kirti's the
10 person to ask, but as I recall, they had
11 certainly done a fair amount of review, and they
12 certainly had a fair amount left to do, which I
13 think was fairly said about all three firms; we
14 had done a fair amount, but we had a ways to go.
15    Q     Who had done, if you know, the
16 Thornton review?
17    A     I don't know.  And to this day
18 I cannot name any individual reviewers at
19 Labaton, for instance.  I mean, I know they were
20 doing the work, but I just -- I don't know
21 names.  I know Todd Kussin was their point
22 person, but I don't know individual names.
23          And the same goes for Thornton.
24 I'm pretty sure Mike Lesser and Evan did what
25 review they could outside of their other

32 (Pages 122 to 125)

126

1            Chiplock
2   litigation responsibilities.
3            And I know, based on preparing
4   for this deposition, we set up an account for
5   Michael Bradley, so I know that name now, too,
6   but I don't know any other names.
7        Q    Okay.
8            And you mentioned just a moment
9   ago that some of your staff attorneys were
10  working remotely; correct?
11       A    Yes.
12       Q    How would they report their
13  hours of document review?
14       A    They reported their hours
15  either on a daily or weekly basis. Whether --
16  either to us directly or to Thornton directly,
17  or both, depending on who they were reporting to
18  at the time.
19       Q    And did their remote status, in
20  your view, have any effect on their performance
21  in document review?
22       A    I would say no. I mean, you
23  met Chris Jordan, who worked remotely, and Chris
24  is one of our best reviewers, and is very
25  impressive, and he does very impressive work

127

1            Chiplock
2   product, is an excellent writer, and I think one
3   reason we use him -- he's based in Texas, and he
4   started on a case that we filed in Texas
5   originally, and we kept him on because he's so
6   good.
7            The people who work remotely
8   have proven themselves and they do high quality
9   work, so I'm confident that they're doing good
10  work, and they report their time to us steadily.
11       Q    Let me talk about the cost
12  sharing agreement with Labaton and Thornton.
13       A    Um-hum.
14       Q    How did that come about, as
15  best you know?
16       A    So --
17       MR. HEIMANN:  Which cost
18  sharing agreement?
19       THE WITNESS:  I was going to go
20  back to the beginning.
21       MR. SINNOTT:  Please.
22       A    From the get-go, the
23  understanding always was that the firms would
24  try to share equally in the risk, the three
25  firms would try to share equally in the risk of

128

1            Chiplock
2   the case. And by sharing in the risk, that
3   means trying to equally bear the costs, and
4   equally investing time and resources in the
5   success of the litigation.
6            That wasn't written down
7   anywhere, as far as I know, at the outset, but
8   the agreement, as it was recited to me -- sort
9   of like the handshake agreement -- was all for
10  one, one for all, that any fee would be -- like,
11  60 percent of that fee would be divided up
12  equally, we're just going to agree that at the
13  outset, so 20/20/20, the three firms split up
14  20/20/20, and the other 40 percent we can figure
15  out at the end of the case just based on an
16  overall appraising of the firms' contributions.
17  So that was --
18       JUDGE ROSEN:  Including the
19  ERISA firms?
20       THE WITNESS:  That was not
21  including the ERISA firms, because this
22  was before we even filed our case. So
23  this was before 2011 this understanding
24  came to be, so this was as we're
25  getting ready to file the case. The

129

1            Chiplock
2   ERISA case doesn't get filed until
3   later on, and we had no discussions
4   with them.
5       JUDGE ROSEN:  Okay.
6       A    So that was the overarching
7   understanding that animated the case throughout,
8   that all the firms would try to make equal
9   contributions, and so at the end of the day we
10  wouldn't have one firm saying, "Well, we did
11  everything," or, "We did all this stuff and you
12  didn't take on any of the risk, therefore you
13  don't get your fair share of the fee."
14       Q    So that was a handshake
15  agreement that you all --
16       A    Essentially.
17       Q    Nothing in writing, to your
18  knowledge?
19       A    Nothing in writing, to my
20  knowledge, because I -- yeah, I never saw
21  anything in writing on that.
22       JUDGE ROSEN:  Who were -- these
23  conversations, who were the
24  participants in these conversations?
25       THE WITNESS:  So I was not part

33 (Pages 126 to 129)

130

1              Chiplock
2        of that initial conversation, it was
3        just relayed to me that this is the
4        understanding.  And so Bob Lieff, Larry
5        Sucharow, I think Chris Keller at
6        Labaton may have been part of that, and
7        Mike Thornton.  I'm not sure who else.
8   BY MR. SINNOTT:
9        Q       Did that agreement stay the
10       same until the resolution of the case, or was
11       there a change in the outlook of it?
12       A       The final fee agreement, you
13       mean?
14       Q       No, this handshake agreement to
15       share costs.
16       A       It became more formalized near
17       the conclusion of the litigation.  And when I
18       say "conclusion," I mean literally a month or
19       two before we filed the final approval papers,
20       because the rest of that 40 percent has to be
21       figured out.  So that became more formalized at
22       the very, very tail end of the case, where it
23       was agreed that, you know, Lieff Cabraser, at
24       the end of the day, would collect something just
25       under 25 percent of any awarded fee, Thornton

131

1              Chiplock
2        would have its percentage, Labaton would have
3        its, and ERISA counsel would get 10 rather
4        than 9.
5              So that was divvied up formally
6        before we actually submitted the fee petition,
7        but up until that point the general
8        understanding was always the three firms will
9        try to equally contribute to the risk.
10       Q       And with respect to how they
11       would contribute to the risk, was there a change
12       of some kind in January of 2015 or thereabouts?
13       A       I wouldn't say it was a change.
14       I think there was an effort to implement.
15             Because we knew we had to staff
16       up the review to get it done, Thornton wished to
17       contribute to that effort on equal terms, or on
18       as equal terms as it could with the other firms,
19       understanding that it did not have the
20       facilities to host a dozen -- or however many --
21       attorneys who were strictly doing document
22       review.
23             And so they asked -- and I
24       think it was a telephone conversation I had with
25       Garrett Bradley, who asked me whether we at

132

1              Chiplock
2        Lieff Cabraser would be willing to house some
3        staff attorney document reviewers that Thornton
4        would pay for, so that Thornton could be making
5        its equal contribution to bearing the risk in
6        the litigation.  And I agreed to that.  I had no
7        problem with that.
8        Q       And were you aware as to
9        whether there was a parallel agreement with
10       Labaton?
11       A       I was aware at that time that
12       the same ask or arrangement was being requested
13       of Labaton.
14             I wasn't aware of any prior
15       arrangement.  So in January 2015 my assumption
16       was, "Okay, both we and Labaton are going to do
17       this so that Thornton can be an equal partner in
18       this effort."
19             JUDGE ROSEN:  Was there a
20       discussion between you, or someone else
21       at Lieff, and somebody at Labaton to
22       the effect, in order to implement
23       this -- "Okay, we've got 15 staff
24       attorneys working on this" -- or 30
25       staff attorneys, whatever the number,

133

1              Chiplock
2        between your two firms -- and by "staff
3        attorneys" I mean also document
4        reviewers -- "Why don't we each
5        contribute five" -- or some other
6        number -- "and allocate those five" --
7        or some other number -- "to Thornton
8        and bill them for that"?
9              Was there that sort of
10       discussion between you and the Labaton
11       folks?
12             THE WITNESS:  I believe there
13       was, that sounds familiar, and I
14       believe those were actually the numbers
15       we arrived at.
16             JUDGE ROSEN:  Conceptually, how
17       much detail did you discuss about how
18       this was going to be done?  Between you
19       and Labaton.
20             THE WITNESS:  Other than what
21       you just said, in terms of "We'll do
22       this and here's how the numbers -- you
23       know, we'll do this many staff
24       attorneys," I would say none.
25             We had had our own way at Lieff

34 (Pages 130 to 133)

134

Chiplock

1    Chiplock
2    Cabraser of keeping track, and I'm sure
3    we're going to get to how that process
4    broke down, but we had our own
5    processes in place for how we were
6    going to do that and how we were going
7    to keep track going forward to making
8    sure that Thornton was making its equal
9    contribution to the effort.
10       JUDGE ROSEN:  How did you --
11   Lieff -- decide which staff attorneys,
12   or reviewers/agency attorneys, would be
13   allocated to Thornton?  Was there some
14   sort of --
15       THE WITNESS:  Method?
16       JUDGE ROSEN:  Yes.
17       THE WITNESS:  I don't think
18   there really was.  I discussed it with
19   Kirti, and we talked about
20   practicalities, we talked about who's
21   available, who's -- because this is in
22   January of 2015, remember, so we have a
23   bunch of people coming over from Bank
24   of New York Mellon, so we're deciding,
25   okay, who's available.  I think Kirti

135

Chiplock

1    Chiplock
2    had a couple of people who had been
3    freed up from another case that were
4    being brought in.
5        So we decided who do we have --
6    we wanted to make sure Lieff Cabraser's
7    putting in its fair share, and then we
8    want to make sure we are meeting our
9    obligation to Thornton, so if we need
10   to hire a couple of people that are
11   being paid for by Thornton, let's go do
12   that, and we'll send Thornton the
13   resumes so they have them.
14       So those were the discussions.
15   But we didn't say, "X person should be
16   a Thornton person" just because --
17   there really wasn't much of a method to
18   it, we just decided who was available
19   and divided them up.
20       JUDGE ROSEN:  As part of your
21   initial discussions with Garrett
22   Bradley, and then your discussions with
23   Labaton, did you go to the next step
24   and say, "If there's a successful
25   resolution, either by settlement or a

