# EX. 11

```
                                                                    1
 1              UNITED STATES DISTRICT COURT
 2               DISTRICT OF MASSACHUSETTS
 3   - - - - - - - - - - - - - -x
 4     ARKANSAS TEACHER        :
 5     RETIREMENT SYSTEM,      :
 6     et al.,                 :
 7         Plaintiffs,         :  CA No. 11-10230-MLW
 8         v.                  :
 9     STATE STREET BANK       :
10     AND TRUST COMPANY,      :
11         Defendant.          :
12   - - - - - - - - - - - - - -x
13                                        July 7, 2017
                                       Washington, D.C.
14
15
16   Deposition of:
17              J. BRIAN MCTIGUE,
18   called for oral examination by Counsel to the
19   Special Master, pursuant to notice, at JAMS,
20   1155 F Street, Northwest, Suite 1150, Washington,
21   D.C. 20004, before Christina S. Hotsko, RPR, of
22   Veritext, a Notary Public in and for the District
23   of Columbia, beginning at 3:30 p.m., when were
24   present on behalf of the respective parties:
25
```

6



8

7

1      MS. KEEVERS PALMER:  Kimberly Keevers
2  Palmer, Richardson, Patrick, Westbrook & Brickman.
3      MR. SINNOTT:  Thank you.  And Lynn?
4      MR. SARKO:  Lynn Sarko from Keller
5  Rohrback on behalf of the Andover plaintiffs.
6      MR. SINNOTT:  Okay.  Thank you, Lynn.
7  Has anyone else joined us on the phone line?
8      (No response.)
9      MR. SINNOTT:  I see no response, we'll
10  proceed.
11      EXAMINATION BY COUNSEL FOR THE SPECIAL MASTER
12  BY MR. SINNOTT:
13      Q.  Brian, could you describe for us your
14  background, beginning with your education?
15      A.  I graduated the University of Notre Dame
16  in 1968.  I held a number of jobs between then --
21  which I set up, which is called the Public Pension
22  Investment Project.
23          And then I became a reporter in Europe
24  and Africa and the United States for a period of
25  time.  And then I became employed in the House and

9

1      A.  Basically from the beginning I've been
2  involved in what I will call malinvestment of
3  ERISA plans.  And they've been class actions
4  pursuant to Rule 23 and ERISA.
5      Q.  All right.  And that is the predominant
6  subject of your practice?
7      A.  Very much predominant.
8      Q.  All right, sir.  Now, let me bring you
9  forward to the State Street litigation to set the
10  stage, but ask you if prior to that case, you had
11  any experience in foreign currency transaction
12  matters?
13      A.  Other than a few foreign currency
14  transactions, no.  Personally, foreign currency
15  transactions.
16      Q.  At some point did you become involved in
17  a California action?
18      A.  Involving foreign currency transactions?
19      Q.  Yes, sir.
20      A.  No, not to my recollection.
21      Q.  And how about the Bank of New York Mellon
22  case?
23      A.  I became involved in the Bank of New York
24  Mellon case after filing the State Street Bank
25  foreign currency case.

3 (Pages 6 to 9)

**10**

1  Q. All right. And when was that that you
2  became involved in BNY Mellon?
3  A. The exact date escapes me, but I think it
4  was in the fall of 2012. I'm going to say
5  October.
6  Q. And who did you represent in the
7  BNY Mellon case and what were the allegations?
8  A. I represented participants in ERISA
9  plans, both defined benefit and defined
10 contribution, which is generally known as 401(k)
11 plan. And the allegations were the defendant was
12 the custodian or trustee of the plans that these
13 participants took part in. Generally speaking,
14 people say they were members of, but they're
15 actually participants under the law. And the
16 trustee and custodian engaged in transacted
17 foreign currency exchanges for those plans in
18 violation of federal pension law. Section --
19 prudent person rule and the prohibited
20 transactions rule because these transactions were
21 not exempt under any prohibited transactions
22 exemptions issued by the Department of Labor, the
23 two relevant ones are PTE9420 and PTE9854, or as
24 subsequently enacted statute, 408B18 of ERISA.
25 Q. And what was the outcome of that case?

