# EX. 12

**George Hopkins**

1

Volume: 1

Pages: 1-115

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

---------------------------------------

In Re: STATE STREET ATTORNEYS FEES

---------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,
United States District Court, Retired

DEPOSITION of GEORGE HOPKINS

September 5, 2017, 9:20-11:26 a.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter: Paulette Cook, RPR/RMR

Page 14

1  relation -- that the procurement was stale, and I
2  didn't have to enter it if I didn't want to.  And I
3  told 'em -- I figured four was enough at the time.
4      THE SPECIAL MASTER: George, could you
5  remind us just what year did you become the
6  executive director?
7      THE WITNESS: I became executive
8  director December 29, 2008.
9      BY MR. SINNOTT:
10 Q.  And, Mr. Hopkins, you took over for an
11 executive director named Doane; is that correct?
12 A.  Actually, there was a period of time when
13 Mr. Doane left and I arrived that he resigned
14 sometime in the fall, and the deputy -- the lady who
15 was my deputy director at the time -- she's since
16 had a stroke and works very part time -- became
17 interim director.
18     So there was Paul Doane, Gail bold even
19 as interim director, and then I -- I replaced the
20 interim director.
21 Q.  And --
22 A.  I think she was there three or four months.
23 I'm sorry to jump on top of you.  I'll be better
24 next time.

Page 16



Page 15



Page 17

1  to you.  I don't know if it was in the deposition or
2  in our more informal discussion.
3      After I got there, Bernstein brought to
4  me a cert- -- I didn't know what it was at the
5  time -- a certification to enter a case.  I told him
6  I was really just too busy to mess with that kind of
7  thing and really wasn't interested in securities
8  litigation.  I was more focused on a bunch of things
9  we had going on.
10     That was probably -- I don't even -- it
11 was in the spring -- late winter, early spring of
12 2009, and that's when, you know -- you know, some of
13 the legislative leaders called me over to the
14 Capitol and said they thought we ought to be
15 involved in securities litigation, and the other
16 Retirement System was, and they thought we ought to
17 be, too.
18     And so then I said, okay, I'll look at
19 those and consider 'em, and I talked to my board
20 chair.  And he said, hey, you know, if it's -- if
21 the legislature's interested and you have time to do
22 it, hey, you know, just figure out what it's all
23 about.
24     And so I started learning about how it

Page 18

1 worked. So probably within four to six months after
2 I got there I became aware of the securities cases
3 and how they worked.
4 　　BY MR. SINNOTT:
5 Q. And did the legislators that called you over
6 indicate why they were interested in securities
7 litigation?
8 A. I got the idea that, you know, they
9 understood the Retirement System had a lot of, you
10 know, financial issues. I mean, obviously, we
11 did -- when I got there, our system was in deep
12 trouble both operationally, I think politically
13 because they thought that the system didn't have a
14 strong board, didn't have strong leadership, and we
15 were, obviously, in trouble actuarially, you know,
16 when you have those kind of losses, and I think they
17 thought, you know, part of my duty was to bring in
18 all the money I could. That was sort of the message
19 I got.
20 Q. Did any of the legislators indicate that
21 they had contact with any law firms with respect to
22 potential litigation?
23 A. You know, that -- they didn't -- the one
24 thing I think I told you before in a later meeting I

Page 19

[redacted]

Page 20

1 we actually --
2 　　THE SPECIAL MASTER: Was that firm one
3 of the monitoring counsel at the time?
4 　　THE WITNESS: No, no. They'd never --
5 they never monitored for us. They just applied to
6 be one.
7 　　THE SPECIAL MASTER: I see.
8 　　THE WITNESS: No, they never -- they
9 never made that cut.
10 　　BY MR. SINNOTT:
11 Q. Do you remember where that firm was out of?
12 A. Philadelphia.
13 Q. Out of Philadelphia?
14 A. Yeah. I remember that because -- 'cause my
15 grandmother always had this saying, you know, he's
16 dressed like a Philadelphia attorney.
17 　　And so I remember -- I walked in and
18 thought, you know, my grandmother would be proud
19 'cause that guy was dressed to the nines. I'm
20 sorry. That's my own little side.
21 Q. We appreciate the insights.
22 　　Were you aware that members of a law
23 firm with a Little Rock office had introduced
24 individuals that you later would come to know as

