# EX. 16

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Case No. 11-cv-10230 MLW

- - - - - - - - - - - - - - - - - - - - -x

ARKANSAS TEACHER RETIREMENT SYSTEM, et al.,

Plaintiffs,

-against-

STATE STREET BANK AND TRUST COMPANY,

Defendant.

- - - - - - - - - - - - - - - - - - - - -x

JAMS
Reference No. 1345000011

- - - - - - - - - - - - - - - - - - - - -x

In Re: STATE STREET ATTORNEYS' FEES

- - - - - - - - - - - - - - - - - - - - -x

June 14, 2017
5:17 p.m.

B e f o r e :

SPECIAL MASTER HON. GERALD ROSEN
United States District Court (Retired)

Deposition of LAWRENCE SUCHAROW, taken by Counsel to the Special Master, held at the offices of JAMS, 620 Eighth Avenue, New York, New York, before Helen Mitchell, a Registered Professional Reporter and Notary Public.



Page 6

Page 8

Page 7

Page 9

Sucharow

A Tall order.

Starting with college?

Q Yes, please.

A I went to the Baruch School of the City College of the City University of New York, where I received a bachelor of business administration cum laude. I then went to Brooklyn Law School, evening session, where I received a JD cum laude.

In law school I applied for a private practice firm as a law clerk. Coincidentally, that firm, in 1973, actually practiced securities class action derivative litigation, which, to my knowledge -- I had no knowledge of that field even, and they were probably one of ten firms in the United States that even practiced it.

Two or three years later, I answered a blind ad for what turned out to be my current firm, under a different name, Kass, Goodkind -- and then there were a lot of name changes over the years -- where I became an associate in the securities litigation class action area.

Sucharow

The firm probably at that time -- 1977-1978 -- probably had less than 20 lawyers, most of whom practiced corporate -- billable corporate, trust and estate law. I think the firm was formed in 1965 by three or four Yale Law School graduates who -- Yale and Harvard -- who believed, after serving their ten years at large firms, that they could deliver better advice faster, more personable, at cheaper rates. I assume that's the way most of those firms started.

The class action department grew rapidly while the business -- while the classic corporate billable practice did not. That led to a lot of tension. Somewhere around -- it's about me, not the firm.

Around 1982 I became a partner. Somewhere around -- I don't know when I became managing partner. I was in effect managing partner for many years without the title, but I became managing partner. Sometime thereafter I became chairman, without a managing partner. So effectively, while I thought my duties would be diminished, in fact I had now undertaken two

Sucharow

roles, as chairman and managing partner.

I don't know if there's more you want to know.

Q Could you just tell me, Larry, how did the practice of the firm change over the last ten to 15 years?

A Well, there was a lot of tension between the billable people and what they believed they should be earning, class action people and what they believed they should be earning. It required a lot of juggling, a lot of stress. Somewhere around ten years ago we brought in a management consultant -- actually at the suggestion of Bob Goodkind, who was then chairing the billable department.

She did whatever analysis she did, and told us that our best route to success was to split apart, that billable people were like horses and class action people were like zebras; they look alike, but you're not the same, your goals are different, your risk tolerances are different, what you think you're entitled to is different. And we proceeded to implement that.

Sucharow

Q Sounds like a marriage counselor.

A Very much so. A partnership, to me, is very much like a marriage, actually.

We proceeded to implement that. The billable people basically left, and we continued on with a clearer goal in mind of what we wanted to be and what we wanted to become And we believe we achieved that; that is, we set a goal as being among the top five respected securities class action firms in the United States.

Q And in the course of your securities class action work, Larry, did you -- prior to the State Street case, did you have contact or a working relationship with the Thornton law firm?

A Working relation -- contact, yes. Working relationship, yes.

Q And what did that consist of?

A Well, I don't think I prosecuted any cases in conjunction with the Thornton firm, but my partners did, so I know there were matters -- I don't have the names of

Sucharow

the matters, but we did prosecute cases, and I was consulted on some of those cases.

Q So there was some history with Thornton before the case?

A Before this, yes.

Q And how about Lieff Cabraser, was there any history there?

A Yes. Long history with the Lieff Cabraser firm.

