# EX. 18

Page 1

1

2    JAMS, Inc.

3    Reference No. 1345000011

4    -----------------------------------x

5    In Re State Street Attorneys Fees

6    -----------------------------------x

7                    June 6, 2017

8                    10:25 a.m.

9

10   BEFORE:

11   Special Master Hon. Gerald Rosen, United

12   States District Court, Retired

13

14               Deposition of STEVEN FINEMAN,

15   taken by Counsel to the Special Master,

16   held at JAMS, Inc., 620 Eighth Avenue, New

17   York, New York, before Jineen Pavesi, a

18   Registered Professional Reporter,

19   Registered Merit Reporter, Certified

20   Realtime Reporter and Notary Public of the

21   State of New York.

22

23

24

25       Job No. CS2629875



Page 6

Page 8

1        FINEMAN
2  after a very brief period of time and
3  beginning in January of 1991 started with
4  Leiff Cabraser in San Francisco.
5        Q.      You have been with Leiff
6  Cabraser continuously since then?
7        A.      I actually took a
8  year-and-a-half off in the -- in 1996 and
9  beginning of 1997.
10            I had moved to New York for
11 reasons that had nothing to do with the
12 practice of law, personal reasons, I
13 worked with a firm called Weitz &
14 Luxenberg for a year-and-a-half and when
15 the firm decided to open a New York
16 office, I came back to the firm and have
17 been with the firm since 1997.
18     Q.      Describe, if you would, your
19 previous work on class action litigation
20 on behalf of Leiff Cabraser.
21     A.      I am not sure how to answer
22 that.
23            Since I started with the firm
24 in 1991, a large portion of my practice
25 over the years has been doing class action

Page 7

Page 9

1        FINEMAN
2  litigation in financial fraud, securities
3  fraud, consumer fraud cases.
4            In the early days we did mass
5  torts that were also class actions, as
6  time wore on in the Nineties, those cases
7  sought being class cases became a bit more
8  mass actions.
9            I more or less have done class
10 action practice since I started in
11 mid-1991.
12            In recent years I've also done
13 a fair bit of nonclass direct action
14 litigation for institutional investors
15 and, as you know, I am the managing
16 partner of the law firm, so I spend a fair
17 bit of my time on management as well as
18 practice.
19     Q.      Could you tell us how you
20 became involved in the instant matter, to
21 include the lead-up to it?
22     A.      I have never been involved in
23 the substantive part of the case.
24            The firm was involved in the
25 False Claims Act case in California

3 (Pages 6 - 9)

FINEMAN

1
2 involving State Street and there was a
3 time when we talked about doing a class
4 case as well and I was involved in trying
5 to identify potential clients for the
6 State Street class case that would
7 ultimately -- that we hoped we would file
8 at some point.
9         I think I had some, you know,
10 consulting kind of relationship with the
11 lawyers who were doing the False Claims
12 Act case.
13         I am not a False Claims Act
14 lawyer so it really wasn't my area of
15 expertise.
16         I was in and out at a very
17 superficial level of the substantive part
18 of the cases.
19    Q.    When was your first contact
20 with the false claims portion of the case?
21    A.    I don't remember the dates, but
22 it was beginning of the time the case was
23 filed.
24         I remember the firm being asked
25 to participate in the case by Mike

1         FINEMAN
2 Thornton.
3    Q.    Was that approximately 2008?
4    A.    Sounds about right.
5    Q.    Describe Mike Thornton's pitch
6 to you and to the firm.
7    A.    I never got a pitch.
8         I think what happened is that
9 Mike had already been involved in
10 investigating these cases for some time
11 and he approached Bob Lieff about the firm
12 being involved, I think in part because
13 the firm had a long-standing past
14 relationship with the California Attorney
15 General's Office.
16         Bob brought the opportunity to
17 the law firm and then the firm decided
18 that we would get involved.
19         At that point my involvement
20 would have been as a member of the
21 executive committee in approving the case,
22 but I wasn't involved in the substantive
23 development of the case.
24    Q.    Were you involved in the
25 drafting of the complaint or amended

1         FINEMAN
2 complaint?
3    A.    It is possible that I reviewed
4 it, but I don't have any specific memory
5 of it.
6    Q.    Once Lieff was involved, could
7 you describe the progress of the case?
8    A.    I can't really, actually, I
9 don't have any memory of how the case
10 progressed, I wasn't dealing with the
11 day-to-day of the case.
12    Q.    How about when The Bank of New
13 York Mellon case came to be, were you
14 involved at all in that?
15    A.    Again, only very superficially.
16         The day-to-day handling of that
17 case was managed by my partner, Dan
18 Chiplock, and Dan and I are in the same
19 office, two offices down from one another,
20 and I am the senior securities financial
21 fraud lawyer in the New York office, so I
22 would periodically talk with Dan about the
23 case.
24         But I wasn't involved in the
25 day-to-day of that case.

1         FINEMAN
2    Q.    Was that a foreign exchange --
3    A.    It was; substantively the same
4 as the State Street case.
5    Q.    Did Lieff have a client at that
6 point?
7    A.    Which case?
8    Q.    In the State Street case.
9    A.    No.
10         We didn't have a client --
11    Q.    I'm sorry --
12    A.    We didn't have the client for
13 the class case; in the BoNY case we did,
14 in the -- if I remember correctly, that
15 case started off in California and we had
16 a client, I can't remember who it was,
17 then the case went to New York where it
18 got combined in front of Judge Kaplan with
19 the Kessler Topaz case that I think had
20 come from Philadelphia, and along with a
21 case, an actual 10b-5 case that was being
22 handled by Bernstein Litowitz, and at that
23 point we had Ohio Pension Fund as a
24 client.
25    Q.    Are you able to draw a

4 (Pages 10 - 13)

Page 14

1      FINEMAN
2  comparison between the case before Judge
3  Kaplan and State Street as far as the
4  complexity or difficulty of the case?
5    A.   Not really.
6         I think the cases were
7  substantially similar in terms of the
8  factual allegations.
9         Obviously in the BoNY case we
10  litigated the case further than we did in
11  State Street.
12        In the BoNY case there were, I
13  don't know, more than a hundred
14  depositions taken and the case was heading
15  towards trial, the case advanced much more
16  quickly and there was more done I think
17  than in State Street.
18    Q.   Were there depositions done in
19  the BoNY case?
20    A.   More than a hundred.
21    Q.   Did the work of Lieff's staff
22  attorneys differ between those two cases?
23    A.   I think only to the extent
24  that, because the BoNY case went further,
25  the staff attorneys did a step beyond what

Page 15

1      FINEMAN
2  they had finished in State Street.
3         In other words, in State
4  Street, my understanding is the attorneys
5  got through to review and analysis of
6  documents, drafting an issue memoranda,
7  but we didn't do specific witness kits
8  because we didn't depose any witnesses.
9         In the BoNY case they prepared
10  witness kits, so they went the next step
11  because the case was more advanced.
12    Q.   Did that distinction impact the
13  rate that the staff attorneys were billed
14  out at?
15    A.   No.
16    Q.   What was the range of rates, if
17  you recall, for the two cases?
18    A.   So in the State Street case,
19  the rates that were used were the rates at
20  the time of the fee application in 2016
21  and the rates were $415 per hour for the
22  staff attorneys, with a couple of
23  exceptions, I think some were 515.
24        The BoNY case, I don't really
25  remember, I think the actual rates were

Page 16

1      FINEMAN
2  higher in BoNY because I think the fee
3  application was 2015 and I think a lot of
4  the rates were higher in 2015 than they
5  were in 2016.
6    Q.   In a little while I will ask
7  you about how rates were arrived at --
8    A.   I will add that that's -- all
9  the details of that are in the documents
10  we produced.
11    Q.   One of the documents that you
12  provided in interrogatory response, you
13  referenced ████████████████████████
14  ████████  settlement with State Street, also
15  on foreign exchange claims.
16        Were you involved in that case
17  at all?
18    A.   I don't think it was a case, I
19  think we had talked to ████████ about
20  them serving as class rep in the case that
21  was ultimately filed in Boston and I was
22  not personally involved in that, no.
23    Q.   Was Kirti Dugar involved in
24  that in any level?
25    A.   Kirti would have only been

