# EX. 20

# Michael Lesser

1

```
                JAMS, INC.                Volume:  1

                                          Pages:  1-92

Ref. No. 1345000011                       Exhibits:  0



_____

In Re:   STATE STREET ATTORNEYS FEES

_____



Before:  SPECIAL MASTER HONORABLE GERALD ROSEN,

         UNITED STATES DISTRICT COURT, RETIRED



Date:  June 19, 2017

Time:  2:28-4:14 p.m.
```

Deposition of MICHAEL LESSER, taken by counsel to the Special Master held at JAMS, Inc., One Beacon Street, Boston, Massachusetts before Cynthia Stutz, CPR, Notary Public of the Commonwealth of Massachusetts.

Page 14



Page 15

Page 16

1 litigation yourself or to not continue.
2 Q. And with respect to the California action,
3 Mike, how had that relator come to Thornton Law
4 Firm?
5 A. The co-counsel that I mentioned, Philip
6 Michael had been working with a consultant and the
7 client came to Philip Michael through that
8 relationship, I believe.
9 Q. All right. Was that consultant Harry
10 Markopolos?
11 A. That's right.
12 Q. And as a result, you filed in the State of
13 California, correct?
14 A. Correct.
15 Q. And did the State of California join in
16 the litigation?
17 A. They did, about a year later.
18 Q. And when did that case resolve?
19 A. That case resolved 2016, I believe.
20 Q. And during your representation of that
21 relator in the State of California did any other law
22 firms partner with Thornton and/or Thornton and
23 Naumes?
24 A. Yes. Lieff Cabraser was local and

Page 17

1 co-counsel in that matter.
2 Q. And how did Lieff come to be co-counsel?
3 A. I believe Mike Thornton discussed the
4 matter with Robert Lieff and it arose out of that
5 relationship.
6 Q. All right. And is it a fact that Lieff is
7 a California firm?
8 A. That's correct.
9 Q. So that was an advantage?
10 A. Absolutely.
11 Q. Were there any other advantages to Lieff
12 Cabraser being co-partner?
13 A. They're excellent lawyers.
14 Q. And were any other firms involved in the
15 California action?
16 A. I cannot recall specifically which firm
17 Philip Michael was with at this time. There were a
18 couple. But no, it's just those three.
19 Q. At some point, Mike, did Thornton in
20 another matter partner with Labaton Sucharow?
21 A. An FX case?
22 Q. Yes.
23 A. Yes.
24 Q. And what was that matter?

Page 18

[content redacted]

Page 20

[content redacted]

Page 19

[content redacted]

Page 21

1  us, from the client, and they involved foreign
2  exchange trading data and a provision of certain
3  documents that had been referred to in the meeting,
4  specifically investment manager guides.  And I
5  remember we asked for the data and it took a long
6  time, relatively speaking, for it to show up.  When
7  we received the data, we had it reviewed by a
8  consulting expert that we had been working in with
9  in the FX cases.
10 Q.  And who was that consulting expert?
11 **A.  FX Transparency.**
12 Q.  And what did FX Transparencies tell you
13  about those documents?
14 [redacted]
[redacted]
[redacted]
[redacted]
18 Q.  So what did this indicate with respect to
19  any liability or exposure or misconduct on the part
20  of State Street?
21 [redacted]
[redacted]
[redacted]

Page 22

1  Q. And do you recall what that amount was?
2  A. I think that the average on the standing
3     instruction trades was somewhere around 18 basis
4     points of the trade, and the direct trades were
5     closer to 3. So maybe a multiple of five or between
6     five and six was the difference.
7  Q. So what does that mean as far as total
8     damages?
9  A. For Arkansas?
10 Q. Yes.
11 A. The dollar amounts? I, I can't recall the
12    exact number in that report. Something maybe around
13    $1 million maybe sticks out in my head. But I'd
14    have to look at it again to really be able to --
15 Q. But upon hearing this, what effect did it
16    have on your client?
17 A. The client was already upset about from
18    what he had heard and this was consistent -- It
19    didn't make him feel any better.
20 Q. And were you the lead attorney for
21    Thornton at this stage?
22 A. I was the lead on a lot of the substantive
23    matters, matters ultimately relating to damages and
24    what I would call knowledge issues on the part of

Page 23

1  the bank, yeah.



Page 38

[redacted]

Page 39

[redacted]

Page 40

1  background that you wanted people to be familiar
2  with in order to be able to do the review
3  effectively, and that's knowing what issues are in
4  the case beyond what's in the complaint.
5      THE SPECIAL MASTER: So on that
6  latter piece of it, did you participate in
7  developing a binder for the staff attorneys telling
8  them about the case?
9      THE WITNESS: I did participate in
10 this phase of it, Judge. I drafted an e-mail with
11 some of the things that I thought were important for
12 people to look for at that time. The binder per se
13 is something that -- Well, there are many binders.
14 I did collect all of the memos that the staff
15 attorneys wrote after they were done in a binder,
16 but, and I drafted the issue memo assignments.
17     THE SPECIAL MASTER: Yeah, that's
18 where I was going next. Did you participate in the
19 development of the issues for the staff attorneys to
20 research or to look for in their document review?
21     THE WITNESS: I drafted every single
22 one, Judge. Hoffman might have done a couple at my
23 direction, but all of the initial memo assignments
24 -- Or strike that. I drafted 60 some odd

Page 41

1  assignments. I don't know if any were drafted by
2  any other firm. I don't think so. But the ones
3  that I sent out to everybody were the ones that were
4  done.
5      THE SPECIAL MASTER: This is for the
6  Labaton attorneys, staff attorneys?
7      THE WITNESS: Well, for all of the
8  staff attorneys.
9      THE SPECIAL MASTER: Labaton and
10 Lieff staff attorneys?
11     THE WITNESS: Yes, Judge.
12     THE SPECIAL MASTER: As well as
13 those that were allocated to you?
14     THE WITNESS: Yes, sir.
15 Q.  Did any of the Thornton Law Firm attorneys
16 take on any of these topics for briefing or drafting
17 of memoranda?
18 A.  No.
19 Q.  Who did, to the best of your knowledge?
20 A.  The staff attorneys that were located at
21 the Lieff and Labaton offices physically, including
22 the ones that were allocated to the Thornton firm.
23 Q.  Did Michael Bradley take any on any of
24 those memoranda?

Page 54

1  and you were billed for them?  By you, I mean
2  Thornton.
3     **THE WITNESS:** Well, I understand
4  that we actually had the direct financial
5  responsibility for at least some of these folks,
6  Judge, and then there were others that were
7  reimbursed, but, however it's phrased, yes, I don't
8  recall that we've done this before.
9  Q.  Why was, why were certain attorneys at
10 Lieff and Labaton designated as Thornton attorneys?
11 **A.  Well, everything we'd done through the**
12 **discovery process with Lieff and Labaton had been a**
13 **joint effort and we had achieved some level of**
14 **parity.  And we had started with contributions to**
15 **the litigation fund.  Every time Catalyst needed**
16 **more money or Jonathan Marks needed more money,**
17 **which was a few times because of all the mediation**
18 **sessions, we contributed equally.  And the division**
19 **of the staff attorneys was a logical progression of**
20 **that kind of parity between the firms.**
21 Q.  But in this particular case there were by
22 name designations of attorneys at Labaton and Lieff
23 as being Thornton, as working for Thornton, correct?
24 **A.  I believe that's the case, yes.**



Page 55 / Page 56 / Page 57 (redacted)