# EX. 21

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x
ARKANSAS TEACHER :
RETIREMENT SYSTEM, :
et al., :
Plaintiffs, : CA No. 11-10230-MLW
v. :
STATE STREET BANK :
AND TRUST COMPANY, :
Defendant. :
- - - - - - - - - - - - - - -x

July 6, 2017
Washington, D.C.

Deposition of:

CARL S. KRAVITZ,

called for oral examination by Counsel to the Special Master, pursuant to notice, at JAMS, 1155 F Street, Northwest, Suite 1150, Washington, D.C. 20004, before Christina S. Hotsko, RPR, of Veritext, a Notary Public in and for the District of Columbia, beginning at 10:20 a.m., when were present on behalf of the respective parties:

Page 10

litigation department?

A. I have been or I was for well over a decade. I think that position has sort of decreased in its importance, given the change in our management structure and also my advancing in age.

Q. All right. And could you describe the work that Zuckerman Spaeder does, practice areas that it's involved in?

A. Sure. We, I would say, are best known for our white collar criminal defense practice. We, however, do -- more than half our work is civil litigation.

Historically we've been sort of capped at 15 percent, contingent fee, the rest hourly work. Although, in the last couple of years the contingent/class action work has increased to maybe up to a quarter because we added a practice in our New York office that is on the plaintiff side.

But the best description of our firm is litigation boutique.

Q. Thank you, Attorney Kravitz.

Could you give us an overview of your firm's role in the State Street Trust litigation

Page 11

that brings us here today?

A. Yes. We were asked to come into the case by Brian McTigue on behalf of the Henriquez plaintiffs. And we participated in the case in that role, and also I would say generally as one of the ERISA counsel because we worked cooperatively. And the "we" is Brian's firm and my firm worked cooperatively with Keller Rohrback and the other ERISA firms.

Q. And when did you first become involved in the Henriquez complaint?

A. Best of my memory is September of 2012.

Q. And were you involved in that matter when it was removed and transferred?

A. No. My understanding is that there was a case filed in 2011 in Maryland that -- at some point I thought it had been dismissed without prejudice and re-filed in Massachusetts. But I wasn't involved at that point. By the time I got involved, the case was in Massachusetts and had been assigned to Judge Wolf.

Q. And were you involved when the Andover Companies complaint was filed?

A. Yes. Shortly after we got involved, Lynn's firm, Keller Rohrback, filed the Andover

Page 12

Page 13

Page 22

[redacted]

Page 23

[redacted]

Page 24

[redacted]

Page 25

Q. Okay. And with respect to the Henriquez complaint, what were -- in your assessment and in your discussions with co-counsel, what were the risks of bringing that complaint? And did the risks that you considered differ at all from the risks that the consumer class firms were confronting in the case?

A. Let me see if I can answer both parts of it. But yes, I can try to describe to you what I recall the risks to be. And the answer to your question is, yes, I do believe that the risks differed.

In terms of the main risks that I recall -- and I just need to have a caveat here, which is that I can't with a hundred percent certainty say that that's exactly what was in my mind or the firm's mind in September of 2012 because this case went on for a long time. But let me see if I can get to the risks and do my best.

Q. Sure.

A. I recall that there was an issue of whether or not the bank was actually an ERISA fiduciary. The issue of whether a entity like the bank is a fiduciary. It would turn on a number of

Page 26

things, but in particular whether it exercised discretion in what it did. That was a major factor.

So that was one issue. And, obviously, if we didn't establish that the bank was an ERISA fiduciary, that would have been significant, both as to breach of fiduciary duty claim but also the prohibited transaction claim.

I must say that Brian was way more of an expert on the prohibited transaction side. But that was definitely an issue, were these, in fact, prohibited transactions, in which case, if they were, then the bank would just be liable.

There were issues and risks -- and I don't know if it goes directly to the strength of our claim. But there were issues at the beginning concerning preemption. And that, in my memory, took two forms. One is, with the ERISA claims that we had alleged, did they preempt the state law claims that the consumer people had alleged. So that was an issue.

The other issue that I know that we considered was whether or not there were state law claims that had been -- that had not been alleged by the consumer people that might not be

Page 27

preempted. So I recall that.

