# EX. 22

1

1          UNITED STATES DISTRICT COURT

2           DISTRICT OF MASSACHUSETTS

3
                              No. 1:11-cv-10230-MLW
4    ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of
     itself and all others similarly situated,
5              Plaintiffs
     vs.
6    STATE STREET BANK AND TRUST COMPANY,
               Defendant
7
                              No. 1:11-cv-12049-MLW
8    ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR,
     RICHARD A. SUTHERLAND, and those similarly situated,
9              Plaintiffs
     vs.
10   STATE STREET BANK AND TRUST COMPANY, and STATE STREET
     GLOBAL MARKETS, LLC, and DOES 1-20,
11             Defendants

12                            No. 1:12-cv-11698-MLW
     THE ANDOVER COMPANIES EMPLOYEES SAVINGS AND PROFIT
13   SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK
     STANGELAND, and all others similarly situated,
14             Plaintiffs
     vs.
15   STATE STREET BANK AND TRUST COMPANY,
               Defendant,
16
                       * * * * * * * * *
17
                    Lobby Conference Before:
18                 Chief Judge Mark L. Wolf

19                  United States District Court
                    District of Massachusetts (Boston)
20                  One Courthouse Way
                    Boston, Massachusetts 02210
21                  Thursday, November 15, 2012

22                     * * * * * * * *

23           REPORTER: RICHARD H. ROMANOW, RPR
                    Official Court Reporter
24                United States District Court
        One Courthouse Way, Room 5200, Boston, MA 02210
25                  bulldog@richromanow.com

```
 1                A P P E A R A N C E S

 2

 3   DAVID J. GOLDSMITH, ESQ.
        Labaton Sucharow, LLP
 4      140 Broadway
        New York, New York 10005
 5      Email: Dgoldsmith@labaton.com
    and
 6   ROBERT L. LIEFF, ESQ.
        Lieff Cabraser Heimann & Bernstein, LLP
 7      275 Battery Street, 9th Floor
        San Francisco, California 94111
 8      Email: Rlieff@lchb.com
    and
 9   MICHAEL P. THORNTON, ESQ.
     MICHAEL A. LESSER, ESQ.
10      Thornton & Naumes, LLP
        100 Summer Street, 30th Floor
11      Boston, Massachusetts 02110
        Email: Mthornton@tenlaw.com
12      For the Arkansas plaintiffs

13

     CARL S. KRAVITZ, ESQ.
14      Zuckerman Spaeder, LLP
        1800 M. Street, NW, Suite 1000
15      Washington, D.C. 20036-5807
        Email: Ckravitz@zuckerman.com
16      For the ERISA Henriquez plaintiffs

17

     LYNN LINCOLN SARKO, ESQ.
18      Keller Rohrback, LLP
        1201 Third Avenue, Suite 3200
19      Seattle, Washington 98101-3052
        Email: Lsarko@kellerrohrback.com
20      For the ERISA Andover plaintiffs

21

     JEFFREY B. RUDMAN, ESQ.
22   DANIEL W. HALSTON, ESQ.
     ADAM J. HORNSTINE,ESQ.
23      Wilmer Cutler Pickering Hale and Dorr, LLP
        60 State Street
24      Boston, Massachusetts 02109
        Email: Jeffrey.rudman@wilmerhale.com
25      For the State Street defendants
```

```
 1              P R O C E E D I N G S
 2              (In lobby, 2:00 p.m.)
 3              THE COURT:  Would counsel identify themselves
 4    and with regard to the plaintiffs let me know with which
 5    case they've appeared, please.
 6              MR. SARKO:  Lynn Sarko on behalf of the
 7    Andover plaintiffs, the ERISA plaintiffs.
 8              MR. THORNTON:  Michael Thornton on behalf of
 9    the Arkansas plaintiffs.
10              MR. LIEFF:  Robert Lieff, the Arkansas
11    plaintiffs.
12              THE COURT:  I'm sorry.  Could you tell me
13    that, again?
14              MR. LIEFF:  Robert Lieff, the Arkansas
15    plaintiffs.
16              MR. GOLDSMITH:  And then David Goldsmith for
17    the Arkansas Teacher Retirement System.
18              MR. KRAVITZ:  Carl Kravitz for the Henriquez,
19    the ERISA plaintiffs.
20              THE COURT:  Okay.
21              MR. LESSER:  One more on the plaintiffs' side,
22    Judge.  Michael Lesser for Arkansas.
23              THE COURT:  All right.
24         And, Mr. Rudman, you represent the defendant in
25    all of the cases?
```

