# EX. 24

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Arnold Henriquez, on behalf of the Waste Management Retirement Savings Plan, and all other similarly situated plans, | ) ) ) ) | |
| Plaintiffs, | ) ) | **C.A. No.:** |
| v. | ) ) | |
| State Street Bank and Trust Company, State Street Global Markets, LLC and Does 1-20 | ) ) ) ) | |
| Defendants. | ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff Arnold Henriquez alleges the following on behalf of the Waste Management Retirement Savings Plan ("Plan") and its participants and beneficiaries and a class of similarly-situated ERISA retirement plans (collectively, "Plans") and their participants and beneficiaries against State Street Bank and Trust Company ("SSBT") and State Street Global Markets, LLC ("SSGM") based on the investigative efforts of private whistleblower firms, the State of California, the Securities and Exchange Commission ("SEC"), and an investigation by counsel, which included reviewing: Internal Revenue Service Forms 5500 ("Form 5500") filed with the United States Department of Labor ("DOL"); filings with the United States Securities and Exchange Commission, including Annual Reports on Form 10-K; and other publicly available documents related to this action.

## I.     NATURE OF THE ACTION

1.     This is a civil enforcement action brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq., and in particular under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), to recover losses and obtain equitable relief on behalf of the Plan, and all other similarly situated plans.

2.　　　　SSBT and SSGM (collectively, "Defendants") were required to act prudently and solely in the interest of the Plans' participants and beneficiaries in their capacity as ERISA fiduciaries.  On information and belief, rather than fulfilling their fiduciary duties under ERISA (the "highest known to the law")[1], the Defendants charged improper, undisclosed markups on transactions in foreign currency ("FX transactions" or "FX trading").

3.　　　　The Plan and the similarly situated Plans are established and sponsored by private entities in accordance with ERISA.

4.　　　　Plaintiff alleges that Defendants violated ERISA by causing the Plans, or collective funds operated by Defendants in which the Plans were invested, to execute FX transactions at exchange rates favorable to Defendants and reporting those transactions at less favorable rates.  These transactions were prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

5.　　　　Plaintiff also alleges that Defendants failed to act solely in the interest of the participants and beneficiaries of the Plans and breached their fiduciary duties of prudence and loyalty with respect to the Plans.  Specifically, Plaintiff alleges that Defendants, as fiduciaries of the Plans, violated their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104 by causing the Plans or the collective funds operated by Defendants in which the Plans were invested to engage in transactions that were not to the exclusive benefit of the Plans or their participants and beneficiaries.

## II.　　　JURISDICTION AND VENUE

6.　　　　ERISA provides for exclusive federal jurisdiction over these claims.  The Plan is an "employee benefit plan" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and Mr. Henriquez is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), who is authorized pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), to

---

[1] _Donovan v. Bierwirth_, 680 F.2d 263, 272 n.8 (2d Cir. 1982)

bring the present action on behalf of the Plan and its participants and beneficiaries to obtain appropriate relief.

7.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.     Venue is proper in this district pursuant to 28 U.S.C. ' 1391(b) and ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this district and the Defendants reside and may be found in this district.

## III.     PARTIES

*A.     Plaintiffs*

9.     **Plaintiff Arnold Henriquez.**  Plaintiff Arnold Henriquez is a participant in the Waste Management Retirement Savings Plan, an ERISA-covered defined contribution plan.  At all material times from the second quarter of 2005 through the second quarter of 2009, Mr. Henriquez invested in the "International Equity Fund"[2] sponsored by SSBT and offered by the Plan.  Mr. Henriquez also invested in other funds sponsored by SSBT and offered by the Plan during the Class Period, including the Large Cap Equity Fund, the Small Cap Equity Fund, the Conservative Asset Allocation Fund, the Moderate Asset Allocation Fund, the Aggressive Allocation Fund, the Bond Market and the SSgA Target Retirement 2030 Fund.  Mr. Henriquez resides in Frederick, Maryland.  Mr. Henriquez brings this action as a representative plaintiff on behalf of all similarly situated plans.

10.     **Defendant State Street Bank and Trust Company ("SSBT").**  Defendant State Street Bank and Trust Company is incorporated in Massachusetts and is headquartered in

---

[2] The "International Equity Fund" is the fund name used by SSBT on disclosures to participants in the Plan.  The International Equity Fund's name, according to the International Equity Fund's Forms 5500 for 2009 and 2010, filed by SSBT with DOL, is the "Active Intl Stock Selection SL SF CL I (CM8J [sic]."  From 2006 through 2008, the International Equity Fund's name, according to the International Equity Fund's Forms 5500 filed by SSBT with DOL was the "International Alpha Select SL Series Fund – [sic]."  The foreign fund names may refer to the International Equity Fund at a particular point in time, as well as to one or more of several classes of interests offered in the International Equity Fund.

Boston, Massachusetts. Defendant State Street Bank and Trust Company directly, or indirectly through one or more subsidiaries, operates as a custodial bank for ERISA covered benefit plans and for collective investment funds offered by defined contribution plans. SSBT is a subsidiary of State Street Corporation, a financial holding company headquartered in Boston, Massachusetts.

11. **Defendant State Street Global Markets, LLC ("SSGM")**. Defendant State Street Global Markets, LLC, a subsidiary of State Street Corporation, is incorporated in Delaware and is headquartered in Boston, Massachusetts. SSGM describes itself as "the investment research and trading arm of State Street Corporation." It provides specialized investment research and trading in foreign exchange, equities, fixed income, and derivatives to ERISA covered benefit plans.

12. **Defendants Does 1-20**. Does 1-20 are fiduciaries of the Plans relevant to this lawsuit whose exact identities will be ascertained through discovery.

## IV. FACTUAL BACKGROUND

*A. The Plans.*

13. **Waste Management Retirement Savings Plan**. The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Pursuant to ERISA, the relief requested in this action is for the benefit of the Plan.

14. **Other Similarly Situated Plans**. Defendants provide services similar to those provided to the Plan to other, similarly situated Plans, either directly as plan custodian or indirectly as custodian of funds in which the Plans invest.

*B. Defendants' Fiduciary Status*

15. Every plan governed by ERISA must have fiduciaries to administer and manage the plan. A custodial bank is among these fiduciaries.

16.    ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA §402(a)(1), but also any other persons who in fact perform fiduciary functions.  ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i) (stating that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. . .") (emphasis added).

17.    Defendants functioned as fiduciaries to the Plan by exercising authority and control over Plan assets.

18.    SSBT served as custodian for the Plans' assets, including both defined benefit and defined contribution plans. As custodian, SSBT is a fiduciary under ERISA. SSBT is a fiduciary of the Plan and owed fiduciary duties to the Plan and its participants under ERISA.

19.    SSGM exercised authority and control over plan assets in its role as SSBT's affiliate responsible for setting the exchange rates on FX transactions and executing those transactions.  As discussed below, this process created the maximum spread between the marked up custody exchange rate offered to custodial clients and the marked down exchange rate used to process repatriation and other FX transactions.

C.    *Retirement Plan Investment Strategy*

20.    There are two types of retirement plans, defined benefit plans and defined contributions plans.  Both types of retirement plans, especially over the last decade, have found it to be necessary and prudent to expand their investments to include exposure to foreign markets. Accordingly, defined benefit plans have expanded international holdings, and defined contribution plans frequently include at least one, if not several, international investment options.

21.    Retirement plans regularly purchase and sell foreign securities, receive dividends that are paid in foreign currencies, or participate in other investments that require the exchange

of foreign currency into and from US Dollars ("USD"), that is, FX trading, either directly or through participation in collective investment funds.

22.    A "custodian" is an institution that holds securities on behalf of investors. The responsibilities entrusted to a custodian include the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities. Custodians may also perform ancillary services for their clients. Custodians are typically used by institutional investors who do not wish to leave securities on deposit with their broker-dealers or investment managers. The use of a custodial bank is intended to reduce the risk of misconduct by separating the custodial and asset management duties. An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

23.    SSBT served as custodian for ERISA covered defined benefit plans.

24.    SSBT operated collective investment funds invested in foreign securities in which ERISA covered defined contribution plans invested during the Class Period.  SSBT served as custodian for these collective investment funds.  Collective investment funds that invest in foreign securities, such as the SSBT-sponsored International Equity Fund offered in the Plan, must engage in FX transactions in order to buy and sell securities, to repatriate dividends or interest payments, and to engage in other transactions.

25.    Class members placed a high degree of trust in Defendants.  Plaintiff and the Class depended upon Defendants to both execute and report FX trades honestly and accurately.

