# EX. 26

Page 1

1                    UNITED STATES DISTRICT COURT

2                     DISTRICT OF MASSACHUSETTS

3     - - - - - - - - - - - - - -x

4      ARKANSAS TEACHER      :

5      RETIREMENT SYSTEM,    :

6      et al.,               :

7          Plaintiffs,       :   CA No. 11-10230-MLW

8          v.                :

9      STATE STREET BANK     :

10     AND TRUST COMPANY,    :

11         Defendant.        :

12    - - - - - - - - - - - - - -x

13                                     July 6, 2017

14                                     Washington, D.C.

15

16    Deposition of:

17                    JAMES STANGELAND,

18    called for oral examination by Counsel to the

19    Special Master, pursuant to notice, at JAMS,

20    1155 F Street, Northwest, Suite 1150, Washington,

21    D.C. 20004, before Christina S. Hotsko, RPR, of

22    Veritext, a Notary Public in and for the District

23    of Columbia, beginning at 5:33 p.m., when were

24    present on behalf of the respective parties:

25



Page 6

Page 8

Page 7

Page 9

1  in --
2       MR. SINNOTT:  Let's leave it the way it
3  is.  As long as you can hear us, let's just go
4  with it.
5       THE WITNESS:  Okay.
6  BY MR. SINNOTT:
7       Q.  So go ahead, your responsibilities.
8       A.  Yeah.  Supervising the case; acting in
9  the best interest of the class, not just myself;
10  providing documents to Keller Rohrback; answering
11  any questions asked in relation to the case;
12  reviewing documents that were to be submitted and
13  making sure that I understood them; if I had
14  questions, asking questions; if I had comments,
15  adding my comments.  Yeah.
16       Q.  So is it fair to say you've played an
17  active role as part of your -- in your capacity as
18  class representative?
19       A.  Yes.
20       Q.  Let me direct your attention to Boeing's
21  company plan.  Are you a participant in the 401(k)
22  program?
23       A.  Yes.
24       Q.  And how long have you been involved in
25  that?

3 (Pages 6 - 9)

Page 10

1    A.  Since arriving at Boeing.  So yeah,
2  roughly September 2004.
3    Q.  And as part of your involvement in that,
4  have you participated in contributing money to
5  funds which were being traded in the foreign
6  exchange market?
7    A.  Yes.
8    Q.  And do you choose the funds that you
9  invest in?
10    A.  There are a variety of funds, and I can
11  choose where my money goes.  So yes.
12    Q.  And what information is provided to you
13  about foreign exchange funds that are being
14  traded?
15    A.  Foreign exchange transactions that take
16  place by those funds?  Is that what you mean?
17    Q.  Yes, sir.
18    A.  None.
19    Q.  Okay.  Do you receive information or have
20  you in the past regarding trading practices?
21    A.  Not that I'm aware of.
22    Q.  All right.  And prior to the State Street
23  case, had you ever been involved in a class action
24  litigation?
25    A.  No.

Page 11

Page 12

1  conversation, did you have any follow-up
2  conversations with other attorneys at Keller
3  Rohrback?
4    A.  Yes.  After that, I contacted Laura
5  Gerber.
6    Q.  All right.  And at some point did you
7  agree to become a class representative?
8    A.  I did.
9    Q.  And what did Keller Rohrback ask you to
10  do in your capacity as class representative?
11    A.  They asked me to supervise the case, to
12  act on the best interest of the class, to provide
13  documents to them, and to support the case in any
14  manner I could.
15    Q.  And did you see any downside in your
16  acting as a class representative?
17    A.  They assured -- well, I didn't believe
18  that there would be a problem with Boeing, and
19  they assured me that Boeing was legally not
20  allowed to have a problem with me doing this.  So
21  no.
22    Q.  And you have not received any
23  interference or pushback from Boeing, have you?
24    A.  None at all.
25    Q.  All right.  Now, did your law firm make

Page 13

1  any promises to you about the chances for success
2  in this litigation?
3    A.  No.
4    Q.  Did they promise you that you'd receive a
5  service award of any kind?
6    A.  No.
7    Q.  Did they promise results of any kind?
8    A.  Well, no.  I mean, they promised to
9  pursue the case.  I guess --
10    Q.  All right.  But they didn't promise you
11  that there was going to be a large settlement or
12  any kind of a settlement in the case?
13    A.  No.
14    Q.  And at some point in time, did you read a
15  civil complaint?
16    A.  The complaint that KR filed on my behalf?
17    Q.  Yes, sir.
18    A.  Yes.
19    Q.  All right.  And did you have any input
20  into that complaint before it was filed?
21    A.  I don't recall what my response to that
22  e-mail was, but I -- I read through it, and I
23  recall approving of it and signing it.
24    Q.  And had you provided factual information
25  to your law firm prior to that complaint being



**Page 14**

1  shown to you?

