# EX. 28

1              UNITED STATES DISTRICT COURT

2               DISTRICT OF MASSACHUSETTS

3      - - - - - - - - - - - - - -x

4      ARKANSAS TEACHER      :

5      RETIREMENT SYSTEM,   :

6      et al.,              :

7          Plaintiffs,      :   CA No. 11-10230-MLW

8          v.               :

9      STATE STREET BANK     :

10     AND TRUST COMPANY,   :

11         Defendant.       :

12     - - - - - - - - - - - - - -x

13                              July 6, 2017

14                              Washington, D.C.

15

16     Deposition of:

17                    LYNN L. SARKO,

18     called for oral examination by Counsel to the

19     Special Master, pursuant to notice, at JAMS,

20     1155 F Street, Northwest, Suite 1150, Washington,

21     D.C. 20004, before Christina S. Hotsko, RPR, of

22     Veritext, a Notary Public in and for the District

23     of Columbia, beginning at 2:35 p.m., when were

24     present on behalf of the respective parties:

25



**Page 10**

1 being managing partner is an elected position, and
2 I'm happy to say or I'm unhappy to say I've been
3 the managing partner ever since.
4     SPECIAL MASTER ROSEN:  Were you elected
5 each time by acclamation?
6     THE WITNESS:  Yes.  There's a period --
7 we have a rotating executive committee to terms.
8 And the managing partner currently serves a
9 three-year term.
10 BY MR. SINNOTT:
11     Q.  And, Lynn, have you been involved in
12 other class action representations?
13     A.  Yes.  Since I came to Keller Rohrback, I
14 would say my career since then -- at the beginning
15 I did some white-collar criminal defense work,
16 some other types of actions.  But since around
17 1991, I have done probably 95 percent -- I
18 wouldn't say all class actions -- class actions
19 and contingent fee commercial litigation.
20     In fact, currently, I would say in the
21 last ten years the complex litigation department,
22 by revenue, has been about 50 percent class
23 actions and 50 percent commercial contingent fee
24 litigation, direct actions on behalf of financial
25 institutions, other types of large companies.

**Page 11**

1     Q.  All right.  And could you give us an idea
2 of the types of cases that you've -- class action
3 cases that you've worked on?
4     A.  I've personally been involved all the way
5 in the way from environmental cases, such as the
6 Exxon Valdez oil spill, others of those types, a
7 large number of ERISA cases.  In fact, I think the
8 firm Keller Rohrback -- the firm and some of my
9 partners and I have probably been involved in
10 almost every major ERISA class action probably in
11 the last 15 years.
12     We also do a large amount of anti-trust,
13 torts, employment-type cases, mortgage backed
14 securities.  So many of those cases they make my
15 head spin.  But generally a pretty good overview
16 of the type of commercial and class action cases
17 going on in the country.
18     SPECIAL MASTER ROSEN:  Those are all on a
19 contingent basis?
20     THE WITNESS:  Those are all either on a
21 contingent -- as I said, about 50 percent would be
22 contingent fee, what we call an alternative fee
23 arrangement, or class actions.  In fact, over the
24 last ten years, you know, one of the other firms
25 in our building we do and have done work with is

**Page 12**

(redacted)

**Page 13**

1     THE WITNESS:  In the BNY case we were one
2 of the ERISA counsel.  In fact, Brian McTigue was
3 one of the ERISA counsel.  The non-ERISA counsel
4 included Lieff Cabraser and Kessler Topaz.
5 BY MR. SINNOTT:
6     Q.  Lynn, could you give us an overview of
7 your involvement in the incident case, the State
8 Street Trust case?
9     A.  Yes.  My involvement in this case goes
10 back to originally we were involved in a prior
11 State Street case that I think we had discussed
12 earlier this morning.  That was before Judge
13 Howell in the Southern District of New York, it
14 had to do with their bond funds and mortgage
15 backed securities.  That case ended in -- my
16 recollection is the settlement was in the fall of
17 2009 and final approval hearing was in 2010.
18     In the fall of 2009, the attorney general
19 for the State of California unsealed a
20 whistleblower case that they had dealing with
21 State Street FX cases.  At that point we started
22 looking at it, investigating the State Street
23 case.  We were gathering evidence.  We talked to
24 different pension funds, et cetera, including the
(redacted), gathering evidence.  We



Page 16

1  Did they -- let me just put it to you directly.
2      THE WITNESS:  All right.
3      SPECIAL MASTER ROSEN:  Did they approach
4  you and ask you to become involved in this case
5  because of some concern about the case or concern
6  about the law that this case could make or any
7  other reason?
8      THE WITNESS:  Let me answer it in a very
9  delicate and direct way.
10      SPECIAL MASTER ROSEN:  This isn't the
11  time to be modest.
12      THE WITNESS:  The Department of Labor had
13  good professional relationships with us, with me
14  and some of the other lawyers.  They thought we
15  did a good job and knew the law.  And this was a
16  case that some people at the Department of Labor,
17  lawyers, were concerned about.  And that they --
18  some of them expressed to me that they wished "too
19  bad you guys weren't involved."  Something like
20  that.
21      I'm being sensitive because the
22  Department of Labor does not direct private
23  counsel to file cases.
24      However, the Department of Labor has a
25  limited budget, and they're very careful about

5 (Pages 14 - 17)



Page 22

1 was a decision by the mediator or a decision -- or
2 was it done at the request of the consumer class
3 representatives?
4        THE WITNESS:  Let me tell you factually
5 what I know, and then I won't speculate, which I'm
6 not supposed to do.
7        Factually, I know that Lieff Cabraser had
8 no problem, or at least Bob Lieff had no problem.
9 Thought it would be helpful.
10        I didn't know -- had no conversations
11 with the Thornton firm, so I didn't know.  And I
12 didn't know what Larry Sucharow thought, but had
13 no great reason to believe that he was against it.
14        I do know that there was some concerns --
15 there might have been some concerns by his client,
16 but that's speculating.
17        If I had to guess, my issue was that
18 there was concerns at State Street.  If I
19 speculate greatly from discussions that day and
20 subsequent days, I think if you graft how old the
21 lawyer was, the younger lawyers thought separate
22 silos were a great idea, and the older lawyers
23 thought, you know, probably if this is going to
24 get done, it's going to be a grand bargain.
25        And when I -- and the mediator -- there

Page 23

Page 24

Page 25

20        So I think those two pieces.  I will also
21 say that knowing the mediator as well as I do, I
22 must have had 25-some mediations, probably more,
23 with him.  There are some mediators that would
24 have taken the other approach.  But that doesn't
25 surprise me.

