# EX. 30

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

---

Arnold Henriquez, on behalf of the Waste
Management Retirement Savings Plan,
and all other similarly situated plans,

        **Plaintiffs,**

        **v.**

State Street Bank and Trust Company,
State Street Global Markets, LLC
and Does 1-20,

        **Defendants.**

**Case No.: 1:11-cv-02920-WDQ**

**Notice of Voluntary Dismissal**

---

## NOTICE OF VOLUNTARY DISMISSAL

**PLEASE TAKE NOTICE** that, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i), Plaintiff Arnold Enriquez voluntarily dismisses this action. In connection with this voluntary dismissal, Plaintiff states the following:

1.    No defendant has filed an answer or motion for summary judgment herein.

2.    Plaintiff has not sought certification of the class herein, and no class has been certified. Accordingly, Plaintiff's voluntary dismissal of this action does not require the Court's approval pursuant to Federal Rule of Civil Procedure 23(e).

3.    Plaintiff has not previously dismissed any federal- or state-court action based on or including the claims asserted in the Complaint herein.

November 17, 2011

Respectfully Submitted,

By /s/ Jonathan Axelrod
Jonathan G. Axelrod, Esq. (Bar No. 22247)
BEINS, AXELROD, PC

1

1625 Massachusetts Ave, NW   Suite 500
Washington, DC 20036
Telephone: (202) 328-7222
Telecopier: (202 438-7030
E-mail: jaxelrod@beinsaxelrod.com


J. Brian McTigue (*Pro Hac Vice* ID#: 96584)
MCTIGUE & VEIS LLP
4530 Wisconsin Avenue, NW   Suite 300
Washington, DC 20016
Telephone: (202) 364-6900
Telecopier: (202) 364-9960
E-mail: bmctigue@mctiguelaw.com


Counsel for Plaintiffs

2

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing **Notice of Voluntary Dismissal** ("Notice") was filed electronically with the Court on November 17, 2011, and that the **Notice** and a copy of the **Complaint** (Docket No. 1-4) were served that same day by First Class U.S. Mail, postage pre-paid, upon the following registered agents for service of process:


State Street Bank & Trust Company
c/o The Corporation Trust Incorporated
351 West Camden Street
Baltimore, MD 21201-7912

State Street Global Markets LLC
c/o CT Corporation
155 Federal Street
Boston, MA 02110


November 17, 2011          /s/   Jonathan G. Axelrod
                                 Jonathan G. Axelrod

3

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 5 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 1 of 21
Case 1:11-cv-02920-WDQ   Document 3-1   Filed 10/13/11   Page 1 of 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| Arnold Henriquez, on behalf of the Waste Management Retirement Savings Plan, and all other similarly situated plans, | Case No.: |
| 2217 Wetherburne Way<br>Frederick, Maryland  21702 | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | |
| v. | |
| State Street Bank and Trust Company,<br>One Lincoln Street<br>Boston, Massachusetts 02111 | |
| and | |
| State Street Global Markets, LLC<br>One Lincoln Street<br>Boston, Massachusetts 02111 | |
| and Does 1-20 | |
| Defendants. | |

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 6 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 2 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 2 of 21

## CLASS ACTION COMPLAINT

Plaintiff Arnold Henriquez alleges the following on behalf of the Waste Management Retirement Savings Plan ("Plan") and a class of similarly-situated ERISA retirement plans (collectively, "Plans") against State Street Bank and Trust Company ("SSBT") and State Street Global Markets ("SSGM") based on the investigative efforts of private whistleblower firms, the State of California, the Securities and Exchange Commission, and an investigation by counsel, which included reviewing: Internal Revenue Service Forms 5500 ("Form 5500") filed with the United States Department of Labor ("DOL"); filings with the United States Securities and Exchange Commission, including Annual Reports on Form 10-K; and other publicly available documents related to this action.

## I. NATURE OF THE ACTION

1.      This is a civil enforcement action brought pursuant to the Employee Retirement Income Securities Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, and in particular under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), to recover losses and obtain equitable relief on behalf of the Plan, and all other similarly situated plans (collectively "Plans").

2.      SSBT and SSGM (collectively, "Defendants") were required to act prudently and solely in the interest of the Plans' participants and beneficiaries in their capacity as an ERISA fiduciary. Rather than fulfilling their fiduciary duties under ERISA (the "highest duties known to the law")[1], the Defendants charged improper, undisclosed markups on transactions in foreign currency ("FX" or "FX transactions").

