# EX. 34

```
                                                                    1
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MASSACHUSETTS
 3   - - - - - - - - - - - - - -x
 4     ARKANSAS TEACHER       :
 5     RETIREMENT SYSTEM,     :
 6     et al.,                :
 7          Plaintiffs,       : CA No. 11-10230-MLW
 8          v.                :
 9     STATE STREET BANK      :
10     AND TRUST COMPANY,     :
11          Defendant.        :
12   - - - - - - - - - - - - - -x
13                                        July 7, 2017
                                          Washington, D.C.
14
15
16  Deposition of:
17              WILLIAM R. TAYLOR,
18  called for oral examination by Counsel to the
19  Special Master, pursuant to notice, at JAMS,
20  1155 F Street, Northwest, Suite 1150, Washington,
21  D.C. 20004, before Christina S. Hotsko, RPR, of
22  Veritext, a Notary Public in and for the District
23  of Columbia, beginning at 11:07 a.m., when were
24  present on behalf of the respective parties:
25
```



Page 8

```
 1  Johnson, what did you do for a living?
 2      A.  I was a chemical operator.  Like 25
 3  years, off and on different companies.
 4      Q.  All right.  And when did you begin work
 5  for Johnson & Johnson?
 6      A.  I think it was '97.
 7      Q.  And are you now retired from Johnson &
 8  Johnson?
 9      A.  Yes.
10      Q.  And was that a ▓▓▓▓▓▓▓▓▓▓,
11  sir?
12      A.  Yes.
13      Q.  Okay.
14      A.  2007 I retired.
15      Q.  And was that ▓▓▓▓▓▓▓▓▓▓
16  Johnson & Johnson?
17      A.  It was part.  Part was another company.
18  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
20      Q.  All right, sir.  But you were a chemical
21  operator for Johnson & Johnson?
22      A.  Yes.
23      Q.  And could you tell us something about the
24  pension plan at Johnson & Johnson?  Do you know if
25  it was a defined benefit plan or a defined
```

Page 9

```
 1  contribution or 401(k) plan?
 2          (Interruption in the proceedings.)
 3          MR. SINNOTT:  Welcome, Justin.  We just
 4  got started with Mr. Taylor.
 5  BY MR. SINNOTT:
 6      Q.  Go ahead, Mr. Taylor.
 7      A.  I actually don't even remember.  I don't
 8  think it was 401(k).  It might have been.  I don't
 9  remember, to be honest.  I know they took
10  deductions, you know, for a savings plan or
11  something we had.  You're talking ten years ago.
12  I can't even remember last week, let alone ten
13  years ago.
14      Q.  All right, sir.  And had you ever before
15  this case been involved in a class action case?
16      A.  No.  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
19      Q.  Okay.  And was that part of a class
20  action case or was it --
21      A.  No, no --
22      Q.  -- an individual suit.
23      A.  -- I don't think it was.  Both parties
24  just settled.
25      Q.  And to your knowledge you've never served
```

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400



**10**

[redacted]

**12**

1  interest of the class above your own?
2      A.  Yes.  That's what I was told, I guess.
3      Q.  And did Brian or anyone else at his firm
4  make any promises to you about recovery or what
5  you or the class would get out of the case?
6      A.  No, no.
7      Q.  Were you promised a service award when
8  you joined the case?
9      A.  No.  I didn't hear about the award until
10 after the settlement.  He said me might -- the
11 Judge could award us a service award.  That was
12 after it was settled.  That you might get it, you
13 might not.
14     Q.  All right, sir.
15         And when you did get it, how much was
16 that service award for?
17     A.  10,000.
18     Q.  And when Brian asked you to get involved
19 in the case, did he ask you for any documents, or
20 did you provide any documents?
21     A.  Yeah.  I -- he asked me for some.
22 Whatever I had, I don't think it was much, I just
23 mailed it to him.
24     Q.  All right, sir.
25         And did you ever read the complaint

**11**

[redacted]

**13**

1  against State Street or the amended complaint
2  against State Street?
3      A.  I read some of it.  I didn't understand
4  it.  I mean, yeah, I read a little bit of it.
5      Q.  Did you talk to Brian or anybody else at
6  McTigue about it?
7      A.  I'm sure I did.  I mean...
8      Q.  And was it your understanding that the
9  information that you had provided to Brian might
10 have had some role in the drafting of the
11 complaint?
12     A.  I would imagine, yeah.  I'm sure the
13 other participants had some, too.
14     Q.  Did you have any concerns as to downsides
15 that might come about as a result of your
16 participation in the case?
17     A.  What do you mean "downside"?
18     Q.  For example, were you concerned that
19 Johnson & Johnson might look badly on it or that
20 others might criticize you for it?
21     A.  No, no.
22     Q.  And did you and Brian or other members of
23 McTigue Law have discussions about other
24 complaints against State Street that had been
25 filed on behalf of other classes?



