# EX. 37

Volume: 1

Pages: 1-136

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

--------------------------------------

In Re: STATE STREET ATTORNEYS FEES

--------------------------------------

BEFORE: Special Master Honorable Gerald Rosen, United States District Court, Retired

DEPOSITION of LYNN LINCOLN SARKO

September 8, 2017, 9:11 a.m.-12:29 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter: Paulette Cook, RPR/RMR



Page 10

Page 12

Page 11

Page 13

case progressed?

A. Um, yes. But I will say in every case there are tensions. There were -- you know, we came into this case after it had already started, and I was aware of some tensions when we first got in between Mr. McTigue and the Labaton firm.

And I don't say that casting dispersions towards anyone, but they were both representing at that time different classes.

Q. And beyond the occasional tension among counsel, could you characterize for us the level of scrutiny that federal regulators presented in this case?

A. I'm most familiar with the Department of Labor, and I think, as I had explained before, under the ERISA statute there is authority on three people to bring these types of cases.

One are the plan participants. The second one are the fiduciaries of the plan. And the third one is the Department of Labor.

The Department of Labor monitors these very clearly, and they have a -- they're not only interested in the defendants and what the release issues are if you try to settle a case, they're

Page 14

**interested in the recovery and how much of that recovery is going to class members.**

**And part of that is the attorneys' fees. And they -- their view is that they have a obligation to scrutinize those fees on the sense that the more that goes to the attorneys, the less goes to the plan participants.**

**However, there's a tension because they do not have the resources to bring all the cases in the world. They value private plaintiffs bringing cases. They also, at least in the past, had believed that counsel should be compensated. So they -- they want to make sure that the fees are fair and that, you know, they're proper.**

**They also believe in transparency. So they want to know, you know, just as a Court does, what the fees are and whether they're justified.**

**THE SPECIAL MASTER:** Lynn, so that we're clear, in a case such as this in which there are two classes or sets of classes --

**THE WITNESS:** Right.

**THE SPECIAL MASTER:** -- an ERISA class and a non-ERISA class, customer class, is the Department of Labor's focus on the ERISA class, or

Page 15

is it looking at both classes? Does it view itself as a protector of both classes?

**THE WITNESS:** I'm not speaking on the Department of Labor, but in my experience --

**THE SPECIAL MASTER:** Just based on your experience --

**THE WITNESS:** -- they're focused with laser-like intensity on the ERISA case and the ERISA class. And they will, you know -- I don't think they really pay attention to what the non-ERISA part of the case the fee award is.

I think their view is that's the purview of the federal judge, and it's not their business.

**THE SPECIAL MASTER:** Is that because of the department's jurisdictional mandate --

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** -- under the statute?

**THE WITNESS:** Yes. And I also think that, you know, their view is in many of these cases there are lots of different interests.

There is the department of the SEC, the Department of Justice, etcetera, and they -- they pretty much, as you say, stay in their lane, and

Page 16

[redacted]

Page 17

[redacted]

Page 22

[redacted].

Page 23

[redacted]: So the DOL -- in realistic terms DOL had to be satisfied[redacted]

[redacted] in almost every case I've been in where there is an ERISA -- large ERISA exposure, the defendants will want to make sure they [redacted] I mean in this case, bluntly, you have State Street, and you never know, but it seemed clear that they wanted a global settlement. They were free to have settled the customer case separate and the ERISA case separate.

It was pretty clear that they weren't

Page 24

going to settle -- if they were going to settle the ERISA case, they were going to settle the Department of Labor and the plaintiffs' class case at the same time

And as a background, you know, we have a history of litigating with alongside the Department of Labor. I mean I mentioned Enron. We were -- during the time of this case had a case in Alabama where we were jointly going to trial with the Department of Labor as co-counsel.

So in the ERISA portions of the case they view themselves as active participants.

**BY MR. SINNOTT:**

Q. And the top paragraph I found a bit intriguing, counsel.

Attorney Bob Lieff addresses the concerns that have been and the course of action that have been raised by Attorney Sucharow and Thornton and says,[redacted]

What's going on here? Why is that the proper tact as far as -- to the extent your

Page 25

[redacted]

Page 34

[redacted]

Page 35

**THE WITNESS:** That was a negotiated point with the Department of Labor, and it was having discussions with them about this case, other case -- other similar-type cases, how large this case is, how much work the ERISA folks did, etcetera.

As I say, they're very focused on the ERISA portion.

