# EX. 38

**Lawrence Sucharow**

1

Volume:  1

Pages:  1-124

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

------------------------------------

In Re:  STATE STREET ATTORNEYS' FEES

------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,

United States District Court, Retired

DEPOSITION of LAWRENCE A. SUCHAROW

September 1, 2017, 1:31-3:59 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter:  Paulette Cook, RPR/RMR

In Re:  State Street Attorneys' Fees

Lawrence Sucharow<br>September 1, 2017

---

Page 6

```
 1                I N D E X
 2
 3  Examination of:                    Page
 4  LAWRENCE A. SUCHAROW
 5   By Mr. Sinnott                       10
 6
 7
 8
 9             E X H I B I T S
10  No.                                Page
11
12        [No additional exhibits were marked.]
13
14
15
16
17
18
19
20
21
22
23
24
```

---

Page 7

1 P R O C E E D I N G S
2 (Witness sworn.)
3 **MR. SINNOTT:** Good afternoon, everyone.
4 Welcome back. It's approximately 1:33, and our
5 witness is Attorney Lawrence Sucharow. This is the
6 case of Arkansas Teacher Retirement System, District
7 of Massachusetts C.A. No. 11-10230-MLW also known as
8 the State Street Bank & Trust Company case.
9 My name is William Sinnott,
10 S-I-N-N-O-T-T. I'm an attorney with the law firm of
11 Donoghue, Barrett & Singal. I am counsel to the
12 special master.
13 The special master is The Honorable
14 Gerald Rosen, retired, formerly of the Eastern
15 District of Michigan, and he's been appointed by
16 Judge Mark L. Wolf as special master in this matter
17 pursuant to rule federal procedure.
18 Also assisting --
19 **TELECON VOICE MESSAGE:** The following
20 participants have entered the conference. The
21 following participants have entered the conference.
22 No names available.
23 **MR. SINNOTT:** Also assisting the special
24 master to my right is Attorney Elizabeth McEvoy,

---

Page 8

1 M-C-E-V-O-Y, and to her right is Justice Mary Beth
2 Kelly who's also part of the special master's team.
3 On the telephone is Attorney John
4 Toothman, and we'll get everyone else's identity on
5 the phone in a moment just to see who's called back.
6 But at this time I would respectfully
7 ask that counsel identify themselves beginning with
8 Joan.
9 **MS. LUKEY:** Joan Lukey, Choate Hall &
10 Stewart here as outside counsel to Labaton Sucharow,
11 and the witness.
12 **MR. SINNOTT:** Thank you. Justin.
13 **MR. WOLOSZ:** Justin Wolosz from Choate
14 Hall & Stewart also on behalf of Labaton Sucharow
15 and the witness.
16 **MR. STOCKER:** Mike Stocker, general
17 counsel to Labaton.
18 **MR. SINNOTT:** Brian.
19 **MR. KELLY:** Brian Kelly and James Vallee
20 of Nixon Peabody, outside counsel for the Thornton
21 Law Firm.
22 **MR. SINNOTT:** Thank you. Jim.
23 **MR. VALLEE:** He announced me. Thank
24 you.

---

Page 9

1 **MR. SINNOTT:** I thought you might want
2 to do it for yourself.
3 **MR. VALLEE:** Brian Kelly can --
4 **MR. SINNOTT:** More reason if he tried to
5 speak for me. All right.
6 And on the line let me -- just to save
7 talk-overs, if I could see here, John Toothman, are
8 you on the line?
9 **MR. TOOTHMAN:** Yes.
10 **MR. SINNOTT:** Richard, are you on the
11 line?
12 **MR. HEIMANN:** Yes. Richard Heimann of
13 Lieff Cabraser. Thank you.
14 **MR. SINNOTT:** Thank you, Richard. Lynn,
15 are you on the line?
16 **MR. SARKO:** I am briefly, but David
17 Coakley is going to get on shortly.
18 **MR. COAKLEY:** Yes. David Coakley is on
19 the line. I'm with Lynn's firm.
20 **MR. SINNOTT:** Okay, thanks, David.
21 Brian? Brian McTigue, are you on the line?
22 (No response.)
23 **MR. SINNOTT:** Okay. Emily?
24 **MS. HARLAN:** Yes. Emily Harlan of Nixon

---

In Re:  State Street Attorneys' Fees

Lawrence Sucharow
September 1, 2017

Page 14



Page 16

```
 1  being brought to meet you by Eric, what was his
 2  relationship to your firm?
 3  A.  Joint venturer.
 4  Q.  What do you mean by that?
 5  A.  That he was working with Eric to try to
 6  secure opportunities to speak with pension funds,
 7  union funds in the area in which he had some what I
 8  call credibility.  He had been working.
 9      He had a Little Rock office, for
10  example, and we were seeking to get an interview by
11  Arkansas Teachers, for example, but I do know that
12  he's also acted as co-counsel and local counsel in
13  cases where he's qualified to do so.  I think his
14  office is somewhere in Texas.
15  Q.  And what --
16  A.  I think I need you to understand in context
17  this is just one relationship of Eric trying to
18  develop business, and we're trying to develop
19  business through multiple relationships.
20      So it's nothing that -- there was
21  nothing special about that.
22  Q.  Okay.  So this was a typical type of
23  relationship that Eric or one of your relationship
24  people would develop with someone.
```

Page 15

```
 1  A.  I do know of the name.  I know the name
 2  Damon more than Chargois.
 3  Q.  All right.  Tell us about the individual you
 4  know as Damon or Damon Chargois.
 5  A.  I don't understand the question.  I'm sorry.
 6  Q.  Sure.  When did you first meet him?  How do
 7  you know him?  What's his relationship with Labaton?
 8  A.  I knew the name before I met him.  I had
 9  understood that my partner, Eric Belfi, was working
10  with him in trying to develop business relationships
11  in the south.  So I saw e-mails that had the name
12  and things like that.
13      I think I met him on one, possibly two,
14  occasions when he might have come to the office in
15  New York, and Eric brought him by to say hello
16  'cause I was the chairman of the firm.
17      I smiled, shook his hand, said good to
18  be working with you.
19  Q.  Okay.  And when was that approximately?
20  A.  The visits to the office?  I -- I -- I can't
21  -- two years ago, four years ago would be a best
22  guess.
23  Q.  And describe if you would, Larry, what
24  Chargois' relationship -- other than his, you know,
```

Page 17

```
 1      But this one took on some significance,
 2  didn't it?
 3  A.  I don't know what you mean by the question.
 4  I'm sorry.
 5  Q.  Let me -- let me try to be specific.
 6  A.  This is always significant.  I mean
 7  that's --
 8  Q.  In the State Street case what was Damon's
 9  role or connection to the case?
10  A.  I'm not sure I ever knew in the sense that I
11  didn't hear 'til later on that there was an
12  obligation to him.  So I don't know -- again, I was
13  not at the commencement of the case.
14      I was brought in, effectively, after we
15  succeeded on defeating the motion to dismiss in an
16  effort -- a long effort to see if there's a way to
17  take a non- -- in my view, take a non-traditional
18  path towards resolution.
19  Q.  And was that your first contact with the
20  State Street case was after the motion to dismiss?
21  A.  I might have been involved in some
22  discussions with the Lieff Cabraser firm and the
23  Thornton firm about the nature of the claim.
24  Q.  When did you first learn that Mr. Chargois
```

Jones & Fuller Reporting
617-451-8900   603-669-7922

In Re:  State Street Attorneys' Fees

Lawrence Sucharow
September 1, 2017

Page 18

1   was a referring attorney in this case?
2   A.   **Closer to the time that we approached**
3   **settlement.  It may have been that I should have**
4   **known because I know we had some ongoing**
5   **relationship with him, but it was nothing that was**
6   **in the forefront of my mind.**
7        **In fact, I remember Mr. Bradley saying**
8   **I'm talking with Chargois, and I -- I had to say**
9   **who.  I -- and he said Damon.  I said oh, oh, Damon.**
10  **At least I knew where to place him.  So it was -- my**
11  **relationship was relatively remote.**
12  Q.   How did Bradley meet Damon Chargois?  Do you
13  know?
14  A.   **I do not know.**
15  Q.   Do you know how long he'd known him for?
16  A.   **No.**
17  Q.   And when did you become aware that Damon
18  Chargois had a referring attorney a significant
19  stake in this case?
20  A.   **At some point -- I'm trying to think what**
21  **year; 2015 -- I happen to be speaking with Garrett,**
22  **and he mentioned that there was an obligation that**
23  **had to be dealt with, and Eric confirmed that to me.**
24       **So I knew there was an obligation.  It**

Page 19

1   **was not described to me in any further detail.**
2   Q.   And by obligation you mean that he was owed
3   a piece of any settlement or --
4   A.   **No.**
5   Q.   -- judgment?
6   A.   **A piece of our attorneys' fees.**
7   Q.   Of the attorneys' fees?
8   A.   **Yeah.**
9   Q.   And when did you become aware of
10  specifically how much of an obligation he was owed?
11  A.   **I'm trying to answer the question in my**
12  **mind.  I became aware of an amount when I was told**
13  **by Garrett and Eric what the amount was.  I don't**
14  **know where it started.  I only know where it ended.**
15  Q.   Okay.  And it ended at 5-and-a-half percent?
16  A.   **That's correct.**
17  Q.   Did you have any discussions that you recall
18  with your fellow customer class counsel as far as
19  whether Damon Chargois' role in the case should be
20  made known to the Court?
21  A.   **I was never broached by anybody that I**
22  **recall to me or, you know...**
23  Q.   Was it broached in the context of informing
24  ERISA counsel about Damon Chargois' role in the

Page 20

1   case?
2   A.   **No.  I had my own opinions about that, but**
3   **nobody spoke to me about that.**
4   Q.   And you weren't part of any conversations
5   that involved whether his identity or his role as a
6   referring attorney should be revealed to the ERISA
7   attorneys?
8   A.   **To the best of my recollection, there were**
9   **no such discussions in which I was either informed**
10  **or participated.**
11       **MR. SINNOTT:** Larry, Joan, let me just
12  give each of you a copy of an e-mail thread.
13       **THE WITNESS:** Not the most efficient
14  setup.
15       **MR. SINNOTT:** No.  I'm thinking of
16  making them into paper airplanes.
17       **BY MR. SINNOTT:**
18  Q.   If you'd just take a moment and take a look
19  at that document.
20       (Pause.)
21  A.   **Yes.**
22  Q.   All right.  You know, just quickly scanning
23  it from the earliest -- by the way, this is Bates
24  stamped as TLF SST 012272, 2273 and 2274.

