# EX. 39

1

```
 1              UNITED STATES DISTRICT COURT

 2                DISTRICT OF MASSACHUSETTS

 3    - - - - - - - - - - - - - -x

 4      ARKANSAS TEACHER       :

 5      RETIREMENT SYSTEM,     :

 6      et al.,                :

 7           Plaintiffs,       :   CA No. 11-10230-MLW

 8           v.                :

 9      STATE STREET BANK      :

10      AND TRUST COMPANY,     :

11           Defendant.        :

12    - - - - - - - - - - - - - -x

13                                 July 7, 2017

                                   Washington, D.C.

14

15

16  Deposition of:

17             JONATHAN G. AXELROD,

18  called for oral examination by Counsel to the

19  Special Master, pursuant to notice, at JAMS,

20  1155 F Street, Northwest, Suite 1150, Washington,

21  D.C. 20004, before Christina S. Hotsko, RPR, of

22  Veritext, a Notary Public in and for the District

23  of Columbia, beginning at 1:44 p.m., when were

24  present on behalf of the respective parties:

25
```



**6**

**7**

**8**

1   employed by the Eastern Conference of Teamsters in
2   July of 1974.  We represented Teamster locals from
3   South Carolina to Maine, basically the 13 colonies
4   plus West Virginia and Maine.  And we did for them
5   basic labor law.  In a lot of those places,
6   particularly in the Carolinas and Virginia, there
7   were no law firms looking to represent unions.  So
8   we did a lot of work in the South.  I did work in
9   Maine and New Hampshire, Vermont, a little bit in
10   New York for them.
11       And then in June of 1980, my boss said
12   let's -- my boss at the Eastern Conference of
13   Teamsters said let's start a law firm.  And we
14   did.  And it started June 1st of 1980.
15       Q.  What was the name of that firm, Jon?
16       A.  At the time it was Beins Axelrod and
17   Osborne, PC.  That firm expanded and added named
18   partners and non-named people.  And then in 1996,
19   it split into three.  And Hugh Beins and I went
20   one way, the Mooney Green part of it went another
21   way, and Osborne went a third way.
22       So the firm that I'm in now started -- or
23   became Beins Axelrod in 1996 and it's had other
24   people in it and now it's smaller.
25       Q.  And your current practice for Beins

**9**

1   Axelrod, does it involve ERISA work?
2       A.  Yes.
3       Q.  And what percentage of the work is ERISA?
4       A.  Depends how you define ERISA.  But I
5   represent pension funds and health and welfare
6   funds.  That's some part of it.  I'm a trustee on
7   a retirement fund, and I'm an independent
8   fiduciary for health and welfare and pension
9   funds.  So if you combine all of that plus the
10   work that I do with Mr. McTigue, it's probably 30
11   percent, 35 percent.
12       Q.  And prior to your forming the predecessor
13   firm at Beins Axelrod, is it fair to say your
14   practice was pretty much labor and employment law?
15       A.  Yes.  But in 1992, I believe, I began
16   representing a pension and health and welfare
17   fund.  And then as it became obvious that the firm
18   was starting to split, I started to do more.
19       Q.  All right, sir.  And prior to the State
20   Street case, were you involved in any other class
21   action cases?
22       A.  Not ERISA cases.  But class action
23   employment cases, yes.
24       Q.  All right.  And just in general terms,
25   could you describe what those were?

3 (Pages 6 to 9)

**10**

1    A. We sued the District of Columbia Public
2  Schools twice in class action wage cases.  And
3  those settled.
4        We sued a company that was not making
5  proper contributions to its 401(k)s.  It was a
6  union 401(k) plan.  And that started as an
7  individual case for four plaintiffs and the
8  company said we can't do this for four, it has to
9  be for everybody, so they agreed to turn it into a
10  class action.  And that settled also.
11    Q. Okay.  And let me ask you about the
12  firm's involvement in the State Street case and
13  ask you how your involvement in the case came
14  about.
15    A. You mean how I met Brian or how -- or
16  this particular case?
17    Q. Going back to how you met Brian, if that
18  was your connection with the case.
19    A. Yeah.  About 20 years ago I represented a
20  woman who was Brian's wife at the time in an
21  individual employment case, and we became friends.
22  She was no longer his wife.  I represented his
23  girlfriend at the time in an individual employment
24  case.
25        And then he was looking for local counsel

