# EX. 40

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - -x

ARKANSAS TEACHER :
RETIREMENT SYSTEM, :
et al., :
Plaintiffs, : CA No. 11-10230-MLW
v. :
STATE STREET BANK :
AND TRUST COMPANY, :
Defendant. :

- - - - - - - - - - - - - - -x

July 7, 2017
Washington, D.C.

Deposition of:

MICHAEL J. BRICKMAN,

called for oral examination by Counsel to the Special Master, pursuant to notice, at JAMS, 1155 F Street, Northwest, Suite 1150, Washington, D.C. 20004, before Christina S. Hotsko, RPR, of Veritext, a Notary Public in and for the District of Columbia, beginning at 9:18 a.m., when were present on behalf of the respective parties:

6

8

interim.

I then left there with some of the other partners and formed Richardson Patrick Westbrook & Brickman. And I've been at Richardson Patrick Westbrook & Brickman for the last approximately 15 years.

Q. And Michael, could you tell us what your areas of practice have been, both at Richardson Patrick and at your dad's firm and the other positions that you held?

A. Well, starting with my dad's firm, I only kiddingly joke that the motto of the firm when I went to work there was no case too small now that Michael is here. I went to virtually every court. I did domestic relations, I did small claims, traffic court. I did everything.

I then -- when I went over to Ness Motley, I primarily did asbestos litigation, along with some other personal injury cases. We also did some premises liability cases while I was at that firm.

We then branched out into a number of other areas, including tobacco litigation. Since that time, I've done cases against the tobacco companies. I've done environmental cases, natural

7

9

resource cases. I've done business litigation. I've done a number of what we refer to as mutual fund cases where the case revolved around whether the mutual fund is charging excessive fees to its shareholders.

I have been involved in antitrust cases. I have been involved in a number of class actions from the antitrust cases to what we refer to as the hot gas, which was the case involving whether the temperature of gasoline is impacting the value of the gas you're getting for consumers.

I've done medical malpractice cases. I've done the gamut. I still do the gamut. I consider myself a trial attorney. And I work in a number of different areas involving that.

Q. Well, that's very helpful. Thank you, Mike.

Prior to this matter, had you had experience in ERISA cases?

A. I had only been involved, I think, in one other ERISA case, to the best of my recollection. And that really dealt with whether a plan truly was an ERISA plan such that it was given certain exemptions. I don't think I've been in any others. My law firm has been involved in others,

10

but I have not.
Q. Thank you. And prior to this case, did you have any past experience in matters involving foreign currency exchanges?
A. Only tangentially in the mutual fund cases. But it's really a side issue. It's not an important large part of the case.
Q. All right. Let me bring you forward, Mike, to the State Street case, and ask if you'll give us an overview as to how you became involved in the case and what your and your firm's role was in the State Street litigation.
A. Okay. We were -- I think I was contacted sometime in either February or March of 2012 by Brian McTigue, who is with you. I had, I think, one prior contact with Brian about another potential case. I do not recall how Brian got our name originally, but he contacted us about some other case. It did not work out. And he called us about this case.
Q. And what did Brian tell you about this case?
A. Well, quite frankly, I wouldn't be able to recall exactly what he said. It's been, you know, over five years ago. But my guess is that

12

11

he explained to me that he had filed a case. I'm sure he told me what the case was about. He probably showed me the complaint. And I believe he said he needed help in trying the case, getting it set for trial and trying the case.
Q. So as a result of that request by Brian, did you and your firm engage in an evaluation as to whether you should enter an appearance?
A. Yes, we did.
Q. And what were the factors that were relevant in this evaluation, if you recall?
A. I can't say I recall specifically. I have no doubt we looked at the complaint. I have no doubt that I would have brought in some of the lawyers in my firm and we would have done some preliminary research as to the law and the likelihood of success and whether, in fact, what was claimed was a violation.
And then we would have looked at how hard it would be in this case to certify a class. We would have looked at whether we could certify a class. And I'm sure we would have looked at to some extent, although it would have been very difficult for us to look at whether there would be damages that could be collected in a class format.

13

18

19

motion to dismiss that was filed early on. We wanted to do some discovery. I think we filed some briefing on getting discovery before having to respond to the motion to dismiss. There were a lot of issues dealing with that, what we needed, what we should be getting. Things of a more practical nature.

We then had some discussion as to how to deal with the mediation that we thought was going to take place in the other case and how we should handle it, whether we should intervene, whether we should object.

We also had discussions about experts, lined up experts. And I think -- I'm pretty sure Mrs. Palmer went to meet one of the experts with Brian and line up one of the experts for being a witness in the case. I don't know if we interviewed that many. I know we were looking at a number of experts, and I'm pretty sure we settled on one expert early on.

