# EX. 41

Volume: 1

Pages: 1-155

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

-------------------------------------

In Re: STATE STREET ATTORNEYS FEES

-------------------------------------

BEFORE: Special Master Honorable Gerald Rosen, United States District Court, Retired

DEPOSITION of DANIEL P. CHIPLOCK

September 8, 2017, 1:17-4:20 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter: Paulette Cook, RPR/RMR

think about the 20 million dollars of lodestar that we put into BNY Mellon that we may never get back. That was a lie.

I don't think that thought ever left my mind.

Q. Yeah.

**A. So in 2015 we have yet to hear what the result is going to be in BNY Mellon.**

**Garrett is pressing me for an agreement that we share some portion of Lieff Cabraser's allotment with Thornton Law Firm in recognition of the fact that Thornton had developed the initial concept --**

**THE SPECIAL MASTER:** Hang on. Share some portion of Lieff's allotment in the BNY Mellon case?

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** And shared that with Thornton --

**THE WITNESS:** Yeah.

**THE SPECIAL MASTER:** -- in the BNY Mellon case?

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** But not share the



allotment from BNY Mellon to whatever Lieff got in State Street?

Or didn't it matter to him? He didn't care where it came from?

**THE WITNESS:** Well, there was a little bit of tit for tat-ness [sic] in his e-mails --

**THE SPECIAL MASTER:** Yeah.

**THE WITNESS:** -- and you've probably seen it.

You know, there was one e-mail I think he sent to Bob where he says, you know, if you treat us right in BNY Mellon, we'll treat you right in State Street.

And, you know, I guess that stuff goes on in these cases. It's not something I've had experience with before this case as --

**BY MR. SINNOTT:**

Q. Is it unusual to try to meld or blend different cases?

**A. I don't know if it's usual or unusual. I mean these cases were sui generis because you had two competitors, and there's really only like four actors in this space.**

**So you had two main competitors who are**



**being sued for the same scheme at roughly the same time involving many of the same counsel.**

**So I'm actually willing to bet in a similar -- if you had a similar situation but against a different industry, different defendant, similar issues might come up.**

Q. Okay.

**A. It's not outside the realm of my imagination.**

Q. Are you aware of a perception that Thornton Law Firm might have dropped the ball a little bit on their BNY Mellon submission?

**A. On their BNY Mellon submission?**

**THE SPECIAL MASTER:** Yeah, their lodestar petition.

**THE WITNESS:** Their petition?

In BNY Mellon? No. You mean the actual declaration that they filed?

Q. Yes.

**A. I don't recall that. I think what -- I think what the rub was there was their relatively modest lodestar in that case and their -- I think they -- it seemed to me they were caught unawares perhaps; that --**

So that was the tug of war that I was having with Garrett in this 2015 timeframe.

**BY MR. SINNOTT:**

Q. Okay. So on page 1 of that same e-mail, Dan, Garrett jumps in and says, "I see no need for that at this time. It can even be done after final approval."

A. **Hm hm.**

Q. Did that seem wise to you?

A. **Well, I -- it didn't -- it didn't make sense to me. I mean maybe this has been done elsewhere, but it didn't make sense to me to wait until after final approval --**

Q. And why is that?

A. **-- to settle up a fee.**

**It just -- I mean you need to all be on the same page going into a final approval hearing. Even a preliminary approval hearing, it's helpful to be on the same page so you don't have internecine squabbles distracting you while you're trying to get the class certified and get a settlement approved for the good of the class.**

Q. Hm hm.

A. **And it seemed to me at this point a simple**

**enough issue to address given that we were at the tail end of the case and everybody's contributions at this point should be pretty clear, including their lodestar.**

**We've all been keeping track of our lodestar up to this point, and the discovery effort is basically over. The discovery effort had wound down in early July.**

Q. And, in fact, in response to Garrett you say, "I guess I don't understand the reluctance to square up the percentages."

Are you making reference to the lodestar on that?

A. **I'm -- I'm -- I'm making reference to the additional 40 percent, the final 40 percent --**

Q. I see.

A. **-- of the fee to be allocated.**

Q. After the 20/20/20 --

A. **Correct.**

Q. -- the remaining 40?

A. **Yeah. If not now when is I'm saying.**

Q. And Larry responds: "For one thing, we'll know the actual fees awarded by the Court."

Now did you interpret Court to be a

reference to the BNY Mellon Court or to the State Street Court?

A. **Oh, I thought he was talking about State Street.**

Q. Okay. And then in the final word, at least on this e-mail thread, is "I don't see how that matters." This is from you. "It would seem that the respective lodestars, contributions, etcetera, are not terribly divergent and not a skeptical judge..." -- is this the same Judge Mark Wolf that --

A. **Well, that is not meant to be pejorative. What that is meant to say is I think we have a judge who appreciates that we've been working hard.**

Q. And he had given signals to that effect?

A. **Yeah, because, you know, at this point we had reported to him more than once about the progress of the mediation. And Jonathan Marks had also.**

**And I -- I had the sense that he was pretty convinced that all sides had worked in good faith to craft a hard-won settlement in this case, including -- including State Street's counsel.**

Q. Yep.

A. **And I got the sense that he appreciated that. So that's what I was saying there.**

Q. Was part of your concern, Dan, that you thought this might be BNY Mellon all over again; that Thornton Law Firm was not approaching this in the proper way, or they weren't emphasizing the right things?

A. **Well, you know, it's not as if they weren't approaching BNY Mellon in the right way. I think they -- 'cause they made real contributions in that case as I've talked about --**

Q. Yes.

A. **-- Mike Lesser in particular --**

Q. Sure. I mean as far as the presentation, as far as the documentation and --

A. **I don't think they made any errors in their documentation that I can recall in BNY Mellon because as lead counsel we reviewed all those submissions, and I don't recall anything that was off kilter.**

**I mean their main concern was how modest their lodestar appeared in comparison to other firms in the case, especially Kessler Topaz. So I wasn't concerned that they were doing anything improper.**

**I was just trying to keep these two cases separate and not have them cross streams.**

**THE SPECIAL MASTER:** Let me pursue this further. It looks to me in that e-mail that you sent --

**THE WITNESS:** Yep.

**THE SPECIAL MASTER:** -- not to be difficult, it would seem that the respective lodestars, contributions are not terribly divergent. You mean in the State Street case?

**THE WITNESS:** In the State Street case, judge.

**THE SPECIAL MASTER:** And not a skeptical judge as far as we can tell --

**THE WITNESS:** Right.

**THE SPECIAL MASTER:** -- meaning Judge Wolf was not like Judge Kaplan. He was not going to drill down on lodestar and give overemphasis to lodestar as opposed to other kinds of contributions.

**THE WITNESS:** Right, and I -- yes, I think that's fair, and I --

**THE SPECIAL MASTER:** And then -- I'm sorry. Go ahead.

**THE WITNESS:** Well, you're jogging my

**THE WITNESS:** I don't know if I was saying quite that much. I think what I was mainly saying was we have three firms here, and Labaton and Thornton and Lieff Cabraser who have all put in sizable lodestar contributions.

That distinguishes this case from BNY Mellon where you had sort of a top-heavy distribution.

I'm also saying that Judge Kaplan has had a tendency to look closely at detailed lodestar reports and say you didn't need to staff this deposition with as many people, or why is this firm --

**THE SPECIAL MASTER:** I'm sorry. Go ahead.

**THE WITNESS:** -- why is this firm doing that.

We did not think Judge Wolf was likely to do that because this was a case that was mediated for the duration with all three firms pulling, in my view, pretty equal weight in that mediation and the overall effort.

(Pause.)

**BY MR. SINNOTT:**



to square up the percentages.
A. **Huh-huh.**
Q. Then Larry responds: "I believe there are other cases and other agreements which are influencing people's desire to either reach agreement now or later. I don't have a dog in the hunt, and I don't want to be drawn into it. I apologize for any mistakes, but I'm not in a position where I can edit my e-mails so I dictate them."
It seems like Larry recognizes the fact that BNY Mellon on has surfaced in this context --
A. **Yep.**
Q. -- and he's trying to move everybody away from that, correct?
A. **Hm hm.**
**(Mr. McTigue has joined the proceeding.)**
**BY MR. SINNOTT:**
Q. Then there's a response to that from Chris Keller who says we should talk this through. And you're not on this distribution --
A. **No, this is the first time I'm seeing this.**
**MR. HEIMANN:** Could you please wait until he finishes his question?

**THE WITNESS:** Sorry.
**BY MR. SINNOTT:**
Q. You're not on this distribution so I'm assuming this is the first time you've seen it, Dan?
A. **This is the first time I'm seeing this.**
Q. But Chris says, "We should talk this through. The Court absolutely need not understand what the allocation of fees is amongst counsel. So that should not be included in any documents to be filed with the Court. I have to say I'm quite overwhelmed by the size genitals..." -- I guess that's a compliment -- "...Lieff has in this case in which they have no client or title. That said, an agreement or allocation will not happen until the fees are actually in and need to be distributed."
So I guess I'd ask you if you'd agree that Keller and Labaton were not taking this as constructive criticism on your part?
A. **If you want to characterize it that way, sure.**
Q. And Garrett --
A. **It wasn't criticism actually.**
Q. All right. It was a suggestion -- a strong suggestion?

A. **It was a strong suggestion --**
Q. Yeah.
A. **-- as I thought a wise way to proceed.**
Q. All right. But Garrett concludes by saying -- in response to Keller's message, "I agree they will threaten their own fee app which I say would invalidate the agreement we have."
Now how would that invalidate the agreement?
A. **I don't know.**
Q. I couldn't figure that out, but I was hoping you'd be able to enlighten me.
A. **I don't know --**
**THE SPECIAL MASTER:** You don't remember any conversations along these lines that if we squared up at this point earlier it could threaten your fee application?
**THE WITNESS:** If --
**THE SPECIAL MASTER:** Your, Lieff's, fee application.
**THE WITNESS:** No. I think what he's -- I think what he's saying there is -- I think what Garrett is speculating there is if -- is if Labaton and Thornton will not agree with my suggestion, then



Mellon, in which they had a much lower lodestar and got less than they thought they should have gotten, they were learning from that experience and looking for a way to build up their lodestar in this case?

**THE WITNESS:** I was concerned about the prospect of inflated lodestar showing up on their application or anybody else's application, for that matter, 'cause we didn't need to create problems for us.

**THE SPECIAL MASTER:** As part of that concern, were you concerned about the way in which the staff attorneys that you had loaned them effectively for purposes of cost allocation showing up on their lodestar?

**THE WITNESS:** No. I was expecting that staff attorneys that they had born the financial responsibility for to appear on their lodestar reports.

**THE SPECIAL MASTER:** So that raises this question, Dan --

**THE WITNESS:** Hm hm?

**THE SPECIAL MASTER:** -- which has perplexed all of us from the beginning on this side of the table.

**THE WITNESS:** Hm hm?

**THE SPECIAL MASTER:** Is there any agreement, written, e-mail, handwritten notes, anything that indicates that Lieff or Labaton specifically consented to Thornton including on their lodestar these staff attorneys that were employed by Lieff or Labaton?

**THE WITNESS:** Um, okay. There's -- as I answered last time, there's no written agreement to that effect.

**THE SPECIAL MASTER:** Even not an agreement. An e-mail, anything?

**THE WITNESS:** Well, there is I think an acknowledgement in August of 2015. I think I sent an e-mail to the team saying should we talk about -- since we're nearing the end here, should we talk about how we're going to account for staff attorneys. Do we want to settle on a uniform billing rate?

And Mike Rogers responds and says that's for another day.

**THE SPECIAL MASTER:** But that certainly is -- it doesn't approach any kind of an authorization or -- or an agreement to allow

Thornton to take your staff attorneys and put them in their lodestar.

