# EX. 42

David Goldsmith

1

Volume:  1

Pages:  1-266

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

---------------------------------------

In Re:  STATE STREET ATTORNEYS FEES

---------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,
         United States District Court, Retired

DEPOSITION of DAVID J. GOLDSMITH

September 20, 2017, 9:21 a.m.-4:20 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter:  Paulette Cook, RPR/RMR

Page 14

[redacted]

Page 15

[redacted]

Page 16

1   That wasn't the sum total of our
2   communications with ERISA counsel by any means, but
3   a very large part of it to my recollection concerned
4   the DOL side of the settlement.
5  Q. Great. Thank you. And that's a good
6   overview, and I'll ask you some specifics on that
7   shortly.
8       Is it fair to say notwithstanding the
9   fact that Labaton was lead counsel in this matter
10  that the ERISA firms were active and equal partners
11  in this prosecution of this matter?
12 A. I hesitate a bit when you say prosecution.
13  The reason I hesitate a bit is that the ERISA
14  counsel were not put to the test of surviving a
15  motion to dismiss at the outset of their cases.  We
16  were.  We meaning the Arkansas counsel.
17      We were put to the test of having our
18  complaint tested.  Our allegations were tested and
19  survived.  The ERISA complaints, as I recall, State
20  Street moved to dismiss those complaints, but those
21  motions to dismiss were ultimately withdrawn as moot
22  once it was agreed that all of the cases would be
23  moved into the mediation protocol.
24      So in terms of prosecution, that's why I

Page 17

1  hesitate.

[redacted]

Page 30



Page 31

1    I then questioned him on then on what
2    role did ERISA counsel have. And maybe it's what I
3    sort of characterize as the hybrid nature of the
4    mediation and discovery, but I'm very interested in
5    what your view was of Labaton's relationship to the
6    what I will characterize as the ERISA plaintiffs.
7        Did you view them as clients? Or at
8    least did you view Labaton as in some sense
9    representing them?
10       **THE WITNESS:** I would not view the ERISA
11   plaintiffs as clients of Labaton Sucharow. I would
12   say -- and, you know -- I would say that Labaton
13   Sucharow as lead counsel for the broad case -- there
14   is a consolidation order; the precise words of which
15   I don't have in front of me, but I would say the
16   overall.
17       **MR. WOLOSZ:** I do have them.
18       **THE SPECIAL MASTER:** Let him finish and
19   then maybe unlock this mystery. I'm sorry, David.
20   Go ahead.
21       **THE WITNESS:** I would say that Labaton
22   Sucharow as the lead counsel had the overall
23   umbrella responsibility for the entire matter. I
24   mean there is a reason why I argued, for example,

Page 32

1    the fairness hearing and not one of the ERISA
2    counsel.
3        You know, there's a reason why -- and
4    I'm sure we're going to talk about this -- why we,
5    you know, the big three so-to-speak received the
6    lion's share of fees in the case.
7        So I would say as a practical management
8    reality concern, I do think Labaton Sucharow led the
9    three captions, but I do not believe that the ERISA
10   plaintiffs -- those actual persons or entities --
11   were formal clients of my firm.
12       **THE SPECIAL MASTER:** Okay. Not formal
13   clients, but do you view -- do you believe that
14   Labaton had some representational responsibility to
15   the named ERISA clients? Or named ERISA parties?
16       **THE WITNESS:** Yes in the sense that --
17   yes in the sense that we -- because we signed onto a
18   settlement agreement and settled the case in which
19   the settlement class is defined to include those
20   parties.
21       **THE SPECIAL MASTER:** How about before
22   the settlement though?
23       I mean once you got to the settlement
24   class and you were representing the larger -- I

Page 33

1    don't know the term you want to use -- merged cases,
2    merged plaintiffs, larger settlement class, you
3    probably did have some representational
4    responsibilities at that point would you agree to
5    the ERISA named plaintiffs?
6        **THE WITNESS:** Once we signed the
7    settlement agreement?
8        **THE SPECIAL MASTER:** Yes.
9        **THE WITNESS:** Yes.
10       **THE SPECIAL MASTER:** And made the
11   application for approval to the Court in the
12   fairness hearing.
13       **THE WITNESS:** I would say yes.
14       **THE SPECIAL MASTER:** Okay. Let's go
15   back then to the beginning of the mediation process.
16       What did you believe was Labaton's
17   relationship to the named ERISA clients up to the
18   point that settlement was reached, and there was an
19   agreement to present that settlement as one
20   settlement class to the Court?
21       **THE WITNESS:** I would -- I would say, as
22   I said before, I think we had no actual client
23   relationship or formal representational
24   responsibility.

