# EX. 43

**Garrett Bradley**

```
                                                              1

              JAMS, INC.              Volume:  1

                                      Pages:   1-99

Ref. No. 1345000011                   Exhibits: 0


_____

In Re:  STATE STREET ATTORNEYS FEES

_____


Before:  SPECIAL MASTER HONORABLE GERALD ROSEN,

         UNITED STATES DISTRICT COURT, RETIRED


Date:  June 19, 2017

Time:  4:32-6:17 p.m.




            Deposition of GARRETT J. BRADLEY,

taken by counsel to the Special Master held at JAMS,

Inc., One Beacon Street, Boston, Massachusetts

before Cynthia Stutz, CPR, Notary Public of the

Commonwealth of Massachusetts.
```

Page 42

1  with Labaton and Lieff come about?
2  A.  I recall in late '14, early '15 I got a
3  call from Eric Belfi.  For whatever reason, I
4  remember walking, I was walking onto an airplane, I
5  think in Detroit.  And Eric said that we needed to
6  staff up.  There was a significant amount of
7  documents to go through and he wanted to know if we
8  would accept risk sharing proposal where we would
9  assume the risk for a certain number of staff
10 attorneys.  I think the number was ten.  And he
11 wanted to know if we could reach out to Lieff and
12 see if they would be interested in sharing the risk,
13 as well.
14 Q.  So this was Eric Belfi's idea?
15 A.  He called me, yes.
16 Q.  Okay.  And was this memorialized in
17 e-mails or any kind of an agreement?
18 A.  There's not an agreement laying it out,
19 but there's e-mail traffic that I think we've turned
20 over to you that we talk about that it's happening.
21 Q.  And you say this was in 2014 or '15?
22 A.  Late '14, early '15.
23 Q.  Not 2011?
24 A.  2011 there was an agreement reached on the

Page 43

1  fee, on part of the fee, but not on the sharing of
2  risk on the staff attorneys.  That wasn't until late
3  '14, early '15.
4  Q.  And when you say the sharing of risk on
5  staff attorneys, describe what you mean?
6  A.  Well, we were a contingent firm.  You're
7  extending money against one of the largest custodial
8  banks in the world.  The idea is you want to share
9  the risk.  That's why we have multiple firms in the
10 case.  So that's what we did.  We paid for ten
11 reviewers, five that were at Labaton and five that
12 were at Lieff or this affiliate company and we paid
13 their costs through a couple year period.
14 Q.  Is it true, though, that it actually went
15 beyond just paying their costs?  There was a by name
16 designation of certain attorneys at those two firms
17 as being Thornton designated attorneys?
18 A.  That would have been something that
19 whoever housed them would have designated.  All's we
20 know is that there were ten people that we were
21 responsible for picking up the cost for however long
22 the process required.  We didn't -- I wasn't, I
23 wasn't picking names out of a hat.  It was you pick
24 the ten and we'll pay for them and we'd get monthly

Page 44



Page 45



Page 46

1  will go to Labaton, with 40% of the net fee to the
2  three firms to be determined as we get to the end,
3  which it was.
4      If you're not sharing in the risk as
5  you go along, you're not going to have a very strong
6  or any argument to get the 30%, which we did. We
7  ended up getting 29%, and that was because we shared
8  the risk with the other two firms.
9  Q. Sure. I think you're missing my point,
10 though. I'm not saying that you shouldn't share in
11 the risk. I'm just asking why it was done this
12 particular way, as opposed to just saying, Look,
13 every month we'll pay a third of the costs for these
14 document reviewers.
15 A. Well, when I got the invoice from Ray
16 Politano at Labaton, it didn't say John Smith, Nancy
17 smith. It just said amount, rate, and here's the
18 bill. So in my mind, I was paying one-third as we
19 went along every month.
20 Q. Was there a feeling, Garrett, that by
21 having particular attorneys that the firm could
22 claim as its own, that it would help in its load
23 star calculation in the final fee petition?
24 A. From the fact of the matter is we had a

