# EX. 44

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) | |
| Plaintiffs | ) | |
| v. | ) | Case No.: 1:11-cv-10230-MLW |
| STATE STREET CORPORATION, STATE STREET BANK AND TRUST COMPANY, and STATE STREET GLOBAL MARKETS, LLC, | ) ) ) ) | |
| Defendants | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................................................ i

TABLE OF AUTHORITIES ............................................................................................... iii

INTRODUCTION ..................................................................................................................1

ALLEGATIONS OF THE COMPLAINT...........................................................................2

    I.    The Parties ................................................................................................2

          A.    State Street ....................................................................................2

          B.    Arkansas Teacher Retirement System ........................................3

    II.    Foreign Exchange Trading.......................................................................5

          A.    FX Markets ...................................................................................5

          B.    ARTRS's FX Trading ..................................................................5

    III.    The Custody Contracts.............................................................................8

    IV.    Indirect Rates Are "Based On" Market Rates........................................10

ARGUMENT ........................................................................................................................11

    I.    Plaintiff's Conclusory Allegations Should Be Dismissed Because They Are Not Well-Pleaded...........................................................................................11

    II.    The Complaint Does Not State A Claim For Breach Of Fiduciary Duty .............12

          A.    ARTRS's Allegations Do Not Support The Existence Of A Fiduciary Relationship ................................................................................12

          B.    The Custody Contracts Did Not Create A Fiduciary Relationship...........15

          C.    State Street Had No Fiduciary Or Other Duty Of Loyalty Or Disclosure .18

    III.    The Complaint Fails To State A Plausible Claim Under Section 9 Or Section 11 Of Mass. Gen. Laws Chapter 93A ........................................................................19

          A.    None Of The Alleged Conduct Amounts To A Violation Of Chapter 93A, Under Either Section 9 Or Section 11........................................................19

                1.    There Is Nothing Unfair Or Deceptive About State Street's Indirect FX Pricing Methods Because A Mark Up Or A Mark Down To Market Rates Is Not Unfair Or Deceptive .....................................19

        2.     ARTRS's Knowledge Of FX Mark Ups And Mark Downs Defeats Any Conclusory Allegations Of Unfair Or Deceptive Practices ...20

   B.     ARTRS's Chapter 93A Claim Is Undermined By Its Continued Use Of Indirect FX After Disclosure Of State Street's Pricing Practices .............23

   C.     The Conduct Alleged Does Not Meet The Section 11 Liability Standard 25

   D.     ARTRS Cannot Recover Under Section 9 Of Chapter 93A Because It Is Engaged In Trade Or Commerce .............................................................26

        1.     ARTRS Is Engaged In Trade Or Commerce ................................26

        2.     ARTRS Cannot Plead A Section 9 Claim Premised On Conclusory Allegations That It Is A Not-For-Profit Entity .............................29

        3.     Plaintiff Cannot Rely On the Attorney General's Regulations Because These Regulations Do Not Apply To Business-to-Business Claims .............................................................................31

IV.     The Negligent Misrepresentation Claim Must Be Dismissed................................32

V.     ARTRS Has Not Stated A Claim For Breach Of Contract....................................34

   A.     SSBT Had No Contractual Obligation To Trade FX With ARTRS..........34

   B.     Plaintiff's Reliance On Fee Schedules Is Absurd ......................................35

   C.     ARTRS's Custody Contracts Did Not Require Disclosure Of Execution Times Or The Amount Paid For Currency Sold To ARTRS....................38

   D.     Plaintiff Cannot Plead A Breach Of Contract By Relying On The Investment Manager Guides ......................................................................38

VI.     ARTRS's Claims Are Barred, In Part, By Statutes of Limitations.......................40

   A.     ARTRS Was On Notice Of Its Purported Claims......................................40

   B.     The Statutes Of Limitations Have Not Been Tolled..................................41

   C.     Plaintiff's Defense That The Statutes Of Limitations Cannot Run Against Its Contract Claim Fails .............................................................................42

VII.    ARTRS Does Not State a Claim Against State Street Corporation Or SSGM LLC, Because Neither Played Any Role In FX Transactions.........................................43

CONCLUSION....................................................................................................................44

# TABLE OF AUTHORITIES

Federal Cases

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) .......................................................................................... 32, 33

*Ahern v. Scholz*,
  85 F.3d 774 (1st Cir. 1996) ...................................................................................... 26

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009) ..................................................................................... *passim*

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................... 11, 12, 23

*Cahill v. TIG Premier Ins. Co.*,
  20 F. Supp. 2d 141 (D. Mass. 1998) ...................................................................... 23

*Callahan v. Harvest Bd. Int'l, Inc.*,
  138 F. Supp. 2d 147 (D. Mass. 2001) .................................................................... 23

*City of Stamps, Ark. v. Alcoa, Inc.*,
  2006 WL 2254406 (W.D. Ark. Aug. 7, 2006) ........................................................ 43

*Commodity Futures Trading Comm'n v. Baragosh*,
  278 F.3d 319 (4th Cir. 2002) ..................................................................................... 5

*Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*,
  785 F. Supp. 411 (S.D.N.Y. 1992) .......................................................................... 18

*Cont'l Ins. Co. v. Bahnan*,
  216 F.3d 150 (1st Cir. 2000) .................................................................................... 26

*Cook & Co., Inc. v. Matrix Risk Mgmt. Servs. Services, LLC*,
  2011 WL 241966 (D. Mass. Jan. 24, 2011) ........................................................... 29

*Davenport v. Bd. of Trs. of the Univ. of Ark. at Pine Bluff*,
  2011 WL 9000095 (E.D. Ark. Mar. 14, 2011) ................................................. 35, 37

*Dorn v. Astra USA, Inc.*,
  1997 WL 258491 (D. Mass. April 2, 1997) ............................................................ 44

*Epstein v. C.R. Bard, Inc.*,
  2004 WL 1598912 (D. Mass. July 19, 2004) .......................................................... 33

*Fernandes v. Havkin*,
   731 F. Supp. 2d 103 (D. Mass. 2010) .................................................................. 25

*Fireman v. News Am. Marketing In-Store, Inc.*,
   2009 WL 3080716 (D. Mass. Sept. 26, 2009) .................................................... 23

*In re Erickson Ret. Cmtys., LLC*,
   425 B.R. 309 (Bankr. N.D. Tex. 2010) .............................................................. 30

*In re First New Eng. Dental Ctrs., Inc.*,
   291 B.R. 229 (D. Mass. 2003) ........................................................................... 31

*In re Mexico Money Transfer Litig.*,
   267 F.3d 743 (7th Cir. 2001) ...................................................................... passim

*In re Pharm. Industry Average Wholesale Price Litig.*,
   491 F. Supp. 2d 20 (D. Mass. 2007) .................................................................. 30

*In re Vincent*,
   381 B.R. 564 (D. Mass. Bankr. 2008) ............................................................... 13

*Interactive Intelligence Inc. v. KeyCorp.*,
   546 F.3d 897 (7th Cir. 2008) ............................................................................. 18

*J.E. Pierce Apothecary, Inc. v. Harvard Pilgrim Health Care Inc.*,
   365 F. Supp. 2d 119 (D. Mass. 2005) ........................................................... 31, 32

*Jackson Nat'l Life Ins. Co. v. Gofen & Glossberg, Inc.*,
   1993 WL 266548 (N.D. Ill. July 15, 1993) .................................................... 14, 16

*James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co.*,
   112 F.3d 1240 (1st Cir. 1997) ........................................................................... 20

*Kerlinsky v. Fidelity & Deposit Co. of Md.*,
   690 F. Supp. 1112 (D. Mass. 1987), *aff'd*, 843 F.2d 1383 (1st Cir. 1988) .............................. 28

*Lefkowitz v. Smith Barney, Harris Upham & Co., Inc.*,
   804 F.2d 154 (1st Cir. 1986) ............................................................................. 13

*Mass. v. Sebelius*,
   677 F. Supp. 2d 397 (D. Mass. 2009) ................................................................ 11

*Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*,
   62 F. Supp. 2d 236 (D. Mass. 1999) .................................................................. 33

*Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*,
   142 F.3d 26 (1st Cir. 1998) ...................................................................... 25, 30, 33

*Max-Planck-Gesellschaft Zur Förderung Der Wissenchaften E.V. v. Whitehead Inst. for Biomedical Research*,
2010 WL 2900340 (D. Mass. July 26, 2010) ............................................................ 16

*McDaniel v. Chevron Corp.*,
203 F.3d 1099 (9th Cir. 2000) .................................................................................. 39

*McIntyre v. Okurowski*,
717 F. Supp. 10 (D. Mass. 1989) ........................................................................ 13, 15

*Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*,
2009 WL 331426 (D.N.J. Feb. 10, 2009) .................................................................. 33

*New Eng. Envtl. Techs. v. Am. Safety Risk Retention Grp., Inc.*,
738 F. Supp. 2d 249 (D. Mass. 2010) ....................................................................... 25

*OrbusNeich Med. Co., Ltd., BVI v. Boston Scientific Corp.*,
694 F. Supp. 2d 106 (D. Mass. 2010) .................................................................. 13, 14

*Petri v. Gatlin*,
997 F. Supp. 956 (N.D. Ill. 1997) ............................................................................ 39

*Platten v. HG Bermuda Exempted Ltd.*,
437 F.3d 118 (1st Cir. 2006) .................................................................................... 44

*Quinn v. Ocwen Fed. Bank FSB*,
470 F.3d 1240 (8th Cir. 2006) .................................................................................. 37

*R.I. Hosp. Trust Nat'l Bank v. Zapata Corp.*,
848 F.2d 291 (1st Cir. 1988) .................................................................................... 17

*Ray v. Am. Airlines, Inc.*,
2008 WL 2323923 (W.D. Ark. June 2, 2008) ........................................................... 34

*Riccio v. Ford Motor Credit Co.*,
238 F.R.D. 44 (D. Mass. 2006) ................................................................................ 43

*Risberg ex rel. Aspen Tech., Inc. v. McArdle*,
529 F. Supp. 2d 213 (D. Mass. 2008) ........................................................................ 2

*Rodi v. S. New England Sch. of Law*,
389 F.3d 5 (1st Cir. 2004) ........................................................................................ 40

*Salomon Forex, Inc. v. Tauber*,
8 F.3d 966 (4th Cir. 1993) ......................................................................................... 5

*Sekerak v. Nat'l City Bank*,
342 F. Supp. 2d 701 (N.D. Ohio 2004) ............................................................ 15, 16, 17

*Sturm Ruger & Co. v. Chao,*
    135 Fed. Appx. 431 (1st Cir. 2005) ........................................................................ 39

*Tagliente v. Himmer,*
    949 F.2d 1 (1st Cir. 1991) ............................................................................ 23, 26

*Trs. of Boston Univ. v. ASM Commc'ns, Inc.,*
    33 F. Supp. 2d 66 (D. Mass. 1998) ........................................................................ 29

*Vieira v. First American Title Insurance Company,*
    668 F. Supp. 2d 282 (D. Mass. 2009) ............................................................. 24, 31

*Watterson v. Page,*
    987 F.2d 1 (1st Cir. 1993) ........................................................................................ 2

<u>State Cases</u>

*Albrecht v. Clifford,*
    436 Mass. 706 (2002) ........................................................................................... 41

*Ark. Dept. of Envtl. Quality v. Brighton Corp.,*
    102 S.W.3d 458 (Ark. 2003) ................................................................................. 42

*Atkinson v. Rosenthal,*
    33 Mass. App. Ct. 219 (1992) ............................................................................... 23

*Barrett v. Mass. Insurers Insolvency Fund,*
    412 Mass. 774 (1992) ........................................................................................... 29

*Begelfer v. Najarian,*
    381 Mass. 177 (1980) ........................................................................................... 30

*Bolden v. Liquor Liab. Joint Underwriting Ass'n of Mass.,*
    2000 WL 1473569 (Mass. Super. June 29, 2000) ................................................ 29

*C&A Constr. Co., Inc. v. Benning Constr. Co.,*
    256 Ark. 621 (1974) .............................................................................................. 35

*Cape Painting & Carpentry Inc. v. Maher,*
    2009 WL 321271 (Mass. App. Ct. Feb. 3, 2009) ................................................. 24

*Chrysler Fin. Co., LLC v. East,*
    2003 WL 21228295 (Ark. App. Ct. May 28, 2003) ....................................... 35, 36

*CIBC Bank & Trust Co. v. Credit Lyonnais,*
    270 A.D.2d 138 (N.Y. App. Div. 2000) .............................................................. 16

*DeLuca v. Jordan,*
    57 Mass. App. Ct. 126 (2003) ............................................................................... 32

*Denbesten v. Safari Motor Coaches, Inc.*,
　2007 WL 1297710 (Mass. App. Ct. May 3, 2007) ................................................. 31

*Frullo v. Landenberger*,
　61 Mass. App. Ct. 814 (2004) ........................................................... 26, 27, 28

*Gossels v. Fleet Nat'l Bank*,
　453 Mass. 366 (2009) .......................................................................... passim

*Hill v. Windsor*,
　118 Mass. 251 (1875) ................................................................................ 17

*Ingersoll-Rand Co. v. El Dorado Chem. Co.*,
　283 S.W.3d 191 (Ark. 2008) ..................................................................... 39

*Keene v. New Eng. Mut. Acc. Ass'n*,
　161 Mass. 149 (1894) ................................................................................ 17

*Knapp Shoes Inc. v. Sylvania Shoe Mfg. Corp.*,
　418 Mass. 737 (1994) ................................................................................ 31

*Koe v. Mercer*,
　450 Mass. 97 (2007) .................................................................................. 40

