# EX. 45

```
 1                 UNITED STATES DISTRICT COURT

 2                  DISTRICT OF MASSACHUSETTS

 3                              No. 1:11-cv-10230-MLW

 4


 5   ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of
     itself and all others similarly situated,
 6              Plaintiffs

 7

     vs.
 8

 9

     STATE STREET CORPORATION, et al,
10              Defendants

11

12                      * * * * * * * * *

13

                       For Hearing Before:
14              Chief Judge Mark L. Wolf

15

                       Motion to Dismiss
16

17              United States District Court
                District of Massachusetts (Boston)
18              One Courthouse Way
                Boston, Massachusetts 02210
19              Tuesday, May 8, 2012

20

                        * * * * * * * *
21

22         REPORTER: RICHARD H. ROMANOW, RPR
                 Official Court Reporter
23           United States District Court
     One Courthouse Way, Room 5200, Boston, MA 02210
24              bulldog@richromanow.com

25
```

```
 1                 A P P E A R A N C E S

 2

 3    DAVID J. GOLDSMITH, ESQ.
          Labaton Sucharow, LLP
 4        140 Broadway
          New York, New York 10005
 5        (212) 907-0777
          Email: Dgoldsmith@labaton.com
 6    and
      DANIEL P. CHIPLOCK, ESQ.
 7        Lieff Cabraser Heimann & Bernstein, LLP
          250 Hudson Street, 8th Floor
 8        New York, New York 10013-1413
          (212) 355-9500
 9        Email: Dchiplock@lchb.com
      and
10    MICHAEL P. THORNTON, ESQ.
          Thornton & Naumes, LLP
11        100 Summer Street, 30th Floor
          Boston, Massachusetts 02110
12        (617) 720-1333
          Mthornton@tenlaw.com
13        For plaintiffs

14

15    JEFFREY B. RUDMAN, ESQ.
      WILLIAM H. PAINE, ESQ.
16    ADAM J. HORNSTINE,ESQ.
          Wilmer Cutler Pickering Hale and Dorr, LLP
17        60 State Street
          Boston, Massachusetts 02109
18        (617) 526-6912
          Email: Jeffrey.rudman@wilmerhale.com
19        For defendants

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              (Begins, 11:00 a.m.)
 3              THE CLERK:  Civil Action 11-10230, Arkansas
 4    Teacher Retirement System versus State Street
 5    Corporation, et al.  The Court is in session.  You may
 6    be seated.
 7              THE COURT:  Good morning.  I'm sorry to have
 8    kept you waiting while I was organizing my thoughts.
 9         All right.  Would counsel please identify
10    themselves for the Court and for the record.
11              MR. GOLDSMITH:  Good morning, your Honor.
12    David Goldsmith, Labaton Sucharow, for the plaintiff,
13    Arkansas Teacher Retirement System, and the class.  Also
14    with me today, your Honor, is Mr. George Hopkins,
15    Executive Director of the Arkansas Teacher Retirement
16    System.
17              THE COURT:  Thank you.
18              MR. CHIPLOCK:  Daniel P. Chiplock, Lieff
19    Cabraser Heimann & Bernstein, on behalf of plaintiff and
20    the proposed class.
21              MR. THORNTON:  Michael Thornton, Thornton &
22    Naumes in Boston, on behalf of the plaintiff.
23              THE COURT:  All right.
24              MR. RUDMAN:  Jeff Rudman, if you please, your
25    Honor, for the State Street defendants.
```

```
 1            MR. PAINE:  Bill Paine for the same.

 2            MR. HORNSTINE:  Adam Hornstine as well.

 3            THE COURT:  Okay.

 4       We're here in connection with the defendants'

 5  motion to dismiss under Rule 12(b)(6).  It's my hope

 6  that I'll decide the motion today.  I'm familiar with

 7  the submissions.

 8       As an overview, I'll tell you that, in my

 9  tentative view, it would be appropriate to dismiss the

10  case with regard to State Street Corporation, which I

11  understand is the parent of State Street Bank and

12  Trust.  It doesn't, at the moment, appear to me that the

13  allegations are sufficient to state a plausible claim

14  that the corporate veil ought to be pierced.

15       I would hope the parties could, by agreement,

16  resolve the question of whether State Street Global

17  Markets, LLC is a proper defendant or whether there's a

18  different entity that's just called State Street Global

19  Markets that's a subsidiary of State Street Bank and

20  Trust.  Basically if the wrong entity's been named, I'd

21  permit an amendment to name the right entity.  But you

22  should clean that up.

23       It appears to me that the remaining elements of

24  the motion to dismiss any or all of the claims against

25  State Street Bank and Trust and State Street Global
```

1     Markets are not meritorious.  There's a thread that, in

2     my present conception -- and we can take them up claim

3     by claim, you know, that runs through all of this, um,

4     but there were custodial agreements between the parties,

5     um, and that custodial agreement said that State Street

6     Bank and Trust would get compensation at the rate set

7     forth on the fee schedules.  Um, the first fee schedule,

8     in 1998, said there would be no charge for FX

9     transactions.  The rest were silent.  But *Patsos* teaches

10    me that while there may not -- while there wasn't, as I

11    view it at the moment, a general fiduciary duty, there

12    was a transactional fiduciary duty and that involved the

13    duty to disclose the compensation that State Street was

14    getting in connection with the FX transactions pursuant

15    to standing instructions.

16          In the elements of the different claims, breach of

17    fiduciary duty, negligent misrepresentation, and Chapter

18    93A, this may most likely be a Section 9 claim, but that

19    may require some factual development, um, anyway, for

20    the breach of contract.  And for the Massachusetts

21    claims, it seems to me it's adequately alleged that the

22    statute of limitations didn't start running until 2009

23    when the fraudulent concealment is adequately alleged,

24    which was the time you know of the injury that triggers

25    the running of the statute.

1    The breach of contract claim was governed by

2    Arkansas law and I don't think it's fully developed the

3    jurisprudence on when it starts running.  But if my

4    tentative views are sustained today, um, then we have

5    time to figure out the statute of limitations issues on

6    breach of contract.

7         So that's a brief overview and it's a tentative

8    view, but I think it would make sense for you to give me

9    whatever overview you want of the case and then to take

10   up each of the claims one at a time.  I try to organize

11   along the order that I think the defendant presented the

12   claims, the first one being the breach of fiduciary

13   duty.

14        But in any event, um, it's the defendants' motion,

15   you know where I'm starting, and we'll see where we end

16   up.

17             MR. RUDMAN:  Well, thank you, your Honor.  And

18   may I speak from here, if it's okay?

19             THE COURT:  Absolutely.

20             MR. RUDMAN:  Let me change what I was going to

21   say to you in light of your overview.

22        And the first point I would make to you is this

23   case is really about **Twombley** and **Iqbal** and ask how

24   plausible is it that these folks had no idea of what

25   they were doing or buying or selling?  Remember, the

1    plaintiffs' entire theory boils down to the assertion

2    that State Street, a principal broker -- not an agent

3    broker, a principal broker, engaged in a for-profit

4    business, a currency exchange, and had a duty to give

5    them, essentially in perpetuity, free trades in these

6    small-op indirect transactions.  Your Honor pointed out

7    the only thing they have to hang their hat on and that

8    thing is the reference to "no charge" in the first of

9    the fee agreements.

10            THE COURT:  I didn't view it as the only

11    thing, I just thought it was one worth mentioning.  And

12    let me just see if I understand the allegations.  I

13    think they allege that in 2009, for custodial services,

14    they paid State Street something like $50,000?

15            MR. RUDMAN:  Yes, and they don't say what's

16    unreasonable about that, and they don't say why, over

17    and above that, they get a pop-up toaster, in effect, in

18    the form of free currency trades.

19            (Laughs.)

20            THE COURT:  Go ahead.

21            MR. RUDMAN:  And here's why I'd like to press

22    the point, if you please, and if I can restrict this to

23    the texts that are floating around -- and may I approach

24    the bench?  Here is a chart that is tethered to the

25    implausibility point, why they say that --

1    THE COURT: Did you give this to the

2 plaintiffs?

3    MR. RUDMAN: I did. I did.

4    THE COURT: And you could also -- well,

5 Mr. Hornstine probably could put it up on the presenter

6 and then everybody can see what we're talking about.

7    MR. RUDMAN: All right. I'm not going to take

8 you in much detail through that document, it's a chalk

9 for the convenience of the Court, and I don't suppose my

10 friends would welcome this as a convenience, but at

11 least they have a copy.

12    THE COURT: Well, let him put it up.

13    (On overhead.)

14    MR. RUDMAN: Is it up?

15    MR. HORNSTINE: It's up.

16    MR. RUDMAN: The two points --

17    THE COURT: Do you have another one? I'll

18 give it to my law clerk.

19    MR. RUDMAN: I'm sure I do. I usually do.

20    THE COURT: I thought you would.

21    (Hands up.)

22    MR. RUDMAN: Thank you so much.

23   I have two purposes in offering the chart. First,

24 you will see that it asserts throughout the complaint

25 that the FX transaction should have been essentially

1    free.  Notice that word "essentially."  Even they don't

2    --

3              THE COURT:  Where is it?

4              MR. RUDMAN:  In the very top dark "read"

5    bullet line.  "Plaintiff asserts throughout the

6    complaint that indirect FX should have been essentially

7    free."  They don't say and they don't rely on anything

8    for the proposition it should have been utterly free.

9    They say, "We could have charged them on the small-op

10   nonrounded transactions the same markup we gave the bank

11   of England."  That's what they're saying, that they

12   should have got the real, true interbank rate.

13             THE COURT:  Where do they say that in the

14   complaint?

15             MR. RUDMAN:  If I may?  If I could direct you

16   to the bullets in this chart.  What I tried to do was

17   gather in one convenient place the most convenient

18   references to the points I'm trying to make orally this

19   morning and you will see that I focus principally on

20   Paragraphs 8, 43, 48, 57, 63 and 74, and then what I

21   have tried to do is show you, in similar fashion,

22   pulling right from the complaint -- and this is not from

23   anything broader than that, but why that is so utterly,

24   utterly implausible.  So even they don't say it should

25   be absolutely free.

1        THE COURT:  Well, let me ask you this.  Is

2  "essentially free" your word or a word that I find in

3  the amended -- in the complaint?

4        MR. RUDMAN:  I will own up to responsibility

5  for the "essentially."

6        THE COURT:  All right.

7        MR. RUDMAN:  But I do think it is a fair

8  reading that they say, "Oh, if you had given us the same

9  rate as the Bank of England got, then no problem."  All

10  right?

11     The other document -- the only other document I

12  plan to impose upon you for, if you please, sir, is the

13  Hornstine declaration and there are pieces of that

14  declaration that I want to draw your very, very specific

15  attention to.  That's a bulky voluminous --

16        THE COURT:  Hold on just a second.  (Pause.)

17  Okay.  I have it.

18     You're talking about this?

19        MR. RUDMAN:  I think that's -- it certainly is

20  the right size and --

21        THE COURT:  Is there only one Hornstine?

22        MR. RUDMAN:  There's only one Hornstine.

23        THE COURT:  Then this is it.  Go ahead.

24        MR. RUDMAN:  All right.  So I will accept

25  responsibility for the "essentially," but I don't think

1  I'm wrong and I could have rewritten the sentence to say

2  "There was no problem charging the true interbank

3  rate."  All right?  Point 1.

4       Point 2.  Remember, your Honor, that this pension

5  plan was a $9 billion enterprise, it had blue chip Gucci

6  Gulch advisors, UBS, Wellington, so forth and so on, and

7  they knew -- they knew that on 61 percent of the 10,000

8  trades they did, they weren't getting the same rate the

9  Bank of England gets, they were getting a rate that was

10 3.6 one hundredths of 1 percent above an average of the

11 day.

12       THE COURT:  What were those, the trades that

13 they gave specific instructions on?

14       MR. RUDMAN:  No, the trades on which we just

15 say "Go buy," those are the negotiated trades.  Yes, in

16 that sense the --

17       THE COURT:  The negotiated trades?

18       MR. RUDMAN:  Yes, the negotiated trades.

19       THE COURT:  So there you say they knew they

20 were paying for the negotiated trades?

21       MR. RUDMAN:  Correct.

22       And the idea that there's something hidden about

23 what the rates are for currency transactions or what we

24 were charging is not even remotely true.  With respect

25 to the indirect trades where -- now, here's the

1   extortion.

2           THE COURT:  Okay, what's an "indirect trade"?

3           MR. RUDMAN:  The "indirect trade" is no

4   negotiation, no setting things in advance, you send in a

5   computer ticket.  The computer ticket says, "I'd like to

6   buy 100,000 shares in London of Burberry common stock.

7   Please get me the currency."  The computer reads the

8   ticket, generates the currency, pays it out where

9   appropriate, and far from concealing it, that day or no

10  later than the next day an entry goes back saying

11  "Here's what's done."

12      So now you have a highly-sophisticated well-

13  advised pension plan making, during the class period,

14  approximately 10,000 trades, knowing exactly what it's

15  paying by way of a markup on 61 percent of the trades,

16  and thinking, "Yeah, this makes a lot of sense.  On the

17  61 percent of the trades that should be cheap, I'm

18  paying -- I'm paying something, but the others that

19  should be more expensive because they're nuisance,

20  small-fry, small-opt deals, well, that should be free."

21      If you believe, sir, that these contractual

22  documents, which we put before you and not my friends,

23  if you believe those documents create a right of

24  free-of-charge FX exchange, why did they knowingly,

25  indisputably pay 3.6 one hundredths of one basis point?

1   They did it all along.  Never once did they say to us --

2           THE COURT:  Well, let me ask you this.

3           MR. RUDMAN:  Yes.

4           THE COURT:  And not rhetorically.

5       Where in the amended complaint does it tell me

6   that they were paying and knew they were paying 3.6 one

7   hundredths of a basis point on the negotiated

8   transaction?

9           MR. RUDMAN:  Is it Paragraph 45?  Would you

10  give me just a minute to look?

11          THE COURT:  Sure.

12          (Pause.)

13          MR. RUDMAN:  Yes, Paragraph 72.  "For direct

14  FX" --

15          THE COURT:  Wait a minute.  Let me get it.

16          MR. RUDMAN:  Paragraph 72.

17          (Pause.)

