# EX. 47

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| ARNOLD HENRIQUEZ, ET AL. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE STREET BANK AND TRUST | ) |
| COMPANY AND STATE STREET | ) |
| GLOBAL MARKETS LLC AND | ) |
| DOES 1-20 | ) |
| | ) |
| Defendants. | ) |
| | ) |

C.A. No. 11-cv-12049-MLW

**FILED UNDER SEAL**

---

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# <u>TABLE OF CONTENTS</u>

**Page(s)**

PRELIMINARY STATEMENT ...................................................................................................1

FACTS AND ALLEGATIONS………………………………………………..……………….....1

A.      State Street .....................................................................................................................2

B.      The Plaintiffs And The Plans........................................................................................3

       1.      The Defined Contribution Plans ......................................................................4

       2.      The J & J Defined Benefit Plan .......................................................................7

       3.      Plaintiffs' Foreign Exchange "Scheme" Allegations........................................9

ARGUMENT………………………………………………………………………………....…..9

I.      PLAINTIFFS LACK STANDING TO BRING CLAIMS CONCERNING FOREIGN
      EXCHANGE TRADING BY THEIR PENSION PLANS OR ANY OTHER
      PLANS...……………………………………………………………………...…………9

A.      Legal Standard ...............................................................................................................9

B.      Plaintiffs Lack Standing To Bring Claims As To SSgA-Managed Collective
      Funds..............................................................................................................................13

C.      Plaintiffs Lack Standing To Bring Claims On Behalf Of The J & J Plan ..................13

D.      Plaintiffs Lack Standing To Assert Claims Based On Alleged Trades By Funds In
      Which They Did Not Invest And Plans in Which They Did Not Participate .............16

II.     THE COMPLAINT DOES NOT STATE A CLAIM WITH RESPECT TO FOREIGN
      EXCHANGE TRADING INITIATED BY INVESTMENT MANAGERS OTHER
      THAN STATE STREET………………………………………………………………....21

A.      Legal Standard .............................................................................................................23

B.      Count I Does Not State A Claim Against State Street As To Trades Initiated By
      Other Investment Managers...........................................................................................23

C.      Plaintiffs' Section 404 Claim Depends On Their Defective Fiduciary Duty
      Allegations. ...................................................................................................................28

D.      Plaintiffs Do Not State A Claim Against LLC .........................................................29

i

E.      The Complaint Contains No Plausible Allegation Of Any Foreign Exchange
        "Scheme" By Any Defendant .........................................................................................30

        1.      The Complaint's Inconsistent "Scheme" Allegations.....................................30

        2.      The Complaint's "Scheme" Allegations Fail To State A Claim.....................32


CONCLUSION..………………………………………………………………………………32

# TABLE OF AUTHORITIES

**Page(s)**

Federal Cases

*Arizona State Carpenters Pension Trust Fund v. Citibank,*
125 F.3d 715 (9th Cir. 1997) ............................................................................. 22

*Arizonans for Official English v. Arizona,*
520 U.S. 43 (1997) ............................................................................................. 12

*BAII Banking Corp. v. UPG, Inc.,*
985 F.2d 685 (2d Cir. 1993) .............................................................................. 21

*Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.,*
132 F.3d 1017 (4th Cir. 1997) ........................................................................... 22

*Barry v. St. Paul Fire & Marine Ins. Co.,*
555 F.2d 3 (1st Cir. 1977) .................................................................................. 15

*Beddall v. State Street Bank & Trust Co.,*
137 F.3d 12 (1st Cir. 1998) .................................................................... 21, 23, 24

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) ..................................................................................... 19, 22

*Blum v. Yaretsky,*
457 U.S. 991 (1982) ..................................................................................... 10, 11

*Britt v. McKenney,*
529 F.2d 44 (1st Cir. 1976) ................................................................................ 15

*Caiafa v. Sea Containers, Ltd.,*
525 F. Supp. 2d 398 (S.D.N.Y. 2007) ............................................................... 29

*City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.,*
703 F. Supp. 2d 253 (E.D.N.Y. 2010) ............................................................... 17

*Cohen v. Indep. Blue Cross,*
No. 10-4910, 2011 WL 5040706 (D.N.J. Oct. 24, 2011) ................................... 22

*Coughlin v. Town of Arlington,*
No. 10-10203, 2011 WL 6370932 (D. Mass. Dec. 19, 2011) ............................ 19

*Crawford v. Lamantia,*
34 F.3d 28 (1st Cir. 1994) ............................................................................ 11, 12

*David v. Alphin,*
No. 07-cv-11, 2008 WL 5244504 (W.D.N.C. Dec. 15, 2008)................................................. 14

*Fantini v. Salem State Coll.,*
557 F.3d 22 (1st Cir. 2009)................................................................................................ 19

*Fishman Haygood Phelps Walmsley Willis & Swanson, L.L.P. v. State Street Corp.,*
No. 09-10533, 2010 WL 1223777 (D. Mass. Mar. 25, 2010) ................................................ 2

*Forsythe v. Sun Life Fin., Inc.,*
417 F. Supp. 2d 100 (D. Mass. 2006) .................................................... 15, 16, 17, 18

*Gill v. United States, No.*
05-10309, 2009 WL 3152892 (D. Mass. Sept. 25, 2009) ........................................................ 2

*Glanton v. AdvancePCS Inc.,*
465 F.3d 1123 (9th Cir. 2006) ............................................................................................... 13

*Gross v. Summa Four,*
93 F.3d 987 (1st Cir. 1996).......................................................................................... 11, 15

*Harley v. Minnesota Mining & Mfg. Co.,*
284 F.3d 901 (8th Cir. 2002) ............................................................................. 11, 12, 13, 14

*Hayduk v. Lanna,*
775 F.2d 441 (1st Cir. 1985)................................................................................................. 19

*Hill v. State Street Corp.*
No. 09-cv-12146, 2011 WL 3420439 (D. Mass. Aug. 3, 2011) ............................................ 29

*Hoffman v. UBS-AG,*
591 F. Supp. 2d 522 (S.D.N.Y. 2008)............................................................................. 16, 17

*Hughes Aircraft Co. v. Jacobson,*
525 U.S. 432 (1999)....................................................................................................... 12, 13

*In re AIG Advisor Group Sec. Litig.,*
No. 06 CV 1625, 2007 WL 1213395 (E.D.N.Y. Apr. 25, 2007)............................................ 17

*In re Boston Scientific Corp. ERISA Litig.,*
254 F.R.D. 24 (D. Mass. 2008).................................................................................. 11, 12, 18

*In re Columbia Entities Litig.,*
No. 04-11704-REK, 2005 U.S. Dist. LEXIS 33439 (D. Mass. Nov. 30, 2005) ...................... 16

*In re Connetics Corp. Sec. Litig.,*
542 F. Supp. 2d 996 (N.D. Cal. 2008) ................................................................................. 29

iv

*In re Eaton Vance Corp. Sec. Litig.*,
219 F.R.D. 38 (D. Mass. 2003) ...................................................................... 15, 16, 17

*In re IndyMac Mortgage-Backed Sec. Litig.*,
718 F. Supp. 2d 495 (S.D.N.Y. 2010) ...................................................................... 17

*In re Lehman Bros. Sec. & ERISA Litig.*,
684 F. Supp. 2d 485 (S.D.N.Y. 2010) ...................................................................... 17

*In re Merrill Lynch & Co., Research Reports Sec. Litig.*,
218 F.R.D. 76 (S.D.N.Y. 2003) ............................................................................... 29

*In re Mexico Money Transfer Litig.*,
267 F.3d 743 (7th Cir. 2001) ..................................................................... 21, 29, 30, 31

*In re Salomon Smith Barney Mutual Fund Fees Litig.*,
441 F. Supp. 2d 579 (S.D.N.Y. 2006) ................................................................ 17, 18

*In re Smith Barney Transfer Agent Litig.*,
765 F. Supp. 2d 391 (S.D.N.Y. 2011) ................................................................ 16, 17

*Jenkins v. Union Labor Life Ins. Co.*,
No. 10-7361, 2011 WL 3919501 (E.D. Pa. Sept. 7, 2011) .................................... 22

*Katz v. Pershing, LLC*,
No. 11-1983, 2012 WL 612793 (1st Cir. Feb. 28, 2012) ...................................... 14

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ................................................................................. 20

*Kenney v. State Street Corp.*,
754 F. Supp. 2d 288 (D. Mass. 2010) ...................................................... 10, 12, 15

*LaRue v. DeWolff, Boberg & Assocs.*,
552 U.S. 248 (2008) .............................................................................................. 11, 12

*Lewis v. Casey*,
518 U.S. 343 (1996) .............................................................................................. 10, 11

*Livick v. The Gillette Co.*,
524 F.3d 24 (1st Cir. 2008) ...................................................................................... 25

*Low v. Robb, No.*
11-CV-2321, 2012 WL 173472 (S.D.N.Y. Jan. 20, 2012) ...................................... 29

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) .............................................................................................. 10, 12

*Maine People's Alliance v. Mallinckrodt, Inc.*,
  471 F.3d 277 (1st Cir. 2006) ............................................................................. 14

*Maniace v. Commerce Bank of Kansas City, N.A.*,
  40 F.3d 264 (8th Cir. 1994) ............................................................................... 24

*McCullough v. AEGON USA Inc.*,
  585 F.3d 1082 (8th Cir. 2009) ........................................................................... 13

*New Jersey Carpenters Health Fund v. Residential Capital, LLC*,
  No. 08 CV 8781, 2010 WL 1257528 (S.D.N.Y. Mar. 31, 2010) ....................... 17

*New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*,
  720 F. Supp. 2d 254 (S.D.N.Y. 2010) ................................................................ 17

*North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*,
  567 F.3d 8 (1st Cir. 2009) ................................................................................... 20

*O'Toole v. Arlington Trust Co.*,
  681 F.2d 94 (1st Cir. 1982) ................................................................................. 24

*Pakovich v. Verizon LTD Plan*,
  653 F.3d 488 (7th Cir. 2011) .............................................................................. 12

*Paulsen v. CNF, Inc.*,
  559 F.3d 1061 (9th Cir. 2009) ............................................................................ 13

*Pegram v. Herdrich*,
  530 U.S. 211 (2000) ............................................................................................ 25

*Pipefitters Local 636 Ins. Fund v. Blue Cross Blue Shield of Mich.*,
  654 F.3d 618 (6th Cir. 2011) .............................................................................. 22

*Plumber's Union Local No.12 Pension Plan v. Nomura Asset Acceptance Corp.*,
  632 F.3d 762 (1st Cir. 2011) ............................................................. 15, 16, 17, 19

*Press v. Chem. Inv. Servs. Corp.*,
  166 F.3d 529 (2d. Cir. 1999) .............................................................................. 22

*Raines v. Byrd*,
  521 U.S. 811 (1997) .............................................................................................. 9

*Risberg v. McArdle*,
  529 F. Supp. 2d 213 (D. Mass. 2008) ................................................................. 27

*Rivera-Flores v. Puerto Rico Tel. Co.*,
  64 F.3d 742 (1st Cir. 1995) ................................................................................... 2

*RSM Prod. Corp. v. Fridman*,
  643 F. Supp. 2d 382 (S.D.N.Y. 2009) .................................................. 29

*S.E.C. v. Patel*,
  No. 07-cv-39, 2009 WL 3151143 (D.N.H. Sept. 30, 2009) ..................................... 29

*Sekerek v. Nat'l City Bank*,
  342 F. Supp. 2d 701 (N.D. Ohio 2004) .................................................. 24

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) .......................................................... 9, 10

*Stegall v. Ladner*,
  394 F. Supp. 2d 358 (D. Mass. 2005) .................................................. 18

*United States v. Hays*,
  515 U.S. 737 (1995) .......................................................... 10

*United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*,
  412 U.S. 669 (1973) .......................................................... 14

*Valentin v. Hospital Bella Vista*,
  254 F.3d 358 (1st Cir. 2001) .................................................... 2

*Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*,
  454 U.S. 464 (1982) .......................................................... 10

*Wal-Mart Stores, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) ........................................................ 18

*Warth v. Seldin*,
  422 U.S. 490 (1975) .......................................................... 9, 10

*Watterson v. Page*,
  987 F.2d 1 (1st Cir. 1993) ..................................................... 27

*Wilson v. MicroFinancial, Inc.*,
  No. 03-11883, 2006 WL 1650971 (D. Mass. June 13, 2006) ................................... 29

<u>Federal Statutes</u>

29 U.S.C. § 1001 .......................................................... passim

29 U.S.C. § 1002(34) ......................................................... 3

29 U.S.C. § 1104(a) ......................................................... 25

29 U.S.C. § 1105 .......................................................... 25, 27

Case 1:11-cv-10230-MLW Document 401-96 Filed 07/23/18 Page 10 of 42
Case 1:11-cv-10230-MLW Document 401-596 Filed 08/12/18 Page 10 of 372
Redacted Document

29 U.S.C. § 1106(b)(1) ................................................................................................................. 20

<u>Federal Rules</u>

Federal Rule of Civil Procedure 12(b)(1) .................................................................................. 1, 2

Federal Rule of Civil Procedure 12(b)(6) ........................................................................ 1, 20, 28

Federal Rule of Civil Procedure 9(b) ............................................................................... 20, 21, 30

## PRELIMINARY STATEMENT

Defendants State Street Bank and Trust Company ("State Street") and State Street Global Markets, LLC ("LLC") submit this memorandum in support of their motion to dismiss the Amended Class Action Complaint ("Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim. The Complaint should be dismissed for lack of jurisdiction because Plaintiffs have suffered no injury-in-fact as a result of any conduct challenged in the Complaint; and because they lack standing to bring claims on behalf of any pension plans other than their own plans, or on behalf of collective funds in which their own plans did not invest. In addition, certain claims should be dismissed for failure to state a claim.

## FACTS AND ALLEGATIONS OF THE COMPLAINT

### A.        State Street

State Street provides a range of services to institutional investors through a number of separate divisions. State Street's Investor Services Division ("IS") provides custody services. (*See, e.g.*, Affidavit of Mark Curran ("Curran Aff.") ¶ 4.)[1] As custodian, IS "holds securities on behalf of investors" and performs various administrative functions at the direction of the client or

---

[1] Because defendants challenge Plaintiffs' Article III standing under Federal Rule of Civil Procedure 12(b)(1), Defendants may "proffer[] materials of evidentiary quality" to "controvert[] the accuracy (rather than the sufficiency) of the jurisdictional facts asserted by the plaintiff." *Valentin v. Hospital Bella Vista*, 254 F.3d 358, 363-64 (1st Cir. 2001); *see, e.g.*, *Fishman Haygood Phelps Walmsley Willis & Swanson, L.L.P. v. State Street Corp.*, No. 09-10533, 2010 WL 1223777, at *7 (D. Mass. Mar. 25, 2010) (dismissing ERISA case for lack of standing for failure to show injury). "Thus, the plaintiff's jurisdictional averments are entitled to no presumptive weight; the court must address the merits of the jurisdictional claim by resolving the factual disputes between the parties." *Valentin*, 254 F.3d at 364. In conducting this inquiry, the court enjoys "broad authority" to consider extrinsic evidence "in order to determine its own jurisdiction." *Id.* at 364; *see, e.g.*, *Gill v. United States*, No. 05-10309, 2009 WL 3152892, at *3 (D. Mass. Sept. 25, 2009) (in deciding a motion to dismiss under Rule 12(b)(1), court may "'make such factual findings as are necessary to determine its subject matter jurisdiction'" (quoting *Rivera-Flores v. Puerto Rico Tel. Co.*, 64 F.3d 742, 748 (1st Cir. 1995))).

FILED UNDER SEAL

the client's investment manager, including "the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities." (Complaint ("Cmplt.") ¶ 51.) State Street's custodial clients include pension plans, such as the three plans in which Plaintiffs allegedly are participants. (*Id.* ¶ 52.)

State Street Global Advisors ("SSgA") is a division of State Street that is an investment manager. Among other things, SSgA manages collective investment funds, which are investment vehicles consisting of pooled assets that are similar to mutual funds. (Affidavit of Robert Dempsey ("Dempsey Aff.") ¶ 4.) Some pension plans designate SSgA-managed collective funds as permitted plan investments. (*See* Dempsey Aff. ¶ 4.)

State Street Global Markets ("SSGM") is a division of State Street that acts as a principal dealer in foreign currency. (Affidavit of Catherine M. Hayes-Duffy ("Hayes-Duffy Aff.") ¶ 4.) Investment managers for State Street custody clients are permitted to cause their clients to trade foreign currency with SSGM. (*Id.* ¶ 6.) No other State Street entity executed foreign exchange transactions with State Street custody clients during the putative class period of January 1, 2001 through the present (the "Class Period"). (*Id.*)

LLC is a legal entity distinct from State Street,[2] which does not execute foreign exchange transactions with custody clients of State Street. (*See* Hayes-Duffy Aff. ¶ 5.)[3]

---

[2] LLC and State Street are both subsidiaries of State Street Corporation. (Hayes-Duffy Aff. ¶ 5.)

[3] As the Complaint acknowledges, State Street has represented that foreign exchange trading between State Street and its custody clients is executed by the SSGM division of State Street (not LLC). (Cmplt. ¶ 15.) Plaintiffs nevertheless name LLC as a defendant, apparently because of mistaken assumptions not logically supported by factual allegations, and their own admitted confusion. (*See id.*)

FILED UNDER SEAL

Case 1:11-cv-02049-MLW Document 596 Filed 08/23/18 Page 13 of 372
Case 1:11-cv-02049-MLW Document 405 Filed 07/23/18 Page 12 of 43
Redacted Document

### B.    The Plaintiffs And The Plans

Plaintiff Michael T. Cohn ("Cohn") is an alleged participant in the Citigroup 401(k) Plan (the "Citi Plan").  (Cmplt. ¶ 11.)  Plaintiff Arnold Henriquez is an alleged participant in the Waste Management Retirement Savings Plan (the "WM Plan").  (Id. ¶ 10.)  Both the Citi Plan and the WM Plan are defined contribution retirement plans (the "defined contribution Plans"). (Id. ¶¶ 10, 11.)[4]    Plaintiffs William R. Taylor ("Taylor") and Richard A. Sutherland ("Sutherland") are alleged participants in the Retirement Plan of Johnson & Johnson (the "J & J Plan").  (Id. ¶¶ 12-13.)  The J & J Plan is a defined benefit plan.  (Id. ¶ 13.)

Although Plaintiffs allegedly participate only in the Citi, WM and J & J Plans, they purport to bring claims on behalf of all pension plans for which State Street served as custodian or manager of collective trust investments.

### 1.    The Defined Contribution Plans

During the Class Period, State Street's IS division acted as custodian and/or a directed trustee of the Citi Plan and the WM Plan pursuant to written agreements with those plans.[5]

---

[4]  A "defined contribution plan" is "a pension plan which provides for an individual account for each participant and for benefits based solely upon the amount contributed to the participant's account." 29 U.S.C. § 1002(34); see, e.g., Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 439 (1999).  By contrast, a defined benefit plan, with certain exceptions not relevant here, is "a pension plan other than an individual account plan." 29 U.S.C. § 1002(35).  It "consists of a general pool of assets rather than individual dedicated accounts."  Hughes Aircraft Co., 525 U.S. at 439.

[5]  See Duncan Aff. ¶ 7, Ex. B at ¶ 4.2 ("Defined Contribution Plan Trust Agreement Between Citigroup Inc. and State Street Bank and Trust Company" (effective December 8, 2008) [hereinafter, the "Citi Plan Agreement"] & Curran Aff. ¶ 6, Ex. A at ¶ 4.2 ("Defined Contribution Plans Master Trust Agreement Between Waste Management, Inc. and State Street Bank and Trust Company" (effective January 1, 1999) [hereinafter, the "WM Plan Agreement," and together with the Citi Plan Agreement, the "defined contribution Plan Agreements"].  Prior to December 8, 2008, State Street was appointed by the Citi Plan's named fiduciaries as custodian of Citi Plan assets (but not trustee) in a custody contract dated January 1, 1999.  (See Duncan Aff. ¶ 6 & Ex. A ("Custodian Contract Between Citigroup, Inc., Citibank, N.A. and State Street Bank and Trust Company" [hereinafter, the "Citi Custody Agreement"]).)  Under the terms of the custody contract, State Street was appointed to perform certain administrative

FILED UNDER SEAL

Those agreements expressly specified the limited nature of State Street's custodial responsibilities that may be taken without direction from an investment manager or third party. (*See, e.g.,* Citi Plan Agreement ¶ 4.2 ("Administrative Powers of the Trustee")).

More specifically, under the Citi Plan Agreement, as custodian, State Street's powers were purely administrative in nature, and had nothing to do with foreign exchange. (*Id.* ¶ 4.2 (employ agents and subordinate trustees, register securities, and perform other ministerial acts)). As custodian, State Street was not permitted to take any action in connection with the purchase or sale of plan assets without express instructions of an investment manager, a plan participant or the plan administrator. (*Id.* ¶ 4.1.) Absent such instructions, State Street as custodian was not permitted to purchase or sell plan property (*id.* ¶¶ 4.1(a) & (b)), including "foreign exchange and contracts for foreign exchange." (*Id.* ¶4.1(m).)

Although the Citi Plan Agreement contemplates that State Street might be appointed investment manager for plan assets pursuant to a separate written agreement (*id.* ¶¶ 3.5, 4.1), any instruction given as investment manager would not be in State Street's capacity as custodian. The WM Plan Agreement likewise reflects that State Street as custodian had no fiduciary responsibility for foreign exchange trading. (*See* WM Plan Agreement ¶¶ 4.1, 4.1(o), 4.2.) That is, as the Complaint concedes, it is the custody client or the investment manager of given assets (including currency assets) that was responsible for the foreign exchange trading of the defined contribution Plans. (Cmplt. ¶¶ 45-46, 57, 67.)

---

functions only upon receiving "proper instructions" from the plan's managing fiduciaries. (*Id.* § 2.) The agreement did not permit State Street to exercise "discretion" in performing these functions except within narrowly drawn limits. (*See id.* § 2.11.) Thus, the custody agreement specified no fiduciary obligations at all. (*See* Citi Custody Agreement ¶¶ 2, 5.)

FILED UNDER SEAL

Case 1:11-cv-10230-MLW Document 596 Filed 08/23/18 Page 15 of 372
Case 1:11-cv-10230-MLW Document 401-5 Filed 07/23/18 Page 45 of 372
Redacted Document

During the Class Period, the defined contribution Plans' fiduciaries (not State Street) from time to time selected SSgA-managed collective funds as investment options for the defined contribution Plans. (Duncan Aff. ¶ 8; Curran Aff. ¶ 7.) This afforded the defined contribution Plan participants the opportunity to choose these funds as investments for their individual accounts. (Duncan Aff. ¶ 8; Curran Aff. ¶ 7.)[6] Plaintiffs allege that Cohn and Henriquez caused their respective defined contribution Plans to invest assets from their accounts in certain SSgA-managed collective funds (collectively, the "Selected Funds"). (Cmplt. ¶¶ 10, 11 & n.2.) These Selected Funds in turn held units in other SSgA-managed collective funds (the "Sub-Funds"), which in turn may have held units in other such funds (collectively, the "Other Funds"). (Dempsey Aff. ¶ 17 & n.32.)

Plaintiffs do not allege that any foreign exchange transaction was necessary to permit a plan to invest or recoup its investments in SSgA-managed collective funds. Instead, they assert that Selected Funds in which Cohn or Henriquez caused plan assets to be invested (or related Sub-Funds or Other Funds) executed foreign exchange transactions with SSGM or LLC. (Cmplt. ¶¶ 45-46, 57.) In fact, none were executed with LLC. (Hayes-Duffy Aff. ¶ 6.) Plaintiffs do not allege that State Street had any role as investment manager with respect to any assets of the defined contribution Plans other than investments in collective funds managed by

---

[6] As is the case with a mutual fund, "[n]o Participant [is] deemed to have severable ownership in any individual asset in any [collective fund] or any right of participation or possession thereof." (Dempsey Aff. ¶ 5 & Ex. A, Declaration of Trust § 5.5.) Each fund is "a separate trust and the assets of each [collective fund are] separately held, managed, administered, valued, invested, reinvested, distributed, accounted for and otherwise dealt with as a separate trust hereunder." (Declaration of Trust § 3.1.) Moreover, "[e]very note, bond, contract, instrument, certificate, or undertaking and every other act or thing whatsoever executed or done by or on behalf of any [collective fund is] conclusively deemed to have been executed or done only by or for such Fund." (*Id.* § 3.3.) No collective fund is responsible for any obligations of another collective fund. (*Id.* § 3.3.)

FILED UNDER SEAL

SSgA.  (*Id.*) Nor do they allege any basis to infer that they personally suffered injury from any such foreign exchange trading.



The SSgA collective funds made available to defined contribution Plan participants during the Class Period are established as investment trusts.  (Dempsey Aff. ¶ 5 & Ex. A, Declaration of Trust § 3.1.)  Investors in the SSgA-managed investment trusts receive a beneficial interest in Units that are proportional to their investment in the fund.  (*Id.* § 4.1.)[8]  Investors are entitled to "withdraw a sum arrived at by multiplying the number of Units withdrawn by the net asset value



[8]  These units represent an "undivided proportionate interest in all assets and liabilities of the Fund."  (*Id.* § 4.1.)

FILED UNDER SEAL

of each Unit."[9] (*Id.* § 5.3(a).)



### 2. The J & J Defined Benefit Plan

The J & J Plan is a defined benefit retirement plan. (Cmplt. ¶ 13.) During the Class Period, State Street's IS division provided custody services to the J & J Plan. (Cmplt. ¶ 47.) On January 2, 2001, the J & J Plan's named fiduciary appointed State Street as the J & J Plan's directed trustee. (*See* Connolly Aff. ¶¶ 6-7 & Ex. A & B (J & J Plan Agreement at ¶ 4.2).) Like the defined contribution Plan Agreements, the J & J Plan Agreement provides that, in most respects, State Street performs its custodial services at the direction of the Plan's fiduciaries (not State Street), and sets forth the limited nature of its obligations that might be characterized as fiduciary in nature. (*See* J & J Plan Agreement ¶¶ 4.1, 4.2.) Consistent with Plaintiffs' concession that investment managers or custody clients retain responsibility for foreign exchange



FILED UNDER SEAL

Case 1:11-cv-02049-MLW Document 596 Filed 08/23/18 Page 18 of 372
Case 1:11-cv-10230-MLW Document 401-6 Filed 07/23/18 Page 18 of 72
Redacted Document

transactions (Cmplt. ¶¶ 27, 47, 67), the J & J Plan Agreement does not confer any such responsibility on State Street.

The J & J Plan invests its assets in various accounts overseen by investment managers selected by the Plan's named fiduciaries. (*See* Cmplt. ¶¶ 12-13; J & J Plan Agreement ¶ 3.1.) Unlike a defined contribution plan, the J & J Plan pays a specified level of monthly benefits to eligible participants. (*See* Cmplt. ¶¶ 12-13; *see also* Connolly Aff. ¶ 9.) The amount of benefits each participant is entitled to receive is calculated based upon their years of service, not on the value of any individual plan account. (Connolly Aff. ¶ 9; *see* Declaration of Nolan J. Mitchell ("Mitchell Decl.") Ex. A at 14 ("Plan Form 5500").) Those benefits are funded by payments from the J & J Plan's sponsor and not by individual contributions. (*See* Plan 2010 Form 5500 at 14; Connolly Affidavit ¶ 9.)

██████████████████████████████████████

██████████████████████████████████████

████████████ According to its 2010 public filings with the Department of Labor, the market value of the J & J Plan's assets ($7,169,082,110) exceeds the "total actuarial present value of accumulated plan benefits" ($6,343,630,382) by over $800 million. (*See* Mitchell Decl. Ex. A (Plan 2010 Form 5500) at 3, 12; *see also* Connolly Affidavit ¶ 14.) Accordingly, the Complaint does not assert that any participant in the J & J Plan has suffered any injury due to foreign exchange trading with State Street. Plaintiffs Taylor and Sutherland do not even allege that they were entitled to a benefit payment during the Class Period.

### 3.    Plaintiffs' Foreign Exchange "Scheme" Allegations

Plaintiffs' allegation that State Street engaged in a foreign exchange "scheme" during the Class Period is drawn entirely from unsubstantiated allegations in other complaints and materials

FILED UNDER SEAL

incorporated therein, none of which purport to address State Street's foreign exchange pricing practices for ERISA-covered entities.  (*Compare* Cmplt. ¶¶18-30 (describing allegations relating to State Street's foreign exchange practices for "*Non-ERISA Clients*"), *with id.* ¶ 31 (asserting "[o]n information and belief" that ERISA custodial clients and collective funds were subject to "this pricing scheme").  Plaintiffs have simply plucked the most inflammatory allegations from each of these sources, with no attempt to reconcile the significant inconsistencies among them.  Nor do they address the custody contracts the Complaint incorporates by reference, which plainly establish that State Street as custodian had no fiduciary role with respect to foreign exchange trading.  Accordingly, as set forth in more detail below, Plaintiffs have failed to allege any facts to support the allegation that State Street engaged in any foreign exchange "scheme."

## ARGUMENT

## I.  PLAINTIFFS LACK STANDING TO BRING CLAIMS CONCERNING FOREIGN EXCHANGE TRADING BY THEIR PENSION PLANS OR ANY OTHER PLANS.

### A.  Legal Standard

It is a "bedrock requirement" of Article III of the United States Constitution that federal courts must restrict the exercise of their jurisdiction to actual cases and controversies.  *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (internal quotation marks omitted).  This standing requirement ensures that "the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf."  *Wrath v. Seldin*, 422 U.S. 490, 498-99 (1975) (citation omitted).  It also ensures that federal courts will not expend judicial resources on complex matters without "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions."  *Simon v. E. Ky. Welfare Rights Org.*,

FILED UNDER SEAL

426 U.S. 26, 38 n.16 (1976) (quoting *Baker v. Carr,* 369 U.S. 186, 204 (1962)). The Supreme Court has repeatedly emphasized that Article III standing is a "threshold question in every federal case." *Wrath*, 422 U.S. at 498; *see also United States v. Hays*, 515 U.S. 737, 742 (1995) (standing is "perhaps the most important" of jurisdictional doctrines).

To establish Article III standing, a plaintiff must show an injury *to himself* that is likely to be redressed by a favorable decision. *Wrath*, 422 U.S. at 498. "Absent such a showing, exercise of its power by a federal court would be gratuitous and thus inconsistent with the Art. III limitation." *Simon*, 426 U.S. at 38; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).

A plaintiff must demonstrate an "injury-in-fact" with respect to each and every asserted claim. *See Lujan*, 504 U.S. at 560. Standing to raise one claim does not confer standing to raise other claims, regardless of whether the other claims are closely related. As the Supreme Court put it, "standing is not dispensed in gross." *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("If the right to complain of *one* administrative deficiency automatically conferred the right to complain of *all* administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review. That is of course not the law." (emphasis in original)); *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.").

Article III's personal injury requirement applies with equal force when a plaintiff purports to sue on behalf of an ERISA-covered plan. A plan participant "must allege individual injury in order to have standing to sue under ERISA." *Kenney v. State Street Corp.*, 754 F. Supp.

10

2d 288, 291-92 (D. Mass. 2010) ("[E]ven if a defined contribution plan participant casts his suit against a plan fiduciary as a claim on behalf of the entire plan, it is primarily concerned with *individual* injury." (emphasis added)); *see, e.g.*, *Harley v. Minnesota Mining & Mfg. Co.*, 284 F.3d 901, 908 (8th Cir. 2002) (to same effect as to a defined benefit plan); *In re Boston Scientific Corp. ERISA Litig.*, 254 F.R.D. 24, 32 (D. Mass. 2008) ("'[m]erely because Plaintiffs claim that they are suing on behalf of the respective ERISA plans does not change the fact that they must establish individual standing'" by showing they were personally "harmed" by the alleged breach (citations omitted)); *see also LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 254-56 (2008) (suit under ERISA § 502(a)(2) permits defined contribution plan beneficiaries to "recover[] for fiduciary breaches that impair the value of plan assets *in a[n] . . . individual account*" (emphasis added)).

Similarly, the assertion that a claim is brought on behalf of a class does nothing to expand the standing of the named plaintiff. As the Supreme Court has held, "[t]hat a suit may be a class action . . . adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent." *Lewis*, 518 U.S. at 357 (internal quotation marks omitted); *Blum*, 457 U.S. at 997 n.11, 1001 & n.13; *Gross v. Summa Four*, 93 F.3d 987, 993 (1st Cir. 1996).

## B. Plaintiffs Lack Standing To Bring Claims As To SSgA-Managed Collective Funds

Plaintiffs Henriquez and Cohn have no standing to bring claims on account of foreign exchange trading by SSgA-managed collective funds—the only claims they have alleged in the Complaint—because they have failed to allege, and cannot establish, any injury-in-fact due to those funds having bought or sold foreign currency. *See, e.g.*, *Kenney*, 754 F. Supp. 2d at 291-

FILED UNDER SEAL

92; *In re Boston Scientific*, 254 F.R.D. at 32. ███████████

███████████████████████████████

███████████████████████     ███████████████     Accordingly,

Plaintiffs suffered no loss and have no standing to sue. *See Lujan*, 504 U.S. at 560; *In re Boston Scientific*, 254 F.R.D. at 32 (same).[11]

### C. Plaintiffs Lack Standing To Bring Claims On Behalf Of The J & J Plan

A participant in a defined benefit plan must allege an individual injury in order to sue under ERISA. *See, e.g.*, *Hughes Aircraft Co. v. Jacobson,* 525 U.S. 432, 439-40 (1999); *Harley*, 284 F.3d at 908. Where a defined benefit plan's "assets [are] more than adequate to pay all accrued or accumulated benefits, then any loss [that occurs is] to plan surplus." *Harley*, 284 F.3d at 906. In that case, participants suffer no individual injury. *Id.* at 907-08; *see Hughes Aircraft*, 525 U.S. at 439-40 ("Given the employer's obligation to make up any shortfall, no [plan] member has a claim to any particular asset that composes a part of the plan's general asset pool. . . . Since a decline in the value of a plan's assets does not alter accrued benefits, members have no entitlement to share in a plan's surplus.").

Accordingly, in order to have standing, participants in defined benefit plans must allege and prove that an individual injury has already occurred or is "imminent"—for example, by showing that the plan is not substantially overfunded. *See, e.g.*, *Harley*, 284 F.3d at 907-08;



<u>FILED UNDER SEAL</u>

*McCullough v. AEGON USA Inc.*, 585 F.3d 1082, 1085-91 (8th Cir. 2009); *cf. Paulsen v. CNF, Inc.*, 559 F.3d 1061, 1073-74 (9th Cir. 2009) (ERISA plan participants did not suffer a redressable injury because "recovery [of damages], which [would be] payable to PBGC, would not necessarily compel PBGC to increase the benefits paid to the Employees"); *Glanton v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (ERISA plan participants lacked standing to challenge allegedly inflated prices that the plan paid for drugs because the plan sponsors could have used any recovery to replace their own contributions to the plan rather than reducing the participants' copayments).

Plaintiffs Taylor and Sutherland do not allege that their own interests have been or imminently will be affected by foreign exchange trading between any defendant and the J & J Plan. The J & J Plan has timely paid benefits to its participants for the entire period in which they may have been eligible for payments. (Connolly Aff. ¶¶ 11, 13 & Ex. B.) Based on the present value of accumulated plan benefits, the Plan also has an $800 million surplus. (*See* Mitchell Decl. Ex. A (Plan 2010 Form 5500) at 3, 12.) Thus, Plaintiffs have no standing to bring claims addressing such trading. *See David v. Alphin*, No. 07-cv-11, 2008 WL 5244504, at *2-3 (W.D.N.C. Dec. 15, 2008) (dismissing ERISA claims by defined benefit participants for failure to allege "that they were denied their benefits or that their future benefits were in jeopardy"); *Harley*, 284 F.3d at 908 (defined benefit participants bear the burden of proving the absence of a

FILED UNDER SEAL

plan surplus).[12]

**D.** **Plaintiffs Lack Standing To Assert Claims Based On Alleged Trades By Funds In Which They Did Not Invest And Plans In Which They Did Not Participate**

In addition to lacking standing to assert any claims with respect to their own plans, Plaintiffs also lack standing to challenge any transactions: (1) involving collective funds that were not selected by any plaintiff; or (2) involving ERISA plans in which Plaintiffs did not participate. (Cmplt. ¶ 70 (purporting to bring suit not only on behalf of their ERISA plans, but also any other ERISA plans for which State Street served as investment manager, trustee, or custodian).) Plaintiffs could not have suffered any injury due to trading by a collective fund in which plan assets from their own accounts were not invested, nor can they have suffered injury as to foreign exchange trading by other ERISA plans in which they did not participate. There is no chance (let alone a likelihood) that any favorable outcome with respect to such trading would yield any recovery for them. Thus, as to such funds and plans, Plaintiffs have alleged no injury-in-fact likely to be redressed and therefore they lack standing under Article III.

The First Circuit has long recognized that, if named plaintiffs lack standing themselves to pursue relief, "they may not seek such relief on behalf of a class." *Britt v. McKenney*, 529 F.2d 44, 45 (1st Cir. 1976) (citation omitted); *Gross*, 93 F.3d at 993 (named plaintiff "cannot maintain an action on behalf of class members to redress an injury for which he has no standing in his own

---

[12] *See also United States v. Students Challenging Regulatory Agency Procedures (SCRAP),* 412 U.S. 669, 688–89 (1973) (explaining that standing is not an "ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed . . ., not that he can imagine circumstances in which he could be affected"); *Katz v. Pershing, LLC*, No. 11–1983, 2012 WL 612793, at *12 (1st Cir. Feb. 28, 2012) ("[A] purely theoretical possibility simply does not rise to the level of a reasonably impending threat."); *Maine People's Alliance v. Mallinckrodt, Inc.*, 471 F.3d 277, 284 (1st Cir. 2006) ("To establish an injury in fact based on a probabilistic harm, a plaintiff must show that there is a substantial probability that harm will occur.").

FILED UNDER SEAL

right" (citing *Lewis*, 518 U.S. at 357)).[13]

In cases relating to financial instruments, the First Circuit has recognized that Article III standing depends on the named plaintiff's purchase of the actual instrument that is the subject of the litigation. *See Plumber's Union Local No. 12 Pension Plan v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 768-71 (1st Cir. 2011) (named plaintiff lacked standing to sue as to securities it did not own); *Gross*, 93 F.3d at 993 (plaintiff lacked standing to bring a securities fraud class action based on alleged misstatements made *after* he purchased securities because they "could not possibly have caused the injury about which he complained"); *Barry v. St. Paul Fire & Marine Ins. Co.*, 555 F.2d 3, 5, 13 (1st Cir. 1977) (plaintiffs lacked standing to sue insurance companies that sold no policy to them, even though "[e]ach of the insurance companies had almost certainly sold such policies to some members of the class."), *aff'd*, 438 U.S. 531 (1978).[14]

More specifically, in *Plumbers' Union,* the First Circuit recently affirmed dismissal of purported class claims brought by a named plaintiff that related to securities he did not own,

---

[13] "Named plaintiffs in a class action must be able to make out an individual claim." *Kenney*, 754 F. Supp. 2d at 288; *see, e.g., Forsythe v. Sun Life Fin., Inc.*, 417 F. Supp. 2d 100, 119 (D. Mass. 2006) ("[a] plaintiff may not avoid the standing inquiry merely by styling his suit as a class action" but rather must "'show that [he has] personally been injured'" (citation omitted)); *In re Eaton Vance Corp. Sec. Litig.*, 219 F.R.D. 38, 40-41 (D. Mass. 2003) ("The plaintiffs' burden [to show Article III standing] is in no way lessened by the fact that they seek to represent a class.").

[14] *See also Plumbers' Union*, 632 F.3d at 769 (noting that *Barry* held plaintiffs lacked standing as to two companies from which "none of the named plaintiffs ever bought [the challenged] policy"); *Forsythe*, 417 F. Supp. 2d at 119 ("[P]laintiffs may not rely on the rules-based class action procedural device as a method to 'bootstrap themselves into standing they lack' merely because in theory some member of the putative class, if it were to be certified, might have a claim because they owned shares in the other [accused] Funds at the time the suit was brought." (citation omitted)).

FILED UNDER SEAL

ruling that he had "no stake in establishing liability" for these securities. 632 F.3d at 768-71.[15] There, named plaintiffs bought certificates in only two of the eight trusts holding pools of mortgage backed securities, underwritten by a single underwriter. *Id.* at 766-67 & n.2. Nevertheless, they sought to bring claims relating to six other trusts organized by the same defendants, the certificates for which were underwritten by other underwriters. *Id.* Plaintiffs argued that they could bring such claims because all offerings were conducted pursuant to the same registration statements, certain defendants participated in all offerings, and all defendants allegedly acted in concert pursuant to identical misstatements as to all offerings. The First Circuit rejected these arguments and affirmed dismissal of all claims as to the six trusts "whose certificates were purchased by no named plaintiff." *Id.* at 771.[16]

For similar reasons, these cases require dismissal of Plaintiffs' claims related to collective funds in which they never invested. (Cmplt. ¶ 70.) A holder of an undivided portion of an entity holding a pool of assets—whether a trust holding mortgages, a trust or other entity registered as an investment company (mutual fund), or as here a collective fund that is similar to a mutual fund—is not injured when a different entity or fund is alleged to have suffered an injury with

---

[15] The court in *Plumbers' Union* concluded that the propriety of the named plaintiff's efforts to bring claims related to securities in which he had no interest rested on Article III standing principles, and thus could not be resolved under Rule 23. *Id.* at 770.

[16] Numerous courts in this District and others have reached the same conclusion with respect to holders of interests in a mutual fund seeking to bring claims with respect to other mutual funds with common service providers. *See, e.g.*, *In re Columbia Entities Litig.*, No. 04-11704-REK, 2005 U.S. Dist. LEXIS 33439, at *29 (D. Mass. Nov. 30, 2005) ("Courts in this circuit have held that ownership of shares of a limited number of defendant mutual funds is *not* sufficient to confer standing against all funds, regardless of the similarity of the alleged wrongful conduct[.]" (emphasis in original)); *Forsythe*, 417 F. Supp. 2d at 119-20; *Eaton Vance*, 219 F.R.D. at 40-41; *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 398-400 (S.D.N.Y. 2011) (plaintiffs "lack standing for claims relating to funds in which they did not personally invest" (internal quotation marks omitted)); *Hoffman v. UBS-AG*, 591 F. Supp. 2d 522, 530-31 (S.D.N.Y. 2008) (same).

FILED UNDER SEAL

respect to a different pool of assets.[17]

The rule barring individuals from bringing claims related to funds in which they have not invested has been applied in various legal contexts, including under the Securities Act of 1933,[18]

---

[17] In *Plumbers' Union*, the First Circuit in *dicta* avoided expressly disagreeing with decisions of the Sixth and Seventh Circuits by supposing that there might be a case in which the named plaintiffs' claims "*necessarily* g[ave] them—not just their lawyers—essentially the same incentive to litigate the counterpart claims of the class members because the establishment of the named plaintiffs' claims *necessarily establishes* those of other class members." *Plumbers' Union*, 632 F.3d at 770 (emphasis added) (citing *Payton v. County of Kane*, 308 F.3d 673, 680 (7th Cir. 2002), and *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998)). That is not the case here, where the facts are indistinguishable from those in *Plumbers' Union*. In this case, as in *Plumbers' Union*, the assets in different collective funds are different. To the extent that the collective funds engaged in foreign exchange transactions at all, they would necessarily have done so at different times and in different amounts. The assets of ERISA plans not invested in collective funds are also distinct from those invested in the collective funds. The ERISA plans also have different managers, and they too would have engaged in foreign exchange transactions (if at all) at different times and in different amounts. Plaintiff will get nothing if holders of interests in different collective funds or different ERISA plans recover. Thus, as in *Plumbers' Union* itself, the named plaintiff lacks the posited identity of interest with other ERISA plans and investors in other collective funds. *See* 632 F.3d at 771 (noting that the "necessary identity of issues and alignment of incentives is not present" because each investment was "backed by loans from a different mix of banks" and the named plaintiffs "have no stake in establishing liability as to misconduct involving the sales of . . . certificates" they did not purchase); *see also Forsythe*, 417 F. Supp. 2d at 118 (plaintiffs may not sue to recover losses in funds in which they did not invest, notwithstanding allegation of identical scheme of misconduct as to common fund trustees, because plaintiffs "may not use the corporate structure of the broader investment company to confer standing"); *Eaton Vance*, 219 F.R.D. at 40-41 (dismissing class action claims as to investment funds plaintiff did not purchase without regard to plaintiffs' allegation that certain common defendants were alleged to have made the same false and misleading statements with respect to all funds).

[18] *Eaton Vance*, 219 F.R.D. at 40-41; *see In re Lehman Bros. Sec. & ERISA Litig.*, 684 F. Supp. 2d 485, 490 (S.D.N.Y. 2010) (dismissing claims relating to 85 of 94 securities offerings because "no named plaintiff has alleged that he or she purchased Certificates in any of the other eighty-five offerings"); *New Jersey Carpenters Health Fund v. Residential Capital, LLC*, No. 08 CV 8781, 2010 WL 1257528, at *4 (S.D.N.Y. Mar. 31, 2010) (dismissing claims relating to offerings that named plaintiffs did not purchase); *New Jersey Carpenters Vacation Fund v. Royal Bank of Scotland Grp., PLC*, 720 F. Supp. 2d 254, 265-66 (S.D.N.Y. 2010) (same); *In re IndyMac Mortgage-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 501 (S.D.N.Y. 2010) (same); *City of Ann Arbor Employees' Ret. Sys. v. Citigroup Mortgage Loan Trust Inc.*, 703 F. Supp. 2d 253, 260 (E.D.N.Y. 2010) (dismissing Securities Act claims relating to 16 of 18 trusts in which the plaintiff did not invest).

FILED UNDER SEAL

the Securities Exchange Act of 1934,[19] and the Investment Company Act of 1940.[20] In these cases, courts repeatedly determined that a plaintiff with a claim with respect to one fund did not have standing to bring the same or similar claims with respect to other funds, notwithstanding that those other funds had similar or common management; and no court in this Circuit has found otherwise. This is because a plaintiff himself suffers no injury from a loss to an investment pool in which he has no interest; and because Rule 23 does not expand a plaintiff's standing. *See* Fed. R. Civ. P. 82 (Rules "do not extend or limit the jurisdiction of the United States district courts"); *see, e.g.*, *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011) ("[T]he Rules Enabling Act forbids interpreting Rule 23 to "'abridge, enlarge or modify any substantive right.'" (quoting 28 U.S.C. § 2072(b))). This rule applies equally under ERISA; standing doctrine does not vary based on the underlying federal statute that is the subject of the litigation. *Cf. Boston Scientific*, 254 F.R.D. at 32 (dismissing ERISA class action because named plaintiffs suffered no harm related to the subject investment and therefore did not have individual standing).

---

[19] *Smith Barney*, 765 F. Supp. 2d at 399-400 (dismissing claims relating to 102 of the 105 mutual funds that the named plaintiff did not own); *Hoffman*, 591 F. Supp. 2d at 530-31 (dismissing Section 10(b) claims because plaintiffs "cannot claim to be personally injured by violations" relating to funds in which they had not invested); *In re AIG Advisor Group Sec. Litig.*, No. 06 CV 1625, 2007 WL 1213395, at *3-6 (E.D.N.Y. Apr. 25, 2007) (dismissing securities fraud claims relating to 3 of 19 mutual funds that plaintiff did not own, because "the named plaintiffs can allege no injury from the purchase or sale of funds they never invested in. . . . They therefore have no standing to ask me to remedy injuries related to those funds." (citations omitted)), *aff'd*, 309 F. App'x 495 (2d Cir. 2009); *In re Salomon Smith Barney Mutual Fund Fees Litig.*, 441 F. Supp. 2d 579, 605-07 (S.D.N.Y. 2006) (dismissing claims relating to 68 mutual funds in which plaintiffs did not invest).

[20] *Forsythe*, 417 F. Supp. 2d at 119-20 (dismissing Investment Company Act claims relating to 60 of 62 mutual funds that the named plaintiff did not own); *Stegall v. Ladner*, 394 F. Supp. 2d 358, 362 (D. Mass. 2005) (dismissing claims relating to 32 of 33 funds that the named plaintiff did not own); *Salomon Smith Barney*, 441 F. Supp. 2d at 604-08 (dismissing claims relating to 68 of 88 mutual funds in which the plaintiffs did not invest).

FILED UNDER SEAL

Case 1:11-cv-02013-MLW Document 406 Filed 08/03/18 Page 29 of 372
Case 1:11-cv-02013-NLW Document 415-6 Filed 08/02/18 Page 29 of 372
Redacted Document

This same logic also applies to the situation where a pension plan in which a named plaintiff has no interest at all is allegedly harmed by foreign exchange trading. For example, Cohn—a Citi Plan participant—would himself suffer no harm at all to the extent that the J & J Plan executed foreign exchange transactions with SSGM. This is true regardless of whether the other plan is a defined benefit plan or a defined contribution plan.[21] Thus, all Plaintiffs lack standing to sue on account of foreign exchange trades executed by plans in which they did not participate.

## II. THE COMPLAINT DOES NOT STATE A CLAIM WITH RESPECT TO FOREIGN EXCHANGE TRADING INITIATED BY INVESTMENT MANAGERS OTHER THAN STATE STREET

Plaintiffs' confusing claims concerning foreign exchange trading with pension plans advised by investment managers other than State Street do not state a claim under ERISA. Moreover, the Complaint lacks an adequate pleaded factual basis to support the conclusion that State Street perpetrated a fraudulent foreign exchange scheme.

### A. Legal Standard

To survive a motion under Rule 12(b)(6), the complaint must contain sufficient factual matter, accepted as true, "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "'[N]aked assertions devoid of further factual enhancement' need not be accepted, and '[i]f the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere

---

[21] The result is the same whether the mutual funds are established in separate trusts or as separate divisions of a single trust. *See, e.g.*, *Forsythe,* 417 F. Supp. 2d at 119-20 (plaintiffs lack standing to sue for alleged losses from mutual funds established as separate trusts within the same complex); *Stegall,* 394 F. Supp. 2d at 362 (plaintiff lacks standing to assert claims on behalf of purchasers of funds established pursuant to single trust in which he did not invest because he cannot "bootstrap claims arising out of investment decisions made in relation to other funds [established under the same trust] in which he was not a participant").

FILED UNDER SEAL

conjecture, the complaint is open to dismissal.'" *Plumbers' Union*, 632 F.3d at 771 (citations omitted); *see Fantini v. Salem State Coll.*, 557 F.3d 22, 26 (1st Cir. 2009) (on a motion to dismiss, court need not accept "bald assertions, periphrastic circumlocutions, unsubstantiated conclusions, or outright vituperation, or subjective characterizations, optimistic predictions, or problematic suppositions" (internal quotation marks omitted)). "Where a complaint pleads facts that are 'merely consistent' with a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Coughlin v. Town of Arlington*, No. 10-10203, 2011 WL 6370932, at *4 (D. Mass. Dec. 19, 2011) (Wolf, J.) (citations omitted).

Moreover, the Complaint's "scheme" allegations sound in fraud and are therefore subject to the heightened pleading requirements of Rule 9(b). *See, e.g., Shaw v. Digital Equipment Corp.*, 82 F.3d 1194, 1223 (1st Cir. 1996) (where complaint alleges "a single complaint of a unified course of fraudulent conduct," claims "sound in fraud" and must satisfy Rule 9(b)); *Hayduk v. Lanna*, 775 F.2d 441, 443 (1st Cir. 1985) (holding that "in actions alleging conspiracy to defraud or conceal, the particularity requirements of Rule 9(b) must be met"); *see also* Fed. R. Civ. P. 9(b). In particular, the Complaint alleges that State Street knowingly undertook "a course of conduct designed to conceal" a purported "scheme" to overcharge clients for indirect foreign exchange transactions at "false rate[s]." (Cmplt. ¶¶ 24, 26.) They directly challenge the "truthfulness" of State Street's statements. (Cmplt. ¶ 36.) Thus, Plaintiffs allege a "unified course of fraudulent conduct" and rely entirely on that course of conduct as the basis of their "scheme" claims, and they must therefore plead their "scheme" claim with particularity. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (Rule 9(b) applies to allegations that defendants "misrepresent[ed] the benefits of its CPO program to sell more cars and increase revenue"); *North Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8,

    FILED UNDER SEAL

15 (1st Cir. 2009) (Rule 9(b) applies where "core allegations effectively charge fraud.").

### B. Count I Does Not State A Claim Against State Street As To Trades Initiated By Other Investment Managers

Count I purports to state a claim under Sections 406(b)(1) and (b)(3) of ERISA, 29 U.S.C. § 1106(b)(1) & (b)(3). Section 406(b)(1) prevents a fiduciary from dealing "with the assets of the plan in his own interest or for his own account." Section 406(b)(3) prohibits a fiduciary from receiving any consideration for his own account from a party dealing with the plan in connection with a transaction involving the plan's assets. Plaintiffs do not state a claim under these sections with respect to foreign exchange trades initiated by investment managers other than State Street because they do not plead an adequate factual basis to conclude either that: (i) any State Street entity acted as a fiduciary with respect to such a foreign exchange transaction initiated by third-party investment managers; or (ii) State Street received any consideration from a party to such a foreign exchange transaction with the plan.

There is no fiduciary duty inherent in the relationship between a pension plan and its custodian. *Beddall v. State Street Bank & Trust Co.*, 137 F.3d 12, 18-21 (1st Cir. 1998). In *Beddall*, as in this case, State Street acted as custodian for a pension plan pursuant to a contract establishing State Street as the plan's directed trustee. The First Circuit affirmed this Court's judgment that State Street in that capacity was not an ERISA fiduciary with respect to its activities in that case. *Id.* at 21.

Similarly, there is no fiduciary relationship inherent in a foreign exchange transaction. "Money is just a commodity in an international market." *In re Mexico Money Transfer Litig.*, 267 F.3d 743, 749 (7th Cir. 2001). In describing foreign exchange transactions as similar to transactions involving any commodity, the Seventh Circuit noted that "Neiman Marcus does not tell customers what it paid for the clothes they buy, nor need an auto dealer reveal rebates and

incentives it receives to sell cars. This is true in financial markets no less than markets for physical goods." *Id.* Banks ordinarily have no duty, as a result, to disclose the difference between their rates for foreign exchange and wholesale rates. *Id.*

The legal obligations of an agent who brokers a purchase or sale of a security or commodity differ significantly from those applicable to a buyer or seller acting as principal. An agent broker typically is a fiduciary agent of a principal who buys an asset on behalf of the principal, and is compensated by the principal's payment of an additional commission or brokerage fee. *See BAII Banking Corp. v. UPG, Inc.*, 985 F.2d 685, 700 (2d Cir. 1993). A principal dealer, such as State Street when it conducts its foreign exchange business, buys and sells assets to and from third parties, and obtains a profit or suffers a loss depending on what it pays and receives. *See Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 539-40 (2d. Cir. 1999). Dealers acting as principals are not fiduciaries absent some express agreement between the parties to that effect. *See id.*; *Banca Cremi, S.A. v. Alex. Brown & Sons, Inc.*, 132 F.3d 1017, 1038 (4th Cir. 1997).

Plaintiffs cannot state a claim under Section 406(b) without pleading factual allegations supporting a plausible inference that State Street acted as fiduciary in executing foreign exchange transactions with a plan. It is not enough for Plaintiffs to allege in a conclusory manner that "Defendants acted as fiduciaries within the meaning of ERISA" (Cmplt. ¶ 79) or that they "functioned as fiduciaries . . . both by acting as trustee and custodian . . . and by exercising authority and control over plan assets" (Cmplt. ¶50). *See Bell Atl. Corp.*, 550 U.S. at 570; *Cohen v. Indep. Blue Cross*, No. 10-4910, 2011 WL 5040706, at *4-5 (D.N.J. Oct. 24, 2011) ("[T]he Amended Complaint reveals no factual support, other than conclusory assertions, that IBC is a plan fiduciary."); *Jenkins v. Union Labor Life Ins. Co.*, No. 10-7361, 2011 WL 3919501, at *5

FILED UNDER SEAL

n.7, 6 (E.D. Pa. Sept. 7, 2011) ("Plaintiffs allege in conclusory terms that Amalgamated had discretionary authority over the defined benefit plan, but they do not provide other facts that makes this legal conclusion appear plausible."); *Arizona State Carpenters Pension Trust Fund v. Citibank*, 125 F.3d 715, 722 (9th Cir. 1997) (custodial bank not plan fiduciary).

Even if Plaintiffs' conclusions could be accepted as true, they do not clear the high hurdle set by *Beddall*, which made clear both that "the mere exercise of physical control or the performance of mechanical administrative tasks generally is insufficient to confer fiduciary status"; and that "fiduciary status is not an all or nothing proposition; the statutory language indicates that a person is a plan fiduciary only 'to the extent' that he possesses or exercises the requisite discretion and control." 137 F.3d at 18, 21 (citation omitted).

The Complaint does not allege, even in conclusory terms, that State Street was offered or accepted a role executing foreign exchange trades as any plan's agent; and it nowhere alleges any facts plausibly supporting the conclusion that State Street acted as a plan's agent. The factual allegations of the Complaint are at the very least consistent with the conclusion that State Street is a non-fiduciary principal dealing for its own account; in some respects, they actually rebut the conclusion Plaintiffs seek to advance. Plaintiffs assert that "clients or their investment managers"—not State Street as custodian—initiated and were "ultimately responsible" for foreign exchange transactions. (*See*, *e.g.*, Cmplt. ¶¶ 46-47, 57, 67 (emphasis added).) As custodian, State Street is alleged only to have received and transmitted instructions from investment managers. (Cmplt. ¶ 27.) [22]

---

[22] Plaintiffs allegations as to LLC are no more than a guess. They admit their confusion as to LLC's role, and plead as to LLC only upon information and belief. *Compare* Cmplt. ¶¶ 14, 64-66.

FILED UNDER SEAL

Moreover, the custody contracts of record make clear that State Street was not appointed as any plan's agent to buy or sell currency; rather, only the plans or their fiduciary investment managers had discretion to decide whether the plan should buy or sell assets, including currency.[23]  (*Compare* J & J Plan Agreement ¶ 4.1 (State Street acts "*at the direction*" of investment fiduciaries "[t]o purchase and sell foreign exchange and contracts for foreign exchange, including transactions entered into with State Street Bank and Trust Company, its agents or subcustodians" (emphasis added)), *with id.* ¶ 4.2 (setting forth limited authority of State Street as custodian); *accord* defined contribution Plan Agreements ¶¶ 4.1, 4.2.).  As the First Circuit made clear as to an indistinguishable agreement in *Beddall*, it "is beyond cavil" that appointment of an investment manager for designated assets "shifts all significant discretion and control over those assets to the investment manager and relegates the trustee to the role of an administrative functionary." [24]  137 F.3d at 21; *see also Maniace v. Commerce Bank of Kansas City, N.A.*, 40 F.3d 264, 267 (8th Cir. 1994) (where trust agreement explicitly limits trustee's discretion vis a vis stock at issue, it "had no discretion and could only act at the direction of the Committee.  As such, [it] could not be a fiduciary (nor breach fiduciary duties) with respect to" that stock).[25]

---

[23] Because "fiduciary responsibility under ERISA is directly and solely attributable to [an entity's] possession or exercise of discretionary authority, fiduciary liability arises in specific increments correlated to the vesting or performance of particular fiduciary functions in service of the plan, not in broad, general terms." *Beddall*, 137 F.3d at 18.  Plaintiff therefore cannot plead a claim for fiduciary breach merely by asserting that "any action taken by [SSGM] was an action of SSBT" without alleging the "particular fiduciary function" it was exercising at the time.  (Cmplt. ¶ 15.)

[24] Indeed, the pre-2008 Citi Plan Agreement shows that State Street was not even a Trustee until December 2008.  (*See* Duncan Aff. ¶ 6 & Ex. A.)

[25] The Complaint otherwise alleges that State Street's responsibilities as custodian were purely administrative or ministerial, and that it was "independent" of the plan's fiduciaries who exercised investment management authority.  (Cmplt. ¶ 51 (alleging that custodial

FILED UNDER SEAL

Because the allegations of the Complaint and the contracts themselves support only the conclusion that State Street is not a fiduciary with respect to foreign exchange transactions ordered by third party fiduciaries, Count I of the Complaint should be dismissed for failure to state a claim under Sections 406(b)(1) and (b)(3).[26]  *See Sekerek v. Nat'l City Bank*, 342 F. Supp. 2d 701, 712 (N.D. Ohio 2004) (no fiduciary duty where custody contract did not create such a duty); *O'Toole v. Arlington Trust Co.*, 681 F.2d 94, 97 n.1 (1st Cir. 1982) (fiduciary status a "predicate condition" for liability under § 1106(b)).  Even if State Street was a fiduciary, Plaintiffs state no claim under Section 406(b)(3).  Plaintiffs have no factual basis to assert, and do not assert, that a party dealing with a Plan paid anything to State Street on account of foreign exchange. ███████████████████████████████

███████████████████████████████████████████

████████████████████████████████

### C.     Plaintiffs' Section 404 Claim Depends On Their Defective Fiduciary Duty Allegations

Count II of the Complaint asserts that Defendants' breached Section 404 of ERISA, 29 U.S.C. § 1104(a)(1)(A) & (B).  (Cmplt. ¶ 87.)  This statute also applies only to actions of fiduciaries. 29 U.S.C. § 1104(a) (providing, among other things, that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries").  "In every case charging breach of ERISA fiduciary duty, then, the threshold question is . . . whether

---

responsibilities include "the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities" and "ancillary services").

[26]  As State Street's 2006 Investment Manager Guide makes clear, State Street's custodial clients or their investment managers were free to "execute foreign exchange transactions with third party FX providers." (Mitchell Decl. Ex. C at 5); *see also* defined contribution Plan Agreements ¶ 4.1).

Case 1:11-cv-10230-MLW Document 401-596 Filed 08/23/18 Page 536 of 4372
Case 1:11-cv-10230-MLW Document 401-596 Filed 08/23/18 Page 36 of 72

Redacted Document

th[e] person was acting as a fiduciary (that is, was performing a fiduciary function) when taking

the action subject to the complaint." *Pegram v. Herdrich,* 530 U.S. 211, 226 (2000). "With no

fiduciary function involved, there can be no breach of fiduciary duty." *Livick v. The Gillette Co.*,

524 F.3d 24, 30 (1st Cir. 2008). Because Plaintiffs have not adequately alleged that State Street

is a fiduciary with respect to foreign exchange transactions ordered by third party investment

managers, Count II fails to state a claim.

### D.  Plaintiffs Do Not State A Claim Against LLC

Finally, Count III of the Complaint asserts a claim against LLC under Section 405 of

ERISA, 29 U.S.C. § 1105(a)(1) & (a)(3), which prohibits "a fiduciary with respect to a plan"

from knowingly participating in, concealing or failing to remedy "a breach of fiduciary

responsibility of another fiduciary with respect to the same plan."[27]  As the Complaint has not

alleged any facts to support the conclusion that either State Street or LLC acted in a fiduciary

capacity with respect to foreign exchange transactions ordered by third party investment

managers, this claim also fails.[28]

---

[27] Further, the statute expressly provides that "notwithstanding subsections (a)(2) and (3) . . . no trustee shall be liable for the acts or omissions of [an] investment manager or managers [appointed by the plan], or be under an obligation to invest or otherwise manage any asset of the plan which is subject to the management of such investment manager." 29 U.S.C. § 1105(d)(1).

[28]  There is no factual basis in the Complaint to infer that LLC had anything to do with foreign exchange trading at all.  Plaintiffs assert "confusion" as to whom they intend to sue, but there is nothing ambiguous in State Street's response to the California Attorney General's (the "AG's") Complaint-in-Intervention which they cite (Cmplt. ¶ 15 n.3; *see* Mitchell Decl. Ex. H ¶¶ 1, 12), or in the brief and affidavits filed in response to Plaintiffs' first complaint which made clear that LLC had nothing to do with foreign exchange trading.  Both documents explain that LLC had no involvement in the activities challenged in this case.

FILED UNDER SEAL

E.     **The Complaint Contains No Plausible Allegation Of Any Foreign Exchange "Scheme" By Any Defendant**

1.     **The Complaint's Inconsistent "Scheme" Allegations**

Plaintiffs rely wholesale on other complaints in other cases (and the materials incorporated therein) to assert that State Street perpetrated a foreign exchange "scheme" during the Class Period.[29]  In fact, Plaintiffs' allegations about the so-called foreign exchange "scheme" are themselves misleading and do not satisfy their pleading burdens here.  (*Compare* Cmplt. ¶¶ 20-35.)

Plaintiffs tout an allegedly "extensive" investigation by the California Attorney General ("AG") leading to a complaint against State Street (Cmplt. ¶¶ 20-21), but decline to reveal that the AG did not adopt the allegations made by the *qui tam* relators in California upon which Plaintiffs here rely to assert a "scheme."  That is, the AG did not allege that it was State Street's ordinary practice or "scheme" to "lock in" rates for *customer* trades "early in the day" and then to change those rates to more favorable ones later in the day.  (*Compare* Cmplt. ¶¶ 29-30, *with* CA Complaint ¶ 26-28.)  The AG rejected those allegations by filing a complaint in intervention that did not include them.[30]  Plaintiffs advance no plausible factual basis for such a claim, and

---

[29]  Plaintiffs seek to incorporate allegations and other materials referred to in complaints filed in three other cases: *Hill v. State Street*, 09-cv-12146–NG (D. Mass. July 29, 2010) [hereinafter, *Hill*]; *Brown v. State Street*, Case No. 34-2008-00008457-CU-MC-GDS. (Cal. Super. Ct., Sacramento County Oct. 20, 2009.); and *Arkansas Teachers Retirement System v. State Street*, No. 11-CV-10230 (D. Mass. April 15, 2011) [hereinafter, *ARTRS*].  These materials are attached to the Affidavit of Nolan Mitchell, submitted herewith.  *See* Mitchell Decl. Ex. D, E, F, G.

[30]  The AG's theory was that State Street's specific agreements with California pension funds required State Street to charge those clients interbank market rates, and not rates set with reference to interbank market rates.  (*See* Mitchell Decl. Ex. D at ¶ 2.)  That theory (which Plaintiffs here do not assert) was also incorrect:  State Street's agreements only represented that it would charge its clients foreign transaction rates "based on"—not "at"—the interbank market rate.

FILED UNDER SEAL

plainly acknowledge that their critical scheme allegation—the notion that State Street systematically changed the rates on trades previously executed with customers—is a guess made purely "on information and belief." (*See* Cmplt. ¶¶ 29-35.)

In the Complaint, Plaintiffs adopt allegations from other complaints, despite their mutual inconsistency and despite Plaintiffs' concession that they have no factual basis or source of their own to advance their claims. (*See* Cmplt. ¶ 1.) These inconsistent allegations, particularly in the context of a record including the materials that Plaintiffs now incorporate by reference (most of which were not included in the *Hill* complaint brought before Judge Gertner and now before Judge O'Toole), fail to plead a plausible factual basis for their conclusion that State Street pursued a fraudulent foreign exchange scheme.[31]

For example, Plaintiffs here incorporate the 2009 State Street Investment Manager Guide, which plainly states that in pursuing its business as a principal dealer SSGM buys and sells foreign currency for its own account and not as an agent for its counterparty. (Hayes-Duffy Aff. Ex. A at 5.) That is, it buys currency *from* those with whom it deals, not *on their behalf. Id.* Plaintiffs advance no plausible factual basis for a conclusion to the contrary, and instead plead facts that tend to support the conclusion that State Street did not act as a fiduciary agent in executing foreign exchange trades. They attribute to *ARTRS* the allegation that State Street foreign exchange traders "were informed of SSBT's aggregated standing instruction trade

---

[31] For purposes of defendants' motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court may consider materials incorporated by reference in the Complaint, as well as from relevant public sources. *See Risberg v. McArdle*, 529 F. Supp. 2d 213, 219 (D. Mass. 2008) ("Rule 12(b)(6) permits the court to take into consideration matters of public record, including public filings . . . as well as documents incorporated in, central to, or materially referenced in the Complaint.") (citations omitted); *Watterson v. Page*, 987 F.2d 1, 3-4 (1st Cir. 1993) (on motion to dismiss, Court may consider "documents the authenticity of which are not disputed by the parties," "official public records," "documents central to plaintiffs' claim," and "documents sufficiently referred to in the complaint").

FILED UNDER SEAL

requirements during the course of the day" and would "that day, trade in the interbank FX market in order to satisfy *SSBT's* standing instruction positions." (Cmplt. ¶ 28 (emphasis added)). This allegation—in addition to being inaccurate—amounts to no more than an assertion that State Street would trade during the day in the interbank market with knowledge of the amounts of currency its standing instruction customers sought to trade with State Street. That in no way supports—and indeed rebuts—the Plaintiffs' relator-based claims.

Plaintiffs also fail to grapple with the fact that the custody contracts incorporated in the Complaint do not appoint State Street as an agent of any of the Plans with respect to foreign exchange execution, and do not impose any duty upon State Street with respect to the rates at which foreign exchange transactions would occur. For example, unlike RFP responses submitted to the California customers to which the AG's complaint refers, no custody contract or other information supplied to a custody client in this case even allegedly addresses foreign exchange pricing. Instead, the contracts establish that State Street was a mere custodian or directed trustee with no duties arising under the contracts for foreign exchange execution at all. *See supra* at 4-5.

### 2. The Complaint's "Scheme" Allegations Fail To State A Claim

Plaintiffs provide no facts plausibly to support their allegation that State Street engaged in a "Foreign Exchange Scheme." Instead, the Complaint simply recites unsubstantiated, inflammatory allegations made by other plaintiffs, none of which purport to describe State

FILED UNDER SEAL

Street's foreign exchange pricing and disclosures for ERISA-covered entities.[32]

Blanket reference to other complaints is "legally immaterial." *See, e.g.*, *Low v. Robb*, No. 11-CV-2321, 2012 WL 173472, at *9 (S.D.N.Y. Jan. 20, 2012) (granting motion to strike because "[a]llegations in a complaint 'that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial"); *RSM Prod. Corp. v. Fridman,* 643 F. Supp. 2d 382, 403-04 (S.D.N.Y. 2009) (such allegations immaterial as a matter of law); *In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005-06 (N.D. Cal. 2008) (dismissing claims that relied on complaint filed by SEC); *Caiafa v. Sea Containers, Ltd.*, 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007); *In re Merrill Lynch & Co., Research Reports Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (striking references to SEC and National Association of Securities Dealers complaints); *see also Wilson v. MicroFinancial, Inc.*, No. 03-11883, 2006 WL 1650971, at *3 (D. Mass. June 13, 2006) ("The Amended Complaint, which appears to have been cobbled together without any editorial oversight, is a classic example of what one court has termed 'puzzle' pleading."); *S.E.C. v. Patel*, No. 07-cv-39, 2009 WL 3151143, at *2 n.2 (D.N.H. Sept. 30, 2009) ("A complaint which relies on shotgun or puzzle pleading *does not meet Rule 9(b)'s particularity requirement*.") (emphasis in original and

---

[32] For example, the Complaint asserts that a former State Street employee who worked on the "same floor" as State Street's foreign exchange traders "in sworn testimony, described the practices of SSBT's FX traders as a 'totally unethical thing to do' and said that the FX Traders practices were not within the 'industry standard.'"  (Cmplt. ¶ 23.)  As the attached declaration shows, however, this opinion has no probative value and no foundation: it reflects the following facts which undermine use of this assertion here: the employee was located "within an earshot of any discussions about FX pricing"; he "discussed his views and advice about the markets with FX traders"; he was "familiar enough with the FX traders to recall most of their names"; and he "overheard that State Street FX traders were marking up custody FX trade prices."  (*See* Mitchell Decl. Ex. B at 9-10.)  Obviously, because markups are not ordinarily illegal, "overhearing" that there were markups proves nothing.  *See In re Mexico Money*, 267 F.3d at 749 (banks ordinarily have no duty to disclose the difference between their rates for foreign exchange and wholesale rates).

FILED UNDER SEAL

Case 1:11-cv-12049-MLW Document 596 Filed 08/23/18 Page 41 of 372
Case 1:11-cv-10230-MLW Document 401-5 Filed 07/23/18 Page 41 of 372
Redacted Document

internal quotation marks omitted).[33]  Because the other complaints are not an adequate basis to plead a scheme, and because the Plaintiffs admittedly have no other basis, the Complaint fails to state a scheme claim.  (*See, e.g.,* Cmplt. ¶¶ 1, 31-35 (relying on information and belief).)

The regurgitated "scheme" allegations Plaintiffs advance in this case are in any event mutually inconsistent, factually unsupported and in many cases inapposite.  For example, the California AG's claim is based on contract language not alleged to be included in the Plan Agreements.  And the *qui tam* relators' assertion that State Street consistently repriced trades executed with clients was rejected by the AG.  (CA Complaint ¶¶ 26-28.)  Nowhere do plaintiffs allege a basis to assert that the Plan Agreements contained any pricing commitment or established any fiduciary (or other) duty to disclose the difference between wholesale and other rates for foreign exchange.  Indeed, as a matter of law, no such other duty exists.  *See In re Mexico Money*, 267 F.3d at 749.

Plaintiffs also ignore other factual context embedded in the Complaint.  For example, State Street's 2006 Investment Manager Guide *encouraged* investment managers to execute foreign exchange with State Street *directly* (i.e., not using the methods challenged in this case) and noted investment managers were free to "execute foreign exchange transactions with third party FX providers."  (Mitchell Decl. Ex. C at 3, 5 (2006 Investment Manager Guide.)  It described additional disclosures made to investment managers for ERISA clients, noting that State Street had "a special procedure when effecting foreign exchange transactions for ERISA trust and custody clients" in which State Street "post[ed] to its website on a daily basis, a specific

---

[33] *But see Hill v. State Street Corp.* No. 09-cv-12146, 2011 WL 3420439, at *10-14 (D. Mass. Aug. 3, 2011).  In *Hill*, Judge Gertner rejected the argument that the plaintiffs could not rely on the relator's allegations.  *Id.* at *10-14.  Judge Gertner relied heavily on the AG's "investigation," which she mistakenly did not recognize did not support (and indeed rebutted) the assertion that State Street systematically changed the rates for indirect foreign exchange trades previously executed with clients.  *Id.* at *13.

FILED UNDER SEAL

buy rate and sell rate for each currency," and that "[e]ach ERISA plan manager [could] direct [SSBT] to effect the plan's FX transactions . . . at the posted rates or at rates more favorable if market conditions warrant." (Cmplt. ¶ 67 (citing State Street's 2006 Investment Manager Guide).) The Complaint does not allege that this procedure was not followed. It does not explain how the "scheme" applied to ERISA clients at all. Instead, it advances allegations of other plaintiffs in non-ERISA cases, and assumes without basis that what they had to say applies with equal force to ERISA clients. (*Compare* Cmplt. ¶¶ 18-30 (describing allegations relating to SSGM's foreign exchange practices for "*Non-ERISA Clients*"), *with id.* ¶ 31 (asserting "[o]n information and belief" that ERISA custodial clients and collective funds were subject to "this pricing scheme").)

## **CONCLUSION**

For the foregoing reasons, the Court should dismiss this case for lack of jurisdiction or for failure to state a claim.

> STATE STREET BANK AND TRUST COMPANY and STATE STREET GLOBAL MARKETS LLC
>
> By its attorneys,
>
> /s/ William H. Paine
> Jeffrey B. Rudman (BBO# 433380)
> William H. Paine (BBO# 550506)
> Mark C. Fleming (BBO# 639358)
> Nolan J. Mitchell  (BBO# 668145)
> Robert Tannenbaum (BBO# 680568)
> Wilmer Cutler Pickering Hale and Dorr LLP
> 60 State Street
> Boston, Massachusetts, 02109
> (617) 526-6000

Dated April 9, 2012

FILED UNDER SEAL

Redacted Document

## CERTIFICATE OF SERVICE

I, Nolan J. Mitchell, certify that this document filed under seal will be sent to all counsel of record via First Class mail on April 9, 2012.

/s/ Nolan J. Mitchell
Nolan J. Mitchell

FILED UNDER SEAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

ARNOLD HENRIQUEZ, ET AL.     )
             )
        Plaintiff,     )
             )
v.             )     C.A. No. 11-cv-12049-MLW
             )
STATE STREET BANK AND TRUST     )
COMPANY AND STATE STREET     )
GLOBAL MARKETS LLC     )
             )
        Defendants.     )
_____)

## AFFIDAVIT OF JOHN CONNOLLY  IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

John Connolly states:

### Background and Qualifications

1.     I am a Senior Vice President in the Institutional Investor Services ("IIS") Division of State Street Bank and Trust Company ("State Street"), which provides custodial banking services to institutional investors.

2.     I am the relationship manager for the Johnson & Johnson Retirement Savings Plan (the "J & J Plan").  My responsibilities include providing custody, accounting, daily valuation and client service to the J & J Plan.

3.     I  submit this affidavit in support of Defendants' Motion to Dismiss the Complaint in the matter captioned above.  I state in this affidavit the source of any information that is not based on personal knowledge.

### State Street's Relationship to the J & J Plan

4.     State Street provides custody services to institutional investors.  These services are provided by divisions of State Street that are separate from the State Street divisions

1

responsible for providing investment management services to collective funds and for executing foreign exchange transactions with custody clients of State Street.

5.    During the alleged class period ("Class Period"), State Street provided custody services to the J & J Plan, which is alleged to be an ERISA defined benefit plan. Complaint ¶ 13.

6.    Prior to January 1, 2003, State Street's responsibilities as custodian were set forth in the Johnson & Johnson General Pension Trust Agreement dated January 11, 2001, a true and accurate copy of which is attached hereto as Exhibit A.

7.    From January 1, 2003 to date, State Street's responsibilities as custodian are set forth in the Johnson & Johnson Pension and Savings Plans Master Trust Agreement, a true and accurate copy of which is attached hereto as Exhibit B.

8.    The J & J plan invests its assets in accounts managed by investment managers appointed from time to time by the J & J Plan's named fiduciaries in accordance with the trust agreements referenced in Paragraphs 6 and 7 above.

9.    The J & J Plan pays a fixed level of benefits to participants when they become eligible. The amount of benefits is determined by the participant's years of service. The amount of benefits each participant receives is not based on the value of any individual account. The benefits are funded by payments from the J & J Plan's Sponsor and not by individual contributions. *See* The Retirement Plan of Johnson & Johnson, Department of Labor Form 5500 (2010), Notes to Financial Statements, at 6 [attached as Exhibit A to the Declaration of Nolan J. Mitchell].

10.   Pursuant to separate agreements, State Street's Retiree Services Division processes payments from the J & J Plan to eligible participants.

[REDACTED]

12.    Plaintiffs William R. Taylor and Richard A. Sutherland allege that they are participants in the J & J Plan.  Complaint ¶¶ 12-13.

[REDACTED]

14.    To my knowledge, the J & J plan is neither underfunded nor in jeopardy of becoming underfunded.

I declare under penalty of perjury that the forgoing is true and correct to the best of my personal knowledge, information, and belief.

_____

John S. Connolly

THE JOHNSON & JOHNSON GENERAL PENSION TRUST AGREEMENT

Johnson & Johnson MasterTR6.doc
12/00

MASTERTR.DOC

TABLE OF CONTENTS

PAGE

1. TRUST FUND . . . . . . . . . . . . . . . . . . .   2

    1.1  Trust Name. . . . . . . . . . . . . . . .   2
    1.2  Receipt of Assets . . . . . . . . . . . .   3
    1.3  Employers . . . . . . . . . . . . . . . .   3
    1.4  Plans . . . . . . . . . . . . . . . . . .   3
    1.5  Accounting for a Plan's Undivided
             Interest in the Trust Fund . . . . .    3
    1.6  No Trustee Duty Regarding Contributions .   4

2. DISBURSEMENTS FROM THE TRUST FUND. . . . . . .   5

3. RESPONSIBILITIES RELATING TO INVESTMENT
       FUNDS AND INVESTMENT ACCOUNTS . . . . . . .   6

    3.1  Investment Funds. . . . . . . . . . . . .   6
    3.2  Investment Manager Appointment. . . . . .   7
    3.3  Company Directed Investment Accounts. . .  10
    3.4  Trustee Directed Investment Accounts. . .  11

4. POWERS OF THE TRUSTEE. . . . . . . . . . . . .  12

    4.1  Investment Power of the Trustee . . . . .  12
    4.2  Administrative Powers of the Trustee. . .  19

5. INDEMNIFICATION. . . . . . . . . . . . . . . .  20

6. SECURITIES . . . . . . . . . . . . . . . . . .  21

7. SECURITY CODES . . . . . . . . . . . . . . . .  22

8. TAXES AND TRUSTEE COMPENSATION . . . . . . . .  22

9. ACCOUNTS OF THE TRUSTEE. . . . . . . . . . . .  24

10. RELIANCE ON COMMUNICATIONS . . . . . . . . . .  27

11. RESIGNATION AND REMOVAL OF TRUSTEE . . . . . .  28

12. AMENDMENT. . . . . . . . . . . . . . . . . . .  28

13. TERMINATION. . . . . . . . . . . . . . . . . .  29

TABLE OF CONTENTS
(cont.)

PAGE

14.  WITHDRAWAL FROM TRUST FUND. . . . . . . . . . .      29

     14.1 Withdrawal of a Plan . . . . . . . . . . .      29
     14.2 Withdrawal Due to Disqualification . . . .      30
     14.3 Withdrawal of a Group of Employees . . . .      30

15.  MISCELLANEOUS. . . . . . . . . . . . . . . . .      31

     15.1    Governing Law . . . . . . . . . . . . .      31
     15.2    No Reversion to Employers . . . . . . .      31
     15.3    Non-Alienation of Benefits. . . . . . .      33
     15.4    Duration of Trust . . . . . . . . . . .      33
     15.5    No Guarantees . . . . . . . . . . . . .      33
     15.6    Duty to Furnish Information . . . . . .      33
     15.7    Withholding . . . . . . . . . . . . . .      34
     15.8    Parties Bound . . . . . . . . . . . . .      34
     15.9    Necessary Parties to Disputes . . . . .      35
     15.10   Unclaimed Benefit Payments. . . . . . .      35
     15.11   Severability. . . . . . . . . . . . . .      36
     15.12   References. . . . . . . . . . . . . . .      36
     15.13   Headings. . . . . . . . . . . . . . . .      36
     15.14   No Liability for Acts of Predecessor
             and Successor Trustees . . . . . . .        36
     15.15   Counterparts. . . . . . . . . . . . . .      36

THE JOHNSON & JOHNSON GENERAL PENSION TRUST AGREEMENT

Agreement effective as of January 2, 2001, by and between
JOHNSON & JOHNSON, a corporation organized and existing under the
laws of New Jersey (the "Company") and STATE STREET BANK AND
TRUST COMPANY, a trust company organized under the laws of the
Commonwealth of Massachusetts (hereinafter referred to as the
"Trustee").

### WITNESSETH:

WHEREAS, the Company maintains certain tax-qualified
employee benefit plans (hereinafter referred to as the "Plans")
for the exclusive benefit of certain of its employees;

WHEREAS, the Company has by Trust Agreement dated April 1,
1957 with Bankers Trust Company of New York established a single
trust to serve as the funding vehicle for the Plans;

WHEREAS, the authority to conduct the general operation and
administration of the Plans is vested in the Company, which has
appointed the Pension Committee, as "Administrator" of the Plans,
and the Pension Committee and its delegates (collectively, for
purposes of this Trust Agreement, the "Pension Committee") shall
have the authorities and shall be subject to the duties with
respect to the trust specified in the Plans and in this Trust
Agreement;

WHEREAS, the Company has appointed State Street Bank and
Trust Company as successor trustee to Bankers Trust Company of
New York, effective January 2, 2001; and

WHEREAS, the Company and the Trustee desire to amend and

1

restate the said Trust Agreement in its entirety.

NOW, THEREFORE, the Company and the Trustee do hereby amend and restate the said Trust Agreement and continue the trust as the funding vehicle for the Plans, upon the terms and conditions hereinafter set forth:

1. <u>TRUST FUND</u>

1.1  <u>Trust Name</u>.  This Trust shall be known as The Johnson & Johnson General Pension Trust.

1.2  <u>Receipt of Assets</u>.  The Trustee shall receive and accept for the purposes hereof all sums of money and other property paid to it by or at the direction of the Company or any Employer, and pursuant to the terms of this Trust Agreement shall hold, invest, reinvest, manage, administer and distribute such monies and other property and the increments, proceeds, earnings and income thereof for the exclusive benefit of participants in the Plans and their beneficiaries.  The Trustee acknowledges that it is a fiduciary of the Plan with respect to the duties and obligations imposed upon it under this Trust Agreement which are within the scope of ERISA section 3(21)(A). The Trustee will discharge its fiduciary duties under the Trust with the skill, care, prudence, and diligence under the circumstances then prevailing of a prudent trustee acting in like capacity and familiar with such matters.  The Trustee need not inquire into the source of any money or property transferred to it nor into the authority or right of the transferor of such money or property to transfer such money or property to the Trustee.  All

2

assets held by the Trustee in the trust pursuant to the provisions of this Trust Agreement at the time of reference are referred to herein as the "Trust Fund".

1.3  Employers.  For purposes of this Trust Agreement the term "Employer" means any corporation which is a member of a controlled group of corporations of which the Company is a member as determined under Section 1563(a) of the Internal Revenue Code of 1986, as amended without regard to Section 1563(a)(4) and Section 1563(e)(3)(C) of such Code.

1.4  Plans.  References in this Trust Agreement to the "Plan" or the "Plans" shall, unless the context indicates to the contrary, mean the tax-qualified employee benefit plan or plans of the Company.

The Pension Committee shall be responsible for verifying that while any assets of a particular Plan are held in the Trust Fund, that Plan (i) is "qualified" within the meaning of Section 401(a) of the Code; (ii) is permitted by existing or future rulings of the United States Treasury Department to pool its funds in a group trust; and (iii) permits its assets to be commingled for investment purposes with the assets of other such Plans by investing such assets in this Trust Fund whether or not its assets will in fact be held in a separate Investment Fund.

1.5  Accounting for a Plan's Undivided Interest in the Trust Fund.  All transfers to, withdrawals from, and other transactions regarding the Trust Fund shall be conducted in such a way that the proportionate interest in the Trust Fund of each Plan and the

3

fair market value of that interest may be determined at any time.

Whenever the assets of more than one Plan are commingled in the Trust Fund or in any Investment Fund, the undivided interest therein of that Plan shall be debited or credited (as the case may be) (i) for the entire amount of every contribution received on behalf of that Plan, every benefit payment, or other expense attributable solely to that Plan, and every other transaction relating only to that Plan; and (ii) for its proportionate share of every item of collected or accrued income, gain or loss, and general expense; and other transactions attributable to the Trust Fund or that Investment Fund as a whole. As of each date when the fair market value of the investments held in the Trust Fund or an Investment Fund are determined as provided for in Article 9, the Trustee shall adjust the value of each Plan's interest therein to reflect the net increase or decrease in such values since the last such date. For all of the foregoing purposes, fractions of a cent may be disregarded.

1.6 <u>No Trustee Duty Regarding Contributions</u>. The Trustee shall not be under any duty to require payment of any contributions to the Trust Fund, or to see that any payment made to it is computed in accordance with the provisions of the Plans, or otherwise be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plans. The named fiduciary responsible for ensuring timely payment of contributions to the Trust Fund is the Pension Committee.

4

Redacted Document

## 2. DISBURSEMENTS FROM THE TRUST FUND.

The Trustee shall from time to time on the directions of the Pension Committee make payments out of the Trust Fund to such persons, or any member thereof, in such manner, in such amounts and for such purposes as may be specified in the directions of the Pension Committee.

The Pension Committee shall be responsible for insuring that any payment directed under this Article conforms to the provisions of the Plans, this Trust Agreement, and the provisions of the Employee Retirement Income Security Act of 1974, as amended (referred to herein as "ERISA"). Each direction of the Pension Committee shall be in writing (including but not limited to electronic writing such as e-mail, if agreed to by Trustee) and shall be deemed to include a certification that any payment or other distribution directed thereby is one which the Pension Committee is authorized to direct, and the Trustee may conclusively rely on such certification which is given in accordance with this Trust Agreement without further investigation unless it knows the certification constitutes a breach of fiduciary duty. Payments may be made by the Trustee by wire transfer, or such other electronic method or check to the order of the payee, as the Pension Committee may determine. Payments or other distributions hereunder may be mailed to the payee at the address last furnished to the Trustee by the Pension Committee or if no such address has been so furnished, to the payee in care of the Pension Committee. The Trustee shall not

Redacted Document

incur any liability or other damage on account of any payments or other distributions made by it in accordance with the written directions of the Pension Committee, unless reasonable care required under industry standards for a directed trustee would require alternate action.

3.   RESPONSIBILITIES RELATING TO INVESTMENT FUNDS AND INVESTMENT ACCOUNTS.

     3.1   <u>Investment Funds</u>.   The Pension Committee, from time to time and in accordance with provisions of the Plans, may direct the Trustee to establish one or more separate investment accounts within the Trust Fund, each separate account being hereinafter referred to as an "Investment Fund".   The Trustee shall transfer to each such Investment Fund such portion of the assets of the Trust Fund as the Pension Committee directs in accordance with the specific provisions of each Plan.   The Trustee shall be under no duty to question, and shall not incur any liability on account of following, any direction of the Pension Committee which is given in accordance with this Trust Agreement.   The Trustee shall be under no duty to review the investment guidelines, objectives and restrictions established, or the specific investment directions given, by the Pension Committee for any Investment Fund, or to make suggestions to the Pension Committee in connection therewith.   To the extent that directions from the Pension Committee to the Trustee represent investment elections of the Plans' members, the Trustee shall have no responsibility for such investment elections and shall incur no liability on

6

account of investing the assets of the Trust Fund in accordance with such directions.

The Trustee shall credit and reinvest in the Investment Fund all interest, dividends and other income received with respect to, and any proceeds received from the sale or other disposition of, securities or other property held in such Investment Fund. All expenses of the Trust Fund which are allocable to a particular Investment Fund shall be so allocated and charged. Subject to the provisions of the Plans, the Pension Committee may direct the Trustee to eliminate an Investment Fund or Funds, and the Trustee shall thereupon dispose of the assets of such Investment Fund and reinvest the proceeds thereof in accordance with the directions of the Pension Committee.

If, and to the extent specifically authorized by the Plans, the Pension Committee may direct the Trustee to establish one or more Investment Funds all of the assets of which shall be invested in securities which constitute "qualifying employer securities" or "qualifying employer real property" within the meaning of Section 407 of ERISA. It shall be the duty of the Pension Committee to determine that such investment is not prohibited by Sections 406 or 407 of ERISA.

3.2 <u>Investment Manager Appointment</u>. The Pension Committee, from time to time and in accordance with the provisions of the Plans, may appoint one or more independent Investment Managers, pursuant to a written investment management agreement describing the powers and duties of the Investment Manager, to direct the

7

investment and reinvestment of all or a portion of the Trust Fund
or an Investment Fund (hereinafter referred to as an "Investment
Account").

The Pension Committee shall be responsible for ascertaining
that while each Investment Manager is acting in that capacity
hereunder, the following requirements are satisfied:

(a) The Investment Manager is either (i) registered as an
investment adviser under the Investment Advisers Act of
1940; (ii) is not registered as an investment adviser under
such Act by reason of paragraph (1) of Section 203A(a) of
such Act, is registered as an investment adviser under the
laws of the State (referred to in such paragraph (1)) in
which it maintains its principal office and place of
business, and, at the time the fiduciary last filed the
registration form most recently filed by the fiduciary with
such State in order to maintain the fiduciary's registration
under the laws of such State, also filed a copy of such form
with the Secretary, (iii) a bank as defined in that Act or
(iv) an insurance company qualified to perform the services
described in (b) below under the laws of more than one
state.

(b) The Investment Manager has the authority to manage, acquire
or dispose of any assets of the Plans for which it is
responsible hereunder.

(c) The Investment Manager has acknowledged in writing to the
Pension Committee and the Trustee that he or it is a
fiduciary with respect to the Plans within the meaning of
Section 3(21)(A) of ERISA.

(d) The Plans provide for the appointment of the Investment
Manager in accordance with Section 402(c)(3) of ERISA, and
the Investment Manager is appointed as so provided.

(e) Any Investment Manager with authority to invest in assets
which will be held outside the jurisdiction of the district
courts of the United States is an entity described in ERISA
regulations at 29 C.F.R. 2550.404b-1(a)(2)(i).

The Pension Committee shall furnish the Trustee with written
notice of the appointment of each Investment Manager hereunder,
and of the termination of any such appointment. Such notice

8

shall specify the assets which shall constitute the Investment
Account. The Trustee shall be fully protected in relying upon
the effectiveness of such appointment and the Investment
Manager's continuing satisfaction of the requirements set forth
above until it receives written notice from the Pension Committee
to the contrary.

The Trustee shall conclusively presume that each Investment
Manager, under its investment management agreement, is entitled
to act, in directing the investment and reinvestment of the
Investment Account for which it is responsible, in its sole and
independent discretion and without limitation, except for any
limitations which from time to time the Pension Committee and the
Trustee agree (in writing) shall modify the scope of such
authority.

The Trustee shall have no liability (i) for the acts or
omissions of any Investment Manager; (ii) for following
directions, including investment directions of an Investment
Manager, unless reasonable care required under industry standards
for a directed trustee would require alternate action; or (iii)
for any loss of any kind which may result by reason of the
directed manner of division of the Trust Fund or Investment Fund
into Investment Accounts.

An Investment Manager shall certify, at the request of the
Trustee, the value of any securities or other property held in
any Investment Account managed by such Investment Manager, and
such certification shall be regarded as a direction with regard

9

to such valuation. The Trustee shall be entitled to conclusively rely upon such valuation for all purposes under this Trust Agreement, provided that it satisfies either any tolerance checks agreed upon by the parties or the Trustee's customary tolerance checks.

3.3 <u>Company Directed Investment Accounts</u>. The Trustee shall, if so directed in writing by the Pension Committee, segregate all or a portion of the Trust Fund held by it into one or more separate investment accounts to be known as Company Directed Accounts. The Pension Committee, by written notice to the Trustee, may at any time relinquish its powers under this Section 3.3 and direct that a Company Directed Account shall no longer be maintained. The Pension Committee also may direct the investment of cash within an Investment Account. In addition, during any time when there is no Investment Manager with respect to an Investment Account (such as before an investment management agreement takes effect or after it terminates), the Pension Committee shall direct the investment and reinvestment of such Investment Account. Whenever the Pension Committee is directing the investment and reinvestment of an Investment Account or a Company Directed Account, the Pension Committee shall have the powers and duties which an Investment Manager would have under this Trust Agreement if an Investment Manager were then serving and the Trustee shall be protected in relying on the Pension Committee's directions without reviewing investments or making suggestions to the same extent as it would be protected under

10

this Trust Agreement if it had relied on the directions of an Investment Manager.

3.4 <u>Trustee Directed Investment Accounts</u>. The Trustee shall have no duty or responsibility to direct the investment and reinvestment of the Trust Fund, any Investment Fund or any Investment Account unless the Pension Committee expressly appoints the Trustee as an Investment Manager, as agreed to in writing between the Trustee and the Pension Committee in accordance with the investment guidelines applicable to the Trustee as set forth on Schedule A (as amended from time to time, the "Trustee Investment Guidelines") with respect to any Portfolio (as defined in the Trustee Investment Guidelines). In the event that the Pension Committee appoints the Trustee pursuant to the Trustee Investment Guidelines, it shall have the powers and duties of an Investment Manager under this Trust Agreement with regard to such Portfolio. The Trustee Investment Guidelines may be modified from time to time by a written agreement signed by the authorized representatives of both parties. With respect to the Trustee's role as Investment Manager with respect to a Portfolio, the provisions of this Agreement shall apply to the extent not inconsistent with the Trustee Investment Guidelines. Additionally, the Trustee shall be entitled to such compensation as set forth in the Trustee Investment Guidelines for its services as Investment Manager with respect to a Portfolio. Such compensation shall be in addition to any compensation the Trustee receives in its role as Trustee

11

under this Trust Agreement. The Trustee, in its capacity as Investment Manager represents and warrants that it qualifies as an "investment manager," as defined in Section 3(38) of ERISA, with respect to the Portfolio. The Pension Committee acknowledges that the Trustee and its affiliates perform investment advisory services for various clients. The Pension Committee agrees that the Trustee may give advice and take action in the performance of its duties with respect to any of its other clients which differ from action taken with respect to the Portfolios, provided that the Portfolio is treated in a fair and equitable manner.

4. **POWERS AND DUTIES OF THE TRUSTEE**.

4.1 Investment Powers and Duties of the Trustee. The Trustee shall have and exercise the powers and authorities lettered (a) through (y) below (i) over Investment Accounts where it has express investment management discretion as provided in Section 3.4 or (ii) upon direction of the Investment Manager of an Investment Account or (iii) upon direction of the Pension Committee: (x) for a Company Directed Account and for cash within certain Investment Accounts identified by a standing direction letter to the Trustee, (y) for voting and tendering of qualifying employer securities, and (z) for lending to participants in the Plans.

(a)   To purchase, receive, or subscribe for any securities or other property and to retain in trust such securities or other property.

(b)   To acquire and hold qualifying employer securities and qualifying employer real property, as such investments are

12

defined in Section 407(d) of ERISA.

(c)  To collect income and distributions received due to the
Trust Fund and sign on behalf of the Trust Fund any
declarations, affidavits, certificates of ownership and
other documents required to collect income and principal
payments, including but not limited to, tax reclaimations,
rebates and other withheld amounts.

(d)  To sell for cash or on credit, to grant options, convert,
redeem, exchange for other securities or other property, to
enter into standby agreements for future investment, either
with or without a standby fee, or otherwise to dispose of
any securities or other property at any time held by it and
subject to the timely receipt of notice from an issuer,
Investment Manager or Pension Committee, collect proceeds
received from securities, certificates of deposit or other
investments which may mature or be called.

(e)  To settle, compromise or submit to arbitration any claims,
debts, or damages, due or owing to or from the trust, to
commence or defend suits or legal proceedings and to
represent the trust in all suits or legal proceedings in any
court of law or before any other body or tribunal.

(f)  To trade in financial options and futures, including index
options and options on futures and to execute in connection
therewith such account agreements and other agreements in
such form and upon such terms as the Investment Manager or
the Pension Committee shall direct.

(g)  To exercise all voting rights, tender or exchange rights,
any conversion privileges, subscription rights and other
rights and powers available in connection with any
securities or other property at anytime held by it; to
oppose or to consent to the reorganization, consolidation,
merger, or readjustment of the finances of any corporation,
company or association, or to the sale, mortgage, pledge or
lease of the property of any corporation, company or
association any of the securities which may at any time be
held by it and to do any act with reference thereto,
including the exercise of options, the making of agreements
or subscriptions and the payment of expenses, assessments or
subscriptions, which may be deemed necessary or advisable by
the Investment Manager or Pension Committee in connection
therewith, and to hold and retain any securities or other
property which it may so acquire; and to deposit any
property with any protective, reorganization or similar
committee, and to pay and agree to pay part of the expenses
and compensation of any such committee and any assessments
levied with respect to property so deposited.

(h)  To exercise all voting or tender offer rights with respect

13

to all qualifying employer securities held by it to the extent provided in the plans, or otherwise from the Pension Committee. The Pension Committee shall inform the Trustee of the voting and tender offer provisions of each Plan. Each participant entitled to do so may direct the Trustee, confidentially, how to vote or whether or not to tender the qualifying employer securities representing his proportionate interest in the assets of the Plans. The Pension Committee shall furnish the Trustee with the name of each participant and the number of shares held for the participant's account as near as practicable to the record date fixed for the determination of shareholders entitled to vote and shall provide the Trustee with all other information and assistance which the Trustee may reasonably request.

(i)   To lend to participants in the Plans such amounts and upon such terms and conditions as the Pension Committee may direct. Any such direction shall be deemed to include a certification by the Pension Committee that such lending is in accordance with the provisions of ERISA and the Plans.

(j)   To borrow money in such amounts and upon such terms and conditions as shall be deemed advisable or proper by the Pension Committee or Investment Manager to carry out the purposes of the trust and to pledge any securities or other property for the repayment of any such loan.

(k)   To invest all or a portion of the Trust Fund in contracts issued by insurance companies, including contracts under which the insurance company holds Plan assets in a separate account or commingled separate account managed by the insurance company. The Trustee shall be entitled to rely upon any written directions of the Pension Committee or the Investment Manager under this Section 4.1, and the Trustee shall not be responsible for the terms of any insurance contract that it is directed to purchase and hold or for the selection of the issuer thereof or for performing any functions under such contract (other than the execution of any documents incidental thereto on the instructions of the Pension Committee or the Investment Manager).

(l)   To manage, administer, operate, lease for any number of years, develop, improve, repair, alter, demolish, mortgage, pledge, grant options with respect to, or otherwise deal with any real property or interest therein at any time held by it, and to hold any such real property in its own name or in the name of a nominee, with or without the addition of words indicating  that such property is held in a fiduciary capacity, all upon such terms and conditions as may be deemed advisable by the Investment Manager or Pension Committee.

14

(m) To renew, extend or participate in the renewal or extension of any mortgage, upon such terms as may be deemed advisable by the Investment Manager or Pension Committee, and to agree to a reduction in the rate of interest on any mortgage or of any guarantee pertaining thereto in any manner and to any extent that may be deemed advisable by the Investment Manager or Pension Committee for the protection of the Trust Fund or the preservation of the value of the investment; to waive any default, whether in the performance of any covenant or condition of any mortgage or in the performance of any guarantee, or to enforce any such default in such manner and to such extent as may be deemed advisable by the Investment Manager or Pension Committee; to exercise and enforce any and all rights of foreclosure, to bid on property on foreclosure, to take a deed in lieu of foreclosure with or without paying consideration therefor, and in connection therewith to release the obligation on the bond secured by such mortgage, and to exercise and enforce in any action, suit or proceeding at law or in equity any rights or remedies in respect to any such mortgage or guarantee.

(n) To hold part or all of the Trust Fund uninvested.

(o) To employ suitable agents and counsel and to pay their reasonable and proper expenses and compensation.

(p) To purchase and sell foreign exchange and contracts for foreign exchange, including transactions entered into with State Street Bank and Trust Company, its agents or subcustodians.

(q) To form corporations and to create trusts to hold title to any securities or other property, all upon such terms and conditions as may be deemed advisable by the Investment Manager or Pension Committee.

(r) To register any securities held by it hereunder in its own name or in the name of a nominee with or without the addition of words indicating that such securities are held in a fiduciary capacity and to hold any securities in bearer form and to deposit any securities or other property in a depository or clearing corporation.

(s) To make, execute and deliver, as Trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases, or other instruments in writing necessary or desirable for the accomplishment of any of the foregoing powers.

(t) To invest at State Street Bank and Trust Company (i) in any type of interest bearing investments (including, but not limited to savings accounts, money market accounts, certificates of deposit and repurchase agreements) and (ii)

15

in noninterest bearing accounts (including but not limited to checking accounts).

(u)  To invest in collective investment funds maintained by State Street Bank and Trust Company or by others for the investment of the assets of employee benefit plans qualified under Section 401 of the Code, whereupon the instruments establishing such funds, as amended, shall be deemed a part of this Trust Agreement and incorporated by reference herein.

(v)  To invest in open-end and closed-end investment companies, regardless of the purposes for which such fund or funds were created, including those managed, serviced, or advised by the Trustee or an affiliate of the Trustee, and in any partnership, limited or unlimited, joint venture and other forms of joint enterprise created for any lawful purpose.

(w)  To lend securities through a securities lending program of the Trustee, as authorized under a separate lending agreement.

(x)  To commingle any part or all of the assets of the Trust Fund for purposes of investment with the assets any other trust maintained by the Company for funding of retirement plans qualified under Section 401(a) of the Code, as directed by the Pension Committee.

(y)  To generally take all action, whether or not expressly authorized, which the Trustee may deem necessary or proper for the fulfillment of the foregoing duties hereunder.

Except as otherwise provided in this Trust Agreement, the Investment Manager of an Investment Account or the Pension Committee in the case of a Company Directed Account shall have the power and authority, to be exercised in its sole discretion at any time and from time to time, to issue orders for the purchase or sale of securities directly to a broker. Written notification of the issuance of each such order shall be given promptly to the Trustee by the Investment Manager or the Pension Committee and the confirmation of each such order shall be confirmed to the Trustee by the broker. Unless otherwise

16

directed by the Pension Committee or Investment Manager, such notification shall be authority for the Trustee to pay for securities purchased or to deliver securities sold as the case may be. Upon the direction of the Investment Manager or the Pension Committee, unless reasonable care required under industry standards for a directed trustee would require alternate action, the Trustee will execute and deliver appropriate trading authorizations, but no such authorization shall be deemed to increase the liability or responsibility of the Trustee under this Trust Agreement.

The Trustee shall transmit promptly to the Pension Committee or the Investment Manager, as the case may be, all notices of conversion, redemption, tender, exchange, subscription, class action, claim in insolvency proceedings or other rights or powers relating to any of the securities in the Trust Fund, which notices are received by the Trustee from its agents or custodians, from issuers of the securities in question and from the party (or its agents) extending such rights. The Trustee shall have no obligation to determine the existence of, or to exercise any right or power with respect to any conversion, redemption, tender, exchange, subscription, class action, claim in insolvency proceedings or other right or power relating to any of the securities in the Trust Fund which would not be reasonably evident to a similar trustee with similar experience acting in a similar capacity or of which notice was not given after the purchase of such securities by the Trust Fund.

Redacted Document

The Trustee shall not be liable for any untimely exercise or assertion of such rights or powers described in the paragraph immediately above in connection with securities or other property of the Trust Fund at any time held by it unless (i) it or its agents or custodians are in actual possession of such securities or property and (ii) it receives directions to exercise any such rights or powers from the Pension Committee or the Investment Manager, as the case may be, and both (i) and (ii) occur at least three business days prior to the Trustee's deadline date to exercise such right or power.

If the Trustee is directed by the Pension Committee or an Investment Manager to purchase securities issued by any foreign government or agency thereof, or by any corporation or other entity domiciled outside of the United States:  i) the Trustee shall provide market information to the Pension Committee or the Trust's Investment Managers consistent with industry standards for professional global custodians;  ii)  the Trustee shall receive for and credit to the Trust Fund any money or assets, including dividends and interest, due and payable from or on account of the securities  and other investments and /or assets in the Trust Fund, based upon tax status information supplied by the Pension Committee;  iii)  the Trustee shall, in the ordinary course of business, take all necessary administrative steps for the timely collection of interest, repayments and dividends, and for exercising or cashing in rights and warrants as instructed, obtaining new coupon or dividend sheets and effecting conversion

18

transactions; however, the Trustee shall not attempt to enforce such collections by legal process unless directed in writing to do so by the Pension Committee or Investment Manager, and unless arrangements are made to Trustee's reasonable satisfaction with respect to reimbursement of expenses for any such legal process; (iv) the Trustee will submit to the relevant tax authorities documents received from the Pension Committee with regard to the Trust's tax status and will use reasonable efforts to claim any refund or withholding of tax to which the Trust Fund has been subject; (v) provide settlement of purchases and sales of securities as a global custodian. Except with respect to the foregoing activities conducted in the ordinary course of business, the Trustee shall have no responsibility to determine what foreign laws or regulations (including, without limitation, any laws or regulations affecting receipt by the Trust of dividends, interest or other distributions) might apply to such securities or other investments or to the Trust.

4.2 <u>Administrative Powers of the Trustee</u>. Notwithstanding the appointment of an Investment Manager, the Trustee shall have the following powers and authority, to be exercised in its sole discretion, with respect to the Trust Fund:

(a) To employ suitable agents, custodians and counsel, except that the indicia of ownership of any assets of the Fund shall not be held outside the jurisdiction of the District Courts of the United States unless in compliance with Section 404(b) of ERISA and regulations thereunder, and to pay their reasonable expenses and compensation.

(b) To appoint ancillary trustees to hold any portion of the assets of the trust and to pay their reasonable expenses and compensation.

19

(c)  To register any securities held by it hereunder in its own name or in the name of a nominee with or without the addition of words indicating that such securities are held in a fiduciary capacity and to hold any securities in bearer form and to deposit any securities or other property in a depository or clearing corporation.

(d)  To make, execute and deliver, as Trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases or other instruments in writing necessary or desirable for the accomplishment of any of the foregoing powers.

(e)  Generally to do all ministerial acts, whether or not expressly authorized, which the Trustee may deem necessary or desirable in carrying out its duties under this Trust Agreement.

Notwithstanding anything in the Plans or this Trust Agreement to the contrary, the Trustee shall not be required by the Company, the Pension Committee or any Investment Manager to engage in any action, nor make any investment which constitutes a prohibited transaction or is otherwise contrary to the provisions of ERISA or which is otherwise contrary to law or to the terms of the Plans or this Trust Agreement.

The Trustee may consult with legal counsel concerning any question which may arise with reference to this Trust Agreement and its powers and duties hereunder.  The written opinion of such counsel shall be full and complete protection of the Trustee in respect to any action taken or suffered by the Trustee hereunder in good faith reliance on said opinion.

5.  <u>INDEMNIFICATION</u>.

Unless resulting from the Trustee's negligence, willful misconduct, lack of good faith, or breach of its fiduciary duties under this Agreement or ERISA, the Company shall indemnify and

20

save harmless the Trustee for and from any loss or expense
(including reasonable attorneys' fees) arising directly (a) out
of an authorized action hereunder taken in good faith by the
Trustee or any matter as to which this Trust Agreement provides
that the Trustee is directed, protected, not liable, or not
responsible, or (b) by reason of any breach of any statutory or
other duty owed to the Plans by the Company, any Employer, the
Pension Committee, any Investment Manager or any authorized
delegate of any of them (and for the purposes of this sentence
the Trustee shall not be considered to be such a delegate),
whether or not the Trustee may also be considered liable for that
person's breach under the provisions of section 405(a) of ERISA,
unless the Trustee knowingly participates in or knowingly
undertakes to conceal an act or omission of another fiduciary
knowing it to be a fiduciary breach, or has knowledge of a breach
by another fiduciary and fails to notify the Pension Committee of
such breach.

6.    SECURITIES OR OTHER PROPERTY.

The words "securities or other property", used in this Trust
Agreement, shall be deemed to refer to any property, real or
personal, or part interest therein, wherever situated, including,
without limitation, governmental, corporate or personal
obligations, trust and participation certificates, partnership
interests, annuity or investment contracts issued by an insurance
company, leaseholds, fee titles, mortgages and other interests in
realty, preferred and common stocks, certificates of deposit,

21

Redacted Document

financial options and futures or any other form of option, evidences of indebtedness or ownership in foreign corporations or other enterprises or indebtedness of foreign governments, and any other evidences of indebtedness or ownership, including securities or other property of the Company, even though the same may not be legal investment for trustees under any law other than ERISA.

7.    SECURITY CODES.

If the Trustee has issued to the Company, the Pension Committee or to any Investment Manager appointed by the Pension Committee, security codes or passwords in order that the Trustee may verify that certain transmissions of information, including directions or instructions, have been originated by the Company, Pension Committee or the Investment Manager, as the case may be, the Trustee shall be kept indemnified by and be without liability to the Company for any action taken or omitted by it in reliance upon receipt by the Trustee of transmissions of information with the proper security code or password, including communications purporting to be directions or instructions, which the Trustee reasonably believes to be from the Company, Pension Committee or Investment Manager.

8.    TAXES AND TRUSTEE COMPENSATION.

The Trustee shall pay out of the Trust Fund all real and personal property taxes, income taxes and other taxes or assessments of any and all kinds levied or assessed under existing or future laws against the Trust Fund by any

22

Redacted Document

governmental authority. Until advised to the contrary by the
Pension Committee (or such governmental authority), the Trustee
shall assume that the Trust is exempt from Federal, State and
local income taxes, and shall act in accordance with that
assumption. The Pension Committee shall timely file all Federal,
State and local tax and information returns relating to the Plans
and Trust. The Trustee shall notify the Pension Committee as soon
as reasonably practicable (but in any event no later than five
(5) business days) after the Trustee receives notice of any tax
or assessment and shall provide the Pension Committee with such
information as the Trustee has received concerning such tax or
assessment. The Pension Committee may direct that the Trustee
refrain from paying the tax or assessment until such tax or
assessment is due and payable (the "Review Period"), during which
time the Trustee will provide all reasonable assistance to the
Pension Committee in determining the validity of such tax or
assessment and will cooperate in all reasonable efforts to have
the tax or assessment waived or mitigated if such tax or
assessment is considered not to be owed by the Trust. At the end
of the Review Period, if the tax or assessment remains
outstanding, the Trustee may pay the tax or assessment from the
Trust Fund, only upon the advice of counsel acceptable to Pension
Committee and Trustee, but will continue to provide all
reasonable assistance to the Pension Committee in seeking a
refund of the tax or assessment.

The Trustee shall be paid such reasonable compensation as

23

shall from time to time be agreed upon by the Pension Committee and the Trustee. Such compensation and all reasonable and proper expenses of administration of the Trust shall be withdrawn by the Trustee out of the Trust Fund, upon approval or direction of the Pension Committee, unless paid by the Company, but such compensation and expenses shall be paid by the Company if the same cannot by operation of law be withdrawn from the Trust Fund.

If the Trustee has advanced cash or securities for any proper purpose under the Trust, such as, but not limited to, the purchase or sale of foreign exchange to settle trades, such advances shall remain a charge on the Trust Fund until withdrawn by the Trustee or paid to it by the Company.

All payments from the Trust Fund under this Article 8 shall be accounted for to the Pension Committee.

9.   **ACCOUNTS OF THE TRUSTEE**.

The Trustee shall maintain or cause to be maintained suitable records, data and information relating to its functions hereunder.

The Trustee shall keep accurate and detailed accounts of all investments, receipts, disbursements, and other actions hereunder, and such other records as the Pension Committee shall from time to time direct, as agreed to by the Trustee. Its books and records relating thereto shall be open to inspection and audit at all reasonable times by the Pension Committee or its duly authorized representatives and each Investment Manager. The Trustee shall be entitled to reasonable compensation and

24

reimbursement of its reasonable expenses incurred in connection with such audits or inspections.

In accordance with the Trustee's standard operating procedure, the Trustee shall credit the Trust Fund with income and maturity proceeds on securities on contractual payment date net of any taxes or upon actual receipt. To the extent the Trustee credits income on contractual payment date, the Trustee may reverse such accounting entries to the contractual payment date if the Trustee reasonably believes that such amount will not be received. The collection of income due the Trust Fund on securities loaned by the Trust Fund other than through a securities lending program of the Trustee shall be the responsibility of the Company and such income shall be credited upon actual receipt by the Trustee.

Within sixty days after the close of each fiscal year of the trust and at more frequent intervals if agreed to by the parties hereto, and within sixty days after the removal or resignation of the Trustee as provided hereunder, the Trustee shall render to the Pension Committee a written statement and account showing in reasonable summary the investments, receipts, disbursements, and other transactions engaged in during the preceding fiscal year or period, and setting forth the assets and liabilities of the trust. Unless the Pension Committee shall have filed with the Trustee written exceptions or objections to any such statement and account within sixty days after receipt thereof, the Pension Committee shall be deemed to have approved such statement and

25

account, and in such case or upon written approval by the Pension Committee of any such statement and account, the Trustee shall be released and discharged with respect to the accuracy of all matters and things embraced in such statement and account as though it had been settled by a decree of a court of competent jurisdiction in an action or proceeding in which the Company, all other necessary parties and all persons having any beneficial interest in the Trust Fund were parties.

The Trustee shall certify the value of any securities or other property held in the Trust Fund and determine the fair market value of the Trust Fund monthly, or for such other period as may be mutually agreed upon (with the expectation of beginning daily valuation during April, 2001), in accordance with methods consistently followed and uniformly applied, based upon information and financial publications of general circulation, statistical and valuation services, records of security exchanges, appraisals by qualified persons, transactions and bona fide offers in assets of the type in question and other information customarily used in the valuation of property, including, in the case of securities or other property for which the value cannot be readily obtained, valuations provided by Investment Managers.

The Pension Committee or its delegate, each Investment Manager, and the Trustee shall file such descriptions and reports and make such other publications, disclosures, registrations and other filings as are required of them respectively by ERISA.

26

Nothing contained in this Trust Agreement or in the Plans shall deprive the Trustee of the right to have a judicial settlement of its account. In any proceeding for a judicial settlement of the Trustee's accounts or for instructions in connection with the trust, the only necessary party thereto in addition to the Trustee shall be the Pension Committee, and no participant or other person having or claiming any interest in the Trust Fund shall be entitled to any notice or service of process (except as required by law). Any judgment, decision or award entered in any such proceeding or action shall be conclusive upon all interested persons.

10. **RELIANCE ON COMMUNICATIONS**.

The Trustee may rely upon a certification of the Pension Committee with respect to any instruction, direction or approval of such Pension Committee, and may continue to rely upon such certification until a subsequent certification is filed with the Trustee.

The Trustee shall be fully protected in acting upon any instrument, certificate, or paper of the Company, its Board of Directors, the Pension Committee, reasonably believed by it to be genuine and to be signed or presented by any authorized person, and the Trustee shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing but may accept the same as fully authorized by the Company, its Board of Directors or the Pension Committee, as the case may be.

The Trustee shall be further protected in reasonable

27

reliance upon a certification from any Investment Manager appointed by the Pension Committee as to the person or persons authorized to give instructions or directions on behalf of such Investment Manager and may continue to rely upon such certification until a subsequent certification is filed with Trustee.

11. RESIGNATION AND REMOVAL OF TRUSTEE.

Any Trustee acting hereunder may resign at any time by giving sixty days' prior written notice to the Pension Committee, which notice may be waived by the Pension Committee. The Pension Committee may remove the Trustee at any time upon sixty days' prior written notice to the Trustee, which notice may be waived by the Trustee. In case of the resignation or removal of the Trustee, the Pension Committee shall appoint a successor trustee. The removal of a Trustee and the appointment of a new Trustee shall be by a written instrument delivered to the Trustee. Upon the appointment of a successor trustee, the resigning or removed Trustee shall transfer or deliver the Trust Fund to such successor trustee on a timely basis.

12. AMENDMENT.

This Trust Agreement may be amended by agreement between the Trustee and the Company at any time or from time to time and in any manner, and the provisions of any such amendment may be applicable to the Trust Fund as constituted at the time of the amendment as well as to the part of the Trust Fund subsequently acquired.

28

Redacted Document

13. __TERMINATION__.

This Trust Agreement and the trust created hereby may be terminated at any time by the Company, and upon such termination or upon the dissolution or liquidation of the Company, in the event that a successor to the Company by operation of law or by the acquisition of its business interests shall not elect to continue the Plans and the trust, the Trust Fund shall be paid out by the Trustee after the settlement of its final account when directed by the Pension Committee. Notwithstanding the foregoing, the Trustee shall not be required to pay out any assets of the Trust Fund upon termination of the Trust until the Trustee has received written certification from the Pension Committee: (i) that all provisions of law with respect to such termination have been complied with; and (ii) (after the Trustee has made a determination of the fair market value of the Plans' assets) that the Plans' assets are sufficient to discharge when due all obligations of the Plans required by law. The Trustee shall rely conclusively on such written certification, and shall be under no obligation to investigate or otherwise determine its propriety.

14. __WITHDRAWAL FROM TRUST FUND__.

14.1 __Withdrawal of a Plan__. In the event of the withdrawal of a Plan from the trust or in the event of the Company's or an Employer's election to terminate or to fund separately the benefits provided under any of its Plans, the Company shall cause

29

a valuation to be made of the share of the Trust Fund which is held for the benefit of persons having an interest therein under such Plans. The Trustee shall thereupon segregate and dispose of such share in accordance with the written direction of the Company accompanied by its certification to the Trustee that such segregation and disposition is in accordance with the terms of the Plans and the requirements of the law.

14.2 **Withdrawal Due to Disqualification**. If the Company or any Employer receives notice that one or more of its Plans is no longer qualified under the provisions of Section 401 of the Code or the corresponding provisions of any future Federal revenue act, the Company shall immediately cause a valuation to be made of the share of the Trust Fund which is held for the benefit of such persons having an interest under such disqualified Plan or Plans. The Trustee shall thereupon segregate, withdraw from the Trust Fund, and dispose of such share in accordance with the terms of the disqualified Plan or Plans. The Company may direct the Trustee to dispose of such share by the transfer and delivery of such share to itself as trustee of a separate trust, the terms and conditions of which shall be identical with those of this Trust Agreement, except that either the Company or the Employer maintaining such disqualified Plan or Plans and the Trustee shall be the only parties thereto.

14.3 **Withdrawal of a Group of Employees**. In the event that any group of employees covered by a Plan is withdrawn from such Plan, the Company shall, if required by the terms of such Plan,

30

cause a valuation to be made of the share of the Trust Fund which is held for the benefit of such group of employees. The Trustee shall thereupon segregate and dispose of such share in accordance with the direction of the Company accompanied by its certification to the Trustee that such segregation and disposition is in accordance with the terms of such Plan and the requirements of the law.

The Trustee shall have no duty to see that the valuation of any share in accordance with the provisions of this Section 14 is caused to be made by the Company, nor to segregate and dispose of any such share in the absence of the written direction of the Company to do so.

15. **MISCELLANEOUS**.

15.1 <u>Governing Law</u>. To the extent not inconsistent with ERISA, as heretofore or hereafter amended, the provisions of this Trust Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of the conflicts of laws of that state; however, to the extent required by law, the Trustee's rights, duties, obligations and powers with respect to the trust created hereby, and the terms and conditions of any common or collective trust maintained by the Trustee into which any assets held hereunder are deposited shall in all respects be governed by and construed in accordance with the Commonwealth of Massachusetts' laws governing trusts.

15.2 <u>No Reversion to Employers</u>. Except as provided herein,

31

no portion of the principal or the income of the Trust Fund shall revert to or be recoverable by the Company or any Employer or ever be used for or diverted to any purpose other than for the exclusive benefit of participants in the Plans and persons claiming under or through them pursuant to the Plans, provided, however, that:

(a)   if a contribution is conditioned upon the deductibility of the contribution under Section 404 of the Code, then, to the extent the deduction is disallowed, the Trustee shall, upon written request of the affected Employer or the Company, return such amounts as may be permitted by law to such Employer or the Company, as appropriate, within one year after the date the deduction is disallowed; and

(b)   if a contribution or any portion thereof is made by the Company or an Employer by a mistake of fact, the Trustee shall, upon written request of the Company or such Employer, return such amounts as may be permitted by law to the Company or such Employer, as appropriate, within one year after the date of payment to the Trustee or within such other period as is permitted by applicable law; and

(c)   if a contribution is conditioned upon the qualification of the Plans and Trust under Section 401 and 501 of the Code, the contributions of the Company or an Employer to the Trust for all Plans Years, with the gains and losses thereon, shall be returned by the Trustee to the Company or such Employer, as appropriate, within one year in the event that the Commissioner of Internal Revenue fails to rule that the Plans and Trust were as of such date qualified and tax-exempt (within the meaning of Sections 401 and 501 of the Code); and

(d)   in the event that a Plan whose assets are held in the Trust Fund is terminated, assets of such Plan may be returned to the Employer if all liabilities to participants and beneficiaries of such Plan have been satisfied; and

(e)   assets may be returned to the Employer to the extent that the law permits such transfer.

The Trustee shall be under no obligation to return any part of the Trust Fund as provided in this Section 15.2 until the

32

Trustee has received a written certification from the Pension Committee that such return is in compliance with this Section 15.2, the Plans and the requirements of the law. The Trustee shall rely conclusively on such written certification and shall be under no obligation to investigate or otherwise determine its propriety.

15.3 __Non-Alienation of Benefits__. No benefit to which a participant or his beneficiary is or may become entitled under a Plan shall at any time be subject in any manner to alienation or encumbrance, nor be resorted to, appropriated or seized in any proceeding at law, in equity or otherwise. No participant or other person entitled to receive a benefit under a Plan shall, except as specifically provided in such Plans, have power in any manner to transfer, assign, alienate or in any way encumber such benefit under such Plan, or any part thereof, and any attempt to do so shall be void.

15.4 __Duration of Trust__. Unless sooner terminated, the trust created under this Trust Agreement shall continue for the maximum period of time which the laws of the State of New York shall permit.

15.5 __No Guarantees__. Neither the Company, the Pension Committee nor any Employer, nor the Trustee guarantees the Trust Fund from loss or depreciation, nor the payment of any amount which may become due to any person under the Plans or this Trust Agreement.

15.6 __Duty to Furnish Information__. Both the Pension

33

Redacted Document

Committee and the Trustee shall furnish to the other any documents, reports, returns, statements, or other information that the other reasonably deems necessary to perform its duties imposed under the Plans or this Trust Agreement or otherwise imposed by law.

15.7 **Withholding**. The Company or its agent shall withhold any tax which by any present or future law is required to be withheld from any payment under the Plans, unless the Trustee or its agents or affiliates shall have agreed in writing to do so. The Administrator shall provide all information reasonably requested by the Trustee to enable the Trustee to so withhold.

15.8 **Parties Bound**. This Trust Agreement shall be binding upon the parties hereto, all participants in the Plans and persons claiming under or through them pursuant to the Plans, and, as the case may be, the heirs, executors, Pension Committees, successors, and assigns of each of them. The provisions of Articles 5 and 7 shall survive termination of the Trust created under this Trust Agreement or resignation or removal of the Trustee for any reason.

In the event of the merger or consolidation of the Company or any Employer or other circumstances whereby a successor person, firm or company shall continue to carry on all or a substantial part of its business, and such successor shall elect to carry on the provisions of the Plan or Plans applicable to such business, as therein provided, such successor shall be substituted hereunder for the Company or such Employer, as the

34

Redacted Document

case may be, upon the filing in writing of its election so to do with the Trustee. The Trustee may, but need not, rely on the certification of an officer of the Company, and a certified copy of a resolution of the Board of Directors of such successor, reciting the facts, circumstances and consummation of such succession and the election of such successor to continue the said Plan or Plans as conclusive evidence thereof, without requiring any additional evidence.

15.9 **Necessary Parties to Disputes**. Necessary parties to any accounting, litigation or other proceedings shall include only the Trustee, the Company, the Pension Committee and any appropriate Employers and the settlement or judgment in any such case in which the Company, the Pension Committee, the appropriate Employers and the Trustee are duly served or cited shall be binding upon all participants in the Plans and their beneficiaries and estates, and upon all persons claiming by, through or under them.

15.10 **Unclaimed Benefit Payments**. If any check or share certificate in payment of a benefit hereunder which has been mailed by regular US mail to the last address of the payee furnished the Trustee by the Company is returned unclaimed, the Trustee shall notify the Company and shall discontinue further payments to such payee until it receives the further instruction of the Company. Any such returned benefits shall be promptly redeposited into the Trust Fund in accordance with the Trustee's standard operating procedure.

35

15.11 __Severability__.  If any provisions of this Trust Agreement shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions of this Trust Agreement shall continue to be fully effective.

15.12 __References__.  Unless the context clearly indicates to the contrary, a reference to a statute, regulation, document or provision shall be construed as referring to any subsequently enacted, adopted or executed counterpart.

15.13 __Headings__.  Headings and subheadings in this Trust Agreement are inserted for convenience of reference only and are not to be considered in the construction of its provisions.

15.14 __No Liability for Acts of Predecessor and Successor Trustees__.  The Trustee shall have no liability for the acts or omissions of any predecessors or successors in office.

15.15 __Counterparts__.  This Trust Agreement may be executed in one or more counterparts, each of which shall constitute an original.

36

Redacted Document

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed by their duly authorized officers as of the day and year first above written.

ATTEST:

JOHNSON & JOHNSON

BY: _____

NAME:   John A. Papa

TITLE:  Treasurer

DATE:   December 21, 2000

ATTEST:

STATE STREET BANK AND TRUST COMPANY

BY: _____

NAME: _____

TITLE: _____

DATE: _____

REVIEWED
LEGAL DIVISION
By _____
Date _____

Redacted Document

## SCHEDULE A

### TRUSTEE INVESTMENT GUIDELINES

From time to time, the Pension Committee may appoint the Trustee to act as Investment Manager for the investment and reinvestment of certain assets of the Trust in a certain portfolio of securities (the "Portfolio") identified on a supplement hereto (each a "Supplement"). By executing a copy of the Supplement for a Portfolio, the Trustee accepts its appointment as the Investment Manager with respect to such Portfolio. In such event, the provisions of this Schedule A, and, to the extent they are not inconsistent with this Schedule A, the provisions of the Trust Agreement shall apply to the provision of such investment management services by the Trustee. In no event shall the Trustee be considered to be an Investment Manager with respect to securities or other assets held in the Trust unless otherwise appointed by the Pension Committee pursuant to this Schedule A, as amended from time to time. The Trustee, in its capacity as Investment Manager represents and warrants that it qualifies as an "investment manager," as defined in Section 3(38) of ERISA, with respect to the Portfolio. The Trustee, in its capacity as Investment Manager, acknowledges that it is a fiduciary with respect to the Portfolio and that it will discharge its duties as Investment Manager in good faith, with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person who is familiar with such matters would use.

The Pension Committee shall direct the Trustee to acquire on behalf of the Portfolio units in the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans (the "State Street Trust"), a trust pursuant to which State Street operates and maintains the funds identified on the Supplement (collectively referred to as the "Funds"). The Funds will be maintained in accordance with investment objectives (the "Objectives"), the current form of which is set forth on the Supplement. Any amendment to such Objectives shall be effective only upon mutual acceptance, in writing, by both the Pension Committee and the Trustee. In the event that the Plan loses its tax-qualified status, the Pension Committee warrants that it shall immediately cause such assets to be withdrawn from the Portfolio.

Redacted Document

The Trustee shall be entitled to a fee in accordance with the Supplement. Fees will be charged to the Portfolio quarterly in arrears following each calendar quarter based on the average of the Portfolio's month-end market values within each such calendar quarter. The Trustee will provide the Portfolio with an invoice subsequent to the end of each calendar quarter. Any and all reasonable expenses directly relating to the investment of the assets of the Portfolio, and all taxes, including any interest and penalties with respect thereto, which may be levied or assessed under existing or future laws upon or in respect of the Funds or income thereof and applied to the Funds' participants on a pro rata basis pursuant to applicable law shall, unless otherwise provided, be charged to and paid out of the assets of the Portfolio.

**SUPPLEMENT**

## Daily EAFE Securities Lending Fund Series A

The investment objective of the Fund shall be to match, as closely as possible, the performance of the Morgan Stanley Capital International EAFE Index.



## Russell 3000 Index Securities Lending Fund; and, Russell 3000 Index Securities Lending Fund Series A

The investment objective of the Fund shall be to match, as closely as possible, the performance of the Russell 3000 Index.



Master Trust

**Government Securities Funds**

The investment objective of the Fund shall be to maximize current income while preserving capital and liquidity through investing in fixed-rate and floating-rate securities backed by the U.S. Treasury and its agencies.  The Net Asset ████████████████████
████████████████████████████████████

All of the above shall be effective as of December 29, 2000.

ATTEST:                          JOHNSON & JOHNSON PENSION COMMITTEE

_____                  BY: _____

                                 NAME:  John A. Papa

                                 TITLE: Member, Pension Committee


ATTEST:                          JOHNSON & JOHNSON PENSION COMMITTEE

_____                  BY: _____

                                 NAME:  Lori P. Blutfield

                                 TITLE: Member, Pension Investment
                                        Subcommittee, as delegate for
                                        the Pension Committee


ATTEST:                          STATE STREET BANK AND TRUST COMPANY

_____                  BY: _____

                                 NAME: _____JOHN R. SERHANT_____

                                 TITLE: _____E.V.P_____

REVIEWED
LEGAL DIVISION
By _____
Date 1/11/01

# Connolly Ex. B

THE JOHNSON & JOHNSON PENSION AND SAVINGS PLANS MASTER TRUST
AGREEMENT

JohnsonDBDC.doc
JOHNSON & JOHNSON DC PLAN4.DOC
082803 ssbt

TABLE OF CONTENTS

| | | PAGE |
|---|---|---|
| 1. | TRUST FUND . . . . . . . . . . . . | 2 |
| | 1.1 Trust Name. . . . . . . . . . . | 2 |
| | 1.2 Receipt of Assets . . . . . . . . . . . | 2 |
| | 1.3 Employers . . . . . . . . . . . . . . | 3 |
| | 1.4 Plans . . . . . . . . . . . . . . | 4 |
| | 1.5 Accounting for a Plan's Undivided Interest in the Trust Fund. . . . . . . . . | 5 |
| | 1.6 Appointment of Recordkeeper. . . . . . . . | 5 |
| | 1.7 No Trustee Duty Regarding Contributions. . | 6 |
| | 1.8 Withholding. . . . . . . . . . . . | 7 |
| 2. | DISBURSEMENTS FROM THE TRUST FUND. . . . . . . | 6 |
| 3. | PENSION COMMITTEE SELECTED INVESTMENT FUNDS. . | 8 |
| | 3.1 In General. . . . . . . . . . . . | 8 |
| | 3.2 Participant-Directed Brokerage Accounts . | 10 |
| | 3.3 Company Managed Stock Investment Accounts. . . . . . . . . . . . | 11 |
| | 3.4 Company Managed Investment Accounts . . . | 11 |
| | 3.5 Trustee Managed Investment Accounts . . . | 12 |
| | 3.6 Investment Manager Accounts . . . . . . | 13 |
| 4. | POWERS AND DUTIES OF THE TRUSTEE . . . . . . . | 16 |
| | 4.1 Investment Powers and Duties of the Trustee. . . . . . . . . . . | 16 |
| | 4.2 Administrative Powers of the Trustee. . . | 24 |
| | 4.3 The Leveraged Employee Stock Ownership Plan. . . . . . . . . | 27 |
| | 4.4 ESOP Shares . . . . . . . . . . . . | 25 |
| | 4.5 Common Stock of the Company Held Outside The ESOP. . . . . . . . . . . . | 28 |
| | 4.6 Limitation of Powers. . . . . . . . . . | 30 |
| 5. | INDEMNIFICATION. . . . . . . . . . . | 31 |
| 6. | SECURITIES OR OTHER PROPERTY . . . . . . . | 31 |
| 7. | SECURITY CODES . . . . . . . . . . . | 32 |
| 8. | TAXES AND TRUSTEE COMPENSATION . . . . . . . | 33 |
| 9. | ACCOUNTS OF THE TRUSTEE. . . . . . . . . . | 34 |
| 10. | RELIANCE ON COMMUNICATIONS . . . . . . . . . | 37 |

TABLE OF CONTENTS (CONT.)

11.  RESIGNATION AND REMOVAL OF TRUSTEE . . . . . . .          38

12.  AMENDMENT. . . . . . . . . . . . . . . . . . .           38

13.  TERMINATION. . . . . . . . . . . . . . . . . .           39

14.  WITHDRAWAL FROM TRUST FUND . . . . . . . . . .          40

     14.1  Withdrawal of a Plan . . . . . . . . . .           40
     14.2  Withdrawal Due to Disqualification . . .           40
     14.3  Withdrawal of a Group of Employees . . .           41

15.  MISCELLANEOUS. . . . . . . . . . . . . . . . .           41

     15.1   Governing Law . . . . . . . . . . . . .           41
     15.2   No Reversion to Employers . . . . . . .           42
     15.3   Non-Alienation of Benefits. . . . . . .           42
     15.4   Duration of Trust . . . . . . . . . . .           43
     15.5   No Guarantees . . . . . . . . . . . . .           44
     15.6   Duty to Furnish Information . . . . . .           44
     15.7   Parties Bound . . . . . . . . . . . . .           44
     15.8   Necessary Parties to Disputes . . . . .           45
     15.9   Unclaimed Benefit Payments. . . . . . .           45
     15.10  Severability. . . . . . . . . . . . . .           46
     15.11  References. . . . . . . . . . . . . . .           46
     15.12  Headings. . . . . . . . . . . . . . . .           46
     15.13  No Liability for Acts of Predecessor
              and Successor Trustees. . . . . . . .           46
     15.14  Counterparts. . . . . . . . . . . . . .           47

THE JOHNSON & JOHNSON

PENSION AND SAVINGS PLANS MASTER TRUST AGREEMENT

Agreement (hereinafter referred to as the "Trust Agreement") effective as of January 1, 2003, by and between Johnson & Johnson, a corporation organized under the laws of New Jersey (hereinafter referred to as the "Company") and STATE STREET BANK AND TRUST COMPANY, a trust company organized under the laws of the Commonwealth of Massachusetts (hereinafter referred to as the Trustee").

WITNESSETH:

WHEREAS, the Company maintains certain tax-qualified plans (hereinafter referred to collectively as the "Plans," and identified on Exhibit A hereto, as it may be amended from time to time) for the exclusive benefit of certain of its employees and the employees of certain of its affiliates and subsidiaries;

WHEREAS, the Pension Committee has by Agreements dated April 1, 1957 and June 1, 1982 with Bankers Trust Company of New York established two trusts to serve as the funding vehicles for the Plans (the "General Pension Trust" and the "Savings Trust," respectively);

WHEREAS, the authority to conduct the general operation and administration of the Plans is vested in the Company, which has appointed the Pension Committee as "Administrator" of the Plans, and the Pension Committee and its delegates (collectively, for purposes of this Trust Agreement, the "Pension Committee") shall

1

have the authorities and shall be subject to the duties with respect to the trust specified in the Plans and in this Trust Agreement;

WHEREAS, the Company has appointed State Street Bank and Trust Company as successor trustee to Bankers Trust Company of New York, effective January 2, 2001; and

WHEREAS, the Company has appointed a recordkeeper to provide recordkeeping and other administrative services other than those the Pension Committee continues to perform for the Plan in such capacity, and any other person or entity hereafter engaged by the Company to provide such services, being hereinafter referred to as the "Recordkeeper";

WHEREAS, the Company and the Trustee desire to amend and restate the two said Trust Agreements into a single Trust Agreement and to merge the General Pension Trust into the Savings Trust as the sole funding vehicle for the Plans, and wish to rename the surviving Trust.

NOW, THEREFORE, the Company and the Trustee do hereby amend and restate the two said Trust Agreements into a single Trust Agreement and continue the merged trust as the funding vehicle for the Plans, upon the terms and conditions hereinafter set forth:

1. TRUST FUND

1.1 Trust Name. This Trust shall be known as The Johnson & Johnson Pension and Savings Plans Master Trust.

1.2 Receipt of Assets. The Trustee shall receive and

2

accept for the purposes hereof all sums of money and other property paid to it by or at the direction of the Company or any Employer, and shall hold, invest, reinvest, manage, administer and distribute such monies and other property and the increments, proceeds, earnings and income thereof pursuant to the terms of this Trust Agreement and for the exclusive benefit of participants in the Plans and their beneficiaries. The Trustee acknowledges that it is a fiduciary of the Plans with respect to the duties and obligations imposed upon it under this Trust Agreement which are within the scope of ERISA section 3(21)(A). The Trustee will discharge its fiduciary duties under the Trust with the skill, care, prudence, and diligence under the circumstances then prevailing of a prudent trustee acting in like capacity and familiar with such matters. The Trustee need not inquire into the source of any money or property transferred to it nor into the authority or right of the transferor of such money or property to transfer such money or property to the Trustee. All Plan assets held by the Trustee in the trust pursuant to the provisions of this Trust Agreement at the time of reference are referred to herein as the "Trust Fund".

1.3 <u>Employers</u>. For purposes of this Trust Agreement the term "Employer" means the Company or any corporation (or other trade or business) which is a member of a controlled group of corporations of which the Company is a member as determined under Section 414(b) or (c) of the Internal Revenue Code of 1986, as amended (hereinafter referred to as the "Code").

3

1.4 _Plans_. References in this Trust Agreement to the "Plan" or the "Plans" shall mean the tax-qualified employee benefit plan or plans of the Company, or the plan or plans of any Employer which are tax qualified under Section 401(a) of the Code or which are treated as so qualified pursuant to Section 1022(i) of ERISA (a "Qualified Puerto Rican Plan"), provided that the Employer has adopted the trust as a funding vehicle for such plan or plans.

The Pension Committee shall be responsible for verifying that while any assets of the Plan are held in the Trust Fund, the Plan (i) is "qualified" with the meaning of Section 401(a) of the Code (or is a Qualified Puerto Rican Plan) and, if a defined contribution plan either (x) the Plan provides that each participant is a "named fiduciary" (as described in Section 402(a)(2) of the provisions of the Employee Retirement Income Security Act of 1974, as amended (referred to herein as "ERISA")) who is duly authorized under the Plan to provide investment direction to the Pension Committee, acting as agent for such participant, for conveyance to the Trustee or (y) the Plan is duly qualified as an "ERISA Section 404(c) Plan" described in 29 C.F.R. 2550.404c under which each participant is authorized to provide investment direction to the Pension Committee, acting as agent for such Participant, for conveyance to the Trustee; (ii) is permitted by existing or future ruling of the United States Treasury Department to pool its funds in a group trust; (iii) permits its assets to be commingled for investment purposes with

4

the assets of other such plans by investing such assets in this Trust Fund whether or not its assets will in fact be held in a separate investment fund; and (iv) the Plan does not prohibit the Company from appointing the Recordkeeper to perform daily recordkeeping services as described herein, and provides that the Pension Committee is the fiduciary responsible for carrying out participant investment directions.

1.5 Accounting for a Plan's Undivided Interest in the Trust Fund. All transfers to, withdrawals from, and other transactions regarding the Trust Fund shall be conducted in such a way that the proportionate interest in the Trust Fund of each Plan and the fair market value of that interest may be determined at any time. Whenever the assets of more than one Plan are commingled in the Trust Fund or in any Investment Fund, the undivided interest therein of that Plan shall be debited or credited (as the case may be) (i) for the entire amount of every contribution received on behalf of that Plan, every benefit payment, or other expense attributable solely to that Plan, and every other transaction relating only to that Plan; and (ii) for its proportionate share of every item of collected or accrued income, gain or loss, and general expense; and other transactions attributable to the Trust Fund or that Investment Fund as a whole. As of each date when the fair market value of the investments held in the Trust Fund or an Investment Fund are determined as provided for in Article 9, the Trustee shall adjust the value of each Plan's interest therein to reflect the net increase or decrease in such values

5

since the last such date. For all of the foregoing purposes, fractions of a cent may be disregarded.

1.6 Appointment of Recordkeeper. Under the Plan, the Pension Committee is the fiduciary responsible for carrying out participant investment directions and in order to effect this, the Pension Committee has appointed Recordkeeper to perform certain services including but not limited to maintaining participant accounts for all contributions, loans and loan repayments, rollovers, and other deposits made for the purpose of determining how such deposits are to be allocated to the Investment Funds of the Plan, for determining requirements for disbursements from or transfers among Investment Funds in accordance with the terms of the Plan, for maintaining participant records for the purpose of voting or tendering shares in an Investment Fund as described in Section 4.1 herein, for distributing information about the Investment Funds provided for under the Plan, and for distributing participant statements at periodic intervals.

1.7 No Trustee Duty Regarding Contributions. The Trustee shall not be under any duty to require payment of any contributions to the Trust Fund or determine that a contribution is in compliance with a participant investment direction, or to see that any payment made to it is computed in accordance with the provisions of the Plans, or otherwise be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plans. The named fiduciary responsible for ensuring

6

timely payment of contributions to the Trust Fund is the Pension Committee.

    1.8 <u>Withholding</u>. Unless otherwise agreed by the Pension Committee and the Trustee, the Pension Committee, its delegate, or the Recordkeeper shall withhold any tax which by any present or future law is required to be withheld from any payment under the Plans.

2.   <u>DISBURSEMENTS FROM THE TRUST FUND</u>.

    The Trustee shall from time to time on the directions of the Pension Committee or Recordkeeper make payments out of the Trust Fund to such persons, including the Pension Committee or Recordkeeper, in such manner, in such amounts and for such purposes as may be specified in the directions of the Recordkeeper or Pension Committee.

    The Recordkeeper or Pension Committee shall be responsible for insuring that any payment directed under this Article conforms to the provisions of the Plans, this Trust Agreement, and the provisions of the Employee Retirement Income Security Act of 1974, as amended (hereinafter referred to as "ERISA"). Each direction of the Recordkeeper or Pension Committee shall be in writing (including but limited to electronic writing such as e-mail, if agreed to by Trustee) and shall be deemed to include a certification that any payment or other distribution directed thereby is one which the Recordkeeper or Pension Committee is authorized to direct, and the Trustee may conclusively rely on such certification which is given in accordance with this Trust

7

Agreement without further investigation unless it knows the certification constitutes a breach of fiduciary duty. Payments may be made by the Trustee by wire transfer, or such other electronic transfer method, or check to the order of the payee, as the Pension Committee may determine. Payments or other distributions hereunder may be mailed to the payee at the address last furnished to the Trustee by the Recordkeeper or if no such address has been so furnished, to the payee in care of the Recordkeeper. The Trustee shall not incur any liability or other damage on account of any payments or other distributions made by it in accordance with the written directions of the Recordkeeper or Pension Committee, unless reasonable care required under industry standards for a directed trustee would require alternate action.

3.   COMPANY SELECTED INVESTMENT FUNDS.

    3.1   In General. The Pension Committee from time to time and in accordance with provisions of the Plan, may direct the Trustee to establish one or more separate investment accounts within the Trust Fund, each separate account being hereinafter referred to as an "Investment Fund" which may be invested in (i) shares of investment companies registered under the Investment Company Act of 1940, (ii) collective funds maintained by a bank or trust company, (iii) various classes of common stock of the Company, (iv) participant directed brokerage accounts, (v) pools that contain insurance contracts, (vi) funds managed by a registered investment manager, bank or insurance company, (vii)

8

accounts managed by named fiduciaries for the Plan; and (viii) other investment options available from time to time under the Plan (specifically the Investment Funds described on Attachment "A" to this Trust Agreement, as amended from time to time by the Pension Committee and with the consent of the Trustee). The Trustee shall have no liability for any loss of any kind which may result by reason of the manner of division of the Trust Fund into Investment Funds, or for the investment management of these accounts, except as provided for in Section 3.5 respecting a Trustee Managed Investment Account, if any. The Trustee shall transfer to each such Investment Fund such portion of the assets of the Trust Fund as the Pension Committee or the Recordkeeper directs. The Trustee shall not incur any liability on account of following any direction of the Pension Committee or the Recordkeeper and the Trustee shall be under no duty to review the investment guidelines, objectives and restrictions so established. To the extent that directions from the Pension Committee or Recordkeeper to the Trustee represent investment instructions of the Plans' participants, the Trustee shall have no responsibility for such investment elections and shall incur no liability on account of the direct and necessary results of investing the assets of the Trust Fund in accordance with such participant investment instructions.

The Trustee shall credit and reinvest in the Investment Fund all interest, dividends and other income received with respect to, and any proceeds received from the sale or other disposition

9

of, securities or other property held in an Investment Fund shall be credited to and reinvested in such Investment Fund. All expenses of the Trust Fund which are allocable to a particular Investment Fund shall be so allocated and charged. Subject to the provisions of the Plans, the Pension Committee may direct the Trustee to eliminate an Investment Fund or Funds, and the Trustee shall thereupon dispose of the assets of such Investment Fund and reinvest the proceeds thereof in accordance with the directions of the Pension Committee.

3.2 Participant-Directed Brokerage Accounts. The Trustee shall, if so directed by the Pension Committee segregate all or a portion of the Trust Fund held by it into one or more separate investment accounts to be known as Participant Directed Brokerage Accounts. Whenever a Participant is directing the investment and reinvestment of a Participant Directed Brokerage Account, the Participant shall have the powers and duties which an Investment Manager would have under this Trust Agreement if an Investment Manager were then serving and the Trustee shall be protected to the same extent as it would be protected under this Trust Agreement as to directions or the absence of directions of an Investment Manager. Participants shall be entitled to give orders directly to the broker for the purchases and sale of securities as defined in Section 6 of this Agreement. The broker shall provide confirmation of each order to the Pension Committee or Recordkeeper which shall maintain records in such form as to satisfy reporting requirements of the Plan.

10

3.3 <u>Company Managed Stock Investment Accounts</u>. If, and to the extent specifically authorized by the Plans, the Pension Committee may direct the Trustee to establish one or more Investment Funds substantially all of the assets of which shall be invested in securities which constitute "qualifying employer securities" or "qualifying employer real property" within the meaning of Section 407 of ERISA. It shall be the duty of the Pension Committee to determine that such investment is not prohibited by Sections 406 or 407 of ERISA. The Pension Committee also may direct the investment of cash within an Investment Account. In addition, during any time when there is no Investment Manager with respect to a Company Managed Stock Account (such as before an investment management agreement takes effect or after it terminates), the Pension Committee shall direct the investment and reinvestment of such Company Managed Stock Account.

3.4 <u>Trustee Directed Investment Accounts</u>. The Trustee shall have no duty or responsibility to direct the investment and reinvestment of the Trust Fund, any Investment Fund or any Investment Account unless the Pension Committee expressly appoints the Trustee as an Investment Manager, as agreed to in writing between the Trustee and the Pension Committee in accordance with the investment guidelines applicable to the Trustee as set forth on Schedule A (as amended from time to time, the "Trustee Investment Guidelines") with respect to any Portfolio (as defined in the Trustee Investment Guidelines). In

11

the event that the Pension Committee appoints the Trustee pursuant to the Trustee Investment Guidelines, it shall have the powers and duties of an Investment Manager under this Trust Agreement with regard to such Portfolio. The Trustee Investment Guidelines may be modified from time to time by a written agreement signed by the authorized representatives of both parties. With respect to the Trustee's role as Investment Manager with respect to a Portfolio, the provisions of this Agreement shall apply to the extent not inconsistent with the Trustee Investment Guidelines. Additionally, the Trustee shall be entitled to such compensation as set forth in the Trustee Investment Guidelines for its services as Investment Manager with respect to a Portfolio. Such compensation shall be in addition to any compensation the Trustee receives in its role as Trustee under this Trust Agreement. The Trustee, in its capacity as Investment Manager represents and warrants that it qualifies as an "investment manager," as defined in Section 3(38) of ERISA, with respect to the Portfolio. The Pension Committee acknowledges that the Trustee and its affiliates perform investment advisory services for various clients. The Pension Committee agrees that the Trustee may give advice and take action in the performance of its duties with respect to any of its other clients which differ from action taken with respect to the Portfolios, provided that the Portfolio is treated in a fair and equitable manner.

    3.5 <u>Trustee Managed Investment Accounts</u>. The Trustee shall

12

have no duty or responsibility to direct the investment and reinvestment of the Trust Fund, any Investment Fund or any Investment Account unless expressly agreed to in writing between the Trustee and the Company. In the event that the Trustee enters into such an agreement, it shall have the powers and duties of an Investment Manager under this Trust Agreement with regard to such Investment Account.

3.6 <u>Investment Manager Accounts</u>. The Company or Pension Committee, from time to time and in accordance with the provisions of the Plans, may appoint one or more independent Investment Managers, pursuant to a written investment management agreement describing the powers and duties of the Investment Manager, to direct the investment and reinvestment of all or a portion of the Trust Fund or an Investment Fund (hereinafter referred to as an "Investment Account").

The Pension Committee shall be responsible for ascertaining that while each Investment Manager is acting in that capacity hereunder, the following requirements are satisfied:

(a)  The Investment Manager is either (i) registered as an investment adviser under the Investment Advisers Act of 1940; (ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of Section 203A(a) of such Act, is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filled the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary, (iii) a bank as defined in that Act or (iv) an insurance company qualified to perform the services described in (b) below under the laws of more than one state.

13

(b)  The Investment Manager has the authority to manage, acquire or dispose of any assets of the Plans for which it is responsible hereunder;

(c)  The Investment Manager has acknowledged in writing to the Pension Committee and the Trustee that he or it is a fiduciary with respect to the Plans within the meaning of Section 3(21)(A) of ERISA.

(d)  The Plans provide for the appointment of the Investment Manager in accordance with Section 402(c)(3) of ERISA, and the Investment Manager is appointed as so provided.

(e)  Any Investment Manager with authority to invest in assets which will be held outside the jurisdiction of the district courts of the United States is an entity described in ERISA regulations at 29 C.F.R. 2550.404b-1(a)(2)(i).

The Pension Committee shall furnish the Trustee with written notice of the appointment of each Investment Manager hereunder, and of the termination of any such appointment. Such notice shall specify the assets which shall constitute the Investment Account of such Investment Manager. The Trustee shall be fully protected in relying upon the effectiveness of such appointment and the Investment Manager's continuing satisfaction of the requirements set forth above until it receives written notice from the Pension Committee to the contrary.

The Trustee shall conclusively presume that each Investment Manager, under its investment management agreement, is entitled to act, in directing the investment and reinvestment of the Investment Account for which it is responsible, in its sole and independent discretion and without limitation, except for any limitations which from time to time the Pension Committee and the Trustee agree (in writing) shall modify the scope of such authority.

14

The Trustee shall have no liability (i) for the acts or omissions of any Investment Manager (except to the extent the Trustee itself is serving as Investment Manager); (ii) for following directions, including investment directions of an Investment Manager (other than the Trustee) or the Pension Committee, unless reasonable care required under industry standards for a directed trustee would require alternate action; (iii) for failing to act in the absence of Investment Manager direction; or (iv) for any loss of any kind which may result by reason of the directed manner of division of the Trust Fund or Investment Fund into Investment Accounts.

An Investment Manager shall certify, at the request of the Trustee, the value of any securities or other property held in any Investment Account managed by such Investment Manager, and such certification shall be regarded as a direction with regard to such valuation.  The Trustee shall be entitled to conclusively rely upon such valuation for all purposes under this Trust Agreement, provided that it satisfies either any tolerance checks agreed upon by the parties or the Trustee's customary tolerance checks.

Except as otherwise provided in this Trust Agreement, the Investment Manager of an Investment Account shall have the power and authority, to be exercised in its sole discretion at any time and from time to time, to issue orders for the purchase or sale of securities directly to a broker.  Written notification of the issuance of each such order shall be given promptly to the

15

Trustee by the Investment Manager and the confirmation of each
such order shall be confirmed to the Trustee by the broker. The
broker shall promptly provide confirmation of each such order to
the Recordkeeper, which shall maintain all participant level
accounts. The Recordkeeper shall provide to the Trustee all
information reasonably required by the Trustee to fulfill its
accounting and reporting obligations with respect to assets held
in the Participant Directed Brokerage Accounts. Unless otherwise
directed by the Investment Manager, such notification shall be
authority for the Trustee to pay for securities purchased or to
deliver securities sold as the case may be. Upon the direction
of the Investment Manager, unless reasonable care required under
industry standards for a directed trustee would require alternate
action the Trustee will execute and deliver appropriate trading
authorizations, but no such authorization shall be deemed to
increase the liability or responsibility of the Trustee under
this Trust Agreement.

4.    POWERS AND DUTIES OF THE TRUSTEE.

     4.1   Investment Powers and Duties of the Trustee.   The
Trustee shall have and exercise the following powers and
authorities lettered (a) through (x) below (i) over Investment
Accounts for which it has express investment management
discretion as provided in Section 3.5 or (ii) upon direction of
the Investment Manager of an Investment Account or (iii) upon
direction of a Participant with respect to a Participant Directed
Brokerage Account or (iv) upon direction of the Pension

16

Committee: (x) for a Company Managed Account and for cash within certain Investment Accounts identified by a standing direction letter to the Trustee; (y) subject to Section 4.1(h), for voting and tendering of qualifying employer securities; and (z) for lending to participants in the Plans:

(a) To purchase, receive, or subscribe for any securities or other property and to retain in trust such securities or other property.

(b) To acquire and hold qualifying employer securities and qualifying employer real property, as such investments are defined in Section 407(d) of ERISA.

(c) To collect income and distributions received due to the Trust Fund and sign on behalf of the Trust Fund any declarations, affidavits, certificates of ownership and other documents required to collect income and principal payments, including but not limited to, tax reclaimations, rebates and other withheld amounts.

(d) To sell for cash or on credit, to grant options, convert, redeem, exchange for other securities or other property, to enter into standby agreements for future investment, either with or without a standby fee, or otherwise to dispose of any securities or other property at any time held by it and subject to the timely receipt of notice from an issuer, Investment Manager or Pension Committee, collect proceeds received from securities, certificates of deposit or other investments which may mature or be called.

(e) To settle, compromise or submit to arbitration any claims, debts, or damages, due or owing to or from the trust, to commence or defend suits or legal proceedings and to represent the trust in all suits or legal proceedings in any court of law or before any other body or tribunal.

(f) To trade in financial options and futures, including index options and options on futures and to execute in connection therewith such account agreements and other agreements including contracts for the exchange of interest rates, or investment performance, currencies or other notional principal contracts in such form and upon such terms as the Investment Manager or the Pension Committee shall direct.

(g) Subject to Section 4.1(h), to exercise all voting rights, tender or exchange rights, any conversion privileges, subscription rights and other rights and powers available in

17

connection with any securities or other property at any time held by it; to oppose or to consent to the reorganization, consolidation, merger, or readjustment of the finances of any corporation, Pension Committee or association, or to the sale, mortgage, pledge or lease of the property of any corporation, Pension Committee or association any of the securities which may at any time be held by it and to do any act with reference thereto, including the exercise of options, the making of agreements or subscriptions and the payment of expenses, assessments or subscriptions, which may be deemed necessary or advisable by the Investment Manager or Pension Committee in connection therewith, and to hold and retain any securities or other property which it may so acquire; and to deposit any property with any protective, reorganization or similar committee, and to pay and agree to pay part of the expenses and compensation of any such committee and any assessments levied with respect to property so deposited.

(h)  To exercise all voting or tender or exchange offer rights with respect to all qualifying employer securities held by it as provided in sections 4.3 and 4.4  The Recordkeeper shall furnish the Trustee with the name and address of each participant and the number of shares held for the participant's account as near as practicable to the record date fixed for the determination of shareholders entitled to vote, tender or exchange, and shall provide the Trustee with all other information and assistance which the Trustee may reasonably request.

(i)  To lend to participants in the Plans such amounts and upon such terms and conditions as the Pension Committee or Recordkeeper may direct.  Any such direction shall be deemed to include a certification by the Pension Committee or Recordkeeper that such lending is in accordance with the provisions of ERISA and the Plans.

(j)  To borrow money in such amounts and upon such terms and conditions as shall be deemed advisable or proper by the Pension Committee or Investment Manager to carry out the purposes of the trust and to pledge any securities or other property for the repayment of any such loan.

(k)  To invest all or a portion of the Trust Fund in contracts issued by insurance companies, including contracts under which the insurance company holds Plan assets in a separate account or commingled separate account managed by the insurance company.  The Trustee shall be entitled to rely upon any written directions of the Pension Committee or the Investment Manager under this Section 5.1, and the Trustee shall not be responsible for the terms of any insurance contract that it is directed to purchase and hold or for the

18

selection of the issuer thereof or for performing any
functions under such contract (other than the execution of
any documents incidental thereto on the instructions of the
Pension Committee or the Investment Manager).

(l) To manage, administer, operate, lease for any number of
years, develop, improve, repair, alter, demolish, mortgage,
pledge, grant options with respect to, or otherwise deal
with any real property or interest therein at any time held
by it, and to hold any such real property in its own name or
in the name of a nominee, with or without the addition of
words indicating that such property is held in a fiduciary
capacity, all upon such terms and conditions as may be
deemed advisable by the Investment Manager or Pension
Committee.

(m) To renew, extend or participate in the renewal or extension
of any mortgage, upon such terms as may be deemed advisable
by the Investment Manager or Pension Committee, and to agree
to a reduction in the rate of interest on any mortgage or of
any guarantee pertaining thereto in any manner and to any
extent that may be deemed advisable by the Investment
Manager or Pension Committee for the protection of the Trust
Fund or the preservation of the value of the investment; to
waive any default, whether in the performance of any
covenant or condition of any mortgage or in the performance
of any guarantee, or to enforce any such default in such
manner and to such extent as may be deemed advisable by the
Investment Manager or Pension Committee; to exercise and
enforce any and all rights of foreclosure, to bid on
property on foreclosure, to take a deed in lieu of
foreclosure with or without paying consideration therefor,
and in connection therewith to release the obligation on the
bond secured by such mortgage, and to exercise and enforce
in any action, suit or proceeding at law or in equity any
rights or remedies in respect to any such mortgage or
guarantee.

(n) To hold part or all of the Trust Fund uninvested.

(o) To employ suitable agents and counsel and to pay their
reasonable and proper expenses and compensation.

(p) To purchase and sell foreign exchange and contracts for
foreign exchange, including transactions entered into with
State Street Bank and Trust Company, its agents or
subcustodians.

(q) To form corporations and to create trusts to hold title to
any securities or other property, all upon such terms and
conditions as may be deemed advisable by the Investment
Manager or Pension Committee.

19

(r)  To register any securities held by it hereunder in its own name, in the name of its nominee, in the name of its agent, or in the name of its agent's nominee with or without the addition of words indicating that such securities are held in a fiduciary capacity, and to hold any securities in bearer form and to deposit any securities or other property in a depository or clearing corporation.

(s)  To make, execute and deliver, as Trustee, any and all documents and agreements, or other instruments in writing necessary or desirable for the accomplishment of any of the foregoing powers.

(t)  To invest at any bank including State Street Bank and Trust Company (i) in any type of interest bearing investments (including, but not limited to savings accounts, money market accounts, certificates of deposit and repurchase agreements) and (ii) in noninterest bearing accounts (including but not limited to checking accounts).

(u)  To invest in collective investment funds maintained by State Street Bank and Trust Company or by other banks for the investment of the assets of employee benefit plans qualified under Section 401(a) of the Code, whereupon the instruments establishing such funds, as amended, shall be deemed a part of this Trust Agreement and incorporated by reference herein.

(v)  To lend securities through a securities lending program of the Trustee, as authorized under a separate lending agreement.

(w)  To commingle any part or all of the assets of the Trust Fund for purposes of investment with the assets any other trust maintained by the Company for funding of retirement plans qualified under Section 401(a) of the Code, as directed by the Pension Committee.

(x)  To generally take all action, whether or not expressly authorized, which the Trustee may deem necessary or proper for the fulfillment of the foregoing duties hereunder.

(y)  To invest in open-end and closed-end investment companies, regardless of the purposes for which such fund or funds were created, including those managed, serviced, or advised by the Trustee or an affiliate of the Trustee, and in any partnership, limited or unlimited, joint venture and other forms of joint enterprise created for any lawful purpose.

The Trustee shall transmit promptly to the Pension Committee or the Investment Manager, as the case may be, all information received by the Trustee regarding ownership rights pertaining to property held in the Trust Fund, all notices of conversion, redemption, tender, exchange, subscription, class action, claim in insolvency proceedings or other rights or powers relating to any of the securities in the Trust Fund, which notices are received by the Trustee from its agents or custodians, from issuers of the securities in question and from the party (or its agents) extending such rights.  The Trustee shall have no obligation to determine the existence of, or to exercise any right or power with respect to any conversion, redemption, tender, exchange, subscription, class action, claim in insolvency proceedings or other right or power relating to any of the securities in the Trust Fund which would not be reasonably evident to a similar trustee with similar experience acting in a similar capacity or of which notice was not given after the purchase of such securities by the Trust Fund.

The Trustee shall not be liable for any untimely exercise or assertion of such rights or powers described in the paragraph immediately above in connection with securities or other property of the Trust Fund at any time held by it unless (i) it or its agents or custodians are in actual possession of such securities or property and (ii) it receives directions to exercise any such rights or powers from the Pension Committee or the Investment Manager, as the case may be, and both (i) and (ii) occur at least

21

three business days prior to the date on which such rights or powers are to be exercised.

If the Trustee is directed by the Pension Committee or an Investment Manager to purchase securities issued by any foreign government or agency thereof, or by any corporation or other entity domiciled outside of the United States: i) the Trustee shall provide market information to the Pension Committee or the Trust's Investment Managers consistent with industry standards for professional global custodians; ii)  the Trustee shall receive for and credit to the Trust Fund any money or assets, including dividends and interest, due and payable from or on account of the securities  and other investments and/or assets in the Trust Fund, based upon tax status information supplied by the Pension Committee;  iii)  the Trustee shall, in the ordinary course of business, take all necessary administrative steps for the timely collection of interest, repayments and dividends, and for exercising or cashing in rights and warrants as instructed, obtaining new coupon or dividend sheets and effecting conversion transactions; however, the Trustee shall not attempt to enforce such collections by legal process unless directed in writing to do so by the Pension Committee or Investment Manager, and unless arrangements are made to Trustee's reasonable satisfaction with respect to reimbursement of expenses for any such legal process; (iv)  the Trustee will submit to the relevant tax authorities documents received from the Pension Committee with regard to the Trust's tax status and will use reasonable efforts to claim any

22

refund or withholding of tax to which the Trust Fund has been subject; (v) provide settlement of purchases and sales of securities as a global custodian. Except with respect to the foregoing activities conducted in the ordinary course of business, the Trustee shall have no responsibility to determine what foreign laws or regulations (including, without limitation, any laws or regulations affecting receipt by the Trust of dividends, interest or other distributions) might apply to such securities or other investments or to the Trust.

All Investment Company Shares shall be registered in the name of the Trustee or its nominee. Subject to any requirement of applicable law, the Trustee will transmit to Recordkeeper or the Pension Committee, as the case may be, copies of any notices of shareholders' meetings, proxies and proxy-soliciting materials, prospectuses and the annual or other reports to shareholders, with respect to Investment Company Shares held in the Trust. The Trustee shall act in accordance with appropriate directions received from Recordkeeper or the Pension Committee, as the case may be, with respect to matters to be voted upon by the shareholders of the Investment Company. Such directions must be in writing on a form approved by the Trustee, signed by the addressee and delivered to the Trustee within the time prescribed by it. The Trustee will not vote Investment Company shares as to which it receives no written directions. For the purposes of this Section, Investment Company means a registered investment company provided that its prospectus offers its shares under the

23

Plan.

4.2 <u>Administrative Powers of the Trustee</u>. Notwithstanding the appointment of an Investment Manager, the Trustee shall have the following powers and authority, to be exercised in its sole discretion, with respect to the Trust Fund:

(a) To employ suitable agents, custodians and counsel, except that the indicia of ownership of any assets of the Fund shall not be held outside the jurisdiction of the District Courts of the United States unless in compliance with Section 404(b) of ERISA and regulations thereunder, and to pay their reasonable expenses and compensation.

(b) To appoint ancillary trustees to hold any portion of the assets of the trust and to pay their reasonable expenses and compensation.

(c) To register any securities held by it hereunder in its own name, in the name of its nominee, in the name of its agent, or in the name of its agent's nominee with or without the addition of words indicating that such securities are held in a fiduciary capacity, and to hold any securities in bearer form and to deposit any securities or other property in a depository or clearing corporation.

(d) To make, execute and deliver, as Trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases or other instruments in writing necessary or desirable for the accomplishment of any of the foregoing powers.

(e) Generally to do all ministerial acts, whether or not expressly authorized, which the Trustee may deem necessary or desirable in carrying out its duties under this Trust Agreement.

Notwithstanding anything in the Plans or this Trust Agreement to the contrary, the Trustee shall not be required by the Company, the Pension Committee, Recordkeeper or any Investment Manager to engage in any action, nor make any investment which constitutes a prohibited transaction or is otherwise contrary to the provisions of ERISA or which is

24

otherwise contrary to law or to the terms of the Plans or this Trust Agreement.

The Trustee may consult with legal counsel concerning any question which may arise with reference to this Trust Agreement and its powers and duties hereunder. The written opinion of such counsel shall be full and complete protection of the Trustee in respect to any action taken or suffered by the Trustee hereunder in good faith reliance on said opinion.

4.3   The Leveraged Employee Stock Ownership Plan.

(a)   Committee Directions.  Upon the direction of the Pension Committee, the Trustee shall borrow funds under any Acquisition Loans, enter into, execute and deliver any instruments, documents, agreements, and other related materials in connection with such borrowings under any Acquisition Loans (including delivering stock so pledged to another custodian for the benefit of the pledgee), and to prepay, extend, repay or refinance Acquisition Loans, all as directed by the Pension Committee in accordance with this Section 4.3.

It is specifically contemplated that the trust established by this Trust Agreement will operate pursuant to a leveraged employee stock ownership plan (the "ESOP") and that the Trustee will, at the written direction of the Pension Committee, incur indebtedness for the purpose of acquiring Common Stock of the Company to be held under the ESOP ("ESOP Shares"). The Pension Committee may from time to time direct the Trustee to incur indebtedness (including indebtedness to the Company or an affiliate thereof) on behalf of the trust (an "Acquisition Loan") on such terms and conditions as the Pension Committee shall determine, and shall direct the Trustee to take such actions as the Pension Committee shall determine with respect to any such actions as the Pension Committee shall determine with respect to any such Acquisition Loan including, without limitation, electing applicable interest rates, extending the term of the Acquisition Loan, prepaying and repaying principal of, and interest on, such Acquisition Loan, refinancing such Acquisition Loan, acquiring ESOP Shares pursuant to such Acquisition Loan, establishing the timing, manner and purchasing agent for the investment of the proceeds of such Acquisition Loan in ESOP Shares, pledging ESOP Shares acquired therewith to secure such borrowings, establishing

25

and maintaining an ESOP suspense account, purchasing ESOP Shares from the Company or other sellers, and providing or causing to be provided to the Trustee opinions, directions, orders or certifications acceptable to the Trustee in connection with such Acquisition Loan. The Provision thereof by the Pension Committee to the Trustee or any other person relying on the giving of a direction, order or certification by named fiduciary under any documents related to an Acquisition Loan, shall constitute a representation and warranty to the Trustee that all of the terms and conditions of the transaction are proper and appropriate under the Plan, this Agreement, the Code, ERISA and any other law applicable to the transaction and shall be given with respect to the initial Acquisition Loan and any subsequent or additional Acquisition Loans in form and substance reasonable satisfactory to the Trustee. The Company shall undertake on behalf of the Trust to make all filings that are required to be made under any Federal or state securities laws as a result of any public offering related to an Acquisition Loan.

(b) Trustee Determinations. The Trustee shall determine at the time of the initial Acquisition Loan, and upon request of the Committee in connection with any refinancing of such Acquisition Loan, that the terms of such Acquisition Loan or refinancing are at least as favorable to the Plan as the terms of a comparable loan resulting from arm's-length negotiations between independent parties and that the acquisition of the ESOP Shares with the proceeds of such Acquisition Loan is for a price which, on the date of each such acquisition, is not in excess of adequate consideration.

(c) Requirements for Acquisition Loans. Any such Acquisition Loan shall meet all of the requirements necessary to constitute an "exempt Association Loan" within the meaning of Treasury Regulation Section 54.4975-7(b)(1)(iii) and shall be used primarily for the benefit of the Plan participants and their beneficiaries. The proceeds of any such Acquisition Loan shall be used only to purchase ESOP Shares or to repay such Acquisition Loan or a prior Acquisition Loan. Any such Acquisition Loan shall provide for no more than a reasonable rate of interest and must be without recourse against the Plan and Trust. The number of years to maturity under the Acquisition Loan must be definitely ascertainable at all times. The Acquisition Loan may not be payable at the demand of any person, except in the case of a default. The only assets of the Trust that may be given as collateral for an Acquisition Loan are ESOP Shares acquired with the proceeds of the Acquisition Loan and ESOP Shares that were used as collateral on prior Acquisition Loans repaid with the proceeds of the current

26

Acquisition Loan. In the event that ESOP Shares are used as collateral for an Acquisition Loan, such ESOP Shares shall be released from such encumbrance at an annual rate which is geared to the rate of total repayment (principal plus interest) of the Acquisition Loan or the rate of principal repayment of the Acquisition Loan, provided that in either case all applicable requirements of the applicable regulations shall be satisfied. No person entitled to payment under an Acquisition Loan shall be entitled to payment from the Trust other than from ESOP Shares acquired with the proceeds of the Acquisition Loan which are collateral for the Acquisition Loan, contributions made under the Plan by the Company or an affiliated company for the purpose of satisfying the Acquisition Loan obligation, earnings attributable to such ESOP Shares and such Company or affiliated company contributions, the proceeds from the sale of unallocated ESOP Shares ("Unallocated ESOP Shares") and such other assets, if any, as to which recourse may be permitted under Section 4975 of the Code. Payments of principal and interest on any such Acquisition Loan shall be made by the Trustee (as directed by the Pension Committee) only from (1) Company or affiliated company contributions made under the Plan for the purpose of satisfying such Acquisition Loan obligation, earnings on such contributions, and earnings on ESOP Shares acquired with the proceeds of such Acquisition Loan, (2) the proceeds of a subsequent Acquisition Loan made to repay the prior Acquisition Loan, and/or (3) in the case of the termination of the Plan or the ESOP portion of the Plan, the proceeds of the sale of any Unallocated ESOP Shares acquired with the proceeds of such Acquisition Loan. In the event of a default under an Acquisition Loan, the value of Trust assets transferred to the lender shall not exceed the amount of the default, provided further that if the lender is a "party in interest" within the meaning of Section 3(14) of ERISA, a transfer of trust assets upon default shall be made only if, and to the extent of, the Trust's failure to meet the Acquisition Loan's payment schedule.

4.4 ESOP Shares. It is intended that the Trustee's functions and responsibilities with respect to the ESOP Shares (including fractional interests therein) as to voting and tender exchange offers shall be custodial and ministerial only, and shall be exercised in accordance with the terms of the Savings Plan and with certain additional procedures contained in Section

27

4.5(c) of this Trust Agreement.

4.5  <u>Common Stock of the Company Held Outside the ESOP</u>.  It
is intended that the Trustee's functions and responsibilities as
to voting and tender offers with respect to the Common Stock of
the Company which are not ESOP Shares shall be custodial and
ministerial only, and shall be exercised as follows:

(a)  <u>Shares held under the Union Plan (as set forth on Exhibit A)</u>
     <u>("Union Plan Shares")</u>.  The Trustee shall vote Union Plan
     Shares in each Union Plan participant's Account in
     accordance with directions of each Union Plan participant.
     The Trustee shall abstain from voting Union Plan Shares for
     which it has not received Union Plan participant direction,
     to the extent such abstention is permitted by law.  The
     Trustee shall exercise tender offer rights with respect to
     Union Plan Shares in each Union Plan participant's Account
     in accordance with directions of each Union Plan
     participant.  The Trustee shall not exercise such rights
     with respect to Union Plan Shares for which it has not
     received Union Plan participant direction, to the extent
     such abstention is permitted by law.  The additional
     procedures contained in Section 4.5(c) of this Trust
     Agreement shall apply to Union Plan Shares.

(b)  <u>Shares held under the Savings Plan and Puerto Rico Plan</u>
     <u>outside of the ESOP ("Savings Plan Shares")</u>.

     (i) <u>Voting</u>.  The Trustee shall vote Savings Plan Shares
     attributable to the proportionate value in each Plan
     participant's Account in accordance with directions of each
     Plan participant (received by the Trustee from the
     Committee) to whose Account such proportionate value has
     been allocated to the extent of his whole share interest
     therein.  For purposes of determining the number of shares
     to be voted the Trustee shall use the nearest practicable
     valuation date as determined by the Pension Committee in
     conjunction with the record date for proxy solicitation by
     the Company.  The Trustee shall vote Savings Plan Shares for
     which it has not received direction (including allocated
     Savings Plan Shares for which no affirmative voting
     direction is received by the Trustee and unallocated Savings
     Plan Shares) in the same proportion as directed allocated
     Savings Plan Shares are voted by Plan participants (or
     beneficiaries) and, except as required by law, the Trustee
     shall have no discretion in such matter.

28

(ii) <u>Tender Offer Rights with Respect to Savings Plan Shares</u>. The provisions of this Section 4.5(b)(ii) shall apply in the event a tender or exchange offer including, but not limited to, a tender offer or exchange offer within the meaning of the Securities Exchange Act of 1934, as from time to time amended and in effect (hereinafter, a "tender offer"), for Savings Plan Shares is commenced by a person or persons. The Trustee shall have no discretion or authority to sell, exchange or transfer any of such Savings Plan Shares pursuant to such tender offer except to the extent, and only to the extent, as provided in this Trust Agreement.

Each Savings Plan participant is, for purposes of this Section 4.5(b)(ii), hereby designated as a named fiduciary with respect to the Savings Plan Shares allocated to his Account and each Savings Plan participant and beneficiary shall have the right, to the extent of the number of the Savings Plan Shares allocated to his Account, to direct the Trustee in writing as to the manner in which to respond to a tender offer with respect to such Savings Plan Shares. The Company shall use its best efforts to timely distribute or cause to be distributed to each Savings Plan participant (or beneficiary) such information as will be distributed to stockholders of the Company in connection with any such tender offer. Upon timely receipt of such instructions, the Trustee shall respond as instructed with respect to such Savings Plan Shares. If the Trustees shall not receive timely instructions from a Savings Plan participant (or beneficiary) as to the manner in which to respond to such a tender offer, the Trustee shall not tender or exchange any Savings Plan Shares with respect to which such Savings Plan participant (or beneficiary) has the right of direction, and, except as required by law, the Trustee shall have no discretion in such matter. Savings Plan Shares which have not been allocated to a Savings Plan participant's Account shall be tendered or exchanged by the Trustee in the same proportion it tenders or exchanges the Savings Plan Shares with respect to which Savings Plan participants have the right of direction, and, except as required by law, the Trustee shall have no discretion in such manner. In determining such proportion, the Trustee shall under all circumstances include in its calculation the direction of Savings Plan participants (or beneficiaries) on all Savings Plan Shares allocated to a Savings Plan participant's Account. The Pension Committee shall solicit from each Savings Plan participant (or beneficiary) the directions described in this paragraph as to whether Savings Plan Shares are to be tendered and shall instruct the Trustee as to the amount of Savings Plan Shares to be tendered, in accordance with the above provisions.

(c) <u>Procedures</u>.

(i) <u>Direction by Pension Committee</u>. In the event that a tender offer is made on a date when no Savings Plan Shares have been allocated, the Pension Committee shall direct the Trustee whether to sell, offer to sell, exchange or otherwise dispose of all Savings Plan Shares.

(ii) <u>Allocation of Proceeds</u>. Any securities or other property received by the Trustee as a result of having tendered Savings Plan Shares after a tender offer shall be held, and any cash so received shall be held, in the account or investment fund from which the corresponding shares were tendered. Such proceeds of tendering shall be invested in short term investments, pending any further action which the Trustee may be directed to take by the Pension Committee pursuant to the Savings Plan.

(iii) <u>Allocation of Returned Shares</u>. Common Stock of the Company which, following the Trustee's tender thereof, has not been accepted by the party making such a tender offer and is returned to the Trustee, shall be credited to the accounts from which such stock was tendered. For these purposes, the portion of the total Common Stock of the Company returned to the Trustee which is allocated to any account shall be the product determined by multiplying a fraction, the numerator of which is the total Common Stock of the Company tendered from such account, and the denominator of which is the total Common Stock of the Company tendered from all accounts, times the total Common Stock of the Company returned to the Trustee.

4.6 <u>Limitation of Powers</u>. The forgoing provisions of this Section 4 shall not be deemed to expand the permissible investments for any Investment Fund under Section 3 or to limit the Pension Committee's power to restrict the exercise of such powers by an Investment Manager. In addition, any powers conferred on the Trustee or any other Investment Manager thereunder may be suspended or revoked at any time by the Pension Committee upon notice to the Investment Manager or the Trustee, as the case may be.

30

5.   INDEMNIFICATION.

Unless resulting from the Trustee's negligence, willful misconduct, lack of good faith, or breach of its fiduciary duties under this agreement or ERISA, the Company shall indemnify and save harmless the Trustee for and from any loss or expense (including reasonable attorneys' fees) directly arising (a) out of an authorized action hereunder taken in good faith by the Trustee or any matter as to which this Trust Agreement provides that the Trustee is directed, protected, not liable, or not responsible, (b) out of a Plan not qualifying as an ERISA 404(c) plan or the inability of a Plan participant or beneficiary to exercise independent control over his account within the meaning of 29 C.F.R. section 2550.404c-1, or (c) by reason of any breach of any statutory or other duty owed to the Plans by the Company, any Employer, the Pension Committee, the Recordkeeper or any Investment Manager or any authorized delegate of any of them (and for the purposes of this sentence the Trustee shall not be considered to be such a delegate), whether or not the Trustee may also be considered liable for that person's breach under the provisions of section 405(a) of ERISA, unless the Trustee knowingly participates in or knowingly undertakes to conceal an act or omission of another fiduciary knowing it to be a fiduciary breach, or has knowledge of a breach by another fiduciary and fails to notify the Pension Committee of such breach.

6.   SECURITIES OR OTHER PROPERTY.

The words "securities or other property", used in this Trust

31

Agreement, shall be deemed to refer to any property, real or personal, or part interest therein, wherever situated, including, without limitation, governmental, corporate or personal obligations, trust and participation certificates, partnership interests, annuity or investment contracts issued by an insurance company, leaseholds, fee titles, mortgages and other interests in realty, preferred and common stocks, certificates of deposit, financial options and futures or any other form of option, evidences of indebtedness or ownership in foreign corporations or other enterprises or indebtedness of foreign governments, and any other evidences of indebtedness or ownership, including securities or other property of the Company, even though the same may not be legal investment for trustees under any law other than ERISA.

7.   SECURITY CODES.

If the Trustee has issued to the Company, the Pension Committee or to any Investment Manager appointed by the Pension Committee, security codes or passwords in order that the Trustee may verify that certain transmissions of information, including directions or instructions, have been originated by the Company, Pension Committee or the Investment Manager, as the case may be, the Trustee shall be kept indemnified by and be without liability to the Company for any action taken or omitted by it in reliance upon receipt by the Trustee of transmissions of information with the proper security code or password, including communications purporting to be directions or instructions, which the Trustee

32

reasonably believes to be from the Company, Pension Committee or Investment Manager.

8.  TAXES AND TRUSTEE COMPENSATION.

The Trustee shall pay out of the Trust Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws against the Trust Fund by any governmental authority. Until advised to the contrary by the Pension Committee (or such governmental authority), the Trustee shall assume that the Trust is exempt from Federal, State and local income taxes, and shall act in accordance with that assumption. The Pension Committee shall timely file all Federal, State and local tax and information returns relating to the Plans and Trust. The Trustee shall notify the Pension Committee as soon as reasonably practicable (but in any event no later than five (5) business days) after the Trustee receives notice of any tax or assessment and shall provide the Pension Committee with information as the Trustee has received concerning such tax or assessment. The Pension Committee may direct that the Trustee refrain from paying the tax or assessment until such tax or assessment is due and payable (the "Review Period"), during which time the Trustee will provide all reasonable assistance to the Pension Committee in determining the validity of such tax or assessment and will cooperate in all reasonable efforts to have the tax or assessment waived or mitigated if such tax or assessment is considered not to be owed by the Trust. At the end of the Review Period, if the

33

tax or assessment remains outstanding, the Trustee may pay the tax or assessment from the Trust Fund, only upon the advice of counsel acceptable to Pension Committee and Trustee, but will continue to provide all reasonable assistance to the Pension Committee in seeking a refund of the tax or assessment.

The Trustee shall be paid such reasonable compensation as shall from time to time be agreed upon by the Pension Committee and the Trustee in writing. Such compensation and all reasonable and proper expenses of administration of the Trust shall be withdrawn by the Trustee out of the Trust Fund upon approval or direction of the Pension Committee, unless paid by the Company, but such compensation and expenses shall be paid by the Company if the same cannot by operation of law be withdrawn from the Trust Fund.

If the Trustee has advanced cash or securities for any proper purpose under the Trust, such as, but not limited to, the purchase or sale of foreign exchange to settle trades, such advances shall remain a charge on the Trust Fund until withdrawn by the Trustee or paid to it by the Company.

All payments from the Trust Fund under this Article 8 shall be accounted for to the Pension Committee.

9.  ACCOUNTS OF THE TRUSTEE.

The Trustee shall maintain or cause to be maintained suitable records, data and information relating to its functions hereunder.

The Trustee shall keep accurate and detailed accounts of all

34

investments, receipts, disbursements, and other actions hereunder, and such other records as the Pension Committee shall from time to time direct, as agreed to by the Trustee. Its books and records relating thereto shall be open to inspection and audit at all reasonable times by the Pension Committee or its duly authorized representatives and each Investment Manager. The Trustee shall be entitled to reasonable compensation and reimbursement of its reasonable expenses incurred in connection with such audits or inspections.

In accordance with the Trustee's standard operating procedure, the Trustee shall credit the Trust Fund with income and maturity proceeds on securities on contractual payment date net of any taxes or upon actual receipt. To the extent the Trustee credits income on contractual payment date, the Trustee may reverse such accounting entries to the contractual payment date if the Trustee reasonably believes that such amount will not be received. The collection of income due the Trust Fund on securities loaned by the Trust Fund other than through a securities lending program of the Trustee shall be the responsibility of the Company and such income shall be credited upon actual receipt by the Trustee.

Within sixty days after the close of each fiscal year of the trust and at more frequent intervals if agreed to by the parties hereto, and within sixty days after the removal or resignation of the Trustee as provided hereunder, the Trustee shall render to the Pension Committee a written statement and account showing in

35

reasonable summary the investments, receipts, disbursements, and other transactions engaged in during the preceding fiscal year or period, and setting forth the assets and liabilities of the trust. Accounts maintained by the Pension Committee or Recordkeeper, such as participant directed brokerage accounts, may be incorporated into Trustee reports. Unless the Pension Committee shall have filed with the Trustee written exceptions or objections to any such statement and account within sixty days after receipt thereof and except as otherwise required or provided by applicable law, the Pension Committee shall be deemed to have approved such statement and account, and in such case or upon written approval by the Pension Committee of any such statement and account, the Trustee shall be released and discharged with respect to the accuracy of all matters and things embraced in such statement and account as though it had been settled by a decree of a court of competent jurisdiction in an action or proceeding in which the Company, all other necessary parties and all persons having any beneficial interest in the Trust Fund were parties.

The Trustee shall certify the value of any securities or other property held in the Trust Fund and determine the fair market value of the Trust Fund monthly, or for such other period as may be mutually agreed upon (with the expectation of beginning daily valuation during April, 2001), in accordance with methods consistently followed and uniformly applied, based upon information and financial publications of general circulation,

36

statistical and valuation services, records of security exchanges, appraisals by qualified persons, transactions and bona fide offers in assets of the type in question and other information customarily used in the valuation of property, including, in the case of securities or other property for which the value cannot be readily obtained, valuations provided by Investment Managers.

The Pension Committee or its delegate, each Investment Manager, and the Trustee shall file such descriptions and reports and make such other publications, disclosures, registrations and other filings as are required of them respectively by ERISA.

Nothing contained in this Trust Agreement or in the Plans shall deprive the Trustee of the right to have a judicial settlement of its account. In any proceeding for a judicial settlement of the Trustee's accounts or for instructions in connection with the trust, the only necessary party thereto in addition to the Trustee shall be the Pension Committee, and no participant or other person having or claiming any interest in the Trust Fund shall be entitled to any notice or service of process (except as required by law). Any judgment, decision or award entered in any such proceeding or action shall be conclusive upon all interested persons.

10. RELIANCE ON COMMUNICATIONS.

The Trustee may rely upon a certification of the Pension Committee or the Recordkeeper with respect to any instruction, direction or approval of such Pension Committee or the

37

Recordkeeper and may rely upon a certification of the Company as to the membership of the Board, or Pension Committee as it then exists, and may continue to rely upon such certification until a subsequent certification is filed with the Trustee.

The Trustee shall be fully protected in acting upon any instrument, certificate, or paper of the Company, its Board of Directors, the Pension Committee or the Recordkeeper, reasonably believed by it to be genuine and to be signed or presented by any authorized person, and the Trustee shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing but may accept the same as fully authorized by the Pension Committee, the Board, or the Recordkeeper, if applicable, as the case may be.

The Trustee shall be further protected in reasonable reliance upon a certification from any Investment Manager appointed by the Company as to the person or persons authorized to give instructions or directions on behalf of such Investment Manager and may continue to rely upon such certification until a subsequent certification is filed with Trustee.

11.  RESIGNATION AND REMOVAL OF TRUSTEE.

Any Trustee acting hereunder may resign at any time by giving sixty days' prior written notice to the  Pension Committee, which notice may be waived by the Pension Committee. The Pension Committee may remove the Trustee at any time upon thirty days' prior written notice to the Trustee, which notice may be waived by the Trustee.  In case of the resignation or

38

removal of the Trustee, the Pension Committee shall appoint a successor trustee. The removal of a Trustee and the appointment of a new Trustee shall be by a written instrument delivered to the Trustee. Upon the appointment of a successor trustee, the resigning or removed Trustee shall transfer or deliver the Trust Fund to such successor trustee.

12. AMENDMENT.

This Trust Agreement may be amended by agreement between the Trustee and the Company at any time or from time to time and in any manner, and the provisions of any such amendment may be applicable to the Trust Fund as constituted at the time of the amendment as well as to the part of the Trust Fund subsequently acquired.

13. TERMINATION.

This Trust Agreement and the trust created hereby may be terminated at any time by the Company, and upon such termination or upon the dissolution or liquidation of the Company, in the event that a successor to the Company by operation of law or by the acquisition of its business interests shall not elect to continue the Plans and the trust, the Trust Fund shall be paid out by the Trustee when directed by the Pension Committee. Notwithstanding the foregoing, the Trustee shall not be required to pay out any assets of the Trust Fund upon termination of the Trust until the Trustee has received written certification from the Pension Committee that all provisions of law with respect to such termination have been complied with. The Trustee shall rely

39

conclusively on such written certification, and shall be under no obligation to investigate or otherwise determine its propriety.

14. WITHDRAWAL FROM TRUST FUND.

14.1 Withdrawal of a Plan . In the event of the withdrawal of a Plan from the trust or in the event of the Company's or an Employer's election to terminate or to fund separately the benefits provided under any of its Plans, the Company shall cause a valuation to be made of the share of the Trust Fund which is held for the benefit of persons having an interest therein under such Plans. The Trustee shall thereupon segregate and dispose of such share in accordance with the written direction of the Company accompanied by its certification to the Trustee that such segregation and disposition is in accordance with the terms of the Plans and the requirements of the law.

14.2 Withdrawal Due to Disqualification. If the Company or any Employer receives notice that one or more of its Plans is no longer qualified under the provisions of Section 401 of the Code or the corresponding provisions of any future Federal revenue act, the Company shall immediately cause a valuation to be made of the share of the Trust Fund which is held for the benefit of such persons having an interest under such disqualified Plan or Plans. The Trustee shall thereupon segregate, withdraw from the Trust Fund, and dispose of such share in accordance with the terms of the disqualified Plan or Plans. The Company may direct the Trustee to dispose of such share by the transfer and delivery of such share to itself as trustee of a separate trust, the terms

40

and conditions of which shall be identical with those of this Trust Agreement, except that either the Company or the Employer maintaining such disqualified Plan or Plans and the Trustee shall be the only parties thereto.

14.3 Withdrawal of a Group of Employees. In the event that any group of employees covered by a Plan is withdrawn from such Plan, the Company shall, if required by the terms of such Plan, cause a valuation to be made of the share of the Trust Fund which is held for the benefit of such group of employees. The Trustee shall thereupon segregate and dispose of such share in accordance with the direction of the Company accompanied by its certification to the Trustee that such segregation and disposition is in accordance with the terms of such Plan and the requirements of the law.

The Trustee shall have no duty to see that the valuation of any share in accordance with the provisions of this Section 14.1 is caused to be made by the Company, nor to segregate and dispose of any such share in the absence of the written direction of the Company to do so.

15. MISCELLANEOUS.

15.1 Governing Law. To the extent not inconsistent with ERISA, as heretofore or hereafter amended, the provisions of this Trust Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the principles of the conflicts of laws of that state; however, to the extent required by law, the Trustee's rights, duties,

41

obligations and powers with respect to the trust created hereby, and the terms and conditions of any common or collective trust maintained by the Trustee into which any assets held hereunder are deposited shall in all respects be governed by and construed in accordance with the Commonwealth of Massachusetts' laws governing trusts.

15.2 <u>No Reversion to Employer</u>. Except as provided herein, no portion of the principal or the income of the Trust Fund shall revert to or be recoverable by the Company or any Employer or ever be used for or diverted to any purpose other than for the exclusive benefit of participants in the Plans and persons claiming under or through them pursuant to the Plans, provided, however, that:

(a) all contributions are conditioned upon the deductibility of the contributions under Section 404(a) of the Code, and, to the extent determined to be nondeductible, the Trustee shall, upon written request of the affected Company, return such amount as may be permitted by law to such Company, as appropriate, within one year after the determination of nondeductibility or within such other period as is permitted by applicable law; and

(b) if a contribution or any portion thereof is made by the Company by a mistake of fact, the Trustee shall, upon written request of the Company, return such amounts as may be permitted by law to the Company, as appropriate, within one year after the date of payment to the Trustee or within such other period as is permitted by applicable law; and

(c) if a contribution is conditioned upon the qualification of the Plans and Trust under Section 401 and 501 of the Code, the contributions of the Company to the Trust for all Plans Years, with the gains and losses thereon, shall be returned by the Trustee to the Company, as appropriate, within one year in the event that the Commissioner of Internal Revenue fails to rule that the Plans and Trust were as of such date qualified and tax-exempt (within the meaning of Sections 401 and 501 of the Code); and

42

(d)  in the event that a Plan whose assets are held in the Trust Fund is terminated, assets of such Plan may be returned to the Employer if all Plan liabilities to participants and beneficiaries of such Plan have been satisfied; and

(e)  assets may be returned to the Employer to the extent that the law permits such transfer.

The Trustee shall be under no obligation to return any part of the Trust Fund as provided in this Section 15.2 until the Trustee has received a written certification from the Pension Committee that such return is in compliance with this Section 15.2, the Plans and the requirements of applicable law. The Trustee shall rely conclusively on such written certification and shall be under no obligation to investigate or otherwise determine its propriety.

15.3  Non-Alienation of Benefits. No benefit to which a participant or his beneficiary is or may become entitled under a Plan shall at any time be subject in any manner to alienation or encumbrance, nor be resorted to, appropriated or seized in any proceeding at law, in equity or otherwise. No participant or other person entitled to receive a benefit under a Plan shall, except as specifically provided in such Plan, have power in any manner to transfer, assign, alienate or in any way encumber such benefit under such Plan, or any part thereof, and any attempt to do so shall be void.

15.4  Duration of Trust. Unless sooner terminated, the trust created under this Trust Agreement shall continue for the maximum period of time which the laws of the State of New York shall permit.

43

15.5  <u>No Guarantees</u>.  Neither the Company, the Pension Committee nor any Employer, nor the Trustee guarantees the Trust Fund from loss or depreciation, nor the payment of any amount which may become due to any person under the Plans or this Trust Agreement.

15.6  <u>Duty to Furnish Information</u>.  Both the Company and the Trustee shall furnish to the other any documents, reports, returns, statements, or other information that the other reasonably deems necessary to perform its duties imposed under the Plans or this Trust Agreement or otherwise imposed by law.

15.7  <u>Parties Bound</u>.  This Trust Agreement shall be binding upon the parties hereto, all participants in the Plans and persons claiming under or through them pursuant to the Plans, and, as the case may be, the heirs, executors, Pension Committees, successors, and assigns of each of them.  The provisions of Articles 5 and 7 shall survive termination of the Trust created under this Trust Agreement or resignation or removal of the Trustee for any reason.

In the event of the merger or consolidation of the Company or any Employer or other circumstances whereby a successor person, firm or Company shall continue to carry on all or a substantial part of its business, and such successor shall elect to carry on the provisions of the Plan or Plans applicable to such business, as therein provided, such successor shall be substituted hereunder for the Company or such Employer, as the case may be, upon the filing in writing of its election so to do

with the Trustee. The Trustee may, but need not, rely on the certification of an officer of the Company, and a certified copy of a resolution of the Board of Directors of such successor, reciting the facts, circumstances and consummation of such succession and the election of such successor to continue the said Plan or Plans as conclusive evidence thereof, without requiring any additional evidence.

15.8 Necessary Parties to Disputes. Necessary parties to any accounting, litigation or other proceedings shall include only the Trustee, the Company, the Pension Committee and any appropriate Employers and the settlement or judgment in any such case in which the Company, the Pension Committee, the appropriate Employers and the Trustee are duly served or cited shall be binding upon all participants in the Plans and their beneficiaries and estates, and upon all persons claiming by, through or under them.

15.9 Unclaimed Benefit Payments. If any check or share certificate in payment of a benefit hereunder which has been mailed by regular US mail to the last address of the payee furnished the Trustee by the Pension Committee or Recordkeeper is returned unclaimed, the Trustee shall notify the Pension Committee or Recordkeeper and shall discontinue further payments to such payee until it receives the further instruction of the Pension Committee or Recordkeeper. Any such returned benefits shall be promptly redeposited into the Trust Fund in accordance with the Trustee's standard operating procedure.

45

15.10  Severability.  If any provisions of this Trust
Agreement shall be held by a court of competent jurisdiction to
be invalid or unenforceable, the remaining provisions of this
Trust Agreement shall continue to be fully effective.

15.11  References.  Unless the context clearly indicates to
the contrary, a reference to a statute, regulation, document or
provision shall be construed as referring to any subsequently
enacted, adopted or executed counterpart.

15.12  Headings.  Headings and subheadings in this Trust
Agreement are inserted for convenience of reference only and are
not to be considered in the construction of its provisions.

15.13  No Liability for Acts of Predecessor and Successor
Trustees.  The Trustee shall have no liability for the acts or
omissions of any predecessors or successors in office.


[Remainder of page intentionally left blank.]

15.14  Counterparts.  This Trust Agreement may be executed in one or more counterparts, each of which shall constitute an original.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed by their duly authorized officers as of the day and year first above written.

ATTEST:                          JOHNSON & JOHNSON

_____        BY: _____

ITS: _____                NAME: ____ JOHN A. PAPA

                                 TITLE: _____ Treasurer _____

                                 DATE: _____ 9/22/03 _____


ATTEST:                          STATE STREET BANK AND TRUST COMPANY

_____        BY: _____

ITS: ___ Officer ___             NAME: __ ALAN FLOWERS

                                 TITLE: _ VICE PRESIDENT _____

                                 DATE: ___ 10/6/03 _____

47

Redacted Document

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARNOLD HENRIQUEZ, ET AL. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | C.A. No. 11-cv-12049-MLW |
| ) | |
| STATE STREET BANK AND TRUST ) | |
| COMPANY AND STATE STREET ) | |
| GLOBAL MARKETS LLC ) | |
| ) | |
| Defendants. ) | |

## AFFIDAVIT OF MARK A. CURRAN
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Mark A. Curran states:

### Background and Qualifications

1.     I am a Vice President in the Investor Services ("IS") Division of State Street Bank and Trust Company ("State Street"), which provides custodial banking services to institutional investors.

2.     I am the relationship manager for the Waste Management Retirement Savings Plan (the "WM Plan").   My responsibilities include providing custody, accounting, daily valuation and client service to the WM Plan.

3.     I submit this affidavit in support of Defendants' Motion to Dismiss the Complaint in the matter captioned above.  I state in this affidavit the source of any information that is not based on personal knowledge.

### State Street's Relationship to the WM Plan

4.     State Street provides custody services to institutional investors.  These services are provided by divisions of State Street that are separate from the State Street divisions

1

responsible for providing investment management services to collective funds and for executing foreign exchange transactions with custody clients of State Street.

5.     During the alleged class period ("Class Period"), State Street provided custody services to the WM Plan, which is alleged to be an ERISA defined contribution plan or 401(k) plan. Complaint ¶ 10.

6.     State Street's responsibilities as custodian are set forth in a trust agreement, dated January 1, 1999, in which the WM Plan's Investment and Administrative Committees appointed State Street as the WM Plan's custodian pursuant to a Defined Contribution Plans Master Trust Agreement Between Waste Management, Inc. and State Street Bank and Trust Company. A true and accurate copy of that agreement is attached as Exhibit A hereto.

7.     During the Class Period, the WM Plan's Investment and Administrative Committees, which are the named fiduciaries of the WM Plan, from time to time pursuant to written direction selected collective funds advised by State Street's separate State Street Global Advisors division ("SSgA") as WM Plan investment options. WM Plan participants could choose such funds as investments for their individual accounts.

8.     During the Class Period, Plaintiff Arnold Henriquez ("Henriquez") alleges that he selected certain such collective funds for allocation of WM Plan assets in his account (the "WM Selected Funds"). Specifically, Henriquez alleges that he was invested in funds referred to as the "International Equity Fund" from "the second quarter of 2005 through the second quarter of 2009" and, at unspecified points during the Class Period, in the Large Cap Equity Fund, the Small Cap Equity Fund, the Conservative Asset Allocation Fund, the Moderate Asset Allocation Fund, the Aggressive Allocation Fund, the Bond Market Fund and the SSgA Target Retirement 2030 Fund. Complaint ¶ 10 & n.2.

2



I declare under penalty of perjury that the forgoing is true and correct to the best of my personal

knowledge, information, and belief.

_Mark A. Curran_

DEFINED CONTRIBUTION PLANS

MASTER TRUST AGREEMENT

Between

WASTE MANAGEMENT, INC.

and

STATE STREET BANK AND TRUST COMPANY

# TABLE OF CONTENTS

|  |  |  | PAGE |
|---|---|---|---|
| 1. | | TRUST FUND . . . . . . . . . . . . . . . . . . | 3 |
| | 1.1 | Receipt of Assets . . . . . . . . . . . . | 3 |
| | 1.2 | Employers . . . . . . . . . . . . . . . . | 3 |
| | 1.3 | Plans . . . . . . . . . . . . . . . . . . | 3 |
| | 1.4 | Accounting for a Plan's Undivided Interest in the Trust Fund. . . . . . . . . . . | 4 |
| | 1.5 | Appointment of Recordkeeper. . . . . . . | 4 |
| | 1.6 | No Trustee Duty Regarding Contributions. . | 5 |
| 2. | | DISBURSEMENTS FROM THE TRUST FUND. . . . . . . | 5 |
| 3. | | COMPANY SELECTED INVESTMENT FUNDS. . . . . . . | 6 |
| | 3.1 | In General. . . . . . . . . . . . . . . . | 6 |
| | 3.2 | Participant-Directed Brokerage Accounts . | 7 |
| | 3.3 | Company Managed Stock Investment Accounts. . . . . . . . . . . . . . . . | 7 |
| | 3.4 | Company Managed Investment Accounts . . . | 7 |
| | 3.5 | Trustee Managed Investment Accounts . . . | 8 |
| | 3.6 | Investment Manager Accounts . . . . . . . | 8 |
| 4. | | POWERS OF THE TRUSTEE. . . . . . . . . . . . . | 10 |
| | 4.1 | Investment Power of the Trustee . . . . . | 10 |
| | 4.2 | Administrative Powers of the Trustee. . . | 15 |
| 5. | | INDEMNIFICATION. . . . . . . . . . . . . . . . | 16 |
| 6. | | SECURITIES OR OTHER PROPERTY . . . . . . . . . | 16 |
| 7. | | SECURITY CODES . . . . . . . . . . . . . . . . | 17 |
| 8. | | TAXES AND TRUSTEE COMPENSATION . . . . . . . . | 17 |
| 9. | | ACCOUNTS OF THE TRUSTEE. . . . . . . . . . . . | 18 |

TABLE OF CONTENTS
(cont.)

| | | PAGE |
|---|---|---|
| 10. | RELIANCE ON COMMUNICATIONS . . . . . . . . . . | 19 |
| 11. | RESIGNATION AND REMOVAL OF TRUSTEE . . . . . . | 20 |
| 12. | AMENDMENT. . . . . . . . . . . . . . . . . . | 20 |
| 13. | TERMINATION. . . . . . . . . . . . . . . . | 21 |
| 14. | PARTICIPATION OF OTHER EMPLOYERS . . . . . . . | 21 |
| | 14.1 Adoption by Other Employers; Withdrawals. . . . . . . . . . . . . . | 21 |
| | 14.2 Powers and Authorities of Other Employers to be Exercised Exclusively by Company. | 22 |
| 15. | MISCELLANEOUS. . . . . . . . . . . . . . . . | 23 |
| | 15.1 Governing Law . . . . . . . . . . . . . | 23 |
| | 15.2 No Reversion to Employers . . . . . . . | 23 |
| | 15.3 Non-Alienation of Benefits. . . . . . . | 24 |
| | 15.4 Duration of Trust . . . . . . . . . . . | 24 |
| | 15.5 No Guarantees . . . . . . . . . . . . . | 24 |
| | 15.6 Duty to Furnish Information . . . . . . | 24 |
| | 15.7 Withholding . . . . . . . . . . . . . . | 25 |
| | 15.8 Parties Bound . . . . . . . . . . . . . | 25 |
| | 15.9 Necessary Parties to Disputes . . . . . | 25 |
| | 15.10 Unclaimed Benefit Payments. . . . . . . | 26 |
| | 15.11 Severability. . . . . . . . . . . . . . | 26 |
| | 15.12 References. . . . . . . . . . . . . . . | 26 |
| | 15.13 Headings. . . . . . . . . . . . . . . . | 26 |
| | 15.14 No Liability for Acts of Predecessor and Successor Trustees . . . . . . . | 26 |
| | 15.15 Counterparts. . . . . . . . . . . . . . | 26 |

DEFINED CONTRIBUTION PLANS
MASTER TRUST AGREEMENT


Agreement (hereinafter referred to as the "Trust Agreement") made as of 1st day of January, 1999, by and between WASTE MANAGEMENT, INC. corporation organized under the laws of _____ (hereinafter referred to as the "Company") and STATE STREET BANK AND TRUST COMPANY, a trust company organized under the laws of the Commonwealth of Massachusetts (hereinafter referred to as the "Trustee").

WITNESSETH:

WHEREAS, the Company maintains a certain tax-qualified plan known as the U.S.A Waste Services, Inc. Employee Savings Plan (hereinafter referred to as the "USA Plan") for the exclusive benefit of certain of its employees and the employees of certain of its affiliates and subsidiaries;

WHEREAS, the Company's subsidiary, Waste Management Holdings, Inc., maintains a certain tax-qualified plan known as the Waste Management Retirement Savings Plan for the benefit of certain of its, and its subsidiaries and affiliates, employees (hereinafter referred to as the "Holding Plan"); and

WHEREAS, the Company's subsidiaries, Wheelabrator Technologies Inc. and Trust International Inc., maintain a certain tax-qualified plan known as the Wheelabrator-Rust Savings and Retirement Plan for the benefit of certain of its, and its subsidiaries and affiliates, employees (hereinafter referred to as the "WTI-Rust Plan"); and

WHEREAS, the Company intends to establish the new Waste Management Retirement Savings Plan (the "WM Plan") effective January 1, 1999 and to merger the USA Plan, the Holdings Plan and the WTI-Rust Plan effective as soon after January 1, 1999 as the assets can be transferred from the respective trusts to this Trust; and

WHEREAS, the Company's subsidiary, Waste Management Holdings, Inc., maintains a certain tax-qualified plan known as the Waste Management Retirement Savings Plan for Collectively Bargained Employees for the benefit of certain of its, and its subsidiaries and affiliates, employees (hereinafter referred to as the "Union Plan"); and

WHEREAS, the Company's subsidiary, Waste Management Industrial Services, maintains a certain tax-qualified plan known as the Industrial Cleaning 401(k) Plan for the benefit of certain of its, and its subsidiaries and affiliates', employees (hereinafter referred to as the "Cleaning Plan"); and

WHEREAS, certain affiliates and subsidiaries of the Company may in the future maintain separate tax-qualified employee benefit plans for certain of their employees and may adopt the trust and Trust Agreement to serve as the funding vehicle for such plans (hereinafter together with the WM Plan  and the Union Plan, referred to individually as a "Plan" and  collectively as the "Plans");

WHEREAS, the authority to conduct the general operation and administration of the Plans is vested in the Administrative Committee and Investment Committee, each as defined and as provided in the Plan, who shall have the authorities and shall be subject to the duties with respect to the trust specified in the Plans and in this Trust Agreement;

WHEREAS, the Company has appointed State Street Bank and Trust Company as trustee under this Agreement effective January 1, 1999; and

WHEREAS, the Company has appointed State Street Bank and Trust Company to provide recordkeeping and other administrative services other than those the Administrative Committee continues to perform for the Plan (in such capacity, and any other person or entity hereafter engaged by the Company to provide such services, being hereinafter referred to as the "Recordkeeper");

WHEREAS, the Company and the Trustee desire to adopt this Agreement effective January 1, 1999.

NOW, THEREFORE, the Company and the Trustee do hereby adopt the Trust Agreement as the funding vehicle for the Plan, and the Company and Trustee do hereby agree to the following provisions of the Trust Agreement:

2

1.    TRUST FUND.

1.1    Receipt of Assets. The Trustee shall receive and accept for the purposes hereof all sums of money and other property paid to it by or at the direction of the Company or any Employer, and shall hold, invest, reinvest, manage, administer and distribute such monies and other property and the increments, proceeds, earnings and income thereof pursuant to the terms of this Trust Agreement and for the exclusive benefit of participants in the Plans and their beneficiaries. The Trustee need not inquire into the source of any money or property transferred to it nor into the authority or right of the transferor of such money or property to transfer such money or property to the Trustee. All Plan assets held by the Trustee in the trust pursuant to the provisions of this Trust Agreement at the time of reference are referred to herein as the "Trust Fund".

1.2    Employers. For purposes of this Trust Agreement the term "Employer" means the Company or any corporation (or other trade or business) which is a member of a controlled group of corporations of which the Company is a member as determined under Section 414(b) or (c) of the Internal Revenue Code of 1986, as amended (hereinafter referred to as the "Code"), and which corporation has adopted this Trust Agreement in accordance with the provisions of Section 14.1.

1.3    Plans. References in this Trust Agreement to the "Plan" or the "Plans" shall, mean the tax-qualified employee benefit plan or plans of the Company or the tax-qualified employee benefit plan or plans of any Employer that has adopted the trust as the funding vehicle for such plan or plans as the case may be.

The Company shall be responsible for verifying that while any assets of the Plan are held in the Trust Fund, the Plan (i) is "qualified" with the meaning of Section 401(a) of the Code and, as a defined contribution plan either (x) the Plan provides that each participant is duly authorized under the Plan to provide investment direction to the Administrative Committee or Recordkeeper, acting as agent for such participant, for conveyance to the Trustee; (ii) is permitted by existing or future ruling of the United States Treasury Department to pool its funds in a group trust; (iii) permits its assets to be commingled for investment purposes with the assets

3

in a group trust; (iii) permits its assets to be commingled for investment purposes with the assets of other such plans by investing such assets in this Trust Fund whether or not its assets will in fact be held in a separate investment fund; and (iv) the Plan does not prohibit the Company from appointing the Recordkeeper to perform daily recordkeeping services as described herein, and provides that the Administrative Committee is the fiduciary responsible for carrying out participant investment directions.

1.4    Accounting for a Plan's Undivided Interest in the Trust Fund.  All transfers to, withdrawals from, and other transactions regarding the Trust Fund shall be conducted in such a way that the proportionate interest in the Trust Fund of each Plan and the fair market value of that interest may be determined at any time.  Whenever the assets of more than one Plan are commingled in the Trust Fund or in any Investment Fund, the undivided interest therein of that Plan shall be debited or credited (as the case may be) (i) for the entire amount of every contribution received on behalf of that Plan, every benefit payment, or other expense attributable solely to that Plan, and every other transaction relating only to that Plan; and (ii) for its proportionate share of every item of collected or accrued income, gain or loss, and general expense; and other transactions attributable to the Trust Fund or that Investment Fund as a whole.  As of each date when the fair market value of the investments held in the Trust Fund or an Investment Fund are determined as provided for in Article 9, the Trustee shall adjust the value of each Plan's interest therein to reflect the net increase or decrease in such values since the last such date.  For all of the foregoing purposes, fractions of a cent may be disregarded.

1.5    Appointment of Recordkeeper.  Under the Plan, the Company is the fiduciary responsible for carrying out participant investment directions and in order to effect this, the Company has appointed Recordkeeper to perform certain services including but not limited to maintaining participant accounts for all contributions, loans and loan repayments, rollovers, and other deposits made for the purpose of determining how such deposits are to be allocated to the Investment Funds of the Plan, for determining requirements for disbursements from or transfers among Investment Funds in accordance with the terms of the Plan,  for maintaining participant records for the purpose of voting or tendering shares in an Investment Fund as described in

4

Section 3.1 herein, for distributing information about the Investment Funds provided for under the Plan, and for distributing participant statements at periodic intervals.

    1.6    No Trustee Duty Regarding Contributions. The Trustee shall not be under any duty to require payment of any contributions to the Trust Fund or determine that a contribution is in compliance with a participant's deferral election, or to see that any payment made to it is computed in accordance with the provisions of the Plans, or otherwise be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plans.

2.    DISBURSEMENTS FROM THE TRUST FUND.

    The Trustee shall from time to time on the directions of the Administrative Committee or Recordkeeper make payments out of the Trust Fund to such persons, including the Administrative Committee or Recordkeeper, in such manner, in such amounts and for such purposes as may be specified in the directions of the Recordkeeper or Administrative Committee.

    The Recordkeeper or Administrative Committee shall be responsible for insuring that any payment directed under this Article conforms to the provisions of the Plans, this Trust Agreement, and the provisions of the Employee Retirement Income Security Act of 1974, as amended (hereinafter referred to as "ERISA"). Each direction of the Recordkeeper or Administrative Committee shall be in writing and shall be deemed to include a certification that any payment or other distribution directed thereby is one which the Recordkeeper or Administrative Committee is authorized to direct, and the Trustee may conclusively rely on such deemed certification without further investigation. Payments by the Trustee may be made by its check to the order of the payee. Payments or other distributions hereunder may be mailed to the payee at the address last furnished to the Trustee by the Recordkeeper or if no such address has been so furnished, to the payee in care of the Recordkeeper. The Trustee shall not incur any liability or other damage on account of any payments or other distributions made by it in accordance with the written directions of the Recordkeeper or Administrative Committee.

5

3.    COMPANY SELECTED INVESTMENT FUNDS.

    3.1    In General. The Investment Committee from time to time and in accordance with provisions of the Plan, may direct the Trustee to establish one or more separate investment accounts within the Trust Fund, each separate account being hereinafter referred to as an "Investment Fund" which may be invested in (i) shares of investment companies registered under the Investment Company Act of 1940, (ii) collective funds maintained by a bank or trust company, (iii) various classes of common stock of the Company, (iv) Participant directed brokerage accounts, (v) pools of insurance contracts, (vi) funds managed by a registered investment manager, bank or insurance company, (vii) accounts managed by named fiduciaries for the Plan; and (viii) other investment options available from time to time under the Plan (specifically the Investment Funds described on Attachment "A" to this Trust Agreement, as amended from time to time by the Committee and with the consent of the Trustee). The Trustee shall have no liability for any loss of any kind which may result by reason of the manner of division of the Trust Fund into Investment Funds, or for the investment management of these accounts, except as provided for in Section 3.5 respecting a Trustee managed investment account, if any. The Trustee shall transfer to each such Investment Fund such portion of the assets of the Trust Fund as the Administrative Committee or the Recordkeeper directs. The Trustee shall not incur any liability on account of following any direction of the Administrative Committee or the Recordkeeper and the Trustee shall be under no duty to review the investment guidelines, objectives and restrictions so established. To the extent that directions from the Administrative Committee or Recordkeeper to the Trustee represent investment instructions of the Plans' participants, the Trustee shall have no responsibility for such investment elections and shall incur no liability on account of the direct and necessary results of investing the assets of the Trust Fund in accordance with such participant investment instructions.

    All interest, dividends and other income received with respect to, and any proceeds received from the sale or other disposition of, securities or other property held in an Investment Fund shall be credited to and reinvested in such Investment Fund. All expenses of the Trust Fund which are allocable to a particular Investment Fund shall be so allocated and charged.

6

Subject to the provisions of the Plans, the Investment Committee may direct the Trustee to eliminate an Investment Fund or Funds, and the Trustee shall thereupon dispose of the assets of such Investment Fund and reinvest the proceeds thereof in accordance with the directions of the Administrator.

3.2    Participant-Directed Brokerage Accounts.  The Trustee shall, if so directed by the Investment Committee segregate all or a portion of the Trust Fund held by it into one or more separate investment accounts to be known as Participant Directed Brokerage Accounts. Whenever a Participant is directing the investment and reinvestment of a Participant Directed Brokerage Account, the Participant shall have the powers and duties which an Investment Manager would have under this Trust Agreement if an Investment Manager were then serving and the Trustee shall be protected to the same extent as it would be protected under this Trust Agreement as to directions or the absence of directions of an Investment Manager.  Participant shall be entitled to give orders directly to the broker for the purchases and sale of securities as defined in Section 6 of this Agreement.  The broker shall provide confirmation of each order to the Administrative Committee or Recordkeeper which shall maintain records in such form as to satisfy reporting requirements of the Plan.

3.3    Company Stock Funds  The Investment Committee may direct the Trustee to establish one or more Investment Funds substantially all of the assets of which shall be invested in securities which constitute "qualifying employer securities" or "qualifying employer real property" within the meaning of Section 407 of ERISA.  It shall be the duty of the Investment Committee to determine that such investment is not prohibited by Sections 406 or 407 of ERISA.  In addition, during any time when there is no Investment Manager with respect to a Company Stock Fund (such as before an investment management agreement takes effect or after it terminates), the Investment Committee shall direct the investment and reinvestment of such Company Stock Fund.

3.4    Investment Committee Managed Investment Accounts.  The Trustee shall, if so directed in writing by the Investment Committee, segregate all or a portion of the Trust Fund held by it into one or more separate investment accounts to be known as Investment Committee

7

Managed Investment Accounts. The Investment Committee, by written notice to the Trustee, may at any time relinquish its powers under this Section 3.4 and direct that a Investment Committee Managed Investment Account shall no longer be maintained. Whenever the Investment Committee is directing the investment and reinvestment of an Investment Account or a Investment Committee Managed Investment Account, the Investment Committee shall have the powers and duties which an Investment Manager would have under this Trust Agreement if an Investment Manager were then serving and the Trustee shall be protected to the same extent as it would be protected under this Trust Agreement as to directions or the absence of directions of an Investment Manager.

3.5 <u>Trustee Managed Investment Accounts</u>. The Trustee shall have no duty or responsibility to direct the investment and reinvestment of the Trust Fund, any Investment Fund or any Investment Account unless expressly agreed to in writing between the Trustee and the Investment Committee. In the event that the Trustee enters into such an agreement, it shall have the powers and duties of an Investment Manager under this Trust Agreement with regard to such Investment Account.

3.6 <u>Investment Manager Accounts</u>. The Investment Committee, from time to time and in accordance with the provisions of the Plans, may appoint one or more independent Investment Managers, pursuant to a written investment management agreement describing the powers and duties of the Investment Manager, to direct the investment and reinvestment of all or a portion of the Trust Fund or an Investment Fund (hereinafter referred to as an "Investment Account").

The Investment Committee shall be responsible for ascertaining that while each Investment Manager is acting in that capacity hereunder, the following requirements are satisfied:

(a) The Investment Manager is either (i) registered as an investment adviser under the Investment Advisers Act of 1940, as amended, (ii) a bank as defined in that Act or (iii) an insurance company qualified to perform the services described in (b) below under the laws of more than one state;

8

(b)     The Investment Manager has the power to manage, acquire or dispose of any assets of the Plans for which it is responsible hereunder;

(c)     The Investment Manager has acknowledged in writing to the Investment Committee and the Trustee that he or it is a fiduciary with respect to the Plans within the meaning of Section 3(21)(A) of ERISA.

The Investment Committee shall furnish the Trustee with written notice of the appointment of each Investment Manager hereunder, and of the termination of any such appointment. Such notice shall specify the assets which shall constitute the Investment Account of such Investment Manager. The Trustee shall be fully protected in relying upon the effectiveness of such appointment and the Investment Manager's continuing satisfaction of the requirements set forth above until it receives written notice from the Investment Committee to the contrary.

The Trustee shall conclusively presume that each Investment Manager, under its investment management agreement, is entitled to act, in directing the investment and reinvestment of the Investment Account for which it is responsible, in its sole and independent discretion and without limitation, except for any limitations which from time to time the Investment Committee and the Trustee agree (in writing) shall modify the scope of such authority.

The Trustee shall have no liability (i) for the acts or omissions of any Investment Manager (except to the extent the Trustee itself is serving as Investment Manager); (ii) for following directions, including investment directions of an Investment Manager (other than the Trustee) or the Investment Committee, which are given in accordance with this Trust Agreement; (iii) for failing to act in the absence of Investment Manager direction; or (iv) for any loss of any kind which may result by reason of the manner of division of the Trust Fund or Investment Fund into Investment Accounts.

An Investment Manager shall certify, at the request of the Trustee, the value of any securities or other property held in any Investment Account managed by such Investment Manager, and such certification shall be regarded as a direction with regard to such valuation.

9

The Trustee shall be entitled to conclusively rely upon such valuation for all purposes under this Trust Agreement.

Except as otherwise provided in this Trust Agreement, the Investment Manager of an Investment Account shall have the power and authority, to be exercised in its sole discretion at any time and from time to time, to issue orders for the purchase or sale of securities directly to a broker. Written notification of the issuance of each such order shall be given promptly to the Trustee by the Investment Manager and the confirmation of each such order shall be confirmed to the Trustee by the broker. The broker shall promptly provide confirmation of each such order to the Recordkeeper, which shall maintain all participant level accounts. The Recordkeeper shall provide to the Trustee all information reasonably required by the Trustee to fulfill its accounting and reporting obligations with respect to assets held in the Participant Directed Brokerage Accounts. Unless otherwise directed by the Investment Manager, such notification shall be authority for the Trustee to pay for securities purchased or to deliver securities sold as the case may be. Upon the direction of the Investment Manager, the Trustee will execute and deliver appropriate trading authorizations, but no such authorization shall be deemed to increase the liability or responsibility of the Trustee under this Trust Agreement.

4. POWERS OF THE TRUSTEE.

4.1 Investment Powers of the Trustee. The Trustee shall have and exercise the following powers and authority (i) over Investment Accounts for which it has express investment management discretion as provided in Section 3.5 or (ii) upon direction of the Investment Manager of an Investment Account or (iii) upon direction of a Participant with respect to a Participant Directed Brokerage Account or (iv) upon direction of the Investment Committee: (x) for a Investment Committee Managed Investment Account; or (y) for voting and tendering of qualified employer securities; or (v) upon direction of the Administrative Committee for lending to participants in the Plans:

(a)     To purchase, receive, or subscribe for any securities or other property and to retain in trust such securities or other property.

10

(b)     To acquire and hold qualifying employer securities and qualifying employer real property, as such investments are defined in Section 407(d) of ERISA.

(c)     To sell for cash or on credit, to grant options, convert, redeem, exchange for other securities or other property, to enter into standby agreements for future investment, either with or without a standby fee, or otherwise to dispose of any securities or other property at any time held by it.

(d)     To settle, compromise or submit to arbitration any claims, debts, or damages, due or owing to or from the trust, to commence or defend suits or legal proceedings and to represent the trust in all suits or legal proceedings in any court of law or before any other body or tribunal.

(e)     To trade in financial options and futures, including index options and options on futures and to execute in connection therewith such account agreements and other agreements including contracts for the exchange of interest rates, or investment performance, currencies or other notional principal contracts in such form and upon such terms as the Investment Manager or the Administrator shall direct.

(f)     Subject to Section 4.1(g), to exercise all voting rights, tender or exchange rights, any conversion privileges, subscription rights and other rights and powers available in connection with any securities or other property at any time held by it; to oppose or to consent to the reorganization, consolidation, merger, or readjustment of the finances of any corporation, company or association, or to the sale, mortgage, pledge or lease of the property of any corporation, company or association any of the securities which may at any time be held by it and to do any act with reference thereto, including the exercise of options, the making of agreements or subscriptions and the payment of expenses, assessments or subscriptions, which may be deemed necessary or advisable by the Investment Manager or Investment Committee in connection therewith, and to hold and retain any securities or other property which it may so acquire; and to deposit any property with any protective, reorganization or similar committee, and to pay and agree to pay part of the expenses and compensation of any such committee and any assessments levied with respect to property so deposited.

(g)     To exercise all voting or tender or exchange offer rights with respect to all qualifying employer securities held by it except that portion, if any, for which it has received voting or tender or exchange offer instructions from participants in the Plans as provided in this paragraph. If the Plan provides, each participant may direct the Trustee, confidentially, how to vote or whether or not to tender or exchange the qualifying employer securities representing his proportionate interest in the assets of the Plans. The Recordkeeper shall furnish the Trustee with the name and address of each participant and the number of shares held for the participant's account as near as practicable to the record date fixed for

11

the determination of shareholders entitled to vote, tender or exchange, and shall provide the Trustee with all other information and assistance which the Trustee may reasonably request. Shares for which the Trustee has not received timely voting or tender or exchange instructions shall be voted or tendered by the Trustee to the extent permitted by the Plans or, if required by applicable law, in its sole discretion.

(h)     To lend to participants in the Plans such amounts and upon such terms and conditions as the Administrative Committee or Recordkeeper may direct. Any such direction shall be deemed to include a certification by the Administrative Committee or Recordkeeper that such lending is in accordance with the provisions of ERISA and the Plans.

(i)     To borrow money in such amounts and upon such terms and conditions as shall be deemed advisable or proper by the Investment Committee or Investment Manager to carry out the purposes of the trust and to pledge any securities or other property for the repayment of any such loan.

(j)     To invest all or a portion of the Trust Fund in contracts issued by insurance companies, including contracts under which the insurance company holds Plan assets in a separate account or commingled separate account managed by the insurance company. The Trustee shall be entitled to rely upon any written directions of the Investment Committee or the Investment Manager under this Section 4.1, and the Trustee shall not be responsible for the terms of any insurance contract that it is directed to purchase and hold or for the selection of the issuer thereof or for performing any functions under such contract (other than the execution of any documents incidental thereto on the instructions of the Investment Committee or the Investment Manager).

(k)     To manage, administer, operate, lease for any number of years, develop, improve, repair, alter, demolish, mortgage, pledge, grant options with respect to, or otherwise deal with any real property or interest therein at any time held by it, and to hold any such real property in its own name or in the name of a nominee, with or without the addition of words indicating  that such property is held in a fiduciary capacity, all upon such terms and conditions as may be deemed advisable by the Investment Manager or Investment Committee.

(l)     To renew, extend or participate in the renewal or extension of any mortgage, upon such terms as may be deemed advisable by the Investment Manager or Investment Committee, and to agree to a reduction in the rate of interest on any mortgage or of any guarantee pertaining thereto in any manner and to any extent that may be deemed advisable by the Investment Manager or Investment Committee for the protection of the Trust Fund or the preservation of the value of the investment; to waive any default, whether in the performance of any covenant or condition of any mortgage or in the performance of any guarantee, or to enforce any such default in such manner and to such extent as may be

deemed advisable by the Investment Manager or Investment Committee; to exercise and enforce any and all rights of foreclosure, to bid on property on foreclosure, to take a deed in lieu of foreclosure with or without paying consideration therefor, and in connection therewith to release the obligation on the bond secured by such mortgage, and to exercise and enforce in any action, suit or proceeding at law or in equity any rights or remedies in respect to any such mortgage or guarantee.

(m) To hold part or all of the Trust Fund uninvested.

(n) To employ suitable agents and counsel and to pay their reasonable and proper expenses and compensation.

(o) To purchase and sell foreign exchange and contracts for foreign exchange, including transactions entered into with State Street Bank and Trust Company, its agents or subcustodians.

(p) To form corporations and to create trusts to hold title to any securities or other property, all upon such terms and conditions as may be deemed advisable by the Investment Manager or Investment Committee.

(q) To register any securities held by it hereunder in its own name, in the name of its nominee, in the name of its agent, or in the name of its agent's nominee with or without the addition of words indicating that such securities are held in a fiduciary capacity, and to hold any securities in bearer form and to deposit any securities or other property in a depository or clearing corporation.

(r) To make, execute and deliver, as Trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases, or other instruments in writing necessary or desirable for the accomplishment of any of the foregoing powers.

(s) To invest at any bank including State Street Bank and Trust Company (i) in any type of interest bearing investments (including, but not limited to savings accounts, money market accounts, certificates of deposit and repurchase agreements) and (ii) in noninterest bearing accounts (including but not limited to checking accounts).

(t) To invest in collective investment funds maintained by State Street Bank and Trust Company or by other banks for the investment of the assets of employee benefit plans qualified under Section 401(a) of the Code, whereupon the instruments establishing such funds, as amended, shall be deemed a part of this Trust Agreement and incorporated by reference herein.

13

The Trustee shall transmit promptly to the Investment Committee or the Investment Manager, as the case may be, all notices of conversion, redemption, tender, exchange, subscription, class action, claim in insolvency proceedings or other rights or powers relating to any of the securities in the Trust Fund, which notices are received by the Trustee from its agents or custodians, from issuers of the securities in question and from the party (or its agents) extending such rights. The Trustee shall have no obligation to determine the existence of any conversion, redemption, tender, exchange, subscription, class action, claim in insolvency proceedings or other right or power relating to any of the securities in the Trust Fund of which notice was given prior to the purchase of such securities by the Trust Fund, and shall have no obligation to exercise any such right or power unless the Trustee is informed of the existence of the right or power.

The Trustee shall not be liable for any untimely exercise or assertion of such rights or powers described in the paragraph immediately above in connection with securities or other property of the Trust Fund at any time held by it unless (i) it or its agents or custodians are in actual possession of such securities or property and (ii) it receives directions to exercise any such rights or powers from the Investment Committee or the Investment Manager, as the case may be, and both (i) and (ii) occur at least three business days prior to the date on which such rights or powers are to be exercised.

If the Trustee is directed by the Investment Committee or an Investment Manager to purchase securities issued by any foreign government or agency thereof, or by any corporation or other entity domiciled outside of the United States, it shall be the responsibility of the Investment Committee or Investment Manager, as the case may be, to advise the Trustee in writing with respect to any laws or regulations of any foreign countries or any United States territory or possession which shall apply in any manner whatsoever to such securities, including, without limitation, receipt by the Trustee of dividends, interest or other distributions on such securities.

All Investment Company shares shall be registered in the name of the Trustee or its nominee. Subject to any requirement of applicable law, the Trustee will transmit to Recordkeeper or the Investment Committee, as the case may be, copies of any notices of shareholders' meetings, proxies and proxy-soliciting materials, prospectuses and the annual or

14

other reports to shareholders, with respect to Investment Company shares held in the Trust. The Trustee shall act in accordance with appropriate directions received from Recordkeeper or the Investment Committee, as the case may be, with respect to matters to be voted upon by the shareholders of the Investment Company. Such directions must be in writing on a form approved by the Trustee, signed by the addressee and delivered to the Trustee within the time prescribed by it. The Trustee will not vote Investment Company shares as to which it receives no written directions. For the purposes of this Section, Investment Company means a registered investment company provided that its prospectus offers its shares under the Plan.

4.2     Administrative Powers of the Trustee. Notwithstanding the appointment of an Investment Manager, the Trustee shall have the following powers and authority, to be exercised in its sole discretion, with respect to the Trust Fund:

(a)     To employ suitable agents, custodians and counsel and to pay their reasonable expenses and compensation.

(b)     To appoint ancillary trustees to hold any portion of the assets of the trust and to pay their reasonable expenses and compensation.

(c)     To register any securities held by it hereunder in its own name, in the name of its nominee, in the name of its agent, or in the name of its agent's nominee with or without the addition of words indicating that such securities are held in a fiduciary capacity, and to hold any securities in bearer form and to deposit any securities or other property in a depository or clearing corporation.

(d)     To make, execute and deliver, as Trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases or other instruments in writing necessary or desirable for the accomplishment of any of the foregoing powers.

(e)     Generally to do all ministerial acts, whether or not expressly authorized, which the Trustee may deem necessary or desirable in carrying out its duties under this Trust Agreement.

Notwithstanding anything in the Plans or this Trust Agreement to the contrary, the Trustee shall not be required by the Investment Committee, the Administrative Committee, Recordkeeper or any Investment Manager to engage in any action, nor make any investment

15

which constitutes a prohibited transaction or is otherwise contrary to the provisions of ERISA or which is otherwise contrary to law or to the terms of the Plans or this Trust Agreement.

The Trustee may consult with legal counsel concerning any question which may arise with reference to this Trust Agreement and its powers and duties hereunder.

5.     INDEMNIFICATION.

To the extent permitted by applicable law, the Company shall indemnify and save harmless the Trustee for and from any loss or expense (including reasonable attorneys' fees) arising (a) out of an authorized action hereunder taken in good faith by the Trustee, or (b) out of any matter as to which this Trust Agreement provides that the Trustee is directed, protected, not liable, or not responsible, or (c) by reason of any breach of any statutory or other duty owed to the Plans by the Company, any Employer, the Administrative Committee, the Recordkeeper, the Investment Committee or any Investment Manager or any delegate of any of them (and for the purposes of this sentence the Trustee shall not be considered to be such a delegate), whether or not the Trustee may also be considered liable for that other person's breach under the provisions of Section 405(a) of ERISA, except for any loss or expense arising from a negligent performance of or negligent failure to perform a duty under this Trust Agreement, or a breach of fiduciary duty by (I) State Street in any capacity, (ii) any parent organization of State Street, (iii) any subsidiary or division of State Street or any parent thereof, or (iv) any officer, director, employee of State Street, or any contractor or agent selected by State Street or any of the foregoing (any of (ii), (iii) or (iv) herewith referred to as an "Affiliate").   Central securities depositories and clearing agencies shall not be considered contractors or agents of the Trustee.

6.     SECURITIES OR OTHER PROPERTY.

The words "securities or other property", used in this Trust Agreement, shall be deemed to refer to any property, real or personal, or part interest therein, wherever situated, including, without limitation, governmental, corporate or personal obligations, trust and participation certificates, partnership interests, annuity or investment contracts issued by an insurance

16

company, leaseholds, fee titles, mortgages and other interests in realty, preferred and common stocks, certificates of deposit, financial options and futures or any other form of option, evidences of indebtedness or ownership in foreign corporations or other enterprises or indebtedness of foreign governments, and any other evidences of indebtedness or ownership, including securities or other property of the Company, even though the same may not be legal investment for trustees under any law other than ERISA.

7.    SECURITY CODES.

If the Trustee has issued to the Investment Committee, or to any Investment Manager appointed by the Investment Committee, security codes or passwords in order that the Trustee may verify that certain transmissions of information, including directions or instructions, have been originated by the Investment Committee or the Investment Manager, as the case may be, the Trustee shall be kept indemnified by and be without liability to the Company for any action taken or omitted by it in reliance upon receipt by the Trustee of transmissions of information with the proper security code or password, including communications purporting to be directions or instructions, which the Trustee reasonably believes to be from the Investment Committee or Investment Manager.

8.    TAXES AND TRUSTEE COMPENSATION.

The Trustee shall pay out of the Trust Fund all real and personal property taxes, income taxes and other taxes of any and all kinds levied or assessed under existing or future laws against the Trust Fund. Until advised to the contrary by the Administrative Committee, the Trustee shall assume that the Trust is exempt from Federal, State and local income taxes, and shall act in accordance with that assumption. The Administrative Committee shall timely file all Federal, State and local tax and information returns relating to the Plans and Trust.

The Trustee shall be paid such reasonable compensation as shall from time to time be agreed upon by the Company and the Trustee in writing. Such compensation and all reasonable and proper expenses of administration of the Trust, including counsel fees, shall be withdrawn by

qualified persons, transactions and bona fide offers in assets of the type in question and other information customarily used in the valuation of property.

The Administrative Committee or its delegate, each Investment Manager, and the Trustee shall file such descriptions and reports and make such other publications, disclosures, registrations and other filings as are required of them respectively by ERISA.

Nothing contained in this Trust Agreement or in the Plans shall deprive the Trustee of the right to have a judicial settlement of its account. In any proceeding for a judicial settlement of the Trustee's accounts or for instructions in connection with the trust, the only necessary party thereto in addition to the Trustee shall be the Company, and no participant or other person having or claiming any interest in the Trust Fund shall be entitled to any notice or service of process (except as required by law). Any judgment, decision or award entered in any such proceeding or action shall be conclusive upon all interested persons.

10.    RELIANCE ON COMMUNICATIONS.

The Trustee may rely upon a certification of the Administrative Committee, the Investment Committee or the Recordkeeper with respect to any instruction, direction or approval of such Administrative Committee, Investment Committee or the Recordkeeper and may rely upon a certification of the Company as to the membership of Administrative Committee and Investment Committee as they then exist, and may continue to rely upon such certification until a subsequent certification is filed with the Trustee.

The Trustee shall be fully protected in acting upon any instrument, certificate, or paper of the Company, its Board of Directors, the Administrative Committee, the Investment Committee (or any member of the Board, Board Committee or the Committee, if applicable) or the Recordkeeper, believed by it to be genuine and to be signed or presented by any authorized person, and the Trustee shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing but may accept the same as fully authorized by the Company, the Board, Board Committee, Administrative Committee , the Investment Committee or the Recordkeeper, if applicable, as the case may be.

The Trustee shall be further protected in relying upon a certification from any Investment Manager appointed by the Investment Committee as to the person or persons authorized to give instructions or directions on behalf of such Investment Manager and may continue to rely upon such certification until a subsequent certification is filed with Trustee.

11.  RESIGNATION AND REMOVAL OF TRUSTEE.

Any Trustee acting hereunder may resign at any time by giving sixty days' prior written notice to the Company, which notice may be waived by the Company. The Company may remove the Trustee at any time upon sixty days' prior written notice to the Trustee, which notice may be waived by the Trustee. In case of the resignation or removal of the Trustee, the Company shall appoint a successor trustee. Any successor trustee shall have the same powers and duties as those conferred upon the Trustee named in this Trust Agreement. The removal of a Trustee and the appointment of a new Trustee shall be by a written instrument delivered to the Trustee. Upon the appointment of a successor trustee, the resigning or removed Trustee shall transfer or deliver the Trust Fund to such successor trustee.

12.  AMENDMENT.

This Trust Agreement may be amended by agreement between the Trustee and the Company at any time or from time to time and in any manner, and the provisions of any such amendment may be applicable to the Trust Fund as constituted at the time of the amendment as well as to the part of the Trust Fund subsequently acquired.

13.  TERMINATION.

This Trust Agreement and the trust created hereby may be terminated at any time by the Company, and upon such termination or upon the dissolution or liquidation of the Company, in the event that a successor to the Company by operation of law or by the acquisition of its business interests shall not elect to continue the Plans and the trust, the Trust Fund shall be paid out by the Trustee when directed by the Administrative Committee. Notwithstanding the

20

foregoing, the Trustee shall not be required to pay out any assets of the Trust Fund upon termination of the Trust until the Trustee has received written certification from the Administrative Committee that all provisions of law with respect to such termination have been complied with. The Trustee shall rely conclusively on such written certification, and shall be under no obligation to investigate or otherwise determine its propriety.

14.    PARTICIPATION OF OTHER EMPLOYERS.

14.1    Adoption by Other Employers; Withdrawals.   The Trust is maintained by the Company for use as the funding vehicle for the Plans which it maintains for various groups of employees and for use as the funding vehicle for the Plans of any Employer.

(a)    Any Employer which has been certified to the Trustee by the Company as being authorized and as having adopted this Trust with the consent of the Company as a funding vehicle for its own Plans may, at any time thereafter, become a party to this Trust Agreement by filing with the Trustee a certified copy of a resolution of its Board of Directors evidencing its election so to do; and

(b)    Any Employer which is a party to this Trust Agreement and which has been certified to the Trustee by the Company as having adopted one or more other Plans and as being authorized to adopt this Trust as the funding medium for such other Plan or Plans may, at any time thereafter, adopt this Trust for the purposes of such other Plan or Plans by filing with the Trustee a certified copy of a resolution of its Board of Directors evidencing its election so to do.

Thereafter, the Trustee shall receive and hold as a part of the Trust Fund, subject to the provisions of this Trust Agreement, any deposits made to it under such Plans by or at the direction of such Employer.  Should this paragraph become operative:

(a)    In the event of the withdrawal of a Plan from the trust or in the event of the Company's or an Employer's election to terminate or to fund separately the benefits provided under any of its Plans, the Company shall cause a valuation to be made of the share of the Trust Fund which is held for the benefit of persons having an interest therein under such Plans.  The Trustee shall thereupon segregate and dispose of such share in accordance with the written direction of the Company accompanied by its certification to the Trustee that such segregation and disposition is in accordance with the terms of the Plans and the requirements of the law.

21

(b)     If the Company or any Employer receives notice that one or more of its Plans is no longer qualified under the provisions of Section 401 of the Code or the corresponding provisions of any future Federal revenue act, the Company shall immediately cause a valuation to be made of the share of the Trust Fund which is held for the benefit of such persons having an interest under such disqualified Plan or Plans. The Trustee shall thereupon segregate, withdraw from the Trust Fund, and dispose of such share in accordance with the terms of the disqualified Plan or Plans. The Company may direct the Trustee to dispose of such share by the transfer and delivery of such share to itself as trustee of a separate trust, the terms and conditions of which shall be identical with those of this Trust Agreement, except that either the Company or the Employer maintaining such disqualified Plan or Plans and the Trustee shall be the only parties thereto.

(c)     In the event that any group of employees covered by a Plan is withdrawn from such Plan, the Company shall, if required by the terms of such Plan, cause a valuation to be made of the share of the Trust Fund which is held for the benefit of such group of employees. The Trustee shall thereupon segregate and dispose of such share in accordance with the direction of the Company accompanied by its certification to the Trustee that such segregation and disposition is in accordance with the terms of such Plan and the requirements of the law.

The Trustee shall have no duty to see that the valuation of any share in accordance with the provisions of this Section 14.1 is caused to be made by the Company, nor to segregate and dispose of any such share in the absence of the written direction of the Company to do so.

14.2    Powers and Authorities of Other Employers to be Exercised Exclusively by Company. Each Employer, other than the Company, which is or shall become a party to this Trust Agreement, hereby irrevocably gives and grants to the Company, the Administrative Committee and the Investment Committee full and exclusive power and authority to exercise all of the powers conferred upon it by the terms of this Trust Agreement and to take or refrain from taking any and all action which such Employer might otherwise take or refrain from taking with respect to this Trust Agreement, including the sole and exclusive power to exercise, enforce or waive any rights whatsoever which such Employer might otherwise have with respect to the Trust Fund, and each such Employer, by becoming a party to this Trust Agreement, irrevocably appoints the Company, the Administrative Committee and the Investment Committee its agent for such purposes. The Trustee shall have no obligation to account to any such Employer or to

22

follow the instructions of or otherwise deal with any such Employer, the intention being that the Trustee shall deal solely with the Company as if the Trustee and the Company were the only parties in this Trust Agreement.

15. MISCELLANEOUS.

15.1 Governing Law. To the extent not inconsistent with ERISA, as heretofore or hereafter amended, the provisions of this Trust Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts. The Company hereby submits to the jurisdiction of the State and Federal Courts located in the Commonwealth of Massachusetts including any appellate courts thereof.

15.2 No Reversion to Employer. Except as provided herein, no portion of the principal or the income of the Trust Fund shall revert to or be recoverable by the Company or any Employer or ever be used for or diverted to any purpose other than for the exclusive benefit of participants in the Plans and persons claiming under or through them pursuant to the Plans, provided, however, that:

(a)     all contributions are conditioned upon the deductibility of the contributions under Section 404(a) of the Code, and, to the extent determined to be nondeductible, the Trustee shall, upon written request of the affected Company, return such amount as may be permitted by law to such Company, as appropriate, within one year after the determination of nondeductibility or within such other period as is permitted by applicable law; and

(b)     if a contribution or any portion thereof is made by the Company by a mistake of fact, the Trustee shall, upon written request of the Company, return such amounts as may be permitted by law to the Company, as appropriate, within one year after the date of payment to the Trustee or within such other period as is permitted by applicable law; and

(c)     if a contribution is conditioned upon the qualification of the Plans and Trust under Section 401 and 501 of the Code, the contributions of the Company to the Trust for all Plans Years, with the gains and losses thereon, shall be returned by the Trustee to the Company, as appropriate, within one year in the event that the Commissioner of Internal Revenue fails to rule that the Plans and Trust were as of such date qualified and tax-exempt (within the meaning of Sections 401 and 501 of the Code); and

23

(d)    in the event that a Plan whose assets are held in the Trust Fund is terminated, assets of such Plan may be returned to the Employer if all Plan liabilities to participants and beneficiaries of such Plan have been satisfied; and

(e)    assets may be returned to the Employer to the extent that the law permits such transfer.

The Trustee shall be under no obligation to return any part of the Trust Fund as provided in this Section 15.2 until the Trustee has received a written certification from the Administrative Committee that such return is in compliance with this Section 15.2, the Plans and the requirements of applicable law. The Trustee shall rely conclusively on such written certification and shall be under no obligation to investigate or otherwise determine its propriety.

15.3    <u>Non-Alienation of Benefits</u>. Except in accordance with the procedures set forth in the Plan with respect to qualified domestic relations orders, no benefit to which a participant or his beneficiary is or may become entitled under a Plan shall at any time be subject in any manner to alienation or encumbrance, nor be resorted to, appropriated or seized in any proceeding at law, in equity or otherwise. No participant or other person entitled to receive a benefit under a Plan shall, except as specifically provided in such Plan, have power in any manner to transfer, assign, alienate or in any way encumber such benefit under such Plan, or any part thereof, and any attempt to do so shall be void.

15.4    <u>Duration of Trust</u>. Unless sooner terminated, the trust created under this Trust Agreement shall continue for the maximum period of time which the laws of the Commonwealth of Massachusetts shall permit.

15.5    <u>No Guarantees</u>. Neither the Company, nor any Employer, nor the Trustee guarantees the Trust Fund from loss or depreciation, nor the payment of any amount which may become due to any person under the Plans or this Trust Agreement.

15.6    <u>Duty to Furnish Information</u>. Both the Company and the Trustee shall furnish to the other any documents, reports, returns, statements, or other information that the other reasonably deems necessary to perform its duties imposed under the Plans or this Trust Agreement or otherwise imposed by law.

24

15.7 <u>Withholding</u>. The Administrative Committee or the Recordkeeper shall withhold any tax which by any present or future law is required to be withheld from any payment under the Plans, unless the Trustee shall have agreed in writing to do so. The Administrative Committee or the Recordkeeper shall provide all information reasonably requested by the Trustee to enable the Trustee to so withhold.

15.8 <u>Parties Bound</u>. This Trust Agreement shall be binding upon the parties hereto, all participants in the Plans and persons claiming under or through them pursuant to the Plans, and, as the case may be, the heirs, executors, administrators, successors, and assigns of each of them. The provisions of Articles 5 and 7 shall survive termination of the Trust created under this Trust Agreement or resignation or removal of the Trustee for any reason.

In the event of the merger or consolidation of the Company or any Employer or other circumstances whereby a successor person, firm or company shall continue to carry on all or a substantial part of its business, and such successor shall elect to carry on the provisions of the Plan or Plans applicable to such business, as therein provided, such successor shall be substituted hereunder for the Company or such Employer, as the case may be, upon the filing in writing of its election so to do with the Trustee. The Trustee may, but need not, rely on the certification of an officer of the Company, and a certified copy of a resolution of the Board of Directors of such successor, reciting the facts, circumstances and consummation of such succession and the election of such successor to continue the said Plan or Plans as conclusive evidence thereof, without requiring any additional evidence.

15.9 <u>Necessary Parties to Disputes</u>. Necessary parties to any accounting, litigation or other proceedings shall include only the Trustee, the Company and any appropriate Employers and the settlement or judgment in any such case in which the Company, the appropriate Employers and the Trustee are duly served or cited shall be binding upon all participants in the Plans and their beneficiaries and estates, and upon all persons claiming by, through or under them.

15.10 <u>Unclaimed Benefit Payments</u>. If any check or share certificate in payment of a benefit hereunder which has been mailed by regular US mail to the last address of the payee

25

furnished the Trustee by the Administrative Committee or Recordkeeper is returned unclaimed, the Trustee shall notify the Administrative Committee or Recordkeeper and shall discontinue further payments to such payee until it receives the further instruction of the Administrative Committee or Recordkeeper.

15.11   Severability.  If any provisions of this Trust Agreement shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions of this Trust Agreement shall continue to be fully effective.

15.12   References.  Unless the context clearly indicates to the contrary, a reference to a statute, regulation, document or provision shall be construed as referring to any subsequently enacted, adopted or executed counterpart.

15.13   Headings.  Headings and subheadings in this Trust Agreement are inserted for convenience of reference only and are not to be considered in the construction of its provisions.

15.14   No Liability for Acts of Predecessor and Successor Trustees.  The Trustee shall have no liability for the acts or omissions of any predecessors or successors in office.

15.15   Counterparts.   This Trust Agreement may be executed in one or more counterparts, each of which shall constitute an original.

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed by their duly authorized officers as of the day and year first above written.

ATTEST:                         WASTE MANAGEMENT, INC.

_____                 BY: _____
                                TITLE: _Sr. Vice President_

ATTEST: _____           STATE STREET BANK AND TRUST COMPANY
                                BY: _____
                                    Vice President

26

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARNOLD HENRIQUEZ, ET AL. ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | C.A. No. 11-cv-12049-MLW |
| ) | |
| STATE STREET BANK AND TRUST ) | |
| COMPANY AND STATE STREET ) | |
| GLOBAL MARKETS LLC ) | |
| ) | |
| Defendants. ) | |
| ) | |

## AFFIDAVIT OF ROBERT DEMPSEY IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Robert Dempsey states:

### Background and Qualifications

1.    I am a Managing Director for Portfolio Administration in the State Street Global Advisors ("SSgA") division of State Street Bank and Trust Company ("State Street").

2.    My responsibilities include the management of investment operations, including for the SSgA-managed collective funds discussed below.

3.    State Street has authorized me to submit this affidavit in support of Defendants' motion to dismiss the Complaint in the matter captioned above. I state in this affidavit the source of any information that is not based on personal knowledge.

### SSgA Collective Funds

4.    SSgA manages collective investment vehicles similar to mutual funds. Institutional investors such as the Waste Management Retirement Savings Plan ("WM Plan") and the Citigroup 401(k) Plan (the "Citi Plan") are permitted to invest in certain of these collective investment funds.

1

**CONFIDENTIAL -- FILED UNDER SEAL**

5.     The collective funds are governed by a declaration of trust for the "State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans," which has been restated from time to time during the alleged class period beginning January 1, 2001 (the "Class Period"). The Fourth Amended and Restated version has an effective date of October 1, 2005, and is attached hereto as Exhibit A (the "Declaration of Trust"). The Fifth Amended and Restated Version has an effective date of September 30, 2011, and is attached hereto as Exhibit B.[1]

6.     The Declaration of Trust provides that "each Fund … constitute[s] a separate trust and the assets of each Fund shall be separately held, managed, administered, valued, invested, reinvested, accounted for and otherwise dealt with as a separate trust hereunder." (*Id.* § 3.1.)

7.     The Declaration of Trust provides that investors in each collective fund receive a "beneficial interest" in "Units" proportional to their investment in each fund, which represents an "undivided proportionate interest in all assets and liabilities of the Fund . . . ." (*Id.* § 4.1.)

8.     The Declaration of Trust provides that the net asset value (or NAV) of each such "Unit" is calculated as (i) the "fair value of the assets of the Fund"; (ii) less "any fees, expenses, charges and other liabilities"; (iii) divided by the "by the number of outstanding Units." (*Id.* § 4.3.)

9.     The Declaration of Trust provides that when an investor redeems Units from the Fund, he or she receives "a sum arrived at by multiplying the number of Units withdrawn by the

---

[1]     Based on my review of past versions of the Declaration of Trust, the relevant provisions of the applicable master trust agreements cited in this Affidavit did not materially change over the Class Period.

2

CONFIDENTIAL -- FILED UNDER SEAL

[NAV] of each Unit as of the close of business on the relevant Valuation Date." (*Id.* § 5.3.).

Investors also buy Units at NAV.[2]

10.    State Street is the custodian for the collective funds subject to the Declaration of

Trust.

### Plaintiffs' Alleged Collective Fund Investments

11.    Plaintiff Arnold Henriquez ("Henriquez") alleges that he is a participant in the

WM Plan. Henriquez alleges that WM Plan assets in his account were invested in certain SSgA-

managed collective funds (the "WM Selected Funds") at certain times. *See* Complaint ¶ 10 &

n.2.

12.    Plaintiff Michael T. Cohn ("Cohn") alleges that he is a participant in the Citi Plan.

Cohn alleges that Citi Plan assets in his account were invested in certain SSgA-managed

collective funds (the "Citi Selected Funds") at certain times. *See* Complaint ¶ 11.



**CONFIDENTIAL -- FILED UNDER SEAL**



4

CONFIDENTIAL — FILED UNDER SEAL



5

**CONFIDENTIAL -- FILED UNDER SEAL**



6

CONFIDENTIAL -- FILED UNDER SEAL



7

CONFIDENTIAL -- FILED UNDER SEAL

Redacted Document



I declare under penalty of perjury that the forgoing is true and correct to the best of my personal

knowledge, information and belief.

_Robert Kempsey_

8
**CONFIDENTIAL -- FILED UNDER SEAL**

# STATE STREET BANK AND TRUST COMPANY
# INVESTMENT FUNDS FOR TAX EXEMPT RETIREMENT PLANS

### Fourth Amended and Restated
### Declaration of Trust

WHEREAS pursuant to a Declaration of Trust, dated February 21, 1991 (the "Trust Declaration") State Street Bank and Trust Company ("the Trust Company") established the STATE STREET BANK AND TRUST COMPANY INVESTMENT FUNDS FOR TAX EXEMPT RETIREMENT PLANS which amended, restated and consolidated various declarations of trust and the commingled investment funds created thereunder;

WHEREAS pursuant to a First Amendment to Declaration of Trust dated July 19, 1991 the Trust Company amended the Trust Declaration;

WHEREAS pursuant to a Second Amended and Restated Declaration of Trust dated March 13, 1997 the Trust Company further amended the Trust Declaration;

WHEREAS, pursuant to a Third Amended and Restated Declaration of Trust dated December 22, 2003, the Trust Company further amended the Trust Declaration;

WHEREAS, the Trust Company desires to make certain additional amendments to the Trust Declaration, as so amended;

NOW THEREFORE, the Trust Company hereby amends and restates the Trust Declaration as follows:

By this Fourth Amended and Restated Declaration of Trust (the "Declaration of Trust"), there is hereby continued a previously established trust known as the "STATE STREET BANK AND TRUST COMPANY INVESTMENT FUNDS FOR TAX EXEMPT RETIREMENT PLANS". This Declaration of Trust shall govern the operation of all Funds created under the Trust Declaration and its predecessors (and any other funds established pursuant to Article III of this Declaration of Trust), each with such separate classes or divisions of interests as the Trust Company may deem necessary or desirable, in all respects. The Trust Company agrees and declares that it will hold, administer and deal with all money and property received or purchased by it as trustee hereunder upon the following terms and conditions:

## ARTICLE I - DEFINITIONS

Wherever used in this Declaration of Trust, unless the context clearly indicates otherwise, the following words shall have the following meanings:

1.1    "Affiliate" means any general partnership, limited partnership, corporation, joint venture, trust, business trust or similar organization controlling, controlled by, or under common control with the Trust Company.

1.2    "Business Day" means any day or part of a day on which the New York Stock Exchange and the Trust Company are open for business.

1.3    "Class" means (i) one of the separate classes or divisions of interests of a Fund that is established pursuant to Article III of this Declaration of Trust, or (ii) with respect to a Fund for which no such classes or divisions have been established, the Fund.

1.4    "Class Description" means a written description of a Class of a Fund as established by the Trustee and reflected in a written instrument by the Trustee.

1.5    "Code" means the Internal Revenue Code of 1986, as amended.

1.6    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

1.7    "Existing Funds" means the Funds as of the date hereof, each of which is listed on Schedule A hereto.

1.8    "Fiscal Year" means the fiscal year of a Fund, which shall be the 12 months ending on December 31 of each year unless otherwise specified in the Fund Declaration.

1.9    "Fund" means one of the Existing Funds or one of the investment funds which is established pursuant to Article III of this Declaration of Trust after the date hereof and, in either case, refers to the investment fund to which the particular provision hereof is being applied.

1.10   "Fund Declaration" means one of the separate declarations executed by the Trustee pursuant to Section 3.1 for the purpose of establishing a Fund hereunder or for the purpose of confirming or ratifying an Existing Fund.

1.11   "Investing Fiduciary" means the person or persons, natural or legal, including a committee, who exercise discretion with respect to the decision to invest assets of a Qualified Investor in a Fund; provided, however, that, if the person who exercises investment discretion is a participant or beneficiary entitled to benefits under the Qualified Investor and is acting in his capacity as such, then Investing Fiduciary shall mean the Qualified Investor Signatory.

1.12   "Investment Company Act" means the Investment Company Act of 1940, as amended.

1.13   "Participant" means a Qualified Investor which, with the consent of the Trustee, has made a deposit in a Fund and has a beneficial interest in a Fund.

1.14   "Plan Sponsor" means the employer establishing or maintaining the Qualified Investor, if the Qualified Investor is a single employer plan (as defined in Section 3(41) of ERISA) and, in the case of any other Qualified Investor, the board of trustees or other similar group of representatives of the parties who establish or maintain the Qualified Investor.

1.15   "Qualified Investor" means an investor described in Section 2.1 of this Declaration of Trust.

1.16   "Qualified Investor Signatory" means the person or persons, natural or legal, including a committee, who executes the agreement pursuant to which the Trust Company is appointed as trustee, co-trustee, custodian, investment manager, or agent for the trustee or trustees with respect to a Qualified Investor.

1.17   "Securities Act" means the Securities Act of 1933, as amended.

1.18   "Trust Company" means State Street Bank and Trust Company.

1.19   "Trustee" means the Trust Company in its capacity as trustee under this Declaration of Trust.

1.20   "Unit" means a book-entry record used to determine the value of the beneficial interest of each Participant in a Fund or a Class of a Fund.

1.21   "Valuation Date" means the last Business Day of each calendar month, unless otherwise specified in the Fund Declaration, and such other additional days as the Trustee may from time to time designate.

## ARTICLE II - ELIGIBILITY FOR PARTICIPATION; ACCEPTANCE OF DEPOSITS; NON-DIVERSION OF ASSETS

2.1   <u>Eligibility for Participation</u>.  An investor may participate in a Fund only if (1) the Trust Company is acting as trustee, co-trustee, custodian, investment manager, or agent of the investor, (2) the Trust Company, in its discretion, has accepted it as a Participant, and (3) one of the following conditions is met:

(a)   The investor is a trust created under an employees' pension or profit sharing plan (1) which is qualified within the meaning of Code Section 401(a) and is therefore exempt from tax under Code Section 501(a); and (2) which is administered under one or more documents which authorize part or all of the assets of the trust to be commingled for investment purposes with the assets of other such trusts in a collective investment trust and which adopt each such collective investment trust as a part of the plan.  If such trust covers self-employed individuals within the meaning of Section 401(c)(1) of the Code (a "Keogh Plan") and interests in the Fund are not registered under the Securities Act, then each such Keogh Plan will be permitted to invest in the Fund only to the extent permitted by the Securities Act and rules and regulations promulgated thereunder.

(b)   The investor is a plan or governmental unit (1) which is described in Code Section 818(a)(6), (2) which, if interests in the Fund are not registered under the Securities Act and the Fund is not registered under the Investment Company Act, satisfies the requirements of Section 3(a)(2) or any other available exemption of the Securities Act and any applicable requirements of the Investment Company Act and rules and regulations promulgated thereunder, and (3) which is administered under one or more documents which authorize part or all of the assets of the trust to be commingled for investment purposes with the assets of other such trusts in a collective investment trust and which adopt each such collective investment trust as a part of the plan.

(c)     The investor is a segregated asset account maintained by a life insurance company (1) consisting exclusively of assets of investors described in subsections (a) and/or (b) of this Section 2.1, and (2) which is administered under one or more documents which authorize part or all of the assets of the trust to be commingled for investment purposes with the assets of other such trusts in a collective investment trust and whose constituent trusts adopt each such collective investment trust as a part of their respective plans.

(d)     If interests in the Fund are registered under the Securities Act and the Fund is registered under the Investment Company Act, the investor is (1) an individual retirement account exempt from taxation under Code Section 408(e), and (2) administered under one or more documents which authorize part or all of the assets of the trust to be commingled for investment purposes with the assets of other such trusts in a collective investment trust and which adopt each such collective investment trust as a part of the individual retirement account.

(e)     The investor is a trust (1) for the collective investment of assets of any investor otherwise described in this Section 2.1 (including without limitation a Fund created under this Declaration of Trust), which trust qualifies as a "group trust" under Internal Revenue Service Revenue Ruling 81-100, as amended, or any successor ruling, and (2) which is administered under one or more documents which authorize part or all of the assets of the trust to be commingled for investment purposes with the assets of other such trusts in a collective investment trust and which adopt each such collective investment trust as a part of the trust.

2.2     Acceptance of Deposits.  The Trustee shall accept deposits in a Fund under this Declaration of Trust only from Qualified Investors.  All deposits so accepted together with the income therefrom shall be held, managed and administered pursuant to this Declaration of Trust.

2.3     Qualification as Group Trusts.  It is intended that the Funds be exempt from taxation under Code Section 501(a) and qualify as "group trusts" under Internal Revenue Service Revenue Ruling 81-100, as amended, or any successor ruling, and other applicable Internal Revenue Service rules and regulations.  In furtherance of this intent, each investor which seeks to invest in a Fund shall represent and warrant that such investor is a Qualified Investor.

2.4     Non-Diversion of Assets.  At no time prior to the satisfaction of all liabilities with respect to the employees and their beneficiaries entitled to benefits from a Participant shall any part of the principal or income allocable hereunder to such Participant be used or diverted for or to purposes other than for the exclusive benefit of such employees or their beneficiaries except that, solely to the extent necessary to retain qualification under Section 457 of the Code, such assets shall remain subject to the claims of the general creditors of the Plan Sponsor of any Participant which is a plan within the meaning of Code Section 457.

2.5     Other Conditions of Participation.  The Trustee may establish from time to time conditions or requirements for eligibility to participate in any particular Class of a Fund by setting forth such conditions in the Class Description for such Class.

# ARTICLE III - INVESTMENT FUNDS

3.1     Establishment of Funds. The STATE STREET BANK AND TRUST COMPANY INVESTMENT FUNDS FOR TAX EXEMPT RETIREMENT PLANS shall consist of the Existing Funds that are currently maintained by the Trustee and described on Schedule A attached hereto and such additional Funds as may be established by the Trustee from time to time in accordance with this Declaration of Trust. The Trustee shall establish a Fund by executing a Fund Declaration which shall incorporate the terms of this Declaration of Trust by reference and shall specify such other terms applicable to the Fund as the Trustee shall determine. Each Fund shall constitute a separate trust and the assets of each Fund shall be separately held, managed, administered, valued, invested, reinvested, distributed, accounted for and otherwise dealt with as a separate trust hereunder.

3.2     Establishment of Classes. The Trustee, in its sole discretion, may divide a Fund into one or more Classes of Units representing beneficial interests in such Fund, each with its own fee and expense obligations and assessments. The Trustee shall establish each such Class by establishing a Class Description that shall specify the rate or amount of, or formula for, Trustee compensation, to the extent applicable, and the rate, amount description or type of fees, expenses, costs, charges and other liabilities specially allocable to, or assessed against, such Class of Units, as well as any conditions to, or requirements for, participation in such Class. The fact that a Fund shall have been established and designated without any specific establishment or designation of Classes, or that a Fund shall have more than one established and designated Class, shall not limit the authority of the Trustee, in its sole discretion and at any time, to subsequently establish and designate separate Classes, or one or more additional Classes, of such Fund. If no Classes are designated for a Fund, then all Units of such Fund shall be deemed to be of the same Class for purposes of this Agreement. The Trustee shall not amend a Class Description of a Fund without providing each Investing Fiduciary participating in such Class or, if such Investing Fiduciary is the Trust Company, the Qualified Investor Signatory, with written notice and a description of the amended Class Description at least 30 days prior to the Valuation Date on or immediately preceding the effective date of such amendment. Nothing herein shall require the Trustee to give the Class Description or notice of an amendment to a Class Description to any Investing Fiduciaries or Qualified Investor Signatories who are not participating in such Class.

3.3     Dealings with the Funds. All persons extending credit to, contracting with, or having any claim of any type against any Fund (including, without limitation, contract, tort and statutory claims) shall look only to the assets of such Fund for payment under such credit, contract or claim. No Participant, nor any beneficiary, trustee, employee or agent thereof, nor the Trustee, nor any of its officers, directors, shareholders, partners, employees or agents shall be personally liable for any obligation of any Fund. Every note, bond, contract, instrument, certificate, or undertaking and every other act or thing whatsoever executed or done by or on behalf of any Fund shall be conclusively deemed to have been executed or done only by or for such Fund, and no Fund shall be answerable for any obligation assumed or liability incurred by another Fund established hereunder.

3.4     Management of the Funds. The Funds shall be under the exclusive management and control of the Trustee in conformity with the provisions of this Declaration of Trust. The

5

Trustee, from time to time, may invest and reinvest assets of the Fund in investments which are permissible investments for employee pension benefit plans under the laws of the United States, subject, however, to the following restrictions and provisions:

(a)     Assets of each Fund which the Trustee may maintain or establish hereunder shall be invested and reinvested in accordance with such investment objectives, guidelines and restrictions as the Trustee may specify in the Fund Declaration of such Fund. The Trustee shall not invest the assets of any Qualified Investor in a Fund until the Trustee has provided a copy of the relevant Fund Declaration and Class Description to the Investing Fiduciary or, if such Investing Fiduciary is the Trust Company, to the Qualified Investment Signatory. The Trustee shall not amend the Fund Declaration of any Fund without providing each Investing Fiduciary or, if such Investing Fiduciary is the Trust Company, the Qualified Investor Signatory, with written notice and a description of the amended Fund Declaration at least 30 days prior to the Valuation Date on or immediately preceding the effective date of such amendment.

(b)     Notwithstanding anything to the contrary elsewhere herein provided, the Trustee is specifically authorized to establish one or more short-term investment funds (each such Fund when referred to specifically herein is sometimes referred to as a "STIF") provided that a STIF shall be subject to the following provisions:

(i)     The STIF may be invested in bonds, notes, commercial paper, certificates of deposit, repurchase agreements or other evidences of indebtedness (including variable rate notes) with effective maturity dates (or rights to exercise the put or sale of such investments) not exceeding 397 days from their date of settlement after purchase by the Trustee and/or registered investment companies which invest primarily in money market instruments ("Money Market Mutual Funds"), including registered investment companies sponsored or managed by the Trust Company or its Affiliates; and

(ii)     Principal of the STIF shall be valued at the close of business of each Valuation Date at original cost adjusted for amortization of premiums and accretion of discounts.

(c)     Notwithstanding the investment objectives, restrictions and guidelines set forth in the relevant Fund Declaration, the assets of any Fund may be invested in obligations of the United States Government, commercial paper, certificates of deposit, savings and money market deposit accounts (including deposits bearing a reasonable rate of interest in the Trust Company or any of its Affiliates), Money Market Mutual Funds (including those sponsored or managed by the Trust Company or any of its Affiliates), or any other short-term fixed income investments (including without limitation any commingled short-term investment fund maintained by the Trust Company or any of its Affiliates for the collective investment of the assets of Qualified Investors whether such short-term investment fund is established and maintained pursuant to this Declaration of Trust or any other instrument).

(d)     The decision of the Trustee as to whether an investment is of a type which may be purchased for a Fund under the relevant Fund Declaration and this Declaration of Trust shall be conclusive.

(e)    Pending the selection and purchase of suitable investments, or the payment of expenses or other anticipated distributions, the Trustee may retain in cash, without liability for interest, such portion of the Fund as it shall deem reasonable under the circumstances.

(f)    The Trustee may use one or more computer programs which it believes will assist it in achieving the investment objectives of the Fund or in complying with the guidelines and restrictions applicable to the Fund.

## ARTICLE IV - UNITS OF PARTICIPATION

4.1    Recording of Beneficial Interests. The beneficial interest of each Participant in a Fund shall be represented by Units, which will be designated on a Class-by-Class basis. With respect to a Class of Units of a Fund, each Unit shall be of equal value to every other Unit of the same Class. Each Unit of a Class shall represent an undivided proportionate interest in all assets and liabilities of the Fund attributable to that Class, and all income, profits, and losses, as well as expenses, costs, charges, and other liabilities specifically allocable to, or assessed against, such Class shall be allocated to all Units of the same Class equally. No certificates of such Units shall be issued, but the Trustee shall keep books in which shall be recorded the number of Units standing to the credit of each Participant. The Trustee may from time to time divide the Units of any Class of the Fund into a greater number of Units of lesser value or decrease the number of Units of any Class of the Fund into a lesser number of Units of greater value provided that the proportionate interest of each Participant in such Class of the Fund shall not thereby be changed.

4.2    Apportionment of Income, Profits and Losses. Profits and losses of a Fund shall be credited or charged to the Fund; provided that, as described in Section 4.3 below, any expenses, costs, charges, or other liabilities specifically incurred or accrued by a Fund and attributable to a Class in accordance with the Class Description for such Class shall be allocated to such Class and all other fees, expenses, costs, charges, or other liabilities not specifically allocated to a Class shall be allocated to the Fund. Except as herein provided, all income earned by a Fund after expenses shall be added to the principal of the Fund and invested and reinvested as a part thereof. The Trustee in its sole discretion may make pro rata distributions of the net income attributable to a Class of the Fund to each Participant of the Class. Notwithstanding the foregoing, (a) in the case of a STIF, as of the close of business on each Valuation Date, all net income (as determined by the Trustee in accordance with uniform rules which are intended to preserve the Unit value of each Class of the STIF at $1.00 or such other constant amount as the Trustee may specify to the Participants of each Class of the STIF from time to time) attributable to a Class of the STIF shall be allocated among the Participants of such Class in proportion to the number of Units of each Participant in such Class and shall be reinvested on behalf of each such Participant in additional Units of such Class, and (b) if the Fund Declaration provides that the Fund's Unit Value shall be held constant to the extent feasible (a "Constant Value Fund"), then as of the close of business on each Valuation Date an amount equal to the sum of all net income, realized gains and losses, and unrealized appreciation and depreciation (determined in accordance with this Article IV) attributable to a Class of the Constant Value Fund shall be allocated among the Participants of such Class in proportion to the number of Units of each Participant in such Class and shall be reinvested on behalf of each such Participant in additional

Units of such Class; provided, however, that such amount, if positive, may be distributed in cash to a Participant, if the Participant so elects.

4.3    Valuation of Units. At the inception of a Fund, the value of each Unit of each Class of the Fund shall be deemed to be one dollar ($1.00) or such other amount as the Trustee shall specify in the Fund Declaration for such Fund, and thereafter, the value of each Unit of each Class shall be determined in accordance with the following provisions of this Section 4.3, except as otherwise provided elsewhere in this Declaration of Trust in the case of a STIF or a Constant Value Fund. As of the close of business on each Valuation Date, the Trustee shall determine, in accordance with the valuation rules of Section 4.4, the then fair value of the assets of the Fund (the "Total Value of the Fund"). The Trustee shall then subtract from the Total Value of the Fund any fees, expenses, charges and other liabilities incurred or accrued by the Fund and not specifically allocated to, or assessed against, a particular Class of the Fund, and the resulting value shall be the "Net Value of the Fund." The Trustee shall allocate the Net Value of the Fund among the Fund's Classes in proportion to their respective Class Percentages as of such date (as defined below) (for each Class, such amount is the "Total Class Value"). The Trustee shall then, with respect to each Class, subtract from the Total Class Value of such Class any fees, expenses, costs, charges or other liabilities specifically incurred or accrued by the Fund and attributable to such Class in accordance with the Class Description for such Class, and the resulting value shall be the "Net Class Value." The value of a Unit of a particular Class shall be calculated by dividing the Net Class Value of such Class by the number of outstanding Units of such Class.

Each valuation shall be completed within such period following each Valuation Date as may be specified by applicable law or regulation and if no such date is so specified, each valuation shall be made within ten Business Days following each Valuation Date; provided, however, that if the Trustee cannot reasonably complete such valuation within the ten-day period it shall complete such valuation as soon as reasonably possible thereafter. As used in this Section 4.3, a Fund Class's "Class Percentage" on any date is equal to (i) the aggregate fair value of the assets of the Fund attributable to such Class on such date (determined in accordance with the same principles used to determine the Total Value of the Fund), divided by (ii) the Total Value of the Fund on such date; provided that both the numerator and the denominator shall be determined before taking into account any fees, expenses, costs, charges or other liabilities allocable to the Fund (but not a Class) and any fees, expenses, costs, charges, or other liabilities specifically incurred or accrued by the Fund and attributable to a Class in accordance with the Class Description for such Class and not previously reflected in such Class's Net Class Value.

4.4    Valuation Rules. Except as otherwise provided elsewhere in this Declaration of Trust in the case of a STIF, or as may be more specifically set forth in the Fund Declaration, the assets of the Fund shall be valued by the Trustee at fair value, in accordance with generally accepted valuation principles consistently followed and uniformly applied. At the discretion of the Trustee, certain securities and investments shall be stated at fair value on the basis of valuations furnished by a pricing service, approved by the Trustee, which determines valuations for such securities using methods based on market transactions for comparable securities and various relationships between securities which are generally recognized by institutional traders. The Trustee may conclusively rely upon any regularly published reports of sale prices, bid

prices, and over-the-counter quotations for the values of any listed or unlisted securities or futures contracts. The reasonable and equitable decision of the Trustee regarding whether a method of valuation fairly indicates fair value, and the selection of a pricing service, shall be conclusive and binding upon all persons.

4.5     Suspension of Valuations and Withdrawal Rights. Notwithstanding anything to the contrary elsewhere in this Agreement, the Trustee, in its sole discretion, may suspend the valuation of the assets or Units of any Fund pursuant to this Article IV and/or the right to make withdrawals from such Fund in accordance with Article V for the whole or any part of any period when (i) any market or stock exchange on which a significant portion of the investments of such Fund are quoted is closed (other than for ordinary holidays) or during which dealings therein are restricted or suspended; (ii) there exists any state of affairs which, in the opinion of the Trustee, constitutes an emergency as a result of which disposition of the assets of such Fund would not be reasonably practicable or would be seriously prejudicial to the Participants therein; (iii) there has been a breakdown in the means of communication normally employed in determining the price or value of any of the investments of such Fund, or of current prices on any stock exchange on which a significant portion of the investments of such Fund are quoted, or when for any reason the prices or values of any investments owned by such Fund cannot reasonably be promptly and accurately ascertained; or (iv) the transfer of funds involved in the realization or acquisition of any investment cannot, in the opinion of the Trustee, be effected at normal rates of exchange.

## ARTICLE V - DEPOSITS AND WITHDRAWALS

5.1     Deposits. With the consent of the Trustee and upon such prior notice as the Trustee may specify from time to time to the Qualified Investors, a Qualified Investment may, as of any Valuation Date (or, in the case of a STIF, as of such Valuation Dates as the Trustee may designate from time to time), deposit assets in such proportions among the Funds as the Investing Fiduciary of such Qualified Investor shall instruct. The Trustee shall be fully protected in following the instructions of the Investing Fiduciary as to the amounts and proportions of the assets of any deposit to be placed in each of the Funds. If, with the consent of the Trustee, assets that are to be deposited in a Fund other than the STIF are received by the Trustee prior to a Valuation Date, the Trustee may, in its sole discretion, invest such assets in such other Fund or Funds (including, without limitation, any STIF) as the Trustee deems appropriate until the next Valuation Date following receipt of such assets. Only money and such other assets as are permissible investments for the Fund, and acceptable to the Trustee, may be deposited in such Fund. Assets other than money deposited in a Fund shall be valued at their fair value (as determined under Section 4.4) as of the close of business on the Valuation Date on which the deposit is made. The Trustee shall credit to the account of such Participant which makes a deposit in the Fund that number of Units of a Class which the deposit will purchase at the then value of each such Unit. All deposits to a Fund shall be deemed to have been made as of the close of business on the relevant Valuation Date.

5.2     Withdrawals. Subject to Section 4.5 of this Declaration of Trust, the Investing Fiduciary of a Participant may, as of the close of business on any Valuation Date (or, in the case of a STIF, as of the close of business on such Valuation Dates as the Trustee may designate from

time to time), withdraw any number of Units from the Fund provided that such right of withdrawal may be further limited in the Fund Declaration applicable to such Fund. Notice of withdrawal must be received by the Trustee no later than 15 days prior to such Valuation Date or within such other prior notice period as the Trustee may establish in the Fund Declaration, but the Trustee may waive this requirement in any case.

5.3     Distributions Upon Withdrawal. Upon the withdrawal of Units from a Fund, the Trustee shall distribute to the Participant making such withdrawal a sum arrived at by multiplying the number of Units withdrawn by the value of each Unit as of the close of business on the relevant Valuation Date. The sum shall be distributed in cash or in kind or partly in cash and partly in kind, in any manner consistent with applicable Massachusetts law, as the Trustee in its sole discretion shall determine. The value of any asset other than cash which is transferred shall be deemed to be the value thereof (as determined under Section 4.4) as of the close of business on the Valuation Date on which the withdrawal is made. Such distribution shall be effected within a reasonable time following the applicable Valuation Date except that such distribution may be delayed if the Trustee determines that it cannot reasonably make such distribution on account of any order, directive or other interference by an official or agency of any government or any other cause reasonably beyond its control including, but not limited to, illiquid markets or illiquid securities. The Participant receiving such distribution shall not be entitled to any interest or income earned on such monies pending distribution.

5.4     Distribution Upon Disqualification. Notwithstanding any provision herein to the contrary, if the Trustee receives notice that a Participant has ceased to be a Qualified Investor (as defined in Section 1.13), then all Units allocated to such Participant shall be withdrawn from the Fund as of the close of business on the first Valuation Date which is more than 15 days (or such other period as the Trustee determines to be reasonable) after the date the Trustee receives such notice and distribution shall be made in accordance with Section 5.3 as soon as reasonably possible.

5.5     Title To Assets. All of the assets of each Fund shall at all times be considered as vested in the Trustee in a fiduciary capacity. No Participant shall be deemed to have severable ownership in any individual asset in any Fund or any right of participation or possession thereof. Except as otherwise specifically provided herein, each Participant shall have a proportionate, undivided, beneficial interest in each Fund in which such Participant participates and shall share ratably in the income, profits and losses thereof with the other Participants participating in such Fund.

5.6     Expenses Chargeable to the Participant. Notwithstanding any provision of this Declaration of Trust to the contrary, brokerage fees and other expenses (including, but not limited to, settlement, stamp taxes, duty, stock listing and related expenses) incurred in connection with the purchase or sale of securities relating to or arising out of the deposit of assets in a Fund or the withdrawal of assets from a Fund by a Participant may, in the Trustee's discretion, be charged to such Participant. Such charge may be effected either by a corresponding adjustment in the number of Units of such Fund credited to such Participant or by a direct assessment against such Participant.

For purposes of clarity, such expenses may also include intra-day market gain or loss attributable in the determination of the Trustee to the purchase or sale of securities by the fund in connection with Participant contributions or withdrawals, and may be aggregated across contributing or withdrawing Participants, as the case may be, on a weighted average basis as determined by the Trustee for any given trading period.

## ARTICLE VI - RIGHTS AND DUTIES OF TRUSTEE

6.1 _Powers of the Trustee_. In exercising its exclusive right to manage and control the Funds created hereby, the Trustee shall have the following rights and powers which are in addition to any other powers or rights conferred by law or by other Articles of this Declaration of Trust or by a Fund Declaration:

(a) to hold, manage, and control all property at any time forming part of a Fund and, consistently with the investment objectives, restrictions and guidelines set forth in the relevant Fund Declaration, to invest and reinvest any or all of the assets of a Fund in any property, real, personal or mixed, wherever situated, and whether or not productive of income or consisting of wasting assets, including, without limitation, common and preferred stocks; bonds; notes; debentures; foreign securities; commodities; futures contracts and options thereon of any type; stock options and option contracts of any type, whether or not traded on any exchange; contracts for the immediate or future delivery of financial instruments and other property; direct or indirect investments in real property through fee ownership, leases, loans secured by primary or subordinated liens or mortgages on real property (including, without limitation, any collective or part interest in any bond and mortgage or note and mortgage), or stock or other securities of corporations, partnerships or other entities holding or investing in real property, including mortgage-backed securities, or other assets, including asset-backed securities; certificates of deposit, demand or time deposits (including deposits bearing a reasonable rate of interest in the Trust Company or any of its Affiliates); bills; certificates; acceptances; repurchase agreements; commercial paper; variable rate or master notes; interests in trusts; limited partnership interests; interests in or shares of mutual funds or other investment companies (whether or not incorporated and whether or not registered under the Investment Company Act of 1940, as amended, including any such mutual funds or investment companies managed or sponsored by the Trust Company or any of its Affiliates); interests in collective investment trusts which are exempt from tax under applicable Internal Revenue Service rulings and regulations (including, without limitation, any collective investment trust maintained by the Trust Company or any of its Affiliates for the collective investment of the assets of Qualified Investors whether such collective investment trust is established and maintained pursuant to this Declaration of Trust or any other instrument), and, while the assets of any Fund are so invested, such collective investment trusts shall constitute a part of this Declaration of Trust with respect to such Fund; foreign currencies; contracts for the immediate or future delivery of foreign currencies; insurance policies and contracts; annuity contracts; oil, mineral or gas properties, royalties, interests or rights (including equipment pertaining thereto); gems, works of art, gold, bullion and coin; evidences of indebtedness or ownership in foreign corporations or other enterprises; indebtedness of foreign governments, foreign agencies or international organizations; patents, copyrights, trade secrets, licenses, or royalties; or any other property of any kind, real or personal, tangible or intangible, as the Trustee may deem advisable; without being limited to

classes of property in which trustees are authorized to invest trust funds by any law, or any rule of court, of any state and without regard to the proportion any such property or interest may bear to the entire amount of the STATE STREET BANK AND TRUST COMPANY INVESTMENT FUNDS FOR TAX EXEMPT RETIREMENT PLANS or of any Fund;

(b)    to retain any property, real or personal, tangible or intangible, at any time received by it;

(c)    to sell, convey, transfer, exchange, pledge, grant options on or otherwise dispose of the property of the Fund from time to time in such manner, for such consideration and upon such terms and conditions as the Trustee, in its discretion, shall determine;

(d)    to employ such brokers, agents, consultants, custodians (including foreign custodians), depositories, advisers, and legal counsel as may be reasonably necessary or desirable in the Trustee's judgment in managing and protecting a Fund including, but not limited to, Affiliates and, subject to applicable law, to pay their reasonable expenses and compensation out of the Fund;

(e)    to settle, compromise, abandon or submit to arbitration all claims and demands in favor of or against a Fund and to establish reserves in connection therewith; to commence or defend suits or legal proceedings whenever, in its judgment, any interest of a Fund requires it; and to represent a Fund in all suits or legal proceedings in any court or before any other body or tribunal;

(f)    to borrow money, with or without security, for a Fund; to encumber property of a Fund by mortgages or deeds of trust to secure repayment of indebtedness; to assume existing mortgages or deeds of trust on properties acquired by a Fund; and to acquire properties subject to existing mortgages or deeds of trust, all subject to Section 3.3;

(g)    except as may be provided otherwise in the Fund Declaration, to vote any security forming part of a Fund either in person or by proxy for any purpose; to exercise any conversion privilege or subscription right given to the Trustee as the owner of any security forming part of a Fund; to consent to take any action in connection with, and receive and retain any securities resulting from, any reorganization, consolidation, merger, readjustment of the financial structure, sale, lease or other disposition of the assets of any corporation or other organization, the securities of which may constitute a portion of a Fund;

(h)    to cause any securities or other property which may at any time form a part of a Fund to be issued, held or registered in the individual name of the Trustee, or in the name of its nominee or agent (including any custodian employed by the Trustee, any nominee of such a custodian, and any depository, clearing corporation or other similar system), or in such form that title will pass by delivery;

(i)    to enter into stand-by agreements for future investment either with or without a stand-by fee;

(j)     to lend any securities and to secure the same in any manner, and during the term of such loan to permit the securities so lent to be transferred in the name of and voted by the borrower, or others, provided that in lending securities of a Fund the Trustee shall comply with ERISA Prohibited Transaction Class Exemptions 81-6 and 82-63 to the extent applicable;

(k)     to collect and receive any and all money and other property due to any Fund and to give full discharge thereof;

(l)     to maintain the indicia of ownership of assets outside the United States to the extent permitted by applicable Federal regulations;

(m)     to organize corporations or partnerships or trusts for the purpose of acquiring and holding title to any property which the Trustee is authorized to acquire under subparagraph (a) of this Paragraph 6.1;

(n)     to manage, improve, repair, mortgage, lease for any term and control all property, real or personal, at any time forming part of the Fund upon such terms and conditions as the Trustee, in its discretion, shall determine;

(o)     to enter into custodian and sub-custodian agreements with one or more banks located outside the United States to the extent permitted by ERISA pursuant to which such foreign banks will, in addition to acting as custodian, provide brokerage services with respect to Fund assets held in custody, but only if the Trustee has determined that the total compensation paid to such foreign bank is reasonable in light of all the services being rendered;

(p)     to convert any monies into any currency through foreign exchange transactions to the extent permitted under ERISA;

(q)     on behalf of each of the Participants, to delegate responsibility for the management of all or any of the assets of the Funds to one or more investment managers (as such term is defined in Section 3(38) of the Employee Retirement Income Security Act of 1974, as amended).

(r)     to do all other acts in its judgment necessary or desirable for the proper administration of a Fund or with respect to the investment, disposition or liquidation of any assets of a Fund, although the power to do such acts is not specifically set forth herein.

6.2     <u>Records and Accounts</u>.  The Trustee shall keep full records and books of account. The Trustee's accounts shall be kept on an accrual basis.  Annually, within a reasonable period after the close of each Fund's Fiscal Year, the Trustee shall furnish a written account of the operation of the Fund for the preceding Fiscal Year to the Investing Fiduciary of each Participant having an interest in such Fund during the Fiscal Year, or, if such Investing Fiduciary is the Trust Company, to the Qualified Investor Signatory.  Any person to whom an account of the Trustee is furnished may approve such account by an instrument in writing delivered to the Trustee.  If objections to specific items in such account are filed with the Trustee within 60 days after the account has been furnished and the Trustee believes such objections to be valid, the Trustee may adjust the account in such manner as it deems equitable under the circumstances.

Each person to whom the Trustee furnishes an account shall be notified by the Trustee of any adjustments so made. If

      (a)     all persons to whom such account of the Trustee is furnished approve such account, or

      (b)     no objections to specific items in such account are filed with the Trustee within sixty (60) days after the account has been furnished, or

      (c)     the Trustee shall give notice of an adjustment of the account and legal proceedings are not commenced against the Trustee within 60 days after notice of such adjustment has been furnished,

then the account of the Trustee, with respect to all matters contained therein (as originally furnished if no adjustment was made, or as adjusted if an adjustment was made), shall be deemed to have been approved with the same effect as though judicially approved by a court of competent jurisdiction in a proceeding in which all persons interested were made parties and were properly represented before such court. The Trustee hereunder, nevertheless, shall have the right to have its accounts settled by judicial proceeding if it so elects, in which case the only necessary parties shall be the Trustee hereunder and each person to whom the Trustee furnishes an account.

      6.3    <u>Audits and Reports</u>. The Trustee shall at least once each year cause an independent certified public accountant to audit each Fund. The reasonable expense of such audit shall be charged to the Fund. A copy of the report of such audit shall be furnished, or a notice given that a copy of such report is available and will be furnished without charge upon request, to each person entitled to receive a copy of the annual account of the Trustee hereunder. The cost of distribution of the report shall be borne by the Trustee.

      6.4    <u>Governmental Filings</u>. The Trustee shall make direct filings on behalf of the Participants with the Department of Labor of the information described in 29 C.F.R. Section 2520.103-12.

      6.5    <u>Expenses and Fees</u>. The Trustee may pay all reasonable expenses of the Fund (or any Class thereof) (including counsel fees and expenses of litigation) that may be lawfully charged to the Fund (or such Class) under applicable laws and regulations. The Trustee shall be entitled to receive a reasonable fee for its services as Trustee and, if the Fund Declaration and/or Class Description applicable to the Fund so provides and to the extent not inconsistent with Section 406(b) or any other provision of ERISA, for its services as custodian with respect to a Fund. The amount of such fees or the basis on which such fees shall be determined and charged may be (i) established in the Fund Declaration and/or Class Description applicable to the Fund, as amended from time to time, (ii) established in such schedules as the Trustee may furnish to the affected Participants from time to time, or (iii) negotiated separately with each Participant in the Fund. Such fees may be charged against the Fund (as long as the fees charged against the Fund are uniform for all Participants) or against a Class of the Fund (as long as the fees charged against the Class are uniform for all Participants in that particular Class) or may be paid directly by the individual Participants or Plan Sponsors. If the fees are to be charged to each Participant

separately, the Trustee may, in its discretion, charge the fees against the interest of a Participant in the Fund by redemption of such Participant's Units. The expenses incurred in connection with a deposit of assets in a Fund or a withdrawal of assets from a Fund by a Participant may be charged to such Participant pursuant to the provisions of Section 5.6.

6.6     <u>Mailing of Notices, Accounts and Reports</u>. Notices, accountings and reports required to be given or furnished by the Trustee may be given or furnished by actual delivery, or by mailing by first class mail, postage prepaid, to the most recent address known, to the person or persons entitled to receive such notice, accounting or report. The date of such actual delivery or of such mailing, as the case may be, for all purposes hereunder, shall be deemed to be the date as of which such notice, accounting or report was given in the case of actual delivery or the date upon which such mailing was made.

6.7     <u>Reliance on Authority of Trustee</u>. Persons dealing with the Trustee shall be under no obligation to see to the proper application of any money paid or property delivered to the Trustee or to acquire into the Trustee's authority as to any transaction.

6.8     <u>Reliance on Experts and Others</u>. The Trustee shall, in the performance of its duties, be fully protected by relying in good faith upon the books of account or other records of the Trust, or upon reports made to the Trustee by (a) any of the officers or employees of the Trust, (b) the custodians, depositories, any valuation committee or agents, pricing agents, or transfer agents of the Trust, or (c) any accountants, attorneys, or appraisers or other agents, experts or consultants selected with reasonable care by the Trustee. The Trustee, officers, employees, and agents of the Trust may take advice of counsel with respect to the meaning and operation of this Declaration of Trust or any Fund Declarations or Class Description applicable to a Fund, and shall be under no liability for any act or omission in accordance with such advice or for failing to follow such advice. The exercise by the Trustee of its powers and discretion hereunder and the construction in good faith by the Trustee of the meaning or effect of any provisions of this Declaration of Trust or a Plan applicable to a Fund shall be binding upon everyone interested.

6.9     <u>Limitation on Liability</u>. Except as otherwise provided by applicable law, (i) the Trustee shall not be liable by reason of the purchase, retention, sale, or exchange of any investment, or for any loss in connection therewith, except to the extent such loss shall have been caused by its own negligence, willful misconduct, or lack of good faith, and (ii) the Trustee shall not be liable for any mistake made in good faith in the administration of the Fund if, promptly after discovering the mistake, the Trustee takes whatever action the Trustee, in its sole discretion, may deem to be advisable under the circumstances to remedy the mistake.

<u>ARTICLE VII - AMENDMENT; TERMINATION; MERGER</u>

7.1     <u>Amendment</u>. This Declaration of Trust may be amended from time to time by the Trust Company. Such an amendment may be retroactive and, in any event, shall become effective on the date specified by the Trust Company; provided that no amendment may either directly or indirectly operate to deprive any Participant of its beneficial interest in any Fund as it is then constituted. Notice of such amendment shall be sent to each person entitled to receive a copy of the Trustee's annual account for such Fund. A Fund Declaration may be amended from

time to time by the Trust Company as provided in Section 3.4(a) of this Declaration of Trust. A Class Description may be amended from time to time by the Trust Company as provided in Section 3.2 of this Declaration of Trust.

7.2    Termination. Subject to the terms of the Fund Declaration applicable to a Fund, the Trustee may, on any Valuation Date, without advance notice to any person, terminate a Fund, and thereupon the value of each Unit in such Fund shall be determined and there shall be distributed to each Participant in cash or in kind or partly in cash and partly in kind a sum arrived at by multiplying the number of Units in the account of each Participant by the value of each Unit at the close of business on such Valuation Date all as provided in Section 5.3.

7.3    Merger

(a)    From time to time, the Trust Company in its discretion may merge any two or more of the Funds (or any two or more Classes of a Fund) now or hereafter established and maintained pursuant to this Declaration of Trust in whole or in part, in such manner and under such terms and conditions as the Trust Company in its discretion may determine. Any such merger shall be consistent with this Article VII and shall become effective only as of a Valuation Date. Such merger shall thereupon be binding upon every Participant of the Funds (or Classes) which are merged and upon every fiduciary thereof and upon every person beneficially interested therein. Notice of any proposed merger shall be sent to each Investing Fiduciary (or if the Investing Fiduciary is the Trustee, to the Qualified Investor Signatory) of the Participants in the Funds (or Classes) being merged at least thirty days prior to the effective dates of such merger.

(b)    As of the effective date of any merger authorized by subsection (a), the assets of each of the Funds (or Classes) involved shall be valued in accordance with Section 4.4 of this Declaration of Trust, and the value of the Units of each merging Fund (or Class) shall be determined. Thereupon all the combined assets of all Funds (or Classes) involved in the merger shall be divided by the Trustee into such number of equal Units of the Fund (or Class) created by the merger (the "Merged Fund" (or the "Merged Class," as the case may be)) as the Trustee shall determine. There then shall be allocated to each Participant in the Funds (or Classes) being merged such number of Units of the Merged Fund (or the Merged Class) as will have a total net value equal to the value of the aggregate Units held by each Participant in one or the other or both of the respective Funds (or Classes) prior to the Merger. The value of the beneficial interest of each Participant in the Merged Fund (or the Merged Class) shall be equal to the aggregate value of such Participant's beneficial interest(s) in the separate Funds (or Classes) involved in such merger immediately prior to the merger.

## ARTICLE VIII - LIQUIDATING ACCOUNTS

8.1    Establishment of Liquidating Accounts. The Trustee may from time to time in its discretion transfer any investment of a Fund to a liquidating account or accounts. Each liquidating account shall be maintained and administered solely for the ratable benefit of the Participants interested in the Fund at the time such account is established. The primary purpose of liquidating accounts shall be to provide a method of liquidation of the assets contained

therein, but the period during which the Trustee may continue to hold any such assets shall rest in its discretion.

8.2     Powers and Duties of Trustee.  The Trustee shall have, in addition to all of the powers granted to it by law and by the terms of this Declaration of Trust, each and every discretionary power of management of the assets contained in a liquidating account and of all proceeds of such assets which the Trustee shall deem necessary or convenient to accomplish the liquidation of such assets.  At the time of the establishment of a liquidating account, the Trustee shall prepare a schedule showing the interest of each Participant therein.  When the assets of such liquidating account shall have been completely distributed, such schedule shall be thereafter held as part of the permanent records of the Fund to which the liquidating account relates.  The Trustee shall include in any report of audit for a Fund, a report for each liquidating account established in connection with such Fund.

8.3     Limitation on Investment of Further Money.  No further money shall be invested in any liquidating account except that the Trustee shall have the power and authority, if in the Trustee's opinion such action is advisable for the protection of any asset held therein, to borrow money from others to be secured by the assets held in such liquidating account and to give and renew such note or notes therefor as the Trustee may determine.

8.4     Distributions.  The Trustee may make distributions from a liquidating account in cash or in kind or partly in cash and partly in kind, and, except as otherwise provided in the Fund Declaration for the Fund to which such liquidating account relates, the time and manner of making all such distributions shall rest in the sole discretion of the Trustee; provided that all such distributions as of any one time shall be made in a manner consistent with applicable Massachusetts law.

8.5     Effect of Establishing Liquidating Accounts.  After an asset of a Fund has been set apart in a liquidating account, it shall be subject to the provisions of this Article VIII, but such asset shall also be subject to all other provisions of this Declaration of Trust so far as the same shall be applicable thereto and not inconsistent with the provisions of this Article VIII.  For the purpose of deposits to and withdrawals from a Fund, the value of any investment transferred therefrom to a liquidating account shall be excluded.

## ARTICLE IX - MISCELLANEOUS

9.1     Spendthrift Provision.  The beneficial interests of the Participants in a Fund shall not be assignable or subject to attachment or receivership nor shall such interests pass to any trustee in bankruptcy or be reached or applied by any legal process for the payment of any obligation of any Participant except as otherwise required to retain qualification under Code Section 457 in the case of a Participant which is a plan within the meaning of Code Section 457.

9.2     CFTC Matters.  The Trustee is exempt from registration with the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA") as a commodity pool operator in connection with the Trustee's operation of each Fund pursuant to an exemption with respect to operation of a "qualifying entity" by a trust company subject to regulation by a state, as set forth in Rule 4.5(a)(3) under the Commodity Exchange Act (the

"CEA"). Unlike a registered commodity pool operator, the Trustee is not subject to regulation by the CFTC and NFA and is not required to deliver a disclosure document prepared in accordance with Rules 4.24 and 4.25 under the CEA or a certified annual report to participants in a Fund and the participants in a Fund are not subject to the protective provisions afforded under the CEA.

 9.3 <u>Judicial Proceedings Involving Funds</u>. The Trustee shall be deemed to represent all persons, natural or legal, having an interest in a Fund for the purposes of all judicial proceedings affecting the Fund or any asset thereof, and only the Trustee need be made a party to any such action.

 9.4 <u>Successors and Assigns</u>. In the event that the Trust Company shall at any time merge or consolidate with, or shall sell or transfer substantially all of its assets to, another trust company or corporation, state or federal, the trust company or corporation resulting from such merger or consolidation or the trust company or corporation into which it is converted, or to which such sale or transfer shall be made, shall thereupon become and be substituted hereunder in the place of the Trust Company and shall become the Trustee hereunder with the same effect as though originally so named.

 9.5 <u>Controlling Law</u>. The powers and duties of the Trustee and all questions of interpretation of this Declaration of Trust shall be governed by ERISA, as amended, and to the extent permitted by such law, by the laws of the Commonwealth of Massachusetts. The Trust established by this Declaration of Trust is organized in the United States and will be maintained at all times as a domestic trust in the United States.

 9.6 <u>Effective Dates</u>. This Fourth Amended and Restated Declaration of Trust shall be effective as of October 1, 2005.

IN WITNESS WHEREOF, STATE STREET BANK AND TRUST COMPANY has caused its name to be hereunto signed by its proper officer as of the ___15th___ day of August, 2005.

ATTEST

STATE STREET BANK AND TRUST COMPANY

Name: Christopher W. Thorne
Title: Principal and Counsel

By: 
Name: Timothy Connolly
Title: Senior Principal

COMMONWEALTH OF MASSACHUSETTS )
                                               ) SS.

COUNT OF SUFFOLK               )

On this _15th_ day of August, 2005, before me personally came _Christopher Thome_ and _Timothy Connolly_ to me personally known, who being by me duly sworn did depose and say that they reside in _Stoughton_, Massachusetts and _Marshfield_, Massachusetts, respectively; that they are the _Principal and Counsel_ and _Senior Principal_, respectively, of STATE STREET BANK AND TRUST COMPANY, the Trust Company described in and which executed the foregoing instrument; that they know the seal of said Trust Company; that the seal was affixed by the authority of the Board of Directors of said Trust Company; and that they signed their names thereto by like authority; and the said _Christopher Thome_ and _Timothy Connolly_ severally acknowledged said instrument to be their free act and deed and the free act and deed of said Trust Company.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal at the City of Boston, in the County of Suffolk and Commonwealth of Massachusetts, on the day and year above appearing.

_Kelly A. Broderick_
Notary Public: Kelly A. Broderick
My commission expires: June 11, 2010

**STATE STREET BANK AND TRUST COMPANY**
**INVESTMENT FUNDS FOR TAX EXEMPT RETIREMENT PLANS**

**FIFTH AMENDED AND RESTATED DECLARATION OF TRUST**

**ARTICLE 1 - DEFINITIONS**................................................................1

    1.01    "Affiliate" ......................................................................1
    1.02    "Amended Declaration of Trust" ...............................1
    1.03    "Business Day" ...........................................................1
    1.04    "Class" .........................................................................1
    1.05    "Class Description"....................................................2
    1.06    "Code"..........................................................................2
    1.07    "Declaration of Trust".................................................2
    1.08    "Dedicated Account" ..................................................2
    1.09    "Dedicated Assets" .....................................................2
    1.10    "Duties".......................................................................2
    1.11    "ERISA" ......................................................................2
    1.12    "Fund"..........................................................................2
    1.13    "Fund Declaration" .....................................................2
    1.14    "Fund General Assets".................................................2
    1.15    "General Assets"..........................................................2
    1.16    "Investing Fiduciary"..................................................2
    1.17    "Investment Company Act" .........................................2
    1.18    "Liquidating Account".................................................2
    1.19    "Net asset value".........................................................2
    1.20    "Participant"................................................................3
    1.21    "Plan Sponsor"............................................................3
    1.22    "Qualified Investor"....................................................3
    1.23    "Qualified Investor Signatory" ...................................3
    1.24    "Securities Act" ..........................................................3
    1.25    "SSBT"........................................................................3
    1.26    "STIF"..........................................................................3
    1.27    "Strategy Disclosure Document" ................................3
    1.28    "Transaction Charges" ................................................3
    1.29    "Trustee" .....................................................................4
    1.30    "Unit"...........................................................................4
    1.31    "Valuation Date".........................................................4

**ARTICLE 2 - ESTABLISHMENT OF FUNDS AND CLASSES OF UNITS** ..........................4

    2.01    Establishment of Funds................................................4
    2.02    Establishment of Classes..............................................4
    2.03    Rights and Preferences, etc ..........................................4
    2.04    Change in the Units......................................................6
    2.05    No Certificates.............................................................6

**ARTICLE 3 - PARTICIPATION**................................................................6

    3.01    Conditions of Participation; Acceptance of Assets; Funds as "Group Trusts".....................................................................................6
    3.02    Other Conditions of Participation ................................8
    3.03    Withdrawals from Participation; Suspension of Withdrawal Rights.....................9
    3.04    Adjustments ...............................................................11

i

3.05    Transaction Charges in respect of Acquisition of Units and Withdrawals ............12

**ARTICLE 4 - INVESTMENTS AND ADMINISTRATION** .......................................................**12**

    4.01    Management and Administrative Powers ................................................12
    4.02    Cash Balances ....................................................................................18
    4.03    Loans .................................................................................................18
    4.04    Ownership of Assets ...........................................................................18
    4.05    Dealings with the Funds......................................................................18
    4.06    Management Authority and Delegation .................................................19

**ARTICLE 5 - VALUATION, ACCOUNTING, RECORDS, AND REPORTS** ....................**19**

    5.01    Valuation of Units ..............................................................................19
    5.02    Suspension of Valuations.....................................................................20
    5.03    Accounting Rules and Fiscal Year ........................................................20
    5.04    Expenses and Taxes ............................................................................20
    5.05    Records, Accounts and Audits .............................................................21
    5.06    Financial Reports ...............................................................................21
    5.07    Judicial Accounting ............................................................................21

**ARTICLE 6 - CONCERNING THE TRUSTEE** .....................................................................**21**

    6.01    Merger, Consolidation of and Successor to Trustee ...............................22
    6.02    Discretion of Trustee...........................................................................22
    6.03    Limitation on Liability and Indemnification...........................................22
    6.04    Trustee Compensation ........................................................................23
    6.05    Trustee's Authority .............................................................................23
    6.06    Reliance on Experts and Others............................................................23
    6.07    Reliance on Communications ...............................................................24
    6.08    Action by Trustee ...............................................................................24

**ARTICLE 7 - AMENDMENT, MERGER AND TERMINATION** .......................................**24**

    7.01    Amendment........................................................................................24
    7.02    Merger and Termination ......................................................................25
    7.03    Notices ..............................................................................................25

**ARTICLE 8 - LIQUIDATING ACCOUNTS AND DEDICATED ACCOUNTS** ................**26**

    8.01    Establishment.....................................................................................26
    8.02    Additional Powers and Duties of Trustee ..............................................27
    8.03    Limitation on Contributions to Liquidating Account ...............................27
    8.04    Distributions......................................................................................27
    8.05    Effect of Establishing Liquidating Accounts and Dedicated Accounts................28
    8.06    Fees and Expenses .............................................................................28

**ARTICLE 9 - GENERAL PROVISIONS** .................................................................................**28**

    9.01    No Diversion; Assignment Prohibited ..................................................28
    9.02    Governing Law ...................................................................................29
    9.03    ERISA ...............................................................................................29
    9.04    Inspection ..........................................................................................29

ii

9.05    Titles ...........................................................................................................30
9.06    Invalid Provisions ......................................................................................30
9.07    Status of Instrument ...................................................................................30

**APPENDIX A** ....................................................................................................**1**
    A.1    Establishment of STIFs.............................................................. 1
    A.2    Investment of STIF Assets.......................................................... 1
    A.3    Valuation of STIF Assets........................................................... 1
    A.4    Valuation of STIF Units............................................................. 2
    A.5    Deposits in and Withdrawals from a STIF ................................. 2
    A.6    Special Circumstances ............................................................... 2
    A.7    Termination of STIF .................................................................. 3
    A.8    Liquidating Accounts and Dedicated Accounts.......................... 3

LIBC/3992798.14

# STATE STREET BANK AND TRUST COMPANY

## INVESTMENT FUNDS FOR TAX EXEMPT RETIREMENT PLANS

## FIFTH AMENDED AND RESTATED DECLARATION OF TRUST

This FIFTH AMENDED AND RESTATED DECLARATION OF TRUST (the "Declaration of Trust") made at Boston, Massachusetts this 30th day of September, 2011.

WITNESSETH, that

**WHEREAS**, the State Street Bank and Trust Company Investment Funds For Tax Exempt Retirement Plans (the "Trust") was organized by State Street Bank and Trust Company ("SSBT"), a Massachusetts trust company with its principal offices in Boston, Massachusetts, pursuant to a Declaration of Trust dated February 21, 1991, and which Declaration of Trust was amended in its entirety pursuant to the First Amendment to Declaration of Trust dated July 19, 1991, the Second Amended and Restated Declaration of Trust dated March 13, 1997, the Third Amended and Restated Declaration of Trust dated December 22, 2003, and the Fourth Amended and Restated Declaration of Trust dated August 15, 2005 (the "Amended Declaration of Trust");

**WHEREAS**, SSBT now wishes by this instrument to amend and restate the Amended Declaration of Trust in its entirety as of this date; and

**NOW, THEREFORE**, SSBT hereby declares that all existing Funds previously established by SSBT under the Amended Declaration of Trust and all Funds established after the date hereof shall be subject to, and governed by, this Declaration of Trust, and SSBT will hold in trust as Trustee all cash, securities, and other assets which it may from time to time hold or acquire in any manner in accordance with the following terms and conditions:

## ARTICLE 1- DEFINITIONS

1.01 "Affiliate" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, investment fund or trust, or similar organization or entity controlling, controlled by, or under common control with SSBT. Affiliate shall also mean any registered or unregistered investment company, common trust fund, collective investment fund, and any other fund or trust managed or sponsored by SSBT or any of its Affiliates.

1.02 "Amended Declaration of Trust" has the meaning specified in the recitals hereto.

1.03 "Business Day" means any day when both the New York Stock Exchange and SSBT are open for business.

1.04 "Class" shall mean any of the classes of Units established by the Trustee pursuant to Section 2.02.

1.05    "Class Description" has the meaning specified in <u>Section 2.02</u>.

1.06    "Code" means the Internal Revenue Code of 1986 and the applicable rules and regulations thereunder, as amended from time to time.  Any reference to a provision of the Code in this Declaration of Trust also shall be deemed to refer to any successor provision.

1.07    "Declaration of Trust" means this Fifth Amended and Restated Declaration of Trust of the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans.

1.08    "Dedicated Account" means a segregated account established and maintained in accordance with <u>Article 8</u>.

1.09    "Dedicated Assets" has the meaning specified in <u>Section 8.01(b)</u>.

1.10    "Duties" has the meaning specified in <u>Section 4.01(b)</u>.

1.11    "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and the applicable rules and regulations thereunder, as amended from time to time.

1.12    "Fund" shall mean any of the funds established by the Trustee pursuant to <u>Section 2.01</u>.

1.13    "Fund Declaration" has the meaning specified in <u>Section 2.01</u>.

1.14    "Fund General Assets" has the meaning specified in <u>Section 2.03 (i)</u>.

1.15    "General Assets" has the meaning specified in <u>Section 2.03 (i)</u>.

1.16    "Investing Fiduciary" means the person or persons, natural or legal, including a committee, who exercise discretion with respect to the decision to invest assets of a Qualified Investor in a Fund; provided, however, that, if the person who exercises such investment discretion is a participant or beneficiary entitled to benefits under the Qualified Investor and is acting in his capacity as such, then Investing Fiduciary shall mean the plan fiduciary who has authorized the use of the Funds as an investment option for participants and beneficiaries of the relevant Qualified Investor.

1.17    "Investment Company Act" means the Investment Company Act of 1940 and the applicable rules and regulations thereunder, as amended from time to time.

1.18    "Liquidating Account" means a segregated account established and maintained in accordance with Article 8 primarily in order to facilitate the liquidation, pricing, and close-out of the assets contained therein for the benefit of the Participants participating therein.

1.19    "Net asset value" of Units of a Fund without Classes shall mean:  (i) the value of all the securities and other assets of such Fund; (ii) less total liabilities of such Fund; (iii) divided by the number of Units of such Fund outstanding, in each case at the time of each determination.  In the case of a Class of Units within a Fund, "net asset value" shall mean (i) the value of all of

2

the securities and other assets of such Fund allocated to such Class; (ii) less the total liabilities of such Fund allocated to such Class; (iii) divided by the number of Units of such Class outstanding, in each case at the time of each determination.

1.20 "Participant" means a Qualified Investor which, with the consent of the Trustee, has made a deposit in a Fund and has a beneficial interest in a Fund.

1.21 "Plan Sponsor" means the employer establishing or maintaining the Qualified Investor, if the Qualified Investor is a single employer plan (as defined in Section 3(41) of ERISA) and, in the case of any other Qualified Investor, the board of trustees or other similar group of representatives of the parties who establish or maintain the Qualified Investor.

1.22 "Qualified Investor" has the meaning specified Section 3.01.

1.23 "Qualified Investor Signatory" means the person or persons, natural or legal, including a committee, who executes the agreement pursuant to which SSBT is appointed as trustee, co-trustee, investment manager, or agent for the trustee or trustees with respect to a Qualified Investor.

1.24 "Securities Act" means the Securities Act of 1933 and the applicable rules and regulations thereunder, as amended from time to time.

1.25 "SSBT" has the meaning specified in the recitals hereto.

1.26 "STIF" has the meaning specified in Section 2.01.

1.27 "Strategy Disclosure Document" has the meaning specified in Section 2.01.

1.28 "Transaction Charges" means brokerage and related transaction fees and expenses incurred or estimated by the Trustee to be incurred (including, but not limited to, broker, dealer, and underwriting fees, commissions, and spreads, stamp taxes, duties, settlement, stock listing, registration, and similar fees and charges, and all transaction-related expenses) and the market effect arising out of, or in connection with, the purchase, sale, transfer, or re-registration of securities or other assets of a Fund relating to or arising out of the contribution of cash, securities, or other assets to a Fund by a Participant or the withdrawal of Units by a Participant in a Fund, all as determined in the sole discretion of the Trustee. For purposes of clarity and without limiting the foregoing, Transaction Charges may also include actual or estimated intra-day market gain or loss attributable in the sole determination of the Trustee to the purchase or sale of securities or other assets by a Fund in connection with any such contribution or withdrawal, and may be aggregated across contributing or withdrawing Participants, as the case may be, on a weighted average basis for any given trading period or trading periods or on such other basis as may be determined by the Trustee in its sole discretion. The Trustee may also in its sole discretion from time to time or in particular circumstances calculate Transaction Charges for a Fund based upon the utilization of a formula based upon a pre-determined or other specified percentage or amount of the cash and/or securities or other assets that are contributed to a Fund by a Participant in a Fund or withdrawn by a Participant in such Fund. Transaction Charges may be described in a Fund Declaration, Strategy Disclosure Document or in any other communication to Participants as the Trustee may determine from time to time.

3

1.29    "Trustee" means SSBT, as trustee of a Fund, or any successor trustee in accordance with Section 6.01.

1.30    "Unit" means a unit of the beneficial interest of a Fund or a Class of a Fund, as the case may be.

1.31    "Valuation Date" of a Fund means a day on or as of which the Trustee determines the value of the Units of such Fund.

## ARTICLE 2- ESTABLISHMENT OF FUNDS AND CLASSES OF UNITS

2.01    Establishment of Funds.  The Trustee shall have the authority to establish any one or more Funds from time to time without consent or vote by Participants.  The Trustee shall establish a Fund by executing a declaration (the "Fund Declaration") which shall incorporate the terms of this Declaration of Trust by reference and shall set out the name of such Fund and such other terms, conditions, rights, and preferences and special or relative rights and privileges (including conversion rights, if any) of such Fund as the Trustee shall in its discretion determine. A Fund Declaration may, but need not, set out the investment policies relating to the Fund in question.  Each Fund shall constitute a separate trust and the Trustee shall separately hold, manage, administer, value, invest, reinvest, account for, and otherwise deal with each such Fund. Notwithstanding anything to the contrary herein, as to Short-Term Investment Funds ("STIFs") referred to in Appendix A, STIFs shall be subject to the provisions of Appendix A and, to the extent not inconsistent with Appendix A, the generally applicable rules of this Declaration of Trust.

(a)    The Trustee may from time to time provide to each of the Participants of a Fund a written statement, as such may be amended, modified, or supplemented from time to time (the "Strategy Disclosure Document"), setting out information as to the investment policies and other terms or conditions of or relating to such Fund, together with any instrument or document incorporating all or any part of such Strategy Disclosure Document into the Fund Declaration relating to such Fund, whereupon all or such part of such Strategy Disclosure Document, as the case may be, shall in the sole discretion of the Trustee be deemed, from the date designated by the Trustee, to have become part of such Fund Declaration; the Trustee may, at any time by notice to the Participants of such Fund, terminate such incorporation by reference or revise, amend, or supplement all or any part of the provisions previously so incorporated by reference into such Fund Declaration.

2.02    Establishment of Classes.  The establishment and designation of any Class of Units shall be effective upon the adoption by the Trustee of a written Class description (a "Class Description"), setting forth such establishment and designation and the relative rights and preferences of such Class.

2.03    Rights and Preferences, etc.  Units of each Fund or Class established pursuant to this Section 2, unless otherwise provided in the Fund Declaration establishing such Fund or Class Description establishing such Class, shall have the following relative rights and preferences:

4

(i)    <u>Assets Belonging to Fund</u>.  All consideration received by the Trust for the issue or sale of Units of a particular Fund, together with all securities and other assets in which such consideration is invested or reinvested, all income, earnings, profits, and proceeds thereof from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange, or liquidation of such assets, and any funds or payments derived from any reinvestment of such proceeds in whatever form the same may be, shall irrevocably belong to that Fund for all purposes, subject only to the rights of creditors with claims against the particular Fund, and shall be so recorded upon the books of account of the Fund.  Such considerations, securities and other assets, income, earnings, profits, and proceeds thereof, from whatever source derived, including, without limitation, any proceeds derived from the sale, exchange, or liquidation of such assets, and any funds or payments derived from any reinvestment of such proceeds, in whatever form the same may be, are herein referred to as "assets belonging to" that Fund.  In the event that there are any securities and other assets, income, earnings, profits, and proceeds thereof, funds, or payments which are not readily identifiable as belonging to any particular Fund (collectively "<u>General Assets</u>"), the Trustee shall allocate such General Assets to, between, or among any one or more of the Funds in such manner and on such basis as it, in its sole discretion, may deem fair and equitable, and any General Asset so allocated to a particular Fund shall belong to that Fund; and, in the event that there are any assets, income, earnings, profits, and proceeds thereof, funds, or payments belonging to any Fund which are not readily identifiable as belonging to any particular Class (collectively "<u>Fund General Assets</u>"), the Trustee shall allocate such Fund General Assets to, between, or among any one or more of the Classes of such Fund in such manner and on such basis as it, in its sole discretion, may deem fair and equitable, and any Fund General Asset so allocated to a particular Class shall belong to that Class.  Each such allocation by the Trustee shall be conclusive and binding upon the Participants of all Funds and Classes for all purposes.

(ii)    <u>Liabilities Belonging to Fund</u>.  The securities and other assets belonging to each particular Fund shall be charged with the liabilities of the Trust in respect of that Fund and all expenses, costs, charges, and reserves attributable to that Fund and any general liabilities of the Trust, or of any Fund, which are not readily identifiable as belonging to any particular Fund, or any particular Class of any Fund, shall be allocated and charged by the Trustee to and among any one or more of the Funds, or to and among any one or more of the Classes of a Fund, as the case may be, in such manner and on such basis as the Trustee in its sole discretion may deem fair and equitable.  The liabilities, expenses, costs, charges, and reserves so charged to a Fund or Class are herein referred to as "liabilities belonging to" that Fund or Class.  Each allocation of liabilities, expenses, costs, charges, and reserves by the Trustee shall be conclusive and binding upon the Unit holders of all Funds and Classes for all purposes.  Under no circumstances shall the assets allocated or belonging to any particular Fund be charged with liabilities belonging to any other Fund.  All persons who have extended credit which has been allocated to a particular Fund, or who have a claim or contract which has been allocated to any particular Fund, shall look only to the assets of that particular Fund for payment of such credit, claim, or contract.

(iii)    <u>Dividends, Distributions, and Withdrawals</u>.  No dividend or distribution (including, without limitation, any distribution paid upon termination of any Fund) with respect to, nor any payment upon withdrawal of, the Units of any Fund shall be effected by the Fund other than from the securities and other assets belonging to such Fund, nor shall any Participant of any particular Fund otherwise have any right or claim against the assets belonging to any other

Fund except to the extent that such Participant has such a right or claim hereunder as a Participant of such other Fund. The Trustee shall have full discretion to determine which items shall be treated as income and which items as capital; and each such determination and allocation shall be conclusive and binding upon the Participants.

(iv)    Fractions. Any fractional Unit of a Fund or Class of any Fund shall carry proportionately all the rights and obligations of a whole share of that Fund or Class, as the case may be, including rights with respect to receipt of dividends and distributions, withdrawals of Units, and termination of the Fund.

(v)    Combination of Fund. The Trustee shall have the authority, without the approval of the Participants of any Fund or Class of any Fund unless otherwise required by applicable law, to combine the assets and liabilities belonging to any two or more Funds or Classes into assets and liabilities belonging to a single Fund or Class.

2.04    Change in the Units. The Trustee may from time to time divide or combine the Units of any Fund or Class into a greater or lesser number without thereby changing the proportionate beneficial interest in the Fund or Class.

2.05    No Certificates. No certificates shall be issued to evidence the interest of any Participant in any Fund. The record books of the Fund as kept by the Trustee or any transfer or similar agent, as the case may be, shall be conclusive as to who are the Participants of each Fund and Class and as to the number of Units of each Fund and Class held from time to time by each Participant. In addition, the Trustee shall maintain, and shall keep a record of, separate accounts as evidenced by the Units held by each Participant in the Fund to reflect the interest of each Participant in the Fund, including separate accounting for contributions to the Fund by each Participant, disbursements and withdrawals made from each Participant's account in the Fund and the investment experience of the Fund allocable to each Participant. For the avoidance of doubt, the maintenance of Units on the books and records of the Fund reflecting each Participant's interest in the Fund shall be sufficient to satisfy the foregoing requirement.

## ARTICLE 3- PARTICIPATION

3.01    Conditions of Participation; Acceptance of Assets; Funds as "Group Trusts".

The Trustee shall accept investments in the Trust from such persons and on such terms and for such consideration, which may consist of cash or securities or other assets or a combination thereof, as it may from time to time in its sole discretion determine.

An investor may participate in a Fund only if (1) SSBT is acting as trustee, co-trustee, investment manager, or agent of the investor, (2) SSBT, in its sole discretion, has accepted it as a Participant, and (3) one of the following conditions is met:

(a)    The investor is a trust created under an employees' pension or profit sharing plan) (1) which is qualified within the meaning of Code Section 401(a) and is therefore exempt from tax under Code Section 501(a); and (2) which is administered under one or more documents which specifically authorize part or all of the assets of the trust to be commingled for investment purposes with the assets of other such trusts in a

6

collective investment trust, which specifically or in substance and effect, adopt each such collective investment trust as a part of the plan and which expressly and irrevocably provide that it is impossible for any part of the corpus or income of such trust to be used for, or diverted to, purposes other than for the exclusive benefit of its participants and their beneficiaries consistent with the requirement of Treasury Regulation §1.401(a)-2 (as the same may be modified by amendment or statute).  If such trust covers self-employed individuals within the meaning of Section 401(c)(1) of the Code (a "Keogh Plan") and interests in the Fund are not registered under the Securities Act, then each such Keogh Plan will be permitted to invest in the Fund only to the extent permitted by the Securities Act and rules and regulations promulgated thereunder;

(b)      To the extent permitted by applicable Internal Revenue Service rulings, the investor is a trust created under an employees' pension or profit sharing plan (1) which is a Puerto Rican plan described in Section 1022(i)(1) of ERISA; and (2) which is administered under one or more documents which specifically authorize part or all of the assets of the trust to be commingled for investment purposes with the assets of other such trusts in a collective investment trust, which specifically or in substance and effect, adopt each such collective investment trust as a part of the plan and which expressly and irrevocably provide that it is impossible for any part of the corpus or income of such trust to be used for, or diverted to, purposes other than for the exclusive benefit of its participants and their beneficiaries;

(c)      The investor is a plan (1) which is described in Code Section 401(a)(24) or 457(b) and is not subject to Federal income taxation, (2) which, if interests in the Fund are not registered under the Securities Act and the Fund is not registered under the Investment Company Act, satisfies the requirements of Section 3(a)(2) or any other available exemption of the Securities Act and any applicable requirements of the Investment Company Act and rules and regulations promulgated thereunder, and (3) which is administered under one or more documents which specifically authorize part or all of the assets of the plan to be commingled for investment purposes with the assets of other such plans in a collective investment trust, which specifically or in substance and effect, adopt each such collective investment trust as a part of the plan and which expressly and irrevocably provide that it is impossible for any part of the corpus or income of such trust to be used for, or diverted to, purposes other than for the exclusive benefit of its participants and their beneficiaries, consistent (in the case of a plan described in Code Section 457(b)) with the requirements of Treasury Regulation §1.457-8(a)(2) (as the same may be modified by amendment or statute);

(d)      To the extent permitted by applicable Internal Revenue Service rulings, the investor is a segregated asset account maintained by a life insurance company (1) consisting exclusively of assets of investors described in subsections (a) and/or (c) of this Section 3.01, and (2) which is administered under one or more documents which authorize part or all of the assets of the account to be commingled for investment purposes with the assets of other such accounts in a collective investment trust and which expressly and irrevocably provides that it is impossible for any part of the corpus or income of such account to be used for, or diverted to, purposes other than the exclusive benefit of its participants and their beneficiaries and whose constituent trusts adopt,

7

specifically or in substance and effect, each such collective investment trust as a part of their respective plans;

(e)     The investor is a trust (1) for the collective investment of assets of any investor otherwise described in this <u>Section 3.01</u> (including without limitation a Fund created under this Declaration of Trust), which trust qualifies as a "group trust" under Internal Revenue Service Revenue Ruling 2011-1, as amended, or any successor ruling, and (2) which is administered under one or more documents which authorize part or all of the assets of the trust to be commingled for investment purposes with the assets of other such trusts in a collective investment trust, which specifically or in substance and effect, adopt each such collective investment trust as a part of the trust and which expressly and irrevocably provide that it is impossible for any part of the corpus or income of such trust to be used for, or diverted to, purposes other than the exclusive benefit of its participants and their beneficiaries consistent with the requirement of Treasury Regulation §1.401(a)-2 (as the same may be modified by amendment or statute).

(f)     The Trustee shall accept assets in a Fund under this Declaration of Trust only from investors meeting the conditions set forth in this <u>Section 3.01</u> (each, a "<u>Qualified Investor</u>").  All assets so accepted together with the income therefrom shall be held, managed and administered pursuant to this Declaration of Trust.  At no time prior to the satisfaction of all liabilities with respect to the employees and their beneficiaries entitled to benefits from a Participant shall any part of the principal or income allocable hereunder to such Participant be used or diverted for or to purposes other than for the exclusive benefit of such employees or their beneficiaries.   Investments in a Fund shall be accepted only as of a Valuation Date and on the basis of the Unit value of such Fund (or of the Class in question, as the case may be) as of the Valuation Date, as provided in <u>Section 5.01</u>; provided that the Trustee in its sole discretion may, to the extent permitted by applicable law, including any applicable rules and requirements of ERISA, assess Transaction Charges to a Participant making contributions and may allocate such Transaction Charges in any manner that the Trustee deems reasonable, including, without limitation, by aggregating across contributing Participants  on a weighted average basis as determined by the Trustee for a given trading period.  No Participant may cancel or countermand an investment in a Fund unless in accordance with the Fund Operating Guidelines for SSgA U.S. Bank Maintained Commingled Funds or otherwise approved by the Trustee.  Securities and other assets other than cash accepted by the Trustee shall be valued as determined by the Trustee, on the Valuation Date in accordance with the provisions of Article V hereof.

It is intended that the Funds be exempt from taxation and qualify as "group trusts" under Internal Revenue Service Revenue Ruling 2011-1, as amended, or any successor ruling, and other applicable Internal Revenue Service rules and regulations.  In furtherance of this intent, each investor which seeks to invest in a Fund shall represent and warrant that such investor is a Qualified Investor.

3.02     <u>Other Conditions of Participation</u>.  The Trustee may in its discretion establish from time to time conditions for eligibility to participate in a Fund or in any particular Class of a

Fund. Participants shall have no preemptive or other right to acquire any additional Units or other securities issued by any of the Funds.

3.03    <u>Withdrawals from Participation; Suspension of Withdrawal Rights.</u>

(a)    Except as otherwise provided in <u>Section 3.03(b)</u>, any Participant may, as of any Valuation Date, withdraw any number of Units from a Fund pursuant to notice received by the Trustee at least 15 days, or such lesser period as may be determined by the Trustee in its discretion, prior to such Valuation Date (which notice period may be waived by the Trustee in its discretion). No withdrawal by a Participant may be canceled or countermanded on or after the Valuation Date to which it relates. Within a reasonable time following the Valuation Date, the Trustee shall, subject to <u>Section 3.05</u>, distribute from such Fund to the Participant making such withdrawal a sum arrived at by multiplying the number of Units withdrawn by the net asset value of each Unit as of the close of business on the Valuation Date on which such withdrawal is effected. Such sum shall be distributed in cash, in kind, or in a combination of cash and in kind, or in any other manner as the Trustee in its sole discretion shall determine. For the purpose of this Declaration of Trust, "in kind" refers to securities and all other assets (excepting cash only). In making distributions of securities or other assets in whole or in part along with cash under this Section 3.03(a) or any other provision of this Declaration of Trust, the Trustee is authorized to adjust in its good faith discretion the relative proportion, mix, amount, and number of securities and other assets and the amount of cash distributed to withdrawing Participants to reflect any trading, legal, contractual, securities exchange, and market requirements, practices, restrictions and/or practical considerations applicable to any securities or other assets being distributed to such Participants, including, without limitation, minimum trade size requirements for securities and other assets (such as odd lot holdings or fractional interests), Rule 144A of the Securities Act of 1933, as amended, or other legal or regulatory requirements applicable to such securities or other assets or the eligibility of particular beneficial owners to receive such securities or other assets, trading limits or requirements established by securities exchanges, government regulators, brokers, dealers, or other market participants, and similar limits and requirements. To the extent permitted under ERISA, each Participant and any person or entity claiming through such Participant waives any and all claims and potential claims against SSBT and its Affiliates, with respect to any distribution of securities, cash and other assets that has been adjusted by SSBT in its capacity as Trustee as provided above in good faith to reflect the same approximate value per Unit of securities, cash and other assets distributed to each Participant at any particular time notwithstanding that the percentage, mix and/or amount of securities, assets and cash differs on a per-Unit basis to some degree among such withdrawing Participants for any of the foregoing reasons. All distributions from the Trust to the Participant shall be deemed to be for the exclusive benefit of participants and their beneficiaries under such Participant.

(b)    Notwithstanding any other provision of this Declaration of Trust or a Fund Declaration, and in addition to any other authority granted to the Trustee hereunder and thereunder, in the interest of the protection of one or more Funds and the fair and equitable treatment of Participants, the Trustee may in its sole discretion, at any time and from time to time, suspend valuations of the securities and other assets of one or more

9

Funds and/or the Units of one or more Funds and may adopt and implement withdrawal practices and policies with respect to the rights of Participants to withdraw or redeem Units from one or more Funds when, in the sole discretion of the Trustee, prevailing market conditions or other circumstances, events, or occurrences make the disposition or valuation of investments of a Fund impracticable or inadvisable or when the Trustee in its sole discretion otherwise considers such action to be in the best interests of the Fund or its Participants or believes that such action would assist in eliminating or mitigating an adverse effect on the Fund or its Participants. In exercising its authority under this Section 3.03(b), the Trustee may take into account such factors as the Trustee deems appropriate in its sole discretion, including the current and anticipated market conditions that are or may be experienced by the Fund, the liquidity (including known and anticipated requirements for liquidity) of the Fund and the liquidity and trading volume of the securities and other assets of the Fund, including the reported and anticipated sales prices, bid/ask spreads, and participation of market makers and dealers in the markets for such securities and other assets, the current and anticipated volatility of the relevant securities markets, the current and anticipated impact of any sales made by the Fund on the values of the securities and other assets held by the Fund, the absolute and relative sizes of the number of Units requested for withdrawal by one or more Participants, prior and any anticipated future withdrawals of Units by one or more Participants, the reason or reasons for any pending or anticipated requested withdrawals, the Fund's ability to generate cash to fund withdrawals and satisfy other obligations of the Fund, and the likelihood and materiality of losses or gains relating thereto; a particular Participant's absolute or relative ownership interest in the Fund; amounts previously withdrawn by one or more particular Participants; the length of time and frequency of any outstanding or accrued withdrawal requests by particular Participants; and such other factors and considerations as may be deemed relevant by the Trustee.

Any such practices and policies may include, without limitation, suspending or limiting the frequency of withdrawal rights for some or all Participants; effecting withdrawals wholly or partially in-kind; varying the per Unit withdrawal amount paid to Participants based on such factors as the Trustee may determine, such as the amount and timing of a Participant's withdrawal requests; limiting withdrawal rights for some or all Participants to specified dollar amounts or percentage interests in the Fund; and permitting one or more (but less than all) Participants to withdraw on a priority or preferential basis relative to one or more other Participants based upon such factors as the Trustee determines to be equitable, including time, amount or frequency of withdrawals and/or withdrawal requests by Participants. The Trustee may in its sole discretion treat one or more Participants differently from other Participants in determining the extent to which a particular Participant is entitled to withdraw, the per Unit withdrawal amount to be paid to a particular Participant, the timing, manner (cash, in-kind or a combination thereof) and frequency of withdrawal payments, and any other matters relevant to a Participant's withdrawal. Any such action by the Trustee will be evaluated and implemented in its sole discretion and undertaken by the Trustee as part of a plan designed to protect the Fund and be in the best interests of all Participants over time and will seek to preserve the Fund's liquidity, avoid or mitigate losses to the Fund, permit the Fund to achieve its investment objectives and to otherwise avoid any adverse consequences to the Fund and its Participants. Such practices and policies may be

10

adopted, modified or terminated (in whole or in part) by the Trustee at any time in its sole discretion. The Trustee shall, to the extent practicable, provide reasonable notice (which need not be prior notice) to the relevant Participants of any such withdrawal practices and policies as they may be in effect from time to time.

(c)     Notwithstanding any other provision of this Declaration of Trust or the applicable Fund Declaration, and in addition to any other authority granted to the Trustee hereunder and thereunder, if the Participant or any person or entity with investment authority on behalf of such Participant is, or may be, following a market-timing strategy or is, or may be, otherwise engaged in excessive trading or illegal activities as determined in the sole discretion of the Trustee, the Trustee may cause or require such Participant or any person or entity with investment authority on behalf of such Participant to (i) suspend purchases and/or withdrawal of Units on a temporary basis, (ii) cease any additional purchases of Units of a Fund for a specified period of time or on a permanent basis, (iii) withdraw some or all of its Units from a Fund, and/or (iv) liquidate sufficient Units of any such Participant (including those attributable to any person or entity that directed or engaged in the conduct described above) and apply all or part of the net proceeds realized upon such liquidation to satisfy and/or reimburse the Fund for any losses or damages suffered by the Fund.

(d)     If any tax or charge shall be payable out of the assets of a Fund, in respect of some but not all Units or Participants in the Fund, an equalizing distribution from the assets of the Fund may, in the sole discretion of the Trustee, be made with respect to such other Units or to such other Participants that were not subject to any such tax or charge, and such equalizing distribution shall not reduce the number or value of the Units in the Fund held by such other Participants that have received any such equalizing distribution; or the Trustee may require payment to such other Participants that were not subject to such tax or charge of part or all of such tax or charge by the Participants whose Units are affected or for which such taxes or charges are assessed, and any such Participants that are required to make such payments will have no right to the issuance of any additional Units or any increase in the value of their Units by reason of the payment of any such assessment.

3.04    <u>Adjustments</u>.  The Trustee may make, in its good faith discretion, retroactive or subsequent adjustments to reflect the actual expenses, liabilities, and obligations allocable to assets held in the Fund or in any Liquidating Account or Dedicated Account and to reflect the correct pricing of any assets of the Fund or any Liquidating Account or Dedicated Account not later than 15 months after the date in question.  In such event, the Trustee shall make appropriate additions to, or deductions from, as the case may be, the net asset value of the Units held by the Participants in the Fund or their interests in any Liquidating Account or Dedicated Account, as the case may be, or take such other actions as the Trustee in its discretion considers appropriate. If a Participant has withdrawn all its Units in the Fund or interests in the Liquidating Account or Dedicated Account and any such adjustment results in a deduction to the value of the withdrawn Units or interests as of the relevant time, then the Participant will be liable to the Fund to repay promptly the amount of any such deduction which has been so previously allocated by the Trustee to such Participant.  If any such Participant is entitled to a credit, then the Trustee shall promptly issue additional Units to the Participant equal to the value of the credit or, to the extent

the Trustee deems appropriate, promptly remit from the assets of the Fund payment of the same to such Participant if the Participant has withdrawn all of its Units in the Fund.

3.05   Transaction Charges in respect of Acquisition of Units and Withdrawals. Transaction Charges incurred in connection with, or relating to, any purchase or withdrawal of Units in a Fund may, to the extent permitted by applicable law, including ERISA, in the sole discretion of the Trustee, be allocated and charged to the Participant making such acquisition or withdrawal of Units and applied to reduce (i) the number of Units purchased by any such Participant, and (ii) the net cash proceeds, if any, payable upon any withdrawal of Units by any Participant and/or, to the extent applicable, the net asset value of any securities or other assets distributed to any Participant in connection with the withdrawal of any such Units.

## ARTICLE 4- INVESTMENTS AND ADMINISTRATION

4.01   Management and Administrative Powers.  The Trustee shall have the rights, powers, and privileges of an absolute owner in the management, operation and administration of the Funds established pursuant to this Declaration of Trust.  In addition to and without limiting the powers and discretion conferred on the Trustee elsewhere in this Declaration of Trust, but subject to applicable law, including ERISA and any applicable exemptions from the prohibited transaction provisions thereof, and any restrictions in the Fund Declaration with respect to a Fund, the Trustee shall have the following discretionary powers with respect to any Fund:

(a)   To subscribe for and to invest and reinvest funds in, to enter into contracts with respect to, and to hold for investment and to sell or otherwise dispose of any property, real, personal, or mixed, wherever situated, and whether or not productive of income or consisting of wasting assets, including, but not limited to, obligations issued or guaranteed by the U.S. Government or any foreign country (including, but not limited to, its agencies, government sponsored entities, and instrumentalities), bonds, debentures, notes (including, but not limited to, structured notes), mortgages, commercial paper, bankers' acceptances, and all other evidences of indebtedness; trust and participation certificates; certificates of deposit, demand, savings, or time deposits (including, but not limited to, any such deposits bearing a reasonable rate of interest in the banking department of SSBT or any Affiliate); foreign and domestic securities; commodities of all kinds; options on securities, commodities, financial instruments, indexes, futures contracts, foreign and U.S. currencies, or other assets; contracts for the immediate or future delivery of securities, commodities, financial instruments, indexes, foreign and U.S. currencies, or other assets; spot and forward contracts, puts, calls, straddles, spreads or any combination thereof on or with respect to any of the securities or other assets described in this subsection (a), and options on all of the foregoing contracts and instruments; swap contracts; beneficial interests in any trusts (including, but not limited to, structured trusts); mortgage-backed securities and other asset-backed securities; securities issued by registered or unregistered investment companies and exchange-traded funds and other products (including, but not limited to, securities, companies, funds and products maintained, sponsored, managed, issued, and/or advised by SSBT or any of its Affiliates to the extent permitted by ERISA); interests in common trust funds or collective investment trusts, including those funds or trusts for which SSBT or any of its Affiliates acts as trustee, investment manager or adviser, or in any other capacity and

while the assets of a Fund are so invested in collective investment trusts, such collective investment trusts (and the instruments pursuant to which such trusts are established) shall constitute a part of this Declaration of Trust with respect to such Fund; interests in structured investment vehicles; repurchase agreements and reverse repurchase agreements; variable and indexed interest notes and investment contracts; common and preferred stocks, equity securities of any kind or nature, convertible securities, subscription rights, warrants, limited or general partnership interests, profit sharing interests or participations and all other contracts for or evidences of equity interests or securities of any kind or nature; direct or indirect interests in real estate; and any other assets; and to hold cash uninvested pending investment or distribution;

(b)        In accordance with and subject to Section 9.03 hereof, to purchase, sell, lend, pledge, mortgage, hypothecate, write options on and lease any of the securities, instruments, commodities, currencies, futures, or other assets referred to in subsection (a) of this Section, including without limitation, those issued, originated, sold, loaned, structured, held, owned, purchased, or borrowed by, or from, as the case may be, SSBT or its Affiliates, and without limiting the foregoing, to engage in any securities lending program on behalf of a Fund (and in connection therewith to direct the investment of cash collateral and other assets received as collateral in connection therewith), and during the term of such loan of securities to permit the securities so lent to be transferred into the name of and voted by the borrower or others and without limiting the foregoing, to the extent consistent with applicable law including ERISA and any applicable exemptions from the prohibited transaction provisions thereof, SSBT and its Affiliates are authorized to borrow securities and other assets from any Fund or Funds for their own accounts or for the accounts of others and engage in and effect as a principal, conduit, or agent the other transactions described above in good faith without such borrowings or other transactions being considered a breach of SSBT's or its Affiliates' fiduciary, legal, common law, contractual, or other duties or obligations (collectively, the "Duties") and the power and authorization granted to SSBT and its Affiliates herein are granted expressly for the purpose of eliminating and causing to be waived any and all claims or potential claims by any person or entity, including without limitation the Trust or any Funds or any Participant, that the exercise in good faith of any such power or authority resulted in or gave rise to any breach or violation of the Duties by SSBT or its Affiliates to the Trust or any Funds or any Participant, and in no circumstance will any such exercise constitute a breach or violation of the Duties on the part of SSBT or its Affiliates or require that SSBT or its Affiliates disgorge, repay, or rebate to the Trust or any Funds or any Participant any profits, gains, income, fees or compensation by reason of any of the borrowings or other transactions described herein as long as such borrowings or other transactions are effected in good faith by SSBT or its Affiliates and in compliance with applicable law, including ERISA and any applicable exemptions from the prohibited transaction provisions thereof;

(c)        To make distributions to Participants, payable in cash, securities, or other assets or any combination of cash, securities or other assets as determined by the Trustee in its sole discretion, out of the assets of a Fund;

13

(d)     In accordance with and subject to <u>Section 9.03</u> hereof, to establish and maintain bank, custodial, brokerage, commodity, futures, currency, and other similar accounts, whether domestic or foreign, to enter into agreements and engage in principal, agency and other transactions in connection therewith, including agreements for the purchase and sale of securities, commodities, currency and other assets and, from time to time, to deposit securities, cash, or other Fund assets in such accounts and without limiting the foregoing, to the extent consistent with applicable law including ERISA and any applicable exemptions from the prohibited transaction provisions thereof, each Fund may establish and maintain any such accounts and engage in any such agency, principal, and other transactions with, and deposit any securities, cash, and other Fund assets in, such accounts as may from time to time be established and maintained by the Trustee at SSBT and its Affiliates without any such accounts and transactions and any related services and actions being considered a breach of SSBT's or its Affiliates' Duties, and the power and authorization granted to SSBT and its Affiliates herein are granted expressly for the purpose of eliminating and causing to be waived any and all claims or potential claims by any person, including without limitation any Participant, that the exercise in good faith of any such power or authority resulted in or gave rise to any breach or violation of the Duties by SSBT or its Affiliates to the Trust or any Funds, and in no circumstance will any such exercise constitute a breach or violation of the Duties on the part of SSBT or its Affiliates as long as such borrowings or other transactions are effected in good faith by SSBT or its Affiliates and in compliance with applicable law, including ERISA and any applicable exemptions from the prohibited transaction provisions thereof;

(e)     To sell for cash or upon credit, to convert, withdraw, or exchange for other securities or assets, to tender securities pursuant to tender offers, or otherwise to dispose of any securities or other assets at any time held by a Fund or the Trustee on behalf of a Fund;

(f)     In accordance with and subject to <u>Section 9.03</u> hereof, to borrow money or other funds and in connection with any such borrowing to issue notes or other evidences of indebtedness, to secure such borrowing by mortgaging, pledging, or otherwise subjecting the Fund assets to security interests, to borrow securities and other assets and in connection with any such borrowings, pledge or transfer cash, securities, or other assets to secure such borrowing, to endorse or guarantee the payment of any notes or other obligations of any person, and to make contracts of guaranty or suretyship, or otherwise assume liability for payment thereof and without limiting the foregoing, to the extent consistent with applicable law, including ERISA and any applicable exemptions from the prohibited transaction provisions thereof, SSBT and its Affiliates are authorized to lend cash, securities and other assets to, and borrow cash, securities and other assets from, any Fund or Funds for its own account as principal or as agent for the account of others, to act as agent for any Fund or Funds in connection with any securities lending or borrowing transactions by such Funds for compensation, and to engage as principal, agent, broker or in any other capacity in the lending, borrowing and other transactions described above in good faith without such loans, borrowings or other transactions being considered a breach of SSBT's or its Affiliates' Duties and the power and authorization granted to SSBT and its Affiliates herein are given expressly for the purpose of

14

eliminating and causing to be waived any and all claims or potential claims by any person or entity, including without limitation any Participant or Fund, that the exercise in good faith of any such power or authority resulted in or gave rise to any breach or violation of the Duties by SSBT or its Affiliates to the Trust or any Participant or any Funds, and in no circumstance will any such exercise constitute a breach or violation of the Duties on the part of SSBT or its Affiliates or require that SSBT or its Affiliates disgorge, repay or rebate to the Trust or any Funds or any Participants any profits, gains, income, interest, fees, or compensation paid to, earned or received by, SSBT or its Affiliates by reason of any such lending, borrowing or other transactions as long as such lending, borrowing or other transactions are effected in good faith by SSBT or its Affiliates and in compliance with applicable law, including ERISA and any applicable exemptions from the prohibited transaction provisions thereof;

(g)    To incur and pay out of the assets of a Fund or Class of a Fund any compensation, fees, charges, taxes, and expenses which in the opinion of the Trustee are necessary or appropriate to, or in support of, the carrying out of any of the purposes of this Declaration of Trust or the Fund Declaration applicable to such Fund or Class of a Fund (including, but not limited to, the compensation, fees, charges, and expenses of the Trustee, custodians, investment advisers, investment managers, the valuation committees or agents, depositories, pricing and valuation agents, administrators, recordkeepers, tax return preparers, auditors, agents, accountants, attorneys, brokers and broker dealers, and other agents and service providers, whether or not some or all of these are Affiliates of the Trustee) and in compliance with applicable law, including ERISA and any applicable exemptions from the prohibited transaction provisions thereof;

(h)    To allocate assets, liabilities, income, and expenses of the Trust to a particular Fund or to apportion the same among two or more Funds and to allocate assets, liabilities, income, and expenses of a Fund to a particular Class of Units of that Fund or to apportion the same among two or more Classes of Units of that Fund;

(i)    To join with other holders of any securities or debt instruments in acting through a committee, depositary, voting trustee or otherwise, and in that connection to deposit any security or debt instrument with, or transfer any security or debt instrument to, any such committee, depositary or trustee, and to delegate to them such power and authority with relation to any security or debt instrument (whether or not so deposited or transferred) as the Trustee shall deem proper, and to agree to pay, and to pay, such portion of the expenses and compensation of such committee, depositary or trustee as the Trustee shall deem proper;

(j)    To enter into joint ventures, general or limited partnerships, limited liability companies, business trusts, investment trusts, and any other combinations or associations;

(k)    To collect and receive any and all money and other assets due to any Fund and to give full discharge thereof;

(l)     To maintain the indicia of ownership of assets outside the United States, to the extent permitted by applicable law, including subject to compliance with ERISA to the extent applicable;

(m)     To transfer any securities and other assets of a Fund to one or more custodians or sub custodians (which may be Affiliates) employed by the Trustee and to delegate to one or more investment advisers or investment managers (which may be Affiliates) the authority to invest certain assets of a Fund to the extent permitted under ERISA; provided that no such delegation shall cause the Trustee to not have ultimate investment discretion with respect to such Fund;

(n)     To retain any securities and other assets received by it at any time and to sell or exchange any securities and other assets, for cash, on credit or for other consideration of any kind or nature, at public or private sale;

(o)     In accordance with and subject to Section 9.03 hereof, to borrow money as may be necessary or desirable to protect the securities and other assets of a Liquidating Account or Dedicated Account and to encumber or hypothecate the securities and other assets of such Liquidating Account or Dedicated Account to secure repayment of such indebtedness;

(p)     To exercise or dispose of any conversion, subscription, or other rights, discretionary or otherwise, including, but not limited to, the right to vote and grant proxies, appurtenant to any assets held by the Fund at any time; and to vote and grant proxies with respect to all investments held by the Fund at any time;

(q)     To renew or extend any obligation held by the Fund;

(r)     To register or cause to be registered any assets of the Fund in the name of a nominee of the Trustee or any custodian or sub-custodian or any agent appointed by the Trustee; provided, the records of the Trustee and any such custodian or any such agent shall show that such assets belongs to such Fund;

(s)     To deposit securities and other assets of the Fund with a securities depository or clearing corporation and to permit the securities so deposited to be held in the name of the depository's or clearing corporation's nominee, and to deposit securities issued or guaranteed by the U.S. Government or any agency or instrumentality thereof, including, but not limited to, securities evidenced by book-entry rather than by certificate, with the U.S. Department of the Treasury, a Federal Reserve Bank, or other appropriate custodial entity or agent; provided the records of the Trustee or any custodian or agent appointed by the Trustee shall show that such securities belong to such Fund;

(t)     To settle, compromise, or submit to arbitration any claims, debts, or damages due or owing to or from the Fund; to commence or defend suits or legal proceedings whenever, in the Trustee's judgment, any interest of the Fund so requires; and to represent the Fund in all suits or legal proceedings in any court or before any other body or tribunal; and to pay from the Fund all costs and attorneys' fees in connection therewith;

16

(u)     To organize or acquire one or more corporations, limited partnerships, limited liability companies, business or statutory trusts, or other similar entities, wholly or partly owned by the Fund, any of which may be exempt from federal income taxation under the Code; to appoint ancillary or subordinate trustees, custodians or agents to hold title to or other indicia of ownership of assets of the Fund and to define the scope of the responsibilities of such trustees, custodians or agents;

(v)     To employ suitable agents or service providers, including, but not limited to, pricing agents or pricing services to perform pricing and valuations of the securities, foreign currencies, and other assets of the Fund, custodians, investment advisers, investment managers, administrators, recordkeepers, tax preparers, marketing agents, consultants, auditors, accountants, depositories, and attorneys, domestic or foreign (including, but not limited to, SSBT and entities that are Affiliates of SSBT), and, subject to applicable law, to pay their expenses and compensation from the Fund;

(w)     To make, execute, and deliver any and all contracts and other instruments and documents deemed necessary and proper for the accomplishment of any of the Trustee's powers and responsibilities under this Declaration of Trust;

(x)     To utilize such means of communication as the Trustee deems appropriate, including without limitation telephonic and electronic communications of all kinds (such as electronic mail), and to accept and recognize instructions and signatures (and all other forms of validation) in electronic or other format;

(y)     To enter into (or to cause any Affiliate to enter into) any agreement, arrangement, transaction, or other dealing or course of dealing with the Trust or any Fund, whether as agent or principal, in good faith in a manner the Trustee considers, in its sole discretion, to be in the interest of the Trust or the Fund in question or consistent with the purposes or policies of the Trust or such Fund (for clarity, the specific grant of any power or authority to the Trustee elsewhere in this Declaration of Trust to enter into any such agreement, arrangement, transaction, or other dealing or course of dealing with the Trust or any Fund shall not be deemed directly or indirectly to be a limitation on the power and authority granted pursuant to this clause (y)) and in compliance with applicable law, including ERISA and any applicable exemptions from the prohibited transaction provisions thereof; and

(z)     To do all other acts in its judgment necessary or desirable for the proper administration of the Fund or with respect to the investment, management, disposition, or liquidation of any securities and other assets of the Fund, although the power to do such acts is not specifically set forth herein.

Notwithstanding any custom or implied obligation or duty on the part of trustees, investment managers, or investment advisers under common law or otherwise, neither the Trustee nor any investment adviser, investment manager or other person charged with managing, or providing investment advice with respect to, all or any portion of the investment portfolio of a Fund shall have any obligation or responsibility for considering or taking into account or determining the effect of any investment held in such portfolio, the risks associated with such

LIBC/3992798.14

investment portfolio, or of an investment in the portfolio generally, on the overall investment portfolio or investment program of any Participant, including without limitation in respect of the diversification or risk profile of the investments of any such Participant in one or more Funds and/or in or through any other investment funds, accounts, or products.

In construing the provisions of this Declaration of Trust, the presumption shall be in favor of a grant of power to the Trustee.  Such powers of the Trustee may be exercised without order of or resort to any court or governmental authority or agency, and without the posting of any bond or collateral by the Trustee.  The determination of the Trustee as to whether an investment is of a type consistent with the provisions of the Fund Declaration of a Fund or any Strategy Disclosure Document, as the case may be, and this Declaration of Trust shall be conclusive and binding on all persons having an interest in the Fund.  In the case of any conflict between the specific terms of the Fund Declaration or any Strategy Disclosure Document, as the case may be, and this Declaration of Trust, the Fund Declaration or any Strategy Disclosure Document, as the case may be, shall control, except that no term of the Fund Declaration or any Strategy Disclosure Document, as the case may be, may vary any term or condition of this Declaration of Trust which would cause such Fund to fail to satisfy the requirements of Revenue Ruling 2011-1 (or any successor provision).

4.02    Cash Balances.  The Trustee is authorized in its discretion to hold all or any part of the assets of a Fund uninvested as may be reasonably necessary for orderly administration of the Fund, and to deposit cash awaiting investment or distribution in accounts maintained in the commercial or savings department of any bank, trust company, or savings association, including SSBT or any bank, trust company, or savings association that is an Affiliate and in compliance with applicable law, including ERISA and any applicable exemptions from the prohibited transaction provisions thereof.

4.03    Loans.  SSBT and any Affiliate may lend money to a Fund and receive interest on such loans provided, however, that such lending is consistent with Section 9.03.

4.04    Ownership of Assets.  The Trustee shall have legal title to the assets of the Fund.  No Participant shall have an individual ownership of any asset of any Fund, but each Participant shall have an undivided interest in such Fund and shall share proportionately with all other Participants in the net income, profits, and losses thereof, to the extent permissible under applicable law and subject to the allocation of certain fees and expenses with respect to the various Classes, if any, of the Fund, provided that nothing in this Declaration of Trust shall preclude the Trustee from directly charging any one or more Participants fees and expenses (which fees and expenses may differ among one or more of such Participants).

4.05    Dealings with the Funds.  All persons extending credit to, contracting with, or having any claim of any type against any Fund (including, but not limited to, contract, tort, and statutory claims) shall look only to the assets of such Fund (and not to the assets of any other Fund) for payment under such credit, contract or claim, and no expense or charge specifically allocable to any one Class shall otherwise be allocable to or borne by any other Class or Classes.  No Participant, nor any beneficiary, trustee, employee, or agent thereof, nor SSBT (or any Affiliate of SSBT), nor any of the officers, directors, shareholders, partners, employees or agents of SSBT (or any Affiliate of SSBT) shall be personally liable for any debt, liability, or obligation

LIBC/3992798.14

of the Trust or any Fund. Every note, bond, contract, instrument, certificate, or undertaking and every other act or thing whatsoever executed or done by or on behalf of the Trust or any Fund shall be conclusively deemed to have been executed or done only by or for the Trust or such Fund, as the case may be, and no Fund shall be answerable for any obligation assumed or liability incurred by another Fund established hereunder.

4.06    Management Authority and Delegation. The Trustee shall have full management and investment authority with respect to any Fund established pursuant to this Declaration of Trust. The Trustee may retain and consult with such investment advisers, investment managers, or other agents or service providers, including, but not limited to, any Affiliate of the Trustee, as the Trustee, in its sole discretion, may deem advisable to assist it in carrying out its responsibilities under this Declaration of Trust, and may also delegate all or part of its duties and obligations to any agents or service providers, which may be Affiliates of SSBT.

## ARTICLE 5- VALUATION, ACCOUNTING, RECORDS, AND REPORTS

5.01    Valuation of Units. As of each Valuation Date in respect of a Fund or a Class, the Trustee or its agents shall determine the net asset value of the Units of such Fund or Class, as the case may be.

(a)    In valuing the securities and other assets of any Fund for the determination of the net asset value per Unit of such Fund or any Class thereof, securities and other assets for which market prices or quotations are readily available shall be valued at prices which, in the opinion of the Trustee or the pricing services or agents designated by the Trustee to make the determination, represent or most nearly represent the market value of such securities and other assets, and other assets without such market prices or quotations shall be valued at their fair values as determined by or pursuant to the direction of the Trustee, which in the case of debt obligations, mortgage-backed securities, asset-backed securities, commercial paper, repurchase agreements, and similar fixed income securities, may, but need not, be on the basis of yields or prices for customary institutional-sized trading units for debt obligations, fixed income securities or repurchase agreements of comparable maturity, quality, rating, and type, or on the basis of amortized cost, or on such other basis as the Trustee or the pricing services or agents may deem appropriate under the circumstances. Expenses and liabilities of the Fund shall be accrued each day. Liabilities may include such reserves for taxes, estimated accrued expenses, and contingencies as the Trustee or its designees may in their sole discretion deem appropriate under the circumstances. The Trustee may in its sole discretion rely on one or more pricing agents or services in determining the value of any securities or other assets of a Fund, or delegate the determination of such value to any such agent or service. The Trustee or pricing services or agents shall have a reasonable period of time within which to determine the value of the Units as of the relevant Valuation Date and the aggregate value of the beneficial interest of each Participant in the Fund as of such Valuation Date.

(b)    To the extent permitted by applicable law, short-term securities and other investments having a maturity of up to 60 days may, in the sole discretion of the Trustee,

be valued at cost with accrued interest, discount earned or premium amortized included or reflected, as the case may be, in interest receivable.

For any or all valuations of securities or other assets of the Funds, the Trustee and any pricing agents or services selected by the Trustee, including Affiliates of the Trustee, may (without limitation) in its or their sole discretion consider, utilize and rely upon any regularly published reports of sales, bid, asked, and closing prices, and over the counter quotations or prices and may utilize so-called matrix, model, or similar pricing or valuation methodologies in determining the fair value of any securities or other assets of the Funds.  The decision of the Trustee regarding whether a method of valuation fairly represents fair market value (or fair value, as the case may be), and the selection of a pricing agent or service and the good faith determination of the Trustee or any pricing agent or service, shall be conclusive and binding upon all persons.

5.02     <u>Suspension of Valuations</u>.  Notwithstanding anything to the contrary elsewhere in this Declaration of Trust or the Fund Declaration with respect to any Fund, the Trustee, in its sole discretion, may suspend the valuation of the securities or other assets and/or the Units of any Fund as provided in <u>Section 3.03(b)</u> of this Declaration of Trust.

5.03     <u>Accounting Rules and Fiscal Year</u>.  The Trustee, in its discretion, may keep the Trust's or any Fund's accounts either on an accrual system (which complies with generally accepted accounting principles unless otherwise determined by the Trustee) or to the extent permitted by law, on a cash system and may change from one of such systems to the other as of the close of any fiscal year.  The fiscal year of each Fund initially shall be the calendar year, unless otherwise specified in the Fund Declaration or otherwise determined by the Trustee.

5.04     <u>Expenses and Taxes</u>.  The Trustee may charge to a Fund or to a particular Class of a Fund, as the case may be, (i) the cost of money borrowed, (ii) costs, commissions, dealer-concessions, financial index license, data and any related charges and fees, income taxes, withholding taxes, transfer and other taxes and expenses associated with the holding, purchase and/or sale of, and receipt of income from, securities and other assets, (iii) the reasonable expenses of an audit of the Fund and fees and other charges related to Fund accounting services provided by third parties, (iv) reasonable attorneys' fees and litigation expenses, (v) the Trustee's compensation as provided in <u>Section 6.04</u>, and (vi) any other expense, claim, liability, or charge, including, but not limited to, fees, expenses, charges, and other liabilities due to the Trustee or any Affiliate of the Trustee (which may include fees or other compensation payable to the Trust or such Affiliate and the reimbursement of expenses, without credit, rebate, offset, disgorgement, or deduction against the compensation payable to the Trustee), but only to the extent permitted by applicable law, including ERISA and any applicable exemptions from the prohibited transaction provisions thereof.  The Trustee may also charge to a particular Class of a Fund any expense, claim, liability, or charge to be specifically allocated to such Class and may also charge to a particular Participant or Participants any withholding, excise or other taxes or governmental assessments that in the Trustee's judgment are specially allocable or attributable to such Participant.  The Trustee may liquidate from time to time sufficient Units of such Participants to pay or otherwise discharge any such taxes or governmental assessments.

5.05    Records, Accounts and Audits.  The Trustee shall keep such records as it deems necessary or advisable in its sole discretion to account properly for the operation and administration of a Fund.  At least once during each period of 12 months, the Trustee shall cause a suitable audit to be made of each Fund by auditors responsible only to the board of directors of SSBT.  The reasonable compensation and expenses of the auditors for their services with respect to a Fund shall be charged to such Fund.

5.06    Financial Reports.  The Trustee shall prepare a written financial report, based on the audit referred to in Section 5.05, within 90 days after the close of each fiscal year of a Fund; provided that such 90-day period may be extended to a date specified by the Trustee if the Trustee determines in its discretion that additional time is required to prepare such financial report.

    (a)    A copy of the report shall be furnished, or notice given that a copy thereof is available and will be furnished without charge on request, to the Investing Fiduciary of each Participant (or, if such Investing Fiduciary is SSBT, to the Qualified Investor Signatory) at such time.  In addition, a copy of the report shall be furnished on request to any other person, in the discretion of the Trustee, and the Trustee may make a reasonable charge therefor.

    (b)    If no written objections to specific items in the financial report are filed by a Participant with the Trustee within 60 days after the report is sent by the Trustee, the report shall be deemed to have been approved with the same effect as though judicially approved by a court of competent jurisdiction in a proceeding in which all persons interested were made parties and were properly represented before such court, and, to the fullest extent permitted by applicable law, the Trustee shall be released and discharged from liability and accountability with respect to the propriety of its acts and transactions disclosed in the report.  Any such written objection shall apply only to the proportionate share of the Participant on whose behalf the objection is filed and shall not affect the proportionate share of any other Participant.  The Trustee shall, in any event, have the right to a settlement of its accounts in a judicial proceeding if it so elects.

    (c)    Except as otherwise required by this Declaration of Trust or applicable law which cannot be waived, the Trustee shall have no obligation to render an accounting to any Participant or beneficiary thereof.

5.07    Judicial Accounting.  In any case where applicable law provides for the judicial accounting of the Trustee's account with respect to a Fund, or for any other action to be brought against the Trustee with respect to a Fund or the Trustee's actions as Trustee, only the Trustee and any Participant of the Fund of record may require such a judicial settlement of the Trustee's account or bring such other action.  In any such action or proceeding it shall be necessary to join as parties only the Trustee and such persons, and any judgment or decree which may be entered therein shall be conclusive and binding on all persons.

ARTICLE 6- CONCERNING THE TRUSTEE

21

6.01    Merger, Consolidation of and Successor to Trustee.  Any corporation, limited liability company, partnership, business trust, association, or other entity (i) into which SSBT may be merged or with which it may be consolidated, (ii) resulting from any merger, consolidation, or reorganization to which SSBT may be a party, or (iii) to which all or any part of SSBT's fiduciary business which includes the Funds may be transferred shall become successor Trustee, and shall have all the rights, powers, and obligations of the Trustee under this Declaration of Trust, without the necessity of executing any instrument or performing any further act or obtaining the approval or consent of Participants.  SSBT may also appoint any bank, trust company, corporation, limited liability company, partnership, business trust, association, or other entity with the power to act as Trustee under applicable law, which may or may not be an Affiliate of the Trustee, to act as successor Trustee for any or all Funds, in which case SSBT shall cease to act as Trustee for such Funds, and any such entity shall become the sole Trustee for any such Funds and shall have all the rights, powers, and obligations of the Trustee under this Declaration of Trust, without the necessity of executing any instrument or performing any further act or obtaining the approval or consent of any Participant.  In any such event, all references to SSBT herein shall be deemed to be references to such successor entity.  The Trustee shall, if practicable under the circumstances, provide the Investing Fiduciary of each Participant (or if such Investing Fiduciary is SSBT, to the Qualified Investor Signatory) subject to any of the foregoing actions not less than 30 days' written notice prior to the effectuation of any such action.

6.02    Discretion of Trustee.  The discretion of the Trustee, when exercised in good faith and with reasonable care under the circumstances then prevailing, shall be final and conclusive and binding upon each Participant and all persons interested therein.  The Trustee shall act with the degree of care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

6.03    Limitation on Liability and Indemnification.  The Trustee shall not be liable for any loss, liability, expense, claim, or damages incurred by any Fund arising out of, or relating to, any action or omission of the Trustee, including without limitation, by reason of the purchase, retention, sale, or exchange of any securities or other investments by a Fund, except to the extent, and then only to the extent, such loss, liability, expense, claim, or damages shall have been determined, by a court of competent jurisdiction in a non-appealable judgment, to have been caused by the Trustee's breach of Section 6.02 hereof or breach of fiduciary duty under ERISA, willful misconduct, or lack of good faith, and, in any event, the Trustee shall not be liable for any loss, liability, expense, claim, or damages arising out of, or relating to, any mistake made by the Trustee in good faith in the administration or operation of any Fund if, promptly after discovering the mistake, the Trustee takes whatever action the Trustee, in its sole discretion, may deem to be practicable under the circumstances to remedy the mistake.  To the fullest extent permitted by applicable law, SSBT (and its Affiliates, and the directors, officers, and employees of SSBT and its Affiliates and their respective heirs, estates, successors, and assigns) shall be held harmless and indemnified out of the securities, cash and other assets of the Trust for any losses, liabilities, expenses, claims, and damages it (or they) may incur (including without limitation the reasonable legal and other fees and expenses of defending any claim brought with respect to any action so taken or omitted) by reason of any action taken or omitted to be taken by it (or them) hereunder except to the extent any such loss, liability, expense, claim, or damage

22

shall have been determined, by a court of competent jurisdiction in a non-appealable judgment, to have been caused by its (or their) breach of Section 6.02 hereof or breach of fiduciary duty under ERISA, willful misconduct, or lack of good faith. A claim shall include, without limitation, all lawsuits, legal proceedings, governmental investigations, proceedings, and other actions at law or in equity. Expenses, including counsel fees, so incurred by any such person or entity (but excluding amounts paid in satisfaction of judgments, in compromise, or as fines or penalties), shall be paid from time to time by the Trust in advance of the final disposition of any such action, suit, or proceeding upon receipt of an undertaking by or on behalf of such person or entity to repay amounts so paid to the Trust, with interest thereon, if it is ultimately determined, by a court of competent jurisdiction in a non-appealable judgment, that indemnification of such expenses is not authorized under this Article.

The right of indemnification hereby provided shall not be exclusive of or affect any other rights to which any person or entity may be entitled.

6.04    Trustee Compensation. The Trustee may charge and pay from a Fund and/or each Class of a Fund, as the case may be, reasonable compensation, fees and expenses for its services in managing and administering the Fund and/or such Class, which may include, without limitation, any compensation, fees and other charges and expenses payable to a sub-advisor, custodian service provider, or other agent that are borne by the Trustee. In addition to the foregoing, each Fund shall also pay or bear its allocable share of any compensation, fees, charges and expenses (including compensation, fees, charges and expenses payable to the Trustee or any Affiliate) charged to any pooled investment fund, common trust fund, collective investment trust or fund, registered or unregistered investment company, or other investment vehicle in which the Fund may have invested, including without limitation, any Affiliate (collectively, the "Other Investment Funds") without any reimbursement or repayment by the Other Investment Funds or by any trustee, investment adviser, investment manager, custodian, or agent or service provider of the Other Investment Funds of any such compensation, fees, charges or expenses, to the extent permitted by applicable law, including ERISA and any applicable exemptions from the prohibited transaction provisions thereof.

6.05    Trustee's Authority. No person dealing with the Trustee shall be under any obligation to inquire regarding the authority of the Trustee, the validity or propriety of any transaction engaged in by the Trustee, or the application of any payment made to the Trustee.

6.06    Reliance on Experts and Others. The Trustee shall, in the performance of its duties, be fully protected by relying in good faith upon the books of account or other records of the Fund, or upon reports made to the Trustee by (a) any of the officers or employees of SSBT or any of its Affiliates, (b) the custodians, depositories, or pricing or valuation agents of the Fund, or (c) any investment manager, investment advisers, custodians, auditors, accountants, tax return preparers, attorneys, appraisers, or other agents, experts and service providers, or consultants to the Fund or the Trustee, any or all of which may be the Trustee or any Affiliate. The Trustee and the officers, employees, and agents of the Trustee may take advice of counsel (which may be SSBT's own internal counsel) with respect to the meaning and operation of this Declaration of Trust or any Fund Declaration or Class Description applicable to a Fund, or with respect to the interpretation and application of law to each Fund and Class thereof, and shall be fully protected and under no liability for any act or omission in reliance upon such advice. The exercise by the

23

Trustee of its powers and discretions hereunder and the construction in good faith by the Trustee of the meaning or effect of any provisions of this Declaration of Trust and any Fund Declaration, Strategy Disclosure Document, Class Description or any document governing a Participant shall be binding upon everyone interested.

6.07    Reliance on Communications.  The Trustee shall be fully protected in acting upon any writing, instrument, certificate, document, facsimile or electronic mail, reproduction, image, or transmission believed by it to be genuine and to be signed, presented or transmitted by the proper person or persons (including, without limitation, the Participants.  The Trustee shall have no duty to make an investigation or inquiry as to any statement contained in any such writing or transmission, but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained.  Notwithstanding anything to the contrary contained herein and without limiting the foregoing, any such writing, instrument, certificate, or document may be proved by original copy or reproduced copy thereof, including without limitation a photocopy, a facsimile transmission, an electronic image, or any other electronic reproduction, and the Trustee may rely on the same as if it had received the original signed writing, instrument, certificate, or document.  The Trustee may, in its sole discretion, give the same effect to a telephonic instruction, voice recording, or any instruction received through electronic commerce or other electronic means as it gives to a written instruction, and the Trustee's action in doing so shall be protected to the same extent as if such telephonic or electronic instructions were, in fact, a written instruction.  Without limiting the foregoing, such instruction may be proved by audio-recorded tape, electronic reproduction, or other means acceptable to the Trustee, as the case may be.  If the Trustee receives any instruction, or other information that is, as determined by the Trustee in its sole discretion, incomplete or not clear, the Trustee may request instructions or other information from the person or entity providing such instructions or information, including from brokers, stock exchanges, or other market participants.  Pending receipt of any such instructions or other information, the Trustee shall not be liable to anyone for any loss resulting from delay, action, or inaction on the part of the Trustee.

6.08    Action by Trustee.  The Trustee may exercise its rights and powers and perform its duties hereunder through any of its officers and employees.  However, the Trustee solely shall be responsible for the performance of all rights and responsibilities conferred on it as Trustee hereunder, and no such officer or employee individually shall be deemed to have any fiduciary authority or responsibility with respect to any Fund, except to the extent specifically provided under ERISA.

## ARTICLE 7- AMENDMENT, MERGER AND TERMINATION

7.01    Amendment.  The Trustee may amend this Declaration of Trust, the Fund Declaration and any Strategy Disclosure Document of a Fund, or the Class Description with respect to an existing Class of a Fund at any time.  Any such amendment shall take effect as of the date specified by the Trustee, which shall be no earlier than 30 days after the Trustee gives notice of such amendment in accordance with Section 7.03; provided, however, that if the Trustee determines in its discretion that such amendment will not have a material adverse effect on affected Participants or provides amended, modified, or supplemental information with respect to the investment policies of a Fund, the effective date specified by the Trustee may be any date on, before, or after such notice.  No approval or consent shall be required from any

affected Participant to effect any amendment. Any amendment adopted by the Trustee shall be binding upon each Participant and all persons interested therein.

7.02    Merger and Termination. As of any Valuation Date, the Trustee may cause any Fund to be merged with or into any other collective investment trust or series thereof or similar pooled fund (including, without limitation, any other Fund or other collective investment trust or series thereof or similar pooled fund maintained by the Trustee or any of its Affiliates) (each other collective investment trust or series thereof or similar pooled fund (other than a Fund) is referred to as, an "Other Fund"). For the purpose of this Section 7.02, a Fund or Other Fund that does not survive the merger and is terminated shall be referred to as the Merging Fund, and a Fund or Other Fund that survives the merger shall be referred to as the Surviving Fund. Any such merger shall be effected by the Merging Fund contributing its assets in-kind to the Surviving Fund in exchange for Units or beneficial interests in the Surviving Fund, as the case may be, followed by the termination of the Merging Fund and a distribution in-kind of Units or the beneficial interests in the Surviving Fund (or any class thereof), as the case may be, held by the Merging Fund to the participating trusts in the Merging Fund. If a Fund is the Surviving Fund, the participants in the Merging Fund that are Qualified Trusts shall, as of the date of such merger, receive Units in the Surviving Fund (or any Class thereof designated by the Trustee) as determined by the Trustee in its discretion in exchange for the Units or beneficial interests of such Merging Fund (or any class thereof), as the case may be, held by such participants immediately prior to such merger. If a Fund is the Merging Fund, the Participants in such Fund shall, as of the date of such merger, receive Units or beneficial interests in the Surviving Fund (or any class thereof), as the case may be, in exchange for the Units of such Fund (or any Class thereof) held by such Participants immediately prior to such merger. In connection with any merger pursuant to this Section, Units in a Fund (or any Class thereof) or beneficial interests in an Other Fund (or any class thereof) shall be valued on such reasonable basis as may be determined by the Trustee of the Fund or the trustee of the Other Fund, as the case may be, including for this purpose on the basis of the net asset value of the respective Units (or any Class thereof) of the Fund and net asset value of the respective beneficial interests of the Other Fund (or any class thereof), on the date of the merger. The Trustee shall provide the Participants subject to any such merger written notice of any such merger, which notice shall be provided at least 30 days prior to the merger; provided, however that if the Trustee determines that such merger will not have a material adverse effect on affected Participants, the effective date of such merger may be any date on, before, or after such notice. The Trustee or any successor Trustee shall not be required to obtain the approval or consent of any Participants in connection with any such merger.

Subject to the terms of the Fund Declaration applicable to a Fund, the Trustee may, on any Valuation Date, without advance notice to any person, terminate a Fund (or any Class thereof), and thereupon the value of each Unit in such Fund (or in such Class) shall be determined and there shall be distributed to each Participant in cash or in kind or partly in cash and partly in kind a sum arrived at by multiplying the number of Units in the account of each Participant by the value of each Unit at the close of business on such Valuation Date all as provided in Article 5.

7.03    Notices. The Trustee shall give written notice of any amendment or merger (to the extent required by Section 7.01 or Section 7.02, as applicable), or of the termination of a

Fund (or any Class thereof), to each affected Participant of record. Any such notice or other communication required or permitted hereunder shall be deemed to have been given at the time the Trustee (a) delivers the notice personally, (b) mails the notice first class, postage prepaid, registered or certified, (c) delivers the notice by overnight courier, (d) transmits the notice by telecopier or facsimile transmission, (e) transmits the notice electronically, including without limitation by means of electronic mail or other electronic means, in each case (a) through (e) to the current address, facsimile number, internet address, website, or other electronic address of the appropriate recipient as shown on the Trustee's records, or (f) posts the notice on any website maintained and/or made available by the Trustee to Participants (such as "Client Corner" or such other application or website maintained by or on behalf of State Street from time to time) and transmits a notice describing the topic of the website posting to the current address, facsimile number, internet address, website, or other electronic address of the appropriate recipient as shown on the Trustee's records. Notices or communications required or permitted hereunder may be provided as part of any financial reports provided by the Trustee hereunder. The Trustee shall not be required to provide notice of any amendment or termination of a Fund to any Participant if such Participant is not participating in such Fund.

## ARTICLE 8- LIQUIDATING ACCOUNTS AND DEDICATED ACCOUNTS

8.01    Establishment.

(a)    The Trustee may in its sole discretion, from time to time, transfer to a Liquidating Account any illiquid, impaired, or defaulted investment of a Fund, any investment of a Fund that the Trustee determines is not readily capable of being correctly, accurately, and/or appropriately valued, or any securities loans and the related cash collateral and the rights and obligations pertaining thereto that cannot be readily terminated or closed out or that can be terminated or closed out only at an anticipated or actual loss. The primary purpose of each Liquidating Account shall be to facilitate the liquidation, pricing, and/or termination or close-out of the assets and any related transactions and agreements contained therein or held thereunder for the benefit of the Participants holding an undivided beneficial interest therein. The period during which the Trustee may continue to hold any such assets shall rest in its sole discretion.

(b)    The Trustee may, to the extent permitted by applicable law, also in its sole discretion, from time to time, establish one or more Dedicated Accounts related to a Fund to receive and hold cash, securities, or other assets (the "Dedicated Assets") received from, and other investments made for the benefit of, one or more specific Participants, to convert the Dedicated Assets into securities or other assets which the Trustee considers suitable for such Fund, or in connection with the distribution or withdrawal of cash, securities, or other investments held for the benefit of the Participants holding a beneficial interest in such Dedicated Account, the conversion of such Dedicated Assets into cash, securities or other assets for distribution to the Participants holding a beneficial interest in such Dedicated Account, or for such other purposes as the Trustee shall deem appropriate.

(c)    Each Liquidating Account or Dedicated Account shall be maintained and administered solely for the ratable benefit of the Participants whose cash, securities, or

other assets have been transferred thereto or deposited therein and each Participant whose cash, securities, or other assets have been transferred thereto or deposited therein shall have a beneficial interest therein equal to the portion of such account represented by the value of the assets so transferred or deposited.

8.02    Additional Powers and Duties of Trustee.  The Trustee shall have, in addition to all of the powers granted to it by law and by the terms of this Declaration of Trust, each and every discretionary power of management of the cash, securities and other assets contained in a Liquidating Account or a Dedicated Account (and of all income on or proceeds of such assets) which the Trustee shall deem necessary or appropriate to accomplish the purposes of such Liquidating Account or Dedicated Account.  At the time of the establishment of a Liquidating Account or a Dedicated Account, and upon each deposit of additional money to any such Dedicated Account, the Trustee shall prepare a schedule showing the interest of each Participant therein.  When the cash, securities and other assets of such Liquidating Account or Dedicated Account shall have been completely distributed, such schedule shall be thereafter held as part of the permanent records of the Fund to which the Liquidating Account or Dedicated Account relates.  The Trustee shall include in any report of audit for a Fund a report for each related Liquidating Account and Dedicated Account established hereunder.  For purposes hereof, the value of assets transferred to or held in a Liquidating Account or Dedicated Account (and the beneficial interest of any Participant therein) may be based upon value as provided in Section 5.01, or amortized cost, or book value, as determined by the Trustee in its sole discretion.

8.03    Limitation on Contributions to Liquidating Account.  No further contributions shall be made to any Liquidating Account after its establishment, except that the Trustee shall have the power and authority, if in the Trustee's reasonable opinion such action is advisable for the protection of any asset held therein, to borrow from others (to be secured by the assets held in such Liquidating Account), including the Trustee or its Affiliates, to the extent permitted by applicable law, including ERISA and any applicable exemptions from the prohibited transaction provisions thereof, and to make and renew such note or notes therefor as the Trustee may determine.

8.04    Distributions.  The Trustee may make distributions from a Dedicated Account or Liquidating Account in cash or in kind or partly in cash and partly in kind or in any other manner consistent with applicable law, and, except as otherwise provided in the Fund Declaration with respect to the Fund or Class to which such Dedicated Account or Liquidating Account relates, the time and manner of making all such distributions shall rest in the sole discretion of the Trustee.  Income, gains, and losses attributable to a Dedicated Account or Liquidating Account shall be allocated among the Participants which hold a beneficial interest in such Dedicated Account or Liquidating Account, in proportion to such respective beneficial interests. Notwithstanding anything to the contrary elsewhere herein, with respect to a Dedicated Account established to pay the Participants for the withdrawal of Units from the Fund pursuant to Section 3.03 hereof, the Trustee shall have satisfied its obligation to the Participants to pay the amount due upon withdrawal as long as (i) the Trustee has transferred to the Dedicated Account, as soon as reasonably practicable after the applicable Valuation Date which has established the value of the Units of the Fund so withdrawn, securities and other assets with a fair market value or a fair value (as the case may be), as of the applicable Valuation Date before consideration of

27

applicable transaction expenses (as described in <u>Section 8.06</u>) equal to the value of the Units so withdrawn, and (ii) the Trustee pays out to the Participants the net proceeds realized upon the sale, disposition, or liquidation of the securities and assets in such Dedicated Account as provided in this Section, after applying allocable expenses and satisfying any obligations, within a reasonable time after the sale, disposition or liquidation of such securities and other assets by such Dedicated Account.

8.05   <u>Effect of Establishing Liquidating Accounts and Dedicated Accounts</u>.  After an asset of a Fund has been set apart in a Liquidating Account or when assets of one or more Participants are held in a Dedicated Account, such assets shall be subject to the provisions of this Article, but such assets shall also be subject to all other provisions of this Declaration of Trust insofar as the same shall be applicable thereto and not inconsistent with the provisions of this Article.  Without limiting the general application of the foregoing, the limitation on liability and indemnification provisions of <u>Section 6.03</u> shall apply to each Liquidating Account and Dedicated Account to the same extent as such provisions apply to a Fund.  For purposes of determining the value of the Units of a Fund and the income, gains, or losses of a Fund that are allocated among Participants pursuant to the other provisions of this Declaration of Trust, the value, income, gains, or losses of any assets held in any Liquidating Account or Dedicated Account shall be excluded.  As of any subsequent Valuation Date selected by the Trustee in its sole discretion, any assets held in a Dedicated Account may be valued in accordance with <u>Section 5.01</u> and transferred by the Trustee to the appropriate Fund, in which event the Participants which hold a beneficial interest in such Dedicated Account shall be allocated in proportion to their respective beneficial interests such number of Units of such Fund as would be issued if the assets so transferred from the Dedicated Account were treated as a deposit to the Fund pursuant to <u>Section 3.01</u>.  The Participants with a beneficial interest in any Liquidating Account or Dedicated Account shall bear all market, credit, and other investment risks with respect to the assets held in any such Liquidating Account or Dedicated Account.

8.06   <u>Fees and Expenses</u>.  Each Liquidating Account and Dedicated Account shall be charged with the expenses and charges attributable to the administration and management of such account and with regard to the purchase, sale or other disposition of securities and other assets held in any such Dedicated Account or Liquidating Account (including, but not limited to, brokerage fees, settlement charges, stamp taxes, duty, stock listing and related expenses, attorneys' fees and auditing fees).  Such Liquidating Accounts and Dedicated Accounts shall remain as part of the assets of the applicable Fund or Class or Classes, as the case may be, for purposes of determining the fee payable to the Trustee in accordance with such fee schedule as may apply from time to time, and with regard to any other fees and expenses otherwise attributable to the applicable Fund or Class or Classes, as the case may be.

ARTICLE 9- GENERAL PROVISIONS

9.01   <u>No Diversion; Assignment Prohibited</u>.

(a)     In accordance with Revenue Ruling 2011-1, no part of the corpus or income of any Fund which equitably belongs to a Participant shall be used for, or diverted to, any purposes other than for the exclusive benefit of its participants and their beneficiaries.

28

    (b)    No Participant may assign, transfer, or sell Units or any interest therein.

    (c)    No part of the Fund which equitably belongs to a Participant shall be subject to any legal process, levy of execution, or attachment or garnishment proceedings for payment of any claim against any such Participant or any beneficiary thereof.

9.02    <u>Governing Law</u>.  The powers and duties of the Trustee, administration of the Fund and all questions of interpretation of this Declaration of Trust shall be governed by ERISA, as amended, and to the extent permitted by such law, by the laws of the Commonwealth of Massachusetts.  The Trust established by this Declaration of Trust is organized in the United States and will be maintained at all times as a domestic trust in the United States.

9.03    <u>ERISA</u>.

    (a)    To the extent that assets of a Fund constitute ERISA plan assets, the Trustee hereby acknowledges its status as a fiduciary under ERISA with respect to each Participant subject to Title I of ERISA, and the provisions of this Section 9.03 shall apply.

    (b)    The Trustee shall not cause the Trust to enter into any transaction that would constitute a non-exempt "prohibited transaction" under <u>Section 406</u> of ERISA, and in connection with its management of the Trust and the Funds shall, as necessary or applicable with respect to a given transaction, rely upon relevant statutory or administrative prohibited transaction exemptions, including, without limitation, ERISA Prohibited Transaction Class Exemptions 91-38, 77-4, 84-14, 86-128, 2002-12 or any other applicable exemption.

    (c)    Any securities lending activities conducted by the Trustee in accordance with <u>Section 4.01(b)</u> shall comply with ERISA Prohibited Transaction Class Exemption 2006-16, 2002-30, or any other applicable exemption.

    (d)    To the extent that SSBT or any Affiliate lends money to any Fund in accordance with <u>Section 4.03</u>, such loan will be on an interest-free basis and will be otherwise consistent with the requirements of Prohibited Transaction Class Exemption 80-26.  Notwithstanding the foregoing, the Trustee may charge for advances made to provide overdraft protection, but only to the extent permitted by ERISA.

    (e)    The Trustee shall provide the Investing Fiduciary with information that is in its possession that is reasonably designed to satisfy the reporting and disclosure requirements of ERISA and the regulations thereunder, including without limitation the disclosures required to satisfy <u>Section 408(b)(2)</u> of ERISA.

9.04    <u>Inspection</u>.  A copy of this Declaration of Trust shall be kept on file at the principal office of the Trustee, available for inspection during normal business hours.  A copy of this Declaration of Trust shall be sent upon request to any Participant, and, at the discretion of the Trustee, shall be furnished to any other person upon request for a reasonable charge.

29

9.05 <u>Titles</u>.  The titles and headings in this Declaration of Trust are for convenience and reference only, and shall not limit or affect in any manner any provision contained therein.

9.06 <u>Invalid Provisions</u>.  If any provision contained in this Declaration of Trust is illegal, null, or void, unenforceable, or against public policy, the remaining provisions hereof shall not be affected.

9.07 <u>Status of Instrument</u>.  This instrument contains the provisions of this Declaration of Trust as of the date specified below.

LIBC/3992798.14

IN WITNESS WHEREOF, STATE STREET BANK AND TRUST COMPANY hereby ratifies, approves and confirms this Declaration of Trust entitled Fifth Amended and Restated Declaration of Trust of State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans Declaration of Trust as of the 30th day of September, 2011.

STATE STREET BANK AND TRUST COMPANY

By: _____

Name: Ellen M. Needham

Title: Senior Vice President

Date: September 30, 2011

Attest:

By: _____

Name: Stephanie W. Berdik

Title: Vice President

The foregoing Declaration of Trust was approved by a resolution of a duly authorized committee of the Board of Directors of STATE STREET BANK AND TRUST COMPANY adopted at a meeting therefore held.

APPENDIX A


## STATE STREET BANK AND TRUST COMPANY
## INVESTMENT FUNDS FOR TAX EXEMPT RETIREMENT PLANS

## SPECIAL PROVISIONS RELATING SOLELY TO
## SHORT-TERM INVESTMENT FUNDS

A.1     Establishment of STIFs.  This Appendix establishes special rules governing the establishment and operation of Funds which are short-term investment funds (each a "STIF"). The Fund Declaration that establishes a STIF shall state that the Fund established thereunder is a STIF, in which case such Fund shall be subject to the following provisions and, to the extent not inconsistent with this Appendix, the generally applicable provisions of the Declaration of Trust.

A.2     Investment of STIF Assets.  Unless otherwise specified in a Fund Declaration for a STIF, each STIF shall maintain a dollar-weighted average portfolio maturity of 90 days or less, shall hold the Fund's assets until maturity under usual circumstances, and shall be invested and reinvested primarily in the following investments, irrespective of whether such securities or such assets are of the character authorized by any state law from time to time for trust investments, and without regard to the proportion any such assets or interest may bear to such STIF:  bonds, debentures, notes (including structured notes), mortgages, commercial paper, money market instruments, and all other evidences of indebtedness or ownership, trust and participation certificates, certificates of deposit, demand or time deposits (including any such deposits bearing a reasonable rate of interest in the banking department of the Trustee or any Affiliate), bankers' acceptances, variable and indexed interest notes and investment contracts, swap contracts, repurchase agreements and reverse repurchase agreements, variable rate notes, beneficial interests in any trusts (including structured trusts), equipment trust certificates, foreign currencies, contracts for the immediate or future delivery of currency, financial instruments, securities, or other assets or property, options on futures contracts, spot and forward contracts, puts, calls, straddles, spreads, or any combination thereof.  Such investments may be made directly or indirectly by the STIF's investment in interests or shares of investment funds having in the Trustee's judgment investment characteristics generally similar to those of the STIF, including, without limitation, limited partnerships, limited liability companies, or other companies, trusts, or other entities, whether registered or exempt or excepted from registration under the Investment Company Act, or common trust funds or collective investment trusts which are exempt from tax under applicable Internal Revenue Service rulings and regulations (including, without limitation, any collective investment trusts maintained by SSBT or any of its Affiliates).

A.3     Valuation of STIF Assets.  With regard to a STIF, "Valuation Date" shall mean each Business Day, except as otherwise provided in the applicable Fund Declaration or as determined by the Trustee pursuant to the provisions of the Declaration of Trust.  The securities and other assets of each STIF shall be valued in accordance with the amortized cost method; provided that this rule shall not apply if the Trustee determines that the special circumstances

described in <u>Section A.6</u> hereof are present and require or permit, as the case may be, application of the rules set forth therein.

A.4    <u>Valuation of STIF Units</u>.  The Units of each STIF shall be valued and the income of each STIF shall be apportioned in the following manner.  The value of each Unit of a STIF shall be one dollar ($1.00) (or such other constant amount as the Trustee may specify).  As of the close of business on each Valuation Date, all net income and net realized gains of a STIF, as determined by the Trustee in its reasonable discretion, in accordance with rules intended to account for charges and expenses payable by such STIF and, to the extent practicable, to preserve the Unit value of such STIF at one dollar ($1.00) (or such other constant amount as the Trustee may specify from time to time) shall be allocated among the Participants in such STIF in proportion to the number of Units of each Participant in such STIF and shall be reinvested on behalf of each such Participant in new Units of such STIF.  The Trustee may determine in its sole discretion from time to time, that preserving the Unit value of a STIF at a constant amount or at one dollar ($1.00) is unfair, impractical, or inappropriate and may allow such value to fluctuate.

A.5    <u>Deposits in and Withdrawals from a STIF</u>.  The Trustee may designate from time to time the Valuation Dates as of which deposits in, and withdrawals from, a STIF may be made. The Trustee may from time to time establish rules for deposits which provide that a Participant shall not participate in the net income of a STIF with regard to the amount being deposited by such Participant unless and until such deposit satisfies such requirements as the Trustee may specify with regard to the time and manner of such deposit.  The Trustee may, in its sole discretion, accept deposits in a STIF in a form other than money, provided that such deposits shall be in securities and other assets that are permissible investments for such STIF and that such securities and other assets shall be valued as provided in <u>Section A.4</u> or <u>Section A.6</u> hereof, as applicable.  In any case in which the Trustee, in its sole discretion, makes a distribution from a STIF (partly or wholly) in kind, the securities and other assets so distributed shall be valued as provided in <u>Section A.4</u> or <u>A.6</u> hereof, as applicable.

A.6    <u>Special Circumstances</u>.  Notwithstanding the preceding provisions of this Appendix or any other provision of the Declaration of Trust or any applicable Fund Declaration, the following shall apply in the case of the special circumstances described in this Section.  The Trustee may determine in its sole discretion that application of some or all of the other provisions of this Appendix and the Declaration of Trust (including, without limitation, where applicable, the rules of <u>Section A.3</u> and/or <u>A.4</u>) or any applicable Fund Declaration may cause a material dilution or other unfair result to Participants proposing to acquire Units in a Fund, or an adverse impact on a Fund, and in such event the Trustee reserves the right to adjust the valuation of Units or assets of such Fund, or to take such other action that it deems appropriate to eliminate or reduce such dilution or other unfair result, to the extent reasonably practicable, including, without limitation, reducing or eliminating the amount of income credited to or payable with respect to each Unit of such Fund, or applying net realized losses to offset net realized gains as of the Valuation Date such losses are realized or on subsequent Valuation Dates, or suspending deposits or withdrawals in whole or in part.  If the Trustee determines that such action is appropriate to reduce or eliminate the potential for material dilution or other unfair result or an adverse impact on a Fund, one or more Participants proposing to acquire interests in a Fund, then the Trustee may adjust the valuation of the Units of one or more Participants that are being

B-2

withdrawn as of a Valuation Date, and/or the Units in such Fund that are being credited as a result of a deposit as of a Valuation Date, even though the value of Units of one or more other Participants in the same Fund which are being withdrawn as of such Valuation Date and/or Units in the same Fund which are being credited as a result of a deposit as of such Valuation Date is not so adjusted or is adjusted on a different basis.  In determining the fair value of securities and other assets of a Fund in the case of special circumstances described in this Section, the valuation rules described in Section 5.01 of this Declaration of Trust shall apply.

A.7    Termination of STIF.  In valuing the Units of a STIF in connection with the termination of such STIF pursuant to Section 7.02 of this Declaration of Trust, the rules of Section A.4 or A.6 hereof shall apply, as applicable.

A.8    Liquidating Accounts and Dedicated Accounts.  If any security or other asset of a STIF is transferred to a Liquidating Account or a Dedicated Account under Article 8, or if cash or other assets pending investment in a STIF are deposited in a Dedicated Account under Article 8 of this Declaration of Trust, the securities and other assets of such Liquidating Account or Dedicated Account may, in the Trustee's sole discretion, be valued based on the rules of Section A.3 or Section A.6 hereof.

B-3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARNOLD HENRIQUEZ, ET AL. ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | C.A. No. 11-cv-12049-MLW |
| ) | |
| STATE STREET BANK AND TRUST ) | |
| COMPANY AND STATE STREET ) | |
| GLOBAL MARKETS LLC ) | |
| ) | |
| Defendants. ) | |
| ) | |

**AFFIDAVIT OF LISA B. DUNCAN**
**IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Lisa B. Duncan states:

**Background and Qualifications**

1.      I am a Vice President in the Institutional Investor Services ("IIS") Division of State Street Bank and Trust Company ("State Street"), which provides custodial banking services to institutional investors.

2.      I am the relationship manager for the Citigroup 401(k) Plan (the "Citi Plan"). My responsibilities include providing custody, accounting, daily valuation and client service to the Citi Plan.

3.      I submit this affidavit in support of Defendants' Motion to Dismiss the Complaint in the matter captioned above. I state in this affidavit the source of any information that is not based on personal knowledge.

1

**State Street's Relationship to the Citi Plan**

4.      State Street provides custody services to institutional investors.  These services are provided by divisions of State Street that are separate from the State Street divisions responsible for providing investment management services to collective funds and for executing foreign exchange transactions with custody clients of State Street.

5.      During the alleged class period of January 1, 2001 through the present (the alleged "Class Period"), State Street provided custody services to the Citi Plan, which is alleged to be an ERISA defined contribution plan or 401(k) plan.  Complaint ¶ 11.

6.      Prior to December 8, 2008, State Street's responsibilities as custodian were set forth in a Custodian Contract Between Citigroup, Inc., Citibank, N.A. and State Street Bank and Trust Company dated January 1, 1999, pursuant to which the Citi Plan's sponsor and named fiduciaries appointed State Street to act solely as custodian of assets.  A true and accurate copy of that custody contract is attached hereto as Exhibit A.

7.      Since December 8, 2008, State Street's responsibilities as custodian have been set forth in a Defined Contribution Plan Trust Agreement Between Citigroup Inc. and State Street Bank and Trust Company, pursuant to which the Citi Plan's sponsor and named fiduciaries appointed State Street to act as custodian of assets and a directed trustee.  A true and accurate copy of that agreement is attached hereto as Exhibit B.

8.      During the Class Period, the named fiduciaries of the Citi Plan from time to time pursuant to written direction selected collective funds advised by State Street's separate State Street Global Advisors division ("SSgA") as Citi Plan investment options.  They also selected as investment options various investment vehicles managed by third parties that are not affiliated with State Street.  Citi Plan participants could choose such funds or investment vehicles as investments for their individual accounts.

2

9.      During the Class Period, Plaintiff alleges Michael T. Cohn alleges that he selected two such collective funds for allocation of Citi Plan assets in his account (the "Citi Selected Funds"). Complaint ¶ 11.



I declare under penalty of perjury that the forgoing is true and correct to the best of my personal

knowledge, information, and belief.

CUSTODIAN CONTRACT

Between

CITIGROUP INC.,

CITIBANK, N.A.

and

STATE STREET BANK AND TRUST COMPANY

TABLE OF CONTENTS

PAGE

1.  EMPLOYMENT OF CUSTODIAN AND PROPERTY
        TO BE HELD BY IT. . . . . . . . . . . . . . . .   1

2.  DUTIES OF THE CUSTODIAN WITH RESPECT TO PROPERTY OF
        THE COMPANY HELD BY THE CUSTODIAN . . . . . . .   2

    2.1   Holding Securities . . . . . . . . . . . . .   2
    2.2   Delivery of Securities . . . . . . . . . . .   2
    2.3   Registration of Securities . . . . . . . . .   4
    2.4   Bank Accounts. . . . . . . . . . . . . . . .   4
    2.5   Income and Settlement Crediting. . . . . . .   5
    2.6   Payment of Account Moneys. . . . . . . . . .   6
    2.7   Appointment of Agents and Subcustodians. . .   7
    2.8   Proxies. . . . . . . . . . . . . . . . . . .   8
    2.9   Communications Relating to Account Securities. .  8
    2.10  Proper Instructions. . . . . . . . . . . . .   9
    2.11  Actions Permitted without Express Authority. . .  10
    2.12  Evidence of Authority. . . . . . . . . . . .  10

3.  REPORTING . . . . . . . . . . . . . . . . . . . .  11

4.  COMPENSATION OF CUSTODIAN . . . . . . . . . . . .  11

5.  RESPONSIBILITY OF CUSTODIAN . . . . . . . . . . .  11

6.  SECURITY CODES. . . . . . . . . . . . . . . . . .  13

7.  TAX LAW . . . . . . . . . . . . . . . . . . . . .  14

8.  INVESTMENT MANAGER. . . . . . . . . . . . . . . .  15

    8.1   Appointment and Termination of Appointment . . .  15
    8.2   Authority. . . . . . . . . . . . . . . . . .  15

9.  EFFECTIVE PERIOD, TERMINATION AND AMENDMENT . . . .  15

10. ACTION ON TERMINATION . . . . . . . . . . . . . .  16

11. REPRESENTATIONS AND WARRANTIES. . . . . . . . . .  18

12. NOTICES . . . . . . . . . . . . . . . . . . . . .  18

13. MASSACHUSETTS LAW TO APPLY. . . . . . . . . . . .  19

14. PRIOR CONTRACTS . . . . . . . . . . . . . . . . .  19

CUSTODIAN CONTRACT

This Contract between CITIGROUP INC. organized and existing under the laws of Delaware, having its principal place of business at New York, New York, USA, hereinafter called the "Company", CITIBANK, N.A. organized and existing under the laws of New York, having its principal place of business at New York, New York, USA, hereinafter called the "Trustee", and STATE STREET BANK AND TRUST COMPANY, a Massachusetts trust company, having its principal place of business at Boston, Massachusetts, USA, hereinafter called the "Custodian".

WITNESSETH:

That in consideration of the mutual covenants and agreements contained herein the Company, the Trustee and the Custodian agree as follows:

1.    EMPLOYMENT OF CUSTODIAN AND PROPERTY TO BE HELD BY IT.

The Company hereby directs the Trustee to employ the Custodian as the custodian of certain assets of the Company, hereinafter called the "Account". All property delivered to the Custodian, its agents or its subcustodians shall be held and dealt with as hereinafter provided.  The Custodian shall not be responsible for any property held or received by the Trustee and not delivered to the Custodian, its agents or its subcustodians.

2.   DUTIES OF THE CUSTODIAN WITH RESPECT TO PROPERTY OF THE
COMPANY HELD BY THE CUSTODIAN.

2.1  Holding Securities.  The Custodian shall hold, or
direct its agents or its subcustodians to hold, for the Account,
all noncash property including all securities, other than
securities which are held for the Account by the Custodian, its
agents or subcustodians in the Federal Reserve book-entry system,
in a clearing agency which acts as a securities depository or in
another book-entry system for the central handling of securities
collectively referred to herein as "Securities System".

2.2  Delivery of Securities.  The Custodian shall release
and deliver, or direct its agents or its subcustodians to release
and deliver, securities of the Account held by the Custodian, its
agents or its subcustodians or in a Securities System account of
the Custodian, its agents or its subcustodians only upon receipt
of Proper Instructions (as defined in Section 2.10 herein), which
may be standing instructions when deemed appropriate by the
parties in the following cases:

>    (a)  Upon sale of such securities for the Account, unless
>    otherwise directed by Proper Instructions; (i) in accordance
>    with the customary or established practices and procedures
>    in the jurisdiction or market where the transactions occur,
>    including, without limitation, delivery to the purchaser
>    thereof or to a dealer therefor (or an agent of such
>    purchaser or dealer) against expectation of receiving later
>    payment; or (ii) in the case of a sale effected through a
>    Securities System, in accordance with the rules governing
>    the operation of the Securities System;

2

(b)  Upon the receipt of payment in connection with any repurchase agreement related to such securities;

(c)  To the depository agent in connection with tender or other similar offers for securities of the Account;

(d)  To the issuer thereof or its agent when such securities are called, redeemed, retired or otherwise become payable; provided that, unless otherwise directed by Proper Instructions, the cash or other consideration is to be delivered to the Custodian, its agents or its subcustodians;

(e)  To the issuer thereof, or its agent, for transfer into the name of the Custodian or of any nominee of the Custodian or into the name or nominee name of any of its agents or subcustodians or for exchange for a different number of bonds, certificates or other evidence representing the same aggregate face amount or number of units;

(f)  To brokers, clearing banks or other clearing agents for examination in accordance with "street delivery" custom;

(g)  For exchange or conversion pursuant to any plan of merger, consolidation, recapitalization, reorganization or readjustment of the securities of the issuer of such securities, or pursuant to provisions for conversion contained in such securities, or pursuant to any deposit agreement; provided that, unless otherwise directed by Proper Instructions, the new securities and cash, if any, are to be delivered to the Custodian, its agents or its subcustodians;

(h)  In the case of warrants, rights or similar securities, the surrender thereof in the exercise of such warrants, rights or similar securities or the surrender of interim receipts or temporary securities for definitive securities; provided that, unless otherwise directed by Proper Instructions, the new securities and cash, if any, are to be delivered to the Custodian, its agents or its subcustodians;

(i)  For delivery as security in connection with any borrowings by the Trustee requiring a pledge of assets by the Trustee from the Account;

(j)   In connection with trading in options and futures contracts, including delivery as original margin and variation margin;

(k)   In connection with the loan of securities; and

(l)   For any other purpose, but only upon receipt of Proper Instructions specifying the securities to be delivered and naming the person or persons to whom delivery of such securities shall be made.

2.3   Registration of Securities.   Securities held by the Custodian, its agents or its subcustodians (other than bearer securities or securities held in a Securities System) shall be registered in the name of the Custodian or in the name of any nominee of the Custodian or in the name of any of its agents or its subcustodians or of their nominees.   The Custodian, its agents and its subcustodians shall not be obligated to accept securities on behalf of the Account under the terms of this Contract unless such securities are in "street name" or other good delivery form.

2.4   Bank Accounts.   The Custodian, its agents or its subcustodians may open and maintain a bank account or accounts in the name of the Company, Trustee, Custodian, subcustodian, their respective nominees or otherwise, in such banks or trust companies as they may in their discretion deem advisable (including a bank of the Custodian), subject only to draft or order by the Custodian, its agents or its subcustodians acting pursuant to the terms of this Contract, and shall hold in such

4

account or accounts, subject to the provisions hereof, cash received by or from or for the account of the Trustee. Such funds shall be deposited by the Custodian, its agents or its subcustodians in their capacity as Custodian, agent or subcustodian and, except as otherwise provided in this Contract, shall be withdrawable by the Custodian, its agents or its subcustodians only in that capacity.

2.5 <u>Income and Settlement Crediting</u>. Subject to Sections 2.5(a-c) below the Custodian shall credit or debit the appropriate cash account of the Trustee in connection with the purchase, sale, maturity, redemption, income, dividends or other disposition of securities and other assets held for the time being on behalf of the Company and Trustee in said accounts on an actual settlement basis. The collection of income due the Account on any securities loaned by the Account other than through the Custodian's Securities Lending Program shall be the responsibility of the Trustee and such income shall be credited upon actual receipt by the Custodian.

> (a) The Custodian may make available provisional credit of settlement, maturity, redemption proceeds, income and dividends on a contractual settlement basis in markets deemed appropriate for such a practice by the Custodian. Income shall be credited contractually in markets identified on Schedule A, which may be amended from time to time. The Custodian reserves the right to reverse any such crediting at any time before actual receipt of the item associated with the credit when the Custodian determines that actual receipt will not be received in due course for such an item.

In such instances, the Custodian may charge the appropriate cash account of the Trustee for the expense of providing funds associated with such advance.

(b)  In markets where the Custodian makes available the provisions of Section 2.5(a), the consideration payable in connection with a purchase transaction shall be debited from the appropriate cash account of the Trustee upon the contractual settlement date for the relevant purchase transaction.  The Custodian shall promptly recredit such amount at the time that the Trustee notifies the Custodian by Proper Instruction that such transaction has been canceled.

(c)  All credits made under Section 2.5(a) are made subject to actual collection.  The Custodian shall not be liable to the Company or Trustee for any amount that is not actually collected in accordance with the terms of this Contract. The provisions of Section 2.5(a) are intended to facilitate settlement in ordinary course.  The Custodian may terminate or suspend any part of the provision of the contractual settlement under Section 2.5(a) immediately upon notice to Company and Trustee, particularly in the event of force majeure affecting settlement, disorder in markets or with respect to particular investments or other changed external business circumstances.  Any provisional credits provided under Section 2.5(a) shall be considered an advance of cash for purposes of Section 5 of this Contract to the extent that they cannot be reversed in accordance with the terms of Section 2.5(a).

2.6  Payment of Account Moneys.  Only upon receipt of Proper Instructions and written agreement as to security procedures for payment orders, which may be standing instructions, or as may be otherwise authorized within this Contract, the Custodian shall pay out, or direct its agents or its subcustodians to pay out, moneys of the Account in the following cases:

(a)  Upon the purchase of securities for the Account, unless otherwise directed by Proper Instructions; (i) in accordance with the customary or established practices and procedures

in the jurisdiction or market where the transactions occur, including, without limitation, delivering money to the seller thereof or to a dealer therefor (or an agent for such seller or dealer) against expectation of receiving later delivery of such securities; or (ii) in the case of a purchase effected through a Securities System, in accordance with the rules governing the operation of such Securities System;

(b)  In connection with the conversion, exchange or surrender of securities of the Account as set forth in Section 2.2 hereof;

(c)  For the payment of any expense or liability including but not limited to the following payments:  interest, taxes, management, accounting, transfer agent and legal fees, and operating expenses;

(d)  For the purchase or sale of foreign exchange or foreign exchange contracts for the Account, including transactions executed with or through the Custodian, its agents or its subcustodians.

(e)  In connection with trading in options and futures contracts, including delivery as original margin and variation margin.

(f)  In connection with the borrowing of securities.

(g)  For any other purpose, but only upon receipt of Proper Instructions specifying the amount of such payment and naming the person or persons to whom such payment is to be made.

2.7  Appointment of Agents and Subcustodians.  The Custodian may at its discretion appoint and remove agents or subcustodians to carry out such of the provisions of this Contract as the Custodian may from time to time direct; provided, however, that such appointment shall not relieve the Custodian of its responsibilities or liabilities under this Contract.

2.8  Proxies.  The Custodian will, with respect to the securities held hereunder, cause to be promptly executed by the registered holder of such securities proxies received by the Custodian from its agents or its subcustodians or from issuers of the securities being held for the Account, without indication of the manner in which such proxies are to be voted, and, upon the receipt of Proper Instructions, shall promptly deliver such proxies, proxy soliciting materials and other notices relating to such securities.

2.9  Communications Relating to Account Securities.  The Custodian shall transmit promptly to the Company, Trustee or Investment Manager (as defined in Section 8 herein) written information (including, without limitation, pendency of calls and maturities of securities and expirations of rights in connection therewith) received by the Custodian from its agents or its subcustodians or from issuers of the securities being held for the Account.  With respect to tender or exchange offers, the Custodian shall transmit promptly to the Company, Trustee or Investment Manager written information received by the Custodian from its agents or its subcustodians or from issuers of the securities whose tender or exchange is sought or from the party (or his agents) making the tender or exchange offer.  The Custodian shall not be liable for any untimely exercise of any

tender, exchange or other right or power in connection with securities or other property of the Account at any time held by it unless (i) it or its agents or subcustodians are in actual or effective possession of such securities or property and (ii) it receives Proper Instructions with regard to the exercise of any such right or power, and both (i) and (ii) occur at least three business days prior to Custodian's deadline date to exercise such right or power.

    2.10 <u>Proper Instructions</u>. The term "Proper Instructions" shall mean instructions received by the Custodian from the Company, the Trustee, the Investment Manager, or any person duly authorized by any of them. Such instructions may be in writing signed by an authorized person or may be in a tested communication effected between electro-mechanical or electronic devices or by such other means as may be agreed to from time to time by the Custodian and the party giving such instructions (including, without limitation, oral instructions). The Company or Trustee shall cause their duly authorized officer, or the duly authorized officer of any Investment Manager, to certify to the Custodian in writing the names and specimen signatures of persons authorized to give Proper Instructions. The Custodian shall be entitled to rely upon the identity and authority of such persons

until it receives written notice from the Company, the Trustee or the Investment Manager to the contrary.

2.11  Actions Permitted without Express Authority.  The Custodian may, at its discretion, without express authority from the Company, the Trustee or the Investment Manager:

(a)  make payments to itself or others for minor expenses of handling securities or other similar items relating to its duties under this Contract, provided that all such payments shall be accounted for to the Company;

(b)  surrender securities in temporary form for securities in definitive form;

(c)  endorse for collection checks, drafts and other negotiable instruments; and

(d)  in general attend to all nondiscretionary details in connection with the sale, exchange, substitution, purchase, transfer and other dealings with the securities and property of the Account.

2.12  Evidence of Authority.  The Custodian shall be protected in acting upon any instruction, notice, request, consent, certificate or other instrument or paper reasonably believed by it to be genuine and to have been properly executed or otherwise given by or on behalf of the Company, the Trustee or an Investment Manager.  The Custodian may receive and accept a certificate from the Company, the Trustee or an Investment Manager as conclusive evidence (i) of the authority of any person to act in accordance with such certificate or (ii) of any determination or of any action by the Company, the Trustee or the

Investment Manager as described in such certificate, and such certificate may be considered in full force and effect until receipt by the Custodian of written notice to the contrary.

3. <u>REPORTING</u>. The Custodian shall render to the Company or Trustee, as noted in instructions given to the Custodian, a monthly report of all monies received or paid on behalf of the Account and an itemized statement of the securities for which it is accountable under this Contract as of the end of each month, as well as a list of all securities transactions that remain unsettled at that time. Custodian has no duty to verify reports it incorporates regarding securities or cash held outside its custody submitted by third parties selected by the Company or the Trustee, including but not limited to brokers, other banks or trust companies

4. <u>COMPENSATION OF CUSTODIAN</u>. The Custodian shall be entitled to compensation for its services and expenses as Custodian set forth in a written Fee Schedule between the parties hereto until a different compensation shall be agreed upon in writing between the Company, the Trustee and the Custodian.

5. <u>RESPONSIBILITY OF CUSTODIAN</u>. The Custodian shall not be responsible for the title, validity or genuineness, including good deliverable form, of any property or evidence of title thereto received by it or delivered by it pursuant to this

Contract and shall be held harmless in acting upon any notice, request, consent, certificate or instrument reasonably believed by it to be genuine and to be signed or otherwise given by the proper party or parties.  The Custodian shall be held to the exercise of reasonable care in carrying out the provisions of this Contract, but shall be kept indemnified by and shall be without liability to the Company or Trustee for any action taken or omitted by it in good faith and without negligence.  The Custodian shall be without liability to the Company or Trustee for any loss resulting from or caused by:  (i) events or circumstances beyond its reasonable control including, but not limited to nationalization, expropriation, currency restrictions, act of war or terrorism, riot, revolution, acts of God or other similar events or acts; (ii) errors by the Company or Trustee, or any Investment Manager in their instructions to the Custodian or (iii) acts or omissions by a Securities System.  It shall be entitled to rely on and may act upon advice of counsel (who may be counsel for the Company) on all matters, and shall be without liability for any action reasonably taken or omitted pursuant to such advice.

If the Custodian advances cash or securities for any purpose, including the purchase or sale of foreign exchange or of contracts for foreign exchange, or in the event that the

Custodian shall incur or be assessed taxes, interest, charges, expenses, assessments, or other liabilities in connection with the performance of this Contract, except such as may arise from its own negligent action, or negligent omission, any property at any time held for the Company or Trustee in the Account shall be security therefor and, should the Company or Trustee fail to repay the Custodian promptly, the Custodian shall be entitled to utilize available cash and to dispose of the assets of the Company or Trustee held in the Account to the extent necessary to make itself whole.

Notwithstanding the foregoing, the Custodian shall indemnify and hold harmless the Company and the Trustee for any and all losses and liabilities which may arise as a result of this Contract due to the Custodian's negligence, wrongful acts or failure to act in a commercially reasonable manner upon receipt of a notice from the Company or the Trustee.

6.  SECURITY CODES.  If the Custodian has issued to the Company, the Trustee or to any Investment Manager appointed by the Company, security codes or passwords in order that the Custodian may verify that certain transmissions of information, including Proper Instructions, have been originated by the Company, the Trustee or the Investment Manager, as the case may be, the Custodian shall be kept indemnified by and be without liability

13

to the Company or Trustee for any action taken or omitted by it
in reliance upon receipt by the Custodian of transmissions of
information with the proper security code or password, including
instructions purporting to be Proper Instructions, which the
Custodian reasonably believes to be from the Company, Trustee or
Investment Manager.

7.    TAX LAW.  The Custodian shall have no responsibility or
liability for any obligations now or hereafter imposed on the
Company, the Trustee, the Account or the Custodian as custodian
of the Account by the tax law of the United States of America or
any state or political subdivision thereof.  It shall be the
responsibility of the Company or Trustee to notify the Custodian
of the obligations imposed on the Company, the Trustee, the
Account or the Custodian as custodian of the Account by the tax
law of jurisdictions other than those mentioned in the above
sentence, including responsibility for withholding and other
taxes, assessments or other governmental charges, certifications
and governmental reporting.  The sole responsibility of the
Custodian with regard to such tax law shall be to use reasonable
efforts to assist the Company and Trustee with respect to any
claim for exemption or refund under the tax law of jurisdictions
for which the Company has provided such information.

8.  <u>INVESTMENT MANAGER</u>.

8.1  <u>Appointment and Termination of Appointment</u>.  The
Company at any time may appoint one or more Investment Managers
to manage the investment of all or any portion of the Account.
In such event, the Company shall notify the Custodian in writing
of the appointment of such Investment Manager, and of the portion
of the assets over which the Investment Manager may exercise its
authority.  The Company similarly shall notify the Custodian of
the termination of the appointment of any Investment Manager.

8.2  <u>Authority</u>.  The Custodian, in performing its duties
under this Contract, shall be entitled to rely upon Proper
Instructions from an Investment Manager, with such limitations as
the Company and the Custodian by written agreement provide.  In
the absence of such limitations, the Custodian shall accept
Proper Instructions from the Investment Manager to the same
extent as the Custodian would be entitled to accept such Proper
Instructions from the Company or Trustee if no Investment Manager
had been appointed.

9.  <u>EFFECTIVE PERIOD, TERMINATION AND AMENDMENT</u>.  This Contract
shall become effective as of the date hereinafter set forth,
shall continue in full force and effect until terminated as
hereinafter provided, may be amended at any time by mutual
written agreement of the parties hereto, and may be terminated by

either party by an instrument in writing delivered or mailed, postage prepaid to the other party, such termination to take effect not sooner than ninety days after the date of such delivery or mailing, unless a different period is agreed to in writing by the parties.

The provisions of Sections 5, 6 and 7 of this Contract shall survive termination of this Contract for any reason.  Upon termination of this Contract, the Company or Trustee shall pay to the Custodian upon demand such compensation as may be due in connection with such termination and shall likewise reimburse the Custodian for its costs, expenses and disbursements.

10.  ACTION ON TERMINATION.  If a successor custodian shall be appointed by the Company or Trustee (at the direction of the Company), the Custodian shall, within a reasonable time after termination, deliver to such successor custodian at the office of the Custodian, its agents or its subcustodians or as otherwise agreed, duly endorsed and in the form for transfer, all securities, funds and other property then held by it hereunder and shall transfer to an account of the successor custodian all of the Account's securities held in a Securities System.

If no such successor custodian shall be appointed, the Custodian shall, in like manner, upon receipt of Proper Instructions from the Company or Trustee, deliver at the office

16

of the Custodian, its agents or its subcustodians or as otherwise agreed and transfer such securities, funds and other property in accordance with such Proper Instructions.

In the event that no written order designating a successor custodian and no Proper Instructions as aforesaid shall have been delivered to the Custodian on or before the date when such termination shall become effective, the Custodian shall have the right to deliver to a bank or trust company of its own selection, having an aggregate capital, surplus, and undivided profits, as shown by its last published report of not less than $100,000,000, all securities, funds, and other property held by the Custodian. Thereafter, such bank or trust company shall be the successor of the Custodian under this Contract.

In the event that securities, funds and other property remain in the possession of the Custodian, its agents or its subcustodians after the date of termination hereof owing to failure of the Company or Trustee to appoint a successor custodian or to give the Proper Instructions referred to above, the Custodian shall be entitled to fair compensation for its services during such period as the Custodian retains possession of such securities, funds and other property and the provisions of this Contract relating to the duties and obligations of the Custodian shall remain in full force and effect.

17

11. <u>REPRESENTATIONS AND WARRANTIES</u>. The Company and Trustee represent and warrant to the Custodian that they have the power under their Articles of Incorporation and By-Laws (or equivalent) to enter into and perform their obligations under this Contract, and have duly executed this Contract so as to constitute valid and binding obligations of the Company or Trustee, as the case may be;

12. <u>NOTICES</u>. Notices and other writings shall be delivered or mailed postage prepaid:

    To the Trustee:

        Citibank, N.A.
        399 Park Avenue
        New York, NY  10043
        Attn:  james Hiseler

    To the Company:

        CITIGROUP INC.
        Corporate Benefits
        1 Court Square
        15th Floor, Zone A
        Long Island City, NY  11120
        Attn:  Timothy Peach

    To the Custodian:

        State Street Bank and Trust Company,
        Westwood Division
        P.O. Box 351
        Specialized Trust Services
        Boston, Massachusetts  02101-0351
        ATTN:  Kevin Smith, Fund Manager

or to such other address as the Company, Trustee or the Custodian may hereafter specify in writing.

Telephone and facsimile notices shall be sufficient if communicated to the party entitled to receive such notice at the following numbers:

If to Trustee:

Telephone (212) 657-2884     Facsimile (212) 657-3310

If to Company:

Telephone (718) 248-8983     Facsimile (718) 248-5090

If to Custodian:

Telephone (781) 302-6024     Facsimile (781) 302-8130

13. MASSACHUSETTS LAW TO APPLY. This Contract shall be construed and the provisions thereof interpreted under and in accordance with laws of the Commonwealth of Massachusetts. The Company hereby submits to the jurisdiction of the State and Federal courts located in Commonwealth of Massachusetts including any appellate courts thereof.

14. PRIOR CONTRACTS. This Contract supersedes and terminates, as of the date hereof, all prior contracts between the Company, the Trustee and the Custodian relating to the custody of the assets in the Account.

IN WITNESS WHEREOF, each of the parties has caused this instrument to be executed in its name and behalf by its duly authorized representative as of the 1st day of January, 1999.

ATTEST:                              CITIGROUP INC.



_Sacha Kessel_                       BY: _____

                                     TITLE: _CORPORATE SECRETARY_



ATTEST:                              CITIBANK, N.A._, as Trustee_



                                     BY: _____

                                     TITLE: _VICE PRESIDENT_



ATTEST:                              STATE STREET BANK AND TRUST COMPANY



                                     BY: _____

                                     Vice President

Citicus1
12/29/1998

REVIEWED
LEGAL DIVISION
By _____
Date _____

20

IMAGING SERVICES

# Imaging folder: **IIS** NewClient/Scanned

**NAME** (Client Name) ___CitiGroup Inc_____

**REFERENCE:**
**EFFECTIVE DATE OF DOCUMENT** (mm/dd/yy) _12_/ _1_ / _08_

(Entity/Description) __401(k) Plan Trust_____

**SUBJECT**   Document type:

- ☐ ASSIGNMENT
- ☐ FTOP
- ☐ REMOTE ACCESS    ☐ OFFERING MEMO
- ☐ RESOLUTION       ☐ CASH MGT SERVICE AUTH
- ☐ FEE              ☑ TRUST AGREEMENT
- ☐ APPT INV MGR      ☐ CUSTODIAN AGREEMENT
- ☐ INCUMBENCY CERT   ☐ AUTHORIZED SIGNATURES
- ☐ SWEEP LTR         ☐ AMENDMENT
- ☐ TAX DET LTR       ☐ OPINION OF COUNSEL
- ☐ W9               ☐ W8
- ☐ CLASS ACTION LETTER  ☐ ADHOC LETTER
- ☐ PLAN DOCUMENT     ☐ ID AFFIRM LETTER
- ☐ FORM 8821
- ☐ RAA – 3rd Party Access  3rd party_____Fund _____
- ☐ OTHER: _____

NOTES:

IIS: Forward document & form to IIS Compliance, Vin Baldi, LCC/6. IIS Compliance: forward to Peter McKinney of Imaging Services. Imaging Services: forward to Samantha Beck, CPH/4. Limited Access

Redacted Document

DEFINED CONTRIBUTION PLAN
TRUST AGREEMENT

Between

CITIGROUP INC.

and

STATE STREET BANK AND TRUST COMPANY

STRDC3.DOC

TABLE OF CONTENTS                    SS Draft 11/20/08

                                                    PAGE

1. TRUST FUND ................................................ 4

    1.1   Trust Name........................................ 4
    1.2   Receipt of Assets................................. 4
    1.3   Plan.............................................. 5
    1.4   Appointment of Recordkeeper....................... 6
    1.5   Appointment of Company Stock Trustee.............. 8
    1.6   No Trustee Duty Regarding Contributions........... 9
    1.7   Withholding....................................... 9

2. DISBURSEMENTS FROM THE TRUST FUND ....................... 9

3. COMPANY SELECTED INVESTMENT FUNDS ...................... 11

    3.1   In General....................................... 11
    3.2   Participant-Directed Brokerage Account........... 13
    3.3   RESERVED......................................... 14
    3.4   Company Managed Investment Accounts.............. 14
    3.5   Trustee Managed Investment Accounts.............. 14
    3.6   Investment Manager Accounts ..................... 15

4. POWERS OF THE TRUSTEE .................................. 19

    4.1   Investment Power of the Trustee.................. 19
    4.2   Administrative Powers of the Trustee............. 25

5. INDEMNIFICATION AND STANDARD OF CARE. .................. 26
    5.1   Indemnification.................................. 26
    5.2   Standard of Care................................. 28

6. SECURITIES OR OTHER PROPERTY ........................... 28

7. SECURITY CODES ......................................... 29

8. TAXES AND TRUSTEE COMPENSATION ......................... 29

9. ACCOUNTS OF THE TRUSTEE. ............................... 30

10. RELIANCE ON COMMUNICATIONS ........................... 34

11. RESIGNATION AND REMOVAL OF TRUSTEE ................... 35

12. AMENDMENT ............................................ 36

13. TERMINATION .......................................... 36

TABLE OF CONTENTS
(cont.)

SS Draft 11/20/08

14. MISCELLANEOUS ........................................... 37

    14.1  Governing Law........................................ 37
    14.2  No Reversion to Company............................. 37
    14.3  Non-Alienation of Benefits.......................... 38
    14.4  Duration of Trust .................................. 38
    14.5  No Guarantees....................................... 39
    14.6  Duty to Furnish Information ......................... 39
    14.7  Parties Bound....................................... 39
    14.8  Necessary Parties to Disputes....................... 39
    14.9  Unclaimed Benefit Payments.......................... 40
    14.10 Severability....................................... 41
    14.11 References......................................... 41
    14.12 Headings........................................... 41
    14.13 No Liability for Acts of Predecessor and Successor
    Trustees .............................................. 41
    14.14 Counterparts....................................... 41
    14.15 Appointments....................................... 41
    14.16 Representations.................................... 42

15. CUSTODY OF COMPANY STOCK ................................ 43

DEFINED CONTRIBUTION PLAN
TRUST AGREEMENT

Agreement (hereinafter referred to as the "Trust Agreement") made as of December 1, 2008, by and between CITIGROUP INC., a corporation organized under the laws of Delaware (hereinafter referred to as the "Company") and STATE STREET BANK AND TRUST COMPANY, a trust company organized under the laws of the Commonwealth of Massachusetts (hereinafter referred to as the "Trustee").

WITNESSETH:

WHEREAS, the Company maintains a certain tax-qualified plan known as the Citigroup 401(k) Plan (hereinafter referred to as the "Plan") for the exclusive benefit of certain of its employees and the employees of certain of its affiliates and subsidiaries;

WHEREAS, the Company has by Trust Agreement dated January 1, 2006 with Citibank, N.A., established a trust to serve as the funding vehicle for the Plan;

WHEREAS, the Company and Citibank, N.A., have by a custody agreement dated January 1, 1999, appointed State Street Bank and Trust Company Custodian of the assets of the Trust Agreement dated January 1, 2006 between Company and Citibank, N.A.;

WHEREAS, the Company has appointed State Street Bank and

1

Redacted Document

Trust Company as successor trustee to Citibank, N.A. for all assets except the Qualifying Employer Securities (as defined below), effective December 8, 2008;

WHEREAS, the authority to conduct the general operation and administration of the Plan is vested in the person, committee or entity appointed under the Plan to serve as Plan Administrator of the Plan, who shall have the authorities and shall be subject to the duties with respect to the trust specified in the Plan and in this Trust Agreement;

WHEREAS, the Plan Administrator, as of the date of this Trust Agreement is the Plans Administration Committee of the Company;

WHEREAS, the authority with respect to the management, disposition and investment of the Plan is vested in the person, committee or entity appointed, in accordance with the Plan, to make and effect investment decisions under the Plan, who shall have the authorities and shall be subject to the duties with respect to the trust specified in the Plan and in this Trust Agreement;

WHEREAS, as of the date of this Trust Agreement the 401(k) Plan Investment Committee of the Company (the "Investment Committee") is appointed to make and effect investment decisions under the Plan;

WHEREAS, all qualifying employer securities within the

2

meaning of ERISA Section 407(d)(5) ("Qualifying Employer Securities") that will be, are or were contributed to the Plan, including those currently held as custodian under the custody agreement dated January 1, 1999, are held or retained by the Trustee solely as custodian ("Custodian"), exclusively under the terms of Section 15 herein with respect to such Qualifying Employer Securities, subject to the obligations of any agreement between the Company and a Bank or Trust Company assigning trustee duties to such entity with respect to such Qualifying Employer Securities ("Company Stock Trustee");

WHEREAS, in order to induce Trustee to enter into this agreement, prior to or concurrently with entering into this Agreement, the Company has entered into an agreement with Reliance Trust Company to serve as Company Stock Trustee, pursuant to Section 1.5 herein;

WHEREAS, the Company has appointed ING to provide recordkeeping and other administrative services other than those the Plan Administrator continues to perform for the Plan in such capacity, and any other person or entity hereafter engaged by the Company to provide such services, being hereinafter referred to as the "Recordkeeper";

WHEREAS, the Company and the Trustee desire to amend and restate the said Trust Agreement;

WHEREAS, except as to the Qualifying Employer Securities,

3

the Company and State Street Bank and Trust Company desire to
terminate the custody agreement dated January 1, 1999, appointed
State Street Bank and Trust Company Custodian of the assets of
the trust agreement between Company and Citibank, N.A.; and

WHEREAS, as to the Qualifying Employer Securities, the
Company and State Street Bank and Trust Company desire to amend
and restate the terms of the custody agreement dated January 1,
1999, appointed State Street Bank and Trust Company Custodian of
the assets of the trust agreement between Company and Citibank,
N.A., herein as section 15.

NOW, THEREFORE, the Company and the Trustee do hereby amend
and restate the said Trust Agreement and continue the trust as
the funding vehicle for the Plan, upon the terms and conditions
hereinafter set forth:

1. TRUST FUND

1.1  Trust Name.    This Trust shall be known as the
Citgroup 401(k) Plan Trust.

1.2  Receipt of Assets.  The Trustee shall receive and
accept for the purposes hereof all sums of money and other
property paid to it by or at the direction of the Company (as
defined herein), and shall hold, invest, reinvest, manage,
administer and distribute such monies and other property and the
increments, proceeds, earnings and income thereof pursuant to the
terms of this Trust Agreement and for the exclusive benefit of

4

participants in the Plan and their beneficiaries. The Trustee need not inquire into the source of any money or property transferred to it nor into the authority or right of the transferor of such money or property to transfer such money or property to the Trustee. All Plan assets held by the Trustee in the trust pursuant to the provisions of this Trust Agreement at the time of reference are referred to herein as the "Trust Fund".

To the extent that any portion of the Trust Fund constitutes Qualifying Employer Securities that will be, are or were contributed to the Plan, such assets are held separately by State Street Bank and Trust Company solely as Custodian of such assets, pursuant to the separate Custodial Agreement in effect between the parties and dated as of January 1, 1999 which shall remain in full force and effect solely with respect to such Qualifying Employer Securities, and Trustee shall have no responsibility as trustee with respect to such Qualifying Employer Securities.

1.3 <u>Plan</u>. References in this Trust Agreement to the "Plan" shall, mean the tax-qualified employee benefit plan of the Company that has adopted the trust as the funding vehicle for such plan.

The Company shall be responsible for verifying that while any assets of the Plan are held in the Trust Fund, the Plan (i) is "qualified" with the meaning of Section 401(a) of the Code and, as a defined contribution plan either (x) the Plan provides

5

that each participant is a "named fiduciary" (as described in Section 402(a)(2) of the provisions of the Employee Retirement Income Security Act of 1974, as amended (referred to herein as "ERISA") who is duly authorized under the Plan to provide investment direction to the Recordkeeper, acting as agent for such participant, for conveyance to the Trustee or (y) the Plan is duly qualified as an "ERISA Section 404(c) Plan" described in 29 C.F.R. 2550.404c under which each participant is authorized to provide investment direction to the Recordkeeper, acting as agent for such Participant, for conveyance to the Trustee; (ii) is permitted by existing or future ruling of the United States Treasury Department to pool its funds in a group trust; (iii) permits its assets to be commingled for investment purposes with the assets of other such plans by investing such assets in this Trust Fund whether or not its assets will in fact be held in a separate investment fund; and (iv) the Plan does not prohibit the Company from appointing the Recordkeeper to perform daily recordkeeping services as described herein, and provides that Plan Administrator is the fiduciary responsible for carrying out participant investment directions.

1.4 <u>Appointment of Recordkeeper</u>. In order to effect the carrying out of participant investment directions pursuant to the Plan provisions, the Company has appointed Recordkeeper to perform certain services including but not limited to maintaining

6

participant accounts for all contributions, loans and loan repayments, rollovers, and other deposits made for the purpose of determining how such deposits are to be allocated to the Investment Funds of the Plan, for determining requirements for disbursements from or transfers among Investment Funds in accordance with the terms of the Plan, for maintaining participant records for the purpose of voting or tendering shares in an Investment Fund as described in Section 4.1 herein, for distributing information about the Investment Funds provided for under the Plan, and for distributing participant statements at periodic intervals. Company may appoint a successor Recordkeeper at any time, and shall provide Trustee notice in writing of such appointment as soon as practicable.

To the extent that all or part of the assets of the Trust Fund are to be invested according to the instructions of Plan participants, in accordance with the Plan and ERISA Section 404(c), the Trustee shall invest those assets in accordance with such instructions consistent with the investment choices and investment direction procedures authorized or prescribed by the Plan Administrator, or the Investment Committee (including directions on behalf of the participants by the Investment Committee or the delegated administrator of participant accounts), as conveyed by the Recordkeeper. Subject applicable law and regulation, the Trustee shall be under no duty or

7

obligation to review any investment to be acquired, held or disposed of pursuant to such directions, or to review any non-trustee related fees associated therewith, nor to make any recommendations with respect to the disposition or continued retention of any such investment, or to evaluate the performance of such investment, and the Trustee shall be fully protected in acting in accordance with such directions or for failing to act in the absence of such directions. In any case where participant direction is in effect, the Investment Committee shall exercise on behalf of the participants, in a matter consistent with the Plan and procedures prescribed by the Investment committee for the exercise or pass through of participant information and rights, the same rights and responsibilities that would have been accorded an Investment manager acting in accordance with this Trust Agreement.

1.5 <u>Appointment of Company Stock Trustee</u>. Company may appoint a Company Stock Trustee to hold title to Qualifying Employer Securities that are held by the Plan. The Trustee may rely on such appointment until 1) notified in writing by the Company that the Company has appointed a successor Company Stock Trustee, and 2) if Trustee requires in its reasonable discretion, written notice from the successor of its acceptance of such appointment. The Company may appoint a successor at any time, however, Trustee may consider such appointment to be a

8

termination of Section 15 of this Agreement, and, upon 30 days written notice to Company, Trustee may, notwithstanding any other provision of this Agreement, invoke its rights and responsibilities under Section 13 of this Agreement as to the Company Stock Fund or Qualifying Employer Securities. Nothing herein is intended to limit the services or duties Company may assign to such Company Stock Trustee.

1.6  No Trustee Duty Regarding Contributions. The Trustee shall not be under any duty to require payment of any contributions to the Trust Fund or determine that a contribution is in compliance with a participant investment direction, or to see that any payment made to it is computed in accordance with the provisions of the Plan, or otherwise be responsible for the adequacy of the Trust Fund to meet and discharge any liabilities under the Plan. The named fiduciary responsible for ensuring timely payment of contributions to the Trust Fund is Plan Administrator.

1.7  Withholding. The Plan Administrator or the Recordkeeper shall withhold any tax which by any present or future law is required to be withheld from any payment under the Plan.

2.  DISBURSEMENTS FROM THE TRUST FUND.

The Trustee shall from time to time on the directions of the Plan Administrator or Recordkeeper make payments out of the Trust

9

Redacted Document

Fund to such persons, including the Plan Administrator or Recordkeeper, in such manner, in such amounts and for such purposes as may be specified in the directions of the Recordkeeper or Plan Administrator.

The Recordkeeper or Plan Administrator shall be responsible for insuring that any payment directed under this Article conforms to the provisions of the Plan, this Trust Agreement, and the provisions of the Employee Retirement Income Security Act of 1974, as amended (hereinafter referred to as "ERISA"). Each direction of the Recordkeeper or Plan Administrator shall be in writing and shall be deemed to include a certification that any payment or other distribution directed thereby is one which the Recordkeeper or Plan Administrator is authorized to direct, and the Trustee may conclusively rely on such deemed certification without further investigation, unless such direction is contrary to the Trustee's duties under ERISA or this Agreement. Payments by the Trustee may be made by its check (or other reasonable method) to the order of the payee. Payments or other distributions hereunder may be mailed to the payee at the address last furnished to the Trustee by the Recordkeeper or if no such address has been so furnished, to the payee in care of the Recordkeeper. The Trustee shall not incur any liability or other damage on account of any payments or other distributions made by it in accordance with the written directions of the Recordkeeper

Redacted Document

or Plan Administrator, unless such direction is contrary to the Trustee's duties under ERISA or this Agreement.

If, in the performance of this Agreement hereunder, the Trustee holds uninvested cash received from the Recordkeeper or Plan Administrator any "float" earned thereon shall constitute a part of the Trustee's overall compensation for performance of the Services. The Client has negotiated with the Trustee and has agreed to allow the Trustee to retain such float income with the knowledge that the Client had the choice to either (i) retain such income for the benefit of the participants of the Plan and incur a higher trustee fee or (ii) allow the Trustee to retain such float income and realize a lower trustee fee.

3. <u>COMPANY SELECTED INVESTMENT FUNDS</u>.

3.1 <u>In General</u>. The Investment Committee from time to time and in accordance with provisions of the Plan, may direct the Trustee to establish one or more separate investment accounts within the Trust Fund, each separate account being hereinafter referred to as an "Investment Fund" which may be invested in (i) shares of investment companies registered under the Investment Company Act of 1940, (ii) collective funds maintained by a bank or trust company (including collective funds maintained by Trustee), (iii) Participant directed brokerage accounts, (iv) pools of insurance contracts, (v) funds managed by a registered investment manager, bank or insurance company, (vi) accounts

11

managed by fiduciaries or named fiduciaries for the Plan; and
(vii) other investment options available from time to time under
the Plan (specifically the Investment Funds described on
Attachment "A" to this Trust Agreement, as amended from time to
time in writing by the Investment Committee and the Trustee).
The Trustee shall have no liability for any loss of any kind
which may result by reason of the manner of division of the Trust
Fund into Investment Funds, or for the investment management of
these accounts, except as provided for in Section 3.5 respecting
a Trustee managed investment account, if any. The Trustee shall
transfer to each such Investment Fund such portion of the assets
of the Trust Fund as the Company or the Recordkeeper directs.
The Trustee shall not incur any liability on account of following
any direction of the Company or the Recordkeeper (unless such
direction is contrary to the Trustee's duties under ERISA or this
Agreement) and the Trustee shall be under no duty to review the
investment guidelines, objectives and restrictions so
established. To the extent that directions from the Company or
Recordkeeper to the Trustee represent investment instructions of
the Plan's participants, the Trustee shall have no responsibility
for such investment elections and shall incur no liability on
account of the direct and necessary results of investing the
assets of the Trust Fund in accordance with such participant
investment instructions.

All interest, dividends and other income received with respect to, and any proceeds received from the sale or other disposition of, securities or other property held in an Investment Fund shall be credited to and reinvested in such Investment Fund. All expenses of the Trust Fund which are allocable to a particular Investment Fund shall be so allocated and charged. Subject to the provisions of the Plan, the Investment Committee may direct the Trustee to eliminate an Investment Fund or Funds, and the Trustee shall thereupon dispose of the assets of such Investment Fund and reinvest the proceeds thereof in accordance with the directions of the Plan Administrator.

3.2 <u>Participant-Directed Brokerage Accounts</u>. The Trustee shall, if so directed by the Company segregate all or a portion of the Trust Fund held by it into one or more separate investment accounts to be known as Participant Directed Brokerage Accounts. Whenever a Participant is directing the investment and reinvestment of a Participant Directed Brokerage Account, the Participant shall have the powers and duties which an Investment Manager would have under this Trust Agreement if an Investment Manager were then serving and the Trustee shall be protected to the same extent as it would be protected under this Trust Agreement as to directions or the absence of directions of an Investment Manager. Participants shall be entitled to give

13

orders directly to the broker for the purchases and sale of securities as defined in Section 6 of this Agreement. The broker shall provide confirmation of each order to the Plan Administrator or Recordkeeper which shall maintain records in such form as to satisfy reporting requirements of the Plan.

3.3 RESERVED.

3.4 Company Managed Investment Accounts. The Trustee shall, if so directed in writing by the Company, segregate all or a portion of the Trust Fund held by it into one or more separate investment accounts to be known as Company Managed Investment Accounts. The Company, by written notice to the Trustee, may at any time relinquish its powers under this Section 3.4 and direct that a Company Managed Investment Account shall no longer be maintained. Whenever the Plan Administrator or named fiduciary is directing the investment and reinvestment of an Investment Account or a Company Managed Investment Account, the Plan Administrator or named fiduciary shall have the powers and duties which an Investment Manager would have under this Trust Agreement if an Investment Manager were then serving and the Trustee shall be protected to the same extent as it would be protected under this Trust Agreement as to directions or the absence of directions of an Investment Manager.

3.5 Trustee Managed Investment Accounts. The Trustee shall have no duty or responsibility to direct the investment and

14

reinvestment of the Trust Fund, any Investment Fund or any
Investment Account unless expressly agreed to in writing between
the Trustee and the Company. In the event that the Trustee
enters into such an agreement, it shall have the powers and
duties of an Investment Manager under this Trust Agreement with
regard to such Investment Account.

3.6   Investment Manager Accounts.

The Investment Committee, from time to time and in
accordance with the provisions of the Plan, may appoint one or
more independent Investment Managers, pursuant to a written
investment management agreement describing the powers and duties
of the Investment Manager, to direct the investment and
reinvestment of all or a portion of the Trust Fund or an
Investment Fund (hereinafter referred to as an "Investment
Account").

The Investment Committee, in its capacity as named fiduciary
shall be responsible for ascertaining that while each Investment
Manager is acting in that capacity hereunder, the following
requirements are satisfied:

(a)   The Investment Manager is either (i) registered as an
      investment adviser under the Investment Advisers Act of
      1940; (ii) is not registered as an investment adviser under
      such Act by reason of paragraph (1) of Section 203A(a) of
      such Act, is registered as an investment adviser under the
      laws of the State (referred to in such paragraph (1)) in
      which it maintains its principal office and place of
      business, and, at the time the fiduciary last filed the
      registration form most recently filed by the fiduciary with
      such State in order to maintain the fiduciary's registration

15

under the laws of such State, also filed a copy of such form with the Secretary of the Securities and Exchange Commission, (iii) a bank as defined in that Act or (iv) an insurance company qualified to perform the services described in (b) below under the laws of more than one state.

(b)   The Investment Manager has the power to manage, acquire or dispose of any assets of the Plan for which it is responsible hereunder;

(c)   The Investment Manager has acknowledged in writing to the Investment Committee and the Trustee that he or it is a fiduciary with respect to the Plan within the meaning of Section 3(21)(A) of ERISA.

(d)   The Plan provide for the appointment of the Investment Manager in accordance with Section 402(c)(3) of ERISA, and the Investment Manager is appointed as so provided.

(e)   Any Investment Manager with authority to invest in assets (other than those described in 29 CFR 2550.404b-1(a)(1)) which will be held outside the jurisdiction of the district courts of the United States is an entity described in ERISA regulations at 29 C.F.R. 2550.404b-1(a)(2)(i).

The Investment Committee shall furnish the Trustee with written notice of the appointment of each Investment Manager hereunder, and of the termination of any such appointment.   Such notice shall specify the assets which shall constitute the Investment Account of such Investment Manager.   The Trustee shall be fully protected in relying upon the effectiveness of such appointment and the Investment Manager's continuing satisfaction of the requirements set forth above until it receives written notice from the Investment Committee to the contrary.

The Trustee shall conclusively presume that each Investment Manager, under its investment management agreement, is entitled

16

to act, in directing the investment and reinvestment of the
Investment Account for which it is responsible, in its sole and
independent discretion, and in accord with the terms of ERISA and
the Plan, and without limitation, except for any limitations
which from time to time the Investment Committee and the Trustee
agree (in writing) shall modify the scope of such authority.

The Trustee shall have no liability (i) for the acts or
omissions of any Investment Manager (except to the extent the
Trustee itself is serving as Investment Manager); (ii) for
following directions, including investment directions of an
Investment Manager (other than the Trustee) or the Company or
named fiduciary, which are given in accordance with this Trust
Agreement, unless such direction is contrary to the Trustee's
duties under ERISA or this Agreement; (iii) for failing to act in
the absence of Investment Manager direction, unless such
direction is contrary to the Trustee's duties under ERISA or this
Agreement; or (iv) for any loss of any kind which may result by
reason of the manner of division of the Trust Fund or Investment
Fund into Investment Accounts.

At the request of the Trustee, the Company, the Investment
committee or the duly appointed Investment Manager shall certify,
the value of any securities or other property held in any
Investment Account managed by such Investment Manager, and such
certification shall be regarded as a direction with regard to

17

such valuation. The Trustee shall be entitled to conclusively rely upon such valuation for all purposes under this Trust Agreement.

An Investment Manager shall certify, at the request of the Trustee, the value of any securities or other property held in any Investment Account managed by such Investment Manager, and such certification shall be regarded as a direction with regard to such valuation. The Trustee shall be entitled to conclusively rely upon such valuation for all purposes under this Trust Agreement.]

Except as otherwise provided in this Trust Agreement, the Investment Manager of an Investment Account shall have the power and authority, to be exercised in its sole discretion at any time and from time to time, to issue orders for the purchase or sale of securities directly to a broker. Written notification of the issuance of each such order shall be given promptly to the Trustee by the Investment Manager and the confirmation of each such order shall be confirmed to the Trustee by the broker. The broker shall promptly provide confirmation of each such order to the Recordkeeper, which shall maintain all participant level accounts. The Recordkeeper shall provide to the Trustee all information reasonably required by the Trustee to fulfill its accounting and reporting obligations with respect to assets held in the Participant Directed Brokerage Accounts. Unless otherwise

18

directed by the Investment Manager, such notification shall be authority for the Trustee to pay for securities purchased or to deliver securities sold as the case may be. Upon the direction of the Investment Manager, the Trustee will execute and deliver appropriate trading authorizations, but no such authorization shall be deemed to increase the liability or responsibility of the Trustee under this Trust Agreement.

4. POWERS OF THE TRUSTEE.

4.1 Investment Powers of the Trustee. The Trustee shall have and exercise the following powers and authority (i) over Investment Accounts where it has express investment management discretion as provided in Section 3.5, (ii) upon direction of the Investment Manager of an Investment Account, (iii) upon direction of a Participant with respect to a Participant Directed Brokerage Account, or (iv) upon direction of the Plan Administrator: (x) for a Company Managed Account; or (y) for lending to participants in the Plan:

(a) To purchase, receive, or subscribe for any securities or other property and to retain in trust such securities or other property.

(b) To sell for cash or on credit, to grant options, convert, redeem, exchange for other securities or other property, to enter into standby agreements for future investment, either with or without a standby fee, or otherwise to dispose of any securities or other property at any time held by it.

(c) To settle, compromise or submit to arbitration any claims, debts, or damages, due or owing to or from the trust, to commence or defend suits or legal proceedings and to represent the trust in all suits or legal proceedings in any

court of law or before any other body or tribunal.

(d) To trade in financial options and futures, including index options and options on futures and to execute in connection therewith such account agreements and other agreements including contracts for the exchange of interest rates, or investment performance, currencies or other notional principal contracts in such form and upon such terms as the Investment Manager or the Investment Committee shall direct.

(e) To exercise all voting rights, tender or exchange rights, any conversion privileges, subscription rights and other rights and powers available in connection with any securities or other property at anytime held by it; to oppose or to consent to the reorganization, consolidation, merger, or readjustment of the finances of any corporation, company or association, or to the sale, mortgage, pledge or lease of the property of any corporation, company or association any of the securities which may at any time be held by it and to do any act with reference thereto, including the exercise of options, the making of agreements or subscriptions and the payment of expenses, assessments or subscriptions, which may be deemed necessary or advisable by the Investment Manager or Investment Committee in connection therewith, and to hold and retain any securities or other property which it may so acquire; and to deposit any property with any protective, reorganization or similar committee, and to pay and agree to pay part of the expenses and compensation of any such committee and any assessments levied with respect to property so deposited.

(f) To lend to participants in the Plan such amounts and upon such terms and conditions as the Plan Administrator or Recordkeeper may direct. Any such direction shall be deemed to include a certification by the Plan Administrator or Recordkeeper that such lending is in accordance with the provisions of ERISA and the Plan.

(g) To borrow money in such amounts and upon such terms and conditions as shall be deemed advisable or proper by the Investment Committee or Investment Manager to carry out the purposes of the trust and to pledge any securities or other property for the repayment of any such loan.

(h) To invest all or a portion of the Trust Fund in contracts issued by insurance companies, including contracts under which the insurance company holds Plan assets in a separate account or commingled separate account managed by the

insurance company. The Trustee shall be entitled to rely
upon any written directions of the Investment Committee or
the Investment Manager under this Section 4.1, and the
Trustee shall not be responsible for the terms of any
insurance contract that it is directed to purchase and hold
or for the selection of the issuer thereof or for performing
any functions under such contract (other than the execution
of any documents incidental thereto on the instructions of
the Investment Committee or the Investment Manager).

(i)     To manage, administer, operate, lease for any number of
        years, develop, improve, repair, alter, demolish, mortgage,
        pledge, grant options with respect to, or otherwise deal
        with any real property or interest therein at any time held
        by it, and to hold any such real property in its own name or
        in the name of a nominee, with or without the addition of
        words indicating that such property is held in a fiduciary
        capacity, all upon such terms and conditions as may be
        deemed advisable by the Investment Manager or Investment
        Committee.

(j)     To renew, extend or participate in the renewal or extension
        of any mortgage, upon such terms as may be deemed advisable
        by the Investment Manager or Investment Committee, and to
        agree to a reduction in the rate of interest on any mortgage
        or of any guarantee pertaining thereto in any manner and to
        any extent that may be deemed advisable by the Investment
        Manager or Investment Committee for the protection of the
        Trust Fund or the preservation of the value of the
        investment; to waive any default, whether in the performance
        of any covenant or condition of any mortgage or in the
        performance of any guarantee, or to enforce any such default
        in such manner and to such extent as may be deemed advisable
        by the Investment Manager or Investment Committee; to
        exercise and enforce any and all rights of foreclosure, to
        bid on property on foreclosure, to take a deed in lieu of
        foreclosure with or without paying consideration therefor,
        and in connection therewith to release the obligation on the
        bond secured by such mortgage, and to exercise and enforce
        in any action, suit or proceeding at law or in equity any
        rights or remedies in respect to any such mortgage or
        guarantee.

(k)     To hold part or all of the Trust Fund uninvested.

(l)     To employ suitable agents and counsel and to pay their
        reasonable and proper expenses and compensation, provided,
        however, that such the party instructing payment has

properly considered its fiduciary responsibilities as to such payment or received approval from the Company for such payments.

(m) To purchase and sell foreign exchange and contracts for foreign exchange, including transactions entered into with State Street Bank and Trust Company, its agents or subcustodians.

(n) To form corporations and to create trusts to hold title to any securities or other property, all upon such terms and conditions as may be deemed advisable by the Investment Manager or Investment Committee.

(o) To register any securities held by it hereunder in its own name, in the name of its nominee, in the name of its agent, or in the name of its agent's nominee with or without the addition of words indicating that such securities are held in a fiduciary capacity, and to hold any securities in bearer form and to deposit any securities or other property in a depository or clearing corporation.

(p) To make, execute and deliver, as Trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases, or other instruments in writing necessary or desirable for the accomplishment of any of the foregoing powers.

(q) To invest at any bank including State Street Bank and Trust Company (i) in any type of interest bearing investments (including, but not limited to savings accounts, money market accounts, certificates of deposit and repurchase agreements) and (ii) in noninterest bearing accounts (including but not limited to checking accounts).

(r) To invest in collective investment funds maintained by State Street Bank and Trust Company or by other banks for the investment of the assets of employee benefit plans qualified under Section 401(a) of the Code, whereupon the instruments establishing such funds, as amended, shall be deemed a part of this Trust Agreement and incorporated by reference herein.

(s) To invest in open-end and closed-end investment companies, regardless of the purposes for which such fund or funds were created, including those managed, serviced or advised by the Trustee, an affiliate of the Trustee, and any partnership, limited or unlimited, joint venture and other forms of joint enterprise created for any lawful purpose.

22

The Trustee shall transmit promptly to the Investment Committee or the Investment Manager, as the case may be, all notices of conversion, redemption, tender, exchange, subscription, class action, claim in insolvency proceedings or other rights or powers relating to any of the securities in the Trust Fund, which notices are received by the Trustee from its agents or custodians, from issuers of the securities in question and from the party (or its agents) extending such rights. The Trustee shall have no obligation to determine the existence of any conversion, redemption, tender, exchange, subscription, class action, claim in insolvency proceedings or other right or power relating to any of the securities in the Trust Fund of which notice was given prior to the purchase of such securities by the Trust Fund, and shall have no obligation to exercise any such right or power unless the Trustee is informed of the existence of the right or power.

The Trustee shall not be liable for any untimely exercise or assertion of such rights or powers described in the paragraph immediately above in connection with securities or other property of the Trust Fund at any time held by it unless (i) it or its agents or custodians are in actual possession of such securities or property and (ii) it receives directions to exercise any such rights or powers from the Investment Committee or the Investment Manager, as the case may be, and both (i) and (ii) occur at least

23

three business days prior to the date on which such rights or powers are to be exercised.

If the Trustee is directed by the Investment Committee or an Investment Manager to purchase securities issued by any foreign government or agency thereof, or by any corporation or other entity domiciled outside of the United States, it shall be the responsibility of the Investment Committee or Investment Manager, as the case may be, to advise the Trustee in writing with respect to any laws or regulations of any foreign countries or any United States territory or possession which shall apply in any manner whatsoever to such securities, including, without limitation, receipt by the Trustee of dividends, interest or other distributions on such securities.

All shares of a registered investment company ("Investment Company Shares") shall be registered in the name of the Trustee or its nominee. Subject to any requirement of applicable law, the Trustee will transmit to Recordkeeper or the Investment Committee, as the case may be, copies of any notices of shareholders' meetings, proxies and proxy-soliciting materials, prospectuses and the annual or other reports to shareholders, with respect to Investment Company Shares held in the Trust. The Trustee shall act in accordance with appropriate directions received from Recordkeeper or the Investment Committee, as the case may be, with respect to matters to be voted upon by the

shareholders of the Investment Company. Such directions must be in writing on a form approved by the Trustee, signed by the addressee and delivered to the Trustee within the time prescribed by it. The Trustee will not vote Investment Company Shares as to which it receives no written directions. For the purposes of this Section, Investment Company means a registered investment company provided that its prospectus offers its shares under the Plan.

4.2 <u>Administrative Powers of the Trustee</u>. Notwithstanding the appointment of an Investment Manager, the Trustee shall have the following powers and authority, to be exercised in its sole discretion, with respect to the Trust Fund:

(a) To employ suitable agents, custodians and counsel and to pay their reasonable expenses and reasonable compensation, provided, however, that Trustee shall not employ, subcontract to, or delegate any responsibility hereunder to Company or any affiliate thereof, and provided, further, that such compensation shall not be paid from plan assets without the consent of the Investment Committee.

(b) To appoint ancillary or subordinate trustees or custodians to hold any portion of the assets, title to the assets or other indications of ownership to the assets of the trust, provided, however, that such arrangements shall be consistent with ERISA and the regulations thereunder, and to pay the reasonable expenses of and reasonable compensation to such custodian or ancillary or subordinate trustee.

(c) To register any securities held by it hereunder in its own name, in the name of its nominee, in the name of its agent, or in the name of its agent's nominee with or without the addition of words indicating that such securities are held in a fiduciary capacity, and to hold any securities in bearer form and to deposit any securities or other property in a depository or clearing corporation.

(d)   To make, execute and deliver, as Trustee, any and all deeds, leases, mortgages, conveyances, waivers, releases or other instruments in writing necessary or desirable for the accomplishment of any of the foregoing powers.

(e)   Generally to do all ministerial acts, whether or not expressly authorized, which the Trustee may deem necessary or desirable in carrying out its duties under this Trust Agreement.

Notwithstanding anything in the Plan or this Trust Agreement to the contrary, the Trustee shall not be required by the Company, the Investment Committee, Recordkeeper or any Investment Manager to engage in any action, nor make any investment which constitutes a prohibited transaction or is otherwise contrary to the provisions of ERISA or which is otherwise contrary to law or to the terms of the Plan or this Trust Agreement, and Trustee shall not knowingly engage in any such investment.

The Trustee may consult with legal counsel (who may be counsel for the Company or Investment Committee) concerning any question which may arise with reference to this Trust Agreement and its powers and duties hereunder.  Provided such counsel is reasonably acceptable to the Company or Investment Committee (in the case of subjects delegated to the Investment Committee), the written opinion of such counsel shall be full and complete protection of the Trustee in respect to any action taken or suffered by the Trustee hereunder in good faith reliance on said opinion.

5.   INDEMNIFICATION AND STANDARD OF CARE.

5.1 <u>Indemnification</u>. To the extent permitted by applicable law, the Company shall indemnify and save harmless the Trustee and any Nominee used for transactions of the Trust Fund for and from any loss or expense (including reasonable attorneys' fees) arising (a) out of an authorized action hereunder taken the Trustee or any matter as to which this Trust Agreement provides that the Trustee is directed, protected, not liable, or not responsible, (b) out of a Plan not qualifying as an ERISA 404(c) plan or the inability of a Plan participant or beneficiary to exercise independent control over his account within the meaning of 29 C.F.R. section 2550.404c-1, or (c) by reason of any breach of any statutory or other duty owed to the Plan by the Company, the Investment Committee, the Recordkeeper or any Investment Manager or any delegate of any of them (and for the purposes of this sentence the Trustee shall not be considered to be such a delegate), whether or not the Trustee may also be considered liable for that other person's breach under the provisions of Section 405(a) of ERISA; provided, however, that the Trustee shall not be entitled to indemnification to the extent that such loss, expense, cost or fee arises out of or in connection with the negligence, fraud, willful misconduct, bad faith, malfeasance, material breach of this Agreement (including the standard of care), or violation of applicable law of the Trustee or its agent.

Redacted Document

For the forgoing indemnity to apply, Trustee shall 1) promptly notify the Company in writing of any legal or regulatory action against the Trustee, 2) cooperate in the defense of such claim, 3) reasonably accept counsel provided by the Company, 4) share counsel with another defendant in such action (provided, however, there is no conflict between defendants), and 5) not settle, compromise or capitulate to such action without the consent of the Company (such consent shall not be reasonably withheld).

5.2  Standard of Care.  The Trustee shall discharge its duties under this Agreement with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of any enterprise of like character and with like aims.

6.  SECURITIES OR OTHER PROPERTY.

The words "securities or other property", used in this Trust Agreement, shall be deemed to refer to any property, real or personal, or part interest therein, wherever situated, including, without limitation, governmental, corporate or personal obligations, trust and participation certificates, partnership interests, annuity or investment contracts issued by an insurance company, leaseholds, fee titles, mortgages and other interests in realty, preferred and common stocks, certificates of deposit,

financial options and futures or any other form of option,
evidences of indebtedness or ownership in foreign corporations or
other enterprises or indebtedness of foreign governments, and any
other evidences of indebtedness or ownership, including
securities or other property of the Company, even though the same
may not be legal investment for trustees under any law other than
ERISA.

7.  SECURITY CODES.

      If the Trustee has issued to the Company, or to any duly
appointed Investment Manager, security codes or passwords in
order that the Trustee may verify that certain transmissions of
information, including directions or instructions, have been
originated by the Company or the Investment Manager, as the case
may be, the Trustee shall be kept indemnified by and be without
liability to the Company for any action taken or omitted by it in
reliance upon receipt by the Trustee of transmissions of
information with the proper security code or password, including
communications purporting to be directions or instructions, which
the Trustee reasonably believes to be from the Company or
Investment Manager.

8.  TAXES AND TRUSTEE COMPENSATION.

      The Trustee shall pay out of the Trust Fund all real and
personal property taxes, income taxes and other taxes of any and
all kinds levied or assessed under existing or future laws

against the Trust Fund. Until advised to the contrary by the Company, Investment Committee or Plan Administrator, the Trustee shall assume that the Trust is exempt from Federal, State and local income taxes, and shall act in accordance with that assumption. The Plan Administrator shall timely file all Federal, State and local tax and information returns relating to the Plan and Trust.

Trustee shall timely provide any pertinent information it receives or maintains to Company (or its delegee) necessary to satisfy tax reporting obligations and requirements of the Trust Fund. Trustee shall also provide timely periodic reports of taxes incurred, levied or assessed against the Trust Fund.

The Trustee shall be paid such reasonable compensation as provided in Schedule A, attached hereto and made a part hereof. Such compensation exhibit may from time to time be amended by the Company and the Trustee in writing.

Such compensation and all reasonable and proper expenses of administration of the Trust, including counsel fees, shall be withdrawn by the Trustee out of the Trust Fund unless paid by the Company (or objected to in writing) within 30 days of invoice, but such compensation and expenses shall be paid by the Company if the same cannot by operation of law be withdrawn from the Trust Fund.

All payments from the Trust Fund under this Article 9 may be

made without approval or direction.

9.   ACCOUNTS OF THE TRUSTEE.

The Trustee shall maintain or cause to be maintained
suitable records, data and information relating to its functions
hereunder.

The Trustee shall keep accurate and detailed accounts of all
investments, receipts, disbursements, and other actions
hereunder, and such other records as the Company shall from time
to time direct, as reasonably agreed to by the Trustee, and shall
certify to the accuracy and completeness of such records.   The
Trustee's books and records relating thereto shall be open to
inspection and audit at all reasonable times by the Company or
its duly authorized representatives and each Investment Manager.
The Trustee shall be entitled to reasonable compensation and
reimbursement of its reasonable expenses incurred in connection
with such audits or inspections.

Within sixty days after the close of each fiscal year of the
trust and at more frequent intervals if reasonably requested by
the Plan Administrator, and within sixty days after the removal
or resignation of the Trustee as provided hereunder, termination
of the Plan, or termination of this Agreement, the Trustee shall
render to the Company a written statement and account showing in
reasonable summary the investments, receipts, disbursements, and
other transactions engaged in during the preceding fiscal year or

31

period, and setting forth the assets and liabilities of the trust. Trustee shall use its reasonable efforts to provide such statement within thirty days after the removal or resignation of the Trustee as provided hereunder, termination of the Plan, or termination of this Agreement.

Without otherwise limiting the provisions of this Agreement, the Trustee shall furnish the Company and the Plan Administrator such financial statements, and other information, as the Company or the Plan Administrator may reasonably request from time to time with respect to the assets held under the Trust Fund, and the Trustee shall timely provide the Company and the Plan Administrator with all information in its possession or reasonably available to it relating to the services provided by the Trustee under this Trust.

Accounts maintained by the Investment Committee, Plan Administrator or Recordkeeper, such as participant directed brokerage accounts, may be incorporated into Trustee reports. Unless the Company shall have filed with the Trustee written exceptions or objections to any such statement and account within ninety days after receipt thereof and except as otherwise required or provided by applicable law, the Company shall be deemed to have approved such statement and account, and in such case or upon written approval by the Investment Committee of any such statement and account, the Trustee shall be released and

discharged with respect to all matters and things embraced in such statement and account as though it had been settled by a decree of a court of competent jurisdiction in an action or proceeding in which the Company, all other necessary parties and all persons having any beneficial interest in the Trust Fund were parties. Notwithstanding the foregoing, the actual or deemed approval of an account by the Company or the Investment Committee shall not discharge the Trustee as to any matter set forth in such account that is attributable to the Trustee's negligence, willful misconduct, or fraud in carrying out the responsibilities specifically allocated to it under the terms of this Agreement with respect to which the Company or the Investment Committee, files a specific written objection with the Trustee within the ninety day period.

The Trustee shall determine the fair market value of assets of the Trust Fund based upon valuations provided by Investment Managers, information and financial publications of general circulation, statistical and valuation services, records of security exchanges, appraisals by qualified persons, transactions and bona fide offers in assets of the type in question and other information customarily used in the valuation of property.

The Company or its delegate, each Investment Manager, and the Trustee shall file such descriptions and reports and make such other publications, disclosures, registrations and other

33

filings as are required of them respectively by ERISA.

Nothing contained in this Trust Agreement or in the Plan shall deprive the Company or the Trustee of the right to have a judicial settlement of its account. In any proceeding for a judicial settlement of the Trustee's accounts or for instructions in connection with the trust, the only necessary party thereto in addition to the Trustee shall be the Plan Administrator and any party required by law, and no participant or other person having or claiming any interest in the Trust Fund shall be entitled to any notice or service of process (except as required by law). Any judgment, decision or award entered in any such proceeding or action shall be conclusive upon all interested persons.

10. RELIANCE ON COMMUNICATIONS.

The Trustee may rely upon a certification of the Plan Administrator, Investment Committee or its delegates, or the Recordkeeper with respect to any instruction, direction or approval of such person or the Recordkeeper and may rely upon a written certification of the Company as to the membership of the Plan Administrator, Investment Committee or such replacement thereto as they then exist, and may continue to rely upon such certification until a subsequent certification is filed with the Trustee.

The Trustee shall be fully protected in acting upon any instrument, certificate, or paper of the Company, the Plan

34

Administrator, the Investment Committee or the Recordkeeper, believed by it to be genuine and to be signed or presented by any authorized person, and the Trustee shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing but may accept the same as fully authorized by the Company, the Plan Administrator, the Investment Committee or the Recordkeeper, if applicable, as the case may be.

The Trustee shall be further protected in relying upon a certification from any Investment Manager appointed by the Investment Committee as to the person or persons authorized to give instructions or directions on behalf of such Investment Manager and may continue to rely upon such certification until a subsequent certification is filed with Trustee.

11.  RESIGNATION AND REMOVAL OF TRUSTEE.

Any Trustee acting hereunder may resign at any time by giving ninety days' prior written notice to the Company, which notice may be waived in writing by the Company in its sole discretion.  The Company may remove the Trustee at any time upon thirty days' prior written notice to the Trustee, which notice may be waived in writing by the Trustee.  In case of the resignation or removal of the Trustee, the Company shall appoint a successor trustee.  If a new trust agreement is not used, any successor trustee shall have the same powers and duties as those conferred upon the Trustee named in this Trust Agreement.  The

35

removal of a Trustee and the appointment of a new Trustee shall be by a written instrument delivered to the Trustee. Upon the appointment of a successor trustee, the resigning or removed Trustee shall transfer or deliver the Trust Fund to such successor trustee.

12.  AMENDMENT.

This Trust Agreement may be amended by written agreement between the Trustee and the Company at any time or from time to time, and the provisions of any such amendment may be applicable to the Trust Fund as constituted at the time of the amendment as well as to the part of the Trust Fund subsequently acquired.

13.  TERMINATION.

This Trust Agreement and the trust created hereby may be terminated at any time by the Company, and upon such termination or upon the dissolution or liquidation of the Company, in the event that a successor to the Company by operation of law or by the acquisition of its business interests shall not elect to continue the Plan and the trust, the Trust Fund shall be paid out by the Trustee when directed by the Investment Committee. Notwithstanding the foregoing, the Trustee shall not be required to pay out any assets of the Trust Fund upon termination of the Trust until the Trustee has received written certification from the Investment Committee that the termination is in compliance with all provisions of law with respect to such termination.  The

Trustee shall rely conclusively on such written certification, and shall be under no obligation to investigate or otherwise determine its propriety, unless it knows it violates ERISA.

14. <u>MISCELLANEOUS</u>.

14.1 <u>Governing Law</u>. To the extent not governed by ERISA, as heretofore or hereafter amended, the provisions of this Trust Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts. The Company hereby submits to the jurisdiction of the State and Federal Courts located in the Commonwealth of Massachusetts including any appellate courts thereof.

14.2 <u>No Reversion to Company</u>. Except as provided herein, no portion of the principal or the income of the Trust Fund shall revert to or be recoverable by the Company or ever be used for or diverted to any purpose other than for the exclusive benefit of participants in the Plan and persons claiming under or through them pursuant to the Plan, provided, however, that:

(a) all contributions are conditioned upon the deductibility of the contributions under Section 404(a) of the Code, and, to the extent determined to be nondeductible, the Trustee shall, upon written request of the affected Company, return such amount as may be permitted by law to such Company, as appropriate, within one year after the determination of nondeductibility or within such other period as is permitted by applicable law; and

(b) if a contribution or any portion thereof is made by the Company by a mistake of fact, the Trustee shall, upon written request of the Company, return such amounts as may be permitted by law to the Company, as appropriate, within one year after the date of payment to the Trustee or within

such other period as is permitted by applicable law; and

(c) if a contribution is conditioned upon the initial qualification of the Plan and Trust under Section 401 and 501 of the Code, respectively, and if the Plan receives an adverse determination with respect to its initial qualification, the contribution of the Company or an Employer to the Trust shall be returned by the Trustee to the Company or such Employer, as appropriate, within one year after such determination, but only if the application for the determination is made by the time prescribed by law for filing the Company's or such Employer's federal income tax return for the taxable year in which such Plan was adopted, or such later date as the Secretary of the Treasury may prescribe; and

(d) in the event that a Plan whose assets are held in the Trust Fund is terminated, assets of such Plan may be returned to the Company if all Plan liabilities to participants and beneficiaries of such Plan have been satisfied; and

(e) assets may be returned to the Employer to the extent that the law permits such transfer.

The Trustee shall be under no obligation to return any part of the Trust Fund as provided in this Section 14.2 until the Trustee has received a written certification from the Plan Administrator that such return is in compliance with this Section 14.2, the Plan and the requirements of applicable law. The Trustee shall rely conclusively on such written certification and shall be under no obligation to investigate or otherwise determine its propriety, unless it knows that such certification violates ERISA.

14.3 <u>Non-Alienation of Benefits</u>. No benefit to which a participant or his beneficiary is or may become entitled under a Plan shall at any time be subject in any manner to alienation or

encumbrance, nor be resorted to, appropriated or seized in any
proceeding at law, in equity or otherwise. No participant or
other person entitled to receive a benefit under a Plan shall,
except as specifically provided in such Plan, have power in any
manner to transfer, assign, alienate or in any way encumber such
benefit under such Plan, or any part thereof, and any attempt to
do so shall be void.

14.4 Duration of Trust. Unless sooner terminated, the
trust created under this Trust Agreement shall continue for the
maximum period of time which the laws of the Commonwealth of
Massachusetts shall permit.

14.5 No Guarantees. Neither the Company, nor the Trustee
guarantees the Trust Fund from loss or depreciation, nor the
payment of any amount which may become due to any person under
the Plan or this Trust Agreement.

14.6 Duty to Furnish Information. Both the Company and the
Trustee shall furnish to the other any documents, reports,
returns, statements, or other information that the other
reasonably deems necessary to perform its duties imposed under
the Plan or this Trust Agreement or otherwise imposed by law.

14.7 Parties Bound. This Trust Agreement shall be binding
upon the parties hereto, all participants in the Plan and persons
claiming under or through them pursuant to the Plan, and, as the
case may be, the heirs, executors, administrators, successors,

39

and assigns of each of them. The provisions of Articles 5, 7 and 8 shall survive termination of the Trust created under this Trust Agreement or resignation or removal of the Trustee for any reason.

In the event of the merger or consolidation of the Company or other circumstances whereby a successor person, firm or company shall continue to carry on all or a substantial part of its business, and such successor shall elect to carry on the provisions of the Plan applicable to such business, as therein provided, such successor shall be substituted hereunder for the Company upon the filing in writing of its election so to do with the Trustee. The Trustee may, but need not, rely on the certification of an officer of the Company, and a certified copy of a resolution of the Board of Directors of such successor, reciting the facts, circumstances and consummation of such succession and the election of such successor to continue the said Plan as conclusive evidence thereof, without requiring any additional evidence.

14.8 Necessary Parties to Disputes. Necessary parties to any accounting, litigation or other proceedings shall include only the Trustee and the Company and the settlement or judgment in any such case in which the Company and the Trustee are duly served or cited shall be binding upon all participants in the Plan and their beneficiaries and estates, and upon all persons

claiming by, through or under them.

14.9  <u>Unclaimed Benefit Payments</u>.  If any check or share certificate in payment of a benefit hereunder which has been mailed by regular US mail to the last address of the payee furnished the Trustee by the Company or Recordkeeper is returned unclaimed, the Trustee shall notify the Company or Recordkeeper and shall discontinue further payments to such payee until it receives the further instruction of the Company or Recordkeeper.

14.10  Severability.  If any provisions of this Trust Agreement shall be held by a court of competent jurisdiction to be invalid or unenforceable, the remaining provisions of this Trust Agreement shall continue to be fully effective.

14.11  References.  Unless the context clearly indicates to the contrary, a reference to a statute, regulation, document or provision shall be construed as referring to any subsequently enacted, adopted or executed counterpart.

14.12  Headings.  Headings and subheadings in this Trust Agreement are inserted for convenience of reference only and are not to be considered in the construction of its provisions.

14.13  No Liability for Acts of Predecessor and Successor Trustees.  The Trustee shall have no liability for the acts or omissions of any predecessors or successors in office.

14.14  Counterparts.  This Trust Agreement may be executed in one or more counterparts, each of which shall constitute an

41

original.

14.15   Appointments.   The Company is solely responsible for appointment of the Plans Administration Committee and the Investment Committee.   The company may also replace either committee with other persons, entities or committees by written notice to the Trustee, who may rely on such notice until it is revoked in writing.   If the respective committee does not exist and no successor appointment has been made by Company, Company shall act in place of the Plans Administration Committee under this Agreement, and the Named Fiduciary (but not the Plan's participants) shall act in place of the Investment Committee, and if no Named Fiduciary exists, the Company shall so serve.

14.16   Representations.   Each of the parties represents and warrants to the other party that it has full authority to enter into this Trust Agreement upon the terms and conditions hereof and that the individual executing this Trust Agreement on its behalf has the requisite authority to bind such party to this Trust Agreement.   Each of the parties represents and warrants that this Trust Agreement constitutes a legal, valid and binding obligation, enforceable against the other parties in accordance with its terms, except as enforcement may be limited by ERISA, bankruptcy, insolvency, moratorium or other laws affecting the enforcement of creditors' rights generally.

42

Further, as to the Company Stock Fund, the Company

represents to the Trustee

> The documents establishing the Company Stock Fund and any
> related plans and trusts permit investment in the collective
> investment Company Stock Funds referred to in Section
> 15.3.7(d) of this Contract and incorporate the terms of such
> collective Company Stock Funds by reference.

> The Company Stock Fund is part of a Trust that is tax exempt
> under section 501 of the Code.

> The Company Stock Fund is part of a defined contribution
> Plan that is "qualified" with the meaning of Section 401(a)
> of the Code.

> Either (i) the Plan provides that each participant is a
> "named fiduciary" as described in Section 402(a)(2) of the
> provisions of the Employee Retirement Income Security Act of
> 1974, as amended ("ERISA") who is duly authorized under the
> Plan to provide investment direction to the Company, acting
> as agent for such participant, for conveyance to the Company
> Stock Trustee or (ii) the Plan is duly qualified as an
> "ERISA Section 404(c) Plan" described in 29 C.F.R. 2550.404c
> under which each participant is authorized to provide
> investment direction to the Company, acting as agent for
> such Participant, for conveyance to the Company Stock
> Trustee.

> The Plan does not prohibit the Company from entering into an
> Agreement with the Company Stock Trustee

> The Plan does not prohibit the Company from appointing the
> Recordkeeper to perform daily recordkeeping services as
> described herein.

15. CUSTODY OF COMPANY STOCK

15.1 EMPLOYMENT OF CUSTODIAN AND PROPERTY TO BE HELD BY IT.

The Company employs the Custodian as the custodian of

certain assets, comprising of Qualifying Employer Securities,

which are subject to an Agreement dated December 8, 2008 between

43

the Company and the Company Stock Trustee whereby the Company Stock Trustee acts as a "directed trustee" with respect the portion of the Plan comprised of the Citigroup Common Stock Fund. Such assets shall hereinafter be called the "Company Stock Fund."

All property of the Company Stock Fund delivered to the Custodian, its agents or its subcustodians shall be held and dealt with as provided in this Section 15. The Custodian shall not be responsible for any property of the Company Stock Fund not delivered to the Custodian, its agents or its subcustodians.

15.2 APPOINTMENT OF RECORDKEEPER

The Company has appointed ING as "Recordkeeper" to perform certain services including but not limited to maintaining participant accounts for all contributions, loans and loan repayments, rollovers, and other deposits made for the purpose of determining how such deposits are to be allocated to the investment options of the Plan, for determining requirements for disbursements from or transfers among investment options in accordance with the terms of the Plan, for maintaining participant records for the purpose of voting or tendering shares in an investment option as described in Section 15.3 herein, for distributing information about the investment options provided for under the Plan, and for distributing participant statements at periodic intervals.

15.3 DUTIES OF THE CUSTODIAN WITH RESPECT TO PROPERTY

HELD BY THE CUSTODIAN

15.3.1    Holding Securities and Cash.  The Custodian shall
hold, or direct its agents or its subcustodians to hold, for the
account of the Company Stock Fund cash and all securities and
other noncash property other than securities which are held by
the Custodian, its agents or subcustodians in the Federal Reserve
book-entry system, in a clearing agency which acts as a
securities depository or in another book-entry system for the
central handling of securities collectively referred to herein as
"Securities System."

15.3.2    Delivery of Securities.  The Custodian shall
release and deliver, or direct its agents or its subcustodians to
release, securities of the Company Stock Fund held by the
Custodian, its agents or its subcustodians or in a Securities
System account of the Custodian, its agents or its subcustodians
only upon receipt of Proper Instructions (as defined in Section
15.3.11 herein), which may be standing instructions, in the
following cases:

> (a)  Upon sale of such securities for the Company Stock
> Fund, unless otherwise directed by Proper Instructions; (i)
> in accordance with the customary or established practices
> and procedures in the jurisdiction or market where the
> transactions occur, including, without limitation, delivery
> to the purchaser thereof or to a dealer therefor (or an
> agent of such purchaser or dealer) against expectation of
> receiving later payment; or (ii) in the   case of a sale
> effected through a Securities System, in accordance with the
> rules governing the operations of the Securities System;
>
> (b)  Upon the receipt of payment in connection with any

45

Redacted Document

repurchase agreement related to such securities;

(c)   To the depository agent in connection with tender or other similar offers for securities;

(d)   To the issuer thereof or its agent when such securities are called, redeemed, retired or otherwise become payable; provided that, unless otherwise directed by Proper Instructions, the cash or other consideration is to be delivered to the Custodian, its agents or its subcustodians;

(e)   To the issuer thereof, or its agent, for transfer into the name of the Custodian or of any nominee of the Custodian or into the name of any of its agents or subcustodians or their nominees or for exchange for a different number of bonds, certificates or other evidence representing the same aggregate face amount or number of units;

(f)   To brokers, clearing banks or other clearing agents for examination in accordance with "street delivery" custom in connection with a sale authorized by the Investment Manager (as defined in Section 15.9 herein);

(g)   For exchange or conversion to any plan of merger, consolidation, recapitalization, reorganization or readjustment of the securities of the issuer of such securities, or pursuant to provisions for conversion contained in such securities, or pursuant to any deposit agreement; provided that, unless otherwise directed by Proper Instructions, the new securities and cash, if any, are to be delivered to the Custodian, its agents or its subcustodians;

(h)   In the case of warrants, rights or similar securities, the surrender thereof in the exercise of such warrants, rights or similar securities or the surrender of interim receipts or temporary securities; provided that, unless otherwise directed by Proper Instructions, the new securities and cash, if any, are to be delivered to the Custodian, its agents or its subcustodians;

(i)   For delivery as security in connection with any borrowings by Company Stock Trustee and requiring a pledge of assets by the Company Stock Fund;

(j) In connection with trading in options and futures contracts, including delivery as original margin and variation margin;

(k) In connection with securities lending by the Company Stock Fund; and

(1) For any other purpose, <u>but only</u> upon receipt of Proper Instructions specifying the securities to be delivered and naming the person or persons to whom delivery of such securities shall be made.

15.3.3    <u>Registration of Securities</u>.  Securities held by the Custodian, its agents or its subcustodians (other than bearer securities or securities held in a Securities System) shall be registered in the name of the Custodian or in the name of any nominee of the Custodian or in the name of any of its agents or its subcustodians or of their nominees. The Custodian, its agents and its subcustodians shall not be obligated to accept securities on behalf of the Company Stock Fund under the terms of this Contract unless such securities are in "street name" or other good delivery form.

15.3.4    <u>Bank Accounts</u>.  The Custodian, its agents or its subcustodians may open and maintain a bank account or accounts in the name of the Custodian, subcustodian, their respective nominees otherwise, in such banks or trust companies as they may in their discretion deem advisable (including a bank of the Custodian), subject only to draft or order by the Custodian, its agents or its subcustodians acting pursuant to the terms of this Contract, and shall hold in such account or accounts, subject to the provisions hereof, cash received by or from or for the account of the Company Stock Fund.  Such Company Stock Funds

47

shall be deposited by the Custodian, its agents or its subcustodians in their capacity as Custodian, agent or subcustodian and, except as otherwise provided under this Contract, shall be withdrawable by the Custodian, its agents or its subcustodians only in that capacity.

15.3.5 <u>Income Crediting</u>.  With respect to the securities or other assets held hereunder, the Custodian shall credit income to the Company Stock Fund as such income is received or in accordance with Custodian's then current payable date income schedule.  Any credit to the Company Stock Fund in advance of receipt may be reversed when Custodian determines that payment will not occur in due course and the Company Stock Fund may be charged at Custodian's applicable rate for time credited.  Income on securities loaned other than from Custodian's securities lending program shall be credited as received.

15.3.6 <u>Settlement Crediting (Purchases and Sales)</u>.

(a)   The Custodian shall, in accordance with the terms set out in this Section 15.3.6, debit or credit the appropriate cash account of the Company Stock Fund in connection with (i) the purchase of securities and (ii) proceeds of the sale of securities on a contractual settlement basis.

(b)   The services described above (the "Contractual Settlement Services") shall be provided for such instruments and in such markets as the Custodian may advise from time to time. The Custodian may terminate or suspend any part of the provision of the Contractual Settlement Services under this Contract at its sole discretion immediately upon notice to the Company, including, without limitation, in the event of force majeure events affecting settlement, any disorder in markets, or other changed external business circumstances affecting the markets.

48

(c)   The consideration payable in connection with a purchase transaction shall be debited from the appropriate cash account of the Company Stock Fund as of the time and date that monies would ordinarily be required to settle such transaction in the applicable market.  The Custodian shall promptly recredit such amount at the time that the Investment Manager notifies the Custodian by Proper Instruction that such transaction has been canceled.

(d)   With respect to the settlement of a sale of securities, a provisional credit of an amount equal to the net sale price for the transaction (the "Settlement Amount") shall be made to the Company Stock Fund as if the Settlement Amount had been received as of the close of business on the date that monies would ordinarily be available in good Company Stock Funds in the applicable market.  Such provisional credit will be made conditional upon the Custodian having received Proper Instructions with respect to, or reasonable notice of, the transaction, as applicable; and the Custodian or its agents having possession of the asset(s) (which shall exclude assets subject to any third party lending arrangement) associated with the transaction in good deliverable form and not being aware of any facts which would lead them to believe that the transaction will not settle in the time period ordinarily applicable to such transactions in the applicable market.

(e)   Simultaneously with the making of such provisional credit, the Company agrees that the Custodian shall have, and hereby grants to the Custodian, a security interest in any property at any time held in the Company Stock Fund to the full extent of the credited amount, and the Company hereby pledges, assigns and grants to the Custodian a continuing security interest and a lien on any and all such property under the Custodian's possession, in accordance with the terms of Section 15.6 of this Contract.  In the event that the Company Stock Fund fails to promptly repay any provisional credit, the Custodian shall have all of the rights and remedies of a secured party under the Uniform Commercial Code of The Commonwealth of Massachusetts.

(f)   The Custodian shall have the right to reverse any provisional credit or debit given in connection with the Contractual Settlement Services at any time when the

49

Custodian believes, in its reasonable judgment, that such transaction will not settle in accordance with its terms or amounts due pursuant thereto will not be collectable or where the Custodian has not been provided Proper Instructions with respect thereto, as applicable, and the Company Stock Fund shall be responsible for any costs or liabilities resulting from such reversal. Upon such reversal, a sum equal to the credited or debited amount shall become immediately payable by the Company Stock Fund to the Custodian and may be debited from any cash account held in the Company Stock Fund.

(g) In the event that the Custodian is unable to debit the Company Stock Fund, and the Company Stock Fund fails to pay any amount due to the Custodian at the time such amount becomes payable in accordance with this Contract, (i) the Custodian may charge the Company Stock Fund for costs and expenses associated with providing the provisional credit, including without limitation the cost of Company Stock Funds associated therewith, (ii) the amount of any accrued dividends, interest and other distributions with respect to assets associated with such transaction may be set off against the credited amount, (iii) the provisional credit and any such costs and expenses shall be considered an advance of cash for purposes of the Contract and (iv) the

Custodian shall have the right to setoff against any property and the discretion to sell, exchange, convey, transfer or otherwise dispose of any property at any time held for the Company Stock Fund to the full extent necessary for the Custodian to make itself whole.

15.3.7    Payment of Company Stock Fund Moneys. Only upon receipt of Proper Instructions and written agreement as to security procedures for payment orders, which may be standing instructions, or as may be otherwise authorized within this Contract, the Custodian shall pay out, or direct its agents or its subcustodians to pay out, moneys of the Company Stock Fund in the following cases:

(a)    Upon the purchase of securities for the Company Stock Fund, unless directed by Proper Instructions; (i) in accordance with the customary or established practices and procedures in the jurisdiction or market where the transactions occur, including, without limitation, delivering money to the seller thereof or to a dealer therefor (or an agent for such seller or dealer) against expectation of receiving later delivery  of such securities; or (ii) in the case of a purchase effected through a Securities System, in accordance with the rules governing the operation of such Securities System;

(b)    In connection with conversion, exchange or surrender of securities of the Company Stock Fund as set forth in Section 15.3.2 hereof;

(c)    For the payment of any expense or liability including but not limited to the following payments:  interest, taxes, management, accounting, transfer agent fees, legal fees and operating expenses;

51

(d) To the Trustee, including State Street Bank and Trust Company, of any collective investment Company Stock Fund maintained for the investment of the assets of employee benefit plans qualified under Section 401(a) and exempt from tax under Section 501(a) of the Internal Revenue Code;

(e)  For the purchase or sale of foreign exchange or foreign exchange contracts for the account of the Company Stock Fund, including transactions executed with or through the Custodian, its agents or its subcustodians;

(f) In connection with trading in options and futures contracts, including delivery as original margin and variation margin;

(g) In connection with securities borrowing by the Company Stock Fund; and

(h) For any other purpose, but only upon receipt of Proper Instructions specifying the amount of such payment and naming the person or persons to whom such payment to be made.

15.3.8    Appointment of Agents and Subcustodians.   The Custodian may at its discretion appoint and remove agents or subcustodians ("Custodial Agent") to carry out such of the provisions of this Contract as the Custodian may from time to time direct; provided, however, that such appointment shall not relieve the Custodian of its responsibilities or liabilities under this Contract.

15.3.9    Proxies.   The Custodian will, with respect to the securities held hereunder, cause to be promptly executed by the registered hold of such securities proxies received by the Custodian from its agents or its subcustodians or from issuers of the securities being held for the Company Stock Fund, without indication of the manner in which such proxies are to be voted,

52

and, upon receipt of Proper Instructions, shall promptly deliver such proxies, proxy soliciting materials and other notices relating to such securities.

15.3.10    Communications Relating to Company Stock Fund Securities.  The Custodian shall transmit promptly to the Recordkeeper, Investment Committee or Investment Manager written information (including, without limitation, pendency of calls and maturities of securities and expirations of rights in connection therewith) received by the Custodian from its agents or its subcustodians or from issuers of the securities being held for the Company Stock Fund.  With respect to tender or exchange offers, the Custodian shall transmit promptly to the Recordkeeper, Investment Committee, Company Stock Trustee or Investment Manager written information received by the Custodian from its agents or its subcustodians or from issuers of the securities whose tender or exchange is sought and from the party (or his agents) making the tender or exchange offer.  The Custodian shall not be liable for any untimely exercise of any tender, exchange or other right or power in connection with securities or other property, of the Company Stock Fund at any time held by it unless (i) it or its agents or subcustodians are in actual or effective possession of such securities or property and (ii) it receives Proper Instructions with regard to the exercise of any such right or power and both (i) and (ii) occur

53

at least three (3) business days prior to Custodian's deadline date to exercise such right or power.

15.3.11  Proper Instructions.  The term "Proper Instructions" shall mean instructions received by the Custodian from the Recordkeeper, Company Stock Trustee, the Investment Manager, the Investment Committee, or any person duly authorized by any of them.  Such instructions may be in writing signed by the authorized person or may be in a tested communication or in a communication utilizing access codes effected between electro-mechanical or electronic devices or may be by such other means as may be agreed to from time to time by the Custodian and the party giving such instructions (including, without limitation, oral instructions).  The Company Stock Trustee shall cause its duly authorized officer, or the duly authorized officer of any Investment Manager, to certify to the Custodian in writing the names and specimen signatures of persons authorized to give Proper Instructions.  The Custodian shall be entitled to rely upon the identity and authority of such persons until it receives notice from the Company Stock Trustee or the Investment Manager to the contrary.

15.3.12  Actions Permitted without Express Authority.  The Custodian may, at its discretion, without express authority from the Recordkeeper, Company Stock Trustee or the Investment Manager:

(a)   make payments to itself or others for minor expenses of handling securities or other similar items relating to its duties under this Contract, provided that all such payments shall be accounted for to the Company Stock Trustee;

(b)   surrender securities in temporary form for securities in definitive form;

(c)   endorse for collection checks, drafts, and other negotiable instruments; and

(d)   in general attend to all nondiscretionary details in connection with the sale, exchange, substitution, purchase, transfer and other dealings with the securities and property of the Company Stock Fund.

15.3.13   Evidence of Authority.  The Custodian shall be protected in acting upon any instructions, notice, request, consent, certificate, instrument or paper reasonably believed by it to be genuine and to have been properly executed or otherwise given by or on behalf of the Company Stock Trustee or an Investment Manager.  The Custodian may receive and accept a certificate from the Company Stock Trustee or an Investment Manager as conclusive evidence (i) of the authority of any person to act in accordance with such certificate or (ii) of any determination or of any action by the Company Stock Trustee or the Investment Manager as described in such certificate, and such certificate may be considered as in full force and effect until receipt by the Custodian of written notice to the contrary.

15.4 REPORTING.  The Custodian shall render to the Recordkeeper or Company Stock Trustee a monthly report of all monies received or paid on behalf of the Company Stock Fund and an itemized

statement of the securities for which it is accountable under this Contract as of the end of each month, as well as a list of all securities transactions that remain unsettled at that time. Custodian has no duty to verify reports it incorporates regarding securities or cash held outside its custody submitted by third parties, including but not limited to brokers, other banks or trust companies.

15.5 <u>COMPENSATION OF CUSTODIAN</u>. The Custodian shall be entitled to compensation for its services and expenses as Custodian set forth on the Fee Schedule XX attached hereto until a different compensation shall be in writing agreed upon between the Company and the Custodian.

If, in the performance of this Contract hereunder, the Custodian holds uninvested cash received from the Company Stock Trustee, Recordkeeper or Plan sponsor (or any related employer) any "float" earned thereon shall constitute a part of the Custodian's overall compensation for performance of the Services. The Company has negotiated with the Custodian and has agreed to allow the Custodian to retain such float income with the knowledge that the Company had the choice to either (i) retain such income for the benefit of the participants of the Plan and incur a higher custodian fee or (ii) allow the Custodian to retain such float income and realize a lower custodian fee.

15.6 <u>RESPONSIBILITY OF CUSTODIAN</u>. The Custodian shall not be

responsible for the title, validity or genuineness, including good deliverable form, of any property or evidence of title thereto received by it or delivered by it pursuant to this Contract and shall be held harmless in acting upon any notice, request, consent, certificate or instrument reasonably believed by it to be genuine and to be signed or otherwise given by the proper party or parties. The Custodian shall be held to the exercise of reasonable care in carrying out the provisions of this Contract, but the Custodian or its Nominee shall be kept indemnified by the Company for any action taken or omitted by it in good faith and without negligence. The Custodian shall be without liability to the Company Stock Fund, the Company or the Company Stock Trustee for any loss resulting from or caused by: (i) events or circumstances beyond its reasonable control including nationalization, expropriation, currency restrictions, act of war or terrorism, riot, revolution, acts of God or other similar events or acts; (ii) errors by the Company Stock Trustee, Recordkeeper, or any Investment Manager in its instructions to the Custodian or (iii) acts or omissions by a Securities System. It shall be entitled to rely on and may act upon advice of counsel (who may be counsel for the Company Stock Trustee or Company Stock Fund or the Company) on all matters, and shall be without liability for any action reasonably taken or omitted pursuant to such advice.

If the Custodian advances cash or securities for any purpose, including the purchase or sale of foreign exchange or of contracts for foreign exchange, or in the event that the Custodian shall incur or be assessed taxes, interest, charges, expenses, assessments or other liabilities including, without limitation, unpaid fees in connection with the performance of this Contract, except such as may arise from its own negligent act or negligent omission, any property at any time held for the account of the Company Stock Trustee or in the Company Stock Fund shall be security therefor and, should the Company fail to repay the Custodian promptly, the Custodian shall be entitled to utilize available cash and to dispose of the Company Stock Fund assets to the extent necessary to effect its right of setoff and make itself whole.

Notwithstanding any express provision to the contrary herein, Custodian shall not be liable for any indirect, consequential, incidental, special or exemplary damages, even if State Street has been apprised of the likelihood of such damages occurring.

15.7 SECURITY CODES. If the Custodian has issued to the Company Stock Trustee, or to any Investment Manager, security codes or passwords in order that the Custodian may verify that certain transmissions of information, including Proper Instructions, have been originated by the Company Stock Trustee or the Investment

Manager, as the case may be, the Custodian shall be kept indemnified by and be without liability to the Company Stock Fund and the Company and be without liability to the Company Stock Trustee for any action taken or omitted by it in reliance upon receipt by the Custodian of transmissions of information with the proper security code or password, including instructions purporting to be Proper Instructions, which the Custodian reasonably believes to be from the Company Stock Trustee or Investment Manager.

15.8 TAX LAW. The Custodian shall have no responsibility or liability for any obligations now or hereafter imposed on the Company Stock Trustee, the Company Stock Fund or the Custodian as custodian of the Company Stock Fund by the tax law of the United States of America or any state or political subdivision thereof.

It shall be the responsibility of the Investment Committee to notify the Custodian of the obligations imposed on the Company Stock Trustee, the Company Stock Fund or the Custodian as custodian of the Company Stock Fund by the tax law of jurisdictions other than those mentioned in the above sentence, including responsibility for withholding and other taxes, assessments or other governmental charges, certifications and governmental reporting. The Plan Administrator or the Recordkeeper, and not the Custodian, shall withhold any tax which by any present or future law is required to be withheld from any

payment under the Plan.

15.9 INVESTMENT MANAGER.

15.9.1 Appointment and Termination of Appointment. The
Company at any time may appoint one or more Investment Managers
to manage the investment of all or any portion of the Company
Stock Fund. In such event, the Company shall notify the
Custodian in writing of the appointment of such Investment
Manager, and of the portion of the Company Stock Fund over which
the Investment Manager may exercise its authority. The Company
similarly shall notify the Custodian of the termination of the
appointment of any Investment Manager.

15.9.2 Authority. The Custodian, in performing its
duties under this Contract, shall be entitled to rely upon Proper
Instructions from the Investment Manager, Company Stock Trustee,
the Investment Committee or Recordkeeper. In the absence of
written limitations agreed to by the Custodian and Company, the
Custodian shall accept Proper Instructions from the Recordkeeper
or Investment Manager to the same extent as the Custodian would
be entitled to accept such Proper Instructions from the Company
Stock Trustee if no Investment Manager has been appointed.

15.10 EFFECTIVE PERIOD, TERMINATION AND AMENDMENT. The terms
of this Section 15 shall become effective as of the date
hereinafter set forth, shall continue in full force and effect
until terminated as hereinafter provided, may be amended at any

time by mutual written agreement of the parties hereto and may be
terminated by either the Company or the Custodian by an
instrument in writing delivered or mailed, postage prepaid to the
other party, such termination to take effect not sooner than
ninety days after the date of such delivery or mailing unless a
different period is agreed to in writing by the parties. The
provisions of Sections 15.5, 15.6 15.7 and 15.8 of this Contract
shall survive termination of this Contract for any reason.

Upon termination of the Custody provisions of this Contract,
the Company shall pay to the Custodian upon demand such
compensation as may be due as of the date of such termination and
shall likewise reimburse the Custodian for its costs, expenses
and disbursements.

15.11    ACTION ON TERMINATION.  If a successor custodian shall
be appointed by the Company, the Custodian shall, within a
reasonable time after termination, deliver to such successor
custodian at the office of the Custodian, its agents or its
subcustodians or as otherwise agreed, duly endorsed and in the
form for transfer, all securities, Company Stock Funds and other
property then held by it hereunder and shall transfer to any
account of the successor custodian all of the Company Stock
Fund's securities held in a Securities System.

If no such successor custodian shall be appointed, the
Custodian shall, in like manner, upon receipt of Proper

61

Instructions from the Company, deliver at the office of the Custodian, its agents or its subcustodians or as otherwise agreed and transfer such securities, Company Stock Funds and other property in accordance with such Proper Instructions.

In the event that no written order designating a successor custodian and no Proper Instructions as aforesaid shall have been delivered to the Custodian on or before the date when such termination shall become effective, the Custodian shall have the right to deliver to a bank or trust company of its own selection, having an aggregate capital, surplus, and undivided profits, as shown by its last published report of not less than $100,000,000 all securities, Company Stock Funds, and other property held by the Custodian. Thereafter, such bank or trust company shall be the successor of the Custodian under this Contract.

In the event that securities, Company Stock Funds and other property remain in the possession of the Custodian, its agents or its subcustodians after the date of termination hereof owing to failure of the Company to appoint a successor custodian or to give the Proper Instructions referred to above, the Custodian shall be entitled to fair compensation for its services during such period as the Custodian retains possession of such securities, Company Stock Funds and other property and the provisions of this Contract relating to the duties and obligations of the Custodian shall remain in full force and

effect.

15.15     <u>PRIOR CONTRACT</u>.   This Contract supersedes and
terminates, as of the date hereof, all prior contracts between
all parties relating to the custody of the Company Stock Fund's
assets.

[signature page follows]

Redacted Document

IN WITNESS WHEREOF, the parties hereto have caused this instrument to be executed by their duly authorized officers as of the day and year first above written.

ATTEST:                                        CITIGROUP INC.

_Geraldine Moloney_                            BY: _____

Assistant Secretary                            TITLE: _VICE CHAIRMAN CITIGROUP, INC._

GERALDINE MOLONEY
Notary Public, State of New York
No. 01MO6177236
Qualified in ___ County
Expires 11/13/2011

ATTEST:                                        STATE STREET BANK AND TRUST COMPANY

_____                          BY: _____

                                                    Vice President

Belynda J. Crick
Notary Public
My Commission Expires
September 25, 2009

## NOTICE OF APPOINTMENT

### OF
### INVESTMENT MANAGERS

Citigroup Inc., (the "Company"), certifies to STATE STREET BANK AND TRUST COMPANY (the "Trustee"), through the duly authorized person whose signature appears below, that the firms whose names are set forth below have been appointed as Investment Managers for the Company with respect to the Trust Agreement between the Company and the Trustee dated as of December 8, 2008, with authority over the portions of its assets indicated opposite their names.  The Company further certifies that the Trustee may rely upon this certificate until such time as it receives another certificate bearing a later date.

INVESTMENT MANAGER                   PORTION OF ASSETS

_____              _____

_____              

_____              _____

_____              _____

_____              _____


CITIGROUP INC.


BY: _____

TITLE: _____

DATE: _____

67



Redacted Document

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ARNOLD HENRIQUEZ, ET AL. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 11-cv-12049-MLW |
| | ) | |
| STATE STREET BANK AND TRUST | ) | |
| COMPANY AND STATE STREET | ) | |
| GLOBAL MARKETS, LLC | ) | |
| | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF CATHERINE HAYES-DUFFEY IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS**

Catherine M. Hayes-Duffey states:

Background and Qualifications

1.      I am Catherine M. Hayes-Duffey at Defendant State Street Bank and Trust
Company and its subsidiaries ("State Street").

2.      I am a Senior Vice President and the Chief Operating Officer for State Street
Global Markets Sales and Trading and Research.

3.      I submit this affidavit in support of Defendants' Motion to Dismiss the
Complaint in the matter captioned above.  I state in this affidavit the source of any information
that is not based on personal knowledge.

4.      State Street through its State Street Global Markets division ("SSGM") is a
principal dealer in foreign currency.

5.      SSGM is a separate entity from named defendant State Street Global Markets LLC ("LLC"). State Street and LLC are both subsidiaries of State Street Corporation.

6.      Certain State Street custody clients have chosen to execute foreign exchange transactions with SSGM. During the alleged class period beginning January 1, 2001 (the "Class Period"), SSGM was the only State Street entity that executed foreign exchange transactions with U.S. pension plan and U.S. collective fund custody clients of State Street. LLC did not execute such transactions.

7.      SSGM offered a variety of foreign exchange execution methods falling into two categories. In some cases, asset owners or their investment managers negotiated a rate or spread for each transaction prior to execution of the trade (what the Plaintiff refers to as "direct" transaction). Complaint ¶ 18. In other cases, no specific agreement concerning rate or spread was made prior to the execution of the transaction (what the Plaintiff refers to as "indirect" transactions).





I declare under penalty of perjury that the foregoing is true and correct to the best of my personal knowledge, information and belief.

_____
Catherine M. Hayes-Duffey
Senior Vice President

Case 1:09-cv-10230-LTS Document 355-1 Filed 09/09/16 Page 343 of 372



# INVESTMENT MANAGER GUIDE

REVISED NOVEMBER 20, 2009

Case 1:13-cv-02208-WDD Document 10335 Filed 12/07/20 Page 10 of 13

## Introduction

State Street is pleased to make available to you this revised edition of the *Investment Manager Guide* (*Guide*). With detailed information useful in our mutual efforts to provide the highest level of service to our clients, this *Guide* represents the collective expertise of numerous State Street personnel, with valuable input from investment managers, service providers and other market sources. As we have done on a regular basis, we have refreshed the information contained in this edition of the *Guide*. State Street is committed to sharing timely information and expertise relating to worldwide custody practices. Throughout the year, we monitor market changes and update this *Guide* as appropriate.

### PURPOSE OF THE INVESTMENT MANAGER GUIDE

Purpose of this *Investment Manager Guide* and Other Important Sources of Information Regarding Our Services Available to Investment Managers and Asset Owners

The purpose of this *Guide* is to describe in detail certain services that State Street Bank and Trust Company and its affiliates provide to our clients or their external investment managers, and procedural requirements and other important information regarding those services. While this *Guide* is written primarily for use by internal or external investment managers of our clients, it also contains information that is relevant to a client's understanding of the scope and cost of our services. Consequently, we encourage both investment managers and asset owners to read this *Guide*. If asset owners have any questions regarding the information set forth in this *Guide*, we encourage you to contact your client service representative for more information.

State Street also publishes or otherwise makes available other information to our clients or their investment managers or other agents that may be important in understanding the scope and cost of the various services that we offer and certain risks or considerations that asset owners or their agents should

understand in using such services. While the following is not a complete list of such publications, these documents or websites do contain information that may be relevant to you.

State Street provides our clients and their investment managers with relevant and timely information about our network of subcustodians and the markets in which they operate through several other publications. State Street publishes *The Guide to Custody in World Markets*, which provides an overview of the safekeeping and settlement practices and procedures of each market in which State Street offers subcustody services. The *Global Market Bulletin* reports on market news and changes within our network. The *Global Custody Network Review* profiles the subcustodians in our global custody network. This publication also contains information explaining how State Street selects and establishes relationships with subcustody service providers, as well as the rigorous processes and controls that State Street follows to monitor their financial condition and operational performance. The *Securities Depository Review* contains custody risk analyses of the securities depositories presently operating in network markets. These materials are also available and regularly updated in the *Global Market Information* area of State Street's information portal, my.statestreet.com.

State Street offers a broad array of services to clients with differing investment objectives, regulatory structures and servicing needs. As a financial institution, we similarly have financial considerations and regulatory requirements that are distinct from those applicable to our clients. In addition, with respect to some, but not all, of our clients, we act in a fiduciary role or are otherwise subject to heightened regulatory responsibility. Consequently, in many circumstances our interest may differ from our clients and the interests of clients receiving the same or similar services from us may differ from each other in how and the terms on which we provide such services. Our goal is to act at all times in accordance with our legal, regulatory or fiduciary obligations to our clients and to provide an appropriate level of disclosure as to the risks inherent in our products and services and appropriate transparency regarding our pricing. However, except as expressly agreed by contract or required by law, we do not assume a fiduciary role with respect to any client

or with regard to particular transactions. In many instances, we act as principal in transactions with clients and will have differing financial interests in that transaction than our clients. Similarly, we may take differing views of economic and market developments, have different financial objectives, liquidity needs and risk tolerances and have differing purposes and be subject to differing risks in offering services to our clients than are applicable to our own business operations.

Since our business entails servicing sophisticated, institutional clients, the manner and content of our communications to our clients and their agents are geared to such an audience. Our goal is to be as transparent as possible in all dealings with our clients, consistent with the prudent management of our business. If you need additional information about any of our services, you should contact your client service representative. We strongly encourage all of our clients, either directly or through their advisors, to understand the services that we offer, the potential conflicts of interests and the direct, and indirect costs of our services and products.

This edition of the *Guide* supersedes information contained in earlier versions and remains subject to further changes and updates from time to time without prior notice to any person and at our discretion. Timeframes provided in this *Guide* refer to local time unless otherwise noted. The information in the *Guide* has been carefully researched, but due to the nature of this *Guide* and the complexities of and constant change in the markets, we are not responsible for its completeness or accuracy. This *Guide* should not be construed or relied upon as a substitute for appropriate legal, investment or tax advice or research. You should seek from other sources specific advice and information relevant to your investment activities. Nothing contained in this *Guide* shall in any way alter, supplement or amend the terms and conditions contained in (and all of the information in this *Guide* is qualified by and remains subject to any specific provision in) any agreement to which State Street is a party or impose any legal obligation or duty upon State Street to any party. State Street does not accept responsibility for losses or claims incurred or made as a result of use of or reliance on any information in this *Guide*. This *Guide* contains proprietary information and registered trademarks, is copyrighted and is fully protected by relevant copyright and trademark laws worldwide. This *Guide* is intended for use solely by custody clients of State Street and their investment managers and for use solely in connection with their receipt of services from State Street. Duplication, alteration, and further

distribution or disclosure of this *Guide* and any information contained herein to any person other than a client or agent of a client of State Street without State Street's express written approval is strictly prohibited. References in this *Guide* to costs, charges, interest or similar terms may include amounts actually paid to other parties and internal charges made by State Street in accordance with our policies and procedures as in effect from time to time. Language in this *Guide*, which could be construed as an undertaking by State Street (such as reasonable, commercially reasonable or similar language), means that although State Street may try to accomplish the desired action or result despite the circumstances and constraints, neither State Street nor any agents shall incur any liability or responsibility for not doing so.

### STATE STREET — A TRADITION OF QUALITY

State Street's emphasis on the servicing of financial assets has led to its leadership in a number of businesses. We have been ranked as the largest US master trust/master custody bank, the largest global custodian of US pension assets and the largest mutual fund custodian in the United States. Our success is the result of our commitment to quality, technological innovation and professional, personalized service.

### SERVICING INVESTMENT MANAGERS

At State Street, we are committed to providing quality products and services and have implemented an organizational structure to effectively manage the multiple business relationships we may have with an investment manager. The Asset Manager Services group (AMS) provides service to investment managers hired as external advisors by our mutual client(s). To provide local support in the time zone of their Investment Managers, AMS teams are located worldwide in North America, Europe, Asia and the Pacific Rim. It is their responsibility to manage the day-to-day relationship while specialists provide support in areas such as transaction processing, corporate actions, income collection, cash management and fund accounting.

### WORKING EFFECTIVELY WITH STATE STREET

State Street's *Investment Manager Guide* provides you with information about how we can work together effectively to serve our mutual clients. It describes how we operate and deal with trade notification and settlement, cash management, foreign exchange, corporate actions, and unique investments.

We strongly encourage you to familiarize yourself with these guidelines so that you can provide us with the information and the instructions that will lead to fast, accurate transaction processing. We also encourage you to consider what other areas of your organization have a need to know and understand the information included in this *Guide*, including investment operations, portfolio management, legal, compliance and risk personnel. Please distribute this *Guide* within your organization as appropriate. Please let your client service officer know as soon as possible if you have any questions about this *Guide*.

State Street appreciates the valuable observations and suggestions we receive from investment managers and clients regarding our publications. As we continuously develop our publications, feedback on our services with respect to your information needs is always welcome. If you have any inquiries or comments, please contact your client service representative. We remain committed to keeping you informed with up-to-date and pertinent information that is most useful to your investment management activities.

**STATE STREET.**

## Foreign Exchange

This section will review:

· State Street Foreign Exchange Transactions

· Third-Party Foreign Exchange

· Overdrafts

· Netting

### STATE STREET FOREIGN EXCHANGE TRANSACTIONS

As a custodian, State Street facilitates the processing of foreign exchange transactions at the direction of its custody clients or their independent investment managers. The internal and third-party investment managers of our custody clients are referred to in this *Guide* collectively as the "investment managers." These foreign exchange transactions may be executed with either third-party dealers or with State Street Global Markets, a separate division within State Street in which our foreign exchange business is conducted.

The investment managers determine what foreign exchange transactions are appropriate, with which foreign exchange dealer to execute these transactions, and on what terms and in what manner those transactions will be executed. The role that the custody division at State Street plays within foreign exchange at State Street is simply to facilitate the processing of transactions at the direction of clients or their investment managers, whether the transactions are executed through State Street Global Markets or other third-party dealers.

If an investment manager decides to execute a foreign exchange transaction through State Street Global Markets, like all third-party foreign exchange dealers, State Street Global Markets acts as principal (i.e., not as an agent) when effecting foreign exchange transactions, taking principal positions and risks. As such, State Street Global Markets acts as the counterparty, not as a broker, with respect to these foreign exchange transactions. If requested by its clients, State Street Global Markets also may act as agent in executing foreign exchange transactions as part of its transition management or currency overlay services.

State Street Global Markets is separate from the division of State Street that provides custody services and all foreign exchange execution services provided by State Street Global Markets are separate and independent of any services provided to custody clients under their custody or similar contractual arrangements with State Street. The relationship of the investment manager with State Street Global Markets and the terms of the foreign exchange transactions entered into by such investment manager with State Street Global Markets will often be governed by a separate master agreement governing foreign exchange, typically in the form of an International Swaps and Derivatives Association Master Agreement.

The foreign exchange services offered by State Street Global Markets are conducted as part of the over-the-counter market. As a dealer in the foreign exchange market, State Street Global Markets enters into principal transactions with other banks as well as institutional investor clients. The rates that banks, acting as principal dealers in the foreign exchange market, quote to one another for currency pairs throughout the trading day are referred to as "inter-bank" rates. There is no single inter-bank rate at any given time, nor is there consolidated reporting of recently executed transactions as exists in the equity markets.

Inter-bank rates are quoted 24 hours a day, five days a week and change continuously throughout the trading period. No two market makers will necessarily quote the same rates or bid-offer spread at any given moment in time. The rates and the size of these bid-offer spreads may be based on a variety of factors at the time of pricing a client's foreign exchange transaction, including, but not limited to, the size of the requested foreign exchange transaction, the level of trading activity with the counterparty over time, and the volatility and perceived liquidity of the relevant currency pair in the market, which can be affected by the time of day and any known and/or anticipated economic or other data releases or news in the foreign exchange and other financial markets. Inter-bank rates are normally used as wholesale reference prices for foreign exchange transactions and mark-ups or mark-downs are customarily applied when banks price transactions with institutional investor clients.

This section will outline the trade instruction requirements for an investment manager that submits trade instructions for the execution and/or settlement of foreign exchange in the following circumstances:

- State Street Global Markets Foreign Exchange Services
- Sales Trading Foreign Exchange Services
- Custody Foreign Exchange Services
- StreetFx Foreign Exchange Services
- Transaction Pricing and Reporting
- Third-Party Foreign Exchange Services
- Overdrafts

## STATE STREET GLOBAL MARKETS FOREIGN EXCHANGE EXECUTION SERVICES

State Street Global Markets offers three primary methods by which institutional investors may execute principal foreign exchange transactions with State Street Global Markets: Custody Fx, Street Fx™ and Sales Trading. The breadth of these services enables investment managers to select the method of execution they believe best suits the needs of their clients with respect to any particular foreign exchange transaction. Other than Custody Fx, State Street Global Markets also makes these services available to institutional investors whose assets are not in custody at State Street.

The range of services provided by State Street Global Markets is designed to address the needs of all types of institutional investment professionals (e.g., investment managers for mutual funds and pension funds, including currency overlay managers, asset owners, hedge funds, commodity trading advisors and sovereign wealth funds). As noted above, all foreign exchange execution services provided by State Street Global Markets are exclusive of any services provided to custody clients under their custody or similar contractual arrangements with State Street.

## SALES TRADING FOREIGN EXCHANGE SERVICES

State Street Global Markets provides 24-hour market-making services in the foreign exchange markets from trading desks in Boston, Toronto, Montreal, London, Sydney, Singapore, Hong Kong, Seoul, Taipei and Tokyo.

As a principal dealer in the foreign exchange market, State Street Global Markets employs a dedicated team of market risk professionals that operate as market makers in the foreign exchange market, providing liquidity in a number of currency pairs. Throughout the trading day, these individual market risk professionals quote prices (i.e., a bid and ask price) for the relevant currency pairs in which they trade. These prices are based on a variety of factors at the time of pricing a counterparty's foreign exchange transaction, including, but not limited to, the size of the requested foreign exchange transaction, the level of trading activity with the counterparty over time, and the volatility and perceived liquidity of the relevant currency pair in the market, which can be affected by the time of day and any known and/or anticipated economic or other data releases or news in the foreign exchange and other financial markets. State Street Global Markets is taking principal risk when it purchases and sells currency in the foreign exchange market and the bid and offer spread around each foreign exchange transaction is compensation for taking that risk. The pricing of any transaction by State Street Global Markets is not determined by reference to its actual costs. State Street Global Markets does not separately charge a commission in connection with the execution of its principal foreign exchange transactions.

State Street Global Markets offers a full range of foreign exchange products, including spot transactions, forward transactions (deliverable and non-deliverable forwards), and currency options (standard and exotic). State Street Global Markets also facilitates electronic execution of foreign exchange transactions via its proprietary electronic platforms, FxConnect, VectorFx and StreetFx.

Investment managers are responsible for determining whether to execute foreign exchange transactions with State Street Global Markets based on their own criteria, which typically include price, speed to quote, credit worthiness, proprietary research, account coverage, electronic trading capabilities and trade order handling. The investment managers also are responsible for negotiating foreign exchange transactions directly with State Street Global Markets. The investment managers obtain bid and ask prices directly from the foreign exchange market risk professionals of State Street Global Markets. If you have discussions about bid and ask prices with your custody client service representative, those discussions do not constitute a quote for or an execution of a foreign exchange transaction with State Street Global Markets.

Investment managers can submit foreign exchange transaction requests to the foreign exchange traders of State Street Global Markets either by telephone or electronically through third party or proprietary trading platforms, such as FxConnect. State Street Global Markets also offers a number of trading platforms to institutional investors, including Currenex and FxConnect, for which State Street Global Markets may receive a "click" or use fee for foreign exchange transactions executed over those platforms.

The foreign exchange operations team for State Street Global Markets strives to ensure that each foreign exchange transaction is confirmed in a timely manner and communicates with its counterparties or their investment managers to resolve any discrepancies. Specifically, each trading desk will seek to confirm the terms of each foreign exchange transaction with the investment manager promptly on the date of execution, generally through either its proprietary Global Trade Settlement System (GTSS) or through other means, including by electronic trade matching, telex, facsimile, SWIFT or telephone. The foreign exchange operations team for State Street Global Markets also works to maintain the standard settlement instructions for its counterparties in an effort to ensure foreign exchange transactions settle correctly and efficiently.

## CUSTODY FOREIGN EXCHANGE SERVICES

### General

Our custody foreign exchange services are available only to institutional investors (and their investment managers) whose assets are in custody at State Street. Similar to its sales trading foreign exchange execution services, State Street Global Markets acts as a principal dealer in executing custody foreign exchange transactions requested by investment managers, taking principal positions and risks. Except as otherwise expressly provided by contract, all foreign exchange execution services provided by State Street Global Markets are separate and independent of any services provided to custody clients under their custody or similar contractual arrangements with State Street.

### Security Purchase and Sale Activity

Investment managers may elect to use our custody foreign exchange service to facilitate the execution of foreign exchange transactions when they notify State Street, as custodian, that they have purchased or sold a foreign security. Specifically, custody clients and their investment managers can instruct State Street, as custodian, to execute their foreign exchange requests either though State Street Global Markets or, when the relevant currency is not traded by State Street Global Markets, through a local subcustodian. As of the date hereof, State Street Global Markets effects custody foreign exchange transaction requests in the following currencies, unless otherwise noted:

| Currency | Currency Code |
|---|---|
| Australian dollar | AUD |
| Brazilian real | BRL* |
| Bulgarian lev | BGN |
| Canadian dollar | CAD |
| Croatian kuna | HRK |
| Czech koruna | CZK |
| Danish krone | DKK |
| Estonian kroon | EEK |
| Euro | EUR |
| Great British pound sterling | GBP |
| Hong Kong dollar | HKD |
| Hungarian forint | HUF |
| Indonesian rupiah | IDR* |
| Indian rupee | INR* |
| Israeli new shekel | ILS |
| Japanese yen | JPY |
| Kuwaiti dinar | KWD |
| Latvian lat | LVL |
| Lithuanian lita | LTL |
| Malaysian ringgit | MYR* |
| Mexican peso | MXN |
| New Zealand dollar | NZD |
| Norwegian krone | NOK |
| Peruvian new sol | PEN |
| Philippine peso | PHP* |
| Polish zloty | PLN |
| Singapore dollar | SGD |
| Slovakian koruna | SKK |
| South African rand | ZAR |
| Swedish krona | SEK |
| Swiss franc | CHF |
| Thai baht | THB* |
| Turkish lira | TRY |
| United States dollar | USD |

*These currencies have trading restrictions related to local regulatory or other requirements and are only traded with clients that custody their assets at State Street. With the exception of the Philippine peso, these currencies are traded as part of the automated dividend and interest income repatriation service, but are priced and executed along with the security purchase and sale activity described above, because they are restricted currencies that trade only when the local market is open.

## Instructing Foreign Exchanges

An investment manager may instruct State Street in one of the following ways to execute their foreign exchange transactions, either through State Street Global Markets or through the third-party local subcustodian, when they notify State Street, as custodian, that they have purchased or sold a foreign security:

- Standing instructions by fund and by currency pair to execute a foreign exchange transaction upon electronic notification to State Street Investor Services of a purchase or sale of a foreign security that requires a foreign exchange transaction in the designated currency to settle such security transaction or to repatriate the proceeds resulting from such security transaction to the designated base currency of the investment manager

- On a trade-by-trade basis by incorporation of an instruction to execute a foreign exchange transaction into a security trade advice (or other transaction advice that requires a foreign exchange transaction) that is delivered to State Street Investor Services either electronically or by another authenticated method described below

Security trade advices that are delivered electronically to State Street are authenticated and validated by State Street Global Trade Processing Group within State Street Investor Services. Once a trade advice is validated, the State Street Global Trade Processing Group determines if the currency is traded by State Street Global Markets. If the relevant currency is traded by State Street Global Markets, as indicated in the list above, the foreign exchange transaction request is sent to State Street Global Markets for automated execution. If the relevant currency is not traded by State Street Global Markets, the foreign exchange transaction request is sent to the subcustodian in the local market for execution.

Foreign exchange transaction requests that are able to be executed by State Street Global Markets are accumulated throughout the trading day and, as described further below, priced on a net basis periodically by currency pair for each investment manager, although this practice may vary in certain emerging markets due to foreign exchange controls, tax or other regulatory considerations. State Street Global Markets generally prices these foreign exchange transaction requests on a net basis only at the individual investment manager level and not at the custody client level or across any subset of investment managers or sub-advisors.

## Pricing

The pricing of foreign exchange transactions under this service is established on a regional basis. Specifically, in the United States, the requested foreign exchange transactions are priced once at the end of the trading day to allow all investment manager foreign exchange trade requests across funds for that day to be received by State Street. However, foreign exchange transactions requiring same day settlement may be priced earlier in accordance with payment deadlines in the relevant jurisdictions. In Europe and Asia, such requests are typically priced multiple times throughout the day, reflecting either the investment manager preferences in that region or other requirements relating to settlement of the currency.

The price of a foreign exchange transaction executed by State Street Global Markets under this service is based on an inter-bank market rate. Specifically, the pricing with respect to each currency pair is determined in a three-step process. First, indicative inter-bank bid and ask market rates for the currency pair are obtained at the time the prices for these transactions are set, generally from a third-party source. However, in circumstances in which State Street Global Markets believes that such indicative market rates do not reflect current market conditions, State Street Global Markets may select the inter-bank bid and ask rates quoted by its trading desk. The time of day this inter-bank rate is determined varies by geographic region, as discussed above.

Second, a mark-up (if the trade requests submitted by an investment manager on behalf of its clients, in the aggregate, represent a net purchase of a currency pair) or mark-down (if the trade requests submitted by an investment manager on behalf of its clients, in the aggregate, represent a net sale of a currency pair), as applicable, is applied to this indicative inter-bank market rate. The amount of the mark-up or mark-down may be adjusted by State Street Global Markets from time-to-time.

Effective December 1, 2009, the current mark-ups and mark-downs used by State Street Global Markets for these foreign exchange transaction requests will be posted each business day on my.statestreet.com and notice of any changes in these amounts will be provided at least two business days in advance. These notices will be provided on my.statestreet.com and also sent by email alert to my.statestreet.com users.

**STATE STREET.**

Third, the resulting transaction price is compared to the day's high and low prices up to the time the trade is priced as reported by a third-party source (the "High-Low Range"), and if the transactional price is outside the High-Low Range, the transaction price is modified to be the high or low price, as the case may be, quoted by such third-party pricing service at such time.

When an investment manager's clients are, in the aggregate, net purchasers of a specific currency pair on a particular day, the price is set by adding, as described above, a mark-up to the indicative ask rate in the relevant currency pair. If an investment manager's clients are, in the aggregate, net sellers of a specific currency pair on a particular day, the price is set by subtracting a mark-down from the indicative market bid rate in the relevant currency pair. In either case, the price ultimately applied to any custody foreign exchange transaction will be within the High-Low Range for the currency pair. This execution price is then applied to all purchase and sale requests priced at that time and region submitted by the investment manager on behalf of its clients using the custody foreign exchange services, other than in connection with *Automated Dividend and Interest Income Repatriation Activity* discussed below. The result is that all underlying clients of that investment manager receive the same execution price for transactions executed at the same time through this service, irrespective of whether their individual foreign exchange transactions are purchases or sales in that currency pair. If a custody client has hired more than one investment manager to manage its assets, that custody client may receive different execution prices in the same currency pair on a given day depending on whether the investment managers that elected to submit the transactions through this service were net buyers or sellers at the time of execution. Unless specified in the fee schedule of the relevant custody agreement, State Street does not impose any separate transaction charges on the underlying custody client if their investment manager elects to execute its foreign exchange transactions with State Street Global Markets.

With this custody foreign exchange service, custody clients receive consistent pricing and straight-through processing that substantially reduces settlement risk. The pricing of these trades on a net basis, together with the execution of all trades within the High-Low Range for the currency pair, tends to decrease the impact of the mark-up or mark-down. While this pricing methodology is fair to all clients, it is particularly advantageous for any client with individual foreign exchange transactions that are in the opposite direction of the net position of an investment

manager's clients. For example, if all of the foreign exchange requests of an investment manager's clients result in that investment manager being a net purchaser of a particular currency pair, then any of that investment manager's clients that are sellers of that currency pair are able to sell at the indicative ask rate plus the mark-up added for this service.

State Street, as custodian, will only initiate foreign exchange requests on your behalf when complete and authenticated instructions are received by State Street according to the requirements noted in this *Guide*. A foreign exchange transaction request, amendment or cancellation that is sent using this service may not be executed in as timely a manner, or at the same execution rate, as if the investment manager were to deal directly with the sales trading desk of a foreign exchange dealer, including State Street Global Markets or, if applicable, the local subcustodian.

*Therefore, if the timing of the execution of a foreign exchange transaction request is important, an investment manager should directly contact the sales trading desk of State Street Global Markets. Similarly, a foreign exchange request using this service is unlikely, in most circumstances, to be completed at the same or as favorable an execution rate as it would be if the investment manager were to deal directly with the sales trading desk of State Street Global Markets, reflecting a number of factors, including the convenience offered by custody foreign exchange services and the relatively smaller size of trades executed through these services. If any client or investment manager prefers different pricing from what State Street Global Markets provides in connection with these custody foreign exchange services, they can elect not to be enrolled in State Street's automated dividend and interest income repatriation service and to execute their foreign exchange transactions directly with State Street Global Markets through the sales trading desk or through StreetFx℠.*

### Automated Dividend and Interest Income Repatriation Activity

In addition, investment managers of custody clients at State Street can also elect to participate in the automated dividend and interest income repatriation service offered by State Street. These services constitute part of the overall custody foreign exchanges services offered by State Street. The types of income events covered by this service include cash dividends, interest income, interest on mortgage-backed securities, interest (credit or debit) on transaction accounts, and tax reclaims. Under this service, State Street aggregates all income of a custody client across all State Street custody locations on a set interval (e.g.,

on a daily, weekly or monthly basis) in accordance with standing instructions provided by an investment manager who, in turn, directs the execution of one net trade per currency, per portfolio at the end of such period.

If the relevant currency is traded by State Street Global Markets, as indicated in the list above, the investment manager instructs State Street to send the foreign exchange transaction request to State Street Global Markets for automated execution. If the relevant currency is not traded by State Street Global Markets, the investment manager instructs State Street to send the foreign exchange transaction to the subcustodian in the local market for execution.

The price of a foreign exchange transaction executed by State Street Global Markets under this service is based on an inter-bank market rate. Specifically, the pricing with respect to each currency pair is determined in a two-step process. First, at the opening of the trading day in Australia, State Street determines a mid-rate for each currency pair based on indicative market bid and ask rates, which are generally obtained from third-party sources. However, in circumstances in which State Street Global Markets believes that such mid-rate does not reflect current market conditions, State Street Global Markets may select a mid-rate quoted by its trading desk.

Second, a mark-down and a mark-up, as applicable, is applied to this mid-rate, effectively establishing both a bid and ask rate for such currency pair. These rates are fixed for 24 hours, meaning this pricing is used for all dividend and interest income repatriation foreign exchange transactions executed with State Street Global Markets during this period. If the foreign exchange transaction requests of a portfolio at the end of the relevant interval set by an investment manager, in the aggregate, represent a net purchase of a currency pair, that portfolio will receive a transaction price for that net transaction equal to the mid-rate for that day plus the mark-up. If the foreign exchange transaction requests of a portfolio at the end of the relevant interval set by an investment manager, in the aggregate, represent a net sale of a currency pair, that portfolio will receive a transaction price for that net transaction equal to the mid-rate for that day minus the mark-down. The amount of the mark-up or mark-down for these services may be adjusted by State Street Global Markets from time-to-time.

Effective December 1, 2009, the current mark-ups and mark-downs used by State Street Global Markets for these foreign exchange transaction requests will be posted each business day on my.statestreet.com and notice of any changes in these amounts will be provided at least two business days in advance. These notices will be provided on my.statestreet.com and sent via email alert to my.statestreet.com users. Due to the manner in which these foreign exchange transactions are priced and executed, the transaction prices applied to such transactions are not limited to prices within the daily high-low range for the relevant currency pair at the time of execution.

The mark-up and mark-down on automated dividend and interest income repatriation services geneally tends to be somewhat higher than mark-ups and mark-downs on transactions to facilitate settlement of purchase and sale transactions. This higher amount reflects a number of factors, including the smaller size of these transactions and the greater risk to State Street Global Markets to effect transactions throughout a 24-hour period at a price determined and set at the outset of the trading day.

*Accordingly, a foreign exchange transactions request related to automated dividend and interest income repatriation is unlikely to be completed at the same or as favorable an execution rate as it would be if the investment manager were to deal directly with the sales trading desk of State Street Global Markets, reflecting a number of factors including the convenience offered by these automated dividend and interest income repatriation services and the relatively smaller size of trades executed through these services. If any client or investment manager prefers different pricing from what State Street Global Markets provides in connection with its automated dividend and interest income repatriation services, they can elect to execute their foreign exchange transactions directly with State Street Global Markets through the sales trading desk or through Street FX".*

STATE STREET.

Transaction Pricing and Reporting

Custody clients and their investment managers can view pricing information for foreign exchange transactions to facilitate settlement of purchase and sale activity and automated dividend and interest income repatriation transactions executed with State Street Global Markets at my.statestreet.com. Specifically, with respect to settlement of purchase and sale activity, the following information, by currency pair, will be available for review on a next-business day basis:

- Indicative Rate Reference. This explains whether the source for the indicative market rates was a third-party pricing source, the market risk traders of State Street Global Markets or, for some emerging markets, subcustodian quotes or other independent dealer quotes.

- Indicative Rate Local Time. This will be the local time at which the relevant indicative market spot bid and ask rates are obtained.

- Indicative Spot Rate. This will include both the actual bid and offer indicative market spot rates to which the mark-up or mark-down is applied, as discussed above.

- Execution Rates. These are the actual spot execution rates for each foreign exchange transaction executed with State Street Global Markets related to purchases and sales of foreign securities. The spot rates for foreign exchange transactions that do not settle on the spot settlement date may be adjusted to reflect forward points.

- High-Low Range. This represents the daily high-low range up to the time the foreign exchange transactions are priced (i.e., the Indicative Rate Local Time).

- Actual Mark-up or Mark-Down. This is the actual mark-up or mark-down, in basis points, applied to the Indicative Spot Rate and reflects the impact of the high low range for the day on the mark-up or mark-down, if any.

With respect to automated dividend and interest income repatriation foreign exchange transactions, the following information, by currency pair, will be available for review on a next business day basis:

- Indicative Rate Reference. This explains whether the source for the indicative market bid and ask rates that were used to derive the mid-rate was a third party pricing source, the market risk traders of State Street Global Markets or, for some emerging markets, subcustodian quotes or other independent dealer quotes.

- Indicative Rate Local Time. This will be the local time at which the relevant indicative market spot rates are obtained.

- Indicative Spot Mid-Rate. This will be the indicative spot mid-rate to which the mark-up or mark-down is applied, as discussed above.

- Execution Rates. These are the actual spot execution rates for each automated dividend and income repatriation foreign exchange transaction. With respect to certain restricted currency transactions, the execution rate will be reported as described above for purchase and sale activity because they only trade when the local market is open.

- Actual Mark-up or Mark-Down. This is the actual mark-up or mark-down, in basis points, applied to the Indicative Spot Rate.

State Street, as custodian, does not negotiate, review or approve any of the rates for foreign exchange transaction requests sent to State Street Global Markets or any subcustodian for execution. State Street expects that investment managers will review and approve these rates on an ongoing basis.

State Street receives the foreign exchange rate applied by the subcustodian to each deal and passes these on to the client. As a custodian, State Street monitors the timely execution of the foreign exchange requests by the subcustodian. State Street is readily available to contact the subcustodian on a case-by-case basis upon request by the client to pursue further details of the foreign exchange rates applied by the subcustodian.

### Subcustodians

The forgoing pricing methodologies, including the applicable mark-ups and mark-downs, do not apply to custody foreign exchange transactions that are processed through subcustodians because State Street Global Markets does not make a market in the applicable currency pairs. For a list of currencies in which State Street Global Markets is able to execute custody foreign exchange transaction requests, you should refer to the table set forth above in the Custody Foreign Exchange Services section.

The pricing of foreign exchange transactions requests executed by the local subcustodian is determined solely by the subcustodian, except for transactions involving the Korean won and Taiwan dollar, for which State Street Global Markets provides the pricing at the individual transaction level consistent with the description above with respect to the processing of requests to facilitate settlement of purchase and sale activity, and automated dividend and interest income repatriation activity. Although the foreign exchange transaction requests related to the Korean won and Taiwan dollar are executed by the subcustodian resident in those jurisdictions, State Street Global Markets obtains the revenue associated with the mark-up or mark-down.

State Street, as custodian, is not compensated by the subcustodian in relation to the foreign exchange activity forwarded to the subcustodian per our client instructions. State Street does not mark-up or mark-down this foreign exchange activity processed by the subcustodian. The subcustodian is compensated for services and the execution of foreign exchange requests by the foreign exchange rate applied to the respective foreign exchange deal(s) and transaction charges where it may be applicable. This potential business is included in our negotiations for favorable fees with our subcustodians to support our business with them as a global custodian.

### Employee Retirement Income Security Act of 1974

State Street Global Markets uses policies and procedures that are designed to comply with Section 408(b)(18) under the Employee Retirement Income Security Act of 1974, as amended, when executing foreign exchange transactions under these custody foreign exchange services. Accordingly, if an investment manager instructs State Street to execute foreign exchange transactions through State Street Global Markets on behalf of a plan that is subject to the Employee Retirement Income Security Act, as amended, that investment manager is deemed to be representing and warranting to State Street and State Street Global Markets that such foreign exchange transactions are related solely to the purchase, sale or holding of securities or other investments on behalf of that plan. These foreign exchange transactions may also include currency hedging transactions designed to hedge currency risk directly associated with securities and other assets held for investment.

### Operational Requirements for Custody Foreign Exchange Services

There are several operational requirements that should be considered by investment managers that elect to use custody foreign exchange services. These include:

· No oral instructions to request, amend or cancel a foreign exchange transaction with State Street Global Markets or any subcustodian will be accepted.

· At a minimum, instructions must be authenticated and include the following information: the fund account number, ISO currency code, amount of currency bought or sold, offsetting ISO currency code, and the desired value date.

· With respect to a foreign exchange transaction request accompanying a securities trade advice, if no amount is listed as bought or sold, then State Street will direct a foreign exchange transaction against the net amount of the security trade.

· If an instruction to execute a foreign exchange transaction is sent to State Street electronically via MT52x (Custom Format), which is an individual securities transaction instruction, the foregoing information should be included in Field 72 of the ISITC security trade advice using the code word, AFXC or AFXA, in conjunction with the offsetting ISO currency code (e.g., Field72:/AFXC/USD). Using these codes indicates that State Street, as custodian, should, upon receipt of such security trade advice, direct the execution of a foreign exchange transaction to State Street Global Markets or the local subcustodian as described above versus the offsetting currency indicated.

· If instructions are sent electronically via MT54x, which is a securities transaction instruction, the foregoing information should be included in Field 11A (TRADDET BLOCK) of the ISITC security trade advice using the appropriate code word, FXIB or FXIS, in conjunction with the offsetting ISO currency code (e.g., Field 11A:/FXIB/USD). Using these codes indicates that State Street, as custodian, should, upon receipt of such securities transaction instruction, direct the execution of a foreign exchange transaction to State Street Global Markets or the local subcustodian as described above versus the offsetting currency indicated.

Case 1:11-cv-10230-MLW Document 401-43 Filed 07/23/18 Page...

TRADE PROCESSING | FOREIGN EXCHANGE

STATE STREET.

- If a value date for settling any foreign exchange transaction request is not included in any of the foregoing instructions, the foreign exchange transaction will be executed with a value date equal to the contractual settlement date of the corresponding securities transaction unless market circumstances dictate otherwise. State Street cannot honor any request to execute a foreign exchange transaction on the actual settlement date of the corresponding securities transaction.

- State Street asks that investment managers use the securities deadlines noted in the Securities Deadline Summary Matrix in the Reference Matrices Chapter of this *Guide*.

- Additionally, if instructions are not received according to the deadlines noted in the Reference Matrices chapter of this *Guide*, the execution date of the foreign exchange transaction may be delayed to the next trading date.

- State Street will not accept liability that may result from instructions that do not meet these requirements. State Street also reserves the right not to process incomplete or unclear instructions. Incomplete instructions, even if clarified or replaced by new instructions, may result in delayed execution of the transaction, for which we cannot assume any liability.

## STREETFX® FOREIGN EXCHANGE SERVICES

StreetFx is an advanced technology service that allows foreign exchange transactions to be electronically transmitted directly to State Street Global Markets by the investment manager. These transactions are executed by State Street Global Markets throughout the trading day as directed by the investment manager at benchmark rates with a mark-up or mark-down agreed upon with the investment manager. StreetFx allows an investment manager to customize how foreign exchange transactions are electronically delivered, executed, confirmed and reported.

## STATE STREET GLOBAL MARKETS CONTACTS

### Boston

Foreign Exchange Trading
+ 1 800 DOLLAR FX
+ 1 800 365 5273

Confirmations
+1 800 9 AFFIRM
+1 800 923 3476

Middle Office
+1 617 664 8302

### Canada

24 Hour Toll-Free Service
+1 888 SSFOREX

FX Confirmations
+1 800 923 3476

### London

UK — FX Sales/Trading
+44 203 395 1955

UK — Toll-Free Service
+0800 56 0800

Operations
+44 203 395 7292

Middle Office
+44 203 395 7694

### Tokyo

FX Sales/Trading
+813 4530 7610

Trade/Payment Confirmation
+813 4530 7640

Sydney
24 Hour Toll-Free Service
+1 800 644 218

New Zealand Toll Free FX
+0800 443 055

FX Trading — Sydney
+612 8249 1150

Operations
+(61) 2 8249 1122

Hong Kong
FX Trading — Hong Kong
+(852) 2810 8012

Operations
+(852) 2978 9218

Seoul
FX Trading — Seoul
+(822) 3706 4550

Operations
+(852) 2978 9218

Singapore
FX Toll-Free Service
+(800) 616 1481

FX Trading — Singapore
+(65) 6826 7113

Operations
+(852) 2978 9218

Taiwan
FX Trading — Taiwan
+(886) 2 2735 3011

Operations
+(852) 2978 9218

## THIRD-PARTY FOREIGN EXCHANGE

### Requirements for Third-Party Foreign Exchange

Investment managers may execute foreign exchange transactions with third-party (i.e., non-State Street) FX providers. State Street must receive authenticated instructions with correct currency payment and receipt details by the deadlines noted in the Reference Matrices chapter of this *Guide*. Instructions, regardless of type, received after the relevant deadline specified in the Reference Matrices chapter will be processed on a reasonable efforts basis. This may result in delayed currency payments, delayed posting of currency receipts, or both.

The instructions must include the following:

- Fund Number
- Fund Name
- Trade Date/Settlement Date
- Purchase Amount and ISO Currency
- Sale Amount and ISO Currency
- Exchange Rate
- Cash Remittance Instructions

  - Receiving Bank S.W.I.F.T. TID or Bank Identifier Code (BIC)
  - Beneficiary Name and Location or Beneficiary S.W.I.F.T. TID or BIC
  - Beneficiary Account Number

Investment managers that execute third-party foreign exchange contracts must also ensure that they provide their counterparty with the correct payment details for State Street. Care should be given as State Street payment details may differ based upon client domicile. State Street will, based on receipt of a pre-advice, credit client accounts on contractual value date for receipt of funds expected from third parties and reserves the right to reverse them from the client account by debiting the same amount with original value after three business days if the funds have not been delivered in the market. Payments received by State Street and its agents after contractual value date incur a delayed value cost. This expense may be claimed if State Street receives an instruction from the investment manager to do so. If claims are not attempted, or are unsuccessful, the expense, if greater than $500, will be applied to the portfolio's cash account.

Foreign exchange contracts executed by investment managers with third-party providers should be in the name of the underlying client, not in the name of State Street.

State Street will not accept liability that may result from instructions that do not meet these requirements. State Street also reserves the right not to process incomplete or unclear instructions. Incomplete instructions, even if clarified or replaced by new instructions, may result in delayed processing of the transaction, for which State Street cannot assume any liability.

## OVERDRAFTS

- Overdrafts that occur as a result of related securities transaction(s) failing will be charged to the client's account and will be borne by the client. Accordingly, the investment manager should incorporate such charges into the portfolio's daily cash funding requirements.

- To minimize potential overdrafts, investment managers may initiate a foreign exchange transaction after monitoring settlement activity and reviewing local cash balances.

## NETTING

Many investment managers have recognized the settlement risk reduction advantages of netting settlement obligations for forward foreign exchange transactions that close out large hedge positions. When presented with authenticated instructions and required information (including gross deal detail as well as net payment/receipt amount), State Street will pay and/or receive net amounts in settlement of the associated gross obligations. Please note that legal agreements are required between the parties to establish a netting arrangement in order for the net settlement to clear the gross obligations. As our mutual client's agent, it is the responsibility of investment managers to be certain that effective netting agreements are in place with the counterparties with whom they settle on a net basis. State Street will respond to your instructions accordingly. Authenticated netting instructions must be received by State Street by the deadlines noted in the Reference Matrices chapter of this *Guide*.

## DELIVERABLE CURRENCY TRADING —— METHODS OF EXECUTION

The following table describes the various methods by which a State Street custody client or its investment manager can execute foreign exchange transactions. *The Third-Party Foreign Exchange Matrix* below provides details on trading foreign exchange with third-party dealers. Clients are not obligated to execute foreign exchange transactions through State Street Global Markets. The markets in which State Street Global Markets is able to trade foreign exchange are provided for informational purposes only.

TRADE PROCESSING / FOREIGN EXCHANGE

Deliverable Currency Trading — Methods of Execution

| Market | Currency | Eligible for Third Party Execution | State Street Global Markets Currency FX Purchase and Sell | Ask | StreetFX | FX Sales Trading | Subcustodian Trade | AIR |
|---|---|---|---|---|---|---|---|---|
| Argentina | ARS | ▲ | | | | | ✓ | |
| Australia | AUD | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Bahrain | BHD | ✓ | | | | | ✓ | ✓ |
| Bangladesh | BDT | | | | | | ✓ | ✓ |
| Benin | XOF | ✓ | | | | | ✓ | ✓ |
| Bermuda | BMD | ✓ | | | | | ✓ | ✓ |
| Botswana | BWP | ✓ | | | | | ✓ | ✓ |
| Brazil | BRL* | ▲ | ✓ | ✓ | | | | |
| Bulgaria | BGN | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Burkina Faso | XOF | ✓ | | | | | ✓ | ✓ |
| Canada | CAD | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Cayman Islands | KYD | ✓ | | | | | ✓ | ✓ |
| Chile | CLP | ▲ | | | | | ✓ | |
| China | CNY | | | | | | ✓ | ✓ |
| Colombia | COP | ▲ | | | | | ✓ | ✓ |
| Costa Rica | CRC | ✓ | | | | | ✓ | ✓ |
| Croatia | HRK | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Czech Republic | CZK | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Denmark | DKK | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Ecuador | USD | | | | | | | ✓ |
| Egypt | EGP | | | | | | ✓ | ✓ |
| Estonia | EEK | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Eurozone | EUR | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Ghana | GHS | ✓ | | | | | ✓ | ✓ |
| Great Britain | GBP | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Guinea-Bissau | XOF | ✓ | | | | | ✓ | ✓ |
| Hong Kong | HKD | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Hungary | HUF | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Iceland | ISK | | | | | | ✓ | ✓ |
| India | INR* | ▲ | ✓ | ✓ | | | | ✓ |
| Indonesia | IDR* | ✓ | ✓ | ✓ | | | | |
| Israel | ILS | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Ivory Coast | XOF | ✓ | | | | | ✓ | ✓ |
| Jamaica | JMD | ✓ | | | | | ✓ | ✓ |
| Japan | JPY | ✓ | ✓ | ✓ | ✓ | ✓ | | |

This matrix speaks to currencies, not settlement market.

*These currencies have trading restrictions related to local regulatory or other requirements and are only traded with clients that custody their assets at State Street. With the exception of the Phillipine peso, these currencies are traded as part of the automated dividend and interest income repatriation service but are priced and executed along with the security purchase and sale activity described above, because they are restricted currencies that trade only when the local market is open.

^Foreign exchange transaction requests related to the Korean won and Taiwan dollar are executed by the subcustodian resident in those jurisdictions; however, State Street Global Markets provides the pricing and liquidity for this activity and obtains the associated revenues. Please see the Foreign Exchange section of this Guide for a further discussion.

The Ecuador and Puerto Rico markets conduct business in USD.

ARS currency is not processed through AIR due to regulations.

Although third-party foreign exchanges are allowed, clients are encouraged to closely review local market considerations, such as regulations, restrictions, documentation and operational limitations.

Case 1:11-cv-10230-MLW Document 401-53 Filed 07/23/18 Page ... of ...

STATE STREET

TRADE PROCESSING / FOREIGN EXCHANGE

## Deliverable Currency Trading — Methods of Execution (continued)

| Market | Currency | Eligible for Third Party Execution | State Street Global Markets | | | | Subcustodian | |
|---|---|---|---|---|---|---|---|---|
| | | | Custody FX | | | | | |
| | | | Pre-fixed and sell | AIR | Store FX | FX Sales Trading | Trader | AIR |
| Jordan | JOD | ▲ | | | | | ✓ | ✓ |
| Kazakhstan | KZT | ▲ | | | | | ✓ | ✓ |
| Kenya | KES | ✓ | | | | | ✓ | ✓ |
| Korea | KRW^ | ▲ | | | | | ✓ | ✓ |
| Kuwait | KWD | ✓ | ✓ | ✓ | | ✓ | | |
| Latvia | LVL | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Lebanon | LBP | ✓ | | | | | ✓ | ✓ |
| Lithuania | LTL | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Malaysia | MYR* | ✓ | ✓ | ✓ | | | | |
| Mali | XOF | ✓ | | | | | ✓ | ✓ |
| Mauritius | MUR | ✓ | | | | | ✓ | ✓ |
| Mexico | MXN | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Morocco | MAD | ✓ | | | | ✓ | ✓ | ✓ |
| Namibia | NAD | ✓ | | | | | ✓ | ✓ |
| New Zealand | NZD | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Niger | XOF | ✓ | | | | | ✓ | ✓ |
| Nigeria | NGN | ▲ | | | | | ✓ | ✓ |
| Norway | NOK | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Oman | OMR | ✓ | | | | | ✓ | ✓ |
| Pakistan | PKR | ▲ | | | | | ✓ | |
| Palestine | JOD | ✓ | | | | | ✓ | ✓ |
| Peru | PEN | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Philippines | PHP* | ▲ | ✓ | ✓ | | ✓ | | |
| Poland | PLN | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Puerto Rico | USD | | | | | | | ✓ |
| Qatar | QAR | ✓ | | | | | ✓ | ✓ |
| Romania | RON | ✓ | | | | ✓ | ✓ | ✓ |
| Russia | RUB | | | | | | ✓ | |
| Saudi Arabia | SAR | ✓ | | | | | ✓ | ✓ |
| Senegal | XOF | ✓ | | | | | ✓ | ✓ |
| Serbia | RSD | ▲ | | | | | ✓ | ✓ |
| Singapore | SGD | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| South Africa | ZAR | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Sri Lanka | LKR | ▲ | | | | | ✓ | ✓ |
| Swaziland | SZL | ✓ | | | | | ✓ | ✓ |

This matrix speaks to currencies, not settlement market.

*These currencies have trading restrictions related to local regulatory or other requirements and are only traded with clients that custody their assets at State Street. With the exception of the Phillipine peso, these currencies are traded as part of the automated dividend and interest income repatriation service but are priced and executed along with the security purchase and sale activity described above, because they are restricted currencies that trade only when the local market is open.

^Foreign exchange transaction requests related to the Korean won and Taiwan dollar are executed by the subcustodian resident in those jurisdictions; however, State Street Global Markets provides the pricing and liquidity for this activity and obtains the associated revenues. Please see the Foreign Exchange section of this Guide for a further description.

The Ecuador and Puerto Rico markets conduct business in USD.

ARS currency is not processed through AIR due to regulations.

Although third-party foreign exchanges are allowed, clients are encouraged to closely review local market considerations, such as regulations, restrictions, documentation and operational limitations.

Deliverable Currency Trading — Methods of Execution (continued)

| Market | Currency | Eligible for Third Party Execution | State Street Global Markets | | | | Subcustodian | |
|---|---|---|---|---|---|---|---|---|
| | | | Custody FX | | | | | |
| | | | Fixed-rate and sell | AIP | StreetFX | FX Sales Trading | Trader | AIR |
| Sweden | SEK | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Switzerland | CHF | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Taiwan | TWD^ | ▲ | | | | | ✓ | ✓ |
| Thailand | THB* | ▲ | ✓ | ✓ | | | | |
| Togo | XOF | ✓ | | | | | ✓ | ✓ |
| Trinidad and Tobago | TTD | ✓ | | | | | ✓ | ✓ |
| Tunisia | TND | ✓ | | | | | ✓ | ✓ |
| Turkey | TRY | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Uganda | UGX | ✓ | | | | | ✓ | ✓ |
| Ukraine | UAH | | | | | | ✓ | |
| United Arab Emirates | AED | ✓ | | | | | ✓ | ✓ |
| United States | USD | ✓ | ✓ | ✓ | ✓ | ✓ | | |
| Uruguay | UYU | ✓ | | | | | ✓ | ✓ |
| Venezuela | VEF | ▲ | | | | | ✓ | ✓ |
| Vietnam | VND | ▲ | | | | | ✓ | ✓ |
| Zambia | ZMK | ✓ | | | | | ✓ | ✓ |
| Zimbabwe | ZWD | ✓ | | | | | ✓ | ✓ |

This matrix speaks to currencies, not settlement market.

*These currencies have trading restrictions related to local regulatory or other requirements and are only traded with clients that custody their assets at State Street. With the exception of the Phillipine peso, these currencies are traded as part of the automated dividend and interest income repatriation service but are priced and executed along with the security purchase and sale activity described above, because they are restricted currencies that trade only when the local market is open.

^Foreign exchange transaction requests related to the Korean won and Taiwan dollar are executed by the subcustodian resident in those jurisdictions; however, State Street Global Markets provides the pricing and liquidity for this activity and obtains the associated revenues. Please see the Foreign Exchange section of this Guide for a further explanation.

The Ecuador and Puerto Rico markets conduct business in USD.

AIR currency is not processed through AIR due to regulations.

Although third-party foreign exchanges are allowed, clients are encouraged to closely review local market considerations, such as regulations, restrictions, documentation and operational limitations.

Case 1:11-cv-10230-MLW Document 409-43 Filed 07/23/18 Page 1 of 1

**STATE STREET.**

## THIRD-PARTY FOREIGN EXCHANGE MATRIX

This matrix is for informational purposes only and should not be construed as, or used as a substitute for, appropriate legal, investment or tax advice. The contents of this matrix have been researched using various resources believed to be reliable. However, due to the complexities of the markets, we cannot guarantee that it is complete and accurate in every respect. This information was last reviewed in its entirety in November 2009.

Third-Party Foreign Exchange Matrix

**For Foreign Exchange Execution — Restriction Categories are as follows: A. Third-party FXs are allowed. B. FX must directly relate to underlying investment activity. C. Repatriation restrictions such as proof of funds inflow. D. No ownership allowed. Account must be funded prior to any debit. E. Documentation must be executed in market to settle FX. F. FX must be dealt with locally accepted FX institution.

| Market | Currency | Currency Code | Foreign Exchange Execution — Restriction Categories:** | Comments |
|---|---|---|---|---|
| Argentina | Argentine peso | ARS | A*, B, C*, D, E, F | A* - Third-party FXs are allowed; however, there are challenges in transferring documentation for the cash reserve. Inflow of cash subject to a one-year, 30% USD cash reserve.<br><br>C* - No restrictions on repatriation of income of National Government Bonds, provided that the investor can demonstrate that the funds are related to an interest payment. No restrictions on repatriation of interest and principal of National Government Bonds issued in USD. Repatriation of principal is subject to various conditions such as proof of inward remittance, proof of portfolio transaction that generated the funds, etc. No restrictions on repatriation of dividends, provided that the investor can demonstrate that the funds are related to a dividend payment. No restrictions on repatriation of principal and interest from corporate bonds issued by Argentine companies in USD. To benefit from the above exemptions, the investor must prove that between the time the income was received and the time the income is repatriated, the income earned was not used to fund any type of investment.<br><br>Details of repatriation restrictions are:<br><br>Up to USD5,000/month (for State Street as a whole) without any terms or documentation;<br>USD5,001 up to USD500,000/month, no central bank approval required, provided below terms are fulfilled<br><br>- Provide proof of the original entrance of funds into the country through the official foreign exchange market or through a credit in a local U.S. dollar account;<br>- Provide proof that the funds were kept for 365 calendar days. The period of 365 days is to be counted from the date on which the investor entered the cash into the country and not the date on which the securities were effectively bought;<br>- Provide proof of the use and flow of funds since they entered the country until the portfolio liquidation or transaction that generated the funds to be repatriated.<br><br>Above USD500,000, central bank approval required. State Street is unaware of central bank granting such approval. |
| Australia | Australian dollar | AUD | A | |
| Austria | Euro | EUR | A | |
| Bahrain | Bahraini dinar | BHD | A | |

**STATE STREET.**

## Third-Party Foreign Exchange Matrix (continued)

**For Foreign Exchange Execution — Restriction Categories are as follows: A. Third-party FXs are allowed. B. FX must directly relate to underlying investment activity. C. Repatriation restrictions, such as proof of funds inflow. D. No overdrafts allowed. Account must be funded prior to any debit. E. Documentation must be executed in market to settle FX. F. FX must be dealt with locally licensed FX institution.

| Market | Currency | Currency Code | Foreign Exchange Execution — Restriction Categories:** | Comments |
|---|---|---|---|---|
| Bangladesh | Bangladesh taka | BDT | B, D, F | In the Bangladesh market, a third-party FX is not allowed for investment in securities. For securities investment purpose, a special type of cash account called NITA is used (non-resident investor taka account). As per central bank regulation, NITA account can only be credited through three main sources: <br> - Inward remittance <br> - Sales proceeds of securities <br> - Income proceeds <br><br> Moreover, the reporting responsibility related to the NITA account only lies with the NITA account holding bank, which also restricts the third-party FX dealing. |
| Belgium | Euro | EUR | A | |
| Benin | Franc de la Communauté Financière Africaine | XOF | A, D, F | |
| Bermuda | Bermuda dollar | BMD | A | There is no market for BMD outside of Bermuda. The rate is set across Bermuda. |
| Botswana | Botswanan pula | BWP | A, B, C*, F | C* - A non-resident account must be funded by the inward remittance of foreign currency, with the balance being freely convertible into any currency. Capital and income derived from investments purchased with inwardly remitted funds are also freely convertible. <br><br> Intra-day overdrafts only. |
| Brazil | Brazilian real | BRL | A*, D, E, F | A* - MT210 (exclusive of IOF tax) must be sent to subcustodian by Noon (local time) on Value Date for pre-matching purposes. Party executing FX is responsible for providing FX details to Central Bank and paying IOF to Tax Authorities. <br><br> Clients continue to maintain the dual account structure. FX purchases must be instructed, as settling in the equities (formerly exempt) or other instruments (formerly non-exempt) account, depends on the security being purchased. <br><br> 2% IOF tax will apply to all foreign exchange (FX) inflows. |
| Bulgaria | Bulgarian lev | BGN | A, C*, E* | C* - Repatriation of investment income is subject to the investor's payment of any taxes due; however, non-resident investors are subject to statutory withholding tax rates of 5% on dividends and 10% on interest. <br> E* - A legal agreement must be in place between the two FX counterparts to perform FX transactions. |
| Burkina Faso | Franc de la Communauté Financière Africaine | XOF | A, D, F | |
| Canada | Canadian dollar | CAD | A | |
| Cayman Islands | Cayman dollar | KYD | A | All settlements occur free-of-payment, with USD moving offshore. |
| Chile | Chilean peso | CLP | A*, B*, D, E, F | A* - Entity executing FX must report FX details to the central bank and provide a copy of the "*Planilla de comercio invisible*" to the Subcustodian. <br> B* - Only foreign investors entering the market under Resolutions 5412 and 43; FX must be directly related to underlying investment activity. |

Case 1:11-cv-10230-MLW Document 401-40 Filed 07/23/18 Page ... of ...

STATE STREET.

TRADE PROCESSING | FOREIGN EXCHANGE

**Third-Party Foreign Exchange Matrix (continued)**

\*\*For Foreign Exchange Execution — Restriction Categories are as follows: A. Third-party FXs are allowed. B. FX must directly relate to underlying investment activity. C. Repatriation restrictions such as proof of funds inflow. D. No overdrafts allowed. Account must be funded prior to any debit. E. Documentation must be executed in market to settle FX. F. FX must be dealt with locally licensed FX institution.

| Market | Currency | Currency Code | Foreign Exchange Execution — Restriction Categories:\*\* | Comments |
|---|---|---|---|---|
| China | Chinese renminbi | CNY | B\*, C\*, D, F\* | CNY is not freely convertible. B\* - QFII should make securities investment within 10 business days after converting foreign currency into CNY. For quota injection, SAFE will publish the conversion rates of various foreign currencies against United States dollars (USD) on the 25th day of every month. If a QFII's base currency is not USD, the QFII will calculate the quota injection in accordance with the conversion rates published by SAFE. C\* - Foreign institutional investors must obtain quota approval from the State Administration of Foreign Exchange. Principal remitted into China will be converted into CNY and deposited into the investor's cash account. Repatriation of principal is subject to a lock-in period. F\* - According to QFII regulation, QFII's FXs shall be processed via its local custodian bank. |
| Colombia | Colombian peso | COP | A\*, B, D\*, E\*, F | A\* - The Local Administrator (subcustodian) is responsible for registering the FX with the central bank and would rely on the third-party to complete the registration form and return it to the subcustodian, which may cause delays. D\* - Overdraft cannot exceed 5 days. E\* - All foreign exchange transactions must be registered with the central bank on a trade-by-trade basis. |
| Costa Rica | Costa Rican colon | CRC | A | Third-party FXs are allowed but are not market practice as the majority of trades settle vs. USD. |
| Croatia | Croatian kuna | HRK | A, D\*, F | D\* - Overdrafts in non-resident investors' accounts are not permitted. |
| Cyprus | Euro | EUR | A | |
| Czech Republic | Czech koruna | CZK | A, F\* | F\* - Investors may conduct foreign exchange transactions only through local banks and financial institutions licensed by the *Česká národní banka* (CNB). |
| Denmark | Danish kroner | DKK | A | |
| Ecuador | United States dollar | USD | N/A | All trades settle versus USD. |
| Egypt | Egyptian pound | EGP | B, C, D, F | Central Bank of Egypt's (CBE) regulations do not support third-party (FX) transactions or clean cash payments. |
| Estonia | Estonian kroon | EEK | A | |
| Finland | Euro | EUR | A | |
| France | Euro | EUR | A | |
| Germany | Euro | EUR | A | |
| Ghana | Ghanaian cedi | GHC | A, C, D\*, F | D\* - Accounts may be overdrawn if a prior agreement is in place. |
| Greece | Euro | EUR | A | |
| Guinea Bissau | Franc de la Communauté Financière Africaine | XOF | A, D, F | |
| Hong Kong | Hong Kong dollar | HKD | A | |
| Hungary | Hungarian forint | HUF | A\* | \*Offshore FXs are allowed; however, settlement always occurs in Hungary. |

Case 1:11-cv-10230-MLW Document 401-33 Filed 07/23/18 Page ... of ...

STATE STREET.

**Third-Party Foreign Exchange Matrix (continued)**

**\*\***For Foreign Exchange Execution — Restriction Categories are as follows: A. Third-party FXs are allowed. B. FX must directly relate to underlying investment activity. C. Repatriation restrictions such as proof of funds inflow. D. No overdrafts allowed. Account must be funded prior to any debit. E. Documentation must be executed in market to settle FX. F. FX must be dealt with locally licensed FX institution.

| Market | Currency | Currency Code | Foreign Exchange Execution — Restriction Categories:\*\* | Comments |
|---|---|---|---|---|
| Iceland | Icelandic króna | ISK | B, C, D, E | Recent restrictions within the Icelandic market: <br>- Withdrawals from Icelandic króna (ISK) accounts for the transfer of capital are not allowed <br>- There are no restrictions on transfers between ISK accounts of non-residents in Iceland <br>- Principal repayment and maturity proceeds from ISK-denominated bonds or securities may not be repatriated in foreign currency; however, coupon payments are freely convertible and may be repatriated <br>- Investors may settle spot FX transactions entered into prior to the issuance of the rules <br>- ISK-denominated instruments must be settled in ISK <br>- Non-residents may reinvest ISK from a mature deposit or FX swap in ISK-denominated securities <br>- ISK-denominated instruments may not be settled in foreign currency but non-resident investors may trade ISK-denominated bonds with other non-resident investors <br>- Derivatives made before the rules entered into force may be settled; however, payments must be made to ISK accounts <br><br>Transfers abroad from these accounts for capital transactions are prohibited. |
| India | Indian rupee | INR | A\*, B, C, D, F | A\* - Third-party FXs for inward remittances are permitted, but, not recommended because of risk of late or misdirected payment, missing FX documentation, etc. Outbound FXs can only be done through the bank holding the FII's cash account, per central bank regulations. |
| Indonesia | Indonesian rupiah | IDR | A, B, D, E, F\* | F\* - The central bank regulation prohibits IDR to be traded outside the country or offshore. |
| Ireland | Euro | EUR | A | |
| Israel | Israeli shekel | ILS | A | |
| Italy | Euro | EUR | A | |
| Ivory Coast | Franc de la Communauté Financière Africaine | XOF | A, D, F | |
| Jamaica | Jamaican dollar | JMD | A | |
| Japan | Japanese yen | JPY | A | |
| Jordan | Jordanian dinar | JOD | A\* | A\* - The subcustodian's experience is that third-party FXs cause trade failures and delays in receiving funds on time. |

**STATE STREET.**

## Third-Party Foreign Exchange Matrix (continued)

**For Foreign Exchange Execution — Restriction Categories are as follows: A. Third-party FXs are allowed. B. FX must directly relate to underlying investment activity. C. Repatriation restrictions, such as proof of funds inflow. D. No overdrafts allowed. Account must be funded prior to any debit. E. Documentation must be executed in market to settle. FX. F. FX must be dealt with locally licensed FX institution.

| Market | Currency | Currency Code | Foreign Exchange Execution — Restriction Categories:** | Comments |
|---|---|---|---|---|
| Kazakhstan | Kazakhstan tenge | KZT | A*, C*, F | A* - There is no explicit regulation prohibiting third-party FXs, however, there may be difficulties because the interbank KZT cash payment deadline is 6:00 p.m., whereas KASE security settlements must be finished by 5:00 p.m. If a third-party FX is executed, there is a potential risk that funds will be received by the subcustodian later than required to settle a pending transaction which may result in the trade being rejected/cancelled. C* - In order to convert KZT into foreign currency, the subcustodian must present and retain proof of receipt of KZT proceeds or income, in the form of a trade ticket, a KASE confirmation, or sale-purchase agreement. The market allows overdrafts, provided that separate documentation is signed, and an overdraft limit is established. An overdraft facility is not currently in place with the subcustodian and will be reviewed on a client-by-client basis. |
| Kenya | Kenyan shilling | KES | A, C, E, F | |
| Korea | Korean won | KRW | A*, D, F* | A* - A registered foreign investor may also execute FX deals for the purpose of securities investment with any bank licensed to engage in FX business by the Ministry of Finance and Economy (MOFE). If an investor's local subcustodian is not used as the FX Bank, i.e., a third-party FX bank is used, the investor must open a cash account with the third-party FX bank. Third-party funding for securities purchases must be received into the foreign investor's cash account for securities settlement at the local subcustodian by 4:00 pm, on SD-1. F* - Foreign investors are required to open a "Non-Resident Cash Account opened Exclusively for Securities Investments" with a bank licensed to operate in Korea, and a foreign exchange must be performed via this account. |
| Kuwait | Kuwaiti dinar | KWD | A | |
| Latvia | Latvian lat | LVL | A | No restrictions of any kind exist regarding foreign exchange transactions. |
| Lebanon | Lebanese pound | LBP | A | Settlement of equities is against USD. T-bills settle against LBP. Foreign investors may not hold LBP overnight. |
| Lithuania | Lithuanian lita | LTL | A | |
| Luxembourg | Euro | EUR | A | |
| Malaysia | Malaysian ringgit | MYR | A, B*, E, F | B*- Deliverable forward FX must be executed onshore, needs to be linked to a transaction, and is required at the point of FX execution of which the dealer will request some evidence of the confirmed contract. Although regulations provide for exceptions, overdraft of ringgit is prohibited. |
| Mali | Franc de la Communauté Financière Africaine | XOF | A, D, F | |
| Malta | Euro | EUR | A | |
| Mauritius | Mauritian rupee | MUR | A, F | |

**STATE STREET.**

Third-Party Foreign Exchange Matrix (continued)

**For Foreign Exchange Execution — Restriction Categories are as follows: A. Third-party FXs are allowed. B. FX must directly relate to underlying investment activity. C. Repatriation restrictions such as proof of funds inflow. D. No overdrafts allowed. Account must be funded prior to any debit. E. Documentation must be executed in market to settle FX. F. FX must be dealt with locally licensed FX institution.

| Market | Currency | Currency Code | Foreign Exchange Execution — Restriction Categories:** | Comments |
|---|---|---|---|---|
| Mexico | Mexican peso | MXN | A*, E*, F | A* - Third Party FXs are allowed although not common.<br>E* - There is no need to register in the country as a foreign investor to execute FXs.<br>F* In order to execute a 3rd Party FX, an institution needs to have a direct agreement with the local FX institution, which can be a Bank, Broker house or Currency Exchange Agency. |
| Morocco | Moroccan dirham | MAD | A, C, D*, F | D* - Only technical overdrafts are permitted. |
| Namibia | Namibian dollar | NAD | A, D, F | |
| Netherlands | Euro | EUR | A | |
| New Zealand | New Zealand dollar | NZD | A | |
| Niger | Franc de la Communauté Financière Africaine | XOF | A, D, F | |
| Nigeria | Nigerian naira | NGN | A*, B, C, D, E, F | A* - Third-party FXs are permitted but not recommended due to risk of mishandled FX documentation (especially Certificate of Capital Importation), etc. |
| Norway | Norwegian krone | NOK | A | |
| Oman | Omani riyal | OMR | A | |
| Pakistan | Pakistani rupee | PKR | A*, B, C, D, E, F | A* - Allowed but not encouraged because of possible failed trades due to settlement cut-off times. Foreign portfolio investors' PKR funds are held in Special Convertible Rupee Accounts (SCRAs) through which repatriation of sale proceeds and dividend income is freely allowed.<br><br>The authorized foreign exchange bank/dealer is required to maintain a Proceeds Realization Certificate (PRC) summarizing details of the origin of the funds. The FX bank will provide the PRC to the subcustodian, and will require a "form R" from the subcustodian in return. The form R specifies the purpose of the funds received (e.g. purchase of shares). The FX Bank in turn would file this return with the State Bank of Pakistan. |
| Palestine | Jordanian dinar/ United States dollar | JOD / USD | A, D | Trades settle vs. USD or JOD.<br><br>Overnight and technical overdrafts are not permitted in Palestine. Palestine Monetary Authority's (PMA) prior approval is required for foreign investors to have overdraft facilities. |
| Peru | Peruvian nuevo sol | PEN | A | *Banco Central de Reserva del Perú*, the central bank, requires 48 hours to process a commercial bank's request to transfer funds abroad. |

Third-Party Foreign Exchange Matrix (continued)

**For Foreign Exchange Execution — Restriction Categories are as follows: A. Third-party FXs are allowed. B. FX must directly relate to underlying investment activity. C. Repatriation restrictions such as proof of funds inflow. D. No overdrafts allowed. Account must be funded prior to any debit. E. Documentation must be executed in market to settle. F. * & ** must be dealt with locally licensed FX institution.

| Market | Currency | Currency Code | Foreign Exchange Execution — Restriction Categories:** | Comments |
|--------|----------|---------------|---------------------------------------------------------|----------|
| Philippines | Philippine peso | PHP | A*, B*, C, D, E, F | A* - Allowed but not encouraged because of possible failed trade due to settlement cut-off times. B* - Not always necessary; however, should the client need to repatriate the funds in the future, they will not be able to unless it is further invested in either equities, government securities or time deposits (with maturities of 90 days or greater), as supporting documents are required (such as the Bangko Sentral Registration Document (BSRD)). Foreign investors are permitted to remit funds without prior regulatory approval and repatriate funds, provided that these are invested in eligible instruments. *Bangko Sentral ng Pilipinas* requires that subcustodians maintain a registry of all foreign funding and evidence of inward conversions called a Bangko Sentral Registration Document (BSRD). A third-party agent must send a Certificate of Inward Remittance to the subcustodian bank at the same time it transfers the PHP. |
| Poland | Polish zloty | PLN | A, F | Polish zloty (PLN) is a convertible currency; however, some foreign exchange controls exist for investors who are not domiciled in a European Union (EU), Organization for Economic Cooperation and Development (OECD), or European Economic Area (EEA) member country. Foreign investors are allowed to conduct foreign exchange transactions only through one of the Polish banks authorized and supervised by the National Bank of Poland (NBP) to perform such transactions. |
| Portugal | Euro | EUR | A | |
| Puerto Rico | United States dollar | USD | N/A | |
| Qatar | Qatari riyal | QAR | A | |
| Romania | Romanian leu | RON | A, B*, D, F | RON accounts established under State Street's custody agreement are intended for activity related to securities investment. RON FX activity not linked to an underlying securities investment may result in delayed settlement. |
| Russia | Russian ruble | RUB | A* | A* - Foreign investors settle cash obligations off-shore versus USD. For State Street clients, no FX takes place in the market. |
| Saudi Arabia | Saudi riyal | SAR | A | |
| Senegal | Franc de la Communauté Financière Africaine | XOF | A, D, F | |
| Serbia | Serbian dinar | RSD | A*, C, F | Prior to the repatriation of sales proceeds and dividends, foreign investors must satisfy their tax obligations. Clients must open both RSD and EUR accounts at the subcustodian to support settlements and entitlements. Cash prefunding is a requirement prior to execution of a trade. |
| Singapore | Singapore dollar | SGD | A | |
| Slovak Republic | Euro | EUR | A | |
| Slovenia | Euro | EUR | A | |
| South Africa | South African rand | ZAR | A | |
| Spain | Euro | EUR | A | |

# STATE STREET.

Third-Party Foreign Exchange Matrix (continued)

**For Foreign Exchange Execution — Restriction Categories are as follows: A. Third-party FXs are allowed. B. FX must directly relate to underlying investment activity. C. Repatriation restrictions, such as proof of funds inflow. D. No overdrafts allowed. Account must be funded prior to any debit. E. Documentation must be executed in market to settle FX. F. FX must be dealt with locally licensed FX institution.

| Market | Currency | Currency Code | Foreign Exchange Execution — Restriction Categories:** | Comments |
|---|---|---|---|---|
| Sri Lanka | Sri Lanka rupee | LKR | A*, B, C, D, F | A* - Allowed but not encouraged because of possible failed trade due to settlement cut-off times.<br><br>Exchange control regulations require that all payments relating to the purchase and sale of shares by foreigners be routed through a Share Investment External Rupee Account (SIERA), which must be opened by each foreign investor. Remittance of dividends requires tax clearance. Similarly, exchange control regulations require that all payments relating to the purchase and sale of government treasury bonds and bills by foreigners be routed through a Treasury Investment External Rupee Account (i.e. TIERA for bonds and TIERA2 for bills), which must be opened by each foreign investor. Remittance of interest income and sales proceeds is freely permitted. |
| Swaziland | Swaziland lilangeni | SZL | A, B, C, D, F | |
| Sweden | Swedish krona | SEK | A | |
| Switzerland | Swiss franc | CHF | A | |
| Taiwan | New Taiwan dollar | TWD | A*, C*, D, E, F | A* - Although not prohibited by regulation, third-party FXs are not common due to reporting requirements and need to have funding in place on T+1. State Street's subcustodians reserve the right to charge a processing fee for third-party FX transactions due to manual reporting required.<br>C* - The investor's local Tax Filing Agent must authorize repatriation of any gains in the market; gains are defined as any amount over the total inwardly remitted TWD. |
| Thailand | Thai baht | THB | A*, D | A* - Clients instructing clean payments through third-parties to fund securities investments must instruct the sending bank to pay the THB directly to State Street's NRBS account. Clients executing securities-related FX with third-party on-shore banks, State Street's NRBS number must be referenced as the receiving/paying account to the resident institution executing the FX. The third-party may request underlying information (e.g. broker contract) before executing the FX. THB can only transfer between like accounts, NRBS to/from NRBS, or NRBA to/from NRBA. The total daily outstanding amounts for THB cash accounts of non-resident investors must not exceed THB300 million per non-resident entity. |
| Togo | Franc de la Communauté Financière Africaine | XOF | A, D, F | |
| Trinidad and Tobago | Trinidad and Tobagan dollar | TTD | A*, D | A* - Funds are typically delivered directly to the broker. Offshore FX is allowed, but, this is not market practice. |
| Tunisia | Tunisian dinar | TND | A, D, F | |
| Turkey | Yeni Turk lirasi | TRY | A | |
| UAE - ADX | UAE dirham | AED | A | |
| UAE - DFM | UAE dirham | AED | A | |
| UAE - DIFC | US dollar / UAE dirham | USD AED | A | |
| Uganda | Ugandan shilling | UGX | A, F | |
| Ukraine | Ukrainian hryvna | UAH | C | Foreign investors settle cash obligations offshore versus USD. For State Street clients, no FX takes place in the market. Proof of inward remittance is required for repatriations. However, it is normally not available because of offshore cash settlement. Consequently, dividends may be non-repatriable. |

TRADE PROCESSING / FOREIGN EXCHANGE

## Third-Party Foreign Exchange Matrix (continued)

**Foreign Exchange Execution — Restriction Categories are as follows: A. Third-party FXs are allowed. B. FX must directly relate to underlying investment activity. C. Repatriation restrictions such as proof of funds inflow. D. No overdrafts allowed. Account must be funded prior to any debit. E. Documentation must be executed in market to settle FX. F. FX must be dealt with locally licensed FX institution.

| Market | Currency | Currency Code | Foreign Exchange Execution — Restriction Categories:** | Comments |
|--------|----------|---------------|--------------------------------------------------------|----------|
| United Kingdom | British pound sterling | GBP | A | |
| United States | US dollar | USD | N/A | |
| Uruguay | Uruguayan peso/ US dollar | UYU USD | A*, D | A*- The majority of securities are issued and trade vs.USD. |
| Venezuela | Venezuelan bolivar fuerte | VEF | A*, B*, C*, D, F | A* - Third-party FXs are not market practice due to the fixed rate (1 USD = 2.1446 VEF) established by the central bank. B* - Central Bank must approve all purchases of VEF. C* - Sale of VEF has been suspended since February 5, 2003. |
| Vietnam | Vietnamese dong | VND | A*, B, C*, D, F | VND is not freely convertible and cannot be traded offshore. A* - United States dollars (USD) can be remitted and exchanged for VND for further payment to a local third-party, at a prevailing exchange rate within a fixed margin of the official exchange rate, fixed by the State Bank of Vietnam (SBV) on a daily basis (the SBV announces a daily USD/VND official exchange rate and the current ceiling rate is +/- 5%). All other FX exchange rates e.g., EUR/VND, JPY/VND are currently still market driven. Please note that third-party FXs for securities investment is not a common practice in Vietnam and there are no clearly defined procedures/documentation requirements in such cases. In the case of a third-party FX, the subcustodian bank will require a written confirmation from the third-party bank. Third-party FXs are more complicated for repatriation, as the remitting bank must ensure that all taxes are paid prior to repatriation and need to be aware of the source of funds for the investments. C* - Conversion of VND into foreign currency is permitted if the VND can be linked to a previous conversion of foreign currency into VND for investment purpose. Repatriation can be done after payment of relevant taxes. |
| Zambia | Zambian kwacha | ZMK | A, D, F | |
| Zimbabwe | Zimbabwean dollar | ZWD | A, B, C, D, F | |

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

ARNOLD HENRIQUEZ, ET AL.     )
          )
        Plaintiffs,     )
          )
v.          )     C.A. No. 11-cv-12049-MLW
          )
STATE STREET BANK AND TRUST     )
COMPANY AND STATE STREET     )
GLOBAL MARKETS LLC     )
          )
        Defendants.     )
_____)

## AFFIDAVIT OF ANALYSIS GROUP, INC. IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Michael Quinn states:

### Background and Qualifications

1.    I am a Managing Principal in Analysis Group, Inc. ("Analysis Group"), a consulting firm that, among other things, performs data analysis.

2.    I have a Ph.D. in Economics from Princeton University. I supervised the work summarized below.

3.    I state in this affidavit the source of any information that is not based on personal knowledge.

4.    I am authorized by Analysis Group to submit this affidavit in support of Defendants' motion to dismiss the Complaint in the matter captioned above.

1

Redacted Document



I declare under penalty of perjury that the forgoing is true and correct to the best of my personal knowledge, information, or belief.

_____