# EX. 50

Redacted Document

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| ARNOLD HENRIQUEZ, ET AL., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )     C.A. No. 11-cv-12049-MLW |
| | ) |
| STATE STREET BANK AND TRUST | ) |
| COMPANY,  STATE STREET | ) |
| GLOBAL MARKETS LLC, AND | ) |
| DOES 1-20, | ) |
| | ) |
| Defendants. | ) |

_____)

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
## FOR JURISDICTIONAL DISCOVERY

Defendants State Street Bank and Trust Company ("State Street") and State Street Global Markets, LLC ("LLC") submit this memorandum in response to the Plaintiffs' request for overbroad, unfocused jurisdictional discovery.

Defendants have moved to dismiss the Amended Complaint on standing and other grounds.  Instead of responding to the motion, Plaintiffs proposed a long period in which to conduct jurisdictional discovery and sought at least five months for the filing of any opposition. In response, Defendants noted that the facts included in the record in support of their jurisdictional motion were not extensive, and proposed that Plaintiffs draft the discovery requests they would propose and share them with Defendants.  Defendants would then work with Plaintiffs to negotiate a limited amount of discovery allowing Plaintiffs to address the facts Defendants relied upon to move to dismiss on standing grounds.  Plaintiffs initially agreed, but then recanted.  They refused to permit Defendants or the Court to see just what discovery they

1

have in mind, and instead insist on unfettered discovery addressed to a list of topics that are just too broad.

In their motion, Plaintiffs pared back their initial list of topics somewhat, but it is still too broad. Moreover, it makes no sense to invite a raft of motions concerning the scope of discovery by permitting the Plaintiffs to proceed with jurisdictional discovery without letting Defendants and the Court know what actual requests Plaintiffs plan to make. Plaintiffs at some point are going to have to describe their document requests and any other discovery demands. They should do so now. The discipline of actually drafting the requests should cause Plaintiffs further to narrow and focus their demands, thereby decreasing the grounds for disputes between the parties and allowing the Defendants and the Court to evaluate the actual utility and burden of what Plaintiffs propose.

The reality is that the facts that are dispositive of the scope of the Court's jurisdiction are those relied upon in the affidavits filed in support of Defendants' Motion. There is no need for early merits discovery in the guise of jurisdictional discovery. ██████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ Plaintiffs' acknowledge that they have no information to the contrary, although it is their threshold burden to plead and prove injury.

In these circumstances, courts have repeatedly emphasized that jurisdictional discovery should be limited to the essential facts necessary to determine the Court's subject matter jurisdiction. Plaintiffs are not entitled to put Defendants to the burden and expense of responding to expansive and unfocused discovery not relevant to Defendants' Rule 12(b)(1) Motion. Nor can they contend that their discovery proposal meets this test. For example, they

2

request permission to fish for whatever information they later would claim to be relevant "to issues raised in Defendants' [separate] Motion to Dismiss Pursuant to **Rule**[] . . . **12(b)(6)**." (*See* Pls.' Proposed Order, at 2 (emphasis added).) Obviously, discovery relative to the separate motion for failure to state a claim is broader than necessary to address the jurisdictional motion and impermissible at this stage of the proceedings.

Accordingly, Plaintiffs' motion should be denied and jurisdictional discovery should be limited to the facts relied on in the affidavits filed in support of Defendants' Motion to Dismiss (as set forth in Defendants' Proposed Discovery Order (Exh. 1)).[1]

## **Background**

Plaintiffs are allegedly participants in defined contribution retirement plans who caused the plans to invest assets in collective investment funds managed by State Street (the "DC Plaintiffs"), or participants in a defined benefit plan for which State Street served as custodian of assets (the "DB Plaintiffs").[2] On February 24, 2012, Plaintiffs filed an Amended Complaint alleging that Defendants violated the Employee Retirement Income Security Act, 29 U.S.C. § 1001, *et seq.* ("ERISA"), with respect to so-called "indirect" foreign currency exchange transactions that Plaintiffs claim the collective funds or the defined benefit plan executed with the State Street Global Markets division of State Street ("SSGM"). (*See* Dkt. No. 24.)[3] Plaintiffs

---

[1] Exhibits are attached to the Declaration of Nolan J. Mitchell.

[2] The State Street Global Advisor's division of State Street ("SSgA") is the investment manager for the collective funds. SSgA is separate from those divisions of State Street that act as a foreign currency principal dealer or that provide custodial banking services to retirement plans. (*See* Defs.' Br. in Support of Motion to Dismiss, at 1-2.)

[3] On November 18, 2011, one of the present Plaintiffs, Arnold Henriquez, filed a Complaint alleging similar ERISA claims. After Defendants moved to dismiss those claims on January 20, 2012 for lack of standing and failure to state a claim, the Plaintiff exercised his right to amend the Complaint rather than respond to Defendants' motion. Pursuant to a proposed briefing schedule agreed to by the parties, the Amended Complaint was filed on February 24, 2012.

3

CONFIDENTIAL -- FILED UNDER SEAL

purport to represent a putative class of all ERISA-covered plans for which State Street acted as custodian of assets or which invested in collective investment funds managed by State Street, and which executed so-called "indirect" foreign exchange transactions with State Street over an eleven-year putative class period from January 1, 2001 to the present.[4]

### A. Defendants' Motion To Dismiss

On April 9, 2012, Defendants moved to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. In support of their Rule 12(b)(1) motion, Defendants submitted affidavits of State Street employees and a consultant showing that Plaintiffs lacked Article III standing because they were never injured by alleged indirect foreign exchange trading with SSGM. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

On March 3, 2012, the parties filed a joint report, pursuant to Fed. R. Civ. P. 26(f), in which they agreed to defer a discovery plan on the merits of Plaintiffs' claims "until twenty-one days after any adverse ruling on Defendants' soon-to-be-filed motion to dismiss …, or seven days prior to any scheduling conference ordered by the court." (Dkt. No. 25, Report at 1). Plaintiffs reserved their right to seek preliminary discovery only "[t]o the extent that Defendants again assert fact-based defenses in their anticipated motion to dismiss, *e.g.*, another Motion to Dismiss under Fed. R. Civ. P. 12(b)(1) …." (*Id*. at 3-4.)

[4] State Street offers a variety of foreign exchange methods falling into two general categories, referred to in the Amended Complaint as "direct" and "indirect" foreign exchange trading. (Compl. ¶ 18.) The Complaint makes no allegation with respect to "direct" foreign exchange transactions.

[5] The DC Plaintiffs assert claims on behalf of the Waste Management Retirement Savings Plan and the Citigroup 401(k) Plan. (Compl. ¶¶ 10-11.)

4

CONFIDENTIAL -- FILED UNDER SEAL

███████████████████████████████████

███████████████████████████████████

██

████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████

      Defendants' 12(b)(1) Motion with respect to the DB Plaintiffs focused on the adequacy of the Amended Complaint's injury allegations—not their accuracy. [7]  Defendants relied principally on deficiencies in the Amended Complaint (i.e., its failure to allege actual or imminent injury as a result of any challenged conduct), and on publicly-available documents like the plan's public filings with the Department of Labor, to show that the plan is adequately funded and in no imminent danger of becoming unable to pay benefits.  (*See* Defs.' Br. in Support of Motion to Dismiss, at 12-13.)  To the extent the Motion relied on the publicly



---

[7] The DB Plaintiffs assert claims on behalf of the Retirement Plan of Johnson and Johnson. (Compl. ¶¶ 12-13.)

CONFIDENTIAL  -- FILED UNDER SEAL

disclosed fact that the DB plan at issue paid DB Plaintiffs benefits in full every month, that information is equally (if not more readily) available to DB Plaintiffs.

