# EX. 54

```
                                                              1
 1
 2   UNITED STATES DISTRICT COURT
     DISTRICT OF MASSACHUSETTS
 3
     Case No. 11-cv-10230 MLW
 4   - - - - - - - - - - - - - - - - - - - -x
 5   ARKANSAS TEACHER RETIREMENT SYSTEM,
     et al.,
 6
                          Plaintiffs,
 7
            -against-
 8
     STATE STREET BANK AND TRUST COMPANY,
 9
                          Defendant.
10
     - - - - - - - - - - - - - - - - - - - -x
11
     JAMS
12   Reference No. 1345000011
     - - - - - - - - - - - - - - - - - - - -x
13
     In Re:   STATE STREET ATTORNEYS' FEES
14
     - - - - - - - - - - - - - - - - - - - -x
15
                     June 16, 2017
16                   3:41 p.m.
17
     B e f o r e :
18
            SPECIAL MASTER HON. GERALD ROSEN
19          United States District Court, Retired
20
            Deposition of MICHAEL ROGERS, taken by
21
22   Counsel to the Special Master, held at the
23   offices of JAMS, 620 Eighth Avenue, New York,
24   New York, before Helen Mitchell, a Registered
25   Professional Reporter and Notary Public.
```

**54**

[page heavily redacted]

**56**

[page heavily redacted]

**55**

[page heavily redacted]

**57**

```
 1                  Rogers
 2   were you involved in assigning specific staff
 3   attorneys to the State Street review?
 4          A     As you may have -- you've
 5   spoken to other people.  I mean, there were sort
 6   of -- there were two waves to it.
 7                  I mean, back in around 2013,
 8   very early on, we constructed a smaller team; I
 9   think it was Todd plus four other staff
10   attorneys.
11                  I don't remember specifically,
12   but I have a general sense that I vetted resumes
13   and what I would call canvassing internally.  I
14   mean, it's hard for me to remember precisely
15   when I did this, I just know I do it in all my
16   cases.  When we create a team of staff
17   attorneys, I'll sometimes look at resumes, I'll
18   ask people like Todd, or Todd's similar
19   colleague --
20              THE WITNESS:  I mean, Judge,
21         you visited the 23rd floor, so you know
22         what I'm talking about.
23          A     There's other people who have
24   analogous roles to Todd that I've worked with,
25   and I'll send them an e-mail, and I'll say,
```

15 (Pages 54 to 57)

**58**

Rogers

"Here's Joe Blow's resume.  What do you think of Joe Blow?"  And they'll say, "Oh, you know, he's really hard working but, you know, maybe he's not as good at X," or, "Oh, that person really has a good financial background."

I don't remember specifically doing that in January of '13, but I always do that, so I have a recollection of me and David, to some degree, sort of pulling together that team.

Q    Let me ask you this:  When you vetted resumes, as you just described, were there particular experiences or backgrounds that you looked for for this case?

A    For this case?

Yeah.  I mean, in most of my cases I would look for actual federal securities experience.  In this case I would have been looking for complex litigation, certainly financial industry for sure.

I mean, it took me a while -- I'll admit, it took me a while to figure out what a pip and a basis point and all these spreads, and today -- I mean, I know it well

**59**

Rogers

now, embarrassingly so, but at the time it took a while.

So, yeah, anybody who had banking, mutual fund, certainly currency trading, or experience legally on what I would call a financial industry case.

I can't remember specifically today, but that's something that I looked at at the time, yes.

Q    Do you recall ever seeing the resume of David Alper, an individual who actually worked in the FX world and on Wall Street for many years?

A    I know Dave Alper, and I can picture his face as I sit here today.  I don't know whether I ever remember reading his resume, but I certainly know who Dave Alper is.

Q    Is that because he worked in the State Street case?

A    I know him because he worked on the Goldman Sachs case and the Virginia case and the State Street case.

