# EX. 57

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

## LIEFF CABRASER HEIMANN & BERNSTEIN LLP'S RESPONSES TO SPECIAL MASTER HONORABLE GERALD E. ROSEN'S (RET.) FIRST SET OF INTERROGATORIES DUE ON JUNE 1, 2017

In accordance with the Federal Rules of Civil Procedure, Lieff Cabraser Heimann & Bernstein, LLP ("LCHB" or the "Firm") hereby responds to Special Master Honorable Gerald E. Rosen's (Ret.) First Set of Interrogatories (the "Interrogatories"), propounded on LCHB on May 18, 2017, as revised on May 23, 2017, and due on June 1, 2017.

## GENERAL OBJECTIONS

LCHB makes the following general objections, which are incorporated by reference into each Interrogatory response, whether or not a specific further objection is made with respect to a specific Interrogatory. Each Interrogatory response incorporates, is subject to, and does not waive the general objections.

1.      LCHB objects to the Interrogatories and Instructions to the extent they seek information protected by the attorney-client privilege, the attorney work product doctrine, or otherwise is privileged, protected or exempt from discovery.

2.      LCHB objects to the Interrogatories and Instructions to the extent they purport to impose obligations that differ from or exceed those imposed by the Federal Rules of Civil Procedure, particularly Rule 33, and by any court decisions interpreting those Rules.

3.      LCHB objects to the Interrogatories and Instructions to the extent they seek information beyond the scope of, or not relevant to, the Courts' February 6, 2017 Memorandum and Order in the above-referenced cases.

4.      In responding to the Interrogatories, LCHB has made reasonable efforts to respond based on its understanding and interpretation of each Interrogatory. If the Special Master subsequently asserts a reasonable interpretation of an Interrogatory which differs from that of LCHB, LCHB reserves the right to supplement its responses.

5.      LCHB will make all reasonable efforts to respond to the Interrogatories on or before the dates specified in the Special Master's May 23, 2017 revised Interrogatories.  LCHB, however, reserves the right to supplement its responses should it require additional time, and/or should responsive information be discovered following the designated dates for the responses.

6.      LCHB objects to Definition No. 1 and Instruction B, to the extent they seek Interrogatory responses from any source other than the law firm, its partners, associates, of counsel, employees and contractors.  LCHB has no "affiliates," and no "agents" or "representatives" that are or would be in the possession of responsive information.

## RESPONSES TO THE INTERROGATORIES

### INTERROGATORY NO. 1:

Describe each of the Law Firm's practice area(s), including areas of specialty, special services offered, the total number of attorneys and staff, and a brief description of any representative matters.

### RESPONSE TO INTERROGATORY NO. 1:

LCHB incorporates the general objections stated above.  LCHB further objects to this Interrogatory on the grounds that it is vague and overbroad in that it provides no time-frame for the information sought.  LCHB further objects to this Interrogatory on the grounds that it is overbroad and seeks information that is not relevant to the subject matter of this proceeding.  Subject to and without waiving those objections, LCHB responds as follows.

LCHB represents plaintiffs in class, group and individual civil litigation in federal and state courts throughout the country in the following practice areas:  securities and financial fraud; antitrust; consumer fraud; data privacy; employment discrimination; whistleblower/False Claim Act; medical device and pharmaceutical mass torts; environmental mass torts; personal injury;

non-personal injury product defect; and, civil and human rights.   Attached hereto as Exhibit A is

a "description of … representative matters."

As of the date of these Responses, LCHB has 81 attorneys (including 28 Staff Attorneys),

43 document review lawyers working for the Firm via agencies, and 134 staff members

(including paralegals, financial analysts, administrative assistants, receptionists, word processors,

and employees in the Firm's information technology, library services, human resources,

accounting, records, calendaring/conflicts, marketing and office/facilities services departments).

Steven E. Fineman, LCHB's Managing Partner, has knowledge of the information

provided in this Response.  Numerous Firm attorneys and staff have knowledge of some of the

information provided in this Response.

**INTERROGATORY NO. 3:**

Describe in detail the Firm's involvement in the California Action and in the BNY

Mellon Action and how that involvement assisted the Firm in the SST Litigation.

**RESPONSE TO INTERROGATORY NO. 3:**

LCHB incorporates the general objections stated above.  Subject to and without waiving

those objections, LCHB responds as follows:

The Firm's involvement in investigating custodial foreign currency exchange ("FX")

overcharges dates back to 2008, when it was approached by counsel for the relator (or

whistleblower) in a proposed false claims (or *qui tam*) case against State Street.  The Firm (and,

for a time, Lieff Global, which was headed by current Of Counsel Robert L. Lieff) worked with

Thornton and other counsel for the relator to develop and file *qui tam* cases under seal against

State Street in California and other states.  In connection with this, the Firm helped draft and edit

an amended complaint on behalf of several California county or municipal funds based on a

lengthy disclosure statement filed with the California Attorney General ("California AG") outlining the alleged custodial FX scheme carried out by State Street. This is the same scheme that formed the basis for the SST Litigation filed more than two years later.

The California AG intervened in the *qui tam* lawsuit in October 2009, making the FX scheme public. The attendant publicity caused a number of custodial clients to question whether they had been overcharged on FX trades in a similar manner. The questions were not restricted to State Street; BNY Mellon faced similar allegations in *qui tam* lawsuits that were unsealed in Virginia and Florida in early 2011.

