# EX. 58

1  UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

2  Case No. 11-cv-10230 MLW

- - - - - - - - - - - - - - - - - - -x

3

ARKANSAS TEACHER RETIREMENT SYSTEM,

4  et al.,

                              Plaintiffs,

5

                    -against-

6

STATE STREET BANK AND TRUST COMPANY,

7                              Defendant.

- - - - - - - - - - - - - - - - - - -x

8  JAMS

Reference No. 1345000011

9  - - - - - - - - - - - - - - - - - - -x

In Re:  STATE STREET ATTORNEYS' FEES

10  - - - - - - - - - - - - - - - - - - -x

                              July 17, 2017

11                              11:13  a.m.

12     B e f o r e :

13

14  SPECIAL MASTER HON. GERALD ROSEN

15  United States District Court, Retired

16  Deposition of DAVID GOLDSMITH, taken

17  by Counsel to the Special Master, held at

18  the offices of JAMS, 620 Eighth Avenue, New

19  York, New York, before Jessica Taft, a

20  Registered Professional Reporter and Notary

21  Public.

22

23

24

25



Page 11

4     A   So I spend really most of my time
5  on class action matters, mostly securities
6  class action matters.  Most of those cases
7  are securities fraud under the Security
8  Exchange Act or the Securities Act.  So
9  these are 10(b)(5) and Section 11 cases.
10        I've also had experience in
11  individual fraud matters on behalf of large
12  institutional investors.  In particular, I
13  was one of the partners in the group, in the
14  firm's RMBS practice group.  And so for a
15  number of years I handled a large series of
16  cases which were in New York State Supreme
17  Court, which were common law fraud
18  litigations based on the issuance and sale
19  of residential mortgage-backed securities.
20        Early in my time at Labaton, to
21  answer your question completely, I worked on
22  cases that were in Delaware Chancery Court,
23  but I no longer work on Delaware cases
24  today.  But really mostly securities class
25  actions is my practice area.

4 (Pages 10 - 13)



Page 14

1           D. GOLDSMITH
2 settled for when we actually achieved the
3 settlement agreement in principle.  I did
4 have a lot of involvement in the
5 documentation of the settlement and
6 submission of papers relating to the
7 settlement.
8      Q   Did you have any involvement in
9 overseeing document review in the case, in
10 this case?
11      A   I would say formally, yes, but
12 fairly, in a fairly attenuated basis.  I
13 mean it was really Mike Rogers, one of my
14 partners, who was closer to supervising the
15 staff attorney review on a day-to-day basis.
16 But I certainly was involved in that.  And
17 in particular I attended and led one of the
18 larger training sessions that we had with
19 staff attorneys who were hired for purposes
20 of the review.
21      Q   Did you receive regular or
22 intermittent reports either from Mike Rogers
23 or from Todd Kussin or others with respect
24 to the document review?
25      A   Yes, I did.

Page 15

Page 16

Page 17

Veritext Legal Solutions
212-267-6868                www.veritext.com                516-608-2400



Page 22

Page 24

```
1          D. GOLDSMITH
2  heavily involved in drafting that complaint
3  and researching claims in the complaint.  I
4  was also involved in meetings whereby we
5  would learn the subject matter, learn
6  something about the industry, and
7  investigate the claims involved.
8          I had no role in the preparation
9  and filing of the initial complaint in
10 February.
11     Q   With respect to the investigation
12 that you just referred to, what steps did
13 Labaton take to investigate potential claims
14 against State Street?
15     A   Well, we did a number of things.
16 One thing that comes to mind is we had at
17 least one, there might have been two
18 meetings with a consulting expert from a
19 firm called FX Transparency in Framingham,
20 Massachusetts.  The man from FX
21 Transparency, his name was James McGeehan.
22 He came into our office, he spent probably
23 four hours in our office with us.  I
24 remember that Thornton representatives and
25 Lieff Cabraser representatives were in our
```

