# EX. 63

1

2    JAMS, Inc.

3    Reference No. 1345000011

4    -----------------------------------x

5    In Re State Street Attorneys Fees

6    -----------------------------------x

7                    June 5, 2017

8                    9:16 a.m.

9

10   BEFORE:

11   Special Master Hon. Gerald Rosen, United

12   States District Court, Retired

13

14             Deposition of EVAN HOFFMAN,

15   taken by Counsel to the Special Master,

16   held at JAMS, Inc., 620 Eighth Avenue, New

17   York, New York, before Jineen Pavesi, a

18   Registered Professional Reporter,

19   Registered Merit Reporter, Certified

20   Realtime Reporter and Notary Public of the

21   State of New York.

22

23

24

25      Job No. CS2629858



Page 22

1        HOFFMAN
2  potentially tens or even hundreds of
3  thousands of dollars on a single trade as
4  a result of State Street sort of either
5  waiting to see what the market did or
6  adding sort of an undisclosed markup to
7  the trade.
8        Again, basis points seem like
9  small numbers, but when they are applied
10  to trades of hundreds of thousands and in
11  some cases million dollar trades, they can
12  add up, and because these are public
13  pension funds and private pension funds,
14  it is a lot of money that can be lost.
15        JUDGE ROSEN:  And in your view,
16  plaintiff's view, was that process
17  immediately transparent to customers?
18        THE WITNESS:  No.
19  BY MR. SINNOTT:
20  Q.    What was the total amount of
21  damages that was alleged or found out
22  during the course of the litigation?
23  A.    Well, I think each side had a
24  different view and it was a sticing point
25  of mediation.

Page 23

1        HOFFMAN
2        It all depended on what the
3  markup was in relation to what the initial
4  trade should have been and so the only way
5  to get that information, and what we
6  eventually obtained in discovery, informal
7  discovery, was taking the volume of all of
8  the trades and multiplying it by whatever
9  spread the parties could try and agree on
10  was the actual markup.
11        And that gave you --  and it
12  had to be for a certain number of years
13  because not all the clients were part of
14  the ten-year class period necessarily.
15        It is in the hundreds of
16  millions of dollars, I think plaintiff
17  reasonably believed it was probably close
18  to a billion, State Street believed, I
19  don't know, I think they said something
20  like 50 million, and that was part of the
21  negotiation process, was trying to find a
22  number.
23  Q     So pretty wide range there, 50
24  million to a billion or more?
25  A.    Yes.

Page 24

1        HOFFMAN

Page 25

1        HOFFMAN

Page 30



Page 32

```
 1              HOFFMAN
 2 this case for a class on its own without
 3 assistance of other large law firms?
 4         THE WITNESS:  That's probably a
 5 better question to ask of Mike Thornton,
 6 but probably not, I think our model was,
 7 because it had been successful in the
 8 past, in Mellon and other cases that we've
 9 done, I think the model was for everyone
10 to get together and work together.
11         JUDGE ROSEN:  Here I'm talking
12 about not simply financial resources and
13 the risks associated with putting out
14 up-front all of the financial resources,
15 but attorney resources, this was going to
16 be a very large undertaking obviously, did
17 Thornton have the ability to staff a case
18 like this on its own?
19         THE WITNESS:  Probably not.
20 BY MR. SINNOTT:
21     Q.     So partnering was essential in
22 this case, is that correct?
23     A.     Yes.
24     Q.     Did that partnering extend
25 beyond Labaton and Lieff to other firms?
```

Page 31

```
 1              HOFFMAN
 2         JUDGE ROSEN:  And if the class
 3 couldn't be certified, if the court
 4 ultimately ruled that the class was not
 5 certifiable under Rule 23, what would have
 6 been the ramifications of that for not
 7 just putative class members, but for the
 8 law firms that were undertaking this?
 9         THE WITNESS:  We would have
10 spent with, again, the experts alone, the
11 consulting firms, tens of thousands of
12 dollars each time to do this stuff and
13 lots of attorney time.
14         The ramifications would have
15 been we would have spent all of this
16 money, everyone would have spent money and
17 obviously the class wouldn't have been
18 able to recover because there would be no
19 class and, you know, it may not have been
20 a successful result.
21         JUDGE ROSEN:  As I understand
22 from your testimony so far in the previous
23 interview we've done, Thornton was sort of
24 first in on this.
25         Could Thornton have litigated
```

