# EX. 67

JAMS, INC. Volume: 1

Pages: 1-76

Ref. No. 1345000011 Exhibits: 0

---

In Re: STATE STREET ATTORNEYS FEES

---

Before: SPECIAL MASTER HONORABLE GERALD ROSEN, UNITED STATES DISTRICT COURT, RETIRED

Date: June 19, 2017

Time: 9:38-10:59 a.m.

Deposition of MICHAEL G. BRADLEY, taken by counsel to the Special Master held at JAMS, Inc., One Beacon Street, Boston, Massachusetts before Cynthia Stutz, CPR, Notary Public of the Commonwealth of Massachusetts.

Page 10

November 10th, 2016 letter from David Goldsmith, Esq. of Labaton Sucharow to the Court; (c), the accuracy and reliability of the representations made by the parties requesting service awards; (d), the reasonableness of the amounts of attorneys' fees, expenses and service awards previously ordered and whether any or all of them should be reduced; (e), whether any misconduct occurred in connection with such awards, and if so; (f), whether it should be sanctioned. So that is why we're here.

**DIRECT EXAMINATION**
**BY MR. SINNOTT:**

Q. Good morning, Mr. Bradley.
**A. Good morning.**
Q. Could we start off by --
**MR. FULLER:** Bill, can I just make one observation on the record?
**MR. SINOTT:** Absolutely.
**MR. FULLER:** On behalf of Mr. Bradley, since he's not a party. He's here to answer all questions. I just want to preserve all of his rights as a non-party and assert that he's not waiving any of them under the Court's order for any future orders the Court might issue or for any

Page 11

other reason. I just wanted to state that. Thank you.
**MR. SINOTT:** Thank you. That statement is reflected in the record.
Q. Mr. Bradley, could you tell us about your background, beginning with your education?
**A. So I graduated UMass Boston, then Suffolk Law School, graduated 2004, but walked in 2005. From there I worked for Norfolk County District Attorneys office for several years, two years roughly and change, and then after that time I worked from the Norfolk District Attorney's office, opened up my own practice for just a bit. And then I actually got a job with the Department of Work Force Development -- excuse me, Labor and Work Force Development, specifically the Underground Economy Task Force, which was situated within the Division of Industrial Accidents.**
Q. Was that a Commonwealth of Massachusetts entity?
**A. It was.**
Q. And how long did you work for the Underground Economy Task Force?
**A. I'd say approximately two years.**

Page 12

Q. And what year did that terminate or come to an end?
**A. So the DA's office was '5 to '7. That was about '8 to '10, maybe beginning --**
**MR. FULLER:** Are you saying 2005?
**A. Yeah, 2005 to 2007 was the District Attorney's office. And then early 2008, I would say, to late 2010 or very, very early 2011, at which time I went into back into the solo practice.**
Q. Okay.
**A. Until now.**
Q. And beginning in 2011 in solo practice and in your previous tenure in solo practice, can you tell us about your practice areas and the type of work that you have performed?
**A. For the vast majority of the work I do is criminal defense work. I do private work, obviously. I'm also a member of the Norfolk County Bar Advocate Program, which if you're familiar with, I can expand on that, if you like.**
Q. Yes.
**A. So the Norfolk County Bar Advocate Program is a program where it's under the Committee of Public Counsel Services where private practitioners**

