# EX. 79

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Case No. 11-cv-10230 MLW

- - - - - - - - - - - - - - - - - - - - -x

ARKANSAS TEACHER RETIREMENT SYSTEM, et al.,

Plaintiffs,

-against-

STATE STREET BANK AND TRUST COMPANY,

Defendant.

- - - - - - - - - - - - - - - - - - - - -x

JAMS
Reference No. 1345000011

- - - - - - - - - - - - - - - - - - - - -x

In Re: STATE STREET ATTORNEYS' FEES

- - - - - - - - - - - - - - - - - - - - -x

June 14, 2017
2:05 p.m.

B e f o r e :

SPECIAL MASTER HON. GERALD ROSEN
United States District Court (Retired)

Deposition of NICOLE ZEISS, taken by Counsel to the Special Master, held at the offices of JAMS, 620 Eighth Avenue, New York, New York, before Helen Mitchell, a Registered Professional Reporter and Notary Public.

Page 10

Zeiss

and some labor law.

What I really wanted to do was public interest work, and I left Gaynor & Bass I think in about '98 or '99, and went to MFY Legal Services, also here in the city, where I represented mentally ill clients in a broad scope of civil litigation matters, trusts and estates, housing, benefits; anything that came up for them. They just -- to qualify for my services, they just needed to have a mental illness and be poor.

And I left there right after September 11th to become an associate at Labaton, which at the time was called Goodkind Labaton Rudolph & Sucharow.

Q And tell us what you've done at Labaton since joining in 2001.

A So I was, I don't know, a litigation associate in the securities practice when I joined, so worked on -- I think at the start I worked mainly on one of our bigger cases at the time, against Bristol-Myers Squibb, so just litigating securities fraud cases. And then, in about 2008, maybe 2009, the firm made a

Page 11

Zeiss

decision to have somebody focus on documenting and negotiating the firm's settlements, so I became the settlement counsel. So I then took over all the securities/class action settlements.

So prior to that, the litigation team, when their case settled they would handle the settlement. Other firms had, you know, a team that would specialize in the settlements, and eventually Labaton decided to use that model.

Q That's your full-time position, is the settlement counsel?

A Yes. So I stopped litigating the merits of the cases and switched to settlements in about 2008.

Q And you continue to do that?

A I continue to do that.

Q Was that your role in the State Street litigation?

A Yes, it was.

Q Could you tell us, in your capacity as settlement counsel, what your contributions were to the State Street case?

Page 12

Page 13

Zeiss

THE WITNESS: Yeah.

BY MR. SINNOTT:

Q Do you remember when that was, Nicole?

A Yes, I was on vacation --

Q So it stands out in your mind.

A -- it was July 2015.

Q Okay.

A So I got involved at the term sheet. We then -- so my role and my team -- I'm the head of a team, and I have an associate and a paralegal. So we drafted the -- and the term sheet took quite a while. So while we were doing that, we were also working on the settlement agreement, and drafting the exhibits for the settlement agreement, so the preliminary approval order, the judgment, the long form notice, the summary notice. Here there was no claim form, so we didn't have to do that. There was a lot of attention to the plan of allocation, I was involved in that.

So negotiating -- you know, first making sure internally, you know, we had what we wanted, and then negotiating with Wilmer

Page 14

Page 15

Zeiss

It might have been David Goldsmith. Maybe I did a draft and then he -- he continued with it.

So, I mean, my typical role would be to do the preliminary approval motion, get the submission to the court, and then there's a preliminary approval hearing usually, sometimes there isn't, work with the administrator to get the notice out the door, and then --

JUDGE ROSEN: Were you involved in the selection of the claims administrator?

THE WITNESS: Yes. I think we -- I think we all knew we wanted to use AB Data. It wasn't a big, drawn-out process.

A Then you switch gears to, you know, reacting to any objections that come in, and preparing the final approval motion and the fee motion, and submitting that.

