# EX. 80

**Chris Keller**

1

```
                                Volume:  1

                                Pages:   1-271



                        JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW
------------------------------------------------X


In Re:   STATE STREET ATTORNEYS FEES


------------------------------------------------X


BEFORE:  Special Master Honorable GERALD ROSEN,
         United States District Court, Retired




     DEPOSITION of CHRIS KELLER, taken before

Sadie L. Herbert, a RPR and Notary Public of

States of New York and New Jersey on October 13,

2017, from 10:20 a.m. to 4:03 p.m.
```

Page 18

[page redacted]

Page 19

[page redacted]

Page 20

[page redacted]

Page 21

1  Chris, but what was the -- the purpose of that
2  trip to Little Rock, were you by yourself, was
3  Eric with you --
4  A.  Oh, no, I wouldn't have been by myself,
5  Eric would have been with me, this was a very --
6  this was -- this was introductory.
7  Q.  Okay.
8  A.  We were -- we were just beginning, sort
9  of, what we would consider to be the education
10 process, so we would meet with people and we
11 would have to walk them through what we do, what
12 we do is --
13 Q.  And what was your objective, what were
14 you looking for in these introductions?
15 A.  I mean, ultimately, the ultimate goal
16 was we wanted to be able to get in front of the
17 right people to talk about our firm and our
18 business.
19    THE SPECIAL MASTER: And that would
20    include institutional --
21    THE WITNESS: Yeah, institutional
22    investors, sure.
23    BY MR. SINNOTT:
24 Q.  Okay.  And on this particular trip, you

Page 22

[redacted]

Page 23

[redacted]

Page 24

1  A.  No, it would have been -- it would have
2  been in -- in the spring, early spring is, I
3  think, how -- how it worked out, like in March
4  or April, as I recall.
5  Q.  And what was the event in -- did you
6  say Miami?
7  A.  Yes.
8  Q.  What was the event in Miami that
9  brought you and Mr. Chargois together?
10 A.  There was -- I don't know who came up
11 with the idea, either Eric or myself, to bring
12 together the people that we're working with,
13 mostly lawyers, but we -- we had extended
14 invitations to non-lawyers as well, and the
15 point was to just get people down there, in a
16 comfortable setting and -- and relax and -- and
17 have, you know, sort of a, for lack of a better
18 word, have a captive audience for a couple of
19 days, so we can talk about, not obsessively, but
20 talk about what we do.  Because what we do is --
21 takes -- takes a while for people to -- to
22 really sort of understand it to the point where
23 it can be useful to them.
24 Q.  Okay.

Page 25

[redacted]

Page 42

1 you typically meet him in the company of other
2 Labaton attorneys or by yourself?
3 A. I don't think I ever met with George by
4 myself, it was always in the company of other
5 lawyers.
6 Q. Okay. And do you remember who those
7 lawyers were?
8 A. If Eric was in town, it certainly would
9 have been Eric. It could have been with the
10 lawyers in the firm working on those cases,
11 whichever cases they were, probably John
12 Gardner, who was -- who was running, internally,
13 a bunch of cases that we had -- where Arkansas
14 was the lead plaintiff.
15 Q. Okay. And the significance of Arkansas
16 being lead plaintiff included, did it not, that
17 Damon Chargois would receive compensation of
18 some kind; correct?
19 A. We had an understanding with -- with
20 Damon's firm that they would receive a
21 percentage of the fee associated with our
22 representation of the Arkansas Teachers
23 Retirement System, yes, that's true, that's
24 correct.

Page 43

1 Q. How did that agreement come about,
2 Chris?
3 A. So, you know, just a little background,
4 because I think this could be helpful. So we
5 had a very, sort of, good, productive
6 relationship with the Thornton Law Firm and --
7 where, you know, we would -- we would jointly
8 get retained by, you know, funds in the
9 Northeast area, which was their sort of area
10 of -- they had lots of relationships within the
11 area. And we, you know, had an understanding
12 they would get, sort of, let's say, up to
13 20 percent. And the understanding was that, it
14 was going to be somewhat of a, I call it, a
15 turnkey, but I'm using a -- what I mean is we
16 didn't have to do any heavy lifting up in the --
17 up in the area, because there's a lot -- I mean,
18 we're a national firm. Think about this, so we
19 have over 200 pension fund clients, we may have
20 one within driving distance of our office, okay.
21 So we maintain a national practice and -- but
22 without offices all over the nation. So it's
23 very important, any time that we can leverage
24 others who -- who are ready and willing and able

Page 44

1 to do the heavy lifting locally, we're happy to
2 sort of let that happen, and, of course, pension
3 funds feel much more comfortable with people
4 they know or people who are close by or were
5 introduced through someone they know, so we made
6 that a -- a -- this is how Labaton was going to
7 build more business.
8 I think we -- my -- my -- what I
9 remember is Eric telling me, oh, this guy,
10 Damon, boy, he -- he knows everybody, between
11 him and Tim, they know everyone in Houston and
12 Arkansas, you know, so I had hopes that -- that
13 that could become another relationship like a
14 Thornton relationship. So I -- I was willing to
15 do the same sort of arrangement with Damon,
16 which I think was up to 20 percent on whatever
17 clients are -- are generated, with the
18 understanding that they would do all the heavy
19 lifting because --
20   THE SPECIAL MASTER: Heavy lifting
21 in the litigation side of it,
22 substantive litigation side or client
23 development side?
24   THE WITNESS: More on the client

