# EX. 83

Volume: 2

Pages: 272-574

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

-------------------------------------

In Re: STATE STREET ATTORNEYS FEES

-------------------------------------

BEFORE: Special Master Honorable Gerald Rosen, United States District Court, Retired

DEPOSITION of CHRISTOPHER J. KELLER

October 25, 2017, 10:17 a.m.-5:25 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter: Paulette Cook, RPR/RMR

Page 297

limitation on this?

**THE WITNESS:** You know, it depends on how you read that sentence.

**THE SPECIAL MASTER:** Do you really read this as permissive of the arrangement that you ultimately had?

**THE WITNESS:** I can't say that that was specifically contemplated that they would be a, you know, referral attorney. I can -- you know, in terms of reading this language, what she's saying is work with that firm. And, you know, Christa Clark isn't here. I don't know who Tamara Henderson is. She's copied.

I don't know what was in her head, but I can probably read this and say she anticipated that we would be working with Chargois & Herron --

**THE SPECIAL MASTER:** Perhaps on a local counsel basis.

**THE WITNESS:** Yeah. -- in a more involved way which is, frankly, how I expected that relationship to evolve.

**THE SPECIAL MASTER:** Yeah, I think you testified to that the last time.

**THE WITNESS:** Yeah, given the closeness

Page 298

,

Page 299

Page 300

Page 313

Page 315

that you had made to the April 7th draft that had been sent to you on April 9.

A. **Okay. Well my -- you know, when I first received the draft, I recall saying to myself, you know -- I was busy when I first asked him to take that first crack at it, and I realized I probably had made a mistake in the sense that, you know, power of the pen, opening draft, and, you know, didn't want to completely rewrite it. So I left as much intact as I could.**

**Turning to some of the changes, I went with the -- what I considered to be sort of a core term which goes to when you have multiple clients participating in the same action as a joint lead plaintiff, you may have multiple peripheral obligations or multiple obligations; and if you have -- let's just assume it's 20 percent. If you have a 20 percent fee deal with one firm and a 20 percent fee deal with another firm, Labaton's not going to be out 40 percent.**

**And what I've explained is that Labaton would be out a maximum of 20 percent and that there would be an allocation of the 20 percent amongst the various firms that may be referring clients.**

Page 314

Page 316

Q. So the 20 percent was not hard and fast?

A. **Correct.**

Q. It was situational depending on how many other lead --

A. **That's correct.**

Q. -- plaintiffs there were --

A. **Yes.**

Q. -- and how much recovery --

A. **And what their losses were --**

Q. -- there was.

A. **I mean it would still be percentage-wise. It really wasn't based on the recovery. It was, rather, based on the contributory losses of the lead plaintiffs.**

**So if you had -- and, by the way, this scenario really gets at cases filed pursuant to the PSLRA which is The Reform Act of 1995 and because there you had the term of the PSLRA is the plaintiff -- the movant that moves for lead plaintiff with the largest financial interest in the case will be appointed as lead plaintiff.**

**So, therefore, the touchtone is the largest financial interest. So we use that as a method to then allocate or to at least make a motion**

Page 321

[redacted]

Page 322

[redacted]

Page 323

split?

**THE WITNESS:** There is nothing in this agreement that requires them to perform work in order to receive the benefits.

**THE SPECIAL MASTER:** So why would it be in their economic interest to perform work, expend resources, whether dollars or hours, to accomplish what they can accomplish under this agreement without doing anything?

**THE WITNESS:** That's a great question. And the answer is that we can -- we look back with hindsight, and our hindsight is 20/20. George Hopkins comes on board, and Eric develops a wonderful rapport with him. Turns out to be a rapport that is, you know, unique and special.

But that's one of 200 clients we have. Let's go back and put ourselves in that time and place.

We wouldn't have been able to get their attention -- most clients' attention. We wouldn't be able to get meetings were it not for the local lawyer.

So when I say what was in their economic best interest, their economic best interest is to

Page 324

[redacted]

Page 353

A. **It's Labaton sensitive --**
Q. Okay.
A. **-- just to be specific.**
Q. But you're doing this in the capacity of informing a valued client as to a potential case?
A. **Yes, we are doing that in connection with advising them about a case. That is correct.**
Q. All right. And, Chris, look at the addressees. Do you see BCC, colon, in the top there?
A. **Yes.**
Q. And who does it say after BCC?
A. **Tim Herron.**
Q. All right. And you know BCC to be a blind copy, correct?
A. **That's correct.**
Q. So the message to include the information provided by two confidential witnesses went to George Hopkins, but a blind copy was sent to Tim Herron, correct?
A. **It appears to be.**
Q. And I know you're not an addressee, but let me ask you, just as I did in the previous session, why was a blind copy sent to an attorney that had

Page 354

not entered an appearance in the case or was not actively involved in the case?
A. **I believe Tim Herron was blind copied to keep Tim in the loop.**
**If I can anticipate your next question, it would be why blind copy on something else, and I believe my prior testimony was, you know, I would have forwarded that information. I would have gone into my sent folder and pulled up that e-mail and forwarded the information.**
**Eric chose to BCC, and that was his practice which is not my practice.**
Q. Would it appear to you that Mr. Herron was BCC'd in order to conceal his identity from Mr. Hopkins?
A. **Again, you know, it doesn't make sense to me. I still haven't figured out why. This was -- this was not something that needed to be concealed. You know, it's a rare situation where you have express authority from a general counsel to work with a firm and affiliate with them and then feel the need to conceal it.**
**So if I'm sitting here looking at this, I'd say, well, there's probably some other reason**

Page 355

[redacted]

Page 356

[redacted]

Page 357

s.

