# EX. 85

Volume: 1

Pages: 1-171

JAMS

Reference No. 1345000011

--------------------------------------

In Re: STATE STREET ATTORNEYS FEES

--------------------------------------

BEFORE: Special Master Honorable Gerald Rosen, United States District Court, Retired

DEPOSITION of GARRETT J. BRADLEY

September 14, 2017, 2:02-5:18 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter: Paulette Cook, RPR/RMR

Page 14

Page 16

Page 15

Page 17

meetings?
A. **In Boston, yes.**
Q. Okay. And tell us about those.
A. **I think we discussed this in the last deposition. We went to State Street as George wanted to lay the facts as we had presented them to him out to State Street.**
Q. Yep?
A. **And we had a meeting with some officials there.**
Q. Let me direct your attention, Garrett, to the packet of materials in front of you. I'd like you to find a document from July 17, 2008 from Christopher Keller to Ira Schochet, Nicole Zeiss and Ray Politano.
A. **Do you know where it is in the packet?**
Q. I think it's about two-thirds of the way down.
**MR. KELLY:** Does the face page say July 17?
**MR. SINNOTT:** The face page is -- says 7/17. The Bates number in the right-hand corner -- lower right-hand corner is LBS 032283.
**MR. KELLY:** LBS 2283?



Page 18

Page 20

c

Page 19

?

Page 21

were to tell you that Mr. Chargois was local counsel in that matter, would it be fair to say that the law firm would have -- your law firm would have worked with him in all probability?

**A. No, I wouldn't agree with that. In this situation we don't necessarily would have had contact with him. We may have, but that's not always the case in these matters. And I don't remember a specific involvement with him directly on this case.**

Q. How were you able to -- strike that.

Is Bristol County Retirement System the client?

**A. It is.**

Q. How were you able to bring them in as a client?

**A. I don't remember specifically, but I'm sure we contacted the administrator at some point, went down and had a meeting, explained the services, and at some point they signed an agreement.**

Q. Now I know that you are a public official, correct?

**A. Then? Yes.**

Q. At that time. You're not now.

Page 22

Were there any prohibitions on your dealing with state retirement systems?
**A. Well, that's not a state retirement system.**
Q. That's not?
**A. No. That's a county retirement system.**
Q. Isn't it part of the same system?
**A. No, it's not.**
Q. It's not?
**A. No.**
Q. So your bar of prohibition was strictly on PRIM or state systems?
**A. State or quasi-state entities. There's a specific rulings allowing legislators to worth with county city and municipal funds and has been since the mid eighties.**
Q. So you were able to bring in this contact Bristol County and introduce them to the Labaton firm?
**A. I brought somebody from the Labaton firm at some point I suspect to Bristol County to make a presentation.**
Q. Okay.
**A. I don't remember specifically when.**
Q. And they were the client; they were the

Page 23

Page 24

Page 25



Page 38

What was the services that your firm provided for the fee of $238,000 as best you remember?

**A. As best as I remember here today, it would have been approaching the client about the case, advocating to do the case, the pluses and minuses, getting the clients to sign the paperwork, getting them to approve the complaint after I reviewed it and then whatever else moved on from there.**

**If this went into discovery, we would have been involved in discovery issues, etcetera.**

Q. All right. And, once again, you did not enter an appearance to the best of your recollection?

**A. No.**

Q. All right. And do you have any recollection looking at this as to interaction with Chargois & Herron during this case?

**A. I don't know Herron. I don't recall ever meeting him or talking with him. And I don't recall ever talking with or meeting with Damon in this particular case.**

Q. But at this point did you know Damon or had you yet to meet him at the industry meeting?

Page 39

Page 40

Page 41



Q. Were there discussions contemporaneous with this e-mail or this letter about Chargois and what he would receive for the State Street case?
**A. I don't recall at this time when we started talking about him.**
**THE SPECIAL MASTER:** Was there any other referring counsel on the State Street case?
**THE WITNESS:** Not that I'm aware of.
**THE SPECIAL MASTER:** So it's likely that this --
**THE WITNESS:** I don't know, judge.
**MR. KELLY:** I'm sorry. The question was likely that it was Chargois or likely there's another counsel?
**THE SPECIAL MASTER:** Likely that it was Mr. Chargois.
**THE WITNESS:** Yeah, I don't know, judge.
**THE SPECIAL MASTER:** Did you ever hear any reference to any other referring counsel?
**THE WITNESS:** I did not.
**BY MR. SINNOTT:**
Q. Well, at some point, whether it was contemporaneous with this particular e-mail and this particular unsigned letter, did you engage in

