# EX. 96

UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT          )
SYSTEM, on behalf of itself          )
and all similarly situated,          )
                                     )
   Plaintiffs,                        )          Civil Action
                                     )          No. 11-10230-MLW
                                     )
vs.                                  )
                                     )
STATE STREET BANK AND TRUST          )
COMPANY,                             )
                                     )
   Defendant.                         )


**HEARING**


BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT COURT JUDGE


UNITED STATES DISTRICT COURT
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
March 7, 2017
10:00 a.m.


\*   \*   \*   \*


CATHERINE A. HANDEL, RPR-CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts 02210
(617) 261-0555

APPEARANCES:

For the Plaintiffs:

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
By:  Richard M. Heimann, Esq.
     275 Battery Street
     29th Floor
     San Francisco, CA 94111-3339

     -and-

LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
By:  Daniel P. Chiplock, Esq., and
     Jonathan D. Selbin, Esq.
     250 Hudson Street
     8th Floor
     New York, NY 10013-1413

     -and-

LABATON SUCHAROW LLP
By:  Lawrence A. Sucharow, Esq.
     140 Broadway
     New York, NY 10013

     -and-

THORNTON LAW FIRM LLP
By:  Garrett J. Bradley, Esq.,
     Brian T. Kelly, Esq., and
     Michael P. Thornton, Esq.
     100 Summer Street
     30th Floor
     Boston, MA 02110

     -and-

KELLER ROHRBACK LLP
By:  Lynn Lincoln Sarko, Esq.
     1201 Third Avenue
     Suite 3200
     Seattle, WA 98101-3052

     (Appearances continued on the next page.)

```
1    APPEARANCES (Cont'd):

2
     For the Plaintiffs:
3
     ZUCKERMAN SPAEDER LLP
4    By:  Carl S. Kravitz, Esq.
          1800 M Street, NW
5         Suite 1000
          Washington, DC 20036-5807
6
     -and-
7
     CHOATE HALL & STEWART LLP
8    By:  Joan A. Lukey, Esq.
          Two International Place
9         Boston, MA 02110

10   -and-

11   McTIGUE LAW LLP
     By:  J. Brian McTigue, Esq.
12        4530 Wisconsin Avenue, NW
          Suite 300
13        Washington, DC 20016

14   -and-

15   BRADLEY ASSOCIATES
     By:  Michael G. Bradley, Esq.
16        80 Washington Square
          Building K
17        Norwell, MA 02061

18   -and-

19   RICHARDSON, PATRICK, WESTBROOK & BRICKMANN, L.L.C.
     By:  Kimberly Keevers Palmer, Esq.
20        1017 Chuck Dawley Boulevard
          Post Office Box 1007
21        Mt. Pleasant, SC 29464

22   -and-

23   FEINBERG, CAMPBELL & ZACK, P.C.
     By:  Catherine M. Campbell, Esq.
24        177 Milk Street
          Boston, MA 02109
25
     (Appearances continued on the next page.)
```

```
 1      APPEARANCES (Cont'd):

 2

 3      For the Defendant:

 4      WILMER HALE LLP
        By:  William H. Paine, Esq., and
 5           Daniel Halston, Esq.
             60 State Street
 6           Boston, MA 02109

 7      -and-

 8      BEINS, AXELROD, P.C.
        By:  Jonathan G. Axelrod, Esq.
 9           1030 15th Street, N.W.
             Suite 700 East
10           Washington, DC 20005-1503

11

12      ALSO PRESENT:

13      Retired Judge Gerald Rosen.

14      COMPETITIVE ENTERPRISE INSTITUTE
        By:  Theodore H. Frank, Esq.
15           1310 L Street NW
             7th Floor
16           Washington, DC 20005

17      George Hopkins, Executive Director for Arkansas Teacher
        Retirement System.
18
        Irwin Schwartz on behalf of Colorado Public Employee's
19      Association.

20      Plaintiffs Arnold Henriquez, Michael T. Cohn, William R.
        Taylor (appearing telephonically), Richard A. Sutherland
21      (appearing telephonically), and James Pehoushek-Stangeland
        (appearing telephonically).
22
        Janet Wallace, vice-president of Andover Company and trustee of
23      the retirement plan.

24      Irwin Schwartz, counsel for the Colorado Public Employee's
        Retirement Association.
25
```

```
1                    P R O C E E D I N G S

2              (The following proceedings were held in open court

3    before the Honorable Mark L. Wolf, United States District Judge,

4    United States District Court, District of Massachusetts, at the

5    John J. Moakley United States Courthouse, One Courthouse Way,

6    Boston, Massachusetts, on March 7, 2017.)

7              THE DEPUTY CLERK:  This is Civil Action No. 11-10230,

8    Arkansas Teacher Retirement System versus State Street

9    Corporation.  Court is now in session.  You may be seated.

10             THE COURT:  Good morning.

11             ATTORNEYS:  Good morning, your Honor.

12             THE COURT:  I have an unopposed motion for admission

13   pro hac vice on behalf of Theodore Frank, and I've allowed the

14   motion to appear pro hac vice.  I expect I'll hear from Mr.

15   Frank today, but allowing that motion is not a ruling on the

16   merits with regard to the request to serve as sort of a

17   permanent amicus or guardian ad litem.

18             Would the remaining counsel and others present to

19   participate with them please identify themselves for the Court

20   and for the record.

21             MR. HEIMANN:  Richard Heimann, your Honor, from Lieff

22   Cabraser representing Lieff Cabraser here.

23             THE COURT:  Okay.  I had an affidavit from Mr.

24   Chiplock.

25             MR. HEIMANN:  Mr. Chiplock is sitting next to me,
```

1   sir.

2              THE COURT:  Go ahead.

3              MR. CHIPLOCK:  Daniel Chiplock for Lieff Cabraser.

4              THE COURT:  Thank you very much.

5              MR. BRADLEY:  Michael Bradley, your Honor.

6              MR. G. BRADLEY:  Garrett Bradley from the Thornton

7   Law Firm, your Honor.

8              MR. KELLY:  Brian Kelly on behalf of Thornton Law

9   Firm as well, your Honor.

10             MS. LUKEY:  Good morning.  Joan Lukey on behalf of

11  Labaton Sucharow.  With me is Lawrence Sucharow at table and

12  in the jury box is George Hopkins, the executive director for

13  the Arkansas Teacher Retirement System.

14             THE COURT:  Thank you.

15             MR. PAINE:  Bill Paine and Dan Halston for the

16  defendant.

17             MR. AXELROD:  Jonathan Axelrod --

18             THE COURT:  Hold on.  Stop.

19             (Pause.)

20             MR. AXELROD:  Jonathan Axelrod, Beins, Axelrod.

21             THE COURT:  Okay.

22             MR. McTIGUE:  Brian McTigue of the McTigue Law Firm

23  representing four individual ERISA plaintiffs.

24             THE COURT:  The four individuals are?

25             MR. McTIGUE:  Mr. Henriquez.

```
 1              THE COURT:  Is Mr. Henriquez present?

 2              (Mr. Henriquez indicating.)

 3              THE COURT:  Thank you.

 4              MR. McTIGUE:  And Mr. Michael Cohn.

 5              THE COURT:  Mr. Cohn.

 6              MR. McTIGUE:  And Mr. William Taylor, who I

 7  understand is on the phone.

 8              THE COURT:  Mr. Taylor, are you on the phone?

 9              (No response.)

10              THE COURT:  Mr. Taylor?

11              (No response.)

12              THE COURT:  All right.  We'll check on that.

13              MR. McTIGUE:  And Mr. Richard Sutherland, who I

14  understand as of ten minutes ago was not on the phone.

15              THE COURT:  Hold on just one second.

16              Mr. Sutherland?  Is the phone working?  It's working.

17              Mr. McTigue -- well, actually, there should be a

18  third of your clients I think on the phone.

19              MR. McTIGUE:  There are four clients.

20              THE COURT:  James Pehoushek-Stangeland?

21              MR. McTIGUE:  Pardon me?

22              THE COURT:  James -- or perhaps you don't represent

23  him.

24              Hold on just one second.  Let me finish that for this

25  purpose with Mr. McTigue.  Okay.
```

```
1               Is Mr. Taylor on the phone?

2               (No response.)

3          THE COURT:  No.

4          MR. TAYLOR:  I'm here.

5          THE COURT:  Mr. Taylor, are you on the phone?

6          MR. TAYLOR:  Yes, I am.

7          THE COURT:  Thank you very much.  Okay.

8          Mr. Sutherland is not on the phone.  The

9     submission --

10         MR. SUTHERLAND:  Yes, he is.

11         THE COURT:  Mr. Sutherland, are you on the phone now?

12         MR. SUTHERLAND:  Yes, sir.

13         THE COURT:  Mr. Sutherland, the submission I got

14    asking that you be allowed to participate by telephone told me

15    that you had been debilitated as a result of cancer and the

16    treatment for cancer since 2012.  I think this hearing is

17    probably going to take a couple of hours and toward the end I

18    may have a question for you or two or three, but if it's

19    difficult for you even to participate by telephone, if you

20    want, I'll excuse you, and then I'll take a break and we'll

21    call you later as long as you'll be accessible when I need

22    you.

23         MR. SUTHERLAND:  Okay.

24         THE COURT:  Do you want to stay on the phone or would

25    you like to -- would it be healthier for you to not have to
```

1    listen to this even for this period of time?

2             MR. SUTHERLAND:  Okay.  I'll take the call.  That's

3    fine.

4             THE COURT:  You'll take the call later?

5             MR. SUTHERLAND:  Yes.

6             THE COURT:  Okay.  So, are you going to go off the

7    phone now?

8             MR. SUTHERLAND:  Yes.

9             THE COURT:  Would that be better for you?

10            MR. SUTHERLAND:  Yes, it would.

11            THE COURT:  All right.  Well, Mr. McTigue, you know

12   how to reach Mr. Sutherland, I take it?

13            MR. McTIGUE:  Yes, I do.  We've been in touch with

14   him already today.

15            THE COURT:  All right.  We'll give you a call later,

16   but I think it will probably be an hour, maybe even two.

17   Okay, Mr. Sutherland?

18            MR. SUTHERLAND:  That is fine.

19            THE COURT:  Thank you very much.

20            Who else do we have?

21            MS. CAMPBELL:  Catherine Campbell from Feinberg,

22   Campbell & Zack, your Honor.  I'm local counsel with McTigue

23   Law on behalf of Henriquez plaintiff.

24            THE COURT:  All right.  I'll tell you all, I'm

25   recovering from a sinus infection and my ears are a little

1    blocked.  So, be sure to speak into the microphones loudly.

2          MR. SARKO:  Good morning, your Honor.  Lynn Sarko

3    from the law firm of Keller Rohrback.  We have two clients,

4    one Mr. Stangeland, who is on the telephone who answered

5    before, and the second is the Andover Companies, and here in

6    the jury box is Janet Wallace, who is the vice-president of

7    Andover and a trustee of the retirement plan.

8          THE COURT:  Thank you.

9          MR. KRAVITZ:  Good morning.  Carl Kravitz from

10   Zuckerman Spaeder.  I was co-counsel in the Henriquez case and

11   one of the ERISA counsel.

12         MS. PALMER:  Good morning, your Honor.  Kimberly

13   Keevers Palmer, from Richardson, Patrick, Westbrook &

14   Brickman.  We were formerly ERISA counsel.  We withdrew in

15   December of 2013 from the Henriquez case.

16         THE COURT:  Okay.

17         MR. FRANK:  Theodore H. Frank, Competitive Enterprise

18   Institute.

19         THE COURT:  Well, according to my scorecard,

20   everybody is present who was ordered to be present and retired

21   Judge Gerald Rosen is seated to my left in the first seat in

22   the jury box.

23         I'd like to try and ensure we have a clear common

24   sense of why we're here.  It's pursuant to my February 6th,

25   2017 order.  On November -- as explained in that order, on

1    November 2, 2016, I approved a class action settlement in this

2    case in the amount of $300 million to be paid by the defendant

3    State Street Bank.  The plaintiffs' attorneys in connection

4    with that requested almost $75 million in reasonable

5    attorneys' fees and $1,250,000 in expenses.  They also

6    requested service awards to the named plaintiffs.  State

7    Street has paid $300 million, as I understand it.

8          The service awards went to the named plaintiffs who

9    represented that they actively supervised this litigation and

10   that they supported the requested fee awards.

11         As I explained in the February 6th order, like many

12   judges, I use the so-called loadstar to check the

13   reasonableness of the requested attorneys' fees, which were

14   based also on a percentage -- or primarily on a percentage of

15   the common fund.  The lodestar, as a matter of law, is the

16   reasonable number of hours worked, multiplied by the

17   reasonable rates for the attorneys doing the work.  The

18   reasonable rate is what private counsel in the community would

19   charge a paying client for similar services.  What a

20   particular firm charges paying clients for similar services by

21   the attorney at issue is an indicator of a reasonable rate.

22         The attorneys in requesting attorneys' fees advised

23   me that the total lodestar was about $41 million.  They

24   represented that that was based on the regular rates charged

25   for the services of the attorneys involved.  $41 million as a

1   base of the $75 million award would involve a multiplier of

2   1.8.

3          At the November 2nd hearing, when we got to

4   attorneys' fees, I note that the adversary system was not

5   operating, as is always the case when State Street committed

6   to paying $300 million.  It had no interest in how that total

7   was distributed between the class and attorneys.  So, relying

8   upon on the lodestar check, I awarded the requested fees and

9   expenses finding them reasonable.

10          I also made the requested service awards of $10,000

11  each to the named plaintiffs, except for Arkansas Teacher's,

12  which received a service award of $25,000.  That was based on

13  the representation that each of the named plaintiffs actively

14  supervised the litigation.

15          On November 10, 2016, I received a letter from David

16  Goldsmith of Labaton.  It's Exhibit B to the February 6th

17  order.  It informed me that about 9,000 hours worked by

18  so-called special attorneys who did primarily document review

19  double-counted in the reported total lodestar.  23 special

20  attorneys on the lodestar report were also on either Labaton

21  or Lieff's reports.  Thornton attributed higher rates to those

22  attorneys than the other firms.

23          I was told that the corrected lodestar would be $37

24  million rather than $41 million and the multiplier, therefore,

25  would be 2 rather than 1.8.

1          The letter asks that I not reduce the fee based on

2     this new information.  It implicitly recognized that I have

3     the authority to do that.  The letter -- Mr. Goldsmith in the

4     letter apologized and stated, "We are available to respond to

5     any questions or concerns the Court may have."  The letter

6     involved no discussion of the accuracy or reliability of the

7     hourly rates attributed to each attorney.

8          On December 17, 2016, the Boston Globe published an

9     article that is Exhibit C to the February 6th order.  It

10    raised questions regarding whether Michael Bradley, as

11    reported by the Thornton firm, worked 406 hours on this case

12    and had a regular rate of $500 an hour, as reported in the fee

13    submission.

14         The article also stated that the hourly rate paid to

15    the special attorneys was $25 to $40.  It raised questions

16    concerning whether paying clients -- raised questions for me

17    concerning whether paying clients were ever charged $425 an

18    hour or more for the services that those special attorneys or

19    the services of other lawyers who provided similar service.

20         In the February 6th order, I identified these issues.

21    I proposed appointing retired Judge Rosen to investigate the

22    report regarding them.  Although it wasn't specifically

23    mentioned in the February 6th order, I'm now contemplating --

24    inclined to include in the mandate of any special master

25    considering the propriety of the service awards as well as the

1     attorneys' fees and expenses, but in that order I gave the

2     parties an opportunity to object to the proposed other special

3     masters and to comment on this approach.

4          This hearing is -- well, I've received those

5     responses in this hearing to address the issues raised in the

6     February 6th order as I just amplified them and the issues

7     raised in the responses.

8          (Discussion off the record at the Bench.)

9          THE COURT:  There's a threshold issue as to who

10    should participate in the full range of this hearing.  The

11    Competitive Enterprise person of Mr. Frank has moved to file

12    an amicus brief relating to my February 6th order and to serve

13    as a guardian ad litem or amicus in future proceedings in this

14    case.  The amicus brief relating to this hearing, which

15    prompted a reply -- which prompted oppositions, a reply and

16    sur-reply was filed yesterday.  I've read all that.

