# EX. 98

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Case No. 11-cv-10230 MLW

- - - - - - - - - - - - - - - - - - - - -x

ARKANSAS TEACHER RETIREMENT SYSTEM, et al.,

Plaintiffs,

-against-

STATE STREET BANK AND TRUST COMPANY,

Defendant.

- - - - - - - - - - - - - - - - - - - - -x

JAMS
Reference No. 1345000011

- - - - - - - - - - - - - - - - - - - - -x

In Re: STATE STREET ATTORNEYS' FEES

- - - - - - - - - - - - - - - - - - - - -x

June 14, 2017
4:04 p.m.

B e f o r e :

SPECIAL MASTER HON. GERALD ROSEN
United States District Court (Retired)

Deposition of RAY POLITANO, taken by Counsel to the Special Master, held at the offices of JAMS, 620 Eighth Avenue, New York, New York, before Helen Mitchell, a Registered Professional Reporter and Notary Public.



Page 6

Page 8

Page 7

Page 9

Politano

Q Did you attend college?

A Yes. As I said, I have a bachelor's degree in finance, that's at Baruch College.

Q And did you attend any further education after receiving your bachelor's?

A No.

Q And briefly describe your employment history after graduating college.

A Oh, it's a long time ago.

Q Okay. In that case, let me stop you and say, you're currently chief operating officer of Labaton?

A Yes.

Q And have you held that position previously as chief operating officer?

A Yes.

Q Could you please briefly describe the other institutions for which you've served as chief operating officer?

A I was a chief operating officer for Baker McKenzie in their New York office.

Q Anywhere else?

A No.

Page 10

Politano

Q Have you held other senior financial positions prior to serving in your current position?

A Yes.

Q And where have you held those positions?

A I was a controller at -- also at Baker & McKenzie, and prior to that I was an accounting manager at Milbank Tweed.

Q And as chief operating officer of Labaton Sucharow, briefly describe your duties.

A My responsibilities are to maintain the review of the administrative area. I'm in charge of accounting, records, marketing, word processing, all the administrative functions within the firm.

Q Specifically with accounting, what processes do you oversee?

A Well, I'm the -- I'm responsible for the entire group. I oversee the preparation of the firm's financials. I oversee the distributions that are made to the firm -- I basically oversee most, if not all, of the cash

Page 11

Page 12

Page 13

Politano

A It was at some point during the case. I don't remember at what specific point.

Q Was it early in the case, around 2012 or '13, if you recall?

A I don't recall exactly when that was.

Q And what specifically do you recall being conveyed to you about that arrangement?

A That we needed to bill the Thornton firm for a number of staff attorneys.

Q Was there any additional information provided about how those staff attorneys would be accounted for on a fee petition down the road?

A No.

Q Did you have any understanding of whether those staff attorneys would be reported on the firm's fee petition? "The firm" being Labaton.

A The common practice was that it would be on Labaton's fee declaration, but there was no discussion at that point as to the way it would be handled.

Politano

Q And when you say "common practice," had you provided similar instruction to accounting to share or allocate costs of staff attorneys in previous cases?

A Yes

Q Approximately how many times had you been involved in those arrangements?

A I'm going to estimate maybe about ten times.

Q And in each of those instances, did Labaton always put those hours on Labaton's fee petition?

A Ninety percent of the time.

Q And then the remaining 10 percent, do you recall how the hours for staff attorneys were accounted for?

A They would have been on the other firm's fee petition.

Q And as a mechanical process, how was that allocation to the cost sharing firm done within the accounting department at Labaton?

A For that 10 percent?

Q For that 10 percent.

Politano

A So they would put their time in directly to that other firm's database.

Q So in those 10 percent cases that we've referred to, the time was never reported to Labaton?

A Correct

Q Did Labaton keep track of the time, if you know?

A I don't know.

Q And would you also have confirmed directly with the other firm that they were reporting those hours?

A I would not be doing that, no.

Q Do you know who at Labaton would be in charge of keeping track of staff attorney hours in the instances where another firm was reporting them on their lodestar?

A Well, those -- those staff -- there would be a coordinator from that other firm coordinating with the staff attorneys that were at Labaton to send those hours over there, so we were kind of separated from that.

Q In the State Street case do you know if new staff attorneys were hired that had

Page 26

Politano

those particular staff attorneys, did any of them have any particular experience, that you're aware of, in the area of FX trading?

A Again, I didn't review the resumes. I wasn't involved at that level.

Q I'm going to talk specifically about invoices, and invoicing procedures in this case. And when I say "this case," I mean State Street.

How were the costs of the staff attorneys that we've previously discussed allocated to Thornton? Was that done through a formal invoicing system?

A Yes. I believe the process was there would be an invoice for, I'm going to say, a thousand hours, 500 hours, as a preliminary number, that would be adjusted when the actual time would be reported.

Q I just want to break that down.

A Sure.

Q So the preliminary invoice, was that an estimated cost?

A It was an estimated cost.

