# EX. 111

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
                              )
ARKANSAS TEACHER RETIREMENT   )
SYSTEM, on behalf of itself and )
all others similarly situated, )
                              )
          Plaintiffs,         )
                              )   Civil Action
v.                            )   No. 11-CV-10230-MLW
                              )
STATE STREET CORPORATION,     )
STATE STREET BANK AND TRUST   )
COMPANY and STATE STREET GLOBAL )
MARKETS, LLC,                 )
                              )
          Defendants.         )
                              )
```

BEFORE THE HONORABLE MARK L. WOLF
UNITED STATES DISTRICT JUDGE

HEARING

August 8, 2016
3:08 p.m.

John J. Moakley United States Courthouse
Courtroom No. 10
One Courthouse Way
Boston, Massachusetts  02210

Kelly Mortellite, RMR, CRR
Official Court Reporter
John J. Moakley United States Courthouse
One Courthouse Way, Room 5200
Boston, Massachusetts  02210
mortellite@gmail.com

```
 1    APPEARANCES:

 2    On behalf of Plaintiffs:

 3    Michael P. Thornton
      Thornton Law Firm LLP
 4    30th Floor
      100 Summer Street
 5    Boston, MA 02110
      617-720-1333
 6    mthornton@tenlaw.com

 7    Daniel P. Chiplock
      Lieff Cabraser Heimann & Bernstein, LLP
 8    250 Hudson Street
      8th Floor
 9    New York, NY 10013-1413
      212-355-9500
10    dchiplock@lchb.com

11    David J. Goldsmith
      Labaton Sucharow LLP
12    140 Broadway
      New York, NY 10005
13    212-907-0777
      dgoldsmith@labaton.com
14
      J. Brian McTigue
15    McTigue Law LLP
      4530 Wisconsin Avenue, NW
16    Washington, DC 20016
      (202) 364-6900
17    bmctigue@mctiguelaw.com

18    Carl S. Kravitz
      Zuckerman Spaeder LLP
19    1800 M Street, NW
      Washington, DC 20036
20    (202) 778-1800
      ckravitz@zuckerman.com
21
      Amy Williams-Derry
22    Keller Rohrback LLP
      1201 Third Avenue
23    Seattle, Washington 98101
      (206) 224-7463
24    awilliams-derry@kellerrohrback

25    (continued)
```

```
1    APPEARANCES:   (cont.)

2    On behalf of Defendants:

3    Daniel W. Halston
     Wilmer Hale LLP
4    60 State Street
     Boston, MA 02109
5    617-526-6654
     daniel.halston@wilmerhale.com
6
     William H. Paine
7    Wilmer Hale LLP
     60 State Street
8    Boston, MA 02109
     617-526-6134
9    william.paine@wilmerhale.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

<pre>
 1                    P R O C E E D I N G S
 2            THE COURT:  Good afternoon.  Would counsel please
 3    identify themselves for the Court and for the record.
 4            MR. GOLDSMITH:  Good afternoon, Your Honor.  David
 5    Goldsmith, Labaton Sucharow, for plaintiffs and the settlement
 6    class.
 7            MR. THORNTON:  Good afternoon, Your Honor.  Michael
 8    Thornton for plaintiffs and the settlement class.
 9            MR. CHIPLOCK:  Good afternoon.  Daniel Chiplock, Lieff
10    Cabraser Heimann & Bernstein, LLP, also here for plaintiffs and
11    the settlement class.
12            MR.KRAVITZ:  Carl Kravitz, Zuckerman Spaeder, for the
13    plaintiffs and the settlement class.
14            MR. McTIGUE:  Your Honor, Brian McTigue from McTigue
15    Law for the plaintiffs and the settlement class.
16            MR. PAINE:  Bill Paine and Bill Halston from Wilmer
17    Hale for the defendants.
18            THE COURT:  Okay.
19            We are here, as anticipated at the June 23 hearing,
20    with regard to the motion for preliminary certification of
21    class action and preliminary approval of the proposed class
22    settlement.  The issues presented, I think, were anticipated
23    and discussed somewhat at the June 23, 2016 hearing.  I've read
24    the memo in support of the motion and the related documents.
25            I propose to conduct this hearing by having you
</pre>

1    address first the request for preliminary class certification

2    for settlement purposes; second, whether the proposed

3    settlement appears to be fair, reasonable and adequate and

4    therefore should be circulated to the class; and third, issues

5    relating to the dates and the content of the notices.

6              Does that agenda make sense to the parties?

7              MR. GOLDSMITH:  That's fine, Your Honor.

8              THE COURT:  Is there anything missing from that

9    agenda?

03:10 10              MR. GOLDSMITH:  Your Honor, there's nothing missing,

11    per se.  I mean, there may perhaps be one or two elements of

12    the settlement that I might want to bring to the Court's

13    attention.

14              THE COURT:  No.  I want you to speak to all of this --

15              MR. GOLDSMITH:  Sure.

16              THE COURT:  -- to the extent that you want to or to

17    the extent that I have questions.  But it does appear to me

18    that it's appropriate to certify a class for settlement

19    purposes because the requirements of Rule 23(a) and 23(b)(3)

03:11 20    are met, but I'm interested in hearing from you all on that, I

21    guess.

22              MR. GOLDSMITH:  Would Your Honor like me to run

23    through the elements?  I'm happy to do that.

24              THE COURT:  Sure.

25              MR. GOLDSMITH:  Okay.  Thank you, Your Honor.  David

1   Goldsmith, Labaton Sucharow, for plaintiffs in the class.

2          So as Your Honor said, we argued or discussed a number

3   of issues during the status conference.  Your Honor had set a

4   deadline for the parties to complete their lengthy and

5   protracted negotiations and to file the fully executed

6   settlement agreement and exhibits by July 27.  We beat that

7   deadline by one day, and that brings us here.

8          Your Honor had set today and now as the time for a

9   hearing on preliminary approval.  So one of the matters that

03:12 10   needs to be discussed today, as Your Honor says, is preliminary

11   class certification.  The reason why it's preliminary and not

12   final is because class members do have a constitutional right

13   to object to class certification if they see fit to do so.  We

14   don't see objections to class cert very often, but it is

15   something they are permitted to do.

16          So the Rule 23 elements are familiar to Your Honor,

17   and they are no different really than the elements that we see

18   in a litigated context, except for the fact that Your Honor

19   doesn't have to consider whether the trial of this action, if

03:12 20   there is a trial, would be manageable or unmanageable.  Since

21   we're settling the case, there will be no trial, so Your Honor

22   doesn't have to consider that.  And that, of course, is the

23   *Amcan* case.

