# EX. 115

Volume: 1

Pages: 1-171

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

---------------------------------------

In Re: STATE STREET ATTORNEYS FEES

---------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,
United States District Court, Retired

DEPOSITION of NICOLE M. ZEISS

September 14, 2017, 9:10 a.m.-1:13 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter: Paulette Cook, RPR/RMR

Page 18

[redacted]

Page 20

[redacted]

Page 19

(Noise interruption.)
**A. We -- we can't really check them for accuracy per se because the information is known to the individual firm, but we would review it for, you know, consistency, overall reasonableness or questions -- do we have questions about them.**
Q. Okay. It's fair to say this is an interactive --
**A. Yes.**
Q. -- process that you're engaged in?
**A. Yes.**
Q. Now let me get back to the Damon Chargois relationship with the firm.
Could you describe for us your understanding of Labaton's relationship, including any financial relationship, with Chargois?
**A. So I -- you know, in my role as settlement counsel, I don't have any kind of direct knowledge of the relationship with him, but my general understanding is that he and his firm have worked with us to develop relationships with clients in different cases.**
Q. Okay. Let me just give you -- I'm sorry, that's the wrong.

Page 21

[redacted]

Page 22

[redacted]

Page 23

[redacted]

Page 24

[redacted]

Page 25

**A. I don't oversee that.**
Q. Fair enough. Thank you.
**A. I mean in our settlement funds there are -- you know, obviously a settlement fund can only be used to pay the notice, the expenses --**
Q. Yes.
**A. -- and the awarded fees.**
Q. We'll talk about State Street in just a little bit.
To the extent that you're familiar with it, Nicole, what were the --
**TELECON VOICE MESSAGE:** The following participant has entered the conference: John Toothman.
Q. To the extent you're familiar with it, what were the terms as you knew them of the relationship between Damon Chargois or Chargois & Herron and Labaton as far as, you know, percentages of recovery or things of that nature?
Were you familiar with that?
**A. No.**
**MR. WOLOSZ:** Sorry. When you say "were," at what time?
Q. During the course of your dealings with the



Page 26

State Street case, when you came into that, were you familiar based on these previous cases with a standard percentage that was to go to Chargois?
**A. No.**
Q. Okay. Are you familiar with one now?
**A. No.**
Q. All right. You mentioned the HCC case and that you met Damon Chargois when you attended a hearing on that?
**A. Yes.**
Q. Was that the preliminary approval hearing you testified to previously?
**A. I -- it was definitely the final approval hearing. I'm not sure I had to go to Houston twice. Preliminary approval might have been on the telephone.**
Q. Okay.
**A. So I only distinctly remember one hearing in Houston.**
Q. Okay. And this is the first time you had met Chargois?
**A. Yes.**
Q. And is it fair to say that he wasn't what you were expecting?

Page 27

Page 28

Page 29



[redacted]

**THE SPECIAL MASTER:** Well, Saxena White, Webster or Goldman Scariato [sic]?
**THE WITNESS:** Definitely not Goldman Scarlato. They're of counsel to us.
**THE SPECIAL MASTER:** Okay.
**THE WITNESS:** So maybe Saxena White or Webster.
**THE SPECIAL MASTER:** And they would have filed a lodestar petition?
**THE WITNESS:** Yes.
**THE SPECIAL MASTER:** If they did work on the case as local counsel?
**THE WITNESS:** Yes.
**THE SPECIAL MASTER:** Do you recall -- going up to that first e-mail, Jon Gardner is telling Cindy Ng and you these allocations stay the same, except we need to pay $200,000 to Damon Chargois as a referral.
Do you know how that $200,000 figure was arrived at?
**THE WITNESS:** I don't know.
Q. Do you know if --
**THE SPECIAL MASTER:** Did somebody just decide -- or maybe Jonathan Gardner just told you.

[redacted]

[redacted]



[redacted]

that is, you know, what's going on there?
A. Sure.
Q. What formed the basis for that discussion?
A. Sure. Some -- the -- so the settlement fund was governed by escrow agreements, and it required written letters for disbursements, and those letters had to be signed by two members of the executive committee.
So just the logistics of deducting money just take time. You got to write the letter. You got to find people. I was trying to get clarification about when Damon communicated with Eric, you know, please wire me the money if he would -- if it's the case that he would be expecting payment within 24 hours. It's faster if we already have the money in our IOLA, and then it can just be wired from us to him.
Um, if it's the case that Damon would say, um, you know, please pay me, I don't need it in 24 hours, like just please process the payment, and we had a couple days, then his money could stay in the settlement fund. And he could wait while that letter-writing process happens.
So it's just -- I was trying to get

[redacted]

[redacted]

Page 122

**A. Who it is fluctuates depending on who's traveling a lot, if somebody, you know, litigated the case, they might want to be a signer.**

**Like Larry, you know, litigated State Street so it made sense to have him sign --**

**THE SPECIAL MASTER:** To authorize payment out of the settlement fund does it have to be a lawyer who had responsibility in the case?

**THE WITNESS:** No. It just needs to be an executive committee member Um, but, you know, the bank when you're asking for fees, it wants to see the actual fee order. Um -- yeah.

