# EX. 117

**Carl Kravitz**

1

Volume:  1

Pages:  1-121

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

-------------------------------------

In Re:  STATE STREET ATTORNEYS FEES

-------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,

United States District Court, Retired

DEPOSITION of CARL S. KRAVITZ

September 11, 2017, 9:15-11:54 a.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter:  Paulette Cook, RPR/RMR

In Re:  State Street Attorneys Fees

Carl Kravitz
September 11, 2017



Page 11

1    is that there was resistance to our participation;
2    that after the first ERISA fee agreement -- and by
3    that I am referring to the 9 percent deal -- that
4    our participation was more welcome.
5        Over time -- and let me -- let me strike
6    that last sentence.
7        As the case wore on, we did work closely
8    with the customer class.  But towards the end I
9    would say there are two things:  We took the lead
10   and had extensive contact and conversation with the
11   DOL; and in terms of the actual outcome, which
12   involved the allocation between the customer class
13   and the ERISA class, we played a critical role.
14       And in my view this couldn't have been
15   settled appropriately without separate ERISA
16   representation because we were allocating between
17   the ERISA share of the class and the rest, and in my
18   mind the notion that the same set of lawyers could
19   have done that is just not appropriate.
20       And if an objector had raised that in my
21   view, that there was one lawyer on both sides of
22   that negotiation, I think that would have been a
23   difficulty.  So that is something that came into
24   play at the end which is it was critically important

Page 38



Page 40

```
 1   that could be deducted from the ERISA share?
 2       THE WITNESS: That is exactly what I was
 3   trying to say.
 4       THE SPECIAL MASTER: Okay.  So -- and
 5   was DOL's objective in wanting this cap to ensure
 6   that at the very least -- to ensure a minimum
 7   recovery for the -- what we'll refer to as the ERISA
 8   class?
 9       THE WITNESS: Right.  Yes, that was my
10   understanding of at least part or -- or the major
11   part of their motivation.  They were trying to
12   protect what the ERISA part would get on a net basis
13   as in addition to on a gross basis.
14       BY MR. SINNOTT:
15   Q.   All right, Carl.  Look at just about
16   two-thirds of the way down page 3.  It may be
17   highlighted on your page, but it appears that this
18   was something that Attorney Zeiss had highlighted.
19       It says, "The ERISA settlement
20   allocation was negotiated directly between customer
21   counsel, ERISA counsel and representatives of the
22   DOL, FYI previously defined, and in light of the
23   fiduciary and other claims available under ERISA
24   laws provides a premium per dollar of indirect FX
```

Page 39

```
 1   Q.   And the subject matter is State Street,
 2   dash, revised POA language, correct?
 3   A.   Yes.
 4   Q.   And what does POA refer to?
 5   A.   Plan of allocation.
 6   Q.   Okay.
 7   A.   I believe.
 8   Q.   And would it be a fair statement that Nicole
 9   is attempting to address the allocation of ERISA in
10   this e-mail?
11   A.   Yes, in general that's right, describing,
12   you know, the allocation to ERISA and the
13   $10,900,000 fee deduct if in fact the fee award
14   reached a certain level.  Yes.
15   Q.   So is it fair to say that that 10.9 million
16   is a cap of sorts?  That's the outer limit that the
17   Department of Labor has set for ERISA fees?
18   A.   I -- I -- ERISA fees.  I would -- I always
19   thought of it a tiny bit differently.  I always
20   thought of it as the cap of the amount of the fee
21   award that could be deducted from the ERISA share.
22   Q.   Okay.
23       THE SPECIAL MASTER: The cap on the
24   amount -- the cap on the amount of the fee award
```

Page 41



Page 66

1   correct?

2   A.   I see that.  And maybe I -- I don't know

3   whether the rest of the e-mail string was attached.

4   If it was, then it appears to have been sent to me.

5   I have no reason to think that it wasn't, or I -- I

6   don't know whether the rest was or it wasn't.  I'm

7   not saying it wasn't.

8   Q.   All right.  And is it fair to say that that

9   message that has been forwarded to you by Attorney

10  Goldsmith makes the 10.9-million-dollar cap an

11  essential term in this settlement, correct?

12  A.   Yes.  And I believe that's true.  I mean I

13  believe that one of the things that DOL said was

14  that that 10.9 million dollars was the maximum

15  deduct from the ERISA share that they would agree

16  to.

17  Q.   So DOL had demanded that as one of their

18  preconditions?

