# EX. 122

Volume: 1

Pages: 1-132

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

-------------------------------------

In Re: STATE STREET ATTORNEYS FEES

-------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,
United States District Court, Retired

DEPOSITION of ERIC BELFI

September 5, 2017, 11:54 a.m.-3:15 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter: Paulette Cook, RPR/RMR

Page 10

Page 12

Page 11

Page 13

.

We developed a relationship. He had a firm and still has a firm that does a lot of referring of clients. They do some litigation, but mostly what they do is they find clients, and they refer it to other law firms such as ourselves.

So he approached me and said he had some opportunities to introduce us to pension plans in the Texas, Arkansas, Oklahoma region because him and his partner had contacts down there.



[redacted]

Q. Notwithstanding the statement that in October 2008 ARTRS with full knowledge that Labaton [redacted] as one of its monitoring counsel, would you agree with me that neither Mr. Doane, nor others at Arkansas Teacher Retirement System, was aware of the referral agreement between Chargois & Herron and Labaton?

**A. They understood that we were working together on this.**

Q. All right.

**A. That it was a joint presentation and that both firms would be representing them in these cases.**

Q. All right. And let me take you beyond that particular proposal --

**THE SPECIAL MASTER:** Let me -- more specifically, was Arkansas -- anyone at Arkansas, Mr. Doane at the time, Miss Clark, anyone or

subsequently George Hopkins -- made aware of what's referred to as a referral fee of 20 percent on all cases in which Arkansas serves as lead plaintiff or co-lead plaintiff and Labaton is lead or co-lead counsel?

**THE WITNESS:** As to the 20 percent? I don't believe they were ever notified about the 20 percent, but they certainly understood that there was a relationship and that there would be some obligation to pay fees to that firm.

**THE SPECIAL MASTER:** On every case? Even if Chargois was not involved specifically as a referring attorney and even if Chargois did no work on the case? Were they aware of that?

**THE WITNESS:** I don't know what was in their mind as far as -- I knew what we had presented to them; that this was a joint application; that we would be working together on this. They came to us and said, look, we can only have one firm on, and they said we'll put your firm on because you're going to be doing the actual monitoring, but you guys can work with them and be part of the team.

As far as, you know, everything else you asked, I don't know what was in their mind as far as

what they knew or didn't know.

**THE SPECIAL MASTER:** And that's a fair answer. Let's not speculate about what was in their mind.

**THE WITNESS:** Yeah.

**THE SPECIAL MASTER:** Was it disclosed to them -- anyone at Arkansas -- that Chargois and Herron or the Chargois & Herron firm were going to receive a fee for every case in which Arkansas was either lead plaintiff or co-lead plaintiff that Labaton served as co-counsel -- lead counsel or co-load counsel?

Was that disclosed to them by, as far as you know, anyone at Labaton?

**THE WITNESS:** As far as I know, what was disclosed is that we were working together but not that specific verbiage.

But we do put in our retainer agreements that there may be referral fees which is included in the State Street one and is included in other ones that we've done with Arkansas.

**THE SPECIAL MASTER:** What is your understanding of what a referral fee is?

**THE WITNESS:** A referral fee is when you

have another lawyer or law firm that helps establish a relationship with a client, and essentially they refer the client to you basically as an introduction to the client. And that can have many different manifestations as it goes forward how the relationship proceeds.

I think the big distinction between the normal kind of common parlance of what a referring attorney is for most plaintiffs' litigation is they refer them for one case. Maybe it's a personal injury case, and they refer them once. It's not like the injury keeps occurring.

Whereas, this is a different type of scenario because the possibility exists, which occurred -- we didn't know it was going to occur -- but that Arkansas could end up being in multiple cases.

So when you establish the relationship, the referral, you know, goes along with the fact that they established a relationship and that's how we got into the introduction.

[redacted]



Page 22

Page 23

Q. Is there a specific person that you can point to that was told that Chargois and Herron and/or their firm would be receiving referral fees for every case that Labaton worked on?
**A. There's no document that shows that.**
Q. Can you point to any conversation with anyone at Arkansas Teachers Retirement System that you or Chris Keller or Damon Chargois or Tim Herron had where this arrangement was discussed?
**A. At this point I can't recall that, um, you know, going back that many years. I cannot recall a specific conversation.**
**I can recall a conversation that I had with George Hopkins after the Colonial case in which we talked about, you know, how fees worked, and he basically said that, you know, he only wanted to deal with our firm and wasn't concerned about how we would cut fees up if we're working with other firms and how that worked out.**
**He only wanted to know what the absolute**

