# EX. 127

Volume: 1

Pages: 1-168

JAMS

Reference No. 1345000011/C.A. No. 11-10230MLW

-------------------------------------

In Re: STATE STREET ATTORNEYS' FEES

-------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,
United States District Court, Retired

DEPOSITION of MICHAEL P. THORNTON

September 1, 2017, 9:05 a.m.-12:52 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter: Paulette Cook, RPR/RMR

Page 18

Page 19

attorneys as being a sounding board for the client or an intermediary or liaison with the client?
**A. Potentially, and I think some of them probably do a lot less than that. It varies, you know, with the individuals. Some -- sometimes with referring attorneys we hear quite a bit from them during the course of the case. They want to know what's going on, you know, trial, what's the settlement about, you know, what's the basis of it. Some of them we never hear anything from.**
Q. Do they sometimes after referring a case to your firm continue to work on the case?
**A. No. I -- there may have been -- we've done a lot of these cases. There may have been instances, but I don't recall one.**
Q. Okay.
**A. Like I say, they're referring the case for a reason.**
Q. All right. Do you know an individual named Damon Chargois?
**A. I do not.**
Q. Do not. In your deposition you testified on page 44 and 45 that you and Mike Lesser attended a meeting in Chicago with EnnisKnupp?

Page 20

**A. That's correct.**
Q. And also there was Eric Belfi and George Hopkins and I believe -- was Mr. Labaton there as well?
**A. No.**
Q. Or one of the Labaton employees?
**A. I think Harry Bellevue was probably the only Labaton employee who attended that.**
Q. Okay. And at that time were you aware of Labaton's referral relationship with Damon Chargois on Arkansas Teachers Fund matters?
**A. I'm not sure if I was aware of it or -- relatively early on -- not that early -- I mean not at the very beginning, but I was told that there was a local, slash, referring counsel for Arkansas Teachers that was involved in a referring -- referral basis.**
**THE SPECIAL MASTER:** And that was on this case pending in Boston?
**THE WITNESS:** Yes.
**THE SPECIAL MASTER:** But not on any previous case that you'd work with Labaton on?
**THE WITNESS:** I was unaware of any -- any -- no, I had no knowledge of that.

Page 21

**BY MR. SINNOTT:**
Q. During that trip, Michael, do you remember Chargois' name or his firm or Herron being mentioned?
**MR. KELLY:** Excuse me. Is this the Chicago meeting?
**MR. SINNOTT:** Yes.
**MR. KELLY:** Do we have a date on that?
**MR. SINNOTT:** I don't here. I could look in his transcript and see.
**THE SPECIAL MASTER:** Do we have the transcript?
**MR. SINNOTT:** Yeah, I've got it.
**THE SPECIAL MASTER:** Page 42 -- 44.
**THE WITNESS:** It would have been prior to the filing of the complaint in the federal district court because --
**THE SPECIAL MASTER:** But it was in connection with the case, even if it was --
**THE WITNESS:** We were investigating the case at that point on behalf of the teachers fund.
**MR. SINNOTT:** Yeah, the transcript does not indicate the date.
**THE WITNESS:** So if we filed in early

warning you that if the ERISA counsel were made aware of excessive hours or pumping up the load star or whatever you want to characterize it as, that they could cause problems for the case?
A. **Well, you know what, if we were, it would have caused problems for the case, but we didn't and we weren't --**
Q. Did you ever tell ERISA about the cost-sharing arrangement?
A. **I have no recollection of that one way or the other.**
Q. Did you or any other firm ever tell the ERISA attorneys about Damon Chargois?
A. **I didn't know about Damon Chargois. I -- I know I was -- I -- occasionally I was copied on a letter. On occasion I'm saying less than five probably. His name along with a lot of others. I knew there was a local/referring counsel involved, but actually his name? Until this most recent supplementary interrogatories came in is the first time I'd ever -- I think it was a name -- if I had had ever a discussion with somebody named Damon Chargois, 'cause it's a rather unusual name, I think I would have remembered it.**

