# EX. 139

**Robert Lieff**

1

Volume:  1

Pages:  1-114

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

-------------------------------------

In Re:  STATE STREET ATTORNEYS FEES

-------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,

United States District Court, Retired

DEPOSITION of ROBERT L. LIEFF

September 11, 2017, 12:13-2:57 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter:  Paulette Cook, RPR/RMR

Page 14



Page 16

1  Q.  And if you'd take a look at that thread, and
2  I'd ask that you begin from the oldest, which
3  appears to be a message from you on page 4, being at
4  2:05 p.m.
5  (Pause.)
6  **A.  I've looked through it quickly.**
7  Q.  Okay, thank you.
8  If you look on page 4 with that message
9  that begins about a fifth of the way down on August
10  28, 2015 at 2:05 p.m., Lieff, Robert wrote.
11  It would appear that you are responding
12  to Garrett Bradley's back and forth with
13  Mr. Chiplock.  Is that your recollection?
14  **A.  From glancing at this briefly, yes.**
15  Q.  All right.  And what are you telling Garrett
16  in that message with respect to the splits or the
17  percentages?
18  **A.  Well, I'm saying that we should have a**
19  **meeting.  Then I make reference to the November 9,**
20  **2010 get-together that I had, apparently, with Chris**
21  **Keller and Mike Thornton.**
22  **I mean you want me to read it?**
23  Q.  No.  No.  I'm just directing your attention
24  to the percentages there.

Page 15

1  **THE SPECIAL MASTER:** Would that have
2  specific been Garrett Bradley of the Thornton firm?
3  **THE WITNESS:** Yes.
4  **BY MR. SINNOTT:**
5  Q.  Now let me ask you to look at -- excuse me.
6  **MR. SINNOTT:** I'm sorry.
7  Q.  Let me ask you to look at the document
8  before you that's dated August 30, 2015 from Dan
9  Chiplock to Michael Thornton and Garrett Bradley,
10  and you are CC'd on this message.  And that was at
11  12:50 p.m.
12  And the designation of this message is
13  TLF-SST-038574 through 038579.  Do you have that in
14  front of you, sir?
15  **A.  Yes.**
16  Q.  Okay.
17  **MR. WOLOSZ:** Do you have another copy of
18  this one?
19  **MR. SINNOTT:** Yes, I do, Justin.
20  **MR. WOLOSZ:** Thank you.
21  **MR. SINNOTT:** Do you want a copy,
22  Richard?
23  **MR. HEIMANN:** Thank you.
24  **BY MR. SINNOTT:**

Page 17

1  Where does that break down -- that
2  breakout of percentages come from?
3  **A.  The 20/20/20?**
4  Q.  Yeah.  The 33, 26.5, what are those figures
5  based on?
6  **A.  Oh, I see here.**
7  **(Pause.)**
8  **A.  I think those were numbers that I must have**
9  **discussed with Garrett Bradley.**
10  Q.  Okay.  And the Arkansas local, 5.0, is a
11  reference to?
12  **A.  The Arkansas local, at the time I didn't**
13  **know anything really other than the fact that it was**
14  **the Arkansas local.  That's how he was referred to.**
15  **I now see he has a name.**
16  Q.  Okay.  But --
17  **THE SPECIAL MASTER:** Did you know his
18  name at the time?
19  **THE WITNESS:** No.  Although it appeared
20  in some e-mails, but I hadn't remembered that.
21  **BY MR. SINNOTT:**
22  Q.  And if you go to the bottom of the previous
23  page, page 3, it would appear that Garrett Bradley
24  responds within minutes and, in fact, he says:

Page 34



Page 36

1  Q.  Okay.  All right.  Let me direct your
2  attention to -- well, let me first ask you how would
3  you characterize your relationship and the
4  relationship of other customer class counsel with
5  the ERISA firms?
6  **A.  My relationship particularly with Lynn Sarko**
7  **of Keller Rohrback was extremely close.  We were and**
8  **are very good friends.**
9  **    As to the other two, Carl Kravitz and**
10 **Brian McTigue, I only knew them through this**
11 **litigation.  In Brian's case, both State Street and**
12 **the Bank of New York.  And I think I had a -- I**
13 **think I and my firm had a decent relationship with**
14 **the two of them as well.**
15 Q.  All right.  And had you worked with Lynn
16 Sarko professionally before?
17 **A.  I've worked with Lynn Sarko going back to**
18 **1989 when we were both involved representing the**
19 **fishermen in the Exxon Valdez spill.**
20 Q.  Okay.  So you had some history with him and
21 some trust of him?
22 **A.  Absolutely.**
23 Q.  And let me direct your attention to an
24 August 21, 2015 e-mail at 9:17 a.m.

Page 35

Page 37

Page 42

Page 44

Page 43

Page 45



```
 1   minutes for lunch?
 2       THE SPECIAL MASTER: Let's do that,
 3   break now for 15, 20 minutes.
 4       MS. HARLAN: How long are we breaking?
 5       MR. SINNOTT: Fifteen to 20 minutes.
 6       (A lunch recess was taken.)
 7       CONTINUED EXAMINATION BY MR. SINNOTT:
 8   Q.   Hi, Bob.  Welcome back.
 9       Let me direct your attention to a e-mail
10   from September 2, 2015, and it was at 10:25 a.m.,
11   and the Bates stamp is TLF-SST-054014 through 54016.
12       And if I could ask you to look at the --
13   just for background -- on the second page.
14       MR. HEIMANN: Do you have an extra copy?
15       MR. SINNOTT: I do.
16       MR. HEIMANN: Thank you.
17       MR. SINNOTT: Sure.
18   Q.   So, Bob, if I could direct your attention to
19   the top of the second page.
20       And, as you can see, there's a message
21   from Larry at 11:07 p.m., and he says, "Lynn, you
22   and I should discuss how best to handle Brian.  I
23   completely agree with you perhaps a side letter from
24   me as lead counsel saying I intend to abide by the
```

Page 46

1  agreement entered into between class counsel and
2  ERISA counsel dated whatever would satisfy him?"
3      Do you remember what prompted this
4  exchange?
5  **A.  Perhaps it was one of the e-mails we read**
6  **before, but I don't remember the date or anything.**
7  **But I remember something from Brian that may have**
8  **prompted this.**
9  Q.  Is it fair to say that you and other counsel
10  looked to Lynn to kind of troubleshoot among the
11  ERISA attorneys or to kind of smooth things over in
12  addition to, you know, what you expected he'd do
13  with the government regulatory agencies?
14  **A.  Definitely, yes.**
15  Q.  All right.  If I could ask you to look at
16  the document dated July 25, 2016 at 5:29 p.m.
17      And, as you can see from the back, Bob,
18  there's several pages, and they begin on
19  TLF-SST-051653 through 657.
20      **MR. HEIMANN:** Thank you.
21      **MR. SINNOTT:** Sorry.
22      **MR. WOLOSZ:** Thank you.
23  Q.  And the topic is State Street revised POA
24  language.

Page 47

1      (Pause.)
2      **MR. HEIMANN:** I think we're waiting for
3  a question.
4  Q.  Oh, I was waiting for you to put your head
5  up.
6  **A.  I wait for you to read it, and then I**
7  **respond.**
8  Q.  Okay.  Well, now that I know that, Bob --
9  **A.  Yeah, don't waste time.**
10  Q.  -- I'll save us both some time.
11  **A.  Absolutely.**
12  Q.  Okay.  I won't read the original message
13  from Nicole other than to ask you would you agree
14  that Nicole Zeiss of Labaton is putting out some
15  draft language for purposes of the settlement; is
16  that correct?
17  **A.  Yes.**
18  Q.  And there's an exchange about some language
19  that she's put out there from several attorneys
20  including Mike Lesser and David Goldsmith.
21      And then ultimately at the top of page
22  2, Dan Chiplock in a message to you and to other
23  customer class counsel says, "The real premium here
24  was demanded/earned by DOL, not ERISA counsel, whose

Page 48

1  claims offered no greater benefit than our claims.
2  That's why I wouldn't have bothered including that
3  first highlighted sentence below.  By doing so we
4  are saying that the private ERISA claims added extra
5  heft to ERISA plaintiffs' damages.  They didn't.
6      The only reason ERISA plaintiffs are
7  getting more money is to keep the DOL from filing
8  its own lawsuit; in other words, to settle the DOL's
9  claims.  We didn't have this language in the BNY
10  notice.  That's why I was wondering who wanted this
11  language inserted."
12      My question to you on that, Bob, is are
13  you in agreement with Dan's assessment that the
14  private ERISA claims did not add heft to the
15  plaintiffs' damages?
16  **A.  I agree with him in saying that the DOL was**
17  **the one that was adding heft, and we had to deal**
18  **with the DOL.**
19  Q.  Okay.  And --
20      **MR. HEIMANN:** I'm sorry, are you saying
21  you had "to" deal with the DOL?
22      **THE WITNESS:** Yes.
23      **THE SPECIAL MASTER:** By that you mean
24  because State Street was insisting on a global

Page 49

1  release and wanted a global settlement, you had to
2  deal with the DOL.
3      **THE WITNESS:** That's correct.
4      **BY MR. SINNOTT:**
5  Q.  Okay.  And directing your attention, Bob, to
6  the next to newest e-mail at 5:27 p.m. Dan writes to
7  you and others on the list:  "Yes, the premium is
8  obvious by virtue of the math just as it was in BNY
9  and where we didn't include any narrative in the
10  plan of allocation like the one in the first
11  highlighted section below.
12      If we feel compelled to explain the
13  premium, that can be done at the hearing or in
14  response to an objection, but we shouldn't be
15  attributing it to claims asserted by ERISA plans as
16  opposed to a lawsuit that the DOL could have brought
17  because it isn't so.  And it's too easy to
18  discredit.  They had standing problems, never got
19  past a motion to dismiss, didn't offer treble
20  damages, etcetera."
21      Was that your take on things as well?
22  You know, Dan seems to be downplaying the strength
23  of the ERISA case.
24  **A.  I don't know that I would have stated it the**

