# EX. 161

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br>          Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br>          Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br>          Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br>          Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br>          Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br>          Defendant. | No. 12-cv-11698 MLW |

**REBUTTAL RESPONSE BY LABATON SUCHAROW LLP**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ................................................................... 1

II.   SELECTED CONTESTED FACTS ........................................................... 5

      A.   Labaton Sucharow Did Not "Take Pains" To Hide The Chargois
           Agreement From George Hopkins .......................................................... 6

      B.   George Hopkins Ratified The Chargois Agreement On Behalf Of
           ARTRS ....................................................................................................... 8

      C.   The Court Did Not Ask For Information Regarding Fee Agreements
           At The Settlement Hearing, Nor Did It Even Imply That It Wanted
           Such Information ...................................................................................... 9

      D.   No Record Evidence Exists For The Finding That The ERISA Trading
           Volume Was 12-15% Of The Total Trading Volume ......................... 10

      E.   Information Regarding The Chargois Agreement Was Not Responsive
           To The Special Master's Discovery Requests Because The Special
           Master Withdrew The Only Document Request That Would Have
           Elicited Such Information ....................................................................... 11

III.  PROF. GILLERS' EXPERTISE DOES NOT EXTEND TO
      MASSACHUSETTS PRACTICE, TO FEDERAL RULES OF CIVIL
      PROCEDURE 23 AND 54, OR TO STATUTORY CONSTRUCTION ......................... 11

IV.   THE CHARGOIS AGREEMENT COMPLIED WITH THE
      MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT AND HAS
      NOW, IN ANY EVENT, BEEN RATIFIED BY ARTRS ............................... 14

      A.   Labaton Sucharow Complied With Rule 1.5(e) .................................. 14

      B.   If Labaton Sucharow Did Not Comply With Saggese, Its Non-
           Compliance Was Minimal And Has Now Been Cured ....................... 17

      C.   MRPC 1.5(e), Not 7.2(b), Applies To Labaton Sucharow's Division
           Of Fee ...................................................................................................... 18

      D.   MRPC 1.5(a) Does Not Apply To The Division Of Fee With Chargois .............. 21

V.    LABATON SUCHAROW WAS NOT REQUIRED TO DISCLOSE THE
      CHARGOIS AGREEMENT TO THE COURT .............................................. 23

      A.   The Federal Rules Of Civil Procedure Control And Do Not Require
           Disclosure ............................................................................................... 24

B.    Prof. Gillers' Legal Authorities Do Not Support His Position That Disclosure Is Required to the Court ................................................... 26

C.    MRPC 3.3(d) Does Not Apply ............................................................ 28

VI.   DISCLOSURE TO THE CLASS WAS NOT REQUIRED. ........................................... 29

A.    The Federal Rules Of Civil Procedure Do Not Require Disclosure To The Class ............................................................................................ 29

B.    The Court Has Endorsed The Notice Used By Labaton Sucharow ..................... 30

C.    The Rules Of Professional Conduct Do Not Require Disclosure To The Class ............................................................................................ 32

VII.  ADDITIONAL DISCLOSURES TO CUSTOMER CLASS CO-COUNSEL WERE NOT REQUIRED; AND, ANY FAILURE TO DISCLOSE DOES NOT CONSTITUTE A VIOLATION OF ANY RULE IN ANY EVENT ..................... 34

VIII. WHERE PERCEIVED TRANSGRESSIONS ARE OF ASPIRATIONAL OBJECTIVES RATHER THAN ACTUAL RULES, SANCTIONS AND DISCIPLINE ARE INAPPROPRIATE ................................................................ 36

A.    Discipline And Sanctions Cannot Properly Be Imposed For Failure To Disclose The Fee Sharing Agreement To The Court .......................................... 36

B.    Discipline And Sanctions Cannot Properly Be Imposed For Failure To Disclose The Fee Sharing Agreement To The Class ........................................... 39

C.    Discipline And Sanctions Cannot Properly Be Imposed For Failure To Disclose The Fee Sharing Agreement To Other Counsel .................................... 39

D.    Even If Labaton Sucharow In Some Fashion Failed To Meet The Technical Requirements Of Saggese Or Of Rule 1.5(e), Which It Did Not, Neither Sanctions Nor Discipline Would Be Warranted ............................. 40

E.    Although Labaton Sucharow Did Nothing Improper, It Would Consider Reasonable Remedies to Address Any Concerns Of The Court Regarding The Double Counting Matter .................................... 43

IX.   THESE PROCEEDINGS HAVE DEPRIVED LABATON SUCHAROW OF BASIC FAIRNESS AND DUE PROCESS ........................................................ 43

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# TABLE OF AUTHORITIES

**Cases**

*In re "Agent Orange" Prod. Liab. Litig.*,
597 F. Supp. 740 (E.D.N.Y. 1984) ....................................................27

*In re "Agent Orange" Prod. Liab. Litig.*,
818 F.2d 216 (2d Cir. 1987)...........................................................27

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998)........................................................................20

*Amnesty Int'l United States v. Clapper*,
638 F.3d 118 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 398 (2013).........13

*Arkansas Teacher Retirement System, et al. v. State Street, et al.*,
C.A. No. 11-10230, Docket No. 95-1, 95-3, and 95-5............................31

*Arkansas Teacher Retirement System v. Insulet Corp.*,
1:15-cv-12345 (D. Mass) (Wolf, J.), ECF No. 120 [Ex. 10] ........................ *passim*

*Bacchi v. Mass. Mut. Life Ins. Co.*,
No. 12-cv-11280, 2016 U.S. Dist. LEXIS 37772 (D. Mass. Mar. 23, 2016) ............5

*Bernstein v. Bernstein Litowitz Berger & Grossmann LLP* 814 F.3d 132, 137-38
(2d Cir. 2016)..........................................................................24, 25, 27, 29

*Daynard v. Ness, Motely, Loadholt, Richardson & Poole, P.A.*,
188 F. Supp. 2d 115 ......................................................................19

*In re Discipline of an Atty.*,
442 Mass. 660 (2004) ...............................................................36, 38, 39

*Evangelist v. Fid. Mgmt. & Research Co.*,
No. 81-536-Z, 82-912-Z, 1986 U.S. Dist. LEXIS 20993 (D. Mass. Aug. 29,
1986) ..............................................................................................2

*In re Fordham*,
423 Mass. 481 (1996) ......................................................................22

*Harden Mfg. v. Pfizer, Inc (In re Neurontin Mktg. & Sales Practices Litig.)*,
58 F. Supp. 3d 167, 172 (D. Mass. 2014) ...........................................2

*Hartless v. Clorox*,
273 F.R.D. 630 (S.D. Cal. 2007) .......................................................31

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Holstein v. Grossman*,
  246 Ill. App. 3d 719 (1993) ...............................................19

*KBC Asset Management NV, et al. v. Aegerion Pharmaceuticals, Inc., et al.*,
  C.A. No. 14-10105, Docket No. 145-1 ...............................................31

*In re Lupron Mktg. & Sales Practices Litig.*,
  No. 01-CV-10861-RGS, 2005 U.S. Dist. LEXIS 17456 (D. Mass. Aug. 17,
  2005) ...............................................2

*Nieves-Villanueva v. Soto-Rivera*,
  133 F.3d 92 (1st Cir. 1997) ...............................................5

*O'Connell v. Shalala*,
  79 F.3d 170 (1st Cir. 1996) ...............................................20

*Pierce v. Barnhart*
  440 F.3d 657, 660-61, 664-65 (5th Cir. 2006) ...............................................24

*Rand v. Monsanto Co.*,
  926 F.2d 596 (7th Cir. 1991) ...............................................33

*In re Ruffalo*,
  390 U.S. 544 (1968) ...............................................38

*In re Saab*,
  406 Mass. 315 (1989) ...............................................42

*Saggese v. Kelley*,
  445 Mass. 434 (2005) ............................................... *passim*

*United States v. Ven-Fuel, Inc.*,
  758 F.2d 741 (1st Cir. 1985) ...............................................22

**Other Authorities**

Board of Bar Overseers, *Massachusetts Legal Ethics: Substance and Practice*
  (2017) ...............................................3, 5, 12, 22

Christina Pazzanese, *Attorney Fee Rules Undergo Revisions in Massachusetts* ...............................................41

Fed. R. Civ. P. 23 ............................................... *passim*

Fed. R. Civ. P. 53(a)(3) ...............................................45

Fed. R. Civ. P. 54 ............................................... *passim*

H.P. Wilkins, *The New Massachusetts Rules of Professional Conduct: An
  Overview*, 82 Mass. L. Rev. 261, 261-262 (1997) ...............................................12, 22

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Ill. Sup. Ct. R. 2-107 .........................................................................................19

James S. Bolan, *Ethical Lawyering in Massachusetts* § 1.1 .......................................41

District of Massachusetts Local Rule 83.6.1 ...............................................41

Massachusetts Rule of Professional Conduct, Rule 1.5......................................... *passim*

Massachusetts Rule of Professional Conduct, Rule 3.3......................................... *passim*

Massachusetts Rule of Professional Conduct, Rule 7.2......................................... *passim*

Model Rule of Professional Conduct 1.5 .........................................................3

*Moore's Federal Practice - Civil*............................................................25, 26, 33, 36

Pazzanese, *Attorney Fee Rules Undergo Revisions in Massachusetts* .........................................41

Mass S.J.C. Rule 3:07 .........................................................................40, 41

Mass S.J.C. Rule 4:01 .........................................................................40

Stephen Gillers, *Regulation of Lawyers: Problems of Law and Ethics* (9th Ed. 2012)...............................................................................12

William B. Rubenstein, *Newberg on Class Actions* (5th ed. 2016)............................................25

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## I.     **PRELIMINARY STATEMENT**

After three million dollars[1] and more than a year, the long and arduous road of this investigation is nearing its end.  Having begun as a result of a self-reported double-counting error in the lodestar reports of the three customer class law firms, it has morphed into a challenge of the practice of paying referral fees, in Massachusetts where they are perfectly permissible.  Accusations of ethical misconduct – e.g., whether the existence of such fee splits must be disclosed to the Court and the class notwithstanding the express terms of Fed. R. Civ. P. 54(d)(2) and 23(h) and the absence of a court order or inquiry – have been asserted.  Threats of discipline and sanctions hang over prominent law firms, although they have "violated" nothing more than the aspirational views of those who wish to change that bar without effecting change in the rules that govern it.

This constitutes the final submission to the Special Master, and is specifically intended to respond to Prof. Stephen Gillers' Ethical Report for Special Master Gerald E. Rosen (the "Gillers Report"), including the statement of assumed facts provided to Prof. Gillers by the Special Master and constituting the Special Master's findings of fact.[2]  The submission incorporates the expert reports and testimony on behalf of customer class counsel submitted by Profs. Bruce Green, Peter Joy, Brad Wendel, William Rubenstein, ethics practitioner Hal Lieberman, and

---

[1]     That is the amount that the Court has ordered the customer class law firms to pay into the Court to defray the expenses of the Special Master and the lawyers and experts retained by him to make findings of fact and recommendations relating to the firms' fee petition to the Court in the captioned matter.  The first $2,000,000 payment has apparently been exhausted, although the customer class law firms have not seen any invoices or received an accounting.  It is unclear whether any of the final $1,000,000 will be returned to the firms upon the conclusion of this investigation.

[2]     These findings were reached before the Special Master had received the rebuttal reports of Profs. Green, Joy, Wendel, and Rubenstein, and Mr. Lieberman.  Labaton Sucharow will not have the opportunity to file an additional submission to the Special Master if the Gillers Report, including the Special Master's findings of fact, is changed.  To the extent that it becomes necessary or prudent, Labaton Sucharow reserves the right to submit the original Gillers Report, with the original findings of fact of the Special Master, to the Court.

experienced Massachusetts practitioner Camille Sarrouf.[3]  As to matters not expressly addressed

by Prof. Gillers, but nonetheless raised by the Special Master during his investigation – i.e., the

double counting investigation  –  Labaton Sucharow LLP ("Labaton Sucharow") incorporates its

November 3, 2017 Response by Labaton Sucharow LLP to Special Master's September 7, 2017

Request for Supplemental Submission (attached hereto as Ex. 1), and all prior submissions.

These proceedings are highly unusual and have been, at many junctures, a moving target

and difficult for Labaton Sucharow and its counsel to follow.  The proceedings arise in the

aftermath of a $300 million class action settlement, in which Labaton Sucharow's client and

named plaintiff Arkansas Teacher Retirement System ("ARTRS") has repeatedly expressed

unfettered satisfaction with its representation in a complex case against State Street Bank and

Trust Company (the "State Street litigation").  ARTRS has approved and ratified the 25% fee

awarded by the Court to all counsel, which fee – although already distributed – is now in limbo

as a result of a $4,000,000 double-counting error in the lodestar reports[4] of the three customer

class law firms.  The accusations against Labaton Sucharow have evolved and changed

frequently (and apparently are still changing). Yet, ARTRS' attorneys are being investigated for,

and apparently accused of, ethical violations entirely unrelated to the double-counting error, the

---

[3]      The cited expert reports and expert deposition excerpts are attached hereto as Exhibits A – Q, but
for clarity, they are referred to as "Rep." (report) and "Dep." (deposition transcript excerpt) throughout
this submission.  Other cited materials, such as documents or legal authority, are cited with a number
designation (e.g., "Ex. 1") and also attached hereto.

