# EX. 162

1

Volume:  1

Pages:  1-324

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

------------------------------------

In Re:  STATE STREET ATTORNEYS FEES

------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,

United States District Court, Retired

HEARING

April 13, 2018, 9:35 a.m.-4:35 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter:  Paulette Cook, RPR/RMR

Page 2

```
 1   A P P E A R A N C E S :
 2
 3       BARRETT & SINGAL
 4       By William F. Sinnott, Esq.
 5       Elizabeth J. McEvoy, Esq.
 6       One Beacon Street, Suite 1320
 7       Boston, Massachusetts 02108-3106
 8       617-720-5090/wsinnott@barrettsingal.com
 9           and
10       JAMS
11       By Linda Hylenski, Esq. (via teleconference)
12       150 West Jefferson
13       Detroit, Michigan 48226
14       313-872-1100
15       Counsel for the Special Master
16
17
18
19
20
21
22
23
24       [appearances continued]
```

Page 4

```
 1   A P P E A R A N C E S (cont.):
 2
 3       CHOATE HALL & STEWART, LLP
 4       By Joan A. Lukey, Esq.
 5       Stuart M. Glass, Esq.
 6       Kevin Finnerty, Esq.
 7       Natalia Smychkovich, Esq.
 8       Two International Place
 9       Boston, Massachusetts 02110
10       617-248-5000/sglass@choate.com
11           and
12       LABATON SUCHAROW, LLP
13       By Michael Canty, Esq.
14       140 Broadway
15       New York, New York 10005
16       212-907-0882/mcanty@labaton.com
17       Counsel for Labaton Sucharow, LLP
18
19
20
21
22
23
24       [appearances continued]
```

Page 3

```
 1   A P P E A R A N C E S :
 2
 3       NIXON PEABODY, LLP
 4       By Brian T. Kelly, Esq.
 5       Honorable James E. Vallee, Esq.
 6       Joshua C. Sharp, Esq.
 7       100 Summer Street
 8       Boston, Massachusetts 02110-2131
 9       617-345-1065/bkelly@nixonpeabody.com
10       jvallee@nixonpeabody.com
11           and
12       (via teleconference)
13       By Emily Crandall Harlan, Esq.
14       799 Ninth Street, NW, Suite 500
15       Washington, D.C. 20001
16       202-585-8217/eharlan@nixonpeabody.com
17       Counsel for the Thornton Law Firm
18
19
20
21
22
23
24       [appearances continued]
```

Page 5

```
 1   A P P E A R A N C E S (cont.):
 2
 3   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
 4   By Richard M. Heimann, Esq.
 5   Robert L. Lieff, Esq.
 6   Daniel P. Chiplock, Esq.
 7   275 Battery Street, 29th Floor
 8   San Francisco, California 94111
 9   415-956-1000/rheimann@lchb.com
10   Counsel for Leiff Cabraser
11
12      ALSO PRESENT: Michael Thornton, Esq.
13      Professor Stephen Gillers
14      (via teleconference):
15      Lynn Sarko, Esq.
16      Laura Gerber, Esq.
17
18
19
20
21
22
23
24
```

Page 6

1    P R O C E E D I N G S

2

3    **MS. LUKEY:** Thank you for this
4 opportunity to make the closing arguments.
5 Obviously, this case is very important to the firms
6 involved because there is nothing of greater
7 importance to a lawyer or his or her law firm than
8 their reputation. And when allegations that relate
9 to ethics are leveled against them, that's a
10 serious, serious matter that shouldn't be taken
11 lightly.
12    I'm sure we're all aware of
13 circumstances in our lives where colleagues and
14 friends have been charged, if not we ourselves, with
15 ethics violations, and it's not a good or easy
16 thing. It's a very serious thing which is the
17 reason this jurisdiction at least, and I suspect all
18 others, requires any findings that relate to ethics
19 matters or, for that matter, to sanctions to involve
20 intentional conduct, not inadvertent conduct.
21    My plan, your Honor, is to run through
22 the very helpful outline, not necessarily in the
23 exactly the same order that Bill forwarded to us a
24 few days ago as to the issues in which you're

Page 7

1 interested. Obviously, I know you'll feel free to
2 stop when you have questions, and that's perfectly
3 fine.
4    The time I spend on the double counting
5 issue will be limited, and with regard to that issue
6 -- I am going to go over it -- will be limited to
7 Labaton Sucharow because there's a different
8 situation involving Lieff Cabraser.
9    The arguments that I make that relate to
10 the Chargois agreement will in substantial part deal
11 with the law that came in through the experts, not
12 only for us but for the other parties. It's
13 basically the same law. There will be some
14 Labaton-specific issues that I address.
15    Going first to the double counting --
16    **THE SPECIAL MASTER:** Hang on one second.
17 My pen just ran out of ink.
18    **MS. LUKEY:** Okay. I had to take JAMS'
19 pens you want a --
20    **THE SPECIAL MASTER:** Brought a refill.
21    **MS. LUKEY:** All set?
22    **THE SPECIAL MASTER:** All set.
23    **MS. LUKEY:** Starting with the double
24 counting issue I would suggest to the Court that the

Page 8

1 evidence indicated that what happened here was a
2 matter of inadvertent errors; that at the end of the
3 day the mistake was just that, a mistake, by which
4 certain staff attorneys' time was double counted.
5    Now there are two different principles
6 that were involved in what happened here, and they
7 inevitably became conflated which is not surprising.
8 One has to do with how do you effectuate a sharing
9 of the cost burden among law firms, and the second
10 is who then takes responsibility or takes the
11 opportunity, since there's a certain stature
12 involved in one's lodestar report in this field, to
13 include the individuals on their firm's respective
14 lodestars.
15    So what happened here was this: The
16 Thornton Law Firm didn't have a regular situation
17 where it had staff attorneys that were on staff or
18 regularly brought in on a contract basis. Again,
19 limiting myself to Labaton. As the Court knows,
20 Labaton actually employs staff attorneys. You had
21 the opportunity to meet several of them who worked
22 on this case. They're a talented group with some
23 pretty extraordinary experience and great
24 credentials.

Page 9

1    The arrangement, the model that is used
2 there is really beneficial for both sides. The
3 staff attorneys have the ability to leave for three
4 or six months, travel the world or whatever they
5 want to do, come back for the next project. They
6 have the ability to work defined set hours ending at
7 a far more reasonable time, usually 5:30 or 6 than
8 would an on-partnership-track associate's hour would
9 be --
10    **THE SPECIAL MASTER:** Now spend as much
11 time on this as you want, but let me just give you
12 an indication.
13    **MS. LUKEY:** Absolutely.
14    **THE SPECIAL MASTER:** I was impressed
15 with the staff attorneys for both firms. These were
16 folks -- and I know different judges take different
17 views of rates of which they should be, quote,
18 billed. My heavy inclination is to find that these
19 staff attorneys were doing what was essentially
20 associate-level work.
21    **MS. LUKEY:** Yes.
22    **THE SPECIAL MASTER:** Either in some
23 cases lower-level associate work and in other cases
24 maybe mid-level associate work and made significant

Page 10

1 contributions to the results in the litigation. The
2 rates at which they were billed seemed to be
3 reasonable and commensurate with their experience
4 and the value that they contributed to the firm --
5 to the firms.
6    So you don't have to persuade me on it.
7 You can move on. I think that the time that we
8 spent going to Labaton, seeing the staff attorney
9 operation, meeting the staff attorneys, interviewing
10 them and deposing the four or five that we
11 interviewed was very helpful.
12    I was particularly struck by a number of
13 'em, one particular is David Alpert who had a
14 significant background in the subject matter
15 himself, and probably in terms of the value he
16 contributed was worth as much as any associate or
17 even partner to the ultimate outcome of the case.
18    So you don't have to spend anymore time.
19 Judge Wolf may not agree with me on that. Other
20 judges may not agree with me, but I thought that the
21 rates at which they were attributed in the lodestar
22 petitions were appropriate.
23    We may have a disagreement over the
24 agency attorneys, but not necessarily related to the

Page 11

1 work but more in the nature of the relationship and
2 the lack of risk that the firms undertook and
3 everything else. And again judges disagree.
4    So you may disagree about that and point
5 to that, but I was well persuaded that the work that
6 these staff attorneys did contributed great value to
7 the settlement, and the support they provided to the
8 attorneys in the mediation contributed great value.
9 So you don't have to persuade me anymore on that.
10    MS. LUKEY: Well, thank you.
11    Just quickly the only other issue for us
12 on the staff attorney -- excuse me -- on the double
13 counting issue is the specific bullet point that
14 asked what was the agreement and how did it happen.
15    THE SPECIAL MASTER: Well, before we get
16 to that, if you want to address the issue of whether
17 agency attorneys who were retained from contracting
18 agencies and the firms paid those contracting
19 agencies should have been billed at the same rate as
20 the staff attorneys employed by the firms, I want to
21 give you an opportunity to address that because that
22 is an issue that is troubling me.
23    MR. HEIMANN: I'll address that.
24    MS. LUKEY: We didn't have any staff

Page 12

1 attorneys. So I will leave that for Richard.
2    THE SPECIAL MASTER: Richard, you'll
3 address that?
4    MR. HEIMANN: I will.
5    MS. LUKEY: The question you asked in
6 the outline you provided was what was the agreement
7 as to who was going to put it on the lodestar.
8    As I said, what happened was a
9 conflation of two principles. There was no question
10 that Thornton was going to share in the cost and the
11 burden which is the way these things work. Frankly,
12 there's no question but that there was then an
13 innocent and inadvertent misunderstanding as to how
14 those would then be handled on the lodestar.
15    Your Honor has already noted, and we
16 have discussed and earlier suggested best practices,
17 most of which have already been implemented in this
18 area at Labaton about how to prevent what would be
19 called a silo effect from the circumstance where you
20 have people too specialized in their roles sort of
21 trying to get efficiency and expertise.
22    The more senior people and the people
23 who dealt regularly in the area of putting together
24 settlements, the Harry Goldbergs, the Ray Politanos

Page 13

1 and then taking direction from them, Nicole Zeiss,
2 although relatively new to the job, understood that
3 the traditional practice is in fact that while
4 another firm may bear part of the cost in order to
5 be fairly be carrying their share of the weight in
6 these long-term cases, some of which don't end well
7 for these plaintiffs' firms, those individuals
8 thought it was going on to the Labaton lodestar
9 report because that's what they traditionally did.
10    THE SPECIAL MASTER: So can I infer from
11 your comments that you would agree that there should
12 not be -- two things: One, what you referred to as
13 silos, what I've referred to as
14 compartmentalization, which I do believe contributed
15 to the reason why we're all here with one part of
16 the firm not knowing what was going on in other
17 parts of the firm. Do you agree with that?
18    MS. LUKEY: I think Larry Sucharow sat
19 here and said it. I'm not going to disagree with
20 the founding partner.
21    THE SPECIAL MASTER: All right.
22    MS. LUKEY: There was a problem with the
23 compartmentalization which has been corrected and
24 addressed.

Page 14

1 **THE SPECIAL MASTER:** It would have been
2 helpful if Nicole Zeiss had known at least about the
3 cost-sharing agreement as to the staff attorneys.
4 **MS. LUKEY:** There is no question, and my
5 heart, frankly, has gone out to Nicole throughout
6 this situation 'cause she's a relatively young
7 partner. She did not know, and it would have been
8 helpful for her to know.
9 And at the same time the relatively
10 younger partners like Mike Rogers didn't know what
11 the usual practice had been, and therefore, as he
12 testified, was in agreement -- he didn't know if
13 he'd actually said it to the folks at Thornton, but
14 he was in agreement that they believed they were
15 putting it on the lodestar.
16 So you had two different things going on
17 at Labaton. It was a mistake. It's recognized. It
18 had never happened before. They feel very confident
19 with the changes they've now made. It will never
20 happen again. They actually have now prohibited the
21 situation where another firm reimburses them for
22 cost.
23 **THE SPECIAL MASTER:** So, bingo, you've
24 segued into my next question which is for best

Page 15

1 practice purposes, would you agree that allocating
2 cost sharing through the allocation of employees, be
3 they staff attorneys, associates or anything else,
4 and reimbursement from one firm to another firm is
5 not a best practice; that the best practice would be
6 to simply figure out a reimbursement schedule based
7 on maybe not just the staff attorneys but any other
8 costs and implement that maybe at the end of the
9 case or at some interim part of the case's
10 gestation?
11 **MS. LUKEY:** Labaton certainly agrees it
12 considers that the best practice. I think they may
13 be a little reluctant to say that on behalf of the
14 entire plaintiffs securities class action bar that
15 they would tell them what the best practices are,
16 but they agree that what your Honor's referencing is
17 the best practice, and they have implemented it for
18 all of their cases.
19 **THE SPECIAL MASTER:** All right. So
20 moving next to the issue of the lodestar allocation
21 to the Thornton firm. Here's where I am concerned.
22 It appears from the discovery that Thornton was very
23 concerned about getting its fair share of what it
24 perceived as its fair share of any ultimate fee

Page 16

1 award.
2 And rightly or wrongly, Garrett Bradley
3 focused on among other things -- focused on his
4 words "jacking up the lodestar" -- his words -- so
5 that he could be -- he, his firm, could be fairly
6 compensated and that the lodestars of the Thornton
7 firm would be commensurate with the lodestars of
8 Lieff and Labaton.
9 And as we've seen, there was this back
10 and forth between Garrett Bradley and, among others,
11 Dan Chiplock as to what was an appropriate lodestar
12 and how to achieve that and how it was effectively
13 aimed at Thornton getting what it perceived as its
14 fair share vis-a-vis the other firms and in
15 Thornton's perception that it had not gotten its
16 fair share in the BNY Mellon case. That was all
17 context and background.
18 My question is wasn't the easiest way to
19 have achieved that simply have been to have an
20 agreement like there was that irrespective of
21 lodestar Thornton got X percentage and then another
22 X percentage of whatever the -- I can't remember the
23 term that was used for the amount above the 60
24 percent; I think in one e-mail it was the gravy, but

Page 17

1 whatever it was, wouldn't that have been a better
2 way to do that than to try to inflate a lodestar on
3 what were really quite artificial factors?
4 **MS. LUKEY:** I'm reluctant to say that
5 any other firm inflated a lodestar because I don't
6 think it would be fair for us to do that.
7 **THE SPECIAL MASTER:** I don't want you to
8 imply that they did. You don't have to imply that.
9 I'm only asking about a line question, which I'm
10 going to have for everybody, but wasn't the best way
11 to do this to simply abide by the agreement that the
12 three customer class counsel made at the beginning
13 which was 20/20/20 and then figure out the rest
14 later?
15 Wouldn't that have been a far better way
16 rather than this artificial construct?
17 **MS. LUKEY:** Your Honor, I think it would
18 have been a far cleaner way, and I suspect what the
19 problem is is that different judges treat the
20 lodestar crosscheck a little differently. And that
21 may have caused a concern.
22 I will be honest with you and say last
23 night I had a chance to review the documents that
24 Lieff had pulled out for use in this demonstration,

---

Page 18

1  all of which had been previously produced, but I
2  confess I have not read all of the thousands of
3  documents in this case, and I saw some of the
4  earlier communications which were only between the
5  two firms, and clearly there were other issues at
6  play because they had the prior case, and I had
7  never focused on those before.  I don't know that
8  they're particularly important.
9      But do I think it would be cleaner and
10 better for them not to try to match lodestars?  Yes.
11 And I think what ended up happening was, if I recall
12 correctly, an even division among the firms, and I
13 think the concern that may have led to what happened
14 here is partially a product that we don't actually
15 have totally clear guidance from the courts on this
16 issue.
17     The first circuit has said that it does
18 recognize contingent fees would then allow the
19 firms simply to do an even split if that's what they
20 felt was appropriate, because remember here it's --
21 it is Thornton and Lieff that brought this case to
22 Labaton because Labaton had the potential, it had an
23 active pension fund in the Arkansas Teacher
24 Retirement System.

Page 19

1      So would that have been better?  Yes,
2  but can I understand why there were concerns?  Yes,
3  because some judges even in the first circuit which
4  says, okay, we honor contingencies and just use the
5  lodestar as a crosscheck, and it's okay if the ratio
6  isn't more than one to three usually -- usually, not
7  always -- but that's usually okay, it would have
8  been better.
9      But there are, as I understand it --
10 this is not my regular field -- there are judges who
11 treat the lodestar, even though it's only intended
12 to be a crosscheck here, as having greater weight
13 than that.
14     THE SPECIAL MASTER: But presumably that
15 concern that you might get a judge like Judge Stein
16 in the Citigroup case who was very focused on
17 lodestar, could that not have been addressed through
18 an inter-counsel agreement as there was in this
19 case?
20     Could that not have been addressed by an
21 inter-counsel agreement; and then after hopefully
22 there was a successful result, as there was here,
23 then divide up the fee at that point?
24     That could have been addressed rather

Page 20

1  than this, you know, circumlocution of having people
2  who didn't work for a firm, weren't employed by a
3  firm appear --
4      MS. LUKEY: We're in total agreement
5  with you on that one, your Honor.  They have changed
6  that.  We agree that although this was not an
7  aberrational circumstance where a firm that didn't
8  have its own staff attorneys asked for -- then I
9  think we said in our initial submission about ten
10 times this had happened over Labaton's history, and
11 seven of the times it was clearly carried on the
12 lodestar for Labaton, and the others were different
13 arrangements made at the end.
14     That's not going to happen again at
15 Labaton because they've changed their practice.  Do
16 I think you should recommend a best practice that
17 way?
18     THE SPECIAL MASTER: Yes.
19     MS. LUKEY: Yes.
20     THE SPECIAL MASTER: One thing I'm
21 looking to do here, as I've said from the beginning
22 is, to make recommendations on best practices going
23 forward to Judge Wolf.  He's free to adopt those or
24 reject those, but I -- I don't think any of us would

Page 21

1  be here had that been the practice.
2      MS. LUKEY: And I agree.  And, as I
3  said, Labaton has already adopted it.  The only
4  reason I hesitated was purporting to speak for an
5  entire segment of the bar would be, I think,
6  inappropriate.
7      THE SPECIAL MASTER: Well, I want to
8  give everybody an opportunity to address --
9      MS. LUKEY: But Labaton agrees that's
10 certainly a best practice, and it's certainly
11 already adopted it for itself.  It gets too
12 convoluted --
13     MR. HEIMANN: Do you want us to address
14 this now or wait 'til we're  rather than waiting
15 'til the end?
16     THE SPECIAL MASTER: Why don't we not
17 cut into Joan's time?
18     MR. HEIMANN: Okay.
19     THE SPECIAL MASTER: Why don't we not
20 cut into Joan's time.  Yes.
21     MS. LUKEY: Shall I then go on?
22     THE SPECIAL MASTER: Yes.
23     MS. LUKEY: Did you have any other
24 questions that related to double counting?

Page 22

1    THE SPECIAL MASTER: Yes.  I understand,
2 I think, how this happened.  Where I'm struggling is
3 how it is that Thornton put these staff attorneys on
4 their lodestar without some kind of explicit
5 agreement.
6    I understand that there are some -- and
7 there's been testimony that there was belief among
8 lawyers at Labaton and certainly at Lieff that they
9 may include them.  But shouldn't this -- if that had
10 ripened into an agreement, shouldn't this have been
11 put in an explicit agreement rather than just
12 relying on shadowy assumptions that other firms
13 understand?
14    And the others are going to be able to
15 address this as well.
16    We found no explicit agreement as to
17 that.  And I think everybody -- everybody agrees
18 with it that there was no explicit agreement.  I'm
19 not sure there was even an implicit agreement.  I
20 think some lawyers at some of the customer -- the
21 other customer firms, Labaton and Lieff, may have
22 thought that that was reasonable for them to do it,
23 but it seems to me that when you are making
24 representations to a Court such as those that we're

Page 23

1 all now familiar with about lodestar and sworn
2 declarations, that this should be front and center;
3 that there should be an explicit agreement if it's
4 going to be done and that the Court should be told
5 that these are not employees of the firm that's
6 submitting the lodestar quite explicitly.
7    MS. LUKEY: I think that would be a
8 second best practice that one would consider if you
9 weren't doing what Labaton decided to do which is
10 not to permit this to happen at all.  That's number
11 one.
12    They're not going to allow their staff
13 attorneys to be carried on anyone else's lodestar or
14 to be reimbursed.  In other words, they are
15 eliminating that aspect of what is fairly
16 traditional practice in saying we're carrying our
17 own employees; we wouldn't allow another firm to
18 reimburse us for the partnership track associates.
19 We're not going to let them reimburse us for
20 non-partnership track associates.
21    THE SPECIAL MASTER: There are all sorts
22 of reasons to do that as I've been thinking about
23 this.  Malpractice.
24    What if one of these staff attorneys had

Page 24

1 made a terrible error in law upon which the lawyers
2 rely that resulted in some awful thing happening?
3 How do you allocate out the malpractice in that
4 case?
5    MS. LUKEY: Well, that's --
6    THE SPECIAL MASTER: The potential for
7 malpractice.
8    MS. LUKEY: The Labaton expectation
9 because at the level where people were actually
10 thinking about it believed they were putting it on
11 their own lodestar had been the assumption that
12 they're responsible for the malpractice of their own
13 employees.
14    THE SPECIAL MASTER: Right.  But if the
15 cost is being --
16    MS. LUKEY: -- reimbursed --
17    THE SPECIAL MASTER: -- and they're
18 going on the lodestar.
19    MS. LUKEY: But what it's going to do
20 it's going to give the plaintiff an opportunity to
21 sue two firms instead of one without question.
22    THE SPECIAL MASTER: My point exactly.
23    MS. LUKEY: And, as I said, Labaton has
24 said no more.  We're not going to do that.  I think

Page 25

1 it's a different situation -- and I leave it to
2 Richard -- when one is dealing with agency attorneys
3 because there's a different way of handling that
4 other than -- you can do it differently.  You can
5 just have a direct hire.  We couldn't.  These were
6 employees.
7    It is no longer going to be permitted.
8 It happens, but, as I said, there are only ten times
9 that this had been done over the history of a firm
10 that's been around for quite a while.  So it wasn't
11 common practice.  But it won't happen again from
12 Labaton's perspective.
13    Your second alternative as to how that
14 might be done with notice to the Court and clear
15 indications and express agreement make all kinds of
16 sense, but you don't even need to go there if you've
17 done what Labaton has done which is to say no more;
18 we're not going to allow anybody to reimburse us.
19    THE SPECIAL MASTER: Okay.  I think
20 that's a higher best practice than the second.
21    MS. LUKEY: Well, after learning the
22 curve of this, that's the way they decided to go,
23 and that was adopted some months ago.
24    THE SPECIAL MASTER: Okay.

Page 26

1    **MS. LUKEY:** If there are no other
2  questions on the double counting, I'll go to what --
3    **THE SPECIAL MASTER:** I mean I want to
4  hear from Richard and Brian --
5    **MS. LUKEY:** Of course.
6    **THE SPECIAL MASTER:** -- on this but...
7    **MS. LUKEY:** It's up to you on timing.
8  I'll either go directly into fee division. Shall I
9  go to it?
10    **THE SPECIAL MASTER:** Fee division.
11    **MS. LUKEY:** All right. The fee division
12  analysis is one that I will readily admit has caused
13  considerable consternation and often frustration
14  because it felt as if we were dealing with a moving
15  target because, with all due respect to Professor
16  Gillers who is here today, we felt the opinions that
17  were being raised were changing and evolving.
18    So let me begin with the --
19    **THE SPECIAL MASTER:** Isn't that what's
20  supposed to happen during an investigation?
21    **MS. LUKEY:** Not when the opinion's
22  already been rendered, your Honor, and we had his
23  report. And as the professor was confronted with
24  responses -- because some -- again, with all due

Page 27

1  respect to a respected ethicist who may have gotten
2  outside of his area a little with the Federal Rules
3  of Civil Procedure, it became problematic.
4    And one of the things that I think was
5  particularly problematic was that this was a case
6  that probably did cry out for a Massachusetts expert
7  -- there aren't that many of them -- and preferably
8  one who also had Massachusetts practice experience
9  which is what made actually Hal Leiberman was an
10  interesting combination having practiced both as an
11  attorney in the ethics field and as the deputy bar
12  counsel in Massachusetts for many, many years and
13  then gone to New York, and he was the deputy here;
14  he was the actual bar counsel there, and it brought
15  an interesting perspective.
16    In fact, Judge Wolf had indicated at the
17  first hearing his initial thought on a special
18  master was to bring in an experienced practitioner
19  here, and he couldn't -- he asked a couple of them,
20  and people didn't want to do it. It's hard for
21  lawyers to take on other lawyers and law firms. We
22  have friends and respect, and it's not an easy thing
23  to do.
24    But Massachusetts presents an

Page 28

1  interesting problem because it's one of the
2  states -- I believe one of the experts said about
3  fifteen -- who absolutely not only permit bare
4  referrals but embrace them.
5    There have been two occasions in my
6  practicing lifetime -- so, admittedly, that's not
7  forever, but it's 44 years -- in which the Supreme
8  Judicial Court, which is the body that implements
9  our laws, suggested a change, and in both times
10  pulled back because the bar reacted strongly.
11    There's been no attempt, as I understand
12  it at least, since the late 1990's to make this
13  change again because there is a recognition that
14  there is a reason as a policy matter for preferring
15  bare referrals, and that is that it will encourage
16  the lawyer who really doesn't have the expertise
17  necessary for the client to refer the client to
18  someone who can better handle the case.
19    And so the decision has been made that
20  absolutely no services need be rendered, no
21  assumption of liability need be made. And that is
22  just simply the rule, and it doesn't matter what you
23  label the particular payment or fee as. You'll
24  notice that 1.5(e) doesn't have a label. It just

Page 29

1  talks about a fee division. And it doesn't matter
2  what the dollar amount is.
3    In a moment when I get to 1.5(a), I will
4  say it doesn't even matter whether it appears to be
5  a fair or logical deal what percentage the referring
6  attorney and the receiving attorney strike as their
7  division agreement.
8    All of that is outside of 1.5(e). When
9  this started, I'm not sure that was fully
10  recognized. I mean I will go back to a little bit
11  of history. I remember the day I got the call from
12  Bill about Chargois & Herron, and I remember it
13  because Bill said to me what do you know about Damon
14  Chargois, and I said who.
15    **THE SPECIAL MASTER:** That's what we
16  said.
17    **MS. LUKEY:** Well, I had to go back and
18  figure it out. The documents that related to
19  Mr. Chargois were not called for because in the
20  discussion between counsel and Mr. Sinnott as we
21  were all trying to narrow this to get the production
22  quickly, the fee allocation request was taken out of
23  the mix, and it obviously wasn't done with any
24  intent to deceive because I didn't have a clue about

Page 30

1 Mr. Chargois at that point.  It was simply not --
2 **THE SPECIAL MASTER:** Your clients did.
3 **MS. LUKEY:** -- a pertinent issue.
4 **THE SPECIAL MASTER:** Your clients did.
5 **MS. LUKEY:** Which clients?
6 **THE SPECIAL MASTER:** Labaton.  They knew
7 about Chargois.
8 **MS. LUKEY:** Yes, but the issue is did it
9 matter.
10 **THE SPECIAL MASTER:** And that will be an
11 issue I'm going to have to decide whether the
12 requests that were ultimately agreed upon called for
13 the documents that we ultimately got on
14 Mr. Chargois.  That'll be something we'll have to
15 come to a conclusion on.
16 **MS. LUKEY:** Well, that's fine.  I can
17 only tell you what we concluded on our review was
18 that there was one request only that would have
19 called for anything that related to fee divisions
20 and allocations.  That was one that was withdrawn.
21 It didn't have anything to do with anything Labaton
22 did.
23   It was my colleague and my partner,
24 Justin Wolosz, and I sitting down with Bill and

Page 31

1 Elizabeth and trying to get through it because the
2 request was so broad, and there was a need for you
3 to have the documents in I believe it was two weeks
4 because you needed to start -- I don't recall now
5 whether it was the interviews or the depositions
6 but --
7 **THE SPECIAL MASTER:** No, no -- yeah, the
8 timing was certainly compressed.
9 **MS. LUKEY:** That was nobody's fault, but
10 it was compressed, and we just couldn't do it fast
11 enough.  So this was --
12 **THE SPECIAL MASTER:** Don't you think it
13 would have been -- I understand you didn't know
14 about Chargois, but don't you think it would have
15 been a prudent practice at this very late date
16 during an investigation into fees to simply, as
17 Thornton did, to simply give us the Chargois
18 documents?
19   Whether or not by the letter of the
20 request that ultimately was propounded, would it not
21 have been a better practice to simply at the very
22 beginning given us the Chargois documents?
23 **MS. LUKEY:** Your Honor, if you're asking
24 me what best practices would be as opposed to what

Page 32

1 constituted a disciplinary or sanctionable piece of
2 conduct --
3 **THE SPECIAL MASTER:** I'm not suggesting
4 this was sanctionable.
5 **MS. LUKEY:** The best practices with the
6 benefit of 20/20 hindsight, which is usually I think
7 how best practices end up being developed, of course
8 it would have been better.  If we had known that
9 this was going to be a subject of interest to the
10 special master, in retrospect, yes.  It would have
11 been easier to explain everything and do it all up
12 front --
13 **THE SPECIAL MASTER:** It could only have
14 been a subject of interest to the special master had
15 the special master known about it.
16 **MS. LUKEY:** Well, obviously.  But my
17 point is if we had -- with the benefit of 20/20
18 hindsight, we would all rather have had all the
19 depositions once, not twice, you included.
20 **THE SPECIAL MASTER:** My point.
21 **MS. LUKEY:** But we're in a circumstance
22 where the existence of the fee is perfectly
23 permissible, and -- as we'll get to in a moment --
24 there's no obligation to disclose to the Court and

Page 33

1 we say no obligation to disclose to the client.  It
2 is a private matter.  And in Massachusetts --
3 **THE SPECIAL MASTER:** But in an
4 investigation about the reasonableness and accuracy
5 of the fees, was that a decision that the firm --
6 since you, apparently, didn't know about it as
7 counsel, is that a decision that it was prudent for
8 the Court -- for the firm to make not to give these
9 documents to us in the first instance?
10   This -- look, this investigation
11 started.  It was, as Judge Wolf spelled out in some
12 detail in his order and in my mandate, was all about
13 the reasonableness and the accuracy of the fees.
14 That's what it was about.  That's how the door
15 opened on this.
16   Would it not have been prudent to simply
17 give us this stuff at the beginning, and let us sort
18 it out rather than have to find it in a document
19 production by the other firm?
20 **MS. LUKEY:** Well, let me say this, your
21 Honor.  The question in Massachusetts is is the
22 aggregate fee reasonable.  I hear what you're saying
23 now with the benefit of 20/20 hindsight, but there
24 is no rule and no case law suggesting that anything

Page 34

1 other than the aggregate fee is the matter to be
2 reviewed.
3     As Professor Rubenstein -- it wasn't
4 even our expert; he's Lieff's expert -- said it's a
5 two-stage process.  The issue and particularly in a
6 place like Massachusetts which doesn't choose to
7 assess the nature of what was done for a referral
8 fee, the first step is what is the reasonable fee.
9     THE SPECIAL MASTER: So you -- you give
10 the special master all the documents, and then you
11 make the arguments.  That seems pretty clear.
12     MS. LUKEY: Well, yeah, but let's think
13 about how this actually happened.  You gave us a
14 document request.  Counsel was unaware of any fee
15 allocation.  I'm not sure I would have considered it
16 to have been relevant.
17     I might have reacted differently to the
18 suggestion as to whether it was in or out, and I
19 honestly don't remember if it's one of the ones that
20 Bill pulled or that we said what does this have to
21 do with anything.  I just don't remember.
22     We then take what remains of the
23 document requests, and we give them to the client
24 whose regular law firm Mayer Brown in New York does

Page 35

1 the document review with the request that we gave
2 them.
3     So the request -- now you may differ
4 when you look at the request, but we went back --
5 when Professor Gillers' report included the footnote
6 that implied there had been discovery misconduct, we
7 went back and confirmed that the only request that
8 we thought could even arguably apply had been
9 withdrawn before it went to Labaton and Mayer Brown
10 for review.
11     THE SPECIAL MASTER: We may have a
12 disagreement about whether broadly interpreted other
13 requests that remained in the production request
14 called for.  You know, Thornton must have thought it
15 did because Thornton produced.
16     MS. LUKEY: Yeah, I don't know what
17 Thornton thought, your Honor.  And I'll have to
18 leave that to Brian.  I assume they weren't
19 attempting to cause harm to Labaton or anyone else.
20 I don't know what their reasoning was.
21     So it was --
22     THE SPECIAL MASTER: I mean --
23     MS. LUKEY: It was what it was.  So from
24 our perspective --

Page 36

1     THE SPECIAL MASTER: I don't view this
2 as a primary issue, maybe not even a secondary
3 issue.  But I do believe that best practices and
4 prudence would have required Labaton first to tell
5 you about the Chargois Arrangement, and, second, to
6 produce the documents to us in the first instance.
7 We would have been long done.
8     MS. LUKEY: Well, I just want to be
9 clear with you.  I can't tell you what to determine
10 about the scope of the request.
11     All I can say to you is I want you to
12 understand that the process was such that the
13 request that was cited in Professor Gillers'
14 footnote wasn't in the list that we sent.
15     As you know, we disclosed each time that
16 the document review was being done in New York --
17     THE SPECIAL MASTER: Yes.
18     MS. LUKEY: -- and the pull was there
19 and not by us.  So what we gave them did not have
20 the request in it.  And what you choose to do with
21 the other requests, of course, is completely up to
22 you.
23     THE SPECIAL MASTER: As I said, this is
24 not a primary issue.  We are where we are.  But it

Page 37

1 is my view that prudence -- given the scope of the
2 investigation or the scope of my mandate -- let me
3 put it that way.
4     Given the scope of the mandate that
5 Judge Wolf levied upon me in his order, it would
6 have been most prudent of Labaton to produce to
7 Chargois information in the first go-around and to
8 have not done so -- and I'm not blaming you for
9 this, Joan; they obviously didn't even tell you --
10 but had that information been produced in the first
11 go-around, we'd be long since done at, I might add,
12 a much lower cost.
13     MS. LUKEY: I understand what you're
14 saying, your Honor.  I just want to point out that I
15 think what happened here is because we took the
16 request as ultimately agreed upon in a negotiation
17 where I didn't know that there was another set of
18 documents, and that's what they were given to
19 produce.
20     So, again, we may have had
21 compartmentalization none, of which was meant to be
22 malicious or intentional in any way.  And that
23 perhaps led us to where we are.
24     But let me just -- going back to where I

1 was, 1.5(e) is the governing rule in Massachusetts,
2 and we all had an interesting learning process with
3 regard to 1.5(e) because I will be perfectly blunt,
4 I started out with the current rule and made the
5 mistaken assumption that the last time the rule was
6 changed was when we made the major conversion from
7 the disciplinary rule designations and then
8 restructured with DR --
9    **THE SPECIAL MASTER:** Hm hm.
10    **MS. LUKEY:** -- I think it was 107 or
11 207, and then it switched to the Rules of
12 Professional Conduct, and I did not tell my team to
13 go back and see if there had been an intervening
14 change because I didn't remember one, and I credit
15 Josh Sharp sitting over here -- Mr. Kelly's
16 colleague -- is the one who brought it to my
17 attention with the usual skill of the younger set
18 pulling it up on his iPhone in the midst of one of
19 the depositions when it was exactly on point.
20    So what ended up happening was even our
21 experts were working with what we gave them on the
22 rules, and it turned out -- and I think everybody --
23 I'm going to make an exception to that in a minute,
24 but I think we were all operating on that

1 assumption, and Professor Gillers told me in his
2 deposition that he actually knew that there had been
3 a change, and I really have a question about why
4 that wasn't highlighted or made known to the rest of
5 us, but that doesn't excuse me for not figuring it
6 out, and I didn't until Josh told me for which I am
7 very grateful.
8    We then have the issue of what rule was
9 applicable, but at the end of the day when we then
10 went out and retained experts, they said to us it
11 doesn't matter because you are in compliance with
12 the old 1.5(e) with the dictum in Saggese and with
13 the new 1.5(e). The new 1.5(e) imposed the writing
14 requirement and the requirement that the consent be
15 obtained at or before the time of the engagement.
16    Saggese prospectively said in what had
17 to be dictum, because they weren't talking about the
18 future, we're going to have a writing requirement,
19 and we want it to be before the referral is made
20 which every expert said the same thing, let's
21 illogically you don't actually --
22    **THE SPECIAL MASTER:** You and I are going
23 to have a big disagreement over what constitutes
24 dictum in a judge's decision when a Court says going

1 forward from here on after.
2    **MS. LUKEY:** Well --
3    **THE SPECIAL MASTER:** You and I are going
4 to have a big disagreement about that.
5    **MS. LUKEY:** -- we may, your Honor, but
6 I'm going to point something out to you which is
7 that there's a rule-making process in Massachusetts
8 followed by the SJC. They chose not to go through
9 it for six years.
10    When they did go through it, two things
11 of importance happened. One, they didn't match the
12 terms of what they said in Saggese. They changed
13 the timing to become much more logical at the time
14 of the engagement, not before the referral was made,
15 and they kept the reasonableness requirement, but
16 they also imposed a 90-day period, a grace period
17 before it took effect. So you don't have to do this
18 for 90 days, but be forewarned it's coming.
19    The other thing is, as we presented to
20 you, in that interim period there was not a single
21 case or bar decision or ethics -- from the two
22 ethics committees dealing with this or saying
23 anything about a purported change in the rule.
24    But, more importantly, I think for our

1 purposes here where there are questions of
2 discipline and sanctions, what you did here from the
3 several experts on our side is you don't sanction or
4 discipline somebody for following the text of the
5 rule. That's not what you do.
6    And, frankly, if you go back -- I'm not
7 sure -- I think we offered this to you, and I think
8 it was in the submissions somewhere at one point,
9 but, of course, these were attorneys who were pro
10 hac'd in. The pro hac application asks that you
11 certify that you're familiar with the rules, not
12 with the cases. I venture to guess as a
13 practitioner here -- because there wasn't a big deal
14 made about a change at the time of Saggese maybe
15 because we all knew that there's a rule-making
16 process before rules become applicable here, I
17 venture to guess that a fairly significant
18 percentage, probably well over half of the
19 practicing bar, didn't even focus on the fact that
20 Saggese was now adding a writing requirement. But,
21 you know, all of that is academic and very
22 interesting, but the fact of the matter is there is
23 an engagement letter.
24    And the engagement letter, although we

Page 42

1 parsed the words, I had a hard time the first time
2 you raised understanding what you were saying; but
3 as we read the engagement letter, Arkansas said you
4 have our permission to use local or liaison counsel,
5 you have our permission to pay referral fees, and
6 you have our permission to pay fees for other
7 services that may be rendered.
8     Our experts say -- and I don't honestly
9 remember whether Professor Gillers said that he
10 thought that wasn't good enough, but our experts
11 said, I think very credibly, that's written consent
12 to the payment of a referral fee.
13     We also have the fact that -- you have
14 to take this in the context of the history -- George
15 Hopkins is not synonymous with Arkansas. It's an
16 institution. And clearly Paul Doane, a lawyer
17 himself, a Massachusetts lawyer, and Christa Clark,
18 a lawyer in Arkansas, knew of Damon Chargois and
19 Chargois & Herron.
20     And in the case of Ms. Clark who was the
21 chief counsel, Eric Belfi actually said to her,
22 okay, you said you can't have two unrelated firms as
23 panel counsel, but we are going to go forward
24 affiliated with them. We are going to work with

Page 43

1 them. And there is no counterevidence to that.
2 George Hopkins then comes in, hasn't heard the name
3 Chargois but expressly says, look, I don't want to
4 be placed in the position of the gatekeeper. His
5 testimony was interesting on that at the deposition.
6     It is a distraction. He confirmed this
7 in his ratification declaration. It is a
8 distraction from my role as the class rep if you say
9 to me now I want you to pay attention to these local
10 attorneys. You know, he used it in another context,
11 actually, I think with regard to the ERISA attorneys
12 something about the flies buzzing around or
13 something of that nature --
14     **MR. SINNOTT:** Fleas I think he said.
15     **MS. LUKEY:** I don't think it was fleas.
16 I don't think it was that bad, but it may have been.
17 Anyway, he said something to suggest he doesn't want
18 to be distracted from the role he is playing for the
19 benefit of his beneficiaries as the plan and as
20 class rep by having to deal with local attorneys,
21 the hand holders.
22     **THE SPECIAL MASTER:** Again, might it not
23 have been more prudent here in each case in which
24 Mr. Chargois was going to receive a division of the

Page 44

1 fee for doing no work, not appearing or anything
2 else, to have for its own protection informed the
3 client?
4     Inform the client specifically of this
5 preexisting arrangement with Mr. Chargois to pay him
6 5 -- well, 20 percent of any fee that Labaton --
7     **MS. LUKEY:** Five percent of the total
8 settlement.
9     **THE SPECIAL MASTER:** Five percent of the
10 total in this case but --
11     **MS. LUKEY:** Yep.
12     **THE SPECIAL MASTER:** -- would that not
13 have been best practices and prudent?
14     **MS. LUKEY:** Again, I'm going to say this
15 about what Labaton has already done in deciding what
16 is a best practice for itself -- and, again, I feel
17 reluctant to speak for an entire segment of the bar,
18 but Labaton has determined and ended any
19 relationships of this nature.
20     That's not easy for a plaintiffs'
21 securities class action firm because those kinds of
22 relationships tend to be in many instances where
23 clients come from, and the service provided by the
24 plaintiffs' securities class action bar is

Page 45

1 substantial.
2     I mean there are many a many situation,
3 State Street and BNY Mellon among them, where but
4 for the bar being willing to go forward and but for
5 being able to find a named plaintiff like Arkansas
6 to stand up, those practices will continue.
7     **THE SPECIAL MASTER:** I don't doubt that.
8 And I'm going to say that in my report that the
9 service provided not just to institutional investors
10 in these kinds of cases but to the public is
11 substantial and that the risk that the plaintiffs'
12 bar undertakes in these cases is substantial and
13 that they have to be appropriately compensated at
14 the same level as those firms who they can expect to
15 see on the other side.
16     I find that a totally unobjectionable --
17 not just unobjectionable but totally reasonable
18 approach. That is much different than saying that
19 if you go out you get a guy to do door opening which
20 is effectively what Mr. Chargois did -- he didn't do
21 anything more than that -- and you make a deal with
22 him to pay him 20 percent of your fee on every
23 single case that comes from that client, that's one
24 issue.

Page 46

1 But even if you do that, even if you do
2 that, the next question is who do you disclose it
3 to.
4 **MS. LUKEY:** Well, what if you --
5 **THE SPECIAL MASTER:** Who do you disclose
6 it to and how detailed should the disclosure to be
7 seems to me at the very, very least best practices
8 are that -- if for no other reason than its own
9 protection, a law firm says to the client, hey, we
10 have this existing arrangement.
11 You remember this guy who first
12 introduced us? He's going to get 20 percent of
13 every fee that we get going forward, and we're going
14 to include it in every single retention letter, and
15 we want you to know about it. Is that not a better
16 practice than some vague reference -- and we may
17 disagree about sentence construction -- but than
18 some vague reference about referral fees?
19 We weren't even sure at the beginning of
20 this part of the investigation what to call what
21 Mr. Chargois had. I counted up one night when I was
22 reading -- I counted up at least six different
23 appellations that people used for the Chargois
24 Arrangement.

Page 47

1 **MS. LUKEY:** Well, a rose by any name,
2 your Honor. I hear what you're saying, and as long
3 as you are distinguishing between best practices on
4 the one hand and improper or wrongful conduct,
5 ethical or in violation of Rules of Civil Procedure
6 on the other, I don't take issue with you.
7 If anything, this case, this
8 investigation has certainly highlighted in
9 retrospect with the benefit of having seen where the
10 pitfalls are way better practices and best practices
11 that could be implemented and by Labaton have been
12 implemented.
13 I also don't take issue if the special
14 master makes a recommendation that for the
15 plaintiffs class action or securities class action
16 bar generally the best practice going forward would
17 be to, even when not required in a state like
18 Massachusetts, to put in the engagement letter to
19 whom the referral fee will be paid.
20 That is not an obligation in
21 Massachusetts. Is it a better practice to protect
22 the firms? Yes. And in that sense it's a best
23 practice.
24 **THE SPECIAL MASTER:** And while we're

Page 48

1 talking about best practices, at the very least
2 should the firm have not gotten a signed written
3 agreement with the Chargois & Herron firm as to what
4 the terms were which could then be attached to the
5 retention letter?
6 **MS. LUKEY:** I hope your Honor recalls
7 how hard they tried to get this --
8 **THE SPECIAL MASTER:** Oh, I remember
9 that. But all the more reason why something like
10 this should be disclosed to the client.
11 **MS. LUKEY:** Let me respectfully suggest
12 to you if you look back on the evidence, especially
13 the expert evidence, there is also the issue of a
14 contractual obligation; and whether or not that was
15 in writing, that's not an agreement covered by the
16 statute of frauds. They were on the hook to
17 Chargois & Herron.
18 The best practice that you're suggesting
19 would be a nice balance to strike. What wouldn't be
20 a best practice or would create a lot of problems is
21 simply to declare with regard to an existing and
22 binding contract that that's not invalid here, may
23 not be invalid in the state of the other party, and
24 it creates an impossible rock and a hard place

Page 49

1 situation for the firm. Labaton's response is that
2 it has ended that relationship and any others that
3 were similar in nature.
4 But we have to focus. In terms of
5 determining whether anything was done improperly
6 here, we have to look at the specific agreement and
7 the specific circumstances and the fact that George
8 Hopkins actually said he didn't want to know the
9 identities because of the problems locally if he had
10 to deal with these attorneys. He said something
11 very interesting in his declaration. I want to make
12 it clear. You met George Hopkins several times. I
13 didn't get to write his declaration. You can just
14 bet on that. He dictated it to me. And then he
15 still rewrote it before he signed it.
16 **THE SPECIAL MASTER:** I have no doubt
17 that Mr. Hopkins has very strong views on a whole
18 range of issues.
19 **MS. LUKEY:** Many issues.
20 **THE SPECIAL MASTER:** But I will tell you
21 I was troubled by his declaration both prospectively
22 and retrospectively on a number of issues one of
23 which was he an adequate representative for the
24 class taking the positions that he's been taking. I

Page 50

1 don't want to know.  I don't want to know any of
2 this, that concerns me as a judge as to whether the
3 class representative is an adequate representative
4 for the class where you have the head of that class
5 representative saying I don't want to know this, I
6 don't want to know anything about this.  Because
7 he's -- just let me finish here.
8     He's got to be aware that he is not
9 speaking just for himself.  He's not even speaking
10 just for Arkansas.  He's speaking for a class.  And
11 when the class representative says we don't want to
12 know anything about this, I've got serious concerns
13 about adequacy of representation of the class.
14     **MS. LUKEY:** I have to tell you if
15 there's going to be any point on which we disagree
16 today, that is going to be the one about which I
17 feel most strongly.  George Hopkins did more as a
18 class representative than I have ever seen in any
19 class action anywhere in 44 years.
20     **THE SPECIAL MASTER:** You're not going to
21 get any disagreement from me on whether he was more
22 involved, more engaged and contributed more value
23 than not just the average class representative but
24 almost any class representative, but that doesn't

Page 51

1 give him a pass, and it doesn't give him a license
2 to say I don't want to know about this, I don't want
3 to know about fees, I don't want to know about local
4 fees.  That doesn't give him a pass on that.
5     **MS. LUKEY:** That's not fair, your Honor.
6 There was a single issue he did not want to be
7 involved in, and it was perfectly permissible under
8 Massachusetts law.  He did not want to know about
9 the fee divisions particularly with regard to local
10 attorneys.  He had a very good basis for that.
11     And he actually made it very clear how
12 strongly he felt and that he felt that in not
13 telling him the name Labaton had followed his
14 instructions, and to have done otherwise would have
15 violated those instructions.
16     **THE SPECIAL MASTER:** We may well
17 disagree on that.  I found his declaration and his
18 deposition testimony on those points troubling in
19 view of his role as the head of the class
20 representative and the obligations of the class
21 representative to the entire class, and especially a
22 class like this, which was effectively a hybrid
23 class that consisted of three different lawsuits.
24     Now did everybody overlook that in the

Page 52

1 context of the larger good of the settlement?
2 Probably.  With the benefit of hindsight, should it
3 have been overlooked?  Probably not.  But that's
4 hindsight.
5     **MS. LUKEY:** Well, there were three class
6 reps.  At the end of the day I understand at the
7 time of the settlement that the judge made the
8 determination to name I believe -- I believe at
9 least he made the determination to name George
10 Hopkins as the class rep when he decided not to have
11 three subclasses, but the fact of the matter is we
12 had three unrelated lawsuits that were put together
13 for convenience for pretrial purposes only.
14     The other two class reps each received
15 the same rep fee, $25,000 each, that Mr. Hopkins
16 did, even though he's the individual who was
17 actually there negotiating.  He actually had
18 meetings with everybody's blessing and with Judge
19 Wolf alone, with the WilmerHale lawyers alone.  He
20 was in there fighting tooth and nail for that class.
21 And he had a good faith basis for believing that if
22 he had to deal with the breakdown within the
23 reasonable fee among the classes, that would be an
24 inappropriate distraction.

Page 53

1     Knowing -- he didn't -- he didn't need
2 to know what the three customer class firms were
3 doing in terms of how they decided to allocate.  He
4 didn't need to know that there was someone who
5 facilitated an introduction but for which there
6 wouldn't have been any State Street litigation.
7 That has nothing to do with the responsibilities of
8 the class rep.
9     His responsibility, which he took more
10 seriously than I have ever seen ever, was to be in
11 there fighting for the class to get the best
12 settlement that could be obtained for the class.
13 And there is no question the value he brought to
14 that in that the number that was achieved related in
15 significant part to George Hopkins.  He didn't have
16 to know about attorneys fighting.
17     I have to tell you reading the e-mails
18 that I was focused on for the first time last night,
19 it's distasteful.  Who wants to see lawyers having
20 disputes with each other about their fee?  It's
21 business.  It has to happen.  But it's distasteful.
22     In the larger firms we don't do referral
23 fees, and that's part of the reason.  But George
24 Hopkins didn't want to be drawn into the morass of

Page 54

1 disputes among lawyers about what they should be
2 paid.
3    **THE SPECIAL MASTER:** Whether that's an
4 adequate explanation to excuse him from knowing --
5 and to tell the lawyers I don't want to know about
6 where potential class funds are going to go, that's
7 a decision I'm going to have to make.
8    Look, I will say George Hopkins provided
9 a remarkable service, not only once the case was
10 filed but in spotting the California case and in
11 bringing that to Labaton's attention.  As he put
12 it -- I think it was him who said he smelled a rat
13 after he read about it.
14    Look, he contributed great value, and I
15 want to say that.  That doesn't give him a pass to
16 say I don't care where class funds are going as to
17 local counsel, as to this or that, I don't want to
18 be told, I don't want to know anything particularly
19 when you have a class as broad as this class was.
20    **MS. LUKEY:** Your Honor, I'm going to
21 refer now to Professor Rubenstein who is so much
22 smarter than I am to say nothing if more experienced
23 in the field of class actions that it's not even a
24 joke.

Page 55

1    He said to you -- you and he sparred --
2 I reread it last night -- on the issue of whether
3 these were class funds or funds that were
4 appropriately already designated as attorneys' fees.
5 He told you -- and there is -- he's the one who
6 wrote the current edition of Newberg on class
7 actions.  He told you the courts across the board
8 look at this in two stages.  And I'm sure there's a
9 good reason for that.
10    They make the decision on what
11 constitutes a reasonable attorney's fee first.  They
12 do that so when the notice goes out to the class
13 about the settlement, the aggregate amount can be in
14 that notice.  You know -- you probably haven't had a
15 chance to actually read everything because it got
16 there pretty late, and I apologize for that, but you
17 know that last month Judge Wolf was dealing with
18 another one of these cases, and it was Arkansas
19 again.  Only this time it was Bernstein Litowitz who
20 was their counsel.
21    In that case when the lawyers came in to
22 see him to make their presentation, their hearing on
23 the settlement and then on what would go in the
24 class notice -- and, actually, I think this one was

Page 56

1 a subsequent one; it was on the class notice 'cause
2 he was unhappy with it -- a couple of things of
3 interest happened.  One, for the first time I
4 believe in Massachusetts Federal District Court
5 history the judge asked if there was an allocation
6 to anyone else.  I have to assume that comes from
7 discussions where he's vaguely aware of at least of
8 what's happening here.  He actually asked a question
9 is there anyone else who is receiving an allocation.
10    The other thing he did was to instruct
11 the lawyers to go back and take Labaton's class
12 notice in this case and use it as the model for the
13 notice to the class and to include in it the
14 aggregate percentage.  What he specifically said was
15 -- and I'm paraphrasing -- but don't say up to 25
16 percent, say to the class in this instance the
17 attorneys are requesting 25 percent.  He said if we
18 decide you're going to get less than 25 percent, no
19 one's going to complain, but I want them to know
20 that's the number that could be the applicable
21 number.
22    They have since gone back with the
23 notice based on the -- and there was one other case
24 notice he also referenced them to, but they used the

Page 57

1 Labaton notice because it was obviously available to
2 Arkansas very easily, and he's approved it.
3    So we don't have a situation where the
4 rule is that you do it all at once which is what you
5 were sparring with Professor Rubenstein about.  You
6 don't say here are all the class funds, now let's
7 decide what goes in the notice.
8    You first decide what the reasonable
9 attorneys' fee is, and then you do the notice so you
10 can put that aggregate amount in there.
11    **THE SPECIAL MASTER:** But deciding that
12 is a function of what's in the fee, of what's
13 included in the fee.  The lodestar crosscheck.  What
14 the aggregate fee is.  Other factors.
15    **MS. LUKEY:** I'm going to respectfully
16 disagree with you, your Honor.  What matters to the
17 class is the aggregate fee.  The judge never even
18 asked what class counsel were -- how they were
19 dividing it among themselves.  I believe he had some
20 awareness of the ERISA break-out because it matched
21 the allocation more or less what was expected for
22 the class --
23    **THE SPECIAL MASTER:** Well, and that was
24 in the settlement agreement.

Page 58

1  MS. LUKEY: Right. So it's a different
2  circumstance, but he didn't care how these three
3  firms were splitting it up, nor does it matter in
4  terms of what's a reasonable percentage to take how
5  they were splitting it up.
6      In fact, if you think about it, the
7  lodestars to the crosscheck, even if you use the
8  corrected number that this would be two times --
9  that is, 25 percent would be two times the hourly
10  fees -- the fact that Chargois is taking 4.1 million
11  of that is reducing the benefit to the class
12  counsel, but it's not having any impact on whether
13  that's a fair number of hours, fair percentage.
14     If anything, it would be understating --
15  it would be overstating what the attorneys -- or I'm
16  sorry -- understating what the attorneys did because
17  they're not going to get all of it.
18     And you do that first. What's a fair
19  fee. It just is -- I don't know what the case is in
20  Detroit, your Honor. I do know particularly with
21  the help of Professor Rubenstein that no judge in
22  Massachusetts has ever asked what the allocation is.
23  They want to know whether the fee in its totality,
24  its aggregate amount, is fair to the class.

Page 59

1  THE SPECIAL MASTER: Well, I'll tell you
2  what I do know as a judge at the fairness hearing --
3  at the very least at the fairness hearing, if not at
4  the preliminary approval stage, some lawyer who's
5  never appeared in the case, never done any work, has
6  no connection whatsoever to the case is getting 5.5
7  percent of a substantial fee, I want to know that.
8      MS. LUKEY: Do you ask?
9      THE SPECIAL MASTER: You know, I would
10  now. For sure I would. But I shouldn't have to
11  ask.
12     MS. LUKEY: Well, respectfully --
13     THE SPECIAL MASTER: Lawyers should tell
14  them.
15     MS. LUKEY: Well, let me move --
16     THE SPECIAL MASTER: We may disagree on
17  that. A judge only knows what a judge only knows.
18  And I shouldn't have to ask.
19     As a judge, I should be able to rely on
20  the lawyers to tell me everything and not -- you
21  know, and not play this cat and mouse game of, well,
22  we don't have to tell because maybe the rules say --
23  are unclear about whether we have to tell.
24     There is an inherent duty of candor to

Page 60

1  the Court to tell judges at these critical stages,
2  especially in these class actions -- especially in
3  these class actions -- there is an inherent duty
4  upon counsel to tell judges of anything that is
5  material that a judge has to decide without the
6  judge having to ask about whether the settlement is
7  fair to the class.
8      MS. LUKEY: Your Honor, I'm going to
9  disagree with you again because we as practicing
10  lawyers which is all I've ever been -- I haven't
11  been a judge -- can't possibly know what factors any
12  given judge thinks are material.
13     We have to rely on the rules and the
14  case law. Where you start here is with two Federal
15  Rules of Civil Procedure, and they are not
16  ambiguous. They are not leaving it up in the air.
17  Rule 54(d)(2) specifically tells you what you have
18  to tell the Court when you're going in for approval
19  of a fee; and what it says is if the Court inquires
20  or if there is an order, then you must tell the
21  Court about a division of the fees. And lest there
22  be any doubt in the class action context that
23  there's a different rule, Rule 23(h), which is the
24  fee allocation rule there, says you will follow

Page 61

1  54(d)(2).
2      So a lawyer looking at that doesn't have
3  to walk in and say here's everybody who's sharing in
4  the fee. The judge can ask. Would it be a good
5  thing -- and, you know, maybe the plaintiffs' bar
6  here isn't going to like me for saying this, but
7  would it be a good idea for the District of
8  Massachusetts to adopt a local rule as some other
9  districts have or the first circuit for that matter
10  or for Judge Wolf to have a standing order saying
11  tell me what all the fees are? You know, with the
12  benefit again of 20/20 hindsight so that nobody has
13  to go through this, sure. Because if I were to make
14  an educated guess, it wouldn't have mattered.
15     All Judge Wolf wanted to do was to
16  protect the class. That was his fiduciary duty. In
17  the fee allocation process it's the Court that ends
18  up with the fiduciary duty because there's an
19  inherent conflict between lawyers who are seeking
20  fees and the class --
21     THE SPECIAL MASTER: Should a judge not
22  be concerned at either the preliminary approval
23  stage or the fairness hearing stage about a lawyer
24  who has done no work on the case, never appeared in

Page 62

1 the case, has some preexisting agreement getting 4.1
2 million dollars of fees -- a judge should not be
3 concerned about this?  Whether the judge asks or
4 not.
5     MS. LUKEY: He should not be concerned
6 in Massachusetts because it doesn't matter under the
7 Massachusetts rules.  We pay the but-for price.
8 This case wouldn't have existed but for Damon
9 Chargois, whatever I may think of Damon Chargois,
10 but Damon Chargois' partner was Tim Herron.  Tim
11 Herron was Senator Faris' friend and neighbor.
12 Senator Faris gave Damon the permission to make the
13 call to Doane --
14     THE SPECIAL MASTER: Well, let's not go
15 too far with that.  To your point about George
16 Hopkins, my guess is once George Hopkins got on the
17 scent of the FX trading practices of State Street,
18 he would have found somebody.
19     Whether it was Labaton or Lieff or
20 somebody or one of the other monitoring counsel -- I
21 think there were five monitoring counsel -- one of
22 the other monitoring counsel, George Hopkins would
23 have found somebody.
24     MS. LUKEY: He may have.  He may not

Page 63

1 have.  It was Labaton that was willing to respond.
2 The FX exchange cases were not popular cases because
3 they weren't traditional securities class actions,
4 and the plaintiffs' securities class action bar was
5 uneasy about them.  Labaton was willing to give it a
6 shot.
7     THE SPECIAL MASTER: So to say that this
8 case doesn't happen without Damon Chargois is a
9 bridge too far.
10     MS. LUKEY: Well, I'm saying what
11 Professor Rubenstein said to you.  You said to him
12 what's the benefit to the class.  I'm not the
13 expert.  He is.  He said the benefit to the class is
14 the but-for analysis.
15     In a jurisdiction that permits bare
16 referral fees --
17     THE SPECIAL MASTER: Okay.  That's his
18 view.  It may not be my view.
19     MS. LUKEY: I understand it may not.
20 I'm saying --
21     THE SPECIAL MASTER: I cannot imagine
22 George Hopkins once he is on the scent -- or, as I
23 think he put it, he smelled a rat -- not finding a
24 law firm to take this case.  Labaton did a great

Page 64

1 job.
2     MS. LUKEY: Yes.
3     THE SPECIAL MASTER: Lieff did a great
4 job.  The Thornton folks did a great job.  All of
5 that is true in prosecuting the case, but to say
6 that there would not have been a State Street
7 case without Damon --
8     MS. LUKEY: How about saying there would
9 not have been a successful State Street case?
10     THE SPECIAL MASTER: Well, I don't --
11 look, none of us knows --
12     MS. LUKEY: None of us knows.
13     THE SPECIAL MASTER: -- none of us knows
14 that.  To say that without Damon Chargois given
15 George Hopkins' laser-like focus once he got on the
16 scent, that's a bridge too far.
17     MS. LUKEY: Respectfully, it's as
18 speculative for you to say that he would have found
19 another law firm as it is for me to say that he
20 wouldn't have had the same result.  We don't know
21 that.
22     We can only deal with the facts we have,
23 and the facts we have are that Damon Chargois -- for
24 whom I have very little use, by the way, after

Page 65

1 meeting him -- didn't add value by making that
2 introduction, by being able to pick up the phone and
3 tell Paul Doane that Senator Faris had given him
4 name and number?  Really?  Anything to that effect
5 to me is speculative.
6     But the fact of the matter is in
7 Massachusetts a referral fee is a referral fee.
8 Bare as it can be, it doesn't matter.  I think, your
9 Honor, that you have struggled throughout coming
10 from the majority -- one of the majority
11 jurisdictions with this notion.  It's not an extreme
12 notion to those of us who have only practiced here
13 and grown up here.  We see its value.  We see its
14 shortcomings.  It's the law in Massachusetts.
15     Nothing is required -- several times in
16 this hearing you asked questions, and I understood
17 how concerned you were.  You asked questions that
18 were framed in terms of 4.1 million dollars going to
19 someone who had done no work, not appeared in the
20 case, wasn't on the pleadings, etcetera, and it
21 troubled you.
22     THE SPECIAL MASTER: I think what
23 troubled me -- that troubled me.  But what also
24 troubles me is no one was aware of it.  Not

Page 66

1 Mr. Hopkins. Not -- apparently not the Lieff firm.
2 Not the Court. That troubles me even more than the
3 payment of the fee itself. That does trouble me,
4 yes.
5    **MS. LUKEY:** Well, then let's go from the
6 rules -- we just talked about the rules which do not
7 require disclosure, the Rules of Civil Procedure --
8 to the candor rule, 3.3.
9    First of all, the candor rule as
10 Professor Joy explained to you and I think some of
11 the experts referenced it, there has to already be
12 -- there has to be an obligation to speak. Let me
13 get you the exact language if I can find it.
14    What 3.3 says is that a lawyer shall not
15 knowingly -- I'm only going to refer to the relevant
16 subsection -- make a false statement of fact or law
17 to a tribunal or fail to correct a false statement
18 of material fact or law previously made to the
19 tribunal by the lawyer.
20    So, first of all, we have the knowing
21 requirement. And then we have the fact that there
22 has to be a false statement or a glaring omission
23 which would be sufficient to constitute a false
24 statement in a circumstance where the omission would

Page 67

1 be relating to something which the Rules of Civil
2 Procedure, which, by the way, will trump these rules
3 if there's a conflict, says you don't have to
4 disclose.
5    So you're asking -- even if it turns out
6 that your Honor's interpretation is correct, that
7 Rule 54(d)(2) and 23(h) should be ignored because a
8 judge really would want to know, even though he
9 didn't ask and had never asked -- even if that were
10 true, how could one possibly say there was a knowing
11 violation of the duty of candor in the face of the
12 language of 54(d)(2) and 23(h)?
13    **THE SPECIAL MASTER:** To me this is
14 simpler. It really is. Is the Chargois Arrangement
15 a material fact that a client would want to know,
16 that the class would want to know and the Court
17 would want to know before making a determination as
18 to whether or not this money should be paid? Is it
19 a material fact?
20    That's where the duty of candor is. If
21 it's a material fact, then they should have been
22 told.
23    **MS. LUKEY:** Your Honor --
24    **THE SPECIAL MASTER:** And the question

Page 68

1 I'm going to have to decide is given the construct
2 of the rules that Professor Rubenstein shared with
3 us, given Professor Gillers' construct of the duty
4 of candor, whether this material fact should have
5 been made known to the client, to the class and to
6 the Court and, quite honestly, to co-counsel who
7 were sharing the fee.
8    **MS. LUKEY:** We will come back to that
9 because that's a separate issue. If you would allow
10 us to.
11    **THE SPECIAL MASTER:** Yes.
12    **MS. LUKEY:** But in terms of -- starting
13 with the Court, because that is dealt with
14 specifically in the rules, with all due respect to
15 Professor Gillers, he has admitted he's not an
16 expert on the Rules of Civil Procedure, and he's not
17 an expert on class actions.
18    What you heard from Professors Green,
19 Wendel, Joy, Rubenstein and Hal Leiberman was it's
20 the judge's obligation to ask if it's material to
21 him. And I'm going to respectfully say I think
22 Judge Wolf is being placed in an impossible
23 situation by who you're talking about here 'cause
24 the criticism that's going to be leveled, at least

Page 69

1 by the bar, is going to be if someone had an
2 obligation to say something because it was a
3 material fact, it was the judge whose obligation it
4 was to ask if it was material to him.
5    I don't believe it was material to him.
6 Until that hearing last month, I don't believe Judge
7 Wolf has ever asked about an allocation of fees.
8 You talked about the fact that you expect all of
9 these reports to end up in the press. And I can't
10 help but think after, you know -- I can't remember
11 how long Judge Wolf's been on the bench, but let's
12 say 35 years because he went on as a young person,
13 and with the respect that I have for him, what the
14 press says about his failure to ask in a
15 circumstance where I don't think he had any duty to
16 ask because I, honestly, don't believe he considered
17 it material what Labaton and the other class counsel
18 did with the fees after he determined what was
19 reasonable.
20    But he's going to have -- whatever
21 criticism gets leveled against the law firms, it's
22 going to be leveled against him, too, and I don't
23 get why we're going there in a circumstance where
24 the rule makes it clear and where he obviously

Page 70

1 decided he didn't need to know.  If he thought it
2 was material, he would have asked.
3   **THE SPECIAL MASTER:** We'll decide that.
4   **MS. LUKEY:** Well, fine.
5   **THE SPECIAL MASTER:** My very clear view
6 is that judges should be made aware of anything that
7 is material for them to know in approving a class
8 action settlement.  Judges only know what they're
9 told.  That's all they know.
10   And the question in this case -- one of
11 the questions in this case is going to be should the
12 judge have been told about this preexisting
13 arrangement given the nature of it and given the way
14 it was originated, given the way it was implemented,
15 given the fact that there was no written agreement,
16 given the fact that the client wasn't told of the
17 arrangement, given the fact that co-counsel weren't
18 told of the arrangement, should the judge have been
19 made aware of it?
20   That's a critical issue in this case
21 irrespective of Rule 54(d)(2) and --
22   **MS. LUKEY:** -- 23(h).
23   **THE SPECIAL MASTER:** -- 23(h) and the
24 interplay between those rules should the judge have

Page 71

1 been told.
2   **MS. LUKEY:** I hear what you're saying.
3   **THE SPECIAL MASTER:** That is a critical
4 question.  And, you know, as a judge who has to
5 preside over these issues, is that something I would
6 want to know?  You betcha.
7   **MS. LUKEY:** I hear what you're saying.
8 I'm simply saying that when you level this criticism
9 against the law firms, even though they were in
10 compliance with 54(d)(2) and 23(h) --
11   **THE SPECIAL MASTER:** Joan, that's a
12 different question.  That's a question of whether
13 there should be discipline or sanctions.  That's a
14 different question.
15   **MS. LUKEY:** Your Honor, anything you
16 want to say in terms of best practices going forward
17 are not a matter with which I would take issue with
18 you right now.  We might have some issues as to what
19 they were as practitioners.
20   I'm here because there's a question of
21 whether my client is going to be disciplined or
22 sanctioned which destroys a reputation and can
23 destroy a law firm for conduct that was absolutely
24 permissible under the Federal Rules of Civil

Page 72

1 Procedure and the Massachusetts Rules of
2 Professional Conduct.
3   Whatever criticism is leveled against
4 them regrettably is going to be leveled, perhaps in
5 a great amount, against the judge who doesn't
6 deserve it in my view.  If he wanted to know, he
7 would have asked.  I know Mark Wolf as do you.  If
8 he thought it was material, there is no question in
9 my mind he would have asked.  His concern was with
10 the fairness of the aggregate fee to the class.
11   If Labaton had wanted to take its whole
12 share and invested on a gambling boat on the
13 Mississippi River, that might not be something a lot
14 of people up here would love, but it doesn't affect
15 the class.
16   So if -- unless you have other questions
17 on disclosures to the Court where we, apparently,
18 have a strong disagreement, I'll go to the clients.
19 Okay.
20   Typically in the analysis, as I think
21 Professor Joy said, any issue about disclosure to
22 the clients will flow through the issue of the
23 obligation to the Court.  The reason for that is as
24 follows:  The nature of the relationship between

Page 73

1 class counsel and a class once certified is a
2 different breed of attorney/client relationship as
3 Newberg makes clear and as Professor Rubenstein
4 testified.
5   And it is a different type of fiduciary
6 duty than those that exist between a lawyer or a law
7 firm and his individual client here as in Arkansas.
8   So that's the reason that the case law
9 developed that says that the Court ends up with the
10 fiduciary duty during the fee process rather than
11 the law firm.  That's the reason in turn that the
12 ethicists say that any obligation to the class flows
13 through what the obligations to the Court are.  And
14 if there is no duty of disclosure to the Court, as
15 there was not here, there is no doubt of disclosure
16 to the class.  The requirements for what must be
17 disclosed to the class are in Rule 23.
18   There is a requirement to disclose the
19 aggregate fee.  That's the requirement.  There is no
20 requirement in Rule 23 to disclose fee splits.
21 There has never been a case in which class counsel
22 has been required to go to the class and tell the
23 class about the allocation of its own fee, and there
24 is no authority for that anywhere.  And the reason

Page 74

1  for that is Professor Rubenstein's two-step process.
2      The Court first determines what
3  constitutes a reasonable fee and then determines
4  what goes in the notice to the class.  And as Judge
5  Wolf just determined recently, that what goes in is
6  an aggregate amount without language like "up to"
7  which is you tell them this is going to be the fee.
8  That is what has to be disclosed.
9      I mean we had different rules were kind
10 of being thrown at us along the way.  Rule 1.2 which
11 is the scope of representation and 1.4 which is
12 communication I don't remember being in Professor
13 Gillers' report, but they've been referenced.  And
14 the fact of the matter is that there's nothing in
15 those rules in 1.2 or 1.4 that would require
16 disclosure or otherwise override the aggregate
17 requirement of Rule 23.
18     **THE SPECIAL MASTER:** Let me ask you a
19 question.  Judge Wolf toward the end of the
20 confirmation hearing said I'm relying heavily upon
21 what's been submitted to me here.
22     Professor Rubenstein didn't think that
23 was enough to trigger a duty of disclosure.  All
24 right.  We can disagree about that.

Page 75

1      What if he would have said something to
2  the effect of -- would there have been a duty of
3  disclosure if Judge Wolf instead had said something
4  to the effect of is there anything else I should
5  know about the fees in this case so that I may carry
6  out my fiduciary duty to the class?  What if he had
7  said that?
8      **MS. LUKEY:** Well, it's a hypothetical
9  that didn't happen, your Honor.  I think it would
10 depend --
11     **THE SPECIAL MASTER:** Well, I'm trying to
12 understand Joan where the line is.  I mean where is
13 the lawyer's duty of disclosure?
14     **MS. LUKEY:** If I may, your Honor --
15     **THE SPECIAL MASTER:** Does a judge have
16 to actually come out and say -- 'cause apparently
17 Judge Wolf did in the last one --
18     **MS. LUKEY:** Are there fee allocations
19 here.
20     **THE SPECIAL MASTER:** -- is there a fee
21 allocation.
22     **MS. LUKEY:** Yes.
23     **THE SPECIAL MASTER:** A judge has to
24 actually come out and say that.

Page 76

1      **MS. LUKEY:** If he wants to know under
2  54(d)(2) he has to say it.  I want to say, by the
3  way, I believe Professor Gillers at his deposition
4  acknowledged that that general language at the end
5  was not enough.  I pushed him on that.  It's in my
6  -- I've got the page cited in the written
7  submission.  I believe he indicated that's not alone
8  enough.
9      **THE SPECIAL MASTER:** For purposes of
10 Rule 54(d)?
11     **MS. LUKEY:** I don't remember the
12 context.  I just remember him saying, okay -- that's
13 a general statement, anything else I should know.
14 If the judge hasn't indicated that he considers it
15 material how the counsel are whacking up the fees --
16     **THE SPECIAL MASTER:** How could he know
17 whether it was material unless he's told what the
18 agreement is?  And what is constituted?
19     This is utterly circular.  He has no
20 interest in knowing if he doesn't know because he
21 hasn't asked.
22     **MS. LUKEY:** Well, respectfully --
23     **THE SPECIAL MASTER:** It's utterly
24 circular.

Page 77

1      **MS. LUKEY:** Respectfully, your Honor,
2  from the perspective of the practitioner, if
3  something's perfectly permissible under
4  Massachusetts law, why would we even assume that a
5  judge might consider it remotely material?
6      I know you're bothered by the fact it's
7  a 4.1-million-dollar bare referral fee, and I know
8  equally well that's perfectly okay under
9  Massachusetts law.  It may not be okay under the law
10 of some other jurisdiction, but it is here.  We've
11 lived with that our whole -- the Massachusetts
12 practitioners have lived with that our whole
13 careers.
14     It's the law.  We've never known any
15 other rule.  It's all right.  You can get a referral
16 fee for doing absolutely nothing.
17     **THE SPECIAL MASTER:** When the experts --
18 when the experts testified about what a referral fee
19 was and why somebody could receive a referral fee
20 for doing nothing, they all testified that the
21 policy behind it was that -- to assist a client in
22 finding somebody better qualified to handle a case.
23 That's the policy behind it.
24     I believe it was Camille Sarrouf who

Page 78

1 said I have had hundreds and hundreds of cases when
2 the people come in to me and say I have this
3 problem, and Mr. Sarrouf says this is not something
4 I can handle, but I know a lawyer that can handle it
5 better.
6      And that's the policy. And that is what
7 serves the public; that somebody will be handling it
8 better. That's not what happened in this case. Not
9 even close.
10     **MS. LUKEY:** I respectfully disagree.
11 What happened was the introduction to allow the
12 panel counsel relationship to exist. The reason for
13 panel counsel is precisely because that's the pool
14 from which litigation counsel are selected. That's
15 why panel monitors exist.
16     He caused Labaton to become panel
17 counsel which means the cases that flow, which are a
18 product of being panel counsel, came to Labaton
19 through him. Saggese talks in terms of referral of
20 clients. The focus is on the Doe case where Saggese
21 got a $90,000 fee for doing nothing, much smaller
22 case, much smaller circumstances. But he was
23 getting a third, not 20 percent.
24     But the language of the case is referral

Page 79

1 of clients. There are circumstances in which that
2 happens and the panel monitoring circumstance -- the
3 feeder for the actual cases is the paradigm of that
4 situation. You pressed Hal Leiberman really hard on
5 this.
6      **THE SPECIAL MASTER:** I did.
7      **MS. LUKEY:** And he said to you that is
8 common practice. That's the way it's done. And
9 what everybody in this room has to be mindful of is
10 we're doing this in the context of the plaintiffs'
11 class action bar in securities and securities-like
12 complex cases.
13     Board of Bar Overseers handbook, which
14 we cite, has some really interesting language in it
15 that talks about how they look at and assess when
16 something is proper or improper. They actually take
17 into account the practices in the area -- the legal
18 area and geographically. They actually say that it
19 matters what the standard of practice is in
20 Massachusetts which is why initially we gave you
21 what was a fact witness on the standard of practice
22 in Massachusetts, Camille Sarrouf.
23     And only after you selected Professor
24 Gillers and I raised the issue with you because I

Page 80

1 continue to believe you can't have an expert on law
2 and that all of these experts, except for Camille
3 and Hal, should -- and Mr. Dacey should have just
4 been filing legal briefs because they can do that,
5 but they can't be experts, but that is something to
6 be considered. Massachusetts law and area of
7 practice law.
8      And the plaintiffs' class action bar has
9 certain typical practices which happen to include
10 that an introduction, for example, to an
11 institutional investor is going to be an ongoing
12 relationship. There's nothing in the rules that
13 says that that's improper, and there are no cases
14 that say it's improper.
15     **THE SPECIAL MASTER:** Well, then disclose
16 it. If that's the answer. Disclose --
17     **MS. LUKEY:** If you want to disclose,
18 ask.
19     **THE SPECIAL MASTER:** Disclose it to the
20 client. Disclose it to the class. Disclose it to
21 co-counsel and disclose it to the Court. That's the
22 answer. It may be perfectly fine.
23     **MS. LUKEY:** Well, Court and client --
24 I'll turn to co-counsel in a moment. Court and

Page 81

1 client disclose it on the basis of no existing case
2 law. There is no authority for that, and there is
3 no rule for it.
4      Again, your Honor, whatever you want to
5 say in terms of best practices and changes that
6 should be made, that is clearly within your purview.
7 But to suggest there's been misconduct that's either
8 sanctionable or subject to discipline would be
9 totally unfair and inappropriate because there isn't
10 a single case that says it, and there isn't a single
11 rule that says it.
12     We're in Massachusetts. We're in the
13 first circuit. Nothing happened here that was
14 wrong. Nothing. I turn, if I may, then to the
15 issue of disclosure to other counsel. I'm going to
16 point out to you that Professor Gillers does not
17 offer any opinion that there should have been
18 disclosure to other counsel. Because if, as I just
19 said, there is no rule and no case that requires
20 disclosure to the Court and the client, well, we're
21 worlds removed when it comes to disclosure to other
22 counsel in terms of anything that's governed by
23 rules or by case law.
24     We start with ERISA counsel because,

Page 82

1 indeed, I do think that Lieff and Thornton stand in
2 a different position from ERISA counsel. ERISA
3 counsel also didn't disclose their agreements and
4 arrangements, their fee allocations to class
5 counsel.
6     **THE SPECIAL MASTER:** But didn't those
7 folks appear on their lodestar?
8     **MS. LUKEY:** No. In one instance --
9 there are two that aren't in the lodestar, and
10 there's one that doesn't appear anywhere in this
11 case.
12     And now he may have had an appearance in
13 before the case transferred, but in terms of what's
14 in the docket in this matter once it was a
15 consolidated heading, there was no disclosure. He
16 was never made known. Class counsel never
17 complained about it.
18     **THE SPECIAL MASTER:** Who is that,
19 please?
20     **MS. LUKEY:** I can't remember the name.
21 And, actually, I have to credit this one to
22 Richard's the one who has raised it twice in
23 arguments. And I will defer to him on who it was.
24 We know it happened. It was in the -- you will

Page 83

1 recall that we asked you to do an emergency
2 interrogatory --
3     **THE SPECIAL MASTER:** Yes.
4     **MS. LUKEY:** -- in the midst of some of
5 this going on --
6     **THE SPECIAL MASTER:** Yes, yes.
7     **MS. LUKEY:** -- because I was convinced,
8 because I had heard through the grapevine, that
9 there was somebody else and there was. It was
10 someone who when the matter was going to be a
11 standalone case would have been a more traditional
12 local counsel just as before George Hopkins, Damon
13 Chargois would have been a traditional local
14 counsel. The handholder, the person that takes care
15 of matters locally.
16     That person didn't do anything in the
17 consolidated case, didn't participate in anything,
18 etcetera, wasn't on the lodestar, got a payment.
19 Don't know what it was. We just know they disclosed
20 the fee agreement in response to the
21 interrogatories. They didn't disclose it because
22 they're bad or unethical people; it's because there
23 isn't a requirement to disclose it. There was no
24 reason that class counsel who had a contract with

Page 84

1 ERISA counsel had to tell 'em how they're whacking
2 it up among themselves. It's really not the
3 business of ERISA counsel.
4     **THE SPECIAL MASTER:** So how can the
5 ERISA counsel serve the interests of their clients
6 who are the named representatives in the other two
7 cases if they're not told about 4.1 million dollars
8 coming out of counsel fees and ask their counsel --
9 ask their clients, their representatives is this
10 okay?
11     **MS. LUKEY:** Well, your Honor, you can't
12 have it both ways. At the point in time when the
13 class was certified -- this is not the practical
14 truth probably because this was a highly unusual
15 situation when you kind of smash together three
16 different cases and call them one class, but at that
17 point the attorneys became the class counsel, became
18 their attorneys.
19     The fiduciary duty became the Court's
20 duty. The ERISA counsel were still in the fee
21 allocation process. The ERISA counsel were still
22 I'm sure actually actively involved, but they
23 weren't functioning in that role.
24     So it's nice to say, oh, if we'd known

Page 85

1 -- they can say in retrospect if we'd known, we
2 would have told them --
3     **THE SPECIAL MASTER:** So who is
4 protecting the class? And particularly in these two
5 other cases that have now been consolidated, who is
6 protecting them?
7     **MS. LUKEY:** On the fee issue?
8     **THE SPECIAL MASTER:** Yes.
9     **MS. LUKEY:** According to the case law,
10 the Court is protecting the class because the
11 lawyers -- all of the lawyers have an inherent
12 conflict of interest at that point.
13     **THE SPECIAL MASTER:** Correct.
14     **MS. LUKEY:** So it's the Court. That's
15 what the law says. Whether you like it or not.
16 Whether you want to change it. That's what the law
17 says.
18     **THE SPECIAL MASTER:** So the Court has an
19 obligation, but the Court can't -- according to you
20 and your experts, the Court can't protect its -- or
21 fulfill its fiduciary obligation unless it asks.
22     **MS. LUKEY:** That's what the law says.
23 It's not what I say. It's what the law says.
24     **THE SPECIAL MASTER:** Well, we'll -- I'll

Page 86

1  have to decide that, Joan.
2      **MS. LUKEY:** The courts -- well, if you
3  can cite me to a case, I'll be grateful, your Honor,
4  or a rule.  But the Court's obligation is to
5  determine that the fee that is paid is a fair and
6  reasonable fee.  That's the Court's obligation.
7      **THE SPECIAL MASTER:** Fair and reasonable
8  in light of all the circumstances, and one of the
9  circumstance here is that a lawyer who did no work
10  in the case, never appeared in the case, had no
11  connection with the case was getting a substantial
12  amount of money.
13      **MS. LUKEY:** Do you know what, your
14  Honor?  If you -- and I mean this with all respect.
15  If you had practiced --
16      **THE SPECIAL MASTER:** That usually means
17  you don't respect.  But okay.
18      **MS. LUKEY:** No comment.
19      If you were a Massachusetts
20  practitioner, if you had spent your years here as a
21  judge and a lawyer, you wouldn't be bothered by
22  this.  The problem is that you're in an ABA Model
23  Rule jurisdiction, and the notion -- I understand
24  you find it abhorrent.

Page 87

1      **THE SPECIAL MASTER:** These class
2  members, Joan, were all over the country.
3      **MS. LUKEY:** But the case was here.
4      **THE SPECIAL MASTER:** But the case was
5  here.  But the class members were all over the
6  country.  They had different interests.  They had
7  different class representatives.  This was a
8  polyglot class.
9      It was not a single -- once the case was
10  consolidated for pretrial purposes, it was a
11  polyglot -- effectively a polyglot class consisting
12  of a myriad of claims, a myriad of interests, and
13  what I'm not understanding -- we'll deal with the
14  question of what Rule 23(h) requires, what Rule
15  54(d) requires.  We'll deal with that.
16      But I simply don't understand how a
17  judge can perform his or her fiduciary duties to the
18  class if a judge is not told at the very least where
19  a substantial amount of money is going to lawyers
20  who never appeared to the judge, was totally --
21  totally non-transparent not just to the Court but to
22  other lawyers.
23      **MS. LUKEY:** Your Honor, why do you think
24  there have been 127 of these proceedings in the

Page 88

1  District of Massachusetts and no Massachusetts
2  federal district court judge until Judge Wolf did it
3  presumably in reaction to something you told him in
4  this case who has ever asked?  I'll give you the
5  answer.  You can come up with your own.
6      But the answer is because in
7  Massachusetts bare referral fees are legal and
8  permissible and ethical.
9      **THE SPECIAL MASTER:** One answer may be
10  also that this issue of a lawyer being paid a very
11  substantial share of the fees has never been aired
12  before, never been brought out.  That might be why.
13      **MS. LUKEY:** Because it's permissible.
14      **THE SPECIAL MASTER:** It might be as
15  simple as that.
16      **MS. LUKEY:** Respectfully, your Honor.
17      **THE SPECIAL MASTER:** It might be as
18  simple as that.
19      **MS. LUKEY:** We've had a lot of judges
20  over the course of those 127 cases -- Judge Wolf
21  wasn't being derelict in his duty.  Every judge in
22  this district who practiced in this district, who
23  became a judge in this district has grown up with
24  the rule that I know and have no problem with and

Page 89

1  that you are troubled by.
2      As a matter of principle, it should not
3  matter, by the way, in determining ethics or
4  discipline whether the fee was $10,000 or 10 million
5  dollars.  That's irrelevant.
6      What's relevant is is this a
7  jurisdiction that permits a law firm to pay whatever
8  amount it agrees to pay to someone who refers them
9  or introduces them as happened in this case.  It is
10  permissible in Massachusetts, and it is very hard I
11  understand for someone --
12      **THE SPECIAL MASTER:** What do you think
13  the public would say about this?  What do you think
14  the public -- just the normal person on the street?
15      **MS. LUKEY:** I don't think the public
16  would care.
17      **THE SPECIAL MASTER:** You don't?
18      **MS. LUKEY:** As long as the attorney fee
19  -- if they accept the procedure, which has always
20  been the procedure everywhere which is you decide
21  the fee first and then you decide what goes in the
22  class -- so you figure out first what's a reasonable
23  fee -- I think the reaction of the public to this
24  circumstance would be twofold:  One, boy, Labaton

Page 90

1 was stupid to agree to 20 percent, maybe give the
2 guy 5. Pretty high fee. Two, the rule says the
3 judge should ask. If the judge thinks it's
4 material, he should ask.
5     I'm not criticizing this judge because
6 it's not material in Massachusetts. It is not
7 material under our rules which differ from the
8 majority rule. I know that. But Judge Wolf didn't
9 ask because it isn't material. I am convinced of
10 that just as of all of his colleagues over the years
11 have not asked, just as no expert, including
12 Professor Gillers, can point to a single case where
13 they have asked or where any Massachusetts court or
14 disciplinary body or ethics committee has ever said
15 that not disclosing it when not asked is in any way
16 wrongful or impermissible. If it's not wrongful or
17 impermissible and the overall fee and aggregate is
18 totally reasonable, then it's not material.
19     The last thing that I would be
20 addressing subject to your questions is the issue of
21 co-counsel. You have seen that in May of 2011 there
22 was an attempt -- an early attempt by Labaton to
23 firm up an agreement between the firms. That didn't
24 actually come to pass for a while. Different terms

Page 91

1 ultimately entered into it.
2     But as it happens, in that draft letter
3 there is an actual statement about the fact that
4 there is a referral -- there's a referral fee to be
5 paid to an attorney, and I think it's framed in
6 terms of the total -- I think it's actually referred
7 to as 6 percent -- I can't remember if it's
8 5-and-a-half or 6 percent -- and that Labaton is
9 proposing that comes off the top because all three
10 firms will be benefiting from the but for analysis.
11     That letter was sent by Chris Keller to
12 Garrett Bradley to get his opinion on -- I suspect
13 nobody was really focusing on the referral fee issue
14 so much as they were focusing on the overall
15 agreement and how are we going to divide the fees at
16 the end of the day.
17     But clearly there was notice, and I
18 believe that there was a reference along the way to
19 the fact that Garrett -- I mean Garrett knew Damon
20 Chargois. You got the testimony. He knew that
21 Damon was a local -- an attorney who had done a
22 referral. So the Thornton firm knew all the terms.
23 I mean I don't know what else they were supposed to
24 be told. They knew that it was being paid as a

Page 92

1 referral fee; they knew what the amount was; they
2 knew who the person was --
3     THE SPECIAL MASTER: Garrett Bradley
4 testified that he didn't know that Damon Chargois
5 was not doing local counsel work.
6     MS. LUKEY: Well, it's pretty clear in
7 that letter it says as a referral fee to be paid.
8 It doesn't say our local counsel is going to do X.
9 But let's -- because by that time whatever Damon may
10 have thought earlier because in fact -- I'm sorry --
11 whatever Garrett may have thought, Damon was -- did
12 do local counsel role in other situations; but once
13 George Hopkins came in, he ceased to do it with
14 regard to Arkansas because George preferred to have
15 the direct relationship and his communications
16 completely with Labaton.
17     But -- and I'm not suggesting to you in
18 any way that Mr. Bradley was intentionally being
19 untruthful in his testimony. I'm sure that he
20 looked at it, and he thought of him as local
21 counsel. He knew him as local counsel in other
22 situations, and he likely didn't focus on the fact
23 that there's a letter that says what do you think of
24 this, we're going to take this percentage fee for a

Page 93

1 referral fee. Not for local counsel fee. Not for
2 liaison. For a referral fee.
3     And, again, because they all knew each
4 other, I'm sure people melded in their own minds the
5 cases in which Damon actually was doing local
6 relationship work and Arkansas post George Hopkins.
7 I mean how are you supposed to distinguish? His
8 involvement was to introduce them to clients in
9 Texas and Arkansas, not just to the Arkansas Teacher
10 Retirement System. It's asking a lot to --
11     THE SPECIAL MASTER: So you believe that
12 -- cutting through this, you believe that Garrett
13 Bradley knew enough?
14     MS. LUKEY: Yes. Now I turn to --
15     THE SPECIAL MASTER: One of the things
16 I'll have to sort out here, and I'm not sure it
17 matters, but from January of 2015 on Garrett Bradley
18 was wearing two hats. He was of counsel to Labaton,
19 and he was the managing partner at the Thornton
20 firm. I don't know how to divvy up that knowledge.
21 If it's necessary but --
22     MS. LUKEY: I don't know that you can.
23 As you know, we don't think it's particularly
24 pertinent. All they have to know is they're

Page 94

1 agreeing to pay a certain amount of money; and
2 unless they ask -- and there's no suggestion that
3 anybody here was concerned about it -- I don't know
4 that it matters. But do I think that -- I think
5 it's asking a lot to ask Garrett who knew
6 Mr. Chargois more generally, not just in the context
7 of Arkansas, to be able to distinguish or remember
8 what his role was in one matter as opposed to what
9 his role was once George Hopkins became the director
10 at Arkansas.
11   So I think there was adequate notice.
12 With regard to Lieff, I can tell you that there was
13 a very sincere effort to determine whether that
14 letter ever got finalized and sent. There is no
15 evidence that it ever did.
16   **THE SPECIAL MASTER:** Which letter? I'm
17 sorry.
18   **MS. LUKEY:** The draft letter that laid
19 out --
20   **THE SPECIAL MASTER:** The 2011 letter
21 agreement?
22   **MS. LUKEY:** Yes, the May 2011 letter
23 which said and there's a referral relationship; we
24 need to take 6 percent off. As far as we know, as

Page 95

1 far as we've been able to determine, it did not go,
2 and it would have gone to multiple partners, and we
3 would have been able to figure it out. Somebody
4 would have found it.
5   **THE SPECIAL MASTER:** So what -- as far
6 as you've been able to determine, what do you think
7 happened to that letter? Do you think it was
8 drafted and not sent? What happened?
9   **MS. LUKEY:** We can't track it. I think
10 it was drafted and not sent, but I can tell you
11 Chris Keller thought it was sent. But -- but, you
12 know, it's just -- it's a little bit akin to some of
13 the other letters here.
14   Letters did in fact encompass -- for
15 example, the letters back and forth with Chargois,
16 talked about what the deal was going to be. There
17 were a variety of letters at times among the three
18 firms. Things tended not to always get signed --
19   **THE SPECIAL MASTER:** What are we to make
20 of this fact which seems to have been the case, the
21 correspondence that we've seen other than this
22 December -- this 2011 letter refers to Damon
23 Chargois as local counsel or the local; a number of
24 these communications Labaton is on it and doesn't

Page 96

1 correct it back to Lieff.
2   **MS. LUKEY:** Well, the problem is in how
3 -- in attaching too much significance to the phrase
4 "local counsel." Obviously, when I think of local
5 counsel if it's a phrase of art, that refers, to me
6 at least, to someone in the jurisdiction where the
7 lawsuit is pending who in those states that don't
8 admit pro hacs without an attorney who is a member
9 of the local bar which Massachusetts is one of,
10 that's a local counsel, the person who serves that
11 function.
12   **THE SPECIAL MASTER:** Or a person who is
13 having a relationship with the client as effectively
14 a liaison counsel and serving the counsel in that
15 locality.
16   **MS. LUKEY:** I wouldn't call that a local
17 counsel because of the confusion it causes with the
18 one up in Massachusetts --
19   **THE SPECIAL MASTER:** We've had several
20 people testify to that.
21   **MS. LUKEY:** I understand. So you've got
22 -- I think what you've got is a variety of
23 interpretations, probably all in good faith, being
24 attached to a phrase which only -- which is only a

Page 97

1 phrase of art when used in the context of the court
2 rules where local counsel has a meaning.
3 Massachusetts has a court rule saying you must have
4 local counsel if you're appearing pro hac. I think
5 there's talk about changing that, but that's what it
6 is right now.
7   So the phrases that I saw -- and there
8 were on some of the communications Labaton people
9 and not others -- refer to him as the local. The
10 local. Local Arkansas counsel was what Larry called
11 him. I think there was one reference to the liaison
12 or something of that nature.
13   **THE SPECIAL MASTER:** Garrett Bradley
14 referenced him as the local counsel who provided
15 something like significant value to the case --
16   **MS. LUKEY:** Unless Garrett --
17   **THE SPECIAL MASTER:** -- or important
18 value to the case.
19   **MS. LUKEY:** Unless Garrett was referring
20 to the but-for piece, I'm not sure what he was
21 referring to.
22   But there also could simply have been
23 confusion about the fact that in point of fact Damon
24 Chargois did act as a local or liaison, except with

Page 98

1 regard to Arkansas post George Hopkins. He was a
2 relationship person, and he was good at it.
3     (Telephone interruption.)
4     **THE SPECIAL MASTER:** Turn on your --
5 turn on your mute, please.
6     **MS. LUKEY:** Somebody on the phone, you
7 need to mute.
8     **THE SPECIAL MASTER:** Lynn, is that you?
9     **MR. SINNOTT:** Hello, Lynn?
10     **THE SPECIAL MASTER:** Lynn?
11     **MS. LUKEY:** You need to mute.
12     **MR. SINNOTT:** Mute, please.
13     **MS. HYLENSKI:** It's not me.
14     **MS. LUKEY:** No, it was a male voice.
15     **MR. SINNOTT:** For once we didn't accuse
16 you, Linda.
17     **MS. LUKEY:** So I understand why there
18 may have been confusion among people because it's
19 easy to think of a person and confuse his role in
20 multiple cases, and I don't think it's relevant to
21 anything.
22     So I think there --
23     **THE SPECIAL MASTER:** Here's where it's
24 relevant I suppose to the extent it's relevant. I

Page 99

1 think it was probably relevant to Bob Lieff and the
2 Lieff firm.
3     But to this inquiry where it's relevant
4 is is this part of a larger pattern of Labaton
5 simply not telling anybody about the nature of the
6 relationship with Damon Chargois? And what does
7 that mean?
8     **MS. LUKEY:** Well, that's not in front of
9 us, and I don't have a clue. I don't have any
10 evidence. You have no evidence. And I don't think,
11 respectfully, Judge Wolf's order would say go down
12 to Arkansas and Texas and check what they're doing
13 down there.
14     I don't know the answer. You don't know
15 the answer. What's important to us is what happened
16 in front of Judge Wolf and to the clients here --
17     **THE SPECIAL MASTER:** It may be relevant
18 circumstantially to the larger question to why
19 nobody was told about Damon Chargois and the nature
20 of the relationship.
21     **MS. LUKEY:** Your Honor --
22     **THE SPECIAL MASTER:** It may be relevant
23 to that.
24     **MS. LUKEY:** He was a traditional liaison

Page 100

1 counsel otherwise. So what is it you think they're
2 not being told?
3     The problem here is that post George
4 Hopkins he stopped doing that. So that's where
5 you've got the issue, and that's why this case is
6 relevant to this Court because he was initially
7 supposed to be in that role. That's what the
8 Labaton folks said.
9     And Lord only knows, Mr. Chargois sent
10 an e-mail telling them how important he was and how
11 much time he put in and all the political capital he
12 expended and the great things he had done for them,
13 and then he sat in front of us and said I didn't do
14 anything. Which may be unique to concerns he has of
15 his own in Texas --
16     **THE SPECIAL MASTER:** Well, in fairness
17 to Damon Chargois, he said I didn't do anything in
18 this case.
19     **MS. LUKEY:** Okay.
20     **THE SPECIAL MASTER:** He said I didn't do
21 anything in this case. He did not say he didn't do
22 anything at the inception of the relationship.
23     **MS. LUKEY:** My point is this: We're
24 supposed to be looking at the circumstance of

Page 101

1 whether in this case a reasonable fee ceased to be
2 reasonable because there was a referral fee being
3 paid that was perfectly permissible under
4 Massachusetts law, and that from what I have
5 gathered from the questioning might not have been an
6 issue to your Honor if it weren't so large, and it
7 was so large because the size of the fee and the
8 settlement were so large.
9     The principle does not change. If it's
10 okay to have a bare referral fee, it's okay at
11 $10,000, and it's okay at 4.1 million dollars. If
12 it's not okay to have a bare referral fee, it's not
13 all right at 10,000, and it's not all right at 4.1.
14 We are in a jurisdiction where it is all right.
15     **THE SPECIAL MASTER:** So the only thing
16 the Court needs to be concerned about is the
17 aggregate fee, not how it's shared, not whether
18 lawyers did anything to contribute to the value of
19 that fee?
20     **MS. LUKEY:** In Massachusetts that is
21 correct, your Honor.
22     **THE SPECIAL MASTER:** Okay.
23     **MS. LUKEY:** Unless if the judge has a
24 reason that he's concerned, he has the right to ask.

Page 102

1  But I again am not faulting Judge Wolf for not
2  asking, just as none of his colleagues has ever
3  asked.  Because it's all right in Massachusetts.
4  And they know that.
5     What are they going to do?  Call someone
6  on the carpet for a referral fee that's permissible?
7  Suppose the judge did out of curiosity ask, and they
8  told him.  Suppose he then said I think I'll keep
9  back 4.1 million and give it to the ERISA lawyers
10 because they weren't paid enough.  Can he do that?
11 Probably not actually.
12    THE SPECIAL MASTER: Or give it to the
13 class.
14    MS. LUKEY: Well, then he has taken what
15 was a reasonable fee and has made it unreasonable
16 for the lawyers.  So that would probably precipitate
17 an appeal.
18    THE SPECIAL MASTER: Or give it to the
19 class.
20    MS. LUKEY: That's what I'm talking
21 about.
22    THE SPECIAL MASTER: If the judge knows
23 about this, the judge can then make a determination
24 at that point.

Page 103

1     MS. LUKEY: I -- well, there is no such
2  thing as unfettered discretion, your Honor.  I'm not
3  suggesting that the first circuit would necessarily
4  reverse when that occurs, but it's certainly a
5  possibility.
6     The point is that if the judge thought
7  that that's something he might be inclined to do, he
8  could ask.  But if we look at the few situations in
9  which questions have been raised, it's typically
10 either going to be something like the shared -- the
11 investment risks shared in litigation which is in
12 the category of cases where there's a negative
13 impact potentially on the class.
14    As Professor Rubenstein indicated, if he
15 had seen e-mails that said, uh-oh, we got to hurry
16 up and settle this because we have to pay that
17 Chargois obligation or something of that nature,
18 then that would change the equation.  But that
19 wasn't the case.
20    Nobody was -- at least let me put it
21 this way:  As far as we know -- because there is no
22 other evidence -- none of the lawyers here was
23 motivated to do anything differently because of the
24 Chargois agreement.  In fact --

Page 104

1     THE SPECIAL MASTER: Well, we do have
2  some testimony from the ERISA lawyers that they
3  would not have accepted the fee split had they known
4  about Mr. Chargois.
5     MS. LUKEY: So, what, they would look
6  then for a windfall?  Because, first of all, they
7  had a contract as to what they were taking and they
8  were given --
9     THE SPECIAL MASTER: Based upon what
10 they were told.
11    MS. LUKEY: Your Honor, that contract
12 was on the basis of the trading volume of customer
13 class dollars versus ERISA class dollars.
14    THE SPECIAL MASTER: But they thought
15 they knew about it at the time.
16    MS. LUKEY: Respectfully, your Honor,
17 for an interested party to say I would have acted
18 differently is pretty speculative, but the fact of
19 the matter is that's not going to change what the
20 trading volume was.  The trading volume's the
21 trading volume.
22    Right now, as we have in the record, it
23 appears it's going to come out at 9 to 9.5 percent.
24 A.B. Data is trying to finish, but it needs to be

Page 105

1  able to get the last data from the group trust which
2  are a mixture of customer class and ERISA investors.
3  And it's been unable to collect some of that.  But
4  there is nothing to indicate, at least at this
5  point, that it's going to exceed the estimated 10
6  percent.  Looks like it'll come in a little under
7  that.
8     So for the ERISA counsel to say, oh, if
9  I had known, I would have done something differently
10 would involve a windfall.
11    THE SPECIAL MASTER: It would possibly
12 though have gone into the mix of the negotiations
13 between the customer class and the ERISA class
14 counsel as you've been referring to them.
15    MS. LUKEY: That's speculative, and I'm
16 going to point to two things.  I'm not here to
17 criticize anyone, but I'm going to say two things.
18 I already mentioned that there's a fee split that
19 wasn't brought to the attention of the Court or
20 other counsel on the ERISA side, and I don't like
21 have to do this, but we went over it at the
22 deposition the other day there are Mr. Sarko's
23 e-mails saying I'm not telling the Department of
24 Labor; I'm avoiding their questions; let's be

Page 106

1 careful what we say.
2     I'm not going to take issue with his
3 decision in that regard, your Honor. I'm just going
4 to say we need the same rules applied across the
5 board to everyone. If there is an issue about what
6 needed to be disclosed, that same principle applies
7 to the ERISA lawyers.
8     It's not fair to say only the customer
9 class counsel have certain obligations. The truth
10 is none of them had these obligations. Mr. Sarko
11 didn't do anything wrong. The ERISA attorney who
12 did not disclose in my view did not do anything
13 wrong. Nobody did anything wrong.
14     And if the worst case scenario here is
15 that the Labaton attorneys were a little bit
16 careless in making sure that the Lieff attorneys got
17 the full information that the Thornton firm got,
18 that's something for which they should apologize to
19 Lieff. But there is nothing to suggest that it was
20 intentional. Nor is there anything to suggest that
21 Lieff was hurt by that, except insofar as you do
22 something in these proceedings that hurts their
23 reputation in some way.
24     They knew what they knew that affected

Page 107

1 them, how much they had to pay. If they want to say
2 I would have reacted differently, you know what,
3 that's something between Lieff and Labaton.
4     If they want to say if we'd known that,
5 we would have negotiated a different deal, that's
6 their right to do it. But it's not an appropriate
7 subject for a proceeding in which you're looking
8 into whether the Court and the clients were treated
9 fairly.
10     **THE SPECIAL MASTER:** It's all
11 circumstantial, Joan, to -- circumstantial evidence
12 of whether or not there was a pattern from the
13 inception of the case not to disclose the nature of
14 the Chargois relationship and what he was being paid
15 for.
16     That's an issue in the case, whether or
17 not there was a pattern within this case by Labaton
18 of non-disclosure at virtually every point.
19     **MS. LUKEY:** Well, respectfully, there
20 are only a set number of points where it could be.
21 There was a disclosure via the draft letter and the
22 fact that Mr. Bradley was familiar with
23 Mr. Chargois, and they also actually participated in
24 the seminars together and so forth.

Page 108

1     But I think it's a little unfair to say
2 that he should be able to remember in his own
3 head --
4     **THE SPECIAL MASTER:** Which seminar? The
5 networking.
6     **MS. LUKEY:** This is the networking
7 seminars in Florida or wherever they were at various
8 years. I think it's a little bit unfair to him to
9 suggest that he should be able to keep straight in
10 which matters for which client Damon had one role
11 versus the non-role he ended up having once George
12 Hopkins came into Arkansas.
13     With regard to Lieff, again I think
14 that's a matter for discussion between the two of
15 them. But certainly the fact that Chris Keller tore
16 apart his files and that the effort was made so
17 strenuously to find it suggests that he thought he
18 had notified them. It was a mistake. Apparently,
19 he didn't. But at very least, we know that Lieff
20 was aware of what the amount was and who the
21 recipient was.
22     If they thought he was doing more in
23 this particular matter, then Labaton's sorry for
24 that, but there's nothing to suggest they were

Page 109

1 intentionally trying to hide it. What's unfortunate
2 here is that Lieff got a little bit pulled into some
3 of this because of it, but that wasn't by any intent
4 of Labaton.
5     As we've said with regard to the Court,
6 that's the cleanest one, and it's actually the issue
7 from which all else flows. The rules say only
8 disclose if you're asked. No judge in Massachusetts
9 had ever asked until Judge Wolf asked when it was
10 brought to his attention more recently. It isn't
11 the practice the phasing of the determination of the
12 reasonableness --
13     **THE SPECIAL MASTER:** I'm just curious
14 what was the answer?
15     **MS. LUKEY:** I don't know. I think they
16 said there were no other fee allocations, but I
17 don't know. I only looked at the excerpts that what
18 were pulled for me.
19     It was actually -- it's kind of a
20 throw-away question. He said it very casually. He
21 passed it very quickly. It was like two lines. But
22 then what followed was to say put the aggregate -- I
23 don't want you to put "up to." I want you to put 25
24 percent.

Page 110

1   So, respectfully, I think it's unfair to
2 suggest that they were hiding anything from anyone.
3 With regard to the client, Mr. Hopkins had very good
4 reasons for not wanting to know what the local
5 attorneys were.
6   **THE SPECIAL MASTER:** And what about once
7 the ERISA folks were members of the class but still,
8 apparently, part of the class representatives -- I
9 think we've determined that the other day -- no
10 obligation to tell them either?
11   **MS. LUKEY:** No. There is no obligation
12 to tell them. Rule 23 governs. And Rule 23(h) is
13 very specific. Follow Rule 52(d)(2) [sic]. There
14 was no obligation to tell them.
15   **THE SPECIAL MASTER:** 54(d)(2).
16   **MS. LUKEY:** 54(d)(2). Thank you.
17   That obligation would have flowed
18 through the Court because the nature of the
19 relationship, as has been explained, is, well, yes,
20 it's kind of an attorney/client relationship but not
21 like with your one on one. It's kind of a fiduciary
22 duty but not the same kind.
23   **THE SPECIAL MASTER:** So who is speaking
24 for the members of the class that the ERISA

Page 111

1 representatives were part of when George Hopkins
2 says I don't want to know, I don't want to know
3 anything?
4   No ERISA members said that. No ERISA
5 representatives said that. So who's protecting the
6 ERISA members?
7   **MS. LUKEY:** Well, at the end of the day
8 once the class is certified, then you're in a
9 circumstance where the fiduciary duty is the Court's
10 which is why you look to what the Court is referring
11 to.
12   **THE SPECIAL MASTER:** And counsel had no
13 remaining fiduciary duty after that?
14   **MS. LUKEY:** To make disclosure?
15   **THE SPECIAL MASTER:** Yes.
16   **MS. LUKEY:** No. Of a fee allocation
17 after a fee determination of what's reasonable? No.
18 They can do whatever they want with the fee --
19   **THE SPECIAL MASTER:** Well, there is that
20 interim period between August 8th of 2016 and
21 November 2nd of 2016 in which the class is
22 preliminarily certified -- the settlement class is
23 preliminarily certified, and at that point they are
24 clients.

Page 112

1   And is there no obligation at that point
2 to inform the ERISA -- at least inform the ERISA
3 class representatives? Whether through their
4 counsel or directly of this relationship.
5   **MS. LUKEY:** At that point they weren't
6 the ERISA class representatives anymore. There was
7 only one class rep once that had happened. But --
8   **THE SPECIAL MASTER:** What did the
9 settlement agreement say, if anything, about the
10 ERISA class representatives in the two cases and
11 their role in the larger settlement class? Was the
12 settlement agreement silent on that?
13   **MS. LUKEY:** I do not know. I know they
14 got a fee, but I do not know which would have
15 related to the prior period --
16   **THE SPECIAL MASTER:** They certainly did
17 get service awards.
18   **MS. LUKEY:** But that could have related
19 to the previous period. I don't know the answer to
20 your question, your Honor. I didn't look at it for
21 that purpose.
22   So if there are other questions I can
23 answer, I'll be glad to. Otherwise, I've talked
24 long enough.

Page 113

1   **THE SPECIAL MASTER:** This is going to be
2 a flowing situation.
3   **MS. LUKEY:** Yes.
4   **THE SPECIAL MASTER:** So if Bill wants to
5 ask a question.
6   **MR. SINNOTT:** Just a couple quick
7 questions, Joan.
8   **MS. LUKEY:** Sure.
9   **MR. SINNOTT:** First a factual question.
10 When you talk about ERISA not disclosing a firm in
11 the case, what firm are you referring to?
12   **MS. LUKEY:** Well, as I mentioned, I
13 can't remember. It's a local Massachusetts firm
14 that when the case was a stand alone was the local
15 attorney to allow the pro hac in. We can get it for
16 you --
17   **MR. HEIMANN:** It's Sarko's local
18 counsel.
19   **MS. LUKEY:** Sarko's local, okay.
20   **THE SPECIAL MASTER:** Then if they were
21 local counsel, wouldn't they have appeared on the
22 case?
23   **MR. HEIMANN:** I believe they were on the
24 complaint that was filed initially. What was being

Page 114

1 suggested is they were no longer on the pleadings
2 once the case was -- was it MDL? I can't remember.
3    **MS. LUKEY:** No, it was just
4 consolidated.
5    **MR. SINNOTT:** Was that Hutchings
6 Barsamian?
7    **MS. LUKEY:** Yes.
8    **MR. SINNOTT:** My recollection, and I
9 believe that when we sent this the supplemental
10 interrogatories out, all of this information came in
11 and was disclosed was that they had actually worked
12 as local counsel; that they had filed an appearance
13 in the case and, in fact, had filed the complaint.
14    **MS. LUKEY:** In the standalone case, but
15 in terms of what was in front of Judge Wolf, there
16 was nothing.
17    **MR. SINNOTT:** But you'd agree that there
18 was -- it was apparent to everyone what they had
19 done in the case?
20    **MS. LUKEY:** Wouldn't have been apparent
21 to Judge Wolf. They weren't in the lodestar. They
22 didn't enter an appearance, and they never appeared.
23    **THE SPECIAL MASTER:** If they were on a
24 pleading that was filed in a case that was before

Page 115

1 Judge Wolf --
2    **MS. LUKEY:** It wasn't.
3    **THE SPECIAL MASTER:** -- they appeared.
4    **MS. LUKEY:** Well, I shouldn't say that
5 so clearly. I don't know whether he had the
6 original complaint or not.
7    **THE SPECIAL MASTER:** Well, it was
8 consolidated.
9    **MS. LUKEY:** They are not on the docket
10 for this consolidated action. They did not file a
11 lodestar.
12    **THE SPECIAL MASTER:** In the consolidated
13 action but in the original complaint that was filed?
14    **MS. LUKEY:** As I understand it, they,
15 apparently, were on the original, but they were not
16 on the consolidated docket I believe. And they are
17 not in the lodestar. They did not file a separate
18 fee declaration.
19    **THE SPECIAL MASTER:** Okay.
20    **MR. SINNOTT:** Another question, Joan.
21    **MR. SARKO:** This is Lynn Sarko. I just
22 want to clear this up.
23    The Andover complaint was filed with
24 Judge Wolf. Our local counsel is listed as counsel

Page 116

1 of record. Our local counsel actually filed things
2 on the docket in that case. Our local counsel
3 reported to the Labaton firm.
4    Nicole Zeiss decided -- told us that she
5 was not going to include their time in the fee
6 application because it was de minimis but was going
7 to include the expenses. That's all in the record.
8 I just don't want people to misstate the record in
9 this argument.
10    **THE SPECIAL MASTER:** If we don't have
11 that information, would you please provide it to us?
12 If you've already provided it us, that's fine.
13    **MR. SINNOTT:** I'll pull the
14 interrogatory.
15    **MS. LUKEY:** That's not my understanding.
16 But we did it based on the interrogatories and
17 checking the docket, and we didn't find anything.
18 But if I'm wrong, I apologize. That's what we
19 understood to be the case.
20    **THE SPECIAL MASTER:** Okay.
21    **MR. SINNOTT:** Joan, so that I understand
22 correctly, you're not saying that the Federal Rules
23 of Civil Procedure 23 and 54 trump Rule 3.3, are
24 you?

Page 117

1    **MS. LUKEY:** I am saying if there is an
2 issue on which there is a flat-out inconsistency,
3 then the federal rule would govern.
4    However, here you wouldn't even need to
5 get there because the federal rule is a specific
6 rule about when you must disclose. Rule 3.3 is a
7 general rule about the duty of candor. Under
8 standard statutory construction which also applies
9 to rules, the specific trumps the general.
10    So if you have a specific requirement or
11 indication there is no requirement to do and act and
12 you have a general discussion of something like
13 candor, then the specific requirement that says you
14 don't have to disclose trumps the general
15 requirement of candor in the sense that you cannot
16 be obligated as if it were wrongful conduct which is
17 what the candor rule is to disclose when the
18 specific rule says you don't have to.
19    **THE SPECIAL MASTER:** I'm curious about
20 this. If a lawyer discloses for purposes of a fee
21 petition that A, B, C and D are going to get X
22 amount of money but doesn't disclose that lawyer --
23 where did I leave off? Did I say E? -- was
24 disclosed doesn't disclose that lawyer X is going to

Page 118

1 get money and lawyer X has never appeared, lawyer X
2 is non-transparent to the Court, was the statement
3 true because it's partially true, or is it false
4 because it's not fully true?
5    **MS. LUKEY:** Two things:  First, it's a
6 hypothetical that's inapplicable because there was
7 neither a request, nor was there a filing that said
8 the three customer class firms will each receive X.
9 That never happened.  Wasn't asked for.
10    Secondly --
11    **THE SPECIAL MASTER:** But there were
12 lodestar petitions filed, and the judge could infer
13 that each of these firms that appeared to him in the
14 lodestar petitions and in the case were going to get
15 some allocation -- maybe not knowing what allocation
16 but some allocation.
17    **MS. LUKEY:** But that's a crosscheck to
18 see whether the percentage is reasonable.  What
19 you're doing if you're not putting in one of the
20 lawyers is understating something, not overstating
21 it.  So that's not going to hurt the crosscheck.
22    You could choose, as Labaton does for
23 example, not to include in your lodestar attorneys
24 who have under a certain amount, a de minimis amount

Page 119

1 which is like five hours for some set period, they
2 don't disclose them.  That doesn't make it unlawful
3 or deceptive because they're understating the number
4 that they're asking the Court to use for the
5 crosscheck of their contingent fee.
6    So leaving someone out -- if it's going
7 to disadvantage anyone, it's going to disadvantage
8 the petitioner putting in the lodestar report.  So I
9 don't see that.
10    But, secondly, one of the issues here is
11 at what point does it cease to be relevant to whom
12 you choose to distribute funds.  So let's -- we
13 didn't have a circumstance where the judge asked how
14 much each firm was getting.
15    But let's say he did and he asked
16 Labaton how much are you getting, and Labaton says,
17 well, we're getting a little under 25 million
18 dollars.  And they don't say but we have to give 4.1
19 million or their percentage -- 1.3 million -- away.
20 If they wait a week, if they wait two weeks, the
21 funds are in their account.  It's their funds.
22 When's it okay?  I mean that's the problem.
23    You can't -- it's not like there's being
24 a payment that's not funneling through the law firm.

Page 120

1 How long do you have to hold it before it's no
2 longer anybody's concern?  That's part of the reason
3 why there is no arbitrary rule that says if
4 you're willing to give away part of your money you
5 have to tell the Court.
6    **THE SPECIAL MASTER:** Bill, did you
7 have --
8    **MR. SINNOTT:** Just to follow up on what
9 you said before.
10    Just so I understand it and the special
11 master understands it, Joan, you're saying that a
12 specific procedural rule trumps a general rule of
13 professional conduct?
14    **MS. LUKEY:** You can drop the word
15 "procedural" and the word "rule of professional
16 conduct" from that.  I'm saying specific governs
17 over the general.
18    So you don't even have to get into the
19 issue of is a Federal Rule of Civil Procedure if it
20 conflicts with a professional rule going to govern
21 in terms of whether a person can be disciplined or
22 sanctioned for their conduct in the federal court
23 where the federal rule applies.
24    I believe the answer to the latter

Page 121

1 question is that the federal rule is going to
2 govern, but you don't have to get there.  It's
3 easier to use the standard rule of statutory
4 construction which is you've got a specific rule on
5 when you have to disclose a fee allocation, a fee
6 division.  And then you have a general rule that
7 says you need to be candid with the Court.
8    **THE SPECIAL MASTER:** Let me ask this:
9 What are we to make of I think it was comment 14-A
10 and the comment which then incorporates 3.3(d) --
11 wasn't it 3.3(d)?
12    **MS. LUKEY:** It's 3.3(d).
13    **THE SPECIAL MASTER:** -- on ex parte
14 proceedings?
15    **MS. LUKEY:** I'm glad you mentioned that
16 'cause I didn't go back in my outline to that.  I
17 also didn't go back to 7.2 because it appears that's
18 no longer a matter -- you didn't ask about it, but I
19 can come back to it if you want.
20    **THE SPECIAL MASTER:** I think we did.
21 Didn't we?
22    **MS. LUKEY:** No.  1.5 and 7.2 we didn't
23 talk about.  I can talk about that but starting --
24    **THE SPECIAL MASTER:** Wait, wait, wait.

Page 122

1    **MS. LUKEY:** Did you ask about it?
2    **THE SPECIAL MASTER:** I'm pretty sure we
3 did.  We asked about 7.2, 7.
4    **MS. LUKEY:** No, the list doesn't have
5 it.
6    **MR. HEIMANN:** You asked about 7.3 but
7 not 7.2.
8    **MS. LUKEY:** You didn't ask about 7.2,
9 but I can come back to that, your Honor, if it was
10 left out.
11    **THE SPECIAL MASTER:** I want to give you
12 an opportunity to address 7.2 and 7.3.
13    **MS. LUKEY:** I will come back to those --
14    **THE SPECIAL MASTER:** And I think we put
15 1.5(a), too.
16    **MS. LUKEY:** Yes, I skipped over some of
17 them and forgot about them, but I can go back to
18 those issues.
19    **THE SPECIAL MASTER:** What am I to make
20 of 14-A and 3.3(d)?
21    **MS. LUKEY:** Okay.  First of all, 14-A is
22 obviously a subsection of 14, and in the comment on
23 14 it specifically says that nothing in there will
24 change or affect any substantive legal requirement.

Page 123

1    Rules 54(d)(2) and 23(h) are substantive
2 legal requirements.  So this would not overcome
3 those.  This general rule of candor with the note
4 would not overcome that.
5    The second issue is the rule is pretty
6 specific.  You don't -- I'm sorry.  The note is
7 pretty specific.  You don't look at something to see
8 if it is like a non-adversarial proceeding or a
9 joint petition.
10    It says if you have a joint petition
11 such that it is then a non-adversarial situation, it
12 would be treated like an ex parte proceeding which
13 has a somewhat stronger rule of candor.  Doesn't
14 apply if you've got another rule that governs as you
15 do with 54(d)(2).  But this was also not a joint
16 petition.  You can't say it was non-adversarial.
17    The fact that State Street made the
18 decision that it wasn't going to get in the mix
19 doesn't make it non-adversarial or ex parte.  State
20 Street was there.  State Street just made the
21 strategic decision --
22    **THE SPECIAL MASTER:** Why would a higher
23 duty of candor exist if there was a joint petition
24 and State Street was part of that than if it was --

Page 124

1    **MS. LUKEY:** No, no.
2    **THE SPECIAL MASTER:** -- solely a
3 proceeding brought for fees by one side's lawyer?
4    **MS. LUKEY:** No.  The higher duty of care
5 -- of candor -- excuse me -- applies in the
6 circumstance where you have a joint petition such
7 that there's nobody who even can argue the opposite
8 point.
9    So here --
10    **THE SPECIAL MASTER:** Then why are we
11 focusing on State Street?  I don't --
12    **MS. LUKEY:** Well, because it's not a
13 joint petition.  They're at the settlement
14 conference where this occurred.
15    They're perfectly -- they did not join
16 in the fee petition.  Had they heard something that
17 troubled them, they had every right and opportunity
18 to object.  They didn't.
19    **THE SPECIAL MASTER:** But as a practical
20 matter, this was a non-adversary -- as to the fees,
21 this was a non-adversarial proceeding.
22    **MS. LUKEY:** Only because State Street
23 chose not to object.  Trust me if --
24    **THE SPECIAL MASTER:** And there were no

Page 125

1 objectors.  So it was a non-adversary proceeding.
2    **MS. LUKEY:** Well, no one objected
3 because it was a good deal, your Honor.
4    **THE SPECIAL MASTER:** So why does the
5 comment not apply?  It was, effectively, a
6 non-adversarial proceeding, and why does that not
7 raise the implications of 3.3(d) or the duties under
8 3.3(d)?
9    **MS. LUKEY:** First and foremost is
10 because what note 14 says in which 14-A is a subset
11 and when originally presented to us 14-A was put in
12 front of one of our witnesses without 14, which was
13 really not altogether fair, because A is a subset.
14    Fourteen says if there is a substantive
15 legal provision that governs what -- none of this
16 applies; and whichever expert it was in front of, we
17 then asked are Rule 54(d)(2) and 23(h) substantive
18 legal provisions, and he said yes.  Of course, they
19 are.  And they're governing rules of federal
20 procedure.  So that note, you know, if you drop the
21 first paragraph, you miss that.
22    But if you get to the paragraph to which
23 the subparagraph was qualifying, the answer is it's
24 not applicable at all because there are two rules on

Page 126

1 point. And the rules on point say you disclose only
2 if you're asked. So that's why.
3     The other thing is the rule -- if we're
4 going to get even down to just 14-A -- doesn't say
5 if you have a proceeding that's not joint but it's
6 like being joint because they're not objecting,
7 there's no one objecting, then you treat it
8 differently. You treat it as requiring more candor.
9 It's specific. It's got to be a joint petition so
10 that the other party doesn't have the opportunity to
11 object because they're part of the petitioning
12 activity.
13     Here State Street had every opportunity
14 to object, but, you know, frankly 25 percent's a
15 reasonable fee. They weren't going to object to
16 that. But the more important point is 14-A
17 qualifies 14. Fourteen says if there's a
18 substantive law on point, this doesn't apply.
19     **THE SPECIAL MASTER:** Okay.
20     **MS. LUKEY:** So there's that. I should
21 go back quickly to 7.2 and 1.5 --
22     **THE SPECIAL MASTER:** While we're on this
23 -- I want you to come back, but, Bill, did you have
24 something on this?

Page 127

1     **MR. SINNOTT:** Yeah, just on this
2 particular point. So if Judge Wolf were to find
3 that this was a non-adversarial proceeding, would
4 you agree that 3.3(d) applies?
5     **MS. LUKEY:** I'd have to look at it, but
6 I wouldn't -- I don't agree the note applies, and I
7 presume I'm not going to agree that 3.3(d) applies,
8 but I'm not --
9     **MR. SINNOTT:** In an ex parte proceeding
10 a lawyer shall inform the tribunal of all material
11 facts known to the lawyer that will enable the
12 tribunal to make an informed decision whether or not
13 the facts are adverse.
14     **MS. LUKEY:** No, I'm not going to agree.
15 It was not an ex parte proceeding.
16     **MR. SINNOTT:** But what I'm saying is if
17 Judge Wolf rules that it was an ex parte proceeding,
18 would that rule apply?
19     **MS. LUKEY:** Well, with all due respect,
20 if the opponent is sitting there and has the
21 opportunity to comment -- and I suspect if we go
22 back, the Court probably said do you have anything
23 to say, Mr. Payne -- I don't know that, but I would
24 suspect it -- then I don't know how a judge as good

Page 128

1 as Judge Wolf would say that's ex parte.
2     I mean I know what an ex parte
3 proceeding is when I slip in for a TRO, and I don't
4 tell the other side. This is not ex parte. They're
5 sitting there. So, you know, were the judge to say
6 that, then I would say the question of materiality
7 has to be determined by what the law says, and the
8 law in the form of the Rules of Civil Procedure says
9 that's not material.
10     You don't have to disclose it unless
11 you're asked. So that would be my answer to that.
12     **MR. SINNOTT:** All right, Joan, the other
13 thing I'd ask before you go onto 7.2 is Arkansas was
14 the lead plaintiff in a number of other cases in
15 other jurisdictions--
16     **MS. LUKEY:** Yes.
17     **MR. SINNOTT:** -- where there was a
18 requirement of written notice of the division of
19 fees with Chargois.
20     Why didn't Labaton notify Arkansas of
21 the division of fees in those other cases?
22     **MS. LUKEY:** I haven't the slightest idea
23 what they did in the other cases, Bill, so I can't
24 answer that question.

Page 129

1     **MR. SINNOTT:** Do you think it reflects
2 upon their motivation in this case?
3     **MS. LUKEY:** No.
4     **THE SPECIAL MASTER:** Circumstantially?
5     **MS. LUKEY:** Respectfully, no. The only
6 evidence that was cited for a basis as I recall in
7 Professor Gillers' opinion for the fact finding that
8 you folks made -- he didn't make it, but he then
9 reiterated it about this being secret and pains
10 being taken to hide it related to the use of blind
11 copies or separate communications.
12     And given, as George Hopkins said, that
13 he had -- he had a very valid reason for not wanting
14 to know who the local attorney was -- any local
15 attorney because that creates issues for these folks
16 who are in charge of huge investment funds. They
17 don't want to be besieged or lobbied by these local
18 attorneys.
19     So that's the reason that blind copies
20 were used. I have absolutely no evidence and
21 neither, respectfully, do you of what happened in
22 any other jurisdiction or what the rules were in any
23 other jurisdiction. I don't know what happened. I
24 don't know what may have been said in a period

1 before George arrived.  I don't know.
2    All I know is that Eric did in fact tell
3 Christa Clark who carried over for a period of some
4 months at least that there was an ongoing
5 relationship with Chargois & Herron.  That's all I
6 know.  That's all the record shows.  So I do not
7 know.
8    **THE SPECIAL MASTER:** Anything else on
9 this point?
10    **MR. SINNOTT:** No, judge.  Go ahead.
11    **THE SPECIAL MASTER:** Just so we're
12 clear, we did in our e-mail to you say please
13 describe how you would characterize the Chargois &
14 Herron contact with Paul Doane and/or Senator Faris
15 taken to secure an introduction to ATRS including
16 your view on whether the arrangement constitutes a
17 solicitation, recommendation, introduction, referral
18 and/or endorsement.  We did not use the Rule 7.2,
19 but that's pretty clearly the implication.
20    **MS. LUKEY:** That's fine.  I assumed it
21 was probably an oversight, and I didn't get to it
22 because I was tracking through the order here.  But
23 7.2 is not -- 7.3 is the rule that would be
24 implicated by what you just said.  7.2 is

1 advertising.
2    **THE SPECIAL MASTER:** We used the phrase
3 recommendation which is 7.2.
4    **MS. LUKEY:** Fine.  Frankly, I skipped it
5 by mistake.  It's in my outline so I will go to
6 that.
7    **THE SPECIAL MASTER:** Tell us what you
8 think about it.
9    **MS. LUKEY:** All right.
10    **THE SPECIAL MASTER:** Whatever we call
11 it.
12    **MS. LUKEY:** Yes.  And I think there's a
13 difference, and I should also comment on 7.3.  If I
14 could do that quickly and easily.
15    **THE SPECIAL MASTER:** Please.
16    **MS. LUKEY:** 7.3 in Massachusetts if you
17 read it, that's the solicitation rule, only applies
18 to a lawyer making in-person contact with an
19 individual who is not representing an organization.
20    In other words, it is designed to apply,
21 for example, to soliciting someone after they lost a
22 loved one in an airplane crash or to a car accident
23 because the exceptions in Massachusetts one might
24 say swallow the rule.  It says a lawyer shall not by

1 in person, live telephone or real-time electronic
2 contact solicit professional employment for a fee
3 unless the person contacted -- exception number one
4 is a lawyer; Paul Doane is a lawyer, and I gave you
5 his bar number in the submission -- but number 4
6 and, more importantly, which is the basis for what I
7 just said a moment ago, the first section of number
8 4, which is the applicable section, says unless the
9 person contacted is a representative of an
10 organization including a non-profit or government
11 entity in connection with the activities of such
12 organization.
13    So if you reach -- obviously Arkansas
14 Teacher Retirement System is an organization, not an
15 individual.  It happens also to be a governmental
16 entity.
17    If you read it, that would then say that
18 it's okay to contact the executive director of an
19 organization which happens to be a governmental
20 organization about its activities, investment --
21 we're coming in, and we're asking you to let us
22 bring a suit for you because of investment
23 impropriety.
24    So in Massachusetts at least, 7.3, the

1 non-solicitation rule, is extraordinarily narrow,
2 and it's inapplicable here.  I suspect, frankly,
3 that's why Professor Gillers doesn't reference it in
4 his report.  It's a very -- bless you.
5    Turning then -- I also didn't do 1.5(a)
6 but let me go first to --
7    **THE SPECIAL MASTER:** -- 7.2.
8    **MS. LUKEY:** -- 7.2 and 1.5(e).
9    This was the first theory that I was
10 told about, at least when I pressed Bill about how
11 we could be having an issue on the fee allocation in
12 Massachusetts where bare referral fees are
13 permitted, he told me that we would be hearing from
14 Professor Gillers when we got his report about an
15 interplay between 7.2(b) and 1.5(e).
16    That interplay as -- not long after that
17 -- excuse me -- we got that report.  That interplay
18 reads something like this:  7.2(b) is the governing
19 rule for the circumstance in which a lawyer can pay
20 somebody a fee.  There's then listed there an
21 exception that incorporates 1.5(e).
22    But if you go to --
23    **THE SPECIAL MASTER:** I think you said
24 "can" pay.  Do you mean "can't" pay?

Page 134

1  **MS. LUKEY:** It lists exceptions where
2  you "can" --
3  **THE SPECIAL MASTER:** Correct.
4  **MS. LUKEY:** -- pay.
5  **THE SPECIAL MASTER:** 7.2 is broadly the
6  -- it's the prohibition for a recommendation, paying
7  anything of value for a recommendation.
8  **MS. LUKEY:** Right.
9  **THE SPECIAL MASTER:** And then there are
10  exceptions carved out to that.
11  **MS. LUKEY:** Right.
12  **THE SPECIAL MASTER:** Exception I believe
13  it's 5 permits payments under 1.5(e).
14  **MS. LUKEY:** Right.  So it's a lawyer
15  shall not give anything of value to a person for
16  recommending the lawyer's services except that a
17  lawyer may pay fees permitted by Rule 1.5(e).
18  **THE SPECIAL MASTER:** Correct.
19  **MS. LUKEY:** Professor Gillers suggest
20  you then go look at 1.5(e) which is actually the
21  applicable rule, it's not the default rule on fee
22  divisions, and you find the requirements there.
23  He took the position that obtaining the
24  consent was a condition precedent that had basically

Page 135

1  not been met, and therefore 1.5(e) was out of the
2  equation, and you're flipped back to 7.2 where you
3  now have automatically committed an ethics
4  violation.
5  The problem is that's not the correct
6  interpretation of the rules or an interpretation
7  that has ever been implied -- been applied in
8  Massachusetts.  In Massachusetts if you have a fee
9  paid between two law firms which unquestionably is
10  what happened here -- Labaton paid Chargois & Herron
11  a fee -- that's the fee division rule.
12  As it turns out and as I did argue at
13  the beginning, the requirements of 1.5(e) as existed
14  at the time even using the Saggese gloss -- I'll
15  accept that for the moment -- is you get the consent
16  in writing before you do the engagement or as you're
17  doing the engagement, and it has to be a reasonable
18  overall fee.
19  **THE SPECIAL MASTER:** So let me
20  understand your argument here, and I confess I
21  didn't fully understand which expert it was who
22  testified on this.  So was it Peter Joy?
23  **MS. LUKEY:** On which?
24  **THE SPECIAL MASTER:** 7.2(b).

Page 136

1  **MS. LUKEY:** Wendel and Green --
2  **THE SPECIAL MASTER:** Wendel, that's
3  right.
4  **MS. LUKEY:** -- both testified
5  exclusively on this issue because we thought that
6  was the whole focus and then Joy --
7  **THE SPECIAL MASTER:** So let me
8  understand this.  If a lawyer does not comply with
9  1.5(e), does that then not implicate 7.2(b) --
10  **MS. LUKEY:** No.
11  **THE SPECIAL MASTER:** -- and the general
12  prohibition?
13  **MS. LUKEY:** It isn't a general
14  prohibition.  That's the problem.  That's not how
15  7.2 has been interpreted in Massachusetts in the
16  circumstance where it's a lawyer fee split.  7.2
17  advertising rule does not apply to lawyer fee
18  splits.
19  Damon Chargois is a lawyer.  Chargois &
20  Herron which received the payment is a law firm.
21  Labaton Sucharow split its fee with Chargois &
22  Herron.  That's under 1.5(e).  The board would look
23  to see -- the Board of Bar Overseers would look to
24  see whether you complied with 1.5(e).

Page 137

1  If you didn't, they don't then go to
2  7.2.  They've never done that.
3  **THE SPECIAL MASTER:** So here's the
4  concern I have on this, and I'm undecided on this
5  yet.  Does simply having a law degree and being a
6  lawyer and recommending somebody or doing what
7  Mr. Chargois did in this case -- we had a lot of
8  back and forth and quibbling about what he did by
9  his own testimony, but -- and paying a fee for that
10  totally insulate a lawyer from the proscriptions of
11  7.2(b)?
12  **MS. LUKEY:** Yes.
13  **THE SPECIAL MASTER:** I think that's what
14  the expert testified.
15  **MS. LUKEY:** That's correct.  And that's
16  probably the reason --
17  **THE SPECIAL MASTER:** And I've got to
18  decide whether to accept that or to accept Professor
19  Gillers' view.
20  **MS. LUKEY:** Well, I'm going to say this:
21  There is no case anywhere in the country that has
22  done what Professor Gillers said, even when you
23  belatedly came up with the bar opinion in New York,
24  doesn't say that.  The only thing it does is to have

Page 138

1 a paragraph on 1.5(e) or its equivalent and one on
2 7.2, but it doesn't say how they relate to each
3 other. I can't even tell what the facts are.
4 **THE SPECIAL MASTER:** 1.5(e) carved out
5 and recognized as a specific exception, and I have
6 to say I was very skeptical and troubled by the
7 explanation that it's mere surplusage.
8 **MS. LUKEY:** Well, if you knew
9 Massachusetts rules and statutes, you'd find
10 surplusages all over the place.
11 **THE SPECIAL MASTER:** That was his
12 answer.
13 **MS. LUKEY:** It's the truth. It wouldn't
14 trouble a Massachusetts judge. We have drafting
15 with issues shall we say, and the fact of the matter
16 is the only rule that's ever been looked at in
17 Massachusetts when two lawyers or law firms split a
18 fee is 1.5(e) --
19 **THE SPECIAL MASTER:** That may go to the
20 issue of sanctionability, discipline, all of that.
21 It may go to that. But as a matter of statutory
22 construction what the expert was asking me to accept
23 was that there was no purpose whatsoever of the
24 carve-out in 7.2(b)(5) to the rule, just ignore it

Page 139

1 because it's surplusage. I find that hard to
2 accept.
3 Look, I did legislative drafting for a
4 lot of years in Washington, and, you know, we
5 covered over a lot of stuff when there were
6 disagreements, but what we certainly tried not to
7 was put something in a statute that was intended to
8 be meaningless.
9 **MS. LUKEY:** Well, no one ever does it
10 with that intent, your Honor. It's just that it
11 happens when rules are being drafted. It was not
12 one expert, by the way. I'm not sure you asked all
13 three, but if you go to the reports, Wendel,
14 Green --
15 **THE SPECIAL MASTER:** You're right, Green
16 said it also.
17 **MS. LUKEY:** -- and Leiberman all said it
18 if asked. It's in their reports, if not asked. 7.2
19 doesn't apply --
20 **THE SPECIAL MASTER:** So there's no
21 implication that I should draw at all from the fact
22 that 1.5(e) is a specific carve-out to 7.2(b)? No
23 implication at all? It's just surplusage --
24 **MS. LUKEY:** No, because you should be

Page 140

1 looking at 1.5(e) to begin with. Rule 1.5 is the
2 fee rule; 1.5(e) is the fee division rule; 7.2 is
3 the advertising touting rule --
4 **THE SPECIAL MASTER:** So under no
5 circumstances, no matter what a lawyer does, if he's
6 driving a taxicab -- so no matter what a lawyer
7 does, if he has a law degree, and he says, you know,
8 I know this great firm, you should hire this firm,
9 by the way, I want a percentage --
10 **MS. LUKEY:** Your Honor, that's a
11 hypothetical --
12 **THE SPECIAL MASTER:** -- 7.2(b) is not
13 implicated at all?
14 **MS. LUKEY:** I'm not going to go that
15 far, and it's not applicable here. The person's not
16 functioning in any way as a lawyer. Chargois &
17 Herron was a legitimate law firm. Chargois & Herron
18 was --
19 **THE SPECIAL MASTER:** In this case they
20 performed no legal services.
21 **MS. LUKEY:** Let's talk about what
22 happened here. In this case what Chargois did was
23 to get permission from Faris to call Doane, no doubt
24 use Faris' name to ask Doane for a meeting involving

Page 141

1 Chargois for Chargois & Herron and someone from
2 Labaton Sucharow.
3 They agreed -- Doane agreed to the
4 meeting. You suggested at the time of your
5 questioning perhaps it related to the fact that
6 Senator Faris' committee had oversight or funding
7 responsibility for the fund. That's not an
8 unrealistic assumption. But the fact is what
9 Chargois did was to facilitate a meeting so that
10 they could jointly ask for the opportunity to become
11 monitoring counsel.
12 And, again, the monitoring counsel is
13 the precursor because that's the pool from which the
14 litigation funds were paid. So together that was
15 the plan; they file a petition asking jointly to be
16 monitoring counsel.
17 Christa Clark responds the system isn't
18 set up for two non-affiliated firms to be a single
19 monitoring counsel, but do what you want in terms of
20 working together. She's told later by Eric Belfi
21 that they are working together.
22 So what happens here is Chargois &
23 Herron --
24 **THE SPECIAL MASTER:** So nothing changed

Page 142

1 when they stopped working -- quote, working
2 together?  And they did stop working together as to
3 Arkansas cases.
4    MS. LUKEY: Well, they stopped working
5 together in the sense that --
6    THE SPECIAL MASTER: Labaton didn't stop
7 paying --
8    MS. LUKEY: Right.
9    THE SPECIAL MASTER: -- but they stopped
10 working together.
11    MS. LUKEY: Well, because Mr. Hopkins
12 didn't want a local firm to be involved.  So you're
13 correct.  That wasn't the intent.  That's what
14 happened later.
15    But in the meantime what you're focusing
16 on right now is the call that Mr. Chargois made to
17 set up the meeting, and then he went to the meeting
18 with them, and they jointly pitched being
19 co-monitoring counsel.  One position on the panel.
20    So that's functioning as a law firm.  If
21 you're focusing on them in a moment in time which is
22 what you would do for purposes of this rule
23 analysis, he's asking -- he asks for the meeting to
24 be happening jointly.  It happens jointly.  They're

Page 143

1 both asking to be monitoring counsel.  They are
2 functioning as law firms.  That is a 1.5(e)
3 circumstance.  Then the only thing that you need to
4 know is what did 1.5(e) say at the time.  Said you
5 had to have consent.  It had to be a reasonable fee.
6 How did Saggese gloss it if it did?  It has to be in
7 writing.  That happens.  They get the engagement
8 letter.  They get the consent.  And 1.5(e) is
9 complied with.  That's the end of the inquiry.
10    But let's say that there was a
11 deficiency.  It was an imperfect compliance.  Let's
12 say the writing had to be more specific, you then go
13 to look at what happens in the case law.  First of
14 all, if you look at the board, the board's only
15 interested if a client is complaining that something
16 happened.  There's no client complaint here.
17    The courts are only interested if
18 there's a contract dispute between the attorneys,
19 and they don't decide it on a disciplinary or
20 sanction basis.  But it's still 1.5(e), and in all
21 those times and in all those cases, not just in
22 Massachusetts, anywhere in the United States as far
23 as I know, there's no case that says if you find
24 imperfect compliance with 1.5(e) you get bounced

Page 144

1 into 7.2.  7.2 was the anti-touting rule --
2    THE SPECIAL MASTER: Okay, I understand
3 your argument on 1.5(e) and imperfect compliance
4 with it.
5    MS. LUKEY: Hm hm.
6    THE SPECIAL MASTER: Then it's a
7 violation, however technical, of 1.5(e), and 7.2(b)
8 is not implicated.
9    MS. LUKEY: Right.
10    THE SPECIAL MASTER: What if there's no
11 attempt at all to comply with 1.5(e); it's simply a
12 bare recommendation -- you know, just accept for the
13 moment this.  If a lawyer is simply making a bare
14 recommendation and nothing more, is 7.2(b)
15 implicated then?
16    MS. LUKEY: No.  It's a hypothetical
17 that doesn't apply, and you and I had our issues as
18 I got upset with some of the hypotheticals during
19 the case, during the investigation, but, no, it does
20 not.
21    A lawyer fee split is decided under
22 1.5(e).  If there's no effort comply, that may make
23 a whole lot of difference in terms of what the Board
24 of Bar Overseers is going to do.  The federal court

Page 145

1 here happens to have for the last several years it
2 can use its own disciplinary procedure -- it never
3 has -- for 1.5(e) as far as I know.  It usually
4 doesn't use its own procedure; it usually refers,
5 but that would not be -- it would be a question of
6 what's the penalty in that circumstance, but it
7 doesn't flip into 7.2.
8    7.2 is the taxi driver who's not acting
9 as a lawyer, even if he has a degree and is a
10 licensed member of the bar, which is a little hard
11 to expect that would be happening unless the license
12 is no longer valid, handing out the lawyers'
13 business cards at accident scenes as he drives by or
14 the touter who goes down the emergency room --
15    THE SPECIAL MASTER: But then 7.2(b) in
16 that hypothetical would be implicated.
17    MS. LUKEY: That's correct.  Yes,
18 absolutely.
19    THE SPECIAL MASTER: Okay.
20    MS. LUKEY: So I mean from my -- I know
21 our experts were very adamant with you about someone
22 -- if it's a lawyer getting a fee, it's a lawyer
23 getting fee, but, you know, I doubt very much
24 they're thinking of the cabdriver who has a

1  suspended license to practice law because he
2  misbehaved or something.  I'm sure they weren't
3  thinking of that.
4      But if it's a law firm getting a split
5  on the fee, the answer is it's 1.5(e).  And it's
6  also, I think, unfair to refer to this as a bare
7  recommendation when you think of the facts, even as
8  Chargois chose to spin them now as contrasted with
9  what he was telling Labaton at the time, it was a
10 request for a meeting for the two firms so they
11 could ask to become monitoring counsel.  And then
12 one of the experts pointed out that it was Labaton
13 that was selected on its own merits, not on anything
14 that was said at that point by Chargois.
15     So I mean I have to tell you the
16 suggestion that there's an interplay of this fashion
17 between 7.2 and 1.5(e) is way out there.  Way, way
18 out there.
19     THE SPECIAL MASTER: Well, whether it's
20 way out there or whether it doesn't apply are two
21 different questions.  But the rule on its face -- on
22 its face -- implicates 1.5(e).
23     And, you know, the experts can say all
24 they want; that it's surplusage, not intended to

1  have any impact, but the rule -- as you keep telling
2  me, the rule is the rule is the rule.  So to accuse
3  Professor Gillers of inventing something out of
4  whole cloth which is what you're doing --
5      MS. LUKEY: Yes.
6      THE SPECIAL MASTER: -- I think is very
7  unfair to him.
8      MS. LUKEY: I respectfully disagree.
9      THE SPECIAL MASTER: It is a reading of
10 the rule that has support in the textual language of
11 the rule.
12     MS. LUKEY: When I asked him how he
13 could read the two rules together in that fashion at
14 his deposition, he replied that it was a syllogism
15 or syllogistic for those of us who at one point or
16 another have taken logic courses, we know the
17 dangers of referring to a syllogism because the
18 deduction that works in one instance doesn't work
19 when you continue with the -- the example that we're
20 always taught is a dog has four legs, and a dog is
21 an animal --
22     THE SPECIAL MASTER: That was my
23 logic --
24     MS. LUKEY: Right, the same one for

1  everybody.  So now there's a creature grazing in the
2  grass over there going "moo;" it has four legs.  The
3  syllogism, therefore it is an animal works.
4      The next part of the syllogism which is
5  the reason that people who deal in logic don't deal
6  with syllogisms is --
7      THE SPECIAL MASTER: -- that it's a dog.
8      MS. LUKEY: -- the creature has four
9  legs, therefore it's a dog.  So I thought it was an
10 apt word for him to use.  That's the problem.
11     The syllogism doesn't work which is why
12 it has never been done.  I am sorry if it's
13 offensive to you or to Professor Gillers, but I do
14 think it's of whole cloth --
15     THE SPECIAL MASTER: Well, I think to
16 say that it is made out of whole cloth and has no
17 root anywhere I do think is unfair to Professor
18 Gillers.  Whether I accept his view or not is
19 something else, but the textual language of the rule
20 invites as one interpretation that interpretation.
21     You can try to persuade me otherwise,
22 Joan, but you're not going to.
23     MS. LUKEY: I respectfully disagree.
24 I'm just telling you that --

1      THE SPECIAL MASTER: Because I don't
2  believe that drafting bodies put in language for no
3  reason, and that may be my own background having
4  drafted legislation but --
5      MS. LUKEY: You were drafting in
6  Washington, sir.
7      THE SPECIAL MASTER: And with that maybe
8  we should take a break.
9      MS. LUKEY: Fine with me.
10     THE SPECIAL MASTER: You've been going
11 for almost three hours.
12     (A recess was taken.)
13     MS. LUKEY: I offered to defer to my
14 colleagues, but they told me to go ahead and finish
15 1.5(a) which we didn't get to.  It'll be very brief.
16     Obviously, that's the rule that deals
17 with the clearly excessive fee.  It's the position
18 of the customer class law firms that that refers to
19 the aggregate, not to individual pieces of the fee
20 which would be the necessary interpretation here
21 because of the bare referral fee.  Much along the
22 lines of what you were talking about about surplus
23 language, 1.5(a) starts with as a factor to be
24 considered in whether a fee is excessive the time

Page 150

1 and labor required.  With a bare referral fee there
2 is no time and labor required.
3     Also we would point to the Saggese
4 decision which is instructive because of a $90,000
5 fee on a 320 I think something dollar judgment was
6 discussed only from the perspective of whether
7 proper consent had been obtained, and the Court had
8 no problem at all with the notion of $90,000 for no
9 work.
10     So I guess the only other issue on
11 1.5(a) is what does clearly excessive mean in this
12 case.  And although I know your Honor's position on
13 the but-for analysis, if one considered that but for
14 the facilitation of the introduction that
15 Mr. Chargois conducted, this was not clearly an
16 excessive fee on that basis.
17     I will answer any questions.  Otherwise,
18 I would simply stop and turn it over to others.
19     THE SPECIAL MASTER: Okay.  Who's next?
20     MR. KELLY: I'm up, judge.  All right.
21 So maybe I can start with the basic simple premise
22 that everyone in this room can agree upon, even
23 Richard.  And that would be, look, everyone makes
24 mistakes.  And clearly the mistakes were made in

Page 151

1 this case.  Whatever walks of life, people make
2 mistakes.  Lawyers make mistakes.  Judges make
3 mistakes.  That's why we have court of appeals.  But
4 when judges make mistakes and they get reversed, no
5 one says, oh, that's intentional misconduct.  It's a
6 mistake.
7     Baseball, Golden Gloves winners, they
8 make mistakes; they make errors every year.  So I
9 think we're holding these lawyers in this case to an
10 impossible standard here.  I mean starting with the
11 double counting itself, right.  If there's any
12 mistake in this case that's significant that would
13 have mattered to the judge, it would be that one
14 'cause it was about 4 million dollars in the overall
15 lodestar.
16     Now that is clearly I think, as we've
17 seen from the testimony of multiple people
18 throughout this case, an inadvertent error, and I
19 think the special master, you indicated you
20 yourself in one of the depositions.  I think it was
21 when you were questioning Garrett Bradley back on
22 September 14.  You had an exchange with him, and you
23 said that it was a mistake, yes, and I think
24 inadvertent.  And that was after there had been some

Page 152

1 reference to Chiplock's testimony, Zeiss' testimony,
2 Sucharow's testimony about what happened here with
3 this double counting.  And it's unfortunate
4 obviously.
5     The press brings it to their attention,
6 and they are appropriately mortified because it's
7 not a sophisticated mistake.  If they were trying to
8 scheme together to fool Judge Wolf, they could have
9 done it a lot better than this.
10     And I'm not faulting anyone, but
11 clearly, as Joan explained, it was a young partner,
12 Nicole Zeiss, who didn't give a close read to all
13 the documents, right?  All she had to do was spread
14 out on a counter like this the various declarations,
15 and she would have noticed the obvious mistakes.
16 There's a few staff attorneys over here that are
17 also over here.  You know, we're double counting.
18     But, again, she did not give it close
19 enough read, and it's a mistake.  And that's not
20 something that should give rise to sanctions.  It's
21 something the law firms appropriately notified Judge
22 Wolf about; and when they did so, they pointed out
23 that even though it's 4 million bucks, even that is
24 not really material to the total aggregate fee that

Page 153

1 Judge Wolf allowed.
2     THE SPECIAL MASTER: So there are two
3 parts to the inadvertence question.  The question as
4 to whether it was inadvertent that they were double
5 counted, the qua appeared on the same staff -- the
6 same staff attorneys appeared on different firms'
7 lodestar, was that inadvertent?
8     MR. KELLY: Absolutely.
9     THE SPECIAL MASTER: The question -- the
10 question as to whether it was inadvertent as to
11 Thornton in not receiving explicit permission to
12 include folks who were not employed by the Thornton
13 firm on its law -- on its lodestar and then tell the
14 judge that these people were employed by the firm,
15 that's not inadvertent.
16     MR. KELLY: Well, okay, I disagree
17 strongly, and here's why, and there's two reasons
18 why, okay?  Miss Lukey alluded to the fact that
19 there seems to be some moving targets throughout
20 this process.  And, you know, I understand this is
21 an investigation to figure out what rules apply --
22     THE SPECIAL MASTER: How many
23 investigations did you quarterback as an AUSA,
24 Brian?  Did you keep track?

Page 154

1  **MR. KELLY:** Multiple.  Multiple.
2  **THE SPECIAL MASTER:** Did they all
3  exactly end up where they started?
4  **MR. KELLY:** No.  In fact, that's a good
5  point.  In fact, often times when I did a grand jury
6  investigation that went on for months, cost millions
7  of dollars, I did not feel at the end of it I had to
8  get a particular result.  A lot of times I declined
9  prosecution, and I would hope this process ends in
10  the same way.
11      It's involved multiple months, lots of
12  money, lots of time, and I would think hopefully at
13  the end of this if the evidence and the law is
14  evaluated fairly, that no sanctions are recommended.
15      And with respect to your question --
16  with respect to your question about how did this --
17  you know, why is it on their lodestar?  There was a
18  clear albeit implicit agreement.
19      Now the reason I say it's a moving
20  target, because up until today -- up until this
21  morning, the continued question to us was where's
22  the explicit or implicit agreement.  Where is it?
23  Then this morning all of a sudden it's dropped.  Now
24  it's where's the explicit agreement.  There's no

Page 155

1  written agreement.  It is clearly an implicit
2  agreement.
3      And when I questioned Professor Gillers,
4  he hadn't even seen our submission where we laid it
5  out, and we made the submission late yesterday.  I'm
6  going to lay it out again right now so that it's
7  clear that the parties knew Thornton was paying for
8  it.  Of course, they were going to get credit for it
9  at the end.  It makes no sense for them to pay for
10  these staff attorneys and then not get credited in
11  their lodestar.
12      **THE SPECIAL MASTER:** This is where you
13  and I are going to disagree -- in the lodestar.
14  Thornton could have easily paid for it and got it
15  credit in its fee easily --
16      **MR. KELLY:** Well --
17      **THE SPECIAL MASTER:** -- as a piece of
18  the larger fee recovery.
19      That would have been perfectly
20  appropriate.  But instead it chose to put these
21  staff attorneys on its lodestar who were not
22  employed by them and tell the Court that they were
23  employed by them.
24      **MR. KELLY:** Okay, a couple things,

Page 156

1  judge.  I think you're ignoring an important
2  chronology here and that is the firms agreed --
3  these three customer class firms agreed to the fee
4  in August a month before they submitted it.  There's
5  no motive.  There's no incentive to lie about
6  lodestar to the judge in September.
7      These firms have battled it out, and,
8  yes, each firm wants a bigger piece of the pie, and
9  that's business.  They want more than him.  He wants
10  more than her.  And so forth.  And that's where you
11  have chronologically the e-mail that's been waved
12  around, you know, in a sensationalistic fashion the
13  Garrett talks about jacking up the lodestar.  Okay,
14  yeah, he did say that.  And yes, he does want to
15  protect his firm's interest vis-a-vis these two
16  firms.  They're friendly enough, but they're
17  competitors, and they're all trying to get their
18  piece of the pie.
19      He and his firm had had experience in
20  the past where they didn't think they got their fair
21  share.  You know, this -- this case they had
22  substantial amount to do with.  It was Mike -- Mike
23  Thornton was critically important to the whole idea
24  of it --

Page 157

1      **THE SPECIAL MASTER:** I'm not questioning
2  any of that.  My question is why did they put these
3  staff attorneys on their lodestar and tell the Court
4  they were employees of the firm?
5      **MR. KELLY:** Well, there's multiple
6  questions there.  Why did they put them on their
7  lodestar?  They paid for them.  And there was an
8  implicit agreement amongst counsel that that was
9  okay.  And let me just direct your attention to
10  that, okay, and then I'll address the other point.
11      Now -- and we laid this out again in our
12  November 3rd submission which again was not provided
13  to Professor Gillers before he adopted all of the
14  facts in his report.  You know, some of the most
15  clear testimony from this was from Mr. Chiplock I
16  believe.  He testifies at length in two different
17  depositions that he understood there was an
18  agreement.  Quote, it was completely understood by
19  me when I talked with Garrett that would be how it
20  worked because it was obvious to me that if you pay
21  for the work that's being done, that you include
22  their hours in your lodestar when you report it at
23  the end of the day.  It was just obvious.  That's
24  his testimony.

Page 158

1  Now Lieff -- that's not just Lieff's
2  point of view; it's also Labaton's point of view.
3  They got two different partners.  And, by the way,
4  that was Chiplock's testimony on 6/16 at page 136,
5  lines 10 to 22.
6  But Labaton, they had two separate
7  partners who testified, Mike Rogers and Eric Belfi.
8  And they both said they assumed or if they had been
9  asked at the time would have assumed that the
10  Thornton Law Firm was going to claim the staff
11  attorneys in its fee declaration.  That's again June
12  16th, the Rogers deposition, page 91, lines 18 to
13  23.  And for many of the same reasons cited by
14  Mr. Chiplock, Rogers said, well, quote they were
15  paying for it up front.  I assume they would want to
16  get paid on the back end.
17  **THE SPECIAL MASTER:** So is your argument
18  that an assumption is an agreement?
19  **MR. KELLY:** Well, I think as we footnote
20  in our submission last night if you look at the
21  dictionary -- The American Heritage Dictionary --
22  **THE SPECIAL MASTER:** I haven't seen
23  the --
24  **MR. KELLY:** -- the word "implicit" is

Page 159

1  defined as implied or understood though not directly
2  expressed.  That's an implicit agreement, and it's a
3  logical agreement.  There's nothing nefarious about
4  it because let's say -- let's say Thornton did not
5  claim these ten staff attorneys.  Let's say Lieff
6  and Labaton did.  So what?
7  Judge Wolf would have seen the same
8  amount of time.  You know, so it's not like Thornton
9  has a motive to make it up --
10  **THE SPECIAL MASTER:** Nobody's debating
11  that, Brian --
12  **MR. KELLY:** Well, that's why it's
13  material --
14  **THE SPECIAL MASTER:** -- whether he's
15  seeing the same amount of time.  What is material is
16  why we're all here, because they were included on
17  the Thornton fee petition.  Whether Dan Chiplock
18  assumed that it was going to happen or Mike Rogers
19  assumed that it was going to happen, there was not
20  an explicit agreement on it that allowed -- I'm not
21  even sure there was an implicit agreement.  Chiplock
22  says he assumes.  Rogers says he assumes.  But let's
23  assume that there was some kind of implicit
24  understanding that they would claim 'em.

Page 160

1  The whole reason we're here is because
2  your folks put these on their lodestar and then told
3  the Court that they were their employees and that
4  they were the charges of their employees -- current
5  charges of their employees, and I think -- which was
6  pretty clear at the hearing that's what Judge Wolf
7  was reacting to.
8  **MR. KELLY:** Well, I think where you're
9  wrong is that you're trying to put the double
10  counting fault in Thornton's lap.  And I think if
11  you look at the Goldsmith letter to the Court in
12  November, it quite clearly states words to the
13  effect that these certain -- like the Alpert hours
14  were mistakenly put on Labaton, and some others
15  hours were mistakenly put on Lieff because those
16  were the hours Thornton paid for.  And I'm not
17  faulting them.  The mistake is adding the hours to
18  their lodestar, not our mistake.  So I don't know
19  why it's being viewed as Thornton's mistake.  It's
20  their mistake.
21  If you look at the Goldsmith letter,
22  that's the way it's framed, and it is in fact, as I
23  said, it's an honest mistake.  It's a screw-up.  You
24  know, it's not very sophisticated.  If you put these

Page 161

1  -- if Nicole Zeiss whose job it was to look at this
2  stuff and submit it to the Court and put these three
3  declarations down and just looked at 'em, it's
4  obvious.  So there's no -- the idea that you would
5  make -- if you're trying to fool Judge Wolf, that's
6  not the way to do it, okay.  He's a very
7  sophisticated judge.  There's no way that can be
8  viewed as an attempt to mislead him.
9  She made an honest mistake because she
10  did not give a close read to the documents.  It
11  happens.  Everyone makes mistakes.  And -- but
12  that's the point.  It's the same thing what Garrett
13  testified to.  He said when you questioned him I
14  gave it obviously not a close read, and then I
15  signed it.  That's his testimony back in June 19th
16  on page 84, lines 23 to 24.
17  He, obviously, didn't give it a close
18  read.  He signed this boilerplate declaration, and
19  he didn't go line by line and scrutinize it and say,
20  oh, shoot, this staff attorney's down in New York
21  City's not here.  I mean -- but to make this
22  admittedly sloppy effort and suggest that it's an
23  intentional effort to mislead Judge Wolf is,
24  frankly, way off base.  I'm urging you not to

Page 162

1 recommend sanctions.  Could it be done better in the
2 future?  Of course.  But -- but put this in context,
3 okay --
4    **THE SPECIAL MASTER:** Do I then just
5 ignore Garrett's persistent attempts to -- or
6 persistent indications that he's very concerned
7 about the lodestar, he's very concerned about how to
8 jack up the lodestar and his e-mail in which he says
9 to Mike the best way to do it is to -- this is the
10 best way to jack up the lodestar?  Do I just ignore
11 that?
12    **MR. KELLY:** Well, to paraphrase Ronald
13 Regan "there you go again."  Okay.  You keep going
14 back to --
15    **THE SPECIAL MASTER:** There I go again
16 quoting from Garrett's e-mail.
17    **MR. KELLY:** There you go again ignoring
18 the date context, okay, judge.  I'm serious.  You
19 got to look at the date context here.
20    **THE SPECIAL MASTER:** I thought you were
21 going to say quoting Ronald Regan "trust but
22 verify."
23    **MR. KELLY:** That's later.  That's later
24 on.  Look, you got to look at the chronological

Page 163

1 context, okay.  Garrett says that in -- let me get
2 the dates -- to jack up the lodestar starts in
3 February 2015.  There's no doubt these firms are
4 jockeying for position.  They want more.  They're
5 aggressive lawyers.  They're good lawyers, and they
6 all think they deserve more.
7    You see it within law firms themselves.
8 Partners jockey for position.  They want more
9 credit.  They want more pay.  On a bigger scale we
10 got this going on with these three law firms, and
11 Garrett's no shrinking violet.  He's trying to
12 protect his interest.  And, yes, he says let's jack
13 up the lodestar vis-a-vis any of these guys.  If
14 anyone hasn't bitched -- excuse my language.  If
15 anyone's got a complaint, it's these guys, not Judge
16 Wolf.
17    And all of this gets hashed out, and
18 they reach an agreement in August of 2016.  We have
19 that in the record.  The agreement is in the record.
20 There's testimony about the agreement.
21    The agreement itself is at TLF 056305.
22 And the actual testimony that we had a fee agreement
23 in place in August comes from Mr. Chiplock on
24 September 18th, page 135, lines 6 through 9 --

Page 164

1    **THE SPECIAL MASTER:** The fee agreement,
2 you're talking about the 20/20/20 agreement?
3    **MR. KELLY:** Yeah, amongst the lawyers.
4    **THE SPECIAL MASTER:** Yeah, okay.
5    **MR. KELLY:** Before that, yeah, they're
6 trying to, you know, say, listen, I did more than
7 you, okay.  But they're not trying to mislead the
8 Court.
9    They get an agreement amongst themselves
10 in August.  So by September, the next month, they
11 don't care; they have no motive to misrepresent
12 their individual lodestars to Judge Wolf.  That's
13 why -- that's one of the reasons why it's a mistake.
14 It would be such a stupid -- they have no
15 incentive --
16    **THE SPECIAL MASTER:** So, Brian, why put
17 these folks on the lode -- the question that I asked
18 Joan.  Why put 'em on the lodestar at all?  You're
19 going to get what you're going to get.  Why put them
20 on the lodestar at all?
21    **MR. KELLY:** They don't have to, but they
22 did.  They paid for it.  Nothing required them to.
23 But that's the way they thought it should be done,
24 and maybe, you know -- and it's not ideal.

Page 165

1    Now maybe in terms of best practices
2 simplicity and clarity is better.  And maybe this
3 should have been laid out in a much simpler form,
4 and we wouldn't be sitting here.  But it wasn't,
5 right?  But doing it the way they did is not
6 sanctionable or not intentionally misconduct to
7 Judge Wolf.  It just isn't.
8    So, you know, Ms. Zeiss, she didn't
9 carefully read the three declarations.  Garrett
10 doesn't carefully read his boilerplate.  And, look,
11 the point I think I was trying to make before I got
12 off the track a little bit is on his boilerplate
13 declaration that he sent, it's important that what
14 he didn't do -- he didn't correct it, right?  And I
15 think that's a little different from he didn't take
16 pen to paper and write out a declaration and say,
17 all right, let's submit this to Judge Wolf.  I
18 think -- you know, then I think it would require a
19 little bit more thought, little bit more care --
20    **MR. SINNOTT:** But, Brian, doesn't the
21 interchange between Dan and Garrett about the BNY
22 Mellon case in the context of what appears to be
23 Garrett feeling like Thornton didn't get their just
24 due in that case, doesn't that color the motivation

Page 166

1 there that in this case, you know -- and, you know,
2 I mean however you read up the "jack up the
3 lodestar" comment -- that his objective was for them
4 to document the participation by consciously making
5 an effort to put it in there on their lodestar?
6     MR. KELLY: Okay, and that's why dates
7 matter.  Just like Professor Gillers said facts
8 matter, dates matter.  That's all going on before
9 they come to their agreement amongst the counsel,
10 and could Garrett have felt, well --
11     THE SPECIAL MASTER: Wait, wait, wait.
12 No.  The initial e-mail to Mike "jack up the
13 lodestar" was before the 20/20/20 agreement I think.
14 But I -- I think it was.  But the interchange with
15 Dan was after the 20/20/20 agreement.
16     MR. KELLY: Well, the initial "jack up
17 the lodestar" as I understand it is February 2015.
18 If I can get the other one, I can take a look --
19     THE SPECIAL MASTER: That was the one --
20 I think it was the e-mail in which he says they're
21 not playing nice in the sandbox and --
22     MR. KELLY: Well, the final August 2016
23 agreement that I'm talking about is not the
24 20/20/20 --

Page 167

1     THE SPECIAL MASTER: Oh, you're talking
2 about the final agreement now.
3     MR. KELLY: Amongst lawyers, yes.
4 Because up until then, yeah, they're jockeying for
5 position.  And were they perhaps -- and I think this
6 is -- I think Garrett testified to this that you,
7 know, he and Mr. Chiplock did have an issue about
8 the BNY Mellon case 'cause Mr. Chiplock did point
9 out that your lodestar wasn't big enough, and
10 Garrett conceded, yeah, he was right.  We didn't
11 have -- we did get less in that case because our
12 lodestar wasn't big enough.  He pointed it out.  He
13 insisted upon it.
14     And so everyone brings to their next
15 experience memories of their past experience.  And
16 everyone remembers, well, you know, from my
17 perspective, my firm has to make sure it does its
18 share of the work.  We can't just sit here up in
19 Boston and let Labaton and Lieff do all the work and
20 at the end of it say, well, we want 36 percent.
21 They're going to say, now wait a minute, we paid for
22 all the staff attorneys; we housed all the
23 attorneys; what did you guys do besides come up with
24 the original idea --

Page 168

1     THE SPECIAL MASTER: That's different
2 than putting them on your lodestar.  That's
3 different than putting them on your lodestar.  I'm
4 not questioning whether you guys should have gotten
5 your share, your fair share of the total fee.  You
6 know, that's a different question as to how you do
7 it and what you tell the Court about what you're
8 doing.
9     MR. KELLY: Okay, but it didn't change
10 the overall lodestar.  In other words --
11     THE SPECIAL MASTER: Well, in this case
12 it did.  It changed it by 4 million dollars.
13     MR. KELLY: Okay, but again you are
14 trying to shift the double counting mistake all to
15 Thornton, and I, respectfully, submit that's not
16 what happened.  If you look at the record, that's
17 not what happened.  If you look at the e-mails that
18 we pointed out, that's not what happened.  If you
19 look at the Goldsmith letter, that's not how it's
20 framed.
21     And so there should not be some negative
22 inference --
23     THE SPECIAL MASTER: Actually, the
24 Goldsmith letter says virtually nothing about how it

Page 169

1 happened, only that it happened.
2     MR. KELLY: I think if you look at
3 bullets 1 and 4 on page 2 it's reflected that, you
4 know, the hours of Thornton were mistakenly put on
5 -- the hours were mistakenly put on Labaton.  So I
6 mean I think it's clear if you read that second page
7 and those bullets.  But I'm not faulting Lieff and
8 Labaton for it either.  And I'm not faulting Miss
9 Zeiss.  It was a mistake because, as I said,
10 everyone makes mistakes.  She didn't carefully read
11 'em, but ultimately -- ultimately you have to bear
12 in mind what did Professor Rubenstein say.
13     In this case -- and I think, you know,
14 as an expert he is very impressive, world-renowned
15 in this field, and he gave some very strong
16 testimony, and his prior affidavit -- the first
17 affidavit I think pertained to this -- that in a
18 case like this the multiplier could have been much
19 higher.  So before the double counting mix-up, it's
20 1.8.  When they corrected the double counting, it
21 was 2.0.  It could have been 3 or 4 --
22     THE SPECIAL MASTER: Brian, you're
23 certainly not trying to tell me that because the fee
24 was appropriate to the circumstances in the case it

Page 170

1 doesn't matter what you tell the Court.  You're
2 certainly not trying to tell me that?
3    **MR. KELLY:** No.  And I think that's
4 twisting around what I'm saying because it's always
5 important what you tell the Court.  You always have
6 to be a hundred percent careful.  You don't want to
7 have sloppy efforts in any courtroom, especially in
8 a federal courtroom, especially in a fee like this.
9 No doubt about it.
10    But what we're dealing with now is
11 reality.  What did happen here.  And it wasn't an A
12 effort, you know.  You know, it was a C effort,
13 frankly, and that's not what should have happened
14 here given the stakes involved, given the money
15 involved, but that does not mean that these
16 attorneys should get sanctioned.
17    That does not mean -- and they've
18 already paid a price, judge.  They've already paid a
19 heavy price, not just in terms of money that had
20 been basically garnished from them and has funded
21 this investigation but a reputational harm, and in
22 the media.  It's been dragged through the media, and
23 it's been, you know, suggested they've done all
24 sorts of wrongdoing.

Page 171

1    That's a serious collateral problem for
2 them, and it's yet another reason I'd urge you not
3 to at the end of the day include Professor Gillers'
4 report to whatever you submit to Judge Wolf.  And if
5 you do, in fairness all of our expert reports should
6 be attached as well, but I would suggest you don't
7 attach it because it's going to go into the media.
8 It's going to get bandied about.  And if you
9 selectively decide some things are accurate, some
10 things aren't, why should you have any of them in
11 your report?
12    **THE SPECIAL MASTER:** No, I think we've
13 decided, just so everyone's clear, to include all of
14 the reports in the record.
15    **MR. KELLY:** Well, for the record, my
16 preference would be just to have none of them, but
17 certainly all of them is better than one.
18    **THE SPECIAL MASTER:** Don't you think
19 Judge Wolf would want to see all of them?
20    **MR. KELLY:** Yes, I'm sure he would.  I'm
21 sure he would.
22    And I should make clear for the record
23 when I'm being a professor and giving out grades
24 about a C effort, the C was with respect to the

Page 172

1 presentation of the paperwork.  The case itself is
2 an A effort -- A plus.
3    **THE SPECIAL MASTER:** I understood,
4 Brian.
5    **MR. KELLY:** Because --
6    **MR. HEIMANN:** Thank you, Mike.
7    **THE SPECIAL MASTER:** Let me go back to
8 my own college experience.  I went to a college in
9 which most of the professors thought that C was an
10 honorable grade.  As I often tell people, I achieved
11 honorability much before I went on the bench.
12    But you wouldn't say that a C is an
13 honorable grade here for what occurred, would you?
14    **MR. KELLY:** I'd say there was a lot of
15 grading --
16    **THE SPECIAL MASTER:** -- by what
17 occurred, I mean --
18    **MR. KELLY:** -- and you know, C's a
19 pretty bad grade now.  And if you want to give him a
20 C minus, so be it, but one of the points I was
21 trying to make with respect to Garrett's declaration
22 that he signed, it's a boilerplate template.
23    The exact same language albeit in
24 different paragraphs were in the submissions of

Page 173

1 Lieff and Labaton, okay.  He didn't write it --
2    **THE SPECIAL MASTER:** But as to Lieff and
3 Labaton, they were true.
4    **MR. KELLY:** Well, I'm not casting stones
5 at them.  But certainly they didn't have regular
6 billing rates.  They're a contingency firm, too.
7 They didn't have a customary rate.  So if you want
8 to start nitpicking and say, ah-hah, there's an
9 inaccuracy; this must be sanctionable, you could do
10 it to them, too, but that wouldn't make sense.
11    I think the law is clear -- let's talk
12 the law.  Rule 11 sanctions is not strict liability.
13 It's not.  There's first circuit law right on point.
14 So there's got to be some sort of strict liability
15 for a declaration that, frankly, was -- there was no
16 motivation to try to trick Judge Wolf on this and --
17 you know, and ultimately was immaterial because the
18 multiplier could have been so much higher.
19    **THE SPECIAL MASTER:** All right.  Let's
20 talk about what was immaterial and what wasn't.
21    Let's assume that instead of getting a C
22 here, Garrett Bradley got an A because he went over
23 the declaration that he signed; he read it, and he
24 stopped, and he said, well, wait a minute, we can't

Page 174

1 say this; we have to say that we are including these
2 people on our declaration because we paid for them,
3 but they are not employed by our firm.  These are
4 not the current rates that our firm charges for
5 these.  These are the rates that have been approved
6 by other courts for these people.  Let's assume he
7 says all of that which is accurate.
8    **MR. KELLY:** Yep.  I think Judge Wolf
9 would have said, thank you, I appreciate that;
10 that's very interesting.  I'm glad you specified.
11 Same result.
12    **THE SPECIAL MASTER:** Before we even
13 got --
14    **PHONE LINE CONFERENCE:** The following
15 participant has entered the conference:  Laura
16 Gerber.
17    **THE SPECIAL MASTER:** Before we even got
18 to Judge Wolf, don't you think Nicole Zeiss would
19 have read that and said, well, wait a minute, these
20 people are on the Thornton petition; I better check
21 to see if they're on Labaton's petition and Lieff's
22 petition?  When she got that back from Garrett
23 Bradley, don't you think she would have said that?
24 That would have been the stop and think moment.

Page 175

1    **MR. KELLY:** Well, maybe though if you're
2 going to make this hypothetical where he got an A
3 effort and lined it up, maybe the other firms would
4 have had an A effort and done it the same way
5 because there was an implicit agreement if they're
6 paying for 'em, they're going to claim 'em.
7    So, again, you're I guess fault shifting
8 right at Thornton for no apparent reason.  This was
9 a collective screw-up no doubt about it, but they
10 corrected it after the media made its inquiry.  And,
11 you know, I know Judge Wolf is not going to be
12 pleased that a boilerplate affidavit was submitted
13 to him that was not entirely accurate.
14    But at the same time he's probably going
15 to look at it and say, well, what would be their
16 motive to try to trick me with some boilerplate?
17 There is no motive.  It's sloppy --
18    **THE SPECIAL MASTER:** Well, one might be
19 that Judge Wolf potentially, as some judges might,
20 if your lodestar didn't include these or they didn't
21 include -- or their lodestar was lower because yours
22 was included, he might have said, well, wait a
23 minute, the hours on this don't add up to the kind
24 of multiplier they're asking for.

Page 176

1    Whatever he might have said, my only
2 point is had Garrett -- had Garrett accurately given
3 him the facts as to what the true situation was, we
4 might not be here.  Nicole Zeiss might have caught
5 it.  She might have caught it, and it would have
6 been a red flag for her to look at all of the fee
7 petitions and then do what you said she didn't do
8 which she didn't do, put 'em side by side and
9 compare.
10    **MR. KELLY:** You know, that's -- we can
11 speculate all day long, yeah, we might not be here.
12 But what if the other two attorneys who did their
13 declarations had done theirs perfectly as well?  We
14 might not be here.  But we are here because that
15 wasn't done.
16    And I'm not trying to argue with you
17 that it's not a sloppy effort, and it shouldn't
18 happen again in the future, and that, frankly, you
19 know, Garrett is -- does not seem to be the person
20 who goes line by line in a boilerplate affidavit and
21 check it to make sure before he signed it, but I can
22 assure you he will in the future.
23    He's not going to be signing anymore
24 declarations without scrutinizing them, especially

Page 177

1 ones that go to Judge Wolf or any federal judge.
2 It's really -- you know, it would be an act of
3 madness to intentionally create a boilerplate
4 affidavit to try to fool Judge Wolf in a situation
5 like this when he doesn't have to.  He doesn't have
6 to at all.
7    And, you know, again the multiplier just
8 went from 1.8 to 2 when you corrected that mistake.
9 And, frankly, if you do a little math, if you back
10 out all of Thornton's time, the max it goes to is
11 two-and-a-half.  So, you know, Judge Rubenstein -- I
12 mean not judge, Professor Rubenstein -- maybe it's
13 Judge Rubenstein, but Professor Rubenstein, you
14 know, the multiplier testimony he gave is very
15 important to the analysis in materiality, and it
16 doesn't excuse sloppy behavior.
17    I'm not saying, well, it doesn't matter;
18 you can be sloppy in your pleadings.  You can't.
19 There's no question that you shouldn't be sloppy in
20 your pleadings.  But Rule 11 sanctions are not
21 covered under strict liability grounds, and I don't
22 think they're warranted here.
23    I mean the courts have been pretty clear
24 on that.  They're a little forgiving to mistakes

Page 178

1 that attorneys make because attorneys are human,
2 too. We make mistakes.
3     THE SPECIAL MASTER: Let me ask you a
4 question. And this is a question that I asked
5 Professor Vairo. The issue is poised up by the
6 media inquiry which comes in the first instance to
7 someone at Thornton -- I guess the Thornton media
8 person, but then it immediately comes to Garrett.
9 And the testimony is that he calls the other
10 lawyers, the other firms and says something's going
11 on, and everyone scrambles around and tries to
12 figure out what's going on.
13     That happens even before The Globe
14 article comes out, right?
15     MR. KELLY: The inquiry occurs before
16 there's an article, correct.
17     THE SPECIAL MASTER: And the letter is
18 written by David Goldsmith on the 10th.
19     MR. KELLY: Yes.
20     THE SPECIAL MASTER: I think the inquiry
21 came on November 8th.
22     MR. KELLY: Eighth.
23     THE SPECIAL MASTER: The letter's
24 written on the 10th.

Page 179

1     MR. KELLY: Yes.
2     THE SPECIAL MASTER: Garrett doesn't say
3 anything about his declaration, apparently, to
4 anybody at all until Judge Wolf issues his order in
5 February.
6     MR. KELLY: Okay, but --
7     THE SPECIAL MASTER: He doesn't make any
8 attempt to -- until he's caught, he doesn't make --
9 caught in the sense of his declaration being
10 untruthful, at least strictly untruthful, he makes
11 no attempt to explain it at all or to call attention
12 to it.
13     MR. KELLY: Because I think you heard
14 testimony or evidence to the effect of the focus is
15 on the double counting. That's the mistake that
16 matters. It's 4 million bucks of double counting.
17 That's what everyone's worried about --
18     THE SPECIAL MASTER: And Garrett's
19 declaration is totally divorce from the double
20 counting?
21     MR. KELLY: It's not a significant --
22     THE SPECIAL MASTER: Really?
23     MR. KELLY: It's not a significant --
24 it's inaccurate, but it's not a significant mistake

Page 180

1 that would have them running around pulling their
2 hair out like, shoot, I should have told Judge Wolf
3 the staff attorneys are down in New York, or, shoot,
4 we don't have regular billing rates. Well, no
5 kidding. They're contingency fee firms. Of course,
6 they don't have regular billing rates and, so one
7 way to read it is, well, class action firms they
8 don't have regular billing rates. Their regular
9 billing rates are always determined at the end based
10 on prior cases. So it's not the focus.
11     The media inquiry is about the double
12 counting, the simple --
13     THE SPECIAL MASTER: Brian, I'm just
14 going to come right back at you on this because one
15 is -- as was explained to Judge Wolf at the hearing,
16 one is a matter of nomenclature. Strictly speaking
17 was the use of the word "charged" totally accurate?
18 Maybe not. But it's a matter of nomenclature.
19     Garrett's misstatements were not
20 nomenclature. Garrett's misstatements were out and
21 out misrepresentations.
22     MR. KELLY: Well, they are inaccurate.
23 But none of them rise to the level of the
24 seriousness of the double counting mistake.

Page 181

1     THE SPECIAL MASTER: No, but you're
2 trying to -- my point is only this: That you're
3 trying to glom onto the representations made in
4 Labaton's fee petition and in Lieff's fee petition
5 as to rates charged -- and, by the way, I think
6 there was testimony from Lieff that they actually
7 have private clients that they do charge, but my
8 only point is could they have used a better term?
9     I think in the depositions everybody
10 agreed that best practices would be a better
11 definition. One of the firms -- I believe it was
12 Carl Kravitz's firm that actually changed the
13 template. Kravitz's firm actually changed the
14 template to accurately reflect -- fully and
15 accurately reflect, but there's a big difference
16 between using a term a little loosely like "charged"
17 if there wasn't a charge -- if there wasn't a record
18 of charging and telling the Court that these are our
19 employees, and these are the rates that my firm
20 currently charges for these employees. There's a
21 big difference there.
22     MR. KELLY: Well, because it goes back
23 to he did not, as he testified, give it a close
24 read. Now if he had given it a close read and

Page 182

1 studied it, yes, he would know it's inaccurate then.
2     But that does not mean he made a
3 knowingly false submission to the Court. And that's
4 where this whole business of objectively if he knows
5 something does that therefore mean he's knowingly
6 make a false submission? No. If he doesn't closely
7 read this document --
8     **THE SPECIAL MASTER:** So knows doesn't
9 mean knows?
10     **MR. KELLY:** No, it --
11     **THE SPECIAL MASTER:** Is it read into the
12 rule if not explicit -- we can get the rule -- isn't
13 there a should have known after inquiry --
14     **MR. KELLY:** In every brief someone files
15 -- tell me if you submit a brief to the United
16 States Supreme Court, you're not going to study that
17 a little bit more closely than a pleading in -- and
18 no offense to a Massachusetts district court DUI
19 case, you're going to study that supreme court brief
20 like your career depends upon it, and
21 unfortunately --
22     **THE SPECIAL MASTER:** And what about a
23 sworn declaration to Judge Wolf in this case, you're
24 not going to study that carefully?

Page 183

1     **MR. KELLY:** Well, certainly it should
2 have been studied more closely in this case, but he
3 didn't. He didn't. He should have, but he didn't.
4 And because he didn't -- because he did not give it
5 a close read as he admits under oath, it explains
6 why the boilerplate had these stupid mistakes.
7     It's not as though he had a master plan
8 to trick Judge Wolf with a boilerplate declaration.
9 He got it from experienced lead counsel, Labaton,
10 who has far more experience in these procedures than
11 he does. He says I think it was his first rodeo
12 just like Nicole Zeiss, she was a young partner;
13 they didn't have a lot of experience in doing these
14 things.
15     It doesn't excuse the fact that he
16 should have drilled down and read line by line by
17 line and analyzed it closely. Yes, he should have,
18 but he didn't. And because he didn't that explains
19 why it was submitted, and that's when -- there's no
20 knowing attempt to trick the judge.
21     **THE SPECIAL MASTER:** So let me ask you
22 this: There are -- within Rule 11 there are all
23 sorts of what I'll generically call filings that are
24 called out, pleadings, statements, all sorts of

Page 184

1 pleadings that are called out for the same level of
2 attention.
3     In my own mind there is no higher
4 requirement of a lawyer for Rule 11 purposes than a
5 sworn declaration. That's not just a pleading.
6 That's not just a filing. That's not just a
7 statement. That is a sworn declaration.
8     **MR. KELLY:** But I think --
9     **THE SPECIAL MASTER:** Does that matter at
10 all?
11     **MR. KELLY:** I think that gets to my
12 point, judge, to put in context of what he didn't
13 do. He didn't fix a boilerplate declaration. He
14 did not draft this declaration. He did not sit down
15 and say, all right, what am I going to say to Judge
16 Wolf about the fee in here and write it and then
17 make his fee declaration, and I'm not trying to
18 split hairs, but I think it matters.
19     If you prepare an affidavit for the
20 judge, and you write it all up, and there's blatant
21 mistakes in there, that's on you. Now if you take a
22 lazy read of a document that you think is part of a
23 traditional package to be submitted to a Court, and
24 it's a boilerplate template that everyone else is

Page 185

1 using, and you don't study it, and you just go sign
2 (indicating), not great. But I put it in a
3 different category. I put it in the category of
4 lazy effort, stupid mistake, shouldn't have done it.
5 But you're not deliberately trying to mislead the
6 Court. I just don't see it here.
7     And this is not just advocacy. I just
8 don't see it. People make mistakes all the time.
9     **THE SPECIAL MASTER:** And then once this
10 all comes to light November 8th and the letter, he
11 doesn't do anything to say -- to write a separate
12 letter to Judge Wolf and say in addition to the
13 double counting questions or within the double
14 counting questions, there's another problem that I
15 want to immediately call to your attention.
16     **MR. KELLY:** Well, I mean, frankly,
17 everyone could have done with respect that to
18 boilerplate template at that point, but they're not
19 concerned with it. They're concerned with the
20 double counting.
21     **THE SPECIAL MASTER:** But the double
22 counting at that point has already been called out
23 to the Court, Brian. The double counting has been
24 called out to the Court. The Court was told it was

Page 186

1 inadvertent.
2    At that point he's got three months --
3 three months to say in addition to what we told you
4 in the David Goldsmith letter of November 10th, you
5 should also know that there were -- he can call it
6 whatever he wants -- mistakes made, inadvertent
7 misstatements, whatever he wants to call it.  He
8 should then call that out to the Court, and at that
9 point maybe under some construction of Rule 11 he's
10 availed himself of the safe harbor.
11    **MR. KELLY:** Well, at his first
12 opportunity when he goes into court he admits it.
13 He could have sat there and said, you know, let me
14 consult --
15    **THE SPECIAL MASTER:** You really think
16 Judge Wolf would have let him sit there?
17    **MR. KELLY:** I think Judge Wolf in fact
18 said something to me in that hearing to the effect
19 of if he'll let you talk or something like that.
20 There was an allusion to that as to maybe he should
21 consult his own personal counsel rather than company
22 counsel, and Garrett just said, oh, no, waved him
23 off and had his colloquy and admitted the mistakes.
24 So I think that should be to his credit that he did

Page 187

1 it then.
2    He didn't say, oh, let me think about
3 this, let me go get private counsel; I'll tell you
4 right now what happened, and he did.  And all I can
5 tell you is with respect to the delay in November to
6 the first opportunity he had in court, the focus
7 after they sent that letter and -- at the time they
8 sent that letter and afterwards was this constant
9 wringing of the hands of how could we have made such
10 a stupid mistake.  This looks terrible.  You know,
11 Judge Wolf is going to be furious.  He's going to,
12 you know -- he's going to really be upset and really
13 going to be negative consequences about this
14 4-million-dollar mistake.  That's the mistake
15 they're worrying about.
16    Now best practice, should they had
17 sensed, you know, what else could be a mistake in
18 this pleading?  Let's all check our templates.
19 Let's do it.  Probably would have been better.  But
20 I don't think it's evidence of a willful intent to
21 mislead Judge Wolf that warrants sanctions.  I just
22 don't see that.
23    Let me segue into another issue which is
24 kind of like the elephant in the room, and that's

Page 188

1 not me, even though I've gained a few pounds here,
2 judge.  The issue --
3    **MR. SINNOTT:** We agree.
4    **THE SPECIAL MASTER:** We all have.
5    **MR. KELLY:** The issue which I think may
6 be tainting Thornton and Garrett in particular in
7 this case is the situation with Michael Bradley
8 that's been, you know, referenced in some of these
9 -- the report and some of the special master's
10 remarks.
11    But I think, you know, what we have to
12 remember with him is, you know, look, there's
13 nothing illegal -- and there's certainly not even
14 anything improper with using your brother in your
15 business.  And it's a law business, okay.  The guy's
16 not a plumber.  He's a lawyer.  And he did have some
17 experience unique to him on the state -- that fraud
18 task force he was on.  So it's not as though he
19 didn't have any ability to analyze --
20    **THE SPECIAL MASTER:** I got to tell you,
21 Brian, when I heard that, it didn't past the smell
22 test as a justification for $500 an hour.  It didn't
23 past the smell test.
24    **MR. KELLY:** Well, but the -- one step at

Page 189

1 a time.  It's certainly permissible to use your
2 brother in your business, and he's a lawyer, okay.
3 But that's been suggested 'cause he's mostly in
4 state courts and doesn't do a lot of high profile
5 cases, that it's somehow improper to use him.  It's
6 not.
7    And let's put it on the table in terms
8 of what was the value he brings?  He did this -- all
9 his work he does it contingency fee based, right.
10 Thornton is not a big firm like these other firms,
11 right.  There's a value to not taking money out of
12 your pocket and paying people like --
13    **THE SPECIAL MASTER:** He also did it on
14 his spare time.  He was not -- that was his
15 testimony.  That was Michael Bradley's testimony.
16    **MR. KELLY:** Yep.
17    **THE SPECIAL MASTER:** He did it on his
18 spare time, did not infringe at all upon his
19 earnings, upon his other work that he was doing
20 whereas -- and I'm going to push you on this -- all
21 these other firms and all the lawyers in the other
22 firms could do it on the if come --
23    **THE REPORTER:** I'm sorry, could do it on
24 the?

Page 190

THE SPECIAL MASTER: If come.  You can put that in quotes -- could do it on the if come.  They're doing that as part of an effort that is taking up their time, that is draining their resources, that is draining their attention from other cases or potential cases.  That wasn't the case with Michael Bradley.  This was totally gravy.  It was used in another context.  This was totally gravy.

MR. KELLY: Okay.  And so do you know who has got a complaint with that is the other two law firms.  If they don't like the fact that they have Michael Bradley getting -- adding to Thornton's lodestar vis-à-vis them, they can complain and say, listen, we don't like this guy; he's only doing two hours a night; he's not as good as our staff attorneys.  That's among these private lawyers to fight about --

THE SPECIAL MASTER: It becomes our problem -- it becomes my problem because my mandate is to look at the reasonableness -- accuracy and reasonableness of the fees that were paid.  It becomes my problem.

MR. KELLY: Okay.  Okay.  Let's go then

Page 191

to math.  Mathematics.  Take Michael Bradley's time --

THE SPECIAL MASTER: 406.1 hours.

MR. KELLY: Throw it into the Boston Harbor over there.  Do you know what effect mathematically that has on the multiplier?  Zippo.  It remains 2.  He's irrelevant.

You know, it's kind of unusual that the brother was used.  It's kind of unusual he's got a state court background.  It's kind of unusual he did a contingency, but ultimately it's irrelevant.  His time means nadda.

THE SPECIAL MASTER: There's one other factor, and your answer to this might be the same, and that is the work that he performed, accepting at face value that he performed it -- even though we were not able to independently track it because we didn't have access to the database -- we had access to his e-mails, and his calendars so I'm willing to accept that he did the work -- that he performed the work, even though we could not independently verify it.

But let's assume that he did it was as a matter of quality significantly different than those

Page 192

that the staff attorneys for Labaton and Lieff did.  These staff attorneys for Labaton and Lieff were by virtue of their background uniquely qualified to do this work, number one.  The Lieff attorneys had been through the war -- the BNY Mellon war and had developed expertise in this area.

The Labaton attorneys had developed some expertise -- as I pointed out earlier, David Alpert who was the only one -- well, there may have been one other staff attorney -- that billed it at a comparable rate to Michael Bradley not only had extensive experience in FX litigation but had extensive substantive experience, but much more than that -- much more than that, if I'm looking at reasonableness of rates charged and fees, I'm looking at that, I have to also look at the work that was done.

The folks in this case for Labaton and for Lieff prepared memorandum.  They prepared deposition books.  They did more than simply look for HotDocs.  They did a lot more.  They did -- as I said earlier, they did associate-level work.  The work that Michael Bradley did by his own testimony was at best -- at best, paralegal work and probably

Page 193

not even that.

It was simply clerical word search work; and, as he testified, he only found a few I think he said highly relevant documents whereas the other staff attorneys were finding all sorts of relevant documents and writing memoranda about 'em and doing deposition books.

The nature and quality of the work that was done was vastly different.

MR. KELLY: Well, I don't disagree with most of that.  I do think the --

THE SPECIAL MASTER: Well, how do I evaluate it?

MR. KELLY: Well, all right.  I don't disagree with most of that, and I would say that the staff attorneys were extremely well qualified, and they did do a lot of work.  That doesn't mean there aren't different roles on a team for different types of players.

Some people can pitch.  Some people can -- can't.  And some people are highly skilled.  Some aren't.  But that does not mean there's --

THE SPECIAL MASTER: And the Cy Young -- using your baseball analogy further, the Cy Young

Page 194

1 Award-winning pitchers are paid much more than the
2 guys who are kicking around back and forth from
3 Pawtucket to the Red Sox.
4     MR. KELLY: Well, then I would submit
5 Richard's the Cy Young award winner; the staff
6 attorneys are Pawtucket. He got a lot more than the
7 staff attorney did.
8     And so what I would suggest is, you
9 know, you can quibble about, you know, which
10 attorneys should have got more, which attorney's
11 better, which --
12     THE SPECIAL MASTER: All right, let me
13 ask you straight out what do you want me to do about
14 -- assume -- you can see where I'm going with
15 Michael Bradley. I'm not indicating that he should
16 be zeroed out. What do you think he should be
17 evaluated at? The value of his work.
18     MR. KELLY: Well, as I said, even if his
19 value was zero, which it should not be, it doesn't
20 affect the multiplier, okay. So I think his -- you
21 know, I want to just -- just for the record make
22 sure I don't -- it's not conceded in any way that he
23 didn't do work.
24     You're not saying you're going to make

Page 195

1 that finding, but, you know, we do have two exhibits
2 from Professor Gillers' deposition which I'll cite
3 again, Exhibits 22 and 23, from that deposition.
4 One of them is the Hoffman and Michael Bradley
5 e-mail back and forth about how to use --
6     THE SPECIAL MASTER: Let's assume he did
7 the work. Let's assume he spent every nanosecond of
8 the 406.1 -- every nanosecond of the 406.1 hours
9 that he billed. Let's assume that. I'm not saying
10 I'm going to assume that, but let's just assume
11 that.
12     MR. KELLY: All right.
13     THE SPECIAL MASTER: What is a fair --
14 in your view a fair value that his work should be
15 billed at?
16     MR. KELLY: Well, you know, it's a tough
17 question because of the Hot Document that he found,
18 was it the one that led, you know, Chiplock to
19 figure out a better theory? I don't know --
20     THE SPECIAL MASTER: We don't know that
21 because he did not tell us. He could not tell us
22 anything about any of the documents he found.
23     MR. KELLY: But in fairness, judge, you
24 know, the Catalyst system, which is the subject of

Page 196

1 Exhibit 22, it doesn't have the data anymore. If we
2 had that thing up and running, we could tell who did
3 what when. We've got e-mails from him specifying
4 his time. I don't know exactly what value in the --
5     THE SPECIAL MASTER: Brian, you like to
6 cut to the chase so let's cut to the chase.
7     MR. KELLY: Fair enough.
8     THE SPECIAL MASTER: Are you trying to
9 tell me here today that Michael Bradley's time was
10 worth as much as David Alpert's time?
11     MR. KELLY: No, but -- but his time was
12 contingent time, and Alpert's is a very talented
13 lawyer in his own right, and he deserved the rate he
14 got. He probably could get a higher rate. Bradley,
15 maybe not so much.
16     But Bradley at least agreed to do it
17 with the possibility of getting the goose egg, zero.
18 If these guys didn't win this case which was no slam
19 dunk, he would have got nothing. So part of me
20 says --
21     THE SPECIAL MASTER: But he was doing it
22 on free time. He wasn't losing money. He wasn't
23 taking a risk. The only risk he was taking was that
24 he would do this work and maybe potentially not get

Page 197

1 paid for it.
2     MR. KELLY: Well, free time. I mean you
3 might want to spend your time with your family. You
4 might want to spend your time watching the Red Sox
5 beat the Tigers. You might want to spend your time
6 other ways, judge.
7     THE SPECIAL MASTER: He just lost a
8 hundred bucks an hour.
9     MR. KELLY: That was poor advocacy.
10 Sorry, your Honor. Seriously --
11     THE SPECIAL MASTER: But at least you
12 didn't say he might have been watching the 2013
13 playoff game --
14     MR. KELLY: Right.
15     MR. VALLEE: That really hurt.
16     MR. KELLY: Yeah, he did it at night and
17 so forth. And it's -- you know, he's not as
18 significant as the rest of the staff attorneys for
19 sure, but he did do work. We have records of his
20 work.
21     People can quibble later his rate was
22 too high, but the fact that he's Garrett's brother
23 is in and of itself interesting but so what? He's a
24 lawyer.

Page 198

1    THE SPECIAL MASTER: You don't think --
2  you don't think some people might look at it and
3  say, hmm, feather betting?
4    MR. KELLY: Well, that's with respect to
5  a public position.  These are private lawyers.  If
6  they want to spend their money amongst their family
7  because they want to put their family to work,
8  they're allowed to do that.
9    THE SPECIAL MASTER: So should Judge
10  Wolf be concerned about the public's perception here
11  about what appears -- I'm not saying that this will
12  influence the ultimate decision that Judge Wolf
13  would make on this, but should he be concerned about
14  how this looks on the front page of The Boston
15  Globe --
16    MR. KELLY: Well, I don't think we
17  can --
18    THE SPECIAL MASTER: -- and the
19  relationship of his brother.
20    MR. KELLY: I don't think we can analyze
21  everything under the light of the poison pen of the
22  injury ESPYs, right.  I mean the press is going to d
23  what they're going to do.
24    They don't like lawyers to begin with.

Page 199

1  They don't like lawyers getting 75 million bucks,
2  but, guess what, if you don't have lawyers like
3  this, you don't have big cases like this.  A lot of
4  lawyers don't want to do things on a contingent fee
5  basis.  I don't.  I want to get paid.  These guys,
6  they want to take big risks, well, they're going to
7  get big pay if they win.  So the public doesn't like
8  that no matter what.
9    And if the public understands that there
10  was a real harm here that wasn't being addressed;
11  and, as Rubenstein pointed out, these guys didn't
12  piggyback on some government work and then just make
13  a case, they thought it up themselves, and they took
14  the risks, and they won.
15    THE SPECIAL MASTER: I hope you're not
16  putting Michael Bradley -- look, Michael Bradley's a
17  fine guy.  He came in, likeable guy.  But you're not
18  putting him in the same category of the firms here
19  who took the risk, made the investment, devoted the
20  resources, and I include within that this firm, the
21  Thornton firm -- you're not putting him in that, are
22  you?
23    MR. KELLY: In a much, much smaller
24  scale.  Like them, he took a contingency fee risk.

Page 200

1  Unlike them, he doesn't have the vast experience and
2  skill, but he is a member of the team, albeit small,
3  and he got a small fee.
4    And if you analyze it mathematically, at
5  the end of the day it's a pittance and has no effect
6  on the multiplier that Judge Wolf was giving.  It
7  really doesn't.
8    THE SPECIAL MASTER: I take it from your
9  rather lengthy answer that you don't want to give me
10  what you think would be a fair value for setting his
11  rates at?  You don't have to if you don't want to,
12  but I --
13    MR. KELLY: The rates they charge me at
14  I'm not so sure is a fair value, but they get some
15  high rates.  So it's hard for me to judge.  And, you
16  know, what was the New York rate?  Four and a
17  quarter?  What was it?  You know, was he as talented
18  as them or as experienced as them?  No.  But he was
19  contingent.  They weren't.  Every day they got a
20  paycheck.  He didn't.
21    And so he was totally wasting his time
22  if he -- if they didn't win.  So that's worth
23  something, judge.  And I think Rubenstein himself if
24  you look at the expert -- I'm no expert.  Look at

Page 201

1  the expert.  And Rubenstein's affidavit, he said it
2  was reasonable.  So I'll rely upon the Harvard law
3  school professor expert rather than my own seat of
4  the pants --
5    THE SPECIAL MASTER: You're
6  bootstrapping Michael Bradley into the rest of this
7  group including the rest of the staff attorneys, and
8  I'm not sure if I'm prepared to do that.
9    MR. KELLY: I think Rubenstein --
10    THE SPECIAL MASTER: But hang on.  The
11  guy who's picking me up at the airport wants to know
12  if I'm going to be on the 4:45 flight.  So unless,
13  Richard, you're going to waive oral argument, I'm
14  going to tell him I'm not going to be on the 4:45.
15    MR. KELLY: All right.  Well, I'll try
16  to cut to the chase --
17    THE SPECIAL MASTER: No, no.  I'm going
18  to tell him I'm not going to be on the 4:45.
19    MR. SINNOTT: So take another hour,
20  Brian.
21    (Off the record.)
22    MR. KELLY: I'm not going to wade too
23  far into issues that you've already gone back and
24  forth with Miss Lukey, but I think a couple points I

Page 202

1  would like to re-emphasize, if I could, because I
2  think they're important.
3      You know, the data shows -- and I think
4  they're finalizing the data -- that the work that
5  the ERISA counsel did was less than 10 percent. So
6  the notion that they somehow got shafted here is not
7  sound.
8      They got less than 10 percent, and yet
9  these consumer class attorneys agreed to 10 percent.
10  So I think that's an important factor to bear in
11  mind as to whether or not they got shortchanged in
12  any way. That's just a data point.
13      In terms of Ms. Lukey's point that the
14  total aggregate fee is what matters, I couldn't
15  agree -- well, with the caveat that there's no
16  excuse for sloppy paperwork being submitted to a
17  federal court, I couldn't agree more that the total
18  aggregate fee is what Judge Wolf would be most
19  focused on because he, as the fiduciary for the
20  absent class members, is going to be focused on that
21  number. And I don't know why it's not being
22  discussed or focused upon more than it is.
23      But to put this whole exercise in
24  context, you have to go back to June when Judge Wolf

Page 203

1  who's a man -- as a judge who's very careful with
2  his words, who's always prepared and does not say
3  things willy-nilly from the bench, he tells these
4  lawyers in no uncertain terms after he asks
5  Goldsmith about what, you know, attorney fee range
6  they're looking for, and Goldsmith says 25 percent
7  range, Judge Wolf says that's great.
8      THE SPECIAL MASTER: Wait, wait, wait.
9  Is this at the hearing -- the preliminary hearing?
10      MR. KELLY: This is on June 23, 2016.
11      THE SPECIAL MASTER: Okay.
12      MR. KELLY: Before these guys even
13  submitted anything.
14      THE SPECIAL MASTER: This is before the
15  preliminary.
16      MR. KELLY: Yes. This is Judge Wolf
17  telling these attorneys with respect to 25 percent,
18  that's great because when I became -- when I became
19  a judge, I did a lot of studying on this. And the
20  range was about 20 to 30 percent. Whatever the
21  authoritative treatise at the time was, and, you
22  know, I usually start with 25 percent in mind.
23      So this aggregate number of 25 percent
24  was important to Judge Wolf. He signaled that to

Page 204

1  these lawyers, and it remains I think the big
2  picture issue which has to be remembered here
3  because that's what he imposed. And none of this
4  unfortunate paperwork sloppiness takes away from
5  that.
6      You know, he imposed 25 percent, and I
7  think you can assume -- I think it's unfair to
8  assume that Judge Wolf didn't know enough to ask
9  questions. If anything of any federal judges I've
10  been in front of, he is not shy about asking
11  questions. I think you well know -- I mean a lot of
12  his questions led to the uncovering of FBI
13  corruption. He asked questions no one wanted to
14  ask, and he's not a judge who's afraid to ask a
15  question.
16      And if he wanted to simply say, hey,
17  what are you lawyers making, and how are you
18  divvying it up, he obviously could have if he was
19  really interested in doing so. And I understand you
20  know --
21      THE SPECIAL MASTER: And so I should
22  infer from your -- I should infer from your argument
23  here that he's got no interest in the Chargois -- in
24  your view, no interest in the Chargois Arrangement,

Page 205

1  no interest in the 4.1 million dollars being paid to
2  Mr. Chargois out of the -- arising out of the
3  arrangement that he has no interest in that because
4  he didn't ask?
5      MR. KELLY: No, I think that's a
6  different question. I think he'll be interested.
7  It is interesting how this was all whacked up and
8  decided on who got what, but I don't think he's
9  going to say this is material to my determination
10  because --
11      THE SPECIAL MASTER: I'm talking about
12  at the point at which he approved the fee. You want
13  me to infer from your statement that he was focused
14  only and solely on the aggregate fee and whether
15  that was fair and that he was not interested in the
16  fact that Mr. Chargois was going to get 4 million
17  dollars of that?
18      MR. KELLY: I don't think he was
19  interested in how these attorneys cut up their
20  money.
21      THE SPECIAL MASTER: And that's a little
22  different answer than the one I had asked you -- an
23  answer to a different question.
24      MR. KELLY: I think -- you know, like

Page 206

1 Professor Gillers, I'm not a mind reader, but I have
2 had substantial experience in front of Judge Wolf,
3 and he's not shy about asking questions.  And he
4 always wants more information.  And he probably
5 would have preferred to have this information.
6    But I don't think given the fact there
7 is no rule, there is no requirement, no other
8 federal judge in this district apparently in the X
9 number of cases Joan has cited has ever inquired.
10    I don't think he's going to say, well,
11 this is a violation that I didn't ask that question
12 because if this was the custom to ask the question,
13 I would have asked it.  But now if this comes up,
14 going forward he'll probably have a standing order
15 to this effect.  I don't know.  I can't predict,
16 obviously, what he'll do.  But all I can tell you is
17 I don't expect him to say at the end of the day I'm
18 going to change the 25 percent because this was a
19 great result by these lawyers in a tough case, and
20 the class got a lot of money, and it may be unseemly
21 to some about how much money they get or how they
22 whack it up amongst themselves, but that's not
23 something I want to get involved with which what
24 district court judge over there wants to start

Page 207

1 saying, you know what, I think you deserve 40
2 percent, I think you deserve 38 percent, I think you
3 deserve 12 percent.
4    This referral fee, which is the now work
5 referral, which is permissible in this case, I
6 don't like it so I'm only going to say instead of
7 four million, Chargois, you should get two million.
8 Does he really want to get into that business of
9 fighting with -- amongst the lawyers about who gets
10 what fee?  I doubt it.
11    I think he's going to be ultimately
12 laser focused on how much the class gets because
13 that's what matters.
14    **THE SPECIAL MASTER:** Okay.
15    **MR. KELLY:** One moment, your Honor.
16    (Pause.)
17    **MR. KELLY:** One second.  So I guess what
18 I would close in asking you to do --
19    **THE SPECIAL MASTER:** Well, before you
20 say you're going to close, let me ask you if you
21 want to tell me anything about what Garrett Bradley
22 knew about Damon Chargois and what he didn't know?
23    **MR. KELLY:** Well, I think the record
24 evidence is that he did not know that he was

Page 208

1 anything more than a typical local counsel.  Now --
2    **THE SPECIAL MASTER:** Let me suggest a
3 few things that I've got to consider.  I haven't
4 decided this yet, but I've got to consider it.  Much
5 more so than Bob Lieff or any of the Lieff lawyers,
6 he was of counsel from January 1 of 15 to the
7 Labaton firm.
8    **MR. KELLY:** Yep.
9    **THE SPECIAL MASTER:** He was paid
10 specifically as of counsel.  I think it was 100,000
11 a year to generate business or -- not paid.  He was
12 given a budget for expenses.  He was much closer to
13 Damon Chargois than any of the Lieff lawyers and
14 indeed much closer to Damon Chargois than any of the
15 Labaton lawyers, other than Eric Belfi and maybe
16 Chris Keller.
17    He attended these networking seminars
18 down in Florida along with Damon Chargois.  He was
19 there.  And with Eric Belfi and Chris Keller.
20    When the time came to divvy up the fees
21 and the negotiation was being done with Damon
22 Chargois about how much he should get, Labaton
23 didn't ask Eric Belfi to go negotiate the deal with
24 Damon Chargois.  He didn't ask Chris Keller of their

Page 209

1 own firm.  He asked Garrett Bradley.
2    And I'm concerned about that because for
3 me to credit his testimony that he knew nothing
4 about the fact that he performed no work, I have to
5 believe that in all of this relationship that he had
6 with Damon Chargois and his relationship with
7 Labaton that he had no knowledge -- that he acquired
8 no knowledge of the true nature of Damon Chargois'
9 relationship.
10    So if you want to address it, you can.
11    **MR. KELLY:** Sure, be glad to.
12    **THE SPECIAL MASTER:** Because I am
13 struggling to take at face value his testimony.  Bob
14 Lieff testified to it, but they've got a raft of
15 documents that at least support that.  In Garrett
16 Bradley's case there are all sorts of other contacts
17 with Damon Chargois and Garrett Bradley far beyond
18 the relationship with the Lieff lawyers.
19    **MR. KELLY:** All right.  Much of that --
20 well, I think all of that is accurate of what you
21 said, but what follows from all those different
22 subparts I think the Court should consider and that
23 is this --
24    **THE SPECIAL MASTER:** Okay.

Page 210

1  **MR. KELLY:** -- look, using him to
2  negotiate the ultimate fee with Chargois doesn't say
3  anything about whether or not he knew the guy did no
4  work. Using him makes sense if you know these
5  different lawyers' skill sets. To hammer down on
6  another lawyer and push back and get a fee, you need
7  a type of personality that's not afraid to be
8  abrasive. You need a type of personality that's not
9  afraid to cut to the chase and tell this guy,
10  listen, you know, you're lucky we don't give you 4
11  percent instead of 5 percent and, you know, who are
12  you; you know, you're just local counsel; we did all
13  the heavy lifting. You know, I don't care if you
14  have to sue Labaton 'cause he thought there was some
15  sort of contractual thing. I don't know.
16  I don't think using him to negotiate
17  with Chargois means anything other than he's
18  probably a pretty good negotiator. Used to be a
19  politician. I'm sure he has certain skills that
20  other lawyers lack. He's not perhaps the guy you
21  want doing all your research, but he's certainly the
22  guy you want hammering down and negotiate --
23  **THE SPECIAL MASTER:** Well, or even
24  reading your fee petitions.

Page 211

1  **MR. KELLY:** Perhaps. Perhaps. But I
2  don't think a negative inference should be drawn
3  that he therefore knows this guy did zero. I think
4  there's half a dozen, maybe ten e-mails where he
5  calls him local counsel. Local counsel. Did he
6  reflect upon that and investigate that? Probably
7  not. He assumes he's typical local counsel.
8  He did something as local counsel back
9  there. But I don't think there's any evidence in
10  the record that suggests, you know, he was part of
11  the original deal. He doesn't know the original
12  deal, and he doesn't take it upon himself to
13  investigate --
14  **THE SPECIAL MASTER:** No, I don't know
15  that there's any -- I haven't seen any evidence that
16  he was part of the original deal that got Labaton in
17  the door. I'm not suggesting that.
18  **MR. KELLY:** Okay. So --
19  **THE SPECIAL MASTER:** But as the --
20  **MR. KELLY:** -- what I'm saying then --
21  **THE SPECIAL MASTER:** -- relationship
22  gestated, Garrett Bradley seems much closer to Damon
23  Chargois -- much closer -- than almost any lawyer in
24  this case with the exception of Eric Belfi.

Page 212

1  **MR. KELLY:** But so what follows from
2  that? It doesn't necessarily mean he knows what
3  local counsel --
4  **THE SPECIAL MASTER:** Well, what might
5  follow from it is that he's getting all this money
6  in all these cases for doing no work and not filing
7  an appearance; that it's just a fee he's getting.
8  **MR. KELLY:** All right, but now we're
9  into rank speculation. You have the record
10  evidence. You have his testimony.
11  **THE SPECIAL MASTER:** I don't know that
12  it's rank speculation. It's circumstantial
13  evidence.
14  **MR. KELLY:** Well, what's the best
15  circumstantial evidence you have? You have multiple
16  real-time e-mails where he calls him local counsel,
17  local counsel. You've heard all these different
18  definitions, explanations, understandings of what
19  local counsel is. There's nothing in the record
20  saying, well, I knew he was doing nothing.
21  But let me pivot to that I don't
22  disagree with their legal analysis that, apparently,
23  in Massachusetts even if you do nothing, you can get
24  money for a referral fee. So you do have that

Page 213

1  fundamental premise where you start with.
2  I'm not willing to start and stop there
3  because I do think the evidence is that like Lieff,
4  Thornton, Bradley and the rest of them thought he's
5  just a typical local counsel. They don't know
6  exactly what he's doing. He must have done
7  something. That was their understanding.
8  Did they investigate and press on that
9  issue? No. But that's what I think the evidence
10  is, and that's what I think you should understand it
11  to be.
12  So ultimately no matter what you may
13  decide in terms of what the best practices are going
14  forward and what should be done better in the future
15  and what sort of, you know, language should be used
16  to say, you know, sloppy efforts like this should
17  certainly be discouraged and never happen again in
18  these type of petitions, it doesn't affect the total
19  aggregate fee. I think ultimately big picture,
20  these attorneys did a great job.
21  The so-called "red ants" of the
22  plaintiff bar that Professor Gillers now says is a
23  term of endearment I think they did their jobs.
24  They got a great result, and it's unfortunate it's

Page 214

1 been marred by this sloppy paperwork by double
2 counting.  It's unfortunate we've ended up here.
3     **THE SPECIAL MASTER:** On that we're going
4 to agree.
5     **MR. KELLY:** Can I take a two-second
6 break before I rest?
7     **THE SPECIAL MASTER:** You want to get
8 more water?
9     **MR. KELLY:** I do.
10     **MR. HEIMANN:** Shall we take five?
11     **THE SPECIAL MASTER:** Before you start,
12 but let's wait until he's done.
13     **MR. HEIMANN:** All right.
14     (Pause.)
15     **MR. KELLY:** Your Honor, I can break for
16 good, but I want to make clear on the record that --
17     **THE SPECIAL MASTER:** Yes, please.
18     **MR. KELLY:** -- the so-called -- in terms
19 of dates so I haven't misspoke -- the so-called
20 "jack up the lodestar" e-mail that we've discussed
21 is February 6, 2015.
22     The so-called Chiplock warning e-mail to
23 Thornton with respect to Thornton's mistaken
24 estimate, it turns out to be a guess, and there's a

Page 215

1 lot of back and forth, that's in August of 2015.  So
2 a year before --
3     **THE SPECIAL MASTER:** But after the
4 20/20/20 agreement.
5     **MR. HEIMANN:** Long after.
6     **THE SPECIAL MASTER:** Long after the
7 20/20/20 agreement.
8     **MR. KELLY:** The agreement to the entire
9 fee is in August 2016, okay, a year later and then
10 obviously the filings for the declarations --
11     **THE SPECIAL MASTER:** I think we've got
12 the chronology.
13     **MR. KELLY:** Okay.
14     **MR. SINNOTT:** Just one thing on that
15 point, Brian.
16     With Professor Vairo you may remember we
17 showed her an e-mail -- I'm sorry -- we showed her
18 the deposition of Evan Hoffman.  And Evan --
19     **PHONE LINE CONFERENCE:** The following
20 participant has entered the conference:  No names
21 are available.
22     **MR. SINNOTT:** Could whoever entered just
23 identify yourself, please?
24     **MS. HARLAN:** Sure.  This is Emily

Page 216

1 Harlan.
2     **MR. SINNOTT:** Okay, thanks, Emily.
3     Do you remember that e-mail -- that
4 testimony of Professor Vairo where we showed her the
5 Evan Hoffman deposition, Brian?
6     **MR. KELLY:** I believe I do, and I think
7 I'm trying to find it.  Yeah.  That -- well, go
8 ahead.  I'm sorry.
9     **MR. SINNOTT:** It appeared from that --
10 and tell me if you differ with this characterization
11 -- this wasn't just Garrett signing something that
12 was put in front of him without reading it, this was
13 a collective process that Evan, possibly Mike
14 Lesser, and Garrett had participated in and maybe
15 others at Thornton -- a process of review and back
16 and forth with Nicole Zeiss it would appear.
17     So I mean would you agree with me that
18 this was a collective failure and not just a Garrett
19 Bradley failure?
20     **MR. KELLY:** No, because I think it goes
21 back to the maxim earlier when I thought the record
22 said something.  You got to trust but verify and go
23 back and read it.
24     And what Hoffman said, he's describing

Page 217

1 -- what you're referring to, this collective effort,
2 yes, collective effort to do the bulk of this work,
3 but the rest of the language was a model fee
4 declaration.  That's the boilerplate document that
5 Garrett signed without carefully reading it.  He did
6 not carefully read it.  There's no doubt about it,
7 okay.
8     And the rest of the stuff that they're
9 talking about with that testimony is, yes,
10 collective effort.  But this language in the model
11 fee declaration, which again they got it from the
12 lead counsel 'cause it's a boilerplate, that's not a
13 collective effort.  So you shouldn't squish all that
14 together.
15     There's a lot of collective work going
16 on, but that fee declaration is just a form that
17 they get, and he doesn't carefully read it, and he
18 signs it, and now here we are.
19     **THE SPECIAL MASTER:** But others at the
20 firm also read it.
21     **MR. KELLY:** Well, all the firms read it,
22 and none of 'em thought much except it's a
23 boilerplate declaration.
24     **THE SPECIAL MASTER:** So if there was

1 this implicit agreement, why did Labaton and Lieff
2 include these staff attorneys on their petitions?
3    **MR. KELLY:** Well, because I think, as
4 you've referenced, there's been some siloing of
5 attorneys in different firms; they're big firms, and
6 maybe one firm didn't realize that Thornton paid for
7 some of these. Usually the person putting that
8 together had no idea, well, they're sitting here in
9 my office, I must include them. It's not illogical.
10 And maybe they don't know about the deal that
11 Thornton's paying the bill for X number, you know.
12    These are big firms, and perhaps Miss
13 Zeiss was not privy to all those --
14    **THE SPECIAL MASTER:** Well, she said she
15 wasn't privy to any of these details.
16    **MR. KELLY:** So there you go. So
17 ultimately her mistake -- her inadvertent mistake is
18 simply not putting together these documents and
19 looking at them.
20    Like Bradley, she didn't give it a close
21 read, and now here we sit.
22    **THE SPECIAL MASTER:** Was there another
23 point you wanted to address?
24    **MR. KELLY:** I'm out of points, judge.

1    **MR. SINNOTT:** No more baseball analogies
2 or shots at the Tigers? You got to admit that felt
3 good, didn't it?
4    **THE SPECIAL MASTER:** All right, why
5 don't we take a break, and then, Richard, you're on.
6    **MR. HEIMANN:** Okay.
7    (A recess was taken.)
8    **MR. HEIMANN:** So I have prepared a
9 binder for both of you. It's a sort of
10 show-and-tell, and I want to walk through it during
11 the course of my presentation. Let me begin by
12 saying that subject to questions that you all may
13 have about any of the topics you have identified, I
14 only propose to address two of them, the first being
15 the -- in the order of your presentation -- the
16 issue of the staff attorney compensation and the
17 marking up of hourly rates issue and including the
18 notion of a distinction between rating agency or --
19 excuse me -- agency lawyers and other non-agency
20 lawyers and then also the third bullet point that
21 has to do with Lieff Cabraser's awareness of the
22 Chargois Arrangement and so forth. And I propose to
23 start with the latter of the two.
24    **THE REPORTER:** I'm sorry, but could you

1 speak up?
2    **MR. LIEFF:** Yes.
3    **MR. HEIMANN:** Louder? All right. Yes,
4 yes, yes. All right.
5    So Tab 1 I start with Professor Gillers'
6 opinion or opinions as expressed at his deposition
7 in response to a hypothetical that I posed to him
8 that is spelled out in four parts in this first
9 page, and I won't go through each, but the point is
10 here that Professor Gillers testified, I believe,
11 that if the points of the hypothetical are
12 factually accurate, then his opinion Lieff Cabraser
13 did not violate in any respect its ethical
14 obligations either with respect to a disclosure or
15 non-disclosure of what we knew about Chargois to the
16 Court or with respect to disclosure or
17 non-disclosure of what we knew to -- in disclosing
18 or not disclosing to the class in which respect the
19    Going to Tab 2, because what I propose
20 to do now is with some curtailing of the total
21 record to go through what the record shows with
22 respect to the basis -- factual basis for the four
23 points of the hypothetical.
24    And I start with something that's not in

1 the binder which is the 2011 draft letter that your
2 Honor questioned someone about --
3    **PHONE LINE CONFERENCE:** The following
4 participant has entered the conference: Mike.
5    **THE SPECIAL MASTER:** There's one other
6 thing I do want you to address -- and maybe you're
7 intending to address it -- and that is whether or
8 not what you're going to tell me -- what I assume
9 you're going to assume to tell me Lieff knew or did
10 not know whether or not there was any obligation of
11 further inquiry. So if you would address that.
12    **MR. HEIMANN:** I will, although I think
13 that's implicit in Professor Gillers' opinions that
14 if the factual bases that I'm going to demonstrate
15 supporting the hypothetical is in fact correct,
16 there was no obligation to make any further inquiry
17 of lead counsel about Chargois. But I will address
18 that separately, or maybe you'll remind me if I
19 don't get close enough to it.
20    **THE SPECIAL MASTER:** I will.
21    **MR. HEIMANN:** Great. So, again, back to
22 the 2011 letter. The record I think is now clear
23 that that letter was never shared with Lieff
24 Cabraser in draft form or otherwise. The testimony

Page 222

1 about it indicates as much. We have searched high
2 and low among our archives to find it without any
3 success. Had we received it in e-mail, we would
4 have had it in our files, and we would have found
5 it.
6    I could gild that lily by saying you all
7 asked me about it, and I have no recollection of it.
8 And Chiplock's and Lieff's first recollection of any
9 note -- awareness of any other lawyer being involved
10 came two years later in 2013. So let me go there.
11 That's the first e-mail that I have up.
12    This is the e-mail from May of 2013,
13 e-mail string I should say, that importantly reads
14 from -- I should say this is from Bradley. And in
15 some respects the identities of the people --
16    **THE SPECIAL MASTER:** Can we go back to
17 the -- I was just confirming. I just looked at the
18 draft of the 11 -- let me also -- I should have
19 asked...
20    (Pause.)
21    **THE SPECIAL MASTER:** Yeah. So the draft
22 of the letter is to Mike Thornton, Garrett Bradley,
23 Steve Fineman, Dan Chiplock and you.
24    **MR. HEIMANN:** Yes.

Page 223

1    **THE SPECIAL MASTER:** Is there any
2 evidence in the record one way or another as to
3 whether Mike Thornton -- I should have asked this
4 earlier -- or Garrett Bradley ever got this letter?
5    **MS. LUKEY:** It's produced by Thornton.
6 Garrett should have gotten it. It's produced by
7 Thornton.
8    **MR. HEIMANN:** There's evidence that
9 Garrett Bradley got it because that's the e-mail
10 that it was produced by the Thornton Law Firm.
11    **THE SPECIAL MASTER:** Okay. Okay.
12    **MR. THORNTON:** Off the record. I didn't
13 get it. That I recall. It's a long time ago.
14    **THE SPECIAL MASTER:** So there is
15 evidence that Garrett Bradley got it.
16    **MR. HEIMANN:** Yes.
17    **THE SPECIAL MASTER:** So my question
18 would be -- and that's what I thought. My question
19 would be if it was sent, quote, via electronic mail,
20 which we can assume is e-mail, how is it that the
21 Thornton folks would not -- that the Lieff folks
22 would not have gotten it?
23    **MR. HEIMANN:** Because it wasn't sent.
24 The draft letter itself was not sent. It simply

Page 224

1 says if it had been sent it would have been sent by
2 e-mail. You have to look at the first page -- the
3 one that bears the Bates 33910, that's the e-mail
4 from Keller to Bradley --
5    **THE SPECIAL MASTER:** That's the covering
6 e-mail.
7    **MR. HEIMANN:** That's the covering
8 e-mail. So what is happening here is that Keller is
9 sending a draft --
10    **THE SPECIAL MASTER:** What's the Bates on
11 it, please.
12    **MR. HEIMANN:** TLF-SST-33910.
13    **MS. LUKEY:** It's Tab 20 in our
14 submission.
15    **THE SPECIAL MASTER:** Oh. Tab 20.
16    **MS. LUKEY:** Of the appendix. Wait a
17 minute. Yeah, the second -- one of them's numbered.
18 The other one's lettered. It's in the one that's
19 numbered.
20    **THE SPECIAL MASTER:** It's in the one
21 that's numbered?
22    **MS. LUKEY:** Yes. And it's only sent to
23 Garrett.
24    **THE SPECIAL MASTER:** I should have

Page 225

1 stayed up all night reading this. All right. The
2 one that says what do you think of this?
3    **MS. LUKEY:** Yes.
4    **MR. HEIMANN:** Yes.
5    **THE SPECIAL MASTER:** That's from Chris
6 Keller to Garrett Bradley?
7    **MR. HEIMANN:** Yes.
8    **THE SPECIAL MASTER:** Okay.
9    **MR. HEIMANN:** So, as I was saying, it
10 appears that the draft was set up to be sent by
11 e-mail if it was sent, but it wasn't. And the way
12 you know that is, among other things, there's no
13 e-mail address.
14    **THE SPECIAL MASTER:** Yes.
15    **MR. HEIMANN:** All right. So back to
16 moving forward to the year 2013 and the kick-off
17 e-mail which is the e-mail from Bradley --
18    **THE SPECIAL MASTER:** Could I -- while
19 I'm thinking of this. I'm sorry, Richard.
20    **MR. HEIMANN:** It's all right.
21    **THE SPECIAL MASTER:** I didn't focus on
22 this when Brian and I were having our exchange, but
23 I want to give Brian an opportunity to address it as
24 one more piece of evidence that Garrett Bradley knew

Page 226

1  about the nature of the Chargois relationship.
2      But we'll wait.  I want to hear -- just
3  -- I want to give you an opportunity.
4      MR. KELLY: Just clearing my throat.
5      THE SPECIAL MASTER: I want to give you
6  an opportunity to address that.  Just to put on the
7  string of other things that I called out.  Okay.
8      MR. HEIMANN: All right.  So the leading
9  e-mail is the one from Bradley April 24, 2013
10  addressed to Bob Lieff, Mike Thornton and Eric Belfi
11  with copies to Chargois and Keller and Dan Chiplock.
12  The subject:  State Street fee regarding local
13  counsel.
14      THE SPECIAL MASTER: Where?
15      MR. HEIMANN: Tab 1 -- Tab 2.  I'm
16  sorry.  This is one we've seen --
17      THE SPECIAL MASTER: This is the Dublin.
18      MR. HEIMANN: Dublin.  All the e-mails
19  I'm going to show you have been made part of the
20  record and most have been testified about.
21      THE SPECIAL MASTER: Okay, go ahead.
22      MR. HEIMANN: This is one way of
23  gathering them all in one place to go over it
24  chronologically so that the basis for the

Page 227

1  understanding on the part of Lieff Cabraser lawyers,
2  primarily Bob Lieff and Dan Chiplock, can be made
3  clear.
4      So Bradley writes Bob, "As you, Mike and
5  I make discussed in Dublin last week, I am sending
6  this e-mail regarding the obligation to the local
7  counsel who assists Labaton in matters involving the
8  Arkansas Teachers Retirement System."
9      And then he goes on to describe what
10  that obligation is and suggests that the three firms
11  agree to share it which would amount to
12  approximately a 4 percent fee share with the local
13  counsel, Mr. Chargois.  Of course, he's referred to
14  at least two more times in the body of that e-mail
15  as the local counsel.
16      Now Bob when he testified about this
17  testified that he didn't recall this being discussed
18  at the occasion of that meeting in Dublin, but it
19  seems evident that it was discussed at that time.
20  Also, I would suggest from the text of this e-mail
21  again this supports the notion that this is the
22  first time that the matter of the involvement with
23  Mr. Chargois had been broached with any of the Lieff
24  Cabraser lawyers.

Page 228

1      So the next e-mail in that string is Bob
2  responding it looks like that same day some three
3  hours or so later that he's in agreement with the
4  proposal, and then Eric Belfi in this string follows
5  up a few days later, looks like on the 6th of May,
6  saying that he's in agreement, and again those
7  e-mails, both Lieff's e-mails and Mr. Belfi's
8  e-mails, are all copied to the same people who were
9  on the first e-mail including Chargois.
10      Then if you go -- oh, and let me back up
11  for one second about this idea of what local counsel
12  is.  I know there was testimony to this effect, but
13  you will recall that both Chiplock and Bob Lieff
14  testified that they knew full well in this arena
15  what local counsel meant.
16      Now there are two types of local counsel
17  in practice.  One is the one we're more generally
18  familiar in the general practice of law where you
19  have a lawyer who's local to the forum.  So you're
20  litigating in a place where you don't have your
21  offices; you get a local lawyer -- ideally you get
22  one who's very well-known to the courts and
23  respected to front for you, in effect, in a local
24  forum, but there is also local --

Page 229

1      THE SPECIAL MASTER: That's sort of the
2  Keller Rohrback model of the locals -- the model --
3  the Keller Rohrback model of their local --
4      MR. HEIMANN: -- in this case.
5      THE SPECIAL MASTER: -- in this case.
6      MR. HEIMANN: Yes.  But there's another
7  use of that term in the securities practice,
8  particularly in the practice where it involves
9  public pension funds as plaintiffs, and I know Dan
10  Chiplock testified about this -- and you'll see more
11  of this in a few minutes -- but it is not at all
12  uncommon in our experience -- and when I say "our
13  experience," I'm talking about Lieff Cabraser's
14  experience -- in the securities field in particular
15  but also in the antitrust field but certainly in the
16  securities field where there is incredibly heated
17  competition for plaintiffs firms to link up with
18  public pension funds who have the ability to serve
19  as lead -- apply for and be appointed as lead
20  plaintiffs in securities class actions, and it is
21  not at all unusual in those circumstances for public
22  pensions funds to want to have a firm that they're
23  comfortable with and familiar with that is local to
24  them to serve as local counsel in the litigation.

Page 230

1  Sometimes those firms are listed of
2  record in cases.  Sometimes they're not.  It depends
3  upon things I'll come to in a little bit about that.
4  We do list them in those instances when we have
5  them.  But not all firms do.  And we knew that, too,
6  as a firm in terms of corporate knowledge --
7      THE SPECIAL MASTER:  And in that
8  arrangement isn't there some obligation upon the
9  local to act as, effectively, liaison counsel back
10  to the client?
11      MR. HEIMANN:  Typically that's how it
12  works.  That's the reason, at least in large part,
13  for their existence is they have an ongoing
14  relationship with the fund -- with the public
15  pension fund, either with general counsel to the
16  fund or other corporate representatives of the fund,
17  and they serve typically in that role so that, for
18  example, when we have such a situation, while we
19  like to communicate directly to the fund itself, if
20  we have a local counsel, we'll try to communicate
21  directly, but, more often than not, we end up
22  communicating, at least in part, through the local
23  counsel.
24      THE SPECIAL MASTER:  And you may -- a

Page 231

1  lawyer from your firm might call the local counsel
2  and say, hey, we have an issue here, we want to
3  bounce it around with you as to how client A is
4  going to react to this?
5      MR. HEIMANN:  Certainly.
6      THE SPECIAL MASTER:  And how do we
7  handle this with client A?
8      MR. HEIMANN:  Absolutely.  And that's
9  one of the reasons from our perspective to work well
10  with the local counsel in the sense of what we're
11  talking about.
12      So the point here is that when we were
13  told -- when Bob and Dan were told in this
14  communication about the existence of Mr. Chargois
15  and his function or role as local counsel, it would
16  have not come as a surprise that Arkansas had such a
17  person and that Labaton worked through that person
18  in dealing with the Arkansas Fund.
19      Now the next e-mail in order is same
20  e-mail from Bradley to Bob, but this time in the
21  string we have Damon Chargois responding once again
22  to the same folks who were on the original e-mail
23  saying thank you, Garrett.  Agreed.
24      Now why is that significant?  Because

Page 232

1  that's Damon Chargois communicating directly to us
2  confirming the accuracy of his description as
3  contained in the Bradley e-mail.
4      So it means that not only now have we
5  been told by Bradley that Chargois is the local
6  counsel who assists Labaton in matters involving the
7  Arkansas Fund, we have Chargois himself confirming
8  that in the e-mail that he sends to all of the folks
9  including both Lieff and Chiplock.  That's April of
10  2013.
11      Now we move forward to 2015 two years
12  later, and now we're in a situation where there has
13  been a settlement reached in principle.  And I think
14  that was in June or so of 2015.  And what is now
15  going to be going on for the next several e-mails is
16  a discussion among participants, the lawyers, about
17  how to allocate among themselves the fee, interest
18  that they hope to obtain.  Of course, we haven't got
19  a fee yet.  The fee application hasn't been
20  submitted, but they're already talking about how can
21  they divide it up.
22      And in this e-mail you have Bradley
23  writing to Lieff with a copy to Mike Thornton
24  discussing a proposal or engaged in a discussion

Page 233

1  about the fee, and you'll see again about -- oh, I
2  think I've highlighted it about a third of the way
3  down the page Bradley provides for a
4  three-million-dollar allocation to Arkansas local.
5      The next e-mail, and it's continuing
6  actually in the same vein, although we've moved
7  forward a few months in 2015 -- no, actually not.
8  Couple weeks later.  We have another e-mail
9  exchange.  And this one it kicks off with Bob Lieff
10  writing to Garrett.  That's the middle of the first
11  page is Lieff's e-mail in which he says, "I called
12  and suggested that we have a meeting together with
13  the Labaton people to talk about putting in writing
14  an understanding of the fee division."  So this is a
15  continuing discussion.
16      And Bob writes in the course of that
17  e-mail -- looking down to the second full paragraph
18  at the end, he says, "Of course, we also have to
19  factor in the 9 percent that ERISA counsel get
20  pursuant to written agreement and a provision for
21  Arkansas local counsel."  So this is Bob Lieff
22  expressing his understanding of the Arkansas
23  counsel's involvement.
24      THE SPECIAL MASTER:  So my question to

Page 234

1  you in all of this -- there's a continuing
2  discussion about paying Damon Chargois. Bob Lieff
3  seems to be the principal person carrying the ball
4  on these negotiations.
5      Should he not have inquired -- does it
6  not seem that at the very least he was incurious
7  about what Damon Chargois was doing for this money?
8      **MR. HEIMANN:** Bob Lieff has been
9  practicing in this arena --
10     **MR. LIEFF:** -- 54 years.
11     **MR. HEIMANN:** -- 54 years. And the
12 notion of local counsel in the sense that we're
13 talking about here was well-known to Bob.
14     He certainly would have had an
15 expectation of the kinds of things that local
16 counsel would do typically. He would have had an
17 understanding that it is not at all unusual in this
18 situation where we're not lead -- somebody else is
19 lead -- and as lead counsel who has the relationship
20 with the local counsel and has the relationship with
21 the fund, that what local counsel is doing would not
22 be transparent to other lawyers on the plaintiffs'
23 side in a case because typically local counsel
24 doesn't come in, for example, and make court

Page 235

1  appearances in the forum court. Typically local
2  counsel doesn't participate in a significant way in
3  the plaintiffs' discovery, depositions and so forth,
4  although albeit there weren't depositions in this
5  case, but typically the local counsel is behind the
6  scenes at the local location where the fund is
7  located.
8           And in addition to that -- and I'll come
9  to this in a few minutes -- 5 percent, which is what
10 they're talking about here, is on the low end of
11 what one would expect a local counsel in a case of
12 this sort to be allocated.
13          THE SPECIAL MASTER: If he was really
14 local.
15          MR. HEIMANN: If he was really local
16 counsel.
17          THE SPECIAL MASTER: So but my question
18 to you is at some point would it not be prudent or
19 just common sense for Bob Lieff to say, wait a
20 minute, we're talking about paying this guy five
21 million dollars, four million dollars, what the
22 heck's he doing?
23          MR. HEIMANN: I don't -- I think the
24 answer is there were much more important things for

Page 236

1  Bob Lieff to be worried about in connection with
2  these negotiations than whether or not -- why local
3  counsel would be sharing in the fee at this level
4  given that that is -- and I don't know if I have it
5  in the show-and-tell, but I know I put it in the
6  submission that we gave you last week about our own
7  experience in terms of when we have engaged local
8  counsel and what the fee ranges in those situations,
9  and this -- and I've said in that; and it's true --
10 our experience with local counsel is that the fees
11 -- put it differently, our experience over the past
12 several years at least has been when we have been
13 asked to serve as local counsel typically -- and
14 when we ask others to serve as local counsel for us,
15 so both ways -- it is not at all unusual for us or
16 them, depending on which way you're going, to give
17 the person an option, to either base their fee
18 ultimately on a lodestar how much work they do in a
19 case -- that would be an important function or
20 factor -- or just on a straight percentage. And
21 when it's a straight percentage, the low is -- I
22 mean that I have seen is 5 percent and with an upper
23 bound of roughly 10 percent. Now it could actually
24 go beyond that, particularly in local counsel not in

Page 237

1  the sense we're talking about here, but in forum
2  local counsel. And if the local counsel happens to
3  be particularly strong, we might -- we may even go
4  to 20 percent.
5      But the real point here is that 5
6  percent is no big deal. Would not have raised an
7  eyebrow on our part when we were being told that's
8  what the local counsel percentage range is.
9      So the answer is, no, judge, I don't
10 think that there would have been a -- it would
11 demonstrate a lack of curiosity for Lieff not to
12 have gone to Larry Sucharow and say, Larry, what the
13 hell is going on here, what did the guy actually do.
14 No, that's not something that a lawyer in a class
15 case like this would likely do in terms of going to
16 lead counsel and challenging them, in effect, for
17 what they're proposing with respect to their local
18 counsel.
19     **THE SPECIAL MASTER:** Which raises the
20 question that I asked I think you in your
21 deposition -- I asked a number of the witnesses --
22 was this arrangement with Mr. Chargois as we now
23 know it a common arrangement in plaintiffs' class
24 action world?

Page 238

1  **MR. HEIMANN:** Well, if you mean the full
2  panoply of the Chargois Arrangement --
3  **THE SPECIAL MASTER:** I do. I mean the
4  full panoply where a lawyer opens the door, makes an
5  introduction, facilitates a relationship at the
6  beginning years before cases -- not just this case
7  but other cases gets an interest in every case
8  thereafter? Is that common?
9  **MR. HEIMANN:** Not in our experience. I
10 mean I'm not saying it doesn't happen. And,
11 obviously, it did in this instance. But if you're
12 talking about Lieff Cabraser's experience, the
13 answer's no, we have not experienced this sort of
14 thing before.
15   Now that's not to say that we are
16 unaware of the fact that there is an intense
17 competition among the plaintiffs' securities law to
18 secure funds like the Arkansas Fund as clients and
19 ongoing clients.
20   There is a high priority paid to getting
21 on the panels -- portfolio moderating panel in this
22 case. Not all of the funds actually have portfolio
23 monitoring funds or panels, but they do have panels
24 of law firms that are the law firms they go to if

Page 239

1  and when they are interested in getting involved in
2  class litigation. That we're familiar with. And
3  we're certainly familiar with the fact that there
4  are all sorts of favors that can be handed out to
5  local counsel if local counsel facilitates your
6  entree into that arrangement.
7    But this -- the sort of thing you're
8  talking about with a set percentage on an ongoing
9  basis in every case is not something we've
10 experienced.
11 **THE SPECIAL MASTER:** I ask the question
12 because I'm wondering if it were common, wouldn't
13 that have informed Bob and created some kind of an
14 obligation to inquire further to the effect, you
15 know, is this guy really doing local counsel work or
16 liaison counsel work, or is he just one of these
17 pilot fish that are out there who's taking a
18 finder's fee?
19 **MR. HEIMANN:** Well, I can say with a
20 high degree of confidence that the idea that this
21 was a pilot fish would not have crossed Bob Lieff's
22 mind given what was said from the outset.
23 **THE SPECIAL MASTER:** You know, the term
24 a "pilot fish" --

Page 240

1  **MR. HEIMANN:** Yes, I do.
2  **MS. LUKEY:** I don't.
3  **THE SPECIAL MASTER:** I first saw it in a
4  Hemingway novel. It's a person or a group of people
5  that go in and sort of test the water and create a
6  relationship and then brings in all kinds of people
7  afterward to bring in the business. It's not a
8  perfect analogy here but...
9    I think it was -- I don't know; I read
10 all the books at once.
11 **MR. LIEFF:** The Old Man and the Sea.
12 **THE SPECIAL MASTER:** No, it wasn't The
13 Old Man and the Sea. It was one of the --
14 **MR. HEIMANN:** If I could go to the next
15 e-mail string. This is also the 28th of August of
16 2015. And the purposes of -- the significance here,
17 I start on the first page with the Chiplock e-mail
18 where he's writing to Larry Sucharow with a copy to
19 Garrett Bradley and to Mike Thornton and to Bob
20 Lieff, and he raises a question -- he says,
21 "Actually, one wrinkle I'm not sure about is how
22 ERISA and local counsel fits in." And, again, we're
23 in the context now of talking about fee allocation
24 among the plaintiffs' firms.

Page 241

1    And what's happened here is that Dan is
2  really raising the question of how do you -- how do
3  you compute, if you will, the percentage for ERISA
4  and for Arkansas counsel meaning do you take it off
5  the top, or is there some other way of computing
6  their share by application of the percentages.
7    And then Lieff writes back to this -- to
8  Chiplock alone you'll notice, and he says, "Dan, if
9  you take ERISA and Arkansas local off the top, you
10 end up with the following." And he again refers to
11 the Arkansas counsel as Arkansas local. So
12 basically what Bob was explaining to Dan is this is
13 how you do the math; you have to take it off the
14 top.
15   And if you'll go to the next e-mail in
16 the string or the next one I've got is an August 30
17 e-mail. Now, again, this is an e-mail again
18 addressing this question of how you compute it, and
19 that is to say, the Arkansas and the ERISA part of
20 it, and you'll see that again about halfway down
21 Garrett Bradley writes to Chiplock with copies to
22 Sucharow, to Mike Thornton and to Bob Lieff --
23 **THE SPECIAL MASTER:** And what date are
24 we on? August 30?

1  **MR. HEIMANN:** This is August 30.
2  **THE SPECIAL MASTER:** Is this a separate
3  chain?  Oh, yeah.  Yeah, yeah.  Okay.
4  **MR. HEIMANN:** So about halfway down the
5  first page you'll see Bradley -- Garrett Bradley
6  writing to those that I just mentioned saying, "Dan,
7  there is a written agreement between all of the
8  parties that the Arkansas component would come off
9  the top."  And then he goes on to refer to Arkansas
10 counsel which you'll notice in the e-mail from
11 Chiplock, which is just below that, Dan refers to
12 the Arkansas local -- the Arkansas lawyer as the
13 local Arkansas counsel indicating again his
14 understanding --
15 **THE SPECIAL MASTER:** Hm hm.
16 **MR. HEIMANN:** -- of the role being
17 played by Chargois.
18 And then if you go through the rest of
19 the e-mail string, but basically it's again with all
20 the same people.  So it includes Sucharow and
21 Garrett Bradley and Lieff and Thornton in which
22 they're asking about getting a copy of this --
23 **THE SPECIAL MASTER:** -- written
24 agreement.

1  **MR. HEIMANN:** -- written agreement that
2  goes back to the 2013 agreement where Bob wrote I'm
3  in full agreement.
4  And the last e-mail here in this string
5  is Garrett Bradley writing to Lieff with a copy to
6  Chiplock, Sucharow, Mike Thornton in which he says,
7  "I re-sent it to you a while ago.  It is the
8  agreement that whatever the obligation is to the
9  Arkansas firm, it is off the top."
10 And just below that you can see Bob
11 saying I don't have the agreement; I have not seen
12 it.  He had apparently forgotten it at this point in
13 time.  He says he doesn't necessarily agree, but he
14 wants to see the agreement.
15 If we then move forward to the next
16 e-mail in order, now jumping a year ahead 'cause
17 that's the end of that August 2015 discussion, we're
18 now in June of 2016, and we have -- the e-mail
19 string begins with a July 28, 2015 e-mail from
20 Bradley to Lieff.  Subject:  State Street fee
21 regarding local counsel.
22 And what he's doing is he's forwarding
23 to Bob a copy of the --
24 **THE SPECIAL MASTER:** -- Dublin e-mail?

1  **MR. HEIMANN:** -- Dublin e-mail.
2  **THE SPECIAL MASTER:** I remember this.
3  **MR. HEIMANN:** -- in July --
4  **THE SPECIAL MASTER:** Yeah.
5  **MR. HEIMANN:** -- and, you know, I don't
6  want to complicate the case too much, but a moment
7  ago I read you an e-mail in which Bradley says --
8  **THE SPECIAL MASTER:** -- he sent the
9  agreement --
10 **MR. HEIMANN:** -- that he had sent it
11 earlier, and that's this July 28, 2015 one I was
12 talking about.  And so now -- and again, the --
13 well, I don't want to characterize it.
14 You'll see then that Bradley then writes
15 on August 30, 2015 saying I found it in my e-mail,
16 and the last e-mail in the string is Chiplock on
17 June 14, 2016, subject:  State Street fee regarding
18 local counsel.  And this is now from Dan to Bob in
19 which he says, "Bob, see below.  I don't know how
20 you get around this."
21 So acknowledging that they've agreed to
22 this long ago.  They now understand it is going to
23 come off the top.  And, okay, it's local counsel.
24 The next one I've got here in order is a

1  July 2016 e-mail exchange, and this is the one that
2  begins with Garrett Bradley writing gentlemen -- and
3  all the recipients on this e-mail you can see on the
4  very top one.  So he's writing to Sucharow, to Mike
5  Thornton, to Bob Lieff, to Keller, to Belfi and
6  Chiplock --
7  **THE SPECIAL MASTER:** Where are you on
8  this?  I've got the right string.  But where are the
9  addressees?
10 **MR. HEIMANN:** Halfway down you'll see --
11 **THE SPECIAL MASTER:** Oh, is that the
12 July 8, 2016 --
13 **MR. HEIMANN:** Yep.  You'll see Garrett
14 Bradley.
15 **THE SPECIAL MASTER:** 2:59?
16 **MR. HEIMANN:** Yep -- well, 3:06
17 actually.
18 **THE SPECIAL MASTER:** 3:06.
19 **MR. HEIMANN:** It begins with Bradley
20 saying:  "Gentlemen:  As we discuss how to
21 distribute the fee between ourselves..." --
22 **THE SPECIAL MASTER:** Yeah.
23 **MR. HEIMANN:** 'Cause they haven't quite
24 reached an agreement.

Page 246

1   THE SPECIAL MASTER: Yeah, I remember
2   this e-mail well but --
3   MR. HEIMANN: He writes: "As we discuss
4   how to distribute the fee between ourselves and of
5   course the ERISA attorneys, I have had discussion
6   with Damon Chargois, the local attorney in this
7   matter who has played an important role."
8   And then he goes on to talk about what
9   Damon and his firm are willing to accept,
10  5-and-a-half percent and so forth.
11  But, obviously, the key terms of this
12  discussion here is that's how Chargois was described
13  to us, as a local attorney who had played an
14  important role in the case.
15  Now both Bob and Dan have submitted both
16  in response to the questions at their depositions --
17  and I'll come to those in a moment -- and their
18  declarations what they took that to mean, and in the
19  context of what all they had been told; that this
20  was something actually doing work as a local counsel
21  would be expected to do and who had made a valuable
22  contribution to the class and to the outcome of the
23  case.
24  And just walking through this string,

Page 247

1   you'll see that Larry Sucharow responds saying
2   sounds right.  And then Damon Chargois writes --
3   this is about just a little less than halfway down
4   the page -- agree.  Larry, does your reply mean that
5   you agree to the terms in Garrett's e-mail?  And
6   Sucharow writes back -- Larry Sucharow, "I almost
7   always agree with Garrett, but, yes, Damon, that's
8   what I meant."
9   And then Damon Chargois writes in an
10  e-mail that goes to Sucharow but is copied to
11  Bradley -- Garrett Bradley, to Mike Thornton, to Bob
12  Lieff and to Dan Chiplock and to Chris Keller and to
13  Eric Belfi in which Damon says, "Me, too, Larry.
14  Garrett has that ability.  Same to you."
15  Now what's the significance there?  It's
16  Damon Chargois confirming the representation that
17  had been made at the outset of this e-mail string
18  about the important role that he had played in the
19  litigation.  At least from the perspective of Bob
20  Lieff and Dan Chiplock.  That's what they were being
21  told.
22  And then just to sort of finish this
23  off, the next e-mail is from July 8, 2016 in which
24  Bob Lieff in response to the e-mail that we just

Page 248

1   looked at -- the kick-off e-mail in this string is
2   the same one as before --
3   THE SPECIAL MASTER: Hm hm.
4   MR. HEIMANN: -- we had a discussion.
5   The important lawyer.  And Bob then writes we, LCHB,
6   are in agreement with the 5.5 to Chargois.  Now
7   let's continue to resolve the split among us.  So
8   they were still talking about how to divide or
9   allocate the fee amongst the various firms -- the
10  three firms primarily.
11  And for what it's worth, then the last
12  e-mail in this string is Bradley congratulating --
13  having received the e-mail from Keller.  "Great work
14  getting this done."  And Bradley thanks Keller for
15  the compliment about how Bradley had effectively got
16  it done.  I presume that means the 5-and-a-half
17  percent deal with Chargois.
18  THE SPECIAL MASTER: What is your view
19  if I might ask, if you have one, on what weight I
20  should attribute to Garrett Bradley playing this
21  significant intermediary role?
22  MR. HEIMANN: Well, my take on it is
23  that he had -- my take it on is that I accept the
24  testimony from the Labaton people who have talked

Page 249

1   about this that there was tension, and I see that in
2   some of the e-mails, between the Labaton firm and
3   Chargois because they were repeatedly renegotiating
4   the deal with Chargois case by case, and Chargois
5   didn't like that.  And I don't have the e-mail that
6   most signifies that here, but you know what I'm
7   talking about.
8   THE SPECIAL MASTER: No, I remember.
9   MR. HEIMANN: All right.  And my take on
10  it is --
11  THE SPECIAL MASTER: That's the one
12  where Chargois sends the e-mail and says you're
13  constantly cutting me back; I contributed all this
14  work, time, political effort, contributions --
15  MR. HEIMANN: Yes.
16  MS. LUKEY: I think it's two separate
17  e-mails.  I think.
18  MR. HEIMANN: Well, it may be, but the
19  point is -- the point is that -- I don't need to
20  list -- I don't need to credit the after-the-fact
21  deposition testimony to see that there was tension
22  between Labaton and Chargois based on their
23  contemporaneous exchanges, and it seems likely, if
24  not evident, from the contemporaneous e-mails that

Page 250

1 Bradley had a decent relationship with Chargois.
2 And keep in mind though Bradley had the same deal
3 with Labaton that Chargois did.
4     **THE SPECIAL MASTER:** Yeah.  This is also
5 complicated, and I raised this to Brian and with
6 Joan, by the fact that Garrett Bradley was not
7 wearing one hat here; he was wearing two hats at
8 this time.
9     **MR. HEIMANN:** I don't really think much
10 about that in response to your question.
11     To me you're asking why Bradley and not,
12 you know, Eric Belfi or Keller was doing the
13 negotiating, and I think the reason is as I've
14 described here.  At least based on my interpretation
15 of the e-mails.
16     **THE SPECIAL MASTER:** Well, as I
17 discussed with Brian, it just seems passing strange
18 to me that a lawyer would go outside of his own firm
19 to get somebody to cut a sensitive deal when you've
20 got a guy in your own firm that has the
21 relationship, but be that as it may.
22     **MR. HEIMANN:** I think I only have two
23 more e-mails to walk through.
24     The next one is an e-mail that begins

Page 251

1 with Bob.  It's on the second page.  Lieff writing
2 to Thornton and to Bradley with a copy to Chiplock
3 confirming the agreement that he believes has been
4 reached respecting the allocation of the fee that
5 they're hoping to get.
6     And you can see initially he says
7 Labaton, Thornton and LCHB has various percentages
8 adding up to a hundred percent -- it's on the second
9 page you'll see.
10     **THE SPECIAL MASTER:** Yes.
11     **MR. HEIMANN:** And then Bob shortly
12 thereafter -- maybe not so shortly; it looks like he
13 wrote the first in the morning, and the second one
14 was at noon.  So maybe he had woken up by that time.
15 And he says -- he writes an e-mail in which he says,
16 I should have said we agree that the 84.5 percent of
17 the fee not going to ERISA and local counsel
18 highlighting and underlining local counsel.  So,
19 once again, he's expressing in contemporaneous time
20 his understanding of who Chargois is and what role
21 he played.
22     And, finally, the last e-mail that I've
23 put in this is one from Nicole Zeiss dated a couple
24 months later in November of 2016, and this is after

Page 252

1 the fee has been awarded by the Court I believe in
2 which she is confirming the actual dollar figure of
3 the allocation among counsel, and she writes
4 Labaton's local counsel is the description of
5 Chargois here at the 5-and-a-half percent of the
6 gross fee.
7     So I think I've put in the submission
8 that I sent to you last week all of the e-mails --
9     **THE SPECIAL MASTER:** You did.
10     **MR. HEIMANN:** This is a subset of the
11 e-mails to show what contemporaneously in terms of
12 written exchanges we were led to believe about
13 Chargois and the role that he played and the
14 significance of the role that he played in terms of
15 the services both to the local -- excuse me -- to
16 the fund and to the class.
17     And the next tab I have is Tab 3.  I
18 just have a subset again of the testimony that you
19 all elicited from both Lieff and Dan Chiplock at
20 their depositions --
21     **THE SPECIAL MASTER:** I'm curious about
22 something here.  Bob testified that had he known the
23 true nature of the Chargois Arrangement -- I want to
24 be careful because I don't have the e-mail in front

Page 253

1 of me or the deposition testimony in front of me --
2 but to the effect that had he known the true nature
3 of it, he would not have agreed to share the fee.
4     **MR. HEIMANN:** I think that's correct.  I
5 think that's what he said.
6     **MR. LIEFF:** I think I said I would have
7 gone to see Larry Sucharow.
8     **THE SPECIAL MASTER:** No, I thought you
9 said --
10     **MR. LIEFF:** Go ahead.
11     **THE SPECIAL MASTER:** But whatever it is,
12 what would the firms -- you're the counsel to the
13 firm.  What would the firm's institutional response
14 have been back at this time?
15     **MR. HEIMANN:** Okay.  So you've asked a
16 number of folks what they would have done had they
17 known things that they didn't know, and I can answer
18 that question, but it's speculation.  I mean really.
19     We probably would have been unhappy
20 about the -- well, strike that.  We would have been
21 unhappy that we had not been told about the -- given
22 the full state of affairs with respect to the
23 relationship when we were asked to share in
24 Labaton's contractual obligation to Chargois.  And I

Page 254

1 imagine we would have questioned why we should be
2 agreeing to pay a share of that Labaton obligation.
3    THE SPECIAL MASTER: That's my question.
4 What would the firm's reaction have been?
5    MR. HEIMANN: Well, I think -- I think
6 -- but, again, this is hindsight -- that that would
7 have been our reaction.
8    I don't know that I can go any further
9 to how things would have worked out 'cause I don't
10 know now what -- if Bob had gone to Larry and said,
11 look, this wasn't what we bargained for; we thought
12 you had a true local counsel who was actually doing
13 work and contributing, and it turns out that all
14 this is is the guy that got you gig, and we don't
15 think we should be sharing any part of that, I don't
16 know, maybe Larry would have said you got me; you're
17 right, you shouldn't so don't worry about it.
18    MR. LIEFF: Yes, I would have said we're
19 paying $800,000 towards this guy, our share.
20    MR. HEIMANN: Bob is sensitive about
21 those sorts of things. But, you know, we weren't
22 told --
23    THE SPECIAL MASTER: I think it was
24 actually more but I don't want to --

Page 255

1    MR. HEIMANN: It was a lot of money.
2    THE SPECIAL MASTER: Yeah, it was.
3    MR. LIEFF: It was about 20 percent of 4
4 million approximately but...
5    Maybe 25 percent, whatever it was, yeah.
6    THE SPECIAL MASTER: Anyway...
7    MR. HEIMANN: So I don't need to walk
8 through all his testimony. I mean Lieff was asked,
9 and he said -- you said how was Chargois described,
10 and he said it was represented, yes, by Bradley that
11 he was local counsel, and it sounded like he was
12 taking care of the situation in Arkansas as
13 typically a local counsel would, or that was my
14 understanding.
15    Then he was asked -- I don't recall
16 whether it was you, judge, or Bill that asked him
17 did you have any concerns beyond the financial
18 aspect about the situation, and he said it's hard to
19 answer this without reference to the timeframe.
20 Back in the early days when I first heard about it,
21 as I now know it was April 2013 and then 2015, I
22 didn't think too much about it because we had a very
23 similar situation in the companion -- I call it the
24 companion but in the Bank of New York we had local

Page 256

1 counsel in Ohio dealing with the fund. I thought
2 this was local counsel in Arkansas dealing with the
3 fund.
4    So not only did we have the general
5 knowledge in the field of how local counsel serves
6 pension funds in this kind of capacity, but we
7 actually had an immediate experience with the
8 companion cases Bob calls it where we had local
9 counsel for the Ohio fund that we represented as
10 lead counsel in that case who the Ohio attorney
11 general had selected to serve as local counsel for
12 the Ohio fund.
13    And then again Bob was asked what was
14 your firm's agreement to share the payment. He
15 answered lead counsel said to the other two class
16 firms that we have a local counsel in Arkansas
17 helping us in Arkansas, later saying I think they
18 were doing a good job or something, and that we have
19 to compensate them for what they have done.
20    So, again, that's the mindset that Lieff
21 had, and Chiplock -- as we'll come to in a moment --
22 was that this was a lawyer who was doing important
23 and valuable work.
24    And then I have the declaration -- this

Page 257

1 is just to back up because Bob at his deposition
2 couldn't recall what the magnitude, although he
3 thought it was comparable, of the fee that went to
4 the Ohio local counsel was, but, as it turns out, it
5 was in line with this. The fee awarded by Judge
6 Kaplan to the Ohio local counsel was just a shade
7 under 4 percent of the total fee there in that case.
8    The last point, paragraphs 5 and 6 of
9 the declaration, is just to drive home the point
10 that in our experience when we serve as lead counsel
11 in class litigation, we take on the responsibility
12 to review the allocation of fees among the
13 plaintiffs' counsel that worked on the case.
14 Sometimes that's a handful. Sometimes it's a great
15 many --
16    THE SPECIAL MASTER: Could I ask this
17 question: You were lead counsel in the BNY Mellon
18 case, correct?
19    MR. HEIMANN: The firm was, yes.
20    MR. CHIPLOCK: Co-lead.
21    MR. HEIMANN: Co-lead, right.
22    THE SPECIAL MASTER: And in that case
23 you had a local counsel in Ohio?
24    MR. HEIMANN: Yes.

Page 258

1    THE SPECIAL MASTER: Was there a
2 fee-sharing agreement in which other firms agreed to
3 share the local counsel's fee?
4    MR. HEIMANN: No.  Not in that sense.
5 You remember Judge Kaplan handles fee allocations a
6 little bit -- a lot differently than other judges
7 do.  So in that case when it comes to fee allocation
8 time, the lawyers -- and there were several of them.
9 I actually have the fee award here somewhere.
10    There were more -- there were at least
11 half a dozen firms including Mr. McTigue, by the
12 way, as it turns out.
13    THE SPECIAL MASTER: Yes.
14    MR. HEIMANN: And the fee submission
15 before Judge Kaplan while it requested a percentage
16 fee award, which Judge Kaplan actually awarded, it
17 also included the lodestar submissions and a
18 proposal to the judge about what kind of multiplier
19 should be applied to each of the firms based on
20 their lodestar submission.
21    THE SPECIAL MASTER: Was your local
22 counsel on that fee petition?
23    MR. HEIMANN: Yes, he was.  And I have
24 -- that's the fee award from that case.  And the

Page 259

1 blank -- I scribbled on my copy.  So if you go to
2 the last page of it, you'll see --
3    MR. CHIPLOCK: Those are redactions.
4    MR. HEIMANN: Those are redactions
5 'cause I scribbled on it.  I didn't have a clean
6 copy with me.  But you can see what Judge Kaplan
7 did.  He said plaintiffs' counsel are hereby awarded
8 attorneys' fees in the amount of 83.75 million which
9 is a percentage award from the 320- or
10 30-million-dollar settlement.
11    MR. CHIPLOCK: 335.
12    MR. HEIMANN: But then he goes on to say
13 that attorneys' fees awarded hereby are allocated
14 among the relevant counsel as follows based on the
15 multipliers applied to each firm's lodestar as
16 proposed by lead counsel.  So the multipliers were
17 proposed by co-lead counsel.
18    THE SPECIAL MASTER: Was Murray Murphy
19 the lead counsel there?
20    MR. HEIMANN: Yes.
21    THE SPECIAL MASTER: So Lou -- Judge
22 Kaplan was fully apprised that your local counsel
23 was going to get $3,154,000?
24    MR. HEIMANN: Yes.

Page 260

1    MS. LUKEY: But there's a rule.
2    MR. LIEFF: What?
3    MS. LUKEY: There's a local rule.
4    MR. HEIMANN: Well, look, Joan's
5 referring to local rule.  The local rule doesn't
6 have anything to do with how Judge Kaplan handles
7 his fee award situations.
8    I mean the local rule does require that
9 the fee allocation be disclosed in that district.
10    MR. CHIPLOCK: Actually, at that time
11 that local rule I don't think was in effect.
12    MR. HEIMANN: Really?
13    MR. CHIPLOCK: Yeah, I think what Judge
14 Kaplan --
15    MR. HEIMANN: Judge Kaplan would require
16 it in any event and does require it.
17    MR. LIEFF: But in that case we were
18 lead counsel and were supposed to do this --
19    MR. HEIMANN: We got that, Bob.  We got
20 that.
21    I wanted to come back and finish off the
22 point --
23    THE SPECIAL MASTER: Please, go ahead.
24    MR. HEIMANN: -- when you interjected

Page 261

1 with the question.
2    And this is in paragraphs 5 and 6 of
3 Lieff's declaration.  When Lieff Cabraser serves as
4 lead counsel or co-lead counsel we take on, as we
5 understand is typically the case, responsibility for
6 seeing about the allocation among plaintiffs'
7 counsel, and that's expected.  That's one of lead
8 counsel's typical functions, and one of the things
9 that we're sensitive to is lawyers who are going to
10 share in the fee don't get too much and don't get
11 too little.
12    And so we have to assess not just the
13 lodestar -- that's a relevant factor most of the
14 time in fee allocations -- but all of the more
15 subjective factors that go into what the value
16 brought to a case.  And we as lead counsel then
17 expect to be able to justify any of the allocations
18 that are made, and typically particularly if we have
19 an institutional investor as the class
20 representative, we share that information with the
21 class representative.
22    Now I know Professor Rubenstein
23 basically said that that's not universally the case,
24 and I'm sure he's right when you have class counsel

Page 262

1 -- class representatives as you often do in all
2 sorts of class actions that are individuals not
3 sophisticated and so forth.
4   **THE SPECIAL MASTER:** Do you believe
5 that's best practices, Richard?
6   **MR. HEIMANN:** No question.  Certainly
7 recall with an institutional investor and
8 particularly when you're talking about a local
9 counsel whose primary value to a case was the work
10 that the local counsel did with respect to the class
11 representative.
12   **THE SPECIAL MASTER:** And that therefore
13 the client would be very aware of the local counsel
14 because that local counsel was interacting with the
15 client?
16   **MR. HEIMANN:** Exactly, but the important
17 point is -- or a part of the important point is that
18 the fund would be very familiar with what value that
19 local counsel brought to the fund service as the
20 class representative.
21   So it's not just a matter of hours or
22 even the particular work that they did in terms of
23 work, but it's also what -- of what value was that
24 lawyer to the fund in performing and discharging its

Page 263

1 responsibilities as the class representative.
2   The rest of the section is really Dan
3 Chiplock's both testimony and declaration, and I
4 think perhaps the second of these clips from the
5 deposition is particularly important because he's
6 asked did you interpret that description of he
7 assisted as meaning he took an actual --
8   **THE SPECIAL MASTER:** Where are you,
9 Richard?
10   **MR. HEIMANN:** I'm on the second page of
11 the Chiplock excerpts from deposition 115 to --
12   **THE SPECIAL MASTER:** Where are we?
13 Which section?
14   **MR. HEIMANN:** We're in the same tab but
15 just a couple pages forward.
16   **THE SPECIAL MASTER:** Still in 3?
17   **MR. HEIMANN:** Yes.
18   **THE SPECIAL MASTER:** Oh, I see.
19   **MR. HEIMANN:** In the first excerpt from
20 101 to 103 he testified -- Dan testified as to the
21 Ohio situation and the fact that he assumed that
22 this situation is similar.
23   And then you asked him or Bill asked him
24 did you interpret the description that was given to

Page 264

1 you about Chargois as meaning he took an actual
2 active role in those cases.
3   And he said I actually assumed that,
4 yes; that it was some kind of a role -- some kind of
5 an assistance offered by a local counsel, and for
6 that assumption I based it on my own experience, my
7 own recent experience in the BNY Mellon case.
8   And then the next section is just
9 excerpts from the declaration we recently submitted
10 in which Dan elaborated, if you will, on what
11 happened with respect to the BNY Mellon case, and I
12 think the significant thing here is that what Dan is
13 testifying to here is that we as lead counsel or
14 co-lead counsel in the BNY Mellon case, and as the
15 attorney for the Ohio fund -- 'cause that was
16 directly Lieff Cabraser to Ohio -- we knew what the
17 Ohio local counsel was doing because we were
18 directing the Ohio local counsel as to what tasks to
19 take on and what work to do.
20   And even our co-lead counsel, Kessler
21 Topaz in that case, didn't really have transparency
22 into what our local counsel was doing in Ohio, and
23 the several other firms that were involved in the
24 case had virtually no understanding, including

Page 265

1 Thornton, of what the Ohio local counsel was doing.
2   So the point is it wasn't any surprise
3 to Dan that we didn't have any greater transparency
4 in the State Street case as to what Labaton's local
5 counsel was doing than Thornton had in the BNY
6 Mellon case as to what our local counsel was doing
7 in Ohio.
8   So that's all of the testimony that I
9 have for this presentation, but I want to go to one
10 other aspect of this.
11   The question has been raised by you all,
12 and some others actually, wasn't there something
13 weird about the fact that Chargois was an attorney
14 of record in the case and that there wasn't any
15 lodestar submission by Labaton on behalf of Chargois
16 when it came time for the fee petition.  And the
17 answer to that is really --
18   **THE SPECIAL MASTER:** Or --
19   **MR. HEIMANN:** Pardon?
20   **THE SPECIAL MASTER:** -- just a
21 disclosure of any kind, a lodestar of any kind of
22 disclosure.
23   **MR. HEIMANN:** Right, but the key -- the
24 point I'm keying on is the identity of Chargois by

Page 266

1 name, why that wasn't -- why it wasn't surprising to
2 us that he wasn't attorney of record and that he
3 didn't submit a lodestar under his own name.
4     And that comes back to this notion that
5 I got into a few minutes ago about how competitive
6 the field is in the plaintiffs' securities bar for
7 clients like Arkansas and how important the local
8 counsel for funds like Arkansas can be in the
9 plaintiffs securities firm getting the business of
10 the pension funds.
11     Local -- the identity of your local
12 counsel in the minds of some plaintiffs' firm is
13 proprietary. They don't want their competitors
14 learning who they have who has influence with
15 Pensions Fund ABCD.
16     THE SPECIAL MASTER: But my question to
17 you is a little sharper. Should the fact that he
18 was not disclosed anywhere in the fee petition,
19 neither in the lodestar, in narrative, in break-out
20 of any kind, should that not have disclosed or put
21 you, the Lieff firm, on notice?
22     MR. HEIMANN: Of what?
23     THE SPECIAL MASTER: That maybe he
24 didn't do anything.

Page 267

1     MR. HEIMANN: No, no. I'm sorry. No.
2     THE SPECIAL MASTER: Well, you guys when
3 you have a local counsel, as you did in BNY Mellon,
4 you put him on the fee petition.
5     MR. HEIMANN: That's our general
6 practice, that's correct. Well, I don't know about
7 that. It depends on how much work they did. Some
8 local counsel don't do anything, okay.
9     THE SPECIAL MASTER: This guy was
10 getting 4.1 million dollars.
11     MR. HEIMANN: Five percent. I'm telling
12 you, judge, you know, when we served as local
13 counsel -- I'm going back to this. I know it's a
14 little different 'cause I'm talking about forum
15 local counsel; but when we agree to serve as local
16 counsel, and we do it on a percentage basis instead
17 of a lodestar basis, I don't expect to do much of
18 anything, and I don't do much of anything.
19     I may go to court --
20     THE SPECIAL MASTER: So when you saw the
21 fee petition and he wasn't -- he, Chargois, was
22 nowhere to be seen on the fee petition, that should
23 not have raised a red flag, a suspicion?
24     MR. HEIMANN: I mean in retrospect sure,

Page 268

1 but, you know, not based on what we knew at the
2 time. We first learned of the lodestar petition
3 after the fee petition is filed, right. We don't
4 see it going in. We don't have any control over it.
5 That's lead counsel's responsibility.
6     And they make the decisions of who goes
7 in that petition. I mean I heard Lynn Sarko say
8 that his local counsel didn't get on the fee
9 petition because Labaton made a judgment that it
10 wasn't worth putting him on.
11     Now again, no, I'm just -- I'm not
12 willing to accede that that is a red flag in what we
13 thought what we were told and our experience in the
14 field --
15     THE SPECIAL MASTER: Well, let me pursue
16 that because I believe the reason they were told not
17 to put him on the petition was that their local
18 counsel was under $10,000, and Labaton made the
19 determination that that was de minimis and shouldn't
20 be on.
21     MR. HEIMANN: I assume that's the
22 reason.
23     THE SPECIAL MASTER: Chargois was not de
24 minimis. He may have been -- it may have been well

Page 269

1 within what local counsel are paid, but he was not
2 de minimis.
3     MR. HEIMANN: I agree.
4     THE SPECIAL MASTER: So he got 4.1
5 million dollars. Should that not have been a red
6 flag somewhere in your firm to say, hey, you know,
7 why is this guy not on the fee petition?
8     MR. HEIMANN: Well, the reason I just
9 told you -- I mean Rubenstein gave you a number of
10 reasons why that might be the case. I'm giving you
11 another one that I know of from our firm's
12 experience.
13     That is that Labaton did not want to
14 disclose to the world who their local contact was
15 for their Arkansas Fund client. And that was
16 testimony -- I don't need to speculate about that.
17 Chris Keller testified to that effect. And I've got
18 -- if you look at Tab 4 --
19     THE SPECIAL MASTER: They were afraid of
20 someone poaching 'em.
21     MR. HEIMANN: Exactly. And so it
22 wouldn't have been of any surprise. I can't say
23 that Dan or Bob actually thought this at the time,
24 but I damn sure would have. I would have understood

Page 270

1 that they didn't want to disclose to us or their
2 other competitors in the field -- well, narrow it
3 down to us because we knew at the time because they
4 had to tell us when they got us to pay a share of
5 it, but I can understand why they wouldn't have
6 wanted to have that name in the public domain where
7 the Bernstein Litowitz and the Kessler Topaz's and
8 the Laraque firm and the old Milberg firm would have
9 gone rushing down to buy dinner for Mr. Chargois.
10   You know, that -- it's a vicious,
11 cut-throat industry. And it's just not a surprise.
12 It is not -- it was not a surprise to me.
13   THE SPECIAL MASTER: Judges are
14 blissfully unaware of this.
15   MR. HEIMANN: No, some of them are.
16 Some of them know it full well.
17   THE SPECIAL MASTER: I suppose that's
18 true. Okay.
19   MR. HEIMANN: Anyway, that is my -- what
20 I have to say on the subject of what we knew, and I
21 think it can -- I'm confident that the evidence
22 supports factually each one of the hypothetical
23 points that led Professor Gillers to say if those
24 were true, then in his opinion Lieff Cabraser did

Page 271

1 not violate its ethical responsibilities in any
2 respect with regard to the disclosure or
3 non-disclosure of Chargois in this case.
4   And that I submit is the correct
5 conclusion from the facts as they appear in this
6 litigation.
7   I can go on if you'd like to address
8 this other issue having to do with --
9   THE SPECIAL MASTER: I only have one
10 more question on this.
11   MR. HEIMANN: Okay.
12   THE SPECIAL MASTER: What, if anything,
13 do you want me to do about it in my report and
14 recommendation?
15   MR. HEIMANN: You mean not just as to us
16 but as to the other two firms?
17   THE SPECIAL MASTER: Well, I think you
18 can only answer as to you.
19   MR. HEIMANN: I think you should tell
20 Judge Wolf that you've reviewed all of the record,
21 and you understand that Lieff Cabraser was of a good
22 faith understanding as to Mr. Chargois' role as
23 being legitimate, and that the fee that he received,
24 at least insofar as Lieff Cabraser had insight into

Page 272

1 it, was reasonable, and that Lieff Cabraser did not
2 violate any ethical obligations in respect to our
3 conduct.
4   THE SPECIAL MASTER: That's a partial
5 answer.
6   MR. LIEFF: A what?
7   THE SPECIAL MASTER: That's a partial
8 answer.
9   MR. HEIMANN: What more are you looking
10 for?
11   THE SPECIAL MASTER: Do you want me to
12 recommend any remedial action? Going to put you on
13 the spot here because I have to be on the spot.
14   MR. HEIMANN: Yeah, yeah. You mean
15 financial? Is that what you're talking about?
16   THE SPECIAL MASTER: Yes.
17   MR. HEIMANN: You know --
18   THE SPECIAL MASTER: Look, if I don't
19 ask the indelicate questions here, folks, and I do
20 something, you're going to say, well, we didn't get
21 a chance to address it.
22   MR. HEIMANN: I -- we're not happy with
23 what's happened here. We're not happy that we
24 weren't fully informed in real-time about the

Page 273

1 Chargois and that we ended up paying a very large
2 sum of money to him that we probably would have had
3 some serious questions about had we been fully
4 informed.
5   We're not happy about the fact that --
6 I'm going to come to it in a moment -- how much this
7 whole process has cost us. But we do business with
8 these other folks. We've got a good relationship
9 with Thornton. We've had a good relationship with
10 the Labaton firm. They're a fine firm with really
11 an excellent reputation and excellent body of work.
12   So I just -- I can't -- I cannot tell
13 you that we think -- that we advocate -- I cannot
14 tell you that we advocate for compensation to be
15 paid to us by either of those firms. I think that's
16 what you're asking.
17   THE SPECIAL MASTER: It's among -- it's
18 within the question that I asked. One of the things
19 I have to decide is how to make this come out right
20 as it should have come out. And within that
21 question is should there be a reallocation. That's
22 a question I've got to decide what to recommend.
23   And very late in the game we hear that
24 Lieff didn't know anything about the true nature of

Page 274

1 the Chargois Arrangement. What do I do about it, if
2 anything? That's a question I have to decide
3 whether to make a recommendation.
4     **MR. HEIMANN:** I guess --
5     **THE SPECIAL MASTER:** If you want to
6 think about it --
7     **MR. HEIMANN:** No. I've thought about it
8 already, and I think the answer is that as I've
9 given it to you.
10     I don't think -- there may be
11 disagreement on this -- on this side of the table.
12 I don't think that we, Lieff Cabraser, and me as a
13 named partner in the firm -- active named partner in
14 the firm want to be in the business of seeking
15 recompense from either of the other two firms in
16 this matter.
17     Now I know we have -- even you and I
18 have a disagreement over the propriety of what
19 happened here. I don't necessarily share your view
20 that there was a requirement that the Chargois deal
21 be disclosed to the Court. Our expert witness
22 testified that there wasn't any legal requirement in
23 the absence of a request from the Court.
24     So I'm just -- I just can't go there. I

Page 275

1 just can't go there.
2     **MR. LIEFF:** Could I say something?
3     **THE SPECIAL MASTER:** Should there have
4 been a requirement -- should it have been disclosed
5 to you?
6     **MR. HEIMANN:** I think that the Labaton
7 should have told the firms that they were asking to
8 share in that obligation what the true nature of the
9 obligation was.
10     **THE SPECIAL MASTER:** Should it have been
11 disclosed to the ERISA lawyers?
12     **MR. HEIMANN:** No. The ERISA lawyers
13 have no business -- they have no business in that.
14 Lynn Sarko said it right when he was talking about
15 the Department of Labor. It was none of their
16 business.
17     **THE SPECIAL MASTER:** You were straining
18 at the bit.
19     **MR. HEIMANN:** He's not speaking for the
20 firm.
21     **MR. LIEFF:** I was straining at the bit.
22 Richard was going like this. Is he able to instruct
23 me not to speak or what --
24     **MR. HEIMANN:** You can speak, but you're

Page 276

1 doing so on your own behalf.
2     **MR. LIEFF:** Oh, of course.
3     **THE SPECIAL MASTER:** Anybody here can
4 say anything they want to me. This is the time for
5 you folks to tell me.
6     **MR. LIEFF:** WELL, I would say this on my
7 own behalf.
8     **THE SPECIAL MASTER:** By the way, I don't
9 see anybody restraining themselves.
10     **MR. LIEFF:** No, no, but I'm speaking as
11 of counsel to this firm. Richard can speak as an
12 active -- as he put it, an active partner in the
13 firm.
14     As of counsel in this firm and as
15 someone who participated in this case, I'm not very
16 happy that I've had to come out of pocket for this
17 investigation because I don't share in the firm
18 payments. And, yes, I think that we should get back
19 our money that we contributed to pay Mr. Chargois
20 who didn't do what we thought he was doing. I think
21 it was wrong.
22     I think that's what you're getting at.
23     **THE SPECIAL MASTER:** That's what I'm
24 getting at.

Page 277

1     **MR. LIEFF:** Thank you.
2     **THE SPECIAL MASTER:** Do you want to
3 change your answer, Richard?
4     **MS. LUKEY:** No.
5     **MR. HEIMANN:** No.
6     **THE SPECIAL MASTER:** Okay. Well, this
7 is very interesting. What else, Richard, if
8 anything? Don't feel obligated.
9     **MR. HEIMANN:** No, no. Unless you have
10 further questions, I'm done with that subject.
11     **THE SPECIAL MASTER:** Look, in all
12 seriousness, these are hard questions, and I'm fully
13 sensitive to the sensitivities as between the firms,
14 and you guys have to work in the same space, and
15 sometimes you're competitors, and sometimes you're
16 allies. I'm fully sensitive to all of that.
17     Unfortunately, I have to make a
18 recommendation. And if I don't give you an
19 opportunity to weigh in, you would rightly I think
20 say we didn't have a chance to address it.
21     **MS. LUKEY:** Well, we haven't addressed
22 that. We have not addressed that issue.
23     **THE SPECIAL MASTER:** I'll give you a
24 chance, Joan.

Page 278

1   MS. LUKEY: We didn't in the written
2 submission either, judge. I didn't know it was on
3 the table --
4   THE SPECIAL MASTER: Well, remedies are
5 always on the table.
6   MS. LUKEY: No, I understand that, but I
7 just wasn't aware it was going to be raised, and the
8 firm hadn't raised it --
9   THE SPECIAL MASTER: I'm certainly
10 considering it in the context of the ERISA lawyers;
11 and, frankly, I'm considering it in the context of
12 the Lieff firm, at least to the extent that they
13 have been involved in this investigation based on an
14 incomplete knowledge of all of the circumstances, at
15 least -- at least as to this part of it now.
16   MS. LUKEY: At an appropriate moment I'd
17 like to respond, but I don't want to interrupt
18 Richard if he's moving onto his second issue.
19   MR. HEIMANN: Let me turn to the other
20 issue --
21   THE SPECIAL MASTER: I think everybody
22 knows I am in my report and recommendation and best
23 practices, I am going to be looking for ways to make
24 this come out right. Putting Humpty Dumpty back

Page 279

1 together again.
2   I think everybody in this room would
3 agree that if we could all back go and redo this,
4 lots of things would have been done differently.
5   MS. LUKEY: Yes. I just had never heard
6 anyone from the Lieff side suggest that they thought
7 that --
8   THE SPECIAL MASTER: Well, to be honest,
9 Joan, I hadn't thought about until Richard
10 originally made the point and gave me this stack of
11 documents (indicating).
12   But I think I would not be thorough in
13 coming to some conclusions on recommendations on how
14 to make this come out right in not considering it.
15 That's why I was interested.
16   MS. LUKEY: I'm not suggesting it's
17 improper for you to consider it. I'm just saying
18 it's something we hadn't considered because it had
19 never been suggested to us within the class counsel
20 thing.
21   And when he's done I do have to tell you
22 something that I think bears on the local counsel
23 issue.
24   THE SPECIAL MASTER: Okay.

Page 280

1   MR. HEIMANN: The other issue that I
2 wanted to address has to do with the contract
3 lawyers. And specifically you asked -- addressed
4 the justification or rationale for how firms billed
5 off-track associates including the differences, if
6 any, between the firms billing of off-track
7 attorneys and contract attorneys employed by a
8 third-party agency and any legal decisions
9 specifically addressing the propriety of marking up
10 the hourly rates charged staff attorneys or contract
11 attorneys in a fee petition submitted to the Court.
12   THE SPECIAL MASTER: Let me just say
13 feel free to address any part of that that you want.
14   But as I think I indicated to Joan, I'm
15 much less concerned about the marking up of the
16 staff attorneys than I am of the agency attorneys,
17 but I will say Judge Wolf may have a different view.
18   MR. HEIMANN: So my first position is
19 that the notion of marking up is fundamentally wrong
20 to begin with. There's no marking up. If by that
21 you mean that one looks to the hourly in this case
22 cost to the firm of the contract lawyers and what
23 the firm bills those lawyers for purposes of
24 lodestar, there's just no support for that as a

Page 281

1 notion -- I shouldn't say no support -- there is
2 little if any support as that for a notion.
3   And the same thing true is, even more
4 so, of the idea of distinguishing between contract
5 attorneys that are employed and paid directly by the
6 law firm and those who are employed by an agency and
7 paid by an agency. There is no case that I'm aware
8 of or any other authority that supports there being
9 a distinction between those two --
10   THE SPECIAL MASTER: So let's talk about
11 one case -- and I haven't read it in a while, but in
12 one case Judge Stein, the Citigroup case, what he
13 seemed to do was to look at all of them as a group
14 and reduce all of them as a group.
15   MR. HEIMANN: What Judge Stein did --
16   THE SPECIAL MASTER: And I'm not sure I
17 agree with him on that because, as I've already
18 indicated, I see in this case a much -- a much more
19 impactful relationship between a firm and its staff
20 attorneys and agency attorneys. Much more --
21   MR. HEIMANN: Say that again.
22   THE SPECIAL MASTER: A much more
23 impactful relationship between its own staff
24 attorneys and agency attorneys.

Page 282

1  MR. HEIMANN: I don't know what that
2  means.
3  THE SPECIAL MASTER: Significant. A
4  much more significant --
5  MR. HEIMANN: Relationship?
6  THE SPECIAL MASTER: Yes. In the
7  following sense: I think we learned in this case
8  that your firm pays benefits to your staff
9  attorneys. We learned that your firm has ongoing
10  relationships with these staff attorneys, and that
11  in many of the instances the fact that they are --
12  the fact that they are staff attorneys as opposed to
13  associates is simply a lifestyle choice for these
14  staff attorneys.
15  That's not the case with the lawyers
16  that you retain for a given project on a one-shot
17  basis from an agency.
18  MR. HEIMANN: I disagree.
19  THE SPECIAL MASTER: Okay. How?
20  MR. HEIMANN: There are some aspects of
21  that that are true. We don't pay benefits of the
22  sort that we pay to employees as with contract
23  lawyers.
24  THE SPECIAL MASTER: Hm hm.

Page 283

1  MR. HEIMANN: First of all, they perform
2  exactly the same functions. And, secondly, they
3  come and go. They are -- if a staff attorney is
4  there over more than one case, it's just gratuitous
5  because if there hadn't been a second case, they
6  would have been gone.
7  Secondly, it is not at all infrequently
8  the case that an agency lawyer becomes a staff
9  attorney.
10  THE SPECIAL MASTER: Could I ask this
11  question? Malpractice insurance. Your firm makes a
12  mistake or a staff attorney makes a significant
13  mistake, your malpractice coverage covers that --
14  MR. HEIMANN: I hope so.
15  THE SPECIAL MASTER: -- for staff
16  attorneys.
17  MR. HEIMANN: I hope so.
18  THE SPECIAL MASTER: You hope so. But
19  not for the agency --
20  MR. HEIMANN: I'm not sure that's true.
21  You'd have to ask Steve Fineman about that. I would
22  have assumed that our malpractice coverage would
23  cover any lawyer that we hold out as a lawyer doing
24  work for the firm and representing the firm. Agency

Page 284

1  lawyers --
2  THE SPECIAL MASTER: My understanding --
3  and if somebody wants to correct that understanding,
4  I'd be happy to have it -- is that the agencies
5  themselves get malpractice insurance for their
6  agency lawyers.
7  MR. HEIMANN: Could be. I will ask my
8  managing partner and see what his answer is to that
9  question.
10  The real key question is not whether the
11  agency has their own malpractice insurance, it's
12  whether our insurance covers it would seem to me.
13  THE SPECIAL MASTER: Yes. Yes.
14  MR. HEIMANN: Yeah. So let me -- can I
15  come back to -- you asked for cases, and I've given
16  you -- I've got three cases in my binder that I'd
17  like to walk through.
18  THE SPECIAL MASTER: Is that Tab 7?
19  MR. HEIMANN: That's Tab 5.
20  THE SPECIAL MASTER: Ah, all right.
21  MR. HEIMANN: And these are all
22  relatively recent cases, and it includes the
23  CitiGroup case which I'll come to last.
24  Starting with the AOL/Time-Warner case,

Page 285

1  this is from Judge McMahon in the Southern District
2  of New York, and I've highlighted on page 18 of this
3  printout starting at the bottom the point that he
4  makes -- she makes -- excuse me -- that I want to
5  emphasize, and that is the Court should no more
6  attempt --
7  THE SPECIAL MASTER: Where are you,
8  please?
9  MR. HEIMANN: I'm at Tab 5. The
10  AOL/Time-Warner.
11  THE SPECIAL MASTER: Oh, the
12  AOL/Time-Warner case.
13  MR. HEIMANN: Second page. It should be
14  highlighted for you.
15  MR. CHIPLOCK: These are excerpts.
16  These are not the entire case file.
17  THE SPECIAL MASTER: Ah, okay. There it
18  is. Got it.
19  MR. HEIMANN: This has to do with the
20  question of whether or not from a conceptual
21  standpoint it's appropriate to try and mark up the
22  cost number to a billing number.
23  And what Judge McMahon said is the Court
24  should no more attempt to determine a correct spread

Page 286

1 between the contract attorneys' cost and his or her
2 hourly rate than it should pass judgment on the
3 differently between a regular associate's hourly
4 rate and his or her salary.  And she cites a ABA
5 opinion supporting that proposition.
6     **THE SPECIAL MASTER:** Could I ask is it
7 clear in this -- I haven't read the opinion.
8     Is it clear in this opinion that when
9 she refers to, quote, contract attorneys she's
10 referring to agency attorneys and not staff
11 attorneys?
12     **MR. HEIMANN:** No.  She makes no
13 distinction between the two.  I'm going to come to
14 Judge Stein's opinion where he's talking about
15 agency lawyers exclusively, but I'll come to that
16 later.  But I'm going to go on.
17     She then writes:  "The ultimate test in
18 Goldberger's and Arbor Hill's marketplace is what a
19 reasonable client would pay for the individual's
20 time.  Contracted personnel are now a feature in the
21 legal community.  Reimbursement for these personnel
22 is consistent with the second circuit's endorsement
23 of market-driven compensation."
24     And that, as I will come to in a moment,

Page 287

1 is how we do it and have done it.
2     Next I go to the Whirlpool case.  This
3 comes out of the central district of California from
4 October of 2016.  And if you'll go to the second
5 page, we start there.  I've got it highlighted
6 again.
7     "The determination of reasonable hourly
8 rate is not made by reference to the rates actually
9 charged the prevailing party but, rather, by
10 reference to the fees that private attorneys of an
11 ability and reputation comparable to that of
12 prevailing counsel charge their paying clients for
13 legal work of similar complexity."  So the same
14 concept.
15     But now if you go over to the next page
16 -- this is page 12 of the opinion -- you'll see that
17 this is actually a case that we were involved in,
18 Lieff Cabraser was involved in.  And you'll see that
19 the blended rate for contract attorneys who did
20 document review in this case was a little over $400
21 an hour.
22     And now to the next section of the
23 opinion --
24     **THE SPECIAL MASTER:** Hang on.  Where is

Page 288

1 that, Richard?
2     **MR. HEIMANN:** It's on the left side --
3 it should be highlighted.
4     **MR. CHIPLOCK:** Their copies aren't
5 highlighted.
6     **MR. HEIMANN:** Why aren't they
7 highlighted?
8     **MR. CHIPLOCK:** They're case printouts.
9 Sorry.
10     **MR. HEIMANN:** Ughh, sorry.  I thought
11 they were highlighted.
12     **THE SPECIAL MASTER:** Oh, I see.  Here it
13 is.  I got it.
14     **MR. HEIMANN:** You see in particular
15 defendants challenge the fees sought, blah, blah,
16 blah.  The blended hourly rate of $421.60 for
17 lawyers who were involved in -- contract lawyers who
18 were involved in document review.
19     We now want to go over to the next
20 column starting at the top where it says contrary to
21 defendants position.  It goes arguably -- and this
22 is the distinction that we tried to draw early on,
23 but I didn't have a case to give you the support.
24 The difference between what a document review lawyer

Page 289

1 does when he's working for a defense firm producing
2 documents and what a document review and analysis
3 consists of when it's a plaintiffs' firm reviewing
4 documents produced by a defendant in complex
5 litigation.  And this is what the judge is talking
6 about here.
7     "Arguably when a party needs to conduct
8 basic document review to respond to voluminous
9 discovery requests, a task that is typically limited
10 to 'checking the box' quote, for relevance and
11 privilege, it might make sense to engage in agency
12 offering a pool of temporary contract attorneys.
13 The same is not true, however, when a small
14 plaintiffs' firm engaged in high-stakes litigation
15 needs to review voluminous disclosures by
16 well-healed corporate defendants, a task that to
17 ensure critical evidence is not missed requires
18 attention to detail and a sophisticated
19 understanding of the facts and the law at issue in
20 the case.  Given class counsel's experience
21 prosecuting similar complex civil cases, class
22 counsel..." -- and he's talking about us I believe
23 -- "...class counsel are among the most capable and
24 experienced lawyers in the country in these kinds of

Page 290

1  cases, and the ninth circuit's admonition that the
2  Court may not attempt to impose its own judgment
3  regarding the best way to operate a law firm, the
4  Court will not second guess class counsel's staffing
5  decisions in this case."
6      And that's the point I made some time
7  ago, and then I think that we solidified when we had
8  an opportunity to meet and talk with our staff
9  attorneys --
10     **THE SPECIAL MASTER:** So the question is
11  not second guessing class counsel's staffing
12  decisions; the question is how the firm gets
13  compensated -- when there's a successful result
14  whether by settlement or by verdict, how that firm
15  gets compensated for agency attorneys.
16     **MR. HEIMANN:** Next paragraph.
17     In any event, regardless of whether a
18  task is performed by a law firm partner, a contract
19  attorney or a paralegal, the reasonableness of the
20  fees depends on the difficulty and skill level of
21  the work performed and result achieved, not upon --
22  I'm paraphrasing now -- not upon whether they're an
23  agency lawyer or non-agency lawyer. The legal
24  community now commonly uses contract attorneys.

Page 291

1  There is not the slightest justification to
2  downgrade their billing rates or not apply a
3  multiplier to them.
4      **THE SPECIAL MASTER:** Well, I may just
5  disagree with this judge, whoever it is. Who is
6  this?
7      **MR. HEIMANN:** One other thing because
8  it's --
9      **THE SPECIAL MASTER:** It might be my
10  friend Chuck Pryor.
11     **MR. SINNOTT:** Fernando Olguin.
12     **THE SPECIAL MASTER:** I don't know
13  Fernando Olguin.
14     **MR. HEIMANN:** He's actually quoting from
15  a Judge Tiger from the northern district there. Let
16  me go on with the last point 'cause I think it's
17  important to us in the plaintiffs' world.
18     With respect to difficulty, the Court
19  does not agree that document review is menial --
20  excuse me -- menial or mindless work in complex
21  civil litigation such as the incident case. It is a
22  critically important and challenging task.
23     With respect to skill while defendants
24  argue that the Court should consider class counsel's

Page 292

1  first-level reviewers as contract attorneys -- well,
2  that doesn't -- that's not important. But the last
3  point was.
4      Now let me come to this case that's the
5  next one in my thing that's from the CitiGroup
6  litigation. And this is Judge Stein's -- actually,
7  Judge Stein had two opinions that come out of
8  CitiGroup. This was the equity case, and the next
9  opinion, which I haven't given you, is the Bond
10  case, but there's an important point with respect to
11  the Bond case I'll come back to in a moment.
12     But if you go over to page 21, the
13  subheading reasonable hourly rates, and you go down
14  to the second full paragraph -- now this has to do
15  with this idea of agency lawyers.
16     **THE SPECIAL MASTER:** Hm hm.
17     **MR. HEIMANN:** Judge Stein wrote: The
18  Court's focus is on the proffered hourly rates for
19  the services of contract attorneys. Attorneys who
20  are not permanent employees of the law firm are
21  hired largely from outside staffing agencies are not
22  listed on counsel's law firm website, etcetera.
23     So he's talking about primarily the very
24  lawyers you're talking about, agency lawyers. And

Page 293

1  there is nowhere in this opinion that you will find
2  he draws any distinction between how the rates
3  should appropriately be set for those lawyers as
4  opposed to non-agency lawyers.
5      **THE SPECIAL MASTER:** So are you urging
6  me to adopt Judge Stein's positions on this case?
7      **MR. HEIMANN:** Yeah, in principle but not
8  his conclusions. And why do I say --
9      **THE SPECIAL MASTER:** But don't you think
10  -- I mean it's been a long time since I've read
11  this. I read this at the beginning of this case.
12     **MR. HEIMANN:** Yeah.
13     **THE SPECIAL MASTER:** Don't you think
14  what he was doing here is sort of homogenizing their
15  rates, and he doesn't -- I don't recall him saying
16  it, but he does at some point talk about blended
17  hourly rates and that sort of thing and decides that
18  he's going to give a much lower rate for these staff
19  attorneys/contract attorneys.
20     **MR. HEIMANN:** Than what was requested.
21     **THE SPECIAL MASTER:** Than what was
22  requested.
23     **MR. HEIMANN:** Yeah, yeah. And I'll come
24  to it in a moment. He picked a number out of his --

Page 294

1 he picked a number out of midair.  He had no basis
2 for the $200 figure that he came up with, and he
3 basically acknowledges that in his opinion, and
4 then -- and this is why I say the next opinion is
5 important.
6    In the next opinion, which is a few
7 months later, he picked a number that was like a
8 third bigger.  It was $300 or $350.
9    **THE SPECIAL MASTER:** Is that for the
10 same lawyers?
11    **MR. HEIMANN:** No.  I think -- I'd have
12 to go back and look at the case -- well, they were
13 the same lawyers in the sense they were contract
14 lawyers.  That's what he was talking about in both
15 cases, the lawyers who did the document review and
16 analysis in the case.
17    But I don't want to prolong this, judge,
18 but if you look at page 22 --
19    **THE SPECIAL MASTER:** It's okay.  I'm not
20 going to make my 4:45 plane anyways.
21    **MR. SINNOTT:** Don't count on that.
22    **MR. HEIMANN:** There are two points he
23 made --
24    **THE SPECIAL MASTER:** There are no seats

Page 295

1 on that anyway.
2    **MR. HEIMANN:** There are two points he
3 made in the opinion that are important in terms of
4 at least Lieff Cabraser in this case.  The first at
5 the top of page 22 he's talking about the difference
6 between rates between for contract attorneys and
7 associate attorneys.
8    **THE SPECIAL MASTER:** Where are you
9 reading now, Richard?
10    **MR. HEIMANN:** Top of page 22.  The
11 pagination is in the bottom right corner of the
12 pages.
13    **THE SPECIAL MASTER:** Got it.  All right.
14    **MR. HEIMANN:** What he says here is he
15 says -- first there are a couple of small points but
16 important ones.
17    In the first paragraph he says, First,
18 courts routinely reject claims that contract
19 attorney labor should be treated as a reimbursable
20 litigation expense.  We don't have that issue here I
21 don't think anymore, although one of your
22 consultants was an advocate of that and is an
23 advocate of that.  But that's been universally
24 rejected.

Page 296

1    I think there's one judge in the country
2 who actually thinks that's a good idea.
3    Then he goes on to say -- now he's
4 quoting the AOL/Time-Warner thing that I just
5 mentioned a moment ago.  The Court should no more
6 attempt to determine a correct spread between the
7 contract attorneys' cost and his or her hourly rate
8 that it should pass judgment on the differential
9 between a regular associate's hourly rate and his or
10 her salary.
11    So that's again the notion of saying,
12 well, if you're only paying him $60, it's obscene to
13 bill; em out at 400.  That's a nonsensical approach
14 to try and figure out what a reasonable hourly rate
15 for charging purposes is.
16    But now I want to get to the next point.
17    **THE SPECIAL MASTER:** Didn't Judge Stein
18 also find that contract attorneys and the work that
19 they do are not equivalent -- are not factually
20 equivalent to associates?  Something like that?
21    **MR. HEIMANN:** No, what he said was --
22 and I'll come to that.  What he actually said was in
23 the marketplace the market would not be willing to
24 pay contract attorneys' rates that are the

Page 297

1 equivalent of associates rates.
2    It's not a matter of whether or not the
3 work was equivalent.  It was simply a matter of the
4 marketplace, and that's the point of the opinion.
5 So, for example, if you go down just about halfway
6 down this page, you'll pick up with a sentence that
7 reads:  "But courts seem to agree that a contract
8 attorney's status as a contract attorney rather than
9 being a firm associate..." --
10    **THE SPECIAL MASTER:** Where are you
11 reading?  Are you still on 22?
12    **MR. HEIMANN:** I'm on page 22.  There's a
13 footnote 6 in the middle of the page.  And then
14 there's a paragraph that begins with the words "lead
15 counsel's own position."
16    **THE SPECIAL MASTER:** Yes.
17    **MR. HEIMANN:** Then if you just keep
18 following there's a footnote 7, and immediately
19 after footnote 7 the following sentence appears:
20 "But courts seem to agree that a contract attorney's
21 status as a contract attorney rather than being a
22 firm associate affects his market rate."
23    And he cites one case for that
24 proposition.  I disagree.  That's not true in my

Page 298

1 book --
2    **THE SPECIAL MASTER:** So if I were to
3 adopt Judge Stein's approach, I should not fully
4 credit the staff attorney rates at associate rates?
5    **MR. HEIMANN:** If you followed -- if you
6 followed his approach, yes, you would conclude that
7 a fair market rate for a contract attorney is not
8 the same as the rate for an equivalent associate
9 attorney. That's what -- that's the conclusion that
10 he reaches.
11    The second point that he makes -- and
12 that's at the next page, page 23, and I won't read
13 it; I'll just tell you what it is is that it's the
14 burden on the plaintiff or the plaintiff's counsel
15 to support the contract rates -- the rates that
16 they're seeking through empirical data.
17    And he says in this case he concluded
18 that the empirical data provided was not -- well,
19 let me read the sentence 'cause actually it's
20 important.
21    **THE SPECIAL MASTER:** Are you on page 23
22 now?
23    **MR. HEIMANN:** I'm at page 23 under the
24 subheading paying clients negotiate a wide range of

Page 299

1 rates for contract attorney services.
2    He says to answer that question -- I'm
3 on second sentence now -- the Court may conduct an
4 empirical inquiry based on the parties' evidence or
5 may rely on the Court's own familiarity with the
6 rates if no such evidence is submitted.
7    Well, here there was evidence submitted
8 in this case to you. So in this case the judge
9 concluded that empirical evidence that was submitted
10 was unreliable for one reason or another, and so he
11 then went on and picked $200 an hour out of thin air
12 as near as I can tell because he certainly doesn't
13 support it with any empirical data of his own or any
14 experience of his own.
15    And that is why I've given you at the
16 end of this section the explanation from Steve
17 Fineman actually. This goes -- now this addresses
18 the first question. How did Lieff Cabraser set the
19 rates for the, quote, contract attorneys who did the
20 document review and analysis in this case. And what
21 -- you probably don't remember this, it's such a
22 fine point, but what Steve told you was -- in his
23 deposition and in his answer to interrogatory that
24 prior to 2016 we had been billing our contract

Page 300

1 attorneys out at comparable rates but for associates
2 based on years of experience primarily.
3    So if we had a contract attorney with
4 ten years of experience, we billed them at the rate
5 that we billed our ten-year associates if we have
6 any ten-year associates. We probably -- we don't
7 but anyway...
8    But beginning in 2016 we concluded, just
9 as Judge Stein concluded, that the market doesn't
10 support that approach, and therefore we came up with
11 a uniform rate for our contract attorneys that our
12 investigation suggested was supported by the market
13 that's $415 which is what we billed in this case for
14 contract attorneys.
15    And so all of our contract attorneys
16 were billed in this case, with one exception which
17 was a mistake, at $415 an hour regardless of how
18 much more experience than -- I should back up. The
19 415 rate was our rate for fourth-year associates.
20    We picked that based not because it was
21 the rate for our four-year associates but, rather,
22 because that's what our investigation showed the
23 market rate for contract attorneys doing the kind of
24 work --

Page 301

1    **THE SPECIAL MASTER:** Unrelated to the
2 experience of the contract attorneys?
3    **MR. HEIMANN:** If they have less
4 experience than a fourth-year associate, they get
5 billed out at a lower rate. Almost all, if not all,
6 of our contract attorneys at the time had
7 considerably more experience than a fourth-year
8 associate and in fact --
9    **THE SPECIAL MASTER:** When I say contract
10 attorneys, are we still talking about agency
11 attorneys?
12    **MR. CHIPLOCK:** Staff attorneys.
13    **MR. HEIMANN:** Both.
14    **THE SPECIAL MASTER:** I don't want to
15 blur that distinction here. How do you decide what
16 to bill out agency attorneys at? Same way?
17    **MR. HEIMANN:** Same way. No difference.
18 They do the same work. They provide the same value.
19 They -- to us it's about the same cost. Although I
20 don't think that matters at all. And they have
21 comparable experience.
22    And so we're billing out -- and we did
23 in this case, and we do continuing today -- those
24 attorneys at $415 an hour despite the fact that they

Page 302

1 have seven, eight, nine, ten years experience,
2 graduated from Harvard, Stanford, Yale.  That's the
3 rate they get billed out at.
4   So that in my mind fully satisfies the
5 Judge Stein concern about market rates for contract
6 lawyers being systemically lower than market rate
7 for full-time associate attorneys.
8   The other thing that I think is
9 important in this case -- and this is at Tab 6 --
10 and I won't go through it in detail, but this is an
11 excerpt from Professor Rubenstein's initial report
12 in which he did do a serious investigation into the
13 market for contract attorneys of the sort that we
14 used in this case and the billing rates that we
15 associated with them in this case and concluded
16 based on his market analysis that our rates were
17 fully justified by the market.
18   So bottom line, judge --
19   THE SPECIAL MASTER: I'll read this.  I
20 think I read this sometime ago.
21   MR. HEIMANN: I'm sure you did.
22   THE SPECIAL MASTER: Yeah.
23   MR. HEIMANN: But the bottom line is we
24 were sensitive to -- I don't know if it was because

Page 303

1 of Judge Stein that we did this, but we were
2 certainly sensitive to the notion that, A, you need
3 to be able to support the rates that you're
4 providing to the Court with market data, not just
5 pulling it out of the sky, but with market data, and
6 you need to be able to meet, at least in the second
7 circuit if you're in front of Judge Stein, this
8 distinction between contract attorney rates and
9 associate rates.
10   But there is nothing in any of these
11 decisions or in any other decision that I'm aware of
12 that makes any distinction between how you set the
13 rates for a agency contract lawyer and how you set
14 the rates for a non-agency contract lawyer.
15   THE SPECIAL MASTER: Except common
16 sense.
17   MR. HEIMANN: Except -- except Judge
18 Rosen.
19   THE SPECIAL MASTER: Well, I would say
20 this to you, Richard:  I haven't done the math on
21 this.  You guys may well come out better under my
22 approach than under Judge Stein's approach.
23   MR. HEIMANN: Well, I can tell you we've
24 done the math.

Page 304

1   THE SPECIAL MASTER: Good.  Tell me.
2   MR. CHIPLOCK: It's the one before.
3   MR. HEIMANN: Is it even in here?
4   MR. CHIPLOCK: Yeah, there it is.
5 (Indicating).
6   THE SPECIAL MASTER: Where is it?
7   MR. CHIPLOCK: The last page of Tab 6.
8   THE SPECIAL MASTER: Tab 6?
9   MR. HEIMANN: Yeah, the very last page.
10 Basically less than 20 percent --
11   MR. KELLY: Seven.  Tab 7.
12   MR. CHIPLOCK: Last page of Tab 6.
13   THE SPECIAL MASTER: I got it.  Okay.
14   MR. HEIMANN: For us anyway, less than
15 20 percent of the lodestar for our, quote, contract
16 attorneys were for agency attorneys.  So 80/20
17 split.
18   THE SPECIAL MASTER: So putting it
19 another way, 80 percent of your staff
20 attorney/contract attorney were staff attorneys?
21   MR. HEIMANN: Right.
22   MR. CHIPLOCK: Correct.
23   THE SPECIAL MASTER: As I said, then I'm
24 right.  You might well come out better with my

Page 305

1 approach than Judge Stein's approach because I'm
2 assuming as a tentative conclusion going in as I
3 said to Joan, that the work that was done by your
4 staff attorneys was the same level of work that was
5 done by lower or mid-level associates; and in
6 addition to that you accepted all of the burden and
7 risk and relationship issues including employment
8 relationship issues, HR issues, the applicability of
9 a panoply of state and federal law to the employment
10 relationships for your state -- for your staff
11 attorneys, but you don't have any of those
12 responsibilities, risks or obligations on agency
13 attorneys.  And to me that is significant.
14   MR. CHIPLOCK: May I say something,
15 Richard?
16   MR. HEIMANN: Speak up.
17   THE SPECIAL MASTER: Please.
18   MR. CHIPLOCK: So --
19   THE SPECIAL MASTER: Ask your lawyer.
20   MR. CHIPLOCK: Yeah, I just asked him.
21 He gave me the okay.
22   So if you look on that page, it shows --
23 in terms of the relationship, it shows that at least
24 four of those attorneys started out on an agency

Page 306

1 basis but transitioned to a staff attorney basis.
2     THE SPECIAL MASTER: Well, then we'll
3 have to go through that and see because I do think,
4 unlike apparently any other judge -- I don't know
5 how extensively this has been written on -- I do
6 think there is a significant difference where a law
7 firm accepts all of the responsibilities that I've
8 just called out and, look, we all know -- we're
9 grown-ups here -- we all know that hiring somebody
10 as an employee subjects a firm to much greater
11 obligation, burden and risk than simply renting
12 somebody to do a spot job as an independent
13 contractor.  And that's not insignificant in our
14 world today.  Not insignificant at all.
15     So while I applaud you and Labaton for
16 having this stable of extremely well-qualified
17 people and taking on all the burdens and risks and
18 obligations both internally as to those
19 relationships and under the laws and maybe
20 malpractice risks, it just makes sense to me that
21 there has to be a distinction.
22     I don't care what other judges say.  I
23 shouldn't say I don't care. I'll read what they
24 say.  But from a common sense perspective, there's a

Page 307

1 huge difference.  Just a huge difference.
2     MR. HEIMANN: So let me close with Tab
3 7.
4     THE SPECIAL MASTER: That's my story,
5 and I think I'm sticking to it.
6     MR. HEIMANN: I knew you were going to
7 stick to it, but I had to take my shot.
8     THE SPECIAL MASTER: I appreciate it.
9     MR. HEIMANN: So I've given you Tab 7,
10 and Tab 7, by the way, was not presented, at least
11 in my mind, for purposes of answering the questions
12 which you tried to put me on the spot on earlier,
13 but rather to show you in case you were considering
14 some sort of sanction against us -- monetary
15 sanction, I wanted you to appreciate how much this
16 exercise has cost us.
17     And the bottom line is that we got a fee
18 in this case of just a little over 15 million
19 dollars, and our total expenses, both out of pocket
20 and my time, for example, have reduced that now to
21 just over 12.8 million dollars.
22     In other words, we've --
23     THE SPECIAL MASTER: So you've paid
24 about 2.2 million dollars --

Page 308

1     MR. HEIMANN: Either out of pocket or in
2 terms of our lawyers, my time and Dan's time and
3 Steve's time primarily.
4     MR. CHIPLOCK: Yeah.  That doesn't
5 include April time.
6     MR. HEIMANN: It doesn't include April
7 time.  All right.
8     THE SPECIAL MASTER: Well, I've been a
9 bargain in this case.  You're just one firm.
10     MR. HEIMANN: Right.
11     MS. LUKEY: I can tell you we are under
12 $450,000.  We are under $450,000.
13     THE SPECIAL MASTER: Well, you're a
14 bargain.
15     MS. LUKEY: So I'm not sure what they're
16 referring to but --
17     THE SPECIAL MASTER: Okay.
18     MS. LUKEY: -- I'm sure that will go up
19 this month as you've just alluded to.  If he's done,
20 I just wanted to make one quick point whenever --
21     THE SPECIAL MASTER: And I want to give
22 Brian an opportunity, too --
23     MS. LUKEY: Sure.
24     THE SPECIAL MASTER: -- with this

Page 309

1 additional exhibit that I've now seen in which
2 Garrett Bradley -- I hadn't focused on the fact that
3 Garrett Bradley was on this 2011 letter, and Lieff
4 apparently never saw it, never got it.
5     So I want to give Brian --
6     MS. LUKEY: Whatever order you want.
7     THE SPECIAL MASTER: Brian, this would
8 be an added indicia that Garrett Bradley knew the
9 nature of the relationship to the list that I called
10 out earlier.
11     MR. KELLY: Well, respectfully, I
12 disagree once again.  Here's what you've got.
13 You've got a 2011 reference to him as referring
14 counsel.
15     I think we've had a lot of back and
16 forth in the record about these labels, whether it's
17 local counsel or it's referring counsel.  And I
18 think -- and I don't have the cites off the top of
19 my head, but there's testimony that some people
20 viewed him as referring counsel, as local counsel.
21     I think the best evidence of these
22 real-time e-mails that you see Garrett Bradley on
23 going back and forth with everyone calling him local
24 counsel, and that suggests to me he assumed they

Page 310

1 were traditional local counsel.
2    But -- but -- but, okay, if there is a
3 difference between referring counsel or local
4 counsel, it doesn't I would think to a
5 Massachusetts-based lawyer matter much because here,
6 again as Joan went on for some length, the rules
7 permit a non-work referral fee, and maybe that's the
8 backdrop of not really caring what's he called.
9 He's referring counsel; he's local counsel or what,
10 but the testimony in the record at least is that
11 both Mr. Thornton, Mr. Bradley viewed him as
12 traditional local counsel, and certainly they didn't
13 make any great investigation as to what he was
14 doing, but I don't think that letter really changes
15 the calculus as to whether he investigated further,
16 nor does it change the analysis of would they have
17 thought it through because of the -- you know, the
18 nature of the Massachusetts rules have permitted.
19    **THE SPECIAL MASTER:** It does add one
20 thing to it.  Garrett was in at the inception.
21    **MR. KELLY:** Well, I don't think that
22 means he was in at the inception of the deal with
23 Chargois in terms of who did what with the --
24    **THE SPECIAL MASTER:** By the inception, I

Page 311

1 mean the inception of this case.  Not the inception
2 of the Chargois --
3    **MR. KELLY:** There's no doubt he knows
4 Chargois and knows him better than these guys.  I
5 think Richard's probably right if there's tension
6 between Labaton and Chargois in addition to his own
7 personality and being able to hammer down fees, he
8 probably used him as a neutral party to get a better
9 deal.
10    But I think one thing -- and maybe
11 Richard mentioned this, but this Chargois fee comes
12 off -- it comes out of their pockets, the three
13 consumer counsel.  It's not coming out of ERISA.
14 I've never understood how ERISA counsel can make a
15 claim for any of this.
16    They did less than 10 percent of the
17 work, and they got a 10 percent fee.  So really if
18 Chargois did not exist, that would have been more
19 money for these three consumer class firms.  That's
20 who would have whacked it up.  So it would not have
21 affected the total aggregate fee Judge Wolf was
22 approving.  It would have been more money for these
23 three firms to fight over on who gets what.  So...
24    **THE SPECIAL MASTER:** Joan.

Page 312

1    **MS. LUKEY:** First I want to make a
2 correction.  My assistant gave me 450.  He tells me
3 with last month's time it's over a million.
4    **THE SPECIAL MASTER:** Boy, that was a big
5 month.
6    **MR. GLASS:** It's the last several
7 months, Joan.
8    **MS. LUKEY:** He says it's several months.
9    **THE SPECIAL MASTER:** Well, I can say to
10 all of you who are representing the firms I hope
11 that your work and contributions in this case are
12 recognized at the end of the year.
13    **MS. LUKEY:** We'll see.  So I wanted to
14 correct my error.  We are probably more akin to
15 where they are, but that's not the point I wanted to
16 make here.
17    We're in a situation at least to the
18 extent that we're talking about either disciplines
19 or sanctions where the conduct has to be
20 intentional.  I wanted to point out a very important
21 fact that actually bears on what Brian was just
22 trying to address for Garrett as well as on my
23 people.
24    Arkansas Teacher Retirement System

Page 313

1 doesn't have one case or did not have one case going
2 or still have State Street at exactly the same time
3 starting with the work-up in 2013 -- so the time
4 period covered by these e-mails -- to the filing
5 date, first complaint in February of 2014 and the
6 second in April of 2014, Labaton represented
7 Arkansas in two cases filed in Texas against BP.
8 You were aware of them during the discovery.
9    **THE SPECIAL MASTER:** Yes.
10    **MS. LUKEY:** I alluded to them earlier
11 when I said that I thought it was probably not fair
12 to expect an individual to necessarily focus on and
13 remember the distinction in the case, but it goes
14 beyond that.  Damon Chargois is the attorney of
15 record and traditional local counsel in the case in
16 the southern district of Texas.
17    **THE SPECIAL MASTER:** This was the HC
18 case?
19    **MS. LUKEY:** No, that's another case
20 where he's local counsel.
21    **THE SPECIAL MASTER:** But that was a very
22 early case.
23    **MS. LUKEY:** Yes.  I'm talking about BP,
24 against BP in February -- I think the April case had

Page 314

1 to be related 'cause it's the same against BP.
2    In the case pending in Texas where
3 Mr. Chargois is the attorney -- local attorney and
4 has appeared and is actively representing Arkansas
5 and has been since the filing of the case in
6 February of 2014, there is no question that he falls
7 within the rubric of local counsel.
8    I mention that -- that's not this case
9 where because Mr. Hopkins is actively involved as
10 the class rep, that case although huge, is not a
11 class action.  Mr. Chargois -- Mr. Hopkins did not
12 want to have the involvement, but there is no
13 question that Mr. Chargois has served as local
14 counsel and that Arkansas is -- is actually his
15 client -- it is an active client.
16    THE SPECIAL MASTER: Why didn't Hopkins
17 say, okay, I do know that name?
18    MS. LUKEY: Because he only involves
19 himself when he is a class rep in a class action.
20 That action is huge because of the BP losses.  But
21 in that action Labaton is the sole plaintiffs'
22 attorney but not a class representing the retirement
23 systems of in addition to the Arkansas Teacher
24 system, Hawaii and Illinois, representing all three.

Page 315

1 It's not a class.  But they are suing BP.  It's
2 ongoing.  And Mr. Chargois is local counsel as he
3 had been in earlier cases actively acting in that
4 role.
5    So when you have a circumstance where
6 somebody refers to him as the local or local
7 counsel, it is the truth, although I might have my
8 thoughts and recommendations as to whether it
9 continues to be the case, that Damon Chargois is
10 Arkansas' local counsel.
11    THE SPECIAL MASTER: Was Garrett Bradley
12 aware of these cases?
13    MS. LUKEY: I have no idea, your Honor.
14    THE SPECIAL MASTER: When he refers to
15 them as the local -- as to him as the local or local
16 counsel?
17    MS. LUKEY: I don't know, but I wouldn't
18 be surprised if there's an awareness because Damon
19 Chargois has been affirmatively acting in that role
20 during the exactly the same time period.  The
21 exception to the rule is what happened when
22 Mr. Hopkins came in and was going to be the class
23 rep if they were successful in their efforts.  He
24 does not want to know about or be involved with

Page 316

1 local counsel.
2    Somebody down there, obviously, has some
3 dealings -- somebody at Arkansas -- with Damon
4 Chargois.  I can't tell you who.  But he is their
5 lawyer.  He does cover court hearings in those
6 instances when the New York lawyers don't go down
7 from Labaton.  I mention this --
8    THE SPECIAL MASTER: How does that cut
9 though, Joan?
10    I mean if that's the case, wouldn't it
11 be likely then that Arkansas would think that in the
12 retention agreement the person would be somebody
13 like Damon Chargois in the BP case and doing the
14 work --
15    MS. LUKEY: No, 'cause there's two
16 different categories.
17    In the retention agreement that was
18 Mr. Hopkins who was executing it, and they
19 specifically referred to permission being granted
20 for local or liaison counsel, for the payment of
21 referral fees which would not be for local or
22 liaison counsel.  That's not a referral fee.  And
23 for payment for other services.
24    The distinction -- what set us apart,

Page 317

1 the State Street case, is because it was a class
2 action, and Mr. Hopkins was going to be as we know
3 extremely actively involved as class rep, there was
4 a difference structure.  He didn't want to deal with
5 a local counsel or even be aware of it.
6    Again, I mention this because these
7 proceedings deal at least in significant part --
8 although I hope we are moving into the area now of
9 talking about best practices rather than suggesting
10 that these law firms have committed ethical
11 violations or sanctionable conduct -- intent is key;
12 the conduct had to be intentionally wrongful in
13 violation of the rules, and to the extent there was
14 a looseness of language -- well, I shouldn't even
15 call it a looseness of language but perhaps a
16 concept of Damon Chargois as Labaton Sucharow's
17 local attorney in Arkansas and Texas, that is
18 correct.  He is their local attorney.  As far as I
19 know, their only local attorney.
20    And during exactly the same time period
21 and while all of these e-mails are going on, there
22 are three Arkansas cases handled by Labaton -- two
23 related because of BP -- and the other State Street.
24    So is it surprising or can it be seen to

Page 318

1 be some kind of intentional misrepresentation for
2 someone like Larry Sucharow to use a phrase like
3 "our local Arkansas counsel"?  It shouldn't be a
4 surprise.  That's the role that Chargois has
5 typically played.  In this case he did not because
6 it was a class action.
7     **THE SPECIAL MASTER:** Or in the other
8 eight cases apparently.
9     **MS. LUKEY:** I wouldn't jump to that
10 conclusion, your Honor.  I'm not sure -- I don't
11 know what the -- I don't remember evidence coming in
12 on that.
13     **THE SPECIAL MASTER:** With the exception
14 of the HC case and now the BP case, have you given
15 us any evidence that he did any work on any of these
16 other cases?
17     **MS. LUKEY:** I'm not trying to make a
18 representation.  I just don't know the answer to
19 your question --
20     **THE SPECIAL MASTER:** Okay.  All right.
21     **MS. LUKEY:** -- but he is -- now it is
22 again -- it is local counsel in the traditional
23 sense.  He is the local counsel for Arkansas Texas
24 cases.

Page 319

1     What I can't recall is whether the
2 balance of the other six I guess it is cases,
3 whether they were in Arkansas or Texas which are the
4 two states in which he's a member of the bar.  So
5 it's not a misnomer.  It's not a made-up phrase.  It
6 simply is a shorthand by which he had come to be
7 known.  We do not dispute he was not doing work in
8 this case.  George Hopkins did not want a local
9 attorney to be doing work in this case.  And that's
10 permissible under Massachusetts law.
11     But I do -- because you have to be
12 thinking about whether somebody engaged in
13 intentional misleading, for example, intentionally
14 misleading Lieff, when they refer to the attorney
15 who is indeed their local -- the traditional sense
16 local counsel in Arkansas and Texas.  With that
17 phraseology, I respectfully suggest that it would be
18 unfair and inappropriate to assume that they did so
19 with an intent to deceive.  There's no evidence that
20 they were intentionally deceiving anyone and I --
21     **THE SPECIAL MASTER:** But they certainly
22 didn't tell Dan Chiplock or Bob Lieff that he was
23 getting this money for doing some work or that he
24 was getting this money for not doing any work.

Page 320

1     **MS. LUKEY:** I don't think there was a
2 discussion about it either way as I understand it.
3 And I, again, suggest to the Court there's no
4 requirement that there be such a discussion.
5     I understand that Lieff as a firm is not
6 requesting that action be taken.  It's not a subject
7 we researched.  I do know the ERISA counsel have no
8 claim to it 'cause theirs is a completely separate
9 pool of funds which was tied to trading allocation.
10 They don't get to bump it up.  When they've agreed
11 to trading allocation, they don't get to change it
12 because they think that something may have been done
13 that put more of a burden on Lieff let's say than
14 should have been placed.  That's not for the ERISA
15 counsel to claim back.
16     That should have been a private dispute
17 among the three firms, if there was to be a dispute
18 at all, and in this field where these three firms
19 have worked together as well as against each other
20 for many years, there's a benefit to maintaining a
21 relationship which I assume is the reason that the
22 firm through its general counsel took a position
23 different from that than Mr. Lieff just asserted.
24 That's all I wish to point out.

Page 321

1     **THE SPECIAL MASTER:** Anybody on the
2 phone?  Laura?  Are you still on the phone?
3     **MR. SARKO:** No, Laura is off.  It's Lynn
4 Sarko.  I'm still on.
5     **THE SPECIAL MASTER:** Okay, Lynn, do you
6 want to address anything that you've heard or tell
7 me anything?
8     **MR. SARKO:** I think the only thing I
9 want to address -- and we put it in our
10 interrogatory answers -- but to clear up the issue
11 of our local counsel which I think is clear that he
12 is -- he is counsel of record in the Andover case.
13 He filed documents with the Court.  The Court was
14 aware of him.  In my fee declaration I identified
15 him as local counsel.
16     All of the three customer class firms
17 were aware of him and aware that he was our local
18 counsel, and they consented to us paying him.
19 Defense counsel was aware of him.  The DOL was aware
20 of him.  So I really think it's a different issue.
21 But if anyone has questions, I'm happy to clear
22 those up.
23     **THE SPECIAL MASTER:** No, I don't think
24 so.  Bill, do you have any questions?

Page 322

1   **MR. SINNOTT:** No.  Thank you, Lynn.
2   **THE SPECIAL MASTER:** All right.
3   Anything anyone?
4   **MR. LIEFF:** Thank you.
5   **THE SPECIAL MASTER:** It's only 4:35.
6   **MS. McEVOY:** Four hours, right?
7   **MR. SINNOTT:** Can I just make a comment?
8   **THE SPECIAL MASTER:** Yeah, right.
9   **MR. SINNOTT:** Judge, just a comment.
10  You know we're coming to the close of the
11  investigative case which has taken up the better
12  part of a year.
13   I think all of your clients should be
14  extremely satisfied and gratified at the lawyering
15  that's gone on in this case.  I mean I think it's
16  been phenomenally fine advocacy --
17   **THE SPECIAL MASTER:** Yes.
18   **MR. SINNOTT:** -- consistently by each of
19  you, and it's been -- I'm not going to say it's been
20  fun, but it's certainly been very pleasing as a
21  member of the bar to watch the level of lawyering in
22  the room.  So thank you all for that.
23   **THE SPECIAL MASTER:** Yeah, I would
24  second that.  Very excellent lawyering.  We're all

Page 323

1   been in sort of the vortex of a storm not of our
2   creation, and we have to all operate within it.  And
3   the lawyering has been -- the lawyering has been
4   very, very, very good.  Okay.
5   **MR. SINNOTT:** Have a good weekend.
6   **MS. LUKEY:** Thank you all.
7   **MR. SHARP:** Thank you.
8   (Whereupon the proceedings
9   adjourned at 4:35 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 324

1            C E R T I F I C A T E
2
3    I, Paulette M. Cook, Registered Merit Reporter,
4   do hereby certify that the foregoing transcript,
5   Volume 1, is a true and accurate transcription of my
6   stenographic notes taken to the best of my ability
7   on Friday, April 13, 2018.
8
9
10
11
12
13        Paulette M. Cook
14        Registered Merit Reporter
15
16
17
18        - - - - -
19
20
21
22
23
24

## $

**$10,000 (3)**
89:4;101:11;268:18
**$200 (2)**
294:2;299:11
**$25,000 (1)**
52:15
**$3,154,000 (1)**
259:23
**$300 (1)**
294:8
**$350 (1)**
294:8
**$400 (1)**
287:20
**$415 (3)**
300:13,17;301:24
**$421.60 (1)**
288:16
**$450,000 (2)**
308:12,12
**$500 (1)**
188:22
**$60 (1)**
296:12
**$800,000 (1)**
254:19
**$90,000 (3)**
78:21;150:4,8

## [

**[sic] (1)**
110:13

## A

**AB (1)**
104:24
**ABA (2)**
86:22;286:4
**ABCD (1)**
266:15
**aberrational (1)**
20:7
**abhorrent (1)**
86:24
**abide (1)**
17:11
**ability (6)**
9:3,6;188:19;229:18;
247:14;287:11
**able (17)**
22:14;45:5;59:19;65:2;
94:7;95:1,3,6;105:1;108:2,
9;191:17;261:17;275:22;
303:3,6;311:7
**above (1)**
16:23
**abrasive (1)**
210:8

**absence (1)**
274:23
**absent (1)**
202:20
**Absolutely (9)**
9:13;28:3,20;71:23;77:16;
129:20;145:18;153:8;231:8
**academic (1)**
41:21
**accede (1)**
268:12
**accept (11)**
89:19;135:15;137:18,18;
138:22;139:2;144:12;
148:18;191:20;246:9;
248:23
**accepted (2)**
104:3;305:6
**accepting (1)**
191:15
**accepts (1)**
306:7
**access (2)**
191:18,18
**accident (2)**
131:22;145:13
**According (2)**
85:9,19
**account (2)**
79:17;119:21
**accuracy (4)**
33:4,13;190:21;232:2
**accurate (4)**
171:9;174:7;175:13;
180:17;209:20;220:12
**accurately (3)**
176:2;181:14,15
**accuse (2)**
98:15;147:2
**achieve (1)**
16:12
**achieved (4)**
16:19;53:14;172:10;
290:21
**acknowledged (1)**
76:4
**acknowledges (1)**
294:3
**acknowledging (1)**
244:21
**acquired (1)**
209:7
**across (2)**
55:7;106:4
**act (4)**
97:24;117:11;177:2;230:9
**acted (1)**
104:17
**acting (3)**
145:8;315:3,19
**action (23)**
15:14;44:21,24;47:15,15;
50:19;60:22;63:4;70:8;

79:11;80:8;115:10,13;
180:7;237:24;272:12;
314:11,19,20,21;317:2;
318:6;320:6
**actions (8)**
54:23;55:7;60:2,3;63:3;
68:17;229:20;262:2
**active (6)**
18:23;264:2;274:13;
276:12,12;314:15
**actively (5)**
84:22;314:4,9;315:3;
317:3
**activities (2)**
132:11,20
**activity (1)**
126:12
**actual (4)**
27:14;79:3;91:3;163:22;
252:2;263:7;264:1
**actually (64)**
8:20;14:13,20;18:14;24:9;
27:9;34:13;39:2,21;42:21;
43:11;49:8;51:11;52:17,17;
55:15,24;56:8;75:16,24;
79:16,18;82:21;84:22;
90:24;91:6;93:5;102:11;
107:23;109:6,19;114:11;
116:1;134:20;168:23;181:6,
12,13;233:6,7;237:13;
238:22;240:21;245:17;
246:20;254:12,24;256:7;
258:9,16;260:10;264:3;
265:12;269:23;287:8,17;
291:14;292:6;296:2,22;
298:19;299:17;312:21;
314:14
**adamant (1)**
145:21
**add (4)**
37:11;65:1;175:23;310:19
**added (1)**
309:8
**adding (4)**
41:20;160:17;190:13;
251:8
**addition (5)**
185:12;186:3;305:6;
311:6;314:23
**additional (1)**
309:1
**address (28)**
7:14;11:16,21,23;12:3;
21:8,13;22:15;122:12;
157:10;209:10;218:23;
219:14;221:6,7,11,17;
225:13,23;226:6;271:7;
272:21;277:20;280:2,13;
312:22;321:6,9
**addressed (9)**
13:24;19:17,20,24;
199:10;226:10;277:21,22;
280:3

**addressees (1)**
245:9
**addresses (1)**
299:17
**addressing (3)**
90:20;241:18;280:9
**adequacy (1)**
50:13
**adequate (4)**
49:23;50:3;54:4;94:11
**adjourned (1)**
323:9
**admit (3)**
26:12;96:8;219:2
**admits (2)**
183:5;186:12
**admitted (2)**
68:15;186:23
**admittedly (1)**
28:6;161:22
**admonition (1)**
290:1
**adopt (4)**
20:23;61:8;293:6;298:3
**adopted (4)**
21:3,11;25:23;157:13
**adverse (1)**
127:13
**advertising (3)**
131:1;136:17;140:3
**advocacy (3)**
185:7;197:9;322:16
**advocate (4)**
273:13,14;295:22,23
**affairs (1)**
253:22
**affect (4)**
72:14;122:24;194:20;
213:18
**affected (2)**
106:24;311:21
**affects (1)**
297:22
**affidavit (7)**
169:16,17;175:12;176:20;
177:4;184:19;201:1
**affiliated (1)**
42:24
**affirmatively (1)**
315:19
**afraid (4)**
204:14;210:7;9;269:19
**after-the-fact (1)**
249:20
**afterward (1)**
240:7
**afterwards (1)**
187:8
**Again (62)**
8:18;11:3;14:20;20:14;
25:11;26:24;28:13;37:20;
43:22;44:14,16;55:19;60:9;
61:12;81:4;93:3;102:1;

108:13;141:12;152:18;
155:6;157:11,12;158:11;
162:13,15,17;168:13;175:7;
176:18;177:7;195:3;213:17;
217:11;221:21;227:21;
228:6;231:21;233:1;240:22;
241:10,17,17,20;242:13,19;
244:12;251:19;252:18;
254:6;256:13,20;268:11;
279:1;281:21;287:6;296:11;
309:12;310:6;317:6;318:22;
320:3

**against (11)**
6:9;69:21,22;71:9;72:3,5;
307:14;313:7,24;314:1;
320:19

**agencies (4)**
11:18,19;284:4;292:21

**agency (30)**
10:24;11:17;25:2;219:18,
19;280:8,16;281:6,7,20,24;
282:17;283:8,19,24;284:6,
11;286:10,15;289:11;
290:15,23;292:15,24;
301:10,16;303:13;304:16;
305:12,24

**aggregate (23)**
33:22;34:1;55:13;56:14;
57:10,14,17;58:24;72:10;
73:19;74:6,16;90:17;
101:17;109:22;149:19;
152:24;202:14,18;203:23;
205:14;213:19;311:21

**aggressive (1)**
163:5

**ago (11)**
6:24;25:23;132:7;223:13;
243:7;244:7,22;266:5;
290:7;296:5;302:20

**agree (33)**
10:19,20;13:11,17;15:1,
16;20:6;21:2;90:1;114:17;
127:4,6,7,14;150:22;188:3;
202:15,17;214:4;216:17;
227:11;243:13;247:4,5,7;
251:16;267:15;269:3;279:3;
281:17;291:19;297:7,20

**agreed (14)**
30:12;37:16;141:3,3;
156:2,3;181:10;196:16;
202:9;231:23;244:21;253:3;
258:2;320:10

**agreeing (2)**
94:1;254:2

**agreement (83)**
7:10;11:14;12:6;14:3,12,
14;16:20;17:11;19:18,21;
20:4;22:5,10,11,16,18,19;
23:3;25:15;29:7;48:3,15;
49:6;57:24;62:1;70:15;
76:18;83:20;90:23;91:15;
94:21;103:24;112:9,12;
154:18,22,24;155:1,2;157:8,

18;158:18;159:2,3,20,21;
163:18,19,20,21,22;164:1,2,
9;166:9,13,15,23;167:2;
175:5;215:4,7,8;218:1;
228:3,6;233:20;242:7,24;
243:1,2,3,8,11,14;244:9;
245:24;248:6;251:3;256:14;
258:2;316:12,17

**agreements (1)**
82:3

**agrees (3)**
15:11;21:9;22:17;89:8

**Ah (2)**
284:20;285:17

**ahead (7)**
130:10;149:14;216:8;
226:21;243:16;253:10;
260:23

**ah-hah (1)**
173:8

**aimed (1)**
16:13

**air (2)**
60:16;299:11

**aired (1)**
88:11

**airplane (1)**
131:22

**airport (1)**
201:11

**akin (1)**
95:12;312:14

**albeit (3)**
154:18;172:23;200:2

**allegations (1)**
6:8

**allies (1)**
277:16

**allocate (4)**
24:3;53:3;232:17;248:9

**allocated (1)**
259:13

**allocating (1)**
15:1

**allocation (30)**
15:2,20;29:22;34:15;56:5,
9;57:21;58:22;60:24;61:17;
69:7;73:23;75:21;84:21;
111:16;118:15,15,16;121:5;
133:11;233:4;240:23;251:4;
252:3;257:12;258:7;260:9;
261:6;320:9,11

**allocations (7)**
30:20;75:18;82:4;109:16;
258:5;261:14,17

**allow (7)**
18:18;23:12,17;25:18;
68:9;78:11;113:15

**allowed (3)**
153:1;159:20;198:8

**alluded (3)**
153:18;308:19;313:10

**allusion (1)**

186:20

**almost (5)**
50:24;149:11;211:23;
247:6;301:5

**alone (5)**
52:19,19;76:7;113:14;
241:8

**along (4)**
74:10;91:18;149:21;
208:18

**Alpert (3)**
10:13;160:13;192:8

**Alpert's (2)**
196:10,12

**alternative (1)**
25:13

**although (12)**
13:2;20:6;41:24;150:12;
221:12;233:6;257:2;295:21;
301:19;314:10;315:7;317:8

**altogether (1)**
125:13

**always (11)**
19:7;89:19;95:18;147:20;
170:4,5;180:9;203:2;206:4;
247:7;278:5

**ambiguous (1)**
60:16

**American (1)**
158:21

**among (27)**
8:9;16:3,10;18:12;22:7;
45:3;52:23;54:1;57:19;84:2;
95:17;98:18;190:17;222:2;
225:12;232:16,17;238:17;
240:24;248:7;252:3;257:12;
259:14;261:6;273:17;
289:23;320:17

**amongst (9)**
157:8;164:3,9;166:9;
167:3;198:6;206:22;207:9;
248:9

**amount (21)**
16:23;29:2;55:13;57:10;
58:24;72:5;74:6;86:12;
87:19;89:8;92:1;94:1;
108:20;117:22;118:24,24;
156:22;159:8,15;227:11;
259:8

**analogies (1)**
219:1

**analogy (2)**
193:24;240:8

**analysis (13)**
26:12;63:14;72:20;91:10;
142:23;150:13;177:15;
212:22;289:2;294:16;
299:20;302:16;310:16

**analyze (3)**
188:19;198:20;200:4

**analyzed (1)**
183:17

**and/or (2)**

130:14,18

**Andover (2)**
115:23;321:12

**animal (2)**
147:21;148:3

**answered (1)**
256:15

**answer's (1)**
238:13

**anti-touting (1)**
144:1

**antitrust (1)**
229:15

**ants (1)**
213:21

**anymore (6)**
10:18;11:9;112:6;176:23;
196:1;295:21

**anyways (1)**
294:20

**AOL/Time-Warner (4)**
284:24;285:10,12;296:4

**apart (2)**
108:16;316:24

**apologize (3)**
55:16;106:18;116:18

**apparent (3)**
114:18,20;175:8

**apparently (14)**
33:6;66:1;72:17;75:16;
108:18;110:8;115:15;179:3;
206:8;212:22;243:12;306:4;
309:4;318:8

**appeal (1)**
102:17

**appeals (1)**
151:3

**appear (5)**
20:3;82:7,10;216:16;
271:5

**appearance (4)**
82:12;114:12,22;212:7

**appeared (14)**
59:5;61:24;65:19;86:10;
87:20;113:21;114:22;115:3;
118:1,13;153:5,6;216:9;
314:4

**appearing (2)**
44:1;97:4

**appears (8)**
15:22;29:4;104:23;
121:17;165:22;198:11;
225:10;297:19

**appellations (1)**
46:23

**appendix (1)**
224:16

**applaud (1)**
306:15

**applicability (1)**
305:8

**applicable (7)**
39:9;41:16;56:20;125:24;

132:8;134:21;140:15

**application (4)**
41:10;116:6;232:19;241:6

**applied (4)**
106:4;135:7;258:19;
259:15

**applies (9)**
106:6;117:8;120:23;
124:5;125:16;127:4,6,7;
131:17

**apply (13)**
35:8;123:14;125:5;
126:18;127:18;131:20;
136:17;139:19;144:17;
146:20;153:21;229:19;
291:2

**appointed (1)**
229:19

**appreciate (3)**
174:9;307:8,15

**apprised (1)**
259:22

**approach (9)**
45:18;296:13;298:3,6;
300:10;303:22,22;305:1,1

**appropriate (8)**
10:22;16:11;18:20;107:6;
155:20;169:24;278:16;
285:21

**appropriately (5)**
45:13;55:4;152:6,21;
293:3

**approval (1)**
59:4;60:18;61:22

**approved (3)**
57:2;174:5;205:12

**approving (2)**
70:7;311:22

**approximately (2)**
227:12;255:4

**April (7)**
226:9;232:9;255:21;
308:5,6;313:6,24

**apt (1)**
148:10

**arbitrary (1)**
120:3

**Arbor (1)**
286:18

**archives (1)**
222:2

**area (8)**
12:18,23;27:2;79:17,18;
80:6;192:6;317:8

**arena (2)**
228:14;234:9

**arguably (3)**
35:8;288:21;289:7

**argue (4)**
124:7;135:12;176:16;
291:24

**argument (6)**
116:9;135:20;144:3;

158:17;201:13;204:22

**arguments (4)**
6:4;7:9;34:11;82:23

**arising (1)**
205:2

**Arkansas (62)**
18:23;42:3,15,18;45:5;
50:10;55:18;57:2;73:7;
92:14;93:6,9,9;94:7,10;
97:10;98:1;99:12;108:12;
128:13,20;132:13;142:3;
227:8;231:16,18;232:7;
233:4,21,22;238:18;241:4,9,
11,11,19;242:8,9,12,13;
243:9;255:12;256:2,16,17;
266:7,8;269:15;312:24;
313:7;314:4,14,23;316:3,11;
317:17,22;318:3,23;319:3,
16

**Arkansas' (1)**
315:10

**around (9)**
25:10;43:12;156:12;
170:4;178:11;180:1;194:2;
231:3;244:20

**arrangement (20)**
9:1;36:5;44:5;46:10,24;
67:14;70:13,17,18;130:16;
204:24;205:3;219:22;230:8;
237:22,23;238:2;239:6;
252:23;274:1

**arrangements (2)**
20:13;82:4

**arrived (1)**
130:1

**art (2)**
96:5;97:1

**article (1)**
178:14,16

**artificial (2)**
17:3,16

**aspect (3)**
23:15;255:18;265:10

**aspects (1)**
282:20

**asserted (1)**
320:23

**assess (3)**
34:7;79:15;261:12

**assist (1)**
77:21

**assistance (1)**
264:5

**assistant (1)**
312:2

**assisted (1)**
263:7

**assists (2)**
227:7;232:6

**associate (12)**
9:23,24;10:16;295:7;
297:9,22;298:4,8;301:4,8;
302:7;303:9

**associated (1)**
302:15

**associate-level (2)**
9:20;192:22

**associates (13)**
15:3;23:18,20;280:5;
282:13;296:20;297:1;300:1,
5,6,19,21;305:5

**associate's (3)**
9:8;286:3;296:9

**assume (22)**
35:18;56:6;77:4;158:15;
159:23;173:21;174:6;
191:23;194:14;195:6,7,9,10,
10;204:7,8;221:8,9;223:20;
268:21;319:18;320:21

**assumed (9)**
130:20;158:8,9;159:18,
19;263:21;264:3;283:22;
309:24

**assumes (3)**
159:22,22;211:7

**assuming (1)**
305:2

**assumption (7)**
24:11;28:21;38:5;39:1;
141:8;158:18;264:6

**assumptions (1)**
22:12

**assure (1)**
176:22

**ATRS (1)**
130:15

**attach (1)**
171:7

**attached (3)**
48:4;96:24;171:6

**attaching (1)**
96:3

**attempt (12)**
28:11;90:22,22;144:11;
161:8;179:8,11;183:20;
285:6,24;290:2;296:6

**attempting (1)**
35:19

**attempts (1)**
162:5

**attended (1)**
208:17

**attention (12)**
38:17;43:9;54:11;105:19;
109:10;152:5;157:9;179:11;
184:2;185:15;190:5;289:18

**attorney (47)**
10:8;11:12;27:11;29:6,6;
89:18;91:5,21;96:8;106:11;
113:15;129:14,15;192:10;
194:7;203:5;219:16;246:6,
13;256:10;264:15;265:13;
266:2;283:3,9,12;290:19;
295:19;297:8,21;298:4,7,9;
299:1;300:3;303:8;304:20;
306:1;313:14;314:3,3,22;

**associated (1)**
302:15

**attorney/client (2)**
73:2;110:20

**attorney/contract (1)**
304:20

**attorneys (124)**
8:17,20;9:3,15,19;10:9,
24;11:6,8,17,20;12:1;14:3;
15:3,7;20:8;22:3;23:13,24;
25:2;41:9;43:10,11,20;
49:10;51:10;53:16;56:17;
58:15,16;84:17,18;106:15,
16;110:5;118:23;129:18;
143:18;152:16;153:6;
155:10,21;157:3;158:11;
159:5;167:22,23;170:16;
176:12;178:1,1;180:3;
190:17;192:1,2,4,7;193:5,
16;194:6,10;197:18;201:7;
202:9;203:17;205:19;
213:20;218:2,5;246:5;
280:7,7,10,11,16,16;281:5,
20,20,24,24;282:9,10,12,14;
283:16;286:9,10,11;287:10,
19;289:12;290:9,15,24;
292:1,19,19;293:19;295:6,7;
296:18;299:19;300:1,11,14,
15,23;301:2,6,10,11,12,16,
24;302:7,13;304:16,16,20;
305:4,11,13,24

**attorneys' (8)**
8:4;55:4;57:9;259:8,13;
286:1;296:7,24

**attorney's (5)**
55:11;161:20;194:10;
297:8,20

**attorneys/contract (1)**
293:19

**attribute (1)**
248:20

**attributed (1)**
10:21

**August (14)**
111:20;156:4;163:18,23;
164:10;166:22;215:1,9;
240:15;241:16,24;242:1;
243:17;244:15

**AUSA (1)**
153:23

**authoritative (1)**
203:21

**authority (3)**
73:24;81:2;281:8

**automatically (1)**
135:3

**available (2)**
57:1;215:21

**availed (1)**
186:10

**average (1)**
50:23

**avoiding (1)**
105:24

**award (7)**
16:1;194:5;258:9,16,24;
259:9;260:7
**awarded (5)**
252:1;257:5;258:16;
259:7,13
**awards (1)**
112:17
**Award-winning (1)**
194:1
**aware (19)**
6:12;50:8;56:7;65:24;
70:6,19;108:20;262:13;
278:7;281:7;303:11;313:8;
315:12;317:5;321:14,17,17,
19,19
**awareness (4)**
57:20;219:21;222:9;
315:18
**away (3)**
119:19;120:4;204:4
**awful (1)**
24:2

**B**

**back (72)**
9:5;16:9;28:10;29:10,17;
35:4,7;37:24;38:13;41:6;
48:12;56:11,22;68:8;95:15;
96:1;102:9;121:16,17,19;
122:9,13,17;126:21,23;
127:22;135:2;137:8;151:21;
158:16;161:15;162:14;
172:7;174:22;177:9;180:14;
181:22;194:2;195:5;201:23;
202:24;210:6;211:8;215:1;
216:15,21,23;221:21;
222:16;225:15;228:10;
230:9;241:7;243:2;247:6;
249:13;253:14;255:20;
257:1;260:21;266:4;267:13;
276:18;278:24;279:3;
284:15;292:11;294:12;
300:18;309:15,23;320:15
**backdrop (1)**
310:8
**background (5)**
10:14;16:17;149:3;
191:10;192:3
**bad (3)**
43:16;83:22;172:19
**balance (2)**
48:19;319:2
**ball (1)**
234:3
**bandied (1)**
171:8
**Bank (1)**
255:24
**bar (28)**
15:14;21:5;27:11,14;
28:10;40:21;41:19;44:17,

24;45:4,12;47:16;61:5;63:4;
69:1;79:11,13;80:8;96:9;
132:5;136:23;137:23;
144:24;145:10;213:22;
266:6;319:4;322:21
**bare (14)**
28:3,15;63:15;65:8;77:7;
88:7;101:10,12;133:12;
144:12,13;146:6;149:21;
150:1
**bargain (2)**
308:9,14
**bargained (1)**
254:11
**Barsamian (1)**
114:6
**base (1)**
161:24
**Baseball (3)**
151:7;193:24;219:1
**based (17)**
15:6;56:23;104:9;116:16;
180:9;189:9;249:22;250:14;
258:19;259:14;264:6;268:1;
278:13;299:4;300:2,20;
302:16
**bases (1)**
221:14
**basic (2)**
150:21;289:8
**basically (8)**
7:13;134:24;170:20;
241:12;242:19;261:23;
294:3;304:10
**basis (20)**
8:18;51:10;52:21;81:1;
104:12;129:6;132:6;143:20;
150:16;199:5;220:22,22;
226:24;239:9;267:16,17;
282:17;294:1;306:1,1
**Bates (2)**
224:3,10
**Battery (1)**
5:7
**battled (1)**
156:7
**bear (3)**
13:4;169:11;202:10
**bears (3)**
224:3;279:22;312:21
**beat (1)**
197:5
**became (9)**
8:7;27:3;84:17,17,19;
88:23;94:9;203:18,18
**become (5)**
40:13;41:16;78:16;
141:10;146:11
**becomes (4)**
190:19,20,23;283:8
**begin (5)**
26:18;140:1;198:24;
219:11;280:20

**beginning (9)**
17:12;20:21;31:22;33:17;
46:19;135:13;238:6;293:11;
300:8
**begins (5)**
243:19;245:2,19;250:24;
297:14
**behalf (4)**
15:13;265:15;276:1,7
**behavior (1)**
177:16
**behind (2)**
77:21,23
**belatedly (1)**
137:23
**Belfi (7)**
42:21;141:20;158:7;
208:15,19,23;211:24;
226:10;228:4;245:5;247:13;
250:12
**Belfi's (1)**
228:7
**belief (1)**
22:7
**believes (1)**
251:3
**believing (1)**
52:21
**below (3)**
242:11;243:10;244:19
**bench (3)**
69:11;172:11;203:3
**beneficial (1)**
9:2
**beneficiaries (1)**
43:19
**benefit (11)**
32:6,17;33:23;43:19;47:9;
52:2;58:11;61:12;63:12,13;
320:20
**benefiting (1)**
91:10
**benefits (2)**
282:8,21
**BERNSTEIN (3)**
5:3;55:19;270:7
**besides (1)**
167:23
**besieged (1)**
129:17
**best (44)**
12:16;14:24;15:5,5,12,15,
17;17:10;20:16,22;21:10;
23:8;25:20;31:24;32:5,7;
36:3;44:13,16;46:7;47:3,10,
16,22;48:1,18,20;53:11;
71:16;81:5;162:9,10;165:1;
181:10;187:16;192:24,24;
212:14;213:13;262:5;
278:22;290:3;309:21;317:9
**bet (1)**
49:14
**betcha (1)**

71:6
**better (30)**
17:1,15;18:10;19:1,8;
28:18;31:21;32:8;46:15;
47:10,21;77:22;78:5,8;
152:9;162:1;165:2;171:17;
174:20;181:8,10;187:19;
194:11;195:19;213:14;
303:21;304:24;311:4,8;
322:11
**betting (1)**
198:3
**beyond (3)**
209:17;255:17;313:14
**big (17)**
39:23;40:4;41:13;167:9,
12;181:15,21;189:10;199:3,
6,7;204:1;213:19;218:5,12;
237:6;312:4
**bigger (3)**
156:8;163:9;294:8
**Bill (16)**
6:23;29:12,13;30:24;
34:20;113:4;120:6;126:23;
128:23;133:10;218:11;
255:16;263:23;296:13;
301:16;321:24
**billed (13)**
9:18;10:2;11:19;192:10;
195:9,15;280:4;300:4,5,13,
16;301:5;302:3
**billing (11)**
173:6;180:4,6,8,9;280:6;
285:22;291:2;299:24;
301:22;302:14
**bills (1)**
280:23
**binder (3)**
219:9;221:1;284:16
**binding (1)**
48:22
**bingo (1)**
14:23
**bit (13)**
29:10;95:12;106:15;
108:8;109:2;165:12,19,19;
182:17;230:3;258:6;275:18,
21
**bitched (1)**
163:14
**blah (3)**
288:15,15,16
**blaming (1)**
37:8
**blank (1)**
259:1
**blatant (1)**
184:20
**blended (3)**
287:19;288:16;293:16
**bless (1)**
133:4
**blessing (1)**

52:18

**blind (2)**
129:10,19

**blissfully (1)**
270:14

**blunt (1)**
38:3

**blur (1)**
301:15

**BNY (11)**
16:16;45:3;165:21;167:8;
192:5;257:17;264:7,11,14;
265:5;267:3

**board (7)**
55:7;79:13;106:5;136:22,
23;143:14;144:23

**board's (1)**
143:14

**boat (1)**
72:12

**Bob (44)**
99:1;208:5;209:13;
226:10;227:2,4,16;228:1,13;
231:13,20;233:9,16,21;
234:2,8,13;239:13,21;
240:19;241:12,22;243:2,10,
23;244:18,19;245:5;246:15;
247:11,19,24;248:5;251:1,
11;252:22;254:10,20;256:8,
13;257:1;260:19;269:23;
319:22

**bodies (1)**
149:2

**body (4)**
28:8;90:14;227:14;273:11

**boilerplate (16)**
161:18;165:10,12;172:22;
175:12,16;176:20;177:3;
183:6,8;184:13,24;185:18;
217:4,12,23

**Bond (2)**
292:9,11

**book (1)**
298:1

**books (3)**
192:20;193:7;240:10

**bootstrapping (1)**
201:6

**Boston (3)**
167:19;191:4;198:14

**both (23)**
9:2,15;27:10;28:9;49:21;
84:12;136:4;143:1;158:8;
219:9;228:7,13;232:9;
246:15,15;252:15,19;263:3;
294:14;301:13;306:18;
307:19;310:11

**bothered (2)**
77:6;86:21

**bottom (5)**
285:3;295:11;302:18,23;
307:17

**bounce (1)**

231:3

**bounced (1)**
143:24

**box' (1)**
289:10

**boy (2)**
89:24;312:4

**BP (9)**
313:7,23,24;314:1,20;
315:1;316:13;317:23;
318:14

**Bradley (76)**
16:2;10;91:12;92:3,18;
93:13,17;97:13;107:22;
151:21;173:22;174:23;
188:7;190:7,13;192:11,23;
194:15;195:4;196:14,16;
199:16;201:6;207:21;209:1,
17;211:22;213:4;216:19;
218:20;222:14,22;223:4,9,
15;224:4;225:6,17,24;
226:9;227:4;231:20;232:3,
5,22;233:3;240:19;241:21;
242:5,5,21;243:5,20;244:7,
14;245:2,14,19;247:11,11;
248:12,14,15,20;250:1,2,6,
11;251:2;255:10;309:2,3,8,
22;310:11;315:11

**Bradley's (5)**
189:15;191:1;196:9;
199:16;209:16

**break (4)**
149:8;214:6,15;219:5

**breakdown (1)**
52:22

**break-out (1)**
57:20;266:19

**breed (1)**
73:2

**Brian (23)**
26:4;35:18;153:24;
159:11;164:16;165:20;
169:22;172:4;180:13;
185:23;188:21;196:5;
201:20;215:15;216:5;
225:22,23;250:5,17;308:22;
309:5,7;312:21

**bridge (2)**
63:9;64:16

**brief (4)**
149:15;182:14,15,19

**briefs (1)**
80:4

**bring (3)**
27:18;132:22;240:7

**bringing (1)**
54:11

**brings (4)**
152:5;167:14;189:8;240:6

**broached (1)**
227:23

**broad (2)**
31:2;54:19

**broadly (2)**
35:12;134:5

**brother (5)**
188:14;189:2;191:9;
197:22;198:19

**Brought (12)**
7:20;8:18;18:21;27:14;
38:16;53:13;88:12;105:19;
109:10;124:3;261:16;
262:19

**Brown (2)**
34:24;35:9

**bucks (4)**
152:23;179:16;197:8;
199:1

**budget (1)**
208:12

**bulk (1)**
217:2

**bullet (2)**
11:13;219:20

**bullets (2)**
169:3,7

**bump (1)**
320:10

**burden (6)**
8:9;12:11;298:14;305:6;
306:11;320:13

**burdens (1)**
306:17

**business (17)**
53:21;84:3;145:13;156:9;
182:4;188:15,15;189:2;
207:8;208:11;240:7;266:9;
273:7;274:14;275:13,13,16

**but-for (4)**
62:7;63:14;97:20;150:13

**buy (1)**
270:9

**buzzing (1)**
43:12

**C**

**cabdriver (1)**
145:24

**CABRASER (17)**
5:3,10;7:8;220:12;221:24;
227:1,24;261:3;264:16;
270:24;271:21,24;272:1;
274:12;287:18;295:4;
299:18

**Cabraser's (3)**
219:21;229:13;238:12

**calculus (1)**
310:15

**calendars (1)**
191:19

**California (3)**
5:8;54:10;287:3

**call (18)**
29:11;46:20;62:13;84:16;
96:16;102:5;131:10;140:23;

142:16;179:11;183:23;
185:15;186:5,7,8;231:1;
255:23;317:15

**called (15)**
12:19;29:19;30:12,19;
35:14;97:10;183:24;184:1;
185:22,24;226:7;233:11;
306:8;309:9;310:8

**calling (1)**
309:23

**calls (2)**
178:9;211:5;212:16;256:8

**came (15)**
7:11;55:21;78:18;92:13;
108:12;114:10;137:23;
178:21;199:17;208:20;
222:10;265:16;294:2;
300:10;315:22

**Camille (3)**
77:24;79:22;80:2

**can (103)**
10:7;13:10;19:2;25:4,4;
28:18;30:16;36:11;45:14;
49:13;55:13;57:10;61:4;
64:22;65:8;66:13;71:22;
74:24;77:15;78:4,4;80:4;
84:4;85:1;86:3;87:17;88:5;
90:12;93:22;94:12;95:10;
102:10,23;111:18;112:22;
113:15;120:14,21;121:19,
23;122:9,17;124:7;133:19,
24;134:2;145:2;146:23;
148:21;150:21,22;161:7;
166:18,18;176:10,21;
177:18;182:12;186:5;187:4;
190:1,14;193:20,20;194:9,
14;197:21;198:17,20;204:7;
206:16;209:10;212:23;
214:5,15;222:16;223:20;
227:2;232:20;239:4,19;
243:10;245:3;251:6;253:17;
254:8;259:6;266:8;270:5,
21;271:7,18;275:24;276:3,
11;284:14;299:12;303:23;
308:11;311:14;312:9;
317:24;322:7

**candid (1)**
121:7

**candor (15)**
59:24;66:8,9;67:11,20;
68:4;117:7,13,15,17;123:3,
13,23;124:5;126:8

**capable (1)**
289:23

**capacity (1)**
256:6

**capital (1)**
100:11

**car (1)**
131:22

**cards (1)**
145:13

**care (11)**

54:16;58:2;83:14;89:16;
124:4;164:11;165:19;
210:13;255:12;306:22,23
**career (1)**
182:20
**careers (1)**
77:13
**careful (4)**
106:1;170:6;203:1;252:24
**carefully (7)**
165:9,10;169:10;182:24;
217:5,6,17
**careless (1)**
106:16
**caring (1)**
310:8
**Carl (1)**
181:12
**carpet (1)**
102:6
**carried (3)**
20:11;23:13;130:3
**carry (1)**
75:5
**carrying (3)**
13:5;23:16;234:3
**carved (2)**
134:10;138:4
**carve-out (2)**
138:24;139:22
**case (234)**
6:5;8:22;10:17;15:9;
16:16;18:3,6,21;19:16,19;
24:4;27:5;28:18;33:24;
40:21;42:20;43:23;44:10;
45:23;47:7;54:9,10;55:21;
56:12,23;58:19;59:5,6;
60:14;61:24;62:1,8;63:8,24;
64:5,7,9;65:20;70:10,11,20;
73:8,21;75:5;77:22;78:8,20,
22,24;81:1,10,19,23;82:11,
13;83:11,17;85:9;86:3,10,
10,11;87:3,4,9;88:4;89:9;
90:12;95:20;97:15,18;
100:5,18,21;101:1;103:19;
106:14;107:13,16,17;
113:11,14,22;114:2,13,14,
19,24;116:2,19;118:14;
129:2;137:7,21;140:19,22;
143:13,23;144:19;150:12;
151:1,9,12,18;156:21;
165:22,24;166:1;167:8,11;
168:11;169:13,18,24;172:1;
182:19,23;183:2;188:7;
190:7;192:18;196:18;
199:13;206:19;209:16;
211:24;229:4,5;234:23;
237:15;238:6,7,22;239:9;
244:6;246:14,23;249:4,4;
256:10;257:7,13,18,22;
258:7,24;260:17;261:5,16,
23;262:9;264:7,11,14,21,24;
265:4,6,14;269:10;271:3;
276:15;280:21;281:7,11,12,
12,18;282:7,15;283:4,5,8;
284:23,24;285:12,16;287:2,
17,20;288:8,23;289:20;
290:5;291:21;292:4,8,10,11;
293:6,11;294:12,16;295:4;
297:23;298:17;299:8,8,20;
300:13,16;301:23;302:9,14,
15;307:13,18;308:9;311:1;
312:11;313:1,1,13,15,18,19,
22,24;314:2,5,8,10;315:9;
316:10,13;317:1;318:5,14,
14;319:8,9;321:12;322:11,
15
**cases (54)**
9:23,23;13:6;15:18;41:12;
45:10,12;55:18;63:2,2;78:1,
17;79:3,12;80:13;84:7,16;
85:5;88:20;93:5;98:20;
103:12;112:10;128:14,21,
23;142:3;143:21;180:10;
189:5;190:6,6;199:3;206:9;
212:6;230:2;238:6,7;256:8;
264:2;284:15,16,22;289:21;
290:1;294:15;313:7;315:3,
12;317:22;318:8,16,24;
319:22
**case's (1)**
15:9
**casting (1)**
173:4
**casually (1)**
109:20
**cat (1)**
59:21
**Catalyst (1)**
195:24
**categories (1)**
316:16
**category (4)**
103:12;185:3,3;199:18
**caught (4)**
176:4,5;179:8,9
**cause (22)**
14:6;35:19;56:1;68:23;
75:16;121:16;151:14;167:8;
189:3;210:14;217:12;
243:16;245:23;254:9;259:5;
264:15;267:14;291:16;
298:19;314:1;316:15;320:8
**caused (3)**
17:21;26:12;78:16
**causes (1)**
96:17
**caveat (1)**
202:15
**cease (1)**
119:11
**ceased (2)**
92:13;101:1
**center (1)**
23:2
**central (1)**
287:3
**certain (8)**
8:4,11;80:9;94:1;106:9;
118:24;160:13;210:19
**certainly (30)**
15:11;21:10,10;22:8;31:8;
47:8;103:4;108:15;112:16;
139:6;169:23;170:2;171:17;
173:5;183:1;188:13;189:1;
210:21;213:17;229:15;
231:5;234:14;239:3;262:6;
278:9;299:12;303:2;310:12;
319:21;322:20
**certified (5)**
73:1;84:13;111:8,22,23
**certify (1)**
41:11
**chain (1)**
242:3
**challenge (1)**
288:15
**challenging (2)**
237:16;291:22
**chance (5)**
17:23;55:15;272:21;
277:20,24
**change (16)**
28:9,13;38:14;39:3;40:23;
41:14;85:16;101:9;103:18;
104:19;122:24;168:9;
206:18;277:3;310:16;
320:11
**changed (8)**
20:5,15;38:6;40:12;
141:24;168:12;181:12,13
**changes (3)**
14:19;81:5;310:14
**changing (2)**
26:17;97:5
**characterization (1)**
216:10
**characterize (2)**
130:13;244:13
**charge (5)**
129:16;181:7,17;200:13;
287:12
**charged (7)**
6:14;180:17;181:5,16;
192:15;280:10;287:9
**charges (4)**
160:4,5;174:4;181:20
**charging (2)**
181:18;296:15
**Chargois (147)**
7:10;29:12,14,19;30:1,7,
14;31:14,17,22;36:5;37:7;
42:18,19;43:3,24;44:5;
45:20;46:21,23;48:3,17;
58:10;62:9,9;63:8;64:14,23;
67:14;83:13;91:20;92:4;
94:6;95:15,23;97:24;99:6,
19;100:9,17;103:17,24;
104:4;107:14,23;128:19;
130:5,13;135:10;136:19,19,
21;137:7;140:16,17,22;
141:1,1,9,22;142:16;146:8,
14;150:15;204:23,24;205:2,
16;207:7,22;208:13,14,18,
22,24;209:6,17;210:2,17;
211:23;219:22;220:15;
221:17;226:11,11;227:13,23;
228:9;231:14,21;232:1,5,7;
234:2,7;237:22;238:2;
242:17;246:6,12;247:2,9,16;
248:6,17;249:3,4,4,12,22;
250:1,3;251:20;252:5,13,23;
253:24;255:9;264:1;265:13,
15,24;267:21;268:23;270:9;
271:3;273:1;274:1,20;
276:19;310:23;311:2,4,6,11,
18;313:14;314:3,11,13;
315:2,9,19;316:4,13;317:16;
318:4
**Chargois' (3)**
62:10;209:8;271:22
**chase (4)**
196:6,6;201:16;210:9
**check (4)**
99:12;174:20;176:21;
187:18
**checking (2)**
116:17;289:10
**chief (1)**
42:21
**Chiplock (49)**
5:6;16:11;157:15;158:14;
159:17,21;163:23;167:7,8;
195:18;214:22;222:23;
226:11;227:2;228:13;
229:10;232:9;240:17;241:8,
21;242:11;243:6;244:16;
245:6;247:12,20;251:2;
252:19;256:21;257:20;
259:3,11;260:10,13;263:11;
285:15;288:4,8;301:12;
304:2,4,7,12,22;305:14,18,
20;308:4;319:22
**Chiplock's (4)**
152:1;158:4;222:8;263:3
**choice (1)**
282:13
**choose (4)**
34:6;36:20;118:22;119:12
**chose (4)**
40:8;124:23;146:8;155:20
**Chris (9)**
91:11;95:11;108:15;
208:16,19,24;225:5;247:12;
269:17
**Christa (3)**
42:17;130:3;141:17
**chronological (1)**
162:24
**chronologically (2)**
156:11;226:24
**chronology (2)**

156:2;215:12
**Chuck (1)**
  291:10
**circuit (7)**
  18:17;19:3;61:9;81:13;
  103:3;173:13;303:7
**circuit's (2)**
  286:22;290:1
**circular (2)**
  76:19,24
**circumlocution (1)**
  20:1
**circumstance (19)**
  12:19;20:7;32:21;58:2;
  66:24;69:15,23;79:2;86:9;
  89:24;100:24;111:9;119:13;
  124:6;133:19;136:16;143:3;
  145:6;315:5
**circumstances (9)**
  6:13;49:7;78:22;79:1;
  86:8;140:5;169:24;229:21;
  278:14
**circumstantial (4)**
  107:11,11;212:12,15
**circumstantially (2)**
  99:18;129:4
**cite (3)**
  79:14;86:3;195:2
**cited (5)**
  36:13;76:6;129:6;158:13;
  206:9
**cites (3)**
  286:4;297:23;309:18
**Citigroup (5)**
  19:16;281:12;284:23;
  292:5,8
**City's (1)**
  161:21
**Civil (12)**
  27:3;47:5;60:15;66:7;
  67:1;68:16;71:24;116:23;
  120:19;128:8;289:21;
  291:21
**claim (7)**
  158:10;159:5,24;175:6;
  311:15;320:8,15
**claims (2)**
  87:12;295:18
**clarity (1)**
  165:2
**Clark (4)**
  42:17,20;130:3;141:17
**class (160)**
  15:14;17:12;43:8,20;
  44:21,24;47:15,15;49:24;
  50:3,4,4,10,11,13,18,19,23,
  24;51:19,20,21,22,23;52:5,
  10,14,20;53:2,8,11,12;54:6,
  16,19,19,23;55:3,6,12,24;
  56:1,11,13,16;57:6,17,18,
  22;58:11,24;60:2,3,7,22;
  61:16,20;63:3,4,12,13;
  67:16;68:5,17;69:17;70:7;

72:10,15;73:1,1,12,16,17,21,
22,23;74:4;75:6;79:11;80:8,
20;82:4,16;83:24;84:13,16,
17;85:4,10;87:1,5,7,8,11,18;
89:22;102:13,19;103:13;
104:13,13;105:2,13,13;
106:9;110:7,8,24;111:8,21,
22;112:3,6,7,10,11;118:8;
149:18;156:3;180:7;202:9,
20;206:20;207:12;220:18;
229:20;237:14,23;239:2;
246:22;252:16;256:15;
257:11;261:19,21,24;262:1,
2,10,20;263:1;279:19;
289:20,21,23;290:4,11;
291:24;311:19;314:10,11,
19,19,22;315:1,22;317:1,3;
318:6;321:16
**classes (1)**
  52:23
**clean (1)**
  259:5
**cleaner (2)**
  17:18;18:9
**cleanest (1)**
  109:6
**clear (29)**
  18:15;25:14;34:11;36:9;
  49:12;51:11;69:24;70:5;
  73:3;92:6;115:22;130:12;
  154:18;155:7;157:15;160:6;
  169:6;171:13,22;173:11;
  177:23;214:16;221:22;
  227:3;286:7,8;321:10,11,21
**clearing (1)**
  226:4
**clearly (15)**
  18:5;20:11;42:16;81:6;
  91:17;115:5;130:19;149:17;
  150:11,15,24;151:16;
  152:11;155:1;160:12
**clerical (1)**
  193:2
**client (33)**
  28:17,17;33:1;34:23;44:3,
  4;45:23;46:9;48:10;67:15;
  68:5;70:16;71:21;73:7;
  77:21;80:20,23;81:1,20;
  96:13;108:10;110:3;143:15,
  16;230:10;231:3,7;262:13,
  15;269:15;286:19;314:15,
  15
**clients (21)**
  30:2,4,5;44:23;72:18,22;
  78:20;79:1;84:5,9;93:8;
  99:16;107:8;111:24;181:7;
  238:18,19;266:7;287:12;
  298:24;322:13
**clips (1)**
  263:4
**close (15)**
  78:9;152:12,18;161:10,
  14,17;181:23,24;183:5;

207:18,20;218:20;221:19;
307:2;322:10
**closely (4)**
  182:6,17;183:2,17
**closer (4)**
  208:12,14;211:22,23
**closing (1)**
  6:4
**cloth (3)**
  147:4;148:14,16
**clue (2)**
  29:24;99:9
**co-counsel (5)**
  68:6;70:17;80:21,24;
  90:21
**Co-lead (6)**
  257:20,21;259:17;261:4;
  264:14,20
**collateral (1)**
  171:1
**colleague (2)**
  30:23;38:16
**colleagues (4)**
  6:13;90:10;102:2;149:14
**collect (1)**
  105:3
**collective (8)**
  175:9;216:13,18;217:1,2,
  10,13,15
**college (2)**
  172:8,8
**colloquy (1)**
  186:23
**color (1)**
  165:24
**column (1)**
  288:20
**combination (1)**
  27:10
**comfortable (1)**
  229:23
**coming (8)**
  40:18;65:9;84:8;132:21;
  279:13;311:13;318:11;
  322:10
**commensurate (2)**
  10:3;16:7
**comment (10)**
  86:18;121:9,10;122:22;
  125:5;127:21;131:13;166:3;
  322:7,9
**comments (1)**
  13:11
**committed (2)**
  135:3;317:10
**committee (2)**
  90:14;141:6
**committees (1)**
  40:22
**common (7)**
  25:11;79:8;237:23;238:8;
  239:12;303:15;306:24
**commonly (1)**

290:24
**communicate (2)**
  230:19,20
**communicating (2)**
  230:22;232:1
**communication (2)**
  74:12;231:14
**communications (5)**
  18:4;92:15;95:24;97:8;
  129:11
**community (2)**
  286:21;290:24
**co-monitoring (1)**
  142:19
**companion (3)**
  255:23,24;256:8
**company (1)**
  186:21
**comparable (5)**
  192:11;257:3;287:11;
  300:1;301:21
**compare (1)**
  176:9
**compartmentalization (3)**
  13:14,23;37:21
**compensate (1)**
  256:19
**compensated (4)**
  16:6;45:13;290:13,15
**compensation (3)**
  219:16;273:14;286:23
**competition (2)**
  229:17;238:17
**competitive (1)**
  266:5
**competitors (4)**
  156:17;266:13;270:2;
  277:15
**complain (2)**
  56:19;190:14
**complained (1)**
  82:17
**complaining (1)**
  143:15
**complaint (9)**
  113:24;114:13;115:6,13,
  23;143:16;163:15;190:11;
  313:5
**completely (4)**
  36:21;92:16;157:18;320:8
**complex (4)**
  79:12;289:4,21;291:20
**complexity (1)**
  287:13
**compliance (5)**
  39:11;71:10;143:11,24;
  144:3
**complicate (1)**
  244:6
**complicated (1)**
  250:5
**complied (2)**
  136:24;143:9

**compliment (1)**
248:15
**comply (3)**
136:8;144:11,22
**component (1)**
242:8
**compressed (2)**
31:8,10
**compute (2)**
241:3,18
**computing (1)**
241:5
**conceded (2)**
167:10;194:22
**concept (2)**
287:14;317:16
**conceptual (1)**
285:20
**concern (7)**
17:21;18:13;19:15;72:9;
120:2;137:4;302:5
**concerned (17)**
15:21,23;61:22;62:3,5;
65:17;94:3;101:16,24;
162:6,7;185:19,19;198:10,
13;209:2;280:15
**concerns (5)**
19:2;50:2,12;100:14;
255:17
**conclude (1)**
298:6
**concluded (6)**
30:17;298:17;299:9;
300:8,9;302:15
**conclusion (5)**
30:15;271:5;298:9;305:2;
318:10
**conclusions (2)**
279:13;293:8
**condition (1)**
134:24
**conduct (17)**
6:20,20;32:2;38:12;47:4;
71:23;72:2;117:16;120:13,
16,22;272:3;289:7;299:3;
312:19;317:11,12
**conducted (1)**
150:15
**conference (7)**
124:14;174:14,15;215:19,
20;221:3,4
**confess (2)**
18:2;135:20
**confidence (1)**
239:20
**confident (2)**
14:18;270:21
**confirmation (1)**
74:20
**confirmed (2)**
35:7;43:6
**confirming (6)**
222:17;232:2,7;247:16;

251:3;252:2
**conflated (1)**
8:7
**conflation (1)**
12:9
**conflict (3)**
61:19;67:3;85:12
**conflicts (1)**
120:20
**confronted (1)**
26:23
**confuse (1)**
98:19
**confusion (3)**
96:17;97:23;98:18
**congratulating (1)**
248:12
**connection (3)**
59:6;86:11;132:11
**consciously (1)**
166:4
**consent (7)**
39:14;42:11;134:24;
135:15;143:5,8;150:7
**consented (1)**
321:18
**consequences (1)**
187:13
**consider (7)**
23:8;77:5;208:3,4;209:22;
279:17;291:24
**considerable (1)**
26:13
**considerably (1)**
301:7
**considered (6)**
34:15;69:16;80:6;149:24;
150:13;279:18
**considering (4)**
278:10,11;279:14;307:13
**considers (2)**
15:12;76:14
**consisted (1)**
51:23
**consistent (1)**
286:22
**consistently (1)**
322:18
**consisting (1)**
87:11
**consists (1)**
289:3
**consolidated (9)**
82:15;83:17;85:5;87:10;
114:4;115:8,10,12,16
**constant (1)**
187:8
**constantly (1)**
249:13
**consternation (1)**
26:13
**constitute (1)**
66:23

**constituted (2)**
32:1;76:18
**constitutes (4)**
39:23;55:11;74:3;130:16
**construct (3)**
17:16;68:1,3
**construction (5)**
46:17;117:8;121:4;
138:22;186:9
**consult (2)**
186:14,21
**consultants (1)**
295:22
**consumer (3)**
202:9;311:13,19
**cont (1)**
5:1
**contact (5)**
130:14;131:18;132:2,18;
269:14
**contacted (2)**
132:3,9
**contacts (1)**
209:16
**contained (1)**
232:3
**contemporaneous (3)**
249:23,24;251:19
**contemporaneously (1)**
252:11
**context (21)**
16:17;42:14;43:10;52:1;
60:22;76:12;79:10;94:6;
97:1;162:2,18,19;163:1;
165:22;184:12;190:8;
202:24;240:23;246:19;
278:10,11
**contingencies (1)**
19:4
**contingency (5)**
173:6;180:5;189:9;
191:11;199:24
**contingent (5)**
18:18;119:5;196:12;
199:4;200:19
**continue (4)**
45:6;80:1;147:19;248:7
**continued (1)**
154:21
**continues (1)**
315:9
**continuing (4)**
233:5,15;234:1;301:23
**contract (50)**
8:18;48:22;83:24;104:7,
11;143:18;280:2,7,10,22;
281:4;282:22;286:1,9;
287:19;288:17;289:12;
290:18,24;292:1,19;294:13;
295:6,18;296:7,18,24;297:7,
8,20,21;298:7,15;299:1,19,
24;300:3,11,14,15,23;301:2,
6,9;302:5,13;303:8,13,14;

**constituted (2)**

**contributed (9)**
10:4,16;11:6,8;13:14;
50:22;54:14;249:13;276:19
**contributing (1)**
254:13
**contribution (1)**
246:22
**contributions (3)**
10:1;249:14;312:11
**control (1)**
268:4
**convenience (1)**
52:13
**conversion (1)**
38:6
**convinced (2)**
83:7;90:9
**convoluted (1)**
21:12
**copied (2)**
228:8;247:10
**copies (5)**
129:11,19;226:11;241:21;
288:4
**copy (8)**
232:23;240:18;242:22;
243:5,23;251:2;259:1,6
**corner (1)**
295:11
**corporate (3)**
230:6,16;289:16
**corrected (5)**
13:23;58:8;169:20;
175:10;177:8
**correction (1)**
312:2
**correctly (2)**
18:12;116:22
**correspondence (1)**
95:21
**corruption (1)**
204:13
**cost (15)**
8:9;12:10;13:4;14:22;
15:2;24:15;37:12;154:6;
273:7;280:22;285:22;286:1;
296:7;301:19;307:16
**costs (1)**

**304:15**
**Contracted (1)**
286:20
**contracting (2)**
11:17,18
**contractor (1)**
306:13
**contractual (2)**
48:14;210:15;253:24
**contrary (1)**
288:20
**contrasted (1)**
146:8
**contribute (1)**
101:18

15:8

**cost-sharing (1)**
14:3

**Counsel (255)**
5:10;17:12;27:12,14;
29:20;33:7;34:14;42:4,21,
23;54:17;55:20;57:18;
58:12;60:4,6;62:20,21,22;
69:17;73:1,21;76:15;78:12,
13,14,17,18;81:15,18,22,24;
82:2,3,5,16;83:12,14,24;
84:1,3,5,8,8,17,20,21;92:5,8,
12,21,21;93:1,18;95:23;
96:4,5,10,14,14,17;97:2,4,
10,14;100:1;105:8,14,20;
106:9;111:12;112:4;113:18,
21;114:12;115:24,24;116:1,
2;141:11,12,16,19;142:19;
143:1;146:11;157:8;166:9;
183:9;186:21,22;187:3;
202:5;208:1,6,10;210:12;
211:5,5,7,8;212:3,16,17,19;
213:5;217:12;221:17;
226:13;227:7,13,15;228:11,
15,16;229:24;230:9,15,20,
23;231:1,10,15;232:6;
233:19,21;234:12,16,19,20,
21,23;237:2,2,8,16,18;
239:5,5,15,16;240:22;241:4,
11;242:10,13;243:21;
244:18,23;246:20;251:17,
18;252:3,4;253:12;254:12;
255:11,13;256:1,2,5,9,10,11,
15,16;257:4,6,10,13,17,23;
258:22;259:7,14,16,17,19,
22;260:18;261:4,4,7,16,24;
262:9,10,13,14,19;264:5,13,
14,17,18,20,22;265:1,5,6;
266:8,12;267:3,8,13,15,16;
268:8,18;269:1;276:11,14;
279:19,22;287:12;289:22,
23;298:14;309:14,17,17,20,
20,24;310:1,3,4,9,9,12;
311:13,14;313:15,20;314:7,
14;315:2,7,10,16;316:1,20,
22;317:5;318:3,22,23;
319:16;320:7,15,22;321:11,
12,15,18,19

**counsel's (10)**
233:23;258:3;261:8;
268:5;289:20;290:4,11;
291:24;292:22;297:15

**count (1)**
294:21

**counted (4)**
8:4;46:21,22;153:5

**counter (1)**
152:14

**counterevidence (1)**
43:1

**counting (24)**
7:4,15,24;11:13;21:24;
26:2;151:11;152:3,17;

160:10;168:14;169:19,20;
179:15,16,20;180:12,24;
185:13,14,20,22,23;214:2

**country (5)**
87:2,6;137:21;289:24;
296:1

**couple (9)**
27:19;56:2;113:6;155:24;
201:24;233:8;251:23;
263:15;295:15

**course (16)**
26:5;32:7;36:21;41:9;
88:20;125:18;155:8;162:2;
180:5;219:11;227:13;
232:18;233:16,18;246:5;
276:2

**courses (1)**
147:16

**Court (101)**
7:24;8:19;22:24;23:4;
25:14;28:8;32:24;33:8;
39:24;56:4;60:1,18,19,21;
61:17;66:2;67:16;68:6,13;
72:17,23;73:9,13,14;74:2;
80:21,23,24;81:20;85:10,14,
18,19,20;87:21;88:2;90:13;
97:1,3;100:6;101:16;
105:19;107:8;109:5;110:18;
111:10;118:2;119:4;120:5,
22;121:7;127:22;144:24;
150:7;151:3;155:22;157:3;
160:3,11;161:2;164:8;
168:7;170:1,5;181:18;
182:3,16,18,19;184:23;
185:6,23,24,24;186:8,12;
187:6;191:10;202:17;
206:24;209:22;220:16;
234:24;252:1;267:19;
274:21,23;280:11;285:23;
290:2,4;291:18,24;296:5;
299:3;303:4;316:5;320:3;
321:13,13

**courtroom (2)**
170:7,8

**courts (11)**
18:15;55:7;86:2;143:17;
174:6;177:23;189:4;228:22;
295:18;297:7,20

**Court's (6)**
84:19;86:4,6;111:9;
292:18;299:5

**cover (2)**
283:23;316:5

**coverage (2)**
283:13,22

**covered (4)**
48:15;139:5;177:21;313:4

**covering (2)**
224:5,7

**covers (2)**
283:13;284:12

**crash (1)**
131:22

**create (3)**
48:20;177:3;240:5

**created (1)**
239:13

**creates (2)**
48:24;129:15

**creation (1)**
323:2

**creature (2)**
148:1,8

**credentials (1)**
8:24

**credibly (1)**
42:11

**credit (9)**
38:14;82:21;155:8,15;
163:9;186:24;209:3;249:20;
298:4

**credited (1)**
155:10

**critical (4)**
60:1;70:20;71:3;289:17

**critically (2)**
156:23;291:22

**criticism (4)**
68:24;69:21;71:8;72:3

**criticize (1)**
105:17

**criticizing (1)**
90:5

**crosscheck (8)**
17:20;19:5,12;57:13;58:7;
118:17,21;119:5

**crossed (1)**
239:21

**cry (1)**
27:6

**C's (1)**
172:18

**curiosity (2)**
102:7;237:11

**curious (3)**
109:13;117:19;252:21

**current (4)**
38:4;55:6;160:4;174:4

**currently (1)**
181:20

**curtailing (1)**
220:20

**curve (1)**
25:22

**custom (1)**
206:12

**customary (1)**
173:7

**customer (12)**
17:12;22:20,21;53:2;
104:12;105:2,13;106:8;
118:8;149:18;156:3;321:16

**cut (9)**
21:17,20;196:6,6;201:16;
205:19;210:9;250:19;316:8

**cut-throat (1)**

270:11

**cutting (2)**
93:12;249:13

**Cy (3)**
193:23,24;194:5

---

# D

**Dacey (1)**
80:3

**damn (1)**
269:24

**Damon (51)**
29:13;42:18;62:8,9,10,12;
63:8;64:7,14,23;83:12;
91:19,21;92:4,9,11;93:5;
95:22;97:23;99:6,19;
100:17;108:10;136:19;
207:22;208:13,14,18,21,24;
209:6,8,17;211:22;231:21;
232:1;234:2,7;246:6,9;
247:2,7,9,13,16;313:14;
315:9,18;316:3,13;317:16

**Dan (26)**
16:11;159:17;165:21;
166:15;222:23;226:11;
227:2;229:9;231:13;241:1,
8,12;242:6,11;244:18;
246:15;247:12,20;252:19;
263:2,20;264:10,12;265:3;
269:23;319:22

**dangers (1)**
147:17

**Daniel (1)**
5:6

**Dan's (1)**
308:2

**Data (11)**
104:24;105:1;196:1;
202:3,4,12;298:16,18;
299:13;303:4,5

**database (1)**
191:18

**date (5)**
31:15;162:18,19;241:23;
313:5

**dated (1)**
251:23

**dates (4)**
163:2;166:6,8;214:19

**David (5)**
10:13;178:18;186:4;
192:8;196:10

**day (15)**
8:3;29:11;39:9;52:6;
91:16;105:22;110:9;111:7;
157:23;171:3;176:11;200:5,
19;206:17;228:2

**days (5)**
6:24;40:18;228:5;255:20

**de (5)**
116:6;118:24;268:19,23;
269:2

**deal (30)**
7:10;29:5;41:13;43:20;
45:21;49:10;52:22;64:22;
87:13,15;95:16;107:5;
125:3;148:5,5;208:23;
211:11,12,16;218:10;237:6;
248:17;249:4;250:2,19;
274:20;310:22;311:9;317:4,
7

**dealing (8)**
25:2;26:14;40:22;55:17;
170:10;231:18;256:1,2

**dealings (1)**
316:3

**deals (1)**
149:16

**dealt (2)**
12:23;68:13

**debating (1)**
159:10

**deceive (2)**
29:24;319:19

**deceiving (1)**
319:20

**December (1)**
95:22

**decent (1)**
250:1

**deceptive (1)**
119:3

**decide (18)**
30:11;56:18;57:7,8;60:5;
68:1;70:3;86:1;89:20,21;
137:18;143:19;171:9;
213:13;273:19,22;274:2;
301:15

**decided (10)**
23:9;25:22;52:10;53:3;
70:1;116:4;144:21;171:13;
205:8;208:4

**decides (1)**
293:17

**deciding (2)**
44:15;57:11

**decision (14)**
28:19;33:5,7;39:24;40:21;
54:7;55:10;106:3;123:18,
21;127:12;150:4;198:12;
303:11

**decisions (5)**
268:6;280:8;290:5,12;
303:11

**declaration (34)**
43:7;49:11,13,21;51:17;
115:18;158:11;161:18;
165:13,16;172:21;173:15,
23;174:2;179:3,9,19;
182:23;183:8;184:5,7,13,14,
17;217:4,11,16,23;256:24;
257:9;261:3;263:3;264:9;
321:14

**declarations (8)**
23:2;152:14;161:3;165:9;

**declare (1)**
48:21

**declined (1)**
154:8

**deduction (1)**
147:18

**default (1)**
134:21

**defendant (1)**
289:4

**defendants (4)**
288:15,21;289:16;291:23

**defense (2)**
289:1;321:19

**defer (2)**
82:23;149:13

**deficiency (1)**
143:11

**defined (2)**
9:6;159:1

**definition (1)**
181:11

**definitions (1)**
212:18

**degree (4)**
137:5;140:7;145:9;239:20

**delay (1)**
187:5

**deliberately (1)**
185:5

**demonstrate (2)**
221:14;237:11

**demonstration (1)**
17:24

**Department (2)**
105:23;275:15

**depend (1)**
75:10

**depends (4)**
182:20;230:2;267:7;
290:20

**deposing (1)**
10:10

**deposition (21)**
39:2;43:5;51:18;76:3;
105:22;147:14;158:12;
192:20;193:7;195:2,3;
215:18;216:5;220:6;237:21;
249:21;253:1;257:1;263:5,
11;299:23

**depositions (8)**
31:5;32:19;38:19;151:20;
157:17;181:9;246:16;
252:20

**deputy (2)**
27:11,13

**derelict (1)**
88:21

**describe (2)**
130:13;227:9

**described (3)**
246:12;250:14;255:9

**describing (1)**
216:24

**description (4)**
232:2;252:4;263:6,24

**deserve (5)**
72:6;163:6;207:1,2,3

**deserved (1)**
196:13

**designated (1)**
55:4

**designations (1)**
38:7

**designed (1)**
131:20

**despite (1)**
301:24

**destroy (1)**
71:23

**destroys (1)**
71:22

**detail (3)**
33:12;289:18;302:10

**detailed (1)**
46:6

**details (1)**
218:15

**determination (9)**
52:8,9;67:17;102:23;
109:11;111:17;205:9;
268:19;287:7

**determine (7)**
36:9;86:5;94:13;95:1,6;
285:24;296:6

**determined (6)**
44:18;69:18;74:5;110:9;
128:7;180:9

**determines (2)**
74:2,3

**determining (2)**
49:5;89:3

**Detroit (1)**
58:20

**developed (4)**
32:7;73:9;192:6,7

**devoted (1)**
199:19

**dictated (1)**
49:14

**Dictionary (2)**
158:21,21

**dictum (3)**
39:12,17,24

**differ (3)**
35:3;90:7;216:10

**difference (12)**
131:13;144:23;181:15,21;
288:24;295:5;301:17;306:6;
307:1,1;310:3;317:4

**differences (1)**
280:5

**different (51)**
7:7;8:5;9:16,16;14:16;
17:19;20:12;25:1,3;45:18;

46:22;51:23;58:1;60:23;
71:12,14;73:2,5;74:9;82:2;
84:16;87:6,7;90:24;107:5;
146:21;153:6;157:16;158:3;
165:15;168:1,3,6;172:24;
185:3;191:24;193:9,18,18;
205:6,22,23;209:21;210:5;
212:17;218:5;267:14;
280:17;316:16;320:23;
321:20

**differential (1)**
296:8

**differently (11)**
17:20;25:4;34:17;103:23;
104:18;105:9;107:2;126:8;
258:6;279:4;286:3

**difficulty (2)**
290:20;291:18

**dinner (1)**
270:9

**direct (3)**
25:5;92:15;157:9

**directing (1)**
264:18

**direction (1)**
13:1

**directly (8)**
26:8;112:4;159:1;230:19,
21;232:1;264:16;281:5

**director (2)**
94:9;132:18

**disadvantage (2)**
119:7,7

**disagree (22)**
11:3,4;13:19;46:17;50:15;
51:17;57:16;59:16;60:9;
74:24;78:10;147:8;148:23;
153:16;155:13;193:10,15;
212:22;282:18;291:5;
297:24;309:12

**disagreement (8)**
10:23;35:12;39:23;40:4;
50:21;72:18;274:11,18

**disagreements (1)**
139:6

**discharging (1)**
262:24

**disciplinary (5)**
32:1;38:7;90:14;143:19;
145:2

**discipline (6)**
41:2,4;71:13;81:8;89:4;
138:20

**disciplined (2)**
71:21;120:21

**disciplines (1)**
312:18

**disclose (32)**
32:24;33:1;46:2,5;67:4;
73:18,20;80:15,16,17,19,20,
20,21;81:1;82:3;83:21,23;
106:12;107:13;109:8;117:6,
14,17,22,24;119:2;121:5;

126:1;128:10;269:14;270:1

**disclosed (14)**
36:15;48:10;73:17;74:8;
83:19;106:6;114:11;117:24;
260:9;266:18,20;274:21;
275:4,11

**discloses (1)**
117:20

**disclosing (4)**
90:15;113:10;220:17,18

**disclosure (21)**
46:6;66:7;72:21;73:14,15;
74:16,23;75:3,13;81:15,18,
20,21;82:15;107:21;111:14;
220:14,16;265:21,22;271:2

**disclosures (2)**
72:17;289:15

**discouraged (1)**
213:17

**discovery (4)**
15:22;35:6;289:9;313:8

**discretion (1)**
103:2

**discuss (2)**
245:20;246:3

**discussed (8)**
12:16;150:6;202:22;
214:20;227:5,17,19;250:17

**discussing (1)**
232:24

**discussion (13)**
29:20;108:14;117:12;
232:16,24;233:15;234:2;
243:17;246:5,12;248:4;
320:2,4

**discussions (1)**
56:7

**dispute (4)**
143:18;319:7;320:16,17

**disputes (2)**
53:20;54:1

**distasteful (2)**
53:19,21

**distinction (11)**
219:18;281:9;286:13;
288:22;293:2;301:15;303:8,
12;306:21;313:13;316:24

**distinguish (2)**
93:7;94:7

**distinguishing (2)**
47:3;281:4

**distracted (1)**
43:18

**distraction (3)**
43:6,8;52:24

**distribute (3)**
119:12;245:21;246:4

**District (15)**
56:4;61:7;88:1,2,22,22,
23;182:18;206:8,24;260:9;
285:1;287:3;291:15;313:16

**districts (1)**
61:9

**divide (4)**
19:23;91:15;232:21;248:8

**dividing (1)**
57:19

**division (14)**
18:12;26:8,10,11;29:1,7;
43:24;60:21;121:6;128:18,
21;135:11;140:2;233:14

**divisions (3)**
30:19;51:9;134:22

**divorce (1)**
179:19

**divvy (2)**
93:20;208:20

**divvying (1)**
204:18

**Doane (8)**
42:16;62:13;65:3;130:14;
132:4;140:23,24;141:3

**docket (5)**
82:14;115:9,16;116:2,17

**document (18)**
33:18;34:14,23;35:1;
36:16;166:4;182:7;184:22;
195:17;217:4;287:20;
288:18,24;289:2,8;291:19;
294:15;299:20

**documents (22)**
17:23;18:3;29:18;30:13;
31:3,18,22;33:9;34:10;36:6;
37:18;152:13;161:10;193:4,
6;195:22;209:15;218:18;
279:11;289:2,4;321:13

**Doe (1)**
78:20

**dog (4)**
147:20,20;148:7,9

**DOL (1)**
321:19

**dollar (3)**
29:2;150:5;252:2

**dollars (18)**
62:2;65:18;84:7;89:5;
101:11;104:13,13;119:18;
151:14;154:7;168:12;205:1,
17;267:10;269:5;307:19,21,
24

**domain (1)**
270:6

**done (55)**
23:4;25:9,14,17,17;29:23;
34:7;36:7,16;37:8,11;44:15;
49:5;51:14;59:5;61:24;
65:19;79:8;91:21;100:12;
105:9;114:19;137:2,22;
148:12;152:9;157:21;162:1;
164:23;170:23;175:4;
176:13,15;185:4,17;192:17;
193:9;208:21;213:6,14;
214:12;248:14,16;253:16;
256:19;277:10;279:4,21;
287:1;303:20,24;305:3,5;
308:19;320:12

**don't (241)**
10:6,18;11:9;13:6;17:5,7,
8;18:7,14;20:24;21:16,19;
25:16;31:4,12,14;34:19,21;
35:16,20;36:1;39:21;40:17;
41:3;42:8;43:3,15,16;45:7;
47:6,13;50:1,1,5,6,11;51:2,
2,3;53:22;54:5,16,17,18;
56:15;57:3,6;58:19;59:22;
64:10,20;67:3;69:5,6,15,16,
22;74:12;76:11;83:19;
86:17;87:16;89:15,17;
91:23;93:20,22,23;94:3;
96:7;98:20;99:9,9,10,14,14;
105:20;109:15,17,23;111:2,
2;112:19;115:5;116:8,10;
117:14,18;119:2,9,18;
120:18;121:2;123:6,7;
124:11;127:6,23,24;128:3,
10;129:17,23,24;130:1;
137:1;143:19;148:5;149:1;
160:18;164:11,21;170:6;
171:6,18;174:18,23;175:23;
177:21;180:4,6,8;185:1,6,8;
187:20,22;190:12,15;
193:10,14;194:22;195:19,
20;196:4;198:1,2,16,20,24;
199:1,2,3,4,5;200:9,11,11;
202:21;205:8,18;206:6,10,
15,17;207:6;210:10,13,15,
16;211:2,9,14;212:11,21;
213:5;218:10;219:5;221:19;
228:20;237:9;240:2,9;
243:11;244:5,13,19;249:5,
19,20;250:9;252:24;254:8,9,
14,15,17,24;255:7,15;
260:11;261:10,10;266:13;
267:6,8,17,18;268:3,4;
269:16;272:18;274:10,12,
19;276:8,17;277:8,18;
278:17;282:1,21;291:12;
293:9,13,15;294:17,21;
295:20,21;299:21;300:6;
301:14,20;302:24;305:11;
306:4,22,23;309:18;310:14,
21;315:17;316:6;318:10,11,
18;320:1,10,11;321:23

**door (4)**
33:14;45:19;211:17;238:4

**double (26)**
7:4,15,23;8:4;11:12;
21:24;26:2;151:11;152:3,
17;153:4;160:9;168:14;
169:19,20;179:15,16,19;
180:11,24;185:13,13,20,21,
23;214:1

**doubt (12)**
45:7;49:16;60:22;73:15;
140:23;145:23;163:3;170:9;
175:9;207:10;217:6;311:3

**down (27)**
30:24;99:11,13;126:4;
145:14;161:3,20;180:3;

183:16;184:14;208:18;
210:5,22;233:3,17;241:20;
242:4;245:10;247:3;270:3,
9;292:13;297:5,6;311:7;
316:2,6

**downgrade (1)**
291:2

**dozen (2)**
211:4;258:11

**DR (1)**
38:8

**draft (11)**
91:2;94:18;107:21;
184:14;221:1,24;222:18,21;
223:24;224:9;225:10

**drafted (4)**
95:8,10;139:11;149:4

**drafting (4)**
138:14;139:3;149:2,5

**dragged (1)**
170:22

**draining (2)**
190:4,5

**draw (2)**
139:21;288:22

**drawn (2)**
53:24;211:2

**draws (1)**
293:2

**drilled (1)**
183:16

**drive (1)**
257:9

**driver (1)**
145:8

**drives (1)**
145:13

**driving (1)**
140:6

**drop (2)**
120:14;125:20

**dropped (1)**
154:23

**Dublin (6)**
226:17,18;227:5,18;
243:24;244:1

**due (5)**
26:15,24;68:14;127:19;
165:24

**DUI (1)**
182:18

**Dumpty (1)**
278:24

**dunk (1)**
196:19

**during (9)**
26:20;31:16;73:10;
144:18,19;219:10;313:8;
315:20;317:20

**duties (2)**
87:17;125:7

**duty (24)**
59:24;60:3;61:16,18;

67:11,20;68:3;69:15;73:6,
10,14;74:23;75:2,6,13;
84:19,20;88:21;110:22;
111:9,13;117:7;123:23;
124:4

**E**

**earlier (12)**
12:16;18:4;92:10;192:8,
22;216:21;223:4;244:11;
307:12;309:10;313:10;
315:3
**early (4)**
90:22;255:20;288:22;
313:22
**earnings (1)**
189:19
**easier (2)**
32:11;121:3
**easiest (1)**
16:18
**easily (4)**
57:2;131:14;155:14,15
**easy (4)**
6:15;27:22;44:20;98:19
**edition (1)**
55:6
**educated (1)**
61:14
**effect (18)**
12:19;40:17;65:4;75:2,4;
160:13;179:14;186:18;
191:5;200:5;206:15;228:12,
23;237:16;239:14;253:2;
260:11;269:17
**effectively (8)**
16:12;45:20;51:22;87:11;
96:13;125:5;230:9;248:15
**effectuate (1)**
8:8
**efficiency (1)**
12:21
**effort (20)**
94:13;108:16;144:22;
161:22,23;166:5;170:12,12;
171:24;172:2;175:3,4;
176:17;185:4;190:3;217:1,
2,10,13;249:14
**efforts (3)**
170:7;213:16;315:23
**egg (1)**
196:17
**eight (2)**
302:1;318:8
**Eighth (1)**
178:22
**Either (15)**
9:22;26:8;61:22;81:7;
103:10;110:10;169:8;
220:14;230:15;273:15;
274:15;278:2;308:1;312:18;
320:2

**elaborated (1)**
264:10
**electronic (2)**
132:1;223:19
**elephant (1)**
187:24
**elicited (1)**
252:19
**eliminating (1)**
23:15
**Elizabeth (1)**
31:1
**else (17)**
11:3;15:3;35:19;44:2;
56:6,9;75:4;76:13;83:9;
91:23;109:7;130:8;148:19;
184:24;187:17;234:18;
277:7
**else's (1)**
23:13
**em (13)**
10:13;84:1;159:24;161:3;
164:18;169:11;175:6,6;
176:8;193:6;217:22;269:20;
296:13
**e-mail (76)**
16:24;100:10;130:12;
156:11;162:8,16;166:12,20;
195:5;214:20,22;215:17;
216:3;222:3,11,12,13;223:9,
20;224:2,3,6,8;225:11,13,
17,17;226:9;227:6,14,20;
228:1,9;231:19,20,22;232:3,
8,22;233:5,8,11,17;240:15,
17;241:15,17,17;242:10,19;
243:4,16,18,19,24;244:1,7,
15,16;245:1,3;246:2;247:5,
10,17,23,24;248:1,12,13;
249:5,12;250:24;251:15,22;
252:24
**e-mails (23)**
53:17;103:15;105:23;
168:17;191:19;196:3;211:4;
212:16;226:18;228:7,7,8;
232:15;249:2,17,24;250:15,
23;252:8,11;309:22;313:4;
317:21
**embrace (1)**
28:4
**emergency (2)**
83:1;145:14
**Emily (2)**
215:24;216:2
**emphasize (1)**
285:5
**empirical (5)**
298:16,18;299:4,9,13
**employed (10)**
11:20;20:2;153:12,14;
155:22,23;174:3;280:7;
281:5,6
**employee (1)**
306:10

**employees (13)**
15:2;23:5,17;24:13;25:6;
157:4;160:3,4,5;181:19,20;
282:22;292:20
**employment (3)**
132:2;305:7,9
**employs (1)**
8:20
**enable (1)**
127:11
**encompass (1)**
95:14
**encourage (1)**
28:15
**end (31)**
8:2;13:6;15:8;20:13;
21:15;32:7;39:9;52:6;69:9;
74:19;76:4;91:16;111:7;
143:9;154:3,7,13;155:9;
157:23;158:16;167:20;
171:3;180:9;200:5;206:17;
230:21;233:18;241:10;
243:17;299:16;312:12
**endearment (1)**
213:23
**ended (2)**
18:11;38:20;44:18;49:2;
108:11;214:2;273:1
**ending (1)**
9:6
**endorsement (2)**
130:18;286:22
**ends (3)**
61:17;73:9;154:9
**engage (1)**
289:11
**engaged (4)**
50:22;232:24;289:14;
319:12
**engagement (9)**
39:15;40:14;41:23,24;
42:3;47:18;135:16,17;143:7
**enough (15)**
31:11;42:10;74:23;76:5,8;
93:13;102:10;112:24;
152:19;156:16;167:9,12;
196:7;204:8;221:19
**ensure (1)**
289:17
**enter (1)**
114:22
**entered (5)**
91:1;174:15;215:20,22;
221:4
**entire (6)**
15:14;21:5;44:17;51:21;
215:8;285:16
**entirely (1)**
175:13
**entity (2)**
132:11,16
**entree (1)**
239:6

**equally (1)**
77:8
**equation (2)**
103:18;135:2
**equity (1)**
292:8
**equivalent (6)**
138:1;296:19,20;297:1,3;
298:8
**Eric (12)**
42:21;130:2;141:20;
158:7;208:15,19,23;211:24;
226:10;228:4;247:13;
250:12
**ERISA (44)**
43:11;57:20;81:24;82:2,2;
84:1,3,5,20,21;102:9;104:2,
13;105:2,8,13,20;106:7,11;
110:7,24;111:4,4,6;112:2,2,
6,10;113:10;202:5;233:19;
240:22;241:3,9,19;246:5;
251:17;275:11,12;278:10;
311:13,14;320:7,14
**error (3)**
24:1;151:18;312:14
**errors (2)**
8:2;151:8
**especially (7)**
48:12;51:21;60:2,2;170:7,
8;176:24
**ESPYs (1)**
198:22
**Esq (6)**
5:4,5,6,12,15,16
**essentially (1)**
9:19
**estimate (1)**
214:24
**estimated (1)**
105:5
**etcetera (3)**
65:20;83:18;292:22
**ethical (6)**
47:5;88:8;220:13;271:1;
272:2;317:10
**ethicist (1)**
27:1
**ethicists (1)**
73:12
**ethics (9)**
6:9,15,18;27:11;40:21,22;
89:3;90:14;135:3
**evaluate (1)**
193:13
**evaluated (2)**
154:14;194:17
**Evan (4)**
215:18,18;216:5,13
**even (64)**
10:17;18:12,19;19:3,11;
22:19;25:16;29:4;34:4;35:8;
36:2;37:9;38:20;41:19;46:1,
1,19;47:17;50:9;52:16;

54:23;57:17;58:7;66:2;67:5,
8,9;71:9;77:4;78:9;117:4;
120:18;124:7;126:4;135:14;
137:22;138:3;145:9;146:7;
150:22;152:23,23;155:4;
159:21;174:12,17;178:13;
188:1,13;191:16,21;193:1;
194:18;203:12;210:23;
212:23;237:3;262:22;
264:20;274:17;281:3;304:3;
317:5,14

**event (2)**
260:16;290:17

**everybody (12)**
17:10;21:8;22:17,17;
38:22;51:24;61:3;79:9;
148:1;181:9;278:21;279:2

**everybody's (1)**
52:18

**everyone (12)**
106:5;114:18;150:22,23;
161:11;167:14,16;169:10;
178:11;184:24;185:17;
309:23

**everyone's (2)**
171:13;179:17

**everywhere (1)**
89:20

**evidence (35)**
8:1;48:12,13;94:15;99:10,
10;103:22;107:11;129:6,20;
154:13;179:14;187:20;
207:24;211:9,15;212:10,13,
15;213:3,9;223:2,8,15;
225:24;270:21;289:17;
299:4,6,7,9;309:21;318:11,
15;319:19

**evident (2)**
227:19;249:24

**evolving (1)**
26:17

**ex (9)**
121:13;123:12,19;127:9,
15,17;128:1,2,4

**exact (2)**
66:13;172:23

**exactly (12)**
6:23;24:22;38:19;154:3;
196:4;213:6;262:16;269:21;
283:2;313:2;315:20;317:20

**example (10)**
80:10;95:15;118:23;
131:21;147:19;230:18;
234:24;297:5;307:20;
319:13

**exceed (1)**
105:5

**excellent (3)**
273:11,11;322:24

**except (8)**
80:2;97:24;106:21;
134:16;217:22;303:15,17,17

**exception (9)**

38:23;132:3;133:21;
134:12;138:5;211:24;
300:16;315:21;318:13

**exceptions (3)**
131:23;134:1,10

**excerpt (2)**
263:19;302:11

**excerpts (4)**
109:17;263:11;264:9;
285:15

**excessive (4)**
149:17,24;150:11,16

**exchange (5)**
63:2;151:22;225:22;
233:9;245:1

**exchanges (2)**
249:23;252:12

**exclusively (2)**
136:5;286:15

**excuse (13)**
11:12;39:5;54:4;124:5;
133:17;163:14;177:16;
183:15;202:16;219:19;
252:15;285:4;291:20

**executing (1)**
316:18

**executive (1)**
132:18

**exercise (2)**
202:23;307:16

**Exhibit (2)**
196:1;309:1

**exhibits (2)**
195:1,3

**exist (5)**
73:6;78:12,15;123:23;
311:18

**existed (2)**
62:8;135:13

**existence (3)**
32:22;230:13;231:14

**existing (3)**
46:10;48:21;81:1

**expect (7)**
45:14;69:8;145:11;
206:17;261:17;267:17;
313:12

**expectation (2)**
24:8;234:15

**expected (3)**
57:21;246:21;261:7

**expended (1)**
100:12

**expense (1)**
295:20

**expenses (2)**
116:7;208:12;307:19

**experience (35)**
8:23;10:3;27:8;156:19;
167:15,15;172:8;183:10,13;
188:17;192:12,13;200:1;
206:2;229:12,13,14;238:9,
12;256:7;257:10;264:6,7;

268:13;269:12;289:20;
299:14;300:2,4,18;301:2,4,
7,21;302:1

**experienced (7)**
27:18;54:22;183:9;
200:18;238:13;239:10;
289:24

**expert (22)**
27:6;34:4,4;39:20;48:13;
63:13;68:16,17;80:1;90:11;
125:16;135:21;137:14;
138:22;139:12;169:14;
171:5;200:24,24;201:1,3;
274:21

**expertise (4)**
12:21;28:16;192:6,8

**experts (16)**
7:11;28:2;38:21;39:10;
41:3;42:8,10;66:11;77:17,
18;80:2,5;85:20;145:21;
146:12,23

**explain (2)**
32:11;179:11

**explained (4)**
66:10;110:19;152:11;
180:15

**explaining (1)**
241:12

**explains (2)**
183:5,18

**explanation (3)**
54:4;138:7;299:16

**explanations (1)**
212:18

**explicit (10)**
22:4,11,16,18;23:3;
153:11;154:22,24;159:20;
182:12

**explicitly (1)**
23:6

**express (1)**
25:15

**expressed (2)**
159:2;220:6

**expressing (2)**
233:22;251:19

**expressly (1)**
43:3

**extensive (2)**
192:12,13

**extensively (1)**
306:5

**extent (4)**
98:24;278:12;312:18;
317:13

**extraordinarily (1)**
133:1

**extraordinary (1)**
8:23

**extreme (1)**
65:11

**extremely (4)**
193:16;306:16;317:3;

322:14

**eyebrow (1)**
237:7

---

## F

**face (5)**
67:11;146:21,22;191:16;
209:13

**facilitate (1)**
141:9

**facilitated (1)**
53:5

**facilitates (2)**
238:5;239:5

**facilitation (1)**
150:14

**fact (70)**
13:3;27:16;41:19,22;
42:13;49:7;52:11;58:6,10;
65:6;66:16,18,21;67:15,19,
21;68:4;69:3,8;70:15,16,17;
74:14;77:6;79:21;91:3,19;
92:10,22;95:14,20;97:23,23;
103:24;104:18;107:22;
108:15;114:13;123:17;
129:7;130:2;138:15;139:21;
141:5,8;153:18;154:4,5;
160:22;183:15;186:17;
190:12;197:22;205:16;
206:6;209:4;221:15;238:16;
239:3;250:6;263:21;265:13;
266:17;273:5;282:11,12;
301:8,24;309:2;312:21

**factor (5)**
149:23;191:14;202:10;
233:19;261:13

**factors (4)**
17:3;57:14;60:11;261:15

**facts (11)**
64:22,23;127:11,13;
138:3;146:7;157:14;166:7;
176:3;271:5;289:19

**factual (3)**
113:9;220:22;221:14

**factually (3)**
220:12;270:22;296:19

**fail (1)**
66:17

**failure (3)**
69:14;216:18,19

**fair (26)**
15:23,24;16:14,16;17:6;
29:5;51:5;58:13,13,18,24;
60:7;86:5,7;106:8;125:13;
156:20;168:5;195:13,14;
196:7;200:10,14;205:15;
298:7;313:11

**fairly (6)**
13:5;16:5;23:15;41:17;
107:9;154:14

**fairness (7)**
59:2,3;61:23;72:10;

100:16;171:5;195:23
**faith (3)**
    52:21;96:23;271:22
**falls (1)**
    314:6
**false (7)**
    66:16,17,22,23;118:3;
    182:3,6
**familiar (8)**
    23:1;41:11;107:22;
    228:18;229:23;239:2,3;
    262:18
**familiarity (1)**
    299:5
**family (3)**
    197:3;198:6,7
**far (17)**
    9:7;17:15,18;62:15;63:9;
    64:16;94:24;95:1,5;103:21;
    140:15;143:22;145:3;
    183:10;201:23;209:17;
    317:18
**Faris (4)**
    62:12;65:3;130:14;140:23
**Faris' (3)**
    62:11;140:24;141:6
**fashion (3)**
    146:16;147:13;156:12
**fast (1)**
    31:10
**fault (3)**
    31:9;160:10;175:7
**faulting (5)**
    102:1;152:10;160:17;
    169:7,8
**favors (1)**
    239:4
**FBI (1)**
    204:12
**feather (1)**
    198:3
**feature (1)**
    286:20
**February (7)**
    163:3;166:17;179:5;
    214:21;313:5,24;314:6
**Federal (20)**
    27:2;56:4;60:14;71:24;
    88:2;116:22;117:3,5;
    120:19,22,23;121:1;125:19;
    144:24;170:8;177:1;202:17;
    204:9;206:8;305:9
**fee (216)**
    15:24;19:23;26:8,10,11;
    28:23;29:1,22;30:19;32:22;
    33:22;34:1,8,8,14;42:12;
    44:1,6;45:22;46:13;47:19;
    51:9;52:15,23;53:20;55:11;
    57:9,12,13,14,17;58:19,23;
    59:7;60:19,24;61:4,17;65:7,
    7;66:3;68:7;72:10;73:10,19,
    20,23;74:3,7;75:18,20;77:7,
    16,18,19;78:21;82:4;83:20;

84:20;85:7;86:5,6;89:4,18,
21,23;90:2,17;91:4,13;92:1,
7,24;93:1,1,2;101:1,2,7,10,
12,17,19;102:6,15;104:3;
105:18;109:16;111:16,17,
18;112:14;115:18;116:5;
117:20;119:5;121:5,5;
124:16;126:15;132:2;
133:11,20;134:21;135:8,11,
11,18;136:16,17,21;137:9;
138:18;140:2,2;143:5;
144:21;145:22,23;146:5;
149:17,19,21,24;150:1,5,16;
152:24;155:15,18;156:3;
158:11;159:17;163:22;
164:1;168:5;169:23;170:8;
176:6;180:5;181:4,4;
184:16,17;189:9;199:4,24;
200:3;202:14,18;203:5;
205:12,14;207:4,10;210:2,6,
24;212:7,24;213:19;215:9;
217:3,11,16;226:12;227:12;
232:17,19,19;233:1,14;
239:18;240:23;243:20;
244:17;245:21;246:4;248:9;
251:4,17;252:1,6;253:3;
257:3,5,7;258:3,5,7,9,14,16,
22,24;260:7,9;261:10,14;
265:16;266:18;267:4,21,22;
268:3,8;269:7;271:23;
280:11;307:17;310:7;
311:11,17,21;316:22;321:14
**feeder (1)**
    79:3
**feel (7)**
    7:1;14:18;44:16;50:17;
    154:7;277:8;280:13
**feeling (1)**
    165:23
**fees (42)**
    18:18;31:16;33:5,13;42:5,
    6;46:18;51:3,4;53:23;55:4;
    58:10;60:21;61:11,20;62:2;
    63:16;69:7,18;75:5;76:15;
    84:8;88:7,11;91:15;124:3,
    20;128:19,21;133:12;
    134:17;190:22;192:15;
    208:20;257:12;259:8,13;
    287:10;288:15;290:20;
    311:7;316:21
**fee-sharing (1)**
    258:2
**felt (7)**
    18:20;26:14,16;51:12,12;
    166:10;219:2
**Fernando (2)**
    291:11,13
**few (11)**
    6:24;103:8;152:16;188:1;
    193:3;208:3;228:5;229:11;
    233:7;266:5;294:6
**fiduciary (12)**
    61:16,18;73:5,10;75:6;

84:19;85:21;87:17;110:21;
111:9,13;202:19
**field (13)**
    8:12;19:10;27:11;54:23;
    169:15;229:14,15,16;256:5;
    266:6;268:14;270:2;320:18
**fifteen (1)**
    28:3
**fight (2)**
    190:18;311:23
**fighting (4)**
    52:20;53:11,16;207:9
**figure (11)**
    15:6;17:13;29:18;89:22;
    95:3;153:21;178:12;195:19;
    252:2;294:2;296:14
**figuring (1)**
    39:5
**file (4)**
    115:10,17;141:15;285:16
**filed (12)**
    54:10;113:24;114:12,13,
    24;115:13,23;116:1;118:12;
    268:3;313:7;321:13
**files (3)**
    108:16;182:14;222:4
**filing (6)**
    80:4;118:7;184:6;212:6;
    313:4;314:5
**filings (2)**
    183:23;215:10
**final (2)**
    166:22;167:2
**finalized (1)**
    94:14
**finalizing (1)**
    202:4
**finally (1)**
    251:22
**financial (2)**
    255:17;272:15
**find (17)**
    9:18;33:18;45:5,16;66:13;
    86:24;108:17;116:17;127:2;
    134:22;138:9;139:1;143:23;
    216:7;222:2;293:1;296:18
**finder's (1)**
    239:18
**finding (5)**
    63:23;77:22;129:7;193:5;
    195:1
**findings (1)**
    6:18
**fine (12)**
    7:3;30:16;70:4;80:22;
    116:12;130:20;131:4;149:9;
    199:17;273:10;299:22;
    322:16
**Fineman (3)**
    222:23;283:21;299:17
**finish (5)**
    50:7;104:24;149:14;
    247:22;260:21

**firm (126)**
    6:7;8:16;10:4;13:4,16,17;
    14:21;15:4,4,21;16:5,7;
    17:5;20:2,3,7;23:5,17;25:9;
    33:5,8,19;34:24;44:21;46:9;
    48:2,3;49:1;63:24;64:19;
    66:1;71:23;73:7,11;89:7;
    90:23;91:22;93:20;99:2;
    106:17;113:10,11,13;116:3;
    119:14,24;136:20;140:8,8,
    17;142:12,20;146:4;153:13,
    14;156:8,19;157:4;158:10;
    167:17;173:6;174:3,4;
    181:12,13,19;189:10;
    199:20,21;208:7;209:1;
    217:20;218:6;223:10;
    229:22;230:6;231:1;243:9;
    246:9;249:2;250:18,20;
    253:13;257:19;266:9,12,21;
    269:6;270:8,8;273:10,10;
    274:13,14;275:20;276:11,
    13,14,17;278:8,12;280:22,
    23;281:6,19;282:8,9;283:11,
    24,24;289:1,3,14;290:3,12,
    14,18;292:20,22;297:9,22;
    306:7,10;308:9;320:5,22
**firms (86)**
    6:5;8:9;9:15;10:5;11:2,18,
    20;13:7;16:14;18:5,12,19;
    22:12,21;24:21;27:21;
    42:22;45:14;47:22;53:2,22;
    58:3;69:21;71:9;90:23;
    91:10;95:18;118:8,13;
    135:9;138:17;141:18;143:2;
    146:10;149:18;152:21;
    156:2,3,7,16;163:3,7,10;
    175:3;178:10;180:5,7;
    181:11;189:10,21,22;
    190:12;199:18;217:21;
    218:5,5,12;227:10;229:17;
    230:1,5;238:24,24;240:24;
    248:9,10;253:12;256:16;
    258:2,11,19;264:23;271:16;
    273:15;274:15;275:7;
    277:13;280:4,6;311:19,23;
    312:10;317:10;320:17,18;
    321:16
**firms' (1)**
    153:6
**firm's (7)**
    8:13;156:15;253:13;
    254:4;256:14;259:15;
    269:11
**first (65)**
    7:15;18:17;19:3;27:17;
    33:9;34:8;36:4,6;37:7,10;
    42:1;46:11;53:18;55:11;
    56:3;57:8;58:18;61:9;66:9,
    20;74:2;81:13;89:21,22;
    103:3;104:6;113:9;118:5;
    122:21;125:9,21;132:7;
    133:6,9;143:13;169:16;
    173:13;178:6;183:11;

186:11;187:6;219:14;220:8;
222:8,11;224:2;227:22;
228:9;233:10;240:3,17;
242:5;251:13;255:20;
263:19;268:2;280:18;283:1;
295:4,15,17,17;299:18;
312:1;313:5
**first-level (1)**
292:1
**fish (3)**
239:17,21,24
**fits (1)**
240:22
**five (7)**
10:10;44:7,9;62:21;119:1;
214:10;267:11
**fix (1)**
184:13
**flag (4)**
176:6;267:23;268:12;
269:6
**flat-out (1)**
117:2
**Fleas (2)**
43:14,15
**flies (1)**
43:12
**flight (1)**
201:12
**flip (1)**
145:7
**flipped (1)**
135:2
**Floor (1)**
5:7
**Florida (2)**
108:7;208:18
**flow (2)**
72:22;78:17
**flowed (1)**
110:17
**flowing (1)**
113:2
**flows (2)**
73:12;109:7
**focus (12)**
41:19;49:4;64:15;78:20;
92:22;136:6;179:14;180:10;
187:6;225:21;292:18;
313:12
**focused (11)**
16:3,3;18:7;19:16;53:18;
202:19,20,22;205:13;
207:12;309:2
**focusing (5)**
91:13,14;124:11;142:15,
21
**folks (20)**
9:16;14:13;64:4;82:7;
100:8;110:7;129:8,15;
153:12;160:2;164:17;
192:18;223:21,21;231:22;
232:8;253:16;272:19;273:8;

276:5
**follow (4)**
60:24;110:13;120:8;212:5
**followed (5)**
40:8;51:13;109:22;298:5,
6
**following (8)**
41:4;174:14;215:19;
221:3;241:10;282:7;297:18,
19
**follows (5)**
72:24;209:21;212:1;
228:4;259:14
**fool (3)**
152:8;161:5;177:4
**footnote (6)**
35:5;36:14;158:19;
297:13,18,19
**force (1)**
188:18
**foremost (1)**
125:9
**forever (1)**
28:7
**forewarned (1)**
40:18
**forgiving (1)**
177:24
**forgot (1)**
122:17
**forgotten (1)**
243:12
**form (4)**
128:8;165:3;217:16;
221:24
**forth (16)**
16:10;95:15;107:24;
137:8;156:10;194:2;195:5;
197:17;201:24;215:1;
216:16;219:22;246:10;
262:3;309:16,23
**forum (4)**
228:19,24;237:1;267:14
**forward (14)**
20:23;40:1;42:23;45:4;
46:13;47:16;71:16;206:14;
213:14;225:16;232:11;
233:7;243:15;263:15
**forwarded (1)**
6:23
**forwarding (1)**
243:22
**found (11)**
22:16;51:17;62:18,23;
64:18;95:4;193:3;195:17,
22;222:4;244:15
**founding (1)**
13:20
**four (10)**
10:10;147:20;148:2,8;
200:16;207:7;220:8,22;
305:24;322:6
**Fourteen (2)**

125:14;126:17
**fourth-year (3)**
300:19;301:4,7
**four-year (1)**
300:21
**framed (4)**
65:18;91:5;160:22;168:20
**Francisco (1)**
5:8
**Frankly (13)**
12:11;14:5;41:6;126:14;
131:4;133:2;161:24;170:13;
173:15;176:18;177:9;
185:16;278:11
**fraud (1)**
188:17
**frauds (1)**
48:16
**free (5)**
7:1;20:23;196:22;197:2;
280:13
**friend (2)**
62:11;291:10
**friendly (1)**
156:16
**friends (2)**
6:14;27:22
**front (17)**
23:2;32:12;99:8,16;
100:13;114:15;125:12,16;
158:15;198:14;204:10;
206:2;216:12;228:23;
252:24;253:1;303:7
**frustration (1)**
26:13
**fulfill (1)**
85:21
**full (9)**
106:17;228:14;233:17;
238:1,4;243:3;253:22;
270:16;292:14
**full-time (1)**
302:7
**fully (12)**
29:9;118:4;135:21;
181:14;259:22;272:24;
273:3;277:12,16;298:3;
302:4,17
**fun (1)**
322:20
**function (3)**
57:12;96:11;231:15
**functioning (4)**
84:23;140:16;142:20;
143:2
**functions (2)**
261:8;283:2
**fund (22)**
18:23;141:7;230:14,15,
16,16,19;231:18;232:7;
234:21;238:18;252:16;
256:1,3,9,12;262:18,19,24;
264:15;266:15;269:15

**fundamental (1)**
213:1
**fundamentally (1)**
280:19
**funded (1)**
170:20
**funding (1)**
141:6
**funds (20)**
54:6,16;55:3,3;57:6;
119:12,21,21;129:16;
141:14;229:9,18,22;238:18,
22,23;256:6;266:8,10;320:9
**funneling (1)**
119:24
**furious (1)**
187:11
**further (7)**
193:24;221:11,16;239:14;
254:8;277:10;310:15
**future (5)**
39:18;162:2;176:18,22;
213:14
**FX (3)**
62:17;63:2;192:12

**G**

**gained (1)**
188:1
**gambling (1)**
72:12
**game (3)**
59:21;197:13;273:23
**garnished (1)**
170:20
**Garrett (71)**
16:2,10;91:12,19,19;92:3,
11;93:12,17;94:5;97:13,16,
19;151:21;156:13;157:19;
161:12;163:1;165:9,21,23;
166:10;167:6,10;173:22;
174:22;176:2,2,19;178:8;
179:2;186:22;188:6;207:21;
209:1,15,17;211:22;216:11,
14,18;217:5;222:22;223:4,6,
9,15;224:23;225:6,24;
231:23;233:10;240:19;
241:21;242:5,21;243:5;
245:2,13;247:7,11,14;
248:20;250:6;309:2,3,8,22;
310:20;312:22;315:11
**Garrett's (9)**
162:5,16;163:11;172:21;
179:18;180:19,20;197:12;
247:5
**gatekeeper (1)**
43:4
**gathered (1)**
101:5
**gathering (1)**
226:23
**gave (14)**

34:13;35:1;36:19;38:21;
62:12;79:20;132:4;161:14;
169:15;177:14;269:9;
279:10;305:21;312:2

**general (18)**
76:4,13;117:7,9,12,14;
120:12,17;121:6;123:3;
136:11,13;228:18;230:15;
256:4,11;267:5;320:22

**generally (3)**
47:16;94:6;228:17

**generate (1)**
208:11

**generically (1)**
183:23

**gentlemen (2)**
245:2,20

**geographically (1)**
79:18

**George (26)**
42:14;43:2;49:7,12;50:17;
52:9;53:15,23;54:8;62:15,
16,22;63:22;64:15;83:12;
92:13,14;93:6;94:9;98:1;
100:3;108:11;111:1;129:12;
130:1;319:8

**Gerber (2)**
5:16;174:16

**gestated (1)**
211:22

**gestation (1)**
15:10

**gets (10)**
21:11;69:21;163:17;
184:11;207:9,12;238:7;
290:12,15;311:23

**gig (1)**
254:14

**gild (1)**
222:6

**Gillers (23)**
5:13;26:16;39:1;42:9;
68:15;76:3;79:24;81:16;
90:12;133:3,14;134:19;
137:22;147:3;148:13,18;
155:3;157:13;166:7;206:1;
213:22;220:10;270:23

**Gillers' (10)**
35:5;36:13;68:3;74:13;
129:7;137:19;171:3;195:2;
220:5;221:13

**given (34)**
31:22;37:1,4,18;60:12;
64:14;65:3;68:1,3;70:13,13,
14,15,16,17;104:8;129:12;
170:14,14;176:2;181:24;
206:6;208:12;239:22;
253:21;263:24;274:9;
282:16;284:15;289:20;
292:9;299:15;307:9;318:14

**giving (3)**
171:23;200:6;269:10

**glad (4)**

112:23;121:15;174:10;
209:11

**glaring (1)**
66:22

**GLASS (1)**
312:6

**Globe (2)**
178:13;198:15

**glom (1)**
181:3

**gloss (2)**
135:14;143:6

**Gloves (1)**
151:7

**go-around (2)**
37:7,11

**goes (22)**
55:12;57:7;74:4,5;89:21;
145:14;176:20;177:10;
181:22;186:12;216:20;
227:9;242:9;243:2;246:8;
247:10;259:12;268:6;
288:21;296:3;299:17;
313:13

**Goldberger's (1)**
286:18

**Goldbergs (1)**
12:24

**Golden (1)**
151:7

**Goldsmith (8)**
160:11,21;168:19,24;
178:18;186:4;203:5,6

**good (27)**
6:15;42:10;51:10;52:1,21;
55:9;61:4,7;96:23;98:2;
110:3;125:3;127:24;154:4;
163:5;190:16;210:18;
214:16;219:3;256:18;
271:21;273:8,9;296:2;
304:1;323:4,5

**goose (1)**
196:17

**govern (3)**
117:3;120:20;121:2

**governed (1)**
81:22

**governing (3)**
38:1;125:19;133:18

**government (2)**
132:10;199:12

**governmental (2)**
132:15,19

**governs (4)**
110:12;120:16;123:14;
125:15

**grace (1)**
40:16

**grade (3)**
172:10,13,19

**grades (1)**
171:23

**grading (1)**

172:15

**graduated (1)**
302:2

**grand (1)**
154:5

**granted (1)**
316:19

**grapevine (1)**
83:8

**grass (1)**
148:2

**grateful (2)**
39:7;86:3

**gratified (1)**
322:14

**gratuitous (1)**
283:4

**gravy (3)**
16:24;190:7,9

**grazing (1)**
148:1

**great (20)**
8:23;11:6,8;54:14;63:24;
64:3,4;72:5;100:12;140:8;
185:2;203:7,18;206:19;
213:20,24;221:21;248:13;
257:14;310:13

**greater (4)**
6:6;19:12;265:3;306:10

**Green (4)**
68:18;136:1;139:14,15

**gross (1)**
252:6

**grounds (1)**
177:21

**group (6)**
8:22;105:1;201:7;240:4;
281:13,14

**grown (2)**
65:13;88:23

**grown-ups (1)**
306:9

**guess (13)**
41:12,17;61:14;62:16;
150:10;175:7;178:7;199:2;
207:17;214:24;274:4;290:4;
319:2

**guessing (1)**
290:11

**guidance (1)**
18:15

**guy (19)**
45:19;46:11;90:2;190:15;
199:17,17;201:11;210:3,9,
20,22;211:3;237:13;239:15;
250:20;254:14,19;267:9;
269:7

**guys (13)**
163:13,15;167:23;168:4;
194:2;196:18;199:5,11;
203:12;267:2;277:14;
303:21;311:4

**guy's (1)**

188:15

## H

**hac (3)**
41:10;97:4;113:15

**hac'd (1)**
41:10

**hacs (1)**
96:8

**hair (1)**
180:2

**hairs (1)**
184:18

**Hal (4)**
27:9;68:19;79:4;80:3

**half (3)**
41:18;211:4;258:11

**halfway (3)**
241:20;242:4;245:10;
247:3;297:5

**hammer (2)**
210:5;311:7

**hammering (1)**
210:22

**hand (2)**
43:21;47:4

**handbook (1)**
79:13

**handed (1)**
239:4

**handful (1)**
257:14

**handholder (1)**
83:14

**handing (1)**
145:12

**handle (5)**
28:18;77:22;78:4,4;231:7

**handled (2)**
12:14;317:22

**handles (2)**
258:5;260:6

**handling (2)**
25:3;78:7

**hands (1)**
187:9

**Hang (3)**
7:16;201:10;287:24

**happen (16)**
11:14;14:20;20:14;23:10;
25:11;26:20;53:21;63:8;
75:9;80:9;159:18,19;
170:11;176:18;213:17;
238:10

**happened (41)**
8:1,6,15;12:8;14:18;
18:13;20:10;22:2;34:13;
37:15;40:11;56:3;78:8,11;
81:13;82:24;89:9;95:7,8;
99:15;112:7;118:9;129:21,
23;135:10;140:22;142:14;
143:16;152:2;168:16,17,18;

169:1,1;170:13;187:4;
241:1;264:11;272:23;
274:19;315:21
**happening (7)**
18:11;24:2;38:20;56:8;
142:24;145:11;224:8
**happens (14)**
25:8;79:2;91:2;132:15,19;
139:11;141:22;142:24;
143:7,13;145:1;161:11;
178:13;237:2
**happy (6)**
272:22,23;273:5;276:16;
284:4;321:21
**harbor (2)**
186:10;191:5
**hard (11)**
27:20;42:1;48:7,24;79:4;
89:10;139:1;145:10;200:15;
255:18;277:12
**HARLAN (2)**
215:24;216:1
**harm (3)**
35:19;170:21;199:10
**Harry (1)**
12:24
**Harvard (2)**
201:2;302:2
**hashed (1)**
163:17
**hat (1)**
250:7
**hats (2)**
93:18;250:7
**Hawaii (1)**
314:24
**HC (2)**
313:17;318:14
**head (4)**
50:4;51:19;108:3;309:19
**heading (1)**
82:15
**hear (7)**
26:4;33:22;47:2;71:2,7;
226:2;273:23
**heard (11)**
43:2;68:18;83:8;124:16;
179:13;188:21;212:17;
255:20;268:7;279:5;321:6
**hearing (14)**
27:17;55:22;59:2,3;61:23;
65:16;69:6;74:20;133:13;
160:6;180:15;186:18;203:9,
9
**hearings (1)**
316:5
**heart (1)**
14:5
**heated (1)**
229:16
**heavily (1)**
74:20
**heavy (3)**

9:18;170:19;210:13
**HEIMANN (184)**
5:3,4;11:23;12:4;21:13,
18;113:17,23;122:6;172:6;
214:10,13;215:5;219:6,8;
220:3;221:12,21;222:24;
223:8,16,23;224:7,12;225:4,
7,9,15,20;226:8,15,18,22;
229:4,6;230:11;231:5,8;
234:8,11;238:1,9;239:19;
240:1,14;242:1,4,16;243:1;
244:1,3,5,10;245:10,13,16,
19,23;246:3;248:4,22;249:9,
15,18;250:9,22;251:11;
252:10;253:4,15;254:5,20;
255:1,7;257:19,21,24;258:4,
14,23;259:4,12,20,24;260:4,
12,15,19,24;262:6,16;
263:10,14,17,19;265:19,23;
266:22;267:1,5,11,24;
268:21;269:3,8,21;270:15,
19;271:11,15,19;272:9,14,
17,22;274:4,7;275:6,12,19,
24;277:5,9;278:19;280:1,
18;281:15,21;282:1,5,18,20;
283:1,14,17,20;284:7,14,19,
21;285:9,13,19;286:12;
288:2,6,10,14;290:16;291:7,
14;292:17;293:7,12,20,23;
294:11,22;295:2,10,14;
296:21;297:12,17;298:5,23;
301:3,13,17;302:21,23;
303:17,23;304:3,9,14,21;
305:16;307:2,6,9;308:1,6,10
**hell (1)**
237:13
**Hello (1)**
98:9
**help (2)**
58:21;69:10
**helpful (4)**
6:22;10:11;14:2,8
**helping (1)**
256:17
**Hemingway (1)**
240:4
**hereby (2)**
259:7,13
**Here's (6)**
15:21;61:3;98:23;137:3;
153:17;309:12
**Heritage (1)**
158:21
**Herron (15)**
29:12;42:19;48:3,17;
62:10,11;130:5,14;135:10;
136:20,22;140:17,17;141:1,
23
**hesitated (1)**
21:4
**hey (1)**
46:9;204:16;231:2;269:6
**hide (2)**

109:1;129:10
**hiding (1)**
110:2
**high (7)**
90:2;189:4;197:22;
200:15;222:1;238:20;
239:20
**higher (7)**
25:20;123:22;124:4;
169:19;173:18;184:3;
196:14
**highlighted (10)**
39:4;47:8;233:2;285:2,14;
287:5;288:3,5,7,11
**highlighting (1)**
251:18
**highly (3)**
84:14;193:4,21
**high-stakes (1)**
289:14
**Hill's (1)**
286:18
**himself (8)**
10:15;42:17;50:9;186:10;
200:23;211:12;232:7;
314:19
**hindsight (7)**
32:6,18;33:23;52:2,4;
61:12;254:6
**hire (2)**
25:5;140:8
**hired (1)**
292:21
**hiring (1)**
306:9
**history (5)**
20:10;25:9;29:11;42:14;
56:5
**hm (12)**
38:9,9;144:5,5;242:15,15;
248:3,3;282:24,24;292:16,
16
**hmm (1)**
198:3
**Hoffman (4)**
195:4;215:18;216:5,24
**hold (2)**
120:1;283:23
**holders (1)**
43:21
**holding (1)**
151:9
**home (1)**
257:9
**homogenizing (1)**
293:14
**honest (4)**
17:22;160:23;161:9;279:8
**honestly (4)**
34:19;42:8;68:6;69:16
**Honor (48)**
6:21;12:15;17:17;19:4;
20:5;26:22;31:23;33:21;

35:17;37:14;40:5;47:2;48:6;
51:5;54:20;57:16;58:20;
60:8;65:9;67:23;71:15;75:9,
14;77:1;81:4;84:11;86:3,14;
87:23;88:16;99:21;101:6,
21;103:2;104:11,16;106:3;
112:20;122:9;125:3;139:10;
140:10;197:10;207:15;
214:15;221:2;315:13;
318:10
**honorability (1)**
172:11
**honorable (2)**
172:10,13
**Honor's (3)**
15:16;67:6;150:12
**hook (1)**
48:16
**hope (9)**
48:6;154:9;199:15;
232:18;283:14,17,18;
312:10;317:8
**hopefully (2)**
19:21;154:12
**hoping (1)**
251:5
**Hopkins (34)**
42:15;43:2;49:8,12,17;
50:17;52:10,15;53:15,24;
54:8;62:16,16,22;63:22;
66:1;83:12;92:13;93:6;94:9;
98:1;100:4;108:12;110:3;
111:1;129:12;142:11;314:9,
11,16;315:22;316:18;317:2;
319:8
**Hopkins' (1)**
64:15
**Hot (1)**
195:17
**HotDocs (1)**
192:21
**hour (8)**
9:8;188:22;197:8;201:19;
287:21;299:11;300:17;
301:24
**hourly (14)**
58:9;219:17;280:10,21;
286:2,3;287:7;288:16;
292:13,18;293:17;296:7,9,
14
**hours (18)**
9:6;58:13;119:1;149:11;
157:22;160:13,15,16,17;
169:4,5;175:23;190:16;
191:3;195:8;228:3;262:21;
322:6
**housed (1)**
167:22
**HR (1)**
305:8
**huge (5)**
129:16;307:1,1;314:10,20
**human (1)**

178:1
**Humpty (1)**
278:24
**hundred (3)**
170:6;197:8;251:8
**hundreds (2)**
78:1,1
**hurry (1)**
103:15
**hurt (3)**
106:21;118:21;197:15
**hurts (1)**
106:22
**Hutchings (1)**
114:5
**hybrid (1)**
51:22
**HYLENSKI (1)**
98:13
**hypothetical (11)**
75:8;118:6;140:11;
144:16;145:16;175:2;220:7,
11,23;221:15;270:22
**hypotheticals (1)**
144:18

# I

**idea (12)**
61:7;128:22;156:23;
161:4;167:24;218:8;228:11;
239:20;281:4;292:15;296:2;
315:13
**ideal (1)**
164:24
**ideally (1)**
228:21
**identified (2)**
219:13;321:14
**identify (1)**
215:23
**identities (2)**
49:9;222:15
**identity (2)**
265:24;266:11
**ignore (3)**
138:24;162:5,10
**ignored (1)**
67:7
**ignoring (2)**
156:1;162:17
**illegal (1)**
188:13
**Illinois (1)**
314:24
**illogical (1)**
218:9
**illogically (1)**
39:21
**imagine (2)**
63:21;254:1
**immaterial (2)**
173:17,20

**immediate (1)**
256:7
**immediately (3)**
178:8;185:15;297:18
**impact (3)**
58:12;103:13;147:1
**impactful (2)**
281:19,23
**imperfect (3)**
143:11,24;144:3
**impermissible (2)**
90:16,17
**implement (1)**
15:8
**implemented (5)**
12:17;15:17;47:11,12;
70:14
**implements (1)**
28:8
**implicate (1)**
136:9
**implicated (5)**
130:24;140:13;144:8,15;
145:16
**implicates (1)**
146:22
**implication (3)**
130:19;139:21,23
**implications (1)**
125:7
**implicit (12)**
22:19;154:18,22;155:1;
157:8;158:24;159:2,21,23;
175:5;218:1;221:13
**implied (3)**
35:6;135:7;159:1
**imply (2)**
17:8,8
**importance (2)**
6:7;40:11
**important (33)**
6:5;18:8;97:17;99:15;
100:10;126:16;156:1,23;
165:13;170:5;177:15;202:2,
10;203:24;246:7,14;247:18;
248:5;256:22;262:16,17;
263:5;266:7;291:17,22;
292:2,10;294:5;295:3,16;
298:20;302:9;312:20
**importantly (3)**
40:24;132:6;222:13
**impose (1)**
290:2
**imposed (4)**
39:13;40:16;204:3,6
**impossible (3)**
48:24;68:22;151:10
**impressed (1)**
9:14
**impressive (1)**
169:14
**improper (7)**
47:4;79:16;80:13,14;

188:14;189:5;279:17
**improperly (1)**
49:5
**impropriety (1)**
132:23
**inaccuracy (1)**
173:9
**inaccurate (3)**
179:24;180:22;182:1
**inadvertence (1)**
153:3
**inadvertent (12)**
6:20;8:2;12:13;151:18,24;
153:4,7,10,15;186:1,6;
218:17
**inapplicable (2)**
118:6;133:2
**inappropriate (4)**
21:6;52:24;81:9;319:18
**incentive (2)**
156:5;164:15
**inception (7)**
100:22;107:13;310:20,22,
24;311:1,1
**incident (1)**
291:21
**inclination (1)**
9:18
**inclined (1)**
103:7
**include (19)**
8:13;22:9;46:14;56:13;
80:9;116:5,7;118:23;
153:12;157:21;171:3,13;
175:20,21;199:20;218:2,9;
308:5,6
**included (6)**
32:19;35:5;57:13;159:16;
175:22;258:17
**includes (2)**
242:20;284:22
**including (12)**
90:11;130:15;132:10;
174:1;201:7;219:17;228:9;
232:9;258:11;264:24;280:5;
305:7
**incomplete (1)**
278:14
**inconsistency (1)**
117:2
**incorporates (2)**
121:10;133:21
**incredibly (1)**
229:16
**incurious (1)**
234:6
**indeed (3)**
82:1;208:14;319:15
**indelicate (1)**
272:19
**independent (1)**
306:12
**independently (2)**

191:17,21
**indicate (1)**
105:4
**indicated (8)**
8:1;27:16;76:7,14;103:14;
151:19;280:14;281:18
**indicates (1)**
222:1
**indicating (5)**
185:2;194:15;242:13;
279:11;304:5
**indication (2)**
9:12;117:11
**indications (2)**
25:15;162:6
**indicia (1)**
309:8
**individual (7)**
52:16;73:7;131:19;
132:15;149:19;164:12;
313:12
**individuals (3)**
8:13;13:7;262:2
**individual's (1)**
286:19
**industry (1)**
270:11
**inevitably (1)**
8:7
**infer (5)**
13:10;118:12;204:22,22;
205:13
**inference (2)**
168:22;211:2
**inflate (1)**
17:2
**inflated (1)**
17:5
**influence (2)**
198:12;266:14
**Inform (4)**
44:4;112:2,2;127:10
**information (8)**
37:7,10;106:17;114:10;
116:11;206:4,5;261:20
**informed (5)**
44:2;127:12;239:13;
272:24;273:4
**infrequently (1)**
283:7
**infringe (1)**
189:18
**inherent (4)**
59:24;60:3;61:19;85:11
**initial (5)**
20:9;27:17;166:12,16;
302:11
**initially (4)**
79:20;100:6;113:24;251:6
**injury (1)**
198:22
**ink (1)**
7:17

**innocent (1)**
12:13
**in-person (1)**
131:18
**inquire (1)**
239:14
**inquired (2)**
206:9;234:5
**inquires (1)**
60:19
**inquiry (11)**
99:3;143:9;175:10;178:6,
15,20;180:11;182:13;
221:11,16;299:4
**insight (1)**
271:24
**insignificant (2)**
306:13,14
**insisted (1)**
167:13
**insofar (2)**
106:21;271:24
**instance (7)**
33:9;36:6;56:16;82:8;
147:18;178:6;238:11
**instances (4)**
44:22;230:4;282:11;316:6
**instead (7)**
24:21;75:3;155:20;
173:21;207:6;210:11;
267:16
**institution (1)**
42:16
**institutional (5)**
45:9;80:11;253:13;
261:19;262:7
**instruct (2)**
56:10;275:22
**instructions (2)**
51:14,15
**instructive (1)**
150:4
**insulate (1)**
137:10
**insurance (4)**
283:11;284:5,11,12
**intended (3)**
19:11;139:7;146:24
**intending (1)**
221:7
**intense (1)**
238:16
**intent (7)**
29:24;109:3;139:10;
142:13;187:20;317:11;
319:19
**intentional (8)**
6:20;37:22;106:20;151:5;
161:23;312:20;318:1;
319:13
**intentionally (7)**
92:18;109:1;165:6;177:3;
317:12;319:13,20

**interacting (1)**
262:14
**interchange (2)**
165:21;166:14
**inter-counsel (2)**
19:18,21
**interest (13)**
32:9,14;56:3;76:20;85:12;
156:15;163:12;204:23,24;
205:1,3;232:17;238:7
**interested (10)**
7:1;104:17;143:15,17;
204:19;205:6,15,19;239:1;
279:15
**interesting (12)**
27:10,15;28:1;38:2;41:22;
43:5;49:11;79:14;174:10;
197:23;205:7;277:7
**interests (3)**
84:5;87:6,12
**interim (3)**
15:9;40:20;111:20
**interjected (1)**
260:24
**intermediary (1)**
248:21
**internally (1)**
306:18
**interplay (5)**
70:24;133:15,16,17;
146:16
**interpret (2)**
263:6,24
**interpretation (7)**
67:6;135:6,6;148:20,20;
149:20;250:14
**interpretations (1)**
96:23
**interpreted (2)**
35:12;136:15
**interrogatories (3)**
83:21;114:10;116:16
**interrogatory (4)**
83:2;116:14;299:23;
321:10
**interrupt (1)**
278:17
**interruption (1)**
98:3
**intervening (1)**
38:13
**interviewed (1)**
10:11
**interviewing (1)**
10:9
**interviews (1)**
31:5
**into (32)**
14:24;21:17,20;22:10;
26:8;31:16;53:24;79:17;
91:1;105:12;107:8;108:12;
109:2;120:18;144:1;145:7;
171:7;182:11;186:12;

187:23;191:4;201:6,23;
207:8;212:9;239:6;261:15;
264:22;266:5;271:24;
302:12;317:8
**introduce (1)**
93:8
**introduced (1)**
46:12
**introduces (1)**
89:9
**introduction (8)**
53:5;65:2;78:11;80:10;
130:15,17;150:14;238:5
**invalid (2)**
48:22,23
**inventing (1)**
147:3
**invested (1)**
72:12
**investigate (3)**
211:6,13;213:8
**investigated (1)**
310:15
**investigation (17)**
26:20;31:16;33:4,10;37:2;
46:20;47:8;144:19;153:21;
154:6;170:21;276:17;
278:13;300:12,22;302:12;
310:13
**investigations (1)**
153:23
**investigative (1)**
322:11
**investment (5)**
103:11;129:16;132:20,22;
199:19
**investor (3)**
80:11;261:19;262:7
**investors (2)**
45:9;105:2
**invites (1)**
148:20
**involve (2)**
6:19;105:10
**involved (22)**
6:6;8:6,12;50:22;51:7;
84:22;142:12;154:11;
170:14,15;206:23;222:9;
239:1;264:23;278:13;
287:17,18;288:17,18;314:9;
315:24;317:3
**involvement (4)**
93:8;227:22;233:23;
314:12
**involves (2)**
229:8;314:18
**involving (4)**
7:8;140:24;227:7;232:6
**iPhone (1)**
38:18
**irrelevant (2)**
89:5;191:7,11
**irrespective (2)**

16:20;70:21
**issue (67)**
7:5,5,24;11:11,13,16,22;
15:20;18:16;30:3,8,11;34:5;
36:2,3,24;39:8;45:24;47:6,
13;48:13;51:6;55:2;68:9;
70:20;71:17;72:21,22;
79:24;81:15;85:7;88:10;
90:20;91:13;100:5;101:6;
106:2,5;107:16;109:6;
117:2;120:19;123:5;133:11;
136:5;138:20;150:10;167:7;
178:5;187:23;188:2,5;
204:2;213:9;219:16,17;
231:2;271:8;277:22;278:18,
20;279:23;280:1;289:19;
295:20;321:10,20
**issues (18)**
6:24;7:14;18:5;49:18,19,
22;71:5,18;119:10;122:18;
129:15;138:15;144:17;
179:4;201:23;305:7,8,8

**J**

**jack (8)**
162:8,10;163:2,12;166:2,
12,16;214:20
**jacking (2)**
16:4;156:13
**JAMS' (1)**
7:18
**January (2)**
93:17;208:6
**Joan (24)**
37:9;71:11;75:12;86:1;
87:2;107:11;113:7;115:20;
116:21;120:11;128:12;
148:22;152:11;164:18;
206:9;250:6;277:24;279:9;
280:14;305:3;310:6;311:24;
312:7;316:9
**Joan's (3)**
21:17,20;260:4
**job (8)**
13:2;64:1,4,4;161:1;
213:20;256:18;306:12
**jobs (1)**
213:23
**jockey (1)**
163:8
**jockeying (2)**
163:4;167:4
**join (1)**
124:15
**joint (9)**
123:9,10,15,23;124:6,13;
126:5,6,9
**jointly (5)**
141:10,15;142:18,24,24
**joke (1)**
54:24
**Josh (2)**

38:15;39:6
**Joy (5)**
  66:10;68:19;72:21;
  135:22;136:6
**Judge (193)**
  10:19;19:15,15;20:23;
  27:16;33:11;37:5;50:2;52:7,
  18;55:17;56:5;57:17;58:21;
  59:2,17,17,19;60:5,6,11,12;
  61:4,10,15,21;62:2,3;67:8;
  68:22;69:3,6,11;70:12,18,
  24;71:4;72:5;74:4,19;75:3,
  15,17,23;76:14;77:5;86:21;
  87:17,18,20;88:2,2,20,21,
  23;90:3,3,5,8;99:11,16;
  101:23;102:1,7,22,23;103:6;
  109:8,9;114:15,21;115:1,24;
  118:12;119:13;127:2,17,24;
  128:1,5;130:10;138:14;
  150:20;151:13;152:8,21;
  153:1,14;156:1,6;159:7;
  160:6;161:5,7,23;162:18;
  163:15;164:12;165:7,17;
  170:18;171:4,19;173:16;
  174:8,18;175:11,19;177:1,1,
  4,11,12,13;179:4;180:2,15;
  182:23;183:8,20;184:12,15,
  20;185:12;186:16,17;
  187:11,21;188:2;195:23;
  197:6;198:9,12;200:6,15,23;
  202:18,24;203:1,7,16,19,24;
  204:8,14;206:2,8,24;218:24;
  237:9;255:16;257:5;258:5,
  15,16,18;259:6,21;260:6,13,
  15;267:12;271:20;278:2;
  280:17;281:12,15;285:1,23;
  286:14;289:5;291:5,15;
  292:6,7,17;293:6;294:17;
  296:1,17;298:3;299:8;
  300:9;302:5,18;303:1,7,17,
  22;305:1;306:4;311:21;
  322:9
**judges (18)**
  9:16;10:20;11:3;17:19;
  19:3,10;60:1,4;70:6,8;
  88:19;151:2,4;175:19;
  204:9;258:6;270:13;306:22
**judge's (2)**
  39:24;68:20
**judgment (5)**
  150:5;268:9;286:2;290:2;
  296:8
**Judicial (1)**
  28:8
**July (6)**
  243:19;244:3,11;245:1,
  12;247:23
**jump (1)**
  318:9
**jumping (1)**
  243:16
**June (7)**
  158:11;161:15;202:24;

203:10;232:14;243:18;
  244:17
**jurisdiction (9)**
  6:17;63:15;77:10;86:23;
  89:7;96:6;101:14;129:22,23
**jurisdictions (1)**
  65:11
**jurisdictions- (1)**
  128:15
**jury (1)**
  154:5
**justification (3)**
  188:22;280:4;291:1
**justified (1)**
  302:17
**justify (1)**
  261:17
**Justin (1)**
  30:24

**K**

**Kaplan (9)**
  257:6;258:5,15,16;259:6,
  22;260:6,14,15
**keep (7)**
  102:8;108:9;147:1;
  153:24;162:13;250:2;
  297:17
**Keller (18)**
  91:11;95:11;108:15;
  208:16,19,24;224:4,8;225:6;
  226:11;229:2,3;245:5;
  247:12;248:13,14;250:12;
  269:17
**KELLY (116)**
  150:20;153:8,16;154:1,4;
  155:16,24;157:5;158:19,24;
  159:12;160:8;162:12,17,23;
  164:3,5,21;166:6,16,22;
  167:3;168:9,13;169:2;
  170:3;171:15,20;172:5,14,
  18;173:4;174:8;175:1;
  176:10;178:15,19,22;179:1,
  6,13,21,23;180:22;181:22;
  182:10,14;183:1;184:8,11;
  185:16;186:11,17;188:5,24;
  189:16;190:10,24;191:4;
  193:10,14;194:4,18;195:12,
  16,23;196:7,11;197:2,9,14,
  16;198:4,16,20;199:23;
  200:13;201:9,15,22;203:10,
  12,16;205:5,18,24;207:15,
  17,23;208:8;209:11,19;
  210:1;211:1,18,20;212:1,8,
  14;214:5,9,15,18;215:8,13;
  216:6,20;217:21;218:3,16,
  24;226:4;304:11;309:11;
  310:21;311:3
**Kelly's (1)**
  38:15
**kept (1)**
  40:15

**Kessler (2)**
  264:20;270:7
**key (4)**
  246:11;265:23;284:10;
  317:11
**keying (1)**
  265:24
**kicking (1)**
  194:2
**kick-off (2)**
  225:16;248:1
**kicks (1)**
  233:9
**kidding (1)**
  180:5
**kind (22)**
  22:4;74:9;84:15;109:19;
  110:20,21,22;159:23;
  175:23;187:24;191:8,9,10;
  239:13;256:6;258:18;264:4,
  4;265:21,21;266:20;300:23;
  318:1
**kinds (6)**
  25:15;44:21;45:10;
  234:15;240:6;289:24
**knew (35)**
  30:6;39:2;41:15;42:18;
  91:19,20,22,24;92:1,2,21;
  93:3,13;94:5;104:15;
  106:24,24;138:8;155:7;
  207:22;209:3;210:3;212:20;
  220:15,17;221:9;225:24;
  228:14;230:5;264:16;268:1;
  270:3,20;307:6;309:8
**know (259)**
  7:1;9:16;14:7,8,10,12;
  18:7;20:1;29:13;31:13;33:6;
  35:14,16,20;36:15;37:17;
  41:21;43:10;46:16;47:17;
  50:1,1,5,6,12;51:2,3,3,8;
  53:2,4,16;54:5,18;55:14,17;
  56:19;58:19,20,23;59:2,7,9,
  21;60:11;61:5,11;64:20;
  67:8,15,16,17;69:10;70:1,7,
  8,9;71:4,6;72:6,7;75:5;76:1,
  13,16,20;77:6,7;78:4;82:24;
  83:19,19;86:13;88:24;90:8;
  91:23;92:4;93:20,22,23,24;
  94:3,24;95:12;99:14,14;
  102:4;103:21;107:2;108:19;
  109:15,17;110:4;111:2,2;
  112:13,13,14,19;115:5;
  125:20;126:14;127:23,24;
  128:2,5;129:14,23,24;130:1,
  2,6,7;139:4;140:7,8;143:4,
  23;144:12;145:3,20,23;
  146:23;147:16;150:12;
  152:17;153:20;154:17;
  156:12,21;157:14;159:8;
  160:18,24;164:6,24;165:8,
  18;166:1,1;167:7,16;168:6;
  169:4,13;170:12,12,23;
  172:18;173:17;175:11,11,

176:10,19;177:2,7,11,14;
  182:1;186:5,13;187:10,12,
  17;188:8,11,12;190:10;
  191:5,8;194:9,9,21;195:1,
  16,18,19,20,24;196:4;
  197:17;200:16,17;201:11;
  202:3,21;203:5,22;204:6,8,
  11,20;205:24;206:15;207:1,
  22,24;210:4,10,11,12,13,15;
  211:10,11,14;212:11;213:5,
  15,16;218:10,11;221:10;
  225:12;228:12;229:9;
  237:23;239:15,23;240:9;
  244:5,19;249:6;250:12;
  253:17;254:8,10,16,21;
  255:21;261:22;267:6,12,13;
  268:1;269:6,11;270:10,16;
  272:17;273:24;274:17;
  278:2;282:1;291:12;302:24;
  306:4,8,9;310:17;314:17;
  315:17,24;317:2,19;318:11,
  18;320:7;322:10
**knowing (8)**
  13:16;53:1;54:4;66:20;
  67:10;76:20;118:15;183:20
**knowingly (3)**
  66:15;182:3,5
**knowledge (6)**
  93:20;209:7,8;230:6;
  256:5;278:14
**known (18)**
  14:2;32:8,15;39:4;68:5;
  77:14;82:16;84:24;85:1;
  104:3;105:9;107:4;127:11;
  182:13;252:22;253:2,17;
  319:7
**knows (16)**
  8:19;59:17,17;64:11,12,
  13;100:9;102:22;182:4,8,9;
  211:3;212:2;278:22;311:3,4
**Kravitz's (2)**
  181:12,13

**L**

**Labaton (108)**
  7:7;8:19,20;10:8;12:18;
  13:8;14:17;15:11;16:8;
  18:22,22;20:12,15;21:3,9;
  22:8,21;23:9;24:8,23;25:17;
  30:6,21;35:9,19;36:4;37:6;
  44:6,15,18;47:11;51:13;
  57:1;62:19;63:1,5,24;69:17;
  72:11;78:16,18;89:24;
  90:22;91:8;92:16;93:18;
  95:24;97:8;99:4;100:8;
  106:15;107:3,17;109:4;
  116:3;118:22;119:16,16;
  128:20;135:10;136:21;
  141:2;142:6;146:9,12;
  158:6;159:6;160:14;167:19;
  169:5,8;173:1,3;183:9;
  192:1,2,7,18;208:7,15,22;

209:7;210:14;211:16;218:1;
227:7;231:17;232:6;233:13;
248:24;249:2,22;250:3;
251:7;254:2;265:15;268:9,
18;269:13;273:10;275:6;
306:15;311:6;313:6;314:21;
316:7;317:16,22
**Labaton's (12)**
20:10;25:12;49:1;54:11;
56:11;108:23;158:2;174:21;
181:4;252:4;253:24;265:4
**Labaton-specific (1)**
7:14
**label (2)**
28:23,24
**labels (1)**
309:16
**Labor (3)**
105:24;150:1,2;275:15;
295:19
**lack (3)**
11:2;210:20;237:11
**laid (4)**
94:18;155:4;157:11;165:3
**language (17)**
66:13;67:12;74:6;76:4;
78:24;79:14;147:10;148:19;
149:2,23;163:14;172:23;
213:15;217:3,10;317:14,15
**lap (1)**
160:10
**Laraque (1)**
270:8
**large (5)**
101:6,7,8;230:12;273:1
**largely (1)**
292:21
**larger (6)**
52:1;53:22;99:4,18;
112:11;155:18
**Larry (13)**
13:18;97:10;237:12,12;
240:18;247:1,4,6,13;253:7;
254:10,16;318:2
**laser (1)**
207:12
**laser-like (1)**
64:15
**last (27)**
17:22;38:5;53:18;55:2,17;
69:6;75:17;90:19;105:1;
145:1;158:20;227:5;243:4;
244:16;248:11;251:22;
252:8;257:8;259:2;284:23;
291:16;292:2;304:7,9,12;
312:3,6
**late (5)**
28:12;31:15;55:16;155:5;
273:23
**later (16)**
17:14;141:20;142:14;
162:23,23;197:21;215:9;
222:10;228:3,5;232:12;

233:8;251:24;256:17;
286:16;294:7
**latter (2)**
120:24;219:23
**Laura (4)**
5:16;174:15;321:2,3
**law (82)**
6:7;7:11,13;8:9,16;24:1;
27:21;33:24;34:24;46:9;
51:8;60:14;63:24;64:19;
65:14;66:16,18;69:21;71:9,
23;73:6,8,11;77:4,9,9,14;
80:1,6,7;81:2,23;85:9,15,16,
22,23;89:7;101:4;119:24;
126:18;128:7,8;135:9;
136:20;137:5;138:17;140:7,
17;142:20;143:2,13;146:1,
4;149:18;152:21;153:13;
154:13;158:10;163:7,10;
173:11,12,13;188:15;
190:12;201:2;223:10;
228:18;238:17,24,24;281:6;
289:19;290:3,18;292:20,22;
305:9;306:6;317:10;319:10
**laws (2)**
28:9;306:19
**lawsuit (1)**
96:7
**lawsuits (2)**
51:23;52:12
**lawyer (73)**
6:7;28:16;42:16,17,18;
59:4;61:2,23;66:14,19;73:6;
78:4;86:9,21;88:10;117:20,
22,24;118:1,1;124:3;127:10,
11;131:18,24;132:4,4;
133:19;134:14,17;136:8,16,
17,19;137:6,10;140:5,6,16;
144:13,21;145:9,22,22;
184:4;188:16;189:2;196:13;
197:24;210:6;211:23;222:9;
228:19,21;231:1;237:14;
238:4;242:12;248:5;250:18;
256:22;262:24;283:8,23,23;
288:24;290:23,23;303:13,
14;305:19;310:5;316:5
**lawyering (5)**
322:14,21,24;323:3,3
**lawyers (85)**
22:8;20;24:1;27:21,21;
52:19;53:19;54:1,5;55:21;
56:11;59:13,20;60:10;
61:19;85:11,11;87:19,22;
101:18;102:9,16;103:22;
104:2;106:7;118:20;138:17;
151:2,9;163:5,5;164:3;
167:3;178:10;189:21;
190:17;198:5,24;199:1,2,4;
203:4;204:1,17;206:19;
207:9;208:5,13,15;209:18;
210:20;219:19,20;227:1,24;
232:16;234:22;258:8;261:9;
275:11,12;278:10;280:3,22,

23;282:15,23;284:1,6;
286:15;288:17,17;289:24;
292:15,24,24;293:3,4;
294:10,13,14,15;302:6;
308:2;316:6
**lawyers' (2)**
145:12;210:5
**lawyer's (2)**
75:13;134:16
**lay (1)**
155:6
**lazy (2)**
184:22;185:4
**LCHB (2)**
248:5;251:7
**lead (23)**
128:14;183:9;217:12;
221:17;229:19,19;234:18,
19,19;237:16;256:10,15;
257:10,17;259:16,19;
260:18;261:4,7,16;264:13;
268:5;297:14
**leading (1)**
226:8
**learned (3)**
268:2;282:7,9
**learning (3)**
25:21;38:2;266:14
**least (41)**
6:17;14:2;28:12;46:7,22;
48:1;52:9;56:7;59:3;68:24;
87:18;96:6;103:20;105:4;
108:19;112:2;130:4;132:24;
133:10;179:10;196:16;
197:11;209:15;227:14;
230:12,22;234:6;247:19;
250:14;258:10;271:24;
278:12,15,15;295:4;303:6;
305:23;307:10;310:10;
312:17;317:7
**leave (6)**
9:3;12:1;25:1;35:18;
117:23
**leaving (2)**
60:16;119:6
**led (6)**
18:13;37:23;195:18;
204:12;252:12;270:23
**left (2)**
122:10;288:2
**legal (14)**
79:17;80:4;88:7;122:24;
123:2;125:15,18;140:20;
212:22;274:22;280:8;
286:21;287:13;290:23
**legislation (1)**
149:4
**legislative (1)**
139:3
**legitimate (2)**
140:17;271:23
**legs (3)**
147:20;148:2,9

**Leiberman (4)**
27:9;68:19;79:4;139:17
**Leiff (1)**
5:10
**length (2)**
157:16;310:6
**lengthy (1)**
200:9
**less (11)**
56:18;57:21;167:11;
202:5,8;247:3;280:15;
301:3;304:10,14;311:16
**Lesser (1)**
216:14
**lest (1)**
60:21
**letter (38)**
31:19;41:23,24;42:3;
46:14;47:18;48:5;91:2,11;
92:7,23;94:14,16,18,20,22;
95:7,22;107:21;143:8;
160:11,21;168:19,24;
178:17;185:10,12;186:4;
187:7,8;221:1,22,23;222:22;
223:4,24;309:3;310:14
**lettered (1)**
224:18
**letters (4)**
95:13,14,15,17
**letter's (1)**
178:23
**level (8)**
24:9;45:14;71:8;180:23;
184:1;290:20;305:4;322:21
**leveled (6)**
6:9;68:24;69:21,22;72:3,4
**levied (1)**
37:5
**liability (4)**
28:21;173:12,14;177:21
**liaison (10)**
42:4;93:2;96:14;97:11,24;
99:24;230:9;239:16;316:20,
22
**license (3)**
51:1;145:11;146:1
**licensed (1)**
145:10
**lie (1)**
156:5
**LIEFF (112)**
5:3,5;7:8;16:8;17:24;
18:21;22:8,21;62:19;64:3;
66:1;82:1;94:12;96:1;99:1,
2;106:16,19,21;107:3;
108:13,19;109:2;158:1;
159:5;160:15;167:19;169:7;
173:1,2;181:6;192:1,2,4,19;
208:5,5,13;209:14,18;213:3;
218:1;219:21;220:2,12;
221:9,23;223:21;226:10;
227:1,2,3;228:13;229:13;
232:9,23;233:9,21;234:2,8,

10;237:11;238:12;240:11,
20;241:7,22;242:21;243:5,
20;245:5;247:12,20,24;
251:1;252:19;253:6,10;
254:18;255:3,8;256:20;
260:2,17;261:3;264:16;
266:21;270:24;271:21,24;
272:1,6;273:24;274:12;
275:2,21;276:2,6,10;277:1;
278:12;279:6;287:18;295:4;
299:18;309:3;319:14,22;
320:5,13,23;322:4

**Lieff's (9)**
34:4;158:1;174:21;181:4;
222:8;228:7;233:11;239:21;
261:3

**life (1)**
151:1

**lifestyle (1)**
282:13

**lifetime (1)**
28:6

**lifting (1)**
210:13

**light (3)**
86:8;185:10;198:21

**lightly (1)**
6:11

**likeable (1)**
199:17

**likely (4)**
92:22;237:15;249:23;
316:11

**lily (1)**
222:6

**limited (3)**
7:5,6;289:9

**limiting (1)**
8:19

**Linda (1)**
98:16

**line (16)**
17:9;75:12;161:19,19;
174:14;176:20,20;183:16,
16,17;215:19;221:3;257:5;
302:18,23;307:17

**lined (1)**
175:3

**lines (6)**
109:21;149:22;158:5,12;
161:16;163:24

**link (1)**
229:17

**list (5)**
36:14;122:4;230:4;
249:20;309:9

**listed (4)**
115:24;133:20;230:1;
292:22

**listen (3)**
164:6;190:15;210:10

**lists (1)**
134:1

**litigating (1)**
228:20

**litigation (16)**
10:1;53:6;78:14;103:11;
141:14;192:12;229:24;
239:2;247:19;257:11;271:6;
289:5,14;291:21;292:6;
295:20

**Litowitz (2)**
55:19;270:7

**little (31)**
15:13;17:20;27:2;29:10;
64:24;95:12;105:6;106:15;
108:1,8;109:2;119:17;
145:10;165:12,15,19,19;
177:9,24;181:16;182:17;
205:21;230:3;247:3;258:6;
261:11;266:17;267:14;
281:2;287:20;307:18

**live (1)**
132:1

**lived (2)**
77:11,12

**lives (1)**
6:13

**LLP (1)**
5:3

**lobbied (1)**
129:17

**local (186)**
42:4;43:9,20;51:3,9;
54:17;61:8;83:12,13;91:21;
92:5,8,12,20,21;93:1,5;
95:23,23;96:4,4,9,10,16;
97:2,4,9,10,10,14,24;110:4;
113:13,14,17,19,21;114:12;
115:24;116:1,2;129:14,14,
17;142:12;208:1;210:12;
211:5,5,7,8;212:3,16,17,19;
213:5;226:12;227:6,12,15;
228:11,15,16,19,21,23,24;
229:3,23,24;230:9,20,22;
231:1,10,15;232:5;233:4,21;
234:12,15,20,21,23;237:2,2,
8,17;239:5,5,15;240:22;
241:9,11;242:12,13;243:21;
244:18,23;246:6,13,20;
251:17,18;252:4,15;254:12;
255:11,13,24;256:2,5,8,11,
16;257:4,6,23;258:3,21;
259:22;260:3,5,5,8,11;
262:8,10,13,14,19;264:5,17,
18,22;265:1,4,6;266:7,11,
11;267:3,8,12,15,15;268:8,
17;269:1,14;279:22;309:17,
20,23;310:1,3,9,12;313:15,
20;314:3,7,13;315:2,6,6,10,
15,15,15;316:1,20,21;317:5,
17,18,19;318:3,22,23;319:8,
15,16;321:11,15,17

**locality (1)**
96:15

**locally (2)**

49:9;83:15

**locals (1)**
229:2

**lode (1)**
164:17

**lodestar (80)**
8:12;10:21;12:7,14;13:8;
14:15;15:20;16:4,11,21;
17:2,5,20;19:5,11,17;20:12;
22:4;23:1,6,13;24:11,18;
57:13;82:7,9;83:18;114:21;
115:11,17;118:12,14,23;
119:8;151:15;153:7,13;
154:17;155:11,13,21;156:6,
13;157:3,7,22;160:2,18;
162:7,8,10;163:2,13;164:18,
20;166:3,5,13,17;167:9,12;
168:2,3,10;175:20,21;
190:14;214:20;258:17,20;
259:15;261:13;265:15,21;
266:3,19;267:17;268:2;
280:24;304:15

**lodestars (6)**
8:14;16:6,7;18:10;58:7;
164:12

**logic (3)**
147:16,23;148:5

**logical (3)**
29:5;40:13;159:3

**long (14)**
36:7;37:11;47:2;69:11;
89:18;112:24;120:1;133:16;
176:11;215:5,6;223:13;
244:22;293:10

**longer (5)**
25:7;114:1;120:2;121:18;
145:12

**long-term (1)**
13:6

**look (58)**
33:10;35:4;43:3;48:12;
49:6;54:8,14;55:8;64:11;
79:15;103:8;104:5;111:10;
112:20;123:7;127:5;134:20;
136:22,23;139:3;143:13,14;
150:23;158:20;160:11,21;
161:1;162:19,24,24;165:10;
166:18;168:16,17,19;169:2;
175:15;176:6;188:12;
190:21;192:16,20;198:2;
199:16;200:24,24;210:1;
224:2;254:11;260:4;269:18;
272:18;277:11;281:13;
294:12,18;305:22;306:8

**looked (6)**
92:20;109:17;138:16;
161:3;222:17;248:1

**looking (12)**
20:21;61:2;100:24;107:7;
140:1;192:14,16;203:6;
218:19;233:17;272:9;
278:23

**Looks (7)**

105:6;187:10;198:14;
228:2,5;251:12;280:21

**loosely (1)**
181:16

**looseness (2)**
317:14,15

**Lord (1)**
100:9

**losing (1)**
196:22

**losses (1)**
314:20

**lost (2)**
131:21;197:7

**lot (26)**
48:20;72:13;88:19;93:10;
94:5;137:7;139:4,5;144:23;
152:9;154:8;172:14;183:13;
189:4;192:21;193:17;194:6;
199:3;203:19;204:11;
206:20;215:1;217:15;255:1;
258:6;309:15

**lots (3)**
154:11,12;279:4

**Lou (1)**
259:21

**Louder (1)**
220:3

**love (1)**
72:14

**loved (1)**
131:22

**low (1)**
222:2

**lower (6)**
37:12;175:21;293:18;
301:5;302:6;305:5

**lower-level (1)**
9:23

**lucky (1)**
210:10

**LUKEY (283)**
6:3;7:18,21,23;9:13,21;
11:10,24;12:5;13:18,22;
14:4;15:11;17:4,17;20:4,19;
21:2,9,21,23;23:7;24:5,8,16,
19,23;25:21;26:1,5,7,11,21;
29:17;30:3,5,8,16;31:9,23;
32:5,16,21;33:20;34:12;
35:16,23;36:8,18;37:13;
38:10;40:2,5;43:15;44:7,11,
14;46:4;47:1;48:6,11;49:19;
50:14;51:5;52:5;54:20;
57:15;58:1;59:8,12,15;60:8;
62:5,24;63:10,19;64:2,8,12,
17;66:5;67:23;68:8,12;70:4,
22;71:2,7,15;75:8,14,18,22;
76:1,11,22;77:1;78:10;79:7;
80:17,23;82:8,20;83:4,7;
84:11;85:7,9,14,22;86:2,13,
18;87:3,23;88:13,16,19;
89:15,18;92:6;93:14,22;
94:18,22;95:9;96:2,16,21;

97:16,19;98:6,11,14,17;
99:8,21,24;100:19,23;
101:20,23;102:14,20;103:1;
104:5,11,16;105:15;107:19;
108:6;109:15;110:11,16;
111:7,14,16;112:5,13,18;
113:3,8,12,19;114:3,7,14,
20;115:2,4,9,14;116:15;
117:1;118:5,17;120:14;
121:12,15,22;122:1,4,8,13,
16,21;124:1,4,12,22;125:2,
9;126:20;127:5,14,19;
128:16,22;129:3,5;130:20;
131:4,9,12,16;133:8;134:1,
4,8,11,14,19;135:23;136:1,
4,10,13;137:12,15,20;138:8,
13;139:9,17,24;140:10,14,
21;142:4,8,11;144:5,9,16;
145:17,20;147:5,8,12,24;
148:8,23;149:5,9,13;153:18;
201:24;223:5;224:13,16,22;
225:3;240:2;249:16;260:1,
3;277:4,21;278:1,6,16;
279:5,16;308:11,15,18,23;
309:6;312:1,8,13;313:10,19,
23;314:18;315:13,17;
316:15;318:9,17,21;320:1;
323:6

**Lukey's (1)**
202:13

**Lynn (10)**
5:15;98:8,9,10;115:21;
268:7;275:14;321:3,5;322:1

## M

**made-up (1)**
319:5

**madness (1)**
177:3

**magnitude (1)**
257:2

**mail (1)**
223:19

**maintaining (1)**
320:20

**major (1)**
38:6

**majority (3)**
65:10,10;90:8

**makes (18)**
47:14;69:24;73:3;150:23;
155:9;161:11;169:10;
179:10;210:4;238:4;283:11,
12;285:4,4;286:12;298:11;
303:12;306:20

**making (8)**
22:23;65:1;67:17;106:16;
131:18;144:13;166:4;
204:17

**male (1)**
98:14

**malicious (1)**

37:22

**Malpractice (10)**
23:23;24:3,7,12;283:11,
13,22;284:5,11;306:20

**man (3)**
203:1;240:11,13

**managing (2)**
93:19;284:8

**mandate (4)**
33:12;37:2,4;190:20

**many (12)**
27:7,12,12;44:22;45:2,2;
49:19;153:22;158:13;
257:15;282:11;320:20

**Mark (2)**
72:7;285:21

**market (13)**
296:23;297:22;298:7;
300:9,12,23;302:5,6,13,16,
17;303:4,5

**market-driven (1)**
286:23

**marketplace (3)**
286:18;296:23;297:4

**marking (5)**
219:17;280:9,15,19,20

**marred (1)**
214:1

**Massachusetts (58)**
27:6,8,12,24;33:2,21;
34:6;38:1;40:7;42:17;47:18,
21;51:8;56:4;58:22;61:8;
62:6,7;65:7,14;72:1;77:4,9,
11;79:20,22;80:6;81:12;
86:19;88:1,1,7;89:10;90:6,
13;96:9,18;97:3;101:4,20;
102:3;109:8;113:13;131:16,
23;132:24;133:12;135:8,8;
136:15;138:9,14,17;143:22;
182:18;212:23;310:18;
319:10

**Massachusetts-based (1)**
310:5

**MASTER (557)**
7:16,20,22;9:10,14,22;
11:15;12:2;13:10,21;14:1,
23;15:19;17:7;19:14;20:18,
20;21:7,16,19,22;22:1;
23:21;24:6,14,17,22;25:19,
24;26:3,6,10,19;27:18;
29:15;30:2,4,6,10;31:7,12;
32:3,10,13,14,15,20;33:3;
34:9,10;35:11,22;36:1,17,
23;38:9;39:22;40:3;43:22;
44:9,12;45:7;46:5;47:14,24;
48:8;49:16,20;50:20;51:16;
54:3;57:11,23;59:1,9,13,16;
61:21;62:14;63:7,17,21;
64:3,10,13;65:22;67:13,24;
68:11;70:3,5,23;71:3,11;
74:18;75:11,15,20,23;76:9,
16,23;77:17;79:6;80:15,19;
82:6,18;83:3,6;84:4;85:3,8,

13,18,24;86:7,16;87:1,4;
88:9,14,17;89:12,17;92:3;
93:11,15;94:16,20;95:5,19;
96:12,19;97:13,17;98:4,8,
10,23;99:17,22;100:16,20;
101:15,22;102:12,18,22;
104:1,9,14;105:11;107:10;
108:4;109:13;110:6,15,23;
111:12,15,19;112:8,16;
113:1,4,20;114:23;115:3,7,
12,19;116:10,20;117:19;
118:11;120:6,11;121:8,13,
20,24;122:2,11,14,19;
123:22;124:2,10,19,24;
125:4;126:19,22;129:4;
130:8,11;131:2,7,10,15;
133:7,23;134:3,5,9,12,18;
135:19,24;136:2,7,11;137:3,
13,17;138:4,11,19;139:15,
20;140:4,12,19;141:24;
142:6,9;144:2,6,10;145:15,
19;146:19;147:6,9,22;148:7,
15;149:1,7,10;150:19;
151:19;153:2,9,22;154:2;
155:12,17;157:1;158:17,22;
159:10,14;162:4,15,20;
164:1,4,16;166:11,19;167:1;
168:1,11,23;169:22;171:12,
18;172:3,7,16;173:2,19;
174:12,17;175:18;178:3,17,
20,23;179:2,7,18,22;180:13;
181:1;182:8,11,22;183:7,21;
184:9;185:9,21;186:15;
188:4,20;189:13,17;190:1,
19;191:3,13;193:12,23;
194:12;195:6,13,20;196:5,8,
21;197:7,11;198:1,9,18;
199:15;200:8;201:5,10,17;
203:8,11,14;204:21;205:11,
21;207:14,19;208:2,9;
209:12,24;210:23;211:14,
19,21;212:4,11;214:3,7,11,
17;215:3,6,11;217:19,24;
218:14,22;219:4;221:5,20;
222:16,21;223:1,11,14,17;
224:5,10,15,20,24;225:5,8,
14,18,21;226:5,14,17,21;
229:1,5;230:7,24;231:6;
233:24;237:19;238:3;
239:11,23;240:3,12;241:23;
242:2,15,23;243:24;244:2,4,
8;245:7,11,15,18,22;246:1;
248:3,18;249:8,11;250:4,16;
251:10;252:9,21;253:8,11;
254:3,23;255:2,6;257:16,22;
258:1,13,21;259:18,21;
260:23;262:4,12;263:8,12,
16,18;265:18,20;266:16,23;
267:2,9,20;268:15,23;269:4,
19;270:13,17;271:9,12,17;
272:4,7,11,16,18;273:17;
274:5;275:3,10,17;276:3,8,
23;277:2,6,11,23;278:4,9,

21;279:8,24;280:12;281:10,
16,22;282:3,6,19,24;283:10,
15,18;284:2,13,18,20;285:7,
11,17;286:6;287:24;288:12;
290:10;291:4,9,12;292:16;
293:5,9,13,21;294:9,19,24;
295:8,13;296:17;297:10,16;
298:2,21;301:1,9,14;302:19,
22;303:15,19;304:1,6,8,13,
18,23;305:17,19;306:2;
307:4,8,23;308:8,13,17,21,
24;309:7;310:19,24;311:24;
312:4,9;313:9,17,21;314:16;
315:11,14;316:8;318:7,13,
20;319:21;321:1,5,23;322:2,
5,8,17,23

**master's (1)**
188:9

**match (2)**
18:10;40:11

**matched (1)**
57:20

**material (29)**
60:5,12;66:18;67:15,19,
21;68:4,20;69:3,4,5,17;70:2,
7;72:8;76:15,17;77:5;90:4,
6,7,9,18;127:10;128:9;
152:24;159:13,15;205:9

**materiality (2)**
128:6;177:15

**math (5)**
177:9;191:1;241:13;
303:20,24

**mathematically (2)**
191:6;200:4

**Mathematics (1)**
191:1

**matter (53)**
6:10,19;8:2;10:14;28:14,
22;29:1,4;30:9;33:2;34:1;
39:11;41:22;52:11;58:3;
61:9;62:6;65:6,8;71:17;
74:14;82:14;83:10;89:2,3;
94:8;104:19;108:14,23;
121:18;124:20;138:15,21;
140:5,6;166:7,8,8;170:1;
177:17;180:16,18;184:9;
191:24;199:8;213:12;
227:22;246:7;262:21;
274:16;297:2,3;310:5

**mattered (2)**
61:14;151:13

**matters (14)**
6:19;57:16;79:19;83:15;
93:17;94:4;108:10;179:16;
184:18;202:14;207:13;
227:7;232:6;301:20

**max (1)**
177:10

**maxim (1)**
216:21

**may (71)**
10:19,20,23;11:4;13:4;

15:12;17:21;18:13;22:9,21;
27:1;35:3,11;37:20;40:5;
42:7;43:16;46:16;48:22;
51:16;59:16;62:9,24,24;
63:18,19;75:5,14;77:9;
80:22;81:14;82:12;88:9;
90:21;92:9,11;94:22;98:18;
99:17,22;100:14;129:24;
134:17;138:19,21;144:22;
149:3;188:5;192:9;206:20;
213:12;215:16;219:12;
222:12;228:5;230:24;237:3;
249:18;250:21;267:19;
268:24,24;274:10;280:17;
290:2;291:4;299:3,5;
303:21;305:14;320:12

**maybe (37)**
9:24;15:7,8;36:2;41:14;
59:22;61:5;90:1;118:15;
149:7;150:21;164:24;165:1,
2;175:1,3;177:12;180:18;
186:9,20;196:15,24;208:15;
211:4;216:14;218:6,10;
221:6,18;251:12,14;254:16;
255:5;266:23;306:19;310:7;
311:10

**Mayer (2)**
34:24;35:9

**McEVOY (1)**
322:6

**McMahon (2)**
285:1,23

**McTigue (1)**
258:11

**MDL (1)**
114:2

**mean (55)**
26:3;29:10;35:22;45:2;
74:9;75:12;86:14;91:19,23;
93:7;99:7;119:22;128:2;
133:24;145:20;146:15;
150:11;151:10;161:21;
166:2;169:6;170:15,17;
172:17;177:12,23;182:2,5,9;
185:16;193:17,22;197:2;
198:22;204:11;212:2;
216:17;238:1,3,10;246:18;
247:4;253:18;255:8;260:8;
267:24;268:7;269:9;271:15;
272:14;280:21;293:10;
311:1;316:10;322:15

**meaning (4)**
97:2;241:4;263:7;264:1

**meaningless (1)**
139:8

**means (8)**
78:17;86:16;191:12;
210:17;232:4;248:16;282:2;
310:22

**meant (3)**
37:21;228:15;247:8

**meantime (1)**
142:15

**media (7)**
170:22,22;171:7;175:10;
178:6,7;180:11

**mediation (1)**
11:8

**meet (3)**
8:21;290:8;303:6

**meeting (11)**
10:9;65:1;140:24;141:4,9;
142:17,17,23;146:10;
227:18;233:12

**meetings (1)**
52:18

**melded (1)**
93:4

**Mellon (11)**
16:16;45:3;165:22;167:8;
192:5;257:17;264:7,11,14;
265:6;267:3

**member (5)**
96:8;145:10;200:2;319:4;
322:21

**members (7)**
87:2,5;110:7,24;111:4,6;
202:20

**memoranda (1)**
193:6

**memorandum (1)**
192:19

**memories (1)**
167:15

**menial (2)**
291:19,20

**mention (2)**
314:8;316:7;317:6

**mentioned (6)**
105:18;113:12;121:15;
242:6;296:5;311:11

**mere (1)**
138:7

**merits (1)**
146:13

**met (2)**
49:12;135:1

**Michael (14)**
5:12;188:7;189:15;190:7,
13;191:1;192:11,23;194:15;
195:4;196:9;199:16,16;
201:6

**midair (1)**
294:1

**middle (2)**
233:10;297:13

**mid-level (2)**
9:24;305:5

**midst (2)**
38:18;83:4

**might (38)**
19:15;25:14;34:17;37:11;
43:22;71:18;72:13;77:5;
88:12,14,17;101:5;103:7;
131:23;175:18,19,22;176:1,
4,4,5,11,14;191:14;197:3,4,

5,12;198:2;212:4;231:1;
237:3;248:19;269:10;
289:11;291:9;304:24;315:7

**Mike (20)**
14:10;156:22,22;158:7;
159:18;162:9;166:12;167:6;
216:13;221:4;222:22;223:3;
226:10;227:4;232:23;
240:19;241:22;243:6;245:4;
247:11

**Milberg (1)**
270:8

**million (27)**
58:10;62:2;65:18;84:7;
89:4;101:11;102:9;119:17,
19,19;151:14;152:23;
168:12;179:16;199:1;205:1,
16;207:7,7;255:4;259:8;
267:10;269:5;307:18,21,24;
312:3

**millions (1)**
154:6

**mind (10)**
72:9;169:12;184:3;
202:11;203:22;206:1;
239:22;250:2;302:4;307:11

**mindful (1)**
79:9

**mindless (1)**
291:20

**minds (2)**
93:4;266:12

**mindset (1)**
256:20

**minimis (5)**
116:6;118:24;268:19,24;
269:2

**minus (1)**
172:20

**minute (6)**
38:23;167:21;173:24;
174:19;175:23;224:17

**minutes (2)**
229:11;266:5

**misbehaved (1)**
146:2

**misconduct (4)**
35:6;81:7;151:5;165:6

**mislead (5)**
161:8,23;164:7;185:5;
187:21

**misleading (2)**
319:13,14

**misnomer (1)**
319:5

**misrepresent (1)**
164:11

**misrepresentation (1)**
318:1

**misrepresentations (1)**
180:21

**miss (5)**
125:21;153:18;169:8;

5,12;198:2;212:4;231:1;
237:3;248:19;269:10;
289:11;291:9;304:24;315:7

201:24;218:12

**missed (1)**
289:17

**Mississippi (1)**
72:13

**misspoke (1)**
214:19

**misstate (1)**
116:8

**misstatements (3)**
180:19,20;186:7

**mistake (33)**
8:3,3;14:17;108:18;131:5;
151:6,12,23;152:7,19;
160:17,18,19,20,23;161:9;
164:13;168:14;169:9;177:8;
179:15,24;180:24;185:4;
187:10,14,14,17;218:17,17;
283:12,13;300:17

**mistaken (2)**
38:5;214:23

**mistakenly (4)**
160:14,15;169:4,5

**mistakes (17)**
150:24,24;151:2,2,3,4,8;
152:15;161:11;169:10;
177:24;178:2;183:6;184:21;
185:8;186:6,23

**misunderstanding (1)**
12:13

**mix (3)**
29:23;105:12;123:18

**mixture (1)**
105:2

**mix-up (1)**
169:19

**model (8)**
9:1;56:12;86:22;217:3,10;
229:2,2,3

**moderating (1)**
238:21

**moment (18)**
29:3;32:23;80:24;132:7;
135:15;142:21;144:13;
174:24;207:15;244:6;
246:17;256:21;273:6;
278:16;286:24;292:11;
293:24;296:5

**monetary (1)**
307:14

**money (26)**
67:18;86:12;87:19;94:1;
117:22;118:1;120:4;154:12;
170:14,19;189:11;196:22;
198:6;205:20;206:20,21;
212:5,24;234:7;255:1;
273:2;276:19;311:19,22;
319:23,24

**monitoring (11)**
62:20,21,22;79:2;141:11,
12,16,19;143:1;146:11;
238:23

**monitors (1)**

78:15
**month (6)**
55:17;69:6;156:4;164:10;
308:19;312:5
**months (12)**
9:4;25:23;130:4;154:6,11;
186:2,3;233:7;251:24;
294:7;312:7,8
**month's (1)**
312:3
**moo (1)**
148:2
**morass (1)**
53:24
**more (80)**
9:7;11:1;12:22;19:6;
24:24;25:17;40:13,24;
43:23;45:21;48:9;50:17,21,
22,22;53:9;54:22;57:21;
66:2;83:11;94:6;108:22;
109:10;126:8,16;132:6;
143:12;144:14;156:9,10;
163:4,6,8,9;164:6;165:19,
19;182:17;183:2,10;192:13,
14,20,21;194:1,6,10;202:17,
22;206:4;208:1,5;214:8;
219:1;225:24;227:14;
228:17;229:10;230:21;
250:23;254:24;258:10;
261:14;271:10;272:9;281:3,
18,20,22;282:4;283:4;285:5,
24;296:5;300:18;301:7;
311:18,22;312:14;320:13
**morning (3)**
154:21,23;251:13
**mortified (1)**
152:6
**most (12)**
12:17;37:6;50:17;157:14;
172:9;193:11,15;202:18;
226:20;249:6;261:13;
289:23
**mostly (1)**
189:3
**motivated (1)**
103:23
**motivation (3)**
129:2;165:24;173:16
**motive (5)**
156:5;159:9;164:11;
175:16,17
**mouse (1)**
59:21
**move (4)**
10:7;59:15;232:11;243:15
**moved (1)**
233:6
**moving (7)**
15:20;26:14;153:19;
154:19;225:16;278:18;
317:8
**much (57)**
9:10;10:16;37:12;40:13;

45:18;54:21;78:21,22;
91:14;96:3;100:11;107:1;
119:14,16;145:23;149:21;
165:3;169:18;172:11;
173:18;192:13,14;194:1;
196:10,15;199:23,23;
206:21;207:12;208:4,12,14,
22;209:19;211:22,23;
217:22;222:1;244:6;250:9;
255:22;261:10;267:7,17,18;
273:6;280:15;281:18,18,20,
22;282:4;293:18;300:18;
306:10;307:15;310:5
**multiple (8)**
95:2;98:20;151:17;154:1,
1,11;157:5;212:15
**multiplier (10)**
169:18;173:18;175:24;
177:7,14;191:6;194:20;
200:6;258:18;291:3
**multipliers (2)**
259:15,16
**Murphy (1)**
259:18
**Murray (1)**
259:18
**must (8)**
35:14;60:20;73:16;97:3;
117:6;173:9;213:6;218:9
**mute (4)**
98:5,7,11,12
**myriad (2)**
87:12,12
**myself (1)**
8:19

## N

**nadda (1)**
191:12
**nail (1)**
52:20
**name (12)**
43:2;47:1;51:13;52:8,9;
65:4;82:20;140:24;266:1,3;
270:6;314:17
**named (4)**
45:5;84:6;274:13,13
**names (1)**
215:20
**nanosecond (2)**
195:7,8
**narrative (1)**
266:19
**narrow (3)**
29:21;133:1;270:2
**nature (22)**
11:1;34:7;43:13;44:19;
49:3;70:13;72:24;97:12;
99:5,19;103:17;107:13;
110:18;193:8;209:8;226:1;
252:23;253:2;273:24;275:8;
309:9;310:18

near (1)
299:12
**necessarily (7)**
6:22;10:24;103:3;212:2;
243:13;274:19;313:12
**necessary (3)**
28:17;93:21;149:20
**need (22)**
25:16;28:20,21;31:2;53:1,
4;70:1;94:24;98:7,11;106:4;
117:4;121:7;143:3;210:6,8;
249:19,20;255:7;269:16;
303:2,6
**needed (2)**
31:4;106:6
**needs (4)**
101:16;104:24;289:7,15
**nefarious (1)**
159:3
**negative (4)**
103:12;168:21;187:13;
211:2
**negotiate (5)**
208:23;210:2,16,22;
298:24
**negotiated (1)**
107:5
**negotiating (2)**
52:17;250:13
**negotiation (2)**
37:16;208:21
**negotiations (2)**
105:12;234:4
**negotiator (1)**
210:18
**neighbor (1)**
62:11
**neither (3)**
118:7;129:21;266:19
**networking (3)**
108:5,6;208:17
**neutral (1)**
311:8
**new (13)**
13:2;27:13;34:24;36:16;
39:13,13;137:23;161:20;
180:3;200:16;255:24;285:2;
316:6
**Newberg (2)**
55:6;73:3
**next (32)**
9:5;14:24;15:20;46:2;
148:4;150:19;164:10;
167:14;228:1;231:19;
232:15;233:5;240:14;
241:15,16;243:15;244:24;
247:23;250:24;252:17;
264:8;287:2,15,22;288:19;
290:16;292:5,8;294:4,6;
296:16;298:12
**nice (3)**
48:19;84:24;166:21
**Nicole (11)**

13:1;14:2,5;116:4;152:12;
161:1;174:18;176:4;183:12;
216:16;251:23
**night (8)**
17:23;46:21;53:18;55:2;
158:20;190:16;197:16;
225:1
**nine (1)**
302:1
**ninth (1)**
290:1
**nitpicking (1)**
173:8
**nobody (6)**
61:12;91:13;99:19;
103:20;106:13;124:7
**nobody's (2)**
31:9;159:10
**nomenclature (1)**
180:16,18,20
**non-adversarial (7)**
123:8,11,16,19;124:21;
125:6;127:3
**non-adversary (2)**
124:20;125:1
**non-affiliated (1)**
141:18
**non-agency (4)**
219:19;290:23;293:4;
303:14
**non-disclosure (4)**
107:18;220:15,17;271:3
**none (13)**
37:21;64:11,12,13;102:2;
103:22;106:10;125:15;
171:16;180:23;204:3;
217:22;275:15
**non-partnership (1)**
23:20
**non-profit (1)**
132:10
**non-role (1)**
108:11
**nonsensical (1)**
296:13
**non-solicitation (1)**
133:1
**non-transparent (2)**
87:21;118:2
**non-work (1)**
310:7
**noon (1)**
251:14
**nor (4)**
58:3;106:20;118:7;310:16
**normal (1)**
89:14
**northern (1)**
291:15
**note (6)**
123:3,6;125:10,20;127:6;
222:9
**noted (1)**

12:15
**notice (21)**
25:14;28:24;55:12,14,24;
56:1,12,13,23,24;57:1,7,9;
74:4;91:17;94:11;128:18;
220:18;241:8;242:10;
266:21
**noticed (1)**
152:15
**notified (2)**
108:18;152:21
**notify (1)**
128:20
**notion (14)**
65:11,12;86:23;150:8;
202:6;219:18;227:21;
234:12;266:4;280:19;281:1,
2;296:11;303:2
**novel (1)**
240:4
**November (8)**
111:21;157:12;160:12;
178:21;185:10;186:4;187:5;
251:24
**nowhere (2)**
267:22;293:1
**number (30)**
10:12;23:10;49:22;53:14;
56:20,21;58:8,13;65:4;
95:23;107:20;119:3;128:14;
132:3,5,5,7;192:4;202:21;
203:23;206:9;218:11;
237:21;253:16;269:9;
285:22,22;293:24;294:1,7
**numbered (3)**
224:17,19,21

**O**

**oath (1)**
183:5
**object (5)**
124:18,23;126:11,14,15
**objected (1)**
125:2
**objecting (2)**
126:6,7
**objective (1)**
166:3
**objectively (1)**
182:4
**objectors (1)**
125:1
**obligated (2)**
117:16;277:8
**obligation (32)**
32:24;33:1;47:20;48:14;
66:12;68:20;69:2,3;72:23;
73:12;85:19,21;86:4,6;
103:17;110:10,11,14,17;
112:1;221:10,16;227:6,10;
230:8;239:14;243:8;253:24;
254:2;275:8,9;306:11

**obligations (8)**
51:20;73:13;106:9,10;
220:14;272:2;305:12;
306:18
**obscene (1)**
296:12
**obtain (1)**
232:18
**obtained (3)**
39:15;53:12;150:7
**obtaining (1)**
134:23
**obvious (8)**
152:15;157:20,23;161:4
**Obviously (20)**
6:5;7:1;29:23;32:16;37:9;
57:1;69:24;96:4;122:22;
132:13;149:16;152:4;
161:14,17;204:18;206:16;
215:10;238:11;246:11;
316:2
**occasion (1)**
227:18
**occasions (1)**
28:5
**occurred (3)**
124:14;172:13,17
**occurs (2)**
103:4;178:15
**October (1)**
287:4
**off (20)**
91:9;94:24;117:23;
161:24;165:12;186:23;
201:21;223:12;233:9;241:4,
9,13;242:8;243:9;244:23;
247:23;260:21;309:18;
311:12;321:3
**offense (1)**
182:18
**offensive (1)**
148:13
**offer (1)**
81:17
**offered (3)**
41:7;149:13;264:5
**offering (1)**
289:12
**office (1)**
218:9
**offices (1)**
228:21
**off-track (2)**
280:5,6
**often (5)**
26:13;154:5;172:10;
230:21;262:1
**Ohio (15)**
256:1,9,10,12;257:4,6,23;
263:21;264:15,16,17,18,22;
265:1,7
**old (4)**
39:12;240:11,13;270:8

**Olguin (2)**
291:11,13
**omission (2)**
66:22,24
**once (22)**
32:19;54:9;57:4;62:16;
63:22;64:15;73:1;82:14;
87:9;92:12;94:9;98:15;
108:11;110:6;111:8;112:7;
114:2;185:9;231:21;240:10;
251:19;309:12
**one (167)**
7:16;8:8;10:13;13:12,15;
15:4;16:24;19:6;20:5,20;
23:8,11,24;24:21;25:2;
26:12;27:4,8;28:1,2;30:18,
20;34:19;38:14,16,18;
40:11;41:8;45:23;46:21;
47:4;49:22;50:16;55:5,18,
24;56:1,3,23;62:20,21;
65:10,24;67:10;70:10;
75:17;82:8,10,21,22;84:16;
86:8;88:9;89:24;93:15;94:8;
96:9,18;97:11;108:10;
109:6;110:21,21;112:7;
118:19;119:10;124:3;125:2,
12;126:7;131:22,23;132:3;
138:1;139:9,12;142:19;
146:12;147:15,18,24;
148:20;150:13;151:5,13,20;
164:13;166:18,19;171:17;
172:20;175:18;180:6,14,16;
181:11;188:24;191:13;
192:4,9,10;195:4,18;204:13;
205:22;207:15,17;215:14;
218:6;221:5;223:2;224:3,
17,18,20;225:2,24;226:9,16,
22,23;228:11,17,17,22;
231:9;233:9;239:16;240:13,
21;241:16;244:11,24;245:1,
4;248:2,19;249:11;250:7,
24;251:13,23;261:7,8;
265:9;269:11;270:22;271:9;
273:18;280:21;281:11,12;
283:4;291:7;292:5;295:21;
296:1;297:23;299:10;
300:16;304:2;308:9,20;
310:19;311:10;313:1,1
**ones (3)**
34:19;177:1;295:16
**one's (3)**
8:12;56:19;224:18
**one-shot (1)**
282:16
**ongoing (7)**
80:11;130:4;230:13;
238:19;239:8;282:9;315:2
**only (65)**
7:12;11:11;17:9;18:4;
19:11;21:3;25:8;28:3;30:17,
18;32:13;35:7;52:13;54:9;
55:19;59:17,17;64:22;
65:12;66:15;70:8;79:23;

**Olguin (2)** ...
**on-partnership-track (1)**
9:8
**onto (3)**
128:13;181:3;278:18
**opened (1)**
33:15
**opening (1)**
45:19
**opens (1)**
238:4
**operate (2)**
290:3;323:2
**operating (1)**
38:24
**operation (1)**
10:9
**opinion (20)**
81:17;91:12;129:7;
137:23;220:6,12;270:24;
286:5,7,8,14;287:16,23;
292:9;293:1;294:3,4,6;
295:3;297:4
**opinions (4)**
26:16;220:6;221:13;292:7
**opinion's (1)**
26:21
**opponent (1)**
127:20
**opportunity (20)**
6:4;8:11,21;11:21;21:8;
24:20;122:12;124:17;
126:10,13;127:21;141:10;
186:12;187:6;225:23;226:3,
6;277:19;290:8;308:22
**opposed (4)**
31:24;94:8;282:12;293:4
**opposite (1)**
124:7
**oral (1)**
201:13
**order (15)**
6:23;13:4;33:12;37:5;
60:20;61:10;99:11;130:22;
179:4;206:14;219:15;
231:19;243:16;244:24;
309:6
**organization (6)**
131:19;132:10,12,14,19,
20
**original (3)**
115:6,13,15;167:24;
211:11,11,16;231:22

96:24,24;100:9;101:15;
106:8;107:20;109:7,17;
112:7;124:22;126:1;129:5;
131:17;137:24;138:16;
143:3,14,17;150:6,10;169:1;
176:1;181:2,8;190:15;
192:9,11;193:3;196:23;
205:14;207:6;219:14;
224:22;232:4;250:22;256:4;
271:9,18;296:12;314:18;
317:19;321:8;322:5

**originally (2)**
125:11;279:10
**originated (1)**
70:14
**others (11)**
6:18;16:10;20:12;22:14;
49:2;97:9;150:18;160:14;
216:15;217:19;265:12
**otherwise (7)**
51:14;74:16;100:1;
112:23;148:21;150:17;
221:24
**ourselves (3)**
6:14;245:21;246:4
**out (120)**
7:17;14:5;15:6;17:13,24;
24:3;27:6;29:18,22;33:11,
18;34:18;37:14;38:4,22;
39:6,10;40:6;45:19;55:12;
67:5;75:6,16,24;81:16;84:8;
88:12;89:22;93:16;94:19;
95:3;102:7;104:23;114:10;
119:6;122:10;134:10;135:1,
12;138:4;145:12;146:12,17,
18,20;147:3;148:16;152:14,
22;153:21;155:5,6;156:7;
157:11;163:17;165:3,16;
167:9,12;168:18;171:23;
177:10;178:12,14;180:2,20,
21;183:24;184:1;185:22,24;
186:8;189:11;192:8;194:13,
16;195:19;199:11;205:2,2;
214:24;218:24;220:8;226:7;
239:4,17;254:9,13;257:4;
258:12;273:19,20;276:16;
278:24;279:14;283:23;
287:3;292:7;293:24;294:1;
296:13,14;299:11;300:1;
301:5,16,22;302:3;303:5,21;
304:24;305:24;306:8;
307:19;308:1;309:10;
311:12,13;312:20;320:24
**outcome (2)**
10:17;246:22
**outline (4)**
6:22;12:6;121:16;131:5
**outset (2)**
239:22;247:17
**outside (4)**
27:2;29:8;250:18;292:21
**over (37)**
7:6;10:23;20:10;25:9;
38:15;39:23;41:18;71:5;
87:2,5;88:20;90:10;105:21;
120:17;122:16;130:3;
138:10;139:5;148:2;150:18;
152:16,17;173:22;191:5;
206:24;226:23;268:4;
274:18;283:4;287:15,20;
288:19;292:12;307:18,21;
311:23;312:3
**overall (5)**
90:17;91:14;135:18;

151:14;168:10
**overcome (2)**
123:2,4
**overlook (1)**
51:24
**overlooked (1)**
52:3
**override (1)**
74:16
**Overseers (3)**
79:13;136:23;144:24
**oversight (2)**
130:21;141:6
**overstating (2)**
58:15;118:20
**own (38)**
20:8;23:17;24:11,12;44:2;
46:8;73:23;88:5;93:4;
100:15;108:2;137:9;145:2,
4;146:13;149:3;172:8;
184:3;186:21;192:23;
196:13;201:3;209:1;250:18,
20;264:6,7;266:3;276:1,7;
281:23;284:11;290:2;
297:15;299:5,13,14;311:6

**P**

**package (1)**
184:23
**page (39)**
76:6;158:4,12;161:16;
163:24;169:3,6;198:14;
220:9;224:2;233:3,11;
240:17;242:5;247:4;251:1,
9;259:2;263:10;285:2,13;
287:5,15,16;292:12;294:18;
295:5,10;297:6,12,13;
298:12,12,21,23;304:7,9,12;
305:22
**pages (2)**
263:15;295:12
**pagination (1)**
295:11
**paid (38)**
11:18;47:19;54:2;67:18;
86:5;88:10;91:5,24;92:7;
101:3;102:10;107:14;135:9,
10;141:14;155:14;157:7;
158:16;160:16;164:22;
167:21;170:18,18;174:2;
190:22;194:1;197:1;199:5;
205:1;208:9,11;218:6;
238:20;269:1;273:15;281:5,
7;307:23
**pains (1)**
129:9
**panel (9)**
42:23;78:12,13,15,16,18;
79:2;142:19;238:21
**panels (3)**
238:21,23,23
**panoply (3)**

238:2,4;305:9
**pants (1)**
201:4
**paper (1)**
165:16
**paperwork (4)**
172:1;202:16;204:4;214:1
**paradigm (1)**
79:3
**paragraph (8)**
125:21,22;138:1;233:17;
290:16;292:14;295:17;
297:14
**paragraphs (3)**
172:24;257:8;261:2
**paralegal (2)**
192:24;290:19
**paraphrase (1)**
162:12
**paraphrasing (2)**
56:15;290:22
**Pardon (1)**
265:19
**parsed (1)**
42:1
**part (32)**
7:10;13:4,15;15:9;46:20;
53:15,23;99:4;110:8;111:1;
120:2,4;123:24;126:11;
148:4;184:22;190:3;196:19;
211:10,16;226:19;227:1;
230:12,22;237:7;241:19;
254:15;262:17;278:15;
280:13;317:7;322:12
**parte (9)**
121:13;123:12,19;127:9,
15,17;128:1,2,4
**partial (2)**
272:4,7
**partially (2)**
18:14;118:3
**participant (3)**
174:15;215:20;221:4
**participants (1)**
232:16
**participate (1)**
83:17
**participated (3)**
107:23;216:14;276:15
**participation (1)**
166:4
**particular (9)**
10:13;28:23;108:23;
127:2;154:8;188:6;229:14;
262:22;288:14
**particularly (14)**
10:12;18:8;27:5;34:5;
51:9;54:18;58:20;85:4;
93:23;229:8;237:3;261:18;
262:8;263:5
**parties (3)**
7:12;155:7;242:8
**parties' (1)**

299:4
**partner (13)**
10:17;13:20;14:7;30:23;
62:10;93:19;152:11;183:12;
274:13,13;276:12;284:8;
290:18
**partners (5)**
14:10;95:2;158:3,7;163:8
**partnership (1)**
23:18
**parts (3)**
13:17;153:3;220:8
**party (6)**
48:23;104:17;126:10;
287:9;289:7;311:8
**pass (6)**
51:1,4;54:15;90:24;286:2;
296:8
**passed (1)**
109:21
**passing (1)**
250:17
**past (4)**
156:20;167:15;188:21,23
**pattern (3)**
99:4;107:12,17
**Paul (4)**
42:16;65:3;130:14;132:4
**Pause (3)**
207:16;214:14;222:20
**Pawtucket (2)**
194:3,6
**pay (27)**
42:5,6;43:9;44:5;45:22;
62:7;89:7,8;94:1;103:16;
107:1;133:19,24,24;134:4,
17;155:9;157:20;163:9;
199:7;254:2;270:4;276:19;
282:21,22;286:19;296:24
**paycheck (1)**
200:20
**paying (15)**
134:6;137:9;142:7;155:7;
158:15;175:6;189:12;
218:11;234:2;254:19;273:1;
287:12;296:12;298:24;
321:18
**payment (9)**
28:23;42:12;66:3;83:18;
119:24;136:20;256:14;
316:20,23
**payments (2)**
134:13;276:18
**Payne (1)**
127:23
**pays (1)**
282:8
**pen (3)**
7:17;165:16;198:21
**penalty (1)**
145:6
**pending (2)**
96:7;314:2

**pens (1)**
7:19
**pension (6)**
18:23;229:9,18;230:15;
256:6;266:10
**pensions (2)**
229:22;266:15
**people (40)**
12:20,22,22;20:1;24:9;
27:20;46:23;72:14;78:2;
83:22;93:4;96:20;97:8;
98:18;116:8;148:5;151:1,
17;153:14;172:10;174:2,6,
20;185:8;189:12;193:20,20,
21;197:21;198:2;222:15;
228:8;233:13;240:4,6;
242:20;248:24;306:17;
309:19;312:23
**perceived (2)**
15:24;16:13
**percent (54)**
16:24;44:6,7,9;45:22;
46:12;56:16,17,18;58:9;
59:7;78:23;90:1;91:7,8;
94:24;104:23;105:6;109:24;
167:20;170:6;202:5,8,9;
203:6,17,20,22,23;204:6;
206:18;207:2,2,3;210:11,11;
227:12;233:19;237:4,6;
246:10;248:17;251:8,16;
252:5;255:3,5;257:7;
267:11;304:10,15,19;
311:16,17
**percentage (17)**
16:21,22;29:5;41:18;
56:14;58:4,13;92:24;
118:18;119:19;140:9;237:8;
239:8;241:3;258:15;259:9;
267:16
**percentages (2)**
241:6;251:7
**percent's (1)**
126:14
**perception (2)**
16:15;198:10
**perfect (1)**
240:8
**perfectly (11)**
7:2;32:22;38:3;51:7;77:3,
8;80:22;101:3;124:15;
155:19;176:13
**perform (2)**
87:17;283:1
**performed (7)**
140:20;191:15,16,20;
209:4;290:18,21
**performing (1)**
262:24
**perhaps (10)**
37:23;72:4;141:5;167:5;
210:20;211:1,1;218:12;
263:4;317:15
**period (12)**

40:16,16,20;111:20;
112:15,19;119:1;129:24;
130:3;313:4;315:20;317:20
**permanent (1)**
292:20
**permissible (12)**
32:23;51:7;71:24;77:3;
88:8,13;89:10;101:3;102:6;
189:1;207:5;319:10
**permission (7)**
42:4,5,6;62:12;140:23;
153:11;316:19
**permit (3)**
23:10;28:3;310:7
**permits (3)**
63:15;89:7;134:13
**permitted (4)**
25:7;133:13;134:17;
310:18
**persistent (2)**
162:5,6
**person (22)**
69:12;83:14,16;89:14;
92:2;96:10,12;98:2,19;
120:21;132:1,3,9;134:15;
176:19;178:8;218:7;231:17,
17;234:3;240:4;316:12
**personal (1)**
186:21
**personality (3)**
210:7,8;311:7
**personnel (2)**
286:20,21
**person's (1)**
140:15
**perspective (9)**
25:12;27:15;35:24;77:2;
150:6;167:17;231:9;247:19;
306:24
**persuade (3)**
10:6;11:9;148:21
**persuaded (1)**
11:5
**pertained (1)**
169:17
**pertinent (2)**
30:3;93:24
**Peter (1)**
135:22
**petition (29)**
117:21;123:9,10,16,23;
124:6,13,16;126:9;141:15;
159:17;174:20,21,22;181:4,
4;258:22;265:16;266:18;
267:4,21,22;268:2,3,7,9,17;
269:7;280:11
**petitioner (1)**
119:8
**petitioning (1)**
126:11
**petitions (7)**
10:22;118:12,14;176:7;
210:24;213:18;218:2

**phasing (1)**
109:11
**phenomenally (1)**
322:16
**phone (7)**
65:2;98:6;174:14;215:19;
221:3;321:2,2
**phrase (7)**
96:3,5,24;97:1;131:2;
318:2;319:5
**phraseology (1)**
319:17
**phrases (1)**
97:7
**pick (2)**
65:2;297:6
**picked (5)**
293:24;294:1,7;299:11;
300:20
**picking (1)**
201:11
**picture (2)**
204:2;213:19
**pie (2)**
156:8,18
**piece (6)**
32:1;97:20;155:17;156:8,
18;225:24
**pieces (1)**
149:19
**piggyback (1)**
199:12
**pilot (3)**
239:17,21,24
**pitch (1)**
193:20
**pitched (1)**
142:18
**pitchers (1)**
194:1
**pitfalls (1)**
47:10
**pittance (1)**
200:5
**pivot (1)**
212:21
**place (6)**
34:6;48:24;138:10;
163:23;226:23;228:20
**placed (3)**
43:4;68:22;320:14
**plaintiff (5)**
24:20;45:5;128:14;
213:22;298:14
**plaintiffs (6)**
15:14;47:15;229:9,17,20;
266:9
**plaintiffs' (21)**
13:7;44:20,24;45:11;61:5;
63:4;79:10;80:8;234:22;
237:23;238:17;240:24;
257:13;259:7;261:6;266:6,
12;289:3,14;291:17;314:21

**plaintiff's (1)**
298:14
**plan (4)**
6:21;43:19;141:15;183:7
**plane (1)**
294:20
**play (2)**
18:6;59:21
**played (8)**
242:17;246:7,13;247:18;
251:21;252:13,14;318:5
**players (1)**
193:19
**playing (3)**
43:18;166:21;248:20
**playoff (1)**
197:13
**pleading (4)**
114:24;182:17;184:5;
187:18
**pleadings (6)**
65:20;114:1;177:18,20;
183:24;184:1
**please (12)**
82:19;98:5,12;116:11;
130:12;131:15;214:17;
215:23;224:11;260:23;
285:8;305:17
**pleased (1)**
175:12
**pleasing (1)**
322:20
**plumber (1)**
188:16
**plus (1)**
172:2
**pm (1)**
323:9
**poaching (1)**
269:20
**pocket (4)**
189:12;276:16;307:19;
308:1
**pockets (1)**
311:12
**point (89)**
11:4,13;19:23;24:22;30:1;
32:17,20;37:14;38:19;40:6;
41:8;50:15;62:15;81:16;
84:12,17;85:12;90:12;
97:23;100:23;102:24;103:6;
105:5,16;107:18;111:23;
112:1,5;119:11;124:8;
126:1,1,16,18;127:2;130:9;
146:14;147:15;150:3;154:5;
157:10;158:2,2;161:12;
165:11;167:8;173:13;176:2;
181:2,8;184:12;185:18,22;
186:2,9;202:12,13;205:12;
215:15;218:23;219:20;
220:9;231:12;237:5;243:12;
249:19,19;257:8,9;260:22;
262:17,17;265:2,24;279:10;

285:3;290:6;291:16;292:3,
10;293:16;296:16;297:4;
298:11;299:22;308:20;
312:15,20;320:24
**pointed (6)**
146:12;152:22;167:12;
168:18;192:8;199:11
**points (11)**
51:18;107:20;172:20;
201:24;218:24;220:11,23;
270:23;294:22;295:2,15
**poised (1)**
178:5
**poison (1)**
198:21
**policy (4)**
28:14;77:21,23;78:6
**Politanos (1)**
12:24
**political (2)**
100:11;249:14
**politician (1)**
210:19
**polyglot (3)**
87:8,11,11
**pool (4)**
78:13;141:13;289:12;
320:9
**poor (1)**
197:9
**popular (1)**
63:2
**portfolio (2)**
238:21,22
**posed (1)**
220:7
**position (14)**
43:4;82:2;134:23;142:19;
149:17;150:12;163:4,8;
167:5;198:5;280:18;288:21;
297:15;320:22
**positions (2)**
49:24;293:6
**possibility (2)**
103:5;196:17
**possibly (4)**
60:11;67:10;105:11;
216:13
**post (3)**
93:6;98:1;100:3
**potential (4)**
18:22;24:6;54:6;190:6
**potentially (3)**
103:13;175:19;196:24
**pounds (1)**
188:1
**practical (2)**
84:13;124:19
**practice (37)**
13:3;14:11;15:1,5,5,12,
17;20:15,16;21:1,10;23:8,
16;25:11,20;27:8;31:15,21;
44:16;46:16;47:16,21,23;

48:18,20;79:8,19,21;80:7;
109:11;146:1;187:16;
228:17,18;229:7,8;267:6
**practiced (4)**
27:10;65:12;86:15;88:22
**practices (25)**
12:16;15:15;20:22;31:24;
32:5,7;36:3;44:13;45:6;
46:7;47:3,10,10;48:1;62:17;
71:16;79:17;80:9;81:5;
165:1;181:10;213:13;262:5;
278:23;317:9
**practicing (4)**
28:6;41:19;60:9;234:9
**practitioner (4)**
27:18;41:13;77:2;86:20
**practitioners (2)**
71:19;77:12
**precedent (1)**
134:24
**precipitate (1)**
102:16
**precisely (1)**
78:13
**precursor (1)**
141:13
**predict (1)**
206:15
**preexisting (3)**
44:5;62:1;70:12
**preferably (1)**
27:7
**preference (1)**
171:16
**preferred (2)**
92:14;206:5
**preferring (1)**
28:14
**preliminarily (2)**
111:22,23
**preliminary (4)**
59:4;61:22;203:9,15
**premise (2)**
150:21;213:1
**prepare (1)**
184:19
**prepared (5)**
192:19,19;201:8;203:2;
219:8
**PRESENT (1)**
5:12
**presentation (5)**
55:22;172:1;219:11,15;
265:9
**presented (3)**
40:19;125:11;307:10
**presents (1)**
27:24
**preside (1)**
71:5
**press (2)**
69:9,14;152:5;198:22;
213:8

pressed (2)
79:4;133:10
**presumably (2)**
19:14;88:3
**presume (2)**
127:7;248:16
**pretrial (2)**
52:13;87:10
**pretty (14)**
8:23;34:11;55:16;90:2;
92:6;104:18;122:2;123:5,7;
130:19;160:6;172:19;
177:23;210:18
**prevailing (2)**
287:9,12
**prevent (1)**
12:18
**previous (1)**
112:19
**previously (2)**
18:1;66:18
**price (3)**
62:7;170:18,19
**primarily (3)**
227:2;248:10;292:23;
300:2;308:3
**primary (3)**
36:2,24;262:9
**principal (5)**
234:3
**principle (5)**
89:2;101:9;106:6;232:13;
293:7
**principles (2)**
8:5;12:9
**printout (1)**
285:3
**printouts (1)**
288:8
**prior (5)**
18:6;112:15;169:16;
180:10;299:24
**priority (1)**
238:20
**private (7)**
33:2;181:7;187:3;190:17;
198:5;287:10;320:16
**privilege (1)**
289:11
**privy (2)**
218:13,15
**pro (5)**
41:9,10;96:8;97:4;113:15
**probably (30)**
10:15;27:6;41:18;52:2,3;
55:14;84:14;96:23;99:1;
102:11,16;127:22;130:21;
137:16;175:14;187:19;
192:24;196:14;206:4,14;
210:18;211:6;253:19;273:2;
299:21;300:6;311:5,8;
312:14;313:11
**problem (18)**

13:22;17:19;28:1;78:3;
86:22;88:24;96:2;100:3;
119:22;135:5;136:14;
148:10;150:8;171:1;185:14;
190:20,20,23
**problematic (2)**
27:3,5
**problems (2)**
48:20;49:9
**procedural (2)**
120:12,15
**Procedure (15)**
27:3;47:5;60:15;66:7;
67:2;68:16;72:1;89:19,20;
116:23;120:19;125:20;
128:8;145:2,4
**procedures (1)**
183:10
**proceeding (13)**
107:7;123:8,12;124:3,21;
125:1,6;126:5;127:3,9,15,
17;128:3
**proceedings (5)**
87:24;106:22;121:14;
317:7;323:8
**process (14)**
34:5;36:12;38:2;40:7;
41:16;61:17;73:10;74:1;
84:21;153:20;154:9;216:13,
15;273:7
**produce (3)**
36:6;37:6,19
**produced (7)**
18:1;35:15;37:10;223:5,6,
10;289:4
**producing (1)**
289:1
**product (2)**
18:14;78:18
**production (3)**
29:21;33:19;35:13
**Professional (6)**
38:12;72:2;120:13,15,20;
132:2
**Professor (56)**
5:13;26:15,23;34:3;35:5;
36:13;39:1;42:9;54:21;57:5;
58:21;63:11;66:10;68:2,3,
15;72:21;73:3;74:1,12,22;
76:3;79:23;81:16;90:12;
103:14;129:7;133:1,3,14;
134:19;137:18,22;147:3;
148:13,17;155:3;157:13;
166:7;169:12;171:3,23;
177:12,13;178:5;195:2;
201:3;206:1;213:22;215:16;
216:4;220:5,10;221:13;
261:22;270:23;302:11
**Professors (2)**
68:18;172:9
**proffered (1)**
292:18
**profile (1)**

189:4
**prohibited (1)**
14:20
**prohibition (3)**
134:6;136:12,14
**project (2)**
9:5;282:16
**prolong (1)**
294:17
**proper (2)**
79:16;150:7
**proposal (3)**
228:4;232:24;258:18
**propose (3)**
219:14,22;220:19
**proposed (2)**
259:16,17
**proposing (2)**
91:9;237:17
**proposition (2)**
286:5;297:24
**propounded (1)**
31:20
**proprietary (1)**
266:13
**propriety (2)**
274:18;280:9
**proscriptions (1)**
137:10
**prosecuting (2)**
64:5;289:21
**prosecution (1)**
154:9
**prospectively (2)**
39:16;49:21
**protect (5)**
47:21;61:16;85:20;
156:15;163:12
**protecting (2)**
85:4,6,10;111:5
**protection (2)**
44:2;46:9
**provide (2)**
116:11;301:18
**provided (9)**
11:7;12:6;44:23;45:9;
54:8;97:14;116:12;157:12;
298:18
**provides (1)**
233:3
**providing (1)**
303:4
**provision (2)**
125:15;233:20
**provisions (1)**
125:18
**prudence (2)**
36:4;37:1
**prudent (6)**
31:15;33:7,16;37:6;43:23;
44:13
**Pryor (1)**
291:10

**public (14)**
45:10;78:7;89:13,14,15,
23;198:5;199:7,9;229:9,18,
21;230:14;270:6
**public's (1)**
198:10
**pull (2)**
36:18;116:13
**pulled (5)**
17:24;28:10;34:20;109:2,
18
**pulling (3)**
38:18;180:1;303:5
**purported (1)**
40:23
**purporting (1)**
21:4
**purpose (2)**
112:21;138:23
**purposes (12)**
15:1;41:1;52:13;76:9;
87:10;117:20;142:22;184:4;
240:16;280:23;296:15;
307:11
**pursuant (1)**
233:20
**pursue (1)**
268:15
**purview (1)**
81:6
**push (2)**
189:20;210:6
**pushed (1)**
76:5
**put (54)**
12:7;22:3,11;37:3;47:18;
52:12;54:11;57:10;63:23;
100:11;103:20;109:22,23,
23;122:14;125:11;139:7;
149:2;155:20;157:2,6;
160:2,9,14,15,24;161:2;
162:2;164:16,18,19;166:5;
169:4,5;176:8;184:12;
185:2,3;189:7;190:2;198:7;
202:23;216:12;226:6;
251:23;252:7;266:20;267:4;
268:17;272:12;276:12;
307:12;320:13;321:9
**putting (16)**
12:23;14:15;24:10;
118:19;119:8;168:2,3;
199:16,18,21;218:7,18;
233:13;268:10;278:24;
304:18

**Q**

**qua (1)**
153:5
**qualified (3)**
77:22;192:3;193:16
**qualifies (1)**
126:17

**qualifying (1)**
125:23
**quality (2)**
191:24;193:8
**quarter (1)**
200:17
**quarterback (1)**
153:23
**quibble (2)**
194:9;197:21
**quibbling (1)**
137:8
**quick (2)**
113:6;308:20
**quickly (5)**
11:11;29:22;109:21;
126:21;131:14
**quite (6)**
17:3;23:6;25:10;68:6;
160:12;245:23
**quote (9)**
9:17;142:1;157:18;
158:14;223:19;286:9;
289:10;299:19;304:15
**quotes (1)**
190:2
**quoting (4)**
162:16,21;291:14;296:4

**R**

**raft (1)**
209:14
**raise (1)**
125:7
**raised (11)**
26:17;42:2;79:24;82:22;
103:9;237:6;250:5;265:11;
267:23;278:7,8
**raises (2)**
237:19;240:20
**raising (1)**
241:2
**ran (1)**
7:17
**range (6)**
49:18;203:5,7,20;237:8;
298:24
**rank (2)**
212:9,12
**rat (2)**
54:12;63:23
**rate (28)**
11:19;173:7;192:11;
196:13,14;197:21;200:16;
286:2,4;287:8,19;288:16;
293:18;296:7,9,14;297:22;
298:7,8;300:4,11,19,19,21,
23;301:5;302:3,6
**rates (44)**
9:17;10:2,21;173:6;174:4,
5;180:4,6,8,9;181:5,19;
192:15;200:11,13,15;

219:17;280:10;287:8;291:2;
292:13,18;293:2,15,17;
295:6;296:24;297:1;298:4,
4,15,15;299:1,6,19;300:1;
302:5,14,16;303:3,8,9,13,14
**rather (16)**
17:16;19:24;21:14;22:11;
32:18;33:18;73:10;186:21;
200:9;201:3;287:9;297:8,
21;300:21;307:13;317:9
**ratification (1)**
43:7
**rating (1)**
219:18
**ratio (1)**
19:5
**rationale (1)**
280:4
**Ray (1)**
12:24
**reach (2)**
132:13;163:18
**reached (3)**
232:13;245:24;251:4
**reaches (1)**
298:10
**react (1)**
231:4
**reacted (3)**
28:10;34:17;107:2
**reacting (1)**
160:7
**reaction (4)**
88:3;89:23;254:4,7
**read (44)**
18:2;42:3;54:13;55:15;
131:17;132:17;147:13;
152:12,19;161:10,14,18;
165:9,10;166:2;169:6,10;
173:23;174:19;180:7;
181:24,24;182:7,11;183:5,
16;184:22;216:23;217:6,17,
20,21;218:21;240:9;244:7;
281:11;286:7;293:10,11;
298:12,19;302:19,20;306:23
**reader (1)**
206:1
**readily (1)**
26:12
**reading (9)**
46:2;53:17;147:9;
210:24;216:12;217:5;225:1;
295:9;297:11
**reads (3)**
133:18;222:13;297:7
**real (3)**
199:10;237:5;284:10
**reality (1)**
170:11
**realize (1)**
218:6
**reallocation (1)**
273:21

**really (35)**
9:2;17:3;28:16;39:3;65:4;
67:8,14;79:4,14;84:2;91:13;
125:13;152:24;177:2;
179:22;186:15;187:12,12;
197:15;200:7;204:19;207:8;
239:15;241:2;250:9;253:18;
260:12;263:2;264:21;
265:17;273:10;310:8,14;
311:17;321:20
**real-time (4)**
132:1;212:16;272:24;
309:22
**reason (32)**
6:17;13:15;21:4;28:14;
46:8;48:9;53:23;55:9;72:23;
73:8,11,24;78:12;83:24;
101:24;120:2;129:13,19;
137:16;148:5;149:3;154:19;
160:1;171:2;175:8;230:12;
250:13;268:16,22;269:8;
299:10;320:21
**reasonable (30)**
9:7;10:3;22:22;33:22;
34:8;45:17;52:23;55:11;
57:8;58:4;69:19;74:3;86:6,
7;89:22;90:18;101:1,2;
102:15;111:17;118:18;
126:15;135:17;143:5;201:2;
272:1;286:19;287:7;292:13;
296:14
**reasonableness (8)**
33:4,13;40:15;109:12;
190:21,22;192:15;290:19
**reasoning (1)**
35:20
**reasons (7)**
23:22;110:4;153:17;
158:13;164:13;231:9;
269:10
**recall (12)**
18:11;31:4;83:1;129:6;
223:13;227:17;228:13;
255:15;257:2;262:7;293:15;
319:1
**recalls (1)**
48:6
**receive (3)**
43:24;77:19;118:8
**received (5)**
52:14;136:20;222:3;
248:13;271:23
**receiving (3)**
29:6;56:9;153:11
**recent (2)**
264:7;284:22
**recently (3)**
74:5;109:10;264:9
**recess (2)**
149:12;219:7
**recipient (1)**
108:21
**recipients (1)**

245:3
**recognition (1)**
28:13
**recognize (1)**
18:18
**recognized (4)**
14:17;29:10;138:5;312:12
**recollection (3)**
114:8;222:7,8
**recommend (4)**
20:16;162:1;272:12;
273:22
**recommendation (12)**
47:14;130:17;131:3;
134:6,7;144:12,14;146:7;
271:14;274:3;277:18;
278:22
**recommendations (3)**
20:22;279:13;315:8
**recommended (1)**
154:14
**recommending (2)**
134:16;137:6
**recompense (1)**
274:15
**record (34)**
104:22;116:1,7,8;130:6;
163:19,19;168:16;171:14,
15,22;181:17;194:21;
201:21;207:23;211:10;
212:9,19;214:16;216:21;
220:21,21;221:22;223:2,12;
226:20;230:2;265:14;266:2;
271:20;309:16;310:10;
313:15;321:12
**records (1)**
197:19
**recovery (1)**
155:18
**red (7)**
176:6;194:3;197:4;
213:21;267:23;268:12;
269:5
**redactions (2)**
259:3,4
**redo (1)**
279:3
**reduce (1)**
281:14
**reduced (1)**
307:20
**reducing (1)**
58:11
**re-emphasize (1)**
202:1
**refer (7)**
28:17;54:21;66:15;97:9;
146:6;242:9;319:14
**reference (10)**
46:16,18;91:18;97:11;
133:3;152:1;255:19;287:8,
10;309:13
**referenced (6)**

56:24;66:11;74:13;97:14;
188:8;218:4
**referencing (1)**
15:16
**referral (41)**
34:7;39:19;40:14;42:5,12;
46:18;47:19;53:22;63:16;
65:7,7;77:7,15,18,19;78:19,
24;88:7;91:4,4,13,22;92:1,7;
93:1,2;94:23;101:2,10,12;
102:6;130:17;133:12;
149:21;150:1;207:4,5;
212:24;310:7;316:21,22
**referrals (2)**
28:4,15
**referred (5)**
13:12,13;91:6;227:13;
316:19
**referring (16)**
29:5;97:19,21;105:14;
111:10;113:11;147:17;
217:1;260:5;286:10;308:16;
309:13,17,20;310:3,9
**refers (10)**
89:8;95:22;96:5;145:4;
149:18;241:10;242:11;
286:9;315:6,14
**refill (1)**
7:20
**reflect (3)**
181:14,15;211:6
**reflected (1)**
169:3
**reflects (1)**
129:1
**Regan (2)**
162:13,21
**regard (13)**
7:5;38:3;43:11;48:21;
51:9;92:14;94:12;98:1;
106:3;108:13;109:5;110:3;
271:2
**regarding (5)**
226:12;227:6;243:21;
244:17;290:3
**regardless (2)**
290:17;300:17
**regrettably (1)**
72:4
**regular (10)**
8:16;19:10;34:24;173:5;
180:4,6,8,8;286:3;296:9
**regularly (2)**
8:18;12:23
**reimbursable (1)**
295:19
**reimburse (3)**
23:18,19;25:18
**reimbursed (2)**
23:14;24:16
**reimbursement (3)**
15:4,6;286:21
**reimburses (1)**

14:21
**reiterated (1)**
129:9
**reject (2)**
20:24;295:18
**rejected (1)**
295:24
**relate (4)**
6:8,18;7:9;138:2
**related (11)**
10:24;21:24;29:18;30:19;
53:14;112:15,18;129:10;
141:5;314:1;317:23
**relating (1)**
67:1
**relationship (44)**
11:1;49:2;72:24;73:2;
78:12;80:12;92:15;93:6;
94:23;96:13;98:2;99:6,20;
100:22;107:14;110:19,20;
112:4;130:15;198:19;209:5,
6,9,18;211:21;226:1;
230:14;234:19,20;238:5;
240:6;250:1,21;253:23;
273:8,9;281:19,23;282:5;
305:7,8,23;309:9;320:21
**relationships (5)**
44:19,22;282:10;305:10;
306:19
**relatively (4)**
13:2;14:6,9;284:22
**relevance (1)**
289:10
**relevant (16)**
34:16;66:15;89:6;98:20,
24,24;99:1,3,17,22;100:6;
119:11;193:4,5;259:14;
261:13
**reluctant (3)**
15:13;17:4;44:17
**rely (5)**
24:2;59:19;60:13;201:2;
299:5
**relying (2)**
22:12;74:20
**remained (1)**
35:13
**remaining (1)**
111:13
**remains (3)**
34:22;191:7;204:1
**remarkable (1)**
54:9
**remarks (1)**
188:10
**remedial (1)**
272:12
**remedies (1)**
278:4
**remember (30)**
16:22;18:20;29:11,12;
34:19,21;38:14;42:9;46:11;
48:8;69:10;74:12;76:11,12;

82:20;91:7;94:7;108:2;
113:13;114:2;188:12;
215:16;216:3;244:2;246:1;
249:8;258:5;299:21;313:13;
318:11
**remembered (1)**
204:2
**remembers (1)**
167:16
**remind (1)**
221:18
**remotely (1)**
77:5
**removed (1)**
81:21
**rendered (3)**
26:22;28:20;42:7
**renegotiating (1)**
249:3
**renting (1)**
306:11
**rep (10)**
43:8,20;52:10,15;53:8;
112:7;314:10,19;315:23;
317:3
**repeatedly (1)**
249:3
**replied (1)**
147:14
**reply (1)**
247:4
**report (18)**
8:12;13:9;26:23;35:5;
45:8;74:13;119:8;133:4,14,
17;157:14,22;171:4,11;
188:9;271:13;278:22;
302:11
**reported (1)**
116:3
**REPORTER (2)**
189:23;219:24
**reports (5)**
69:9;139:13,18;171:5,14
**representation (4)**
50:13;74:11;247:16;
318:18
**representations (2)**
22:24;181:3
**representative (16)**
49:23;50:3,3,5,11,18,23,
24;51:20,21;132:9;261:20,
21;262:11,20;263:1
**representatives (11)**
84:6,9;87:7;110:8;111:1,
5;112:3,6,10;230:16;262:1
**represented (3)**
255:10;256:9;313:6
**representing (6)**
131:19;283:24;312:10;
314:4,22,24
**reps (2)**
52:6,14
**reputation (5)**

6:8;71:22;106:23;273:11;
287:11
**reputational (1)**
170:21
**request (17)**
29:22;30:18;31:2,20;
34:14;35:1,3,4,7,13;36:10,
13,20;37:16;118:7;146:10;
274:23
**requested (3)**
258:15;293:20,22
**requesting (2)**
56:17;320:6
**requests (5)**
30:12;34:23;35:13;36:21;
289:9
**require (6)**
66:7;74:15;165:18;260:8,
15,16
**required (7)**
36:4;47:17;65:15;73:22;
150:1,2;164:22
**requirement (23)**
39:14,14,18;40:15;41:20;
66:21;73:18,19,20;74:17;
83:23;117:10,11,13,15;
122:24;128:18;184:4;206:7;
274:20,22;275:4;320:4
**requirements (4)**
73:16;123:2;134:22;
135:13
**requires (5)**
6:18;81:19;87:14,15;
289:17
**requiring (1)**
126:8
**reread (1)**
55:2
**research (1)**
210:21
**researched (1)**
320:7
**re-sent (1)**
243:7
**resolve (1)**
248:7
**resources (2)**
190:5;199:20
**respect (30)**
26:15;27:1,22;68:14;
69:13;86:14,17;127:19;
154:15,16;171:24;172:21;
185:17;187:5;198:4;203:17;
214:23;220:13,14,16,22;
237:17;253:22;262:10;
264:11;271:2;272:2;291:18,
23;292:10
**respected (2)**
27:1;228:23
**respectfully (20)**
48:11;57:15;59:12;64:17;
68:21;76:22;77:1;78:10;
88:16;99:11;104:16;107:19;

110:1;129:5,21;147:8;
148:23;168:15;309:11;
319:17
**respecting (1)**
251:4
**respective (1)**
8:13
**respects (1)**
222:15
**respond (3)**
63:1;278:17;289:8
**responding (2)**
228:2;231:21
**responds (2)**
141:17;247:1
**response (7)**
49:1;83:20;220:7;246:16;
247:24;250:10;253:13
**responses (1)**
26:24
**responsibilities (5)**
53:7;263:1;271:1;305:12;
306:7
**responsibility (6)**
8:10;53:9;141:7;257:11;
261:5;268:5
**responsible (1)**
24:12
**rest (11)**
17:13;39:4;197:18;201:6,
7;213:4;214:6;217:3,8;
242:18;263:2
**restraining (1)**
276:9
**restructured (1)**
38:8
**result (8)**
19:22;64:20;154:8;
174:11;206:19;213:24;
290:13,21
**resulted (1)**
24:2
**results (1)**
10:1
**retain (1)**
282:16
**retained (2)**
11:17;39:10
**retention (4)**
46:14;48:5;316:12,17
**Retirement (6)**
18:24;93:10;132:14;
227:8;312:24;314:22
**retrospect (4)**
32:10;47:9;85:1;267:24
**retrospectively (1)**
49:22
**reverse (1)**
103:4
**reversed (1)**
151:4
**review (16)**
17:23;30:17;35:1,10;

36:16;216:15;257:12;
287:20;288:18,24;289:2,8,
15;291:19;294:15;299:20
**reviewed (2)**
34:2;271:20
**reviewers (1)**
292:1
**reviewing (1)**
289:3
**rewrote (1)**
49:15
**Richard (22)**
5:4;12:1,2;25:2;26:4;
150:23;201:13;219:5;
225:19;262:5;263:9;275:22;
276:11;277:3,7;278:18;
279:9;288:1;295:9;303:20;
305:15;311:11
**Richard's (3)**
82:22;194:5;311:5
**right (86)**
13:21;15:19;24:14;26:11;
58:1;71:18;74:24;77:15;
97:6;101:13,13,14,24;102:3;
104:22;107:6;124:17;
128:12;131:9;134:8,11,14;
136:3;139:15;142:8,16;
144:9;147:24;150:20;
151:11;152:13;155:6;165:5,
14,17;167:10;173:13,19;
175:8;178:14;180:14;
184:15;187:4;189:9,11;
193:14;194:12;195:12;
196:13;197:14;198:22;
201:15;209:19;212:8;
214:13;219:4;220:3,4;
225:1,15,20;226:8;245:8;
247:2;249:9;254:17;257:21;
261:24;265:23;268:3;
273:19;275:14;278:24;
279:14;284:20;295:11,13;
304:21,24;308:7,10;311:5;
318:20;322:2,6,8
**rightly (2)**
16:2;277:19
**ripened (1)**
22:10
**rise (2)**
152:20;180:23
**risk (8)**
11:2;45:11;196:23,23;
199:19,24;305:7;306:11
**risks (6)**
103:11;199:6,14;305:12;
306:17,20
**River (1)**
72:13
**Robert (1)**
5:5
**rock (1)**
48:24
**rodeo (1)**
183:11

**Rogers (6)**
14:10;158:7,12,14;
159:18,22
**Rohrback (2)**
229:2,3
**role (27)**
43:8,18;51:19;84:23;
92:12;94:8,9;98:19;100:7;
108:10;112:11;230:17;
231:15;242:16;246:7,14;
247:18;248:21;251:20;
252:13,14;264:2,4;271:22;
315:4,19;318:4
**roles (2)**
12:20;193:18
**Ronald (2)**
162:12,21
**room (6)**
79:9;145:14;150:22;
187:24;279:2;322:22
**root (1)**
148:17
**rose (1)**
47:1
**Rosen (1)**
303:18
**routinely (1)**
295:18
**Rubenstein (20)**
34:3;54:21;57:5;58:21;
63:11;68:2,19;73:3;74:22;
103:14;169:12;177:11,12,
13,13;199:11;200:23;201:9;
261:22;269:9
**Rubenstein's (3)**
74:1;201:1;302:11
**rubric (1)**
314:7
**rule (109)**
28:22;33:24;38:1,4,5,7;
39:8;40:23;41:5;57:4;60:17,
23,23,24;61:8;66:8,9;67:7;
69:24;70:21;73:17,20;
74:10,17;76:10;77:15;81:3,
11,19;86:4,23;87:14,14;
88:24;90:2,8;97:3;110:12,
12,13;116:23;117:3,5,6,6,7,
17,18;120:3,12,12,15,19,20,
23;121:1,3,4,6;123:3,5,13,
14;125:17;126:3;127:18;
130:18,23;131:17,24;133:1,
19;134:17,21,21;135:11;
136:17;138:16,24;140:1,2,2,
3;142:22;144:1;146:21;
147:1,2,2,2,10,11;148:19;
149:16;173:12;177:20;
182:12,12;183:22;184:4;
186:9;206:7;260:1,3,5,5,8,
11;315:21
**rule-making (2)**
40:7;41:15
**Rules (46)**
27:2;38:11,22;41:11,16;

47:5;59:22;60:13,15;62:7;
66:6,6,7;67:1,2;68:2,14,16;
70:24;71:24;72:1;74:9,15;
80:12;81:23;90:7;97:2;
106:4;109:7;116:22;117:9;
123:1;125:19,24;126:1;
127:17;128:8;129:22;135:6;
138:9;139:11;147:13;
153:21;310:6,18;317:13
**run (1)**
6:21
**running (2)**
180:1;196:2
**rushing (1)**
270:9

## S

**safe (1)**
186:10
**Saggese (10)**
39:12,16;40:12;41:14,20;
78:19,20;135:14;143:6;
150:3
**salary (2)**
286:4;296:10
**same (54)**
6:23;7:13;11:19;14:9;
39:20;45:14;52:15;64:20;
106:4,6;110:22;147:24;
153:5,6;154:10;158:13;
159:7,15;161:12;172:23;
174:11;175:4,14;184:1;
191:14;199:18;228:2,8;
231:19,22;233:6;242:20;
247:14;248:2;250:2;263:14;
277:14;281:3;283:2;287:13;
289:13;294:10,13;298:8;
301:16,17,18,18,19;305:4;
313:2;314:1;315:20;317:20
**San (1)**
5:8
**sanction (4)**
41:3;143:20;307:14,15
**sanctionability (1)**
138:20
**sanctionable (6)**
32:1,4;81:8;165:6;173:9;
317:11
**sanctioned (3)**
71:22;120:22;170:16
**sanctions (10)**
6:19;41:2;71:13;152:20;
154:14;162:1;173:12;
177:20;187:21;312:19
**sandbox (1)**
166:21
**Sarko (9)**
5:15;106:10;115:21,21;
268:7;275:14;321:3,4,8
**Sarko's (3)**
105:22;113:17,19
**Sarrouf (3)**

77:24;78:3;79:22
**sat (3)**
13:18;100:13;186:13
**satisfied (1)**
322:14
**satisfies (1)**
302:4
**saw (5)**
18:3;97:7;240:3;267:20;
309:4
**saying (47)**
23:16;33:22;37:14;40:22;
42:2;45:18;47:2;50:5;61:6,
10;63:10,20;64:8;71:2,7,8;
76:12;97:3;105:23;116:22;
117:1;120:11,16;127:16;
170:4;177:17;194:24;195:9;
198:11;207:1;211:20;
212:20;219:12;222:6;225:9;
228:6;231:23;238:10;242:6;
243:11;244:15;245:20;
247:1;256:17;279:17;
293:15;296:11
**scale (2)**
163:9;199:24
**scenario (1)**
106:14
**scenes (1)**
145:13
**scent (3)**
62:17;63:22;64:16
**schedule (1)**
15:6
**scheme (1)**
152:8
**school (1)**
201:3
**scope (5)**
36:10;37:1,2,4;74:11
**scrambles (1)**
178:11
**screw-up (2)**
160:23;175:9
**scribbled (2)**
259:1,5
**scrutinize (1)**
161:19
**scrutinizing (1)**
176:24
**Sea (2)**
240:11,13
**search (1)**
193:2
**searched (1)**
222:1
**seat (1)**
201:3
**seats (1)**
294:24
**second (30)**
7:16;8:9;23:8;25:13,20;
36:5;123:5;169:6;207:17;
224:17;228:11;233:17;

251:1,8,13;263:4,10;278:18;
283:5;285:13;286:22;287:4;
290:4,11;292:14;298:11;
299:3;303:6;313:6;322:24
**secondary (1)**
36:2
**Secondly (4)**
118:10;119:10;283:2,7
**secret (1)**
129:9
**section (7)**
132:7,8;263:2,13;264:8;
287:22;299:16
**secure (2)**
130:15;238:18
**securities (15)**
15:14;44:21,24;47:15;
63:3,4;79:11;229:7,14,16,
20;238:17;266:6,9
**securities-like (1)**
79:11
**seeing (3)**
10:8;159:15;261:6
**seeking (3)**
61:19;274:14;298:16
**seem (5)**
176:19;234:6;284:12;
297:7,20
**seemed (2)**
10:2;281:13
**seems (10)**
22:23;34:11;46:7;95:20;
153:19;211:22;227:19;
234:3;249:23;250:17
**segment (2)**
21:5;44:17
**segue (1)**
187:23
**segued (1)**
14:24
**selected (4)**
78:14;79:23;146:13;
256:11
**selectively (1)**
171:9
**seminar (1)**
108:4
**seminars (3)**
107:24;108:7;208:17
**Senator (5)**
62:11,12;65:3;130:14;
141:6
**sending (2)**
224:9;227:5
**sends (2)**
232:8;249:12
**senior (1)**
12:22
**sensationalistic (1)**
156:12
**sense (20)**
25:16;47:22;117:15;
142:5;155:9;173:10;179:9;

210:4;231:10;234:12;237:1;
258:4;282:7;289:11;294:13;
303:16;306:20,24;318:23;
319:15

**sensed (1)**
187:17

**sensitive (7)**
250:19;254:20;261:9;
277:13,16;302:24;303:2

**sensitivities (1)**
277:13

**sent (22)**
36:14;91:11;94:14;95:8,
10,11;100:9;114:9;165:13;
187:7,8;223:19,23,24;224:1,
1,22;225:10,11;244:8,10;
252:8

**sentence (5)**
46:17;297:6,19;298:19;
299:3

**separate (8)**
68:9;115:17;129:11;
158:6;185:11;242:2;249:16;
320:8

**separately (1)**
221:18

**September (4)**
151:22;156:6;163:24;
164:10

**serious (8)**
6:10,10,16;50:12;162:18;
171:1;273:3;302:12

**seriously (2)**
53:10;197:10

**seriousness (2)**
180:24;277:12

**serve (7)**
84:5;229:18,24;230:17;
256:11;257:10;267:15

**served (2)**
267:12;314:13

**serves (4)**
78:7;96:10;256:5;261:3

**service (5)**
44:23;45:9;54:9;112:17;
262:19

**services (8)**
28:20;42:7;134:16;
140:20;252:15;292:19;
299:1;316:23

**serving (1)**
96:14

**set (16)**
7:21,22;9:6;37:17;38:17;
107:20;119:1;141:18;
142:17;225:10;239:8;293:3;
299:18;303:12,13;316:24

**sets (1)**
210:5

**setting (1)**
200:10

**settle (1)**
103:16

**settlement (19)**
11:7;44:8;52:1,7;53:12;
55:13,23;57:24;60:6;70:8;
101:8;111:22;112:9,11,12;
124:13;232:13;259:10;
290:14

**settlements (1)**
12:24

**seven (3)**
20:11;302:1;304:11

**several (11)**
8:21;41:3;49:12;65:15;
96:19;145:1;232:15;258:8;
264:23;312:6,8

**shade (1)**
257:6

**shadowy (1)**
22:12

**shafted (1)**
202:6

**Shall (8)**
21:21;26:8;66:14;127:10;
131:24;134:15;138:15;
214:10

**share (27)**
12:10;13:5;15:23,24;
16:14,16;72:12;88:11;
156:21;167:18;168:5,5;
227:11,12;241:6;253:3,23;
254:2,19;256:14;258:3;
261:10,20;270:4;274:19;
275:8;276:17

**shared (5)**
68:2;101:17;103:10,11;
221:23

**sharing (5)**
8:8;15:2;61:3;68:7;
254:15

**Sharp (2)**
38:15;323:7

**sharper (1)**
266:17

**shift (1)**
168:14

**shifting (1)**
175:7

**shoot (3)**
161:20;180:2,3

**shortchanged (1)**
202:11

**shortcomings (1)**
65:14

**shorthand (1)**
319:6

**shortly (2)**
251:11,12

**shot (2)**
63:6;307:7

**shots (1)**
219:2

**show (3)**
226:19;252:11;307:13

**show-and-tell (1)**

219:10

**showed (4)**
215:17,17;216:4;300:22

**shows (5)**
130:6;202:3;220:21;
305:22,23

**shrinking (1)**
163:11

**shy (2)**
204:10;206:3

**side (10)**
41:3;45:15;105:20;128:4;
176:8,8;234:23;274:11;
279:6;288:2

**sides (1)**
9:2

**side's (1)**
124:3

**sign (1)**
185:1

**signaled (1)**
203:24

**signed (9)**
48:2;49:15;95:18;161:15,
18;172:22;173:23;176:21;
217:5

**significance (4)**
96:3;240:16;247:15;
252:14

**significant (19)**
9:24;10:14;41:17;53:15;
97:15;151:12;179:21,23,24;
197:18;231:24;248:21;
264:12;282:3,4;283:12;
305:13;306:6;317:7

**significantly (1)**
191:24

**signifies (1)**
249:6

**signing (2)**
176:23;216:11

**signs (1)**
217:18

**silent (1)**
112:12

**silo (1)**
12:19

**siloing (1)**
218:4

**silos (1)**
13:13

**similar (5)**
49:3;255:23;263:22;
287:13;289:21

**simple (4)**
88:15,18;150:21;180:12

**simpler (1)**
67:14;165:3

**simplicity (1)**
165:2

**simply (28)**
15:6;16:19;17:11;18:19;
28:22;30:1;31:16,17,21;

33:16;48:21;71:8;87:16;
97:22;99:5;137:5;144:11,
13;150:18;192:20;193:2;
204:16;218:18;223:24;
282:13;297:3;306:11;319:6

**sincere (1)**
94:13

**single (9)**
40:20;45:23;46:14;51:6;
81:10,10;87:9;90:12;141:18

**Sinnott (36)**
29:20;43:14;98:9,12,15;
113:6,9;114:5,8,17;115:20;
116:13,21;120:8;127:1,9,16;
128:12,17;129:1,1;130:10;
165:20;188:3;201:19;
215:14,22;216:2,9;219:1;
291:11;294:21;322:1,7,9,18;
323:5

**sit (4)**
167:18;184:14;186:16;
218:21

**sitting (6)**
30:24;38:15;127:20;
128:5;165:4;218:8

**situation (25)**
7:8;8:16;14:6,21;25:1;
45:2;49:1;57:3;68:23;79:4;
84:15;113:2;123:11;176:3;
177:4;188:7;230:18;232:12;
234:18;255:12,18,23;
263:21,22;312:17

**situations (4)**
92:12,22;103:8;260:7

**six (4)**
9:4;40:9;46:22;319:2

**size (1)**
101:7

**SJC (1)**
40:8

**skeptical (1)**
138:6

**skill (5)**
38:17;200:2;210:5;
290:20;291:23

**skilled (1)**
193:21

**skills (1)**
210:19

**skipped (2)**
122:16;131:4

**sky (1)**
303:5

**slam (1)**
196:18

**slightest (2)**
128:22;291:1

**slip (1)**
128:3

**sloppiness (1)**
204:4

**sloppy (10)**
161:22;170:7;175:17;

176:17;177:16,18,19;
202:16;213:16;214:1
**small (4)**
200:2,3;289:13;295:15
**smaller (3)**
78:21,22;199:23
**smarter (1)**
54:22
**smash (1)**
84:15
**smell (2)**
188:21,23
**smelled (2)**
54:12;63:23
**so-called (4)**
213:21;214:18,19,22
**sole (1)**
314:21
**solely (2)**
124:2;205:14
**solicit (1)**
132:2
**solicitation (2)**
130:17;131:17
**soliciting (1)**
131:21
**solidified (1)**
290:7
**somebody (22)**
41:4;62:18,20,23;77:19,
22;78:7;83:9;95:3;98:6;
133:20;137:6;234:18;
250:19;284:3;306:9,12;
315:6;316:2,3,12;319:12
**somehow (2)**
189:5;202:6
**someone (19)**
28:18;53:4;65:19;69:1;
83:10;89:8,11;96:6;102:5;
119:6;131:21;141:1;145:21;
178:7;182:14;221:2;269:20;
276:15;318:2
**something's (2)**
77:3;178:10
**sometime (1)**
302:20
**Sometimes (6)**
230:1,2;257:14,14;
277:15,15
**somewhat (1)**
123:13
**somewhere (3)**
41:8;258:9;269:6
**sophisticated (5)**
152:7;160:24;161:7;
262:3;289:18
**sorry (16)**
58:16;92:10;94:17;
108:23;123:6;148:12;
189:23;197:10;215:17;
216:8;219:24;225:19;
226:16;267:1;288:9,10
**sort (18)**

12:20;33:17;93:16;
173:14;210:15;213:15;
219:9;229:1;238:13;239:7;
240:5;247:22;282:22;
293:14,17;302:13;307:14;
323:1
**sorts (9)**
23:21;170:24;183:23,24;
193:5;209:16;239:4;254:21;
262:2
**sought (1)**
288:15
**sound (1)**
202:7
**sounded (1)**
255:11
**sounds (1)**
247:2
**Southern (2)**
285:1;313:16
**Sox (2)**
194:3;197:4
**space (1)**
277:14
**spare (2)**
189:14,18
**sparred (1)**
55:1
**sparring (1)**
57:5
**speak (8)**
21:4;44:17;66:12;220:1;
275:23,24;276:11;305:16
**speaking (7)**
50:9,9,10;110:23;180:16;
275:19;276:10
**SPECIAL (557)**
7:16,20,22;9:10,14,22;
11:15;12:2;13:10,21;14:1,
23;15:19;17:7;19:14;20:18,
20;21:7,16,19;22:2,21;
23:21;24:6,14,17,22;25:19,
24;26:3,6,10,19;27:17;
29:15;30:2,4,6,10;31:7,12;
32:3,10,13,14,15,20;33:3;
34:9,10;35:11,22;36:1,17,
23;38:9;39:22;40:3;43:22;
44:9,12;45:7;46:5;47:13,24;
48:8;49:16,20;50:20;51:16;
54:3;57:11,23;59:1,9,13,16;
61:21;62:14;63:7,17,21;
64:3,10,13;65:22;67:13,24;
68:11;70:3,5,23;71:3,11;
74:18;75:11,15,20,23;76:9,
16,23;77:17;79:6;80:15,19;
82:6,18;83:3,6;84:4;85:3,8,
13,18,24;86:7,16;87:1,4;
88:9,14,17;89:12,17;92:3;
93:11,15;94:16,20;95:5,19;
96:12,19;97:13,17;98:4,8,
10,23;99:17,22;100:16,20;
101:15,22;102:12,18,22;
104:1,9,14;105:11;107:10;

108:4;109:13;110:6,15,23;
111:12,15,19;112:8,16;
113:1,4,20;114:23;115:3,7,
12,19;116:10,20;117:19;
118:11;120:6,10;121:8,13,
20,24;122:2,10,19,24;
123:22;124:2,10,19,24;
125:4;126:19,22;129:4;
130:8,11;131:2,7,10,15;
133:7,23;134:3,5,9,12,18;
135:19,24;136:2,7,11;137:3,
13,17;138:4,11,19;139:15,
20;140:4,12,19;141:24;
142:6,9;144:2,6,10;145:15,
19;146:19;147:6,9,22;148:7,
15;149:1,7,10;150:19;
151:19;153:2,9,22;154:2;
155:12,17;157:1;158:17,22;
159:10,14;162:4,15,20;
164:1,4,16;166:11,19;167:1;
168:1,11,23;169:22;171:12,
18;172:3,7,16;173:2,19;
174:12,17;175:18;178:3,17,
20,23;179:2,7,18,22;180:13;
181:1;182:8,11,22;183:21;
184:9;185:9,21;186:15;
188:4,9,20;189:13,17;190:1,
19;191:3,13;193:12,23;
194:12;195:6,13,20;196:5,8,
21;197:7,11;198:1,9,18;
199:15;200:8;201:5,10,17;
203:8,11,14;204:21;205:11,
21;207:14,19;208:2,9;
209:12,24;210:23;211:14,
19,21;212:4,11;214:3,7,11,
17;215:3,6,11;217:19,24;
218:14,22;219:4;221:5,20;
222:16,21;223:1,11,14,17;
224:5,10,15,20,24;225:5,8,
14,18,21;226:5,14,17,21;
229:1,5;230:7,24;231:6;
233:24;237:19;238:3;
239:11,23;240:3,12;241:23;
242:2,15,23;243:24;244:2,4,
8;245:7,11,15,18,22;246:1;
248:3,18;249:8,11;250:4,16;
251:10;252:9,21;253:8,11;
254:3,23;255:2,6;257:16,22;
258:1,13,21;259:18,21;
260:23;262:4,12;263:8,12,
16,18;265:18,20;266:16,23;
267:2,9,20;268:15,23;269:4,
19;270:13,17;271:9,12,17;
272:4,7,11,16,18;273:17;
274:5;275:3,10,17;276:3,8,
23;277:2,6,11,23;278:4,9,
21;279:8,24;280:12;281:10,
16,22;282:3,6,19,24;283:10,
15,18;284:2,13,18,20;285:7,
11,17;286:6;287:24;288:12;
290:10;291:4,9,12;292:16;
293:5,9,13,21;294:9,19,24;
295:8,13;296:17;297:10,16;

298:2,21;301:1,9,14;302:19,
22;303:15,19;304:1,6,8,13,
18,23;305:17,19;306:2;
307:4,8,23;308:8,13,17,21,
24;309:7;310:19,24;311:24;
312:4,9;313:9,17,21;314:16;
315:11,14;316:8;318:7,13,
20;319:21;321:1,5,23;322:2,
5,8,17,23
**specialized (1)**
12:20
**specific (18)**
11:13;49:6,7;110:13;
117:5,9,10,13,18;120:12,16;
121:4;123:6,7;126:9;138:5;
139:22;143:12
**specifically (9)**
44:4;56:14;60:17;68:14;
122:23;208:10;280:3,9;
316:19
**specified (1)**
174:10
**specifying (1)**
196:3
**speculate (2)**
176:11;269:16
**speculation (3)**
212:9,12;253:18
**speculative (4)**
64:18;65:5;104:18;105:15
**spelled (2)**
33:11;220:8
**spend (7)**
7:4;9:10;10:18;197:3,4,5;
198:6
**spent (3)**
10:8;86:20;195:7
**spin (1)**
146:8
**split (11)**
18:19;104:3;105:18;
136:16,21;138:17;144:21;
146:4;184:18;248:7;304:17
**splits (2)**
73:20;136:18
**splitting (2)**
58:3,5
**spot (4)**
272:13,13;306:12;307:12
**spotting (1)**
54:10
**spread (3)**
152:13;285:24;296:6
**squish (1)**
217:13
**stable (1)**
306:16
**stack (1)**
279:10
**staff (65)**
8:4,17,17,20;9:3,15,19;
10:8,9;11:6,12,20,24;14:3;
15:3,7;20:8;22:3;23:12,24;

152:16;153:5,6;155:10,21;
157:3;158:10;159:5;161:20;
167:22;180:3;190:16;192:1,
2,10;193:5,16;194:5,7;
197:18;201:7;218:2;219:16;
280:10,16;281:19,23;282:8,
10,12,14;283:3,8,12,15;
286:10;290:8;293:18;298:4;
301:12;304:19,20;305:4,10;
306:1
**staffing (3)**
290:4,11;292:21
**stage (3)**
59:4;61:23,23
**stages (2)**
55:8;60:1
**stakes (1)**
170:14
**stand (3)**
45:6;82:1;113:14
**standalone (2)**
83:11;114:14
**standard (5)**
79:19,21;117:8;121:3;
151:10
**standing (2)**
61:10;206:14
**standpoint (1)**
285:21
**Stanford (1)**
302:2
**start (15)**
31:4;60:14;81:24;150:21;
173:8;203:22;206:24;213:1,
2;214:11;219:23;220:5,24;
240:17;287:5
**started (5)**
29:9;33:11;38:4;154:3;
305:24
**Starting (8)**
7:23;68:12;121:23;
151:10;284:24;285:3;
288:20;313:3
**starts (2)**
149:23;163:2
**State (28)**
45:3;47:17;48:23;53:6;
62:17;64:6,9;123:17,19,20,
24;124:11,22;126:13;
188:17;189:4;191:10;207:5;
226:12;243:20;244:17;
253:22;265:4;305:9,10;
313:2;317:1,23
**statement (9)**
66:16,17,22,24;76:13;
91:3;118:2;184:7;205:13
**statements (1)**
183:24
**states (6)**
28:2;96:7;143:22;160:12;
182:16;319:4
**stature (1)**
8:11

**status (2)**
297:8,21
**statute (2)**
48:16;139:7
**statutes (1)**
138:9
**statutory (3)**
117:8;121:3;138:21
**stayed (1)**
225:1
**Stein (10)**
19:15;281:12,15;292:7,
17;296:17;300:9;302:5;
303:1,7
**Stein's (6)**
286:14;292:6;293:6;
298:3;303:22;305:1
**step (2)**
34:8;188:24
**Stephen (1)**
5:13
**Steve (4)**
222:23;283:21;299:16,22
**Steve's (1)**
308:3
**stick (1)**
307:7
**sticking (1)**
307:5
**still (12)**
49:15;84:20,21;110:7;
143:20;248:8;263:16;
297:11;301:10;313:2;321:2,
4
**stones (1)**
173:4
**stop (6)**
7:2;142:2,6;150:18;
174:24;213:2
**stopped (5)**
100:4;142:1,4,9;173:24
**storm (1)**
323:1
**story (1)**
307:4
**straight (2)**
108:9;194:13
**straining (2)**
275:17,21
**strange (1)**
250:17
**strategic (1)**
123:21
**Street (21)**
5:7;45:3;53:6;62:17;64:6,
9;89:14;123:17,20,20,24;
124:11,22;126:13;226:12;
243:20;244:17;265:4;313:2;
317:1,23
**strenuously (1)**
108:17
**strict (3)**
173:12,14;177:21

**strictly (2)**
179:10;180:16
**strike (3)**
29:6;48:19;253:20
**string (16)**
222:13;226:7;228:1,4;
231:21;240:15;241:16;
242:19;243:4,19;244:16;
245:8;246:24;247:17;248:1,
12
**strong (4)**
49:17;72:18;169:15;237:3
**stronger (1)**
123:13
**strongly (4)**
28:10;50:17;51:12;153:17
**struck (1)**
10:12
**structure (1)**
317:4
**struggled (1)**
65:9
**struggling (2)**
22:2;209:13
**studied (2)**
182:1;183:2
**study (4)**
182:16,19,24;185:1
**studying (1)**
203:19
**stuff (4)**
33:17;139:5;161:2;217:8
**stupid (5)**
90:1;164:14;183:6;185:4;
187:10
**subclasses (1)**
52:11
**subheading (2)**
292:13;298:24
**subject (14)**
10:14;32:9,14;81:8;90:20;
107:7;195:24;219:12;
226:12;243:20;244:17;
270:20;277:10;320:6
**subjective (1)**
261:15
**subjects (1)**
306:10
**submission (15)**
20:9;76:7;132:5;155:4,5;
157:12;158:20;182:3,6;
224:14;252:7;258:14,20;
265:15;278:2
**submissions (2)**
41:8;172:24;258:17
**submit (8)**
161:2;165:17;168:15;
171:4;182:15;194:4;266:3;
271:4
**submitted (14)**
74:21;156:4;175:12;
183:19;184:23;202:16;
203:13;232:20;246:15;

**submitting (1)**
23:6
**subparagraph (1)**
125:23
**subparts (1)**
209:22
**subsection (2)**
66:16;122:22
**subsequent (1)**
56:1
**subset (4)**
125:10,13;252:10,18
**substantial (10)**
7:10;45:1,11,12;59:7;
86:11;87:19;88:11;156:22;
206:2
**substantive (6)**
122:24;123:1;125:14,17;
126:18;192:13
**success (1)**
222:3
**successful (5)**
19:22;64:9;290:13;315:23
**Sucharow (16)**
7:7;13:18;136:21;141:2;
237:12;240:18;241:22;
242:20;243:6;245:4;247:1,
6,6,10;253:7;318:2
**Sucharow's (2)**
152:2;317:16
**sudden (1)**
154:23
**sue (2)**
24:21;210:14
**sufficient (1)**
66:23
**suggest (18)**
7:24;43:17;48:11;81:7;
106:19,20;108:9,24;110:2;
134:19;161:22;171:6;194:8;
208:2;227:20;279:6;319:17;
320:3
**suggested (9)**
12:16;28:9;114:1;141:4;
170:23;189:3;233:12;
279:19;300:12
**suggesting (8)**
32:3;33:24;48:18;92:17;
103:3;211:17;279:16;317:9
**suggestion (3)**
34:18;94:2;146:16
**suggests (4)**
108:17;211:10;227:10;
309:24
**suing (1)**
315:1
**suit (1)**
132:22
**sum (1)**
273:2
**supplemental (1)**
114:9

**support (11)**
  11:7;147:10;209:15;
  280:24;281:1,2;288:23;
  298:15;299:13;300:10;
  303:3
**supported (1)**
  300:12
**supporting (2)**
  221:15;286:5
**supports (3)**
  227:21;270:22;281:8
**suppose (4)**
  98:24;102:7,8;270:17
**supposed (6)**
  26:20;91:23;93:7;100:7,
  24;260:18
**Supreme (3)**
  28:7;182:16,19
**sure (42)**
  6:12;22:19;29:9;34:15;
  41:7;46:19;55:8;59:10;
  61:13;84:22;92:19;93:4,16;
  97:20;106:16;113:8;122:2;
  139:12;146:2;159:21;
  167:17;171:20,21;176:21;
  194:22;197:19;200:14;
  201:8;209:11;210:19;
  215:24;240:21;261:24;
  267:24;269:24;281:16;
  283:20;302:21;308:15,18,
  23;318:10
**surplus (1)**
  149:22
**surplusage (4)**
  138:7;139:1,23;146:24
**surplusages (1)**
  138:10
**surprise (6)**
  231:16;265:2;269:22;
  270:11,12;318:4
**surprised (1)**
  315:18
**surprising (3)**
  8:7;266:1;317:24
**suspect (6)**
  6:17;17:18;91:12;127:21,
  24;133:2
**suspended (1)**
  146:1
**suspicion (1)**
  267:23
**swallow (1)**
  131:24
**switched (1)**
  38:11
**sworn (4)**
  23:1;182:23;184:5,7
**syllogism (5)**
  147:14,17;148:3,4,11
**syllogisms (1)**
  148:6
**syllogistic (1)**
  147:15

**synonymous (1)**
  42:15
**System (8)**
  18:24;93:10;132:14;
  141:17;195:24;227:8;
  312:24;314:24
**systemically (1)**
  302:6
**systems (1)**
  314:23

**T**

**Tab (21)**
  220:5,19;224:13,15;
  226:15,15;252:17,17;
  263:14;269:18;284:18,19;
  285:9;302:9;304:7,8,11,12;
  307:2,9,10
**table (4)**
  189:7;274:11;278:3,5
**tainting (1)**
  188:6
**talented (3)**
  8:22;196:12;200:17
**talk (13)**
  97:5;113:10;121:23,23;
  140:21;173:11,20;186:19;
  233:13;246:8;281:10;290:8;
  293:16
**talked (6)**
  66:6;69:8;95:16;112:23;
  157:19;248:24
**talking (36)**
  39:17;48:1;68:23;102:20;
  149:22;164:2;166:23;167:1;
  205:11;217:9;229:13;
  231:11;232:20;234:13;
  237:1;238:12;239:8;240:23;
  244:12;248:8;249:7;262:8;
  267:14;272:15;275:14;
  286:14;289:5,22;292:23,24;
  294:14;295:5;301:10;
  312:18;313:23;317:9
**talks (4)**
  29:1;78:19;79:15;156:13
**target (2)**
  26:15;154:20
**targets (1)**
  153:19
**task (5)**
  188:18;289:9,16;290:18;
  291:22
**tasks (1)**
  264:18
**taught (1)**
  147:20
**taxi (1)**
  145:8
**taxicab (1)**
  140:6
**Teacher (5)**
  18:23;93:9;132:14;

  312:24;314:23
**Teachers (1)**
  227:8
**team (3)**
  38:12;193:18;200:2
**technical (1)**
  144:7
**teleconference (1)**
  5:14
**Telephone (2)**
  98:3;132:1
**telling (10)**
  51:13;99:5;100:10;
  105:23;146:9;147:1;148:24;
  181:18;203:17;267:11
**tells (3)**
  60:17;203:3;312:2
**template (5)**
  172:22;181:13,14;184:24;
  185:18
**templates (1)**
  187:18
**temporary (1)**
  289:12
**ten (6)**
  20:9;25:8;159:5;211:4;
  300:4;302:1
**tend (1)**
  44:22
**tended (1)**
  95:18
**tension (3)**
  249:1,21;311:5
**tentative (1)**
  305:2
**ten-year (2)**
  300:5,6
**term (6)**
  16:23;181:8,16;213:23;
  229:7;239:23
**terms (38)**
  10:15;40:12;48:4;49:4;
  53:3;58:4;65:18;68:12;
  71:16;78:19;81:5,22;82:13;
  90:24;91:6,22;114:15;
  120:21;141:19;144:23;
  165:1;170:19;189:7;202:13;
  203:4;213:13;214:18;230:6;
  237:15;246:11;247:5;
  252:11,14;262:22;295:3;
  305:23;308:2;310:23
**terrible (2)**
  24:1;187:10
**test (4)**
  188:22,23;240:5;286:17
**testified (25)**
  14:12;73:4;77:18,20;92:4;
  135:22;136:4;137:14;158:7;
  161:13;167:6;181:23;193:3;
  209:14;220:10;226:20;
  227:16,17;228:14;229:10;
  252:22;263:20,20;269:17;
  274:22

**testifies (1)**
  157:16
**testify (1)**
  96:20
**testifying (1)**
  264:13
**testimony (42)**
  22:7;43:5;51:18;91:20;
  92:19;104:2;137:9;151:17;
  152:1,1,2;157:15,24;158:4;
  161:15;163:20,22;169:16;
  177:14;178:9;179:14;181:6;
  189:15,15;192:23;209:3,13;
  212:10;216:4;217:9;221:24;
  228:12;248:24;249:21;
  252:18;253:1;255:8;263:3;
  265:8;269:16;309:19;
  310:10
**Texas (10)**
  93:9;99:12;100:15;313:7,
  16;314:2;317:17;318:23;
  319:3,16
**textual (1)**
  147:10;148:19
**thanks (2)**
  216:2;248:14
**That'll (1)**
  30:14
**theirs (2)**
  176:13;320:8
**them's (1)**
  224:17
**theory (2)**
  133:9;195:19
**thereafter (2)**
  238:8;251:12
**therefore (8)**
  14:11;135:1;148:3,9;
  182:5;211:3;262:12;300:10
**thin (1)**
  299:11
**thinking (6)**
  23:22;24:10;145:24;
  146:3;225:19;319:12
**third (4)**
  78:23;219:20;233:2;294:8
**third-party (1)**
  280:8
**Thornton (65)**
  5:12;8:16;12:10;14:13;
  15:21,22;16:6,13,21;18:21;
  22:3;31:17;35:14,15,17;
  64:4;82:1;91:22;93:19;
  106:17;153:11,12;155:7,14;
  156:23;158:10;159:4,8,17;
  160:16;165:23;168:15;
  169:4;174:20;175:8;178:7,
  7;188:6;189:10;199:21;
  213:4;214:23;216:15;218:6;
  222:22;223:3,5,7,10,12,21;
  226:10;232:23;240:19;
  241:22;242:21;243:6;245:5;
  247:11;251:2,7;265:1,5;

273:9;310:11
**Thornton's (7)**
  16:15;160:10,19;177:10;
  190:13;214:23;218:11
**thorough (1)**
  279:12
**though (15)**
  19:11;52:16;67:8;71:9;
  105:12;152:23;159:1;175:1;
  183:7;188:1,18;191:16,21;
  250:2;316:9
**thought (43)**
  10:20;13:8;22:22;27:17;
  35:8,14,17;42:10;70:1;72:8;
  92:10,11,20;95:11;103:6;
  104:14;108:17,22;136:5;
  148:9;162:20;164:23;
  165:19;172:9;199:13;
  210:14;213:4;216:21;
  217:22;223:18;253:8;
  254:11;256:1;257:3;268:13;
  269:23;274:7;276:20;279:6,
  9;288:10;310:17;313:11
**thoughts (1)**
  315:8
**thousands (1)**
  18:2
**three (33)**
  9:3;17:12;19:6;51:23;
  52:5,11,12;53:2;58:2;84:15;
  91:9;95:17;118:8;139:13;
  149:11;156:3;161:2;163:10;
  165:9;186:2,3;227:10;
  228:2;248:10;284:16;
  311:12,19,23;314:24;
  317:22;320:17,18;321:16
**three-million-dollar (1)**
  233:4
**throat (1)**
  226:4
**throughout (4)**
  14:5;65:9;151:18;153:19
**Throw (1)**
  191:4
**throw-away (1)**
  109:20
**thrown (1)**
  74:10
**tied (1)**
  320:9
**Tiger (1)**
  291:15
**Tigers (2)**
  197:5;219:2
**til (2)**
  21:14,15
**Tim (2)**
  62:10,10
**timeframe (1)**
  255:19
**times (13)**
  20:10,11;25:8;28:9;49:12;
  58:8,9;65:15;95:17;143:21;

154:5,8;227:14
**timing (3)**
  26:7;31:8;40:13
**TLF (1)**
  163:21
**TLF-SST-33910 (1)**
  224:12
**today (6)**
  26:16;50:16;154:20;
  196:9;301:23;306:14
**together (19)**
  12:23;52:12;84:15;
  107:24;141:14,20,21;142:2,
  2,5,10;147:13;152:8;
  217:14;218:8,18;233:12;
  279:1;320:19
**told (44)**
  23:4;39:1,6;54:18;55:5,7;
  67:22;70:9,12,16,18;71:1;
  76:17;84:7;85:2;87:18;88:3;
  91:24;99:19;100:2;102:8;
  104:10;116:4;133:10,13;
  141:20;149:14;160:2;180:2;
  185:24;186:3;231:13,13;
  232:5;237:7;246:19;247:21;
  253:21;254:22;268:13,16;
  269:9;275:7;299:22
**took (11)**
  37:15;40:17;53:9;134:23;
  199:13,19,24;246:18;263:7;
  264:1;320:22
**tooth (1)**
  52:20
**top (12)**
  91:9;241:5,9,14;242:9;
  243:9;244:23;245:4;288:20;
  295:5,10;309:18
**Topaz (1)**
  264:21
**Topaz's (1)**
  270:7
**topics (1)**
  219:13
**tore (1)**
  108:15
**total (13)**
  20:4;44:7,10;91:6;152:24;
  168:5;202:14,17;213:18;
  220:20;257:7;307:19;
  311:21
**totality (1)**
  58:23
**totally (13)**
  18:15;45:16,17;81:9;
  87:20,21;90:18;137:10;
  179:19;180:17;190:7,8;
  200:21
**tough (2)**
  195:16;206:19
**touter (1)**
  145:14
**touting (1)**
  140:3

toward (1)
  74:19
**towards (1)**
  254:19
**track (6)**
  23:18,20;95:9;153:24;
  165:12;191:17
**tracking (1)**
  130:22
**trading (7)**
  62:17;104:12,20,20,21;
  320:9,11
**traditional (12)**
  13:3;23:16;63:3;83:11,13;
  99:24;184:23;310:1,12;
  313:15;318:22;319:15
**traditionally (1)**
  13:9
**transferred (1)**
  82:13
**transitioned (1)**
  306:1
**transparency (2)**
  264:21;265:3
**transparent (1)**
  234:22
**travel (1)**
  9:4
**treat (4)**
  17:19;19:11;126:7,8
**treated (3)**
  107:8;123:12;295:19
**treatise (1)**
  203:21
**tribunal (4)**
  66:17,19;127:10,12
**trick (4)**
  173:16;175:16;183:8,20
**tried (4)**
  48:7;139:6;288:22;307:12
**tries (1)**
  178:11
**trigger (1)**
  74:23
**TRO (1)**
  128:3
**trouble (2)**
  66:3;138:14
**troubled (7)**
  49:21;65:21,23,23;89:1;
  124:17;138:6
**troubles (1)**
  65:24;66:2
**troubling (2)**
  11:22;51:18
**true (20)**
  64:5;67:10;118:3,3,4;
  173:3;176:3;209:8;252:23;
  253:2;254:12;270:18,24;
  273:24;275:8;281:3;282:21;
  283:20;289:13;297:24
**trump (2)**
  67:2;116:23

**trumps (3)**
  117:9,14;120:12
**trust (4)**
  105:1;124:23;162:21;
  216:22
**truth (4)**
  84:14;106:9;138:13;315:7
**try (10)**
  17:2;18:10;148:21;
  173:16;175:16;177:4;
  201:15;230:20;285:21;
  296:14
**trying (27)**
  12:21;29:21;31:1;75:11;
  104:24;109:1;152:7;156:17;
  160:9;161:5;163:11;164:6,
  7;165:11;168:14;169:23;
  170:2;172:21;176:16;181:2,
  3;184:17;185:5;196:8;
  216:7;312:22;318:17
**turn (8)**
  73:11;80:24;81:14;93:14;
  98:4,5;150:18;278:19
**turned (1)**
  38:22
**Turning (1)**
  133:5
**turns (6)**
  67:5;135:12;214:24;
  254:13;257:4;258:12
**twice (2)**
  32:19;82:22
**twisting (1)**
  170:4
**two (67)**
  8:5;12:9;13:12;14:16;
  18:5;24:21;28:5;31:3;40:10,
  21;42:22;52:14;55:8;58:8,9;
  60:14;82:9;84:6;85:4;90:2;
  93:18;105:16,17;108:14;
  109:21;112:10;118:5;
  119:20;125:24;135:9;
  138:17;141:18;146:10,20;
  147:13;153:2,17;156:15;
  157:16;158:3,6;176:12;
  190:11,15;195:1;207:7;
  219:14,23;222:10;227:14;
  228:16;232:11;249:16;
  250:7,22;256:15;271:16;
  274:15;281:9;286:13;292:7;
  294:22;295:2;313:7;316:15;
  317:22;319:4
**two-and-a-half (1)**
  177:11
**twofold (1)**
  89:24
**two-second (1)**
  214:5
**two-stage (1)**
  34:5
**two-step (1)**
  74:1
**type (4)**

73:5;210:7,8;213:18
**types (2)**
193:18;228:16
**typical (5)**
80:9;208:1;211:7;213:5;
261:8
**Typically (11)**
72:20;103:9;230:11,17;
234:16,23;255:13;261:5,18;
289:9;318:5

**U**

**Ughh (1)**
288:10
**uh-oh (1)**
103:15
**ultimate (5)**
10:17;15:24;198:12;
210:2;286:17
**ultimately (13)**
30:12,13;31:20;37:16;
91:1;169:11,11;173:17;
191:11;207:11;213:12,19;
218:17
**unable (1)**
105:3
**unaware (3)**
34:14;238:16;270:14
**uncertain (1)**
203:4
**unclear (1)**
59:23
**uncommon (1)**
229:12
**uncovering (1)**
204:12
**undecided (1)**
137:4
**under (32)**
51:7;62:6;71:24;76:1;
77:3,8,9;90:7;101:3;105:6;
117:7;118:24;119:17;125:7;
134:13;136:22;140:4;
144:21;177:21;183:5;186:9;
198:21;257:7;266:3;268:18;
298:23;303:21,22;306:19;
308:11,12;319:10
**underlining (1)**
251:18
**understandings (1)**
212:18
**understands (2)**
120:11;199:9
**understating (4)**
58:14,16;118:20;119:3
**understood (9)**
13:2;65:16;116:19;
157:17,18;159:1;172:3;
269:24;311:14
**undertakes (1)**
45:12
**undertook (1)**

11:2
**uneasy (1)**
63:5
**unethical (1)**
83:22
**unfair (9)**
81:9;108:1,8;110:1;146:6;
147:7;148:17;204:7;319:18
**unfettered (1)**
103:2
**unfortunate (5)**
109:1;152:3;204:4;
213:24;214:2
**unfortunately (2)**
182:21;277:17
**unhappy (3)**
56:2;253:19,21
**uniform (1)**
300:11
**unique (2)**
100:14;188:17
**uniquely (1)**
192:3
**United (2)**
143:22;182:15
**universally (2)**
261:23;295:23
**unlawful (1)**
119:2
**unless (13)**
72:16;76:17;85:21;94:2;
97:16,19;101:23;128:10;
132:3,8;145:11;201:12;
277:9
**Unlike (2)**
200:1;306:4
**unobjectionable (2)**
45:16,17
**unquestionably (1)**
135:9
**unrealistic (1)**
141:8
**unreasonable (1)**
102:15
**unrelated (3)**
42:22;52:12;301:1
**unreliable (1)**
299:10
**unseemly (1)**
206:20
**untruthful (3)**
92:19;179:10,10
**unusual (6)**
84:14;191:8,9,10;229:21;
234:17
**up (103)**
16:4;18:11;19:23;26:7;
32:7,11;36:21;38:18,20;
45:6;46:21,22;56:15;58:3,5;
60:16;61:18;65:2,13;69:9;
72:14;73:9;74:6;76:15;84:2;
88:5,23;90:23;93:20;96:18;
103:16;108:11;109:23;

115:22;120:8;137:23;
141:18;142:17;150:20;
154:3,20,20;156:13;158:15;
159:9;162:8,10;163:2,13;
166:2,2,12,16;167:4,18,23;
175:3,23;178:5;184:20;
190:4;196:2;199:13;201:11;
204:18;205:7,19;206:13,22;
208:20;214:2,20;219:17;
220:1;222:11;225:1,10;
228:5,10;229:17;230:21;
232:21;241:10;251:8,14;
257:1;273:1;280:9,15,19,20;
285:21;294:2;297:6;300:10,
18;305:16;308:18;311:20;
320:10;321:10,22;322:11
**upon (21)**
24:1;30:12;37:5,16;60:4;
74:20;104:9;129:2;150:22;
167:13;182:20;189:18,19;
201:2;202:22;211:6,12;
230:3,8;290:21,22
**upset (2)**
144:18;187:12
**urge (1)**
171:2
**urging (2)**
161:24;293:5
**use (20)**
17:24;19:4;42:4;56:12;
58:7;64:24;119:4;121:3;
129:10;130:18;140:24;
145:2,4;148:10;180:17;
189:1,5;195:5;229:7;318:2
**used (15)**
9:1;16:23;43:10;46:23;
56:24;97:1;129:20;131:2;
181:8;190:8;191:9;210:18;
213:15;302:14;311:8
**uses (1)**
290:24
**using (8)**
135:14;181:16;185:1;
188:14;193:24;210:1,4,16
**usual (2)**
14:11;38:17
**usually (10)**
9:7;19:6,6,7;32:6;86:16;
145:3,4;203:22;218:7
**utterly (2)**
76:19,23

**V**

**vague (2)**
46:16,18
**vaguely (1)**
56:7
**Vairo (3)**
178:5;215:16;216:4
**valid (2)**
129:13;145:12
**VALLEE (1)**

197:15
**valuable (2)**
246:21;256:23
**value (29)**
10:4;15;11:6,8;50:22;
53:13;54:14;65:1,13;97:15,
18;101:18;134:7,15;189:8,
11;191:16;194:17,19;
195:14;196:4;200:10,14;
209:13;261:15;262:9,18,23;
301:18
**variety (2)**
95:17;96:22
**various (4)**
108:7;152:14;248:9;251:7
**vast (1)**
200:1
**vastly (1)**
193:9
**vein (1)**
233:6
**venture (2)**
41:12,17
**verdict (1)**
290:14
**verify (3)**
162:22;191:21;216:22
**versus (2)**
104:13;108:11
**via (3)**
5:14;107:21;223:19
**vicious (1)**
270:10
**view (18)**
36:1;37:1;51:19;63:18,18;
70:5;72:6;106:12;130:16;
137:19;148:18;158:2,2;
195:14;204:24;248:18;
274:19;280:17
**viewed (4)**
160:19;161:8;309:20;
310:11
**views (2)**
9:17;49:17
**violate (3)**
220:13;271:1;272:2
**violated (1)**
51:15
**violation (6)**
47:5;67:11;135:4;144:7;
206:11;317:13
**violations (2)**
6:15;317:11
**violet (1)**
163:11
**virtually (3)**
107:18;168:24;264:24
**virtue (1)**
192:3
**vis-a-vis (3)**
16:14;156:15;163:13
**vis-à-vis (1)**
190:14

**voice (1)**
98:14
**volume (3)**
104:12,20,21
**volume's (1)**
104:20
**voluminous (2)**
289:8,15
**vortex (1)**
323:1

## W

**wade (1)**
201:22
**wait (19)**
21:14;119:20,20;121:24,
24,24;166:11,11,11;167:21;
173:24;174:19;175:22;
203:8,8,8;214:12;224:16;
226:2
**waiting (1)**
21:14
**waive (1)**
201:13
**walk (5)**
61:3;219:10;250:23;
255:7;284:17
**walking (1)**
246:24
**walks (1)**
151:1
**wants (12)**
53:19;76:1;113:4;156:8,9;
186:6,7;201:11;206:4,24;
243:14;284:3
**war (2)**
192:5,5
**warning (1)**
214:22
**warranted (1)**
177:22
**warrants (1)**
187:21
**Washington (2)**
139:4;149:6
**wasting (1)**
200:21
**watch (1)**
322:21
**watching (2)**
197:4,12
**water (2)**
214:8;240:5
**waved (2)**
156:11;186:22
**way (60)**
12:11;16:18;17:2,10,15,
18;20:17;25:3,22;37:3,22;
47:10;64:24;67:2;70:13,14;
74:10;76:3;79:8;89:3;90:15;
91:18;92:18;103:21;106:23;
139:12;140:9,16;146:17,17,

17,20;154:10;158:3;160:22;
161:6,7,24;162:9,10;164:23;
165:5;175:4;180:7;181:5;
194:22;202:12;223:2;
225:11;226:22;233:2;241:5;
258:12;276:8;290:3;301:16,
17;304:19;307:10;320:2
**ways (3)**
84:12;197:6;278:23
**wearing (3)**
93:18;250:7,7
**website (1)**
292:22
**week (3)**
119:20;227:5;252:8
**weekend (1)**
323:5
**weeks (3)**
31:3;119:20;233:8
**weigh (1)**
277:19
**weight (3)**
13:5;19:12;248:19
**weird (1)**
265:13
**well-healed (1)**
289:16
**well-known (2)**
228:22;234:13
**well-qualified (1)**
306:16
**Wendel (4)**
68:19;136:1,2;139:13
**weren't (17)**
20:2;23:9;35:18;39:17;
46:19;63:3;70:17;84:23;
101:6;102:10;112:5;114:21;
126:15;146:2;200:19;
254:21;272:24
**whack (1)**
206:22
**whacked (2)**
205:7;311:20
**whacking (2)**
76:15;84:1
**what's (22)**
26:19;56:8;57:12,12;58:4,
18;63:12;74:21;82:13;89:6,
22;99:15;109:1;111:17;
145:6;178:12;212:14;
224:10;241:1;247:15;
272:23;310:8
**whatsoever (2)**
59:6;138:23
**whenever (1)**
308:20
**When's (1)**
119:22
**whereas (2)**
189:20;193:4
**where's (2)**
154:21,24
**Whereupon (1)**

323:8
**wherever (1)**
108:7
**whichever (1)**
125:16
**Whirlpool (1)**
287:2
**whole (14)**
49:17;72:11;77:11,12;
136:6;144:23;147:4;148:14,
16;156:23;160:1;182:4;
202:23;273:7
**who's (13)**
59:4;61:3;111:5;145:8;
150:19;201:11;203:1,1,2;
204:14;228:19,22;239:17
**whose (4)**
34:24;69:3;161:1;262:9
**wide (1)**
298:24
**willful (1)**
187:20
**willing (9)**
45:4;63:1,5;120:4;191:19;
213:2;246:9;268:12;296:23
**willy-nilly (1)**
203:3
**WilmerHale (1)**
52:19
**win (3)**
196:18;199:7;200:22
**windfall (2)**
104:6;105:10
**winner (1)**
194:5
**winners (1)**
151:7
**wish (1)**
320:24
**withdrawn (2)**
30:20;35:9
**within (13)**
52:22;81:6;107:17;163:7;
183:22;185:13;199:20;
269:1;273:18,20;279:19;
314:7;323:2
**without (14)**
22:4;24:21;60:5;63:8;
64:7,14;74:4;96:8;125:12;
176:24;216:12;217:5;222:2;
255:19
**witness (2)**
79:21;274:21
**witnesses (2)**
125:12;237:21
**woken (1)**
251:14
**Wolf (73)**
10:19;20:23;27:16;33:11;
37:5;52:19;55:17;61:10,15;
68:22;69:7;72:7;74:5,19;
75:3,17;88:2,20;90:8;99:16;
102:1;109:9;114:15,21;

115:1,24;127:2,17;128:1;
152:8,22;153:1;159:7;
160:6;161:5,23;163:16;
164:12;165:7,17;171:4,19;
173:16;174:8,18;175:11,19;
177:1,4;179:9;184:2;180:2,15;
182:23;183:8;184:16;
185:12;186:16,17;187:11,
21;198:10,12;200:6;202:18,
24;203:7,16,24;204:8;
206:2;271:20;280:17;
311:21
**Wolf's (2)**
69:11;99:11
**Wolosz (1)**
30:24
**won (1)**
199:14
**wondering (1)**
239:12
**word (6)**
120:14,15;148:10;158:22;
180:17;193:2
**words (10)**
16:4,4;23:14;42:1;131:20;
160:12;168:10;203:2;
297:14;307:22
**work (84)**
9:6,20,23,24;11:1,5;
12:11;20:2;42:24;44:1;59:5;
61:24;65:19;86:9;92:5;93:6;
147:18;148:11;150:9;
157:21;167:18,19;189:9,19;
191:15,20,21;192:4,16,22,
23,24;193:2,8,17;194:17,23;
195:7,14;196:24;197:19,20;
198:7;199:12;202:4;207:4;
209:4;210:4;212:6;217:2,
15;231:9;239:15,16;246:20;
248:13;249:14;254:13;
256:23;262:9,22,23;264:19;
267:7;273:11;277:14;
283:24;287:13;290:21;
291:20;296:18;297:3;
300:24;301:18;305:3,4;
311:17;312:11;316:14;
318:15;319:7,9,23,24
**worked (7)**
8:21;114:11;157:20;
231:17;254:9;257:13;
320:19
**working (9)**
38:21;141:20,21;142:1,1,
2,4,10;289:1
**works (3)**
147:18;148:3;230:12
**work-up (1)**
313:3
**world (5)**
9:4;237:24;269:14;
291:17;306:14
**world-renowned (1)**
169:14

**worlds (1)**
81:21
**worried (1)**
179:17
**worry (1)**
254:17
**worrying (1)**
187:15
**worst (1)**
106:14
**worth (5)**
10:16;196:10;200:22;
248:11;268:10
**wringing (1)**
187:9
**wrinkle (1)**
240:21
**write (6)**
49:13;165:16;173:1;
184:16,20;185:11
**writes (13)**
227:4;233:16;241:7,21;
244:14;246:3;247:2,6,9;
248:5;251:15;252:3;286:17
**writing (17)**
39:13,18;41:20;48:15;
135:16;143:7,12;193:6;
232:23;233:10,13;240:18;
242:6;243:5;245:2,4;251:1
**written (15)**
42:11;48:2;70:15;76:6;
128:18;155:1;178:18,24;
233:20;242:7,23;243:1;
252:12;278:1;306:5
**wrong (8)**
81:14;106:11,13,13;
116:18;160:9;276:21;
280:19
**wrongdoing (1)**
170:24
**wrongful (5)**
47:4;90:16,16;117:16;
317:12
**wrongly (1)**
16:2
**wrote (4)**
55:6;243:2;251:13;292:17

**Y**

**Yale (1)**
302:2
**year (8)**
151:8;208:11;215:2,9;
225:16;243:16;312:12;
322:12
**years (19)**
27:12;28:7;40:9;50:19;
69:12;86:20;90:10;108:8;
139:4;145:1;222:10;232:11;
234:10,11;238:6;300:2,4;
302:1;320:20
**Yep (6)**

44:11;174:8;189:16;
208:8;245:13,16
**yesterday (1)**
155:5
**York (10)**
27:13;34:24;36:16;
137:23;161:20;180:3;
200:16;255:24;285:2;316:6
**young (7)**
14:6;69:12;152:11;
183:12;193:23,24;194:5
**younger (2)**
14:10;38:17

**Z**

**Zeiss (13)**
13:1;14:2;116:4;152:12;
161:1;165:8;169:9;174:18;
176:4;183:12;216:16;
218:13;251:23
**Zeiss' (1)**
152:1
**zero (3)**
194:19;196:17;211:3
**zeroed (1)**
194:16
**Zippo (1)**
191:6

**0**

**056305 (1)**
163:21

**1**

**1 (4)**
169:3;208:6;220:5;226:15
**1.2 (2)**
74:10,15
**1.3 (1)**
119:19
**1.4 (2)**
74:11,15
**1.5 (3)**
121:22;126:21;140:1
**1.5a (6)**
29:3;122:15;133:5;
149:15,23;150:11
**1.5e (37)**
28:24;29:8;38:1,3;39:12,
13,13;133:8,15,21;134:13,
17,20;135:1,13;136:9,22,24;
138:1,4,18;139:22;140:1,2;
143:2,4,8,20,24;144:3,7,11,
22;145:3;146:5,17,22
**1.8 (2)**
169:20;177:8
**10 (8)**
89:4;105:5;158:5;202:5,8,
9;311:16,17
**10,000 (1)**

101:13
**100,000 (1)**
208:10
**101 (1)**
263:20
**103 (1)**
263:20
**107 (1)**
38:10
**10th (3)**
178:18,24;186:4
**11 (6)**
173:12;177:20;183:22;
184:4;186:9;222:18
**115 (1)**
263:11
**12 (2)**
207:3;287:16
**12.8 (1)**
307:21
**127 (2)**
87:24;88:20
**135 (1)**
163:24
**136 (1)**
158:4
**14 (7)**
122:22,23;125:10,12;
126:17;151:22;244:17
**14-A (7)**
121:9;122:20,21;125:10,
11;126:4,16
**15 (2)**
208:6;307:18
**16th (1)**
158:12
**18 (2)**
158:12;285:2
**18th (1)**
163:24
**1990's (1)**
28:12
**19th (1)**
161:15

**2**

**2 (5)**
169:3;177:8;191:7;
220:19;226:15
**2.0 (1)**
169:21
**2.2 (1)**
307:24
**2:59 (1)**
245:15
**20 (12)**
44:6;45:22;46:12;78:23;
90:1;203:20;224:13,15;
237:4;255:3;304:10,15
**20/20 (4)**
32:6,17;33:23;61:12
**20/20/20 (7)**

17:13;164:2;166:13,15,
24;215:4,7
**2011 (8)**
90:21;94:20,22;95:22;
221:1,22;309:3,13
**2013 (9)**
197:12;222:10,12;225:16;
226:9;232:10;243:2;255:21;
313:3
**2014 (3)**
313:5,6;314:6
**2015 (14)**
93:17;163:3;166:17;
214:21;215:1;232:11,14;
233:7;240:16;243:17,19;
244:11,15;255:21
**2016 (15)**
111:20,21;163:18;166:22;
203:10;215:9;243:18;
244:17;245:1,12;247:23;
251:24;287:4;299:24;300:8
**207 (1)**
38:11
**21 (1)**
292:12
**22 (8)**
158:5;195:3;196:1;
294:18;295:5,10;297:11,12
**23 (12)**
73:17,20;74:17;110:12;
116:23;158:13;161:16;
195:3;203:10;298:12,21,23
**23h (10)**
60:23;67:7,12;70:22,23;
71:10;87:14;110:12;123:1;
125:17
**24 (2)**
161:16;226:9
**25 (14)**
56:15,17,18;58:9;109:23;
119:17;126:14;203:6,17,22,
23;204:6;206:18;255:5
**275 (1)**
5:7
**28 (2)**
243:19;244:11
**28th (1)**
240:15
**29th (1)**
5:7
**2nd (1)**
111:21

**3**

**3 (3)**
169:21;252:17;263:16
**3.3 (4)**
66:8,14;116:23;117:6
**3.3d (8)**
121:10,11,12;122:20;
125:7,8;127:4,7
**3:06 (2)**

245:16,18
**30 (5)**
  203:20;241:16,24;242:1;
  244:15
**30-million-dollar (1)**
  259:10
**320 (1)**
  150:5
**320- (1)**
  259:9
**335 (1)**
  259:11
**33910 (1)**
  224:3
**35 (1)**
  69:12
**36 (1)**
  167:20
**38 (1)**
  207:2
**3rd (1)**
  157:12

---

**4**

**4 (14)**
  132:5,8;151:14;152:23;
  168:12;169:3,21;179:16;
  205:16;210:10;227:12;
  255:3;257:7;269:18
**4.1 (11)**
  58:10;62:1;65:18;84:7;
  101:11,13;102:9;119:18;
  205:1;267:10;269:4
**4.1-million-dollar (1)**
  77:7
**4:35 (2)**
  322:5;323:9
**4:45 (4)**
  201:12,14,18;294:20
**40 (1)**
  207:1
**400 (1)**
  296:13
**406.1 (3)**
  191:3;195:8,8
**415 (1)**
  300:19
**415-956-1000/rheimann@lchbcom (1)**
  5:9
**44 (2)**
  28:7;50:19
**450 (1)**
  312:2
**4-million-dollar (1)**
  187:14

---

**5**

**5 (9)**
  44:6;90:2;134:13;210:11;
  237:5;257:8;261:2;284:19;
  285:9

**5.5 (2)**
  59:6;248:6
**5:30 (1)**
  9:7
**52d2 (1)**
  110:13
**54 (3)**
  116:23;234:10,11
**54d (2)**
  76:10;87:15
**54d2 (12)**
  60:17;61:1;67:7,12;70:21;
  71:10;76:2;110:15,16;
  123:1,15;125:17
**5-and-a-half (4)**
  91:8;246:10;248:16;252:5

---

**6**

**6 (13)**
  9:7;91:7,8;94:24;163:24;
  214:21;257:8;261:2;297:13;
  302:9;304:7,8,12
**6/16 (1)**
  158:4
**60 (1)**
  16:23
**6th (1)**
  228:5

---

**7**

**7 (8)**
  122:3;284:18;297:18,19;
  304:11;307:3,9,10
**7.2 (27)**
  121:17,22;122:3,7,8,12;
  126:21;128:13;130:18,23,
  24;131:3;133:7,8;134:5;
  135:2;136:15,16;137:2;
  138:2;139:18;140:2;144:1,
  1;145:7,8;146:17
**7.2b (10)**
  133:15,18;135:24;136:9;
  137:11;139:22;140:12;
  144:7,14;145:15
**7.2b5 (1)**
  138:24
**7.3 (6)**
  122:6,12;130:23;131:13,
  16;132:24
**75 (1)**
  199:1

---

**8**

**8 (2)**
  245:12;247:23
**80 (1)**
  304:19
**80/20 (1)**
  304:16
**83.75 (1)**

259:8
**84 (1)**
  161:16
**84.5 (1)**
  251:16
**8th (3)**
  111:20;178:21;185:10

---

**9**

**9 (3)**
  104:23;163:24;233:19
**9.5 (1)**
  104:23
**90 (1)**
  40:18
**90-day (1)**
  40:16
**91 (1)**
  158:12
**94111 (1)**
  5:8