# EX. 202

**Professor Georgene Vairo**

1

Volume:  1

Pages:  1-115

Exhibits:  1-4

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

------------------------------------

In Re:  STATE STREET ATTORNEYS FEES

------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,

United States District Court, Retired

DEPOSITION of PROFESSOR GEORGENE M. VAIRO

April 10, 2018, 9:43 a.m.-12:21 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter:  Paulette Cook, RPR/RMR

```
 1  A P P E A R A N C E S:
 2       DONOGHUE BARRETT & SINGAL
 3       By William F. Sinnott, Esq.
 4       Elizabeth J. McEvoy, Esq.
 5       One Beacon Street, Suite 1320
 6       Boston, Massachusetts 02108-3106
 7       617-720-5090/wsinnott@dbslawfirm.com
 8       Counsel for the Special Master
 9
10       NIXON PEABODY, LLP
11       By Brian T. Kelly, Esq.
12       Honorable James E. Vallee, Esq.
13       Joshua C. Sharp, Esq. (via teleconference)
14       100 Summer Street
15       Boston, Massachusetts 02110-2131
16       617-345-1065/bkelly@nixonpeabody.com
17       jvallee@nixonpeabody.com
18            and
19       By Emily Crandall Harlan, Esq.
20       799 Ninth Street, NW, Suite 500
21       Washington, D.C. 20001
22       202-585-8217/eharlan@nixonpeabody.com
23       Counsel for the Thornton Law Firm
24            [appearances continued]
```

```
 1                 I N D E X
 2
 3  Examination of:                          Page
 4  PROFESSOR GEORGENE M. VAIRO
 5   By Mr. Sinnott                            7
 6
 7
 8
 9            E X H I B I T S
10  No.                                      Page
11  Exhibit 1   Expert Declaration of          8
12              Georgene M. Vairo
13  Exhibit 2   Declaration of Garrett        27
14              Bradley (also Ex. 16)
15  Exhibit 3   Hearing Transcript 3/7/17     83
16  Exhibit 4   Transcript Excerpt of         96
17              Evan Hoffman Deposition
18              6/5/17
19
20
21
22
23
24
```

```
 1   A P P E A R A N C E S (cont.):
 2  CHOATE HALL & STEWART, LLP
 3  By Stuart M. Glass, Esq.
 4  Two International Place
 5  Boston, Massachusetts 02110
 6  617-248-5000/sglass@choate.com
 7    and
 8  LABATON SUCHAROW, LLP
 9  By Michael Canty, Esq. (via teleconference)
10  140 Broadway
11  New York, New York 10005
12  212-907-0882/mcanty@labaton.com
13  Counsel for Labaton Sucharow, LLP
14
15  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
16  By Richard M. Heimann, Esq.
17  Robert L. Lieff, Esq.
18  275 Battery Street, 29th Floor
19  San Francisco, California 94111
20  415-956-1000/rheimann@lchb.com
21  Counsel for Leiff Cabraser
22
23    ALSO PRESENT: Michael Thornton, Esq.
24    Stephen Gillers (via teleconference)
```

```
 1   P R O C E E D I N G S
 2  (Witness duly sworn.)
 3  MR. SINNOTT: Good morning, professor.
 4  THE WITNESS: Good morning.
 5  MR. SINNOTT: Thank you for being here.
 6  For the record, my name is William Sinnott,
 7  S-I-N-N-O-T-T.  I'm counsel to the special master.
 8    The special master is The Honorable
 9  Gerald T. Rosen, retired, formerly of the United
10  States District Court in Detroit, Michigan.  Judge
11  Rosen has been appointed as special master by The
12  Honorable Mark L. Wolf in the matter of Arkansas
13  Teacher Retirement System, et al., versus State
14  Street Bank & Trust Company, defendant.  And this is
15  civil action number 11-10230-MLW.
16    The special master is to my right, and
17  on my left also on the special master's team is
18  Attorney Elizabeth McEvoy also of the law firm of
19  Barrett & Singal, and on the telephone line is
20  Professor Stephen Gillers.  We're not expecting
21  Attorney Hylenski to join the call this morning.
22    At this time I'd ask that the counsel in
23  the room identify themselves.  Stu, if you could
24  lead it off.
```

Page 6

1    **MR. GLASS:** Stuart Glass from Choate,
2  Hall & Stewart from for the Labaton firm.
3    **MR. VALLEE:** Attorney Jim Vallee from
4  Nixon Peabody for Thornton.
5    **MR. KELLY:** Brian Kelly of Nixon Peabody
6  also on behalf of Thornton.
7    **MS. HARLAN:** Emily Harlan of Nixon
8  Peabody for the Thornton Law Firm.
9    **MR. SINNOTT:** Welcome back, Emily.
10   **MS. HARLAN:** Thank you.
11   **MR. THORNTON:** Michael Thornton of the
12  Thornton Law Firm.
13   **MR. LIEFF:** Robert Lieff of Lieff
14  Cabraser.
15   **MR. HEIMANN:** Richard Heimann for Lieff
16  Cabraser.
17   **MR. SINNOTT:** And, Josh, could you
18  identify yourself for the record?
19   **MR. SHARP:** Joshua Sharp of Nixon
20  Peabody for the Thornton Law Firm.
21   **MR. SINNOTT:** All right.  Thank you.
22   Just the normal caveat that because we
23  have phone participants, I'd ask that participants
24  in the room and not just the witness but also any

Page 7

1  questioners or commenters keep their voices up so
2  that the folks on the phone can hear.
3    And by the same token, Josh, and, Steve,
4  if anything is unclear or garbled or you have what
5  you think may be a loss of audio or communication,
6  please let us know at the earliest possible time so
7  that we don't have to repeat testimony or do
8  read-backs.
9    **EXAMINATION**
10   **BY MR. SINNOTT:**
11
12  Q.  All right.  Having said that, welcome,
13  professor.
14  **A.  Thank you.**
15   **MR. KELLY:** Just for the record, Bill,
16  we'll again object to Professor Gillers'
17  participation in this other expert's deposition.
18   **MR. SINNOTT:** All right.  So noted.
19  Thank you.
20   **BY MR. SINNOTT:**
21  Q.  Professor, you've submitted an expert
22  declaration in connection with this case; is that
23  correct?
24  **A.  Yes, I did.**

Page 8

1  Q.  And I have in my hands a document that you
2  signed on March 26, 2018 in Santa Barbara,
3  California that's styled as Expert Declaration of
4  Georgene M. Vairo.
5    Is that how you pronounce your last
6  name?
7  **A.  Yes.**
8    **MR. SINNOTT:** Paulette, if we could mark
9  that as Exhibit 1.
10   (Exhibit 1 marked
11   for identification.)
12   **BY MR. SINNOTT:**
13  Q.  And, professor, looking at that document
14  that's been marked as Exhibit 1, is that the expert
15  declaration that you've submitted in this case?
16  **A.  It looks like it is, sir.**
17  Q.  Okay.  And let me direct your attention to
18  the CV that's attached as Exhibit A to your report.
19  Do you see that?
20  **A.  Yes, I do.**
21  Q.  And does that accurately state your
22  experience and background in the law?
23  **A.  I think it does for the most part.  I'm sure**
24  **there's a few things missing, but, you know, it's a**

Page 9

1  **fairly -- it's a fair representation of what I've**
2  **done over the course of my career.**
3  Q.  Okay.  And since you signed your report on
4  March 26, are there any changes or additions to your
5  CV that you think need to be noted?
6  **A.  No, sir.**
7  Q.  And are there any previous roles or
8  positions you've held that inform your opinion that
9  are not described in your CV?
10  **A.  No, sir.  I mean the only thing that when I**
11  **was reviewing this I realized there was one more**
12  **recent Rule 11 program that I participated in with**
13  **Greg Joseph, and, um, I for some reason didn't put**
14  **it on my resume, and I can't remember what year it**
15  **was, but it was within the last couple of years.**
16  Q.  Okay.
17  **A.  It was sort of a PLI thing or something like**
18  **that.**
19  Q.  And do you remember what the -- was there a
20  specific area of Rule 11 that was discussed?
21  **A.  No.  It was just a general developments**
22  **update.**
23   **THE SPECIAL MASTER:** Anymore bicycle
24  road racing championships?

Page 10

1    THE WITNESS: No, sir.  No, your Honor.
2  But I still have six bikes hanging in my garage.
3    THE SPECIAL MASTER: I notice that
4  neither tennis or golf are on your resume.
5    THE WITNESS: I have played tennis.  My
6  farther was playing up to the moment he died, and he
7  taught me how to play.
8    MR. SINNOTT: The professor is now doing
9  trail running lest you think she's goofing off.
10    THE SPECIAL MASTER: Ah.
11    BY MR. SINNOTT:
12  Q.  And, professor, are you being compensated
13  for your work in this case?
14  A.  Yes, I'm being compensated for my work.
15  Q.  What's your rate of compensation?
16  A.  Nine hundred dollars an hour plus expenses.
17  Q.  And approximately how many hours to date do
18  you estimate you've spent on this case?
19  A.  I would say probably about 60 or so.
20  Q.  And with respect to your deposition today,
21  have you prepared for your testimony?
22  A.  Yes, sir.
23  Q.  And how did you prepare?
24  A.  If you'd like me to go back to the

Page 11

1  beginning, I got an e-mail from Brian Kelly asking
2  to talk about a possible Rule 11 matter, and we had
3  a chat, and he gave me the general outlines of the
4  situation, and I asked for him to send me a copy of
5  Professor Gillers' report which I read, and we
6  talked a little further, and I agreed to become the
7  expert to provide an expert declaration.
8    After that time, I received various
9  documents, transcripts of hearings, depositions that
10  have been taken in connection with this
11  investigation.  As I read through them, I would ask
12  for other depositions, other materials, other
13  hearings, etcetera, and received them from Nixon
14  Peabody.
15    So I read all of the transcripts.  I
16  read all of the depositions and then began to sit
17  down and write my report and, you know, referred
18  back and forth to the things I read, the research I
19  had done and prepared the declaration.
20    THE SPECIAL MASTER: Did you meet with
21  Garrett Bradley or anybody else from the Thornton
22  Law Firm?
23    THE WITNESS: I never met with Garrett
24  Bradley, but I also was at Nixon Peabody yesterday

Page 12

1  going over the declaration, and at the end of the
2  day Brian came by with Mike Thornton.  So I met him
3  yesterday afternoon.
4  Q.  When Mr. Kelly first contacted you on this
5  case, what did he tell you the case was about?
6  A.  I don't remember specifically, but that the
7  matter arose out of a complex class action and that
8  there had been a settlement and that an attorney and
9  law firm that he was representing was, you know,
10  being investigated for various -- you know, various
11  things that Judge Wolf was concerned about.
12  Q.  Were you able to understand Attorney Kelly?
13  A.  Yes.
14  Q.  'Cause most of us can't.
15  A.  Well, I'm from New York so somehow you
16  know, I specifically can understand a Boston accent.
17  Q.  All right.
18    THE SPECIAL MASTER: I don't have any
19  problem understanding him.
20    MR. KELLY: Thank you, your Honor.
21    MR. SINNOTT: That's very troubling,
22  your Honor.
23    THE SPECIAL MASTER: Agreeing with him
24  is another matter.

Page 13

1    MR. KELLY: It's a process, judge.  It's
2  a process.
3    MR. SINNOTT: He's an acquired taste.
4    MR. KELLY: Yeah.
5    BY MR. SINNOTT:
6  Q.  Professor, you mentioned that you read all
7  the transcripts.
8    I take it you're referring to all the
9  transcripts that Attorney Kelly sent to you,
10  correct?
11  A.  Yes.
12  Q.  Can you recall what transcripts those were?
13  A.  I read a transcript of a status conference
14  that was held in June of 2016.  That might have been
15  the first.  I read the transcript of the hearing at
16  which preliminary approval was -- Judge Wolf
17  preliminarily approved the settlement.  I read the
18  transcript of the November 2 hearing at which final
19  approval was given.
20    I read the transcript of the March 7
21  hearing in 2017.  I think that's it, but there could
22  have been more.
23  Q.  Okay.  Did you read any deposition
24  transcripts?

Page 14

1  A.  I read a number of deposition transcripts.
2  I read Garrett Bradley's transcript, the transcript
3  of his deposition, Evan Hoffman, Nicole Zeiss, Mike
4  Thornton, Mike Lesser, Larry Sucharow.
5     I can't remember -- I know I read
6  depositions of somebody from the Lieff firm.  I
7  can't remember who it was now off the top of my
8  head.
9  Q.  Was it Dan Chiplock?
10  A.  Could have been Chiplock, but I feel like
11  there was another one I read.  Maybe it was
12  Chiplock.  I just don't -- I just don't -- I have it
13  listed, but I don't recall.
14  Q.  Okay.  I thought you had cited Attorney
15  Chiplock in your --
16  A.  Well, I did read that one, yes.
17  Q.  Okay.
18  A.  But I have a feeling I read another -- or
19  maybe it was just references in the transcripts that
20  have me not recollecting perfectly.
21  Q.  And I might have missed this, but among the
22  hearing transcripts that you reviewed, did you
23  review the March 7, 2017 hearing transcript?
24  A.  Yes, I did.  I also read the February 6

Page 15

1  order that led to that hearing.
2  Q.  Okay.  Now with respect to those deposition
3  transcripts and hearing transcripts, is it your
4  testimony that you read all of them in their
5  entirety?
6  A.  Yes.
7  Q.  Were any particular portions pointed out to
8  you by Attorney Kelly or anyone else as being more
9  pertinent than others?
10  A.  No.
11  Q.  And --
12  A.  Let me amend that just a little bit --
13  Q.  Sure.
14  A.  -- because I also did read -- when I cited I
15  read the Zeiss depositions and the Garrett Bradley
16  depositions, I read the ones in June as well as the
17  ones in September.
18     But I have to say that I did not read
19  the September ones as carefully as I did the earlier
20  ones because they had to do with a matter that I'm
21  not involved with.
22  Q.  Okay.  And the opinions that are contained
23  in your report between pages 8 and 19 were written
24  by whom?

Page 16

1  A.  By me.
2  Q.  And did you have any assistance?
3  A.  No, sir.
4  Q.  And --
5  A.  I mean other than towards the end of the
6  process I sent drafts to the Nixon Peabody firm for
7  help with making sure that my citations were
8  correct; that typos -- and I did see a couple of
9  typos; I apologize for that -- but you know, that
10  kind of formalistic thing.
11  Q.  Beyond the typos, with respect to your
12  actual opinions, did you solicit or receive any
13  feedback on those opinions?
14  A.  No, sir.
15  Q.  And notwithstanding the fact you didn't
16  solicit any opinions, did Mr. Kelly or anyone from
17  Nixon Peabody offer to opine on them or to evaluate
18  them at any point?
19  A.  No, sir.
20  Q.  And did you do all of the research with
21  respect to your report yourself, or did you have
22  research assistants?
23  A.  I have no research assistants.
24  Q.  All right.  Now are you an expert in Federal

Page 17

1  Rule of Civil Procedure 11?
2  A.  Yes, sir.
3  Q.  And is it fair to say that Rule 11(b)
4  imposes certain obligations on counsel who are
5  making a filing?
6  A.  Yes, sir.
7  Q.  To include fee petitions, correct?
8  A.  It would include any paper, including a fee
9  petition.
10  Q.  All right.  And if you'd just listen to this
11  and tell me if I'm stating this correctly.
12     Rule 11(b) under the heading of
13  representations to the Court says, "By presenting to
14  the Court a pleading, written motion or other paper,
15  whether by signing, filing, submitting or later
16  advocating it, an attorney or unrepresented party
17  certifies that to the best of the person's
18  knowledge, information and belief formed after an
19  inquiry reasonable under the circumstances."  And
20  then there are four subheadings.
21     Is that correct based on your
22  familiarity with Rule 11(b)?
23  A.  Yes, sir.
24  Q.  And Subsection 3 of those four items says,

Page 18

1  "The factual contentions have evidentiary support or
2  as specifically so identified will likely have
3  evidentiary support after a reasonable opportunity
4  for further investigation or discovery."
5      Now is that correct based on your
6  familiarity with Rule 11?
7  **A.  Yes, it is.**
8  Q.  Does Rule 11 impose a duty of candor to the
9  Court?
10 **A.  I would say that even though the language is**
11 **not in the rule, both with respect to the 1983 and**
12 **1993 amendments, the courts have characterized Rule**
13 **11 as requiring a duty of candor, yes, sir.**
14 Q.  All right.  And from either your work on
15 this case or in other context, are you familiar with
16 Massachusetts Rule of Professional Conduct 3.3?
17 **A.  I read about it in Professor Gillers'**
18 **report, but I have not studied the Massachusetts**
19 **Rules of Professional Conduct.**
20 Q.  All right.  Would you agree with me based on
21 what you've read in Professor Gillers' report that
22 Rule 3.3 also imposes a duty of candor to the
23 tribunal?
24    **MR. KELLY:** Objection.  Beyond the

Page 19

1  scope.
2  **A.  I would say that my reading of Rule 3.3, the**
3  **language seems very similar to that of the duties**
4  **imposed by Rule 11.**
5  Q.  All right.  So --
6  **A.  But I have not read, you know, opinions**
7  **interpreting Rule 3.3 or the like.**
8  Q.  Okay.
9     **THE SPECIAL MASTER:** And you're not here
10 to testify about Rule 3.3 or Rule 8.4?
11    **THE WITNESS:** Correct, your Honor.
12 Q.  All right.  So are you sufficiently familiar
13 with 3.3 to opine at all as to how the duties in
14 each of these rules -- in Rule 11 as opposed to Rule
15 3.3 -- differ?
16    **MR. KELLY:** Objection.  Beyond the
17 scope.
18 **A.  I would say I did not do the research to be**
19 **able to form an opinion about that.**
20 Q.  Okay.  Let me direct your attention,
21 professor, to pages 24 and 25 of your report.
22 **A.  Do you mean paragraphs 24 --**
23 Q.  I'm sorry, paragraphs 24 and 25.
24 **A.  Yes, sir.**

Page 20

1  Q.  On page 9 --
2  **A.  Hm hm.**
3  Q.  -- of your report.
4      And specifically let me direct your
5  attention to paragraph 24.
6  **A.  Hm hm.  Yes, sir?**
7  Q.  And approximately five lines -- or four
8  lines into that paragraph -- and you're welcome, of
9  course, to read the entire paragraph, but I'm
10 referencing the sentence that begins with the words
11 "even if."
12 **A.  Hm hm.  Yes, sir.**
13 Q.  Even if an attorney has failed to conduct a
14 reasonable inquiry into factual contentions, Rule 11
15 sanctions may be imposed only when an attorney later
16 advocates a position taken in a paper filing -- in a
17 paper filed in court.
18     Is that a correct reading of that
19 portion of your opinion?
20 **A.  Yes, sir.**
21 Q.  And you go on to state that Rule 11(b)
22 provides that by presenting to the Court a pleading,
23 written motion or other paper, whether by signing,
24 filing, submitting or later advocating it, an

Page 21

1  attorney or unrepresented party certifies that to
2  the best of the person's knowledge, information and
3  belief formed after an inquiry reasonable under the
4  circumstances that the paper is well grounded in the
5  facts and law and not filed for improper purposes.
6      And then you finish that sentence by
7  saying the later advocating language must be read
8  together with Rule 11(c)(2) which provides a safe
9  harbor for an attorney who is the target of a motion
10 for sanctions if any paper is withdrawn or
11 appropriately corrected within 20 days, and you cite
12 11(c)(2).
13 **A.  Hm hm.  Yes.**
14 Q.  So if I might refer you to the first
15 sentence that I read and ask you what is the basis
16 for your concluding that Rule 11 sanctions are only
17 appropriate when an attorney later advocates a
18 position as opposed to when the pleading stating the
19 position is filed?
20 **A.  Well, as I say earlier in my declaration,**
21 **the 1993 amendments to Rule 11 substantially altered**
22 **the whole approach of the rule.**
23 **    The idea of the 1993 amendments which**
24 **were designed to correct some other problems, too,**

In Re:  State Street Attorneys Fees

Page 22

1 but a very important problem that the 1993
2 amendments were designed to correct was the idea
3 that attorneys may make a mistake, attorneys may
4 file a paper in court, whether it's a complaint, an
5 answer, whatever, and it may in the context of an
6 adversarial situation be pointed out to them by
7 their adversary, and that's why I say you have to
8 take a look at the later advocating language read
9 together with Rule 11(c)(2) safe harbor because the
10 rule -- what the rule is doing is providing an out
11 so-to-speak for an attorney who files a paper where
12 it is pointed out that there's something wrong with
13 it.
14     So that's the basis for my opinion.  The
15 whole purpose of the 1993 amendment providing an
16 opportunity for an attorney to make corrections to a
17 paper, aspects of the paper, once there's a need to
18 do so.
19     So, for example, if the complaint is
20 entirely frivolous, what a plaintiff should do is
21 withdraw once put on notice that the paper is
22 entirely frivolous, and sanctions may not be imposed
23 if the complaint is in fact withdrawn within those
24 21 days.

Page 23

1 Q.  But isn't your emphasis on later advocating
2 -- and I see that you've emphasized that in italics
3 in your presentation -- isn't that belied by a plain
4 language reading of the rule which has the word "or"
5 prior to that -- "whether by signing, filing,
6 submitting or later advocating it"?
7     I mean isn't -- doesn't the word "or" in
8 that rule indicate that the original signing, filing
9 or submitting can be a violation of that rule?
10 A.  I don't read it that way, especially read in
11 conjunction with 11(c)(2) because the whole purpose
12 of the amendment was to provide an opportunity for
13 an attorney to make corrections.
14     So it may well be true that when the
15 attorney presented the pleading, written motion or
16 other paper a Court could reasonably find that that
17 paper violated Rule 11, but sanctions can't be
18 imposed if the attorney ceases to advocate the
19 positions that are encompassed in that paper.
20     THE SPECIAL MASTER: So let me ask just
21 a couple questions about that.
22     Putting aside for just a moment temporal
23 issue that you and Mr. Sinnott are discussing,
24 professor.

Page 24

1     THE WITNESS: Hm hm.
2     THE SPECIAL MASTER: What if an attorney
3 knows at the time that the paper that is being filed
4 contains false statements, blatantly false
5 statements, is it still your position that
6 nevertheless sanctions cannot be imposed under Rule
7 11 if at some later time the attorney fesses up and
8 says, gee, I'm sorry?
9     THE WITNESS: If -- yes, your Honor.
10     THE SPECIAL MASTER: Okay.
11     THE WITNESS: I mean it's -- there may
12 be other tools available, but, you know, certainly
13 not Rule 11.
14     Rule 11 was designed to ensure that an
15 attorney withdraws a paper that's an offending
16 paper.  Unless they continue to advocate it, you
17 know, they have that safe harbor.
18     I hesitate to even answer the question
19 because I don't know exactly, you know, in the
20 context of knowingly false and all of that, but the
21 whole purpose of the rule is to enable a party to
22 correct whatever mistakes are made.
23     THE SPECIAL MASTER: All right.  Let's
24 drill down on that a little bit.

Page 25

1     I want you to assume that the statements
2 are knowingly false.
3     MR. KELLY: Objection.
4     THE SPECIAL MASTER: We can go further
5 in this, but I want you to at least for now assume
6 that, okay?
7     THE WITNESS: May I -- may I ask what
8 "knowingly" means?
9     THE SPECIAL MASTER: That at the time
10 they were made the attorney knew that the statements
11 were false or certainly should have known that the
12 statements were false.  I want you to assume that
13 for now.  Okay?
14     Is it your testimony then that even in
15 those situations sanctions are not appropriate if
16 the attorney says, yes, I was wrong, I apologize?
17     MR. KELLY: Object to the hypo unless
18 the Court specifies knowingly in the sense of when.
19     THE SPECIAL MASTER: All right.  Let's
20 get into this instead of fencing around.
21     THE WITNESS: Okay.
22     THE SPECIAL MASTER: Let's talk about
23 what these statements are, okay?
24     THE WITNESS: Okay.

Page 26

1    THE SPECIAL MASTER: You've read
2  Professor Gillers' --
3    THE WITNESS: Yes.
4    THE SPECIAL MASTER: -- report?
5    THE WITNESS: Yes.
6    THE SPECIAL MASTER: He calls out I
7  believe six statements.
8    THE WITNESS: Six statements, yes, sir.
9    (Pause.)
10   MR. SINNOTT: Do you have a copy of
11 that, professor?
12   THE WITNESS: I don't have it before me.
13   THE SPECIAL MASTER: Let's get a copy
14 before her.  Or just the declaration.
15   MS. McEVOY: We have the declaration.
16   THE SPECIAL MASTER: The declaration
17 would be fine.  Exhibit 8.
18   MR. KELLY: Which declaration?
19   THE SPECIAL MASTER: The Bradley
20 declaration to the lodestar.
21   MS. McEVOY: Exhibit 16.
22   MR. SINNOTT: Paulette, if we could mark
23 this as an exhibit.
24   (Exhibit 2 marked

Page 27

1    for identification.)
2    MR. SINNOTT: That's been marked as
3  Exhibit 2.
4    THE WITNESS: Okay.  Exhibit?
5    THE SPECIAL MASTER: The declaration,
6  please.
7    THE WITNESS: Okay.
8    THE SPECIAL MASTER: Paragraphs 3 and 4.
9    THE WITNESS: Okay.
10   THE SPECIAL MASTER: You understand
11 these statements were made under oath in the
12 declaration.
13   THE WITNESS: Yes, your Honor.
14   THE SPECIAL MASTER: All right.
15 Paragraph 3.
16   "The schedule attached hereto as
17 Exhibit A, which is the lodestar petition, is a
18 summary indicating the amount of time spent by each
19 attorney and professional support staff member of my
20 firm who was involved in the prosecution of the
21 class actions, and the lodestar calculation is based
22 on my firm's current billing rates.
23   For personnel who are no longer employed
24 by my firm, the lodestar calculation is based upon

Page 28

1  the billing rates for such personnel in his or her
2  final year of employment by my firm.  The schedule
3  was prepared from contemporaneous daily records
4  regularly prepared and maintained by my firm which
5  are available at the request of the Court.  Time
6  expended in preparing this application for fees and
7  payment of expenses has not been included in this
8  request."
9    Paragraph 4.  "The hourly rate for
10 attorneys and professional support staff in my firm
11 included in Exhibit A are the same as my firm's
12 regular rates charged for their services which have
13 been accepted in other class actions."
14   So in the sworn declaration Mr. Bradley
15 says Exhibit A contains professional support staff
16 members of my firm.
17   THE WITNESS: Correct.
18   THE SPECIAL MASTER: We're talking here
19 about the staff attorneys.
20   THE WITNESS: Right.
21   THE SPECIAL MASTER: And what we've all
22 colloquially referred to in this as the double
23 counting issue.
24   THE WITNESS: Correct.

