# EX. 227

**Peter Joy**

1

                              Volume:  1
                              Pages:  1-193
                              Exhibits:  1-8

                    JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

-----------------------------------------------X


In Re:  STATE STREET ATTORNEYS FEES


-----------------------------------------------X



                         630 8th Avenue
                         New York, New York

                         April 3, 2018
                         1:45 p.m. to 5:51 p.m.


B E F O R E:

     Special Master Honorable GERALD ROSEN,
     United States District Court, Retired

     MELISSA GILMORE, Reporter


                    DEPOSITION OF

                    PETER A. JOY

---

Page 2

```
1   A P P E A R A N C E S :

2

3   BARRETT & SINGAL

4   On Behalf of the Special Master

5        One Beacon Street, Suite 1320

6        Boston, Massachusetts 02108-3106

7   BY:  WILLIAM F. SINNOTT, ESQ.

8        ELIZABETH J. McEVOY, ESQ.

9        617-720-5090

10       wsinnott@barrettsingal.com

11       emcevoy@barrettsingal.com

12

13

14  JAMS

15       150 West Jefferson, Suite 850

16       Detroit, Michigan 48226

17  BY:  THE HON. GERALD ROSEN (Ret.), ESQ.

18       313-872-1100

19

20

21

22

23

24
```

Page 4

```
1   A P P E A R A N C E S :  (Cont'd)

2

3   LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

4   On Behalf of Lieff Cabraser

5        275 Battery Street, 29th Floor

6        San Francisco, California 94111

7   BY:  RICHARD M. HEIMANN, ESQ.

8        ROBERT L. LIEFF, ESQ.

9        415-956-1000

10       rheimann@lchb.com

11

12

13  KELLER ROHRBACK, LLP

14  On Behalf of ERISA Plaintiffs

15       1201 Third Avenue, Suite 3200

16       Seattle, Washington 98101

17  BY:  T. DAVID COPLEY, ESQ. (Via telephone)

18       206-623-1900

19       dcopley@kellerrohrback.com

20

21

22

23

24
```

---

Page 3

1   **A P P E A R A N C E S :** (Cont'd)

2

3   CHOATE HALL & STEWART LLP

4   On Behalf of Labaton Sucharow

5   Two International Place

6   Boston, Massachusetts 02110

7       **BY:** JOAN A. LUKEY, ESQ.

8   STUART M. GLASS, ESQ.

9   617-248-5000

10  joan.lukey@choate.com

11  sglass@choate.com

12

13

14  NIXON PEABODY, LLP

15  On Behalf of Thornton Law Firm

16  100 Summer Street

17  Boston, Massachusetts 02110-2131

18      **BY:** BRIAN T. KELLY, ESQ.

19  JOSHUA SHARP, ESQ. (Via telephone)

20  EMILY CRANDALL HARLAN, ESQ. (Via telephone)

21  617-345-1065

22  bkelly@nixonpeabody.com

23

24

Page 5

1   **A P P E A R A N C E S :** (Cont'd)

2

3       **ALSO PRESENT:**

4   MICHAEL CANTY, Labaton Sucharow

5   MICHAEL THORNTON, Thornton Law Firm

6   LINDA HYLENSKI, ESQ., JAMS

7   PROFESSOR STEPHEN GILLERS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

---

Page 6

```
1   -------------------- I N D E X --------------------
2   WITNESS                 EXAMINATION BY        PAGE
3   PETER A. JOY            MR. SINNOTT            10
4                           MS. LUKEY             187
5
6
7   --------------- E X H I B I T S ---------------
8   JOY             DESCRIPTION          FOR I.D.
9   Exhibit 1       Curriculum Vitae of Peter    11
10                  A. Joy
11  Exhibit 2       Expert Report of             14
12                  Professor Peter A. Joy,
13                  dated March 26, 2018
14  Exhibit 3       E-Mail Chain, Bates          33
15                  Stamped LBS017593 through
16                  17594
17  Exhibit 4       Excerpt of Deposition,       47
18                  dated October 2, 2017
19  Exhibit 5       Excerpt Deposition of        50
20                  Damon J. Chargois, dated
21                  October 2, 2017
22  Exhibit 6       Excerpts from the            97
23                  Massachusetts Rules of
24                  Professional Conduct
```

Page 7

```
1   ------------ E X H I B I T S (Cont'd)------------
2   JOY             DESCRIPTION          FOR I.D.
3   Exhibit 7       Excerpt of Deposition of    111
4                   Lynn Lincoln Sarko, dated
5                   September 8, 2017
6   Exhibit 8       In re: Agent Orange         128
7                   Product Liability
8                   Litigation
9
10
11          (EXHIBITS RETURNED TO ATTORNEY SINNOTT)
12
```

Page 8

```
1  P E T E R   J O Y,    called as a witness,
2      having been duly sworn by a Notary
3      Public, was examined and testified as
4      follows:
5
6          MR. SINNOTT:  Good afternoon, sir.
7          THE WITNESS:  Good afternoon.
8          MR. SINNOTT:  For the record, my
9      name is William Sinnott, S-I-N-N-O-T-T,
10     from the firm of Barrett & Singal.  I'm
11     counsel to the special master.
12         We are here on a special master
13     investigation deriving from Arkansas
14     Teachers Retirement System versus State
15     Street Bank, Number 11-cv-10230-MLW.
16         The special master is the Honorable
17     Gerald T. Rosen, R-O-S-E-N, formerly with
18     the United States District Court in
19     Detroit, Michigan.  He is a retired
20     federal district court judge.
21         Also on the special master's team to
22     my left is Attorney Elizabeth McEvoy, also
23     of Barrett & Singal.
24         On the telephone is Linda Hylenski,
```

Page 9

```
1  also on the team.  The special master will
2  be joining us shortly.
3      I would ask, at this time, that the
4  parties, beginning with our witness,
5  identify themselves and their affiliation.
6      THE WITNESS:  My name is Peter Joy,
7  and I am a witness on behalf of the law
8  firm of Labaton & Sucharow.
9      MR. SINNOTT:  Thank you, Peter.
10 Joan?
11     MS. LUKEY:  Joan Lukey from Choate
12 Hall, representing Labaton Sucharow.
13     MR. CANTY:  Michael Canty on behalf
14 of Labaton.
15     MR. GLASS:  Stuart Glass, Choate
16 Hall, for Labaton.
17     MR. HEIMANN:  Richard Heimann for
18 Lieff Cabraser.
19     MR. LIEFF:  Robert Lieff, Lieff
20 Cabraser.
21     MR. THORNTON:  Michael Thornton,
22 Thornton Law Firm.
23     MR. KELLY:  Brian Kelly, Nixon
24 Peabody, on behalf of Thornton Law Firm.
```

Page 10

1     **MR. SINNOTT:** Thank you.  And if the
2  phone participants could identify
3  themselves, beginning with David.
4     **MR. COPLEY:** David Copley for Keller
5  Rohrback on behalf of the ERISA
6  plaintiffs.
7     **MR. SINNOTT:** Josh?
8     **MR. SHARP:** Josh Sharp of Nixon
9  Peabody for the Thornton Law Firm.
10    **MR. SINNOTT:** Thank you.  And
11  outside of Linda, I don't believe we have
12  anyone else on the telephone, do we?
13  Okay.  Great.  Thanks.
14  EXAMINATION BY
15    **MR. SINNOTT:**
16  Q.  Good afternoon, sir.
17  **A.  Good afternoon.**
18  Q.  Thank you for being here.  And thank
19  you for your patience in waiting.
20    Professor, I would like to ask you a
21  few questions, but not many, about your
22  background.
23  **A.  Okay.**
24  Q.  And I note that with your report

Page 11

1  came a CV?
2  **A.  Yes.**
3  Q.  In the name of Peter A. Joy.
4    And have you had a chance to look at
5  this CV recently?
6  **A.  I prepared it.  And the last time I**
7  **looked at it is probably a week ago.**
8  Q.  Okay.
9    **MR. SINNOTT:** Madam Court Reporter,
10  if I could ask that this be marked as
11  Exhibit 1.
12    (Joy Exhibit 1, Curriculum Vitae of
13  Peter A. Joy, marked for identification.)
14  Q.  And, Professor, if you'll take a
15  look at that.
16  **A.  Yes.**
17  Q.  And tell me whether there are any
18  changes or additions that need to be made to
19  that CV.
20  **A.  No, there aren't.**
21  Q.  Okay.  And beyond that CV, were
22  there any other relevant experiences that
23  informed your opinion in this case?
24  **A.  One thing that's not on the CV is I**

Page 12

1  successfully litigated a class action case on
2  behalf of various classes of taxicab drivers
3  that resulted in a reported decision out of the
4  Northern Districts of Ohio.  It happened to be
5  an ERISA case.
6  Q.  Okay.  And what was the name of that
7  case?
8  A.  Bruchac, B-R-U-C-H-A-C, versus
9  Universal Cab.  They are et al. because there
10  were several cab companies, all owned by the
11  same family, but Universal Cab is the first
12  defendant.  If you were to look it up, you
13  would find the decision was written by the
14  Honorable David Dowd who, unfortunately, is now
15  deceased.
16  Q.  And when you say "successfully
17  litigated," was it a trial?
18  A.  Cross-motions for summary judgment
19  on the issue of liability.  And we prevailed on
20  the issues of liability.  And then we settled
21  the matter for the class.
22    This was before the Supreme Court
23  decision in Evans versus Jeff D.  So we settled
24  the class issue, their damages, and then we

Page 13

1  later submitted our attorneys' fee petition.
2  The defendants didn't really fight us over it,
3  and then we got awarded our attorneys' fees
4  separately.
5    So unlike what happens sometimes
6  today.
7  Q.  Okay.  Congratulations.  Successful
8  in litigating and got attorneys' fees.
9  A.  That's right.
10  Q.  It's a good day.
11    According to your report, you
12  receive $400 an hour for each hour spent
13  preparing your opinion; is that correct?
14  A.  That's correct.
15  Q.  And can you estimate how many hours
16  you've spent up until this point, both writing
17  your report and preparing for your testimony?
18  A.  Total is in the area of about 95.
19  Q.  95 hours?
20  A.  Yes.
21  Q.  All right, sir.  And did you prepare
22  for your testimony today?
23  A.  Yes, I did.
24  Q.  And how did you do that?

Page 14

1   A.  I read my report twice, and also I
2   met with counsel for Labaton for approximately
3   two hours yesterday.
4   Q.  All right, sir.  And, Professor, I'm
5   holding in my hand a report whose face sheet
6   says, "Expert Report, March 26, 2018, Professor
7   Peter A. Joy."
8      Is this your rebuttal report in this
9   case?
10  A.  My report, that's correct.
11  Q.  Okay.
12     MR. SINNOTT:  And Madam Court
13  Reporter, if I could ask that that be
14  marked as Exhibit 2.
15     (Joy Exhibit 2, Expert Report of
16  Professor Peter A. Joy, dated March 26,
17  2018, marked for identification.)
18  Q.  And the witness has that report.
19  And looking at that, is that a complete copy of
20  your submission in this matter as an expert?
21  A.  (Perusing.)  Yes, it is.
22  Q.  All right.  And let me direct your
23  attention to that report, Exhibit 2, Professor,
24  and specifically with respect to the factual

Page 15

1   statement.
2   A.  Okay.
3   Q.  Beginning on page 2.
4   A.  Yes.
5   Q.  And going to page 13.
6   A.  Yes.
7   Q.  Who drafted that factual statement?
8   A.  The factual statement was drafted by
9   counsel for Labaton.  I indicate that on page
10  13. I then reviewed the various portions of
11  depositions and other items that were cited to
12  verify the citations in the factual report to
13  confirm that those citations supported the
14  facts in the report.
15  Q.  Okay.  And did you request any
16  additional facts in the course of that review?
17  A.  I did not request additional facts.
18  Initially, before I got the factual statement,
19  I had asked about some matters, some of which
20  are in the factual statement, but I did not
21  request any additional facts after I received
22  this factual statement.
23  Q.  Okay.  And the documents that you
24  received, do you recall what they were?

Page 16

1   A.  Well, there are the items that are
2   either cited in the factual report.  I could go
3   through them, but --
4   Q.  In general terms, if you can
5   describe them.
6   A.  Okay.  They were depositions, copies
7   of e-mails that went back and forth, a draft
8   retention letter between Labaton and Arkansas
9   Teachers Retirement System, which if it's okay,
10  I'll refer to as Arkansas, because it's kind of
11  a mouthful.
12  Q.  I'll do the same.
13  A.  Okay.  I received a copy of the
14  expert report written by Professor Stephen
15  Gillers.  I received a copy of a submission by
16  lawyers representing Labaton.  And then I
17  looked at some things just for me to get a feel
18  of the underlying litigation.
19     I didn't ask for copies, but I
20  accessed the docket for the underlying case in
21  just -- I wanted to take a look at the class
22  notice that went out, and relative -- I mean,
23  just having to deal with this case.  I think
24  that's about it.

Page 17

1   Q.  And was that on your own initiative
2   to request the notice?
3   A.  Well, I didn't request the notice.
4   I just looked for the notice.
5   Q.  But that had been provided to you?
6   A.  I didn't -- I had already -- I
7   already downloaded a copy of it, so I didn't
8   ask for it.
9   Q.  Okay.  And when you received the
10  transcripts, were they the full transcripts or
11  excerpts?
12  A.  I received -- I definitely received
13  excerpts that conformed with this, but there
14  was also some documents that were made
15  available to me through an internet connection
16  site that I believe were the full transcripts,
17  but I did not read the full transcripts.
18     I looked for the portions that
19  supported the facts that were -- the facts that
20  I accepted.
21  Q.  All right.  So even when you
22  received a full transcript, you focused on what
23  you considered to be the relevant portions?
24  A.  That's correct.

Peter Joy
April 3, 2018

---

Page 18

1  Q.  Did Labaton indicate to you which
2  portions of those transcripts you should focus
3  on?
4  **A.  Only in the sense of the facts --**
5  **factual statement that I adopted.**
6  Q.  Okay.  Now, let me direct your
7  attention to the opinion in Exhibit 2.
8  **A.  Okay.**
9  Q.  That begins on page 13 and goes to
10  page 56.
11  **A.  Okay.**
12  Q.  Who wrote that opinion?
13  **A.  I did.**
14  Q.  And did you have any assistance in
15  writing that opinion?
16  **A.  No, I did not.**
17  Q.  Did you have any assistance in
18  researching the law underlying that report?
19  **A.  No.**
20  Q.  And were you in conversation with
21  Labaton as to your opinions?
22  **A.  Before I wrote the report, after I**
23  **got a good feel, but hadn't drilled down, you**
24  **know, totally deep on every one of the issues,**

---

Page 19

1  **but where I felt comfortable, I verbally stated**
2  **what my tentative opinions were at that point**
3  **in time, subject to changing if anything else**
4  **developed.**
5  **Then I wrote the report, and the**
6  **only thing, after I wrote the report, is some**
7  **of the lawyers working on behalf of Labaton**
8  **proofed it, and there were some typographical**
9  **errors that they helped me with, but that's the**
10  **only assistance I received.**
11  Q.  Did the Labaton attorneys have any
12  role in your opinions?
13  **A.  No.**
14  Q.  All right.  So you didn't bounce
15  certain opinions off of them and receive their
16  take on those opinions or suggestions on those
17  opinions?
18  **A.  No.  They framed the questions that**
19  **they wanted my opinions on.  And as I said, I**
20  **gave them my tentative, you know, what I**
21  **thought they were going to be, and then I wrote**
22  **up my report and that was it.**
23  Q.  Okay.  So let me start off by
24  referencing something that you discuss early in

---

Page 20

1  your report, and that's so-called imperfect fee
2  divisions under Rule 1.5(e).
3  **A.  Okay.**
4  Q.  You state that no Massachusetts
5  court has opined on Rule 7.2(b) and 1.5(e)
6  together, correct?
7  **A.  That's correct.**
8  Q.  Now, you are aware that New York has
9  opined on these together, correct?
10  **A.  Not that I'm aware of.**
11  Q.  All right.  Does the fact that
12  Massachusetts or other courts have not
13  discussed 7.2(b) and 1.5(e) in a single opinion
14  make those rules ineffective as written?
15  **A.  No.  Separately, each is effective.**
16  **But what I do not see is that if a violation of**
17  **1.5(e) automatically then converts any fee**
18  **division under 1.5(e) into a -- what was then**
19  **Massachusetts Rule 7.2(c), that that's the**
20  **connection that is, as far as I could tell,**
21  **non-existent.**
22  Q.  And what is the significance of the
23  Massachusetts court failure to address these
24  together, in your opinion?

---

Page 21

1  **A.  It demonstrates that the**
2  **understanding is that they're not connected,**
3  **that they are separate rules meant to address**
4  **separate issues.**
5  Q.  All right, sir.  You state in your
6  report that Rule 7.2(b) prohibits only payments
7  to non-lawyers; is that correct?
8  **A.  That's correct.**
9  Q.  And, specifically, let me address
10  you -- direct your attention to footnote 18.
11  **MS. LUKEY:** In his report?
12  Q.  In your report.
13  **A.  I think on page 20.**
14  Q.  Thank you.
15  **A.  Yes.**
16  Q.  And just for the record, footnote 18
17  on page 20 of Professor Joy's report states,
18  "The comment to which Professor Wolfram
19  referred was titled 'Paying Others to Recommend
20  A lawyer,' and it states, 'A lawyer is allowed
21  to pay for advertising permitted by this rule,
22  but otherwise is not permitted to pay another
23  person for channeling professional work.  This
24  restriction does not prevent an organization or

---

Page 22

1  person, other than lawyer' -- 'other than the
2  lawyer from advertising or recommend the lawyer
3  services.  Thus, a lawyer may participate in
4  not-for-profit lawyer referral programs and pay
5  the usual fees charged by such programs.
6  Paragraph C does not prohibit paying regular
7  compensation to an assistant, such as a
8  secretary, to prepare communications permitted
9  by this rule.'"
10     So footnote 18 says that the rule
11  prohibits payments made for channeling
12  professional work."  Rather, that's how you
13  refer to that -- that comment.
14 **A.  Well, that's what Professor Wolfram**
15 **states.  I'm quoting him.**
16 Q.  You are quoting Wolfram.
17     Do you consider Damon Chargois' call
18  and Herron's meeting to be channeling?
19     MS. LUKEY: Objection.
20 **A.  No, I don't.**
21 Q.  How else would you characterize it?
22 **A.  Initially, my understanding, and**
23 **based on everything I have reviewed, is he was**
24 **going to be local counsel, and then later, when**

Page 23

1 **he did not act in that capacity, he received a**
2 **referral fee.**
3 **So referral fee is separate from**
4 **something, again, that Professor Wolfram would**
5 **refer to as touts or runners or cappers.  And**
6 **those are people like who are trying to,**
7 **basically, do like in-person advertising.  So,**
8 **you know, a taxicab driver, one of the examples**
9 **he uses in Nevada would try to steer somebody,**
10 **literally drive them to the lawyer's office to**
11 **do a divorce for them, but that's separate and**
12 **distinct from referral fees.**
13 Q.  You would agree with me, would you
14  not, that Chargois did not act as an attorney
15  in the traditional sense --
16     MS. LUKEY: Objection.
17 Q.  -- in this case?
18     MS. LUKEY: Objection.
19 **A.  When you say "the case," you mean**
20 **just the class action or what are you talking**
21 **about?**
22 Q.  No.  I mean with respect to --
23 **A.  Everything with Arkansas?**
24 Q.  Yes.

Page 24

1 **A.  Well, again, initially, he was going**
2 **to be acting as local counsel, though my**
3 **understanding is that did not develop in terms**
4 **of the class action.  And I guess the other**
5 **thing is, even in terms of recommending another**
6 **lawyer, if one lawyer recommends another**
7 **lawyer, the first lawyer is basically telling**
8 **the client this is somebody I think is**
9 **competent and capable of handling your work,**
10 **but putting in the lawyer's professional**
11 **judgment on that issue.**
12 **And that's why fee sharing or fee**
13 **splitting or referral fees are permitted,**
14 **because there's that act of basically vouching**
15 **on the professional qualifications for a**
16 **particular lawyer or law firm to assist a**
17 **client.**
18 Q.  But you would agree that, in this
19  case, the client, Arkansas, never sought legal
20  advice from Chargois?
21     MS. LUKEY: Objection.
22 **A.  In terms of the class action, I**
23 **didn't see evidence of that, but I'm not sure**
24 **if Arkansas had sought other advice from him,**

Page 25

1 **because my understanding is he was known to the**
2 **first director, not the -- not the second, not**
3 **Mr. Hopkins, but Mr. Hopkins' predecessor.**
4 **So I don't know, since he knew**
5 **Mr. Hopkins, if he ever gave any advice or**
6 **representation to Arkansas prior to Labaton's**
7 **involvement.**
8     **THE SPECIAL MASTER:** Is it your
9  understanding that the relationship
10  between Arkansas, Labaton and Mr. Chargois
11  was at the initiation of Arkansas?
12     **THE WITNESS:** At one point, Arkansas
13  invited Labaton and Chargois Herron to
14  submit a proposal of qualifications to be
15  monitoring counsel.  So they extended that
16  invitation.
17     **THE SPECIAL MASTER:** I'm actually
18  going back to the inception of the
19  relationship.
20     **THE WITNESS:** Okay.
21     **THE SPECIAL MASTER:** So what is your
22  understanding of how the relationship
23  initially evolved?
24     **THE WITNESS:** That Mr. Chargois

Page 26

1  and/or others from Chargois & Herron
2  helped to arrange a meeting where lawyers
3  from Labaton could meet with the
4  predecessor, I think Mr. Doane, but I
5  don't want to say that.
6      THE SPECIAL MASTER: Yes.
7      THE WITNESS: So Mr. Doane. And
8  then subsequent to that meeting, at some
9  point while Mr. Doane was still head of
10  Arkansas, he invited them to submit a
11  proposal showing their qualifications to
12  be monitoring counsel.
13      THE SPECIAL MASTER: So it is your
14  understanding that Mr. Chargois and
15  Mr. Herron initiated the relationship with
16  Arkansas and facilitated it through --
17  with the help of a state senator?
18      MS. LUKEY: Objection.
19      THE WITNESS: I've seen some
20  indication of that. The only thing I'm
21  not sure about is what may have preceded
22  that or things in addition to that, but I
23  do know that either Mr. Chargois or others
24  from Chargois & Herron helped to arrange

Page 27

1  the meeting. And I know that a senator in
2  Arkansas was also helpful in that regard.
3      THE SPECIAL MASTER: Okay. So it is
4  your understanding that Arkansas did not
5  reach out to Mr. Chargois or Chargois &
6  Herron and effectively invite them to find
7  somebody to have a relationship with
8  Arkansas?
9      THE WITNESS: I did not see anything
10  that indicated that they did, but like I
11  said, I don't know what happened, you
12  know, prior to that. But based on what
13  I've seen, I didn't see that.
14      BY MR. SINNOTT:
15  Q.  Was it, in fact, in this case, this
16  was the opposite, where Chargois & Herron's
17  role was to find a client or solicit a client?
18      MS. LUKEY: Objection.
19  A.  Again, based on everything that I
20  saw, I saw them serving in that role, but I do
21  know that there was some pre-existing
22  relationship of some sort between lawyers in
23  the Arkansas office of Chargois & Herron and
24  Mr. Doane, and perhaps others with Arkansas.

Page 28

1  So -- but based on what I saw, I would say yes.
2      THE SPECIAL MASTER: If there is no
3  evidence in the record that there was a
4  pre-existing relationship between
5  Mr. Doane or anyone else at Arkansas and
6  Chargois & Herron, does that change your
7  view as to whether this was a
8  solicitation?
9      MS. LUKEY: Objection.
10      THE WITNESS: Okay. I mean, the one
11  thing I do know that's in the record is,
12  is that lawyers at the Arkansas office of
13  Chargois & Herron had some pre-existing
14  relationship with Mr. Doane, that they
15  were -- at least one of the lawyers was
16  known to Mr. Doane. I don't know the
17  nature of that relationship. Like I said,
18  I don't know if he had ever provided any
19  legal services to either Arkansas or
20  Mr. Doane individually or anybody
21  associated with Arkansas.
22      THE SPECIAL MASTER: If there was no
23  relationship pre-existing, would that be a
24  solicitation?

Page 29

1      MS. LUKEY: Objection.
2      THE WITNESS: It depends. What I
3  mean by that is it depends on what the
4  form of the interaction is. So that if a
5  lawyer calls somebody up and says, you
6  know, I can help you with your legal
7  problems, that would definitely be a
8  solicitation.
9      If a lawyer sees somebody they know
10  and the person says, you know, I have this
11  problem and, you know, do you think you
12  might be able to help them, then that's
13  not a solicitation.
14      THE SPECIAL MASTER: If the lawyer,
15  in this case, Chargois and his partner,
16  Tim Herron, initiate the contact with
17  Mr. Doane and Arkansas for purposes of
18  introducing Labaton to Arkansas, initially
19  to serve as monitoring counsel, if that's
20  what the record shows, would that be a
21  solicitation?
22      MS. LUKEY: Objection.
23      THE WITNESS: It could be. And the
24  only hesitation I have here is this.

Page 30

1  Again, it depends on the nature of the
2  interaction.  So that if Arkansas is
3  looking for monitoring counsel, and it's
4  known to Mr. Herron or Mr. Chargois and
5  they respond to that, then that's not a
6  solicitation.  But if they are coming out
7  of the blue, then it would be
8  solicitation.
9      THE SPECIAL MASTER: And would that
10  solicitation, absent compliance with
11  1.5(e) and the exception in 7.2(b)(5),
12  absent -- putting that aside for a moment,
13  would that bring the relationship within
14  7.2(b)?
15      MS. LUKEY: Objection.
16      THE SPECIAL MASTER: If it was
17  solicitation?
18      THE WITNESS: No.  It would bring it
19  within 7.2(b) if a lawyer with Chargois &
20  Herron was, you know, basically going
21  around knocking on doors saying, I have
22  somebody, you know, that could help you
23  with your legal problems, you know, if
24  they were not acting in a lawyer capacity.

Page 31

1      So like, for example, a lawyer who's
2  a taxicab driver in Nevada steering
3  clients to divorce lawyers, that's --
4      THE SPECIAL MASTER: That doesn't
5  insulate them.
6      THE WITNESS: Then the person is a
7  taxicab driver.
8      THE SPECIAL MASTER: So that's an
9  interesting issue.  Where is the line
10  between acting as a lawyer and acting as
11  a, what I think is referred to as a tout?
12  Where is that line?  What you seem to be
13  saying is it's not simply having a law
14  degree.  That's not enough.  Just because
15  the person has a law degree, that's not
16  enough to insulate them from 7.2(b),
17  right?
18      THE WITNESS: Again, yeah, that's
19  right.  If they are not acting in a lawyer
20  capacity, that's right.
21      THE SPECIAL MASTER: So, at some
22  level, for 7.2(b) to apply or to not
23  apply, I should say, the person who is
24  doing the recommending has to be acting in

Page 32

1  some capacity as a lawyer.
2      THE WITNESS: That's right.  And
3  that capacity could be simply knowing that
4  the lawyer/law firm they are recommending
5  is well qualified to assist the potential
6  client.
7      THE SPECIAL MASTER: And that's
8  sufficient to insulate them from 7.2(b)?
9      THE WITNESS: Yes.
10      THE SPECIAL MASTER: Just knowing
11  that they are well qualified?
12      THE WITNESS: That's right.  And
13  that's especially true in Massachusetts,
14  that allows for pure referral fee without
15  either working on the matter or accepting
16  joint responsibility for the case.
17      BY MR. SINNOTT:
18  Q.  You mentioned earlier that you had
19  reviewed, among other things, e-mails, correct?
20  A.  That's correct.
21  Q.  Do you remember seeing an e-mail
22  exchange between Damon Chargois and Eric Belfi
23  in which Chargois reminds Belfi of what he has
24  done to acquire Arkansas as a client?

Page 33

1  A.  I recall seeing e-mail exchanges
2  between the two of them involving Arkansas, as
3  you characterize it, about reminding him what
4  he's done.  If you have the e-mail exchange,
5  and I could see it, I would let you know if
6  that was one I definitely reviewed.
7      MR. SINNOTT: I will ask that Madam
8  Court Reporter mark this.  This is an
9  e-mail, and the relevant portion begins on
10  LBS017593.  At the top of the page, it
11  says from Damon Chargois, sent October 18,
12  2014, to Eric Belfi, subject, concerning
13  Eric.  "In reviewing your text regarding
14  HP it," and it starts to say "appears."
15      So if I could ask that this item be
16  marked as Exhibit 3.
17      (Joy Exhibit 3, E-Mail Chain, Bates
18  Stamped LBS017593 through 17594, marked
19  for identification.)
20  Q.  And, Professor, you are welcome to
21  read the whole thing but my question will begin
22  with the e-mail that begins at the very bottom
23  of the first page of 593.
24  A.  Okay.

Page 34

1    MS. LUKEY: Do you have any other
2  copies?
3    MR. SINNOTT: I'm sorry.  We do.
4    MS. LUKEY: Thank you.
5  A.  I'm reading it.
6  Q.  Yep.  Take your time.
7  A.  (Perusing.) I can't say, with a
8  hundred percent certainty, that I've seen this.
9  Colonial Bank does not ring any bell to me --
10  any bell to me.  I mean, but the idea of like
11  sort of expending political capital or
12  something, I know I've read that.  So I can't
13  say, with a hundred percent certainty, that
14  I've seen this.
15  Q.  So some of it appears to be
16  familiar?
17  A.  Yeah, some of it does -- I mean,
18  some of the ideas appear to be familiar, but
19  there are other things that I think I would
20  remember.  But, you know, I don't have perfect
21  memory.
22  Q.  All right.  And directing your
23  attention to that second page, and
24  approximately a third of the way down that

Page 35

1  second page, there's a paragraph that reads, "I
2  am very concerned that you guys are attempting
3  to significantly, substantially and materially
4  alter our agreement.  Our deal with Labaton is
5  straightforward.  We got you, ATRS, as a client
6  (after considerable favors, political activity,
7  money spent and time dedicated in Arkansas),
8  and Labaton would use ATRS to seek lead counsel
9  appointments in institutional investor fraud
10  and misrepresentation cases."
11    And then it finishes by saying,
12  "Where Labaton is successful in getting
13  appointed lead counsel and obtains a settlement
14  or judgment award, we split Labaton's attorney
15  fee award 80/20, period."
16    And, sir, it's fair to say that this
17  is an e-mail from Damon Chargois to Eric Belfi
18  on Saturday, October 18, 2014, at 9:15 a.m.
19  correct?
20  A.  That's what it states, yes.
21  Q.  So looking at that paragraph that I
22  just read, isn't it apparent from the language
23  in that paragraph that Labaton used Chargois to
24  get Arkansas as a client?  Would you agree with

Page 36

1  that?
2    MS. LUKEY: Objection.
3  A.  They were involved in getting
4  Arkansas as a client.  I'm not sure -- I mean,
5  I know you used the word "used," but in the
6  context of this e-mail, it seems like -- I just
7  want to be sure -- Mr. Chargois was
8  characterizing this as sort of feeling like he
9  was being used in some fashion.
10  Q.  Okay.  And I wasn't using it in that
11  sense, but that may be reflective of how he
12  feels based on the first paragraph.
13  A.  Because I know that they were
14  involved in getting Arkansas as a client, and
15  as I stated previously, initially, they were
16  going to be local counsel, and then that didn't
17  develop.
18  Q.  Well, let me back up to the dash,
19  dash, and then read from there on the second
20  line of that paragraph.
21    "We got you ATRS," or Arkansas," as
22  a client (after considerable favors, political
23  activity, money spent and time dedicated in
24  Arkansas.)"

Page 37

1    Do you see anything about legal
2  services in that parenthetical reference?
3    MS. LUKEY: Objection.
4  A.  I'm not -- well, I'm not sure, when
5  he talks about considerable favors and time
6  dedicated in Arkansas, I just don't know what
7  he's referring to.
8  Q.  Doesn't it sound like the tout that
9  you were referring to previously?
10    MS. LUKEY: Objection.
11  A.  No.
12  Q.  I mean, isn't it apparent here that
13  Chargois' role, at least as portrayed in this
14  paragraph, was to get Arkansas as a client for
15  Labaton?
16    MS. LUKEY: Objection.
17  A.  According to Chargois' paragraph
18  there, he was involved in getting Arkansas as a
19  client, absolutely.
20  Q.  And there's nothing about Arkansas
21  asking Labaton to -- or asking Chargois to get
22  Labaton as counsel, is there?
23    MS. LUKEY: Objection.
24  A.  Well, there isn't, except it's my

Page 38

1 understanding that, after Labaton was serving
2 as monitoring counsel, that's when later they
3 got involved as being class counsel for
4 Arkansas.
5     So I think this paragraph is
6 referring to the initial involvement of
7 Chargois & Herron in securing Arkansas as a
8 client on the monitoring counsel.
9 Q.  Sure.
10    THE SPECIAL MASTER: I would like
11 you to assume that the testimony from
12 Mr. Chargois was that Eric Belfi asked him
13 if he knew any people that he could be --
14 he, on behalf of Labaton, could be put in
15 touch with -- that were institutional
16 investors, and could he help make
17 introductions to institutional investors.
18    Mr. Chargois' testimony was he
19 didn't know what an institutional investor
20 was, and he had to find out what an
21 institutional investor was, and he found
22 out that he understood what an
23 institutional investor was once he found
24 that out, and that he then proactively,

Page 39

1 along with his partner, Tim Herron, set
2 about initiating the relationship, the
3 introduction to Arkansas, and he did that
4 through the good offices of Senator Faris,
5 who chaired the committee that oversaw
6 state pension activity.  And that this was
7 all at the initiation of, in the first
8 instance, Labaton.  And, in the second
9 instance, Mr. Chargois, and that that was
10 how the relationship started for the
11 purpose of bringing institutional
12 investors to Labaton as clients.
13    Does that inform your opinion as to
14 whether this was a solicitation?
15    MS. LUKEY: Objection.
16    THE WITNESS: I still don't see it
17 as a solicitation if that's the bottom
18 line of your question.
19    THE SPECIAL MASTER: It is.
20    THE WITNESS: I still don't see it
21 as a solicitation.
22    THE SPECIAL MASTER: What is it
23 about that chain of facts that takes it
24 out of being a solicitation?

Page 40

1     THE WITNESS: All right.  The
2 following.  It's all right for a lawyer to
3 contact a client that they have to see if
4 that client needs any more legal
5 assistance.  And lawyers do that all the
6 time.
7     THE SPECIAL MASTER: The client that
8 they have who --
9     THE WITNESS: That's right.  So what
10 I don't know is if --
11    THE SPECIAL MASTER: I want you to
12 assume there was no existing relationship
13 at all, at least of the record, I want you
14 to assume it, that there was no existing
15 relationship between Chargois & Herron and
16 Arkansas.
17    MS. LUKEY: Objection.
18    THE WITNESS: And then the next
19 thing is, assuming that there was no
20 relationship whatsoever, that they had
21 never had any type of a relationship --
22    THE SPECIAL MASTER: We are not
23 talking about running into people at a
24 cocktail party.  We are talking about a

Page 41

1 professional relationship.
2     THE WITNESS: Okay.  That they have
3 no professional relationship.
4     THE SPECIAL MASTER: Yes.
5     THE WITNESS: And that either
6 Mr. Doane or other people at Arkansas
7 hadn't been putting out any requests for
8 any assistance, then it could be a
9 solicitation.
10    THE SPECIAL MASTER: What if it was
11 just what we call a cold call?  Now,
12 obviously, there were more than calls
13 involved, but what if it was a cold call?
14 They went to Senator Faris, and Senator
15 Faris, at Chargois' initiation, on behalf
16 of Labaton, helped facilitate the
17 introduction, and that there had been no
18 previous relationship between
19 Mr. Chargois, Mr. Herron, their firm and
20 Arkansas.
21    THE WITNESS: And no relationship
22 with Senator Faris either?
23    MS. LUKEY: Objection.
24    THE SPECIAL MASTER: Let's assume

Page 42

1   there was a relationship between
2   Mr. Herron, but not Mr. Chargois, but
3   Mr. Herron and Senator Faris.
4       **THE WITNESS:** Then it wouldn't be a
5   solicitation.
6       **THE SPECIAL MASTER:** Because?
7       **THE WITNESS:** Because it's okay for
8   a lawyer to talk to a client or someone
9   that they have other kinds of
10  relationships with, to say, do you know
11  anyone who could use my services.  And
12  it's okay, then, for that person to
13  facilitate them getting other clients.
14  Lawyers do that every day.
15      **THE SPECIAL MASTER:** So
16  Mr. Chargois, again, no relationship
17  between Chargois & Herron and Arkansas, so
18  Mr. Chargois or Mr. Herron could go to the
19  senator and say, we have this law firm
20  that does securities work, we would like
21  an introduction to Arkansas for purposes
22  of Arkansas -- for purposes of Labaton
23  serving as monitoring counsel.  And by the
24  fact they went to Senator Faris, that

Page 43

1   would take it out of a solicitation?
2       **MS. LUKEY:** Objection.
3       **THE WITNESS:** Again, assuming they
4   have a relationship with Senator Faris and
5   then Senator Faris, I don't know what he
6   says to either Mr. Doane or others at
7   Arkansas, but if he says something to the
8   effect of, I would like you to meet with
9   or I know a lawyer or a law firm that
10  might be able to assist you, they still,
11  then, have the opportunity to say, sure,
12  we will set up a meeting or, no, we won't
13  set up a meeting.
14      **THE SPECIAL MASTER:** So using
15  somebody as an intermediary who does have
16  the relationship, when the lawyer who's
17  doing the recommending does not have the
18  relationship with the client, takes it out
19  of solicitation?
20      **MS. LUKEY:** Objection.
21      **THE WITNESS:** It depends in what we
22  have talked about, I mean, in the
23  abstract, it could still be solicitation.
24  But, in this situation, if they have a

Page 44

1   relationship with Senator Faris and if
2   Senator Faris doesn't compel Arkansas to
3   have the meeting, just suggests, you know,
4   this is an opportunity, have it or not.
5       **THE SPECIAL MASTER:** You know that
6   Senator Faris chaired the committee with
7   oversight responsibility over Arkansas.
8       **THE WITNESS:** Yes, I do.
9       **THE SPECIAL MASTER:** And the fact
10  that the senator with oversight
11  responsibility over this public retirement
12  system calls and says I'd like you to meet
13  with this firm, is that a professional
14  relationship that takes it out of
15  solicitation?
16      **MS. LUKEY:** Objection.
17      **THE WITNESS:** When you say "a
18  professional relationship," do you mean
19  Senator Faris' relationship with Arkansas?
20  I have lost which relationship.
21      **THE SPECIAL MASTER:** We have a
22  number of different levels of the
23  relationship.
24      **THE WITNESS:** Okay.