136

Chiplock

1    Chiplock
2    litigated result, in the fee petition
3    we will permit Thornton to claim in
4    their fee petition for these
5    attorneys"?
6        THE WITNESS:  The attorneys
7    that they were financially responsible
8    for?
9        JUDGE ROSEN:  Correct.
10       THE WITNESS:  I would say it
11   was completely understood by me when I
12   talked with Garrett that that would be
13   how it worked, because it was obvious
14   to me that if you pay for the work that
15   is being done, then, just as with any
16   other employee when you're paying them,
17   that you include their hours in your
18   lodestar when you report it at the end
19   of the day.
20       I don't think that needed to be
21   spelled out for me or for Garrett; it
22   was just obvious.
23       JUDGE ROSEN:  It was tacit?
24       THE WITNESS:  I would go beyond
25   tacit, as in -- well, yeah.  I mean, we

137

Chiplock

1    Chiplock
2    didn't write it out, but it was obvious
3    to me that if you have an employee --
4    essentially, when you're paying someone
5    to do work, and you're taking on the
6    risk of not being paid for that work,
7    which is always a risk in our cases,
8    that if you paid for that work, you
9    include it in your lodestar at the end
10   of the day.  That was the
11   understanding.
12       JUDGE ROSEN:  So let me just
13   pursue this a little more.
14       There are at least two ways,
15   maybe more, in which Thornton could
16   have shared in the risk and cost
17   sharing, and ultimately shared in the
18   award.
19       One is the way in which you did
20   it, allowing these -- allowing Thornton
21   to claim these staff attorneys in their
22   fee petition --
23       THE WITNESS:  As their own.
24       JUDGE ROSEN:  -- as their own,
25   and bill the rates.  That's one way to

35 (Pages 134 to 137)

**138**

```
1              Chiplock
2  do it.
3         The other way to do it would be
4  to simply have billed them, without
5  allocating the attorneys, without
6  permitting them to put the attorneys in
7  their fee petition, simply billed them,
8  and then at the end you send them an
9  invoice for the pro rata share of the
10 costs of these document reviewers, and
11 then they paid it on an ongoing basis,
12 just as they were doing, and then at
13 the end, if there was a successful
14 result, either by settlement or
15 litigation, have the same reward
16 sharing agreement that you had,
17 20/20/20, or 25/25/25, however it
18 worked out, without having the paradigm
19 of putting these staff attorneys --
20 allowing Thornton to have these staff
21 attorneys on their fee petition.
22        THE WITNESS:  So -- okay, I
23 want to make sure I understand --
24        JUDGE ROSEN:  It's a long
25 question.
```

**139**

```
1              Chiplock
2         THE WITNESS:  -- the two
3  different scenarios.
4         To understand the alternative
5  that you're presenting, you're not
6  suggesting that Thornton should only
7  have been able to submit these people
8  as a cost item, in other words?
9         JUDGE ROSEN:  No, I'm not
10 suggesting that.
11        THE WITNESS:  You're saying
12 that Thornton ought to have been
13 able --
14        JUDGE ROSEN:  Well, they could
15 have done that, or not done it at all,
16 and gotten -- and gotten compensated at
17 the end in the way you had talked
18 about.
19        THE WITNESS:  Well -- okay.
20        I guess -- I guess what I would
21 say to that is Thornton didn't want to
22 be a special case, I don't think.
23        I mean, I shouldn't -- they can
24 speak for themselves, but the only
25 thing different about Thornton from us
```

**140**

```
1              Chiplock
2  is that the people doing the work for
3  them were not actually sitting in
4  Thornton's offices in Boston and doing
5  it.
6         JUDGE ROSEN:  And they were not
7  supervised by Thornton?
8         THE WITNESS:  I wanted to speak
9  to that.
10        JUDGE ROSEN:  All right, we'll
11 get to that.
12        But from what we've heard, from
13 some of your folks anyway, they had no
14 contact with Thornton lawyers, number
15 one --
16        THE WITNESS:  I can address
17 that.
18        JUDGE ROSEN:  Okay.
19        These were the staff attorneys.
20        THE WITNESS:  Um-hum.
21        JUDGE ROSEN:  Number two, many
22 of these folks -- not the agency folks,
23 but all of the other folks -- were your
24 employees.  You took the -- "you" Lieff
25 and Labaton -- took the burden of
```

**141**

```
1              Chiplock
2  employing them, you gave them W-2s and
3  all of the other -- they were employees
4  for --
5         THE WITNESS:  Right.
6         JUDGE ROSEN:  They weren't
7  called associates, but they were
8  employees.
9         THE WITNESS:  Um-hum.
10        JUDGE ROSEN:  You don't see
11 that as a distinction?
12        THE WITNESS:  Well, let me
13 speak first to whether the staff
14 attorneys had any interaction with
15 Thornton.
16        They may not have been
17 supervised on a day-to-day basis by
18 Thornton, the ones who were putting in
19 "Thornton hours" or doing "Thornton
20 review."  However, they did receive
21 guidance from Thornton, filtered
22 through me and/or Kirti.  And I say
23 that because Mike Lesser in
24 particular -- I would characterize Mike
25 as one of the thought leaders of this
```

**142**

Chiplock

1  
2  case overall, and Mike did send very
3  thoughtful, lengthy e-mails, and
4  musings, via e-mail to the rest of us
5  about what we should be looking for in
6  the case, important issues for
7  discovery.
8      Mike Lesser also was the
9  principal author of -- he was the
10  principal compiler of all the issues
11  that the staff attorneys wound up
12  writing memos on -- all of them, not
13  just the Thornton staff attorneys.
14  Mike was the principal author of that
15  list.
16      And so, yes, the staff
17  reviewers -- the staff attorneys whom
18  you have deposed were correct, and by
19  and large, that they had little or no
20  direct contact with Thornton attorneys,
21  but to say that the Thornton attorneys
22  were not providing guidance to the
23  overall effort would be unfair.  So I
24  want to make that clear.
25      JUDGE ROSEN:  That's good.

**143**

Chiplock

1  
2      THE WITNESS:  In terms of the
3  distinction, yes, we -- yes, we hosted
4  people in our facilities.  There are
5  costs associated with that.  We
6  provided the physical training for how
7  to use the Catalyst system.  We
8  provided workstations.  But we were
9  reimbursed, if we needed to be, for
10  that, or else, you know, Thornton paid
11  an agency directly for those people and
12  we just provided the physical space.
13      The reason why Thornton
14  included these people in their lodestar
15  was simply to recognize, I think, that
16  apart from that distinction, their
17  physical location, Thornton was not
18  making any less of a contribution to
19  this document review effort than the
20  other two firms were.
21      That was my belief.  And that's
22  what we were trying to implement by
23  keeping the numbers equitable as much
24  as we could.
25      JUDGE ROSEN:  That could have

**144**

Chiplock

1  
2  been recognized at the end, in giving
3  them the same share of an award.
4      THE WITNESS:  Fair enough.
5      If you have a judge who doesn't
6  care.  Some judges do.
7      Now, Judge Kaplan, in the
8  Southern District of New York, has a
9  reputation for looking beyond the total
10  lodestar number, and he will often say
11  in his cases, "I want to know what each
12  firm did.  I want to see your lodestar
13  reports, and I want to know who really
14  bore the risk in this case."
15      And Thornton had experienced
16  that in the Bank of New York Mellon
17  case, and I think they may have felt
18  that was unfair, and you can talk to
19  them about it.
20      JUDGE ROSEN:  Well, you've
21  anticipated my question, because it
22  goes to almost a philosophical
23  jurisprudential difference between
24  judges, and how judges --
25      THE WITNESS:  I think --

**145**

Chiplock

1  
2      MR. HEIMANN:  Let him finish.
3      JUDGE ROSEN:  -- and how judges
4  view the lodestar, how they view the
5  risk, how they evaluate, for purposes
6  of determining a fee, the risk.  It's
7  one of the interesting issues,
8  obviously, in this case, and in some
9  ways law firms have to know the strike
10  zone of their judge.
11      THE WITNESS:  Fair enough.
12      I think -- the bottom line is,
13  from my perspective, I viewed Thornton
14  as a co-equal partner in the venture in
15  getting the job done and in bearing the
16  risk of the case.  And as part of that
17  I viewed it as fair that they would
18  contribute the overall -- they would
19  contribute to the overall burden of
20  making sure that document review was
21  staffed and completed appropriately.
22  And they did that.  And I had no issue
23  with them seeking to be treated on an
24  equitable basis for purposes of their
25  fee petitions from us.  They didn't

37 (Pages 142 to 145)

---

146

1        Chiplock
2   want to be looked at differently, to
3   the extent anybody would look at them
4   differently, because their staff
5   attorneys were not sitting in their
6   offices in Boston, they were sitting
7   somewhere else.
8        JUDGE ROSEN:  I don't mean to
9   unduly expand this deposition and take
10  time, but this is a really important
11  issue, obviously, to Judge Wolf --
12       THE WITNESS:  Um-hum.
13       JUDGE ROSEN:  -- and in the
14  public perception.
15       From the perception of the
16  public and the perception of a judge,
17  the judge gets fee petitions.  It is
18  represented on the fee petition that
19  Thornton had X number of staff
20  attorneys/document reviewers working on
21  the case for them doing the review, and
22  this is the regular rates of these
23  lawyers charged to clients and having
24  been approved in cases.
25       THE WITNESS:  Um-hum.