**11**



**12**

1  rules and prohibited transaction rules.
2  Q. And are there any other FX cases that
3  you've come to be involved in?
4  A. No.
5  Q. And what other firms have been frequently
6  involved in ERISA litigation based on your
7  experience?
8  A. Keller Rohrback. Jon Axelrod's firm, and
9  members of the securities plaintiffs' bar who tend
10 to take a portion of large securities class
11 actions, the portion which might involve ERISA
12 claims. And those firms -- Stull Stull & Brody
13 would be an example in Manhattan.
14 Q. Okay.
15 A. I mean, there are various and sundry
16 smaller firms. ERISA is a very large field. We
17 do not bring what are called benefit claims. Jon
18 Axelrod would bring such claims. We have
19 typically not done benefit claims. And I'm not
20 going to bore you here with the details of them,
21 but there's a practice area out there for benefit
22 claims.
23 Q. Okay.
24 A. Where a participant, you know, retires
25 and they have a DB plan and they say they didn't

**13**

1  get enough. They expected to get $1500 a month
2  and they got 1200 a month. That would be a
3  benefit claim. Typically, those are not class
4  actions.
5  Q. Okay. And how did you become aware of
6  the potential ERISA claims against State Street?
7  
22 Q. And as a result of that, what was the
23 next thing you did with respect to State Street?
24 A. I don't know what the next thing I did
25 was.

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400

Case 1:11-cv-10230-MLW   Document 401-10   Filed 07/23/18   Page 5 of 10



```
18   In fact, Mr. Sutherland was in both the Johnson &
19   Johnson defined benefits plan and the Johnson &
20   Johnson 401(k) plan.  Mr. Taylor was a participant
```

6 (Pages 18 to 21)

**Veritext Legal Solutions**

212-267-6868   www.veritext.com   516-608-2400

**42**



**43**

1  settlement, which I think was fair because we had
2  settled an almost similar case against Bank of New
3  York Mellon a year before, which had involved over
4  a hundred depositions. It was extremely hard
5  fought, and we were quite involved in that. And
6  that settled for about $330 million. And I think
7  the ERISA set-aside was 70 million.
8      And so the State Street settlement at 300
9  million seemed to be fair in comparison. And the
10  $60 million set-aside in the State Street
11  settlement for ERISA plans -- by the way, it's no
12  less than 60 million. It could be more. But the
13  settlement agreement says no less than 60 million.
14      That is 20 percent of the recovery. And
15  we now learn, subsequent to the settlement, that
16  60.75 percent of the FX volume was for ERISA
17  plans. So we -- in terms of the ERISA plans, we
18  got 20 percent of the recovery based on -- we
19  didn't know it, but it turned out we got lucky --
20  16.75 percent of the FX transactions.
21      So there was what we've called an ERISA
22  premium, which I think is due because ERISA was a
23  stronger case. National, uniform law with
24  prohibited transaction exemptions that we believe
25  would not have been met had we had discovery.

**44**

1      Q.  So did you have any involvement in
2  discussions about what portion of that fee award
3  would go to ERISA counsel?
4      A.  Yes, I did.
5      Q.  And describe who was involved in those
6  discussions and what was talked about.
7      A.  Well, let me correct. When we had
8  discussions of what part of the fee award would go
9  to ERISA counsel, we didn't know that there would
10  be a settlement and we didn't know the ERISA
11  volume. All right? And these discussions took
12  place in 2013. We settled in 2016.
13      Q.  And who were the discussions in 2013
14  with? Who did they involve?
15      A.  Lynn Sarko.
16      Q.  So Lynn represented the ERISA firms in
17  those discussions?
18      A.  I don't know.
19      Q.  Did you feel like you were not
20  represented in those discussions?
21      A.  Well, I was part of the discussions. But
22  I was presented what I thought was a fiat. Out of
23  the blue. Lynn called me up and said the state
24  law claimants, not my term, the big three, not his
25  term, but the consumer plaintiffs, want to split