Page 21

1 Eric Belfi and Chris Keller to influential Arkansas
2 officials in an effort to secure legal work with the
3 state?
4 A. I had no idea.
5 Q. Are you familiar with the firm name of
6 Chargois & Herron?
7 A. As of about two weeks, ten days ago.
8 Q. But you never encountered them to the best
9 of your recollection years ago?
10 A. I had never heard of that firm before.
11 Q. Did Gail or Paul or the records that you
12 examined when you became executive director reveal
13 that firm's name anywhere?
14 A. As I told you, I never -- to this day I have
15 not looked at the records about how Labaton became
16 involved with us. The only records that relate back
17 to that time I looked at was this Texarkana,
18 Arkansas firm, and I won't tell you too much of the
19 story, but these guys showed up at my office,
20 demanded to meet with me I said about a year, maybe
21 nine months after I got there.
22 　　And this guy said I'm a Harvard-educated
23 lawyer and, you know, you've got to sign this
24 contract because y'all agreed to do this, and

Page 34



Page 35

**THE SPECIAL MASTER:** On Arkansas it says, "On Arkansas the senator is going to come visit us at the end of the month."

Assuming that's Arkansas Teachers, do you know what senator that would have been?

**THE WITNESS:** Well, I think from my discussions with, you know, my non-attorneys here I think that was probably a senator named Steve Farris.

**THE SPECIAL MASTER:** Was he at the time -- was he on the retirement system committee?

**THE WITNESS:** He was on -- it's on the retirement -- joint retirement committee legislature.

In fact, he was probably the longest-serving member of the retirement committee. He was, you know -- I will say this: Before I left the legislature, for better/for worse, I was known as the retirement expert in the legislature.

When I left, there was a pretty good-sized hole. Steve Farris had been on the retirement committee for two or three terms by then, and I think later -- I think he was -- he was cochair once when he was in the house, but he never

Page 36

-- he never chaired the committee but he was -- in the senate -- he ended up in the senate, and in the senate he was the one that handled almost all the hard, complex legislation for the retirement systems, and he was what I would call, you know, one of the -- leaders is not the -- you know, a benevolent leader to ensure the retirement systems had the resources they needed.

**THE SPECIAL MASTER:** So I assume you knew him from your service --

**THE WITNESS:** I did.

**THE SPECIAL MASTER:** -- in the house and the senate?

**THE WITNESS:** Right. I was never in the house but from his service in the house.

**THE SPECIAL MASTER:** I'm sorry. Yep.

**BY MR. SINNOTT:**

Q. And you were a chair of a committee in the senate, correct?

A. The only --

Q. Retirement committee?

A. Well, I may have chaired the rules committee or something. The senate is sort of a select committee, but the only -- I always chose the

Page 37



Page 58



Page 59

Page 60

You know, when -- the first case I did with Labaton was Colonial Bank. And those were some egregious facts in Colonial Bank. Those -- if they didn't hang those guys up and put 'em in jail a long time, which I don't think they did, you know, justice was not served, and they took advantage of us and a bunch of others.

So, you know, the first time that Eric, you know, wanted to talk to me about doing this case, he wanted -- you know, he wanted me to understand everything about what all they were doing.

He asked me if I knew any local counsel in Alabama that I was interested in. You know, he was -- I think he asked if I wanted to hire Arkansas counsel that would help them assist me in understanding the case, and I told him that I expected the attorneys to handle the attorney stuff because, you know, once you become the gatekeeper of what law firms are hired, then suddenly I become the -- the last thing I wanted was to have any knowledge or power about what law firms were hired and what they did because once you have that, then the pressure comes.

Page 61

You know, I wanted the law firms that represent us to represent us and not -- and not pay -- not pay a price in order to -- that I determined saying, well, you've got to hire this firm over here this time as my local counsel; you've got to do this or that.

I wanted them to know I only had one focus. When I do these cases, I have one focus, and that is to get a good outcome. I'm not trying to be a referee. I'm not trying to be a bank teller. I'm not trying to be somebody that directs fees to one law firm or another, and I -- I didn't want that. And I don't want that.

Let me tell you since this thing came up, you would think the first thing I would do is maybe call the other four law firms I have and ask if they have a referring attorney agreement, and I haven't. And I won't. You know why?