They're among the finest firms in the United States, not just on securities class actions, but on class actions generally. I have a lot of respect for that firm, and their partners.

Q So let me bring you up to the State Street litigation and your role in it.

Could you tell us in general terms what your connection to the case was, and then we'll work back to some specifics?

A Sure.

I was not necessarily aware of the case when it was brought into the office because I was not asked to prosecute. I think my partner, Joel Bernstein, was the senior



Page 14

Page 16

Page 15

Page 17

Sucharow

you know, without getting us involved in a class action. And we agreed to try to come up with some format that would allow for a long-term mediation at the same time that the case itself would proceed.

And I believe there was a presentation to the court, and the court said, "That sounds fine, I want to be sure that when you guys come out of the tunnel, either with an agreement or not, that this case is ready to go; we're not just going to waste time."

So we committed to the court that we would conduct our discovery at the same time that we were mediating, and that it would not be long to trial, whatever happened at the end of what was then perceived to be two years.

We went back for several periods of additional time, making the same commitment to the court, and came out ultimately at the last -- I don't want to say at the last minute, the negotiations were all cordial, but we never knew that they would actually take fruit, but we came out with the agreement that you've seen and presented to the court.

Page 26

Page 28

Sucharow

doesn't mean you're going to get twice as much, but it's an argument you can make. So people like to have lodestar, they like to possess lodestar --

JUDGE ROSEN: Which means the firm giving up the allocated attorneys in their lodestar is making a pretty big sacrifice; yes?

THE WITNESS: No, not if that's the arrangement. You're going to pay for it one way or the other. The intent is not to cheat the other party, the intent is if you're going to take the economic risk and reimburse us at the time, then you should be entitled to the value that that time accrues to.

There's two ways to do it. One is it's on our books, a difficult mathematical calculation, but it can be done, they have computers. If we have it on our time and then we segregate it out, if each hour of time is worth the same amount of money, plus the multiple, then that's what you would

Page 27

Sucharow

JUDGE ROSEN: Your lawyer's going to tell you not to speculate.

MR. STOCKER: I think you might find it helpful.

JUDGE ROSEN: Okay.

THE WITNESS: Lodestar is a precious commodity, right, because we're sitting here about a case that was awarded a fee based on a percentage, and yet this whole thing is going to be about lodestar. So somehow lodestar always comes up, whether it's in fee negotiations among the counsel or in discussions with the -- you know, presentations to the court. So firms like to have lodestar. And if it's on -- if it's brought over to these books, then these people have lodestar, and that's their lodestar, so if you ask them, "Well, what did you do," they say, "Well, we put in ten hours, we put in five hours, we got twice as much work as you, and therefore we should get" -- it's not symmetrical, it

Page 29

Sucharow

get. If it's on yours, and your time is already segregated out -- in other words, we reach an agreement among ourselves how to split the fees, then it's the same difference.

I don't see it as a sacrifice; it's just two different ways of arriving to the same point.

JUDGE ROSEN: Well, the lodestar's going to be the same overall --

THE WITNESS: Correct.

JUDGE ROSEN: -- it's going to be the same. But --

THE WITNESS: Correct.

And I was working with friends, and we knew that we'd have a discussion and a negotiation. It wasn't a -- this wasn't a hostile arrangement with a forced marriage; each party brought something to the table.

JUDGE ROSEN: It just seems that doing it that way rather than just a straight "Here's your share" based on

Page 30

Sucharow

number of hours, "Here's an invoice for it," you can claim that as an expense later rather than doing a separate lodestar petition, it's a much simpler, cleaner, less risk-free way to do it.

THE WITNESS: I'm sorry, I missed the part about expense. I apologize. I zoned out on you.

JUDGE ROSEN: Okay.

So one way to do it, we've said, is you simply send a bill every month to Thornton -- right -- and say, "Here's your share of the expenses for the staff attorneys who are doing document review, please pay us this," and they send you a check. Thornton can then claim that as an expense in their fee petition.

THE WITNESS: Well, it's not a -- it's not an expense. They're attorneys hired by the firm, same as any other attorneys.