Page 17

Page 18



Page 20

1        FINEMAN
2 to be done in a case like that, both in
3 terms of personnel and our ability to help
4 finance the litigation.
5        Specifically, we have the
6 benefit of having been through the BoNY
7 Mellon case and so we had a tremendous
8 amount of institutional knowledge of the
9 issues involving FX litigation.
10    Q.    Beyond the objective of,
11 financial objective, of a judgment or
12 settlement in the State Street case, were
13 there any other benefits that Lieff
14 foresaw in affiliating with the case?
15    A.    Not that I can think of,
16 nothing is coming to mind.
17        We had been involved obviously
18 in State Street, we had tried to get a
19 client to take a leadership role in State
20 Street, that didn't work out, we were
21 included I think -- Labaton and Thornton
22 wanted us involved in the case, we were
23 happy to be involved, we liked the case.
24    Q.    Did you see this case as being
25 an entree into other work or other

Page 19

1        FINEMAN
2 the work that was done in that case, the
3 pleadings, the depositions, the settlement
4 negotiations, the resolution of the case,
5 arguments, everything was determined
6 jointly with our co-lead counsel.
7    Q.    I think you testified that in
8 the State Street case, Lieff did not have
9 a client, is that correct?
10    A.    That's correct.
11    Q.    What was Lieff's role in the
12 State Street case?
13    A.    To litigate the case.
14        We were co-counsel on the case
15 along with Labaton and Thornton and we --
16 you will have to ask Dan Chiplock the
17 specifics, but generally speaking, we
18 worked cooperatively with the other
19 lawyers on the case to prosecute the case.
20    Q.    What were the skill sets or
21 tools that Lieff brought to that
22 partnership?
23    A.    Well, generally speaking, our
24 experience in prosecuting complex cases
25 and our capacity to do the work that has

Page 21



Veritext Legal Solutions
800-567-8658                                    973-410-4040

Page 22



Page 24

```
 1        FINEMAN
 2        So other than the general types
 3  of risks we face in all of our cases, I
 4  wasn't particularly aware of anything
 5  specific to the case.
 6        JUDGE ROSEN:  I think what
 7  we're looking for here is, all of these
 8  cases have risks, but the specific legal
 9  risks, if you know; it sounds like your
10  substantive involvement in the case was
11  not deep, is that correct?
12        THE WITNESS:  Correct, it was
13  not deep.
14        JUDGE ROSEN:  So we've heard
15  during the interview stage from other
16  witnesses that there were significant
17  challenges on issues like Rule 23
18  commonality, potential barriers to class
19  certification, ERISA preemption, whether
20  State Street was even a fiduciary since it
21  was a custodian, existence of trading
22  relationships that may have allowed them
23  to fall within exemptions, all of these
24  things.
25        And so what we're trying to
```

Page 23

Page 25

```
 1        FINEMAN
 2  understand, and you may not have the
 3  knowledge, maybe Dan Chiplock would be the
 4  better witness on this, but we're trying
 5  to understand that when you took this case
 6  on, which obviously was going to be a
 7  commitment for the firm both in terms of
 8  financial resources and human resources,
 9  how or where were you of the substantive
10  challenges the case faced.
11        THE WITNESS:  I have no doubt
12  at the time we decided to take the case we
13  were presented with the strengths and
14  weaknesses, but sitting here today I don't
15  remember what those were and I am not the
16  best person to ask the question, I think
17  Dan is definitely better.
18        JUDGE ROSEN:  But you would
19  have been involved, as a manager, you
20  would have been involved in the decision
21  to either green light it or red light it
22  or amber light it and say let's go slow?
23        THE WITNESS:  I think that's
24  all true, that also would have been at the
25  time we got involved in BoNY Mellon.
```

7 (Pages 22 - 25)

Page 26

1    FINEMAN
2        I don't recall how different it
3  was when we got to State Street.
4        Every case the firm takes has
5  to be approved by the executive committee.
6        So at some point whenever that
7  case was presented to us, we looked at the
8  strengths and weaknesses.
9        JUDGE ROSEN:  At the time were
10  you chairing the executive committee?
11       THE WITNESS:  Yes.
12  BY MR. SINNOTT:
13   Q.    If you recall, Steve, do you
14  remember whether you considered this case
15  to be of equal risk or difficulty to the
16  Mellon case, was it more difficult, less
17  difficult?
18   A.    I don't recall what I thought
19  at the time, I probably thought it was
20  going to be as difficult as BoNY Mellon
21  was and BoNY Mellon was hard, really hard,
22  and so I expected State Street would be
23  the same.
24   Q.    Were you, during the crafting
25  of the allegations in this case, were you

Page 28



Page 27



Page 29

1    FINEMAN
2        But we didn't --  because the
3  case was in that posture, we didn't get to
4  depositions or other pretrial activities
5  or class cert.
6   Q.    But did that production prompt
7  the firm to ramp up, if you will, with the
8  document review?
9   A.    I don't know the connection
10  between the timing of the productions and
11  settlement discussions.
12   Q.    Were you part of the process of
13  shifting staff attorney resources from
14  Mellon to State Street?
15   A.    I was not.
16   Q.    Who would have been involved in
17  that?
18   A.    Dan would have made the request
19  and our partner, David Stellings is our
20  staffing partner, he is responsible for
21  basically making sure that all of the --
22  all cases get the staffing they need.
23        So if a lawyer is looking for
24  staffing for a particular case, they go to
25  him and say I need, you know, an associate

8 (Pages 26 - 29)

FINEMAN

1
2  or I need a partner or I need staff
3  attorney support.
4        In this particular instance,
5  Dan will be the better source for how the
6  specific people ended up on this specific
7  case.
8        I think, as we told you before,
9  I think most of them came from --
10  transferred over from BoNY Mellon when the
11  BoNY Mellon case was completed, when their
12  work was completed, we moved them into the
13  State Street review, so it was a natural
14  shift.
15        I am not sure they even had to
16  go to David for that.
17  Q.    How many total shifted into or
18  were hired into the State Street review?
19  A.    I don't remember the exact
20  numbers, it is in the materials; I think
21  it was something like 13 or 14 of the 18,
22  something like that.
23        JUDGE ROSEN: I think you told
24  us in the interview at the time you had 28
25  staff attorneys, does that sound right?

FINEMAN

1
2        THE WITNESS:  Yes, that's all
3  in the materials we produced, the exact
4  numbers.
5        I think today we have around --
6  I would have to look at the actual --
7        MR. SINNOTT:  28 staff
8  attorneys?
9        THE WITNESS:  We have about
10  that, somewhere around 28 to 35 staff
11  attorneys, lawyers, who are on the Leiff
12  Cabraser payroll working in our offices,
13  and then we have --  right now we have
14  like 30 or 40 additional lawyers that are
15  working for us through agencies.
16        We're just rolling out of a
17  couple of very, very large pieces of
18  litigation that required a lot of
19  additional help that we don't have on
20  staff.
21        JUDGE ROSEN: When you have
22  that, you go to a contract firm?
23        THE WITNESS:  We use an agency
24  if we need --  you know, if we need
25  additional support doc review that's not

FINEMAN

1
2  covered by our additional staffing, we'll
3  go to an agency.
4        It could be maybe for doc
5  review, it may be for translation
6  purposes, depending on the case.
7  BY MR. SINNOTT:
8  Q.    As far as staff attorneys that
9  are engaged in document review, are they
10  full-time employees?
11  A.    Yes -- well, yes and no.
12        We have staff attorneys who are
13  full-time employees and we have other doc
14  review attorneys who work on part-time
15  schedules, depending on their
16  circumstances.
17  Q.    The staff attorneys, are they
18  all paid by the hour?
19  A.    No.
20        Here's the way we have it set
21  up; I am not sure of the exact numbers, it
22  is around 22, 23 staff attorneys who are
23  salaried employees of the law firm, they
24  get a salary and they get all the bells
25  and whistles of being in the law firm,

FINEMAN

1
2  benefits and all that kind of stuff.
3        We have an additional group of
4  staff attorneys who are not  -- they are
5  on LCHB payroll, but they're not full-time
6  employees, they're more on a contract
7  basis, and that's for various reasons.
8        Some of them want part-time
9  schedules, some of them want flexibility
10  of working remotely, some of them want the
11  flexibility of taking on other jobs while
12  they're working for us; they functionally
13  are the same thing but have different
14  relationships with the firm.
15        The third category would be the
16  contract lawyers who are working through
17  agencies who again do functionally the
18  same work, but they are specific to
19  specific pieces of the litigation.
20  Q.    As far as the staff attorneys
21  are concerned, Steve, are all of them
22  eligible for benefits or does that depend
23  on whether they are full-time or
24  part-time?
25  A.    The answer is a little