And the last thing that I recall in terms of case risks, sort of on a general level, is how you would measure damages in a case like this. You know, what was the baseline that one might use to calculate the delta and what the actual damage was. Was it going to be the entire markup or was it going to be the markup of something in particular?

And as to that, we did consult an expert named Stephen Glass to help us with that concept and also some of the internal details of the foreign currency transactions.

Those, as I sit here right now, are the main risks that we were considering or issues we were considering at the outset, on top of which, you know, it's a big case defended by a powerful institution and a Class A law firm, Wilmer -- whatever they're called right now. And they were going to put up a terrific defense.

SPECIAL MASTER ROSEN: How large was the issue of whether State Street was a fiduciary within the meaning of ERISA, such that State Street could be subjected to ERISA liability?

THE WITNESS: I don't know exactly how to

Page 28

answer. It's a good question. I --

SPECIAL MASTER ROSEN: I mean this in the context of risk analysis.

THE WITNESS: Yeah. I think that we considered it a significant enough risk that we, you know, put it into our, you know, calculation of the case.

I do believe that, over time, I felt like we had a good argument on that. But, you know, it was a big risk. And if we lost it, we were in a world of hurt in the case.

SPECIAL MASTER ROSEN: Other legal hurdles as well, whether procedural, jurisdictional, or substantive?

THE WITNESS: Well, there were -- well, for sure there were other hurdles. I mean, there was the preempt -- in terms of our participation in the case, if in fact -- well, let me back up for a second.

The class definition of the consumer people technically covered our clients. There was definitely a faction on the consumer side that said we represent these people, what are you doing in the case? Now, they didn't assert ERISA claims and, as it turned out, it was important that we

Page 29

did. And I think it was important to the outcome.

But there was a risk that we were going to be somehow shunted to the side. And that was a big risk that we considered in terms of our taking the case. So thank you, Judge Rosen, for reminding me of that. I sort of forgot --

SPECIAL MASTER ROSEN: I didn't want to ask a leading question.

THE WITNESS: Well, I would say that you refreshed my memory.

And I will also tell you that we seriously considered the procedural issue of whether we needed to intervene in the consumer case. And we did fairly extensive research on that, and we may have even drafted a motion. We did not end up filing it because, as things started to play out, we were able to participate in the mediation. But that was a significant risk.

SPECIAL MASTER ROSEN: What about other potential procedural obstacles.

THE WITNESS: Whether it was class certification. And I have not answered, by the way, the second half of your question, which is were there differences between the ERISA case and

Page 30

[redacted]. [redacted]

Page 31

[redacted]

Page 32

transactions, you don't have the sophistication of the client defense, you know, in terms of, you know, did they actually rely on this, did they know?

So those aspects, which can be characterized as individual issues, in my opinion, were absent on the ERISA side. But on the other hand, we had the fiduciary issue and this. And also, obviously, with the prohibited transactions, if there were a couple of, you know, sets of transactions that basically fell within a certain form, in my opinion that would be easier to certify.

But this was a debate in the case and this was a risk particularly for us coming in because the consumer people didn't really want us coming in and taking a chunk of their case. And those were all issues.

SPECIAL MASTER ROSEN: And if a court were to find ERISA preemption vis-a-vis the consumer side, presumably the ERISA class would have taken some percentage of the class that they were purporting to represent?

THE WITNESS: Yes. And that's for sure. Or maybe the consumer people would have amended,

Page 33

add ERISA claims, and then they would have said they don't need us. When we're looking at the risk of the case for the firm, you know, these were all unknowns at the beginning and were ways in which we could get in the case, expend fairly significant amount of time, and not end up with anything at the end.

SPECIAL MASTER ROSEN: So I want to go back to the Rule 23 standards for class certification and get your thoughts on what barriers to entry there may have been posed by Rule 23 and the more recent decisions of the Supreme Court, if any.

THE WITNESS: Well, I guess I'm trying to think a little bit about Comcast. I haven't really thought that through because Comcast came along afterwards. But you do have to be able to show that there is a damage theory based on a common course of conduct that can be approved class wide.

SPECIAL MASTER ROSEN: I don't want you to speculate in terms of later-acquired knowledge. But when you were looking at the case and doing your risk analysis, which was the time frame 2012, 2013?