1          MR. RUDMAN:  Yes, sir.

2          MR. HALSTON:  And Dan Halston, the same.

3          MR. HORNSTINE:  Adam Hornstine, also the same.

4          THE COURT:  Okay.

5      All right.  As I understand it, you would like

6  these three cases to proceed together for reasons you'll

7  explain.  There was an effort to mediate the case that

8  was not successful, although I was told in

9  communications I received that you had a proposal for

10  how the cases ought to proceed and you wanted to see me,

11  so I scheduled this pretty quickly, and Mr. Rudman made

12  the request that we do this in the lobby.  But there are

13  two members of the public, maybe not the general public,

14  but interested third parties, in the courtroom and

15  judicial proceedings are presumptively open, um, so

16  there would have to be some good reason for me to

17  exclude them from any or all of this, I think.  But I

18  wanted to give you a chance to be heard.

19          MR. RUDMAN:  I don't think, in good faith, I

20  have a compelling basis for seeking to exclude them.  Is

21  it my preference for them not to be here?  Yes.  But,

22  no, I do understand.

23          THE COURT:  Well, why don't we bring them in.

24          (Clerk leaves to get public.)

25          THE COURT:  And there are some documents under

1    seal, I think, at the moment.  If we get to some point

2    where somebody thinks there's something of a properly

3    confidential nature that should be discussed in the

4    absence of people who are not parties to this case, um,

5    you can let me know and perhaps I'll ask them to step

6    out.

7              MR. RUDMAN:  Well, you sort of anticipated the

8    point I wished to raise with you, sir.  We did have a

9    mediation that is subject to a confidentiality

10   arrangement.

11             THE COURT:  All right, then just tell Dan to

12   keep them out there until I tell them to come in.  But

13   that's about where I was going to start.

14        Dan can come in, but --

15             MR. RUDMAN:  Yes, we have no secrets from you,

16   sir.

17             THE COURT:  I wonder about that, but if you

18   don't, you should.

19             (Laughter.)

20             (The Clerk enters.)

21             THE COURT:  Um, it's not that funny.

22        All right.  Here, um -- here, why don't you bring

23   me up to date including the reference to the mediation

24   and we'll go from there.

25             MR. RUDMAN:  Okay.  May I give that a stab?

1          THE COURT:  Yes.

2          MR. RUDMAN:  We met with you after argument on

3    the motion to dismiss here in May.  We spoke at that

4    time exclusively with counsel in the Arkansas case.

5    There was an existing ERISA case, but nobody was here

6    from that group at the time.  Since that time there have

7    been additional ERISA cases filed.  And so over time

8    first we engaged a mediator to deal with --

9          THE COURT:  Who's the mediator?

10         MR. RUDMAN:  Jonathan Marks.

11         THE COURT:  Okay.  Go ahead.

12         MR. RUDMAN:  And we engaged Mr. Marks by

13   agreement.  We thought the right thing to do would be to

14   take it in the path your Honor had suggested, which is

15   that we would first see if we could mediate a resolution

16   to Arkansas as an individual matter and we tried that

17   and I think what emerged very quickly from that

18   interchange is that there's a very big informational gap

19   between the parties.  Nobody knows except we know what's

20   in our files, but -- and the amount of paper that's

21   involved is kind of stupefying.