26.    SSBT described itself as "a leading specialist in meeting the needs of institutional investors." In its Class Period filings with the SEC, the Company repeatedly stated that its customer relationships were "predicated upon our reputation as a fiduciary and a service provider that adheres to the highest standards of ethics, service quality and regulatory compliance." One of the services provided by SSBT to its custodial clients was the execution of foreign exchange

transactions, which allowed clients to purchase and sell foreign securities or engage in currency trades.

D.     *SSBT's Scheme*

27.     On October 20, 2009, the California Attorney General ("California AG") filed a complaint alleging that State Street had overcharged two of California's largest public pension funds by tens of millions of dollars for foreign exchange trades conducted over a period of at least eight years. The California AG's action was based on an extensive eighteen-month investigation, which included interviewing witnesses and reviewing hundreds of thousands of internal State Street documents.

28.     On information and belief, and according to the California AG, Defendants, starting in 2001, added an undisclosed and substantial "mark-up" to the exchange rate it used when making foreign exchange trades for its clients. The scheme was simple and not disclosed to the Plans. Defendants had agreements with their large custodial clients that obligated Defendants to charge their clients the same "exchange rate" as the one that Defendants actually used to execute foreign exchange trades requested by the client. Rather than doing so, however, SSGM would execute the trade at one exchange rate without informing its client, and then monitor fluctuations in the rate throughout the day. Then, before the end of the day, SSGM would pick a rate that was more beneficial to Defendants, and tell its clients that the trade had occurred at this other, false rate.

29.     For instance, if the transaction was a purchase of a foreign security, SSGM would charge the client a higher foreign exchange rate that occurred later in the day, thus causing the client to pay more than what SSGM had already paid. If the transaction was a sale of a foreign security, SSGM would charge the client a lower foreign exchange, thus paying the client less than what SSGM actually received. In either event, Defendants would take for itself the

difference between the amount for which the trade was actually executed and the amount that SSBT charged its clients.

30. Defendants' clients, including the Plans, had no way of discovering the truth because the records, including statements of account and transaction records provided by State Street in the ordinary course to their clients, including the Plans, showed only that the trade had been executed within the range of rates occurring during that day, notwithstanding that the rate reported was not the actual rate for the transaction. Defendants' clients, including the Plans, were never informed of the actual rates at which FX transactions were made. Defendants' providing such incomplete statements and transaction records to their clients, including the Plans, was a course of conduct designed to conceal evidence of their breaches of fiduciary duty and prohibited transactions set forth herein. The Plans were not on actual or constructive notice of such evidence despite their exercise of reasonable diligence.

31. All foreign exchange transactions are executed at a prevailing exchange rate, which determines how much one currency is worth in terms of another. The most commonly used exchange rate is the Interbank Rate, which fluctuates throughout each day and is tracked and published by various industry sources. Throughout the Class Period, Defendants executed two types of foreign exchange transactions for its clients. Some of Defendants' clients would conduct "direct" or "negotiated" foreign exchange trades. In a direct trade, an institution would contact a Defendants' representative who would quote an exchange rate that the institution could accept or reject. If Defendants' rate was sufficiently competitive, the client would accept and the trade would be executed at the agreed upon exchange rate. Defendants would collect a fee for processing the trade and pass along the cost of the exchange rate to its client.

32. For more than 75% of SSBT's large custodial clients, however, Defendants would conduct "indirect" or "standing instruction" foreign exchange trades. In a standing instruction trade, neither the institution nor its outside investment manager would be quoted an exchange

rate. Instead, the client would request a transaction involving a foreign exchange (such as a purchase of foreign securities), and Defendants would execute the transaction pursuant to its contract with its client. On information and belief, under the terms of SSBT's custodial arrangements, SSBT was obligated to provide its clients the same exchange rate that Defendants actually used to make the trade. This arrangement was supposed to be beneficial to Defendants' clients because, among other things, they would not have to incur the expense and time of identifying and choosing the most competitive exchange rate.

33.    Defendants, on information and belief, executed FX transactions on behalf of their own collective investment funds using the same standing instruction method.  SSBT, as custodian of their own funds, were not subject to substantial scrutiny on these transactions beyond internal controls.

34.    However, this was not the case for all clients.  Those clients who conducted direct trades would be quoted an exchange rate by SSGM before executing the transaction. These clients – often large hedge funds – typically had easy access to an alternate price source, such as Bloomberg or Reuters, to double-check the truthfulness of SSGM's rate quotes. Accordingly, Defendants could not overcharge these clients, and thus referred to them internally as "smart" clients or "smart money."

35.    As detailed by the California AG, the other clients or their investment managers would initiate a foreign exchange transaction by sending a request, often electronically, to the Securities Processing Unit of SSBT, which was located on the "custody side" of the Company. This request was then sent electronically to the State Street foreign exchange trading desk in SSGM, where it would appear on the Market Order Management System ("MOMS") software used by Defendants' traders.

36.    The duty of "best execution" requires that a broker-dealer seek to obtain for its customers the most favorable terms reasonably available under the circumstances. At a

minimum, therefore, "best execution standards" require that Defendants execute trades on terms that are no less favorable than those offered to unrelated parties in a comparable arm's-length transaction.

37.    Plaintiff and the Class reasonably expected, because Defendants represented and because ERISA so requires, that they or the collective investment funds they participated in would be offered terms on "standing instructions" trades that were no less favorable than those offered by Defendants to unrelated parties in comparable arm's-length FX transactions.

38.    FX trading takes place around the world on a nearly 24-hour cycle, five-and-a-half days a week. The official FX trading week begins at 7:00 a.m., New Zealand time on Monday, with each subsequent trading day ending at 5:00 p.m., New York City time.

39.    On information and belief, SSGM's FX traders were informed of SSBT's aggregated standing instruction trade requirements during the course of the day. The FX traders will, that day, trade on the interbank FX market in order to satisfy SSBT's standing instruction positions. This process is called "offsetting" the trades.

40.    On information and belief, upon receipt of the request, SSGM's foreign exchange traders checked the exchange rate, set a price, and executed the transaction, which typically occurred early in the day because SSGM traders were at their desks by 7 a.m. Eastern Standard Time. All of those transactions were then entered by the trader into a separate software system called Wall Street Systems ("WSS"), which memorialized the transaction and charged the cost (for purchases) or remitted the payment (for sales) directly to Defendants. The WSS recorded time stamps for the actual, "real time" transaction.

41.    On information and belief, although the transaction was now completed and the price locked in, Defendants did not inform the client. Instead, on information and belief, SSGM observed market fluctuations until sometime around 3 p.m. in the afternoon and then assigned either a higher exchange rate (for purchases) or a lower exchange rate (for sales) to the foreign

exchange transactions that occurred during that day. SSGM then applied that rate to all of the "standing instruction" foreign exchange transactions it had conducted that day.

42.     On information and belief, at all relevant times to this Complaint, this pricing scheme was used for FX transactions for both custodial clients and for transactions involving SSBT's collective investment funds.

43.     With each FX trade priced in this manner, Defendants did not simply profit; they made the biggest possible profit on each trade, based upon the range-of-the-day's FX rates at the point the trade was priced for the Plan.

44.     Because Defendants' scheme always priced the trades at the very lowest or very highest rates of the day, Defendants were able to make a profit without any risk to SSBT.

45.     On information and belief, by pricing trades in this manner for their standing instruction trades, Defendants secured a spread ten to twenty or more times greater than when a custodial client directly negotiated an FX transaction. That is, Defendants' profits arising from their custodial standing instruction trades were as much as ten to twenty times higher than their profits from comparable, arm's length FX transactions.

46.     On information and belief, Defendants' practice of pricing trades in this manner and taking the largest possible mark-up or mark-down was not disclosed to custodial clients like the Plan over the period of time relevant to this Complaint.

47.     On information and belief, all Defendants' custodial clients who had standing instruction trades (including spot, forward, swaps, repatriation, and major, minor, emerging, and regulated market trades) suffered from the same inaccurate FX pricing.

48.     On information and belief, all of Defendants' collective investment funds which invested in foreign securities and used standing instruction trades (including spot, forward, swaps, repatriation, and major, minor, emerging, and regulated market trades) suffered from the same inaccurate FX pricing.

49.     On information and belief, end-of-month reports were prepared by Defendants on or before mid-month. These reports listed the custodial client's FX trades by date, amount, and price, i.e., the fictitious FX rate (as reported to the custody side of SSBT by its FX traders). These reports never contained time-stamps for the FX trades, but there was nothing on the report that would lead a custodial client to suspect that it or a collective investment fund in which it participated had been unfairly charged exorbitant mark-ups (or mark-downs) on its FX trades.