2      A.  Yes.  A good deal.

3      Q.  Were there any risks involved in suing

4  State Street, as far as you knew?

5      A.  Well, there was a risk that we wouldn't

6  win.

7      Q.  Okay.  And was there discussion as to the

8  identities of any of the other plaintiffs in the

9  case?

10      A.  I was made aware of who they were, I

11  believe.

12      Q.  All right.

13      A.  I mean, they were in the documents that

14  were filed.

15      Q.  All right, sir.

16        And let me ask you about attorneys' fees

17  in the case and any discussion you might have had

18  with Keller Rohrback.  At some point did you sign

19  a class representative agreement?

20      A.  I believe so.  Yes.

21      Q.  And do you remember whether that

22  agreement had any indication of hourly rates or

23  include information about what percentage would be

24  paid to the attorneys if the case was successful?

25      A.  It talked about percentage, I believe.

**Page 16**

**Page 15**

**Page 17**

1      Q.  All right, sir.  And that was with Judge

2  Wolf?

3      A.  Correct.

4      Q.  And did you attend any meetings with

5  other law firms besides Keller Rohrback?

6      A.  There was some in that courtroom.  But

7  besides that, I don't believe so.

8      Q.  And during the life of the case between

9  the time that you came on board as a class

10  representative and the settlement, were you

11  advised by the Keller Rohrback attorneys as to the

12  progress of the case?

13      A.  Yes.

14      Q.  And how would that communication take

15  place?

16      A.  I'd say primarily by e-mail but also via

17  several phone conversations.

18      Q.  And did you have any discussions with

19  those attorneys, as far as their litigation

20  strategy?

21      A.  Well, they kept me apprized of what they

22  were doing and the status of the case.  I didn't

23  dictate strategy.  That's their department.

24        (Interruption in the proceedings.)

25        MR. SINNOTT:  Just a moment.  We're



Page 18

Page 20

Page 19

1  this matter?
2      A.  I can guess, but I'm not super
3  comfortable guessing.
4      Q.  You can give us a range if that would be
5  better.
6      A.  So here -- this was one of my major
7  failings as an engineer.  I would estimate the
8  hours I thought it would take me to do a project,
9  and invariably it would be far, far longer.
10     Q.  It's kind of how we plan depositions.
11     A.  If I'm going to -- if you want a guess, I
12  can give you a guess, but I'm uncomfortable with
13  it.
14     Q.  No, we don't want a guess.  But thank you
15  for your candor.
16         Do you think it was more than 50 hours or
17  less than 50 hours?
18     A.  I think it was probably more.
19

Page 21

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 22



Page 24

1  duties and responsibilities and what you actually
2  did in the course of your role as class
3  representative.
4      A.  Sure.  Well, it started with contacting
5  KR.  And then they wanted to see if I would be
6  suitable as a class representative, which required
7  looking at some documents that I provided them.
8  We pretty quickly established that it looked like
9  the Stage 3 case did, in fact, apply to Boeing and
10  to myself.
11          They filled out a draft complaint, I
12  guess you would call it.  I read through that,
13  signed it.  A little bit later we amended it.  I
14  read through that, signed it.
15          I continued to provide more documents
16  from my retirement plan.  I could get up to two
17  years' history online and just get that in PDF
18  form and e-mail it off to them, but we wanted to
19  go back farther than that.  I had to submit a
20  request for hard copies, which I did.  Got those,
21  supplied that to Keller Rohrback.
22          Had the interview with the FBI and
23  Department of Labor.
24          At that point, I believe we entered into
25  the mediation, which was a span of roughly three

Page 23

Page 25

1  years.  And KR kept me apprized of what was going
2  on, but that was definitely a decreased level of
3  activity over those three years as opposed to the
4  initial three months, where it was pretty
5  comparatively hectic.
6          And then once all the parties involved
7  had agreed to the proposed settlement, Keller
8  Rohrback provided me with that.  I read through
9  that and indicated my approval and submitted that
10  to the court.
11      Q.  Thank you, sir.  That's helpful.
12          When did you first learn about the issue
13  of double -- duplicate billing in the fee
14  petitions?
15      A.  It was after the case was settled.  I was
16  made aware of it by Laura Gerber.  I could get an
17  exact date for you if I were to go through my
18  e-mail, but I don't know it off the top of my
19  head.
20      Q.  Did you read a newspaper article?
21      A.  She provided -- I can't remember if she
22  provided a link or a copy of it.  But yes, I did.
23      Q.  And what was your reaction?
24      A.  Looks bad.
25      Q.  Okay.  And any recommendations for the

7 (Pages 22 - 25)