7 (Pages 22 - 25)

Page 26

1 BY MR. SINNOTT:
2    Q. Did you and Jeff Rudman have a prior
3 relationship as well?
4    A. We did. We had been involved in cases
5 together. We had appeared at conferences
6 together. We had a purely professional
7 relationship, but great respect for each other.
8 So that was not unknown.
9       You have to understand, too, is that
10 there was -- you know, the Arkansas case, they had
11 filed their case, they had been litigating for a
12 while. They had survived a motion to dismiss.
13 And then suddenly these ERISA folks come along.
14      And I think if you'll just look at the
15 relative size of the cases, the ERISA case volume
16 we thought was between 5 and 9 percent. So, you
17 know, if it they were the United States, we were
18 Lithuania. You know? So it doesn't totally
19 surprise me.
20      And, you know, some of them -- there's
21 been some discussion, oh, the ERISA people would
22 take their case. I think as Mike Lesser kind
23 of -- you know, his view in talking to him, he was
24 always very helpful because I thought -- he
25 thought we were the tail on the dog. And the

Page 27

[redacted]

Page 28

1 trustee, in the last case, the last State Street
2 case. Called them up to tell them about the case
3 and see if they were interested.
4       And as an aside, it was very important,
5 we thought, to add a plan to the case. Because I
6 mentioned before that there were three entities
7 that could have standing to bring a case: A
8 planned participant, a trustee on behalf of the
9 plan, or the Department of Labor.
10      This case, I thought, was a no-brainer on
11 class certification for ERISA, bringing it as a
12 single case. The risk came whether you could
13 bring what's called a class of plans case. Was
14 it -- could you bring a case where State Street
15 was the fiduciary for a plan on behalf of all
16 plans that State Street was the fiduciary for.
17      And that's an area of law that has
18 developed over time. We actually, and Rebecca, I
19 think have had those cases and were part of
20 helping develop that law, have gotten courts to
21 certify those cases.
22      So that was to me the class certification
23 risk here. And the way to reduce that risk was to
24 do that.
25      I will say, it is not easy to find a

Page 29

1 plan, an ERISA plan, who is willing to be a class
2 rep because they tend to be conservative or, you
3 know, they're busy, they're doing other things.
4 And I will say usually it costs them more money
5 than they ever will recover. And one of the
6 issues is a lot of them will say if it costs us
7 money, how can we justify to the plan as a
8 fiduciary that we're spending their money to
9 recover something for the plan, might be a small
10 amount of money.
11 BY MR. SINNOTT:
12    Q. And how did you come to represent
13 Mr. Stangeland in the case?
14    A. He was an acquaintance, friend, of a
15 person by the name of Ben Gould, who is a lawyer
16 at the firm. Which I should actually alter my fee
17 submission because the table that has all the
18 lawyers, it incorrectly lists Mr. Gould as a
19 paralegal. And he actually is an accomplished
20 lawyer, clerked for, I think, Tenth Circuit and
21 also on the Ninth Circuit.
22      But he told them about the case. At
23 least it was reported to me that he was

8 (Pages 26 - 29)



Page 30

Page 32

1 exempt of what's considered a prohibited
2 transaction violation. In other words, you cannot
3 take money from the client and stick it in your
4 own pocket, you know, if you're advantaging
5 yourself. I guess to put it -- break it down as
6 simple as possible.
7        And in this case, the reason why it's a
8 very good claim for us, and from the very
9 beginning the beat on State Street about that was
10 that they actually -- at least our theory was if
11 they were engaged in all of these transactions,
12 they had to provide their best most advantageous
13 pricing to the ERISA plans.
14        So we basically could just go through and
15 figure out who did they give a better -- who got a
16 better deal, and we should get that same deal for
17 fiduciary. It makes damages calculations easy and
18 different than a customer class case.
19        The customer class, 93A, at least as I
20 understand it, is a very powerful tool. It has
21 challenges, which are class certification
22 challenges. You know, it -- it's based as
23 misrepresentation, sort of fraud-like claims,
24 which, you know, based on issues where you have
25 different contracts can be a challenge. But not

Page 31

Page 33

1 unlike a lot of those cases.
2        So the differences in the two cases were,
3 on the defense side, class certification was huge
4 for the customer class. And damages, how to
5 calculate them.
6        On the ERISA side, we had different --
7 you know, we had different issues we had to look
8 at and overcome. We had our class of plans issue,
9 whether they were a fiduciary, those types of
10 things. Which flows into that one of the
11 discussions of the mediation, to understand, was
12 when we started mediating, we didn't know whether
13 this was going to be a one-month or two-month or
14 two-session deal.
15        First, we didn't really know how long it
16 would take until we went and spoke -- talked to
17 Judge Wolf. And, in fact, we had an in-chambers
18 session in which there was a court reporter, and
19 there was a record of that. The transcript is
20 floating around. In which we told him our pitch.
21 And this was a joint pitch of State Street, ERISA,
22 and customer class. To basically say let's put
23 the litigation on hold and discovery on hold and
24 see if we can proceed in mediation.
25        And the pitch to him is we would not

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400



Page 34

Page 35

1 say, the Southern District of New York.  You had
2 the Department of Labor.  One difference is the
3 Boston field office is very active.  And certain
4 other places you would have the main office of DOL
5 would be more in charge of the litigation.  In
6 Boston it was the Boston office.
7        So you had those issues.  You had to get
8 ours settled.  It was complicated because if you
9 were State Street, at least the pitch we made was
10 it was cheaper for State Street and more
11 beneficial for all the private plaintiffs if we
12 could settle everything at once.  That being the
13 private plaintiffs could get more money in
14 settlement and State Street would have to pay
15 less.  Because when you settled separately,
16 there's all this money lost.
17        For example, the Department of Labor has
18 a penalty that if the Department of Labor settles
19 the case, they take 10 percent of the settlement
20 amount, that has to go as a penalty into the
21 Treasury.  It doesn't even go to victims or
22 anything.  It goes right into the general treasury
23 to buy bombers and bombs and stuff, whatever.
24        So in all of these cases, if you're able
25 to resolve the case in the private sector with the