---

[1] *Donovan v.Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

1

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 7 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 3 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 3 of 21

3.      The Plan and the similarly situated Plans are established and sponsored by private entities in accordance with ERISA, 29 U.S.C. §§ 1001, *et seq.*

4.      Plaintiff alleges that Defendants, who are fiduciaries of the Plans, violated ERISA by causing the Plans, or the collective funds operated by Defendants in which the Plans were invested, to execute FX transactions at exchange rates favorable to Defendants and reporting those transactions at less favorable rates. These transactions were prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

5.      Plaintiff also alleges that Defendants failed to act solely in the interest of the participants and beneficiaries of the Plans and breached their fiduciary duties of prudence and loyalty with respect to the Plans. Specifically, Plaintiffs allege that Defendants, as fiduciaries of the Plans, violated their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104 by causing the Plans or the collective funds operated by Defendants in which the Plans were invested to engage in transactions that were not to the exclusive benefit of the Plans or their participants and beneficiaries.

## II. JURISDICTION AND VENUE

6.   ERISA provides for exclusive federal jurisdiction over these claims. The Plan is an "employee benefit plan" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and Mr. Henriquez is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), who is authorized pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), to bring the present action on behalf of the Plan and its participants and beneficiaries to obtain appropriate relief.

7.   This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

2

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 8 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 4 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 4 of 21

8.   Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2),

because the Plan is administered in this district, and some or all of the fiduciary breaches for which

relief is sought occurred in this district.

## III. PARTIES

### A.   Plaintiffs

9.   **Plaintiff Arnold Henriquez.**   Plaintiff Arnold Henriquez is a participant in the Waste

Management Retirement Savings Plan, an ERISA-covered defined contribution plan.  At all material

times from the second quarter of 2005 through the second quarter of 2009, Mr. Henriquez invested in

the "International Equity Fund"[2] sponsored by SSBT and offered by the Plan.  Mr. Henriquez also

invested in other funds sponsored by SSBT and offered by the Plan during the Class Period set forth

below, including the Large Cap Equity Fund, the Small Cap Equity Fund, the Conservative Asset

Allocation Fund, the Moderate Asset Allocation Fund, the Aggressive Allocation Fund, the Bond

Market and the SSgA Target Retirement 2030 Fund.  Mr. Henriquez resides in Frederick, Maryland.

Plaintiff Henriquez brings this action as a representative plaintiff on behalf of all similarly situated

plans.

10. **Defendant State Street Bank and Trust Company** ("SSBT").  Defendant State Street Bank

and Trust Company, a subsidiary of State Street Corp, is incorporated in Massachusetts and is

---

[2] The "International Equity Fund" is the fund name used by SSBT on disclosures to participants in the Plan.  The International Equity Fund's name, according to the International Equity Fund's Forms 5500 for 2009 and 2010, filed by SSBT with DOL, is the "Active Intl Stock Selection SL SF CL I (CM8J [*sic*]."  From 2006 through 2008, the International Equity Fund's name, according to the International Equity Fund's Forms 5500 filed by SSBT with DOL was the "International Alpha Select SL Series Fund –[*sic*]."  The foregoing fund names may refer to the International Equity Fund at a particular point in time, as well as to one or more of several classes of interests offered in the International Equity Fund.

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 9 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 5 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 5 of 21

headquartered in Boston, Massachusetts. Defendant State Street Bank and Trust Company operates as a custodial bank for ERISA covered benefit plans and for collective investment funds used in defined contribution plans. These plans have participants and beneficiaries who reside in Maryland, such as the Plaintiff.

11. **Defendant State Street Global Markets, LLC ("SSGM").** Defendant State Street Global Markets, LLC, a subsidiary of State Street Corp., is incorporated in Delaware and is headquartered in Boston, Massachusetts. It provides specialized investment research and trading in foreign exchange, equities, fixed income and derivatives to ERISA covered benefit plans.

12. **Defendants Does 1-20.** Does 1-20 are fiduciaries of the Plans relevant to this lawsuit whose exact identities will be ascertained through discovery.

## IV. FACTUAL BACKGROUND

A.    **The Plans.**

13. **Waste Management Retirement Savings Plan.** The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Pursuant to ERISA, the relief requested in this action is for the benefit of the Plan.