**Page 14** — [redacted]

**Page 15** — [redacted]

**Page 16**

```
 1      Q. Okay. Was that reading it in the Globe
 2   story or was that during your time as class
 3   representative?
 4      A. Yeah, I think it was when I was class
 5   representative -- I might have gotten a paper I
 6   was reading on it. I think he sent me something
 7   like that. I think. Don't quote me on it. I
 8   don't know.
 9      Q. Sure. Was there anything in there as far
10   as attorneys' rates that you remember?
11      A. No, no.
12      Q. And did you ever attend any mediation
13   sessions?
14      A. No.
15      Q. Any court hearings?
16      A. No. Only on the phone.
17      Q. Did you attend any meetings with other
18   law firms besides Brian's?
19      A. No.
20      Q. And you said you were in frequent contact
21   with Brian during the case. Did Brian keep you
22   posted as far as the progress of the mediation and
23   other matters in the case?
24      A. Yeah. He sent me letters. I met him one
25   time and we talked on the phone. You know, I got
```

**Page 17**

```
 1   letters in the mail about what was going on.
 2   Basically he called me.
 3      Q. Okay.
 4      A. I talked to him on the phone a lot.
 5      Q. No e-mails, as far as you remember?
 6      A. Maybe there might have been some. I
 7   don't know.
 8      Q. And did Brian at some point seek your
 9   approval for a settlement or for a range of
10   settlements before the actual settlement?
11      A. No, no. Like I said, I didn't hear -- I
12   didn't know about it till the case was settled.
13      Q. All right. Is it fair to say you trusted
14   Brian to do the right thing?
15      A. Yes. Yes.
16      Q. And I know this calls for great
17   speculation, but Mr. Taylor, can you estimate the
18   number of hours that you spent on this case before
19   the settlement?
20      A. I have no idea. I'm going to be honest
21   with you. I have no idea.
22      Q. Do you think it was more than 20?
23      A. Probably.
24      Q. Do you think it was more than 50?
25      A. A lot of phone calls, I can tell you
```

```
                                            18
 1   that.
 2       Q.  Okay.  Do you think it was more than
 3   50 hours, or do you think it was somewhere between
 4   20 and 50?
 5       A.  Yeah, I guess.  Yeah.  I mean, I guess.
 6       Q.  Okay.  Were you aware, based on your
 7   conversations with Brian or with others, about any
 8   disagreements on strategy or tensions of any kind
 9   between the ERISA attorneys that included Brian
10   and the three big firms in the case?
11       A.  No.
12       Q.  And how did you learn about the final
13   settlement in this case?
14       A.  I think he sent me a letter and he called
15   me and said it's getting near the end or something
16   like that.
17       Q.  Okay.  And do you remember anything else
18   that he said?
19       A.  No.
20       Q.  Do you remember what the amount was,
21   Mr. Taylor?
22       A.  Of what?
23       Q.  The total settlement.
24       A.  I think he told me it could be, like,
25   300 million.
```

```
                                            19
 1       Q.  Okay.  Did that seem fair and reasonable
 2   to you?
 3       A.  I guess.  I wish I had it.
 4       Q.  Don't we all.
 5       A.  Yeah.
 6       Q.  Were you satisfied with McTigue Law
 7   Firm's work in the case?
 8       A.  Yes.  Very much.
 9       Q.  And you indicated that you found out
10   about the service award late in the case.  How
11   much was that service award for?
12       A.  10,000.  I already told you that.
13       Q.  Okay.  And did you think that 10,000 was
14   fair compensation for the work that you'd put into
15   the case?
16       A.  Yeah, I guess.  Yeah.  I mean, everybody
17   wants more but, you know, like I said, like I told
18   the Judge, I think after all this we should get
19   more.  You know?  For all this aggravation we've
20   been going through.
21       Q.  All right.  And were you ever shown any
22   documents that State Street had produced in the
23   case?
24       A.  No.  I don't remember.
25       Q.  All right.  And you weren't aware of, you
```