**THE SPECIAL MASTER:** I can't remember. What's the term of that 10.9 -- ERISA settlement? There's a term --

**THE WITNESS:** 10.9 million dollars in attorneys' fees shall be paid out of the ERISA settlement allocation.

**THE SPECIAL MASTER:** ERISA settlement allocation.

**THE WITNESS:** Right. So that means 60 million, the maximum that can be deducted, and that is because they were focused with laser-like intensity on [redacted]

**THE SPECIAL MASTER:** -- to the class.

**THE WITNESS:** -- to the class.

**THE SPECIAL MASTER:** So the ERISA attorneys did not get 10.9 million dollars.

Page 36

[redacted]

Page 37

[redacted].

Page 50

[redacted]

[redacted]

Q. So the trust issue can I infer is that
Attorney McTigue didn't necessarily trust lead

Page 52

counsel and its discretion in distributing attorneys' fees and was looking for some transparency, or at least to use the documents that had previously been entered in the case?
**A. Yeah, I think as Ronald Regan would say, trust but verify. So I think Brian was being careful.**
Q. But you respond to Brian's e-mail.
Could you tell us what you were telling him there?
**A. One of the issues that the Department of Labor was very interested in was was** [redacted]

Page 53

[redacted]
Q. So you felt the Department of Labor might sense a problem and may respond negatively or at least in a way that counsel did not want it to respond?
A. [redacted]

**And I would just be clear. I was unaware of any agreements or any participation of anyone who was not a class counsel in this case.**

**So, you know, looking at that phrase, I knew that there were some discussions between customer class counsel amongst themselves of how they were going to divide any fee. At the time, you know, I knew that, you know, the case was in Boston, and Labaton was acting as, you know, what I thought was local counsel in addition to their other duties.**

**n**

**"Charlets" which is a type of a cow on a farm but...**

**I don't know who he is or had any dealings with him.**

**THE SPECIAL MASTER:** But the firm -- your firm had at least appeared in cases that he had appeared in apparently.

**THE WITNESS:** Yeah. There is -- there is a airline -- domestic airline case that when we did a search in our database, it turns out he was counsel in a case that was filed in California I think or New York -- I guess we had filed one in California, and he had filed one in New York, but there are hundreds of cases that were MDL in that case. And he showed up as a -- on the service list.

But no one in my firm -- I asked. No one has -- knows who he is or has had any dealings with him.

Q. And in that response you indicate that you did not know -- the firm did not know that Mr. Chargois had any relationship with or involvement in the State Street litigation, and you were not made aware of this involvement prior to the time that the special master and counsel inquired about Mr. Chargois in August.

Can we also infer that you did not know about any other person that might be considered to be a referring attorney for Labaton or for customer class counsel?

A. **I did not. And, in fact, my understanding was that the Arkansas Teachers Association, Mr. Hopkins, contacted Labaton about the case. So I didn't know that there was a referring attorney at all.**

**THE SPECIAL MASTER:** Which brings us to this question I'd like your thoughts about as a veteran practitioner in this area, particularly on the plaintiffs side.

What is your understanding of a referral fee and a referring attorney?

**THE WITNESS:** Um, well, the term "referral fee" has a meaning -- a specific meaning in the ethical rules. And, you know, the ABA has a model rule. I think it's 1.5. Most states have rules as to referral fees.

There also used to be long ago I think in the nineties a term called "forwarding counsel," and certain states allowed forwarding counsel.

But, you know, the ABA was active, and

Page 54

Page 56

Q. And in that response you indicate that you did not know -- the firm did not know that Mr. Chargois had any relationship with or involvement in the State Street litigation, and you were not made aware of this involvement prior to the time that the special master and counsel inquired about Mr. Chargois in August.

Page 55

Page 57

Can we also infer that you did not know about any other person that might be considered to be a referring attorney for Labaton or for customer class counsel?

A. **I did not. And, in fact, my understanding was that the Arkansas Teachers Association, Mr. Hopkins, contacted Labaton about the case. So I didn't know that there was a referring attorney at all.**

specify very clearly who gets what, and others, you know, describe more generally, but that's a second requirement.

**MR. KELLY:** Excuse me. Object -- it's being suggested people are having a hard time hearing the witness, not the questioners.

**THE SPECIAL MASTER:** Can you speak up, Lynn?

**THE WITNESS:** Yeah. There are three issues I think that are involved.

One is the settlement agreement has certain obligations sometimes as to who can share in a distribution. There is class notice, and certain class notice makes representations.