Page 21

1        And going to 2273 in review, there's a
2   message from David Goldsmith to a number of parties.
3   You are a CC on this.  And it indicates that there's
4   a draft letter setting out our plan with regard to
5   the November 10th letter we filed.  Let us know if
6   you have comments and concerns.
7        And then followed by a message from Bob
8   Lieff to the same parties and a couple of additional
9   parties it appears where he says he has no concerns.
10       There's then a change in distribution on
11  the first page of the message where Garrett Bradley
12  -- I'm sorry -- where after a message from Lynn
13  Sarko to the same parties about signing off on that
14  letter, Garrett Bradley sends a letter to you and
15  others saying -- an e-mail, and it's dated November
16  22, 2016 at 11:48, and Mr. Bradley says I think you
17  should put Damon on this letter.  And David
18  Goldsmith responds with we thought we'd do a
19  separate letter to him.
20       And then there's an e-mail from you as
21  part of that thread and that same limited
22  distribution where you say need two letters with
23  breakdown.  ERISA just gets sent to ERISA counsel
24  with 10 percent off the top and then one third each.

Page 22

1  Class co-counsel gets one with ERISA 10 percent off
2  top, Damon's percentage also off the top.  Then each
3  of class co-counsel split with percentages agreed
4  to.  In short, no reason for ERISA to see Damon's
5  split.  They only need to see their 10 percent and
6  then split three ways.
7      By the way, I want to asterisk the 10
8  percent to ERISA with a footnote saying although our
9  fee agreement with ERISA counsel only provides for a
10  9 percent allocation, class co-counsel had
11  determined to increase that to 10 percent in light
12  of the excellent work and contribution of ERISA
13  counsel.
14      Now do you remember that message, Larry?
15  A.  I do.
16  Q.  And that message refreshes your memory that
17  there was a discussion as to whether to give ERISA
18  information as -- the ERISA counsel information as
19  to Damon Chargois, correct?
20      THE WITNESS: Can I get that read back,
21  please?  There's a word that --
22      MS. LUKEY: I thought there was a word
23  drop, too.
24      THE SPECIAL MASTER: In the question or

Page 24

1  Damon should get, he was offering as I understood it
2  -- I had extended conversations, but he was offering
3  two different percentages, and the words are going
4  to get mixed up.  We're going to have to use numbers
5  at some point.
6      But he was offering him a certain -- a
7  lower percentage, quote, off the top which doesn't
8  really mean off the top, except for purposes of
9  calculation or a lower -- or a higher percentage
10  after ERISA.
11      I believe Mr. Bradley may have expressed
12  to Damon that the amount that ERISA might get could
13  be changed by the Court, and therefore it's a moving
14  target whereas the number off the top everyone would
15  know.  So you choose your poison, this one or that
16  one.
17      I was then informed that he was choosing
18  the one that Garrett had described as off the top.
19  Some of my synapses weren't working, and I said, oh,
20  my God, if that's off the top and we promised ERISA
21  off the top, doesn't that affect the calculation,
22  and therefore we're going to have to send a letter
23  describing everything as to how we reached the
24  numbers to everybody.

Page 23

1  the answer?
2      MS. LUKEY: In the question.
3      THE WITNESS: The question.
4      MS. LUKEY: I think there was a "not"
5  maybe dropped.
6      MR. SINNOTT: Why don't you...
7      (Reporter read back.)
8  A.  So the problem I had with the question was
9  the word "discussion."  I don't recall ever having a
10  discussion.  This was my decision to do it this way.
11  And if you want, I'll explain why.
12  Q.  So you don't think it was a discussion that
13  you initiated?
14  A.  No.  I made a -- I made decision as to how
15  the letter should be sent out.
16  Q.  Okay.  Well, why don't you go ahead and tell
17  us --
18  A.  I mean other people may have been expressing
19  -- well, none of it really deals with the issue that
20  I address at the top which is who should get what in
21  the letter.
22      When Mr. Bradley was negotiating on
23  behalf of the three law firms as to what -- and I'll
24  insert "if anything" 'cause it's a negotiation --

Page 25

1      And that's kind of the impression I gave
2  out to both David and probably Nicole.  I later came
3  to my senses to realize that, no, that's not true;
4  you can two off the tops if you use them just as
5  mathematical calculations.
6      So using an example of $100,000, and I
7  promise you, Bill, 10 percent off the top and you,
8  judge, 10 percent off the top, someone's going to
9  say, oh, that's two "off the tops;" you can't do
10  that.  Well, I can.  On the hundred thousand I put
11  in your column 10, I put in the judge's column 10,
12  and what's left over is the money that's left to be
13  distributed to the class counsel.
14      So I realized that doesn't affect the
15  ERISA thing.  Nicole was under the misimpression
16  that it would and actually did some calculations
17  that way, and there's other documents which show
18  wait -- well, wait a second, these are wrong, and it
19  says I checked with Larry; I'll make the
20  corrections.
21      The checking with Larry is where Larry
22  realized that he had made a mistake in his thinking,
23  which in law is okay, but I get very upset with
24  myself if I make a mistake in math.

Page 26

1  Q.  Well, aside from the "synapse" aspect of
2  your explanation, Larry, let me direct your
3  attention to the second half of that non-discussion
4  decision that you laid out.
5      In short, no reason for ERISA to see
6  Damon's split.  Now aside from any allocation
7  concerns here, you're keeping Damon's identity
8  secret from the ERISA counsel, correct?
9  **A.  I saw no reason for them to know that or**
10 **need that.  We're talking about a distribution of**
11 **fees, and what they wanted to see was what they were**
12 **going to get and what we promised them.**
13     **And, in fact, what they were going to**
14 **get was more than what was promised them, and they**
15 **were the ones assisting in receiving the breakdown**
16 **before they would execute the letter.  And the**
17 **numbers would be the same as to them regardless.**
18 Q.  But aren't you presuming what you think they
19 needed to see?
20 **A.  No.  I see no rational explanation as to why**
21 **they would need it.  I don't know what argument they**
22 **could make to me that would say, hey, we need to**
23 **know what you're getting.  They didn't even know how**
24 **we were splitting the fees among ourselves.**

Page 27

1  Q.  Don't you think --
2  **A.  Wouldn't that be of more interest?  I'm**
3  **sorry.  I'm not -- I'm not supposed to be asking**
4  **questions.**
5      **THE SPECIAL MASTER:** There is a
6  difference, Larry.  Let me tell you what it is.
7      Your fees, Lieff's fees and Thornton's
8  fees were going to be before the Court, disclosed to
9  the Court, and the allocation was going to be
10 disclosed to the Court.
11     The fees of the ERISA counsel were going
12 to be before the Court, and the allocation disclosed
13 to the Court.
14     By not bringing it to the ERISA
15 counsel's attention that a lawyer who is not before
16 the Court is going to get 5.5 percent of the total
17 award is depriving the ERISA counsel of having the
18 opportunity to weigh in not only as to their own
19 distribution but as to whether or not it's
20 appropriate in the larger context of the class
21 distribution and the larger context of the
22 allocation to the other lawyers.  You don't see
23 that?

██  ████████████████████████

Page 28

1      **THE SPECIAL MASTER:** Okay.
2      **THE WITNESS:** I do not because -- sorry.
3      **THE SPECIAL MASTER:** Is your belief that
4  the allocation to the -- to Mr. Chargois is
5  unrelated entirely to the larger allocation of fees
6  amongst the other lawyers and the larger issues of
7  the class allocation, the award to the class?
8      **THE WITNESS:** Yes.  I believe the
9  numbers work out identically.  It was a charge.
10 Mr. Chargois was a charge to the three class
11 counsel.  The three class counsel were going to get
12 the same dollars, even if they didn't have an
13 obligation to Damon.
14     If Damon didn't exist --
15     **THE SPECIAL MASTER:** But if the ERISA
16 lawyers had known 5.5 percent of the total award was
17 going to go to a lawyer who was not even before the
18 Court and had done no work on the case, they may
19 well have objected to the entire allocation scheme,
20 right?
21     **THE WITNESS:** I -- I don't know why that
22 would lead them to that conclusion.  We reached an
23 agreement early on as to what percentage the ERISA
24 counsel would get.  We -- we stuck with that

Page 29

1  agreement.
2      It's the same dollar amount except that
3  I, in fact, was the one that recommended to the
4  class counsel that we increase it to 10 percent in
5  recognition of the -- well, what's described here as
6  the great work they did.
7      The calculation of Mr. Chargois's fee --
8  the off the top is a method at arriving at a dollar
9  amount that would be charged solely to the three
10 class counsel.  There was no disclosure to the Court
11 as to what class counsel individually were getting.
12     I don't believe there was any disclosure
13 to the Court as to what each of the ERISA counsel
14 were getting.  I believe there was a gross
15 disclosure that it would be -- I think actually it
16 was 9 percent at the time to them, and that the
17 class counsel would get the balance.
18     **THE SPECIAL MASTER:** So let's talk about
19 what the judge's role is in the context of a
20 fairness hearing and approving attorneys fees.
21     A judge's role in accordance with first
22 circuit law in this case, the judge has to look at
23 the totality of the result, the percentage of fees
24 that are awarded and important to some judges --

Page 30

1 maybe not all but some judges -- how that fee award
2 is going to be distributed among counsel based --
3    THE WITNESS: Sorry.
4    MS. LUKEY: I think he wants to take
5 notes on what you're saying so that he can respond.
6    THE SPECIAL MASTER: Okay.
7    (Pause.)
8    THE SPECIAL MASTER: How that fee award
9 is to be allocated and distributed among class
10 counsel so that the Court can make a determination
11 if the amount it is considering is fair both to the
12 class and to the work done by their respective law
13 firms on the case.  That's what --
14    THE WITNESS: I'm sorry.
15    THE SPECIAL MASTER: That's what the
16 judge's role is.
17    Now it's true some judges are not as
18 interested in how fees are allocated but many other
19 judges are.  And isn't it really up to the judge to
20 make that determination when he or she has all of
21 those fee awards in front of him or her so that he
22 can make a determination?
23    THE WITNESS: You're asking for my
24 opinion?