**11**

1  to -- in the State Street to sue in Maryland.  And
2  that's what we did.  The case was terminated in
3  Maryland, and it transferred to Boston, and we
4  stayed on as counsel of record in the Boston case.
5    Q. Had you had any involvement prior to the
6  Maryland case in an action in California or in the
7  BNY Mellon case?
8    A. Well, the BNY Mellon case, I believe,
9  came afterwards.  The action in California came
10  well afterwards.
11    Q. All right.
12    A. At least the one in California that I
13  know about that I participated in came after.
14    Q. After the State Street case?
15    A. After it started.  Yes.
16    Q. And did you participate in the BNY Mellon
17  case?
18    A. Yes.  In that case I actually helped find
19  plaintiffs.
20    Q. Okay.  So describe how, based on your
21  relationship with Brian, how you were brought into
22  this particular matter.
23    A. I was licensed to practice in the
24  Maryland Federal Court, and he was looking for
25  someone to do that.  And then that started as

**12**



**13**

4 (Pages 10 to 13)

**Veritext Legal Solutions**
**212-267-6868**          **www.veritext.com**          **516-608-2400**

**14**

1 grandmother worked for the Triangle Shirt Company
2 until shortly before the fire.  And she
3 would break into --
4      SPECIAL MASTER ROSEN:  1911?
5      THE WITNESS:  What?
6      SPECIAL MASTER ROSEN:  1911?
7      THE WITNESS:  Yeah.  And she would break
8 into tears while I was growing up and say I just
9 can't stop thinking of the friends that I lost in
10 that fire.
11      And then when I was in college, I did an
12 honor's thesis about labor union endorsements and
13 kind of how members voted.  And one of the union
14 officers that I interviewed suggested that I go to
15 law school.  I was planning to go to law school,
16 and he said you ought to learn labor law and
17 represent unions.  And it all sort of fell into
18 place.
19      And then to see what banks are doing --
20 you know, it's not causing fires that kill people,
21 but it's damaging retirement prospects of
22 thousands or millions of people.
23      So it all sort of made sense to me to do
24 this.
25 BY MR. SINNOTT:



**Veritext Legal Solutions**
212-267-6868     www.veritext.com     516-608-2400



**23**

1      Q.  So there was an issue as to the trading
2   volume --
3      A.  Yeah.
4      Q.  -- and what you were talking about
5   relative to ERISA --
6      A.  Well, because there was never full
7   discovery.
8      Q.  Describe if you would, Jon, the
9   coordination among ERISA counsel, including the
10   entrance of Zuckerman Spaeder into the matter.
11      A.  Brian was in charge of our group.  Brian
12   McTigue.  And he wanted -- I think his word would
13   be more powder.  And so the South Carolina firm
14   was supposed to do that.  And that didn't quite
15   work out, and so Zuckerman Spaeder and Mr. Kravitz
16   came in.  And then slowly after that we were out.
17      Q.  Okay.  And describe how it was that you
18   came to be out of the case.  What were your
19   conversations with Brian about that or --
20      A.  My conversations were mostly with Carl
21   Kravitz, who said we were not supposed to be doing
22   as much work as we were doing.  I think I made a
23   bad decision to stop.
24      Q.  What was the work that you were doing at
25   the time that --