Q. So when did you join the case, as best you can remember? What month and year?

A. March of 2012.

Q. All right. And how long were you involved in the State Street litigation from that

20

time?

A. We were out of the case from a practical point of view in September of that year. We did not formally withdraw until approximately a year later, at Brian's request. But we were out of the case from doing anything, working on the case, providing any resources or anything, from September. So we were only in the case for six months.

Q. And during those six months, Mike, can you give us a timeline of what your firm did with respect to the State Street litigation?

A. Sure. We began gathering documents that we would need to present a case. We began coming up with a plan for discovery. I think we started working on getting discovery out, request for production, interrogatories, things of that nature.

As I mentioned, we went -- we started looking for experts. I don't know if we interviewed more than one, but I know we lined up one expert to testify in the case. And I think he was one of the experts in the...a gentleman by the name of -- last name Glass.

We were working on the motion to dismiss.

21



22

24

time on it.

Q. All right. And how did your participation in this matter come to an end? You know, what prompted or precipitated your exit from the case after six months?

A. Well, I can't say for certain, but my belief was always that two things happened that caused Brian to think that he needed somebody else.

One, in September of 2012, I was about to start a large trial in Kansas City, a class action dealing with the lower temperature sales case. And I'm sure in August, I was taking the month of August to prepare for that trial. It was a big case. And I don't think I was as actively involved in the case as Brian would have wanted.

In addition, although they still worked on the case, we -- Kim and Nina, they were also helping me get ready for the trial in Kansas City. And I think -- I always had a feeling Brian was not happy about that. And we told him we had that trial coming up. We told him in advance about that issue.

But I think understandably he thought he needed somebody who could give him the time he

23

25



38

[redacted]

40

[redacted]

39

Go ahead.

[redacted]

41

THE WITNESS: Best of my recollection, I am not aware of that having taken place in cases I've worked on.

SPECIAL MASTER ROSEN: All right. Thank you.

I don't want to ask for your opinion about whether it's right or wrong. I don't want to put you on the hot seat about that. I'm simply trying to gather from as many people as I can whether this particular approach has ever been done in any other case.

THE WITNESS: I can't answer that. I can only answer in my experience. We have not engaged in it. And I am not aware in any case I've been involved in that any of the attorneys who were involved in those cases did that. I'm not sure I would necessarily have known, but I'm not aware.

SPECIAL MASTER ROSEN: Thank you.

THE WITNESS: Yes, sir.

BY MR. SINNOTT:

Q. Mike, does Richardson Patrick have clients who pay hourly rates?

A. If we do, I don't know about them.

Q. So to the best of your knowledge, your practice is strictly contingent?

## Page 42

1  A.  Yes.  You know, obviously when you say
2  "contingent," that includes, you know, working on
3  class actions where -- or, you know, like mutual
4  fund litigation where we have to get court
5  approval based on some sort of lodestar or
6  something of that nature.
7      It is contingent, meaning we don't have
8  the clients paying an hourly rate.  We're not
9  guaranteed a fee, we're not guaranteed our costs
10 will be paid.  They're contingent in that nature.
11    Q.  How does the firm determine the rates
12 that are put in a lodestar calculation or put in a
13 fee declaration?
14    A.  In our firm, we have an attorney who is
15 referred to as the business manager of the firm.
16 And on approximately an annual basis, he looks at
17 our rates, he talks to a number of attorneys and
18 gets information as to what other firms are
19 charging, best he can tell.  We also collect
20 data -- and I can't tell you where it comes
21 from -- as to -- you know, there are a number of
22 sources where you can find out rates firms are
23 charging and we use that.  He then compiles a
24 list, sends it around to all the partners.  I
25 don't know that he sends it to all the attorneys.

## Page 43

1  He sends it to all the partners.  And they then
2  review it and tweak it.  And that's how we come up
3  with our list pretty much on an annual basis.
4      Q.  And does that process encompass or
5  include the rates that you would charge for agency
6  attorneys or contract attorneys?
7      A.  No.  It only deals with the attorneys in
8  our firm and the paralegals, to the best of my
9  recollection.  I don't believe we have ever made a
10 list of what we would charge for contract
11 attorneys.  And as I said, the only time I have
12 used it we simply expensed it out.  I don't know
13 how others in the firm have necessarily done
14 contract attorneys, whether they mark them up or
15 not.  I just don't know.
16    Q.  Mike, let me get back to Kimberly's
17 declaration and ask if you were part of that
18 process in completing that declaration?
19    A.  I don't have any specific recollection of
20 that.  I'm sure she would have gotten my hours.
21 She would have probably gotten me to review my
22 hours and, you know, I would maybe -- you know,
23 I'm sure we knocked off, you know, as I said, one
24 of the contract lawyers.  I'm pretty sure we did
25 not bill all of my hours.  And that would have

## Page 44

[redacted]

## Page 45

[redacted]