**THE WITNESS:** All I can say is, as I said the last time, which was my belief, was because it seemed -- it seemed common sense to me.

It seemed understood to me, and I believe the reason for Garrett's request, that they be allowed to contribute financially to the document review process would be for them to be able to say that they were contributing to the document -- to document review in the case and credit that in their lodestar.

**THE SPECIAL MASTER:** They could have clearly put an application in for however much they reimbursed you --

**THE WITNESS:** Hm hm.

**THE SPECIAL MASTER:** -- you, Lieff, reimbursed Labaton for the cost of the staff attorneys clearly --

**THE WITNESS:** Right.

**THE SPECIAL MASTER:** -- but the notion that they would then take those costs and put them on their lodestar at, you know, eight to ten times what they were reimbursing you for is a much

different -- a much different notion.

And we have looked -- and if you can point us to anything --

**MR. HEIMANN:** Right here.

**THE SPECIAL MASTER:** Can I see?

**MR. HEIMANN:** Sure.

**THE SPECIAL MASTER:** This is -- you're showing me an e-mail from August 30th which is right about same time.

**MR. SINNOTT:** Same date.

**THE SPECIAL MASTER:** Same date.

**THE WITNESS:** Yep.

**THE SPECIAL MASTER:** From Mike Rogers to Chiplock with CCs to Mike Lesser, Nicole Zeiss, David Goldsmith.

And it says spoke briefly to Nicole. This needs to be part of a larger discussion for purposes of now no caps and all timekeepers --

**MR. HEIMANN:** Well, what I'm really talking about is the e-mail that precedes that from Chiplock --

**THE SPECIAL MASTER:** The one you've highlighted?

**MR. HEIMANN:** The one I've highlighted

which he wrote to Thornton and to -- I think this is both the folks at Thornton and at Labaton -- do we want to cap document reviewer rates at a certain level. We probably need to pick consistent rates.

In BNY Mellon -- it's B-N-Y-M-- the top document reviewer rate was $425/hour, I think. And he goes on from there.

Then what you referred to is the response from Rogers copying Lesser and others about the timing of discussing that.

Now if you want to ask Mr. Chiplock to give you the context of this, I think it answers your suggestion about whether or not, A, Lieff Cabraser expected Thornton to include staff attorneys at those levels, $425 an hour, and whether those included staff attorneys that had been housed at Lieff Cabraser and what his expectation was in that regard.

**THE SPECIAL MASTER:** Since Mr. Heimann has asked the question --

**THE WITNESS:** You want me to answer that question?

**THE SPECIAL MASTER:** -- I'll let you answer that question, and then I'll have a few of my

own.

**THE WITNESS:** It was my expectation that the three firms would be billing their document reviewers at comparable rates. And perhaps the same rate as I'm suggesting here.

**THE SPECIAL MASTER:** It looks like you're looking for uniformity at the least.

**THE WITNESS:** At that point I'm suggesting it might be helpful, yeah, to have a uniform rate. Now it didn't end up happening that way because, as we talked about last time, this discussion gets tabled by lead counsel, and it doesn't get picked up again before the fee applications go in. And that's why the rates are slightly divergent.

Can I also say one other --

**MR. HEIMANN:** Wait until the question. He's not finished his question. I just want to make sure you were listening to his --

**THE SPECIAL MASTER:** Yeah, yeah, I'm listening.

**THE WITNESS:** Can I also say one other thing about -- I want to get into specifics also about the document reviewers that Lieff and Thornton

shared.

So there were six individuals that we either shared with Thornton or housed for Thornton. Four of those people were paid through an agency.

**THE SPECIAL MASTER:** Right.

**THE WITNESS:** So either Lieff paid the agency or Thornton paid the agency.

**THE SPECIAL MASTER:** Right.

**THE WITNESS:** So I'm not sure --

**THE SPECIAL MASTER:** That's interesting. I thought the understanding was Lieff was going to pay the agency, and Thornton would reimburse.

Did Thornton directly pay the agency?

**THE WITNESS:** Thornton directly paid the agency for those four people for all of the time that those people were doing work for Thornton.

So you have four out of those six people are agency attorneys. Now I don't know if you're suggesting that Lieff Cabraser ought to get to bill them at 415 or whatever we bill, but Thornton only gets to bill them at 40.

That doesn't seem fair to me because we're taking turns paying the agency --

**THE SPECIAL MASTER:** Or neither of you

get to bill them at 415 --

**THE WITNESS:** Well, I would push back strongly on that.

**THE SPECIAL MASTER:** Well, you can push back, and I'll have to decide that but as to the agency lawyers --

**THE WITNESS:** Right, as to the agency lawyers who were doing the same work as everybody else.

**THE SPECIAL MASTER:** At this point I'm more focused, however, on what authorization was given to Thornton, and -- and I think it's important here.

I see this e-mail. I don't think it -- with all due respect, Richard, I don't think it answers my question.

**MR. HEIMANN:** We disagree. I think it does.

**THE SPECIAL MASTER:** All right, well, we'll disagree because all it says is we need to pick consistent rates. For any document reviewers.

The question that I've got -- Nicole Zeiss has testified --

**THE WITNESS:** Yeah.

**THE SPECIAL MASTER:** -- she's the one responsible for putting together the declaration and the fee applications; that she knew nothing about any agreement as to -- she knew nothing about any agreement as to allowing Thornton to put your staff attorneys or agency attorneys or Labaton's on Thornton's lodestar.

**THE WITNESS:** Hm hm.

**THE SPECIAL MASTER:** As far as I know, that's been the consistent testimony of everybody.

**MR. HEIMANN:** There's no question yet.

**THE SPECIAL MASTER:** Yeah, there's no question yet. That's the consistent testimony of everybody.

I keep looking for any direct agreement, implicit agreement, anything that says to Thornton you can put these folks on your lodestar.

By "these folks," I mean staff attorneys or agency attorneys.

**MR. HEIMANN:** Is that a question now?

**THE SPECIAL MASTER:** That is a question. If you know of any, please direct me to it. And with all due respect, Richard, this ain't it in my view.

**MR. HEIMANN:** We have a difference of opinion, judge.

**THE SPECIAL MASTER:** Okay. It certainly isn't an agreement. This is a --

**MR. HEIMANN:** Well, wait a minute --

**THE SPECIAL MASTER:** This is an e-mail from Dan Chiplock it looks like to Mike Rogers.

**THE WITNESS:** Who's --

**THE SPECIAL MASTER:** And others are copied on it.

**THE WITNESS:** Right, and Mike Rogers --

**THE SPECIAL MASTER:** Including the Thornton people.

**THE WITNESS:** Mike Rogers is one of the key point people at Labaton overseeing the document reviewers at Labaton, as I think he testified to.

**THE SPECIAL MASTER:** Okay.

**MR. HEIMANN:** Hold on. I can't let this slide. You keep slipping in your language. One time you talk about an agreement. You want an agreement.

Then you go on to say anything explicit or implicit which supports the notion that Lieff Cabraser expected or -- you used the word

"authorized" -- that Thornton would include on its fee application the staff reviewers at rates that are comparable to what Dan is talking about in this e-mail.

This, at the very least, implicitly acknowledges that's going to happen at those levels in terms of the billing rates. At least when you combine it --

**THE SPECIAL MASTER:** You and I are going to disagree --

**MR. HEIMANN:** -- excuse me, let me finish. When you combine it with his testimony about the context in which this occurred.

**THE SPECIAL MASTER:** You and I are going to disagree about this, but I'm going to remind you, Richard, right now this is a deposition governed by Rule 30.

Under Rule 30(c) objections are to be made non-argumentative and non-suggestive. If you want to testify based on your personal knowledge, that's fine. We'll give you an opportunity. I don't think you have any personal knowledge, frankly.

**MR. HEIMANN:** And, you're right, I don't

about this particular --

**THE SPECIAL MASTER:** So I would appreciate it -- you'll have an opportunity to weigh in on this. That's fine. My question, whether explicit or implicit, was very clear.

I -- my job is to make findings pursuant to my mandate. The accuracy and reliability of representations made in the lodestar. There were representations made in the lodestar to the Court by the Thornton firm that these were the regular rates charged by these attorneys in their firm.

**MR. HEIMANN:** Hm hm.

**THE SPECIAL MASTER:** I'm looking for anything that says to Thornton you can put these folks on your lodestar. That's what I'm looking for.

This may raise some slight implication, but this is an e-mail that looks to me to be from Dan to Mike Rogers.

Now Mike Lesser is copied on it. Nicole is copied on it. David Goldsmith is copied on it. But it looks to me to be looking for consistency.

**THE WITNESS:** Right. And I would just add, judge, that all the people you just named were

the key people to be involved in the discussion of how these people were to be billed and in what manner.

I would also refer --

(Pause.)

**THE WITNESS:** When you're ready.

**THE SPECIAL MASTER:** Yep.

**THE WITNESS:** I would also refer you back to my communications with Garrett at the beginning of this effort back in January, February of 2015, and also with Mike Lesser, where we're talking about finding them document reviewers, and we're sending them resumes.

And we're saying we're going out to an agency to get a couple people because a couple people left. We want to make sure that, you know, we're kept at parity. There's also a subsequent e-mail in March or April or, whenever it was, where I say I thought the agreement was we were all going to have ten document reviewers. It seems you have more than that now. So I'm going to cut back to get us back to parity.

All these things taken together to me give you the implicit agreement that there are

document reviewers being credited to each of the three firms that will be included in those lodestar reports at the end of the day.

**THE SPECIAL MASTER:** If that's the case, why did you include these document reviewers that were allocated to Thornton on your lodestar?

**THE WITNESS:** Judge, we've been over this --

**THE SPECIAL MASTER:** It's a very simple question.

If you believed that Thornton was going to claim these folks on their petition, on their lodestar --

**THE WITNESS:** Right.

**THE SPECIAL MASTER:** -- why did you claim them?

**THE WITNESS:** Judge, they weren't all claimed. Four of them were inadvertently claimed, and we've been over this many, many times.

But that was an innocent mistake. Now if your Honor is not convinced of that fact yet, I'll stay here for two more days because that is the truth.

**THE SPECIAL MASTER:** I don't know about

innocent. What we're trying to understand here is what was the agreement and arrangement between the law firms. That's what we're trying to understand.

And I'm not making -- I'm not implying in any way as to Lieff that there was anything intentional or anything else in billing these lawyers. I'm not implying that other than the fact that there was a claim for lodestar for these attorneys, and there was also claim for the same attorneys by Thornton.

**THE WITNESS:** Not all six of them.

**THE SPECIAL MASTER:** Not all six but four of them.

**THE WITNESS:** Four of them. And for two of them it was nine weeks of time, and for the other two it was three months of time. For the other two the time was allocated correctly because there was not a bookkeeping error made.

And we've answered these questions at length in our interrogatory responses; and, again, I will stay here until the cows go home -- come home to convince you that that was an innocent mistake if you believe otherwise.