Page 42

1   The way these two cases got put together
2   and the way, as I think Judge Rosen indicated, our
3   firm was appointed lead counsel in the Arkansas
4   case, and then the ERISA cases came around. And the
5   ERISA plaintiffs, to my recollection -- and I
6   believe Judge Rosen may have mentioned this -- were
7   not appointed lead plaintiff in the ERISA cases.
8       But the ERISA counsel was still or
9   became very much involved in the case throughout.
10  Usually in these kinds of class actions to my
11  experience, once you have lead counsel appointed in
12  the case, by design any other counsel that brought a
13  -- that filed a complaint goes away. Right?
14      I mean that's sort of the whole point of
15  the exercise is that once -- when you have a lead
16  counsel and lead plaintiff competition for lack of a
17  better word, once the judge settles the -- um, the
18  competition and appoints a lead plaintiff and a lead
19  counsel, that sets up the leadership of the case,
20  and all of the other prospective lead plaintiffs and
21  lead counsel go back to their various firms and, you
22  know, move on.
23      Here that didn't happen. And -- and I
24  suppose shouldn't have happened because you had the

Page 43

1   Arkansas case over here (indicating) with the 93A
2   claims with the Arkansas class. Then you had the
3   ERISA class cases with the ERISA claims over here
4   (indicating).
5       And it was -- and it was decided that
6   these cases would be -- would go forward on tracks;
7   that we would be cooperative with each other; we
8   would do this discovery protocol and at a mediation
9   effort all at the same time, and we would work
10  cooperatively together.
11      However, it was understood at some point
12  pretty early on that the ERISA cases were much
13  smaller, and Larry was the one who brokered this
14  entire thing. Our case came first. We survived the
15  motion to dismiss. And so it was understood pretty
16  early on that Labaton would be leading the entire
17  overall effort, and Larry, correctly, wanted to
18  preserve that position.
19      So I think that was the motivator for
20  Larry's e-mail here. So I think you naturally have
21  a bit of confusion in terms of exactly how this
22  stuff gets divvied up.
23      **THE SPECIAL MASTER:** So I'm still trying
24  to understand.



Page 44 and Page 45 (redacted)



Page 58

Page 59

Page 60

Page 61

1     **THE SPECIAL MASTER:** Okay, fair enough.
2  So let me break it down.
3     **THE WITNESS:** Sure.
4     **THE SPECIAL MASTER:** Is it fair to say
5  that at no point did you view the ERISA named
6  plaintiffs as your clients?
7     **THE WITNESS:** At no point before the
8  signing of the stipulation of settlement did I view
9  the ERISA named plaintiffs as my clients.
10    **THE SPECIAL MASTER:** Okay.  At the point
11 of the signing of the stipulation of settlement, did
12 you then view them as your clients?
13    **THE WITNESS:** It's not something that
14 actively entered my mind on that day, but thinking
15 about it now, I think that is fair to say.
16    (Pause.)
17    **THE WITNESS:** But -- I'm sorry.  But as
18 a practical matter, their lawyers in terms of who
19 they would call and who they would speak to --
20    (Interruption.)
21    (Off the record.)
22    **MR. SINNOTT:** If we could pause for a
23 moment.
24    **THE SPECIAL MASTER:** Why don't you go.



Page 65

1  **THE SPECIAL MASTER:** Please.
2  **THE WITNESS:** So as a practical
3  matter --
4  **MR. SINNOTT:** Thank you, Paulette.
5  **THE WITNESS:** Thank you.  As a practical
6  matter, throughout the life of the case and
7  continuing to today, if you were to ask any of the
8  ERISA plaintiffs who their lawyers are, they will
9  all say the same thing, either Mr. Sarko or
10 Mr. Kravitz or Mr. McTigue.  I'm confident that if
11 you took a poll that would be your answer.  I think
12 that's clearly the case.
13     Um, and with respect to the signing of
14 the stipulation of settlement, one thing that also
15 occurs to me, given my experience in this area, is
16 that the class hadn't yet been certified.
17     So actually once -- since the class
18 wasn't yet certified, absent class members -- and I
19 viewed the ERISA class members as absent class
20 members once we signed the settlement agreement.
21     They actually weren't Labaton clients,
22 to the extent they ever were, until the class is
23 certified.  The class wasn't certified until the
24 settlement was approved, if they ever were -- until