Page 47

1  fee agreement in place in August of '16 before we
2  filed the fee application. We knew at the time what
3  our fee was going to be. Quite frankly, we didn't
4  have to put them on our fee application. It's just
5  that was the way it was decided to be done. It
6  could have been left on Lieff and Labaton and it
7  could have no effect on our net fee at all.
8  Q. So this was not an attempt to demonstrate
9  to the court that, you know, we're as much of a
10 player as these other firms. We had, you know, ten
11 attorneys doing document review in this case.
12 A. There was one overall fee that was
13 authorized by the client, 25%. And we never -- The
14 Court never asked us how we were going to divide
15 that. It was already determined how it was going to
16 be divided. So quite frankly, we didn't have to put
17 a fee application if we didn't want to.
18 Q. But just from a practicality perspective,
19 didn't it confuse things at times?
20 A. Well, clearly it got confused, because we
21 made a mistake at the end and it got double counted,
22 which is highly embarrassing and we're sitting here.
23 But, you know, it wouldn't have mattered if we left
24 them on Lieff and Labaton's, what the Thornton fee

Page 48

1  was going to be. We just assumed -- I just assumed
2  where the local counsel were on the papers, we're
3  litigating the case, we're putting the fee up, why
4  wouldn't we put the people up that we were paying
5  for?
6  Q. Who was responsible at the respective
7  firms for insuring the accuracy of hours and time-
8  keeping?
9  A. Well, you have Evan Hoffman was probably
10 point for calculating all of our time and collecting
11 it all from the staff attorney times from Lieff and
12 Labaton. My brother Michael also reported to him, I
13 believe, on a weekly basis what his time was.
14     So he and Mike Lesser took the main
15 role in drafting the fee, the fee application that
16 we got. We got a draft form from lead counsel to
17 fill in certain sections that related to us. So
18 Mike and Evan did that and then I reviewed it and I
19 signed it.
20 Q. What was your understanding, Garrett, as
21 far as what billing rates would be used for the
22 staff attorneys performing document review at
23 Labaton and Lieff?
24 A. There was a conversation that I think it

Page 49

1  was on the e-mail chain at one point of using the
2  same rate that we had used in the Mellon case, which
3  was 425. So that's how we ended up with the 425 for
4  the most of them. Our partners and staff have a
5  rate, and then obviously, my brother's rate.
6  Q. Had Thornton ever entered into a similar
7  cost sharing agreement with other firms in past
8  cases?
9  A. Not that I recall in past cases, no.
10 Q. And did you ever have any discussions with
11 Eric or Chiplock or anybody else as far as what the
12 impact of the cost sharing agreement would be on the
13 load star calculation and the fee petition?
14 A. You mean individual load star or overall
15 load star?
16 Q. Both.
17 A. Overall, I mean, I wasn't really concerned
18 about overall load star in this case. Number 1, we
19 have a 25% fee agreement with Arkansas. The case
20 went on for seven years, had nine firms working on
21 it.
22     And load star really isn't a concern
23 in this jurisdiction, because it's a common fund
24 jurisdiction. When you look at the Goldberg

Page 50

1  Factors, it's called Berger Factors, one of them is
2  load star as a cross check.  But that was going to
3  be in our favor anyways.  And then the other factor
4  is risk.  Did the government follow you?  Did you
5  follow the government?  They were all very much in
6  our favor.  So I was never really concerned about it
7  on an overall perspective.
8  Q.  But you didn't discuss this with other
9  counsel, to your recollection?
10 A.  I think we needed to get through the
11 documents.  And that was the reason to go and hire
12 the staff attorneys.  That was the discussion, not
13 about, you know, helping load star.
14 Q.  Okay.
15    MR. KELLY: Could we just have a
16 clarification?  Aggregate load star versus
17 individual load star?
18    MR. SINNOTT: Yeah.  And my response
19 was with both.
20 A.  Well, let me clarify, Bill.  That last
21 answer I'm talking about aggregate load star.
22 Clearly, I had a concern about our load star until
23 we had a division of the 40%.  I wanted to make sure
24 we were keeping pace with the other two firms who