*Lambert v. Fleet Nat'l Bank*,
　449 Mass. 119 (2007) ................................................................................ 25

*Lantner v. Carson*,
　374 Mass. 606 (1978) ...................................................................... 27, 28, 30

*Levings v. Forbes & Wallace, Inc.*,
　8 Mass. App. Ct. 498 (1979) ...................................................................... 25

*Linkage Corp. v. Trs. of Boston Univ.*,
　425 Mass. 1 (1997) .......................................................................... 27, 28, 29

*Manning v. Zuckerman*,
　388 Mass. 8 (1983) ................................................................................... 27

*Marram v. Kobrick Offshore Fund, Ltd.*,
　2010 WL 4457179 (Mass. Super. Aug. 25, 2010) ........................................ 28

*Matos v. First Nat'l Bank*,
　2010 WL 3327725 (Mass. Super. June 16, 2010) ......................................... 40

*McCann v. Lucky Money, Inc.*,
　129 Cal. App. 4th 1382 (2005) .............................................................. 20, 23

*My Bread Baking Co. v. Cumberland Farms, Inc.*,
   353 Mass. 614 (1968) ................................................................ 44

*Nat'l Shawmut Bank of Boston v. Hallett*,
   322 Mass. 596 (1948) ................................................................ 14

*Patsos v. First Albany Corp.*,
   433 Mass. 323 (2001) ............................................... 14, 15, 17, 41

*Pittman v. Pittman*,
   139 S.W.3d 134 (Ark. App. Ct. 2003) ................................. 35, 36

*Poznik v. Mass. Med. Prof'l Ins. Ass'n*,
   417 Mass. 48 (1994) ................................................................ 29

*Ray & Sons Masonry Contractors, Inc. v. U.S. Fidelity & Guar. Co.*
   114 S.W.3d 189 (Ark. 2003) ..................................................... 40

*Rosado v. Boston Gas Co.*,
   27 Mass. App. Ct. 675 (1989) ................................................... 17

*Salinsky v. Perma-Home Corp.*,
   15 Mass. App. Ct. 193 (1983) ................................................... 42

*Schrier v. Banknorth, N.A. Mass.*,
   2007 WL 609847 (Mass. App. Ct. Feb. 28, 2007) ................... 31, 33

*Snow v. Merchants Nat'l Bank of New Bedford*,
   309 Mass. 354 (1941) .......................................................... 13, 18

*Superior Glass Co., Inc. v. First Bristol Cnty. Nat'l Bank*,
   380 Mass. 829 (1980) ................................................................ 13

*Swinton v. Whitinsville Sav. Bank*,
   311 Mass. 677 (1942) ................................................................ 32

*Wheatley v. Mass. Insurers Insolvency Fund*,
   456 Mass. 594 (2010) ................................................................ 29

*Zichelle v. Parigian*,
   2006 WL4114290 (Mass. Super. Dec. 22, 2006) ...................... 17

*Zimmerman v. Kent*,
   31 Mass. App. Ct. 72 (1991) ..................................................... 33

Federal Rules

Fed. R. Civ. P. 8(a)(2) ..................................................................... 11

## State Statutes

940 Mass. Code Regs. 3.16 .................................................................................. 31

Act 266 of 1937 (Ark. Code Ann. § 24-7-101 *et seq.*) ...................................... 3

Ark. Code Ann. § 16-56-111 ............................................................................. 40

Ark. Code. Ann. § 24-7-303 ................................................................................ 4

Ark. Code. Ann. § 24-7-305 ................................................................................ 3

Ark. Code. Ann. § 24-7-401 .......................................................................... 3, 30

Mass. Gen. Laws ch. 260 .............................................................................. 40, 41

Mass. Gen. Laws ch. 93A .......................................................................... *passim*

## Treatises

Howard W. Brill, 1 Arkansas Law of Damages § 13:4 (5th ed. 2010) ......................................... 42

## Other Sources

Sam Y. Cross, All About…the Foreign Exchange Market in the United States
   21 (Fed. Reserve Bank of N.Y. 2002) ...................................................... 5

## INTRODUCTION

Plaintiff Arkansas Teacher Retirement System ("ARTRS") is a sophisticated institutional investor that manages an $8.8 billion pension fund using its own large staff, outside investment consultants, and some of the world's best investment managers ("IMs"). It has allocated more than $2 billion of its investment portfolio to international investments. Foreign currency exchange ("FX") is a commonplace feature of such an international investment strategy, because foreign investments typically are settled using, and pay income in, foreign currency.

The Amended Complaint ("Complaint" or "Compl.") addresses one kind of FX transaction – indirect FX trades – that ARTRS or its investment managers executed with the State Street Global Markets ("SSGM") division of State Street Bank and Trust Company ("SSBT").[1] SSGM is a principal FX dealer that executed FX trades with ARTRS directly (at rates agreed to by ARTRS or its IMs prior to execution) and indirectly (at rates set by SSGM and disclosed to ARTRS and its IMs). ARTRS claims that State Street breached its custody contract and other legal duties by setting rates for indirect FX trades by adjusting (marking up or down) market rates without disclosing the amount of the mark up or mark down.

ARTRS's fiduciary duty claim fails because the parties' custody contracts defined and limited the scope of the parties' relationship, which was not fiduciary in nature. These contracts did not require SSBT to execute FX transactions, to do so at a particular rate, or to disclose its margin on FX transactions. Instead, the contracts required SSBT to hold assets and provide administrative services to ARTRS. Plaintiff's contract claim fails for the same reasons.

---

[1] Plaintiff nevertheless asserts claims against State Street Corporation (SSBT's parent corporation), SSBT, and State Street Global Markets, LLC (hereinafter "SSGM LLC"), to which ARTRS refers to as "Defendants" and "State Street." SSGM LLC is a separate subsidiary of State Street Corporation that is different from the SSGM division of SSBT. SSGM LLC does not enter into principal FX transactions. Of the three named Defendants, only SSBT is a party to ARTRS's custody contracts and only SSBT trades foreign currency. It does so through its SSGM division. *See infra* at 3, 5, 43-44.

ARTRS's claims under Chapter 93A and for negligent misrepresentation fail because nothing unfair or deceptive occurs when the buyer or seller of a commodity does not disclose its margin on a purchase or sale.  State Street had no more duty to disclose the mark up on FX transactions than would any other merchant as to any other commodity.  Moreover, Plaintiff cannot plausibly assert that ARTRS and its sophisticated IMs were unaware that the rates for its FX transactions were marked up from market rates.

All of ARTRS's claims, which seek relief for events dating back to 1998, are also in part barred by the applicable statutes of limitations.  Finally, State Street Corporation and SSGM LLC must be dismissed because neither had any role in FX trading.

## ALLEGATIONS OF THE COMPLAINT[2]

### I.      The Parties

#### A.      State Street

SSBT, which provides a variety of financial services to institutional investors, has served as custodian for ARTRS since 1998.  (Compl. ¶¶ 2-3, 16.)  In its role as custodian, SSBT holds assets and provides administrative services including accounting, safekeeping of assets, and making payments from client funds upon receipt of instructions from the client or its IMs, including payments to settle securities and currency transactions.  (*Id.* ¶¶ 1-3; Custody Contract

---

[2]      The following allegations are taken from the Complaint and from materials incorporated by reference in the Complaint, as well as from relevant public sources.  *See Risberg ex rel. Aspen Tech., Inc. v. McArdle*, 529 F. Supp. 2d 213, 219 (D. Mass. 2008) ("Rule 12(b)(6) permits the court to take into consideration matters of public record, including public filings … as well as documents incorporated in, central to, or materially referenced in the Complaint.") (citations omitted); *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) (on motion to dismiss, Court may consider "documents the authenticity of which are not disputed by the parties," "official public records," "documents central to plaintiff's claim," and "documents sufficiently referred to in the complaint").  For purposes of this motion, Defendants assume that well-pleaded, factual allegations are true.  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009).  The Defendants do not admit any of the Complaint's allegations.  Documents referenced herein are attached to the Declaration of Adam J. Hornstine in Support of Defendants' Motion to Dismiss ("Hornstine Decl.").

between ARTRS and SSBT, Sept. 15, 1998, §§ 2, 8 (Hornstine Decl. Ex. A).)  Those custody

duties are described in custody agreements between SSBT and ARTRS.  Separately, the SSGM

division of SSBT also acts as a principal dealer in foreign currency for its own account.  As

discussed more fully below, SSGM trades currency with various counterparties, including some

of SSBT's custody clients like ARTRS.  (State Street Investment Manager Guide, Nov. 20, 2009

at 34 (Hornstine Decl. Ex. B); Compl. ¶ 3.)  SSBT's custody contracts with ARTRS did not

require either SSBT or ARTRS to execute FX transactions with one another.

### B.      Arkansas Teacher Retirement System

ARTRS is a sophisticated institutional investor that oversees the investment of $8.8

billion in assets held with respect to Arkansas defined benefit pension plans for public school

and other public education-related employees.  (Compl. ¶ 14.)  ARTRS manages pension assets

contributed with respect to 343 participating employers and more than 115,000 individuals.

(*Id.*)[3]  ARTRS employs a full-time professional administrative staff, including a general counsel,

and retains the services of multiple outside professional services firms.  (ARTRS 2010

Comprehensive Annual Financial Report at 11-12 (Hornstine Decl. Ex. D).)[4]

ARTRS's mandate is to invest its assets to obtain a return on its investment such that its

total assets, expressed as a percentage of active member payroll, will remain constant over time.

*See* Ark. Code. Ann. § 24-7-401; Hornstine Decl. Ex. D at 41.  To do so, ARTRS has developed

investment guidelines (Compl. ¶ 15) that allow it "to capture opportunities, yet ensure that both

prudence and care are maintained in the execution of the investment program" while

---

[3]      ARTRS was established by Act 266 of 1937 (Ark. Code Ann. § 24-7-101 *et seq.*) for the
purpose of providing retirement benefits for employees of any school or other educational
agency participating in the system.  (Compl. ¶ 14.)

[4]      ARTRS's annual report is a statutorily required public filing.  *See* Ark. Code Ann. § 24-
7-305(e).

simultaneously taking "appropriate levels of risk to earn higher levels of investment return" over a long-term investment horizon. (Hornstine Decl. Ex. D at 39.)

In order to ensure compliance with its guidelines, ARTRS hires external IMs that are "experts in their field," chosen based on their "demonstrated professional performance, organizational depth, institutional investment management capability, and reasonableness of fee structure." (Hornstine Decl. Ex. D at 9, 39, 41.) ARTRS's IMs include premier investment management companies who invest ARTRS's assets in the full range of investment opportunities, from domestic and global equities to convertible bonds and fixed income to alternative investments and private equity. Many of the IMs chosen by ARTRS are household names, including BlackRock, PIMCO, Loomis Sayles & Company, and Putnam Investment Management.[5] (Hornstine Decl. Ex. D at 12-14.) The IMs are required to report quarterly and annually to ARTRS. (Hornstine Decl. Ex. D at 44.) For the fiscal year ending June 2010, ARTRS paid its domestic, international, and alternative money managers approximately $26 million for their professional services. (Hornstine Decl. Ex. D at 34.)

ARTRS is also advised by a team of professional investment consultants. (Hornstine Decl. Ex. D at 9, 12-14.) Although it is ARTRS's responsibility to supervise its IMs, ARTRS's Board also appoints a professional investment counsel to advise it on each investment. *See* Ark. Code. Ann. §§ 24-7-303(e)(1), 24-7-303(e)(2)(A). ARTRS does not make investments without the advice of investment consultants. (Hornstine Decl. Ex. D at 39, 41.) In September 2009, ARTRS held one-third of its investment portfolio in overseas markets. (Compl. ¶¶ 32-33.)

---

[5]     ARTRS's IMs also include a number of other sophisticated entities – including Lazard, Knight Vinke, Wellington, UBS, and T. Rowe Price – that focus specifically on global equities. (Hornstine Decl. Ex. D at 12-13.)

## II.    Foreign Exchange Trading

### A.    FX Markets

An FX trade is an exchange of one sovereign currency for another.  (Compl. ¶ 33.)
Larger FX trades often occur in what is known as the interbank currency market – an informal
network of banks and dealers, including SSBT, that trade with each other.  The interbank market
has no central exchange or consolidated record of the prices or volume of transactions executed
among market participants.[6]  *See* Sam Y. Cross, All About ... the Foreign Exchange Market in
the United States 21 (Fed. Reserve Bank of N.Y. 2002); Hornstine Decl. Ex. B at 34.  As far
back as 2001, the average interbank FX transaction exceeded $5 million.  *See In re Mexico
Money Transfer Litig*., 267 F.3d 743, 745 (7th Cir. 2001).  Principal dealers like SSGM (also
known as market makers) also make their own markets in FX by selling or buying currency to or
from parties who are not interbank market participants.  (*See* Hornstine Decl. Ex. B at 35.)

### B.    ARTRS's FX Trading

SSGM is a principal dealer in FX, which means that it buys and sells currency for
SSBT's own account and not as an agent for a counterparty (such as ARTRS).  (Hornstine Decl.
Ex. B at 34.)  When a dealer buys currency as a principal (*e.g.*, buys currency *from* ARTRS and
not *for* ARTRS), it assumes and manages the risk that the value of the currency it buys may
decline.  (*Id.*)

FX trading is a fundamental part of investment management.  IMs for institutional
investors like ARTRS determine what FX transactions are appropriate, with which FX dealer to
execute those transactions, and on what terms and in what manner those transactions will be
executed.  (Hornstine Decl. Ex. B at 34.)  This means that SSBT does not decide with whom and

---

[6]    *See Salomon Forex, Inc. v. Tauber*, 8 F.3d 966, 977 (4th Cir. 1993) (describing the
interbank market as an informal network of banks and dealers exempted from regulation);
*Commodity Futures Trading Comm'n v. Baragosh*, 278 F.3d 319, 328 (4th Cir. 2002) (accord).

on what terms ARTRS will execute FX transactions. That determination is generally made by an

IM for ARTRS, which is free to choose any FX dealer. The custody contracts between SSBT

and ARTRS do not oblige either party to execute any FX transactions with the other.[7] (*Id.*;

Compl. ¶¶ 3, 53-54.)