18          THE COURT:  Okay.

19          MR. RUDMAN:  Okay?  And now, just so you know

20  -- just so you know what they're paying on the small-fry

21  trade, the indirect FX, as opposed to 3.6 one hundredths

22  of 1 percent, they're paying approximately 18 one

23  hundredths of 1 percent.  I actually think it's 17.8 one

24  hundredths of 1 percent, but we're now really slicing

25  and dicing.  But the point I would make to you is they

```
1    know they're paying something on the big trades, why
2    shouldn't they pay a little more on the lesser trades
3    where they're saving labor?  In other words, the reason
4    they negotiate some trades is they have to say to their
5    IM, their Investment Manager, "Don't negotiate for me."
6              THE COURT:  Let me ask you this.
7              MR. RUDMAN:  Yeah.
8              THE COURT:  Where is that in the complaint?
9    And, in other words -- I mean, I'm very interested in
10   this.  I almost don't want to interrupt, but I can't
11   help it.
12             MR. RUDMAN:  No, no, no, no --
13             THE COURT:  Anyone can argue that it's
14   implausible, but I have to look at the allegations of
15   the complaint, draw the reasonable inferences in the
16   plaintiffs' favor and --
17             MR. RUDMAN:  Yes.
18             THE COURT:  Do you want to read that or listen
19   to me?
20             MR. RUDMAN:  No, I'm listening.  I'm
21   listening, sir.  I did not want to --
22             THE COURT:  Well, I would like your undivided
23   attention.
24             MR. RUDMAN:  You do have my undivided
25   attention.
```

```
 1              THE COURT:  Not if you're reading.

 2              MR. RUDMAN:  I'm sorry.  I apologize.

 3              THE COURT:  I mean, if you want to take a

 4    break?

 5              MR. RUDMAN:  No, no, sir.  I apologize.  I

 6    mean, I really apologize.  I'm sorry.

 7              THE COURT:  I have to take the allegations in

 8    the complaint as true.

 9              MR. RUDMAN:  Yes.

10              THE COURT:  I have to draw all the reasonable

11    inferences in the plaintiffs' favor.

12              MR. RUDMAN:  Yes.

13              THE COURT:  I can rely on the documents that

14    are referenced in the complaint.

15              MR. RUDMAN:  Correct.

16              THE COURT:  And I have to decide whether they

17    made a plausible claim.

18              MR. RUDMAN:  Uh-huh.

19              THE COURT:  You know, when you start telling

20    me about Wellington and, you know, their Investment

21    Manager does this, um, I don't think that's in the

22    amended complaint.  And, you know, I've read a lot of

23    cases, you know --

24              MR. RUDMAN:  Right.

25              THE COURT:  -- including *Gossels*, for example,
```

1    which was decided after trial, and I can see that if my

2    tentative views endure and I dismiss the case, you're

3    giving me and the plaintiffs a preview of coming

4    attractions, "Who will be so stupid?"  But, you know,

5    you rightly started with the standard because until we

6    get the question right, we can't tell what the answer is

7    for today.

8        But, you know, if you want to tell me things that

9    aren't in the amended complaint or are reasonable

10   inferences from the amended complaint, then why don't

11   you highlight, you know, that that's what I'm going to

12   get, because not all of this is intuitively obvious to

13   me.

14       You know, somebody could argue, after I hear it:

15   "You know, we're paying $900,000, these are small

16   things, they told us there would be no charge for FX

17   transactions, and we thought, you know, they were giving

18   us the little ones for free."  I -- I mean, would that

19   be implausible to a juror or to me?  I don't know.

20        MR. RUDMAN:  Well, it certainly isn't

21   plausible to Judge Easterbrook.

22       If you look at the **Mexico Money** case, Judge

23   Easterbrook accurately describes how the currency market

24   works and he has no trouble blowing through the fog of

25   uncertainty.  And at the plaintiffs' --

```
 1                THE COURT:  Well, as I recall, and let me
 2    check.
 3                MR. RUDMAN:  Sure.
 4                THE COURT:  Was **Mexico Money** an appeal from a
 5    motion to dismiss?
 6                MR. RUDMAN:  No, it was a -- I understand
 7    there was a more fully --
 8                THE COURT:  Well, what was it?  It was either
 9    summary judgment or trial.
10                MR. RUDMAN:  I thought it was after summary
11    judgment.
12            Oh, after settlement.
13                THE COURT:  Oh, after settlement.
14                MR. RUDMAN:  There was a more fully-developed
15    record.
16                THE COURT:  Okay.  Precisely
17                MR. RUDMAN:  All right.  But here's what
18    I'm trying to -- with respect to the record, and I'm
19    trying to stick to this complaint, one, and the
20    paragraphs that are listed on this green chalk I'd like
21    you to focus on, and I'd like you to focus on the
22    Hornstine affidavit, and I'd like to walk through with
23    you, if you please, that affidavit and the certain key
24    portions just quickly.  But let me try to pick off what
25    I think should be the low-hanging fruit.
```

1    There's no dispute that we were a principal

2    broker/dealer, they don't claim that they have an agency

3    agreement with us -- but, yes, where they're a

4    custodian, but what is it that makes us a fiduciary?

5    They have put before you nothing that says the contract

6    deems us a fiduciary.

7    The language that you have by way of a standard

8    for our care is reasonable care. That's commercial

9    speak, that's not, um, fiduciary speak. They are

10   attended by their own advisors and all they say, in

11   utter conclusion, and without a single supporting fact,

12   is "We knew that they regarded us as fiduciaries."

13   THE COURT: Yeah, but actually that's not what

14   influenced me, what influenced me was, I think, maybe

15   Footnote 15 in *Patsos*.

16   MR. RUDMAN: Yes.

17   THE COURT: As I understand it, um, State

18   Street didn't have the authority to do discretionary

19   trading, and that's why I said I didn't, at the moment,

20   think there was a general fiduciary duty, but I thought

21   that in *Patsos* the SJC was saying that in every case,

22   um, essentially a broker has a transactional fiduciary

23   duty, not --

24   MR. RUDMAN: That's the agent.

25   THE COURT: Can I finish? I was waiting for

1  Mr. Paine to finish talking to you.

2          MR. PAINE:  I apologize, sir.

3          THE COURT:  "For nondis" -- this is just so I

4  can be transparent and you can tell me if you think this

5  is a misunderstanding.  It says:  "For nondiscretionary

6  accounts, each transaction is viewed singularly.  The

7  broker is bound to act in its customer's interest when

8  transacting business for the account.  But all duties to

9  the customer cease when the transaction is closed."  And

10  then it has a footnote noting that, in another case, in

11  another jurisdiction, the Court suggested that:  "The

12  duties associated with nondiscretionary accounts," which

13  I took to mean fiduciary duties, include the following,

14  and the fifth one was "the duty not to misrepresent any

15  fact material to the transaction."

16          And just to spin this out, um, I, coming in, have

17  tentatively reasoned a couple of things.  One, you have

18  written agreements that say, "We're going to charge you

19  the fees on the written schedules," and the 1998

20  schedule said, "No charge for FX transactions," but the

21  subsequent schedules were silent on that, um, and

22  there's no charge for compensation.  And so it seemed to

23  me that they had a plausible argument that they thought

24  there was no compensation being charged for these

25  smaller transactions, it was part of the 800,000 or

1    $900,000 they were paying, and, um, State Street had a

2    duty to tell them that it was actually taking

3    compensation and in terms of this spread.  That was one

4    of the -- you know, some of the thinking on fiduciary

5    duty.  And also the fiduciary, under some of the

6    negligent misrepresentation cases, 93A cases, you have

7    an affirmative duty to disclose that's different than in

8    the bare nondisclosure cases and you have this half-

9    truth principle that if you say something you have to be

10   reliable in what you say, and if you at one time told

11   them you weren't charging and didn't tell them you were

12   changing, then maybe they'd survive on that theory, too.

13              MR. RUDMAN:  May I push back?

14              THE COURT:  Absolutely.  That's why I said I

15   want you to -- well, you'll do it anyway.  But, yes, you

16   may.

17              MR. RUDMAN:  You know, in my old age I've

18   become reasonably obedient, I think, sir.

19              THE COURT:  I know.  I've become mellow, so --

20              MR. RUDMAN:  Okay, it's a draw.  So fair

21   enough.

22        Point one, we were nobody's agent.  We are a

23   principal broker engaged in making money in the

24   commodities markets.  There is no language of agency, no

25   language of fiduciary duty, none of it.

1          Second, there is no dispute from this complaint

2     that all this stuff about free FX notwithstanding, they

3     knew they were paying on 61 percent of their trades.

4          Third, on these small-fry trades, remember they

5     get a ticket from us showing what we charged.  These

6     folks know enough about the currency market to say, "Oh,

7     on these trades you're charging us 3.6 percent -- or

8     hundredths of a percent above the inter-day average."

9     It's not as though there's some big secret.  There are

10    simply currency trades.

11         Now you say there is one reference to "free of

12    charge."  If I could contextualize that for you, okay,

13    it's very important, and I'd like to direct your

14    attention starting to 2.6 percent of the contracts.

15              THE COURT:  Wait.  Wait.  Wait.

16              MR. RUDMAN:  Sorry.

17              THE COURT:  Which exhibit is the Hornstine --

18              MR. RUDMAN:  I'm sorry.  The Hornstine

19    affidavit, it is Exhibit A, and it says Section 2.6.

20              THE COURT:  2.6?

21              MR. RUDMAN:  2.6.

22              THE COURT:  Because I was focusing on Section

23    4.  Okay.  2.6.

24              (Reads.)

25              THE COURT:  Okay, I have it.

```
1              MR. RUDMAN:  All right.

2         If you look in the complaint, one of the first

3    paragraphs the plaintiff relies upon is Section 2.6, to

4    argue that this creates a pricing obligation for FX.  If

5    you read Section 2.6 percent, it's got nothing

6    whatsoever to do with that.

7         The section says that the custodian may pay out

8    fund monies when it receives proper instructions from

9    ARTS or the IMs -- and there's no dispute about the

10   existence of the Investment Managers, okay, for several

11   purposes including for FX trades.

12             THE COURT:  Where's the reference to FX

13   trades?

14             MR. RUDMAN:  If you look at Section 2.6, you

15   will see that one of the things for which it may pay out

16   money is "foreign currency trades."  And if I could read

17   down just --

18             THE COURT:  I have it.  That's E?

19             MR. RUDMAN:  Yes, that's right.  And what it

20   says is "Only upon proper receipt -- only upon receipt

21   of proper instructions and written agreement as to

22   security procedures for payment order, which may be

23   standing instructions or may as otherwise be authorized

24   within this contract, the custodians shall pay out or

25   direct its agents or subcustodians to pay out monies of
```

```
 1   the account in the following cases," and then it says,
 2   "for the purchase or sale of foreign currency."  That
 3   language they used to try to suggest there's a pricing
 4   mechanism built into this contract.
 5             THE COURT:  Well, I -- all right.  And then
 6   you're going to tell me about Paragraph 4?
 7             MR. RUDMAN:  I don't know which paragraph --
 8             THE COURT:  Paragraph 4's on Page 9 and it
 9   says "Compensation of Custodians."  The one that I've
10   been focused on.
11             MR. RUDMAN:  Yes.
12             THE COURT:  It says:  "The custodians shall be
13   entitled to compensation for its services and expenses
14   as custodian set forth in a written fee schedule between
15   the parties hereto until a different compensation shall
16   be in writing and agreed upon between the system and the
17   custodian."
18         Now, here what are we looking at, the 2008
19   contract?  Is this the first one?
20             MR. RUDMAN:  This is the first one.
21             THE COURT:  It's says "2008."
22             MR. RUDMAN:  No, the first one is 2001, I
23   believe.
24             THE COURT:  Oh, I'm sorry, 1998.
25             MR. RUDMAN:  1998.
```

1            THE COURT:  I misspoke.  Okay.  So this is

2      1998.  Then, I thought, that the corresponding fee

3      schedule is Exhibit H, right?

4            MR. RUDMAN:  Right.  I'm coming to that.

5            THE COURT:  Well, that's what I want to get

6      to.  It says "Foreign Exchange," "No charge will be

7      assessed for foreign exchange executed to a third

8      party.  Foreign exchange through State Street, no

9      charge."

10           MR. RUDMAN:  Good.  Can I just respond to your

11     last point about custodians and then come to that

12     document?  Because if I may, with very great respect,

13     you are reading that to say that there should be no

14     charge for FX as opposed to what it really means, which

15     is that certain small-bore charges, like charges for

16     shipping and handling, will not be charged.

17           THE COURT:  Well, see, I thought, um, on that

18     first, um, to the extent the contract is unambiguous, it

19     tells me, on this one, that you're not going to charge

20     him a penny.

21           MR. RUDMAN:  No, sir.  But if --

22           THE COURT:  Well, let me finish.

23           MR. RUDMAN:  I'm sorry.

24           THE COURT:  Let me finish.

25           MR. RUDMAN:  Sorry.

1          THE COURT:  If it's unambiguous, it

2    communicates to me that you're not going to get any

3    compensation for this.  This is a service you're

4    providing as a custodian without any additional charge.

5    If it's ambiguous, under Arkansas law, similar to

6    Massachusetts law, um, it's a matter of fact, and there

7    can be parol evidence as to what the meaning of that

8    was, what the understanding of it was between the

9    parties.  Maybe there was some discussion about what it

10   meant, but that would make it not susceptible to being

11   resolved on a motion to dismiss.  And so that was my

12   thinking about that.

13          MR. RUDMAN:  All right.  Could I suggest

14   there's a third choice?  There's unambiguous, ambiguous,

15   and so implausible as to flunk **Twombley,** and that is the

16   burden of my argument to you today.

17       And now -- well, first of all, let's just start

18   with the custodian.  The custodian's only duty in this

19   context is to settle, trade and pay the money.  It

20   doesn't say anything about what the custodian is

21   charging or not charging.

22          THE COURT:  How does the complaint tell me

23   that?

24          MR. RUDMAN:  You just read what the

25   custodian's duties are.

1          THE COURT:  One of the custodians -- well,
2     where did I just read it?
3          MR. RUDMAN:  You just read it to me a minute
4     ago.  I was just standing here.
5          MR. PAINE:  It was in 2.6, your Honor, 2.6(e).
6          THE COURT:  Yeah, "The purchase and sale of
7     foreign exchange."  So that's one of the duties and in
8     Paragraph 4, it says:  "The compensation for the
9     custodian's duties will be set forth in the fee schedule
10    in writing."
11         MR. RUDMAN:  (To Mr. Paine.)  Do you want to
12    speak about it?
13         MR. PAINE:  Do you mind, your Honor?
14         THE COURT:  Go ahead.  He's paying you a great
15    compliment.
16         MR. PAINE:  He doesn't usually like to let me
17    talk, and there's a good reason for that, but this one
18    time I would appreciate yours and his indulgence.
19         The point here is that Arkansas hired State Street
20    to be their custodian.  A custodian is a provider of
21    administrative services.  Okay?  A custodian is not a
22    principal dealer who executes for an exchange.  This
23    contract sets forth a list of custodial duties in
24    Section 2, "We hold securities," "We deliver
25    securities," "We make payments pursuant to proper

1    instructions."  Okay?

2         So if you look at Pages 1 through 8 in Sections

3    2.1 through 2.12, you see the list of the things that

4    Arkansas hired State Street to do.  Not on that list is

5    "Execute a foreign exchange transaction with me."  This

6    contract does not require State Street to execute a

7    single FX contract with Arkansas.