### B. Plaintiffs' Premature and Overbroad Discovery Motion

After the motion to dismiss was filed, Defendants and Plaintiffs (together, the "Parties") conferred on April 23, 2012 about discovery. Defendants proposed that the Parties attempt to negotiate a reasonable discovery plan that would provide Plaintiffs with an opportunity to test the jurisdictional facts relied upon in support of Defendants' Motion. To do so, the Parties agreed that Plaintiffs would serve written discovery requests as a basis for discussion, after which the Parties would again confer as to the scope of any jurisdictional discovery.[8] On May 9, 2012, Plaintiffs changed course and informed Defendants that they intended to file the instant motion without serving discovery requests. When pressed, Plaintiffs described in an email a list of sixteen discovery topics of expansive scope, which were described as illustrative. (*See* Exh. 2, Email Exchange, at 1-2 ("We are not representing that this is an exhaustive list.")

These topics are too broad; and Plaintiffs' refusal to say just what they are looking for suggests strongly that what they actually intend to demand is broader still. For example, Plaintiffs indicated that they would seek documents, *including voicemails and emails*, *relating to all* "Direct and Indirect FX transactions between [SSGM] and [SSgA] managed investment funds covered by ERISA and certain other SSgA managed funds subject to ERISA" over the eleven-year asserted class period (even though the Amended Complaint makes no allegation regarding "Direct" foreign exchange transactions, and Plaintiffs could not have been injured by alleged

---

[8] *See* Ex. 2, Email Exchange, at 3 ("Plaintiffs' counsel intend serve a formal request for production of documents pursuant to FRCP 34 related to your FRCP 12(b)(1) motion. As you suggested in our phone conference, after we have served the document requests, we should confer again concerning scheduling of discovery and briefs in this case and the other matters listed in the agenda.")

CONFIDENTIAL -- FILED UNDER SEAL

indirect foreign exchange trading by funds in which Plaintiffs' plan accounts had no interest whatsoever). Plaintiffs also overreached in proposing to demand all documents related to SSgA-managed collective funds (regardless of any tether to the jurisdictional issue or the funds in which Plaintiffs caused plan assets to be invested) and all documents related to a variety of State Street policies and practices regarding foreign exchange trading generally (which clearly addresses the merits and not jurisdiction). These are just three examples. ████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

Although the instant motion for jurisdictional discovery appears to have cut back on some of the most extreme discovery demands from the May 9th email exchange, it nonetheless suggests that Plaintiffs intend to fire a discovery cannon loaded with grapeshot. For example, they state that "the discovery Plaintiffs expect to conduct includes, *but may not be limited to*" depositions of not only the six affiants (which itself is cumulative and unnecessary), but also "of other [State Street] or [LLC] officers or employees who are identified in the affidavits" and "additional individuals or entities identified in the course of discovery . . . , as well as Fed. R. Civ. P. 30(b)(6) depositions." Plaintiffs also intend to serve Requests for Admissions and Interrogatories on as yet unspecified topics relating to State Street's foreign exchange activities "with respect to the named Plaintiffs' *retirement plans*," notwithstanding the fact that Defendants' Motion addresses only indirect foreign exchange trading by collective investment

---

[9] (*See* Defs.' Br. in Support of Motion to Dismiss, at 12 n. 11.)

7

Redacted Document

funds in which the DC Plaintiffs have alleged a direct or indirect interest (because the grounds for dismissing the DB plan claims do not depend on the extent of foreign exchange trading between the DB plan and SSGM).

Plaintiffs' description of the documents they intend to seek also contains other categories that sweep far beyond the facts necessary to resolve Defendants' standing Motion, and includes "*without limitation*":

- o "*[R]ecords of <u>all</u> foreign exchange transactions*" executed between SSGM and *any counterparty* over the *eleven-year* putative class period;[10]

- o Various documents and agreements relating to the operation and establishment of the collective funds and plans that were not relied on or referenced in Defendants' Motion and which have nothing to do with the Plaintiffs' threshold standing issue;

- o Unspecified manuals, guides, policy statements, and similar documents concerning State Street's procedures and practices regarding foreign-exchange trading generally;

- o Account Opening Documents for the Plans' investment managers (including third-party investment managers other than State Street) that were apparently referenced in *other litigation*[11]; and

- o ██████████████████████████████████████████████████

(*See* Pls.' Br. in Support of Discovery Mot. at 5-6 (emphasis added).)

Without the benefit of actual discovery demands it is impossible to anticipate the scope of discovery Plaintiffs will ultimately seek, but Plaintiffs' motion plainly requests broad authority



---

[11]  *See* Pls. Discovery Motion, at 6 & n. 4 (seeking discovery of information referenced in declarations filed in *Arkansas Teachers Retirement System v. State Street*, No. 11-CV-10230 (D. Mass. April 15, 2011)).

8

CONFIDENTIAL  -- FILED UNDER SEAL

with respect to a "moving target."  Although Plaintiffs purport to ask for only "limited" jurisdictional discovery—which they assert should "not count against general merits discovery limits"—this simply isn't true.  They seek discovery on matters they acknowledge relate only to Defendants' separate Rule 12(b)(6) motion and on topics that are well beyond the scope of the allegations in the Amended Complaint, much less those raised by Defendants' standing Motion to Dismiss.  (*See* Proposed Order, at 2; Pls.' Mem. in Support of Mot. at 5-6.)[12]

---

[12] In their Rule 12(b)(6) motion, Defendants argued that Plaintiffs failed to state a claim under ERISA for breach of fiduciary duty because, as the allegations in the Amended Complaint and documents incorporated therein plainly demonstrate, State Street's SSGM division was not acting in a fiduciary capacity when it executed foreign exchange transactions at the direction of State Street's custodial clients or their third-party investment managers.  In particular, Defendants' motion pointed out that notwithstanding Plaintiffs' speculation to the contrary, SSGM was not the  agent for any of the plans with respect to foreign currency exchange, but rather a principal dealer that traded foreign currency with counterparties on an arm's-length basis.  (*See* Defs.' Br. in Support of Motion, at 21-25.)  Plaintiffs' requests for discovery related to Defendants' lack of fiduciary status only underscore the extent to which their fiduciary allegations are based on no more than guesswork even as to matters as basic as the foreign exchange services provided by Defendants, on which their claims depend.  Indeed, notwithstanding Defendants' repeated representations that LLC is a separate State Street entity that has nothing to do with foreign currency exchange, they continue to name LLC as a Defendant.  *Compare* Ex. 4, Dkt. No. 33, Order, *Arkansas Teachers Retirement System v. State Street*, No. 11-CV-10230 (May 16, 2012) (Wolf, J.) (dismissing by stipulation of the parties claims against LLC challenging indirect foreign exchange trading).  To the extent the Court later determines Plaintiffs have stated a fiduciary claim minimally adequate to survive dismissal (which, as Defendants have argued, they have not), Defendants believe limited discovery on the straightforward, threshold issue of the type of foreign exchange services SSGM provides and its lack of fiduciary status with respect to foreign exchange trading by State Street's custodial clients could be warranted.  No such discovery should take place, however, unless and until Plaintiffs' Amended Complaint survives the motion to dismiss on Rule 12(b)(6) grounds.

CONFIDENTIAL  -- FILED UNDER SEAL

# Argument

## I. Jurisdictional Discovery Should Be Limited To The Facts Relied Upon In Defendants' Affidavits That Are Essential to Resolve The Jurisdictional Issue.

### A. Legal Standard

When considering a motion to dismiss under Rule 12(b)(1), the Court "has great latitude to direct *limited* discovery." *Rivera-Flores v. Puerto Rico Telephone Co.*, 64 F.3d 742, 748 (1st Cir. 1995) (emphasis added). Nonetheless, a plaintiff's entitlement to jurisdictional discovery "is not absolute." *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 626 (1st Cir. 2001) (discussing discovery as to personal jurisdiction); *see also Blair v. City of Worcester*, 522 F.3d 105, 110-11 & n.8 (1st Cir. 2008) (explaining that the standard for adjudicating motions for jurisdictional discovery under Fed. R. Civ. P. 12(b)(1), (2) and (5) is similar and cases may be cited "interchangeably").