Q    How would you describe his background or his institutional knowledge as



**60**

[redacted]

**61**

[redacted]



**62**

[redacted]

**64**

[redacted]

**63**

```
 1                    Rogers
 2               It generally involves giving
 3   them an opportunity before the meeting to review
 4   some kind of a binder that would most likely
 5   contain the complaint and other relevant
 6   pleadings, especially important underlying
 7   documents.  At which point probably me --
 8   because I like to talk more than David does --
 9   I'll stand up and I'll start to explain all the
10   highlights of the case that are important to me,
11   and I'll ask whether they have any questions.
12   And someone like David would always ask a
13   question.
14               So it was sort of a, you know,
15   conference room sit-around, you know, "Here's
16   the highlights, here's the theory," and then try
17   to create a dialogue out of it.
18               And then periodically we would
19   either, A, ask them to put together a hot doc
20   binder in service of creating a presentation for
21   one of the mediation meetings, or we would just
22   have a periodic "Let's get an update where
23   things are at."  And that would involve just
24   like it sounds like; they would come upstairs,
25   each -- each, you know, staff attorney would
```

**65**

[redacted]

66

[redacted]

67

[redacted]

68

Rogers

facts was the FX overcharge, but it was a 10b case in that when State Street revealed the California case, their stock price went down, and, thus, a 10b case was brought.

Those were documents that no one had seen on our side, either Dan and Lieff or Mike and Thornton, nor certainly Labaton. And I remember there was an ongoing effort to ask Bill Paine to produce those, and he -- I don't remember the details, but we -- we didn't get them right away.

And at some point -- it pretty much dovetails with that time -- there was a time period where it came clear that the obvious sticking point, whether we were going to continue negotiating or not, was Bill's ongoing negotiations with the three regulators.

Now, the sides had vetted out the legal theories pretty well, we knew where they stood and they knew where we stood, and my best recollection is he decided to eventually turn over the Hill docs, probably because it was a way to sort of keep the process going.

So, at any rate, we got the

69

Rogers

Hill docs, and there were a lot of them. I don't remember the exact number, I think it might have been 14 million pages. It could have been more, I don't recall.

And that's the long answer to why there was a bit of a ramp-up in January, was that that's when the Hill docs -- I don't know when we got them; that's when they were loaded for review on Catalyst, was in January or February, somewhere around there, of '15. And it just became clear that, A, because there were a lot of pages that we collectively wanted to get through, and, B, that unlike the California docs, both Thornton and Lieff, along with Labaton, were quite anxious to get eyes on them, so that's why we set up that larger, more omnibus review.

Q Was there also discussion around January of 2015 of allocating some Labaton attorneys to the Thornton payroll?

A I think it's the opposite. I don't remember Labaton attorneys ever being allocated.

Q And when I say "attorneys" I'm



Page 72:

```
 1                    Rogers
 2    in play.
 3         Q    And were the Labaton attorneys
 4    for whom Thornton paid the costs supervised the
 5    same way as the other Labaton staff attorneys?
 6         A    100 percent.
 7         Q    And were they given relatively
 8    the same type of work as the Labaton attorneys?
 9         A    They weren't given relatively
10    the same work, they were given the same work.
11         Q    Were you aware at the time, in
12    early 2015, who was being allocated to
13    Thornton's payroll and who was on Labaton's
14    payroll?
15         A    I don't know about early 2015.
16    I know that at some point during 2015, in a
17    purely administrative manner, I would see lists
18    of who was allocated to which firm, which,
19    frankly, I barely gave more than an eyeball's
20    look at.
21              So I can't say that I ever
22    personally learned -- and even when I saw the
23    list, it didn't have any effect because they
24    were -- they were under Todd's management and my
25    management, they were responsible to Todd's
```

Veritext Legal Solutions
212-267-6868   www.veritext.com   516-608-2400

74

```
 1                    Rogers
 2           THE WITNESS:  In this
 3   particular case, I don't know.  I
 4   mean -- and there are times where both
 5   situations happen in other cases that
 6   I've been on.  This might have been the
 7   same, I don't know.
 8           The best of my recollection is
 9   in the case of State Street -- I can't
10   say all, because I don't know, but I do
11   know that most of the attorneys of that
12   initial -- was it 15 -- came from other
13   cases within Labaton.  That was my best
14   recollection.
15           Could have been all of them.
16   It was definitely most, but I just
17   don't know if there may have been an
18   outlier or two.
19           It was a case called K -- there
20   was a case called K12  s the best of my
21   recollection, that had settled not long
22   before that, and many of these
23   attorneys came from K12; that's my best
24   recollection.
25
```



90

[text redacted]