In July 2011, LCHB filed, with co-counsel, a class action suit against BNY Mellon in the United States District Court for the Northern District of California on behalf of custodial customers of BNY Mellon who were overcharged on FX trades executed indirectly, or pursuant to "standing instructions." That complaint was subsequently amended and BNY Mellon's motion to dismiss was denied in February 2012. The case was put on an aggressive schedule by Judge William Alsup, resulting in Plaintiff filing its opening brief on class certification by April 2012. In the meantime, Plaintiff and BNY Mellon took or defended more than a dozen depositions and produced and reviewed a substantial number of documents. Shortly after Plaintiff filed its class certification motion, however, the case was transferred to Judge Lawrence Kaplan in the Southern District of New York and consolidated with several other customer, ERISA, and securities fraud cases all alleging the same underlying facts about BNY Mellon's custodial FX practices. These cases (now part of a multidistrict litigation, or "MDL") were in turn coordinated for discovery purposes with a later-filed civil suit brought by the United States Department of Justice ("DOJ") against BNY Mellon. A similarly later-filed separate suit

brought by the New York State Attorney General ("NYAG") in New York state court was also coordinated with the MDL and the DOJ's action.

Once before Judge Kaplan, LCHB was appointed co-lead counsel for the proposed class of custodial customers affected by the FX scheme.  In addition, the Firm (specifically Elizabeth Cabraser) was appointed to the three-member Executive Committee overseeing all plaintiffs in the MDL.  Between 2012 and early 2015, BNY Mellon aggressively defended the actions, taking 57 depositions of plaintiffs, absent class members, or third parties, and filing counterclaims against the named customer plaintiffs and absent class members.  Plaintiffs in the MDL and the DOJ took more than 50 depositions of BNY Mellon.  BNY Mellon produced more than 20 million pages of documents.  LCHB, working closely with its co-counsel and the DOJ, reviewed these documents with the aid of 13 Staff Attorneys who later (in most cases[1]) went on to work on the SST Litigation.  These Staff Attorneys individually averaged nearly 2,200 hours doing discovery work in the BNY Mellon Action.  In addition to reviewing and coding documents, the Staff Attorneys prepared highly detailed witness kits and memos to assist the lead attorneys in preparing for depositions.  In most cases the documents used in the depositions were hand-picked by the Staff Attorneys.  The Staff Attorney efforts were summarized in a declaration submitted by Prof. John C. Coffee of Columbia Law School (being produced with these answers), who noted the fact that private customer counsel (including LCHB) did most of the work and bore most of the expense in achieving the successful global resolution of that case not

---

[1] Four of the thirteen Staff Attorneys who worked on both the BNY Mellon Action and SST Litigation did at least some work in the SST Litigation before discovery in the BNY Mellon Action was concluded.  These were Kelly Gralewski, Joshua Bloomfield, Leah Nutting, and Scott Miloro.  Of these four individuals, Ms. Gralewski did the fewest number of hours of discovery work in the BNY Mellon Action (just over 300), and was the only one not to work on the SST Litigation after 2014.  The other three individuals did well over 2,000 or 3,000 hours of work (each) in the BNY Mellon Action, and worked on the SST Litigation both before and after 2014.

just for the benefit of the customer classes but also the DOJ, NYAG, and the United States Department of Labor ("DOL") (which did not file a case).

The Firm's experience in the BNY Mellon Action greatly informed the Firm's understanding of both the challenges to and likelihood of success of the claims asserted in the SST Litigation, and the nature and extent of discovery likely to be necessary both to successfully certify a class and prevail at trial.  The BNY Mellon Action was a vivid demonstration of how intense and extensive a process the litigation would be should State Street adopt a similarly aggressive defensive posture ████████████████████████████████████ ████████.  Perhaps most importantly, however, the fact that the Firm was able to achieve a successful outcome in the BNY Mellon Action after withstanding (along with co-counsel) an extraordinarily aggressive defense was the most important tipping point in the mediation with State Street.  The BNY Mellon Action demonstrated to State Street that at least two of the firms they were facing (LCHB and Thornton) had been through the gauntlet of counterclaims and third party discovery in a custodial FX case, which almost certainly cost BNY Mellon more than $100 million in defense costs, and still achieved a highly successful settlement for the class while becoming experts in custodial FX in the process.  In short, the Firm had developed into an even more formidable adversary to State Street than when the SST Litigation began.  Only after the BNY Mellon Action was settled and preliminary approval papers were filed did the mediation with State Street ████████████████████████████████████████ ████████████████████████.  The DOJ, SEC and DOL, for their part, also all used the global resolution of the BNY Mellon Action as the yardstick for achieving global resolution of their potential claims against State Street.

Daniel P. Chiplock, LCHB Partner has the most extensive knowledge of the information provided in this Response.  Robert L. Lieff, LCHB Of Counsel, Richard M. Heimann, LCHB Partner, Steven E. Fineman, LCHB Managing Partner, and Lexi Hazam, LCHB Partner, each have some knowledge of some of the information provided in this Response.

**INTERROGATORY NO. 5:**

Explain how and when the Law Firm became involved in the SST Litigation, including any conversations between and among the Firm and ARTRS, the Plaintiffs' Law Firms, and/or the ERISA firms.

**RESPONSE TO INTERROGATORY NO. 5:**

LCHB incorporates the general objections stated above.  Subject to and without waiving those objections, LCHB responds as follows:

The Firm had no conversations with ARTRS or the ERISA firms before becoming involved in the SST Litigation.  Prior to the initiation of the SST Litigation, the Firm worked with Thornton on the California Action and the investigation of possible claims by other State Street custodial customers.  Based on the Firm's prior working relationship with Thornton and the Firm's expertise and institutional knowledge concerning custodial FX pricing practices, the Firm was invited to participate in the SST Litigation by Thornton and Labaton after ARTRS (who was Labaton's client) elected to proceed with the filing of a class action against State Street.

Daniel P. Chiplock, LCHB Partner and Robert L. Lieff, LCHB Of Counsel have the most knowledge of the information provided in this Response.  Richard M. Heimann, LCHB Partner, and Steven E. Fineman, LCHB Managing Partner each have some knowledge of some of the information provided in this Response.