Page 23

Page 25

```
1          D. GOLDSMITH
2  offices as well, and he basically taught us
3  about FX and indirect FX trading.  This was
4  not an area that at least I knew anything
5  about at the time I was asked to work on the
6  case.
7          And so there was a good amount of
8  education that needed to be had.  This is a
9  sort of little known corner of the financial
10 services world.  And so we learned a lot
11 from Jimmy -- he went by Jimmy -- about FX
12 and that was part of the investigation.
13         Another part of the investigation
14 was finding whatever public information we
15 could relating to the case that would
16 include not only the complaint and
17 intervention, but also what we called IM
18 guides or investment manager guides.  These
19 were State Street publications that were
20 important for the case and which were
21 referenced in the complaint.
22         Another -- I should have
23 mentioned this earlier.  Another very
24 important part was the analysis that Jimmy
25 did of Arkansas' trades.  So we supplied
```

7 (Pages 22 - 25)



D. GOLDSMITH

2 So I don't think we had the Bank of New York
3 complaint to look to at the time.
4        So that is one of the reasons why
5 this was, I wouldn't call it a blank slate
6 but it was a gray slate.
7     Q   Were there any other legal issues
8 that you thought were novel or risky in this
9 case beyond the ones that you have mentioned
10 such as class certification or things of
11 that nature?
12    A   Yes.  Class certification was a
13 very substantial issue in the case.  Again,
14 class certification is somewhat of a known
15 entity in our federal securities cases.  I
16 mean there is bells and whistles and there's
17 recent Supreme Court cases that have changed
18 things a bit, but class cert was a question
19 here.  You know, we did not bring the breach
20 of contract claim as a class claim because
21 we thought that that would not be a claim
22 that would be susceptible to class
23 certification, but the other claims we did.
24        But there was a real question as
25 to whether you could certify a nationwide

D. GOLDSMITH

2 individual claim or a class claim.  We had
3 to make a decision about whether we would
4 assert the negligent misrepresentation and
5 whether that would be a class claim.  And we
6 also had to make a decision -- I recall this
7 being, it was a bit of debate about this,
8 about whether we would assert a breach of
9 fiduciary duty claim and whether that would
10 be a class or individual claim.
11        In my experience when we write
12 complaints in our federal securities cases,
13 most of those decisions are pretty settled
14 about what kind of claims you have and
15 whether they are class claims or not.  It is
16 pretty, pretty much known at our firm how
17 this gets ordered.
18        In this case, we, this was new
19 territory in many ways because custody banks
20 are almost never sued.  And this was
21 something different and predated the Bank of
22 New York case in many respects procedurally.
23        In fact, I believe the initial
24 complaint, I believe, was filed before the
25 Bank of New York litigation was commenced.

D. GOLDSMITH

2 class on the Massachusetts 93(a) claim, for
3 example, same for the other claims, the
4 fiduciary duty claim and the negligent
5 misrep claim.  For one thing, the custodial
6 contracts that each custodial client had
7 with State Street were not identical.
8        State Street negotiated all of
9 these contracts individually, we learned.
10 And so that is certainly a defense that
11 State Street would have raised.
12        There were many other litigation
13 risks that we identified even after we get,
14 got past the motion to dismiss.  I mean one
15 thing that comes to mind is that in I think
16 it was July 2013, there was a case called
17 Louisiana Municipals, one of the Louisiana
18 pension funds, against the JP Morgan
19 custodial bank here in New York before Judge
20 Cote.  Judge Cote dismissed the whole case.
21        That case was premised on the New
22 York consumer protection statute, which is
23 an analog to the Massachusetts protection
24 statute.  The statutes are not identical,
25 but they are fairly analogous and Judge Cote

Page 42

1           D. GOLDSMITH
2   position and so we proceeded jointly in
3   terms of the mediation.
4           In fact, I think it was -- sorry,
5   I think it was Larry who invited ERISA
6   counsel to become involved in the mediation
7   originally.
8       Q   You weren't concerned about ERISA
9   preemption or anything along those lines?
10      A   That is an issue that did come
11  up.  So we did not assert an ERISA claim in
12  our complaint, but we did allege a class
13  which was broad enough to encompass ERISA
14  governed assets.
15          So I know that some counsel -- it
16  might have been Dan Chiplock of Lieff
17  Cabraser -- had mentioned some issues about
18  possible ERISA preemption sort of on a, you
19  know, handful of times.  And I took that
20  concern as a real one and responded to it.
21  I don't think I mentioned it in the first
22  instance.
23      Q   Now, David, you said that you
24  took an active role in the amended
25  complaint.



Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 46

Page 47

Page 48

```
1            D. GOLDSMITH
2        Were other related issues such as
3   fiduciary relationships or things of that
4   nature of concern to you, or were there any
5   discussions either with ERISA counsel or
6   among the big three firms?
7      A   I think the best way to answer
8   your question is I felt personally that our
9   case was stronger than theirs in many ways.
10  We had gotten past a motion to dismiss; the
11  ERISA cases had not.  I had read the, you
12  know, State Street motions to dismiss that
13  were filed in the ERISA cases.  And whereas
14  I am not an ERISA specialist, I thought they
15  had some decent argument, so I don't know
16  whether those complaints would have
17  survived.
18        And based largely on our efforts
19  they were able to settle their cases without
20  having those allegations tested.
21        I thought that our consumer
22  protection claims were strong based on the
23  nature of 93(a).  We felt there was a strong
24  claim.
25        I think there might have been
```

Page 49

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400



Page 58
1        D. GOLDSMITH

Page 59

Page 60
1        D. GOLDSMITH

25  BY MR. SINNOTT:

Page 61
1          D. GOLDSMITH
2      Q   If you recall, David, what were
3   the specific Department of Labor concerns as
4   far as allocation was concerned?
5      A   Well, they wanted to know how
6   much of the settlement would go to ERISA
7   clients.  What I mean by ERISA clients is,
8   how much would go to members of the class
9   which were, whose assets were entirely
10  governed by ERISA or partially governed by
11  ERISA.  Being the Department of Labor, that
12  was something that they were focused on.  Of
13  course, we were focused on it as well
14  because they were our clients.  But the
15  Department of Labor saw this as their
16  particular mandate.  And so they kind of
17  involved themselves in the negotiations of
18  the plan of allocation and were fairly
19  insistent that certain terms of the plan of
20  allocation be consistent with those
21  concerns.
22         One of the -- this is something
23  we discussed quite candidly in our papers to
24  the court, incidentally, that we filed in
25  support of the settlement and fees.

16 (Pages 58 - 61)



Page 65

1        D. GOLDSMITH
2        MR. SINNOTT:  Well, thank you
3    for your patience as we all engaged in
4    this discussion.
5        MS. LUKEY:  Probably all poorly
6    informed with the probable exception
7    of Elizabeth.
8        THE WITNESS:  I feel like I am
9    in good company.
10 BY MR. SINNOTT:
11    Q    Are you aware, David, that the
12 ERISA counsel were using a different
13 database than the big three?
14    A    Not specifically.  I am aware
15 that they were not affirmatively included in
16 the big three's database.
17    Q    Why was that?
18    A    There is no particular reason for
19 it.  You know, we and Thornton and Lieff, we
20 made efforts to request information from
21 State Street in a manner that was not under
22 the formal federal rules of civil procedure
23 but in an information exchange rubric and
24 they produced a lot of documents to us and
25 we loaded the documents and reviewed them.

17 (Pages 62 - 65)

Page 66

```
1           D. GOLDSMITH
2       I don't think we viewed our
3   mandate with discovery as being joint with
4   the ERISA plaintiffs necessarily.  The cases
5   were consolidated, but they were different
6   claims on behalf of classes that may have
7   overlapped but which were not the same.
8       Q   But weren't they part of the same
9   mediation sessions?
10      A   They were.  They were.  And we
11  never got a request from ERISA counsel to
12  provide database information or to provide
13  documents to them or to include them in
14  certain document productions or the like.
15  So it just really isn't an issue that came
16  up very much.
17      Q   Did that surprise you?
18          MS. LUKEY:  I am sorry, did
19      what?
20      Q   That they weren't asked, that you
21  weren't asked for documents by the ERISA
22  firms?
23      A   I don't have a very clear
24  recollection of, about that.  There may have
25  been a time where I thought to myself what
```