Page 33



```
18     A.     Generally, yes.
```



Page 54

1        HOFFMAN
2

Page 56

Page 55

Page 57

1            HOFFMAN
2  Firm?
3      A.    Nothing.
4      Q.    You weren't part of that
5  discussion?
6      A.    No.
7      Q.    The cost-sharing agreement that
8  we spoke about a few minutes ago, when did
9  you first learn that Thornton would pay
10  costs in this case?
11      A.    I can't give you an exact date;
12  at some point when I was put in charge of
13  sort of intaking the hours, and at one
14  point I received a set of hours or I was
15  told that you're going to be the guy who
16  the people are going to send your hours
17  to, is when I think someone probably told
18  me this is sort of the arrangement.
19            JUDGE ROSEN:  At the very
20  beginning of the arrangement with Labaton
21  and Lieff to utilize their staff attorneys
22  and to then pay them for that, were you
23  involved in that decision and in any
24  negotiations that ensued out of that in
25  the allocation of the Labaton and Lieff

Page 58

1         HOFFMAN
2 staff attorneys to Thornton?
3         THE WITNESS:  No, nothing.
4         JUDGE ROSEN:  Was Mike Lesser?
5         THE WITNESS:  Probably not,
6 Garrett Bradley and Mike Thornton.
7 BY MR. SINNOTT:
8    Q.    What was your understanding,
9 counsel, as far as the rates that would be
10 billed for the staff attorneys that were
11 shared?
12    A.    My understanding was that for
13 attorneys who Thornton was financially
14 responsible for, they would be included on
15 whatever the ultimate fee petition that
16 Thornton would submit.
17         JUDGE ROSEN:  At what rate, did
18 you have an understanding of the rates?
19         THE WITNESS:  At the beginning,
20 no.
21         JUDGE ROSEN:  For these staff
22 attorneys?
23         THE WITNESS:  At the beginning,
24 no.
25         JUDGE ROSEN:  Later?

Page 59

1         HOFFMAN
2         THE WITNESS:  Yes.
3         JUDGE ROSEN:  And what was the
4 range?
5         THE WITNESS:  It was suggested
6 by Dan Chiplock of Lieff and Mike Rogers
7 of Labaton, that we should use for
8 purposes of fee petition rates that had
9 been approved by Judge Kaplan in the
10 Mellon case for the reviewers, which was
11 $425 an hour and that was what was put in
12 on Thornton's end.
13    Q.    Is that what the other firms
14 put in?
15    A.    Well, I subsequently have come
16 to learn that it was not, but as far as we
17 knew at the time, that's what everyone was
18 going to be putting in.
19         JUDGE ROSEN:  And did you know
20 what rate Thornton was actually being
21 charged by Labaton and Lieff for the staff
22 attorneys?
23         THE WITNESS:  What rates?
24         JUDGE ROSEN:  What hourly rate?
25         THE WITNESS:  Not necessarily.

Page 60



Page 61

1         HOFFMAN
2         THE WITNESS:  No, sorry, there
3 were two third-party contracting staffing
4 agencies.
5         JUDGE ROSEN:  And how many of
6 those, how many of the staff attorneys
7 that were allocated to Thornton were
8 subject to this contractual arrangement?
9         THE WITNESS:  I think three and
10 for a time four.
11         There was one staffing agency
12 called Hire Counsel and one staffing
13 agency was called Special Counsel.
14         JUDGE ROSEN:  Hire as in
15 H-I-R-E or H-I-G-H-E-R?
16         THE WITNESS:  H-I-R-E.
17         JUDGE ROSEN:  Were there also
18 staff attorneys from Lieff that were
19 allocated to Thornton that actually worked
20 for directly Lieff?
21         THE WITNESS:  Yes, there was a
22 brief period of time when the relationship
23 in terms of sharing staff attorneys first
24 started that I believe the two members,
25 two attorneys at Lieff were sort of, yes,