Page 13

**like myself participate in bar advocate work. That work is capped at $53 an hour. So that, in conjunction with other work, private clients, along with some limited personal injury work, some limited labor employment work, depending on, you know, what the case may be.**
Q. And the personal injury work that you do, is that on a contingent basis, a flat fee, or an hourly rate?
**A. A contingent basis.**
Q. And the labor work that you do?
**A. That is also on a contingent basis. The labor work I have done is primarily within the Mass. Commission Against Discrimination, so it's contingent.**
Q. And could you tell us what the arrangements are, typically, in your personal injury and labor work as far as how your fee is determined on a contingent basis?
**A. It's roughly one-third of the total expected to recover judgment, minus any fees or costs associated with it. And, you know, that's essentially it.**
Q. And is that regardless of whether a case

goes to trial or not?
A. **That is. If there's any judgment or any recovery, excuse me, any recovery or settlement, it's one-third of the total.**
**THE SPECIAL MASTER:** Michael, let me ask you. You said that it's a third minus any costs or expenses?
**THE WITNESS:** Right.
**THE SPECIAL MASTER:** Aren't the costs or expenses taken off the top, and then you get a third of the actual award?
**THE WITNESS:** That's accurate, Judge. That is actually the way it would be calculated. Thank you.
Q. And, Michael, what's the largest fee prior to the State Street case that you have received during your legal career?
A. **I think the largest fee I charged for one client was $10,000 on one case.**
Q. And what case was that?
A. **The case was an OUI, multiple. If I could just --**
**MR. FULLER:** Just for the record, client confidentiality concerns under Rule 1.6,

Bill, you notice in our production we redacted the names of clients. He hasn't undertaken to track down all his clients to get permission. I assume that's okay. He doesn't have to name the clients.
**MR. SINNOTT:** No, I'm not looking for the names of the clients. I'm just looking for the description of the case and the fees.
A. **The case, that one, I believe, was an OUI, third and subsequent.**
Q. What year was that?
A. **Let me see. That was roughly 2012, 2013. I don't -- I'd have to look it up.**
**MR. FULLER:** Just do your best.
A. **Roughly 2012 to '13.**
Q. And was that case part of your Norfolk Bar Advocate work, or was that a privately acquired and retained case?
A. **That was a private case.**
Q. And besides that 2012 multiple OUI case, what was the, another large judgment or fee that you received?
A. **Some of the other fees range from $5,000 to $7,500, depending on the case and the nature of the case. Some of the cases, again, are OUI-related**

**cases. Some of them are domestic violence cases.**
**THE SPECIAL MASTER:** Were these flat fees or hourly?
**THE WITNESS:** Those are flat fees, Judge, yes.
**THE SPECIAL MASTER:** Flat fees.
Q. Michael, aside from your bar advocate/CPCS work, is any of your criminal work on an hourly basis?
A. **There's really not for the flat rate case -- With criminal defense work, no. I do have a limited number of cases that -- I'm trying to figure. I know I did one in April that's related to a criminal case, but it was a civil motion to seal.**
**MR. FULLER:** Can you be clear about what year you're talking about?
A. **So April of this year. It's related to a criminal case, but it was motion to seal the criminal record, so technically, a civil matter.**
Q. And did you an hourly in that case?
A. **I did.**
Q. And what was your hourly rate in that case?
A. **$500 an hour.**

Q. And did you receive $500 for each hour you worked?
A. **I did.**
Q. What was the total number of hours in that, if you recall?
A. **Just a little over three hours. I charged $1,500 even.**
Q. Now, notwithstanding the $500 per hour, was there an agreement with the client as to a cap or a limit on the total amount of the fee?
A. **There was an estimate. I estimated that it would be roughly three hours and I told him I'd try any best to stick with it, and ended up doing so.**
Q. Okay. Now, in any of your other private cases as part of your engagement agreement with your clients have you provided an hourly rate notwithstanding a flat fee being ultimately arrived at?
A. **So some, there are some probate cases that I've worked on in the past. I would say some in 2011 to '12 range that I charged $250 an hour. Beyond that, there was a case from, I believe, '12 to '13, 2012 to 2013 that I charged $450 an hour.**