So I -- here, the Lieff firm had the laboring oar on the approval brief. I did -- and then Labaton was tasked with what we call the big declaration in support of approval

Page 16

Zeiss

and fees, which is Larry's kind of omnibus declaration that has all the exhibits attached to it. And Labaton also did the fee brief, but I did, you know, the first draft, the framework of Larry's big dec, and then David took it over, and --

JUDGE ROSEN: David Goldsmith?

THE WITNESS: David Goldsmith.

A And I -- I also -- so as part of the big dec, some of the exhibits are what I call -- what we call -- the small fee declarations, so the individual firm fee and expense declarations. So I drafted the model for that, and circulated it to everybody, and worked with them on completing that. And got all that filed September 15th. And then there was the argument.

David Goldsmith did the argument -- sometimes I do it, but here, you know, it was his -- his case, and...

Q Were you present for it?

A Yes.

So I think that summarizes my involvement in this case, and then typically the

Page 17



Page 18

Page 20

Zeiss

had he heard about it separately?

MR. STOCKER: Sorry, Your Honor, what is "it"?

JUDGE ROSEN: It is the possibility of a double counting.

THE WITNESS: Oh, it was -- my impression was that it was definitely the first time that he -- he heard that there were potentially the same timekeepers on two lodestar reports with potentially overlapping time.

JUDGE ROSEN: I just want to go back.

So you prepared the fee petitions and the decs -- I mean, the drafts anyway --

THE WITNESS: I prepared the template.

JUDGE ROSEN: The template, yes.

THE WITNESS: And Labaton's individual firm dec, yeah.

JUDGE ROSEN: And then you reviewed them, did you review all of

Page 19

Page 21

Zeiss

the firm's -- did you review all of the firms' fee petitions?

THE WITNESS: So I sent out the template to all the firms, and asked them to complete the templates and send me drafts.

Eventually everybody sent me a draft back, and I -- in general I reviewed each of them. There was kind of a -- each one had an individual, more detail than usual, narrative of what each firm's role was, which we wanted here because there were so many different firms in different roles.

So I reviewed that, and asked David, I believe -- Goldsmith -- to make sure that comported with his recollection of what everybody did.

I reviewed the lodestar exhibits for form, to make sure everybody was reporting --

JUDGE ROSEN: The lodestar exhibits, you're referring to the actual listing of hours and --

Page 22

Zeiss

THE WITNESS: Yes.

JUDGE ROSEN: -- rates?

THE WITNESS: Yeah, I think they're -- it's Exhibit A, I think, to each declaration.

JUDGE ROSEN: Yes.

THE WITNESS: It's a table listing all the timekeepers, their rates, their lodestar.

So the first thing was to get everybody on the same page to make sure they're actually giving -- reporting all -- reporting all the information we needed.

So sometimes firms forget to put in hourly rates, sometimes the formatting is, you know, off, and hard for somebody to follow.

So reviewing for form to make sure all the information was actually there, that's really all I can do because I don't have people's time records. It's not the practice to exchange time records, but, you know,

Page 23

Zeiss

sometimes if there's a timekeeper that says, you know, .2 hours, we just have sort of a practice where we like to cut that, so I might ask, you know, "Can you just report timekeepers with five hours?"

So that's pretty much what I do on the lodestar tables.

JUDGE ROSEN: On the lodestar, you got the lodestar fees from all of the firms --

THE WITNESS: Yes.

JUDGE ROSEN: -- and did you review those -- you said, for form?

THE WITNESS: Yeah.

JUDGE ROSEN: Okay.

Were you surprised to see a lodestar fee from Thornton?

THE WITNESS: No.

JUDGE ROSEN: Did you look at the names of the people who were listed on the Thornton?

THE WITNESS: I don't think so. I mean, I'm sure I read them, but...

Page 24

Zeiss

JUDGE ROSEN: None of those rang a bell that these were -- some of them, anyway -- were staff attorneys employed by Labaton?