Page 45

1 development side, but, you know, Damon
2 touted himself to be quite an effective
3 lawyer, trial lawyer and, you know,
4 indicated he's ready, willing and able
5 to do whatever we need him to do in
6 these cases and that's why he got
7 the -- what -- in -- you know, from
8 a -- from an economic perspective,
9 that's why he had a premium, up to
10 20 percent, because market, if there is
11 such a thing as a market for a referral
12 within our industry, it's more like 10
13 percent, maybe up to 15, but 20 implies
14 a very high expectation as to the
15 amount of involvement they're going to
16 have in interactions with the client,
17 from, you know, going to present,
18 right, a lot of times, you want a case
19 done, you have to fly in, you've got to
20 present to the board, you know, so all
21 of these things are very
22 time-consuming, you know, helping get
23 the documents together for production
24 when they're a plaintiff, in discovery,

Page 46

1 all sorts of things pop up from time to
2 time, could you imagine --
3 **THE SPECIAL MASTER:** So in what
4 you're describing, there's an overlap
5 between what would be traditional and,
6 I think, thought of as a local counsel
7 relationship, in which somebody like
8 Damon interfaces with the client
9 substantively, as well as on a
10 client-building relationship basis.
11 **THE WITNESS:** Yes.
12 **THE SPECIAL MASTER:** So --
13 **THE WITNESS:** That -- that was what
14 was envisioned.
15 **THE SPECIAL MASTER:** So you
16 envisioned Damon, initially, as being
17 not only a bird dog for clients --
18 **THE WITNESS:** Correct.
19 **THE SPECIAL MASTER:** -- but also
20 doing substantive local counsel work.
21 **THE WITNESS:** That's correct.
22 **BY MR. SINNOTT:**
23 Q. Is that what happened, in the course of
24 Damon's relationship with the firm?

Page 47



Page 48

Page 49

Page 66

1  close relationship. The -- the general
2  counsel in writing says, go work with
3  them, if you want to. You know, it
4  is -- this is an easy one, right. It's
5  an easy one. This isn't like, oh,
6  well, there's this person, he hasn't
7  been approved, but I want to work with
8  him and -- it doesn't make any sense to
9  anybody, to be honest with you. It
10 doesn't make sense to me.
11     **THE SPECIAL MASTER:** That -- what
12 doesn't make sense to you?
13     **THE WITNESS:** That -- that -- that
14 he wouldn't have come to -- that George
15 Hopkins would not have come to know
16 this information about -- of our
17 obligation that we had, even if it was
18 merely to complain, because the
19 obligation that we had, I was not happy
20 with it, personally.
21     **THE SPECIAL MASTER:** From the
22 beginning or as it developed?
23     **THE WITNESS:** No, not from the
24 beginning, from the beginning, I had,

Page 67

1  you know, very high hopes that it was
2  going to, you know, result in, you
3  know, many clients in that area of the
4  country and Damon and his firm were
5  going to be, you know, very much in the
6  way that the Thornton firm was, you
7  know, roll up his sleeves, get
8  involved, handle the clients, do all of
9  that and, you know, of course, you
10 know, I'm busy in -- in my role in the
11 firm and, you know, in getting new
12 matters investigated and off the
13 ground, so I didn't really have a
14 chance to feel my displeasure,
15 probably, until we had to write the
16 first check, and then -- well, but it
17 was very small, so my displeasure
18 was --
19     **THE SPECIAL MASTER:** Was small.
20     **THE WITNESS:** -- was small. But as
21 the checks grew -- or actually, as I
22 saw on the horizon, the potential for a
23 very large one and I -- you know, I got
24 very exasperated, internally and

Page 68

1  basically, this is completely and
2  utterly unfair this amount that we're
3  paying for him, because this is a rate
4  that would be paid for someone who's
5  doing a lot of work, including --
6     **THE SPECIAL MASTER:** A traditional
7  local counsel?
8     **THE WITNESS:** Yeah, someone who was
9  really involved.
10     **BY MR. SINNOTT:**
11 Q.  So, Chris, you were unhappy with this
12 deal?
13 A.  Yes.
14 Q.  You know George Hopkins?
15 A.  Yes.
16 Q.  You've worked with him, you know the
17 type of person he is.
18     Did you really think that George
19 Hopkins would be happy with a deal like this?
20 A.  I don't think George -- there's --
21 George is a very -- he's a very interesting guy.
22 There are certain things that one would expect
23 him to care about that he cares not a whit
24 about. And then there are things that one would