Page 359

Page 358

Can you -- and I know you're not an addressee once again, but can you tell me why this would be -- this e-mail thread strictly to George Hopkins would be forwarded to Damon and Tim as -- without George being referenced or CC'd on that message?

A. **Well, this is probably how he should have done the others which is forwarded an e-mail.**

**THE SPECIAL MASTER:** But the effect is the same --

**THE WITNESS:** Well, to give them --

**THE SPECIAL MASTER:** -- which is to keep George out of the loop. Or I should say not keep George out of the loop but to not --

**THE WITNESS:** I'm certainly not going to --

**THE SPECIAL MASTER:** -- but not reveal Chargois and Herron to George. The effect is the same.

**THE WITNESS:** I believe what Eric was trying to do here was to keep Tim and Damon in the loop. I think Eric was trying to honor the obligation that we had to that firm. That's why I think he did that.

Page 360

."

A. **Yes.**
Q. You're new to the world of investment outside of being a lawyer, and you look forward to more of this --
A. **Not more of that.**
Q. -- missed the Florida conference, but hope to see you soon and enjoy some drinks and good times.
So full of optimism at this time --
A. **Yes.**
Q. -- about the ERA nightclub venture.
And then we'll get to the bad news --
A. **Later on I'm assuming.**
Q. -- subsequently, but let me direct your attention to what you should have next there which is a cover e-mail followed by a three-page agreement.
And the designation for this is TLF-SST-033910 through 913. Once again, there's a cover message and a three-page document.
And you send this to Garrett on Monday, May 23, 2011 at 6:36 p.m., and you -- you ask Garrett what do you think of this.
And in this message -- in this e-mail

dated May 4, 2011 it's addressed to Michael Thornton, Garrett Bradley of Thornton and Steven Fineman and Dan Chiplock of Lieff and also Richard Heimann and Lexi Hazam of Lieff.
And in that letter, which is unsigned and appeared to be a draft, you write: "Dear counsel, I'm pleased we were able to come to terms that we will be working together in this matter. I've outlined below the terms of the matter we have reached.
Arkansas will be represented in the action by Labaton as lead counsel, and Thornton & Naumes and Lieff Cabraser will serve as additional counsel for Arkansas Teacher. Arkansas Teachers made an application to the Court for appointment of its selection by Labaton Sucharow as interim lead counsel. In the event that the Court appoints Labaton Sucharow as interim lead counsel and subsequently as lead counsel, we agree as follows."
And on page 2 it says, "We agree that our firms will act in good faith to divide the work so that each of the firms performs at least 20 percent of the work, and each will receive at least 20 percent of the fees awarded in this matter.

The remaining 40 percent of the fees awarded shall be allocated in good faith at the conclusion of the case based on each firm's actual time spent on this matter. There is an off-the-top obligation to referring counsel of 6 percent of the fees awarded.
In addition, we agree to exchange on a quarterly basis our then-current lodestar reports showing quarterly and aggregate billings in this matter. We also agree that any dispute arising under this agreement or in this case may not be litigated in court, and that all such disputes or claims shall be resolved upon election of any party through binding arbitration conducted pursuant to the applicable rules of the American Arbitration Association and any jurisdiction in which any of the firms reside. Please sign below indicating your agreement to these terms."
Now was this version of the letter signed, Chris, do you know?
A. **I don't.**
Q. Okay. And you sent this message, at least with respect to what we have before us, strictly to Garrett Bradley. Why was that?

Page 417

A. **I wanted to get his thoughts.**
Q. Okay. And were you getting his thoughts before you got the thoughts from --
**TELECON VOICE MESSAGE:** The following participant has entered the conference: Brian McTigue.
Q. Were you getting his thoughts before those of Lieff Cabraser?
A. **Well, I don't know if I was getting thoughts from the other firms. It was intended to be confirmatory.**
**So basically I'm sending him the same understanding that, you know, he's -- he's on this, and he's, you know, a principal of the Thornton firm and said basically does this comport your understanding as to what the essential terms of the deal are to get his --**
Q. Okay.
A. **-- his thoughts.**
Q. And had you had a previous discussion with Garrett about the terms of the deal?
A. **Yes.**
Q. All right. And you discussed the 20/20/20 so-called?