discussions with co-counsel with respect to the share that Damon Chargois would get as referring attorney in this case?
**A. Yes. I was very concerned about it.**
Q. Okay. Why don't you tell us about that, Garrett?
**A. I believe as early as -- just prior to or right around the time of filing in 2011, I raised with Chris how are we going to deal with your obligation to Damon 'cause I was very concerned that he would try to apply for 20 percent of this entire case.**
**And I asked them to deal with it.**
Q. Hm hm?
**A. Nothing seemed to happen for a while.**
**THE SPECIAL MASTER:** By this "entire case," you mean the attorneys' fee in the entire case, 20 percent?
**THE WITNESS:** My understanding of his agreement was that since Arkansas was the only client in here, he would be entitled to 20 percent, and I wanted to shrink that as fast as possible.
**BY MR. SINNOTT:**
Q. And why did you think that it needed to be

shrunk?
**A. I didn't even know what his role was, but this was a different type of case, and there were multiple firms involved -- experienced firms, skilled firms, and I wanted to make sure that we shrunk that as soon as possible.**
Q. All right. What did you understand when you first started talking about this with co-counsel that Chargois' role would be in the case?
**A. I thought his role was similar to ours; that he did substantive work, corresponded with the client, dealt with the client, got authority. That's what I thought his role was.**
Q. Okay. At what point did you realize that that wasn't the case?
**A. When this investigation began a couple weeks ago.**
**THE SPECIAL MASTER:** You didn't know that he was doing no work on the case whatsoever?
**THE WITNESS:** I did not, judge.
**THE SPECIAL MASTER:** Did you ever discuss that with anybody from Labaton what their arrangement was with Mr. Chargois?
**THE WITNESS:** I knew he had a 20 percent

Page 46

Page 48

Page 47

THE WITNESS: I thought that was his role.

THE SPECIAL MASTER: Did you know that the agreement went back to the initial retention of Labaton and how that retention was facilitated by Mr. Chargois?

THE WITNESS: I don't know the details of that, judge.

THE SPECIAL MASTER: You don't now or you didn't then?

THE WITNESS: I didn't then, and I -- I know a little bit more now, but I didn't know the specifics back then of how the relationship came to be.

THE SPECIAL MASTER: Did you never ask Eric Belfi or Chris Keller what the details of the relationship was, how the relationship began and what Mr. Chargois' role was to be?

THE WITNESS: I don't recall any substantive conversations beyond the economics, the 20 percent.

THE SPECIAL MASTER: So when you say you believed that he was interfacing with the client back in Arkansas, did you believe he was effectively

Page 49

?

Page 114

**THE SPECIAL MASTER:** Okay.
**BY MR. SINNOTT:**
Q. All right. Garrett, let me direct your attention to another August 6th message, this one from 9:01 a.m. from you to Bob Lieff and Mike Thornton.
**MR. KELLY:** Hold on. August 6th?
**MR. SINNOTT:** Yes.
**THE WITNESS:** I got it.
**MR. KELLY:** Hold on. Hold on.
**MR. SINNOTT:** Okay.
**MR. KELLY:** Why are they always at the bottom, huh?
**THE WITNESS:** I think it's at the top, Brian. (Indicating). Is it 4 -- does it end 617?
**MR. SINNOTT:** Yes, it is.
**MR. KELLY:** I'll share.
**MR. SINNOTT:** You got it?
**THE SPECIAL MASTER:** Yep.
Q. This is a message from you.
**MR. SINNOTT:** And, Madam Court Reporter, it's TLF-SST-040617, 040618.
Q. And in this message to Lieff and Thornton, you say, "Bob, I was thinking about our call this