17         So, the First Circuit wrote in *Strasser* 432 F.2nd 562

18    to 569, "The acceptance of an amicus brief is within the sound

19    discretion of the Court and that by their nature" -- "by the

20    nature of things, an amicus is not normally impartial."  They

21    have a standard in other cases in my -- I found that it's

22    appropriate for me to allow the filing of that brief.  As I

23    said, I've read it.  The adversary system is not operating at

24    this point.  It had some ideas in it that were helpful.  So,

25    to that limited degree, I'm allowing the motion.  That's

1   Docket No. 126.  If somebody wants me to reconsider that, you

2   may, but, as I said, CEI, as I may refer to it, requests leave

3   to serve as a guardian ad litem for the class or an amicus

4   before the master and before me, although in some places it

5   suggests that giving notice to the class of these proceedings

6   might be an alternative to its participation.

7          Before I get to a general -- hearing generally on

8   this issue, I have a couple of questions or concerns.  The

9   plaintiffs' counsel -- well, CEI raises an issue of whether I

10  can proceed in this matter and if it turns out to be

11  appropriate, revise the fee award, unless somebody files a

12  motion under Federal Rule of Civil Procedure 60(b) to reopen

13  matters.  The view I expressed in the February 6th order is,

14  for the reasons explained, I retain jurisdiction -- retained

15  jurisdiction, still have jurisdiction to do that.

16         In Docket No. 145, Page 11, Labaton wrote in a filing

17  that all the other law firms for plaintiffs filed -- joined in

18  CCAF -- that's CEI for my purposes -- lengthy discussion

19  regarding Rule 60(b) motions and the fundamental leave for a

20  guardian to be able to seek such relief are a distraction.

21  The order and final judgment vests the Court with broad

22  continuing jurisdiction over all matters relating to fee

23  application in the disposition of the class settlement fund.

24  The order awarded attorneys' fees.  It provides similarly that

25  the Court retains exclusive jurisdiction over the subject

1    matter of the class action and all parties thereto.

2              Finally, the stipulation and agreement of settlement

3    specifically provides for the repayment of funds if the fees

4    and expenses -- expense awards are reduced by the Court or on

5    appeal by a non-appealable order.  There is no need for Rule

6    60(b) relief here.

7              Ms. Lukey, is that, indeed, the position of Labaton

8    and, as you understand it, the other plaintiffs' counsel?

9              MS. LUKEY:  It is, your Honor.  Although I believe

10   the ones who joined with us -- of course, we're the lead firm

11   and the Thornton Law Firm.  The ERISA law firms did not join

12   with us in that brief, I don't think.

13             THE COURT:  Well, we can get this clarified.  I

14   thought they may have.

15             MS. LUKEY:  They may have.

16             THE COURT:  Let me just check.

17             MS. PALMER:  Your Honor, Richardson, Patrick did only

18   because we were unclear as to whether or not -- given our

19   position in the case, we were unclear as to whether or not we

20   were supposed to file something, given our misunderstanding

21   with the original filing.  So, we filed in support of their

22   position.

23             THE COURT:  Well, I have the letter -- would you

24   please state your name.

25             MR. KRAVITZ:  Yes, I certainly will.  Carl Kravitz

1    from Zuckerman Spaeder, and I believe that we filed an

2    opposition to Mr. Frank's motions adopting the reasons and

3    authorities in the Labaton brief.

4          THE COURT:  So, it's your position that no Rule 60(b)

5    motion is necessary?

6          MR. KRAVITZ:  We're --

7          THE COURT:  For me to proceed in this matter.

8          MR. KRAVITZ:  We are agreeable to that.  Yes, is the

9    answer to your question.  That would have been shorter.

10         MR. SARKO:  Your Honor, Lynn Sarko on behalf of

11   Keller Rohrback.  We also joined and we agree that it's not

12   necessary.

13         MS. CAMPBELL:  Your Honor, Catherine Campbell,

14   Feinberg, Campbell & Zack.  I did not file an objection, nor a

15   motion to --

16         THE COURT:  Is it your position that no 60(b) motion

17   is necessary for me to retain jurisdiction and to appoint a

18   master and if at the end of all this, I find it appropriate to

19   essentially order the return of some of the funds to the

20   class?

21         MS. CAMPBELL:  Yes, your Honor.

22         MR. McTIGUE:  I concur with my local counsel, your

23   Honor, Ms. Campbell.

24         MR. AXELROD:  Jonathan Axelrod.  We would concur

25   also.

```
 1              THE COURT:  Mr. Kelly?

 2              MR. KELLY:  Yes.  Brian Kelly from the Thornton Law

 3   Firm.  We agree.

 4              MR. HEIMANN:  As do we, your Honor.

 5              THE COURT:  All right.  I've actually -- I'm inclined

 6   to -- I believe I can rely on that, but this is -- I've done a

 7   little work on this issue, among many other things, and it's a

 8   jurisdictional question.

 9              Mr. Frank, do you want to tell me your view of this

10   Rule 60(b) issue?

11              MR. FRANK:  Yes.  Thank you, your Honor.

12              The problem is that while they may represent that you

13   don't need a 60(b) motion now, down the line after, should you

14   strike fees, they would tell the First Circuit that you never

15   had jurisdiction under *Coconut* because you dismissed this case

16   with prejudice, and there are many appellate cases saying that

17   once you have dismissed a class action with prejudice, no

18   matter what the settlement says, you do not actually retain

19   jurisdiction over matters like this.

20              There was a fee order on November 2nd.  They can

21   always take the position that that's a final order and that

22   you can't retract it, and it's notable that they don't cite a

23   single case where a judge retaining jurisdiction over fees

24   issues a fee order and then claws some of it back.

25              THE COURT:  From what I -- this is one of the reasons
```

1    you contend you should be allowed to essentially intervene or

2    serve as a guardian ad litem and then you would make a Rule

3    60(b) order?

4         MR. FRANK:  Not necessarily us, but if there is

5    somebody representing the class, they could make the Rule

6    60(b) motion, and then they would have the standing to do it

7    and could protect the interests of the class that way.

8         THE COURT:  Well, you raise an intriguing issue that

9    I hope is not going to have to be decided.  I think the

10   question is a jurisdictional question.

11        The First Circuit -- there are circuits that have

12   decided that a judge can sua sponte make a Rule 60(b) motion.

13   The First Circuit has not yet decided whether I can do that.

14   There's a case, *Quincy 5 LLC vs. Harman*, 652 F.3d 116, 121,

15   but the plaintiffs could make a Rule 60(b) motion under Rule

16   60(b)(1), which allows reopening as a result of a mistake.  It

17   wouldn't be any concession that any money should be ordered

18   returned at the end of all of this, but I think it would

19   eliminate this argument and possible need for somebody else to

20   represent the class.

21        MS. LUKEY:  Your Honor, if you feel there is a need

22   for it, although I think with the representations on the

23   record, there would not be, we will certainly go ahead and

24   file a 60(b)(1) motion.  We're making it orally in the Court

25   now and follow it up in writing, if you wish.

1        THE COURT:  Does anybody object to that?

2        MR. KELLY:  No objection, your Honor.

3        THE COURT:  I think it just would be prudent.  Okay.

4        So, I now have a Rule 60(b)(1) motion to reopen.  I'm

5 going to take it under advisement.  It will be memorialized,

6 let's say, March 13th, next Monday.

7        MS. LUKEY:  That's fine, your Honor.  Thank you.

8        THE COURT:  So, I think that takes care of that.

9        MR. FRANK:  That does solve that particular issue.

10        THE COURT:  And it's within a reasonable period of

11 time and it's less than a year.  And so, it was helpful to

12 have that raised because it is conceivable there are different

13 counsel at different stages of the litigation.  All right.

14 So, that's done.

15        Then, Mr. Frank, you raise another issue that -- I

16 guess it would be helpful for me to have some clarification of

17 your position because you -- based on something you said a few

18 minutes ago.  I have understood that you as the

19 personification of CEI are seeking to serve as guardian ad

20 litem or amicus before the master, but you also mentioned at

21 some point to me, I think -- and it wasn't clear to me whether

22 it was a possible alternative or in addition that I should

23 order notice to the class.

24        What exactly are you seeking?  And would you explain

25 your concept and thinking with regard to the proposed notice

1    to the class?

2         MR. FRANK:  Certainly.  I think the class needs

3    representation here.  There's a fundamental conflict of

4    interest between the current attorneys for the class and the

5    class in that their interests are absolutely opposed at this

6    point with respect to this one issue of the Rule 23(h) award.

7         For that reason and because of the importance of an

8    adversarial proceeding, there should be somebody and that can

9    be us.  It can be a big law firm here that's willing to do it

10   or another alternative that would be more time consuming and

11   more expensive would be to issue notice to the class, having a

12   class member come forward, recognizing that there's now this

13   dispute and that the class needs representation, offer to be

14   the class representative with respect to this one issue, and

15   you create protections to make sure that that class

16   representative is not somehow bought off or otherwise

17   prejudices the interest of the class.  That's another

18   alternative to appointing a guardian, whether that be us or

19   somebody else.

20        THE COURT:  Well, notice to the class would not

21   necessarily invoke an objection or prompt anybody to come

22   forward.

23        MR. FRANK:  That's correct, your Honor.

24        THE COURT:  So, if there was notice to the class and

25   nobody came forward, you would still seek to participate on

1  behalf of the class?

2      MR. FRANK:  I think it would be best if somebody

3  participated on behalf of the class.  We're offering to do it.

4  We are offering to do it to save time, but if you want to say

5  that you're looking for it, I'm sure it would be widely

6  publicized.

7      THE COURT:  The Boston Globe article was December

8  17th.  My order wasn't until February 2nd.  I don't mean to

9  hurt Judge Rosen's feelings, but he's not the only person I

10  talked to about possibly serving as a master in this case, and

11  I mentioned this in a footnote in the February 6th order.  I

12  did speak to some people in large law firms and repeatedly was

13  told that their firms are in adversarial litigation with some

14  or all of the firms involved here.  So, that probably wouldn't

15  be a promising prospect if I thought it was necessary.

16      I'll ask plaintiffs' counsel.  Why would notice to a

17  class be expense, particularly in the context of $75 million

18  fee award?  It's not a huge class.  About how many class

19  members are there?

20      MS. LUKEY:  About 1300.

21      THE COURT:  1300?

22      MS. LUKEY:  Yes.  I believe the issue raised was not

23  one of expense.  I think you just questioned whether it would

24  be expensive.

25      THE COURT:  Well, Mr. Frank said it would be

1    expensive to do it.

2           MS. LUKEY:  That isn't an issue that's been raised by

3    the plaintiffs.  That's not the objection.  When it's our

4    turn, we'll tell you the objections.

5           THE COURT:  Thank you.

6           Well, this issue of notice to the class, as I said,

7    has engaged my attention.  Why don't you speak to it, Ms.

8    Lukey.

9           MS. LUKEY:  Thank you, your Honor.

10          Your Honor, there's nothing unusual, particularly in

11   a context like the fee petition that's being revisited now to

12   have an investigative procedure in place as opposed to an

13   adversarial procedure.  That bifurcation exists throughout the

14   caselaw.  It's recognized.  It's appropriate.  And there have

15   been repeated times when it's been recognized that the

16   interests of the class are, indeed, adequately protected in

17   these proceedings.

18          Quite apart from the fact that the class

19   representatives, who are all here or on the phone, have

20   expressed no objections or concerns and are available to

21   respond in that fashion to your Honor, there is the fact that

22   -- nor have they objected to their preexisting law firms.

23   That is, the firms that have been named previously in this

24   litigation.

25          But we are in a circumstance where if a notice is

1    going out, the question is notice of what?  At the end of the

2    day, as a result of the special master's determinations, if

3    the Court proceeds as we believe that it will with the

4    appointment of Judge Rosen, there will either be an order that

5    says the existing award was fair and reasonable and addresses

6    the Court's other questions in your February order or there

7    will be an order that orders a clawback of some -- in some

8    fashion and what will happen with regard to the class members,

9    including those who are absent, is that they will receive a

10   larger check.  So, the downside here of sending out an order

11   which could cause some confusion as to what is actually

12   occurring is that we end up --

13          THE COURT:  I think if -- if you wrote a proposed

14   order that I approve, it would be comprehensible by members of

15   this class who --

16          MS. LUKEY:  Sophisticated --

17          THE COURT:  -- meaningful measure of institutions.

18          MS. LUKEY:  Yes, I agree with that, your Honor.

19   Nonetheless, to receive an order in what would be out of the

20   ordinary sequence can invariably give rise to questions that

21   does, in fact, precipitate a delay of some 60 to 90 days and

22   perhaps more --

23          THE COURT:  I'm sorry.  What's the last thing you

24   said?

25          MS. LUKEY:  It does, in fact, precipitate a potential

1　delay of 60 to 90 days, as the order --

2　　　　　THE COURT:  It takes 60 to 90 days to give the order?

3　　　　　MS. LUKEY:  No.  To give them an opportunity to

4　respond, your Honor.  You can address it as you wish, but that

5　would be a typical --

6　　　　　THE COURT:  I could give them 30 days.

7　　　　　MS. LUKEY:  You could give them 30 days.

8　　　　　At the end of that process, let's consider what the

9　alternatives are as to what happens.  Perhaps you end up with

10　no one coming forward, which wouldn't be surprising under

11　these circumstances.  Perhaps you end up with multiple

12　individuals coming forward saying that each of them wishes to

13　be a class rep.  That complicates what is supposed to be an

14　investigative procedure before Judge Rosen.

15　　　　　So, we suggest to you it's unnecessary and that if

16　there's an order to go out, it's the end, saying what you are

17　to receive is larger than what you would have received and

18　here is the amount.

19　　　　　THE COURT:  Any other plaintiffs' counsel want to

20　speak to this?

21　　　　　MR. KELLY:  No, your Honor.

22　　　　　THE COURT:  Okay.

23　　　　　MR. SCHWARTZ:  Your Honor, may I be heard?  My name

24　is Irwin Schwartz and I'm counsel for the Colorado Public

25　Employee's Retirement Association, which is --

1       THE COURT:  First of all, it's been a while since

2   this has happened.  All right.  Say your name for the record.

3       MR. SCHWARTZ:  Yes, your Honor.  Irwin Schwartz on

4   behalf of the Colorado Public Employee's Retirement

5   Association, known as --

6       THE COURT:  Are they part of the class?

7       MR. SCHWARTZ:  I believe they are.

8       THE COURT:  You believe they are or they are?

9       MR. SCHWARTZ:  Well, they are.  They told me they

10  are.  They --

11      MS. LUKEY:  Your Honor, we don't think so.

12      THE COURT:  Okay.  Hold on just one second.

13      Is there any objection to my hearing what Mr.

14  Schwartz has to say?

15      MS. LUKEY:  Well, let me preserve the objection, that

16  I'm being told that this organization is not part of the

17  class.  Therefore, we would object because there's no standing

18  to be in here to address the Court.  I don't have the

19  documents in front of me to verify that, but that is the

20  understanding of plaintiffs' counsel from below.

21      THE COURT:  Mr. Schwartz, why do you think Colorado

22  -- what's the name of the organization?

23      MR. SCHWARTZ:  It's Colorado Public Employee's

24  Retirement Association.  CPERA, as they're known.

25      THE COURT:  And why do you say they're a member of

1    the class?

2           MR. SCHWARTZ:  Because they've been monitoring this

3    case and have asked me to attend and observe and make one

4    statement to the Court, which I think is relevant to this

5    discussion.

6           THE COURT:  Go ahead.  It can be objected to after I

7    hear it, but it may be helpful.

8           MR. SCHWARTZ:  It was only that the Court order that

9    the proceedings of the special master be put on ECF so that

10   members of the class can observe and, hopefully, participate

11   if they want to.

12          THE COURT:  As I said, I'm having a little trouble

13   hearing.  You're asking that what?

14          MR. SCHWARTZ:  That the proceedings of the special

15   master be posted to ECF for this case so the class members can

16   observe and comment if permitted to do so by the special

17   master.

18          THE COURT:  Well, Rule 53 -- I've never appointed a

19   master before and I've been a Judge for almost 32 years, but

20   that means I've studied Rule 53 with some care, but I study

21   everything with some care.

22          Rule 53 provides that orders of the master -- well,

23   my orders will all be on the docket and the transcript of this

24   hearing, for example, will be on the docket.  That's one.

25          Two, Rule 53 provides that the master's orders are on

1    the docket.  So, I'm not quite sure what "all proceedings"

2    means, though.  There may be depositions, for example, taken.

3    I don't think they would be filed in the ordinary course until

4    the report recommendation is filed at the end, and you've

5    touched on something that I've been thinking about.  Well, let

6    me be as transparent as possible so you can address this.