Q And how often would those

Page 27

Politano

preliminary invoices be sent to Thornton?

A Monthly.

Q And after the estimated costs, how would the firm calculate the, quote, actual cost?

A It would be what the actual number of hours would be, and there would be an adjustment.

Q And how was that adjustment --

A Through accounting.

Q Did the accounting department then send an updated invoice to Thornton?

A I think it was just made up on the other invoice.

Q Okay.

And who within accounting determined that adjustment between actual and estimated costs?

A I believe it was between Mike Rogers and Cindy Ng.

Q Were you asked to approve those adjustments?

A No.

Q But Cindy would have likely

Page 28

Politano

been the person in accounting who oversaw that process?

A Yes.

Q With regard to the invoices that were sent to Thornton, do you recall if specific staff attorneys were identified on the invoices?

A No, there weren't.

JUDGE ROSEN: Could I ask.

At any time were specific staff attorneys allocated to Thornton for purposes of billing, or did it vary from month to month?

THE WITNESS: I wasn't involved in the process at the time, but my understanding since that time is specific attorneys were allocated to Thornton.

JUDGE ROSEN: And do you know how it was determined which attorneys to allocate to Thornton?

THE WITNESS: I do not.

MR. SINNOTT: Do you know what the reasoning was for that?

Page 29

[redacted]

Page 34

Page 35

Politano

MS. MCEVOY: Strike that.

Q You don't recall particular individuals that were allocated to Thornton for any particular reason? As we sit here today, there's no name that stands out to you as an individual who was on the Thornton payroll?

A Correct.

Q Did you have any involvement in the preparation of the fee petition that was submitted to the court after the case had settled?

A No.

Q Did Howard Goldberg ever consult you for billing rates in preparing the fee petition?

A I provide the billing rates to the entire accounting department. I don't recall specifically on this specific case a discussion between Howard and I on the billing rates.

Q How do you provide the billing rates, or how do you make them available to the accounting department?

A So there is a subcommittee

Page 36

Politano

that's comprised of two partners -- depending on the timing, maybe three partners -- and I. We review analysis that's provided to us of plaintiff firms' billing rates and defense firm billing rates.

Q And if I could just stop you for a moment.

This is the billing rates subcommittee?

A Yes.

Q You can continue.

A So the committee as a subcommittee reviews the rates. I provide the committee the current rates, and the committee reviews the rates based on the analysis. They would have the reports a few days earlier. And we determine what the rates -- we do a recommendation for the rates.

Once that's completed, those reports that I mentioned, as well as the recommendation, is provided to the executive committee, who then review it again. And based on comments from the executive committee, changes are made, or they're approved. Then I

Page 37

Politano

would get it back.

I would sit in on the executive committee meeting, and I would inform accounting, Howard Goldberg, the records department, and everyone that would need to be informed of those new rates.

Q And how do you inform them? Is there a database that you enter these new rates into?

A I -- I actually just send them a PDF of my handwritten notes.

Q And that is what those individuals rely on for that upcoming year?

A Correct.

Q I just want to back up and take it step by step for a moment.

The first committee you mentioned, the billing rate subcommittee, do you recall the names of the individuals who were on that particular committee?

A Different years there were different individuals. If you could specify which year.

Q Sure.

Page 38

Politano

Do you remember, say, in the end of 2015, when this annual meeting happened, who was on the committee?

A Yes.

Q And who was that?

A Lou Gottlieb, Jonathan Gardner and Mike Stocker.

Q And you mentioned, I believe, that they compiled information about current rates; is that correct?

A The committee did not compile the information. The information was supplied to the committee.

Q By yourself?

A By -- I have a paralegal manager, who has a paralegal project putting together that information.

Q And what sources does your team, the paralegal you just mentioned and others, rely on to gather that information for the billing subcommittee?

A It's a number of sources. It's Westlaw, Lexis, Law 360, it's fee petitions that were filed that's available. It's quite a few

Page 39

Politano

different sources. Bankruptcy filings.

Q Are they all publicly available?

A Yes.

Q In this process do you identify particular firms as competitors or contemporaries that perhaps are more indicative of Labaton's practice?

A Yes.

Q And who, to the best you can remember, would those firms be?

A So it would be Bernstein.

Q Any others?

A As our more direct competitor, I would say that would be the one I would think of most. There are a number of other plaintiff firms included in the report. I'm not sure if they would be at sort of the same level that we are in.

Q Can you elaborate on why they wouldn't be of the same level?

A Well, you mentioned sort of that -- you know, being a top plaintiff firm.

Q Right.

Page 40

Politano

A I think of Bernstein being alongside, a top plaintiff firm.

Q And these other firms, what makes them, in your consideration, not at the same level as Labaton and Bernstein?

A Just a -- bigger cases that had been settled, things of that nature.

Q When you say "bigger" do you mean larger settlement amounts?

A Yes.