24          So on the numerosity point, we know from data that we

25   received from State Street that there are approximately 1,300

1    members of the class, so that exceeds the rule of thumb of 40

2    by quite a lot, so we have numerosity.

3           On commonality, we would say that there are quite a

4    few common questions of law or facts that are involved in the

5    case, and we presented many of those to Your Honor during the

6    argument on the motion to dismiss.  And, you know, under the

7    *Walmart* case, there really only has to be one question that is

8    common to the class.  And whether the defendants allegedly

9    violated, say, the Massachusetts Consumer Protection Act is

03:13 10   itself a common question of law or facts.  You can see a common

11   course of conduct that pervades the case.  And the claims, you

12   know, would depend on a common contention.

13          With regard to the typicality, the question there,

14   your Honor, is whether the interests of the class and the class

15   representatives are sufficiently aligned.  We would say that

16   they are because the claims of the class members and class reps

17   arise from the same essential set of facts.  You have a uniform

18   pricing methodology that we have alleged, and you have, as I

19   said a moment ago, an alleged uniform course of conduct.  So we

03:14 20   think that the interests of the class and the class

21   representatives are the same.  And thus, the plaintiffs

22   themselves are sufficiently typical of the other members of the

23   class.

24          With regard to the adequacy point, that's actually a

25   two-prong showing.  We have -- we believe that the class

 1    representatives, the plaintiffs, that their interests do not

 2    conflict with those of any other class member, which is really

 3    the same thing as typicality, some of the case law shows or

 4    recognizes.  With regard to adequacy also, it requires an

 5    inquiry of class counsel.  We would respectfully submit that

 6    class counsel in this case is adequate and is prepared to

 7    settle the case and has been prepared to litigate the case.

 8            THE COURT:  You're looking for up to $76 million.

 9            MR. GOLDSMITH:  We are.

03:15 10            THE COURT:  You're going to have to be more than

 11    minimally adequate, although you certainly seem to have enough

 12    lawyers in the courtroom.  Go ahead.

 13            MR. GOLDSMITH:  Quality over quantity.

 14            THE COURT:  There's quite a -- how many of these

 15    people in the courtroom are plaintiffs' lawyers today?  One,

 16    two, three.  And how many more back in the offices?  But

 17    anyway, go ahead.

 18            MR. GOLDSMITH:  Our firm, Your Honor, was appointed

 19    back in January of 2012 as the -- I believe the title was

03:15 20    interim class counsel.  Your Honor made some findings with

 21    regard to adequacy, and we would respectfully suggest there's

 22    no reason to depart from those findings today.

 23            With regard to the 23(b)(3) prerequisites, there's the

 24    question of predominance.  There's no -- predominance is

 25    similar to commonality, Your Honor, in the sense that the

1   common issues have to predominate over any of the individual

2   issues.  We think that's easily shown here.  As the Supreme

3   Court has recognized, it's a test that's readily met in certain

4   cases that involve consumer fraud or alleged securities fraud

5   or even antitrust fraud.  You have a lot of common issues here,

6   and we think that they outweigh any issue that bears peculiarly

7   on any individual class member.  I mean, the principal issue --

8          THE COURT:  Am I correct in understanding that with

9   regard to four of the five of Arkansas Teacher's claims they're

03:16 10   common to all class members as a unique contract claim that

11   Arkansas Teacher has; is that right?

12          MR. GOLDSMITH:  That's correct.  And that claim was

13   brought only individually.  So that claim was brought by

14   Arkansas only for itself and not as a class claim.  It can be

15   difficult to certify breach of contract claims, and we did not

16   plead it as such.

17          THE COURT:  And is there any conflict between Arkansas

18   Teacher's interest in that unique individual claim and the

19   other claims?

03:17 20          MR. GOLDSMITH:  I would say no, Your Honor.  That's an

21   extra claim that they pleaded.  Your Honor did deny the motion

22   to dismiss as to that claim, but that claim will be dismissed

23   as part of the class settlement.  Class settlement will result

24   in a dismissal of all the claims in the case.

25          THE COURT:  Putting aside that contract claim, am I

1   correct in understanding that the only issue unique to various

2   parties is the amount of damages it would be entitled to?

3        MR. GOLDSMITH:  That would be our argument, Your

4   Honor.  In all candor, if we were litigating the case, you

5   might hear arguments from the defense on that case.  But our

6   argument would be that the only genuine issue that would be

7   individual to class members would be the amount of money that

8   was lost.

9        THE COURT:  All right.

03:18 10      MR. GOLDSMITH:  The last point, Your Honor, is the

11  superiority point.  We think that's virtually self-evident

12  here.  To have all of these claims of the class members

13  litigated together is superior to any other method of resolving

14  this controversy.  We don't want have to 1,300 separate

15  litigations before the Court, which could produce disparate

16  different judgments and different, you know, results.

17       You only have in this case three custodial clients of

18  all of the clients that proceeded on their own.  You had a qui

19  tam action that was spearheaded by the Attorney General of

03:19 20  California.  That's a different kind of case than the claims

21  that were brought here.  You did have one -- and this was in

22  our brief.  You did have one custodial client that resolved its

23  issues privately with State Street without resorting to

24  litigation.  But interestingly, those custodial clients did not

25  file opt-out litigations of their own.  So I think an inference

1   can be drawn that the custodial clients that remain silent were

2   satisfied as to the claims proceeding on the class basis.

3          THE COURT:  Well, they'll get a chance to let me know,

4   won't they?

5          MR. GOLDSMITH:  That's exactly right.

6          THE COURT:  To the extent a potential class member --

7          MR. GOLDSMITH:  That's right.

8          THE COURT:  -- you have to opt out possibly pursuant

9   to any settlement agreements.

03:19 10         MR. GOLDSMITH:  Correct.  But we think at this point

11   class certification is appropriate, and if there's a class

12   member that feels that its interests justify a different path,

13   they have the right to do what they see fit.

14         THE COURT:  All right.  Mr. Paine, is there anything I

15   should hear from the defendants' perspective?

16         MR. PAINE:  No thanks.

17         THE COURT:  All right.  Subject to a possibility of

18   hearing a persuasive objection to class certification, I do

19   hereby certify the proposed class for settlement purposes only.

03:20 20   I understand if the settlement is not approved, parties may

21   want to litigate the issue of class certification.