**THE SPECIAL MASTER:** Where was this escrow fund? Was it being held by Citibank?

**THE WITNESS:** Yeah, Citibank.

**THE SPECIAL MASTER:** Is that an account owned by the firm itself for settlement funds?

**THE WITNESS:** No. It's a discrete -- it's a discrete fund in the name of -- I don't know whether it's State Street -- by settlement that has its own TIN number.

**THE SPECIAL MASTER:** Ah. Is that established by Labaton, or is it established by State Street? At the direction of the Court?

Page 123

Page 124

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** And that escrow account was CitiGroup or Citibank?

**THE WITNESS:** Yeah, and here Citibank is the escrow agent.

**THE SPECIAL MASTER:** Okay. Was there another escrow account -- a sub-escrow account for the fees?

**THE WITNESS:** Yes. So there's the class settlement account where the 300 million was deposited, and then a lead counsel escrow fund was set up --

**THE SPECIAL MASTER:** Also with Citibank?

**THE WITNESS:** Also with Citibank. Yeah, and that's...

**THE SPECIAL MASTER:** So out of the big escrow account, the 300 million, did the fees for counsel flow into that second escrow account?

**THE WITNESS:** Yes. Once the fee order was entered, they were transferrable into the lead counsel escrow account where they sat until the settlement was effective, and the fee order was final.

And then we --

Page 125

**THE SPECIAL MASTER:** So it went into the second account before the fee order was approved?

**THE WITNESS:** No. It went into the second account when the fee order was entered.

**THE SPECIAL MASTER:** Ah, I'm sorry. Okay.

**THE WITNESS:** And then -- but money could not be taken out until that order was final, and the settlement was effective. Does that make sense?

**THE SPECIAL MASTER:** Okay. And then from there where did that money go?

**THE WITNESS:** So in early December we wrote a bank letter instructing the bank to disperse the fees and expenses and service awards.

So Lieff's fees and expenses went to Lieff. Thornton's fees and expenses went to Thornton. I mean McTigue Law's fees and expenses went to McTigue Law. Lieff -- I'm sorry. Keller Rohrback was on there. I think Carl Kravitz's firm -- I don't think it went through McTigue Law.

Labaton received its fees and expenses including the amounts that later went to Damon Chargois and also the service awards. And then we

Page 130

statement period 1 September 2016 --
**A. Sure.**
Q. -- to 30 September 2016. Do you see that?
**A. I do.**
Q. And could you tell us what this informs us as to?
**A. Sure. These are the Citibank account statements for the State Street indirect FX Trading Class Action Settlement Fund Class Escrow -- I'm not sure if that's the official name. So it's the account statements from September through July 2017.**
Q. Okay.
**THE SPECIAL MASTER:** So is this the big escrow account?
**THE WITNESS:** This is the big.
**BY MR. SINNOTT:**
Q. Were payments continuing to be made through July?
**A. So no. The only -- payments? There might have been some...**
**So in September I believe this is when State Street made the initial deposit of 300 million.**
Q. Yep.

Page 131

Page 132

**ER:** -- escrow agent?
**THE WITNESS:** Yep.

Page 133







Page 134

[redacted]

Page 136

[redacted]

Page 135

[redacted]
Q. Of[redacted]

Page 137

**A.B. Data approximately 90,000 from the big class account for notice and administration expenses.**
Q. Okay.
A. **LBS 041839 looks like a Labaton Sucharow, LLP bank account statement.**
Q. Everything's redacted except for one item in the middle.
A. **Right. So it looks like a deduction on December 19th. Based on the amount, I think that's the payment to Goldman Scarlato from the Labaton fees.**
Q. Okay.
A. **LBS 041840 is a Citibank account statement from Labaton Sucharow, LLP IOLA account. It shows -- it shows a series of -- well, it shows a fund transfer on December 8 of 34 million wire -- oh, so that's a receipt to Labaton of I think our fees and expenses pursuant to the instruction letter to the bank.**
Q. Okay.
A. **The 12/9 withdrawal four million -- I think that's the payment to Damon Chargois.**
Q. Okay.
A. **And then there are a series of checks, and**



**THE WITNESS:** Yes.
**THE SPECIAL MASTER:** -- what we've been referring to as the fee account?
**THE WITNESS:** Right.
**THE SPECIAL MASTER:** I missed the date on it.
**MR. SINNOTT:** December 9th. $4,102,549 dollars.
A. **So then LBS 041882 would be the January statement, and it shouldn't show much of any activity. It looks like there was 21 cents left.**
Q. Okay.
(Pause.)
Q. It appears to remain at 21 cents for the conclusion of the -- or to the 31 July ending period.
And those correspondence after those statements --
A. **Sure.**
Q. -- Nicole, what do these reflect?
A. **So we have LBS 041970 which is a letter from Christopher Keller to Citibank dated December 8, 2016. And this is the bank instruction letter we've been discussing showing the wire of 34 million**