19  A.   Well, yes, they did.  It came up after the

20  settlement.  This was not something that was agreed

21  at the mediation.  They brought up -- they being DOL

22  -- brought up capping the deduct weeks later.

23  That's my memory.

24      THE SPECIAL MASTER: Could you explain



In Re:  **State Street Attorneys Fees**

**Carl Kravitz**
**September 11, 2017**

Page 70

 1     And from that, just so that we can move
 2  right on, Mr. Chargois got some of it.
 3     **THE SPECIAL MASTER:** So --
 4     **THE WITNESS:** As I understand things
 5  based on what I've learned in the last couple of
 6  weeks.
 7     **THE SPECIAL MASTER:** Right.
 8     **THE WITNESS:** As you know, we didn't
 9  know anything about Mr. Chargois until it came up in
10  this investigation last month.
11     **THE SPECIAL MASTER:** So several
12  questions.
13     **THE WITNESS:** Sure.
14     **THE SPECIAL MASTER:** Did any of that 3.5
15  million dollars go to the ERISA class, as far as you
16  know?
17     **THE WITNESS:** As far as I know, based on
18  my understanding of the way the settlement worked,
19  the answer is no because that 3.5 million dollars is
20  attorneys' fees that was awarded by the Court.
21     And so it -- instead of going to the
22  ERISA counsel, it went to the customer class
23  counsel.
24     **THE SPECIAL MASTER:** Did any of that 3.5

Page 71

Page 72

Page 73



Page 82



Page 84

1   back at the time of the ERISA fee agreement I would
2   have been looking ahead to that because I really
3   didn't know what was going to unfold.
4       However, if you fast forward to the time
5   of the ERISA -- strike that.  If you fast forward to
6   the time of the conversations with DOL -- sorry for
7   that -- I think that there is a significant argument
8   that the Chargois arrangement should have been
9   disclosed to DOL.
10      And the fact that we didn't know about
11   it prevented us from doing that.  But if you think
12   about it, some of the money that was being deducted
13   from the ERISA share was going into the class
14   counsel fees, some of which was being shared by
15   Mr. Chargois.
16      Given the DOL's interest in the fee
17   issue, I think that they might have been interested
18   in that, and we would have thought long and hard
19   about making a disclosure to the DOL for that
20   reason.  I mean I didn't go through that thought
21   process, but my gut tells me that Lynn and I would
22   have been of the view that it should be disclosed.
23     **THE SPECIAL MASTER:** What about to your
24   clients?

Page 83

1   and we should have been informed of these facts and
2   all the facts.
3     **THE SPECIAL MASTER:** Had you been
4   informed as counsel, what would you have done?
5     **THE WITNESS:** I could tell you it would
6   have had a material impact on my agreement to enter
7   into the 9 percent because it raised I think serious
8   questions along the lines I've just described, legal
9   and ethical.
10      And I would not have wanted to
11   participate in that process under those
12   circumstances, and I certainly would not have wanted
13   to participate and give my blessing to it.  So
14   that's number one.
15      But there's a second thing from my
16   perspective.  I also think that the amount of money
17   that was going to Mr. Chargois highlighted the
18   inequitable amount of money that was going to the
19   ERISA counsel.  And I think that that would have had
20   an impact on me as well.
21     **THE SPECIAL MASTER:** What about on your
22   negotiations with the Department of Labor?
23     **THE WITNESS:** Well, that actually raises
24   one of the issues, and it's hard for me to say that

Page 85

1     **THE WITNESS:** I -- I believe that there
2   is a serious disclosure issue as to our clients as
3   well for the same reason which is that -- that there
4   is money that is coming out of the ERISA share --
5   the 10.9 million dollars; yet, that's not even going
6   to all the ERISA counsel.  Some of that money is
7   attorneys' fees that is ending up with Mr. Chargois.
8      And that raises a -- you know, an
9   interesting issue as to whether or not there would
10   have to be disclosure to the ERISA named plaintiffs
11   and perhaps consent.
12      I don't know about the consent thing,
13   but in that situation with the money going to
14   Mr. Chargois and not to ERISA counsel and not to the
15   ERISA class, I think that raises a substantial issue
16   of whether or not some sort of disclosure would have
17   to have been made.
18     **THE SPECIAL MASTER:** Does the following
19   play into it at all:  What we have learned to date
20   is that the monies paid to Mr. Chargois were the
21   result of an agreement made with Mr. Chargois back
22   in 2009 in which Mr. Chargois was given an interest
23   of 20 percent in all cases in which Labaton was lead
24   or co-lead counsel and Arkansas was lead or co-lead