Page 24

**number was because as a fiduciary for the class he was only concerned about, you know, how much were the aggregate attorneys getting and not what is the class getting -- I mean not what is -- what his individual attorney's getting.**
Q. So is it your testimony that you discussed with George Hopkins the referral fee being paid to Chargois and Herron?
**A. No, it is not my testimony.**
Q. Did you have any conversation with George that talked about any referring party in that case?
**A. We just discussed about how cases would get divided up and how fees would be split in situations, but it wasn't specific to any particular case; it was more kind of general how the industry worked.**
Q. So the answer is, no, you did not discuss a referral -- referring attorney in that particular case?
**A. That is correct.**

Page 25

**THE SPECIAL MASTER:** Let me just -- before I forget.
We've seen in a number of e-mails Mr. Chargois referred to as local counsel or "the local."

He wasn't local counsel in any of these cases other than maybe the BP case --

**THE WITNESS:** Well, there's --

**THE SPECIAL MASTER:** -- in the legal sense of being local counsel.

**THE WITNESS:** There's two ways that local counsel is defined in our industry.

One is you're local to the jurisdiction of where the case is being brought. So if we filed a case in the Eastern District of Michigan, we would retain a local counsel there.

We also work with --

**THE SPECIAL MASTER:** And in that instance local counsel would file an appearance?

**THE WITNESS:** That is correct. We also work with local firms in the local jurisdiction of where some of the clients are, and they assist us in the relationship with the client.

They may assist in document review. They may assist in -- in preparation for a deposition. There's even some states, such as Pennsylvania, that actually have a requirement that you have local counsel.

counsel would have to appear in court on the docket. The local -- under the local rules, right?

**THE WITNESS:** I -- we have not actually represented Pennsylvania. So I don't know. But that would be my presumption.

**THE SPECIAL MASTER:** I guess my question is in what sense was Damon Chargois local counsel in any case in which they did no work and did not appear on the docket and did not make an appearance in the case?

**THE WITNESS:** When we started the relationship with Damon and Tim to work with Arkansas, our belief -- my belief was that they were going to be partners, and they would help with the client.

As it turned out, very quickly after we established the relationship jointly with ATRS, Paul Doane left and was replaced by George Hopkins. When George Hopkins came in, a couple of months after he started, myself and my partner, Larry Sucharow, went down to Little Rock, and we met with George, and we learned very quickly -- as you probably have found spending time with him -- that he's very direct. He doesn't want any third parties involved. And he

wants to deal directly with you.

And so he was very clear that we were to just deal directly with him. And I got the sense showing up with local counsel would not be the best way to proceed with George going forward. And so we made a decision at that point not to bring the local counsel into the meetings.

**THE SPECIAL MASTER:** So, again, my question is in what sense was he local counsel?

If he was not working on a case, if he was not appearing in the case, he was not appearing on the docket, in what sense was he local counsel?

**THE WITNESS:** He helped us initiate the relationship. He was part of the joint presentation that we got picked.

And the question that you're asking, which I can't answer, is how long does that last.

**THE SPECIAL MASTER:** Well, that's a different question.

I guess my question precedent to that -- preceding to that is in what sense is that local counsel? As a judge understands it.

**THE WITNESS:** Well, it's very different terminology than what you would understand as local





Case 1:11-cv-10230-MLW  Document 401-121  Filed 07/23/18  Page 7 of 17
In Re: State Street Attorneys Fees
Eric Belfi
September 5, 2017

Page 34
Page 35
Page 36
Page 37

Page 37:

15    So how did Chargois and Herron obtain
16    Arkansas Teachers as a client for Labaton?
17 A.  I don't think they necessarily obtained them
18    as a client.  They helped us get an introduction so
19    we could do a presentation to the client.
20         And then once we did the presentation,
21    we were kind of put on their radar.  So at some
22    point later when they did the RFQ, they sent an RFQ
23    to us for us to respond to.
24         THE SPECIAL MASTER: Did Chargois

[Remainder of pages 34–37 redacted.]