Q. Well, did you --
A. **So there was nothing to tell him about Damon.**
Q. Were you aware that 4.1 million dollars was being paid to Mr. Chargois as a result of the State Street settlement?
A. **I was after the award was made, yes.**
Q. You weren't consulted in advance of that arrangement?
A. **Well, the arrangement had been made on a percentage basis which was the basis of his interest in the case with Labaton.**
Q. So what did you know about a referral attorney and the fee he would receive during the course of the settlement of this case?
A. **I knew that there was a referral/local counsel and that that attorney had an agreement with Labaton for a percentage of their fee on cases involving -- in this case involving Arkansas.**
Q. And what did you know with respect to how much of a fee he would get?
A. **I didn't know until pretty far down the road. And I mean it's hard for me to tell you when. I mean I know now because I've been reading this**

**stuff that it was 20 percent of Labaton's net fee was his referral or whatever.**
**When I got that knowledge precisely I can't tell you, but it was well after -- it was probably -- it was probably 2013 when the discussions first started. So the case had been going on for a couple years.**
**You know, frankly, when we started this case, you know, referral fees and fees were the last thing we were worrying about. We were in, you know, for the fight of our life.**
**THE SPECIAL MASTER:** Could I ask -- and I want you to come back to this, Bill, and I don't mean to interrupt your train of thought, but what is your understanding of what a referral fee is?
**THE WITNESS:** Someone has a relationship or a -- with a -- or say in this case an institution or a client of an institution that refers a case to another firm that presumably is capable of conducting a prosecution.
**THE SPECIAL MASTER:** Because the referring attorney is not competent himself or herself to handle the case or there's another firm more competent to handle it?

Page 38

**THE WITNESS:** I think generally that's the case, yes. Or it's just not their role to do that type of case for the fund.

**THE SPECIAL MASTER:** Is your understanding -- is it your understanding that Mr. Chargois or "Chargois" --

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** -- was a referring attorney in this case in the way in which you've just defined it?

**THE WITNESS:** Yes.

**THE SPECIAL MASTER:** How?

**THE WITNESS:** Referring -- well, I said referring and local counsel were used intermittently -- they were both used in the discussions --

**THE SPECIAL MASTER:** Let's break it down and take either one. Either referring attorney or local counsel.

**THE WITNESS:** Okay.

**THE SPECIAL MASTER:** In what way was Mr. Chargois either a referring attorney in the way you've just defined it or local counsel?

**THE WITNESS:** Well, I know at least that he was in his firm helpful in getting Labaton on the

Page 40

Page 39

Page 41



counsel is?

**THE WITNESS:** Local counsel I guess is a little different in that if a firm in another state wanted to file say in Massachusetts -- let's say in federal court here -- a case and they don't have an office here and they're not Massachusetts lawyers, they would need to get local counsel, Massachusetts lawyers, and you work out whatever arrangement out you would with them to perform those functions, and the functions are -- they vary in how much you have to do.

**THE SPECIAL MASTER:** Was Mr. Chargois in any sense local counsel in this case?

**THE WITNESS:** With regard to the State Street case?

**THE SPECIAL MASTER:** Yes.

**THE WITNESS:** Not that I'm aware of.

**THE SPECIAL MASTER:** How would you characterize from your knowledge -- how would you characterize Mr. Chargois's relationship to this case?

**THE WITNESS:** Well, I will say this: Without Mr. Chargois, I think it is unlikely that Labaton or, for that matter, ultimately we would

[redacted]

to be filed?

**THE WITNESS:** I don't know.

**THE SPECIAL MASTER:** What was your understanding -- when you came to an understanding that Mr. Chargois was going to get some percentage, what was your understanding of exactly what he was being compensated for?

**THE WITNESS:** I don't know everything he was being compensated for. I do know -- because I don't know all the interaction, but I do know that he was responsible for getting them on the monitoring panel.

**THE SPECIAL MASTER:** On Arkansas's monitoring panel?

**THE WITNESS:** That's correct.

**THE SPECIAL MASTER:** Did you know at the time that because of his facilitation of that arrangement back in we believe 2008 that that therefore entitled him to 20 percent of Labaton's fees in every case in which Arkansas was either lead plaintiff or co-lead plaintiff? Were you aware of it at the time?