Page 50

1 same way, but he's right that their claims had not
2 been tested.
3 Q.  Okay.
4 A.  Yes.
5 Q.  Because there never was a motion to dismiss
6 hearing on the case?
7 A.  Right.
8 Q.  All right.  Did you feel that the ERISA
9 counsel and claims were subject to greater
10 government scrutiny than the customer class claims?
11 A.  Greater government scrutiny by the
12 appropriate agency meaning the Department of Labor,
13 yes.
14 Q.  Okay.  And that's pretty much par for the
15 course in an ERISA case, correct?
16 A.  Yes.
17 Q.  Okay.  Let me direct your attention to
18 August 6 e-mail at 2:30 p.m.
19     MR. HEIMANN: I'm having a little
20 trouble finding that one.
21     MR. SINNOTT: Okay.
22     MR. HEIMANN: I've got an August 6th
23 at --
24     MR. SINNOTT: There are two August 6th

Page 51

1 ones.  This is the one at 2:30 p.m.
2     MR. HEIMANN: Okay.
3     MR. SINNOTT: Do you just have one copy?
4     MR. HEIMANN: Thank you.
5     MR. SINNOTT: Sure.
6     BY MR. SINNOTT:
7 Q.  If you'd take a look at that.
8 A.  Go ahead and read whatever part you want me
9 to respond to.
10 Q.  So at the bottom of the page Lynn Sarko
11 indicates that he's trying to put a call together
12 with DOL.
13     And then he adds just above it that he
14 did have a call with DOL with Nate Goldstein, and he
15 talks about it and talks about the rather firm
16 approach, perhaps aggressive, approach DOL is taking
17 with respect to the fee percentages.
18     Then there's a -- top of the message
19 there's a response from Garrett, and you're one of
20 the CCs on the message.  "They have done nothing but
21 come in at the end and try and hold us up.  It's
22 time to go over his head."
23     And who did you interpret "they" to
24 refer to there, Bob?

Page 52

1 A.  Department of Labor.
2 Q.  Okay.  "We are asking for 25 percent.  I'm
3 getting a little tired of the tail wagging the dog.
4 ERISA is a small piece here of the overall
5 settlement.  There was a lot of talk about the ERISA
6 counsel ability to guide them to see how good this
7 settlement is.  I think it's time to do that."
8     So I guess it would be fair to say that
9 Garrett is frustrated and that shows in this
10 exchange?
11 A.  Yes, he so expresses himself.  Yes.
12 Q.  And would you also agree that he's
13 challenging the ERISA counsel?
14 A.  He's saying that they should do what they're
15 supposed to be doing, yes.
16 Q.  Okay.  And one of the things that they're
17 supposed to be doing is interacting or helping with
18 the Department of Labor?
19 A.  Yes.
20 Q.  Okay.  Let me ask you to look at August 10,
21 2016 e-mail, and this is at 4:27 p.m.
22     MR. SINNOTT: And, Richard, I'll give
23 you a copy.
24     MR. HEIMANN: Thank you.

Page 53

1     MR. WOLOSZ: Thank you.
2     BY MR. SINNOTT:
3 Q.  And, Bob, let me just direct your attention
4 to the first page, the message from David Goldsmith
5 to a number of parties including State Street and
6 Department of Labor.
7     I don't believe that you're mentioned on
8 this, unless I'm missing it --
9 A.  I'm not.
10 Q.  You're not.  Well, you are at the top of the
11 message.
12 A.  Okay.
13 Q.  But in that middle message, which is what I
14 was I'm making reference to, you're not, but I
15 believe this is forwarded to you by David.
16     And in that message David says, "After
17 hearing back from the DOL, I'm suggesting the
18 following and hopefully final language for this
19 paragraph of the notice.  The ERISA settlement
20 allocation was negotiated directly among lead
21 counsel, ERISA counsel and representatives of the
22 DOL.
23     The ERISA settlement allocation, even
24 without the 10.9 million dollar cap on attorneys'

Page 54

1  fees described above, provides a premium per dollar
2  of indirect FX trading volume for ERISA plans and
3  eligible group trusts in comparison to the
4  allocations to other settlement class members.
5     The precise size of the premium is not
6  known at this time because the amount of ERISA
7  assets within group trusts is currently undetermined
8  as is the amount of attorneys' fees the Court may
9  award.  The premium recognizes the relative strength
10  of the fiduciary duty and other claims available to
11  ERISA plans and eligible group trusts under the
12  federal ERISA laws as ERISA counsel and the DOL have
13  contended and as described in question 2 above.  The
14  10.9-million-dollar cap on attorneys' fees was
15  agreed to by lead counsel and ERISA counsel
16  separately with the DOL after the class settlement
17  amount was agreed to by the parties.
18     The ERISA settlement allocation of 60
19  million dollars and the 10.9-million-dollar cap on
20  attorneys' fees were final essential conditions for
21  the DOL's support of the settlement and the
22  conclusion of its own investigation of SSBT.  These
23  conditions must be met for the settlement to be
24  concluded."

Page 55

1     What is the significance of the cap,
2  Bob?  And why that is an essential term?
3  A.  My recollection of the origin of this 10.9
4  cap was the position by the Department of Labor that
5  they did not think attorneys' fees should be greater
6  than -- I thought it was 18 percent, but somehow I'm
7  doing the math, and it's like 18.17.
8     But I thought it was 10.8 -- maybe I
9  missed something here but in any event -- which
10  would be 18 percent.  But, in any event, they
11  insisted upon the cap.
12  Q.  Okay.
13     MR. SINNOTT: Just bear with me for a
14  second.
15     (Pause.)
16     BY MR. SINNOTT:
17  Q.  Let me direct your attention to July 8, 2016
18  e-mail from Garrett Bradley to Christopher Keller.
19  And this is Bates stamp LBS 039936 and 37.
20     THE WITNESS: I think we're looking for
21  it.
22     MR. HEIMANN: Yeah, I don't see it.
23     MR. SINNOTT: Oh, okay.
24     MR. HEIMANN: Sorry.  The date again was

Page 56

1  July?
2     MR. SINNOTT: July 8, 2016.
3     MR. HEIMANN: I'm sorry, it's from July
4  8 at 7:06?
5     MR. SINNOTT: Yes.  It's from Garrett --
6     MR. HEIMANN: Okay, I got that.
7  Although it doesn't look like the one you're looking
8  at.
9     MR. SINNOTT: It's not at 7:06.  It's at
10  9:36.
11     THE SPECIAL MASTER: 039936.
12     MR. HEIMANN: Don't have it.  Sorry.
13     MR. STOCKER: I think this is it.
14     MR. SINNOTT: Oh, thanks.
15     BY MR. SINNOTT:
16  Q.  And keeping up the technique that we've
17  perfected here, Bob --
18  A.  Yes, please.
19  Q.  -- let me direct your attention to the
20  message in the lower part of the e-mail.
21     On July 8, 2016 at 9:06 p.m. Garrett
22  Bradley wrote: "Gentlemen, as we discuss how to
23  distribute the fee between ourselves and, of course,
24  the ERISA attorneys, I have had discussion with

Page 57

1  Damon Chargois, the local attorney in this matter
2  who has played an important role.  Damon and his
3  firm are willing to accept 5.5 percent of the total
4  fee awarded by the Court in the State Street class
5  case now pending before Judge Wolf.
6     As you know, we had a prior deal with
7  him that his fee would be off the top.  He
8  understands that ERISA counsel is now in the same
9  pool of money.  He has agreed to come down to this
10  number with a guarantee that it will be off the
11  Court-awarded fee number.  Please reply if you all
12  agree.
13     Given that it is off the total number,
14  there is no need to add the ERISA counsel to this
15  e-mail chain."
16     And it appears that you responded, "Bob,
17  we, LCHB, are in agreement with the 5.5 to Chargois.
18  Now let's continue to resolve the split among us."
19     And Christopher Keller says "great work
20  getting this done."  And Garrett says "thanks."
21     Let me ask you this, Bob: When did you
22  first learn about Chargois?
23  A.  I first actually learned about his name
24  about four weeks ago.