[4]      The lodestar reports were used as a cross-check for the Court's approval of a 25% contingent fee.
ECF No. 114.  The ratio moved from 1.8 to 2.0 after the adjustment for that error (ECF No. 116, Letter
from D. Goldsmith to the Court, November 10, 2016), and is still well within the acceptable range in this
Circuit.  *See, e.g.*, *Harden Mfg. v. Pfizer, Inc (In re Neurontin Mktg. & Sales Practices Litig.)*, 58 F. Supp.
3d 167, 172 (D. Mass. 2014) (describing a multiplier of 3.32 as standard in the Boston market), *citing* 4
Newberg on Class Actions § 14:7 (4th ed. 2002) ("Generally, multipliers from 1-3 are the norm.");
*Evangelist v. Fid. Mgmt. & Research Co.*, No. 81-536-Z, 82-912-Z, 1986 U.S. Dist. LEXIS 20993, at *5
(D. Mass. Aug. 29, 1986) ("a multiplier of 2.2 . . . [is] well within the bounds of applicable precedent");
*see also In re Lupron Mktg. & Sales Practices Litig.*, No. 01-CV-10861-RGS, 2005 U.S. Dist. LEXIS
17456, at *18 (D. Mass. Aug. 17, 2005).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

investigation of which appeared to have been largely concluded many months ago.   Even

accusations that are unsupported by the Gillers Report, e.g., an amorphous concept of a duty to

disclose fee agreements to other counsel, will apparently be addressed by the Special Master,

although that is not at all clear given the absence of expert testimony.

   The current investigation relates to customer class counsels' honoring of a Labaton

Sucharow contractual obligation to pay a referral fee[5] to the local Arkansas law firm that

facilitated the introduction to ARTRS.   This unrelated referral fee investigation was undertaken

by the Special Master at or near the end of the $2,000,000 double-counting investigation,[6] and

has presumably consumed all or most of the supplemental $1,000,000 that the Court ordered

Labaton Sucharow to fund.   See Special Master's September 7, 2017 Request for Supplemental

Submission [Ex. 2]; ECF No. 208.   Although the concern of the Special Master and his counsel

William Sinnott appears initially to have been tied to the mistaken belief that Massachusetts

follows the ABA Model Rule (the "Model Rule") regarding fee sharing,[7] the investigation

proceeded long after they understood that that was not the case.   At the latter juncture, the focus

shifted to an evolving series of Massachusetts Rules of Professional Conduct, none of which (as

argued below) is applicable to the facts of this proceeding.   As weaknesses in one theory were

---

[5]     Whether the fee is referred to as a "referral fee," a "forwarding fee," a contractual fee, or by any
other name is of no significance under the Massachusetts Rules of Professional Conduct ("MRPC").   *See*
MRPC 1.5(e); Green Dep. at 138:18-24.

[6]     Labaton Sucharow was required by the Court to fund the initial $2,000,000 (ECF No. 173 ¶¶ 13-
14), which amounted to a full 50% of the double-counting error, and the supplemental $1,000,000
requested by the Special Master to continue his investigation (ECF No. 208).   The obligation was shared
equally with the other two customer class law firms, Lieff Cabraser Heimann & Bernstein, LLP ("Lieff
Cabraser") and the Thornton Law Firm ("TLF").

[7]     The Model Rule requires that the attorney or firm receiving a referral fee either be paid
proportionally for work performed, or that s/he assume responsibility for the provision of appropriate
legal services.   ABA Model Rule Prof. Conduct 1.5(e)(1).   The Massachusetts analog rule, Rule 1.5(e) of
the Massachusetts Rules of Professional Conduct ("R. 1.5(e)")  is a "bare referral rule," requiring no
services or assumption of liability.   Board of Bar Overseers, *Massachusetts Legal Ethics: Substance and
Practice* at 185-86 (2017), *available at* https://bbopublic.blob.core.windows.net/web/f/BBO_Draft_Treatise.pdf.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

revealed by the facts or by the opposing experts, the Special Master's focus, with direction from

Prof. Gillers handing or emailing him questions and comments during the experts' depositions,

shifted from the anti-touting rule MRPC 7.2(b) ("Advertising") and MRPC 1.5(e) ("Fees"), to

1.5(a), then rather amorphously to MRPC 1.4(a) ("Communications") and 1.6(a)

("Confidentiality"), and tangentially to MRPC 7.3 ("Solicitation").[8]   Throughout, Prof. Gillers

pressed the application of MRPC 3.3 ("Candor Toward the Tribunal"), even though it does not

create an obligation independent of one derived from another source (Joy Rep. at 43), and in

passing MRPC 8.4(c) which prohibits a lawyer from engaging in "conduct involving dishonesty,

fraud, deceit or misrepresentation," as to which no evidence exists.   The constantly moving

target has presented, and continues to present, significant difficulties in Labaton Sucharow's

ability to defend itself.

    In sum, there was nothing unethical about the division of a fee between Labaton

Sucharow and Chargois & Herron (the "Chargois Agreement").   To the contrary, Labaton

Sucharow complied with the Massachusetts Rules of Professional Conduct, as confirmed by its

five expert witnesses and by Lieff Cabraser's expert Prof. William Rubenstein.   Prof. Gillers is a

lone outlier, propounding arguments regarding the fee sharing that are unprecedented,

---

[8]     The issue of violation of R. 7.3, entitled "Solicitation," arose in relation to Chargois' outreach, at the suggestion of Sen. Farris, to then-Executive Director of ARTRS Paul Doane to set up a meeting with ARTRS for his firm and Labaton Sucharow.   But, that outreach fell squarely within two of the exceptions to the non-solicitation rule, which is presumably why Prof. Gillers did not allude to that rule in his report. In the first place, MRPC 7.3(a)(4) permits a lawyer, in person or by live telephone or real-time electronic contact to solicit "a representative of an organization, including a non-profit or government entity, in connection with the activities of such organization." Paul Doane was a representative of an organization, specifically ARTRS, which is essentially a government organization, and the outreach was in connection with ARTRS's pension fund investment activities.   (This subsection suggests that the rule is intended to apply to solicitation of individuals, e.g., accident victims.)   Secondly, Paul Doane is a lawyer licensed to practice in Massachusetts (BBO No. 126440), and MRPC 7.3 (a)(1) expressly permits a lawyer to reach out to another lawyer "by in-person, live telephone or real-time electronic contact [to] solicit professional employment for a fee…"   Hence, even if Chargois were deemed to have  "solicited" Paul Doane as Executive Director of ARTRS, which he did not, such contact was expressly permitted by these two subsections of R. 7.3.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

unrealistic, incorrect, and not "believable." *See* Rubenstein Dep. at 73:7-19 ("I think it was made up after the fact to fit the facts of this case."). His conduct has been that of an advocate, and he has been described by Mr. Sinnott as a member of the Special Master's "team." *See, e.g.*, Wendel Dep. at 8:12-17; Green Dep. at 7:19-23. Prof. Gillers has, from Labaton Sucharow's perspective, created and/or imputed ethical duties to meet his apparent perceptions of the Special Master's objectives. In no sense has he served in the traditional role of an expert witness, nor, under the law, could he.[9]

## II.   <u>SELECTED CONTESTED FACTS</u>

Labaton Sucharow respectfully disagrees with the so-called "Factual Background" contained in the Gillers Report at p. 2-53, prepared by the Special Master or his attorney Mr. Sinnott under his direction. Labaton Sucharow submitted an extensive statement of facts in its November 3, 2017 submission [Ex. 1]. It incorporates those facts here, and will not retread the same ground. Nevertheless, Prof. Gillers' report contains several incorrect or misleading factual assertions, generally in the Background Facts section, prepared by the Special Master or his attorney, to which Labaton Sucharow is constrained to respond. Moreover, an important new fact has developed since the November submission, i.e., George Hopkins' written ratification on behalf of ARTRS of the Chargois Agreement. Labaton Sucharow addresses the most egregious, but not all, of the contested facts below.

---

[9]     Expert witnesses may opine on the facts, and in some instances on mixed questions of fact and law. *See, e.g.*, *Bacchi v. Mass. Mut. Life Ins. Co.*, No. 12-cv-11280, 2016 U.S. Dist. LEXIS 37772, at *11 (D. Mass. Mar. 23, 2016). Hence, Labaton Sucharow's original expert, Camille Sarrouf, opined with regard to standard practices among Massachusetts lawyers and judges in dealing with fee sharing, a factor considered by the Board of Bar Overseers when interpreting the Massachusetts Rules of Professional Conduct. *See* Board of Bar Overseers, *Massachusetts Legal Ethics: Substance and Practice* at 185 (2017) [Ex. 3]. However, expert witnesses may not opine on the law, *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997), which is precisely what Prof. Gillers has done. Labaton Sucharow expressed its objection to the Special Master, but was rebuffed, and was therefore compelled to submit its own rebuttal experts to prevent Prof. Gillers' testimony from standing unchallenged. In truth, the opinions of all of the academic experts should have been submitted in legal briefs, not as expert reports.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### A.    LABATON SUCHAROW DID NOT "TAKE PAINS" TO HIDE THE CHARGOIS AGREEMENT FROM GEORGE HOPKINS.

The Special Master or his counsel, who wrote the fifty-plus page "Factual Background" section of Prof. Gillers' Report, *see* Gillers Day 1 Dep. at 35:3-11, employs the inflammatory language that Labaton Sucharow "took pains at every turn not to reveal" Damon Chargois, Chargois & Herron, or the Chargois Agreement to Hopkins. Gillers Rep. at 38. Prof. Gillers relied significantly on these findings, reiterating in his arguments that Labaton Sucharow "took pains to ensure that George Hopkins, ARTRS's Executive Director, would not become aware of the Chargois Arrangement," *id*. at 60, and that "[Labaton Sucharow] acted to conceal the existence of the Chargois Arrangement from ARTRS." *Id.* at 61-62. The referenced finding – and its inflammatory language, which is particularly inappropriate under the circumstances – is wholly unsupported by the record.

#### 1.    *Client Instructions*

Apart from the fact that ARTRS as an institutional party was unquestionably aware of a relationship between Labaton Sucharow and Chargois & Herron (*see* subsection 2 below), the finding of concealment simply disregards the testimony of the only two parties with knowledge of whether there was any attempt to hide information from ARTRS, i.e., Mr. Hopkins and ARTRS' Labaton Sucharow relationship partner Eric Belfi. The finding in the Gillers Report focuses on the fact that Belfi "blind courtesy copied" and/or forwarded ARTRS information to Chargois & Herron separately from his communication with George Hopkins, the executive director of ARTRS as of late December 2009. But, both Belfi and Hopkins testified to an explanation of the blind copies far removed from concealment. After Hopkins joined ARTRS, Belfi raised the subject with Hopkins of "how fees worked." Belfi 2d Dep. at 23:17-23 [Ex. 4]. Hopkins responded that "he only wanted to deal with [Labaton Sucharow] and wasn't concerned

about how [Labaton Sucharow] would cut fees up if [they were] working with other firms." *Id*. In short, Hopkins was interested in the aggregate attorney fee amount – not the allocations of that aggregate fee among various firms. *Id.* at 23:24-24:5. Hopkins' testimony confirmed Belfi's understanding: "I told Eric if I ever want to know about your attorney fees and who all you hired, I'll ask you. And, you know, on any case because I intentionally didn't want to know a whole lot." Hopkins 2d Dep. at 68:23-69:3 [Ex. 5]. For the avoidance of any doubt, he continued, "I don't feel misled because I made it real clear to them I didn't want to be the gatekeeper on all this attorney relationship. And I think if they thought that I wanted to know, they would have told me because Eric always said if you ever want to see how we do all these fees, just let me know. And I said that's fine." *Id.* at 73:11-19; *see also id.* at 74:10-75:8. In sum, Hopkins "didn't want to be the gatekeeper" and didn't want to know the identity of the other lawyers sharing in the fee. Belfi could not face copy Chargois without violating that instruction. As Prof. Rubenstein testified, that is very consistent with the norm, to wit: class representatives are typically not involved in fee allocations, other than under the PSLRA. Rubenstein Dep. at 138:10-140:17. The explanation, provided by the two individuals with personal knowledge of the truth, is a far cry from actively concealing or taking pains at every turn to conceal the relationship.

2. *Institutional Knowledge of the Chargois & Herron Connection*

Prof. Gillers also improperly frames the knowledge of ARTRS (the client) only in terms of what Hopkins knew. *See, e.g.*, Gillers Rep. at 60-61. This conveniently ignores the institutional knowledge of ARTRS. It is undisputed that ARTRS was well-aware of Damon Chargois ("Chargois") and his firm Chargois & Herron. Chargois, with the assistance of his partner Tim Herron and through the offices of Herron's friend or acquaintance State Senator Steve Farris, Chargois Dep. at 33:16-37:10, facilitated the introduction between ARTRS and

Labaton Sucharow and was present at their initial meeting.  LBS040322; LBS017438 [Ex. 6].

Further, Chargois & Herron and Labaton Sucharow jointly responded to ARTRS' Request for

Qualifications for a monitoring counsel role and expressly stated that they intended to work

together.  LBS017743 [Ex. 7].  ARTRS answered through its Chief Counsel Christa Clark that,

while  the state system could not accommodate two unaffiliated firms as a single monitoring

panel member, Labaton Sucharow would be free to "affiliate that firm [Chargois & Herron] or

utilize them."  LBS017456 [Ex. 8].  Thereafter, Belfi spoke with Chief Counsel Clark, and

informed her that Labaton Sucharow *would* be working with Chargois & Herron and that

Chargois & Herron "were going to be involved in the relationship."  Belfi 2d Dep. 114:2-22,

117:20-118:10 [Ex. 4].  All of the foregoing facts are undisputed; yet, none is acknowledged or

accepted by the Special Master or Prof. Gillers in the Gillers Report.

### B.  GEORGE HOPKINS RATIFIED THE CHARGOIS AGREEMENT ON BEHALF OF ARTRS.

During his deposition testimony on September 5, 2017, George Hopkins expressed no

concerns with the Chargois Agreement.  *See*, *e.g.*, Hopkins 2d Dep. at 73:11-19 [Ex. 5].