Page 29

1    THE SPECIAL MASTER: You're familiar
2  with that?
3    THE WITNESS: Yes, your Honor.
4    THE SPECIAL MASTER: Is there any way
5  Mr. Bradley did not know that the staff attorneys
6  listed on professional -- on Exhibit A were not
7  professional support staff members of my firm?
8    Is there any way he could not have known
9  that?
10   THE WITNESS: My understanding of the
11 record is that he knew that the staff attorneys were
12 actually either employees of the other firms or had
13 been supplied, I think in the case of the Lieff
14 Cabraser firm, by outside agencies and that he --
15 that those attorneys were doing the work for the
16 Thornton Law Firm, but they were not employees of
17 the law firm, and Garrett Bradley knew they were not
18 his employees.
19   THE SPECIAL MASTER: More accurately,
20 those attorneys were doing the work for the entire
21 what we've talked about as the customer class
22 lawyers including Thornton but also Lieff Cabraser
23 and Labaton, not just Thornton.
24   THE WITNESS: I mean I'm not quite sure

Page 30

1  what you're getting at with that.  I mean all --
2      THE SPECIAL MASTER: You said they were
3  doing work for Thornton.
4      THE WITNESS: Yes.  And --
5      THE SPECIAL MASTER: They were working
6  for all of the firms.
7      THE WITNESS: They were working for the
8  class.
9      THE SPECIAL MASTER: Correct.
10      THE WITNESS: They were working to
11  review the I think it was something like nine
12  million documents for the entire class -- for the
13  purposes of the entire class.
14      THE SPECIAL MASTER: Nevertheless, my
15  question is the same to you, professor.
16      Is there any way that Garrett Bradley
17  did not know that these professional support staff
18  members were not members of his firm?
19      Is there any way he could not have known
20  that?
21      THE WITNESS: Well, he did know that,
22  but the question is whether the filing of this
23  direct -- of this declaration with respect to
24  language like that violates Rule 11, and Mr. Sinnott

Page 31

1  had previously asked me whether Rule 11 imposes a
2  duty of candor.
3      And so, you know, my -- in my opinion as
4  a Rule 11 expert, what the duty of candor means is
5  that an attorney should not be intentionally
6  misleading the Court.
7      And so despite the fact that he may have
8  known at that time --
9      THE SPECIAL MASTER: May have known?
10      THE WITNESS: Knew.  He knew.  He knew
11  that these attorneys were not employees of his
12  firm --
13      PHONE LINE CONFERENCE: The following
14  participant has entered the conference:  Mike.
15      THE WITNESS: He knew that, your Honor.
16  But in making that statement, it's my opinion that
17  he did not violate his Rule 11 duty of candor to the
18  Court.
19      THE SPECIAL MASTER: Okay.  We'll
20  explore that a little further.
21      THE WITNESS: Okay.
22      THE SPECIAL MASTER: The next statement,
23  "The billing rates for the staff attorneys are based
24  on my firm's current billing rates."

Page 32

1      Did the firm have current billing rates
2  for the staff attorneys?
3      THE WITNESS: No, your Honor, it did not
4  have current billing rates because this is a
5  plaintiffs' contingency firm, and they were not
6  changing clients.
7      So that language was very similar --
8  similar?  -- it was the same as in the fee
9  declarations of the other law firms.
10      THE SPECIAL MASTER: And particularly
11  these staff attorneys had no billing rates, whether
12  contingent or not, with the Thornton firm, did they?
13      THE WITNESS: The Thornton firm paid
14  them.
15      THE SPECIAL MASTER: Paid them what?
16      THE WITNESS: Paid them less than the
17  billing rate.
18      THE SPECIAL MASTER: They reimbursed the
19  Labaton and Lieff firms for the actual cost that
20  those firms bore for these staff attorneys, correct?
21      THE WITNESS: Yes, sir.
22      THE SPECIAL MASTER: All right.  So the
23  statement that the billing rates for the staff
24  attorneys are based on my firm's current billing

Page 33

1  rates is false, right?
2      THE WITNESS: Um, I -- I -- I have -- I
3  have a hard time saying that it's false read in
4  context, and in the context of this case
5  particularly because all the plaintiffs' law firms
6  use similar language, and I mean I'm not an expert
7  in this.  I'm not going to purport to be an expert
8  in this, but it is well-known whether you're talking
9  about contingency fee lawyers or even defense
10  lawyers that the amount that is paid to an attorney,
11  i.e., the cost is different than the rates that
12  would be billed --
13      THE SPECIAL MASTER: Professor, you keep
14  shifting the focus.
15      MR. KELLY: Objection.  Objection.
16  Arguing with the witness when the witness is trying
17  to give an answer.
18      THE SPECIAL MASTER: My focus is
19  strictly on whether the Thornton Law Firm had
20  current billing rates for these staff attorneys as
21  members of my firm.
22      THE WITNESS: They did not.
23      THE SPECIAL MASTER: They did not.
24  Thank you.

1    Just to clarify, I'm not quibbling about
2 whether they can mark up the staff attorneys,
3 whether courts have awarded mark-ups on staff
4 attorneys. That's not my focus, okay?
5    **THE WITNESS:** Okay. Hm hm.
6    **THE SPECIAL MASTER:** My focus is
7 strictly on the truth or falsity of the declaration
8 statement that the billing rates for the staff
9 attorneys are based on my firm's current billing
10 rates. "My firm's current billing rates."
11    The truth is --
12    **MR. KELLY:** And we're objecting to
13 conflating factual inaccuracy with knowingly false
14 submission.
15    **THE SPECIAL MASTER:** Okay. Is there any
16 way that Mr. Bradley could not have known that his
17 firm did not have current billing rates for staff
18 attorneys that were employed by the Lieff firm and
19 the Labaton firm? Plausibly.
20    **THE WITNESS:** May I say, your Honor,
21 that in answering that question -- and, I'm sorry,
22 my head from time to time because I have bronchitis,
23 but --
24    **THE SPECIAL MASTER:** If you need a

1 break, just let us know.
2    **THE WITNESS:** No, no, no. It's not
3 that. I may just from time to time go off a little
4 bit.
5    **THE SPECIAL MASTER:** Okay.
6    **THE WITNESS:** I'm here to talk about
7 Rule 11 and whether Garrett Bradley violated Rule
8 11, and I completely appreciate the Court's concern,
9 your concern, Mr. Sinnott's concern about whether
10 some of the statements in the declaration were
11 inaccurate. I mean I fully appreciate that.
12    And I'm happy to say that I understand
13 that the rates -- that the amounts that were paid to
14 the staff attorneys were less than the mark-up
15 so-to-speak -- the word you used -- with respect to
16 the amounts that were charged for lodestar purposes.
17    But I guess it's -- I just want to make
18 clear that for Rule 11 purposes what's really,
19 really important is not that the statements
20 themselves were inaccurate, but, you know, whether
21 they violate Rule 11, whether they misled the Court,
22 whether they violate the duty of candor.
23    So I mean you have indicated that we're
24 going to get there. So -- but I think it's

1 important to get there because I think that's really
2 the nub of the issue here. Again, I think that to
3 the extent that he knew and could have stated this
4 more artfully, more accurately with greater clarity,
5 I appreciate the concern.
6    But do these statements violate Rule 11?
7 It's my firm conviction that they do not.
8    **THE SPECIAL MASTER:** You understand that
9 declarations are submitted to judges with the intent
10 that the judge relies upon the truthfulness of the
11 statements?
12    **THE WITNESS:** Yes, your Honor.
13    **THE SPECIAL MASTER:** And that, in fact,
14 in looking at a lodestar a judge might well be
15 concerned that the lodestar petition is about
16 lawyers in the declarant's own firm and the personal
17 knowledge that that declarant has of those lawyers,
18 right?
19    **THE WITNESS:** Hm hm. Yes.
20    **THE SPECIAL MASTER:** And that the
21 billing rates in the lodestar are in fact the
22 billing rates for lawyers in that firm? You
23 understand that a judge might well want to be able
24 to rely upon that?

1    **THE WITNESS:** I would think that the
2 judge would want to rely on for fee petition
3 purposes knowing who exactly had performed work
4 overall in the context of the entire case, and I --
5 of course, the judge would want to know what their
6 billing rates were.
7    **THE SPECIAL MASTER:** Okay.
8    **THE WITNESS:** Because the whole purpose
9 of this exercise, the lodestar check, is to ensure
10 that the percentage could be checked by the
11 lodestar.
12    So what's really significant -- and this
13 is I think one of the essences of what my argument
14 here as to why Garrett Bradley did not violate Rule
15 11 is that in fact the Thornton Law Firm was
16 responsible for its share of the costs of various
17 attorneys, its own as well as the staff attorneys,
18 and was responsible for accurately keeping records
19 of the time that they spent so that the number that
20 was presented to the Court was one that would be
21 reliable.
22    **THE SPECIAL MASTER:** Is that the same as
23 telling the judge that these staff attorneys are
24 members of my firm? And that the billing rates are

Page 38

1  the current billing rates that are charged for these
2  staff attorneys by my firm?
3      THE WITNESS: I don't know that that
4  would make a difference -- if I were a judge, I
5  don't know that that would make a difference to me.
6  But I'm not Judge Wolf.
7      But what I think would be important to
8  Judge Wolf would be hours worked and billing rates
9  that are -- and I think that, um, for the purposes
10 -- actually now I should really step aside because I
11 know that we have the expert declaration from
12 Professor Rubenstein who goes into this in much
13 greater detail.
14     And I guess all I would say is that my
15 knowledge of how the world works, the idea that
16 attorneys cost less -- the law firms pay them less
17 than they're billed at is common knowledge and that
18 the rates that were proposed here in all the
19 declarations were well within the range of what's
20 acceptable in class action cases.
21     THE SPECIAL MASTER: So I'm not going to
22 get you off of this notion of conflating what might
23 be accepted policy, marking up staff attorneys from
24 the amount that they're billed to a market rate, to

Page 39

1  the truth or falsity of the statements actually made
2  in the declaration.
3      You're going to continue to conflate
4  those two concepts in your answers?
5      MR. KELLY: Objection.  Argumentative.
6      THE SPECIAL MASTER: Is that right?
7      THE WITNESS: I don't think I'm -- it's
8  difficult to answer your question in the way that I
9  think you want me to because --
10     THE SPECIAL MASTER: I just want you to
11 tell me straight out and simple.
12     THE WITNESS: Okay.
13     THE SPECIAL MASTER: Are the statements
14 made in the declaration in paragraphs 3 and 4 true
15 or false?
16     THE WITNESS: They're inaccurate, yes,
17 they are.
18     THE SPECIAL MASTER: Okay, that's all.
19     THE WITNESS: I thought I --
20     THE SPECIAL MASTER: Is there any way
21 that Garrett Bradley could not have known that they
22 were false?
23     THE WITNESS: He could have known that,
24 yes.

Page 40

1      THE SPECIAL MASTER: Is there any way he
2  could not have known it?
3      He's a managing partner at the Thornton
4  firm.  Is there any way he could not have known that
5  these staff attorneys were not members of his firm?
6      THE WITNESS: He did know that they were
7  not members of his firm --
8      THE SPECIAL MASTER: Okay, thank you.
9      THE WITNESS: -- at the time he signed
10 this declaration, yes.
11     THE SPECIAL MASTER: Let me follow up.
12     THE WITNESS: Okay.
13     THE SPECIAL MASTER: Does motive or
14 intent play any role in your analysis of whether or
15 not there's a violation of Rule 11 made in sworn
16 statements to a Court?
17     THE WITNESS: Yes.
18     THE SPECIAL MASTER: Okay.  Were you
19 shown deposition testimony of Garrett Bradley in
20 which he acknowledged that the best way to jack up
21 the lodestar -- the best way for us, Thornton, to
22 increase our lodestar and make it comparable to the
23 other two firms, I was absolutely concerned about
24 Thornton's lodestar vis-a-vis the other two firms.

Page 41

1      MR. KELLY: Sorry, what was the last
2  line?  Vis-a-vis?
3      THE SPECIAL MASTER: Vis-a-vis the other
4  two firms.
5      THE WITNESS: I read that, your Honor,
6  yes.
7      THE SPECIAL MASTER: Did you read the
8  e-mail of Garrett Bradley to Mike Thornton and Mike
9  Lesser in which he says words to the effect -- we
10 can get it out -- but we need to jack up our
11 lodestar; we need to increase our lodestar?
12     THE WITNESS: Um, I did not read the
13 e-mail, but I probably read reference to it in
14 either the March 7 hearing or in his -- I guess the
15 March 7 hearing.
16     So I did not read the e-mail, but...
17     THE SPECIAL MASTER: Okay.
18     (Pause.)
19     THE SPECIAL MASTER: Are you aware that
20 the staff attorney time on the Thornton lodestar was
21 billed at -- was approximately 70 percent of the
22 entire lodestar hours claimed?
23     THE WITNESS: Um, I -- I don't have that
24 calculation.

Page 42

1      THE SPECIAL MASTER: Okay.  We can do
2  the math but --
3      THE WITNESS: Okay, yes.
4      THE SPECIAL MASTER: -- there's a chart
5  in the fact situation setting out the attorney
6  lodestar time for all three of the firms.
7      THE WITNESS: I just don't recall that,
8  your Honor.  But I'm not, you know --
9      THE SPECIAL MASTER: About 70 percent.
10 So that is a significant portion of the Thornton
11 lodestar you would agree?
12     THE WITNESS: If the staff attorneys'
13 time was 70 percent of the total Thornton time, then
14 that would be a significant portion, yes.  Seventy
15 percent is.
16     THE SPECIAL MASTER: And if there was a
17 motive to in Garrett Bradley's words "jack up the
18 lodestar" --
19     MR. KELLY: I'm going to object as to
20 what I see as a deliberate misinterpretation of the
21 jacking up of the lodestar and the reading out of
22 that last line "vis-a-vis the other firms."
23     The Court here continues to -- I don't
24 want to go on a long speaking objection because I

Page 43

1  know you don't like that, but in the search for the
2  truth here it matters in terms of vis-a-vis the
3  competing law firms getting their share versus the
4  Court and whether we have a Rule 11 violation.
5      So I'm going to object to continuing to
6  ignore the "vis-a-vis the other firms" which I
7  suggest is critical to this analysis that she's here
8  for.
9      THE SPECIAL MASTER: Okay, Brian, that
10 is a blatant violation of Rule 30(c), speaking
11 objections.  I've talked to Joan about this.  I have
12 talked to Richard about this.  And now I'm putting
13 you on notice.  No more speaking objections.
14     Make your record with an objection as
15 the rule requires which is concisely,
16 non-argumentative and non-suggestive.  Back to my
17 questions.
18     THE WITNESS: Okay, let me try if I have
19 it all.
20     I'm aware that there was a fee
21 allocation agreement among the three counsels' law
22 firms, Labaton, Thornton and Lieff.  And I'm aware
23 that the expectation it appears from somebody just
24 coming in cold from the outside that there was

Page 44

1  originally 20/20/20 and that there was another 40
2  percent therefore, that that would have to be
3  allocated among the firms and that their work -- the
4  investment that they would put in would have an
5  impact on their -- you know, their share of the 40
6  percent so-to-speak.  That's my understanding of the
7  agreement.
8      And therefore each of the firms had
9  probably a desire to ensure that they would have a
10 proper share of that 40 percent.  And so the way in
11 which the Thornton Law Firm was able to do that is
12 by virtue of taking on the burden, the risk of
13 paying for certain of those staff attorneys.
14     It's my understanding that there were
15 two fairly large document productions.  I think one
16 was called the California production; the other was
17 the Hill production.  There was a scramble in the
18 context of the whole mediation to get through those
19 documents.
20     And so there was an agreement among the
21 parties that Thornton would be -- bear the risk of a
22 third of those attorneys that they would be on their
23 fee declaration, and so -- so I don't know if that
24 answers your question or what more you want me to

Page 45

1  say, but, you know, they were not his employees.
2  They were not employees of the Thornton Law Firm,
3  but for the purposes of this litigation they were
4  essentially Thornton lawyers and would be treated
5  the same as the staff attorneys would be at the
6  other law firms.
7      THE SPECIAL MASTER: Okay.
8      THE WITNESS: Does that answer your
9  question, your Honor?
10     THE SPECIAL MASTER: Again you've
11 conflated two entirely different principles, the
12 issue of whether the staff attorneys can be marked
13 up --
14     THE WITNESS: Hm hm.
15     THE SPECIAL MASTER: -- and the issue of
16 whether or not these staff attorneys are employees
17 of the firm and whether or not the billing rates
18 were current billing rates for these staff attorneys
19 of the firm is different than the question of
20 whether or not it's appropriate to mark them up, and
21 maybe there could have been a way in which Thornton
22 got credit for a pro rata share on a lodestar
23 without telling the Court on its lodestar in a sworn
24 declaration that these were members of the firm and

Page 46

1 that these were the current billing rates that the
2 firm has for these staff attorneys.
3    There was a way to do that without
4 putting these staff attorneys on the Thornton
5 lodestar and telling the Court that they were
6 members of the firm and that these were the current
7 billing rates for the firm.
8    So --
9    **THE WITNESS:** I appreciate --
10    **MR. KELLY:** Objection.  No question
11 pending.
12    **THE SPECIAL MASTER:** There's no question
13 pending.  My question to you in asking about
14 motive --
15    **THE WITNESS:** Hm hm?
16    **THE SPECIAL MASTER:** -- and the motive
17 being that the best way to jack up the lodestar was
18 putting the staff attorneys on the Thornton firm,
19 and my question to you is is it not reasonable to
20 assume that the motive in putting these staff
21 attorneys on the lodestar was to increase the
22 Thornton lodestar?
23    **THE WITNESS:** I guess I have a hard time
24 saying that -- I mean the lodestar vis-a-vis the

Page 47

1 other firms, not the lodestar vis-a-vis the entire
2 bucket that's going to go to the Court.  Those hours
3 were going to appear on the fee petition, the
4 omnibus fee petition, the award, okay, that Labaton
5 submitted.
6    So the Court was not misled in any
7 manner, shape or form.  Those lawyers' time were
8 going to be accounted for in somebody's fee
9 petition.
10    **THE SPECIAL MASTER:** But not twice.
11    **THE WITNESS:** Well, the twice problem in
12 my opinion was not the Thornton problem.  The
13 Thornton -- Thornton pursuant to the agreement was
14 taking on the burden of those -- burden is probably
15 the wrong word -- but was taking on a share of the
16 staff attorneys.
17    **THE SPECIAL MASTER:** Cost burden is
18 perfectly appropriate if that's what you're
19 referring to.
20    **THE WITNESS:** Well --
21    **THE SPECIAL MASTER:** The cost and risk
22 burden.
23    **THE WITNESS:** But if the agreement was
24 to try to equalize the position of each of the firms

Page 48

1 within the context of the litigation, then I just
2 fail to see what that has to do with Rule 11.
3    The Court was using the lodestar check
4 as a means of determining whether the 25 percent fee
5 was an appropriate one.  And so the dollar amount,
6 the 41 million, would have been there regardless of
7 how the individual firms manifested them on their
8 individual fee declarations.
9    So I -- I have to tell you, your Honor,
10 I do agree that those statements are facially
11 inaccurate, and it's also true, as Garrett Bradley
12 said at the March 7 hearing and then again in his
13 deposition, that, oh, yes, they're inaccurate, and I
14 apologize.  I apologize for the lack of clarity.
15    **THE SPECIAL MASTER:** Was the March 7th
16 hearing the first opportunity that Garrett Bradley
17 had to tell the Court that these statements were
18 inaccurate?
19    **THE WITNESS:** Um, hindsight being 20/20,
20 you know, he could have done a better job at the
21 time the fee petition was written.  Hindsight being
22 20/20, when it was brought to his firm's attention
23 that there might be a problem with the double
24 counting, hindsight being 20/20, he could have, you

Page 49

1 know, focused on that language.
2    But it seems to me from reading
3 everything I read that people were just totally
4 freaked out so-to-speak about the double counting.
5 And so I think that that was the focus, and it seems
6 to me that that was the appropriate focus because
7 what was most important was the numbers, what
8 exactly -- you know, if the 41 million is wrong, the
9 Court needed to know that.  And the attorneys got
10 together and just -- you know, saw there was a
11 problem.  There was a double counting problem, and
12 they sent the letter to the Court saying that their
13 math should have been 37 million.
14    **THE SPECIAL MASTER:** Did you read the --
15 that's the November 10th letter --
16    **THE WITNESS:** Correct.
17    **THE SPECIAL MASTER:** -- that was drafted
18 initially by David Goldsmith of the Labaton firm and
19 then circulated?
20    **THE WITNESS:** Yes.
21    **THE SPECIAL MASTER:** Yes.  Did you read
22 that letter?
23    **THE WITNESS:** Yes, I did.
24    **THE SPECIAL MASTER:** Is there anything

Page 50

1  in there that tells the Court that the double
2  counting occurred because the staff attorneys that
3  were included on the Labaton and Lieff petitions and
4  also included on the Thornton petitions were not
5  staff attorneys employed by the firm and that the
6  rates for those staff attorneys were not the current
7  rates of that firm?
8      **THE WITNESS:** That was not pointed out,
9  your Honor, no.
10     **THE SPECIAL MASTER:** Don't you think
11  that would have been a good opportunity to point
12  that out to the Court?
13     **THE WITNESS:** You know, hindsight being
14  20/20, again, you know, as a law professor I
15  certainly would have graded Garrett higher if, you
16  know, that had been done at the time, but I think
17  that the critical problem was fixing the lodestar
18  number, letting the Court know that a
19  four-million-dollar mistake had been made because
20  the attorneys who were listed on the Thornton fee
21  declaration that were supposed to be listed on the
22  Thornton declaration pursuant to the agreement of
23  the parties happened to be inadvertently double
24  counted on the Lieff fee petition and the Labaton

Page 51

1  fee petition.
2      **THE SPECIAL MASTER:** Were you shown any
3  agreement between the parties -- by the parties we
4  mean the Labaton, Lieff and Thornton firms -- that
5  explicitly tells the Thornton firm it can include
6  these staff attorneys on its lodestar?
7      **THE WITNESS:** Excuse me. No, but there
8  are --
9      **THE SPECIAL MASTER:** Again, if you need
10  a break.
11     **THE WITNESS:** No. But there are many,
12  many references in the various depositions and
13  transcripts by the attorneys involved in all three
14  firms that make it clear to me that everybody
15  understood that those attorneys were going to be
16  counted on the Thornton firm's fee declaration.
17     **THE SPECIAL MASTER:** If it were so
18  clear, why did Labaton and Lieff also include them
19  on their fee petitions?
20     **THE WITNESS:** I don't know why. There
21  was no crosscheck.
22     **THE SPECIAL MASTER:** Can we agree that
23  at least as of November 10th Garrett Bradley had the
24  opportunity to tell the Court that his declaration

Page 52

1  was, in your words, inaccurate?
2      **THE WITNESS:** Um, certainly. But
3  that --
4      **THE SPECIAL MASTER:** So that would have
5  been the first opportunity, right?
6      **THE WITNESS:** It was an opportunity to
7  read more carefully, but -- I mean I don't know
8  what's in Garrett Bradley's mind, but I believe
9  again that because the whole purpose of this was the
10  lodestar check, that probably none of the attorneys
11  were really focusing on the language in the template
12  and that what they were focused on -- you know, I
13  saw many references to, you know, filling in the
14  blanks, and what we're talking about there is the
15  attorneys who worked, the hours they worked and the
16  amount that was being charged or put into the
17  lodestar calculation for each of those attorneys.
18     **THE SPECIAL MASTER:** Was there anything
19  -- after the letter was written --
20     **THE WITNESS:** Hm hm?
21     **THE SPECIAL MASTER:** -- and the
22  freak-out portion had stopped --
23     **THE WITNESS:** Hm hm?
24     **THE SPECIAL MASTER:** -- was there

Page 53

1  anything that prevented Garrett Bradley from writing
2  a supplemental letter to the Court saying in
3  addition to what Mr. Goldsmith has told the Court
4  about the double counting --
5      **THE WITNESS:** Hm hm. Well --
6      **THE SPECIAL MASTER:** -- I want to call
7  the Court's attention to the fact that the
8  statements in my declaration were inaccurate, and I
9  apologize for any problems that this has caused the
10  Court?
11     **THE WITNESS:** He could have done that,
12  but from a Rule 11 perspective the question is
13  whether what he did or didn't do was reasonable
14  under the circumstances. And it seems to me that
15  they have now informed the Court of the double
16  counting problem.
17     They knew there would be a reaction from
18  the Court. The Court did react on February 6th by
19  ordering all the attorneys to appear before him on
20  March 7.
21     So it seems to me that, you know, it was
22  reasonable for the parties to await the Court's
23  instructions in terms of what it wanted to know
24  about.