Page 45

1       **THE SPECIAL MASTER:** For the first
2   level, we have the relationship between
3   Labaton and Chargois & Herron.  We will
4   use those two together.  At that level, we
5   have Labaton, through the person of Eric
6   Belfi, asking Mr. Chargois to introduce
7   him to institutional investors for the
8   purpose of getting them positions as
9   monitoring counsel at least.
10      We then have the relationship
11  between Mr. Herron, as part of Chargois &
12  Herron, having some kind of relationship,
13  we don't know, really, what kind of a
14  relationship, but some kind of
15  relationship with Senator Faris who
16  chaired the committee with oversight
17  responsibility over Arkansas.
18      And then we have the relationship
19  between Senator Faris and Arkansas.
20      I want you to assume these facts.
21  Labaton initiated the relationship with
22  Chargois for the purpose of having
23  Chargois & Herron get introductions to
24  institutional investors.  Chargois didn't

Page 46

1  know any institutional investors.  Herron
2  didn't know any institutional investors.
3  But Herron knew Senator Faris.
4     Mr. Herron goes to Senator Faris and
5  says, we'd like your help in getting an
6  introduction for Labaton to Arkansas to
7  serve as monitoring counsel for Arkansas.
8     I want you to assume that
9  chronology.  And Senator Faris initiates
10  the contact with Arkansas to facilitate
11  that relationship.
12     That's not a solicitation?
13     MS. LUKEY: Objection.
14     THE WITNESS: I still don't see it
15  as one.  And I remember seeing some e-mail
16  exchanges that whether or not Arkansas
17  would end up retaining, at least
18  initially, Labaton Sucharow and Chargois &
19  Herron would depend on how the meeting
20  went, and then I remember some e-mail that
21  meeting went well and then the initial
22  retention occurred.
23     MR. SINNOTT: Madam Clerk -- Madam
24  Court Reporter, Melissa, if you would mark

Page 47

1  this as an exhibit.
2     (Joy Exhibit 4, Excerpt of
3  Deposition of Damon Chargois, dated
4  October 2, 2017, marked for
5  identification.)
6  Q.  For the record, an item has just
7  been marked as Exhibit 4.  It's an excerpt of
8  the deposition of Damon Chargois taken on
9  October 2, 2017.  Let me direct your attention
10  to page 33 in the lower right quadrant,
11  Professor.
12  A.  Okay.
13  Q.  And you see where -- about line
14  12 --
15  A.  Okay.
16  Q.  -- I ask Mr. Chargois, "At some
17  point, did you have some success in making
18  inroads into this area?"
19     And Chargois answers, "Yes, sir."
20     And I say, "Tell us about that."
21     And Chargois responds as follows,
22  "Tim," I will suggest to you that Tim is Tim
23  Herron, "was friends with Senator Faris --
24  Steve Ferris and asked him, do you know anyone

Page 48

1  or point us to anyone we might be able to talk
2  to, and he told Tim that recently a gentleman
3  named Paul Doane had taken over Arkansas
4  Teachers, and you might want to give him a try.
5  Good luck."
6     Do you see that, sir?
7  A.  Yeah, I do.
8  Q.  Had you seen that before?
9  A.  I don't recall this, no.
10  Q.  Would you agree that this indicates
11  that, having been asked as Judge Rosen
12  questioned you about -- by Labaton to find
13  institutional investors, that Chargois &
14  Herron, Damon and Tim, leverage a contact with
15  a Senator Faris, and he made the introduction
16  to Mr. Doane; is that correct?
17     MS. LUKEY: Objection.
18  A.  That appears to, but there's just
19  one thing that I need clarification on, and
20  it's this statement.  He, which I believe
21  refers to Senator Faris, this is line 18,
22  toward the end, he, and I'm just -- "he told
23  Tim that recently a gentleman named Paul Doane
24  had taken over Arkansas Teachers, and you might

Page 49

1  want to give him a try.  Good luck."
2     So, you know, I just -- I need to
3  know what happens after this, because my
4  reading that almost sounds like the senator is
5  telling Tim Herron, why don't you try Paul
6  Doane, and then good luck.
7     So, you know, I need to know like
8  what happens after this to be able to say what
9  the import of this is.
10  Q.  If you were to assume that Senator
11  Faris was treated to dinner and other things,
12  would that indicate -- would that inform your
13  curiosity?
14     MS. LUKEY: Objection.
15  A.  Treated to dinner by Mr. Herron, his
16  good friend or --
17  Q.  Or by Labaton.
18     MS. LUKEY: Objection.
19  A.  If -- it may be relevant.  I just
20  don't know.  I mean, I would need to know more
21  to be able to say, because dinner by itself
22  could be meaningless.
23  Q.  I appreciate your caution, but based
24  on that passage between lines 16 and 21,

Page 50

1  without knowing what happened in the future,
2  does that passage, in and of itself, indicate
3  that Chargois & Herron was trying to bring --
4  **A.  Trying to what?**
5  Q.  Was trying to bring Arkansas on
6  board as a client?
7      **MS. LUKEY:** Objection.
8  **A.  That passage by itself?  No, it**
9  **doesn't by itself.**
10     **MR. SINNOTT:** Madam Court
11  Reporter -- and I apologize for calling
12  you clerk before -- let me show you
13  another document that's an excerpt from
14  that same transcript, but it's the
15  follow-on page, page 34.
16     (Joy Exhibit 5, Excerpt of
17  Deposition of Damon J. Chargois, dated
18  October 2, 2017, marked for
19  identification.)
20  Q.  And that is Exhibit 5.
21  **A.  So should I then continue reading**
22  **where I stopped off?**
23  Q.  Yes, please.
24  **A.  Okay.  Just please give me a moment.**

Page 51

1  **(Perusing.)**
2      **MS. LUKEY:** So we got another page
3  that wasn't on the first exhibit.  So
4  it's -- the previous one is incorporated
5  in this one, but then there is a second
6  page as well.
7      **MR. SINNOTT:** Okay.  But the second
8  page is there.
9      **MS. LUKEY:** Yeah.
10     **MR. SINNOTT:** For a fleeting moment,
11  we thought we had given you exactly the
12  same exhibit.
13  **A.  (Perusing.) Okay.**
14  Q.  All right, Peter.  So looking at the
15  bottom of page 33, which is the second of these
16  three pages, if you count the face sheet, after
17  the passage that we discussed previously, I
18  asked Mr. Chargois, "Did he," referencing Paul
19  Doane, "facilitate that introduction in any
20  way?"  The introduction to -- I'm sorry -- that
21  Ferris, being he, facilitating the introduction
22  of Paul Doane, and did he facilitate that
23  introduction in any way.
24     And Chargois answers, "No, sir.  Tim

Page 52

1  just told me about it."  And then going on to
2  the next page, 34, "and I looked up Paul Doane
3  and called him.
4      And Judge Rosen says, "Cold?"
5      Chargois replies, "Yes, sir."
6      "And what was Mr. Doane's response
7  when you called him?
8      "The gist of it was who are you and
9  why are you calling me, but I told him who I
10  was, who our firm was.  We're local, not far
11  from your office, and how I got his name and
12  why I was calling."
13     Then I asked, "And did he offer to
14  help you?"
15     And Chargois said, "I don't
16  understand."
17     I said, "Did he ask you to come in
18  for a meeting?  Or did he --"
19     Chargois answers, "No, sir."
20     "-- extend -- you know, try to
21  arrange for you to talk again with him?
22     "No, sir.
23     "All right.  What did he say?
24     "He listened to what I had to say

Page 53

1  and I asked him if I could meet with him.  And
2  then I told him that, you know, I was working
3  with a New York law firm that specializes in
4  institutional investors."
5      And so then there is some further
6  discussion on page 35.  And the bottom of 34, I
7  say, "So how did you leave it after that
8  conversation?"
9      Chargois answers, "Let me know if
10  you're willing to give us some time.
11     "Okay.  And what happened next?
12     "He -- I don't know if it was a
13  follow-up call by me or if it was that call,
14  but he ultimately agreed to meet."
15     And then I ask, "Did you meet with
16  him by yourself or were you accompanied by
17  someone else?"
18     And Chargois answers, "The
19  Labaton -- I believe it was Eric Belfi and
20  Chris Keller, but I can't swear to that.  I
21  know Eric Belfi was there.  I don't know if
22  Chris Keller was there."
23     And then -- "And how soon after the
24  telephone conversation did this meeting take

Page 54

1  place?
2      "I'll guess within a week or two."
3      And I ask, "Okay.  And is it fair to
4  say that Eric and Chris were responsive and
5  came down --
6      "Yes.
7      " -- at the time that you told them
8  that the meeting would be -- time and date?
9      "Yes, sir.
10     "Okay.  So tell us what happened at
11  that meeting."
12     And then on page 36 he starts to
13  answer, "Eric."
14     Special master says, "Hold that
15  thought."
16     Special master says, "Was this the
17  first institutional investor that you had been
18  successful in meeting up with?"
19     **THE SPECIAL MASTER:** Setting up.
20  Q.  I'm sorry, "setting up a meeting
21  with?
22     **"THE WITNESS:** Yes, sir."
23     And then the questioning continues.
24  Special master says, "If you remember the

Page 55

1  question.
2      "I do."
3      And I say, "Tell us what happened
4  at the meeting."
5      And Chargois answers, "Eric Belfi
6  presented all of the services that Labaton has
7  available and what their -- what they could do
8  and presented as a courtesy that they do this
9  monitoring of the portfolio.
10     "Okay.  And did Mr. Doane ask any
11  questions of Eric?
12     "I'm sure he did.  I don't remember
13  specific questions."
14     And then I ask, "Okay.  Did you
15  participate in the conversation?
16     **"ANSWER:** I was there.  But as far
17  as substantive matters, no.
18     "You let Eric do the talking?
19     "Yes, sir."
20     And then there's some follow-up
21  conversation on that.
22     So is it apparent to you, from those
23  pages that I read, that Chargois & Herron did
24  their job in setting up a meeting for Eric

Page 56

1  Belfi?
2      **MS. LUKEY:** Objection.
3  **A.  Well, I don't know about "did their
4  job," but I would say that, according to
5  Mr. Chargois' testimony here, he set up a
6  meeting with Mr. Doane.**
7  Q.  Okay.  And does it also appear that,
8  once that meeting was effected, and Doane sat
9  down with Chargois or Chargois and Herron and
10  Eric Belfi, that Chargois and Herron's role was
11  basically as a silent partner here?
12     **MS. LUKEY:** Objection.
13  **A.  I mean, at that meeting, according
14  to Mr. Chargois, he didn't say a lot.  He says,
15  you know, as far as substantive matters, no,
16  but as far as local counsel role, which is what
17  the original plan was, that might be what local
18  counsel would do.**
19  Q.  Okay.  But at least with respect
20  to -- without speculating as to anything that
21  happened in the future, it would appear that
22  this meeting was set up and Chargois & Herron's
23  role was essentially effective, correct?
24     **MS. LUKEY:** Objection.

Page 57

1  **A.  Well, they set up the meeting.  So
2  they were effective in setting up a meeting.**
3  Q.  That's what I mean.
4  **A.  Okay.**
5  Q.  Okay.  Thank you.
6      **THE SPECIAL MASTER:** Could I ask --
7  now that you've read the full
8  transcript -- not the full transcript.
9  You're welcome to read the full
10  transcript, but the transcript of
11  Mr. Chargois' description of the inception
12  of the relationship and his role in it,
13  does that not sound like solicitation to
14  you?
15     **MS. LUKEY:** Objection.
16     **THE WITNESS:** Well, I mean,
17  actually, what this sounds like, and I'm
18  just assuming that what Mr. Chargois says
19  is true, where he calls up Mr. Doane, then
20  not the solicitation that we have been
21  talking about in terms of 7.2(b), but
22  there is also a prohibition against
23  realtime communication with a person who
24  is not already a client.

Page 58

1  Now, with institutional, you know,
2  with corporations, there is some
3  authority, and I wasn't retained for this,
4  so I didn't drill down, but this could be
5  a realtime, in-person solicitation that
6  would raise ethical concerns.
7  **THE SPECIAL MASTER:** Does it sound
8  like Mr. Chargois is acting as an agent of
9  Labaton, and I don't mean any negative
10 connotation by the term "agent," but as an
11 agent for Labaton in seeking to open a
12 relationship between Labaton and Arkansas?
13 **MS. LUKEY:** Objection.
14 **THE WITNESS:** Well, again, I do have
15 an issue with the word "agent," because --
16 **THE SPECIAL MASTER:** Use a different
17 word.
18 **THE WITNESS:** Okay.
19 **THE SPECIAL MASTER:** As simple as
20 acting on behalf of Labaton.
21 **THE WITNESS:** Well, if he is acting
22 as local -- someone who would be local
23 counsel with Labaton, so -- but that's --
24 I mean, acting on behalf, I guess he's

Page 59

1  acting on behalf of -- well, I'm just
2  like -- I'm just hesitant here about how
3  it's been characterized, so.
4  **THE SPECIAL MASTER:** How would you
5  characterize it?
6  **THE WITNESS:** Maybe facilitating, so
7  trying to -- but --
8  **THE SPECIAL MASTER:** Opening the
9  door?
10 **THE WITNESS:** Again, I mean, it
11 could be, but there are a lot of different
12 individuals here and the depth of their
13 relationships with one other is something
14 I would want to know more about, but he is
15 facilitating the meeting.
16 **THE SPECIAL MASTER:** Well, I think
17 it's pretty obvious, from the colloquy,
18 again, crediting Mr. Chargois, that there
19 was no relationship at all --
20 **MS. LUKEY:** Objection.
21 **THE SPECIAL MASTER:** -- between
22 Chargois and Doane.
23 **MS. LUKEY:** Objection.
24 **THE WITNESS:** That's the way

Page 60

1  Mr. Chargois characterizes it.
2  **THE SPECIAL MASTER:** "What was
3  Mr. Doane's response when you called him?
4  "The gist of it was who are you and
5  why are you calling me."
6  **THE WITNESS:** I guess the part that
7  I don't know is how Mr. Chargois is
8  representing this to Labaton, you know,
9  Mr. Belfi.  What's he saying?
10 Because, you know, if he is telling
11 Labaton, oh, look, I have a relationship
12 with this person or that person, Labaton
13 could be relying on that.  So that's what
14 I mean.
15 All these different people and I
16 think, to understand what's going on here,
17 it would be good to take a look at, at the
18 same time, what is Mr. Chargois telling
19 Mr. Belfi or anybody else at Labaton to
20 see if they line up, because he might be
21 saying one thing to them and now something
22 else when he's under oath in a deposition.
23 **THE SPECIAL MASTER:** So if he was
24 saying to Eric Belfi, I know Paul Doane

Page 61

1  and I'm happy to make an introduction to
2  Paul Doane on your behalf, that would take
3  it out of solicitation?
4  **MS. LUKEY:** Objection.
5  **THE WITNESS:** It very well could,
6  yes.
7  **THE SPECIAL MASTER:** And I take it
8  your answer would be that it would take it
9  out of solicitation if he told Mr. Belfi
10 that he had some sort of a professional
11 relationship with Mr. Doane.
12 **THE WITNESS:** Absolutely.
13 **THE SPECIAL MASTER:** But assume
14 there is -- for now, assume that
15 Mr. Chargois' testimony is credited for
16 now, he was asked by Mr. Belfi to help
17 find institutional investors.  He didn't
18 know what an institutional investor was.
19 He had to find out.
20 He went to Senator Faris and Senator
21 Faris said you should call Paul Doane, who
22 is executive director of Arkansas.  He
23 calls Paul Doane cold, as he says.  Paul
24 Doane doesn't know him at all, as he says.

Page 62

1 And in that first conversation he says, "I
2 am working with a New York law firm that
3 specializes in institutional investors."
4     And he makes a request that Paul
5 Doane meet with this New York law firm.
6 That's not a solicitation?
7     MS. LUKEY: Objection.
8     THE WITNESS: And what am I supposed
9 to assume about what he has told
10 Mr. Belfi?
11     THE SPECIAL MASTER: Just assume
12 that Mr. Belfi -- just assume the facts
13 that I gave you.
14     THE WITNESS: And Mr. Belfi doesn't
15 know what's going on.
16     THE SPECIAL MASTER: Mr. Belfi
17 doesn't know.
18     THE WITNESS: Again, as I said, it
19 very well may be the realtime, in-person
20 solicitation issue that I mentioned, but
21 that's something I didn't look into for
22 this.
23     THE SPECIAL MASTER: If that were
24 the case, would that bring 7.2(b) into

Page 63

1 play?
2     MS. LUKEY: Objection.
3     THE WITNESS: It wouldn't bring it
4 into play in terms of -- no, it wouldn't,
5 because by the time -- this is the initial
6 meeting. Then there is the monitoring
7 counsel agreement. And subsequent to the
8 monitoring counsel agreement, there's the
9 retention of Labaton to be lawyers.
10     So this -- this is, as I said, it's
11 the, you know, kind of in-person or
12 telephonic realtime solicitation issue,
13 but by the time we get to the class action
14 being filed, there's a retention letter.
15 It's a fee-sharing issue.
16     THE SPECIAL MASTER: Don't we have
17 to look at what the purpose of the payment
18 that was made to Mr. Chargois was to
19 determine what he was being paid for?
20     MS. LUKEY: Objection.
21     THE WITNESS: Yeah, he was being
22 paid a referral fee.
23     THE SPECIAL MASTER: For
24 recommending to Arkansas that Labaton be

Page 64

1 retained as monitoring counsel?
2     MS. LUKEY: Objection.
3     THE WITNESS: I mean, I guess I'm
4 just a little hesitant here on the issue
5 of recommending. And I'll tell you why.
6 And I'm just looking at what we have here,
7 pages 34 to 37, because I'm just doing
8 what you said, assume that what Chargois
9 says is true.
10     He calls Doane. Then he says, we are
11 a local firm. Then he listened to what I
12 had to say, and I'm on line, I guess, 19
13 of page 34, "And I asked him if I could
14 meet with him. And then I told him that,
15 you know, I was working with a New York
16 law firm that specializes in institutional
17 investors."
18     And then, you know -- and I may have
19 missed it here, but I don't see him say
20 that I am recommending Labaton. What I
21 see is he is setting up a meeting between
22 him and some lawyers from a firm that he's
23 working with that specializes in
24 institutional investors.

Page 65

1     So it's this in-person solicitation
2 issue that I told you about, you know,
3 initiated via telephone and in person and
4 telephone. It's a realtime solicitation
5 issue.
6     So it's not a recommending. You
7 know, I don't see him say that, you know,
8 I want to meet with you to recommend that
9 you hire this firm. He is saying, I want
10 to meet with you so a firm that I'm
11 working with, we might be able to help
12 you, or something to that effect.
13     BY MR. SINNOTT:
14 Q. But isn't it implicit, when Chargois
15 & Herron go to great lengths to get a sit-down
16 with Mr. Doane, and they come to that meeting
17 with Eric Belfi, that they are recommending
18 Eric Belfi and Labaton?
19     MS. LUKEY: Objection.
20 A. Well, I know Chargois, in that
21 e-mail exchange, talked about, you know,
22 putting in a lot of effort. Again, if he is to
23 be believed, in his deposition, it sounds like
24 he had one or maybe two telephone calls with

Page 66

1  Mr. Doane out of the blue.  So something here
2  is -- gives me hesitation.  I don't know what
3  to believe.  But if I'm to assume that his
4  deposition is true, then that contradicts what
5  he says in his e-mail to Belfi.
6      THE SPECIAL MASTER: Is there
7  anything in Chargois' deposition testimony
8  that you've now read that indicates that
9  Mr. Chargois was acting in his capacity as
10  a lawyer, using his legal skills and
11  professional expertise, to make a
12  recommendation or to facilitate the
13  introduction of Labaton to Doane?
14      MS. LUKEY: Objection.
15      THE WITNESS: Well, he says he is
16  working with a law firm, and what I don't
17  know, because it's not in what I've read,
18  is what he knows about Mr. Belfi and what
19  he knows about Labaton.
20      So I don't know that, but he talks
21  about working with a New York law firm
22  which we know to be Labaton, and I know
23  originally -- the inception is I've
24  understood this all along, was he was

Page 67

1  going to be local counsel.
2      So, yes, that would be what -- you
3  know, part of what local counsel would be
4  doing.
5      BY MR. SINNOTT:
6  Q.  Just so that I've got it straight,
7  Professor, you're not claiming that the word
8  "person" in rule 7.2(b) refers only to
9  non-lawyers, are you?
10  A.  Not 100 percent.  That's how the
11  cases have broken down.  But, you know, I
12  mentioned before, it could conceivably apply to
13  a lawyer who is not acting in a lawyer capacity
14  in any way.
15  Q.  All right.  But as a matter of
16  statutory construction, you're not making that
17  claim, correct?
18      MS. LUKEY: Objection.
19  A.  Not on its face.  But I guess, as I
20  said before, how it's been interpreted, and
21  then I also mention -- well, anyway, how it's
22  been interpreted, because there haven't been
23  instances where we have the lawyer taxicab
24  driver that I mention, though I suspect that,

Page 68

1  in today's job market, there may be.
2  Q.  All right.  Let's talk a little bit
3  about 1.5(e).
4  A.  Okay.
5  Q.  And compliance with the pre-2011
6  rule.
7      You talk about Saggese, and you talk
8  about Professor Gillers' references to it.
9      Is it your opinion that the writing
10  requirement articulated in Saggese did not
11  apply prior to the rule change in 2011?
12  A.  You know, that was something that I
13  wondered about, because when I read Saggese, I
14  thought maybe it applies, but then, as I
15  looked, I couldn't find any cases where it
16  applied in between Saggese, the decision, and
17  then the rule change.
18      And then the other thing that
19  bothered me to some extent is what Saggese
20  said, henceforth, this is what 1.5(e) means,
21  isn't what the ultimate new rule 1.5 actually
22  says.  So that was something else.
23      And then the third thing that was
24  kind of puzzling to me is when the rule change

Page 69

1  is made, I forget, I think they gave at least
2  three months notice.  Here's the proposed rule
3  and here's the effective date.
4      So the fact that neither
5  disciplinary body or the courts were following
6  Saggese after Saggese, the fact that the bar
7  didn't immediately change the rule, and then
8  when they did change the rule, they didn't use
9  the same wording that Saggese had, and then
10  when they changed the rule, they had a period
11  of time between the new rule and when it came
12  into effect led me to conclude that Saggese,
13  you know, I don't know if I would say, you
14  know, probably dicta.  I mean, that wasn't an
15  issue in the case.  That's what the court said
16  it was going to do, but then, you know, there
17  weren't any instances where the court did it,
18  and then the bar didn't do what the court said
19  they should be doing.
20      So that's why I think it's most
21  likely dicta and, you know, the writing
22  requirement in some of what Saggese said just
23  was not implemented in the fashion that I
24  think, just reading the case, I would normally

Page 70

1  have believed.  And then after I did all the
2  research, I saw, well it doesn't seem to line
3  up.
4  Q.  You also say that, on page 29 of
5  your report, "The fee agreement did not and was
6  not specifically required to identify Chargois
7  & Herron."
8  A.  That's right.
9  Q.  What's your authority for that
10 opinion?
11 A.  Because the rule that was in effect
12  didn't require it.
13 Q.  Well, can you cite any cases for
14  that proposition?
15 A.  Well, you know, when you're trying
16  to prove something that is well understood,
17  you're generally not going to find cases that
18  are dealing with it.
19     So if everybody -- let me put it
20  this way.  I didn't find any cases that said,
21  oh, you didn't have a writing, so now you've
22  violated this rule.
23     Did I find a case that says you
24  didn't have a writing and you didn't violate

Page 71

1  the rule?  I didn't find that case either.
2     MS. LUKEY: I think he was asking
3  slightly different.  Weren't you asking
4  about identifying the referral firm?
5     MR. SINNOTT: Yes.
6  A.  That's what I meant, the firm name
7  in writing in the agreement.
8  Q.  Okay.  With respect to that
9  identification of the firm, let me just read
10  1.5(e).
11     "A division of a fee between lawyers
12  who are not in the same firm may be made only
13  if, after informing the client that a division
14  of fees will be made, the client consents to
15  the joint participation and the total fee is
16  reasonable."
17     Now, what language, what portion or
18  what clause in 1.5(e) supports your opinion
19  that the fee agreement was not specifically
20  required to identify Chargois & Herron?
21 A.  Because if you have a fee agreement
22  that says that either fee sharing will be
23  taking place or may be taking place, and the
24  ultimate total fee is reasonable and the client

Page 72

1  agrees that you may share fees with others,
2  that fits what you just read.
3  Q.  And the phrase that "a division of
4  fees will be made" does not indicate to you
5  that a specific informing of the client as to
6  that referring arrangement needs to be made?
7  A.  As long as the client is informed
8  that there will be or may be a division of fees
9  and agrees to that, under that old rule, I'm
10  not saying all Rule 1.5(e)s are worded in the
11  same way, but under that rule, that was
12  permissible.
13 Q.  And when, in the life of the State
14  Street case, was that complied with?
15 A.  When the original retention letter
16  between Labaton and Arkansas was consummated in
17  February of 2011, I believe.
18 Q.  And it never happened before that?
19 A.  When you say "it never happened
20  before that," what it are you referring to?
21 Q.  Was 1.5(e) complied with?
22     MS. LUKEY: Objection.
23 A.  Well, there was the prior retention
24  letter for monitoring counsel that contained

Page 73

1  similar language.  I would have to take a look
2  at that earlier one, but 1.5(e) was complied
3  with in the retention letter that Labaton had
4  with Arkansas.
5  Q.  So you believe that the retention
6  letter satisfied the requirement that the
7  client be informed that a division of fees will
8  be made and the client consents to the joint
9  participation?
10 A.  That's right.
11 Q.  But prior to that, you say there was
12  similar language in the?
13 A.  The original?
14 Q.  The application for monitoring.
15 A.  That's right.  When they submitted
16  their qualifications, there was an earlier
17  letter where Labaton was retained by Arkansas.
18 Q.  And what, to the best of your
19  recollection, did that similar language say?
20 A.  It was very similar, but I know that
21  there was some change between the first letter
22  and the second letter, but I'd have to look at
23  both of the letters to tell you what that
24  change is.

Page 74

1    **MR. SINNOTT:** Let me reference a
2    letter dated February -- strike that.
3       Let me first reference an item that
4    was previously introduced by a prior
5    witness as Exhibit 5. You should all
6    still have this.
7    **THE SPECIAL MASTER:** It's the RFQ.
8    Q. Have you seen that document before,
9    Professor?
10   **A. Yes, I have.**
11   Q. And let me direct your attention to
12   page 13.
13   **A. Okay.**
14   Q. And item 5.10.
15   **A. Okay.**
16   Q. And that reads, "Please describe
17   proposed billing arrangements, including
18   contingency fees, for securities litigation.
19   If other than contingency fees are
20   contemplated, please state the range of hourly
21   billing rates, by timekeeper status (paralegal,
22   first or third-year associates, et cetera,
23   staff attorney, shareholder or partner, of
24   counsel, et cetera) of all attorneys and

Page 75

1    paralegals proposed for assignment to ATRS
2    matters. State what discount, if any, to these
3    rates the firm proposes to provide to ATRS.
4    While this RFQ primarily seeks the services of
5    one lead attorney, the involvement of other
6    firm attorneys may be required from time to
7    time, depending on that matter."
8       And I'm not going to read it, but I
9    ask that you look at the responses of Labaton
10   and of Chargois in the following three pages.
11   **A. Okay. (Perusing.) Okay.**
12   Q. All right. Now, looking at those
13   responses to 5.10, would it be fair to say that
14   there's no reference in there to division of
15   fees or a fee referral arrangement?
16   **A. Not in this request.**
17   **MS. LUKEY:** I may have misunderstood
18   the question. May I ask that the reporter
19   read it back?
20   **MR. SINNOTT:** Sure.
21   (Record read.)
22   **MS. LUKEY:** Objection.
23   **A. In this request for qualifications,**
24   **that's not discussed.**

Page 76

1    Q. All right. And based on your
2    previous reading of this document, does that
3    appear elsewhere?
4    **A. Not that I recall in this document.**
5    Q. All right. So is it fair to say
6    that this previous application, this request
7    for qualifications, did not reference a
8    division of fees?
9    **A. It does not. And I may have been**
10   **mistaken. I thought I saw an earlier fee**
11   **arrangement between Labaton and Arkansas for**
12   **the -- I thought it was for the monitoring**
13   **counsel, but it may have just been a draft of**
14   **the letter that ultimately was modified for the**
15   **class action litigation.**
16   **THE SPECIAL MASTER:** Could you be --
17   so that the chronology is clear, the
18   response to the RFQ was in 2008.
19   **THE WITNESS:** Yes.
20   **THE SPECIAL MASTER:** Could you be
21   thinking of the retention agreement, which
22   took place in February of 2011?
23   **THE WITNESS:** Well, as I said, I
24   thought and I am thinking I must be

Page 77

1    mistaken, that subsequent to the 2008
2    request for qualifications, and I'll
3    explain why I'm thinking this, I recall
4    that there was a discussion, I think maybe
5    initially via e-mail, but then on
6    telephone with the woman whose name I
7    forget.
8    **THE SPECIAL MASTER:** Christa Clark?
9    **THE WITNESS:** Yeah, Christa Carter,
10   is that it?
11   **THE SPECIAL MASTER:** Clark.
12   **THE WITNESS:** Christa Clark. That's
13   it.
14      Who said to Eric Belfi, is my
15   recollection, we can only have one firm
16   name listed, and -- and I believe that I
17   saw an agreement that resulted from that,
18   referring to the monitoring counsel role.
19   Now, it could have just been me thinking I
20   saw an agreement because of the back and
21   forth, but I know that it was explicitly
22   understood that there was going to be fee
23   division with Chargois & Herron that
24   Arkansas knew through Christa Clark. And

Page 78

1 the only reason that that wasn't
2 memorialized specifically was because she
3 informed Mr. Belfi that the contracting
4 system in Arkansas wouldn't permit it if
5 the firms did not have a -- some kind of
6 formal affiliation.
7     THE SPECIAL MASTER: Could you be
8 thinking of the e-mail that Christa Clark
9 sent to Eric Belfi in October of 2008?
10     THE WITNESS: I'm definitely
11 thinking of that e-mail.  The thing I
12 think I must be mistaken about is I
13 thought that there was a subsequent
14 written agreement.
15     I still, although, I'm hesitating, I
16 still think, based on the way her e-mail
17 read, that there must have been something,
18 because she said it can only be one, but
19 maybe that had some more internal function
20 with Arkansas, that they were just going
21 to list Labaton themselves, but that's
22 what led me to think I saw another
23 agreement.
24     THE SPECIAL MASTER: There is an

Page 79

1 e-mail that I'm referring to which talks
2 about some other possible role for
3 Mr. Chargois other than jointly with
4 Labaton as monitoring counsel.
5     MS. LUKEY: Objection.
6     THE SPECIAL MASTER: And this is the
7 October 13, 2008, e-mail.
8     MS. LUKEY: Objection.
9     THE SPECIAL MASTER: Do we have
10 that?
11     MR. HEIMANN: Maybe it would be
12 useful to show it to him.
13     MS. McEVOY: I think all the copies
14 were distributed.
15     THE SPECIAL MASTER: It's actually
16 in your fact statement on page 8.
17     MS. LUKEY: It was marked this
18 morning, too.
19     THE SPECIAL MASTER: Okay.  It's
20 actually in your fact statement on page 8.
21 It's quoted.  Maybe you could just take a
22 look and see if that's what -- if that
23 refreshes your recollection as to what
24 informed the relationship.

Page 80

1     THE WITNESS: Right.  (Perusing.)
2 Right.  And so it is just the e-mail
3 exchange and then the subsequent telephone
4 discussion that I, in my own mind, imagine
5 resulted in a separate kind of retention
6 letter between Labaton and Arkansas.
7     THE SPECIAL MASTER: So do you read
8 Christa Clark's e-mail together with the
9 subsequent retention letter in February of
10 2011 as creating the relationship
11 together?
12     MS. LUKEY: Objection.
13     THE WITNESS: No.  What I'm saying
14 is there were two separate relationships.
15 There was the relationship for monitoring
16 counsel, and then there was a separate
17 relationship created when Labaton
18 represented Arkansas and then ultimately
19 became class counsel.
20     So they were retained to do one body
21 of work, and that led to a second body of
22 work.
23     THE SPECIAL MASTER: For which there
24 was a separate retention letter?

Page 81

1     THE WITNESS: That's right, a
2 separate retention letter.
3     BY MR. SINNOTT:
4 Q.  To your knowledge, Professor, what
5    did Eric Belfi or others from Labaton tell
6    George Hopkins about Damon Chargois?
7 A.  Specifically --
8 Q.  I'm not asking for specific words,
9    but as best you can characterize their context.
10 A.  I know there were discussions, and
11    now we are shifting from Doane to now --
12     THE SPECIAL MASTER: Hopkins.
13 A.  Hopkins.  That there were
14    conversations about -- to the effect of, and so
15    this is my paraphrasing, so excuse me, to the
16    effect of there is some fee sharing, and do you
17    want to know who's involved in it, to which
18    Mr. Hopkins, again, my paraphrasing, said I
19    just don't want to know about how you are
20    dividing the fees or how the lawyer fees are
21    working.
22     So I know that there was a
23    conversation to that effect as represented both
24    by Mr. Hopkins and Mr. Belfi.

Page 82

1    I know that, subsequent to the class
2  action settlement, that, at some point,
3  Mr. Hopkins became aware of Chargois & Herron.
4    I don't believe, though I could be
5  wrong, that specifically Mr. Hopkins was
6  informed about Chargois & Herron until -- I
7  don't believe he was informed about them before
8  the class settlement.  That's the best of my
9  recollection.
10    THE SPECIAL MASTER:  Mr. Hopkins
11  testimony was that he didn't know anything
12  about Chargois and the agreement between
13  Labaton and Chargois until this
14  investigation.
15    MS. LUKEY:  Objection.
16    THE SPECIAL MASTER:  That's
17  Mr. Hopkins' testimony.
18    MS. LUKEY:  Objection.
19    THE WITNESS:  Okay.
20    BY MR. SINNOTT:
21  Q.   As a general matter, does a client's
22  request not to be informed of case developments
23  supersede or obviate an attorney's obligation
24  to inform that client?

Page 83

1    MS. LUKEY:  Objection.
2  A.  You have a duty to keep your client
3  informed.  The detail of, you know, the
4  granular nature of the information will depend
5  a lot on what the client wants to know, that
6  there are certain decisions the client, you
7  know, in typical arrangements, has to make.
8  And for those decisions, you have to keep them
9  well informed, and they make those decisions.
10    So if it's a matter going to trial,
11  whether or not the client is going to testify
12  is the client's decision.  And if it's a case
13  that's going to be settled or if you're going
14  to be going to trial, making the decision
15  between settlement and trial those are all
16  client decisions, and they have to be well
17  informed about those, but some clients want
18  more detailed information, and other clients
19  don't.
20  Q.  Do you consider the payment of
21  $4.1 million to an attorney that performed no
22  services in a case to be a significant
23  development?
24    MS. LUKEY:  Objection.

Page 84

1  A.   Not in this -- in the abstract, yes.
2  But in this particular case with a client who
3  says I don't want to know how the fees are
4  being divided, no.
5  Q.   What if that request runs counter to
6  the attorney's obligations under the
7  professional rules?
8    MS. LUKEY:  Objection.
9  A.   If there is a clear professional
10  obligation and a client wants you to violate
11  that obligation, you have to live up to your
12  ethical obligation.
13  Q.   And then, in the February 8, 2011,
14  engagement letter, there is a specific
15  reference, is there not, to Labaton keeping
16  Arkansas apprised of significant investments.
17    Do you recall that?
18  A.   I believe so, but if I could see the
19  letter, then I could say yes without just
20  saying I believe so.
21  Q.   Sure.
22    MR. SINNOTT:  Do you have that,
23  Joan?
24    MS. LUKEY:  Yes.