---

147

1        Chiplock
2        JUDGE ROSEN:  A natural
3   conclusion that a judge is going to
4   draw from that is, "Oh, okay, this firm
5   has these folks, this is part of their
6   risk, and it's part of the" -- you may
7   say, "Well, in the end there's no
8   difference," but in a judge's mind,
9   like Judge Kaplan, I suspect Judge
10  Wolf --
11       THE WITNESS:  Um-hum.
12       JUDGE ROSEN:  -- there's a big
13  difference, because there's a certain
14  element of lack of transparency in the
15  way these fee petitions were presented
16  to Judge Wolf, in that the allocation
17  agreement was never -- at least in
18  anything we've seen -- disclosed to the
19  judge initially in the fee petitions.
20       So all of this begs the
21  question of best practices in the
22  future.  Maybe the best practice is to
23  do it exactly the way you did it here
24  but have a disclosure, an explanatory
25  disclosure to the judge exactly what

---

148

1        Chiplock
2   happened --
3        THE WITNESS:  That the staff
4   attorneys were used --
5        JUDGE ROSEN:  Not just housed,
6   on the grounds, supervised by and
7   employed by, on the employment rolls of
8   a different firm.  I'll go so far as to
9   say possibly, if it had been done that
10  way, the scrutiny may have been
11  different at the outset by your firms,
12  we would not have had the issue of the
13  inadvertent double billing --
14       THE WITNESS:  Double counting,
15  yes.
16       JUDGE ROSEN:  Double counting,
17  thank you.
18       And we might not all be here
19  today.
20       THE WITNESS:  Fair enough.
21  I read --
22       JUDGE ROSEN:  And let me just
23  finish.
24       This is important, at least in
25  terms of my investigation, a number of

---

149

1        Chiplock
2   contexts, not the least of which is I
3   think all of us, and particularly Judge
4   Wolf, is interested in lessons learned
5   and best practices in these kinds of
6   huge cases.  And this is one issue in
7   this case that informs my inquiry on
8   best practices.
9        So feel free, Dan, to comment
10  on anything along the way there, but --
11  and at the end we'll give you an
12  opportunity, as we have for everybody,
13  to comment on what best practices might
14  be from your firm's perspective in
15  managing these cases.
16       THE WITNESS:  Okay.
17       JUDGE ROSEN:  It's a lot.
18       THE WITNESS:  So in terms of
19  best practices, there were two -- there
20  were two errors, fundamental errors, on
21  the Lieff Cabraser side that
22  contributed to what happened by way of
23  an inadvertent double counting -- the
24  double counting.  The first of which I
25  can identify by the fact that Virginia

38 (Pages 146 to 149)

## 150

```
1               Chiplock
2    Weiss --
3          MR. HEIMANN:  Well, wait a
4    minute.
5          This is a volunteered
6    response -- I know where he's going,
7    but I don't think it's really
8    responsive to what you particularly --
9          JUDGE ROSEN:  If it's not
10   responsive, I won't use it, Rich.
11         MR. HEIMANN:  But I assume
12   you're going to get to a point where
13   you're actually asking him questions
14   about this.
15         THE WITNESS:  Well, I was
16   trying to get to that point.
17         JUDGE ROSEN:  I'm genuinely
18   interested -- genuinely interested in
19   not just how this happened, because we
20   do need record evidence on it -- and I
21   think that's where Dan's going here --
22         MR. HEIMANN:  He is, I know it.
23         JUDGE ROSEN:  -- so we do need
24   to get to it -- better now than
25   later --
```

## 151

```
1               Chiplock
2          THE WITNESS:  Yup.
3          JUDGE ROSEN:  -- we do need to
4    get to it, but the second part of the
5    inquiry is what can we do in the future
6    so it doesn't happen again.
7          THE WITNESS:  Yes.
8          So with respect to Virginia
9    Weiss and Andrew McClellan, who were
10   two agency lawyers whom we shared with
11   Thornton, their hours were allocated
12   correctly and accurately, as far as I
13   can tell, between the Thornton firm and
14   my firm.
15         The reason I believe that that
16   was done correctly is that they were
17   trained correctly at the outset not to
18   directly submit any time that they were
19   spending doing review on Thornton
20   folders to Lieff Cabraser's internal
21   time keeping system.  And I believe,
22   just by process of elimination, that
23   was because Kirti was present in early
24   2015, when those people began that
25   process.  And so that's why it was
```

## 152

```
1               Chiplock
2    handled correctly.
3          With respect to Ann Ten Eyck
4    and Rachel Wintterle, who started in
5    March of 2015, they were brought on to
6    fill a gap because we had lost a couple
7    of people, or a couple of people were
8    being transitioning -- transitioned
9    away.  They were brought on in order to
10   keep Thornton's contribution to the
11   effort equitable.
12         They were brought on at a time,
13   in March 2015, when our key people, as
14   it happens, were not there.  Two key
15   people in our human resources or
16   administrative roles at Lieff Cabraser
17   were absent.  One was on maternity
18   leave, one was on an extended sick
19   leave.  And Kirti, as it turns out,
20   during that crucial two or three-week
21   time period, was in India visiting
22   family, and so -- unbeknownst to me and
23   Nick Diamond, who was someone I had
24   delegated some of this role to, we were
25   both sitting in New York.
```

## 153

```
1               Chiplock
2          These new agency attorneys,
3    when they came on in March, were
4    trained to do what every other staff
5    attorney is trained to do when they do
6    work in our office, which is
7    religiously send your time to our
8    internal time keeping department, keep
9    careful record of your time.  Which
10   they did.  Religiously so.
11         We did not know, because we
12   didn't have reason to believe that they
13   were doing that, and that's why the
14   time for those two individuals -- even
15   though they're constantly sending their
16   time to their agency and they're
17   constantly letting the Thornton lawyers
18   know what they're doing, they're also
19   inputting their time into our system,
20   which they should not have been doing.
21         So that -- the process broke
22   down.  And from my vantage point, it
23   was sort of an anomaly created by the
24   absence of some key people, as
25   evidenced to me by the fact that we got
```

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

154

Chiplock

1
2 it right earlier that year when one of
3 our key people was around.
4        So that's not an excuse --
5        JUDGE ROSEN:  So earlier in the
6 year the time was not double counted?
7        THE WITNESS:  Correct, yes.
8        So it's just for those two
9 individuals for the three or so months
10 that they worked on the case, because
11 at the get-go they were trained by
12 somebody, I think in our IT department,
13 who didn't know who from who, that this
14 is how we keep track of our time at
15 Lieff Cabraser; you need to be careful,
16 you need to send it to our timekeeper,
17 and that's what they did.
18        So that's why the time for
19 those two individuals was included in
20 our system and it was never caught.
21 And that falls on me.  When I'm
22 reviewing our time in September of
23 2016, which is more than a -- almost a
24 year and a half later, you know, the
25 passage of time and my ignorance that

155

Chiplock

1
2 these people were not trained in the
3 way that they should have been trained with
4 respect to their time keeping -- I'm
5 paying attention to their work product,
6 to everybody's work product, and I'm
7 assuming that they were trained
8 correctly, but when I'm reviewing time
9 in September of 2016, over a year
10 later, it's not at the forefront of my
11 mind that there may be time in there
12 for certain staff attorneys which
13 shouldn't be.  I think it's been taken
14 care of.
15        So I've kicked myself a
16 thousand times since this process began
17 as to why my memory banks didn't work
18 better in September of 2016 --
19        JUDGE ROSEN:  You had a lot on
20 your mind and a lot to dangle, and you
21 didn't have a process in place to
22 capture this at a later point.
23        THE WITNESS:  Right.
24        JUDGE ROSEN:  Neither firm did,
25 neither Labaton nor Lieff.

156

Chiplock

1
2        THE WITNESS:  That was a
3 breakdown in the process, and it was
4 made possible by the absence of some
5 important people at the time they were
6 trained.
7        With respect to Mr. Zaul and
8 Mr. Jordan, who you met, who we shared
9 responsibility for a time with
10 Thornton, I think Thornton is
11 financially responsible for about eight
12 weeks of their time.  They entered
13 their time into our system so that we
14 had the capacity to create an invoice
15 that we could then send to Thornton.
16        I delegated that process to
17 Nick, and to Kirti, to work out with
18 our accounting department creating an
19 invoice and sending it off to Thornton
20 so that those hours are properly
21 accounted for and paid for.
22        What did not happen is once we
23 got paid for that time, once the check
24 came in --
25        JUDGE ROSEN:  Didn't come off

157

Chiplock

1
2 the rolls.
3        THE WITNESS:  -- that time
4 needed to be deleted from our system,
5 and that instruction, that specific
6 instruction, was never given to our
7 accounting department.  And, again,
8 that ultimately falls on me.
9        Now, in my defense, I'm
10 thinking I've delegated the issue of
11 billing and accounting for time
12 appropriately, I've delegated it
13 elsewhere, and it's being taken care
14 of, but I was not explicit enough with
15 that -- with that final instruction,
16 which is, "Once we get paid, that time
17 has to come out of our system, because
18 Thornton is obviously going to take
19 credit for time that it's paid for, as
20 it should."  So that's my fault also.
21        And so in September of 2016,
22 when I'm reviewing time records, I am
23 not thinking to myself, "There's time
24 in our system that should not be there,
25 I should go back and check."