**45**

1  the money now. The attorneys' fees award, if
2  there is any.
3      And he said they were offering 6 percent,
4  I think. Six percent would go to the ERISA
5  firms -- basically Lynn's firm, Zuckerman, and my
6  firm -- and the state law claimants would get 94
7  percent of any attorneys' fee award.
8      Q.  And that was the initial proposal,
9  correct?
10     A.  Yes.
11     Q.  All right. And what was your response to
12  that?
13     A.  Why? First of all, why that percentage?
14  I knew that we probably would be wise to reach an
15  agreement at some percentage. Precisely because I
16  wanted my class to continue to be represented and
17  not be harmed by fratricide on the plaintiffs'
18  side. It's very important to stay in the case and
19  represent your clients. If it costs me money, I
20  can do that. But if it costs my clients, no.
21     I mean, there's a range of reason, you
22  know. But I'm saying I can't deal with my clients
23  in order to get me more.
24     So I knew that we'd probably arrive at an
25  agreement. I was willing to in order to avoid

12 (Pages 42 to 45)

```
                                                               46
 1    what I call fratricide.  Because boy, all we
 2    needed to do was show problems to the
 3    defendants -- or who knows what it would break out
 4    in terms of fratricide.  And there were no women
 5    involved, so it was fratricide.
 6         And so I said why.  And Lynn said, well,
 7    the FX volume is 6 to 9 percent.  And I had no
 8    idea where the FX volume came from because no one
 9    had ever given me anything in terms of discovery
10    of the FX volume.  So maybe the consumer
11    plaintiffs' firms had the FX volume.  Or maybe
12    they didn't.  But I said 9 percent -- well,
13    actually, I said 11, and Lynn --
14         SPECIAL MASTER ROSEN:  But you were just
15    pulling a number from the air, too, weren't you?
16         THE WITNESS:  Right.  But I decided it
17    was that or fratricide.  So I said 11, accept
18    less.  And Lynn came back with 9.
19         SPECIAL MASTER ROSEN:  I'm curious --
20         THE WITNESS:  And I said yes.
21         SPECIAL MASTER ROSEN:  I'm curious why
22    you and the other ERISA lawyers felt you had to
23    cut the deal early before you really knew where
24    you stood through discovery in terms of the
25    percentage of FX transactions in the ERISA -- on
```



**Veritext Legal Solutions**
212-267-6868   www.veritext.com   516-608-2400

82



83

1  I think the way Labaton wanted, they wanted each
2  individual to send their declaration directly to
3  Labaton.
4       Q.  Okay.
5       A.  Maybe I'm wrong.
6           SPECIAL MASTER ROSEN:  So Labaton
7  controlled the flow --
8           THE WITNESS:  Right.
9           SPECIAL MASTER ROSEN:  -- and the
10 process.
11          THE WITNESS:  Right.  It wasn't what I
12 would call collaboration.  You know, you can have
13 collaboration.  You don't have to have everybody
14 agree.  But, you know, one argument against that
15 is it wastes time.  And the other argument is
16 people get educated, you know.  I mean, there's
17 several ways of looking at things.
18 BY MR. SINNOTT:
19      Q.  Does McTigue Law Firm have clients who
20 actually pay hourly rates?
21      A.  Occasionally we do.
22      Q.  And what types of clients are those,
23 Brian?
24      A.  Typically -- they're very few.  We've got
25 a plan client or had a plan client.  We had a

84

1  person making the benefit claim, that rare benefit
2  claim that we're talking about.
3           Those are the only two that come to mind.
4       Q.  And how are rates in those cases
5  determined?
6       A.  Part of it is what we think they can pay.
7  I mean, if we're asking more than they can afford
8  to pay, then we try to see if we can make an
9  adjustment.  You know, it depends, you know.  If
10 we're getting a case that's different and we can
11 learn something from it, that's a form of
12 compensation to us.
13          We want to know more about ERISA, their
14 ERISA cases.  We want to know more about ERISA.
15 And, you know, if somebody comes to us and
16 presents an area where -- slightly outside of our
17 area of experience -- I don't want to call it
18 expertise -- we might want to do that.  And if
19 they can't afford to pay us a lot, we will take
20 less compensation because we're getting another
21 form of compensation from the case.
22      Q.  Now, aside from those direct payment
23 clients, if you will, how does the firm determine
24 annual attorney billing rates?
25      A.  We don't determine annual -- we're really