Because the firms that we have are honest, and they're ethical. And I will believe that until they prove to me otherwise. I don't -- I want them to hire the best law firms in the states where we're litigating. I want them to have no obligation to hire people that I direct. I want



Page 62

Page 64

1  **THE SPECIAL MASTER:** Let's get down to
2  brass tax here.
3  **THE WITNESS:** Okay.
4  **THE SPECIAL MASTER:** Were you aware that
5  Labaton had this relationship going back to before
6  you came with this firm Chargois Herron -- Chargois
7  & Herron?
8  **THE WITNESS:** No.
9  **THE SPECIAL MASTER:** You weren't aware
10 of that at all?
11 **THE WITNESS:** I was not aware of that at
12 all.
13 **THE SPECIAL MASTER:** Were you aware that
14 in every case in which you -- you Arkansas -- was a
15 lead plaintiff or co-lead plaintiff that under this
16 agreement Mr. Chargois and his firm would get 20
17 percent of whatever Labaton received in the event of
18 a settlement or successful prosecution of the case?
19 Were you aware of that?
20 **THE WITNESS:** I was not.
21 **THE SPECIAL MASTER:** Were you aware that
22 in fact there were -- I don't know -- ten cases
23 maybe? -- in which Mr. -- in which Mr. Chargois got
24 20 percent effectively of the Labaton fee?

Page 65

1  **THE WITNESS:** I was not. But let me
2  go --
3  **THE SPECIAL MASTER:** Just a minute.
4  **THE WITNESS:** Okay.
5  **THE SPECIAL MASTER:** Okay? In any of
6  these cases as the client representative, was it
7  ever disclosed to you that Mr. Chargois was going to
8  receive 20 percent of Labaton's fee?
9  **THE WITNESS:** No.
10 **THE SPECIAL MASTER:** And would that
11 include the State Street case?
12 **THE WITNESS:** That would include State
13 Street.
14 **THE SPECIAL MASTER:** So at no time was
15 it disclosed to you that in the distribution of the
16 fees Mr. Chargois would get, effectively, a referral
17 fee of 20 percent of the Labaton fee?
18 **THE WITNESS:** It was never disclosed to
19 me.
20 **THE SPECIAL MASTER:** Putting it more
21 specifically, was it disclosed to you that in this
22 case Mr. Chargois got 5.5 percent of the total
23 attorneys' fees, the 75-million-dollar attorney fee?
24 **THE WITNESS:** No.

Page 66

**THE SPECIAL MASTER:** Was it disclosed to you that he received 4.1 million dollars?

**THE WITNESS:** Well, since this --

**THE SPECIAL MASTER:** Before -- before the fees were approved.

**THE WITNESS:** Let me --

**THE SPECIAL MASTER:** Just before the fees were approved was it disclosed to you?

**THE WITNESS:** No. My answer as to that qualification of those questions are correct.

**THE SPECIAL MASTER:** Was it disclosed to you that Mr. Chargois received this money, and it was not disclosed in the fee petition to the Court?

**THE WITNESS:** I've asked about -- I've asked about that.

**THE SPECIAL MASTER:** And?

**THE WITNESS:** Well, I asked Ms. -- I asked Miss Lukey was that a violation of any rule or law in Massachusetts. She told me no.

**THE SPECIAL MASTER:** That'll be in the first instance for me to decide.

**THE WITNESS:** Oh, I understand, but I'm just saying --

**THE SPECIAL MASTER:** But all I'm asking

Page 67

you, George, right now --

**THE WITNESS:** Okay.

**THE SPECIAL MASTER:** -- is was it disclosed to you that it was not disclosed to the Court?

**THE WITNESS:** No -- oh, it was -- let me --

**THE SPECIAL MASTER:** Before --

**THE WITNESS:** No. I want to make sure I -- it was not -- the fact that that fee -- that a referral fee was paid was not disclosed to me.

**THE SPECIAL MASTER:** Okay.

**THE WITNESS:** Before the last -- the last two weeks or something.

**THE SPECIAL MASTER:** Were you aware that there was this agreement dating back to 2007 that Mr. Doane had -- apparently, he was aware of -- that Mr. Doane had agreed to have Mr. Chargois receive 20 percent of every fee in which Arkansas was the lead plaintiff or co-lead plaintiff and Labaton was lead or co-lead counsel?