JUDGE ROSEN: Not by their firm, by you. Because these are

Page 31

Sucharow

employees of yours --

THE WITNESS: It's hard for me to argue. I did not know about -- nobody asked me, I did not know about the arrangement. I don't know whether I would have said, "Hey, that doesn't make a hell of a lot of sense to me, why aren't we doing it some other way."

JUDGE ROSEN: But therein lies the difference, and the potential for confusion.

The numbers on the lodestar comes out the same, so in an institutional sense no harm, no foul. The numbers come out, your lodestar would have been the same whether these folks were on your --

THE WITNESS: The total lodestar?

JUDGE ROSEN: Yes, would have been the same.

By allocating it to Thornton, it allows them to -- rather than simply pay the 40 to 50 bucks, or 30 to 40

Page 32

Sucharow

bucks an hour that you would bill them as an expense, it allows that firm -- and I'm not criticizing Thornton, or criticizing you, but it allows them to put in for rates, and established rates, rather than simply putting it in a petition as an expense, or whatever you want to call it. It allows them to bill specific rates and pump up their lodestar.

THE WITNESS: I -- I can't get my head around the term "pump up the lodestar" if the lodestar's going to be the same.

If we give up -- if we're entitled -- because we're paying them and supervising them and they're my employees --

JUDGE ROSEN: Thornton's lodestar --

THE WITNESS: Sorry.

JUDGE ROSEN:  -- pump up Thornton's lodestar, as opposed to the total lodestar.

Page 33

Sucharow

THE WITNESS: I don't see a mathematical difference. I don't.

JUDGE ROSEN: There's a huge difference.

THE WITNESS: Well, if we're charging them --

JUDGE ROSEN: But you're not charging them at $420 an hour --

THE WITNESS: That's correct.

JUDGE ROSEN:  -- you're charging them at 30 or $40 an hour, and they would then pay you whatever invoice you sent them for 30 or $40 an hour.

Right?

THE WITNESS: We would.

JUDGE ROSEN: You wouldn't charge them $400 an hour?

THE WITNESS: Correct.

JUDGE ROSEN: So they pay you that. And, yes, you take the same attorneys, and then you claim it on your lodestar at -- at the higher rate, because they're your employees, they

Page 34

Sucharow

were working for you; right?

So by allocating it to Thornton, and allowing Thornton to claim, you know, the same thing you would have claimed, it dramatically pumps up their lodestar. Not the total lodestar, Thornton's.

THE WITNESS: But I'm saying if it's lodestar, it's lodestar. I don't understand the difference.

An argument could be made -- and it gets more complicated -- that by them reimbursing us the cost of paying them, they really weren't our employees, and they should get the lodestar.

I mean, the way you're doing it is they have an expense and we have the lodestar. That's actually more of a charge to the case.

JUDGE ROSEN: Um --

THE WITNESS: It's lodestar, plus the expense that they pay.

JUDGE ROSEN: I'm not sure how

Page 35

Sucharow

it's more, but it just seems to me that it's -- it seems to me that the perhaps unintended consequence, but I think probably intended, is that it allows a firm to claim a billable rate for people they don't really have a relationship with.

THE WITNESS: I think -- again, speculating -- with the confusion that happened and everyone claiming everybody, that that was the unintended consequence. There was no real understanding as to what was going to happen, who was going to get that lodestar. And that, I think, is where the problem arises.

I think if we gave up that lodestar and it appeared in Thornton, or Thornton gave up that lodestar and it appeared in ours and we made an adjustment at the end, I don't see any harm or foul or -- or anything.

Our problem evidently -- because I was not part of it -- was

Page 36

Sucharow

that nobody had thought it through to the end as to what does it now mean.

We wanted to get compensated for the financial exposure --

JUDGE ROSEN: So let me give you a different perspective, a judge's perspective on this.

Judge gets a fee petition for lodestar, and judges do different things with lodestar fee petitions. A judge looks at these petitions and says, "Okay, Labaton has X number of hours at X rate and X attorneys, Lieff has X number hours at X rates and X attorneys, Keller has X number of hours at X rates. They've really sunk a lot of their own treasure and wealth, because these are people who are working for these firms."

Judge gets a petition and says, "Okay, Thornton also has ten staff attorneys, and they've sunk a lot of treasure in this of their own," thinking that these people are really

Page 37

Sucharow

Thornton employees.