FINEMAN

1
2 complicated.
3        The lawyers, the staff attorney
4 lawyers who are full-time employees of the
5 law firm get benefits, the same benefits
6 that everybody else has, so medical,
7 dental, life, 401(k).
8        The other group of lawyers on
9 payroll do not have firm benefits; the
10 reason is complicated, because we had been
11 preparing to make an overall shift in
12 light of the Affordable Care Act Employer
13 Mandate on providing health insurance, and
14 so this is -- this was part of an overall
15 exercise to shift all these people into
16 the place where we would provide benefits.
17        As we don't know what's going
18 to happen with the Affordable Care Act, it
19 sort of went on hold and it actually works
20 better for the people who are still in
21 that category because of their personal
22 circumstances, they by and large want to
23 be in that category, they don't want
24 full-time employment or they want the
25 flexibility of being able to go do other

FINEMAN

1
2 things.
3        JUDGE ROSEN:  We heard for some
4 of the staff attorneys you give them a
5 stipend of some sort to participate in
6 Healthy San Francisco, it is called, for
7 the California folks.
8        Is that in lieu of health
9 insurance?
10        THE WITNESS:  No, it is just an
11 additional benefit.
12        We provide full medical
13 benefits for all of our people.
14    Q.    Steve, can you give us an idea
15 as to the average or range of compensation
16 that goes to your staff attorneys?
17    A.    So currently the staff
18 attorneys who are on salary have a base of
19 a hundred thousand dollars and then they
20 are eligible for year-end bonuses.
21        JUDGE ROSEN:  Which range?
22        THE WITNESS:  I think last year
23 they all got something in the 3,000 to
24 $5,000 range, that was the first year we
25 had done it, I suspect it will be more

FINEMAN

1
2 this year.
3        And we haven't yet adjusted
4 those salaries, but I'm sure we will.
5    A.    The other payroll group, the
6 other group of staff attorneys on our
7 payroll are paid by the hour and based on
8 the projects they are on and that will
9 range depending on the projects they are
10 on and how much time they are spending
11 working.
12        It can be around or more than a
13 hundred thousand dollars if they're
14 working more time.
15        JUDGE ROSEN:  What's the range
16 on the hourly?
17        THE WITNESS:  In terms of
18 salary, how much they get on annual basis?
19        JUDGE ROSEN:  On an hourly
20 basis.
21        THE WITNESS:  The ones on our
22 payroll, they are around somewhere in the
23 50 to 60 range; again, it is in the
24 materials we produced.
25        The agencies, we pay the agency

FINEMAN

1
2 of course, so we don't actually know how
3 much the agency is paying the lawyer, but
4 I think it is roughly the same amount.
5        Depending on what it is, like
6 if you're using an agency for a Korean or
7 a Japanese or a German translator, you
8 know, we're paying a lot more.
9        Otherwise I think the range is
10 roughly in the same ballpark as what we're
11 paying those people.
12        JUDGE ROSEN:  Is that true
13 across your offices, San Francisco, New
14 York?
15        THE WITNESS:  Yes.
16        JUDGE ROSEN:  So the 50 to $60
17 range, is that roughly all of the staff
18 attorneys, because we heard from one of
19 the staff attorneys that at the time she
20 was making $40.
21        THE WITNESS:  It was possible
22 at the time she was.
23        I would have to go back and
24 look at the paper to tell you what the
25 staff attorneys were getting.

FINEMAN

2 Q. If I were to tell you that the
3 submissions indicate that Lieff pays an
4 average of $55 an hour, in a range of $40
5 to 67 per hour, would that sound about
6 right to you?
7 A. Yes.
8 Q. Are your salaried employees
9 eligible for overtime?
10 A. Yes.
11 Q. Are the hourly employees
12 eligible for overtime?
13 A. I believe the answer under
14 California law is yes, but I am not
15 positive.
16 Q. Do all of your staff attorneys
17 who are working on document review work
18 out of an office location or do any of
19 them work remotely?
20 A. Some people work remotely.
21 So depending on how many people
22 you have at a particular time, what the
23 facility situation is like, what a
24 person's needs are, where they are living,
25 we've had people that work with us for a

FINEMAN

2 long, long time doing review projects who
3 have relocated and we wanted to keep them
4 working for the firm so we allow them to
5 work remotely because we know their work.
6 It varies.
7 Q. To your knowledge, in the State
8 Street case, was everyone working out of
9 the San Francisco spaces?
10 A. I couldn't tell you
11 specifically, I would doubt it.
12 I would think -- I think there
13 is a couple of people in there who
14 generally work remotely for us.
15 Q. Somehow do they report their
16 hours?
17 A. Same as everybody else, they
18 enter them either directly into the system
19 that we use --
20 JUDGE ROSEN: Do you have a
21 system like Rainmaker?
22 THE WITNESS: Elite.
23 A. Or they transmit them in some
24 fashion to an administrative assistant who
25 takes care of their time.

FINEMAN

2 Q. Was Elite in effect during the
3 State Street case, do you know?
4 A. Yes.
5 Q. Your expectation was that they
6 would enter hours through that platform?
7 A. I don't think I had a specific
8 expectation how they would enter their
9 time in this case.
10 People submit their time
11 differently, some -- the younger people
12 who know how to use the technology better
13 tend to enter it directly, whereas some
14 people still write their time and submit
15 it to an assistant who then transcribes
16 it.
17 Q. Steve, you talked about these
18 staffing agencies and the attorneys that
19 Lieff utilizes through them.
20 How are they compensated?
21 A. We pay the agencies.
22 The agency sends us an invoice;
23 so in this particular case, in the
24 documents we produced, we produced the
25 invoices between us and the agency with

FINEMAN

2 respect to the staff attorneys that worked
3 on this case through an agency.
4 Q. Does the work that the agency
5 attorneys perform differ from what the
6 Lieff staff attorneys work on?
7 A. Generally speaking, I think the
8 answer is no.
9 Q. Who supervises them?
10 A. Lawyers are supervised by the
11 lawyers in charge of the case or however
12 that partner staffs or supervises the
13 case.
14 So in some instances, like the
15 partner in charge of the case will
16 supervise everybody on the case, including
17 all the lawyers and including the staff
18 attorneys and the paralegals and analysts
19 and everybody else.
20 I think more frequently what
21 happens is that the more senior people
22 will delegate that responsibility to
23 somebody else on the ground.
24 I think in this particular
25 case, and you'll get this from Dan

11 (Pages 38 - 41)

FINEMAN

1
2 Chiplock, but I think Dan had Kirti Dugar,
3 who was our -- he was managing in a sense
4 the platform for the review of the
5 documents, he would sort of oversee what
6 was going on on a daily basis and then
7 they would report up to Dan or -- I am
8 not exactly sure the extent of his
9 involvement, I think Nick Diamand at Dan's
10 request was also involved a little bit in
11 the supervision of the staff attorneys on
12 the case.
13        I think at various points in
14 the case, once you get to a certain point
15 and memos were being written, you know, a
16 more senior lawyer like Dan would have
17 been involved in discussing with the staff
18 attorneys what he wanted to see in the
19 memos.
20    Q.    So Dan wouldn't go through
21 Kirti, he would go directly to the staff
22 attorneys?
23    A.    I don't know specifically in
24 this case, but generally speaking, that's
25 how it would work.

1        FINEMAN
2        Dan will tell you how he
3 managed it.
4    Q.    If you know, Steve, when State
5 Street was going on, was Kirti involved in
6 other document review matters?
7    A.    I'm sure he was.
8    Q.    So he was overseeing staff
9 attorneys on multiple cases, is that
10 correct?
11    A.    Yes, I would have to go back
12 and look, but I would think -- when I say
13 overseeing, he is not micromanaging staff.
14 You have met some and you will
15 meet more later, they are professionals,
16 they know what their job is and they have
17 been trained what to do and they do their
18 work and they are entering all of their
19 work into the database and they are
20 identifying the documents that we'll need
21 later for prosecuting the case.
22        So on a daily basis, I don't
23 think that exercise requires a tremendous
24 amount of oversight.
25        At some point, and Dan will be

1        FINEMAN
2 the one to tell you this, at some point
3 when we moved onto the memo writing, as
4 you see in the memos we have produced,
5 those memos all have links to numbers of
6 documents that we would then be using in
7 the next phase of the case to take
8 depositions and things like that.
9        At that point, you know, the
10 lawyers are getting more and more
11 involved.
12        How this case progressed, other
13 lawyers would have gotten more involved in
14 preparing for depositions and things like
15 that.
16    Q.    Who kept track of the time that
17 was submitted, who oversaw that process?
18    A.    All the time is entered and we
19 have people in the office whose job it is
20 to make sure all the time is entered and
21 then it is in the system, it is in the
22 Elite system, and then that time can be
23 produced in reports electronically.
24        A normal practice of the firm
25 is for a partner in the law firm who is