Page 34

[redacted]

Page 35

another issue, too. Sorry. I think that there was probably enough for commonality because you just need, you know, one common issue, factual or legal. Whether or not all the class reps would have been sufficient for a typicality, you know, I think probably.

But the biggest issue in a case like this, in my opinion, is the predominance and that the common issues predominate and that you can calculate class-wide damages. And that's where you really get into trouble, particularly in any kind of contract action, which is what the consumers had alleged, plus fraud. Because you're going to be looking at the differences in the actual written contracts. And there were some differences. And Wilmer had found every possible, you know, thing that was possibly different. And obviously there were individual issues when it comes to fraud. And we didn't have a guarantee that we were going to be out of that area.

So that's where I think the biggest thing was. And I want to tell you about another issue that we were facing, which had to do with standing. I'm sorry, I forgot about that. But -- and here's the way I understood the standing

Page 36

issue, which is that if you had an adequately funded plan and the class rep or the plaintiff was a beneficiary, so that even if the bank was ripping off the plan, would that impact what the beneficiary got because the plan was adequately funded. And there was --

SPECIAL MASTER ROSEN: So individual and concrete injury versus injury to the plan in general as a collective injury?

THE WITNESS: Yes.

SPECIAL MASTER ROSEN: Is that accurate?

THE WITNESS: Yes. So then there was the question, did we have the right kind of client. And, you know -- so that was another risk in the case. And we might have to have amended. But that was an issue in the case. I have a memory that there was an Eighth Circuit case that was good for the defense on that, but that's just a memory. And it could be the wrong circuit. But that was another issue in the case, that was another risk in the case that we definitely had to consider.

And I would say procedurally also that when we got into the case, the consumers had survived a motion to dismiss, but the ERISA motion

Page 37

[redacted]



Page 42

[redacted]

Page 43

[redacted]

Page 44

[redacted]

Page 45

when you and your firm were involved, and ask you to describe your relationship with the big three over the life of the case. Could you just describe for us in general terms what that relationship was?

A. Sure. I've mentioned one aspect of it, that there was a tension. And I don't use this really so much in a personal sense. But there was the tension that the class definition of the consumer lawyers included our clients. And that, you know, perhaps we could be intruding in their case. So there was that tension.

Q. Conflicting theories of the case?

A. Well, there were conflicting theories. But, you know, if we come in and we're commanding a chunk of the case, that could have economic repercussions down the road.

So that was there. And it was just a reality of what the claims were and how the litigation unfolded.

I do believe that there were some possibly and some of the exchanges before we got in -- some of the -- well, let me scratch that.

I think there may have been some tension expressed between the consumer lawyers and the

Page 46

ERISA lawyers. Brian -- and I'm not pointing the finger at Brian. But I think there was a little tension between Brian and the Labaton firm. And maybe others. I don't know what prompted it.

SPECIAL MASTER ROSEN: So did the tensions inherent in the conflicting theories and the potentially conflicting results play out in the broader strategies of the case and prosecution of the case?

THE WITNESS: I would say yes. I was going to say yes and no. But I would say yes overall. And let me explain to you why I say yes.

At the beginning, there was this issue. And then there was an issue about the mediation at the very beginning. And I recall that -- fairly quickly that counsel for the Henriquez plaintiffs and the Andover plaintiffs were added to the mediation agreement with Jonathan Marks.

But there was a time period where there was some suggestion that the ERISA side might be negotiated on a separate track from the consumer side. There was initially -- we didn't think that was a good idea, by the way, and we didn't think it was in the interest of the bank. But that was going on, and the mediator, you know, may have

Page 47

[redacted]

Page 48

[redacted]

Page 49

[redacted]