22         Just to give you one example.  We have one case

23   that is proceeding with two customers and we have thus

24   far produced 6 million pages in that solitary case, and

25   if you assume that these folks represent, perhaps in the

1    aggregate, 1500 institutions, and that's the scale of

2    the class they're seeking to involve -- and that's a

3    very, very rough number, sir, but it's a lot of people.

4    So the information gap was prohibitive on that front.

5        We then talked with our friends, just again the

6    Arkansas folks for starters, to see if we could engage

7    in a process of informal document exchange relating to

8    every potential member of their class in the United

9    States of America, and then of course we reached out to

10   --

11           THE COURT:  So Arkansas is an individual case,

12   but I haven't focused on Henriquez and Andover, are they

13   putative class actions?

14           MR. RUDMAN:  Yes.

15           THE COURT:  Okay.

16           MR. RUDMAN:  So we now have --

17           MR. KRAVITZ:  Arkansas is a class action.

18           THE COURT:  Oh, Arkansas is -- oh, I see.

19           MR. GOLDSMITH:  And your Honor directed the

20   settlement from that perspective.

21           THE COURT:  Right.  No, I need to be reminded

22   of this.

23           MR. RUDMAN:  I apologize, your Honor, for --

24           THE COURT:  No, that's good.  That's good.

25           MR. RUDMAN:  So there are three different

 1    class plaintiffs representing two different

 2    constituencies and they may embrace, I don't know, 1500

 3    institutions.  It's a lot of work.

 4        We then tried to think through, with the

 5    mediator's assistance -- and Mr. Marks is incredibly

 6    constructive and helpful, well, how do we go at this?

 7    And we thought as follows.  And I'm speaking for

 8    everybody now, and everybody has pulled together in a

 9    very, I think, a good way.  And I didn't threaten to

10    punch anybody out.  I know you're mindful of my, um --

11        THE COURT:  The other guy threatened to punch

12    you out and you said you could take him.

13        MR. RUDMAN:  Yeah, that's right.

14        (Laughter.)

15        MR. HALSTON:  It was a defensive matter.

16        THE COURT:  Go ahead.

17        MR. RUDMAN:  Anyway.  So we focused on first

18    putting off responsive pleadings, counterclaims,

19    answers, we'd rather not do that, we think it reflects

20    from the main show, and instead we have a fairly

21    ambitious program to complete, quote, "document" -- I'll

22    call it "informal document discovery."

23        THE COURT:  All right.  But, I mean, is this

24    something that the public can't hear?

25        MR. RUDMAN:  No, it's only if you're going to

```
 1    ask particular questions about the mediation.

 2              THE COURT:  Oh, okay.  Then go ahead.  Go

 3    ahead.  If I do, I think I'd do that at the end.

 4         Did you -- I'm sorry.  You said you reached some

 5    kind of agreement on matters generally?  Um -- well,

 6    I'll ask it right now.

 7              MR. RUDMAN:  Yeah.

 8              THE COURT:  I mean, you tried to settle the

 9    case with Arkansas on an individual basis, right?

10              MR. RUDMAN:  Right.

11              THE COURT:  And obviously that didn't

12    succeed.  But, you know, were there any principles, did

13    you make any progress?

14              MR. RUDMAN:  No, I would say, except we

15    quickly recognized that the informational asymmetries --

16              THE COURT:  Well, I think -- I think we ought

17    to bring the people in for this.

18              MR. RUDMAN:  Fine.  Fine.

19              THE COURT:  And, as I said, if I ask a

20    question that you don't feel comfortable answering with

21    the people here, um, then I'll deal with that.

22              (Clerk gets the public.)

23              THE COURT:  All right.  There are two members

24    of the public, perhaps not the general public, who have

25    come in.  This is an open session of the court.
```

1    And just to put this in context.  In May, I had a

2    motion to dismiss in the Arkansas Teachers case, um,

3    which I denied --

4    -- except by agreement one party was dismissed,

5    SSGM, is that correct?

6         MR. RUDMAN:  Yes.

7         THE COURT:  Um, and I think SSGM has been

8    dismissed in the Andover case as well.