E.     *SSBT Makes Exceptions for Certain Clients, Offering Them Special Pricing*

50.     On information and belief, over time, SSBT developed a special class of custodial clients that did not receive the high or low range-of-the-day pricing suffered by other custodial clients, like the Plans or the collective trusts in which the Plans invested. These clients, known internally as "smart money clients," still received the same standing instruction custodial services as the other entities like the Plans or the collective trusts the Plans invested in, but received particular treatment when their FX requirements come to SSBT's FX dealing room.

51.     On information and belief, instead of these custodial clients' FX trades being included with the others, like the Plan or the collective trusts in which the Plans invested, and subject to the extreme range-of-the-day mark-up and mark-down, these clients were allowed to deal directly with Defendants – usually by phone – and were given the chance to directly negotiate prices for their FX requirements for that day, every day, despite their trades coming to SSBT as standing instruction trades.

52.     As a result, the "smart money" custodial clients always received better pricing than their fellow custodial clients who are still subject to SSBT's pricing schemes.

53.     On information and belief, Defendants did not disclose to clients like the Plan over the period of time relevant to this Complaint their practice of providing certain clients, the "smart money clients," FX transactions, resulting from direct dealings on standing instruction trades.

## V.     CLASS ALLEGATIONS

54.     **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plan and its participants and beneficiaries and the following class of similarly-situated persons (the "Class"):

> All qualified ERISA Plans and the participants and beneficiaries thereof for which State Street Bank and Trust Company or State Street Global Markets, LLC provided foreign exchange transactional services, as custodian of its assets, or by acting as custodian of collective trusts in which those ERISA Plans invested, at any time between January 1, 2001 and October 19, 2009 (the "Class Period").

Class treatment is appropriate in this case because it would promote judicial economy by adjudicating the Defendants' fiduciary breach with respect to all of the Plans and participants and beneficiaries in the class.

55.     **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that hundreds of ERISA Plans throughout the country invested in these collective trusts during the Class Period, and sustained losses as a result of the Defendants' imprudent FX trading activities. Defendants have more than $5.2 trillion of pension assets under custody.   These assets could all be exposed to Defendants' improper pricing scheme.  Plaintiff believes that hundreds of ERISA plans are also exposed to Defendants' collective investment funds with investments in foreign securities.  For example, Schedule D to the Form 5500 filed by Defendants for the Active Intl Stock Selection SL SF CL I (CM8J fund for 2009 alone lists nine defined contribution plans and assets of nearly $389 million.  State Street Bank and Trust Company, Active Intl Stock Selection SL SF CL I (CM8J [sic], Annual Return/Report of Employee Benefit Plan (Form 5500), at Schedule H, Part I (December 31, 2009).

56. **Commonality**. The claims of Plaintiff and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by Defendants with regard to management of its FX trading program. The questions of law and fact common to the Class include, but are not limited to:

      a.      Whether Defendants breached their fiduciary duties to the Plans by using an FX trading scheme to overcharge the Plans, or the collective investment funds in which the Plans invested, for FX trading;

      b.      Whether Defendants' self-interested FX transactions constituted transactions prohibited under ERISA's statutory restrictions;

      c.      Whether Defendants' fiduciary breaches caused losses to the Plans; and

      d.      Whether Defendants' prohibited transactions caused losses to the Plans.

57. **Typicality**. Plaintiff's claims on behalf of his Plan are not only typical of, but the same as, claims that would be brought with respect to other Plans. If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same claims based upon the same conduct of the Defendants, using the same legal arguments to prove Defendants' liability, and would be seeking the same relief.

58. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in class action and ERISA litigation. Plaintiff has no interests antagonistic to, or in conflict with those of the Class. Plaintiff has undertaken to protect vigorously the interests of the absent members of the Class.

59. **Rule 23(b)(1)(A) & (B) Requirements**. Class action status is warranted under Fed. R. Civ. P. 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual

members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

60. **Rule 23(b)(2) Requirements**. Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole. No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties.

61. **Rule 23(b)(3) Requirements**. In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VI.  CLAIMS FOR RELIEF

### COUNT I

**Engaging in Self-Interested Prohibited Transactions**
**(Violation of § 406 of ERISA, 29 U.S.C. § 1106 by Defendants)**

62. All previous averments are incorporated herein.

63. At all relevant times, the Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control over Plan assets.

64. The Defendants, by their actions throughout the Class Period, caused the Plans to engage in unfairly and unreasonably priced FX transactions.

65. During the Class Period, Defendants engaged in FX transactions using plan assets that were not for the exclusive benefit of the Plans' or their participants.

66.     Through their FX transactions and pricing scheme, Defendants dealt with assets of the Plans for their own financial benefit and for their own account. This is a violation of ERISA § 406(b)(1) & (3), 29 U.S.C. 1106(b)(1) & (3).

67.     As a direct and proximate result of these prohibited transaction violations, the Plans, directly or indirectly, paid millions of dollars in transaction fees that were prohibited by ERISA and suffered millions of dollars in losses.

68.     Pursuant to ERISA Defendants are liable to disgorge all fees paid them for the Plans' FX transactions, restore all losses suffered by the Plans as a result of the prohibited transactions, and all profits earned on the fees paid by the Plans to Defendants.

## COUNT II

**Breach of Duties of Prudence and Loyalty**
**(Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Defendants)**

69.     All previous averments are incorporated herein.

70.     Defendants breached their ERISA fiduciary duties of prudence and loyalty by, inter alia:

    a.  Using plan assets for the own benefit, causing losses to the Plans and the participants;

    b.  Charging the Plans (or the collective trusts in which the Plans invested) fees for FX trading that were unreasonable and in excess of what Defendants had agreed to charge;

    c.  Failing to disclose to the Plans, their fiduciaries, or participants the amount of fees being charged for FX trading, that those fees were in excess of what Defendants had agreed to charge, and that other clients were charged less for the same services;

71.     These actions during the Class Period were breaches of Defendants fiduciary duties of loyalty and prudence to the Plans under ERISA and Defendants did not execute their

fiduciary responsibilities for the exclusive benefit of the Plans.  § 404(a)(1)(A), (B), 29 U.S.C. §§ 1104(a)(1)(A), (B).

72.     Defendants committed these breaches consistently from 2001 to 2009, during each FX transaction involving assets of the Plans.

73.     As a direct and proximate result of these breaches of duty, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, realized losses.

74.     Pursuant to ERISA the Defendants are liable to restore all losses suffered by the Plans caused by the Defendants' breaches of fiduciary duty.

## COUNT III

### Liability for Breach of Co-fiduciary
### (Violation of § 405 of ERISA, 29 U.S.C. § 1105)

75.     All previous averments are incorporated herein.

76.     SSGM violated ERISA, 29 U.S.C. §1105(a)(1), by knowingly undertaking to conceal SSBT's fiduciary breaches.  It did so through the actions and omissions of its employees and agents by concealing and failing to provide complete and accurate information to the Plans regarding the cost of FX transactions.

77.     SSGM violated ERISA, 29 U.S.C. §1105(a)(3), because it knew that SSBT had breached its fiduciary duties of prudence and loyalty, but failed to take reasonable steps under the circumstances to remedy the breach.

78.     On account of SSGM's violations of these provisions, SSGM is liable for the breach of its co-fiduciary, SSBT.

79.     As a result of SSGM's actions, the Plans suffered losses.

## VII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

80.     Declare that the Defendants have violated ERISA's prohibited transactions provisions;

81.     Declare that the Defendants breached their fiduciary duties under ERISA;

82.     Issue an order compelling a proper accounting of the foreign exchange transactions in which the Plans have engaged;

83.     Issue an order compelling Defendants to restore all losses caused to the Plans;

84.     Issue an order compelling the Defendants to disgorge all fees paid and incurred to Defendants, including any profits thereon;

85.     Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

86.     Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as custodian to the Plans;

87.     That this action be certified as a class action and that each Class be designated to receive the amounts restored to the Plans by Defendants and a constructive trust be established for distribution to the extent required by law;

88.     Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

89.     Award Plaintiffs their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

90.     Award such other and further relief as the Court deems equitable and just.

Dated: November 18, 2011

Respectfully Submitted,
Arnold Henriquez,
By his attorneys,

/s/ Catherine M. Campbell
Catherine M. Campbell, Esq.
BBO # 549397
/s/ Renee J. Bushey
Renee J. Bushey, Esq.
BBO # 629444
**Feinberg, Campbell & Zack, PC**
177 Milk Street, Suite 300
Boston, MA 02109-3408
Tel: (617) 338-1976
Fax: (617) 338-7070
cmc@fczlaw.com

J. Brian McTigue
(Pro Hac Vice to be filed)
bmctigue@mctiguelaw.com

Bryan T. Veis
(Pro Hac Vice to be filed)

James A. Moore
(Pro Hac Vice to be filed)

**McTigue & Veis, LLP**
4530 Wisconsin Avenue, NW
Suite 300
Washington, DC 20016
Tel: (202) 364-6900
Fax: (202) 364-9960

Counsel for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND,  AND THOSE SIMILARLY SITUATED,

       Plaintiffs,

v.