Page 36

1 Department of Labor signing off or issuing a small
2 penalty, you save 10 percent right there.
3        You also have issues where, as you know,
4 there's huge litigation costs.  I mean, this
5 case -- you know, there was a fee awarded.  But
6 even out-of-pocket costs in a case like this can
7 be huge.  So there's settlement issues.
8        Then litigation.  It's an expensive case
9 to litigate.  In a lot of these cases, whether you
10 have, you know, a $10 million recovery or 60
11 million or 300 million, to some extent you have to
12 do a lot of the same work.
13        SPECIAL MASTER ROSEN:  Let me ask a
14 question.  On the issue of who was instigating
15 having the ERISA folks put on the sidelines at the
16 beginning of the mediation, you thought maybe it
17 was State Street.
18        THE WITNESS:  Well, I thought it was the
19 mediator.  But as to why -- because the mediator
20 said he spoke to all the parties, and that was his
21 conclusion.

17        Now, as to -- you know, within that
18 organization who wanted it to work and who didn't?
19 I have no clue.
20 BY MR. SINNOTT:

Veritext Legal Solutions
212-267-6868                    www.veritext.com                    516-608-2400



Page 38

Page 40

Page 39

Page 41

1 fiduciary for all the ERISA plans or none.
2     Q.  And were there any other hurdles or risks
3 that you recall?
4     A.  No.  I thought the biggest risk was,
5 again, there's also an issue of how to measure
6 damages.
7         And I would say that our analysis was
8 pretty accurate in the sense of, as we moved
9 through the case and towards the end, we actually
10 had lots of discussions with the Department of
11 Labor.  And they cross-examined us about what our
12 theories were, what we thought our risks were,
13 what the chances of success, how they evaluated
14 the case, how we evaluated it.
15         And they did their evaluations
16 separately.  They had the documents that were
17 produced or produced to them.  And they did their
18 evaluation and damages.  And then, you know, at
19 the end, before they could sign off, they had to
20 agree that the settlement was adequate and they
21 accepted our analysis.
22     Q.  And with respect to the measure of
23 damages, what was the total damage figure for
24 ERISA as far as you can recall, ERISA
25 participants?

11 (Pages 38 - 41)

Page 42

1    A. I don't recall.
2    Q. Okay. So the --
3    A. I mean, I will say that, you know, I
4 thought -- I was going to say that it was well --
5 I mean, I think the recovery we received on behalf
6 of the ERISA participants I want to say was more
7 than 20 percent of what the damages we thought
8 there was for the ERISA participants.
9    Q. All right. So with all of these
10 challenges in mind, what was the ERISA strategy
11 with respect to litigation and mediation?
12    A. Well, twofold. I think one thing to
13 understand that seems to -- from the questions
14 that have been asked that people don't quite
15 recognize is the ERISA case is not part of the
16 Arkansas case. You know, the Arkansas case was
17 filed. It was before Judge Wolf. There was an
18 order for interim lead counsel that covered that
19 case. There were no ERISA claims in it. It had
20 nothing to do with it.
21    Also before Judge Wolf was the Henriquez
22 case. And then, subsequently, the Andover case is
23 filed.
24    There also was never an order appointing
25 leadership in the ERISA cases. So sort of the

Page 43

1 procedure, the steps were the ERISA case, the
2 lawyers organized themselves. You know, we had
3 two cases. We had known each other -- I knew
4 Brian. I did not know Carl before this case. And
5 I had known some of the prior counsel that were on
6 the ERISA case with Brian before. A North
7 Carolina firm. We'd done work with them before.
8    Q. Is that Richardson Patrick?
9    A. Richardson Patrick. Right.
10    You know, Michael Bradley, we'd had
11 several cases. So we knew lawyers there. But
12 there were --
13    Q. Michael Bradley?
14    A. Brickman, sorry. I didn't know Michael
15 Bradley. But they were gone by the time we got
16 involved.
17    Q. Describe, Lynn, if you would the
18 coordination between ERISA counsel and customer
19 class, or the big three. Was there any tension
20 involved in the relationship?
21    A. Well, I don't think there was any
22 tension, at least from my viewpoint, with any of
23 the ERISA on the customer class side. I thought
24 they were all perfectly professional.
25    There was a difference, and I think this

Page 44

1 has to back up to the way State Street viewed it.
2    When we agreed to go into the mediation,
3 the understanding was that they would provide
4 certain documents to customer class, and we would
5 not have access to those. And we were provided
6 certain documents on the ERISA side that I don't
7 know whether the class received. The reason being
8 that we, of course, think about it, had not
9 survived a motion to dismiss. We're in the
10 process of amending our complaint. And,
11 therefore, we got -- we negotiated with State
12 Street to get the documents we got that we needed
13 for -- you know, for settlement purposes.
14    On the other hand, the customer class
15 received all kinds of documents; for example,
16 class certification was an issue for them. And in
17 our discussions with State Street, they said, " 
21    So we had separate confidentiality
22 agreements at the beginning. We did not have
23 access to those documents.