14. **Other Similarly Situated Plans.** Defendants provide services similar to those provided to the Plan to other, similarly situated Plans, either directly as plan custodian or indirectly as custodian of funds in which the Plans invest.

B.    **Defendants' Fiduciary Status**

4

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 10 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 6 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 6 of 21

15. Every plan governed by ERISA must have fiduciaries to administer and manage the plan. A custodial bank is among these fiduciaries.

16. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA §402(a)(1), but also any other persons who in fact perform fiduciary functions. ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i) (stating that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or *exercises any authority or control respecting management or disposition of its assets. . .*") (emphasis added).

17. Defendants functioned as fiduciaries to the Plan by exercising authority and control over Plan assets.

18. SSBT served as custodian for the Plans' assets, including both defined benefit and defined contribution plans. As custodian, SSBT is a fiduciary under ERISA. SSBT is a fiduciary of the Plan and owed fiduciary duties to the Plan and its participants under ERISA in the manner and to the extent set forth in the governing Plan documents.

19. SSGM exercised authority and control over plan assets in its role as SSBT's affiliate responsible for setting the exchange rates on FX transactions and executing those transactions. As discussed below, this process created the maximum spread between the marked up custody exchange rate offered to custodial clients and the marked down exchange rate used to process repatriation and other FX transactions.

## C.    Retirement Plan Investment Strategy

20. Retirement plans, especially over the last decade, have found it to be necessary and prudent to expand their investments to include exposure to foreign markets. Defined benefit plans have

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 11 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 7 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 7 of 21

expanded international holdings and defined contribution plans frequently include at least one, if not several, international investment options.

21. SSBT served as custodian for ERISA covered defined benefit plans and operated collective investment funds invested in foreign securities in which ERISA covered defined contribution plans invested during the Class Period.

22. SSBT served as custodian for the collective investment funds it operated that invested in foreign securities.

23. Pension funds regularly purchase and sell foreign securities, receive dividends that are paid in foreign currencies, and participate in other investments that require the exchange of foreign currency into and from US Dollars ("USD").  These currency transactions are known as "FX trading."

24.   SSBT provided custodial services for the Plan and the other similarly situated ERISA Plans that constitute the Class during the Class Period.  A "custodian" is an institution that holds securities on behalf of investors. The responsibilities entrusted to a custodian include the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities. Custodians may also perform ancillary services for their clients. Custodians are typically used by institutional investors who do not wish to leave securities on deposit with their broker-dealers or investment managers. Separating the custodial and asset management duties, a custodial bank is intended to reduce the risk of misconduct. An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

6

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 12 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 8 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 8 of 21

25. Collective investment funds that invest in foreign securities, such as the SSBT-sponsored International Equity Fund offered in the Plan, must engage in FX transactions in order to buy and sell securities, to repatriate dividends or interest payments, and to engage in other transactions.

26. Plaintiff and the Class placed a high degree of trust in Defendants. Plaintiff and the Class depended upon Defendants to both execute and report FX trades honestly and accurately.

27. SSBT describes itself as "a leading specialist in meeting the needs of institutional investors." In its Class Period filings with the United States Securities and Exchange Commission ("SEC"), the Company repeatedly stated that its customer relationships were "predicated upon our reputation as a fiduciary and a service provider that adheres to the highest standards of ethics, service quality and regulatory compliance." One of the services that SSBT offers its clients is the ability to conduct foreign exchange transactions, which allows clients to purchase and sell foreign securities or engage in currency trades.

## D.   SSBT's Scheme

28. On information and belief, Defendants, starting in 2001, added an undisclosed and substantial "mark-up" to the exchange rate it used when making foreign exchange trades for its clients. The scheme was simple and not disclosed to the Plans. Defendants had agreements with its large custodial clients that obligated Defendants to charge its clients the same "exchange rate" as the one that Defendants actually used to execute foreign exchange trades requested by the client. Rather than doing so, however, SSGM would execute the trade at one exchange rate without informing its client, then monitor fluctuations in the rate throughout the day. Then, before the end of the day, SSGM would pick a rate that was more beneficial to Defendants, and tell its clients that the trade had occurred at this other,

7

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 13 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 9 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 9 of 21

false rate. Defendants' clients had no way of discovering the truth because the records they received

would show that the trade had been executed within the range of rates occurring during that day.