There is the order that the Court issues approving the settlement that may specify what it is, you know, and -- I mean generally in a class action only class counsel may share in the award of fees. Or shall you say authorize counsel?

You know, and I guess the issue of referral fees are in class actions, in my experience, typically if there is a referral counsel, that referral counsel might receive an extra bump so-to-speak, but usually they appear on

[redacted]

[redacted]

[redacted]



Page 70

Page 71

divided up.

But in every case no judge wants to be surprised. So the answer is if you think it might be relevant, you should tell the Court.

**THE SPECIAL MASTER:** Err on the side of transparency and disclosure?

**THE WITNESS:** Yes. As I said yesterday in a lead counsel appointment hearing in Kansas City, I told Judge Crabtree that one of the issues in appointing lead counsel, he wants to make sure at the end of the case you're not surprised, and you're not embarrassed. And I promise you that I will not do either.

**THE SPECIAL MASTER:** When did you first find out about the arrangement with Mr. Chargois in this case?

**THE WITNESS:** I'm still finding out about the arrangement.

The first time I heard about Mr. Chargois was in August when your counsel asked me about it, and I've listened in on some depositions, to parts of them, you know, usually from airports. So I have pieces.

And I think the issue that -- maybe it'd

Page 72

Page 73

I'm willing to guess that not all the customer class counsel knew the details.

And I only say that because in cases I've had somebody might say, oh, so and so is a local counsel or so and so is a referring counsel.

You know, I in those cases if I'm lead counsel will ask to see -- you know, I want to see the backup so-to-speak.

**THE SPECIAL MASTER:** The referral --

**THE WITNESS:** But if I'm not the lead counsel, you know, I would assume that if somebody says they're the referring counsel or they're the local counsel, that that is a term of art. And therefore I'm assuming it's legit.

**THE SPECIAL MASTER:** And Department of Labor was not aware -- it was not disclosed --

**THE WITNESS:** Correct.

**THE SPECIAL MASTER:** -- to the Department of Labor. Not disclosed to the SEC.

**THE WITNESS:** I have no knowledge of that. I'm guessing not but...

**BY MR. SINNOTT:**

Q. What would you have done, counsel, if during the course of this case you had learned about

Mr. Chargois?

A. **Well, I think in my answer -- if we go back to the original time, the 9 percent deal, I would not have agreed to that. I guess I would not have agreed to file a joint fee petition if some money was going to Mr. Chargois now that all this information has come out.**

**I mean the first thing is I would have asked some questions, but I think that's -- you know, that's 20/20 hindsight.**

**I think the real issue is if I would have known this information, I would have not agreed to file a joint fee petition. Because I would not have wanted -- I mean bluntly in order to do that, I would have had -- I would have first had to talk to the other ERISA counsel, and they would not have agreed.**

**I would have had to get approval from the named plaintiffs who would not have agreed. I mean you've met our named plaintiffs. They're straight shooters. They would say this doesn't sound right.**

**I would have insisted that if we were going to do it, that he would have had to file a**

**notice of appearance, you know, would have been disclosed. I guess there'd be issues as to why he's getting paid, etcetera.**

**But that's easy. I would have -- later if I would have found out at the time before we filed the fee petition, I would have not agreed to be part of this. And I suspect if you ask -- you know, I'm channeling -- but some of even the other customer class counsel, they would say they wouldn't have either, you know. It isn't -- wasn't their deal.**

**And on the claw-back agreement, I would have never signed the claw-back agreement.**

**THE SPECIAL MASTER:** Would you have felt an obligation -- had you known about this agreement with Mr. Chargois that Labaton had and that ultimately the other two firms agreed to participate in the distribution, would you have felt an obligation to disclose that in your depositions with the Department of Labor?

**THE WITNESS:** If it was a joint fee petition, yeah. And I just want to say this last thing -- and you're going to be asking the people. I don't believe that the other customer class

counsel knew about the details of this arrangement.

**THE SPECIAL MASTER:** By the "other customer class," you mean --

**THE WITNESS:** Lieff Cabraser or even the Thornton firm. I mean I listened to part of Mike Thornton's deposition. That's not to say somebody in the firm didn't know, but I mean he seemed to be generally surprised.

And I've dealt with the Lieff Cabraser firm for, you know, many years, and I've never heard of -- of them participating in anything like this.