Page 31

1    THE SPECIAL MASTER: I'm just asking you
2 if it isn't important to disclose to the Court every
3 lawyer that is going to be getting some benefit out
4 of a fee award in a class action case?
5    THE WITNESS: It has been my experience
6 regardless of what Utopia you would like to have --
7 and I have no problem in helping you try to
8 establish that transparency that we spoke about the
9 last time I was deposed and things like that.
10    We practice before hundreds of federal
11 judges, and therefore what we try to do is not
12 guess.  We try to follow the rules.  That's what
13 we're supposed to do.
14    It has been my experience in those years
15 that the courts have struggled with class action fee
16 applications with courts saying, oh, give us all the
17 information and then saying what the hell am I going
18 to do with all of this information; it's millions of
19 pages of documents, and what we're really talking
20 about is what is a fair fee to be imposed upon the
21 class for the work and the result achieved.
22    And, by the way, how do I evaluate
23 whether an hour of your time is the same as an hour
24 of Mr. Sinnott's time?

Page 32

1    I mean suppose I was sitting in a
2 negotiation room, and I came up with a brilliant
3 idea that took ten minutes.  Is that the same as the
4 other 25 people that are sitting in the room who are
5 looking at their e-mails and stuff like that?  But
6 the Court doesn't have a sense of that.
7    So the courts in my opinion have flipped
8 over -- flip-flopped over to the we just want to
9 know the gross information, what percentage are you
10 looking for, how many hours did you work.
11    There's no way I can evaluate the
12 quality of those hours.  I could look at your
13 billing rate.  Still doesn't tell me that you're a
14 genius that brought the case in alone to saying,
15 uh-oh, something's wrong here; going forward now we
16 want to have all the documents, and we're going to
17 send it out to special masters.
18    And then they realize, well, that
19 doesn't work.  That delays the end of the case by
20 nine months to a year typically.  So they flip back
21 to the other way.  So we try to follow the rules.
22    There is a rule in the Eastern and
23 Southern District of New York, for example, that
24 required all agreements with counsel to be

Page 33

1 disclosed.  Doesn't exist anymore.  I don't know the
2 reason why.  It doesn't exist anymore, and no other
3 courts really adopted it.
4    So what is a practitioner supposed to
5 learn from that?  That the Court wants the
6 information or doesn't want the information?  I know
7 of no instance -- and I understand my experience is
8 limited.  I know of no instance where forwarders --
9 people who --
10    THE SPECIAL MASTER: I'm sorry?
11 "Forwarders"?
12    THE WITNESS: Forwarders.  That is
13 people that you owe an obligation to because they
14 introduced you to a client or to a matter --
15    THE SPECIAL MASTER: We've been looking
16 for a term from Mr. Chargois.  Can we agree that
17 that's a good term to use?
18    THE WITNESS: I understand that that's a
19 term that's been used.  I don't necessarily mean it
20 in the direct context.  I believe the relationship
21 was different and turned into that without anybody
22 realizing it, but I know we'll get into that later.
23    I don't know of a single instance where
24 anyone has ever disclosed that information to a

In Re: State Street Attorneys' Fees

Page 34

1 Court or a Court saying that is information I wish
2 to have. Judge, I cannot know what disclose
3 everything means.
4 **THE SPECIAL MASTER:** Courts only know
5 what is put in front of them. They don't know and
6 they can't know what's not brought to their
7 attention.
8 Isn't the better part of practice to
9 give the Court everything and let the Court decide?
10 As you say, many judges are going to say --
11 **THE WITNESS:** I say --
12 **THE SPECIAL MASTER:** Many judges are
13 going to say, okay, that's more than I need. Other
14 judges -- and you've been before some of them -- are
15 going to want to know every dollar that went out in
16 the settlement and to the attorneys.
17 **THE WITNESS:** In the vast majority of
18 cases that I've been involved in and know about, the
19 judge signs off on an order. And -- let me just
20 leave it like that.
21 The judge signs off an order that says
22 lead counsel shall allocate among the counsel
23 entitled to fees in such manner that they believe
24 reflects their contribution to the case and the

Page 35

1 hours worked.
2 And I don't want to call that abdication
3 because, obviously, the lead counsel knows the best
4 of those other issues that the Court cannot be
5 sensitized to, whether somebody made a particularly
6 genius contribution.
7 I had -- I was co-counsel with somebody
8 who, unfortunately, put in his declaration I've
9 worked this many hours, and sometimes I have some of
10 my best ideas while I'm showering. Needless to say,
11 that made it into the judge's opinion.
12 But I have -- I have found that if
13 counsel can agree, courts are more than -- the
14 courts believe that they are actually better. If
15 the judge passes upon the total amount of the fee
16 which is the impact on the class that they're
17 intending to protect, the rest of it they leave,
18 unless somebody wants to bring an objection whether
19 it's a class member or counsel.
20 Nothing prevents counsel from coming in
21 and saying, oh, I was allocated an insufficient
22 amount. Here we had a contract that we agreed to,
23 and we paid more than the contract. So forgive me
24 if I just don't see it. And, I'm sorry, one more

Page 36

1 part of the answer --
2 **THE SPECIAL MASTER:** Let me stop you
3 right there.
4 **THE WITNESS:** Okay.
5 **THE SPECIAL MASTER:** You had a contract
6 with the ERISA counsel, but they had no idea that
7 5.5 percent of the entire fee was going to be paid
8 to a lawyer who was not involved in the case; and,
9 in fact, that that amount was more than any of the
10 ERISA counsel received and 55 percent of the total
11 amount that all of the ERISA got.
12 And you yourself said counsel -- other
13 counsel have a right to know how that distribution
14 is going to go, and they would have a right to
15 object.
16 So with that background -- let me just
17 finish.
18 With that background, how could ERISA
19 counsel have objected to either the contract amount
20 that they were given or to the larger distribution
21 at the end of the case when they simply didn't know?
22 And beyond that, they had obligations to
23 their attorneys -- to their clients rather. And it
24 may have affected how they believed their

Page 37

1 obligations were impacted to their clients.
2 So it may have had impacts all the way
3 down the line. Whether or not they had a contract
4 -- they had a contract, but it was a contract based
5 on imperfect and incomplete knowledge of where the
6 money was going. And therefore, they had not
7 imperfect knowledge about whether they should
8 object, about what to say to their clients and, not
9 just their clients, to government agencies.
10 The Department of Labor was involved.
11 The SEC was involved. The Department of Justice was
12 involved. None of these -- none of these parties in
13 interest had any indication that Mr. Chargois was
14 going to get 4.1 million dollars, 5.5 percent of the
15 total fee award.
16 So how could anybody have made a
17 reasoned estimation and decision?
18 **THE WITNESS:** Your Honor, I guess you
19 and I see it differently.
20 All of those parties have the very basic
21 information upon which they made their decision.
22 This money was paid by the three class counsel from
23 fees that were approved by the Court.
24 It had -- nobody -- no one other than

Page 38

1 those three counsel got less than they thought they
2 were going to get or that --
3     THE SPECIAL MASTER: Is that the test;
4 that they didn't get less than they thought they
5 were going to get based on imperfect information?
6     THE WITNESS: I don't think it's
7 imperfect information.
8     THE SPECIAL MASTER: Not knowing that
9 5.5 percent was going to a lawyer that had not
10 appeared before the Court, played no role in the
11 case whatsoever and was hidden from everybody else
12 in the case --
13     THE WITNESS: The money was only paid by
14 the three class counsel.  It did not impact any of
15 the ERISA counsel.  We didn't --
16     THE SPECIAL MASTER: Well, we'll get to
17 how the money was paid.  We'll get to how it was
18 paid and whether or not it really had no impact on
19 the class.  We'll get to that.
20     BY MR. SINNOTT:
21 Q.  But, Larry, this wasn't a case where nobody
22 asked.  This was a case you would agree, would you
23 not, where a conscious effort was made to keep this
24 information -- the role of Damon Chargois in the

Page 39

1 case -- away from the ERISA attorneys?
2 A.  Because I believed it was irrelevant.
3 Q.  So your answer is, yes, it was, but your
4 justification is because you believed it was
5 irrelevant.
6 A.  Well, my reasoning -- I don't call it a
7 justification.  My reasoning was it was irrelevant
8 to them.
9 Q.  Well, don't you --
10     THE SPECIAL MASTER: Whose decision is
11 that?  Is that yours?  The ERISA lawyers or the
12 Court's?
13     THE WITNESS: That it's irrelevant?
14     THE SPECIAL MASTER: Yes.
15     THE WITNESS: I made the decision.  We
16 already discussed that it wasn't disclosed to the
17 Court 'cause we didn't believe it was necessary to
18 disclose to the Court; that there's no rule that
19 requires it to be disclosed to the Court and that it
20 wouldn't -- we didn't believe it would assist the
21 Court in rendering its decision as to what a fair
22 fee was.
23     THE SPECIAL MASTER: Let me ask you
24 this:  The fee structure in this case was that the