**Veritext Legal Solutions**
**212-267-6868**          **www.veritext.com**          **516-608-2400**



**26**

**27**

**28**

**29**

```
 1        A.  No.  We've never done that.
 2        Q.  You've never done that?  All right.  So
 3   it's partnership-track attorneys who are
 4   conducting the review --
 5        A.  Well, she wasn't partnership track, but
 6   she was of counsel.
 7        Q.  Of counsel?  Okay.
 8        A.  Yes.
 9        Q.  But you don't use staff attorneys, you
10   don't use contract attorneys, you don't use
11   paralegals?
12           SPECIAL MASTER ROSEN:  Agency attorneys?
13           THE WITNESS:  No.  We've never hired
14   anyone to do anything that wasn't a full-time
15   employee of the firm.
16   BY MR. SINNOTT:
17        Q.  And what do you think the advantage of
18   doing that is?
19        A.  I'm sorry, doing which?
20        Q.  Of using members of the firm, as opposed
21   to those other cohorts that we have discussed?
22        A.  Part of it is control.  I mean, I'd like
23   to know what -- I don't know enough about what
24   Regina did to be really thrilled about it.  But if
25   we had someone who was coming in and just sitting
```

8 (Pages 26 to 29)



**35**

```
 1   reasonable.  And I'm not absolutely certain of the
 2   300 million.
 3       SPECIAL MASTER ROSEN:  Okay.
 4   BY MR. SINNOTT:
 5       Q.  And is that because of the issue of
 6   trading volume and how much of that was ERISAs?
 7       A.  That's one issue.  Yes.
 8       Q.  Did you have any knowledge as to the role
 9   of staff attorneys at Lieff and Labaton in
10   document review?
11       A.  You've used the term "staff attorneys."
12   I have to say, I've never heard of that term prior
13   to the newspaper article that led us to where we
14   are.
15       Q.  Were you aware that they were using
16   attorneys to review documents?
17       A.  I mean, from the newspaper article and
18   subsequently, yes.  But at the time I had no idea.
19       Q.  Okay.
20       SPECIAL MASTER ROSEN:  Just so we're
21   clear, when we refer to staff attorneys --
22       THE WITNESS:  You mean attorneys that
23   they're hired for a specific case like contract
24   attorneys?
25       SPECIAL MASTER ROSEN:  No.
```

**37**

```
 1       THE WITNESS:  I know that there are law
 2   firms, big law firms, that have attorneys that are
 3   not on the partnership track and do what you're
 4   talking about.  I also know there are law firms
 5   that hire contract attorneys on an ad hoc basis to
 6   do legal research or more probably document
 7   review.
 8       I was not aware that any of that was
 9   being done in these cases.
10       SPECIAL MASTER ROSEN:  In any of them --
11       THE WITNESS:  Or in any case I've been
12   involved in.
13       SPECIAL MASTER ROSEN:  You mean contract
14   attorneys as you've defined them.  You were not
15   aware of that?
16       THE WITNESS:  I was not aware of that.
17   And I would not have known the distinction between
18   what you're saying is a staff attorney, which I
19   would have just said is a non-tenure track, for
20   example.
21       SPECIAL MASTER ROSEN:  And I think that's
22   how people have been referring to them.
23       THE WITNESS:  Yeah.
24       SPECIAL MASTER ROSEN:  Although many of
25   them are paid by the hour, they are full employees
```

10 (Pages 34 to 37)



**48**

1    A.  Sure.  Most of it.
2    Q.  Most of it?  And those are hourly
3  clients?
4    A.  Yes.  Most of our clients are hourly.
5  There are some that pay a flat monthly rate and --
6  one that pays a flat monthly rate and a couple
7  that pay a flat annual rate in quarters.
8    Q.  Okay.  And aside from those, with respect
9  to the hourly rates that are charged, how are
10  those determined?
11    A.  Most of our hourly rated clients are
12  either individuals or unions, and so they're, in
13  part, determined on ability to pay.  Part of that
14  is based on the fact that we -- union law firms
15  don't have high rates because of who we represent.
16  We had, at one time, an ERISA client that was
17  paying $525 an hour for an ERISA fiduciary case.
18  And that's how we set the rates in this case and
19  in the BNY case.
20      I have union clients -- I'm sorry, I have
21  fund clients that pay around $400 an hour; and I
22  have clients that pay, depending on the number of
23  hours, sometimes much more, sometimes much less.
24    Q.  So the rates are all over the map?
25    A.  Yeah.  But they're lower than the one

**Veritext Legal Solutions**
212-267-6868          www.veritext.com          516-608-2400