**BY MR. SINNOTT:**

Page 62

Q. Let me ask a couple questions, Dan.
And, you know, like the special master, I don't think there's any implication here that this was a nefarious act by -- by your firm.
But you'd agree with me, wouldn't you, that August 30, 2015 was months after the document review was over?
**A. Two months.**
Q. Yeah. Two months?
**A. Yes.**
Q. You'll agree with me also that this does not make reference to share document reviewers, correct?
**A. It doesn't make specific reference to sharing document reviewers.**
Q. And the Thornton Law Firm had document reviewers on staff, Jotham Kinder, Miss Caruth, Evan Hoffman. Mike Lesser would review documents as well.
**A. Hm hm.**
Q. So -- and I believe this was around the time that Garrett and Evan were trying to determine a billing rate for Michael Bradley, correct?
**A. I don't know about that.**
Q. So wouldn't the inference here in light of

Page 63

the timing and in light of the lack of mention of shared or sponsored reviewers indicate that this was about the firm's document reviewers?
**A. No. All I can tell you is I wrote the e-mail, and I know what I was thinking. And I've told you what I was thinking.**
Q. All right, fair enough. All right, thank you.
**MR. HEIMANN:** You may also want to take a look -- I'll give you Bates range -- of the subsequent e-mail to that in the string. It's LCHB 52627 through 29.
**MR. SINNOTT:** Could you give me that again?
**MR. HEIMANN:** 52627 through 52629. I'm happy to share a copy of it with you if you'd like now, but it's a follow-on -- subsequent e-mails that follow on to the string that I gave you.
**MR. SINNOTT:** All right. Thank you.
**BY MR. SINNOTT:**
Q. So it's, you know, just getting back to the issue of the exchange between you and the Thornton Law Firm folks on credibility and on hours that you were warning them about the lodestar.

Page 64

You were warning them about not inflating it. Correct?
**A. Yeah. So here in this e-mail I have heard thirdhand -- I forget even from whom -- that Mike Thornton had mentioned to someone -- it might have been Bob Lieff -- that Thornton's lodestar at that point was 14 million dollars.**
**That did not square with what I understood to have been the case as of June 29th where based on the hours reported, the 12 million -- the 12,750, the lodestar would have been between 7 and 8 million maybe, give or take.**
**So those two numbers, obviously, were out of whack, and I responded this way. Probably I am frustrated at this point given the dialogue that's led up to that e-mail, but I think Mike Thornton may have simply been mistaken because that's not the number they ultimately reported. What they ultimately reported was a number closer to what I had been informed of on June 29th.**
Q. All right. Thank you. But you -- you were expressing a concern about how Thornton Law Firm would present its lodestar?
**A. I was at that moment, yes. And I should**

Page 65

**also add that those hours and that lodestar number that I've given you between 7 and 8 million, that was based on a rough calculation of including their staff attorneys, including the ones that were shared with us or housed at our office and what I guesstimated their rate would be that would be comparable to ours.**
**So that's how I got to the 7 to 8 million ballpark number, and it seemed, you know, drastically different than 14 million.**
Q. All right, thank you.
Now let me direct your attention, Dan, to an e-mail dated -- and it's either the next one or the second one I believe -- Friday, August 28th at 12:04 p.m.
And this is TLF-SST-052975 through 2980. So it would appear to be six pages.
Do you have that in front of you?
**A. Yes.**
Q. Okay. And this is a response to Brian McTigue; is that correct?
**A. You're talking about the e-mail from Larry at the top?**
Q. Yes.

**first became cognizant of it. I don't know if it was before August 28th or after.**
Q. Do you remember how you found out?
**A. There was an e-mail exchange where Garrett I think was mentioning a local counsel who was -- to which people were -- which Labaton was obligated to pay a portion of its fee.**
**And I think I e-mailed back and said I don't think I've seen that agreement; can I see it. And then Garrett forwarded an e-mail string from 2013, which I had not recalled ever seeing, that explained the existence of a local counsel who was owed some percentage of any fee that Labaton was paid in the case.**
**THE SPECIAL MASTER:** Were you on that 2013 e-mail string do you remember?
**THE WITNESS:** Apparently, I was, but I had no memory of it, and I think I even -- I don't think Bob even remembered it at first.
And I think we've even produced e-mails to that effect where I explained to Bob I did not recall receiving that first e-mail. I hadn't responded to it, and it wasn't something I had been paying attention to.

**negotiated with ERISA counsel.**
Q. Okay. And could it also be an issue of transparency for Brian that he's not trusting lead counsel to represent his -- his client's interest?
**A. I am not going to speculate as to what Brian was thinking.**
Q. Fair enough.
Now in the top message from Larry Sucharow to Lynn -- and you're CC'd on it -- Larry says in the bottom paragraph, "Of course I intend to honor all commitments, contracts, obligations, agreements, understandings by whatever name or title but especially those that are in writing like Brian's."
Do you know what specifically commitments and contracts and obligations and agreements Larry was referring to?
**A. Not specifically apart from the written agreement that we had executed with ERISA counsel that everybody had signed memorializing their 9 percent fee interest.**
Q. At this time, Dan, were you aware of the Damon Chargois element in this case?
**A. Um, I can't remember when in 2015 I was -- I**

Zeiss includes you on a distribution and says this sheds light early August.
A. Yes.
Q. And then you respond to your co-counsel and colleagues. You say, "I have e-mails showing that DOL was grumbling about fees as early as July 10th."
A. Hm hm.
Q. "So we need to be careful how we word things. It's not as if two months went by and, bam, they sprang the 10.9 limitation on us."
A. Right.
Q. What is your warning -- what's the nature of your warning or admonition here, Dan?
A. I am trying to recall why we were trying to nail down how much of a time lag there was between the agreement in principle having been reached and the DOL raising this issue.
I think what we were saying here or what we were contemplating saying was that the agreement in principle to settle the case for 300 million dollars with a 25 -- with up to a 25 percent attorneys' fee was reached in late June, early July, and that DOL was there at the mediation when that happened.

And on top of that, Jonathan Marks, who was the mediator, and I think even Lynn and maybe Brian -- but at least Lynn -- had made clear to the DOL that the agreement was 300 million and that the attorney -- and that the potential attorneys' fees sought would be up to 25 percent.
It was only after the fact -- after the agreement had been reached that the DOL started to push back and say we want to talk about capping the attorneys' fees on whatever portion goes to ERISA plans out of the settlement.
Q. Okay. So you didn't want to get caught flat footed?
A. I'm not sure what that means.
Q. You didn't want to be surprised?
A. By whom?
Q. By DOL.
A. Um, no. I -- what we're saying here is that DOL as, far as we were aware, and, as far as the mediator himself confirmed to us was aware of, and signed off on the notion that we had achieved a 300-million-dollar settlement and that we would be seeking up to 25 percent in attorneys' fees for all the counsel involved.

Q. Yep.
A. To be divided amongst all counsel involved.
After that the DOL started to walk back, and say, well, we didn't really agree with that even though the mediator told us he told them that.
So then there was a negotiation period, as Nicole discusses here, where even though we feel like everybody had come to an agreement at that last mediation session, we are now -- we embarked on that dialogue with the DOL beginning on or about July 10 -- I think what happened was I found e-mails on or around July 10th -- and it may have even been from Lynn -- where he was hearing from the DOL that they wanted to do something about attorneys' fees in order to juice up the ERISA recovery that much more.
**THE SPECIAL MASTER:** The ERISA class recovery?
**THE WITNESS:** Well, there was no ERISA class, but to -- to juice up the recovery that would go to ERISA plans a little bit more.
Because in the BNY Mellon case ERISA plans got a slight premium because of the DOL's presence, and the threat of a DOL lawsuit. And the DOL wanted something similar here where they could

say ERISA plans are getting a slight bump.
The 60 million allocation already represented a slight bump, and they wanted a slightly -- an additional bump that would be the product of a slightly lower attorneys' fee that would come out of that 60 million dollars.
But that was all the subject of a negotiation that took several months after the agreement in principle had been reached and after we already thought that we had an agreement. So we had to -- there was -- there was more dialogue with the DOL before we actually got a term sheet signed.
Q. Okay. Dan, look at document dated July 25, 2016. I think it's the next in line. And the Bates numbers on this are TLF-SST-051653, and the top message is from David Goldsmith to you and to others in the customer class.
But just if you'd like, it goes 653 Bates stamped to 657.
A. Hm hm.
Q. And, once again, it would appear that the first couple pages -- several pages from the back are essentially a drafting exercise --
A. Right.

Q. -- by Nicole and -- and Mike Lesser and David.

And then at the top of page 2 you respond to their edits by saying that, "The real premium here was demanded/earned by the DOL, not ERISA counsel whose claims offered no greater benefit than our claims. That's why I wouldn't have bothered including that first highlighted sentence below. By doing so we are saying that the private ERISA claims added extra hefty to ERISA plaintiffs' damages and they didn't. The only reason ERISA plaintiffs are getting more money is to keep the DOL from filing its own lawsuit. In other words, to settle the DOL's claims. We didn't have this language in the Bank of New York notice. That's why I was wondering who wanted this language inserted."

To which Goldsmith responds: "That's a fair point. I would just go with the language that Nicole circulated."

And you respond: "Given a choice between the two, Nicole's version is less problematic if we really feel we have to include language along those lines."

**A. Hm hm.**

Q. Why was there a feeling that you needed to "include language along those lines," Dan?

**A. I'm sorry, that was a long wind-up to a question that I wasn't anticipating. So why -- why -- language along these lines. Which language are we talking about then? It's the language that David Goldsmith suggested in red --**

Q. Yes.

**A. -- or something else?**

Q. I'm assuming that you're advocating Nicole's language because you find it to be less problematic.

**A. All right. Let me just try to find Nicole's language. Nicole's language being on page 3?**

Q. I believe so.

**A. Are we looking specifically at the highlighted language?**

Q. I don't know. I mean your message indicates that you would go with Nicole's language. And I'm assuming this has to deal with the premium.

**A. Okay, I'm sorry. Maybe I should just read it.**

Q. Take your time.

**A. Okay.**

**(Pause.)**

**A. Okay.**

Q. Does that refresh your memory?

**A. Yes. Let me just compare it to David's. Okay. Yes. I'm -- I'm with you now.**

Q. Okay.

**A. The difference between Nicole's language and David's language.**

Q. Right. So what's that -- what's the upshot of adopting Nicole's language?

**A. Well, we wanted to -- I guess the feeling was we wanted to say something in the notice by way of explanation as to why ERISA claimants would be getting a premium over non-ERISA claimants who are members of the same class.**

Q. Okay. All right. Thank you.

As best you recall, Dan, what were the concerns as you understood them that the Department of Labor and SEC had regarding the ERISA participants?

**A. I think the DOL as I -- I'm not in their heads, but I think based on what they said to us in their conversations with us, they wanted to be -- I think, first and foremost, honestly, is that they didn't want to underperform the BNY Mellon**

**settlement.**

Q. What do you mean by that?

**A. They wanted ERISA claimants to get a premium that was on par with what they obtained in the BNY Mellon settlement.**

Q. Okay.

**A. I think that was their sort of -- their underlying concern because they saw the settlement as very similar.**

Q. Did you sense that DOL was giving the ERISA claims greater scrutiny or heightened scrutiny over other claims?

**A. The claims? I think -- you mean the settlement terms?**

Q. The terms, yeah.

**A. I think they -- they, obviously, only cared about the settlement as it applied to ERISA plans. I don't think they cared about the settlement otherwise.**

Q. And was Mr. Sarko the primary point of contact or one of the primary points of contact with the Department of Labor?

**A. Certainly one of the primary points of contact with the DOL, yes.**

Q. Okay. Who else had a --

**A. I think Carl Kravitz also had a fair amount of contact with them.**

Q. Okay. And let me direct your attention, Dan, to two e-mails, the first one from August 6, 2015 at 2:30 p.m. and the second a few minutes later at 2:43.

In the first one -- the 2:30 p.m. one is TLF-SST-053992 --

**A. Hm hm.**

Q. -- and I'd like to make reference -- you know, after Mr. Sarko talks about coordinating a call with DOL and follows that up with an update on page 1, as to his conversation with Mr. Goldstein of the Boston DOL office, Garrett responds: "They have done nothing but come in at the end and try and hold us up. It's time to go over his head. We're asking for 25 percent. I'm getting a little tired of the tail wagging the dog. ERISA is a small piece here of the overall settlement. There was a lot of talk about ERISA counsel's ability to guide them to see how good the settlement is. I think it is time to do that."