Page 66

1  the settlement was finally approved by the Court
2  which was I think on or about November 2, 2016.
3      And so that would be the date that I
4  would give as the date that the ERISA plaintiffs
5  would become clients of Labaton Sucharow, LLP.
6      **THE SPECIAL MASTER:** Who then
7  represented the ERISA named plaintiffs before the
8  Court for purposes of presenting the settlement?
9      **THE WITNESS:** I argued the fairness of
10 the settlement. The fairness of the settlement
11 applies to the whole class. I mean there wasn't any
12 reason to have more than one person argue those
13 issues, although we did during the preliminary
14 approval hearing I believe have one of the ERISA
15 counsel speak up when there was an issue regarding
16 the plan of allocation and how it impacted the ERISA
17 class members to my recollection.
18     **THE SPECIAL MASTER:** So your testimony
19 now is that you had no client relationship -- you
20 Labaton -- no client relationship to the ERISA named
21 plaintiffs, even at the point of presenting the
22 settlement to the Court?
23     **THE WITNESS:** I had no formal client
24 relationship -- I had no formal attorney/client

Page 67

[content redacted]

Page 68

[content redacted]

Page 69

[content redacted]



Page 98

[redacted]

Page 99

[redacted]

Page 100

1 same.
2 **THE SPECIAL MASTER:** Okay. So, in fact,
3 the ERISA lawyers got approximately 7-and-a-half
4 million dollars, correct?
5 **THE WITNESS:** Yes.
6 **THE SPECIAL MASTER:** So there was -- as
7 between the cap and the actual allocation of fees to
8 ERISA counsel, there was approximately a
9 3.4-million-dollar differential?
10 **THE WITNESS:** I mean arithmetically if
11 you subtract one number from other, that's true.
12 But I don't think those two numbers have
13 anything to do with each other. We agreed with
14 ERISA counsel early in the case -- I personally
15 didn't have anything to do with the negotiations,
16 but there was an agreement struck early in the case
17 long before the settlement that the ERISA counsel
18 would have 9 percent of the gross fee.
19 I believe that 9 percent was a function
20 of the approximate ERISA volume of the class.
21 Basically -- basically how big the ERISA case was
22 compared to the Arkansas case.
23 **THE SPECIAL MASTER:** Based upon what was
24 known at the time.

Page 101

1 **THE WITNESS:** Known at the time,
2 correct. Later -- much later Larry decided to
3 voluntarily bump that percentage up to 10 percent,
4 and that's -- and that is the fee that the ERISA
5 counsel received.
6 There was never, to my knowledge, any
7 sort of cross-over or discussion of how this cap,
8 which was requested by the DOL and negotiated
9 between the DOL and Lynn Sarko to my recollection,
10 informed or had anything to do with the 9/91 and
11 then later 10/90 agreement.
12 **THE SPECIAL MASTER:** Okay. So at least
13 from the DOL's perspective, if the differential
14 between the 10.9-million-dollar cap and what ERISA
15 counsel received didn't go to ERISA counsel for
16 fees, shouldn't DOL have rightly expected that
17 differential to go to the ERISA class since DOL's
18 objective was to maximize the recovery to the ERISA
19 class?
20 **MS. LUKEY:** Objection.
21 **THE WITNESS:** Well, DOL did maximize the
22 recovery to the ERISA class, and I believe that DOL
23 was well aware of the -- what I would call the 9
24 percent/91 percent agreement. And the reason I say