Page 51

1  were bigger than us and doing more of these type of
2  cases.  But I most definitely had a concern that we
3  were doing, taking our fair share of the risk so
4  that we could get our fair share of the reward.
5  Because at the end I don't want to end up and
6  somebody says, Well, you didn't put enough work into
7  this case.  I want to make sure we were being
8  offered the work and we were doing the work.
9  Q.  So your concern, Garrett, was beyond the
10 20/20/20, which was a handshake agreement, right?
11 A.  There's a letter agreement that was sent.
12 The older guys they never sign anything, so I don't
13 know where the signed copy is.
14 Q.  Okay.
15 A.  There's one.  Mike's on it, Larry's it and
16 Bob Lieff is on it.
17 Q.  But your concern was for that 40% that was
18 not applied in that 20/20/20 agreement, that you
19 wanted to make sure that vis-a-vis the other firms,
20 that you got your fair share of that?
21 A.  I wanted to make sure we were offered the
22 work and, yes, offered a fair share with a 40% at
23 the end.
24 Q.  Were there tensions with the other members

Page 52



Page 53

1  brother if he had time to do this work.  And I asked
2  Mike Thornton if it would be all right, because he
3  was going to take it on a contingency, to add him
4  into the reviewing people.  We had four people, I
5  think, doing it in-house on staff and then I thought
6  adding him in would help us keep pace with the other
7  firms.
8  Q.  Why did you think your brother would be a
9  good candidate to perform this work?
10 A.  Well, it was -- My understanding at the
11 time was that it was done remotely.  It was an
12 access into a database.  So Number 1, I could trust
13 him because he was going to do it because he's my
14 brother.  Number 2, he was a former prosecutor and
15 was the head of the Underground Economy Task Force,
16 which was a gubernatorial appointment, and their
17 role was to look at fraud in companies.  So I didn't
18 know what was going to be in these documents, but I
19 thought he might have a unique perspective on it and
20 he was willing to take the risk and not get paid
21 until the end.
22 Q.  Was there a particular hourly rate agreed
23 upon?
24 A.  At some point we agreed upon 500.  I think

Page 54

1  I might have had a general conversation about what
2  his rate was when we first started.  And I remember
3  at the end I had to figure it out, because I didn't
4  remember what we had talked about.  But the general
5  consensus was that he had billed around 450 when he
6  started the case and I thought 500 was a reasonable
7  number, given the risk that he had took.
8  Q.  Because it was a contingent?
9  A.  Yeah.  He had to carry it and might not
10 get paid.
11 Q.  Did Michael attend any training in
12 preparation for document review?
13 A.  Yes, Evan Hoffman and him connected and
14 got trained on the system.  I don't understand the
15 system.  I don't know any of the specifics about how
16 it works, but my understanding is that there was a
17 training program that they had to go through before
18 reviewing.
19 Q.  So you never worked in the Catalyst
20 system?
21 A.  No.  All my document review would have
22 been really pertaining to Arkansas and the records
23 pursuant to that, because I and Eric were
24 coordinating with the client throughout the case.

Page 56

1  administrator, this case wasn't settled.
2      But at some point I did, probably
3  when we were determining the fee application or
4  sharing our load star with other counsel at some
5  point, probably late, maybe late '15, around that
6  time frame.
7  Q.  It's fair to say that it wasn't until
8  after the mediation that the $500 amount was
9  confirmed?
10 A.  No, I wouldn't say that.  I think we might
11 have had a conversation at the beginning, because I
12 remember asking him, like, what do you bill?  And at
13 the time he said 450.  And I said, Well, probably
14 try around 500.  I'm pretty sure that was at the
15 beginning.  And then I had to remember it again and
16 go back and confirm it with him, so I'm sure there
17 was a couple of conversations.
18 Q.  All right.  But nothing in writing, to
19 your knowledge?
20 A.  No, not to my knowledge, no.
21 Q.  And do you recall the January 9th, 2015
22 conversation?
23     MR. SINNOTT:  And, Brian, this would
24 be SST-012554.  Did you want to pull it up?  I've



Page 55 / Page 57 (redacted)

Page 62

[redacted]

Page 63

[redacted]