ARTRS alleges that some of the FX transactions that its IMs chose to execute with State

Street were executed at rates negotiated and agreed upon directly between the parties prior to

execution ("direct FX trades"); and others were ordered by ARTRS or its IMs and executed at

rates set by State Street and thereafter promptly disclosed to ARTRS and its IMs ("indirect FX

trades"). (Compl. ¶¶ 41-42.) ARTRS claims that between January 3, 2000 and December 31,

2010, ARTRS or its IMs executed 10,784 FX transactions with State Street, representing a

"majority" of the FX trades that ARTRS and its IMs executed. (*Id.* ¶¶ 45, 66.) This means, of

course, that during the same period ARTRS and its IMs used other FX dealers for a substantial

portion of their FX trades.

ARTRS alleges that a substantial majority (61%) of its FX trades with State Street were

executed directly at rates that ARTRS or its IMs negotiated prior to execution.[8] (*Id.* ¶¶ 41, 66.)

ARTRS does not allege that these trades were conducted at interbank market rates. Quite to the

contrary, ARTRS concedes that these trades were done at a mark up to market rates. (*Id.* ¶ 41.)

According to ARTRS, the remaining minority of FX trades – indirect trades – were smaller

---

[7]     Neither State Street Corporation nor SSGM LLC – entities that are distinct from SSBT –
has anything to do with acting as an FX dealer. ARTRS provides no factual support for any
assertion to the contrary. In addition, neither entity is a party to ARTRS's custody contracts with
SSBT. (*E.g.*, Hornstine Decl. Ex. A.)

[8]     The Complaint does not reveal the percentage of these trades by dollar volume but
concedes that the trades for which rates were set by direct agreement were generally larger than
those executed indirectly. (Compl. ¶¶ 41, 44, 70, 72.) According to ARTRS, the 4,216 indirect
FX trades had an aggregate trading volume exceeding $1.2 billion (or, on average, about
$285,000). (*Id.* ¶ 66.)

transactions that it or its IMs determined did not warrant the time and effort required for direct rate negotiations; and ARTRS or its IMs chose to execute these small transactions at rates set by State Street and reported to ARTRS and its IMs.  (*Id.* ¶¶ 44, 66, 76.)

Throughout the proposed Class Period, SSBT provided reports to ARTRS showing the rates for all direct and indirect FX trades with ARTRS.  (*Id.* ¶ 76.)  The Complaint makes clear that these rates obviously were not interbank market rates.  As noted, the direct rates to which ARTRS or its IMs agreed in advance of execution were less advantageous than interbank rates. So too, according to ARTRS, were the indirect rates.  According to ARTRS, 53% of the indirect FX rates were outside the daily range of market rates on the day of execution – something that ARTRS could determine with publicly available information.  (*Id.* ¶¶ 73.)  ARTRS also asserts that its indirect FX trades were, on average, 17.8 basis points (0.178%) above or below what ARTRS calls the market mid-rate for the day (the average of the market high and low of the day).  (*Id.* ¶ 70.)  These figures also could have been calculated at any time during the proposed Class Period.

ARTRS does not allege, and cannot plausibly allege, that State Street was obliged to execute, or that ARTRS expected State Street to execute, FX trades at interbank market rates. Plaintiff does not allege that ARTRS was ever a participant in the interbank market.  ARTRS identifies no agreement with State Street to execute any FX trades with ARTRS at any particular rates (let alone interbank market rates).  Moreover, ARTRS concedes that it or its IMs separately negotiated and agreed in advance of execution to literally thousands of FX transactions at rates less advantageous than market rates. (*Id.* ¶ 72.)[9]

---

[9]     Similarly, in this context, the Complaint offers no factual context or support for its conclusion that the rates for FX transactions with ARTRS should approach the "average" interbank FX rate in a given currency on a given day.  (Compl. ¶ 39.)

## III.     The Custody Contracts

ARTRS alleges that it entered into four successive custody contracts with SSBT in 1998, 2001, 2004, and 2009.  (Compl. ¶ 49.)  None of these contracts authorized or required either party to execute FX transactions with each other, and none of them required execution of FX transactions at interbank market rates.  More specifically, the Complaint's contract claims rests exclusively on one clause that appears in each of the parties' custody contracts and similar clauses in two of the fee schedules appended over time to two of the contracts (1998 and 2009).

The clause appearing within the parties' 1998 custody contract is typical, and it describes the only service required under any of the contracts with respect to FX transactions executed by ARTRS or its IMs:

> Only upon receipt of Proper Instructions and written agreement as to security procedures for payment order, which may be standing instructions, or as may be otherwise authorized within this Contract, the Custodian shall pay out, or direct its agents or its subcustodians to pay out, moneys of the Account in the following cases … For the purchase or sale of foreign exchange or foreign exchange contracts for the account of the Fund, including transactions executed with or through the Custodian, its agents or its subcustodians.

(Hornstine Decl. Ex. A § 2.6.)[10]  This clause did no more than require SSBT to perform a custodial function: to settle FX trades agreed to by ARTRS or its IMs (*i.e.*, to deliver payment from ARTRS's account at SSBT to the FX counterparty and to deposit the counterparty's funds

---

[10]     The parties' three other contracts contain similar "proper instructions" clauses, but also do not otherwise address FX transactions.  (*See* Custody Contract between ARTRS and SSBT, July 1, 2001, § 2.6 (Hornstine Decl. Ex. E); Custody Contract between ARTRS and SSBT, June 29, 2004, § 2.6 (*id.* Ex. F); Custody Contract between ARTRS and SSBT, June 30, 2009, § 2.7 (*id.* Ex. G).)

in ARTRS's account at SSBT). Accordingly, the custody contracts did not oblige SSBT to execute FX with ARTRS or to do so at any particular rate.[11]

ARTRS's contract claim ignores the fact that the parties to the custody contract did not agree to do any FX trading with each other and then misreads a similar clause in two of the seven fee schedules appended to the contracts to imply an obligation not to deviate from market FX rates. (Compl. ¶¶ 50-51.) In fact, all seven of these schedules actually address only the amount of fees to be charged for custody services, and they do not purport to set rates for FX trades. (*Id.* ¶¶ 50, 52.) That is, as to FX, these schedules (expressly or by silence) address only the extent to which SSBT would charge an administrative fee for *settling – i.e.*, processing – FX transactions and not the actual rates at which FX transactions would be executed.

Specifically, the 1998 fee schedule (in a section entitled "Other Charges (only if applicable)") sets forth a series of fees that could be charged for particular custody services, for example: wire transfer fees ($7.50), couriers (out-of-pocket costs, borne by client), frequency pricing of a net asset value ($0.75), or registration fees (absorbed by SSBT). (Fee Schedule between ARTRS and SSBT, Sept. 15, 1998 at 3 (Hornstine Decl. Ex. H).) As to FX trades, the 1998 fee schedule states: "No Charge will be assessed for foreign exchange executed through a third party. Foreign Exchange through State Street - No Charge." (*Id.* Ex. H at 3; Compl. ¶ 55.) This clause does not address FX execution *rates*. The first sentence of the clause simply could not do so, because SSBT had no ability to prevent third party FX dealers from setting whatever FX rates they saw fit. The only thing that SSBT does with respect to third party FX transactions is process (*i.e.*, settle) them. The second sentence of the clause – in the context of the first and in

---

[11]     Nor is there a duty to provide "time-stamps," which are an "indication of the time of the day that [an FX] trade was executed," to ARTRS under the parties' contracts. (Compl. ¶ 76.) Although ARTRS suggests such information was "important" (*id.* ¶ 139), nothing in the Complaint or the parties' contracts indicates that such time-stamps were ever required.

the overall context of the list of processing fees discussed on the same page – also refers to FX processing and cannot be read to refer to FX execution rates.

Together, all of the fee schedules for all of the contracts are consistent with the proper, contextual interpretation of this clause of the 1998 fee schedule: that the custodian would not charge a fee to process any FX transaction. None of the next five fee schedules agreed upon after 1998 contain the 1998 clause (or mention FX at all). Thus, the next five schedules, covering the period 2001 to 2009, do not contain a rate commitment.[12] Instead, they memorialize via silence the same conclusion reflected in the 1998 schedule – that the custodian would not charge a fee to process or settle FX transactions executed with third parties or SSBT.

The current fee schedule (agreed upon in 2009) helps explain how the 1998 language came to be used. As shown by the 2009 schedule, sometimes SSBT charges a processing fee for third party FX transactions but waives the fee for FX transacted with SSBT. The 2009 schedule states: "A third party FX charge of $25 will be applied for all foreign exchange trades not transacted through State Street. Transaction costs for all foreign exchange trades transacted through State Street will be waived." (Fee Schedule between ARTRS and SSBT, July 1, 2009 at 3 (Hornstine Decl. Ex. N); Compl. ¶ 56.) These two sentences are similar in form to those used in 1998 to memorialize the earlier agreement that no processing fee would be charged for any FX trades, no matter with whom it was executed.

## IV. Indirect Rates Are "Based On" Market Rates

ARTRS alleges that the rates for indirect FX transactions that it challenges were derived from market rates by applying a "mark up" or a "mark down" to an "actual" market rate.

---

[12] *See* Fee Schedule between ARTRS and SSBT, July 1, 2001 (Hornstine Decl. Ex. I); Fee Schedule between ARTRS and SSBT, July 1, 2004 (*id.* Ex. J); Fee Schedule between ARTRS and SSBT, July 1, 2007 (*id.* Ex. K); Fee Schedule between ARTRS and SSBT, April 1, 2008 (*id.* Ex. L); Fee Schedule between ARTRS and SSBT, November 1, 2008 (*id.* Ex. M).

(Compl. ¶ 69; Hornstine Decl Ex. B at 34.)  ARTRS also alleges that the Investment Manager

Guides published by State Street stated that "State Street Foreign Exchange Transactions," direct

or indirect, "are priced *based on* the market rates at the time the trade is executed."  (Compl.

¶ 61.)  The method of pricing described in the Complaint is consistent with the Guides'

language.  This mark up (or mark down) is compensation for the additional services provided

and for the risks taken in executing indirect FX transactions.  (Hornstine Decl. Ex. B at 35.)[13]

## ARGUMENT

**I.      Plaintiff's Conclusory Allegations Should Be Dismissed Because They Are Not Well-Pleaded**

The Complaint must be dismissed because it does not contain "sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'"  *See Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570 (2007); *Mass. v. Sebelius*, 677 F. Supp. 2d 397, 399 (D. Mass.

2009) (citations omitted).  This is because if a Complaint does not include well-pleaded factual

allegations permitting the Court to infer more than the mere possibility of misconduct, then the

plaintiff has not shown that it is entitled to relief.  *Iqbal*, 129 S. Ct. at 1949-50 (where complaint

pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line

between possibility and plausibility of 'entitlement to relief.'"); Fed. R. Civ. P. 8(a)(2).  Here,

Plaintiff identifies no facts supporting a plausible claim.

In ruling on a motion to dismiss, District Courts should "begin by identifying pleadings

that, because they are no more than conclusions, are not entitled to the assumption of truth."

---

[13]      The proposed Class Period runs from January 2, 1998 through December 31, 2009.
Although Plaintiff offers the perfunctory assertion that State Street "dramatically changed its FX
trading policies" after October 2009, ARTRS offers no factual allegations to substantiate its
conclusion that the November 20, 2009 IM Guide referenced in the Complaint (Compl. ¶ 82)
reflects anything more than the continuation of SSBT's longstanding FX trading procedures.
*Iqbal*, 129 S. Ct. at 1949-50.  Indeed, the pricing language in all guides is similar.  (*Compare*,
*e.g.*, Hornstine Decl. Ex. B at 39-40; State Street Investment Manager Guide, Dec. 30, 2008 at 37
(*id.* Ex. C); State Street Investment Manager Guide, Sept. 26, 2006 at 37 (*id.* Ex. O).)

*Iqbal*, 129 S. Ct. at 1950. A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.* at 557. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Iqbal*, 129 S. Ct. at 1949-50.

The Complaint relies heavily on formulaic conclusions and omits facts sufficient to make Plaintiff's claim plausible under *Twombly* and *Iqbal*. ARTRS also relies heavily on "information and belief" pleaded without facts or sources to demonstrate that liability is plausible. As shown below, this paucity of factual detail in the Complaint and the basic inconsistencies between it and the facts of record (including the contracts themselves) mandate dismissal.

## II. The Complaint Does Not State A Claim For Breach Of Fiduciary Duty

### A. ARTRS's Allegations Do Not Support The Existence Of A Fiduciary Relationship

Plaintiff advances the conclusions that State Street acted as its agent to execute FX transactions and that State Street breached a fiduciary "duty of loyalty" or "duty of disclosure" arising from that supposed agency relationship. (Compl. ¶¶ 105-13.) In support of these conclusions, ARTRS relies only on catch-phrases (such as the notion that it "reposed a high degree of trust in State Street" (*id.* ¶ 46)) and additional conclusions (that SSBT, as custodian, owed a fiduciary duty with respect to FX (*id.* ¶¶ 111-12)). These baseless assertions do not state a plausible claim for relief. *Iqbal*, 129 S. Ct. at 1949-50. Moreover, even if these assertions were otherwise sufficient, Plaintiff's claim fails because it pleads no facts showing that SSBT knew ARTRS was "reposing" trust, that SSBT had superior knowledge or control over ARTRS or its IMs (which themselves determined with whom and on what basis to trade FX), or that SSBT had accepted any agency or fiduciary duty as to FX execution.