8              THE COURT:  See, that -- that argument, which

9    I didn't find is clearly made in the papers, and maybe I

10   misunderstood, but it occurred to me, that arguably

11   State Street was not acting as a custodian.  However,

12   it's -- at the moment I would say that at most that

13   creates an ambiguity that can't be resolved on the

14   motion to dismiss.

15        And, you know, you're telling me how this industry

16   operates.  You know, I look at this as, you know,

17   somebody who's worked for the government for the last

18   thirty years and -- and I don't know -- and I don't even

19   know if Judge Easterbrook knows or he just thinks he

20   knows how these industries work, but it has to be in

21   evidence.  It has to be -- well, let me just finish.

22             MR. PAINE:  Yes.

23             THE COURT:  So I've got a contract that says,

24   you know, the custodian -- you know, that makes a

25   reference to "foreign exchange," but doesn't spell it

1    out as clearly as you just did -- and you may be right,

2    but as clearly as you just did, that when State Street

3    is executing trades it's not doing it in its capacity as

4    a custodian.  I mean, that's plausible to me, too.

5         But when it says here:  "Compensation for the

6    custodian, you know, shall be as set forth in the

7    written fee schedule," it could embrace -- if it's

8    ambiguous and doesn't clearly cover these trades, um, it

9    could embrace these trades.  Somebody's going to have to

10   -- the parties are going to have to explain their

11   understanding.  Maybe some expert would testify on the

12   custom in the industry.  But this is a very early stage.

13             MR. RUDMAN:  But we have a list, if you --

14             THE COURT:  Well, let him finish and then you

15   can come back.

16             MR. RUDMAN:  Sorry, Judge.

17             MR. PAINE:  And I -- well, thanks, Jeff.

18             MR. RUDMAN:  That's okay.

19             THE COURT:  No, he was going to let you do it,

20   but I ordered him, and he says he's more obedient now.

21             MR. PAINE:  Thank you.

22        So -- well, what I guess I would say to you, in

23   response to your argument -- to your analysis, is that

24   the contract is not ambiguous in this regard, um, and I

25   think that if you look at 2.6(a) through (h), you will

1    see that what 2.6 is saying with respect to a whole
2    array of categories of fund payments that might be paid,
3    um, by the custodian, that what the custodian is doing
4    is providing the administrative service of transferring
5    money pursuant to instructions.  It's not --
6         You know, take a look at, you know, 2.6(c).  Um,
7    if State Street as custodian -- and that's on Page 5,
8    your Honor.  If State Street as custodian gets a proper
9    instruction, which is defined as an instruction from an
10   Investment Manager or of Arkansas, to pay any expense or
11   liability, including interest, taxes, accounting, et
12   cetera, then it will pay it.  Um, if you look at -- if
13   you look at the other ones, you'll see that this list,
14   including (e), is a -- is a list of the kinds of
15   administrative payment actions that the custodian will
16   take upon proper instruction, and I do think it is a
17   fair argument to read this provision, in light of the
18   allegations, um, of the complaint, as a clear statement
19   that the -- that the activities in 2.6 are custodial and
20   administrative in nature and not, um, you know, the
21   actions of a principal dealer buying and selling its own
22   currency.
23        Again I did say it before, but I think it bears
24   repeating, that this contract does not require us to buy
25   or sell any currency to Arkansas and it doesn't require

1    Arkansas to buy or sell any currency from us.  Instead,

2    the way this works, and this is fairly comprised within

3    the complaint, is that Arkansas hires an Investment

4    Manager, which is a fiduciary, which has the

5    responsibility to decide how stuff is invested, and

6    that's all assets, including currency assets, and that

7    the Investment Manager makes a decision.  If they decide

8    that they want to directly negotiate with the Bank of

9    England, an FX trade, that's up to them.  It is State

10   Street's responsibility as custodian to settle that

11   trade, meaning we pay them the dollars, they pay us the

12   euros.  If they decide that they want to deal with the

13   separate division of State Street that provides FX

14   execution, then the custodian will transfer money from

15   State Street's account to Arkansas' account and back in

16   order to settle that trade, um, you know, pursuant to

17   proper instructions.

18        So back to --

19             THE COURT:  No, I understand the argument.

20             MR. PAINE:  Okay.  Thank you.

21             THE COURT:  Go ahead.

22             MR. RUDMAN:  So may we turn to Exhibit H to

23   the Hornstine declaration.

24             THE COURT:  Yes.

25             MR. RUDMAN:  And the words "there is no

 1    charge."  All right?

 2         If you look at all -- if you look at the language

 3    that is there at Exhibit H, you will see what they're

 4    setting forth, it's a $1 charge for interfund transfers,

 5    a $7.50 fee for wire transfers, $900 for plan

 6    accounting, and so on, and the only mention of FX comes

 7    in the other charge or section of this schedule, which

 8    are all these little fixed costs basically, and it says

 9    "There will be no charge assessed for foreign exchange

10    executed through a third party," like no shipping, no

11    handling, "and there is no charge for foreign exchange

12    through State Street," meaning no shipping, no handling,

13    but it doesn't mean it's free.  And then -- then that

14    language goes away altogether until about 2008 or 2009.

15         So this very valuable hard-bargained-for right to

16    free FX disappears.  And through all that period of

17    time, they know, they absolutely know that they're

18    paying on the larger round-lot trades and they're paying

19    about 3.6 one hundredths of 1 percent.  Because of

20    language that basically appeals or applies to fixed fees

21    and charges that goes away after 1998, they go on paying

22    currency exchange to State Street, so how could anyone

23    possibly think that this is all on the house?  And when

24    they talk to you in sort of dramatic fashion about how

25    expensive the custodial fee was, they don't tell you

1    what's wrong about it or what's unfair about it.  And

2    the "gouging," so called, is they're not getting the

3    interbank rate and they're not the Bank of England and

4    they know they're not the Bank of England.

5         So I submit to your Honor that it just makes no

6    sense to assert that the no charge for FX eliminates any

7    charge for FX over a 9-year period when they know

8    they're paying for FX and they know they're paying it on

9    61 percent of the 10,000 trades they do.  What they are

10   offering you is just implausible in the extreme.  And

11   there's no way you can get from no one of these fixed

12   charges, $1, $9, $900, to some rate-setting obligation.

13   The rate setting comes from what's the markup on the

14   trades in the open market as reflected on the ticket.

15        THE COURT:  I thought the ticket didn't

16   disclose the discrepancy between the trade and

17   essentially the commission that State Street was taking

18   by not giving the full amount to this big client of

19   its?

20        MR. RUDMAN:  Correct, but what is publicly

21   available are the average daily rates for this

22   currency.  This is not shrouded in mystery.

23        THE COURT:  Okay.  How does the complaint tell

24   me it's publicly available?

25        MR. RUDMAN:  They know it's publicly

1   available.  That's where they got the 3.6 percent from.

2           THE COURT:  No -- I mean, I -- well, a couple

3   of things.  For example, in **Gossels**, it was after trial,

4   they decided it after trial, and the SJC reversed the

5   Appeals Court in part because it found the undisputed

6   evidence showed that the bank had a dedicated telephone

7   number that Gossels could have called to find out what

8   he was being charged.  You know, they -- you know, they

9   alerted customers to the fact that customers weren't

10  getting 100 percent and gave them a mechanism to find

11  out.

12      I'm wondering what is sort of almost indisputably

13  comparable to that, you know, that I can draw from

14  that?

15          MR. RUDMAN:  Getting a ticket showing what you

16  were charged.  They don't dispute they didn't know what

17  they were charged, and they don't dispute that and they

18  wanted to --

19          THE COURT:  No, I think they --

20          MR. RUDMAN:  They make the rhetoric, "Of

21  course it's hidden," but they've got a ticket.

22          THE COURT:  It shows what they were paid.

23          MR. RUDMAN:  Yeah.

24          THE COURT:  But not what compensation.

25          MR. RUDMAN:  If you can go and look at the

1    publicly-available data for any particular day and see

2    what the --

3            THE COURT:  How do I know from the complaint

4    that there's publicly-available data every day?

5            MR. RUDMAN:  Could you look at Paragraph 73,

6    if you please, your Honor.

7            THE COURT:  Since you asked me so nicely, I'll

8    be happy to do it.

9            (Pause.)

10           THE COURT:  Okay.  I read it.

11           MR. RUDMAN:  You read it.

12       I don't see how much clearer the admission could

13   be that they knew what the numbers were.  They say,

14   "2217 trades, or 53 percent, fell entirely outside the

15   forward-adjusted range of the day."  "These 2,217 FX

16   trades, with the total volume exceeding $200 million,

17   added trading costs on average of 64.4 basis points over

18   the day's mid rate, an enormous hidden and unauthorized

19   markup."

20       How is it hidden if they can recite it to you with

21   that kind of exactitude in their complaint?  Using the

22   above example on a purchase of 10 million euros, an

23   undisclosed fee of 64.4 basis points would result in a

24   $64,400 State Street profit on that single transaction.

25       And again let's talk about Mr. Gossels by way of

1    comparison.  He didn't get a ticket the next day, there

2    was a phone number he could call.  Mr. Gossels didn't

3    come with Investment Managers who were his fiduciary.

4    Not only that, what we're really talking about, as I've

5    indicated before, is 17 one hundredths of 1 percent that

6    is so extortionate.  The markup in the **Gossels** case is

7    370 basis points -- 370 basis points or roughly 20 times

8    what State Street was charging somebody attended by a

9    bevy of institutional advisors.

10          So the idea they didn't know, couldn't know,

11   didn't get a ticket, is just not true and the complaint

12   gives it away.  And there is no dispute that they knew

13   what they were paying on all these direct FX

14   transactions, meaning the 3.6 one hundredths of a basis

15   point.

16          How can they say to you that, with respect to this

17   no-fee language, that they relied upon it and yet went

18   on and on and on and on paying on direct FX?  If they

19   believed their own puff, they wouldn't say that to you.

20   And at the very end when they do, in some cases,

21   reinstate the charge for indirect, the fee that goes to

22   that indirect cubbyhole is $25.  It's exactly what I

23   said it is, a shipping and handling charge.  That's all

24   it is, and that's all that the other enumerated charges

25   are.

Case: 1:11-cv-10230-MLW Document 401 Filed 05/17/21 Page 36 of 104
Case: 1:11-cv-10230-MLW Document 403 Filed 05/17/21 Page 37 of 104

36

```
 1          There is no language in this case that can
 2   plausibly be construed to say that we ever gave these
 3   folks a promise of free FX.  I'm sorry?
 4              THE COURT:  No.  What are you sorry about?
 5              MR. RUDMAN:  I thought I was interrupting you.
 6              THE COURT:  No, I let you finish for once.  I
 7   thought you were finished.
 8          This is very helpful and every case is unique.
 9   Some cases do get dissolved on motions to dismiss and
10   Iqbal and Bell Atlantic are supposed to make that
11   somewhat more common.  However, um, can you point -- um,
12   there are many cases cited, but can you point me to one
13   in which a motion to dismiss -- where the defendant
14   prevailed on a motion to dismiss in circumstances that
15   you think are comparable to the circumstances here?
16              MR. RUDMAN:  Well, let me try the 93A claim
17   for just a second in that regard.
18              THE COURT:  Well, there's a whole bunch of
19   claims and if any of them, you know, survive, you know,
20   you've got to do discovery.
21          So, you know, like what's the best case for you on
22   a motion to dismiss?
23              MR. RUDMAN:  Well, I may ask one of my friends
24   at counsel table to see if they have a suggestion.  But
25   while they're looking for that --
```

```
 1              THE COURT:  No, let them look.
 2              MR. RUDMAN:  All right.  But could I offer you
 3    --
 4              THE COURT:  No, no, let me stop and think, so
 5    I can keep my question.
 6              MR. RUDMAN:  Okay.
 7              (Pause.)
 8              THE COURT:  All right.  Here, they can look
 9    while you --
10         Oh, you've got it?
11              MR. PAINE:  Um, I'd go for -- if I've got to
12    pick one, I would go for the McCann vs. Lucky
13    Money, Inc. case, which is intermediate --
14              THE COURT:  Here, I've got it here.  Let me go
15    get it.  I actually thought it --
16              MR. PAINE:  It sustains a demurrer, I think.
17              MR. RUDMAN:  It does sustain a demurrer.
18              (Pause.)
19              THE COURT:  All right.  Let me just check
20    something.
21              (Pause.)
22              THE COURT:  So McCann is a dismissal --
23              MR. RUDMAN:  -- on a motion to dismiss a
24    demurrer arising under the California unfair competition
25    laws.  And, if I may?  It does rely on Judge
```

1  Easterbrook's decision in *In re Mexico Money* --

2        THE COURT:  Hold on just one second.

3        (Pause.)

4        THE COURT:  Okay.  Go ahead.

5        MR. RUDMAN:  It says -- it relies -- they

6  called the complaint "absurd."

7        THE COURT:  Where -- what page do you think?

8        MR. RUDMAN:  I don't have the page cite in

9  front of me.  They do rely on Judge Easterbrook's *Mexico*

10 *Money* case, which is 267 F.3d 743, and they call the

11 decision -- they call the plaintiff's theory "absurd."

12 But they go off on a slightly different ground, if you

13 please.

14       THE COURT:  Well, let me take a look at it.  I

15 thought this was a case -- "where the retail rates were

16 publicly posted prior to engaging in a transaction."

17 And maybe yours is similar.  But hold on just a second.

18       (Pause.)

19       THE COURT:  Well --

20       MR. RUDMAN:  Judge, it's similar in this

21 sense, if you please.

22       THE COURT:  Go ahead.

23       MR. RUDMAN:  Their whole pitch, that we just

24 read to you, is it's outside the interbank rates, and

25 the interbank rates are very public.

```
 1              THE COURT:  How do I know that from the
 2     complaint?
 3              MR. RUDMAN:  Well, you know it from the
 4     paragraph I just read to you in terms of how much they
 5     know about, um, what they were being overcharged.  And
 6     if I could -- if I could, I'd direct your attention to
 7     Paragraph 36 of the complaint, "Every time, um, ARTS" --
 8              THE COURT:  Just one second.
 9              (Pause.)
10              THE COURT:  Go ahead.  Paragraph 36?
11              MR. RUDMAN:  Paragraph 36.  And then I'm going
12     to direct your attention to Paragraph 62 and a couple of
13     other paragraphs.  I'm looking now, if you please, sir,
14     at the third bullet point in the second half of the
15     chalk I handed to you at the beginning, because I've
16     tried to anticipate, as best I could, the "Where do I
17     find this in the complaint?" question.  Okay?
18         The language I'm directing your attention to is:
19     "Every time ATRS or its IM has negotiated direct FX
20     rates, they have access to interbank market rates
21     through services such as EDS and Reuters and could see
22     the extent to which they were paying more than interbank
23     participants were paying."  That's Paragraph 36.
24              THE COURT:  Okay.  (Reads.)  That's not what
25     Paragraph 36 says.  Is that the way you characterized
```

1    this?