Courts have repeatedly cautioned against allowing jurisdictional discovery to serve as "a fishing expedition based only upon bare allegations, under the guise of jurisdictional discovery." *Eurofins Pharma U.S. Holdings v. BioAlliance Pharma SA,* 623 F.3d 147, 157 (3d Cir. 2010); s*ee, e.g.*, *Sanchez v. United States*, 671 F.3d 86, 98-99 (1st Cir. 2012) (affirming denial of plaintiffs' "sweeping" jurisdictional discovery requests, which were tantamount to a "fishing expedition" covering "broad range of documents, many of which had no apparent relationship to jurisdictional questions"). Thus, when a party challenges subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1), "discovery and fact-finding should be limited to the essentials necessary to determining the preliminary question of jurisdiction." *Federal Ins. Co. v. Richard I. Rubin & Co., Inc.*, 12 F.3d 1270, 1284 n.11 (3rd Cir. 1993); *see, e.g.*, *Crocker v. Hilton Int'l Barbados, Ltd.*, 976 F.2d 797, 801 (1st Cir. 1992) (affirming denial of jurisdictional discovery requests to the extent they were not relevant to the narrow jurisdictional issue); *Strahan v. Roughead*, No.

10

08-cv-10919, 2010 WL 4827880, at *12 (D. Mass. Nov. 22, 2010) (Wolf, J.) (denying motion for jurisdictional discovery except to the extent it sought "documents … relie[d] upon" in defendants' jurisdictional challenge); *Artis v. Greenspan*, 223 F. Supp. 2d 149, 154 (D.D.C. 2002) (noting that "jurisdictional discovery should be 'carefully controlled and limited'"); *Hoover v. Lanois*, No. 00-1266, 2000 WL 1708300, at *2 n.4 (E.D. La. Nov. 13, 2000) ("Discovery and concomitantly, fact-finding, should be limited to the essentials necessary to determining the preliminary question of jurisdiction.").

### B.       Plaintiffs' Motion Should Be Denied As Premature.

Plaintiffs' motion for jurisdictional discovery lacks basic information necessary to support the relief it requests, and it should be denied as premature and for lack of particularity. *See* Fed. R. Civ. P. 7(b) (requiring motions "to state with particularity the grounds for seeking the order"). Without the benefit of actual discovery demands, or some other method clearly demarking the jurisdictional discovery Plaintiffs seek, there is no way for Defendants (or the Court) meaningfully to respond to their discovery motion, the schedule they propose, or their request that "[d]iscovery taken pursuant to this Order shall not count against general merits discovery limits imposed by Federal or Local rules of civil procedure." (Pls.' Proposed Order.) Given that the law requires tailored and targeted discovery, Plaintiffs' refusal to come clean about what they really propose, coupled with their overbroad list of topics, ensures only an unseemly negotiation via motion papers or further motion practice. Instead, Plaintiffs should make actual requests consistent with the limited scope to which they are entitled, engage in discussion with Defendants, and put before the Court only clear disputes that the parties cannot resolve.

CONFIDENTIAL  -- FILED UNDER SEAL

Case: 1:11-cv-10230-MLW Document 406-149 Filed 08/07/18 Page 216 of 739
Case 1:11-cv-10230-MLW Document 401-49 Filed 07/23/18 Page 13 of 39
Redacted Document

## B.     Plaintiffs' Motion Should Be Denied As Overbroad.

Plaintiffs' motion should also be denied to the extent it seeks discovery of facts beyond those relied upon in the affidavits submitted in support of Defendants' Motion.  Only those facts are necessary to resolve this Court's jurisdiction.   In their motion, Plaintiffs have proposed a non-exhaustive list of discovery topics, most of which have no conceivable connection to the discrete facts on which Defendants' standing challenge turns.   These are: (1) whether the Selected Funds or Sub-Funds engaged in indirect foreign exchange transactions with SSGM at a time when assets from Plaintiffs' individual accounts were invested in those funds (directly or indirectly); ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████    ████████████████████████████

████████████████████████████████████████████.[13]

Thus, while Defendants are willing to negotiate with Plaintiffs a reasonable discovery plan concerning the facts Defendants relied on in their standing Motion, there is no reason to engage in the extensive and unfocused discovery Plaintiffs propose.   In order to frame that discussion, Defendants would agree to provide Plaintiffs with the following:

---

[13]  With respect to the DB Plaintiffs, no jurisdictional discovery is warranted at all because the Amended Complaint fails to allege that their individual plan benefits have been or will imminently be reduced as a result of any indirect foreign exchange trading between the Johnson and Johnson plan and SSGM.  The absence of such allegations alone is sufficient to support dismissal.  (*See* Defs.' Br. in Support of Motion to Dismiss, at 12-13.)  To the extent matters outside the pleadings were referenced in Defendants' motion—for example, that the DB Plaintiffs have received all of the plan benefits to which they are entitled, and (according to its public filings) the plan is adequately funded—there is no need for jurisdictional discovery *from Defendants* because those facts are equally available to the Plaintiffs.

CONFIDENTIAL  -- FILED UNDER SEAL

- Plan or collective fund documents relied on in the affidavits submitted in support of Defendants' Motion;

- 

- Tax records confirming that the DB Plaintiffs have been paid in full every month since they began receiving payments; and

- Depositions of up to six affiants, limited to the jurisdictional facts relied upon in their respective affidavits (even though Plaintiffs could very well limit the depositions to Robert Dempsey and Michael Quinn).[15]



[15] Depositions of State Street's relationship managers for the named plans will shed no light on the jurisdictional facts at issue, which turn exclusively on indirect foreign exchange trading by *SSgA*-managed collective funds. While Plaintiffs assert that these depositions are necessary to test the affiants' statements "regarding the responsibilities of various divisions of [State Street, which] … imply that actions of separate non-juridical, divisions of [State Street] are not attributable to other divisions," those facts have nothing to do with Defendants' standing challenge and simply provide relevant context ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

CONFIDENTIAL -- FILED UNDER SEAL

Redacted Document

This information will provide Plaintiffs with more than sufficient information to test the facts on which Defendants' Rule 12(b)(1) standing motion relies, and will avoid putting Defendants (and the Court when discovery issues undoubtedly arise) through the burden and expense of responding to voluminous unnecessary discovery (including electronic discovery) or motion practice that would be avoided by requiring Plaintiffs to be clear at the outset.

Plaintiffs are not entitled to explore under the guise of jurisdictional discovery factual "matters relevant to issues raised in Defendants' Motion to Dismiss Pursuant to Rule [12(b)(6)]" or topics as to which the Amended Complaint makes no allegation.[16] Nor are they entitled to seek discovery that is cumulative and unnecessary to the Court's resolution of the core jurisdictional dispute. For example, there is no reason to depose State Street employees other than the affiants, who are capable of testifying as to all of the facts relied upon in support of Defendants' Motion. Likewise, there is no need to engage in extensive written discovery (including Requests for Admissions and Interrogatories) or electronic discovery (including emails and voicemails) where the discrete facts supporting Defendants' standing challenge are set forth in the affidavits and Plaintiffs can be provided with the relevant documents referenced therein.

Indeed, a narrowly-tailored discovery plan is particularly appropriate here because the burdens and costs of engaging in even focused jurisdictional discovery in this case are potentially enormous. State Street is a massive institution with world-wide operations, and Plaintiffs'

---

[16] These requests include, for example, State Street's records of *direct* foreign exchange transactions or indirect foreign exchange trading by non-ERISA covered entities; plan documents which relate to investments in which Plaintiffs have alleged no interest; policy documents describing State Street's foreign exchange procedures and practices generally; and "Account Opening documents" for the Plan's investment managers, including third-party investment managers referenced in unrelated litigation. (*See infra* at 8 & n.11.)