91

1  Rogers
2  then after that I -- whether I even opened them
3  or looked, I don't -- it didn't mean anything to
4  me. As I said before, we had 15 or whatever, at
5  this point 21, attorneys that Todd was managing
6  in a substantive nature. You know, we had
7  people like Cindy and Danette, who I assumed
8  were handling the accounting issues. It wasn't
9  in my purview. I didn't really care, to be
10 honest.
11     Q    Would it have been Cindy and
12 Danette who really kept track of the individual
13 allocations throughout this time period?
14     A    I don't know.
15     Q    But it wouldn't have fallen to
16 you?
17     A    It did not.
18     Q    And did you have an
19 understanding during this time period about what
20 the implications were of that cost sharing? In
21 other words, whether Thornton was going to claim
22 those staff attorneys on their fee petition?
23     A    I certainly assumed they would.
24     Q    And why did you make that
25 assumption?

92

1  Rogers
2     A    I'm sorry, whether they
3  would -- they would do it on their fee petition?
4     Q    Yes, whether Thornton would
5  file the names of the staff attorneys for whom
6  they paid on their own petition.
7     A    I assumed they were going to
8  get paid for.
9     Q    And when you say "they," you
10 mean Thornton would get paid?
11     A    Yes.
12     Q    What was the basis for that
13 assumption?
14     A    They were paying for it
15 up-front, I assume they wanted to get paid on
16 the back end.
17         JUDGE ROSEN: So this raises an
18     issue, which is there were two ways to
19     ensure that Thornton got paid on the
20     back end. One way was to do it the way
21     it was done here, allocating titularly
22     staff attorneys or agency attorneys to
23     Thornton, having them invoice for
24     those, and then permitting them, if
25     there was a successful result, to claim

93

[text redacted]

Veritext Legal Solutions
212-267-6868           www.veritext.com           516-608-2400

94

1        Rogers
2        We're trying to -- if it had
3   been done the other way, Mike, none of
4   us might be here today.
5        THE WITNESS:  The other way
6   meaning we would just kind of --
7        JUDGE ROSEN:  Meaning, simply,
8   these were Labaton's people, they were
9   Lieff's people.  Labaton and Lieff
10  wanted somebody to share the costs.
11  They could have billed Thornton for
12  them -- just simply billed them for
13  them and got reimbursed for a pro rata
14  share of some sort -- and then at the
15  end, if there was a successful
16  resolution, then Thornton got its
17  allocated share, which reflected what
18  they might have gotten if they had
19  billed themselves.
20        If it had been done that way,
21  rather than through the device of
22  actually allocating lawyers to them and
23  having them put those lawyers on as if
24  they were their lawyers on a fee
25  petition of their own, we might not be

96

1        Rogers
2   knowledge of that.
3   BY MS. MCEVOY:
4        Q    Let me ask you this:  Have you
5   ever worked on another case where you had a cost
6   sharing agreement similar to the one with
7   Thornton in State Street?
8        A    Um-hum, yes
9        Q    And in those instances did the
10  firm who bore the cost of the Labaton staff
11  attorneys include those attorneys on their fee
12  petition?
13       A    I've seen it done both ways.  I
14  think it's more common to do what Judge Rosen's
15  referring to as the latter, you know, sort of
16  the, you know, one big omnibus fee petition and
17  then kind of dole it out in the end.  But, you
18  know, I've occasionally seen it done, earlier in
19  my career, the way that it was done here
20       Q    And in those instances were you
21  made aware prior to the fee petition that the
22  firm paying the costs of those staff attorneys
23  was going to include those staff attorneys?
24       A    Too much -- you're talking
25  about the ones where it was done by a separate

95



97

1        Rogers
2   petition?
3        Q    Yes
4        A    I was an associate, fairly
5   junior in both cases, I wasn't privy to business
6   discussions.
7        Q    Prior to November 2016, had you
8   ever heard the name Michael Bradley in
9   connection with the State Street review?
10       A    I mean, whether he was one of
11  the names on those spreadsheets that I
12  mentioned, I have no idea, but I don't --
13       Q    But that had no significance to
14  you?
15       A    If I saw him on one of those,
16  no, none.
17       Q    Were you aware at any point
18  prior to November 2016 that Thornton had made an
19  arrangement with a non-Thornton attorney to
20  review documents in the State Street case?
21       A    I'm not sure I know that now.
22  I certainly didn't know it before November, no.
23       Q    As far as you know, Thornton
24  was using Thornton's own attorneys and the ones
25  Labaton and Lieff allocated to it?

25 (Pages 94 to 97)