**INTERROGATORY NO. 6:**

Describe the role played by the Law Firm in filing the substantive claims alleged in the SST Litigation, including the filing of the Complaint (Docket #1) and/or the Amended Complaint (Docket #10), a description of any legal or factual research performed, consultations with State Street, legal drafting and/or review of pleadings.

**RESPONSE TO INTERROGATORY NO. 6:**

LCHB incorporates the general objections stated above.  LCHB further objects to this Interrogatory to the extent it seeks attorney work product.  LCHB further objects to this Interrogatory on the grounds that it is vague, overbroad, and seeks information not relevant to the subject matter of this proceeding.  Subject to and without waiving those objections, LCHB responds as follows:

The Firm worked closely from the outset with the other Plaintiffs' Law Firms in, among other things, (a) researching potential causes of action against State Street for overcharging custodial customers on FX trades, (b) drafting both the Complaint and Amended Complaint, (c) briefing Plaintiff's opposition to Defendants' motion to dismiss (with particular responsibility for (i) countering Defendants' statutes of limitations arguments and (ii) supporting Plaintiff's claims under M.G.L. ch. 93A), and (d) researching and drafting memoranda on the viability of class certification (particularly as applied to M.G.L. ch. 93A).  The Firm was principally responsible for developing the M.G.L. ch. 93A theory of liability in the SST Litigation, which was particularly valuable since it allowed for double or treble damages (plus prejudgment interest) and (as directed against a Massachusetts-based company and conduct) provided a potentially more readily-certifiable class claim for State Street custodial customers from across the country. During the mediation, the Firm took the lead in researching and presenting on the viability of

class certification under M.G.L. ch. 93A in particular, as well as the availability of double or

treble damages and the elements and standards of proof necessary to achieve those results.

Daniel P. Chiplock, LCHB Partner has the most extensive knowledge of the information

provided in this Response.  Michael J. Miarmi, LCHB Partner also has some knowledge of the

information provided in this Response.

## INTERROGATORY NO. 8:

Describe the Firm's theory of damages, including an estimate of total damages to the

customer and/or ERISA classes, whether this theory changed throughout the course of the SST

Litigation, and if so, what factors affected the Firm's theory and total calculation of estimated

damages.

## RESPONSE TO INTERROGATORY NO. 8:

LCHB incorporates the general objections stated above.  LCHB further objects to this

Interrogatory to the extent it seeks attorney work product.  LCHB further objects to this

Interrogatory on the grounds that it is vague, overbroad, and seeks information not relevant to the

subject matter of this proceeding.  Subject to and without waiving those objections, LCHB

responds as follows:

Plaintiff's basic theory of damages remained fairly consistent throughout the SST

Litigation, and consisted essentially of the difference between the prices on FX trades that State

Street readily obtained and charged in a competitive marketplace for its custodial customers

when dealing with them in a negotiated context, and the prices that State Street actually charged

to those same customers when performing comparable trades (involving the same currencies) on

an "indirect" or non-negotiated context.  The same basic theory of damages underlay the BNY

Mellon Action.  Even independent of discovery from State Street, analyses that used the average

(or mid-rate) exchange price of the day for major currencies such as USD to British Sterling, Euros, Australian Dollars, or Japanese Yen showed that the "spreads" taken by custodial banks (such as State Street or BNY Mellon) could increase from 2-4 basis points (on a direct, negotiated basis) to 12-20 basis points or more when the trades were done on an indirect or non-negotiated basis.  Spreads taken on indirect FX trades for non-major currencies could be even greater, often more than 60 basis points, although the total volume of such trades tended to be smaller than for the major currencies.

Information exchanged during the mediation from State Street confirmed that the spreads taken by State Street on indirect, non-negotiated trades were indeed many multiples of those taken in a direct, negotiated context.[2]  In sum, State Street applied fixed markups or markdowns, measured by basis points, to its SSH[3] and AIR[4] indirect FX trades during the class period alleged.  The application of the fixed spreads was limited in two circumstances. First, State Street would "net" all of an investment manager's ("IM's") SSH trades in a given currency prior to execution, reducing the amount of currency traded, and, therefore, the total markup or markdown applied to the IM's clients' trades.  Second, for SSH trades, the fixed spread markups and markdowns were limited by the high or low of the range of the day.  Thus, if the difference between the starting point of the indirect pricing process and the high or low of the day was less than the fixed spread, State Street only applied a markup or markdown to the extent of the high

---

[2] *See* ¶¶ 121-125 of the Declaration of Lawrence A. Sucharow in Support of (A) Plaintiffs' Assented-to Motion for Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and (B) Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs [ECF No. 104].

[3] "SSH" refers to Securities Settlement and Handling, meaning purchases and sales of foreign securities.

[4] "AIR" refers to Automated Income Repatriation, meaning dividend and income payments on foreign securities.

or low rate and not beyond.  State Street referred to the spread achieved on indirect FX trades

after the application of such "netting" and "capping" as the "effective" spread.  Plaintiffs'

Counsel began with the dollar volume of SSH indirect FX trades for each year for 1998 through

2009.  The average effective markup across all currency pairs for SSH trades for 2009 was a

narrow basis point range.  Plaintiffs' Counsel multiplied the sum total of SSH volume for 1998-

2009 by the high end of State Street's stated range of effective markups, to estimate damages on

SSH trades at approximately $1.177 billion.  Plaintiffs' Counsel then took the dollar volume of

AIR indirect FX trades for each year for 1998 through 2009.  The volume is a small fraction of

the SSH volume.  Plaintiffs' Counsel multiplied the annual AIR volume for 1998-2009 by the

known markups for each year to estimate damages on AIR trades at approximately $314.49

million.