Page 67

```
1           D. GOLDSMITH
2   are the ERISA folks doing in terms of
3   documents.  But it wouldn't have been more
4   than a thought to myself.  I did not reach
5   out and commence any dialogue on that
6   subject.
7       Q   Were you familiar with any
8   confidentiality agreements or protective
9   orders that might have affected that dynamic
10  of, you know, separate but equal or, you
11  know, documents not going to ERISA?
12      A   Not in particular.  We certainly
13  had a protective order in the case, which
14  was signed off on by Judge Wolf.
15          To the extent that that
16  protective order impacted the ERISA
17  counsel's ability to receive or review
18  documents, I don't, I just don't recall that
19  today, but it is possible that the order may
20  speak to that issue.
21          MS. McEVOY:  In addition to
22      that order, if I could ask a quick
23      follow-up, were there also
24      confidentiality agreements between the
25      Arkansas group and State Street on one
```



Page 68

Page 69



Page 74

Page 75

Page 76

1           D. GOLDSMITH

Page 77

1           D. GOLDSMITH
2  a reasonable amount of time.  I think there
3  was a concern that if we just had the
4  current people review the Hill production,
5  it would take forever, basically.
6      Q   Sure.  It was an issue of
7  capacity?
8      A   Yes.
9      Q   Can I assume that you can't just
10  take new hires cold and put them into
11  document review, that it requires training
12  and supervision?
13      A   It does.
14      Q   Did you come up with a plan for
15  that?
16      A   Yes.  I mean we had, we had
17  manuals relating to the Relativity or the
18  Catalyst database in terms of the technical
19  aspects of how to profile the documents.  I
20  think those were provided by Lieff Cabraser
21  because the database was actually, it was
22  actually housed at Lieff Cabraser.
23          We also had kind of a substantive
24  manual or substantive materials introducing
25  the new hires to the case and talking about

20 (Pages 74 - 77)



Page 78

1            D. GOLDSMITH
2  the issues in the case, talking about
3  players cast of characters in the case,
4  telling them who to look for, telling them
5  what was going on, trying to educate them as
6  best as possible of what the case was about
7  and the types of documents that they wanted
8  to keep an eye out for.
9            I was involved in the training
10  session where we met with a large number of
11  new hires and I recall Mike Rogers was
12  there, Todd Houston was there, Danette might
13  have been there.  And we provided those
14  materials to them.
15            In addition, we also provided --
16  there was a binder or a Redweld that we gave
17  each person.  It included materials of the
18  kind that I just described, but it also
19  included the complaint, the opposition
20  motion to dismiss, the transcript of the
21  motion to dismiss hearing, and perhaps some
22  other papers from the litigations.  We
23  really tried to give each new hire the best
24  possible training and background so that
25  they could approach the review as, with as



Page 86

Page 88

1          D. GOLDSMITH
2  Bradley must be his brother.
3          That, what I subsequently came to
4  realize is that on November 1st, 2016, the
5  day before the fairness hearing, the day
6  before the settlement and fee hearing, there
7  was an e-mail from Garrett to Nicole Zeiss,
8  which Nicole Zeiss forwarded to me, where
9  Garrett asked, "Nicole how many hours did my
10 brother work on this case?"  And then there
11 were some communications relating to that.
12         That was really the first time
13 that I ever knew that Garrett's brother had
14 any involvement in the case whatsoever.
15     Q    You are referring, among other
16 things, to in response to Garrett's message,
17 how many hours did my brother put in on
18 State Street, how much was his rate,
19 Nicole's response, "Who is your brother?"
20     A    Correct.
21     Q    Do you recall a May 20, 2014
22 e-mail from Mike Lesser to you where he's
23 looking for document review hours excluding
24 his, and he mentions Mike Bradley, and then
25 parentheses attorney; Andrea Carruth,