16 (Pages 58 - 61)

HOFFMAN

1
2 directly reporting their hours to Lieff,
3 who would then submit a bill to us.
4       That didn't go on for maybe
5 more than a month or two.
6       JUDGE ROSEN:  With respect to
7 what we'll call the contract attorneys,
8 Thornton was paying Hire and the other one
9 directly on invoice basis?
10      THE WITNESS:  Yes.
11      JUDGE ROSEN:  Do you remember
12 what the hourly rates were for those?
13      THE WITNESS:  I want to say
14 somewhere between 50 and 80 an hour.
15      JUDGE ROSEN:  Were those
16 attorneys also billed at $425 an hour in
17 the fee petition?
18      THE WITNESS:  For Thornton they
19 were, yes.
20 BY MR. SINNOTT:
21   Q.    With respect to Labaton, how
22 were their attorneys assigned to Thornton
23 Law Firm?
24   A.    I don't know.
25   Q.    You weren't part of that?

HOFFMAN

1
2   A.    No, I received an e-mail one
3 day that said these are your people and I
4 made sure to just know who they were and
5 that when it ultimately came time to
6 prepare the hours, to seek the information
7 from those people.
8       JUDGE ROSEN:  I'm curious,
9 Mr. Hoffman, did you ever actually
10 physically work with these attorneys,
11 either the contract attorneys or the
12 allocated attorneys from Lieff and
13 Labaton, physically work with them, meet
14 them, get to know them, talk to them?
15      THE WITNESS:  No.
16      I never met them, to my
17 knowledge; it is possible I did in one of
18 our meetings at Labaton, I just can't
19 remember.
20      There would be maybe a few
21 times I would respond by e-mail to a
22 question, but, no, my understanding is
23 that because they were housed at Lieff and
24 Labaton, that there were respective people
25 there who were in charge of coordinating

HOFFMAN

1
2 what it is they were doing on a daily
3 basis because they were physically there,
4 it would have been a lot easier.
5       JUDGE ROSEN:  Exactly my next
6 question; were you involved in supervising
7 and directing the substantive work of
8 these attorneys?
9       THE WITNESS:  No.
10      With the exception of when the
11 sort of topic-specific memoranda targeted
12 sort of search review project came along,
13 that was really an effort of Mike Lesser,
14 members from the other firms, too, Dan
15 Chiplock and Mike Roger from Labaton and
16 to a lesser degree myself, had input into
17 sort of writing these memos of specific
18 topics we wanted addressed.
19      So with that exception, no, I
20 would not have really a supervisory
21 capacity.
22 BY MR. SINNOTT:
23   Q.    Aside from yourself, counsel,
24 did Thornton Law Firm have any input in
25 selecting who these staff attorneys were?

HOFFMAN

1
2   A.    No.
3   Q.    Did it have any input in the
4 numbers of ratio from one firm to the
5 next?
6   A.    No, although I do know that
7 there was an agreement as to how many we
8 would have, but I was not involved in
9 that.
10  Q.    Do you recall when it was that
11 you and Mike Lesser participated in this
12 process, the memoranda with respect to key
13 topics and things of that nature?
14  A.    I want to say spring of 2015,
15 that's as close as I can get, I can't give
16 you an exact date.
17  Q.    Who made the final decision on
18 what the topics would be?
19  A.    It would primarily have been
20 Mike Lesser because he had just such a
21 body of knowledge at this point.
22      But it would have been
23 discussed between Mike Rogers, Mike
24 Lesser, Dan Chiplock over at Lieff, to a
25 lesser degree maybe David Goldsmith at