Page 18

Q. Okay. And that was the one probate case that you have referred to previously?
**A. That's correct.**
Q. Was that a will contest?
**A. That was a will contest, oral contract to make a will.**
Q. Okay. And in that case where you charged $450 in the probate case how many total hours did you work on that case?
**A. So I received approximately $87,000 total, so I could break it down.**
**MR. FULLER:** So he asked you how many hours you worked, if you can.
**A. I can just break it down. 87,000 minus 450. I don't have to do the math on it.**
**MR. FULLER:** I don't think he wants you to do the math. It's not a math test.
Q. A total of $87,000 in that case?
**A. Yes.**
Q. And have you had other cases, Michael, where, for whatever reason, notwithstanding a flat fee being negotiated with a client, that you ended up seeking an hourly rate?
**A. I did some work for probate clients referred through the Thornton Law Firm on, they were voluntary petition for administration cases. They were flat at $300 an hour, excuse me $300 per the case. The voluntary petition is about 45 to an hour of work. It's a two-page document.**
**THE SPECIAL MASTER:** Michael, can I go back to the probate case that you did?
**THE WITNESS:** Sure.
**THE SPECIAL MASTER:** '12 and '13 at $450 an hour, $87,000. Was all of that based on your hourly rate or was some portion of it a flat fee?
**THE WITNESS:** It was all based on the hourly rate, Judge.
**THE SPECIAL MASTER:** Okay.
Q. And in addition to the petition that you were just describing, were there other criminal cases or probate cases where, notwithstanding an agreement as to a flat fee, where you ended up charging an hourly fee?
**A. There's very few hourly cases, but I can tell you I did a divorce, I would say in the same time frame, 2011 to 2012, at $250 an hourly rate and I think one other probate case at $250 an hour. Most of them are flat rate.**

Page 20

Q. What year was that flat rate that you described?
**A. I would say it's in that range, 2011 to 2012.**
Q. Have you had any cases where, for whatever reason, you and a client had a falling out or there was an agreement that you would not take the case to resolution and you ended up either seeking an hourly rate or a client suggesting an hourly rate?
**A. No.**
Q. So let me talk about the Norfolk Bar Advocate work you indicate that it was capped at $53 an hour. Could you explain that?
**A. So the Norfolk Bar Advocate work is, again, you can obtain $53 an hour as of, I want to say this fiscal year as of July. Prior to that it was $50 an hour. So you're able to charge for the hours actually worked for various amounts of cases, you know. You take a duty day or an assignment day in court. You pick up whatever cases that are on that day and you stay until the end and you bill the court for whatever cases or work completed.**
Q. Is this in district court or superior court?
**A. District court.**
Q. And describe, if you would, the range of the types of cases that you might do as part of your bar advocate work.
**A. I'd say the range of cases comes from minor infractions, such as driving without a license, driving with a suspended license, to serious felonies, including assault and battery, dangerous weapon, deadly weapon, things of that nature.**
Q. Okay. And is there a cap as to how much you can bill for a particular day or week or month?
**A. On any particular day you can not bill over eight hours a day on that. On the cap annually, I believe, prior to the July 1 increase was $82,500 total. I believe it's now $87,500 total annually.**
Q. All right. Have you ever, prior to the State Street case, worked in the area of securities fraud?
**A. No.**
Q. Have you ever worked on any foreign exchange cases?

Page 22

**A. No.**
Q. And the Underground Economy Task Force that you described, was that to investigate financial fraud?
**A. Amongst other things.**
Q. Describe what you were involved in in the Underground Economy Task Force.
**A. So the Underground Economy Task Force was created by the Governor's Patrick's office at the time designed to create a interagency cooperation with other state agencies to locate the underground economy or the black market economy. People in this economy don't pay taxes. They don't pay -- They don't pay unemployment benefits. They don't pay insurance benefits. They seek to improperly pay their workers, whether it's under the table or not paying them fair wages. The purpose is to classify them as independent contractors, for example, so that they don't have to pay them benefits and things of that nature.**
**When they do that, I would say the, you know, the good actors or the good businesses that really make it impossible for them to compete, because they're not paying their fair share of the**