THE WITNESS: No. Unfortunately, no.

JUDGE ROSEN: And you didn't know anything -- at the time you were doing this, you didn't know anything about an allocation agreement -- I use the word "agreement" advisedly, but some allocation arrangement whereby Thornton would be putting in time in its fee petition for staff attorneys who were actually working for Labaton?

You didn't know anything about that at the time?

THE WITNESS: No, I didn't know anything about that.

And from my perspective -- you know, the lodestar reports are reports of each firm's personnel based on their own time records. I mean, it would never occur to me that one firm could

Page 25

Zeiss

be reporting personnel from Labaton. Like, I -- I wouldn't -- I wouldn't think to look for it.

BY MR. SINNOTT:

Q Was anyone from Labaton that was involved on the operational side of things, particularly the use of the staff attorneys for document review, communicating with you about the hours that were being presented?

A I'm not -- I'm sorry, could you restate it?

Q Who did you talk to with respect to the hours, if anyone?

A For the Labaton lodestar?

Q Yes.

A Howard Goldberg, who is in our accounting department.

So he sends me Labaton's time entries in Excel, and I review them -- you know, I take out people with less than five hours, I review them to see if there's anything that, you know, we should cut, anybody sticks out, you know, like this has been misapplied to State Street, somebody who has a typo with a client

Zeiss

matter number, this person didn't work on the case, they should be cut.

So he gives me the data for our time, and then, you know, I make my cuts, and then he prepares the actual table, our final table.

Q And did Howard say anything to you about Thornton law firm cost sharing agreement with Labaton?

A No. No, he didn't.

Q Did anyone else, David or anyone --

A No.

Q -- tell you that there were attorneys -- there were Labaton attorneys that were designated as Thornton staff attorneys?

A No.

Q In addition to Howard and David, who else did you speak to with respect to the compilation of hours?

A I don't think anybody.

Q And do you still have the original spreadsheet of Labaton that you used in putting this together?

Page 42

Zeiss

No. I mean, to the extent there was feedback, I would say people want -- you know, in the description of what each firm did, you know, like, Thornton wanted to make sure we were okay with the description. It was their language, so it's not really that they were giving me feedback.

Q Okay.

A Feedback...

(Pause)

A No. I mean, people just did it, filled it in, sent it in.

Q And specifically on that term, "reasonable rates charged" --

A Yeah.

Q -- no one provided any feedback or pushback on that?

A No, I don't recall that. No.

JUDGE ROSEN: Some of the firms did have different language.

THE WITNESS: Some of the firms did change the language. But we didn't talk about it.

JUDGE ROSEN: You didn't talk

Page 43

Zeiss

about it?

THE WITNESS: No. I felt like each --

JUDGE ROSEN: Did you notice it?

THE WITNESS: I can't -- I noticed it after the fact. I can't remember if I noticed it in September, I probably did, but to me, each firm -- it's their firm dec. If they -- everybody has their own kind of standard language, and if that's what they wanted to do, then...

JUDGE ROSEN: And where did the language that you used in the forms that you sent out, where did it first come from, if you know, if you remember?

THE WITNESS: That's in my model.

JUDGE ROSEN: That's in your model, I know --

THE WITNESS: No, no, it's in the model on the system that I use to

Page 44

Zeiss

do these templates.

JUDGE ROSEN: But what I meant was where did it originally come from, if you know.

THE WITNESS: I don't know. Somewhere over the course of the last eight years.

JUDGE ROSEN: Do you think you originated the language, or did it come from another fee petition that Labaton had been using before you were involved? Or do you know?

THE WITNESS: Probably the latter, because I've definitely seen it in other firms' fee petitions. Totally unrelated to...

JUDGE ROSEN: Maybe we should quote the language exactly, just so the record's clear. I think we all know what it says, but just have Nicole identify the language, because Judge Wolf is obviously focused on it.

MR. SINNOTT: As are we.

JUDGE ROSEN: As are we.