Page 69



Page 70



Page 71

1 **THE WITNESS:** I don't know what you
2 mean.
3 **THE SPECIAL MASTER:** All right.
4 Let me ask it more directly.
5 **THE WITNESS:** Okay.
6 **THE SPECIAL MASTER:** George is an
7 institutional client.
8 **THE WITNESS:** Correct.
9 **THE SPECIAL MASTER:** Not simply an
10 institutional client, but a public
11 institution, with, as we've discussed,
12 public obligations to oversight, to
13 government oversight, involved in very
14 large cases.  Wouldn't lead counsel in
15 these cases want the client to know
16 every aspect of the financial
17 relationships that are arising out of
18 the client relationship and isn't there
19 an obligation to tell the client?  I
20 mean, maybe the client says, you know
21 what, that's your business, but just
22 simply so that the firm is on record as
23 informing the client.
24 **THE WITNESS:** Yeah, I -- I'm not

Page 72

1 going to argue against, you know,
2 clients being made aware of, you know,
3 referral relationships.  I'm not going
4 to argue against that.
5 **MR. SINNOTT:** We're not asking you
6 to argue against that.
7 **THE SPECIAL MASTER:** We're not
8 arguing.
9 **BY MR. SINNOTT:**
10 Q.  We're asking you to embrace that
11 responsibility.
12    Are you willing to do that?
13 A.  I -- I think --
14    **MS. LUKEY:** Objection.
15 A.  I think the -- the rules, you have to
16 follow the applicable rules as they relate to
17 referral fees.  Whatever they are, they are.
18 Q.  But it's not just a rule, Chris, it's
19 the responsibility of -- as part of an
20 attorney-client relationship, isn't it?
21 A.  You know, I don't know.  You know, you
22 can envision scenarios where, you know, we had
23 maybe -- we -- let's say we resolved a -- a
24 departure of a lawyer, and he says, I'm going

Page 73





Page 77

1  these things, so...
2  Q.  And you have no affirmative evidence of
3  any kind that Eric, you, Larry Sucharow or
4  anyone else at the firm ever informed Mr. Doane
5  or Mr. Hopkins of this ongoing obligation to
6  Damon Chargois, do you?
7  A.  I cannot speak on behalf of anyone
8  other than myself.
9  Q.  So the answer is, no, I don't have any
10 evidence to that extent?
11 A.  I -- well, no, I -- yeah, I -- I -- I
12 didn't.  I didn't speak to him, you know, I
13 wasn't client-facing.  The client -- the client,
14 you know, development, is a very kind of a
15 siloed thing within the firm.  They -- they --
16 they operate, you know, a lot on the road,
17 amongst themselves, you know, I couldn't keep up
18 with it really if I tried, you know, so, no, I
19 didn't --
20    THE SPECIAL MASTER: I want to pick
21    up on this, because something
22    throughout the course of this case has
23    struck us and that is -- as different
24    and that is the very siloed, as you



Page 79

1   compartmentalized roles and we've seen
2   this reflected in a number of the
3   issues in this case, the double
4   counting, for example.
5   Do you think that is a good way to
6   run a law firm that has as -- as
7   prominent as Labaton is and in your
8   areas of practice is always in the hunt
9   in these enormously important and huge
10  cases for lead counsel, is that a good
11  way to run a law firm?
12  **MS. LUKEY:** Objection.
13  **THE WITNESS:** You could -- you
14  could -- you could be sitting around a
15  table in my executive committee
16  meetings and we'd be having these very
17  same -- same questions over the years,
18  which is, you know, an effort to
19  modernize, an effort to, you know, work
20  efficiently. One of the things about
21  our practice that is fairly unique,
22  although, nothing can be fairly unique,
23  right, it's either unique or it's not,
24  each -- each aspect of our practice

Page 94



Page 96

1  MS. LUKEY: Was that his? I'm
2  sorry.
3  A.  I -- I don't think I -- I don't think I
4  ever did that.
5  Q.  All right. Do you remember saying
6  words to the effect of that the Court doesn't
7  need to know about Chargois?
8  A.  No.
9  MS. LUKEY: Objection.
10 Q.  So your testimony is that you've never
11 had discussions with anyone at Labaton about
12 concealing or not disclosing the obligation to
13 Damon Chargois and his firm?
14 A.  That's correct.
15 Q.  And that includes ERISA?
16 A.  I never had any conversations regarding
17 disclosure of Damon's referral obligation with
18 anyone, period.
19 Q.  Okay. Let me just ask you to take a
20 look at the -- and I believe you both have a
21 copy of this, the amended responses to the
22 supplemental interrogatories.
23 MS. LUKEY: Is that in the stack,
24 Bill?

Page 95

1  Mr. Doane?
2  A.  No.
3  Q.  Did Eric ever ask you whether he should
4  inform Hopkins of the Chargois relationship?
5  A.  No.
6  Q.  Did anyone else at the firm ever
7  discuss either with you or that you were aware
8  of, whether Hopkins or his organization should
9  be informed of the Chargois relationship?
10 A.  Never came up.
11 Q.  Did anyone ever discuss with you
12 whether or not other entities, such as the ERISA
13 attorneys or the Court, should not be told about
14 the obligation to Damon Chargois?
15 A.  Not -- I mean, I -- I've seen some, you
16 know, documents and testimony on that issue, but
17 I was never involved in that aspect of the case.
18 Q.  So no one ever discussed that with you?
19 A.  No.
20 Q.  So when you -- and we'll get to that
21 email after we finish our overview, but when you
22 made a statement in an email that Chargois'
23 agreement should not be in the fee petition,
24 were you doing that on your own?