Page 418

A. **With Garrett. With -- with Mike Thornton. With Bob Lieff.**
Q. Okay. And who at Labaton had you discussed it with?
A. **Who knew about the 20/20/20? Probably -- Eric would have. Larry would have. For sure. Others may have come to know that was the deal, but I don't know.**
Q. Okay. Did you preview this letter with Larry or anyone else at Labaton?
A. **I don't know.**
Q. All right. Would that have been standard practice before a message went out to other firms?
A. **Not necessarily.**
Q. All right. So you had the authority and autonomy to draft a letter and send it out on your own?
A. **Yes.**
Q. All right. And when on the second page, Chris, you say there is an off-the-top obligation to referring counsel of 6 percent in the fees awarded, where did that number come from?
A. **It's a good question.**
**Um, I think it's a guess, and since this**

Page 419

**is -- again, this is confirmatory -- I think in the discussions that we had we explained to them what our obligation was which was 20 percent of our fee. And then we used some math to sort of extrapolate what that could be, and then we just backed into that number.**
**So a third of the case would have gotten us -- if 20 percent of a third is 6 point something so we probably just went with 6 percent.**
Q. Okay. But you don't reference the 5 percent that you and Damon and Eric had been talking about for some time, correct?
A. **Hmm -- I think your timing's way off.**
Q. Okay. So --
A. **So this -- this agreement is 2011.**
Q. Yep.
A. **The 5 percent, well, I don't think was negotiated until 2016.**
Q. Well -- all right.
So this is a step down --
A. **Very early this is --**
Q. -- from the 20 percent rather that you had discussed with Damon previously?
A. **When you say a "step down," a derivative of**

Page 420

**that 20 percent.**
Q. Okay.
A. **In other words, I -- the 6 percent here (indicating) off the top, if you do a third, a third, a third --**
Q. Yep?
A. **-- you multiply that times three, you get to about 18 percent. So that's how we got the 6 off the top.**
Q. Okay.
A. **Does that make any sense?**
Q. It does, but let me ask you this: Had you spoken to Damon about this?
A. **No.**
Q. All right. Did you think it was important to speak to him in light of your previous agreements?
A. **No.**
Q. Why not?
A. **Our obligation to Damon was going to be the subject of negotiation. It was going to be what it was.**
Q. All right. But hadn't you already laid out certain numbers that had been accepted by both

Page 461

Page 463

-- let me see if you recall it.
Eric writes to George. George, we've been following the trial -- and this is July 24, 2013 at 11:06 a.m., LBS 017825 and 826.
And Eric in writing to George is talking about the Goldman case. The subject is the -- is simply Goldman. And he seems to be forwarding testimony during that trial to your client, Mr. Hopkins.
Do you remember seeing this document before?
**A. No.**
Q. All right. And you would agree that in this message to George Hopkins that Damon Chargois is blind copied, correct?
**A. I would. You know, I -- I'm just going to take this opportunity to make an observation. I mean you've showed me now a number of documents in which I'm not a recipient, and they have George as the recipient with a copy to Damon.**
**I just -- if I can only put myself in Eric's shoes for a moment 'cause I think it's important to sort of understand how I think he viewed this. One was an update to the client, and**

Page 462

Page 464

**the other was an update to the referrer. I think he viewed them as separate things.**
Q. Okay. All right, Chris.
If we could look at the next document which is dated July 30, 2013 at 8:22 p.m., and this is LBS 031502 and 503.
There's a message at the bottom of the first page from Attorney Gardner to you, and Nicole, Ray, Naomi and Eric are copied on it. It's the K12 fee allocation. And Mr. Gardner talks about fee request being approved.
I don't think we need to get into those things, but you wrote to Eric -- and you CC'd Mr. Gardner subsequently -- yeah, less than an hour later, and you said, "Eric, I thought we were going to talk with Damon about maybe lowering that 20 percent number."
And Eric responds, "We can but did not yet."
So with respect to Damon, is it fair to say that he still thinks that he's receiving 20 percent, correct?
**A. I would say at that time he still believes that, correct.**



Page 465

[redacted]

Page 466

Q. Yeah. In that top message from Mr. Gardner to Cindy and you and Eric and Nicole and Naomi are copied, he says, "These allocations stay the same, except we need to pay $200,000 to Damon Chargois as a referral. That $200,000 comes out of our portion. So our allocation becomes 1,250,000. Do we still need a W-9 from anyone?

I'm attaching the wiring instructions for the referral fee payment. Can I get the Goldman Scarlato check tomorrow, please?"

Was Mr. Gardner, based on your recollection, concerned about the amount that was being paid to Damon, or was he just simply making a bookkeeping notation here as to how much?

**A. That looks like bookkeeping.**

Q. Okay. So there's no significance in it beyond what we're reading here, as far as you know?

**A. Yeah, as far as I know.**

Q. On the next document dated July 31, 2013 -- and this is LBS 022769 through 774 -- more about the K12 allocation, but in the top message, Chris, just to kind of cut to the heart of this, Cindy sends something to Mr. Gardner, and you're copied on this along with Eric, Naomi --

Page 467

**A.** [redacted]

Page 468

[redacted]