Page 115

morning yesterday while working out, and I thought it might be helpful to put things in writing so everyone can see what we at Thornton are thinking. As I have said before we start being equal in State Street, we need to be on an even par in both cases."
What are the two cases you're talking about there?
**A. It would be Mellon and State Street. The two cases brought to Lieff Cabraser or Bob Lieff I should say.**
Q. "What I mean by that is even though you had no client, jurisdiction or concept, Mike Thornton went and fought for you and Lieff, the entity, by using his influence with Labaton to get you 20 percent of State Street. As I said yesterday, who was looking out for his interest in Mellon? Where was the corresponding deal?
There was discussion of the same deal when we were in California, but Hausfield, who you brought in, did not sign, and then we got sent to the MDL. Then you brought in Ohio for leverage in the MDL, and Mike asked you what our fee interests were. I know because I was pressing him on it. He told me you said we are in it together. Let's put

Page 116

some numbers behind what I am saying."
So am I correct, Garrett, that at the time that you wrote this the BNY Mellon case was still alive?
**A. I believe the settlement was the next month, September.**
Q. And then you go on to say, "Because of Mike's advocacy, and only Mike's advocacy, you have a minimum in State Street. We both know what that number is will be subject to many factors; but even in a low scenario of 60-million-dollar fee, it could break down as follows: 60-million-dollar fee, 5.4 million to ERISA, 3 million to Arkansas local. That leaves 51.6 million.
For the sake of argument, let's say Labaton sticks with the we want half, that leaves 25.8 million. Under the deal we each get 20 percent of the 51.6 which is 10.32 million each which equals 24.640 million leaving a balance of 5.16 million."
And, by the way, what did you think the Arkansas local was doing in this particular case?
**A. This is the State Street case I'm referencing here.**
Q. Oh, you're not talking about the BNY case

Page 117

here?
**A. No, I'm not.**
Q. All right. So the 60 million dollars is the low number that you're throwing out there that could happen in State Street?
**A. It was a scenario although obviously a year before settlement -- before final settlement.**
Q. Great. Thank you for that clarification.
"Your position is you want to give us 10 percent of Mellon but an equal split of the residual in discussion with Labaton of coming off their, quote/unquote, we want half. In Mellon you have 20 million dollars in lodestar, and you want to get 30 million. So we would get 2 to 3 million plus our lodestar in Mellon only to give it back to you in State Street by splitting the residual balance of $5,160,000 50/50? Would you agree to this under these circumstances?
Here is how I propose we get to par: We fought for you to get at least $10,320,000 in State Street, and here is how I believe you should reciprocate. Our lodestar of 1.5 million to 2.5 million depending on judge, 20 percent of Lieff fee, 4 million to 6 million depending on judge. If you

similar people.

Misunderstanding by Mr. Lieff's comments to Mike Thornton over time. I think you take -- as I said, your negotiations and your experience in one and deal with it in another. And that's what I'm laying out here.

**THE SPECIAL MASTER:** You're actually asking for a reciprocation, aren't you?

**THE WITNESS:** In this case Lieff Cabraser, which I understood when I had a meeting with Steve Fineman and Dan Chiplock, were clearly calling the shots. We had an understanding, we thought, of how we were going to be -- our work and value was going to be treated in Mellon.

When I met with them, they were clearly the people calling the shots, not Bob Lieff, which I wasn't aware of, and caused some frustration.

So all's I was trying to do was then apply that same standard that they applied for us of work and value in State Street. I don't think it's inappropriate.

**THE SPECIAL MASTER:** Do you agree that this e-mail can be read to look like you're attempting to leverage your position in one case and

your position in another case?

**THE WITNESS:** I think people can read this e-mail many different ways. I'm just explaining as the person who wrote it what we were trying to do. And we ended up working it out.

This is the negotiations that happen, judge, in cases.

And in the Mellon case our friends at Lieff Cabraser did end up supporting us in our lodestar application for a higher multiplier because of our work. And Dan Chiplock pointed out that there was work we were offered to do but that we didn't staff up appropriately because of the miscommunication from Mr. Lieff.

Dan and I had a heated discussion over that on this time period. Dan ended up being right as I checked into it. There was work to be done, and we didn't do it. That's the frustration coming out here.

**THE SPECIAL MASTER:** I want to read the next two sentences. "Our lodestar 1.5 million to 2.5 million depending on judge, 20 percent of Lieff fee, 4 million to 6 million depending on judge. If you get Kessler to cover some of that is your

business."

That's referring to Mellon, correct?