7         One, it's my tentative view that I should order that

8    notice of these developments be given to the class just so

9    they know.  I looked at the short notice of preliminary

10   approval that went out to the class members, and then if they

11   -- I believe the way this worked -- and I can be corrected

12   because I may be wrong, but there was a short notice that went

13   out, and then somebody could go on the Website and get the

14   complete notice, and then they could -- I don't know if it was

15   a hyperlink or something else -- find the petitions for

16   attorneys' fees, which are voluminous.  So, it would have

17   taken a class member some effort to get to the attorneys' fees

18   documents.

19        There were no objections to the attorneys' fees and I

20   noted that in finding the requests reasonable, but there might

21   have been objections if the class members had been told that

22   the $41 million reported lodestar involved double-counting.  I

23   don't even know yet if this is true.  We'll get to that, but

24   some of these special attorneys, who I and class members were

25   told had a rate regularly charged to paying clients of $450,

1    themselves were paid a tenth of that.  It doesn't necessarily

2    mean some paying client wouldn't have paid $450, but I wonder

3    about that in the current environment.

4           So, I think a notice could go out, but it seems to

5    me, Ms. Lukey, I think -- then what?  And I think it would be

6    premature to answer, "Then what?"  If somebody knew about

7    this, they could say, Judge, we think you ought to reduce the

8    award or they could say to the master, you know, We'd like to

9    give you a brief, but it would trigger a process in whatever

10   issues arise I think in the first instance.  If they're

11   addressed to the master -- I'll give you a break.  You haven't

12   had a chance to hear this, but others had.  If you want to

13   speak among yourselves, I'll let you do it, but not while I'm

14   speaking because Ms. Lukey has got to listen to this.  It just

15   seems to me they ought to know.

16          I came in thinking perhaps I would order the

17   preparation of a proposed order, and I've talked to you about

18   the mechanics, and I thought there were 1200 class members,

19   but 1300, it's in that order of magnitude.  It would go out.

20   They might have 30 days or 45 days to comment if they're

21   requesting something, to request it, that the master would

22   begin his work before that, but if somebody wanted to be heard

23   by the master or ultimately by me on something, they would

24   know what's going on.  There are several cases that talk about

25   the judge having a special fiduciary duty at this stage with

1    regard to the attorneys' fees because the adversary process

2    doesn't work, and having the questions I now have concerned

3    about whether all the members of the class have had fair

4    notice of things they might regard as material, but -- would

5    that serve your client's purposes?

6            MR. FRANK:  Absolutely, your Honor.  If it's of any

7    use -- I don't know if anyone brought it to your attention,

8    but there was a similar proceeding to this in the *Newmont*

9    *Mining* case in the District of Colorado.  Judge Krieger

10   appointed a special master and --

11           THE COURT:  What's the name of that case?

12           MR. FRANK:  It was -- I think it was *UFCW Local 880*

13   *vs. Newmont Mining*.  She appointed a special master who was a

14   former bankruptcy trustee when she was in bankruptcy court and

15   he did a very thorough review and --

16           THE COURT:  This was after fees were awarded?

17           MR. FRANK:  It was before fees --

18           THE COURT:  I've appointed people to advise on awards

19   of attorneys' fees.  The parties know a case called *Berenson*.

20   I haven't come across another case where the fees were awarded

21   on this issue.  But, anyway, are you able to respond to my

22   tentative thinking?

23           MS. LUKEY:  Your Honor, we would say this.  We have

24   not come across a case in which the appointment of a special

25   master had occurred on fee issues where there's any reference

1   in the decision to a new notice being sent out and, obviously,

2   at the conclusion when the special master has rendered his

3   report and recommendations and your Honor has acted upon it,

4   then, typically, there will be some form of notice available.

5          So, I think what we're concerned about here is

6   layering a complication onto what is otherwise an

7   unobjected-to process, the appointment of a special master.

8          THE COURT:  But here -- here's the concern I have.

9   Mr. Frank says that, you know, perhaps somebody would come

10  forward and want to be heard, but if there's no notice,

11  appoint me or someone else, and I think I would have some

12  difficulty finding somebody else and then -- well, frankly, I

13  don't -- I would like to assure that all of the class members

14  know of these developments and they've been publicized here in

15  Boston, but it's a big country.  That's one.

16         My thought has been that I appoint a special master.

17  There would be somebody else that would conduct an independent

18  investigation.  He can retain counsel, which I think might be

19  needed if it leads to retain some accounting firm to go

20  through the records, he can do that, but I haven't -- in

21  candor, I'm not inclined to -- but this is all tentative, Mr.

22  Frank, except I feel uncomfortable if there's no notice

23  because there may be -- if I don't give notice, I think there

24  might be somebody out there, including the Colorado Public

25  Employee's Pension Fund, if it's a party, to -- you know, that

1    would be interested in being heard at some point.

2          So, to me the part of the reason I've broken these

3    things down, 60(b), notice, is if I can take care of the 60(b)

4    issue and if you can persuade me I don't need to give notice,

5    in any event, it makes the arguments to appoint CEI in some

6    capacity or authorize them to participate in some capacity

7    less weighty.

8          MS. LUKEY:  Your Honor, we do have other issues

9    relating to CEI which causes them to be a totally unacceptable

10   amicus or guardian.

11         THE COURT:  I'm well aware of that.

12         MS. LUKEY:  May I suggest this?  Since we really

13   hadn't focused very specifically on this issue, if we could

14   have until perhaps Monday to brief the issue of notice and --

15   I don't know.  It may be in consultation at that point if

16   there is a suggestion that if notice is in a certain format,

17   it's acceptable.

18         THE COURT:  We might even take a break, and I do want

19   to hear all the argument on this.  I didn't want to spend too

20   much time on this, but I think it's a pretty fundamental

21   issue, is the representation of the class because -- I'm

22   sorry.  Somebody else wanted to be heard?

23         MR. HEIMANN:  I was just going to ask, your Honor, to

24   give us an opportunity to talk among ourselves to respond to

25   this specific issue.

1    THE COURT:  Yes.  I'll tell you, I think -- it

2    occurred to me you might say, Gee, I want to think about the

3    notice issue, but if I don't resolve the notice issue today, I

4    don't think I'll be able to resolve Mr. Frank's motion today.

5    I would really like to get this all done.

6        MS. LUKEY:  As would we.

7        THE COURT:  Which doesn't mean it shouldn't be an

8    adequate, deliberative process.

9        MS. LUKEY:  I believe --

10       THE COURT:  Would this be a good time for me to break

11   so you can discuss that?

12       MR. HEIMANN:  Certainly.

13       MS. LUKEY:  If we could have a few moments, that

14   would be very helpful, your Honor.  Ten minutes?

15       THE COURT:  There's a conference room in the back

16   there to the right if you need to cram in.  Take ten minutes

17   or whatever you need, but I really -- and then I will hear

18   your more general arguments on Mr. Frank, but if I can break

19   this down into bite-sized pieces, I think the argument will

20   change.

21       MS. LUKEY:  Thank you, your Honor.  We'll do that

22   right now.

23       THE DEPUTY CLERK:  All rise for the Honorable Court.

24       (Recess taken.)

25       THE DEPUTY CLERK:  All rise for the Honorable Court.

```
1    Court is back in session.  You may be seated.
2            THE COURT:  Ms. Lukey.
3            MS. LUKEY:  Your Honor, it is the consensus of
4    plaintiffs' counsel that a notice, which we will provide to
5    you in draft form by Monday, would be appropriate, but we
6    request this one caveat.  The class members are, of course,
7    all currently represented.  Hence, we would request that there
8    be at least an oral direction to Mr. Frank, that it would be
9    inappropriate under the disciplinary rules of this unified bar
10   to solicit class members, including by social media, such as
11   his Tweeter feed, which is a process he sometimes uses.  That
12   is, the order will specifically say that there has been a
13   change with some descriptive passage in it and indicate that
14   any objection is to be expressed as your Honor wishes, either
15   to you or to Judge Rosen.  We can have a --
16           THE COURT:  No.  I think I would -- I haven't thought
17   this all the way through.  I was just thinking about it a
18   little more.
19           One, notice would go out and say that -- it would
20   fairly describe what's transpired since -- on and since
21   November 2, ask whether anybody, say, within 30 days of
22   receipt of the notice wishes to file an objection to the $75
23   million award.  It would be filed with the Court.  And then if
24   somebody came in and asked for something else, like we want to
25   participate in any depositions, I believe the special master
```

1   would address that, in the first instance, and an order will

2   be filed.  I'm going to set up a process where there will be

3   seven or ten days to object to any of his orders, and rather

4   than try and anticipate all the issues, just set up what I

5   hope would be an efficient and effective process.  I hadn't

6   thought about this.

7          Everybody is required to comply with the disciplinary

8   rules, and now Mr. Frank has been admitted pro hac vice.  So,

9   he represents that he's familiar with the local rules, that he

10  subjected himself to the Rules of Professional Conduct of the

11  Supreme Judicial Court of Massachusetts, which were adopted by

12  the United States District Court.  There are professional

13  standards as well.  I don't know that I -- but, anyway -- and

14  this merges into the other issues.

15         Mr. Frank, do you want to be heard on this?

16         MR. FRANK:  Yes, we would just like an opportunity to

17  respond to whatever their proposed notice is on Monday or

18  after they file it on Monday, give us a few days to

19  potentially respond to make sure it's not misleading.

20         We would also request that the notice make clear to

21  the class that pro bono representation is available.  There's

22  no class member here that has more than five digits at stake

23  and they may be falsely misled into thinking that they would

24  have to pay for a lawyer to participate.

25         THE COURT:  The pro bono representation is you, CEI?

1           MR. FRANK:  It could be us or that contingency

2    representation is possible also.

3           The danger is that class members have no incentive to

4    spend their own money on a lawyer to do the investigation

5    that's needed, and that's why there were no objections in the

6    first place.

7           Judge Posner recognized this in *Redman vs.*

8    *RadioShack,* that there's just a fundamental problem with the

9    way Rule 23 is structured for the same reason we need class

10   representation, because the individual stakes are too small to

11   bring the litigation in the first place.  The stakes are even

12   smaller once the case is settled for a fraction of the value

13   of the claim and all that's left is a fraction of that

14   fraction, litigating over the attorneys' fees.

15          MS. LUKEY:  Your Honor, Mr. Frank is incorrect on the

16   size of the awards that will be going to some of the class

17   members.  As your Honor previously indicated, these are almost

18   entirely sophisticated institution -- institutional investors.

19   We object -- unless this Court has allowed a motion for Mr.

20   Frank to have some role, we object to his having the

21   opportunity to comment upon the draft, and we suggest that the

22   exact terms of the draft should be as presented and ruled upon

23   by the Court, not by Mr. Frank.

24          THE COURT:  I think this is a meaningful issue, but

25   I'm not going to decide whether to send notice to the class

```
1    until I see the notice and see the range of issues that it
2    implicates.  I am inclined to do it.  I will order this is a
3    reasonable period because I would like to start as quickly as
4    possible, that you file a proposed notice, as I said, that
5    brings people up-to-date as to what happened on November 2nd,
6    but also what's transpired since.  So, that would be the
7    February 2nd order and whatever I decide today, and that
8    directs that objections be filed with the Clerk of the Court.
9    You can leave a blank for the date.  You don't support it, but
10   you can talk to Mr. Frank, hopefully, civilly.  Hopefully
11   you'll be as civil in talking to each other alone as you are
12   in my presence.  I can see from the filings that this is sort
13   of an ending in a logger game, but if you gave me some
14   language that captures what he proposed -- I know you're not
15   asking for endorsing it -- I'll consider it, but I think until
16   I actually see the notice and reflect on this, I probably
17   won't be able to decide whether I should order notice and
18   whether Mr. Frank should have any role beyond today, although
19   -- okay.  Is that sufficient to give you guidance as to what
20   to do by next Monday?
21        MS. LUKEY:  Yes, your Honor.
22        THE COURT:  I'm not deciding now whether Mr. Frank
23   can comment on it or not.  If he wants, he can -- I'll be
24   coming back from out of town on Monday.  So, it will be here
25   when I get here on Tuesday, if he wants to move to comment on
```

1    it.  We'll see.  Let me think about that.

2           Why don't we go to the broader issue.

3           MS. LUKEY:  Just address a quick question, your

4    Honor.  Do you wish that to be filed via ECF as a proposed

5    order?

6           THE COURT:  Yes, as a proposed notice, and I would

7    like you to file a memo or affidavit also describing to me the

8    process for giving this notice.  I view it as sort of

9    analogous to revisiting the preliminary approval, but I want

10   the whole notice to go out.  I don't want a short notice.

11          MS. LUKEY:  Understood.

12          THE COURT:  You have to go through various steps to

13   find all the information, but basically it will be filed with

14   the Court.  Copies would go to plaintiffs' counsel.  There are

15   1200 or 1300 members.  Give 30 or 45 days to object to them,

16   that the -- if I appoint a master or co-master at the end of

17   this, tell them they've been appointed, and I'll see if I

18   think this is feasible and worthwhile.

19          MS. LUKEY:  Thank you, your Honor.  Will do.

20          THE COURT:  But, as I said, it relates to the more

21   general issue of whether CEI ought to be authorized to serve

22   as a guardian ad litem or amicus for events beyond today.

23          As I said, I'm appointing a master.  Well, nobody

24   disputes that.  The master can retain counsel and other

25   professionals.  It doesn't appear to me at the moment that

1  guardians are necessary.  If the master wanted to receive

2  briefs from anyone, he could invite them or accept them or

3  not, and eventually there'll be a report and recommendation,

4  and if there's another motion to file amicus brief, it can be

5  opposed if there's opposition and I can decide what to do.

6        But, at any rate, Mr. Frank, that's my tentative

7  thinking, having studied the written submission.  What would

8  you like to say -- oh, I'm sorry.

9        MS. LUKEY:  Do you want me to say or him?

10       THE COURT:  Mr. Frank, he's moved to --

11       MS. LUKEY:  Intervene.

12       THE COURT:  Let him go first.

13       MR. FRANK:  I think we've stated our position.

14  Again, we're concerned about the interests of plaintiffs'

15  counsel and what that notice says versus the interests of the

16  class with what that notice says.  Just as it's been helpful

17  to you so far here today, I think it would also be helpful

18  with respect to the notice.

19       THE COURT:  What about beyond that, though?  If I

20  give the notice, are you satisfied or not?

21       MR. FRANK:  I think we'll be disappointed if no class

22  member comes forward to protect the interests of the class.

23  If there's a report and recommendation, we'll probably submit

24  an amicus, whether or not there's a class member and the class

25  member has specifically retained us.  Again, I think adversary

1    representation is helpful, and the Court has noted that and

2    other courts have noted that, and it's just a fundamental

3    problem with the way Rule 23 works, that the conflict of

4    interest between class counsel and the class at the Rule 23(h)

5    stage, the procedures don't really cover it.

6              THE COURT:  Are you asking -- still asking that I

7    issue an order authorizing you to appear before the master?

8              MR. FRANK:  I think the master will benefit from

9    adversary representation for the reasons we've previously

10   stated and, again, that can be us.  That can be a

11   representative of the class.  That can be a different guardian

12   ad litem besides us.  My personal preference is that there's a

13   big firm that wants to do it and has more resources than we do

14   to serve as guardian ad litem.  We're offering because we're

15   skeptical that a firm is willing to alienate the powerful law

16   firms here to come forward.

17             THE COURT:  Do you want to respond to that?

18             MS. LUKEY:  I do, your Honor.

19             First of all, if Judge Rosen needs assistance, either

20   in the form of someone to ask cross-examination questions in

21   an adversarial or quasi-adversarial model, you have given him

22   the power to do so.  To the extent that Judge Rosen, who is

23   obviously very skilled and has been in the role of a judge for

24   many, many years needs help, he will be able to make that

25   determination.

1    We have suggested that Judge Layn Phillips might join

2    him.  They know each other well.  He's been off the bench

3    longer and he's done a number of these fee petitions and,

4    therefore, is accustomed to the evidence normally required,

5    but that, I think, is also more a question for what Judge

6    Rosen wishes to do.

7    We are before you with no objection to Judge Rosen.

8    We appreciate the opportunity to present to a special master

9    of his qualifications.  If he wants help, he'll ask for help.