And that's just from my own knowledge. The report provides information for all plaintiff firms, so it doesn't segregate which ones -- you know, my opinion might be Bernstein, but it doesn't matter who they are.

Q Does your team also look at defense firms in class actions?

A Yes.

Q Do you recall off the top of your head any defense firms that you consider at the same level as Labaton?

A No.

Q But you do examine those fees as well?

Page 41

Politano

A Yes.

Q Do you look only at New York, or do you look at other venues?

A We look primarily in New York. When you obtain that information, you may get attorneys that may be in other cities.

Q And how would you get information about other cities? Or on what occasion would you use other cities?

A In a fee petition there may be an attorney that we might know resides in a different city. It's not often -- that doesn't often happen.

Q You don't have any comparative jurisdictions that you look at outside of New York, in other words?

A Correct.

Q Do you look only at firms that do class action, or do you look at other types of firms as well?

A So on the plaintiff side it's primarily class action. I mean, it's primarily -- it's primarily firms. Don't know if those firms have other areas of practice that

Page 42

Politano

are beyond class action.

Q And for our purposes on the record, does Labaton have a non-class action practice, however small it may be, currently?

A Currently today, yes.

Q Just a percentage, if you can estimate, what percentage of cases are hourly, as opposed to class action?

A I just want to clarify.

Q Sure.

A So your question was does the firm have other practice groups beyond class action?

Q Yes.

A So, yes, we have an antitrust practice -- yes, we have a number of practices.

Q And maybe let me frame it slightly differently.

Does the firm take on cases that are not on a contingency basis? Do they have a practice where they have hourly clients?

A We have a partner -- we have an of counsel who works on cases that are not class action cases, that are billed hourly.

Page 43

Politano

Q And do you know what billing rate is used for those clients?

A It would be the standard rates. It would be the rates that I mentioned that the committee puts together.

Q And those are the same -- those rates are applied in class actions that are paid on a contingency basis, such as State Street, as well?

A Correct.

Q And going back to the compilation of data that you supplied to the billing rate subcommittee, do you look particularly at hourly clients, as opposed to what's charged in a class action suit, or do you not make a distinction?

A I don't think we have the information to make a distinction.

Q Would that be significant if you did have that information available?

A I think it would be comparable. Should be comparable.

Q You would expect them to be the same or similar rates, in other words?

Page 44

Politano

A Yes.

Q When that data is analyzed -- in the interrogatories that the firm responded to there was a description provided that suggested part of the analysis involved the particular title that an attorney has, and that being indicative of how a rate is determined.

Is that process of using a title to determine someone's rate a process that you participated in, in your work?

A In putting it together?

Q Correct.

A I didn't put together the research, no. But that would be what would be presented from the paralegals to us.

Q And did you -- kind of on a more general basis, were you involved in the decision of which actual numerical rate should be assigned to which attorney, or did that fall to other members of the committee?

A That -- it was a collaborative effort. I personally didn't have any specific opinion as to what the rates would be. It was a collaborative effort. It would be a discussion.

Page 45

Politano

Q So you would have some input, though?

A Well, I would have the same analysis everybody else would. So, yeah.

Q And what consideration did you give a title when you were looking at the rates?

A Well, you know, when you see partner rates you know that they're within a certain range, depending on the number of years that individual's a partner, and among all the segments you'd have certain -- you would particularly see a certain range.

Q Did you look specifically at staff attorneys at other firms, or contract attorneys?

A Specifically, no. It was part of the process.

Q And how, in that practice, did Labaton assign a rate to a staff attorney, if they didn't have a comparison at another firm?

A I'm sorry, there was analysis --

Q Oh, okay.

A -- from other firms, other



Page 66

Page 68

Page 67

Page 69

Politano

I may have misunderstood.

What I thought I heard you say was something in response to a question along the lines that if there was someone who should have, you know, made the arrangement to record time on a separate fee petition known, you would have assumed it would have been someone on the litigation team?

A Correct.

Q Do you recall that testimony?

A Yes.

Q So just so that we're clear, do you have any reason to believe any partner at Labaton did know ahead of time that Thornton was going to record that time on its own separate small fee petition?

A No.

Q Just another couple small questions.

Do you know of -- first of all, Garrett Bradley, in his role as of counsel, he was listed on the firm's website as of counsel?

A Yes.

Q And do you know whether the

Page 70

Politano

firm has of counsel relationships with other attorneys as well?

A Other attorneys in different firms?

Q Yes.

A Yes.

Q Like who, for example?

A The Philadelphia firm -- I can't remember their --

Q Would that be Goldman Scarlato?

A Goldman Scarlato.

Q Is it your general understanding, Ray, that Garrett's work as of counsel was to assist Labaton in developing clients?

A Yes.

MR. STOCKER: Thank you. That's all I have.

MR. HEIMANN: No questions.

MS. HARLAN: No questions.

MS. MCEVOY: On the phone? Gary, if you're still on, do you have any questions?

MR. GOTTO: No. No questions

Page 71

Page 72

Page 73