22         I find that the requirements of Rule 23 are, for

23   present purposes, met, and the requirements of Rule 23(b)(3)

24   are also, for present purposes, met.  I will consider this

25   issue further at the final hearing and decide whether to

1    confirm the class certification or alter my decision, as I

2    understand I would always have the right to do in any event.

3           With regard to the requirements of Rule 23(a), there

4    are 1,300 class members, which satisfies the numerosity

5    requirement.  Common issues exist.  All of the class claims are

6    applicable to all of the class members.  Four of the five

7    claims of Arkansas Teacher arise from the same alleged

8    practices as the claims of all other class members.  They are

9    therefore typical.  Arkansas Teacher's contract claim does not

03:21 10   undermine my findings of typicality or diminish Arkansas

11   Teacher's incentive to zealously represent the class.

12          Arkansas Teacher is a substantial and sophisticated

13   pension fund.  It's represented by experienced, sophisticated

14   counsel.  Together I find they will adequately represent the

15   class.  And the interests of Arkansas Teacher does not conflict

16   with the interests of other class members.

17          In addition, I find that the requirements of Rule

18   23(b)(3) are met for present purposes.  Questions of law and

19   fact common to the class members predominate.  The only unique

03:22 20   issues relate to damages and Arkansas Teacher's additional

21   individual contract claim.  The class action approach is

22   superior to individual actions who will provide economies of

23   time and effort and judicial resources.  Importantly, it also

24   avoids the risk of inconsistent decisions.

25          So I'd like to move next to the reasonableness of the

1    proposed settlement, the terms of the proposed settlement,

2    which should be mentioned at the outset.  It would be helpful

3    if the plaintiff at least would address the relationship of the

4    Department of Justice, Department of Labor and SEC settlements,

5    if there is an SEC settlement, and also while it's a large

6    number, why $300 million is a reasonable sum in the

7    circumstances.

8         MR. GOLDSMITH:  Thank you, Your Honor.  David

9    Goldsmith for plaintiffs and the class.

03:23 10         So why don't I zero in on the points that Your Honor

11    raised.  So preliminary approval, as Your Honor knows, is a

12    preliminary determination.  And we get to the guts of it more

13    at final approval.  But to respond to those questions, so

14    the -- since we appeared at the end of June, the final

15    settlements between State Street and the SEC and the DOJ were

16    announced publicly, so we now know what those numbers are and

17    how they relate to one another, so I can give the Court the

18    landscape.  And the answer is that we, the plaintiffs, the

19    private sector plaintiffs, negotiated a settlement for $300

03:24 20    million.  That's the first thing.

21         Second thing is, State Street has agreed to pay the

22    Department of Justice a penalty of $155 million.

23         THE COURT:  I don't think I saw that in your memo.

24         MR. GOLDSMITH:  It's not in the memo, Your Honor,

25    because it was after the memo that the press release came out,

1    and we did not know the number.  We were not privy to those

2    discussions.  So I think I indicated that a settlement had been

3    reached or would shortly be reached but we didn't know the

4    number.  So that's the second piece, broadly speaking.  That's

5    1.55.

6              Then the third piece, broadly speaking, is that State

7    Street has also agreed to pay a penalty to the SEC of $75

8    million.  So putting all the monies together, State Street will

9    be paying $530 million in settlement of these various claims.

03:25 10         Now, within --

11             THE COURT:  What about the Department of Labor?

12             MR. GOLDSMITH:  Right.  So to answer that question,

13   Your Honor, within the $300 million settlement that we have

14   secured for the class members -- and the 155 million does not

15   go to class members.  That goes to government.  And 75 million,

16   to our understanding, also does not go to class members and

17   instead goes to the government.  But the $300 million, that

18   does go to class members on a net basis.  There are aspects of

19   a plan of allocation, Your Honor, that were negotiated and

03:26 20   agreed upon in part to satisfy certain of the -- certain

21   elements of certain of the regulator settlements.  So the

22   allocation -- within the plan of allocation to ERISA plan class

23   members, to the custodial clients that are ERISA plans and the

24   group trust class members, to the extent they have ERISA

25   assets, that is in part in order to satisfy State Street's

1   issues with the Department of Labor.  And that allocation, Your

2   Honor, on a gross basis is $60 million.

3           THE COURT:  And is it your understanding essentially

4   that the Department of Labor is relying on this settlement to

5   assuring its responsibilities are satisfied?

6           MR. GOLDSMITH:  Yes.

7           THE COURT:  Do you anticipate asking them to tell me

8   that in connection with any final settlement hearing?

9           MR. GOLDSMITH:  I do not, but -- I do not anticipate

03:27 10   asking them that, but it can be done.

11           THE COURT:  I mean, one other thing that's argued is

12   one reason that this is reasonable and an unusual reason is

13   essentially the settlement has been vetted by three federal

14   government agencies.  It's part of a global resolution.

15           MR. GOLDSMITH:  That's correct.

16           THE COURT:  So I'm not -- I don't think I could and

17   I'm not ordering that they be heard, but it would be helpful.

18           MR. GOLDSMITH:  Well, I would say, I just want to

19   answer Your Honor's point about the SEC because there is that

03:28 20   as well.

21           MR. PAINE:  David, do you mind if I interject with a

22   couple of details?

23           MR. GOLDSMITH:  Go ahead.

24           MR. PAINE:  So there's really only two government

25   agencies that are formally part in any way of this settlement.

1   So our arrangement with the Department of Justice, their civil

2   division stands alone.  It's just a straight agreement that

3   we're paying the money and we're getting a release.

4        With respect to the SEC, there is no formal settlement

5   agreement at this moment.  We have made an offer of settlement

6   to them, which they -- which we expect them to accept shortly

7   after final approval of this settlement.  And the two pieces of

8   the -- the two financial pieces of that, the penalty is one,

9   and that a certain amount of money go to mutual fund customers

03:29 10   of State Street are elements of that settlement.  And so it is

11   in that sense that the SEC has weighed in on the overall.  They

12   are relaying on at least that minimum amount of money going to

13   mutual fund recipients via the settlement that we're asking you

14   to approve.

15        Similarly, with respect to the Department of Labor,

16   there is no separate payment, but a condition of the settlement

17   which must be met, which is necessary in order for us to

18   finalize our settlement with the Department of Labor, is that

19   the $60 million go to ERISA plan participants.

03:29 20        So pretty much exactly what Mr. Goldsmith said with a

21   couple of differences, but we can represent to the Court that

22   each of the SEC and the Department of Labor have made it a

23   condition of our settlement with them that a settlement that

24   has the features that I mentioned be approved by you and that

25   the distribution happen accordingly.