**approximately to Labaton, the 18.5 million to Thornton Law, the 15 point roughly 4 million to Lieff, the 2.8 million to Keller Rohrback, the 2.5 million to McTigue Law and the 2.5 to Zuckerman Spaeder.**
Q. Okay.
A. **Then we have LBS 041972 which is a letter from Christopher Keller and Lawrence Sucharow dated December 8, 2016 instructing the bank to withdraw $660.**
**This might have been interest that wasn't originally taken on the other amounts.**
Q. All right.
A. **So it was kind of cleanup.**
**Then LBS 041973 is a Labaton Sucharow check to Arkansas Teachers in the amount of $25,000 which was a service award.**
Q. Okay.
A. **LBS 041974 is a Labaton Sucharow, LLP check for $10,000 to Arnold Henriquez which would be a service award. LBS 041975 is a Labaton Sucharow, LLP check in the amount of $10,000 to Michael Collen -- that was a service award -- Cohn. Sorry.**
**THE SPECIAL MASTER:** These are the four
[redacted]

**confirmation of being credited the original 300 million on September 2, 2016.**

Q. Okay.

A. **LBS 041982 is a December 8, 2016 letter from Labaton Sucharow to Victoria Lopez of Citibank asking Citibank to process a wire transfer from the Labaton Sucharow, LLP IOLA to Damon J. Chargois in the amount of approximately 4 million.**

**LBS 041983 is a December 19, 2016 Labaton letter to Citi -- well, CitiGroup asking it to process a wire transfer from Labaton Sucharow, LLP account to Goldman Scarlato & Penny in the amount of approximately $363,000.**

**THE SPECIAL MASTER:** What was the date there?

**MR. SINNOTT:** December 19, 2016.

**THE SPECIAL MASTER:** Again who was Goldman Scarlato & Penny?

**THE WITNESS:** They're of counsel to our firm, and they did work on the case.

**THE SPECIAL MASTER:** Did they put a fee petition in?

**THE WITNESS:** They're in -- they're actually of counsel to us. So they're in our --

**THE SPECIAL MASTER:** Oh, I see. They're of counsel to you?

**THE WITNESS:** Yeah.

**THE SPECIAL MASTER:** Not local counsel. Of counsel to you.

**THE WITNESS:** Yeah, so they were on our lodestar.

**MR. SINNOTT:** Great. Thank you, Nicole.

Attorney Kelly, I see where your eyes were closed. Would you like her to go through that again?

**MR. KELLY:** Focusing closely.

**MR. SINNOTT:** We can have her do it one more time.

**MR. KELLY:** Just briefly --

**MR. SINNOTT:** No, I'm not opening up the questions just yet but...

**MR. KELLY:** Oh, oh, oh.

**MR. SINNOTT:** If there is a timely question though and you'd like to ask, you don't have any objection, do you?

**THE SPECIAL MASTER:** No.

**MR. SINNOTT:** Okay. Is there something you wanted to ask, or are you --

[redacted]

.

BY MR. KELLY:
Q. And I'd like you to just tell me if this is what it says. Evan Hoffman writes you a question: "Nicole, are we using historical billing rates or current rates for calculating lodestar? The language in your fee sample seems to indicate we're using current rates. Just want to make sure. Thanks."
And then you respond "current."
That's what it says, right?
A. Correct.
Q. And this was an e-mail approximately one week before the fee declaration -- the fee submission was to the Court, right?
A. Right.
Q. All right. And a separate issue. To the extent you know, there's been some suggestion in these proceedings that the ERISA counsel somehow got a raw deal.
But are you aware that the ERISA FX volume percentage was approximately 9 percent in this case?
A. That sounds right.
Q. And that's certainly less than the 10

percent recovery fee they got, correct?
A. Correct.
MR. KELLY: Nothing further.
THE SPECIAL MASTER: Do you know what the FX volume was on the case as between the customer class?
Do you know of your own knowledge through discovery or some other substantive knowledge, or is that what you were told?
THE WITNESS: WilmerHale produced the volume to us in connection with developing the plan of allocation.
THE SPECIAL MASTER: When?
THE WITNESS: When? Two -- 2016? I don't remember. There were a couple.
MR. SINNOTT: Did you learn about a subsequent revision --
THE SPECIAL MASTER: -- in which the allocation of FX trading that we've been told was higher than 9 or 10 percent?
THE WITNESS: There were a lot of questions about it, and they did another review. But I think it ultimately ended up around 9 percent.
MR. SINNOTT: All right. If that's your

memory, yeah, okay. Justin, anything? Mike?
MR. STOCKER: No.
MR. KELLY: Nothing further.
MR. SINNOTT: Anyone on the phone have a question for Nicole?
(No response.)
MS. KEEVERS PALMER: This is Kim. I have no questions.
MR. SINNOTT: Thank you, Kim. How about Emily?
MS. HARLAN: No questions.
MR. SINNOTT: All right. Steve?
MR. FINEMAN: No, no questions for me.
MR. SINNOTT: Okay. Brian?
MR. McTIGUE: Brian McTigue will have questions.
MR. SINNOTT: Okay, Brian. Why don't you go ahead.

CROSS-EXAMINATION
BY MR. McTIGUE:

Q. Nicole, I think you've testified that you were responsible for assembling and documenting the settlement in this matter, right?