Page 38

participate substantively in that presentation?
**THE WITNESS:** The presentation that we did to the client was in New York because Mr. Doane had a conference in New York, and Damon arranged for him to come to our office, but Damon I do not believe participated in it. It was in New York.
**BY MR. SINNOTT:**
Q. And how was he able to get that introduction for you with Mr. Doane?
**A. His partner, Tim Herron, was from Arkansas. Little Rock is a pretty small community, and he just knew people down there that were able to get us an introduction to the executive director.**
**And I also believe that Tim actually was next-door neighbors with Mr. Doane.**
Q. Okay.
**A. That's Tim Herron.**
Q. Tim Herron?
**A. Yes.**
Q. And were any elected officials brought into the picture for purposes of assisting with this introduction?
**A. Yes. When we went down there -- and it's pretty common that we are given opportunities to**

Page 39

**speak with people from the legislature, attorney's general's office or even sometimes the governor's office, about the service that we want to provide because, as you probably know -- and I know the judge knows -- that we have tremendous problems with our pension plans around this country.**
**So when you have a law firm coming in and saying we are trying to get money back for the pension plan, this certainly piques their interest because they see it as an opportunity to try to recoup funds to bring back to the pension plan. So it's very common for us to speak to elected officials on this issue because it is such an important issue.**

Page 40

Page 41



Page 50

[redacted]

Page 51

[redacted]

Page 52

[redacted]

THE SPECIAL MASTER: Does Labaton have any other ongoing relationship agreements such as the one with Chargois in which an attorney has an interest going out years in every single case that Chargois or any -- I'm sorry -- in any case in which that lawyer originally helped facilitate the relationship?

Page 53

THE WITNESS: Yes.
THE SPECIAL MASTER: It does?
THE WITNESS: Yes.
THE SPECIAL MASTER: Is it the same kind of an agreement that it has with Mr. Chargois in this case in which they get a fee for every single case?
THE WITNESS: Yes.
THE SPECIAL MASTER: How many such relationships would that be?
THE WITNESS: Over ten.
THE SPECIAL MASTER: Over ten?
And in those relationships is the forwarding attorney -- we've heard a number of different names. Do they do any work on these cases, actual substantive work on the case?
THE WITNESS: Yes.
THE SPECIAL MASTER: They actually work on the cases?
THE WITNESS: Varying degrees, yes.
THE SPECIAL MASTER: Varying degrees. So let me rephrase the question.
Does Labaton have any agreements with firms similar to the agreement with the Chargois

firm in which the facilitating attorney or forwarding attorney does no work substantively on the case and yet gets a fee?

**MS. LUKEY:** Your Honor, I think it might be helpful to you if you asked him what the agreement was supposed to be with Chargois about --

**THE SPECIAL MASTER:** Well, he can incorporate that in his answer.

**MS. LUKEY:** -- doing work.

**THE WITNESS:** Could you repeat the question?

**THE SPECIAL MASTER:** I'll try.

Does Labaton have any other agreements, relationships with forwarding attorneys -- that was Mr. Sucharow's phrase --

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** -- in which those attorneys perform no work on a case and simply facilitated the agreement with the client at some point in the past but now have an ongoing interest in Labaton's fee?

**THE WITNESS:** No.

**THE SPECIAL MASTER:** Now --

**THE WITNESS:** They all have varying

degrees of how much they do, but the intent with the agreement with Damon was that he would be active.

We never had the vision that it would turn out the way it did turn out in that they don't do anything in these cases, and it's just a straight contractual obligation that we have.

Any of the referring or forwarding attorneys that we work with have some involvement in the cases. There are some that are very active in the case, and there are some that are less active, but all of them have some sort of activity in these cases.

**THE SPECIAL MASTER:** Is it fair to say that in those other cases those attorneys have a relationship with the client?

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** A relationship that is more than just simply a door-opening relationship?

**THE WITNESS:** There's varying degrees of the importance of the local attorney in these relationships. There are some that, you know, merely were door opening, but they've continued to stay involved. There are some that they had a

actual relationship with the client where they may be were -- they were retained to do other work, and they gave us an introduction.

So this was -- you know, it would be all different degrees. So it kind of runs the gamut.

**THE SPECIAL MASTER:** Is it fair to say that the way that this relationship with Mr. Chargois has turned out in which he gets an ongoing fee, irrespective as to whether he has continued a relationship with a client or has done any work on any case but yet gets a fee, is the only one in which Labaton has of that nature?

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** Now Miss Lukey wanted to give you an opportunity to I think expand upon how the relationship with Mr. Chargois developed.

**MS. LUKEY:** To what you expected and how it developed.

**THE SPECIAL MASTER:** As to what you expected.

**THE WITNESS:** Well, I think it's important to understand that when we first started this relationship we had Paul Doane in there. And,

you know, as it turned out, Paul Doane ends up leaving, and George Hopkins comes in. And, you know, obviously, two totally different personalities.

And so myself, I just had a gut reaction that I needed to deal directly with George, and I didn't want to bring Damon and Tim into the meeting. So that's when Larry and I went down there, and from that point forward George just started dealing with me very directly.