**THE WITNESS:** I don't think I was aware of that at the time, no.

[redacted]



Page 118

Page 120

Page 119

Page 121

A. **Yeah. I -- I don't know if we had -- if the agreement at that time had been struck with the ERISA attorneys. I'm not sure the date of that. Bob Lieff --**
Q. Okay.
A. **-- could opine on that directly.**
Q. Let me just ask you a couple of housekeeping questions, Mike.
A. **Sure.**
Q. You previously testified on page 81 at your June deposition that you reviewed your own hours; you didn't review the staff attorney hours.
Does Thornton Law Firm have billing software?
A. **We do.**
Q. Did you then?
A. **Not during the entire time and some people are better about using it than others is my recollection.**
Q. Did you use it?
A. **No.**
Q. How did you keep your hours?
A. **Mike Lesser and, more important, Evan Hoffman did a good job keeping my hours. My**

Page 122

**assistant kept my hours, and I also kept it. I kept calendars but -- probably -- so that's how I kept it.**
Q. Would you periodically review your hours or anyone else's hours?
**A. I wouldn't review anybody else's hours. I might glance at 'em occasionally, but I really didn't -- I just tried to keep them as best I could, you know.**
**(Pause.)**
**A. Attorneys at work -- I don't have to tell anybody in this room, because almost everybody's attorneys, some do a better job keeping their hours. It's something that no one likes, but it's a necessary part of the job particularly if you do hourly charging as opposed to contingency.**
Q. Yep.
**A. You get contingency you get very sloppy about it normally 'cause you don't have to -- it doesn't make any difference, although some contingency law firms keep track of their hours because they want to see if they're justified -- that in the cases they're justified of the time they're putting in.**

Page 123

**I think if I stopped and had a ten-minute meeting with somebody in the hall about the State Street case during the course of the years this thing was pending, I think it's very unlikely that would have made it onto a time sheet. It's just --**
Q. How did you put your work and hours on the time that was used for the load star here? What sources did you use?
**A. My calendars. My secretary would help. I tried to say on certain things where the hours were going to be necessary I said stop me at the end of the day and make me say how long I spent on times.**
**I also -- my calendar helped in that I knew if I was doing a conference call, um, with other -- or co-counsel on this case, and there are many, many, many of those -- because I would have that on my calendar, and I may have a notation about the time; I might not, but then I could look at either Lieff Cabraser or Labaton's because they tend to be much more methodical than me. And, like I said, other lawyers in my office like Mike Lesser are very methodical about their time.**
Q. How did Garrett keep their hours?

Page 124

**A. Kind of the same way I think.**
**MR. SINNOTT:** Did you want to ask something?
**THE SPECIAL MASTER:** Want to come back to the issue of the time keeping.
**MR. SINNOTT:** Yep.
**THE SPECIAL MASTER:** But in fairness to Mike, I want to go back to this issue about whether or not the payments to Mr. Chargois was a separate, independent deal that had any impact at all upon the allocation of fees amongst the attorneys. Okay?
You said that you believed it was a separate issue and had no impact at all among the distribution of the fees --
**THE WITNESS:** Right.
**THE SPECIAL MASTER:** -- or to the class. I've provided Brian with a copy of an e-mail chain between Garrett and Damon Chargois. I'd like you to take -- you can read as much of it as you want. It goes on for some time.
Because earlier on there are e-mails between other lawyers, Garrett and Bob Lieff, you're on one of them, Eric Belfi is on, Damon Chargois is copied, Chris Keller, Dan Chiplock, discussing

Page 125



Page 146

[redacted]

Page 147

[redacted]

Page 148

**A. Well, it's an accurate figure, but I -- I don't know any other referring counsel.**
Q. So at least as early as May of 2011 your firm was aware of referring counsel, correct?
**THE WITNESS:** Pardon?
**A. I -- I -- I don't recall seeing this letter.**
Q. Okay. Well, when did you first learn of a referring attorney in this?
**A. It could have been as early as this. It might have been the next year.**
Q. How did you learn about the referring attorney? As best you remember.
**A. I think Garrett told me.**
Q. Okay. And had Garrett known of this individual a long time before you or contemporaneously or shortly before?
**A. He had known him before that I think. If I'm not mistaken, he would go to co-counsel meetings like once a year that Labaton had, and Mr. Chargois would be there, Garrett would be there.**
Q. And this was in the State Street case?
**A. Not about State Street, no. It was just about litigation.**
Q. Okay.

Page 149

[redacted]