Page 58

1   Q.   Okay.  Prior to that how did you know him?
2   A.   With the benefit of prior e-mails that I
3   have been directed to read, I see his name showing
4   up as early as 2013.  But I had no recollection of
5   that until I was told to look at it.
6       So that's when I saw his name after I
7   heard about it a month or so ago.
8   Q.   But when you first heard about him, either
9   his name was not associated with him, or the name
10  didn't register with you?
11  A.   Exactly.
12  Q.   Okay.
13  A.   I saw the -- I knew about the so-called
14  local counsel, but I didn't know his name.
15  Q.   Okay.  And did he fit the description of
16  what you think of as a "local counsel" based on what
17  you knew about him?
18  A.   Well, what I knew in 2013 or what I know
19  now?
20      MR. HEIMANN:  No.  2013.  2015.
21  A.   2013 -- 15?  It was so represented, yes, by
22  Garrett Bradley that he was local counsel, and it
23  sounded like he was taking care of the situation in
24  Arkansas as typically a local counsel would do.  So

Page 59

1   that was my understanding.
2   Q.   At some point, Bob, did you find out that he
3   didn't do anything?
4   A.   Yes.
5   Q.   All right.  And what was your reaction to
6   that news?
7   A.   Well, it was recently.
8   Q.   Okay.
9   A.   I mean during the course of all this
10  investigation.
11  Q.   What was your reaction recently?
12  A.   I was surprised, disappointed and offended
13  even, yeah.
14  Q.   And when you say you were offended, why?
15  A.   Hm hm.  I wished that I had known more or
16  had been told more than what I was told back in
17  2013, 2015.
18  Q.   In that e-mail that we first read at the
19  bottom of the page, Bob, where Garrett says he
20  understands that ERISA counsel is now in the same
21  pool of money; he's agreed to come down to this
22  number knowing it will be off the court-awarded fee
23  number.  Please reply if agree.
24      And then the final sentence, "Given that

Page 60

1   it is off the total number, there is no need to add
2   ERISA counsel to this e-mail chain."
3       Did you have any misgivings about
4   keeping this information from ERISA counsel?
5   A.   I never looked at this as an attempt to keep
6   information away from ERISA counsel.  What I read
7   into this was the fact that finally people are
8   understanding how to do the math.  And if somebody
9   has 5.5 percent of a number off the top, it doesn't
10  impact someone else who might have 9 percent off the
11  top.
12      Any number of people could have
13  percentages off the top, although it was my
14  understanding that some people misunderstood it and
15  thought it would impact the second and third fourth
16  people.
17      So the answer is this was a math issue
18  as far as I was concerned, and it makes sense.
19  Q.   Did it -- you know, obviously, experienced
20  counsel and, you know, earlier you told us how
21  uncomfortable you were with the blending of
22  different cases in discussion.
23      Did you have any concerns about --
24  beyond the financial aspect which appears to you to

Page 61

1   be non-problematic -- that there might be other
2   issues, ethical issues or client issues or class
3   issues that the ERISA attorneys might suffer?
4       MR. HEIMANN:  Relative to what?
5   Relative to the local counsel question?  The
6   Chargois question?  Is that what you're asking?
7       MR. SINNOTT:  Yes.  Yes.  Thank you,
8   Richard.
9   A.   Again, it's hard to answer this without
10  reference to the timeframe.  Back in the early days
11  when I first heard about it, as I now know it was
12  April 2013 I believe, and then again 2015, I didn't
13  think too much about it because we had a very
14  similar situation in the companion -- I call it the
15  companion but in the Bank of New York we had local
16  counsel in Ohio dealing with the fund.  I thought
17  this was local counsel in Arkansas dealing with the
18  fund.
19      It wasn't until all this investigation
20  came about that it came to my attention that this
21  was a different situation.
22  Q.   Okay.
23      THE SPECIAL MASTER:  How much -- if I
24  could ask, in fairness, I think -- Rich, do you have

Page 62

1 the 2013 e-mail from Garrett Bradley to Bob and to
2 Mike Thornton and Eric Belfi?
3    **MR. HEIMANN:** Hm hm, I do.
4    **THE SPECIAL MASTER:** Can you show that
5 to him?
6    **MR. HEIMANN:** Sure.
7    **THE WITNESS:** I'm familiar with this
8 one.
9    **THE SPECIAL MASTER:** Okay.  At the time
10 -- this is an e-mail -- for the record, it's an
11 e-mail from Garrett Bradley to Bob Lieff, Mike
12 Thornton and Eric Belfi with copies to Damon
13 Chargois, Chris Keller and Dan Chiplock.  And the re
14 on it is State Street fee regarding local counsel.
15    And we're familiar with it?
16    **THE WITNESS:** Yes, you don't have to
17 read it.
18    **THE SPECIAL MASTER:** I don't have to
19 read it.  It's in the record.
20    **THE WITNESS:** Right.
21    **THE SPECIAL MASTER:** This is 2013, and
22 it refers to -- it's addressed to you, and it refers
23 to a meeting in Dublin last week, i.e., back in 2013
24 -- specifically April of 2013.

Page 63

1    And in that e-mail Garrett Bradley
2 refers to the obligation to the counsel Damon
3 Chargois of 20 percent of the net fee to Labaton on
4 the State Street case before Judge Wolf.
5    How much did you know at this time
6 during this -- I don't know if I should call it a
7 meeting; I don't know what it was -- but this
8 session in Dublin, how much did you know about the
9 Labaton relationship with Chargois?
10    **THE WITNESS:** The meeting in Dublin was
11 a meeting of the Global Justice Network which is an
12 entity that I had put together maybe 15 years ago of
13 lawyers from around the world who come together --
14 plaintiff side lawyers -- to discuss common issues.
15 This was one of maybe 30 different meetings we've
16 had over the years, most of which are in Europe.
17 This happened to be in Dublin.
18    I invited some people to this meeting.
19 I invited Mike Thornton.  I invited Lynn Sarko.  I
20 can't remember if I specifically invited Garrett
21 Bradley or whether Mike Thornton invited Garrett
22 Bradley, but nonetheless we were there --
23    **THE SPECIAL MASTER:** But you invited
24 Mike Thornton?

Page 64

1    **THE WITNESS:** I definitely invited Mike
2 Thornton, yes.  And spouses, by the way.  So we were
3 there and we're basically dealing with our group,
4 our Global Justice Network.
5    I do not remember this conversation in
6 Dublin.  It doesn't mean it did not exist.  There
7 was just too much on my mind, and I wasn't there to
8 talk about this case.
9    **MR. HEIMANN:** Now answer the question.
10    **THE WITNESS:** What was the question?
11    **THE SPECIAL MASTER:** Thank you, Richard.
12    **THE WITNESS:** That was my longest answer
13 and --
14    **THE SPECIAL MASTER:** It's good
15 background.
16    And the question was how much did you
17 know about Mr. Chargois and Labaton's relationship
18 with Mr. Chargois at the time of this Dublin meeting
19 and conversation concerning Mr. Chargois?
20    **THE WITNESS:** At the time of this
21 meeting, which I don't remember, I knew nothing.
22    **THE SPECIAL MASTER:** Did anybody from
23 Labaton at the time -- and by anybody, it looks like
24 it would have been Eric Belfi because he apparently

Page 65

1 was there --
2    **THE WITNESS:** In Dublin?
3    **THE SPECIAL MASTER:** In Dublin.
4    **THE WITNESS:** No, he wasn't there.
5    **THE SPECIAL MASTER:** Chris Keller?
6    **THE WITNESS:** No, he wasn't there.
7    **MR. SINNOTT:** Were you there?
8    **THE SPECIAL MASTER:** Wasn't there.  I'm
9 sorry, yeah.  As you, Mike and I -- all right.  So
10 it was you, Mike and Garrett.
11    **THE WITNESS:** And Lynn.
12    **THE SPECIAL MASTER:** And --
13    **THE WITNESS:** Lynn Sarko.
14    **THE SPECIAL MASTER:** He's not even
15 listed.
16    **THE WITNESS:** I didn't write the e-mail.
17    **THE SPECIAL MASTER:** Yeah, but you
18 believe he was at this meeting?
19    **THE WITNESS:** Of course, he was there.
20 So was his wife --
21    **THE SPECIAL MASTER:** I don't mean the
22 global meeting --
23    **THE WITNESS:** Oh, oh.
24    **THE SPECIAL MASTER:** I mean the

Page 66

1  discussion that has been referred to.
2  **THE WITNESS:** As I testified, I don't
3  remember this particular discussion.  I remember
4  that we were in Dublin, but this was not something
5  that I remember or I was interested in.
6  **THE SPECIAL MASTER:** What were you told
7  at the time about Mr. Chargois?
8  **THE WITNESS:** Nothing.  To my
9  recollection, nothing.
10  **MR. HEIMANN:** And when you say "told,"
11  you mean orally as opposed --
12  **THE SPECIAL MASTER:** Yeah, orally.
13  **MR. HEIMANN:** -- the followup e-mail.
14  **THE SPECIAL MASTER:** Yes.  Nothing.
15  **THE WITNESS:** Nothing.
16  **MR. HEIMANN:** That you recall --
17  **THE WITNESS:** Yeah, nothing I recall I
18  just testified.
19  **THE SPECIAL MASTER:** And the Labaton
20  folks at no time told you anything more about the
21  larger context of the relationship with
22  Mr. Chargois?
23  **THE WITNESS:** No.
24  **THE SPECIAL MASTER:** Other than he was

Page 67

1  local counsel?
2  **THE WITNESS:** And other than later it
3  was 5.5 percent that he was getting.  There was
4  another e-mail -- well, I think we just looked at --
5  about the 5.5 percent.
6  **THE SPECIAL MASTER:** Hm hm.  What was
7  your understanding of what the relationship was
8  between Mr. Chargois and Labaton?
9  **THE WITNESS:** I thought he was local
10  counsel for Labaton in this particular case I
11  assumed dealing with the Arkansas fund because
12  that's what local counsel will do.  That was my
13  understanding.
14  **THE SPECIAL MASTER:** Did you know he was
15  in Texas?
16  **THE WITNESS:** I found that out a couple
17  weeks ago.  I did not know at that -- no.
18  **THE SPECIAL MASTER:** Do you have the
19  e-mail from Garrett Bradley to Damon Chargois?
20  **MR. SINNOTT:** I think that's part of the
21  same --
22  **MR. HEIMANN:** No, it's a different.
23  **THE SPECIAL MASTER:** This is the June
24  21, 2016.