Subsequently, on March 15, 2018, Hopkins submitted a Declaration that acknowledged the fee

division with Chargois, recited its details, and consented to and ratified the fee division on behalf

of ARTRS with respect to the State Street matter.  *See* Hopkins Decl. [Ex. 8].  Hopkins reiterated

that Belfi was following his instructions, and stated that he does not feel misled and has "no

problem" with the fact that details of the agreement were not conveyed to him sooner.  *Id.* at ¶¶

14-16.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**C.    THE COURT DID NOT ASK FOR INFORMATION REGARDING FEE
AGREEMENTS AT THE SETTLEMENT HEARING, NOR DID IT EVEN
IMPLY THAT IT WANTED SUCH INFORMATION.**

Prof. Gillers makes several misleading and (at best) misinformed statements regarding
the November 2, 2016 settlement hearing.  For example, he notes that, "[t]he Court itself
dispelled any uncertainty about what it expected.  Just before approving Lead Counsel's fee
request in full, the Court said:  'I'm relying heavily on the submissions and what's been said
today,'" Gillers Rep. at 67.  He also states that, "[e]arlier in the proceeding, the Court
specifically asked to be reminded 'of the terms of allocation' . . . Chargois was not mentioned."
*Id.* at 68.

When pressed at his deposition, Prof. Gillers acknowledged that the Court's general
statement that it was "relying heavily on the submissions" is of no significance, and certainly
does not indicate a request for information regarding fee agreements between counsel.  Gillers
Day 1 Dep. at 175:10-176:9.[10]  As to Prof. Gillers' statement regarding the "terms of allocation,"
the transcript plainly demonstrates that the Court was inquiring about the allocation of the
settlement among the class, not an allocation of fees among the lawyers.  Indeed, the Court, after
discussing the allocation of the settlement funds among the class, then turned to the new topic of
fees, stating:  "I'm persuaded that the plan of allocation is fair . . . So now with regard to requests
for attorneys' fees."  A discussion of the total amount of attorneys' fees – not the allocation
among law firms – then followed.  ECF 114 (Transcript of November 2, 2016 Hearing) at 20-38.
Prof. Gillers conceded that the Court "never asked about the allocation of fees among the
lawyers, and he never asked about fees to someone whose existence he did not know about."

---

[10]    *See also* Joy Dep. at 185:8-10 ("There's no obligation to disclose a fee-sharing agreement in
response to that."); Rubenstein Dep. at 194:21-22 ("What I don't think he meant is [a request] for fee
agreements.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Gillers Day 1 Dep. at 142:7-10. Prof. Gillers' willingness to rest his arguments upon obvious mischaracterizations of the Court's statements severely undermines his credibility. If the Court wishes to ask about fee agreements, it certainly knows how to do so. *See, e.g.*, Transcript of March 9, 2018 Hearing, *Arkansas Teacher Retirement System v. Insulet Corp.,* 1:15-cv-12345 (D. Mass) (Wolf, J.), ECF No. 120 [Ex. 10] ("Is there one or more other attorneys that would benefit, get money from the settlement of this case?").

### D. NO RECORD EVIDENCE EXISTS FOR THE FINDING THAT THE ERISA TRADING VOLUME WAS 12-15% OF THE TOTAL TRADING VOLUME.

The Special Master found that ERISA trading volume was 12-15% of the total trading volume.[11] Gillers Rep. at 9. This is incorrect and appears to depend entirely upon the unsupported deposition testimony of ERISA lawyers Lynn Sarko and Carl Kravitz. *See id.* There is no documentation in the court record supporting this 12-15% figure. The Special Master and his counsel, in making this finding of fact, completely ignore the testimony of the one witness who is actually responsible for working with A.B. Data, i.e., Labaton Sucharow settlement partner Nicole Zeiss. Zeiss testified that the ERISA trading volume "ended up around 9%." Zeiss Dep. at 163:16-165:1 [Ex. 11]. The Special Master's counsel acknowledged this testimony during the deposition ("All right. If that's your memory, yeah, okay"), *id.* at 164:24-165:1, but Zeiss's testimony is omitted from the Gillers Report. The "official" determination of customer class versus ERISA trading volume remains undetermined, as A.B. Data – which supplies the trading volume information on behalf of State Street – attested in November 2017

---

[11]    This can only be relevant in the context of these proceedings to the Special Master's view that the ERISA counsel in the consolidated actions were underpaid at an allocation of 10%, i.e., one percent *above* their contractually agreed upon 9%.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

that the volume data was still being calculated.  ECF 211 ¶¶ 13-14.[12]  Stated simply, the assertion

regarding ERISA trading volume that the Special Master has adopted is either counterfactual, or

at best premature and without record foundation.

      **E.**    **INFORMATION REGARDING THE CHARGOIS AGREEMENT WAS NOT RESPONSIVE TO THE SPECIAL MASTER'S DISCOVERY REQUESTS BECAUSE THE SPECIAL MASTER WITHDREW THE ONLY DOCUMENT REQUEST THAT WOULD HAVE ELICITED SUCH INFORMATION.**

Finally, the Special Master or his counsel contend in the Factual Background to Prof.

Gillers' report that "[n]either Labaton nor Lieff produced any emails related to Chargois in

response to the Special Master's initial requests for production of documents."  Gillers Rep. at 30

n.34.  The implication of discovery wrongdoing is clear, but incorrect.  In fact, Request for

Production No. 22 (attached hereto as Ex. 12) – which sought documents "regarding the

allocation of a certain percentage of the Fee Award among counsel," and which is the only

discovery request that arguably elicited information about the Chargois Agreement – was

withdrawn after a conference with the Special Master's counsel.  Prof. Gillers acknowledged this

in his deposition.  Gillers Day 1 Dep. at 191:16-192:1.  It is unclear why TLF produced the

materials, but Labaton Sucharow and Lieff Cabraser were justified in not doing so.

**III.**    **PROF. GILLERS' EXPERTISE DOES NOT EXTEND TO MASSACHUSETTS PRACTICE, TO FEDERAL RULES OF CIVIL PROCEDURE 23 AND 54, OR TO STATUTORY CONSTRUCTION.**

Prof. Gillers is a recognized expert regarding many aspects of legal ethics, but he is not

an expert in three key areas:  Massachusetts rules and practice, the Federal Rules of Civil

Procedure including especially Rules 23 and 54, and statutory construction.  Indeed, he admits as

much as to the first two categories.  Gillers Day 1 Dep. at 11:13-16:16, 112:23-113:1.

---

[12]    The issue relates to the so-called "Group Trust" members of the class, whose participants include both ERISA plaintiffs and customer class plaintiffs.  A.B. Data cannot complete its determination of allocations without additional information on the latter breakdown.  *See* ECF 211.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

First, Prof. Gillers is not a member of the Massachusetts Bar, nor has he ever practiced here.  While the same is true of Profs. Green, Joy, and Wendel, that gap is filled for the customer class counsel by Hal Lieberman, Camille Sarrouf, and Prof. William Rubenstein.  Prof. Gillers' opinions regarding ethics specific to Massachusetts practice are not rooted in his own experience.  *See*, *e.g.*, Gillers Day 1 Dep. at 53:23-54:12 (testifying that he is unfamiliar with the Massachusetts Bar Association and the Boston Bar Association).  This absence of experience in Massachusetts is of particular import because Prof. Gillers focuses on the fact that the Chargois Agreement was a bare referral payment (i.e. no work was done) – "quintessentially a Massachusetts practice."  Board of Bar Overseers, *Massachusetts Legal Ethics: Substance and Practice* at 185 (2017) [Ex. 3].  It is apparent that Prof. Gillers views bare referral fees as improper, as apparently does the Special Master, to be prevented by whatever alternative means can be found.  His opinions flow from that misplaced premise.  *See,* e.g., Gillers Rep. at 62, 66, 76; Gillers Day 1 Dep. at 219:12-222:12.  But, such fees are permitted by the Massachusetts fee sharing rule, i.e., MRPC 1.5(e).  The Massachusetts Bar has rejected Prof. Gillers' perspective regarding referral fees time and again, as explained by the Supreme Judicial Court ("SJC"), the Board of Bar Overseers, and lifelong Massachusetts practitioners, among others.  *See Saggese v. Kelley*, 445 Mass. 434, 442 (2005) (describing referral fees as a "time-honored practice in this State"); *Mass. Legal Ethics* at 185 [Ex. 3]; October 31, 2017 Declaration of Camille Sarrouf at ¶¶ 19-21; H.P. Wilkins, *The New Massachusetts Rules of Professional Conduct: An Overview*, 82 Mass. L. Rev. 261, 261-262 (1997) [Ex. 13].  Prof. Gillers may not approve of the practice, but in Massachusetts, it is a bedrock principle.[13]

---

[13]     Prof. Gillers' lack of relevant experience is a serious detriment to the credibility of his opinions. He has in the past explained the importance of practical experience in understanding ethics:  "The rules here may be obscure; they may even be counterintuitive, and they can be subtle in application.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Second, Prof. Gillers concedes that he is not an expert on class action litigation or the Federal Rules of Civil Procedure.  Gillers Day 1 Dep. at 15:16-19; 112:23-113:1.  Nevertheless, he purports to render expert opinions regarding what Fed. R. Civ. P. 54 and 23 require with regard to disclosure to the court and to the class.[14]  His unsupported arguments should be afforded no weight.  Rather, the Special Master should credit the opinions of those who *are* experts on class action litigation and the Federal Rules of Civil Procedure.[15]

Third, Prof. Gillers is not an expert on statutory construction.  Yet he relies on novel and unprecedented text-based arguments regarding Mass. R. Prof. C. 1.5 and 7.2.  Gillers Day 1 Dep. at 59:8-15 ("Well, I'm relying on the language of 7.2(b) and 1.5(e).  So my argument is that the text of the rule self-evidently bring[s] the lawyer within 7.2(b) . . .").  In interpreting these rules, the Special Master should follow the path of the U.S. Court of Appeals for the Second Circuit and decline to credit Prof. Gillers' strained readings.  *See Amnesty Int'l United States v. Clapper*, 638 F.3d 118, 128 n.12 (2d Cir. 2011) ("[T]o the extent that Prof. Gillers declares that the FAA [FISA Amendment Act] creates a sufficient risk of interception to trigger that ethical duty, that

---

Application in turn calls for judgment, and judgment is mostly learned through experience."  Stephen Gillers, *Regulation of Lawyers:  Problems of Law and Ethics* at xxvi (9th Ed. 2012) [Ex. 14].

[14]    Although the Special Master has implied through his questions that he is also troubled by failure to disclose to the ERISA attorneys, neither Prof. Gillers, nor anyone else, has opined that such disclosure was necessary.  Any such claim therefore stands unsupported at the close of the evidence.  It would, in any event, be rebutted by (a) the contractual agreement of the ERISA lawyers to a 9% allocation, and their acceptance without issue of 10%; (b) the inherent fairness of the 10% allocation given the relative trading volume between ERISA investors and non-ERISA investors (*see* p. 11, and in particular n. 14, *supra*); and (c) the circumstances under which the customer class counsel found themselves in a short-term co-counsel role with the ERISA counsel, i.e., the consolidation of the much larger customer class action with the two ERISA cases for pre-trial purposes.

[15]    *Cf.* testimony of Prof. W. Brad Wendel at 167:17-23 ("I will tell you exactly what would happen if someone called me and asked me that question.  I would walk right next door to my colleague, who is a civil procedure expert . . .").  In stark contrast to Prof. Gillers, Prof. Rubenstein *is* an expert on class actions – and he thoroughly researched his opinions.  *E.g.*, Rubenstein Dep. at 20:20-22:24 (describing process of reviewing roughly 1,200 cases).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

assertion relies on his analysis of how the FAA operates, which we are not compelled to accept."), *rev'd on other grounds*, 568 U.S. 398 (2013).[16]

Finally, Prof. Gillers' Report is largely devoid of authority or precedent that supports his novel opinions. During his deposition, he confirmed that he has none. *See, e.g.*, Gillers Day 2 Dep. at 386:6-7 (when confronted by the lack of support for his previously unaddressed 1.5(a) opinion, he explained: "I don't know. I haven't researched this question."). Prof. Gillers' willingness to create or accept from the Special Master brand-new theories regarding Massachusetts ethics without any support – and without looking for any support – severely undermines his credibility.

## IV.   THE CHARGOIS AGREEMENT COMPLIED WITH THE MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT AND HAS NOW, IN ANY EVENT, BEEN RATIFIED BY ARTRS.

Labaton Sucharow's fee division with Chargois complied with Mass. R. Prof. C. 1.5(e). Moreover, even if the Special Master finds that the fee division did not comply with Rule 1.5(e), the Agreement has now been ratified. And, leaving aside whether Labaton Sucharow perfectly complied with Rule 1.5(e), under no circumstances do Mass. R. Prof. C. 1.5(a) or 7.2(b) apply to the Chargois fee division.