Page 54

1    I also know that -- I believe this was
2  in Nicole Zeiss' deposition that there might have
3  been talk about doing something further than writing
4  the letter, but it seemed that all the lawyers
5  agreed -- and I believe it was Nicole Zeiss' advice
6  -- to just let's wait for the judge's instructions,
7  and the judge's instructions came on February 8.
8    **THE SPECIAL MASTER:** Did the Labaton
9  firm -- anybody at the Labaton firm have to correct
10  any misstatements in their declaration?
11    **THE WITNESS:** Well, you know, I don't
12  have them side by side, but I know that all the
13  firms used some of the language verbatim from the
14  template which had been provided by the Labaton
15  firm, which was putting together all the materials
16  for the Court for the fee request, and that every
17  single one of them had some aspects that were less
18  than accurate.
19    For example, if you look at Lieff and
20  Labaton, um, they're also contingency fee law firms.
21  Labaton I believe from the record was -- is totally
22  contingent fee at this point in time.  So, you know,
23  if you think about my firm's billing rates for -- I
24  put that in quotes "billing rates" -- you know, the

Page 55

1  Labaton firm no longer had, you know, the kind of
2  billing rates that we're thinking about in terms of
3  the mark-up.  I'm not trying to conflate, but that's
4  what we're talking about here.
5    And Lieff Cabraser, as I recall from
6  reading various depositions, does have a couple of
7  paying clients, but, um, you know, generally it's
8  well-known that Lieff Cabraser is largely a
9  contingency fee firm as well.
10    **THE SPECIAL MASTER:** So are you saying
11  that Lieff Cabraser and Labaton then should have
12  also stepped forward and said, judge, to the extent
13  that we declared in our sworn statements that these
14  were current rates that were charged, that they
15  should have stepped up and explained to the Court
16  that they don't have current rates charged to
17  clients?
18    **MR. GLASS:** Objection.
19    **THE SPECIAL MASTER:** I'm just trying to
20  understand what she's saying.
21    **THE WITNESS:** All I'm saying is -- I
22  hate to say that it's minor because being a hundred
23  percent accurate to a Court is an important value,
24  and attorneys should try to be perfect, but Rule 11

Page 56

1  does not require perfection.  That's what I'm
2  saying.
3    And so in the context -- and you have to
4  look at whether Rule 11 has been violated in context
5  -- these sorts of statements are not the sorts of
6  statements that the attorneys at that time should
7  have been worried about.  They should have been
8  worried about the lodestar numbers.
9    **THE SPECIAL MASTER:** So do you believe
10  that Garrett Bradley's declarations about the staff
11  attorneys were minor?
12    **THE WITNESS:** I'm not saying that
13  they're minor in that sense.  Everything -- it's
14  minor overall.  I mean I think they were immaterial
15  to the exercise of putting together the fee
16  petition.  I would say that.
17    Not immaterial in a securities fraud
18  type of a context.  But, you know, not important in
19  the sense that the key aspects of the fee
20  declarations were to make sure that the numbers were
21  right.
22    **THE SPECIAL MASTER:** And, of course,
23  they weren't.
24    **THE WITNESS:** Well, they weren't, but --

Page 57

1  you know, and I don't want to cast blame here
2  because I think it was a mistake.  It was an
3  inadvertent mistake as David Goldsmith said in his
4  November 10 letter to the Court.
5    **THE SPECIAL MASTER:** So let me ask you
6  when Garrett Bradley got the template from Nicole
7  Zeiss that was used with these statements in the
8  declaration, he could have changed it to explain
9  exactly what these staff attorney -- the staff
10  attorneys were listed -- exactly what their
11  relationship was to the Thornton firm, right?
12    **THE WITNESS:** He could have.
13    **THE SPECIAL MASTER:** He could have.  And
14  he could have stated exactly what the rates were
15  based on and not tell the Court that they were based
16  on the current rates charged by my firm.  He could
17  have told the Court exactly that.  Right?
18    **THE WITNESS:** Yes.
19    **THE SPECIAL MASTER:** Okay.  And perhaps
20  when Nicole Zeiss got that back and she was doing --
21  you understand she was doing the preparation --
22    **THE WITNESS:** She was the settlement
23  attorney.
24    **THE SPECIAL MASTER:** She was the

Page 58

1 settlement attorney. Perhaps that would have called
2 her attention to the fact that these staff attorneys
3 were also being claimed on the Thornton petition.
4 Would you agree to that?
5    THE WITNESS: I would not agree to that.
6 I don't know, you know, what she would have done
7 with that. I have no idea what she would have done
8 with that. I mean I --
9    THE SPECIAL MASTER: Presumably she
10 would have read it.
11    THE WITNESS: I mean there's all kinds
12 of things that could have been done differently
13 here, but that doesn't mean that the things that
14 could have been done differently show that what was
15 done violates Rule 11.
16    I mean -- I don't know about Lieff. I
17 don't know about Labaton. But what I do know is
18 that Labaton is a highly experienced firm in terms
19 of putting together fee petitions. And I'm not
20 going to say that it was entirely proper or best
21 practice -- I think it's better to put it in terms
22 of best practice -- that you should think in terms
23 of not modifying a template that you're given, but
24 under the circumstances -- and Rule 11 is about

Page 59

1 what's reasonable under the circumstances -- the
2 bottom line of what was going on here is that the
3 Thornton firm was trying to get the numbers right
4 for the attorneys that they were responsible for.
5    And in materials of the fee allocation
6 agreement among Lieff, Labaton and Thornton, they
7 were their attorneys. They were not their
8 employees, but they were the attorneys that they
9 were responsible for presenting in the fee
10 declaration.
11    THE SPECIAL MASTER: That's a different
12 issue, and we'll -- I'll have to deal with that
13 issue.
14    THE WITNESS: Okay.
15    THE SPECIAL MASTER: So your testimony
16 is the Court should simply overlook these statements
17 made in Garrett Bradley's declaration that are
18 clearly inaccurate and clearly misleading?
19    THE WITNESS: I'm not saying the Court
20 should overlook them. I'm saying they're not
21 sanctionable. There's a big difference. And in
22 many, many, many of the cases that you read -- and,
23 your Honor, I know you were a judge for a long time,
24 and I've checked your Rule 11 cases --

Page 60

1    THE SPECIAL MASTER: How many did you
2 find? I'm curious.
3    THE WITNESS: Not very many.
4    THE SPECIAL MASTER: I think you could
5 count on less than three fingers the number of times
6 that I actually imposed Rule 11 sanctions on the
7 Court. I honored the safe harbor provision post 93,
8 and I know exactly what it means.
9    THE WITNESS: Hm hm. I can't remember
10 what the question was.
11    THE SPECIAL MASTER: My question is are
12 you saying to Judge Wolf and to me that courts and
13 in my role here as a special master should simply
14 overlook the clearly inaccurate and misleading
15 statements made in Garrett Bradley's declaration?
16    MR. KELLY: Objection. Asked and
17 answered. Argumentative.
18    THE WITNESS: You know, I'm not saying
19 that you shouldn't think about it. And, again, the
20 Rule 11 jurisprudence I think is very, very clear.
21 Even in many, many cases, some of which I have cited
22 in my declaration, courts should be concerned about
23 ensuring that attorneys practice law in as
24 professional a manner as possible.

Page 61

1    But we all know or anybody who's been an
2 attorney -- and you were an attorney for many, many
3 years before you joined the bench -- mistakes get
4 made. People get called out for them. Getting
5 called out is very, very different from sanctioning
6 somebody when a mistake has been made.
7    Garrett Bradley made a mistake by not
8 taking a closer look at the template before he
9 submitted it to the Court. But that does not mean
10 that he violated Rule 11. There was no intent, no
11 motive to mislead the Court about anything in his
12 declaration.
13    THE SPECIAL MASTER: And you don't
14 accept that the motive to -- in Garrett Bradley's
15 words "to jack up the lodestar" --
16    MR. KELLY: Again objection.
17 Argumentative. Misstates the record.
18    THE WITNESS: I again --
19    THE SPECIAL MASTER: -- is a motive?
20    THE WITNESS: It's a motive -- to the
21 extent that it's a motive, it's a motive vis-à-vis
22 the other firms. The firms it looks to me -- and I
23 didn't read all the e-mails; I read the deposition
24 transcripts, but, you know, there were many, many

Page 62

1 references and quotes from many, many, many of the
2 e-mails, and it's just normal practice that there's
3 going to be a lot of back and forth among the
4 plaintiffs' attorneys that are working together in a
5 complex class action to talk about what's going to
6 happen with the fees at the end of the day.
7     And so since there was, it appeared to
8 me, an agreement that the costs were going to be
9 shared fairly evenly, it's not surprising to me that
10 Garrett Bradley would say, you know, we've got to
11 keep up our share of the -- we got to keep our share
12 of the bargain.
13     So, you know, it's -- he wanted to
14 ensure that his firm was pulling its weight in terms
15 of ensuring that his firm was appropriately
16 financing the prosecution of a very complex case
17 that resulted in what appears to be, and as Judge
18 Wolf found, a very good result for the plaintiff
19 class.
20     THE SPECIAL MASTER: Bill.
21     BY MR. SINNOTT:
22 Q.  Professor, getting back to page 9, and some
23 of what I'm going to ask you is going to follow up
24 on the special master's inquiry.  But at the bottom

Page 63

1 of paragraph 24 you talk about safe harbor.
2 A.  Hm hm.
3 Q.  In paragraph 25 in the third line you say:
4 "While there is no safe harbor for an attorney who
5 ceases relying on an offending paper after the Court
6 issues an order to show cause, here Garrett Bradley
7 took immediate action to investigate the issues
8 raised by the immediate inquiry prior to Judge
9 Wolf's February 6, 2017 order."
10     Now let me first ask you isn't it true
11 that 11(c)(2) in its safe harbor provision only
12 applies to motions brought by opposing counsel?
13 A.  Yes.
14 Q.  And it doesn't apply to a Court initiating
15 inquiry, correct?
16 A.  Correct.
17 Q.  And you don't dispute that?
18 A.  No.
19 Q.  So the safe harbor provision here is
20 irrelevant, is it not?
21 A.  I don't think it's irrelevant for a couple
22 of reasons.  There is no safe harbor.  There is no
23 technical safe harbor.  The advisory committee makes
24 that clear, too.  I think I quote that somewhere.

Page 64

1     But -- but a couple of things.  Number
2 one, the entire purpose of -- not the entire
3 purpose, but one of the key purposes of the 1993
4 amendments to Rule 11 were to give attorneys an
5 opportunity to correct or withdraw.  And so I think
6 that that idea infuses all of Rule 11, whether we're
7 talking about (c)(2) where you have sanctions come
8 up in an adversarial context or (c)(3) where you
9 have the Court raising the issue.
10     And so for the purposes of the double
11 counting, if you -- if you, you know, look at the
12 advisory committee note comment that I have down
13 there, the duplication issue was brought to the
14 attention of the Court before anything happened.  As
15 soon as the attorneys found out about it, they
16 corrected the double counting problem.
17 Q.  But --
18 A.  So, you know, sui sponte sanctions for the
19 duplication problem would be entirely inappropriate
20 in my view.
21 Q.  But is it fair to say that the concept of
22 safe harbor is not relevant to this inquiry?
23 A.  I would not agree with that.
24 Q.  Why do you say that?

Page 65

1 A.  Well, because of what -- well, first of all,
2 the advisory committee note makes clear that we're
3 talking about situations where sanctions might be
4 appropriate after a Court has issued a show cause
5 order.
6     But what I'm saying here with respect to
7 the duplication issue is because the offending paper
8 so-to-speak was already corrected by the November 10
9 letter to the Court, sanctions would be
10 inappropriate.
11     So I guess I would say that Rule
12 11(c)(2) is just -- is irrelevant to what we're
13 talking about right now.
14 Q.  But the concept of safe harbor as opposed to
15 mitigation of sanctions --
16 A.  Hm hm.
17 Q.  -- are two different things, correct?
18 A.  Um, yes.  However -- and Judge Rosen is out
19 of the room, but there's the Wellesley case --
20 Wesley case where he was sitting by designation in
21 the sixth circuit in which he addressed this issue,
22 and I don't have it cited here.  I found it later.
23 And where he talked about even when sui sponte
24 sanctions are being imposed you have to think about

Page 66

1   the spirit of the 1993 amendments.
2   Q.  But aside from the spirit of the 1993
3   amendments, I didn't see anything in your opinion
4   that acknowledged that the safe harbor provision
5   does not apply.
6   A.  I think -- I think I say that.
7   Q.  Could you point that out for me?
8   A.  The rule does not provide a safe harbor.
9   Q.  Could you point that out for me, please?
10  A.  That's at the bottom of page 9.  I cite the
11  advisory committee note there.
12  Q.  Yeah, but you do that in quoting the
13  advisory committee after you make the statement,
14  "While there is no safe harbor for an attorney who
15  ceases relying on an offending paper after the Court
16  issues an order to show cause, here Garrett Bradley
17  took immediate action to investigate the issues
18  raised by the media inquiry prior to Judge Wolf's
19  February 6, 2017 order."
20      Isn't a plain reading of that that
21  Garrett Bradley was entitled to the safe harbor
22  provision because he did take remedial actions?
23  A.  He wasn't entitled to the safe harbor
24  provision in Rule 11(c)(2), but he was entitled to

Page 67

1   the idea of safe harbor which is what the 1993
2   amendments were all about.
3       In other words, you know, the -- the
4   whole purpose of amendments -- the 1993 amendments
5   were to provide incentives for attorneys to correct
6   problems as soon as they found out about them.
7       And here they weren't put on notice by
8   an adversary because there was no adversary, and
9   they weren't put on notice by the Court.  They got
10  media inquiry.  They took a look at it, and they
11  fixed it within two days.
12  Q.  But you're not talking about the spirit of
13  the rule or the 1993 amendment.  In this particular
14  paragraph you're claiming that Garrett Bradley falls
15  under that safe harbor provision?
16  A.  I -- I --
17      MR. KELLY: Objection.
18  Q.  Correct?
19  A.  I put safe harbor in quotes both in
20  paragraph 24 where I'm talking about it in terms of
21  (c)(2) and also where I put it in paragraph 25.  The
22  safe harbor, those words do not appear in (c)(2) or
23  (c)(3).
24      The common knowledge of what (c)(2) is

Page 68

1   all about is it's providing a safe harbor.  So it's
2   typically used in that context because again another
3   one of the key problems with the 1983 version of
4   Rule 11 is that defense attorneys particularly in I
5   believe around 75 percent of the cases were using
6   Rule 11 as a fee-shifting device.
7       So after -- if an attorney actually
8   withdrew a paper, tried to correct a paper, the
9   defendants or the plaintiffs if the shoe were on the
10  other foot would say, voila, you violated Rule 11,
11  you withdrew it, you corrected it so you're
12  admitting you violated Rule 11.
13      So what the advisory committee is trying
14  to do is provide an opportunity and an incentive for
15  attorneys to fix things as soon as they learn that
16  there's something to be fixed.
17  Q.  But don't you think it's misleading to
18  present in the context of a discussion of the safe
19  harbor provision to talk about the timing of Garrett
20  Bradley's immediate action as you described it when
21  you appear to acknowledge now that the safe harbor
22  provision does not apply?
23  A.  Um, no, I -- for the reasons I've already
24  stated, I believe that all the attorneys, including

Page 69

1   Garrett, acted appropriately by -- I mean he's not
2   the only one.
3       I mean the attorneys from all the firms
4   were horrified when they found out that there had
5   been a double counting.
6   Q.  Well, your heading for this particular
7   section on page 8 is Garrett Bradley met his Rule 11
8   obligations because he took immediate action once
9   the duplication and template issues were brought to
10  his attention.
11      That's a safe harbor argument, isn't it?
12  A.  Yes, it is a safe harbor argument, but when
13  I say safe harbor argument here -- and, again, it's
14  in quotes because it's not in the rule anywhere;
15  and, as I've just explained, I believe that the
16  advisory committee was most concerned about the
17  abusive use of Rule 11 motion practice where parties
18  are targeting somebody for Rule 11 sanctions to --
19  and this created a lot of satellite litigation and
20  an inappropriate use of the rule as a fee-shifting
21  device.
22  Q.  I understand your reference to the spirit of
23  the advisory committee in 1993, but would you agree
24  with me that the case law unequivocally states that

1 the 11(c)(2) safe harbor provision only applies to
2 motion brought by opposing counsel and that it does
3 not apply to Court-initiated inquiry such as we have
4 in this case?
5 A.  It does not expressly apply as I indicate on
6 -- in paragraph 25, correct.
7 Q.  I'm sorry, I just -- perhaps I'm missing it,
8 but I don't see how you've alerted the special
9 master to it not applying by quoting from the
10 advisory committee the words the rule does not
11 provide a safe harbor to a litigant for withdrawing
12 a claim defense, etcetera, after a show cause order
13 has been issued on the Court's own initiative.
14     That's not what we're talking about
15 here, is it?
16 A.  Yes, I think with respect to the duplication
17 issue, that is exactly what we're talking about.
18 Q.  Yes, but you're claiming that the safe
19 harbor applies?
20 A.  Well, it's even -- what they did was in a
21 sense even better than what Rule 11(c)(2) provides
22 in the adversarial context because nobody that they
23 were concerned with in the litigation pointed out
24 the problem.

1     So they weren't on notice by an
2 adversary.  They weren't on notice by the Court.  A
3 problem was called to their attention for whatever
4 reason, and they immediately went into action -- all
5 the attorneys -- found that there was a problem and
6 immediately notified the Court.
7 Q.  All right.  So this --
8 A.  And since that was a four-million-dollar
9 error, you know, they had to do that.  That was a
10 big number, even though, you know, I don't want to
11 get into the lodestar multipliers and all of that.
12 It appears to be a big number, but it's a big number
13 because the settlement was a large number.
14     But that was -- that was again the
15 critical aspect of all the fee declarations was
16 ensuring that Judge Wolf had the information he
17 needed to see how many hours were worked, what were
18 the rates and multiplying it out.
19 Q.  So if the safe harbor spirit is the
20 standard, does that also apply to the other
21 statements that Judge Rosen asked you about in
22 Garrett Bradley's declaration?
23 A.  I think the spirit applies, the atmospherics
24 and all that, but the spirit as was used in the

1 opinion I referenced earlier.
2     But I think that there are additional
3 reasons why the statements that we discussed earlier
4 -- what I call the template issues in my
5 declaration -- even if you do not accept the
6 argument that I was making on page 9 which has less
7 force in the context of the template issues, the
8 cases that I've cited in the latter part of my
9 declaration make clear that what we would be looking
10 for is serious misconduct, deliberate falsehoods,
11 intents to deceive the Court, and I just do not in
12 my opinion see that here in any manner, shape or
13 form.
14 Q.  Well, I'm not going to revisit the
15 discussion that Judge Rosen had with you on that,
16 but let me ask you this question:  With respect to
17 those items in the declaration putting aside the
18 duplication, what immediate action was taken by
19 Garrett Bradley to remedy those false statements?
20     MR. KELLY:  Which ones?  Objection.
21 Specification.
22 Q.  The other statements that were discussed in
23 the context of the declaration.  For example -- if
24 you'd like me to --

1 A.  The six identified by Professor Gillers?
2 Q.  Yes, professor.
3 A.  Excuse me.  Could you repeat the question?
4 Q.  Sure.  What immediate action was taken to
5 remedy those false statements?
6 A.  The Garrett Bradley acknowledged the
7 mistakes at the March 7 hearing and apologized.
8 Q.  Why didn't he acknowledge those at the time
9 that The Globe story was addressed?
10     MR. KELLY:  Objection.
11 Q.  Or the potential Globe story was addressed?
12     MR. KELLY:  Objection.  Asked and
13 answered.
14 A.  Like I said before, he could have, but it's
15 not sanctionable that he didn't.
16 Q.  Yes, but you're claiming that his actions in
17 the duplication of effort somehow mitigated his
18 conduct with respect to sanctions, correct?
19 A.  No, that's -- well, with respect to the
20 duplication issue.
21 Q.  Yes.
22 A.  But that does not cure -- I will say that
23 what he did vis-à-vis the duplication issue does not
24 have anything to do with the template issues.  Does

Page 74

1 that answer your question?
2 Q.  No.
3 A.  Okay.  So I'm not sure what you're getting
4 at.
5 Q.  My question is -- well, first of all, let me
6 just ask you what effect with respect to the
7 duplication issues did the November 10th letter to
8 Judge Wolf have?
9 A.  What effect did it have?
10 Q.  Yes.
11 A.  It prompted the Court to issue an order --
12 it seems it prompted the Court to issue an order in
13 February -- February 6 I believe it was --
14 Q.  No, I mean with respect to Garrett Bradley's
15 Rule 11 exposure.
16 A.  That letter in my opinion -- yes, that
17 letter in my opinion cured whatever violation --
18 whatever violation -- because I would dispute that,
19 um, he committed a violation by putting the names of
20 the attorneys that he did in his fee declaration and
21 the hours they worked and the rates at which they
22 were set forth to the Court.
23     So I would say that there was no Rule 11
24 violation; but to the extent that there is a

Page 75

1 violation, to the extent the Court were to find that
2 Thornton was somehow culpable in terms of the
3 duplication issue, any Rule 11 liability that may
4 have arisen as a result of that was mitigated and
5 eliminated by the November 10 letter.
6 Q.  What about these other false statements in
7 the declaration that were not addressed in the
8 November 10th letter?
9     MR. KELLY:  Objection.  Asked and
10 answered.
11 A.  You know, again, I don't see them -- I see
12 them as things that were regrettably not corrected
13 at that time; that regrettably, as Garrett Bradley
14 conceded, not corrected at the time he signed it,
15 but they -- those statements in my opinion are not
16 of the sort of misstatements that rise to the level
17 of a Rule 11 violation.
18     So I'm not talking about safe harbors
19 here at all because he didn't talk about these
20 issues until the March 7 hearing.  So I acknowledge
21 that any kind of safe harbor argument that I make --
22 I might make is of less force when we're talking
23 about the template issues.
24     But when you look at the context of

Page 76

1 these statements, the purpose of the fee
2 declarations, it's my opinion that these are not the
3 sorts of misstatements that are sanctionable.
4     I do not see from the record any intent
5 to mislead.  As I discussed earlier with Judge
6 Rosen, yes, he knew that those people were not staff
7 attorneys -- that those staff attorneys were not
8 employees of his firm, but I would argue that the
9 case law does not support the imposition of
10 sanctions here because they were not material
11 so-to-speak to the inquiry that the Court was
12 making.
13     I am not at all -- and I think these
14 cases make clear, and in many of the cases that I
15 cite in my declaration when the courts of appeals
16 including those in the first circuit reverse an
17 imposition of sanctions, they go out of their way to
18 say that this was a good judge; this judge is doing
19 a good job; I know this judge to be very, very
20 responsible, but the misstatements in these cases do
21 not rise to the level of a Rule 11 violation because
22 in the larger scheme they lack the sort of
23 materiality that should give rise to a Rule 11
24 violation, a finding of a Rule 11 violation.

Page 77

1     We're talking about situations where --
2 I mean Rule 11 is serious.  And Rule 11 findings are
3 very important to lawyers being sanctioned and the
4 law firms in which they work.
5     Therefore, the case law in my opinion is
6 quite clear that lawyers ought not be sanctioned
7 unless a level of seriousness is found.  And in my
8 opinion I don't see it here at all.
9     THE SPECIAL MASTER:  All right.  Let me
10 ask you a question.
11     Is it your position that there should be
12 no sanctions whatsoever --
13     THE WITNESS:  Yes, your Honor, no
14 sanctions --
15     THE SPECIAL MASTER:  -- addressed to
16 Garrett Bradley for his inaccurate statements made
17 to the Court?
18     THE WITNESS:  I do not believe sanctions
19 should be imposed for the template-type issues.  I
20 don't think that in any case for any attorney who
21 makes that sort of a misstatement should be
22 sanctioned.  Not Garrett Bradley.  Not the attorneys
23 from any of the other firms who used the template
24 where there may be some inaccuracies in the overall

Page 78

1  scheme of things.  Not lawyers in other cases.
2     This is not the type of misstatement
3  that should give rise to Rule 11 sanctions.  So I
4  would say no finding of Rule 11.  No Rule 11
5  violation here.
6     BY MR. SINNOTT:
7  Q.  Let me just talk about the facts as you
8  understand them, professor.  At some point --
9     MR. KELLY: You want to take a break --
10    THE WITNESS: No, I'm good.
11 Q.  At some point prior to the letter being sent
12 to Judge Wolf, Garrett Bradley learns that there's a
13 media inquiry involving the fee petitions in this
14 case.
15 A.  Hm hm.
16 Q.  And would you agree with me that prompted by
17 that Garrett Bradley and the other attorneys in the
18 firms of -- in his firm, in Labaton and in Lieff
19 Cabraser go back, and they look at all the fee
20 petitions, correct?
21 A.  I assume they did, but I also -- it appears
22 from the record as I read it that the issue that
23 they were keying in on was the duplication issue.
24 Q.  Well, aside from the issue that they were

Page 79

1  keying on, it's fair to state that Garrett Bradley
2  read through his fee petition --
3  A.  Hm hm.
4     MR. KELLY: Objection.
5  Q.  -- again?
6     MR. KELLY: Not a fair statement.
7  Q.  Correct?
8  A.  I don't know that he stated in his
9  deposition whether he read it or not.  I don't know
10 -- I mean I don't know what any of the attorneys
11 were doing.
12    I mean it seems to me from the various
13 statements about how Garrett Bradley looked when he
14 -- I believe he went down to Evan Hoffman's, and
15 Evan Hoffman described him as looking like a ghost
16 because of his horror over the duplication issue.
17    So I mean I think that the attorneys
18 were quite properly very concerned about the
19 duplication issue because it did have an impact on
20 the amount that they had reported to the Court in
21 terms of the lodestar.
22    THE SPECIAL MASTER: Is it your
23 testimony that the statements made by Garrett
24 Bradley in his declaration was not any part of the

Page 80

1  duplication issue?
2     THE WITNESS: Um, I would say that
3  because -- I would say that any of the six
4  misstatements that Professor Gillers discusses at
5  the end of his report have no bearing on the numbers
6  that were reported by the Thornton firm.  Because --
7     THE SPECIAL MASTER: No bearing on the
8  double counting at all?
9     THE WITNESS: I don't see where it does.
10    I mean I see that the Thornton Law Firm
11 took the same approach to reporting the numbers in
12 terms of billing rates, in terms of counting up the
13 hours as the other law firms.
14    THE SPECIAL MASTER: Which raises this
15 question:  Are you aware that in most -- not all --
16 but in most instances the amounts charged on the
17 Thornton lodestar -- charged I use colloquially --
18    THE WITNESS: Hm hm.
19    THE SPECIAL MASTER: -- for those staff
20 attorneys was more than the amounts charged by
21 either the Lieff firm or the Labaton firm on their
22 own petitions?
23    THE WITNESS: Yes, I'm aware of that.
24 Four twenty-five as opposed to I think 400.  I

Page 81

1  don't --
2     THE SPECIAL MASTER: Does that play into
3  motive at all to increasing the lodestar?
4     THE WITNESS: I don't -- I don't see
5  that there was a -- I mean this is really more
6  Professor Rubenstein's bailiwick, but I know that
7  the Thornton firm was involved in the BNY Mellon
8  case and that Judge Kaplan had approved a rate of
9  425.
10    So that's -- I know from the testimony
11 that I read -- I don't know whether it was in
12 transcripts of hearings or deposition; I can't
13 remember, but it's been testified to that the rate
14 that was approved by Judge Kaplan in BNY Mellon was
15 425, and that's the number that they were relying on
16 in terms of the amounts they were going to charge
17 the staff attorneys because that was the number for
18 the staff attorneys in the other case.
19    THE SPECIAL MASTER: That's a good segue
20 into my next couple questions.
21    Did you see the e-mails between Garrett
22 Bradley and Dan Chiplock in which Garrett Bradley
23 expresses concern that he believed that the lodestar
24 in BNY Mellon vis-a-vis the Lieff firm was not

Page 82

1  sufficient?
2      **THE WITNESS:** I don't understand your
3  question.
4      **THE SPECIAL MASTER:** Were you made aware
5  of the e-mails between Garrett Bradley and Dan --
6  Dan Chiplock is a lawyer at the Lieff firm.
7      **THE WITNESS:** Hm hm.
8      **THE SPECIAL MASTER:** Were you made aware
9  of those e-mails in which Garrett Bradley is
10  expressing concern that the lodestar -- the Thornton
11  lodestar in the BNY Mellon case was inadequate; that
12  it was -- vis-a-vis the lodestar that Lieff
13  submitted, that it was inadequate in that case and
14  that there is considerable discussion between Dan
15  Chiplock and Garrett Bradley about the
16  interrelationship of the BNY Mellon case and the
17  State Street case?
18      **MR. HEIMANN:** Objection. This goes
19  back, your Honor, to my view that if you're going to
20  use e-mails and question the witness about e-mails,
21  she ought to be able to see them rather than rely on
22  your characterization.
23      **THE SPECIAL MASTER:** All right. Are you
24  aware of those e-mails?