Page 85

1  A.  I'm being shown it now.
2  Q.   Second page, second paragraph, first
3  line.
4  A.   Okay.  (Perusing.)
5    Okay.  Yes.
6  Q.   So the engagement letter
7  memorializes an obligation on the part of
8  Labaton to keep Arkansas informed of matters of
9  significance, correct?
10  A.  That's correct.
11  Q.   Was a $4.1 million payment to Damon
12  Chargois a matter of significance?
13  A.   In this particular case, I don't
14  believe so.
15  Q.   Why not?
16  A.   Well, it -- first of all, the
17  preceding paragraph says that, "Arkansas agrees
18  that Labaton Sucharow may allocate fees to
19  other attorneys who serve as local or liaison
20  counsel, as referral fees, or for other
21  services performed."
22    And it goes on but -- and it then
23  says, "Any division of fees among counsel will
24  be Labaton Sucharow's sole responsibility and

Page 86

1   will not increase the fees payable by Arkansas
2   Teacher or the class upon successful resolution
3   of the litigation."
4       So, in that context, it would be
5   significant if Arkansas Teachers were going to
6   be paying the total bill themselves, but not in
7   this instance.
8   Q.  All right.  So the answer is no?
9   A.  That's correct.
10  Q.  Not significant.
11      Beginning on page 31, you discuss
12  the issue of disclosure.
13  A.  Yes.
14  Q.  And you list several grounds for a
15  disclosure or several authorities that would
16  require a disclosure.
17  A.  And you are referring to disclosure
18  to the court, correct?
19  Q.  Yes, disclosure to the court.
20      And these include the Federal Rules
21  of Civil Procedure, local court rules, standing
22  orders, special order applying to class actions
23  and clear precedent, correct?
24  A.  That's correct.

Page 87

1   Q.  You don't list ethical duties,
2   correct?
3   A.  Not here.  I get to ethical duties
4   later on.
5   Q.  Okay.  Why don't you list them here?
6   A.  Because these are the sources of law
7   that inform what the ethical duties are.
8   Q.  You don't put ethical duties as an
9   independent basis for disclosure?
10  A.  Well, I discuss it later, that the
11  ethical rules, in and of themselves, don't
12  create an independent basis and did not create
13  for Labaton to provide notice of the court of
14  its fee-sharing arrangements with Chargois &
15  Herron.
16      But then later when I do discuss the
17  ethical duties, there could be situations where
18  the ethical duty would have been triggered.
19  Q.  All right.  And could be triggered
20  independent of the federal rules?
21  A.  That's right.  There could be no
22  local rule.  There could be no precedent.  If
23  the judge said, I want to know exactly how all
24  the fees are being divided, then that would

Page 88

1   trigger the ethical duty to tell the judge how
2   all the fees were being divided.
3   Q.  Would candor to the court, Rule 3.3,
4   be an independent grounds for disclosure to the
5   court?
6       MS. LUKEY: Objection.
7   A.  Only in a situation where you have a
8   duty to speak.
9   Q.  In addressing the obligation of
10  customer class counsel to the court, did you
11  consider what authority the court had to
12  disallow the Chargois payment even if it was a
13  valid division of fees?
14      MS. LUKEY: Objection.
15  A.  I'm not sure what your question is.
16  Q.  Sure.  Did you consider the fact
17  that the court, regardless of whether it was a
18  valid division of fees, could say not good
19  enough?
20      MS. LUKEY: Objection.
21  Q.  I'm not going to accept it?
22  A.  If the court had required or there
23  was some other authority that required
24  disclosure of all the fees and how they were

Page 89

1   being divided, then, yes, the court would have
2   had that authority.  But without the
3   requirement of disclosure, then that doesn't --
4   I guess the court's authority isn't implicated.
5   Q.  Well, the court's authority remains
6   the same, correct?
7       MS. LUKEY: Objection.
8   A.  That's right.  But the court only
9   decides on what's before it and what's required
10  to be before it.
11  Q.  So what's the responsibility of the
12  court to a certified class?
13  A.  It has a fiduciary duty to the
14  certified class.
15  Q.  And do you have any view on whether
16  Judge Wolf, who would have considered the
17  existence of the Chargois arrangement, relevant
18  to his exercise of that fiduciary duty?
19      MS. LUKEY: Objection.
20  A.  I have no view on that.
21  Q.  You don't have any view as to
22  whether it's relevant?
23      MS. LUKEY: Objection.
24  A.  I don't see it as relevant unless

Page 90

1  **his view was made known to counsel or was**
2  **required -- or that the information was**
3  **required to be disclosed to the court.**
4      THE SPECIAL MASTER: So the burden
5  is totally on the court to ask?
6      THE WITNESS: Or to have a court
7  rule or a standing order as many judges in
8  different courts have.
9      THE SPECIAL MASTER: And in the
10  absence of the court asking, before a
11  judge approves a settlement agreement, the
12  lawyers have no responsibility or duty to
13  make the judge aware of an agreement such
14  as the Chargois agreement?
15      THE WITNESS: That's right, absent a
16  local rule, a standing order or a
17  case-specific order. That's why, you
18  know, rule -- Civil Rule Procedure 54(d),
19  you know, specifically has a clause, "if
20  the court requests."
21      THE SPECIAL MASTER: How is a judge
22  supposed to perform his or her obligations
23  to the class in a proceeding at a
24  settlement hearing, what we call a

Page 91

1  fairness hearing --
2      THE WITNESS: Right.
3      THE SPECIAL MASTER: -- in
4  determining that the allocation of fees is
5  fair to the class if the lawyers don't
6  tell him anything about this agreement
7  that's out there to pay $4.1 million to
8  somebody who did no work on the case and
9  appears nowhere in the fee petition
10  filings? How is a judge supposed to
11  perform his or her obligation?
12      MS. LUKEY: Objection.
13      MR. HEIMANN: Objection.
14      THE WITNESS: That's for the judge
15  to decide. Some judges decide that they
16  are going to have a local rule, and they
17  get together, like the judges of the
18  Southern District and the Eastern District
19  of New York did.
20      Other judges have standing orders.
21  Some judges might have a case-specific
22  order.
23      Even absent all those orders, a
24  direct request made to counsel could

Page 92

1  fulfill that.
2      Is the absence of having all of
3  those rules an indication that the judge
4  is not fulfilling his or her fiduciary
5  obligation? Absolutely no. Because the
6  rules are there. I think it's -- and I
7  haven't opined on this, and I haven't
8  researched the judge's fiduciary
9  obligation, but I've read enough class
10  action cases to see that the primary
11  obligation is to see that the settlement
12  is fair to the class members and that the
13  attorney fees awarded, the gross amount of
14  the attorney fees awarded appears to be
15  fair.
16      What obligation beyond that, I
17  haven't been asked to opine on it, and I
18  haven't researched it.
19      THE SPECIAL MASTER: So, in the
20  absence of a local rule or a judge's
21  standing order, there is no obligation to
22  the lawyers to make a disclosure of a fee
23  agreement or agreement to pay a lawyer
24  $4.1 million who never appeared before the

Page 93

1  court, appears in no fee declaration,
2  appears in no Lodestar petition, never
3  filed an appearance in the court, there is
4  no obligation for the lawyer to come
5  forward to disclose this so that the judge
6  may make a determination as to whether
7  this payment is in the interests of class?
8      MS. LUKEY: Objection.
9      THE WITNESS: That's what I've said.
10  And I guess if there was an obligation for
11  4.1 million, my position would be if
12  there's an obligation for 4.1 million,
13  there would be an obligation for any
14  amount.
15      THE SPECIAL MASTER: What if the
16  judge -- well, that raises a good
17  question.
18      What if the amount was $10 million
19  instead of $4.1 million?
20      MS. LUKEY: Objection.
21      THE WITNESS: In Massachusetts,
22  where you can have a peer referral fee,
23  sometimes known as a naked referral fee or
24  a bear referral fee, again, it would not

Page 94

1   make a difference.
2      THE SPECIAL MASTER: So the amount
3   is irrelevant?
4      THE WITNESS: I think the amount is
5   irrelevant.
6      THE SPECIAL MASTER: What if the
7   judge says, I want to know about the
8   allocation in the case, tell me about the
9   allocation in the case without more.
10     MS. LUKEY: Objection.
11     THE SPECIAL MASTER: Does that
12  trigger an obligation on the part of a
13  lawyer to talk about this fee agreement?
14     MS. LUKEY: Objection.
15     THE WITNESS: Based on the way
16  you've characterized it, no, because I
17  think that's just talking about the
18  allocation among the firms. And then what
19  the firms do with their allocation is,
20  absent the standing order or local court
21  rule or case-specific order or precedent,
22  of which there is none in Massachusetts
23  District Court, no, it doesn't trigger an
24  obligation.

Page 95

1      THE SPECIAL MASTER: You understand
2   that this particular settlement fairness
3   hearing and fee petition was a
4   non-adversary proceeding. There was
5   nobody objecting, nobody there to raise
6   objections or even to raise questions
7   other than the judge. You understand
8   that?
9      MS. LUKEY: Objection.
10     THE WITNESS: I can assume that
11  based on what you've said. I believe I
12  saw something to the effect that there
13  were no objectors and it was not
14  non-adversarial.
15     THE SPECIAL MASTER: Does this raise
16  in any way the obligation of the lawyers
17  to more fully disclose fee agreements to
18  the court?
19     THE WITNESS: No.
20     MS. LUKEY: Objection.
21     THE SPECIAL MASTER: Are you aware
22  of the comment to the Massachusetts Rules
23  of Professional Conduct, specifically
24  comment 14(a) to Rule 3.3, are you aware

Page 96

1   of that?
2      THE WITNESS: I know I've read it,
3   but if you are going to question me on it,
4   if I had a copy, it would be greatly
5   appreciated.
6      MS. LUKEY: Your Honor, can I ask
7   when we might be breaking? I think we
8   have been going two hours.
9      THE SPECIAL MASTER: In a little
10  bit. Okay?
11     14(a). I don't want to mismark it.
12     THE WITNESS: I can remember 14(a).
13     THE SPECIAL MASTER: Just for the
14  record, I will read it.
15     THE WITNESS: If I could follow
16  along with you, or if I could read it
17  silently.
18     THE SPECIAL MASTER: And then I will
19  ask you about the next as well.
20     MR. SINNOTT: Why don't we mark it
21  as an exhibit.
22     (Joy Exhibit 6, Excerpts from the
23  Massachusetts Rules of Professional
24  Conduct, marked for identification.)

Page 97

1      MS. LUKEY: Given the issue we had
2   earlier in the case, do we know if this is
3   what the rule was at the time? I just
4   don't know what the answer to that is.
5      THE SPECIAL MASTER: I think it was,
6   but we can check that.
7      Elizabeth, didn't we check to make
8   sure this was the rule and comment? The
9   time would be August '16 or November 2016
10  hearings. So we think it is.
11     THE WITNESS: Okay.
12     THE SPECIAL MASTER: Does this
13  comment at least imply some higher duty of
14  disclosure to the court where there is a
15  class action settlement and it is in the
16  nature of a non-adversary proceeding?
17     MS. LUKEY: Objection.
18     THE WITNESS: Yeah, it does.
19     THE SPECIAL MASTER: And it seems to
20  define what that is within -- within that
21  comment as being the same duties of candor
22  to the tribunal as lawyers in ex parte
23  proceedings.
24     THE WITNESS: That's correct.

Page 98

1 **THE SPECIAL MASTER:** And should be
2 guided by Rule 3.3(d).
3 **THE WITNESS:** That's right.
4 **THE SPECIAL MASTER:** And I think
5 3.3(d) is next there right in front of
6 you.
7 **THE WITNESS:** Yes.
8 **THE SPECIAL MASTER:** We should read
9 that for the record.
10 "In an ex parte proceeding, a lawyer
11 shall inform the tribunal of all material
12 facts known to the lawyer that will enable
13 the tribunal to make an informed decision,
14 whether or not the facts are adverse."
15 **THE WITNESS:** Uh-huh.
16 **THE SPECIAL MASTER:** Which raises
17 the question. A judge who has to decide
18 whether or not this is a fair settlement
19 to the class in his or her fiduciary role
20 to the class, is this not a material fact,
21 this, the Chargois agreement, not a
22 material fact that a judge, known to the
23 lawyer, that would enable a lawyer to make
24 an informed decision?

Page 99

1 **MS. LUKEY:** Objection.
2 **THE WITNESS:** I don't believe it's a
3 material fact.
4 **THE SPECIAL MASTER:** Really?
5 **THE WITNESS:** Really.
6 **THE SPECIAL MASTER:** Let me ask you
7 this. You understand that the class
8 consisted of not just what we have called
9 the customer class, but also members of
10 two other ERISA lawsuits, correct?
11 **THE WITNESS:** That's correct.
12 **THE SPECIAL MASTER:** You understand
13 that, and that those two other cases were
14 consolidated for all pre-trial purposes?
15 **THE WITNESS:** That's my
16 understanding.
17 **THE SPECIAL MASTER:** That would
18 include settlement.
19 **THE WITNESS:** That's my
20 understanding.
21 **THE SPECIAL MASTER:** Do you
22 understand that the ERISA members of that
23 class, including the named class
24 representatives in the other two lawsuits,

Page 100

1 were never told of the Chargois
2 arrangement? Do you understand that?
3 **THE WITNESS:** I understand the class
4 members were not told, yes.
5 **THE SPECIAL MASTER:** Including the
6 ERISA class members?
7 **THE WITNESS:** That's correct.
8 **THE SPECIAL MASTER:** Do you
9 understand also that their lawyers were
10 not told of the Chargois arrangement?
11 Their lawyers, meaning the lawyers for the
12 ERISA class members, and specifically the
13 ERISA class representatives were not told
14 of the Chargois arrangement?
15 **THE WITNESS:** It's my understanding,
16 at some point, they were, but I'm not sure
17 at what point they were.
18 **THE SPECIAL MASTER:** I want you to
19 assume that they knew nothing about it
20 until this investigation.
21 **THE WITNESS:** Okay.
22 **THE SPECIAL MASTER:** I want you to
23 further assume that there were efforts
24 made to ensure that they knew nothing

Page 101

1 about it by not disclosing it to them in
2 various documents in which it could have
3 been disclosed to them. There were
4 specifically efforts made to not disclose
5 it to them.
6 My question to you, sir, is how
7 would the interests of the class be
8 protected, and here we are talking about
9 the settlement class, which included ERISA
10 members, how would the interest of the
11 class be protected if the ERISA lawyers
12 were not told, the ERISA class members
13 were not told, and the court was not told?
14 **MS. LUKEY:** Objection.
15 **THE WITNESS:** Because, at the
16 hearing, the decision is, was what was
17 submitted in terms of the attorneys' fees,
18 was that, you know, substantiated, and was
19 that fair, you know, given the amount of
20 award that was going to all of the class
21 members.
22 So it would be the same thing as,
23 let's assume that Mr. Chargois happened to
24 be a lawyer with Labaton, and the only

Page 102

1   thing that he did at Labaton was help get
2   Arkansas as a client, and that's the only
3   thing he did, but his agreement with
4   Labaton is he gets $4.1 million.  Nobody
5   takes a look once the firm gets the fee.
6   The judge is looking at what the amount is
7   and how much is going to each of the firms
8   involved.
9       THE SPECIAL MASTER: With one
10  exception, right?  The Labaton firm was
11  appearing before the court as lead
12  counsel, right?
13      MS. LUKEY: Objection.
14      THE WITNESS: They are appearing,
15  that's correct.
16      THE SPECIAL MASTER: And the court
17  is aware that the Labaton firm is before
18  the court.  Yes?
19      THE WITNESS: That's right, sure.
20      THE SPECIAL MASTER: And the court
21  is further aware that the Labaton firm has
22  done a lot of work on the case, correct?
23      THE WITNESS: That's right.
24      THE SPECIAL MASTER: And there's no

Page 103

1   distinction there between that and
2   Mr. Chargois, who had no relationship to
3   the case, did no work on the case, never
4   appeared in the case, was not in a fee
5   petition, was not in a Lodestar petition,
6   and you still see that as exactly the
7   same?
8       MS. LUKEY: Objection.
9       THE WITNESS: I don't see it exactly
10  the same, but I think -- and I see in this
11  case that it doesn't make a difference
12  because there was no obligation to
13  disclose to the court the fee-sharing
14  arrangement because the court didn't ask
15  for it under 54(d).  There was no local
16  rule.  There was no standing order.  There
17  wasn't a specific request from the judge.
18  There's no precedent that says that you
19  have to do it.
20      THE SPECIAL MASTER: And Rule 3.3
21  and 3.3(d) and the comments thereto create
22  no higher obligation?
23      MS. LUKEY: Objection.
24      THE WITNESS: In this instance, they

Page 104

1   don't create an obligation to disclose the
2   fee to Chargois Herron.
3       THE SPECIAL MASTER: So, in the
4   absence of a court rule --
5       THE WITNESS: Yes.
6       THE SPECIAL MASTER: In the absence
7   of a court's standing order, is the only
8   thing the court is to look at, then, is
9   the total fee, and whether that's fair and
10  reasonable in light of all the factors
11  that courts look at, and not to be
12  concerned about how that fee is being
13  divided among the lawyers?
14      MR. HEIMANN: Objection, compound.
15      THE WITNESS: If I understand your
16  question correctly, that's right, because
17  the same way -- although various lawyers
18  at the firm submit their time, the firm's
19  own agreement is going to decide what
20  portion of those fees the lawyers who have
21  done the work is going to get.
22      THE SPECIAL MASTER: You are aware
23  that there is, or maybe you're not aware,
24  that there is testimony in this case from

Page 105

1   the lawyers for the ERISA clients that,
2   had they known of the agreement with
3   Mr. Chargois, they would not have agreed
4   to the settlement.  Are you aware of that?
5       MS. LUKEY: Objection.
6       THE WITNESS: I'm not aware of that.
7       MR. HEIMANN: I object.  There is no
8   such testimony, Your Honor.
9       THE SPECIAL MASTER: They would not
10  have recommended it.
11      MR. HEIMANN: That's not true.  I'm
12  sorry.
13      MS. LUKEY: Objection.
14      THE WITNESS: I'm not aware of any
15  of this.
16      THE SPECIAL MASTER: Are you aware
17  that the ERISA lawyers have said that they
18  would not have agreed had they been aware
19  of the Chargois arrangement, that they
20  would not have agreed with the allocation
21  of their fees?
22      MS. LUKEY: Objection.
23      THE WITNESS: No, I'm not.
24      THE SPECIAL MASTER: Are you aware

1 of the role of the Department of Labor in
2 this case?
3     THE WITNESS: I'm aware that they
4 were involved in working out what the
5 ERISA class members were going to get,
6 like what percentage.  But, you know, I
7 wasn't asked to opine on that.  So that's
8 something I have some awareness of, but
9 only because of digging into this, you
10 know, that is something I became aware of.
11     THE SPECIAL MASTER: You are aware
12 that the Department of Labor has
13 jurisdiction to oversee ERISA plans?
14     THE WITNESS: Yes.
15     THE SPECIAL MASTER: And that the
16 Department of Labor was involved in these
17 negotiations?
18     THE WITNESS: I know they had some
19 role.
20     THE SPECIAL MASTER: And are you
21 aware that one lawyer in particular for
22 the ERISA, who was representing the ERISA
23 clients in this, had primary
24 responsibility for negotiating with the

1 Department of Labor?
2     MR. HEIMANN: Objection.
3     THE WITNESS: That sounds like
4 something I may have come across, but I'm
5 not -- not aware of that entirely.
6     THE SPECIAL MASTER: Are you aware
7 that the defendant in the case with whom
8 the settlement negotiations were going on,
9 was insisting on a global settlement to
10 include the Department of Labor, the SEC
11 and the Department of Justice?
12     THE WITNESS: I'm not aware of that.
13     THE SPECIAL MASTER: I want you to
14 assume that one of the lawyers for the
15 ERISA class was taking primary and lead
16 responsibility for dealing with the
17 Department of Labor, and that that's the
18 testimony of a number of lawyers, not just
19 the ERISA lawyers.
20     THE WITNESS: Okay.
21     THE SPECIAL MASTER: I want you to
22 assume that.
23     And that that lawyer has testified
24 that, had he known of the Chargois

1 arrangement, he would have been obligated
2 to tell the Department of Labor about the
3 Chargois arrangement?
4     MS. LUKEY: Objection.
5     THE WITNESS: I'm assuming that.  Go
6 ahead.
7     THE SPECIAL MASTER: Okay.  And that
8 he believes that the Department of Labor
9 would not have agreed to participate, it's
10 his belief, but he testified to that.
11     MS. LUKEY: Objection.
12     THE SPECIAL MASTER: Which then
13 would have had the effect of blowing up
14 the settlement because there wouldn't be a
15 global settlement.
16     MS. LUKEY: Objection.
17     THE SPECIAL MASTER: Are you aware
18 of that?
19     THE WITNESS: I'm making those
20 assumptions as you've asked me to.
21     THE SPECIAL MASTER: Does that
22 change your view that there was no
23 obligation to tell any of the other
24 lawyers in this case?

1     MS. LUKEY: Objection.
2     THE WITNESS: I wasn't asked to
3 opine on that issue.
4     THE SPECIAL MASTER: Do you believe
5 that there was an obligation to tell the
6 lawyers for the ERISA members of the
7 class?
8     THE WITNESS: Like I said, I wasn't
9 asked to opine on it.  I don't believe so.
10 I would, before rendering an opinion on
11 that, I would want to look deeper into
12 that, but I don't believe so based on
13 everything I'm come across.
14     THE SPECIAL MASTER: I want to go
15 back, taking the objections to the way I
16 characterized the ERISA lawyers.  Let me
17 read you exactly what this ERISA lawyer
18 said and other ERISA lawyers.
19     This is the testimony -- is this
20 from Kravitz or Sarko?
21     MR. SINNOTT: Sarko.
22     THE SPECIAL MASTER: This is
23 questioning by Mr. Sinnott.
24     "What would you have done, Counsel,

Page 110

1 if during the course of this case, you had
2 learned about Mr. Chargois?
3 **"ANSWER:** Well, I think, in my
4 answer -- if we go back in the original
5 time, the 9 percent deal, I would not have
6 agreed to that.  I guess I would not have
7 agreed to file a joint fee petition if
8 some money was going to Mr. Chargois now
9 that all of this information has come out.
10 I mean, the first thing, I would have
11 asked some questions, but I think that's,
12 you know, 20/20 hindsight.
13 "I think the real issue is if I
14 would have known this information, I would
15 not have agreed to file a joint petition,
16 because I would not have wanted, I mean,
17 bluntly, in order to do that, I would have
18 had -- I would have had -- I would have
19 first had to talk to the other ERISA
20 counsel and they would not have agreed."
21 **MS. LUKEY:** What's the question,
22 sir?
23 **THE SPECIAL MASTER:** "I would have
24 had to get approval from the named

Page 111

1 plaintiffs who would not have agreed.  I
2 mean, you have met our named plaintiffs.
3 They're straight shooters.  They would say
4 this doesn't sound right."
5 **MR. SINNOTT:** Could we mark that as
6 an exhibit, please?
7 **THE SPECIAL MASTER:** Yes.  We'll
8 mark it as an exhibit.
9 (Joy Exhibit 5, Excerpt of
10 Deposition of Lynn Lincoln Sarko, dated
11 September 8, 2017, marked for
12 identification.)
13 **MS. LUKEY:** Is there a question?
14 **THE WITNESS:** You were reading from?
15 **THE SPECIAL MASTER:** I'm sorry.
16 Page 75.  If you want to take a moment to
17 read it, it starts at the very bottom of
18 page 74, line 23.
19 **THE WITNESS:** Okay.  Thank you.
20 (Perusing.)
21 And you just want me to read that
22 section for your question, then?
23 **THE SPECIAL MASTER:** You can read as
24 much as you want.

Page 112

1 **THE WITNESS:** If you let me know
2 what I need to read for your question,
3 then that will keep me focused.
4 **THE SPECIAL MASTER:** Okay.  My
5 question to you is, does this impact your
6 opinion at all that members of the class
7 were not told about the Chargois
8 arrangement and there might well have been
9 a significant impact upon whether or not
10 they would have agreed to the settlement?
11 **MS. LUKEY:** Objection.
12 **THE WITNESS:** As I said, I didn't
13 render an opinion about communications
14 between the various law firms, class
15 counsel, the various counsel for the
16 different classes, but in terms of my
17 opinion about notice to the court and my
18 opinion about notice to the class members,
19 it won't change my opinion.
20 **THE SPECIAL MASTER:** So how are the
21 interests of the ERISA class members
22 protected here, where this arrangement
23 with Mr. Chargois was not disclosed to the
24 class, was not disclosed to the ERISA

Page 113

1 lawyers, was not disclosed to the ERISA
2 class members, and was not disclosed to
3 the court, how can a court protect the
4 interests of the class members under these
5 circumstances?
6 **MS. LUKEY:** Objection.
7 **THE WITNESS:** As I said, I wasn't
8 asked to opine about what, as we referred
9 to them, the customer class lawyers told
10 the ERISA class lawyers and what the ERISA
11 class lawyers knew or didn't know.  That
12 was not something I investigated or looked
13 into.
14 **THE SPECIAL MASTER:** Well, you did
15 say that it wasn't necessary to inform the
16 class.
17 **THE WITNESS:** That's correct.
18 **THE SPECIAL MASTER:** And the ERISA
19 members were members of the class.
20 **MS. LUKEY:** I think your question
21 had built in the lawyers as well as the
22 class.  And I think he is just making that
23 point.
24 **THE SPECIAL MASTER:** Yes.  Well, all

Page 114

1  right. You believe there was no
2  obligation to inform the ERISA class
3  members at all of the Chargois agreement
4  as members of the class.
5     THE WITNESS: That's correct.
6     THE SPECIAL MASTER: Even though
7  their lawyer has now testified that that
8  would have been material information,
9  which may have caused them to not file a
10  joint petition with the customer class and
11  to have to tell their clients, the
12  representatives of the ERISA class
13  members, and to -- in this lawyer's
14  view, that their clients would never have
15  agreed to it?
16     MS. LUKEY: Objection.
17     THE SPECIAL MASTER: So the question
18  is, that doesn't change your opinion as to
19  the obligation to tell the class?
20     MR. HEIMANN: Judge, what's the "it"
21  in your question, please?
22     THE SPECIAL MASTER: "It," about the
23  Chargois agreement.
24     MR. HEIMANN: And not agreed to the

Page 115

1  fee. That's what you're saying, correct?
2     MS. LUKEY: That they would not have
3  agreed to the settlement?
4     THE SPECIAL MASTER: "To file a
5  joint fee petition," let me read, "because
6  I would have not have wanted -- I mean
7  bluntly in order to do that, I would have
8  had -- I would have first had to talk to
9  the other ERISA counsel, and they would
10  not have agreed.
11     "I would have to get approval from
12  the named plaintiffs who would not have
13  agreed. I mean you've met our named
14  plaintiffs. They are straight shooters.
15  They would say this doesn't sound right."
16     Does that change your opinion at all
17  that there was no obligation to tell the
18  class?
19     MS. LUKEY: Objection.
20     THE WITNESS: It does not change my
21  opinion.
22     THE SPECIAL MASTER: So my question
23  to you is, how are the interests of the
24  class protected by keeping the Chargois

Page 116

1  agreement from the class, from the class
2  members who were specifically named in the
3  ERISA cases and in the petition, you
4  understand there were three -- the three
5  cases were listed, and the case -- cases
6  had been consolidated for pre-trial
7  purposes, including settlement.
8     So given all of this, how are -- how
9  can the interests of the class, including
10  the ERISA members, be protected?
11     MS. LUKEY: Objection.
12     THE WITNESS: In my opinion, by the
13  judge's determination that the amount
14  going to the class members was fair and
15  equitable, and the amount of attorneys'
16  fees were justified by what had been
17  submitted to the court, and that those
18  were also fair and equitable.
19     THE SPECIAL MASTER: So all the
20  judge has to know, all the judge has to
21  know, is that the total fee is fair. The
22  judge has no interest in knowing anything
23  else, in the absence of a court rule or a
24  standing order?

Page 117

1     MS. LUKEY: Objection.
2     THE WITNESS: Well, I'm comfortable
3  in saying no interest in knowing about fee
4  sharing, but in terms of what has been
5  submitted to the court in terms of what
6  firm A is getting and what firm B is
7  getting, the judge might have an interest
8  between -- you know, in that way, in terms
9  of deciding what's fair and equitable.
10     THE SPECIAL MASTER: That's as to
11  lawyers before the court and the
12  allocation of fees between those lawyers?
13     THE WITNESS: Yeah. Typically,
14  between the firms before the court.
15  That's correct.
16     THE SPECIAL MASTER: Why would the
17  judge have any lesser interest in knowing
18  about a lawyer who's getting $4.1 million
19  who's never appeared before the court, is
20  not listed on any fee petition, is not
21  listed on a Lodestar petition, is not
22  listed as an expense, is not in anywhere,
23  any place brought to the court, why would
24  the judge have more interest in the

In Re: State Street Attorneys Fees

Page 118

1 allocation between the lawyers before him
2 than in a payment to a lawyer who's not
3 appeared at all in any way before the
4 court?
5     MS. LUKEY: Objection.
6     THE WITNESS: For two reasons.  The
7 first reason is the same reason the judge
8 has no interest in what the firm does when
9 it gets its fee and how it shares its fee.
10    And the second reason is we have
11 civil rule -- Federal Rule of Civil
12 Procedure 54(d) that says when the judge
13 wants to know about fee sharing, the judge
14 will ask.  And then we have standing
15 orders where some judges say, I always
16 want to know, or we have court local court
17 rules, like in the Southern District and
18 the Eastern Districts of New York, where
19 all of the judges there have gotten
20 together and say we want to know in every
21 one of these cases.
22    THE SPECIAL MASTER: So to put a cap
23 on this, in these instances in which
24 there's not a court rule and not a

Page 119

1 standing order, the lawyer has no
2 obligation, the lawyers, here, lead
3 counsel, has no obligation to inform the
4 court whatsoever, either under any Rule of
5 Civil Procedure or under the rules of
6 candor to the court and, particularly in
7 light of comment 14(a) and the nature of a
8 settlement brought to the court in a
9 non-adversary context.
10    MS. LUKEY: Objection.
11    THE WITNESS: That's correct, no
12 obligation.
13    MR. SINNOTT: Just a couple
14 questions and we can break.
15    BY MR. SINNOTT:
16 Q.  I know, in your report, you cite
17 3.3(a) and you cite comment 3 to 3.3.  Correct
18 me if I'm wrong, but I did not see comment
19 14(a) or 3.3(d) referenced in your report.
20 A.  That's correct.
21 Q.  Were you aware of comment 14(a) when
22 you wrote your report?
23 A.  I know that I read the rule and all
24 of the comments, and I was focusing on the way

Page 120

1 that the issue had been presented up to that
2 point in time.
3     I didn't focus on this particular
4 comment.  And I would have if that had been
5 already identified as an issue, and I would
6 have done more research and I would have seen
7 if I could have come up with anything one way
8 or the other.
9 Q.  So Labaton had not identified it as
10 an issue for you --
11    MS. LUKEY: Objection.
12 Q.  -- is that correct?
13    MS. LUKEY: Objection.
14 A.  No, no, the only thing --
15    MS. LUKEY: Go ahead.
16 A.  Okay.  No.  What was identified to
17 me was, is there a 3.3(a) issue or is there an
18 8.4(c) issue here.  That's what was identified
19 to me.
20 Q.  But if you read the rule, and let me
21 read it again, read the comment, rather.
22    "When adversaries present a joint
23 petition to a tribunal, such as a joint
24 petition to approve the settlement of a class

Page 121

1 action suit or the settlement of a suit
2 involving a minor, the proceeding loses its
3 adversarial character and, in some respects,
4 takes on the form of an ex parte proceeding.
5     "The lawyers presenting such a joint
6 petition thus have the same duties of candor to
7 the tribunal as lawyers in ex parte
8 proceedings, and should be guided by Rule
9 3.3(d)."
10    And Rule 3.3(d), again, states, "In
11 an ex parte proceeding, a lawyer shall inform
12 the tribunal of all material facts known to the
13 lawyer that will enable the tribunal to make an
14 informed decision whether or not the facts are
15 adverse."
16    Would you agree with me that comment
17 14(a) and 3.3(d) are inconsistent with the
18 opinion that you've offered?
19    MS. LUKEY: Objection.
20 A.  No, I would not.
21 Q.  Well, would you agree with me that
22 they speak to the same issues as -- on duty of
23 candor to the court as you've spoken to?
24    MS. LUKEY: Objection.

Page 122

1 A.  I'm not quite following your
2 question.
3 Q.  Let me just break it down.
4     You've got a comment that makes
5 specific reference to a joint petition to a
6 tribunal such as a joint petition to approve
7 the settlement of a class action suit.  And we
8 had that in this case, correct?
9 A.  Right.
10 Q.  So that's relevant, isn't it?
11 A.  Yeah.  Please correct me if I'm
12 wrong, because I read the ethical report by
13 Professor Gillers, and I don't recall him
14 identifying this as an important issue.
15     And so I suspect that when I did,
16 you know, when I read through it, I thought,
17 well, Professor Gillers doesn't see this as
18 bearing on this, and he's focusing on 3.(a),
19 and he is focusing on 8.4(c) and I'm focusing
20 on there.
21     If you would like me to prepare a
22 supplemental report, I would be happy to do so,
23 and I would research this, and I would do a
24 very thorough job, as I have tried to do

Page 123

1 throughout this.
2 Q.  All right.  But your testimony is
3 that you did not leave this out because it was
4 adverse or inconsistent to your position?
5 A.  Absolutely not.  I did not leave it
6 out because it was adverse.  If I had thought
7 it was adverse, I would have looked into it and
8 I would have disclosed it to the lawyers that
9 had retained me and said, look, I think you
10 have a problem here.  I've done that more times
11 than I could say, because I want to stand by
12 what I've done.
13 Q.  And this is a significant comment,
14 isn't it?
15     MS. LUKEY:  Objection.
16 A.  It could be significant.  It could
17 be significant.
18 Q.  It deserved attention, didn't it?
19     MS. LUKEY:  Well, objection.
20 A.  Not in the context that I was doing
21 this.  Absolutely not.
22     MS. LUKEY:  This is a rebuttal
23 report.  Professor Gillers did not cite to
24 the rule, to the note or to 3.3(d).

Page 124

1     All we asked him to do was a
2 rebuttal to Professor Gillers' report.
3     MR. KELLY:  Objection.  May I add a
4 legal point on the comments?
5     MR. SINNOTT:  Let me ask my question
6 and then you can make any objection.
7     THE SPECIAL MASTER:  But not
8 speaking objections, please.
9     BY MR. SINNOTT:
10 Q.  You have testified, Professor, that
11 the judge could have issued a standing order,
12 the judge could have required or asked
13 questions of the parties if he wanted to know
14 that information about fee allocation or fee
15 referrals, correct?
16 A.  That's correct.
17 Q.  Isn't it just as likely that a judge
18 could say, I don't have to do that.  Based on
19 Rule 3.3 and the comments, these parties have
20 to be candid with me, they have to treat this
21 like it's a non-adversarial setting in which
22 they have a duty to provide this information.
23 Isn't that just as likely?
24     MR. HEIMANN:  Objection, calls for

Page 125

1 speculation, among many other reasons to
2 object.
3     MS. LUKEY:  Objection.
4 A.  So this is my pure speculation, and
5 that is, first of all, we get to the fact that
6 3.3(d) talks about all material facts, right?
7     And so what are the material facts?
8 The material facts at this hearing are what the
9 fees is going to be and what the amount to the
10 class is going to be.
11     As I said, I haven't researched
12 this, but based on my experience, based on
13 everything I've done, I would be very surprised
14 if I would find a case that would say that
15 because of 3.3(d) incorporated through comment
16 14(a) of the Massachusetts Rules of
17 Professional Conduct, there is some heightened
18 duty of candor that would have been applicable
19 in this case that would have required
20 disclosure of the Chargois Herron in the amount
21 of -- the fee that they were going to get out
22 of the fee awarded to class counsel.
23     I would be very surprised, and as I
24 said, I would be happy to provide you with the

Page 126

1  **research that would back up what I've just**
2  **said.**
3  Q.  All right.  Thank you, Professor.
4  **A.  You're welcome.**
5      MR. SINNOTT: On the phone, 15
6  minutes.  We will reconvene at 4:25.
7      (Recess taken.)
8      MR. SINNOTT: All right.  We are
9  back on the record.  And on the phone, I
10 believe we are now joined by Professor
11 Gillers as well.
12     And, David, are you there?
13     MR. COPLEY: Yes, I am.
14     MR. SINNOTT: Okay.  Linda, are you
15 there?
16     MS HYLENSKI: I am.
17     MR. SINNOTT: Okay.  Emily has not
18 returned, has she?
19     Okay.  Josh, are you on the phone?
20     MR. SHARP: Yes, I am.
21     MR. SINNOTT: Is anyone else on the
22 phone?  Could whoever is shuffling papers
23 into the speaker cease and desist?  Thank
24 you.