40 (Pages 154 to 157)

158

1              Chiplock
2        JUDGE ROSEN:  So that's at the
3   front end.
4        THE WITNESS:  Yes.
5        JUDGE ROSEN:  At the back
6   end --
7        THE WITNESS:  What would have
8   helped me to figure it out?
9        JUDGE ROSEN:  Yes.
10       THE WITNESS:  It would have
11  helped -- it probably would have helped
12  had I seen the other firms' fee
13  petitions before they got filed.
14       JUDGE ROSEN:  And you didn't?
15       THE WITNESS:  I did not.
16       JUDGE ROSEN:  Either you or
17  some monitor for the three firms to
18  homogenize the petition to make sure
19  that things like this didn't happen?
20       THE WITNESS:  Yeah, and clearly
21  there were overlapping names on the
22  different fee petitions.
23       That was completely
24  transparent.  Nobody was hiding the
25  fact that there was the same people on

159

1              Chiplock
2   different ledgers.  And Judge Wolf did
3   not comment on that fact, after -- he
4   called the papers excellent.
5        So it was all there, all the
6   hours were there, all the names were
7   there, including names that appeared on
8   more than one ledger.
9        Had I seen the other two
10  petitions and seen the overlapping
11  names, it might have spurred me -- I
12  can't say for certainty, but it might
13  have spurred me to say, "I'm going to
14  go back and -- it's okay that there are
15  the same names here, but I'm going to
16  go back and make sure that we deleted
17  the time we needed to delete before
18  this petition goes in."
19       JUDGE ROSEN:  And that the same
20  names and the same time was not on both
21  petitions?
22       THE WITNESS:  Right.  Which is
23  what I'm saying.
24       JUDGE ROSEN:  For the same time
25  frame?

160

1              Chiplock
2        THE WITNESS:  For the same
3   time -- yeah.  The hours that needed to
4   be deleted should have been deleted,
5   and weren't.  So that's...
6        JUDGE ROSEN:  Look, we all
7   learn from hindsight --
8        THE WITNESS:  Correct.
9        JUDGE ROSEN:  -- but in the
10  benefit of hindsight, and best
11  practices going forward, do you believe
12  that allocating work done by staff
13  attorneys employed by your firm, or by
14  Labaton, for purposes of a fee petition
15  to another firm, is a best practice in
16  terms of transparency to the court, in
17  terms of transparency to the public, in
18  terms of avoiding these kinds of
19  errors, which are human errors --
20  you're beating yourself up.  You're a
21  busy guy and you have substantive
22  responsibility for the case, you're
23  beating yourself up for that when in
24  fact inherent in this system was a very
25  high potential for exactly this sort of

161

1              Chiplock
2   problem.
3        THE WITNESS:  Yes -- I
4   appreciate all of that.  And I think a
5   best -- a better practice going forward
6   would be if we are going to have this
7   kind of arrangement, that we say so in
8   our papers, and -- and say why we think
9   there's nothing wrong with that.  Which
10  I still honestly believe.
11       You know, Thornton could have
12  rented a room in Boston and housed a
13  bunch of staff attorneys.  They could
14  have done that.  It would have --
15       JUDGE ROSEN:  But more than
16  that, they would have had to have had
17  these folks on their payroll, they
18  would have had to have somebody
19  supervising their folks -- a Kirti, a
20  Todd Kussin --
21       THE WITNESS:  Right.
22       JUDGE ROSEN:  -- it's not
23  simply that they were housed somewhere
24  else.
25       THE WITNESS:  I get it.

41 (Pages 158 to 161)

162

Chiplock

1
2    JUDGE ROSEN:  You and I might
3    have a fundamental disagreement here.
4    It's not simply that.
5        THE WITNESS:  Fair enough.
6        I think a better practice would
7    be more transparency about the
8    arrangement, so that the judge can ask
9    us questions about it, if he has them,
10   and express his concerns, and we can
11   have this discussion about --
12       JUDGE ROSEN:  And the judge may
13   say to you, "That's not how I want you
14   to do it."
15       THE WITNESS:  He may.
16       JUDGE ROSEN:  Or she may say,
17   "That's not how I want you to do it, we
18   want full transparency in the
19   process, and attorneys who are paid by
20   a firm should be on that firm's fee
21   petition."
22       Okay, I'm done for a while.
23       Sorry.
24       This is a really important
25   piece of my investigation, because I

163

Chiplock

1
2    know it's an important piece for Judge
3    Wolf.  And I think for the profession.
4        THE WITNESS:  Understood.
5    BY MR. SINNOTT:
6        Q    Dan, let me just jump in with a
7    few documents that I think in some measures
8    buttress or corroborate what you've said, and in
9    one or two instances just prompt a couple of
10   questions.
11       I've got a document that
12   Labaton has provided to us, and it's Bates stamp
13   5253 and 5254, and it's an e-mail thread that
14   originated on Wednesday, November 9th, 2016, at
15   2:55 p.m., and it's from you to -- originally
16   from you to David Goldsmith concerning State
17   Street.
18       Then there's a message that
19   same day, at 3:38 p.m., from -- a return message
20   from Attorney Goldsmith to you, where he
21   appreciates your input where previously you had
22   said, "For what it's worth, I strongly agree
23   with just one fulsome letter on this issue."
24       That being a letter to Judge
25   Wolf; correct?

164

Chiplock

1
2    A    Yes.
3    Q    And then there's a more lengthy
4    message from you on that same day at 7 p.m., and
5    it's from you to David Goldsmith, but you've
6    also cc'd Evan Hoffman and Michael Lesser at the
7    Thornton Law Firm, and you describe what you've
8    been able to determine, and you reference some
9    of the things you just talked about, "Rachel
10   Wintterle and Ann Ten Eyck should not have been
11   included in Lieff's lodestar at all" --
12   A    Yup.
13   Q    -- and you talk about
14   Christopher Jordan and Jonathan Zaul and the
15   confusion over their hours, and you also speak
16   to Andrew McClellan and Virginia Weiss' lodestar
17   checks.  And other than expressing your grief
18   over the presidential election, it seems to
19   encompass some of those items that you've just
20   described.
21   A    Yup.
22   Q    Looking at that, is that, in
23   your view, consistent with the description that
24   you just gave Judge Rosen?
25   A    Yes, it is.  I remember it

165

Chiplock

1
2    well, and I remember the feeling I had as I
3    wrote it.
4        Q    Beyond the grief of the
5    election?
6        A    It was compounded.
7        Q    Let me show you something
8    else --
9        JUDGE ROSEN:  Not a good two or
10   three-day period.
11       THE WITNESS:  It was terrible.
12       I had flown back from
13   Jacksonville, Florida that day, because
14   I had been volunteering on Election Day
15   at a polling place.
16       Q    Let me show you a document
17   dated January 23rd, 2015, and this is from
18   Lieff's disclosure, and it's number 48780, and
19   there's an e-mail at the bottom, which is my
20   focus, from you to an Eric Fastiff, with Kirti
21   being cc'd.
22       Who's Eric?
23   A    Eric Fastiff is a partner in
24   our San Francisco office.
25   Q    Okay.  I was trying to be fancy

42 (Pages 162 to 165)

166

Chiplock
1
2    saying fas-teef, but it's fas-tif.
3        A    It's fas-tif.
4        Q    In that you say, "Eric" -- and
5    once again, this is dated January 23rd, 2015,
6    and initially at 7:16 a.m. you say, "Eric:  We
7    have a compressed amount of time to get some
8    additional document review done in the State
9    Street case, and I understand that some ████
10   reviewers may be freed up soon."
11       A    Uh-huh.
12       Q    "One of our co-counsel,
13   Thornton & Naumes, has asked whether we can
14   'house' up to five reviewers that they can pay
15   for."  And then in parentheses you say, "LCHB
16   itself would be responsible for around a dozen.
17   The entire project should not take more than
18   eight weeks, and may take less than that.  Since
19   this plan would not involve hiring any more
20   people, just reassigning people who are already
21   here, I'm hopeful that we can manage it space
22   wise.
23            "If you want to discuss
24   logistics and economics of it, I'm in the office
25   and available today, except for a handful of

167

Chiplock
1
2    calls.  Thank you very much."
3            Eric acknowledges your message
4    and says, "Joy will come speak with you in the
5    New York office today," and you respond by
6    thanking him.
7        A    Uh-huh.
8        Q    So describe, if you would, in
9    the context of what you just told us, what your
10   conversation was with Garrett Bradley, and what
11   the level of that discussion was as far as the
12   assignment of staff attorneys was.
13       A    Well, it was as I described.
14   I'm sure I sent this e-mail pretty shortly after
15   I spoke with Garrett, and we were trying to
16   quickly come up with a solution.  And Eric was
17   overseeing a case that involved a number of
18   staff reviewers, and so we were simply trying to
19   take stock of who we had available.
20            Separate and apart from people
21   who were being rolled over from the Bank of New
22   York Mellon case, we wanted to take stock,
23   because space was also a concern in our office
24   in San Francisco.  We had a lot of people -- if
25   I remember correctly, in early 2015 we had a lot