85

1  quite small.  We will look in the cases that we're
2  involved in that will settle and we'll look at
3  counsel and co-counsel in cases, we'll look at the
4  amounts that they bill.  And then we'll try to
5  figure out, well, you know, relatively what we
6  should charge vis-a-vis their work.  Because we
7  know their work, we know our work, we know the
8  case.
9           And, you know, we could go to the firms
10 we work with and see what they're doing in cases
11 not involved in, but we don't tend to do that.
12      Q.  All right.  And do you rely on any
13 documents or resources, Valeo or Wells Fargo or
14 other surveys in setting those rates?
15      A.  No, we don't.
16      Q.  Okay.
17      A.  Now, maybe we will.  Because I'm learning
18 about Wells Fargo.  Unfortunately, we sued them.
19 I'm being facetious.  We might search out one of
20 these services, but we were not aware of them.
21      Q.  Let's talk about regular rates charged.
22 In your declaration in paragraph 20 -- do you have
23 that?
24      A.  I do.
25      Q.  It indicates, "The hourly rates of the

22 (Pages 82 to 85)

86

1  attorneys and professional support staff in my
2  firm included in Exhibit A are the same as my
3  firm's regular rates otherwise charged for their
4  services, which have been accepted in other
5  complex class actions my firm has been involved
6  in."
7       In that final clause, "my firm has been
8  involved in," seems to be an addition from the
9  Labaton language.
10       Why was that phrase added?
11  A.  We set our rates in the State Street case
12  looking at a prior case we had settled against
13  Bank of New York Mellon for the same type of
14  claim, almost identical claim, that we had settled
15  the year before.  There were a lot of firms in
16  that case.  And we looked at our rates because we
17  knew those firms and their work.  And we looked at
18  our rates and we found they were dramatically
19  lower.  And we set the rates in the State Street
20  case based on those -- on the rates billed and
21  approved by Judge Kaplan in the Southern District
22  of New York in the BNY FX case.
23  Q.  But --
24  A.  Those --
25       SPECIAL MASTER ROSEN:  And is that why

87

1  you added -- to call it -- to call out that
2  aspect, is that why you added that phrase?
3       THE WITNESS:  Yes, it is.
4  BY MR. SINNOTT:
5  Q.  Do you think, Brian, that there's some
6  lack of clarity, though, in the expression or the
7  phrase "the same as my firm's regular rates
8  otherwise charged for their services"?
9       Do you think that might lead a judge to
10  believe that the references to amounts that were
11  actually charged to a paying client?
12  A.  I think it could.  And I'm learning.
13  Q.  What are you learning, Brian?
14  A.  And I tell -- well, I tell associates
15  don't always think from your point of view.  Look
16  from the point of view of the person who reads
17  your work.  And I'm doing that now.  I'm learning
18  that lesson here.  Brooke is a former reporter,
19  and she has -- as reporters have to figure out,
20  look at it the way the reader looks at it.  And
21  lawyers tend to look at it the way they look at
22  it.  And I may be guilty.
23  Q.  And how would this be changed, if at all,
24  in order to make this more clear or accurate?
25  A.  I think we could strike the phrase.



88

[redacted]

89

[redacted]



```
                                                                  90
[redacted]
```

```
                                                                  92
[redacted]
```

```
                                                                  91
 1       A.  I suggested an edit.
 2       Q.  And what was that edit, Brian?
 3       A.  That was the edit that eventually became
 4   the ERISA footnote -- I believe it was a
 5   footnote -- in which said the ERISA firms have not
 6   been involved in this staff attorney issue.  In
 7   the actions that gave rise to the staff attorney
 8   issue.
 9       Q.  And to the best of your knowledge, did
10   any of those billing issues that Mr. Goldsmith
11   talked about relate to work performed by ERISA
12   counsel?
13       A.  No.
14       Q.  And you thought it was necessary for a
15   reference of clarity to refer to that, hence, the
16   footnote that was included?
17       A.  Well, it's not necessary, but it was very
18   helpful to us.
19       Q.  Sure.  And were there any differences of
20   opinion to your knowledge among counsel with
21   respect to the content of that letter?  Aside from
22   making suggestions that were adopted, do you
23   recall any disagreements?
24       A.  No.
25       Q.  And are you aware of any mistakes not
```

```
                                                                  93
[redacted]
```