**THE WITNESS:** To this day I don't know --

**THE SPECIAL MASTER:** You've not seen --

Page 68

**THE WITNESS:** I'll take it upon your word that there's an agreement. I haven't seen it.

**THE SPECIAL MASTER:** You've not seen the agreement?

**THE WITNESS:** No. But if you say there is, I trust you.

**THE SPECIAL MASTER:** Did you know that there was a decision made not to disclose the existence of this agreement to other counsel in the case?

By "other counsel" I mean the ERISA counsel, the counsel that were representing the ERISA class.

**THE WITNESS:** I have -- I have no knowledge of that.

**THE SPECIAL MASTER:** So none of this was ever bounced off of you?

**THE WITNESS:** But, you know -- can I -- no.

**THE SPECIAL MASTER:** Okay. Now --

**THE WITNESS:** Can I qualify that now?

**THE SPECIAL MASTER:** Yes.

**THE WITNESS:** In the Colonial Bank case I told Eric if I ever want to know about your

Page 69

attorney fees and who all you hired, I'll ask you. And, you know, on any case because I intentionally didn't want to know a whole lot.

**THE SPECIAL MASTER:** And that's a good question. When you said if -- when you told Eric if I ever want to know about other attorneys that you hire, I'll ask you --

**THE WITNESS:** Well, I'm --

**THE SPECIAL MASTER:** -- Mr. Chargois did no work -- as far as we know, did no work on any of these cases.

What he did, according to the information we've been given, was at the very beginning of the relationship in 2007 he facilitated the relationship with Labaton in Labaton becoming one of the monitoring counsels.

And from what we've been able to see -- and I'll stand corrected if other witnesses correct this -- but from what we've been able to see, as a result of that relationship development and facilitation, he now is entitled to 20 percent of every single case in which Arkansas is -- 20 percent of Labaton's fee or an amount equivalent to that in which Arkansas is a lead plaintiff or co-lead



Page 70

Page 71

Page 72

Page 73

1  first of all, let me tell you I don't -- you know, I
2  haven't tried to get too deep into this because, you
3  know, I'm going to let you get deep into it, but let
4  me say I'm not sure whether Massachusetts law
5  applies or Arkansas law or some other state law.
6     I mean there's a lot of conflicts of law
7  issues --
8     **THE SPECIAL MASTER:** We're going to all
9  kill a lot of trees finding that out.
10    **THE WITNESS:** Yeah, but I will say this:
11 You know, that I don't -- I don't feel misled
12 because I made it real clear to them I didn't want
13 to be the gatekeeper on all this attorney
14 relationship.
15    And I think if they thought that I
16 wanted to know, they would have told me because Eric
17 always said if you ever want to see how we do all
18 these fees, just let me know.  And I said that's
19 fine.
20    **THE SPECIAL MASTER:** Then let me ask you
21 this:  As the representative of the lead plaintiff
22 in this case, don't you think you had an obligation
23 to know where all the money is going?
24    **THE WITNESS:** I sure don't.

Page 74

1 **THE SPECIAL MASTER:** Why?
2 **THE WITNESS:** Because -- well, first of
3 all, where does it end? If the secretaries in the
4 firm got a bonus do I need to know that? You know,
5 if --
6 **THE SPECIAL MASTER:** Not quite the same
7 as paying a lawyer for doing nothing 20 percent of a
8 fee.
9 **THE WITNESS:** But let me finish, judge.
10 You know, first of all, you know, when
11 you -- as I told you, when you become the
12 gatekeeper, you know, the -- Judge Wolf for good,
13 for right, wrong or indifferent, he set this
14 attorney fee. And I'm not --
15 **THE SPECIAL MASTER:** He didn't know what
16 he didn't know.
17 **THE WITNESS:** I understand, but, you
18 know, to the extent that Labaton had a legal or a
19 assumed legal or ethical obligation to pay this
20 firm, you know, Labaton's fee would have been no
21 different if they paid it or not paid it from what I
22 can see.
23 You know, if Miss Lukey is right that in
24 Massachusetts a referral fee does not have to be