It could impact a judge's thinking about the respective roles of the firm in the case, what they did, how much work, how much risk they took, all of that.

You don't see that?

THE WITNESS: It's not that I don't see that. I see it coming out basically the same at the end -- in the wash. Which is why I -- which is why I advocate a percentage of the fund, which is why I think that district went with a percentage, so we don't have the judges dealing with all of those issues.

I mean, the money was paid and the time was spent. And maybe I'm making it too simple.

JUDGE ROSEN: Okay.

THE WITNESS: But I think what happened indicates that it wasn't an intentional effort to mislead anybody. It was a --

Sucharow

JUDGE ROSEN: That's not the issue.

THE WITNESS: So you have it both ways, actually -- or maybe three ways. You can test which one is the best way by -- we all reported it.

JUDGE ROSEN: Well, I think maybe we would all agree -- if you disagree, tell me -- the best thing to have done would have been to be fully transparent about what was happening, that these were Labaton staff attorneys who were allocated for purposes of the fee petition to Thornton. Fully transparent in the fee petition.

THE WITNESS: I don't disagree. But people have different perspectives as to what that means.

Evidently our firm, whoever made the decision to include it, said, "This is our lodestar, and we'll deal with it later." The Thornton firm said -- I'm presuming, I had no conversations, no knowledge -- said,

Sucharow

"We paid for these people, their lodestar belongs to us," and we did it both ways.

JUDGE ROSEN: Okay.

THE WITNESS: I don't mean that --

JUDGE ROSEN: I know you don't mean it facetiously, but from a judge's perspective, looking at a lodestar petition, it makes a difference. Because one of the things a judge is looking at, in something like this, is did firms have disproportionate risk in terms of the cost, especially in a risky case, like this was.

Judges are looking to see which firms -- some judges, not all. Look, some judges just say, "Okay, $300 million settlement, 75 seems about right, let me look at the lodestar. Okay, it's not" -- for sure some judges do that.

Other judges -- and I would put Judge Wolf in this category -- are

Sucharow

going to be much more -- drilling down much more deeply and meticulously. And if you're looking for which firms really had the risk here, and which firms really dedicated the resources in making some kind of determination, it may be significant to some judges as to which firms really had the resource commitment, which firms really bore the risk with their own employees.

It would make a difference to some judges. Maybe you don't agree with that, but it would.

THE WITNESS: I don't disagree with that. I certainly don't disagree with transparency. I'm not sure that we realized that it was opaque. And that's a bigger problem when we get to the language thing, you know. You can ask me about transparency in that.

JUDGE ROSEN: You realized it when the Boston Globe article came out.

THE WITNESS: Realized in what sense? I'm sorry. Which aspect of the

Sucharow

article?

JUDGE ROSEN: Well, the Boston Globe article said that Thornton had contract attorneys -- I'm paraphrasing dramatically here -- but that Thornton had contract attorneys that they were paying 40 to $50 an hour for, when in fact they had -- well, they had one contract attorney.

THE WITNESS: I think in our mind, rightly or wrongly, we allocated those people to the Thornton firm in our mind, they were paying for them. But I hear all the other arguments the other way, so I didn't realize that.

JUDGE ROSEN: I'm not trying to make arguments, I'm just trying to suggest other perspectives in the way this can look.

MR. STOCKER: And I'm going to butt in because I want to understand. You're making an important point, I want to make sure I understand it.

How, in your view, do you think

Page 42

Sucharow

Judge Wolf's perception of proportional risk borne by the firms would have been different if it had been known that while the Thornton firm was paying for these staff attorneys, they weren't actually physically located at the Thornton office and they weren't employed directly by the Thornton office?

JUDGE ROSEN: I can't answer for Judge Wolf. He may have said, you know, no harm, no foul. He might have.

Other judges I think would look at it and say --

MR. SINNOTT: It's a sham.

JUDGE ROSEN: -- it's a sham, and they're drafting on the work that Labaton did and the risk that Labaton took, or Lieff took, in terms of the commitment of resources and people.

I can't explain it any better than that. I mean, maybe I was on the bench too long, but it -- it matters. To some judges. To other judges, you

Page 43

Sucharow

know, not so much.