1        FINEMAN
2 supervising a case to periodically review
3 the time.
4        You can ask Dan, I think Dan
5 did that in this case, where he
6 periodically kept an eye on what was going
7 on.
8        I don't recall in this case if
9 Labaton instituted any requirement that we
10 share lodestar on a periodic basis.
11        Like in an MDL, you're --
12 usually leadership requires that you share
13 your lodestar periodically.
14        JUDGE ROSEN:  Benchmarking it
15 as you go through the case, sort of seeing
16 where you are on lodestar?
17        THE WITNESS:  For whatever
18 reason, to keep track of the overall
19 numbers.
20        In an MDL case, as you know,
21 you might have lots and lots of lawyers
22 and people want to keep track.
23        It is less prevalent in a case
24 where there are so few lawyers and we know
25 these firms, we have worked with these

1          FINEMAN
2 firms in the past.
3          I am not sure it was as
4 critical and I don't know in this case if
5 we did it or not.
6     Q.    Let me talk a little about the
7 cost-sharing arrangement --
8          JUDGE ROSEN:  Before we get to
9 that, before we leave the staff attorneys,
10 what I will call the contract lawyers or
11 agency lawyers, the staff attorneys are
12 fully onboard as employees.
13          I assume they get W-2s?
14          THE WITNESS:  Right, which have
15 all been produced -- actually, every
16 lawyer who is on our payroll gets a W-2.
17          JUDGE ROSEN:  The agency
18 lawyers I assume do not.
19          THE WITNESS:  They do not,
20 because we don't pay them directly.
21          JUDGE ROSEN:  You pay the
22 agency.
23          THE WITNESS:  Right.
24          JUDGE ROSEN:  When you do a fee
25 petition for lodestar purposes, you have

1          FINEMAN
2 your staff attorneys and you assign a
3 lodestar rate or number to them?
4          THE WITNESS:  Yes.
5          JUDGE ROSEN:  How do you handle
6 staff attorneys --  sorry, agency
7 attorneys?
8          THE WITNESS:  Same.
9          JUDGE ROSEN:  What's the
10 justification for that?
11          THE WITNESS:  They are doing
12 functionally the same work.
13          JUDGE ROSEN:  But they are not
14 employed by you, I am going to push back
15 on you because this is a big question in
16 the case, they are doing the same work,
17 but they are not employees, you have a
18 fixed cost and they are not receiving
19 benefits, you don't have the same
20 overhead, so you have a very fixed cost
21 and it is an understandable and
22 predictable cost.
23          So why would, for lodestar
24 purposes, for the agency attorneys, why
25 would it be the same for the folks who you

1          FINEMAN
2 have the employment relationship with?
3          THE WITNESS:  Because the
4 amount we pay the lawyers is not relevant
5 to our discussion about how much we're
6 going to peg their hourly rate at.
7          That's a function of what the
8 market in our view pays for those people
9 and how much we pay them is insignificant.
10          It is like an associate, we
11 don't decide how much we're going to
12 bill --  we don't really bill, as we
13 talked about, but the hourly rate for an
14 associate is set based on what we
15 understand to be the market rate for legal
16 services provided by that person, not
17 based on how much we pay that person.
18          JUDGE ROSEN:  Irrespective of
19 whether they are employed by you or not?
20          THE WITNESS:  Irrespective.
21          JUDGE ROSEN:  But you don't
22 have the long-term carrying costs of a
23 long-term employment relationship, you
24 don't have the benefit costs, you don't
25 have all the other staff costs, the

1          FINEMAN
2 administrative costs that we have been
3 talking about, figuring out healthcare and
4 everything else?
5          THE WITNESS:  It is true that
6 for somebody who is coming through an
7 agency --
8          JUDGE ROSEN:  In other words,
9 it is a fixed cost.
10          THE WITNESS:  Well, it is a
11 fixed cost in the sense that we pay the
12 agencies certain amount of money for every
13 hour that person works, so it is a
14 different cost if they work ten hours or
15 40 hours.
16          And it is a different cost
17 depending on how much additional resource
18 the firm uses to support that lawyer, so
19 if that agency lawyer is working in our
20 offices and using our facilities and
21 requiring administrative support, word
22 processing support, whatever it is, then
23 there is an overhead factor applied to
24 that person.
25          It is hard to peg a specific

13 (Pages 46 - 49)

FINEMAN

1
2 overhead figure to those people, to all
3 these people, because it varies from
4 case-to-case and from day-to-day and we
5 don't entirely know.
6          Again, we don't set our rates
7 based on how much we pay people, we don't
8 do it for partners, we don't do it for
9 associates, we don't do it for staff
10 attorneys, we don't do it for the agency
11 hires either.
12          JUDGE ROSEN:  I am still trying
13 to understand the economic justification
14 in the market for billing out people who
15 are employed by others, agency lawyers,
16 that you are contracting your services
17 for, and then when you do a lodestar
18 calculation, marking it up to commensurate
19 rates with your staff attorney employees,
20 a theoretical justification.
21          THE WITNESS:  Again, the
22 assumption you're making is that how much
23 we're paying to have an employee matters
24 in how we set the rates.
25          We don't take into account how

FINEMAN

1
2 much we're paying somebody in setting the
3 hourly rates, we set the hourly rates
4 based on our understanding of what the
5 market will pay for that person's
6 services.
7          JUDGE ROSEN:  I understand
8 there is a market element to this, but it
9 seems to me in terms of your risk factor,
10 your risk with folks who are not employed
11 by you is not as great as it is for
12 ongoing people who you are carrying and
13 have the ongoing -- all of the ongoing,
14 not just costs, but relationship costs,
15 the staff attorneys and your associates
16 are sort of in the same boat, they are
17 employees, they are onboard.
18          The agency people is a much
19 more predictable cost, so I am trying to
20 understand the economic justification
21 where you have a fixed cost.
22          You wouldn't, for example, mark
23 up, if you contracted out your xerox
24 costs, not that these people are doing
25 xeroxing, but you wouldn't mark that up,

FINEMAN

1
2 would you?
3          THE WITNESS:  I am not marking
4 anything up.
5          What we're doing is we're
6 including almost entirely here -- by the
7 way, for lodestar cross-check purposes,
8 right?
9          JUDGE ROSEN:  Yes.
10          THE WITNESS:  We're including
11 as an hourly rate the rate that we
12 determine the market will pay for those
13 people without consideration at all of how
14 much we pay for -- we pay those people or
15 we pay the agencies for those people.
16          So I am not sure -- I think
17 the problem here is that we're not running
18 through a process of trying to justify an
19 hourly rate by how much we pay a person or
20 what our overhead factor is for any
21 particular category of person working for
22 the law firm.
23          JUDGE ROSEN:  I am looking for
24 a comparison, a copying service is not
25 quite the same because here you're paying