A. Okay. And I didn't get to finish the tension thing as it went through.
Q. Please do.
A. But it relates to that.
Q. Yes.
A. First of all, I felt that the ERISA claims, which are not alleged in the consumer case, were important for the class. And so I didn't think that it was adequate representation, simply alleged state law claims on behalf of these private plans, that may be preempted. And, therefore, but the private plans into the fraud breach of contract bucket.
So for that reason, I thought that there should be separate representation.
I also thought that as things played out down the road and when you got to class cert and maybe even Rule 9b, because I don't know whether 9b applied to the ERISA claims. Probably not. But certainly when you got to class cert, that you were going to have a much stronger argument on predominance than you would have just on the fraud breach of contract state law claims.
Okay. So that was a difference. And I thought that the ERISA plans deserved separate

representation for that reason.
The last thing, the main point that comes to mind, is that the way this all played out was that we had to negotiate the overall settlement with the bank for the private plaintiffs, which included the consumer people, the mutual funds, and us, ERISA. And that turned out to be the $300 million.
But the other issue was how is that going to be allocated. What portion of that money was going to go to the ERISA folks? There were also issues with the mutual funds and the SEC. And so that -- and this is just my opinion. And this is another, by the way, issue that could have gone to class certification. But that since we had a defined sum, which was $300 million, if 60 million went to the ERISA plans, then $240 million would go to the consumer side. If those numbers had -- and so every extra dollar that went to ERISA came out of the consumer side.
Whether or not that was a conflict that could have prevented class certification, I definitely think that had there not been separate experienced, competent representation for ERISA, that an objector who had come in and said that

settlement something that really could stick and would be much less objection-proof down the road.
Q. Carl, that $60 million of the 300 million is 20 percent.
A. Yes.
Q. Did that -- was that based on the relative trading volume of ERISA relative to the consumer class?
A. Certainly in part. But the answer is in part, no. Because we initially were told that the ERISA volume -- and, again, I hope I'm being as accurate as I can. Well, I am being as accurate as I can. I hope it is accurate. Was slightly south of 9 percent of the trading volume. I think they gave us numbers that were in the 8s, put pushing 9.

As it turns out, that was bad information. I'm not saying that it was intentionally provided, it just turned out to be inaccurate.
As things played out, the number was between slightly above 9 and 15, or maybe slightly above 15. Why it went to from slightly below 9 to

slightly above 9, I don't know.

But there was another group of entities called group trusts. Group trusts have both ERISA and non-ERISA assets. And I believe that they were not included in the original data we were given under the heading ERISA assets.

And so somewhere between 9-plus and 15-plus would be the actual ERISA volume, depending on what part of the group trusts turned out to be ERISA and what part turned out not to be ERISA.

The settlement, if you look at it, has a process for determining exactly what that percentage is because, at the end of the day, you need to know whether the group trust assets that are ERISA are going to take from the ERISA pile or the non-ERISA pile. And if you ask me do I know what that process has revealed in terms of what the actual percentage is, the answer is I don't know. So I wish I could answer that question.

But definitely at the end of the day, if you even assumed that it was half ERISA and -- half ERISA, you'd be up at 12 percent. Could have been a little higher, could have been a little lower. We ended up getting 20 percent of the

terms of the allocation, we got a little push from the DOL.

SPECIAL MASTER ROSEN: So pursuing that -- and, bill, you may be headed in this direction a little later on. But pursuing that, State Street -- is it accurate to say that State Street wanted a global settlement with all the potential players, including DOL, including SEC, any other government players, as well as the ERISA class, as well as the consumers ultimately?

THE WITNESS: That's my best understanding.

SPECIAL MASTER ROSEN: And if that was the case, what role did the ERISA lawyers play in assisting to bring about that kind of a global settlement?

THE WITNESS: I would say two broad categories. One is as the mediation unfolded, we were active participants in the negotiation with the bank and producing 300 million. I don't want to pat myself on the back or Lynn on the back too much, but I -- and Brian. But I do think that we contributed quite a bit to moving the ball forward. That's one way.

BY MR. SINNOTT:

Q. What was your relationship with DOL, you or other ERISA counsel?

A. I thought that it was very good. I personally worked a ton with the DOL people in the Boston regional office. Lynn and his firm did as well. They were on a good number of the calls that I was on. I think that Brian -- and I'll let him speak for himself tomorrow -- was on some of the calls I was on. But I think they were talking to all of us. I would pick up the phone and the DOL would be there. And I'm sure Brian got calls from the DOL, too. And we couldn't always add everybody on.

But I spent a lot of time with the DOL. I think they felt like the ERISA counsel were on

Page 58

[redacted]

Page 60

[redacted]

Page 59

THE WITNESS: That is my opinion.

BY MR. SINNOTT:

Q. Was that --

SPECIAL MASTER ROSEN: Well --

THE WITNESS: Was that unclear?