9    One of the questions I'll discuss at the

10   appropriate point is whether SSGM should be, at this

11   point, a party in Henriquez?  The dismissal was without

12   prejudice, but if discovery showed representations that

13   indicated that SSGM is not a proper party, um, or were

14   not reliable, it could be brought back in.

15   But there was an effort to mediate Arkansas

16   Teachers, which was unsuccessful, but as I understand it

17   there was an agreement that these three cases should

18   proceed in tandem.  It probably makes sense.  Although

19   I'm going to have the cases explained more to me, um,

20   and I'll have to issue an order consolidating the three

21   cases for pretrial purposes.

22   Is that one of the things you would like me to

23   do?

24        MR. RUDMAN:  Yes, sir.

25        THE COURT:  All right.

1          Then I think it would be helpful to me -- because

2      at one time I was emersed in Arkansas, but I've never

3      focused on Henriquez or Andover, but why don't I hear

4      from counsel for the plaintiffs in those cases to tell

5      me a little about them.  I know that they're ERISA

6      cases.  I think Arkansas Teachers is not.

7                MR. RUDMAN:  Correct.

8                THE COURT:  So what are the implications?  But

9      anyway, I want you to explain this to me.

10               MR. SARKO:  Your Honor, I'm Lynn Sarko on

11     behalf of Andover.  Let me sort of give you a gloss.

12         The claimants or the plaintiffs that would be in

13     these cases, some of the plans are actually governed by

14     ERISA, they're ERISA plans, and some of the customers

15     were not ERISA plans.

16               THE COURT:  I see.

17               MR. SARKO:  And therefore one of the things

18     that -- and I guess to put a gloss on it, there might be

19     a group that arguably as to whether ERISA law applies or

20     there might be other claims in it, and I think one of

21     the things that at least where we got to, um, was to

22     realize you could analyze it as sort of the silos or

23     pure ERISA and what those claims are, but the conduct is

24     the same, it's just, you know, what laws governs it.

25               THE COURT:  Which could make a material

```
 1   difference in the outcome.
 2           MR. SARKO:  And I will say I will sort of jump
 3   to the end and one of the pitches I made which -- we
 4   have to kind of look at these things together because in
 5   some ways this reminds me of the *Madoff* case -- it was
 6   totally different conduct that was, you know, criminal
 7   and all kinds of stuff going on, but one of the things
 8   that was similar is you actually had plans that were
 9   ERISA plans and some plans that weren't ERISA plans and
10   some plans that actually were governed by multiple
11   statutes, and I think that one of the thoughts that we
12   had was if we could -- that rather than having that
13   fight now on some of those issues, if we could move it
14   along -- because one of the issues, it's in all of our
15   power to try to resolve the case, if we can, but the
16   issue is, if you don't have enough information from
17   either side to come to agreement, we kind of thought,
18   "You know what?  Let's do that first and sort of listen
19   to the Court to see if we can set some of these issues
20   aside."  So I would say --
21           THE COURT:  For the moment.  The -- I mean, I
22   suppose -- you're all very experienced and so I --
23   there's a certain presumption that if you work something
24   out, um, it will make sense, but I need to understand
25   it.  And when you say there's sort of information you
```

 1    need up front, information about what?

 2          MR. SARKO:  I think it's discovery which would

 3    be -- if you look at the end, if we were going to

 4    resolve the case or if we were to try the case, you

 5    would start at the end, you would have to say, "What are

 6    the damages you can get as to whether the conduct,"

 7    liability or not, "but assuming there would be

 8    liability, what would those hard numbers be, the volume,

 9    what would be covered, what would the time periods be,"

10    those things?  And one of the things that we've

11    discussed was, you know, whether it's formal or informal

12    discovery -- and let them call it "informal discovery"

13    at this point, but if we actually can not fight and

14    exchange that information and get onto the same page, we

15    actually looked at this as a business transaction that

16    if we could clear away all of the disagreements and just

17    argue about the facts, then maybe we could resolve it.