STATE STREET BANK AND TRUST COMPANY and STATE STREET GLOBAL MARKETS LLC AND DOES 1-20,
       Defendants.

CIVIL ACTION No.
11-cv-12049-MLW

---

## AMENDED CLASS ACTION COMPLAINT

1.     Plaintiffs Arnold Henriquez (bringing this action pursuant to ERISA on behalf of the Waste Management Retirement Savings Plan ("WM Plan") and its participants and beneficiaries), Michael Cohn (bringing this action pursuant to ERISA on behalf of the Citigroup 401(k) Plan ("Citi Plan") and its participants and beneficiaries), and William Taylor and Richard Sutherland (both bringing this action pursuant to ERISA on behalf of the Retirement Plan of Johnson and Johnson ("J&J Plan") and its participants and beneficiaries) (collectively, "Plaintiffs") bring this action as a class action on behalf of a class of similarly-situated ERISA retirement plans (collectively, the "Plans") and their participants and beneficiaries against State Street Bank and Trust Company ("SSBT") and State Street Global Markets, LLC ("SSGM") (collectively, "Defendants").  The allegations below are based on the investigative efforts of private whistleblower firms, the State of California, the Securities and Exchange Commission

("SEC"), and an investigation by counsel, which included reviewing: Internal Revenue Service Forms 5500 ("Forms 5500") filed with the United States Department of Labor ("DOL"); filings with the United States Securities and Exchange Commission, including Annual Reports on Forms 10-K; documents filed in other litigation; and other publicly available documents related to this action.

## I. <u>NATURE OF THE ACTION</u>

2.     This is a civil enforcement action brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, and in particular under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), to recover losses and obtain equitable relief on behalf of the WM Plan, the Citi Plan, and the J&J Plan (the "Named Plaintiffs' Plans"), and pursuant to applicable law as a class action to obtain relief for all other similarly situated ERISA plans.

3.     SSBT and SSGM were required to act prudently and solely in the interest of the Plans' participants and beneficiaries in their capacity as ERISA fiduciaries.  On information and belief, rather than fulfilling their fiduciary duties under ERISA (the "highest known to the law"),[1] the Defendants charged, or allowed to be charged, improper, undisclosed markups on transactions in foreign currency ("FX transactions" or "FX trading") and engaged in prohibited transactions in connection with such FX transactions.

4.     The Named Plaintiffs' Plans and the similarly situated Plans are established and sponsored by private entities in accordance with ERISA.

---

[1] *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

2

5.     Plaintiffs allege that Defendants violated ERISA by causing the Plans, or collective funds (the "Collective Investment Funds") operated by SSBT in which the Plans were invested, to purchase foreign securities through the use of FX transactions at rates favorable to Defendants.  These transactions were prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

6.     Plaintiffs also allege that Defendants failed to act solely in the interest of the participants and beneficiaries of the Plans and breached their fiduciary duties of prudence and loyalty with respect to the Plans.  Specifically, Plaintiffs allege that Defendants, as fiduciaries of the Plans, violated their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, by causing the Plans or the Collective Investment Funds operated by Defendants in which the Plans were invested to engage in transactions that were not to the exclusive benefit of the Plans or their participants and beneficiaries.

## II. JURISDICTION AND VENUE

7.     ERISA provides for exclusive federal jurisdiction over these claims.  The Plans are "employee benefit plans" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and Plaintiffs are participants in the Named Plaintiffs' Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), who are authorized pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), to bring the present action on behalf of those plans and their participants and beneficiaries to obtain appropriate relief.

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and ERISA

§ 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which

relief is sought occurred in this district and the Defendants reside and may be found in this

district.


## III. PARTIES

*A.      Plaintiffs*

10.      **Plaintiff Arnold Henriquez** is a participant in the WM Plan, an ERISA-covered

plan.  At all material times from the second quarter of 2005 through the second quarter of 2009,

Mr. Henriquez invested in the "International Equity Fund"[2] sponsored by SSBT and offered by

the Plan.  Mr. Henriquez also invested in other funds sponsored by SSBT and offered by the WM

Plan during the Class Period, including the Large Cap Equity Fund, the Small Cap Equity Fund,

the Conservative Asset Allocation Fund, the Moderate Asset Allocation Fund, the Aggressive

Allocation Fund, the Bond Market, and the SSgA Target Retirement 2030 Fund.  Mr. Henriquez

resides in Frederick, Maryland.

11.      **Plaintiff Michael T. Cohn** is a participant in the Citi Plan, an ERISA-covered

plan.  At all material times from his initial enrollment in the Citi Plan in January 2005 through

---

[2] The "International Equity Fund" is the fund name used by SSBT on disclosures to participants
in the WM Plan.  The International Equity Fund's name, according to the International Equity
Fund's Forms 5500 for 2009 and 2010, filed by SSBT with DOL, is the "Active Intl Stock
Selection SL SF CL I (CM8J [*sic*]."  From 2006 through 2008, the International Equity Fund's
name, according to the International Equity Fund's Forms 5500 filed by SSBT with DOL was
the "International Alpha Select SL Series Fund – [*sic*]."  From 1999 to 2005, the WM Plan
offered the SSgA International Growth Opportunities Fund Series A Non-Lending as the
"International Equity Fund."  The foregoing fund names may refer to the International Equity
Fund at a particular point in time, as well as to one or more of several classes of interests offered
in the International Equity Fund.

August 2007 Mr. Cohn was invested in the "Aggressive Focus Fund" offered by the Citigroup 401(k) Plan. According to the Citigroup 401(k) Plan Aggressive Focus Fund Fact Sheet for the second quarter of 2004, this fund had the objective of "seek[ing] as high a total return over time as is consistent with a primary emphasis on equity securities and a secondary emphasis on fixed-income and money market securities." The Aggressive Focus Fund was a "fund of funds" managed by SSBT that included two funds focused on international equities: (a) the Daily EAFE Index Securities Lending Series – Class T; and (b) the Daily Emerging Markets Index Non Lending Series Fund. These two funds accounted for 24% of the Aggressive Focus Fund's total holdings in 2004. In September 2007, the Citigroup 401(k) Plan changed its investment options, and Mr. Cohn invested in the newly offered "Emerging Market Equity" collective investment fund. He is still invested in that fund as of the date of this complaint. This Emerging Market Equity fund has used SSBT as an investment manager since it was first offered to the Citigroup 401(k) Plan in 2007. Mr. Cohn resides in Highland Park, Illinois.

12.     **Plaintiff William R. Taylor** is a participant in the Retirement Plan of Johnson and Johnson, an ERISA-covered plan. Mr. Taylor began working at Johnson and Johnson and accruing service towards his pension benefit on September 21, 1998. At all relevant times to this complaint, SSBT served as the trustee and custodian of both the J&J Plan and the Johnson and Johnson Pension and Savings Plan Master Trust in which the J&J Plan was wholly invested. Mr. Taylor resides in Aston, Pennsylvania. The J&J plan holds foreign investments in both international securities that cannot be purchased on a domestic exchange and foreign currency. Each of these types of holdings requires FX transactions.

13.     **Plaintiff Richard A. Sutherland** is a participant in the Retirement Plan of Johnson and Johnson, an ERISA-covered plan. Mr. Taylor began working at Johnson and

Johnson and accruing service towards his pension benefit on January 1, 1999.  At all relevant

times to this complaint, SSBT served as the trustee and custodian of both the J&J Plan and

Johnson and Johnson Pension and Savings Plan Master Trust in which the defined benefit plan

was wholly invested.  Mr. Sutherland resides in Albuquerque, New Mexico.  The J&J plan holds

foreign investments in both international securities that cannot be purchased on a domestic

exchange and foreign currency.   Each of these types of holdings requires FX transactions.

B.      *Defendants*

        14.      **Defendant State Street Bank and Trust Company** ("SSBT") is incorporated in

Massachusetts and is headquartered in Boston, Massachusetts.  Defendant State Street Bank and

Trust Company directly, or indirectly through one or more subsidiaries, operates as a custodial

bank for ERISA-covered benefit plans and for the Collective Investment Funds offered by

ERISA-covered plans.  SSBT is a subsidiary of State Street Corporation, a financial holding

company headquartered in Boston, Massachusetts.  SSBT describes itself as a leading specialist

in meeting the needs of institutional investors.  In its Class Period filings with the SEC, State

Street Corporation repeatedly stated that its customer relationships were predicated upon our

reputation as a fiduciary and a service provider that adheres to the highest standards of ethics,

service quality and regulatory compliance.  One of the services provided by SSBT to its custodial

clients was the execution of FX transactions, which allowed clients to purchase and sell foreign

securities or to engage in foreign currency trades for other purposes.  Another of the services

provided by SSBT to its custodial clients is investment management of custodial client assets

through the use of "collective investment funds," which are described more fully below.