Page 45

1    So we started by taking the documents
2 that we received from State Street. And we had
3 our own separate database.
4    Now, I knew that -- I knew or I assumed,
5 or don't remember what, that they had a database
6 or they were using something. But we didn't have
7 access to that.
8

19    And I think that was the history of why
20 there was no -- you know, we didn't receive
21 write-ups of any work they had done
22 because we couldn't see those documents at State
23 Street. And even though they produced to us
24 the -- some of the same stuff, I mean, we did
25 receive the documents from California. We

12 (Pages 42 - 45)

Page 46

1 received, for example, all the documents produced
2 to the Department of Labor. I don't know if
3 Arkansas got those documents or not.
4       But it was State Street kept those two
5 silos separate so that they could settle with one
6 and not the other.
7       And, in fact, all the way up to the final
8 settlement, there was the threat that we would not
9 settle or that they would be settling without us.
10 And I guess one point I differ a little bit with
11 Carl is we had discussions all the way to the end,
12 until the Department of Labor agreed to sign off,
13 about the possibility of them going ahead and
14 litigating. And we, in fact, kept the option open
15 that the customer class could settle without us
16 and we could not settle -- we would go settle --
17       SPECIAL MASTER ROSEN: You kept the
18 option open. But did State Street keep the option
19 open?
20       THE WITNESS: Oh, yeah. Well, State
21 Street -- it's interesting when you get into the
22 final negotiations when people say things and they
23 mean something different.
24       State Street made it clear that they were
25 not bound to settle with anyone unless it was a

Page 48

1 now, it was going to be a long war. A long war
2 with State Street.
3       SPECIAL MASTER ROSEN: So, Carl, what you
4 heard seemed to imply that one of the important
5 contributions that the ERISA plaintiffs brought to
6 the table was in bringing the Department of Labor
7 into the settlement under the larger tent and
8 thereby paving the way to a global settlement.
9       THE WITNESS: Yes. And I think that's
10 absolutely true. And I think that was also --
11       SPECIAL MASTER ROSEN: But you seem to be
12 now be backing away from that --
13       THE WITNESS: I'm not backing away. I
14 guess what I quibble with is the $300 million
15 figure. And I'm being careful about it. It was
16 not like there's $300 million and now you have to
17 divide it. The division and allocation amount
18 wasn't set in stone until all the pieces were in
19 play. 60 million, 300 million, it was always a
20 possibility that we could walk away.
21       SPECIAL MASTER ROSEN: From whose
22 perspective? Yours or State Street's? What I'm
23 getting at is this. Carl seemed to say that a
24 value that was added to the ultimate settlement by
25 the ERISA plaintiffs was bringing the Department

Page 47

Page 49



Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 50

1    SPECIAL MASTER ROSEN:  Exactly my point.
2    THE WITNESS:  All of those parties.  And
3  a lot of work went into getting everyone on board,
4  getting all those parties to agree.
5    And in the allocation, there was some of
6  the government settlements recognize the amounts
7  that State Street had paid in the private
8  settlements as counting towards the government
9  settlement.
10    SPECIAL MASTER ROSEN:  Were you the one
11  who was principally the liaison during the
12  mediations and settlement talks to the Department
13  of Labor.
14    THE WITNESS:  Yes.  Now, Carl was very
15  involved.  And, you know, as it went on I tried to
16  have --
17    SPECIAL MASTER ROSEN:  But it sounded
18  like you had the relationship -- the pre-existing
19  relationship --
20    THE WITNESS:  I had the pre-existing
21  relationship.  And there was two Departments of
22  Labor.  There was the Department of Labor
23  headquarters and there was the Department of Labor
24  Boston office.
25    SPECIAL MASTER ROSEN:  And did each have

Page 51

1  a secretary of war and a secretary of defense?
2    THE WITNESS:  And I handled almost all of
3  the discussions with DOL office in Washington,
4  D.C., and Carl and I were involved in dealing with
5  the Boston DOL office.
6    And just so you know what the involvement
7  is, we had to satisfy them that we had fully --
8    SPECIAL MASTER ROSEN:  Compensated --
9    THE WITNESS:  -- compensated and
10  analyzed.  And also that we were prepared to
11  continue litigating the case if we couldn't --
12  there wasn't going to be a settlement.  That we
13  weren't just not selling out.  We had done our
14  work and were ready to go.
15  BY MR. SINNOTT:
16    Q.  Did you have discussions with the big
17  three about strategy or strengths and weaknesses
18  of the case that included discussions of the DOL
19  component?
20    A.  Yes.  I mean, I think that at least my
21  view with the Thornton, Lieff, and Labaton firms
22  were that we were selling to State Street that we
23  could settle ours and do our best to deliver the
24  government with us.  I'm being careful because the
25  government agencies decide on their own.  But that



Page 56

1  was an ERISA fiduciary, the answer is no.  It was
2  not possible for them to represent them because
3  their whole argument was built on they were
4  covered by 93A.  And I think there's a very high
5  chance it would be preempted.
6       I guess I would give you as a comparison.
7  In the customer -- in the company stock ERISA
8  cases, you would have securities cases, and the
9  securities cases would also represent ERISA plans.
10  And there would be ERISA lawsuits on behalf of the
11  same plan.  And that's because it was a federal
12  statute for securities, federal statute for ERISA,
13  and ERISA did not preempt as a federal statute.
14       In this case, I think the law is crystal
15  clear that the ERISA statute would preempt this,
16  in this case, the Massachusetts 93A.  But that was
17  my opinion.  And I don't think the customer and
18  class lawyers necessarily agreed with that.
19       So if -- so to the extent that that was
20  even a risk, it was difficult for you to argue to
21  represent both theories.  Because if you're
22  representing both of them, you do not want the
23  non-ERISA plans to be compensated richer than the
24  ERISA plans.
25       So I think they would have separate

Page 57

1  representation.  If the cases were consolidated,
2  Judge Wolf could have cured it by having a
3  subclass that had separate ERISA counsel
4  representing them.  And they could have been, you
5  know, litigated together in a consolidated action.
6       In this case, that didn't happen in part
7  because we went off into the mediation, and that
8  was not the bargain that State Street bargained
9  for.
10  Q.  Let me take you to the settlement, Lynn,
11  and ask you if you thought that the big number,
12  the $300 million, was fair and reasonable.
13  A.  Yes.
14  Q.  And beyond that, were you part of the
15  discussions with respect to the ERISA fee
16  allocation?
17  A.  Yes.
18  Q.  Describe those conversations.  I'm
19  assuming it's approximately 2013.  And how those
20  numbers or that number was arrived at back then.
21  A.  Well, there were actually two fee
22  discussions.  One was the ERISA counsel to divide
23  the fee a third, a third, a third, between the
24  three groups.  The original discussions were 50,
25  then 60/40, you know.  And my thought was that we