29. All foreign exchange transactions are executed at a prevailing exchange rate, which

determines how much one currency is worth in terms of another. The most commonly used exchange

rate is the interbank rate, which fluctuates throughout each day and is tracked and published by various

industry sources. Throughout the Class Period, Defendants executed two types of foreign exchange

transactions for its clients. Some of Defendants' clients would conduct "direct" or "negotiated" foreign

exchange trades. In a direct trade, an institution would contact a Defendants' representative who would

quote an exchange rate that the institution could accept or reject. If Defendants' rate was sufficiently

competitive, the client would accept and the trade would be executed at the agreed upon exchange rate.

Defendants would collect a fee for processing the trade and pass along the cost of the exchange rate to

its client.

30. For more than 75% of its large custodial clients, however, SSBT and SSGM would conduct

"indirect" or "standing instruction" foreign exchange trades. In a standing instruction trade, neither the

institution nor its outside investment manager would be quoted an exchange rate. Instead, the client

would request a transaction involving a foreign exchange (such as a purchase of foreign securities), and

Defendants would execute the transaction pursuant to its contract with its client. Under the terms of

SSBT's custodial arrangements, SSBT was obligated to provide its clients the same exchange rate that

Defendants actually used to make the trade. This arrangement was supposed to be beneficial to

Defendants' clients because, among other things, they would not have to incur the expense and time of

identifying and choosing the most competitive exchange rate.

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 14 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 10 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 10 of 21

31. Defendants, on information and belief, executed FX trades on behalf of their own collective investment funds using the same standing instruction method. SSBT, as custodian of their own funds, were not subject to substantial scrutiny on these transactions beyond internal controls.

32. The scheme itself was relatively straightforward. Upon receiving a standing instruction foreign exchange order, SSGM executed the trade early in the day at the foreign exchange rate available at that time. SSGM was obligated to charge the same exchange rate – usually the interbank rate – as the one it actually used to execute the transaction with the client. Instead of doing so, the Company monitored market fluctuations in the exchange rate throughout the day and picked a rate to charge its custody clients that was more beneficial to Defendants.

33. For instance, if the transaction was a purchase of a foreign security, SSGM charged the client a higher foreign exchange rate that occurred later in the day, thus causing the client to pay more than what SSGM had already paid. If the transaction was a sale of a foreign security, SSGM would charge the client a lower foreign exchange, thus paying the client less than what SSGM actually received. In either event, Defendants would take for itself the difference between the amount for which the trade was actually executed and the amount that SSBT charged its clients.

34. However, this was not the case for all clients. Those clients who conducted direct trades would be quoted an exchange rate by SSGM before executing the transaction. These clients – often large hedge funds – typically had easy access to an alternate price source, such as Bloomberg or Reuters, to double-check the truthfulness of SSGM's rate quotes. Accordingly, Defendants could not overcharge these clients, and thus referred to them internally as "smart" clients or "smart money."

35. The duty of "best execution" requires that a broker-dealer seek to obtain for its customers the most favorable terms reasonably available under the circumstances. At a minimum, therefore, "best

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 15 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 11 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 11 of 21

execution standards" require that Defendants execute trades on terms that are no less favorable than those offered to unrelated parties in a comparable arm's-length transaction.

36.    Plaintiff and the Class reasonably expected, because Defendants represented and because ERISA requires, that they would be offered terms on "standing instructions" trades that were no less favorable than those offered by Defendants to unrelated parties in comparable arm's-length FX transactions.

37.    FX trading takes place around the world on a nearly 24-hour cycle, five-and-a-half days a week. The official FX trading week begins at 7:00 a.m. New Zealand time on Monday, with each subsequent trading day ending at 5:00 p.m. New York City time.

38. SSGM's FX traders are informed of SSBT's aggregated standing instruction trade requirements during the course of the day. The FX traders will, that day, trade on the interbank FX market in order to satisfy SSBT's standing instruction positions. This process is called "offsetting" the trades.

39.  Upon receipt of the request, SSGM's foreign exchange traders checked the exchange rate, set a price, and executed the transaction, which typically occurred early in the day since SSGM traders are at their desks by 7 a.m. Eastern Standard Time. All of those transactions were then entered by the trader into a separate software system called Wall Street Systems ("WSS"), which memorializes the transaction and charges the cost (for purchases) or remits the payment (for sales) directly to Defendants. The WSS recorded time stamps for the actual, "real time" transaction.