**THE SPECIAL MASTER:** They may not have known the details of the arrangement with Mr. Chargois, but they certainly knew that he was going to get a percentage of the total fee based upon an agreement that Chargois had with Labaton.

**THE WITNESS:** I -- I saw an e-mail, but other than that, I have no knowledge.

**THE SPECIAL MASTER:** Okay.

**THE WITNESS:** I saw an e-mail recently.

**THE SPECIAL MASTER:** So what would you have done? You said you would have filed a separate fee petition.

What would you have done had you know of

Page 78

this agreement with Mr. Chargois or to pay -- I should say pay -- Mr. Chargois 5.5 percent of the total fee?

**THE WITNESS:** I guess the question is when. Again --

**THE SPECIAL MASTER:** Well, had you known -- at the time of the negotiation. Let's go back to the time --

**THE WITNESS:** Yeah.

**THE SPECIAL MASTER:** -- you negotiated the 9 percent which became 10 percent.

**THE WITNESS:** Right.

**THE SPECIAL MASTER:** Now it wasn't 5.5 percent at that time, but what would you have done if you had known that Mr. Chargois was in a position to receive a significant fee in this case?

I don't want to call it even a fee -- a significant payment.

**THE WITNESS:** Yeah. I would not have signed the agreement, but I just want to be clear so that no one misunderstands. I'm not quibbling with our agreement over the 9 percent.

You know, the reason why I say I wouldn't have signed it was not because of that. I

Page 80

Page 79

would not have signed it because I would not have wanted to file a joint fee petition in which Mr. Chargois was going to be receiving money, directly or indirectly, from.

**BY MR. SINNOTT:**

Q. That's an interesting response, Lynn.

Do you think that reallocation is appropriate?

**A. You know, I'm being very careful because I don't want anyone to think that, oh, Lynn, is trying to have the ERISA lawyers receive more money. That's not -- to me this is -- I'm not -- that's not where I'm going at all.**

**I don't think Mr. Chargois received -- deserves the money. I also don't believe that the other two firms -- I mean you can break it down -- the other two firms don't deserve to be charged part of it.**

**Now whether you want to, you know, deal with other issues in the case, you can. But the real issue that we start with is I don't understand why Mr. Chargois should be getting money out of the fee pool. Or whether any, you know -- anyone should have been charged any of that.**

Page 81

is, at least clear to me, that the issue here is between the Labaton firm and Chargois. At least that's the way I look at it.

I listened to everything --

**THE SPECIAL MASTER:** Do you think -- look, from everything we've been able to see and hear in depositions, the contract that was entered into between the Labaton -- between Lieff Cabraser rather and Labaton and Thornton on the one hand, the customer class lawyers, and the ERISA lawyers on the other hand was a negotiated contract made early on --

**THE WITNESS:** Hm hm.

**THE SPECIAL MASTER:** -- based on the knowledge that everybody had at the time.

Assuming that on the ERISA side no lawyers knew about the agreement with Mr. Chargois, is your testimony here today that it would not have affected the ERISA lawyers' negotiating position in agreeing to some percentage?

**THE WITNESS:** Not at all. It would have --

**THE SPECIAL MASTER:** I want to be clear on that.

**THE WITNESS:** Yeah, it would have.

It would have because we wouldn't have agreed to file a joint fee application. We would not have agreed to -- well, you know, part of any agreement is that you want there to be full disclosure of anything affecting it at the front end.

I guess, to start with, was that 9 percent deal when Bob Lieff and I discussed it was for the purpose of putting the people onto the same team so-to-speak, and part of that, to get the people trusting each other because there was some distrust between certain ERISA lawyers and certain customer class lawyers.

So I guess the answer is it seems pretty obvious to me step one is if in that negotiation I called the other ERISA lawyers up and say, hey, let's work together with the customer class lawyers and don't worry about bury your issues with the Thornton -- or with the Labaton firm on, oh, by the way, there is this lawyer in Texas that is getting a share of the fee but you can't tell anyone about the person, the deal would have never happened.

entities, to the goal line. And so that was -- that was this piece of it.

And I guess all I'm saying is if you would have dropped this piece of information into the mix, it would have blown that up. But I do believe that that information should have come out at day one. And I'm guessing if it came out at day one, maybe it would have gone away.

You know, I still don't understand why -- why Damon Chargois should have gotten paid money when the witness for the Arkansas Teachers Fund said they didn't know about it.

And if that would have been cleared up at the beginning and you would have taken that away, then maybe we wouldn't have this issue.