Page 40

1 ERISA -- ultimately the ERISA class would get 20
2 percent, 60 million dollars, right?
3     THE WITNESS: The ERISA class?
4     THE SPECIAL MASTER: The ERISA class --
5     THE WITNESS: The ERISA class, yes.  I'm
6 sorry.
7     THE SPECIAL MASTER: -- would get 60
8 million dollars.  Twenty percent, right?
9     THE WITNESS: There's -- yeah, I don't
10 remember the figures.  I'll accept that.  I was
11 focusing on the fee, and you were still talking on
12 the settlement.  I apologize.
13     THE SPECIAL MASTER: We'll get to the
14 fee.  Twenty percent, right?
15     THE WITNESS: Correct.
16     THE SPECIAL MASTER: Further to the
17 agreement, the ERISA attorneys' fees were agreed to
18 be no more than 10.8 million dollars.  That was the
19 hard cap.  And ultimately they got 7-and-a-half
20 million dollars or 10 percent of the total fee,
21 correct?
22     THE WITNESS: ERISA counsel got 10
23 percent of the total fee, that's correct.
24     THE SPECIAL MASTER: Seven-and-a-half

Page 41

1 million dollars.
2     THE WITNESS: Right.
3     THE SPECIAL MASTER: And in the
4 agreement the hard cap on the ERISA fees was 10.8
5 million.  Right?
6     THE WITNESS: Right.
7     THE SPECIAL MASTER: Okay.
8     THE WITNESS: I'll accept your
9 representation.  I just don't have the figure at
10 hand.
11     THE SPECIAL MASTER: If anybody
12 disagrees with it or wants to correct me --
13     MS. McEVOY: It might be 10.9.
14     THE SPECIAL MASTER: 10.9 percent?  I
15 thought it was 10.8 but --
16     MS. LUKEY: I honestly don't know --
17     THE SPECIAL MASTER: -- either 10.8 or
18 10.9 percent.
19     THE WITNESS: Million.
20     THE SPECIAL MASTER: 10.8 -- 10.9
21 million.
22     MR. SINNOTT: Million.
23     THE SPECIAL MASTER: 10.8 is what we
24 thought.  10.8.  10.9.

Page 42

1  The differential between the
2  7-and-a-half million and 10.8 or 10.9 -- 3.3 or 3.4
3  million dollars -- was therefore going to go back to
4  class -- the consumer class counsel, correct?
5  **THE WITNESS:** No.
6  **THE SPECIAL MASTER:** No?  Where did it
7  go?
8  **THE WITNESS:** You're doing a breakdown
9  that didn't exist.  The fees were all pushed
10  together.
11  **THE SPECIAL MASTER:** Well, wasn't that
12  in the agreement?  The differential, whatever the
13  delta was between the hard --
14  **THE WITNESS:** But the fees -- I'm sorry.
15  The fees that the DOL agreed we could
16  apply for were not allocated in any way -- in
17  anyone's mind to ERISA counsel.
18  Class counsel throughout contended that
19  they had ERISA claims but would allow ERISA counsel
20  to prosecute those claims, but it was a blended fee
21  that we were getting.  It was the 10 point -- it was
22  the 75.  It wasn't, oh, here's 10.8, and you're
23  going to get 7-and-a-half of that or three-quarters,
24  and we're going to get the balance.

Page 43

1  That's not the way it was.  That's why
2  the calculation -- 'cause if -- if DOL had
3  decided --
4  **TELECON VOICE MESSAGE:** The following
5  participant has entered the conference:  Linda
6  Hylenski.
7  **THE WITNESS:** If the DOL had decided all
8  you could take is five million, I'm sure ERISA
9  counsel would not agree under our agreement that
10  that's what they were going to get then.  It had
11  nothing to do with what the DOL did.
12  **MS. LUKEY:** Your Honor, at one point you
13  were using percentage, and he was using dollars.
14  **THE SPECIAL MASTER:** Yeah, I think we
15  ought to speak the same language here.  10.9 million
16  dollars.  And what they ultimately got was
17  7-and-a-half million.
18  If you look at the stipulation and
19  agreement of settlement --
20  (Panel confers.)
21  **THE SPECIAL MASTER:** Joan, do you have a
22  copy of this?
23  **MS. LUKEY:** I don't but we'll --
24  **THE SPECIAL MASTER:** Do we have an extra

Page 44

1  copy?  I'll give you an extra copy.
2  **MS. LUKEY:** Thank you.
3  **MR. SINNOTT:** You've got one here,
4  judge.
5  **THE SPECIAL MASTER:** Page 30, footnote
6  1.
7  **THE WITNESS:** Thirty, footnote 1?
8  **THE SPECIAL MASTER:** The settlement --
9  it's the settlement agreement.
10  (Pause.)
11  **THE WITNESS:** Yes, sir?
12  **THE SPECIAL MASTER:** This is paragraph
13  22.  Let's all take a moment and read not just the
14  footnote but the paragraph.
15  **THE WITNESS:** Here, let me take this
16  off.
17  (Pause.)
18  **THE SPECIAL MASTER:** You should read the
19  whole paragraph.
20  **THE WITNESS:** Which number?
21  **THE SPECIAL MASTER:** Paragraph 22 --
22  **MS. LUKEY:** That's what we're doing,
23  yep.
24  **THE WITNESS:** Yes.

Page 45

1  (Pause.)
2  **THE WITNESS:** More than paragraph 22?
3  **MR. SINNOTT:** Paragraph 24.
4  **THE SPECIAL MASTER:** I'm sorry,
5  paragraph 24.  Yeah, I knew that wasn't tracking.
6  (Pause.)
7  **THE SPECIAL MASTER:** Then it goes to
8  footnote note 1.
9  **MS. LUKEY:** Wait.  You got to read
10  footnote 1.
11  **THE WITNESS:** I did.
12  **THE SPECIAL MASTER:** It looks from the
13  settlement agreement that there was a hard cap of
14  10.9 million dollars on the ERISA attorney fee
15  award.
16  **THE WITNESS:** No, sir.
17  **THE SPECIAL MASTER:** No?
18  **THE WITNESS:** No.  There was a hard cap
19  of 10.9 million dollars of fees that could be
20  charged to the ERISA allocation amount fund.
21  There were other funds from which fees
22  were being paid, and there was never a discussion --
23  in fact, I think, you know, when the -- when the --
24  I can't get counsel on the phone to agree with me,

Page 46

1  but there was never any discussion or limitation on
2  where the 10 percent, then 9 percent of the ERISA
3  counsels' fees would come from.  It wasn't limited
4  to the ERISA fund.
5     It was -- I think we described this in
6  our brief -- that the Department of Labor after they
7  had negotiated the 60 million then came back and
8  said, oh -- and because we were involved in doing
9  this, we don't think you -- all counsel -- should be
10  entitled to March than 10.8, 10.9 million dollars
11  from the fund as an additional benefit to the ERISA
12  funds, but as to counsel fees, this doesn't relate
13  to counsel fees at all.
14     The footnote, for example --
15     **THE SPECIAL MASTER:** Well, then help me
16  understand --
17     **THE WITNESS:** Sure.
18     **THE SPECIAL MASTER:** -- what the top
19  sentence on page 30 means.
20     No more than ten hundred thousand --
21  $10,900,000 in attorneys' fees shall be paid out of
22  the ERISA settlement allocation.
23     **THE WITNESS:** We could not take -- there
24  were allocations, like you said, 60 million.

Page 47

1     **THE SPECIAL MASTER:** Hm hm?
2     **THE WITNESS:** From that 60 million that
3  the Department of Labor and ERISA counsel wanted
4  distributed out, we were allowed to take out
5  attorneys' fees limited to 10.9 million dollars.
6     There were then --
7     **THE SPECIAL MASTER:** And then there was
8  the footnote?
9     **THE WITNESS:** Correct.  This basically
10  says in broad terms that if the Court only decides
11  to award 15 percent, a percentage less than what
12  we're allowing you, which I think was 18 percent, we
13  get the benefit of that lower percentage.  We
14  meaning the Department of Labor and the ERISA
15  settlement allocation.
16     There was also then the SEC allocation.
17  And, I'm sorry, I just don't remember how much it
18  was.  I think it was 120 million.  And then
19  everybody else allocation.
20     **THE SPECIAL MASTER:** So who got the
21  differential here between the 10.9 million out of
22  the ERISA settlement allocation and the 7-and-a-half
23  million that the ERISA lawyers were ultimately paid?
24     **THE WITNESS:** I don't think you can look

Page 48

1  at it like that.  There were not separate parts for
2  the allocation of money.
3     Like I said, if they had agreed -- we
4  had agreed with the Department of Labor that we'd
5  only take three million dollars out, there was never
6  an intention and no agreement or understanding to
7  limit ERISA counsel to three million.  Their
8  agreement was 9 percent off the top meaning of the
9  total fee.
10     So it's -- judge, I'm sorry, but it's
11  apples and oranges.  That's what we were allowed to
12  take out of -- and it was described in the notice
13  and the briefs before the Court -- because of the
14  Department of Labor's participation, you can't take
15  out more than 10.8.
16     The judge decided to award 75 million
17  which meant that the 10.8 came out, the balance came
18  out of the other two funds.
19     **THE SPECIAL MASTER:** And where did that
20  balance go?
21     **THE WITNESS:** Well, there was then a pot
22  -- I mean it's a lot of money.  So calling it a pot
23  I'm not being flipping, but there was a pot of 75 --
24  in round numbers 75 million dollars of which the