**A. Hm hm.**

Q. When he talks about "they," is it fair to say he's talking about DOL and them changing the rules --

**MR. HEIMANN:** Wait until he's through.

**A. Changing the rules?**

Q. Changing the rules coming in at the last minute and trying to hold us up? Or is he talking about ERISA counsel?

**A. He's not talking about Lynn and Carl and Brian there.**

Q. Okay.

**A. I think he's talking about the DOL.**

**And, as I explained a little while ago, we were all at a mediation in Boston with Jonathan Marks. He explained the parameters to the DOL and then --**

Q. -- DOL says that's not what we said.

**A. -- and then DOL says, no, we didn't -- we didn't agree to that, even though the mediator said otherwise.**

Q. The second document at 2:43 p.m. which is TLF-SST-053994 through 995 -- it's a two-page document.

In that same update Mr. Sarko references

**talking about there.**

Q. Do you also risk a Court going for the lowest common denominator and saying we'll go with the lower number for both?

**A. That's what I started out by saying, yeah. Because 18 percent was lower that be what everybody was hoping for given what had been invested into the case.**

Q. Okay. All right. Let me direct your attention to the August 10, 2016 e-mail that should be the next in line. And this is TLF-SST-051916 through 918.

And my focus here, even though I see you're not on the original message, it was forwarded to you at 4:27 on August 10th. So it was immediately after this message was sent.

**A. Hm hm.**

Q. And in this message Mr. Goldsmith says that the ERISA settlement allocation was negotiated directly among lead counsel, ERISA counsel and representatives of the DOL. The ERISA settlement allocation even without the $10,900,000 cap on attorneys' fees described above provides a premium per dollar indirect FX trading volume for ERISA

Page 82

plans and eligible group trusts in comparison to the allocations to other settlement class methods.

What's the significance of the 10,900,000 cap here?

A. **Well, it results in a slightly greater -- it results in a slight premium in the recovery that goes back to ERISA plans that are part of the class. So they get a slight premium in their recovery over and above what non-ERISA plans were getting.**

Q. Okay.

A. **And it was because of the DOL and its threat of separate litigation.**

**(Justice Kelly and Mr. Sarko have left the proceeding.)**

**THE SPECIAL MASTER:** Could you -- I'm not -- I'm still not clear how the premium is reflected in the 10.9 cap on the ERISA settlement allocation.

**THE WITNESS:** Well, because 10.9 million of 60 million is less than 25 percent. It's less than a 25 percent fee.

That 60 million has been cordoned off and delineated for ERISA plan class members or those who qualify under ERISA plans under our plan of

Page 83

allocation.

So they're paying less in fees than non-ERISA plans are.

**THE SPECIAL MASTER:** At 10.9.

**THE WITNESS:** At 10.9. Because I don't have a calculator or whatever 10.9 divided by 60 is.

**MR. HEIMANN:** 18.1.

**THE WITNESS:** 18.1. So they're effectively -- ERISA plans are effectively paying an 18.1 percent attorneys' fee.

**THE SPECIAL MASTER:** Capped at that.

**THE WITNESS:** It's capped at that 10.9 million.

**THE SPECIAL MASTER:** And, in fact, they ended up really paying less, right?

**THE WITNESS:** No. No. I think there's a misunderstanding on this point.

**THE SPECIAL MASTER:** So how does that work?

**THE WITNESS:** So that 10.9 million is for all counsel. It's not just for ERISA counsel. That 10.9 --

**THE SPECIAL MASTER:** That's part of the larger pot?

Page 84

**THE WITNESS:** Yes. That 10.9 million dollars is not just ERISA's counsel's fees --

**THE SPECIAL MASTER:** It's all counsel.

**THE WITNESS:** It's all counsel in recognition for everybody's contribution to the recovery that is going to ERISA plans.

**THE SPECIAL MASTER:** But in the way it breaks down then, ERISA counsel ended up getting about 7-and-a-half million, right?

**THE WITNESS:** Sounds about right.

**THE SPECIAL MASTER:** Yeah. And the cap -- the ERISA -- it's called in the agreement the ERISA settlement allocation --

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** -- that was a cap on the allocation of fees out of the ERISA --

**THE WITNESS:** Settlement.

**THE SPECIAL MASTER:** -- plan settlement, right? Out of the ERISA plan settlement, right?

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** 10.9 million, which Richard has done the math, is 18.1 percent --

**MR. HEIMANN:** Well, no. Lynn was doing the -- was the source of that figure.

Page 85

**THE SPECIAL MASTER:** Lynn. 18.1 percent. I haven't done the math. But 18.1 percent which is less than 25 percent.

**THE WITNESS:** Right. Yes.

**THE SPECIAL MASTER:** But in reality, the ERISA lawyers actually only got 7-and-a-half million dollars, and the differential on that then went back to the customer class lawyers, right?

**THE WITNESS:** Correct. Yes.

**THE SPECIAL MASTER:** So that part we understand.

**THE WITNESS:** Right.

**THE SPECIAL MASTER:** Where maybe the lack of understanding is -- and I don't think the agreement really helps us on it, but if it does, make you can walk us through that.

It looks in the agreement like there's a 10.9 percent cap because it's captioned ERISA settlement allocation. It looks like that is an allocation for ERISA counsel.

**THE WITNESS:** No, it never was. No, and let me go back and say that 7.5 or 7.7 million -- whatever it was that ERISA counsel got -- that was 10 percent of the total attorneys' fee.

**THE SPECIAL MASTER:** Right.

**THE WITNESS:** That has nothing to do with this 10.9 million. The 10.9 million goes into that 74 point whatever million dollar attorneys' fee.

But the way you arrive at the 7.5 million for ERISA counsel is by taking 10 percent of the total attorneys' fee. It has nothing whatsoever to do with this ERISA allocation. What the -- the ERISA settlement allocation.

What the DOL was trying to do there was to limit the total attorneys' fee that was taken out of the ERISA settlement. The DOL was not saying only ERISA counsel made this settlement possible. They weren't saying that.

Because the ERISA cases never even got past a motion to dismiss, and nobody had ever even argued, let alone had the argument sustained, that our claims -- the consumer claims which were brought on behalf of everyone, including ERISA plans, were preempted.

So no one had taken the position that you, consumer lawyers, have done nothing for ERISA plans. Nobody had ever said that, and that was not

the DOL's position either. I hope that makes it clear.

**THE SPECIAL MASTER:** It helps certainly, but what I'm not understanding is if that's the case --

**THE WITNESS:** Hm hm?

**THE SPECIAL MASTER:** -- why is the ERISA settlement allocation applicable only as a percentage of the ERISA plans and not to the ERISA fees themselves -- out of the ERISA counsel's fees themselves out of the total 60 million dollars?

Why didn't DOL just come in and say, look, we want to make sure that the folks in the ERISA plans are protected and that they get the greatest possible recovery; therefore, we want to limit their lawyers' fees out of the 60 million to X percent?

**MR. HEIMANN:** Who are their lawyers in your question?

**THE SPECIAL MASTER:** Well, I think testimony and documents say they -- at least the Andover folks and the original four ERISA plaintiffs -- viewed their lawyers as being Lynn Sarko and his firm, Carl Kravitz and his firm, Brian

McTigue and his firm and at varying other times the other folks who have appeared.

**MR. HEIMANN:** He can respond to that. I won't want to suggest that, but is that true?

**THE WITNESS:** The DOL did not think that, as far as I'm aware. The DOL was talking to us, too. They weren't just talking to Lynn and to Carl.

The DOL understood that the 300-million-dollar settlement was for the entire class, including ERISA plans. What the DOL wanted at the end of the day was to make sure that ERISA plans who were participants in the class got some kind of premium in recognition of the fact that they're ERISA plans, and that if the DOL wanted to, it could file its own lawsuit the next day.

**THE SPECIAL MASTER:** So that was in return for a release from DOL --

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** -- presumably?

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** Okay.

**THE WITNESS:** State Street got a release from the DOL ultimately.

**THE SPECIAL MASTER:** Which was an important objective in the settlement to get a global -- a global settlement, and State Street was going to demand global releases.

**THE WITNESS:** Yes. Correct.

**MR. HEIMANN:** Can I ask another question to illuminate -- eliminate something --

**THE SPECIAL MASTER:** Yeah, yeah. Please.

**MR. HEIMANN:** What percentage for fees would have been taken out of the 60 million as allocated to the ERISA plans -- however you characterize them -- had the Court awarded 15 percent rather than 25 percent as the fee?

**THE WITNESS:** 10.9 million.

**MR. HEIMANN:** Really?

**THE WITNESS:** That was the cap.

**MR. HEIMANN:** Think about that. Think about that.

**THE SPECIAL MASTER:** That was 18.1.

**MR. HEIMANN:** Yeah, but if the Court had award reasonable doubt 15 percent instead of 25 percent, what would the fee have been in terms of net out of the 60 million.

Page 90

Page 91

plans.

And I know I might get push-back from my ERISA colleagues over that, but I was class counsel in addition to Labaton and Thornton, and that class, judge, was defined to include all custodial customers of the bank.

We did not exclude ERISA plans. We filed our case in February of 2011 on behalf of a broadly-defined class as such. We got past a motion to dismiss in which we asserted Chapter 93A claims on behalf of everybody that afforded up to treble damages and 12 percent prejudgement interest and attorneys' fees for everybody including ERISA plans.

ERISA counsel filed a case months after we did. Never got past a motion to dismiss. They amended their complaint a couple times but never actually had a motion to dismiss adjudicated. And so it was never decided by anybody that you, customer class, no longer represent ERISA plans because those claims are preempted.

It's not even clear to me had they gotten past a motion to dismiss that our claims would have been preempted. Nobody's told me that definitively one way or another.

Page 92

So at that moment, yes, your Honor, I represented everybody in the class and that included ERISA plans.

**THE SPECIAL MASTER:** Would that not have rendered not just you, but apparently Labaton, and even Thornton then would have also represented the ERISA plans, right?

**THE WITNESS:** ERISA plans were part of our class. They were part of our class.

**THE SPECIAL MASTER:** So the answer's yes?

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** Would that not have rendered the role of Lynn Sarko, Brian McTigue, Carl Kravitz superfluous?

**THE WITNESS:** No -- well, no. Because I think, as we've been trying to say throughout this discovery, is that ERISA counsel filed a case asserting ERISA claims. We did not bring ERISA claims, statutory claims.

So they had a case. It was pending. The judge had asked us all to mediate together. State Street wanted global peace. The DOL becomes interested -- once there are ERISA cases on file,

Page 93

the DOL becomes interested. The DOL investigates, says maybe we'll bring a case.

They don't actually bring one, but all of these things are in the ether when we finally come to an agreement in July of 2015. And to achieve global peace you don't beat up on people and say you're totally superfluous; you were never going to get past a motion to dismiss; you get nothing. Because we don't know that.

So we're trying for global peace as is State Street. And, as I've said previously, ERISA counsel did contribute, particularly in interfacing with the DOL and in trying to assuage whatever concerns the DOL may have, that ERISA plans would get treated in a manner that they should so that the DOL felt satisfied it did not have to bring its own case.

**THE SPECIAL MASTER:** So then you had joint client responsibility to Andover and to the four individual ERISA plaintiffs?

**THE WITNESS:** Um --

**THE SPECIAL MASTER:** Along with Mr. McTigue and Lynn Sarko and Carl Kravitz.

**THE WITNESS:** We had a responsibility as

class counsel to the class. And that included ERISA plans. It included group trusts. It included RICs, registered investment companies. It included pension plans.

I had no interaction with any of the clients that Brian or Lynn had, but we're class counsel. We have a responsibility to the class.