Case 1:11-cv-10230-MLW Document 401-41 Filed 07/23/18 Page 10 of 15

In Re: State Street Attorneys Fees

David Goldsmith
September 20, 2017

Page 106

Page 107



Page 108

1  bring the DOL into the tent -- the settlement tent,
2  I think you testified earlier -- and I just want to
3  make sure that it's still your testimony -- that it
4  was necessary to have DOL as part of the settlement
5  and that DOL be satisfied because State Street
6  wanted DOL as part of a global settlement because
7  State Street wanted a release from all parties,
8  including DOL?
9      THE WITNESS: Right.  It was State
10 Street that wanted the DOL in there.  We didn't want
11 them.
12     THE SPECIAL MASTER: Yeah, because State
13 Street needed a release from everybody including
14 DOL, correct?
15     THE WITNESS: Correct.
16     THE SPECIAL MASTER: So DOL needed to be
17 satisfied.
18     THE WITNESS: They did.
19     BY MR. SINNOTT:
20 Q.  David, when did you first learn of the
21 presence or association of a referring attorney or
22 if you knew him by name of Damon Chargois in the
23 State Street case?
24 A.  I first learned of the existence of the

Page 109

1  referring arrangement, and the first name of the
2  referring attorney on Monday, November 21, 2016.
3  That was the Monday before Thanksgiving.
4      THE SPECIAL MASTER: That was after the
5  class had been certified.
6      THE WITNESS: Yes, sir.
7  Q.  Now had you worked on any previous cases in
8  which Mr. Chargois was the referring attorney?
9  A.  Not to my knowledge.  But, as I sit here
10 today, I know that I have worked on two.
11 Q.  And which two are those?
12 A.  A10 Networks --
13     THE REPORTER: I'm sorry?
14     THE WITNESS: Letter A number 10.
15 A.  -- Networks and Hewlett-Packard.
16     THE SPECIAL MASTER: You didn't work on
17 Colonial?
18     THE WITNESS: No, sir.
19     BY MR. SINNOTT:
20 Q.  You didn't work on K12?
21 A.  No, sir.
22 Q.  When you say you worked on those cases with
23 him, did you meet him during those cases?
24 A.  Well, I did not work with him at all.  I

Page 110

[redacted]

Page 111

1  **THE SPECIAL MASTER:** Does that mean that
2  you didn't know a fee was paid to a -- another
3  attorney?
4  **THE WITNESS:** It does.
5  **THE SPECIAL MASTER:** It means that.
6  **THE WITNESS:** It means that I had no
7  idea that a fee was paid to anyone other than
8  Labaton Sucharow.
9  **THE SPECIAL MASTER:** More generally,
10 were you aware at any point before -- is it November
11 21st of 2016?
12 **THE WITNESS:** That's the correct date.
13 **THE SPECIAL MASTER:** Were you aware that
14 Labaton had an agreement with Mr. Chargois to pay 20
15 percent of any Labaton fee in which Labaton was lead
16 counsel or co-lead counsel and Arkansas was lead or
17 co-lead plaintiff?
18 **THE WITNESS:** No.
19 **THE SPECIAL MASTER:** You knew nothing
20 about that?
21 **THE WITNESS:** Knew nothing. Before
22 November 21st of 2016 -- actually, I should say
23 November 22nd of 2016 because on November 21st of
24 2016 I only knew the name Damon. It wasn't until

Page 112

1  November 22nd of 2016 that I knew the last name
2  Chargois.
3    But I'll tell you -- I can tell you why.
4    But before that time -- this was
5  Thanksgiving week. Before that time I had no idea
6  of any referring relationship of any kind relating
7  to Arkansas Teacher, and I had never heard of Damon
8  Chargois in any capacity. As a referring counsel or
9  as any other type of counsel.
10 **THE SPECIAL MASTER:** So is it fair to
11 say when you made your presentation to the Court of
12 the settlement agreement on November 2, 2016, you
13 knew of no relationship with Mr. Chargois?
14 **THE WITNESS:** That is very fair to say.
15 **THE SPECIAL MASTER:** Is it also fair to
16 say that you did not know that Mr. Chargois was
17 going to receive 5.5 percent of the total attorney
18 fees, 75 million dollars? Is that fair to say?
19 **THE WITNESS:** On November 2, 2016?
20 **THE SPECIAL MASTER:** Correct.
21 **THE WITNESS:** That is correct.
22   The reason I hesitated a bit is I am not
23 clear as to the date on which the 5.5 percent was
24 agreed to. I believe -- could be wrong -- that that