Page 64

1   1136. Do you have that?
2       **MS. McEVOY:** Help me out here.
3       **THE SPECIAL MASTER:** What I'm trying
4   to understand is what was the $500 rate tethered to?
5   Was it tethered to his experience? Was it tethered
6   to the rates that other attorneys doing similar work
7   were getting? Was it tethered to the value to the
8   firm or the work that was being performed or was it
9   tethered to a concern about the load star rate?
10      **THE WITNESS:** It was --
11      **THE SPECIAL MASTER:** Or any of them.
12      **THE WITNESS:** It was tethered to the
13  fact of how many years he was an attorney, what he
14  had recently billed to an hourly client, and the
15  fact that he took it on contingent.
16      **THE SPECIAL MASTER:** The
17  contingency.
18      **THE WITNESS:** That's what led up to
19  the 500.
20      **THE SPECIAL MASTER:** There was a
21  specific e-mail that I'm thinking of that you may
22  have asked him about already. It was an e-mail
23  between Garrett and, I believe, Mike Lesser, but go
24  ahead. I'll look for it. We have many of them

Page 65

[redacted]

Page 66

Page 68

Page 67

 1  vis-a-vis the other firms' and the allocation.
 2  **THE WITNESS:** That is a reference to
 3  us why we were sharing the risk and paying these
 4  staff attorneys, because it is the best way for us
 5  to increase our load star and make it comparable to
 6  the other two firms. Because at this point 40% of
 7  the fee was still outstanding. So we're not going
 8  to take the risk and do the work and we're not going
 9  to have evidence of that work with load star when it
10  came down to distribute that 40%, we would have been
11  left holding the bag. That why we did it. But I
12  absolutely was concerned about Thornton's load star
13  vis-a-vis the other two firms.
14  **THE SPECIAL MASTER:** Okay, good. So
15  now that we're back on track and talking about
16  Thornton's load star, there's one reason for having
17  Mike's rate at $500 to jack up, in the words of the
18  e-mail, jack up Thornton's load star.
19  **THE WITNESS:** No, I never gave that
20  a thought, Judge, to be honest with you, the rates.
21  I don't even know when we shared load star with our
22  other firms, if we gave rates. I thought we just
23  gave time, how many hours were done. So it never
24  occurred to me that that would make a difference at

Page 69



Page 82

 1   THE WITNESS: I did not change it,
 2 no.
 3   THE SPECIAL MASTER: It was exactly
 4 as it was given to you in the form by the Labaton
 5 folks?
 6   THE WITNESS: Yes.
 7   THE SPECIAL MASTER: Right?
 8   THE WITNESS: Yes.
 9   THE SPECIAL MASTER: Could you read
10 that out loud again and tell me if you think it's
11 accurate now in retrospect?
12   THE WITNESS: The hourly rates for
13 the attorneys and professional support staff in my
14 firm included in Exhibit A are the same as my firm's
15 regular rates charge for the services which have
16 been accepted in other complex class actions.
17   And as I indicated at the hearing in
18 front of Judge Wolf, that that is not clear and that
19 is not accurate, given that we allocated staff
20 attorneys on our fee petition. It's messy and it's
21 embarrassing.
22   THE SPECIAL MASTER: Okay. I know
23 you said that in the hearing, but we've got to have
24 a full record.

Page 83

 1   THE WITNESS: I understand that.
 2 But quite frankly, it's embarrassing and it's
 3 disappointing that it wasn't clear.
 4   THE SPECIAL MASTER: And in fact,
 5 it's not really accurate as to Michael Bradley,
 6 either --
 7   THE WITNESS: No.
 8   THE SPECIAL MASTER: Because he is
 9 not an attorney in your firm.
10   THE WITNESS: Correct.
11   THE SPECIAL MASTER: And he's listed
12 on Exhibit A, correct?
13   THE WITNESS: Correct.
14   THE SPECIAL MASTER: I don't have
15 anything more on that, but I just wanted to get a
16 complete record.
17 Q. Garrett, who was primarily responsible for
18   drafting of Thornton's fee petition, the small
19   declaration?
20 A. Mike Lesser.
21 Q. Mike Lesser?
22 A. And with assistance from Evan.
23 Q. Okay. And, ultimately, you signed a
24   declaration?