- 12 -

Massachusetts law presumes that a business relationship does *not* give rise to a fiduciary relationship or any fiduciary duties.[14] *See Lefkowitz v. Smith Barney, Harris Upham & Co., Inc.*, 804 F.2d 154, 155 (1st Cir. 1986) ("a simple stockbroker-customer relationship does not constitute a fiduciary relationship"; affirming dismissal of breach of fiduciary duty claim on motion to dismiss); *See OrbusNeich Med. Co., Ltd., BVI v. Boston Scientific Corp.*, 694 F. Supp. 2d 106, 116 (D. Mass. 2010) ("Business relationships or arms length transactions do not in general rise to the level of a fiduciary relationship.") (citations omitted); *McIntyre v. Okurowski*, 717 F. Supp. 10, 11 (D. Mass. 1989) (accord; granting motion to dismiss breach of fiduciary duty claim) (citations omitted); *In re Vincent*, 381 B.R. 564, 574 (D. Mass. Bankr. 2008) ("Massachusetts courts have viewed a bank's relationship to its customers as one … which imposes no duty to counsel or make disclosures to the customer.") (citation omitted); *Snow v. Merchants Nat'l Bank of New Bedford*, 309 Mass. 354, 360-61 (1941) (bank's purchase and sale of securities for customers not fiduciary in nature; bank not required to disclose profit or commissions on transactions).

Accordingly, Massachusetts courts have repeatedly held that a plaintiff cannot, merely by claiming to have reposed trust and confidence in a defendant, transform an ordinary business relationship into a fiduciary one. *See In re Vincent*, 381 B.R. at 574 (allegations that plaintiff bank customer placed trust in defendant bank failed sufficiently to allege existence of fiduciary duty); *Superior Glass Co., Inc. v. First Bristol Cnty. Nat'l Bank*, 380 Mass. 829, 832-33 (1980) (stating, in context of relationship between bank, acting as lender and owner of property, and

---

[14]    According to the choice of law provisions in the parties' custody contracts, Arkansas law governs Plaintiff's individual contract-based claims. (Hornstine Decl. Ex. A § 13; Ex. E § 13; Ex. F § 13; Ex. G § 13.) Based on the allegations of the Complaint, State Street understands that Plaintiff contends that Massachusetts law applies to Plaintiff's purported class claims and that Arkansas law applies to ARTRS's individual breach of contract claim.

construction subcontractor, that one party cannot unilaterally transform business relationship into fiduciary relationship by reposing trust and confidence in another); *Nat'l Shawmut Bank of Boston v. Hallett*, 322 Mass. 596, 602 (1948) (holding, in context of suit between creditor and debtor, that reposing confidence in business relationship does not make it fiduciary in nature).

In any event, Plaintiff's claim to have reposed trust and confidence in State Street is implausible. ARTRS's sophistication as an investor and asset manager is self-evident. ARTRS exists to oversee the activities of some of the most sophisticated IMs in the world, and ARTRS receives advice and counsel from those IMs and from investment advisors, all at great expense. It does so with a large staff, also assembled at great expense. (Hornstine Decl. Ex. D at 34.) The notion that ARTRS and its IMs abdicated their own responsibility to make or oversee all investment decisions due to "trust" in State Street falls far short of the line separating hopeful conclusion from a plausible entitlement to relief. *See Iqbal*, 129 S.Ct. at 1949-50; *Jackson Nat'l Life Ins. Co. v. Gofen & Glossberg, Inc.*, 1993 WL 266548, at *2 (N.D. Ill. July 15, 1993) (rejecting fiduciary duty claim based on allegations of "great deal of trust" placed in custodian where plaintiff retained control over investment decisions and used outside advisors to "wisely invest" on behalf of policyholders).

Plaintiff's claim also must be dismissed because it has not alleged any facts to suggest that State Street knew that ARTRS would repose trust or confidence in it with respect to FX trading, or that it accepted any fiduciary duty to ARTRS with respect to such trades. *See OrbusNeich*, 694 F. Supp. 2d at 116 (finding no fiduciary duty where "there is nothing to suggest that [defendant] *knew* [plaintiff] was relying on it as a fiduciary.") (emphasis in original); *Patsos*

- 14 -

*v. First Albany Corp.*, 433 Mass. 323, 335 (2001) (mere allegations of trust insufficient to establish fiduciary relationship; defendant's knowledge required).[15]

Plaintiff's factually unsupported assertion that State Street "occupied a superior position" (Compl. ¶ 107) or had "superior knowledge" and "control" relative to ARTRS or its IMs (*id.* ¶ 110), is also insufficient. *See McIntyre*, 717 F. Supp. at 11 (allegations of lack of sophistication and blind reliance insufficient to transform business relationship into fiduciary one). Moreover, the factual allegations of the Complaint are inconsistent with these conclusions. Both ARTRS and its IMs are highly sophisticated entities; either ARTRS or its IMs were responsible for determining with whom and on what basis to execute each FX transaction; and either ARTRS or its IMs, consistent with their responsibility, determined to transact only a minority of their FX trades using the indirect method and to transact many FX trades with third parties. (Compl. ¶¶ 41, 45, 66.) Thus, the Complaint rebuts, rather than plausibly supports, ARTRS's conclusions about superior knowledge or control. *Compare Patsos*, 433 Mass. at 333-35 (considering lack of experience and sophistication of securities investor and relinquishment of total control and discretion over all investment decisions); *Sekerak v. Nat'l City Bank*, 342 F. Supp. 2d 701, 712 (N.D. Ohio 2004) (non-discretionary nature of custodian's role precluded fiduciary duty).

## B. The Custody Contracts Did Not Create A Fiduciary Relationship

The custody contracts with ARTRS did not give rise to a fiduciary "duty of loyalty" or "duty of disclosure" with respect to FX execution. (*Compare* Compl. ¶¶ 109-12.) The scope of

---

[15] At best, ARTRS offers the conclusory assertion that "Defendants understood that Plaintiff and the members of the Class placed their confidence and trust in Defendants to report FX trades accurately." (Compl. ¶ 108.) But, even if the Complaint had plausibly alleged that State Street did not accurately report FX trades, this assertion hardly suffices to allege that State Street knew ARTRS was relying on it as a fiduciary, especially where the parties' contracts created no such duty and did not govern FX execution at all. *See infra* at 15-17.

a contractual fiduciary duty is dependent on the terms of the contract.  *See Sekerak*, 342 F. Supp. 2d at 712 (no fiduciary duty where custody agreement did not create such a duty); *Max-Planck-Gesellschaft Zur Förderung Der Wissenchaften E.V. v. Whitehead Inst. for Biomedical Research*, 2010 WL 2900340, at *1 (D. Mass. July 26, 2010) (provisions of contract between sophisticated parties should be enforced).  The mere existence of a custody contract does not automatically create a fiduciary relationship.  *See Sekerak,* 342 F. Supp. 2d at 712 (custodian bank did not owe fiduciary duty); *Jackson*, 1993 WL 266548, at *2 (accord).

The custody contracts do not require either party to trade FX with the other and thus cannot be read to impose a fiduciary duty on State Street with respect to FX.  (*See*, *e.g.*, Hornstine Decl. Ex. A §§ 2.6, 5.)  Indeed, the custody contracts cannot even be read to impose a fiduciary duty with respect to the administrative services actually contemplated by the contracts, such as holding securities, delivery of securities, registration of securities, maintenance of bank accounts, handling income and settlement crediting, payment of fund moneys, et cetera. (Hornstine Decl. Ex. A § 2; Ex. E § 2; Ex. F § 2; Ex. G § 2.)  As to these duties, the custody contracts required SSBT to use only "reasonable care."  (*Id.* Ex. A § 5; Ex. E § 5; Ex. F § 5; Ex. G § 5.)  This agreement defeats any claim that the contracts create a heightened duty of trust or loyalty.  *See CIBC Bank & Trust Co. v. Credit Lyonnais*, 270 A.D.2d 138, 139 (N.Y. App. Div. 2000) (dismissing claim arising under New York law against investment bank where contract contradicted existence of fiduciary duty, noting parties' recitation that they were both "sophisticated institutional investor[s]" that acted as counterparties, not fiduciaries); *Sekerak*, 342 F. Supp. 2d at 712 (custodian banked owed no fiduciary duty where not explicit in contract);

*see also Gossels v. Fleet Nat'l Bank*, 453 Mass. 366, 371 (2009) (bank's duty of ordinary care did not require it to disclose retail rate on foreign exchange transaction or bank's profit).[16]

State Street assumed no fiduciary duty under the custody contracts because the agreements provided that ARTRS and its IMs retained absolute discretion over the fund's activities. *See Patsos*, 433 Mass. at 333 (no fiduciary obligation where customer retains discretion to make investment decisions). The contracts provide that the custodian was to act only at the direction of ARTRS or its IMs in providing any custody service. For example, the custodian could only act upon receipt of "proper instructions" from ARTRS or its IMs. (*E.g.*, Hornstine Decl. Ex. A §§ 2.6, 2.10.)[17] Even the scope of the custodian's ministerial activities as to actions directed by ARTRS or its IMs were often specifically delineated (*e.g.*, permitting SSBT to endorse checks for collection, to surrender securities in temporary form for securities in definitive form, to make payments to itself or others for minor expenses, and to attend to all nondiscretionary details of transfers of securities). The custody contracts also contemplated that ARTRS would monitor the custodian by requiring periodic reports of money received or paid by the fund. (Hornstine Decl. Ex. A § 3; Ex. E § 3; Ex. F § 3; Ex. G § 3.)

---

[16]     *See also Keene v. New Eng. Mut. Acc. Ass'n*, 161 Mass. 149, 152 (1894) (reasonable care equated with ordinary care); *Hill v. Windsor*, 118 Mass. 251, 256 (1875) (accord); *Zichelle v. Parigian*, 2006 WL 4114290, at *9 (Mass. Super. Dec. 22, 2006) ("reasonable care" means classic negligence standard); *Rosado v. Boston Gas Co.*, 27 Mass. App. Ct. 675, 683 (1989) (duty of reasonable care does not mean "highest" duty); *R.I. Hosp. Trust Nat'l Bank v. Zapata Corp.*, 848 F.2d 291, 293 (1st Cir. 1988) ("reasonable" care means ordinary care). Moreover, because execution of FX transactions is outside the scope of the custody agreements, *see infra* at 34-35, there is no basis in the contracts to imply a fiduciary duty concerning the execution of FX transactions. *See Sekerak*, 342 F. Supp. 2d at 712.

[17]     The custody contracts provided that only "upon receipt of Proper Instructions" could SSBT provide the custody-related services delineated in the parties' agreement. (Hornstine Decl. Ex. A § 2; Ex. E § 2; Ex. F § 2; Ex. G § 2.) "Proper instructions" are defined by the contract as "instructions received by the Custodian from [ARTRS], the Investment Manager, or any person duly authorized by either of them." (*Id.* Ex. A § 2.10; Ex. E § 2.10; Ex. F § 2.10; Ex. G § 2.11.)

## C.     State Street Had No Fiduciary Or Other Duty Of Loyalty Or Disclosure

Plaintiff advances the conclusions that State Street had a duty to disclose its "actual costs" associated with FX trades and "the actual time the trade was executed."  (Compl. ¶ 111.) Any such duty did not arise from a fiduciary relationship because State Street had no such relationship with ARTRS.  Nor did such a duty arise from the custody contracts.  The only reporting requirement in the custody contracts required SSBT to "render to [ARTRS] a monthly report of all monies received or paid on behalf of the Fund and an itemized statement of the securities for which it is accountable under this Contract as of the end of each month, as well as a list of all securities transactions that remain unsettled at that time."  (*E.g.*, Hornstine Decl. Ex. A § 3.)  Plaintiff does not allege that SSBT failed to satisfy this requirement.

Accordingly, there is no legal or factual basis for Plaintiff's claim that State Street was required to disclose the time at which it executed each trade or its costs associated with FX trading.  *See Interactive Intelligence Inc. v. KeyCorp.*, 546 F.3d 897, 898-901 (7th Cir. 2008) (plaintiff alleged undisclosed FX mark up; court held no fiduciary duty or duty to disclose); *Mexico Money*, 267 F.3d at 749 (plaintiff alleged undisclosed FX mark up; court noted no obligation to disclose); *Compania Sud-Americana de Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 425-27 (S.D.N.Y. 1992) (plaintiff alleged undisclosed FX mark up; court held no fiduciary duty or duty to disclose); *Gossels*, 453 Mass. at 371 (bank not required to disclose retail rate on FX transaction or bank's profit); *see also Snow*, 309 Mass. at 360-61 (bank owed no duty to disclose profits on transactions to elderly and unsophisticated widow).[18]

---

[18]     The Complaint also pleads facts contrary to Plaintiff's conclusion that ARTRS was unable to determine that State Street marked up interbank rates.  (*Compare* Compl. ¶¶ 46, 76.) First, SSBT disclosed that all FX rates were "based on" – and therefore not equal to – market rates.  (Compl. ¶ 7); *see infra* at 39.  Second, ARTRS concedes that it willingly paid a mark up on directly negotiated FX transactions.  (Compl. ¶¶ 41, 72.)  Third, at any time ARTRS could have done the analysis referred to in the Complaint – counting the number of trades outside the

III.   **The Complaint Fails To State A Plausible Claim Under Section 9 Or Section 11 Of Mass. Gen. Laws Chapter 93A**

   A.   **None Of The Alleged Conduct Amounts To A Violation Of Chapter 93A, Under Either Section 9 Or Section 11**

ARTRS alleges that State Street violated Chapter 93A by "reporting false and fictitious FX rates for standing-instruction FX trades … rather than the actual rates at which State Street had effected those trades" (Compl. ¶¶ 88(b), 97(b)) and by "unfairly and deceptively pricing standing-instruction FX trades for custodial clients such as ARTRS." (*Id.* ¶¶ 88(a), 88(c), 88(d), 97(a), 97 (c), 97(d).) Paragraphs 63 and 76 suggest that what made the reports deceptive was that State Street did not disclose, along with the rates actually charged, the daily range of interbank rates, the daily mid-rate, the time of execution, or what Plaintiff presumes to be State Street's execution cost (*i.e.*, the market rate at the time of execution).[19] These allegations fall far short of stating a claim under either Section 9 or Section 11 of Chapter 93A.