2           MR. RUDMAN:  That's what is the reasonable --

3    and I did not mean to say it was a quote.

4           THE COURT:  Oh, all right.

5           MR. RUDMAN:  And it doesn't appear in quotes

6    on my chart.  What it is is a reference to what is a

7    reasonable inference to draw from Paragraph 36.  And if

8    you please, your Honor, I just read to you, I think,

9    from Paragraph 73 how specific, how particularized their

10   knowledge was.

11       The other thing I would say to you is that if you

12   look at the *Lucky Money* case, *Lucky Money* says:  "There

13   is no statutory obligation to disclose the rate at which

14   the bank purchases foreign currency or disclosed its

15   profit on the FX spread."  The Court also noted that

16   *Lucky Money* --

17          THE COURT:  Wait.  Wait.  I know you feel

18   you're on a roll, but you want me to read this.  I'm

19   looking -- are you able to tell me which page?  No.

20   You're reading from your brief?

21          MR. RUDMAN:  I was reading, your Honor, from

22   my notes.

23          MR. HORNSTINE:  Your Honor, the page in which

24   the quotations appear are Pages 1397 and 1398, cited to

25   the Cal App. 4th version.

1          THE COURT:  1397 and 1398.  Here, hold on a
2     second.
3          (Pause.)
4          THE COURT:  All right.  Well, the fact that
5     there's no statutory obligation in California, um,
6     doesn't really go to the fiduciary duty analysis under
7     *Patsos* in Massachusetts law.
8          MR. RUDMAN:  If I -- a couple of points on
9     that.  The Court also noted that "*Lucky Money* owed no
10    fiduciary duties to customers in a purely commercial
11    transaction."  And that is at page -- it's at
12    paragraph -- at Page 1398.
13         THE COURT:  But is *Lucky Money* California
14    law?
15         MR. RUDMAN:  It is California law.
16         THE COURT:  You're in Massachusetts.
17         MR. RUDMAN:  Well, or -- but let me talk to
18    you -- if the issue is to match up the California law on
19    consumer protection, which is what law --
20         THE COURT:  Here, why don't we do this.  I
21    have to -- it's conceivable that some claims would
22    survive somewhere.  I started where you started, in your
23    briefs, at fiduciary duties.  You know, *Patsos* tells me
24    -- you tell me you weren't acting as a custodian --
25         MR. RUDMAN:  Well, I didn't say --

1      THE COURT:  I didn't finish.  I don't want to

2   argue with you, I want to expose my thinking, so you can

3   address it.

4      MR. RUDMAN:  Okay.

5      THE COURT:  You've argued that you weren't

6   acting as a custodian, if I understand it right, and

7   that's why that fee schedule is irrelevant.  State

8   Street was acting as a broker.  I read **Patsos** to say

9   that even when you have no discretion, you have, um,

10  transactional fiduciary duties.

11     MR. RUDMAN:  If you're an agent broker.

12     THE COURT:  Well, let's look and see where

13  that is.

14     MR. RUDMAN:  This is very -- your Honor, the

15  word "broker" embraces a multiplicity of sins and

16  commissions.  We are a principal broker.  It is

17  inconceivable that we owe these folks a fiduciary duty.

18     THE COURT:  It's inconceivable?

19     MR. RUDMAN:  And implausible.

20     THE COURT:  Where does -- where does **Patsos**

21  make the distinction you're arguing?

22     MR. RUDMAN:  I'm looking now -- I do know that

23  the broker in **Patsos** was.  You could tell from the

24  text.  Yeah, here:  "Courts in other states have not" --

25     THE COURT:  Where are you reading?

```
 1            MR. RUDMAN:  I'm so sorry.  I'm reading from
 2    Page 849, just at the bottom of 848, possibly.
 3            THE COURT:  Okay.  Go ahead.
 4            MR. RUDMAN:  "Courts in other states have not
 5    been of a single mind whether fiduciary duties adhere in
 6    every relationship between a stockbroker and his
 7    customers.  Some had suggested the resolution I'm
 8    questioning turns on whether the brokers and customers
 9    deal at an arm's length," and then it goes on and on and
10    on.  Then it says:  "There was a general agreement,
11    however, that the scope of the stockbroker's fiduciary
12    duty is a factual issue that turns on the manner in
13    which investment decisions have been reached out and
14    transactions executed for the account and some have
15    suggested that the resolution of that question turns on
16    whether the broker and the customer dealt at arm's
17    length."  Here it's much better --
18            THE COURT:  You didn't keep reading.
19            MR. RUDMAN:  I'm sorry?
20            THE COURT:  No, then go down to 9 and 10.  It
21    says:  "In determining the scope of a broker's fiduciary
22    obligations, courts typically look to the degree of
23    discretion a customer entrusts to his broker.  Where the
24    account is nondiscretionary, meaning the customer makes
25    the investment decision and the stockbroker merely
```

1   receives and executes a customer's order, the

2   relationship does not -- the relationship generally does

3   not give rise to a general fiduciary duty."  Okay.

4   That's where I started.  But then if you go to the next

5   page, it says:  "For nondiscretionary accounts, each

6   transaction is viewed singularly, the broker is bound to

7   act in the customer's interest when transacting business

8   for the account and that all duties for the customer

9   cease when the transaction is closed."  And underneath

10  there's Footnote 15 here.  Let's see where that came

11  in.  They talk about the Court suggested that "duties

12  associated with a nondiscretionary account include the

13  duty to refrain from self-dealing or refusing to

14  disclose any personal interest the broker may have in

15  the particular recommended security," and then the one I

16  focused on at the outset, "the duty not to misrepresent

17  any fact material to the transaction."

18              MR. RUDMAN:  First -- oh, I'm sorry.

19              THE COURT:  And I thought that, in this

20  context, an omission could be a misrepresentation.

21              MR. RUDMAN:  First, there is -- there's no

22  misrepresentation, we disclose on the cost.  Second, and

23  much more important, *Patsos* is about a stockbroker.  In

24  this case the client, Arkansas, has dozens of

25  stockbrokers, dozens of advisors advising him.

1  Generally speaking, we get our orders from the one

2  person who does owe him a fiduciary duty, which is their

3  own broker, maybe.  We are a principal broker.  We just

4  do not owe these folks a fiduciary duty and there is no

5  language of fiduciary obligation anywhere in the

6  contract.

7             THE COURT:  Here, let me ask you this, since

8  the plaintiff hasn't had a chance to argue yet.

9       Is there anything important you haven't said yet?

10            MR. RUDMAN:  I don't think we focused hard

11  enough on *Gossels.*  I'd be pleased to submit --

12            THE COURT:  No, go ahead.  Go ahead.

13            MR. RUDMAN:  Could I turn to *Gossels*?  First

14  of all, the bidding they asked here is really whether

15  there should be a claim for treble damages under Section

16  9 as opposed to just an institutional business-to-

17  business claim?

18            THE COURT:  okay.  What's the difference

19  between 9 and 11, the treble damages?

20            MR. RUDMAN:  The treble damages is the key

21  difference.

22            THE COURT:  Yeah.  Go ahead.

23            MR. RUDMAN:  And the important thing, your

24  Honor --

25            THE COURT:  And, you know, one thing to keep

1  in mind, as a practical thing --

2            MR. RUDMAN:  Yes, sir.

3            THE COURT:  -- even when there's a violation

4  of Section 9, it's unusual to get multiple damages.  I

5  mean, people come in -- I think many lawyers, when they

6  bring these cases, they think "If I win a 93A claim,

7  I'll get multiple damages."  The last time I had to look

8  at this closely, um, there was a pretty high burden to

9  get more than actual damages.

10           MR. RUDMAN:  Yes.  But the point I would make

11  to you is the SJC has spoken on this topic.  Okay?  And

12  could I just describe for you the *Gossels* case with some

13  level of particularity?

14           THE COURT:  Yes.

15           MR. RUDMAN:  Please keep in mind the plaintiff

16  knew full well that State Street makes money on direct

17  or negotiated FX and its Investment Managers voluntarily

18  choose to pay a margin on the trades that they do

19  directly.  So in this context how can it be

20  unconscionable for State Street to make money on

21  indirect trades?  As I'm trying to show you, there's no

22  representation that all these indirect trades are on the

23  house while all the FX trades or the direct trades are

24  charged for.

25           So what is the 93A claim all about?  Plaintiff is

1    not really saying that charging 18 one hundredths of 1

2    percent of more than a wholesale rate is necessarily

3    unfair.  How do you say such a miniscule profit margin

4    could possibly be unfair?  What the plaintiff is saying

5    is that any departure from the interbank rate is unfair

6    even though it has no right, no reason to expect that it

7    will be afforded the interbank rate.  The plaintiff then

8    says:  "Also, though, it's unfair to hide this

9    microscopic profit."  As I've showed you, I think from

10   Paragraph 73, and I forget now, there's nothing hidden

11   about it, that these plaintiffs knew what they were

12   getting.

13        Plaintiff alleges somehow it was unfair for State

14   Street, someone with business of buying and selling

15   currency for its own account, to make a profit on FX.

16   Again, any trade that wasn't done for free or any trade

17   done at the unconscionable markup of 0.18 -- 18

18   hundredths of 1 percent, was just wrong.  And if you

19   look at the facts in *Gossels*, that poor man gets a check

20   for reparations from the Nazi government or from people

21   who are compensating victims of the Nazis.  It's

22   enormous.  There's no way he necessarily would have

23   known what he was overcharged.  That's just not, not,

24   not the way the world works here.

25        And Judge Easterbrook, who is the most eloquent

```
 1    judge, I think, on this topic says that:  "Failure to
 2    disclose the precise difference between wholesale and
 3    retail prices of foreign currency is an ordinary
 4    business practice and there is nothing fraudulent about
 5    adding such a markup."  And in any event -- and in any
 6    event, these plaintiffs say to you, in a sort of a
 7    groveling way, "You should give us a break.  We're a
 8    charity.  We're entitled to the most expansive reading
 9    of 93A."
10              THE COURT:  Well, they're not going to --
11    whether they're a charity, um, according to Judge
12    Saris's thoughtful framework, is relevant to whether
13    Section 9 or Section 11 applies, but once it's
14    determined which applies -- and I actually didn't think
15    it was going to be essential for today's purposes, um,
16    but they don't get a break because they're a charity,
17    the law -- the law applies equally to everybody.
18              MR. RUDMAN:  Yeah, but if I may?  In Judge
19    Saris's case she found that the Taft-Hartley plans
20    weren't seeking to make money.  If you look at 93A, they
21    talk about "transactions" and "commodities."  Currency
22    is just a commodity.  These people were engaged in a
23    heartland -- a heartland of currency transactions to
24    make money and they're fighting about a trivial spread.
25              A last point and then I'll cede the microphone, if
```

```
 1  I may?
 2        Do you know with whom Arkansas is doing its FX
 3  trading today?
 4              THE COURT:  Is it in the complaint?
 5              MR. RUDMAN:  Nope.
 6              THE COURT:  Then why should I know, for
 7  present purposes?
 8              MR. RUDMAN:  Because --
 9              THE COURT:  Oh, because they're doing it with
10  you?
11              MR. RUDMAN:  Correct.
12              THE COURT:  And so they wouldn't and so it
13  shows no reliance, you say.  But it's not in the
14  complaint.
15              MR. RUDMAN:  But there's nothing that stops
16  you from asking them, if you please.
17              THE COURT:  Well, no, there is, the rules.  I
18  have to decide the case based on the allegations and the
19  reasonable inferences.
20        You know, if we were at summary judgment, you
21  could add that evidence and, you know, they -- if they
22  prevail today maybe they've achieved an expensive
23  pyrrhic victory.
24              MR. RUDMAN:  Well, what they've done is
25  foisted upon us the burden of showing you fairly soon
```

Case 1:11-cv-10230-MLW Document 401-44 Filed 07/23/18 Page 51 of 104
Case 1:11-cv-10230-MLW Document 404 Filed 05/17/21 Page 51 of 103

50

1    that there is no way this case is maintainable as a

2    class or at least I would be hard-pressed to believe

3    it's maintainable as a class.

4              THE COURT:  The -- that question has occurred

5    to me, but I haven't -- but that's not where we are now.

6              MR. RUDMAN:  So let me close with three --

7              THE COURT:  And it's not a class action at the

8    moment.

9              MR. RUDMAN:  No, it's not.

10             THE COURT:  You know, if you ever -- after I

11   decide the motion to dismiss, if the case is not gone,

12   um, then we'll talk about a schedule and the schedule

13   will include time for you to talk about whether you want

14   to settle the case the way -- because, you know, here

15   you've got a customer who pays you $900,000 a year, and

16   State Street's probably paying Wilmer Hale more than

17   that, and it can't be great business to be litigating

18   your big customers.

19             MR. RUDMAN:  No, it's not great business.

20             THE COURT:  But you're totally entitled to get

21   a ruling on whether this case survives this stage.

22             MR. RUDMAN:  Could we do this, if you please?

23   Could we, one, submit to you some case law on a

24   principal broker's duties?

25             THE COURT:  No.  No.  No.  I'm going to decide

1    the matter today.

2          MR. RUDMAN:  All right.  Thank you, your

3    Honor.

4          THE COURT:  Okay.

5          MR. GOLDSMITH:  Good afternoon, your Honor.

6    David Goldsmith, Labaton Sucharow, for the plaintiff,

7    Arkansas Fund, and the class.  Mr. Rudman made quite a

8    number of points and I will do my utmost to respond to

9    them all.  And as the Court wishes, if you would like me

10   to respond in any particular order, I'm happy to do

11   that.  But I will proceed.

12         The concept of free FX, I think, your Honor, is a

13   little bit misleading.  Arkansas never thought that the

14   standing instruction trades, that the Custody FX trades,

15   "Custody FX" being their brand name, would be free.

16   Arkansas paid hundreds of thousands of dollars a year

17   for a suite of services pursuant to the custodial

18   contracts.  Arkansas understood that Custody FX would be

19   included in that suite of services.  It's called

20   "Custody FX" for a reason.

21         State Street marketed this service to custodial

22   clients and only its custodial clients, um, intimated

23   that it would save time and effort under the guise of a

24   fiduciary, we would argue, and there was never any sense

25   that it would just be free and on the house, there was a

```
 1    lot of money paid.  Arkansas, as your Honor indicated,
 2    is not a charity, it's a public pension fund.  It paid
 3    hundreds of thousands of dollars a year out of their
 4    accounts in order to have these services.
 5          There's a distinction, your Honor, between the
 6    negotiated trades and the standing instruction or
 7    Custody FX trades.  Defense counsel makes a very big
 8    point that if you knew that you were paying 3.6 basis
 9    points on the negotiated trades, then how could you
10    possibly think that you weren't paying on the -- on the
11    standing instruction trades?  Well, there's a number of
12    reasons why we believe that we get the best and most
13    competitive rate.  The contracts -- the custody
14    contracts supported that, your Honor, with the fee
15    schedules and the like --
16          THE COURT:  You'd get the best and most
17    competitive rate on what?
18          MR. GOLDSMITH:  The best and most
19    competitive.  You'd get the same rate, your Honor, that
20    State Street got when it transacted.  So there would not
21    be a spread in which State Street would be making money
22    because every penny of that spread, your Honor, because
23    of the nature of the transaction, comes directly out of
24    the pocket of Arkansas and all of the other custodial
25    clients.
```

1          THE COURT:  But if -- I'm sorry.  You said you

2    knew that you were paying some rate on the negotiated

3    trades?