CONFIDENTIAL  -- FILED UNDER SEAL

Redacted Document

allegations cut across at least three major divisions of the bank (excluding LLC). State Street's custody division is among the largest in the world, with more than *$20 trillion* in assets held in custody. (*See* Exh. 4, State Street Corp. 2011 Annual Report at 46). Its custody division has thousands of pension fund clients, each of which may invest plan assets in a variety of investment vehicles managed by a variety of investment managers. (*Id.*) State Street's separate SSgA division is the largest investment manager for pension plan assets in the United States, and it operates numerous collective funds in which ERISA-covered entities may choose to invest. (*Id.* at 47.) Those entities may or may not also be State Street custody clients. Moreover, State Street's separate SSGM division has executed millions of foreign currency transactions over the asserted class period for a wide variety of counterparties. (*See generally id.* at 48.) Given the breadth of Plaintiffs' claims and the potential burdens of discovery, Plaintiffs should not be permitted to engage in the merits discovery they propose without first showing that they can meet their preliminary burden of proving Article III standing.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the Court deny the expansive relief requested in Plaintiffs' motion and enter the attached Proposed Order limiting jurisdictional discovery to the essential facts necessary to determine the Court's subject matter jurisdiction and rule upon Defendants' Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(1).

Respectfully submitted,

STATE STREET BANK AND TRUST
COMPANY and STATE STREET GLOBAL
MARKETS LLC

By its attorneys,

/s/ William H. Paine
Jeffrey B. Rudman (BBO# 433380)

15

CONFIDENTIAL  -- FILED UNDER SEAL

William H. Paine (BBO# 550506)
Mark C. Fleming (BBO# 639358)
Nolan J. Mitchell  (BBO# 668145)
Robert Tannenbaum (BBO# 680568)
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, Massachusetts, 02109
(617) 526-6000

Dated May 29, 2012

CONFIDENTIAL  -- FILED UNDER SEAL

Redacted Document

## CERTIFICATE OF SERVICE

I, Nolan J. Mitchell, certify that on May 29, 2012 this document filed under seal will be sent to all counsel of record via E-mail and First Class mail.

/s/ Nolan J. Mitchell
Nolan J. Mitchell

CONFIDENTIAL  -- FILED UNDER SEAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARNOLD HENRIQUEZ, ET AL. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| STATE STREET BANK AND TRUST | ) |
| COMPANY AND STATE STREET | ) |
| GLOBAL MARKETS LLC AND | ) |
| DOES 1-20 | ) |
| | ) |
| Defendants. | ) |

C.A. No. 11-cv-12049-MLW

**DECLARATION OF NOLAN J. MITCHELL IN SUPPORT
OF DEFENDANTS' RESPONSE TO PLAINTIFFS' DISCOVERY MOTION**

I am a senior associate with the law firm of Wilmer Cutler Pickering Hale and Dorr LLP, counsel for Defendants Street Bank and Trust Company and State Street Global Markets, LLC (collectively, "State Street") in the above-captioned matter. I submit this declaration in support of Defendants' Response to Plaintiffs' Discovery Motion.

1. Attached hereto as Exhibit 1 is Defendants' Proposed Discovery Order.

2. Attached hereto as Exhibit 2 is a true and correct copy of an email exchange between Plaintiffs and Defendants' counsel regarding jurisdictional discovery.

3. Attached hereto as Exhibit 3 is a true and correct copy of the Court's May 8, 2010 Order in *Arkansas Teacher Retirement System v. State Street*, No. 11-CV-10230 (D. Mass.).

4. Attached hereto as Exhibit 4 is a true and correct copy of relevant excerpts of State Street Corporation's 2011 Annual Report on Form 10-K.

1

I declare under penalty of perjury, as provided in 28 U.S.C. § 1746, that the foregoing is

true and correct.  Executed in Boston, Massachusetts, on May 29, 2012.

/s/ Nolan J. Mitchell
Nolan J. Mitchell

# Exhibit 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARNOLD HENRIQUEZ, ET AL. | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 11-cv-12049-MLW |
| | ) | |
| STATE STREET BANK AND TRUST | ) | |
| COMPANY and STATE STREET | ) | |
| GLOBAL MARKETS LLC AND DOES | ) | |
| 1-20 | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## [PROPOSED] DISCOVERY ORDER

Upon consideration of the submissions of the parties, it is hereby ORDERED THAT:

1.      The Parties' proposed briefing scheduled (Dkt. No. 23) is reset;

2.      The Parties may take limited, jurisdictional discovery on the factual matters necessary to resolution of Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1);

3.      Plaintiffs' discovery shall be limited to the facts and documents relied on in the affidavits filed in support of Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(1);

4.      Defendants' discovery shall be limited to the individual Plaintiffs' alleged investments in State Street-managed collective investments funds;

5.      The Parties shall serve discovery requests consistent with this Order within 14 days following entry of this Order;

6.      Within 14 days of serving those requests, the Parties shall meet and confer in an attempt to negotiate a reasonable schedule for discovery and for briefing the balance of Defendants' motion to dismiss; and

7.      Within 14 days of the Parties' conference, the Parties shall file a joint status report

setting forth their proposed discovery and briefing schedule.


So ordered:



_____

The Honorable Mark L. Wolf

Redacted Document

# Exhibit 2

Redacted Document

## Mitchell, Nolan J

| | |
|---|---|
| **From:** | James Moore [jmoore@mctiguelaw.com] |
| **Sent:** | Wednesday, May 09, 2012 3:57 PM |
| **To:** | Mitchell, Nolan J; Bryan Veis |
| **Cc:** | Brian McTigue; Emily Peterson; Bond, David; Michael Brickman (mbrickman@rpwb.com); Kim Keevers (kkeevers@rpwb.com); Nina Fields (nfields@rpwb.com); James Bradley; 'Jon Axelrod'; 'Cathy Campbell'; Paine, William; Halston, Daniel |
| **Subject:** | RE: Henriquez v. State Street |

Nolan,

As promised in my previous e-mail, below is a list of topics for which Plaintiffs currently intend to seek document discovery. We are not representing that this is an exhaustive list.

Documents, including voicemails and e-mails, related to:

- ███████████████████████████████████████████

- ███████████████████████████████████████████

- Any SSBT collective fund identified in the Defs MTD

- Any communication with, and data sent by or to, Analysis Group

- Account opening document identified in any Investment Managers Guides

- Any Plan Document, e.g. trust and custody agreement, for the WM, J&J, and Citigroup Plans

- Any Declaration of Trust for the SSBT Investment Funds for Tax Exempt Plans

- Any Fund Declaration of any SSBT Investment Fund for Tax Exempt Plans

- Any Financial and Audit Report created per a Declaration of Trust

- Any Manual, guide policy statement, and similar document concerning procedures and practices regarding FX and Prohibited Transaction Exemptions

- ███████████████████████████████████████████

- Any Employee of SSGM referred to in the Hayes-Duffy Affidavit in Support of Defs MTD

- ███████████████████████████████████████████

- ███████████████████████████████████████████

- SSBT collective funds identified in the Defs MTD

- Citigroup Plan fiduciaries selection of Sub-funds in which SSBT Collective Funds held interests

Jim

```
=================================
```
James A. Moore, Esq.
**McTigue & Veis LLP**
4530 Wisconsin Ave. N.W.
Suite 300
Washington, DC 20016
(202) 364-6900, x309; fax (202) 364-9960
jmoore@mctiguelaw.com
www.mctiguelaw.com

*Member of the District of Columbia and Pennsylvania Bars*

The information contained in this e-mail transmission may be privileged and confidential and is intended solely for use by the individual or entity named as the recipient thereof. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this transmission is prohibited. If you have received this transmission in error, or have any reason to believe that you may have received it in error, please contact us immediately and delete this e-mail and any copies.