Based on this information, the total estimated losses to the U.S.-based customer class for

the wrongful acts alleged in the SST Litigation were nearly $1.5 billion, before the doubling or

trebling (and prejudgment interest) that may have been possible should the class have prevailed

on its M.G.L. ch. 93A claim at trial.  The total volume of affected trades attributable to ERISA

plans (and thus losses potentially actionable under ERISA) was estimated to be anywhere

between 9 and 15% of the total.

Daniel P. Chiplock, LCHB Partner, has the most knowledge of the information provided

in this Response.  Kirti Dugar, Litigation Support, has knowledge of some of the information

provided in this Response.

**INTERROGATORY NO. 9:**

Identify and describe all risk factors you considered prior to getting involved in the SST Litigation, including any "bad facts," meritorious defenses and/or unsettled legal issues, or other circumstances that affected the potential outcome and total damages recoverable in the case.

**RESPONSE TO INTERROGATORY NO. 9:**

LCHB incorporates the general objections stated above. LCHB further objects to this Interrogatory to the extent it seeks attorney work product. LCHB further objects to this Interrogatory on the grounds that it is vague, overbroad, and seeks information not relevant to the subject matter of this proceeding. Subject to and without waiving those objections, LCHB responds as follows:

Some of the risk factors considered prior to getting involved in the SST Litigation included (a) whether or not a custodial bank such as State Street properly could be considered a fiduciary to a custodial customer when offering an elective or courtesy service such as indirect FX trading, where the custodian was acting as a principal on such trades; (b) whether the fact that some custodial customers who engaged in direct/negotiated FX trading while also utilizing indirect FX trading by State Street could undermine Plaintiff's essential theory of the case (in other words, if indirect trading was believed to incur "no charge," why would any putative class member go to the trouble of trading directly with State Street, which took more time and effort?); (c) whether a multi-state class of custodial customers could be certified under the causes of action alleged, particularly a single state's consumer protection law such as M.G.L. ch. 93A; (d) whether statutes of limitation posed risks, given that it was possible to detect adverse FX pricing patterns in one's trades provided one was inspired to look (i.e., by comparing prices achieved to the daily range on the applicable trading days, and consistently comparing them to the mid-rates

of each day); (e) the general reluctance of custodial customers to be in an adverse litigation posture with respect to their custodian; (f) the threat that State Street could turn the tables and file contractual counterclaims and take aggressive discovery of plaintiffs, multiple class members and/or their investment advisors and consultants in an attempt to shift the blame for class member losses (which is precisely what BNY Mellon did); and (g) whether custodial customers of State Street fit the profile of "persons" or businesses that were "engaged in trade or commerce" as contemplated under M.G.L. ch. 93A sections 9 or 11, respectively (the latter of which may require a higher burden of proof).

Daniel P. Chiplock, LCHB Partner has the most extensive knowledge of the information provided in this Response.  Richard M. Heimann, LCHB Partner, and Steven E. Fineman, LCHB Managing Partner, each have some knowledge of some of the information provided in this Response.

## INTERROGATORY NO. 18:

Describe in detail the nature and the scope of the SST Document Review, including the total number of pages and/or size of the productions, the nature and date of each document production(s) received from State Street, all other document production(s) received in connection with the Litigation, and a general description of the information contained in each production.

## RESPONSE TO INTERROGATORY NO. 18:

LCHB incorporates the general objections stated above.  LCHB further objects to this Interrogatory on the grounds that it is vague and overbroad.   Subject to and without waiving those objections, LCHB responds as follows:

State Street's productions largely took place between December 2012 and November/December 2013.  The initial production (in December 2012) of more than 300 CDs

and a hard drive consisted principally of materials gathered and produced by State Street in the

California Action, and totaled more than 260,000 documents.  The latter productions (bringing

the total number of documents to be reviewed in the database to more than 750,000 (including

84,000 native Excel files), and more than 9 million pages or 500 gigabytes) included documents

produced by State Street in *Hill v. State Street Corporation*, No. 09-cv-12146-GAO (D. Mass.)

(a securities fraud lawsuit filed in the wake of the disclosure of the California Action which

contained overlapping allegations of unfair or deceptive custodial FX pricing practices by State

Street), in addition to ERISA client contracts and RFP responses.  The productions contained,

among other things, internal and external email correspondence, custodial contracts and fee

schedules, marketing materials, internal compliance and training manuals, investment manager

guides, internal and external presentations, analyst reports, customer surveys, codes of conduct,

competitive analyses, draft RFP responses, and FX revenue/profit and loss reports.

Daniel P. Chiplock, LCHB Partner, and Kirti Dugar, Litigation Support, have knowledge

of the information provided in this Response.

**INTERROGATORY NO. 19:**

Describe in detail how the Law Firm conducted the SST Document Review, including

how it selected and/or staffed Staff Attorneys, a description of all training binders/protocols or

search terms used for Document Review, and a brief description of the tasks assigned to Staff

Attorneys and any other individuals who participated, and how those tasks furthered the Firm's

overall litigation strategy.