Page 87

1          D. GOLDSMITH
2  think those were also divvied up between the
3  two firms to some degree.
4          So, I think there was some
5  confidence generally going forward that we
6  weren't duplicating subject matter or
7  stepping on each other's toes.
8      Q    Let me shift gears here.
9          Did you know that Michael Bradley
10 was involved in document review?
11     A    Not during the course of the
12 document review, no.
13     Q    When did you first learn that
14 Michael was involved in document review?
15     A    So let me answer the question in
16 a slightly convoluted way.
17         When you interviewed me on April
18 the 4th, I told you the first I ever heard
19 the name Michael Bradley was when Garrett
20 Bradley mentioned to me on November 8th that
21 his brother was -- that questions were being
22 raised about his brother by the Boston
23 Globe.
24         Then on November 8th I then
25 looked into it and realized, oh, Michael

Page 89





Page 114

Page 116

Page 115

1　　　　　D. GOLDSMITH

Page 117

1　　　　　D. GOLDSMITH
2　　A　Which declaration?  Ours?
3　　Q　In the fee petition.
4　　A　It was -- so our firm was lead
5　counsel, and it was our firm's
6　responsibility to report our own hours, our
7　own firm's hours accurately, and I think
8　it's fair to say that it was our firm's
9　responsibility to detect and correct errors
10　to the extent that we could find them in the
11　other firm's fee declarations.
12　　Q　And at Labaton as lead counsel,
13　whose responsibility was that?
14　　A　I mean that review was delegated
15　to Nicole Zeiss, but I also considered that
16　partly my responsibility because I was
17　getting the entire set of papers filed and I
18　considered myself to have responsibility for
19　the settlement fee papers as a whole.
20　　　　JUDGE ROSEN:  So would it be
21　　accurate to say that between you and
22　　Nicole, it was, your shared
23　　responsibility to have ensured that
24　　the fee petition and the declaration
25　　were accurate?

30 (Pages 114 - 117)



Page 130

Page 131

Page 132

```
1            D. GOLDSMITH
2      A    No.
3      Q    So you have no involvement in
4  that process?
5      A    Correct.
6      Q    Do you know if the firm adjusts
7  its rate depending on the venue of a case?
8      A    I believe we do not.
9      Q    Let me get to what I am sure is a
10 few days that you would like to forget and
11 that would be early October of 2016.  I am
12 sorry.  What did I say, December?  You knew
13 exactly what I meant, early November of
14 2016.  And ask you how you first learned of
15 there being a problem?
16     A    I received a call from Garrett
17 Bradley on Tuesday, November 8th, that he
18 had received a communication from the Boston
19 Globe that the Boston Globe had reviewed our
20 fee submissions and noticed that certain of
21 the staff attorneys appeared on both the
22 Thornton lodestar report and Labaton
23 lodestar report with exactly the same number
24 of hours down to a decimal point.
25     Q    Did Garrett say why they should
```

Page 133

```
1            D. GOLDSMITH
2  have been just on the Thornton report?
3      A    No.  Garrett made no, he had no,
4  nothing to say about -- he knew that there
5  was a problem.  He had nothing to say about
6  why or how it should have been.
7      Q    What were the next steps that you
8  took after that conversation?
9      A    He did say one thing, I am sorry,
10 just to be complete.  He said that the
11 Boston Globe also made a comment about
12 rates.  And he said about the Thornton
13 rates, that these are our rates.  Sorry to
14 interrupt you.
15     Q    No, that is helpful.
16     A    He also said -- I am not sure if
17 this was part of your question, but he also
18 alluded to "my brother," he said something
19 to the effect of the Globe is giving me
20 grief about my brother.  That is where I
21 really learned for the first time that his
22 brother was involved in this case.
23         JUDGE ROSEN:  Was this
24 also the first time that you learned
25 that Thornton had claimed on its fee
```

34 (Pages 130 - 133)