17 (Pages 62 - 65)



Page 68

1          HOFFMAN
2

Page 69

1          HOFFMAN
2    A.    Yes, generally we would just
3  get the memo which would address whether
4  or not they were able to find something
5  supportive of what it was we asked them to
6  do
7    Q.    Would it be fair to say your
8  contact with these staff attorneys was
9  providing some general memoranda and
10 information to guide their searches and on
11 some rare occasions responding to requests
12 for information from them?
13   A.    From Thornton's role, yes,
14 that's fair.
15   Q.    Did you have any supervisory
16 responsibilities over the staff attorneys,
17 that you can recall?
18   A.    No, other than for the staff
19 attorneys who were contracted out through
20 the third-party staff agencies, I along
21 with my office manager would have to
22 approve their timesheets at the end of
23 every week, so take a look at their hours
24 and approve it, I think that happened
25 every Friday.

18 (Pages 66 - 69)

Page 70

```
 1              HOFFMAN
 2      In that sense I suppose, yes.
 3      JUDGE ROSEN:  What were you
 4 looking for when you reviewed their hours?
 5      THE WITNESS:  Well, seeing that
 6 the hours were done, how many hours; that
 7 was about it, making sure that --  yeah.
 8      JUDGE ROSEN:  How could you
 9 tell, though, that the work was actually
10 performed if you weren't day-to-day
11 supervising them?
12      THE WITNESS:  I guess there is
13 no way I could, but because they were
14 being physically housed, it wasn't like
15 they were, you know, at an off-site
16 warehouse.
17      I knew they were literally in
18 the building with people at Lieff and
19 Labaton who were in charge of making sure
20 that the work was getting done.
21      JUDGE ROSEN:  The time entries
22 for some of the staff attorneys are pretty
23 cryptic, document review, that sort of
24 thing.
25      Was that your memory of, when
```



Veritext Legal Solutions

800-567-8658                                        973-410-4040



Page 79

    1           HOFFMAN
    2   e-mailed him, he seemed like he knew what
    3   he was doing and was told to me by Mike
    4   Rogers at Labaton that this is the guy to
    5   cc and be involved with, for lack of a
    6   better term, on sort of the lower level
    7   requests.
    8       Q.    In the weeds?
    9       A.    In the weeds, that's a nicer
   10   way to say it, yes.
   11       Q.    Obviously you received training
   12   and were using the Catalyst.
   13           Did you ever use a database
   14   called Relativity?
   15       A.    Relativity was a database used
   16   in Mellon, yes.
   17       Q.    So you were familiar with that?
   18       A.    Yes.
   19       Q.    But that wasn't used in this
   20   particular case?
   21       A.    That's correct.
   22       Q.    At least not by the three law
   23   firms?
   24       A.    Right, not that I know of, no.
   25       Q.    You mentioned earlier that you

21 (Pages 78 - 81)



Page 90

Page 92

Page 91

Page 93

```
1           HOFFMAN
2     Q.    Let me ask you this then.
3           In other cases, to your
4  knowledge --
5           JUDGE ROSEN:  One more
6  question, I'm sorry.
7           Off the record.
8           (Discussion off the record.)
9  BY MR. SINNOTT:
10    Q.    Let's move into the fee
11 declaration.
12          Could you describe what your
13 role was in that process.
14    A.    So we received from Labaton,
15 from a partner there named Nicole Zeiss, a
16 sort of model fee declaration that was
17 sent around in advance of submitting the
18 total fee declaration and it had a bunch
19 of text in it and it was like those
20 fill-in-the-blank, whatever that game is,
21 but it was sort of put your information
22 here.
23          JUDGE ROSEN:  Not Hang Man.
24          THE WITNESS:  Not Hang Man, no.
25    A.    Put your information here, so
```

24 (Pages 90 - 93)