Page 23

**work.**
Q. And were you an investigator or were you a litigator or a combination of those? What was your role with respect to the Underground Economy Task Force?
**A. I was the executive director, and that meant that I was responsible to coordinate the interagency effort and to report results annually.**
Q. And did you personally do any investigation?
**A. To describe it, the investigative work was done together. I would say any work was done by a particular agency, but with cooperation from other agencies. To be specific, we sat in a room like this once a week with all the agencies that were involved. We got complaints from people, from consumers, from businesses, from tip lines. We tried to figure out what agency had the best authority to act under a given, a particular set of circumstances. And then we collaboratively determined what course of action should be taken.**
**So I did not specifically investigate any cases, but I did get to participate with other agencies that did.**

Page 24

Page 25

Q. Okay.
**MR. FULLER:** When you're talking about a database, are you talking about a document review platform?
**MR. SINNOTT:** I am, yeah.
Q. So is it fair to say that State Street was your first contact with an electronic platform or database?
**A. That's fair to say.**
Q. Now, since the State Street case --
**THE SPECIAL MASTER:** Let me just tie up a loose end here. On the task force, you were the executive director?
**THE WITNESS:** That's correct.
**THE SPECIAL MASTER:** Did the task force issue some sort of a report?
**THE WITNESS:** It did -- Not to cut you off, Judge.
**THE SPECIAL MASTER:** No. Recommending legislation, executive action? What was the work product?
**THE WITNESS:** It delivered an annual report, which was required. The annual report did make, not only highlighted what we were able to

recover collectively as a group, but it also recommended changes in future goals, I would say. I'm not sure legislation is in there, Judge, but goals for the future. One of the goals personally was to create legislation that gives more authority to act.

**THE SPECIAL MASTER:** And you say it highlighted the recoveries?

**THE WITNESS:** In the first year I believe approximately $4 million was recovered throughout all agencies that were involved.

Q. Okay. Let me move forward, Mike, to the State Street case. When was the first discussion of your participating in that case with the Thornton law firm?

**A. So I received a call from Garrett Bradley, approximately mid to late February 2013. During that time -- You want the substance of that conversation?**

Q. Please.

**A. So during that conversation he indicated that based on my background and experience, he felt it something that I would be suited for. At that time we discussed the State Street case.**

Q. And Garrett is your brother?

**A. That's correct.**

Q. And what's Garrett's position with the Thornton Law Firm?

**A. He's a partner.**

**case against State Street, that the case required the review of thousands upon thousands of documents, and that based on my background, specifically that in the District Attorney's office and the Underground Economy Task Force, that I would be suited for the document review process.**

Q. And what was it about your prior experience that would make you suitable for this process?

**A. Well, I think that most of the criminal cases, not only from the prosecution side, but also from the investigative side from the Underground Economy Task Force, that it's fraud detection and impropriety by employers and I'd say unfair labor practices is something that I felt I was suited for, to do it.**

Q. And did you and Garrett discuss during this mid February 2013 initial discussion the terms or rate of payment for you?

**A. So at the initial conversation he explained to me that the case would be a contingent based case, meaning I would never recover unless they recovered. He asked me what I felt was a fair rate, and I asked him for a $500 an hour rate, that**

**I specified that I'd recently gotten as much as $450 an hour in the preceding year up front. I did ask him that, again, based on the fact that I knew that I could potentially work on this for a long time and receive nothing.**

Q. And what did Garrett tell you with respect to the case that you would be investigating?

**A. He told me, I would say, the highlights of the case, but he did refer me to Attorney Mike Lesser to go over the details.**

**THE SPECIAL MASTER:** You were not affiliated in any way at this time with Thornton?

**THE WITNESS:** Not at this time, not ever. I'm just someone who does work occasionally. In the past, I mean, I've referred a case and received a referral fee for it.

**THE SPECIAL MASTER:** I was going to ask you, is this the first time you had worked on a Thornton case, actually worked on, as opposed to just referred?