Page 45

[redacted]

Page 62

Zeiss

Page 64

Page 63

Page 65

Zeiss

A Could be. I don't...

It sounds right. I don't really have them memorized.

Q Do you know, Nicole, whether the venue of where a particular action is filed dictates or affects the amount of the fee that the hourlies...

A The venue where we file does not change our -- the rates that we declare in the fee petition. It might change the -- you know, the argument in the fee motion about -- in the discussion about our rates being reasonable.

If -- if we know that the judge is very focused on -- you know, there's a judge in Washington, and she only evaluates attorneys' rates based on Washington rates. So we know that she does that, and there would be, you know, some discussion about that, but we wouldn't change our rates. We would just explain them in that context and try to find -- see what we could determine about Washington rates.

Q So the firm does, it sounds like, make an effort to see what rates are being

Page 66

Zeiss

billed for comparable work in other jurisdictions?

A Definitely comparable work in the community. Not all judges are focused on location. Some are more focused on the community for the legal services. So I would -- what's the -- it's not location community, it's your -- you know, your counterparts doing the same kind of work that you do. They might acknowledge that a firm is nationwide, and so they're not going to have local jurisdiction rates. So it depends on the judge.

Q Would it be fair to say that in setting a fee, that you would not be looking to where a case has been filed? Is that correct? Or would you?

A I'm sorry, can you say it again?

Q Let me just look at this case here.

You applied a New York rate to the case -- or the firm's typical rate?

A Yes.

Q Was there any attempt made to

Page 67

Page 68

Zeiss

A Yes.

Q And you and David exchanged responses. If you could just take a look at that (handing).

(Pause)

A Yes.

Q Is it fair to say that you're assuming that M. Bradley is a staff attorney at Labaton?

MS. LUKEY: I think that may be David who is raising that as a possibility, rather than Nicole.

MR. SINNOTT: Okay.

Q Did you know who Michael Bradley was before this?

A No. That's why I said to David, "Do you have any idea what he's talking about?"

Yeah, so I did not know who Michael Bradley was.

Q And in fact, I've got Thornton Bates 012762, in which you sent a message to Garrett saying, "Who is your brother?"

Do you recall that?

Page 69

Zeiss

A Yeah.

Q In response to his question "How many hours did my brother put on" -- "put in on State Street, and how much was his rate?"

So I'll just (handing) show you that.

A Yeah, I remember that.

Q The final in that sequence, 05361 -- and this was provided by your firm -- there's a conversation in which -- in response to Garrett asking you, "How many hours did my brother put in on State Street, and how much was his rate," you contact David and you ask, "Do you have any idea what he is talking about?"

Did you realize that was really his brother, or did you think he was speaking in a lawyerly or figurative term?

A I was very confused. I'd --

JUDGE ROSEN: You'd never --

A I didn't know why he was asking me about his brother.

JUDGE ROSEN: You had never heard his name before?

THE WITNESS: No. Not before

Page 70

Zeiss

that.

Q So this was a news flash to you about his brother being -- billing?

A Yes, it was a news flash.

Q And just to kind of complete the circuit here, David responds to you several minutes later, "Garrett's lodestar report shows Michael Bradley did 406.4 hours at $500 per hour. I have a feeling he was one of the STAs here who was assigned to Thornton."

A Yeah.

Q And you respond, "Yeah, I just saw that and told him."

A Yeah, I think I looked at the Thornton dec, too.

(Mr. McTigue joins via telephone)

MR. SINNOTT: Hi, Brian.

MR. MCTIGUE: Hi.

MR. SINNOTT: Brian, we're close to finishing with Nicole Zeiss right now.

MR. MCTIGUE: Thank you.

MR. SINNOTT: Sure.

Page 71

Zeiss

(Special Master Rosen leaves the room.)

BY MR. SINNOTT:

Q These e-mails would seem to indicate that you had no idea who Michael Bradley was during the course of this case and during the preparation of fee petitions. Is that an accurate statement?