Page 97



Page 106

1 for which they are -- they do it
2 themselves.
3 **THE SPECIAL MASTER:** You don't have
4 to sign off on those?
5 **THE WITNESS:** That's correct.
6 And -- and, you know, so I would say
7 the majority of them cross my desk
8 and -- and flow through me.
9 **THE SPECIAL MASTER:** Certainly
10 State Street did?
11 **THE WITNESS:** At the outset, it
12 did, yes.
13 **BY MR. SINNOTT:**
14 Q. Did Garrett Bradley have a referring
15 relationship with Labaton?
16 A. No, I mean, I -- I never considered him
17 to be a referring lawyer.
18 Q. Looking at this --
19 **THE SPECIAL MASTER:** He didn't have
20 an agreement that -- I'm not talking
21 about State Street now, but Garrett
22 Bradley didn't have a referral
23 agreement, not necessarily like
24 Chargois', but a relationship in which

Page 107

1 he would get a percentage of cases?
2 **MS. LUKEY:** He personally?
3 **THE SPECIAL MASTER:** No.
4 **THE WITNESS:** No.
5 **THE SPECIAL MASTER:** With the law
6 firm, the law firm.
7 **THE WITNESS:** Thornton, we had a
8 relationship, they would get up to
9 20 percent, but I -- you know, I guess
10 I don't -- the -- the -- the monikers,
11 I don't know how much they really
12 matter. In my mind, I would have
13 called him something different, I would
14 have called him our local counsel.
15 **THE SPECIAL MASTER:** Garrett?
16 **THE WITNESS:** The Thornton firm,
17 because he was local to all the clients
18 and he acted in a very substantive
19 capacity in almost every case he was
20 involved in. So I wouldn't -- I could
21 have probably -- I could have probably,
22 I could have, in an email, called it a
23 referral fee we owed Thornton & Naumes,
24 but, you know, so we had a relationship

Page 108

1 with them where they would receive up
2 to 20 percent of a case in which their
3 client they introduced us to was in the
4 case and they would -- they would do
5 everything.
6 **BY MR. SINNOTT:**
7 Q. Did they typically enter an appearance
8 in those cases?
9 A. No.
10 Q. But notwithstanding the lack of an
11 appearance, you say that they would do
12 everything, what would they do?
13 A. Oh, everything from a client
14 perspective. They would update the clients,
15 they would sometimes present to the boards, you
16 know, when the boards wanted updates.
17 **THE SPECIAL MASTER:** So they would
18 liaise with the clients.
19 **THE WITNESS:** Yeah, in a heavy
20 capacity, they would do the
21 hand-holding on document production,
22 which is -- you know, that in and of
23 itself is -- you know, entitles them to
24 whatever they get, I mean, it's a

Page 109

1 tough --
2 **THE SPECIAL MASTER:** Yeah, but that
3 would be reflected on a time -- or
4 should be reflected on a time sheet,
5 which was then, at the end of the case,
6 filed with the Court in the form of a
7 lodestar petition, no?
8 **THE WITNESS:** We -- we -- we didn't
9 really --
10 **MS. GERBER:** Laura Gerber.
11 **MR. SINNOTT:** Hello, Laura.
12 **THE WITNESS:** We -- we weren't
13 seeking separate compensation for their
14 time, so we didn't submit it.
15 **BY MR. SINNOTT:**
16 Q. All right. And, Chris, looking at the
17 remaining cases on this list, Beckman Coulter,
18 Colonial BancGroup and In Re Capacitors
19 Antitrust Litigation, are you familiar with
20 Mr. Chargois' role in those cases?
21 A. All -- all but Capacitors.
22 Q. All right. Tell us about Beckman
23 Coulter, what was his role?
24 A. I think it would have been -- I mean,

Page 110



Page 111

1 Chargois had no relationship.
2  THE WITNESS: Oh, by that time,
3 yeah, sure, of course. But I'm saying,
4 in the beginning, you go to them
5 because they have that relationship.
6  BY MR. SINNOTT:
7 Q. All right. So you said you thought in
8 Colonial, he had a role, do you recall anything
9 in particular that -- that he did in that case?
10 A. No.
11 Q. Do you know if he entered an appearance
12 in that case?
13 A. No.
14 Q. And you say you're not familiar with
15 the In Re Capacitors case?
16 A. Correct.
17 Q. Okay. Is that an Arkansas case, to
18 your knowledge?
19 A. I don't know.
20 Q. So at some point, Chris, there was an
21 agreement to pay Mr. Chargois and/or his firm a
22 fee for every case in which Arkansas was lead
23 plaintiff; correct?
24 A. That is correct.