**THE WITNESS:** Correct.

**THE SPECIAL MASTER:** What we have or likely will get total from relator cases one-and-a-half to two-and-a-half million gives us between 7 million and 9-and-a-half million. Right?

**THE WITNESS:** I think it said one-and-a-half to two million, judge. Not to quibble.

**THE SPECIAL MASTER:** I'm sorry. One and a half to two million, yep.

Gives us between 7 million and 9-and-a-half million. Correct?

**THE WITNESS:** Correct.

**THE SPECIAL MASTER:** And that's referring to the BNY Mellon case and -- and the relator case?

**THE WITNESS:** Yes. It was our understanding from Bob Lieff that we were going to be getting a percentage. That turned out to be incorrect.

**THE SPECIAL MASTER:** Okay. The next sentence says, "This gets us close enough to par

with your $10,320,000 in State Street."

You don't see the relation between those cases that you're making in this e-mail?

**THE WITNESS:** I'm not saying I'm not making a relation to the cases, judge.

I'm trying to give you the background on how we got to this point and the fact that we're having discussions about fees that would be awarded and how to fairly distribute those between our co-counsel.

**THE SPECIAL MASTER:** In light of what people are getting in a different case?

**THE WITNESS:** Lieff Cabraser is in that case with us.

**THE SPECIAL MASTER:** A different case.

**THE WITNESS:** A different case.

**BY MR. SINNOTT:**

Q. Let me ask you, Garrett, to take a look at an e-mail from August 30, 2015 at 12:50 p.m.

And --

**THE WITNESS:** What'd you say?

**MR. KELLY:** Hold on. We got to find it.

**MR. SINNOTT:** Yeah.

Q. August 30, 2015 at 12:50 p.m --

Q. And how do you do it at the Thornton Law Firm? Is there an electronic program?
**A. We don't keep our time like other firms keep their time as we're a majority plaintiffs' firm. Contingent firm. We do keep our time on matters that we obviously need to keep our time on.**
**I understand there to be a software that's not functional. I don't believe it was used by anybody in this case. It wasn't used by me.**
**The way I kept time on this matter would be I'd write on -- if I was reading a document, I'd write on the document and stick it in the file. I'd also jot down time long hand on pieces of paper.**
**There's -- obviously, many people in the firm were on this case, and Evan as the junior lawyer would track some time if we were all doing something; and, if need be, if there was something specific like a mediation, it maybe tracked by calendar or e-mail.**
**MR. SINNOTT:** Okay.
**THE SPECIAL MASTER:** Did you keep your time -- in whatever way you kept it in whatever format did you keep it contemporaneously or --
**THE WITNESS:** Yes. I averaged two,

two-and-a-half hours a week in this case over the life of it. So it's not a heavy burden.
I may have waited a few days and got on an airplane and thought about what I was doing in the last week, but it was contemporaneous with when things were taking place.
**THE SPECIAL MASTER:** And then in what format did you record that time?
**THE WITNESS:** If I was reading -- I like to feel the paper. So if I was reading, I'd jot it down on paper. I'd jot it down long hand. Different ways.
I'd stick in the file until the master spreadsheet was put together by Evan. I gave it to my assistant, and she uploaded it to that. We turned over whatever I have left from it, of the backup to the backup.
**BY MR. SINNOTT:**
Q. Did you attend the fairness hearing before Judge Wolf?
**A. You mean the final hearing?**
Q. No, the fairness hearing November 2nd.
**A. The final, yes.**
Q. Was there a discussion in strategy

discussion of any kind in preparation for that hearing?
**A. I don't remember talking to anybody. I think David Goldsmith presented. I don't remember any specific conversations.**
Q. Did you enter an appearance at that hearing, or did you sit in the gallery?
**A. I think Mike -- Mike -- we wanted Mike to sit at counsel table, Mike Thornton. This was something he really developed. That's where he sat. I was in the gallery.**
Q. Was there any discussion, Garrett, leading up to that about the issue of whether Damon Chargois' role in this case should be revealed to the Court?
**A. It was -- it was never discussed.**
Q. And do you remember discussing other things with the -- with David or with other attorneys?
**A. I don't. I wasn't taking a leadership role at that hearing.**
Q. All right. So David was the point man on that?
**A. Yes.**
Q. All right. And who else was there?