10   I would be very surprised if he could not himself protect the

11   interests of the class, as your Honor does as a fiduciary to

12   the class at this stage in the proceedings, but if he feels

13   the need to have someone asking the questions, for example, or

14   researching an issue and presenting a brief, he can certainly

15   do that, and that is the appropriate model once the Court has

16   made the election of investigative model, i.e., special master

17   versus adversarial model, like guardian ad litem.

18   Turning just very quickly to the issue of CEI.  Your

19   Honor can already see there is a long history between CEI or

20   CCAF, the law firm of Mr. Frank that was acquired by CEI in

21   2015, and the plaintiffs' law firms in these cases.  It isn't

22   a happy relationship.  It is a circumstance where labels have

23   been applied on both sides.  He has had some very unpleasant

24   things to say about the lawyers who are willing to take the

25   risks of bringing class actions.  We're not talking coupon

1    cases here, your Honor.  We're talking about law firms that

2    represent sophisticated institutional clients who often come

3    to them with these specific questions in recoveries like this

4    of $300 million being divided among 1300 such institutional

5    investors.

6         So, I don't wish to -- I don't wish to turn it

7    adversarial in the courtroom between CEI and the plaintiffs'

8    law firms.  You have seen the submissions.  In the view of the

9    plaintiffs' law firms, Mr. Frank has made a bit of a hobby of

10   being a professional -- or a vocation of being a professional

11   objector in their cases.  It would not be productive or

12   helpful to this process, and I respectfully suggest it would

13   not be helpful to Judge Rosen to have Mr. Frank present in

14   light of the unfortunate relationship and history that has

15   evolved.

16        THE COURT:  Well, here's what I'm going to do.  I

17   want to get this proposed notice and I want to think about all

18   of this further, whether I'm going to issue the notice, but

19   I'm not going to decide the motion for CCAF or CEI to

20   participate separate from the issue of notice.  I'm going to

21   take it under advisement, and I'll decide it sometime after I

22   get back next week.  All right?

23        MS. LUKEY:  Thank you, your Honor.

24        THE COURT:  All right.  Let's move to the issues

25   relating to the master.

1      As I understand it, there's no dispute regarding my

2   authority to appoint the master to investigate and issue a

3   report and recommendation regarding -- on issues regarding

4   reasonable attorneys' fees, expenses, and I would say service

5   awards as well, but can I get confirmation of that?  Does

6   anybody want to -- does anybody object to the appointment of a

7   master?

8           MS. LUKEY:  No objection.

9           MR. KELLY:  No, your Honor.

10          THE COURT:  And I have this in mind.  I'm sorry, Mr.

11  McTigue.  You have a particular objection to Judge Rosen.

12  We'll get to that.

13          MR. McTIGUE:  Very good.

14          THE COURT:  Try to start broad and narrow it down.

15          Then I told you that a proposed order -- and this is

16  another issue that Mr. McTigue is interested in.  The payment

17  of $2 million to the District Court, which I hope will prove

18  to be more than necessary for the master to do his work and

19  the people he employs to help him or to pay the master,

20  co-master.  That's still an open issue, but it's my

21  understanding that plaintiffs agree that I have a submission

22  by the Labaton firm saying that lead counsel is prepared to

23  deposit funds with the Clerk of Court in such sums and at such

24  times as the Court may order to be used to pay fees and

25  expenses.  It says of the co-special master.

1          Are you willing to pay to the Court if ordered to do

2    it -- well, are you willing to pay to the Court $2 million for

3    the master or if I decide it's necessary or appropriate to

4    appoint a co-master?

5          MS. LUKEY:  If I'm understanding, the question is,

6    are we willing to make such payment if it's one master as

7    opposed to co-masters?

8          THE COURT:  Yes.

9          MS. LUKEY:  The answer to that is yes.  I would

10   appreciate if it can be done on an as-needed basis.  That is,

11   the master can indicate --

12         THE COURT:  No.  No, because -- I mean, this jumps

13   ahead on my outline a little bit.

14         MS. LUKEY:  Sorry.

15         THE COURT:  The Court is going to pay the master and

16   it will be comparable to Criminal Justice Act applications.

17   So, it will be paid.  It will be held, as I understand it, in

18   an interest-bearing account, but it needs to be paid to the

19   Court.

20         MS. LUKEY:  If the Court so orders, then the payment

21   will come in as ordered and when ordered.

22         THE COURT:  What's the minimum reasonable time to

23   make the payment?

24         MS. LUKEY:  May I consult with my client?

25         THE COURT:  Yes.

```
1              (Discussion off the record.)

2         MS. LUKEY:  Would five business days be acceptable

3    for putting the money in?

4         THE COURT:  Very.

5         MS. LUKEY:  Thank you.

6         THE COURT:  That's about what I had in mind, can you

7    do it within a week.  All right.

8              But Mr. McTigue raised a point.  As I understand it,

9    he's saying for media purposes and eventually if anything is

10   -- if the fee award is reduced, it should come from the funds

11   that went to Labaton, Thornton and Lieff and not from the

12   funds that went to ERISA counsel.  Do I understand your

13   position correctly?

14        MR. McTIGUE:  Yes, your Honor.

15        THE COURT:  Let me actually just say for media

16   purposes; is that agreeable?

17        MS. LUKEY:  No.

18        THE COURT:  Okay.  Then let me -- Mr. McTigue, why

19   don't you speak to your position and then I'll hear the

20   response.

21        MR. McTIGUE:  I think your Honor is referring to the

22   clawback letter that I put in as an exhibit to my --

23        THE COURT:  Yes.  Okay.  So -- I don't know if you've

24   had any discussions with Ms. Lukey about this.  So, $2 million

25   is going to come to the Court in the next week, and you should
```

1    explain this to me, even though I've read it, what your

2    position is with regard to any -- whether any of that money

3    should come from money attributed -- or paid to you.  So, why

4    don't you go ahead.

5         MR. McTIGUE:  Well, your Honor, I think our

6    submissions say everything that I would need to say again

7    here.

8         THE COURT:  You can repeat it.  I've got a big pile

9    of things and I was here Saturday and Sunday, yesterday.  I've

10   read all of this, but there's a lot to read.  So, you won't

11   insult me if you repeat.

12        MR. McTIGUE:  Well, your Honor, the original letter

13   from Labaton that went to the Court that revealed the

14   circumstances regarding what appears to be double billing, et

15   cetera, had a footnote and that footnote was in there and it

16   said that the ERISA counsel are not affected by these alleged

17   double billings and, as my declaration said, my firm did not

18   know about the staff attorneys, the alleged double billing, or

19   anything related to it.  We never heard of the name of a staff

20   attorney in the whole of the litigation.  We were surprised.

21   We learned about it after the Globe learned about it through a

22   -- the communications that eventually resulted in the letter

23   to the Court by the Labaton firm.

24        So, we are not involved.  We have never taken part in

25   the practices that will be subject to the special master's

1    investigation, and we believe that the clawback letter was

2    proffered to us in an attempt to have us share in the paying

3    that may be felt by --

4              THE COURT:  The clawback letter says what?

5              MR. McTIGUE:  Well, it says two things.

6              THE COURT:  Let me -- there's a chronology to this.

7    So, I made an award on November 2nd and then I was sent the

8    letter on, I think, November 10th from the Labaton firm.  Now

9    you're referring to something you're calling the "clawback

10   letter"?

11             MR. McTIGUE:  Yes.  It's a letter dated November 28th

12   in which the Labaton firm said two things to us:

13             First, they would not distribute the attorneys' fees,

14   awards and the representative plaintiffs' service awards, et

15   cetera, unless we first committed to return it if any of the

16   funds that were awarded by the Court -- had previously been

17   awarded by the Court were called back, and it seems to me that

18   the three firms that are -- whose practices are going to be

19   reviewed here will use that to cause us to pay for the paying

20   that they may have incurred for themselves.

21             Secondly, they said that they would not distribute

22   the award which you had previously ordered be distributed

23   immediately, and I don't think they have the authority to do

24   that under your Honor's order, and our position is that we

25   should not have to pay any special master's expenses and costs

1     or any award unless we are found to be liable for something by

2     the Court. In other words, I don't think the clawback letter

3     should be used by the three firms to cause us to pay sums that

4     they have to return.

5         THE COURT: You're calling yourself ERISA counsel.

6     You represented -- were there originally more than one case

7     that was consolidated?

8         MR. McTIGUE: Yes, we filed a separate action.

9         THE COURT: So, you had brought a separate -- you and

10     perhaps others brought a separate action on behalf of the

11     ERISA class?

12         MR. McTIGUE: Yes.

13         THE COURT: And that was consolidated with this case?

14         MR. McTIGUE: Subsequent to our filing.

15         THE COURT: What's that?

16         MR. McTIGUE: Subsequent to our filing.

17         THE COURT: And I think you told me in your papers

18     that your firm, at least, didn't receive a multiplier of its

19     lodestar. In fact, you only received 90 percent of your

20     lodestar?

21         MR. McTIGUE: Yes, about 91 percent.

22         THE COURT: 91. Now, I didn't expressly -- well, I

23     didn't say anything about service awards in my February 6th

24     order, but now I have -- I'm going to want the master to look

25     into the reliability of the representations made to get the

```
 1    service award and the amounts of them, whether they were
 2    reasonable.  So, that wasn't addressed in your papers.  How do
 3    you think that should affect my thinking on the point you're
 4    raising?
 5              MR. McTIGUE:  Well, the clawback letter proffered by
 6    Labaton Sucharow expressly refers to return of services.
 7              THE COURT:  I'm sorry.  Hold on just one second.
 8              (Discussion off the record.)
 9              (Pause.)
10              THE COURT:  Okay.  How much money did your firm get
11    of the $75 million?
12              MR. McTIGUE:  $2.5 million.
13              THE COURT:  And the service award to your clients was
14    $10,000 each to -- how many?
15              MR. McTIGUE:  Yes, and I distributed the $2.5 million
16    among four firms.
17              THE COURT:  Four firms?
18              MR. McTIGUE:  Yes.
19              THE COURT:  And the .91?
20              MR. McTIGUE:  Every firm got .91 of their lodestar.
21              THE COURT:  And then the service awards to the ERISA
22    plaintiffs totaled how much?
23              MR. McTIGUE:  $10,000 apiece, total of $40,000.
24              THE COURT:  All right.  Ms. Lukey, what would you
25    like to say about this?
```

1          MS. LUKEY:  Let me first correct a factual error on

2     the lodestar issue, which is his two co-counsel.  One got a

3     factor of 1.8 and the other a factor of 2.1.  The division --

4     the fee allocation agreement that was entered into early in

5     the case among all of the various firms once the consolidation

6     occurred was a percentage of fee or POF award which says the

7     ERISA group combined would take nine percent and the

8     institutional claimants for whom Labaton has been lead

9     counsel -- I guess for everybody, actually, but they would

10    take 91 percent.

11         Later Labaton suggested to its companion two firms

12    that enough work had been done -- actually, not by Mr.

13    McTigue's firm, but by all three of the firms together or four

14    firms, that they should get ten percent and without having to

15    do so, they changed the allocation to ten percent.  How they

16    divided it among themselves was up to them, not up to the

17    other institutional group headed by Labaton.

18         So, if Mr. McTigue ended up with a little under the

19    lodestar, that's because of the allocation made among that

20    group.  Because, as I said, the other two of which we know got

21    a 1.8 factor and a 2.8 factor.

22         Now, stepping back from that, having corrected that

23    misunderstanding, we believe this is an issue that actually

24    the Court could easily and quite properly leave to Judge Rosen

25    after he has heard all of the --

1    THE COURT:  Well, there are two separate issues.  One

2    is should the ERISA firms have to contribute to the $2 million

3    being deposited to the Court and then ultimately some of that

4    will be spent, but I might find the $75 million still is

5    reasonable.  You get the balance back and -- or I might find

6    that it should be reduced and I might decide how much it

7    should be reduced for each party, but this is essentially --

8         MS. LUKEY:  We can address that.

9         THE COURT:  -- only the issue of whether they should

10   be required to deposit -- or contribute to the initial

11   deposit.

12        MS. LUKEY:  Well, they probably should be required.

13   The answer is that the other three firms will attempt a filing

14   of the $2 million, your Honor.  We're not going to look to

15   them for the contribution to the $2 million --

16        THE COURT:  That's the only question I'm asking now.

17        MS. LUKEY:  Well, then the answer is, without waiving

18   any rights or suggesting that they don't have to share if the

19   overall is reduced, we agree to take care of that portion.

20        THE COURT:  Okay.  And that's what I would have

21   ordered if you -- I think if you didn't agree that the $2

22   million should come from the funds that were distributed to

23   Labaton, Thornton and Lieff, but it's without prejudice to

24   what any allocation -- the allocation of any reduction down

25   the line.  I'm not addressing that.  I just want to get the

1    money so we can get going.

2              MS. LUKEY:  We agree.

3              THE COURT:  All right.  Mr. McTigue, I think that

4    addresses your immediate concern.

5              MR. McTIGUE:  My immediate concern it does address.

6              THE COURT:  This is how I usually work, step by step.

7              If I eventually decide, you know, 75 million was

8    indeed reasonable, any other issues are moot, although there

9    won't be 75 million left, but there still will be a lot, by

10   judges' standards.

11             MR. McTIGUE:  We would like, your Honor, to remain

12   aware that if -- that the clawback letter should not -- should

13   not be used to make us pay --

14             THE COURT:  You have put me on notice of that issue

15   and I'm just not addressing it now.

16             MR. McTIGUE:  I understand.

17             THE COURT:  Thank you.  All right.

18             So, then we come to the specific issues relating to

19   former Judge Rosen, retired Judge Rosen.  As I understand it,

20   all of the parties agree that Mr. Rosen at the moment is

21   eligible to be appointed as master, except Mr. McTigue based

22   on the written submission.

23             In the February 6th, 2017 order, at Pages 11 and 12,

24   I describe Judge Rosen's relationship with Elizabeth Cabraser,

25   a member of one of the law firms at issue in this case.  They

1    were co-authors of a book or they each write chapters of

2    employment law, update the chapters.  Exhibit D to the

3    February 6th order is the Rosen affidavit describing that

4    relationship, and I didn't discern from the papers -- written

5    submissions, that anybody asserts that Judge Rosen is actually

6    biased or prejudiced or if he were the judge in this case

7    would be disqualified under Section 455(b).  I understood the

8    question was could a reasonable person question his

9    impartiality, which is an issue under Section 455(a).  Is

10   anybody claiming that he would be actually biased or

11   prejudiced or subject to disqualification for any reason under

12   455(b)?

13            MS. LUKEY:  No, your Honor.

14            THE COURT:  If anybody takes that position, they

15   should tell me now.

16            MR. McTIGUE:  Your Honor, I want to make it clear

17   that we have made no comments on 445(b) because we could find

18   none.

19            THE COURT:  Because what?

20            MR. McTIGUE:  We could find none.

21            THE COURT:  Okay.  So, the issue, as I understood it,

22   exclusively under 455(a), plaintiffs' counsel, except for Mr.

23   McTigue, agreed with Judge Rosen's view and the tentative view

24   I expressed in the February 6th order, that a reasonable

25   person could not question his impartiality, and the others,

1    other than Mr. McTigue, in any event, and waived any 455(a)

2    ground for Mr. Rosen's recusal.  They could if he were a

3    judge.

4          Mr. McTigue asserts a reasonable person could

5    question Mr. Rosen's impartiality and proposed instead the

6    appointment of retired Judge James Rosenbaum.  I know Judge

7    Rosenbaum.  We became judges about the same time, exactly the

8    same year, but I couldn't appoint him now.  He hasn't filed

9    the affidavit disclosing whether there are any grounds for his

10   recusal required by Federal Rule of Civil Procedure 53(a) that

11   I said would be required to be considered in my February 6th

12   order at Page 12, Footnote 4.  So, at the moment he's not an

13   eligible candidate.

14          MR. McTIGUE:  May I comment, your Honor?

15          THE COURT:  Yes.

16          MR. McTIGUE:  I talked with Judge Rosenbaum about

17   this subject, his affidavit, and he informed me that he had

18   encouraged Judge Rosen to join JAMS.

19          JUDGE ROSEN:  We're old friends.

20          MR. McTIGUE:  And that is correct.  That's good to

21   hear.