1          THE COURT:  Okay.  I think it would be helpful when --

2   as I expect we will -- we get to the final settlement that this

3   be addressed in the memo more fully than it is here.  At a

4   minimum, it has practical significance.

5          The Department of Justice settlement is independent of

6   what happens in this case?

7          MR. PAINE:  Correct.  I mean, they're all cross-

8   defaulted; meaning, if this settlement is not finally approved,

9   then we have the right to back out of them all.

03:31 10          THE COURT:  I see.

11          MR. PAINE:  But there's no contingency the other way

12   on the department, by which I mean --

13          THE COURT:  Okay.  If I don't approve it, the

14   Department of Justice still collects $155 million for the

15   treasury.

16          MR. PAINE:  Unless we back out.

17          THE COURT:  Unless you back out?

18          MR. PAINE:  Unless we back out.

19          THE COURT:  All right.  It would just be valuable to

03:31 20   remind me of this and discuss the implications of it for the

21   reasonableness of the settlement.

22          MR. GOLDSMITH:  That's fine, Your Honor.

23          Part of the reason why our memo may not have all the

24   needle-specific details on this is that we naturally have not

25   been privy to the lengthy negotiations that we know that

1   Mr. Paine and his team have had with all the government

2   regulators.  So we've been a little bit in the dark on that, on

3   some of those issues.

4        THE COURT:  This is a point at which the adversary

5   process usually fails.  I mean, the defendant can, and I may

6   order, file its own memo telling you why it's reasonable

7   because there may be certain information that you have that the

8   plaintiff doesn't have.

9        MR. PAINE:  Fair enough.  I won't weigh in on what it

03:32 10  is that you should order us to do.  I think the reality is that

11  this is a pretty complicated and nuanced arrangement.

12       THE COURT:  I don't necessarily need all the details.

13  But, you know, the plaintiffs -- I mean, just as a practical

14  matter, if this has indeed -- if what I'm being asked to

15  approve is going to affect something you've negotiated at arm's

16  length with the Department of Justice and something you've

17  negotiated with the SEC and something you've negotiated with

18  the Department of Labor, I think that goes into both the

19  reasonableness of the settlement and the fairness of the

03:33 20  settlement.  And it's argued the presumption of reasonableness.

21  You don't just have arm's length bargaining between the parties

22  in this case.  You've got other people participating.

23       MR. PAINE:  And I agree with that, Your Honor.

24       THE COURT:  But then it needs to be explained to some

25  extent.

         1          MR. PAINE:  Let me reassure you, though, that the

         2    elements of our settlement that are key to the other actors

         3    have been identified, and they are the payment amounts to the

         4    ERISA participants and to the mutual fund participants in the

         5    class, and that that is the only place other than the overall

         6    approval of the arrangement where the regulatory settlements

         7    and this settlement intersect.

         8          THE COURT:  Okay.

         9          MR. GOLDSMITH:  Thank you, Your Honor.  So Your Honor

03:34 10    asked a question, I believe, about how the $300 million relates

        11    to -- I think Your Honor had asked --

        12          THE COURT:  Yeah.  How does it relate to the damage

        13    issue you're seeking and the amount --

        14          MR. GOLDSMITH:  So the damages issues here are

        15    reasonably complex, and there are various scenarios.  We will

        16    be setting all of that out in the final approval brief for Your

        17    Honor to review.

        18          THE COURT:  In connection with that, am I correct in

        19    assuming that the plaintiffs have an expert who estimates the

03:34 20    damages at something and the defendants have an expert that

        21    estimates the damages at a lower amount?

        22          MR. GOLDSMITH:  So we've received a large amount of

        23    data from the defendants that we've been reviewing and we've

        24    been crunching in different ways.  I know the defendants have

        25    been doing the same.  As we review the case, and the defendants

1    will differ on this, but we see the settlement as equalling

2    roughly 20 percent of the damages that we could conceivably

3    achieve at trial were we to go to trial on a best-case-scenario

4    basis.

5            THE COURT:  And do the defendants have a lower damage

6    estimate?

7            MR. PAINE:  Our range includes zero.

8            THE COURT:  I mean, of the -- I understand that, but

9    if I were trying to mediate this settlement, I would say assume

03:35 10   somehow the plaintiffs have won, how much do you think they

11   would be awarded.

12           MR. PAINE:  So there is a common univocal

13   understanding of the total amount of volume of foreign exchange

14   trading that was done during the class period by folks who

15   could be members of the class.  So that is a baseline that we

16   have in common and which has been shared, and it's really a

17   matter of assumption whether you think any of that is an amount

18   that was too much.  You know, so somewhere -- so it's a pretty

19   nuanced set of assumptions that drive what that conceivably

03:36 20   could be.

21           And I think it's quite fair to say that we probably

22   spent days first understanding the alternative models and then

23   trying to sort out with sophisticated help where we've gotten

24   to.  And I think this is really one where the arm's length

25   nature of the negotiations and the supervision of the mediator

1   can give you some comfort that we came to a place that made

2   sense because everybody was motivated to get to a result that

3   made sense.

4         THE COURT:  Two things.  Am I correct, though, that

5   it's the defendant's position that $300 million represents more

6   than 20 percent of what would be recovered if the case was

7   tried and the plaintiffs prevailed?

8         MR. PAINE:  I'd be happy to address that for you at

9   the final hearing.  And my only equivocation is that I just

03:37 10   don't have the numbers firmly in mind.

11         THE COURT:  Okay.  Can you remind me who the mediator

12   was?

13         MR. PAINE:  Jonathan Marks.

14         THE COURT:  We discussed this in June.  Okay.  Thank

15   you.

16         MR. GOLDSMITH:  Thank you, Your Honor.

17         THE COURT:  Let's see.  All right.  Well, the

18   memorandum in support of the motion to preliminarily approve

19   the settlement was thoughtful and thorough.  My particular

03:38 20   questions have been addressed.

21         I do find that the proposed settlement is

22   sufficiently -- appears to be sufficiently fair and reasonable

23   and adequate to be distributed to the class members who then

24   can opt out or object prior to the final hearing.  The

25   settlement has been negotiated over many years in 16 mediation

1   sessions and elsewhere at arm's length by experienced counsel.

2   There's been substantial discovery.  I'm told that the

3   plaintiffs received 9 million documents.  The Department of

4   Labor and Department of Justice and Securities and Exchange

5   Commission have been negotiating with the defendant as well.

6   And the Department of Labor at least evidently is relying on

7   this settlement to propose settlement to vindicate the

8   interests it represents.  It seems to be satisfied with it.  So

9   the settlement is presumptively reasonable.