He'd call me on my cell phone at 10 o'clock at night, and we developed a relationship. I just saw that it was not worth trying to intermix them into what we were doing because we developed this kind of very close relationship, and there was nobody needed in order for me to communicate to him or for him to communicate to me.

He's a very direct guy, and he would never want someone in between us.

**THE SPECIAL MASTER:** So is it fair to say the relationship changed, the nature of the relationship with Mr. Chargois and the Arkansas client? Is that fair to say?

**THE WITNESS:** Yes.

Page 86

[redacted]

Page 87

[redacted]

THE SPECIAL MASTER: Let me ask a

Page 88

question. In this case and, apparently, the other cases, the relationship with Mr. Chargois was not disclosed to the Court as part of the settlement and fee application.

In view of all of this and from your firm's perspective, would it not be -- would it not have been just good business practice to put this in front of the Court and have the Court weigh in?

**THE WITNESS:** We felt as though we had a contractual obligation, and I don't know if the Court would have done anything different with that.

And if we did not meet the contractual obligation, I think we would have ended up with a lawsuit.

**THE SPECIAL MASTER:** I guess my question is more strategic and tactical.

There were obviously problems in the relationship in the amount that you were having to pay to Mr. Chargois in each of these cases in which your firm was having to make a more significant investment because they were settling at a later point in the case after more work by Labaton, right?

**THE WITNESS:** Correct.

**THE SPECIAL MASTER:** Tactically and

Page 89

strategically would it not have been a good idea to bring it to the Court and maybe the Court would say, hey, wait a minute, what's going on here?

**THE WITNESS:** The concern ultimately that drove the decision-making process is our concern with how Arkansas Teacher Retirement System would deal with the fact that even if we brought it in front of the district of Massachusetts in front of Judge Wolf, that we may have ended up in state court in for example Galveston, Texas with other litigation.

And, you know, we would have had a contract dispute that would have brought Arkansas into that, and that was a real concern of ours about what that would have looked like and how the client would have felt about that. It was something I had real concerns about.

[redacted]

Page 90

**THE SPECIAL MASTER:** Was one of the concerns not just in this case but in other cases in disclosing this to a Court that it would invariably draw the client into it and maybe even draw litigation, as you said, from Mr. Chargois?

**THE WITNESS:** Yes.

Page 91

Page 92

Page 93

**A. Obviously, once we got -- once the issue was raised in December of 2016, I contacted Damon and -- and, you know, I reached out to get an undertaking from him on the fee.**

Page 94

Page 96

.

THE SPECIAL MASTER: Okay. There was an agreement at some point not to share the Chargois agreement and the payment to Chargois with the ERISA lawyers. Were you part of that?

THE WITNESS: No.

THE SPECIAL MASTER: Were you aware that it was not going to be shared with the ERISA lawyers?

THE WITNESS: I don't recall. It was not something that was significant to me.

THE SPECIAL MASTER: Did they consult

Page 95

Page 97

with you about it?

THE WITNESS: No.

THE SPECIAL MASTER: So you did not have any role at all in agreeing not to disclose the Chargois payments to the ERISA lawyers?

THE WITNESS: Correct.

first page, and you sent a response to George where you said, "Dear George, I do not believe that I mentioned to you in our call that we need to file the papers on Tuesday. So please have it signed."

You blind copied Mr. Herron on that message, correct?

A. **Yes.**

Q. Why did you do that?

A. **I wanted to keep him updated on what was going on in the case.**

Q. Why didn't you just include him as a CC?

A. **As I testified earlier, George had just started. I didn't know how to deal with him. It was a brand new person. I did not want to bring another person in that wasn't from our firm at this point.**

**So I thought it was best to just keep him apprised but not put him on the correspondence.**

Q. Well, were you trying to hide this referral relationship from him?

A. **No.**

**TELECON VOICE MESSAGE:** The following participant has entered the conference: Sarko.

Q. It seems like the easiest way to keep him



informed -- to keep your referring attorney informed without calling upon Mr. Hopkins to have to do anything would be just to CC him on it or to inform him that you're not -- you weren't looking for action. But you chose to send a blind copy to -- to the referring firm.

Could you tell me again why you did that?

A. **George was brand new. I -- you know, I didn't know if Tim knew who George was or if George knew who Tim was. I knew George was someone that could be a little bit difficult to deal with.**

**I had heard stories of other firms that had dealt with him, and there was one particular incident that I know another one of my competitors had an issue where he wouldn't sign a certification, and I was really just trying to keep it very simple.**

**This was the first case that they retained us. So I really just wanted to keep it very uncomplicated because we wanted to get the certification because we had to file this motion by April 7th.**

**THE SPECIAL MASTER:** Were you concerned that if George had known about the relationship with



Chargois and Herron he may have raised issues?