Page 68

1  **MR. HEIMANN:** So the first e-mail is a
2  reproduction of the April 13 --
3  **THE SPECIAL MASTER:** Yeah, right.
4  **MR. HEIMANN:** -- e-mail, and there's a
5  subsequent e-mail from --
6  **THE SPECIAL MASTER:** Right.
7  **MR. HEIMANN:** -- Bradley to Chargois --
8  **THE SPECIAL MASTER:** Yeah.
9  **MR. HEIMANN:** -- that's not copied to
10  anybody else.
11  **THE WITNESS:** And which I have not seen.
12  **THE SPECIAL MASTER:** But you've seen it
13  now.
14  **THE WITNESS:** I haven't read it.  I just
15  saw it.  But I'd like your counsel to read it to me
16  if you want to ask a question.
17  **THE SPECIAL MASTER:** Okay.  I'll be
18  happy to read it.
19  **MR. SINNOTT:** I think he likes it when I
20  read it.
21  **THE WITNESS:** I do like it when he
22  reads.
23  **THE SPECIAL MASTER:** Yeah, except I'm
24  giving him a break and letting him eat his cough

Page 69

1  drops.
2  **MR. SINNOTT:** Thank you.
3  **THE SPECIAL MASTER:** Damon -- again
4  Garrett Bradley to Damon Chargois, Tuesday, June 21,
5  2016, 3:26 p.m.
6  "As always, it was a pleasure to speak
7  with you today.  As requested, I am laying out to
8  you where we are on the State Street matter, and
9  below is the e-mail that we referenced in the call.
10  That e-mail established that Lieff,
11  Thornton and Labaton would share your obligation
12  whatever it turned out to be.  The status of the
13  case has gotten better yet more confusing when it
14  comes to fees.
15  We have reached a settlement in
16  principle for 300 million dollars with the
17  defendant, but it involves not just our consumer
18  class but also obligations to the SEC and DOL as
19  well as the ERISA class which was merged with ours
20  by the judge for settlement discussions.
21  The DOJ also has a separate agreement
22  that is timed to be announced with ours.  As we
23  spoke this morning, a few matters got screwed up
24  today, but we are hoping to have a status conference

Page 70

1  with the Court on Thursday -- (he is on vacation in
2  all of July) -- with a preliminary approval hearing
3  sometime in August.
4      Given that we have to do a CAFA notice,
5  we are still hoping for a final date late this year.
6  We also have to post bonds or wait the 30-day appeal
7  period to take fees as ████████████████████
8  ████████████████████████████████ It's
9  going to be tight.
10     Since our last conversation, things have
11  changed.  The fee we will apply for is $70,900,000.
12  This will be for Lieff, Thornton, Labaton, you and
13  now three ERISA firms.  We are attempting to hold
14  the ERISA firms to 10 percent because that is what
15  they agreed to several years ago, but the ERISA part
16  of the settlement is now 20 percent.  I think we can
17  hold them to 10 percent.
18     Also, at one point in the litigation it
19  became clear that State Street was going to try and
20  pick off..." -- it says 'of,' but I think it means
21  off -- "...pick off Arkansas as the class rep so we
22  got the ██████████████████ to agree to come in.
23  We never formally had to bring them, but we let the
24  defendants know that it would be a waste to settle

Page 71

1  out with Arkansas.
2      We have not finalized the balance of the
3  fee between us, Lieff and Thornton, but I think it
4  is the right time for me to propose what I think
5  would be a fair and reasonable fee for you.  It was
6  my firm that originated the idea and put the firms
7  together.
8      Also, as we discussed, this is not a
9  securities case and is complicated by all of the
10  above factors.  We have always been direct with each
11  other, and I am not trying to negotiate but rather
12  give you a set percentage.  I would propose that you
13  be paid 5 percent of the fee that the Court awards.
14  As you know, he may award what we ask but could also
15  trim our request.
16     My firm, Lieff, and Labaton have put
17  extensive man hours into the case and looked at
18  millions of pages of documents so I think we have a
19  good chance of getting our request.
20     I have not put anyone else on this
21  e-mail, but if you agree, I will flip this around
22  and get everyone's written assent.  Please let me
23  know your thoughts."
24     And then subsequent e-mails indicate

Page 72

1  that it actually became 5.5 percent, and everybody
2  signed off on it.
3      My question to you is this:  What did
4  you know, and when did you know it about this
5  agreement with Mr. Bradley?
6      THE WITNESS:  About the five --
7      THE SPECIAL MASTER:  About the agreement
8  with Mr. Chargois.
9      THE WITNESS:  The agreement referenced
10  here or, as you point out, it became 5.5 percent --
11     THE SPECIAL MASTER:  Yeah, the
12  relationship and the agreement that culminated in
13  this agreement to pay Mr. Chargois 5.5 percent of
14  the total fee received, almost 75 million dollars.
15     THE WITNESS:  When did I find out about
16  the relationship between --
17     THE SPECIAL MASTER:  Yes.
18     THE WITNESS:  -- Chargois --
19     THE SPECIAL MASTER:  What did you know
20  and when did you know it?
21     THE WITNESS:  In the last year or so of
22  the case I found out that Garrett Bradley was not
23  only a partner in Thornton, but he was of counsel as
24  well to Labaton.  I didn't know that at the

Page 73

1  beginning.  So then I realized when Garrett Bradley
2  was speaking in e-mails, he was wearing two
3  different hats.
4      Of course, I didn't see this e-mail.  So
5  all I knew was what I saw in 2013 and then in 2015,
6  which was the same as the 2013 one, that was when
7  Dan Chiplock didn't remember the original --
8      THE SPECIAL MASTER:  The agreement?
9      THE WITNESS:  Yeah, and then Garrett
10  sent him another copy.  Then in 2016 we started to
11  hear a little bit more about him, but I didn't know
12  about the relationship between them other than what
13  I just said.
14     THE SPECIAL MASTER:  Did you know about
15  the actual agreement itself between Labaton and
16  Mr. Chargois?
17     THE WITNESS:  No --
18     MR. HEIMANN:  Well, when you say "actual
19  agreement," you mean what we know now?
20     THE SPECIAL MASTER:  No.  No, no.  When
21  I say "did you know," I meant did you know anything
22  about it at the time?
23     THE WITNESS:  Well, Richard's question
24  is the agreement as we now know it to be?

Page 74

1  THE SPECIAL MASTER: Yes.
2  THE WITNESS: No, I didn't -- I didn't
3  know anything about that until just recently.  And I
4  don't know very much about it now because my counsel
5  won't let me see some of the depositions.
6  THE SPECIAL MASTER: Wise counsel.
7  THE WITNESS: Yes.
8  MR. SINNOTT: Not much to look at but
9  smart.
10  THE SPECIAL MASTER: I don't want you to
11  speculate, but you're a very experienced lawyer --
12  one of the most experienced lawyers in this case.
13  I'm going to ask you to accept what
14  we've seen so far as the state --
15  THE WITNESS: As the?
16  THE SPECIAL MASTER: -- as the state of
17  play, state of the relationship.
18  THE WITNESS: Okay.
19  THE SPECIAL MASTER: What we have seen
20  so far is that Labaton and Chargois and other -- a
21  firm made a joint application back in 2008 to be
22  monitoring counsel for the Arkansas Teachers
23  Retirement System.
24  That application ultimately was accepted

Page 75

1  in part and rejected in part.  It was rejected -- it
2  was accepted that Labaton would become monitoring
3  counsel.  It was rejected as to Mr. Chargois.
4  In a letter from corporate counsel from
5  counsel -- the general counsel I should say at
6  Arkansas to Labaton -- I believe the letter was to
7  Mr. Belfi -- the general counsel indicated that they
8  only wanted to deal with the Labaton firm.  If
9  Labaton wanted to have some other relationship, it
10  could do so as necessary and appropriate to a case.
11  I'm summarizing.
12  People can add whatever they want to
13  that letter, but that's the burden of the letter.
14  Subsequent to that in 2009 Labaton
15  entered into a contract, an agreement with
16  Mr. Chargois pursuant to which the Chargois firm
17  would have a 20 percent interest in every case that
18  Labaton served as either lead counsel or co-lead
19  counsel and Arkansas was either lead plaintiff or
20  co-lead plaintiff.
21  That was an agreement entered into -- I
22  don't have exactly the date, but I believe it was
23  February of 2009 perhaps?  Sometime earlier in 2009
24  at any rate -- I'm sorry, it's May.

Page 76

1  MR. SINNOTT: 2011.
2  THE SPECIAL MASTER: No, that's not the
3  one.  No, hang on.  The original agreement.  But, at
4  any rate, that was the agreement.
5  We have learned that since that time
6  Mr. Chargois has received payment pursuant to this
7  agreement in approximately ten cases including this
8  case.  I've characterized it as a floating lien.
9  I've invited people to correct it.
10  But, at any rate, he has, obviously, had
11  an ongoing interest in every case, and we are
12  attempting to find out -- and I hope as we continue
13  our investigation that we will find out --
14  particularly Mr. Chargois who we're deposing on the
15  20th, whether he's done any work on any of these
16  cases.
17  I'm sorry, it was later in 2009.  It was
18  September of 2009.  We're attempting to find out if
19  he's done any work in any of the cases.
20  THE WITNESS: This is with Arkansas
21  only?
22  THE SPECIAL MASTER: With Arkansas only,
23  although, apparently, there's a couple of other
24  cases we need to understand that did not involve

Page 77

1  Arkansas, but the agreement is primarily in which
2  Arkansas serves as lead plaintiff or co-lead
3  plaintiff
4  And he has an interest of 20 percent of
5  Labaton's fee in every case that they either settle
6  or try to successful conclusion that they get a fee
7  in
8  THE WITNESS: Could I ask a question?
9  Is he required to do any work in this contract?
10  THE SPECIAL MASTER: I don't know.
11  We're still looking, but we don't believe so far
12  that he's done -- he may have in one or two cases
13  entered an appearance as local counsel
14  But in the vast majority he's not
15  appeared before the Court.  We're unaware of any
16  work that he's done.  But, you know, we're waiting
17  to be informed.
18  Certainly in this case we have not seen
19  any work that he did, and, you know, we're waiting
20  to be informed.  As you saw in one of the e-mails,
21  Garrett Bradley said he played an important role.
22  THE WITNESS: Yes.
23  THE SPECIAL MASTER: We'll ask what that
24  important role was.