### A.   LABATON SUCHAROW COMPLIED WITH RULE 1.5(E).

Contrary to Prof. Gillers' arguments, Labaton Sucharow complied with Rule 1.5(e) because it notified ARTRS that it would be sharing its fee and obtained ARTRS' consent to do so. In February 2011, when the engagement was entered into, Rule 1.5(e) provided that a "division of a fee between lawyers who are not in the same firm may be made only if, after informing the client that a division of fees will be made, the client consents to the joint

---

[16]      *See* Wendel Dep. at 65:22-23 ("[The Rules] are drafted like a statute.").

participation and the total fee is reasonable."[17] Mass. R. Prof. C. 1.5(e) [Ex 15].[18]  In their

engagement letter, ARTRS consented to Labaton Sucharow dividing its fees, *inter alia*, with

"local or liaison counsel" or as "referral fees."  LBS011061 [Ex. 16].  This was sufficient under

the text of Rule 1.5(e) at the time.  *See* Green Rep. at 19-20 ("Particularly in the context of a

retention letter setting forth the parties' respective rights and responsibilities, it seems reasonably

plain to me that the sentence in question in fact memorializes ARTRS's permission.").[19]

　　　　To the extent that it was required – which is an open question in the view of the experts

(Joy Dep. at 69:4-70:3; Lieberman Dep. at 125:5-16; Wendel Rep. at 14) – Labaton Sucharow

also complied with the written consent requirement in the SJC's opinion in *Saggese v. Kelley*,

decided in 2005 (but not codified in the Massachusetts Rules of Professional Conduct until

March 15, 2011).  *See Saggese*, 445 Mass. at 434.  The SJC explained in dictum that Rule 1.5(e)

would be construed prospectively to require consent to be obtained in writing (*id.* at 443), which

Labaton Sucharow did.  LBS011061 [Ex. 16].  The SJC also suggested in dictum that the written

consent must be obtained before the referral is made (*Saggese*, 445 Mass at 443), which, as Hal

---

[17]　　　Until the depositions were in progress in Massachusetts, it appears that neither the attorneys, customer class counsels' experts, nor the Special Master realized that the current version of Rule 1.5(e) took effect on March 15, 2011, just weeks after ARTRS' February 8, 2011 engagement letter with Labaton Sucharow.  *See* Sarrouf Day 1 Dep. at 139:17-24 (Special Master, following an off the record discussion as to what rule governed:  "And I think . . . there was an interim rule to cover *Saggese* until it was finalized which was then adopted in December by the Supreme Court . . . to be effective March 15th."); *see also* Lieberman Dep. at 14:15-15:13.  It is troubling to note that Prof. Gillers *was* aware of this error, but chose not to bring it to the attention of anyone else.  *See* Gillers Day 2 Dep. at 391:6-7 ("I'm aware that the new language of rule 1.5(e) was effective March 15, 2011.").  The requirements of the old (and applicable) rule were considerably more lenient for Labaton Sucharow in terms of proving full technical compliance, e.g., consent did not have to be in writing at all.

[18]　　　Mass. R. Prof. C. 1.5(e) was amended on March 15, 2011 to provide that:  "A division of a fee (including a referral fee) between lawyers who are not in the same firm may be made only if the client is notified before or at the time the client enters into a fee agreement for the matter that a division of fees will be made and consents to the joint participation in writing and the total fee is reasonable."

[19]　　　The Special Master has raised questions regarding whether a client can be referred for a series of matters, rather than a specific matter.  Labaton Sucharow's experts agreed that this was permissible.  As Mr. Lieberman testified, "I think this is a referral fee, and it happens all the time, common."  Lieberman Dep. at 44:12-14.

Lieberman noted, makes no sense.  Lieberman Dep. at 131:1-7.  (Once the rule was actually amended, the requirement was for written consent to be obtained "before or at the time the client enters into a fee agreement for the matter."  Hence, the *Saggese* dictum and the new rule as ultimate promulgated were not identical).  The *Saggese* court, in its two-sentence description of its prospective interpretation of Rule 1.5(e), does not require a disclosure of the identity of other attorney(s) receiving fees or the details of the fee agreements.  445 Mass at 443.[20]  Nor is there such a requirement in either the old or the new version of Rule 1.5(e).  Thus, the engagement letter was sufficient to meet the requirements of both R. 1.5(e) and *Saggese*.

Five different experts – three academics, one practitioner with a deep background in attorney discipline, and one lifelong Massachusetts practitioner – have examined the circumstances of the fee division with Chargois and ARTRS' engagement of Labaton Sucharow. Each has concluded that Labaton Sucharow complied with the applicable requirements of the Massachusetts Rules of Professional Conduct.[21]

---

[20]    *See* Green Dep. at 117:14-17 ("the rule itself does not require more"); Lieberman Dep. at 34:17-20 ("The rule doesn't require anything more than that.  And that's been the common understanding of the rule.").  Contrary to indications from the Special Master, it is well-settled that the details of a fee agreement need not be disclosed.  *See* Mass. R. Prof. C. 1.5 Cmt. 7A ("The Massachusetts rule does not require disclosure of the fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer.").

[21]    Green Rep. at 19 ("Labaton therefore complied with the relevant version of Rule 1.5(e)."); Joy Rep. at 27 ("Labaton's engagement letter with ARTRS for the State Street Litigation met the requirements of Mass. R. Prof. C. 1.5(e) as it existed at the time of the engagement letter."); Joy Dep. at 174:6-8 ("[T]he retention agreement standing on its own, met 1.5(e) as it existed at the time."); Lieberman Rep. at 16 ("Labaton obtained ARTRS' consent to divide its fees with Chargois, and therefore complied with Rule 1.5(e), as it then existed."); Lieberman Dep. at 38:18-19 ("It's plain language to me, sir."); Wendel Rep. at 14 ("In my opinion, the negotiations between Labaton and the ARTRS and the written consent provided by Clark and Hopkins satisfy the requirements of Mass. RPC 1.5(e) and the interpretation placed on the rule by the *Saggese* court."); Wendel Dep. at 25:15-21; Sarrouf Day 1 Dep. at 106:6-107:5.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## B.     IF LABATON SUCHAROW DID NOT COMPLY WITH SAGGESE, ITS NON-COMPLIANCE WAS MINIMAL AND HAS NOW BEEN CURED.

To the extent the Special Master finds that Labaton Sucharow did not comply with the

SJC's opinion in *Saggese*, the non-compliance was at most a procedural technicality.  At worst,

ARTRS did not consent in writing that Labaton Sucharow would split its fee with Chargois

specifically, although *Saggese* does not require, by its terms, that the attorney sharing a fee be

named.  *See Saggese*, 445 Mass. at 443.[22]  However, any non-compliance with Rule 1.5(e) has

now been cured, because Hopkins, acting on behalf of ARTRS, ratified the Chargois Agreement

with respect to the State Street matter.  *See* Hopkins Decl. [Ex. 9].  As the court noted in

*Saggese*, "the beneficiary in a fiduciary relationship may ratify conduct that otherwise would

constitute a breach of fiduciary duties, provided the requisite disclosure has been made."  445

Mass. at 442 (fee-sharing agreement ratified two years after unconsented-to referral, "toward the

end of the attorney-client relationship").  The court further noted that "[r]atification is not the

preferred method to obtain a client's consent to a fee-sharing agreement, but it is adequate."  *Id.*

As such, Hopkins' ratification on behalf of ARTRS is adequate here.  *See id.*[23]  Rule 1.5(e) exists

for the benefit of clients; [24] and, here, the client was protected and is content.

---

[22]     Contrary to Prof. Gillers' description of the Chargois Agreement as "secret," ARTRS knew Damon Chargois – because he introduced ARTRS and Labaton Sucharow – and knew that he would be part of the Labaton-ARTRS relationship.  *See* § II.A, *supra*.  The relationship cannot be characterized as "secret" when the *Chief Counsel* of ARTRS was aware that Labaton Sucharow would be affiliated with Chargois & Herron.  Given ARTRS' consent to Labaton Sucharow dividing its fees, and particularly when considering ARTRS' legal sophistication, the Chargois referral fee was hardly a "secret."  *Cf.* Joy Dep. at 142:17-22 ("But anybody that knows anything about law firms would know that there are other lawyers who are sharing in those fees . . .").

[23]     *See also* Lieberman Rep. at 16 ("In my opinion the foregoing facts fully support the conclusion that ARTRS was adequately informed, in writing, at the inception of the retention, and *de facto*, and retroactively, assented to Labaton's sharing of its fees with Chargois.").

[24]     *See* Green Rep. at 20 ("Further, the purposes of the procedural requirements were adequately served."); Sarrouf Day 2 Dep. at 257:17-258:5 ("[T]he Court in this state has repeatedly said . . . that the purpose of the statute is to protect the clients.  And the client says 'I have not been harmed.  Matter of fact, I think I've been tremendously well represented, and I agree with letting him pay from his fee a

### C.   MRPC 1.5(E), NOT 7.2(B), APPLIES TO LABATON SUCHAROW'S DIVISION OF FEE.

Prof. Gillers argues that, if Labaton Sucharow did not meet the requirement of Rule 1.5(e) of obtaining consent, Rule 1.5(e) would no longer be applicable.  *See* Gillers Rep. at 58-61.  The analysis, he contends, would default to Rule 7.2(b), where, having vitiated the only potential exception, the payment to Chargois & Herron would be rendered an an automatic ethics violation.  *See* MRPC 7.2(b) ("[a] lawyer shall not give anything of value to a person for recommending the lawyer's services").  The respective titles of these two rules – "Fees" and "Advertising" – presage how truly flawed this novel argument is.  While the argument at this point is purely academic, given that Labaton Sucharow very clearly *did* comply with the existing version of Rule 1.5(e), Prof. Gillers' willingness to make the argument is indicative of the extent to which he would go to put Labaton Sucharow in harm's way.  This argument has literally no precedent or support in Massachusetts, which Prof. Gillers acknowledges.  Gillers Day 1 Dep. at 53:9-62:17 (conceding that he found no opinions of the Massachusetts Board of Bar Overseers, the Massachusetts Bar Association, or the Boston Bar Association, or any Massachusetts judicial opinions, which explain or hold that imperfect compliance with Rule 1.5(e) constitutes a violation of 7.2(b)).  Yet, in a remarkably cavalier opinion, he describes his reading of the Rules as "syllogistic," despite his inability to cite a single example where these Rules have been applied as he construes them.  *Id.* at 59:8-24.

The history behind the Rules contradicts Prof. Gillers' novel interpretation.  In Massachusetts, Rule 7.2 was never intended to apply, and has never applied, to a division of a

---

portion to someone else.'. . . The client [] has not been harmed in any way.  And that's the purpose of the statute.").  Notably, the facts here are similar to *Saggese*, although the the fee division in the latter was greater (33%).  *Saggese*, 445 Mass at 437.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

fee between attorneys.  *See, e.g.*, Wendel Rep. at 16; Green Rep. at 16 n.13.[25]  If Rule 7.2(b) did

apply to imperfect fee divisions, decisions disciplining attorneys for violating Rule 1.5(e) would

also discipline the attorneys for violating Rule 7.2(b).  Research has not uncovered a single

example.[26]  *See* Joy Rep. at 16-27 (exhaustive survey of ethics law did not find any authority

supporting Prof. Gillers' position); Lieberman Rep. at 17.[27]  Applying Rule 7.2 here would break

new ground.  *See* Gillers Day 1 Dep. at 62:12-17 (admitting that he is unaware of any lawyer or

law firm that has ever been disciplined based on Rule 7.2(b) for failing to perfect client consent

under Rule 1.5(e)).

Notwithstanding the fact that Prof. Gillers' position lacks any legal precedent, his text-

based argument is also flimsy.  Rule 7.2(b) expressly does not apply to a division of fees

between lawyers.  Mass. R. Prof. C. 7.2(b)(5) ("except that a lawyer may . . . pay fees permitted

by Rule 1.5(e)").[28]  Nor does it state that non-compliance with Rule 1.5(e) leads to a violation of

Rule 7.2.  Instead, Rule 1.5(e) governs the division of fees between lawyers (whether perfect or

---

[25]  *See also* Green Dep. at 80:22-23 ("[T]he purposes of the rule are not implicated at all."); Lieberman Dep. at 77:24-78:7 ("I have never heard this interpretation before, and if you look in the ALI restatement, if you look in the treatises, you never see any case that talks about if you violate the specific express terms of 1.5(e), then you are, therefore, in violation of 7.2 by attempting to get a referral fee from a person.  I've never seen that.").

[26]  Prof. Gillers claims that *Daynard v. Ness, Motely, Loadholt, Richardson & Poole, P.A.*, 188 F. Supp. 2d 115, 130 stands for the proposition that an imperfect fee division would result in the application of Rule 7.2(b).  Gillers Day 1 Dep. at 84:22-86:18.  The case does not state, or even suggest, that concept.  *See Daynard*, 188 F. Supp. 2d at 130.  In fact, despite an analysis of both Rule 1.5(e) and its New York equivalent, Rule 7.2(b) is never mentioned.  *Id.* at 124 n.5.  Prof. Gillers' reliance on *Holstein v. Grossman*, 246 Ill. App. 3d 719 (1993) is similarly inapposite.  That case extensively discusses imperfect fee-splitting agreements under Ill. Sup. Ct. R. 2-107.  Despite its lengthy discussion – and the fact that the referral fees at issue were not consented to in writing – the court never mentions Rule 7.2(b) or its Illinois analogue.  *Id.*

[27]  "Massachusetts state courts, Massachusetts disciplinary authorities, and the United States District Court for Massachusetts have never considered a fee division between law firms based on a flawed or imperfect division of fee arrangement between law firms and a client under Mass. R. Prof. C. 1.5(e) to be a violation of Mass. R. Prof. C. 7.2(c)."  Joy Rep. at 16.

[28]  Prof. Green testified that this language in Rule 7.2(b)(5) operates to "emphasize that fee-sharing agreements are okay in Massachusetts."  Green Dep. at 58:17-19.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

imperfect).  In turn, it does not mention Rule 7.2(b).  A commonsense reading of the Rules demonstrates that Rule 1.5(e) is designed to govern a division of fees between lawyers, while Rule 7.2(b) is designed to govern payments other than fee divisions.  Finally, as briefly noted above, if there were any doubt regarding this sensible reading of the Rules – which, frankly, there should not be – Rule 1.5(e) is titled "Fees," while Rule 7.2 is titled "Advertising."  *See Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (explaining that "the title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute") (internal quotations omitted).[29]  Prof. Gillers' construction impermissibly ignores this clear structure and should be rejected.  *See O'Connell v. Shalala*, 79 F.3d 170, 176 (1st Cir. 1996) ("[C]ourts are bound to afford statutes a practical, commonsense reading.  Instead of culling selected words from a statute's text and inspecting them in an antiseptic laboratory setting, a court engaged in the task of statutory interpretation must examine the statute as a whole, giving due weight to design, structure, and purpose as well as to aggregate language.") (internal citations omitted).[30]

In short, Prof. Gillers' interpretation of the relationship between MRPC 1.5(e) and 7.2(b) is unprecedented and unsupported by the language of the Rules and the history of their

---

[29]    Prof. Green agreed that 1.5(e) "occupies the field" regarding fee divisions.  Green Dep. at 73:11-18.  Given the design, structure, and history of the Rules, this is the most reasonable interpretation.