Page 83

1      **THE WITNESS:** I know that I have read
2  those --
3      **THE SPECIAL MASTER:** We can get them for
4  you.
5      **THE WITNESS:** I haven't read the
6  e-mails. Again, I didn't read e-mails. I read
7  excerpts of e-mails that were presented in
8  deposition testimony and transcripts -- hearing
9  transcripts.
10      **THE SPECIAL MASTER:** Okay.
11      **BY MR. SINNOTT:**
12  Q.  Professor, let me go to the March 7, 2017
13  hearing before Judge Wolf. And I know you've
14  testified that you've read this in its entirety.
15      **MR. KELLY:** Do you have an extra copy of
16  that, Bill?
17      **MR. SINNOTT:** Yes, we do. In fact, let
18  me mark one as an exhibit.
19      (Exhibit 3 marked
20      for identification.)
21      **BY MR. SINNOTT:**
22  Q.  Professor, if you would go to page 86.
23  Looking at line 25 at the bottom of the page --
24  **A.  Hm hm.**

Page 84

1  Q.  -- after -- and that follows I note after
2  three paragraphs containing statements by
3  Mr. Sucharow -- Attorney Sucharow, but the Court
4  says on line 25: Let me ask Garrett Bradley -- and
5  maybe it can be a little shorter -- essentially the
6  same question. Unless you're concerned that I'll
7  listen to Mr. Kelly, but the docket number 104-16 is
8  the same language. It's the hourly rates for the
9  attorneys and professionals, support staff in my
10  firm included in Exhibit A are the same as my firm's
11  regular rates charged for their services which have
12  been accepted in other complex class actions.
13      And then it showed the so-called special
14  attorneys' fee charged at $425 an hour. And Judge
15  Wolf asked were those attorneys employed by
16  Thornton.
17      And Garrett Bradley replies, "They were
18  not, your Honor. The affidavit that was sent by
19  lead counsel was an affidavit requested to be used
20  by our firm and other firms."
21      And there's some further back and forth
22  with Judge Wolf on that, but let me direct your
23  attention to page 88. And beginning on line 14,
24  Mr. Bradley continues a response to a question from

Page 85

1  Judge Wolf with the words: "The staff attorneys
2  that were listed on there -- that under paragraph 4
3  in my affidavit where it states that we paid them is
4  a mistake, your Honor. Those individuals were
5  actually housed at Labaton Sucharow or Lieff
6  Cabraser. We had not used those before. That
7  paragraph, quite frankly, should have been clarified
8  by me at that time. It was not. But those
9  individuals -- those types of individuals have been
10  billed out at those rates before but not by my
11  firm."
12      So is it fair to say that Attorney
13  Garrett Bradley's acknowledgement of the mistakes as
14  he described them in his fee petition, that
15  acknowledgement was made in response to questioning
16  from Judge Wolf, correct?
17  **A.  Correct.**
18  Q.  And it's fair to say that Garrett Bradley
19  did not acknowledge those mistakes, if you will, in
20  the November 10th letter to Judge Wolf, correct?
21  **A.  Correct.**
22  Q.  And that Garrett Bradley did not at anytime
23  between November 10th and the March 7, 2017 hearing
24  bring those mistakes to Judge Wolf's attention,

Page 86

1  correct?
2  A.   Correct.
3  Q.   So it's also fair to say that Garrett
4  Bradley took no immediate action with respect to
5  alerting the Court as to those mistakes, correct?
6      MR. KELLY: Objection to the term
7  "immediate."
8  Q.   Correct?
9  A.   Um, immediately upon becoming aware of the
10  mistake by the Court, um, and by then I have no idea
11  whether Garrett Bradley had focused on that, there's
12  nothing in the record about that because I assume
13  that between the time that the November 10 letter
14  was put in and the February 8 order by Judge Wolf to
15  appear at the March 7 hearing, I mean I don't -- I
16  don't know what Garrett Bradley was doing in
17  between, but I can see here, and have read before,
18  that when the Court was discussing these issues, he
19  owned up to the mistake at that point in time.
20      And, you know, again, as we've discussed
21  previously, Garrett had the opportunity to clean up
22  the language, but the question is whether failing to
23  clean up the language violates Rule 11, and I remain
24  totally convinced, and it's my opinion, that the law

Page 87

1  did not require him to do that at that time; or, to
2  put it probably more accurately, he should not be
3  sanctioned for having failed to do it.
4  Q.   Well, wouldn't it be reasonable for an
5  observer to conclude that in the absence of the
6  specific questioning by Judge Wolf on March 7th,
7  Attorney Bradley would not have acknowledged those
8  mistakes?
9      MR. KELLY: Objection. Argumentative.
10  A.   I really don't know. I mean I don't know
11  whether something similar to what happened earlier
12  on would have caused him to go back.
13      But, again, it's my opinion that a
14  failure to focus on that language which is
15  inaccurate and therefore regrettable is not the sort
16  of thing that a lawyer reasonably would have been
17  expected to focus on at anytime before Garrett was
18  asked about it.
19  Q.   All right.
20      MR. SINNOTT: Can I suggest a break at
21  this time? Is this a good time for everyone?
22      MR. HEIMANN: Sure.
23      THE SPECIAL MASTER: Fifteen minutes.
24      MR. SINNOTT: Fifteen minutes.

Page 88

1      (A recess was taken.)
2      CONTINUED EXAMINATION BY MR. SINNOTT:
3  Q.   We're back from the break. It's 11:46.
4      Professor, I'm looking at paragraph 26.
5  A.   My declaration?
6  Q.   In your declaration, yes.
7  A.   Hm hm?
8  Q.   And you make the statement that only serious
9  misconduct may be the basis for sui sponte
10  imposition of sanctions, relying on Young.
11      And let me ask you what's the standard
12  for serious misconduct? How do you define that?
13  A.   I think the best way to think about it is --
14  you know, is the conduct objectively reasonable
15  under the circumstances. The case law is a little
16  bit confusing, but I think ultimately the standard
17  is is -- the attorney's conduct needs to be judged
18  under the standard was the attorney's conduct
19  objectively reasonable.
20  Q.   Would you agree with me that a violation of
21  Rule 11 does not require bad faith?
22  A.   It does not require subjective bad faith
23  except in the second circuit.
24  Q.   And would you agree that in the first

Page 89

1  circuit at least a violation can be caused by
2  inexperience, incompetence, willfulness or a
3  deliberate choice?
4  A.   Um, you know, I don't know that I want to go
5  with every word that you just used. You know,
6  incompetence by itself may or may not give rise to
7  Rule 11 sanctions. It depends on the paper that
8  came out of the incompetence and how -- various
9  types of things we've already talked about in terms
10  of materiality.
11      The same thing with experience. The
12  same -- I mean willful is -- you know, willful
13  meaning willful. I mean really a knowing intent to
14  mislead the Court, of course.
15      And what was the fourth -- the third
16  actually I think in your list?
17  Q.   The third was -- after incompetence was
18  willfulness or deliberate choice.
19  A.   Deliberate choice? You know, again, it
20  depends on, you know, what does deliberate mean.
21  You know, what were the circumstances around the
22  making of the choice.
23      So I don't think it's in my mind helpful
24  in a Rule 11 analysis to just focus on words like

Page 90

1  that. You have to really in every case take a look
2  at the circumstances and determine whether that
3  attorney behaved reasonably -- objectively
4  reasonably.
5  Q. Well, those are the first circuit's words in
6  Cruz versus Savage --
7  A. Hm hm.
8  Q. -- 896 F2d 626 at 631.
9      In paragraph 27 you write that Garrett
10 Bradley did not violate Rule 11 because he informed
11 the Court that a mistake had been made two days
12 after being alerted to the duplication problem.
13 A. Hm hm.
14 Q. And, once again, I ask you that letter made
15 no reference to the other falsities in the petition,
16 did it?
17 A. No, it didn't. And, of course, this
18 paragraph is in the duplication part of my
19 declaration.
20 Q. All right. And let me point you to
21 paragraph 31. And in that paragraph you say for the
22 same reasons discussed in paragraphs 24 and 25, even
23 if Garrett Bradley failed to conduct a reasonable
24 inquiry, he did not violate Rule 11 because he

Page 91

1  acknowledged at the March 7, 2017 hearing that there
2  were inaccurate statements in his declaration with
3  respect to the nature of the staff attorneys, his
4  firm's billing practices and the other statements
5  when he became aware of them.
6      Now, once again, you'd agree that his
7  acknowledgement was prompted by Judge Wolf's
8  questioning, correct?
9  A. It appears from the record that that's the
10 first time he focused on these issues as being
11 problematic.
12 Q. And he indicated that they were a mistake,
13 correct?
14 A. Yes.
15 Q. And with respect to conducting a reasonable
16 inquiry, is it fair to say that there's a violation
17 of Rule 11 when an attorney fails to make a
18 reasonable pre-filing inquiry into the factual or
19 legal basis of pleadings submitted to the Court?
20 A. That's --
21 Q. Is that a fair statement?
22 A. That's the language of the rule.
23 Q. Yep. But you say that his acknowledgement
24 at the March 7th hearing that there were inaccurate

Page 92

1  statements in his declaration with respect to the
2  nature of the staff attorneys, his firm's billing
3  practices and other statements when he became aware
4  of them somehow absolves him of that violation? Is
5  that your testimony?
6  A. Um, it is because with respect to the
7  template issues, I think it's obvious that he
8  conceded that he had not really focused on that
9  language, but the question then is whether it was
10 reasonable under the circumstances for him to have
11 relied on the Labaton template, the extent to which
12 he should have relied on it, the purpose of the
13 document, the nature of the inaccuracies.
14     So what I would say is, yes, I mean the
15 -- when Rule 11 was amended in 1983, it was clearly
16 designed to try to impose expressly duties on
17 lawyers. And so both in the 83 and the 93 versions
18 of the rule we have this language about what an
19 attorney is supposed to do before they file a paper.
20 But the courts have recognized that, you know, you
21 have to judge the paper; you have to judge the
22 reasonableness of the inquiry in the context of all
23 the circumstances.
24     And so even if we say that he did not

Page 93

1  read the document carefully when it was presented to
2  Nicole Zeiss for the purposes of the fee hearing,
3  and even if back in November 8, November 9 when the
4  November 10 letter was being drafted he did not read
5  and focus on those particular aspects of the
6  declaration, the bottom line is to look at what came
7  out of that.
8      And in looking at what came out of that,
9  there were mistakes, inaccuracies that he fessed up
10 to when they were presented to him at the March 7
11 hearing. And, you know, in my opinion as I say
12 later in the declaration, the misstatements were not
13 the sort of misstatements that should give rise to a
14 Rule 11 liability.
15     To put it another way, I guess, yes,
16 Rule 11 says you're supposed to do a reasonable
17 inquiry but not all failures, you know, in terms of
18 a perfect world of doing a reasonable inquiry should
19 result in sanctions. And in this case I do not
20 believe that these are the types of inaccuracies
21 that should lead to Rule 11 sanctions.
22 Q. So you're acknowledging that there was not a
23 reasonable inquiry?
24 A. I'm saying that -- well, I'm not really

Page 94

1 saying that there's not a reasonable inquiry. I'm
2 assuming that there wasn't.
3 I also would say that under the
4 circumstances where this is a law firm working with
5 a very experienced law firm in terms of putting
6 together fee petitions, that it was not unreasonable
7 at the very least for him to rely on the language in
8 that template when again back to what we talked
9 about before the break the essential purpose of this
10 document was to document the hours worked and the
11 rates.
12 Q. And that's a significant issue, isn't it?
13 A. The hours worked and the rates?
14 Q. Yes.
15 A. Yes, that's significant because that goes to
16 the lodestar.
17 Q. What's the stop and think provision?
18 A. Well, that goes into the reasonable inquiry.
19 And, again, that language is not in the rule, but
20 the idea is, you know, stop and think before you do
21 something.
22 The courts have recognized that
23 sometimes there is -- there are time pressures.
24 There are other circumstances in the hurly-burly of

Page 95

1 practice that make it excusable so-to-speak that an
2 attorney hasn't stopped for long enough or thought
3 long enough.
4 Q. But in this particular case that was not an
5 issue, was it?
6 MR. KELLY: Objection.
7 A. I don't know what you mean by that's not an
8 issue.
9 Q. That the attorney didn't have the time to --
10 A. I don't know that I buy into that because I
11 recall towards the end of the preliminary approval
12 hearing -- I can't remember the date; was that
13 August? -- I can't remember -- Judge Wolf was
14 sensitive to the time it might take for the
15 attorneys to put together all of the settlement
16 documents in order to have enough time to prepare
17 notices to the class and that sort of thing.
18 So there's always time pressures in big
19 complex cases.
20 Q. Have you read the deposition of Evan Hoffman
21 of the Thornton Law Firm on June 5, 2017?
22 A. I did read that, yes.
23 Q. Okay.
24 A. I believe that was the one I read. Say the

Page 96

1 date again? June?
2 Q. June 5, 2017.
3 A. Yes.
4 MR. KELLY: Sorry. Do you have an extra
5 copy of whatever you're reading?
6 MR. SINNOTT: Yeah, let me go ahead and
7 introduce this as an exhibit, Paulette.
8 (Exhibit 4 marked
9 for identification.)
10 BY MR. SINNOTT:
11 Q. So, professor, looking at Exhibit 4, if I
12 could direct your attention to page 93.
13 A. Okay.
14 Q. And specifically to line 9 where I indicate
15 to Mr. Hoffman -- Attorney Hoffman let's move into
16 the fee declaration. "Could you describe what your
17 role was in that process?"
18 And Mr. Hoffman responds: "So we
19 received from Labaton, from a partner there named
20 Nicole Zeiss, a sort of model fee declaration that
21 was sent around in advance of submitting the total
22 fee declaration and had a bunch of text in it, and
23 it was like those fill-in-the-blank -- whatever that
24 game was, but it was sort of put your information

Page 97

1 here."
2 And Judge Rosen helpfully offers "not
3 Hangman?"
4 A. Haven't played that in a long time.
5 Q. Attorney Hoffman responds: "Not Hangman,
6 no."
7 And it continues put your information
8 here. "So there was a section on fill in what your
9 hours are, fill in what your expenses are, fill in
10 what your lodestar is, fill in what your specific
11 contributions were to the case. And the rest of the
12 language was sort of -- it was called a model fee
13 declaration. And so that's what we did. He put in
14 all of the hours that we had kept track of. I,
15 along with our accounting department and Anastasia,
16 put in the expenses, and then mostly Mike Lesser and
17 then Garrett Bradley, Mike Thornton and myself all
18 reviewed the sort of narrative about the firm's
19 contribution which I believe mostly Mike Lesser
20 drafted. And then it was sent back to Labaton for
21 their review and maybe an edit or two, and that was
22 the last we saw of it until it was submitted on ECF
23 a final when it was actually given to the judge."
24 Did I accurately read that, professor?

Page 98

1  A.  Yes, sir.
2  Q.  Is it fair to say that Attorney Hoffman
3  described a ostensibly thoughtful process with
4  respect to the completion of that fee petition?
5  A.  In the context of the purpose of the fee
6  petition, yes.
7  Q.  All right.  Thank you.
8      So would it appear that this was not a
9  process that was rushed based on that passage that I
10  just read?
11  A.  Um, well, I don't know how much time it took
12  them at the time to gather all the numerical
13  information.  I don't have any ideas.  There's
14  nothing in the record about that.
15  Q.  Does it appear that it was a process that
16  involved review and efforts by multiple attorneys at
17  the Thornton Law Firm?
18  A.  I'm not sure I understand the question.
19  Q.  Sure.
20  A.  Well, I mean on its face different attorneys
21  basically took charge of filling in the blanks on
22  the different critical aspects of the fee petition.
23  Q.  But they did more than that, didn't they,
24  based on that passage?  Specifically --

Page 99

1  A.  Well, Mike Lesser, I guess Garrett Bradley
2  and Mike Thornton reviewed the narrative -- prepared
3  and reviewed the narrative which was important to
4  convey to the Court what kinds of things the law
5  firm did that contributed to the effort, and then
6  the lodestar numbers.
7  Q.  Sure.  So you'd agree with me that three or
8  more attorneys from the firm reviewed the fee
9  petition, correct?
10  A.  That's what it says.
11  Q.  And then they sent it back to Labaton for
12  review, correct?
13  A.  That's what it says.
14  Q.  So is it fair to say that at least with
15  respect to the testimony of Attorney Hoffman, this
16  appears to have been a thoughtful and deliberate
17  process by the Thornton Law Firm?
18      MR. KELLY:  Objection.
19  A.  I mean I -- I -- I note that -- and I don't
20  know whether I noted this at the time I originally
21  read it -- but on line 25 on page 93 Evan Hoffman
22  begins by put your information here.  "There was a
23  section fill in what your hours, fill in what your
24  expenses are, fill in what your lodestar is, fill in

Page 100

1  what your specific contributions were to the case,
2  and the rest of the language was sort of it was
3  called a model fee declaration."
4      So, again, as I was saying before, you
5  know, what the attorneys were focusing on were the
6  parts that needed to be filled in.  Apparently, they
7  did not focus on the rest of the language that was
8  sort of a model fee declaration.
9  Q.  All right.
10      THE SPECIAL MASTER:  Was there anything
11  that prevented Garrett Bradley in his own
12  declaration from reading it?
13      THE WITNESS:  Um, no, sir.  No, your
14  Honor, there was nothing.  But again --
15      THE SPECIAL MASTER:  I'm confused about
16  what you mean by focused on it.  When you're signing
17  a statement under oath to a Court, shouldn't you
18  focus on the entire declaration and the language
19  used in it?
20      THE WITNESS:  I think in the context,
21  your Honor, what they had to focus on were the
22  things in this template that they had to fill in
23  because those were the salient parts that needed to
24  be presented to Judge Wolf so that he could do the

Page 101

1  lodestar check.
2      THE SPECIAL MASTER:  So the declarations
3  about the staff attorneys being employed by the
4  firm, the rates being the current rates charged by
5  the firm and the rest of the issues called out by
6  Professor Gillers were not salient?
7      THE WITNESS:  In my judgment I do not
8  view them as the sort -- they're important.
9  Everything's important.  Everything should be
10  perfect.  But it not always is.
11      And, therefore, those aspects of the
12  declaration I do not see as violative of Rule 11.
13  Had they misrepresented the hours, that would have
14  been problematic, and there were problems with the
15  hours.  We had the duplication problem.  But as soon
16  as they figured that out, they tried to correct it.
17      THE SPECIAL MASTER:  So the only
18  obligation under Rule 11 to correct was the
19  duplication?
20      THE WITNESS:  Um, I mean I think Judge
21  Wolf would have wanted to know about the
22  four-million-dollar difference.  So, yes, the
23  attorneys better let the judge know about that.
24      THE SPECIAL MASTER:  Do you think Judge

Page 102

1  Wolf had any interest in how the double counting and
2  the four-million-dollar difference occurred?
3      THE WITNESS: I believe that was
4  explored at the March 7 hearing.
5      THE SPECIAL MASTER: But not in the
6  letter.
7      THE WITNESS: Not in the letter because
8  -- and I have no idea.  I don't think there's
9  anything in the record -- there may be, but I don't
10  recall anything in the record that as the attorneys
11  were working November 8, November 9 to prepare the
12  November 10 letter, I don't recall seeing anything
13  in the record that's suggesting -- sorry, I just
14  lost my train of thought.
15      Could you please repeat the question,
16  and maybe I can get back on track?
17      THE SPECIAL MASTER: The court reporter,
18  please.
19      (Reporter read back.)
20      THE WITNESS: So that reflected that the
21  attorneys at that time understood how the mistake
22  had been made.  I didn't see anything to that.  And
23  then again if -- if they had focused on that, then I
24  think a followup question would be shouldn't they

Page 103

1  have put that in there, and I think my answer would
2  be the same.  Um, you know, maybe a good idea.
3      A plus advocacy it would be a good idea,
4  but the main purpose of the November 10 letter was
5  to inform the Court that a four-million-dollar
6  mistake had been made.
7      THE SPECIAL MASTER: And not how or why
8  it was made?
9      THE WITNESS: You know, I think that it
10  triggered the February 6 order so that we had the
11  March 7 hearing so that we could have a discussion
12  about how the mistake was made, why the mistake was
13  made.
14      THE SPECIAL MASTER: So the March 7th
15  hearing was to have a discussion?
16      THE WITNESS: Well, exploration.  I mean
17  Judge Wolf said in the February 8 -- sorry --
18  February 6 order that he intended to appoint a
19  special master, and that would be you, to
20  investigate all of the issues that arose out of the
21  fee petition.
22      BY MR. SINNOTT:
23  Q.  Let me direct your attention, professor, to
24  paragraphs 33 and 34.

Page 104

1      First looking at paragraph 33, you
2  write: "Although counsel should engage in their own
3  Rule 11 investigation rather than relying on the
4  work of co-counsel, it is reasonable under some
5  circumstances for them to do so."
6      And you cite the Unioil case versus --
7  Unioil Incorporated versus E.F. Hutton & Company a
8  ninth circuit case from 1986.
9  A.  Hm hm.
10  Q.  But having read Unioil, will you agree with
11  me that in that case the ninth circuit also said
12  that even if an attorney relies on another attorney,
13  the attorney must, quote, acquire knowledge of facts
14  sufficient to enable him to certify?
15      Is that an accurate statement based on
16  your familiarity with the Unioil case?
17  A.  I don't, you know, have that specific
18  language before me, but, you know, assuming that
19  that's exactly what the ninth circuit said, fine.
20  Q.  Do you also recall the ninth circuit saying
21  that an attorney cannot simply delegate to
22  forwarding co-counsel his duty of reasonable
23  inquiry?
24  A.  Um, I don't -- I don't have -- I can't have

Page 105

1  a quibble with that.
2  Q.  At the bottom of the paragraph you say,
3  "Given the complexity of the State Street litigation
4  and the time pressures associated with preparing for
5  the settlement hearings, it was appropriate for the
6  Thornton Law Firm attorneys to use the Labaton
7  template as the basis for its lodestar analysis."
8      And then in 34 you go on to say,
9  "Moreover, for the reasons explained above, it was
10  reasonable for counsel in a complex class
11  action..." --
12      MR. SINNOTT: Excuse me, Paulette.
13  Q.  -- "...it was reasonable for counsel in a
14  complex class action such as the State Street
15  litigation to rely on the template that was provided
16  to them by Labaton which was lead counsel in the
17  State Street litigation and especially experienced
18  in submitting fee application in complex class
19  action litigation."
20      Now you'd agree with me that Garrett
21  Bradley, the certifier, had an obligation to at
22  least read the document, correct?
23  A.  Um, yes, but then -- then the question is
24  whether his failure to focus on certain aspects of

Page 106

1  the document give rise to a Rule 11 violation. So,
2  yes, of course.
3  Q.  You're not in any way trying to shift the
4  blame to the Labaton firm, are you?
5  A.  No.  I'm not trying to shift the blame.  I'm
6  just saying that it was reasonable for the Thornton
7  firm as they were preparing for the deposition --
8  and I think that looking at Evan Hoffman's
9  statements that I looked at, yeah, already is very,
10 very important because they were relying on the
11 boilerplate.
12    They were looking to do what Labaton,
13 the experienced firm, said needed to be done for the
14 purposes of the lodestar analysis, and that's
15 filling in the hours, filling in the expenses,
16 filling in the lodestar and filling in the specific
17 contributions.
18    So that's what was important.
19    THE SPECIAL MASTER: None of which were
20 part of the declarations that I read to you earlier,
21 correct?
22    THE WITNESS: Um, I'm sorry, I don't
23 know which declarations --
24    THE SPECIAL MASTER: Those blanks that

Page 107

1  you just recited -- you can go through them again --
2    THE WITNESS: Okay.
3    THE SPECIAL MASTER: -- none of those
4  were part of the declarations I read to you earlier
5  in paragraphs 3 and 4 of Garrett Bradley's
6  declaration?
7    THE WITNESS: Um, would you like me to
8  go back to those to look at them to ensure that I --
9  I mean I will agree with you, your Honor, if you're
10 talking about the sorts of statements that these
11 were members -- you know, "members of my firm,"
12 those sorts of statements?
13    THE SPECIAL MASTER: Yes.
14    THE WITNESS: Is that what you're
15 referring to?
16    THE SPECIAL MASTER: None of those are
17 parts of the blanks to fill in, correct?
18    THE WITNESS: No, no, no.  Exactly.
19    THE SPECIAL MASTER: Okay.  So may I ask
20 you this question?
21    THE WITNESS: Yes.
22    THE SPECIAL MASTER: What was Garrett
23 Bradley relying on in Nicole Zeiss' template to know
24 that the staff attorneys were not employed by his

Page 108

1  own firm?
2    You said they were relying on the
3  template.  What in the template was he relying on to
4  believe that the staff attorneys were employed by
5  his firm or that the rates were charged by his firm?
6  What in that template was he relying on?
7    THE WITNESS: What I say at the bottom
8  of the last part of paragraph 33 is it was
9  appropriate for the Thornton Law Firm to use the
10 Labaton template as the basis for its lodestar
11 analysis.
12    So that's the fill-in-the-blanks part.
13    THE SPECIAL MASTER: Which has nothing
14 -- which doesn't include the statements in the
15 declaration that we've been talking about.
16    THE WITNESS: Concededly, your Honor,
17 but I think back to what Evan Hoffman says at page
18 94 the rest of the language was sort -- it was a
19 model fee declaration.  So that's where there is
20 reasonable reliance arguably; but even if it wasn't
21 reasonable to rely on it, the nature of those
22 statements do not give rise to a Rule 11 violation.
23    Does that answer your question?
24    THE SPECIAL MASTER: Not really.  You

Page 109

1  haven't told me what he was relying on in the
2  template language as to the truth of the matter
3  asserted in paragraphs 3 and 4.
4    THE WITNESS: Okay.  I'm not using the
5  word "reliance" in that sense --
6    THE SPECIAL MASTER: Oh.
7    THE WITNESS: I'm using the word as a
8  basis for its lodestar analysis.
9    So it took the document.  They did what
10 they were instructed to do, and they gave it back
11 because they were accurate for the most part it
12 appears in terms of the fill-in-the-blanks parts.
13    THE SPECIAL MASTER: So no independent
14 obligation to ensure the truthfulness of the sworn
15 statements made in paragraphs 3 and 4?  Is that your
16 view?
17    THE WITNESS: No.  As I've said I think
18 a few times, it's a regrettable -- it was sloppy.  I
19 don't think I'd used that word before, but Garrett
20 used it himself.  Garrett Bradley used it himself.
21 But it's not sanctionable.
22    THE SPECIAL MASTER: Okay.  Do you have
23 anymore?
24    MR. SINNOTT: A couple more.