Page 127

1      BY MR. SINNOTT:
2  Q.  All right.  Professor, welcome back.
3      In your report on page 39, you
4  conclude your examination of one of the cases
5  that Professor Gillers had cited in his report,
6  the Agent Orange case.
7  **A.  That's right.**
8  Q.  And on page 39, the last paragraph
9  in the middle of the page says, "In re: Agent
10 Orange informs and is consistent with my
11 opinion that without a standing order, specific
12 order, inquiry from the court, local court rule
13 or precedent in a circuit, there is no
14 obligation to disclose fee-sharing agreements
15 with the court."
16     I read that correctly, didn't I?
17 **A.  You did.**
18 Q.  But I would suggest to you or let me
19 suggest that Agent Orange does, in fact,
20 require disclosure of a private fee-sharing
21 agreement, and let me just point out a couple
22 things to you.
23     In that case, and you have read the
24 case, obviously, because you rebutted it or

Page 128

1  wrote a rebuttal to it.
2  A.  Yes.
3      MR. SINNOTT: Madam Court Reporter,
4  if we could mark that as the next exhibit.
5      (Joy Exhibit 8, In re: Agent Orange
6  Product Liability Litigation, marked for
7  identification.)
8  Q.  And looking at what has now been
9  marked as Exhibit 8, this is In re: Agent
10 Orange product liability litigation, 818 F.2d
11 216, United States Court of Appeals for the
12 Second Circuit.
13     And would you agree with me that, in
14 Agent Orange, the Second Circuit refused to
15 enforce the agreement among the lawyers despite
16 the absence of a court rule that would have
17 required the lawyers to inform the District
18 Court judge of that agreement?
19     MS. LUKEY: Objection.
20 **A.  Not exactly, because there was a**
21 **court rule that required it, but the District**
22 **Court waived the application of the rule in**
23 **that particular case, and waived the rule at a**
24 **time when the court was unaware of the**

Page 129

1  agreement among counsel.
2  Q.  It was more than just a waiver,
3  wasn't it?
4      MS. LUKEY: Objection.
5  **A.  I'm not sure what you mean by**
6  **"waiver."**
7  Q.  Let me direct your attention to page
8  12 of the opinion.  It would be page 8 at the
9  bottom of your copy.
10 **A.  Okay.  Page 8.  All right.**
11 Q.  And you see up above the bracketed
12 12?
13 **A.  Yes.**
14 Q.  "We do agree with the District
15 Court's ruling that, in all future class
16 actions, counsel must inform the court of the
17 existence of a fee-sharing agreement at the
18 time it is formulated."
19     I read that correctly, didn't I?
20 **A.  You did.**
21 Q.  How do you understand the meaning of
22 the word "all" in that sentence?
23 **A.  That the -- wait.  That all means**
24 **all.  In the Second Circuit, the court was**

Page 130

1  saying you had to disclose in all class
2  actions.
3  Q.   And how do you understand the
4  meaning of the words "a fee-sharing agreement"?
5  A.   As the words state, an agreement to
6  share fees.
7  Q.   Okay.  And the Second Circuit did
8  not limit itself to a particular kind of
9  fee-sharing agreement, did it?
10 A.   Not by that language, no, it did
11 not.
12 Q.   Because it said "all," correct?
13 A.   It did.
14 Q.   And it did not limit itself,
15 certainly, to the kind of fee-sharing agreement
16 in the Agent Orange case, did it?
17 A.   Not by that language, it did not.
18 Q.   Let me direct your attention also to
19 page 5 at the bottom of your pages on the
20 right-hand side of the section bracketed 5.
21 A.   All right.
22 Q.   And the court quotes Lewis versus
23 Teleprompter.
24 A.   Yes -- hold on.  I'm not -- I'm on

Page 131

1  page 5.  Do you mean on the right-hand side?
2  Q.   Page 5, down here, yeah.
3  A.   Okay.  Okay.  I'm sorry.  I was
4  looking on the left column, not the right
5  column.
6  Q.   Yeah, go to the right-hand side, and
7  specifically the sentence that begins "We
8  reject this authority."
9      Do you see that?
10 A.   Yes.
11 Q.   And if I could read it.  "We reject
12 this authority, however, to the extent it
13 allows counsel to divide the award among
14 themselves in any," and you can see that the
15 word "any" is emphasized there.
16 A.   Right.
17 Q.   "Manner they deem satisfactory under
18 a private fee-sharing agreement."
19 A.   Uh-huh.
20 Q.   "Such a division overlooks the
21 District Court's role as protector of class
22 interests under Federal Rule of Civil Procedure
23 23(e) and its role of assuring reasonableness
24 in the awarding of fees in equitable fund

Page 132

1  cases.
2      "In addition, this approach
3  overlooks the class attorney's duty," let me
4  just make sure I'm reading it correctly.
5  A.   So you skipped over the citations.
6  Q.   Yeah.  So I skipped the citations.
7  And if you go down below the quoted reference
8  there, it says, "In addition, this approach
9  overlooks the class attorney's duty to be sure
10 that the court, in passing on the fee
11 application, has all the facts."
12 A.   That's right.
13 Q.   "As well as their fiduciary duty to
14 the class not to overreach."
15     And you see where Lewis versus
16 Teleprompter is cited there.
17 A.   That's right.
18 Q.   My question to you is, how do you
19 interpret the words "has all the facts"?
20     MS. LUKEY: Objection.
21 A.   Well, I'd have to take a look at
22 Lewis versus Teleprompter Corp. to answer that,
23 because it's making -- you know, that's a quote
24 out of context, and I just would want to take a

Page 133

1  look at how they are talking to it.
2      I know the next paragraph talks
3  about that, you know, the decisions where these
4  internal fee agreements have been approved were
5  not ones where there was a return on investment
6  as a factor.
7      So, I mean, I might infer that, you
8  know, if you have an agreement where, you know,
9  having an investment agreement where you're
10 going to get a big multiple of what you've
11 invested, that that's a fact that the court
12 needs to know.  But like I said, I want to take
13 a look at Lewis versus Teleprompter to be
14 certain.
15 Q.   But you would agree that it doesn't
16 say that -- strike that.
17     You would agree that it doesn't say
18 "has all the facts that the parties believe to
19 be relevant," correct?
20 A.   It does not say that.
21 Q.   And why didn't you quote these
22 passages in your discussion of the Agent Orange
23 case?
24     (Discussion off the record.)

Page 134

1   A.  I have no idea why I didn't quote
2   those particular passages out of, you know, the
3   various -- I think I quoted the passages that I
4   quoted because I thought that they were
5   relevant to what I was saying, and I can't tell
6   you why I didn't just append the entire
7   decision.
8   Q.  Would you agree with me that these
9   passages are relevant to the questions that
10  will come before Judge Wolf in this case?
11       MS. LUKEY: Objection.
12  A.  They may be, but I think everything
13  has to be in context.
14       THE SPECIAL MASTER: While he is
15  considering his next line of questioning
16  or next question, was the class, once it
17  was certified, a client of Labaton?
18       MS. LUKEY: Objection.
19       THE WITNESS: Labaton had certain
20  duties to the class as a whole, but they
21  weren't a client like an individual client
22  is.
23       THE SPECIAL MASTER: Without going
24  through the entire record, there are a

Page 135

1   number of references to the ERISA members
2   of the class as they were our clients.
3        MR. HEIMANN: I'm objecting to this
4   unless you show us in the record where
5   that was said.
6        THE SPECIAL MASTER: We can spend
7   time.  I will get them all out if you want
8   to do that.
9        Can you get all those?  There's a
10  list of them that we have.
11       But I want you to assume there's a
12  number, including what's been referenced
13  in this litigation as the lobby
14  conference, in which the judge was told
15  there are overlapping interest, words to
16  the effect, I'll get it exactly, but they
17  are all our clients.
18       Does that change your view about
19  whether the class was class counsel's
20  clients?
21       MS. LUKEY: Objection.
22       THE WITNESS: I don't think what
23  you're saying is inconsistent with what I
24  said.

Page 136

1        I said that class counsel for -- or
2   Labaton let's just say Labaton had certain
3   obliges to the class but those obligations
4   were not exactly the same as a lawyer to
5   the class members, that a lawyer would
6   have to an individual client.
7        THE SPECIAL MASTER: So once the
8   class is certified, Labaton does not have
9   an obligation to comply with the
10  disclosure requirements and consent
11  requirements under Rule 1.5(e)?
12       THE WITNESS: Not to every
13  individual class member, it does not.
14       THE SPECIAL MASTER: What about in
15  this case, where you have three cases
16  consolidated for pre-trial purposes, and
17  you have specific class representatives in
18  those other two cases that are
19  consolidated, no obligation to disclose
20  the Chargois agreement to those class
21  representatives or at least to their
22  lawyers so that it can be disclosed to
23  those class members?
24       MS. LUKEY: Objection.

Page 137

1        THE WITNESS: As I said, I did not
2   look into any obligation that Labaton had
3   to the lawyers representing the ERISA
4   class members.
5        THE SPECIAL MASTER: Okay.  Fine.
6   Let's just stick with the named ERISA
7   class members in the two other cases that
8   have been consolidated and are now members
9   of the settlement class.  No obligation to
10  disclose --
11       THE WITNESS: None, that I could
12  find.
13       THE SPECIAL MASTER: How would the
14  interest, if there's no obligation, are
15  we -- let me start again.
16       No obligation under 1.5(e) to
17  disclose this arrangement.  Is that what
18  you're referring to, the Chargois
19  arrangement?
20       MS. LUKEY: Objection.
21       THE WITNESS: I'm referring to that,
22  yes.
23       THE SPECIAL MASTER: And no
24  obligation under any other rule of ethics

Page 138

1  or legal obligation that you're aware of
2  to disclose it to the named ERISA
3  plaintiffs in the other two cases?
4      THE WITNESS: Not that I could find.
5      THE SPECIAL MASTER: Were these
6  ERISA members of the class clients of
7  Labaton for purposes of 1.5(e)?
8      THE WITNESS: Not in terms of
9  getting each individual's agreement to fee
10 sharing, no.
11     THE SPECIAL MASTER: And when you
12 say "each individual's" you are referring
13 to the named representatives in the two
14 other lawsuits?
15     THE WITNESS: I'm referring to the
16 named representatives, and I'm also
17 referring to every member of those
18 classes.
19     THE SPECIAL MASTER: And there was
20 no obligation to give them, in the notice
21 that went out of the settlement and the
22 payment of attorneys' fees, there was no
23 obligation to tell them of that either?
24     THE WITNESS: That's correct.  There

Page 139

1  was no obligation.
2      THE SPECIAL MASTER: I'm sorry.  I
3  garbled that.
4      There was no obligation in the
5  notice that went out to the class to tell
6  them of the Chargois arrangement in that
7  notice?
8      THE WITNESS: That's correct.  I
9  could not find any obligation to do so.
10     BY MR. SINNOTT:
11 Q.  Would you agree with me that the
12 Agent Orange decision and Lewis, which is cited
13 within it, did not depend on a court rule or a
14 local rule?
15     MS. LUKEY: Objection.
16 A.  Could I take each one separately?
17 Q.  Please.
18 A.  Okay.  So, in Agent Orange, there
19 was a court rule that the judge, and I think I
20 used word "waived" and you used --
21 Q.  You did.
22 A.  But, anyway, the court did not
23 require that the firms follow the local court
24 rule.

Page 140

1      And then, in the Lewis case, I know
2  also refer to Lewis case in my report, and
3  before I speak to it, I would like to take a
4  look at that again to refresh my recollection.
5  Q.  Please feel free.
6  A.  Okay.  Thank you.  (Perusing.)
7  Q.  What page is that, Peter?
8  A.  Starting on page 41.
9  Q.  41 to 42?
10 A.  It starts on 41 and goes over to 42.
11 (Perusing.) Yeah.  And then in terms of Lewis
12 versus Teleprompter, there wasn't any agreement
13 between a law firm and a client about fee
14 sharing.  These were all agreements just
15 between the firms concerning fee -- well, some
16 type of fee sharing or fee splitting, is what
17 the court referred to it.
18     Some of the fee splitting had to do
19 with firms that were supporting the application
20 of the Popper Pomerantz firm.  Some of the
21 other were for firms that were helping to
22 identify clients, but there was nothing that --
23 between the Popper Pomerantz with the client
24 that permitted the fee sharing, and so that's

Page 141

1  how I distinguish that particular case from the
2  case that we have here, where Labaton did have
3  an agreement with Arkansas that explicitly
4  referenced fee sharing.
5  Q.  But didn't Lewis specifically reject
6  the premise that counsel could divide the award
7  among themselves in any manner they deem
8  satisfactory under a private fee-sharing
9  agreement?
10 A.  Yes, it did.
11 Q.  It did.  And, in fact, it referenced
12 the role of the District Court as a protecter
13 of the class, right?
14 A.  Yes.
15 Q.  Tell me if you agree with this
16 statement, Professor.  "A representation
17 stating the truth so far as it goes, but which
18 the maker knows or believes to be materially
19 misleading because of its failure to state
20 additional or qualifying matter, is a
21 fraudulent misrepresentation."
22     Do you agree with that?
23 A.  Basically, yes.
24 Q.  All right.  Now, I'm going to ask

Page 142

1  you to assume that, in this case, the notice of
2  pendency to the class informed recipients that,
3  in September, I believe this was 2016, the
4  lawyer's fee petitions would be placed on the
5  website for the State Street FX class action.
6  Assume that this happened, and the petition
7  listed the Lodestar numerous firms, including
8  customer class counsel.
9      Would it be rational for a class
10  member to conclude, from the fee petition, that
11  only lawyers listed on it would receive a
12  payment from the class recovery?
13      **MS. LUKEY:** Objection.
14  **A.   I don't believe it would be rational**
15  **for a class member to believe that.  An**
16  **unsophisticated class member, yes, that would**
17  **be rational.  But anybody that knows anything**
18  **about law firms would know that there are other**
19  **lawyers who are sharing in those fees who**
20  **aren't specifically listed because of**
21  **partnership agreements that the firms have and**
22  **how fees get divided.**
23  Q.   But that notice doesn't just go out
24  to sophisticated class members, does it?

Page 143

1      **MS. LUKEY:** Objection.
2  **A.   That's right.**
3  Q.   It goes out to unsophisticated class
4  members.  It goes out to semi-sophisticated
5  class members, correct?
6      **MS. LUKEY:** Objection.
7  **A.   I assume so, yes.**
8  Q.   So with respect to those two
9  categories, would you agree with me that it
10  would be rational for one of those
11  unsophisticated or semi-sophisticated class
12  members to assume that that's it?
13      **MS. LUKEY:** Objection.
14  **A.   Well, again, it may be rational for**
15  **them to make that assumption, but I -- it may**
16  **be rational for them to make that assumption.**
17  Q.   I believe it's on page 50 and 52,
18  Peter.  You discuss how the duty to inform the
19  class of the Chargois arrangement depended on
20  the duty to inform the court.
21      Is that a correct statement?
22  **A.   I say it flows from that, and it**
23  **also flows from any other disclosure**
24  **obligations that the class counsel would have**

Page 144

1      to class members.
2      **So it might not be solely to the**
3  **court.**
4  Q.   And you cite Newburg in your
5  opinion, correct?
6  **A.   I do.**
7  Q.   And specifically on page 51, if I
8  could just find it.  (Perusing.)
9      Now on page 51 you quote section
10  8:25.
11  **A.   Yes.**
12  Q.   And you say that, "Rule 23(h)(1)
13  requires that a court considering a motion for
14  reasonable attorney fees direct notice to class
15  members in a reasonable manner.  Yet, other
16  than requiring that the notice be made in a
17  reasonable manner, Rule 23 does not dictate any
18  specific content that the notice must contain.
19      "Newburg continues that class
20  members must be given sufficient information to
21  be able to object to the fee motion.  Newburg
22  states that this requires that the information
23  must conform to Federal Rule Civil Procedure
24  23(h), and Newburg explains that 23(h) requires

Page 145

1  that the fee petition be made by motion
2  according to Rule 54(d), and Rule 54, in turn,
3  requires that the motion specify the judgment
4  and statute, rule or other grounds entitling
5  the movant of the award, state the amount
6  sought or provide a fair estimate of it, and
7  disclose, if the court so orders, the terms of
8  any agreement about fees for the services for
9  which the claim is made."
10      So I ask you again, Professor, was
11  the notice in this case sufficient to
12  adequately inform class members of the division
13  of fees?
14  **A.   It was sufficient to notify class**
15  **members about the fees.  It didn't have to**
16  **describe the division of fees because the court**
17  **did not use Rule 54(d) to order that the terms**
18  **of any agreement about fees for which the claim**
19  **is being made be disclosed.**
20  Q.   I don't believe you quoted it in
21  your opinion, but do you recall Newburg, in
22  that same section and text -- of the text
23  saying that, "In addition to these bare bones
24  requirements, the manual for complex litigation

Page 146

1  notes that the party seeking fees has the
2  burden of submitting sufficient information to
3  justify the requested fees and taxable costs."
4     Now, you didn't quote that, did you?
5  **A.  I did not.**
6  Q.  Why didn't you quote that?
7  **A.  Because I read that to talk about**
8     **justifying the fees and taxable costs, meaning**
9     **the fees that were going to be going in the fee**
10    **petition to the various firms, and then what**
11    **those firms did with the fees would be**
12    **controlled by what the firms decided to do with**
13    **them, provided that they followed the ethics**
14    **rules.**
15 Q.  Do you recognize that members of the
16    certified class are clients of class counsel?
17    **MS. LUKEY:** Objection.
18 **A.  I indicated previously that they are**
19    **clients, but they are not exactly the same as**
20    **an individual -- the relationship between class**
21    **counsel and individual class members is not the**
22    **same as a lawyer's relationship with an**
23    **individual client.**
24 Q.  But are they clients of class

Page 147

1  counsel?
2     **MS. LUKEY:** Objection.
3  **A.  They are a type of client of class**
4     **counsel, that's correct.**
5  Q.  And Newburg says they are, correct?
6  **A.  That's correct.**
7     **THE SPECIAL MASTER:** Let me
8  interject.  I found some of the -- some of
9  the excerpts from both depositions and the
10 rest of the record that I was alluding to
11 earlier, so let me read those to you,
12 okay?
13    **THE WITNESS:** Okay.
14    **THE SPECIAL MASTER:** This is from
15 Mr. Chiplock's deposition.  Mr. Chiplock
16 is a lawyer who's with the Lieff firm, and
17 he is talking about the responsibility to
18 the ERISA members of the class.
19    "We had a responsibility as class
20 counsel to the class, and that included
21 ERISA plans.
22    "I felt that customer class counsel
23 had a responsibility to the entire
24 customer class with no distinctions.  We

Page 148

1  didn't discriminate in our class
2  definition.  We didn't see the need to
3  when we filed our case."
4     That's from Mr. Chiplock.
5     **MR. HEIMANN:** What page?  I didn't
6  hear the word "clients" in that section.
7     **THE SPECIAL MASTER:** He didn't use
8  the word "clients."  He talked about
9  responsibility.
10    **MR. HEIMANN:** Right.
11    **MS. LUKEY:** And he said to the
12 entire customer class.
13    **THE SPECIAL MASTER:** First.  But
14 then he said we didn't discriminate in our
15 class definition.
16    Mr. Goldsmith, who is a lawyer with
17 Labaton, who represented the class, at the
18 preliminary hearing in August and at the
19 fairness hearing in November, said "We did
20 not assert an ERISA claim in our
21 complaint, but we did allege a class that
22 was broad enough to encompass
23 ERISA-governed assets.  How much of the
24 settlement would go to ERISA clients was

Page 149

1  something that DOL was focused on.  Of
2  course, we were focused on it as well,
3  because they were our clients.
4     "There was a lobby conference on
5  November 15 of 2012."
6     **THE WITNESS:** Excuse me.  May I ask
7  a question?
8     **THE SPECIAL MASTER:** Yes.
9     **THE WITNESS:** I'm assuming, when you
10 say "lobby," you mean like in the lobby.
11    **THE SPECIAL MASTER:** In the lobby of
12 the judge's chambers.
13    **THE WITNESS:** I just wanted to make
14 sure that my vision of the lobby was what
15 you were referring to.
16    **THE SPECIAL MASTER:** All of the
17 lawyers were there for both State Street
18 and for the class.
19    **THE WITNESS:** Okay.
20    **THE SPECIAL MASTER:** And Michael
21 Thornton, who's sitting over, was there.
22 Bob Lieff, who's sitting over there, was
23 there.  And Labaton lawyers were there.
24 And the lawyer for State Street had just

Page 150

1 given a summary of where they were in the
2 case.
3     And Michael Thornton says, "I just
4 want to clarify one thing of Mr. Rudman's,
5 State Street's attorney, excellent summary
6 that we might differ on.
7     "There are two clear ERISA cases."
8     THE WITNESS: May I ask one more
9 question?
10    MS. LUKEY: Who's saying this now?
11    THE SPECIAL MASTER: Michael
12 Thornton.
13    THE WITNESS: Just so I'm clear on
14 this, it seems to me that you're reading
15 from a transcript at this point.
16    THE SPECIAL MASTER: I am.
17    THE WITNESS: Good. I just wanted
18 to make sure.
19    THE SPECIAL MASTER: This is a
20 transcript of the November 15, 2012, lobby
21 conference.
22    MS. LUKEY: An excerpt, I assume.
23    THE SPECIAL MASTER: An excerpt.
24    THE WITNESS: Thank very much.

Page 151

1     THE SPECIAL MASTER: I will start
2 over. This Mr. Thornton.
3     "I just want to clarify one thing of
4 Mr. Rudman's, State Street's attorneys,
5 excellent summary that we might differ on.
6 There are two clear ERISA cases, Enriquez
7 and Andover and, in the third case,
8 Arkansas.
9     "The ERISA claims are included in
10 the class definition. We also have a
11 claim. And then Mr. Lieff says there is
12 on overlap. That's all we're trying to
13 say. We represent the same people."
14    And the court asks, "You do
15 represent the same people?"
16    And Mr. Lieff says, "Yes."
17    MR. HEIMANN: I didn't hear the word
18 "clients" there.
19    THE SPECIAL MASTER: He used the
20 word "represent."
21    Mr. Goldsmith, in his deposition,
22 used the word "clients."
23    MR. HEIMANN: He is the only one so
24 far I've heard, yes.

Page 152

1     THE SPECIAL MASTER: Okay. Does any
2 of that change your view as to the
3 obligations that the -- what we have
4 referred to as the customer class law
5 firms, but particularly Labaton, as lead
6 counsel, had to the members of the class
7 to provide notice and as to whether they
8 were clients of Labaton?
9     MS. LUKEY: Objection, compound.
10    THE WITNESS: If I'm understanding
11 your question correctly, you mean an
12 obligation of Labaton to inform the ERISA
13 class members that they were clients of
14 Labaton?
15    THE SPECIAL MASTER: No, not that
16 they were clients. Of the Chargois
17 relationship.
18    THE WITNESS: No, absolutely not.
19    BY MR. SINNOTT:
20 Q. Professor, would you agree that the
21 Chargois agreement or arrangement would be
22 information relevant to a class member's
23 decision on whether to object to the fee?
24    MS. LUKEY: Objection.

Page 153

1 A. Not in this case.
2 Q. And why do you say "not in this
3 case"?
4 A. Because there wasn't an obligation
5 to disclose the fee-sharing arrangement with
6 Chargois & Herron.
7     If you were to say to me, if it had
8 been disclosed, may a class member have
9 objected, then that's a possibility, but since
10 they didn't have an obligation to disclose it,
11 that's why I'm saying not in this case.
12 Q. But that's not what I asked you. I
13 asked you if it would be relevant to the class
14 member's decision whether to object, and
15 regardless -- strike that.
16    Would it be relevant to that
17 member's decision?
18 A. Not in this case.
19 Q. Do you think that information would
20 matter --
21    MS. LUKEY: Objection.
22 Q. -- to a class member?
23    MS. LUKEY: Objection.
24 A. It might matter to them, but they --

Page 154

1 that information was not required to be
2 disclosed to them.
3 Q.   Because the lawyers had come up with
4 an agreement?
5      MS. LUKEY: Objection.
6 A.   Because there was no rule, court
7 order, case-specific order or inquiry from the
8 court asking about fee-sharing agreements.
9 Q.   But there was a fiduciary duty to
10 the class members, correct?
11     MS. LUKEY: Objection.
12 A.   They had a fiduciary duty, but not
13 one that encompassed disclosing the fee-sharing
14 arrangement.
15 Q.   And there was a duty of candor to
16 the court as well, wasn't there?
17     MS. LUKEY: Objection.
18 A.   That's correct.  But, again, the
19 duty of candor to the court did not require
20 disclosure of the fee-sharing arrangement.
21 Q.   But that duty of candor also
22 encompassed the obligation to tell the court
23 any material facts, correct?
24     MS. LUKEY: Objection.

Page 155

1 A.   We've talked about material facts in
2 the context of the cases that you were talking
3 about, absolutely, correct.
4 Q.   Would you agree with me that there
5 was no way for a class member to learn of the
6 Chargois agreement --
7      MR. SINNOTT: Okay.  Who just
8 entered the conversation?
9      MS HYLENSKI: Sorry.  It's just me.
10 I got disconnected.
11     MR. SINNOTT: Okay, Linda.  Thanks.
12 Q.   Let me start again, Peter.
13     Would you agree with me that there
14 was no way for a class member to learn of the
15 Chargois arrangement if class counsel didn't
16 disclose it?
17     MS. LUKEY: Objection.
18 A.   Absent the court requiring
19 disclosure, that's correct.
20 Q.   All right.  And do you agree that
21 Rules 1.2 and 1.4, the duty to inform, require
22 that a lawyer give a client information about
23 any "circumstance with respect to which the
24 client's informed consent is required by these

Page 156

1 rules"?
2      MS. LUKEY: Objection.
3 A.   I didn't -- I wasn't asked to opine
4 on the application of those rules to this
5 situation.
6      What you've paraphrased or read is
7 my recollection of what the rule says, but,
8 again, I haven't done the research to see if
9 they could be implicated in a particular
10 matter.
11 Q.   And, once again, I appreciate your
12 caution.  Thank you.
13     Do you agree that the decision
14 whether to settle belongs to the client under
15 Rule 1.2A?
16 A.   Absolutely.
17 Q.   Do you agree that the Chargois
18 arrangement could rationally bear on a class
19 member's actions regarding the decisions the
20 notice invited class members to make?
21     MS. LUKEY: Objection.
22 A.   Not in this particular case, as I
23 understand the application of that rule, which
24 I have not done thorough investigation into.

Page 157

1 Q.   All right.  But you just agreed that
2 it's the client's decision whether to settle,
3 correct?
4 A.   That's correct.
5 Q.   And my question was, that
6 arrangement could rationally bear on a class
7 member's actions.  I'm not asking about
8 disclosure of it.  I'm asking you whether that
9 information could rationally bear on a class
10 members actions regarding the decision to
11 settle.
12     MS. LUKEY: Objection.
13 A.   Again, I'm hesitant to say anything
14 in an absolute on this matter, because I
15 haven't done the research into this issue.
16     It's conceivable, but I think that
17 the client's decision, at least a class member,
18 and I have been a class member of many classes,
19 as I'm sure many people around this room has,
20 and, you know, and even as a lawyer, when I get
21 the packet of material, I oftentimes don't read
22 it all.  I'm just sort of looking at, am I
23 going to get anything, and what is it that I'm
24 going to get.

Page 158

1    But as I said, I mean, it may, but
2  I'd have to do more research into that
3  particular rule as it applies to class members
4  and what bounds the courts have said or ethics
5  authorities about how much information has to
6  be provided to the class members for them to
7  make a decision about, you know, whether they
8  are going to be an objector.  Because,
9  essentially, if you are a class member, unless
10  you are an objector, you are agreeing to the
11  settlement.
12    So I think the vast majority of
13  class members don't even think they are
14  agreeing.  They are just thinking, am I going
15  to be an objector.  And then, you know, even as
16  a lawyer, when I've looked at that, I've, you
17  know, thought that it's rather onerous to take
18  on the role of an objector.
19    THE SPECIAL MASTER: Let's put aside
20  whether there was a duty of disclosure of
21  the Chargois agreement and Chargois
22  payment to the class.  Let's just put that
23  aside, okay?
24    THE WITNESS: Okay.

Page 159

1    THE SPECIAL MASTER: Do you think
2  that, in making its -- their decision
3  about whether to accept the settlement,
4  that the existence of the Chargois
5  agreement and the payment to Chargois
6  something -- payment is something class
7  members would want to know?
8    MS. LUKEY: Objection.
9    THE WITNESS: Maybe.  And the reason
10  I say maybe is, you know, I have a
11  colleague who's done some work dealing
12  with class actions and also another
13  colleague who's done work about privacy
14  disclosures when we waive all of our
15  privacy rights, and both of them have
16  concluded that most of us waive our rights
17  or we don't assert our rights, because
18  it's just an overload of information.
19    So that's why I'm saying maybe.  I'm
20  not going to say absolutely.
21    THE SPECIAL MASTER: If it were
22  disclosed in the notice to the class that
23  a lawyer, who did not appear in the class,
24  did no work in the case, was note on any

Page 160

1  of the Lodestar petitions, and if it were
2  to appear that this lawyer was going to
3  receive $4.1 million, do you think that is
4  something that reasonably might impact a
5  class member's decision as to whether to
6  accept the settlement?
7    MS. LUKEY: Objection.
8    THE WITNESS: As I said, maybe.
9  Because I could also see a class member
10  looking at, by the time you get the notice
11  of proposed settlement, there's also some
12  indication that there's been some
13  preliminary approval by the court, and a
14  lot of people defer to the legal process
15  and what judges are doing.  Not everybody,
16  because there are some objectors.
17    THE SPECIAL MASTER: I want to focus
18  on the ERISA class members.
19    THE WITNESS: Okay.
20    THE SPECIAL MASTER: Are you aware
21  that the amount that Chargois received was
22  more than any single ERISA firm received?
23    MS. LUKEY: Objection.
24    THE WITNESS: I did not look at how

Page 161

1  the fees were -- you know, what the fee
2  petition -- I mean, I looked at the notice
3  of class, but I didn't pay attention.  I
4  was just trying to sort of get a feel for
5  it, but I am not aware of that.
6    (Discussion off the record.)
7    MR. SINNOTT: If you could, go on
8  mute, everyone.
9    THE WITNESS: Or does candor to the
10  court require whoever was shuffling the
11  papers to identify themselves?  We're not
12  in court.
13    THE SPECIAL MASTER: I think my
14  question was, as to the ERISA class
15  members, do you think it would have been
16  important for them to know that
17  Mr. Chargois, who never appeared in the
18  case, did no work on the case, was
19  receiving more money than any single ERISA
20  firm law firm?
21    MS. LUKEY: Objection.
22    THE WITNESS: Again, it may be.
23    THE SPECIAL MASTER: Do you think it
24  would have been important to the ERISA

1   class members to know that the payment
2   that Mr. Chargois received for doing no
3   work, not appearing in the case, was just
4   about 60 percent of the entire ERISA fee
5   award?
6       **MS. LUKEY:** Objection.
7       **THE WITNESS:** I'm not sure.
8       **THE SPECIAL MASTER:** You don't have
9   an opinion of whether that might be
10  important to the ERISA class members to
11  know that?
12      **MS. LUKEY:** Objection.
13      **THE WITNESS:** No.  Because I'm
14  speculating on what's important to them.
15  That's why I said maybe.  And I'm not
16  sure.
17      **THE SPECIAL MASTER:** I want to
18  recalculate my arithmetic.  I don't want
19  to mislead you.
20      **THE WITNESS:** Okay.  So now we are
21  dealing with candor to the witness.
22      **THE SPECIAL MASTER:** Candor to the
23  witness.  55 percent, not 60 percent.
24      **MR. HEIMANN:** Has anybody done the

1   computation of how much it really impacted
2   the members of the class in terms of how
3   much less they got than what they would
4   have gotten.
5       **THE SPECIAL MASTER:** We are looking
6   at it.
7       **MR. HEIMANN:** I can tell you what it
8   is.
9       **THE SPECIAL MASTER:** You want to be
10  under oath here, Richard?
11      **MR. HEIMANN:** I don't need to be
12  under oath.  You just need to do the math.
13  It's very simple.
14      **MR. SINNOTT:** We welcome anything
15  you want to give us.
16      **BY MR. SINNOTT:**
17  Q.   Let me just get this for the record,
18  Professor.  And if I'm wrong, excuse me, but I
19  didn't see you cite Rules 1.2 or 1.4, or the
20  duty to inform in your opinion.  Did you?
21  **A.   That's correct.  No, I did not.**
22      **MS. LUKEY:** Objection.
23  Q.   Is that because you were not asked
24   to analyze those?

1       **MS. LUKEY:** Objection.
2   **A.   That's correct.  I was not asked to**
3   **analyze them, and I focused -- I was working**
4   **under a limited time frame, and I focused on**
5   **the issues I had, which continued to grow a**
6   **little.**
7       **MS. LUKEY:** Bill, again, it's a
8   rebuttal report.
9       **MR. SINNOTT:** Yeah.  Got it.
10  Q.   But do you think they bear on the
11  issue?
12      **MS. LUKEY:** Objection.
13  **A.   They may.**
14  Q.   Assume, Professor, that Judge Wolf
15  could have ordered the money intended for
16  Chargois to instead go to the class.
17      Between paying Chargois, on the one
18  hand, and having the money, on the other hand,
19  go to the class, what do you believe is in the
20  best interest of the class?
21      **MS. LUKEY:** Objection.
22  **A.   That's too speculative for me to**
23  **answer.**
24  Q.   Could a class member reasonably

1   conclude that the class had no interest in any
2   money going to Chargois?
3       **MS. LUKEY:** Objection.
4   **A.   Again, you're -- this is kind of**
5   **deep speculation, and I just -- I am very**
6   **reluctant to speculate on to this frame.**
7   Q.   We quoted Newburg earlier on class
8   members having sufficient information to decide
9   whether to object to a fee request.
10      Did they have sufficient information
11  in this case?
12  **A.   I believe so.**
13  Q.   On page 54, I'm wrapping up here, in
14  your opinion, you hold that Massachusetts Rule
15  of Professional Conduct 1.5(a)'s prohibition on
16  a clearly excessive fee does not apply to the
17  Mass. Rule of Professional Conduct 1.5(e),
18  division of a fee, including a referral fee
19  between lawyers who are not in the same firm,
20  correct?
21  **A.   That's correct.**
22  Q.   Let me just approach this with some
23  questions.
24      Two lawyers, Jones and Smith, enter

Page 166

1    into an otherwise valid division of a fee
2    agreement and collect, between them, $200,000
3    for their work.  That sum is considered
4    reasonable for the work.
5        Jones does ten hours of work.  Smith
6    does 500 hours of work.  They divide the fee,
7    50,000 for Jones and 150,000 for Smith.
8  **A.  And Smith is the one who did the**
9  **less amount of work?**
10   Q.  Jones.  Jones did ten hours.  Smith
11   did 500.
12  **A.  All right.  I would like a piece of**
13  **paper, because if I don't, you will be**
14  **repeating it.  Okay.**
15   Q.  We can handle that.  Let me start
16   again.
17  **A.  Jones and Smith.**
18   Q.  Jones and Smith enter into an
19   otherwise valid division of fee agreement.
20  **A.  Okay.**
21   Q.  And, between them, they collect
22   $200,000 for the work.
23  **A.  Okay.**
24   Q.  That sum, you can presume, is

Page 167

1    reasonable for the work.
2  **A.  Right.**
3    Q.  Jones does ten hours of work.  Smith
4    does 500 hours of work.  They divide the fee,
5    50,000 for Jones, 150,000 for Smith, who did
6    the 500.
7  **A.  Okay.  Uh-huh.**
8    Q.  Smith earns $300 hourly, which is
9    deemed reasonable for Smith.  Jones earns
10   $5,000 hourly, although he has never billed
11   more than $500 hourly.
12       Can a court apply 1.5(a) and
13   conclude that Jones' fee is clearly excessive?
14      **MS. LUKEY:** Objection.
15  **A.  In Massachusetts, under the rule**
16  **that existed at the time, and assuming we are**
17  **talking about a division of fee under 1.5(e),**
18  **no, I don't think the court would even, you**
19  **know, address the issue, because in Saggese, he**
20  **gets $90,000 from what sounds like ten**
21  **minutes worth of work, and the court didn't**
22  **even blink an eye at it.**
23   Q.  Okay.  Let me just change the facts
24   a little bit.

Page 168

1        I want you to assume, instead, that
2    Jones and Smith are both working on the matter,
3    but there is no division of fee agreement.
4    Jones works for ten hours on the matter.
5  **A.  And they are separate firms?  I**
6  **mean, we're dealing now, we've got separate**
7  **firms?**
8    Q.  Yes.  Assume that.
9  **A.  Okay.  And you say no division of**
10  **fees.  So this is not under a 1.5(e)?**
11      **MS. LUKEY:** No agreement, I think he
12   said.
13   Q.  No agreement.
14  **A.  No agreement of how they are going**
15  **to divide?**
16   Q.  That's right.
17  **A.  But it is a 1.5(e), where the client**
18  **agrees that they can divide the fee?**
19   Q.  Hold on.  So Jones works for ten
20   hours on the matter.  Smith works for 500
21   hours.  Each of them bills the client
22   separately.  Smith bills at $300 an hour.
23   Jones bills at $5,000 an hour.
24       Under those circumstances, is a

Page 169

1    court empowered to find the Jones fee is
2    clearly excessive?
3      **MS. LUKEY:** Objection.
4  **A.  Okay.  Before I answer it, I just**
5  **want to make sure, because I was trying to ask**
6  **this.  So we are no longer dealing with the**
7  **1.5(e).  We are dealing with a straight 1.5(a)**
8  **situation, and the court may conclude that, but**
9  **the court could also conclude that, actually,**
10  **the $5,000 to Jones is not clearly excessive.**
11  **It would depend.  If the client were**
12  **a corporation and it had corporate counsel and**
13  **corporate counsel was aware of what these**
14  **billing rates were and approved of it, it's**
15  **very unlikely that a court would intrude on it.**
16  **In fact, there's a case called the**
17  **Brombeck case that I've taught many times,**
18  **where a lawyer gets this really outrageously,**
19  **to me, it seemed, high fee, and it's usually**
20  **juxtaposed against situations where lawyers get**
21  **even less fee, but the courts have said, under**
22  **the circumstances, it was clearly excessive,**
23  **and in Brombeck, they don't do that because**
24  **there was corporate counsel involved approving**

Page 170

1 of the fee arrangement that resulted in this,
2 **and I'm sure, under today's dollars, the amount**
3 **would be far in excess of $5,000 an hour.**
4 Q.  All right.  So, under 1.5(a), you
5 are prepared to say that it could be found to
6 be clearly excessive?
7 **A.  If it's not under 1.5(e), yes.**
8 Q.  Okay.  Would it be a basis for
9 discipline?
10    MS. LUKEY: Objection.
11 **A.  It could be.  It could be.  You**
12 **know, like I said, it could be.  There are a**
13 **lot of factors that would go into it, but it**
14 **could be.**
15 Q.  Okay.  Thank you.
16 **A.  You're welcome.**
17    THE SPECIAL MASTER: I just want to
18 ask some general questions from your
19 testimony, and there may be --
20    THE WITNESS: Before we do that, may
21 I have a very short break?
22    THE SPECIAL MASTER: Sure.
23    THE WITNESS: I have been drinking
24 water to keep lubricated.