168

Chiplock
1
2    of document reviewers, and I'm not sure how much
3    more room we had to hire new people, so it was
4    more of an allocation issue.
5        Q    Okay.
6            And let me bring you to April
7    of 2015.  And these are documents provided by
8    Thornton Law Firm, and e-mails involving you and
9    persons at Thornton and persons at Labaton as
10   well.  At any time I'll be happy to show it to
11   you, but in the interest of time, let me just
12   reference a couple of things.
13            There's a message from Mike
14   Rogers on Monday, April 13th in the morning, at
15   10:37, to Mike Lesser.  For this particular page
16   the Bates stamp -- the entire Bates unit for
17   this thread is TLFSST 014836 through 843, and
18   this particular document is on 841, and in this
19   message from Mike Lesser of Thornton to -- I'm
20   sorry, from Mike Rogers of Labaton to Mike
21   Lesser of Thornton, in which you, Kirti and Evan
22   Hoffman are cc'd, you respond to a message from
23   just a minute before in which Mike Lesser had
24   written to you, "Batch as necessary for any
25   available reviewers.  I see most of these as one

169

Chiplock
1
2    to a reviewer, except where there is obvious
3    synergy, like the one person should probably
4    take the first three on the PTEs and Section
5    408(b).  Use your judgment in assigning the more
6    hot topics to more better reviewers (bad grammar
7    supplied)" --
8        A    I think he was being funny.
9        Q    I think he was being funny.
10           So what was Mike Lesser saying
11   to you in that message, and to Mike Rogers?
12   What was the message with respect to the
13   document review?
14       A    Well, I think, as best as I can
15   recall, Mike Lesser, as I said earlier, was the
16   principal compiler of the many issues that we
17   had document reviewers focus on when writing the
18   memorandum, and he -- there were a series of
19   e-mails, there wasn't just one, where he
20   circulated ideas for people to focus on.
21           Mike Rogers and I contributed
22   thoughts to that process, but it was mostly Mike
23   Lesser.
24       Q    And you acknowledge that
25   response -- I'm sorry, Mike Rogers acknowledged

43 (Pages 166 to 169)



170

171

172

```
 1            Chiplock
 2  turnover.
 3            That was never explained to me.
 4  I don't think anybody really responded to this
 5  e-mail.  I don't remember getting a response.
 6       Q      I think you kind of respond to
 7  your own e-mail --
 8       A      By cutting -- by cutting back,
 9  yeah.
10            So I think -- this is why we
11  reallocated in the middle of April 2014.  So Jon
12  Zaul and Chris Jordan come back onto the Lieff
13  Cabraser ledger at this point, Ann Ten Eyck and
14  Rachel Wintterle, they continued as Thornton
15  contract agency attorneys.  But that's why --
16  that's why Chris and Jordan were brought back
17  onto the Lieff Cabraser ledger, because I was
18  under the impression that the numbers had
19  changed while I wasn't paying attention, because
20  I wasn't focused on the day-to-day of the
21  staffing, I was assuming it was being maintained
22  on an equitable basis.
23       Q      All right.
24       A      And so that's why we adjusted.
25            But nobody ever corrected me.
```

173

**174**



**176**

```
1              Chiplock
2   with the Department of Labor, we're dealing with
3   other issues, and so when a year goes by and
4   we're preparing the papers, that discussion
5   doesn't get picked back up, and instead we
6   prepare our fee petitions, it's based on a
7   template that's given to us by Labaton, we fill
8   in the information we need to, we review our own
9   lodestar to make sure we're taking out hours we
10  need to take out to the best of your knowledge,
11  and then it all gets filed, and that discussion
12  never continued about harmonizing and making
13  sure we explain what we need to explain.  And so
14  I blame the passage of time.  I don't blame the
15  goodness of the people involved.  I think
16  everybody had good intentions and worked hard,
17  but...
18        Q     Do you think you
19  overcomplicated things by coming up with this
20  allocation theory?
21        A     In retrospect, it was
22  probably -- it didn't need to be this
23  complicated.
24              Again, from the Lieff Cabraser
25  standpoint, this were two fundamental mistakes,
```

**175**

```
1              Chiplock
2         In September of 2016, a year
3   and a half later, we submit the papers, with
4   names -- all the names are there, they're on
5   different ledgers, the same names, but there's
6   no explanation, and I think we should have
7   supplied the explanation, and if we were
8   submitting our fee petitions in May of 2015,
9   when this issue was fresh in our minds, we may
10  have done that, but by September of 2016 -- you
11  know, there's even an e-mail exchange, and we
12  produced it -- we produced these documents also,
13  they're in our production, you just may not have
14  seen it yet --
15        Q     Yeah.
16        A     -- I believe in September of
17  2015, which is a few months after this, there's
18  an e-mail exchange about, you know, we should
19  talk about the fee petitions and, you know, how
20  we're going to harmonize and explain the issues
21  to the court.  And I think Mike Rogers responds
22  and said, "Yes, that's a good idea, let's do
23  this."
24        But this is September 2015.
25  And then we get waylaid because we are dealing
```

**177**

```
1              Chiplock
2   which I've identified; the training of Rachel
3   and Ann when they started, and the failure to
4   instruct our accounting department at the end of
5   the day to remove the time submitted by Jordan
6   and Zaul that was paid for by Thornton.  Those
7   were the two key mistakes.
8         Had we not made those two key
9   mistakes, there would have been no double
10  counting whatsoever.
11        And I, arguably, wouldn't be
12  sitting here -- although maybe I would be
13  because I'm part of the whole case.  But if it
14  weren't for those two mistakes, the double
15  counting would not have occurred on the Lieff
16  Cabraser side.  So that's what I kick myself
17  over, and I wish we could have avoided.
18        I don't blame the process so
19  much as human error for those two mistakes.  The
20  ultimate human error is mine.
21        Q     Thank you, Dan.
22        MR. SINNOTT:  For the record, I
23        just confirm what Attorney Chiplock
24        said, Lieff did turn over that thread,
25        beginning at LCHB-52620 through 626,
```

45 (Pages 174 to 177)



**178**

**180**

1   Chiplock
2

17   Q      And did you consider this to be
18   substantive guidance?
19   A      Yes, I did.
20   Q      Thank you.
21          I have a two-page e-mail thread
22   that your firm has provided as part of
23   discovery, and this is LCHB-52627 and 52628.
24   I'm going to ask you to look at this and explain
25   what's going on, but it would appear that

**179**

to

**181**

1          Chiplock
2   there's a discussion beginning in this thread in
3   August of -- end of August of 2015 in which you
4   and others from Labaton and Thornton are trying
5   to figure out what the document reviewer rate
6   is.
7          So let me ask if that's a
8   mischaracterization, and see if you can tell me
9   if there was any resolution of that.
10   A      Yeah, so this is probably the
11   communication I alluded to earlier.
12          Yes.
13          So there's an e-mail in here --
14   so the exchange begins with Mike Rogers
15   suggesting that at this stage of the case we
16   should gather our time and daily backup, as he
17   calls it, plus our expenses info, and start to
18   get a hang on what the total lodestar expenses
19   are in the case, because this is right around
20   the time when we're getting ready to sign a term
21   sheet in our case.  We had already reached an
22   agreement in principle to settle the case in
23   June, so this is a couple months after that.
24          And I respond and say, "That's
25   a good idea," and then I say, "Do we want to cap

46 (Pages 178 to 181)

182

Chiplock

1    Chiplock
2    document reviewer rates at a certain level?"
3    And I say, "We probably need to pick a
4    consistent rate."  In Bank of New York Mellon,
5    the top document reviewer rate was 425 an hour.
6            And then I say, "We didn't
7    include lodestar for timekeepers who billed less
8    than ten hours."  That's a fairly typical
9    adjustment that's made.
10           Yeah, and then there's
11   follow-up e-mails to this, like, "Are we ready
12   to exchange our time yet?  Are people done
13   preparing their time and expenses?  Can we
14   circulate them?"
15           But that discussion about
16   capping rates never was picked up again.  Like,
17   how -- what rates do we want to set for document
18   reviewers was not picked up again, and this was
19   2015.  We do the fee petitions, I think, almost
20   exactly a year after this, so -- it just didn't
21   happen.
22       Q     And let me show you a thread
23   from 2016 -- I'm sorry, from November 16th of
24   2016, so this would be after the
25   unpleasantness --

183

Chiplock

1    Chiplock
2       A     Yeah.
3       Q     -- in the case.
4       A     On multiple levels.
5       Q     On many levels.
6            This was provided -- the
7    document I have in my hand is from Thornton Law
8    Firm, although it may have been provided by your
9    firm as well, because you are an addressee on
10   it, but beginning with TLFSST-015066, and the
11   thread concludes on 015071.
12           In this thread there's a
13   discussion about the lodestar in this case, and
14   the multiplier.  And if I could direct your
15   attention to page 15067, and ask you to look
16   at -- and I'll give you the preceding pages as
17   well, but the two e-mails in the middle.
18           First of all, the one that you
19   send, but the one below that --
20       A     Yeah.
21       Q     -- what is that discussing as
22   far as a methodology?
23       A     I think where -- you mean where
24   I say, "I think to the extent there are any
25   shared attorneys where the lowest rate that was

184

Chiplock

1    Chiplock
2    reported in the prior declarations is the one
3    that should be used"?
4       Q     Yes.
5       A     Is that -- yeah.
6            So for purposes of the
7    corrective letter, the mea culpa letter that was
8    sent to the court on November 10th --
9       Q     Yeah.
10      A     -- we took the view -- I think
11   it was suggested by Labaton, and I agreed, that
12   we should give the court the most conservative
13   view of what the total all-in lodestar would be
14   once you corrected for the double counting.  And
15   the way to do that was not to worry about who
16   paid for what, in terms of labor, but instead to
17   take any so-called double counting time and only
18   include the time that was billed at a lower
19   rate.
20           And so Thornton I think by and
21   large used 425, perhaps thanks to this e-mail
22   from fall of 2015, where I said, "in Bank of New
23   York Mellon I think we used 425," which I think
24   we did, because Thornton was involved in that
25   case, too.  So they used 425.