Page 75

1 disclosed to the Court, then, you know -- you know,
2 for me to -- for me to know how Labaton divided up
3 their fees, I didn't ask how much Thornton got. I
4 didn't ask how much anybody got because, you know
5 what, law firms have a way -- you know, once you
6 inject yourself into helping law firms divide up
7 fees, that's not helping -- the class was not going
8 to get one penny more.
9 The class was not going to get one penny
10 more out of that case once the judge set the term --
11 **THE SPECIAL MASTER:** Let me ask you
12 this, Mr. Hopkins.
13 **THE WITNESS:** Yeah?
14 **THE SPECIAL MASTER:** Had this
15 relationship been disclosed to Judge Wolf, might he
16 not have said, well, wait a minute, that's an awful
17 lot of money to be going to a lawyer who hasn't done
18 anything on the case, did no work, didn't refer this
19 specific case at all, and maybe the class should get
20 some of that money, or maybe the ERISA counsel
21 should get some of that money rather than this
22 lawyer in Texas who was not involved at all in this
23 case?
24 Isn't that why disclosure to the Court

Page 76

1 in a non-adversary proceeding, which this was, is a
2 better practice?
3 **THE WITNESS:** Let me say this: I've
4 spent enough time with you now that I can feel your
5 -- your passion's not the right word -- your --
6 **THE SPECIAL MASTER:** Skepticism.
7 **THE WITNESS:** -- skepticism or whatever
8 you want to call it. Let me just say this: I have
9 a feeling -- I have a feeling that from here on out
10 Judge Wolf will probably have a line in his order
11 that all referral fees shall be disclosed. And that
12 eliminates the issue.
13 **THE SPECIAL MASTER:** You keep referring
14 to this as a referral fee, but it is not at all in
15 the nature of a referral fee that you described. I
16 don't know what it is. We've had a lot of different
17 names given to it.
18 **THE WITNESS:** Well, for the sake of this
19 -- of this deposition, I will call it a referral
20 fee. It might be some other kind of fee. I don't
21 -- I don't know. You know, if you tell me what to
22 call it, I will call it that.
23 **THE SPECIAL MASTER:** Well, you know,
24 Mr. Sucharow used a term -- we've had local counsel.

Page 77



Page 78

1   **THE SPECIAL MASTER:** How can the judge
2   decide, George, if he doesn't know?
3   **THE WITNESS:** Well, again, I -- I
4   understand your point, but I can also understand the
5   point that if it's coming out of their share and
6   it's a share that the attorneys and everybody have
7   no dispute over, you know, if the ERISA attorneys or
8   somebody else had said we don't think they ought to
9   get --
10  **THE SPECIAL MASTER:** George, let me ask
11  you this. You're a lawyer.
12  **THE WITNESS:** I am.
13  **THE SPECIAL MASTER:** The judge has to
14  decide in a fairness hearing determining whether the
15  class is being treated fairly; if there are any
16  objections, he has to rule on the objections; and as
17  a part of that, the judge has to determine if the
18  fee is a fair fee and whether the allocation within
19  the fee is fair to all of the attorneys.
20      Now some judges care less about the
21  allocation of fees, and other judges care a lot
22  more.
23      How can a judge -- so my question to you
24  is how can a judge decide these questions without

Page 79

1   having full information of where all of the money is
2   going?
3   **THE WITNESS:** Well, first of all, I'm
4   not sure the judge ever gets full information on how
5   all the money is going.
6       Yeah, unless --
7   **THE SPECIAL MASTER:** Well, shouldn't he?
8   **THE WITNESS:** What?
9   **THE SPECIAL MASTER:** Or she?
10  **THE WITNESS:** What?
11  **THE SPECIAL MASTER:** Shouldn't the
12  judge --
13  **THE WITNESS:** Well, I don't know --
14  **THE SPECIAL MASTER:** -- in a class
15  action?
16  **THE WITNESS:** I mean what level of
17  specificity would a judge want? Like how the
18  partners who worked in the case versus not?
19      I -- you know, I'm not trying to be
20  argumentative --
21  **THE SPECIAL MASTER:** This is somebody
22  who did no work on the case. Never filed an
23  appearance. Was never before the Court. Was never
24  subject to the Court's jurisdiction. Was never

Page 80



Page 81