THE WITNESS: I'm not disagreeing.

There's no question pending, so I'm just shutting up.

JUDGE ROSEN: It's a discussion.

THE WITNESS: I'd love to have that with you further --

JUDGE ROSEN: Sure.

MR. STOCKER: Not here.

THE WITNESS: -- down the road.

JUDGE ROSEN: I ask these questions because one of the things Judge Wolf is looking for from us is best practices recommendations for the future to avoid these kinds of issues, the public perception of the legal profession, which is important to Judge Wolf -- well, to every judge -- and we've got to be thinking of best practices to recommend.

One of the things we've talked about internally is what effect does

Page 44

[redacted]

Page 45

Sucharow

A I was presented with drafts, I reviewed and made corrections where I thought corrections were appropriate, and then executed it.

Q Was there anything in there that struck you as being out of whack, or warranted further investigation?

A I haven't looked at it in quite some time. I believe it was the paragraph before -- the paragraph, you know, focusing principally on -- with the word "charged" in it, because I wanted the description of what we did and kind of why we did it to have more bite.

Q Here (handing).

And paragraph seven, I think, is the paragraph that you're referring to.

A That's the one with the "charged," but the one I changed -- the one I changed -- I mean, I read that, and stopped and then proceeded, but the paragraph I was talking about was three.

Q Okay. And tell us about that.

A This summarizes how I started this office, what my role was and how I

Page 46

[redacted]

Page 48

[redacted]

Page 47

Sucharow

too long and he was seeing things a certain way, during my interview I kind of said the same thing, and that is, I've been practicing class action securities litigation for 40 years, there's a lot of language that I know that a lay person may not interpret the same way. I would not necessarily perceive it that way until someone says, "Well, why did you say this?"

When I signed this and saw the phrase "firm's regular rates charged" I focused more on the "regular rates" than did I on the word "charged."

We had in the past used phraseology "charged and paid by billable clients," and we had eliminated that last part to reflect the fact that we generally did not take on billable work.

But I've been trying to think, since the informal discussion we had, what would I have said if it wasn't "charged"? Would it be "referred to"? Would it be "told to"?

We do have inquiries, "What are your rates?" And we provide these rates. So it's not charged, but it's our rates.

Page 49

[redacted]

Page 50

Sucharow

contingent fee in any event.

So what I wanted to convey was these are not rates -- our rates are not rates that we either set for the State Street case in particular, for class actions in general or for billable clients. These are our rates. They're the same rates that we charge straight through, because I think that's the purpose of saying "charged and paid for by billable clients." Somehow if somebody's really willing to actually pay that rate, that gives an imprimatur that it's a better -- that it's right.

I would say that, even at the defense bar, different rates are charged by different firms based on their experience.

I would venture to guess that Cravath's rates are very different than some two-person firm, maybe even my firm when it did business where they said we could do it better, faster and cheaper. That's who they were going to compete against. But there is an interest in hiring Cravath, depending on what you want done.

So I don't think that there's, you know, one rate that's appropriate for any

Page 51

Page 52

Page 53

Page 62

Sucharow

BY MR. SINNOTT:

Q Did you have a role in the writing of a letter to Judge Wolf as a result of all of these things?

A I don't believe so. I don't believe that the time allowed for it. I know we wanted to get the letter out quickly, and where I was located didn't really lend itself to my wordsmithing. And people knew more about it. I still was not understanding it.

I think in Kenya was where I learned that Trump became president as well, so my whole world was shaken.

JUDGE ROSEN: That will be the headline of my report.

BY MR. SINNOTT:

Q Let me ask you a couple of questions, Larry, about the Thornton law firm.

THE WITNESS: I mean, I -- I will tell you --

JUDGE ROSEN: We'll talk later.

THE WITNESS: Okay.

Q Were you aware that Garrett Bradley's brother, Michael, was doing document

Page 63

Sucharow

review work in this case?

A No.

Q When did you first become aware of that?

A Probably in whatever article first related it.

Q My understanding is that Garrett Bradley at some point was of counsel to your firm.

A Yes.

Q Are you aware of that?

A Yes.

Q How did that come about?

A [redacted]

Page 64

Sucharow

[redacted]

[redacted]

[redacted]