FINEMAN

1
2 for professional services.
3          You contract out other services
4 and you put those on the expense side,
5 right, in your fee petitions?
6          THE WITNESS:  No, the fee
7 petition doesn't include how much I pay
8 for an equipment lease or how much we pay
9 for the person to come in and fix the
10 copying machine, that's overhead.
11          JUDGE ROSEN:  But it includes,
12 for example, it includes copying costs
13 when you ship documents out to have them
14 copied?
15          THE WITNESS:  Well, if I send
16 documents out for copying charges and a
17 copying charge is an acceptable expense in
18 the jurisdiction which we're submitting a
19 fee application, we will include that
20 expense.
21          But I don't equate the work
22 being done for us by the lawyers with
23 somebody running a copying machine, it is
24 not a legal service.
25          JUDGE ROSEN:  Okay.

```
1              FINEMAN
2         With respect to one group of
3  costs, you've got a fixed cost, you know
4  what your cost is going to be on these
5  contract lawyers and you hire them for one
6  project and one project only and that's
7  your cost.
8         For the staff attorneys and
9  associates, there is an ongoing
10 relationship and ongoing carrying costs
11 that don't seem to exist with the contract
12 lawyers.
13        I am trying to understand what
14 the justification for that is; it is not
15 your cost, the staff agencies, you hire
16 them, and I know other firms do it,
17 including defense firms.
18        MR. HEIMANN:  Do what, I don't
19 understand that.
20        JUDGE ROSEN:  Bill staff
21 attorneys to clients at a marked up
22 rate -- I'm sorry, not staff attorneys,
23 contract.
24        THE WITNESS:  This is the way
25 we've done it and we have never been told
```

```
1              FINEMAN
2  by any court it was inappropriate to do it
3  that way.
4         As we understand the case law
5  and the law on this and the scholarship on
6  this, at least the best scholarship on
7  this, is that you charge the market rate
8  or you bill the market rate for the
9  service, legal service, that you're
10 providing, which is what we do.
11        So I am not sure how else to
12 answer that question for you, judge.
13        JUDGE ROSEN:  Okay, that's an
14 issue obviously I'm going to have to deal
15 with and an issue I'm going to have to
16 think deeply about, and we may ask you
17 folks to weigh in on that and provide me
18 with something.
19        THE WITNESS:  Happy to do it.
20        JUDGE ROSEN:  And I will
21 consider it.
22 BY MR. SINNOTT:
23  Q.    Let me follow up on that,
24 Steve.
25        Beyond the agency --
```

```
1              FINEMAN
2         JUDGE ROSEN:  I'm sorry.
3         You didn't have that many
4  agency attorneys on this, how many did you
5  have?
6         THE WITNESS:  I can't recall,
7  to be honest with you.
8         The vast majority of these
9  people had been with us on BoNY and came
10 over to this case, so I don't know many of
11 them were agency people.
12  Q.    There were at least two that
13 were --
14  A.    There might have been.
15  Q.    -- double-billed in this case,
16 if I recall correctly?
17        MR. HEIMANN:  That's right.
18        JUDGE ROSEN:  Agency.
19  A.    Double-counted, yeah.
20  Q.    Let me follow up on the judge's
21 questions and ask you about the nonagency
22 attorneys.
23        Do you have a process in place
24 for determining billing rates on an annual
25 basis?
```

```
1              FINEMAN
2  A.    Yes.
3  Q.    Tell us about that.
4  A.    So what has happened over the
5  years is, beginning of the year -- so, you
6  know, we have years of hourly rates,
7  right, and we have --  that they've set in
8  all these preceding years -- and we have
9  years of those rates being used as part of
10 lodestar cross-check in class cases when
11 it happens, it is actually relatively a
12 more recent phenomenon.
13        You go back more than five or
14 six years ago and there was very little
15 lodestar cross-check, it was almost
16 straight percentage of recovery without
17 doing a lodestar cross-check and there was
18 relatively little lodestar-based fee
19 awards in class cases, it pretty much
20 became percentage recovery pretty much
21 everywhere.
22        Several years ago the rates
23 became an issue as far as lodestar
24 cross-check is concerned.
25        And so we have years of courts
```

FINEMAN

1
2 looking at those rates that we are
3 including in our lodestar cross-check and
4 approving those rates.
5        So bearing that in mind, at the
6 beginning of the year I get in touch with
7 the director of our operations, Joe
8 Dragicevic, and the communication with Joe
9 will be what do you know about what's
10 going on in the market, the billable rate
11 market, and we'll talk about if there is
12 any new surveys out, sometimes you get the
13 surveys from American Lawyer, who does the
14 survey that publishes all the big law
15 firms, and we'll look at those.
16        We'll look at whatever other
17 publicly available surveys might be
18 available on rates, we'll discuss it.
19        I will ask him if he heard
20 anything in his world, which is sort of
21 law firm management world.
22        We'll see if there is anything
23 we can find publicly about our
24 competitors' rates.
25        Now, firms in my business,

FINEMAN

1
2 typically because we're not billable rate
3 law firms, you don't usually see our firms
4 in the surveys and we don't respond to the
5 survey questions generally.
6        So you have to find publicly
7 available fee applications in order to see
8 what people are doing, you can't, you
9 know, as the judge knows, you can't go
10 asking other leaders of other law firms
11 how much they're charging for rates
12 because then we get ourselves in all kinds
13 of trouble.
14        So we don't do that; we look at
15 what's publicly available and then I make
16 a proposal based on that conversation,
17 which frankly has pretty much consistently
18 resulted, as you will see in materials we
19 produced, in incremental increases in the
20 rates on an annual basis in most
21 instances.
22        And then sometimes there are
23 anomalies that have arisen, a lawyer may
24 have joined us laterally and come in with
25 a certain billable rate and we will decide

FINEMAN

1
2 at some point we have to adjust that rate
3 to be consistent with what the law firm is
4 customarily charging.
5        I'll send that proposal early
6 in the year to the executive committee and
7 then the executive committee generally --
8 what happens is at the following executive
9 committee meeting it will be on the
10 agenda, we will discuss it, it will be
11 approved, and that will become the rates
12 for the year.
13        Sometimes there will be some
14 followup e-mail communication, modest
15 e-mail communication with people asking
16 questions about the rates.
17        It is really quite simple.
18        JUDGE ROSEN:  Are there any
19 sort of clearinghouse associations or
20 organizations; ever since I have been
21 named special master, I have been getting
22 e-mails from an organization called
23 National Association of Legal Fee Analysis
24 and I'm wondering --
25        THE WITNESS:  There is a lot,

FINEMAN

1
2 there is one called Valeo, you have to pay
3 for it, so most of these you have to pay
4 for.
5        We've looked at them
6 periodically, I actually --  we actually
7 looked at one not too long ago, but it is
8 hard to know how reliable they are because
9 they don't really tell you what their
10 methodology is for collecting data.
11        For example, we looked at the
12 Valeo one, which I think I mentioned when
13 we talked last, and they have a category
14 for staff attorneys; the challenge is they
15 don't define staff attorneys.
16        JUDGE ROSEN:  We don't know if
17 they are agency --
18        THE WITNESS:  I don't know, so
19 you do the best you can.
20        We have the benefit of having
21 submitted our rates in lots and lots of
22 cases where the rates were approved as
23 part of a lodestar cross-check, so if I'm
24 setting rates in 2016 and I have cases
25 from 2015 with Federal judges approving

Page 62

FINEMAN

1
2 our rates for lodestar cross-check
3 purposes or in the rare instance when we
4 have a billable client who has paid those
5 rates, I'm comfortable with the rate and I
6 know that everybody else in the world is
7 raising their rates the following year and
8 so we'll raise them.
9        We raise them incrementally,
10 like 20 bucks, so if you haven't seen
11 already, when you see the schedule we have
12 produced, you will see it goes up very
13 incrementally on an annual basis.
14        And we haven't gotten to a
15 place where we've had any court tell us
16 they thought our rates were out of line.
17        I suppose if I get to that
18 point I will have to rethink how we're
19 doing it, but this is the way we have been
20 doing it for a long time.
21        JUDGE ROSEN:  And I know you
22 have had your fees approved at relatively
23 comparable rates as in this case by
24 courts.
25        Have you had your fees for

Page 63

FINEMAN

1
2 lodestar cross-check purposes approved by
3 courts for agency attorneys?
4        THE WITNESS:  Yes.
5        JUDGE ROSEN:  In a reasoned
6 opinion; by reasoned, I mean an opinion
7 that actually looks at it and says, okay,
8 we understand you're paying X dollars and
9 you're claiming Y dollars, has there been
10 a reasoned opinion that you would like me
11 to look at that analyzes that issue?
12        THE WITNESS:  I don't think we
13 have an opinion that analyzes the issue in
14 quite the way you just put it.
15        Let's take a step back; in most
16 of the lodestar cross-check cases, we
17 submit either a summary of the lodestar or
18 a summary with the description of the work
19 that had been done.
20        Only if asked by the court --
21 as the law says, the courts are not bean
22 counters here for lodestar cross-check
23 purposes, so they have asked us for
24 information about what's our lodestar,
25 what's the range of rates, but they don't

Page 64

FINEMAN

1
2 typically ask us for individual billing
3 rates.
4        There are cases where we've
5 done that, we did it in BoNY Mellon, Judge
6 Kaplan had before him all of the specific
7 rates for all the categories of lawyers.
8        JUDGE ROSEN:  Including broken
9 down by agency lawyers and your staff
10 attorneys?
11        THE WITNESS:  I don't know that
12 in that submission we draw a distinction
13 between lawyers who were agency lawyers
14 versus lawyers who were employees and on
15 the firm's payroll, I couldn't tell you
16 that without looking at the material.
17        To my knowledge, that issue has
18 never come up in any case we have had.
19        JUDGE ROSEN:  One of the issues
20 that we're hearing on the defense side is,
21 for a large firm who gets paid by clients
22 on an hourly basis, is that when these
23 firms use agency lawyers, they have the
24 client pay the agency directly so there
25 isn't, you know, that sort of differential

Page 65

FINEMAN

1
2 in markup.
3        I know you don't have a
4 client --
5        THE WITNESS:  Well, our
6 retainer agreements in class cases aren't
7 really concerned with hours, so that's one
8 of the issues here, right, our agreements
9 with our clients are -- in the class
10 cases, they'll say something like you get
11 a percentage up to a certain percentage
12 but subject to court approval in a class
13 case.
14        There is no reference to hourly
15 rates typically in those kinds of
16 agreements because the client is not
17 interested and we're not asking them to
18 pay us on an hourly basis.
19        The hourly rate issue really
20 only comes up in a class case if the court
21 wants to do either a lodestar cross-check
22 or decides to do a lodestar-based fee
23 analysis.
24        And then it is up to the court,
25 the court will advise us the degree of