SPECIAL MASTER ROSEN: No.

THE WITNESS: I didn't mean it to be if it was.

SPECIAL MASTER ROSEN: That begs this question -- there's no genteel way to put this: The ERISA class ended up with 20 percent of the $300 million, correct?

THE WITNESS: Correct.

SPECIAL MASTER ROSEN: The ERISA --

THE WITNESS: On a gross basis.

SPECIAL MASTER ROSEN: The ERISA lawyers ended up with 10 percent.

THE WITNESS: That's correct.

SPECIAL MASTER ROSEN: How did that happen, given the backdrop we've just been discussing? And understanding that from everything we've learned, the consumers' law firms, the big three as we call it, made a tremendous investment in the case through the document review process. But the ERISA lawyers

Page 61

I would say that there were a few factors that went into that -- oh, I was going to add one thing, and then I'll tell you what those factors are. In that ERISA counsel agreed that we split that 9 percent a third, a third, a third. Lynn's firm, Brian's firm, my firm. And then we had to take care of local counsel and things like that. So that was basically -- why did we do this? And I will try to give you my best answer.

The first is that we had what turned out to be bad information from the bank, which was showing us that the ERISA volume was slightly south of 9 percent, and Bill Paine was telling us that if we did actually do a deeper dive into the data it might go down.

So it looked like it was roughly in the vicinity of the volume.

Second reason was that we were not yet, by that time frame, what I would say full participants in the mediation. We were sitting in the same room, but I didn't feel like we were considered an entire -- you know, completely on the team, because I've described the factors that went into the tension. You know, they represented the same people, we might be taking part of the

Page 78

this subject and this subject or a group of hot documents other than I've already described, nothing like that.

Q. Do you know who put together the PowerPoint presentation that you received or were shown?

A. I'm pretty sure that Michael Lesser would have.

Q. Of the Thornton Law Firm?

A. Yes. Yes. He was an extremely helpful lawyer on this case.

Q. Very knowledgeable about the foreign transactions?

A. He was. He was -- he was good with the numbers. I mean, not all lawyers like numbers so much. I happen to like numbers. So I did talk to him about -- you know, we had the volume data, which I told you we had gotten earlier. And I do recall talking to him about, you know, the volume data.

I also recall that he was helpful in terms of being a participant in that slide show. That's my best memory.

Q. Do you remember, Carl, if the ERISA attorneys ever requested of the consumer class

Page 80

Page 79

Page 81

[redacted]

[redacted]

and more skill.

But yes, our goal is to do what I described but within the confines of what is sometimes just practicality of the real world and e-mail and electronically stored information. There are times when you just have to face reality.

Q. And in those mega cases with the extensive document review, Carl, has the firm used staff attorneys or contract attorneys for the purposes of document review?

A. Yes.

Q. And on how many occasions have you done that?

A. That, I can't give you a reliable number. But on several.

Q. Are staff attorneys employees of the firm?

SPECIAL MASTER ROSEN: In the sense that they're non-partnership track but still attorneys employed by the firm as employees.

THE WITNESS: Yes.

BY MR. SINNOTT:

Q. Receive a W-2, for example.

A. Yes. We have -- most of the lawyers --

and I can only tell you generally. I can't tell you where there are some exceptions, but as a general matter, my understanding is that most, if not almost all, of the what you would call a staff attorney. They're our employees. They're lawyers. They get benefits. We set an hourly rate for them, and they are salaried. And that's most of them.

SPECIAL MASTER ROSEN: So they're not paid by the hour; they're paid by salary?

THE WITNESS: That's my best understanding.

Now, I'm not saying that there aren't some exceptions to that. Okay? And I'm also not saying that we might get what you might call a contract attorney from an agency and they might be in that role for some period of time so that we can evaluate them and if they're good, we might convert them to the staff attorney thing. I'm not saying that there aren't people like that. But I'm giving you our general practice, as I understand it.

SPECIAL MASTER ROSEN: So if you were -- as I understand it, you did not use any contract attorneys in this case --

Page 86

[redacted]

Page 88

went to the Sixth Circuit and ultimately got reversed. But in the meantime, the SEC case went forward and the document review was all done in connection with that case. And so I wasn't really the one who was supervising that.