18          THE COURT:  In principle that's very appealing

19    to me because, one, you know -- you know, if this were

20    just a sort of two-party case, I would sit down with you

21    to talk about settlement, I would say, you know, "First,

22    assume somehow the plaintiff has won, how much do you

23    think the jury will award?"  Then, you know, "What are

24    the chances of winning?"  But I don't know how you could

25    settle a case like this without trying to eliminate

1    misunderstandings regarding the possible damages.  You

2    might disagree and I'm sure you can find experts to

3    support different theories if there was something wrong,

4    but, you know, you shouldn't be operating from different

5    pieces of information.

6        But this does -- and I probably said it in May,

7    although actually I don't remember what I said, that,

8    you know, this is a dispute, um, between formidable

9    business interests, people -- you know, I mean, it's

10   business.  And, you know, it's Fidelity's position they

11   didn't do anything unlawful, but on the other hand, you

12   know, it can't be good for business to have this many

13   substantial investors unhappy enough to sue you and hire

14   lawyers from all over the country to do it.  And from

15   the investor's perspective, you know, as I recall your

16   argument as well, "They gave us this discretion.  They

17   weren't paying any attention.  They didn't ask us before

18   the fact to do things differently."  So, you know, if

19   you could finish -- if you could resolve this or

20   approach this in a business-like basis, um, that makes a

21   lot of sense to me.

22       And I may not have been successfully attentive to

23   something -- or understanding something Mr. Rudman says,

24   I know there's one motion to dismiss and there was, at

25   one time anyway, a dispute about the scope of

 1   jurisdictional discovery.  There's another response due,
 2   I think, on December 7th.  I don't know if that's going
 3   to be another motion to dismiss.
 4        I don't know whether you want to just put all of
 5   that stuff off for the time being?
 6             MR. RUDMAN:  We would like to back-burner all
 7   motion practice.
 8             THE COURT:  Yeah, I think I share your
 9   interests.  The issues in this case are intriguing, but
10   I've got lots of things to do.  I'd rather focus on
11   things that are really necessary.  But why don't you
12   keep going.
13             MR. SARKO:  So I think our thought was that a
14   lot of the motions practice would go to trimming the
15   number of defendants, to reshaping the classes, and if
16   we would be successful at the end reaching resolution,
17   that would all be wasted effort because there would be a
18   global release, etc.
19        So I think our proposal was to sort of move --
20   well, not eliminate discovery, but move -- I want to
21   call it a "nicely informational exchange," it's to sort
22   of get the information back and forth that if we could
23   never settle would be discovery we would have done
24   anyway, um, and if we are successful, we would be able
25   to reach a resolution.

1       The plaintiffs here have thought -- and in every

2  case you have ERISA, quasi-ERISA, you know, all these

3  different claims, people squabble, and I think we've

4  realized that we want to join hands, jump off the cliff,

5  and see if we can get this resolved, and not bother you

6  with, you know, upfront fighting that happens sometimes.

7       THE COURT:  Yeah, I think if you weren't

8  taking such a cooperative approach, I would wonder

9  whether there should be three cases or at most two and

10  whether there should be a single consolidated complaint

11  or two complaints, an ERISA, a nonERISA class, but the

12  approach -- and those are questions for -- well, it

13  seems to me that, you know, you want to leap over some

14  of those questions and get to things that are of more

15  practical importance and so far I'm with you.

16       (Interruption by Court Reporter.)

17       THE COURT:  What?  Why don't you just say for

18  the record who you are.

19       MR. THORNTON:  Yeah, Michael Thornton, for the

20  record.