15.     **Defendant State Street Global Markets, LLC** ("SSGM"), a subsidiary of State Street Corporation, is incorporated in Delaware and is headquartered in Boston, Massachusetts. SSGM is a broker/dealer registered with the SEC, the Financial Industry Regulatory Authority, ten self-regulatory authorities, and fifty-three U. S. states and territories.  SSGM is the only State Street Corporation subsidiary registered as a brokerage firm.  SSGM is the corporate successor of State Street Brokerage Services, Inc. and State Street Capital Markets, LLC.  On or about June 1, 1999, State Street Capital Markets, LLC assumed all of the assets and liabilities of State Street Brokerage Services. Inc.  State Street Brokerage Services, Inc. was dissolved, but "State Street Brokerage Services," not followed by "Inc.," continued to exist as a division of State Street Capital Markets, LLC.  On or about March 1, 2002, SSGM assumed all of the assets and liabilities of State Street Capital Markets, LLC.  SSGM describes itself as "the investment research and trading arm of State Street Corporation."  SSGM provides specialized investment research and trading in foreign exchange, equities, fixed income, and derivatives to ERISA covered benefit plans.  Confusingly, in their answer to the complaint-in-intervention of the California Attorney General described below,[3] SSBT and SSGM assert that SSBT executed FX transactions for its clients through a division of SSBT called "State Street Global Markets," which was a separate entity from Defendant State Street Global Markets, LLC.  In marketing documents for its "Foreign Exchange Global Strategy,"[4] State Street Corporation has described

---

[3]*People of the State of Calif. v. State Street Corp.*, Case No. 34-2008-00008457-CU-MC-GDS. (Cal. Super. Ct., Sacramento County, April 12, 2010.).

[4] State Street Corporation added further confusion through its marketing materials, which state that "[p]roducts and services outlined in this document are offered to professional investors through State Street Global Markets LLC, which is a member of FINRA and SIPC, and State Street Bank and Trust Company, State Street Global Markets International Limited and State Street Bank Europe Limited, all of which are authorized and regulated by the Financial Services Authority in the United Kingdom, and their affiliates."   State Street Global Markets, *Foreign Exchange Global Strategy*, www.statestreetglobalmarkets.com, 09-SGM08041209 (2010).

"State Street Global Markets" as "the marketing name and a registered trademark of State Street Corporation, used for its financial markets business and that of its affiliates."[5]  Any action taken by the "State Street Global Markets" division of SSBT was an action of SSBT.

16.     State Street Corporation, SSBT, and SSGM are under common control within the meaning of 29 C.F.R. § 2510.3-21(e)(1)(i).  Further, State Street Corporation, SSBT, and SSGM are "affiliates" within the meaning of (a) Prohibited Transaction Exemption 94-20, § IV.(d), (e), 59 Fed. Reg. 8022-02, 8026 (Feb. 17, 1994) and (b) Prohibited Transaction Exemption 98-54 §IV. (e), (l), 63 Fed. Reg. 63503, 63510, because they directly or indirectly, or through one or more intermediaries, control, are controlled by, or are under common control with each other.

17.     **Defendants Does 1-20** are fiduciaries of the Plans relevant to this lawsuit whose exact identities will be ascertained through discovery.

## IV. <u>THE FOREIGN EXCHANGE SCHEME</u>

A.     *SSBT's General FX Trading Practices for Non-ERISA Clients*

18.     According to its September 26, 2006 Investment Manager Guide, SSBT purported to offer two generic types of foreign exchange transactions to third party investment managers for SSBT's custody clients.  It offered "direct deals" whereby investment managers "deal[t] foreign exchange directly with [SSBT] Treasury trading desks."  SSBT also offered "indirect deals" whereby "requests to execute a foreign exchange transaction [could be] sent to the processing site with the related securities instruction or as a separate instruction."  As set forth below, indirect deals were also sometimes described as "standing instruction" trades.

---

[5] *Id.*

8

19.     According to a class action securities fraud complaint filed in this Court on July 29, 2010 (*Hill v. State Street Corp.*, Document No. 51, Master Docket No. 09-cv-12146-NG), for more than 75% of SSBT's large custodial clients, Defendants would conduct "indirect" or "standing instruction" foreign exchange trades, as described in SSBT's September 26, 2006 Investment Manager Guide.  Under the terms of SSBT's custodial arrangements, SSBT was obligated to provide its clients the same exchange rate that Defendants actually used to make the trade. This arrangement was supposed to be beneficial to Defendants' clients because, among other things, they would not have to incur the expense and time of identifying and choosing the most competitive exchange rate.

20.     On October 20, 2009, based upon an investigation undertaken after the sealed filing of a *qui tam* complaint by "Associates Against FX Insider Trading" on the personal knowledge of Associates' partners, the California Attorney General ("California AG") filed a complaint alleging that SSBT, SSGM, and a third entity, State Street California Inc., had systematically overcharged two of California's largest public pension funds by tens of millions of dollars for foreign exchange trades conducted over a period of at least eight years.  *People of the State of Calif. v. State Street Corp.*, Case No. 34-2008-00008457-CU-MC-GDS. (Cal. Super. Ct., Sacramento County Oct. 20, 2009.).

21.     The California AG's action was based on an extensive eighteen-month investigation, which included interviewing witnesses and reviewing hundreds of thousands of internal State Street documents.

22.     On information and belief, and according to the *qui tam* relators and the California AG, Defendants herein, starting in 2001, added an undisclosed and substantial "mark-up" to the exchange rate they used when making foreign exchange trades for its clients.

9

23.     The California AG's allegations of undisclosed "mark-ups" were based in part on the sworn testimony of a former SSBT employee who worked on the same trading floor as the SSBT or SSGM foreign exchange traders and who overheard how SSBT or SSGM foreign exchange traders were marking up FX trade prices.  This trader, in sworn testimony, described the practices of SSBT's FX traders as a "totally unethical thing to do" and said that the FX Traders practices were not within the "industry standard."  *People of the State of Calif. v. State Street,* Declaration of Kenny V. Nguyen, Case No. 34-2008-00008457-CU-MC-GDS (January 31, 2012).

24.     The California AG went on to explain that Defendants had agreements with their large custodial clients that obligated Defendants to charge their clients the same exchange rate as the one that Defendants actually used to execute FX trades requested by the client.  Rather than doing so, however, SSBT or SSGM would execute the trade at one exchange rate, and then monitor fluctuations in the rate throughout the day.  Then, before the end of the day, SSBT or SSGM would pick a rate that was more beneficial to Defendants, and tell its clients that the trade had occurred at this other, false rate.

25.     The California *qui tam* relators explained that, for instance, if the transaction was a purchase of a foreign security, SSGM or SSBT would execute the transaction, but would charge the client a higher foreign exchange rate that occurred later in the day, thus causing the client to pay more for the security in U.S. Dollars than the U.S. Dollar value at the time SSBT or SSGM executed the transaction.  If the transaction was a sale of a foreign security, SSBT or SSGM would execute the transaction, but would credit the client at a lower foreign exchange rate, thus paying the client less in U.S. Dollars  than the U.S. Dollar value of what SSBT or SSGM actually received at the time SSBT or SSGM executed the transaction.  In either event, Defendants would

take for themselves the difference between the amount for which the trade was actually executed by SSBT or SSGM and the amount that SSBT or SSGM charged its custody clients for the transaction.

26.     According to the California AG complaint-in-intervention and a subsequent amended class action complaint filed in the District of Massachusetts,[6] Defendants' clients did not discover the truth because the records, including statements of account and transaction records provided by SSBT in the ordinary course to their clients, showed only that the trade had been executed within the range of rates occurring during that day, notwithstanding that the rate reported was not the actual rate for the transaction. Defendants' clients were not informed of the actual rates at which FX transactions were made. Defendants' providing such incomplete statements and transaction records to their clients was a course of conduct designed to conceal evidence of their breaches of fiduciary duty and prohibited transactions set forth herein.

B.     *How SSBT's Foreign Exchange Trading Scheme Worked*

27.     As detailed by the California relators, clients or their investment managers would initiate a foreign exchange transaction by sending a request, often electronically, to the Securities Processing Unit of SSBT, which was located on the "custody side" of the Company. This request was then sent electronically to the State Street foreign exchange trading desk in SSGM, where it would appear on the Market Order Management System ("MOMS") software used by Defendants' traders.