15 (Pages 54 - 57)

Page 58

1 had filed our case more recently and that Brian
2 and Carl, you know, were agreeing that we thought
3 we would do the cases equally in the sense of
4 pooled but more equally.  And, therefore, a third,
5 a third, a third seemed to be fair.
6      I guess I also believed that that
7 agreement and the subsequent agreement was not
8 meant to take away the power from Judge Wolf.  You
9 know, I've had judges explain to me on numerous
10 occasions that in a class action the judge is in
11 charge of the fees and that whatever agreements
12 the lawyers have, if the judge doesn't agree to
13 them, you have no power.  And that's -- you know,
14 we made sure that -- at least that was my view
15 going into it.
16      So that was the first agreement with
17 Henriquez counsel.
18      And then in 2013, over the course of time
19 I had had some discussions with Bob Lieff that,
20 you know, it might make sense for us to try to see
21 if we can come up with some tentative agreement on
22 how to divide the fee between the ERISA case and
23 the customer class case.  And I guess it was
24 more -- in my view it was important not to have
25 the lawyers fight with each other, or at least be

Page 59

1 a greater chance of getting them to cooperate if
2 they didn't think if affected what fees they
3 received.
4      Q.  Did trading volume play any role in that
5 second discussion?
6 

14      And, therefore, he was constantly harping
15 back to me that it was a small piece.  And we
16 tried to quantify that.  And my recollection was
17 that he thought it was 9 percent -- between 5 and
18 9 percent, something like that.  And the
19 discussions with the customer counsel was that we
20 would receive 9 percent, which, at least my
21 understanding, is what the ERISA portion of the
22 case was.  And that at least my pitch was that we
23 would be worth every penny of it and that we
24 should not fight, we should work together and we
25 could make the pie bigger.  It would cost them

Page 60

1 nothing.
2      Q.  And so ultimately you made a practical
3 decision?
4      A.  We made a practical decision.  And they
5 were very -- it was very easy, and they were
6 professional about it.
7      Q.  And who participated in that discussion
8 with respect to the 9 percent that was arrived at?
9      A.  You know, I think that ultimately, at the
10 end, it was agreed to by -- there's agreement and
11 signatories on it.  I think it was, you know,
12 Thornton.  I forgot who at the Lieff firm signed
13 it.  And I think Dan Chiplock and Larry Sucharow
14 and the three ERISA firms.
15      Q.  And ultimately, in 2016, that 9 percent
16 went to 10 percent, correct?
17      A.  It did.
18      Q.  Were you part of that third meeting where
19 that was discussed?
20      A.  It wasn't necessarily a meeting.  I was
21 part of that discussion.  In fact, I think I was
22 the only one in the discussion from the ERISA
23 side.
24      There was a mention of it by Bob Lieff.
25 Also, Larry Sucharow mentioned it to me and I

Page 61

1 think Gary Bradley, that they were thinking of it.
2 I can't recall who mentioned it in what order.
3 And I think -- at least it was represented to me
4 that they thought that I had done a great job
5 getting the Department of Labor involved.
6      MR. SINNOTT:  Let's go off the record.
7      (Discussion off the record.)
8      THE WITNESS:  Going back to it, I had
9 discussions with those three lawyers.  I think it
10 was instigated by them that they were thinking
11 about this.  I talked about, you know, the time I
12 might --
13      SPECIAL MASTER ROSEN:  This was at their
14 own initiative?
15      THE WITNESS:  I think so.  It might have
16 been harping for a while about, you know, this
17 certainly didn't work out so well and that, you
18 know, at least I personally was going to end up
19 with a negative lodestar.
20      But for whatever reason, they said that
21 they were thinking of giving the ERISA folks an
22 additional percent.  They thought we had done a
23 great job, been great team players.  And I said to
24 them rather quickly that, you know, if they gave
25 us an additional percent, it should be poured into

16 (Pages 58 - 61)



Page 64

1     SPECIAL MASTER ROSEN:  That doesn't
2 really answer the question.
3     THE WITNESS:  I guess in my view was, you
4 know, in the perfect world, we would have
5 received --
6     SPECIAL MASTER ROSEN:  Something
7 commensurate with what the ERISA trading value
8 turned out to be?
9     THE WITNESS:  Correct.  Or you can say,
10 put it differently, should we receive a lower
11 multiplier than certain other folks?
12 BY MR. SINNOTT:
13     Q.  All right.  Let me go back, Lynn, to the
14 issue of document review and how it was managed.
15 Did you have any conversations with the big three
16 with respect to how documents received from State
17 Street would be reviewed and shared or processed?
18     A.  None.  And part of that was because we
19 were not supposed to be working with them on
20 documents.
21     Q.  What do you mean you were not supposed to
22 be -- because of the protective order?
23     A.  Yes.  State Street had produced documents
24 separately in different groups of documents, and
25 they had their case.  And at least when the case

Page 65

1 started out, it was -- it was important for State
2 Street not to have us take documents that we
3 didn't have access to to be able to use to prepare
4 an amended complaint.
5     SPECIAL MASTER ROSEN:  In the end,
6 though, would it not have been more cost efficient
7 and resource efficient to have been able to share
8 document production and platforms with the
9 customer base, with the customer counsel?
10     THE WITNESS:  I think the answer would be
11 yes, but that's totally unrealistic, for the same
12 reason why in most cases the defense firms don't
13 share their platform with the plaintiff's firms.
14 I mean, it would be more efficient if the defense
15 and the plaintiff's counsel had one set.
16     But when you get into confidentiality
17 issues and work issues and everything else, no one
18 will do it.  Because if they settle their case and
19 it's their platform, our documents disappear.  And
20 you can set them up on databases so that they are
21 somewhat separate --
22     SPECIAL MASTER ROSEN:  I was just going
23 to say, you can --
24     THE WITNESS:  -- but that is difficult.
25 Then you get into the issue of what database

17 (Pages 62 - 65)