40. Although the transaction was now completed and the price locked in, Defendants did not inform the client. Instead, on information and belief, SSGM observed market fluctuations until sometime around 3 p.m. in the afternoon and then assigned either a higher exchange rate (for purchases)

Case 1:11-cv-10230-MLW Document 401-29 Filed 07/23/18 Page 16 of 25
Case 1:11-cv-02920-WDQ Document 7-1 Filed 11/17/11 Page 12 of 21
Case 1:11-cv-02920-WDQ Document 1 Filed 10/12/11 Page 12 of 21

or a lower exchange rate (for sales) to the foreign exchange transactions that occurred during that day. SSGM then applied that rate to all of the "indirect" foreign exchange transactions it had conducted that day.

41. At all relevant times to this Complaint, this pricing scheme was used for FX transactions for both custodial clients and for transactions involving SSBT's collective investment funds.

42. With each FX trade priced in this manner, Defendants did not simply profit; they made the biggest possible profit on each trade, based upon the range-of-the-day's FX rates at the point the trade is priced for the Plan.

43. Because Defendants' scheme always prices the trades at the very lowest or very highest rates of the day, Defendants are able to make a profit without any risk to SSBT.

44. By pricing trades in this manner for their standing instruction trades, Defendants secured a spread ten to twenty or more times greater than when a custodial client directly negotiated an FX transaction. That is, Defendants' profits arising from their custodial standing instruction trades are at least ten to twenty times higher than its profits from comparable, arm's length FX transactions.

45. Defendants' practice of pricing trades in this manner and taking the largest possible mark-up or mark-down was not disclosed to custodial clients like the Plan over the period of time relevant to this Complaint.

46. All Defendants' custodial clients who had standing instruction trades (including spot, forward, swaps, repatriation, and major, minor, emerging, and regulated market trades) suffered from the same inaccurate FX pricing.

Case 1:11-cv-10230-MLW Document 401-29 Filed 07/23/18 Page 17 of 25
Case 1:11-cv-02920-WDQ Document 7-1 Filed 11/17/11 Page 13 of 21
Case 1:11-cv-02920-WDQ Document 1 Filed 10/12/11 Page 13 of 21

47. All of Defendants' collective investment funds which invested in foreign securities and used standing instruction trades (including spot, forward, swaps, repatriation, and major, minor, emerging, and regulated market trades) suffered from the same inaccurate FX pricing.

48. End-of-month reports are prepared by Defendants on or before mid-month. These reports list the custodial client's FX trades by date, amount, and price, i.e., the fictitious FX rate (as reported to the custody side of SSBT by its FX traders). These reports never contained time-stamps for the FX trades, and there is nothing on the report that would lead a custodial client to suspect that it had been unfairly charged exorbitant mark-ups (or mark-downs) on its FX trades.

**E.     SSBT Makes Exceptions for Certain Clients, Offering Them Special Pricing**

49. Over time, SSBT have developed a special class of custodial clients that do not receive the high or low range-of-the-day pricing suffered by other custodial clients, like the Plan. These clients, known internally as "smart money clients," still receive the same standing instruction custodial services as the other entities like the Plan, but receive particular treatment when their FX requirements come to SSBT's FX dealing room.

50. Instead of these custodial clients' FX trades being included with the others like the Plan and subject to the extreme range-of-the-day mark-up and mark-down, these clients are allowed to deal directly with Defendants – usually by phone – and are given the chance to directly negotiate prices for their FX requirements for that day, every day, despite their trades coming to SSBT as standing instruction trades.

51. As a result, the "smart money" custodial clients always receive better pricing than their fellow custodial clients who are still subject to SSBT's pricing schemes.

Case 1:11-cv-10230-MLW Document 401-29 Filed 07/23/18 Page 18 of 25
Case 1:11-cv-02920-WDQ Document 7-1 Filed 11/17/11 Page 14 of 21
Case 1:11-cv-02920-WDQ Document 1 Filed 10/12/11 Page 14 of 21

52. Defendants did not disclose to clients like the Plan over the period of time relevant to this Complaint their practice of providing certain clients the "smart money clients" FX transactions, resulting in direct dealings on standing instruction trades.