**THE SPECIAL MASTER:** So --

**THE WITNESS:** But it would have been --

**THE SPECIAL MASTER:** I think you answered my question, but there was a lot of answers in it.

**THE WITNESS:** Yeah -- no, let me go forward. I guess I'd also say that if you would have said -- if as part of that you say, okay, get past that, would it have affected your negotiation



Page 86

Page 87

Page 88

million, or was it coincidental, ended up becoming a 7.5 million dollar settlement or allocation?

Did -- you know, who drove that diminution in value? I mean is that just something DOL laid out there as an upper marker that had nothing to do with the number that was originally arrived at?

A. **The discussions with the Department of Labor and the determination of the 8.1 percent was -- did not, as far as I felt, was not connected to any other agreement in the case.**

**It was purely an issue of in a 300-million-dollar settlement, of which we had 60 million dollars for the ERISA class, and we started with the thought of would 25 percent of a fee be proper for -- for everyone, and the issue was what would the Department of Labor feel comfortable of.**

**You know, there were people at the time saying that, you know, this is a hold-up because we've done all the work, and the Department of Labor is waltzing in at the last moment and, you know, trying to take credit. And there's -- you know, it depends on which way you look through the window, but I could see that view.**

Page 89

**And do I think that the -- I think the ERISA class members got a great deal; and if they would have been charged 25 percent, that would have been proper. But what we ended up getting done was an 18.1 percent cap.**

**BY MR. SINNOTT:**

Q. Do you think the role and payments to Chargois were material enough to have warranted notification to the class?

A. **Um, well, I don't think -- let me answer I think no -- I mean I think the class should have been notified as to what attorneys' fees were being paid. I think the class needs to know who is, in essence, getting the money.**

**I think that's actually an issue for the judge to do. I mean the judge should decide who can share in the fee. And if the judge decides that Mr. Chargois should not be getting the money, then he shouldn't get the money.**

**THE SPECIAL MASTER:** He's got to know about it first though.

**THE WITNESS:** He's got to know about it. I guess I'd say the class -- the class was notified and got charged what they charged or paid.

Page 90

Page 91

**THE SPECIAL MASTER:** Let me put it a little more directly, please.

**THE WITNESS:** Right.

**THE SPECIAL MASTER:** If you had known about the Chargois arrangement --

**THE WITNESS:** Right.

**THE SPECIAL MASTER:** -- would you have felt an obligation to disclose that to the class representatives, to the folks at Andover?

**THE WITNESS:** Oh, absolutely, and I would have said it can't be done without their approval.

I guess if it's going to be done out of any monies from the ERISA class. I mean they had authority only over monies from the ERISA class.

**BY MR. SINNOTT:**

Q. What about the regulators, DOL, SEC? Would this have been material to them?

And based on your experience, what do you think they would have done?

A. **Um, I think that -- I think that State Street would have thought -- not State Street.**

**I think the Department of Labor would have thought this was the responsibility of Judge**

Page 92

**Wolf, and they would have expected that Judge Wolf was controlling the class attorneys' fees and that he was over it.**

**I think they would have --**

**THE SPECIAL MASTER:** Inherent in that though is that it would have been disclosed to Judge Wolf.

**THE WITNESS:** Right. Right. And I think if it was disclosed to them, the Department of Labor, they would have called me up and said what's going on here, and, you know, what do you think should happen.

And I think the answer is that if money is to be paid to class counsel -- if money is to be paid to anyone, it has to be by authority of the Court and abide by ethics rules.

And if -- and if those two things happened, the Department of Labor would be happy.

**BY MR. SINNOTT:**

Q. Do you think that the revelation of an obligation like this, ultimately 4.1 million dollars, would make a district court judge a little bit more scrutinizing of lodestar, of numbers that are submitted as part of the case on the premise

Page 93



Page 94

[redacted]

Page 95

[redacted]

Page 96

[redacted]

Page 97

writes: "Lynn, you and I should discuss how best to handle Brian. I completely agree with you. Perhaps a side letter from me as lead counsel saying I intend to abide by the agreement entered into between class counsel and ERISA counsel dated whatever would satisfy him."

Do you see that?

**A. I do.**

Q. What was the issue that was with Brian? Was it the same one as we referenced earlier?

**A.** [redacted]

Q. Okay. And it appears that it might have gone a step further. If you look at Dan Chiplock's e-mail above that, he says, [redacted]