Page 49

1  ERISA counsel were entitled to 9 percent of which we
2  gave them 10 percent.
3     So the money is -- dollars were
4  fungible, but it wasn't limited or -- or benefited
5  by the fact that the ERISA pool of money -- the 20
6  million -- not 20 million --
7     **THE SPECIAL MASTER:** 10.9 million.
8     **THE WITNESS:** It says 60 million --
9     **THE SPECIAL MASTER:** Sixty million.
10     **THE WITNESS:** -- would only pay 10.9
11  towards attorneys' fees.
12     We didn't say to ERISA counsel, oh, my
13  God, you guys only got Department of Labor to agree
14  to an 18 percent fee so we're keeping all the other
15  money.  That's not the way it was.  We were working
16  together.
17     **THE SPECIAL MASTER:** My question to you
18  is much simpler.
19     **THE WITNESS:** Okay.
20     **THE SPECIAL MASTER:** If Mr. Chargois'
21  payment had been disclosed to ERISA -- to the ERISA
22  attorneys, they would have obviously been required
23  to disclose that to their clients.  They probably
24  would have been required to disclose it to the

Page 50

1  Department of Labor, to the SEC -- somebody would
2  have been required to disclose it to the SEC and to
3  the Department of Justice, and they may have
4  objected -- even if they had agreed earlier before
5  knowing this, they may have objected to the
6  allocation of fees, to how that differential of
7  money was spent, that it could have gone -- more
8  money could have gone to the cost.
9     The point is this:  They had no basis to
10  know -- they had no basis to object because they
11  didn't know.  It was kept from them.  Yes, they had
12  a contract.  They signed a contract.  But it was a
13  contract based on knowledge that was kept from them;
14  that Mr. Chargois was going to get 4.1 million
15  dollars which was 55 percent of the entire ERISA
16  award and more than any single ERISA firm was paid,
17  and they had no opportunity to bring that to their
18  class representatives.
19     They had no opportunity to bring it to
20  the Court to object.  They had no opportunity to
21  bring it to the Department of Labor with whom they
22  were negotiating, and I think everybody has told us
23  that that was an essential piece of the overall
24  settlement to get Department of Labor to sign off.

Page 51

1     So what I'm struggling with here is how
2  the payment to Mr. Chargois was not relevant to the
3  larger class settlement issues in a fairness hearing
4  before the Court.
5     THE WITNESS:  I think we simply need to
6  agree to disagree.  I don't accept virtually any of
7  your positions with respect to who needed to be
8  notified.
9     It would be my position that the client
10  representatives needed to be notified of the total
11  amount that would be deducted from the settlement
12  fund into which they would participate.  And I don't
13  believe any of the departments --
14     THE SPECIAL MASTER:  Was Mr. Hopkins
15  told of Mr. Chargois' -- of the famous Mr. Chargois?
16     THE WITNESS:  I don't know.
17     THE SPECIAL MASTER:  He's your client.
18  Wouldn't he have a right to know?
19     THE WITNESS:  I believe he -- well.  I
20  believe he would.  But I don't know whether or not
21  he was told.
22     THE SPECIAL MASTER:  So if he had a
23  right to know, wouldn't the ERISA class
24  representatives also have a right to know so they

Page 52

1  could make a judgment on the totality of the fee
2  award?
3     THE WITNESS:  I think the right to know
4  is based on his retention of counsel and the sharing
5  of legal fees between counsel, not on what fee award
6  would be given to the Court.  It's -- it's something
7  that's different -- it's a different -- different
8  right to know.
9     CONTINUED EXAMINATION BY MR. SINNOTT:
10  Q.  Did ARTRS have to be certified as a lead
11  plaintiff in this case?  Or appointed I should say.
12     THE SPECIAL MASTER:  Appointed lead.
13  A.  They were.
14  Q.  And don't you think it might have been a
15  factor in Judge Wolf's consideration as to whether
16  they should be lead, as to whether their counsel was
17  encumbered by what ended up being 4.1 million
18  dollars to Mr. Chargois?
19  **A.  Well, I disagree with the term "encumbered,"**
20  **and I don't see how it relates.  I mean this case --**
21  **I mean we achieved a phenomenal result here.  We**
22  **told the Court that we were applying for a 25**
23  **percent fee.**
24     **The Court agreed that that was a fair**

Page 53

1  **percentage.  I just don't see how any of this**
2  **relates to that.  It's not -- I'm not trying to be a**
3  **problem.  I really don't --**
4     **THE SPECIAL MASTER:**  Okay.
5     **THE WITNESS:**  -- in the real world see
6  how any of this is relevant to the issues that you
7  raise.  Maybe -- maybe I'm a warped personality with
8  50 years in the business.
9     **THE SPECIAL MASTER:**  I'm not implying
10  you're a warped personality, but let me tell you
11  from a judge's perspective how a judge might look at
12  this.
13     In the context of a class settlement, it
14  is not an adversary proceeding because the
15  defendants and the class -- in the absence of major
16  objections, the defendants in the class and the
17  class attorneys have agreed, and therefore the
18  fairness hearing is essentially the judge looking at
19  everything before him or her and making a
20  determination if the award to the class is fair and
21  if the attorneys' fee award is fair and the
22  distribution and allocation of the attorneys' fee
23  award is fair.  It's a non-adversary position.
24     And as to attorneys' fees in a class

Page 54

1 action, it's particularly non-adversary because the
2 defendant doesn't have a horse in the race.  The
3 defendant pays its money in, and that's it.  And the
4 defendant doesn't care.  So it's a non-adversary
5 process.
6     In such a non-adversary process, does
7 class counsel not have a heightened obligation of
8 transparency and disclosure so that the Court can
9 act in the role that Rule 23 places on it in making
10 determinations of fairness to the class and to all
11 of the counsel before it?  Does the Court not have
12 an obligation there to know everything?
13     THE WITNESS: Yes as to most of what you
14 said.  What I -- what I question is the
15 "everything."  I'd say everything that's reasonably
16 relevant to the judge making a decision.
17     You are expressing a view at one extreme
18 I believe.  There are judges who feel that way, and
19 there are judges at the other extreme who don't even
20 hold the hearing and sign off on the papers as
21 submitted.  It's very difficult for counsel to
22 understand.
23     As I expressed to you, there are judges
24 who vest in lead counsel the very responsibilities

Page 55

1 that you're -- in the vast majority of cases the
2 very responsibilities that you're describing that
3 the Court should take seriously and have a
4 heightened level of scrutiny.
5     It is difficult for class counsel --
6     THE SPECIAL MASTER: Let me stop you.
7 Even in those cases let's say the judge defers that
8 obligation to lead counsel as you suggest.
9     In that case would lead counsel not have
10 an obligation to all other counsel to disclose where
11 all of the money is going?  All the money from the
12 fee award.
13     THE WITNESS: You mean after the judge
14 rules that 75 million dollars is appropriate and
15 lead counsel is writing a check to each of the
16 people and, what, sends a letter with everything?  I
17 mean it's after the event possibly.
18     What I'm saying is it's not disclosed
19 before the event.  Lead counsel will never tell
20 anybody what they're expecting to get.
21     THE SPECIAL MASTER: Whether before or
22 after, even in the context that you're referring to
23 where a judge just throws up his hands or her hands
24 and says, you know what, I don't care what the

Page 56

1 lawyers get; lead counsel you decide.
2     Does lead --
3     THE WITNESS: I don't put --
4     THE SPECIAL MASTER: -- doesn't that put
5 an even higher burden on lead counsel to tell every
6 other lawyer in the case what is being distributed
7 and who it's going to?
8     THE WITNESS: To this day I don't know
9 what some co-counsel got in the case 'cause they had
10 additional counsel.  We know what went to that
11 counsel.  We didn't find it relevant to us.
12     I just don't understand how it could be
13 meaningful to counsel that my firm instead of
14 getting -- and I'm making up numbers 'cause I don't
15 have numbers in mind --
16     THE SPECIAL MASTER: In some sense --
17     THE WITNESS: -- instead of getting 30
18 million dollars got 25 million dollars, and
19 Mr. Chargois got 4 million dollars.  I don't see how
20 that benefits them.  And let me -- let me just
21 clarify one thing.
22     I never said that the Court didn't care.
23 I said it vested that responsibility, or I should
24 have said it vested that responsibility in lead

Page 57

1 counsel.  Most lead counsel take that responsibility
2 very seriously.
3     But it's hard -- I think I was going --
4 just with one more sentence, if I might.  It's hard
5 to understand what "everything" is without some
6 guidance.  And you may think this writes --
7     THE SPECIAL MASTER: What the definition
8 of "is" is?
9     THE WITNESS: Well, when you say the
10 Court should have everything, I'd appreciate more
11 guidance in the future if that's -- you know, we had
12 the discussion at the last deposition of
13 transparency, and I agree with transparency, but I
14 got to understand what you mean by transparency and
15 what the light is shining on.
16     I just don't -- I just see it the same
17 way you do, and that may be a personality flaw in
18 me.
19     THE SPECIAL MASTER: Let me come at this
20 another way.
21     In thinking about the allocation and
22 distribution of fees among the consumer class
23 counsel, didn't the fact that Mr. Chargois was going
24 to get some percentage -- 5 percent, 5.5 percent --

Page 58

1  and that that was going to be negotiated among the
2  lawyers, did that not impact the distribution itself
3  and allocation among all of the lawyers including
4  the ERISA lawyers?
5      **THE WITNESS:** Mathematically I don't see
6  how.
7      **THE SPECIAL MASTER:** Well, in how you
8  set the math.
9      **THE WITNESS:** I agree with --
10     **THE SPECIAL MASTER:** In how you set the
11 math to begin with.
12     **THE WITNESS:** I agree with you, and I'm
13 willing to work with any figures you want to throw
14 out there --
15     **THE SPECIAL MASTER:** I'm not talking
16 about figures.
17     **THE WITNESS:** Oh.
18     **THE SPECIAL MASTER:** I'm talking about
19 the agreement at the beginning.  You say they agreed
20 to 9 percent.
21     **THE WITNESS:** Hm hm.
22     **THE SPECIAL MASTER:** Had they known that
23 Mr. Chargois was going to get 5.5 percent, they may
24 well have had a different viewpoint, and the Court

Page 59

1  may have had a different viewpoint.
2      **THE WITNESS:** I can't answer.  At the
3  time they agreed to 9 percent they knew that 91
4  percent was going elsewhere.  I don't know what else
5  they needed to know.
6      **THE SPECIAL MASTER:** That some guy who
7  had nothing to do with the case, no role in the
8  case, never appeared before the Court --
9      **THE WITNESS:** All -- I'm sorry.
10     **THE SPECIAL MASTER:** -- at all was going
11 to get 55 percent of the award that all of the ERISA
12 lawyers received?
13     **THE WITNESS:** I would venture to guess
14 that all of these lawyers had had forwarding
15 obligations at one time or another and understand
16 that obligation to be payable by the entity that
17 received the benefit.  And it's unrelated to what
18 they did in the case or what they were going to get
19 out of the case.