**THE SPECIAL MASTER:** Okay.

**BY MR. SINNOTT:**

Q. Dan, if you could look at one of the November --

**THE SPECIAL MASTER:** Just let me follow up.

**MR. SINNOTT:** Sure. Of course.

**THE SPECIAL MASTER:** The cases were consolidated --

**THE WITNESS:** I don't think they were --

**THE SPECIAL MASTER:** -- for purposes of -- consolidated may not be the right term.

They were double captioned as separate cases --

**THE WITNESS:** Right.

**THE SPECIAL MASTER:** -- but for purposes of discovery --

interaction with any of the named plaintiffs in the ERISA cases.

**THE SPECIAL MASTER:** But you felt at least that you had a responsibility to the ERISA class members?

**THE WITNESS:** I felt that customer class counsel had a responsibility to the entire customer class with no distinctions. We didn't discriminate in our class definition. We didn't see the need to when we filed our case.

We had a very powerful consumer statute under Massachusetts law with a very generous damages remedy. I don't know if ERISA affords that.

**THE SPECIAL MASTER:** Okay. ERISA, as we've discussed, at least from the ERISA lawyers' viewpoint, they brought things to the case that you didn't have.

**THE WITNESS:** I -- I accept that they say that and that they feel that way.

**THE SPECIAL MASTER:** Okay.

**BY MR. SINNOTT:**

Q. Dan, let me ask you to look at document from December -- from November 22, 2016 at 1:01 p.m., and this is TLF-SST--012272.

Do you recall the discussion around November 22nd about claw-back letters?
A. **I recall a discussion about claw-back letters, yes.**
Q. All right. And I know you're not an addressee on that top message from Larry Sucharow to Labaton attorneys plus Garrett Bradley, but do you see where it says need two letters with breakdown?
A. **Yes.**
Q. "ERISA just gets sent to ERISA counsel with 10 percent off the top and then a third each. Class co-counsel gets one with ERISA 10 percent off top; Damon's percentage also off the top. Then each of class co-counsel split with the percentages agreed to."
And then in the next paragraph it says, "In short, no reason for ERISA to see Damon's split. They only need to see their 10 percent and then split three ways."
Were you part of any conversations about concealing the existence of the referring attorney, Damon Chargois, from the ERISA counsel?
**MR. HEIMANN:** Object -- let me get the objection out.

**MS. LUKEY:** Objection to the characterization as "concealing." This is Joan.
**MR. HEIMANN:** And the reference to ERISA counsel.
A. **The answer is not that I recall.**
Q. Okay. And did you complete the interrogatories?
A. **I worked with the firm to -- which interrogatories are you talking about?**
Q. The supplemental interrogatories that -- the responses that were completed --
A. **-- on August 11?**
Q. -- on August 11.
A. **I worked on those, yes.**
Q. Okay. And to the best of your knowledge, are those truthful and accurate?
A. **To the best of my knowledge, yes.**
Q. All right. And in response to 1F interrogatory, you and the firm responded, "LCHB defers to Labaton as lead counsel with respect to why the nature of Labaton's relationship with Mr. Chargois, and any intention to pay Mr. Chargois a percentage of the fee award was not disclosed to the Court prior to submitting the fee petition."

Is that accurate to the best of your knowledge?
A. **That we were deferring to Labaton for that answer? Yes.**
Q. All right. And is it your testimony that you don't know why the -- well, strike that.
With respect to the e-mail that I just directed your attention to from November 22, 2016 at 1:01 p.m. with the sentence, "in short, no reason for ERISA to see Damon's split," is it your testimony that you don't know why Mr. Sucharow wrote that?
A. **Yes, I don't know why.**
**THE SPECIAL MASTER:** Did you know that the ERISA lawyers were not going to be told or Mr. Chargois' split was not going to be disclosed to them? Did you know that?
**THE WITNESS:** I didn't know one way or another. No, I was not part of this conversation, and I don't recall being part of any such conversation.
**THE SPECIAL MASTER:** All right. So you weren't -- you weren't consulted on it I take it.
**THE WITNESS:** I don't recall being

consulted on that.
**THE SPECIAL MASTER:** All right.
Were you advised in any way that the ERISA lawyers were not going to -- that it was not going to be disclosed to the ERISA lawyers?
**THE WITNESS:** I don't recall one way or another as to Mr. Chargois. It's possible that I may have been aware that there was not a plan -- well, let me put it this way: I never knew what the plan for -- of allocation was on the ERISA side, like how ERISA counsel intended to divide up their fee.
I didn't consider it my business to know. Frankly, if I had a voice in that decision, I would vote for Lynn to get the bulk of it, but it's not up to me.
So I did not know how they planned to allocate their fee, and it would make sense to me if the plan was not to tell ERISA counsel how we planned to divide or allocate the fee on the customer side.
But with respect to Mr. Chargois specifically, I don't recall any such conversation.
Q. Did you recall any conversation aside from

Page 102

the name Damon Chargois that referenced a referring attorney?
A. **No. And with respect to Mr. Chargois, he was never characterized to me as a referring attorney.**
**THE SPECIAL MASTER:** How was he characterized to you?
**THE WITNESS:** Local counsel. He was always described as -- when I say "always," I mean there were maybe five or six e-mails during the life of this case on this issue that I can recall.
He was always described as local counsel. He was never --
Q. And what does that mean to you that someone's local counsel?
A. **Well --**
**MR. HEIMANN:** Excuse me. Generally or in this instance?
**MR. SINNOTT:** Generally.
Q. We'll start -- we'll start there.
A. **Well, it can mean a few things. I can tell you what I thought it must have meant here.**
**What I assumed when I was told local counsel -- and I think there was another e-mail from**

Page 103

**Garrett that said he had played an important role in the case.**
**So it was -- it's not at all atypical in cases like this for an institutional plaintiff, especially a pension fund, to want there to be like a hometown lawyer or a local counsel who's close to them, who's involved in the case somehow.**
**I can give you an example. In the BNY Mellon case we represented Ohio Pension Plans. The Ohio AG selected an Ohio counsel to work with us. We had no -- we had no input into that. And that was their choice.**
**They wanted to have what they called a local counsel, even though the case was pending in New York, to interface with them, to give them comfort, to respond to questions and maybe do, you know, one -- run some things down on the local side on the client-facing side, you know, while we as national counsel are involved in the main part of the litigation.**
**So we had local counsel in the BNY Mellon case who actually did a fair amount of interaction with the Ohio AG's office.**
**THE SPECIAL MASTER:** And is that the

Page 104

role you thought Mr. Chargois -- when you heard about Mr. Chargois, and he was referred to as local counsel or the local --
**THE WITNESS:** Hm hm?
**THE SPECIAL MASTER:** -- is that the role you thought he was playing?
**THE WITNESS:** Well, I didn't think it was anything extensive, but I figured this must be a relationship that goes back to maybe an RFP response, a request for proposals response.
Sometimes a public pension fund will ask you to actually team up with a local counsel meaning a hometown lawyer when you make your presentation. And if you get selected, you're part of a package deal going forward to the extent you do cases together.
I assumed that's the kind of arrangement this was. Yeah.
Q. At some point after you learned about the local counsel or Mr. Chargois --
A. **Hm hm?**
Q. -- did anyone caution you not to reveal his existence to ERISA counsel?
A. **No.**

Page 105

Q. Were there any caveats with respect to Mr. Chargois?
A. **Caveats?**
Q. Warnings. Don't do this.
A. **No. From whom?**
Q. From anyone.
A. **Um, I don't recall anything like that, no.**
Q. And you don't recall exactly how you heard?
A. **Well, I think, as I said earlier, what I recall is in 2015 at some point Garrett Bradley recent an e-mail from 2013 to me and Bob Lieff in which Garrett said something about a conversation that he and Bob and Mike had had in Dublin about a local counsel that Labaton owes an obligation to and trying to devise an agreement whereby essentially we share in that obligation rather than just make it Labaton's.**
Q. And you and your firm were okay with that?
A. **Well, in 2013, as I said, I didn't recall even getting that e-mail. So Bob, apparently, responded and said I agree. I'm not cognizant of it until 2015 when I ask what agreement are you talking about, Garrett, and he resends it. And I don't even think Bob even remembers it.**

**And so by that point two years have gone by, and I think it's difficult for us to walk back the initial agreement by Bob to share in that obligation to local counsel.**
Q. Do you recall what the payment terms were for Mr. Chargois?
A. **Ultimately?**
Q. Both historically and ultimately in State Street.
A. **Well, I think initially how it was characterized to us was that he was local counsel and that he was entitled to 20 percent of Labaton's fee, and the proposal by Garrett was that it instead be taken off the top of whatever the total fee turns out to be.**
**So those were the terms as they were described in 2013 and then in 2015 and then again in 2016 I think. And then ultimately he was paid 5-and-a-half percent of the total fee.**
Q. All right. And how did you learn that?
A. **We agreed ultimately. There was a -- when we finally agreed on the allocation of all fees to all customer counsel in I think late August of 2016, there was a provision in there for local counsel or**

**Arkansas local or however he was described.**
Q. All right. Let me direct your attention to an e-mail before you dated July 8, 2016 at 7:06 p.m., and the Bates number on that is LBS 040924. It's a one-page document.
A. **Sorry.**
Q. Take your time. It's 7/8/16. July 8, 2016 at 7:06 p.m.
A. **You said it's one page?**
Q. Yes.
**THE SPECIAL MASTER:** It's a one pager, yes.
A. **7:06 p.m.?**
Q. That's it.
A. **Okay.**
Q. And you'd agree that that's an e-mail from Garrett Bradley to several others including Michael Thornton, Larry Sucharow, yourself, Christopher Keller and Eric Belfi, correct?
A. **Yes.**
Q. And in that e-mail Garrett writes: "As we discuss how to distribute the fee between ourselves and of course the ERISA attorneys, I have had discussions with Damon Chargois, the local attorney

in this matter, who's played an important role. Damon and his firm are willing to accept 5.5 percent of the total fee awarded by the Court in the State Street class case now pending before Judge Wolf.
As you know, we had a prior deal with him that his fee would be off the top. He understands that ERISA counsel is now in the same pool of money. He has agreed to come down to this..." -- I'm assuming that should be "down" -- "...to this number with a guarantee that it will be off the court-awarded fee number. Please reply all if you agree. Given that it is off the total number, there is no need to add the ERISA counsel to this e-mail chain."
A. **Hmm.**
Q. So do you remember receiving this message, Dan?
A. **I do now, yeah.**
Q. All right. And is it fair to say that there was a warning or caveat that -- or a statement that there was no need to include ERISA counsel in this notification?
**MR. HEIMANN:** I object. Compound.
A. **I see that there's a sentence at the end**

**that indicates there's no need to add ERISA counsel to the chain.**
Q. Okay. Does that refresh your memory as to that statement?
A. **Well, I -- now I recall that statement being made. It wasn't one that made much difference to me one way or another.**
Q. Did you come to know the circumstances of Mr. Chargois' history with Labaton?
**MR. HEIMANN:** At what point in time?
**THE SPECIAL MASTER:** Good question. At the point in time -- since you don't have a recollection of 2013, right --
**THE WITNESS:** Right.
**THE SPECIAL MASTER:** -- at 2015 when you became cognizant that there was going to be a fee -- a payment to Mr. Chargois --
**THE WITNESS:** Hm hm?
**THE SPECIAL MASTER:** -- were you advised by anyone at Labaton of the history with Mr. Chargois -- Labaton's history with Mr. Chargois?
**THE WITNESS:** No. What was always represented to us -- at least the communications that I'm copied on and that I took part in -- were

that he was a local counsel, and sometimes he's described as local counsel for Arkansas or Arkansas local counsel. And sometimes he's described as local counsel for Labaton.