Page 113

1  5.5 percent was set later.
2    But be that as it may, I knew nothing of
3  Damon Chargois or any referral relationship
4  concerning Arkansas Teacher on November 2, 2016.
5  **THE SPECIAL MASTER:** And you knew
6  nothing of any payment that was to be made to Damon
7  Chargois out of the class funds on November 2,
8  anyone when you presented the settlement to the
9  Court?
10 **THE WITNESS:** That is correct.
11 **MS. LUKEY:** Objection.
12 **THE WITNESS:** Correct.
13 **BY MR. SINNOTT:**
14 Q. Wouldn't that have been important
15 information for you to have before you went before
16 Judge Wolf in the fairness hearing?
17 A. Yes. I would have liked to have known that.
18 Q. Did you become aware of any actions or
19 activities by Damon Chargois in the State Street
20 case?
21 A. I'm sorry. Just -- actions or activities?
22 **THE SPECIAL MASTER:** Work on the case.
23 **THE WITNESS:** Oh.
24 **THE SPECIAL MASTER:** Is that a better --

Page 114

**MR. SINNOTT:** That's a better way of putting it, yes.

**THE WITNESS:** Understood. So -- well, in terms of personal knowledge, I never -- no, I never witnessed Damon Chargois performing any work on the State Street case, and I have since read the response to the interrogatory on that subject.

I've never met Damon Chargois. The only e-mails I've had with him have been very limited, and that was beginning in late November 2016.

**THE SPECIAL MASTER:** So as far as you know at this point, even today, Damon Chargois performed no work on this case at all? Is that correct?

**THE WITNESS:** Correct.

**THE SPECIAL MASTER:** Now not looking at your own personal knowledge but what you've been told by anybody else in the case -- any other lawyer in the case --

**MS. LUKEY:** Not outside counsel.

**THE SPECIAL MASTER:** Not outside counsel, Joan. So that we're clear.

Based upon what you've been told by any other lawyer in the case other than outside

Page 115

counsel --

**THE WITNESS:** -- or inside counsel? Just -- sorry.

**THE SPECIAL MASTER:** Yeah. Any other lawyer who worked on the case.

**THE WITNESS:** Fair enough.

**THE SPECIAL MASTER:** Involved with the case itself.

**THE WITNESS:** Fair enough.

**THE SPECIAL MASTER:** Are you aware today of any work that Damon Chargois performed on the case?

**THE WITNESS:** I am not.



Page 116

Page 117

Page 166

[redacted]

Page 167

1  fee is awarded.
2     What I'm trying to say, judge, is to my
3  understanding I don't think there would have been
4  much concrete information that would have been, you
5  know, able to be known at the time the 9 percent/91
6  percent division was agreed to.
7     **THE SPECIAL MASTER:** So is your
8  testimony that at no time was there an obligation on
9  the part of Labaton to disclose to ERISA -- the
10 ERISA lawyers --
11    (Interruption.)
12    **THE SPECIAL MASTER:** Sorry. At no time
13 was there an obligation to disclose to the ERISA
14 lawyers the existence of the Chargois relationship
15 and the fact that Mr. Chargois was going to be
16 receiving a substantial percentage of the attorneys'
17 fees?
18    **THE WITNESS:** Well, first of all, no one
19 knew what percentage that would be until the
20 percentage was agreed to. But to your first point,
21 I say this with all respect 'cause I have a great
22 deal of respect for Mr. Sarko and Mr. Kravitz, but
23 the answer is -- the answer is, yes, I do not
24 believe we had any duty to disclose the Chargois

Page 168

1  relationship to ERISA counsel.
2     That is, in my mind, business
3  proprietary information that is internal to Labaton
4  Sucharow and is not the type of information that we
5  ordinarily disclose to other attorneys. And it's --
6  and I'm being entirely consistent with my testimony
7  with regarding disclosure to the Court.
8     ERISA counsel are smart, sophisticated,
9  experienced, senior lawyers. If they at the time
10 really wanted to know whether the fees were going
11 solely to Labaton, Lieff and Thornton or if there
12 was some referring counsel in the wings who would
13 have received some portion of that fee, they were
14 absolutely free to ask that question. And I am sure
15 that Larry would have provided some information or
16 maybe even full disclosure to them in response. But
17 they didn't -- they didn't ask that question.
18    Now I don't think Larry was thinking
19 about that at all, but they -- they didn't ask the
20 question at the time, and I do not believe it was
21 incumbent upon us to provide that information.
22    **BY MR. SINNOTT:**
23 Q. Well, are you saying this was just an
24 omission; that there wasn't a conscious effort on