Page 84

 1 A. I did.
 2 Q. When and how did Thornton decide on which
 3   hourly rates to charge for the staff attorney hours
 4   for the attorneys located at Lieff and Labaton?
 5 A. I believe Evan had a conversation with --
 6   I'm sorry. I believe Evan had a conversation with
 7   Mike Rogers and Dan Chiplock. I think I was copied
 8   on the e-mail, and we determined -- they determined
 9   to use the rate that was used in Mellon for the
10   staff attorneys, which was a case that had settled
11   about a year before.
12 Q. Was it the same for the two firms?
13 A. Say that again?
14 Q. Was it the same rate?
15 A. I don't remember, I don't recall them
16   going back and clarifying it. We used them for all
17   the attorneys at both Lieff and Labaton, we used the
18   425.
19 Q. Okay. And when you received the small fee
20   declaration from Nicole Zeiss, and did you see that
21   when it came in?
22 A. I saw the final. Evan brought it in. I
23   gave it, obviously, not a close read and than I
24   signed it. I'm sure I was on e-mail traffic for the

Page 85

 1   draft form, as well.
 2 Q. Is it pretty typical that a firm would
 3   receive model declarations from lead counsel in a
 4   case like this?
 5 A. This really was kind of my first rodeo. I
 6   think this similar thing happened in Mellon, but I
 7   don't have enough experience to answer that
 8   question.
 9 Q. Okay, thank you. And is there currently
10   an arrangement between Thornton and Labaton for the
11   use of a staff attorney?
12 A. Yes, in ▮▮▮▮▮▮▮ which is a generic drug
13   litigation.
14 Q. And did you have a discussion with Labaton
15   as far as how costs and fees would be handled in
16   that?
17 A. No. We were getting a monthly invoice,
18   much like State Street. We have not had that
19   discussion yet, because the case is in its infancy.
20 Q. And that's just one staff attorney,
21   correct?
22 A. Yes, just paying for one staff attorney.
23 Q. Let me direct your attention, Garrett, to
24   November of 2016 and ask how you first learned about

Page 86

1  a problem with the billing?
2  **A. Through counsel.**
3  Q. Okay. And when you say through counsel,
4  who do you mean?
5  **A. Attorneys at Nixon Peabody.**
6  Q. Through the firm's counsel?
7  **A. Yes.**
8  Q. Okay. And did you also receive an inquiry
9  from a reporter?
10 **A. That inquiry was received from counsel and**
11 **relayed to us.**
12 Q. I see, okay. And when you learned of this
13 problem or issue with the billing, what was your
14 reaction?
15 **A. First thing I did is I went down to Evan**
16 **Hoffman's office, asked him to print out all of the**
17 **fee declarations, because I only looked at mine**
18 **before filing it. Asked him to lay -- get them all**
19 **out. I took Lieff's and Labaton's and immediately**
20 **noticed same names, different rates, and I knew**
21 **something was wrong right away. So I picked up the**
22 **phone and called.**
23    THE SPECIAL MASTER: Same dates.
24    THE WITNESS: I'm sorry?

Page 87

1    THE SPECIAL MASTER: Same dates.
2    THE WITNESS: I don't even know if I
3  got that far. I knew right away from the same names
4  and the different rates that something was amiss.
5  And I don't know if we had -- We didn't have -- In
6  our fee application we have our backup shows the
7  dates. I don't think I saw Lieff and Labaton's, so
8  I don't think I got into the dates. But as soon as
9  I got on the phone, they pulled up what they had, we
10 pulled up what we had and we could tell that there
11 was a problem. And I had Mike Lesser reach out to
12 Dan Chiplock and check that out, as well.
13 Q. And what else did you do?
14 **A. E-mails back and forth to confirm that,**
15 **you know, the scope of the problem. And then David**
16 **Goldsmith took the lead on writing a letter**
17 **explaining it to the Court.**
18 Q. Okay. And tell us about that letter.
19 **A. Mike Lesser had a lot of involvement. I**
20 **had some stylistic, very small changes to it. I saw**
21 **a couple drafts and then lead counsel, David**
22 **Goldsmith submitted it.**
23 Q. And ultimately, everyone was in agreement
24 that this was the letter that you wanted to send?