   1.   **There Is Nothing Unfair Or Deceptive About State Street's Indirect FX Pricing Methods Because A Mark Up Or A Mark Down To Market Rates Is Not Unfair Or Deceptive**

Courts in Massachusetts and in other jurisdictions have determined that there is nothing unfair or deceptive about a bank trading FX without disclosing the relationship between the rate actually set and rates available (often for larger trades) in trades among interbank market participants. *See Gossels*, 453 Mass. at 373-76 (no false statement or violation of Chapter 93A where bank credited foreign check at retail, not interbank, exchange rate); *see also Mexico Money*, 267 F.3d at 749 (rejecting objections to class action settlement concluding that "failure to disclose the precise difference between wholesale and retail prices" of foreign currency is

---

daily range of interbank rates or comparing accurate disclosures of SSBT's rates with the so-called daily mid-rate upon which ARTRS now relies. (*Id.* ¶¶ 41, 66-67, 73-74.)

[19]    Obviously, the daily range of rates and the mid-rate are determinable from publicly available information. *See supra* at 18 n.18. There is no duty to disclose time stamps. *See infra* at 38.

ordinary business practice and noting that "[n]othing in th[ese] transaction[s] smacks of fraud");

*McCann v. Lucky Money, Inc.*, 129 Cal. App. 4th 1382, 1393-96 (2005) (rejecting claim under

California consumer protection statute for failure to disclose FX mark up and holding that the

defendant was just as entitled to charge a mark up for its services as any other merchant for any

other commodity).[20]

In *Gossels*, the Supreme Judicial Court rejected a similar Chapter 93A theory arising out

of FX pricing. There, a bank customer (Gossels) cashed a check denominated in Euros. Fleet

Bank collected the funds from the payor bank in Euros and then, without disclosure to Gossels,

exchanged the funds into dollars at a retail exchange rate. It also disclosed to and charged

Gossels a $30 processing fee (which it later waived). The difference between the retail exchange

rate and the wholesale interbank rate was approximately 3.7% (370 basis points). Gossels

claimed, among other things, that Fleet's failure to disclose the difference between the interbank

and retail exchange rates violated Chapter 93A. The Court rejected this argument and held that

"[n]either the common law nor the UCC requires" this disclosure, and "[t]herefore, there was no

violation of G.L. c. 93A." *Gossels*, 453 Mass. at 373. The Court also noted that the bank was

not obligated to disclose "that banks were entitled to different exchange rates than customers."

*Id.* at 372; *see also Mexico Money*, 267 F.3d at 749 (no fraud by Western Union arising out of

nondisclosure of difference between retail and interbank exchange rates).

### 2. ARTRS's Knowledge Of FX Mark Ups And Mark Downs Defeats Any Conclusory Allegations Of Unfair Or Deceptive Practices

The Complaint alleges that ARTRS received regular reports that set forth the "rate that

State Street charged for its FX trades," including "a monthly report of all monies received or

---

[20] The First Circuit has said that adherence to industry standard or custom is one factor that can support a finding of no liability under Chapter 93A. *See James L. Miniter Ins. Agency, Inc. v. Ohio Indem. Co.*, 112 F.3d 1240, 1251 (1st Cir. 1997).

paid on behalf of the fund." (Compl. ¶¶ 76-77.) ARTRS does not assert that State Street set

rates different from those accurately and regularly reported. Instead, it relies on the nonsense

conclusion that the accurately reported rates were false because they were set by marking up or

down interbank market rates. (*Id.* ¶ 81.) Accurate rate reports are not false or deceptive by

virtue of nondisclosure of the relationship between the reported rates and market rates. This is

particularly true when the reported rates obviously are not market rates.

ARTRS concedes that it or its IMs regularly agreed to marked up rates for direct FX

trades. (*Id.* ¶ 41.) Plaintiff asserts that the rates to which it agreed in advance of execution were

on average 3.6 basis points higher than interbank market rates. (*Id.* ¶¶ 41, 62, 66, 72.) Based on

this assertion and the pattern of trading by ARTRS and its IMs described in the Complaint, it is

utterly implausible that ARTRS or its IMs did not know throughout the Class Period that SSBT

was marking up indirect FX rates as well.

Every time ARTRS or its IMs negotiated direct FX rates, they had access to interbank

market rates and could see the extent to which they were paying more than interbank market

participants were paying. (*Id.* ¶ 36.) If ARTRS or its IMs had truly believed that SSBT's

indirect rates were more favorable than direct rates (*i.e.*, had a lower or no mark up), they would

not have bothered to negotiate direct rates a majority of the time. (*Id.* ¶ 44.) As the Complaint

makes clear, it is more convenient for ARTRS or its IMs to execute indirect FX trades. (Compl.

¶ 44.) Moreover, indirect FX delivers other benefits, including risk mitigation. (Hornstine Decl.

Ex. B at 35 ("[SSGM] is taking principal risk when it purchases and sells currency in the foreign

exchange market").) Neither ARTRS nor its IMs would have executed direct FX trades with

SSBT (let alone 61% of its FX trades with SSBT (Compl. ¶ 66)), or with any third party dealer at

all, if they believed that indirect FX execution was more cost-effective (or essentially free, as ARTRS suggests). This basic reality renders ARTRS's Chapter 93A claim fatally implausible.

Similarly, ARTRS and its IMs typically would not have executed larger trades directly – and limited their use of indirect FX to relatively small lots – if they believed that indirect FX execution was cheaper by volume than direct FX. (Compl. ¶¶ 44, 70, 72.) That is, if Plaintiff or its IMs believed that indirect FX rates were interbank market rates (with no mark up), and that direct rates carried a "modest" mark up to those rates, they would not have chosen direct FX for any transaction, let alone their larger transactions. (*Id.* ¶¶ 41, 44.) This conclusion is particularly true because indirect FX includes convenience and risk transfer not included with direct FX. (Hornstine Decl. Ex. B at 34; Compl. ¶ 44.)

Rather than trade consistent with the conclusion that indirect FX was cheaper, ARTRS and its IMs traded consistent with the ordinary commercial reality – understood by buyers of all degrees of sophistication – that better prices are generally available for larger purchases. In this regard, these sophisticated purchasers behaved consistently with those who shop at Costco or Sam's Club for other commodities with the goal of saving by buying in bulk. Of course, Costco has no duty to disclose the actual relationship between what it pays for its goods and the prices at which it sells. This is equally true as to FX:

> Money is just a commodity in an international market. Pesos are for sale — at one price for those who buy in bulk (parcels of $5 million or more) and at another, higher price for those who buy at retail and must compensate the middlemen for the expense of holding an inventory, providing retail outlets, keeping records, ensuring that the recipient is the one designated by the sender, and so on. Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and incentives it receives to sell cars. This is true in financial markets no less than markets for physical goods.

*Mexico Money*, 267 F.3d at 749; *see also McCann*, 129 Cal. App. 4th at 1392 (retail customers typically pay mark up or spread on FX transactions above market or wholesale rate).[21]

Because the only plausible conclusion is that ARTRS or its IMs knew that there was a mark up on indirect FX transactions, and because SSBT had no duty to disclose the extent of the mark up, ARTRS cannot state a claim under Chapter 93A. *See Twombly*, 550 U.S. at 570 (claim must be plausible to survive motion to dismiss); *Tagliente v. Himmer*, 949 F.2d 1, 7 (1st Cir. 1991) (independently verifiable statements not deceptive under 93A); *Gossels*, 453 Mass. at 375 (rejecting claim under 93A where plaintiff could easily have determined retail currency exchange rates); *see also Mexico Money*, 267 F.3d at 749.[22]

### B. ARTRS's Chapter 93A Claim Is Undermined By Its Continued Use Of Indirect FX After Disclosure Of State Street's Pricing Practices

Plaintiff by its conduct also concedes that any nondisclosure concerning indirect FX rates was immaterial in that it did not cause ARTRS any injury. *See Gossels*, 453 Mass. at 372-73. According to the Complaint, after 2008 – when Plaintiff alleges that State Street's FX pricing policies were "revealed" – ARTRS continued to execute indirect FX transactions with State

---

[21] Indeed, the average indirect FX trade by ARTRS, which was about $285,000 (Compl. ¶ 66), is about one-twentieth the size of the average interbank trade, which is around $5 million. *See Mexico Money*, 267 F.3d at 745, 749. This size disparity further undercuts ARTRS's claim that it should be entitled to interbank rates.

[22] Nor can ARTRS plead a Chapter 93A claim based upon what amounts to breach of contract allegations. ARTRS's fundamental complaint is that indirect FX was not priced in accordance with the parties' contract. As a threshold matter, this allegation badly misreads the parties' contract, and as a matter of law, State Street's is the only plausible reading of the contract, *see infra* at 34-38. But even if there were a plausible disagreement, any such disagreement does not rise to a Chapter 93A claim. *See, e.g., Callahan v. Harvest Bd. Int'l, Inc.*, 138 F. Supp. 2d 147, 166 (D. Mass. 2001) ("A breach of contract without more, does not violate chapter 93A"); *Cahill v. TIG Premier Ins. Co.*, 20 F. Supp. 2d 141, 143 (D. Mass. 1998) (same); *Fireman v. News Am. Marketing In-Store, Inc.*, 2009 WL 3080716, at *14 (D. Mass. Sept. 26, 2009) (same). ARTRS does not even attempt to plead the type of willful or egregious breach of contract claim – "i.e., the breach of contract has an extortionate quality" – that can potentially rise to the level of a Chapter 93A violation. *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992).

Street.  (Compl. ¶¶ 82-84, 135.)  Moreover, ARTRS nowhere asserts that it would not have executed any of the indirect FX transactions in issue if it had known everything about the challenged rate setting methodology that it now knows (and, in fact, knew all along).  *See Gossels*, 453 Mass. at 372 (Chapter 93A claim failed where no injury because "[t]he record is devoid of evidence that a different bank would have … applied the interbank rate").

In *Vieira v. First American Title Insurance Company*, the Court dismissed a Chapter 93A claim because the insurer did not have a duty to disclose the availability of a 40% lower rate on title insurance.  668 F. Supp. 2d 282, 291-92 (D. Mass. 2009).  There, plaintiffs also failed to allege deception because they failed to allege that they would have acted differently if the insurer had disclosed that they were paying a higher rate.  *Id.* at 293.  ARTRS's similar attempt to seek "a belated rebate" after accepting an accurately reported rate does not allege a deceptive practice. *Id.* (plaintiff's acceptance of rate charged demonstrates immateriality); *see also Cape Painting & Carpentry Inc. v. Maher*, 2009 WL 321271, at *5 (Mass. App. Div. Feb. 3, 2009) (rejecting Chapter 93A claim for lack of injury where contractor failed to disclose 30-40 percent mark up on labor and materials costs and where plaintiffs "failed to present evidence … that they would not have paid" the mark up if it had been disclosed).[23]  Of course, it is unremarkable that ARTRS and its IMs continued to execute indirect FX transactions throughout the proposed Class Period, given that their trading pattern reveals that they have always understood that indirect FX provides a value-added service at a higher cost.

---

[23]  Moreover, *Vieira* dealt with a claim by unsophisticated individual consumers, for whom Chapter 93A provides stronger protections than it offers to the sophisticated businesses such as ARTRS.  As discussed below, the Plaintiff cannot meet the higher burden for plaintiffs under Section 11.

- 24 -

### C.    The Conduct Alleged Does Not Meet The Section 11 Liability Standard

There are, of course, two sections of Chapter 93A under which a plaintiff may seek to plead a claim.  It is more difficult to plead and prove a claim under Section 11 than under Section 9 of that statute.  Accordingly, it is no surprise that ARTRS improperly attempts to avoid Section 11 to advance a claim under Section 9.  But a party may not assert claims under both sections, and any claim by ARTRS could fall only under Section 11.

As a matter of law, ARTRS's allegations that the mark up applied to FX transactions by State Street was inherently unfair do not rise to the level of "egregious rascality" required under Section 11.  *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 41-42 (1st Cir. 1998) (to state a claim under Section 11 "the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce") (quoting *Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. Ct. 498, 504 (1979)); *Lambert v. Fleet Nat'l Bank*, 449 Mass. 119, 127 (2007) ("one engaged in business dealings may need to show greater 'rascality' to prevail on G.L. c. 93A claim than 'less sophisticated party'") (citation omitted).  That is to say, "the defendant's conduct must be not only wrong, but also egregiously wrong."  *Mass. Sch. of Law*, 142 F.3d at 41.[24]

ARTRS, as previously noted, is an unquestionably sophisticated investor, armed with IMs and consultants who managed to distinguish sensibly among different FX execution methods and to use the relatively low cost method for larger transactions and the higher cost method for smaller ones.  (Compl. ¶ 44.)  ARTRS is not an interbank market participant, and it had no contractual or other basis to demand (or expect) interbank market rates.  *See supra* at 7.