4          MR. GOLDSMITH:  Some very small reasonable

5    markup because you were -- because the traders were

6    literally on the phone with each other.  You had equal

7    bargaining power and you had transparency.  Those two

8    elements, your Honor, were missing in the Custody FX

9    scheme and that's how State Street was able to take

10   advantage of that imbalance of information and imbalance

11   of power in order to reap these ill-gotten gainful --

12         THE COURT:  In the standard --

13         MR. GOLDSMITH:  In the standing instructions.

14         THE COURT:  In the standing instructions.

15         MR. GOLDSMITH:  On the standing instructions,

16   right.

17      This case is really not about the negotiated

18   trades, your Honor, except that it shows the tremendous

19   disparity in the markups that were applied on both.  You

20   have 3.6 basis points, a small markup.  You have a

21   sophisticated IM calling another sophisticated

22   institution, a bank perhaps.  They would get on the

23   phone, dicker with one another with live -- or -- and

24   there would be a confirmation a short time thereafter

25   and they would come to an agreement on this small

 1   markup.  That was considered to be a reasonable amount

 2   of money on a negotiated transaction.  It could be a

 3   very large transaction, it could be a smaller

 4   transaction, we don't know.

 5        On the standing instruction trades, you had a huge

 6   markup and our analysis, which by the way could not have

 7   been done reasonably at the time or during the class

 8   period, it was done obviously by a consultant that our

 9   client hired in order to do that.  You have an enormous

10   disparity.  You have 17.6 percent, um, in terms of the

11   standing instruction -- excuse me, the basis points on

12   the standing instruction trades.  So State Street

13   charged five times as much on the standing instruction

14   trades as they did for the negotiated trades.  And when

15   you isolate those trades, your Honor, that were outside

16   the interbank range of the day, you had a 64 basis

17   point, um, average deviation.  So 18 times.

18        Now, why was it reasonable for State Street to

19   charge 18 times as much on the Custody FX trades?  When

20   Arkansas would call State Street on the phone and have a

21   trade, you'd have on average a 3.6 basis point, um,

22   markup.  Arkansas -- it was reasonable for Arkansas to

23   believe that they would do no worse, at least with the

24   Custody FX trades as with the, um, negotiated trades.

25   You have a custody contract that has a large annual fee,

1    it has provisions that involve, in black and white, the

2    purchase and sale of foreign exchange, and that any

3    compensation, your Honor, is limited to what's in the

4    fee schedules and the fee schedules, as your Honor

5    noted, say "no charge."  And there could be differences

6    with the processing and the like and we can go back and

7    forth on that, but as your Honor --

8              THE COURT:  Oh, I'm sorry.  Go ahead.

9              MR. GOLDSMITH:  But any ambiguity on that,

10   your Honor, means that there has to be discovery.

11             THE COURT:  I mean, that -- is it your

12   argument that the contracts referring to the fee

13   schedule, um, meant that for the standing instruction

14   trades there would be no specific or additional

15   compensation to State Street because that is something

16   that was covered by the custodial fee generally?

17             MR. GOLDSMITH:  Correct, your Honor.  The

18   Custody FX service, we allege, was part of the custodial

19   relationship.  The custodial relationship involved a

20   number of things, a number of services, a number of

21   activities, and Arkansas paid a lot of money every year

22   in order to have it.  And if they wanted to have an

23   additional fee, that should have been disclosed.  It was

24   not.

25        The Investment Manager Guides, the IM Guides,

```
 1    there were many of them published during the class

 2    period before November of 2009.  It assured that, um, FX

 3    trades would be priced based on the market rates at the

 4    time the trade is executed.  So -- and that didn't

 5    happen with the standing instruction trades.  And we now

 6    know, because of the November 2009 IM Guide, which came

 7    out just before the end of the class period, that their

 8    methodologies were nowhere in the realm of pricing the

 9    trades based on market rates at the time the trades were

10    executed.  We will prove that --

11             THE COURT:  Just so I understand it --

12             MR. GOLDSMITH:  Sure.

13             THE COURT:  Are the Investment Manager Guides

14    -- you say are guides that were given to people like

15    Arkansas Teacher so that they could give it to their

16    investment advisors?

17             MR. GOLDSMITH:  I believe that's correct, your

18    Honor.  They were -- at a minimum, they were published

19    and given to all the Investment Managers.

20             THE COURT:  Who are the Investment Managers?

21             MR. GOLDSMITH:  The Investment Managers are

22    these --

23             THE COURT:  Is that like Wellington and --

24             MR. GOLDSMITH:  Yes, sir, like Wellington and

25    so --
```

```
 1              THE COURT:  So they weren't State Street
 2    employees?
 3              MR. GOLDSMITH:  No.  No.  No, sir.
 4              THE COURT:  That's what I'm trying to get at.
 5              MR. GOLDSMITH:  No, sir.  Arkansas did not --
 6    like most pension funds, Arkansas did not manage their
 7    accounts themselves.  That's not their wheelhouse.  Um,
 8    Mr. Hopkins does not sit there every day looking for
 9    stocks to pick and stocks to sell, he has other things
10    on his plate.  So Arkansas, like most other pension
11    funds -- and I want to say all other public pension
12    funds, hires a number of Investment Managers, has an
13    agreement with them where they can trade -- they have
14    control over their accounts and they can trade on their
15    behalf.  Arkansas did no internal, um, securities
16    trading.  And so all the talk about sophistication, I
17    think the context for that is important, your Honor,
18    because Arkansas is not an FX trader, Arkansas relied
19    and trusted State Street to handle these services
20    properly.
21         Arkansas gave $9 billion -- put $9 billion in the
22    custody of State Street.  I mean, one cannot -- I think
23    one can't say that you don't have any kind of
24    expectation of trust or confidence when you put $9
25    billion of public school teacher money with such a large
```

1   institution as State Street.  You know, this isn't

2   someone walking off the street into the, um -- into the

3   Western Union, your Honor, or the money transmitter, or

4   the Logan Airport currency exchange kiosk, and that is

5   what **Gossels** and **McCann** and **Mexico Money** are all about.

6   And I'd like to address those three cases because I

7   think those three cases are important and Mr. Rudman, I

8   thought, you know, appropriately had a chance to discuss

9   those and I'd like to discuss those now.

10         **Gossels**, your Honor -- here's what happens in

11  **Gossels**.  So State Street argues that **Gossels** stands for

12  this sort of hard-and-fast rule that a bank is entitled

13  to charge a markup on an FX trade to make a profit

14  without any disclosure.  Your Honor, it does not stand

15  for that proposition at all.  The reason the bank -- a

16  Fleet Bank prevailed on a 93A claim was because there

17  was actually no markup applied in that case and there

18  was no disclosure issue or no disclosure defect in that

19  case.

20         As your Honor noted, first of all, that case was

21  decided on a full evidentiary record after a bench

22  trial, and that fact is important here, not a motion to

23  dismiss.  And with regard to the markup, what happened

24  was Deutsche Bank, which was a German bank that was able

25  to handle the euros check that Mr. Gossels received, all

1    Deutsche Bank did was to transfer euros to Fleet Bank

2    after deducting a small euro transaction fee and then

3    Fleet Bank, your Honor, converted the euros to dollars

4    using a retail rate.  And so it's not the case that

5    Fleet bought euros at one rate and then sold the euros

6    to Mr. Gossels at a different rate and pocketed the

7    difference without disclosing.  There was no markup --

8    there was no markup there.  It may be true that Fleet,

9    your Honor, could have received a lower rate from

10   Deutsche Bank had it purchased the euros from that bank,

11   but that just didn't happen there.  So all records show

12   that there was no markup at all, let alone an excessive

13   markup, which we allege, your Honor.

14        Now, **Gossels** argued that the retail rates were

15   hidden.  It came out in the record -- it came out that,

16   um -- excuse me.  The SJC decided that the appellate

17   court made a mistake and didn't see in the evidentiary

18   record that there was a telephone line, um, where that

19   information could be provided.

20        So here, though -- so you don't have a disclosure

21   and you don't have a markup.  Here it's the reverse.

22   You have huge undisclosed markups and you don't have any

23   disclosure of that fact, of rates, markups, until

24   November of 2009, by State Street.  So --

25             THE COURT:  I'm sorry.  Until when?

1          MR. GOLDSMITH:  November of 2009.

2          THE COURT:  That's after the California

3    litigation?

4          MR. GOLDSMITH:  Right.  That's correct, your

5    Honor.

6          So after the -- so in October of 2009, California

7    somehow figured this all out and they sued and the

8    Attorney General of California -- and it was then, I

9    think, Mr. Brown, um, filed a case and it was unsealed

10   and just a few weeks later State Street filed a new-and-

11   improved Investment Manager Guide that contained a

12   wealth of new facts and new disclosures and new

13   explanations that it never ever provided before to

14   anyone about, "Oh, don't worry, Arkansas, or other

15   custodial clients, this is how we do it," and they

16   finally explained their methodologies.  And for the very

17   first time, your Honor, they say, "By the way, we're

18   principals, so you don't have any kind of expectation of

19   fiduciary duty from us."  "By the way, we're a

20   principal, we're not who you think we are."  So that's

21   essentially -- it's essentially what happened here.  And

22   then they draw these distinctions between State Street

23   Bank and State Street Global Markets and say, "Wait a

24   second, it's not State Street Bank that's the custodian,

25   it's actually State Street Global Markets that executes

1    the trades," and basically they do this huge, you know,

2    scrambling and backing and filling, as we allege, after

3    the -- after the, um, the California complaint comes

4    out.  And then, your Honor, they decide to -- they

5    decide finally to disclose all the markups and all the

6    markdowns on a website.

7         And low and behold, in 2010, the next year, it

8    turns out -- and there was a study that was commissioned

9    on this business, that trading costs on standing

10   instruction trades went down by 63 percent.

11              THE COURT:  Is that in the complaint?

12              MR. GOLDSMITH:  Yes, sir.  It is, sir.  Um,

13   and you can see -- and so what you can see is that it

14   must be that the markups were reduced.

15        And one thing that's interesting, your Honor, is

16   that Judge Easterbrook, in the *Mexico Money* case, noted

17   that one of the -- part of the, um, relief that was

18   granted -- that was agreed to in that settlement was

19   that -- um, was that the Mexico Money company agreed to

20   disclose the FX spreads, it agreed to disclose to

21   customers what was -- how it was making money off of

22   those FX spreads, and Judge Easterbrook himself noted

23   that such disclosure would promote competition that

24   would narrow the spreads.  He said, "That's not an

25   outcome to be sneered at."  And that's exactly what

1    happened here.  As you know, for State Street, however,

2    they didn't do it voluntarily, they were forced by

3    California -- by the litigation, your Honor, to disclose

4    the markups and trading losses dropped significantly

5    there as a result.

6         Now, *McCann* concerned the profit made by money

7    transmitters, the same basic factual scenario as *Mexico*

8    *Money*.  So all the court in *McCann* did, your Honor, was

9    just simply follow the quite sweeping factual assertions

10   by Judge Easterbrook in *Mexico Money* that were not based

11   on a record, and I think as your Honor suggested it was

12   based on the learned judge's own sense of how the market

13   works.  That's not -- those assertions --

14             THE COURT:  I'm not so learned.  I mean, I

15   just don't -- I don't think I know.  When I'm in court I

16   usually know things based on what I'm taught by the

17   lawyers and the experts and the witnesses.  We don't

18   have that at this stage yet.

19             MR. GOLDSMITH:  Well, that's right, your

20   Honor.  As the Court has said, there's no basis to

21   accept any of that today, and we would dispute it

22   anyway.

23        And what I would like to mention about *McCann*,

24   your Honor, and I think it's very important, is that the

25   plaintiffs there -- and I believe counsel for the

```
 1    defendants here mentioned this, is they sort of claim it
 2    under the California Unfair Competition Law, which is
 3    similar to the Chapter 93A issue, your Honor, and that
 4    claim was dismissed.
 5              Here, however, in a case, um -- in a case called
 6    *Local 39 vs. Bank of New York*, there were reasons --
 7    yeah, it's part of our submissions, your Honor.
 8              THE COURT:  Okay, then I'll get it.  I have it
 9    here.  I just haven't read it.
10              (Pause.)
11              MR. GOLDSMITH:  Hold on, your Honor.
12              THE COURT:  What's it called?
13              MR. GOLDSMITH:  It's called -- well, I'll give
14    the short name.  It's called -- it's got a long pension
15    --
16              THE COURT:  Yeah, what's the first name?
17              MR. GOLDSMITH:  *International Union of
18    Operating Engineers*.
19              THE COURT:  Okay.
20              MR. GOLDSMITH:  *vs. the Bank of New York,
21    Mellon Corporation*.
22              THE COURT:  I have it.
23              MR. GOLDSMITH:  Yes, sir.  Okay.  We submitted
24    this as supplemental authority, but this case actually
25    was litigated by my able colleague, Mr. Chiplock.
```

1          This is a very recent decision, um, denying a

2    motion to dismiss and this is a decision by Judge Alsup

3    in San Francisco, um, and the case is against Bank of

4    New York alleging, really for all intents and purposes,

5    the same FX pricing scheme, um, the same, um, alleged

6    unfair deceptive practices that we allege here.

7          And what happened there, in **McCann**, your Honor, is

8    that the court there upheld a California Unfair

9    Competition Law claim based on those allegations, which

10   are really quite analogous to our allegations here.  The

11   Court said a number of things.  The Court said that any

12   supposed convenience of standing instruction FX trading

13   was outweighed by the enormous financial cost of those

14   trades and a loss of trust between the bank and their

15   custodial clients.  That happened here.  We allege the

16   same thing.  Judge Alsup also noted there that the bank

17   was misrepresenting the FX trades at which the bank was

18   transacting.  And here we allege that the rates that

19   were, um -- that were, um, disclosed to the Arkansas

20   Fund and other custodial clients, in periodic

21   statements, um, that they hid the very substantial

22   embedded, um -- they concealed the very substantial

23   markups that were undisclosed and were at variance with

24   the representations made in the contracts and the IM

25   Guides.

1       So in **McCann** and **Mexico Money** and **Gossels**, you

2    know, there were no misrepresentations, there were no

3    disclosure problems that might have set those cases on a

4    different course.  Here you have a deception, um, that

5    is -- that is -- that would take this case really away

6    from those three.  You know, there the defendants

7    essentially there did what they said they would.  Um,

8    here, we allege that they did not.