**From:** Mitchell, Nolan J [mailto:Nolan.Mitchell@wilmerhale.com]
**Sent:** Tuesday, May 08, 2012 1:55 PM
**To:** Bryan Veis
**Cc:** Brian McTigue; James Moore; Emily Peterson; Bond, David; Michael Brickman (mbrickman@rpwb.com); Kim Keevers (kkeevers@rpwb.com); Nina Fields (nfields@rpwb.com); James Bradley; 'Jon Axelrod'; 'Cathy Campbell'; Paine, William; Halston, Daniel
**Subject:** RE: Henriquez v. State Street

Bryan,

Based on our conversation on April 23rd, we understood that plaintiffs' intended to serve Rule 34 discovery requests and that, after defendants received those requests, we would confer again to discuss the scope and timing for any discovery and the balance of the briefing schedule on defendants' motion to dismiss. As your summary below reflects, we had agreed that it "would be more appropriate to wait to file any motion for an extension until after Plaintiffs have served the document requests and we have discussed them with you. That would allow the parties to report to the court on the status of discovery and the parties' views on the time needed to complete discovery, including depositions, and to file briefs on the motion to dismiss."

We believe that the parties' prior understanding, as reflected in your email of April 23d, makes more sense as the more orderly approach to any discovery concerning defendants' motion to dismiss. We continue to believe that it is premature to set a timetable for discovery until the parties have had the opportunity to discuss the scope of any such discovery in light of the plaintiffs' actual discovery demands. We also continue to be more than willing to assent to a motion to reset the proposed briefing schedule currently in place until these issues can be resolved. Please let me know whether plaintiffs' will reconsider their proposed motion to conform with the parties' prior understanding.

Best,

Nolan

---

**From:** Bryan Veis [mailto:bveis@mctiguelaw.com]
**Sent:** Monday, April 23, 2012 4:55 PM
**To:** Paine, William; Halston, Daniel; Mitchell, Nolan J
**Cc:** Brian McTigue; James Moore; Emily Peterson; Bond, David; Michael Brickman (mbrickman@rpwb.com); Kim Keevers (kkeevers@rpwb.com); Nina Fields (nfields@rpwb.com); James Bradley; 'Jon Axelrod'; 'Cathy Campbell'
**Subject:** Henriquez v. State Street

Bill, Dan, and Nolan,

Following up on our phone call today, the parties have reached no agreement on any of the items listed in the agenda attached to my Outlook invitation arranging our conference call, other than your agreement on Friday that Plaintiffs' opposition to the motion to dismiss is not due today, but rather is due on the date set under the stipulated schedule.

Plaintiffs' counsel intend serve a formal request for production of documents pursuant to FRCP 34 related to your FRCP 12(b)(1) motion.  As you suggested in our phone conference, after we have served the document requests, we should confer again concerning scheduling of discovery and briefs in this case and the other matters listed in the agenda.

Thank you for your offer to stipulate to an extension of the briefing schedule to allow time for these matters, particularly discovery issues, to be resolved by the parties.  On reflection, rather than immediately seeking some sort of indefinite extension, we believe that it would be more appropriate to wait to file any motion for an extension until after Plaintiffs have served the document requests and we have discussed them with you.  That would allow the parties to report to the court on the status of discovery and the parties' views on the time needed to complete discovery, including depositions, and to file briefs on the motion to dismiss.

Regards,

Bryan

---

Bryan T. Veis
**McTigue & Veis LLP**

4530 Wisconsin Ave. N.W.
Suite 300
Washington, DC  20016
(202) 364-6900 (202)364-9960 fax
bveis@mctiguelaw.com

Member of the District of Columbia Bar

The information contained in this E-mail transmission may be privileged and confidential and is intended solely for use by the individual or entity named as the recipient thereof.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this transmission is prohibited. If you have received this transmission error, or have any reason to believe that you may have received it in error please notify us immediately by calling the attached telephone number so we may arrange to retrieve this transmission at no cost to you.

# Exhibit 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT      )
SYSTEM, et al,                   )
    Plaintiffs,              )
                      )
      v.                        )
                      )   C.A. No. 11-10230-MLW
STATE STREET CORPORATION,        )
STATE STREET BANK & TRUST        )
COMPANY, and STATE STREET        )
GLOBAL MARKETS, LLC              )
    Defendants.              )

ORDER

WOLF, D.J.                                         May 8, 2012

For the reasons described in detail in court on May 8, 2012, it is hereby ORDERED that:

1. Defendants' Motion to Dismiss (Docket No. 18) is ALLOWED to the extent that the claims against defendant State Street Corporation are DISMISSED and, by agreement of the parties, the claims against defendant State Street Global Markets, LLC are DISMISSED without prejudice. The Motion to Dismiss is DENIED with regard to the claims against defendant State Street Bank & Trust Company.

2. By July 13, 2012, representatives of the parties and their counsel shall meet at least once to discuss the possibility of settling this case; report, jointly if possible but separately if necessary, concerning whether they have reached an agreement to do so; and, if not, report whether they both wish to engage in

1

mediation, either privately or before a magistrate judge.

3. If case is not settled and there is no agreement to engage in mediation, by August 30, 2012, the parties shall respond to the attached Notice of Scheduling Conference.

4. If necessary, a scheduling conference shall be held on September 18, 2012, at 3:00 p.m. Representatives of the parties with settlement authority shall attend.

_____/s/ Mark L. Wolf_____<br>
UNITED STATES DISTRICT JUDGE

2

# Exhibit 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, DC 20549

# Form 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2011**
**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from        to**

**Commission File No. 001-07511**

# STATE STREET CORPORATION
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Massachusetts** | **04-2456637** |
| (State or other jurisdiction of incorporation) | (I.R.S. Employer Identification No.) |
| **One Lincoln Street** | |
| **Boston, Massachusetts** | **02111** |
| (Address of principal executive office) | (Zip Code) |

**617-786-3000**
(Registrant's telephone number, including area code)

**Securities registered pursuant to Section 12(b) of the Act:**

| (Title of Each Class) | (Name of each exchange on which registered) |
|---|---|
| Common Stock, $1 par value | New York Stock Exchange |
| Fixed-to-Floating Rate Normal Automatic Preferred Enhanced Capital Securities of State Street Capital Trust III (and Registrant's guarantee with respect thereto) | New York Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§ 229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See the definitions of "large accelerated filer," "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒        Accelerated filer ☐        Non-accelerated filer ☐        Smaller reporting company ☐
(Do not check if a smaller reporting company)

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐ No ☒

The aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the per share price ($45.09) at which the common equity was last sold as of the last business day of the registrant's most recently completed second fiscal quarter (June 30, 2011) was approximately $22.40 billion.

The number of shares of the registrant's common stock outstanding as of January 31, 2012 was 487,849,175.

Portions of the following documents are incorporated by reference into Parts of this Report on Form 10-K, to the extent noted in such Parts, as indicated below:

(1) The registrant's definitive Proxy Statement for the 2012 Annual Meeting of Shareholders to be filed pursuant to Regulation 14A on or before April 30, 2012 (Part III).

Generally, servicing fees are affected, in part, by changes in daily average valuations of assets under custody and administration, while management fees are affected by changes in month-end valuations of assets under management. Additional factors, such as the level of transaction volumes, changes in service level, balance credits, client minimum balances, pricing concessions and other factors, may have a significant effect on our servicing fee revenue. Generally, management fee revenue is more sensitive to market valuations than servicing fee revenue. Management fees for enhanced index and actively managed products are generally earned at higher rates than those for passive products. Enhanced index and actively managed products may also involve performance fee arrangements. Performance fees are generated when the performance of certain managed funds exceeds benchmarks specified in the management agreements. Generally, we experience more volatility with performance fees than with more traditional management fees.

In light of the above, we estimate, assuming all other factors remain constant, that a 10% increase or decrease in worldwide equity values would result in a corresponding change in our total revenue of approximately 2%. If fixed-income security values were to increase or decrease by 10%, we would anticipate a corresponding change of approximately 1% in our total revenue.

The following table presents selected equity market indices as of and for the years ended December 31, 2011 and 2010. Daily averages and the averages of month-end indices demonstrate worldwide changes in equity market valuations that affect our servicing and management fee revenue, respectively. Year-end indices affect the value of assets under custody and administration and assets under management at those dates. The index names listed in the table are service marks of their respective owners.