**RESPONSE TO INTERROGATORY NO. 19:**

LCHB incorporates the general objections stated above.  LCHB further objects to this

Interrogatory to the extent it seeks attorney work product.  LCHB further objects to this

Interrogatory on the grounds that it is vague, overbroad, and duplicative of Interrogatory Nos. 18, 20, 22, 28-30, and 33.   Subject to and without waiving those objections, LCHB responds as follows:

The Firm refers to and incorporates its responses to Interrogatory Nos. 18, 20, 22, 28-30, and 33.  In addition, the Firm responds that LCHB Staff Attorneys were selected in large part from the pool of Staff Attorneys who had worked previously or simultaneously on the BNY Mellon Action and acquired substantial relevant experience concerning custodial FX trading in general, indirect (or "standing instructions) vs. direct/negotiated FX pricing, and custodial FX marketing.  These Staff Attorneys included Tanya Ashur, Joshua Bloomfield, James Gilyard, Kelly Gralewski[5], Christopher Jordan, Jason Kim, James Leggett, Andrew McClelland, Scott Miloro, Leah Nutting, Marissa Oh, Virginia Weiss, and Jonathan Zaul.  These Staff Attorneys averaged nearly 2,200 hours of work in the BNY Mellon Action (which had a discovery cut-off of January 2015), during which time they helped the lead attorneys prosecuting that case (including Mr. Chiplock) to prepare for and defend scores of depositions.  Three other LCHB Staff Attorneys did not have prior or related experience from the BNY Mellon Action—these were Elizabeth Brehm, Jade Butman, and Coleen Liebmann. Two other Staff Attorneys—Ann Ten Eyck and Rachel Wintterle—were hired in March 2015 from an agency that was paid directly by Thornton.  The purpose of the work performed by the Staff Attorneys—first by reviewing and coding all documents assigned to them and then by preparing detailed discursive memos on a number of topics of special concern to the litigation—was to synthesize and present the information produced by State Street in as useful a manner as possible so as to prepare the lead attorneys in the case for the next phase of the litigation (follow-up targeted discovery,

---

[5] *See* FN 1, *supra*.

depositions, and class certification) in the event the mediation ended without the case being resolved.

Daniel P. Chiplock, LCHB Partner, and Kirti Dugar, Litigation Support, have the most knowledge of the information provided in this Response.

**INTERROGATORY NO. 20:**

Describe how the Law Firm utilized the Catalyst database, including all persons who had access to the database, any electronic and/or technical training provided to those individuals, and a description of the information maintained in the Catalyst database during the course of the SST Document Review.

**RESPONSE TO INTERROGATORY NO. 20:**

LCHB incorporates the general objections stated above.  LCHB further objects to this Interrogatory on the grounds that it is overbroad to the extent it seeks information about those who accessed the database at the direction of Thornton or Labaton.  LCHB further objects to the extent this Interrogatory is duplicative of Document Request No. 1 and Interrogatory No. 18. Subject to and without waiving those objections, LCHB responds as follows:

All Staff Attorneys had access to the Catalyst database, as did Kirti Dugar and Litigation Support Staff which included Anthony Grant and former Firm employees Willow Ashlynn and Erwin Ocampo.  Online technical training on the database was provided by Kirti Dugar in conjunction with staff at Catalyst. The information maintained in the Catalyst database consisted of material produced by State Street in the SST Litigation, including documents and data previously produced by State Street in the California Action and other litigation brought against State Street.  The productions contained, among other things, internal and external email correspondence, custodial contracts and fee schedules, marketing materials, internal compliance

and training manuals, investment manager guides, internal and external presentations, analyst reports, customer surveys, codes of conduct, competitive analyses, draft RFP responses, and FX revenue/profit and loss reports.

Daniel P. Chiplock, LCHB Partner, and Kirti Dugar, Litigation Support, have knowledge of the information provided in this Response.

**INTERROGATORY NO. 21:**

Describe in detail all documents destroyed and/or deleted from the Catalyst database, including the date, and explain why each document was deleted/destroyed.

**RESPONSE TO INTERROGATORY NO. 21:**

LCHB incorporates the general objections stated above.  LCHB further objects to this Interrogatory on the grounds that it lacks foundation.   LCHB further objects on the grounds that this Interrogatory is overbroad to the extent it seeks information about the actions of those who accessed the database at the direction of Thornton or Labaton.  Subject to and without waiving those objections, LCHB responds as follows:

We do not believe that any documents were destroyed or deleted from the Catalyst database.  The Catalyst repository was taken offline and the service provided by Catalyst ceased after an agreement in principle to resolve the SST Litigation was reached.  However, the underlying document database was saved and shipped to the Firm on an external hard drive that can be restored on other platforms, including Concordance or Relativity.

Daniel P. Chiplock, LCHB Partner, and Kirti Dugar, Litigation Support, have knowledge of the information provided in this Response.

**INTERROGATORY NO. 22:**

Identify and describe any training the Firm provided to Staff Attorneys relating to the substantive allegations in the SST Litigation/SST Document Review, including addressing all legal issues, key witnesses, theories of liability, damages, and critical topics raised in the case.

**RESPONSE TO INTERROGATORY NO. 22:**

LCHB incorporates the general objections stated above.  Subject to and without waiving those objections, LCHB responds as follows:

Staff Attorneys were instructed to review relevant pleadings in the SST Litigation, including the Amended Class Action Complaint and Plaintiff's Memorandum of Law in Opposition to Defendants' to Dismiss [ECF No. 22], as well as a Document Review Coding Fields Quick Reference Guide, in which issue codes were listed and followed by a brief description of their relevance to the case.  In addition to these materials, the emails communicating assignments of proposed topics for the factual, legal, and/or discursive memoranda prepared by Staff Attorneys (discussed further below in response to Interrogatory No. 30) contained descriptions, context and/or explanations for the topics assigned.  Staff Attorneys also received periodic emailed descriptions or guidance on issues of specific interest to the litigation and document review from Mr. Dugar or the lead attorneys on the SST Litigation.

Daniel P. Chiplock, LCHB Partner, and Kirti Dugar, Litigation Support, have knowledge of the information provided in this Response.

**INTERROGATORY NO. 26:**

Identify any other individuals who worked on the SST Document review who were not Staff Attorneys and explain their affiliation with the Law Firm, their employment status, and how they were compensated for their time.