Page 134

Page 136

1       D. GOLDSMITH
2       I did have a call subsequently
3   with Mike Lesser and Kevin Hoffman and I
4   think Nicole Zeiss joined me for that call.
5   We were trying to figure out what was going
6   on, and I have a vague recollection of Evan
7   Hoffman saying something to the effect of,
8   you know, we just put the people on based on
9   the names that were given to us.  And I
10  said, well, what the heck is that all about?
11  And I didn't get a very clear answer.
12      Q   Did anyone claim or reference an
13  agreement of any kind between Labaton and
14  Thornton?
15      A   No.
16      Q   What were the next steps that you
17  took, David?
18      A   So I had lots of meetings and
19  lots of conversations with people in the
20  firm, so many that it would be difficult to
21  catalog all of them.
22      But I talked a lot at this point
23  actually with Joel Bernstein who was a
24  senior partner of the firm.  At that point
25  he was on the executive committee.  His

Page 135

Page 137

1       D. GOLDSMITH
2   office was down the hall.  We work very
3   closely together, so I sort of turn to him
4   naturally as a member of the executive
5   committee to liaise with regarding this
6   major issue.
7       The reason I spoke to him
8   and not Larry was Larry happened to be out
9   of town on a vacation and it was difficult
10  to reach.
11      I spoke with Mike Stocker.  I am
12  not saying what I said, but I did speak with
13  him.  Certainly Nicole Zeiss and I were
14  talking a lot.  I spoke with Howard
15  Goldberg.  I spoke with Danette McKenzie, I
16  spoke with Todd Kussin.  And I basically led
17  an effort to determine internally what the
18  double counting was and how we could correct
19  it and disclose the problem to the court.
20      In my mind, the speed, subject to
21  accuracy, was of paramount importance.  I
22  was concerned that Judge Wolf had signed off
23  on a fee order that was based in part on
24  information that was not entirely accurate.
25  And we wanted to correct that.

35 (Pages 134 - 137)

D. GOLDSMITH

1
2  lower, say 415, Thornton's rate across
3  the board would have been 425?
4       THE WITNESS:  Yes.
5       JUDGE ROSEN:  Were there any
6  staff attorneys that were double
7  counted on the Labaton side that those
8  rates would normally have been higher
9  and were in fact higher on the Labaton
10 fee petition than the Thornton rates?
11 Did you find any of those?
12      THE WITNESS:  So to my
13 recollection, for all of the 17 staff
14 attorneys who were listed on both the
15 Thornton and lodestar, Labaton
16 lodestar reports, the rate on the
17 Thornton lodestar report was higher
18 than the rate on the Labaton lodestar
19 report.
20      JUDGE ROSEN:  For all 17?
21      THE WITNESS:  Yes, sir, that is
22 my recollection.
23      JUDGE ROSEN:  And Michael
24 Bradley was sui generis because he was
25 not an overlap.

D. GOLDSMITH

1
2       THE WITNESS:  Correct.  Our
3  rates, to be clear, differed among
4  staff attorneys based on their level
5  of experience.  Thornton applied a
6  uniform rate.
7       JUDGE ROSEN:  Did you ever
8  discover where they got the 425 for all?
9       THE WITNESS:  No.
10      MR. HEIMANN:  But we know the
11 answer to that, Judge.  I can give it
12 to you if you we want.  We've had
13 testimony about it.
14      JUDGE ROSEN:  Okay, I am sure
15 we got it.
16 BY MR. SINNOTT:
17   Q   So you said earlier, David, that
18 when you first heard this you said we got to
19 communicate this to Judge Wolf.  So was that
20 done?
21   A   Yes.
22   Q   How was it done?
23   A   It was done by letter on
24 November 10th, 2016.
25   Q   Did you draft the letter?