Page 94

1         HOFFMAN
2  there was a section on fill in what your
3  hours are, fill in what your expenses are,
4  fill in what your lodestar is, fill in
5  what your specific contributions were to
6  the case, and the rest of the language was
7  sort of, it was called a model fee
8  declaration.
9         And so that's what we did, he
10 put in all the hours that we had kept
11 track of, I along with our accounting
12 department and Anasthasia put in the
13 expenses and then mostly Mike Lesser and
14 then Garrett Bradley, Mike Thornton and
15 myself all reviewed the sort of narrative
16 about the firm's contribution, which I
17 believe mostly Mike Lesser drafted.
18         And then it was sent back to
19 Labaton for their review and maybe an edit
20 or two and that was the last we saw of it
21 until it was submitted on ECF for the
22 final, when it was actually given to the
23 judge.
24         JUDGE ROSEN:  You never saw
25 Labaton's fees or Lieff's fees in the

Page 95

1         HOFFMAN
2  declaration?
3         THE WITNESS:  Correct.
4         JUDGE ROSEN:  In the actual fee
5  declaration, did you ever see their fees?
6         THE WITNESS:  No, not until it
7  was already filed.
8         JUDGE ROSEN:  Not until it was
9  filed?
10        THE WITNESS:  Correct.
11        JUDGE ROSEN:  Did you in any
12 way attempt to edit or change the
13 narrative in the fee declaration?
14        THE WITNESS:  So let me just be
15 clear.
16        The document that I'm talking
17 about is the sort of, whatever it is, I'm
18 talking about the affidavit, so, yes,
19 there was a spot where we were instructed
20 to add what our firm-specific
21 contributions would have been, because it
22 was a fee declaration on behalf of our
23 firm.
24        As to the overall package of
25 whatever the declaration, maybe it was

Page 96

Page 97

Veritext Legal Solutions



Page 102

```
 1          HOFFMAN
 2  what do you call it, fee applications and
 3  hours were for the other firms.
 4          But we worked with Labaton and
 5  Lieff as they were going through their own
 6  internal records and accounting department
 7  and billing stuff trying to figure out
 8  where the problem was and it was
 9  ultimately reported to us that Labaton
10  said there had been some sort of
11  miscommunication between their accounting
12  department and I think probably Nicole,
13  who was in charge of preparing the fee
14  petition, as to who was assigned to what
15  firm and we got a pretty similar
16  explanation from Lieff too that there had
17  been mistakes in terms of people being
18  counted for whatever reason and it wasn't
19  noted that -- by either the reviewers or
20  people in charge of the reviewers, as to
21  who it was they were working for.
22          But it took a couple of days
23  for I think everyone to figure out what
24  happened.
25      Q.    Is this something that would
```

Veritext Legal Solutions

Page 106



Page 108

1            HOFFMAN
2 regular basis, I think usually at the end
3 of the week it would be a summary of his
4 daily breakdown of hours, sometimes it
5 would be every two weeks, but it would
6 include in that e-mail every day how many
7 hours he worked.
8            JUDGE ROSEN:  Was there a
9 narrative on each entry or was it just a
10 summary, on Tuesday I worked eight hours
11 and did document review?
12            THE WITNESS:  That was pretty
13 much what it was, yeah, I worked this many
14 hours doing document review.
15            JUDGE ROSEN:  But it wasn't
16 like the other staff attorneys were doing
17 day, time, specific task?
18            THE WITNESS:  I am not really
19 sure.
20            My recollection is most of the
21 staff attorneys had general narrative
22 about doing document review, however that
23 was phrased.
24            JUDGE ROSEN:  But they did
25 daily times, they kept daily times?