**THE WITNESS:** I would say that's accurate, Judge.

Q. Was the $500 per hour rate agreed upon during this conversation with you and Garrett or was

Page 30

it up in the air?
**A. It was agreed upon. I asked for the rate and he said it was reasonable. He agreed it was reasonable, I should say.**
Q. And this was, as you said, in mid February of 2013. When did you actually begin working on the case?
**A. I'd say mid March of the same year.**
Q. And when you began in March of the same year what type of work were you doing?
**A. The work was document review specifically within the Catalyst database.**
Q. All right. Let me show you something, Mike, and it was provided by the Thornton Law Firm, and for the record the Bates stamp number is TLF-SST-012554.
(Document handed to the witness.)
Q. If I could ask you to take a look at that. And as you can see, reading from the bottom, there's an e-mail, those last three lines there that says on January 8th, 2015 at 9:55 p.m. Garrett Bradley wrote: What rate are we using for my brother's time in SST? And what do you understand SST to be?
**A. State Street. It's an abbreviation I**

Page 31

Page 32

Page 33

Page 34

**log in, how to navigate the database, how to find specific, I would say, beginning number of documents and then within that, there was a subset of documents that I was to begin with and then go from there.**

Q. Okay. And were you comfortable with the database?

A. **After talking with him on phone I was comfortable with it. It was fairly easy to navigate.**

Q. All right. And tell us about what that database allowed you to do with respect to the documents.

A. **So the document itself, just as previously mentioned, you'd log in, you'd go to a specific section, and then within that section there was a subset of thousands of documents. So I started with document to document appear on the screen, and on the right side of the screen was the code information. You know, you'd read the document and then code it for whatever you felt was appropriate.**

Q. And what was the coding information that you referred to? What did that consist of?

A. **So just to be clear, it's been roughly two**

Page 35

Page 36

Page 37

Page 38

Page 40

Page 39

attorney's notes column or something?

**THE WITNESS:** There was. If you wanted to make a notation on the right-hand side under, say if it was a FX trade, you could make a notation under there if you wanted to and then save it and the note would have been saved.

**THE SPECIAL MASTER:** Okay. Did you make notes on documents?

**THE WITNESS:** I believe I did. I just, you know, it's tough for me to remember which document or what note I made. I'm hoping that you have the information from the Catalyst database to confirm.

**THE SPECIAL MASTER:** Were you asked to call out any particularly relevant documents and bring them to Mr. Hoffman's attention, Mr. Lesser's attention?

**THE WITNESS:** It wasn't to their attention. If you felt that you had a hot document, there was a section Hot Document, you could check that.

**THE SPECIAL MASTER:** That's what I was getting at earlier when I didn't want to suggest to you, but when I was asking you about categories

Page 41

Page 46

Attorney Hoffman.
**THE SPECIAL MASTER:** You never saw a binder?
**THE WITNESS:** I didn't get a binder, Judge, no.
Q. Mike, you said a minute ago that there was also, in addition to the Hot Doc and other relevancy standards, that there was an adverse standard. Did you flag anything or identify anything as being adverse to the case?
**A. I didn't see anything that I recall that was adverse to the complaint.**
Q. What would be adverse to the complaint?
**A. I would say accurate and complete information about what the trade was and how much money they paid for it, I guess you would say, or what the exact rate was. I never saw any exact rate information. All I saw was the low rate of the day, the high rate of the day and the mid range. And those documents were few and far between, as well.**
Q. And were you ever assigned, beyond your document review functions, with research or drafting of legal memoranda?
**A. No.**