A That's correct.

Q Would his name and number of hours have appeared on the fee petition, to the best of your knowledge?

A Well, after getting that e-mail, I think Dave and I both did the same thing, we pulled out the dec and looked and saw his name.

I don't remember if it said Michael Bradley; it might have just said Bradley, and then M.

Q I hate to insult your intelligence by asking this yet again, but were you aware of an agreement that Thornton would pay Michael Bradley $500 an hour?

A No.

Page 72

Page 73

Page 78

Page 79

Zeiss

days of this case, the origination of the case --

A No.

Q -- or was your involvement strictly as settlement counsel?

A Strictly as settlement. So not until July 2015.

Q And you were never consulted during the mediation?

A I don't think so.

Q Do you sometimes receive updates on a case that looks like it may settle, get a head start?

A Yes, sometimes the team will think they're close -- mostly it's get a jump start on a term sheet.

Yeah, sometimes.

Q And typically in those cases who has the responsibility, if there is one, of notifying you that "This thing's heading for settlement, let me get you smart on this case"?

A It's usually the most senior partner, unless that partner is -- well, sometimes the senior partner's hands-off, and

Page 80

Zeiss

then it would be the junior partner.

Q Will the senior partner sometimes delegate --

A Sure.

Q -- that duty to a junior partner?

A Yeah.

Q And as far as the ERISA firms were concerned in this case, other than circulating the model fee petition and the response to -- the letter response to Judge Wolf on November 10th, did you have any other communication with them that you recall?

A My communications with them would have just been about the small fee decs. I was definitely cc'd -- you know, David was keeping them in the loop with respect to the motion papers and drafts.

Q Okay.

And you were never advised as to how staff attorneys were being assigned in this case, were you?

A I was not.

MR. SINNOTT: Anything else,

Page 81



Page 82

Page 84

Zeiss

A He was on his own.

Q Anything we haven't asked you or discussed that you think is important or we should hear about?

A No, I think you covered everything.

MR. SINNOTT: Joan, anything?

MS. LUKEY: Just a couple.

MR. STOCKER: I might have a couple, too. It might be the same couple.

MS. LUKEY: It might be.

EXAMINATION

BY MS. LUKEY:

Q Nicole, was it your usual practice to put the declarations side by side for -- the small decs -- side by side when you were preparing the fee petition, to compare the entries?

A No.

Q Could you explain, please, why it was not your usual practice to put the lodestar reports, as encompassed in small decs, side by side?

Page 83

Page 85

Zeiss

A Well, for my -- because I believe the lodestar reports are of each firm, of their own personnel based on their books and records, so I wouldn't anticipate that there could be any overlap. We're all going to have our own rates, so there's no need to compare that. So that's -- and I -- well -- yeah, that's why I wouldn't compare them side to side.

Q Did you consider it to be your role in a situation of this nature, where you're assembling the overall package, to challenge or question the rates or hours expended of other firms?

A No, I wouldn't consider that my role.

Q And why is that?

A It's -- well, I rely on them, it's a representation of their time keeping. I have no billing records to compare it to in order to challenge it. I know each firm has, you know, views on their own hourly rates. We wouldn't want a firm telling us we can't use our hourly rates, so I wouldn't presume to tell another firm.

Page 86

Zeiss

I think that's it.

Q Okay.

Given that you did not consider it your role to challenge the rates or hours expended by other firms in their preparation of fee petitions, and given that you had no knowledge of any allocation having been agreed to in this case, was there any reason for you to put fee petitions or small decs side by side and compare the entries?

A No, I don't think so.

Q Was there any respect in your handling of preparation of the fee petition materials in this case that you felt that you did not follow your regular and usual established practices?

A I don't remember the lead-in to the question.

No, I followed my standard practices.

MS. LUKEY: Anything further?

MR. STOCKER: I just have a couple quick ones.

Page 87

?

Page 88

Page 89