Page 112

1 Q. Who negotiated that agreement with
2 Mr. Chargois?
3 A. It was partially negotiated by myself
4 and, you know, as I -- as we had discussed
5 earlier, at some point, I'm sure I had a
6 discussion with Damon, Damon and Tim, maybe, I
7 don't remember, where we -- we agreed it would
8 be up to 20 percent and -- and, you know,
9 referenced, you know, how things were working at
10 the time with the Thornton firm and what we
11 expected and what we hoped for and that he was
12 getting the premium, you know, participation
13 for, you know, what was expected to be -- I
14 mean, you know, with all due respect to -- to
15 Arkansas and that area of the country, it's not
16 easy to get to, and, you know, you go in -- you
17 go in for a 15-minute meeting, it could take you
18 three days of travel, so they understood that
19 our expectation was that they were going to be
20 doing the hand-holding and I remember making
21 this very --
22  THE SPECIAL MASTER: I'm sorry,
23 they would be doing --
24  THE WITNESS: The hand-holding.

Page 113

1  THE SPECIAL MASTER: Hand-holding.
2 A. And I -- and I remember making that
3 very same presentation when we were talking
4 about why they would be getting the premium, the
5 most we've ever agreed to, up to 20 percent,
6 and -- because of that.
7 Q. Okay. So you recall a specific
8 conversation in which you told them that part of
9 the agreement was that they would be doing the
10 hand-holding or how did you describe that to
11 them?
12 A. I -- in -- basically in -- in
13 referencing the existing relationship with
14 the -- with the Thornton firm, that the Thornton
15 firm was, you know, close to them and would go
16 to meetings and, you know, would -- would get
17 documents signed, sometimes, you know, clients,
18 you know, let a document sit on the desk for
19 three or four days and you need that signed and
20 you don't want to hound them again, you know,
21 you'll -- you'll get your -- your local firm to
22 call up or walk over and get it done.
23  Do I remember where that happened, when
24 that happened, what day? No. But I do remember

Page 114

1  conveying that -- that notion because I wouldn't
2  have agreed to -- to up to 20 percent without
3  that, because I -- we don't agree to that in
4  other -- any other referral situation we may
5  have.
6  Q.  At what point did you stop requiring
7  that hand-holding on the part of Chargois and
8  his firm?
9  A.  Well, you know, again, this is -- once
10  we were retained, you know, I go back to my
11  knitting, I have not a lot to do with anything
12  until fees are coming in, so I'm not paying
13  attention to anything that's going on as it
14  relates to that client.  And as I testified
15  earlier, I came to know that they weren't
16  involved anymore in connection with an unrelated
17  conversation I was having probably with Eric
18  regarding, you know, maybe getting the Chargois
19  and his firm to do something in Arkansas and he
20  says, oh, well, George only deals with me, he
21  doesn't want to deal with -- with other people,
22  something like that, something to that effect.
23  Where I said, so -- I said, so they're out,
24  they're not doing anything.  He said, yeah, or

Page 116



Page 115



Page 117

1  the fees at the same time that the Chargois firm
2  would have interest in fees in the same matter,
3  did they know that, yes.
4  Q.  Well, let me ask you this, was there a
5  protocol that your referring attorney should not
6  be contacted by Thornton or by other firms, that
7  they had to go through you?
8  A.  No.  I mean, you know, referring
9  relationships, depending on who they are and who
10  the client is, can be very sensitive, you don't
11  want that information out there in the public
12  domain, because if it is, I can assure you that
13  our competitors would be calling them up and
14  taking them out to lunch next week.
15  Q.  But in this particular case, that was
16  not a concern?
17  A.  In Beckman?
18  Q.  No, in the Arkansas cases or in the
19  Colonial case, specifically?
20  A.  I -- I don't know if it was a concern
21  or not.
22  Q.  When the State Street case came around,
23  was it a concern?
24  A.  In other words, who -- who was -- I --

Page 202



Page 204

1 Q. And why is that?
2 A. Well, there's -- there's proprietary
3 sort of relationship information. Again, that's
4 one aspect.
5 Q. What is that -- what do you mean by
6 that?
7 A. If -- if we put his name on these
8 papers, that means our competitors know that
9 that firm has relationships with these clients
10 and that means they'll be calling them up trying
11 to poach them as local counsel.
12 Q. But what's to stop them from doing that
13 when anybody lists those clients?
14 A. If they're on there, you can. I -- I
15 think most firms leave those names off.
16 Q. Did Thornton Law Firm ask to be left
17 off or was this a decision by Labaton?
18 A. And we knew -- and we knew we weren't
19 submitting a fee affidavit, so we weren't
20 getting paid on their time, so we just didn't
21 have them on our papers.
22 Q. But Thornton Law Firm did receive money
23 for this case?
24 A. A payment for their service as local

Page 203

1 names and contact information, it's indicated
2 that Labaton and its attorneys are lead counsel
3 for the class and attorneys for Bristol County
4 Retirement System and Plymouth County Retirement
5 System.
6   Are those Massachusetts entities?
7 A. I -- I know Plymouth, I know Plymouth
8 is, I think Bristol is.
9 Q. Okay. Were these brought into the case
10 by Thornton Law Firm?
11 A. These would have been clients with
12 which the Thornton Law Firm was acting as the
13 new local counsel.
14 Q. And was Garrett Bradley Thornton's
15 person in the -- in the case, or do you recall?
16 A. Yeah, I mean -- we often work through
17 Garrett and if Garrett had an assistant, in
18 terms of getting -- communicating with the
19 client and producing documents, et cetera.
20 Q. All right. Can you tell me why Garrett
21 didn't enter an appearance in this case?
22 A. It was our practice, we did not have
23 Garrett's firm as a -- enter appearance in our
24 cases.