22          And he said, "You do not campaign for these

23   positions.  It just is not done, Brian."  And he said he might

24   consider providing an affidavit or going further, if your

25   Honor was interested, but he has said very good things about

1    Judge Rosen to me, and I know Judge Rosenbaum from his serving

2    as a mediator in one of our cases and that's why I recommended

3    him.  So, I am comfortable at this point with your appointing

4    Judge Rosen and I will withdraw my objection.

5            THE COURT:  All right.  Thank you.

6            20 years ago Mr. Kelly and I were involved in a case

7    where the government waived its objection to my participation

8    in a case and based on matters disclosed and those matters

9    were later raised as a basis for my disqualification, and I

10   found they had been waived, but I appreciate what you said,

11   but, nevertheless, I told Judge Rosen to be prepared to orally

12   explain his relationship with Ms. Cabraser and anything else,

13   and I just think it would be prudent to do that because when I

14   have a recusal -- when I have a 455 issue myself, I disclose

15   what I think should be disclosed and I ask the parties if they

16   have any questions they want to ask me.  So, he's been sitting

17   there silently.  I think he won't mind amplifying what he put

18   in his affidavit.

19           JUDGE ROSEN:  Thank you, Judge.  Thank you all.

20           I've been trying to think -- I filed the affidavit.

21   Everything that is in the affidavit in Exhibit D is exactly

22   accurate.  Let me just amplify upon it just a little bit.

23           I was the lead co-author on a Rudder book.  Those of

24   you who are from California may know the Rudder Practice

25   Guides.  The book is Federal Employment Litigation.

1  Originally there were five co-authors, three judges and two

2  lawyers.

3       About five years ago one of the judges and one of the

4  lawyers, Judge Barbara Rothstein, and a lawyer, Kathleen

5  Vogus, decided that they had enough and wanted to come off the

6  book. As the lead co-author, I had to find replacements for

7  them. I did not know Elizabeth Cabraser. I had, I think,

8  heard her name, but I did not know her, but she came highly

9  recommended, not only by a couple of the other judges on the

10  book, but by Kathleen Vogus, who was coming -- the lawyer who

11  was coming off the book.

12       I called Liz. We talked about it. She said she was

13  interested. Coincidentally, we were going to be on a panel

14  together. I believe it was in Chicago, but it was a class

15  action panel and we agreed to talk about it there. We did

16  talk about it. She agreed to do it.

17       I want to stress this. The nature of the Rudder

18  books is that there are co-authors, judges and attorneys. The

19  Rudder Group is a publishing company, sort of a niche

20  publisher in California. It's part of the West Publishing

21  Company, which is now owned by Thomson Reuters. Each

22  co-author is effectively an independent contractor based on

23  the books I worked on.

24       I have another book in which I'm co-author with three

25  judges and a lawyer from Gibson Dunn, Federal Civil Trials and

Evidence.  We are all independent contractors.  We make our
own contractual arrangements with the Rudder Group.  So, I've
had no negotiations whatsoever with Liz about her royalty
arrangements or anything else.

I have a general sense, going back to my original
arrangement before Liz was on the book, Rothstein was on,
Kathleen Vogus was on, of sort of the split, but she may have
cut her own deal, to be honest.  I don't know that.  We're all
basically independent contractors, and in practice the way it
works out, we update the book every single year.  We have a
time slot that we have to get our updates in by and we are all
responsible for our own updates.  We don't even review the
submissions of the other authors.  We see them after they have
been edited, and then they're all sent out to each of the
co-authors after they've been edited by the editors at the
Rudder Group.

So, that -- with respect to the book, that is really
the extent of our relationship.  Our income is not dependent
on each other and is really not influenced in that sense by
each other either.  So, that's the book relationship.  I'm
happy to answer any questions.

THE COURT:  I'll ask you one, which I've asked you
before, because I learned it after I issued my order.  Did the
Lieff Cabraser firm appear before you as a Judge?  Did you
disclose this relationship with the book?  And what was the

1    response of the party?

2          JUDGE ROSEN:  You've anticipated me, Judge.  That's

3    where I was going next.

4          THE COURT:  I see.

5          JUDGE ROSEN:  The Lieff Cabraser firm has appeared

6    before me.  I had for a brief amount of time the *Volkswagen*

7    MDL that is now being handled by Judge Bryer out in

8    California.  There are other lawyers here who were on that

9    case, as well as Mr. Sarko, and at that time I did disclose --

10   we had a meeting in my chambers with plaintiffs' counsel and I

11   disclosed the relationship of the book, not only to

12   plaintiffs' lawyers, but also to the book's lawyers that were

13   there as well.  They found no reason to request my recusal.

14         THE COURT:  Does anybody wish to ask Judge Rosen any

15   further questions?

16         JUDGE ROSEN:  The only thing I would add -- and I

17   apologize to the Lieff Cabraser firm.  I may have had other

18   cases over the years with Lieff Cabraser.  I don't remember

19   having --

20         THE COURT:  And I believe the submissions show that

21   you've had matters with Mr. Sarko as well --

22         JUDGE ROSEN:  Yes.

23         THE COURT:  -- in court?

24         JUDGE ROSEN:  Mr. Sarko has appeared in at least two

25   large class actions, one relatively recently concluded.  His

1    firm and partners of Sarko have appeared.  I have high regard

2    for their lawyering skills.  They've done on both -- in both

3    cases they admirably represented the class, and I've gotten to

4    know Mr. Sarko a little bit through those relationships.

5            I do want to disclose one thing.  Mr. Sarko's memory

6    on this might be better than mine, but we were together at a

7    conference in Atlanta about two months ago, roughly.  That's

8    about right.  There was another class action conference, and

9    as I was getting ready to come off the bench, I was interested

10   in the plaintiffs' view of what the going rates were, and Mr.

11   Sarko and I and several of the other plaintiffs' lawyers that

12   were there as well as some of the defendant lawyers had

13   discussions about that.  Mr. Sarko gave me his discussion --

14   his view, I should say, on what going rates were for different

15   kinds of cases.  I think that describes the extent of our

16   relationship.

17           I hope no one will ask me what Mr. Sarko told me the

18   going rates should be, but I would be happy to answer that as

19   well.  I will only say that in this case, my proposed rate is

20   less than the recommendations I received from Mr. Sarko and

21   other lawyers.  Is that about accurate?

22           MR. SARKO:  That is totally accurate, your Honor.

23           THE COURT:  Okay.  Is there anybody who would like to

24   ask Judge Rosen any question?

25           (No response.)

1    THE COURT:  No.  All right.

2    Well, now there are no objections and, I take it, Mr.

3    McTigue, like the others, waives any objection under 455(a).

4    I've applied the standards that I set out with some care in

5    2015 in *United States vs. Sampson*, 148 F.Supp.3rd, 75, at 85

6    to 88, and I considered what was the objection in advance, and

7    I agree that a reasonable person could not question Judge

8    Rosen's impartiality and the circumstances have been fully

9    disclosed.

10    So, now there's the request of -- the Labaton firm

11    proposes that former Judge Layn Phillips, who I also knew as a

12    judge, be appointed co-master with Judge Rosen.  The Thornton

13    firm joins in that request.  Would you like to speak to it?

14    MS. LUKEY:  Just very briefly.  And I recognize, your

15    Honor, that you have indicated you wish to limit the

16    communications that occur between Judge Rosen and you, but we

17    consider this to be more a procedural issue, not substantive.

18    THE COURT:  Well, in fact, that's my intention, and I

19    think I probably characterized them as administrative in the

20    future, but at this point, until I issue the order, I may talk

21    to him.

22    MS. LUKEY:  And we actually would encourage you to do

23    so.  Our suggestion to add Judge Layn Phillips as a co-master

24    is one that we're hoping will both streamline and expedite the

25    process, but we have recommended and requested only if it's

1    acceptable to Judge Rosen.

2         The thinking behind it is because Judge Phillips has

3    been off the bench for several years now and has, I believe,

4    specialized, but at very least, on a large number of the fee

5    petition mediations or arbitrations in cases similar to this.

6    He has developed a fairly streamlined approach, knows what

7    he's looking for, the investigation, and so forth.  We thought

8    that might be helpful to Judge Rosen since he has much more

9    recently come off the bench and Judge Rosen, of course, has

10   his own class action experience, while a sitting Article III

11   Judge wasn't going through the mediations, and the like.

12        So, it is our suggestion that if Judge Rosen wanted

13   to have that assistance, we would like to see that

14   appointment.  He has the power to join others, we suggested,

15   as co-master and leave it to you as an Article III Judge and

16   to Judge Rosen as special master what role might be offered,

17   but our goal, frankly, because, as you can imagine, this whole

18   process has cast a bit of a shadow and caused doubt, we would

19   like to move forward as efficiently and quickly as we can.

20        THE COURT:  And I appreciate you're putting it the

21   way you just put it.  Your submission indicated that Layn

22   Phillips has in the past been paid by the majority of the

23   firms in the cases, correct?

24        MS. LUKEY:  Correct.

25        THE COURT:  And he's now serving as a mediator in a

1    class action in which Labaton, Lieff and/or Keller represent
2    the plaintiffs, right?
3            MS. LUKEY:  Correct.
4            THE COURT:  And his fee schedule shows he gets paid
5    up to $43,000 a day, right?
6            MS. LUKEY:  I haven't looked at it lately, but --
7            THE COURT:  First day in New York, $43,000.  So, he's
8    actually being paid now, evidently, by some of the firms in
9    this case.
10           MS. LUKEY:  Yes.
11           THE COURT:  I'm not going to put this on Judge Rosen.
12   I'm not going to appoint Judge Phillips.  I don't find that
13   two masters are necessary or appropriate.  I think it could be
14   cumbersome and difficult to coordinate.
15           As I said, former Judge Phillips charges $43,000 a
16   day.  Judge Rosen is going to charge $11,000 a day, which is
17   less than, apparently, Mr. Sarko suggested he charge.  In
18   fact, I understand he's actually going to charge $800 an hour
19   -- or he's going to charge $800 an hour, not by the day, but
20   our review is to make sure they're reasonable.  Because Mr.
21   Phillips has been paid in the past by majority of the firms in
22   the case and now, evidently, was being paid by some of them.
23   I think there would be a serious question as to whether he's
24   eligible under 455(a), but in a certain way you anticipated
25   me, and this is the flip side of Mr. Frank.

1    If Judge Rosen and Judge Phillips -- they're good
2    friends, I'm told.  If he thinks that Judge Phillips has some
3    expertise and he wants an amicus brief or if you hire him as
4    an expert, he may solicit and consider what Judge Phillips has
5    to say in the way he's free to, if he wants to, get advice or
6    assistance from Mr. Frank, but that I leave up to him, but I'm
7    not going to appoint Judge Phillips.  All right.
8        JUDGE ROSEN:  I would only say, Judge Phillips has
9    always been available to give me advice on a range of issues
10   over the years.
11       MS. LUKEY:  Thank you.
12       THE COURT:  On the other hand, the master won't have
13   any ex parte communications, either.  We have jurisprudence in
14   the First Circuit that says you can't consult experts without
15   disclosing it to the parties.  If it turns out that occurred,
16   I will probably have to deal with it in connection with the
17   report and recommendation.
18       So, the scope of the master's work, in the February
19   6th 2017 order I said at the conclusion of his investigation
20   Judge Rosen will prepare for the Court a report and
21   recommendation concerning, one, the accuracy and reliability
22   of the representations made by plaintiffs' counsel and their
23   request for attorneys' fees and expenses, including but not
24   limited to whether counsel employed correct legal standards
25   and had a proper factual basis for what they represented to be

1    the lodestar for each firm, total lodestar.

2            Two, the reasonableness of the amount of the

3    attorneys' fees and expenses that were awarded, including

4    whether they should be reduced; and, three, whether any

5    misconduct occurred; and if so, four, whether it should be

6    sanctioned.

7            I think I would now specifically add, although it's

8    embraced by that more general language, that I would like the

9    master to investigate and advise on the accuracy and

10   reliability of the representations made in the November 10,

11   2016 letter from Labaton.  That is Exhibit 8 in my February

12   6th decision.  Also the service awards, the accuracy and

13   reliability of the representations that were made in awards or

14   the fact that the named plaintiffs were actively supervising

15   the lawyers in the litigation, and any possible sanctions, and

16   I don't -- I'm open-minded myself on all of this, but

17   sanctions -- there could conceivably be disciplinary sanctions

18   for any proven violation of the Rules of Professional Conduct.

19   For example, Rule 3.3(a)(1) of the Supreme Judicial Court's

20   Rules of Professional Conduct adopted by the District Court or

21   incorporated by the District Court, provide that lawyers shall

22   not knowingly make a false statement of fact or law to a

23   tribunal or fail to correct a false statement of material fact

24   or law previously made to the tribunal by a lawyer.

25           In addition, Federal Rule of Civil Procedure 11(b)(3)

1    requires the factual contentions have evidentiary support.

2    So, I regard that within -- that to be within the master's

3    mandate, and then the master is to be authorized to

4    investigate all issues relating to attorneys' fees, expenses

5    and service awards to the plaintiffs in this case.

6            Would anybody like to comment on that sort of

7    amplification on what I wrote in my February 6th order?

8            (No response.)

9            THE COURT:  Apparently not.

10           Who will be -- do you know who should be the primary

11   liaison for Judge Rosen as master?

12           MS. LUKEY:  Your Honor, I would assume, although we

13   haven't consulted about that, that would fall to me since

14   Labaton was lead plaintiffs' counsel.

15           THE COURT:  We'll operate on that assumption, and

16   there may be discrete issues.  They should deal primarily

17   directly with somebody else.

18           Then, as I said, I intend to pay -- compensate Judge

19   Rosen and individuals and organizations he employs reasonable

20   rates from the $2 million being returned to the Court.  I hope

21   that will not be needed, but if somehow it is, I'll give you

22   notice and an opportunity to be heard where it should come

23   from.  I particularly have in mind that Judge Rosen can retain

24   counsel and possibly an accounting firm or others, and I will

25   monitor who is being employed and what the proposed rates are.

1          Mr. McTigue.

2          MR. McTIGUE:  Your Honor, I think with respect to the

3     ERISA firms -- or at least my ERISA firm, that we should have

4     a separate channel to the special master.

5          THE COURT:  Yes.

6          MR. McTIGUE:  And I would offer my firm.

7          THE COURT:  I think that's a valuable refinement.

8     You can talk --

9          MR. KRAVITZ:  Can we discuss who --

10          THE COURT:  You can discuss --

11          MR. KRAVITZ:  -- liaison?

12          THE COURT:  Yes, you can discuss who that should be,

13     and I'm ordering by March 13th that you tell me who will be

14     the primary liaison for the ERISA group and who for the

15     institutional group and, as I said, it's foreseeable there may

16     be discrete issues.  It doesn't mean Judge Rosen can't deal

17     with everybody or anybody directly, but -- okay.  There should

18     be a liaison.

19          MR. McTIGUE:  Your Honor, I only offer this one

20     statement, that thus far I think we have injected in my firm

21     the adversarial-ness in the proceedings, and the

22     adversarial-ness has not been joined in, at least my comment

23     on -- my knowledge or comment on Judge Rosen has not been

24     joined in by --

25          THE COURT:  This is up to all of you and, in fact,

1    you don't have to designate him, if you say you can't agree,

2    but I just have a feeling -- I'm interested in efficiency, but

3    I -- the adversary process hasn't operated up until this date,

4    and this hearing is very helpful.  I do want maximum

5    information.  That's how judges and masters performing a

6    judicial role get educated and make well-informed decisions.

7            But, anyway -- I'm sorry.  Say your name.

8            MR. SARKO:  Lynn Sarko, your Honor.

9            Your Honor, we will confer.  There were two ERISA

10   cases that were consolidated.  We may end up with having two

11   names instead of one, but we will come to you.  We'll try to

12   agree on somebody.

13           THE COURT:  That will be fine.  I just wanted it to

14   be as efficient as possible, but the process I intend to use,

15   I'm going to have Judge Rosen give me his bills and the bills

16   of people he may employ ex parte under seal.  I'll review them

17   and authorize them.  This is the process essentially used

18   under the Criminal Justice Act, and then when it's over, I

19   expect that I'll make part of the public record the amounts

20   that were paid.

21           With regard to his powers and responsibilities,

22   they'll be to conduct an investigation, to have the full

23   authority permitted by Rule 53.  That includes the power to

24   compel, take and record evidence, to require the production of

25   documents from the law firms and third parties, to interview

1    witnesses, conduct depositions and, if appropriate, hearings,

2    and to use counsel, if he wishes, to assist in the

3    investigation and litigation.

4          As I said in my February 2 order, that he attempt to

5    complete the investigation and submit a report and

6    recommendation in six months, but once you start on these

7    things, you can't be sure how long they will take, but he's

8    assured me that he can devote substantial time and give high

9    priority to this matter.