03:39 10         There are other relevant factors that are consistent

11   with this presumption.  The defendants vigorously deny

12   violating their legal obligations.  The outcome is inherently

13   uncertain if this case continues to be litigated.  $300 million

14   payment is a substantial payment in a case where the defendants

15   allege misconduct resulted.  It is alleged in hundreds of

16   millions of dollars in profits annually.  Even if it's only 20

17   percent of the upper end of the potential range, it's a

18   substantial payment, the result, as I said, of arm's length

19   negotiation.  Segments, different segments of the class are

03:40 20   treated equally within reasonable categories.  They're not

21   sub-classes, but the allocation formula seems, at this point,

22   to be reasonable.

23         As I understand it, counsel will seek up to 25

24   percent, roughly $76 million, of the common fund.  The class

25   members will have an opportunity to be heard on the propriety

1    of that.  There's a total I think of $85,000 that might be

2    awarded to and split among the seven plaintiffs for their

3    services in this case.  I don't find that that undermines, for

4    present purposes, the fairness of this.  So I do preliminarily

5    approve the proposed settlement as fair, reasonable and

6    adequate.

7          With regard to the notice and the dates that need to

8    be inserted, I have a couple of observations, a couple of

9    interests, and then we'll fine-tune the dates.  I think I gave

03:41 10   you when you were here in June an October 25 date for the final

11   hearing or something that week.  Is that the date?

12         MR. GOLDSMITH:  It is, Your Honor, but we wanted to

13   address that date if we could.

14         THE COURT:  Here.  Let me tell you I'm not going to be

15   here that week.  I'm going to be out of the country.  I want to

16   propose November 2, but we can talk about this.

17         MR. GOLDSMITH:  That's actually perfect.

18         THE COURT:  Then I think maybe you were proposing that

19   you would make your filings, your memo in support and the

03:42 20   requests for attorney's fees 35 days before the final hearing,

21   and any objections and opt-outs would require 21 days before

22   the final hearing.  I'm concerned that that two weeks may not

23   be enough given the complexity of this, but maybe 45 days would

24   be if we put the hearing day out a little bit.  It pretty much

25   comes to that.  And then we can keep the date for the opt-outs

1   and objections to 21 days before the hearing.  This is

2   tentative.  I want to hear from you.  And then say 14 days

3   before the hearing the parties would confirm their intent to

4   proceed with the settlement or if there's a sufficient number

5   of opt-outs and the defendants want to withdraw from the

6   settlements, you tell me 14 days in advance, and you would also

7   file supplemental memos on the implications of the objections

8   and the opt-outs, which you can't do 45 days in advance because

9   you won't have them.

03:43 10          So would you like to be heard on that, both sides?

11          MR. GOLDSMITH:  Sure.  I think I've got everything

12   down.  So Your Honor, November 2 is fine for the parties.  We

13   had actually spoken about an issue relating to that date before

14   Your Honor took the bench, so I think we can --

15          THE COURT:  Can I see the book?  Go ahead.

16          MR. PAINE:  We're all in agreement that November 2

17   would be good.

18          THE COURT:  Okay.

19          MR. GOLDSMITH:  With regard to -- so one issue that is

03:44 20   built into the proposed order, and it was actually not in the

21   schedule that was in the memo, on page 8 there is the date to

22   put in a brief that would oppose any objection that would be

23   filed.

24          THE COURT:  I didn't see it in the order either.  Is

25   it in the order?

1        MR. GOLDSMITH:  Yes, sir, it is.  I can find that.

2   What we have there -- and Your Honor may want to have more time

3   considering what Your Honor said about complexity.  So I think

4   what's in the order is that the date to file a brief responding

5   to any objection would be seven days before a hearing.  I

6   suspect Your Honor --

7        THE COURT:  I just said I'd prefer 14.

8        MR. GOLDSMITH:  Okay.

9        THE COURT:  That only gives you a week after you get

03:45 10   the opt-outs and the objections.  But will all the objections

11   come in right at the deadline?

12        MR. GOLDSMITH:  No, sir.  So we'd need to open that up

13   a bit I think.

14        THE COURT:  No, but -- what do you mean "open it up"?

15        MR. GOLDSMITH:  I think maybe we'd want two weeks to

16   respond.

17        THE COURT:  Well, my point is different, if they're

18   not all going to come in at the deadline.  Here.  I want this

19   to be realistic.  You know what the -- you know now what the

03:45 20   arguments are in favor of settlement and the arguments you'll

21   make on your attorney's fees.

22        MR. GOLDSMITH:  Right.  No, no.  The issue, Your

23   Honor, is not our approval papers.

24        THE COURT:  If you file approval papers earlier --

25        MR. GOLDSMITH:  That's fine.

1          THE COURT:  I can, you know, make the -- I mean

2    earlier than 45 days.

3          MR. GOLDSMITH:  That's no problem, Your Honor.

4          THE COURT:  Then I might make the opt-outs and

5    exclusions 28 days before, and then you would file your reply

6    to the opt-outs and the exclusions 14 days before.

7          MR. GOLDSMITH:  That's fine, Your Honor.  I just need

8    to make sure -- I don't have all the dates in mind, but the

9    issue that comes to my mind is having enough time between the

03:46 10   mailing of notice to class members and their time to either opt

11   out or object.  That's an important -- it's important that that

12   be sufficient.

13         THE COURT:  It has to be sufficient.  Go ahead.  It

14   has to be legally sufficient.  It has to be fair.

15         MR. GOLDSMITH:  It has to be due-process sufficient.

16   Usually 30 days is a minimum for that.

17         THE COURT:  Okay.  We didn't build 30 days in here,

18   though.

19         MR. GOLDSMITH:  Well, here --

03:47 20         THE COURT:  Because you were going to make your

21   filings 35 days before, I think, and they were going to have to

22   opt out 28 -- 21 days before, so they'd only have two weeks.

23         MR. GOLDSMITH:  This would be a tad -- this would have

24   been 28 days --

25         THE COURT:  What would have been?

1          MR. GOLDSMITH:  Under this schedule, Your Honor.

2          THE COURT:  This schedule where?

3          MR. GOLDSMITH:  I'm sorry.  The schedule that we

4     proposed on page 8 of our brief.

5          THE COURT:  Page 8 of your brief.

6          Well, let's do this this way.  It's my intention to

7     order that you revise the proposed order you gave me in the

8     notice, if I make revisions, by this Wednesday, the day after

9     tomorrow.  Is that realistic?