**THE WITNESS:** I mean it's difficult to go back into my mind back in 09. But to the best of my recollection, I would say that I would have been concerned I didn't know what his response would be, and he seemed to be willing to do the case.

So I did not want to --

**THE SPECIAL MASTER:** -- rock the boat?

**THE WITNESS:** That is correct.

**BY MR. SINNOTT:**

Q. But in trying to avoid rocking the boat, you were concealing this relationship from him, were you not?

A. **I think concealing's a strong word. I mean they were on the papers that we had to ATRS. When we originally were hired, this was a new executive director. I didn't know how he was going to operate.**

**So I was kind of just waiting until we figured things out with him as far as how to address it, but I -- I think concealing is a strong word there.**

**THE SPECIAL MASTER:** The fact that he was a new executive director, wouldn't that have



counseled more transparency rather than less?

**THE WITNESS:** I was trying to deal with the personality of George, and I thought the best way to deal with him initially was to keep it very simple.

Page 114

Page 115

THE SPECIAL MASTER: Was she ever told in any case that Chargois and his firm were being paid -- specifically told were being paid referral fees?

THE WITNESS: Not that I'm aware of.

Page 116

Page 117

A. To the best of my recollection, I had a followup call with Christa after I got this e-mail, and we had a conversation concerning that, you know, we would be working with Chargois & Herron, but we would be the ones that would go on the contract.

Page 118

Q. And did you tell her that Chargois & Herron would be a necessary and appropriate expense?
A. **The issue at this point is this is like eight years ago, and I -- I can't spell out the conversation. I just know I had a followup conversation with Christa concerning the fact that they were going to be involved in the relationship.**
**As far as being able to decipher anything else that happened in that conversation, I couldn't tell you.**

**those into different categories. Certainly with George Hopkins there was no communication to him specifically that Chargois & Herron was going to receive referral fees.**

Page 119

Page 120

Q. George Hopkins has been the executive director since December 29, 2008, and that's, you know, a little less than nine years ago.
You've never mentioned this relationship to him, have you?
A. **Correct.**
Q. Don't you think that would be something that would be prudent and expected for a law firm to do with a client?
A. **He did not seem interested after the Colonial conversation we had about how fees are split up and how it's done to have any conversations. He was only concerned about what the total fee was going to be for the class.**
**He was not concerned with who we were splitting fees with in each of these cases. It was never something that -- it was not -- it was not something that he ever actually asked about, but, more importantly, I think it was something that he basically said he didn't want to deal with. He only wanted to deal with what was the total fee.**
Q. Once again, much like affiliation, allocation is a very broad concept, correct?

Page 121

A. **Yes.**
Q. It encompasses much, much more than fee splitting, correct?
A. **I guess so.**
Q. Well, it certainly encompasses more than fee referrals, correct? Or referring attorneys?
A. **Referring attorneys can have a fee allocation.**
Q. Right. But that's just one small piece, correct?
A. **I'm not sure what you're -- what you're trying to get at with these questions.**
Q. Well, what I'm getting at is that you seem to interpret a statement by Mr. Hopkins that he doesn't want to get into how fees are allocated to be a license to have essentially a no-show referral arrangement with Mr. Chargois.
And isn't that a reach?
A. **We didn't view it as a no-show obligation. We believed it to be a contract obligation that we had, and we were concerned that we were going to get sued if we did not pay them what they thought was their entitlement.**
Q. I'm not -- I'm not taking issue with the

Page 122

decisions you made on that. I'm taking issue with the lack of transparency and the lack of informing of a client of this relationship.
Did you make the decision, Eric, not to disclose this information to Mr. Hopkins, or did someone else at the firm?
A. **I don't think there was any intent not to disclose it. It's just something that didn't come up.**
Q. For in excess of eleven years -- ten years?
A. **I'd say about eight years but...**
Q. Didn't they become a client in 2007?
A. **No, they did not become a client until October 2008.**
Q. So I stand corrected. So for nine years it hasn't come up?
A. **No.**
Q. All right.
**MR. SINNOTT:** Anything else, judge?
**THE SPECIAL MASTER:** Well, I do have a couple of questions. I have to go, but there are other things we want to ask, but let me ask this: Were you involved at all in the decision not to inform the Court of the Chargois relationship?

Page 123

**THE WITNESS:** No.
**THE SPECIAL MASTER:** Who would have made that decision?
**THE WITNESS:** I believe it would have been dealt with by the settlement team.
[redacted]

Page 124

[redacted]

Page 125

[redacted]