Page 78

1    In your experience have there been any
2 such agreements like this that gave a lawyer who
3 began a relationship years before who has a
4 continuing interest in the fees of another lawyer
5 that it had years facilitated a relationship with a
6 client?
7    MR. WOLOSZ: Objection to the question
8 and to the preamble leading up to it.
9    THE WITNESS: In my 50 plus years
10 practicing law almost all in this field, the answer
11 is no, and I have seen some language about
12 forwarding attorneys, referring attorneys, local
13 attorneys only from the three depositions I've been
14 allowed to read. The Charles deposition, Chiplock's
15 deposition and Thornton's deposition. That's all I
16 know.
17    THE SPECIAL MASTER: So there's another
18 description that was in a response to an
19 interrogatory. I believe it was a private fee
20 arrangement.
21    THE WITNESS: I haven't seen that.
22    THE SPECIAL MASTER: We don't know how
23 to characterize this, and we're asking all the
24 witnesses in their experience if they know how to

Page 79

1 characterize it.
2    Mr. Sucharow did characterize it as a
3 forwarding fee arrangement.
4    THE WITNESS: I saw that. I would say,
5 first of all, we have to be talking about class
6 actions only.
7    THE SPECIAL MASTER: Yes.
8    THE WITNESS: That's what we're talking
9 about. And in the context of class actions there is
10 no such thing as a referral lawyer. You cannot
11 refer a class action and be compensated. It just --
12 it's not the way it works.
13    If you have a great idea and you say
14 your mother-in-law had french fries at McDonald's
15 and she got sick and you want us to bring a class
16 action for everybody -- millions of people who got
17 sick from McDonald's, that's not a referral fee.
18 You're not going to get a referral fee, okay?
19 That's one thing.
20    Likewise, forwarding fee. I don't know
21 what that means. But if it's a referral fee,
22 there's no such thing in class actions. Okay.
23    Local counsel there definitely is, and
24 there's no question about the use of local counsel,

Page 80

1 but you choose local counsel in each of your cases.
2    Now that doesn't mean that if it's not
3 the same counsel -- I know, for example, we have
4 represented funds in Ohio, and we have a law firm in
5 Columbus, Ohio chosen by the attorney general, Mike
6 DeWine, of Ohio, and he wants them to be our local
7 counsel, and they work, and they get paid, and we
8 get time records.
9    THE SPECIAL MASTER: So one kind of
10 local counsel is exactly as you've described it. A
11 local counsel who works with the client, works on
12 the case and presumably submits at the appropriate
13 time in the case a fee petition.
14    THE WITNESS: Right.
15    THE SPECIAL MASTER: Is there another
16 kind of local counsel?
17    THE WITNESS: Not that I can think of.
18    THE SPECIAL MASTER: There might be let
19 me suggest --
20    THE WITNESS: Okay.
21    THE SPECIAL MASTER: -- a local counsel
22 in the venue in which the case is brought in which
23 some courts, as you know -- many courts -- have
24 rules that require local counsel to act as a local

Page 81

1 liaison to national firms.
2    THE WITNESS: That could happen,
3 although it's not a necessity. If you bring a case
4 in a court in which you do not have an office, you
5 can be admitted for --
6    THE SPECIAL MASTER: Pro hac vice.
7    THE WITNESS: Exactly, but often you
8 want to have a local counsel.
9    So, you're right, there it's having the
10 counsel in a case that's in a venue where the case
11 is brought with local counsel working where the
12 client is.
13    THE SPECIAL MASTER: Mr. Chargois seems
14 to be neither of these would you agree?
15    MR. WOLOSZ: Objection.
16    THE SPECIAL MASTER: From what we know
17 now.
18    THE WITNESS: From what I just heard,
19 that's correct.
20    THE SPECIAL MASTER: That being the
21 case, should the relationship with Mr. Chargois and
22 the fact that he was getting 5.5 percent of the
23 total fee not have been disclosed to the Court in
24 the context of the larger fee petition?

Page 82

1    **MR. WOLOSZ:** Objection.
2    **THE WITNESS:** Given the nature of the
3    relationship as described by you, I would say, yes,
4    it should have been disclosed to the Court.
5    **THE SPECIAL MASTER:** Should it have been
6    described and disclosed to ERISA counsel -- the
7    three ERISA firms?  Or at least to Lynn Sarko who
8    was acting sort of as the liaison to the customer
9    class lawyers?
10   **THE WITNESS:** I don't know if there's a
11   rule requiring that, but I think better judgment and
12   discretion would be to tell in this case Lynn Sarko.
13   **THE SPECIAL MASTER:** The e-mails reflect
14   you've heard -- you've seen one of 'em; there's a
15   couple of others at least.  The e-mails reflect that
16   there was a decision made not to disclose this
17   information to ERISA counsel.
18   **MR. HEIMANN:** Well --
19   **THE WITNESS:** That's not correct.
20   **MR. WOLOSZ:** Objection.
21   **THE WITNESS:** That's not correct.  Could
22   I answer?
23   **MR. HEIMANN:** You go ahead.
24   **THE WITNESS:** What I read and what I

Page 83

1    responded to with respect to the question was that
2    it was suggested by the writer of the e-mail,
3    Garrett Bradley, that ERISA counsel not be advised
4    and the inference was because -- as I read it -- the
5    math.  They weren't impacted so they need not be
6    advised.
7    This was not some conspiracy to withhold
8    from ERISA counsel the fact we didn't even know
9    about -- about Chargois.  We didn't know anything
10   about him.  At least I didn't.  And I don't think
11   anyone else did.  Lynn, Brian, Carl -- they didn't
12   know either I'm sure.
13   **THE SPECIAL MASTER:** They didn't.
14   That's the point.
15   **THE WITNESS:** I believe they didn't
16   know.
17   **THE SPECIAL MASTER:** That's the point.
18   **THE WITNESS:** And they were not told.
19   **THE SPECIAL MASTER:** And they were not
20   told.
21   **THE WITNESS:** Right.
22   **THE SPECIAL MASTER:** You may have a
23   different take on the e-mails that we've seen, but
24   it looks like that there was a decision made not to

Page 84

1    tell them.
2    **MR. WOLOSZ:** Objection.
3    **THE WITNESS:** I haven't seen that.  I
4    have not seen that in the e-mails.  The one e-mail
5    that you've shown me does not convince me that that
6    was a decision that was made.
7    **THE SPECIAL MASTER:** Do you think it was
8    an accident that they weren't told?
9    **THE WITNESS:** An accident?  I think
10   nobody even bothered to think that they should be
11   told.
12   (Pause.)
13   **THE WITNESS:** I mean if I can finish the
14   answer.
15   **THE SPECIAL MASTER:** Yes, please.
16   **THE WITNESS:** I wasn't told.  So why
17   should they --
18   **THE SPECIAL MASTER:** Well, you were told
19   of the split?
20   **THE WITNESS:** I was told of the split,
21   but I wasn't told about this material that you gave
22   me today.
23   **THE SPECIAL MASTER:** The ERISA counsel
24   weren't even told that Chargois was going to get

Page 85

1    anything.
2    **THE WITNESS:** I don't know what they
3    were told.  I only know what you read from --
4    **THE SPECIAL MASTER:** They testified
5    uniformly they were not told.  And, in fairness,
6    we've got some other documents that I want you to
7    look at --
8    **THE WITNESS:** Okay.
9    **THE SPECIAL MASTER:** -- that you may not
10   have seen.
11   Richard, do you have the e-mails with
12   Eric Belfi, David Goldsmith, Larry Sucharow, Garrett
13   Bradley and Chris Keller and then a November 22,
14   2016 e-mail, David Goldsmith responding to Larry
15   Sucharow, and Larry Sucharow's e-mail November 22,
16   2016 to Goldsmith, Garrett Bradley, Chris Keller and
17   Eric Belfi?  It's TLF-SST-021779.
18   **MR. HEIMANN:** No, I don't have it.
19   **THE SPECIAL MASTER:** We've referred to
20   it many times.
21   **MR. HEIMANN:** Right, I know you have,
22   but I just don't have it with me.  What I have is
23   stuff we produced, and we didn't produce that
24   apparently.