[30]    Assuming solely for the sake of argument that 7.2(b) were applicable to this situation, Prof. Green explains that the facts do not reflect that Chargois was paid for a recommendation.  Green Rep. at 14-15 ("Labaton did not compensate Chargois 'for recommending [Labaton's] services' [to ARTRS]. . . . [t]he original fee-sharing arrangement was not compensation 'for recommending' Labaton but for helping Labaton secure an opportunity to pitch its own services as well as for anticipated future work by Chargois."  The intent had been for Chargois to perform the traditional role of a local relationship counsel for ARTRS until George Hopkins became Executive Director and indicated his preference for dealing directly with Labaton Sucharow.  Belfi 2d Dep. 26:15-27:15, 57:5-19 [Ex. 4]; Keller Dep. Day 1 44:8-46:21.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

application in Massachusetts.[31]  His argument is most notable for the fact that he would make it
at all.

### D.    MRPC 1.5(A) DOES NOT APPLY TO THE DIVISION OF FEE WITH CHARGOIS.

Prof. Gillers' improvised, eleventh-hour opinion, prompted by the Special Master,
regarding MRPC 1.5(a) also does not withstand scrutiny.[32]  Here, again, Prof. Gillers relies on a
strained reading of the Rules.

The payment at issue is a division of Labaton Sucharow's fee with Chargois.  Stated
simply, Rule 1.5(e) governs fee divisions; Rule 1.5(a) does not.  Rule 1.5(a) assesses whether a
singular "fee" is "clearly excessive."  Once that threshold inquiry is made, Rule 1.5(e) addresses
the requirements for dividing the singular "fee," and notes that the "total fee" must be
reasonable.  In other words, the whole fee is evaluated for excessiveness – as the Court did here
– and then it may be divided according to the requirements of Rule 1.5(e).  There is no
requirement that each portion of the fee not be "clearly excessive."  *Compare* Mass. R. Prof. C.
1.5(a) *with* Mass. R. Prof. C. 1.5(e).

As with his argument regarding Rule 1.5(e), Prof. Gillers' construction of Rule 1.5(a)
appears to be unprecedented in Massachusetts.[33]  The absence of any supporting authority is

---

[31]     *See, e.g.*, Green Rep. at 16-17 ("I am unaware of any judicial decision arising in the disciplinary
setting or any other context, or any secondary authority holding that compensating a lawyer for a referral
in the context of an imperfect fee-sharing arrangement violates Rule 7.2(b).  Nor have I found any ethics
opinion of the Massachusetts or Boston bar associations to this effect.").

[32]     Prof. Gillers first introduced his opinion during deposition testimony, largely in response to a line
of leading questions from the Special Master.  Gillers Day 1 Dep. at 364:8-370:17.  This opinion is not
contained in his 84-page report.

[33]     *See, e.g.*, Joy Rep. at 55 ("I could not locate a single case, advisory ethics opinion, or any
authority for the proposition that a lawyer's *share* of a fee in a division of fee under Mass. R. Prof. C.
1.5(e) must not be clearly excessive."); Lieberman Rep. at 19 ("[I]n my experience I cannot recall a single
instance in which a referral fee was scrutinized for reasonability under the Mass. Rules…."); Green Rep.
at 25 ("Prof. Gillers cites no judicial or bar opinions supporting his theory of independent analysis of each
lawyer's share of a fee under Rule 1.5(a).  I am unaware of any."); Wendel Rep. at 19-20.  Gillers admits

unsurprising.  Applying Rule 1.5(a) to fee divisions would run counter to the "time-honored"

Massachusetts tradition of allowing referral fees, even where the referring attorney does no

work.  *See Saggese*, 445 Mass. at 442 (enforcing a 33% referral fee where no work was

performed by referring lawyer, without questioning whether the 33% division was clearly

excessive); *Mass. Legal Ethics* at 185 [Ex. 3].[34]  The encouragement of referral fees in

Massachusetts is the result of deliberate consideration by the state's Bar, and undermines any

argument that Rule 1.5(a) is intended to restrain referral fees.  *See Mass. Legal Ethics* at 185 [Ex.

3]; Wilkins, 82 Mass. L. Rev. at 261-262 [Ex. 13].

   As a practical matter, it does not make sense to apply Rule 1.5(a) to a referral fee because

the factors it enumerates contemplate work being done.  In particular, subsection 1 states that a

factor "to be considered" is "the time and labor required, the novelty and difficulty of the

questions involved, and the skill requisite to perform the legal service properly."  This factor

cannot be applied to a bare referral fee.  *See In re Fordham*, 423 Mass. 481, 490-91 (1996)

(focusing extensively on the hours an attorney spent working on a case and the types of work he

did in determining whether a fee was clearly excessive).  Prof. Gillers' construction would render

Rule 1.5(a)(1) a nullity in some cases and must be rejected.  *See United States v. Ven-Fuel, Inc.*,

758 F.2d 741, 751-52 (1st Cir. 1985) ("All words and provisions of statutes are intended to have

---

that he too is unaware of any authority in Massachusetts that says a referral fee can be deemed clearly
excessive under 1.5(a) on the basis of the time and labor expended. Gillers Day 2 Dep. at 386:9-16.

[34] *See also* Joy Dep. at 167:18-22 ("I don't think the court would even . . . address the issue, because
in *Saggese*, he gets $90,000 from what sounds to be like ten minutes worth of work, and the court didn't
even blink an eye at it."); Green Dep. at 98:17-22 ("Obviously, it's capped by the total fee and the total
fee has to be reasonable, but it does not limit the amount that's paid out of the total share to the lawyer
who made the introduction."); Lieberman Dep. at 103:12-104:10 ("First of all, there's no authority for
that notion, that I'm aware of.  And, secondly, it doesn't make any sense . . . It wouldn't matter.  You can
say 99.9 percent, Judge.  I wouldn't change my opinion.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

meaning and are to be given effect, and no construction should be adopted which would render statutory words or phrases meaningless, redundant or superfluous.").

Moreover, there is no policy reason to scrutinize whether the individual segment of a fee is clearly excessive.  The percentages of a fee division have no effect on the client, who pays the total fee.[35]  Here, the client agrees with this common-sense view and believes that the total fee was fair.  *See* Hopkins Decl. at ¶ 11 [Ex. 9] ("Once the aggregate attorney's fee award has been established by the Court, I am not concerned with how that aggregate fee is distributed among lawyers or law firms, because – in my view – those distributions do not affect the class.").

Simply put, the text of Rules 1.5(a) and 1.5(e), the history of their application in Massachusetts, and common sense all require rejecting Prof. Gillers' last-minute opinion, which he admittedly did not attempt to support with any research.  This, too, is an argument most notable for the fact that it was made.

## V.      LABATON SUCHAROW WAS NOT REQUIRED TO DISCLOSE THE CHARGOIS AGREEMENT TO THE COURT.

As stated in Section III, *supra*, Prof. Gillers admits that he is not an expert on the Federal Rules of Civil Procedure or class action litigation.  Nevertheless, he asserts that customer counsel were "obligated to disclose the Chargois Arrangement to the Court."  Gillers Rep. at 66.  His testimony is contradicted by that of leading national class action expert Prof. William Rubenstein, who noted, "[i]t bothers me that judges do not use their authority to ask for fee agreements." Rubenstein Depo. 197:23-24."  And, ""[t]he judge has a fiduciary duty to absent class members.  …He, in this case Judge Wolf, should be asking these questions."  Id. 198:17-19.

---

[35]      *See* Green Rep. at 24 ("This goes to the fairness of the division among lawyers, not to the fairness of the client's fee, and is a matter for the lawyers to work out among themselves."); Wendel Rep. at 19 ("From the client's point of view, what matters is that the total fee is reasonable.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## A.   THE FEDERAL RULES OF CIVIL PROCEDURE CONTROL AND DO NOT REQUIRE DISCLOSURE.

The Federal Rules of Civil Procedure specifically address a party's obligation to disclose fee agreements.  Federal Rule of Civil Procedure 54(d)(2)(B) provides that a motion or petition for attorneys' fees must "disclose, *if the court so orders*, the terms of any agreement about fees for the services for which the claim is made" (emphasis added).[36]  The Rule's Advisory Notes make clear that this provision includes fee-division agreements:  "*[i]f directed by the court*, the moving party is also required to disclose any fee agreement, including those between . . . attorneys sharing a fee to be awarded . . . ."  Fed. R. Civ. P. 54, 1993 Notes of Advisory Committee, ¶ 8 (emphasis added).  This language is unequivocal:  disclosure of fee agreements is not required unless the court orders it.

Contrary to Prof. Gillers' suggestion, this is not a narrow "construction" by Labaton Sucharow, and courts applying Rule 54 have adhered to its plain terms.  For example, in *Pierce v. Barnhart*, the Fifth Circuit Court of Appeals held that the District Court abused its discretion in denying attorney's fees where the plaintiffs' attorney did not submit information regarding "whether attorney's fees had been paid or were due to other counsel for representation," because she had "complied with the local rules and the district court never directed her" to disclose additional information.  440 F.3d 657, 660-61, 664-65 (5th Cir. 2006).

Nor does Federal Rule of Civil Procedure 23 require the disclosure of fee agreements.  Fed. R. Civ. P. 23(h).  The Second Circuit's decision in *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP* is particularly instructive.  814 F.3d 132, 137-38 (2d Cir. 2016).  There, a fee petition filed in a class action did not disclose fee-sharing agreements with (or the presence of)

---

[36]   Fed. R. Civ. P. 23(h)(1) requires that motions for attorneys' fees in a class action be brought pursuant to Rule 54(d)(2), such that the general disclosure requirement – i.e., disclosure if the court asks – is expressly incorporated into class actions.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

an attorney in Mississippi, who allegedly was paid for unnecessary and irrelevant work, nor did the petition disclose four other law firms. *Id.* The Second Circuit explained that Fed. R. Civ. P. 23(h) "does not mandate automatic disclosure of all fee-sharing arrangements in class actions" in the absence of a local rule. *Id.* at 137 n.2.[37]

Prof. Gillers attempts to avoid the clear meaning of Rules 54 and 23 by claiming – with no legal support – that the latter rules only apply to attorneys about whom the Court knows. Gillers Rep. at 67. The Rules, and the courts interpreting them, make no such distinction. *See* Fed. R. Civ. P. 23(h); Fed. R. Civ. P. 54(d)(2)(B); *Bernstein*, 814 F.3d at 137 n.2 (holding that there was no requirement to disclose fee applications where the court was unaware of the various attorneys receiving fees). Moreover, Prof. Gillers' unsupported argument that the Court cannot be "expected" to ask affirmatively whether there are undisclosed fee agreements is contradicted by the plain language of Rule 54, which expressly contemplates the court taking such action. Fed. R. Civ. P. 54 ("if the court so orders"); *id.*, 1993 Notes of Advisory Committee ("[i]f directed by the court"). As noted at p. 9, *supra*, Judge Wolf did just that in a recent case. The leading authorities reject Prof. Gillers' uninformed view of the Federal Rules. *See, e.g.*, William B. Rubenstein, *Newberg on Class Actions* § 15:11 (5th ed. 2016) [Ex. 17] ("The third prong of Rule 54(d)(2)'s motion requirement – concerning disclosure of fee agreements – is discretionary with the court."); Rubenstein Rep. at 5 ("Rule 23(h) and Rule 54 are therefore clear in mandating the submission of fee agreements – including those concerning the allocation of fees among counsel – only upon court order."); 10-54 *Moore's Federal Practice - Civil* § 54.154 (2018) [Ex.

---

[37]      Nor does Rule 23(e) require disclosure of agreements allocating fees amongst plaintiff's attorneys. *See* Fed. R. Civ. P. 23(e); Rubenstein Rep. at 29 n.94.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

18] ("If the court so directs, the fee motion must also disclose the terms of any fee agreement with respect to the services implicated by the motion."); *see also* Joy Rep. at 31-35.[38]

## B.   PROF. GILLERS' LEGAL AUTHORITIES DO NOT SUPPORT HIS POSITION THAT DISCLOSURE IS REQUIRED TO THE COURT.

The cases that Prof. Gillers cites (*see* Gillers Rep. at 68-71, and cases cited therein) do not require disclosure of fee agreements to the Court.  Instead, they stand for the different proposition that courts have a duty to protect class interests and, in that role, may be interested in fee agreements between attorneys.  *See id.*  It does not follow – nor do these cases hold – that the burden is on the attorneys to disclose information regarding fees in the absence of a court request.  *See* Rubenstein Dep. at 135:8-12 ("Number one, when I see that the Court is a fiduciary for the class members, I immediately think that means the Court has a responsibility to do something.  I don't immediately think that means the parties have a responsibility to do something.").[39]  Respectfully, if a court is interested in scrutinizing fee agreements, it should use its authority under the Rules and order their disclosure, which many commentators favor aspirationally as a matter of policy.  *See Newberg* §15:12 [Ex. 17] ("While Rule 54(d)(2)(B)(iv) makes disclosure of such agreements dependent on a judicial order, there are at least two reasons that courts should regularly order disclosure."); *Moore's* § 54.154 [Ex. 18] ("The compelled

---

[38]     Prof. Rubenstein expanded on this point during his deposition, in no uncertain terms:  "From my point of view . . . it's not complicated.  The judge should have ordered that the fee agreements be released.  He didn't do that.  And absent him doing that, I just don't think there was an obligation to make public any of the fee agreements."  Rubenstein Dep. at 66:13-19.  Moreover, Prof. Rubenstein explains that Prof. Gillers' argument betrays a profound misunderstanding of fee awards in the class action context.  Rubenstein Rep. at 9-12 (noting that "the class action experts who drafted Rule 23(h) were well aware that a class action case encompasses cast and crew – and they nonetheless chose the default embodied in Rule 54:  that fee allocation agreements need not be disclosed absent judicial request, that the judge must ask for the playbill").  Prof. Gillers backtracked from his argument during his deposition.  Gillers Day 1 Dep. at 115:5-7 ("I'm not relying on Rule 54 as the source of authority or obligation to disclose participation of a lawyer whom the court does not know about.").