Page 110

BY MR. SINNOTT:

1  BY MR. SINNOTT:
2  Q.  Professor, based on your understanding of
3  the facts, would you agree with me that if Garrett
4  Bradley read those statements -- and I think we can
5  assume he did --
6      MR. KELLY: Objection.
7  Q.  -- he would have recognized --
8      MR. KELLY: Objection.  Objection.
9  Q.  -- the falsity of those statements?
10 A.  Honestly, I don't know because even earlier
11 I said that I took a look at Nicole Zeiss' September
12 declaration.  I took a look at Garrett Bradley's
13 September -- but to say that I read it?
14     I mean I read it, but I read it very,
15 very differently than I read Garrett Bradley's
16 deposition of June, Evan Hoffman's deposition of
17 June, Nicole Zeiss' deposition in June because those
18 were the ones that were pertinent to the violations
19 that Professor Gillers identified in his report.
20     So I mean I don't want to quibble about
21 what the word "read" means, but we all know that
22 sometimes we read things more carefully than others.
23 Sometimes we read parts of things more carefully
24 than others.

Page 111

1      And it seems to me that what happened
2  here, even though he may have read the entire
3  document before he signed it, he was not focusing on
4  the aspects of the declaration that arose out of the
5  use of the template.
6      And, again, that's regrettable.  I
7  believe that the Court has a right and you all have
8  a right to look into it, you know, to investigate
9  it, but I do not see the failure to correct that
10 language and explain further as in violation of Rule
11 11.
12     THE SPECIAL MASTER: To sum up your view
13 on whether there's a violation of Rule 11 and
14 whether it is sanctionable, no harm was done?  Is
15 that right?
16     THE WITNESS: I would say that no harm
17 was done because of the overall purpose of the
18 document.
19     THE SPECIAL MASTER: And therefore there
20 should be no sanction?
21     THE WITNESS: No sanction.
22     THE SPECIAL MASTER: So no harm, no
23 foul?
24     THE WITNESS: You know, I would like to

Page 112

1  say that.  I say that all the time in my life, but
2  there are -- I don't see the harm here.  I really
3  don't see the harm here.
4      I see a careless failure to look at that
5  language in the template that Evan Hoffman called a
6  model fee declaration, but I do not see anything
7  that gives rise to the level of a Rule 11 sanction.
8      THE SPECIAL MASTER: I think you've just
9  agreed that the characterization "no harm, no foul"
10 is accurate of your testimony.
11     THE WITNESS: Well, there was a mistake,
12 your Honor.  There was a failure to correct, okay.
13 So I mean -- no harm, no foul, I just have a
14 recollection that there might be some Rule 11 case
15 somewhere that uses that language, but I do believe
16 also that there may be situations where an
17 attorney's, you know, conduct is so reprehensible
18 that even though it might -- you know, might harm
19 somebody, there is no harm to anybody where the
20 Court would have a duty to police.  But not under
21 Rule 11.
22     There are other possibilities.  And,
23 again, I don't want to leave the impression that I
24 think that anything Garrett Bradley did was along

Page 113

1  those lines.  In fact, to the contrary.  I see
2  absolutely nothing in the record that indicates
3  there was any kind of willful serious misconduct
4  here.  There was carelessness.
5      THE SPECIAL MASTER: Bill?  I don't
6  think we've got anything further.
7      MR. KELLY: Nothing from me.
8      THE SPECIAL MASTER: Brian?
9      MR. KELLY: No.
10     THE SPECIAL MASTER: No, okay.  Richard?
11     MR. HEIMANN: No questions.
12     MR. SINNOTT: Stu?
13     MR. GLASS: No questions.
14     THE SPECIAL MASTER: Anybody on the
15 phone?
16     MR. SINNOTT: Josh is on the phone.
17     THE SPECIAL MASTER: Josh?
18     MR. SINNOTT: Anyone besides Josh for
19 counsel on the phone?
20     MR. CANTY: Mike on the line.  I don't
21 have anything.
22     MR. SINNOTT: Okay, Mike.  Thank you.
23 Anyone else?
24     (No response.)

Page 114

1    **MR. SINNOTT:** All right.  Hearing none,
2  this examination is concluded.  Thank you,
3  professor.
4    **THE WITNESS:** Thank you.
5    **THE SPECIAL MASTER:** Thank you very
6  much, professor.
7    (Whereupon the proceedings
8    adjourned at 12:21 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 115

1                    CERTIFICATE
2  COMMONWEALTH OF MASSACHUSETTS)
3  SUFFOLK, SS.                )
4
5      I, Paulette M. Cook, Registered Merit Reporter
6  and Notary Public in and for the Commonwealth of
7  Massachusetts, do hereby certify that GEORGENE M.
8  VAIRO, the witness whose deposition is hereinbefore
9  set forth, was duly sworn by me and that such
10  deposition is a true record of the testimony given
11  by the witness.
12      I further certify that I am neither related to
13  or employed by any of the parties in or counsel to
14  this action, nor am I financially interested in the
15  outcome of this action.
16      In witness whereof, I have hereunto set my hand
17  and seal this 11th day of April, 2018.
18
19
20
21                              Notary Public
22
23  My commission expires:
24  February 5, 2021

**$**

**$425 (1)**
84:14

**A**

**able (5)**
12:12;19:19;36:23;44:11;
82:21
**above (1)**
105:9
**absence (1)**
87:5
**absolutely (2)**
40:23;113:2
**absolves (1)**
92:4
**abusive (1)**
69:17
**accent (1)**
12:16
**accept (2)**
61:14;72:5
**acceptable (1)**
38:20
**accepted (3)**
28:13;38:23;84:12
**accounted (1)**
47:8
**accounting (1)**
97:15
**accurate (5)**
54:18;55:23;104:15;
109:11;112:10
**accurately (6)**
8:21;29:19;36:4;37:18;
87:2;97:24
**acknowledge (4)**
68:21;73:8;75:20;85:19
**acknowledged (5)**
40:20;66:4;73:6;87:7;
91:1
**acknowledgement (4)**
85:13,15;91:7,23
**acknowledging (1)**
93:22
**acquire (1)**
104:13
**acquired (1)**
13:3
**acted (1)**
69:1
**action (15)**
5:15;12:7;38:20;62:5;
63:7;66:17;68:20;69:8;71:4;
72:18;73:4;86:4;105:11,14,
19
**actions (5)**
27:21;28:13;66:22;73:16;
84:12
**actual (2)**

16:12;32:19
**actually (8)**
29:12;38:10;39:1;60:6;
68:7;85:5;89:16;97:23
**addition (1)**
53:3
**additional (1)**
72:2
**additions (1)**
9:4
**addressed (5)**
65:21;73:9,11;75:7;77:15
**adjourned (1)**
114:8
**admitting (1)**
68:12
**advance (1)**
96:21
**adversarial (3)**
22:6;64:8;70:22
**adversary (4)**
22:7;67:8,8;71:2
**advice (1)**
54:5
**advisory (9)**
63:23;64:12;65:2;66:11,
13;68:13;69:16,23;70:10
**advocacy (1)**
103:3
**advocate (2)**
23:18;24:16
**advocates (2)**
20:16;21:17
**advocating (6)**
17:16;20:24;21:7;22:8;
23:1,6
**affidavit (3)**
84:18,19;85:3
**afternoon (1)**
12:3
**again (30)**
7:16;36:2;45:10;48:12;
50:14;51:9;52:9;60:19;
61:16,18;68:2;69:13;71:14;
75:11;79:5;83:6;86:20;
87:13;89:19;90:14;91:6;
94:8,19;96:1;100:4,14;
102:23;107:1;111:6;112:23
**agencies (1)**
29:14
**agree (17)**
18:20;42:11;48:10;51:22;
58:4,5;64:23;69:23;78:16;
88:20,24;91:6;99:7;104:10;
105:20;107:9;110:3
**agreed (3)**
11:6;54:5;112:9
**Agreeing (1)**
12:23
**agreement (9)**
43:21;44:7,20;47:13,23;
50:22;51:3;59:6;62:8
**Ah (1)**

10:10
**ahead (1)**
96:6
**al (1)**
5:13
**alerted (2)**
70:8;90:12
**alerting (1)**
86:5
**allocated (1)**
44:3
**allocation (2)**
43:21;59:5
**along (2)**
97:15;112:24
**altered (1)**
21:21
**Although (1)**
104:2
**always (2)**
95:18;101:10
**amend (1)**
15:12
**amended (1)**
92:15
**amendment (3)**
22:15;23:12;67:13
**amendments (10)**
18:12;21:21,23;22:2;64:4;
66:1,3;67:2,4,4
**among (6)**
14:21;43:21;44:3,20;59:6;
62:3
**amount (6)**
27:18;33:10;38:24;48:5;
52:16;79:20
**amounts (5)**
35:13,16;80:16,20;81:16
**analysis (7)**
40:14;43:7;89:24;105:7;
106:14;108:11;109:8
**Anastasia (1)**
97:15
**answered (3)**
60:17;73:13;75:10
**Anymore (2)**
9:23;109:23
**apologize (5)**
16:9;25:16;48:14,14;53:9
**apologized (1)**
73:7
**Apparently (1)**
100:6
**appeals (1)**
76:15
**appear (7)**
47:3;53:19;67:22;68:21;
86:15;98:8,15
**appeared (1)**
62:7
**appears (7)**
43:23;62:17;71:12;78:21;
91:9;99:16;109:12

**application (2)**
28:6;105:18
**applies (4)**
63:12;70:1,19;71:23
**apply (6)**
63:14;66:5;68:22;70:3,5;
71:20
**applying (1)**
70:9
**appoint (1)**
103:18
**appointed (1)**
5:11
**appreciate (4)**
35:8,11;36:5;46:9
**approach (2)**
21:22;80:11
**appropriate (9)**
21:17;25:15;45:20;47:18;
48:5;49:6;65:4;105:5;108:9
**appropriately (3)**
21:11;62:15;69:1
**approval (3)**
13:16,19;95:11
**approved (3)**
13:17;81:8,14
**approximately (3)**
10:17;20:7;41:21
**area (1)**
9:20
**arguably (1)**
108:20
**argue (1)**
76:8
**Arguing (1)**
33:16
**argument (6)**
37:13;69:11,12,13;72:6;
75:21
**Argumentative (4)**
39:5;60:17;61:17;87:9
**arisen (1)**
75:4
**Arkansas (1)**
5:12
**arose (3)**
12:7;103:20;111:4
**around (4)**
25:20;68:5;89:21;96:21
**artfully (1)**
36:4
**aside (5)**
23:22;38:10;66:2;72:17;
78:24
**aspect (1)**
71:15
**aspects (8)**
22:17;54:17;56:19;93:5;
98:22;101:11;105:24;111:4
**asserted (1)**
109:3
**assistance (1)**
16:2

**assistants (2)**
16:22,23
**associated (1)**
105:4
**assume (7)**
25:1,5,12;46:20;78:21;
86:12;110:5
**assuming (2)**
94:2;104:18
**atmospherics (1)**
71:23
**attached (2)**
8:18;27:16
**attention (13)**
8:17;19:20;20:5;48:22;
53:7;58:2;64:14;69:10;71:3;
84:23;85:24;96:12;103:23
**Attorney (54)**
5:18,21;6:3;12:8,12;13:9;
14:14;15:8;17:16;20:13,15;
21:1,9,17;22:11,16;23:13,
15,18;24:2,7,15;25:10,16;
27:19;31:5;33:10;41:20;
42:5;57:9,23;58:1;61:2,2;
63:4;66:14;68:7;77:20;84:3;
85:12;87:7;90:3;91:17;
92:19;95:2,9;96:15;97:5;
98:2;99:15;104:12,12,13,21
**attorneys (95)**
22:3,3;28:10,19;29:5,11,
15,20;31:11,23;32:2,11,20,
24;33:20;34:2,4,9,18;35:14;
37:17,17,23;38:2,16,23;
40:5;44:13,22;45:5,12,16,
18;46:2,4,18,21;47:16;49:9;
50:2,5,6,20;51:6,13,15;
52:10,15,17;53:19;55:24;
56:6,11;57:10;58:2;59:4,7,
8;60:23;62:4;64:4,15;67:5;
68:4,15,24;69:3;71:5;74:20;
76:7,7;77:22;78:17;79:10,
17;80:20;81:17,18;84:9,15;
85:1;91:3;92:2;95:15;98:16,
20;99:8;100:5;101:3,23;
102:10,21;105:6;107:24;
108:4
**attorneys' (2)**
42:12;84:14
**attorney's (3)**
88:17,18;112:17
**audio (1)**
7:5
**August (1)**
95:13
**available (2)**
24:12;28:5
**await (1)**
53:22
**award (1)**
47:4
**awarded (1)**
34:3
**aware (11)**
41:19;43:20,22;80:15,23;
82:4,8,24;86:9;91:5;92:3

## B

**back (21)**
6:9;10:24;11:18;43:16;
57:20;62:3,22;78:19;82:19;
84:21;87:12;88:3;93:3;94:8;
97:20;99:11;102:16,19;
107:8;108:17;109:10
**background (1)**
8:22
**bad (2)**
88:21,22
**bailiwick (1)**
81:6
**Bank (1)**
5:14
**Barbara (1)**
8:2
**bargain (1)**
62:12
**Barrett (1)**
5:19
**based (14)**
17:21;18:5,20;27:21,24;
31:23;32:24;34:9;57:15,15;
98:9,24;104:15;110:2
**basically (1)**
98:21
**basis (7)**
21:15;22:14;88:9;91:19;
105:7;108:10;109:8
**Battery (1)**
3:18
**bear (1)**
44:21
**bearing (2)**
80:5,7
**became (2)**
91:5;92:3
**become (1)**
11:6
**becoming (1)**
86:9
**began (1)**
11:16
**beginning (2)**
11:1;84:23
**begins (2)**
20:10;99:22
**behalf (1)**
6:6
**behaved (1)**
90:3
**belied (1)**
23:3
**belief (2)**
17:18;21:3
**bench (1)**
61:3
**BERNSTEIN (1)**

3:15
**besides (1)**
113:18
**best (8)**
17:17;21:2;40:20,21;
46:17;58:20,22;88:13
**better (4)**
48:20;58:21;70:21;101:23
**Beyond (3)**
16:11;18:24;19:16
**bicycle (1)**
9:23
**big (5)**
59:21;71:10,12,12;95:18
**bikes (1)**
10:2
**Bill (4)**
7:15;62:20;83:16;113:5
**billed (5)**
33:12;38:17,24;41:21;
85:10
**billing (31)**
27:22;28:1;31:23,24;32:1,
4,11,17,23,24;33:20;34:8,9,
10,17;36:21,22;37:6,24;
38:1,8;45:17,18;46:1,7;
54:23,24;55:2;80:12;91:4;
92:2
**bit (4)**
15:12;24:24;35:4;88:16
**blame (3)**
57:1;106:4,5
**blanks (4)**
52:14;98:21;106:24;
107:17
**blatant (1)**
43:10
**blatantly (1)**
24:4
**BNY (5)**
81:7,14,24;82:11,16
**boilerplate (1)**
106:11
**bore (1)**
32:20
**Boston (2)**
3:5;12:16
**both (3)**
18:11;67:19;92:17
**bottom (7)**
59:2;62:24;66:10;83:23;
93:6;105:2;108:7
**Bradley (60)**
11:21,24;15:15;26:19;
28:14;29:5,17;30:16;34:16;
35:7;37:14;39:21;40:19;
41:8;48:11,16;51:23;53:1;
57:6;61:7;62:10;63:6;66:16,
21;67:14;69:7;72:19;73:6;
75:13;77:16,22;78:12,17;
79:1,13,24;81:22,22;82:5,9,
15;84:4,17,24;85:18,22;
86:4,11,16;87:7;90:10,23;

3:15
**Bradley's (14)**
14:2;42:17;52:8;56:10;
59:17;60:15;61:14;68:20;
71:22;74:14;85:13;107:5;
110:12,15
**break (6)**
35:1;51:10;78:9;87:20;
88:3;94:9
**Brian (5)**
6:5;11:1;12:2;43:9;113:8
**bring (1)**
85:24
**Broadway (1)**
3:10
**bronchitis (1)**
34:22
**brought (5)**
48:22;63:12;64:13;69:9;
70:2
**bucket (1)**
47:2
**bunch (1)**
96:22
**burden (5)**
44:12;47:14,14,17,22
**buy (1)**
95:10

## C

**c2 (4)**
64:7;67:21,22,24
**c3 (2)**
64:8;67:23
**CABRASER (11)**
3:15,21;6:14,16;29:14,22;
55:5,8,11;78:19;85:6
**calculation (4)**
27:21,24;41:24;52:17
**California (3)**
3:19;8:3;44:16
**call (3)**
5:21;53:6;72:4
**called (9)**
44:16;58:1;61:4,5;71:3;
97:12;100:3;101:5;112:5
**calls (1)**
26:6
**came (5)**
12:2;54:7;89:8;93:6,8
**can (19)**
7:2;12:16;13:12;23:9;
25:4;34:2;41:10;42:1;45:12;
51:5,22;83:3;84:5;86:17;
87:20;89:1;102:16;107:1;
110:4
**candor (7)**
18:8,13,22;31:2,4,17;
35:22
**Canty (2)**

3:9;113:20
**career (1)**
  9:2
**carefully (5)**
  15:19;52:7;93:1;110:22,
  23
**careless (1)**
  112:4
**carelessness (1)**
  113:4
**case (36)**
  7:22;8:15;10:13,18;12:5,
  5;18:15;29:13;33:4;37:4;
  62:16;65:19,20;69:24;70:4;
  76:9;77:5,20;78:14;81:8,18;
  82:11,13,16,17;88:15;90:1;
  93:19;95:4;97:11;100:1;
  104:6,8,11,16;112:14
**cases (11)**
  38:20;59:22,24;60:21;
  68:5;72:8;76:14,14,20;78:1;
  95:19
**cast (1)**
  57:1
**Cause (5)**
  12:14;63:6;65:4;66:16;
  70:12
**caused (3)**
  53:9;87:12;89:1
**caveat (1)**
  6:22
**ceases (3)**
  23:18;63:5;66:15
**certain (3)**
  17:4;44:13;105:24
**certainly (4)**
  24:12;25:11;50:15;52:2
**certifier (1)**
  105:21
**certifies (2)**
  17:17;21:1
**certify (1)**
  104:14
**championships (1)**
  9:24
**changed (1)**
  57:8
**changes (1)**
  9:4
**changing (1)**
  32:6
**characterization (2)**
  82:22;112:9
**characterized (1)**
  18:12
**charge (2)**
  81:16;98:21
**charged (14)**
  28:12;35:16;38:1;52:16;
  55:14,16;57:16;80:16,17,20;
  84:11,14;101:4;108:5
**chart (1)**
  42:4

**chat (1)**
  11:3
**check (4)**
  37:9;48:3;52:10;101:1
**checked (2)**
  37:10;59:24
**Chiplock (7)**
  14:9,10,12,15;81:22;82:6,
  15
**CHOATE (2)**
  3:2;6:1
**choice (4)**
  89:3,18,19,22
**circuit (8)**
  65:21;76:16;88:23;89:1;
  104:8,11,19,20
**circuit's (1)**
  90:5
**circulated (1)**
  49:19
**circumstances (13)**
  17:19;21:4;53:14;58:24;
  59:1;88:15;89:21;90:2;
  92:10,23;94:4,24;104:5
**citations (1)**
  16:7
**cite (4)**
  21:11;66:10;76:15;104:6
**cited (5)**
  14:14;15:14;60:21;65:22;
  72:8
**civil (2)**
  5:15;17:1
**claim (1)**
  70:12
**claimed (2)**
  41:22;58:3
**claiming (3)**
  67:14;70:18;73:16
**clarified (1)**
  85:7
**clarify (1)**
  34:1
**clarity (2)**
  36:4;48:14
**class (15)**
  12:7;27:21;28:13;29:21;
  30:8,12,13;38:20;62:5,19;
  84:12;95:17;105:10,14,18
**clean (2)**
  86:21,23
**clear (9)**
  35:18;51:14,18;60:20;
  63:24;65:2;72:9;76:14;77:6
**clearly (4)**
  59:18,18;60:14;92:15
**clients (3)**
  32:6;55:7,17
**closer (1)**
  61:8
**co-counsel (1)**
  104:4,22
**cold (1)**

43:24
**colloquially (2)**
  28:22;80:17
**coming (1)**
  43:24
**comment (1)**
  64:12
**commenters (1)**
  7:1
**committed (1)**
  74:19
**committee (9)**
  63:23;64:12;65:2;66:11,
  13;68:13;69:16,23;70:10
**common (2)**
  38:17;67:24
**communication (1)**
  7:5
**Company (2)**
  5:14;104:7
**comparable (1)**
  40:22
**compensated (2)**
  10:12,14
**compensation (1)**
  10:15
**competing (1)**
  43:3
**complaint (3)**
  22:4,19,23
**completely (1)**
  35:8
**completion (1)**
  98:4
**complex (8)**
  12:7;62:5,16;84:12;95:19;
  105:10,14,18
**complexity (1)**
  105:3
**conceded (2)**
  75:14;92:8
**Conceddingly (1)**
  108:16
**concept (2)**
  64:21;65:14
**concepts (1)**
  39:4
**concern (6)**
  35:8,9,9;36:5;81:23;82:10
**concerned (8)**
  12:11;36:15;40:23;60:22;
  69:16;70:23;79:18;84:6
**concisely (1)**
  43:15
**conclude (1)**
  87:5
**concluded (1)**
  114:2
**concluding (1)**
  21:16
**Conduct (9)**
  18:16,19;20:13;73:18;
  88:14,17,18;90:23;112:17

**conducting (1)**
  91:15
**conference (2)**
  13:13;31:13,14
**conflate (2)**
  39:3;55:3
**conflated (1)**
  45:11
**conflating (2)**
  34:13;38:22
**confused (1)**
  100:15
**confusing (1)**
  88:16
**conjunction (1)**
  23:11
**connection (2)**
  7:22;11:10
**considerable (1)**
  82:14
**cont (1)**
  3:1
**contacted (1)**
  12:4
**contained (1)**
  15:22
**containing (1)**
  84:2
**contains (2)**
  24:2;28:15
**contemporaneous (1)**
  28:3
**contentions (2)**
  18:1;20:14
**context (21)**
  18:15;22:5;24:20;33:4,4;
  37:4;44:18;48:1;56:3,4,18;
  64:8;68:2,18;70:22;72:7,23;
  75:24;92:22;98:5;100:20
**contingency (4)**
  32:5;33:9;54:20;55:9
**contingent (2)**
  32:12;54:22
**continue (2)**
  24:16;39:3
**CONTINUED (1)**
  88:2
**continues (3)**
  42:23;84:24;97:7
**continuing (1)**
  43:5
**contrary (1)**
  113:1
**contributed (1)**
  99:5
**contribution (1)**
  97:19
**contributions (3)**
  97:11;100:1;106:17
**convey (1)**
  99:4
**conviction (1)**
  36:7

**convinced (1)**
86:24
**copy (5)**
11:4;26:10,13;83:15;96:5
**corrected (6)**
21:11;64:16;65:8;68:11;
75:12,14
**corrections (2)**
22:16;23:13
**correctly (1)**
17:11
**cost (5)**
32:19;33:11;38:16;47:17,
21
**costs (2)**
37:16;62:8
**Counsel (13)**
3:13,21;5:7,22;17:4;
63:12;70:2;84:19;104:2;
105:10,13,16;113:19
**counsels' (1)**
43:21
**count (1)**
60:5
**counted (2)**
50:24;51:16
**counting (13)**
28:23;48:24;49:4,11;50:2;
53:4,16;64:11,16;69:5;80:8,
12;102:1
**couple (8)**
9:15;16:8;23:21;55:6;
63:21;64:1;81:20;109:24
**course (7)**
9:2;20:9;37:5;56:22;
89:14;90:17;106:2
**Court (77)**
5:10;17:13,14;18:9;20:17,
22;22:4;23:16;25:18;28:5;
31:6,18;35:21;37:20;40:16;
42:23;43:4;45:23;46:5;47:2,
6;48:3,17;49:9,12;50:1,12,
18;51:24;53:2,3,10,15,18,
18;54:16;55:15,23;57:4,15,
17;59:16,19;60:7;61:9,11;
63:5,14;64:9,14;65:4,9;
66:15;67:9;71:2,6;72:11;
74:11,12,22;75:1;76:1;
77:17;79:20;84:3;86:5,10,
18;89:14;90:11;91:19;99:4;
100:17;102:17;103:5;111:7;
112:20
**Court-initiated (1)**
70:3
**courts (7)**
18:12;34:3;60:12,22;
76:15;92:20;94:22
**Court's (4)**
35:8;53:7,22;70:13
**created (1)**
69:19
**credit (1)**
45:22

**critical (4)**
43:7;50:17;71:15;98:22
**crosscheck (1)**
51:21
**Cruz (1)**
90:6
**culpable (1)**
75:2
**cure (1)**
73:22
**cured (1)**
74:17
**curious (1)**
60:2
**current (18)**
27:22;31:24;32:1,4,24;
33:20;34:9,10,17;38:1;
45:18;46:1,6;50:6;55:14,16;
57:16;101:4
**customer (1)**
29:21
**CV (3)**
8:18;9:5,9

## D

**daily (1)**
28:3
**Dan (5)**
14:9;81:22;82:5,6,14
**date (3)**
10:17;95:12;96:1
**David (2)**
49:18;57:3
**day (2)**
12:2;62:6
**days (4)**
21:11;22:24;67:11;90:11
**deal (1)**
59:12
**deceive (1)**
72:11
**declarant (1)**
36:17
**declarant's (1)**
36:16
**declaration (67)**
7:22;8:3,15;11:7,19;12:1;
21:20;26:14,15,16,18,20;
27:5,12;28:14;30:23;34:7;
35:10;38:11;39:2,14;40:10;
44:23;45:24;50:21,22;
51:16,24;53:8;54:10;57:8;
59:10,17;60:15,22;61:12;
71:22;72:5,9,17,23;74:20;
75:7;76:15;79:24;88:5,6;
90:19;91:2;92:1;93:6,12;
96:16,20,22;97:13;100:3,8,
12,18;101:12;107:6;108:15,
19;110:12;111:4;112:6
**declarations (12)**
32:9;36:9;38:19;48:8;
56:10,20;71:15;76:2;101:2;