Page 171

1    MR. SINNOTT: On the phone, we are
2 taking a brief break, five minutes.
3    (Recess taken.)
4    MR. SINNOTT: Back on the record.
5    THE SPECIAL MASTER: I want to ask
6 to try to understand your testimony and
7 where it fits in the larger scheme of
8 things here in this case.
9    THE WITNESS: Okay.
10    THE SPECIAL MASTER: I want to
11 understand your view about the following
12 questions, and I'm going to try to break
13 them out individually.  And in asking this
14 question, I want to give you every
15 opportunity to explain or correct or
16 modify or add caveats to your opinion,
17 okay?
18    THE WITNESS: All right.
19    THE SPECIAL MASTER: So as to the
20 Chargois agreement, under which he and his
21 firm would receive 20 percent of the fee
22 for doing no work in a case, in a class
23 action in which Arkansas is the class
24 representative and Labaton is lead

Page 172

1 counsel, is it your view that there is no
2 ethical or legal obligation upon Labaton
3 first, to inform the client of the nature
4 of the relationship with Chargois if the
5 client doesn't ask?
6    MS. LUKEY: Objection.
7    THE WITNESS: Under these facts,
8 especially where the relationship began,
9 where the client knew that they were going
10 to be working together, where Christa
11 Clark said, we can only have the one name
12 on the agreement, where the resulting
13 agreement does talk about a division of
14 fees, including referral fees, where that
15 agreement does conform to Massachusetts
16 Rule 1.5(e) that was in effect at the
17 time, then, yes, there's no obligation to
18 go into the details of the arrangement
19 between Labaton and Chargois Herron.
20    THE SPECIAL MASTER: Did it also
21 conform to the Supreme Court's decision in
22 Saggese?
23    THE WITNESS: We have talked about
24 that before, and I think it's not

Page 173

1 inconsistent with the Supreme Court's
2 decision in Saggese.
3    THE SPECIAL MASTER: I think you
4 said that the retention agreement resulted
5 from the earlier relationship from -- as
6 spelled out by Christa Clark in her
7 October 2008 e-mail.  Is that what you
8 meant to say?
9    MS. LUKEY: Objection.
10    THE WITNESS: Oh, if you're talking
11 about previously, when I thought there was
12 a separate agreement, yes, I was referring
13 to the e-mail, the subsequent
14 communications.
15    I -- as I said, I had it in my mind
16 that that had a separate kind of fee
17 agreement, but that was the initial
18 agreement that -- about how things were to
19 be done.
20    THE SPECIAL MASTER: So in your
21 answer, that there is no obligation to
22 inform the client of the nature of the
23 Chargois arrangement unless the client
24 asks, that includes going back to 2008 and

Page 174

1  the Christa Clark e-mail.
2      THE WITNESS: Not necessarily, no.
3      THE SPECIAL MASTER: Standing on its
4  own, the retention agreement standing on
5  its own, there's no obligation --
6      THE WITNESS: The retention
7  agreement, standing on its own, met 1.5(e)
8  as it existed at the time.
9      THE SPECIAL MASTER: So no
10  obligation to inform the client of the
11  nature of the relationship if the client
12  doesn't ask, the relationship being the
13  Chargois relationship.
14      MS. LUKEY: Objection.
15      THE WITNESS: You said I could have
16  qualifiers?
17      THE SPECIAL MASTER: Yes.
18      THE WITNESS: So here is one the
19  qualifiers. There are two things.
20      One is there was already imputed to
21  the entity itself, because of Christa
22  Clark's understanding that Chargois Herron
23  was going to be affiliated, so even
24  though, at the time of that particular

Page 175

1  agreement, she was no longer there, that
2  gets imputed to the entity.
3      THE SPECIAL MASTER: Okay. In that
4  imputation, let me ask you --
5      MS. LUKEY: Were you done with your
6  answer?
7      THE SPECIAL MASTER: He is going to
8  answer in two parts.
9      THE WITNESS: I have more to say,
10  that if I could say it now, then I might
11  not forget it later, okay? So that's one
12  thing.
13      The second thing is there was an
14  offer to try to explain how all the
15  fees -- the fee-sharing situation, and the
16  then head of Arkansas said, that's okay, I
17  don't want to know it. And so, under that
18  set of circumstances, you know, I stand by
19  what I said, which --
20      THE SPECIAL MASTER: You're not
21  testifying, you're not trying to tell us
22  that there was anything in Christa Clark's
23  e-mail in which she said it's fine if you
24  want to have an agreement with

Page 176

1  Mr. Chargois to pay him for 20 percent for
2  every case in which Labaton was lead
3  counsel and co-lead counsel and Arkansas
4  was lead or co-lead plaintiff.
5      MS. LUKEY: Objection.
6      THE SPECIAL MASTER: You're not
7  trying to tell us there was anything in
8  that e-mail that they knew that.
9      MS. LUKEY: Objection.
10      THE WITNESS: I'm not saying she put
11  in a specific percentage amount. I'm not
12  saying that.
13      THE SPECIAL MASTER: Or any amount.
14      THE WITNESS: She didn't put in any
15  amount, that's correct.
16      THE SPECIAL MASTER: And is it your
17  belief that the Christa Clark e-mail also
18  says that he could be paid, he, Chargois,
19  could be paid in every one of these cases
20  in which Chargois -- in which Labaton was
21  lead counsel and Arkansas was lead
22  plaintiff for doing no work? Is there
23  anything in that e-mail that you impute to
24  that condition?

Page 177

1      MS. LUKEY: Objection.
2      THE WITNESS: She doesn't say that
3  in that e-mail.
4      THE SPECIAL MASTER: Okay. So with
5  that, let me ask that part of the question
6  again.
7      There is no obligation, ethical or
8  legal, upon Labaton to inform the client,
9  in this case, Arkansas, of the nature of
10  the relationship if the client doesn't
11  ask.
12      THE WITNESS: Okay. Given the
13  agreement that Labaton had with Arkansas,
14  it met its ethical and legal obligation.
15  So that's what I'm saying. That's how I'm
16  qualifying what I'm saying.
17      THE SPECIAL MASTER: And there is no
18  obligation to inform co-counsel in the
19  class of the true nature, the full scope
20  of the Chargois relationship, including
21  the fact that he did no work in the case?
22      MS. LUKEY: Objection.
23      THE WITNESS: Yeah. I didn't opine
24  on that. I didn't research it, and I'm

Page 178

1  not in a position to give an opinion on
2  that.
3      THE SPECIAL MASTER: Is it your
4  opinion that there is no ethical or legal
5  obligation upon Labaton to inform the
6  ERISA counsel on behalf of the ERISA
7  members of the class?
8      MS. LUKEY: Objection.
9      THE WITNESS: Again, I didn't
10  research that issue.  I would -- I didn't
11  form an opinion on that, and I'm not in a
12  position to give an opinion on that at
13  this time.
14      THE SPECIAL MASTER: Is it your
15  opinion that there's no ethical or legal
16  obligation upon Labaton to inform the
17  class itself of the Chargois relationship?
18      THE WITNESS: Absent a court rule,
19  court order, standing order, direct
20  inquiry from the court or precedent in
21  either the District of Massachusetts or
22  the First Circuit or Supreme Court, that's
23  correct.
24      THE SPECIAL MASTER: Is it your

Page 179

1  opinion that there is no ethical or legal
2  obligation upon Labaton to inform the
3  ERISA class members independently from
4  other class members?
5      THE WITNESS: Again, it's my opinion
6  no obligation with the same provision that
7  absent a court order, absent a standing
8  order, absent a local rule, absent
9  precedent either in the District, the
10  First Circuit or the Supreme Court, or the
11  Federal Rules of Civil procedure clearly
12  requiring.
13      THE SPECIAL MASTER: Is it your
14  opinion that there is no ethical or legal
15  obligation upon Labaton to inform the
16  court of the Chargois relationship at
17  either the preliminary approval hearing or
18  the fairness hearing if the court doesn't
19  ask and there's no court order and no
20  court -- local rule on it?
21      THE WITNESS: Right.  And no
22  precedent that would be controlling over
23  the matter, and no ethical rule specific
24  requirement.

Page 180

1      THE SPECIAL MASTER: Taking all of
2  this, what is the public policy that is
3  served by all of this non-disclosure?
4      MS. LUKEY: Objection.
5      THE SPECIAL MASTER: In fairness to
6  the witness, I ask this because we are
7  going to be in a court.  It's likely that
8  my report, the responses of the law firms
9  will receive the attention of the media.
10  That's how this case started, I think you
11  know.  So it's likely that this will
12  receive the attention of the media, which
13  means it will receive the attention of the
14  public.
15      What is the public interest in all
16  of this non-disclosure?  Where is the
17  public interest here?
18      MS. LUKEY: Objection.
19      THE WITNESS: Again, I didn't offer
20  an opinion on this.  I didn't look at the
21  public policy.  I tell you, you know,
22  about various public policies of different
23  rules.  Once something gets in the media,
24  it takes on a life of its own.  And I'm

Page 181

1  not in a position to give an opinion that
2  would be well-informed about public policy
3  concerning the non-disclosure or
4  disclosure.
5      Why we don't have a court rule that
6  says that it's automatically disclosed,
7  some circuits like the Second Circuit has
8  concluded that that's something they want
9  to have.  Some judges have made that
10  decision.  Other, you know, District
11  Courts have made that decision.
12      THE SPECIAL MASTER: So, in this
13  case, the burden is on the Massachusetts
14  District Court or Judge Wolf or both --
15      MS. LUKEY: Objection.
16      THE SPECIAL MASTER: -- to require
17  disclosure.
18      THE WITNESS: To require disclosure,
19  that's correct.
20      It could also be something that the
21  First Circuit could do.
22      THE SPECIAL MASTER: Or a First
23  Circuit rule either by rule or by
24  decision.

Page 182

1  **THE WITNESS:** That's right.  They
2  could do that.  And some circuits have
3  seen that that was how they could promote
4  what they view to be a good public policy,
5  is what I would presume, but I'm not
6  offering an opinion as to what their
7  reasoning was.
8  **THE SPECIAL MASTER:** But, in any
9  event, the burden is on the courts or an
10  individual judge to either adopt a rule, a
11  local rule, a circuit rule, case precedent
12  or to ask?
13  **THE WITNESS:** You know, I'm not sure
14  I would use the word "burden."  I guess I
15  would say --
16  **THE SPECIAL MASTER:** Obligation?
17  **THE WITNESS:** Maybe obligation, or
18  maybe requirement.  That's what the rules
19  say.  And, again, I don't know why the
20  drafters of the rules have drafted them in
21  the way they have drafted them, but that's
22  what they've done.
23  **THE SPECIAL MASTER:** Do you think it
24  was -- putting aside the rules and your

Page 183

1  answers, we've got your answers, they're
2  on the record -- was it prudent for
3  Labaton not to disclose this obligation to
4  Chargois and the payment, was it prudent
5  not to disclose it to -- let's start with
6  Arkansas?
7  **MS. LUKEY:** Objection.
8  **THE SPECIAL MASTER:** Was it prudent?
9  **MS. LUKEY:** Objection.
10  **THE WITNESS:** Again, I haven't
11  looked into what was prudent and what
12  wasn't prudent.
13  In my own experience, what seems to
14  be imprudent is informed by 20/20
15  hindsight, and there are many well-meaning
16  lawyers and law firms and judges who have
17  done things that, at the time, they
18  thought was perfectly fine, and then later
19  somebody is saying maybe it isn't.  And
20  sometimes they are proven to be fine.  And
21  other times, people say, well, you know,
22  that wasn't prudent.
23  But, you know, I'm not in a position
24  to make an opinion about what's prudent or

Page 184

1  not.
2  **THE SPECIAL MASTER:** On any of these
3  questions, including -- well, let me ask
4  you separately.
5  Was it prudent not to inform the
6  court about the fact that Chargois was
7  going to receive $4.1 million without the
8  court asking?
9  **MS. LUKEY:** Objection.
10  **THE WITNESS:** Again, I'm not in a
11  position to say what was prudent at the
12  time that things were occurring.
13  **THE SPECIAL MASTER:** And if the
14  court says, in making its decision to
15  approve a settlement and the fee
16  allocation in the settlement, I'm relying
17  heavily upon what the lawyers have
18  submitted to me here, that's not
19  sufficient for the lawyers to have to
20  speak up.
21  **MR. HEIMANN:** Objection.
22  **MS. LUKEY:** Objection.
23  **THE WITNESS:** Making an assumption
24  that that's what a judge has said, I would

Page 185

1  say --
2  **THE SPECIAL MASTER:** I should say
3  when.  At the settlement hearing, the
4  November 2 fairness hearing.
5  **MR. HEIMANN:** Objection.
6  **MS. LUKEY:** Objection.
7  **THE WITNESS:** Again, assuming that's
8  what's said.  There's no obligation to
9  disclose a fee-sharing agreement in
10  response to that.
11  **THE SPECIAL MASTER:** Okay.
12  **BY MR. SINNOTT:**
13  Q.  Let me just ask you, Professor, if
14  you agree with this statement.
15  "Legal ethics experts should not
16  offer an opinion, even if defensible, unless
17  they would adopt that opinion if they were the
18  judge in the case."
19  **MS. LUKEY:** You asked him that exact
20  question this morning.  That exact one.
21  **MR. SINNOTT:** The other witness.
22  **MS. LUKEY:** Okay.  Sorry.  They're
23  blending.
24  Q.  Do you agree with that statement?

Page 186

1  A.  Could you repeat it again?
2  Q.  "Legal ethics experts should not
3  offer an opinion, even if defensible, unless
4  they would adopt that opinion if they were the
5  judge in the case."
6      MS. LUKEY: Objection.
7  A.  Okay.  If you're asking me if I were
8  the judge in this case, would I adopt my
9  opinions, the answer is absolutely yes.
10 Q.  Okay.  So it would be correct to say
11 that you are prepared to testify in court that
12 Judge Wolf should rule as you've testified
13 today?
14 A.  I mean, I would give the testimony I
15 have given today, and it's up to Judge Wolf to
16 decide how he wants to rule.  My job isn't to
17 tell a judge what to do, and I would never make
18 any attempt to do that.
19     That isn't what the role of an
20 expert witness is.  I would be a resource for
21 the judge.  He would form his own conclusion,
22 but I was saying, if I were a judge in a case
23 like this, I would adopt these opinions.
24 Q.  Okay.  Thank you.

Page 187

1      MR. SINNOTT: That's all the
2  questions I have.
3      THE SPECIAL MASTER: Joan, you had
4  some questions?
5  EXAMINATION BY
6      MS. LUKEY:
7  Q.  Professor Joy, this is a copy of
8  Exhibit 6, which is the excerpts from the Mass.
9  Rules of Professional Conduct.
10 A.  Okay.
11 Q.  The opening line under comment
12 14.(a) to Rule 3.3 says, "When adversaries
13 present a joint petition to a tribunal, such as
14 a joint petition to approve the settlement of a
15 class action or the settlement of a suit
16 involving a minor, the proceeding loses its
17 adversarial character and, in some respects,
18 takes on the form of an ex parte proceeding."
19     Who were the adversaries in the
20 State Street case?
21 A.  They were the -- well, Arkansas and
22 the various classes.  The ERISA classes were
23 the plaintiffs.  And then State Street, and
24 there was some other State Street-type

Page 188

1  entities.  I can't tell you how many.  I
2  believe at least three different ones, but I
3  could -- I know at least two, because there's
4  an et al. in it, and they were the defendants.
5  So those are the adversaries, the plaintiffs
6  and the defendants, those are the adversaries.
7  Q.  To your knowledge, sir, did the
8  State Street defendants join in a joint
9  petition for the award of fees in this case?
10 A.  Not -- to the best of my knowledge,
11 they didn't join in for an award of fees.  I
12 believe that the only place where they were
13 non-adversarial was on the underlying
14 settlement, but I don't believe that they were
15 joining in on the fee petition.
16 Q.  So as far as you were aware, sir,
17 there was no joint petition in which the
18 adversaries were involved on the fee petition
19 in this case, correct?
20 A.  Not that I'm aware of.
21 Q.  Sir, with regard to the Agent Orange
22 case, that's not a First Circuit case, is it?
23 A.  No.  It's a Second Circuit case.
24 Q.  Is it the most recent Second Circuit

Page 189

1  case that deals with the obligation of
2  disclosure to the court?
3  A.  No, it isn't.
4  Q.  Is there a superseding case?
5  A.  Yes.  It's the Bernstein versus
6  Bernstein, other names.
7  Q.  And that is a case that you cite in
8  your report, isn't it?
9  A.  That's correct.
10 Q.  And what is the significance of the
11 superseding Bernstein case to you, sir?
12 A.  Well, that's -- first of all, that's
13 the controlling case authority in the Second
14 Circuit that says, absent a local rule -- well,
15 no.  Actually, it says that Rule 26(e), on its
16 own, does not require disclosure of a
17 fee-sharing agreement.
18     And then, subsequent to that
19 decision, the rules committee revisited the
20 local rules and then they ended up having two
21 layers of the judiciary in the Eastern and
22 Southern Districts adopting and approving a new
23 rule that now requires disclosure in those
24 districts of fee-sharing agreements in class

Page 190

1   action cases.
2   Q.  Sir, I believe you said that, upon
3   questioning today, that you are not aware of
4   any authority in New York that suggests the
5   relationship between 1.5(e) and 7.2(b) that is
6   propounded by Professor Gillers; is that right?
7   A.  That's correct.
8       MS. LUKEY: And, Mr. Sinnott, you
9   asked a question that suggested there is
10  such authority.  Are you able to provide
11  us with that authority?
12      MR. SINNOTT: Yes.
13      MS. LUKEY: Will you provide it?
14      MR. SINNOTT: I will.
15      MS. LUKEY: Okay.  Thank you.  I
16  have nothing further.
17      MR. SINNOTT: Richard?
18      MR. HEIMANN: No questions.
19      MR. SINNOTT: Brian?
20      MR. KELLY: No questions.
21      THE SPECIAL MASTER: I don't have
22  anything further.
23      MR. SINNOTT: David, on behalf of
24  Keller Rohrback, any questions?

Page 191

1       MR. COPLEY: No.  Thank you.
2       MR. SINNOTT: Okay.  Thanks,
3   everyone.  This will conclude this
4   deposition.
5       (Time noted:  5:51 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 192

1       A C K N O W L E D G M E N T
2
3   STATE OF              )
4                          :ss
5   COUNTY OF            )
6
7       I, PETER JOY, hereby certify that I
8   have read the transcript of my testimony taken
9   under oath in my deposition; that the transcript
10  is a true, complete and correct record of my
11  testimony, and that the answers on the record as
12  given by me are true and correct.
13
14
15  _____
16      PETER JOY
17
18
19  Signed and subscribed to before me
20  this _____ day of _____, 2018.
21
22
23  _____
24  Notary Public, State of _____

Page 193

1           C E R T I F I C A T E
2
3   STATE OF NEW YORK        )
4                            :ss
5   COUNTY OF RICHMOND       )
6
7           I, MELISSA GILMORE, a Notary Public
8   within and for the State of New York, do hereby
9   certify:
10          That PETER JOY, the witness whose
11  deposition is hereinbefore set forth, was duly
12  sworn by me and that such deposition is a true
13  record of the testimony given by such witness.
14          I further certify that I am not
15  related to any of the parties to this action by
16  blood or marriage; and that I am in no way
17  interested in the outcome of this matter.
18          IN WITNESS WHEREOF, I have hereunto
19  set my hand this 6th day of April, 2018.
20
21
22
23
24  MELISSA GILMORE

## $

**$10 (1)**
93:18
**$200,000 (2)**
166:2,22
**$300 (2)**
167:8;168:22
**$4.1 (9)**
83:21;85:11;91:7;92:24;
93:19;102:4;117:18;160:3;
184:7
**$400 (1)**
13:12
**$5,000 (4)**
167:10;168:23;169:10;
170:3
**$500 (1)**
167:11
**$90,000 (1)**
167:20

## A

**able (8)**
29:12;43:10;48:1;49:8,21;
65:11;144:21;190:10
**above (1)**
129:11
**absence (7)**
90:10;92:2,20;104:4,6;
116:23;128:16
**absent (12)**
30:10,12;90:15;91:23;
94:20;155:18;178:18;179:7,
7,8,8;189:14
**absolute (1)**
157:14
**absolutely (10)**
37:19;61:12;92:5;123:5,
21;152:18;155:3;156:16;
159:20;186:9
**abstract (2)**
43:23;84:1
**accept (2)**
88:21;159:3;160:6
**accepted (1)**
17:20
**accepting (1)**
32:15
**accessed (1)**
16:20
**accompanied (1)**
53:16
**According (5)**
13:11;37:17;56:4,13;
145:2
**acquire (1)**
32:24
**across (2)**
107:4;109:13
**act (3)**
23:1,14;24:14
**acting (13)**
24:2;30:24;31:10,10,19,
24;58:8,20,21,24;59:1;66:9;
67:13
**action (15)**
12:1;23:20;24:4,22;63:13;
76:15;82:2;92:10;97:15;
121:1;122:7;142:5;171:23;
187:15;190:1
**actions (7)**
86:22;129:16;130:2;
156:19;157:7,10;159:12
**activity (3)**
35:6;36:23;39:6
**actually (7)**
25:17;57:17;68:21;79:15,
20;169:9;189:15
**add (2)**
124:3;171:16
**addition (4)**
26:22;132:2,8;145:23
**additional (4)**
15:16,17,21;141:20
**additions (1)**
11:18
**address (4)**
20:23;21:3,9;167:19
**addressing (1)**
88:9
**adequately (1)**
145:12
**adopt (5)**
182:10;185:17;186:4,8,23
**adopted (1)**
18:5
**adopting (1)**
189:22
**adversarial (2)**
121:3;187:17
**adversaries (6)**
120:22;187:12,19;188:5,
6,18
**adverse (5)**
98:14;121:15;123:4,6,7
**advertising (3)**
21:21;22:2;23:7
**advice (3)**
24:20,24;25:5
**affiliated (1)**
174:23
**affiliation (1)**
78:6
**afternoon (2)**
10:16,17
**again (39)**
23:4;24:1;27:19;30:1;
31:18;42:16;43:3;52:21;
58:14;59:10,18;62:18;
65:22;81:18;93:24;120:21;
121:10;137:15;140:4;
143:14;145:10;154:18;
155:12;156:8,11;157:13;

161:22;164:7;165:4;166:16;
177:6;178:9;179:5;180:19;
182:19;183:10;184:10;
185:7;186:1
**against (2)**
57:22;169:20
**agent (15)**
58:8,10,11,15;127:6,9,19;
128:5,9,14;130:16;133:22;
139:12,18;188:21
**ago (1)**
11:7
**agree (23)**
23:13;24:18;35:24;48:10;
121:16,21;128:13;129:14;
133:15,17;134:8;139:11;
141:15,22;143:9;152:20;
155:4,13,20;156:13,17;
185:14,24
**agreed (17)**
53:14;105:3,18,20;108:9;
110:6,7,15,20;111:1;112:10;
114:15,24;115:3,10,13;
157:1
**agreeing (2)**
158:10,14
**agreement (72)**
35:4;63:7,8;70:5;71:7,19,
21;76:21;77:17,20;78:14,
23;82:12;90:11,13,14;91:6;
92:23,23;94:13;98:21;
102:3;104:19;105:2;114:3,
23;116:1;127:21;128:15,18;
129:1,17;130:4,5,9,15;
131:18;133:8,9;136:20;
138:9;140:12;141:3,9;
145:8,18;152:21;154:4;
155:6;158:21;159:5;166:2,
19;168:3,11,13,14;171:20;
172:12,13,15;173:4,12,17,
18;174:4,7;175:1,24;
177:13;185:9;189:17
**agreements (7)**
95:17;127:14;133:4;
140:14;142:21;154:8;
189:24
**agrees (4)**
72:1,9;85:17;168:18
**ahead (2)**
108:6;120:15
**al (2)**
12:9;188:4
**allege (1)**
148:21
**allocate (1)**
85:18
**allocation (10)**
91:4;94:8,9,18,19;105:20;
117:12;118:1;124:14;
184:16
**allowed (1)**
21:20
**allows (2)**

32:14;131:13
**alluding (1)**
147:10
**almost (1)**
49:4
**along (3)**
39:1;66:24;96:16
**alter (1)**
35:4
**although (3)**
78:15;104:17;167:10
**always (1)**
118:15
**among (9)**
32:19;85:23;94:18;
104:13;125:1;128:15;129:1;
131:13;141:7
**amount (18)**
92:13;93:14,18;94:2,4;
101:19;102:6;116:13,15;
125:9,20;145:5;160:21;
166:9;170:2;176:11,13,15
**analyze (2)**
163:24;164:3
**and/or (1)**
26:1
**Andover (1)**
151:7
**apologize (1)**
50:11
**apparent (3)**
35:22;37:12;55:22
**Appeals (1)**
128:11
**appear (3)**
34:18;56:7,21;76:3;
159:23;160:2
**appearance (1)**
93:3
**appeared (5)**
92:24;103:4;117:19;
118:3;161:17
**appearing (3)**
102:11,14;162:3
**appears (7)**
33:14;34:15;48:18;91:9;
92:14;93:1,2
**append (1)**
134:6
**applicable (1)**
125:18
**application (7)**
73:14;76:6;128:22;
132:11;140:19;156:4,23
**applied (1)**
68:16
**applies (2)**
68:14;158:3
**apply (6)**
31:22,23;67:12;68:11;
165:16;167:12
**applying (1)**
86:22

**appointed (1)**
   35:13
**appointments (1)**
   35:9
**appreciate (2)**
   49:23;156:11
**appreciated (1)**
   96:5
**apprised (1)**
   84:16
**approach (3)**
   132:2,8;165:22
**approval (4)**
   110:24;115:11;160:13;
   179:17
**approve (4)**
   120:24;122:6;184:15;
   187:14
**approved (2)**
   133:4;169:14
**approves (1)**
   90:11
**approving (2)**
   169:24;189:22
**approximately (2)**
   14:2;34:24
**area (2)**
   13:18;47:18
**arithmetic (1)**
   162:18
**Arkansas (85)**
   16:8,10;23:23;24:19,24;
   25:6,10,11,12;26:10,16;
   27:2,4,8,23,24;28:5,12,19,
   21;29:17,18;30:2;32:24;
   33:2;35:7,24;36:4,14,21,24;
   37:6,14,18,20;38:4,7;39:3;
   40:16;41:6,20;42:17,21,22;
   43:7;44:2,7,19;45:17,19;
   46:6,7,10,16;48:3,24;50:5;
   58:12;61:22;63:24;72:16;
   73:4,17;76:11;77:24;78:4,
   20;80:6,18;84:16;85:8,17;
   86:1,5;102:2;141:3;151:8;
   171:23;175:16;176:3,21;
   177:9,13;183:6;187:21
**around (2)**
   30:21;157:19
**arrange (3)**
   26:2,24;52:21
**arrangement (27)**
   72:6;75:15;76:11;89:17;
   100:2,10,14;103:14;105:19;
   108:1,3;112:8,22;137:17,19;
   139:6;143:19;152:21;153:5;
   154:14,20;155:15;156:18;
   157:6;170:1;172:18;173:23
**arrangements (3)**
   74:17;83:7;87:14
**articulated (1)**
   68:10
**aside (4)**
   30:12;158:19,23;182:24

**assert (2)**
   148:20;159:17
**assets (1)**
   148:23
**assignment (1)**
   75:1
**assist (3)**
   24:16;32:5;43:10
**assistance (5)**
   18:14,17;19:10;40:5;41:8
**assistant (1)**
   22:7
**associated (1)**
   28:21
**associates (1)**
   74:22
**assume (29)**
   38:11;40:12,14;41:24;
   45:20;46:8;49:10;61:13,14;
   62:9,11,12;64:8;66:3;95:10;
   100:19,23;101:23;107:14,
   22;135:11;142:1,6;143:7,
   12;150:22;164:14;168:1,8
**assuming (7)**
   40:19;43:3;57:18;108:5;
   149:9;167:16;185:7
**assumption (3)**
   143:15,16;184:23
**assumptions (1)**
   108:20
**assuring (1)**
   131:23
**ATRS (5)**
   35:5,8;36:21;75:1,3
**attempt (1)**
   186:18
**attempting (1)**
   35:2
**attention (13)**
   14:23;18:7;21:10;34:23;
   47:9;74:11;123:18;129:7;
   130:18;161:3;180:9,12,13
**attorney (9)**
   23:14;35:14;74:23;75:5;
   83:21;92:13,14;144:14;
   150:5
**attorneys (5)**
   19:11;74:24;75:6;85:19;
   151:4
**attorneys' (6)**
   13:1,3,8;101:17;116:15;
   138:22
**attorney's (4)**
   82:23;84:6;132:3,9
**August (2)**
   97:9;148:18
**authorities (2)**
   86:15;158:5
**authority (13)**
   58:3;70:9;88:11,23;89:2,
   4,5;133:8,12;189:13;190:4,
   10,11
**automatically (2)**

20:17;181:6
**available (2)**
   17:15;55:7
**award (9)**
   35:14,15;101:20;131:13;
   141:6;145:5;162:5;188:9,11
**awarded (4)**
   13:3;92:13,14;125:22
**awarding (1)**
   131:24
**aware (32)**
   20:8,10;82:3;90:13;95:21,
   24;102:17,21;104:22,23;
   105:4,6,14,16,18,24;106:3,
   10,11,21;107:5,6,12;108:17;
   119:21;138:1;160:20;161:5;
   169:13;188:16,20;190:3
**awareness (1)**
   106:8

## B

**back (12)**
   16:7;25:18;36:18;75:19;
   77:20;109:15;110:4;126:1,
   9;127:2;171:4;173:24
**background (1)**
   10:22
**Bank (1)**
   34:9
**bar (2)**
   69:6,18
**bare (1)**
   145:23
**based (14)**
   22:23;27:12,19;28:1;
   36:12;49:23;76:1;78:16;
   94:15;95:11;109:12;124:18;
   125:12,12
**basically (6)**
   23:7;24:7,14;30:20;56:11;
   141:23
**basis (3)**
   87:9,12;170:8
**Bates (1)**
   33:17
**bear (5)**
   93:24;156:18;157:6,9;
   164:10
**bearing (1)**
   122:18
**became (3)**
   80:19;82:3;106:10
**began (1)**
   172:8
**begin (1)**
   33:21
**beginning (3)**
   10:3;15:3;86:11
**begins (4)**
   18:9;33:9,22;131:7
**Behalf (13)**
   3:4,15;10:5;12:2;19:7;

38:14;41:15;58:20,24;59:1;
   61:2;178:6;190:23
**Belfi (29)**
   32:22,23;33:12;35:17;
   38:12;45:6;53:19,21;55:5;
   56:1,10;60:9,19,24;61:9,16;
   62:10,12,14,16;65:17,18;
   66:5,18;77:14;78:3,9;81:5,
   24
**belief (2)**
   108:10;176:17
**believes (2)**
   108:8;141:18
**bell (2)**
   34:9,10
**belongs (1)**
   156:14
**below (1)**
   132:7
**Bernstein (3)**
   189:5,6,11
**best (5)**
   73:18;81:9;82:8;164:20;
   188:10
**beyond (2)**
   11:21;92:16
**big (1)**
   133:10
**bill (2)**
   86:6;164:7
**billed (1)**
   167:10
**billing (3)**
   74:17,21;169:14
**bills (3)**
   168:21,22,23
**bit (3)**
   68:2;96:10;167:24
**bkelly@nixonpeabodycom (1)**
   3:22
**blending (1)**
   185:23
**blink (1)**
   167:22
**blowing (1)**
   108:13
**blue (2)**
   30:7;66:1
**bluntly (2)**
   110:17;115:7
**board (1)**
   50:6
**Bob (1)**
   149:22
**body (3)**
   69:5;80:20,21
**bones (1)**
   145:23
**Boston (2)**
   3:6,17
**both (8)**
   13:16;73:23;81:23;147:9;
   149:17;159:15;168:2;

**181:14**

**bothered (1)**
68:19

**bottom (7)**
33:22;39:17;51:15;53:6;
111:17;129:9;130:19

**bounce (1)**
19:14

**bounds (1)**
158:4

**bracketed (2)**
129:11;130:20

**break (5)**
119:14;122:3;170:21;
171:2,16

**breaking (1)**
96:7

**BRIAN (2)**
3:18;190:19

**brief (1)**
171:2

**bring (6)**
30:13,18;50:3,5;62:24;
63:3

**bringing (1)**
39:11

**broad (1)**
148:22

**broken (1)**
67:11

**Brombeck (2)**
169:17,23

**brought (2)**
117:23;119:8

**Bruchac (1)**
12:8

**B-R-U-C-H-A-C (1)**
12:8

**built (1)**
113:21

**burden (5)**
90:4;146:2;181:13;182:9,
14

## C

**Cab (3)**
12:9,10,11

**call (8)**
22:17;41:11,11,13;53:13,
13;61:21;90:24

**called (5)**
52:3,7;60:3;99:8;169:16

**calling (4)**
50:11;52:9,12;60:5

**calls (8)**
29:5;41:12;44:12;57:19;
61:23;64:10;65:24;124:24

**came (3)**
11:1;54:5;69:11

**can (8)**
13:15;16:4;29:6;70:13;
77:15;78:18;81:9;93:22;

95:10;96:6,12;97:6;111:23;
113:3;116:9;119:14;124:6;
131:14;135:6,9;136:22;
163:7;166:15,24;167:12;
168:18;172:11

**candid (1)**
124:20

**candor (12)**
88:3;97:21;119:6;121:6,
23;125:18;154:15,19,21;
161:9;162:21,22

**CANTY (1)**
5:4

**cap (1)**
118:22

**capable (1)**
24:9

**capacity (7)**
23:1;30:24;31:20;32:1,3;
66:9;67:13

**capital (1)**
34:11

**cappers (1)**
23:5

**Carter (1)**
77:9

**case (94)**
11:23;12:1,5,7;14:9;
16:20,23;23:17,19;24:19;
27:15;29:15;32:16;62:24;
69:15,24;70:23;71:1;72:14;
82:22;83:12,22;84:2;85:13;
91:8;94:8,9;97:2;102:22;
103:3,3,4,11;104:24;106:2;
107:7;108:24;110:1;116:5;
122:8;125:14,19;127:6,23,
24;128:23;130:16;133:23;
134:10;136:15;140:1,2;
141:1,2;142:1;145:11;
148:3;150:2;151:7;153:1,3,
11,18;156:22;159:24;
161:18,18;162:3;165:11;
169:16,17;171:8,22;176:2;
177:9,21;180:10;181:13;
182:11;185:18;186:5,8,22;
187:20;188:9,19,22,22,23;
189:1,4,7,11,13

**cases (23)**
35:10;67:11;68:15;70:13,
17,20;92:10;99:13;116:3,5,
5;118:21;127:4;132:1;
136:15,18;137:7;138:3;
150:7;151:6;155:2;176:19;
190:1

**case-specific (4)**
90:17;91:21;94:21;154:7

**categories (1)**
143:9

**caused (1)**
114:9

**caution (2)**
49:23;156:12

**caveats (1)**

171:16

**cease (1)**
126:23

**certain (5)**
19:15;83:6;133:14;
134:19;136:2

**certainly (1)**
130:15

**certainty (2)**
34:8,13

**certified (5)**
89:12,14;134:17;136:8;
146:16

**certify (1)**
192:7

**cetera (2)**
74:22,24

**Chain (2)**
33:17;39:23

**chaired (3)**
39:5;44:6;45:16

**chambers (1)**
149:12

**chance (1)**
11:4

**change (16)**
28:6;68:11,17,24;69:7,8;
73:21,24;108:22;112:19;
114:18;115:16,20;135:18;
152:2;167:23

**changed (1)**
69:10

**changes (1)**
11:18

**changing (1)**
19:3

**channeling (3)**
21:23;22:11,18

**character (2)**
121:3;187:17

**characterize (4)**
22:21;33:3;59:5;81:9

**characterized (3)**
59:3;94:16;109:16

**characterizes (1)**
60:1

**characterizing (1)**
36:8

**charged (1)**
22:5

**Chargois (143)**
23:14;24:20;25:10,13,24;
26:1,14,23,24;27:5,5,16,23;
28:6,13;29:15;30:4,19;
32:22,23;33:11;35:17,23;
36:7;37:21;38:7,12;39:9;
40:15;41:19;42:2,16,17,18;
45:3,6,11,22,23,24;46:18;
47:3,8,16,19,21;48:13;50:3,
17;51:18,24;52:5,15,19;
53:9,18;55:5,23;56:9,9,10,
14,22;57:18;58:8;59:18,22;
60:1,7,18;63:18;64:8;65:14,

20;66:9;70:6;71:20;75:10;
77:23;79:3;81:6;82:3,6,12,
13;85:12;87:14;88:12;
89:17;90:14;98:21;100:1,
10,14;101:23;103:2;104:2;
105:3,19;107:24;108:3;
110:2,8;112:7,23;114:3,23;
115:24;125:20;136:20;
137:18;139:6;143:19;
152:16,21;153:6;155:6,15;
156:17;158:21,21;159:4,5;
160:21;161:17;162:2;
164:16,17;165:2;171:20;
172:4,19;173:23;174:13,22;
176:1,18,20;177:20;178:17;
179:16;183:4;184:6