185

Chiplock

1    Chiplock
2            Our rates tended to be lower --
3    not always, but they tended to be at 415,
4    sometimes they were at 515 for just a couple of
5    people, whereas Labaton's tended to be around
6    375.  Some of them might have been higher, I
7    can't remember.
8            So for purposes of that
9    corrective letter, we wanted to give the court
10   the most conservative view of what the total
11   lodestar would be so that we could make -- the
12   companion point was even if you take the most
13   conservative view -- in other words, even if you
14   treated this error the most harshly and removed
15   the time, any double counted time that was at
16   the higher rate, just throw that out, the effect
17   on the multiplier is still not that great, and
18   certainly within the bounds of -- well within
19   the bounds of what's permitted in the First
20   Circuit.
21      Q     All right.
22      A     So that was -- so this
23   discussion happens after that, and we're talking
24   about preparing corrected fee declarations, and
25   I think we're trying to figure out, A, should we

47 (Pages 182 to 185)

**186**

Chiplock

1 
2 do that; B, if we do that, do we do it in a way
3 that's totally consistent with that letter, or
4 do we really try to figure out who paid for what
5 and prepare the corrected declarations that way?
6 Because you can come up with two slightly
7 different results as a result of doing that.
8    Q    And along those lines, the
9 first page in that thread, 015066, you seem to
10 speak about the need for consistency and taking
11 a conservative approach.
12    A    Yeah.
13    Q    Describe that final message
14 from you in the thread.
15    A    Yeah, I think I'm saying if --
16 if we need to submit corrected declarations --
17 and I think we did prepare them.  We didn't file
18 them because we were awaiting instruction, but
19 we were prepared to file them if instructed, and
20 the upshot at this point in time was to prepare
21 them so that when the court took all the fee
22 petitions together and considered the lodestar
23 as a global unit, he would get the most
24 conservative view of what the lodestar should
25 be.

**187**

Chiplock

1 
2    Q    Okay.
3    JUDGE ROSEN:  Could I...
4    I'm trying to understand how
5 taking the lower amount billed would be
6 the most conservative view?  Because if
7 you took the highest amount billed,
8 that would produce a bigger number, and
9 a potentially more alarming --
10    THE WITNESS:  I get it.  I'm
11 saying conservative from our
12 standpoint.
13    JUDGE ROSEN:  From your
14 standpoint.
15    THE WITNESS:  What we wanted to
16 tell the court --
17    JUDGE ROSEN:  But a worst
18 scenario would have been to take a
19 higher number, the higher rate number?
20    THE WITNESS:  Right.  But my
21 point is we wanted to tell the court,
22 "Even if you decide" -- even if we were
23 compensated at lower rates --
24    JUDGE ROSEN:  Ahh.
25    THE WITNESS:  -- across the

**188**

Chiplock

1 
2 board or on average, because you
3 removed the double counted hours that
4 were reported at higher rates, you
5 throw those out and we lose the
6 "benefit" of that higher lower
7 lodestar --
8    JUDGE ROSEN:  I see, by
9 throwing out the higher numbers...
10    THE WITNESS:  We threw out the
11 higher numbers so that we would not get
12 the benefit of that number, which
13 results in a larger multiplier.  And,
14 as you know, the bigger the multiplier
15 gets, the more a court will look at
16 your fee as potentially unjustified.
17    So we wanted to basically tell
18 the court, Judge -- Judge Wolf, "Here's
19 the worst case scenario.  If you were
20 to remove this high-priced time, this
21 high-priced double counted time from
22 our ledgers, even if you did that, the
23 resulting effect on the multiplier is
24 .2, and that's the worst case
25 scenario."

**189**

Chiplock

1 
2    If we included our higher
3 priced time, the resulting effect on
4 the multiplier would have been that
5 much smaller; it might have been .1 or
6 less.
7    JUDGE ROSEN:  But to complete
8 the perspective, if you included it
9 just as it was, the higher time and the
10 lower time, the actual numbers of hours
11 double counted and actual total dollar
12 value double counted would be higher?
13    THE WITNESS:  That's what we --
14 that is what we were reporting.  That's
15 what was reported in the original fee
16 petition, which corresponded to a
17 multiplier of 1.8.
18    Once we made the harshest
19 correction, if you will, that one could
20 based on rates, it resulted in a
21 multiplier of 2.0, as opposed to 1.8.
22 BY MR. SINNOTT:
23    Q    Who in your accounting
24 department maintained the hourly data, Dan?
25    A    I wouldn't say it's one

48 (Pages 186 to 189)



190

192

191

193

1          Chiplock
2     individual qui tam cases was not being included
3     in the class benefit time.
4          Q     So you were trying to segregate
5     to avoid billing for the same work in more than
6     one case?
7          A     Right.  Because they had a very
8     similar -- they had the same case number, but
9     different subcodes, different matter numbers,
10    and sometimes people make mistakes when they're
11    writing down their time, and so I remember going
12    through hundreds of pages of records to make
13    sure that time was correctly allocated between
14    the two different matters.
15         Q     Now, at some point did you
16    receive from Nicole Zeiss at Labaton a template?
17         A     For the fee declarations?
18         Q     Yes.
19         A     Yes.
20         Q     And was this a usual practice
21    for lead counsel?
22         A     Yes.
23         Q     And when Lieff is lead counsel,
24    do you provide templates to other firms?
25         A     I believe we did.  I believe in

49 (Pages 190 to 193)

194

Chiplock

1
2     the BoNY Mellon case we created the template and
3     circulated it to other counsel in the case for
4     them to insert firm-specific information.
5          Q     In this particular case, with
6     this template, do you recall whether you made
7     any changes in the language?
8          A     I don't recall making any
9     changes other than changes that were specific to
10    my firm --
11         Q     Okay.
12         A     -- specific information related
13    to my firm's contributions and lodestar and
14    costs, that sort of thing.
15         Q     And with respect to that
16    language -- showing you the declaration that you
17    submitted in this case, and if I could direct
18    your attention to paragraph five --
19         A     Yup.
20         Q     -- I'm sure it's not a surprise
21    to you that we're going to ask about this
22    matter.
23         A     Yup.
24         Q     To quote it, it says in
25    paragraph five of the fee declaration, "The

195

Chiplock

1
2     hourly rates for the attorneys and professional
3     support staff in my firm included in Exhibit A
4     are the same as my firm's regular rates charged
5     for their services, which have been accepted in
6     other complex class actions."
7          A     Um-hum.
8          Q     As you were reviewing the
9     language for this case, did you pay any
10    particular attention to that paragraph?
11         A     I did.  I reviewed it.
12         Q     Is this the same or similar to
13    language you've used in other cases?
14         A     I don't know that it is
15    identical to any declaration I've ever signed,
16    but the concept is similar to what we have
17    conveyed in our other fee applications, which is
18    to say, "These are our regular rates.  These
19    have been readily accepted in other
20    jurisdictions, in other class cases, or
21    routinely accepted," or whatever the wording
22    might be.
23              I will say that we submitted
24    language that was similar to this in the Bank of
25    New York Mellon case, and if anything we were

196

Chiplock

1
2     even more explicit that these are rates we have
3     charged paying clients, and they have paid them.
4          MR. HEIMANN:  And I have copies
5     of that declaration with me, which you
6     might -- if you haven't seen, you may
7     want to take a look at.
8          JUDGE ROSEN:  The BoNY
9     declaration?
10         MR. HEIMANN:  Yes.
11         JUDGE ROSEN:  I think that
12    would be helpful.
13         Let me just jump in -- quickly,
14    I hope.
15         Your firm at times did have
16    paying clients; right?
17         THE WITNESS:  Yes.
18         JUDGE ROSEN:  Did these rates
19    reflect the rates charged to those
20    paying clients?
21         THE WITNESS:  As far as I know,
22    the rates we charged to paying clients
23    were market-based rates, like these,
24    and were the same or comparable to.
25         And I say that because it might

197

Chiplock

1
2     have happened in different years.
3          So we had a paying client, for
4     instance, on a case I cut my teeth on
5     in the early 2000s, against McKesson
6     HBOC, and we worked for a client who
7     was paying us by the hour, and we had a
8     couple of contract staff attorneys
9     doing document review, and I think on
10    average we billed them out at $300 an
11    hour, but that was in 2003.  So rates
12    do change from year to year, but our
13    regular rates are what they are.
14         JUDGE ROSEN:  But to your
15    recollection, in those relatively rare
16    instances, but in those instances, that
17    you had paying clients, the rates in
18    the fee petition were the rates that
19    you actually charged the paying
20    clients, maybe adjusted for passage of
21    time, inflation and those sort of
22    things?
23         THE WITNESS:  Yes, our regular
24    rates were the same.
25         Now, some clients can get

50 (Pages 194 to 197)

**198**

Chiplock
1
2  discounts, as it does happen, but our
3  regular rates were what they were, and
4  we had clients who paid our regular
5  rates.
6      MR. HEIMANN: I would emphasize
7  you might want to look at the BoNY
8  Mellon declaration, because it
9  addresses this very issue.
10      THE WITNESS: We were very
11  explicit about that.
12      JUDGE ROSEN: Thank you. We
13  will.
14      You know, for purposes of the
15  record, we did this a little bit
16  informally. Are you able to verify --
17  look at this and verify and
18  authenticate this as the declaration
19  that was used? And we should have it
20  as an exhibit.
21      THE WITNESS: I can. Except I
22  will note in the copying of this
23  document they left off my signature
24  page, so we may want to provide you
25  with a completed version.