17 (Pages 62 - 65)

Page 66

```
1          FINEMAN
2  detail he or she wants on the lodestar
3  cross-check.
4          Some courts want very little
5  detail, they want a declaration that says
6  what the lodestar is with some support for
7  it and other courts want like the hourly
8  work.
9          So it is judge-by-judge.
10         JUDGE ROSEN:  Right.
11  I am trying to think of this
12  within the paradigm of comparable rates
13  for comparable services by comparable
14  firms.
15         And as I've told you candidly,
16  you folks, Labaton and Lieff, Keller
17  Rohrback, Thornton, as commensurate with
18  any of the other large firms that bill on
19  an hourly rate, bill clients on an hourly
20  rate, I believe you have the same level of
21  sophistication, same level of approach,
22  ability, so I view you in that same range.
23         What I'm struggling with here
24  is where you have those firms who do have
25  paying clients, who when they need it,
```

Page 67

```
1          FINEMAN
2  when they hire an agency lawyer, they
3  simply have the client pay directly so
4  there is not that increased differential
5  in which the firm makes a profit, that
6  we're aware of, now maybe there is.
7          But as we understand it, in
8  most of these cases, these firms are
9  paying the agencies directly, so how
10 do I --
11         THE WITNESS:  I don't have
12  clients in those cases who are paying us
13  anything, our clients don't pay us
14  directly for anything.
15         We advance all our costs and we
16  bear all the risk of the case, so it is
17  not really comparable.
18         They have a client who pays on
19  a monthly basis hopefully, right, they pay
20  their hours and they pay their costs, all
21  their costs.
22         In our cases, our clients
23  don't, unless we prevail, we get our costs
24  at the end of the day, but we advance all
25  the costs, nothing comes out-of-pocket.
```

Page 68

```
1          FINEMAN
2  BY MR. SINNOTT:
3      Q.   But you do have cases where you
4  bill hourly, correct?
5      A.   We have had a few.
6      Q.   For example, you represented
7  the ███████████████ in a case?
8      A.   I did.
9      Q.   The ███████ case?
10     A.   I did, yes.
11     Q.   And what did you bill in that
12  case?
13     A.   My memory is that was two
14  rates, it was 600 and 400; 600 for
15  partners and 400 for everybody else.
16         JUDGE ROSEN:  And this was a
17  public service, you were hired by a public
18  agency?
19         THE WITNESS:  I was hired by
20  the ████████████████████████ to
21  represent the office in a case that had
22  been brought -- sorry -- yes.
23         So I was hired to represent the
24  ████████████████████████████
25  in a civil rights case that had been
```

Page 69

```
1          FINEMAN
2  brought against two employees of the
3  ████████████████████
4      The ████████████
5  ████████████████ were third parties
6  in -- because we were the ones producing
7  all the discovery in the case and I had
8  represented the ████████████
9  ████████████████████ in securities
10 fraud cases and so they asked me to take
11  this on, I said yes, they said, you know,
12  we talked about appropriate rates that we
13  can all live with and that's what I agreed
14  to.
15         JUDGE ROSEN:  Was there any
16  kind of discount given for the fact this
17  was a public agency?
18         THE WITNESS:  There was a big
19  discount; we went --
20         JUDGE ROSEN:  Because it was a
21  public agency?
22         THE WITNESS:  Yes.
23         JUDGE ROSEN:  In that case in
24  which you were being paid by the hour, did
25  you use agency lawyers?
```

18 (Pages 66 - 69)

Page 70

```
1              FINEMAN
2          THE WITNESS:  No.
3          JUDGE ROSEN:  If you had, would
4   you have billed them at a higher rate than
5   what you were paid?
6          THE WITNESS:  If I had, they
7   would have been at the $400 rate; it was
8   only two rates that we had agreed on, 600
9   and 400.
10   Q.     Steve, there was also a New
11  York State Superior Court case, ████████?
12   A.     Yes, that was a typo, it was
13  actually in the Southern District of New
14  York.
15   Q.     And that was an hourly billing?
16   A.     That was an hourly client,
17  right.
18   Q.     Who did you represent?
19   A.     I knew you were going to ask me
20  that.
21          It was a ████████████████
22  ████████████████████████
23   Q.     Understanding from your
24  submissions, the billing range was between
25  $375 and $435 an hour?
```

Page 71

```
1              FINEMAN
2   A.     Right, that's my understanding.
3   Q.     How was that determined?
4   A.     They were whatever the rates
5   were for the lawyers that were working on
6   that case in the time period that case was
7   being litigated.
8   Q.     So you didn't set the rates?
9   A.     No, I don't believe there was
10  any negotiation over the rates in that
11  case; those were the rates that the
12  people -- that were in our hourly rate
13  schedule, they paid them.
14   Q.     What weight did you give those
15  two cases, for example, in the setting of
16  current rates or rates since 2012 and
17  2015?
18   A.     I don't know that I gave it
19  specific -- I think we just figured in
20  the overall mix.
21          I think if we had had clients
22  who were, you know, protesting our rates,
23  it probably would have influenced me.
24          But I think the fact that the
25  rates were just being paid that were
```

Page 72

```
1              FINEMAN
2   comparable to the rates that we were using
3   in the lodestar cross-checking cases, I
4   don't think it registered --  it would
5   have registered with me if we had a
6   problem.
7   Q.     Do you think these were outlier
8   cases --
9   A.     No, outlier cases, no.
10   Q.     Previously when we talked,
11  Steve, you and Richard had talked about
12  how associate rates are determined and I
13  believe you said the principal factor was
14  the years out of law school?
15   A.     Yes.
16   Q.     And you talked about rate
17  equivalency.
18          Can you explain that to us.
19   A.     Staff attorneys?
20   Q.     Staff attorneys.
21          JUDGE ROSEN:  Yes, it was in
22  the context of staff attorneys.
23   Q.     Staff attorneys as related to
24  the associate pay.
25   A.     I am not sure if this is where
```

Page 73

```
1              FINEMAN
2   you're going, but for a number of years
3   with our staff attorneys and agency
4   lawyers, we tried to match their rates
5   with the rates of a comparable lawyer in
6   the law firm.
7          So if you have been practicing
8   law for eight years and you're a staff
9   attorney, we would look at what an
10  equivalent rate would be in the office
11  already.
12          JUDGE ROSEN:  So you peg them
13  to --
14          THE WITNESS:  Whatever their
15  year was, right.
16   A.     As I mentioned to you when we
17  talked before, we got to a point where
18  just both intuitively and also watching
19  what's happening in the case law, we knew
20  those rates were too much, it wasn't
21  rational, and that's when we decided we
22  would make the rates uniform.
23          Trying to distinguish -- as
24  you know from having met some of the staff
25  attorneys, some of them have been
```

Page 74

1          FINEMAN
2 practicing quite a long time and you can't
3 really start --  you couldn't use the
4 rates that you're charging for a 20-year
5 lawyer for those people, it just wasn't
6 appropriate.
7          And so we spent some time
8 discussing at a meeting what's the right
9 number given this and we decided that a
10 fourth-year associate, at the time we did
11 this, 2016, was the right number and
12 that's I think the conversation that we
13 had.
14     Q.    In the State Street case, the
15 BoNY Mellon rates were referenced in the
16 fee petition.
17     A.    Yes.
18     Q.    How was that decided?
19     A.    They were the rates as of 2015.
20          Like I said, those rates I
21 think were actually higher than the rates
22 for 2016 when we made our fee submission
23 here.
24     Q.    Did you consider the venue of
25 the case as being Massachusetts in the fee

Page 75

1          FINEMAN
2 petition?
3     A.    Well, yes, in the sense we had
4 to follow First Circuit authority in
5 making our fee submission.
6          No in the sense that we didn't
7 alter our hourly rates because the case
8 was in Massachusetts or in the Federal
9 Court in Boston.
10          JUDGE ROSEN:  Did you look at
11 the question, there were cases for circuit
12 cases that seemed to indicate you get
13 compensated, or for purposes of lodestar,
14 compensated, I use that in quotes, at the
15 rate of the venue, not at the rate where
16 the work is performed, did you consider
17 that?
18          THE WITNESS:  I did not have
19 anything to do with preparing the fee
20 application, so I don't know what they
21 considered.
22          But we would have --  with
23 respect to the percentage of the recovery
24 certainly and law for approval, we would
25 have followed First Circuit authority.