And so yes to your question, yes, I've been involved in a case where we've used contractor staff attorneys. And it's recent because the class action is still going on and we definitely are enjoying the fruits of that work. But no, I can't tell you exactly what the financial arrangement was because I just didn't supervise it. I wasn't the one responsible for the bill. And I'm really sorry I can't give you better information on that. I wish I could.

SPECIAL MASTER ROSEN: Well, let me put you on the hot seat.

THE WITNESS: Okay.

SPECIAL MASTER ROSEN: Your firm is one of the relatively few among all of the firms that has paying clients here.

THE WITNESS: Right.

SPECIAL MASTER ROSEN: As well as contingency fee work.

THE WITNESS: Right.

Page 87

[redacted]

Page 89

[redacted]

Page 94

Page 95

documents that may have been in that PowerPoint, I don't recall seeing hot documents from the consumer firms.

Q. Okay.

A. I don't recall that. Whether there was an excerpt of something else, there could have been. But I don't remember that.

In terms of sharing with the ERISA firms, I don't know if we called them hot documents, but we definitely coordinated our efforts. And I think that that is reflected in the billing records.

SPECIAL MASTER ROSEN: Carl, I want to go back to the PowerPoint presentation.

THE WITNESS: Yes.

SPECIAL MASTER ROSEN: I just want to clarify. I think you addressed it. But you got the PowerPoints. But did you participate in sort of a brainstorming session with the consumer class lawyers on the PowerPoint in which the presentation was made? Were you part of that presentation with the PowerPoint?

THE WITNESS: I was definitely in the room and there was definitely discussion. I don't remember specifically what it was because it

Page 96

was -- we're talking at the end of 2013.

But I do remember the PowerPoint and I do remember that there was discussion. So if it was brainstorming, I'm sure we were talking about the substance of the case.

SPECIAL MASTER ROSEN: So the point is, the ERISA lawyers were included in the actual presentation?

THE WITNESS: Yes. They made the -- yes. We were in the room with the other -- with the consumer lawyers when whoever went through the PowerPoint. My guess it was --

SPECIAL MASTER ROSEN: Lesser?

THE WITNESS: Michael Lesser. So yes. Absolutely, we were in the room, and there was discussion and we were included in that sense. And that, to some degree, was a bit of a breakthrough because that was more inclusion than there had been up to that point because we had made the fee deal.

SPECIAL MASTER ROSEN: Thank you.

BY MR. SINNOTT:

Q. Did that PowerPoint presentation in 2013 shape or alter the strategy of the case?

A. I would say no in any significant way. I

Page 97

Page 102

[redacted]

Page 104

[redacted]

Page 103

[redacted]

Page 105

reasonable settlement?
A. I did.
Q. And why?
A. Well, for a few reasons. One is that we had been working with the volume data for some period of time. And we had done some, you know, calculations. And as I said, there was an issue as to what the baseline would be. Would be entitled to the entire markup or, you know, only the markup above a certain level.
And I felt like we were getting a pretty good percentage return on the dollar. I wish I could tell you exactly what it was, but it was I think -- I think the max damages were somewhere in the 1.2, $1.4 million -- billion dollar range. Maybe 1. -- somewhere in there. And we were getting, you know, well over 20 percent on the dollar.
And that -- and when I say over 20 cents on the dollar, I'm talking about of the entire markup. So, you know, if it wasn't on the entire markup, it was higher than that. And I regarded that in a case with a lot of risks. And the certainty that a settlement brought to be a good result.

Page 106

It also produced a fairly significant amount of money for a class member. Because this was a class with between two and three thousand class members. So we're not talking about coupons or movie tickets or a few dollars here and there. I mean, these were real dollars. So I considered it a good deal. That's the 300 million.

In terms of the $60 million allocation to ERISA, I thought that it was a fair representation of the volume plus what I thought were strengths of the ERISA claims over the other claims.

Q. Okay. But it was a good outcome?

A. It was. And I also thought it was -- this is the last point I'll make. I thought it was the best we could get.

Q. Carl, did you have any role in the discussion of service awards and how much they should be?

A. No. Except that I do recall thinking -- did they turn out to be -- were they $10,000?

Q. I believe so.

A. I thought that they shouldn't -- for our clients, we shouldn't ask for more than that. But I thought that that was within the range of reason. And I thought that was the consensus

Page 107

[redacted]

Page 108

[redacted]

Page 109

[redacted]



Page 110

Page 112

in. But the answer is I did it.