21       I just want to clarify one thing of Mr. Rudman's

22  excellent summary that we might differ on.  There are

23  two clear ERISA cases, Henriquez and Andover, and in the

24  third case, Arkansas, um, the ERISA claims are included

25  in the class definition.  So we also have a claim.

```
 1              MR. RUDMAN:  I accept that clarification.
 2              THE COURT:  All right.
 3              MR. RUDMAN:  The Arkansas claim per se, as an
 4     individual claim, was not an ERISA claim --
 5              MR. THORNTON:  That's correct.
 6              MR. RUDMAN:  -- and that's why, I guess, they
 7     said --
 8              MR. LIEFF:  Your Honor, Robert Lieff.  There
 9     is an overlap, that's all we're trying to say.  We
10     represent the same people.
11              THE COURT:  You do represent the same people?
12              MR. LIEFF:  Yes.
13              THE COURT:  And then, as I said, ordinarily,
14     um, you know, why should there be three cases and not
15     one case or maybe one case with two classes seeking
16     certification or whatever?  But we can clean this up
17     later.  Just keep it in mind if your constructive
18     efforts are not successful.
19              MR. RUDMAN:  One thing we do have in mind, if
20     you please, sir, is that -- and I agree 100 percent with
21     Lynn Sarko's comments about stripping away the
22     underbrush, but we also hope to build a record that will
23     allow you to make a judgment on class certification at
24     some point and whether there is or is not predominance
25     and everything else.  So we're trying to go down two
```

1    paths, one, a class path, and, two, enough information

2    about the merits so you can satisfy whatever testing

3    into the merits has to go on to certify a class.

4            THE COURT:  Okay.

5            MR. SARKO:  And I would say lastly, your

6    Honor, that if the cases were ever to resolve, since --

7    for the ones that are ERISA plans, the fiduciaries would

8    have to pass on it and we would have to build the record

9    to be able to get an independent fiduciary to approve it

10    in any case.  So I think --

11            THE COURT:  The proposed settlement?

12            MR. SARKO:  To any proposed settlements.

13            THE COURT:  Yeah, and I -- and you do class

14    actions all the time.  I do them some of the time.  I

15    think there's another issue.  That even if you all

16    agree, which is the **Wal-Mart** -- the issues emerging from

17    **Wal-Mart**, and I haven't given any thought to how it

18    applies here, but, you know, my general understanding is

19    -- and then I just suppose it's the same decision-maker,

20    that if you all treat it the same way, um, it would be

21    an issue, but it has been in some of these foreclosure

22    cases, where, one, as I understand it, the requirements

23    for my certifying the settlement class are the same as

24    they would be if you were disputing class certification,

25    and, two, there has to be sufficient commonality, you

```
 1   know, in the decisions made.  Here, as I say it, it
 2   doesn't sound too likely to be a problem here because
 3   you've got a certain way that Fidelity presumably did
 4   business with everybody and, um --
 5              MR. RUDMAN:  We're State Street, sir.
 6              THE COURT:  Oh, State Street.  Excuse me.
 7              (Pause.)
 8              MR. GOLDSMITH:  There is one distinction, your
 9   Honor.  David Goldsmith.  Your Honor has to consider all
10   the Rule 23 prerequisites to be sure, but under *Amcam*,
11   your Honor has to consider trial manageability issues,
12   if there are some.
13              THE COURT:  Okay.  Well, all right.
14        What else should I know to have a general feel for
15   this and then you'll tell me what you've got in mind
16   specifically?
17              MR. RUDMAN:  Well, we do have a fairly
18   detailed motion, I think, of the time period we'd like.
19   We'd like to spend one year exchanging relevant
20   documents.  I think Mr. Sarko's correct to call it an
21   "informational exchange," okay?  And we're happy to come
22   in and report to the Court on whatever basis you would
23   like.
24              THE COURT:  And do you intend to use the
25   mediator to help you with any discovery or informational
```

```
 1   exchange disputes?
 2              MR. RUDMAN:  Yes.  Exactly.
 3              THE COURT:  Remind me who Mr. Marks is?
 4              MR. RUDMAN:  I think you know Mr. Marks.
 5              THE COURT:  Okay.  Go ahead.
 6              MR. RUDMAN:  He was, for many years, Eric
 7   Green's partner.
 8              THE COURT:  That's what I thought.
 9              MR. HALSTON:  He started in this dispute, your
10   Honor, then he broke off.
11              THE COURT:  Okay.
12         So basically, if I hear this right, what you would
13   like me to do is enter a protective order, and I glanced
14   at it and I think there are a few, I think, not material
15   refinements that I would want you to put in that -- but
16   to essentially stay the case while you engage in this
17   informal process, get reports, and see where we are in
18   here?
19              MR. RUDMAN:  Correct.
20              MR. SARKO:  And I think we would do it in a
21   way so that if it wasn't resolved, all that informal
22   work will still be there for discovery purposes.
23              THE COURT:  Yeah.  I mean, I would assume you
24   can agree that you wouldn't have to repeat the requests
25   for documents for something, you can stipulate --
```