28.     According to the Arkansas State Teacher Retirement System amended class action complaint, SSBT or SSGM's FX traders were informed of SSBT's aggregated standing

---

[6] *Arkansas State Teacher Retirement System v. State Street Corp.*, No. 11-CV-10230 (MLW) (April 15, 2011).

instruction trade requirements during the course of the day. The FX traders would, that day, trade on the interbank FX market in order to satisfy SSBT's standing instruction positions.

29.    According to a class action securities fraud complaint filed in this Court ("*Hill*"),[7] upon receipt of the request, SSBT or SSGM's foreign exchange traders checked the exchange rate, set a price, and executed the transaction, which typically occurred early in the day because SSBT or SSGM traders were at their desks by 7 a.m. Eastern Standard Time. All of those transactions were then entered by the trader into a separate software system called Wall Street Systems ("WSS"), which memorialized the transaction and charged the cost (for purchases) or remitted the payment (for sales) directly to Defendants. The WSS recorded time stamps for the actual, real time transaction.

30.    According to the *Hill* class action securities fraud complaint, although the transaction was now completed and the price locked in, Defendants did not inform the client. Instead, on information and belief, SSBT or SSGM observed market fluctuations until sometime around 3 p.m. and then assigned either a higher exchange rate (for purchases) or a lower exchange rate (for sales) to the foreign exchange transactions that occurred during that day. SSGM then applied that rate to all of the "standing instruction" foreign exchange transactions it had conducted that day.

31.    On information and belief, at all relevant times to this Complaint, this pricing scheme was used for FX transactions for both custodial clients, including custodial ERISA plan clients, and for transactions involving the Collective Investment Funds.

---

[7] *Hill v. State Street Corporation*, Document No. 51, Master Docket No. 09-cv-12146-NG. (July 29, 2010).

32.     On information and belief, with each FX trade priced in this manner, Defendants did not simply profit; they made excessive profits on each trade, based upon the range-of-the-day's FX rates at the point the trade was priced for the Plan.

33.     On information and belief, because Defendants' scheme always priced the trades at or near the very lowest or very highest rates of the day, Defendants were able to make a profit with minimal risk to SSBT.

34.     According to the California AG complaint-in-intervention, Defendants' practice of pricing trades in this manner and taking the largest possible mark-up or mark-down was not disclosed to custodial clients over the period of time relevant to that Complaint.

35.     On information and belief, Defendants' practice of pricing trades in this manner and taking an excessive mark-up or excessive mark-down was not disclosed to investors in the Collective Investment Funds over the period of time relevant to this Complaint.

*C.*     *SSBT Made Exceptions for Certain Clients, Offering Them Special Pricing*

36.     According to the class action securities fraud complaint filed in this Court on July 29, 2010 (*Hill v. State Street Corporation*, Document No. 51, Master Docket No. 09-cv-12146-NG), over time, SSBT developed a special class of custodial clients that did not receive the excessively high or excessively low range-of-the-day pricing suffered by other custodial clients, including ERISA plans.  Those clients who conducted "direct trades" would be quoted an exchange rate by SSBT or SSGM before executing the transaction.  These clients – often large hedge funds – typically had easy access to an alternate price source, such as Bloomberg or Reuters, to double-check the truthfulness of SSBT or SSGM's rate quotes.  Accordingly,

Defendants could not overcharge these clients, and thus referred to them internally as "smart" clients or "smart money."

37.     According to the class action securities fraud complaint, instead of including FX trades for these custodial clients with other clients' trades, and subject to the excessive range-of-the-day mark-ups and mark-downs, these clients were allowed to deal directly with Defendants and were given the chance to directly negotiate prices for their FX requirements for that day, despite their trades coming to SSBT as standing instruction trades.

38.     As a result, according to the class action securities fraud complaint, the "smart money" custodial clients received better pricing than their fellow custodial clients who are still subject to SSBT's excessive pricing schemes.


## V. FACTUAL BACKGROUND OF ERISA PLAN CLAIMS

*A.     The Plans.*

39.     **Waste Management Retirement Savings Plan.** The WM Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

40.     **Citigroup 401(k) Plan.** The Citi Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

41.      **Retirement Plan of Johnson and Johnson.** The J&J Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

42.     **Other Similarly Situated ERISA Plans**.  Defendants provide services similar to those provided to the Waste, Citi, and J&J Plans to other, similarly situated Plans, either directly as plan custodian or indirectly as custodian of funds in which the Plans invest.

14

B. *Retirement Plan Investments in Foreign Securities*

43. There are two types of ERISA-covered pension plans — defined benefit plans and defined contribution plans.  Both types of retirement plans have, especially over the last decade, found it necessary and prudent to expand their investments to include exposure to foreign markets.  Accordingly, defined benefit plans have expanded international holdings, and defined contribution plans frequently include at least one, if not several, international investment options.

44. ERISA-covered plans regularly purchase and sell foreign securities in order to increase diversification and take advantage of opportunities for higher returns.  Retirement plans that invest in foreign securities receive principal, dividends, and interest that are paid in foreign currencies, or participate in other investments that require the exchange of foreign currency into and from US Dollars ("USD"), either directly or through participation in collective investment funds.  As a result, the purchase and sale of currencies incidental to a foreign securities transaction is vital to a plan's participation in the international securities markets and to the acquisition, holding, and disposition of foreign securities.

45. SSBT served as trustee and custodian to the WM Plan.  Beginning in 1999, the WM Plan offered participants the option to invest in certain Collective Investment Funds, the SSgA International Growth Opportunities Fund Series A Non-Lending.  For purposes of communications with the WM Plan and its participants, this fund was named the "International Equity Fund."  The International Equity Fund is described more fully below.  Another example is the SSgA Target Retirement 2030 Fund offered to WM Plan participants.  In 2008, the SSgA Target Retirement 2030 Fund invested in another SSBT Collective Investment Fund, the SSgA MSCI ACWI EX-US Index Fund, a collective investment fund that held foreign securities and

would have been, directly or indirectly, party to FX transactions executed by SSBT or its affiliate SSGM. Neither of these Collective Investment Funds could have been operated without FX transactions, whether or not those transactions were executed at the fund level or at the brokerage level. SSBT, as the operator and manager of these funds, was ultimately responsible for the funds' FX transactions.

46. SSBT served as trustee and custodian to the Citi Plan. Similarly, the Citi Plan in 2008 offered four international Collective Investment Funds (either directly or as part of an underlying investment of the fund) operated and managed by SSBT: the SSgA EAFE Fund; the SSgA International Small Cap Fund; the SSgA MSCI EAFE Fund; and the SSgA MSCI Emerging Markets Free [*sic*]. None of these funds could have been operated without FX transactions, whether those transactions were executed at the Collective Investment Fund level or brokerage level. SSBT, as the operator and manager of these funds, was ultimately responsible for those FX transactions.

47. SSBT served as trustee and custodian to the J&J Plan. The J&J Plan did not invest in the Collective Investment Funds. Rather, the J&J Plan directly held foreign assets, including currency, such as Euros, and foreign securities that could not have been purchased on a domestic exchange. An example of one such security is Elpida Memory Inc, a Japanese stock available only on a Japanese exchange. The J&J Plan could not have made use of foreign currencies or purchased foreign securities which are not traded on U.S. securities exchanges without FX transactions. On information and belief, SSBT, as trustee and custodian of the J&J Plan, executed some or all of the J&J Plan's foreign currency transactions in the relevant period.

C.    *Defendants' Fiduciary Status*

16

48. Every plan governed by ERISA must have fiduciaries to administer and manage the plan. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA §402(a)(1), but also any other person who in fact performs fiduciary functions. ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i) (a person is a fiduciary "to the extent … he exercises any discretionary authority or discretionary control respecting management of such plan or *exercises any authority or control respecting management or disposition of its assets…*") (emphasis added).

49. An ERISA fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … for the exclusive purpose of … providing benefits to participants and beneficiaries and … defraying the reasonable expenses of administering the plan …." ERISA § 404(a)(1)(A)(i), (ii), 29 U.S.C. § 1104(a)(1)(A)(i), (ii).

50. Moreover, ERISA prohibits certain transactions. Specifically, unless exempted pursuant to ERISA § 408, 29 U.S.C. 1108:

A fiduciary with respect to a plan shall not--

> **(1)** deal with the assets of the plan in his own interest or for his own account,
>
> **(2)** in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
>
> **(3)** receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

ERISA §406(b), 29 U.S.C. 1106(b). As described below, Defendants functioned as fiduciaries to the Named Plans both by acting as trustee and custodian for the Plans and by exercising authority and control over Plan assets.