Page 73

1 attorneys.  Staff attorneys is kind of an odd
2 word, which I'm not sure what it means.  You know,
3 some people say not partnership track, which I
4 always laugh because if you take Sullivan and
5 Cromwell, and you say what is a non-partnership
6 track, it's somebody who leaves before they become
7 partner.
8      But we just -- put it a little
9 differently.  All the attorneys who worked on this
10 case were, I guess I would say, regular attorneys
11 who --
12      SPECIAL MASTER ROSEN:  Employees of the
13 firm?
14      THE WITNESS:  Employees of the firm,
15 appear on our website, listed by our malpractice
16 insurance, have business cards.
17 BY MR. SINNOTT:
18      Q.  Received W-2s?
19      A.  Received W-2s, you know, et cetera.
20 Everyone on here was salaried, you know, through
21 the --
22      SPECIAL MASTER ROSEN:  That was my next
23 question.  Were any of the attorneys that worked
24 on the document review paid by the hour?
25      THE WITNESS:  No.  And we didn't have --

19 (Pages 70 - 73)



Page 74

1 I mean, we didn't have -- we don't separate it
2 that way.  We had -- all of the attorneys who
3 worked on the case were regularly working in the
4 firm on, you know, other types of cases.  So there
5 were no difference.
6       The staff attorney label is, you know,
7 more specific to different law firms, I've found.
8 I have to say, after doing this for 15 years and
9 being lead counsel in lots of cases, they have all
10 kinds of different titles.  To me, the big issues
11 are, you know, are they employees, are they not
12 employees?  If they're not employees, are they
13 contract attorneys?  And, you know, if we're going
14 to take a break, we can get into it afterwards,
15 but there is lots of controversy amongst the
16 judiciary about contract attorneys and what that
17 means.
18 BY MR. SINNOTT:
19    Q.  Okay.  And I think you already answered
20 this, but is it fair to say that there was no
21 exchange of hot documents or highly relevant
22 documents between the ERISA firms and the big
23 three?
24    A.  No.  I will say we did not violate the
25 confidentiality orders.

Page 75

1    Q.  All right.
2    A.  There was a period of time where they got
3 relaxed somewhat.  One of the issues was -- at
4 least in my view was if State Street showed us a
5 document in a mediation, it was fair game for us
6 to show it to each other.
7    Q.  And did that happen in the mediation?
8    A.  Yeah.  That happened.  Or we would have
9 times with Bill Paine -- you know, I'd ask him,
10 you know, "Can I share this?"
11    Q.  Who were the key players during the
12 mediations that you were involved in?
13    A.  Well, Mike Lesser was very involved with,
14 you know, factual issues.  I would say that the
15 active negotiators were, you know, Larry Sucharow,
16 Bob Lieff, Dan Chiplock, Mike Thornton, Gary
17 Bradley, to you know -- but I would say on -- the
18 leading spokesperson on the customer class I think
19 was Larry and Bob Lieff to some extent.
20    Q

Page 76

1
2    Q.  Did any of the ERISA team have tensions
3 with the customer class lawyers?
4    A.  I think people -- I think people handle
5 their frustrations in different ways.  You'll have
6 a chance to hear Brian later.  I think that Brian
7 legitimately was frustrated sometimes by the
8 customer -- some customer class people.  You know,
9 the whole issue about whether they represented the
10 ERISA class or not.

Page 77



Page 78

Page 79

1 have an active program depending on who currently
2 is the Secretary of Labor is more robust or less.
3 That's mainly involved at the appellate level.
4 They are somewhat involved at the district court
5 level.
6         They monitor cases like this to see
7 what's going on as it go on, check in with the
8 counsel to find out.  And mainly it's a warning
9 system.  If they think the case is going off track
10 where people are making arguments that they
11 believe are against the proper development of
12 ERISA law, they will step in.
13         So they very much care not only about the
14 amount of money, but they care about, you know,
15 protecting the integrity of the law.
16     Q.  And what role did you play, Lynn, in
17 conducting liaison with the various government
18 agencies during the life of this case?
19     A.  I think -- well, I was looked upon by the
20 participants in the mediation, as that was one of
21 the roles I took on and that I, you know, carried
22 out.
23     Q.  Did any of the other plaintiff attorneys
24 have relationships or histories with federal
25 government agencies?

Page 80

1     A.  Yeah.  Brian, you know, talks with the
2 Department of Labor.  Carl in this case, you know,
3 got involved with the Boston DOL office.  I mean,
4 the amount of work that it took to bring along and
5 satisfy the Department of Labor, you know, was
6 quite large in this case.  They were -- they
7 wanted to understand everything, and they were
8 just not going to pass on it.  Their view was they
9 did their own investigation, we did our
10 investigation, and they wanted to make sure that
11 the work we had done was proper and that the
12 settlement was adequate.
13     Q.  All right.  Did any of the other, to your
14 knowledge, plaintiff's attorneys have
15 relationships with the government?
16     A.  With the other units in the government?
17     Q.  Yes.
18     A.  Yeah, I think --
19         SPECIAL MASTER ROSEN:  Or DOL.
20 BY MR. SINNOTT:
21     Q.  Or DOL.
22     A.  Or DOL.  In this case I think that the
23 Thornton firm was involved in discussions with the
24 Boston DOJ -- you know, AG's office.  There
25 were -- I know the Lieff firm had discussions, I



Page 81



Page 89

1 most of the larger firms, we have a computerized
2 system. Rates are put in for each department for
3 each timekeeper. Rates are reviewed every year.
4 And, you know, whether it's in December or
5 January, any adjustments are made. Whenever you
6 record your time, it goes into the system and it's
7 calculated based upon the -- you know, you can hit
8 historical lodestar or you can hit current rates,
9 what it is.
10      In I would say 95 percent of the cases
11 I've ever been involved in, when judges have asked
12 for a common fee petition for your rates in class
13 actions, they use current rates as opposed to
14 historical rates. Their theory is that it's to
15 compensate you for time, value and money. So in
16 most class actions, that's what people are
17 expecting to happen. But in modern systems, your
18 rates are built in. Your standard rate is
19 recorded unless there is a special override for a
20 discount, you know, that's the rate that goes in.
21      And, in fact, we don't allow people to
22 discount the rates unless they get a sign-off from
23 a managing partner, for obvious reasons. And the
24 rates that are recorded are the firm's standard
25 regular rack rates.