## V. CLASS ALLEGATIONS

53. **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plan and the following class of similarly-situated persons (the "Class"):

> All qualified ERISA Plans, and the participants, beneficiaries, and named fiduciaries of those plans for which State Street Bank and Trust Company or State Street Global Markets, LLC provided foreign exchange transactional services, as custodian of its assets, or by acting as custodian of collective trusts in which those ERISA Plans invested, at any time between October 12, 2005 and October 19, 2009 (the "Class Period").

Class treatment is appropriate in this case because it would promote judicial economy by adjudicating the Defendants' fiduciary breach with respect to all of the Plans and participants in the class.

54. **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that hundreds of ERISA Plans throughout the country invested in these collective trusts during the Class Period, and sustained losses as a result of the Defendants' imprudent FX trading activities. Defendants have more than $5.2 trillion of pension assets under custody.[3] These assets could all be exposed to Defendants' improper pricing scheme. Plaintiff believes that hundreds of ERISA plans are also exposed to Defendants' to collective

---

[3] "Pension – Overview," http://www.statestreetglobalservices.com.

Case 1:11-cv-10230-MLW Document 401-29 Filed 07/23/18 Page 19 of 25
Case 1:11-cv-02920-WDQ Document 7-1 Filed 11/17/11 Page 15 of 21
Case 1:11-cv-02920-WDQ Document 1 Filed 10/12/11 Page 15 of 21

investment funds with investments in foreign securities. For example, Schedule D to the Form 5500 filed by Defendants for the Active Intl Stock Selection SL SF CL I (CM8J fund for 2009 alone lists nine defined contribution plans and assets of nearly $389 million. State Street Bank and Trust Company, Active Intl Stock Selection SL SF CL I (CM8J[*sic*], Annual Return/Report of Employee Benefit Plan (Form 5500), at Schedule H, Part I (December 31, 2009).

55. **Commonality.** The claims of Plaintiff and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by Defendants with regard to management of its FX trading program. The questions of law and fact common to the Class include, but are not limited to:

    a.    Whether Defendants breached their fiduciary duties to the Plans by using an FX trading scheme to overcharge the Plans, or the collective investment funds in which the plan invested, for FX trading;

    b.    Whether Defendants engaged in transactions prohibited by ERISA;

    c.    Whether Defendants' fiduciary breaches caused losses to the Plans; and

    d.    Whether Defendants' prohibited transactions caused losses to the Plans.

56. **Typicality.** Plaintiff's claims on behalf of his Plan are not only typical of, but the same as, claims that would be brought with respect to other plans. If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same claims based upon the same conduct of the Defendants, using the same legal arguments to prove Defendants' liability, and would be seeking the same relief.

57. **Adequacy.** Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that are competent and experienced in class action and ERISA litigation.

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 20 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 16 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 16 of 21

Plaintiff has no interests antagonistic to, or in conflict with those of the Class. Plaintiff has undertaken to protect vigorously the interests of the absent members of the Class.

58. **Rule 23(b)(1)(A) &(B) Requirements.** Class action status is warranted under Fed. R. Civ. P. 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

59. **Rule 23(b)(2) Requirements.** Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole. No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties.

60. **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VI. CLAIMS FOR RELIEF

### COUNT I

15

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 21 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 17 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 17 of 21

**Engaging in Prohibited Transactions by Giving More Favorable FX Transaction Terms to Certain Clients**
**(Violation of § 406 of ERISA, 29 U.S.C. § 1106 by Defendants)**

61.  All previous averments are incorporated herein.

62.  At all relevant times, the Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control over Plan assets.

63.  The Defendants, by their actions and throughout the Class Period, caused the Plans to engage in unfairly and unreasonably priced FX transactions.

64.  During the Class Period, Defendants engaged in FX transactions using plan assets that were not for the exclusive benefit of the Plans' participants and constituted a transfer to, or use by or for the benefit of a party in interest, of plan assets.

65.  Defendants caused the Plans to pay, directly or indirectly, unreasonable FX transaction fees and therefore caused the Plans to engage in transactions that Defendants knew or should have known constituted the use of the assets of the Plans for a transfer to, or use by or for, the benefit of a party in interest in violation of ERISA. § 406(b), 29 U.S.C. 1106(b).

66.  As a direct and proximate result of these prohibited transaction violations, the Plans, directly or indirectly, paid millions of dollars in transaction fees that were prohibited by ERISA and suffered millions of dollars in losses.