Page 60

1  others were going to get?
2      There are e-mails from Garrett Bradley
3  to Damon Chargois and e-mails that you are on which
4  seem to imply that the ERISA -- that Mr. Chargois'
5  fee was related to the allocation, not just of the
6  ERISA lawyers but of the entire distribution.  I've
7  got just two of 'em here, and I'd be happy to show
8  them to you.
9      **THE WITNESS:** I'd like to see what
10 you're referring to.
11     **MS. LUKEY:** Sir, so I can understand,
12 are you saying that the allocation reduced the
13 dollars of the ERISA lawyers --
14     **THE SPECIAL MASTER:** That it played a
15 role in the total mix of the allocation and that
16 Mr. Chargois' fee was factored into the total mix of
17 the allocation and distribution.
18     **MS. LUKEY:** Except that's just -- I
19 think Larry just said this, but just so we're clear,
20 even though the computation was across the total,
21 that dollar amount was then taken and reduced only
22 the three consumer class firms, not the ERISA firms.
23     **THE SPECIAL MASTER:** After the
24 agreement, but the agreement was made before --

Page 61

Page 62



Page 64

1    No.  No.

2       **MR. HEIMANN:** Hi.  This is Richard

3    Heimann.  Judge, you'll have to ask Chiplock that

4    question.  I'm not sure I even understand the limits

5    of that.

6       Fees that Lieff Cabraser got were shared

7    among the Lieff Cabraser partners.  That falls

8    within the ambit of what you just asked.

9       So I really would prefer to do this by

10   examination under oath rather than on the fly with a

11   lawyer -- in this case, me -- answering the

12   questions.

13      **THE SPECIAL MASTER:** That's -- that's

14   fair enough.  We'll ask Dan when we do his

15   deposition.

16      And, of course, I'm not including

17   partners within the three firms or any of the firms.

18      (Pause.)

19      **THE SPECIAL MASTER:** Give a copy to

20   Joan, too, please.

21      **MS. LUKEY:** Thank you.

22      (Pause.)

23      **THE SPECIAL MASTER:** For the record,

24   we're referring to an e-mail dated July 28, 2016 at

Page 63

Page 65

1    8:05:03 from Bob Lieff to Garrett Bradley and then

2    an earlier -- and I should say Mike Thornton is on

3    that, Larry Sucharow is on that, Dan Chiplock is on

4    that, and Chris Keller is on that.

5       Then there's an earlier e-mail of the

6    same day -- or maybe it's a later e-mail.  Well, one

7    is probably -- one is probably Pacific time from Bob

8    Lieff at 8:05:03 p.m., and then there's one from

9    Garrett Bradley at 9:06 p.m. -- presumably that's

10   eastern time.

11      And it looks to be an earlier e-mail.

12   Do you want to take a moment to read that, Larry,

13   and Joan?

14      **THE WITNESS:** Okay.

15      **MS. LUKEY:** Okay.  Thank you, your

16   Honor.  We read it.

17      **THE SPECIAL MASTER:** It reads:  "As we

18   discuss how to distribute the fee between ourselves

19   and, of course, the ERISA attorneys, I have had

20   discussion with Damon Chargois, the local attorney

21   in this matter, who has played an important role.

22   Damon and his firm are willing to accept 5.5 percent

23   of the total fee awarded by the Court in the State

24   Street class case now pending before Judge Wolf.

Page 66

1  As you know, we had a prior deal with
2  him that his fee would be off the top.  He
3  understands that ERISA counsel is now in the same
4  pool of money."
5  "He has agreed to come..." -- it says
6  done; I believe he meant down -- "...to this number
7  with a guarantee that it will be off the
8  Court-awarded fee number.  Please reply all if you
9  agree."
10  "Given that it is off the total number
11  their..." -- it says -- it's spelled T-H-E-I-R; it's
12  probably supposed to be spelled T-H-E-R-E; I'll
13  confirm all of this with Mr. Bradley -- "...there is
14  no need to add the ERISA counsel to this chain."
15  Does that not indicate that the amount
16  that Mr. Chargois was to receive is related to the
17  amount that the ERISA counsel were going to
18  receive --
19  THE WITNESS: No.
20  THE SPECIAL MASTER: -- and that they're
21  very much mixed up together?
22  THE WITNESS: No.
23  THE SPECIAL MASTER: Why?
24  THE WITNESS: Because I think that

Page 67

1  Mr. Bradley may have been using loose language.
2  There was always an intent to honor the
3  agreement.  The only thing outstanding was getting
4  everyone's consent for the additional 1 percent.  So
5  I don't necessarily understand some of the language
6  that he used.
7  In fact, I would say the last sentence
8  given that it is off the total number, I would say
9  there will be a need to add ERISA counsel if in fact
10  it was going to reduce the number from which we were
11  going to pay the 9 or 10 percent.
12  In fact, that's not what was going on.
13  That's what confused me that I said, oh, let's get
14  them involved in this.  It was always the intent to
15  have two numbers off the top and use them as
16  numbers, as dollars.
17  So I look at this in today's light and
18  don't necessarily understand what it is he's saying.
19  Maybe you could clarify it.
20  THE SPECIAL MASTER: What does the
21  sentence he understands -- he, Damon Chargois --
22  understands that ERISA counsel is now in the same
23  pool of money mean?
24  THE WITNESS: That the fee that's being

Page 68

1  applied for includes all counsel and that ERISA may
2  separately ask for --
3  THE SPECIAL MASTER: Yeah, includes all
4  counsel.  So it is part -- in the larger context
5  part of the pool of money being paid to all counsel.
6  THE WITNESS: But it doesn't --
7  THE SPECIAL MASTER: We're getting a
8  little circular here.  I know you say it doesn't
9  affect the amount but the only reason --
10  THE WITNESS: But that's what matters.
11  THE SPECIAL MASTER: What matters is the
12  only reason it doesn't -- the ERISA counsel made an
13  agreement based on incomplete knowledge.
14  THE WITNESS: Again, I don't see how
15  that knowledge would have affected their decision
16  making but --
17  THE SPECIAL MASTER: Well, we'll -- in
18  fairness, we'll let the ERISA counsel testify about
19  this, and maybe they'll say it wouldn't have
20  affected it but --
21  THE WITNESS: I would love to hear that
22  but I was --
23  THE SPECIAL MASTER: Let me ask you a
24  question --

Page 69

1  THE WITNESS: -- not involved -- okay,
2  go ahead.  I'm sorry.
3  THE SPECIAL MASTER: You say that
4  this -- that Garrett Bradley's e-mail that we just
5  read doesn't accurately state what was going on in
6  the entire thing.
7  You're on the e-mail chain.  Did you
8  ever correct it?
9  THE WITNESS: No.  In fact, I
10  incorrectly acted upon it by giving misinformation
11  to my people which I told you I later corrected.  I
12  didn't understand it was incorrect 'til later.
13  THE SPECIAL MASTER: And Mr. Lieff says
14  he's in agreement with it.  That's the top line.
15  THE WITNESS: Well, he's -- your Honor,
16  it says, "We, LCHB, are in agreement with the 5.5
17  percent to Chargois."  He understood that that was
18  only being paid by the three consumer counsel in
19  proportion to the ultimate allocation of fees to
20  them.
21  That's what he -- well, again, you'll
22  have Mr. Chiplock here to tell you what LCHB meant
23  by that.
24  (Pause.)

Page 70

1    THE SPECIAL MASTER: Joan.
2    (Judge and counsel confer.)
3    MS. LUKEY: Justin, could you come here
4  a sec?
5    (Pause.)
6    (Counsel confer.)
7    (Off the record.)
8    THE SPECIAL MASTER: We're here.  We're
9  conferring over a document.  Sorry.
10   UNIDENTIFIED SPEAKER: Oh, okay.  Sorry.
11   THE SPECIAL MASTER: Sorry, guys.
12   THE WITNESS: Trying to drag Larry back
13  into the room.
14   (Pause.)
15   (Off the record.)
16   THE SPECIAL MASTER: I've just conferred
17  with Joan and Justin about an e-mail that I had
18  raised earlier with Mike Thornton from Garrett to
19  Damon with nobody else copied on it.
20   And because Larry -- Joan has not seen
21  it, Justin had not seen it -- he heard about it this
22  morning, but it's probably not fair for me to just
23  spring this on Larry without having seen it.
24   But we'll make sure you get a copy.  The

Page 71

1  burden of this e-mail is that Garrett is saying to
2  Damon in an attempt to get him to take less money
3  that they're trying to hold the ERISA firms down to
4  10 percent.  That's the burden of it.  I know you
5  haven't seen it but...
6    THE WITNESS: I would say that's -- I --
7  I -- I think I know what the answer is, but it's not
8  something that I can say this is one thing that I
9  think you'll find Garrett's answer interesting, but
10  it's probably something you would expect in a
11  negotiation.
12   THE SPECIAL MASTER: Okay.
13   CONTINUED EXAMINATION BY MR. SINNOTT:
14  Q.  Larry, let me ask you about -- double back
15  to something you said about something the Court
16  would be interested in and why the allocation in
17  this case with respect to Chargois, you know, would
18  probably not be of interest to the Court, or at
19  least it was nothing to prompt you to make it
20  relevant to the Court.
21   I'm looking at the -- I'm sorry, I don't
22  have hard copies, but I would imagine counsel has
23  this -- the November 2, 2016 hearing before Judge
24  Wolf that David Goldsmith presented the terms at.