**THE SPECIAL MASTER:** And what did you take that to mean?

**THE WITNESS:** As I said earlier, I assume -- you know, between those representations and between this representation here (indicating) that he performed some kind of an important role, that he was some type of local counsel of the type that I described a little while ago.

**THE SPECIAL MASTER:** In this case, State Street?

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** Did you know that he did no work whatsoever on this case?

**THE WITNESS:** No, I did not know that.

**THE SPECIAL MASTER:** Did you know that the payment was being made pursuant to a much earlier agreement between Labaton and Chargois in which Mr. Chargois was given a 20 percent interest in any Labaton fee that Labaton received in any case in which Arkansas was either lead or co-payment --

or co-plaintiff and Labaton was lead or co-lead counsel?

**THE WITNESS:** Well, the nature of the relationship as it was described I think in the 2013 e-mail was something along those lines; that he has a 20 percent interest in Labaton's fee.

I can't remember -- and I think it might have said in cases involving the Arkansas Teachers Retirement System.

**MR. HEIMANN:** I think you'd be better off looking at the e-mail rather than as to what he says.

**THE WITNESS:** Actually, do you mind if I take a bathroom break?

**THE SPECIAL MASTER:** Yeah, go ahead.

**MR. SINNOTT:** Of course.

(A recess was taken.)

**MR. SINNOTT:** Is there anyone on the phone?

**MS. HARLAN:** Yes. Emily Harlan's on the phone.

**MR. SINNOTT:** Anybody else?

**MR. HEIMANN:** I heard Joan.

**MR. SINNOTT:** Joan, okay.

**MS. LUKEY:** Yeah, I'm on.

**MR. SINNOTT:** Anybody else besides Joan and Emily?

**MS. HYLENSKI:** This is Linda. I'm still on.

**MR. SINNOTT:** Okay, Linda.

**MR. TOOTHMAN:** John Toothman.

**MR. SINNOTT:** We're taking attendance so we can rat you out to your bosses that you're not on the phone. So you guys are all safe. Back on the record.

**BY MR. SINNOTT:**

Q. Dan, just before the break we were talking about the so-called Dublin e-mail and a series of e-mails dating back to April of 2013 that dealt with the referring attorney or local counsel or the local as he's referred to in this e-mail.

In that April 24th -- by the way, the Bates number that I'm referencing is LCHB 005483, 484, 485 as well as 0053538 and 3540.

But with respect to the April 25, 2013 e-mail, at 6:07 p.m. Garrett Bradley informed you and a number of other customer class attorneys -- and CC'd Mr. Chargois -- as follows: "Bob, as you,

Mike and I discussed in Dublin last week, I'm sending this e-mail regarding the obligation to local counsel who assists Labaton in matters involving the Arkansas Teacher Retirement System. Labaton has an obligation to this counsel, Damon Chargois, copied on this e-mail of 20 percent of the net fee to Labaton in the State Street FX class case before Judge Wolf. Currently this amount would be 4 percent because of the agreement between Labaton, Thornton and Lieff of a division of 20 percent guaranteed each with the balance to be decided upon at a later date. Obviously, this may go up should Labaton receive an amount higher than 20 percent.

We have agreed that the amount due to the local, whatever it turns out to be, 4 percent, 5 percent, etcetera, will be paid off the top with the balance of the overall fee split between Lieff, Labaton and Thornton pursuant to our agreement. The local asked that I copy him out on this e-mail so he will have confirmation of this agreement. When we spoke to him, he was agreeable to this as well."

You recall that message?

**A. I recall Garrett sending it to me again in 2015.**

Page 114

Q. Okay.
A. **'Cause I had no memory of it prior to that time.**
Q. All right. But my reading refreshes your memory as to that message?
A. **Yes. I recall that message as recent to me in 2015.**
Q. Okay. And with respect to that message, do you recall that the local or Mr. Chargois responded to Garrett shortly after that message went out?
A. **I did not recall it at the time. I recalled it after going back and looking at e-mails that I had been copied on.**
Q. Okay.
A. **That, apparently, I was copied on that response.**
Q. All right. And in 2016 do you recall receiving that message forwarded to you on June 14th? Does that sound about right?
A. **Of 2016?**
Q. Yes.
A. **Could be. Yeah, I think -- I think Garrett may have forwarded it to me and Bob in 2015 to remind us both of it. And then it was sent again in**

Page 115

**2016.**
Q. Yeah, I see where Bob was an addressee, but maybe Bob gave it to you --
A. **May have been.**
Q. -- in 2015. It looks like it was re-sent to you by Garrett in 2015. So that's how it arrived there.

But, in any event, you do recall being informed as to the arrangement, even though it was not solid or completely defined, between Labaton and consequently by the customer class firms and Mr. Chargois?
A. **I recall his -- the description of him that was offered in that e-mail which was I think the -- the words they used were that he assisted Labaton in matters pertaining to Arkansas.**
Q. And did you interpret that description of he assisted as meaning he took an actual active role in those cases?
A. **I actually assumed that, yes.**
Q. Okay.
A. **That it was some kind of a role, some kind of an assistance offered by a local counsel.**

**And for that assumption I based it on my**

Page 116

**own experience, my own recent experience in the BNY Mellon case.**
Q. Tell us about that experience --

**THE SPECIAL MASTER:** I think he did. I'm curious at any point in all this did you ever learn that the interest that Mr. Chargois had went back years to this original agreement that Labaton had with Mr. Chargois on every case in which -- apparently, in every case in which Labaton served as lead counsel or co-lead counsel and Arkansas was plaintiff or co-lead plaintiff, irrespective of whether Mr. Chargois had any role to play whatsoever?

**THE WITNESS:** No, I didn't understand -- I never learned of the relationship in the manner that you just described. I didn't know how old the relationship was.

All I knew was what was presented to us in that e-mail and in subsequent e-mails in which he was described as local counsel.

**THE SPECIAL MASTER:** Do you know if anyone else in your firm -- I don't want you to speculate, just only on your personal knowledge based on conversations you may have had with Bob

Page 117

Lieff or anybody else.

Did anyone in your firm know the nature of this relationship -- of Labaton's relationship with Mr. Chargois?

**THE WITNESS:** I don't know of anyone else at my firm knowing the nature of the relationship beyond what was described in the e-mails.

**BY MR. SINNOTT:**

Q. Can I ask you this question, Dan: What is the arrangement that your firm typically has with a referring attorney?
A. **A referring attorney?**
Q. Yes, sir.
A. **I have not had many relationships with, quote/unquote, like pure referring counsel who just send you a case and then back off and aren't involved in the case anymore.**

**In fact, I don't think I've had any such relationships in any of the cases I've worked on. Typically this -- this comes up more in torts cases and personal injury type cases that my firm does where counsel will refer cases to us because of our expertise and because we may be doing a mass action**

Page 118

**involving many similarly-situated people where they refer the cases to us, but in our retainer agreements we make clear to the client the nature of that relationship and how much the referring attorney's going to get paid because there are rules that vary from state to state that tell you what you need to do when you're dealing with a referring counsel type of arrangement.**

**THE SPECIAL MASTER:** Did you know that in this case George Hopkins, who was the client representative, did not know about the Chargois relationship?

**THE WITNESS:** No, I did not.

**THE SPECIAL MASTER:** When did you find that out?

**THE WITNESS:** I've -- I don't know if I'm --

**MR. HEIMANN:** Just when. Not from whom.

**THE SPECIAL MASTER:** Just when. Not from whom.

**THE WITNESS:** Within the last couple days.

**THE SPECIAL MASTER:** Just want to take you back to Garrett Bradley's e-mail to Mike

Page 119

Thornton and Larry Sucharow and to you that Bill related -- the 7/8/2016 e-mail at 7:06.

**THE WITNESS:** Hm hm?

**THE SPECIAL MASTER:** Do you agree that there was an agreement not to tell ERISA counsel about the relationship with Mr. Chargois?

**THE WITNESS:** I don't. I don't agree that there was an agreement not to tell because I didn't agree not to tell anybody.

**THE SPECIAL MASTER:** Fair enough.

**THE WITNESS:** I see Garrett saying here that given it's off the total -- given it's off the top, there's no need to add ERISA counsel to that string, and I think I understand the logic which is 9 or 10 percent is 9 or 10 percent of the total fee, and that doesn't change no matter who else is getting paid. I think that's what he's saying there.

But there was -- I wasn't aware of any agreement to hide this.

**THE SPECIAL MASTER:** Let's not say agreement.

Were you aware now -- were you aware then that there was a decision made -- if not an

Page 120

agreement, a decision not to share this information with ERISA counsel?

**THE WITNESS:** Um, yes. It seems clear from this e-mail from Garrett that he feels there's no need to tell ERISA counsel because it doesn't impact their share of the fee one way or the other.

**THE SPECIAL MASTER:** Do you think it might have impacted their approach to arriving to an agreement to receive 9 or 10 percent had they known that Mr. Chargois was going to receive 5.5 percent?

**MR. HEIMANN:** You're asking for him to speculate what might have been in the minds of others folks.

**THE WITNESS:** Yeah. I don't know. I don't know one way or another what they would have thought.

**THE SPECIAL MASTER:** Let me ask it another way.

Were you aware at the time that ERISA counsel made this agreement to receive 9 percent, that they had not been informed about the relationship with Mr. Chargois? Were you aware of that?

**THE WITNESS:** I was not aware, but I

Page 121

have to say nor was I aware of Mr. Chargois myself.

**THE SPECIAL MASTER:** Okay.

**THE WITNESS:** I mean I think the written agreement was reached in December of 2013 with ERISA counsel. I think that's what the date is.

And it's been produced. So you should have it.

**THE SPECIAL MASTER:** Hm hm.

**THE WITNESS:** That's December of 2013. So this -- one of the e-mails we've been referring to is from April of 2013, but I had no memory of it.

So I didn't know who Mr. Chargois was myself in December of 2013 when it was negotiated with ERISA counsel that they would receive 9 percent of the total fee.

And even had I known, to me he was local counsel. That's what -- that's how it was described to me. So he's yet another counsel that you have to take into account. There was nothing untoward about it.

**THE SPECIAL MASTER:** Okay. But another counsel you have to take into account.

**THE WITNESS:** Right.

**THE SPECIAL MASTER:** Don't you think the

clients -- in this case I mean the ERISA plans -- had a right to know about this?

**MR. HEIMANN:** Now you're asking for a legal opinion.

**THE SPECIAL MASTER:** I am asking him based on his experience.

**THE WITNESS:** Um, I think it depends on that lawyer's status. So I assumed that George Hopkins as the client or whoever the client --

**THE SPECIAL MASTER:** Well, the ERISA folks were clients. You testified that they were your clients.

**MR. HEIMANN:** Excuse me. No, I'm sorry, your Honor, that's not what he testified to.

**THE WITNESS:** Yeah, I'm -- I testified that we represented a class of consumers that included ERISA plans.

I understand that ERISA counsel had retainer agreements with individuals who had hired them to be their lawyers, and I'm not purporting to have that type of attorney/client relationship with their clients.

So I just want to make that --

**THE SPECIAL MASTER:** Well, let's cut

through all this. Somebody -- whether it was you or ERISA counsel --

**THE WITNESS:** Hm hm?

**THE SPECIAL MASTER:** -- didn't they have an obligation to tell their clients about an agreement in which an attorney was going to receive 5.5 percent off the top of the attorney fee?

**THE WITNESS:** Maybe.

**MS. LUKEY:** Objection. That's Joan.

**THE WITNESS:** Sorry. I haven't done the research on that issue to answer the question definitively for you.

I think -- as I said before, I do know based on experience that when you have a referring counsel arrangement, it's usually written into your retainer agreement.