Page 169

[redacted]

Page 170



Page 171

1  **BY MR. SINNOTT:**
2  Q.  David, if you could look at the bottom of
3  page 1, there's an e-mail that you sent to obviously
4  multiple parties at 6:54 p.m. on November 21st, and
5  you say, "All, attached please find a draft letter
6  setting out our plan with regard to the November
7  10th letter that we filed with the Court and future
8  distribution of fees and expenses.  Please let us
9  know if you have any comments or concerns.  We'd
10 like to circulate a final version and collect
11 signature before the holiday, if possible."
12     And then just a short period of time --
13 a few minutes later, 39 minutes later, at 7:33 p.m.
14 Larry writes back to you.  And he writes: "David, I
15 was reminded by Garrett that we also need Damon and
16 Arkansas to sign off on a similar letter in case we
17 need to claw back from them.  In addition, we will
18 need both Lieff and Lieff Cabraser firm to sign
19 off." And then some unrelated language after that.
20     And then in response to this --
21 presumably in response to this message from Larry to
22 you about Damon you respond at 12:37 a.m.  "I'll do
23 a letter for Damon from Eric I suppose.  The letter
24 has separate signatures for Bob Lieff and the Lieff

Page 172

1  firm.  Yes, the breakdown wouldn't be circulated
2  until after everyone's at least on board and
3  preferably Brian has signed."
4     Now my question to you is on November
5  21st when Larry brings up the subject of Damon and
6  Arkansas, at least with respect to this e-mail
7  thread, there's no expression of surprise on your
8  part.  There's no questioning as to Damon who or
9  what's this all about.
10    You dutifully say, "I'll do a letter to
11 Damon from Eric I suppose."  I guess were you aware
12 that Eric was the relationship partner that worked
13 with Damon?
14 **A.  That was an assumption because he was and is**
15 **the relationship partner for Arkansas.**
16 Q.  So based on this thread here, it's difficult
17 to discern when you did not know about Damon.
18 Perhaps you can tell us and put this in context.
19 **A.  Sure.  So -- so this was, um -- this e-mail**
20 **from Larry on November 21st, 2016 at 7:33 p.m. was**
21 **in fact, um, the first time that I learned about**
22 **Damon.  Um -- Larry was reminded by Garrett, as the**
23 **e-mail indicates, that we would need this Damon in**
24 **Arkansas to sign off on a similar letter.**

Page 173



Page 254

1 that is to say, negotiating that 60-million-dollar
2 earmark -- that it was their view that it was the
3 ERISA lawyers and only the ERISA lawyers who brought
4 about that result as opposed to any efforts on
5 behalf of the customer class counsel?
6 **A. No.**
7 Q. Why is that?
8 **A. Well, the 60 million dollars wouldn't exist**
9 **unless the 300 million dollars existed. The 300**
10 **million dollars existed because of the efforts of**
11 **customer class counsel and ERISA class -- ERISA**
12 **counsel.**
13 Q. The Department of Labor also negotiated a
14 cap of some 10.9 million dollars on the fees to be
15 charged against the 60-million-dollar amount that
16 they had negotiated for the ERISA class members,
17 correct?
18 **A. Correct.**
19 Q. And did that negotiated fee apply only to
20 the settlement being allocated to the ERISA plan --
21 excuse me.
22 Let me begin again. Did that cap on the
23 fee apply only to the ERISA counsel's fees?
24 **A. No.**

Page 255

1 Q. Did it apply to all counsel's fees?
2 **A. Yes.**
3 Q. In your view did the customer class counsel
4 play a role in obtaining a recovery for the ERISA
5 plans?
6 **A. Absolutely.**
7 Q. Would you regard that role characterized
8 fairly as substantial?
9 **A. Yes, I would.**
10 Q. In the course of the work on the case as
11 opposed to most more recent times, did anyone ever
12 suggest that the ERISA counsel deserved 100 percent
13 of the credit for that 60-million-dollar recovery
14 going to the ERISA members of the class?
15 **A. No.**
16 Q. Did any of the ERISA counsel -- I'm talking
17 now about comments made back during the day, not
18 most recent self-serving comments.
19 Did any of the ERISA counsel ever
20 suggest that?
21 **A. Absolutely not.**
22 Q. And did the DOL, Department of Labor,
23 suggest that?
24 **A. No.**