---

[24]    *See also New Eng. Envtl. Techs. v. Am. Safety Risk Retention Grp., Inc.*, 738 F. Supp. 2d 249, 258 (D. Mass. 2010) (Chapter 93A claims between "sophisticated commercial players" must be evaluated under rascality standard); *Fernandes v. Havkin*, 731 F. Supp. 2d 103, 117 (D. Mass. 2010) (Court may also consider "plaintiff's conduct, his knowledge, and what he reasonably should have known" in evaluating Chapter 93A claim).

It knew it was paying a mark up on larger transactions. (Compl. ¶ 41.) That SSBT charged a different mark up on smaller transactions in which it provides additional services and benefits and takes on additional risks is consistent with general commercial reality applicable to currency transactions and is not egregious or even wrong. *See Mexico Money*, 267 F.3d at 749.[25]

### D. ARTRS Cannot Recover Under Section 9 Of Chapter 93A Because It Is Engaged In Trade Or Commerce

#### 1. ARTRS Is Engaged In Trade Or Commerce

Plaintiff's alternative claim under Section 9 of Chapter 93A is foreclosed because ARTRS is engaged in a prototypically commercial enterprise. In order to hold that Section 9 applies to this case, the Court would have to hold that an enterprise that exists to manage billions of dollars by investing it in worldwide securities markets using dozens of private investment advisors is somehow not engaged in commerce. *See Cont'l Ins. Co. v. Bahnan*, 216 F.3d 150, 156 (1st Cir. 2000) ("section 9 affords no relief to persons engaged in trade or commerce"); *see also* Mass. Gen. Laws ch. 93A, § 9(1) ("Any person, other than a person entitled to bring action under section eleven" may bring an action under Section 9). Plaintiff's attempt to plead under both Sections 9 and 11 makes no sense. *Cont'l Ins. Co.*, 216 F.3d at 156 ("the two sections of chapter 93A that create private rights of action are mutually exclusive").

Chapter 93A creates two avenues for relief that "distinguish[] between 'consumer' and 'business' claims, the former actionable under § 9, the latter actionable under § 11." *Frullo v. Landenberger*, 61 Mass. App. Ct. 814, 821 (2004); Mass Gen. Laws ch. 93A, §§ 9, 11. In other words, Section 9 creates a "a private remedy" for an "individual consumer" while "individuals

---

[25]     *Compare Ahern v. Scholz*, 85 F.3d 774, 798-99 (1st Cir. 1996) (rejecting 93A claim of songwriter where manager deducted fees from songwriter's royalties, even where fees were "commercially unreasonable," because the manager's level of rascality was not sufficient to rise to the level of a violation of 93A where the producer did not conceal the deductions); *Tagliente*, 949 F.2d at 7 (rejecting 93A claim where property seller falsely said property had great access to highways but buyer could have easily verified information).

acting in a business context in their dealings with other business persons" must bring any

Chapter 93A claim under Section 11. *Manning v. Zuckerman*, 388 Mass. 8, 10 (1983); *Lantner*

*v. Carson*, 374 Mass. 606, 610 (1978). The dividing line between claims arising under these

mutually exclusive provisions depends on whether Plaintiff is a "person who engages in the

conduct of any trade or commerce." *Id.*[26]

Here, ARTRS undoubtedly is engaged in trade or commerce when it executes FX trades

with SSBT as counterparty because it is a sophisticated entity effecting commercial transactions

in a business context. *Id.* at 611 (engaging in trade or commerce means "acting in a business

context"); *Frullo*, 61 Mass. App. Ct. at 821 ("a plaintiff who acts in a business context has a

cause of action exclusively under § 11"); *see also Linkage Corp. v. Trs. of Boston Univ.*, 425

Mass. 1, 24 (1997) (the "business context" inquiry requires "assess[ing] the nature of the

transaction, the character of the parties involved, and the activities engaged in by the parties ...

whether similar transactions have been undertaken in the past, whether the transaction is

motivated by business or personal reasons and whether the participant played an active part in

the transaction.") (citations and internal ellipses omitted).

ARTRS is an institutional investor with assets of $8.8 billion that employs sophisticated

IMs and other experts to manage its investments.[27] (Compl. ¶ 14; Hornstine Decl. Ex. D at 9.)

As noted in its annual report, ARTRS's "overall investment goal is to achieve, over a period of

years, the greatest rate of return for the System with due consideration given to preserving capital

---

[26] *See* Mass. Gen. Laws ch. 93A, § 1(b) (defining "trade" and "commerce" to include the sale of any property, commodity, or thing of value).

[27] Allowing a sophisticated entity such as ARTRS to seek relief pursuant to Section 9 would be at odds with the remedial and protective purpose of Section 9. Section 9 is designed to provide a recourse to individual consumers who are harmed by unfair or deceptive business practices, not to allow a sophisticated investor to seek relief under this provision. *See Manning*, 388 Mass. at 12 ("The Legislature originally enacted c. 93A to improve the commercial relationship between consumers and businessmen.").

and its purchasing power." (Hornstine Decl. Ex. D at 41.) By Plaintiff's own description of its activities, therefore, ARTRS is engaged in a commercial activity.

When ARTRS makes its frequent FX trades – either through direct or indirect FX – it buys currency from or sells currency to a counterparty. For instance, in the direct FX context, ARTRS will agree upon a price at which it will deal with SSBT, and both parties act as principals to this trade. (Compl. ¶ 41; Hornstine Decl. Ex. B at 34.) The same is true when ARTRS conducts an indirect FX trade, except that the rate is promptly reported, as opposed to agreed upon in advance. (Compl. ¶ 42; Hornstine Decl. Ex. B at 34.) A repeated pattern – whether by ARTRS itself or through its commercial agent IMs – of buying and selling commodities (foreign currencies) with a principal dealer who executes FX transactions to earn a profit is a quintessentially commercial activity. *See Linkage*, 425 Mass. at 24 (recurrence of active transactions demonstrates entity engaged in trade or commerce).

Moreover, ARTRS buys and sells foreign currency to further its principal objective: to increase the rate of return on its investment portfolio. This is nothing other than commercial activity in a business context, which qualifies as trade or commerce under Chapter 93A. *See Frullo*, 61 Mass. App. Ct. at 821 ("any transaction in which the plaintiff is motivated by business considerations gives rise to claims only under the statute's business section"); *see also Marram v. Kobrick Offshore Fund, Ltd.*, 2010 WL 4457179, at *6 (Mass. Super. Aug. 25, 2010) (applying Section 11 to pension plan's claim of unfair trade practices in connection with the plan's investment in fund).[28]

---

[28]  *See also Kerlinsky v. Fidelity & Deposit Co. of Md.*, 690 F. Supp. 1112, 1117 (D. Mass. 1987), *aff'd*, 843 F.2d 1383 (1st Cir. 1988) ("[a]ll that is required for a plaintiff to fall within the ambit of § 11 is some transaction in a business context."); *Lantner*, 374 Mass. at 610 (noting that "93A creates a sharp distinction between a business person and an individual who participates in

### 2. ARTRS Cannot Plead A Section 9 Claim Premised On Conclusory Allegations That It Is A Not-For-Profit Entity

Even if ARTRS is a "not-for-profit" entity engaged in a "core mission" of "investing and building retirement funds for public employees," the commercial nature of both the "core mission" and the activities at issue here is clear and determinative. (Compl. ¶ 96.)[29] ARTRS nowhere even advances the conclusion that it does not engage in trade or commerce. Its status as a non-profit entity says nothing about whether it does so, because non-profit entities plainly may engage in commercial activities. *Compare Linkage*, 425 Mass. at 23 (stating that a party's "status as a 'charitable' corporation is not, in and of itself, dispositive of the issue whether c. 93A applies" and finding that Boston University could not avoid Chapter 93A liability as a non-profit where it was engaged in the business of operating a satellite educational facility) (citation omitted) *with Trs. of Boston Univ. v. ASM Commc'ns, Inc.*, 33 F. Supp. 2d 66, 77 (D. Mass. 1998) (Boston University not engaged in trade or commerce as an institution of higher learning that purchased term papers as part of its investigation into cheating at the school).[30]

Most of the cases that have focused on non-profit status have done so to consider whether the non-profit can be held liable under Section 11 as a participant in trade or commerce, not to

---

commercial transactions on a private, nonprofessional basis"); *Cook & Co., Inc. v. Matrix Risk Mgmt. Servs., LLC*, 2011 WL 241966, at *9-10 (D. Mass. Jan. 24, 2011).

[29] ARTRS offers nothing more than this conclusory assertion in its Complaint as to why Section 9 would apply in this case. Such perfunctory recitation of legal conclusions must be disregarded. *Iqbal*, 129 S. Ct. at 1949-50.

[30] The same is true of organizations established by statute, like ARTRS. *See Bolden v. Liquor Liab. Joint Underwriting Ass'n of Mass.*, 2000 WL 1473569, at *5 (Mass. Super. June 29, 2000) (applying Chapter 93A to a "creature of statute"). Indeed, the Massachusetts Legislature has acted statutorily to abrogate older decisions that suggest that entities created by statute necessarily are not involved in trade or commerce. *Compare Wheatley v. Mass. Insurers Insolvency Fund*, 456 Mass. 594, 595 (2010) (explaining that *Barret* and *Poznik* were overturned by the Legislature) *with Poznik v. Mass. Med. Prof'l Ins. Ass'n*, 417 Mass. 48, 52-53 (1994) (defendant was "'statutorily mandated, nonprofit' association" whose transactions were "motivated by legislative mandate, not business or personal reasons" and, therefore, not engaged in trade or commerce) *and Barrett v. Mass. Insurers Insolvency Fund*, 412 Mass. 774, 776-77 (1992) (to similar effect).

consider whether a non-profit engaged in commercial activities can bring a claim as a plaintiff under Section 9. *See*, *e.g.*, *Mass. Sch. of Law*, 952 F. Supp. at 890 n.4. These cases, which seek to protect state agencies and charities that do not act with business motivations from being sued as marketplace actors, do not apply to ARTRS – an entity that exists principally to pursue the marketplace activities for which it was organized. ARTRS's status as a sophisticated commercial actor with the benefit of millions of dollars worth of advice annually from a stable of sophisticated advisors who act on behalf of ARTRS to execute commercial transactions also weighs against permitting it to take advantage of Section 9, which was created to protect individual consumers to which ARTRS bears no resemblance. *See In re Erickson Ret. Cmtys., LLC*, 425 B.R. 309, 316 (Bankr. N.D. Tex. 2010) ("The Michigan Retirement System Entities are *sophisticated commercial entities*" and should be bound strictly by their contracts) (emphasis added).[31]

According to Arkansas law, the "financial objective of the Arkansas Teacher Retirement System is to establish and receive contributions that expressed as percentages of active member payroll will remain approximately level from generation to generation of Arkansas citizens," and to invest those assets. *See* Ark. Code. Ann. § 24-7-401. As part of those activities, ARTRS and its IMs over the years made well more than 10,000 FX trades and has bought or holds nearly $9

---

[31] The decision in *In re Pharmaceutical Industry Average Wholesale Price Litigation*, 491 F. Supp. 2d 20, 80-82 (D. Mass. 2007) does not support Plaintiff here. In that case, the Court noted that the line between Section 9 and Section 11 depended on whether the plaintiff is engaged in a business context in the transaction at issue. *Id.* at 81 (citing *Lantner*, 374 Mass. at 610; *Begelfer v. Najarian*, 381 Mass. 177 (1980)). The Court then pointed out that, while not dispositive, the status of a non-profit as a charity influences this analysis, stressing that the plaintiff was a charity "not motivated by the desire to make money" from the purchases of the drugs at issue. *Id.* ARTRS, by contrast, exists to make money by engaging in quintessentially commercial transactions. Moreover, the Court's holding depended in large part on the fact that two other courts had previously decided that the plaintiff was not engaged in trade or commerce for Chapter 93A purposes. *Id.*

- 30 -

billion worth of securities and other assets.  ARTRS is not seeking to avoid Chapter 93A liability

by asserting that it is a non-commercial actor, but rather seeks to bring a claim in its commercial

capacity.  Because ARTRS's core mission is commercial in nature, and because the activities

challenged are commercial in nature, ARTRS cannot sue under Section 9.