9       Now, one other point that was made was the

10   publicly-available nature, apparently, of interbank

11   rates and the defendants argue that you knew the whole

12   time that whenever you got a rate, that it was outside

13   the range because you could have looked at any point.

14   That again is a pure factual assertion that,

15   respectfully, can't be credited today.  And the

16   defendants, in fact, have said a number of times in

17   their submissions -- and we don't dispute this

18   particular assertion, that there is no single interbank

19   rate for a given currency at any time.  The FX market

20   simply is not as integrated as say the equity markets

21   where you always know what the price of any stock is at

22   any, you know, closing date.  You don't have the kind of

23   ability to look up rates as a fait accompli in that

24   way.  And the analysis that we did was based not on, um,

25   interbank rates that were looked up on Bloomberg and

1 Reuters -- which usually charge fees, by the way, for

2 that access, but by a consultant with a proprietary

3 database who has experience in the FX markets, has a

4 proprietary database of more than 2 million trades, and

5 that was the source which of course was done in

6 preparation for the complaint and not done at the same

7 time.

8   So the -- and I think there's a problem with the

9 argument that Arkansas could have looked at the same

10 time.  We allege that State Street was -- we allege that

11 State Street and Arkansas had a -- they had a

12 relationship of trust and confidence and State Street --

13 and I think it's quite improper for State Street to kind

14 of turn the tables on their clients and say "You should

15 have known what we were doing because every time you got

16 a monthly statement that was this big and had hundreds

17 and hundreds of lines in the copy, you should have taken

18 that statement, you should have walked over to the

19 computer terminal and spent your entire day trying to

20 figure out the numbers and so forth."  So I think the

21 argument should be taken in that context.

22   And not all of the trades, your Honor, were done

23 outside the range of the day.  For trades that were done

24 within the range of the day, and what happened actually

25 as we learned from --

1              THE COURT:  What's the range of the day?

2              MR. GOLDSMITH:  Oh, I'm sorry, your Honor.

3    "Range of the day" is the interbank range of the day.

4    So you have a high or low every day.  And what our

5    analysis -- one thing our analysis shows, as alleged in

6    the complaint, is that more than half of the standing

7    instruction trades that were taken, um, on behalf of

8    Arkansas, went outside the range of the day.  We use

9    that undisputed fact to show the enormous disparity in

10   the markups and to show how there was no relationship at

11   all between those trades and those interbank market

12   rates.

13        Now, State Street says, "Well, that's meaningless,

14   you're Arkansas, you're not the Bank of England, you're

15   not entitled to interbank rates as a matter of course.

16   And that might be correct, that they might not be

17   entitled to interbank rates for every trade as a matter

18   of course, but there's nothing to say that if you have a

19   trade at a price at one point within the interbank range

20   of the day, you can have a reasonable markup and still

21   be within the interbank range of the day.  But it simply

22   does not follow that you can blow-out the range, to use

23   a colloquialism, and constantly charge Arkansas a huge,

24   average 64.4, um, percent -- excuse me, basis point

25   markup on all of those trades.

1      And there's no basis -- Arkansas was not a small

2    client, Arkansas traded on standing instructions alone

3    approximately $420 million a year on average.  This is

4    not someone walking up to the kiosk, this is not someone

5    transmitting money, this is a lot of money at stake.

6    And to go outside the range on a regular basis, more

7    than half the time, without disclosure, we allege, your

8    Honor, that that's unfair and unsettling.

9      And there was never any disclosure, in particular,

10   that State Street was acting as a fiduciary.  And we

11   don't know how -- as a principal.  As a principal.  I

12   apologize.

13         THE COURT:  This distinction is not obvious to

14   me.  What's the difference between an agent and a

15   principal in this context?

16         MR. GOLDSMITH:  As I understand it, your

17   Honor, when State Street asserts that they were a

18   principal, it means that essentially they were at arm's

19   length --

20         THE COURT:  So they were -- I'm sorry.  Go

21   ahead.

22         MR. GOLDSMITH:  Yeah, and almost in

23   competition with the counterparty, with their client.

24   So they're saying, "Too bad, Arkansas, you should have

25   known that I was trying to make as much money off of you

1  as possible, and if you didn't know that, it's your

2  fault because you could have gone to some computer

3  terminal and looked up a whole bunch of code."  That's

4  really the argument here, your Honor, if I could just,

5  you know, say it like that.  And especially here at the

6  pleading stage, I respectfully suggest that that's an

7  argument you should not credit.

8          THE COURT:  But that would be a factual issue,

9  whether they were an agent or a principal, I suppose, at

10  best from your perspective.

11          MR. GOLDSMITH:  That's correct, your Honor, it

12  is a factual issue and there's a lot of issues that go

13  along with that.  And I'm no expert on the principal/

14  agent relationships.

15      But there's a question of who are they a principal

16  to, are they a principal to the Arkansas fund or are

17  they a principal to a counterparty when they bought from

18  the Bank of England at the interbank rate?  How did that

19  operate?  And even if they were a principal in terms of

20  execution, there's no license there, your Honor, to

21  price the trade however you want.  So just because

22  you're a principal doesn't mean, without disclosure,

23  that you can say, "Arkansas, I'm going to give you a

24  rate that's 18 times the usual, um, negotiated trade."

25  So it shows the disparity there.

1    And just on that, your Honor, defense counsel

2    talked about the markups being tiny and that there's no

3    spread and -- I'm sorry, he didn't say there's no

4    spread, he said the spread was narrow and that this is

5    .00008 percent.  Well, the 3.6 basis point average

6    markup on the negotiated trades, State Street was just

7    fine with that when they were doing negotiated trades.

8    So State Street is accepting of a markup on negotiated

9    trades of that basis point amount.

10    If you multiply that by 18, that's money.  The

11   average standing instruction trade, your Honor, and

12   defense counsel were talking about a "small fry" and

13   "small bore" and a "tiny lot" and all that stuff.  The

14   average standing instruction trade was $284,000.  That's

15   -- that's not nothing, even in a nonbillion dollar

16   fund.  It's actually a lot when you think of the fact

17   that a lot of the standing instruction trades --

18          THE COURT:  It's a lot more money than a

19   federal judge makes in a year.

20          MR. GOLDSMITH:  Sadly.

21    A lot of the standing instruction trades, your

22   Honor, were repatriations of dividend payments and

23   interest.  "Repatriation" simply means changing the

24   money back from foreign currency into the base currency

25   or U.S. dollars.  $284,000 is a substantial amount of

1    money.  You can't walk up to a Logan Airport currency

2    kiosk and change $284,000.  You can't walk into a Mexico

3    Money transfer service and try to remit $284,000, I

4    don't think.  If you take $10,000 out of the bank, they

5    have to report it to the federal government under the

6    Patriot Act.

7         So I think to try to suggest that these were tiny

8    trades that were -- you know, that require a lot of

9    energy and a lot of work for State Street that would

10    justify a high markup is simply not true.  In fact, I

11    would suggest, your Honor, that there was less work

12    involved in the Custody FX trades than there were in the

13    negotiated trades.  In negotiated trades, you have to

14    have a trader on the other end of the phone line, you

15    have to have overhead, you have salary, you have

16    benefits, you have to pay that person.

17         The Custody FX trade was highly automated.  They

18    referred, in the November 2009 Guide, to their -- the

19    dividend and interest, um, trades, as "automated."  They

20    used a computer.  So there's no operational distinction,

21    as we understand it, that would permit them to charge 18

22    times as much than -- on the standing instruction trades

23    than on the negotiated trades.

24         They talk about the plausibility.  So they argue

25    to your Honor that, "We knew we were, um -- that we were

```
 1    paying a minor markup on the negotiated trades," and so
 2    it's implausible that they didn't know that they were
 3    marking up standing instruction FX trades as well.  I
 4    suggest, your Honor, that one thing doesn't follow the
 5    other.  "Standing instruction" means you have a set
 6    procedure for pricing that was followed each time.
 7    Custody FX clients were led to believe that State Street
 8    profited from the overall custodial relationship.
 9    Custody FX was part of that relationship.  Negotiated
10    trades was a different animal with transparency and live
11    bargaining power.
12              THE COURT:  Well, why would you pay anything
13    for negotiated trades if you thought it was part of the
14    suite of services you got for free from your custodian?
15              MR. GOLDSMITH:  Well, our understanding -- and
16    again, your Honor, all of the trading that was done was
17    done by the Investment Managers.  They may have believed
18    that they could get a better rate in a negotiated trade
19    than a standing instruction trade because of a
20    relationship they had.
21              THE COURT:  How are they going to get better
22    than zero?
23              MR. GOLDSMITH:  I don't know if they knew.  I
24    think they were duped in the same way.  And there was an
25    assumption that we would do no worse with a negotiated
```

```
 1    trade.  So there's no reason to -- we had no reason to
 2    suspect that we would be gouged in a standing
 3    instruction trade relative to a negotiated trade where
 4    there were no additional sources.
 5         And the assertions about convenience and risk
 6    mitigation again are, um -- are facts that are rejected,
 7    um, that cannot be accepted for their truth, and
 8    frankly, you know, we disagree with those.
 9              THE COURT:  All right.
10              MR. GOLDSMITH:  The contracts.  I'm trying to
11    make sure I'm covering the waterfront, your Honor.
12              THE COURT:  Yeah, we've got about five more
13    minutes now and then I have to stop and perform some
14    Chief Judge duties for about an hour, so we won't finish
15    until after lunch.  But I hope we can finish your
16    argument shortly.
17              MR. GOLDSMITH:  I'll try.  I will do so, your
18    Honor.
19         The contracts.  Um, Section 2.6, your Honor,
20    states clearly that it authorized -- that State Street
21    was authorized, "upon receipt of proper instructions,
22    which may be standing instructions," and it says that in
23    black and white, "to pay out monies for the purchase and
24    sale of foreign exchange or foreign exchange contracts
25    for the account of the fund."  That embraces standing
```

1   instruction FX and it embraces it on its face and is not

2   simply a processing fee, but it embraces all the aspects

3   of a trade including the markup or markdown.  That is

4   Article 2 of the contract.  It lists the "duties of the

5   custodian with respect to property held by the

6   custodian," and that is one of the duties.  And as your

7   Honor has noted, the Section 4 of the contract limits

8   any compensation to, um -- to the written fee schedule.

9         And there's no argument here that these markups

10  and markdowns were not -- did not result in

11  compensation.  State Street had hundreds of millions of

12  dollars in FX revenue every year.

13        Now, the argument about the fee schedules, there's

14  a different way you can look at it, because in both of

15  the two fee schedules that your Honor has focused on

16  today, the first one and the last one, there was a

17  section of those, um -- of those fee schedules that

18  concerned transaction fees and those were transaction

19  fees for trades in -- of the securities of foreign

20  countries.  So it stands to reason that --

21             THE COURT:  Wait.  Tell me this again?  Which

22  exhibits are you looking at?

23             MR. GOLDSMITH:  Sure.  Um, Exhibit H.

24             THE COURT:  Okay, I have H.  Go ahead.

25             MR. GOLDSMITH:  So your Honor has seen on Page

1    3 the "No charge" language?

2                THE COURT:  Right.

3                MR. GOLDSMITH:  And the heading there says

4    "Other charges only if applicable."  But on Page 1 of

5    the document, there's a heading called "Transaction

6    Fees."

7                THE COURT:  Wait a minute.

8                (Pause.)

9                THE COURT:  Okay.

10               MR. GOLDSMITH:  And if the "No charge"

11   language, your Honor, referred solely to nominal

12   per-trade processing fees, then that provision

13   rationally should have been part of the "Transaction

14   Fees" category, which is about that, per-trade

15   processing fees, per-international trade processing

16   fees, rather than the "Other charges."  So it's by no

17   means clear.

18               THE COURT:  All right.

19               MR. GOLDSMITH:  The fiduciary duty point, your

20   Honor.  Your Honor mentioned the *Patsos* case.  We agree

21   that that's the leading case.

22               (Pause.)

23               MR. GOLDSMITH:  Sorry, Judge.  What the *Patsos*

24   case says, your Honor, is that there's -- that the

25   relationship between a financial institution and its

1    client, whether it's ordinary or fiduciary, is intensely

2    factual, it's not easily determined at the pleading

3    stage, and there's three principal considerations,

4    according to the SJC, in that case, the degree and

5    discretion of customer interest, the special level of

6    trust and confidence, and the disparity of the

7    relationship.  I would submit, your Honor, that this

8    case fits into those three considerations perfectly,

9    despite the assertions of principal and the fact that

10   State Street is not a stockbroker in the traditional

11   sense.

12        A custodian with $9 billion -- holding $9 billion

13   in trust, a State Street Bank and Trust Company -- not

14   just State Street Bank, a State Street Bank and Trust

15   Company.  State Street was in control of all aspects of

16   the Custody FX trades, your Honor, and that included the

17   timing and setting of rates.  Arkansas and other clients

18   placed their trust in State Street to do it right.

19        The methodology that was finally disclosed in

20   November of 2009 is consistent with that.  You have a

21   level of trust and confidence.  There's no question that

22   custodial clients repose trust and confidence.  State

23   Street had far superior knowledge.  And the complaint

24   alleges, quite clearly we think, an abuse of the

25   relationship that was occasioned by the disparity of

1    power and knowledge. You have an imbalance of

2    knowledge, you have a lack of transparency that is

3    distinct -- that is distinct from the negotiated trade

4    side, and we would argue, your Honor, that a fiduciary

5    relationship exists here or at least that we

6    sufficiently alleged that a fiduciary relationship

7    exists.

8              THE COURT: Well, this has become, in some

9    respects, more complicated rather than more clear

10   because of the extent that State Street argues that it

11   wasn't acting as a broker or agent for Arkansas, but it

12   was buying for its own account and selling, you know --

13   you were selling at some rate where you knew they were

14   enriching themselves. But that would be a factual issue

15   for --

16             MR. GOLDSMITH: They knew they were enriching

17   themselves, your Honor. We did not know.

18             THE COURT: Do you have much more?

19             MR. GOLDSMITH: I have one more point and I

20   appreciate the Court's time.

21             THE COURT: Sure. Go ahead.

22             MR. GOLDSMITH: Just on fiduciary duty. Very

23   quickly.

24        The custodial contract, it's been known that --

25   that it got set forth a reasonable care standard. Um,

the fiduciary relationship here is not dependent on the
language of the contract, it's based on the nature of
the relationship, and I think what's important to
mention is that State Street has insisted more than once
-- I believe it was Mr. Paine's argument, that the
custodial agreements have nothing to do with FX trade
executions, that that's totally a separate thing, and
that we can't rely on that.  So you can't say that --
that there's no fiduciary duty because a reasonable care
standard wasn't met.

     And unless the Court has any other questions?