## INDEX

| | Daily Averages of Indices | | | Averages of Month-End Indices | | | Year-End Indices | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2011 | 2010 | % Change | 2011 | 2010 | % Change | 2011 | 2010 | % Change |
| S&P 500® | **1,268** | 1,140 | 11% | **1,281** | 1,131 | 13% | **1,258** | 1,258 | — |
| NASDAQ® | **2,677** | 2,350 | 14 | **2,701** | 2,334 | 16 | **2,605** | 2,653 | (2)% |
| MSCI EAFE® | **1,590** | 1,525 | 4 | **1,609** | 1,511 | 6 | **1,413** | 1,658 | (15) |

## FEE REVENUE

| Years ended December 31, | 2011 | 2010 | 2009 | % Change 2010-2011 |
|---|---|---|---|---|
| (Dollars in millions) | | | | |
| Servicing fees | **$4,382** | $3,938 | $3,334 | 11% |
| Management fees | **917** | 829 | 766 | 11 |
| Trading services | **1,220** | 1,106 | 1,094 | 10 |
| Securities finance | **378** | 318 | 570 | 19 |
| Processing fees and other | **297** | 349 | 171 | (15) |
| Total fee revenue | **$7,194** | $6,540 | $5,935 | 10 |

*Servicing Fees*

Servicing fees include fee revenue from U.S. mutual funds, collective investment funds worldwide, corporate and public retirement plans, insurance companies, foundations, endowments, and other investment pools. Products and services include custody; product- and participant-level accounting; daily pricing and administration; record-keeping; investment manager and alternative investment manager operations outsourcing; master trust and master custody; and performance, risk and compliance analytics.

We are the largest provider of mutual fund custody and accounting services in the U.S. We distinguish ourselves from other mutual fund service providers by offering clients a broad range of integrated products and services, including accounting, daily pricing and fund administration. At December 31, 2011, we calculated approximately 40.6% of the U.S. mutual fund prices provided to NASDAQ that appeared daily in *The Wall*

*Street Journal* and other publications with an accuracy rate of 99.87%. We serviced U.S. tax-exempt assets for corporate and public pension funds, and we provided trust and valuation services for more than 5,500 daily-priced portfolios at December 31, 2011.

We are a service provider outside of the U.S. as well. In Germany, Italy and France, we provide depotbank services for retail and institutional fund assets, as well as custody and other services to pension plans and other institutional clients. In the U.K., we provide custody services for pension fund assets and administration services for mutual fund assets. At December 31, 2011, we serviced approximately $711 billion of offshore assets, primarily domiciled in Ireland, Luxembourg and the Cayman Islands. At December 31, 2011, we had $1.04 trillion of assets under administration in the Asia/Pacific region, and in Japan, we held approximately 93% of the trust assets held by non-domestic trust banks in that region.

We are an alternative asset servicing provider worldwide, servicing hedge, private equity and real estate funds. At December 31, 2011, we had approximately $816 billion of alternative assets under administration.

The 11% increase in servicing fees from 2010 primarily resulted from the impact on current-period revenue of new business awarded to us and installed during 2011 and prior periods, the addition of a full year of revenue generated by the acquired Intesa securities services and Mourant International Finance Administration, or MIFA, businesses and increases in daily average equity market valuations. For 2011, servicing fees generated outside the U.S. were approximately 42% of total servicing fees compared to approximately 41% for 2010.

At year-end 2011, our total assets under custody and administration were $21.81 trillion, compared to $21.53 trillion a year earlier. The increase compared to 2010 was primarily the result of a higher level of new servicing business won and installed prior to December 31, 2011, partly offset by net client redemptions and distributions, as well as decreases in worldwide equity market valuations. These asset levels as of year-end did not reflect new business awarded to us during 2011 that had not been installed prior to December 31, 2011. The value of assets under custody and administration is a broad measure of the relative size of various markets served. Changes in the values of assets under custody and administration do not necessarily result in proportional changes in our servicing fee revenue.

Assets under custody and administration consisted of the following as of December 31:

## ASSETS UNDER CUSTODY AND ADMINISTRATION

| As of December 31,<br>(Dollars in billions) | 2011 | 2010 | 2009 | 2008 | 2007 | 2010-2011<br>Annual<br>Growth<br>Rate | 2007-2011<br>Compound<br>Annual<br>Growth<br>Rate |
|---|---|---|---|---|---|---|---|
| Mutual funds | $ 5,265 | $ 5,540 | $ 4,734 | $ 4,093 | $ 5,200 | (5)% | — |
| Collective funds | 4,437 | 4,350 | 3,580 | 2,679 | 3,968 | 2 | 3% |
| Pension products | 4,837 | 4,726 | 4,395 | 3,621 | 5,246 | 2 | (2) |
| Insurance and other products | 7,268 | 6,911 | 6,086 | 5,514 | 5,799 | 5 | 6 |
| Total | $21,807 | $21,527 | $18,795 | $15,907 | $20,213 | 1 | 2 |

## FINANCIAL INSTRUMENT MIX OF ASSETS UNDER CUSTODY AND ADMINISTRATION

| As of December 31,<br>(In billions) | 2011 | 2010 | 2009 |
|---|---|---|---|
| Equities | $10,849 | $11,000 | $ 8,828 |
| Fixed-income | 8,317 | 7,875 | 7,236 |
| Short-term and other investments | 2,641 | 2,652 | 2,731 |
| Total | $21,807 | $21,527 | $18,795 |

## GEOGRAPHIC MIX OF ASSETS UNDER CUSTODY AND ADMINISTRATION[1]

| As of December 31,<br>(In billions) | 2011 | 2010 | 2009 |
|---|---|---|---|
| United States | $15,745 | $15,889 | $14,585 |
| Other Americas | 622 | 599 | 606 |
| Europe/Middle East/Africa | 4,400 | 4,067 | 2,773 |
| Asia/Pacific | 1,040 | 972 | 831 |
| Total | $21,807 | $21,527 | $18,795 |

[1] Geographic mix is based on the location at which the assets are custodied or serviced.

*Management Fees*

Through SSgA, we provide a broad range of investment management strategies, specialized investment management advisory services and other financial services for corporations, public funds, and other sophisticated investors. Based on assets under management at December 31, 2011, SSgA was the largest manager of institutional assets worldwide, the largest manager of assets for tax-exempt organizations (primarily pension plans) in the U.S., and the third largest investment manager overall in the world. SSgA offers a broad array of investment management strategies, including passive and active, such as enhanced indexing and hedge fund strategies, using quantitative and fundamental methods for both U.S. and global equities and fixed-income securities. SSgA also offers exchange traded funds, or ETFs, such as the SPDR® ETF brand.

The 11% increase in management fees from 2010 resulted primarily from the impact of increases in average month-end equity market valuations, the addition of revenue from the acquired BIAM business and, to a lesser extent, the impact of new business won and installed during 2011 and prior periods. Average month-end equity market valuations, individually presented in the foregoing "INDEX" table, increased an average of 12% compared to 2010. Management fees generated outside the U.S. were approximately 41% of total management fees for 2011, up from 34% for 2010.

At year-end 2011, assets under management were $1.86 trillion, compared to $2.01 trillion at year-end 2010. Such amounts include assets of the SPDR® Gold ETF, for which we act as distribution agent rather than investment manager, and certain assets managed for the U.S. government under programs adopted during the financial crisis. While certain management fees are directly determined by the value of assets under management and the investment strategy employed, management fees reflect other factors as well, including our relationship pricing for clients who use multiple services, and the benchmarks specified in the respective management agreements related to performance fees.