**RESPONSE TO INTERROGATORY NO. 26:**

LCHB incorporates the general objections stated above.  LCHB further objects to this Interrogatory on the grounds that it is overbroad to the extent it seeks information about those who accessed the database at the direction of Thornton or Labaton.  LCHB further objects to the extent this Interrogatory on the grounds that how any LCHB employee was "compensated for their time" is not relevant to the subject matter of this proceeding. Subject to and without waiving those objections, LCHB responds as follows:

Kirti Dugar, Litigation Support Manager and the firm's chief financial analyst, was the on-site supervisor of document review in San Francisco.  Mr. Dugar is employed full-time by the Firm and is paid a salary.  Apart from providing oversight or responding to questions by Staff Attorneys (as Mr. Chiplock and, to a lesser extent, Mr. Diamand did) or providing technical or logistical support (as did members of our Litigation Support department), no other Law Firm employees worked on the SST Document review.

Daniel P. Chiplock, LCHB Partner, and Kirti Dugar, Litigation Support, have knowledge of the information provided in this Response.

**INTERROGATORY NO. 28:**

Explain how the Firm supervised and/or performed quality control of the work performed by the Staff Attorneys and others who participated in the SST Document Review, including the name, title, and tasks performed by any supervising individual.

**RESPONSE TO INTERROGATORY NO. 28:**

LCHB incorporates the general objections stated above.  LCHB further objects to this Interrogatory on the grounds that it is overbroad to the extent it seeks information about those

who performed "work" in the SST Litigation at the direction of Thornton or Labaton.  Subject to

and without waiving those objections, LCHB responds as follows:

For the most part, Kirti Dugar, the Firm's chief financial analyst and head of the Firm's

Litigation Support department in San Francisco, supervised the Staff Attorneys on a day-to-day

basis.  As necessary, Mr. Dugar consulted with the lead attorneys on the case (principally, Mr.

Chiplock) as to Staff Attorney work assignments, issues of specific concern and emphasis for the

litigation (and therefore the document review), and specific coding questions as they arose.  Mr.

Dugar was also the Firm's chief internal expert on currency exchange trading throughout both

this litigation and the BNYM litigation, having performed estimated damage analyses for several

potential clients and class-members himself.  Mr. Dugar has over 25 years of experience trading

derivatives in financial instruments, equity indices and commodities, including particularly

foreign exchange futures and options traded on the Chicago Mercantile Exchange.  Mr. Dugar

was a key member of the team (led by Richard Heimann, a named partner in our San Francisco

office) that analyzed potential claims that could be asserted by the ████████████████████

████████████ against State Street.  As a result of that analysis and presentation █████,

which included a detailed Powerpoint presentation by Mr. Dugar on possible damages, ████

achieved a pre-filing settlement with State Street worth roughly 100% of their estimated losses

from State Street's FX trading practices.  The Firm received no acknowledgement or payment

for this.

In addition to Mr. Dugar, Nicholas Diamand, a partner in our New York office, and Mr.

Chiplock performed some supervision of Staff Attorneys who worked remotely or in the New

York area.  Mr. Diamand's emphasis was on timekeeping and ensuring that Thornton received

accurate and timely records of work performed by Staff Attorneys whose hours were Thornton's

financial responsibility.  Quality control of the work performed by Staff Attorneys was done by

way of periodic review by the lead attorneys at the Plaintiffs' Law Firms of "hot documents" as

identified by the Staff Attorneys, as well as secondary review of such documents by Staff

Attorneys with prior extensive experience in the BNY Mellon Action.

Daniel P. Chiplock, LCHB Partner, Nick Diamand, LCHB Partner, and Kirti Dugar,

Litigation Support, have knowledge of the information provided in this Response.

## INTERROGATORY NO. 29:

Explain in detail the job responsibilities and tasks performed by the Staff Attorneys

assigned to the SST Document Review, including those Staff Attorneys allocated to Thornton,

including but not limited to, coding, deposition preparation, creation of witness kits and similar

work.

## RESPONSE TO INTERROGATORY NO. 29:

LCHB incorporates the general objections stated above.  Subject to and without waiving

those objections, LCHB responds as follows:

The Staff Attorneys' job responsibilities and tasks consisted entirely of detailed

document review and issue analysis in the case.  This included subjective reviewing and coding

of all documents produced by State Street for six degrees of relevance and/or strength or

weakness in support of Plaintiff's theory of the case.  In addition to coding for relevance, Staff

Attorneys also identified specific issues and subject matters touched on by each of the documents

so that they could be sorted and searched by subject matter or issue at a later date.  Where

necessary, Staff Attorneys had the ability to enter attorney notes to explain or clarify the decision

behind a coding determination.  There were more than 30 different issue or document-type codes

available for assignment by Staff Attorneys to the documents they reviewed.  The initial review

of State Street's documents was largely completed by the end of April 2015, after which the

Firm's Staff Attorneys were tasked with preparing detailed memoranda on approximately 18 (out

of more than 50) selected themes, issues or witnesses to be further developed in depositions and

follow-up discovery.  Each memo contained hyperlinks to supporting documents from State

Street's production, with some memos exceeding 100 pages.

      Daniel P. Chiplock, LCHB Partner, and Kirti Dugar, Litigation Support, have knowledge

of the information provided in this Response.

**INTERROGATORY NO. 30:**

      Describe the process for assigning and reviewing factual, legal, and/or discursive

memoranda prepared by Staff Attorneys, including how such memoranda were relevant to, used

as part of the SST Litigation, and/or shared among counsel.