D. GOLDSMITH

1
2    A   I did.
3    Q   Who else participated in the
4  drafting of the letter?
5    A   So I was the draftsperson.  I did
6  receive comments from a fairly large number
7  of people over that compressed period of
8  time from both inside my firm and from the
9  Thornton and Lieff firms.  I also circulated
10 the letter to the ERISA firms, and I do
11 recall receiving comments from some of them
12 as well.
13   Q   Were there any significant
14 disagreements with respect to the contents
15 of the letter?
16   A   The only two subjects that I
17 would characterize that way are when I wrote
18 the letter, I said that we received an
19 inquiry from the Boston Globe, and Garrett
20 did not want to disclose that the media
21 organization was the Boston Globe.  He just
22 wanted to say media organization.  We ended
23 up just saying media organization.
24   Q   Was there also a request from --
25   A   And there was another, I am

D. GOLDSMITH

1
2  sorry, just to complete my answer.
3       I do recall there was some
4  disagreement about what exactly would be
5  said with regard to the ERISA counsel's part
6  in this.  I had written a footnote saying I
7  think pretty candidly that the lodestar
8  reports of the ERISA counsel appear
9  unaffected.  I can recall receiving some
10 comments that tried to expand on that and,
11 you know, kind of distanced the ERISA
12 counsel from us, and there was some
13 massaging of that.
14   Q   Okay.  That's what I was about to
15 ask you, so thank you.
16   A   Sure.
17   Q   What was your objective in
18 drafting this letter?
19   A   The objective was to disclose
20 candidly and quickly to Judge Wolf that
21 there were inaccuracies in our papers and to
22 invite the court to make whatever orders or
23 directions he saw fit.
24       It was also to resolve any
25 potential ambiguity in how one would

37 (Pages 142 - 145)

Page 150

Page 151



Page 152

1           D. GOLDSMITH
2    an issue with you?
3        THE WITNESS:  No, sir.
4        JUDGE ROSEN:  That was your
5    discussion in the original draft that
6    was circulated, not somebody else's
7    suggestion to put that in?
8        THE WITNESS:  It was definitely
9    not the suggestion of another firm.
10   My recollection is that it was my
11   suggestion to make that presentation.
12   BY MR. SINNOTT:
13   Q   David, let me show you a couple
14   items that the firm has provided to us and
15   these are Bates numbers -- I am sorry, these
16   are from Thornton Law Firm, Thornton Law
17   Firm-SST-012243, 2244 and 2246.  And the
18   first item appears to be an e-mail from you
19   with the balance of the pages attached, the
20   letter attached.  But in the cover e-mail
21   you say:  "Attached please find a draft
22   letter setting out our plan with regard to
23   the November 10th letter we filed with the
24   court and future distribution of fees and
25   expenses.  Please let us know if you have

Page 153

1           D. GOLDSMITH
2    any comments or concerns.  We would like to
3    circulate a final version and collect
4    signatures.  This is dated Monday,
5    November 21, 2016, so 11 days after your
6    letter to the court went out.
7        And then looking at the letter
8    which appears to be the final version or at
9    least it has a subsequent date of
10   November 21st, it's a letter to all counsel
11   including ERISA counsel.  And in that
12   letter, you reference the inquiry from the
13   Boston Globe and your letter to the court.
14       And then you indicate that in
15   that, near the bottom of that first page of
16   the letter:  "Because the fee was determined
17   based on the percentage-of-fund method, and
18   the overstatement of the lodestar resulted
19   only in a modest increase in the multiplier
20   cross-check, we argued that the fee was
21   fully supportable on the court's stated
22   rationale and that no changes were required.
23       "Further, the letter offered our
24   apology for the errors, and indicated that
25   we were available to respond it any

39 (Pages 150 - 153)

Page 154

1         D. GOLDSMITH
2 questions or concerns the court may have."
3         You then indicated that, "The fee
4 order and the court's order and final
5 judgment became final on December 2nd, and
6 the settlement will become effective shortly
7 thereafter on December 7, 2016.  Because
8 there were no objections to the settlement
9 or requested fees, no class member has
10 standing to appeal the fee order or
11 judgment."
12         You indicate that the court had
13 not acted on the letter and if it did not by
14 December 7th:  "We will begin the process of
15 withdrawing the approved fees, expenses and
16 service awards from the lead counsel escrow
17 account for prompt distribution to your
18 firms."
19         And then in the next paragraph
20 you indicate:  "It is possible, however,
21 that the court will respond adversely to the
22 letter and ultimately reduce the fee award.
23 This could occur after the fees, expenses
24 and service awards have been distributed to
25 your respective firms and to the other ERISA