Page 107

1            HOFFMAN
2 this case.
3      A.     I was informed at some point
4 that he was being brought on to do some
5 document review for us on a contingency
6 basis and I think Garrett made the
7 introduction, it was either by phone or
8 e-mail or both.
9            We were introduced, I think he
10 was given a summary at some point of the
11 case that was either prepared by us or may
12 have been the version prepared by Labaton
13 or Lieff to give to their document
14 reviewers.
15            I know he was certainly given
16 the complaints, he was set up, we had to
17 put him in contact with Kirti at Lieff and
18 the Catalyst people to get him credentials
19 to work on the database so he could review
20 the documents.
21            I remember having a call with
22 him to sort of go over the general issues,
23 what it is we were looking for.
24            Then we established a procedure
25 where he would send me his hours on a

Page 109

1            HOFFMAN
2            THE WITNESS:  He kept daily
3 time, too; it would just be e-mailed to me
4 at the end of the week.
5            So instead of sending an e-mail
6 every single day, and that's how I would
7 get it from Special Counsel or Hire
8 Counsel, a weekly summary, but within that
9 weekly summary sent once a week would be a
10 breakdown of the hours worked on a daily
11 basis.
12            JUDGE ROSEN:  Did Michael break
13 down his on a daily basis?
14            THE WITNESS:  Yes, his hours
15 were broken down on a daily basis to the
16 exact minute.
17            And there would be, just to
18 head back, I remember a few occasions
19 where I had a conversation with him, he
20 would call and say, hey, one in particular
21 I remember, he was finding a lot of trade
22 tickets and was trying to figure out
23 whether that was something we were
24 interested in, so I remember having a
25 conversation with him.

28 (Pages 106 - 109)

Page 110

```
1            HOFFMAN
2        I think ultimately the answer
3  was no, because they were not actually
4  involved with standing instruction trades
5  and there was no real relevance.
6        And that's generally how the
7  relationship went.
8        Sometimes there were technical
9  problems; I remember one time his password
10 stopped working so we had to get him back
11 in contact with the Catalyst people and
12 reset his password and that's sort of how
13 it proceeded.
14       JUDGE ROSEN:  Did he receive
15 overview training?
16       THE WITNESS:  He must have
17 received the Catalyst training, yes.
18       JUDGE ROSEN:  I don't mean the
19 Catalyst training; I mean the overview of
20 the case, training and how to look for
21 documents?
22       THE WITNESS:  That's what I am
23 trying to remember; I know we certainly
24 sent him the complaint and I think we sent
25 him the materials that were provided to
```

Page 111

```
1            HOFFMAN
2  the other firm, I can't recall.
3  BY MR. SINNOTT:
4     Q.    Were you his supervisor or did
5  you oversee his work?
6     A.    I wouldn't say so, no; I sort
7  of collected his hours and would answer
8  any questions he had about either the
9  capabilities of the system or documents
10 that he was inquiring about their
11 relevance.
12       JUDGE ROSEN:  So when he would
13 find documents --  first of all, did he
14 find documents?
15       THE WITNESS:  Again, there were
16 times where there were questions that he
17 would ask about whether these were
18 relevant or not or he would send an e-mail
19 saying I am not really finding anything
20 good necessarily.
21       JUDGE ROSEN:  But did he find
22 documents, hot documents, cold documents,
23 warm documents?
24       THE WITNESS:  Again, to the
25 extent they would have been tagged within
```



29 (Pages 110 - 113)



Page 122

23

Page 124

Page 123

1        HOFFMAN
2

Page 125

1        HOFFMAN
2    Q.    When you gathered up your own
3  particular time and submitted it to
4  Labaton, had you kept your time
5  contemporaneously or did you just make it
6  up at the end of the process?
7    A.    No, I kept my time
8  contemporaneously.
9    Q.    And the time that you kept was
10  put down into various notes that we have
11  delivered to the special master and his
12  counsel?
13    A.    That's my understanding.
14    Q.    Quick question on Michael
15  Bradley; you indicated moments ago that he
16  worked on contingency, was your
17  understanding, right?
18    A.    That was my understanding, yes.
19    Q.    Did any of the other staff
20  attorneys work on contingency?
21    A.    I don't believe so.
22    Q.    Did that mean that if you guys
23  did not win this case, he would have
24  gotten zero for all his efforts?
25    A.    Yes.

32 (Pages 122 - 125)