Page 47

Q. And were you ever brought into the process of by Thornton Law of strategizing in this case as far as legal steps to be taken?
**A. I was not.**
Q. Were you aware of any of the weaknesses or potential problems with the plaintiff's case?
**A. I was not.**
Q. So your function was strictly as a document reviewer?
**A. That's correct.**
**THE SPECIAL MASTER:** I want to go back. You said there was a column for attorney notes when you would find a relevant document.
**THE WITNESS:** There was a section at the bottom of the right-hand column and it was just a box. It was a text box and you could make comments in that box and it would have been attached to the document itself.
**THE SPECIAL MASTER:** So did you do that? Did you make comments? Did you call out relevant documents and talk about why they were relevant?
**THE WITNESS:** I made some comments, but not a lot. And trying to remember, I think the

Page 48

only ones I made comments on, again, were where I found rate information or the low to mid to high rate of the day. I felt it was directly relevant to the complaints and I think I said something to the effect of, Relevant to complaint. It was a short sentence or phrase.
Q. So you commenced your work in the spring of 2013, correct?
**A. That's right.**
Q. And when did you complete your document review work?
**A. I was notified about June of 2015 to stop, stop doing doc review.**
Q. So a little bit over two years?
**A. That's right.**
Q. How many cases or documents -- Strike that.
How many documents did you flag, if you can estimate, over the course of those two plus years as being highly relevant?
**A. I didn't find a lot of highly relevant documents. It's tough to put a number on it, being so far away. So I would say a handful of highly relevant documents that I clicked Hot Doc on.**

Page 49

Q. How many documents would you estimate you reviewed during the course of those two plus years?
**A. It's impossible to tell. There was a lot. Almost impossible. I didn't keep a running tally, so I don't have an estimate for you.**
Q. And who was supervising your work?
**A. I was told that the work would be largely independent and that if I had questions or concerns, to consult with Attorney Evan Hoffman, which I did.**
Q. And on how many occasions did you consult with Evan?
**A. I'd say approximately six, seven occasions I e-mailed him with questions or concerns about the database or the Catalyst database itself. And he responded fairly promptly with, you know, with a response, with a solution.**
**To give you an example, one of the documents kept coming up in native format. Couldn't figure out how to see it. I believe I said something to the effect of, What do you wanted me to do with this thing? Do you want me to check it reviewed? I believe he called me and said there was a tab on the screen to convert the document so I could actually view it and clearly, just move on.**

Q. Aside from problems with the database or the platform such as the formatting issue that you just described, on how many occasions did you and Evan talk about a substantive issue that had come to your attention in the documents?
**A. I don't think I talked to him a lot about that at all. I just coded the documents and kept moving through them.**
Q. And beyond coding the documents, I believe earlier you mentioned that the platform allowed for you to do attorney's notes, is that correct?
**A. Yes.**
Q. And what does that mean?
**A. I could put some notations on a particular document if I felt the need to.**
Q. Okay. And what types of things were you encouraged to put on the documents?
**A. I wasn't encouraged specifically to put anything. If you felt the need to make some notes to specify what you were talking about.**
Q. And did you do that on any documents?
**A. I did on some documents, but not a lot.**
Q. Can you estimate on how many you made an attorney's note?

**A. It's, it's so long ago, it's very difficult for me to estimate. I would say not a lot.**
Q. When you say not a lot, a handful?
**A. I'd say a handful.**
Q. And did you ever receive any feedback on that handful of documents that you'd made an attorney's note on?
**A. I did not.**
Q. And did anyone ever contact you from within the firm or from outside of the firm with a question on anything that you had submitted?
**A. No.**
Q. Mike, tell us, what was your schedule in document review?
**A. So what I tried to do is hit a certain amount weekly. For me I tried to hit ten or more hours weekly. It didn't turn out like that. Some days I was able to do some document review, which was a couple hours, some days none at all.**
Q. On an average week -- I understand that this fluctuated, but on an average week did you in fact do ten hours a week?
**A. No. Some weeks I didn't hit the ten at**