Page 205

1 counsel, yes.
2 Q. All right. Even though no one entered
3 an appearance?
4 A. That's correct.
5 Q. Don't you think that's incongruous that
6 an attorney or a firm is local counsel, but
7 doesn't enter an appearance?
8 A. I don't.
9 Q. You don't think that's a prerequisite
10 to status as local counsel?
11 A. No.
12   THE SPECIAL MASTER: There are two,
13   maybe, variations on local counsel, one
14   is a local counsel, and many courts
15   have local rules on this, which -- who
16   are required to file an appearance and
17   interface with the Court, if necessary.
18   And the other local counsel is local
19   counsel who is local to the client and
20   serves the client and does the
21   hand-holding you described.
22   THE WITNESS: That's correct.
23   THE SPECIAL MASTER: So which would
24   this be?

Page 206

1 THE WITNESS: This was the
2 hand-holding.
3 THE SPECIAL MASTER: Even though
4 they're billing hours?
5 THE WITNESS: They're not billing.
6 THE SPECIAL MASTER: Oh, I'm sorry,
7 I thought they were doing substantive
8 work and billing hours.
9 THE WITNESS: They're not billing.
10 They were doing substantive work,
11 though.
12 THE SPECIAL MASTER: So they're
13 doing substantive work on the case, but
14 not billing hours?
15 THE WITNESS: Correct.
16 BY MR. SINNOTT:
17 Q. How much money did the Thornton Law
18 Firm receive in the HCC case?
19 A. I don't know.
20 Q. Can I assume that a fee petition was
21 submitted in this case?
22 A. Sure.
23 Q. Was Thornton Law Firm and the amount
24 that was being paid to the firm and/or to

Page 207

1 Garrett Bradley referenced in that fee petition?
2 A. We -- we never paid money to Garrett
3 Bradley directly, we paid money only to
4 Thornton.
5 We would not have included any
6 description of our obligations to the Thornton
7 firm in our fee applications.
8 Q. Even though you considered them to be
9 local counsel and they did substantive work in
10 the case?
11 A. Well, it -- you -- without splitting
12 hairs on names, okay, they were not local
13 counsel to the Court. This is an instance where
14 they were local counsel to the client. So you
15 can look at that more as referral counsel and,
16 no, we would not put a referring attorney on our
17 fee application.
18 Q. Is that a common practice at Labaton?
19 MS. LUKEY: Is which?
20 MR. SINNOTT: To --
21 MS. LUKEY: Not putting referring
22 attorneys as -- on the fee petition?
23 MR. SINNOTT: Yes.
24 MS. LUKEY: Okay.

Page 208

1 A. I -- it's -- I don't -- I'm not in
2 charge of the settlement process, that would be
3 a question probably better for Nicole, I can't
4 tell you who goes on and who doesn't, but to the
5 cases that I am familiar with where the Thornton
6 firm were involved, I don't think they generally
7 went on papers.
8 Q. All right. Well, let me ask you as a
9 litigator, is it a common practice that counsel
10 who are actively participating in a case don't
11 file an appearance?
12 A. I think it really comes down to --
13 if -- you know, we're taking a hypothetical
14 case. Anyone who's going to appear before the
15 Court has to be on the papers and has to be pro
16 hac'ed, but it was never the intention that they
17 appear in court, so there's no appearance ever
18 filed.
19 THE SPECIAL MASTER: But they're
20 working on the case.
21 THE WITNESS: But they're not
22 billing.
23 THE SPECIAL MASTER: You don't see
24 how that could create problems, put

Page 209

1 yourself in the judge's position.
2 Suppose you've got a judge who has
3 friends or even relatives at this firm,
4 just theoretically, or other interests
5 in the firm, the firm is working on the
6 case, the judge doesn't know it, you
7 don't think that's a problem?
8 THE WITNESS: From what
9 perspective?
10 MR. SINNOTT: From a conflict of
11 interest perspective.
12 THE SPECIAL MASTER: From a
13 conflict of interest perspective.
14 MS. LUKEY: The judge wouldn't know
15 about them.
16 THE SPECIAL MASTER: Others could
17 find out, raise the issue, blow the
18 case up, the case has to get
19 transferred away from the judge in mid
20 case, I think you're playing with fire
21 here, that's my opinion.
22 THE WITNESS: I -- I don't know if
23 it's -- I mean, look, there is -- you
24 know, there is -- I'm sure that we went

Page 210

1 and undertook, you know, conflict
2 checks, I'm sure they did their own
3 conflict checks in any matter they were
4 involved in, we did our conflict
5 checks, so it would have popped up. I
6 don't see what the -- I don't see what
7 the -- how that really -- if they
8 instead, you know, sort of appeared on
9 a signature block, three -- you know,
10 three -- three firms down. It seems
11 more like window dressing.
12   THE SPECIAL MASTER: You've got a
13 different view of this than I do, from
14 a judge's perspective.
15   BY MR. SINNOTT:
16 Q. Chris, who's responsible if Thornton
17 Law Firm screws up on this case?
18 A. Well, they -- clearly, that's our --
19 that's our responsibility. We're working at the
20 direction of lead counsel. If we -- if we asked
21 them to --
22   THE SPECIAL MASTER: Is your
23 carrier advised that they're working on
24 this and they screw up?