10         I want to minimize any ex parte communications with

11   me because I'll need to decide any objections to his report

12   and recommendation.  So, I intend to limit ex parte

13   communications to what I call administrative matters at this

14   point, fee requests or procedural matters, if there are any.

15         It's conceivable to me there may be a substantive

16   matter that -- well, this is not -- if there's some

17   substantive matter he wants to discuss with me, communicate

18   with me ex parte.  That means without the law firms knowing.

19   He'll have to file a motion and explain it.  And it's also

20   conceivable to me that there may be some matters that he would

21   serve on the law firms that need to be brought to me, but

22   should be confidential with regard to the public, and there

23   can be a request to make some submissions under seal.

24         Does anybody want to comment on that sort of

25   framework?

1          (No response.)

2          THE COURT:  No.  Okay.

3          And then I intend to put in my order that since he's

4     performing delegated judicial functions, he should have

5     immunity to the extent I would have.  He'll be required to

6     issue a report and recommendation -- well, he'll issue -- he

7     may issue orders during the course of the case.  Rule 53 deals

8     with this.  If a party objects or has an objection, at least

9     ordinarily it should be made to me within seven days, and I'll

10    require the master respond in seven days.  I think the rule

11    gives 21 days, but it sounds too long.  And then he'll file a

12    report and recommendation.  It will be served on the

13    attorneys.  It will be public.

14         Any objections will have to be filed within 21 days

15    pursuant to Rule 53(f)(2).  I'll decide any objections to the

16    facts de novo and review the legal conclusions de novo, as

17    required by Rule 53(e)(3) and (4) respectfully --

18    respectively, and if a hearing is necessary or appropriate,

19    I'll conduct a hearing.

20         Does anybody want to be heard on that?

21         (No response.)

22         THE COURT:  No.

23         Mr. Sutherland -- who is on the telephone now,

24    please?

25         MR. PEHOUSHEK-STANGELAND:  This is James Pehoushek-

1    Stangeland.  I'm here.

2            MR. TAYLOR:  Bill Taylor is here.

3            THE COURT:  Okay.  We're getting close to the point

4    -- or at the point where we should try to get Mr. Sutherland,

5    but he can wait a minute on that.

6            I want to ask some questions that I hope will

7    facilitate the master's work.  Are the contemporaneous

8    records, billing records, still available?

9            MS. LUKEY:  They're maintained firm by firm.  I can

10   answer for Labaton that they are, your Honor.

11           THE COURT:  Is there anybody who doesn't have them

12   available to be produced if requested by the master?  Mr.

13   Kelly?

14           MR. KELLY:  We'll make them available.

15           MS. PALMER:  Your Honor, because we withdrew in 2013

16   -- actually, our billing stopped in 2012.  I need to check our

17   storage facility.

18           THE COURT:  Say your name, please.

19           MS. PALMER:  I'm sorry.  Kimberly Keevers Palmer with

20   Richardson, Patrick.

21           I need to check our storage because we usually

22   destroy some records, but I believe we do have most of them,

23   but because of the time lag, we may not have all of them.

24   They have them in computer form, but some of us hand wrote

25   them on written sheets of paper and then they were transferred

```
1    into computer form.  So, I don't know if we have the
2    handwritten part, but we have the computer part.
3            THE COURT:  All right.  Thank you.
4            And does anybody foresee an impediment to producing
5    documents requested by the master or responding to questions?
6    Mr. Kelly.
7            MR. KELLY:  No, your Honor, not at this time.  I
8    think this hearing has been helpful and I don't anticipate any
9    problems with that.
10           THE COURT:  Okay.  Because if there are foreseeable
11   issues that would be a problem, I'd like to know about them or
12   if they emerge, as soon as possible and see how they might be
13   resolved.
14           I have some -- evidently, in response to the -- I was
15   told in response to media inquiries, but in response to the
16   inquiries I assume the Boston Globe was making, I got the
17   November 10 letter, but are there any other corrections or
18   clarifications of anything that was represented by anybody
19   that should be made?
20           MR. KELLY:  Your Honor, we don't have a final note,
21   but I know one of the issues driving the Court's opinion is a
22   concern, justifiable, that the hours worked were actually
23   accurate, and the Court in its opinion did highlight Mr.
24   Michael Bradley, and I can say that while we -- we haven't
25   done an exhaustive search of every billing record that we
```

1    could get, to date it actually appears that he worked more

2    hours than was submitted to the Court.  So, at least with

3    respect to that, I think we can represent his hours that were

4    represented in the affidavit to the Court were actually

5    slightly below what the contemporaneous records show.

6            And just so the Court knows, the contemporaneous

7    records are in various formats, like other counsel has

8    mentioned.  It's not just time sheets like a traditional firm

9    that doesn't bill on a contingency basis.  So, the records

10   exist.  With respect to Mr. Bradley, there's a lot of emails

11   that show the time that was submitted and --

12           THE COURT:  What were you saying about the records?

13           MR. KELLY:  They're in different formats.  It's not a

14   time sheet at the end of the day for every billing, but the --

15           THE COURT:  There's not a time sheet?

16           MR. KELLY:  There's a calendar that we can see where

17   there's an eight-hour event here or there's an email back and

18   forth showing how many hours.  So, it's not just one format,

19   but they are taken together contemporaneous records that we

20   believe will, in fact, verify the hours submitted.

21           And the only thing I can represent to the Court now

22   is that Michael Bradley's hours, which seem to be not the only

23   focus, of course, of the opinion, but a serious concern to the

24   Court, the hours appear to be more than was claimed.

25           THE COURT:  I was going to ask Mr. Bradley this, but

1     did Mr. Bradley have an association with the Thornton firm?

2          MR. KELLY:  For the purposes of this case, he did.

3     He assisted in many respects, and I think -- you know, it's

4     been, I think unfairly, suggested his rate was 53 bucks an

5     hour.  That's with a state capped rate.  He has various rates

6     for various matters, and I think there was, in fact, one

7     matter before this case he charged $450 an hour.  I know -- I

8     don't want to get too far into the weeds.  I'm sure the

9     special master --

10         THE COURT:  No.  This actually is something I was

11     hoping to get some feel for myself.  So, I think it's

12     appropriate.  In fact, I was going to ask Mr. Bradley if

13     there's anything that he -- do you represent Michael Bradley?

14         MR. KELLY:  I do not, but I have done -- as I said,

15     we've looked into this on behalf of the firm, but I don't

16     speak for him.

17         THE COURT:  I was going to ask some other questions

18     before this.  I asked the general questions.  This is helpful.

19     Mr. Bradley, Michael Bradley?

20         MR. M. BRADLEY:  Yes.

21         THE COURT:  Did you see that it was represented to me

22     that you worked, I think, 406 hours in this case -- on this

23     case?

24         MR. M. BRADLEY:  That's accurate, Judge.

25         THE COURT:  Is that correct?

1          MR. M. BRADLEY:  That's correct, Judge.

2          THE COURT:  And I was also told with regard to

3    everybody who is on that Thornton list, the rate attributed to

4    them.  The rate for you is $500 an hour.  Is what the firm

5    regularly charged for that lawyer?  Has that been charged by

6    the Thornton firm before to paying clients?

7          MR. M. BRADLEY:  Judge, not before this matter.

8          THE COURT:  Not before this matter?

9          MR. M. BRADLEY:  No.

10         THE COURT:  Have you been charged by the Thornton

11   firm, you know, since this matter at that rate?

12         MR. M. BRADLEY:  Post statement, no, Judge.

13         THE COURT:  What did you do with those 406 hours,

14   generally?

15         MR. M. BRADLEY:  Judge, regarding those hours, I

16   reviewed documentation that was submitted to an online

17   platform.  I believe it was called Callis (phonetic).  I

18   received a user name and log-in.  I was able to log in and

19   view various documents from emails to request for proposals

20   over the course of years, approximately, Judge, from March of

21   2013 to June of 2015, at which time I believe tentative

22   agreements were in place, and I was told to conclude.  So, I

23   did keep my notations from that.  I did regularly update the

24   Thornton Law Firm as to what I was doing.  I did have some

25   correspondence --

```
 1          THE COURT:  Speak into that microphone, please.  As I
 2   said, I'm having a little trouble with my ears.
 3          MR. M. BRADLEY:  I did have correspondence with
 4   members of the Thornton Law Firm to update as to what my time
 5   had been.  In addition, Judge, in the unique platform that
 6   they had, there were certain comments you can make as to the
 7   relevance or irrelevance of particular documents.  So, I did
 8   that over the course of two years.
 9          THE COURT:  And is this the only matter that you
10   worked on for the Thornton Law Firm?
11          MR. M. BRADLEY:  No.  Judge, in previous years I
12   worked on some probate matters for the Thornton Law Firm.  In
13   addition, occasionally I would get a referral for a defense
14   case out of that firm.
15          THE COURT:  Do you know what the law firm charged for
16   your time, say, on a probate matter?
17          MR. M. BRADLEY:  Judge, on one occasion I believe I
18   charged $250 an hour.  On another occasion I charged $300 for
19   what accounted for probably less than an hour's worth of work
20   for a voluntary petition for administrative -- for the
21   administration of --
22          THE COURT:  Were those matters that you billed
23   through the Thornton firm or were these matters that were
24   referred to you?
25          MR. M. BRADLEY:  Those are matters that I billed -- I
```

1    had a separate agreement with the clients that were members of

2    a class action group that the Thornton Law Firm handled.  In

3    addition, I had a separate fee agreement.  It was understood

4    that the fee would come out of the funds that were held in

5    escrow at the Thornton Law Firm.  So, essentially, the fee was

6    ultimately paid by the Thornton Law Firm with the approval of

7    the client.

8          THE COURT:  Did you ever charge as much as $500 an

9    hour for your services?

10         MR. M. BRADLEY:  I charged as much as $450 an hour

11    prior to this case, Judge, or at the same time, approximately.

12         THE COURT:  And do you have records reflecting that?

13         MR. M. BRADLEY:  I do have some records reflecting

14    that, Judge.

15         THE COURT:  And in that 2013 to 2015 period, did you

16    work on other cases that didn't have anything to do with the

17    Thornton Law Firm?

18         MR. M. BRADLEY:  Absolutely, Judge.  I worked on

19    many, many criminal cases, again, Judge, in my private

20    practice.  I take, as everybody knows, some cases that are

21    appointed by the Court system for a member of the Norfolk Bar

22    Advocates is capped at $53 an hour.  I also charge flat-rate

23    cases, Judge, that range in the many thousands of dollars.

24         THE COURT:  And do you have daily time records for

25    the other cases on which you worked?

1          MR. M. BRADLEY:  Judge, I have daily time records for

2     the cases for the Thornton group.  I have some time records on

3     the $53 an hour, the state-appointed cases.  I have

4     submissions that are made in response to requests for payment

5     and those records certainly --

6          THE COURT:  And if the master wants to see those

7     records in some way that takes care of any privilege, would

8     you make them available to him?

9          MR. M. BRADLEY:  I would, of course, make available

10    any records that he requested.

11         THE COURT:  Thank you.  Let me ask this to try to get

12    a feel for this, because I'm sure you've given a lot of

13    thought to it.  This question is for the -- essentially, for

14    the Thornton firm.  How did the 9,000 hours get double

15    counted?  Why did that happen?

16         MS. LUKEY:  Your Honor, while this is still under

17    review as they attempt to figure it out, it appears in the

18    case of the special attorneys, the SA's, they were all

19    employed by Labaton.  By agreement with Thornton, though,

20    Thornton was taking over a share of the costs, as was the

21    arrangement among the parties to keep the cost more or less

22    consistent with their fee allocation agreement.

23         It appears that because the system was put in place a

24    little later than the beginning of the case, there was a

25    breakdown in the communication that is supposed to occur in

1    the accounting department to reflect that even though the time

2    records were being entered into the Labaton system because

3    they were Labaton employees -- these are not agency employees.

4    They're regular attorneys who aren't on partnership track --

5    it was entered into their system and there was a

6    miscommunication or a dropped communication in which the

7    accounting department neglected to tell the partner who was in

8    charge of drafting and putting together the fee petitions.

9              So, Labaton has hourly billable rates for all of the

10   attorneys, including the SA's, and they're established and

11   reviewed each year through public filings to make sure that

12   they're consistent with the level of experience and time out

13   of school, and so forth, used in the Court system accepted

14   regularly.  They are -- because Labaton ten years ago became

15   completely a contingent fee firm representing large

16   institutions, those hourly rates, which are consistent, unless

17   a special negotiation occurs with a client, appear in the fee

18   petition, but they are not changed depending on the particular

19   case.  They are the standard rate for each of the attorneys.

20             THE COURT:  Wait a minute.

21             MS. LUKEY:  So, what happened was they ended up --

22             THE COURT:  Hold on just a second, please.

23             (Pause.)

24             THE COURT:  Okay.  I have the declaration of Lawrence

25   Sucharow.  It's Document No. 104-15.  In Paragraph 7 -- let me

1    ask Mr. Sucharow.  Paragraph 7 says, "The hourly rates for
2    attorneys and professional support staff in my firm, included
3    in Exhibit A, are the same as my firm's regular rates charged
4    for their services which have been accepted in other complex
5    class actions."
6              MR. SUCHAROW:  That's correct, your Honor.
7              THE COURT:  Would those rates attributed to the
8    lawyers ever charged to paying clients?
9              MR. SUCHAROW:  We don't have paying clients, your
10   Honor.  Eight years ago we broke away from a combined billable
11   and contingent firm.  Most firms in our field do not have
12   billable clients.  We took out -- we used to say what your
13   Honor thought had said, which was charged to billable clients.
14   We took that out.  That's intended to reflect that we don't
15   have billable clients.  What we do, however, is we report
16   rates to various institutions when asked what are the rates
17   for the people, because -- for example, we can take a case.
18   We can negotiate a fee up-front of 18 percent, and we would
19   say to the client, Well, what if that doesn't even cover
20   lodestar?  And they would say, Well, we're prepared to support
21   a fee that would cover lodestar.  What are your rates?  And we
22   would have to provide rates.
23             So, we kept up the same process that we've always
24   done, which is to solicit that information which is available
25   in the industry, including defense firms, as to what they

1    charge for the same type of person, but, in essence, if the

2    rule were that you could only charge what you've charged to a

3    billable client, we would all be out of business years ago.

4               THE COURT:  The rule is -- and it descends from the

5    Supreme Court, and there are a lot of -- there are several

6    Southern District cases that address this as well.  The rule

7    is that the -- as I understand it, the lodestar should be

8    calculated on the rates charged for comparable lawyers

9    rendering similar services in the community, and this is my

10   present understanding.  I say this because I can be educated

11   and the master can be educated, and what a firm actually

12   charges for that particular lawyer is evidence of a reasonable

13   rate.  Theoretically, that's an arm's-length negotiation

14   concerning it, but, as you know, I read Paragraph 7 where you

15   say the hourly rates are the same as my firm's regular rates

16   charged for their services which have been accepted in complex

17   class action litigation.

18               MR. SUCHAROW:  I would point out, your Honor --

19               THE COURT:  Something other than you're explaining to

20   me now?

21               MR. SUCHAROW:  I'm sorry about that.  This is the

22   language we used in all the fee petitions since then, and if

23   you don't have hourly rates charged -- because in an hourly

24   practice, the only thing you can do is to try to determine

25   what other firms charge and what has been accepted.

1    THE COURT:  I don't make decisions based on what's in

2    the newspapers, but, evidently, that prompted your letter,

3    which I appreciate getting.

4    MR. SUCHAROW:  I'm sorry.  What prompted our letter

5    was the identification of the miscalculation, what's been

6    called double counting.  We don't countenance that.  I'm very

7    embarrassed by it, and it would be what I used to call back in

8    the day "law office failure."  I personally don't know where

9    the failure occurred.  There's an investigation going on.

10   We'll have it available for the special master, but I've been

11   walled off because I signed the declaration and your Honor

12   directed me to be in court today because I might have to

13   testify.

14   THE COURT:  Did Thornton actually pay some of the

15   special attorneys?

16   MR. SUCHAROW:  They reimbursed Labaton monthly.

17   THE COURT:  They did?

18   MR. SUCHAROW:  Yes.

19   THE COURT:  And it was reported that the special

20   attorneys were paid $25 to $50 an hour; is that right?