03:48  10          MR. GOLDSMITH:  Yes, sir.

11          THE COURT:  Okay.  So let's work from there.  So then

12     you're going to have ten days to make the mailing, right?

13          MR. GOLDSMITH:  Yes.

14          THE COURT:  So that will be made by August 22.

15     Because Wednesday -- actually, Wednesday is the 10th, so you'll

16     have until the 20th, unless that takes us to a Saturday or

17     something.

18          MR. GOLDSMITH:  Okay.

19          MR. HALSTON:  It does.

03:48  20          THE COURT:  Okay.  So then you can have until

21     August --

22          MR. HALSTON:  22nd?

23          THE COURT:  22nd.  Two weeks from today.  Then you're

24     going to post the summary notice, you say 14 calendar days

25     after the notice date.  Is that 14 days after August 22?

1   MR. GOLDSMITH:  Yes, Your Honor.  It's meant to be two

2 weeks after the notice.

3   THE COURT:  All right.  So somebody will have to --

4   MR. CHIPLOCK:  September 5?

5   MR. HALSTON:  September 5.  But is that Labor Day?

6   MR. CHIPLOCK:  It is Labor Day.

7   THE COURT:  Make that September 6.  Then what's the

8 earliest you can reasonably file the motion papers and your

9 request for attorney's fees?  Here you had it 35 days before,

03:49 10 and I don't think that's enough time.

11   MR. GOLDSMITH:  I think, Your Honor, we had a

12 September 20 deadline before.

13   MR. CHIPLOCK:  November 2, 35 days before that would

14 be probably the last week of September.  We could aim for mid-

15 September.

16   MR. GOLDSMITH:  Yeah.

17   THE COURT:  Here, make that filing --

18   MR. GOLDSMITH:  15th, does that make sense, Friday?

19   THE COURT:  All right.

03:50 20   MR. GOLDSMITH:  Sort of doing this on the fly a little

21 bit, Judge.

22   THE COURT:  Do you want September 15?

23   MR. GOLDSMITH:  All right.

24   THE COURT:  Put in there September 15, you make those

25 submissions.

1          MR. HALSTON:  Looks like that would be 48 days.

2          THE COURT:  Then how about exclusions and opt-outs by

3     October 7?  That's a Friday.  Your response to the exclusions

4     and opt-outs by October 21.  We'll have the hearing on November

5     2.  Okay?

6          MR. GOLDSMITH:  Yes, sir.

7          THE COURT:  November 2 at 2:00 p.m.

8          MR. GOLDSMITH:  Your Honor, are you asking us to

9     submit new --

03:51  10          THE COURT:  Papers.

11          MR. GOLDSMITH:  -- papers on that?

12          THE COURT:  Yes, with all these dates put in it by the

13     day after tomorrow, the 10th.

14          MR. GOLDSMITH:  So the preliminary approval order with

15     the notice and summary --

16          THE COURT:  Right.  But now we're going to talk about

17     the notice.

18          MR. GOLDSMITH:  Okay.

19          THE COURT:  I don't know if I discussed this with you

03:51  20     before, but I think I have this inherent authority anyway, but

21     I want it to be clear.  I have the discretion to alter any of

22     these deadlines essentially for cause, and I would like that to

23     be reflected in the notice -- the notices.

24          MR. GOLDSMITH:  So Your Honor, you'll find that, in

25     the long form notice, you'll find that on page 3.

1          THE COURT:  Hold on just a second.  There it is, okay.

2          MR. GOLDSMITH:  I confess it may not be in the summary

3     notice, but we can put it in there as well.

4          THE COURT:  Please do.  Otherwise, somebody may feel

5     they missed a deadline, they were traveling, and now it's too

6     late.

7          MR. GOLDSMITH:  Okay.

8          THE COURT:  Is there anything else you thought I would

9     ask you?  I may have missed something.  Go ahead.

03:52 10          MR. GOLDSMITH:  I had an idea, Your Honor, about

11     something.  In conferring with -- I think there was two things,

12     Your Honor.

13          In conferring with defendants' counsel before Your

14     Honor took the bench, there was something that we wanted to

15     just make sure was brought to your attention, which is that the

16     parties have entered into a supplemental agreement which has

17     not been filed with the Court, but it is referred to in the

18     settlement agreement.

19          THE COURT:  Is this how many opt-outs will authorize

03:53 20     the --

21          MR. GOLDSMITH:  Yes, sir.

22          THE COURT:  -- defendants to withdraw from the

23     settlement?  In fact, I think I discern that, I assume that the

24     defendant at least -- or the parties want that to remain

25     confidential, correct?

1      MR. PAINE:  Yeah.  The general sense is that if it's

2  known, then it's not in the interests of anybody, including the

3  class members, because it gives people the ability to kind of

4  arbitrage the outcome.

5      THE COURT:  Right.  I dealt with this before.  That's

6  reasonable.  But I gave you a date, although we didn't mention

7  it, that date 14 days before -- and this needs to go in the

8  order, I'm glad you raised it -- the date, 14 days before

9  November 2, the defendant has to confirm its intent to proceed

03:54 10  with the settlement or tell me that the opt-outs authorize it

11  to withdraw from the settlement and it's withdrawing.

12      MR. PAINE:  And it's totally fine.  Let me point out

13  that my understanding -- we're going to have a deadline in this

14  agreement that says if you have an opt-out, you've got to get

15  it in by X date.  If you decide later on -- something else

16  comes in and you decide you're going to take it late, you have

17  every right to do that, and we would then at that point

18  reconsider what our point of view is in light of that.

19      THE COURT:  Is that what the contract provides?

03:55 20      MR. PAINE:  Pardon?  Basically -- is that what the

21  contract provides?

22      THE COURT:  Well, see, I don't have the agreement.  I

23  could have you file it under seal.  I don't know that I need

24  it.  Is there a deadline in your agreement with the plaintiffs

25  for exercising the option to withdraw from the settlement if

1    you have the option?

2            MR. PAINE:  There is with respect to that which is

3    before us.  However, if it -- you know -- it would not go away.

4    Essentially, my only point is that if there are no further

5    opt-outs after the opt-out date, it's fine for us to plight our

6    troth 14 days before the hearing, assuming that that's

7    consistent with all the other deadlines, certainly at some

8    point so that we don't have a hearing that doesn't make sense.

9            THE COURT:  I want to know 14 days before because I

03:56 10   don't want to prepare for the hearing if you're going to

11   withdraw.  But I will say, at least from my perspective, if

12   there's some material change after you say you're not

13   withdrawing, as a matter of fairness, I would let you change

14   your view.  But what I don't know is what the terms of your

15   agreement with the plaintiff --

16           MR. PAINE:  The terms of our agreement would be -- it

17   would be consistent with that.