Page 86

1 THE SPECIAL MASTER: Okay. Let me read
2 it to you in fairness.
3 MR. HEIMANN: Give us the --
4 THE SPECIAL MASTER: -- the Bates stamp?
5 MR. HEIMANN: No, no. The author and
6 recipients, if you would, please.
7 THE WITNESS: And the date.
8 THE SPECIAL MASTER: And the date, yeah.
9 There's a long chain. You probably have it with
10 Eric Belfi at the top. Tuesday, November 22, 2016.
11 MR. HEIMANN: Unless it's one of the
12 ones you all gave us before we just began --
13 THE SPECIAL MASTER: No.
14 MR. HEIMANN: -- I don't have it.
15 Sorry.
16 THE SPECIAL MASTER: All right. It
17 actually goes back to a series of e-mails in which
18 Lynn Sarko --
19 MR. HEIMANN: Wait a minute. I got it.
20 THE SPECIAL MASTER: You got it? Do you
21 have the whole --
22 MR. HEIMANN: Well, the ones I have are
23 Bates stamped 72 through 74. Three pages.
24 THE SPECIAL MASTER: No. The Bates

Page 87

1 stamp would be 279 through 282.
2 MR. HEIMANN: I just have a different
3 version then. But it ends with the e-mail from
4 Larry Sucharow to Goldsmith, Bradley, Keller, Belfi,
5 those folks.
6 MR. SINNOTT: Close enough.
7 THE SPECIAL MASTER: You probably have
8 that. Then there's a chain before that in which
9 Lynn Sarko had been copied on the chain and had been
10 -- they had -- the e-mails before that are
11 discussing fees and --
12 MR. HEIMANN: Yep, it's here.
13 THE SPECIAL MASTER: Okay.
14 MR. HEIMANN: At least one of them.
15 THE SPECIAL MASTER: Then the only one I
16 think you don't have is the last one, the Belfi one.
17 You probably have that though, too.
18 MR. HEIMANN: He just agrees.
19 THE SPECIAL MASTER: Yes. He needs to
20 speak to him first.
21 But, at any rate, this is about what has
22 been referred to as a claw-back letter. This is
23 after the -- this is after the inadvertent double
24 billing was discovered, and Dave Goldsmith wrote a

Page 88

1 letter to the Court.
2 And the parties are discussing that if
3 there is a reduction of fees, everybody should
4 participate in that reduction basically evenly.
5 So the discussion is the correspondence
6 about this and the letters and how they should go.
7 On Tuesday, November 22, 2016 at 12:01
8 Larry Sucharow writes to David Goldsmith, Garrett
9 Bradley, Chris Keller and Eric Belfi. "Need two
10 letters with breakdown. The ERISA just gets sent to
11 ERISA counsel with 10 percent off the top and then
12 one third each. Class co-counsel gets one with
13 ERISA..." -- class co-counsel meaning the customer
14 class -- "...gets one with ERISA 10 percent off the
15 top, Damon's percentage also off the top, then each
16 of class counsel split with percentages agreed to.
17 In short, no reason for ERISA to see
18 Damon's split. They only need to see their 10
19 percent and then split three ways."
20 MR. HEIMANN: Is there a question?
21 THE SPECIAL MASTER: Yeah.
22 THE WITNESS: What's the question?
23 THE SPECIAL MASTER: Does that change
24 your view as to whether there was a decision made

Page 89

1 not to disclose the Chargois payment and the
2 Chargois relationship to ERISA counsel?
3 MR. WOLOSZ: Objection.
4 THE WITNESS: It looks like a decision --
5 was made by the Labaton people. And -- well,
6 Garrett Bradley is a Labaton person, too, even
7 though he's a Thornton person as well. He's of
8 counsel to Labaton.
9 THE SPECIAL MASTER: So your point is
10 you believe you and nobody at Lieff agreed to not
11 tell the ERISA counsel about the Chargois payment?
12 THE WITNESS: Well, first of all, you're
13 referencing these e-mails. We're not in the
14 e-mails.
15 THE SPECIAL MASTER: I understand that.
16 THE WITNESS: Okay, okay. Aside from
17 that and aside from receiving an e-mail from Garrett
18 Bradley -- I don't know the number, but we looked at
19 it earlier where he says no reason to advise those
20 people because it comes off the top -- that's all we
21 know about it.
22 No, I don't think we're in agreement to
23 do any of this; that is to say, not notify these
24 people.

Page 90

1  I know that's what you're thinking, but
2  I don't agree with you.
3      THE SPECIAL MASTER: No, no, I'm asking
4  you.
5      THE WITNESS: No.  My answer's no.  I
6  don't even know if I ever discussed any of this with
7  Lynn 'cause Lynn and I would talk all the time.  I'm
8  not suggesting I did, but it's possible.  I don't
9  think I would have discussed it with Brian or Carl.
10     But if Lynn were to say I discussed it
11 with him, I'd say I probably did.  I don't remember.
12     THE SPECIAL MASTER: Actually, he said
13 the first he heard about anything with Damon
14 Chargois, a payment to Damon -- his testimony was
15 the first he heard about it was during this
16 investigation.
17     THE WITNESS: Well, then he has a good
18 memory.  He's right.  I don't know.
19     THE SPECIAL MASTER: That's the first he
20 heard about it.
21     THE WITNESS: Yeah.  It's the first I
22 heard of it.
23     THE SPECIAL MASTER: So -- well, you
24 knew that there was going to be a payment --

Page 91

1      THE WITNESS: I knew there was going to
2  be a 5.5 percent payment, yes.
3      THE SPECIAL MASTER: So that I
4  understand your testimony, what you didn't know was
5  the background of the relationship between the
6  Labaton firm and Mr. Chargois?
7      THE WITNESS: Exactly right.
8      MR. HEIMANN: Well, to put it
9  differently, maybe it's not my turn -- that's what
10 he didn't know.  What he did know is what he's
11 already testified --
12     THE WITNESS: I think he said that's
13 what I knew --
14     MR. HEIMANN: No, he doesn't --
15     THE WITNESS: Oh, then maybe you better
16 say that again.  I thought you said that's what I
17 did not know.
18     THE SPECIAL MASTER: You knew that there
19 was going to be a payment to Mr. Chargois?
20     THE WITNESS: Yes.
21     THE SPECIAL MASTER: Okay.  What you did
22 not know was the background of the relationship
23 between Mr. Chargois and the Labaton firm?
24     THE WITNESS: That's correct, I did not

Page 92

1  know that.
2      THE SPECIAL MASTER: And, further, you
3  did not know how that relationship evolved?
4      THE WITNESS: Did not know that, no.
5      THE SPECIAL MASTER: And how it may have
6  informed the agreement to have all three firms share
7  in the payment --
8      MR. WOLOSZ: Objection.
9      THE SPECIAL MASTER: -- to Mr. Chargois?
10     THE WITNESS: I don't know any effect
11 that that history may have had 'cause I didn't know
12 the history.
13     THE SPECIAL MASTER: But your firm did
14 agree to share in the payment to Mr. Chargois?
15     THE WITNESS: Yes.  But we didn't know
16 the history.
17     THE SPECIAL MASTER: Okay, I understand
18 that.  But what was the basis of your firm's
19 agreement to share in the payment then?
20     THE WITNESS: Lead counsel said to the
21 other two class firms that we have a local counsel
22 in Arkansas helping us in Arkansas -- later saying I
23 think they were doing a good job or something -- and
24 that we have to compensate them for what they've

Page 93

1  done.
2      THE SPECIAL MASTER: And based on
3  that --
4      THE WITNESS: -- I agreed.
5      THE SPECIAL MASTER: -- you agreed.
6      THE WITNESS: Very common to do this,
7  yeah.
8      THE SPECIAL MASTER: And that was all
9  you knew about this local counsel at the time?
10     THE WITNESS: That was all I knew about
11 the local counsel.  I testified I didn't even know
12 his name, although it's apparently in the e-mail,
13 but I didn't remember his name.
14     THE SPECIAL MASTER: Did 5.5 percent
15 seem to be a large number for a local counsel of 75
16 million dollars?
17     THE WITNESS: I'd have to look up, for
18 example, what our local counsel in the Bank of New
19 York case got, what percentage.  I don't remember.
20 But it doesn't seem on the face of it to be unusual.
21     I think perhaps our local counsel got
22 something similar to that, but I'd have to look it
23 up.
24     THE SPECIAL MASTER: Would it depend on

Page 94

1 how much work the local counsel did?
2    THE WITNESS: Well --
3    THE SPECIAL MASTER: Among other
4 factors.
5    THE WITNESS: Yes.  In the Bank of New
6 York case it was easy because we had their time
7 records.  And we were lead counsel.  When I'm lead
8 counsel, I look at this differently than when I'm
9 not lead counsel.
10    THE SPECIAL MASTER: Had you been lead
11 counsel here in this case and Labaton had been in
12 the position that your firm was in, would you have
13 proposed a sharing arrangement?
14    MR. WOLOSZ: Objection.
15    THE WITNESS: With Chargois?
16    THE SPECIAL MASTER: With the other two
17 firms.
18    Would you have proposed a sharing
19 arrangement of a obligation to this sort of -- to
20 Mr. Chargois on this case?
21    MR. WOLOSZ: Objection.
22    THE WITNESS: No, because of what I know
23 now, but why don't you ask me would I have proposed
24 a sharing arrangement to legitimate local counsel

Page 95

1 that we would have had in the case, okay?
2    THE SPECIAL MASTER: You can answer that
3 question.
4    THE WITNESS: And then -- it's my
5 question and my answer.
6    And then I would say, yes, because that
7 local counsel would have given us his time records.
8 I would have known what he had done.  I would have
9 given him the assignments.  Yes.
10    And in a sense it's taken off the top --
11 it's a funny way to put it, but everybody's taken
12 off the top.  You begin with one hundred percent,
13 and then all the components add up to one hundred
14 percent.  So everybody's off the top.
15    THE SPECIAL MASTER: Had you been fully
16 informed of the nature of the fee arrangement or the
17 payments I should say to Mr. Chargois, would you
18 have agreed to share in the Labaton obligation?
19    MR. WOLOSZ: Objection.
20    THE WITNESS: Informed as you informed
21 me today?
22    THE SPECIAL MASTER: Yes.
23    THE WITNESS: No.
24    THE SPECIAL MASTER: What would you have

Page 96

1 done?
2    THE WITNESS: I would have attempted to
3 sit down with the Labaton people starting with Larry
4 Sucharow, and I would have said, Larry, I think
5 you've got a problem here.  I just found out -- if
6 this is what happened -- that this guy in Arkansas
7 is not your local counsel.
8    This guy is somebody with whom you
9 people have had a long-term relationship and
10 apparently, from what I just found out, at least
11 maybe in ten cases have participated sharing fees
12 with him.  I think that's a problem.
13    And I think we have to do something
14 about it.  That's if I had found this out -- if you
15 had told me this.
16    THE SPECIAL MASTER: Would you have
17 suggested, among other things, that it be disclosed
18 to the Court as part of a fee petition?
19    MR. WOLOSZ: Objection.
20    THE WITNESS: I would -- first of all, I
21 would have said let's get rid of this guy; he's not
22 getting anything.  I would have cut him out in which
23 case I would not have to go to the Court.  I mean
24 he's gone.  If he's gone, he's gone.