[39]     If Prof. Gillers' theory were true, the rules regarding disclosure in class action litigation would require it.  They do not.  Fed. R. Civ. P. 23; Fed. R. Civ. P. 54.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

disclosure of such fee agreements may assist the court in determining the appropriate amount of any attorney's fee.").[40]

Prof. Gillers' reliance on *In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 216, 223 (2d Cir. 1987), is misplaced for two reasons.  First, in the more recent *Bernstein* case, the Second Circuit held without qualification that information regarding attorneys' fees was not required to be disclosed even where attorneys collecting fees were unknown to the Court.  *Compare In re "Agent Orange"*, 818 F.2d at 223, *with Bernstein*, 814 F.3d at 137 n.2.  Second, when *Agent Orange* was decided, a local rule required disclosure of fee agreements.  *See In re "Agent Orange" Prod. Liab. Litig.*, 597 F. Supp. 740, 869 (E.D.N.Y. 1984) ("The Court has determined that Rule 5 of the U.S. District Court for the Southern and Eastern Districts of New York should not be applied in this litigation because of the need for continued intensive work by the attorneys until the close of the fairness hearings and because of the complexity of the fee applications.").[41]  Taken together, the import of these two cases is clear:  If there is a local rule requiring disclosure of fee agreements, they must be disclosed.  Otherwise, no disclosure is required.[42]

Nor can the express terms of Fed. R. Civ. P. 23(h) and 54(d)(2) be end-run by relying on the general duty of candor (MRPC 3.3) or the general duty to avoid fraud on the court (MRPC 8.4) as contained in the Massachusetts Rules of Professional Conduct.  *See* Rubenstein Dep. at 149:2-15 ("Rule 23 clearly sets out a process and the structure for the fee process in class action cases.  It's the governing rule.  In the case we're talking about it has a specific subpart directly

---

[40]     Joy Dep. at 91:14-15 ("That's for the judge to decide."); *id.* at 118:11-15 ("Federal Rule of Civil Procedure 54(d) [] says when a judge wants to know about fee sharing, the judge will ask.").

[41]     At his deposition, Prof. Rubenstein explained another difference:  unlike the fee agreement in *Agent Orange*, the Chargois Agreement did not incentivize the plaintiffs' attorneys to change their behavior in a way that negatively affected the class.  Rubenstein Dep. at 55:23-56:3 ("Second, when I look at Chargois' involvement, I don't see anything like in the *Agent Orange* case where anyone's worried that the payment to Chargois conflicted with the class' interest in litigating the case.").

[42]     There is no such rule in the District of Massachusetts.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

on point . . . I feel like you all [The Special Master and his team] are trying very hard to find a way around that specific law . . . from where I sit there's a specific[] rule directly on point.  Just doesn't happen to say what you want it to say, but it's there.").  The Federal Rules of Civil Procedure specifically govern this situation and do not require disclosure.  *See id.*

### C.    MRPC 3.3(D) DOES NOT APPLY.

In the past weeks, the Special Master has intimated a belief that MRPC 3.3(d) (candor in ex parte proceedings), informed by Comment 14A, may govern Labaton Sucharow's disclosure obligations.  *See, e.g.*, Joy Dep. at 95:1-99:3.  This argument also was absent from Prof. Gillers' Report.  Nevertheless, to the extent that it is belatedly at issue here, it is misguided for two reasons.

First, MRPC 3.3(d), by its terms, does not apply because the settlement hearing, and in particular the fee petition, were not ex parte.  *See* MRPC 3.3(d) ("In an ex parte proceeding . . .").  Nor does Comment 14A bring this case under MRPC 3.3(d).  That Comment discusses situations where "adversaries present a joint petition to a tribunal."  MRPC 3.3, Comment 14A.  The fee petition in this case was not joint – it was filed by the plaintiffs.  ECF 102.  Despite the Special Master's continued search to find a codified ethical violation to match his personal view of Labaton Sucharow's non-disclosure, 3.3(d) does not fit.

Second, Comment 14 makes clear that 3.3(d) "does not change the rules applicable in situations covered by specific substantive law . . ."  MRPC 3.3 Comment 14.  As discussed in the preceding section, there is specific substantive law covering this situation, i.e., Fed. R. Civ. P. 23 and 54.  Accordingly, as Comment 14 reflects, Rule 3.3(d) did not mandate disclosure of the

Chargois Agreement during the settlement hearing, despite its purportedly non-adversarial nature.[43]

## VI.   DISCLOSURE TO THE CLASS WAS NOT REQUIRED.

Prof. Gillers also argues that Labaton Sucharow was obligated to disclose the Chargois Agreement to the class once it was certified for settlement purposes.  Gillers Rep. at 75-78. Here, again, Prof. Gillers offers an expert opinion on class action procedure, in which he admittedly has no expertise, and he does so in stark contravention of the report and testimony of Prof. Rubenstein, one of the nation's leading class action experts.  As with most of his other arguments, Prof. Gillers concedes that his position is, as far as he knows, unprecedented.  Gillers Day 1 Dep. at 156:20-157:1 (admitting that none of the cases he cites hold that counsel must disclose fee allocations to class members, including those unnamed).  And again, Prof. Gillers' position is incorrect.[44]

### A.   THE FEDERAL RULES OF CIVIL PROCEDURE DO NOT REQUIRE DISCLOSURE TO THE CLASS.

Rule 23(h)(1) governs the requirements of class notices relative to attorney's fees.[45]  It provides that claims for attorneys' fees be made by motion with notice served on all parties and class members "in a reasonable manner."  *Id.*  The rule says nothing regarding disclosure of fee agreements to the class.  Instead, it directs that the motion for fees must be made pursuant to

---

[43]   And, as Professor Rubenstein has noted, the drafters of Rule 23 are deeply experienced in class action litigation and surely are familiar with this dynamic.  Rubenstein Rep. at 14 ("In other words, the class action law experts who wrote the rule after study and public input balanced the principles at stake by authorizing class counsel to keep fee-sharing agreements confidential absent an explicit judicial order to the contrary.").

[44]   *See* Joy Rep. at 50 ("There was no ethical or legal requirement for Labaton to provide notice of the fee sharing agreement between Labaton and Chargois & Herron to the class members."); Joy Dep. at 139:8-9 ("I could not find any obligation to do so.").

[45]   As Professor Green testified, "[i]n my view the kinds of notice you give to a class is governed by Rule 23 and case law that develops under Rule 23."  Green Dep. at 152:12-14.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Rule 54(d)(2).  As explained in § V, *supra*, Rule 54 does not require fee agreements to be disclosed absent a court order.  Thus, by extension, Rule 23(h) also does not require disclosure of fee agreements absent a court order.  *See Bernstein*, 814 F.3d at 137-38 n.2  (explaining that Fed. R. Civ. P. 23(h) "does not mandate automatic disclosure of all fee-sharing arrangements in class actions").

As Prof.  Rubenstein testified, "…class action law generally does not put fee allocation information in the class notice…I would say it's not an expected part of the notice process in a class action that the allocations as to what each lawyer's getting is put in the notice." Further, "[i]f the class members want to know that information, they can come forward and ask the Court to release it.  I hope the Court would.  But it's not expected in a class action that the allocation as to what each lawyer is getting is ever in the notice to the class." Rubenstein dep. 188:4-20.[46] Prof. Joy concurs:  "Without a disclosure obligation to the Court and without a clear obligation to disclose how fees would be divided to the class, there was no obligation for Labaton to disclose [] the fee sharing agreement with Chargois & Herron to the class members."  Joy Rep. at 50.[47]

## B.    THE COURT HAS ENDORSED THE NOTICE USED BY LABATON SUCHAROW.

Prof. Gillers' arguments regarding the Notice of Pendency of Class Actions (the "Notice") ring especially hollow when considering recent actions taken by Judge Wolf.  In *Arkansas Teacher Retirement System v. Insulet Corp.*, in which Bernstein Litowitz represents

---

[46]    *See also* Rubenstein Rep. at 27-30 (Prof. Gillers' argument that "class counsel must disclose fee-sharing agreements in the class's notice . . . is not supported by the text of Rule 23, nor the cases interpreting it.")..

[47]    Professor Joy explained further during his deposition:  "It was sufficient to notify class members about the fees.  It didn't have to describe the division of fees because the court did not use Rule 54(d) to order that the terms of any agreement about fees for which the claim is being made be disclosed."  Joy Dep. at 145:14-19.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

ARTRS, the parties conducted a preliminary settlement hearing on March 9, 2018, at which the

Court reviewed the draft settlement notices provided by the parties and gave guidance and

instruction as to how they should be revised.  1:15-cv-12345 (D. Mass) (Wolf, J.).  As noted

above, the Court expressly inquired as to the different lawyers who would share in an attorneys'

fee award, demonstrating the ease with which this can be accomplished if the Court wishes to

know.  March 9, 2018 Hearing Tr. at 12 (ECF 120) [Ex. 10]; *see also* p. 9, *supra*.  The Court also

explained that the notice regarding the fee petition need only include the aggregate amount of

fees being requested:  "[i]f it's your intention to ask for 25%, all you have to say is the lawyer is

going to ask for 25%."  *Id*.  This is sensible, because the division of fees among different

attorneys has no effect on the class.  *See, e.g., Hartless v. Clorox*, 273 F.R.D. 630, 646 (S.D. Cal.

2007) ("The agreement as to the amount of attorneys' fees could affect the class members.  The

allocation of those fees amongst class counsel does not affect the monetary benefit to class

members.").

Importantly, in *Insulet*, the Court directed the parties to conform their notice to that sent

by Labaton Sucharow in this case, which the Court described as one of the "templates" it has

been using.  March 9, 2018 Hearing Tr. at 29-30 [Ex. 10] (explaining the need for a notice that

provides enough information to be fair to the class).  After the hearing, the Court ordered that

"[t]he proposed documents shall comply with the requirements discussed by the court at the

March 9, 2018 hearing and be consistent with the notices approved in *Arkansas Teacher*

*Retirement System, et al. v. State Street, et al.*, C.A. No. 11-10230, Docket No. 95-1, 95-3, and

95-5, and *KBC Asset Management NV, et al. v. Aegerion Pharmaceuticals, Inc., et al.*, C.A. No.

14-10105, Docket No. 145-1."  *Id.*, ECF 118.  Neither of those notices describes fee allocations

or fee agreements among lawyers.  In other words, in its most recent pronouncement on what is

appropriate notice to the putative class in a class action settlement, the Court held up Labaton Sucharow's Notice in *State Street* as a model for other law firms, despite the Notice's lack of information regarding fee agreements or fee allocations (including the allocation among the three class counsel firms).  Thus, Prof. Gillers' description of the Notice in this case as ethically infirm is contradicted by the Court's use of that notice as a template for other cases.[48]

### C.   THE RULES OF PROFESSIONAL CONDUCT DO NOT REQUIRE DISCLOSURE TO THE CLASS.

In his attempt to impose an ethical requirement that class counsel must disclose a fee agreement to the class in a notice of settlement and fee petition (*see* Gillers Rep. at 75-78), Prof. Gillers improperly attempts to pound a square peg into a round hole.  The cases upon which he relies, however, do not hold that disclosure of a fee agreement is required, but rather explain that attorneys representing a certified class owe a fiduciary duty to the class.  He then seizes upon the "fiduciary duty" rubric, as did the Special Master in his questioning, *e.g.*, Joy Dep. 154:6-10, to presuppose the highest burden of disclosure, as between an attorney and his or her actual client.

However, as Prof. Gillers should have known before proffering this opinion, this general fiduciary duty to the class did not create an ethical obligation akin to that between an attorney and his or her client, and did not extend to an obligation of disclosure for the following reasons:

Prof. Gillers relies upon Mass. R. Prof. C. 1.2(a) and 1.4(a) – rules that require specific client interactions that are at odds with the nature of class actions – for the premise that, as fiduciaries, Labaton Sucharow and the other class counsel had a vague obligation to provide class members "information relevant to decisions that belonged to the client."  Gillers Rep. at 77-78.  *See, e.g.*, Mass. R. Prof. C. 1.4(a)(2) (lawyer must "reasonably consult with the client about

---

[48]     The Court approved the notice in the *Insulet* case on April 6, 2018.  *Id.*, ECF Nos. 122, 124.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

the means by which the client's objectives are to be accomplished").[49]   Apparently, Prof. Gillers

neglected to read the Advisory Committee's Note to Fed. R. Civ. P. 23, which explains that an

attorney's obligation to the class "may be different from the customary obligations of counsel to

individual clients."  Fed. R. Civ. P. 23, 2003 Advisory Note.  He similarly appears to have

skipped a review of *Moore's Federal Practice.  See* 5-23 *Moore's Federal Practice - Civil* §

23.120 (2018) [Ex. 19] ("[T]he post-2003 appointment procedures probably sharpen the

differences in ethical obligations between class-action attorneys and the 'customary obligations

of counsel to individual clients.'"); *see also* Rubenstein Dep. at 151:19-21 (explaining that

members of the certified class are "clients for some purposes, and they're not clients for other

purposes.").  Moreover, as courts have recognized, class actions are legally unique situations that

do not always neatly fit within the standard framework of ethical rules.  *See Rand v. Monsanto

Co.*, 926 F.2d 596, 600 (7th Cir. 1991) ("We conclude that DR 5-103(B) is inconsistent

with Rule 23 and therefore may not be applied to class actions.").  For example, conflicts rules –

which are suited to individual clients – are "much laxer" in the class action context.  *See*

Rubenstein Dep. at 151:23-153:10.