106:20,23;107:4
**declared (1)**
55:13
**defendant (1)**
5:14
**defendants (1)**
68:9
**defense (3)**
33:9;68:4;70:12
**define (1)**
88:12
**delegate (1)**
104:21
**deliberate (7)**
42:20;72:10;89:3,18,19,
20;99:16
**department (1)**
97:15
**depends (2)**
89:7,20
**deposition (18)**
7:17;10:20;13:23;14:1,3;
15:2;40:19;48:13;54:2;
61:23;79:9;81:12;83:8;
95:20;106:7;110:16,16,17
**depositions (8)**
11:9,12,16;14:6;15:15,16;
51:12;55:6
**describe (1)**
96:16
**described (5)**
9:9;68:20;79:15;85:14;
98:3
**designation (1)**
65:20
**designed (4)**
21:24;22:2;24:14;92:16
**desire (1)**
44:9
**despite (1)**
31:7
**detail (1)**
38:13
**determine (1)**
90:2
**determining (1)**
48:4
**Detroit (1)**
5:10
**developments (1)**
9:21
**device (2)**
68:6;69:21
**died (1)**
10:6
**differ (1)**
19:15
**difference (5)**
38:4,5;59:21;101:22;
102:2
**different (8)**
33:11;45:11,19;59:11;
61:5;65:17;98:20,22

**differently (3)**
58:12,14;110:15
**difficult (1)**
39:8
**direct (7)**
8:17;19:20;20:4;30:23;
84:22;96:12;103:23
**discovery (1)**
18:4
**discussed (6)**
9:20;72:3,22;76:5;86:20;
90:22
**discusses (1)**
80:4
**discussing (2)**
23:23;86:18
**discussion (5)**
68:18;72:15;82:14;
103:11,15
**dispute (2)**
63:17;74:18
**District (1)**
5:10
**docket (1)**
84:7
**document (12)**
8:1,13;44:15;92:13;93:1;
94:10,10;105:22;106:1;
109:9;111:3,18
**documents (4)**
11:9;30:12;44:19;95:16
**dollar (1)**
48:5
**dollars (1)**
10:16
**done (13)**
9:2;11:19;48:20;50:16;
53:11;58:6,7,12,14,15;
106:13;111:14,17
**don't (71)**
7:7;12:6,18;14:12,12,13;
23:10;24:19;26:12;38:3,5;
39:7;41:23;42:7,23;43:1;
44:23;50:10;51:20;52:7;
54:11;55:16;57:1;58:6,16,
17;61:13;63:17,21;65:22;
68:17;70:8;71:10;75:11;
77:8,20;79:8,9,10;80:9;81:1,
4,4,11;82:2;86:15,16;87:10,
10;89:4,23;95:7,10;98:11,
13;99:19;102:8,9,12;104:17,
24,24;106:22;109:19;
110:10,20;112:2,3,23;113:5,
20
**double (13)**
28:22;48:23;49:4,11;50:1,
23;53:4,15;64:10,16;69:5;
80:8;102:1
**down (4)**
11:17;24:24;64:12;79:14
**drafted (3)**
49:17;93:4;97:20
**drafts (1)**

16:6
**drill (1)**
24:24
**duly (1)**
5:2
**duplication (19)**
64:13,19;65:7;69:9;70:16;
72:18;73:17,20,23;74:7;
75:3;78:23;79:16,19;80:1;
90:12,18;101:15,19
**duties (3)**
19:3,13;92:16
**duty (9)**
18:8,13,22;31:2,4,17;
35:22;104:22;112:20

**E**

**earlier (9)**
15:19;21:20;72:1,3;76:5;
87:11;106:20;107:4;110:10
**earliest (1)**
7:6
**ECF (1)**
97:22
**edit (1)**
97:21
**EF (1)**
104:7
**effect (3)**
41:9;74:6,9
**effort (2)**
73:17;99:5
**efforts (1)**
98:16
**either (4)**
18:14;29:12;41:14;80:21
**eliminated (1)**
75:5
**Elizabeth (1)**
5:18
**else (3)**
11:21;15:8;113:23
**e-mail (4)**
11:1;41:8,13,16
**e-mails (11)**
61:23;62:2;81:21;82:5,9,
20,20,24;83:6,6,7
**Emily (2)**
6:7,9
**emphasis (1)**
23:1
**emphasized (1)**
23:2
**employed (7)**
27:23;34:18;50:5;84:15;
101:3;107:24;108:4
**employees (9)**
29:12,16,18;31:11;45:1,2,
16;59:8;76:8
**employment (1)**
28:2
**enable (2)**

24:21;104:14
**encompassed (1)**
23:19
**end (5)**
12:1;16:5;62:6;80:5;
95:11
**engage (1)**
104:2
**enough (3)**
95:2,3,16
**ensure (6)**
24:14;37:9;44:9;62:14;
107:8;109:14
**ensuring (3)**
60:23;62:15;71:16
**entered (1)**
31:14
**entire (11)**
20:9;29:20;30:12,13;37:4;
41:22;47:1;64:2,2;100:18;
111:2
**entirely (5)**
22:20,22;45:11;58:20;
64:19
**entirety (2)**
15:5;83:14
**entitled (3)**
66:21,23,24
**equalize (1)**
47:24
**error (1)**
71:9
**especially (2)**
23:10;105:17
**Esq (5)**
3:3,9,16,17,23
**essences (1)**
37:13
**essential (1)**
94:9
**essentially (2)**
45:4;84:5
**estimate (1)**
10:18
**et (1)**
5:13
**etcetera (2)**
11:13;70:12
**evaluate (1)**
16:17
**Evan (9)**
14:3;79:14,15;95:20;
99:21;106:8;108:17;110:16;
112:5
**even (20)**
18:10;20:11,13;24:18;
25:14;33:9;60:21;65:23;
70:20,21;71:10;72:5;90:22;
92:24;93:3;104:12;108:20;
110:10;111:2;112:18
**evenly (1)**
62:9
**everybody (1)**

51:14
**everyone (1)**
87:21
**Everything's (1)**
101:9
**evidentiary (2)**
18:1,3
**exactly (11)**
24:19;37:3;49:8;57:9,10,
14,17;60:8;70:17;104:19;
107:18
**EXAMINATION (3)**
7:9;88:2;114:2
**example (3)**
22:19;54:19;72:23
**except (1)**
88:23
**excerpts (1)**
83:7
**excusable (1)**
95:1
**Excuse (3)**
51:7;73:3;105:12
**exercise (2)**
37:9;56:15
**Exhibit (20)**
8:9,10,14,18;26:17,21,23,
24;27:3,4,17;28:11,15;29:6;
83:18,19;84:10;96:7,8,11
**expectation (1)**
43:23
**expected (1)**
87:17
**expecting (1)**
5:20
**expended (1)**
28:6
**expenses (6)**
10:16;28:7;97:9,16;99:24;
106:15
**experience (2)**
8:22;89:11
**experienced (4)**
58:18;94:5;105:17;106:13
**expert (10)**
7:21;8:3,14;11:7,7;16:24;
31:4;33:6,7;38:11
**expert's (1)**
7:17
**explain (2)**
57:8;111:10
**explained (3)**
55:15;69:15;105:9
**explicitly (1)**
51:5
**exploration (1)**
103:16
**explore (1)**
31:20
**explored (1)**
102:4
**exposure (1)**
74:15

**expresses (1)**
81:23
**expressing (1)**
82:10
**expressly (2)**
70:5;92:16
**extent (6)**
36:3;55:12;61:21;74:24;
75:1;92:11
**extra (2)**
83:15;96:4

**F**

**F2d (1)**
90:8
**face (1)**
98:20
**facially (1)**
48:10
**fact (11)**
16:15;22:23;31:7;36:13,
21;37:15;42:5;53:7;58:2;
83:17;113:1
**facts (4)**
21:5;78:7;104:13;110:3
**factual (4)**
18:1;20:14;34:13;91:18
**fail (1)**
48:2
**failed (3)**
20:13;87:3;90:23
**failing (1)**
86:22
**fails (1)**
91:17
**failure (5)**
87:14;105:24;111:9;
112:4,12
**failures (1)**
93:17
**fair (12)**
9:1;17:3;64:21;79:1,6;
85:12,18;86:3;91:16,21;
98:2;99:14
**fairly (3)**
9:1;44:15;62:9
**faith (2)**
88:21,22
**falls (1)**
67:14
**false (14)**
24:4,4,20;25:2,11,12;33:1,
3;34:13;39:15,22;72:19;
73:5;75:6
**falsehoods (1)**
72:10
**falsities (1)**
90:15
**falsity (3)**
34:7;39:1;110:9
**familiar (3)**
18:15;19:12;29:1

**familiarity (3)**
  17:22;18:6;104:16
**farther (1)**
  10:6
**February (11)**
  14:24;53:18;54:7;63:9;
  66:19;74:13,13;86:14;
  103:10,17,18
**Federal (1)**
  16:24
**fee (51)**
  17:7,8;32:8;33:9;37:2;
  43:20;44:23;47:3,4,8;48:4,8,
  21;50:20,24;51:1,16,19;
  54:16,20,22;55:9;56:15,19;
  58:19;59:5,9;71:15;74:20;
  76:1;78:13,19;79:2;84:14;
  85:14;93:2;94:6;96:16,20,
  22;97:12;98:4,5,22;99:8;
  100:3,8;103:21;105:18;
  108:19;112:6
**feedback (1)**
  16:13
**feel (1)**
  14:10
**feeling (1)**
  14:18
**fees (2)**
  28:6;62:6
**fee-shifting (2)**
  68:6;69:20
**fencing (1)**
  25:20
**fessed (1)**
  93:9
**fesses (1)**
  24:7
**few (2)**
  8:24;109:18
**Fifteen (2)**
  87:23,24
**figured (1)**
  101:16
**file (2)**
  22:4;92:19
**filed (4)**
  20:17;21:5,19;24:3
**files (1)**
  22:11
**filing (7)**
  17:5,15;20:16,24;23:5,8;
  30:22
**fill (10)**
  97:8,9,9,10;99:23,23,24,
  24;100:22;107:17
**filled (1)**
  100:6
**filling (6)**
  52:13;98:21;106:15,15,
  16,16
**fill-in-the-blank (1)**
  96:23
**fill-in-the-blanks (2)**

108:12;109:12
**final (3)**
  13:18;28:2;97:23
**financing (1)**
  62:16
**find (3)**
  23:16;60:2;75:1
**finding (2)**
  76:24;78:4
**findings (1)**
  77:2
**fine (2)**
  26:17;104:19
**fingers (1)**
  60:5
**finish (1)**
  21:6
**firm (93)**
  5:18;6:2,8,12,20;11:22;
  12:9;14:6;16:6;27:20,24;
  28:2,4,10,16;29:7,14,16,17;
  30:18;31:12;32:1,5,12,13;
  33:19,21;34:17,18,19;36:7,
  16,22;37:15,24;38:2;40:4,5,
  7;44:11;45:2,17,19,24;46:2,
  6,7,18;49:18;50:5,7;51:5;
  54:9,9,15;55:1,9;57:11,16;
  58:18;59:3;62:14,15;76:8;
  78:18;80:6,10,21,21;81:7,
  24;82:6;84:10,20;85:11;
  94:4,5;95:21;98:17;99:5,8,
  17;101:4,5;105:6;106:4,7,
  13;107:11;108:1,5,5,9
**firms (33)**
  29:12;30:6;32:9,19,20;
  33:5;38:16;40:23,24;41:4;
  42:6,22;43:3,6,22;44:3,8;
  45:6;47:1,24;48:7;51:4,14;
  54:13,20;61:22,22;69:3;
  77:4,23;78:18;80:13;84:20
**firm's (13)**
  27:22;28:11;31:24;32:24;
  34:9,10;48:22;51:16;54:23;
  84:10;91:4;92:2;97:18
**first (13)**
  12:4;13:15;21:14;48:16;
  52:5;63:10;65:1;74:5;76:16;
  88:24;90:5;91:10;104:1
**five (1)**
  20:7
**fix (1)**
  68:15
**fixed (2)**
  67:11;68:16
**fixing (1)**
  50:17
**Floor (1)**
  3:18
**focus (14)**
  33:14,18;34:4,6;49:5,6;
  87:14,17;89:24;93:5;100:7,
  18,21;105:24
**focused (7)**

49:1;52:12;86:11;91:10;
  92:8;100:16;102:23
**focusing (3)**
  52:11;100:5;111:3
**folks (1)**
  7:2
**follow (2)**
  40:11;62:23
**following (1)**
  31:13
**follows (1)**
  84:1
**followup (1)**
  102:24
**foot (1)**
  68:10
**force (2)**
  72:7;75:22
**form (3)**
  19:19;47:7;72:13
**formalistic (1)**
  16:10
**formed (2)**
  17:18;21:3
**formerly (1)**
  5:9
**forth (4)**
  11:18;62:3;74:22;84:21
**forward (1)**
  55:12
**forwarding (1)**
  104:22
**foul (3)**
  111:23;112:9,13
**found (7)**
  62:18;64:15;65:22;67:6;
  69:4;71:5;77:7
**four (4)**
  17:20,24;20:7;80:24
**four-million-dollar (5)**
  50:19;71:8;101:22;102:2;
  103:5
**fourth (1)**
  89:15
**Francisco (1)**
  3:19
**frankly (1)**
  85:7
**fraud (1)**
  56:17
**freaked (1)**
  49:4
**freak-out (1)**
  52:22
**frivolous (2)**
  22:20,22
**fully (1)**
  35:11
**further (8)**
  11:6;18:4;25:4;31:20;
  54:3;84:21;111:10;113:6

# G

**game (1)**
  96:24
**garage (1)**
  10:2
**garbled (1)**
  7:4
**Garrett (73)**
  11:21,23;14:2;15:15;
  29:17;30:16;35:7;37:14;
  39:21;40:19;41:8;42:17;
  48:11,16;50:15;51:23;52:8;
  53:1;56:10;57:6;59:17;
  60:15;61:7,14;62:10;63:6;
  66:16,21;67:14;68:19;69:1,
  7;71:22;72:19;73:6;74:14;
  75:13;77:16,22;78:12,17;
  79:1,13,23;81:21,22;82:5,9,
  15;84:4,17;85:13,18,22;
  86:3,11,16,21;87:17;90:9,
  23;97:17;99:1;100:11;
  105:20;107:5,22;109:19,20;
  110:3,12,15;112:24
**gather (1)**
  98:12
**gave (2)**
  11:3;109:10
**gee (1)**
  24:8
**general (2)**
  9:21;11:3
**generally (1)**
  55:7
**Georgene (1)**
  8:4
**Gerald (1)**
  5:9
**ghost (1)**
  79:15
**Gillers (6)**
  3:24;5:20;73:1;80:4;
  101:6;110:19
**Gillers' (5)**
  7:16;11:5;18:17,21;26:2
**given (4)**
  13:19;58:23;97:23;105:3
**gives (1)**
  112:7
**Glass (5)**
  3:3;6:1,1;55:18;113:13
**Globe (2)**
  73:9,11
**goes (4)**
  38:12;82:18;94:15,18
**Goldsmith (3)**
  49:18;53:3;57:3
**golf (1)**
  10:4
**Good (11)**
  5:3,4;50:11;62:18;76:18,
  19;78:10;81:19;87:21;

103:2,3
**goofing (1)**
10:9
**graded (1)**
50:15
**greater (2)**
36:4;38:13
**Greg (1)**
9:13
**grounded (1)**
21:4
**guess (7)**
35:17;38:14;41:14;46:23;
65:11;93:15;99:1

## H

**HALL (2)**
3:2;6:2
**hands (1)**
8:1
**hanging (1)**
10:2
**Hangman (2)**
97:3,5
**happen (1)**
62:6
**happened (4)**
50:23;64:14;87:11;111:1
**happy (1)**
35:12
**harbor (32)**
21:9;22:9;24:17;60:7;
63:1,4,11,19,22,23;64:22;
65:14;66:4,8,14,21,23;67:1,
15,19,22;68:1,19,21;69:11,
12,13;70:1,11,19;71:19;
75:21
**harbors (1)**
75:18
**hard (2)**
33:3;46:23
**HARLAN (3)**
6:7,7,10
**harm (9)**
111:14,16,22;112:2,3,9,
13,18,19
**hate (1)**
55:22
**head (2)**
14:8;34:22
**heading (2)**
17:12;69:6
**hear (1)**
7:2
**hearing (26)**
13:15,18,21;14:22,23;
15:1,3;41:14,15;48:12,16;
73:7;75:20;83:8,13;85:23;
86:15;91:1,24;93:2,11;
95:12;102:4;103:11,15;
114:1
**hearings (4)**

11:9,13;81:12;105:5
**HEIMANN (7)**
3:15,16;6:15,15;82:18;
87:22;113:11
**held (2)**
9:8;13:14
**help (1)**
16:7
**helpful (1)**
89:23
**helpfully (1)**
97:2
**hereto (1)**
27:16
**hesitate (1)**
24:18
**higher (1)**
50:15
**highly (1)**
58:18
**Hill (1)**
44:17
**himself (2)**
109:20,20
**hindsight (4)**
48:19,21,24;50:13
**Hm (48)**
20:2,2,6,6,12,12;21:13,13;
24:1,1;34:5,5;36:19,19;
45:14,14;46:15,15;52:20,20,
23,23;53:5,5;60:9,9;63:2,2;
65:16,16;78:15,15;79:3,3;
80:18,18;82:7,7;83:24,24;
88:7,7;90:7,7,13,13;104:9,9
**Hoffman (12)**
14:3;79:15;95:20;96:15,
15,18;97:5;98:2;99:15,21;
108:17;112:5
**Hoffman's (3)**
79:14;106:8;110:16
**Honestly (1)**
110:10
**Honor (26)**
10:1;12:20,22;19:11;24:9;
27:13;29:3;31:15;32:3;
34:20;36:12;41:5;42:8;45:9;
48:9;50:9;59:23;77:13;
82:19;84:18;85:4;100:14,
21;107:9;108:16;112:12
**Honorable (2)**
5:8,12
**honored (1)**
60:7
**horrified (1)**
69:4
**horror (1)**
79:16
**hour (2)**
10:16;84:14
**hourly (1)**
28:9;84:8
**hours (16)**
10:17;38:8;41:22;47:2;

52:15;71:17;74:21;80:13;
94:10,13;97:9,14;99:23;
101:13,15;106:15
**housed (1)**
85:5
**hundred (2)**
10:16;55:22
**hurly-burly (1)**
94:24
**Hutton (1)**
104:7
**Hylenski (1)**
5:21
**hypo (1)**
25:17

## I

**idea (11)**
21:23;22:2;38:15;58:7;
64:6;67:1;86:10;94:20;
102:8;103:2,3
**ideas (1)**
98:13
**identification (4)**
8:11;27:1;83:20;96:9
**identified (3)**
18:2;73:1;110:19
**identify (2)**
5:23;6:18
**ie (1)**
33:11
**ignore (1)**
43:6
**immaterial (2)**
56:14,17
**immediate (9)**
63:7,8;66:17;68:20;69:8;
72:18;73:4;86:4,7
**immediately (3)**
71:4,6;86:9
**impact (2)**
44:5;79:19
**important (13)**
22:1;35:19;36:1;38:7;
49:7;55:23;56:18;77:3;99:3;
101:8,9;106:10,18
**impose (2)**
18:8;92:16
**imposed (8)**
19:4;20:15;22:22;23:18;
24:6;60:6;65:24;77:19
**imposes (3)**
17:4;18:22;31:1
**imposition (3)**
76:9,17;88:10
**impression (1)**
112:23
**improper (1)**
21:5
**inaccuracies (4)**
77:24;92:13;93:9,20
**inaccuracy (1)**

34:13
**inaccurate (14)**
35:11,20;39:16;48:11,13,
18;52:1;53:8;59:18;60:14;
77:16;87:15;91:2,24
**inadequate (2)**
82:11,13
**inadvertent (1)**
57:3
**inadvertently (1)**
50:23
**inappropriate (3)**
64:19;65:10;69:20
**incentive (1)**
68:14
**incentives (1)**
67:5
**include (5)**
17:7,8;51:5,18;108:14
**included (5)**
28:7,11;50:3,4;84:10
**including (4)**
17:8;29:22;68:24;76:16
**incompetence (4)**
89:2,6,8,17
**Incorporated (1)**
104:7
**increase (3)**
40:22;41:11;46:21
**increasing (1)**
81:3
**independent (1)**
109:13
**indicate (3)**
23:8;70:5;96:14
**indicated (2)**
35:23;91:12
**indicates (1)**
113:2
**indicating (1)**
27:18
**individual (2)**
48:7,8
**individuals (3)**
85:4,9,9
**inexperience (1)**
89:2
**inform (2)**
9:8;103:5
**information (7)**
17:18;21:2;71:16;96:24;
97:7;98:13;99:22
**informed (2)**
53:15;90:10
**infuses (1)**
64:6
**initially (1)**
49:18
**initiating (1)**
63:14
**initiative (1)**
70:13
**inquiry (22)**

**instances (1)**
80:16
**instead (1)**
25:20
**instructed (1)**
109:10
**instructions (3)**
53:23;54:6,7
**intended (1)**
103:18
**intent (5)**
36:9;40:14;61:10;76:4;
89:13
**intentionally (1)**
31:5
**intents (1)**
72:11
**interest (1)**
102:1
**International (1)**
3:4
**interpreting (1)**
19:7
**interrelationship (1)**
82:16
**into (14)**
20:8,14;25:20;38:12;
52:16;71:4,11;81:2,20;
91:18;94:18;95:10;96:15;
111:8
**introduce (1)**
96:7
**investigate (4)**
63:7;66:17;103:20;111:8
**investigated (1)**
12:10
**investigation (3)**
11:11;18:4;104:3
**investment (1)**
44:4
**involved (5)**
15:21;27:20;51:13;81:7;
98:16
**involving (1)**
78:13
**irrelevant (3)**
63:20,21;65:12
**issue (26)**
23:23;28:23;36:2;45:12,
15;59:12,13;64:9,13;65:7,
21;70:17;73:20,23;74:11,
12;75:3;78:22,23,24;79:16,
19;80:1;94:12;95:5,8
**issued (2)**
65:4;70:13
**issues (17)**
63:6,7;66:16,17;69:9;
72:4,7;73:24;74:7;75:20,23;

17:19;20:14;21:3;62:24;
63:8,15;64:22;66:18;67:10;
70:3;76:11;78:13;90:24;
91:16,18;92:22;93:17,18,23;
94:1,18;104:23

77:19;86:18;91:10;92:7;
101:5;103:20
**italics (1)**
23:2
**items (2)**
17:24;72:17

**J**

**jack (5)**
40:20;41:10;42:17;46:17;
61:15
**jacking (1)**
42:21
**Jim (1)**
6:3
**Joan (1)**
43:11
**job (2)**
48:20;76:19
**join (1)**
5:21
**joined (1)**
61:3
**Joseph (1)**
9:13
**Josh (5)**
6:17;7:3;113:16,17,18
**Joshua (1)**
6:19
**Judge (51)**
5:10;12:11;13:1,16;36:10,
14,23;37:2,5,23;38:4,6,8;
55:12;59:23;60:12;62:17;
63:8;65:18;66:18;71:16,21;
72:15;74:8;76:5,18,18,19;
78:12;81:8,14;83:13;84:14,
22;85:1,16,20,24;86:14;
87:6;91:7;92:21,21;95:13;
97:2,23;100:24;101:20,23,
24;103:17
**judged (1)**
88:17
**judges (1)**
36:9
**judge's (2)**
54:6,7
**judgment (1)**
101:7
**June (8)**
13:14;15:16;95:21;96:1,2;
110:16,17,17
**jurisprudence (1)**
60:20

**K**

**Kaplan (2)**
81:8,14
**keep (4)**
7:1;33:13;62:11,11
**keeping (1)**
37:18

**KELLY (44)**
6:5,5;7:15;11:1;12:4,12,
20;13:1,4,9;15:8;16:16;
18:24;19:16;25:3,17;26:18;
33:15;34:12;39:5;41:1;
42:19;46:10;60:16;61:16;
67:17;72:20;73:10,12;75:9;
78:9;79:4,6;83:15;84:7;
86:6;87:9;95:6;96:4;99:18;
110:6,8;113:7,9
**kept (1)**
97:14
**key (3)**
56:19;64:3;68:3
**keying (2)**
78:23;79:1
**kind (4)**
16:10;55:1;75:21;113:3
**kinds (2)**
58:11;99:4
**knew (10)**
25:10;29:11,17;31:10,10,
10,15;36:3;53:17;76:6
**know (116)**
7:6;8:24;11:17;12:9,10,
16;14:5;16:9;19:6;24:12,17,
19,19;29:5;30:17,21;31:3;
35:1,20;37:5;38:3,5,11;
40:6;42:8;43:1;44:5,23;
45:1;48:20;49:1,8,9,10;
50:13,14,16,18;51:20;52:7,
12,13;53:21,23;54:1,11,12,
22,24;55:1,7;56:18;57:1;
58:6,6,16,17,17;59:23;60:8,
18;61:1,24;62:10,13;64:11,
18;67:3;71:9;73:10,17;
76:19;79:8,9,10;81:6,10,11;
83:1,13;86:16,20;87:10,10;
88:14;89:4,4,5,12,19,20,21;
92:20;93:11,17;94:20;95:7,
10;98:11;99:20;100:5;
101:21,23;103:2,9;104:17,
18;106:23;107:11,23;
110:10,21;111:8,24;112:17,
18
**knowing (2)**
37:3;89:13
**knowingly (5)**
24:20;25:2,8,18;34:13
**knowledge (7)**
17:18;21:2;36:17;38:15,
17;67:24;104:13
**known (10)**
25:11;29:8;30:19;31:8,9;
34:16;39:21,23;40:2,4
**knows (1)**
24:3

**L**

**LABATON (35)**
3:8,13;6:2;29:23;32:19;
34:19;43:22;47:4;49:18;

50:3,24;51:4,18;54:8,9,14,
20,21;55:1,11;58:17,18;
59:6;78:18;80:21;85:5;
92:11;96:19;97:20;99:11;
105:6,16;106:4,12;108:10
**lack (2)**
48:14;76:22
**language (30)**
18:10;19:3;21:7;22:8;
23:4;30:24;32:7;33:6;49:1;
52:11;54:13;84:8;86:22,23;
87:14;91:22;92:9,18;94:7,
19;97:12;100:2,7,18;
104:18;108:18;109:2;
111:10;112:5,15
**large (2)**
44:15;71:13
**largely (1)**
55:8
**larger (1)**
76:22
**Larry (1)**
14:4
**last (6)**
8:5;9:15;41:1;42:22;
97:22;108:8
**later (11)**
17:15;20:15,24;21:7,17;
22:8;23:1,6;24:7;65:22;
93:12
**latter (1)**
72:8
**law (39)**
5:18;6:8,12,20;8:22;
11:22;12:9;21:5;29:16,17;
32:9;33:5,19;37:15;38:16;
43:3,21;44:11;45:2,6;50:14;
54:20;60:23;69:24;76:9;
77:4,5;80:10,13;86:24;
88:15;94:4,5;95:21;98:17;
99:4,17;105:6;108:9
**lawyer (2)**
82:6;87:16
**lawyers (12)**
29:22;33:9,10;36:16,17,
22;45:4;54:4;77:3,6;78:1;
92:17
**lawyers' (1)**
47:7
**lead (4)**
5:24;84:19;93:21;105:16
**learn (1)**
68:15
**learns (1)**
78:12
**least (6)**
25:5;51:23;89:1;94:7;
99:14;105:22
**leave (1)**
112:23
**led (1)**
15:1
**left (1)**