**Chargois' (9)**
22:17;37:13,17;38:18;
41:15;56:5;57:11;61:15;
66:7

**check (2)**
97:6,7

**Chiplock (2)**
147:15;148:4

**Chiplock's (1)**
147:15

**CHOATE (1)**
3:3

**Chris (3)**
53:20,22;54:4

**Christa (12)**
77:8,9,12,24;78:8;80:8;
172:10;173:6;174:1,21;
175:22;176:17

**chronology (2)**
46:9;76:17

**circuit (15)**
127:13;128:12,14;129:24;
130:7;178:22;179:10;181:7,
21,23;182:11;188:22,23,24;
189:14

**circuits (2)**
181:7;182:2

**circumstance (1)**
155:23

**circumstances (4)**
113:5;168:24;169:22;
175:18

**citations (4)**
15:12,13;132:5,6

**cite (7)**
70:13;119:16,17;123:23;
144:4;163:19;189:7

**cited (5)**
15:11;16:2;127:5;132:16;
139:12

**Civil (8)**
86:21;90:18;118:11,11;
119:5;131:22;144:23;
179:11

**claim (5)**
67:17;145:9,18;148:20;
151:11

**claiming (1)**
67:7
**claims (1)**
151:9
**clarification (1)**
48:19
**clarify (2)**
150:4;151:3
**Clark (9)**
77:8,11,12,24;78:8;
172:11;173:6;174:1;176:17
**Clark's (3)**
80:8;174:22;175:22
**class (180)**
12:1,21,24;16:21;23:20;
24:4,22;38:3;63:13;76:15;
80:19;82:1,8;86:2,22;88:10;
89:12,14;90:23;91:5;92:9,
12;93:7;97:15;98:19,20;
99:7,9,23,23;100:3,6,12,13;
101:7,9,11,12,20;106:5;
107:15;109:7;112:6,14,18,
21,24;113:2,4,9,10,11,16,19,
22;114:2,4,10,12,19;115:18,
24;116:1,1,9,14;120:24;
122:7;125:10,22;129:15;
130:1;131:21;132:3,9,14;
134:16,20;135:2,19,19;
136:1,3,5,8,13,17,20,23;
137:4,7,9;138:6;139:5;
141:13;142:2,5,8,9,12,15,16,
24;143:3,5,11,19,24;144:1,
14,19;145:12,14;146:16,16,
20,21,24;147:3,18,19,20,22,
24;148:1,12,15,17,21;
149:18;151:10;152:4,6,13,
22;153:8,13,22;154:10;
155:5,14,15;156:18,20;
157:6,9,17,18;158:3,6,9,13,
22;159:6,12,22,23;160:5,9,
18;161:3,14;162:1,10;
163:2;164:16,19,20,24;
165:1,7;171:22,23;177:19;
178:7,17;179:3,4;187:15;
189:24
**classes (6)**
12:2;112:16;138:18;
157:18;187:22,22
**clause (2)**
71:18;90:19
**clear (6)**
76:17;84:9;86:23;150:7,
13;151:6
**clearly (7)**
165:16;167:13;169:2,10,
22;170:6;179:11
**Clerk (2)**
46:23;50:12
**client (60)**
24:8,17,19;27:17,17;32:6,
24;35:5,24;36:4,14,22;
37:14,19;38:8;40:3,4,7;
42:8;43:18;50:6;57:24;

71:13,14,24;72:5,7;73:7,8;
82:24;83:2,5,6,11,16;84:2,
10;102:2;134:17,21,21;
136:6;140:13,23;146:23;
147:3;155:22;156:14;
168:17,21;169:11;172:3,5,9;
173:22,23;174:10,11;177:8,
10
**clients (26)**
31:3;39:12;42:13;83:17,
18;105:1;106:23;114:11,14;
135:2,17,20;138:6;140:22;
146:16,19,24;148:6,8,24;
149:3;151:18,22;152:8,13,
16
**client's (5)**
82:21;83:12;155:24;
157:2,17
**cocktail (1)**
40:24
**co-counsel (1)**
177:18
**cold (4)**
41:11,13;52:4;61:23
**co-lead (2)**
176:3,4
**colleague (2)**
159:11,13
**collect (2)**
166:2,21
**colloquy (1)**
59:17
**Colonial (1)**
34:9
**column (2)**
131:4,5
**comfortable (2)**
19:1;117:2
**coming (1)**
30:6
**comment (18)**
21:18;22:13;95:22,24;
97:8,13,21;119:7,17,18,21;
120:4,21;121:16;122:4;
123:13;125:15;187:11
**comments (4)**
103:21;119:24;124:4,19
**committee (4)**
39:5;44:6;45:16;189:19
**communication (1)**
57:23
**communications (3)**
22:8;112:13;173:14
**companies (1)**
12:10
**compel (1)**
44:2
**compensation (1)**
22:7
**competent (1)**
24:9
**complaint (1)**
148:21

**complete (2)**
14:19;192:10
**complex (1)**
145:24
**compliance (2)**
30:10;68:5
**complied (3)**
72:14,21;73:2
**comply (1)**
136:9
**compound (2)**
104:14;152:9
**computation (1)**
163:1
**conceivable (1)**
157:16
**conceivably (1)**
67:12
**concerned (2)**
35:2;104:12
**concerning (3)**
33:12;140:15;181:3
**concerns (1)**
58:6
**conclude (8)**
69:12;127:4;142:10;
165:1;167:13;169:8,9;191:3
**concluded (2)**
159:16;181:8
**conclusion (1)**
186:21
**condition (1)**
176:24
**Conduct (6)**
95:23;96:24;125:17;
165:15,17;187:9
**conference (3)**
135:14;149:4;150:21
**confirm (1)**
15:13
**conform (3)**
144:23;172:15,21
**conformed (1)**
17:13
**Congratulations (1)**
13:7
**connected (1)**
21:2
**connection (2)**
17:15;20:20
**connotation (1)**
58:10
**consent (2)**
136:10;155:24
**consents (2)**
71:14;73:8
**consider (4)**
22:17;83:20;88:11,16
**considerable (3)**
35:6;36:22;37:5
**considered (3)**
17:23;89:16;166:3
**considering (2)**

134:15;144:13
**consisted (1)**
99:8
**consistent (1)**
127:10
**consolidated (5)**
99:14;116:6;136:16,19;
137:8
**construction (1)**
67:16
**consummated (1)**
72:16
**contact (4)**
29:16;40:3;46:10;48:14
**contain (1)**
144:18
**contained (1)**
72:24
**Cont'd (2)**
3:1;5:1
**contemplated (1)**
74:20
**content (1)**
144:18
**context (8)**
36:6;81:9;86:4;119:9;
123:20;132:24;134:13;
155:2
**contingency (2)**
74:18,19
**continue (1)**
50:21
**continued (1)**
164:5
**continues (2)**
54:23;144:19
**contracting (1)**
78:3
**contradicts (1)**
66:4
**controlled (1)**
146:12
**controlling (2)**
179:22;189:13
**conversation (8)**
18:20;53:8,24;55:15,21;
62:1;81:23;155:8
**conversations (1)**
81:14
**converts (1)**
20:17
**copies (4)**
16:6,19;34:2;79:13
**COPLEY (4)**
10:4,4;126:13;191:1
**copy (7)**
14:19;16:13,15;17:7;96:4;
129:9;187:7
**Corp (1)**
132:22
**corporate (3)**
169:12,13,24
**corporation (1)**

169:12
**corporations (1)**
58:2
**correctly (5)**
104:16;127:16;129:19;
132:4;152:11
**costs (2)**
146:3,8
**counsel (69)**
14:2;15:9;22:24;24:2;
25:15;26:12;29:19;30:3;
35:8,13;36:16;37:22;38:2,3,
8;42:23;45:9;46:7;56:16,18;
58:23;63:7,8;64:1;67:1,3;
72:24;74:24;76:13;77:18;
79:4;80:16,19;85:20,23;
88:10;90:1;91:24;102:12;
109:24;110:20;112:15,15;
115:9;119:3;125:22;129:1,
16;131:13;136:1;141:6;
142:8;143:24;146:16,21;
147:1,4,20,22;152:6;155:15;
169:12,13,24;172:1;176:3,3,
21;178:6
**counsel's (1)**
135:19
**count (1)**
51:16
**counter (1)**
84:5
**COUNTY (1)**
192:5
**couple (2)**
119:13;127:21
**course (3)**
15:16;110:1;149:2
**Court (123)**
11:9;12:22;14:12;20:5,23;
33:8;46:24;50:10;69:15,17,
18;86:18,19,21;87:13;88:3,
5,10,11,17,22;89:1,8,12;
90:3,5,6,10,20;93:1,3;94:20,
23;95:18;97:14;101:13;
102:11,16,18,20;103:13,14;
104:4,8;112:17;113:3,3;
116:17,23;117:5,11,14,19,
23;118:4,16,16,24;119:4,6,
8;121:23;127:12,12,15;
128:3,11,16,18,21,22,24;
129:16,24;130:22;132:10;
133:11;139:13,19,22,23;
140:17;141:12;143:20;
144:3,13;145:7,16;151:14;
154:6,8,16,19,22;155:18;
160:13;161:10,12;167:12,
18,21;169:1,8,9,15;178:18,
19,20,22;179:7,10,16,18,19,
20;180:7;181:5,14;184:6,8,
14;186:11;189:2
**courtesy (1)**
55:8
**courts (8)**
20:12;69:5;90:8;104:11;

158:4;169:21;181:11;182:9
**court's (7)**
89:4,5;104:7;129:15;
131:21;172:21;173:1
**CRANDALL (1)**
3:20
**create (4)**
87:12,12;103:21;104:1
**created (1)**
80:17
**creating (1)**
80:10
**credited (1)**
61:15
**crediting (1)**
59:18
**Cross-motions (1)**
12:18
**curiosity (1)**
49:13
**Curriculum (1)**
11:12
**customer (9)**
88:10;99:9;113:9;114:10;
142:8;147:22,24;148:12;
152:4
**CV (5)**
11:1,5,19,21,24

---

# D

**damages (1)**
12:24
**Damon (10)**
22:17;32:22;33:11;35:17;
47:3,8;48:14;50:17;81:6;
85:11
**dash (2)**
36:18,19
**date (2)**
54:8;69:3
**dated (5)**
14:16;47:3;50:17;74:2;
111:10
**David (5)**
10:3,4;12:14;126:12;
190:23
**day (3)**
13:10;42:14;192:20
**deal (3)**
16:23;35:4;110:5
**dealing (7)**
70:18;107:16;159:11;
162:21;168:6;169:6,7
**deals (1)**
189:1
**deceased (1)**
12:15
**decide (6)**
91:15,15;98:17;104:19;
165:8;186:16
**decided (1)**
146:12

**decides (1)**
89:9
**deciding (1)**
117:9
**decision (29)**
12:3,13,23;68:16;83:12,
14;98:13,24;101:16;121:14;
134:7;139:12;152:23;
153:14,17;156:13;157:2,10,
17;158:7;159:2;160:5;
172:21;173:2;181:10,11,24;
184:14;189:19
**decisions (6)**
83:6,8,9,16;133:3;156:19
**declaration (1)**
93:1
**dedicated (3)**
35:7;36:23;37:6
**deem (2)**
131:17;141:7
**deemed (1)**
167:9
**deep (2)**
18:24;165:5
**deeper (1)**
109:11
**defendant (2)**
12:12;107:7
**defendants (4)**
13:2;188:4,6,8
**defensible (2)**
185:16;186:3
**defer (1)**
160:14
**define (1)**
97:20
**definitely (4)**
17:12;29:7;33:6;78:10
**definition (3)**
148:2,15;151:10
**degree (2)**
31:14,15
**demonstrates (1)**
21:1
**Department (9)**
106:1,12,16;107:1,10,11,
17;108:2,8
**depend (4)**
46:19;83:4;139:13;169:11
**depended (1)**
143:19
**depending (1)**
75:7
**depends (4)**
29:2,3;30:1;43:21
**Deposition (12)**
47:3,8;50:17;60:22;65:23;
66:4,7;111:10;147:15;
151:21;191:4;192:9
**depositions (3)**
15:11;16:6;147:9
**depth (1)**
59:12

**describe (3)**
16:5;74:16;145:16
**description (1)**
57:11
**deserved (1)**
123:18
**desist (1)**
126:23
**despite (1)**
128:15
**detail (1)**
83:3
**detailed (1)**
83:18
**details (1)**
172:18
**determination (2)**
93:6;116:13
**determine (1)**
63:19
**determining (1)**
91:4
**develop (2)**
24:3;36:17
**developed (1)**
19:4
**development (1)**
83:23
**developments (1)**
82:22
**dicta (2)**
69:14,21
**dictate (1)**
144:17
**differ (2)**
150:6;151:5
**difference (2)**
94:1;103:11
**different (9)**
44:22;58:16;59:11;60:15;
71:3;90:8;112:16;180:22;
188:2
**digging (1)**
106:9
**dinner (3)**
49:11,15,21
**direct (10)**
14:22;18:6;21:10;47:9;
74:11;91:24;129:7;130:18;
144:14;178:19
**directing (1)**
34:22
**director (2)**
25:2;61:22
**disallow (1)**
88:12
**disciplinary (1)**
69:5
**discipline (1)**
170:9
**disclose (18)**
93:5;95:17;101:4;103:13;
104:1;127:14;130:1;136:19;

137:10,17;138:2;145:7;
153:5,10;155:16;183:3,5;
185:9
**disclosed (13)**
90:3;101:3;112:23,24;
113:1,2;123:8;136:22;
145:19;153:8;154:2;159:22;
181:6
**disclosing (2)**
101:1;154:13
**disclosure (25)**
86:12,15,16,17,19;87:9;
88:4,24;89:3;92:22;97:14;
125:20;127:20;136:10;
143:23;154:20;155:19;
157:8;158:20;181:4,17,18;
189:2,16,23
**disclosures (1)**
159:14
**disconnected (1)**
155:10
**discount (1)**
75:2
**discriminate (2)**
148:1,14
**discuss (5)**
19:24;86:11;87:10,16;
143:18
**discussed (3)**
20:13;51:17;75:24
**discussion (6)**
53:6;77:4;80:4;133:22,24;
161:6
**discussions (1)**
81:10
**distinct (1)**
23:12
**distinction (1)**
103:1
**distinctions (1)**
147:24
**distinguish (1)**
141:1
**distributed (1)**
79:14
**District (13)**
91:18,18;94:23;118:17;
128:17,21;129:14;131:21;
141:12;178:21;179:9;
181:10,14
**Districts (4)**
12:4;118:18;189:22,24
**divide (6)**
131:13;141:6;166:6;
167:4;168:15,18
**divided (6)**
84:4;87:24;88:2;89:1;
104:13;142:22
**dividing (1)**
81:20
**division (22)**
20:18;71:11,13;72:3,8;
73:7;75:14;76:8;77:23;

85:23;88:13,18;131:20;
145:12,16;165:18;166:1,19;
167:17;168:3,9;172:13
**divisions (1)**
20:2
**divorce (2)**
23:11;31:3
**Doane (35)**
26:4,7,9;27:24;28:5,14,16,
20;29:17;41:6;43:6;48:3,16,
23;49:6;51:19,22;52:2;
55:10;56:6,8;57:19;59:22;
60:24;61:2,11,21,23,24;
62:5;64:10;65:16;66:1,13;
81:11
**Doane's (2)**
52:6;60:3
**docket (1)**
16:20
**document (4)**
50:13;74:8;76:2,4
**documents (3)**
15:23;17:14;101:2
**DOL (1)**
149:1
**dollars (1)**
170:2
**done (19)**
32:24;33:4;102:22;
104:21;109:24;120:6;
123:10,12;125:13;156:8,24;
157:15;159:11,13;162:24;
173:19;175:5;182:22;
183:17
**don't (72)**
10:11;22:20;25:4;26:5;
27:11;28:16,18;34:20;37:6;
39:16,20;40:10;43:5;45:13;
46:14;48:9;49:5,20;52:15;
53:12,21;55:12;56:3;58:9;
60:7;63:16;64:19;65:7;66:2,
16,20;69:13;81:19;82:4,7;
83:19;84:3;85:13;87:1,5,8,
11;89:21,24;91:5;96:11,20;
97:4;99:2;103:9;104:1;
109:9,12;122:13;124:18;
135:22;142:14;145:20;
157:21;158:13;159:17;
162:8,18;163:11;166:13;
167:18;169:23;175:17;
181:5;182:19;188:14;
190:21
**door (1)**
59:9
**doors (1)**
30:21
**Dowd (1)**
12:14
**down (9)**
18:23;34:24;54:5;56:9;
58:4;67:11;122:3;131:2;
132:7
**downloaded (1)**

17:7
**draft (2)**
16:7;76:13
**drafted (4)**
15:7,8;182:20,21
**drafters (1)**
182:20
**drill (1)**
58:4
**drilled (1)**
18:23
**drinking (1)**
170:23
**drive (1)**
23:10
**driver (2)**
23:8;31:2,7;67:24
**drivers (1)**
12:2
**during (1)**
110:1
**duties (8)**
87:1,3,7,8,17;97:21;
121:6;134:20
**duty (24)**
83:2;87:18;88:1,8;89:13,
18;90:12;97:13;121:22;
124:22;125:18;132:3,9,13;
143:18,20;154:9,12,15,19,
21;155:21;158:20;163:20

## E

**earlier (8)**
32:18;73:2,16;76:10;97:2;
147:11;165:7;173:5
**early (1)**
19:24
**earns (2)**
167:8,9
**Eastern (3)**
91:18;118:18;189:21
**effect (11)**
43:8;65:12;69:12;70:11;
81:14,16,23;95:12;108:13;
135:16;172:16
**effected (1)**
56:8
**effective (4)**
20:15;56:23;57:2;69:3
**effectively (1)**
27:6
**effort (1)**
65:22
**efforts (2)**
100:23;101:4
**either (16)**
16:2;26:23;28:19;32:15;
41:5,22;43:6;71:1,22;119:4;
138:23;178:21;179:9,17;
181:23;182:10
**Elizabeth (1)**
97:7

**else (10)**
10:12;19:3;22:21;28:5;
53:17;60:19,22;68:22;
116:23;126:21
**elsewhere (1)**
76:3
**e-mail (28)**
32:21;33:1,4,9,17,22;
35:17;36:6;46:15,20;65:21;
66:5;77:5;78:8,11,16;79:1,
7;80:2,8;173:7,13;174:1;
175:23;176:8,17,23;177:3
**e-mails (2)**
16:7;32:19
**EMILY (2)**
3:20;126:17
**emphasized (1)**
131:15
**empowered (1)**
169:1
**enable (3)**
98:12,23;121:13
**encompass (1)**
148:22
**encompassed (2)**
154:13,22
**end (2)**
46:17;48:22
**ended (1)**
189:20
**enforce (1)**
128:15
**engagement (2)**
84:14;85:6
**enough (5)**
31:14,16;88:19;92:9;
148:22
**Enriquez (1)**
151:6
**ensure (1)**
100:24
**enter (2)**
165:24;166:18
**entered (1)**
155:8
**entire (5)**
134:6,24;147:23;148:12;
162:4
**entirely (1)**
107:5
**entities (1)**
188:1
**entitling (1)**
145:4
**entity (2)**
174:21;175:2
**equitable (4)**
116:15,18;117:9;131:24
**Eric (21)**
32:22;33:12,13;35:17;
38:12;45:5;53:19,21;54:4,
13;55:5,11,18,24;56:10;
60:24;65:17,18;77:14;78:9;

81:5

**ERISA (58)**
10:5;12:5;99:10,22;100:6,
12,13;101:9,11,12;105:1,17;
106:5,13,22,22;107:15,19;
109:6,16,17,18;110:19;
112:21,24;113:1,10,10,18;
114:2,12;115:9;116:3,10;
135:1;137:3,6;138:2,6;
147:18,21;148:20,24;150:7;
151:6,9;152:12;160:18,22;
161:14,19,24;162:4,10;
178:6,6;179:3;187:22

**ERISA-governed (1)**
148:23

**errors (1)**
19:9

**especially (2)**
32:13;172:8

**ESQ (6)**
3:7,8,18,19,20;5:6

**essentially (2)**
56:23;158:9

**estimate (2)**
13:15;145:6

**et (4)**
12:9;74:22,24;188:4

**ethical (19)**
58:6;84:12;87:1,3,7,8,11,
17,18;88:1;122:12;172:2;
177:7,14;178:4,15;179:1,14,
23

**ethics (5)**
137:24;146:13;158:4;
185:15;186:2

**Evans (1)**
12:23

**even (15)**
17:21;24:5;88:12;91:23;
95:6;114:6;157:20;158:13,
15;167:18,22;169:21;
174:23;185:16;186:3

**event (1)**
182:9

**everybody (2)**
70:19;160:15

**everyone (2)**
161:8;191:3

**evidence (2)**
24:23;28:3

**evolved (1)**
25:23

**ex (6)**
97:22;98:10;121:4,7,11;
187:18

**exact (2)**
185:19,20

**exactly (9)**
51:11;87:23;103:6,9;
109:17;128:20;135:16;
136:4;146:19

**EXAMINATION (3)**
10:14;127:4;187:5

**example (1)**
31:1

**examples (1)**
23:8

**excellent (2)**
150:5;151:5

**except (1)**
37:24

**exception (2)**
30:11;102:10

**Excerpt (7)**
47:2,7;50:13,16;111:9;
150:22,23

**excerpts (5)**
17:11,13;96:22;147:9;
187:8

**excess (1)**
170:3

**excessive (6)**
165:16;167:13;169:2,10,
22;170:6

**exchange (4)**
32:22;33:4;65:21;80:3

**exchanges (2)**
33:1;46:16

**excuse (3)**
81:15;149:6;163:18

**executive (1)**
61:22

**exercise (1)**
89:18

**Exhibit (25)**
11:11,12;14:14,15,23;
18:7;33:16,17;47:1,2,7;
50:16,20;51:3,12;74:5;
96:21,22;111:6,8,9;128:4,5,
9;187:8

**existed (2)**
167:16;174:8

**existence (3)**
89:17;129:17;159:4

**existing (2)**
40:12,14

**expending (1)**
34:11

**expense (1)**
117:22

**experience (2)**
125:12;183:13

**experiences (1)**
11:22

**Expert (5)**
14:6,15,20;16:14;186:20

**expertise (1)**
66:11

**experts (2)**
185:15;186:2

**explain (3)**
77:3;171:15;175:14

**explains (1)**
144:24

**explicitly (2)**
77:21;141:3

**extend (1)**
52:20

**extended (1)**
25:15

**extent (2)**
68:19;131:12

**eye (1)**
167:22

**F**

**F2d (1)**
128:10

**face (3)**
14:5;51:16;67:19

**facilitate (3)**
41:16;42:13;46:10;51:19,
22;66:12

**facilitated (1)**
26:16

**facilitating (3)**
51:21;59:6,15

**fact (19)**
20:11;27:15;42:24;44:9;
69:4,6;79:16,20;88:16;
98:20,22;99:3;125:5;
127:19;133:11;141:11;
169:16;177:21;184:6

**factor (1)**
133:6

**factors (2)**
104:10;170:13

**facts (24)**
15:14,16,17,21;17:19,19;
18:4;39:23;45:20;62:12;
98:12,14;121:12,14;125:6,7,
8;132:11,19;133:18;154:23;
155:1;167:23;172:7

**factual (9)**
14:24;15:7,8,12,18,20,22;
16:2;18:5

**failure (2)**
20:23;141:19

**fair (15)**
35:16;54:3;75:13;76:5;
91:5;92:12,15;98:18;
101:19;104:9;116:14,18,21;
117:9;145:6

**fairness (6)**
91:1;95:2;148:19;179:18;
180:5;185:4

**familiar (3)**
34:16,18

**family (1)**
12:11

**far (9)**
20:20;52:10;55:16;56:15,
16;141:17;151:24;170:3;
188:16

**Faris (22)**
39:4;41:14,15,22;42:3,24;
43:4,5;44:1,2,6;45:15,19;
46:3,4,9;47:23;48:15,21;

49:11;61:20,21

**Faris' (1)**
44:19

**fashion (2)**
36:9;69:23

**favors (3)**
35:6;36:22;37:5

**February (5)**
72:17;74:2;76:22;80:9;
84:13

**Federal (5)**
86:20;87:20;118:11;
131:22;144:23;179:11

**fee (87)**
13:1;20:1,17;23:2,3;
24:12,12;32:14;35:15;
63:22;70:5;71:11,15,19,21,
22,24;75:15;76:10;77:22;
81:16;91:9;92:22;93:1,22,
23,24;94:13;95:3,17;102:5;
103:4;104:2,9,12;110:7;
115:1,5;116:21;117:3,20;
118:9,9,13;124:14,14;
125:21,22;132:10;133:4;
138:9;140:13,15,16,16,18,
24;141:4;142:4,10;144:21;
145:1;146:9;152:23;161:1;
162:4;165:9,16,18,18;166:1,
6,19;167:4,13,17;168:3,18;
169:1,19,21;170:1;171:21;
173:16;184:15;188:15,18

**feel (4)**
16:17;18:23;140:5;161:4

**feeling (1)**
36:8

**feels (1)**
36:12

**fees (58)**
13:3,8;22:5;23:12;24:13;
71:14;72:1,4,8;73:7;74:18,
19;75:15;76:8;81:20,20;
84:3;85:18,20,23;86:1;
87:24;88:2,13,18,24;91:4;
92:13,14;101:17;104:20;
105:21;116:16;117:12;
125:9;130:6;131:24;138:22;
142:19,22;144:14;145:8,13,
15,16,18;146:1,3,8,9,11;
161:1;168:10;172:14,14;
175:15;188:9,11

**fee-sharing (19)**
63:15;87:14;103:13;
127:14,20;129:17;130:4,9,
15;131:18;141:8;153:5;
154:8,13,20;175:15;185:9;
189:17,24

**felt (2)**
19:1;147:22

**Ferris (2)**
47:24;51:21

**few (1)**
10:21

**fiduciary (8)**

89:13,18;92:4,8;98:19;
132:13;154:9,12
**fight (1)**
13:2
**file (4)**
110:7,15;114:9;115:4
**filed (3)**
63:14;93:3;148:3
**filings (1)**
91:10
**find (18)**
12:13;27:6,17;38:20;
48:12;61:17,19;68:15;
70:17,20,23;71:1;125:14;
137:12;138:4;139:9;144:8;
169:1
**Fine (4)**
137:5;175:23;183:18,20
**finishes (1)**
35:11
**Firm (43)**
3:15;5:5;10:9;24:16;32:4;
41:19;42:19;43:9;44:13;
52:10;53:3;62:2,5;64:11,16,
22;65:9,10;66:16,21;71:4,6,
9,12;75:3,6;77:15;102:5,10,
17,21;104:18;117:6,6;
118:8;140:13,20;147:16;
160:22;161:20,20;165:19;
171:21
**firms (21)**
78:5;94:18,19;102:7;
112:14;117:14;139:23;
140:15,19,21;142:7,18,21;
146:10,11,12;152:5;168:5,7;
180:8;183:16
**firm's (1)**
104:18
**first (28)**
12:11;24:7;25:2;33:23;
36:12;39:7;45:1;51:3;54:17;
62:1;73:21;74:3,22;85:2,16;
110:10,19;115:8;118:7;
125:5;148:13;172:3;178:22;
179:10;181:21,22;188:22;
189:12
**fits (2)**
72:2;171:7
**five (1)**
171:2
**fleeting (1)**
51:10
**flows (2)**
143:22,23
**focus (3)**
18:2;120:3;160:17
**focused (6)**
17:22;112:3;149:1,2;
164:3,4
**focusing (4)**
119:24;122:18,19,19
**follow (2)**
96:15;139:23

**followed (1)**
146:13
**following (5)**
40:2;69:5;75:10;122:1;
171:11
**follow-on (1)**
50:15
**follows (1)**
47:21
**follow-up (2)**
53:13;55:20
**footnote (3)**
21:10,16;22:10
**forget (3)**
69:1;77:7;175:11
**form (5)**
29:4;121:4;178:11;
186:21;187:18
**formal (1)**
78:6
**formulated (1)**
129:18
**forth (2)**
16:7;77:21
**forward (1)**
93:5
**found (4)**
38:21,23;147:8;170:5
**frame (2)**
164:4;165:6
**framed (1)**
19:18
**fraud (1)**
35:9
**fraudulent (1)**
141:21
**free (1)**
140:5
**friend (1)**
49:16
**friends (1)**
47:23
**front (1)**
98:5
**fulfill (1)**
92:1
**fulfilling (1)**
92:4
**full (8)**
17:10,16,17,22;57:7,8,9;
177:19
**fully (1)**
95:17
**function (1)**
78:19
**fund (1)**
131:24
**further (5)**
53:5;100:23;102:21;
190:16,22
**future (3)**
50:1;56:21;129:15
**FX (1)**

142:5

# G

**garbled (1)**
139:3
**gave (4)**
19:20;25:5;62:13;69:1
**general (3)**
16:4;82:21;170:18
**generally (1)**
70:17
**gentleman (2)**
48:2,23
**George (1)**
81:6
**gets (7)**
102:4,5;118:9;167:20;
169:18;175:2;180:23
**GILLERS (8)**
5:7;16:15;122:13,17;
123:23;126:11;127:5;190:6
**Gillers' (2)**
68:8;124:2
**gist (2)**
52:8;60:4
**given (9)**
51:11;97:1;101:19;116:8;
144:20;150:1;177:12;
186:15;192:12
**gives (1)**
66:2
**GLASS (1)**
3:8
**global (2)**
107:9;108:15
**goes (7)**
18:9;46:4;85:22;140:10;
141:17;143:3,4
**Goldsmith (2)**
148:16;151:21
**Good (14)**
10:16,17;13:10;18:23;
39:4;48:5;49:1,6,16;60:17;
88:18;93:16;150:17;182:4
**granular (1)**
83:4
**Great (2)**
10:13;65:15
**greatly (1)**
96:4
**gross (1)**
92:13
**grounds (3)**
86:14;88:4;145:4
**grow (1)**
164:5
**guess (11)**
24:4;54:2;58:24;60:6;
64:3,12;67:19;89:4;93:10;
110:6;182:14
**guided (2)**
98:2;121:8

**guys (1)**
35:2

# H

**HALL (1)**
3:3
**hand (3)**
14:5;164:18,18
**handle (1)**
166:15
**handling (1)**
24:9
**happened (11)**
12:4;27:11;50:1;53:11;
54:10;55:3;56:21;72:18,19;
101:23;142:6
**happens (3)**
13:5;49:3,8
**happy (3)**
61:1;122:22;125:24
**HARLAN (1)**
3:20
**head (2)**
26:9;175:16
**hear (2)**
148:6;151:17
**heard (1)**
151:24
**hearing (11)**
90:24;91:1;95:3;101:16;
125:8;148:18,19;179:17,18;
185:3,4
**hearings (1)**
97:10
**heavily (1)**
184:17
**heightened (1)**
125:17
**HEIMANN (20)**
79:11;91:13;104:14;
105:7,11;107:2;114:20,24;
124:24;135:3;148:5,10;
151:17,23;162:24;163:7,11;
184:21;185:5;190:18
**help (10)**
26:17;29:6,12;30:22;
38:16;46:5;52:14;61:16;
65:11;102:1
**helped (4)**
19:9;26:2,24;41:16
**helpful (1)**
27:2
**helping (1)**
140:21
**henceforth (1)**
68:20
**hereby (1)**
192:7
**Here's (2)**
69:2,3
**Herron (46)**
25:13;26:1,15,24;27:6,23;

28:6,13;29:16;30:4,20;38:7;
39:1;40:15;41:19;42:2,3,17,
18;45:3,11,12,23;46:1,3,4,
19;47:23;48:14;49:5,15;
50:3;55:23;56:9;65:15;70:7;
71:20;77:23;82:3,6;87:15;
104:2;125:20;153:6;172:19;
174:22
**Herron's (4)**
22:18;27:16;56:10,22
**hesitant (3)**
59:2;64:4;157:13
**hesitating (1)**
78:15
**hesitation (2)**
29:24;66:2
**high (1)**
169:19
**higher (2)**
97:13;103:22
**hindsight (2)**
110:12;183:15
**hire (1)**
65:9
**Hold (4)**
54:14;130:24;165:14;
168:19
**holding (1)**
14:5
**Honor (2)**
96:6;105:8
**Honorable (1)**
12:14
**Hopkins (10)**
25:3,5;81:6,12,13,18,24;
82:3,5,10
**Hopkins' (2)**
25:3;82:17
**hour (5)**
13:12,12;168:22,23;170:3
**hourly (4)**
74:20;167:8,10,11
**hours (12)**
13:15,19;14:3;96:8;166:5,
6,10;167:3,4;168:4,20,21
**HP (1)**
33:14
**hundred (2)**
34:8,13
**HYLENSKI (3)**
5:6;126:16;155:9

## I

**idea (2)**
34:10;134:1
**ideas (1)**
34:18
**identification (9)**
11:13;14:17;33:19;47:5;
50:19;71:9;96:24;111:12;
128:7
**identified (4)**

120:5,9,16,18
**identify (5)**
10:2;70:6;71:20;140:22;
161:11
**identifying (2)**
71:4;122:14
**imagine (1)**
80:4
**immediately (1)**
69:7
**impact (3)**
112:5,9;160:4
**impacted (1)**
163:1
**imperfect (1)**
20:1
**implemented (1)**
69:23
**implicated (2)**
89:4;156:9
**implicit (1)**
65:14
**imply (1)**
97:13
**import (1)**
49:9
**important (5)**
122:14;161:16,24;162:10,
14
**imprudent (1)**
183:14
**imputation (1)**
175:4
**impute (1)**
176:23
**imputed (2)**
174:20;175:2
**inception (1)**
25:18;57:11;66:23
**include (3)**
86:20;99:18;107:10
**included (3)**
101:9;147:20;151:9
**includes (1)**
173:24
**including (11)**
74:17;99:23;100:5;116:7,
9;135:12;142:7;165:18;
172:14;177:20;184:3
**inconsistent (4)**
121:17;123:4;135:23;
173:1
**incorporated (2)**
51:4;125:15
**increase (1)**
86:1
**independent (4)**
87:9,12,20;88:4
**independently (1)**
179:3
**indicate (3)**
15:9;18:1;49:12;50:2;
72:4

**indicated (2)**
27:10;146:18
**indicates (2)**
48:10;66:8
**indication (3)**
26:20;92:3;160:12
**individual (7)**
134:21;136:6,13;146:20,
21,23;182:10
**individually (2)**
28:20;171:13
**individuals (1)**
59:12
**individual's (2)**
138:9,12
**ineffective (1)**
20:14
**infer (1)**
133:7
**inform (27)**
39:13;49:12;82:24;87:7;
98:11;113:15;114:2;119:3;
121:11;128:17;129:16;
143:18,20;145:12;152:12;
155:21;163:20;172:3;
173:22;174:10;177:8,18;
178:5,16;179:2,15;184:5
**information (20)**
83:4,18;90:2;110:9,14;
114:8;124:14,22;144:20,22;
146:2;152:22;153:19;154:1;
155:22;157:9;158:5;159:18;
165:8,10
**informed (18)**
11:23;72:7;73:7;78:3;
79:24;82:6,7,22;83:3,9,17;
85:8;98:13,24;121:14;
142:2;155:24;183:14
**informing (2)**
71:13;72:5
**informs (1)**
127:10
**initial (4)**
38:6;46:21;63:5;173:17
**Initially (8)**
15:18;22:22;24:1;25:23;
29:18;36:15;46:18;77:5
**initiate (1)**
29:16
**initiated (3)**
26:15;45:21;65:3
**initiates (1)**
46:9
**initiating (1)**
39:2
**initiation (3)**
25:11;39:7;41:15
**initiative (1)**
17:1
**in-person (5)**
23:7;58:5;62:19;63:11;
65:1
**inquiry (3)**

127:12;154:7;178:20
**inroads (1)**
47:18
**insisting (1)**
107:9
**instance (4)**
39:8,9;86:7;103:24
**instances (3)**
67:23;69:17;118:23
**instead (3)**
93:19;164:16;168:1
**institutional (20)**
35:9;38:15,17,19,21,23;
39:11;45:7,24;46:1,2;48:13;
53:4;54:17;58:1;61:17,18;
62:3;64:16,24
**insulate (3)**
31:5,16;32:8
**intended (1)**
164:15
**interaction (2)**
29:4;30:2
**interest (13)**
101:10;116:22;117:3,7,
17,24;118:8;135:15;137:14;
164:20;165:1;180:15,17
**interesting (1)**
31:9
**interests (7)**
93:7;101:7;112:21;113:4;
115:23;116:9;131:22
**interject (1)**
147:8
**intermediary (1)**
43:15
**internal (2)**
78:19;133:4
**International (1)**
3:5
**internet (1)**
17:15
**interpret (1)**
132:19
**interpreted (2)**
67:20,22
**into (21)**
20:18;40:23;47:18;62:21,
24;63:4;69:12;106:9;
109:11;113:13;123:7;
126:23;137:2;156:24;
157:15;158:2;166:1,18;
170:13;172:18;183:11
**introduce (1)**
45:6
**introduced (1)**
74:4
**introducing (1)**
29:18
**introduction (11)**
39:3;41:17;42:21;46:6;
48:15;51:19,20,21,23;61:1;
66:13
**introductions (2)**

38:17;45:23
**intrude (1)**
    169:15
**invested (1)**
    133:11
**investigated (1)**
    113:12
**investigation (3)**
    82:14;100:20;156:24
**investment (2)**
    133:5,9
**investments (1)**
    84:16
**investor (6)**
    35:9;38:19,21,23;54:17;
    61:18
**investors (13)**
    38:16,17;39:12;45:7,24;
    46:1,2;48:13;53:4;61:17;
    62:3;64:17,24
**invitation (1)**
    25:16
**invite (1)**
    27:6
**invited (3)**
    25:13;26:10;156:20
**involved (11)**
    36:3,14;37:18;38:3;41:13;
    81:17;102:8;106:4,16;
    169:24;188:18
**involvement (3)**
    25:7;38:6;75:5
**involving (3)**
    33:2;121:2;187:16
**irrelevant (2)**
    94:3,5
**issue (26)**
    12:19,24;24:11;31:9;
    58:15;62:20;63:12,15;64:4;
    65:2,5;69:15;86:12;97:1;
    109:3;110:13;120:1,5,10,17,
    18;122:14;157:15;164:11;
    167:19;178:10
**issued (1)**
    124:11
**issues (5)**
    12:20;18:24;21:4;121:22;
    164:5
**item (4)**
    33:15;47:6;74:3,14
**items (2)**
    15:11;16:1