**199**

Chiplock
1
2      And the very --
3      JUDGE ROSEN: Let me just say,
4  there is a signature page that you
5  signed?
6      THE WITNESS: There is a
7  signature page that I signed.
8      This whole document is on
9  Pacer, it's a public document, but we
10  can get you a complete copy.
11      The other thing we did was to
12  leave off Exhibit A, which is our firm
13  resume, and is over a hundred pages
14  long, and I don't think is necessary
15  for your purposes.
16      MS. MCEVOY: We have the copy
17  of something similar.
18      THE WITNESS: I think we
19  produced it anyway.
20      MR. SINNOTT: And just to read
21  into the record the BoNY Mellon
22  paragraph five also --
23      THE WITNESS: Yes, it's
24  paragraph five.
25      MR. SINNOTT: Why don't you

**200**

Chiplock
1
2  read that into the record, Dan.
3      THE WITNESS: So in the BoNY
4  Mellon fee declaration we said in
5  paragraph five, "The hourly rates
6  charged by the timekeepers are the
7  firm's regular rates for contingent
8  cases, and those generally charged to
9  clients for their services in
10  non-contingent/hourly matters." And
11  then there's a footnote.
12      JUDGE ROSEN: Read the footnote
13  now.
14      THE WITNESS: Yup, footnote
15  two.
16      "On occasion, and for a
17  specific type of representation, the
18  firm may offer a discount on its hourly
19  rates to longstanding clients."
20      So then I can continue -- so
21  going back to the body of paragraph
22  five, it continues, "Based on my
23  knowledge and experience, these rates
24  are also within the range of rates
25  normally and customarily charged in

**201**

Chiplock
1
2  their respective cities by attorneys
3  and paraprofessionals of similar
4  qualifications and experience in cases
5  similar to this litigation, and have
6  been approved in connection with other
7  class action settlements."
8      JUDGE ROSEN: So all of this
9  begs the following question:
10      This is obviously a much more
11  explicit and robust, complete
12  explanation, as compared to
13  paragraph --
14      THE WITNESS: Five.
15      JUDGE ROSEN: -- five of your
16  declaration in the State Street case.
17      THE WITNESS: Yep.
18      JUDGE ROSEN: Why not use
19  exactly this language?
20      THE WITNESS: This was the
21  template provided to me -- there's
22  no...
23      There's no official officially
24  accepted language to convey this point.
25      In the Bank of New York Mellon

51 (Pages 198 to 201)

## 202

1          Chiplock
2    declaration -- I don't even know if
3    other firms in the Bank of New York
4    case used the same exact language that
5    I used in paragraph five.  I know we
6    provided templates.
7          I actually doubt that every
8    firm used the exact same language,
9    because some firms may never have had a
10   paying client at all.  The fact was we
11   had, and we view that fact as helpful
12   for the court to evaluate our rates.
13         JUDGE ROSEN:  Why not put it in
14   the State Street?
15         THE WITNESS:  Well, it does say
16   that.  It says, "These are my firm's
17   regular rates charged for their
18   services."
19         JUDGE ROSEN:  Well, this is a
20   more full, complete and robust
21   explanation.  More transparent, you
22   might say.
23         I'll just ask the question.
24         You knew that in Bank of New
25   York Judge Kaplan was very concerned

## 203

1          Chiplock
2    about these kinds of issues --
3          THE WITNESS:  About fees and
4    billing generally.
5          JUDGE ROSEN:  Fees and billing.
6          Is that why your language was
7    more robust in the BoNY case maybe?
8          THE WITNESS:  I think we were
9    just trying to give the judge as much
10   comfort as possible that the rates we
11   are charging are, in our view,
12   reasonable.  We also submitted a
13   lengthy declaration from Professor
14   Coffey in that case, that went to that
15   point and then some.
16         JUDGE ROSEN:  But your language
17   in paragraph five of the BoNY
18   declaration would have been -- well,
19   let me ask you.
20         Would it not have been equally
21   applicable to the State Street case --
22         THE WITNESS:  Yes.
23         JUDGE ROSEN:  -- and usable --
24         MR. HEIMANN:  Wait until the
25   finish, please.

## 204

1          Chiplock
2          JUDGE ROSEN:  -- and usable in
3    your declaration in State Street?
4          THE WITNESS:  Sure.  I think it
5    would have been.
6          I will add that when I read the
7    language in paragraph five in State
8    Street, I did not have an issue with it
9    because it jibed with my overall
10   understanding of our rates, and the
11   marketplaces in which we've worked, and
12   the fact that our rates had regularly
13   been accepted in class cases.  It's
14   definitely a shorter paragraph than
15   what we used --
16         JUDGE ROSEN:  You thought it
17   captured what you needed to capture?
18         THE WITNESS:  I did not have an
19   issue with it.  I thought it captured
20   what we needed to convey, as far as
21   Lieff Cabraser was concerned.
22         In retrospect, certainly I
23   will -- would have included the longer
24   version that we included in BoNY, but
25   we were not lead counsel, we didn't

## 205

1          Chiplock
2    write the template, and I didn't have
3    an issue with what was presented to me.
4          JUDGE ROSEN:  Can we make both
5    of these exhibits to the deposition?
6          THE WITNESS:  Do you want a
7    version with my signature page?
8          JUDGE ROSEN:  For the
9    deposition, yeah.
10         THE WITNESS:  Okay, we'll get
11   one to you.
12         MR. SINNOTT:  Would you like
13   these marked and entered?
14         JUDGE ROSEN:  Yes, I think so.
15         MR. SINNOTT:  If Madam Court
16   Reporter would first have a document
17   that was Exhibit 17 to the fee
18   petition, and it's styled as
19   "Declaration of Daniel P. Chiplock on
20   Behalf of Lieff Cabraser Heimann &
21   Bernstein, LLP in Support of Lead
22   Counsel's Motion for an Award of
23   Attorneys' Fees and Payment of
24   Expenses" in the Arkansas Teacher
25   Retirement System, et al. case versus

52 (Pages 202 to 205)



**206**

**208**

**207**

**209**

```
 1            Chiplock
 2  would be helpful or appropriate in future fee
 3  petitions?
 4       A    Certainly.
 5            JUDGE ROSEN:  Maybe in
 6  conjunction with the same language that
 7  you used in the BoNY case?
 8            THE WITNESS:  Yeah.  I mean,
 9  it's all intended to convey the same
10  thing, but, yes, we could be even more
11  explicit.
12            MR. HEIMANN:  To clarify, I can
13  tell you that those rates have also
14  been accepted and applied in cases --
15  recent cases -- where the fee award was
16  based on a lodestar and not as a simple
17  cross-check.
18            MR. SINNOTT:  Thanks, Richard.
19  BY MR. SINNOTT:
20       Q    Let me ask you about Michael
21  Bradley.
22       A    Yes.
23       Q    When did you first hear Michael
24  Bradley's name, and in what context?
25       A    Okay.  So I will -- the first
```

53 (Pages 206 to 209)

**210**

Chiplock

1
2 that I recalled hearing Michael Bradley's name
3 was after November 10th, 2016. And the context
4 was I was asked by e-mail by David Goldsmith
5 whether it was possible to go back and check
6 Catalyst to confirm that Michael did -- actually
7 went online and did document review work on the
8 platform. And that was the first time I
9 recalled hearing Michael Bradley's name.
10        JUDGE ROSEN: Did you know who
11    he was?
12        THE WITNESS: I actually did
13    not. I did not make the connection
14    with the last name at all.
15        And only subsequent to that --
16    and I don't remember how much later --
17    I found out it was Garrett's brother.
18    But I -- I did not make that connection
19    when I first heard the name, because
20    Bradley's a common name.
21        As it turns out -- and we've
22    given you the documents in preparation
23    for today's testimony -- Kirti located
24    an e-mail from way back in 2013 where
25    Evan asked Kirti to set up an account

**212**

Chiplock

1
2 Bradley was.
3        Then I think Nicole wrote and
4 said, "You know what, don't check, we'll just
5 wait and see if anything comes of it."
6        But then the Thornton firm
7 actually contacted Kirti directly and asked him
8 the same question. So he checked, and
9 determined, as David suspected, it was not
10 possible to confirm whether or not Michael had
11 worked on the platform because the Catalyst
12 platform had been shut down for a year and a
13 half at that point, and we had all of the
14 documents and the coding on a hard drive, but
15 there was no way to audit any individual user's
16 work in retrospect by looking at that
17 information.
18        JUDGE ROSEN: You could have --
19    I'm not suggesting you should have, but
20    you could have paid to have the
21    Catalyst platform reignited and gotten
22    back into it, could you not have?
23        THE WITNESS: Ask Kirti this
24    question.
25        The answer is yes, we could