Page 76

1          FINEMAN
2          As to the point about the
3 marketplace, I don't know an answer,
4 but --
5          JUDGE ROSEN:  Would that be a
6 question for Dan?
7          THE WITNESS:  You could ask if
8 they considered it, but I will tell you I
9 am not aware of an instance where we have
10 altered the hourly rates for purposes of
11 lodestar cross-check based on being in a
12 different marketplace, New York or San
13 Francisco.
14          JUDGE ROSEN:  Even where the
15 law of the circuit might say that you
16 should?
17          THE WITNESS:  I am not aware of
18 us having done that.
19          But generally --
20          MR. HEIMANN:  Well, with the
21 law being as it is, as you suggested.
22          THE WITNESS:  Also, I don't
23 know the answer to this question, but I
24 don't believe --  I doubt very much the
25 marketplace for legal services in Boston

Page 77

1          FINEMAN
2 is much different than San Francisco,
3 which is the principal basis for setting
4 our rates.
5          Our rates tend to be lower than
6 our competitors in New York and mostly
7 pegged to what's going on in San Francisco
8 because that's where we're based.
9     Q.    Let me ask you about the
10 cost-sharing agreement with the other
11 firms, Labaton and Thornton.
12          Were you involved in that
13 process?
14     A.    I was not.
15     Q.    Do you know how it came about?
16     A.    Other than the fact that we
17 were invited to participate in the case
18 with these guys and there was some
19 agreement, no.
20     Q.    As far as splitting the costs,
21 you don't know about any discussions or
22 agreements?
23     A.    I wasn't part of that.
24          Generally the cost split
25 follows the fee split.

20 (Pages 74 - 77)



Page 78

Page 80

1          FINEMAN
2          JUDGE ROSEN:  What's your
3  understanding of why it was done, why was
4  it done that Thornton was allocated five
5  staff attorneys or six staff attorneys
6  from Labaton and five or six from Lieff,
7  what's your understanding?
8          THE WITNESS:  My understanding
9  is that there was an effort to balance out
10  the lodestar so expenses would correspond
11  in some fashion to the fee split.
12          So my understanding was that
13  Labaton -- in order to get Labaton enough
14  work in the case --  Thornton, I'm
15  sorry -- in order for Thornton to have
16  work in the case, they would pay for the
17  staff attorneys.
18          JUDGE ROSEN:  Was it also to
19  sort of spread the risk and cost burden?
20          THE WITNESS:  I think that's
21  always what we do in these kinds of cases,
22  try to spread it around.
23          That's one of the reasons we
24  were asked to participate; aside from our
25  substantive knowledge, obviously to help

Page 79

Page 81

1          FINEMAN
2  spread the risk.
3          JUDGE ROSEN:  Because Thornton
4  was a much smaller firm and didn't have
5  the capacity to undertake this kind of a
6  case without a much bigger firm like yours
7  and Labaton's.
8          THE WITNESS:  Okay.
9          JUDGE ROSEN:  Right?
10          THE WITNESS:  As far as I know,
11  yeah.
12          JUDGE ROSEN:  But at the same
13  time, they were going to be asked to share
14  the cost burden and associated risk?
15          THE WITNESS:  Yes.
16  Q.    Were you aware, Steve, that
17  Zaul and Jordan were assigned as Thornton
18  staff attorneys?
19  A.    No -- I mean, not until now in
20  this process.
21  Q.    Let me ask you a general
22  question, if you know.
23          Why was it necessary to assign
24  them to Thornton rather than just Thornton
25  paying its one-third share of the cost?

21 (Pages 78 - 81)

1          FINEMAN
2     A.   I don't know.
3          JUDGE ROSEN:  Who would be the
4  best to answer that?
5          THE WITNESS:  I think the idea
6  was that we had lawyers that were working
7  on the case and one way of dealing with
8  that was for the Thornton firm to pay for
9  some of those lawyers.
10         JUDGE ROSEN:  You can split the
11 question.
12         One is the need to get Thornton
13 to contribute on the cost and share the
14 risk.
15         The other is why do this
16 through the device, I don't mean that
17 pejoratively, why do this through the
18 device of saying, okay, we're going to
19 allocate these staff attorneys to Thornton
20 and let Thornton claim the fees for that,
21 because you could easily have just --
22 easily is maybe not the right word --
23 somebody could have gone to Thornton and
24 say, look, you're participating in the
25 case, we want you to share the risk and

1          FINEMAN
2  we'd like you to contribute X amount of
3  dollars, so why go through -- I'm looking
4  for a better word than device -- why go
5  through the process?
6          MS. McEVOY:  Machination?
7          JUDGE ROSEN:  That's an even
8  more negative connotation.
9          I am trying to understand, and
10 I asked the Thornton folks and I am going
11 to ask when we get to Mike Thornton and
12 Garrett Bradley, why go through the
13 process of titularly assigning staff
14 attorneys to them and billing them for the
15 staff attorneys rather than just sending
16 them a bill for an appropriate cost,
17 because it does have the effect of
18 permitting them to claim your staff
19 attorneys, who you're paying for as
20 employees, to raise their lodestar.
21         So I am trying to understand
22 why it was done that way rather than just
23 sending them a bill.
24         THE WITNESS:  I don't know, the
25 answer is I don't know how this

1          FINEMAN
2  arrangement came to be or why they did it
3  this way.
4          I am trying to imagine how you
5  would just send them a bill, though, it
6  doesn't seem --
7          JUDGE ROSEN:  Is that not the
8  practice in these kinds of cases, where if
9  you have firms who are sort of taking the
10 leading ore and asked to share the cost,
11 is it not the practice that part of
12 sharing the cost --  I don't know the
13 answer to this at all, but I am trying to
14 understand what the practice was or is
15 this the practice, where you allocate
16 specific people by name, even though those
17 people are not being supervised at all by
18 the Thornton firm?
19         THE WITNESS:  So, yes, the
20 practice with respect to costs is to share
21 costs and that can be done either by
22 directly asking for contributions or by
23 setting up a cost fund.
24         In the instance of the --  Dan
25 will correct if I get this wrong --  with

1          FINEMAN
2  respect to the agency lawyers, Thornton
3  paid them directly, but these were not
4  cost items.
5          As we discussed earlier, the
6  lawyers doing the document analysis, it
7  was lodestar time, not a cost.
8          I am not aware of a situation
9  where we have in a case billed somebody
10 for later to repay us for lodestar for
11 time.
12         It wasn't a cost, it was the
13 lawyer's time.
14         JUDGE ROSEN:  As we understand
15 it, and correct me if I am wrong, but as
16 we understand it, Thornton was billed by
17 Lieff and Labaton for the hourly cost, by
18 cost I mean what the staff attorneys were
19 actually --  here I'm talking about staff
20 attorneys, not agency attorneys --  what
21 the staff attorneys were actually being
22 paid by the firm.
23         So they were invoiced, you
24 know, if a staff attorney worked in a
25 month 150 hours and that staff attorney

Page 86

1          FINEMAN
2 was being paid $50 an hour, they were just
3 sent a bill for that.
4          THE WITNESS:  Right, we
5 invoiced Thornton for two lawyers, that's
6 my understanding.
7          JUDGE ROSEN:  So my question
8 is, and I am trying to understand this,
9 I'm certainly going to ask the Thornton
10 people this, my question is why not just,
11 rather than allocating these lawyers to
12 them for purposes of working and
13 allocating them, and just, you know, ask
14 them to make a cost contribution
15 commensurate with that rather than
16 allocating the specific attorneys to them,
17 even though they weren't being supervised,
18 or as near as we can see so far, they
19 weren't doing any work specifically for
20 Thornton, you and Labaton were directing
21 the work?
22          THE WITNESS:  The answer to the
23 specific question is I don't know.
24          JUDGE ROSEN:  As far as you
25 know, was there an agreement with Thornton

Page 87

1          FINEMAN
2 to do this so that they can participate
3 when it came time to lodestar at a higher
4 level?
5          THE WITNESS:  I am not sure I
6 understand that last part of the question.
7          The idea was for Thornton to be
8 able to have lodestar in the case, that's
9 why --
10          JUDGE ROSEN:  That answers the
11 question, okay.
12          MR. HEIMANN:  Well, okay.
13          I thought you said you didn't
14 know and now you know.
15          I think you need to ask Dan the
16 question, Steve does not know the answer.
17          JUDGE ROSEN:  You don't know
18 what the thought process was?
19          THE WITNESS:  No, I wasn't
20 there.
21 BY MR. SINNOTT:
22   Q.    By way of comparison, Steve, if
23 you know, there was a case called In re
24 Lithium Ion Batteries Antitrust Litigation
25 and in that case, as we understand it from