Q. Okay. And you anticipated my next question. You got information from your accounting department --

A. Yes.

Q. -- that you needed for that.

During the course of this case, did your firm conduct any periodic review of attorneys' hours?

A. In our firm? In our firm? Yes. In the following sense that, as the one who was leading this case, we try to keep track of what our investment is because we try to identify situation where we may be investing a lot more than we want, and we try to exercise some discipline. I can't say that we are successful all the time in that.

But, sure, I would keep an eye on how much time we were putting into the case.

Q. And when you, in that declaration, were determining hourly rates, were these the rates that were in effect at the time of the fee declaration or at the time that they were entered, that the hours were entered?

A. At the time of the fee declaration.

Q. And is that standard, as far as you know?

Page 111

staff attorneys that are employed by one firm are allocated to other firms and billed for them, and then the other firm would claim those attorneys on their lodestar petitions?

THE WITNESS: I have no idea if that's a common practice. I've never heard of it before, but that does not mean it's not a common practice. I've personally never heard of it or seen it, but that, I think, is largely meaningless.

BY MR. SINNOTT:

Q. And your firm has never done it in any of the class actions or the cases that it's been involved in?

A. That I know of, no.

Q. Let's talk about the fee petition and Zuckerman's declaration.

A. Sure.

Q. You talked about Nicole Zeiss at Labaton providing a model to you. Who filled it in on behalf of Zuckerman?

A. I did.

Q. And where did you get the --

A. Well, I mean, our accounting department gave me the numbers, and I -- well, either I did it or I wrote it down and my assistant typed it

Page 113

Page 114

Page 115

anything else specific about it beyond that.
Q. Okay. And you weren't in a position to assess whether there was double-counting of hours or anything like that?
A. No, no. I didn't know anything about their contract attorneys, about their document review, about their cost sharing. All of that came up after the fact. And we weren't given, to my best memory, the fee declarations of the various firms until after it was filed.
Q. Okay. And with respect to your declaration and the rates for Zuckerman, how do you determine the rates that you use? Do you use an executive committee? Does the managing partner determine them? What's the process at Zuckerman?
A. There is a process. I believe it's directed by the managing partner and maybe the managing partner and the executive committee. The managing partner in our firm is sort of the chairman of the executive committee, which has had three or four members at various times. So it's hard for me to distinguish really the two.
But it's definitely the management of the firm. And the rates are reviewed yearly. And they are distributed to partners to see whether

Page 116

anybody disagrees or comments, and then they are approved by the executive committee and I believe by our partnership board.
Q. And do you know, Carl, if, in doing that, the committee relies on outside resources, Wells Fargo, Valeo, anything of that nature?
A. I know in the past we have gotten some market data. I thought it was Citibank or something --
SPECIAL MASTER ROSEN: Have you served in the past for the firm on the executive committee?
THE WITNESS: Yes.
SPECIAL MASTER ROSEN: And you've been involved in setting rates for the firm?
THE WITNESS: Involved? Yes, in the sense that I knew what was going on. I really didn't do the spade work for it. But I am aware that we got market data. I thought there was a study by Citigroup, but maybe it's Wells Fargo. I don't know.
And I think we have some other market data. You know, we have some idea what our competitors are charging, and we try to make our best assessment of what rates we can charge and keep our business.

Page 117

SPECIAL MASTER ROSEN: And that's for paying clients and contingency fee lodestar petitions?
THE WITNESS: Yes. We have one standard rate card set for us.
BY MR. SINNOTT:
Q. Do realization rates figure into your determination?
A. They may, but I don't know. I haven't really been involved in this in a good number of years. So I would imagine that they do because that would make logical sense. But I don't know that for sure.
SPECIAL MASTER ROSEN: Do you know what your overall, in a given year, relatively -- you can give us a range, realization rates are?
THE WITNESS: Let me answer this way because I don't personally know what they have been. I may have had access for that information. So I don't want to leave the misimpression I couldn't find out. But I believe during my interview, Graham Bush, who had been the managing partner through this period, and I believe he said our realization rate was some number over 90 percent for the average of the past three