1          MR. HALSTON:  We've agreed that it would

2     count.

3          THE COURT:  It would count, right.  Whatever

4     you produce can be used in the --

5          MR. RUDMAN:  In the case that we go back to

6     litigating.

7          THE COURT:  Okay.  Well, it sounds good to me.

8          (Interruption by Court Reporter.)

9          THE COURT:  Would you just say your name and

10    keep your voice up, please.

11         MR. KRAVITZ:  Carl Kravitz.  I'm for the other

12    ERISA group, which is --

13         THE COURT:  Henriquez.

14         MR. KRAVITZ:  Yes.

15      We had been talking about -- I think, Jeff, that

16    you had third-party subpoenas, so to stay -- I think

17    that's something that you were particularly interested

18    in, so there would have to be a way of doing that.

19         MR. RUDMAN:  We do want to accomplish third-

20    party discovery as well, so if the case could be alive

21    for purposes of people having subpoena power, and it's

22    possible that somebody could come in and impose upon

23    this court for a protective order.  But leaving that

24    aside, I think that's the only wrinkle.

25         MR. HALSTON:  Yeah, I think that's right.

```
1              MR. RUDMAN:  Thank you.

2              THE COURT:  All right.  The -- I mean, I could

3    see issuing an order based on what you've told me that

4    says "These three cases are consolidated for pretrial

5    purposes."  Two, um, "As agreed, the parties will, until

6    at least December 1, 2013, engage in informal discovery,

7    exchange of information, and may issue subpoenas to

8    third parties."  And, three, "Unless otherwise ordered,

9    the case is otherwise stayed."  So, you know, you can

10   come back if you want something else.

11             MR. RUDMAN:  Terrific.

12             THE COURT:  Is that essentially what you're

13   proposing?

14             MR. RUDMAN:  Perfect.

15             MR. SARKO:  Yes.

16             MR. HALSTON:  And then your Honor would also

17   rule on the protective order?

18             THE COURT:  Yeah, I can probably do that right

19   now.

20        And I really only just glanced at this, but I

21   think it's generally fine.  But there are three points

22   that I didn't see covered.  It's possible there's some

23   more.

24        It is -- if you want to file something under seal,

25   you would have to file redacted copies for the public
```

```
 1   record.  In other words, to the maximum extent,
 2   everything should be on the record.  So if there's some
 3   confidential information that doesn't permit everything
 4   from, you know, a 30-page document from being part of
 5   the record, that you would just redact the confidential
 6   part.
 7        Second, the protective order governs pretrial
 8   only.  Once we get to trial, again, it's as I said, I
 9   want to bring these people in, the members of the public
10   in, that there's a presumption of public access to
11   judicial proceedings, and that the confidentiality that
12   may attach to the documents exchanged in discovery on
13   which judicial decisions don't rely, um, doesn't apply
14   -- you know, if you've got a motion for summary
15   judgment, a motion for class certification, perhaps, but
16   certainly not at trial.  So, um, you know, we would have
17   to talk about striking the appropriate balance at trial
18   between, you know, the interests of the public in
19   judicial proceedings and claims of confidentiality.
20        The third would be that I retain the right to
21   modify the protective order after giving you notice and
22   an opportunity to be heard, which the last time I looked
23   was in the jurisprudence of the First Circuit anyway.
24        But do you have any problem with any or all of
25   those provisions?
```