17

1. *SSBT as Custodian*

51. An ERISA-covered Plan's custodial bank is an ERISA fiduciary. A "custodian" is an institution that holds securities on behalf of investors. The responsibilities entrusted to a custodian include the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities. Custodians may also perform ancillary services for their clients. Custodians are typically used by institutional investors who do not wish to leave securities on deposit with their broker-dealers or investment managers. The use of a custodial bank is intended to reduce the risk of misconduct by separating the custodial and asset management duties. An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

52. SSBT served as the custodian for many ERISA-covered pension plans. Specifically, SSBT served as custodian for the Named Plans' assets. As custodian, SSBT was a fiduciary under ERISA and owed fiduciary duties to the Named Plans. SSGM also exercised authority and control over the Plans' assets in its role as SSBT's affiliate responsible for setting the exchange rates on FX transactions and executing those transactions. As discussed above, this process created the excessive spread between the marked-up FX exchange rates charged to custodial ERISA plan clients and the marked-down FX exchange rates used to process repatriation of principal, dividends, and interest paid in foreign currencies, and other FX transactions.

2. *SSBT as Investment Manager of Collective Investment Funds for ERISA Plans*

18

53. SSBT sponsored and operated the Collective Investment Funds and offered them to the ERISA plans, including the Plans and the Similarly Situated ERISA Plans. SSBT served as custodian and trustee for the Collective Investment Funds. The Collective Investment Funds were under the exclusive management and control of SSBT.

54. On information and belief, all of the Collective Investment Funds which invested in foreign securities suffered from the same inaccurate FX pricing described in the California *qui tam* complaint, the California AG complaint-in-intervention, and the *Hill* securities fraud class action complaint. *See* ¶¶ 18-38, *supra*.

55. Investments in collective investment funds are equity interests in a separate legal entity, but are not publicly-offered securities or securities issued by an investment company registered under the Investment Company Act of 1940, *i.e.*, mutual funds. Under ERISA, unlike mutual funds and other publicly-offered securities, investments in collective investment funds are subject to a unique "look-through" rule, pursuant to which, the "plan assets" of an ERISA-covered plan include ***both*** its undivided "equity interest [in the entity] ***and*** an undivided interest in each of the underlying assets of the entity …". 29 C.F.R. § 2510.3-101(a)(2); *see also* ERISA § 3(42), 29 C.F.R. § 1002(42) (authority of Secretary of Labor to define term "plan assets" by regulation) (emphasis added). Specifically, when a Plan acquires or holds an interest in a common or collective trust fund, that is, a Collective Investment Fund, "its assets include its investment and an undivided interest ***in each of the underlying assets*** of the entity." *Id*. § 2510.3-101(h)(1) (emphasis added).

56. "[A]ny person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with

respect to such assets for a fee (direct or indirect) is a fiduciary of the investing plan." *Id*. §
2510.3-101(a).

57.    As the sponsor and operator of the Collective Investment Funds, SSBT exercised
authority or control with respect to the management or disposition of plan assets.  Accordingly,
SSBT was a fiduciary of each and every ERISA Plan which invested in the Collective
Investment Funds, including the Named Plaintiffs' Plans and the Plans, with respect to the
underlying assets of each and every SSBT Collective Investment Fund.

58.    In addition, according to SSBT documents provided by the WM Plan in April 2002
to a participant in the WM Plan in response to the participant's request for plan documents
pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), on or about January 1, 1999, the
Investment Committee of the WM Plan appointed SSBT to act as Investment Manager of the
WM Plan "as such term is defined in Section 3(38) of [ERISA]" with respect to designated assets
of the WM Plan.  The designated assets included five of the Collective Investment Funds, one of
which was the "International Growth Opportunities Fund Series A," that is, the International
Equity Fund.  Accordingly, SSBT also had authority and control over plan assets in its capacity
as Investment Manager, including assets invested in the Collective Investment Funds, and
specifically including assets invested in the International Equity Fund.  This arrangement
continued throughout the WM Plan's association with SSBT, regardless of the specific
international equity fund being offered to participants at any given time.

### 3.    *Foreign Exchange Transactions Under ERISA*

59.    Certain of the Collective Investment Funds SSBT operated and offered to ERISA-
covered plans during the Class Period invested in foreign securities.  SSBT served as custodian

and trustee for these Collective Investment Funds.  Collective investment funds that invest in foreign securities, or a person acting on their behalf, must engage in FX transactions in order to buy and sell securities, to repatriate dividends or interest payments, and to engage in other transactions.  As the trustee of the Collective Investment Funds, SSBT was authorized to convert any monies into any currency through foreign exchange transactions and responsible for ensuring that these transactions were within the bounds of SSBT's fiduciary responsibilities and the limitations of ERISA.

60.    For example, according to SSBT documents provided by the WM Plan in April 2002 to a participant in the WM Plan in response to the participant's request for plan documents pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), the stated investment objective of the International Equity Fund in the Waste Management Plan was "to provide long-term capital appreciation through equity investments *in markets outside the United States*."  (Emphasis added).

61.    The WM Plan's Investment Policy Statement noted that "[t]he goal of the International Equity Fund is to invest in a portfolio of common stocks that will provide a vehicle for investing in a broad cross section of non-U.S. equities."  The International Equity Fund was also permitted to invest in equity-based derivatives of foreign securities and fixed income securities issued by governments and corporations located in those countries.  The "investable universe" of the International Equity Fund was "the equities of all developed market countries, excluding the U.S., including American Depositary Receipts."  The International Equity Fund's benchmark was the "MSCI-EAFE Index, an index of more than 1,100 stocks in 21 countries outside of North and South America …."

21

### 4. SSGM as a Functional Fiduciary of ERISA Plan Assets

62.    As noted above, many of the securities purchased, held, or sold in the Collective Investment Funds were foreign securities that could not be purchased or sold except on foreign securities exchanges in transactions denominated in foreign currencies.

63.    As described more fully below, as a practical matter, unless a Collective Investment Fund invested solely in American Depositary Receipts or derivatives issued in the jurisdiction of the United States, the Investment Manager of the Collective Investment Fund, *i.e.*, SSBT, or some person acting on its behalf, such as a broker, was required to engage in foreign currency transactions in order to acquire equity securities "in markets outside the United States."  Any funds used to acquire such securities at any level within SSBT, or through any affiliate thereof, would constitute "plan assets" under 29 C.F.R. § 2510.3-101.

64.    On information and belief, SSGM provided brokerage services, that is, the purchase and sale of foreign securities, to the Collective Investment Funds.  To the extent that the Collective Investment Funds settled such purchases and sales in U.S. Dollars, the Collective Investment Funds did not engage directly in FX trading in connection with the purchase or sale of foreign securities.  Rather, they engaged in FX trading indirectly through SSGM, in that SSGM would have executed a purchase or sale of a foreign security in foreign currency and then converted the transaction to a U.S. Dollar-denominated transaction for purposes of settlement with the Collective Investment Funds.

65.    On information and belief, SSGM also served as the conduit for the repatriation of dividend, principal, and interest payments by issuers of foreign securities and for receipt of proceeds of sales of foreign securities, and engaged in FX transactions in order to remit such payments to the Collective Investment Funds in U.S. Dollars.

66.    SSGM's conversion of foreign currency to U.S. dollars constituted the exercise of authority or control respecting the management or disposition of the underlying assets of the Collective Investment Funds and, therefore, of assets of the ERISA Plans, within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(1), and 29 C.F.R. § 2510.3-101(a).  Accordingly, SSGM was a fiduciary of the ERISA Plans.

5.    *Defendants' Prohibited Transactions*

67.    According to its September 26, 2006 Investment Manager Guide, SSBT purported to comply with a special procedure when effecting foreign exchange transactions for ERISA trust and custody clients.  Until at least September 26, 2006, the so-called "FX Procedure" purported to be "designed to satisfy the conditions of Prohibited Transaction Exemption 94-20 ("PTE 94-20").  A prohibited transaction exemption permit[ted] certain 'directed' FX transactions between [SSBT] and its ERISA clients."  Under the ERISA "FX Procedure," SSBT "agree[d] to post to its website on a daily basis, a specific buy rate and sell rate for each currency.  Each ERISA plan manager [could] direct [SSBT] to effect the plan's FX transactions, including income repatriation and buy/sell related transactions at the posted rates or at rates more favorable if market conditions warrant."

68.    The September 26, 2006 Investment Manager Guide did not, however, address foreign exchange transactions conducted in connection with assets managed directly by SSBT, as in the Collective Investment Funds.  Under the terms of PTE 94-20, FX transactions generated by SSBT as investment manager of the Collective Investment Funds and executed by SSBT or SSGM could not be conducted under this so-called "FX Procedure," because, among other things, SSBT as investment manager would be dealing with itself, regardless of whether the FX

23

transactions were conducted internally at SSBT or through its affiliate, SSGM, without the benefit of an independent fiduciary.