23 (Pages 86 - 89)



Page 90

1     I know in this litigation there's been
2   some questioning about what does the term "regular
3   rates" mean. And I guess, to me, that is a common
4   term that's used in class actions by judges. And
5   what it means is your standard listed rate. And
6   if you're a firm that has all contingent fee work,
7   that's your listed rate that you submit your time
8   at, that isn't made up for this case, isn't made
9   up, isn't higher, isn't raised or ballooned or
10  anything, but that's the rate that you offer your
11  services at.
12     Q.  What role did your expert, Steven Glass,
13  play in the fee declaration?
14     A.  I don't recall that he played a role in
15  the fee application. He might have -- I mean, I
16  have no present recollection. If so, it would
17  have been useful to have an expert opine on
18  damages, you know, calculation of damages.
19     Q.  Did all of the ERISA firms pay for
20  Mr. Glass or was it just Keller Rohrback?
21     A.  I don't recall, but I -- you know, we
22  shared expenses, most expenses, with the other
23  ERISA firms. So, I mean, if it would have been a
24  small amount, we might have written a check to him
25  and not sought reimbursement. But, you know, the

Page 91

Page 92

Page 93

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 94

1      I actually as a -- before I came here, I
2  didn't bring with me.  But actually as an exercise
3  had all the rates put in this case that all the
4  firms charged.  And then had them sorted by
5  billing rate in descending order because I wanted
6  to be able to tell you that, actually, Keller
7  Rohrback was -- might be a bad manager but had
8  amongst the lowest rates of the different firms.
9      SPECIAL MASTER ROSEN:  In each tier?
10      THE WITNESS:  In each tier.
11      SPECIAL MASTER ROSEN:  In each tier,
12  partners, junior partners, senior associates.
13      THE WITNESS:  Right.  Brian's rates were
14  also low.
15  BY MR. SINNOTT:
16      Q.  Do you have an annual process for
17  determining rates at the firm?
18      A.  We do.
19      Q.  Could you describe that for us?
20      A.  It basically consists of three major
21  parts.  One is, during the year we gather
22  information from plaintiff's firms, from fee
23  applications of rates that are charges.  We
24  basically know who our competitors are.  Not only
25  the competitors by the firm but also having worked

Page 95

1  with people, we know that, for example, John Doe,
2  that person's comparator at another firm might be
3  these people.
4      So we take about 20 -- 20 to 25 of those.
5  It's much easier now, now that everything is on --
6  publicly filed and you can pull it off whatever
7  that system is called, Pacer.  So we have those.
8      Then we also have a stack of defense
9  firms that we are litigating against.  And we look
10  at their rates.  Mainly pull from bankruptcy
11  filings.
12      (Interruption in the proceedings.)
13      THE WITNESS:  So the second part is
14  defense firms.  We have those, looking at those
15  rates.
16      The third part is we look at our expense
17  income statements, our expenses for the year, and
18  figure out how much they're going up.  And we put
19  those things together and figure out how much to
20  increase them.
21      We try to not be the top rate firm in our
22  space.
23      SPECIAL MASTER ROSEN:  Your firm has
24  cases with paying clients, correct?
25      THE WITNESS:  All of these clients are

Page 96

1  paying.  But yes.  Non-class actions.
2      SPECIAL MASTER ROSEN:  Non-class actions
3  and clients whom you bill.
4      THE WITNESS:  Yes.
5      SPECIAL MASTER ROSEN:  And who pay your
6  bills on an hourly rate basis, yes?
7      THE WITNESS:  Yes.  Although in the
8  complex litigation group I would say 95 percent or
9  more of the work is non-hourly regular pay.  But
10  we have -- even about half of them that are
11  contingent fee, we do send bills.  The clients --
12  many of those blended-fee cases will have a cap
13  where, you know, you will receive your fee up to a
14  certain percentage up to a cap, they actually want
15  to see monthly bills.
16      So we actually are sending them bills
17  even though -- because they also want to figure
18  out what their costs are, that if we settle, what
19  they're going to end up paying.
20      So the answer is that they typically
21  monitor the time, the lodestar, as you go.
22      SPECIAL MASTER ROSEN:  And as to your
23  firm's rates --
24      THE WITNESS:  Yes.
25      SPECIAL MASTER ROSEN:  -- to paying

Page 97

1  clients --
2      THE WITNESS:  Yes.
3      SPECIAL MASTER ROSEN:  -- these are the
4  same rates that are claimed in your lodestar?
5      THE WITNESS:  Yes.  For this department.
6  I mean, we have, like, trust and estates
7  departments.
8      SPECIAL MASTER ROSEN:  Yes.  I
9  understand.
10      THE WITNESS:  Those other things, but
11  yes.
12      SPECIAL MASTER ROSEN:  In your
13  declaration --
14      THE WITNESS:  Yes.
15      SPECIAL MASTER ROSEN:  -- paragraph 4, you
16  say "The hourly rates for attorneys and
17  professional support staff in my firm included in
18  Exhibit A are the same as my firm's regular rates
19  charged for their services, which have been
20  accepted in other complex class actions."
21      THE WITNESS:  Yes.  Two answers to that.
22      SPECIAL MASTER ROSEN:  Yes.
23      THE WITNESS:  One is class actions, some
24  judges just approve a fee petition and some judges
25  specifically say that they've reviewed the rates

25 (Pages 94 - 97)