67.  Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), Defendants are liable to restore all losses suffered by the Plans as a result of the prohibited transactions and all profits earned on the fees paid by the Plans to Defendants

## COUNT II

16

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 22 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 18 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 18 of 21

**Breach of Duties of Prudence and Loyalty**

**(Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Defendants)**

68. All previous averments are incorporated herein.

69. Defendants breached their ERISA fiduciary duties of prudence and loyalty by, *inter alia*:

    a.  Using plan assets for the own benefit, causing losses to the Plans and the participants;

    b.  Charging the Plans (or the collective trusts in which the Plans invested) fees for FX trading that were unreasonable and in excess of what Defendants had agreed to charge;

    c.  Failing to disclose to the Plans, their fiduciaries, or participants the amount of fees being charged for FX trading, that those fees were in excess of what Defendants had agreed to charge, and that other clients were charged less for the same services;

70. These actions during the Class Period were breaches of Defendants fiduciary duties of loyalty and prudence to the Plans under ERISA and Defendants did not execute their fiduciary responsibilities for the exclusive benefit of the Plans.  § 404(a)(1)(A), (B), 29 U.S.C. §§ 1104(a)(1)(A), (B).

71. Defendants committed these breaches consistently from 2001 to 2009, during each FX transaction involving assets of the Plans.

72. As a direct and proximate result of these breaches of duty, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, realized losses.

73. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and 29 U.S.C. § 1109(a), The Defendants are liable to restore all losses suffered by the Plans caused by the Defendants' breaches of fiduciary duty.

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 23 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 19 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 19 of 21

## COUNT III

### Liability for Breach of Co-fiduciary

### (Violation of § 405 of ERISA, 29 U.S.C. § 1105)

74. All previous averments are incorporated herein.

75. SSGM violated ERISA, 29 U.S.C. §1105(a)(1), by knowingly undertaking to conceal SSBT's fiduciary breaches.  It did so through the actions and omissions of its employees and agents by concealing and failing to provide complete and accurate information to the Plans regarding the cost of FX transactions.

76. SSGM violated ERISA, 29 U.S.C. §1105(a)(3), because it knew that SSBT had breached its fiduciary duties of prudence and loyalty, but failed to take reasonable steps under the circumstances to remedy the breach.

77. On account of SSGM's violations of these provisions, SSGM is liable for the breach of its co-fiduciary, SSBT.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

78. Declare that the Defendants have violated ERISA's prohibited transactions provisions;

79. Declare that the Defendants breached their fiduciary duties under ERISA;

80. Issue an order compelling a proper accounting of the foreign exchange transactions in which the Plans have engaged;

Case 1:11-cv-10230-MLW   Document 401-29   Filed 07/23/18   Page 24 of 25
Case 1:11-cv-02920-WDQ   Document 7-1   Filed 11/17/11   Page 20 of 21
Case 1:11-cv-02920-WDQ   Document 1   Filed 10/12/11   Page 20 of 21

81. Issue an order compelling Defendants to restore all losses caused to the Plans;

82. Issue an order compelling the Defendants to disgorge all fees paid and incurred, Defendants, including disgorgement of profits thereon;

83. Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

84. Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as custodian to the Plans;

85. That this action be certified as a class action and that each Class be designated to receive the amounts restored to the Plans by Defendants and a constructive trust be established for distribution to the extent required by law;

86. Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

87. Award Plaintiffs their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

88. Award such other and further relief as the Court deems equitable and just.

October 12, 2011                     Respectfully Submitted,

                                     By /s/ Jonathan Axelrod

Case 1:11-cv-10230-MLW Document 401-29 Filed 07/23/18 Page 25 of 25
Case 1:11-cv-02920-WDQ Document 7-1 Filed 11/17/11 Page 21 of 21

Case 1:11-cv-02920-WDQ Document 1 Filed 10/12/11 Page 21 of 21

Jonathan G. Axelrod, Esq.
**Beins, Axelrod, PC**
1625 Massachusetts Ave, NW
Suite 500
Washington, DC 20036
(202) 328-7222
jaxelrod@bakgg.com


J. Brian McTigue (*Pro Hac Vice to be filed*)
**MCTIGUE & VEIS LLP**
4530 Wisconsin Avenue, NW
Suite 300
Washington, DC 20016
Tel: (202) 364-6900
Fax: (202) 364-9960
bmctigue@mctiguelaw.com


*Counsel for Plaintiff*

20