Page 72

1    And on page 21 --
2  A.  I don't believe I was present.
3    THE WITNESS: Was I?
4    MR. STOCKER: No.
5    BY MR. SINNOTT:
6  Q.  In the context of what the Court might be
7  interested in, on page 21, line 14 Judge Wolf says
8  to Attorney Goldsmith:  "Why don't you remind me of
9  the terms of the allocation?"  And David says
10  "sure."
11   "We've discussed it before, your Honor.
12  I don't want there to be something that was left out
13  that your Honor wanted to hear.  We discussed it
14  briefly.  There's a plan of allocation here.
15  There's three I suppose you would call them
16  segments.  The funds will be divided among the ERISA
17  plans and the eligible group trust.  Group trusts
18  are the class members where there are certain assets
19  that are ERISA governed and certain aspects that are
20  not.  The ERISA portion of group trusts are part of
21  the ERISA settlement allocation.
22   Then you have the registered investment
23  companies or mutual funds.  They have a portion.
24  And then you have what we call public and other

Page 73

1  which is basically everybody else.  That includes
2  our client Arkansas Teacher, and they have a
3  portion.  Essentially we have a volume-based
4  calculation to figure out how much everybody gets.
5    And that is largely how we will be
6  divvying up the money from the net settlement fund
7  after fees expenses and the like are taken out.  We
8  will be sending letters.  We have sent letter to the
9  group trust class members asking them to tell us
10  about the proportion of ERISA and non-ERISA so that
11  we can get intelligence from them so that we can
12  figure all that out.  We have sufficient data that
13  State Street has provided us so that we can do the
14  calculations.  I just wanted to have that explained
15  to your Honor."
16   And then Judge Wolf asks some other
17  questions.  And then on page 26 --
18   (Pause.)
19   MR. KELLY: Bill, the first quote is
20  page 21.
21   MR. SINNOTT: Yes.
22   MR. KELLY: What's the transcript date?
23   MR. SINNOTT: November 2nd -- the
24  hearing date was November 2, 2016.

Page 74

1   (Pause.)
2   **BY MR. SINNOTT:**
3   Q.   Then on page 26 after discussing the
4   Raytheon case, Judge Wolf asked:  "And your fee
5   agreement in this case provided what at the outset?"
6       And Mr. Goldsmith says it provided --
7   "Well, it's certainly consistent with the fee we're
8   seeking here."
9       And the Court says, "Well, it was a
10  contingent fee agreement, right?"
11      And Mr. Goldsmith says, "It was a
12  contingent fee agreement of course.  Did it have a
13  cap?  I believe it was capped at 25 percent, and we
14  are seeking a fee that's slightly below."
15      Isn't it apparent from what I just read,
16  Larry, that Judge Wolf was interested in the terms
17  of the allocation, and he was interested in whether
18  there was an agreement with ARTRS in this case?
19  **A.   The allocation that you're referring to is**
20  **the allocation of the settlement fund having nothing**
21  **to do with fees to the various components of the**
22  **class which consisted of three-and-a-half -- 'cause**
23  **the group trust were part ERISA, part non-ERISA,**
24  **registered investment company public and other.**

Page 75

1   **That was the allocation.  It had nothing to do with**
2   **fees.**
3       **With respect to the fees he was asking**
4   **-- as I understand it; I wasn't there to get full**
5   **context -- he was asking what are you going to be**
6   **applying for.  Was there a fee agreement with the**
7   **client.  Yes.  "We had a written agreement with the**
8   **client I believe to allow us to apply for fees of up**
9   **to 25 percent."**
10      **We said it was limited to 25 percent.**
11  **Where it was going to be a little bit under, at -- I**
12  **don't know, if it was 24 and a high point something.**
13      **So all of that is consistent with what**
14  **the judge was interested in.  I think the judge**
15  **makes a comment that he was pleased with that in**
16  **fact because he had been seeing some fee**
17  **applications come in at a third and 30 percent.  We**
18  **said we're not asking for that.**
19  Q.   But you testified --
20  **A.   And then everything went to hell in a hand**
21  **basket.**
22  Q.   Thank you, Larry.
23      You testified earlier that you didn't
24  know if Mr. Hopkins was even told about the referral

Page 76

1   fee, correct?
2   A.   **Correct.  That relates to the gross class**
3   **counsel fee.**
4   Q.   Well, do you think Judge Wolf would have
5   been happy to find out that the client was unaware
6   of this referral fee?
7       **MS. LUKEY:** Objection.
8       **THE SPECIAL MASTER:** If he was.  If he
9   was.
10  A.   **I'm sorry, I don't -- I don't know what**
11  **motivates Judge Wolf.  I've never -- well, except**
12  **for the one time I got beaten up by having to appear**
13  **before him.**
14      **You know, I wish the judiciary was**
15  **homogeneous and could set it out, but it's kind of**
16  **all over the place.  I can only say we thought we**
17  **complied with our obligations and duties.  If Judge**
18  **Wolf had a higher standard than us and we didn't**
19  **meet his expectations, I apologize, but this is**
20  **where we thought we were at, and I -- I just**
21  **disagree with some of the premises as to how**
22  **important it is, even if people were to come in here**
23  **and say, oh, oh, it would have been important to us**
24  **to know that.**

Page 77

1       **THE SPECIAL MASTER:** Let me ask you --
2       **THE WITNESS:** Where it would yield to
3   them, they think, a higher fee, I think that may be
4   tainted.
5       **THE SPECIAL MASTER:** Let me ask we
6   talked the last time, and in your letter to me
7   earlier we talked about the importance of disclosure
8   and transparency to the Court.
9       **THE WITNESS:** And best practices.
10      **THE SPECIAL MASTER:** And best practices.
11      Why wouldn't this fall under the rubric
12  of the importance of disclosure and transparency to
13  the Court when we're talking about 5-and-a-half
14  percent of a substantial attorney fee award?
15      **THE WITNESS:** Well, one, because I keep
16  saying it came from counsel who assented to who
17  otherwise would have had the money.  It wouldn't
18  have gone to other counsel.
19      And, two, I would not disagree with you
20  to the extent that if we were developing a plan for
21  transparency and best practices, certainly I would
22  not want to go through this again.  I'd much rather
23  disclose it and find out if there's a problem that
24  anybody has with it.



Page 78

1    Maybe it was a poor judgment on my part.
2  But I certainly would sign off on your
3  recommendation that it be included in future ones in
4  our best practices.
5    One of the things that my people are
6  saying to me is we just don't know what to do.  We
7  look at the rules.
8    **THE SPECIAL MASTER:** Err on the side of
9  disclosure.
10    **THE WITNESS:** As I said, Eastern and
11  Southern District of New York had a rule and then
12  pulled it back.
13    What am I supposed to make of that?
14  That they want to know?  If they want to know, they
15  would have left the rule in place.  I think it's a
16  reasonable inference that sometimes this turns into
17  a burden to the Court, and then they switch over to,
18  like I said, another methodology which is less of a
19  burden, and then they find that maybe they're not
20  getting all the information they want, and they
21  switch over to give us everything, and that presents
22  a different problem.
23    So I've been in the business long enough
24  to know, in the profession long enough to know that

Page 79

Page 80

Page 81

1    Well, the same thing with this.  So I've
2  heard bits and pieces.  And if you want my wisdom on
3  it, which could be entirely wrong, I'll share it
4  with you.
5    **THE SPECIAL MASTER:** Please.
6    **THE WITNESS:** And that is what was
7  intended to be a co-counsel arrangement.  We filled
8  out the forms with him as co-counsel which Arkansas
9  shot down
10    So one of the two people that was
11  supposed to be working together to develop business
12  with Arkansas was pushed off to the side but could
13  be retained -- the letter says it could be retained,
14  and our retention agreement says it could be
15  retained
16    So what started off as a co-counsel
17  relationship morphed over time with people's
18  thinking into a referral relationship; but, yes, it
19  related to the client, not to a particular matter
20  There was no matter on the table
21    **THE SPECIAL MASTER:** But it's actually
22  more than a referral relationship or less than.
23  It's -- it's sort of Mr. Chargois has sort of a
24  floating lien on every case that Labaton serves as

Page 82

```
 1   counsel to Arkansas on and Arkansas is lead
 2   plaintiff or co-lead plaintiff.  It's a floating
 3   lien irrespective of whether he plays any role
 4   whatsoever.
 5       THE WITNESS: The obligation to
 6   Mr. Chargois originated at a time when nobody got
 7   paid anything.  It was the assistance in developing
 8   the introduction so that that entity would listen to
 9   what we have available to them and to decide whether
10   that's something they want to subscribe to, which
11   was the monitoring, which none of the firms in the
12   field charge for, but it could lead -- not
13   necessarily -- it could lead some -- some entities
14   maintain two lists, a litigation counsel and
15   monitoring counsel.  But it could lead to business.
16       So it was the business that originated
17   from that joint relationship.
18       THE SPECIAL MASTER: This relationship
19   which started off as a joint relationship and has
20   continued -- we got a list of I believe ten cases in
21   which Mr. Chargois has been paid a fee, some of
22   which we've been able to determine he never appeared
23   on, never did any work on
24       Apparently, this relationship continues
```