It's very clear with your client how that referring attorney is going to be paid and what percentage they'll be paid and whether they'll be doing work that approximates the amount --

**THE SPECIAL MASTER:** -- the value that they're paid.

**THE WITNESS:** -- the value that they're being paid.

Um, you know, if I'm ERISA counsel, does it matter to me whether there is another firm that's being paid out of the 90 percent -- the 91 percent that I'm not getting?

Does it matter to me that there are four firms rather than three getting the 91 percent?

I don't know that it does.

**THE SPECIAL MASTER:** Before you agreed --

**THE WITNESS:** Uh-huh?

**THE SPECIAL MASTER:** -- to take 9 percent or 10 percent --

**THE WITNESS:** Right.

**THE SPECIAL MASTER:** -- wouldn't you have wanted to have that knowledge?

**THE WITNESS:** I'm not sure why to be honest. I think what matters --

**THE SPECIAL MASTER:** 'Cause you might not have agreed to 9 percent --

**MR. HEIMANN:** All right, I'm sorry, but please, both of you. I'm sorry, but you ought to let him finish his answer, and we'll try to make sure he doesn't answer until you finish your question.

**THE WITNESS:** I'm really not trying to be difficult here. I'm not sure whether it would matter to me whether there's three lawyers, four lawyers or more sharing that 91 percent.

I think the basis for that agreement was I think to try to recognize the approximate value of the ERISA case if it were a standalone case vis-a-vis the consumer case.

I think that's what that ratio was to trying to approximate at that point in time, and I think at that point in time the volume -- the ERISA volume that we understood was less than 9 percent. I think it was much lower than that. It was like 3 or 4 percent were the numbers we were looking at.

So that percentage -- that 9 percent was not a function at all of how many firms on either side, whether it's ERISA side or the consumer side, were working the case.

It was really driven by what we believe to be the estimated value of the ERISA case which was much a much smaller case vis-a-vis the global case.

**THE SPECIAL MASTER:** Mr. Sarko has testified this morning that it would have impacted

Page 126

greatly his willingness and he believed the others -- we'll let Mr. McTigue testify on his own and Mr. Kravitz, but he testified it would have impacted greatly his willingness to have entered into this agreement.

**THE WITNESS:** Can I ask a question?

**THE SPECIAL MASTER:** That's a question --

**MR. HEIMANN:** No. No, no. There's no question's been put. He made a statement to you.

**THE SPECIAL MASTER:** Does that affect your answer now?

**MR. HEIMANN:** Now I object to that question because it misstates --

**MS. LUKEY:** Objection.

**MS. HARLAN:** I object also. This is Emily.

**MR. HEIMANN:** I believe it misstates the testimony, and I don't know what arrangement you're referring to.

You're referring to an arrangement that he knew about or thought existed --

**THE SPECIAL MASTER:** This is a speaking objection. What's your objection?

Page 127

**THE WITNESS:** Well, he's saying exactly what I was about to say.

**THE SPECIAL MASTER:** Yeah, I know that. That's the problem.

**THE WITNESS:** Well, it's not problem because he's -- I'm not being coached 'cause this is exactly what I was just going to say which is I don't know what arrangement you're talking about.

I think -- I need to know what upsets Lynn about that arrangement. Is it the fact that there's one more law firm? I don't think that's what it is.

I think it's that there was this law firm or lawyer who was being paid characterized as local counsel but wasn't as local counsel is typically understood and didn't do anything in the case.

I think that's what Lynn is saying he wished he had known before he agreed to 9 percent. Am I right about that?

**THE SPECIAL MASTER:** He testified that he wouldn't have signed the agreement. You can quibble about that, but that's what his testimony was.

Page 128

**THE WITNESS:** I think that's fair.

**THE SPECIAL MASTER:** He would have felt other obligations.

So does that change your understanding then of whether or not the ERISA lawyers who made the agreement had complete information?

**THE WITNESS:** Well, judge, all I can say is --

**MS. LUKEY:** Objection.

**THE WITNESS:** Yeah.

All I can say is I need to read Lynn's testimony for myself before I can answer your question fairly, and I'm happy to do that.

But I don't know that you're characterizing it in a manner as complete as I need it to be characterized before I can answer that question.

I've just described to you --

**THE SPECIAL MASTER:** Let me just ask you this: Do you think it was appropriate to keep this information from the ERISA lawyers?

**MR. HEIMANN:** And what information are you talking about?

**THE SPECIAL MASTER:** About Mr. Chargois,

Page 129

all of the information -- apparently, it wasn't fully disclosed to you either, at least not the total relationship and the history.

**THE WITNESS:** Hm hm.

**THE SPECIAL MASTER:** Do you think it was fair and appropriate to keep this information from the ERISA lawyers and the complete information from you? By "you" I mean Lieff and Thornton.

**MS. LUKEY:** I respectfully object. This is Joan.

**THE WITNESS:** I myself have only learned of much of this information over the last couple days.

So I am surprised by some of it myself. It surprises me that the client wouldn't have known.

**THE SPECIAL MASTER:** Mr. Hopkins?

**THE WITNESS:** Yes. If -- I mean I wasn't there for his testimony, but as you're describing it to me.

So I can understand Lynn who I respect very much, I can respect his position that he wishes he had known and that he may not have agreed to the original fee allocation had he been informed of that.

Page 130

I don't question Lynn's position on that respect.

**THE SPECIAL MASTER:** Do you believe that Labaton should have disclosed to you or Bob Lieff or somebody at your firm the total relationship and how the obligation to Mr. Chargois arose?

**THE WITNESS:** Um --

**MS. LUKEY:** Objection. This is Joan.

**THE WITNESS:** I think --

(Pause.)

**THE WITNESS:** I am disappointed to learn of things after the fact and that this obligation was shared with us without our being fully informed of the nature of the relationship and who this person was because it may have impacted our view as to whether the Court should be informed.

**THE SPECIAL MASTER:** Well, you've anticipated my next question.

Given the nature of the relationship, do you believe -- what you've learned to date of the nature of the relationship, do you believe that the Court should have been informed?

**THE WITNESS:** I think it would have been better --

Page 131

**MS. LUKEY:** Objection.

**THE WITNESS:** I think it would have been better to have been more transparent with the Court about that. The way rule -- Rule 54 says that fee allocations amongst counsel will be disclosed if the Court so orders.

The judge didn't order that which is why fee allocations amongst counsel were not disclosed. And that's pretty typical in most of these cases. It's usually not volunteered in the first instance. We did it in the BNY Mellon case because we knew as a matter of course Judge Kaplan asks for that information.

So I have to assume that had Judge Wolf asked what the allocation was going to be, that Mr. Chargois' allocation would have been disclosed.

**THE SPECIAL MASTER:** Counsel had no independent obligation to bring this to the Court in the context of a fairness hearing and the allocation of fees and how the fees were going to be allocated to the class and then to -- to the lawyers?

**THE WITNESS:** No --

**MS. LUKEY:** I object.

**THE WITNESS:** What I'm saying is I can

Page 132

only go back to what I knew at the time the materials were submitted to the Court; and at the time the materials were submitted to the Court, there was a local counsel as it was represented to me who was going to share in the fee.

And there were other firms on the ERISA side who we had had no contact with, virtually none, who also shared in the fee. Firms like Beins Axelrod and Richardson Patrick, and there was a local counsel I think for the ERISA cases.

**THE SPECIAL MASTER:** They worked on the case.

**THE WITNESS:** They did. They submitted time. And for all I knew --

**THE SPECIAL MASTER:** And their time was in the lodestar.

**THE WITNESS:** It was. And for all I knew, a declaration was going to be filed by this local counsel, too. I didn't know one way or another. I didn't give a lot of thought to it just as I didn't give much thought to the minor players on the ERISA side.

And I didn't have control over what went in. It all went in, as you know, on the 15th, and

Page 133

there were declarations from firms who weren't otherwise mentioned in the papers like Beins Axelrod and Richardson Patrick and others.

**THE SPECIAL MASTER:** And that's sort of the point; that they were before the Court.

**THE WITNESS:** Right. Ultimately. But I didn't know. I didn't know what the plan was.

**MR. SINNOTT:** Can I just ask a question on that?

**THE SPECIAL MASTER:** (Nods head.)

**BY MR. SINNOTT:**

Q. With respect to the fee declaration and the omnibus declaration, you were heavily involved in that, correct?

**A. Not heavily, no.**

Q. All right. Did you have any role on that at all?

**A. I edited the fee brief and the omnibus declaration. I sent some red lines.**

Q. Was there any discussion in the context of the fee declaration as to whether information should be included about Mr. Chargois?

**A. No, not that I recall.**

Q. With respect to the fairness hearing, did

Page 134

you participate at all in that hearing? Were you present?
A. **I was present.**
Q. And did you and Mr. Goldsmith discuss his presentation?
A. **You mean before he made it?**
Q. Yes.
A. **I'm sure we did.**
Q. Was there any discussion as to whether the role of Mr. Chargois should be proffered to Judge Wolf?
A. **It wasn't mentioned at all. There was no discussion of that.**
Q. And with respect to the November 10, 2016 letter to Judge Wolf, did you participate in that?
A. **Yes.**
Q. Was there any discussion during the preparation of that letter as to whether the existence or the role of Mr. Chargois should be presented?
A. **No. That wasn't the object of that letter.**
Q. What was the object of that letter?
A. **The object of the letter was to inform the Court of the error that had been discovered with**

Page 135

**respect to double count of lodestar and to correct it.**
Q. And it's your testimony that revealing the identity of an individual that had received 4.1 million dollars was not part of that correction?
A. **There was no discussion of Mr. Chargois at all. After -- after the fee agreement, the fee allocation agreement was reached in late August of 2016, I don't recall any discussion one way or another of Mr. Chargois at all that I took part in.**
**THE SPECIAL MASTER:** I just want to understand.
You've been at some pains to say that you viewed the ERISA plans and the ERISA representatives -- the four individuals -- as part of the class --
**THE WITNESS:** No, actually I should correct you.
**THE SPECIAL MASTER:** Please.
**THE WITNESS:** The ERISA individuals wouldn't have been class members because we represented actual -- the class as was defined in our case -- it's in our complaint -- is custodial customers of the bank.

Page 136

So that would be the ERISA plans themselves. I understand that ERISA counsel represented a number of individuals who were plan participants in those plans, and they had -- their argument was the individuals had standing --
**THE SPECIAL MASTER:** Had standing --
**THE WITNESS:** -- to bring claims --
**THE SPECIAL MASTER:** -- to bring claims --
**THE WITNESS:** -- on behalf of injured claims.
So as a technical matter, no, I don't think the individual plan participants that were represented by Mr. McTigue and others were part of the class as we defined it in our complaint.
**THE SPECIAL MASTER:** Now I'm really confused.
**THE WITNESS:** But we did represent a class of customers that included all affected pension plans, ERISA plans, registered investment companies and the like.
**THE SPECIAL MASTER:** And that would have included Andover?
**THE WITNESS:** Yeah. To the extent it's

Page 137

an affected plan, yes.
**THE SPECIAL MASTER:** And that would have included the four individuals that we talked about.
**THE WITNESS:** They're not plans. The individuals are not plans. They're individuals.
**THE SPECIAL MASTER:** But they're punitive class members, aren't they?
**THE WITNESS:** I don't think they could file a claim. I think the ERISA plan of which they are beneficiaries can file a claim and receive money as part of the settlement, but I don't think the individuals can file claims and receive like a check in the mail.
Like Mr. --
**THE SPECIAL MASTER:** But as class representatives they could.
**THE WITNESS:** No. No. They're not going to file -- I mean Brian can correct you, but the individual plan participants are not going to file claims --
**THE SPECIAL MASTER:** Not as individuals but on behalf of the ERISA plan members.
**THE WITNESS:** No. The plans --
**THE SPECIAL MASTER:** They don't have

Page 138

standing?