### 3. Plaintiff Cannot Rely On the Attorney General's Regulations Because These Regulations Do Not Apply To Business-to-Business Claims

Claimants such as ARTRS who fall under Section 11 of Chapter 93A are foreclosed from

relying on regulations promulgated by the Attorney General's Office.  The regulations cited by

Plaintiff (Compl. ¶¶ 88(e), 97(e)) only apply to claims arising under Section 9, which, as noted

above, are not available to ARTRS.[32]  The Supreme Judicial Court, and this Court, have held that

the disclosure requirements embodied in the Attorney General's regulations "attach[] only to

transactions involving private consumers, and not to business to business transactions."  *In re*

*First New Eng. Dental Ctrs., Inc.*, 291 B.R. 229, 241 (D. Mass. 2003) (citing *Knapp Shoes Inc. v.*

*Sylvania Shoe Mfg. Corp.*, 418 Mass. 737 (1994)); *see also J.E. Pierce Apothecary, Inc. v.*

---

[32]    These regulations provide that "unconscionable" and "oppressive" acts violate Chapter 93A and that "[f]ail[ure] to disclose, to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction" is a violation of Chapter 93A.  940 Mass. Code Regs. 3.16(1-2).  But even if ARTRS were able to rely on these regulations, which it cannot, they do not help Plaintiff establish a viable claim because ARTRS never pleads that it would have acted differently had it known about the indirect FX mark up.  *See supra* at 23-24 (citing *Vieira*, 668 F. Supp. 2d at 291-92 (rejecting Chapter 93A claim alleging deception under Attorney General Regulations where plaintiff did not plead it would have acted differently, thus rendering the alleged nondisclosure immaterial)); *Denbesten v. Safari Motor Coaches, Inc.*, 2007 WL 1297710, at *3 (Mass. App. Ct. May 3, 2007) (rejecting Chapter 93A nondisclosure claim where "the plaintiffs failed to offer evidence that they would not have entered the transaction if they had known of" problems with vehicle, noting that Attorney General's regulations "add[] little, if anything, to the provisions of [G.L. c. 93A] ... itself"); *Schrier v. Banknorth, N.A. Mass.*, 2007 WL 609847, at *2 n.5 (Mass. App. Ct. Feb. 28, 2007) (finding no violation of Chapter 93A under Attorney General's regulations where bank failed to tell customer he could have earned more interest in a different bank account because the plaintiff's inaction after he learned of the higher interest rates available undermines his claim that he would have acted differently).

*Harvard Pilgrim Health Care Inc.*, 365 F. Supp. 2d 119, 145 (D. Mass. 2005).  Accordingly, ARTRS lacks standing to pursue a claim under the Attorney General's regulations.

## IV.    The Negligent Misrepresentation Claim Must Be Dismissed

The Complaint fails to allege adequately four of the required elements of a negligent misrepresentation claim.  To state a negligent misrepresentation claim, a plaintiff must allege that the defendant (1) in the course of his business, (2) supplied materially false information for the guidance of others, (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others, (5) by their justifiable reliance on the information, and that the defendant (6) failed to exercise reasonable care or competence in obtaining or communicating the information. *Gossels*, 453 Mass. at 371-72; *DeLuca v. Jordan*, 57 Mass. App. Ct. 126, 136-37 (2003).  Each of Plaintiff's four failures alone mandates dismissal.

First, the Complaint fails to allege any actionable misrepresentation.  ARTRS frames its negligent misrepresentation claim as one of pure omission based on the theory that disclosures to ARTRS omitted "material information about the actual cost to State Street of the purchases and sales of foreign currency, and omitted to state the actual time the foreign currency was purchased or sold by State Street."  (Compl. ¶ 117.)  However, in a case involving FX pricing, the Supreme Judicial Court recently confirmed that "bare nondisclosures" are not actionable as negligent misrepresentations.  *See Gossels*, 453 Mass. at 372 (citing *Swinton v. Whitinsville Sav. Bank*, 311 Mass. 677, 679 (1942)).  Here, ARTRS's negligent misrepresentation claim is entirely based on an inactionable alleged omission.

Second, ARTRS fails to allege reliance or materiality.  ARTRS does not plead reliance but instead asserts an incorrect legal conclusion that "reliance is presumed."[33]  (Compl. ¶ 119.)

---

[33]     ARTRS's attempt to "presume" reliance may be an effort to repurpose *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972), a securities fraud case brought

In fact, actual reliance is required. *See Gossels*, 453 Mass. at 372; *Mass. Sch. of Law*, 142 F.3d at 41 (absent reliance, claim of negligent misrepresentation must be dismissed); *Epstein v. C.R. Bard, Inc.*, 2004 WL 1598912, at *4 (D. Mass. July 19, 2004) (dismissing complaint where plaintiff alleged no facts to support reliance allegations). Moreover, as noted earlier, ARTRS does not allege that it would have done something different if it had the information it claims should have been disclosed, and instead acknowledges that it continued to use indirect FX services after this information was made available to it. *See Schrier*, 2007 WL 609847, at *2 n.5. Thus, the Complaint does not allege that any omitted information was material.[34] (Compl. ¶¶ 41, 117.) *See Zimmerman v. Kent*, 31 Mass. App. Ct. 72, 77-78 (1991) ("material" fact required for negligent misrepresentation claim means one important to determining choice in transaction).

Third, Plaintiff's assertion that State Street failed to exercise reasonable care or competence in obtaining and communicating the FX rates it reported to ARTRS because it did not report "information about the actual cost to State Street of the purchase and sales of foreign currency" (Compl. ¶¶119-20) lacks any factual basis. State Street had no duty to disclose this information. *See supra* at 18.

---

against the United States under Rule 10b-5 in which the Supreme Court held that "[in cases] involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." *Id.* This effort falls short for two reasons. First, nothing in *Affiliated Ute* suggests that this holding applies outside the realm of securities fraud cases. *See Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 2009 WL 331426, at *5 (D.N.J. Feb. 10, 2009) ("this Court is not persuaded that principles of securities law apply in ERISA cases"). Second, the *Affiliated Ute* presumption only applies to pure omissions cases, which are not actionable under Massachusetts law. *See Gossels*, 453 Mass. at 372.

[34] Nor does Plaintiff make any showing that such "presumed" reliance is *reasonable*. As demonstrated above, ARTRS and its IMs knew about the FX mark up, *supra* at 20-23. *See Mass. Laborers' Health & Welfare Fund v. Philip Morris, Inc.*, 62 F. Supp. 2d 236, 243 (D. Mass. 1999) (dismissing misrepresentation claim relating to tobacco usage for failure to plead reasonable reliance because health hazards about tobacco were well-known) (citations omitted).

Finally, any allegation that State Street's omission caused ARTRS injury is belied by the fact that, by using the undisputed FX rate information SSBT reported to ARTRS on a monthly basis, ARTRS could have conducted the same calculations pleaded in the Complaint and reached the same conclusions (however invalid) and by the fact it continued to use SSBT's FX services after the pricing policies were "revealed." *See supra* at 23-24.

## V. ARTRS Has Not Stated A Claim For Breach Of Contract

Plaintiff's custody contract is between ARTRS and SSBT. Plaintiff does not state a claim for breach of contract because it does not allege that anyone at ARTRS sought to obtain a rate cap from SSBT, reached agreement with anyone from SSBT in this regard, or understood that it had obtained one; and because the contracts' terms cannot plausibly be interpreted in the manner in which Plaintiff suggests.

### A. SSBT Had No Contractual Obligation To Trade FX With ARTRS

ARTRS makes a series of bald assertions regarding its custody contracts: (1) that "[o]ne of the services State Street agreed to provide to ARTRS pursuant to the custody contracts is the purchase and sale of FX" (Compl. ¶ 128); (2) that those contracts "provided that State Street would execute FX transactions for no additional fees" (*id.* ¶ 6); and (3) that the contracts "did not authorize additional fees for executing FX transactions" (*id.*). In truth, the contracts do not require State Street to execute even a single FX trade with ARTRS, and the numerous fee schedules attached to the custody contracts over time have no relevance to the rates for execution of FX transactions.[35] *Ray v. Am. Airlines, Inc.*, 2008 WL 2323923, at *12 (W.D. Ark. June 2, 2008) (dismissing breach of contract claim under Arkansas law where "complaint fails to allege sufficient facts regarding Defendant's failure to comply with specific terms" of contract).

---

[35] The custody contracts are between SSBT and ARTRS. State Street Corporation and SSGM LLC are not even parties to the agreements. (Hornstine Decl Exs. A, E-G)

Plaintiff relies on one reference to FX included in each of the contracts themselves. (Compl. ¶ 128.)  In fact, this language does not require SSBT to execute FX with ARTRS. Instead, the language addresses a custodial function: paying money per the instructions of ARTRS or its IMs to settle transactions, including FX transactions.  *See supra* at 15-17.  This language did not create an obligation to execute FX transactions (Compl. ¶¶ 6, 128), because Plaintiff's interpretation is contrary to the plain language of the contract.  *See Pittman v. Pittman*, 139 S.W.3d 134, 136 (Ark. App. Ct. 2003) (rules of contract construction require court to look to plain meaning of contract terms); C&*A Constr. Co., Inc. v. Benning Constr. Co.*, 256 Ark. 621, 622 (1974) (accord); *Chrysler Fin. Co., LLC v. East*, 2003 WL 21228295, at *3 (Ark. App. Ct. May 28, 2003) (accord); *Davenport v. Bd. of Trs. of the Univ. of Ark. at Pine Bluff*, 2011 WL 9000095, at *4 (E.D. Ark. Mar. 14, 2011) (dismissing breach of contract claim where plaintiff "has not set forth specific allegations showing how the University is in breach of any contract between it and him").

### B.    Plaintiff's Reliance On Fee Schedules Is Absurd

ARTRS asserts that the 1998 fee schedule – appended to a contract that is silent as to FX rates (and does not require FX execution) – prohibited execution of FX transactions at rates in excess of market rates.  (Compl. ¶ 132.)  The fee schedule, however, does not address FX rates, and instead addresses the only custody service required pursuant to the contract as to FX: settling FX trades (whether executed with SSBT or a third party).

The fee schedule at issue lists about a dozen "Transaction Fees" that ARTRS might pay on a transaction-by-transaction basis for transactions processed by SSBT as custodian.  For example, ARTRS would pay $1 per interfund transfer and $100 for each "Group E International Trade" (after the first 35 trades).  These plainly are processing fees arising from custodial activities.  As to FX trades, the schedule recites, "*No Charge* will be assessed for foreign

- 35 -

exchange executed through a third party.  Foreign Exchange through State Street – *No Charge*."
(emphasis in original).  (Hornstine Decl. Ex. H.)  This language also refers to a processing
charge and does not set a rate cap.  *See Chrysler*, 2003 WL 21228295, at *3 (court must read
contract clauses in context of whole agreement, not just particular words and phrases in
isolation).

The first sentence of the clause can only refer to a processing charge.  SSBT plainly had
no ability to dictate what third party FX providers would charge relative to interbank rates; and it
has no role in third party FX transactions other than settling (*i.e.*, processing) them.  Under
ordinary contract interpretation principles, the second sentence of the clause has the same
meaning: SSBT would not charge a processing fee for FX executed with SSBT.  *See Pittman*,
139 S.W.3d at 137 (considering "syntax" of section in which contract terms appeared).  This
interpretation of the 1998 fee schedule is confirmed by review of the subsequent fee schedules
and contracts.

The 2001, 2004, and 2009 contracts are themselves indistinguishable from the 1998
contract as to FX.  They do not require FX execution and limit the custodian's duties to
settlement processing.  The 2001 fee schedule contains a similar list of Transaction Charges, but
the sentence from the 1998 fee schedule upon which ARTRS relies is entirely omitted.
(Hornstine Decl. Ex. I.)  This is because the sentence was not required given that SSBT would
assess no processing charge for any FX trade, whether by SSBT or some third party.  Of course,
ARTRS never explains either the deletion of the two words upon which it relies to posit the
supposed earlier agreement or how any fee cap could persist without these words.  Accordingly,
the 2001 fee schedule shows clearly that Plaintiff's hindsight interpretation of the 1998 contract

is implausible. The other intervening fee schedules prior to 2009 are in this regard the same as those in 2001. (Hornstine Decl. Exs. J-M.)

The 2009 contract and fee schedule show why the clause upon which Plaintiff relies was included in the 1998 fee schedule and omitted from all of the other schedules. In 1998, SSBT agreed that there would be no processing fee for any FX transaction. After 1998 and until 2009, the parties chose another way to memorialize the same conclusion – silence. In 2009, however, ARTRS agreed to pay a processing fee for third party FX transactions, and SSBT agreed to waive that fee only as to FX transactions done with SSBT. They memorialized that agreement using language in the 2009 fee schedule similar to the 1998 fee schedule language: "A third party FX charge of $25 will be applied for all foreign exchange trades not transacted through State Street. Transaction costs for all foreign exchange trades transacted through State Street will be waived." (Hornstine Decl. Ex. N.) This represents the only real change in this regard since 1998.[36]

Because none of the custody contracts or fee schedules imposed any obligations with respect to FX execution rates, and because Plaintiff never asserts that any one at ARTRS sought, expected, or believed contemporaneously that it had obtained an agreement concerning FX execution rates, the breach of contract claim must be dismissed. *Davenport*, 2011 WL 9000095, at *4; *Quinn v. Ocwen Fed. Bank FSB*, 470 F.3d 1240, 1245 (8th Cir. 2006) (applying Arkansas law and affirming dismissal of breach of contract claim on grounds that plaintiffs failed to show

---

[36] Plaintiff's strained argument that because the fee schedules in effect from July 1, 2001 through June 30, 2009 "do not mention FX trading" at all, then somehow the parties "contemplated that State Street Bank shall not be compensated for the purchase or sale of foreign exchange over and above the annual flat fee" fails on its face. The only plausible reading is that FX trading was not covered by the contracts and that any processing fee during that period was waived for both FX trades with State Street and any third party. (Compl. ¶ 133.)

existence of valid contract).  Indeed, if such an agreement had been made it would not have been memorialized using the words of the 1998 fee schedule.

### C. ARTRS's Custody Contracts Did Not Require Disclosure Of Execution Times Or The Amount Paid For Currency Sold To ARTRS

The Complaint alleges, without any factual basis, that State Street was somehow obligated to provide ARTRS monthly reports that showed "the time-stamp of the actual time of the trade" and "the actual price at which State Street paid for the purchase or sale of foreign exchange."  (Compl. ¶ 139.)  The contracts say no such thing.