          THE COURT:  No, I think we're going to stop
for now.  I want to take a look at some of these cases
more closely, but I'm not going to be able to do that
for about an hour.

     Why don't you come back at 2:15 and, in the
interim, I'd like you to confer on this issue of State
Street Global Markets, State Street Global Markets,
LLC.

     Do I understand correctly that it's the
defendants' position that State Street Global Markets
would be an appropriate defendant, but not LLC?

          MR. PAINE:  Um, well, what we'd be happy to
represent to the Court is that all of the FX trades that
were executed between anybody related to State Street

1    and Arkansas were executed by the State Street Global

2    Markets division of the bank.  So the only defendant is

3    State Street Bank and Trust Company.  State Street

4    Global Market, LLC is a subsidiary of the parent that

5    did not deal with Arkansas.

6                THE COURT:  All right.

7                MR. GOLDSMITH:  Your Honor, I'm more than

8    happy to confer and to work out any kind of scrivener's

9    error.  It sounds like a minor issue to me.

10               THE COURT:  Okay.  I mean, it sounds like, if

11   I understand it right, they're saying that Global --

12   that State Street Global Markets is not an independent

13   legal entity that's subject to suit, that if you sue

14   State Street Bank and Trust, that includes claims

15   arising out of the conduct of State Street Global

16   Markets.

17               MR. PAINE:  Correct.

18               THE COURT:  We'll talk about it.

19               MR. GOLDSMITH:  I understood.

20               MR. RUDMAN:  Your Honor, after lunch can I

21   have two minutes of rebuttal with respect to my friend's

22   commentary?

23               THE COURT:  Yeah, you can have two minutes.

24               MR. RUDMAN:  I can.

25               THE COURT:  All right.  I'll be back at 2:15

```
 1    or as soon thereafter as I'm ready for you.  The Court
 2    is in recess.
 3                 (Lunch recess, 1:00 p.m.)
 4                 (Resumed, 2:20 p.m.)
 5                 THE COURT:  Good afternoon.  Were you able to
 6    reach some agreement with regard to this State Street
 7    Global Markets issue?
 8                 MR. PAINE:  Yes.  We've agreed that State
 9    Street Global Markets, LLC should be dismissed without
10    prejudice.
11                 MR. GOLDSMITH:  If I could add just one minor
12    footnote to that, your Honor?
13        I believe that -- we did consult during the
14    break.  I believe Mr. Paine made representations to the
15    Court about whether State Street Global Markets, LLC had
16    any involvement in FX trading with respect to the
17    plaintiff, the Arkansas Fund, and we would ask for some
18    reassurance that that -- that the same is true with
19    regard to other custodial clients, um, of State Street
20    so that the members of the class, um, also would not
21    have -- or file any claims against that particular
22    entity.
23                 MR. PAINE:  It is a true statement that State
24    Street Global Markets, LLC has nothing to do with
25    indirect FX application and therefore nothing to do with
```

1    the trades at issue in the complaint either with

2    Arkansas or any other member of the putative class.

3              THE COURT:  All right.

4              MR. GOLDSMITH:  Thank you.

5              MR. FRANKLIN:  Okay.  So State Street Bank

6    Global Markets, LLC is dismissed without prejudice and

7    if something arises in the future, it just -- an

8    amendment required by justice will be permitted.

9         And we haven't discussed it.  I told you I don't

10   see a proper basis for keeping State Street Corporation

11   in the case under the Massachusetts standards alleged

12   by -- or stated in the *My Bread* decision, for example.

13   Okay?

14             MR. GOLDSMITH:  Understood.

15             THE COURT:  All right.

16        Mr. Rudman, you wanted two minutes?

17             MR. RUDMAN:  Very briefly.

18        First, your Honor, you've asked consistently and

19   fairly throughout oral argument, "Where is this in the

20   complaint?"  Did you ever hear from my friend where in

21   the complaint you found the allegation that State Street

22   accepted these fiduciary duties?  Where did you say we

23   were told that they were relying on us and we said,

24   "Yes, we understand that"?  All you were told is that a

25   principal dealer can be a fiduciary for this pension

```
 1    plan.  That's not even, if I may, close to right.
 2         You did hear, however, that State Street caused
 3    these IM guidelines to be distributed to the IMs who
 4    were working for Arkansas, in other words, the folks who
 5    really are the fiduciaries here, the folks who are the
 6    agents here.  And if you look at the Hornstine
 7    affidavit, Exhibit O, at Page 37, you will find the
 8    following language:  "FX transactions" -- now, this is a
 9    quote, not a paraphrase.  "FX transactions are priced
10    based on the market rates at the time the trade is
11    executed."  That's what happened here.  The trade -- the
12    prices were based -- based on the rates, they weren't
13    the rates.
14              THE COURT:  And at best that's -- I noticed
15    that, too, and anticipated that argument.  At best
16    that's ambiguous and potentially misleading because
17    somebody might misconstrue that to mean you're going to
18    get the rate, um -- the market rate at the time the
19    trade is executed.  But hold on a second.
20         That's O, right?
21              (Pause.)
22              THE COURT:  All right.  Well, I don't want to
23    use up your two minutes.
24              MR. RUDMAN:  No, all I was going to say is let
25    me suppose with you that therein lies the ambiguity.
```

1    What that means is that somebody at this pension plan

2    and across this class could have believed this pension

3    plan was to be treated as though it was the Bank of

4    England.  That's the implausibility that lies at the

5    heart of this case.

6         And if I may, Judge, and I'm going to sit down.

7    If I could appeal to your 18th century ways and the Tory

8    within, you ought to join with Dr. Johnson and say,

9    "Here, sir, incredulity must take a stand and this case,

10   which is so utterly implausible, should be dismissed."

11   Thank you, sir.

12              (Pause.)

13         THE COURT:  All right.  This is a case in some

14   respects -- which in some respects the argument has

15   complicated rather than clarified the analysis in my

16   mind, but my tentative view endures.

17         I am allowing the motion to dismiss the claim

18   against State Street Corporation, the parent of State

19   Street Bank and Trust, that the allegations are not

20   sufficient to state a plausible claim to pierce the

21   corporate veil.  The issue of the claims against State

22   Street Global Markets, LLC are being dismissed without

23   prejudice and pursuant to the agreement of the parties.

24   For the reasons I'll describe, I'm denying the motion to

25   dismiss any and all of the claims against State Street

1    Bank and Trust.

2         This is a case or a matter where the definition of

3    the question is decisive.  In denying the motion to

4    dismiss, I'm not making any prediction concerning the

5    merits of the claims or the likelihood that the

6    plaintiff will be able to prove any or all of them.

7    That's not, as the lawyers know, the judge's proper role

8    at this point.  Rather I'm required to take all of the

9    allegations of the complaint as true, draw all

10   reasonable inferences in the plaintiff's favor.

11        I may consider documents sufficiently referenced

12   in the complaint.  The documents that have been

13   submitted and can properly be considered and in fact

14   were submitted by the defendant include or are the

15   following.

16        One, the four custodian contracts between Arkansas

17   Teacher and State Street during the relevant period.

18   Two, seven fee schedules executed by Arkansas Teacher

19   and State Street during the relevant period which

20   governs State Street's fees for various custodial

21   banking and related services under the custodian

22   contracts, although what those services are is a matter

23   that's in dispute.  Three, examples of State Street

24   Investment Manager Guides which contain comprehensive

25   information about State Street's custody practices and

```
 1   services for Investment Managers and clients.  These

 2   documents are not disputed and are both essential to the

 3   plaintiff's claim and sufficiently referred to in the

 4   complaint to be considered on a motion to dismiss.

 5        I have to decide whether the plaintiff, with

 6   regard to each count essentially, has stated a plausible

 7   claim for relief.  This is the standard of *Iqbal* and

 8   *Bell Atlantic*.  It's a higher standard than was

 9   applicable previously.  Among other things, "bald

10   assertions, unsupportable conclusions are not

11   sufficient," as the First Circuit said in *In re

12   Citigroup*, 535 F.3d 45 at 52.  While a higher standard

13   than before *Bell Atlantic* and *Iqbal*, it's still a very

14   friendly standard to the plaintiff and it is the

15   standard I've applied in reaching my conclusions.

16        In this case the plaintiff, Arkansas Teacher

17   Retirement System, filed this putative class action

18   against defendants State Street Corporation, State

19   Street Bank and Trust Company, and State Street Global

20   Markets, LLC, I believe.  The plaintiff alleges the

21   defendants engaged in deceptive acts and practices in

22   connection with foreign currency exchange or FX

23   transactions executed on behalf of their custodial bank

24   clients including the plaintiff.  In essence, plaintiff

25   contends that State Street charged clients inflated FX
```

1    rates when they bought foreign currency and deflated FX

2    rates when they sold foreign currency and pocketed the

3    difference between the rates it paid to conduct those

4    transactions and the rates it charged its clients.

5         Arkansas Teacher asserts class claims under

6    Sections 9 and 11 of the Massachusetts Consumer

7    Protection Act, Mass. General Laws Chapter 93A, and

8    further asserts class claims for breach of duty of trust

9    and negligent misrepresentation.  Plaintiff also asserts

10   an individual claim for breach of contract.  The

11   asserted class period is January 2, 1998 to December 31,

12   2009.  The -- there is an amended complaint on which I

13   focused in deciding the motion to dismiss.

14        The defendants' motion to dismiss alleges that the

15   plaintiff has failed to state a claim for breach of

16   trust because State Street owed no fiduciary duty to the

17   plaintiff.  Second, that plaintiff has failed to state a

18   claim under either Section 9 or Section 11 of Chapter

19   93A.  Third, that the plaintiff has failed to allege

20   elements of a negligent misrepresentation claim.  Four,

21   that the plaintiff has failed to state a claim for

22   breach of contract.  In addition, defendants contend

23   that plaintiffs' claims are partially time barred by the

24   applicable statutes of limitation and, as I said

25   earlier, that State Street Corporation and State Street

1   Global Markets, LLC are not defendants as to whom a

2   plausible claim has been stated.

3        Some of the key alleged facts include the

4   following.  Arkansas Teacher executed four custodian

5   contracts with State Street during the relevant period.

6   This custodian contracts were dated September 15, 1998,

7   July 1, 2001, June 29, 2004, and June 30, 2009.  Each

8   custodian contract provided that the agreement shall be

9   construed, um, and the provisions thereon interpreted

10  under and in accordance with the laws of the State of

11  Arkansas to the extent not preempted by federal law.

12       Custodian contracts authorize State Street to pay

13  monies out of Arkansas Teachers' account for FX

14  transactions.  That, for example, is Section 2.7(e) of

15  the 2009 custodian contract.  Each custodian contract

16  also specified, in substantially the same language, that

17  State Street's compensation would be determined by a

18  separate fee schedule.  Each contract said:  "The

19  custodian shall be entitled to compensation for its

20  services and expenses as custodian set forth in a

21  written fee schedule between the parties until the

22  parties agree in writing on a new fee schedule or

23  compensation."

24       Pursuant to the custodian contracts, Arkansas

25  Teacher and State Street executed seven fee schedules

1   effective September 15, 1998, July 1, 2001, July 1,
2   2004, July 1, 2007, April 1, 2008, and November 1, 2008,
3   as well as July 1, 2009.  The fee schedules, in essence,
4   provided State Street with annual flat fees and set
5   forth categories of ancillary services for which State
6   Street was permitted to charge additional fees.  The
7   first fee schedule for 1998 provided, quote, "No charge
8   will be assessed for each foreign exchange executed
9   through a third party.  A foreign exchange through State
10  Street, no charge," end quote.  The next five fee
11  schedules were silent as to cost, fees or charges for FX
12  transactions.  The 2009 schedule stated a third party FX
13  charge of $25 would be applied for all foreign exchange
14  trades transacted through State Street.  I'm sorry.  "A
15  third-party FX charge of $25 would be applied for all
16  foreign exchange not transacted through State Street.  A
17  transaction cost for all foreign exchange trades
18  transacted through State Street will be waived."
19      The defendant now argues that the fees that I just
20  referenced and described were for shipping-and-handling-
21  types of ministerial charges and did not cover
22  compensation for executing FX transactions.  The
23  defendant now argues that State Street is operating as a
24  third party at arm's length in dealing with the FX
25  transactions at issue here, those conducted pursuant to

1    standing instructions.

2         At best this creates an ambiguity about the

3    meaning of the relevant contracts.  Under Arkansas law

4    as described in cases like **Keller**, 877 Southwest 2d 90

5    at 95, if there's an ambiguity, it is necessary to have

6    discovery and then parol evidence is admissible for

7    the -- to permit the factfinder, ultimately a jury, to

8    determine the meaning of the contract.  If I determine

9    that the contract is ambiguous, a jury will ultimately

10   decide the meaning of the contract, whether the

11   statement that there's no charge for each foreign

12   exchange transaction -- that State Street would receive

13   no compensation for its actions as a broker in those

14   transactions?  Which is what the plaintiff alleges.

15        But in any event, the contract is certainly

16   plausibly susceptible to be interpreted the way the

17   plaintiff alleges it should be interpreted and at this

18   point I am doing that even if, on more consideration, I

19   might find that it's ambiguous.

20        In addition to the custodial contracts and fee

21   schedules, during the relevant period State Street

22   issued at least fifteen different Investment Manager

23   Guides to custodial clients and outside Investment

24   Managers.  The Investment Manager Guides contain

25   comprehensive information about State Street's custom,

1    practices and services, including details on procedures,

2    requirements and costs for various transactions.

3    According to the complaint, in the Investment Manager

4    Guide issued between July of 2003 and January of 2009,

5    State Street stated that it, quote: "State Street

6    foreign exchange transactions are priced based on market

7    rates at the time the trade is executed."  I note that

8    although not pled in the complaint, the next sentence

9    is:  "Rates must be obtained directly from State Street

10    Global Markets."

11    Examples of these Investment Manager Guides show

12    that although they describe various services or

13    procedures relating to FX trades, they provide no

14    specific information regarding cost or pricing of FX

15    transactions.  The defendant argues that the statement

16    that "FX transactions are priced based on market rates

17    at the time the trade is executed" does not mean that

18    the customer, Arkansas Teacher, is given those market

19    rates.  But again, at best, there's an ambiguity that

20    will need to be resolved after discovery.

21    The complaint alleges that State Street charged

22    the plaintiff and other custodial bank clients hidden

23    fees for standing instruction FX trades during the class

24    period by adding or subtracting basis points, or

25    hundredths of a percentage point, to FX rates when

1    reporting standing instruction FX trades to clients.

2    According to the complaint, when a custodial client

3    requested that State Street execute an FX transaction,

4    the trade would be executed, but trade information that

5    did not reflect the actual rate that State Street

6    received or paid to conduct the transaction would be

7    entered into State Street's computer system.  The

8    complaint asserts that State Street charged clients

9    inflated FX rates when clients bought foreign currency

10   and deflated FX rates when clients sold foreign currency

11   via standing instruction FX transactions and, as I said

12   earlier, pocketed the difference.  These additional

13   charges are frequently referred to as "markups" or

14   "markdowns."  The defendants do not dispute that the

15   markups or markdowns occurred.