The overall decrease in assets under management at December 31, 2011 compared to December 31, 2010, which can be seen in the tables that follow this discussion, generally reflected net lost business (including the planned reduction associated with the U.S. Treasury's winding down of its portfolio of agency-guaranteed mortgage-backed securities) and depreciation in the values of the assets managed. These decreases were partly offset by the addition of approximately $23 billion of managed assets from the BIAM acquisition. Passive fixed-income assets under management declined 32% year over year, mainly reflective of the sale of U.S. government securities associated with the U.S. Treasury's winding down of its mortgage-backed securities portfolio. Managed cash balances declined 11%, and reflected the effect of reductions of securities lending volumes associated with continued weak loan demand. These declines were partly offset by an increase in sales of passive exchange-traded funds as well as other actively managed products.

The net lost business of $140 billion for 2011 presented in the following analysis of activity in assets under management does not reflect $20 billion of new business awarded to us during 2011 that had not been installed prior to December 31, 2011. This new business will be reflected in assets under management in future periods after installation, and will generate management fee revenue in subsequent periods.

Assets under management consisted of the following as of December 31:

**ASSETS UNDER MANAGEMENT**

| As of December 31,<br>(Dollars in billions) | 2011 | 2010 | 2009 | 2008 | 2007 | 2010-2011<br>Annual<br>Growth<br>Rate | 2007-2011<br>Compound<br>Annual<br>Growth<br>Rate |
|---|---|---|---|---|---|---|---|
| Passive: | | | | | | | |
| Equities | $ 638 | $ 655 | $ 504 | $ 344 | $ 522 | (3)% | 5% |
| Fixed-income | 246 | 363 | 395 | 200 | 178 | (32) | 8 |
| Exchange-traded funds[1] | 274 | 255 | 205 | 170 | 171 | 7 | 13 |
| Other | 208 | 210 | 211 | 163 | 171 | (1) | 5 |
| Total Passive | 1,366 | 1,483 | 1,315 | 877 | 1,042 | (8) | 7 |
| Active: | | | | | | | |
| Equities | 50 | 55 | 66 | 72 | 179 | (9) | (27) |
| Fixed-income | 19 | 17 | 25 | 32 | 38 | 12 | (16) |
| Other | 45 | 28 | 28 | 17 | 105 | 61 | (19) |
| Total Active | 114 | 100 | 119 | 121 | 322 | 14 | (23) |
| Cash | 378 | 427 | 517 | 468 | 632 | (11) | (12) |
| Total | $1,858 | $2,010 | $1,951 | $1,466 | $1,996 | (8) | (2) |

[1] Includes SPDR® Gold Fund, for which State Street is not the investment manager but acts as distribution agent.

**GEOGRAPHIC MIX OF ASSETS UNDER MANAGEMENT[1]**

| As of December 31,<br>(In billions) | 2011 | 2010 | 2009 |
|---|---|---|---|
| United States | $1,298 | $1,425 | $1,397 |
| Other Americas | 30 | 29 | 29 |
| Europe/Middle East/Africa | 320 | 341 | 345 |
| Asia/Pacific | 210 | 215 | 180 |
| Total | $1,858 | $2,010 | $1,951 |

[1] Geographic mix is based on the location at which the assets are managed.

The following table presents activity in assets under management for the three years ended December 31:

**ASSETS UNDER MANAGEMENT**

| Years Ended December 31,<br>(In billions) | 2011 | 2010 | 2009 |
|---|---|---|---|
| Balance at beginning of year | $2,010 | $1,951 | $1,466 |
| Net new (lost) business[1] | (140) | (68) | 261 |
| Assets added from BIAM acquisition | 23 | — | — |
| Market appreciation (depreciation) | (35) | 127 | 224 |
| Balance at end of year | $1,858 | $2,010 | $1,951 |

[1] Amount for 2011 included the sale of approximately $125 billion of U.S. government securities associated with the U.S. Treasury's winding down of its portfolio of agency-guaranteed mortgage-backed securities. Future sales by the U.S. Treasury of the remaining portfolio of approximately $47 billion, which are anticipated to occur in 2012, will further reduce our assets under management.

*Trading Services*

Trading services revenue includes revenue from foreign exchange trading, as well as brokerage and other trading services. We earn foreign exchange trading revenue by acting as a market maker. We offer a range of foreign exchange, or FX, products, services and execution models which focus on clients' global requirements for our proprietary research and the execution of trades in any time zone. Most of our FX products and execution models can be grouped into three broad categories: "direct FX," "indirect FX," and electronic trading. Foreign exchange trading revenue is influenced by three principal factors: the volume and type of client foreign exchange transactions; currency volatility; and the management of currency market risks. We also offer a range of brokerage and other trading products tailored specifically to meet the needs of the global pension community, including transition management, commission recapture and self-directed brokerage. These products are differentiated by our position as an agent of the institutional investor. Direct and indirect FX revenue is recorded in foreign exchange trading revenue; revenue from electronic trading is recorded in brokerage and other trading services revenue.

Trading services revenue increased 10%, to $1.22 billion, for the year ended December 31, 2011 from $1.11 billion for the year ended December 31, 2010. In the same comparison, foreign exchange trading revenue increased 14% to $683 million for 2011 from $597 million for 2010. The increase resulted from higher client volumes, which were up 10%, partly offset by a 4% decline in currency volatility.

We enter into FX transactions with clients and investment managers that contact our trading desk directly. These trades are all executed at negotiated rates. We refer to this activity, and our market-making activities, as direct FX. Alternatively, clients or their investment managers may elect to route FX transactions to our FX desk through our asset servicing operation; we refer to this activity as indirect FX. We execute indirect FX trades as a principal at rates based on a published formula. We calculate revenue for indirect FX using an attribution methodology based on estimated effective mark-ups/downs and observed client volumes.

For the years ended December 31, 2011 and 2010, our indirect FX revenue was approximately $331 million and $336 million, respectively, a decline of approximately 1% year over year. All other FX revenue not included in this indirect FX revenue, and unrelated to electronic trading, is considered by us to be direct FX revenue. For the years ended December 31, 2011 and 2010, our direct FX revenue was $352 million and $261 million, respectively, an increase of approximately 35% year over year. For the year ended December 31, 2009, our indirect FX revenue was approximately $369 million, and our direct FX revenue was $308 million.

Our clients may choose to execute FX transactions through one of our electronic trading platforms. This service generates revenue through a "click" fee. For the years ended December 31, 2011 and 2010, our revenue from electronic FX trading platforms, which is recorded in brokerage and other trading services revenue, was $282 million and $240 million, respectively, an increase of approximately 18% year over year.

During 2011, particularly in the second half of the year, some of our clients who relied on our indirect model to execute their FX transactions transitioned to other methods to conduct their FX transactions. Through State Street, they can transition to either direct FX execution, including our "Street FX" service where trades are executed at agreed-upon benchmarks, where State Street continues to act as a principal market maker, or to one of our electronic trading platforms.

Brokerage and other trading services revenue increased 6% to $537 million for the year ended December 31, 2011, compared to $509 million for the year ended December 31, 2010. The increase was largely related to higher electronic trading volumes and higher trading profits, partly offset by lower levels of revenue from transition management. Our transition management revenue was adversely affected by compliance issues in our U.K. business, the reputational impact of which may adversely affect our revenue from transition management in 2012.

*Securities Finance*

Our securities finance business consists of two components: investment funds with a broad range of investment objectives which are managed by SSgA and engage in agency securities lending, which we refer to as the SSgA lending funds; and an agency lending program for third-party investment managers and asset owners, which we refer to as the agency lending funds.

Our securities finance business provides liquidity to the financial markets, as well as an effective means for clients to earn incremental revenue on their securities portfolios. By acting as a lending agent and coordinating loans between lenders and borrowers, we lend securities and provide liquidity to clients worldwide. Borrowers provide collateral in the form of cash or securities to State Street in return for loaned securities. Borrowers are generally required to provide collateral equal to a contractually agreed percentage equal to or in excess of the fair value of the loaned securities. As the fair value of the loaned securities changes, additional collateral is provided by the borrower or collateral is returned to the borrower. Such movements are typically referred to as daily mark-to-market collateral adjustments.