**RESPONSE TO INTERROGATORY NO. 30:**

      LCHB incorporates the general objections stated above.  Subject to and without waiving

those objections, LCHB responds as follows:

      The proposed topics for the factual, legal, and/or discursive memoranda prepared by Staff

Attorneys were assigned to the Staff Attorneys beginning in April 2015 as the initial review was

nearing completion.  The proposed topics (of which there were ultimately more than 50) were

developed principally by Michael Lesser of the Thornton Law Firm, and were divided up and

assigned via email to the Staff Attorneys at each Plaintiffs' Law Firm.  The purpose of the

memos was to synthesize the state of the firms' knowledge as to key issues concerning liability

and proof based strictly on State Street's own documents at the time, and to lay the groundwork

for the next phase of discovery—i.e., further document requests, interrogatories, depositions, and

requests for admission—in the event mediation ended without resolution of the case.  The

memos were circulated to the lead attorneys at each firm on a rolling basis after they were completed.  Had the mediation ended without resolution of the case, the memos would have formed the principal repository of knowledge for the lead attorneys as they geared up for the next phase of the litigation.

Daniel P. Chiplock, LCHB Partner, and Kirti Dugar, Litigation Support, have knowledge of the information provided in this Response.

## INTERROGATORY NO. 33:

Explain the origin of the cost-sharing agreement with Thornton through which the Firm agreed to allocate the costs associated with a certain number of Staff Attorneys to Thornton, including the names and descriptions of all other matters in which the Firm entered into a similar arrangement (whether or not documented) to share costs with other firms, prior to or after the SST Litigation.

## RESPONSE TO INTERROGATORY NO. 33:

LCHB incorporates the general objections stated above.  Subject to and without waiving those objections, LCHB responds as follows:

The Firm agreed, based on a telephonic request made in January 2015 by Garrett Bradley of the Thornton Law Firm to Mr. Chiplock, to either host or share financial responsibility for several Staff Attorneys based on Mr. Bradley's description of Thornton's physical space and facilities as being too limited to host a sufficient number of Staff Attorneys.  The Firm's agreement to do this was based on and consistent with the general understanding by Thornton, Labaton, and the Firm throughout the litigation that the firms would strive to share the costs of the litigation equitably.

In *In re Lithium Ion Batteries Antitrust Litigation*, No. 4:13-md-02420-YGR (N.D. Cal.),

between September 2014 and February 2016, LCHB hosted in its New York office a Staff

Attorney paid by another law firm.   That Staff Attorney had previously worked for LCHB

reviewing and translating documents from Japanese to English.   In the *Batteries Antitrust* case

that Staff Attorney was paid by the other firm, reported to the other firm, and helped prepare that

firm's lawyers for depositions concerning the documents the Staff Attorney was reviewing and

translating.

Daniel P. Chiplock, LCHB Partner, Steven E. Fineman, LCHB Partner, and Kirti Dugar,

Litigation Support, have knowledge of the information provided in this Response.

## INTERROGATORY NO. 34:

Describe the Firm's understanding, in or about early 2015, as to how Thornton would

account for the allocation/sharing of costs for certain of the Firm's Staff Attorneys in its Fee

Petition, including the Firm's understanding as to which firm was responsible for reporting the

total number of hours worked by those Staff Attorneys on its Fee Petition and/or Lodestar

calculation.

## RESPONSE TO INTERROGATORY NO. 34:

LCHB incorporates the general objections stated above.  Subject to and without waiving

those objections, LCHB responds as follows:

In or about early 2015, it was the Firm's understanding that Thornton would include in its

lodestar total (to be reported in any Fee Petition submitted by Thornton) any hours worked by

Staff Attorneys for which Thornton had borne financial responsibility.

Daniel P. Chiplock, LCHB Partner, has the most knowledge of the information provided

in this Response.

**INTERROGATORY NO. 38:**

Describe in detail the process through which the Law Firm invoiced or otherwise sought reimbursement from Thornton for costs of those Staff Attorneys allocated to Thornton as part of the SST Litigation/Document Review.

**RESPONSE TO INTERROGATORY NO. 38:**

LCHB incorporates the general objections stated above.  Subject to and without waiving those objections, LCHB responds as follows:

Invoices for work performed by Staff Attorneys Zaul and Jordan between February 9 and April 10 or 13, 2015 were prepared by the Firm's Accounting Department and emailed by Mr. Diamand of our Firm to Evan Hoffman at the Thornton Law Firm on April 24, 2015.  These communications have been produced to the Special Master.

Daniel P. Chiplock, LCHB Partner and Nick Diamand, LCHB Partner, have knowledge of the information provided in this Response, as do staff in the Firm's Accounting Department in San Francisco.

**INTERROGATORY NO. 39:**

Explain the Firm's process for removing time reported by Staff Attorneys allocated to Thornton for whom Thornton reimbursed the Firm, from the Firm's Fee Petition, including the role of the Firm's Accounting Department, and explain why time reported by Christopher Jordan and Jonathan Zaul for reviewing Thornton folders 2/9/15 to 4/14/15 was not removed from the Firm's timekeeping records.

**RESPONSE TO INTERROGATORY NO. 39:**

LCHB incorporates the general objections stated above.  Subject to and without waiving those objections, LCHB responds as follows:

Shortly after discovering the inadvertent inclusion of time reported by Staff Attorneys Zaul and Jordan in LCHB's lodestar total and Fee Petition for work performed between February 9 and April 10 or 13, 2015, Mr. Chiplock instructed the Firm's Accounting Department to remove all such time from LCHB's time records.  This instruction was given in November 2016, shortly after the error was discovered and the November 10, 2016 corrective letter was submitted to the Court.  This error appears to have been due to miscommunication in the February – May 2015 timeframe between and among the lead attorney on the case (Mr. Chiplock), the partner tasked with ensuring that time was correctly reported and invoiced to Thornton (Mr. Diamand), the person overseeing Staff Attorneys on a day-to-day basis (Mr. Dugar), the Firm's Accounting Department, and the Firm's Human Resources Department.  Although great care was taken to ensure both that Thornton was accurately invoiced for this time and that Thornton received contemporaneous reports of this time (with multiple communications exchanged on these topics), the Accounting Department apparently did not receive a direct instruction from any of the individuals listed above to remove this time from the Firm's timekeeping records once the Accounting Department had received payment from Thornton.  This was a pure oversight and not intentional.