Page 155

1         D. GOLDSMITH
2 counsel."
3         And then most importantly, in the
4 next to the last paragraph you say:
5 "Accordingly, before we distribute your
6 shares of the fees, expenses and service
7 awards, we will require an undertaking,
8 evidenced by your signature below,
9 concerning your agreement to refund to us
10 within five business days for redeposit into
11 the lead counsel escrow account, your pro
12 rata share of any court-ordered reduction of
13 fees, expenses and/or service awards."
14         What prompted this letter and in
15 your own words can you tell us what the
16 significance of this letter is?
17     A    So this is a letter that I wrote
18 basically at Larry Sucharow's direction.
19 There came a point in time after we sent the
20 November 10th letter where we thought it was
21 possible that we would be able legitimately
22 to take down our court awarded fees and
23 expenses and to distribute them among
24 co-counsel, so to get paid in the case.
25         But we recognize that this letter



Page 158

1          D. GOLDSMITH
2     to deal with the issue at hand.  But
3     also to distribute the fees and
4     expenses pursuant to the settlement
5     agreement.
6          JUDGE ROSEN:  But that doesn't
7     really answer the question I asked
8     which was:  Was it fair to -- the
9     ERISA folks, as near as we can tell,
10    had nothing to do with this.  They
11    didn't have this cost-sharing
12    agreement.  They weren't allocated
13    staff attorneys.  They weren't part of
14    your fee petition.
15         Was it fair to ask the ERISA
16    attorneys to share on a pro rata basis
17    any court ordered reduction of fees,
18    expenses or service awards?
19         THE WITNESS:  I mean, all I
20    can say about that was we wanted to
21    protect ourselves to the extent
22    possible.  We didn't know what Judge
23    Wolf would do with our letter.  We
24    didn't know exactly what had happened
25    at that point.  And we thought that

Page 159

1          D. GOLDSMITH
2     the best way to deal with this would
3     be to gather signatures from
4     everybody, even if perhaps they
5     apparently weren't involved in the
6     double counting, that if there was a
7     reduction that applied to them, that
8     they would return the money.
9          So if I understand Your Honor's
10    question, I suppose that if there
11    were, if there was a determination
12    that expressly applied only to some
13    firms, then I guess this letter would
14    bring up some questions about how that
15    would be handled.
16         JUDGE ROSEN:  You got some
17    push-back from the ERISA firms on
18    that?
19         THE WITNESS:  The only
20    push-back we got was from Brian
21    McTigue.  We got a lot of push-back
22    from Brian McTigue.  We didn't get any
23    push-back to my recollection from Lynn
24    Sarko or Carl Kravitz.
25 BY MR. SINNOTT:

Page 160

1          D. GOLDSMITH
2     Q   Did they sign off on the letter?
3     A   Ultimately, everyone signed off
4  on the letter.  But we basically to my
5  recollection, we got everybody's signature
6  within a couple days.  Then we had to wait
7  weeks to get Brian McTigue's signature.
8          JUDGE ROSEN:  It sort of
9     became a non-issue, right, because as
10    I -- was there ever an allocation of
11    distribution of the fees and expenses?
12         THE WITNESS:  Yes.  I mean the
13    counsel received their -- counsel
14    received their fees and their expenses
15    in this case consistent with our
16    internal fee division agreements.
17         JUDGE ROSEN:  But was this
18    agreement itself ever implemented?
19         THE WITNESS:  No, sir.
20         JUDGE ROSEN:  I misstated it,
21    but that is what I meant.
22 BY MR. SINNOTT:
23    Q   Were you aware during your
24 association with Garrett on this case that
25 for at least a portion of the time he was of

Page 161