**all. And other weeks I hit it or exceeded it slightly.**
Q. And what time of day would you typically work on the State Street case?
**A. So my specific memory is that I used to do whatever I was doing in the morning, then come back in the afternoon or evening when I was in my office and I would work on the State Street documents.**
Q. All right. So you did it from your office?
**A. That's right.**
Q. Not from Thornton Law spaces?
**A. No.**
Q. And is it fair to say that you did the document review around your private practice?
**A. Yes, that's fair to say.**
Q. When you had available time?
**A. Yes.**
Q. Were you ever involved in discussions with Evan or Mike Lesser or Garrett or Mike Thornton about the mediation that was going on in 2015?
**A. I wasn't involved in it. I did question periodically how's it going or something to that effect of what's going on with State Street, just to**



Page 54

the work product of other Thornton attorneys?
A. **I did not.**
Q. Did you ever see work product of any Labaton or Lieff Cabraser attorneys?
A. **No.**
Q. After your --
**MR. FULLER:** Bill, I'm sorry. Can you clarify what you mean by work product?
**MR. SINOTT:** Document review.
**MR. FULLER:** Documents that had been tagged by another --
**MR. SINOTT:** Yes.
**THE SPECIAL MASTER:** Or memos.
**MR. FULLER:** Okay.
A. **Not to both.**
Q. Okay. And after your initial training on Catalyst and on coding in the spring of 2013, over the next two plus years did you ever receive any updates or direction on specific things that you should be looking for?
A. **No, I did not.**
Q. So the only information you received as to what you should be looking for was at its inception?
A. **That's correct.**

Page 55

Q. And did you ever have any communication with attorneys from Labaton or Lieff Cabraser?
A. **No.**
Q. Did you ever speak with ERISA counsel?
A. **No.**
Q. Were you aware of ERISA counsel being involved in the case?
A. **Only because there was a category for it on the document review.**
Q. Okay. But you didn't have any contact with any of those attorneys?
A. **No.**
Q. And how did you record your time spent reviewing?
A. **I took handwritten notes on a piece of paper, similar to this. I put the date on the left side and I put the start date and the finish date. I tried to be as accurate as possible.**
**I feel it's important to say that I made a real effort to do only the time that I actually spent reviewing documents, because as stated, I was in my office. If I began the document review and a client came in to speak with me, I would stop the document review and I tried to log it**

Page 56

Page 57

Page 70

potentially proceeding, he asked me what information that I would like to give, and I basically gave my background and history to them.

**THE SPECIAL MASTER:** Did you give that to the journalist, as well, Estes?

**THE WITNESS:** No. I knew that they were in contact with Miss Estes and if they wanted it, they could make it available.

Q. When you and Garrett first discussed this case, Mike, was there any discussion either in your prompting or at Garrett's about doing document review, but not doing it on a contingent basis?

**A. No. He was very, very clear that this had to be done on a contingent basis and that was the only avenue.**

Q. And have you been paid anything on this case to date?

**A. I did. I got paid the total of, I believe, $204,000, roughly.**

Q. And when did you receive that payment or payments?

**A. I received that, I think, the last week of December 2016.**

**THE SPECIAL MASTER:** The 204,000,

Page 71

does that represent the $500 an hour?

**THE WITNESS:** Yes, it does.

**THE SPECIAL MASTER:** And how many hours, if you can do the math?

**THE WITNESS:** I believe it was about 406 hours, roughly.

Q. Mike, in that case where you billed $450 per hour and I believe you described it as a probate case involving a will, how did you get that client or how was that client referred to you?

**A. The client contacted me directly, explained the nature of the case, basically, explained that he had become a party to the case. He was the administrator of the estate and could no longer, obviously, represent himself and needed counsel.**

Q. Okay. And at what point did you agree upon the $450?

**A. It's in the first or second conversation, which took place, I want to say, roughly mid summer 2011. I don't know exactly. I have to look. But I believe I started work on that case in the mid to the end of the summer of 2011.**

Q. And that was memorialized in a fee letter?

Page 72

Page 73