Page 211

1   THE WITNESS: I have no idea what
2 our carrier is advised of.
3   THE SPECIAL MASTER: I think you're
4 playing with fire with this kind of
5 stuff, it's not a good practice, from
6 all sorts of perspectives.
7   THE WITNESS: Well, I mean, you
8 know --
9   THE SPECIAL MASTER: Go ahead.
10 Good luck with it.
11   MR. SINNOTT: You were about to say
12 something?
13   THE WITNESS: No, I mean, look --
14   MR. SINNOTT: Joan hasn't kicked
15 you under the table.
16 A. She hasn't kicked me. You know, look
17 we're not -- you know, we're not, what's that,
18 the foolish consistency being the hobgoblin of
19 little minds, we're -- we're open to learning
20 from, you know, things that don't go well, and,
21 you know, you have to sit back and say, you
22 know, what can we do, what can we do in the
23 future that -- that ensures this is never going
24 to happen again. You know, it' s-- it's in our

Page 212

1 interests and our clients' interests that, you
2 know, things be done in a way that protects
3 everyone and -- and -- and so that's what we're
4 going to do.
5 Q. Chris, aside from the Chargois referred
6 relationship and aside from Thornton's role in
7 HCC, how many other cases are you aware of where
8 the -- where Labaton has had silent partners
9 like this that don't enter an appearance but are
10 ostensibly representing a party?
11 A. In other words, if we have a referral
12 relationship, let's say?
13 Q. Or a relationship like this, where, as
14 I understand it, from you, the Thornton Law Firm
15 was --
16 A. Right.
17 Q. -- was actually doing things?
18 A. I -- I just -- I just don't know the
19 answer to that question. I mean, is it -- you
20 know, is it, you know, five or ten, I just -- I
21 don't know. Is it zero? Nicole would know who
22 goes on those papers and who doesn't.
23 Q. What's the purpose of filing an
24 appearance?

Page 213

1 A. If you're going to appear before the
2 Court.
3   THE SPECIAL MASTER: Whoa, whoa,
4 whoa.
5   THE WITNESS: In my -- in my
6 estimation.
7   THE SPECIAL MASTER: How do you
8 define, "appear before the Court"?
9   THE WITNESS: If you are going to
10 sign documents or otherwise subject
11 yourself through jurisdiction of the
12 Court.
13   THE SPECIAL MASTER: So under your
14 view, a law firm could be working
15 totally quietly, doing all the work,
16 substantive work, you have another firm
17 that has appeared in front of the
18 Court, fronting for that law firm,
19 using that law firm's work and not
20 advising the Court of that?
21   THE WITNESS: Well, I mean, I
22 think -- I think there's a continuum.
23 You know, if you're having some -- if
24 you're having someone sort of draft --

Page 214

1  draft briefs, I don't know, could
2  you -- could you outsource that, that's
3  a good question, I don't know.  Let's
4  say, could you -- you know, as -- I
5  mean, you see these firms popping up
6  now, where they're -- they're virtual
7  and, you know, they -- all their work
8  comes in, gets farmed out to another
9  firm, that firm never goes on papers,
10 comes back, they sign their name to it.
11 I don't know.  I don't know what the
12 law is on that.
13     **MS. LUKEY:** That's an interesting
14 question, because the outsourcing firms
15 that are out there now.
16     **THE WITNESS:** They're all over the
17 place.
18     **MS. LUKEY:** Very interesting.
19     **THE SPECIAL MASTER:** I don't know.
20     **BY MR. SINNOTT:**
21 Q.  You know, a cynic might say, and I'm
22 certainly not one, that keeping Thornton's role
23 in this case under the radar might have
24 something to do with the public position of

Page 215

1  Garrett Bradley as a state senator in
2  Massachusetts.
3      Were there ever any discussions that
4  you're aware of, not necessarily you
5  participating in them, but you being aware of or
6  listening in on, where there was a discussion
7  about keeping Garrett's role as a finder or as a
8  referrer or --
9  **A.  That's a new term you just introduced.**
10 Q.  Yes, we can make up all sorts of words,
11 but hopefully, you get my gist.
12     -- as being involved in the case on the
13 down-low?  Were there any discussions like that,
14 that you were aware of?
15 **A.  Specific to that narrow issue, no.**
16 **Specific to, you know, did we want all of our**
17 **competitors to start chasing down the Thornton**
18 **Law Firm the next day, that, as I've said**
19 **before, was definitely on my mind.**
20     **THE SPECIAL MASTER:** But you knew
21 that Garrett was disabled from
22 participating in certain kinds of
23 cases, at least in Massachusetts.
24     **THE WITNESS:** Very limited number