21   MR. SUCHAROW:  I am not sure.  That sounds correct.

22   We've discussed within the firm what to pay based on

23   experience.

24   I would point out, your Honor, because a lot of this

25   is blown out of context, if you take an associate at $125,000

1    a year and expect them to bill 2200 hours, which is not

2    unusual, and they put in another 200 of pro bono work, it

3    works out to $50 an hour.

4         So, we simply could have paid somebody -- made them

5    annualized.  We have these attorneys, some of them have been

6    there 15 years.  They're just not on a partnership track,

7    basically.  Some of them are very experienced in accounting

8    and other things.  If we have another matter that we can put

9    them on, we do.  I guess our biggest error is calling them

10   staff attorneys and paying them hourly, but if they were

11   converted to paying them hourly, I should say, if they were

12   paid annually, we wouldn't be having this discussion.

13        THE COURT:  Is it your understanding that what has

14   been called here "special attorneys," people who do document

15   review, as I understand, primarily exclusively are billed by

16   other firms -- and are paid in that $25 to $50 range are

17   billed by other firms to their paying clients at $450 an hour?

18        MR. SUCHAROW:  Only by inference.  We know what other

19   class actions -- we can only get public data.  So, we look at

20   other fee petitions by other firms that practice in our field

21   and see what they've put in for them.  We looked at bankruptcy

22   counsel because they have to file a public petition as well.

23   Gives us a little bit of an insight into the defense firms.

24   So, I can't answer directly what they charge private clients.

25   It's only what they say they're charging private clients.

1          THE COURT:  Mr. Paine, you represent the defendant in

2     this case and produced a lot of documents, right?  Is that

3     correct?

4          MR. PAINE:  Yes.

5          THE COURT:  Did you use what -- have you read the

6     papers in this case?

7          MR. PAINE:  Yes, I have.

8          THE COURT:  They say -- defense counsel say they

9     employed special attorneys essentially to do document review.

10    Did you use attorneys -- special attorneys that way?

11         MR. PAINE:  We used -- in this set of cases we used a

12    different model than they used.  So, we used a contractor

13    model.  So, our client has a preferred provider arrangement

14    with a firm that supplies temporary employees, temporary

15    lawyers, to do what we call first-level document review.

16    After which -- so, basically, to simplify it -- and it doesn't

17    do justice to their experience and the actual effort that

18    they're putting in, but they're basically taking millions and

19    millions of documents and dividing them into two piles:  The

20    pile nobody is ever going to go look at again and the pile

21    that has sufficient relevance according to the way that we've

22    trained them, that they're going to be looked at again.

23         So, the special -- so, no, we didn't -- there are no

24    Wilmer Hale special attorneys that worked on this case.

25    There's a firm in town that -- they're like a personnel firm.

1    They provide space and a platform and they run these attorneys

2    in and we train them.  Then the pile that gets looked at

3    further our regular tenure track attorneys look at and then we

4    do stuff with them.

5           THE COURT:  Those contract lawyers, did Wilmer Hale

6    pay them?

7           MR. PAINE:  They were paid directly by the client.

8           THE COURT:  They're paid directly by the client?

9           MR. PAINE:  Yes.

10          THE COURT:  Do you know approximately what they get

11   per hour or per week or per year?

12          MR. PAINE:  Yes.  They get $35 an hour.

13          THE COURT:  They get what?

14          MR. PAINE:  $35 an hour.

15          THE COURT:  $35 an hour.  So, the cost to your client

16   -- the cost to your client -- paying client for such services

17   was about $35 an hour -- well, do you know what your client

18   was charged?

19          MR. PAINE:  That's what the client was charged.

20          THE COURT:  35?

21          MR. PAINE:  Now, they have -- they're a great big

22   company and they have a -- other people for smaller cases, and

23   less consistent relationships would pay more for the same

24   services, but if you're going to have a company that has

25   multi-million document reviews more than once, then you can

1    get a better deal.

2        THE COURT:  So, basically, the client, you seem to be

3    telling me, in your experience essentially pays the actual

4    cost?

5        MR. PAINE:  There's basically three ways clients can

6    do the first-level document review.  They can hire somebody

7    themselves, in which case they absorb all the costs and they

8    pay whatever they pay.  They can have our regular lawyers do

9    it, in which case they get charged the same as if they were

10   researching in the library, or whatever, or we have a back-

11   office facility in Dayton, Ohio that hires off-track employees

12   that are permanent employees and they can hire them.

13       THE COURT:  Do you have a sense of what those Dayton

14   off-track lawyers get paid?

15       MR. PAINE:  $75 an hour.

16       THE COURT:  $75 an hour?

17       MR. PAINE:  Yes.

18       THE COURT:  Are clients --

19       MR. PAINE:  The reason that they're in Dayton --

20       THE COURT:  What do you charge --

21       MR. PAINE:  Pardon me?

22       THE COURT:  What are you charging paying clients for

23   them?

24       MR. PAINE:  I don't know.  Actually, I have no idea

25   what the Dayton lawyers are paid, but we charge our clients

1    $75 an hour for them, and the reason that they're in Dayton is

2    everybody in Dayton makes a whole hell of a lot less money

3    than Boston.

4            THE COURT:  Less expensive.

5            MR. SUCHAROW:  Two comments, if I might.

6            THE COURT:  Sure.

7            MR. SUCHAROW:  Our special attorneys, as we're

8    calling them, perform both functions.  They don't just stop at

9    segregating one big pile into two smaller piles.  They also

10   assist in deposition, pulling those documents that are

11   important, educating us about what's important.  We don't have

12   as big a permanent staff as Wilmer Hale, with all due respect.

13   So, we have to rely on them more, your Honor.

14           There are two methods that are available.  Both have

15   been accepted by the Court.  One is we can go to an agency and

16   say, Hey, you got some attorneys lying around that we can use?

17   The agency then pays them -- maybe they bill us $50 an hour

18   and the agency pays them like $30 an hour.

19           They're not very happy people.  They're not easily

20   managed.  We used to use that in the past.  We found that not

21   to be acceptable.  It's not producing the optimal result.

22   Just like in the future, we look to that computer technology

23   which many firms are turning to and not using special

24   attorneys as much, but right now that's the best alternative.

25           THE COURT:  Let me ask Garrett Bradley, and maybe it

1    can be a little shorter, essentially, the same question.

2    Unless you're concerned that I'll listen to Mr. Kelly, but the

3    Docket No. 104-16 is the same language.  It's, "The hourly

4    rates for the attorneys and professionals, support staff in my

5    firm, included in Exhibit A, are the same as my firm's regular

6    rates charged for their services which have been accepted in

7    other complex class actions," and then it showed the so-called

8    special attorney fee charged at $425 an hour.  Were those

9    attorneys employed by Thornton?

10            MR. G. BRADLEY:  They were not, your Honor.  The

11   affidavit that was sent by lead counsel was an affidavit

12   requested to be used by our firm and other firms.  In there --

13            THE COURT:  Well, you signed the affidavit.

14            MR. G. BRADLEY:  I did, your Honor, and within that

15   affidavit is a listing of all the staff attorneys which are

16   not housed at our firm.  The rate that we applied to those

17   individuals was the rate determined based on the *Mellon* case,

18   which we had worked on in that particular time, and the rates

19   of the staff attorneys --

20            THE COURT:  Was that a class action?

21            MR. G. BRADLEY:  It was, your Honor.  Same theory

22   against Mellon Bank's foreign exchange, settled about a year

23   earlier.  We did not house nor pay for staff attorneys in that

24   case, but our co-counsel in that matter -- in that case the

25   staff attorneys were billed at $425 an hour, which is how that

1   got on to our --

2           THE COURT:  The Court was told that was their billing

3   rate.

4           MR. G. BRADLEY:  That is what the rate was that the

5   Court approved in that case.

6           THE COURT:  Had you ever charged any of those

7   individuals, paying client, at $425 an hour?

8           MR. G. BRADLEY:  We don't have paying clients, your

9   Honor.  The individuals that are housed in my firm that are

10  listed on the fee application, myself, Mr. Thornton, Mr.

11  Lesser, Mr. Hoffman and I believe Mr. Kinder, all worked on

12  the *Mellon* case and those are the rates that we paid that were

13  billed in that particular matter and approved by the Court.

14          The staff attorneys that were listed on there that

15  under -- Paragraph 4 in my affidavit where it states that we

16  paid them is a mistake, your Honor.  Those individuals were

17  actually housed at Labaton Sucharow or Lieff Cabraser.  We had

18  not used those before.  That paragraph, quite frankly, should

19  have been clarified by me at that time.  It was not.  But

20  those individuals -- those types of individuals have been

21  billed out at those rates before, but not by my firm.

22          THE COURT:  And you represented that Michael Bradley

23  is your brother?

24          MR. G. BRADLEY:  Yes, your Honor.

25          THE COURT:  Your firm's regular rate charged for

1    Michael Bradley's services was $500 an hour?

2         MR. G. BRADLEY:  Yes.  Mr. Michael Bradley, when he

3    started on the case in May of 2013 -- we are a small firm.

4    The agreement with him was he was not going to get paid as he

5    went.  He would agree to get paid if we were successful at the

6    end of the case.

7         Prior to starting the case, I inquired of him what

8    his most recent billable rate is, because he had various

9    structures, including $10,000 criminal case where the hourly

10   rate may end up, depending on the work, at $1500 an hour.  He

11   indicated to me at that time he was billing out on a state

12   case at $450 an hour.  We had a discussion at that time that

13   most likely $500 would be appropriate since he was going to

14   carry that on his books for several years, which he did.

15        The actual billing of my firm for him previously --

16   he had worked on -- and I think he was explaining it.  We have

17   a complex class action case involving asbestosis.  We had one

18   that went for ten years up to the Supreme Court and came back.

19   There were many individuals that had died in that process.

20   The amount of claims to those individuals would be small,

21   $1500, $1200.  So, to try to get people within the family to

22   go and get a voluntary prorate, we worked on an arrangement --

23   the voluntary prorate could take anywhere from a half hour to

24   45 minutes.  We worked out a flat fee of $300 an hour at that

25   point for Mr. Michael Bradley to work on those cases and then

1    he would put that as an expense in the case and then we would

2    take it out of the settlement if the people would actually go

3    and sign the release.

4             THE COURT:  I'm not putting my handwriting on it.  It

5    may be in the memorandum rather than the affidavit, but I was

6    told that the lawyers were billing at their current rates,

7    which I understood to mean if their rates had gone up -- the

8    rates that were charged to paying clients had gone up in those

9    several years.  You're using the current rate, which the

10   jurisprudence judges, including me, have found is often

11   appropriate in making a fee award, say, in a 1983 case,

12   because somebody has had to wait to get paid, but -- this is a

13   helpful clarification and I hope this gives you a chance to

14   explain things to me.

15            MR. G. BRADLEY:  It does, your Honor.

16            THE COURT:  It may be beyond me.  As I say, it may

17   facilitate the master's work, but I understood the

18   representations made by all the firms, that these are the

19   rates we charge our paying clients.  I think the other

20   affidavit along these lines is Mr. Chiplock's.

21            MR. G. BRADLEY:  If I may just finish, your Honor.

22   One point to clarify.

23            THE COURT:  Sure.  Go ahead, yes.

24            MR. G. BRADLEY:  I think there are -- I think if -- I

25   reread all nine petitions.  I believe two of the petitions

1    change the form that had come out from lead counsel and put in

2    that they charge that rate -- the particular rates to paying

3    clients, because they actually had paying clients.  That is

4    not us, which is why you have the language here.  And,

5    admittedly, your Honor, the language here, we should have been

6    clearer in this and that fault lies with me in that particular

7    paragraph.

8          I also want to point out one thing regarding the

9    records.  We have a Master Excel spreadsheet, which we're

10   happy to turn over to Judge Rosen once he's appointed.  That

11   Master Excel spreadsheet goes back to work in this case back

12   to 2008.  We have backup for that information.  It does go --

13   you know, it goes back to 2008.  So, there may be some gaps in

14   the backup to the backup.  I just want to alert the Court now

15   as we pull that information together.

16         THE COURT:  You can respond, Mr. Sucharow.

17         But did you think that people were charging their --

18   well, I'll ask you first.  Did you think that other firms were

19   paying similar lawyers to do similar work as much as $450 an

20   hour?

21         MR. G. BRADLEY:  Within the -- the lawyers that are

22   housed and on tenure track and actual employees were paid a

23   yearly salary, and then there was the group of attorneys that

24   were staff attorneys, which the three firms had agreed there

25   would be a cost sharing to, and my understanding was that

those are the rates that our three firms generally were paying

for those type of attorneys.

There was a discussion at the time as to what to use,

and then our firm and, I believe, the Lieff firm used the same

rates that were used within the *Mellon* case, but everybody

understood that those were the rates that were going to be

applied to the type of work being done by that group of

people.

THE COURT: The type of rates that were going to be

attributed for the purpose of making an application for

attorneys' fees?

MR. G. BRADLEY: For the work that was being done by

the attorneys doing the staff attorney work.

THE COURT: Let me ask Mr. Chiplock essentially the

same question. Paragraph 5, Document No. 104-17, your

declaration, "The hourly rates for the attorneys and

professional support staff in my firm, included in Exhibit A,

are the same as my firm's regular rates charged for their

services which have been accepted in other complex class

actions."

Did you ever charge attorneys on your Exhibit A at

that rate, at the reflected rates for paying clients -- to

paying clients?

MR. CHIPLOCK: The answer is yes, your Honor, we do

have some paying clients. We have had some paying clients for

1    whom we have billed out document review work done by attorneys

2    at this level.  We call them staff attorneys or contract

3    attorneys, depending on the year, but we have had two or three

4    cases where we've had paying clients who have paid close to

5    market rates or the actual market rates that are listed in my

6    declaration.

7              MR. HEIMANN:  If I might add, your Honor.

8              THE COURT:  Okay.  Say your name, please.

9              MR. HEIMANN:  Richard Heimann, counsel for Lieff

10   Cabraser.

11             We meant the same thing that has been described to

12   you by the language that was in that declaration.  We did not

13   intend to represent by that declaration that we had actually

14   paid -- paying clients those rates.  It turns out we did in a

15   handful of cases, but like Mr. Sucharow's firm and the

16   Thornton firm, we have -- their case they have none.  We have

17   only a handful of paying clients over the years.  We're almost

18   entirely a contingent fee firm, very sensitive to what the

19   appropriate rates are for all levels of attorneys within the

20   firm, including the attorneys who performed the services that

21   are in question here.

22             THE COURT:  When you say -- there's a large body of

23   jurisprudence on this, as I say.  I just cited a couple of

24   cases -- well, I know I just cited a couple of cases beginning

25   with the Supreme Court.  I have since read some of the

1  relatively recent Southern District of New York cases that

2  have raised some of these issues, but I think the

3  jurisprudence in those cases are like *Weatherford*, 2015

4  WestLaw 127847; *Citigroup*, 965 F.Supp.2nd 369; another

5  *Citigroup*, 988 F.Supp.2d 371; *Beacon Associates*, 2013 WestLaw

6  2450960; *City of Pontiac*, 954 F.Supp.2d 2013.

7         I think the jurisprudence indicates that the rates --

8  the lodestar is supposed to be calculated on what lawyers are

9  charging to paying clients in the community, however it's

10 properly defined, not -- I think probably many other judges

11 made the same mistake -- well, have understood the

12 representations made the way I have for many years when we try

13 to do that lodestar reasonableness check.

14        MR. HEIMANN:  Well, sir, I'm not prepared, obviously,

15 to address the specific cases that your Honor has referred to.

16 I think the jurisprudence does support the position we're

17 taking.  This is a matter we'll take up with the special

18 master when we have the opportunity to present fully under the

19 full context.

20        THE COURT:  What I'm trying to do both for the master

21 and for you is to let you know what my present state of mind

22 is, what my concerns are, so what emerges from this process

23 can be as helpful to me and focused and maybe as efficient as

24 possible.

25        There are representatives of each of the named

1   plaintiffs here.

2           (Pause.)

3           THE COURT:  Excuse me.  I've got too many pages.

4           Mr. Hopkins?

5           MR. HOPKINS:  Yes, your Honor.

6           THE COURT:  Mr. Hopkins, I've got your declaration.

7   It is Document No. 104-1, report of final approval and award

8   of attorneys' fees and service awards.  Is there anything in

9   there, now that this has come into focus, that you think needs

10  correction, clarification or explanation?

11          MR. HOPKINS:  In terms of my declaration, I don't

12  think so, your Honor.