18           THE COURT:  That's okay.

19           MR. PAINE:  Great.  Thanks.

03:56 20           THE COURT:  And when you file the memo -- I would say

21   memos because I would like something from the defendant as

22   well -- you'll tell me, We don't think they would prevail, if

23   that is what you believe.  In any event, the damages would not

24   be as high as they estimate; the Department of Labor is

25   depending on this case to vindicate the interests it

1    represents, whatever you'd say.  You may have some information,

2    I'm educated to understand, that the plaintiffs don't have.

3            All right.  Is there anything else we haven't

4    addressed?

5            MR. GOLDSMITH:  Your Honor, just one minor point I

6    wanted to make, which is not absolutely essential to today's

7    hearing.  But Your Honor mentioned a couple of times the fee

8    that we're planning to seek.  I wanted to mention that the way

9    we've structured it is that it's a percentage of the --

03:58 10          THE COURT:  Common fund?

11           MR. GOLDSMITH:  I'm sorry, Your Honor?

12           THE COURT:  It's a percentage of the common fund?

13           MR. GOLDSMITH:  It's a percentage of the common fund

14   but after the expense figure is taken out and after the service

15   award figure is taken out.  So it's not 25 percent of the $300

16   million, which would be $75 million, but rather it's a bit less

17   because it's 300 million, minus 1.75 million, which is our

18   estimated expense amount, minus 85,000, which is the estimated

19   service award amount, and then you divide that by four.  That's

03:58 20   how you get that odd number of 74 million and change.

21           And the reason we did it that way, Your Honor, is I

22   appeared before you a number of years ago in a class action,

23   securities class action called *American Tower*, and we had made

24   a request to have a percentage fee, and Your Honor's approach

25   there was to do it that way.  Your Honor's approach there was

1    to take the expenses -- we didn't ask for service awards there,

2    but Your Honor took the expenses off the top of the gross and

3    then awarded a percentage of the remaining amount.

4         THE COURT:  Well, actually I thought that what I

5    usually do is count the expenses and the fees together to see

6    whether they total a reasonable -- whether they're reasonable.

7         MR. GOLDSMITH:  In this case it would -- in this case,

8    doing it that way also is a way to keep it a little bit more

9    reasonable because I had mentioned a percentage to Your Honor

03:59 10   of approximately 25 percent, so the fee here is a little bit

11   less than 25 percent, and then the fee plus the expenses plus

12   any service awards, if Your Honor awards that, will be a little

13   bit more than 25 percent but not as much more.

14        THE COURT:  That actually raises something else that I

15   thought about, because in your memo, when you describe the

16   settlement -- I don't know where it is.  But the amount

17   allocated to, say, the ERISA plan or the group trust is before

18   fees, expenses; is that right?

19        MR. GOLDSMITH:  The -- yes, the 60 million is 60

04:00 20   million of the $300 million.

21        THE COURT:  And then a pro rata share of the fees and

22   expenses would come from the ERISA plan payment or a

23   proportional share?

24        MR. GOLDSMITH:  There is a cap.  There's a cap that on

25   the fees -- on the fee that comes out of the ERISA allocation

1    as part of the overall negotiation of the plan of allocation.

2         THE COURT:  Is it the same -- if the ERISA plan

3    hypothetically is getting 25 percent of the 300 million and the

4    group trust is getting 50 percent, is the amount of fees paid

5    by the ERISA group half of what the group trusts would pay?

6         MR. GOLDSMITH:  No, Your Honor, because with the group

7    trusts, the group trusts kind of -- they sort of slide a little

8    bit because the group trusts have to tell us what proportion of

9    their volume or their assets were governed by ERISA.  And to

04:01 10   the extent as opposed to not -- to the extent that they do

11   that, then the ERISA portion of the group trusts will drink, as

12   it were, out of the ERISA allocation.  They'll have the right

13   to do that.  Then their assets that are not ERISA will not

14   drink out of the ERISA allocation, or if they don't tell us,

15   then we won't know.

16        THE COURT:  Let's say ERISA turns out to be

17   one-third -- $100 million is going for ERISA plans.

18        MR. GOLDSMITH:  Well, it won't, Your Honor, because

19   it's a strict -- the 20 percent of the gross will go to the

04:02 20   pure, shall we say, ERISA class members, which is separate from

21   the group trusts.  The group trusts are about 55 people that

22   are kind of unicorns that are over here that have to be dealt

23   with separately.  And the ERISA plans that we know are ERISA

24   plans are in the ERISA bucket, which is the $60 million.

25        THE COURT:  Is one of these groups required to pay a

1    disproportionate percentage of the fees and expenses, a

2    different and higher percentage of the fees and expenses?

3              MR. GOLDSMITH:  Yes, because there's a cap on the

4    amount of the -- so depending on the fee that is awarded,

5    there's a cap on the amount of fee that comes out of the ERISA

6    allocation versus the other two allocations.  That was part of

7    the overall negotiation.

8              THE COURT:  Where is that explained in the notice?

9              MR. GOLDSMITH:  That's in the premium language, in the

04:03 10   plan of allocation, Your Honor, that's at page 11 in the

11   notice.  There's language in the text --

12             THE COURT:  Hold on just a second.

13             MR. GOLDSMITH:  Sure.

14             THE COURT:  Where is the language?

15             MR. GOLDSMITH:  There's a paragraph on page 11, Your

16   Honor, "The ERISA settlement allocation."

17             THE COURT:  Right.

18             MR. GOLDSMITH:  Then closer to the end, the last

19   sentence of that paragraph starts, "The ERISA settlement

04:04 20   allocation also was negotiated directly."  It mentions a

21   premium per dollar.

22             THE COURT:  That's not intelligible to me.  How does

23   that -- what does that mean?  "The ERISA settlement allocation

24   is negotiated directly between customer counsel, ERISA counsel

25   and representatives of the Department of Labor, and in light of

1    the fiduciary and other claims available under ERISA laws,

2    provides a premium per dollar of indirect FX trading volume for

3    ERISA plans and eligible group trusts in comparison to the

4    allocations to other settlement class members."

5            MR. GOLDSMITH:  What it means, Your Honor, is that

6    because ERISA plans have federal statutory claims under ERISA

7    which are fiduciary duty claims and prohibited transaction

8    claims that other types of class members do not have, other

9    class members including public pension funds and mutual funds

04:05 10   and the like do not have to bring, that ERISA plans under the

11   plan of allocation will do better in terms of their settlement

12   payments than other class members.  And we believe it's fair

13   for that reason.