Page 97

1    And then even then there's a question of
2 whether somebody should have gone to the Court.  At
3 some time.  Even after the case.  It doesn't matter.
4    I would have gotten him out because
5 after all we were all paying -- I mean we? -- Lieff
6 Cabraser was paying approximately 20 percent of that
7 and so forth.
8    Labaton for 40 --
9    THE SPECIAL MASTER: Yeah.
10    THE WITNESS: -- whatever it is.  The
11 percentages were what the percentages were.
12    THE SPECIAL MASTER: Yeah.
13    THE WITNESS: No, I would not have paid,
14 and I think it would have been appropriate to
15 convince Larry or his firm to go to the Court and
16 tell the Court what they have here.
17    THE SPECIAL MASTER: Anything else?
18    MR. SINNOTT: Just a couple of docs.
19    BY MR. SINNOTT:
20 Q.  Richard, this is May 23, 2011 e-mail from
21 Keller to Garrett, and it's got a letter attached --
22 or at least a draft letter attached.  And the Bates
23 stamp is TLF-SST---
24    MR. HEIMANN: Got it --

Page 98

1    MR. SINNOTT: 033910 through 913.  Do
2  you have two copies?
3    MR. HEIMANN: No, I just have the one
4  copy you gave me.  Thank you.
5    BY MR. SINNOTT:
6  Q.  What I'm interested in in here, Bob, is the
7  letter more than the e-mail from Keller to Bradley.
8    Just take a look at that May 4, 2011
9  unsigned letter.  It appears to be addressed to
10  Richard and Lexi --
11  **A.  Right.**
12  Q.  At the firm.  Let me know if you've seen it
13  before.
14  **A.  This unsigned letter I do not believe I saw**
15  **it either in an unsigned or signed form.  It's not**
16  **addressed to me either.**
17  Q.  Right.  It's your able counsel.  And who's
18  Lexi?
19  **A.  She's a young woman lawyer now partner at**
20  **Lieff Cabraser.**
21  Q.  But --
22  **A.  I don't know how they got this combination,**
23  **frankly.**
24  Q.  Well, it looks like Labaton put it together.

Page 99

1  **A.  Yeah.**
2  Q.  And albeit an unsigned letter, there is a
3  statement there is a, quote/unquote, off the top
4  obligation to referring counsel of 6 percent of the
5  fees awarded.  In addition, we agree to exchange on
6  a quarterly basis our then-current lodestar report
7  showing quarterly aggregate billings in this matter.
8    Can I assume that that didn't happen?
9  **A.  You could assume that if I had seen this, I**
10  **would say, hold it, there's no such thing as a**
11  **referring counsel.**
12  Q.  Right.
13  **A.  It doesn't happen in class actions.**
14    MR. SINNOTT: Richard, I have an e-mail
15  from Garrett Bradley to Michael Thornton, and Larry
16  and Bob, Dan Chiplock, Christopher Keller and Eric
17  Belfi dated July 8, 2016 at 7:06 p.m.
18    This is LBS 040924.
19    MR. HEIMANN: Give me the date and time
20  again.
21    MR. SINNOTT: Sure.  It's 7/8/2016 at
22  7:06 p.m.
23    MR. HEIMANN: Got it.  Okay, got it.
24  Q.  And --

Page 100

1  A.  You don't have to read this one, sir.
2  Q.  Okay.
3    (Pause.)
4    BY MR. SINNOTT:
5  Q.  I don't know if we've questioned you on it,
6  Bob --
7  **A.  I believe you have.**
8  Q.  We have?
9  **A.  Especially the last sentence.**
10  Q.  Yeah, I --
11    THE SPECIAL MASTER: I don't think so.
12  It's a different one.
13  Q.  There was a variation of this.
14  **A.  Oh.**
15  Q.  The timing of this is different than the
16  other ones --
17  **A.  Okay.**
18  Q.  -- July 8th.
19    But you'd agree that Garrett is
20  informing the addressees again of Damon Chargois
21  who's willing to accept 5-and-a-half percent.
22    And then what I want to question you
23  about is the statement:  "He understands..." -- he
24  being Damon -- "...understands that ERISA counsel is

Page 101

1  now in the same pool of money.  He has agreed to
2  come down..." -- it says 'done' but think it's
3  'down' I'm assuming -- "...to this number with a
4  guarantee that it will be off the Court-awarded fee
5  number.  Please reply all if you agree.  Given that
6  it is off the total number, there is no need to add
7  the ERISA counsel to this e-mail chain."
8    So whether from today or from another
9  occasion, this is familiar to you, correct?
10  **A.  Yes.  I believe you asked me some questions**
11  **about it already but go ahead.**
12  Q.  You may be right, but I thought it was a
13  different -- a variation.
14    THE SPECIAL MASTER: The time is
15  different on it.
16    MR. HEIMANN: But the text is identical
17  to the one you showed us earlier, and you questioned
18  him about.
19    THE WITNESS: Right.
20    MR. SINNOTT: Maybe that was included in
21  another message.
22    BY MR. SINNOTT:
23  Q.  Let me just then ask the obvious question.
24    Do you remember hearing in July of 2016

Page 102

1  about Damon and his deal of 5-and-a-half percent?
2  A.  Excuse me.  This appears to be -- it's the
3  same e-mail.  Okay.  It's already been asked and
4  answered.  You want to answer it again --
5  Q.  Bear with me today.  I'm kind of slow today.
6  A.  Okay.
7  Q.  You recall his deal of 5-and-a-half percent,
8  and the statement "he understands that's ERISA
9  counsel is now in the same pool of money," what does
10  that mean?
11  A.  I believe it's his somewhat inartful way of
12  saying both the 5.5 and what turned out to be 10 --
13  it was 9 but it became 10 -- those two are coming
14  out of the same pool of money meaning one hundred
15  percent minus 10 and then one hundred percent minus
16  5.5.  That's what I believe he's saying.
17  Q.  Okay.
18  A.  As best as he can.
19  Q.  Finally, Bob, that last sentence.
20      "Given that it is off the total number,
21  there is no need to add the ERISA counsel to this
22  e-mail chain."  Why not?
23  A.  Only because again of the math implications;
24  that is to say, there's no reason to tell each other

Page 103

1  recipient that that recipient is getting some
2  percentage of one hundred percent.  That's what he's
3  saying.
4      Now you might think there's some
5  conspiracy here, but, no, to me this is very simple
6  -- or maybe I missed what he's doing.  I don't know.
7  That's what I thought he meant.
8  Q.  We have multiple e-mails, the claw-back
9  e-mail, this one and another one where it appears
10  that there's a conscious effort to keep ERISA from
11  learning about Damon Chargois.
12      And my question is what's the big deal?
13  These are co-counsel.  These are folks that have
14  their own clients and stake in the game.  Why the
15  secrecy?
16      MR. WOLOSZ:  Objection to the question.
17  A.  I can't imagine -- I can't imagine what the
18  secrecy is.  Frankly, the only explanation I've been
19  able to come up with each time I've been asked is he
20  thinks it's a mathematical exercise.
21      If Bradley did not want ERISA counsel to
22  know about this, I wish he had said it a little more
23  clearly.  This was not a good way to communicate
24  that.