Hence, Rule 23 provides the rules of ethical conduct relating to class counsel's fiduciary

duty, and the latter do not encompass the meaning attributed to them by Prof. Gillers in any

event.  *See* Rubenstein Dep. at 154:16-20 ("What the Court found [in other cases] was that there

was not a breach of fiduciary duty because Rule 23 had been complied with and hence in some

ways what the Court's saying is that whatever fiduciary duty the lawyer had was co-extensive

with its Rule 23 duties.").

---

[49]     As Professor Wendel testified, "[u]nless there is something about class action procedure that I
don't know, there is nothing as a matter of the Rules of Professional Conduct that would create that
obligation."  Wendel Dep. at 132:1-5.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## VII.   ADDITIONAL DISCLOSURES TO CUSTOMER CLASS CO-COUNSEL WERE NOT REQUIRED; AND, ANY FAILURE TO DISCLOSE DOES NOT CONSTITUTE A VIOLATION OF ANY RULE IN ANY EVENT.

Although Prof. Gillers offered no opinion that Labaton Sucharow owed or violated a legal or ethical rule to any co-counsel, be they other customer class counsel or ERISA counsel,[50] the Special Master has persisted in raising the issue through his deposition questioning.  His concerns are unfounded.

TLF was aware of the referral relationship since at least May of 2011, when Labaton Sucharow partner Christopher Keller forwarded a draft letter to TLF Managing Partner Garrett Bradley memorializing the proposed relationship among the three customer class law firms. Among the disclosed terms was this:  "There is an 'off the top' obligation to referring counsel of 6% of the fees awarded."  TLF-SST-033911 et seq. at 033912 [Ex. 20].   TLF does not dispute receipt of the cover email (TLF-SST-033910) or the draft letter.  Indeed, TLF produced them in these proceedings.  (Although the draft letter was addressed to Lieff Cabraser partners Fineman, Chiplock, Heimann, and Hazam, as well as to Michael Thornton and Garrett Bradley, Labaton Sucharow has uncovered no evidence that the letter was actually finalized and sent.)

Prof. Gillers opined in his report – incorrectly for the reasons that forth in Section VI, *supra* -- that as fiduciaries and lawyers, Labaton Sucharow, TLF, and Lieff Cabraser all "had a duty to provide the unnamed customer and ERISA members of the class whom they represented after the Court certified the class for settlement purposes on August 8, 2016 of the existence of the Chargois Arrangement and its terms when in the notice of pendency they purported to inform class members of the terms of the settlement including anticipated counsel fee requests and explained their options to object or opt out."  Gillers Rep. at 78.  When pressed by Lieff

---

[50]     *See* Gillers Rep. at 14, n.17.

Cabraser's in-house attorney Richard Heimann about the attribution of such responsibility to Lieff Cabraser specifically, Prof. Gillers responded, "the assumptions I make are that even though Lieff Cabraser did not know what Labaton Sucharow knew about the Chargois Arrangement, Chargois never shows up in any of the work that is done on behalf of [ARTRS]," that TLF leads Lieff Cabraser to believe that Chargois is acting as local counsel but that Lieff Cabraser "never encounters Chargois," and that "Chargois is getting a substantial amount of money – more money than someone who is merely local counsel and not doing valuable work meriting 4.1 million dollars would ordinarily receive."  Gillers Dep. Vol. I at 227:4-19.  Because of the "duty to the class as counsel to protect its recovery," Gillers opined that Lieff Cabraser was obligated to ask questions about the payment to Chargois.  *Id.*, 227:19-24.  Although acknowledging that Lieff Cabraser may have been lacking sufficient information to trigger a disclosure requirement – which did not exist in any event – Prof. Gillers concluded that "the unusual nature of the payment for a local counsel would have at least impelled the firm in protecting its client to look into the matter."  *Id.* 228:1-13.

Prof. Gillers is in error in concluding that any of the customer class firms had a duty of disclosure to the class.  But, the suggestion that either TLF or Lieff Cabraser were in any way kept in the dark or misled[51] by Labaton Sucharow is equally erroneous.  The fact that the draft was directed to both Lieff Cabraser and TLF demonstrates that Labaton Sucharow intended that both be informed of the referral relationship.

---

[51]     As Lieff Cabraser's ethics expert Timothy Dacey acknowledged, Chargois did not appear in Labaton Sucharow's lodestar report, did not file a separate fee declaration, was not on any of the pleadings, and never appeared at any hearing or mediation session.  Dacey Dep. at 75:6-77:16.  Moreover the client, George Hopkins, was personally present at most of the mediation sessions and hearings.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## VIII. WHERE PERCEIVED TRANSGRESSIONS ARE OF ASPIRATIONAL OBJECTIVES RATHER THAN ACTUAL RULES, SANCTIONS AND DISCIPLINE ARE INAPPROPRIATE.

Prof. Gillers is not alone in musing about the wisdom of such matters as adopting local rules requiring the disclosure to the Court of all fee allocations in class actions. See, e.g., Newberg §15:12 [Ex. 17] ("While Rule 54(d)(2)(B)(iv) makes disclosure of such agreements dependent on a judicial order, there are at least two reasons that courts should regularly order disclosure."); Moore's § 54.154 [Ex. 18] ("The compelled disclosure of such fee agreements may assist the court in determining the appropriate amount of any attorney's fee."). But, such aspirational musings are themselves indicative of the absence of a current requirement of disclosure. The imposition of a court sanction or discipline, or the referral to a disciplinary body, are all inappropriate for perceived transgressions of aspirational goals as a matter of due process and basic fairness.

### A. DISCIPLINE AND SANCTIONS CANNOT PROPERLY BE IMPOSED FOR FAILURE TO DISCLOSE THE FEE SHARING AGREEMENT TO THE COURT.

Prof. Gillers' opinion regarding disclosure to the Court lacks any basis in law or principle. He does not believe that disclosure is always required. Rather, he argues that disclosure was required *in this specific case*, because (1) the payment to Chargois was a bare referral fee, and (2) the consent to that fee division was allegedly imperfect. *See* Gillers Day 1 Dep. at 219:12-222:12.[52] In other words, it is Prof. Gillers' "expert" opinion that, although Rule 54 does not require disclosure, an attorney can be subject to discipline for nondisclosure if some subjective and unstated combination of factors exists. This cannot be the basis for an ethical

---

[52]    As discussed above, Prof. Gillers' opinions are squarely at odds with "time-honored" Massachusetts practice regarding referral fees. *See, e.g.*, *Saggese*, 445 Mass. at 442. Prof. Gillers' inability to separate his personal views of ethics from the actual rules in Massachusetts pervades his opinions.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

violation. "Due process requires that attorneys, like anyone else, not be subject to laws and rules of potential random application or unclear meaning." *In re Discipline of an Atty.*, 442 Mass. 660, 668 (2004). Prof. Gillers' "rule" is at odds with the Federal Rules of Civil Procedure and, even in his view, only sometimes applies. It is, by definition, "unclear" and "random." *See id.*

Moreover, Prof. Gillers' formulation of the disclosure requirement is entirely inconsistent with the actual practice in the District of Massachusetts. As Prof. Rubenstein (a member of the Massachusetts bar) notes, throughout the 127 class action settlements in the District of Massachusetts over the past seven years, the Court never ordered disclosure of fee agreements. Rubenstein Rep. at 6. Thus, there is no local practice that should have alerted Labaton Sucharow that a disclosure of fees was expected despite the lack of any applicable rule or a court inquiry.[53] Nor did the Court create a duty of disclosure through its statements to the parties. It did not ask a *single* question regarding the allocation of fees between the Customer Class lawyers. *See* ECF 114 (Transcript of November 2, 2016 Hearing). Prof. Gillers' assertion that the Court "dispelled any uncertainty" that it desired information on fee agreements is either disingenuous or oblivious to the record. Gillers Rep. at 67.[54] In sum, as explained by Prof. Rubenstein – who, unlike Prof. Gillers, is an expert in class action litigation – Labaton Sucharow fully complied with its disclosure obligations.

In light of the lack of an obligation to disclose the Chargois Agreement to the Court, Prof. Gillers' arguments regarding Mass. R. Prof. C. 3.3(a) and 8.4(c) badly miss the mark. As noted by Profs. Joy and Wendel, those Rules require a "knowing" misrepresentation or omission on the

---

[53]     *See also* Sarrouf Day 2 Dep. at 292:12-13 ("I've never been asked [about referral fees by a court] in all my years.").

[54]     By material contrast, at a recent hearing the Court *did* ask about fee agreements. *See* Transcript of March 9, 2018 Hearing at 16, *Arkansas Teacher Retirement System v. Insulet Corp.*, 1:15-cv-12345 (D. Mass.) (Wolf, J.), ECF No. 120 [Ex. 10] ("Is there one or more other attorneys that would benefit, get money from the settlement of this case?")).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

part of the attorney.  Mass. R. Prof. C. 3.3(a) ("A lawyer shall not knowingly:  (1) make a false statement of fact or law to a tribunal . . .").  Thus, "[f]or there to be an ethical duty for Labaton to disclose to the Court its fee sharing agreement with Chargois & Herron under Mass R. Prof. C. 3.3(a) or 8.4(c), the ethical duty would have to be based on Labaton *knowingly* engaging in impermissible conduct."  Joy Rep. at 43.  Because there was no legal obligation to disclose the Chargois Agreement, it cannot be that Labaton Sucharow lawyers "knowingly" made some kind of unethical omission.[55]  Simply put, it strains credulity to argue that nondisclosure of fee-related information is an ethical violation, where the Federal Rules of Civil Procedure do not require disclosure of such information in the absence of a local rule or a court order or inquiry..

Prof. Gillers appears to have invented his own disclosure requirement for the purposes of this case.  *See, e.g.*, Gillers Day 1 Dep. at 144:24-145:1 ("I know of no authority that applies 3.3 to the duty to disclose a fee agreement.").  Imposing discipline would punish Labaton Sucharow for following a clear rule, in the absence of any notice of purported wrongdoing.  *See, e.g.*, Rubenstein Dep. at 63:15-16 ("I'm not making up a rule for one case."); *id.* at 73:18-19 ("I think it was made up after the fact to fit the facts of this case."); *id.* at 75:2-3 ("I am adamantly saying the rules were clear."); *id.* at 126:20-22 ("I think that lawyers have the right to rely on the rules, and the rule is the Court can ask for the fee agreements if they want."); *id.* at 198:6-10 ("[Y]ou know, the law is clear here, and the lawyers have reason to rely on the clearness, the clarity of the law.  Rule 23 and Rule 54 could not be more clear . . .").  Any finding of wrongdoing would

---

[55]     To be clear, there was no omission in the first place, but – assuming solely for the sake of argument that nondisclosure of the Chargois Arrangement could be called an omission – it certainly was not knowingly made in violation of an obligation.  *Id.* at 44.  ("For an omission to be the equivalent of a misrepresentation, the omission has to occur where there is a duty to speak."); Joy Dep. at 88:3-8 (explaining that Rule 3.3 applies "[o]nly in a situation where you have a duty to speak.").  Prof. Gillers' citations to cases involving Mass R. Prof. C. 3.3(a) and 8.4(c) do not change the analysis, because those cases are wholly inapposite.  Gillers Rep. at 71-72.  Each of them involved an egregious non-disclosure. *See* Joy Rep. at 47-49.  In none of those cases did a rule of procedure specifically govern the disclosure. *Id.*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

be ad hoc, retroactive, and "random," which due process does not allow . *See In re Discipline of an Atty.*, 442 Mass. at 668, citing with approval *In re Ruffalo*, 390 U.S. 544, 554-556 (1968) (White, J., concurring) (discipline inappropriate "on the basis of a determination after the fact that conduct is unethical if responsible attorneys would differ in appraising the propriety of that conduct"); *see also* Rubenstein Dep. at 104:5-6 ("[T]here is nothing that the lawyers did here that was unusual.").

The Special Master should reject, in strong terms, Prof. Gillers' reckless accusations that Labaton Sucharow committed ethical violations by intentionally misleading the Court.

**B.     DISCIPLINE AND SANCTIONS CANNOT PROPERLY BE IMPOSED FOR FAILURE TO DISCLOSE THE FEE SHARING AGREEMENT TO THE CLASS.**

In the absence of a procedural requirement to disclose fee agreements to class members, Mass. R. Prof. C. 1.2(a) and 1.4(a) do not independently create such a requirement.  Joy Rep. at 50.  As with Prof. Gillers' argument regarding disclosure to the court (see § VII.A, *supra*), a vague, subjective, and unprecedented interpretation of ethical requirements in contravention of the Federal Rules of Civil Procedure is not nearly definite enough to offer a basis for discipline. *See In re Discipline of an Atty.*, 442 Mass. at 668; *see also* Green Dep. at 178:18-23 ("I don't think that's the job that Rule 1.5(e) was meant to do.  And you hit lawyers by surprise unfairly if you interpret the rule to do the work that judges are supposed to do in class actions under Rule 23.").