5:17
**legal (1)**
91:19
**Leiff (1)**
3:21
**less (8)**
32:16;35:14;38:16,16;
54:17;60:5;72:6;75:22
**Lesser (5)**
14:4;41:9;97:16,19;99:1
**lest (1)**
10:9
**letter (22)**
49:12,15,22;52:19;53:2;
54:4;57:4;65:9;74:7,16,17;
75:5,8;78:11;85:20;86:13;
90:14;93:4;102:6,7,12;
103:4
**letting (1)**
50:18
**level (4)**
75:16;76:21;77:7;112:7
**liability (2)**
75:3;93:14
**LIEFF (28)**
3:15,17;6:13,13,13,15;
14:6;29:13,22;32:19;34:18;
43:22;50:3,24;51:4,18;
54:19;55:5,8,11;58:16;59:6;
78:18;80:21;81:24;82:6,12;
85:5
**life (1)**
112:1
**likely (1)**
18:2
**line (13)**
5:19;31:13;41:2;42:22;
59:2;63:3;83:23;84:4,23;
93:6;96:14;99:21;113:20
**lines (3)**
20:7,8;113:1
**list (1)**
89:16
**listed (6)**
14:13;29:6;50:20,21;
57:10;85:2
**listen (2)**
17:10;84:7
**litigant (1)**
70:11
**litigation (8)**
45:3;48:1;69:19;70:23;
105:3,15,17,19
**little (7)**
11:6;15:12;24:24;31:20;
35:3;84:5;88:15
**LLP (4)**
3:2,8,13,15
**lodestar (54)**
26:20;27:17,21,24;35:16;
36:14,15,21;37:9,11;40:21,
22,24;41:11,11,20,22;42:6,
11,18,21;45:22,23;46:5,17,

21,22,24;47:1;48:3;50:17;
51:6;52:10,17;56:8;61:15;
71:11;79:21;80:17;81:3,23;
82:10,11,12;94:16;97:10;
99:6,24;101:1;105:7;
106:14,16;108:10;109:8
**long (5)**
42:24;59:23;95:2,3;97:4
**longer (2)**
27:23;55:1
**look (15)**
22:8;54:19;56:4;61:8;
64:11;67:10;75:24;78:19;
90:1;93:6;107:8;110:11,12;
111:8;112:4
**looked (2)**
79:13;106:9
**looking (11)**
8:13;36:14;72:9;79:15;
83:23;88:4;93:8;96:11;
104:1;106:8,12
**looks (2)**
8:16;61:22
**loss (1)**
7:5
**lost (1)**
102:14
**lot (2)**
62:3;69:19

# M

**main (1)**
103:4
**maintained (1)**
28:4
**makes (3)**
63:23;65:2;77:21
**making (6)**
16:7;17:5;31:16;72:6;
76:12;89:22
**managing (1)**
40:3
**manifested (1)**
48:7
**manner (3)**
47:7;60:24;72:12
**many (20)**
10:17;51:11,12;52:13;
59:22,22,22;60:1,3,21,21;
61:2,2,24,24;62:1,1,1;71:17;
76:14
**March (21)**
8:2;9:4;13:20;14:23;
41:14,15;48:12,15;53:20;
73:7;75:20;83:12;85:23;
86:15;87:6;91:1,24;93:10;
102:4;103:11,14
**Mark (6)**
5:12;8:8;26:22;34:2;
45:20;83:18
**marked (7)**
8:10,14;26:24;27:2;45:12;

83:19;96:8
**market (1)**
38:24
**marking (1)**
38:23
**mark-up (2)**
35:14;55:3
**mark-ups (1)**
34:3
**Massachusetts (3)**
3:5;18:16,18
**master (166)**
5:7,8,11,16;9:23;10:3,10;
11:20;12:18,23;19:9;23:20;
24:2,10,23;25:4,9,19,22;
26:1,4,6,13,16,19;27:5,8,10,
14,28:18,21;29:1,4,19;30:2,
5,9,14;31:9,19,22;32:10,15,
18,22;33:13,18,23;34:6,15,
24;35:5;36:8,13,20;37:7,22;
38:21;39:6,10,13,18,20;
40:1,8,11,13,18;41:3,7,17,
19;42:1,4,9,16;43:9;45:7,10,
15;46:12,16;47:10,17,21;
48:15;49:14,17,21,24;50:10;
51:2,9,17,22;52:4,18,21,24;
53:6;54:8;55:10,19;56:9,22;
57:5,13,19,24;58:9;59:11,
15;60:1,4,11,13;61:13,19;
62:20;70:9;77:9,15;79:22;
80:7,14,19;81:2,19;82:4,8,
23;83:3,10;87:23;100:10,
15;101:2,17,24;102:5,17;
103:7,14,19;106:19,24;
107:3,13,16,19,22;108:13,
24;109:6,13,22;111:12,19,
22;112:8;113:5,8,10,14,17;
114:5
**master's (2)**
5:17;62:24
**material (1)**
76:10
**materiality (2)**
76:23;89:10
**materials (3)**
11:12;54:15;59:5
**math (2)**
42:2;49:13
**matter (6)**
5:12;11:2;12:7,24;15:20;
109:2
**matters (1)**
43:2
**may (23)**
7:5;20:15;22:3,3,5,22;
23:14;24:11;25:7,7;31:7,9;
34:20;35:3;75:3;77:24;88:9;
89:6,6;102:9;107:19;111:2;
112:16
**Maybe (7)**
14:11,19;45:21;84:5;
97:21;102:16;103:2
**McEvoy (3)**

5:18;26:15,21
**mean (44)**
9:10;16:5;19:22;23:7;
24:11;29:24;30:1;33:6;
35:11,23;46:24;51:4;52:7;
56:14;58:8,11,13,16;61:9;
69:1,3;74:14;77:2;79:10,12,
17;80:10;81:5;86:15;87:10;
89:12,13,20;92:14;95:7;
98:20;99:19;100:16;101:20;
103:16;107:9;110:14,20;
112:13
**meaning (1)**
89:13
**means (5)**
25:8;31:4;48:4;60:8;
110:21
**media (3)**
66:18;67:10;78:13
**mediation (1)**
44:18
**meet (1)**
11:20
**Mellon (5)**
81:7,14,24;82:11,16
**member (1)**
27:19
**members (12)**
28:16;29:7;30:18,18;
33:21;37:24;40:5,7;45:24;
46:6;107:11,11
**mentioned (1)**
13:6
**met (3)**
11:23;12:2;69:7
**Michael (3)**
3:9,23;6:11
**Michigan (1)**
5:10
**might (14)**
13:14;14:21;21:14;36:14,
23;38:22;48:23;54:2;65:3;
75:22;95:14;112:14,18,18
**Mike (13)**
12:2;14:3,4;31:14;41:8,8;
97:16,17,19;99:1,2;113:20,
22
**million (4)**
30:12;48:6;49:8,13
**mind (2)**
52:8;89:23
**minor (4)**
55:22;56:11,13,14
**minutes (2)**
87:23,24
**misconduct (4)**
72:10;88:9,12;113:3
**misinterpretation (1)**
42:20
**mislead (1)**
61:11;76:5;89:14
**misleading (4)**
31:6;59:18;60:14;68:17

**misled (2)**
35:21;47:6
**misrepresented (1)**
101:13
**missed (1)**
14:21
**missing (2)**
8:24;70:7
**misstatement (2)**
77:21;78:2
**misstatements (7)**
54:10;75:16;76:3,20;80:4;
93:12,13
**Misstates (1)**
61:17
**mistake (16)**
22:3;50:19;57:2,3;61:6,7;
85:4;86:10,19;90:11;91:12;
102:21;103:6,12,12;112:11
**mistakes (9)**
24:22;61:3;73:7;85:13,19,
24;86:5;87:8;93:9
**mitigated (2)**
73:17;75:4
**mitigation (1)**
65:15
**model (6)**
96:20;97:12;100:3,8;
108:19;112:6
**modifying (1)**
58:23
**moment (2)**
10:6;23:22
**more (17)**
9:11;13:22;15:8;29:19;
36:4,4;43:13;44:24;52:7;
80:20;81:5;87:2;98:23;99:8;
109:24;110:22,23
**Moreover (1)**
105:9
**morning (3)**
5:3,4,21
**most (7)**
8:23;12:14;49:7;69:16;
80:15,16;109:11
**mostly (2)**
97:16,19
**motion (6)**
17:14;20:23;21:9;23:15;
69:17;70:2
**motions (1)**
63:12
**motive (12)**
40:13;42:17;46:14,16,20;
61:11,14,19,20,21,21;81:3
**move (1)**
96:15
**much (3)**
38:12;98:11;114:6
**multiple (1)**
98:16
**multipliers (1)**
71:11

**multiplying (1)**
71:18
**must (2)**
21:7;104:13
**myself (1)**
97:17

**N**

**name (2)**
5:6;8:6
**named (1)**
96:19
**names (1)**
74:19
**narrative (3)**
97:18;99:2,3
**nature (4)**
91:3;92:2,13;108:21
**need (6)**
9:5;22:17;34:24;41:10,11;
51:9
**needed (5)**
49:9;71:17;100:6,23;
106:13
**needs (1)**
88:17
**neither (1)**
10:4
**nevertheless (2)**
24:6;30:14
**New (3)**
3:11,11;12:15
**next (2)**
31:22;81:20
**Nicole (10)**
14:3;54:2,5;57:6,20;93:2;
96:20;107:23;110:11,17
**Nine (2)**
10:16;30:11
**ninth (4)**
104:8,11,19,20
**Nixon (8)**
6:4,5,7,19;11:13,24;16:6,
17
**nobody (1)**
70:22
**non-argumentative (1)**
43:16
**none (5)**
52:10;106:19;107:3,16;
114:1
**non-suggestive (1)**
43:16
**normal (2)**
6:22;62:2
**note (5)**
64:12;65:2;66:11;84:1;
99:19
**noted (3)**
7:18;9:5;99:20
**notice (7)**
10:3;22:21;43:13;67:7,9;

71:1,2
**notices (1)**
95:17
**notified (1)**
71:6
**notion (1)**
38:22
**notwithstanding (1)**
16:15
**November (18)**
13:18;49:15;51:23;57:4;
65:8;74:7;75:5,8;85:20,23;
86:13;93:3,3,4;102:11,11,
12;103:4
**nub (1)**
36:2
**number (13)**
5:15;14:1;37:19;50:18;
60:5;64:1;71:10,12,12,13;
81:15,17;84:7
**numbers (7)**
49:7;56:8,20;59:3;80:5,
11;99:6
**numerical (1)**
98:12

**O**

**oath (2)**
27:11;100:17
**object (4)**
7:16;25:17;42:19;43:5
**objecting (1)**
34:12
**Objection (26)**
18:24;19:16;25:3;33:15,
15;39:5;42:24;43:14;46:10;
55:18;60:16;61:16;67:17;
72:20;73:10,12;75:9;79:4;
82:18;86:6;87:9;95:6;99:18;
110:6,8,8
**objections (2)**
43:11,13
**objectively (3)**
88:14,19;90:3
**obligation (3)**
101:18;105:21;109:14
**obligations (2)**
17:4;69:8
**observer (1)**
87:5
**obvious (1)**
92:7
**occurred (2)**
50:2;102:2
**off (5)**
5:24;10:9;14:7;35:3;
38:22
**offending (4)**
24:15;63:5;65:7;66:15
**offer (1)**
16:17
**offers (1)**

97:2
**omnibus (1)**
47:4
**once (5)**
22:17,21;69:8;90:14;91:6
**one (14)**
9:11;14:11,16;37:13,20;
44:15;48:5;54:17;64:2,3;
68:3;69:2;83:18;95:24
**ones (6)**
15:16,17,19,20;72:20;
110:18
**only (8)**
9:10;20:15;21:16;63:11;
69:2;70:1;88:8;101:17
**opine (2)**
16:17;19:13
**opinion (19)**
9:8;19:19;20:19;22:14;
31:3,16;47:12;66:3;72:1,12;
74:16,17;75:15;76:2;77:5,8;
86:24;87:13;93:11
**opinions (5)**
15:22;16:12,13,16;19:6
**opportunity (11)**
18:3;22:16;23:12;48:16;
50:11;51:24;52:5,6;64:5;
68:14;86:21
**opposed (4)**
19:14;21:18;65:14;80:24
**opposing (2)**
63:12;70:2
**order (13)**
15:1;63:6,9;65:5;66:16,
19;70:12;74:11,12;86:14;
95:16;103:10,18
**ordering (1)**
53:19
**original (1)**
23:8
**originally (2)**
44:1;99:20
**ostensibly (1)**
98:3
**others (3)**
15:9;110:22,24
**ought (2)**
77:6;82:21
**out (32)**
12:7;15:7;22:6,10,12;
26:6;39:11;41:10;42:5,21;
49:4;50:8,12;61:4,5;64:15;
65:18;66:7,9;67:6;69:4;
70:23;71:18;76:17;85:10;
89:8;93:7,8;101:5,16;
103:20;111:4
**outlines (1)**
11:3
**outside (2)**
29:14;43:24
**over (3)**
9:2;12:1;79:16
**overall (4)**

37:4;56:14;77:24;111:17
**overlook (3)**
59:16,20;60:14
**own (7)**
36:16;37:17;70:13;80:22;
100:11;104:2;108:1
**owned (1)**
86:19

# P

**page (11)**
20:1;62:22;66:10;69:7;
72:6;83:22,23;84:23;96:12;
99:21;108:17
**pages (2)**
15:23;19:21
**paid (6)**
32:13,15,16;33:10;35:13;
85:3
**paper (26)**
17:8,14;20:16,17,23;21:4,
10;22:4,11,17,17,21;23:16,
17,19;24:3,15,16;63:5;65:7;
66:15;68:8,8;89:7;92:19,21
**paragraph (21)**
20:5,8,9;27:15;28:9;63:1,
3;67:14,20,21;70:6;85:2,7;
88:4;90:9,18,21,21;104:1;
105:2;108:8
**paragraphs (10)**
19:22,23;27:8;39:14;84:2;
90:22;103:24;107:5;109:3,
15
**part (9)**
8:23;72:8;79:24;90:18;
106:20;107:4;108:8,12;
109:11
**participant (1)**
31:14
**participants (2)**
6:23,23
**participated (1)**
9:12
**participation (1)**
7:17
**particular (5)**
15:7;67:13;69:6;93:5;
95:4
**particularly (3)**
32:10;33:5;68:4
**parties (6)**
44:21;50:23;51:3,3;53:22;
69:17
**partner (2)**
40:3;96:19
**parts (5)**
100:6,23;107:17;109:12;
110:23
**party (3)**
17:16;21:1;24:21
**passage (2)**
98:9,24

**Paulette (4)**
8:8;26:22;96:7;105:12
**Pause (2)**
26:9;41:18
**pay (1)**
38:16
**paying (2)**
44:13;55:7
**payment (1)**
28:7
**Peabody (8)**
6:4,5,8,20;11:14,24;16:6,
17
**pending (2)**
46:11,13
**people (3)**
49:3;61:4;76:6
**percent (10)**
41:21;42:9,13,15;44:2,6,
10;48:4;55:23;68:5
**percentage (1)**
37:10
**perfect (3)**
55:24;93:18;101:10
**perfection (1)**
56:1
**perfectly (2)**
14:20;47:18
**performed (1)**
37:3
**perhaps (3)**
57:19;58:1;70:7
**personal (1)**
36:16
**personnel (2)**
27:23;28:1
**person's (2)**
17:17;21:2
**perspective (1)**
53:12
**pertinent (2)**
15:9;110:18
**petition (20)**
17:9;27:17;36:15;37:2;
47:3,4,9;48:21;50:24;51:1;
56:16;58:3;79:2;85:14;
90:15;98:4,6,22;99:9;
103:21
**petitions (9)**
17:7;50:3,4;51:19;58:19;
78:13,20;80:22;94:6
**phone (6)**
6:23;7:2;31:13;113:15,16,
19
**Place (1)**
3:4
**plain (2)**
23:3;66:20
**plaintiff (2)**
22:20;62:18
**plaintiffs (1)**
68:9
**plaintiffs' (3)**

32:5;33:5;62:4
**Plausibly (1)**
34:19
**play (3)**
10:7;40:14;81:2
**played (2)**
10:5;97:4
**playing (1)**
10:6
**pleading (4)**
17:14;20:22;21:18;23:15
**pleadings (1)**
91:19
**please (5)**
7:6;27:6;66:9;102:15,18
**PLI (1)**
9:17
**plus (2)**
10:16;103:3
**pm (1)**
114:8
**point (9)**
16:18;50:11;54:22;66:7,9;
78:8,11;86:19;90:20
**pointed (5)**
15:7;22:6,12;50:8;70:23
**police (1)**
112:20
**policy (1)**
38:23
**portion (4)**
20:19;42:10,14;52:22
**portions (1)**
15:7
**position (6)**
20:16;21:18,19;24:5;
47:24;77:11
**positions (2)**
9:8;23:19
**possibilities (1)**
112:22
**possible (3)**
7:6;11:2;60:24
**post (1)**
60:7
**potential (1)**
73:11
**practice (5)**
58:21,22;60:23;62:2;
69:17;95:1
**practices (2)**
91:4;92:3
**pre-filing (1)**
91:18
**preliminarily (1)**
13:17
**preliminary (2)**
13:16;95:11
**preparation (1)**
57:21
**prepare (3)**
10:23;95:16;102:11
**prepared (5)**

10:21;11:19;28:3,4;99:2
**preparing (3)**
28:6;105:4;106:7
**PRESENT (2)**
3:23;68:18
**presentation (1)**
23:3
**presented (6)**
23:15;37:20;83:7;93:1,10;
100:24
**presenting (3)**
17:13;20:22;59:9
**pressures (3)**
94:23;95:18;105:4
**Presumably (1)**
58:9
**prevented (2)**
53:1;100:11
**previous (1)**
9:7
**previously (2)**
31:1;86:21
**principles (1)**
45:11
**prior (4)**
23:5;63:8;66:18;78:11
**pro (1)**
45:22
**probably (6)**
10:19;41:13;44:9;47:14;
52:10;87:2
**problem (16)**
12:19;22:1;47:11,12;
48:23;49:11,11;50:17;
53:16;64:16,19;70:24;71:3,
5;90:12;101:15
**problematic (2)**
91:11;101:14
**problems (5)**
21:24;53:9;67:6;68:3;
101:14
**Procedure (1)**
17:1
**proceedings (1)**
114:7
**process (8)**
13:1,2;16:6;96:17;98:3,9,
15;99:17
**production (2)**
44:16,17
**productions (1)**
44:15
**Professional (9)**
18:16,19;27:19;28:10,15;
29:6,7;30:17;60:24
**professionals (1)**
84:9
**professor (37)**
5:3,20;7:13,16,21;8:13;
10:8,12;11:5;13:6;18:17,21;
19:21;23:24;26:2,11;30:15;
33:13;38:12;50:14;62:22;
73:1,2;78:8;80:4;81:6;

83:12,22;88:4;96:11;97:24;
101:6;103:23;110:2,19;
114:3,6
**program (1)**
9:12
**prompted (4)**
74:11,12;78:16;91:7
**pronounce (1)**
8:5
**proper (2)**
44:10;58:20
**properly (1)**
79:18
**proposed (1)**
38:18
**prosecution (2)**
27:20;62:16
**provide (6)**
11:7;23:12;66:8;67:5;
68:14;70:11
**provided (2)**
54:14;105:15
**provides (3)**
20:22;21:8;70:21
**providing (3)**
22:10,15;68:1
**provision (11)**
60:7;63:11,19;66:4,22,24;
67:15;68:19,22;70:1;94:17
**pulling (1)**
62:14
**purport (1)**
33:7
**purpose (14)**
22:15;23:11;24:21;37:8;
52:9;64:2,3;67:4;76:1;
92:12;94:9;98:5;103:4;
111:17
**purposes (11)**
21:5;30:13;35:16,18;37:3;
38:9;45:3;64:3,10;93:2;
106:14
**pursuant (2)**
47:13;50:22
**put (20)**
9:13;22:21;44:4;52:16;
54:24;58:21;67:7,9,19,21;
86:14;87:2;93:15;95:15;
96:24;97:7,13,16;99:22;
103:1
**Putting (11)**
23:22;43:12;46:4,18,20;
54:15;56:15;58:19;72:17;
74:19;94:5

## Q

**questioners (1)**
7:1
**quibble (2)**
105:1;110:20
**quibbling (1)**
34:1

**quite (4)**
29:24;77:6;79:18;85:7
**quote (2)**
63:24;104:13
**quotes (4)**
54:24;62:1;67:19;69:14
**quoting (2)**
66:12;70:9

## R

**racing (1)**
9:24
**raised (2)**
63:8;66:18
**raises (1)**
80:14
**raising (1)**
64:9
**range (1)**
38:19
**rata (1)**
45:22
**rate (6)**
10:15;28:9;32:17;38:24;
81:8,13
**rates (48)**
27:22;28:1,12;31:23,24;
32:1,4,11,23;33:1,11,20;
34:8,10,10,17;35:13;36:21,
22;37:6,24;38:1,8,18;45:17,
18;46:1,7;50:6,7;54:23,24;
55:2,14,16;57:14,16;71:18;
74:21;80:12;84:8,11;85:10;
94:11,13;101:4,4;108:5
**rather (2)**
82:21;104:3
**react (1)**
53:18
**reaction (1)**
53:17
**read (79)**
11:5,11,15,16,18;13:6,13,
15,17,20,23;14:1,2,5,11,16,
18,24;15:4,14,15,16,18;
18:17,21;19:6;20:9;21:7,15;
22:8;23:10,10;26:1;33:3;
41:5,7,12,13,16;49:3,14,21;
52:7;58:10;59:22;61:23,23;
78:22;79:2,9;81:11;83:1,5,6,
6,14;86:17;93:1,4;95:20,22,
24;97:24;98:10;99:21;
102:19;104:10;105:22;
106:20;107:4;110:4,13,14,
14,15,21,22,23;111:2
**read-backs (1)**
7:8
**reading (9)**
19:2;20:18;23:4;42:21;
49:2;55:6;66:20;96:5;
100:12
**realized (1)**
9:11

**really (14)**
35:18,19;36:1;37:12;
38:10;52:11;81:5;87:10;
89:13;90:1;92:8;93:24;
108:24;112:2
**reason (2)**
9:13;71:4
**reasonable (27)**
17:19;18:3;20:14;21:3;
46:19;53:13,22;59:1;87:4;
88:14,19;90:23;91:15,18;
92:10;93:16,18,23;94:1,18;
104:4,22;105:10,13;106:6;
108:20,21
**reasonableness (1)**
92:22
**reasonably (4)**
23:16;87:16;90:3,4
**reasons (5)**
63:22;68:23;72:3;90:22;
105:9
**recall (8)**
13:12;14:13;42:7;55:5;
95:11;102:10,12;104:20
**receive (1)**
16:12
**received (3)**
11:8,13;96:19
**recent (1)**
9:12
**recess (1)**
88:1
**recited (1)**
107:1
**recognized (3)**
92:20;94:22;110:7
**recollecting (1)**
14:20
**recollection (1)**
112:14
**record (16)**
5:6;6:18;7:15;29:11;
43:14;54:21;61:17;76:4;
78:22;86:12;91:9;98:14;
102:9,10,13;113:2
**records (2)**
28:3;37:18
**refer (1)**
21:14
**reference (3)**
41:13;69:22;90:15
**referenced (1)**
72:1
**references (4)**
14:19;51:12;52:13;62:1
**referencing (1)**
20:10
**referred (2)**
11:17;28:22
**referring (3)**
13:8;47:19;107:15
**reflected (1)**
102:20

**regardless (1)**
48:6
**regrettable (3)**
87:15;109:18;111:6
**regrettably (2)**
75:12,13
**regular (2)**
28:12;84:11
**regularly (1)**
28:4
**reimbursed (1)**
32:18
**relationship (1)**
57:11
**relevant (1)**
64:22
**reliable (1)**
37:21
**reliance (2)**
108:20;109:5
**relied (2)**
92:11,12
**relies (2)**
36:10;104:12
**rely (6)**
36:24;37:2;82:21;94:7;
105:15;108:21
**relying (11)**
63:5;66:15;81:15;88:10;
104:3;106:10;107:23;108:2,
3,6;109:1
**remain (1)**
86:23
**remedial (1)**
66:22
**remedy (2)**
72:19;73:5
**remember (9)**
9:14;19:12;6:14:5,7;60:9;
81:13;95:12,13
**repeat (3)**
7:7;73:3;102:15
**replies (1)**
84:17
**report (13)**
8:18;9:3;11:5,17;15:23;
16:21;18:18,21;19:21;20:3;
26:4;80:5;110:19
**reported (2)**
79:20;80:6
**reporter (2)**
102:17,19
**reporting (1)**
80:11
**reprehensible (1)**
112:17
**representation (1)**
9:1
**representations (1)**
17:13
**representing (1)**
12:9
**request (3)**

28:5,8;54:16
**requested (1)**
    84:19
**require (4)**
    56:1;87:1;88:21,22
**requires (1)**
    43:15
**requiring (1)**
    18:13
**research (5)**
    11:18;16:20,22,23;19:18
**respect (21)**
    10:20;15:2;16:11,21;
    18:11;30:23;35:15;65:6;
    70:16;72:16;73:18,19;74:6,
    14;86:4;91:3,15;92:1,6;
    98:4;99:15
**responds (2)**
    96:18;97:5
**response (3)**
    84:24;85:15;113:24
**responsible (5)**
    37:16,18;59:4,9;76:20
**rest (5)**
    97:11;100:2,7;101:5;
    108:18
**result (3)**
    62:18;75:4;93:19
**resulted (1)**
    62:17
**resume (2)**
    9:14;10:4
**retired (1)**
    5:9
**Retirement (1)**
    5:13
**reverse (1)**
    76:16
**review (5)**
    14:23;30:11;97:21;98:16;
    99:12
**reviewed (5)**
    14:22;97:18;99:2,3,8
**reviewing (1)**
    9:11
**revisit (1)**
    72:14
**Richard (4)**
    3:16;6:15;43:12;113:10
**right (36)**
    5:16;6:21;7:12,18;12:17;
    16:24;17:10;18:14,20;19:5,
    12;24:23;25:19;27:14;
    28:20;32:22;33:1;36:18;
    39:6;52:5;56:21;57:11,17;
    59:3;65:13;71:7;77:9;82:23;
    87:19;90:20;98:7;100:9;
    111:7,8,15;114:1
**rise (9)**
    75:16;76:21,23;78:3;89:6;
    93:13;106:1;108:22;112:7
**risk (3)**
    44:12,21;47:21

**road (1)**
    9:24
**Robert (2)**
    3:17;6:13
**role (3)**
    40:14;60:13;96:17
**roles (1)**
    9:7
**room (3)**
    5:23;6:24;65:19
**Rosen (7)**
    5:9,11;65:18;71:21;72:15;
    76:6;97:2
**Rubenstein (1)**
    38:12
**Rubenstein's (1)**
    81:6
**Rule (114)**
    9:12,20;11:2;17:1,3,12,
    22;18:6,8,11,12,16,22;19:2,
    4,7,10,10,14,14;20:14,21;
    21:8,16,21,22;22:9,10,10;
    23:4,8,9,17;24:6,13,14,21;
    30:24;31:1,4,17;35:7,7,18,
    21;36:6;37:14;40:15;43:4,
    10,15;48:2;53:12;55:24;
    56:4;58:15,24;59:24;60:6,
    20;61:10;64:4,6;65:11;66:8,
    24;67:13;68:4,6,10,12;69:7,
    14,17,18,20;70:10,21;74:15,
    23;75:3,17;76:21,23,24;
    77:2,2;78:3,4,4;86:23;
    88:21;89:7,24;90:10,24;
    91:17,22;92:15,18;93:14,16,
    21;94:19;101:12,18;104:3;
    106:1;108:22;111:10,13;
    112:7,14,21
**Rules (2)**
    18:19;19:14
**running (1)**
    10:9
**rushed (1)**
    98:9

**S**

**safe (33)**
    21:8;22:9;24:17;60:7;
    63:1,4,11,19,22,23;64:22;
    65:14;66:4,8,14,21,23;67:1,
    15,19,22;68:1,18,21;69:11,
    12,13;70:1,11,18;71:19;
    75:18,21
**salient (2)**
    100:23;101:6
**same (14)**
    7:3;28:11;30:15;32:8;
    37:22;45:5;80:11;84:6,8,10;
    89:11,12;90:22;103:2
**San (1)**
    3:19
**sanction (3)**
    111:20,21;112:7

**sanctionable (5)**
    59:21;73:15;76:3;109:21;
    111:14
**sanctioned (4)**
    77:3,6,22;87:3
**sanctioning (1)**
    61:5
**sanctions (26)**
    20:15;21:10,16;22:22;
    23:17;24:6;25:15;60:6;64:7,
    18;65:3,9,15,24;69:18;
    73:18;76:10,17;77:12,14,18;
    78:3;88:10;89:7;93:19,21
**Santa (1)**
    8:2
**satellite (1)**
    69:19
**Savage (1)**
    90:6
**saw (3)**
    49:10;52:13;97:22
**saying (20)**
    21:7;33:3;46:24;49:12;
    53:2;55:10,20,21;56:2,12;
    59:19,20;60:12,18;65:6;
    93:24;94:1;100:4;104:20;
    106:6
**schedule (2)**
    27:16;28:2
**scheme (2)**
    76:22;78:1
**scope (2)**
    19:1,17
**scramble (1)**
    44:17
**search (1)**
    43:1
**second (1)**
    88:23
**section (3)**
    69:7;97:8;99:23
**securities (1)**
    56:17
**seeing (1)**
    102:12
**seemed (1)**
    54:4
**seems (5)**
    19:3;49:2,5;53:14,21;
    74:12;79:12;111:1
**segue (1)**
    81:19
**send (1)**
    11:4
**sense (5)**
    25:18;56:13,19;70:21;
    109:5
**sensitive (1)**
    95:14
**sent (8)**
    13:9;16:6;49:12;78:11;
    84:18;96:21;97:20;99:11
**sentence (3)**

20:10;21:6,15
**September (1)**
    15:17,19;110:11,13
**serious (5)**
    72:10;77:2;88:8,12;113:3
**seriousness (1)**
    77:7
**services (2)**
    28:12;84:11
**set (1)**
    74:22
**setting (1)**
    42:5
**settlement (7)**
    12:8;13:17;57:22;58:1;
    71:13;95:15;105:5
**Seventy (1)**
    42:14
**shape (2)**
    47:7;72:12
**share (8)**
    37:16;43:3;44:5,10;45:22;
    47:15;62:11,11
**shared (1)**
    62:9
**SHARP (2)**
    6:19,19
**shift (2)**
    106:3,5
**shifting (1)**
    33:14
**shoe (1)**
    68:9
**shorter (1)**
    84:5
**show (5)**
    58:14;63:6;65:4;66:16;
    70:12
**showed (1)**
    84:13
**shown (2)**
    40:19;51:2
**side (2)**
    54:12,12
**signed (5)**
    8:2;9:3;40:9;75:14;111:3
**significant (5)**
    37:12;42:10,14;94:12,15
**signing (5)**
    17:15;20:23;23:5,8;
    100:16
**similar (5)**
    19:3;32:7,8;33:6;87:11
**simple (1)**
    39:11
**simply (3)**
    59:16;60:13;104:21
**Singal (1)**
    5:19
**single (1)**
    54:17
**SINNOTT (40)**
    5:3,5,6;6:9,17,21;7:10,18,

20;8:8,12;10:8,11;12:21;
13:3,5;23:23;26:10,22;27:2;
30:24;62:21;78:6;83:11,17,
21;87:20,24;88:2;96:6,10;
103:22;105:12;109:24;
110:1;113:12,16,18,22;
114:1
**S-I-N-N-O-T-T (1)**
5:7
**Sinnott's (1)**
35:9
**sit (1)**
11:16
**sitting (1)**
65:20
**situation (3)**
11:4;22:6;42:5
**situations (4)**
25:15;65:3;77:1;112:16
**six (5)**
10:2;26:7,8;73:1;80:3
**sixth (1)**
65:21
**sloppy (1)**
109:18
**so-called (1)**
84:13
**solicit (2)**
16:12,16
**somebody (5)**
14:6;43:23;61:6;69:18;
112:19
**somebody's (1)**
47:8
**somehow (4)**
12:15;73:17;75:2;92:4
**sometimes (3)**
94:23;110:22,23
**somewhere (1)**
63:24;112:15
**soon (4)**
64:15;67:6;68:15;101:15
**sorry (9)**
19:23;24:8;34:21;41:1;
70:7;96:4;102:13;103:17;
106:22
**sort (15)**
9:17;75:16;76:22;77:21;
87:15;93:13;95:17;96:20,
24;97:12,18;100:2,8;101:8;
108:18
**sorts (5)**
56:5,5;76:3;107:10,12
**so-to-speak (7)**
22:11;35:15;44:6;49:4;
65:8;76:11;95:1
**speaking (3)**
42:24;43:10,13
**special (169)**
5:7,8,11,16,17;9:23;10:3,
10;11:20;12:18,23;19:9;
23:20;24:2,10,23;25:4,9,19,
22;26:1,4,6,13,16,19;27:5,8,

10,14;28:18,21;29:1,4,19;
30:2,5,9,14;31:9,19,22;
32:10,15,18,22;33:13,18,23;
34:6,15,24;35:5;36:8,13,20;
37:7,22;38:21;39:6,10,13,
18,20;40:1,8,11,13,18;41:3,
7,17,19;42:1,4,9,16;43:9;
45:7,10,15;46:4,12,16;47:10,
17,21;48:15;49:14,17,21,24;
50:10;51:2,9,17,22;52:4,18,
21,24;53:6;54:8;55:10,19;
56:9,22;57:5,13,19,24;58:9;
59:11,15;60:1,4,11,13;
61:13,19;62:20,24;70:8;
77:9,15;79:22;80:7,14,19;
81:2,19;82:4,8,23;83:3,10;
84:13;87:23;100:10,15;
101:2,17,24;102:5,17;103:7,
14,19;106:19,24;107:3,13,
16,19,22;108:13,24;109:6,
13,22;111:12,19,22;112:8;
113:5,8,10,14,17;114:5
**specific (6)**
9:20;87:6;97:10;100:1;
104:17;106:16
**specifically (6)**
12:6,16;18:2;20:4;96:14;
98:24
**Specification (1)**
72:21
**specifies (1)**
25:18
**spent (3)**
10:18;27:18;37:19
**spirit (7)**
66:1,2;67:12;69:22;71:19,
23,24
**sponte (3)**
64:18;65:23;88:9
**staff (56)**
27:19;28:10,15,19;29:5,7,
11;30:17;31:23;32:2,11,20,
23;33:20;34:2,3,8,17;35:14;
37:17,23;38:2,23;40:5;
41:20;42:12;44:13;45:5,12,
16,18;46:2,4,18,20;47:16;
50:2,5,6;51:6;56:10;57:9,9;
58:2;76:6,7;80:19;81:17,18;
84:9;85:1;91:3;92:2;101:3;
107:24;108:4
**standard (4)**
71:20;88:11,16,18
**State (8)**
5:13;8:21;20:21;79:1;
82:17;105:3,14,17
**stated (4)**
36:3;57:14;68:24;79:8
**statement (10)**
31:16,22;32:23;34:8;
66:13;79:6;88:8;91:21;
100:17;104:15
**statements (49)**
24:4,5;25:1,10,12,23;26:7,

8;27:11;35:10,19;36:6,11;
39:1,13;40:16;48:10,17;
53:8;55:13;56:5,6;57:7;
59:16;60:15;71:21;72:3,19,
22;73:5;75:6,15;76:1;77:16;
79:13,23;84:2;91:2,4;92:1,
3;106:9;107:10,12;108:14,
22;109:15;110:4,9
**States (3)**
5:10;69:24;85:3
**stating (2)**
17:11;21:18
**status (1)**
13:13
**step (1)**
38:10
**Stephen (2)**
3:24;5:20
**stepped (2)**
55:12,15
**Steve (1)**
7:3
**STEWART (2)**
3:2;6:2
**still (2)**
10:2;24:5
**stop (2)**
94:17,20
**stopped (2)**
52:22;95:2
**story (2)**
73:9,11
**straight (1)**
39:11
**Street (6)**
3:18;5:14;82:17;105:3,14,
17
**strictly (2)**
33:19;34:7
**Stu (2)**
5:23;113:12
**Stuart (2)**
3:3;6:1
**studied (1)**
18:18
**styled (1)**
8:3
**subheadings (1)**
17:20
**subjective (1)**
88:22
**submission (1)**
34:14
**submitted (8)**
7:21;8:15;36:9;47:5;61:9;
82:13;91:19;97:22
**submitting (6)**
17:15;20:24;23:6,9;96:21;
105:18
**Subsection (1)**
17:24
**substantially (1)**
21:21

8:27:11;35:10,19;36:6,11;
39:1,13;40:16;48:10,17;
53:8;55:13;56:5,6;57:7;
59:16;60:15;71:21;72:3,19,
22;73:5;75:6,15;76:1;77:16;
79:13,23;84:2;91:2,4;92:1,
3;106:9;107:10,12;108:14,
22;109:15;110:4,9
**SUCHAROW (2)**
3:8,13;14:4;84:3,3;85:5
**sufficient (2)**
82:1;104:14
**sufficiently (1)**
19:12
**suggest (2)**
43:7;87:20
**suggesting (1)**
102:13
**sui (1)**
64:18;65:23;88:9
**sum (1)**
111:12
**summary (1)**
27:18
**supplemental (1)**
53:2
**supplied (1)**
29:13
**support (9)**
18:1,3;27:19;28:10,15;
29:7;30:17;76:9;84:9
**supposed (3)**
50:21;92:19;93:16
**sure (11)**
8:23;15:13;16:7;29:24;
56:20;73:4;74:3;87:22;
98:18,19;99:7
**surprising (1)**
62:9
**sworn (6)**
5:2;28:14;40:15;45:23;
55:13;109:14
**System (1)**
5:13

**T**

**talk (9)**
11:2;25:22;35:6;54:3;
62:5;63:1;68:19;75:19;78:7
**talked (7)**
11:6;29:21;43:11,12;
65:23;89:9;94:8
**talking (16)**
28:18;33:8;52:14;55:4;
64:7;65:3,13;67:12,20;
70:14,17;75:18,22;77:1;
107:10;108:15
**target (1)**
21:9
**targeting (1)**
69:18
**taste (1)**
13:3
**taught (1)**
10:7
**Teacher (1)**
5:13
**team (1)**
5:17
**technical (1)**

63:23
**teleconference (2)**
3:9,24
**telephone (1)**
5:19
**telling (3)**
37:23;45:23;46:5
**tells (2)**
50:1;51:5
**template (25)**
52:11;54:14;57:6;58:23;
61:8;69:9;72:4,7;73:24;
75:23;77:23;92:7,11;94:8;
100:22;105:7,15;107:23;
108:3,3,6,10;109:2;111:5;
112:5
**template-type (1)**
77:19
**temporal (1)**
23:22
**tennis (2)**
10:4,5
**term (1)**
86:6
**terms (17)**
43:2;53:23;55:2;58:18,21,
22;62:14;67:20;75:2;79:21;
80:12,12;81:16;89:9;93:17;
94:5;109:12
**testified (2)**
81:13;83:14
**testify (1)**
19:10
**testimony (12)**
7:7;10:21;15:4;25:14;
40:19;59:15;79:23;81:10;
83:8;92:5;99:15;112:10
**therefore (6)**
44:2,8;77:5;87:15;101:11;
111:19
**thinking (1)**
55:2
**third (4)**
44:22;63:3;89:15,17
**Thornton (62)**
3:23;6:4,6,8,11,11,12,20;
11:21;12:2;14:4;29:16,22,
23;30:3;32:12,13;33:19;
37:15;40:3,21;41:8,20;
42:10,13;43:22;44:11,21;
45:2,4,21;46:4,18,22;47:12,
13,13;50:4,20,22;51:4,5,16;
57:11;58:3;59:3,6;75:2;
80:6,10,17;81:7;82:10;
84:16;95:21;97:17;98:17;
99:2,17;105:6;106:6;108:9
**Thornton's (1)**
40:24
**though (4)**
18:10;71:10;111:2;112:18
**thought (2)**
14:14;39:19;95:2;102:14
**thoughtful (2)**

98:3;99:16
**three (6)**
42:6;43:21;51:13;60:5;
84:2;99:7
**times (2)**
60:5;109:18
**timing (1)**
68:19
**today (1)**
10:20
**together (9)**
21:8;22:9;49:10;54:15;
56:15;58:19;62:4;94:6;
95:15
**token (1)**
7:3
**told (3)**
53:3;57:17;109:1
**took (11)**
63:7;66:17;67:10;69:8;
80:11;86:4;98:11,21;109:9;
110:11,12
**tools (1)**
24:12
**top (1)**
14:7
**total (2)**
42:13;96:21
**totally (1)**
49:3;54:21;86:24
**towards (2)**
16:5;95:11
**track (2)**
97:14;102:16
**trail (1)**
10:9
**train (1)**
102:14
**transcript (7)**
13:13,15,18,20;14:2,2,23
**transcripts (16)**
11:9,15;13:7,9,12,24;14:1,
19,22;15:3,3;51:13;61:24;
81:12;83:8,9
**treated (1)**
45:4
**tribunal (1)**
18:23
**tried (2)**
68:8;101:16
**triggered (1)**
103:10
**troubling (1)**
12:21
**true (4)**
23:14;39:14;48:11;63:10
**Trust (1)**
5:14
**truth (5)**
34:7,11;39:1;43:2;109:2
**truthfulness (2)**
36:10;109:14
**try (4)**

43:18;47:24;55:24;92:16
**trying (7)**
33:16;55:3,19;59:3;68:13;
106:3,5
**twenty-five (1)**
80:24
**twice (2)**
47:10,11
**Two (11)**
3:4;39:4;40:23,24;41:4;
44:15;45:11;65:17;67:11;
90:11;97:21
**type (2)**
56:18;78:2
**types (3)**
85:9;89:9;93:20
**typically (1)**
68:2
**typos (3)**
16:8,9,11

---

# U

**ultimately (1)**
88:16
**um (25)**
9:13;33:2;38:9;41:12,23;
48:19;52:2;54:20;55:7;
65:18;68:23;74:19;80:2;
86:9,10;89:4;92:6;98:11;
100:13;101:20;103:2;
104:24;105:23;106:22;
107:7
**unclear (1)**
7:4
**under (18)**
17:12,19;21:3;24:6;27:11;
53:14;58:24;59:1;67:15;
85:2;88:15,18;92:10;94:3;
100:17;101:18;104:4;
112:20
**understood (2)**
51:15;102:21
**unequivocally (1)**
69:24
**Unioil (4)**
104:6,7,10,16
**United (1)**
5:9
**Unless (4)**
24:16;25:17;77:7;84:6
**unreasonable (1)**
94:6
**unrepresented (2)**
17:16;21:1
**up (24)**
7:1;10:6;24:7;34:2;38:23;
40:11,20;41:10;42:17,21;
45:13,20;46:17;55:15;
61:15;62:11,23;64:8;80:12;
86:19,21,23;93:9;111:12
**update (1)**
9:22

upon (4)
27:24;36:10,24;86:9
**use (8)**
33:6;69:17,20;80:17;
82:20;105:6;108:9;111:5
**used (13)**
35:15;54:13;57:7;68:2;
71:24;77:23;84:19;85:6;
89:5;100:19;109:19,20,20
**uses (1)**
112:15
**using (4)**
48:3;68:5;109:4,7

---

# V

**Vairo (1)**
8:4
**VALLEE (2)**
6:3,3
**value (1)**
55:23
**various (8)**
11:8;12:10,10;37:16;
51:12;55:6;79:12;89:8
**verbatim (1)**
54:13
**version (1)**
68:3
**versions (1)**
92:17
**versus (5)**
5:13;43:3;90:6;104:6,7
**via (2)**
3:9,24
**view (3)**
64:20;82:19;101:8;
109:16;111:12
**violate (7)**
31:17;35:21,22;36:6;
37:14;90:10,24
**violated (6)**
23:17;35:7;56:4;61:10;
68:10,12
**violates (3)**
30:24;58:15;86:23
**violation (22)**
23:9;40:15;43:4,10;74:17,
18,19,24;75:1,17;76:21,24,
24;78:5;88:20;89:1;91:16;
92:4;106:1;108:22;111:10,
13
**violations (1)**
110:18
**violative (1)**
101:12
**virtue (1)**
44:12
**vis-a-vis (10)**
40:24;41:2,3;42:22;43:2,
6;46:24;47:1;81:24;82:12
**vis-à-vis (2)**
61:21;73:23

**voices (1)**
7:1
**voila (1)**
68:10

## W

**wait (1)**
54:6
**way (20)**
23:10;29:4,8;30:16,19;
34:16;39:8,20;40:1,4,20,21;
44:10;45:21;46:3,17;76:17;
88:13;93:15;106:3
**weight (1)**
62:14
**Welcome (3)**
6:9;7:12;20:8
**Wellesley (1)**
65:19
**well-known (2)**
33:8;55:8
**weren't (6)**
56:23,24;67:7,9;71:1,2
**Wesley (1)**
65:20
**What's (9)**
10:15;35:18;37:12;38:19;
52:8;59:1;62:5;88:11;94:17
**whatsoever (1)**
77:12
**Whereupon (1)**
114:7
**whole (8)**
21:22;22:15;23:11;24:21;
37:8;44:18;52:9;67:4
**who's (1)**
61:1
**willful (4)**
89:12,12,13;113:3
**willfulness (2)**
89:2,18
**William (1)**
5:6
**withdraw (2)**
22:21;64:5
**withdrawing (1)**
70:11
**withdrawn (2)**
21:10;22:23
**withdraws (1)**
24:15
**withdrew (2)**
68:8,11
**within (6)**
9:15;21:11;22:23;38:19;
48:1;67:11
**without (2)**
45:23;46:3
**Witness (144)**
5:2,4;6:24;10:1,5;11:23;
19:11;24:1,9,11;25:7,21,24;
26:3,5,8,12;27:4,7,9,13;

28:17,20,24;29:3,10,24;
30:4,7,10,21;31:10,15,21;
32:3,13,16,21;33:2,16,16,
22;34:5,20;35:2,6;36:12,19;
37:1,8;38:3;39:7,12,16,19,
23;40:6,9,12,17;41:5,12,23;
42:3,7,12;43:18;45:8,14;
46:9,15,23;47:11,20,23;
48:19;49:16,20,23;50:8,13;
51:7,11,20;52:2,6,20,23;
53:5,11;54:11;55:21;56:12,
24;57:12,18,22;58:5,11;
59:14,19;60:3,9,18;61:18,
20;77:13,18;78:10;80:2,9,
18,23;81:4;82:2,7,20;83:1,5;
100:13,20;101:7,20;102:3,7,
20;103:9,16;106:22;107:2,7,
14,18,21;108:7,16;109:4,7,
17;111:16,21,24;112:11;
114:4
**Wolf (23)**
5:12;12:11;13:16;38:6,8;
60:12;62:18;71:16;74:8;
78:12;83:13;84:15,22;85:1,
16,20;86:14;87:6;95:13;
100:24;101:21;102:1;
103:17
**Wolf's (4)**
63:9;66:18;85:24;91:7
**word (9)**
23:4,7;35:15;47:15;89:5;
109:5,7,19;110:21
**words (11)**
20:10;41:9;42:17;52:1;
61:15;67:3,22;70:10;85:1;
89:24;90:5
**work (10)**
10:13,14;18:14;29:15,20;
30:3;37:3;44:3;77:4;104:4
**worked (7)**
38:8;52:15,15;71:17;
74:21;94:10,13
**working (6)**
30:5,7,10;62:4;94:4;
102:11
**works (1)**
38:15
**world (2)**
38:15;93:18
**worried (2)**
56:7,8
**write (3)**
11:17;90:9;104:2
**writing (2)**
53:1;54:3
**written (6)**
15:23;17:14;20:23;23:15;
48:21;52:19
**wrong (4)**
22:12;25:16;47:15;49:8

## Y

**year (2)**
9:14;28:2
**years (2)**
9:15;61:3
**Yep (1)**
91:23
**yesterday (2)**
11:24;12:3
**York (3)**
3:11,11;12:15
**Young (1)**
88:10

## Z

**Zeiss (6)**
14:3;15:15;57:7,20;93:2;
96:20
**Zeiss' (5)**
54:2,5;107:23;110:11,17

## 0

**02110 (1)**
3:5

## 1

**1 (3)**
8:9,10,14
**10 (7)**
57:4;65:8;75:5;86:13;
93:4;102:12;103:4
**10005 (1)**
3:11
**104-16 (1)**
84:7
**10th (6)**
49:15;51:23;74:7;75:8;
85:20,23
**11 (80)**
9:12,20;11:2;17:1;18:6,8,
13;19:4,14;20:14;21:16,21;
23:17;24:7,13,14;30:24;
31:1,4,17;35:7,8,18,21;36:6;
37:15;40:15;43:4;48:2;
53:12;55:24;56:4;58:15,24;
59:24;60:6,20;61:10;64:4,6;
68:4,6,10,12;69:7,17,18;
74:15,23;75:3,17;76:21,23,
24;77:2,2;78:3,4,4;86:23;
88:21;89:7,24;90:10,24;
91:17;92:15;93:14,16,21;
101:12,18;104:3;106:1;
108:22;111:11,13;112:7,14,
21
**11:46 (1)**
88:3
**11-10230-MLW (1)**
5:15
**11b (4)**
17:3,12,22;20:21
**11c2 (9)**

21:8,12;22:9;23:11;63:11;
65:12;66:24;70:1,21
**12:21 (1)**
114:8
**14 (1)**
84:23
**140 (1)**
3:10
**16 (1)**
26:21
**19 (1)**
15:23
**1983 (3)**
18:11;68:3;92:15
**1986 (1)**
104:8
**1993 (12)**
18:12;21:21,23;22:1,15;
64:3;66:1,2;67:1,4,13;69:23

## 2

**2 (3)**
13:18;26:24;27:3
**20 (1)**
21:11
**20/20 (4)**
48:19,22,24;50:14
**20/20/20 (1)**
44:1
**2016 (1)**
13:14
**2017 (9)**
13:21;14:23;63:9;66:19;
83:12;85:23;91:1;95:21;
96:2
**2018 (1)**
8:2
**21 (1)**
22:24
**212-907-0882/mcanty@labatoncom (1)**
3:12
**24 (7)**
19:21,22,23;20:5;63:1;
67:20;90:22
**25 (10)**
19:21,23;48:4;63:3;67:21;
70:6;83:23;84:4;90:22;
99:21
**26 (3)**
8:2;9:4;88:4
**27 (1)**
90:9
**275 (1)**
3:18
**29th (1)**
3:18

## 3

**3 (8)**
17:24;27:8,15;39:14;
83:19;107:5;109:3,15

**3.3 (7)**
18:16,22;19:2,7,10,13,15
**30c (1)**
43:10
**31 (1)**
90:21
**33 (3)**
103:24;104:1;108:8
**34 (2)**
103:24;105:8
**37 (1)**
49:13

**4**

**4 (9)**
27:8;28:9;39:14;85:2;
96:8,11;107:5;109:3,15
**40 (3)**
44:1,5,10
**400 (1)**
80:24
**41 (2)**
48:6;49:8
**415-956-1000/rheimann@lchbcom (1)**
3:20
**425 (2)**
81:9,15

**5**

**5 (2)**
95:21;96:2

**6**

**6 (6)**
14:24;63:9;66:19;74:13;
103:10,18
**60 (1)**
10:19
**617-248-5000/sglass@choatecom (1)**
3:6
**626 (1)**
90:8
**631 (1)**
90:8
**6th (1)**
53:18

**7**

**7 (15)**
13:20;14:23;41:14,15;
48:12;53:20;73:7;75:20;
83:12;85:23;86:15;91:1;
93:10;102:4;103:11
**70 (3)**
41:21;42:9,13
**75 (1)**
68:5
**7th (4)**
48:15;87:6;91:24;103:14

**8**

**8 (8)**
15:23;26:17;54:7;69:7;
86:14;93:3;102:11;103:17
**8.4 (1)**
19:10
**83 (1)**
92:17
**86 (1)**
83:22
**88 (1)**
84:23
**896 (1)**
90:8

**9**

**9 (7)**
20:1;62:22;66:10;72:6;
93:3;96:14;102:11
**93 (4)**
60:7;92:17;96:12;99:21
**94 (1)**
108:18
**94111 (1)**
3:19