**J**

**JAMS (1)**
    5:6
**Jeff (1)**
    12:23
**JOAN (3)**
    3:7;84:23;187:3
**joanlukey@choatecom (1)**
    3:10

**job (5)**
    55:24;56:4;68:1;122:24;
    186:16
**join (2)**
    188:8,11
**joined (1)**
    126:10
**joining (1)**
    188:15
**joint (16)**
    32:16;71:15;73:8;110:7,
    15;114:10;115:5;120:22,23;
    121:5;122:5,6;187:13,14;
    188:8,17
**jointly (1)**
    79:3
**Jones (16)**
    165:24;166:5,7,10,10,17,
    18;167:3,5,9;168:2,4,19,23;
    169:1,10
**Jones' (1)**
    167:13
**Josh (3)**
    10:7,8;126:19
**JOSHUA (1)**
    3:19
**Joy (15)**
    11:3,12,13;14:7,15,16;
    33:17;47:2;50:16;96:22;
    111:9;128:5;187:7;192:7,16
**Joy's (1)**
    21:17
**Judge (48)**
    48:11;52:4;87:23;88:1;
    89:16;90:11,13,21;91:10,14;
    92:3;93:5,16;94:7;95:7;
    98:17,22;102:6;103:17;
    114:20;116:20,20,22;117:7,
    17,24;118:7,12,13;124:11,
    12,17;128:18;134:10;
    135:14;139:19;164:14;
    181:14;182:10;184:24;
    185:18;186:5,8,12,15,17,21,
    22
**judges (10)**
    90:7;91:15,17,20,21;
    118:15,19;160:15;181:9;
    183:16
**judge's (4)**
    92:8,20;116:13;149:12
**judgment (2)**
    12:18;24:11;35:14;145:3
**judiciary (1)**
    189:21
**jurisdiction (1)**
    106:13
**Justice (1)**
    107:11
**justified (1)**
    116:16
**justify (1)**
    146:3
**justifying (1)**

146:8
**juxtaposed (1)**
    169:20

**K**

**keep (5)**
    83:2,8;85:8;112:3;170:24
**keeping (2)**
    84:15;115:24
**Keller (4)**
    10:4;53:20,22;190:24
**KELLY (3)**
    3:18;124:3;190:20
**kind (12)**
    16:10;45:12,13,14;63:11;
    68:24;78:5;80:5;130:8,15;
    165:4;173:16
**kinds (1)**
    42:9
**knew (9)**
    25:4;38:13;46:3;77:24;
    100:19,24;113:11;172:9;
    176:8
**knocking (1)**
    30:21
**know (150)**
    18:24;19:20;23:8;25:4;
    26:3;27:1,11,12,21;28:11,
    16,18;29:6,9,10,11;30:20,
    22,23;33:5;34:12,20;36:5,
    13;37:6;38:19;40:10;42:10;
    43:5,9;44:3,5;45:13;46:1,2;
    47:24;49:2,3,7,7,20,20;
    52:20;53:2,9,12,21,21;56:3,
    15;58:1;59:14;60:7,8,10,24;
    61:18,24;62:15,17;63:11;
    64:15,18;65:2,7,7,20,21;
    66:2,17,20,22,22;67:3,11;
    68:12;69:13,13,14,16,21;
    70:15;73:20;77:21;81:10,
    17,19,22;82:1,11;83:3,5,7;
    84:3;87:23;90:18,19;94:7;
    96:2;97:2,4;101:18,19;
    106:6,10,18;110:12;112:1;
    113:11;116:20,21;117:8;
    118:13,16,20;119:16,23;
    122:16;124:13;132:23;
    133:2,3,8,8,12;134:2;140:1;
    142:18;157:20;158:7,15,17;
    159:7,10;161:1,16;162:1,11;
    167:19;170:12;175:17,18;
    180:11,21;181:10;182:13,
    19;183:21,23;188:3
**knowing (6)**
    32:3,10;50:1;116:22;
    117:3,17
**knowledge (3)**
    81:4;188:7,10
**known (11)**
    25:1;28:16;30:4;90:1;
    93:23;98:12,22;105:2;
    107:24;110:14;121:12

**knows (4)**
    66:18,19;141:18;142:17
**Kravitz (1)**
    109:20

**L**

**Labaton (101)**
    3:4;5:4;14:2;15:9;16:8,
    16;18:1,21;19:7,11;25:10,
    13;26:3;29:18;35:4,8,12,23;
    37:15,21,22;38:1,14;39:8,
    12;41:16;42:22;45:3,5,21;
    46:6,18;48:12;49:17;53:19;
    55:6;58:9,11,12,20,23;60:8,
    11,12,19;63:9,24;64:20;
    65:18;66:13,19,22;72:16;
    73:3,17;75:9;76:11;78:21;
    79:4;80:6,17;81:5;82:13;
    84:15;85:8,18,24;87:13;
    101:24;102:1,4,10,17,21;
    120:9;134:17,19;136:2,2,8;
    137:2;138:7;141:2;148:17;
    149:23;152:5,8,12,14;
    171:24;172:2,19;176:2,20;
    177:8,13;178:5,16;179:2,15;
    183:3
**Labaton's (2)**
    25:6;35:14
**Labor (8)**
    106:1,12,16;107:1,10,17;
    108:2,8
**language (7)**
    35:22;71:17;73:1,12,19;
    130:10,17
**larger (1)**
    171:7
**last (2)**
    11:6;127:8
**later (8)**
    13:1;22:24;38:2;87:4,10,
    16;175:11;183:18
**Law (23)**
    3:15;5:5;10:9;18:18;
    24:16;31:13,15;42:19;43:9;
    53:3;62:2,5;64:16;66:16,21;
    87:6;112:14;140:13;142:18;
    152:4;161:20;180:8;183:16
**lawsuits (3)**
    99:10,24;138:14
**lawyer (56)**
    21:20;22:2,2,3,4;24:6,6,7,
    7,16;29:5,9,14;30:19,24;
    31:1,10,19;32:1;40:2;42:8;
    43:9,16;66:10;67:13,13,23;
    81:20;92:23;93:4;94:13;
    98:10,12,23,23;101:24;
    106:21;107:23;109:17;
    114:7;117:18;118:2;119:1;
    121:11,13;136:4,5;147:16;
    148:16;149:24;155:22;
    157:20;158:16;159:23;
    160:2;169:18

**lawyer'** (2)
21:20;22:1
**lawyer/law** (1)
32:4
**lawyers** (60)
16:16;19:7;26:2;27:22;
28:12,15;31:3;40:5;42:14;
63:9;64:22;71:11;90:12;
91:5;92:22;95:16;97:22;
100:9,11,11;101:11;104:13,
17,20;105:1,17;107:14,18,
19;108:24;109:6,16,18;
113:1,9,10,11,21;117:11,12;
118:1;119:2;121:5,7;123:8;
128:15,17;136:22;137:3;
142:11,19;149:17,23;154:3;
165:19,24;169:20;183:16;
184:17,19
**lawyer's** (5)
23:10;24:10;114:13;
142:4;146:22
**layers** (1)
189:21
**LBS017593** (2)
33:10,18
**lead** (12)
35:8,13;75:5;102:11;
107:15;119:2;152:5;171:24;
176:2,4,21,21
**learn** (2)
155:5,14
**learned** (1)
110:2
**least** (12)
28:15;37:13;40:13;45:9;
46:17;56:19;69:1;97:13;
136:21;157:17;188:2,3
**leave** (3)
53:7;123:3,5
**led** (3)
69:12;78:22;80:21
**left** (1)
131:4
**legal** (19)
24:19;28:19;29:6;30:23;
37:1;40:4;66:10;124:4;
138:1;160:14;172:2;177:8,
14;178:4,15;179:1,14;
185:15;186:2
**lengths** (1)
65:15
**less** (3)
163:3;166:9;169:21
**lesser** (1)
117:17
**letter** (18)
16:8;63:14;72:15,24;73:3,
6,17,21,22;74:2;76:14;80:6,
9,24;81:2;84:14,19;85:6
**letters** (1)
73:23
**level** (3)
31:22;45:2,4

**levels** (1)
44:22
**leverage** (1)
48:14
**Lewis** (9)
130:22;132:15,22;133:13;
139:12;140:1,2,11;141:5
**liability** (4)
12:19,20;128:6,10
**liaison** (1)
85:19
**Lieff** (4)
147:16;149:22;151:11,16
**life** (2)
72:13;180:24
**light** (2)
104:10;119:7
**likely** (5)
69:21;124:17,23;180:7,11
**limit** (2)
130:8,14
**limited** (1)
164:4
**Lincoln** (1)
111:10
**LINDA** (4)
5:6;10:11;126:14;155:11
**line** (13)
31:9,12;36:20;39:18;
47:13;48:21;60:20;64:12;
70:2;85:3;111:18;134:15;
187:11
**lines** (1)
49:24
**list** (5)
78:21;86:14;87:1,5;
135:10
**listed** (8)
77:16;116:5;117:20,21,
22;142:7,11,20
**listened** (2)
52:24;64:11
**literally** (1)
23:10
**litigated** (2)
12:1,17
**litigating** (1)
13:8
**litigation** (8)
16:18;74:18;76:15;86:3;
128:6,10;135:13;145:24
**little** (5)
64:4;68:2;96:9;164:6;
167:24
**live** (1)
84:11
**LLP** (2)
3:3,14
**lobby** (7)
135:13;149:4,10,10,11,14;
150:20
**local** (28)
22:24;24:2;36:16;52:10;

56:16,17;58:22,22;64:11;
67:1,3;85:19;86:21;87:22;
90:16;91:16;92:20;94:20;
103:15;118:16;127:12;
139:14,23;179:8,20;182:11;
189:14,20
**Lodestar** (5)
93:2;103:5;117:21;142:7;
160:1
**long** (1)
72:7
**longer** (2)
169:6;175:1
**look** (24)
11:4,15;12:12;16:21;
60:11,17;62:21;63:17;73:1,
22;75:9;79:22;102:5;104:8,
11;109:11;123:9;132:21;
133:1,13;137:2;140:4;
160:24;180:20
**looked** (11)
11:7;16:17;17:4,18;52:2;
68:15;113:12;123:7;158:16;
161:2;183:11
**looking** (12)
14:19;30:3;35:21;51:14;
64:6;75:12;102:6;128:8;
131:4;157:22;160:10;163:5
**loses** (2)
121:2;187:16
**lost** (1)
44:20
**lot** (7)
56:14;59:11;65:22;83:5;
102:22;160:14;170:13
**lower** (1)
47:10
**lubricated** (1)
170:24
**luck** (3)
48:5;49:1,6
**LUKEY** (180)
3:7;21:11;22:19;23:16,18;
24:21;26:18;27:18;28:9;
29:1,22;30:15;34:1,4;36:2;
37:3,10,16,23;39:15;40:17;
41:23;43:2,20;44:16;46:13;
48:17;49:14,18;50:7;51:2,9;
56:2,12,24;57:15;58:13;
59:20,23;61:4;62:7;63:2,20;
64:2;65:19;66:14;67:18;
71:2;72:22;75:17,22;79:5,8,
17;80:12;82:15,18;83:1,24;
84:8,24;88:6,14,20;89:7,19,
23;91:12;93:8,20;94:10,14;
95:9,20;96:6;97:1,17;99:1;
101:14;102:13;103:8,23;
105:5,13,22;108:4,11,16;
109:1;110:21;111:13;
112:11;113:6,20;114:16;
115:2,19;116:11;117:1;
118:5;119:10;120:11,13,15;
121:19,24;123:15,19,22;

125:3;128:19;129:4;132:20;
134:11,18;135:21;136:24;
137:20;139:15;142:13;
143:1,6,13;146:17;147:2;
148:11;150:10,22;152:9,24;
153:21,23;154:5,11,17,24;
155:17;156:2,21;157:12;
159:8;160:7,23;161:21;
162:6,12;163:22;164:1,7,12,
21;165:3;167:14;168:11;
169:3;170:10;172:6;173:9;
174:14;175:5;176:5,9;
177:1,22;178:8;180:4,18;
181:15;183:7,9;184:9,22;
185:6,19,22;186:6;187:6;
190:8,13,15
**Lynn** (1)
111:10

## M

**Madam** (7)
11:9;14:12;33:7;46:23,23;
50:10;128:3
**majority** (1)
158:12
**maker** (1)
141:18
**makes** (2)
62:4;122:4
**making** (9)
47:17;67:16;83:14;
108:19;113:22;132:23;
159:2;184:14,23
**Manner** (4)
131:17;141:7;144:15,17
**manual** (1)
145:24
**many** (9)
10:21;13:15;90:7;125:1;
157:18,19;169:17;183:15;
188:1
**March** (2)
14:6,16
**mark** (6)
33:8;46:24;96:20;111:5,8;
128:4
**marked** (14)
11:10,13;14:14,17;33:16,
18;47:4,7;50:18;79:17;
96:24;111:11;128:6,9
**market** (1)
68:1
**Mass** (2)
165:17;187:8
**Massachusetts** (17)
3:6,17;20:4,12,19,23;
32:13;93:21;94:22;95:22;
96:23;125:16;165:14;
167:15;172:15;178:21;
181:13
**MASTER** (222)
25:8,17,21;26:6,13;27:3;

28:2,22;29:14;30:9,16;31:4,
8,21;32:7,10;38:10;39:19,
22;40:7,11,22;41:4,10,24;
42:6,15;43:14;44:5,9,21;
45:1;54:14,16,19,24;57:6;
58:7,16,19;59:4,8,16,21;
60:2,23;61:7,13;62:11,16,
23;63:16,23;66:6;74:7;
76:16,20;77:8,11;78:7,24;
79:6,9,15,19;80:7,23;81:12;
82:10,16;90:4,9,21;91:3;
92:19;93:15;94:2,6,11;95:1,
15,21;96:9,13,18;97:5,12,
19;98:1,4,8,16;99:4,6,12,17,
21;100:5,8,18,22;102:9,16,
20,24;103:20;104:3,6,22;
105:9,16,24;106:11,15,20;
107:6,13,21;108:7,12,17,21;
109:4,14,22;110:23;111:7,
15,23;112:4,20;113:14,18,
24;114:6,17,22;115:4,22;
116:19;117:10,16;118:22;
124:7;134:14,23;135:6;
136:7,14;137:5,13,23;138:5,
11,19;139:2;147:7,14;148:7,
13;149:8,11,16,20;150:11,
16,19,23;151:1,19;152:1,15;
158:19;159:1,21;160:17,20;
161:13,23;162:8,17,22;
163:5,9;170:17,22;171:5,10,
19;172:20;173:3,20;174:3,9,
17;175:3,7,20;176:6,13,16;
177:4,17;178:3,14,24;
179:13;180:1,5;181:12,16,
22;182:8,16,23;183:8;184:2,
13;185:2,11;187:3;190:21
**material (12)**
98:11,20,22;99:3;114:8;
121:12;125:6,7,8;154:23;
155:1;157:21
**materially (2)**
35:3;141:18
**math (1)**
163:12
**matter (17)**
12:21;14:20;32:15;67:15;
75:7;82:21;83:10;85:12;
141:20;153:20,24;156:10;
157:14;168:2,4,20;179:23
**matters (5)**
15:19;55:17;56:15;75:2;
85:8
**may (33)**
22:3;26:21;36:11;49:19;
62:19;64:18;68:1;71:12,23;
72:1,8;75:6,17,18;76:9,13;
85:18;93:6;107:4;114:9;
124:3;134:12;143:14,15;
149:6;150:8;153:8;158:1;
161:22;164:13;169:8;
170:19,20
**Maybe (16)**
59:6;65:24;68:14;77:4;

78:19;79:11,21;104:23;
159:9,10,19;160:8;162:15;
182:17,18;183:19
**McEVOY (1)**
79:13
**mean (35)**
16:22;23:19,22;28:10;
29:3;34:10,17;36:4;37:12;
43:22;44:18;49:20;56:13;
57:3,16;58:9,24;59:10;
60:14;64:3;69:14;110:10,
16;111:2;115:6,13;129:5;
131:1;133:7;149:10;152:11;
158:1;161:2;168:6;186:14
**meaning (4)**
100:11;129:21;130:4;
146:8
**meaningless (1)**
49:22
**means (3)**
68:20;129:23;180:13
**meant (3)**
21:3;71:6;173:8
**media (3)**
180:9,12,23
**meet (10)**
26:3;43:8;44:12;53:1,14,
15;62:5;64:14;65:8,10
**meeting (27)**
22:18;26:2,8;27:1;43:12,
13;44:3;46:19,21;52:18;
53:24;54:8,11,18,20;55:4,
24;56:6,8,13,22;57:1,2;
59:15;63:6;64:21;65:16
**Melissa (1)**
46:24
**member (14)**
136:13;138:17;142:10,15,
16;153:8,22;155:5,14;
157:17,18;158:9;160:9;
164:24
**members (61)**
92:12;99:9,22;100:4,6,12;
101:10,12,21;106:5;109:6;
112:6,18,21;113:2,4,19,19;
114:3,4,13;116:2,10,14;
135:1;136:5,23;137:4,7,8;
138:6;142:24;143:4,5,12;
144:1,15,20;145:12,15;
146:15,21;147:18;152:6,13;
154:10;156:20;157:10;
158:3,6,13;159:7;160:18;
161:15;162:1,10;163:2;
165:8;178:7;179:3,4
**member's (6)**
152:22;153:14,17;156:19;
157:7;160:5
**memorialized (1)**
78:2
**memorializes (1)**
85:7
**memory (1)**
34:21

**mention (2)**
67:21,24
**mentioned (3)**
32:18;62:20;67:12
**met (5)**
14:2;111:2;115:13;174:7;
177:14
**MICHAEL (5)**
5:4,5;149:20;150:3,11
**middle (1)**
127:9
**might (20)**
29:12;43:10;48:1,4,24;
56:17;60:20;65:11;91:21;
96:7;112:8;117:7;133:7;
144:2;150:6;151:5;153:24;
160:4;162:9;175:10
**million (12)**
83:21;85:11;91:7;92:24;
93:11,12,18,19;102:4;
117:18;160:3;184:7
**mind (2)**
80:4;173:15
**minor (1)**
121:2;187:16
**minutes (3)**
126:6;167:21;171:2
**mislead (1)**
162:19
**misleading (1)**
141:19
**mismark (1)**
96:11
**misrepresentation (2)**
35:10;141:21
**missed (1)**
64:19
**mistaken (3)**
76:10;77:1;78:12
**misunderstood (1)**
75:17
**modified (1)**
76:14
**modify (1)**
171:16
**moment (4)**
30:12;50:24;51:10;111:16
**money (7)**
35:7;36:23;110:8;161:19;
164:15,18;165:2
**monitoring (19)**
25:15;26:12;29:19;30:3;
38:2,8;42:23;45:9;46:7;
55:9;63:6,8;64:1;72:24;
73:14;76:12;77:18;79:4;
80:15
**months (1)**
69:2
**more (18)**
40:4;41:12;49:20;59:14;
78:19;83:18;94:9;95:17;
117:24;120:6;123:10;129:2;
150:8;158:2;160:22;161:19;

167:11;175:9
**morning (2)**
79:18;185:20
**most (3)**
69:20;159:16;188:24
**motion (4)**
144:13,21;145:1,3
**mouthful (1)**
16:11
**movant (1)**
145:5
**much (7)**
102:7;111:24;148:23;
150:24;158:5;163:1,3
**multiple (1)**
133:10
**must (7)**
76:24;78:12,17;129:16;
144:18,20,23
**mute (1)**
161:8

**N**

**naked (1)**
93:23
**name (7)**
11:3;12:6;52:11;71:6;
77:6,16;172:11
**named (12)**
48:3,23;99:23;110:24;
111:2;115:12,13;116:2;
137:6;138:2,13,16
**names (1)**
189:6
**nature (10)**
28:17;30:1;83:4;97:16;
119:7;172:3;173:22;174:11;
177:9,19
**necessarily (1)**
174:2
**necessary (1)**
113:15
**need (9)**
11:18;48:19;49:2,7,20;
112:2;148:2;163:11,12
**needs (3)**
40:4;72:6;133:12
**negative (1)**
58:9
**negotiating (1)**
106:24
**negotiations (2)**
106:17;107:8
**neither (1)**
69:4
**Nevada (2)**
23:9;31:2
**New (12)**
20:8;53:3;62:2,5;64:15;
66:21;68:21;69:11;91:19;
118:18;189:22;190:4
**Newburg (7)**

144:4,19,21,24;145:21;
147:5;165:7
**next (9)**
40:18;52:2;53:11;96:19;
98:5;128:4;133:2;134:15,16
**NIXON (2)**
3:14;10:8
**nobody (2)**
95:5,5;102:4
**non-adversarial (3)**
95:14;124:21;188:13
**non-adversary (3)**
95:4;97:16;119:9
**non-disclosure (3)**
180:3,16;181:3
**none (2)**
94:22;137:11
**non-existent (1)**
20:21
**non-lawyers (2)**
21:7;67:9
**normally (1)**
69:24
**Northern (1)**
12:4
**Notary (1)**
192:24
**note (3)**
10:24;123:24;159:24
**noted (1)**
191:5
**notes (1)**
146:1
**not-for-profit (1)**
22:4
**notice (22)**
16:22;17:2,3,4;69:2;
87:13;112:17,18;138:20;
139:5,7;142:1,23;144:14,16,
18;145:11;152:7;156:20;
159:22;160:10;161:2
**notify (1)**
145:14
**November (5)**
97:9;148:19;149:5;
150:20;185:4
**nowhere (1)**
91:9
**number (4)**
44:22;107:18;135:1,12
**numerous (1)**
142:7

## O

**oath (4)**
60:22;163:10,12;192:9
**object (6)**
105:7;125:2;144:21;
152:23;153:14;165:9
**objected (1)**
153:9
**objecting (2)**

95:5;135:3
**Objection (158)**
22:19;23:16,18;24:21;
26:18;27:18;28:9;29:1,22;
30:15;36:2;37:3,10,16,23;
39:15;40:17;41:23;43:2,20;
44:16;46:13;48:17;49:14,
18;50:7;56:2,12,24;57:15;
58:13;59:20,23;61:4;62:7;
63:2,20;64:2;65:19;66:14;
67:18;72:22;75:22;79:5,8;
80:12;82:15,18;83:1,24;
84:8;88:6,14,20;89:7,19,23;
91:12,13;93:8,20;94:10,14;
95:9,20;97:17;99:1;101:14;
102:13;103:8,23;104:14;
105:5,13,22;107:2;108:4,11,
16;109:1;112:11;113:6;
114:16;115:19;116:11;
117:1;118:5;119:10;120:11,
13;121:19,24;123:15,19;
124:3,6,24;125:3;128:19;
129:4;132:20;134:11,18;
135:21;136:24;137:20;
139:15;142:13;143:1,6,13;
146:17;147:2;152:9,24;
153:21,23;154:5,11,17,24;
155:17;156:2,21;157:12;
159:8;160:7,23;161:21;
162:6,12;163:22;164:1,12,
21;165:3;167:14;169:3;
170:10;172:6;173:9;174:14;
176:5,9;177:1,22;178:8;
180:4,18;181:15;183:7,9;
184:9,21,22;185:5,6;186:6
**objections (3)**
95:6;109:15;124:8
**objector (4)**
58:8,10,15,18
**objectors (2)**
95:13;160:16
**obligated (1)**
108:1
**obligation (66)**
82:23;84:10,11,12;85:7;
88:9;91:11;92:5,9,11,16,21;
93:4,10,12,13;94:12,24;
95:16;103:12,22;104:1;
108:23;109:5;114:2,19;
115:17;119:2,3,12;127:14;
136:9,19;137:2,9,14,16,24;
138:1,20,23;139:1,4,9;
152:12;153:4,10;154:22;
172:2,17;173:21;174:5,10;
177:7,14,18;178:5,16;179:2,
6,15;182:16,17;183:3;
185:8;189:1
**obligations (5)**
84:6;90:22;136:3;143:24;
152:3
**obliges (1)**
136:3
**obtains (1)**

35:13
**obviate (1)**
82:23
**obvious (1)**
59:17
**obviously (2)**
41:12;127:24
**occurred (1)**
46:22
**occurring (1)**
184:12
**October (8)**
33:11;35:18;47:4,9;50:18;
78:9;79:7;173:7
**off (5)**
19:15,23;50:22;133:24;
161:6
**offer (5)**
52:13;175:14;180:19;
185:16;186:3
**offered (1)**
121:18
**offering (1)**
182:6
**office (4)**
23:10;27:23;28:12;52:11
**offices (1)**
39:4
**oftentimes (1)**
157:21
**Ohio (1)**
12:4
**old (1)**
72:9
**once (7)**
38:23;56:8;102:5;134:16;
136:7;156:11;180:23
**One (41)**
11:24;18:24;23:8;24:6;
25:12;28:10,15;33:6;46:15;
48:19;51:4,5;59:13;60:21;
65:24;73:2;75:5;77:15;
78:18;80:20;102:9;106:21;
107:14;118:21;120:7;127:4;
139:16;143:10;150:4,8;
151:3,23;154:13;164:17;
166:8;172:11;174:18,20;
175:11;176:19;185:20
**onerous (1)**
158:17
**ones (2)**
133:5;188:2
**Only (22)**
18:4;19:6,10;21:6;26:20;
29:24;67:8;71:12;77:15;
78:1,18;88:7;89:8;101:24;
102:2;104:7;106:9;120:14;
142:11;151:23;172:11;
188:12
**open (1)**
58:11
**Opening (2)**
59:8;187:11

**opine (7)**
92:17;106:7;109:3,9;
113:8;156:3;177:23
**opined (3)**
20:5,9;92:7
**opinion (46)**
11:23;13:13;18:7,12,15;
20:13,24;39:13;68:9;70:10;
71:18;109:10;112:6,13,17,
18,19;114:18;115:16,21;
116:12;121:18;127:11;
129:8;144:5;145:21;162:9;
163:20;165:14;171:16;
178:1,4,11,12,15;179:1,5,
14;180:20;181:1;182:6;
183:24;185:16,17;186:3,4
**opinions (9)**
18:21;19:2,12,15,16,17,
19;186:9,23
**opportunity (3)**
43:11;44:4;171:15
**opposite (1)**
27:16
**Orange (11)**
127:6,10,19;128:5,10,14;
130:16;133:22;139:12,18;
188:21
**order (25)**
86:22;90:7,16,17;91:22;
92:21;94:20,21;103:16;
104:7;110:17;115:7;116:24;
119:1;124:11;127:11,12;
145:17;154:7,7;178:19,19;
179:7,8,19
**ordered (1)**
164:15
**orders (5)**
86:22;91:20,23;118:15;
145:7
**organization (1)**
21:24
**original (4)**
56:17;72:15;73:13;110:4
**originally (1)**
66:23
**Others (7)**
21:19;26:1,23;27:24;43:6;
72:1;81:5
**otherwise (3)**
21:22;166:1,19
**out (33)**
12:3;16:22;27:5;30:6;
38:20,22,24;39:24;41:7;
43:1,18;44:14;61:3,9,19;
66:1;91:7;106:4;110:9;
123:3,6;125:21;127:21;
132:24;134:2;135:7;138:21;
139:5;142:23;143:3,4;
171:13;173:6
**outrageously (1)**
169:18
**outside (1)**
10:11

**over (12)**
13:2;44:7,11;45:17;48:3,
24;132:5;140:10;149:21,22;
151:2;179:22
**overlap (1)**
151:12
**overlapping (1)**
135:15
**overload (1)**
159:18
**overlooks (3)**
131:20;132:3,9
**overreach (1)**
132:14
**oversaw (1)**
39:5
**oversee (1)**
106:13
**oversight (3)**
44:7,10;45:16
**own (10)**
17:1;80:4;104:19;174:4,5,
7;180:24;183:13;186:21;
189:16
**owned (1)**
12:10

**P**

**packet (1)**
157:21
**page (46)**
15:3,5,9;18:9,10;21:13,
17;33:10,23;34:23;35:1;
47:10;50:15,15;51:2,6,8,15;
52:2;53:6;54:12;64:13;70:4;
74:12;79:16,20;85:2;86:11;
111:16,18;127:3,8,9;129:7,
8,10;130:19;131:1,2;140:7,
8;143:17;144:7,9;148:5;
165:13
**pages (5)**
51:16;55:23;64:7;75:10;
130:19
**paid (4)**
63:19,22;176:18,19
**paper (1)**
166:13
**papers (2)**
126:22;161:11
**Paragraph (13)**
22:6;35:1,21,23;36:12,20;
37:14,17;38:5;85:2,17;
127:8;133:2
**paralegal (1)**
74:21
**paralegals (1)**
75:1
**paraphrased (1)**
156:6
**paraphrasing (2)**
81:15,18
**parenthetical (1)**

37:2
**part (6)**
45:11;60:6;67:3;85:7;
94:12;177:5
**parte (6)**
97:22;98:10;121:4,7,11;
187:18
**participants (1)**
10:2
**participate (3)**
22:3;55:15;108:9
**participation (2)**
71:15;73:9
**particular (14)**
24:16;84:2;85:13;95:2;
106:21;120:3;128:23;130:8;
134:2;141:1;156:9,22;
158:3;174:24
**particularly (2)**
119:6;152:5
**parties (3)**
124:13,19;133:18
**partner (4)**
29:15;39:1;56:11;74:23
**partnership (1)**
142:21
**parts (1)**
175:8
**party (2)**
40:24;146:1
**passage (4)**
49:24;50:2,8;51:17
**passages (4)**
133:22;134:2,3,9
**passing (1)**
132:10
**patience (1)**
10:19
**Paul (12)**
48:3,23;49:5;51:18,22;
52:2;60:24;61:2,21,23,23;
62:4
**pay (7)**
21:21,22;22:4;91:7;92:23;
161:3;176:1
**payable (1)**
86:1
**Paying (4)**
21:19;22:6;86:6;164:17
**payment (13)**
63:17;83:20;85:11;88:12;
93:7;118:2;138:22;142:12;
158:22;159:5,6;162:1;183:4
**payments (2)**
21:6;22:11
**PEABODY (2)**
3:14;10:9
**peer (1)**
93:22
**pendency (1)**
142:2
**pension (1)**
39:6

**people (10)**
23:6;38:13;40:23;41:6;
60:15;151:13,15;157:19;
160:14;183:21
**percent (9)**
34:8,13;67:10;110:5;
162:4,23,23;171:21;176:1
**percentage (2)**
106:6;176:11
**perfect (1)**
34:20
**perfectly (1)**
183:18
**perform (2)**
90:22;91:11
**performed (2)**
83:21;85:21
**perhaps (1)**
27:24
**period (2)**
35:15;69:10
**permissible (1)**
72:12
**permit (1)**
78:4
**permitted (5)**
21:21,22;22:8;24:13;
140:24
**person (13)**
21:23;22:1;29:10;31:6,15,
23;42:12;45:5;57:23;60:12,
12;65:3;67:8
**Perusing (11)**
14:21;34:7;51:1,13;75:11;
80:1;85:4;111:20;140:6,11;
144:8
**Peter (10)**
11:3,13;14:7,16;51:14;
140:7;143:18;155:12;192:7,
16
**petition (29)**
13:1;91:9;93:2;95:3;
103:5,5;110:7,15;114:10;
115:5;116:3;117:20,21;
120:23,24;121:6;122:5,6;
142:6,10;145:1;146:10;
161:2;187:13,14;188:9,15,
17,18
**petitions (2)**
142:4;160:1
**phone (6)**
10:2;126:5,9,19,22;171:1
**phrase (1)**
72:3
**piece (1)**
166:12
**Place (7)**
3:5;54:1;71:23,23;76:22;
117:23;188:12
**placed (1)**
142:4
**plaintiff (2)**
176:4,22

**plaintiffs (8)**
10:6;111:1,2;115:12,14;
138:3;187:23;188:5
**plan (1)**
56:17
**plans (2)**
106:13;147:21
**play (2)**
63:1,4
**please (10)**
50:23,24;74:16,20;111:6;
114:21;122:11;124:8;
139:17;140:5
**pm (1)**
191:5
**point (14)**
13:16;19:2;25:12;26:9;
47:17;48:1;82:2;100:16,17;
113:23;120:2;124:4;127:21;
150:15
**policies (1)**
180:22
**policy (4)**
180:2,21;181:2;182:4
**political (3)**
34:11;35:6;36:22
**Pomerantz (2)**
140:20,23
**Popper (2)**
140:20,23
**portfolio (1)**
55:9
**portion (3)**
33:9;71:17;104:20
**portions (4)**
15:10;17:18,23;18:2
**portrayed (1)**
37:13
**position (7)**
93:11;123:4;178:1,12;
181:1;183:23;184:11
**positions (1)**
45:8
**possibility (1)**
153:9
**possible (1)**
79:2
**potential (1)**
32:5
**pre-2011 (1)**
68:5
**preceded (1)**
26:21
**precedent (9)**
86:23;87:22;94:21;
103:18;127:13;178:20;
179:9,22;182:11
**preceding (1)**
85:17
**predecessor (2)**
25:3;26:4
**pre-existing (4)**
27:21;28:4,13,23

**preliminary (3)**
148:18;160:13;179:17
**premise (1)**
141:6
**prepare (3)**
13:21;22:8;122:21
**prepared (3)**
11:6;170:5;186:11
**preparing (2)**
13:13,17
**PRESENT (3)**
5:3;120:22;187:13
**presented (3)**
55:6,8;120:1
**presenting (1)**
121:5
**presume (2)**
166:24;182:5
**pre-trial (3)**
99:14;116:6;136:16
**pretty (1)**
59:17
**prevailed (1)**
12:19
**prevent (1)**
21:24
**previous (4)**
41:18;51:4;76:2,6
**previously (6)**
36:15;37:9;51:17;74:4;
146:18;173:11
**primarily (1)**
75:4
**primary (3)**
92:10;106:23;107:15
**prior (6)**
25:6;27:12;68:11;72:23;
73:11;74:4
**privacy (2)**
159:13,15
**private (3)**
127:20;131:18;141:8
**proactively (1)**
38:24
**probably (2)**
11:7;69:14
**problem (2)**
29:11;123:10
**problems (2)**
29:7;30:23
**Procedure (7)**
86:21;90:18;118:12;
119:5;131:22;144:23;
179:11
**proceeding (9)**
90:23;95:4;97:16;98:10;
121:2,4,11;187:16,18
**proceedings (2)**
97:23;121:8
**process (1)**
160:14
**Product (2)**
128:6,10

**professional (18)**
21:23;22:12;24:10,15;
41:1,3;44:13,18;61:10;
66:11;84:7,9;95:23;96:23;
125:17;165:15,17;187:9
**PROFESSOR (35)**
5:7;10:20;11:14;14:4,6,
16,23;16:14;21:17,18;
22:14;23:4;33:20;47:11;
67:7;68:8;74:9;81:4;122:13,
17;123:23;124:2,10;126:3,
10;127:2,5;141:16;145:10;
152:20;163:18;164:14;
185:13;187:7;190:6
**programs (2)**
22:4,5
**prohibit (1)**
22:6
**prohibition (2)**
57:22;165:15
**prohibits (2)**
21:6;22:11
**promote (1)**
182:3
**proofed (1)**
19:8
**proposal (2)**
25:14;26:11
**proposed (4)**
69:2;74:17;75:1;160:11
**proposes (1)**
75:3
**proposition (1)**
70:14
**propounded (1)**
190:6
**protect (1)**
113:3
**protected (5)**
101:8,11;112:22;115:24;
116:10
**protecter (1)**
141:12
**protector (1)**
131:21
**prove (1)**
70:16
**proven (1)**
183:20
**provide (8)**
75:3;87:13;124:22;
125:24;145:6;152:7;190:10,
13
**provided (4)**
17:5;28:18;146:13;158:6
**provision (1)**
179:6
**prudent (9)**
183:2,4,8,11,12,22,24;
184:5,11
**public (10)**
44:11;180:2,14,15,17,21,
22;181:2;182:4;192:24

**pure (2)**
32:14;125:4
**purpose (4)**
39:11;45:8,22;63:17
**purposes (7)**
29:17;42:21,22;99:14;
116:7;136:16;138:7
**put (5)**
38:14;70:19;87:8;118:22;
158:19,22;176:10,14
**putting (5)**
24:10;30:12;41:7;65:22;
182:24
**puzzling (1)**
68:24

**Q**

**quadrant (1)**
47:10
**qualifications (7)**
24:15;25:14;26:11;73:16;
75:23;76:7;77:2
**qualified (2)**
32:5,11
**qualifiers (2)**
174:16,19
**qualifying (2)**
141:20;177:16
**quite (1)**
122:1
**quote (6)**
132:23;133:21;134:1;
144:9;146:4,6
**quoted (6)**
79:21;132:7;134:3,4;
145:20;165:7
**quotes (1)**
130:22
**quoting (2)**
22:15,16

**R**

**raise (4)**
58:6;95:5,6,15
**raises (2)**
93:16;98:16
**range (1)**
74:20
**rates (3)**
74:21;75:3;169:14
**Rather (3)**
22:12;120:21;158:17
**rational (6)**
142:9,14,17;143:10,14,16
**rationally (3)**
156:18;157:6,9
**re (3)**
127:9;128:5,9
**reach (1)**
27:5
**read (45)**

14:1;17:17;33:21;34:12;
35:22;36:19;55:23;57:7,9;
66:8,17;68:13;71:9;72:2;
75:8,19,21;78:17;80:7;92:9;
96:2,14,16;98:8;109:17;
111:17,21,23;112:2;115:5;
119:23;120:20,21,21;
122:12,16;127:16,23;
129:19;131:11;146:7;
147:11;156:6;157:21;192:8
**reading (8)**
34:5;49:4;50:21;69:24;
76:2;111:14;132:4;150:14
**reads (2)**
35:1;74:16
**real (1)**
110:13
**really (6)**
13:2;45:13;99:4,5;163:1;
169:18
**realtime (5)**
57:23;58:5;62:19;63:12;
65:4
**reason (5)**
78:1;118:7,7,10;159:9
**reasonable (9)**
71:16,24;104:10;144:14,
15,17;166:4;167:1,9
**reasonableness (1)**
131:23
**reasonably (2)**
160:4;164:24
**reasoning (1)**
182:7
**reasons (2)**
118:6;125:1
**rebuttal (5)**
14:8;123:22;124:2;128:1;
164:8
**rebutted (1)**
127:24
**recalculate (1)**
162:18
**recall (8)**
15:24;33:1;48:9;76:4;
77:3;84:17;122:13;145:21
**receive (9)**
13:12;19:15;142:11;
160:3;171:21;180:9,12,13;
184:7
**received (13)**
15:21,24;16:13,15;17:9,
12,12,22;19:10;23:1;160:21,
22;162:2
**receiving (1)**
161:19
**recent (1)**
188:24
**recently (3)**
11:5;48:2,23
**Recess (2)**
126:7;171:3
**recipients (1)**

142:2

**recognize (1)**
146:15

**recollection (6)**
73:19;77:15;79:23;82:9;
140:4;156:7

**Recommend (3)**
21:19;22:2;65:8

**recommendation (1)**
66:12

**recommended (1)**
105:10

**recommending (9)**
24:5;31:24;32:4;43:17;
63:24;64:5,20;65:6,17

**recommends (1)**
24:6

**reconvene (1)**
126:6

**record (20)**
21:16;28:3,11;29:20;
40:13;47:6;75:21;96:14;
98:9;126:9;133:24;134:24;
135:4;147:10;161:6;163:17;
171:4;183:2;192:10,11

**recovery (1)**
142:12

**refer (4)**
16:10;22:13;23:5;140:2

**reference (8)**
37:2;74:1,3;75:14;76:7;
84:15;122:5;132:7

**referenced (4)**
119:19;135:12;141:4,11

**references (2)**
68:8;135:1

**referencing (2)**
19:24;51:18

**referral (15)**
22:4;23:2,3,12;24:13;
32:14;63:22;71:4;75:15;
85:20;93:22,23,24;165:18;
172:14

**referrals (1)**
124:15

**referred (5)**
21:19;31:11;113:8;
140:17;152:4

**referring (15)**
37:7,9;38:6;72:6,20;
77:18;79:1;86:17;137:18,
21;138:12,15,17;149:15;
173:12

**refers (2)**
48:21;67:8

**reflective (1)**
36:11

**refresh (1)**
140:4

**refreshes (1)**
79:23

**refused (1)**
128:14

regard (2)
27:2;188:21

**regarding (3)**
33:13;156:19;157:10

**regardless (2)**
88:17;153:15

**regular (1)**
22:6

**reject (3)**
131:8,11;141:5

**relationship (64)**
25:9,19,22;26:15;27:7,22;
28:4,14,17,23;30:13;39:2,
10;40:12,15,20,21;41:1,3,
18,21;42:1,16;43:4,16,18;
44:1,14,18,19,20,23;45:2,10,
12,14,15,18,21;46:11;57:12;
58:12;59:19;60:11;61:11;
79:24;80:10,15,17;103:2;
146:20,22;152:17;172:4,8;
173:5;174:11,12,13;177:10,
20;178:17;179:16;190:5

**relationships (3)**
42:10;59:13;80:14

**relative (1)**
16:22

**relevant (14)**
11:22;17:23;33:9;49:19;
89:17,22,24;122:10;133:19;
134:5,9;152:22;153:13,16

**reluctant (1)**
165:6

**relying (2)**
60:13;184:16

**remains (1)**
89:5

**remember (7)**
32:21;34:20;46:15,20;
54:24;55:12;96:12

**reminding (1)**
33:3

**reminds (1)**
32:23

**render (1)**
112:13

**rendering (1)**
109:10

**repeat (1)**
186:1

**repeating (1)**
166:14

**replies (1)**
52:5

**report (39)**
10:24;13:11,17;14:1,5,6,8,
10,15,18,23;15:12,14;16:2,
14;18:18,22;19:5,6,22;20:1;
21:6,11,12,17;70:5;119:16,
19,22;122:12,22;123:23;
124:2;127:3,5;140:2;164:8;
180:8;189:8

**reported (1)**
12:3

Reporter (7)
11:9;14:13;33:8;46:24;
50:11;75:18;128:3

**represent (3)**
151:13,15,20

**representation (2)**
25:6;141:16

**representative (1)**
171:24

**representatives (7)**
99:24;100:13;114:12;
136:17,21;138:13,16

**represented (3)**
80:18;81:23;148:17

**representing (4)**
16:16;60:8;106:22;137:3

**request (15)**
15:15,17,21;17:2,3;62:4;
75:16,23;76:6;77:2;82:22;
84:5;91:24;103:17;165:9

**requested (1)**
146:3

**requests (2)**
41:7;90:20

**require (10)**
70:12;86:16;127:20;
139:23;154:19;155:21;
161:10;181:16,18;189:16

**required (14)**
70:6;71:20;75:6;88:22,23;
89:9;90:2,3;124:12;125:19;
128:17,21;154:1;155:24

**requirement (6)**
68:10;69:22;73:6;89:3;
179:24;182:18

**requirements (3)**
136:10,11;145:24

**requires (5)**
144:13,22,24;145:3;
189:23

**requiring (3)**
144:16;155:18;179:12

**research (9)**
70:2;120:6;122:23;126:1;
156:8;157:15;158:2;177:24;
178:10

**researched (3)**
92:8,18;125:11

**researching (1)**
18:18

**resolution (1)**
86:2

**resource (1)**
186:20

**respect (6)**
14:24;23:22;56:19;71:8;
143:8;155:23

**respects (2)**
121:3;187:17

**respond (1)**
30:5

**responds (1)**
47:21

response (4)
52:6;60:3;76:18;185:10

**responses (3)**
75:9,13;180:8

**responsibility (13)**
32:16;44:7,11;45:17;
85:24;89:11;90:12;106:24;
107:16;147:17,19,23;148:9

**responsive (1)**
54:4

**rest (1)**
147:10

**restriction (1)**
21:24

**resulted (5)**
12:3;77:17;80:5;170:1;
173:4

**resulting (1)**
172:12

**retained (5)**
58:3;64:1;73:17;80:20;
123:9

**retaining (1)**
46:17

**retention (16)**
16:8;46:22;63:9,14;72:15,
23;73:3,5;76:21;80:5,9,24;
81:2;173:4;174:4,6

**Retirement (2)**
16:9;44:11

**return (1)**
133:5

**returned (1)**
126:18

**review (1)**
15:16

**reviewed (4)**
15:10;22:23;32:19;33:6

**reviewing (1)**
33:13

**revisited (1)**
189:19

**RFQ (3)**
74:7;75:4;76:18

**Richard (2)**
163:10;190:17

**right (74)**
13:9,21;14:4,22;17:21;
19:14;20:11;21:5;31:17,19,
20;32:2,12;34:22;40:1,2,9;
47:10;51:14;52:23;67:15;
68:2;70:8;73:10,15;75:12;
76:1,5;80:1,2;81:1;86:8;
87:19,21;89:8;90:15;91:2;
98:3,5;102:10,12,19,23;
104:16;111:4;114:1;115:15;
122:9;123:2;125:6;126:3,8;
127:2,7;129:10;130:21;
131:4,16;132:12,17;141:13,
24;143:2;148:10;155:20;
157:1;166:12;167:2;168:16;
170:4;171:18;179:21;182:1;
190:6

**right-hand (3)**
130:20;131:1,6
**rights (3)**
159:15,16,17
**ring (1)**
34:9
**Rohrback (2)**
10:5;190:24
**role (18)**
19:12;27:17,20;37:13;
56:10,16,23;57:12;77:18;
79:2;98:19;106:1,19;
131:21,23;141:12;158:18;
186:19
**room (1)**
157:19
**Rosen (2)**
48:11;52:4
**Rudman's (2)**
150:4;151:4
**Rule (94)**
20:2,5,19;21:6,21;22:10;
67:8;68:6,11,17,21,24;69:2,
7,8,10,11;70:11,22;71:1;
72:9,10,11;87:22;88:3;90:7,
16,18,18;91:16;92:20;
94:21;95:24;97:3,8;98:2;
103:16,20;104:4;116:23;
118:11,11,24;119:4,23;
120:20;121:8,10;123:24;
124:19;127:12;128:16,21,
22,23;131:22;136:11;
137:24;139:13,14,19,24;
144:12,17,23;145:2,2,4,17;
154:6;156:7,15,23;158:3;
165:14,17;167:15;172:16;
178:18;179:8,20,23;181:5,
23,23;182:10,11,11;186:12,
16;187:12;189:14,15,23
**rule' (1)**
22:9
**rules (27)**
20:14;21:3;84:7;86:20,21;
87:11,20;92:3,6;95:22;
96:23;118:17;119:5;125:16;
146:14;155:21;156:1,4;
163:19;179:11;180:23;
182:18,20,24;187:9;189:19,
20
**ruling (1)**
129:15
**runners (1)**
23:5
**running (1)**
40:23
**runs (1)**
84:5

**S**

**Saggese (13)**
68:7,10,13,16,19;69:6,6,9,
12,22;167:19;172:22;173:2

**same (25)**
12:11;16:12;50:14;51:12;
60:18;69:9;71:12;72:11;
89:6;97:21;101:22;103:7,
10;104:17;118:7;121:6,22;
136:4;145:22;146:19,22;
151:13,15;165:19;179:6
**Sarko (3)**
109:20,21;111:10
**sat (1)**
56:8
**satisfactory (2)**
131:17;141:8
**satisfied (1)**
73:6
**Saturday (1)**
35:18
**saw (9)**
27:20,20;28:1;70:2;76:10;
77:17,20;78:22;95:12
**saying (25)**
30:21;31:13;35:11;60:9,
21,24;65:9;72:10;80:13;
84:20;115:1;117:3;130:1;
134:5;135:23;145:23;
150:10;153:11;159:19;
176:10,12;177:15,16;
183:19;186:22
**scheme (1)**
171:7
**scope (1)**
177:19
**SEC (1)**
107:10
**second (22)**
25:2;34:23;35:1;36:19;
39:8;51:5,7,15;73:22;80:21;
85:2,2;118:10;128:12,14;
129:24;130:7;175:13;181:7;
188:23,24;189:13
**secretary (1)**
22:8
**section (5)**
111:22;130:20;144:9;
145:22;148:6
**securing (1)**
38:7
**securities (2)**
42:20;74:18
**seeing (3)**
32:21;33:1;46:15
**seek (1)**
35:8
**seeking (2)**
58:11;146:1
**seeks (1)**
75:4
**seem (2)**
31:12;70:2
**seemed (1)**
169:19
**seems (4)**
36:6;97:19;150:14;183:13

**sees (1)**
29:9
**semi-sophisticated (2)**
143:4,11
**senator (28)**
26:17;27:1;39:4;41:14,14,
22;42:3,19,24;43:4,5;44:1,2,
6,10,19;45:15,19;46:3,4,9;
47:23;48:15,21;49:4,10;
61:20,20
**sense (3)**
18:4;23:15;36:11
**sent (2)**
33:11;78:9
**sentence (2)**
129:22;131:7
**separate (13)**
21:3,4;23:3,11;80:5,14,16,
24;81:2;168:5,6;173:12,16
**separately (5)**
13:4;20:15;139:16;
168:22;184:4
**September (2)**
111:11;142:3
**serve (3)**
29:19;46:7;85:19
**served (1)**
180:3
**services (9)**
22:3;28:19;37:2;42:11;
55:6;75:4;83:22;85:21;
145:8
**serving (3)**
27:20;38:1;42:23
**set (7)**
39:1;43:12,13;56:5,22;
57:1;175:18
**Setting (6)**
54:19,20;55:24;57:2;
64:21;124:21
**settle (3)**
156:14;157:2,11
**settled (3)**
12:20,23;83:13
**settlement (37)**
35:13;82:2,8;83:15;90:11,
24;92:11;95:2;97:15;98:18;
99:18;101:9;105:4;107:8,9;
108:14,15;112:10;115:3;
116:7;119:8;120:24;121:1;
122:7;137:9;138:21;148:24;
158:11;159:3;160:6,11;
184:15,16;185:3;187:14,15;
188:14
**several (3)**
12:10;86:14,15
**sglass@choatecom (1)**
3:11
**shall (2)**
98:11;121:11
**share (2)**
72:1;130:6
**shareholder (1)**

74:23
**shares (1)**
118:9
**sharing (11)**
24:12;71:22;81:16;117:4;
118:13;138:10;140:14,16,
24;141:4;142:19
**SHARP (4)**
3:19;10:8,8;126:20
**sheet (2)**
14:5;51:16
**shifting (1)**
81:11
**shooters (2)**
111:3;115:14
**short (1)**
170:21
**show (3)**
50:12;79:12;135:4
**showing (1)**
26:11
**shown (1)**
85:1
**shows (1)**
29:20
**shuffling (2)**
126:22;161:10
**side (3)**
130:20;131:1,6
**Signed (1)**
192:19
**significance (4)**
20:22;85:9,12;189:10
**significant (8)**
83:22;84:16;86:5,10;
112:9;123:13,16,17
**significantly (1)**
35:3
**silent (1)**
56:11
**silently (1)**
96:17
**similar (4)**
73:1,12,19,20
**simple (2)**
58:19;163:13
**simply (2)**
31:13;32:3
**single (3)**
20:13;160:22;161:19
**SINNOTT (57)**
10:1,7,10,15;11:9;14:12;
27:14;32:17;33:7;34:3;
46:23;50:10;51:7,10;65:13;
67:5;71:5;74:1;75:20;81:3;
82:20;84:22;96:20;109:21,
23;111:5;119:13,15;124:5,
9;126:5,8,14,17,21;127:1;
128:3;139:10;152:19;155:7,
11;161:7;163:14,16;164:9;
171:1,4;185:12,21;187:1;
190:8,12,14,17,19,23;191:2
**sit-down (1)**

65:15
**site (1)**
   17:16
**sitting (2)**
   149:21,22
**situation (5)**
   43:24;88:7;156:5;169:8;
   175:15
**situations (2)**
   87:17;169:20
**skills (1)**
   66:10
**skipped (2)**
   132:5,6
**slightly (1)**
   71:3
**Smith (14)**
   165:24;166:5,7,8,10,17,
   18;167:3,5,8,9;168:2,20,22
**so-called (1)**
   20:1
**sole (1)**
   85:24
**solely (1)**
   144:2
**solicit (1)**
   27:17
**solicitation (30)**
   28:8,24;29:8,13,21;30:6,8,
   10,17;39:14,17,21,24;41:9;
   42:5;43:1,19,23;44:15;
   46:12;57:13,20;58:5;61:3,9;
   62:6,20;63:12;65:1,4
**somebody (9)**
   23:9;24:8;27:7;29:5,9;
   30:22;43:15;91:8;183:19
**someone (3)**
   42:8;53:17;58:22
**sometimes (4)**
   13:5;93:23;183:20
**soon (1)**
   53:23
**sophisticated (1)**
   142:24
**sorry (9)**
   34:3;51:20;54:20;105:12;
   111:15;131:3;139:2;155:9;
   185:22
**sort (6)**
   27:22;34:11;36:8;61:10;
   157:22;161:4
**sought (3)**
   24:19,24;145:6
**sound (5)**
   37:8;57:13;58:7;111:4;
   115:15
**sounds (5)**
   49:4;57:17;65:23;107:3;
   167:20
**sources (1)**
   87:6
**Southern (3)**
   91:18;118:17;189:22

**speak (4)**
   88:8;121:22;140:3;184:20
**speaker (1)**
   126:23
**speaking (1)**
   124:8
**SPECIAL (223)**
   25:8,17,21;26:6,13;27:3;
   28:2,22;29:14;30:9,16;31:4,
   8,21;32:7,10;38:10;39:19,
   22;40:7,11,22;41:4,10,24;
   42:6,15;43:14;44:5,9,21;
   45:1;54:14,16,19,24;57:6;
   58:7,16,19;59:4,8,16,21;
   60:2,23;61:7,13;62:11,16,
   23;63:16,23;66:6;74:7;
   76:16,20;77:8,11;78:7,24;
   79:6,9,15,19;80:7,23;81:12;
   82:10,16;86:22;90:4,9,21;
   91:3;92:19;93:15;94:2,6,11;
   95:1,15,21;96:9,13,18;97:5,
   12,19;98:1,4,8,16;99:4,6,12,
   17,21;100:5,8,18,22;102:9,
   16,20,24;103:20;104:3,6,22;
   105:9,16,24;106:11,15,20;
   107:6,13,21;108:7,12,17,21;
   109:4,14,22;110:23;111:7,
   15,23;112:4,20;113:14,18,
   24;114:6,17,22;115:4,22;
   116:19;117:10,16;118:22;
   124:7;134:14,23;135:6;
   136:7,14;137:5,13,23;138:5,
   11,19;139:2;147:7,14;148:7,
   13;149:8,11,16,20;150:11,
   16,19,23;151:1,19;152:1,15;
   158:19;159:1,21;160:17,20;
   161:13,23;162:8,17,22;
   163:5,9;170:17,22;171:5,10,
   19;172:20;173:3,20;174:3,9,
   17;175:3,7,20;176:6,13,16;
   177:4,17;178:3,14,24;
   179:13;180:1,5;181:12,16,
   22;182:8,16,23;183:8;184:2,
   13;185:2,11;187:3;190:21
**specializes (4)**
   53:3;62:3;64:16,23
**specific (11)**
   55:13;72:5;81:8;84:14;
   103:17;122:5;127:11;
   136:17;144:18;176:11;
   179:23
**specifically (16)**
   14:24;21:9;70:6;71:19;
   78:2;81:7;82:5;90:19;95:23;
   100:12;101:4;116:2;131:7;
   141:5;142:20;144:7
**specify (1)**
   145:3
**speculate (1)**
   165:6
**speculating (2)**
   56:20;162:14
**speculation (3)**

125:1,4;165:5
**speculative (1)**
   164:22
**spelled (1)**
   173:6
**spend (1)**
   135:6
**spent (4)**
   13:12,16;35:7;36:23
**split (1)**
   35:14
**splitting (3)**
   24:13;140:16,18
**spoken (1)**
   121:23
**ss (1)**
   192:4
**staff (1)**
   74:23
**Stamped (1)**
   33:18
**stand (2)**
   123:11;175:18
**standing (18)**
   86:21;90:7,16;91:20;
   92:21;94:20;103:16;104:7;
   116:24;118:14;119:1;
   124:11;127:11;174:3,4,7;
   178:19;179:7
**start (6)**
   19:23;137:15;151:1;
   155:12;166:15;183:5
**started (2)**
   39:10;180:10
**Starting (1)**
   140:8
**starts (4)**
   33:14;54:12;111:17;
   140:10
**state (21)**
   20:4;21:5;26:17;39:6;
   72:13;74:20;75:2;130:5;
   141:19;142:5;145:5;149:17,
   24;150:5;151:4;187:20,23,
   24;188:8;192:3,24
**stated (2)**
   19:1;36:15
**statement (14)**
   15:1,7,8,18,20,22;18:5;
   48:20;79:16,20;141:16;
   143:21;185:14,24
**states (7)**
   21:17,20;22:15;35:20;
   121:10;128:11;144:22
**stating (1)**
   141:17
**status (1)**
   74:21
**statute (1)**
   145:4
**statutory (1)**
   67:16
**steer (1)**

23:9
**steering (1)**
   31:2
**STEPHEN (2)**
   5:7;16:14
**Steve (1)**
   47:24
**STEWART (1)**
   3:3
**stick (1)**
   137:6
**still (10)**
   26:9;39:16,20;43:10,23;
   46:14;74:6;78:15,16;103:6
**stopped (1)**
   50:22
**straight (4)**
   67:6;111:3;115:14;169:7
**straightforward (1)**
   35:5
**Street (8)**
   3:16;72:14;142:5;149:17,
   24;187:20,23;188:8
**Street's (2)**
   150:5;151:4
**Street-type (1)**
   187:24
**strike (3)**
   74:2;133:16;153:15
**STUART (1)**
   3:8
**subject (2)**
   19:3;33:12
**submission (2)**
   14:20;16:15
**submit (3)**
   25:14;26:10;104:18
**submitted (6)**
   13:1;73:15;101:17;
   116:17;117:5;184:18
**submitting (1)**
   146:2
**subscribed (1)**
   192:19
**subsequent (9)**
   26:8;63:7;77:1;78:13;
   80:3;82:1;173:13;189:18
**substantially (1)**
   35:3
**substantiated (1)**
   101:18
**substantive (2)**
   55:17;56:15
**success (1)**
   47:17
**Successful (4)**
   13:7;35:12;54:18;86:2
**successfully (2)**
   12:1,16
**Sucharow (4)**
   3:4;5:4;46:18;85:18
**Sucharow's (1)**
   85:24

**sufficient (8)**
32:8;144:20;145:11,14;
146:2;165:8,10;184:19

**suggest (3)**
47:22;127:18,19

**suggested (1)**
190:9

**suggestions (1)**
19:16

**suggests (2)**
44:3;190:4

**suit (4)**
121:1,1;122:7;187:15

**sum (2)**
166:3,24

**summary (4)**
12:18;150:1,5;151:5

**Summer (1)**
3:16

**supersede (1)**
82:23

**superseding (2)**
189:4,11

**supplemental (1)**
122:22

**supported (2)**
15:13;17:19

**supporting (1)**
140:19

**supports (1)**
71:18

**supposed (3)**
62:8;90:22;91:10

**Supreme (5)**
12:22;172:21;173:1;
178:22;179:10

**sure (27)**
24:23;26:21;36:4,7;37:4;
38:9;43:11;55:12;75:20;
84:21;88:15,16;97:8;
100:16;102:19;129:5;132:4,
9;149:14;150:18;157:19;
162:7,16;169:5;170:2,22;
182:13

**surprised (2)**
125:13,23

**suspect (2)**
67:24;122:15

**swear (1)**
53:20

**System (3)**
16:9;44:12;78:4

## T

**talk (11)**
42:8;48:1;52:21;68:2,7,7;
94:13;110:19;115:8;146:7;
172:13

**talked (5)**
43:22;65:21;148:8;155:1;
172:23

**talking (12)**

23:20;40:23,24;55:18;
57:21;94:17;101:8;133:1;
147:17;155:2;167:17;
173:10

**talks (5)**
37:5;66:20;79:1;125:6;
133:2

**taught (1)**
169:17

**taxable (2)**
146:3,8

**taxicab (5)**
12:2;23:8;31:2,7;67:23

**Teacher (1)**
86:2

**Teachers (4)**
16:9;48:4,24;86:5

**telephone (9)**
3:19,20;10:12;53:24;65:3,
4,24;77:6;80:3

**telephonic (1)**
63:12

**Teleprompter (5)**
130:23;132:16,22;133:13;
140:12

**telling (4)**
24:7;49:5;60:10,18

**ten (6)**
166:5,10;167:3,20;168:4,
19

**tentative (2)**
19:2,20

**term (1)**
58:10

**terms (16)**
16:4;24:3,5,22;57:21;
63:4;101:17;112:16;117:4,
5,8;138:8;140:11;145:7,17;
163:2

**testified (5)**
107:23;108:10;114:7;
124:10;186:12

**testify (2)**
83:11;186:11

**testifying (1)**
175:21

**testimony (19)**
13:17,22;38:11,18;56:5;
61:15;66:7;82:11,17;
104:24;105:8;107:18;
109:19;123:2;170:19;171:6;
186:14;192:8,11

**Thanks (3)**
10:13;155:11;191:2

**thereto (1)**
103:21

**thinking (7)**
76:21,24;77:3,19;78:8,11;
158:14

**third (3)**
34:24;68:23;151:7

**third-year (1)**
74:22

**Thornton (8)**
3:15;5:5,5;10:9;149:21;
150:3,12;151:2

**thorough (2)**
122:24;156:24

**though (5)**
24:2;67:24;82:4;114:6;
174:24

**thought (14)**
19:21;51:11;54:15;68:14;
76:10,12,24;78:13;122:16;
123:6;134:4;158:17;173:11;
183:18

**three (7)**
51:16;69:2;75:10;116:4,4;
136:15;188:2

**throughout (1)**
123:1

**Thus (2)**
22:3;121:6

**Tim (10)**
29:16;39:1;47:22,22,22;
48:2,14,23;49:5;51:24

**timekeeper (1)**
74:21

**times (3)**
123:10;169:17;183:21

**titled (1)**
21:19

**today (5)**
13:6,22;186:13,15;190:3

**today's (2)**
68:1;170:2

**together (9)**
20:6,9,24;45:4;80:8,11;
91:17;118:20;172:10

**told (20)**
48:2,22;52:1,9;53:2;54:7;
61:9;62:9;64:14;65:2;100:1,
4,10,13;101:12,13,13;112:7;
113:9;135:14

**took (1)**
76:22

**top (1)**
33:10

**Total (6)**
13:18;71:15,24;86:6;
104:9;116:21

**totally (2)**
18:24;90:5

**touch (1)**
38:15

**tout (2)**
31:11;37:8

**touts (1)**
23:5

**toward (1)**
48:22

**traditional (1)**
23:15

**transcript (10)**
17:22;50:14;57:8,8,10,10;
150:15,20;192:8,9

**transcripts (5)**
17:10,10,16,17;18:2

**treat (1)**
124:20

**treated (2)**
49:11,15

**trial (4)**
12:17;83:10,14,15

**tribunal (9)**
97:22;98:11,13;120:23;
121:7,12,13;122:6;187:13

**tried (1)**
122:24

**trigger (3)**
88:1;94:12,23

**triggered (2)**
87:18,19

**true (8)**
32:13;57:19;64:9;66:4;
105:11;177:19;192:10,12

**truth (1)**
141:17

**try (8)**
23:9;48:4;49:1,5;52:20;
171:6,12;175:14

**trying (11)**
23:6;50:3,4,5;59:7;70:15;
151:12;161:4;169:5;175:21;
176:7

**turn (1)**
145:2

**twice (1)**
14:1

**Two (24)**
3:5;14:3;33:2;45:4;54:2;
65:24;80:14;96:8;99:10,13,
24;118:6;136:18;137:7;
138:3,13;143:8;150:7;
151:6;165:24;174:19;175:8;
188:3;189:20

**type (3)**
40:21;140:16;147:3

**typical (1)**
83:7

**Typically (1)**
117:13

**typographical (1)**
19:8

## U

**ultimate (2)**
68:21;71:24

**ultimately (3)**
53:14;76:14;80:18

**unaware (1)**
128:24

**under (33)**
20:2,18;60:22;72:9,11;
84:6;103:15;113:4;119:4,5;
131:17,22;136:11;137:16,
24;141:8;156:14;163:10,12;
164:4;167:15,17;168:10,24;

169:21;170:2,4,7;171:20;
172:7;175:17;187:11;192:9
**underlying (4)**
16:18,20;18:18;188:13
**understood (4)**
38:22;66:24;70:16;77:22
**unfortunately (1)**
12:14
**United (1)**
128:11
**Universal (2)**
12:9,11
**unless (6)**
89:24;135:4;158:9;
173:23;185:16;186:3
**unlike (1)**
13:5
**unlikely (1)**
169:15
**unsophisticated (3)**
142:16;143:3,11
**up (32)**
12:12;13:16;19:22;29:5;
36:18;43:12,13;46:17;52:2;
54:18,19,20;55:24;56:5,22;
57:1,2,19;60:20;64:21;70:3;
84:11;108:13;120:1,7;
126:1;129:11;154:3;165:13;
184:20;186:15;189:20
**upon (10)**
86:2;112:9;172:2;177:8;
178:5,16;179:2,15;184:17;
190:2
**use (8)**
35:8;42:11;45:4;58:16;
69:8;145:17;148:7;182:14
**used (8)**
35:23;36:5,5,9;139:20,20;
151:19,22
**useful (1)**
79:12
**uses (1)**
23:9
**using (3)**
36:10;43:14;66:10
**usual (1)**
22:5
**usually (1)**
169:19

**V**

**valid (4)**
88:13,18;166:1,19
**various (10)**
12:2;15:10;101:2;104:17;
112:14,15;134:3;146:10;
180:22;187:22
**vast (1)**
158:12
**verbally (1)**
19:1
**verify (1)**

15:12
**versus (8)**
12:8,23;130:22;132:15,
22;133:13;140:12;189:5
**Via (4)**
3:19,20;65:3;77:5
**view (12)**
28:7;89:15,20,21;90:1;
108:22;114:14;135:18;
152:2;171:11;172:1;182:4
**violate (2)**
70:24;84:10
**violated (1)**
70:22
**violation (1)**
20:16
**vision (1)**
149:14
**Vitae (1)**
11:12
**vouching (1)**
24:14

**W**

**wait (1)**
129:23
**waiting (1)**
10:19
**waive (2)**
159:14,16
**waived (3)**
128:22,23;139:20
**waiver (2)**
129:2,6
**wants (4)**
83:5;84:10;118:13;186:16
**water (1)**
170:24
**way (19)**
34:24;51:20,23;59:24;
67:14;70:20;72:11;78:16;
94:15;95:16;104:17;109:15;
117:8;118:3;119:24;120:7;
155:5,14;182:21
**website (1)**
142:5
**week (2)**
11:7;54:2
**welcome (6)**
33:20;57:9;126:4;127:2;
163:14;170:16
**well-informed (1)**
181:2
**well-meaning (1)**
183:15
**weren't (3)**
69:17;71:3;134:21
**What's (14)**
60:9,16;62:15;70:9;89:9,
9,11;110:21;114:20;117:9;
135:12;162:14;183:24;
185:8

**whatsoever (2)**
40:20;119:4
**whole (2)**
33:21;134:20
**who's (12)**
31:1;43:16;81:17;117:18,
19;118:2;147:16;149:21,22;
150:10;159:11,13
**whose (2)**
14:5;77:6
**willing (1)**
53:10
**within (6)**
30:13,19;54:2;97:20,20;
139:13
**without (9)**
32:14;50:1;56:20;84:19;
89:2;94:9;127:11;134:23;
184:7
**witness (189)**
14:18;25:12,20,24;26:7,
19;27:9;28:10;29:2,23;
30:18;31:6,18;32:2,9,12;
39:16,20;40:1,9,18;41:2,5,
21;42:4,7;43:3,21;44:8,17,
24;46:14;54:22;57:16;
58:14,18,21;59:6,10,24;
60:6;61:5,12;62:8,14,18;
63:3,21;64:3;66:15;74:5;
76:19,23;77:9,12;78:10;
80:1,13;81:1;82:19;90:6,15;
91:2,14;93:9,21;94:4,15;
95:10,19;96:2,12,15;97:11,
18,24;98:3,7,15;99:2,5,11,
15,19;100:3,7,15,21;101:15;
102:14,19,23;103:9,24;
104:5,15;105:6,14,23;106:3,
14,18;107:3,12,20;108:5,19;
109:2,8;111:14,19;112:1,12;
113:7,17;114:5;115:20;
116:12;117:2,13;118:6;
119:11;134:19;135:22;
136:12;137:1,11,21;138:4,8,
15,24;139:8;147:13;149:6,9,
13,19;150:8,13,17,24;
152:10,18;158:24;159:9;
160:8,19,24;161:9,22;162:7,
13,20,21,23;170:20,23;
171:9,18;172:7,23;173:10;
174:2,6,15,18;175:9;176:10,
14;177:2,12,23;178:9,18;
179:5,21;180:6,19;181:18;
182:1,13,17;183:10;184:10,
23;185:7,21;186:20
**Wolf (6)**
89:16;134:10;164:14;
181:14;186:12,15
**Wolfram (4)**
21:18;22:14,16;23:4
**woman (1)**
77:6
**wondered (1)**
68:13

**word (13)**
36:5;58:15,17;67:7;
129:22;131:15;139:20;
148:6,8;151:17,20,22;
182:14
**worded (1)**
72:10
**wording (1)**
69:9
**words (5)**
81:8;130:4,5;132:19;
135:15
**work (28)**
21:23;22:12;24:9;42:20;
80:21,22;91:8;102:22;
103:3;104:21;159:11,13,24;
161:18;162:3;166:3,4,5,6,9,
22;167:1,3,4,21;171:22;
176:22;177:21
**working (14)**
19:7;32:15;53:2;62:2;
64:15,23;65:11;66:16,21;
81:21;106:4;164:3;168:2;
172:10
**works (3)**
168:4,19,20
**worth (1)**
167:21
**wrapping (1)**
165:13
**writing (7)**
13:16;18:15;68:9;69:21;
70:21,24;71:7
**written (4)**
12:13;16:14;20:14;78:14
**wrong (4)**
82:5;119:18;122:12;
163:18
**wrote (3)**
18:12,22;19:5,6,21;
119:22;128:1

**Y**

**Yep (1)**
34:6
**yesterday (1)**
14:3
**York (9)**
20:8;53:3;62:2,5;64:15;
66:21;91:19;118:18;190:4

**0**

**02110 (1)**
3:6
**02110-2131 (1)**
3:17

**1**

**1 (2)**
11:11,12

**1.2 (2)**
155:21;163:19
**1.2A (1)**
156:15
**1.4 (2)**
155:21;163:19
**1.5 (1)**
68:21
**1.5a (3)**
167:12;169:7;170:4
**1.5a's (1)**
165:15
**1.5e (24)**
20:2,5,13,17,18;30:11;
68:3,20;71:10,18;72:21;
73:2;136:11;137:16;138:7;
165:17;167:17;168:10,17;
169:7;170:7;172:16;174:7;
190:5
**1.5es (1)**
72:10
**100 (2)**
3:16;67:10
**12 (3)**
47:14;129:8,12
**13 (5)**
15:5,10;18:9;74:12;79:7
**14a (9)**
95:24;96:11,12;119:7,19,
21;121:17;125:16;187:12
**15 (3)**
126:5;149:5;150:20
**150,000 (2)**
166:7;167:5
**16 (2)**
49:24;97:9
**17594 (1)**
33:18
**18 (6)**
21:10,16;22:10;33:11;
35:18;48:21
**19 (1)**
64:12

---

## 2

**2 (9)**
14:14,15,23;15:3;18:7;
47:4,9;50:18;185:4
**20 (4)**
21:13,17;171:21;176:1
**20/20 (2)**
110:12;183:14
**2008 (6)**
76:18;77:1;78:9;79:7;
173:7,24
**2011 (5)**
68:11;72:17;76:22;80:10;
84:13
**2012 (2)**
149:5;150:20
**2014 (2)**
33:12;35:18

**2016 (2)**
97:9;142:3
**2017 (4)**
47:4,9;50:18;111:11
**2018 (3)**
14:6,17;192:20
**21 (1)**
49:24
**216 (1)**
128:11
**23 (2)**
111:18;144:17
**23e (1)**
131:23
**23h (2)**
144:24,24
**23h1 (1)**
144:12
**26 (2)**
14:6,16
**26e (1)**
189:15
**29 (1)**
70:4

---

## 3

**3 (3)**
33:16,17;119:17
**3.3 (6)**
88:3;95:24;103:20;
119:17;124:19;187:12
**3.3a (2)**
119:17;120:17
**3.3d (10)**
98:2,5;103:21;119:19;
121:9,10,17;123:24;125:6,
15
**31 (1)**
86:11
**33 (2)**
47:10;51:15
**34 (5)**
50:15;52:2;53:6;64:7,13
**35 (1)**
53:6
**36 (1)**
54:12
**37 (1)**
64:7
**39 (2)**
127:3,8
**3a (1)**
122:18

---

## 4

**4 (2)**
47:2,7
**4.1 (2)**
93:11,12
**4:25 (1)**
126:6

**41 (3)**
140:8,9,10
**42 (2)**
140:9,10

---

## 5

**5 (7)**
50:16,20;74:5;130:19,20;
131:1,2
**5.10 (2)**
74:14;75:13
**5:51 (1)**
191:5
**50 (1)**
143:17
**50,000 (2)**
166:7;167:5
**500 (5)**
166:6,11;167:4,6;168:20
**51 (2)**
144:7,9
**52 (1)**
143:17
**54 (2)**
145:2;165:13
**54d (5)**
90:18;103:15;118:12;
145:2,17
**55 (1)**
162:23
**56 (1)**
18:10
**593 (1)**
33:23

---

## 6

**6 (2)**
96:22;187:8
**60 (2)**
162:4,23
**617-248-5000 (1)**
3:9
**617-345-1065 (1)**
3:21

---

## 7

**7 (1)**
111:9
**7.2b (12)**
20:5,13;21:6;30:14,19;
31:16,22;32:8;57:21;62:24;
67:8;190:5
**7.2b5 (1)**
30:11
**7.2c (1)**
20:19
**74 (1)**
111:18
**75 (1)**
111:16

---

## 8

**8 (8)**
79:16,20;84:13;111:11;
128:5,9;129:8,10
**8.4c (2)**
120:18;122:19
**8:25 (1)**
144:10
**80/20 (1)**
35:15
**818 (1)**
128:10

---

## 9

**9 (1)**
110:5
**9:15 (1)**
35:18
**95 (2)**
13:18,19