**211**



**213**

Chiplock

1
2 have had it all put back on the
3 Catalyst system, but I think even then
4 it would not have been possible to do
5 an audit of any individual user's work
6 from years prior, because I just don't
7 think the system was built to capture
8 that.
9 BY MR. SINNOTT:
10        Q     So to this date you're unaware
11 whether there was any substantive entries in
12 Catalyst by Michael Bradley?
13        A     I'm personally unaware. All I
14 know is, as I learned yesterday, we did set up a
15 Catalyst account for him in 2013.
16        Q     And were you aware of any
17 other --
18        MR. SINNOTT: Strike that.
19        Q     Outside of what would be
20 required to -- if anything -- to capture entries
21 by Bradley -- Michael Bradley -- in the Catalyst
22 system, did any other documents ever come to
23 your attention, or since that time, with Michael
24 Bradley's name on them in the way of hot
25 documents or work product relative to document

54 (Pages 210 to 213)

214



215

216

1        Chiplock
2    issue, I'm trying to figure out what happened."
3    And I believe all that has been produced also.
4    And essentially it's just retracing the
5    essential communications from the January to
6    May 2015 time frame that lay out who was doing
7    what work for whom and when, and which hours
8    were actually paid for, or otherwise covered, by
9    Thornton.
10       Q       All right, thank you.
11       A       Yup.
12       Q       Previously you've referred to
13   the Thornton file or folder.
14       A       Folders.
15       Q       Folders.
16               What were you referring to?
17       A       So when we agreed to allocate a
18   certain chunk of the document review to staff
19   attorneys who were Thornton's financial
20   responsibility, Kirti created what he called
21   Thornton folders -- or he might have called them
22   Naumes folders.  He used one of the names.
23       Q       And the previous name of the
24   firm was Thornton & Naumes?
25       A       Was Thornton & Naumes, yeah.

217

1        Chiplock
2            So Kirti actually created these
3    folders that were specifically delineated for
4    review by attorneys who were Thornton & Naumes'
5    financial responsibility, so that's why in some
6    of our time records you see the occasional
7    reference to a staff attorney working in a
8    Thornton folder or a Naumes folder.
9        Q       All right, thank you.
10       A       Um-hum.
11       Q       Did you participate in the
12   letter that was ultimately -- and rather soon --
13   sent to the court?
14       A       On November 10th, 2016?  Yes, I
15   reviewed it, and I'm sure I contributed, added
16   some suggestions.
17       Q       And showing you what the firm
18   has provided, 50564, I see there's a message
19   dated November 9th, 2016 at 8:42 p.m. from you
20   to Garrett and David, with cc's to a number of
21   other Thornton and Labaton attorneys, and you
22   indicate, "I have some suggested redlines apart
23   from what Garrett mentions.  See attached."
24       A       Uh-huh.
25       Q       Do you recall what those

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400



218

219

220

```
 1                      Chiplock
 2        Q      -- talked about everything of
 3   relevance in this case, but let me just ask you,
 4   is there anything that we haven't discussed that
 5   you think is relevant or helpful to our
 6   examination of the facts in this case?
 7        A      Well, we've been over a lot.
 8   All I can say is, on a personal level I'm
 9   extremely sorry that we're here, and I have
10   regretted pretty consistently the oversights
11   that led to the double counting that went into
12   the fee petitions that were submitted in
13   September of 2016, and I wish I could go back
14   and change that.  But I think going forward we
15   will be extra careful, obviously, to ensure it
16   doesn't happen again.
17             I think apart from that, I can
18   just say I'm here to answer any more questions
19   at a future date.  If you have any, I'm happy to
20   do it.
21             JUDGE ROSEN:  Just one sort of
22        very broad question that I sort of
23        foreshadowed earlier.
24             One of the things that I'm
25        going to be interested in recommending
```

221

```
 1                      Chiplock
 2        to Judge Wolf, because I think he's
 3        interested in it, recommendations for
 4        best practices going forward on fees,
 5        recording of fees, fee petitions,
 6        relationships between multiple counsel
 7        in complex cases.  Anything you want to
 8        tell us that you want me to consider as
 9        best practices?
10             THE WITNESS:  Well, in terms of
11        things we could have done better, and
12        should have done in this case, I think
13        there should have been more
14        coordination and communication amongst
15        the firms before the individual fee
16        declarations were submitted, in order
17        to assure that we did not confuse the
18        court.
19             JUDGE ROSEN:  How about on an
20        ongoing basis during the gestation of
21        the case itself?
22             THE WITNESS:  Well, there
23        should also be, I think, more
24        consistent sharing of lodestar over the
25        life of a case in order to try to head
```

56 (Pages 218 to 221)

222

```
1              Chiplock
2    off mistakes like this from happening,
3    and it should be at regular increments.
4    And in many cases it has been.  In this
5    case it wasn't.  There were -- there
6    were several exchanges of lodestar
7    during the life of the case, but it
8    wasn't regularized.  And if it had
9    been, an error like this -- with very
10   smart, capable lawyers, an error as
11   silly as this I think would have been
12   caught sooner had we done that.
13             So I think a better practice, a
14   best practice, would be to exchange
15   time regularly.  And also to talk about
16   our rates, and make sure we're being
17   completely transparent about what our
18   rates are, where -- you know, how
19   they've been accepted in other courts
20   and that sort of thing.
21             JUDGE ROSEN:  One question
22   occurred to me during the course of not
23   only your deposition, but other
24   depositions, and the interviews, is on
25   a very large, complex case like this,
```



Veritext Legal Solutions

212-267-6868         www.veritext.com         516-608-2400

226

```
 1              Chiplock
 2    failsafe.
 3              Again, I do view it as an
 4    anomaly that it happened.  I don't
 5    personally see a practice area
 6    recommendation coming out that would
 7    forestall something like this.  I think
 8    it was -- I still look at it as an
 9    anomaly, a regrettable mistake, an
10    anomaly.
11              I think that's the most I can
12    say about it.
13              JUDGE ROSEN:  Okay, thanks.
14              MR. SINNOTT:  Richard.
15    EXAMINATION
16    BY MR. HEIMANN:
17         Q    What was the impact on the
18    rates for staff attorneys by using 2016 then
19    current rates, rather than historical rates?
20         A    So the rate was -- actually
21    went down at Lieff Cabraser from 2016 -- or in
22    2016.
23              The rates that we used in 2015
24    in the Bank of New York Mellon case were
25    actually generally higher for staff attorneys.
```

227

```
 1              Chiplock
 2    They were generally 425, which is the guidance
 3    that Thornton used when they submitted their
 4    declarations.
 5              MR. SINNOTT:  Anything else,
 6    Richard?
 7              MR. HEIMANN:  No.
 8              MR. SINNOTT:  Thank you.
 9              Mike?
10              MR. STOCKER:  Just a couple
11         minor points.
12    EXAMINATION
13    BY MR. STOCKER:
14         Q    I think it was your testimony
15    earlier that in your view it was Labaton
16    Sucharow that bore responsibility to ensure the
17    accuracy of the fee petition that went in to the
18    court.  Do you remember that?
19         A    Well, I don't know if I used
20    those exact words.
21         Q    Well, you can express it
22    better, then.
23         A    I think Labaton was the only
24    one in a position to see all the fee
25    declarations before they were filed.
```

228

```
 1              Chiplock
 2         Q    And my short follow-up to that
 3    is, in your view is it Labaton Sucharow's
 4    responsibility or role to ensure the accuracy of
 5    the lodestar reported by Lieff in Lieff's small
 6    fee declaration?
 7         A    I don't view it as Labaton's
 8    ultimate responsibility to ensure that Lieff
 9    Cabraser's lodestar was reported accurately.
10              What I do think is that only
11    one firm had access to all the fee declarations
12    before they were filed.  And if there was an
13    opportunity to catch a mistake, that was it, in
14    addition to the opportunities that I had and
15    missed before my individual fee declaration was
16    filed.
17         Q    Fair enough.
18              And one other short question.
19              I think you had testified
20    earlier to the existence of a general
21    understanding between you and Garrett Bradley
22    with respect to the idea that the time generated
23    by the document reviewers paid for by Thornton,
24    that that time would ultimately be reflected in
25    Thornton's small fee declaration.
```

229

```
 1              Chiplock
 2              Do you remember that testimony?
 3         A    Yes.
 4         Q    Do you know whether anyone at
 5    Labaton was aware of that general understanding
 6    that existed between Thornton and your firm?
 7         A    I don't know that anybody -- it
 8    wouldn't have occurred to me that anyone at
 9    Labaton would question that, I guess is what I
10    would say.
11              I know what people at Labaton
12    were aware of, was that we were hosting some
13    document reviewers for Thornton.  And it seemed
14    to me common sense that if a firm is paying for
15    labor, they can get credit for that labor in
16    their fee petition.
17              MR. STOCKER:  That's all I
18         have, thank you.
19              MR. SINNOTT:  Hannah?
20              MS. BORNSTEIN:  No questions.
21              MR. SINNOTT:  Lynn, are you
22         still on the line?
23              MR. SARKO:  I am still on the
24         line.
25              MR. SINNOTT:  Do you have any
```

58 (Pages 226 to 229)