Page 88

Page 89

Veritext Legal Solutions

800-567-8658                                        973-410-4040



Page 98

Page 100

Page 99

Page 101

1          FINEMAN
2    one of them.
3          You're talking about --  there
4    are more than one, I knew Lynn Sarko.
5     Q.    Did you have any contact with
6    Mr. Hopkins or anyone else?
7     A.    No.
8     Q.    Or any of the plaintiffs, and I
9    take it the answer is no.
10         Steve, we asked you this during
11   the informal interview process, but I am
12   going to ask again.
13         What steps could your firm have
14   taken to prevent the problem, if any, that
15   we're faced with here, the Globe story and
16   all of that unpleasantness?
17    A.    If you mean what we could have
18   done to prevent the double-counting?
19         JUDGE ROSEN:  I think there are
20   two aspects to it for purposes of your
21   firm, of course we'll ask the other firms
22   the same.
23         One is the double-billing and
24   two is the representations that were made
25   in the fee declaration that Judge Wolf has

26 (Pages 98 - 101)

1        FINEMAN
2 alluded to, including at the hearing, in
3 which the declarations refer to -- I ask
4 this because this is obviously part of my
5 charge and Judge Wolf has zeroed in on
6 this himself.
7        Paragraph 5, this is Dan
8 Chiplock's fee declaration, "The hourly
9 rates for the attorneys and professional
10 support staff in my firm included in
11 Exhibit A are the same as my firm's
12 regular rates charged for their services,
13 which have been accepted in other complex
14 class actions," so it is a two-part
15 question, one on the double-billing and
16 two on the declaration statement.
17    A.    So what could we have done to
18 prevent that; well, in retrospect, you
19 know, it is possible I guess if Dan had
20 looked or somebody had looked more
21 carefully, I guess, at the time
22 submissions for the staff attorneys that
23 were being paid by Labaton.
24        You know, the thing is, we
25 didn't have the other applications, so I

1        FINEMAN
2 am not sure we could have done anything.
3        If we looked at it and thought
4 these people shouldn't be here for this
5 time period -- remember, part of the
6 problem that we had was we didn't have
7 anybody else's time or fee --
8        JUDGE ROSEN:  You didn't see
9 Labaton's and --
10        THE WITNESS:  That's my
11 understanding; you can check with Dan, my
12 understanding is we didn't.
13        JUDGE ROSEN:  That went to my
14 question I asked you earlier about the
15 double-billing, about whether or not
16 anybody was looking at and monitoring to
17 make sure that Thornton -- that you
18 weren't claiming what was allocated to
19 Thornton and why was this allocated to
20 Thornton and whether that was the regular
21 practice in this kind of case.
22        MR. HEIMANN:  I haven't heard a
23 question.
24        JUDGE ROSEN:  There are too
25 many questions, you heard two or three or

1        FINEMAN
2 five questions, that's the problem, that
3 is a classic compound question.
4        One of the points of my
5 questions earlier, is this a practice in
6 plaintiff large class action cases where
7 attorneys, staff attorneys, are allocated,
8 without the firm to whom they are
9 allocated being supervised for purposes of
10 claiming a fee petition in the fee
11 petition?
12        So the question I ask is is
13 this a standard practice, is this done?
14        THE WITNESS:  Are you talking
15 about is the arrangement we had with
16 Thornton done in other cases?
17        JUDGE ROSEN:  Yes.
18        THE WITNESS:  I think that was
19 the subject of one of the discovery
20 requests and my response was the instance
21 I was aware of where we were involved in
22 it is the example we put in the discovery
23 responses that we talked about earlier.
24        MR. SINNOTT:  In re Lithium
25 Battery.

1        FINEMAN
2        THE WITNESS:  Right, I am not
3 aware of another case that we have where
4 we have done this.
5        JUDGE ROSEN:  How about in the
6 industry?
7        THE WITNESS:  I couldn't say, I
8 don't know.
9        JUDGE ROSEN:  One of the
10 mandates that I have is to make
11 recommendations and so I'm searching for a
12 way here where firms, if this is a
13 standard practice, can make sure this
14 doesn't happen.
15        So that's really I think what
16 Bill is getting at.
17        MR. HEIMANN:  But there is
18 still no question.
19        JUDGE ROSEN:  Let me put the
20 question then very clearly.
21        What could have been done here
22 to have prevented that?
23        THE WITNESS:  The answer is,
24 obviously I'm speculating about what could
25 have been done, if we had had or somebody

27 (Pages 102 - 105)

1        FINEMAN
2 had had all of the lodestar in front of
3 them, they could have I suppose seen that
4 the same people were being claimed in
5 different declarations --
6        JUDGE ROSEN:  Somebody did,
7 Labaton.
8        THE WITNESS:  I told you I
9 don't know how that process worked, I
10 don't know who did what.
11        As far as we're concerned, I
12 don't know what Dan could have done, you
13 can ask him what he could have done
14 differently given whatever information he
15 had at the time.
16        JUDGE ROSEN:  Would it have
17 been helpful if Dan had been involved in
18 the fee declaration with, I think Nicole
19 Zeiss was ultimately doing it, with her so
20 that he would have also had eyes on all of
21 the different fees, would that have been
22 helpful?
23        THE WITNESS:  Maybe.
24        JUDGE ROSEN:  Meaning they
25 might not have caught it anyway?

1        FINEMAN
2        THE WITNESS:  I don't know, I
3 don't know how it looked physically, so I
4 don't know, I don't know what they would
5 have seen or how they would have
6 approached it.
7        JUDGE ROSEN:  One more
8 question.
9        I take it you have never had
10 this happen before, the double-billing?
11        THE WITNESS:  Double-counting;
12 we didn't bill anybody.
13        No, it has never happened
14 before.
15        JUDGE ROSEN:  Are you aware of
16 it ever happening in any other case to any
17 other firm, have you ever heard of it?
18        THE WITNESS:  No, I am not
19 aware of it.
20        JUDGE ROSEN:  Never heard of
21 it?
22        THE WITNESS:  I haven't heard
23 of this, no.
24        JUDGE ROSEN:  Do you have
25 anything else you would like us to

1        FINEMAN
2 consider from your perspective, from your
3 firm, given the issues in the case; is
4 there anything else you would like us to
5 consider?
6        THE WITNESS:  Not in the
7 context of deposition, no.
8        JUDGE ROSEN:  Anything else you
9 want to tell us about the issues that
10 Judge Wolf identified in the order of
11 appointment?
12        THE WITNESS:  Not in the
13 context of deposition, no.
14    Q.    On that note, though, Steve, as
15 Judge Rosen alluded to, we're very much
16 interested in lessons learned, so beyond
17 the context of your deposition, we welcome
18 any feedback.
19        JUDGE ROSEN:  We're going to
20 talk about among the team, we haven't
21 quite gotten to it, but what kind of
22 opportunity we want to give to the firms
23 to have input before the report is
24 submitted to the court.
25        We do want to give you an

1        FINEMAN
2 opportunity to have input and we're just
3 not sure, I haven't decided at what point
4 that should come, in fairness to you,
5 because we want -- you know the issues
6 that Judge Wolf identified, so we want to
7 give you an opportunity to weigh in on
8 some of these issues that we've discussed
9 and perhaps other issues.
10        MR. HEIMANN: I guess I would
11 say yes, we know the issues that the judge
12 has identified, but they are stated in
13 such broad terms that it is a little
14 difficult for us to respond.
15        So I think it would be useful,
16 if you're intending to give us an
17 opportunity to weigh in, to put specific
18 questions to us.
19        JUDGE ROSEN:  I have not
20 discussed this with my team, but I have
21 been giving this a lot of thought and I
22 think in fairness to the firm, the firms,
23 that the firms should have an opportunity
24 to weigh in with some kind of pleading.
25        Before we come to conclusion on

28 (Pages 106 - 109)

Page 110

1        FINEMAN
2   this we will certainly consult with you
3   and give you an opportunity.
4            And there are factors to weigh
5   in a lot of different ways as to how you
6   do have input, but we definitely want to
7   give you an opportunity to weigh in,
8   because I want to consider some of the
9   issues we have discussed and some of the
10  other issues in the case.
11           So we do want to give you an
12  opportunity; before we submit our report,
13  you'll have an opportunity to weigh in,
14  you, all the firms, plural, to weigh in.
15           (Continued on next page.)
16
17
18
19
20
21
22
23
24
25

Page 111