1           MR. HALSTON:  We can make those provisions,

2   your Honor.  It all makes sense to me.

3           MR. GOLDSMITH:  The second piece --

4           MR. HALSTON:  We handled the trial piece --

5   yeah, we took out the reference so that it would not

6   govern at trial.

7           THE COURT:  Yeah, but you should just be, you

8   know, clear.

9           MR. RUDMAN:  We will make those changes, your

10   Honor.

11           THE COURT:  So you should submit that.  If you

12   want, you can try your hand at that order I just gave

13   you, but it's, one, the three cases are consolidated for

14   pretrial purposes --

15     Well, there are some pending motions, and I guess

16   I don't know what to do with them, but I have to -- this

17   is ministerial and it may be not important, but I have

18   to report on pending motions, and unless I ignore it, I

19   mean --

20           MR. HALSTON:  Well, we could withdraw all of

21   them.

22           THE COURT:  Yeah, they could be denied without

23   prejudice, they could be withdrawn without prejudice.

24   Well, why don't you just withdraw the motions without

25   prejudice.

1    MR. KRAVITZ:  We've got one, also.  We can

2 withdraw that as well.

3    THE COURT:  Yeah, just write it out, say, you

4 know, "This motion," Docket Number X, "that motion,"

5 Docket Number Y, "are withdrawn without prejudice."

6    But I commend you on this approach.  You know,

7 with all these good lawyers around the table, I know you

8 could raise an infinite number of -- an almost infinite

9 number of fascinating threshold issues.  We dealt with

10 some of them in May.  However, you know, what you're

11 focusing on is what has practical importance and the day

12 -- and the day may come when I can't say this anymore,

13 but in more than 27 years I haven't tried a class action

14 case, some of them perhaps have been dismissed and most

15 have been settled.  So this is the time to focus on --

16 this is a good time to focus on it.

17    All right.  Anything else?

18    (Silence.)

19    THE COURT:  How long do you want to submit the

20 order?

21    MR. RUDMAN:  By Monday morning?

22    THE COURT:  Yeah, why don't you submit it,

23 say, by Monday at noon, if you need more time doing it.

24    MR. RUDMAN:  Then Monday at noon.

25    THE COURT:  I would like to deal with this

Case 1:11-cv-10230-MLW Document 408-721 Filed 11/07/23 Page 26 of 27
Case 1:11-cv-10230-MLW Document 408-721 Filed 11/07/23 Page 26 of 27

26

1   while it's fresh in my mind.

2           MR. SARKO:  Before you get bad weather here.

3           THE COURT:  That could be in an hour or so.

4   But, anyway.

5       Let me see if I have anything else on my list.

6           (Pause.)

7           THE COURT:  All right.  So it's not going to

8   be -- well, the motions will be withdrawn.

9       As I said, I commend you.  It's a very sensible

10  approach.

11      Okay.  Thank you very much.

12          (Ends, 2:30 p.m.)

13

14              C E R T I F I C A T E

15

16      I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

17  do hereby certify that the foregoing record is a true

18  and accurate transcription of my stenographic notes,

19  before Chief Judge Mark L. Wolf, on Thursday, November

20  15, 2012, to the best of my skill and ability.

21

22  /s/ Richard H. Romanow 11-29-12
    _____
23  RICHARD H. ROMANOW  Date

24

25