69.     Nor was there any other applicable prohibited transaction exemption.  As set forth above, the terms of FX transactions conducted on behalf of the Collective Investment Funds were conducted on terms less favorable than the terms generally available in comparable arm's length FX transactions between unrelated parties and on terms less favorable than the terms generally afforded by the bank in comparable arm's length FX transactions between unrelated parties.  Accordingly, the Defendants could not engage in FX transactions in connection with plan assets in the Collective Investment Funds without engaging in a prohibited transaction.

## VI. CLASS ALLEGATIONS

70.     **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plan and its participants and beneficiaries and the following class of similarly-situated persons (the "Class"):

> All qualified ERISA Plans (including the participants and beneficiaries thereof) for which State Street Bank and Trust Company or State Street Global Markets, LLC served as investment manager (including serving as the manager of a collective trust in which such a Plan invested) or trustee or custodian of assets and for which State Street Bank and Trust Company or State Street Global Markets, LLC provided foreign currency exchange transactional services (including foreign currency transactional services provided to entities such as collective trusts that held such ERISA Plans' assets), at any time between January 1, 2001 and the present (the "Class Period").

Class treatment is appropriate in this case because it would promote judicial economy by adjudicating the Plaintiffs' ERISA fiduciary breach and prohibited transaction claims with respect to all of the Plans and participants and beneficiaries in the class.

71.    **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of ERISA Plans throughout the country invested in the Collective Investment Funds during the Class Period, and sustained losses as a result of the Defendants' imprudent FX trading activities. Defendants have more than $5.2 trillion of pension assets under custody.  These assets could all be exposed to Defendants' improper pricing scheme.  Plaintiffs believe that hundreds of ERISA plans are also exposed to the Collective Investment Funds with investments in foreign securities.

72.    **Commonality.** The claims of Plaintiffs and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by Defendants with regard to management of its FX trading program.  The questions of law and fact common to the Class include, but are not limited to:

      a.    Whether Defendants breached their fiduciary duties to the Plans by using an FX trading scheme to overcharge the Plans, or the Collective Investment Funds in which the Plans invested, for FX trading;

      b.    Whether Defendants' self-interested FX transactions constituted transactions prohibited under ERISA's statutory restrictions;

      c.    Whether Defendants' fiduciary breaches caused losses to the Plans; and

      d.    Whether Defendants' prohibited transactions caused losses to the Plans.

73.    **Typicality.**  Plaintiffs' claims on behalf of their Plans are not only typical of, but the same as, claims that would be brought with respect to other Plans.  If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same

claims based upon the same conduct of the Defendants, using the same legal arguments to prove Defendants' liability, and would be seeking the same relief.

74.     **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel that are competent and experienced in class action and ERISA litigation. Plaintiffs have no interests antagonistic to, or in conflict with those of the Class. Plaintiffs have undertaken to protect vigorously the interests of the absent members of the Class.

75.     **Rule 23(b)(1)(A) & (B) Requirements.** Class action status is warranted under Fed. R. Civ. P. 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

76.     **Rule 23(b)(2) Requirements.** Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole.  No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties.

77.     **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any

questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VII. CLAIMS FOR RELIEF

## COUNT I

**Engaging in Self-Interested Prohibited Transactions**
**(Violation of § 406 of ERISA, 29 U.S.C. § 1106 by Defendants)**

78.     All previous averments are incorporated herein.

79.     At all relevant times, the Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control over ERISA plan assets.

80.     The Defendants, by their actions throughout the Class Period, caused the Plans to engage in unfairly and unreasonably priced FX transactions.

81.     During the Class Period, Defendants engaged in FX transactions using plan assets that were not for the exclusive benefit of the Plans' or their participants.

82.     Through their FX transactions and pricing scheme, Defendants dealt with assets of the Plans for their own financial benefit and for their own account.  This is a violation of ERISA § 406(b)(1) & (3), 29 U.S.C. 1106(b)(1) & (3).

83.     As a direct and proximate result of these prohibited transaction violations, the Plans, directly or indirectly, paid millions of dollars in transaction fees that were prohibited by ERISA and suffered millions of dollars in losses.

84.     Pursuant to ERISA, Defendants are liable to disgorge all fees paid them for the Plans' FX transactions, to restore all losses suffered by the Plans as a result of the prohibited transactions, and to disgorge all profits earned on the fees paid by the Plans to Defendants.

## COUNT II

**Breach of Duties of Prudence and Loyalty**
**(Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Defendants)**

85.     All previous averments are incorporated herein.

86.     Defendants breached their ERISA fiduciary duties of prudence and loyalty by, *inter alia*:

    a.   Using plan assets for the own benefit, causing losses to the Plans and the participants;

    b.   Charging the Plans (or the Collective Investment Funds in which the Plans invested) fees for FX trading that were unreasonable and in excess of what Defendants had agreed to charge;

    c.   Failing to disclose to the Plans, their fiduciaries, or participants the amount of fees being charged for FX trading, that those fees were in excess of what Defendants had agreed to charge, and that other clients were charged less for the same services;

87.     These actions during the Class Period were breaches of Defendants' fiduciary duties of loyalty and prudence to the Plans under ERISA, and Defendants did not execute their fiduciary responsibilities for the exclusive benefit of the Plans.  § 404(a)(1)(A), (B), 29 U.S.C. §§ 1104(a)(1)(A), (B).

88.     Defendants committed these breaches during each FX transaction involving assets of the Plans.

28

89.     As a direct and proximate result of these breaches of duty, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, realized losses.

90.     Pursuant to ERISA, the Defendants are liable to restore all losses suffered by the Plans caused by the Defendants' breaches of fiduciary duty.

## COUNT III

### Liability for Breach of Co-fiduciary
### (Violation of § 405 of ERISA, 29 U.S.C. § 1105)

91.     All previous averments are incorporated herein.

92.     SSGM violated ERISA, 29 U.S.C. §1105(a)(1), by knowingly undertaking to conceal SSBT's fiduciary breaches.  It did so through the actions and omissions of its employees and agents by concealing and failing to provide complete and accurate information to the Plans regarding the cost of FX transactions.

93.     SSGM violated ERISA, 29 U.S.C. §1105(a)(3), because it knew that SSBT had breached its fiduciary duties of prudence and loyalty, but failed to take reasonable steps under the circumstances to remedy the breach.

94.     On account of SSGM's violations of these provisions, SSGM is liable for the breach of its co-fiduciary, SSBT.

95.     As a result of SSGM's actions, the Plans suffered losses.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.  Declare that the Defendants have violated ERISA's prohibited transactions provisions;

29

b. Declare that the Defendants breached their fiduciary duties under ERISA;

c. Issue an order compelling a proper accounting of the foreign exchange transactions in which the Plans have engaged;

d. Issue an order compelling Defendants to restore all losses caused to the Plans (or that will be caused to the Plans after the filing of this Complaint);

e. Issue an order compelling the Defendants to disgorge all fees paid and incurred to Defendants (or that will be paid or incurred by the Plans after the filing of this Complaint), including any profits thereon;

f. Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

g. Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as custodian to the Plans;

h. That this action be certified as a class action and that each Class be designated to receive the amounts restored to the Plans by Defendants and a constructive trust be established for distribution to the extent required by law;

i. Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

j. Award Plaintiffs their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

k. Award such other and further relief as the Court deems equitable and just.

Dated:    February 24 , 2012

By: __/s/ Bryan T. Veis_____
J. Brian McTigue (*pro hac vice*)
Bryan T. Veis (*pro hac vice*)
James A. Moore (*pro hac vice*)
**McTigue & Veis, LLP**
4530 Wisconsin Ave, NW
Suite 300
Washington, DC 20016
202-364-6900
Fax: 202-364-9960
Email: bveis@mctiguelaw.com
        bmctigue@mctiguelaw.com
        jmoore@mctiguelaw.com

**Catherine M. Campbell**
**Renee J. Bushey**
Feinberg, Campbell & Zack, P.C.
3rd Floor
177 Milk Street
Boston, MA 02109
617-338-1976
Fax: 617-338-7070
Email: cmc@fczlaw.com
        rjb@fczlaw.com

**Jonathan G. Axelrod** (*pro hac vice*)
Beins, Axelrod, P.C.
1625 Mass. Ave. NW
Washington, DC 20036
202-328-7222
Email: jaxelrod@beinsaxelrod.com

*Attorneys for Plaintiffs*

31

## CERTIFICATE OF SERVICE

I, Bryan T. Veis, hereby certify that on February 24, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

<u>/s/  Bryan T. Veis</u>