Page 98

1 and find they're fair and reasonable. So the
2 answer is -- to that is that we have cases where
3 the courts have found that the rates are fair and
4 reasonable.
5     But even better than that, we have cases
6 where we have fee shifting. And, in fact, not to
7 put him as a witness here, but Gary Gotto sitting
8 to my left, we had an ERISA case recently in
9 Mississippi in which there was fee shift. So we
10 actually had to put in a declaration with our
11 rates, our regular rates, posted rates that are
12 the same, you know, right out of the computer.
13 And the Court went through that fee shifting and
14 reviewed them and found that they were fair and
15 reasonable to order the other side to pay the
16 fees.
17     SPECIAL MASTER ROSEN: But you did not
18 add to that sentence, as Carl Kravitz did, "In
19 other complex class actions and are charged to
20 clients paying us currently by the hour."
21     THE WITNESS: So, yeah, I've heard that.
22 And I just want to say that I'm confused by this
23 line of questioning. Because in the cases that I
24 regularly appear in and judges that actually have
25 you have fee orders at the beginning, regular

Page 99

1 rates, at least to me in the industry that I've
2 seen, are the regular rate, posted rates, whether
3 or not -- doesn't mean and charged to individual
4 clients because most firms -- many of the firms
5 don't have that.
6     As an aside, I will give you -- if you
7 ever get to best practices -- two good examples
8 are in the Fiat case, commissions case, Judge Chen
9 in the Northern District, just issued his order
10 on -- to lead counsel and PSC on keeping track of
11 fees. And there's a paragraph in there that says
12 you're supposed to record your time at your,
13 quote, regular rates.
14     And that's a common document that's in
15 the Northern District of California. And it's the
16 same in others. And that is -- that requires --
17 that's actually filed with the Court as an order,
18 and it requires the parties to send to lead
19 counsel or their designee on a monthly basis their
20 time. It's entered into a computer system, you
21 have to code it, it specifically says your regular
22 rates, which at least, as I understood that term,
23 to be your regular rates that you charge your
24 time.
25     Whether it's -- and you have to have



Veritext Legal Solutions
212-267-6868     www.veritext.com     516-608-2400



Page 102

Page 104

Page 103

1    THE WITNESS:  Right.  Right.
2    SPECIAL MASTER ROSEN:  But if a firm does
3  not have hourly clients -- clients who pay on an
4  hourly basis, then, as you've indicated,
5  transparency as to how the rates were arrived at
6  would be helpful to a court.
7    THE WITNESS:  I agree.  I think that it
8  would be good -- and let's face it.  If you want
9  to make sure that the lodestar is accurate,
10  there's hours times rates.  So you want to make
11  sure the rate is accurate, which I think most
12  courts are thinking is fair and reasonable.  And
13  the answer is the firm is putting down a rate.
14  Why is it saying that is a fair and reasonable
15  rate.
16  BY MR. SINNOTT:
17    Q.  Lynn, thank you.  I know we touched on
18  this a little bit earlier.  But prior to
19  November of 2016, did you ever hear the name
20  Michael Bradley?
21    A.  No.
22    Q.  Were you aware that there was an
23  individual by any name doing work on behalf of
24  the -- document review on behalf of the Thornton
25  Law Firm that was not a member of that firm?

Page 105



Page 106

Page 108

Page 107

1  there might be an article about this or --
2       THE WITNESS:  No, I can't recall.  I
3  mean, I obviously saw a draft of the letter that
4  was being sent to Judge Wolf.  But my recollection
5  is that that was the first I heard of this.  But I
6  can't recall the exact timing.
7       SPECIAL MASTER ROSEN:  Did you weigh in
8  on the draft of the letter to Judge Wolf?
9       THE WITNESS:  I think that -- I think
10 that Carl beat me to it.  I remember the one thing
11 I wanted to be in there was that it had nothing to
12 do with the ERISA counsel.
13 BY MR. SINNOTT:
14      Q.  So you didn't make any edits or have any
15 recommendations that you recall?
16      A.  Not that I recall.
17      Q.  And as far as that allocation of
18 attorneys that I mentioned a moment ago, have you
19 ever seen that in any other cases, Lynn?
20      A.  I've seen lawyers having lawyers from
21 other firms come and work out of their offices.  I
22 mean, that -- especially before we got into
23 electronic documents as much.  That was even --
24 you know, 10, 15 years ago, that was very common
25 that you would have document war rooms in your

Page 109

1  we don't end up in situations like this where
2  people are deposed.  I mean, it's ironic because,
3  ultimately, if everyone had put the people on
4  their own fee petition, the total fee submission
5  would have looked the same.  It would have had
6  their total same number.
7       SPECIAL MASTER ROSEN:  Well, it actually
8  wouldn't have because you wouldn't have had the
9  double-counting.
10      THE WITNESS:  Right.  The double
11 counting, I have a good answer as to why -- how to
12 make sure that doesn't happen.
13      SPECIAL MASTER ROSEN:  Right.  That's --
14      THE WITNESS:  But if we take out -- once
15 they strip out the double-counting, you know, the
16 issue is it's not the total number because it
17 would be the same.  It's as to, you know, what the
18 judge is going to do.  If the judge wants to know
19 what the different lodestar of different firms are
20 because he wants to give specific awards to
21 different firms, then it's important.
22      I mean, the irony here is, I got to say,
23 the result was fabulous.  The 25 percent award is
24 right in line.  In fact, we talked about the prior
25 State Street case.  My recollection was that there

28 (Pages 106 - 109)

Page 114

1  set and you send it to a recoder to basically
2  figure out are they doing a good job or not.  In
3  cases people are fired.
4       And the reason why I don't want to
5  comment on what happened on the Catalyst database,
6  without getting under the hood, you know, I
7  can't -- I don't really know how they were doing
8  it, what they were doing, et cetera.
9       I mean, the work product -- the only work
10  product I saw was the information that Mike Lesser
11  provided.  And he would always have answers to
12  things.  So whatever he was doing was great.
13       SPECIAL MASTER ROSEN:  And the PowerPoint
14  and the --
15       THE WITNESS:  The PowerPoint came about
16  because -- that I saw, the one I recall, was right
17  after we entered into this 9 percent agreement, we
18  actually had a meeting of all counsel.  It was in
19  California.  And it was a chance to present the
20  differing views of the case.  Because we really at
21  that point had been proceeding totally separately.
22  And that was a PowerPoint that was prepared by the
23  customer counsel, and Mike Lesser did the
24  verbalizing of it, presentation, you know, of how
25  they viewed the case, et cetera.



Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400