Page 86

1  written agreement somewhere that we have, isn't
2  there?  There's a written agreement
3      **THE WITNESS:** Then I've never seen it.
4      **THE SPECIAL MASTER:** Do you know if
5  Labaton has paid Mr. Chargois for any cases in which
6  Arkansas was not the lead plaintiff or co-lead
7  plaintiff?
8      **THE WITNESS:** I know that we have
9  co-counsel and local counsel relationships, not
10  forwarding relationships with him, for example, I
11  think in Texas.  I only learned that recently.  So
12  he would have been a co-counsel and worked.
13      **THE SPECIAL MASTER:** Okay.
14      **BY MR. SINNOTT:**
15  Q.  It's fair to say though, Larry, that
16  Chargois other than that original referral played
17  absolutely no role in this case?
18  **A.  That would be an assumption I would make.  I**
19  **only saw what I saw.  So I came in from -- well, a**
20  **couple of things.  No application was submitted for**
21  **time and work on the case.  So you can draw a**
22  **conclusion from that.**
23      **And I never called upon him to do any**
24  **work when I was -- I think I described myself as the**

Page 87

1  **lead negotiator and lead strategist.  I wasn't**
2  **necessarily the hands-on lawyer as you saw David**
3  **Goldsmith appear before the Court.**
4  Q.  He never entered an appearance in this case,
5  correct?
6  **A.  Matter of record.  I would doubt it.**
7  Q.  Okay.  Let me just direct your attention to
8  a document that we gave you earlier.  It's the
9  stipulation and agreement of settlement that was
10  filed on July 26th.  And along with other counsel,
11  you signed it on page 48, although there were
12  several page 48s because it's signed in parts.
13      But let me just direct your attention to
14  paragraph 21 of that document.
15  **A.  Paragraph 21?**
16  Q.  Yeah, paragraph 21 on page 27.  Do you see
17  that?
18      (Pause.)
19  **A.  I -- I -- I do.  I don't know whether I need**
20  **to read the whole thing to answer your question.**
21  Q.  No.  Just really the first sentence is what
22  I want to ask you about.
23  **A.  Oh.**
24  Q.  You're welcome to read the balance, but the



Page 90

1  actually find the answer in discovery that came in
2  yesterday.
3      MR. SINNOTT:  Okay.  We'll still making
4  our way through that.
5      THE SPECIAL MASTER:  We're going through
6  it.
7      MS. LUKEY:  Going as fast as we can
8  trying to get it to you.
9      THE SPECIAL MASTER:  So are we.
10     MR. SINNOTT:  Larry, take your time
11  reading that.
12     THE WITNESS:  Do you want me to read the
13  whole thing?
14     MR. SINNOTT:  No, you don't have to read
15  the whole thing.  The questions are going to be on
16  the first page but you may want --
17     THE WITNESS:  Yeah, I got to see how we
18  got there.  I apologize it's hard to...
19     (Pause.)
20     THE SPECIAL MASTER:  Off the record.
21     (Off the record.)
22  A.  Yes, sir.
23  Q.  All right.  Just in general terms, Larry,
24  would you agree that leading up to that face page,

Page 91

1  the first page there, there's discussion about
2  allocation and the process -- by the way, this is
3  TLF SST 052975 through 52980.
4      And looking at 52975, the first page,
5  you see there's an e-mail from Brian McTigue.  And
6  Brian says -- this is August 28, 2015 at 9:30 a.m.
7  -- Brian says I don't agree with lead settlement
8  counsel distributing attorneys' fees and expenses in
9  its sole discretion.  Attorneys' fees and expenses
10  should be distributed pursuant to the existing
11  written agreement of counsel.
12      Was that an accurate recitation of that?
13  A.  Yes.
14  Q.  And is it fair to say that Mr. McTigue
15  seemed to be asking for transparency in how the fees
16  were to be allocated?
17  A.  No.
18  Q.  No?  How do you interpret that sentence?
19  A.  I interpret Mr. McTigue to be concerned that
20  somehow he's going to get screwed, and he wants to
21  be sure that this agreement that we had was going to
22  be honored.
23  Q.  And transparent?
24  A.  No.

Page 92

1      MS. LUKEY:  Objection.
2  A.  That he was going to get what he negotiated
3  for.
4  Q.  All right.  Well, let me direct your
5  attention to Lynn Sarko's followup to that at 1:02
6  p.m. just above it.
7      And Mr. Sarko says, "We need to be
8  careful about this as the DOL had asked if there
9  were any agreements on fees between counsel, and I
10  would never answer their question.  And then they
11  seemed to forget about it, but I'd rather not
12  highlight it and have the DOL go sideways on it."
13      Isn't it fair to say that this talked
14  about how there was a risk of DOL not being
15  satisfied with the disclosures on these -- on these
16  agreements?
17  A.  I -- I don't know.  You're going to have
18  Lynn.  You can ask Lynn.  He had the conversation.
19      I don't understand it that way.  To me
20  it doesn't look like -- it doesn't look like Lynn is
21  supporting Brian in his position and would prefer
22  not to disclose the agreements.
23  Q.  Well, you respond --
24  A.  And the agreements being the 9 percent

Page 93

1  agreement and --
2  Q.  Okay.
3  A.  -- the other.
4  Q.  Well, speaking of agreements, you --
5  A.  I mean you see from my -- I'm sorry.
6  Q.  No, go ahead, Larry.
7  A.  You can see from my response that -- I don't
8  know what Caroline means.  It's just...
9      MS. McEVOY:  I think it's a voice
10  command.
11     THE WITNESS:  Can and should?  Maybe it
12  meant can.
13     MS. McEVOY:  Yeah, I assume so.
14  A.  And this had to do with power in my view.
15  You have my current view there.  This has to do with
16  power and control.
17      Brian was not prepared even after the
18  case was litigated to allow me to have what I had
19  described to the judge as a typical power these days
20  of a lead counsel.
21      He had negotiated and signed off on an
22  agreement, and he wanted that to be part and parcel
23  of both the stipulation and the notice 'cause it's
24  the only notice I've ever seen where we've broken

In Re:  State Street Attorneys' Fees

Page 94

1  out what people are going to get.
2      I believe -- I'm not trying to
3  psychoanalyze him, but I believe he was more
4  comfortable seeing it public so there wouldn't be a
5  way that somebody who wanted to say, oh, no, no,
6  we're going to give you less.  It was better than
7  what he already had which was everyone's signature.
8  Q.  It's fair to say though that notwithstanding
9  this request, you did not inform ERISA counsel of
10  the Damon Chargois referral factor in this case?
11  A.  I -- I had -- I did not inform ERISA counsel
12  -- that is correct.
13  Q.  Let me just ask -- back up and ask this
14  question:  Why not?
15  A.  One, it wasn't relevant.  To us it was -- it
16  was a firm -- a firm business obligation.  If we had
17  earned 2 million dollars and we owed 3 million
18  dollars, they weren't contributing to that to help
19  me out.
20      This was just a firm business
21  obligation.  What did it have to do with them?  I'm
22  still entitled to the fee that I'm entitled to.  And
23  what I then choose to do with it I consider to be my
24  money.  We told the Court what class counsel was

Page 95

1  going to get.
2      If that was fair, then I should get it.
3  And if I have obligations, I have lighting bills to
4  pay, I have lawyers to pay and things like that,
5  what does it matter?  This was a contractual,
6  finger --
7      THE SPECIAL MASTER:  -- quotes.
8  A.  -- quotes --
9      MS. McEVOY:  Air quotes.
10  A.  -- air quotes --
11      THE WITNESS:  Thank you.
12  A.  -- contractual obligation that we had.
13  Good, bad or indifferent, we had it.  I didn't see
14  any purpose in involving them.
15  Q.  If I characterize your statement as a
16  charade, you'll understand that I'm not casting any
17  aspersions on you --
18  A.  No, I'm not -- I'm not -- it wasn't a
19  charade.  It was a -- I use the word "contract"
20  loosely.  I'm not agreeing there was a contract.  I
21  don't know what it was.
22  Q.  And just to press you a little bit more on
23  that, Larry.
24      The reason -- even though you felt that

Page 96

1  it was none of their business, what would have been
2  the downside in telling them?
3  A.  It would just be something else I'd have to
4  deal with.  I was already dealing with something
5  that was very -- nothing was very simple when I had
6  to involve ERISA people.  I'll just leave it at
7  that.
8      This was -- even this wasn't simple.  If
9  you see -- I said in my e-mail response:  "Of
10  course, I intend to honor all commitments,
11  contracts, obligations, agreements, understandings
12  by whatever name or title, but especially those that
13  are in writing like Brian's."
14      I mean I -- I -- I was very frustrated.
15  I know your Honor pursued with other people was
16  there tension.  There was never ever tension on the
17  substantive stuff with ERISA counsel.  Never tension
18  with Lynn Sarko.
19      But from the day -- I think you have the
20  correspondence.  Let's just say that Brian and I did
21  not hit it off, and I didn't understand the way he
22  wanted to approach things.
23      So just by way of example, we had won
24  the motion to dismiss.  I had taken weeks or months

Page 97

1  to set up the first mediation in a very big case
2  without any conditions.  Defendants didn't impose
3  any conditions.  I didn't impose any conditions.
4  Brian is consolidated with our case.  He hasn't had
5  a motion to dismiss against him yet, and I
6  invite him to the mediation, and he gets back to me
7  with two pages of conditions.
8      So I -- I just -- I wasn't going there.
9  I mean maybe it's my personality.  But I get along
10  with most people.
11      THE SPECIAL MASTER:  Did this background
12  inform your decision in any way not to share the
13  Chargois relationship with ERISA counsel?
14      THE WITNESS:  Everything -- everything
15  that has made Larry Larry informed the decision.
16  It's hard to say.  I don't -- I don't think it was
17  the primary one.  The primary one is why.  It's
18  irrelevant to them.
19      We have to pay it.  We're fortunate
20  enough that two other counsel who did know about it
21  agreed to share it with us.  That's why I laughed,
22  and I wasn't asking anything of them, but that's the
23  main thing but...
24      MR. SINNOTT:  Speaking of tension.