**THE WITNESS:** The plans themselves will receive notice. Their administrator or whoever receives notice of class settlements that impact them will receive a notice. It's probably someone sitting in the main office for that pension plan will receive a notice and will submit a claim for that plan.

And to the extent the plan gets money, it would inure to the benefit to its participants which would include individuals.

**THE SPECIAL MASTER:** But at the very least, Andover --

**THE WITNESS:** Yeah.

**THE SPECIAL MASTER:** -- was --

**MR. HEIMANN:** Wait a minute. Did you hear a question there?

**THE WITNESS:** Sorry.

**THE SPECIAL MASTER:** At the very least Andover was a member of the class?

**THE WITNESS:** Should have been, yes. I mean I haven't vetted their custody data to make sure they were actually a custody customer of State Street but as represented, yes.

Page 139

**THE SPECIAL MASTER:** So if you and Labaton and Thornton were representing the class and Andover was a named plaintiff in the -- what we've characterized as the ERISA litigation --

**THE WITNESS:** Okay.

**THE SPECIAL MASTER:** -- should they not have been given notice by somebody?

Probably Labaton as lead counsel. Should they not have been advised of the Chargois relationship?

**MR. HEIMANN:** Because they were members of the class? Is that what you're saying?

**THE SPECIAL MASTER:** Yes. And -- and given the procedural posture here, which is a little unusual, but given the procedural posture in which there was a separate case in which they were a named plaintiff, should they not have been advised?

**MR. HEIMANN:** Well, again, I have to object as compound 'cause there are two questions in that.

**THE SPECIAL MASTER:** You can pick any one.

**MS. LUKEY:** I need to add my objection as well respectfully.

Page 140

**THE WITNESS:** Can you repeat it?

**THE SPECIAL MASTER:** It's a pretty simple question.

Should Andover not have been advised of the payment that Mr. Chargois was receiving given their role in this case?

**THE WITNESS:** Um, I think it -- I would not have objected to their being advised. It would have been fine with me to advise them and ERISA counsel, frankly, of Mr. Chargois' existence.

**THE SPECIAL MASTER:** And the payment to him?

**THE WITNESS:** Sure -- well, the ultimate payment? Because nobody knows what Lieff Cabraser got paid either, except you 'cause we told you in discovery.

**THE SPECIAL MASTER:** I don't mean -- the 5.5 percent split.

**THE WITNESS:** Well, nobody knows what Lieff Cabraser's split was either except you asked and we told you.

**THE SPECIAL MASTER:** Okay.

**THE WITNESS:** So, again, this goes back to Rule 54 which is you disclose things if you're

Page 141

ordered to do it or if the Court asks you. If the Court is interested.

**THE SPECIAL MASTER:** So -- I'm sorry. Go ahead.

**THE WITNESS:** And the Court didn't ask what the allocation was on either the customer side or the ERISA side.

Had he asked, again, I have to assume that it would have been disclosed; that all of the allocation would have been disclosed to the Court.

**MR. HEIMANN:** And I don't want to make a speaking objection here, but it may make a difference, your Honor, when you ask these questions as to whether the role that Chargois played was as Mr. Chiplock understood it when you're asking the questions or as it really was as we've now learned?

**THE SPECIAL MASTER:** Fair enough.

**MR. HEIMANN:** That may make a difference in terms of his opinion as to what should have been disclosed --

**THE SPECIAL MASTER:** Fair enough.

Yeah, I guess I'm assuming in all of my questions that Mr. -- that the role was as we've now

learned it, not as Mr. Chiplock understood it at the time.

**THE WITNESS:** Hm hm. Okay.

**THE SPECIAL MASTER:** So let me ask it again.

Given the role that we've now -- that we all now understand that Mr. Chargois had and the reasons why he was paid --

**THE WITNESS:** Hm hm?

**THE SPECIAL MASTER:** -- should that not have been disclosed to the Court?

**THE WITNESS:** I think insofar --

**MS. LUKEY:** Objection.

**THE WITNESS:** If Mr. Chargois was acting as a pure referral counsel for Labaton and it was at the client's behest that he be paid, I'm not certain that it's required that that relationship and that payment be disclosed in the first instance because it's not unusual for referral counsel to exist in cases. There are rules that govern those relationships, as I've testified to earlier.

So if there was that type of relationship, even if he had not done any work in the case, if he was being paid pursuant to a pure

referral arrangement, I don't know that it's actually required to disclose that in the first instance, unless you are asked or ordered to do so.

Given that it sounds like the client -- given the relationship as it's been described to me over the last two days -- and I'm not sure I fully understand it -- I think the better part of valor would have been to disclose --

**THE SPECIAL MASTER:** Or at least the better part of discretion.

**THE WITNESS:** The better part of discretion. Sorry, it's a long day. -- to disclose, you know, frankly -- so the client and everyone else are on board with who's being paid and how.

**THE SPECIAL MASTER:** I want to understand your testimony on the relationship that Rule 54 plays here.

**THE WITNESS:** Hm hm.

**THE SPECIAL MASTER:** And Rule 23.

**THE WITNESS:** Yep.

**THE SPECIAL MASTER:** Are you implying that given all of the circumstances here the burden is on the Court to ask?

**THE WITNESS:** I'm not implying anything, judge. I think what I've tried to describe are two different situations.

One is if you have a referral counsel who's subject to some kind of a written agreement and full disclosure to the client, the client understands what the parameters are and how they're being paid. If that's all up to snuff under the rules, I don't know that there is an obligation to tell the Court that in the first instance along with all the other allocation information.

If there is, I'm sorry. I have not done the research in the last 48 hours because I did not know this was an issue. So I'm only speaking off the cuff on that based on my understanding of Rule 54 and how this usually works. And usually you don't in the first instance tell the judge what the allocation is amongst all counsel.

And if you have a referral counsel who didn't submit a fee declaration but is still going to get paid, I just don't know for certainty whether that has to be disclosed, even if the other parts of the allocation don't. Okay?

But what I have said I think twice now,

and I'll say it again, is given as it's been described to me and as I think I've come to understand over the last two days -- and I'm not sure I have a full understanding yet -- but if it's true that the client didn't even know, then I think there needed to be more transparency in that regard.

**THE SPECIAL MASTER:** Andover was a client.

**THE WITNESS:** Of who?

**THE SPECIAL MASTER:** Well, you tell me. 'Cause I'm totally confused on what your view is who the clients were here. They were at least a client I believe of Mr. Sarko and Mr. McTigue.

**THE WITNESS:** Uh-huh. Yeah, so all the clients. Everybody. Disclosure to everybody.

If the relationship was such as it's been described over the last couple of days, I think the better part of discretion would have been for all clients to know and the Court to know.

**THE SPECIAL MASTER:** Meaning ERISA counsel should have been told so that they could disclose it to Andover, and, if they viewed the four individuals as their clients, to those folks.

**THE WITNESS:** I think it's the better --

Page 146

Page 148

that's what I had -- well, wait a minute. What's this?

**MR. HEIMANN:** No, that's not it.

**THE SPECIAL MASTER:** What's the date, Rich?

**MR. HEIMANN:** It's -- the date is --

**THE WITNESS:** Is it double-sided?

**MR. HEIMANN:** Is it double-sided. I always tell my folks never to give me double-sided documents, and they always do. So -- all right.

**BY MR. HEIMANN:**

Q. There are several e-mails in succession. The first is dated April 24, 2013. And it's an e-mail from Garrett Bradley to Bob Lieff, Mike Thornton and Eric Belfi with a CC to Damon Chargois.

And it's the e-mail that we looked at earlier --

**THE SPECIAL MASTER:** That's the Dublin e-mail?

**MR. HEIMANN:** It begins as you, Mike and I discussed in Dublin.

**THE SPECIAL MASTER:** Okay.

**BY MR. HEIMANN:**

Q. That e-mail was forwarded to Bob Lieff or --

Page 147

Page 149

sorry.

The next e-mail is Bob Lieff's responding to that e-mail which he says, "I am in full agreement. Bob."

The next e-mail is dated July 28, 2015, and it's from Garrett Bradley to Bob Lieff, and it reads: "Here is the e-mail we discussed tonight." So that's forwarding the below e-mail.

And then Garrett Bradley -- the next e-mail is from Bradley to Lieff, Chiplock and Thornton. Subject: Forward State Street fee regarding local counsel that reads: "I found it in my e-mail..." -- in my sent e-mail -- excuse me.

And then the concluding e-mail is from Chiplock to Bob Lieff that reads: "See below. I don't know how you get around this." All right?

Now with all of that, can you describe the circumstances under which you sent that e-mail to Lieff, the last e-mail?

**A. Yes. So Bob I believe -- even at this stage in 2016 -- didn't recall this arrangement, even though there'd been a couple e-mails about it and even though --**

**THE SPECIAL MASTER:** What goes in Dublin

Page 150

stays in Dublin probably.

**THE WITNESS:** Well, I don't know. He responded in 2013 saying I am in full agreement, Bob. I didn't recall it. He didn't recall it --

**THE SPECIAL MASTER:** Were you in Dublin?

**THE WITNESS:** No, I was not in Dublin.

**THE SPECIAL MASTER:** Okay.

**THE WITNESS:** So Garrett forwards this e-mail in 2015 I think after I've asked the question there's a local counsel? Describe it for me and describe this agreement, send it to me if you have it. And he forwards to Bob -- I'm sorry.

He forwards it to me on August 30th after he had previously sent it to Bob a month earlier. So Bob and I are both having difficulty remembering this in 2015 -- in the summer of 2015.

Then almost a year passes which is June 2016 where I go back into my archives to find the e-mail again because the question has come up one more time about this local counsel that we are -- we are all supposed to share in the obligation for.

And Bob and I are trying to recall what the origins of that agreement were. So I forward that to him, and I say I don't know how you get

Page 151

around the fact that you said yes in 2013.

**THE SPECIAL MASTER:** Meaning no way to get out of this agreement?

**THE WITNESS:** Meaning no way to get out of sharing in Labaton's obligation to Labaton's local counsel.

**THE SPECIAL MASTER:** Right.

**THE WITNESS:** Right. 'Cause Labaton had decided we were all going to share in paying rather than Labaton fulfill that obligation itself.

**THE SPECIAL MASTER:** Just a followup.

Had you known then what you know now about the nature of the relationship, would that have been maybe a way to get around this?

**THE WITNESS:** Yes. Um, I certainly --

**MS. LUKEY:** Objection.

**THE WITNESS:** Yes. At this point in time all we know is local counsel, and it's something we agreed to three years prior.

So we couldn't really say no at that point. But had I known now what I knew then --

**THE SPECIAL MASTER:** Had you known then what you know now --

**THE WITNESS:** Had I known then what I

Page 152

now know -- sorry. Again, it's been a long day.

**THE SPECIAL MASTER:** Yeah.

**THE WITNESS:** -- I would not have been so amenable to that proposal.

**THE SPECIAL MASTER:** And we've seen in other e-mails that we've discussed that you pushed back in certain situations when you were concerned.

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** Would you have pushed -- had you known then what you know now, would you have pushed back similarly?

**THE WITNESS:** Yes.

**MS. LUKEY:** Objection. I'm sorry, I can't get the objections in fast enough 'cause I'm not sitting there, and the witness is answering before the question is done.

**THE SPECIAL MASTER:** They're noted, Joan.

**MS. LUKEY:** I ask that they be treated as timely.

**THE SPECIAL MASTER:** All right. In fact, if you like, we'll give you a standing objection, okay?

**MS. LUKEY:** No, your Honor, because

Page 153