The only reporting requirement in ARTRS's custody contracts relative to FX required SSBT to "render to [ARTRS] a monthly report of all monies received or paid on behalf of the Fund and an itemized statement of the securities for which it is accountable under this Contract as of the end of each month, as well as a list of all securities transactions that remain unsettled at that time."  (*E.g.*, Hornstine Decl. Ex. A § 3; Compl. ¶ 138.)  The Complaint does not allege that SSBT failed to do so.  In fact, the Complaint acknowledges that SSBT sent ARTRS periodic reports that "showed ... the rate that State Street charged for its FX trades."[37]  (Compl. ¶ 76.)

### D. Plaintiff Cannot Plead A Breach Of Contract By Relying On The Investment Manager Guides

Throughout its Complaint, Plaintiff refers to IM Guides.  These documents cannot contribute to a breach of contract claim.  Plaintiff does not, and cannot, allege that the IM Guides were part of ARTRS's custody contracts with SSBT.  Reference to these documents, therefore, does not support a breach of contract claim because the documents are not part of the contracts.

---

[37]    Plaintiff's own allegation that 53% of the indirect FX rates reported to ARTRS were outside the range of the day, (Compl. ¶¶ 62, 73), belies its allegation that "[n]othing in the FX rates State Street actually reported ... indicated that those rates included hidden and unauthorized mark-ups (or mark-downs)."  (Compl. ¶ 9.)  *See also Gossels*, 453 Mass. at 379 (currency exchange rates not "secret" where information publicly available to customer).

*Ingersoll-Rand Co. v. El Dorado Chem. Co.*, 283 S.W.3d 191, 197 (Ark. 2008) (contract does not include terms contained in separate document not incorporated by reference).

In any event, the IM Guides do nothing other than support State Street's assertion that ARTRS knew that it was not paying interbank market rates for indirect FX. The IM Guides stated that FX transactions "are priced *based on* the market rates at the time the trade is executed." (Hornstine Decl. Ex. O at 37.) Based on "is synonymous with 'arising from' and ordinarily refers to a 'starting point' or a 'foundation.'" *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1111 (9th Cir. 2000) (citations omitted) ("based on" language in retirement plan allowed benefit to be calculated using either a set back or set forward as long as standard mortality table served as starting point or foundation for calculation.) Indeed, Plaintiff acknowledges that these rates were "derived" by "adding (on purchases) or subtracting (on sales) 'basis points' or 'pips' from the actual FX rate." (Compl. ¶ 69.)[38] In addition, the November 2009 IM Guide, which Plaintiff contends "explained the pricing of FX trades" (*id.* ¶ 7), specifically explained that "[i]nter-bank rates are normally used as wholesale reference prices for foreign exchange transactions and mark-ups or mark-downs are customarily applied when banks price transactions with institutional investor clients." (Hornstine Decl. Ex. B at 34.) Rates marked up from market rates are "based on" market rates.[39]

---

[38] Plaintiff's allegations that State Street's indirect FX rates were "unrelated to the market-based rates" (Compl. ¶ 8) and "invented" (*id.* ¶ 63) or "fictitious" (*id.* ¶ 73) are merely another permutation of its allegation that State Street "derived" indirect FX rates from the market rate. (*id.* ¶ 69.)

[39] *See Sturm Ruger & Co. v. Chao*, 135 Fed. Appx. 431, 435 (1st Cir. 2005) ("on basis of" in Occupational Safety and Health Act of 1970 means "arising from," a "starting point" or "foundation" and conferred discretion on OSHA to require additional information); *Petri v. Gatlin*, 997 F. Supp. 956, 966 (N.D. Ill. 1997) (contract provision requiring rates to be "based on" a monthly market price obligated defendant "only to charge rates which bore some relation to the monthly market price, not to charge rates that were identical to the lowest monthly market price.").

## VI.    ARTRS's Claims Are Barred, In Part, By Statutes of Limitations

The applicable statutes of limitations bar Plaintiff's claims at least to the applicable

limitations period.[40]

### A.    ARTRS Was On Notice Of Its Purported Claims

Massachusetts provides a 3-year statute of limitations for tort claims and a 4-year period

for claims under Chapter 93A.  Mass. Gen. Laws ch. 260, §§ 2A, 5A.  Arkansas provides a 5-

year period for breach of contract claims.  Ark. Code Ann. §16-56-111(b).  In Massachusetts, a

tort claim accrues when the plaintiff is injured.  *Koe v. Mercer*, 450 Mass. 97, 101 (2007).

Similarly, in Arkansas, a claim accrues when there is a complete and present cause of action.

*Ray & Sons Masonry Contractors, Inc. v. U.S. Fidelity & Guar. Co.* 114 S.W.3d 189, 198 (Ark.

2003) ("Cause of action accrues the moment the right to commence an action comes into

existence, and the statute of limitations commences to run from that time.").

ARTRS alleges that it suffered an injury as to every indirect FX trade from 1998 until

2009.  Thus, its tort claims and Chapter 93A claims accrued upon execution of each trade and

were extinguished except as to trades executed within three or four years, respectively, prior to

the filing of the Complaint on February 10, 2011.  ARTRS's contract claim based on the 1998

contract (and to the extent a claim is asserted, based on the 2001 and 2004 contracts) is barred by

the statute of limitations.  All of the fee schedules, except for the 2009 fee schedule, fall beyond

---

[40]    A statute of limitations defense can be considered on a Rule 12(b)(6) motion if "the complaint and any documents that properly may be read in conjunction with it show beyond doubt that the claim asserted is out of time."  *See Rodi v. S. New England Sch. of Law*, 389 F.3d 5, 17 (1st Cir. 2004); *Matos v. First Nat'l Bank*, 2010 WL 3327725 (Mass. Super. June 16, 2010) (granting motion to dismiss fraudulent misrepresentation claim and 93A claim because limitations period had run).  As noted above, *see supra* at 13 n.14, State Street understands from the Complaint that ARTRS contends that Massachusetts law applies to its class claims and Arkansas law applies to its contract claim.

the limitations period or are silent as to FX (and thus inapplicable).[41] (Hornstine Decl. Exs. H-
N.) Thus, Plaintiff's contract claim prior to the date of the 2009 contract and fee schedule is
barred by the Arkansas statute.

## B. The Statutes Of Limitations Have Not Been Tolled

In advancing claims that are up to thirteen years old, ARTRS ignores its actual
knowledge that a large number of its indirect FX trades were at rates outside the daily range of
interbank rates. (Compl. ¶ 62.) When coupled with ARTRS's allegation that a simple
calculation reveals whether an FX provider is charging rates in excess of interbank market rates,
it is obvious that ARTRS was on notice of its claims when it received its regular reports from
SSBT that included the actual FX rates charged. (*Id.* ¶¶ 35-40, 62, 70, 77.) Accordingly, the
statutes of limitations have not been tolled.

To avoid this result, ARTRS asserts the conclusion that it could not reasonably have
detected its claims at any time during the Class Period. (*Id.* ¶ 9.) Although Massachusetts tolls
the statute of limitations until the plaintiff knew or should have known about the existence of a
claim, plaintiffs seeking the benefit of tolling must plead and prove that they did not know, and
"in the exercise of reasonable diligence, they should not have known" about the claim. *Albrecht
v. Clifford*, 436 Mass. 706, 714-15 (2002) (upholding summary judgment for defendants and
finding Chapter 93A claim to be time-barred); *Patsos*, 433 Mass. at 328. Because according to
ARTRS it had all the information necessary to calculate the mark up or mark down on its FX
trades shortly after each trade was made (Compl. ¶¶ 41, 62, 70, 77), its claims were not tolled
under the so-called "discovery rule."

ARTRS also has not made out a claim for fraudulent concealment. Under Mass. Gen.
Laws ch. 260, § 12, the statute of limitations may be tolled if a fiduciary affirmatively prevents

---

[41]     *See also supra* at 35-35 & n.36.

an injured party from learning the facts that give rise to the cause of action. *See Salinsky v. Perma-Home Corp.*, 15 Mass. App. Ct. 193, 197 (1983) ("In Massachusetts mere silence is not ordinarily a fraudulent concealment. There must be some affirmative act of concealment of the cause of action."). This tolling theory does not apply because State Street did not owe any fiduciary duty to ARTRS, *see supra* at 12-18, and because it has pleaded no facts whatsoever to suggest that State Street acted to intentionally hide Plaintiff's potential cause of action. (Compl. ¶¶ 76-79.) Instead, SSBT accurately reported rates to ARTRS.

### C. Plaintiff's Defense That The Statutes Of Limitations Cannot Run Against Its Contract Claim Fails

Finally, Plaintiff attempts in vain to circumvent the dismissal of the untimely portions of its breach of contract claim by invoking the Arkansas common law doctrine that limitations periods do not run against the state (*nullum tempus occurrit regi*). (Compl. ¶ 141.) In fact, under Arkansas law, where a public plaintiff is "seeking to enforce a contract right, or some right belonging to it in a proprietary sense," it "may be defeated by the statute of limitations." *Ark. Dept. of Envtl. Quality v. Brighton Corp.*, 102 S.W.3d 458, 469 (Ark. 2003) (finding that Arkansas environmental department not subject to statute of limitations where it sought to "enforce environmental regulations intended to improve the environment for the benefit of the public" on behalf of the entire public) (citations omitted); Howard W. Brill, 1 Arkansas Law of Damages § 13:4 (5th ed. 2010) (statute of limitations "may bar a government's action … if the government is merely enforcing a contractual or proprietary right.")

Here, even if ARTRS is an arm of the state, ARTRS's contract claim against State Street represents only its own proprietary interests and not the interests of the State of Arkansas or its citizens as a whole. *Compare City of Stamps, Ark. v. Alcoa, Inc.*, 2006 WL 2254406 (W.D. Ark. Aug. 7, 2006) (under Arkansas law, personal trespass and negligence claims asserted solely on

behalf of a municipal plaintiff, and not the public, not subject to *nullum tempus*). As such,

Plaintiff cannot invoke *nullum tempus* as a bar to Arkansas's five-year statute of limitations for

contract claims.

## VII. ARTRS Does Not State a Claim Against State Street Corporation Or SSGM LLC, Because Neither Played Any Role In FX Transactions

ARTRS improperly asserts claims against two distinct corporate entities – State Street

Corporation and SSGM LLC. State Street Corporation is SSBT's parent. SSGM LLC is a

subsidiary of State Street Corporation that is separate and distinct from SSGM, which is a

division of SSBT. Neither State Street Corporation nor SSGM LLC traded FX with ARTRS,

and the Complaint does not allege a single fact to suggest otherwise.

Plaintiff's refusal to distinguish between State Street Corporation, SSBT, and SSGM

LLC cannot surmount the strong presumption that corporations are separate. It was SSBT that

was a party to the custody contracts with ARTRS, and it was the SSGM division of SSBT (not

SSGM LLC) that executed FX trades with ARTRS. (*See also* Hornstine Decl. Exs. A, E-G.)

The Complaint nowhere alleges facts suggesting involvement by State Street Corporation or

SSGM LLC in any relevant activities. The only allegations in the record are to the contrary.

(Compl. ¶ 82 ("State Street advised custodial clients that it would post on its website,

my.statestreet.com, 'current mark-ups and mark-downs used by *State Street Global Markets* for

[standing-instruction] foreign exchange transaction requests.'") (emphasis added); *id.* ¶ 135

("*State Street Bank* informed ARTRS of 'current mark-ups and mark-downs used by *State Street*

*Global Markets* for [standing-instruction] foreign exchange transaction requests.'") (emphasis

added); Hornstine Decl. Ex. C at 37 (noting that SSGM is responsible for FX trading).)[42]

---

[42]    *See Riccio v. Ford Motor Credit Co.*, 238 F.R.D. 44, 47-48 (D. Mass. 2006)
(disregarding, for purposes of motion to dismiss, allegations in complaint where they were
contradicted by documents attached to complaint).

Massachusetts law rarely permits plaintiffs to hold corporations liable for the acts of subsidiary (or sister) corporations. *My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 620 (1968) (veil piercing impermissible unless (1) the parent corporation exercised pervasive control over its subsidiary resulting in some fraudulent or injurious conduct, or (2) that there was confused intermingling among the activities of the parent and subsidiary); *Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 128-29 (1st Cir. 2006) (accord). ARTRS, however, pleads no facts which, if proved, would permit such an outcome. Accordingly, the Complaint should be dismissed as to State Street Corporation and SSGM LLC. *See Platten*, 437 F.3d at 129 (upholding dismissal of action against affiliated corporate entities under Rule 12(b)(6) where plaintiffs failed to make sufficient allegations of pervasive control and confused intermingling); *Dorn v. Astra USA, Inc.*, 1997 WL 258491, at *3 (D. Mass. April 2, 1997) (similar).

## CONCLUSION

For all of the above-stated reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

RESPECTFULLY SUBMITTED,

/s/ Adam J. Hornstine
Jeffrey B. Rudman (BBO# 433380)
William H. Paine (BBO# 550506)
Daniel W. Halston (BBO# 548692)
Beth E. Bookwalter (BBO# 643425)
Adam J. Hornstine (BBO# 666296)
Andrew R. Golden (BBO# 679402)
WILMER CUTLER PICKERING HALE AND
DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000


Counsel for Defendants

Date: June 3, 2011

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document, filed through the ECF system, will be sent electronically to the registered participants of record as identified on the Notice of Electronic Filing on June 3, 2011.

/s/ Adam J. Hornstine
Adam J. Hornstine