16        The complaint asserts that the plaintiff did not

17   agree to the markups or was not aware of them during the

18   relevant period because financial reports State Street

19   sent to Arkansas Teacher showed only the rate that State

20   Street charged for each standing instruction FX trade

21   and did not include any information such as the interest

22   -- such as the interbank FX rates at the time each trade

23   was executed that would have allowed the plaintiff to

24   determine he was being charged these extra costs.  The

25   plaintiff states that he only became aware of State

Case: 1:11-cv-10230-MLW Document 401-44 Filed 05/07/21 Page 293 of 304
Case 1:11-cv-10230-MLW Document 401-64 Filed 05/07/21 Page 293 of 304

92

1    Street's standing instruction FX practices after a

2    lawsuit was filed on October of 2009 by the Attorney

3    General of California.  A California lawsuit made

4    substantially the same allegations as the allegations

5    made in this case asserting that State Street wrongfully

6    charged California pension plans markups on standing

7    instruction FX trades.

8         All right.  The plaintiff has alleged a plausible

9    claim for breach of fiduciary duty.  There is a

10   plausible claim that the defendant was acting as a

11   broker for the plaintiff, not as a third party

12   negotiating with Arkansas Teacher at arm's length for

13   its own benefit.  The defendant did not have the

14   discretion to decide what trades should be made,

15   therefore it did not have a general fiduciary duty to

16   Arkansas Teacher, essentially as explained by the

17   Supreme Judicial Court of Massachusetts in **Patsos** at 433

18   Mass. 323 at 333.  However, for nondiscretionary

19   accounts, as plaintiffs allege the account here to be,

20   each transaction is viewed singularly, but "the broker

21   is bound to act in the customer's interest when

22   transacting business for the account," the SJC went on

23   to say that in **Patsos**.  This is sometimes called a

24   "transactional fiduciary duty."  This duty includes,

25   among others, the duty not to misrepresent any fact

material to the transaction, the Supreme Judicial Court
indicated in **Patsos** at 333, Note 15.  Where as here a
fiduciary duty exists, the Supreme Judicial Court has
indicated, in the context of analyzing statute of
limitations defenses, that the fiduciary has a "duty to
disclose adequate information" to apprise a plaintiff
that it has a cause of action.  The Supreme Judicial
Court wrote this in **Patsos** at 329 quoting and citing
**Demoulas,** 424 Mass. 501 at 519.  The plaintiffs
adequately allege the defendants violated this plausibly
alleged fiduciary duty.

In addition, even in the absence of a fiduciary
duty, a half truth is an actionable misrepresentation.
If a party said something, it must "speak honestly and
divulge all relevant material facts," as the Mass.
Appeals Court said in **Golber**, 46 Mass. Appeals Court 256
at 258.

In this case, it is plausibly alleged that
defendant State Street entered into custodial agreements
that may plausibly be interpreted as providing the
custodian would receive the compensation stated in a
written fee schedule between the parties.  The only
relevant fee schedule which references FX transactions,
the 1998 fee schedule, stated there would be no charge
for FX transactions.  The other agreements are silent, I

1  believe, as to FX transactions.

2      As I indicated, the Investment Managers Guides did

3  not disclose that State Street was making money on the

4  standing instruction FX transactions.  The plaintiff

5  could have plausibly believed that there was no extra

6  charge for the FX services, but rather that they were

7  covered by the substantial custodial fee that was being

8  paid.

9      This may not prove to be a strong claim.  I do

10  recognize that it's discernable from the complaint that

11  the plaintiff was paying and knew it was paying

12  something for negotiating the transactions and, um, I'm

13  sure I, if we get that far, and the jury will hear

14  repeatedly "How can they honestly say they weren't

15  paying for standing instruction transactions?  If they

16  thought those were free, why negotiate a rate?"  But

17  this, as I said earlier, is not a point at which the

18  Court decides even whether the evidence is sufficient

19  for a jury to reasonably find for the plaintiff.  There

20  is no evidence, there are only allegations.

21      So I find that the alleged facts and the

22  reasonable inferences drawn from them state a plausible

23  claim for a breach of fiduciary duty.  I find that cases

24  like *Gossels*, 453 Mass. 366 are distinguishable.  For

25  example, *Gossels* was decided after a trial, not on a

1  motion to dismiss.  Among other things, the Supreme

2  Judicial Court found that it was undisputed -- or there

3  was undisputed testimony that customers would call a

4  dedicated phone number to get the daily retail currency

5  exchange rate that the bank allegedly kept secret.  The

6  plaintiff here alleges that while an expert, until

7  today, using a proprietary database was able to

8  retroactively figure out what the daily retail -- what

9  the daily exchange rates were, um, that couldn't have

10 been done in real-time by Arkansas Teacher.  It is

11 plausible, as the plaintiff argues, that comparable

12 information, that is, information comparable to the

13 information available to Mr. Gossels was not available

14 to Arkansas Teacher.

15      I have now -- I have, since we took the lunch

16 break, read or reread *Mexico Money*, 267 F.3d 743,

17 *McCann*, 29 Cal. Reporter 3d at 437, and *International*

18 *Union* at 2012 Westlaw 476526.  I note that the rates in

19 *Mexico Money* and *McCann* were also publicly available.

20 The plaintiffs -- the plaintiff class knew what rate it

21 was getting in advance.  Those cases involve individuals

22 dealing retail with businesses that took dollars from

23 individuals of the United States and converted them into

24 foreign currency for the benefit of their families and

25 others.  Different laws were being applied, none of them

1    were decided under the laws of Massachusetts, and in

2    none of those cases did the courts -- in **Mexico Money**

3    and **McCann** there was no finding of breach of fiduciary

4    duty.  Or to be more precise, there's no finding of the

5    existence of a fiduciary duty.

6        I do recognize that **McCann** was dismissed, **Mexico**

7    **Money** was a class action, and it's not even clear what

8    the evidentiary basis for some of the factual

9    conclusions were to me.  A motion to dismiss claims that

10   are similar to the claims in this case was more recently

11   denied in a federal court in California in **International**

12   **Union**.

13       I find that the plaintiff has also stated a

14   plausible claim for negligent misrepresentation, as the

15   Mass. Appeals Court said in **Nota**, 45 Mass. Appeals Court

16   15 at 19.  That's usually an issue of fact.  As I

17   described earlier, a half truth can be a negligent

18   misrepresentation, as indicated by **Golber**.  The cost of

19   the transactions in this case could plausibly be

20   material.  Those costs could reasonably cause a large

21   investor to change custodians or negotiate a more

22   favorable rate with State Street.  It is also plausible

23   that the plaintiff could have relied on being told that

24   all of the defendants' compensation would be according

25   to the fee schedule entered into between the parties.

1    As I noted earlier, the 1998 fee schedule said there was

2    no charge for FX transactions.

3         I also find that the plaintiff has stated a

4    plausible claim for a violation of Mass. General Law

5    Chapter 93A.  However, it's -- it is not possible for

6    me, at this point, to determine whether this case should

7    proceed under Section 9 or Section 11.  That's going to

8    require further factual development and argument to

9    decide.

10        Judge Saris set out what I think are the

11   applicable standards in *In re Pharmaceutical Industry*,

12   491 F. Supp. 2d 20 at page 80.  If the facts demonstrate

13   the plaintiff is a nonprofit entity whose investment

14   activities were performed in accordance with its

15   legislative mandate in furtherance of its core mission,

16   Section 9, the consumer provision which provides for

17   treble damages in certain extreme cases, would apply.

18   If not, it would be viewed as a big business and Section

19   11 would be the applicable provision.

20        This may make a difference not just for whether

21   treble damages or up to treble damages are available,

22   but also for the applicable standard.  It appears to me

23   at the moment that under Section 9 a mere failure to

24   disclose a material fact may violate Chapter 93A.

25   That's how the First Circuit in *V.H.S Realty*, 757 F.2d

1    411 at 417, interpreted, and I think correctly

2    interpreted, the Supreme Judicial Court's decision in

3    **Slaney**, 366 Mass. 688 at 784.

4         In addition, even if we're under Section 11, it

5    appears that if as I had found is plausibly alleged

6    there is -- or State Street had a fiduciary duty to

7    disclose, then a material omission would violate Chapter

8    93A, Section 11.  This may or will need more work by all

9    of us, but as stated in 52 Mass. Practice Series,

10   Section 4.19 at Page 202, um, it may be that under

11   Massachusetts law, quote:  "There probably is a general

12   duty of disclosure in Section 9 cases and in Section 11

13   cases there probably must be a duty to speak before

14   disclosure is required."

15        Moreover -- although this hasn't been expressly

16   alleged as a separate count by the plaintiffs, um, for

17   Section 9 and 11, a violation of the implied covenant of

18   good faith and fair dealing violates Chapter 93A.  And

19   my colleague Judge Saylor discussed this in **Speakman**,

20   367 F. Supp. 2d 122 at 141, citing many cases.

21        I recognize that Sections 9 and 11 have been held

22   to be and are mutually exclusive.  However, the

23   defendants' claim that it's Section 11 that should apply

24   here rather than Section 9, or the plaintiffs' claim to

25   the opposite, turns on facts.  I have to know more about

1    Arkansas Teacher's business.  And I'm going to defer at

2    least until a motion for summary judgment and perhaps

3    trial deciding which applies here.  That's the approach

4    that was taken in **Lorazepam and Clorazepate**, which I'll

5    spell later for the Court Reporter, at 295 F. Supp. 2d

6    30 at 43 to 44, a 2003 District of Columbia case.

7         I also find that a plausible claim has been stated

8    for a breach of contract.  Arkansas law governs this

9    claim under the contract.  As I indicated earlier, I

10   must apply the plain meaning of the contract as a matter

11   of law if it's unambiguous.  If the Court finds the

12   contract is ambiguous, the meaning of it is a question

13   of fact for the jury, which can consider parol evidence

14   -- or the factfinder, which can consider parol

15   evidence.  That's **Keller** cited earlier.

16        In this case, the custodial case, State Street is

17   entitled to compensation for services as set forth in

18   the fee schedule.  The fee schedules, um, state that

19   State Street will receive no compensation for FX

20   transactions, or at least one of them in 1998 says that,

21   the rest were silent.  As I said earlier, I now

22   understand there may be an ambiguity as to whether that

23   covers the standing instruction FX transactions, um,

24   completely or only relates to administrative fees.

25   There seem to be competing sections of the fee

1    schedules, I assume probably drafted by State Street,

2    but taking undisclosed compensation could be found a

3    breach of an unambiguous agreement or if there is, and

4    I'm now inclined to think there may be, an ambiguity,

5    factual developments require it.  The one thing I can

6    conclude now is that the agreement does not

7    unambiguously provide that the fee schedules do not

8    cover standing instruction FX transactions.  If State

9    Street, you know, believed it was authorized to take the

10   kind of compensation it took, um, it could have spelled

11   it out clearly and we wouldn't be here today.

12        With regard to the statute of limitations issues,

13   Massachusetts law governs all but the breach of contract

14   claim.  The statute of limitations is three years for

15   all but the Chapter 93A claim, it's four years for the

16   93A claim, and five years for the breach of contract

17   claim under Arkansas law.  As I said, in this case the

18   plaintiff has adequately alleged violations of

19   Massachusetts law were fraudulently concealed in

20   violation of a fiduciary duty to disclose.  In view of

21   the fiduciary duty to disclose that's alleged, the

22   statute of limitations began running when the plaintiff

23   had actual knowledge of the injury, as the Supreme

24   Judicial Court held in **Demoulas**, 424 Mass at 519.  This

25   is generally a factual issue.

1       There were a number of cases that have held,

2   including -- well, a factual issue decided by a finder

3   of fact.  Some of the cases noting this are **Genereux**,

4   577 F.3d at 360, **Albrecht**, 436 Mass. at 714 and 715, and

5   **Patsos**, 433 Mass. at 329.

6       It is alleged that the defendant fraudulently

7   concealed compensation it was taking for 1998 to 2009.

8   The plaintiff alleges it had no notice of its injury

9   until 2009 when a suit was filed in California making a

10   comparable claim and the defendant revised its

11   Investment Manager's Guide to disclose the compensation

12   it was taking for FX transactions.  This case was filed

13   in 2011, therefore the Massachusetts claims at this

14   point, at this motion to dismiss point, um, cannot be

15   found to be time barred.

16       Nor is the five-year -- nor does the five-year

17   statute of limitations on the Arkansas -- under Arkansas

18   law for the contract claim bar all of the plaintiffs'

19   claims.  The briefing doesn't educate me to understand

20   that with discovery the tolling rules apply to the

21   contract claim under Arkansas law.  The parameters of

22   that -- for that decision won't affect discovery as far

23   as I can tell.  There's at least five years worth of

24   claims that would be in the case and the statute of

25   limitations under Arkansas law wouldn't be a good

1  waiver.

2       As I said, the complaint does fail to state a

3  plausible claim against State Street Corporation on a

4  piercing-the-corporate-veil theory under **My Bread**, 353

5  Mass. 614 at 619, therefore that claim is being denied,

6  and by agreement the claim against State Street Global

7  LLC -- I'm sorry.  I am dismissing -- I'm allowing the

8  motion to dismiss with regard to State Street

9  Corporation and the parties have agreed that State

10 Street Global, LLC will be dismissed without prejudice.

11      I will enter a very conclusory order saying, in

12 effect, "For the reasons just described, the motion to

13 dismiss regarding State Street Bank and Trust is

14 denied."  The transcript will be the record of the

15 decision, at least initially.  Um, I encourage you to

16 order it.

17      And since we're all here, although I failed to

18 order you to confer about a schedule, I do want to see

19 you to talk about setting up a scheduling conference.

20 If you've got your clients here, then bring them back.

21      Okay?  The Court's in recess.

22           MR. RUDMAN:  Does your Honor want us to stay

23 here?

24           THE COURT:  I want you to come back and see me

25 in the jury room.

```
1              MR. RUDMAN:  Oh, okay.  Thank you, sir.

2              THE COURT:  In a few minutes.

3              MR. RUDMAN:  I'm sorry.  I didn't understand

4     that.

5                  (Ends, 3:15 p.m.)

6

7                  C E R T I F I C A T E

8

9         I, RICHARD H. ROMANOW, OFFICIAL COURT REPORTER,

10    do hereby certify that the foregoing record is a true

11    and accurate transcription of my stenographic notes,

12    before Chief Judge Mark L. Wolf, on Tuesday, May 8,

13    2012, to the best of my skill and ability.

14

15

16
      /s/ Richard H. Romanow 05-17-12
17    _____
      RICHARD H. ROMANOW  Date
18

19

20

21

22

23

24

25
```