We also participate in securities lending transactions as a principal, rather than an agent. As principal, we borrow securities from the lending client and then lend such securities to the subsequent borrower, either a State Street client or a broker/dealer. Our involvement as principal is utilized when the lending client is unable to transact directly with the market and requires us to execute the transaction and furnish the securities. We provide our credit rating to the transaction as well as our ability to source securities through our assets under custody and administration.

For cash collateral, our clients pay a usage fee to the provider of the cash collateral, and we invest the cash collateral in certain investment vehicles or managed accounts as directed by the owner of the loaned securities. In some cases, the investment vehicles or managed accounts may be managed by SSgA. The spread between the yield on the investment vehicle and the usage fee paid to the provider of the collateral is split between the lender of the securities and State Street as agent. For non-cash collateral, the borrower pays a fee for the loaned securities, and the fee is split between the lender of the securities and State Street.

Securities finance revenue, composed of our split of both the spreads related to cash collateral and the fees related to non-cash collateral, is principally a function of the volume of securities on loan and the interest-rate spreads and fees earned on the underlying collateral. For 2011, securities finance revenue increased 19% from 2010, substantially the result of higher spreads across all lending programs, partly offset by a 9% decrease in average lending volumes. Average spreads increased 28% for 2011 compared to 2010, and securities on loan averaged $361 billion for 2011 compared to $396 billion for 2010.

As previously reported, in December 2010, we divided certain of the agency lending collateral pools into liquidity pools, from which clients can obtain cash redemptions, and duration pools, which are restricted and operate as liquidating accounts. These actions were taken to provide greater flexibility to participants with respect to their control of their level of participation in our agency lending program. As of December 31, 2011, the aggregate net assets of the liquidity pools and duration pools were $25.3 billion and $3.5 billion, respectively, compared to $26.2 billion and $11.8 billion, respectively, as of December 31, 2010.

The decline in the aggregate net assets of the duration pools from year-end 2010 reflected both pay-downs on securities held by some of the pools and in-kind redemptions by clients into separately managed accounts. These declines were partly offset by improvement in the market value of securities held by the pools. The return obligations of participants in the agency lending program represented by interests in the duration pools exceeded the market value of the assets in the duration pools by approximately $198 million as of December 31, 2011, compared to $319 million as of December 31, 2010. This amount is expected to be eliminated as the assets in the duration pools mature or pay down.

Market influences continued to affect our revenue from, and the profitability of, our securities lending activities during 2011, and may do so in future periods. As long as securities lending spreads remain below the levels generally experienced prior to late 2007, client demand is likely to remain at a reduced level and our revenues from our securities lending activities will be adversely affected relative to the revenues we earned in 2007, 2008 (which were extraordinarily high) and 2009. In addition, proposed or anticipated regulatory changes may affect the volume of our securities lending activity and related revenue in future periods.

*Processing Fees and Other*

Processing fees and other revenue includes diverse types of fees and revenue, including fees from our structured products business, fees from software licensing and maintenance, equity income from our joint venture

investments, gains and losses on sales of leased equipment and other assets, and amortization of our investments in tax-advantaged financings. Processing fees and other revenue declined 15% to $297 million for 2011, from $349 million for 2010. This decrease primarily resulted from fair-value adjustments related to positions in the fixed-income trading initiative, as well as lower net revenue from joint ventures.

## NET INTEREST REVENUE

Net interest revenue is defined as total interest revenue earned on interest-earning assets less interest expense incurred on interest-bearing liabilities. Interest-earning assets, which principally consist of investment securities, interest-bearing deposits with banks, repurchase agreements, loans and leases and other liquid assets, are financed primarily by client deposits, short-term borrowings and long-term debt. Net interest margin represents the relationship between annualized fully taxable-equivalent net interest revenue and total average interest-earning assets for the period. Revenue that is exempt from income taxes, mainly that earned from certain investment securities (state and political subdivisions), is adjusted to a fully taxable-equivalent basis using a federal statutory income tax rate of 35%, adjusted for applicable state income taxes, net of the related federal tax benefit.

The following tables present the components of average interest-earning assets and average interest-bearing liabilities, related interest revenue and interest expense, and rates earned and paid, for the periods indicated:

| | 2011 | | | 2010 | | | 2009 | | |
|---|---|---|---|---|---|---|---|---|---|
| **Years ended December 31,** | Average Balance | Interest Revenue/ Expense | Rate | Average Balance | Interest Revenue/ Expense | Rate | Average Balance | Interest Revenue/ Expense | Rate |
| **(Dollars in millions; fully taxable-equivalent basis)** | | | | | | | | | |
| Interest-bearing deposits with banks | $ 20,241 | $ 149 | .74% | $ 13,550 | $ 93 | .69% | $ 24,162 | $ 156 | .64% |
| Securities purchased under resale agreements | 4,686 | 28 | .61 | 2,957 | 24 | .83 | 3,701 | 24 | .65 |
| Federal funds sold | — | — | — | — | — | — | 68 | — | .29 |
| Trading account assets | 2,013 | — | .01 | 376 | — | — | 1,914 | 20 | 1.02 |
| Investment securities | 103,075 | 2,615 | 2.54 | 96,123 | 3,140 | 3.27 | 81,190 | 2,943 | 3.63 |
| Investment securities purchased under AMLF[1] | — | — | — | — | — | — | 882 | 25 | 2.86 |
| Loans and leases | 12,180 | 280 | 2.30 | 12,094 | 331 | 2.73 | 9,703 | 242 | 2.49 |
| Other interest-earning assets | 5,462 | 2 | .03 | 1,156 | 3 | .24 | 1,303 | 2 | .15 |
| Total interest-earning assets | $147,657 | $3,074 | 2.08 | $126,256 | $3,591 | 2.84 | $122,923 | $3,412 | 2.78 |
| Interest-bearing deposits: | | | | | | | | | |
| U.S. | $ 4,049 | $ 11 | .27% | $ 8,632 | $ 37 | .43% | $ 7,616 | $ 61 | .81% |
| Non-U.S. | 84,011 | 209 | .25 | 68,326 | 176 | .26 | 61,551 | 134 | .22 |
| Securities sold under repurchase agreements | 9,040 | 10 | .11 | 8,108 | 4 | .05 | 11,065 | 3 | .03 |
| Federal funds purchased | 845 | — | .05 | 1,759 | 1 | .05 | 956 | — | .04 |
| Short-term borrowings under AMLF[1] | — | — | — | — | — | — | 877 | 18 | 2.02 |
| Other short-term borrowings | 5,134 | 86 | 1.67 | 13,590 | 252 | 1.86 | 16,847 | 197 | 1.17 |
| Long-term debt | 8,966 | 289 | 3.22 | 8,681 | 286 | 3.30 | 7,917 | 304 | 3.84 |
| Other interest-bearing liabilities | 3,535 | 8 | .24 | 940 | 7 | .69 | 1,131 | 5 | .46 |
| Total interest-bearing liabilities | $115,580 | $ 613 | .53 | $110,036 | $ 763 | .69 | $107,960 | $ 722 | .67 |
| Interest-rate spread | | | 1.55% | | | 2.15% | | | 2.11% |
| Net interest revenue - fully taxable-equivalent basis | | $2,461 | | | $2,828 | | | $2,690 | |
| Net interest margin - fully taxable-equivalent basis | | | 1.67% | | | 2.24% | | | 2.19% |
| Tax-equivalent adjustment | | $ (128) | | | $ (129) | | | $ (126) | |
| Net interest revenue - GAAP basis | | $2,333 | | | $2,699 | | | $2,564 | |

---

[1] Amounts represent averages of asset-backed commercial paper purchases from eligible unaffiliated money market mutual funds under the Federal Reserve's Asset-Backed Commercial Paper Money Market Mutual Fund Liquidity Facility, or AMLF, and associated borrowings. The AMLF expired in February 2010.