When reviewing the Firm's detailed lodestar report prior to submitting the Fee Petition (which took place more than a year later), Mr. Chiplock was under the mistaken belief that any Staff Attorney time for which Thornton was financially responsible was not included in the Firm's timekeeping records.  The simple fact that a time entry may have indicated review of "Thornton Naumes folders," or something similar, was not by itself indicative of the need to eliminate that time from the Firm's timekeeping records prior to submitting the Fee Petition

because some of that work, which was done in 2015, was not ultimately paid for by Thornton, and some Staff Attorneys were shifted between firms.

Daniel P. Chiplock, LCHB Partner has the most knowledge of the information provided in this Response.

**INTERROGATORY NO. 40:**

Explain the Firm's process for removing time reported by Staff Attorneys allocated to Thornton for whom Thornton paid directly through a third-party staffing agency from the Firm's Fee Petition, including the role of the Firm's Accounting Department, and explain why time reported by Staff Attorneys Ann Ten Eyck and Rachel Wintterle for work performed from March through June 2015, was not removed from the Firm's timekeeping records.

**RESPONSE TO INTERROGATORY NO. 40:**

LCHB incorporates the general objections stated above. Subject to and without waiving those objections, LCHB responds as follows:

Staff Attorneys Andrew McClelland and Virginia Weiss were paid through an outside agency for their work on the SST Litigation. During the February to mid-April 2015 timeframe, that agency was paid directly by Thornton for the work done by these two attorneys. The corresponding time for these two attorneys during that period was accordingly not entered into the Firm's timekeeping records in the first place, and was instead included in Thornton's timekeeping records. Mr. McClelland left his employment with LCHB and Thornton on or about March 27, 2015 to take a position at another firm. LCHB took back financial responsibility from Thornton for Ms. Weiss' hours on April 21, 2015, after which her time entries were included in LCHB's timekeeping records. In short, the Firm understands Mr. McClelland and Ms. Weiss' time entries to have been appropriately allocated between LCHB and Thornton, without

duplication.  There was thus no need to remove any of their time entries from the Firm's timekeeping records.

Shortly after discovering the inadvertent inclusion of time reported by Staff Attorneys Wintterle and Ten Eyck for work performed from March through June 2015 in LCHB's lodestar total and Fee Petition, Mr. Chiplock instructed the Firm's Accounting Department to remove all such time from LCHB's time records.  This instruction was given in November 2016, shortly after the error was discovered and the November 10, 2016 corrective letter was submitted to the Court.  The Firm believes that Ms. Wintterle's and Ms. Ten Eyck's time was inadvertently included in LCHB's time reports in the first place due to an error in their initial training, which may have been made possible by the unfortunate simultaneous absence of several key people in our San Francisco office when Ms. Wintterle and Ms. Ten Eyck commenced work.  In our investigation, the Firm concluded that while working in the Firm's offices, Ms. Wintterle and Ten Eyck regularly submitted their time reports directly to the Firm's Word Processing department for entry into the Firm's timekeeping system.  While this would have been ordinary practice for Staff Attorneys employed or contracted by the Firm, Ms. Wintterle and Ten Eyck should have been instructed not to do so.  The apparent fact that they were not so instructed appears to be due to an honest mistake on the part of whoever trained them on Firm timekeeping policies when they commenced work in our San Francisco office in March 2015.  At that time, our regular San Francisco-based Human Resources Department staffer in charge of Staff Attorney hiring and training (Thony You) was out on maternity leave, and our regular time entry staffer (Christine Dunev) was on a leave of absence.  Mr. Dugar, who had the most day-to-day interaction with Staff Attorneys in our San Francisco office, was also out for several weeks in March 2015 visiting relatives in India.  Ms. Wintterle and Ms. Ten Eyck accordingly may have

been trained on timekeeping protocols by someone in the Firm's Information Technology ("IT") department who lacked specific knowledge of their status as outside attorneys being paid for by Thornton.  In short, due to personnel issues, Ms. Ten Eyck and Ms. Wintterle do not appear to have received the same timekeeping training that Mr. McClelland and Ms. Weiss received earlier that year (and whose time, as described above, was correctly allocated).

When reviewing the Firm's detailed lodestar report prior to submitting the Fee Petition (which took place more than a year after the document review ended), Mr. Chiplock was under the mistaken belief that any Staff Attorney time for which Thornton was financially responsible was not included in the Firm's timekeeping records.  The simple fact that a time entry may have indicated review of "Thornton Naumes folders," or something similar, was not by itself indicative of the need to eliminate that time from the Firm's timekeeping records prior to submitting the Fee Petition because some of that work, which was done in 2015, was not ultimately paid for by Thornton, and some Staff Attorneys were shifted between firms.

Daniel P. Chiplock, LCHB Partner, and Kirti Digar, Litigation Support have knowledge of the information provided in this Response.


Dated: June 1, 2017                          Respectfully submitted,

                                             Lieff Cabraser Heimann & Bernstein, LLP
                                             275 Battery Street, 29th Floor
                                             San Francisco, CA  94111
                                             415-956-1000


                                             By: _____
                                                 Richard M. Heimann
                                                 Attorney for Lieff Cabraser Heimann &
                                                 Bernstein, LLP