Page 216

Page 217

Page 226

[redacted]

Page 228

[redacted]

Page 227

[redacted]

Page 229

```
 1  A.  It was 20 percent of our fees, our net
 2  fees, so I'm -- I -- I don't know how the
 3  calculations were performed here, but Damon
 4  probably got 150 off the top and then Garrett
 5  got 20 percent of everything left over.
 6  Q.  I'm not asking how the math was done,
 7  I'm asking, how was the number 20 percent
 8  arrived at?
 9  A.  Oh, we had -- it was up to 20 percent,
10  that was the deal, and Garrett and I would talk.
11  Q.  All right.  Now, that was the deal, did
12  you negotiate that deal?
13  A.  Oh, gosh, I don't know.  I mean, that
14  was an overarching deal, I don't know if it was
15  in place before I got involved in that
16  relationship or after.
17  Q.  Okay.  But do you -- you don't know how
18  the 20 percent amount was arrived at?
19  A.  It's very possible that I -- I, you
20  know, was negotiating that.  It -- it could have
21  been something that was discussed before I got
22  involved.  I just don't remember, I don't have
23  any specific recollection.
24  Q.  Was there a written agreement with
```

Page 230

1  Thornton Law Firm and/or Garrett for that
2  amount?
3  A. Not that I'm aware of.
4  Q. Was that an amount that was used in any
5  prior or subsequent cases with Thornton Law
6  Firm?
7  A. The 20 percent?
8  Q. Yes.
9  A. Up to. Sure.
10 Q. And was it ever reduced to a written
11 agreement?
12 A. I don't believe so.
13 Q. And 20 percent is also what you
14 negotiated with Damon Chargois; correct?
15 A. That's correct.
16 Q. Is that a standard amount for --
17 A. No.
18 Q. -- an attorney?
19 A. Sorry.
20    As I testified earlier, it was the
21 maximum that we were willing to pay to a firm
22 that was acting as referral counsel, but then
23 doing all of these things necessary local to the
24 client that was of real value to the firm so it

Page 231

1  didn't have to undertake that significant
2  legwork associated with local, by "local"
3  meaning near to the client, matters, whether it
4  was making a brief presentation, getting
5  signatures, holding their hand through some
6  document production issue that arose, you know,
7  suddenly, that kind of thing.
8  Q. All right. Did -- I believe you
9  testified that Thornton did not bill in this
10 case; correct?
11 A. That's correct, they did not submit
12 time as part of their fee application.
13 Q. So how did you arrive at 20 percent?
14 A. It's a -- it's a discussion, you know,
15 was the case profitable to us, if it wasn't,
16 we'd come down off 20 percent, so it was -- it
17 was like that.
18    I think in the beginning, and this was
19 one of the first few cases, I think we tried to
20 stay pretty close to 20 percent. As time went
21 on, you know, it just seemed a little rich
22 and --
23    THE SPECIAL MASTER: Did it have
24    anything to do with how much

Page 232

1  substantive work the Thornton firm
2  actually put into the case?
3  THE WITNESS: I mean, that -- that
4  wasn't irrelevant, you know, it wasn't
5  irrelevant. You know, if there was a
6  case in -- that was heavy plaintiffs
7  discovery, you know, it would be
8  considered. It was sort a -- it was
9  sort of an equitable, you know, back
10 and forth, and we had a very good
11 rapport with them, and, you know,
12 sometimes they, you know, pushed a
13 little more and we would be okay, and
14 sometimes we pushed a little more and
15 they would be okay, and -- and, you
16 know, we actually used to talk about
17 how wonderful the relationship was
18 between the firms because, you know, we
19 would -- we would all be reasonable
20 people.
21 BY MR. SINNOTT:
22 Q. How did you know what work they were
23 doing?
24 A. I wouldn't know everything, that's for

Page 233

1  sure. But, you know, we all maintained, you
2  know, sort of open lines of communication. I
3  mean, I was on the phone with, at that time, you
4  know, Garrett almost daily, because we had so
5  many cases together, and so we could be on the
6  phone talking about one case, and he could say,
7  oh, gosh, you know, we got killed in this other
8  case you got me, there's three plaintiff's deps
9  coming up, I've got dep prep all week on this,
10 you know, and he would -- you know, you better
11 not cut me or something like that. I mean,
12 that's the kind of rapport we had.
13 Q. Were you taking it on faith as far as
14 what they said they were doing for you?
15 A. Yes.
16 Q. Okay. Because you didn't have any way
17 of checking?
18 A. I mean, I could have, but I probably
19 wouldn't.
20 Q. Did Chargois know that Thornton Law
21 Firm was doing work in this case?
22 A. Well, if you're asking me did Chargois
23 know that Garrett was the referral attorney,
24 let's say, for that case or doing that function?