13          THE COURT:  Okay.  And I've got another case with the

14  Arkansas Teacher's Retirement System next week.  Maybe I'll

15  see you again.  What is Arkansas Teacher's Retirement System?

16          MR. HOPKINS:  Arkansas Teacher's Retirement System is

17  a system that has about 45,000 retirees.  We pay about $85

18  million a month in retirement benefits from Pocahontas,

19  Arkansas throughout every small municipality and glad spot in

20  the road.  We have about 75,000 active members.  We have

21  approximately $15.5 billion in a trust fund and we provide

22  retirement benefits to all the school employees of the State

23  of Arkansas, along with educational institutions, your Honor.

24          THE COURT:  And how did you come to be a plaintiff in

25  this case?

1          MR. HOPKINS:  Well, in the fall of 2010, your Honor,

2     I read about State Street having some issues with California

3     retirement plans.  Later in the fall I saw State Street had

4     settled a case with the State of Washington, and I started

5     trying to read all I could about it and I read all of the

6     documents.  State Street is our custodial bank.  I tried to

7     read documents that we had.  I called our financial -- our

8     general financial consultant to ask if other of their clients

9     were -- they're not a law firm.  They're financial

10    consultants.  Asked if any of their other -- I'll call them

11    "clients" -- was having inquiries.  And they said no.  And in

12    Arkansas we believe that somebody who takes money from a

13    retired teacher, we want it back and that's sort of our

14    attitude.

15         THE COURT:  Who is your lawyer in this case?

16         MR. HOPKINS:  Labaton Sucharow.  In Arkansas we

17    pronounce it a little differently.

18         THE COURT:  My wife is from Tennessee.  It sounds

19    good to me.

20         MR. HOPKINS:  She'll understand me better than you do.

21         So, we have some firms that we have on general

22    availability monitor, you know, generally our security

23    systems.  This was a different kind of case, and I called up

24    about three of them said, Are you all doing any research on

25    this?  All of them said no.  And I said, Well, I would like

1    you to.  Generally, in these cases, your Honor, I get a call
2    from a law firm.  In this case they got a call from me because
3    I could smell --
4           THE COURT:  You say generally you get a call from the
5    law firm.  What do you mean?
6           MR. HOPKINS:  Well, that means often if there is a
7    new case that's out there or somebody has filed a lawsuit, you
8    know, one of the law firms or two of them will send me a thing
9    saying here's a little memo.  There might be a case that you
10   have $3 million loss, $4 million loss, and you may be
11   interested in us looking at it for you.
12          In this case, instead of a law firm that we have
13   on -- I won't call retainer -- under contract to review cases
14   for us, if we have a loss that we may want to pursue.  I
15   contacted several of our law firms.  The Labaton firm was a
16   firm that agreed to look at it more in depth.  So, you know, I
17   actually had a staff member go through to start producing
18   documents.  I think ultimately we produced about 90,000 pages
19   of documents.  A lot of them were FX kinds of information from
20   our financial --
21          THE COURT:  That's helpful.  We're running out of
22   time a little bit.  Did you review the requests for attorneys'
23   fees in this case?
24          MR. HOPKINS:  Well, I didn't review that whole
25   document.  You're talking about the lodestar.  That is a --

1     that's not a pay grade issue for me to look at all those

2     hundreds of pages.

3             All I'll say is all the lawyers on the East Coast do

4     a lot more than Arkansas, but I'm glad I live in Arkansas

5     instead of on the East Coast, your Honor, but I didn't look at

6     all that, but, you know, essentially, I would -- if I can say

7     this.  You may not want to hear it, but I have never seen law

8     firms work as hard, and at times I wanted to apologize to the

9     Labaton firm for getting them in this case, because this

10    fellow right here, State Street, put up one heck of a fight.

11    It wasn't easy.  There were times where somebody told me there

12    would be $300 million settlement.  I told them they've been

13    drinking something they shouldn't have been drinking.  It was

14    hard work, patience, tenacity.

15            And I will tell you what.  My hat is off to the

16    lawyers in this room and my hat is off also to you, because,

17    you know, there was no stone unturned.  There was nothing that

18    should have been done that wasn't done, and all those

19    highlights that you got, you know, worked out for us to get

20    the right information, reach the right settlement, and I think

21    the class was well represented by these attorneys, and I'm

22    proud they were attorneys that I managed.

23            THE COURT:  Thank you.  Mr. Cohn.

24            MR. COHN:  Yes, your Honor.

25            THE COURT:  I see you're on a cane.  You can sit

1    down.

2            MR. COHN:  I'm okay right now.  Thank you.

3            THE COURT:  I have a declaration from you and you're

4    represented by Mr. McTigue and his firm, Document No. 104-7.

5    Is there anything in there that requires any correction or

6    clarification or explanation in your view?

7            MR. COHN:  No, your Honor.  I think I'm comfortable

8    with that document.

9            THE COURT:  How did you come to be a plaintiff in

10   this case?

11           MR. COHN:  I had met Mr. McTigue several years ago on

12   a different case and I had provided some documents to him and

13   he asked if I might have some other documents.

14           THE COURT:  You met him on another case?

15           MR. COHN:  Yeah.  Years ago when I got sick, he had

16   helped me on a different case and --

17           THE COURT:  Was that a class action or an individual

18   case?

19           MR. COHN:  When I first met him, it was through my

20   individual case.  My attorney in that had introduced me to Mr.

21   McTigue and this was a different --

22           THE COURT:  So, you were a plaintiff in another class

23   action?

24           MR. COHN:  No, it was not a class action.

25           THE COURT:  What did you do to supervise this

1    litigation, the lawyers?

2           MR. COHN:  Well, I communicated often with Mr.

3    McTigue or someone in his office.  I had lots of documents I

4    had received that were filed and put in boxes that I had to

5    take out and go through, you know, the communications and

6    sending documents to his law firm.

7           THE COURT:  What did you do before you became

8    disabled?

9           MR. COHN:  I was a stock options trader with the

10   Chicago Board Options Exchange.

11          THE COURT:  Thank you.

12          Mr. Henriquez, you, too.

13          MR. HENRIQUEZ:  Yes, your Honor.

14          THE COURT:  You are represented by Mr. McTigue; is

15   that right?

16          MR. HENRIQUEZ:  I'm sorry?

17          THE COURT:  Would you say your name, please, for the

18   record.

19          MR. HENRIQUEZ:  Arnold Henriquez.

20          THE COURT:  And, Mr. Henriquez, what did you do for a

21   living?

22          MR. HENRIQUEZ:  I'm a truck driver for Waste

23   Management, sanitation job.

24          THE COURT:  Sanitation?

25          MR. HENRIQUEZ:  Sanitation, yes.

```
 1              THE COURT:  It's not you, it's me.  My ears are not
 2    working as well as they usually do.
 3              How did you come to be a plaintiff in this case?
 4              MR. HENRIQUEZ:  It's been a while.  Many years ago
 5    Mr. McTigue visited my house and started asking me questions
 6    about my job, and everything.
 7              THE COURT:  Asked you questions about what?
 8              MR. HENRIQUEZ:  About my job.  And he asked me about
 9    my pension plan or 401k.  And I said, yeah, I keep all my
10    documents all the ways up to now.  And he asked me if I want
11    to give it to him to review them.  And I said, yeah, that's
12    fine, no problem.
13              THE COURT:  And what did you do in connection with
14    this case?
15              MR. HENRIQUEZ:  What did I do?
16              THE COURT:  Yes.
17              MR. HENRIQUEZ:  Basically just provide the documents
18    to him.
19              THE COURT:  Did you review the fee petition, the
20    request for attorneys' fees?
21              MR. HENRIQUEZ:  He sent me a bunch of documents.
22              THE COURT:  I'm sorry.  Say that again.
23              MR. HENRIQUEZ:  I did not review any documents.
24              THE COURT:  And, actually, I should have asked that
25    same question to Mr. Cohn.  Just sit there.
```

1           Did you review the requests for attorneys' fees in

2   this case?

3           MR. COHN:  Mr. McTigue sent me many documents and I

4   did review them, yes.

5           THE COURT:  You did?

6           MR. COHN:  Yes.  I am not a lawyer, but I did review

7   them.  So, my understanding of them, it seemed to make sense

8   to me and I was comfortable with those documents.

9           THE COURT:  And, Ms. Wallace, can you say your name

10  for the record.

11          MS. WALLACE:  Janet Wallace.

12          THE COURT:  Is there anything in your declaration

13  that requires any correction or clarification or explanation?

14          MS. WALLACE:  Not at all, your Honor.

15          THE COURT:  What did you do?

16          MS. WALLACE:  I'm a vice-president at a property

17  insurance company in Andover, Mass.

18          THE COURT:  How did you become a plaintiff in this

19  case?

20          MS. WALLACE:  My predecessor retired and I got a

21  promotion.  So, Allen Colbert was really the person way back

22  when that was involved in this.

23          THE COURT:  You're not personally a plaintiff.  You

24  represent an Andover company?

25          MS. WALLACE:  Yes.

```
1          THE COURT:  What did you do in connection with this

2     case?

3          MS. WALLACE:  I was brought up to -- encouraged by

4     prior counsel, Keller Rohrback, after Mr. Colbert retired,

5     which was around the 1st of 2014.  I took over his position at

6     the company.

7          THE COURT:  Did you do anything after that?

8          MS. WALLACE:  I'm still -- I'm still at the company,

9     but I just would occasionally hear from Keller Rohrback about

10    what was going on, and so forth, and I am the administrator of

11    our 401(k) plan.  So, I did sign off in January, February,

12    whenever the final service.

13         THE COURT:  Did you review the fee petitions?

14         MS. WALLACE:  I did not.

15         THE COURT:  Thank you.

16         And, Mr. Stangeland, are you still on the phone?

17         MR. PEHOUSHEK-STANGELAND:  Mr. Stangeland?

18         THE COURT:  Yes.

19         MR. PEHOUSHEK-STANGELAND:  Yes, I am.

20         THE COURT:  Is there anything in your declaration

21    that needs any correction or clarification or explanation?

22         MR. PEHOUSHEK-STANGELAND:  Not at this moment, no.

23         THE COURT:  How did you become a plaintiff in this

24    case?

25         MR. PEHOUSHEK-STANGELAND:  A friend of mine, Ben
```

| | |
|---|---|
| 1 | Gould, is an attorney with Keller Rohrback and he informed me |
| 2 | that he was aware of the State Street case and he said that |
| 3 | there was a suspicion that it affected the 401(k) plan, and he |
| 4 | put me in touch with -- or he gave me another attorney at |
| 5 | Keller Rohrback contact information, telephone number, and I |
| 6 | contacted her. |
| 7 | THE COURT:  And what did you do in connection with |
| 8 | this case? |
| 9 | MR. PEHOUSHEK-STANGELAND:  I provided information on |
| 10 | my 401(k) program and reviewed documents that my attorneys at |
| 11 | Keller Rohrback had submitted to the Court. |
| 12 | THE COURT:  And did you review -- |
| 13 | MR. PEHOUSHEK-STANGELAND:  And participated in a |
| 14 | phone call with -- oh, I forget.  The other side. |
| 15 | THE COURT:  Did you review the -- any of the fee |
| 16 | requests in the case? |
| 17 | MR. PEHOUSHEK-STANGELAND:  I'm sorry.  Did you ask if |
| 18 | I reviewed the fee request? |
| 19 | THE COURT:  Yes. |
| 20 | MR. PEHOUSHEK-STANGELAND:  Yes.  Yes, I did. |
| 21 | THE COURT:  Thank you. |
| 22 | Mr. Taylor, are you still on? |
| 23 | (No response.) |
| 24 | THE COURT:  Mr. Taylor? |
| 25 | MR. TAYLOR:  Hello. |

```
 1              THE COURT:  Hi.  Are you still on the phone?
 2              MR. TAYLOR:  Yes.  My battery has gone dead.  I can
 3     hardly hear you.
 4              THE COURT:  Well, I'll shout and you can shout and,
 5     hopefully, we'll hear each other.
 6              MR. TAYLOR:  It's pretty bad.
 7              THE COURT:  Mr. Taylor, I have your declaration.
 8     It's Document No. 104-11 in this case.  Is there anything in
 9     there that you think needs to be corrected or clarified or
10     explained?
11              MR. TAYLOR:  No.  Brian explained everything to me.
12              THE COURT:  Who is Brian?
13              MR. TAYLOR:  Brian McTigue.
14              THE COURT:  And how did you become a plaintiff in
15     this case?
16              MR. TAYLOR:  He contacted me about our pension plan
17     through Johnson & Johnson and State Street Bank and I don't
18     know how long it's been, five, six years.  I don't know.  I
19     don't remember.
20              THE COURT:  And what did you do in connection with
21     the case?
22              MR. TAYLOR:  I gave him information from my
23     statements from the pension plan.
24              THE COURT:  Did you do anything else?
25              MR. TAYLOR:  I talked to him a lot about it.  That's
```

1   about it.  I let him take care of it.

2          THE COURT:  Okay.  I think the only other person I

3   intended to question was Mr. Sutherland.  Based on the

4   information I have from counsel and his doctor, he's in bad

5   shape.  I'll leave that for Judge Rosen.  I'll leave Mr.

6   Sutherland with Judge Rosen.

7          I doubt that this is necessary, but I'm ordering that

8   the parties -- or at least the defendant State Street doesn't

9   have to if it doesn't want to, but the parties shall order the

10  transcript of the case -- of the hearing today.

11         Is there anything -- that exhausts my agenda.

12  Perhaps you, too.  Is there anything else that would be

13  valuable to discuss?

14         MR. TAYLOR:  Are you still talking to me?

15         THE COURT:  No.  No.  In fact, if you want, you can

16  go off the line before your battery dies.

17         MR. TAYLOR:  Thank you.  My battery is really going

18  dead.  Thanks a lot.

19         THE COURT:  Mr. Frank, I haven't authorized you to

20  participate generally, but is there anything briefly you

21  wanted to say?

22         MR. FRANK:  Very briefly, your Honor.

23         We had four sentences in our February 17th filing

24  about a previous encounter with Lieff Cabraser.  They waited

25  until March 6th to file 140 pages, ostensibly responding to

1  that.  It's all in our mind irrelevant ad hominems.  If you

2  would like an explanation why those attacks are false, I'll be

3  happy to provide them at whatever time you feel appropriate.

4  Otherwise, I don't want to waste your time, your Honor.

5          THE COURT:  Thank you.  Thank you.  Is that the

6  filing that was made yesterday?

7          MR. FRANK:  Yes, your Honor.

8          THE COURT:  I've read the sur-reply.  I didn't read

9  the 140 pages.

10          MR. FRANK:  The sur-reply has many false statements.

11          THE COURT:  Okay.  But this -- is there anything else

12  that somebody -- a party in the case thinks ought to be

13  addressed?

14          MS. LUKEY:  Nothing from us, your Honor.

15          THE COURT:  I will issue an order memorializing the

16  decisions, but you have the decisions.  You have them orally.

17  You have some schedule to follow.  I'll issue an order

18  appointing the master, and the case will proceed under his

19  direction.

20          If there are matters that need to be brought to me,

21  they should be brought to me before the report and

22  recommendation, and I'll hear from you again and probably see

23  you again.  Court is in recess.

24          THE DEPUTY CLERK:  All rise for the Honorable Court.

25          JUDGE ROSEN:  Can I just have three minutes off the

1    record?

2           THE COURT:  No, we don't do anything off the record.

3           JUDGE ROSEN:  This on the record.

4           I'd like to go take three or four minutes of the

5    lawyers to talk about logistics and planning while they're all

6    here.

7           THE COURT:  That's fine.  Why don't you take one

8    minute with me, because I have to go somewhere.  Will counsel

9    wait for Judge Rosen, please.

10          MR. HEIMANN:  We will.

11          THE COURT:  Court is in recess.

12          (Adjourned, 1:12 p.m.)

13

14                C E R T I F I C A T E

15          I, Catherine A. Handel, Official Court Reporter of the

16   United States District Court, do hereby certify that the

17   foregoing transcript, from Page 1 to Page 108, constitutes to the

18   best of my skill and ability a true and accurate transcription of

19   my stenotype notes taken in the matter of Civil Action No.

20   11-10230-MLW, Arkansas Teacher Retirement System versus State

21   Street Bank and Trust Company.

22

23

24   <u>March 10, 2017</u>          /s/Catherine A. Handel
     Date                      Catherine A. Handel RPR-CM, CRR
25