14           And there are two mechanisms that create that premium.

15   One is, on a gross level, the 20 percent allocation on a gross

16   level to ERISA plans and the group --

17           THE COURT:  20 percent is more than their percentage

18   of the losses.

19           MR. GOLDSMITH:  Because 20 percent, Your Honor, is

04:05 20   more than the total volume --

21           THE COURT:  Okay.

22           MR. GOLDSMITH:  -- than the proportion that ERISA

23   plans represented the total volume of all the class members, if

24   I said that correctly.  That's one.

25           And then two, the fee issue that Your Honor asked

1    about is another mechanism that contributes to that.

2         THE COURT:  Well, I want you to spell that out in this

3    this notice more clearly.

4         MR. GOLDSMITH:  We're happy to.  I would draw your

5    attention also to the footnote on that page, Your Honor, same

6    page.

7         THE COURT:  I don't think that does it.  It doesn't

8    tell the other groups that the ERISA group is being treated

9    more favorably on fees.  Who are these 1,300 customers?  Are

04:07 10   any of them individuals?

11        MR. PAINE:  No.  They're all institutional customers.

12   So basically, the premise of this document is that the money is

13   going to be allocated on the basis of volume, meaning the total

14   amount of volume of foreign currency swapped, expressed in U.S.

15   dollar terms.  So we've divided the world basically into three

16   groups, the ERISA group, the mutual fund group and the other

17   group.  And as Mr. Goldsmith mentioned, the group trusts are

18   going to participate either in the other group or in the ERISA

19   group, and money is going to follow them over.  So everybody is

04:07 20   an institutional investor.

21        THE COURT:  And you think, even if I don't understand

22   this, they would?

23        MR. PAINE:  I think that the sentence I think clearly

24   expresses that that per-unit volume, the ERISA group is going

25   to do better than the other groups.  I think that part is

1  clear.

2            THE COURT:  Where is that?

3            MR. PAINE:  The sentence that we just read, "provides

4  a premium per dollar of indirect FX trading volume for ERISA

5  plans."  When you read those words in context, the first

6  premise is that all of the settlement money is going to be

7  allocated according to volume, and that these guys are getting

8  a premium I think is fairly clear.  It also says that --

9            THE COURT:  Is there someplace here that explains the

04:08 10  way it was just explained to me why they're getting a premium,

11  because of the unique statutory claim?

12            MR. GOLDSMITH:  Well, it does say, Your Honor, "In

13  light of the fiduciary and other claims available under ERISA

14  laws."

15            MR. PAINE:  Same sentence, Your Honor.

16            THE COURT:  And how does this communicate that they're

17  paying a lower percentage of the attorney's fees?

18            MR. GOLDSMITH:  I suppose, Your Honor, it does in the

19  sense that the 10.9 million figure is there and the fee number

04:09 20  is there.

21            THE COURT:  But that doesn't tell you what happens to

22  the others.  Let's say I give you 15 percent, hypothetically --

23  don't have a heart attack.  Let's say I give you 15 percent as

24  your fee.

25            MR. PAINE:  That, Your Honor, is addressed.  It's

1    addressed in the notice and in the agreement that to the extent

2    you provide a lower percentage than they're asking, then

3    everybody comes down.

4              THE COURT:  But not proportionally.

5              MR. KRAVITZ:  I can --

6              THE COURT:  Can you say your name for the record?

7              MR. KRAVITZ:  Yes.  I'm Carl Kravitz.  I'm one of the

8    ERISA counsel.  So to answer the question that you asked

9    directly, if hypothetically you awarded 15 percent, and 10.9

04:10 10   million is less -- is more than 15 percent of the 60 million,

11   then the ERISA fee would come down to 15 percent and be equal

12   to all the others.  It's only in the circumstance where you

13   award a fee above the whatever 10.9 divided by 60 is, where

14   there would be some amount of unequalness.  Okay?  So if you

15   ask the question, Will there be a different fee, the answer is

16   there could be, depending on what fee you award.

17             THE COURT:  Well, do you think you could write a

18   sentence that would explain that?

19             MR. KRAVITZ:  Yes.  I was going to say, in listening

04:11 20   to all of this, and I hope my co-counsel forgive me, but I

21   think we would like to take a look at this and see if we can

22   clarify it so that it satisfies Your Honor and is clearer to

23   the recipients.

24             THE COURT:  When you give me the proposed documents on

25   Wednesday, point out where this new language is.  Give me a

1     redline version, and give me the disc --

2          MR. KRAVITZ:  Yes, Your Honor.

3          THE COURT:  -- So if I want to edit it a bit.  And if

4     I edit it and you feel I made a mistake and fouled it up, don't

5     be timid about telling me.  I hope I won't.  But my point is

6     this is complicated.  You've been living with it for years.

7     This is going to go to people who are just going to have a

8     couple of weeks to try to digest it.  A, it's fair to make sure

9     it's comprehensible.  This is more technical than most notices

04:12 10   I approve.  However, it's going to sophisticated entities, not

11    to consumers, as I understand it.  But nevertheless, I think in

12    fairness it should be clear, and it's in your interests in

13    terms of finality because, again, this is a point at which the

14    adversary system doesn't work.  So, you know, you've explained

15    to me reasons why the ERISA group would get more favorable

16    treatment than the others.  It just should be clear.  And to

17    the extent they're getting more favorable treatment with regard

18    to attorney's fees, it should be stated clearly.

19         MR. KRAVITZ:  Okay.  We'll do our best.

04:13 20   THE COURT:  You can do it.  Dare I ask is there

21    anything else?

22         All right.  You may have to work to get your 75

23    million or even 50 million.  Court is in recess.

24         (Adjourned, 4:13 p.m.)

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3              I, Kelly Mortellite, Registered Merit Reporter

 4    and Certified Realtime Reporter, in and for the United States

 5    District Court for the District of Massachusetts, do hereby

 6    certify that pursuant to Section 753, Title 28, United States

 7    Code that the foregoing is a true and correct transcript of the

 8    stenographically reported proceedings held in the

 9    above-entitled matter and that the transcript page format is in

10    conformance with the regulations of the Judicial Conference of

11    the United States.

12                         Dated this 9th day of August, 2016.

13

14                         /s/ Kelly Mortellite

15                         _____

16                         Kelly Mortellite, RMR, CRR

17                         Official Court Reporter

18

19

20

21

22

23

24

25
```