Page 104

1      And I had no reason whatsoever not to
2  share this with ERISA counsel, and I believe, as I
3  testified, I may have done so.  Not in writing.  But
4  I may have done so.  If only with Lynn -- my good
5  friend, Lynn Sarko, with whom I speak all the time.
6      And if I had to question myself about
7  whether I ever shared any knowledge about this weird
8  situation as it evolved with respect to this guy at
9  Arkansas, I would have spoken to Lynn.  But he says
10  no, and I believe that's his present recollection
11  that I never said anything about it.
12      I cannot say I did.
13      MR. SINNOTT:  Anything else?
14      THE SPECIAL MASTER:  No.
15      MR. SINNOTT:  Richard, anything?
16      MR. HEIMANN:  A few questions.
17      CROSS-EXAMINATION
18  BY MR. HEIMANN:
19
20  Q.  I hope I can do this without documents.
21      Towards the end of this litigation were
22  there negotiations among the class -- the three
23  class counsel, for want of a better term, about how
24  to allocate the attorneys' fee among those three

Page 105

1  firms?
2  A.  Yes.
3  Q.  And were there writings exchanged in the
4  form of e-mails, among others, that reflected
5  negotiations and those discussions?
6  A.  Yes.
7  Q.  And when there was a final agreement with
8  respect to that allocation, were there writings
9  circulated amongst the counsel about that
10  allocation?
11  A.  Yes.
12  Q.  Was any of that shared with ERISA counsel?
13  A.  I believe it all was but --
14  Q.  Listen to me.
15      Was any of those -- the discussions --
16  shared with ERISA counsel?
17  A.  The discussions or the result?
18  Q.  No.  Let's talk about discussions first.
19  A.  Okay.  Discussions?  Probably not.
20  Q.  All right.
21  A.  I don't remember.  They did see the result
22  I'm sure.
23  Q.  How -- why do you say that?
24  A.  If they didn't see it, I certainly spoke

Page 106

1  **about it.**
2  Q.  Spoke about it with whom?
3  **A.  Lynn, if anyone.**
4  Q.  All right.
5  **A.  Yeah.**
6  Q.  And explain to me what you mean by that.
7     Did you talk with him about how -- what
8  percentages of the fees the various three class
9  counsel were going to share meaning each one?
10  **A.  I don't know if I mentioned numbers, but it**
11  **was always clear to me that we better work hard to**
12  **hang on to the 20 percent that we were agreed to**
13  **have from the beginning 'cause I was always**
14  **concerned whether we would have that chipped away**
15  **at.**
16     **And as it turned out, we got our -- I**
17  **think it's 20.4 percent of the total fee, Lieff**
18  **Cabraser got.**
19  Q.  All right.
20     **MR. HEIMANN:** That's all I have.
21     **THE WITNESS:** Thank you.
22     **MR. SINNOTT:** Mike, Justin?
23     **MR. WOLOSZ:** Could we just have one
24  moment?

Page 107

1     **MR. SINNOTT:** Sure.
2     **MR. WOLOSZ:** Just a few questions.
3     **CROSS-EXAMINATION**
4     **BY MR. WOLOSZ:**
5
6  Q.  Sir, does Lieff Cabraser pay referral fees
7  in any circumstances?
8  **A.  Yes.**
9  Q.  And does it ever pay them in class cases
10  such as antitrust cases?
11  **A.  Not to my knowledge.**
12  Q.  Does Lieff Cabraser have local counsel
13  arrangements with client-handling firms?
14  **A.  Yes.**
15  Q.  And is the existence of such an arrangement
16  disclosed to the Court in all class cases?
17  **A.  I believe so in the fee application.**
18     **MR. WOLOSZ:** That's all I have.
19     **THE SPECIAL MASTER:** May I follow up?
20  Actually following up both Richard's question and
21  Justin's question.
22     Richard asked you if the negotiations on
23  the payments between the three firms was made known
24  to ERISA.  All three of the firms did substantive

Page 108

1  work on the case, right?
2     **THE WITNESS:** Yes.
3     **THE SPECIAL MASTER:** Right.
4     **THE WITNESS:** The three firms that were
5  customer --
6     **THE SPECIAL MASTER:** Thornton --
7     **THE WITNESS:** Yes.
8     **THE SPECIAL MASTER:** Thornton Lieff?
9     **THE WITNESS:** Yeah.
10     **THE SPECIAL MASTER:** Mr. Chargois did no
11  work on the case --
12     **THE WITNESS:** So I understand.
13     **THE SPECIAL MASTER:** -- and yet got 5.5
14  percent.
15     **THE WITNESS:** That's -- I understand
16  that's right.
17     **THE SPECIAL MASTER:** In your mind is
18  that a distinction about why it should have been
19  told to the ERISA lawyers?
20     **THE WITNESS:** That he got 5.5 rather
21  than .5 or 55.5 or --
22     **THE SPECIAL MASTER:** 5.5 percent for
23  doing no work.
24     **THE WITNESS:** If we all knew that,

Page 109

1  perhaps.  But we didn't know that -- you're kind of
2  telling me now, and I've been hearing in the last
3  few weeks.
4     Because I -- and I believe my firm --
5  never saw the fee application breakdown meaning who
6  did what, the hours and so forth, for the other two
7  principle firms.
8     **THE SPECIAL MASTER:** Hm hm.
9     **THE WITNESS:** I certainly never saw any
10  of that.  So whether Mr. Chargois' name was on there
11  or not, I haven't the slightest idea.
12     Now I've seen it, but I had not seen --
13  that was not shared with us for whatever reason.
14     **THE SPECIAL MASTER:** Okay.
15     **MR. SINNOTT:** Okay.  On the phone, Brian
16  Kelly, any questions?
17     (No response.)
18     **MR. SINNOTT:** Brian McTigue, any
19  questions?
20     (No response.)
21     **MR. McTIGUE:** I have a question.  It has
22  to do with a piece of an e-mail.  The e-mail
23  referring to a call with Goldstein of DOL.  I think
24  I've heard that correctly.

Page 110

1  The "time to go over his head" was a
2  phrase I believe used in that e-mail.  Is that an
3  e-mail dated August 6, 2016?
4     **MR. SINNOTT:** It sounds about right, but
5  give me a second, Brian --
6     **MR. McTIGUE:** I will.
7     **MR. SINNOTT:** -- and I'll track it down.
8     (Pause.)
9     **MR. SINNOTT:** I believe so, but hang on.
10  I've got another one on August 6th that --
11     **THE SPECIAL MASTER:** 2015.  Is that the
12  one?
13     **MR. WOLOSZ:** Yeah, I think it's 2015.
14     **MR. SINNOTT:** Yes.  August 6, 2015.
15     **THE SPECIAL MASTER:** 2:43 p.m.
16     **MR. SINNOTT:** 2:43 p.m.
17     **MR. McTIGUE:** Okay.  That's the one --
18  that's an e-mail referring to a call with Goldstein?
19     **THE SPECIAL MASTER:** Nate Goldstein.
20     **MR. SINNOTT:** Yes.  In response to a
21  call with Goldstein -- a conversation with Lynn
22  Sarko.
23     **THE SPECIAL MASTER:** That Lynn -- Lynn
24  Sarko describes that conversation in an e-mail of

Page 111

1  August 6, 2015 at 3:17 p.m.
2     **MR. SINNOTT:** And that same --
3     **MR. McTIGUE:** Where does the phrase --
4  go ahead.
5     **MR. SINNOTT:** That same e-mail, Brian,
6  resulted in another response from Garrett at 2:30
7  p.m. where he said I think it's about time for ERISA
8  counsel to -- to get down to work or words to that
9  effect and with the government regulators.
10     **THE SPECIAL MASTER:** In answer to your
11  question, Brian, the e-mail from Garrett Bradley to
12  Lynn, Thursday, August 6, 2015, 2:43 p.m., in that
13  e-mail Garrett Bradley says, "Nate should be
14  concerned about objections to the fact that ERISA is
15  being allocated far too much here.  He is
16  overreaching, and every time he moves the goal post
17  we say okay.  It is time to go over his head and let
18  his superiors know he is overreaching.  What did DOL
19  say about fees in Mellon?  Anyone disagree because
20  I'm happy to call DOL in D.C. myself."  Signed
21  Garrett.
22     I think that's the e-mail you're
23  referring to.
24     **MR. McTIGUE:** That's the e-mail I was

Page 112

1  asking about.  In that e-mail the phrase is "time to
2  go over his head."
3     **THE SPECIAL MASTER:** Yes.  Do you have a
4  question?
5     **MR. McTIGUE:** I do.  To Bob Lieff.
6     **CROSS-EXAMINATION**
7     **BY MR. McTIGUE:**
8
9  Q.  Bob, are you aware of any efforts to go over
10  this person mentioned here -- I think his name is
11  Goldstein of DOL -- to go over his head?
12  **A.  No, I am not.**
13     **MR. McTIGUE:** Thank you.  I'm finished.
14     **MR. SINNOTT:** All right, thanks, Brian.
15  Lynn?
16     **MR. SARKO:** No questions.
17     **MR. SINNOTT:** Emily?
18     **MS. HARLAN:** No questions.
19     **MR. SINNOTT:** All right.  Is Brian Kelly
20  on there?
21     (No response.)
22     **MS. HYLENSKI:** I believe he is.
23     **MR. SINNOTT:** Brian, any questions?
24     (No response.)

Page 113

1     **MR. SINNOTT:** Okay.  Any other counsel
2  on the line that has a question?
3     (No response.)
4     **MR. SINNOTT:** All right.  Seeing none,
5  this is concluded.  Thank you, Bob.  It was a
6  pleasure reading to you.
7     **THE WITNESS:** You did a great job.
8     **THE SPECIAL MASTER:** Thank you, Bob.
9     (Whereupon the proceedings
10     adjourned at 2:57 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 114

```
 1                    CERTIFICATE
 2   COMMONWEALTH OF MASSACHUSETTS)
 3   SUFFOLK, SS.                 )
 4
 5       I, Paulette M. Cook, Registered Merit Reporter
 6   and Notary Public in and for the Commonwealth of
 7   Massachusetts, do hereby certify that ROBERT L.
 8   LIEFF, the witness whose deposition is hereinbefore
 9   set forth, was duly sworn by me and that such
10   deposition is a true record of the testimony given
11   by the witness.
12       I further certify that I am neither related to
13   or employed by any of the parties in or counsel to
14   this action, nor am I financially interested in the
15   outcome of this action.
16       In witness whereof, I have hereunto set my hand
17   and seal this 13th day of September, 2017.
18
19
20
21                              Notary Public
22
23   My commission expires:
24   February 5, 2021
```