**C.     DISCIPLINE AND SANCTIONS CANNOT PROPERLY BE IMPOSED FOR FAILURE TO DISCLOSE THE FEE SHARING AGREEMENT TO OTHER COUNSEL.**

Neither Prof. Gillers, nor any other expert, has offered the opinion that Labaton Sucharow had an ethical or legal obligation to disclose the fee sharing agreement to other counsel.  *See generally* Gillers Rep.  Nonetheless, the Special Master has continued to raise the

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

issue of such an obligation, perhaps in response to self-interested, after-the-fact grumblings from

the ERISA counsel, who actually received a gratuitous move from their contractual 9%

entitlement to a 10% allocation of fees at the suggestion of Larry Sucharow.  *See* Sucharow Day

2 Dep. 28:22-29:6.  What one person may perceive as fair, to another may seem an inappropriate

derogation of contract terms.  On the basis of anyone's perception of fairness, Labaton Sucharow

should not be sanctioned or disciplined in the absence of a rule or other requirement.

### D.     EVEN IF LABATON SUCHAROW IN SOME FASHION FAILED TO MEET THE TECHNICAL REQUIREMENTS OF SAGGESE OR OF RULE 1.5(E), WHICH IT DID NOT, NEITHER SANCTIONS NOR DISCIPLINE WOULD BE WARRANTED.

If the Special Master finds that Labaton Sucharow did not perfectly comply with Rule

1.5(e) or the SJC's dictum in *Saggese* – presumably for not identifying Chargois & Herron,

although there was no such requirement in the rule or the dictum – no discipline or sanctions are

warranted, for at least two reasons.

First, as explained above, any alleged violation of Rule 1.5(e) was a technical procedural

lapse at most.  "Technical non-compliance with a state rule of professional conduct – particularly

one regulating, rather than prohibiting, a practice – is not the kind of fraud or abuse of the

judicial process that justifies sanctions under the federal court's inherent power."  Wendel Rep.

at 19.[56]  Any procedural violation by Labaton Sucharow is especially benign because ARTRS

has now expressly ratified the Chargois Agreement with respect to the State Street matter.

Second, no discipline is warranted because any non-compliance on Labaton Sucharow's

part is a result of the *Saggese* decision's gloss, rather than the text of the rule in place at the time

the State Street engagement began.  It is fundamental that the codified rules of professional

---

[56]     *See also* Green Rep. at 22-23 ("Imperfect compliance with a prophylactic procedural requirement of a professional conduct rule (as construed by a court opinion) is unlikely to signify that the lawyer in question poses a threat to future clients or to the public generally.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

conduct are the touchstone for any disciplinary adjudication. For example, SJC Rule 4:01 – "Bar Discipline" – states that: "Each act or omission by a lawyer, individually or in concert with any other person or persons, which violates any of the Massachusetts Rules of Professional Conduct (see Rule 3:07), shall constitute misconduct and shall be grounds for appropriate discipline . . . ." SJC Rule 4:01, § 3(1); *see also* James S. Bolan, *Ethical Lawyering in Massachusetts* § 1.1, MCLE (4th Ed. 2015) [Ex. 21] ("[The rules] set forth the standards of professional conduct for members of the Massachusetts bar and serve as the basis for professional discipline."). Likewise, in the District of Massachusetts, Local Rule 83.6.1 provides that "[t]he rules of professional conduct for attorneys appearing and practicing before this court shall be the Massachusetts Rules of Professional Conduct adopted by the Massachusetts Supreme Judicial Court, *as set forth as Rule 3:07 of that court* . . ." D. Mass. L. R. 83.6.1 (1) (emphasis added).

Therefore, while *Saggese* may have suggested or even changed how the courts would construe Rule 1.5(e), it did not change the codified rules that provide a basis for discipline.[57] During the intervening time period between *Saggese* and the amendment to Rule 1.5(e), attorneys' obligations regarding fee divisions were unclear. As the chairman of the Standing Advisory Committee that initiated the 2011 amendments explained: "[b]efore these rules were adopted, *there were not such clear guidelines as to what had to be done*." Christina Pazzanese, *Attorney Fee Rules Undergo Revisions in Massachusetts*, Mass. Law. Wkly., Jan. 12, 2011 [Ex. 22] (emphasis added). And, even when the SJC finally amended Rule 1.5(e), it allowed for a

---

[57]     In that vein, research has not uncovered a single case between November 30, 2005 and March 15, 2011 disciplining a lawyer for an improper fee division under the terms of *Saggese* (or otherwise). Indeed, when searching a comprehensive Massachusetts Board of Bar Overseers database, not a single decision citing to *Saggese* has been found. Tellingly, the BBO appears to not have used *Saggese* as a basis for discipline. Mr. Lieberman's experience is consistent: "I have never seen a disciplinary case for a lawyer where the court has disciplined a lawyer based on a ruling of a court as opposed to a violation of a Rule of Professional Conduct . . ." Lieberman Dep. at 120:2-7. The Special Master should adopt the same approach.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

three-month period between the amendment and the new Rule taking effect, reflecting that some time was necessary to adjust to the changes. *See* December 22, 2010 Order of the Supreme Judicial Court regarding SJC Rule 3:07 [Ex. 23]; *see also* Pazzanese, *Attorney Fee Rules Undergo Revisions in Massachusetts* [Ex. 22] (local attorney and former BBA subcommittee member explaining that "the rule changes will require the bar to do some broad educational outreach").[58]

The lack of a rule implementing *Saggese* raises due process concerns regarding attorney discipline, particularly with attorneys admitted *pro hac vice*, who rely on the Rules of Professional Conduct to understand their obligations. As the SJC has acknowledged, "[o]rdinarily, an individual case is an inappropriate mechanism for promulgating rules." *In re Saab*, 406 Mass. 315, 324 n.13 (1989). Even if Labaton Sucharow's conduct did not comply with the *Saggese* opinion – which, to be clear, it did – it would be inappropriate to impose discipline because Labaton Sucharow complied with the Rule then in effect. *See* Lieberman Rep. at 19 ("In my opinion, which is informed by decades of practice in the disciplinary realm, an attorney would not be expected to research case law in order to ascertain the relevant standards of conduct, and should not be sanctioned for failing to do so.").[59] Prof. Gillers

---

[58]    The import of *Saggese* is not clear, as Labaton's experts have testified. As Professor Joy noted, the text of the amended MRPC 1.5(e) did not even match the language in *Saggese*. *See, e.g.*, Joy Dep. at 69:4-19 ("So the fact that neither disciplinary body or the courts were following *Saggese* after *Saggese*, the fact that the bar didn't immediately change the rule, and then when they did change the rule, they didn't use the same wording as *Saggese* had, and then when they changed the rule, they had a period of time between the new rule and when it came into effect led me to conclude that *Saggese* [was] probably dicta.").

[59]    Mr. Lieberman expanded on this point at his deposition: "[A]s a regulatory lawyer in disciplining or recommending discipline for a lawyer who, theoretically or arguably, didn't comply with the admonition or prospective ruling, but was in compliance with the rule as it existed in the Code of Professional Responsibility, I would be very reluctant to charge that lawyer with misconduct if the lawyer were relying on, and as he would have a right or she would have a right to do, the rule as it existed in the code, because the SJC, the Supreme Judicial Court, is ultimately the authority for implementing and changing the rule." Lieberman at 109; *see also id.* at 83 ("And if there is no notice that a rule requires, for

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

concedes as much.  Gillers Day 2 Dep. at 395:1-5 ("There is a constitutional notice requirement

for discipline of course.  And so a lawyer can't be disciplined under a rule that didn't exist at the

time the lawyer's conduct was committed.").  It would be manifestly unfair to discipline Labaton

Sucharow under these circumstances.

### E.   ALTHOUGH LABATON SUCHAROW DID NOTHING IMPROPER, IT WOULD CONSIDER REASONABLE REMEDIES TO ADDRESS ANY CONCERNS OF THE COURT REGARDING THE DOUBLE COUNTING MATTER.

Labaton Sucharow is firmly convinced that there was nothing improper in any of its

conduct.  However, the benefit of ending the heavy cost, distraction and stress of these

proceedings would be of value to the Firm. It therefore would consider discussing reasonable

remedies and adoption of best practices relating to the double counting issues, as long as such

remedies are entered with no findings of bad faith or unethical conduct, and as long as the

remedies are in lieu of sanctions and discipline.

If  Judge Wolf believes that he would have reduced the aggregate attorney fee for the

amount of the lodestar cross-check error ($4 million), although that seems unlikely, Labaton

Sucharow would consider disgorging its one-third share of the amount of that error ($1,333,200).

With regard to best practices relating to the double-counting, Labaton Sucharow incorporates its

suggestions in its submission of November 3, 2017 Response by Labaton Sucharow LLP to

Special Master's September 7, 2017 Request.

### IX.   THESE PROCEEDINGS HAVE DEPRIVED LABATON SUCHAROW OF BASIC FAIRNESS AND DUE PROCESS.

The proceedings now underway were commenced by an appointment pursuant to Fed. R.

Civ. P. 23(h)(4), which states that in class actions, "the court may refer issues related to the

---

example, disclosure of the name of the . . . lawyers who referred, it would be very, very difficult for a
prosecuting lawyer, as I was for many years, to bring charges against that lawyer . . . because of notice
and due process concerns.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

amount of the [attorneys' fee] award to a special master . . . as provided in Rule 54(d)(2)(D)."
ECF No. 117 at 8.  The Memorandum & Order of appointment directed that "[t]he Master shall
investigate and prepare a Report and Recommendation concerning all issues relating to the
attorneys' fees, expenses, and service awards previously made in this case."  ECF No. 173 at 2.
In turn, the Special Master informed customer class counsel that he was appointing Mr. Sinnott
to serve as Counsel to the Special Master, and that Mr. Sinnott would be "attending all of the
interviews, propounding written discovery and taking any necessary depositions" (although he
would also attend the latter).  *See* Email from Special Master, March 9, 2017 4:48 PM [Ex. 24];
*see also* Email from Special Master, March 9, 2017 7:29 AM [Ex. 25] (affirming statement that
appointment of Mr. Sinnott would "allow[] [the Special Master] to function as a neutral.").

Labaton Sucharow's expectation was that the Special Master would function as an
independent fact finder, not as a prosecutor or one committed to proving a pre-determined
conclusion of wrongdoing.  Unfortunately, the proceedings did not progress in that fashion,[60]
which Labaton Sucharow attributes in significant part to an inherent flaw in the process itself:

---

[60]     By way of very limited non-exclusive example, Labaton Sucharow points to the following:

Mr. HOPKINS:  Because -- well, first of all, where does it end? If the secretaries in the
firm got a bonus do I need to know that? You know, if –

THE SPECIAL MASTER:  Not quite the same as paying a lawyer for doing nothing 20
percent of a fee.

. . . .

THE SPECIAL MASTER:  Had this relationship been disclosed to Judge Wolf, might he
not have said, well, wait a minute, that's an awful lot of money to be going to a lawyer
who hasn't done anything on the case, did no work, didn't refer this specific case at all,
and maybe the class should get some of that money, or maybe the ERISA counsel should
get some of that money rather than this lawyer in Texas who was not involved at all in
this case?  Isn't that why disclosure to the Court in a non-adversary proceeding, which
this was, is a better practice?

THE WITNESS:  Let me say this: I've spent enough time with you now that I can feel
your -- your passion's not the right word -- your --

THE SPECIAL MASTER: Skepticism.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

The Court ordered that an initial $2,000,000 be provided to the Clerk of the United States District Court for the District of Massachusetts "to pay the reasonable fees and expenses of the Master. ECF 173 at ¶¶ 13, 14. Thereafter, the Special Master "informed the court that recent, unforeseeable developments required further investigation. See Docket No. 207-1" ECF 208 at 2. On October 6, 2017, the Special Master informed the Court that, "as a result of the additional required investigation, additional funding for his work will be necessary," and requested that "the court order that Labaton Sucharow pay another $1,000,000 to the Clerk for that purpose." The request was granted. *Id.* For obvious reasons, Labaton Sucharow did not feel that it could object while the investigation was on-going without potentially causing itself harm, although the amount does raise questions under Fed. R. Civ. P. 53(a)(3).[61]

The imposition of costs representing 50% of the initial double-counting error, and almost 25% of the subsequent investigation of the $4.1 million Chargois fee does more than raise questions of fairness and unreasonable expense. It also inherently gives rise to an unconscious or subconscious motivation for the Special Master to find some significant wrongdoing on the part of one or more of the customer class counsel firms. Simply stated, where the firms have been required to fund $3,000,000 to investigate issues relating to their fee, a conclusion that no rules were violated causes the extraordinary amount to appear even more extraordinary. Whether and

---

Hopkins 2d Dep. at 74:2-76:6.

> THE SPECIAL MASTER: . . . This feels a lot [] like "Don't Ask, Don't Tell." . . . If the judge doesn't ask – maybe it should be "doesn't ask, don't tell."
>
> . . .
>
> MR. RUBENSTEIN:    It's not – I don't think it's a fair way of stating it because it implies that there's always hiding going on, and I just don't think that's a fair way of characterizing class action lawyers in general.

Rubenstein Dep. at 128:3-21.

[61]    "In appointing a master, the court must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay."

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

to what extent the manner in which discovery was conducted proves this concern justified is a subject for another day.[62]

Dated: April 12, 2018                                    Respectfully submitted,


                                                    By: /s/ Joan A. Lukey
                                                    _____
                                                        Joan A. Lukey
                                                        Justin J. Wolosz
                                                        Stuart M. Glass
                                                        Kevin J. Finnerty
                                                        Choate, Hall & Stewart LLP
                                                        Two International Place
                                                        Boston, MA 02110

                                                        *Counsel for Labaton Sucharow LLP*

---

[62]        *See, e.g.*, n.60, *supra.*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER