# EX. 228

**Hal Lieberman**

1

```
                              Volume:  1
                              Pages:  1-136
                              Exhibits:  1-3

                    JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

-----------------------------------------------X

In Re:  STATE STREET ATTORNEYS FEES

-----------------------------------------------X


                        620 8th Avenue
                        New York, New York

                        April 4, 2018
                        1:27 p.m. to 4:02 p.m.



B E F O R E:

     Special Master Honorable GERALD ROSEN,
     United States District Court, Retired

MELISSA GILMORE, Reporter



                    DEPOSITION OF

                    HAL LIEBERMAN
```

Page 2

```
1  A P P E A R A N C E S :
2
3  BARRETT & SINGAL
4  On Behalf of the Special Master
5       One Beacon Street, Suite 1320
6       Boston, Massachusetts 02108-3106
7  BY:  WILLIAM F. SINNOTT, ESQ.
8       ELIZABETH J. McEVOY, ESQ.
9       617-720-5090
10      wsinnott@barrettsingal.com
11      emcevoy@barrettsingal.com
12
13
14  JAMS
15       150 West Jefferson, Suite 850
16       Detroit, Michigan 48226
17  BY:  THE HON. GERALD ROSEN (Ret.), ESQ.
18       313-872-1100
19
20
21
22
23
24
```

Page 4

```
1  A P P E A R A N C E S :  (Cont'd)
2
3  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
4  On Behalf of Lieff Cabraser
5       275 Battery Street, 29th Floor
6       San Francisco, California 94111
7  BY:  RICHARD M. HEIMANN, ESQ.
8       ROBERT L. LIEFF, ESQ.
9       415-956-1000
10      rheimann@lchb.com
11
12
13  KELLER ROHRBACK, LLP
14  On Behalf of ERISA Plaintiffs
15       1201 Third Avenue, Suite 3200
16       Seattle, Washington 98101
17  BY:  T. DAVID COPLEY, ESQ. (Via telephone)
18       206-623-1900
19       dcopley@kellerrohrback.com
20
21
22
23
24
```

Page 3

```
1       A P P E A R A N C E S : (Cont'd)
2
3  CHOATE HALL & STEWART LLP
4  On Behalf of Labaton Sucharow
5  Two International Place
6  Boston, Massachusetts 02110
7     BY: JOAN A. LUKEY, ESQ.
8  STUART M. GLASS, ESQ.
9  617-248-5000
10  joan.lukey@choate.com
11  sglass@choate.com
12
13
14  NIXON PEABODY, LLP
15  On Behalf of Thornton Law Firm
16  100 Summer Street
17  Boston, Massachusetts 02110-2131
18     BY: BRIAN T. KELLY, ESQ.
19  JOSHUA SHARP, ESQ. (Via telephone)
20  EMILY CRANDALL HARLAN, ESQ. (Via telephone)
21  617-345-1065
22  bkelly@nixonpeabody.com
23
24
```

Page 5

```
1       A P P E A R A N C E S : (Cont'd)
2
3     ALSO PRESENT:
4  MICHAEL CANTY, Labaton Sucharow
5  MICHAEL THORNTON, Thornton Law Firm
6  LINDA HYLENSKI, ESQ., JAMS (Via telephone)
7  PROFESSOR STEPHEN GILLERS
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 6

```
 1  ------------------ I N D E X ------------------
 2  WITNESS              EXAMINATION BY        PAGE
 3  HAL LIEBERMAN        MR. SINNOTT            10
 4
 5
 6  --------------- E X H I B I T S ---------------
 7  LIEBERMAN     DESCRIPTION           FOR I.D.
 8  Exhibit 1     Curriculum Vitae of Hal    11
 9                R. Lieberman
10  Exhibit 2     Expert Report of Hal R.    18
11                Lieberman
12  Exhibit 3     Saggese v. Kelley          85
13                Decision
14
15
16            (EXHIBITS RETURNED TO ATTORNEY SINNOTT)
17
18
19
20
21
22
23
24
```

Page 7

1    **MR. SINNOTT:** For the record, it's
2  approximately 1:27, and we are ready to
3  begin the examination of Attorney Hal
4  Lieberman.
5    If the witness could be sworn.
6  H A L   L I E B E R M A N,   called as a
7  witness, having been duly sworn by a
8  Notary Public, was examined and testified
9  as follows:
10
11    **MR. SINNOTT:** Thank you, Hal.
12    For the record, my name is William
13  Sinnott, S-I-N-N-O-T-T. I'm counsel to
14  the special master. The special master is
15  the Honorable Gerald Rosen, retired.
16  Formerly of the United States District
17  Court in Detroit, Michigan.
18    Judge Rosen has been appointed as
19  special master in the matter of Arkansas
20  Teacher Retirement System versus State
21  Street Bank, Number 11-cv-10230-MLW.
22    Also on the special master's team to
23  my left is attorney Elizabeth McEvoy, also
24  of Barrett & Singal. And to her left,

Page 8

1  Professor Gillers of the New York
2  University School of Law.
3    On the phone, Linda, are you there?
4    **MS. HYLENSKI:** I'm here.
5    **MR. SINNOTT:** Okay. Is Attorney
6  Linda Hylenski, also on the special
7  master's team.
8    And, at this time, if I could ask
9  participants who are in the room first to
10  identify themselves beginning with
11  Attorney Lieberman.
12    **THE WITNESS:** Yes. Hal Lieberman.
13    **MS. LUKEY:** Joan Lukey from Choate
14  Hall, for Labaton Sucharow.
15    **MR. CANTY:** Michael Canty for
16  Labaton Sucharow.
17    **MR. GLASS:** Stuart Glass, Choate
18  Hall, for Labaton.
19    **MR. HEIMANN:** Richard Heimann, Lieff
20  Cabraser.
21    **MR. LIEFF:** Robert Lieff, Lieff
22  Cabraser.
23    **MR. THORNTON:** Michael Thornton,
24  Thornton Law Firm.

Page 9

1    **MR. KELLY:** Brian Kelly of Nixon
2  Peabody, on behalf of Thornton Law Firm.
3    **MR. SINNOTT:** Thank you, folks. On
4  the telephone, we've already identified
5  Attorney Hylenski.
6    Is Josh on the phone?
7    **MR. SHARP:** Yes. Joshua Sharp of
8  Nixon Peabody for the Thornton Law Firm.
9    **MR. SINNOTT:** Thank you, Josh.
10    Is David on the phone?
11    **MR. COPLEY:** Yes. David Copley,
12  Keller Rohrback, for the ERISA plaintiffs.
13    **MR. SINNOTT:** All right. Is Emily
14  on the phone? Okay.
15    Has anyone else joined us on the
16  telephone? All right. Hearing none.
17    The usual caveats with respect to
18  encouraging witnesses and questioners to
19  speak up loudly and clearly so that the
20  participants by phone can hear us.
21    And a word of caution to the
22  participants by phone. If you can't hear
23  us or if there's distortion in the line,
24  please bring it to our attention at the

Page 10

1  earliest possible time so that we don't
2  have to revisit testimony.
3      All right, with those preliminaries
4  out of the way.
5  EXAMINATION BY
6      MR. SINNOTT:
7  Q.  Good afternoon, sir.
8  A.  Good afternoon.
9  Q.  Thank you for being here.  And
10  pardon me if I mistakenly call you professor,
11  because it's been professor palooza for the
12  last day and a half here.
13      But you are a practitioner, correct?
14  A.  I have also been an adjunct
15  professor over the years, but I am a
16  practitioner, yes, sir.
17  Q.  All right, sir.  And in the course
18  of this case, you were asked to write a report;
19  is that correct?
20  A.  Yes.
21  Q.  And in conjunction with that report,
22  you submitted a CV; is that correct?
23  A.  Yes.
24      MR. SINNOTT: Madam Court Reporter,

Page 11

1  if I could pass to you this document and
2  ask that you mark that as Exhibit 1.
3      (Lieberman Exhibit 1, Curriculum
4  Vitae of Hal R. Lieberman, marked for
5  identification.)
6  Q.  And, Attorney Lieberman, showing you
7  Exhibit 1.  Is that the CV that you submitted
8  in conjunction with your expert report?
9  A.  (Perusing.)  Yes.
10  Q.  All right.  And, sir, your expert
11  report was submitted on March 26 of 2018.
12      Since that time, have you drafted
13  any more recent copies of the CV?
14  A.  No.
15  Q.  So there are no changes or additions
16  that need to be made to that CV?
17  A.  No.
18  Q.  Is there any other relevant
19  experience, beyond what's in the CV, that
20  informs your opinion, the opinions that you've
21  submitted in your report?
22  A.  (Perusing.)  No.
23  Q.  All right.  And, Attorney Lieberman,
24  are you being compensated for being here today?

Page 12

1  A.  Yes.
2  Q.  And what's your rate of
3  compensation?
4  A.  $750 an hour.
5  Q.  And can you estimate how many hours
6  you've worked on this case up until this point?
7  A.  I haven't really thought about it.
8  It would be -- no, I can't really estimate.
9  Q.  All right, sir.  Would it be in
10  excess of 25 hours?
11  A.  Probably not.
12  Q.  And in preparation for today's
13  deposition, did you conduct any review or other
14  kind of preparation?
15  A.  Yes.
16  Q.  And would you describe what you did
17  in order to prepare for today's deposition?
18  A.  Well, in the course of preparing my
19  report, I reviewed various documents that were
20  provided to me by counsel for Labaton, and I
21  also met with counsel for Labaton on -- well,
22  several occasions on the telephone and once in
23  person.
24  Q.  All right.  And was that meeting in

Page 13

1  person today?
2  A.  Well, we did talk briefly today, but
3  the meeting that I'm -- where I prepared was
4  last week.
5  Q.  Okay.  And, sir, referring to the --
6  referencing the documents that you mentioned,
7  that were used in the preparation for your
8  deposition, were those the same documents you
9  used in order to write your report?
10  A.  Well, I referred to those to
11  understand the case better.  I didn't use those
12  documents to write my report, but they were
13  helpful in terms of providing facts and
14  background and understanding people's
15  positions, if that's what you mean.
16  Q.  All right, sir.  Well, let me ask
17  you about the facts in this case.
18      Who drafted the factual statement
19  that appears between pages 3 and 13 of your
20  report?
21  A.  It was a joint effort between myself
22  and Labaton counsel.
23  Q.  All right.  And could you describe
24  for us what that process was?

1  A.  Sure.  I asked Labaton to provide to
2  me a set of facts that I would base my opinion
3  on, my assumed facts.  They did.  We worked on
4  it together and, ultimately, it's what you see
5  in the report.
6      But I needed my -- my practice is to
7  request facts on which I'm going to rely and
8  then to provide an opinion based on those
9  facts.
10 Q.  All right.  And was that a static
11 process?  And by that I mean, once you received
12 statement of facts from counsel for Labaton,
13 did that remain the statement of facts that you
14 operated on in formulating your report?
15 A.  No.  It evolved.
16 Q.  And how did it evolve?
17 A.  Based on discussions with counsel
18 and with --
19 Q.  Can you give us some insight as to
20 the types of things that made it evolve?
21 A.  Sure.  One of the things was the
22 fact that I was under the impression,
23 initially, that the rule that was applicable to
24 the time period at issue was the so-called

1  newer rule promulgated in 2011 when, in fact,
2  it turned out, and I found out, and it affected
3  my opinion to a degree -- I shouldn't say it
4  substantially affected my opinion, but it
5  affected my opinion that, in fact, the old rule
6  applied at the time of the signing of the
7  retention letter.
8  Q.  Okay.
9  A.  So that was an issue that evolved.
10 Q.  Any other things that evolved with
11 respect to the facts during the course of that
12 process?
13 A.  That's probably the main thing.
14 Q.  All right.  And with respect to the
15 underlying documents in this case, can you
16 describe for us, in general terms, what those
17 documents were?
18 A.  Professor Gillers' report, the
19 Camille Sarrouf declaration, the George Hopkins
20 declaration, various deposition excerpts.
21     I'm trying to think what else there
22 might have been.  There probably are other
23 things.  Those would be the things I recall
24 right now.

1  Q.  And you say deposition excerpts.
2      Did you receive any complete
3  transcripts?
4  A.  I don't know if I did.  I doubt it.
5  I may have.  I know that there was testimony by
6  Eric Belfi.  There was testimony by George
7  Hopkins.
8      I don't recall -- I don't recall any
9  additional testimony offhand, but there may
10 have been others.
11 Q.  All right.  Thank you, sir.
12     And with respect to your opinion
13 that appears between pages 13 and 20 of your
14 report, who wrote that opinion?
15 A.  I did.
16 Q.  And did you have any assistance in
17 that?
18 A.  I had assistance from my research
19 associate in my law firm, but I wrote the
20 opinion.
21 Q.  And prior to you writing the opinion
22 with the assistance of your research associate,
23 had you seen Mr. Sarrouf's declaration?
24 A.  Yes.

1  Q.  And in addition to Mr. Sarrouf's
2  declaration, did counsel for Labaton give you
3  any additional guidance?
4  A.  I'm not sure I understand your
5  question.
6  Q.  Did they, for example, tell you what
7  questions they wanted you to address?
8  A.  No.  I formulated the questions.
9  Q.  Okay.  And how did you formulate the
10 questions?
11 A.  Based on Professor Gillers' report.
12 I wanted to respond to it.
13 Q.  All right.  And was that strictly --
14 strike that.
15     So beyond reading Professor Gillers'
16 report and Mr. Sarrouf's declaration, did you
17 receive anyone -- input from anyone else,
18 suggestions, if you will, as to what your
19 report should encompass?
20 A.  No.
21 Q.  And did you personally perform all
22 the research in your opinion or did your
23 research assistant did all or some of it?
24 A.  He did some of it.

Page 18

1  Q.  All right.  Thank you.
2      MR. SINNOTT:  And Madam Court
3  Reporter, if I could pass over to you the
4  expert report of Hal R. Lieberman and ask
5  you to mark that as Exhibit 2.
6      (Lieberman Exhibit 2, Expert Report
7  of Hal R. Lieberman, marked for
8  identification.)
9  Q.  Now, sir, showing you that expert
10  report that's been marked as Exhibit 2, and
11  directing your attention to page 15.
12  **A.  Okay.**
13  Q.  Under the letter A, you write,
14  "Contrary to Professor Gillers' central
15  argument, the facts support the conclusion that
16  Labaton substantially complied with its
17  obligations under Mass. Rule 1.5(e) to disclose
18  to its client, ARTRS," and if you don't mind,
19  I'll call them Arkansas, "that its fees could
20  be shared with Chargois."
21      Do you see that, sir?
22  **A.  Yes.**
23  Q.  And just so it's fresh in everyone's
24  mind, although I suspect that most people in

Page 19

1  this room have it memorized, stated in full,
2  that provision reads, "A division of a fee
3  between lawyers who are not in the same firm
4  may be made only if, after informing the client
5  that a division of fees will be made, the
6  client consents to the joint participation and
7  the total fee is reasonable."
8      Is that your understanding of how
9  the rule reads, Attorney Lieberman?
10  **A.  Yeah.  I'm reading the rule as you**
11  **spoke.**
12  Q.  Okay.  And I have accurately stated
13  the rule?
14  **A.  You read the words in the rule, yes.**
15  Q.  So when you say that "Labaton
16  substantially complied with its obligation
17  under 1.5(e) to disclose its client, Arkansas,
18  that its fees could be shared with Chargois,"
19  what do you base that on?
20  **A.  First of all, I would amend that**
21  **slightly.  I think now I would take out the**
22  **word "substantially," and I would simply say**
23  **Labaton complied.  I don't think it was**
24  **substantial.  I think it was full compliance.**

Page 20

1      And you are asking the question,
2  what do I base it on?
3      The facts that were provided to me
4  and on which I assumed for purposes of my
5  opinion.
6  Q.  Let me just back you up there.
7      In changing from the word
8  "substantially" to full or fully complied, do
9  you base that on more recent information or
10  have you just changed your mind?
11  **A.  No, I haven't changed my mind.**
12  **Yeah, I think -- I think that -- I think it was**
13  **just ill advised to include the word**
14  **"substantial," because I think they fully**
15  **complied with both 1.5(e), as stated in**
16  **February 2011 and as later changed by the**
17  **adoption of 1.5(e) in revised form, based on --**
18  **on page 14.  I think they fully complied with**
19  **either -- either rule -- either version of the**
20  **rule.**
21  Q.  And, specifically, Attorney
22  Lieberman, with respect to the provision of the
23  rules that states that after saying, "The
24  division of a fee between lawyers who are not

Page 21

1  in the same firm may be made only if,"
2  specifically with respect to the words "after
3  informing the client that a division of fees
4  will be made," I ask you, how did Labaton
5  adhere to or comply with that provision?
6  **A.  I think, on the final retention**
7  **letter, it states, "Arkansas Teacher agrees**
8  **that Labaton Sucharow may allocate fees to**
9  **other attorneys who serve as local or liaison**
10  **counsel, as referral fees or for other services**
11  **performed in connection with the litigation."**
12  Q.  All right.  So you're basing
13  compliance with that particular phrase on the
14  retention agreement?
15  **A.  Yes, sir, among other things.**
16  Q.  What are the other things that you
17  base it on?
18  **A.  Well, that they also disclosed the**
19  **existence of the relationship with Chargois to**
20  **Mr. Hopkins' predecessor and to the general**
21  **counsel.**
22  Q.  What did they disclose, first of
23  all, to the general counsel, and then I'm going
24  to ask you what they disclosed to Mr. Hopkins,

Page 22

1  but, to your knowledge, what was disclosed to
2  George Hopkins?
3  **A.  I'm sorry.  You said you were going**
4  **to ask me -- you reversed the order.**
5  Q.  Yes, I did.
6  **A.  I'm sorry.**
7  Q.  Tell me first what you understand
8  was disclosed to George Hopkins.
9  **A.  Well, the retention letters.**
10  Q.  All right.  And that's it?
11  **A.  At that time, that's the best of my**
12  **knowledge.  Maybe there were conversations with**
13  **Mr. Hopkins.  I think there's some testimony**
14  **about that on -- on page 9 of my report, there**
15  **is reference to that, but I don't -- I mean, I**
16  **don't know anything more specific than that.**
17  Q.  So you're not aware of any
18  conversations between Eric Belfi or other
19  Labaton attorneys and George Hopkins with
20  respect to a division of fees?
21  **A.  I'm only aware of what's in the**
22  **facts section of my report.**
23  Q.  All right.  But with respect to
24  what's in the facts section of your report, in

Page 23

1  making or concluding that Labaton complied with
2  its obligations under 1.5(e) and specifically
3  that phrase that I asked you about, informing
4  the client that the division of fees will be
5  made, is it your testimony that that is, with
6  respect to Mr. Hopkins, solely contained within
7  that line that you read from the retention
8  agreement?
9  **A.  No, that's not my testimony.  My**
10  **testimony is that that's one thing, but that**
11  **there may have been conversations as well.  It**
12  **appears that there were, and that Mr. Hopkins**
13  **apparently said he wasn't interested in knowing**
14  **about the fee split as long as the overall fee**
15  **was whatever it was, and it was fair to him and**
16  **to the prospective class.**
17  Q.  All right.  Now, who did he say that
18  to?
19  **A.  I don't know.  I wasn't there.  But**
20  **my assumption is that he said it to Belfi.**
21  Q.  When did he say it to Belfi?
22  **A.  I don't know precisely when he said**
23  **it to Belfi.**
24  Q.  Is it important as to when he said

Page 24

1  it to Belfi?
2  **A.  Not for purposes of 1.5(e) in terms**
3  **of the compliance aspect.**
4  Q.  So if he said it to Belfi yesterday,
5  that would be sufficient?
6  **A.  It might be.**
7  Q.  If he said it to Belfi a month from
8  now, that would be sufficient in order to
9  indicate that the client has been informed that
10  a division of fees will be made?
11  **MS. LUKEY:** Objection.
12  **A.  That's not my -- that's not my**
13  **testimony, but the courts certainly have**
14  **enforced fee-splitting agreements where there's**
15  **been even no notice to the client ahead of**
16  **time, such as in the Daynard case, which**
17  **Professor Gillers cites in his report.**
18  Q.  Well, do you adopt that view, that a
19  division of fees can be in satisfaction of
20  1.5(e) if there's no notice to the client?
21  **MS. LUKEY:** Objection.
22  **A.  Do I adopt that point of view with**
23  **respect to 1.5(e)?**
24  Q.  Yes, sir.

Page 25

1  **A.  No, I don't.**
2  Q.  So you would agree that 1.5(e)
3  requires that a division of fees can be made
4  only if, after informing the client that a
5  division of fees will be made, the client
6  consents, correct?
7  **A.  That's what the rule says.**
8  Q.  So the rule would indicate that the
9  client needs to be informed before a division
10  of fees will be made.
11  Do you agree with that?
12  **A.  Well, it's not so clear.  In**
13  **Massachusetts, the Saggese decision seems to**
14  **suggest that that would be the preferred**
15  **practice going forward.  But, apparently, the**
16  **court enforced that fee agreement as --**
17  **fee-splitting agreement as between the lawyers**
18  **when it was not disclosed.**
19  **So it's not clear.**
20  Q.  It's your view that Saggese said
21  that that would be the preferred practice?
22  (Emily Harlan attends telephonically
23  at this time.)
24  **A.  That's what I just said, yes.**

Page 26

1  Q.  So you don't ascribe to the belief
2  that the Saggese court said it should be done
3  in all agreements?
4      MS. LUKEY: Objection.
5  Q.  All fee agreements?
6      MS. LUKEY: Objection.
7  A.  The opinion speaks for itself.  It
8  was -- certainly, it was dictum, but it was
9  certainly important, and that's what the court
10  said.  It wasn't a rule at the time.
11  Q.  All right.  But when you say it's
12  preferred practice, was it optional in Saggese?
13  A.  I'm sorry.  Was what optional in
14  Saggese?
15  Q.  Was the -- for example, the
16  requirement that the consent be in writing
17  optional?
18  A.  No.  The court enforced the
19  agreement even though it wasn't in writing.
20  Q.  And the court said that it would
21  apply to all future agreements, correct?
22      MS. LUKEY: Objection.
23  A.  The opinion speaks for itself, sir.
24  I can't get into the head of the court.  That's

Page 27

1  the way I read the opinion.
2  Q.  All right.  But -- and the reason I
3  asked you is because you used the expression
4  "preferred practice."
5      And would you agree with me that
6  preferred practice connotes that something is
7  not mandated by the court?
8  A.  That's a complicated question.  It's
9  unclear what the court meant when it said that
10  this should be the practice going forward,
11  because the rule was not amended in accordance
12  with Saggese for many years.
13      And the SJC certainly had the
14  authority to do that if it chose to.
15  Q.  So as a practitioner after the
16  Saggese case, but before the rule was codified
17  to mirror that or to comply with that, how
18  would you have advised a client with respect to
19  a division of fees agreement?  And by that
20  specifically I mean whether to comply with
21  Saggese.  Was it optional?
22  A.  When you say "as a practitioner," do
23  you mean when I was a regulator prosecuting
24  lawyers, or when I was a defense lawyer

Page 28

1  representing lawyers?  Which do you mean?
2  Q.  The latter.  I'm saying, what would
3  you have advised your client?
4  A.  I would have advised my client to
5  comply with the rules applicable at the time
6  under the Code of Professional Responsibility
7  or then Rules of Professional Conduct.
8      I would have advised my client, if I
9  knew about Saggese, which I would have,
10  presumably, that there was this case out there
11  and to, you know, if possible, follow the
12  greater formality that Saggese was suggesting,
13  although I'm not sure that it really would have
14  changed anything in this case.
15      But, I mean, as a defense lawyer for
16  lawyers, I would have said that the lawyer is
17  bound by the rule as it is written, not by a
18  decision of a court, albeit, the high court of
19  the Commonwealth of Massachusetts.
20  Q.  So, in your view as a practitioner,
21  advising clients, you would not have informed
22  your client, you got to comply with Saggese?
23  A.  Of course, I would have suggested to
24  my client that the client comply with Saggese.

Page 29

1  Q.  Okay.
2  A.  But I don't think that changes
3  anything, as I said.
4  Q.  I'm not asking you if it changes
5  anything.
6  A.  I understand.  Okay.
7  Q.  If I could just get back to this
8  phrase "informing the client that a division of
9  fees will be made."
10  A.  Yes.
11  Q.  And ask you, outside of the
12  retention letter, what other evidence do you
13  have of that, that that was complied with?
14  A.  Well, the declaration of George
15  Hopkins.
16  Q.  All right.  And did George Hopkins
17  claim to have been told about Damon Chargois?
18  A.  Not in his declaration.  He didn't
19  say that in his declaration.  He may have -- he
20  said he wasn't interested.
21  Q.  He said he wasn't interested.
22      And, in your view, is that
23  sufficient to obviate any obligation on the
24  part of the parties to inform the client about

Page 30

1  a division of fees?
2      MS. LUKEY: Objection.
3  A.  Whether or not the client is
4  interested, it doesn't obviate the obligation
5  to say there will be a division of fees, no.
6  Q.  All right.  And, once again, going
7  back to the engagement letter that we have
8  already referenced, you pointed to the first
9  sentence at the top of page 2 that says,
10  "Arkansas Teacher agrees that Labaton Sucharow
11  may allocate fees to other attorneys who serve
12  as local or liaison counsel, as referral fees
13  or for other services performed in connection
14  with the litigation," correct?
15  A.  Correct.
16  Q.  Now, where does it say there that a
17  division of fees will be made?
18  A.  It's the whole sentence says that.
19  It says they have permission to do that.  "May"
20  means permission.
21  Q.  Right.  But permission and actually
22  being informed are two different things, are
23  they not?
24      MS. LUKEY: Objection.

Page 31

1  A.  I don't agree.
2  Q.  So when the rule says "informing the
3  client that a division of fees will be made,"
4  you believe that this "may allocate" satisfies
5  that?
6  A.  Yes, sir.
7  Q.  And as a long-time practitioner and
8  regulator, it's not your view that had the rule
9  wanted to convey that a division of fees may be
10  made, it would have put it in the rule itself?
11  That's not your belief?
12      MS. LUKEY: Objection.
13  A.  I actually don't understand the
14  question.
15  Q.  Well, let's look at 1.5(e).
16  A.  Okay.
17  Q.  And change -- change the words,
18  after it says "a division of fees between
19  lawyers who are not in the same firm may be
20  made only if, after informing the client that a
21  division of fees may be made, the client
22  consents to the joint participation and the
23  total fee is reasonable."
24      Wouldn't that more accurately

Page 32

1  encapsulate your interpretation of that first
2  sentence --
3  A.  No.
4  Q.  -- in the agreement?
5  A.  No.
6  Q.  Why not?
7  A.  Because it's substantially the same
8  thing.  The client is being informed that there
9  may be a division of fees, and the client
10  needs -- doesn't need to know any more than
11  that if the client is not affected by it
12  because the overall fee is reasonable.
13  Q.  And what legal authority do you have
14  for that interpretation?
15  A.  I don't have any legal authority for
16  it other than the plain language and my
17  knowledge of regulation and enforcement over
18  the years and my experience in advising people
19  about fee-sharing agreements.
20  Q.  All right.  So the answer is you do
21  not have any legal authority for it?
22      MS. LUKEY: Objection.
23  A.  Legal authority for what, sir?
24  Q.  For your interpretation that, had

Page 33

1  the court wished to make that optional, if you
2  will, it would have said, "Informing the client
3  that a division of fees may be made."
4  A.  When you say "legal authority,"
5  you're referring to either case law or ethics
6  opinions.  And you certainly -- there's a
7  wealth of case law out there where courts have
8  enforced imperfect or substantial compliance
9  fee-splitting arrangements between -- when
10  there's a fight between lawyers, where there's
11  not a perfect following or compliance with this
12  rule.
13      So I guess I would rely on that as
14  well.
15  Q.  Let me ask you this, sir.
16      In the requirement for -- that "the
17  division of fees may be made only if, after
18  informing the client that a division of fees
19  will be made, the client consents to the joint
20  participation," did you interpret "consent" to
21  be informed consent?
22      MS. LUKEY: Objection.
23  A.  There's a definition in New York
24  that says that consent implies informed

Page 34

1  consent.  I don't believe that there's a
2  similar definition of consent or there was at
3  that time in the Massachusetts Code of
4  Professional Responsibility, but consent
5  implies informed consent.  And so I would read
6  it into the rule.
7  Q.   And reading it into the rule, as you
8  do, what does the requirement that the consent
9  be informed suggest with respect to what the
10  client would be told?
11     MS. LUKEY: Objection.
12  A.   Client would be told that there's
13  going to be a fee splitting or there might be a
14  fee-splitting arrangement between law firms.
15     THE SPECIAL MASTER: Nothing more
16  than that?
17     THE WITNESS: The rule doesn't
18  require anything more than that.  And
19  that's been the common understanding of
20  the rule.
21     BY MR. SINNOTT:
22  Q.   And it's your opinion that 1.5(e)
23  did not require that Arkansas be informed of
24  anything more than that Labaton may allocate

Page 35

1  fees to other attorneys who serve as local or
2  liaison counsel, as referral fees or for other
3  services performed in connection with the
4  litigation.
5     Is that your opinion?
6  A.   Yes, sir.
7  Q.   And there was no requirement that
8  Labaton inform Arkansas of the existence of
9  Damon Chargois and his role in this case?
10  A.   Not beyond what I just said.
11  Q.   So, in your opinion, it was not
12  necessary that, even though Labaton was aware
13  of the role of Damon Chargois, that it inform
14  Arkansas?
15     MS. LUKEY: Objection.
16  A.   Inform Arkansas of what?
17  Q.   Of his role and of his existence.
18  A.   Of Chargois' existence?
19  Q.   Yes, sir.
20  A.   No.
21  Q.   And the fact that informed consent
22  would be at issue -- would be operative here
23  does not change that opinion of yours?
24     MS. LUKEY: Objection.

Page 36

1  A.   No, sir.
2     THE SPECIAL MASTER: Let me ask just
3  a couple questions about what the
4  engagement letter -- do you have a copy of
5  it?
6     THE WITNESS: I have a copy of the
7  quote.
8     MS. LUKEY: (Handing.)  He has got
9  it now.
10     THE SPECIAL MASTER: You quoted in
11  your opinion, you can read the whole
12  letter if you'd like, but I would like to
13  focus on the paragraph at the top of page
14  2, which seems to be the operative
15  language here.
16     And, by the way, we haven't met.
17  I'm Gerry Rosen.
18     THE WITNESS: How do you do?  Nice
19  to meet you, Judge.
20     THE SPECIAL MASTER: Nice to meet
21  you.
22     What do you interpret or infer
23  Labaton was permitted, reading "may" as
24  permissive, to do under this agreement?

Page 37

1     THE WITNESS: It seems to me that
2  Labaton was basically trying to tell the
3  client, and did tell the client, that they
4  might need to retain local or liaison
5  counsel, that they might need to pay a
6  referral fee to such local counsel, and
7  that they might need to pay somebody for
8  services performed in connection with the
9  litigation, and that they were getting the
10  permission of the Arkansas Teacher Fund to
11  do that.
12     THE SPECIAL MASTER: So you read the
13  phrase who -- "may allocate fees to other
14  attorneys who serve as local or liaison
15  counsel, as referral fees"?
16     MS. LUKEY: Objection.
17     THE SPECIAL MASTER: Modifying and
18  referring back to local or liaison
19  counsel.
20     MS. LUKEY: Objection.
21     THE WITNESS: No, I don't read it
22  that way, sir.
23     THE SPECIAL MASTER: I'm sorry.  I
24  thought that's what you said.

1    THE WITNESS: No, no.  I read it
2   that they have the right to, under this
3   agreement, allocate fees to people who
4   serve as local or liaison counsel or
5   allocate fees as referral fees or allocate
6   fees for other services performed in
7   connection with the litigation.  I read it
8   as the --
9    THE SPECIAL MASTER: Each phrase in
10   the disjunctive?
11    THE WITNESS: Yes.
12    THE SPECIAL MASTER: Of course,
13   that's not what it says, is it?
14    MS. LUKEY: Objection.
15    THE SPECIAL MASTER: On its face.
16    MS. LUKEY: Objection.
17    THE WITNESS: I don't agree.  That's
18   the way I read it.  It's plain language to
19   me, sir.
20    THE SPECIAL MASTER: You don't read
21   "as referral fees" as modifying local or
22   liaison counsel?
23    THE WITNESS: No, I don't.
24    THE SPECIAL MASTER: You read it

1   separately and independently as a
2   permissive separate and independent
3   payment?
4    THE WITNESS: I do.
5    THE SPECIAL MASTER: On page --
6    THE WITNESS: By the way, I'm not
7   sure it makes a difference, but I do.
8    THE SPECIAL MASTER: Okay.  Well,
9   you agree that the contract forms the
10   basis of the relationship and what Labaton
11   is permitted to do under the contract?
12    MS. LUKEY: Objection.
13    THE WITNESS: I agree that a
14   contract is a written agreement, sure.
15    THE SPECIAL MASTER: So if it were
16   read as referral fees to modify local or
17   liaison counsel, the payment would be made
18   to Mr. Chargois in this case as a referral
19   fee for serving as local counsel or for
20   serving as liaison counsel.
21    THE WITNESS: It's possible.  I
22   don't read it that way.
23    THE SPECIAL MASTER: Or the payments
24   could be made for other services

1   performed, right?
2    THE WITNESS: I think there are
3   three different possibilities there.
4    THE SPECIAL MASTER: Three different
5   possibilities for payment?
6    THE WITNESS: For allocation of fees
7   among counsel.
8    THE SPECIAL MASTER: Reading it the
9   way you say you read it, there are four
10   different possibilities, right?
11    THE WITNESS: Well, I suppose you
12   could say local or liaison counsel could
13   be two different possibilities, sure.
14   Sure.  So there could be four.
15    THE SPECIAL MASTER: In fact, there
16   may well be.
17    THE WITNESS: Could be.
18    THE SPECIAL MASTER: But if you read
19   it the other way this could be read, and
20   parse the sentence differently, whereby,
21   as referral fees modifying local or
22   liaison counsel, that would indicate that
23   the referral fees would be paid for
24   serving as local or liaison counsel

1   because it's an offset clause divided by
2   commas.
3    MS. LUKEY: Objection.
4    THE WITNESS: You could read it that
5   way.  I just don't read it that way, sir.
6    THE SPECIAL MASTER: Okay.  And the
7   fact that the next phrase says "or for
8   other services performed," does that not
9   indicate that the agreement contemplates
10   some form of services that relates to a
11   fee?
12    MS. LUKEY: Objection.
13    THE WITNESS: I would imagine it
14   relates to a fee, an allocation of fees to
15   other counsel besides Labaton.  That's
16   what the purpose was.
17    THE SPECIAL MASTER: I'm interested
18   in your view of what a referral fee is.
19    I have been interested from the
20   beginning of this investigation as to what
21   people's views are as a referral fee.
22   People seem to have very different views
23   about, first of all, what it was that
24   Mr. Chargois got paid.  We've had vastly

Page 42

1  different views, including Mr. Chargois'
2  own view.
3      I'm interested in yours.  What was
4  the nature of the payment to Mr. Chargois?
5      THE WITNESS: As best I understand,
6  it was a referral fee.
7      THE SPECIAL MASTER: What informs
8  that view?
9      THE WITNESS: The fact that
10  Mr. Chargois introduced the client to
11  Labaton.
12     THE SPECIAL MASTER: But not in
13  connection with this case specifically?
14     THE WITNESS: And it followed from
15  this -- it followed, as part of the
16  introduction, that there would be
17  potential litigation, although, initially,
18  it was monitoring.  And that, therefore,
19  the -- but for Chargois' introduction,
20  Labaton would not have perhaps become
21  counsel in the State Street litigation.
22     THE SPECIAL MASTER: So you read
23  referral fee as any kind of a fee paid for
24  an introduction that preceded the instant

Page 43

1  case by years, that the payment would be a
2  referral fee?
3      THE WITNESS: Well, it depends on
4  the facts and the circumstances, but I
5  suppose it could conceivably be, yes.
6      THE SPECIAL MASTER: So let's talk
7  about the facts and circumstances.
8      Assume that the deposition
9  testimony, including Mr. Chargois', but
10  also including the witnesses from Labaton,
11  indicate that Mr. Chargois was asked to
12  make an introduction to what was termed
13  institutional investors, and that out of
14  that came a phone call by Mr. Chargois to
15  the executive director of Arkansas, and
16  that out of that came a meeting, the first
17  meeting at which Mr. Chargois
18  participated.  And after that, he
19  participated in no other meetings.
20     But as a result of that, there was
21  an agreement between Labaton and
22  Mr. Chargois and Chargois & Herron that
23  Mr. Chargois would receive 20 percent of
24  every fee Labaton got in which Arkansas

Page 44

1  was either lead or co-lead plaintiff and
2  Labaton was either lead or co-lead
3  counsel.
4      And that this was the genesis of the
5  relationship and the agreement, and that
6  this continued forward until February 8 of
7  2011.  And that it was pursuant to this
8  agreement with this context that Labaton
9  paid Mr. Chargois.
10     Is that a referral fee?
11     MS. LUKEY: Objection.
12     THE WITNESS: I think this is a
13  referral fee, and it happens all the time,
14  common.
15     THE SPECIAL MASTER: Do you see any
16  difference between this and a finder's
17  fee?
18     MS. LUKEY: Objection.
19     THE WITNESS: Finder's fee?  I don't
20  know what a finder's fee is.
21     THE SPECIAL MASTER: In other
22  context, such as real estate or businesses
23  in which a business agent goes out and
24  finds a client for another business, it's

Page 45

1  often referred to as a finder's fee.
2      MS. LUKEY: Objection.
3      THE WITNESS: A referral fee, in my
4  world of legal ethics, refers to a fee
5  paid by one lawyer to another lawyer who
6  is not affiliated with the first lawyer.
7      THE SPECIAL MASTER: For anything?
8      THE WITNESS: For referring a case
9  or a matter.
10     THE SPECIAL MASTER: And is that
11  what happened in this case?  Was a case
12  referred or was a matter referred?
13     THE WITNESS: Absolutely.
14     THE SPECIAL MASTER: And exactly
15  when was this case referred?
16     THE WITNESS: Whenever the
17  litigation was about to begin, to my
18  knowledge.
19     THE SPECIAL MASTER: Mr. Chargois
20  referred the State Street matter to
21  Labaton.  That's your understanding?
22     THE WITNESS: There was a referral
23  fee arrangement between Labaton and the
24  Chargois & Herron firm that had basically

Page 46

1  incorporated the notion that Labaton would
2  be counsel in this kind of litigation.  So
3  that was the arrangement that they had.  I
4  don't understand why --
5      **THE SPECIAL MASTER:** And it didn't
6  matter that it is not case specific at
7  all?
8      **THE WITNESS:** No.
9      **THE SPECIAL MASTER:** But just that
10  it's kind of a floating lien over all
11  cases in which Labaton serves as lead
12  counsel and Arkansas as lead plaintiff?
13      **MS. LUKEY:** Objection.
14      **THE WITNESS:** I can't answer the way
15  you've described it as a floating lien,
16  but it certainly is not an uncommon
17  arrangement.
18      **THE SPECIAL MASTER:** How about a
19  continuing interest, is that better?
20      **THE WITNESS:** I don't know.  I
21  can't -- I don't have an opinion on that.
22      **THE SPECIAL MASTER:** You say it's
23  common that, where a lawyer makes an
24  introduction to a client, that that

Page 47

1  lawyer, the introducing lawyer, receives a
2  fee in every case that that client has
3  going forward without limitation to
4  specific referrals for specific cases.
5      **THE WITNESS:** Judge Rosen, I know a
6  number of lawyers in New York, and
7  probably in Massachusetts, although I
8  can't think of anybody specifically in
9  Massachusetts, I know a number of lawyers
10  in New York who have referral fee
11  arrangements on an ongoing basis with
12  trial counsel who are not litigators, but
13  who refer, essentially, all or most of
14  their matters to trial counsel, and it's
15  an understood, sometimes oral, but usually
16  in writing at the outset agreement, and a
17  stream of cases are referred to the same
18  trial counsel because the referring lawyer
19  knows that that trial counsel is an
20  excellent litigator and has excellent
21  results, and it's common.
22      **THE SPECIAL MASTER:** I want to parse
23  that more carefully.
24      Is that on a case-by-case basis?

Page 48

1  When more clients come in, that referring
2  lawyer gets the case and says, you know, I
3  know Lawyer Smith, he's excellent, he has
4  handled a number of cases, I'm going to
5  refer it.  Is that the situation you are
6  referring to?
7      **THE WITNESS:** All the time.
8      **THE SPECIAL MASTER:** Okay.  That
9  didn't happen in this case, though.
10      **MS. LUKEY:** Objection.
11      **THE WITNESS:** I don't know what you
12  mean by that.
13      **THE SPECIAL MASTER:** Well, let me
14  explain it to you so you do.
15      **THE WITNESS:** Sure.
16      **THE SPECIAL MASTER:** Mr. Chargois
17  had no involvement whatsoever, the
18  testimony shows, no involvement whatsoever
19  in this specific matter.  His fee was paid
20  simply and only for the original
21  introduction with no specific involvement
22  in this or any of the other nine cases he
23  received a fee for.
24      **MS. LUKEY:** Objection.

Page 49

1      **THE SPECIAL MASTER:** So what I'm
2  trying to parse down on here is whether,
3  in all of these other cases you say
4  happened, there is -- the referring lawyer
5  has no contact whatsoever with the client,
6  but only receives the fee for the initial
7  introduction, not touching or having
8  anything else to do with the specific case
9  at issue.
10      **THE WITNESS:** It's common, Judge.
11      **THE SPECIAL MASTER:** So the lawyer
12  who is referring makes no independent
13  judgment, has no independent role, has no
14  specific involvement or even touches on a
15  case-by-case basis.  He simply has a
16  continuing interest in every single case.
17      **THE WITNESS:** It's common, Judge.
18      **THE SPECIAL MASTER:** What if the
19  referring lawyer isn't involved at all?
20  What if the relationship then reverts back
21  to the lawyer that is being referred, in
22  this case, Labaton, and the client, and
23  the client continues to hire Labaton
24  without any involvement of the initial

1 lawyer?
2     **MS. LUKEY:** Objection.
3     **THE WITNESS:** Unless there is an
4 understanding between the referring lawyer
5 and the referred lawyer that that is going
6 to be the case, then the fee agreement
7 wouldn't be enforceable between the
8 lawyers. But if there's an understanding
9 between them, and the client is told that
10 there is a fee-splitting agreement, that's
11 sufficient, whether the lawyer, the
12 referring lawyer does a stitch of work or
13 not.
14     **THE SPECIAL MASTER:** I'm not
15 focusing on the work.
16     **THE WITNESS:** I thought you were.
17     **THE SPECIAL MASTER:** No.
18     **THE WITNESS:** Okay.
19     **THE SPECIAL MASTER:** I am focusing
20 on the act of referring a specific case.
21     **THE WITNESS:** I'm sorry, then.
22 What's your question? I may have
23 misunderstood it.
24     **THE SPECIAL MASTER:** Let me be clear

1 again. I'm trying to be clear.
2     **THE WITNESS:** I understand.
3     **THE SPECIAL MASTER:** Okay. Let me
4 be very clear.
5     **THE WITNESS:** Sure.
6     **THE SPECIAL MASTER:** As I understood
7 your description, you say it's done all
8 the time, where cases come into a lawyer
9 and they say, I'm referring it to Lawyer
10 Smith. That's a specific case.
11     And then other cases come in, maybe
12 on the same matter or maybe on a different
13 matter, and that lawyer says, I'm
14 referring this to Lawyer Smith.
15     Is that the relationship you're
16 referring to?
17     **MS. LUKEY:** Objection.
18     **THE SPECIAL MASTER:** As a referral
19 fee?
20     **THE WITNESS:** Very frequently what
21 happens is that lawyer A does a lot of
22 advertising and gets people to respond to
23 his or her advertising, and if it's a
24 particular type of case which involves

1 litigation, and lawyer A is not a
2 specialist in litigation, if you can call
3 him that, if he doesn't concentrate in
4 litigation --
5     **THE SPECIAL MASTER:** Is lawyer A
6 referring --
7     **THE WITNESS:** Yes. Then lawyer A
8 will refer to lawyer B. And that's it.
9 There is a relationship between lawyer A
10 and lawyer B that is either written or
11 unwritten, but that is an understanding of
12 a fee-splitting arrangement and the client
13 is told, in one form or another, that
14 lawyer B will be handling the matter
15 henceforth. And lawyer A doesn't do
16 anything further. And that is common.
17     **THE SPECIAL MASTER:** I think we are
18 talking past each other.
19     **THE WITNESS:** Maybe.
20     **THE SPECIAL MASTER:** In your
21 hypothetical, lawyer A, the referring
22 lawyer, is actually getting the cases or
23 matters in. Whether he does any work or
24 she does any work at all on it, he then

1 refers it to lawyer B.
2     **THE WITNESS:** Correct.
3     **THE SPECIAL MASTER:** That didn't
4 happen here.
5     What happened here is lawyer A, the
6 referring lawyer, made an introduction
7 three years before. Never touched the
8 case. Never had any involvement in any
9 other specific case in which Arkansas
10 served. Well, there was one. Sorry.
11     There were eight cases in which he
12 had no specific involvement at all. The
13 relationship then was directly between
14 lawyer B, Labaton, the referred lawyer,
15 and the client. Lawyer A was never
16 involved, Mr. Chargois. Never even knew
17 about it until the cases were filed and,
18 in some cases, after the cases were filed.
19     You see the distinction?
20     **THE WITNESS:** No.
21     **THE SPECIAL MASTER:** I'm not asking
22 you now whether there is a legal
23 distinction. I'm asking you if you see
24 the factual distinction so that I can

Page 54

1  understand your view?
2      THE WITNESS: I don't see the
3  factual distinction either, sir.
4      THE SPECIAL MASTER: I don't know
5  what more I can do to explain it to you,
6  except to say this directly to you.
7      In this case, as contra to the cases
8  you described, lawyer A never touched this
9  specific case, ever.  The client did not
10  come into him and say, I want to file a
11  case and lawyer A then referred it to
12  lawyer B.
13      In this case, lawyer A, the only
14  thing he did, I'm not asking you whether
15  it's proper or under 1.5, all that
16  happened in this case was three years
17  before or four years before, lawyer A
18  opened the door, made the introduction,
19  and then, in every subsequent case in
20  which the client used lawyer B to
21  represent the client in the case, totally
22  divorced at this point from anything
23  lawyer A did, other than the initial
24  introduction, a fee was paid.

Page 55

1      And my only question to you, is that
2  a referral fee?
3      THE WITNESS: Yes.
4      THE SPECIAL MASTER: Why?
5      THE WITNESS: Because A caused the
6  introduction to be made and A caused the
7  attorney/client relationship to come to
8  be.
9      THE SPECIAL MASTER: And that's
10  sufficient to be a referral fee, whether
11  or not lawyer A has any more involvement
12  whatsoever in any of the future cases?
13      THE WITNESS: In my opinion, yes.
14      THE SPECIAL MASTER: Now, you said
15  it happens all the time.  Common practice.
16      Is the description I have now given
17  you common practice as a referral fee?
18      THE WITNESS: It's a variation on a
19  theme, if I can put it that way.  It's not
20  common practice in the sense that I was
21  describing a moment ago, but it's not
22  dissimilar in substance.  Same concept.
23      The real question here, for purposes
24  of this case, I think, is what's the

Page 56

1  purpose of the referral fee rule, and who
2  is supposed to be the beneficiary of the
3  referral fee rule, and I have views on
4  that, if you want to ask me.
5      THE SPECIAL MASTER: Does the
6  referral fee rule not contemplate, at
7  least in part, and the policy behind the
8  referral fee, that a lawyer who, by virtue
9  of his or her practice and expertise, is
10  not or does not feel totally competent to
11  handle a case, but knows of another lawyer
12  who is more competent and more experienced
13  to handle that case, refers the case out
14  to that lawyer, who is more experienced
15  and more competent.
16      THE WITNESS: I agree with that,
17  yes.
18      THE SPECIAL MASTER: Okay.  Does
19  that not, just as a policy matter, imply
20  that what we have been calling lawyer A,
21  the referring lawyer, make some judgment,
22  however modest, however scarce, however
23  skimpy, that that lawyer makes some
24  judgment that lawyer B should handle the

Page 57

1  case rather than him or her?
2      THE WITNESS: Yes.
3      THE SPECIAL MASTER: Okay.  That's
4  not what happened in this case.
5      MS. LUKEY: Objection.
6      THE SPECIAL MASTER: What happened
7  in this case is that lawyer A, the
8  referring lawyer, made an introduction.
9  There's even some question in this case as
10  to whether or not, by other experts not
11  retained by the special master, as to
12  whether or not, in that introduction,
13  there was even a recommendation.
14      The previous expert testified that
15  there was not even a recommendation, that
16  it was simply an introduction.
17      Is the policy behind referral fees
18  served in those circumstances?
19      THE WITNESS: The policy behind
20  referral fees is served when clients are
21  able to retain, through the referral
22  process, competent counsel to handle their
23  matter, whatever that may be.
24      THE SPECIAL MASTER: What's the

Page 58

1 difference between somebody who does what
2 Mr. Chargois did here, makes an
3 introduction, a lawyer who does it, and a
4 non-lawyer who maybe knows the client, who
5 calls him and says, hey, you know, I have
6 got this friend who's a lawyer, and I'd
7 love for you to meet him because he does
8 this kind of work.
9     THE WITNESS: The rules preclude
10 paying referral fees to non-lawyers.
11     THE SPECIAL MASTER: And that's the
12 only difference?
13     THE WITNESS: That's one of the
14 differences.
15     THE SPECIAL MASTER: So you see no
16 significance right now just in terms of
17 the policy basis behind referral fees, you
18 see no significance in the fact that the
19 cases in question, and this case in
20 particular, developed out of the
21 relationship that Labaton had with the
22 client once it had -- once it was hired as
23 monitoring counsel, and, at that point,
24 Mr. Chargois is totally out of the

Page 59

1 relationship.  You see no difference
2 there?
3     THE WITNESS: No.
4     THE SPECIAL MASTER: In terms of the
5 policy behind referral fees, do you see a
6 difference?
7     THE WITNESS: No.
8     THE SPECIAL MASTER: So the fee can
9 simply relate back?
10     THE WITNESS: Yes.
11     THE SPECIAL MASTER: This is what I
12 was referring to when I said it was a
13 floating lien, because that sure is what
14 it sounds like to me.
15     MS. LUKEY: Objection.
16     THE SPECIAL MASTER: A floating
17 interest in any cases that the client that
18 was introduced, as to subsequent cases by
19 the referred lawyer.  It sounds to me like
20 just simply -- you can call it a floating
21 lien, you can call it a floating interest,
22 but it doesn't sound like a referral fee
23 in the way I've always thought of referral
24 fees and I have seen them, at least in my

Page 60

1 court, because there is no judgment
2 whatsoever exercised, no participation
3 whatsoever exercised by lawyer A in these
4 subsequent cases.  He just has an interest
5 in future cases.
6     Is there any professional -- that
7 was a speech. Let me stop the speech and
8 ask you a question.
9     Given the scenario, is there any
10 professional aspect of this for which
11 Mr. Chargois was compensated in his role
12 as a lawyer?
13     MS. LUKEY: Objection.
14     THE WITNESS: There is a
15 professional aspect, and it has to do with
16 the referral fee rule and his right to
17 referral fees if there's a referral fee
18 arrangement.
19     THE SPECIAL MASTER: Isn't that
20 circular?
21     THE WITNESS: Yes.
22     THE SPECIAL MASTER: It's a referral
23 fee, because it's a referral fee because
24 he's a lawyer.

Page 61

1     THE WITNESS: Because the purpose is
2 for the client's benefit to have competent
3 counsel, and if Chargois plays a role in
4 that, a meaningful role in getting the
5 client competent counsel, then under the
6 rules as I understand them, the referring
7 lawyer is entitled to a fee.
8     THE SPECIAL MASTER: Irrespective of
9 whether he ever touched the case again,
10 even whether he knew about the case?
11     THE WITNESS: That's what the rule
12 says.
13     THE SPECIAL MASTER: Where does the
14 rule say that, please?  And we can look at
15 the rule that was in effect at the time.
16     THE WITNESS: All the lawyer has to
17 do is inform the client that a division of
18 fees will be made and the client agrees
19 and the total fee is reasonable.  That's
20 what happened here.
21     THE SPECIAL MASTER: It does say the
22 client consents to the joint
23 participation.
24     Where was Mr. Chargois'

Page 62

1  participation, please?
2      THE WITNESS: He was -- participated
3  by referring the matter.  That's
4  sufficient for the rule.
5      THE SPECIAL MASTER: Joint
6  participation can refer back however long
7  ago it was?
8      THE WITNESS: The courts do not
9  require that a lawyer be -- appear as
10  co-counsel, file a notice of appearance,
11  supervise the lawyer to whom the case is
12  referred.
13      THE SPECIAL MASTER: Or do any work?
14      THE WITNESS: Or do any work.
15      THE SPECIAL MASTER: Or even know
16  about the case?
17      MS. LUKEY: Objection.
18      THE WITNESS: I don't understand
19  that question.
20      THE SPECIAL MASTER: Suppose
21  Mr. Chargois didn't even know about this
22  case until after it was filed and much
23  later into its gestation.  Suppose he
24  doesn't know about that.  Is that joint

Page 63

1  participation for purposes of the rule?
2      THE WITNESS: Yes.
3      THE SPECIAL MASTER: Because he
4  initiated the relationship.
5      THE WITNESS: The relationship, yes.
6      THE SPECIAL MASTER: Years before.
7      THE WITNESS: Yes.
8      THE SPECIAL MASTER: And, again,
9  tell me how the policy behind referral
10  fees is served by that.
11      THE WITNESS: Because the idea is
12  that the client should get counsel who is
13  competent in the particular area, and it's
14  for the client's benefit that we have the
15  referral fee rule to encourage lawyers who
16  are not specialists or practice in
17  particular areas, to refer those matters
18  rather than try to handle them and dabble
19  in them or try to somehow participate so
20  they can get some kind of a proportionate
21  fee.  That's why the rules changed so that
22  it added the joint participation or joint
23  responsibility as opposed to simply in
24  proportion to the fee.

Page 64

1      It was never the case in
2  Massachusetts, but it certainly was the
3  case in other jurisdictions.
4      The ABA really went out of its way
5  to liberalize the rules so to encourage
6  referral fees.  That was the idea.
7      THE SPECIAL MASTER: So the phrase
8  "joint participation" connotes not a
9  single, not a single piece of
10  participation in the case itself?
11      THE WITNESS: I'm not going -- I'm
12  not going to say that joint participation
13  means that there is not a single piece of
14  effort, but the effort that the courts
15  have said is sufficient is the referral
16  itself.
17      THE SPECIAL MASTER: I'm not -- not
18  of the specific case, I'm not quibbling
19  about that, of the client.  It's really a
20  referral of a client, not a case.
21      THE WITNESS: Referral of a client
22  to a lawyer, that's right.
23      THE SPECIAL MASTER: And you think
24  that's what joint participation

Page 65

1  anticipates in the rule?
2      THE WITNESS: That's what the courts
3  have said, and that's the way I read it.
4      THE SPECIAL MASTER: Okay.
5      BY MR. SINNOTT:
6  Q.  Let me direct your attention,
7  Counsel, to page 16 of your report.
8  A.  Sure.
9  Q.  And specifically in the paragraph
10  that begins near the top, "Both the Labaton
11  partner."
12      The second sentence says, "Hopkins
13  has also recently provided a declaration
14  confirming that he retroactively approves of
15  the instant fee-splitting arrangement.  Indeed,
16  Hopkins has affirmatively stated that he did
17  not wish to be involved in discussions
18  concerning fee allocation or becoming a referee
19  between law firms because that would have
20  districted him from focusing on protecting the
21  class.  His only concern about fees was that
22  the overall attorney fee award remain the
23  same."
24      Then you go on in the next paragraph

Page 66

1    to say that, "The foregoing facts support the
2    conclusion that Labaton obtained ARTRS' consent
3    to divide its fees with Chargois and,
4    therefore, complied with Rule 1.5(e) as it then
5    existed."
6        So let me focus on the declaration,
7    Attorney Lieberman.  What's the significance of
8    this declaration which was drafted years after
9    the engagement letter in this case?
10       MS. LUKEY: Objection.
11   A.   Well, as I think about it, it may
12   not be all that significant because Hopkins did
13   sign the engagement letter.  Just, I guess, the
14   parties couldn't find a signed copy.
15       THE SPECIAL MASTER: So that's why
16   the ratification declaration was
17   necessary, because they couldn't find a
18   signed copy?
19       THE WITNESS: I don't know.  I don't
20   know why it was necessary.
21   Q.   Well, how is it significant to your
22   report, or is it?
23   A.   Well, it's simply -- it corroborates
24   or reemphasize -- it reemphasizes that he gave,

Page 67

1    you know, gave consent and that he knew what he
2    was doing and that he is a sophisticated
3    individual who was focused on the more
4    meaningful issue which was, you know, getting
5    the right counsel for the case.
6    Q.   Did you view any documents that seem
7    to suggest that he did not consent in an
8    informed fashion to referral fee arrangements
9    or division of fees?
10       MS. LUKEY: Objection.
11   Q.   Do you recall any such documents?
12   A.   No, I don't.
13   Q.   Would it have informed your
14   interpretation of the declaration if you were
15   to have learned that both before and after the
16   engagement letters were signed that Eric Belfi
17   took steps that might be interpreted to have
18   concealed the involvement of Damon Chargois
19   from Mr. Hopkins?
20       MS. LUKEY: Objection.
21   A.   I don't know that Mr. Belfi did
22   that, but, in any event, the main thing was
23   Mr. Hopkins emphasized repeatedly, apparently,
24   that he wasn't really concerned about that.

Page 68

1    That was something that was between the lawyers
2    and he didn't want to know about it.
3    Q.   But would you agree that, assuming
4    that there was an attempt to circumvent
5    Mr. Hopkins before and after the signing of
6    that or the execution of that retention letter,
7    that that would be significant on the issue of
8    whether Mr. Hopkins had provided consent to
9    this arrangement?
10       MS. LUKEY: Objection.
11   A.   Not according to Mr. Hopkins.  It
12   wouldn't have mattered.
13   Q.   Well, I'm asking, according to you?
14   A.   I don't have an independent opinion
15   of Mr. Hopkins.  According to me, if
16   Mr. Hopkins said it doesn't matter to him, it
17   didn't matter.  So it wouldn't change my
18   opinion.
19   Q.   What if, upon learning that,
20   Mr. Hopkins had said, geez, I had no idea that
21   they were going around my back with this guy,
22   Chargois, who I just found out was paid
23   $4.1 million, I never consented to that, would
24   that have affected your opinion as to whether

Page 69

1    1.5(e) was complied with?
2        MS. LUKEY: Objection.
3    A.   It would not have, because 1.5(e)
4    doesn't require disclosure of the name of the
5    firm.  It simply requires disclosure of the
6    fee-splitting arrangement.  That's all it
7    requires.
8        So, as a regulatory matter, it would
9    be tough to prove that case against the
10   lawyers.
11   Q.   But you've indicated that the
12   subjective view of Mr. Hopkins is relevant as
13   to whether 1.5(e) was complied with, correct?
14   A.   I have indicated that Mr. Hopkins
15   testified and also provided the declaration and
16   also signed an agreement that acknowledged the
17   understanding that there was a fee-splitting
18   agreement, but didn't care.  That's what I
19   said.
20   Q.   All right.  And, in your view, it's
21   important that he didn't care, correct?
22       MS. LUKEY: Objection.
23   A.   No.  What's important is that the
24   disclosure was made to him of the fee-splitting

Page 70

1 agreement, and that the overall fee was
2 reasonable.
3    His subjective feelings about it --
4 if he had objected, presumably, that would be a
5 different matter, but he consented, and that's
6 all that counts.
7 Q.  So that provision in the retention
8 letter that indicates that Labaton may allocate
9 attorneys' fees obviates, in your view, any
10 attempt by Labaton to deprive Mr. Hopkins of
11 information about the referring attorney?
12    MS. LUKEY: Objection.
13 A.  I don't understand your question
14 exactly.  What do you mean "obviates"?
15    I think I testified that the
16 important thing was the compliance with the
17 rule and the terms of the rule, and the rule
18 required disclosure and consent by the client
19 and that the overall fee is reasonable, and
20 those things were complied with.
21    I don't understand what else you are
22 asking me.
23 Q.  Can that disclosure be considered
24 complete or sufficient if it does not

Page 71

1 contemplate or include information that the
2 client is being deprived of important
3 information?
4    MS. LUKEY: Objection.
5 A.  The rule doesn't define what kind of
6 information as long as there's a fee-splitting
7 arrangement disclosed.  It doesn't say
8 specifically you have to say the name of the
9 lawyer or lawyers.  It doesn't say you have to
10 say the amount of the fee split.  It doesn't
11 require any of that in Massachusetts.
12 Q.  Sure.  But my question to you is,
13 can the client be considered to be informed if
14 he's been consciously deprived of important
15 information?
16    MS. LUKEY: Objection.
17 A.  Again, the rule doesn't require
18 important information be disclosed.  It's a
19 very simple rule.  It only requires that
20 information be disclosed -- to repeat myself --
21 about the fact of the fee-splitting
22 arrangement -- a fee-splitting arrangement.
23    THE SPECIAL MASTER: And no details
24 about the arrangement whatsoever, to whom

Page 72

1 it's going, whether or not any work will
2 be done, whether or not this lawyer has
3 ever touched the case, has anything to do
4 with the case, or even knows about the
5 case.  None of that is required to get the
6 informed consent of the client; is that
7 right?
8    THE WITNESS: That's right.
9    THE SPECIAL MASTER: I'd like to go
10 back to this issue.  I'm stuck on this, I
11 know, of what a referral fee is and the
12 policies that we discussed.
13    Are you familiar with the secondary
14 source, "Massachusetts Legal Ethics,
15 Substance and Practice"?
16    MS. LUKEY: Is that the Gilda Tuoni?
17    THE WITNESS: Yes, I mentioned it in
18 my footnote.
19    THE SPECIAL MASTER: I thought I saw
20 it in yours.  I couldn't immediately put
21 my hands on it.
22    THE WITNESS: It's on the first
23 page.
24    THE SPECIAL MASTER: Maybe that's

Page 73

1 why.  I was looking further.
2    THE WITNESS: Yes, I knew her when
3 she was actively practicing.
4    THE SPECIAL MASTER: Actually, it's
5 not.  This is a secondary source that was
6 referred to by another expert, and it's
7 called "Massachusetts Legal Ethics,
8 Substance and Practice."
9    THE WITNESS: Who is the author,
10 sir?
11    THE SPECIAL MASTER: I knew you
12 would ask that, and I couldn't find it.
13    MS. McEVOY: It's the draft BBO
14 treatise.
15    THE WITNESS: Oh, that's the 2015
16 draft.
17    MS. McEVOY: 2017 draft?  I don't
18 know which one, actually.
19    THE WITNESS: Yes, I am familiar
20 with that.  I know -- I used to work
21 there.
22    THE SPECIAL MASTER: Okay.  Good.
23 So that treatise says, "Unlike almost
24 every other jurisdiction in the nation,

Page 74

1  Massachusetts permits an attorneys' fee to
2  be divided with a lawyer who does not
3  practice in the firm of the primary
4  lawyer, i.e., a referral fee, even if the
5  referring lawyer does nothing more than
6  refer the matter."
7      That sounds like what we were
8  talking about when you initially told me
9  what a referral fee was, refer the matter.
10     Can we read anything into referral
11  fee in the context of 1.5(e) from that?
12     MS. LUKEY: Objection.
13     THE WITNESS: I think it reenforces
14  my opinion.
15     THE SPECIAL MASTER: We're going
16  around in circles here, Mr. Lieberman.
17     I want to know how Mr. Chargois
18  referred the matter, State Street matter,
19  in this case.
20     THE WITNESS: He referred ARTRS to
21  Labaton.  And subsequently --
22     THE SPECIAL MASTER: Referred
23  Labaton to ARTRS.
24     THE WITNESS: I'm sorry.  Well, he

Page 75

1  created -- he introduced them.  Let's put
2  it that way.
3      THE SPECIAL MASTER: And you believe
4  that constitutes referring the State
5  Street matter?
6      THE WITNESS: Yes, sir.
7      THE SPECIAL MASTER: Okay.
8      BY MR. SINNOTT:
9  Q.  All right.  Let me direct your
10  attention to page 17, Counsel.
11 A.  I'm there, sure.
12 Q.  All right.  The middle paragraph
13  that begins, "Notably," and just for context,
14  I'll read that.
15     "Notably, to the best of my
16  knowledge, neither lawyer in Saggese was
17  subsequently disciplined following the court's
18  opinion, nor is there any evidence that the
19  Massachusetts Board of Bar Overseers took or
20  has ever taken the position that lawyers who
21  engage in imperfectly documented, but,
22  nonetheless, enforceable fee-splitting
23  arrangements, are thereby automatically subject
24  to discipline or sanctions for violating Mass.

Page 76

1  Rule 7.2 by sending a forwarding fee not to
2  another law firm, but to a person."
3      And then you say, "I am not aware of
4  any such bootstrapped interpretation or
5  application of Rule 7.2 in any jurisdiction,
6  and Professor Gillers cites no authority beyond
7  his own expansive reading of the rules."
8      Drawing your attention to that last
9  sentence, "I'm not aware of any such
10  bootstrapped interpretation," does the fact
11  that the courts have not discussed 7.2 and
12  1.5(e) in a single opinion make those rules
13  ineffective as written, in your view?
14 A.  I don't understand your question at
15  all.  I'm sorry.
16 Q.  Is bootstrapped interpretation of
17  Rule 7.2 in any jurisdiction, what specifically
18  are you referring to when you say "bootstrapped
19  interpretation"?
20 A.  Well, there have been many
21  situations where lawyers, in referral-fee
22  arrangements, have not crossed their Ts and dot
23  their Is, if I can put it that way, and the
24  only litigation, to the best of my knowledge,

Page 77

1  has been between lawyers, one lawyer trying to
2  enforce a fee arrangement, a referral fee
3  agreement with another.  I don't know of any
4  litigation where clients have litigated the
5  issue of a referral fee arrangement presumably
6  because they are satisfied with the idea of the
7  overall reasonableness of the fee.
8      So, in those cases, where lawyers
9  have litigated referral fees and where disputes
10  have arisen about referral fees, I don't know
11  of any court that has ever said, because the
12  referral fee arrangement was imperfect,
13  therefore, the lawyer somehow violated Rule 7.2
14  by referring the matter and seeking a referral
15  fee from a person as opposed to another lawyer.
16  I don't know of any court that's ever said that
17  or any ethics opinion has ever said that as
18  between lawyer-to-lawyer referrals.
19     There may be some obscure ethics
20  opinion somewhere that says something where
21  those two rules are mentioned, but I don't know
22  of anything that relates to anything close to
23  this case where that would be the case.
24     I have never heard this

Page 78

1 interpretation before, and if you look in the
2 ALI restatement, if you look in the treatises,
3 you never see any case that talks about if you
4 violate the specific express terms of 1.5(e),
5 then you are, therefore, in violation of 7.2 by
6 attempting to get a referral fee from a person.
7 I've never seen that.
8     THE SPECIAL MASTER: Could I ask a
9 question another way, please?
10     THE WITNESS: Sure.
11     THE SPECIAL MASTER: Suppose there's
12 no attempt whatsoever to comply with
13 1.5(e)?  There's just simply a
14 recommendation by a lawyer to a client
15 that another lawyer be used.  Simply that.
16 There's no notice to the client.  No
17 consent by the client, written or
18 otherwise.
19     Are we then in 7.2(b)?
20     THE WITNESS: No, we're not.
21     THE SPECIAL MASTER: Why?
22     THE WITNESS: Because it's between
23 lawyers.  7.2 doesn't talk about referrals
24 to -- between lawyers.  7.2 talks about

Page 79

1 the policy of not seeking -- not paying
2 non-lawyers for referrals.  It has nothing
3 to do with lawyers.
4     THE SPECIAL MASTER: Suppose the
5 lawyer is no longer practicing, but
6 maintains his law license.
7     MS. LUKEY: Objection.
8     THE WITNESS: If the lawyer is a
9 member of the bar, then that takes it out
10 of Rule 7.2, in my judgment.
11     THE SPECIAL MASTER: So a lawyer
12 degree and being a member of the bar
13 insulates any transaction from 7.2(b)?
14     THE WITNESS: I've never heard of an
15 interpretation that 7.2(b) -- 7.2 or
16 7.2(b) would apply in that circumstance,
17 ever.
18     THE SPECIAL MASTER: Then why have
19 subsection 5 in 7.2(b), which looks to be
20 a safe harbor provision for agreements
21 that comply with 1.5(e)?
22     THE WITNESS: Right.  Just to
23 emphasize the very point that I just made.
24     THE SPECIAL MASTER: Surplusage,

Page 80

1 unnecessary and surplusage.
2     MS. LUKEY: Objection.
3     THE WITNESS: I wouldn't agree with
4 that.
5     MS. LUKEY: Do we happen to have a
6 copy of the rule or shall I pull it up
7 electronically?
8     MS. McEVOY: I can give you a hard
9 copy.
10     MS. LUKEY: 7.2(b).
11     THE WITNESS: This is the
12 Massachusetts 7.2(b).  I'm familiar with
13 it.
14     MS. McEVOY: This is the language
15 that's been consistent throughout.
16     THE WITNESS: This is the language
17 in 2011?
18     MS. McEVOY: Currently.
19     THE SPECIAL MASTER: That's the
20 current language.
21     MS. LUKEY: I think the language was
22 the same, but it was 7.2(c) at the point.
23     THE SPECIAL MASTER: Yeah, it was a
24 different number, 7.2(c).

Page 81

1     So it says, "7.2(b).  A lawyer shall
2 not give anything of value to a person for
3 recommending the lawyer's services."  And
4 then there's an exception, "Except that a
5 lawyer may," and then there are permissive
6 applications and specifically
7 permissive -- pay fees permitted by Rule
8 1.5(e).
9     THE WITNESS: Okay.
10     THE SPECIAL MASTER: So what's the
11 purpose of that if, as long as the person
12 doing the recommending is a lawyer, what's
13 the purpose of subsection 5?
14     THE WITNESS: Just perfectly
15 consistent with the rest of the rules.  I
16 have no idea why it was necessary, but if
17 they put it in, they put it in.  It
18 doesn't change a thing in terms of what I
19 just said.
20     THE SPECIAL MASTER: All right.  So,
21 for your purposes, a lawyer shall not give
22 anything of value to a person.  A lawyer
23 is not a person under 7.2(b).
24     There are many people who would

Page 82

1  agree with that, but for purposes of
2  construing that rule, a lawyer is not a
3  person?
4      THE WITNESS: Correct.
5      THE SPECIAL MASTER: Period.
6      THE WITNESS: Period.
7      THE SPECIAL MASTER: So a law degree
8  and membership in the bar insulates a
9  person from violating 7.2(b), period?
10     THE WITNESS: Correct.  Period.
11     THE SPECIAL MASTER: And 7.2(b)(5)
12  is merely surplusage, unnecessary?
13     THE WITNESS: It's probably
14  redundant.
15     THE SPECIAL MASTER: Redundant.
16     THE WITNESS: That's not the only
17  place in the rules where the rules are
18  redundant, but that's one of them.
19     THE SPECIAL MASTER: You are
20  familiar with statutory construction,
21  rules of statutory construction?  Or maybe
22  you're not.
23     THE WITNESS: I don't purport to be
24  an expert in statutory construction.

Page 83

1      THE SPECIAL MASTER: Okay.
2      THE WITNESS: I understand something
3  about it.
4      THE SPECIAL MASTER: There is a
5  presumption that language in a statute is
6  not surplus, that language in a statute is
7  there for a purpose.
8      THE WITNESS: I can only tell you
9  that I know something about the Rules of
10  Professional Conduct and the prior Code of
11  Professional Responsibility, and there is
12  redundancy.  That's all I can tell you,
13  sir.
14     THE SPECIAL MASTER: And this would
15  be one of those issues of redundancy?
16     THE WITNESS: It seems to be, yes.
17     THE SPECIAL MASTER: And it should
18  be viewed as redundancy and not construed
19  pursuant to normal rules of statutory
20  construction, which is that we read rules,
21  we read statutes as having a purpose and
22  not to assume that statutory language or
23  rules language is redundant or surplusage.
24     MS. LUKEY: Objection.

Page 84

1      THE WITNESS: I have no opinion on
2  that one way or the other.
3      THE SPECIAL MASTER: So in
4  considering whether 7.2(b) covers lawyers,
5  just that question at the top, one should
6  ignore 7.2(b)(5), yes?
7      MS. LUKEY: Objection.
8      THE WITNESS: I testified what I
9  testified to.  It's redundant.
10     THE SPECIAL MASTER: Has nothing to
11  say about the construction of the rule?
12     MS. LUKEY: Objection.
13     THE WITNESS: Same answer.
14     THE SPECIAL MASTER: And your
15  answer, correct, has nothing to say about
16  construction of the rule?
17     THE WITNESS: No.  My answer is that
18  it's redundant.
19     THE SPECIAL MASTER: Okay.
20     BY MR. SINNOTT:
21  Q.   Attorney Lieberman, let me direct
22  your attention, again, to that middle paragraph
23  on page 17.  And the first sentence that I read
24  before, "Notably, to the best of my knowledge,

Page 85

1  neither lawyer in Saggese was subsequently
2  disciplined following the court's opinion."
3      Isn't it true, though, that the
4  court, in Saggese, did say that the lawyers
5  could be disciplined, even as it enforced the
6  agreement between the lawyers?
7  A.   I'd have to look at the Saggese
8  opinion to see what it says on that.  I don't
9  think that's the wording of the opinion.
10     I just want to look at the opinion.
11  And can I have the specific reference, if you
12  wouldn't mind?
13  Q.  Yeah.
14     THE SPECIAL MASTER: Off the record.
15     (Discussion off the record.)
16     (Lieberman Exhibit 3, Saggese v.
17  Kelley Decision, marked for
18  identification.)
19  Q.   If I could direct your attention to
20  the page that has a 6 in the lower right of the
21  page on the right-hand side.
22  A.   Yep.  I'm there.
23  Q.   So the paragraph that begins, "These
24  problems are avoidable in fee-sharing

Page 86

1  situations if the referring lawyer, who usually
2  is in the best position to secure compliance
3  with Rule 1.5(a), is required to disclose the
4  fee-sharing agreement to the client before the
5  referral is made and secures the client's
6  consent in writing.  This rule will be
7  construed to require this in fee-sharing
8  agreements that are formed after the issuance
9  of the rescript in this decision."
10    I want to bring you down to the
11  final sentence of that paragraph.  "We
12  emphasize that, although failure to comply with
13  the rule may not necessarily render a contract
14  unenforceable between lawyers, it may subject
15  both lawyers to disciplinary action upon
16  division of a fee."
17  A.  Right.
18  Q.  Does that refresh your memory as to
19  what the court said?
20  A.  It does.
21  Q.  Let me direct your attention to --
22    THE SPECIAL MASTER: Could I ask a
23  more general question?  And I'm interested
24  in your view.

Page 87

1    Let's assume here there was not
2  compliance with 1.5(e), but there was an
3  attempt to comply.
4    THE WITNESS: When you say "here,"
5  you mean in Saggese or in this case?
6    THE SPECIAL MASTER: In this case.
7  There was an attempt to comply.
8    Does that go to whether or not the
9  rule is technically violated or does it go
10  to consideration of discipline and
11  sanction?
12    MS. LUKEY: Objection.
13    THE WITNESS: Well, that's a good
14  question, and a hard question to answer.
15    THE SPECIAL MASTER: And I'm very
16  interested in your answer.
17    THE WITNESS: I can tell you, from a
18  disciplinary and sanction standpoint,
19  first, that the substantial compliance or
20  imperfect compliance would be certainly
21  taken into consideration.  The equities
22  would be looked at.  But the most
23  important factor, really, is letter of the
24  rule.

Page 88

1    And if there is no notice that a
2  rule requires, for example, disclosure of
3  the name of the, you know, lawyers who
4  referred, it would be very, very difficult
5  for a prosecuting lawyer, as I was for
6  many years, to bring charges against that
7  lawyer, notwithstanding that it says so in
8  a case of the high court, because of the
9  notice and due process concerns.
10    So from an enforcement standpoint,
11  sanctions, discipline, what really counts
12  is the attempt to and the substantial
13  compliance with the rule as written in the
14  code of professional responsibility.
15    From an enforcement standpoint in
16  terms of enforcing a contract, the courts
17  have pretty much said that they will
18  enforce imperfect or substantially
19  complied with fee-sharing agreements when
20  the equities so suggest.
21    THE SPECIAL MASTER: As between the
22  lawyers.
23    THE WITNESS: As between the
24  lawyers, as was the case in Daynard, which

Page 89

1  was clearly -- I mean, kind of shocking
2  for a law professor not to have anything
3  but an oral agreement with a bunch of
4  lawyers, law firms, but never the less,
5  Judge Young took the position, hey, ten
6  years of work.
7    THE SPECIAL MASTER: I was going to
8  say, in Daynard, the lawyer did a lot of
9  work.
10    THE WITNESS: I say ten years of
11  work.  And I knew Daynard when I was in
12  Massachusetts.
13    So, I mean, I think it's, from all
14  standpoints, this rule is viewed in
15  context, very much in context.
16    THE SPECIAL MASTER: Okay.  I want
17  you to assume, as a hypothetical, there is
18  consent to a division of fee, but it is
19  not informed consent in the context of all
20  the circumstances.  It is not informed.
21  Is that an imperfect compliance?
22    MS. LUKEY: Objection.
23    THE WITNESS: I don't think the rule
24  says the word "informed."  It says

Page 90

1  consent.  You could read into it informed,
2  but it doesn't say informed.
3      So according to -- if I'm a
4  prosecutor and we are talking about
5  discipline or if I'm looking at potential
6  sanctions under Rule 11 or some other
7  rule, I would not read into a rule
8  language that's more than what's required
9  by the rule for purposes of not only
10 statutory construction, but also for
11 purposes of due process.
12     THE SPECIAL MASTER: If the consent
13 given is not based upon full and complete
14 information, but only the bare minimum
15 that there would be a division of fee in
16 light of all the circumstances, and I'm
17 going to have a follow-up question, is
18 that imperfect compliance with the rule?
19     MS. LUKEY: Objection.
20     THE WITNESS: I'm not sure I would
21 say it's imperfect.  I would say it's in
22 compliance with the rule as written.
23     THE SPECIAL MASTER: Because it
24 gives bare consent to the division?

Page 91

1      THE WITNESS: Yes.
2      THE SPECIAL MASTER: What if there
3  is imperfect compliance, does that then go
4  to discipline and sanction?
5      MS. LUKEY: Objection.
6      THE WITNESS: I don't know of any
7  disciplinary cases in New York, and there
8  might be private admonitions, but I don't
9  know of anybody who's been disciplined for
10 imperfect compliance in New York.  And I
11 don't know of anybody in Massachusetts,
12 but I'm not ruling out the possibility
13 that somebody once received a letter of
14 caution or a letter of admonition.  I
15 don't know.  I have not seen a public
16 case.
17     THE SPECIAL MASTER: So you can have
18 imperfect compliance, not technically
19 comply with the rule, and no discipline or
20 sanction.
21     THE WITNESS: Judge, the bar
22 disciplinary authorities are strapped for
23 resources and money, and they focus on
24 perjury, neglect, misappropriation of

Page 92

1  funds.  And they don't focus, generally
2  speaking, on imperfect compliance with the
3  rule that ultimately benefits the client.
4      They're consumer protection agencies
5  looking out for the rights and interest of
6  the clients, vis-a-vis, the bar.  They are
7  not focused on disputes between lawyers,
8  generally speaking.
9      So that's the emphasis.  And I
10 was -- I have been on both sides of that
11 for many, many years.  And I'm confident
12 about that from a disciplinary standpoint,
13 and from representing people in sanctions
14 cases.
15     Could I possibly take a break and go
16 to the washroom for a minute or two?
17     MR. SINNOTT: Absolutely.
18     THE SPECIAL MASTER: Let's break for
19 15 minutes.
20     (Recess taken.)
21     MR. SINNOTT: It's approximately
22 3:15.
23     BY MR. SINNOTT:
24 Q.  Counsel, just to finish up on that

Page 93

1  middle paragraph on page 17, where you say, in
2  the final sentence, "I'm not aware of any such
3  bootstrapped interpretation or application of
4  Rule 7.2 in any jurisdiction, and Professor
5  Gillers cites no authority beyond his own
6  expansive reading of the policies."
7  A.  Of the rules.
8  Q.  Of the rules.  I'm sorry.
9      You mentioned, before the break,
10 that there might have been private admonitions.
11 And is it fair to say that those private
12 admonitions might have reflected such an
13 interpretation?
14     MS. LUKEY: Objection.
15 A.  Anything is possible.  I think the
16 likelihood of that is practically zero.
17 Q.  And why do you say that?
18 A.  Because it doesn't make any sense,
19 and I don't think that any bar disciplinary
20 agency, and I have been involved with two of
21 them, would interpret it that way.
22 Q.  That's your --
23 A.  That's my professional opinion.
24 Q.  Your professional opinion.

Page 94

1  A.  Yes, sir.

2  Q.  Let me move on from that and direct

3  your attention to the following page, page 18.

4  A.  Sure.

5      THE SPECIAL MASTER: Before you do

6  that, I want to test your core belief that

7  7.2(b) has no application whatsoever to a

8  lawyer.  Isn't that what you said?

9      THE WITNESS: To a member of the

10  bar.

11     THE SPECIAL MASTER: To a member of

12  the bar, okay.

13     We're talking about lawyers A and B.

14  I can't remember which was the referring

15  lawyer.  Let's say -- let's say lawyer A

16  is the referred lawyer.  Lawyer B is the

17  one who's doing the referring.

18     But, anyway, let's say that if

19  lawyer A, member of the bar, routinely

20  gives a fee every time lawyer B makes a

21  recommendation of a client who ultimately

22  retains lawyer A.

23     Are you with me?

24     THE WITNESS: I'm with you so far.

Page 95

1      THE SPECIAL MASTER: Without regard

2  to the eventual size of the fee to lawyer

3  A, could that be a violation of 7.2(b)?

4      MS. LUKEY: Objection.

5      THE WITNESS: I don't see how.

6      THE SPECIAL MASTER: What if the

7  clients don't even know about the

8  arrangement?  In other words, it doesn't

9  comply with 1.5(e).

10     MS. LUKEY: Objection.

11     THE WITNESS: I suppose the court

12  could say that the agreement is

13  unenforceable.

14     THE SPECIAL MASTER: But we are

15  still not under 7.2?

16     THE WITNESS: No.

17     THE SPECIAL MASTER: I will add one

18  more fact.  There's no division of fee

19  agreement whatsoever.  So the client isn't

20  told, and there is no agreement.  He just

21  gives him $5,000.

22     Are we then into 7.2(b)?

23     THE WITNESS: No.

24     THE SPECIAL MASTER: Period.

Page 96

1      THE WITNESS: Period.

2      THE SPECIAL MASTER: Okay.  So

3  you're pretty absolutist on this, right?

4  If a referring lawyer or a recommending

5  lawyer has a law degree and is a member of

6  the bar and is paid a fee for doing the

7  recommendation, nothing else matters.  We

8  are not under 7.2(b)?

9      THE WITNESS: Judge, I'm just giving

10  you my best professional opinion.

11     THE SPECIAL MASTER: I'm just asking

12  you a question.

13     THE WITNESS: I have never heard

14  such an interpretation.

15     THE SPECIAL MASTER: Okay.  And

16  there's no purpose served in the --

17     THE WITNESS: Until now, I should

18  say.

19     THE SPECIAL MASTER: Okay.  Well,

20  you've heard it from Professor Gillers.

21     THE WITNESS: That's right.  Other

22  than that, I have never heard it.

23     THE SPECIAL MASTER: Professor

24  Gillers is a respected member of your

Page 97

1  profession.

2      THE WITNESS: He is.

3      THE SPECIAL MASTER: He is a

4  nationally recognized expert in the area

5  of legal ethics, is he not?

6      THE WITNESS: Absolutely.  And he is

7  a friend.

8      MS. LUKEY: I have to object to the

9  fact that he is present, which I didn't do

10  at the beginning.

11     THE WITNESS: Flattery won't matter

12  to him.

13     MS. LUKEY: I just figured you are

14  being nicer because he is here.

15     THE WITNESS: I would say that

16  whether he is here or not.

17     THE SPECIAL MASTER: So this gets me

18  to my last question.  Why?

19     THE WITNESS: I doubt that it's your

20  last question.

21     THE SPECIAL MASTER: My last

22  question about 7.2(b).  That reminds me of

23  what I always said to lawyers when they

24  told me they only had one more question,

1  and half an hour later.
2     If that is the way the rule is to be
3  construed, and by "it," I mean that as
4  long as the recommender has a law degree
5  and is a member of the bar, it does not
6  come under 7.2(b), why in the world would
7  they have put 7.2(b)(5) in it?
8     **THE WITNESS:** I think you have asked
9  me that question before.
10     **MS. LUKEY:** Objection.
11     **THE SPECIAL MASTER:** I did ask it
12  before. And I'm still searching for an
13  answer.
14     **THE WITNESS:** I have no idea.
15     **THE SPECIAL MASTER:** Well, I do
16  appreciate your candor.
17     **BY MR. SINNOTT:**
18  Q. Is it your testimony that person in
19  7.2(b) means non-lawyer?
20  A. Yes.
21  Q. How do you explain the fact that the
22  drafters did not use the word "non-lawyer" when
23  they used that word five other times in the
24  rule or in its comment?

1  A. **Bad drafting.**
2  Q. Bad drafting?
3  A. **Perhaps.**
4  Q. I know you say you are not an expert
5  in statutory construction, nor am I, but
6  doesn't it indicate that they would have used
7  non-lawyer if that's what they wanted to use?
8     **MS. LUKEY:** Objection.
9  A. **Maybe.**
10     **THE WITNESS:** Sorry. I'm too fast.
11     **MS. LUKEY:** Yeah, you are.
12  A. **Maybe.**
13  Q. Let me direct your attention to page
14  18, and the top of the page. You describe
15  Professor Gillers as "Professor Gillers labors
16  mightily." I think I'm getting tired just
17  reading that, "labors mightily to distinguish
18  the circumstances in Saggese and Daynard by
19  focusing on what he terms the equities," and
20  you cite the page in his report.
21     You then say, "He claims that the
22  equities are somehow different here, because in
23  Saggese the lawyer tried to keep the fee for
24  himself, justifying that claim, in part, by the

1  fact that the referring lawyer did no work, and
2  in Daynard, that the law professor, as
3  referring counsel, contributed substantially to
4  the success of the litigation."
5     And then you conclude as follows,
6  "But neither of these alleged differentiating
7  rationales holds water. Mass. Rule 1.5(e) does
8  not require referring firm to do any work on
9  the case, as Professor Gillers is aware. It is
10  also unclear why the equities here are any
11  different with respect to Daynard."
12     Does the court have the authority to
13  enforce equities?
14     **MS. LUKEY:** Objection.
15  A. **The court has -- certainly has the**
16  **discretion to take into consideration the**
17  **equities. I would agree with that.**
18  Q. All right. Thank you.
19     Now, let me direct your attention to
20  the bottom of the page and the paragraph that
21  begins, "In short, in my opinion the equities
22  here are not meaningfully different. The
23  possible payment of a referral or forwarding
24  fee was not kept from ARTRS, which agreed

1  through its engagement letter that Labaton was
2  free to pay referral fees to other firms.
3  Hopkins, on behalf of ARTRS ratified the
4  fee-splitting arrangement as well." And you
5  cite the declaration.
6     And then you say, "As a matter of
7  good policy and public interest, it is well
8  recognized that the bar should encourage
9  fee-sharing relationships that serve the client
10  by helping to ensure that cases, especially
11  litigation matters like this one, are handled
12  by the best, most experienced lawyer in the
13  particular area of law. That is exactly what
14  happened here, and the results speak for
15  themselves."
16     So going up to that statement
17  "should encourage fee-sharing relationships
18  that serve the client," who's the client in
19  this case?
20  A. **ARTRS.**
21  Q. And how were the equities to the
22  client served in this case?
23  A. **How were the equities served? I**
24  **don't understand what you mean by that.**

1 Q.  Well --
2 A.  The client's interests were served,
3   if that's what you mean.
4 Q.  Describe for me how the client's
5 interest was served.
6 A.  By the fact that it was, through
7   Chargois, able to find or meet up with Labaton,
8   and Labaton got a great result for them in the
9   litigation matter that is at issue here.
10 Q.  And beyond -- strike that.
11   Directing your attention to the
12 following page.
13 A.  I should say Labaton and other
14   counsel.  They didn't do it alone.
15 Q.  All right.  Because they are
16 listening.
17 A.  And they deserve to be.
18   MR. SINNOTT: On that note, Mike is
19 going to walk out on us.
20 Q.  In your final paragraph on page 19,
21 you say, "The payment," under the heading C,
22 "The payment to Chargois did not violate Rule
23 1.5(a)," and you reference that, "Professor
24 Gillers recently testified that the payment to

1 Chargois may have violated Mass Rule 1.5(a).
2 In my opinion, this does not withstand scrutiny
3 on its face.  Mass. Rule 1.5(e) applies to fee
4 divisions and requires only that the total fee
5 is reasonable."
6   Shouldn't a reasonableness
7 requirement be read into 1.5(e) for fee
8 sharing?
9 A.  I don't know where my friend came up
10   with that idea.  The answer is no.
11 Q.  And what do you base that on?
12 A.  First of all, there's no authority
13   for that notion, that I'm aware of.  And,
14   secondly, it doesn't make any sense.
15 Q.  Why not?
16 A.  Because if you're going to have a
17   rule that says that you don't have to share
18   fees in proportion to the work done, but simply
19   on the basis of a joint participation or joint
20   responsibility, then there wouldn't be any
21   scrutiny of fees at all.
22   So whether the fees were -- that
23   were paid to the referring lawyer were $10,000
24   or $4.1 million wouldn't make any difference as

1 long as the overall fee was reasonable for the
2 client.  And as I understand it in this case,
3 the court has essentially concluded that it
4 was.
5   THE SPECIAL MASTER: What if the
6 recommending fee were 90 percent of the
7 total fee?
8   THE WITNESS: It wouldn't matter.
9 You can say 99.9 percent, Judge.  I
10 wouldn't change my opinion.
11   THE SPECIAL MASTER: Okay.
12   THE WITNESS: Just to be clear.
13   THE SPECIAL MASTER: Hal, I keep
14 thinking of more questions to ask you
15 about your view on 7.2(b).
16   THE WITNESS: I welcome your
17 questions.
18   THE SPECIAL MASTER: I'm not going
19 to say one more, because I keep thinking
20 of more.
21   THE WITNESS: Fire away.
22   THE SPECIAL MASTER: Wouldn't your
23 interpretation of 7.2(b) encourage
24 ambulance chasing by lawyers who are

1 members of the bar?
2   MS. LUKEY: Objection.
3   THE WITNESS: I'm not sure I follow
4 why that would be the case.
5   THE SPECIAL MASTER: Because they
6 can get a fee without being subject to
7 7.2(b) simply by finding clients and
8 recommending them.  For example, going to
9 hospitals, finding people who have been
10 injured and recommending them.
11   THE WITNESS: Well, there are rules
12 against that, rules that apply to lawyers
13 as well as to laypeople.
14   THE SPECIAL MASTER: Solicitation
15 rules.
16   THE WITNESS: Solicitation rules.
17 So that would be precluded under the
18 solicitation rules, whether you're a
19 lawyer or a layperson.
20   THE SPECIAL MASTER: So maybe a
21 better way to think about your view,
22 correct me, is that if a lawyer who has a
23 law degree and is a member of the bar
24 engages in solicitation.

Page 106

1   **THE WITNESS:** Improper solicitation,
2   you mean?  Engaging in solicitation is
3   perfectly proper.
4   **THE SPECIAL MASTER:** Improper
5   solicitation.  Cold calling.
6   **THE WITNESS:** In-person solicitation
7   would be improper, generally speaking,
8   with some exceptions.
9   **THE SPECIAL MASTER:** Including a
10  cold call by telephone?
11  **THE WITNESS:** Cold call or going to
12  a hospital or talking to a person lying in
13  the street after hit by a car, whatever.
14  **THE SPECIAL MASTER:** Okay.  So if
15  the lawyer does that, then the appropriate
16  section 2, construe the lawyer's conduct
17  under, is the solicitation rule, and not
18  the -- and not Rule 7.2(b).
19  **THE WITNESS:** In my view, yes,
20  Judge.
21  **THE SPECIAL MASTER:** So what if --
22  **THE WITNESS:** And, by the way, there
23  is a criminal statute in New York about
24  that as well.  Not in Massachusetts, but

Page 107

1   in New York.
2   **THE SPECIAL MASTER:** So what if a
3   lawyer engages in solicitation and
4   receives a fee for it?
5   **THE WITNESS:** Proper or improper
6   solicitation?
7   **THE SPECIAL MASTER:** Let's assume
8   it's improper solicitation.
9   **MS. LUKEY:** Objection.
10  **THE SPECIAL MASTER:** Let's assume
11  improper solicitation.
12  **THE WITNESS:** Well, the lawyer would
13  be subject to discipline for improper
14  solicitation, and the fee aspect would be,
15  you know, just another add-on, but it
16  would basically be -- the violation would
17  be improper solicitation.
18  **THE SPECIAL MASTER:** So, in that
19  situation, 7.2(b) would still not be
20  implicated, but the solicitation rule
21  would be?
22  **THE WITNESS:** Yes, sir.  If I'm a
23  disciplinary enforcement lawyer, yes,
24  that's the way I would view it.

Page 108

1   **THE SPECIAL MASTER:** What if the
2   lawyer picks up the phone on behalf of
3   another lawyer and calls a client cold,
4   doesn't even know the client, and says,
5   I'm working with lawyer A, and I'd like
6   you to have a meeting with him.  Will you
7   meet with him?
8   Is that improper or proper
9   solicitation?
10  **MS. LUKEY:** Objection.
11  **THE WITNESS:** It's improper for
12  lawyers to cold call people they don't
13  have a relationship with and seek their
14  business.  It's not the proper way to go
15  about getting the client business.
16  **THE SPECIAL MASTER:** Let's assume
17  that that's what happened in this case by
18  Mr. Chargois.  Let's not focus on Labaton
19  yet.  Let's assume that Mr. Chargois cold
20  called Arkansas, the executive director,
21  says, I am working with a New York law
22  firm that specializes in securities
23  litigation.  Will you meet with them?
24  **THE WITNESS:** And Mr. Chargois and

Page 109

1   the ARTRS has no -- they have no
2   relationship, no knowledge, he just picks
3   them out of the phone book.
4   **THE SPECIAL MASTER:** No pre-existing
5   relationship.
6   **MS. LUKEY:** You two said two
7   different things.
8   **THE SPECIAL MASTER:** We did.  No
9   pre-existing relationship, but there's a
10  recommendation from a third party that
11  that lawyer should call Arkansas, and he
12  does.
13  **THE WITNESS:** Well, if there's a
14  connection, if there's a reasonable
15  connection, I'm not sure that would
16  violate the solicitation rule, but if
17  there wasn't, then that might violate the
18  solicitation rule.  It might.
19  **THE SPECIAL MASTER:** And then we are
20  under the solicitation rule and not under
21  7.2(b).
22  **THE WITNESS:** I think that's right.
23  **THE SPECIAL MASTER:** Even if the
24  lawyer gets paid a fee for facilitating

Page 110

1  that introduction?
2      THE WITNESS: It's -- the fee aspect
3  of it is not really relevant to 7.2.  That
4  would be relevant, I suppose, to 1.5(e),
5  depending on the way in which that went
6  down, but it wouldn't be relevant to 7.2.
7      THE SPECIAL MASTER: Well, it is
8  relevant because it says a lawyer shall
9  not give anything of value.
10     A fee would be of value.
11     THE WITNESS: But to a person, that
12 doesn't mean lawyers, as I read the rules,
13 for what it's worth, based on my own
14 experience in teaching and writing,
15 there's a distinction.
16     THE SPECIAL MASTER: It simply
17 excludes every person who has a law degree
18 and is a member of the bar, period.
19     THE WITNESS: That's my reading of
20 it.
21     THE SPECIAL MASTER: Okay.  I keep
22 not wanting to beat this dead horse,
23 but --
24     THE WITNESS: I don't have to catch

Page 111

1  a train.
2      MS. LUKEY: I do.
3      BY MR. SINNOTT:
4  Q.  Tell me if you agree with this
5  statement, Counsel.
6      "Legal ethics experts should not
7  offer an opinion, even if defensible, unless
8  they would adopt that opinion if they were the
9  judge in the case."
10     Do you agree with that?
11 A.  I'm not sure I understand that.
12 Could you read that again, please, just one
13 more time?
14 Q.  Absolutely.
15 A.  Thank you.
16 Q.  "Legal ethics experts should not
17 offer an opinion, even if defensible, unless
18 they would adopt that opinion if they were the
19 judge in the case."
20 A.  I don't think -- I don't agree with
21 that.  I mean, if the legal ethics expert
22 believes there's a basis in law or ethics for a
23 particular viewpoint on the Rules of
24 Professional Conduct, I think the legal ethics

Page 112

1  expert can give that advice to the client.
2      I mean, if the judge -- the judge
3  may not be knowledgeable or an expert in legal
4  ethics.  I mean, that's one of the reasons why
5  expert opinions are provided to courts in this
6  field.
7      Strange as it may seem, because it's
8  about the law and the law of ethics, but we
9  have often been asked to help the courts to
10 address legal ethics issues and the courts have
11 asked us to help them.  Maybe I just said the
12 same thing.
13     But I think that my opinion would be
14 independent of what I thought a judge might
15 adopt.
16 Q.  Okay.
17 A.  I wouldn't be offering an opinion
18 that would be contrary to a judge's instruction
19 or order or rule -- ruling, but I would try to
20 be independent as I -- as I think I am in terms
21 of that with clear respect for the court.
22     THE SPECIAL MASTER: Speaking of
23 judges, let me ask this.
24     There's been an allusion, although I

Page 113

1  don't believe by an expert, but I would
2  like your opinion on it, if a lawyer
3  violates a rule handed down by the Supreme
4  Judicial Court, but that rule has not been
5  codified as a rule of conduct, how should
6  that be handled?
7      THE WITNESS: Well, approaching it
8  from the standpoint of regulatory or
9  disciplinary lawyer, first of all, you
10 used the testimony "rule of court," and if
11 you are referring to, as I think you are,
12 the Saggese decision and the court's
13 admonition going forward, my problem would
14 be, as a regulatory lawyer in disciplining
15 or recommending discipline for a lawyer
16 who, theoretically or arguably, didn't
17 comply with the admonition or prospective
18 ruling, but was in compliance with the
19 rule as it existed in the Code of
20 Professional Responsibility, I would be
21 very reluctant to charge that lawyer with
22 misconduct if the lawyer were relying on,
23 and as he would have a right or she would
24 have a right to do, to the rule as it

Page 114

1  existed in the code, because the SJC,
2  Supreme Judicial Court, is ultimately the
3  authority for implementing and changing
4  the rule. And if the SJC doesn't get
5  around to changing the rule, but simply
6  writes something that could be, arguably,
7  called dictum in an opinion, there would
8  be serious due process problems and notice
9  problems.
10     And under, you know, under the
11  Supreme Court juris prudence, you know, In
12  re: Ruffalo, notice is the critical aspect
13  of lawyer discipline from a due process
14  standpoint.
15     THE SPECIAL MASTER: So are lawyers
16  not held to have notice of rulings of the
17  Supreme Judicial Court?
18     THE WITNESS: Like I just said, you
19  know, there's an old phrase, you know,
20  ignorance of the law is no excuse, but I
21  would certainly argue, if I were before
22  the Supreme Judicial Court, that they
23  could not enforce the Saggese ruling
24  prospectively or at the time against a

Page 115

1  lawyer who was going by and who relied on
2  the rule as it was written, because the
3  court hadn't changed the rule.
4     So I would be very careful to
5  describe the Saggese ruling as a -- as a
6  rule of conduct. And I disagree with the
7  notion that the -- a lawyer could be
8  disciplined or sanctioned or otherwise
9  criticized for following the existing rule
10  in the Code of Professional Responsibility
11  until it was changed, and if it was
12  materially changed.
13     THE SPECIAL MASTER: What if the
14  change was adopted but yet not effective?
15     THE WITNESS: Same thing. Same
16  thing. It's got to be effective.
17     As a prosecutor, I would never try
18  to do that -- never try to charge
19  somebody, just as I believe a criminal
20  prosecutor would not charge somebody with
21  a law that had not come into effect yet.
22     THE SPECIAL MASTER: So the fact
23  that the Supreme Court adopts a rule and
24  sets a future effective date --

Page 116

1     THE WITNESS: It's the effective
2  date for me.
3     THE SPECIAL MASTER: Isn't the
4  important thing notice?
5     THE WITNESS: Yeah.
6     THE SPECIAL MASTER: So, certainly,
7  when the Supreme Court adopts a rule, the
8  lawyer should have notice of a rule
9  change.
10     THE WITNESS: Not necessarily. Not
11  necessarily. It would be published, but
12  it might not be -- it doesn't even matter.
13  I mean, to me, it's about enforcing the
14  letter of the rule as it exists at the
15  time.
16     As a prosecutor, I have done this
17  work for 15 years as a prosecutor, and
18  then many years as a defense lawyer. And
19  I think I would have a very good case for
20  reversal if a disciplinary body tried to
21  enforce a rule that wasn't in effect at
22  the time in the courts, both in
23  Massachusetts and New York,
24  notwithstanding the SJC's decision in

Page 117

1  Saggese.
2     THE SPECIAL MASTER: You understand,
3  to a judge, how counterintuitive that
4  sounds?
5     MS. LUKEY: Objection.
6     THE WITNESS: With all due respect,
7  I think I understand, but I stick by my
8  position as a government lawyer, former
9  government lawyer. I think prosecutors
10  owe duties.
11     THE SPECIAL MASTER: The question of
12  prosecutorial discretion and whether a
13  prosecutor prosecutes under it is one
14  thing. A question of whether a lawyer is
15  bound by it is a different thing. You
16  would acknowledge that.
17     THE WITNESS: Well, no. I mean, in
18  the context of discipline, as a
19  prosecutor, I owe a duty to prosecute only
20  those cases where I believe that there is
21  probable cause to believe that the lawyer
22  will be found guilty of the violation, and
23  that's my ethical obligation as a
24  prosecutor.

Page 118

1    THE SPECIAL MASTER: That doesn't
2  really answer my question at all.
3    My question is, is a lawyer bound by
4  a decision of the highest court in the
5  jurisdiction, is he bound by it as opposed
6  to whether or not a prosecutor should
7  exercise discretion in enforcing it?  Two
8  different things.
9    Can you answer that?
10    THE WITNESS: A lawyer is bound by
11  it in the sense that a lawyer should not
12  knowingly violate a court order or ruling
13  of the court.  There's a specific rule of
14  conduct about that.
15    THE SPECIAL MASTER: And a lawyer,
16  then, is not held to know the law as
17  pronounced by the highest judicial body in
18  the jurisdiction.
19    THE WITNESS: That's a real problem,
20  because the law that the highest body may
21  have pronounced may be inconsistent with
22  the law that is in the statute or rule.
23  And so what's the lawyer supposed to do?
24    THE SPECIAL MASTER: Well, it raises

Page 119

1  a good question.  Which takes precedence,
2  the rule or the highest judicial body
3  interpreting that rule?
4    THE WITNESS: And I'm telling you,
5  based on my own experience and my own
6  views as a former government regulator and
7  consumer protector, so to speak, that it
8  would be the rule itself that would
9  govern, and I would never prosecute
10  somebody or charge them with misconduct
11  based on an inconsistent ruling of the
12  court when there's an existing rule.
13    THE SPECIAL MASTER: Even when the
14  Supreme Court says this rule shall apply
15  prospectively?
16    THE WITNESS: It wasn't codified.
17  They could have codified it the next day.
18    THE SPECIAL MASTER: But that would
19  have very strong, far-reaching, very
20  far-reaching ramifications for rulings of
21  supreme judicial bodies in every state and
22  the United States, wouldn't it?
23    MS. LUKEY: Objection.
24    THE SPECIAL MASTER: Not only as to

Page 120

1  lawyers, but as to common citizens.
2    THE WITNESS: I have never seen a
3  disciplinary case for a lawyer where the
4  court has disciplined a lawyer based on a
5  ruling of a court as opposed to a
6  violation of a Rule of Professional
7  Conduct or a rule -- disciplinary rule
8  under the old code.  I have never seen a
9  case.  Maybe you know of one.  I don't.
10    THE SPECIAL MASTER: So lawyers
11  should -- are held to know the law of the
12  land or the jurisdiction.  They're held to
13  know it, yes?
14    THE WITNESS: In theory.  I mean, we
15  all know certain things, but I wouldn't
16  presume to tell you that I know the law of
17  the land in every instance.  I would never
18  presume that.
19    THE SPECIAL MASTER: So lawyers are
20  not held to know the law of the land that
21  governs their professional conduct?
22    THE WITNESS: They absolutely are.
23    THE SPECIAL MASTER: Okay.  So what
24  are you saying?

Page 121

1    THE WITNESS: I'm saying that they
2  are bound by the rules that are set forth
3  in the lawyer's code or the lawyer's Rules
4  of Professional Conduct.  That's what they
5  need to know.
6    THE SPECIAL MASTER: Maybe I should
7  ask it a different way.
8    A lawyer is not bound to conform
9  with the law of the land as pronounced by
10  the highest court of the jurisdiction if
11  the rule is different.  Is that what
12  you're saying?
13    MS. LUKEY: Objection.
14    THE WITNESS: The way -- the way the
15  rules work is that a lawyer is bound not
16  to engage in conduct that is illegal,
17  fraudulent, dishonest or violates a
18  particular Rule of Conduct.
19    To charge the lawyer with knowledge
20  of what might be subtle distinctions
21  between a ruling of a court and the actual
22  rule, as written, would be unreasonable
23  and unfair.
24    THE SPECIAL MASTER: Does that go to

Page 122

1  the wilfulness of the misconduct?
2  **THE WITNESS:** Absolutely.
3  **THE SPECIAL MASTER:** And does that
4  get considered at -- in prosecutorial
5  discretion as to whether to charge or if
6  discipline is charged at the time the
7  discipline is enforced?
8  **THE WITNESS:** I believe both.
9  **THE SPECIAL MASTER:** So, in summary,
10  we can have a violation of a law imposed
11  by the Supreme Court, which has not yet
12  been codified, and there is no actionable
13  conduct by the lawyer.
14  **THE WITNESS:** It depends on the
15  context and the facts.  I don't know if
16  you have given me enough facts.
17  If you are saying that the lawyer
18  knowingly violates a law that he is aware
19  of, that is embodied in a case in the
20  Supreme Judicial Court of Massachusetts,
21  that may be one thing.  If you are saying
22  a law or the lawyer did something that
23  technically was inconsistent with the
24  ruling of the court, but conformed to the

Page 123

1  Rule of Professional Conduct, absolutely
2  not.  There would be no disciplinary
3  action and no significant enforcement of
4  it, in my view, by any reasonable court.
5  **THE SPECIAL MASTER:** So for purposes
6  of the Rules of Professional Conduct, a
7  lawyer is not held to know the law.
8  **MS. LUKEY:** Objection.
9  **THE WITNESS:** That's not what I
10  said.
11  **THE SPECIAL MASTER:** Let me amend
12  it.
13  A lawyer is not held to know the law
14  as pronounced by the highest judicial
15  authority --
16  **THE WITNESS:** How could that
17  possibly be?
18  **THE SPECIAL MASTER:** -- of a
19  jurisdiction.
20  **MS. LUKEY:** Objection.
21  **THE WITNESS:** How could a lawyer
22  possibly know every case?  I wouldn't
23  presume to know the law as set forth by
24  the New York Court of Appeals and the

Page 124

1  Massachusetts SJC in all fields all the
2  time.  How could I know that?
3  **THE SPECIAL MASTER:** So I think the
4  answer to my question is yes, that's true.
5  **MS. LUKEY:** Objection.
6  **THE SPECIAL MASTER:** Let me restate
7  the question.
8  A lawyer is not held to know the law
9  of the land as pronounced by the highest
10  court in the jurisdiction if that law has
11  not been codified.
12  **THE WITNESS:** No, that's not what I
13  testified to.
14  **THE SPECIAL MASTER:** I'm not sure
15  what you're testifying to.
16  You're telling me that somebody can
17  violate the law, as pronounced by the
18  Supreme Judicial Court, not comply with
19  it, but because that law has not been
20  codified, it's not a violation of the
21  governing law of professional conduct.
22  That seems to be what you're saying.
23  **MS. LUKEY:** Objection.
24  **THE SPECIAL MASTER:** I'm not asking

Page 125

1  you whether it should be disciplined or
2  sanctioned.  I'm only asking you whether
3  it's a violation.
4  **MS. LUKEY:** Objection.
5  **THE WITNESS:** It might be considered
6  by some people to be a violation.  I
7  wouldn't consider it to be a violation of
8  the Rules of Professional Conduct or the
9  rules of -- or the Code of Professional
10  Responsibility.  It might be a violation
11  of what the SJC said, but --
12  **THE SPECIAL MASTER:** About the Rules
13  of Professional Conduct.
14  **THE WITNESS:** About what the rules
15  should be.  What the rules should be,
16  Judge.  Not what it is.
17  **BY MR. SINNOTT:**
18  Q.  Let me focus on the word
19  "actionable."
20  And you have been discussing this in
21  terms of bar discipline authorities, but let's
22  say an attorney, after Saggese, advises a
23  client using pre-Saggese standards.  And he
24  doesn't inform the client of things like the

1 writing requirement.
2     And, at a later point in time, the
3 client is not happy and wants to take action
4 against his attorney based on the lawyer's
5 failure to inform him of the post-Saggese
6 requirements, what the court had pronounced.
7     Is that actionable?
8 A.  Actionable in what context?
9 Q.  Can the lawyer reasonably -- can the
10 lawyer reasonably be sued, for example, by the
11 client?
12     MS. LUKEY: Objection.
13 A.  I doubt it.  If the lawyer complied
14 with the Rules of Professional Conduct or
15 the -- whatever the existing rule was at the
16 time, 1.5(e) at the time, I think the courts
17 heavily rely on the language of the rules in
18 their interpretation of -- in civil litigation.
19     I mean, the basic idea is that the
20 rules are not, themselves, the basis for a
21 cause of action.  But the courts will interpret
22 the rules in conjunction with actual recognized
23 civil causes of action, violations of contract,
24 conflicts of interest issues, disqualification

1     For example, in the case back in the
2 day where the Supreme Court of the United
3 States said there ought to be a rule on
4 trial publicity, and the ABA went ahead
5 and tried to adopt a rule they had never
6 adopted before.  That was dicta, but it
7 was court dicta.  It happens all the time.
8 Well, maybe not all the time, but
9 sometimes.
10     BY MR. SINNOTT:
11 Q.  Let me ask you about, again, that
12 private action that I asked previously.
13     What if the client sought to retract
14 his consent under 1.5(e) because of the
15 attorney's non-compliance with Saggese?  Could
16 he do so?
17     MS. LUKEY: Objection.
18 A.  I think it would depend on the --
19 not only the equities of the matter, but also
20 the contract or the retainer agreement,
21 engagement letter between the attorney and the
22 lawyer -- attorney and the client and what it
23 said and what the client was told about the
24 engagement.  I think it would be a contract

1 motions and those things.
2 Q.  So you don't think that there would
3 be a private right of action on the part of
4 that claim?
5 A.  Not on the basis of 1.5(e).  There
6 might be a private right of action if there's a
7 claim of breach of contract in some way, but
8 not on the basis of 1.5(e).
9     MR. SINNOTT: Do you want to beat
10 that dead horse some more, Judge?
11     THE SPECIAL MASTER: Not that one.
12     Did you believe that the rule
13 pronounced by Saggese and its
14 interpretation of 1.5(e), then existing
15 1.5(e), was dicta?
16     THE WITNESS: Well, it was certainly
17 an add-on.  They didn't need to say all
18 that stuff to make the decision they made.
19     They were instructing the bar.  It's
20 not dissimilar from other cases I can
21 think of where the Supreme Court of the
22 United States, for example, added
23 significant dicta to otherwise important
24 rulings.

1 issue.
2 Q.  And would you look to the equities?
3 A.  Well, that would be a factor, for
4 sure.  I mean, there are some times where
5 courts will enforce oral agreements, for
6 example, based on the equities even if they --
7 you know, there's a dispute about them.
8     THE SPECIAL MASTER: Do you have a
9 view on who the client was in this case?
10     THE WITNESS: I mean, I have a view
11 for purposes of my opinion that it was
12 ARTRS.  I understand that there's some
13 discussion about class members being
14 clients, but I'm not a class action
15 lawyer, and I don't have an opinion about
16 that.
17     THE SPECIAL MASTER: You don't have
18 an opinion about whether, at the time that
19 the class was certified, they became a
20 client?  They, the class members?
21     THE WITNESS: I don't have an
22 opinion about that.
23     THE SPECIAL MASTER: Okay.  Do you
24 have an opinion about, if they did become

Page 130

1  clients, should there have been further
2  compliance with 1.5(e) by notice and
3  consent of the class to a fee-sharing
4  agreement?
5      THE WITNESS: No.  I don't have an
6  opinion about that.
7      THE SPECIAL MASTER: And just to tie
8  up Saggese a little bit, this is the rule
9  we are talking about, which I finally
10  found.  I thought it was in a different
11  place.
12      The court says, "These problems are
13  avoidable in fee-sharing situations if the
14  referring lawyer, who usually is in the
15  best position to secure compliance with
16  Rule 1.5(e), is required to disclose the
17  fee-sharing agreement to the client before
18  the referral is made and secures the
19  client's consent in writing.  The rule
20  will be construed to require this in
21  fee-sharing agreements that are formed
22  after the issuance of the rescript of this
23  decision."
24      Is that dicta?

Page 131

1      THE WITNESS: It is dicta, it seems.
2  I also don't understand what they are
3  talking about when they say "disclose the
4  fee-sharing agreement to the client before
5  the referral is made."  It doesn't make
6  any sense, actually, in terms of the real
7  world.
8      Usually, it's at the time of the
9  referral, not before.  So I don't quite
10  understand what the court is saying.  And
11  it certainly didn't make its way into the
12  rule.  But, you know, you can characterize
13  it any way you like.
14      THE SPECIAL MASTER: At what point
15  should it be?
16      THE WITNESS: Should what be?
17      MS. LUKEY: Objection.
18      THE SPECIAL MASTER: Disclosed.  The
19  referral fee.
20      THE WITNESS: At or about the time
21  of the engagement.  And that's what I
22  think the rule does say these days.
23      THE SPECIAL MASTER: And if the
24  engagement changes and the client changes,

Page 132

1  does there have to be a notice to the
2  additional client?
3      THE WITNESS: When you say "the
4  engagement changes," I don't know exactly
5  what you mean, Judge.
6      THE SPECIAL MASTER: At the time of
7  the engagement here, ATRS was the client.
8      THE WITNESS: Yes.
9      THE SPECIAL MASTER: After the
10  certification of the class, I want you to
11  assume that the class became the client.
12      MS. LUKEY: Objection.
13      THE WITNESS: And as I testified
14  before, I don't have an opinion on that.
15      THE SPECIAL MASTER: Okay.  So then
16  you don't have an opinion as to whether
17  there should be a further notice to the
18  class.
19      THE WITNESS: Yes.
20      THE SPECIAL MASTER: I assume you
21  meant yes, you don't have an opinion.
22      THE WITNESS: Yes, I don't have an
23  opinion.
24      THE SPECIAL MASTER: All right.

Page 133

1      BY MR. SINNOTT:
2  Q.  So let me just follow up on
3  something you said.
4      Because you're not a class action
5  expert, your opinions here do not take into
6  consideration, one way or the other, that ATRS,
7  Arkansas, was a putative class representative
8  and, eventually, class representative for a
9  certified class?
10      MS. LUKEY: Objection.
11  A.  I'm sorry.  What's the question?
12  Q.  Sure.  The question is, your
13  opinions here do not take into consideration,
14  one way or the other, that Arkansas was a
15  putative class representative and eventually
16  class representative for a certified class?
17  A.  Right.
18  Q.  Thank you.
19      MR. SINNOTT: Anything else, Judge?
20      THE SPECIAL MASTER: Oh, I've got
21  lots more questions, but I don't need to
22  ask them.
23      MR. SINNOTT: I have nothing
24  further.

Page 134

1    Joan, any questions?

2    **MS. LUKEY:** No questions.

3    **MR. SINNOTT:** Richard I do not see.

4    Brian?

5    **MR. KELLY:** No questions.

6    **MR. SINNOTT:** David, on behalf of

7    Keller Rohrback?

8    **MR. COPLEY:** I have nothing.  No

9    questions.  Thank you.

10    **MR. SINNOTT:** Okay.  All right.

11    Hearing -- and there's no one on the phone

12    from Lieff, is there?

13    Okay.  So that concludes our

14    examination.

15    Thank you, Attorney Lieberman.

16    **THE WITNESS:** You're very welcome.

17    (Time noted:  4:02 p.m.)

18

19

20

21

22

23

24

---

Page 135

1    A C K N O W L E D G M E N T

2

3    STATE OF              )

4        :ss

5    COUNTY OF              )

6

7    I, HAL LIEBERMAN, hereby certify that

8    I have read the transcript of my testimony taken

9    under oath in my deposition; that the transcript

10    is a true, complete and correct record of my

11    testimony, and that the answers on the record as

12    given by me are true and correct.

13

14

15    _____

16    HAL LIEBERMAN

17

18

19    Signed and subscribed to before me

20    this _____ day of _____, 2018.

21

22

23    _____

24    Notary Public, State of _____

---

Page 136

1              C E R T I F I C A T E

2

3    STATE OF NEW YORK      )

4                          :ss

5    COUNTY OF RICHMOND     )

6

7         I, MELISSA GILMORE, a Notary Public

8    within and for the State of New York, do hereby

9    certify:

10         That HAL LIEBERMAN, the witness

11    whose deposition is hereinbefore set forth, was

12    duly sworn by me and that such deposition is a

13    true record of the testimony given by such

14    witness.

15         I further certify that I am not

16    related to any of the parties to this action by

17    blood or marriage; and that I am in no way

18    interested in the outcome of this matter.

19         IN WITNESS WHEREOF, I have hereunto

20    set my hand this 9th day of April, 2018.

21

22

23

24    MELISSA GILMORE

---

## $

**$10,000 (1)**
103:23
**$4.1 (2)**
68:23;103:24
**$5,000 (1)**
95:21
**$750 (1)**
12:4

## A

**ABA (2)**
64:4;128:4
**able (2)**
57:21;102:7
**Absolutely (7)**
45:13;92:17;97:6;111:14;
120:22;122:2;123:1
**absolutist (1)**
96:3
**accordance (1)**
27:11
**according (4)**
68:11,13,15;90:3
**accurately (2)**
19:12;31:24
**acknowledge (1)**
117:16
**acknowledged (1)**
69:16
**act (1)**
50:20
**action (10)**
86:15;123:3;126:3,21,23;
127:3,6;128:12;129:14;
133:4
**actionable (4)**
122:12;125:19;126:7,8
**actively (1)**
73:3
**actual (2)**
121:21;126:22
**actually (6)**
30:21;31:13;52:22;73:4,
18;131:6
**add (1)**
95:17
**added (2)**
63:22;127:22
**addition (1)**
17:1
**additional (3)**
16:9;17:3;132:2
**additions (1)**
11:15
**add-on (2)**
107:15;127:17
**address (2)**
17:7;112:10
**adhere (1)**

21:5
**adjunct (1)**
10:14
**admonition (3)**
91:14;113:13,17
**admonitions (3)**
91:8;93:10,12
**adopt (6)**
24:18,22;111:8,18;
112:15;128:5
**adopted (2)**
115:14;128:6
**adoption (1)**
20:17
**adopts (2)**
115:23;116:7
**advertising (2)**
51:22,23
**advice (1)**
112:1
**advised (5)**
20:13;27:18;28:3,4,8
**advises (1)**
125:22
**advising (2)**
28:21;32:18
**affected (5)**
15:2,4,5;32:11;68:24
**affiliated (1)**
45:6
**affirmatively (1)**
65:16
**afternoon (2)**
10:7,8
**again (8)**
30:6;51:1;61:9;63:8;
71:17;84:22;111:12;128:11
**against (5)**
69:9;88:6;105:12;114:24;
126:4
**agencies (1)**
92:4
**agency (1)**
93:20
**agent (1)**
44:23
**ago (2)**
55:21;62:7
**agree (15)**
25:2,11;27:5;31:1;38:17;
39:9,13;56:16;68:3;80:3;
82:1;100:17;111:4,10,20
**agreed (1)**
100:24
**agreement (31)**
21:14;23:8;25:16,17;
26:19;27:19;32:4;36:24;
38:3;39:14;41:9;43:21;44:5,
8;47:16;50:6,10;69:16,18;
70:1;77:3;85:6;86:4;89:3;
95:12,19,20;128:20;130:4,
17;131:4
**agreements (10)**

24:14;26:3,5,21;32:19;
79:20;86:8;88:19;129:5;
130:21
**agrees (3)**
21:7;30:10;61:18
**ahead (2)**
24:15;128:4
**albeit (1)**
28:18
**ALI (1)**
78:2
**alleged (1)**
100:6
**allocate (9)**
21:8;30:11;31:4;34:24;
37:13;38:3,5,5;70:8
**allocation (3)**
40:6;41:14;65:18
**allusion (1)**
112:24
**almost (1)**
73:23
**alone (1)**
102:14
**although (6)**
18:24;28:13;42:17;47:7;
86:12;112:24
**always (2)**
59:23;97:23
**ambulance (1)**
104:24
**amend (2)**
19:20;123:11
**amended (1)**
27:11
**among (2)**
21:15;40:7
**amount (1)**
71:10
**anticipates (1)**
65:1
**apparently (3)**
23:13;25:15;67:23
**Appeals (1)**
123:24
**appear (1)**
62:9
**appearance (1)**
62:10
**appears (3)**
13:19;16:13;23:12
**applicable (2)**
14:23;28:5
**application (3)**
76:5;93:3;94:7
**applications (1)**
81:6
**applied (1)**
15:6
**applies (1)**
103:3
**apply (4)**
26:21;79:16;105:12;

119:14
**appointed (1)**
7:18
**appreciate (1)**
98:16
**approaching (1)**
113:7
**appropriate (1)**
106:15
**approves (1)**
65:14
**approximately (2)**
7:2;92:21
**area (3)**
63:13;97:4;101:13
**areas (1)**
63:17
**arguably (2)**
113:16;114:6
**argue (1)**
114:21
**argument (1)**
18:15
**arisen (1)**
77:10
**Arkansas (18)**
7:19;18:19;19:17;21:7;
30:10;34:23;35:8,14,16;
37:10;43:15,24;46:12;53:9;
108:20;109:11;133:7,14
**around (3)**
68:21;74:16;114:5
**arrangement (18)**
34:14;45:23;46:3,17;
52:12;60:18;65:15;68:9;
69:6;71:7,22,22,24;77:2,5,
12;95:8;101:4
**arrangements (5)**
33:9;47:11;67:8;75:23;
76:22
**ARTRS (8)**
18:18;74:20,23;100:24;
101:3,20;109:1;129:12
**ARTRS' (1)**
66:2
**ascribe (1)**
26:1
**aspect (6)**
24:3;60:10,15;107:14;
110:2;114:12
**assistance (3)**
16:16,18,22
**assistant (1)**
17:23
**associate (2)**
16:19,22
**Assume (10)**
43:8;83:22;87:1;89:17;
107:7,10;108:16,19;132:11,
20
**assumed (2)**
14:3;20:4
**assuming (1)**

68:3
**assumption (1)**
    23:20
**ATRS (2)**
    132:7;133:6
**attempt (6)**
    68:4;70:10;78:12;87:3,7;
    88:12
**attempting (1)**
    78:6
**attends (1)**
    25:22
**attention (12)**
    9:24;18:11;65:6;75:10;
    76:8;84:22;85:19;86:21;
    94:3;99:13;100:19;102:11
**Attorney (18)**
    7:3,23;8:5,11;9:5;11:6,23;
    19:9;20:21;65:22;66:7;
    70:11;84:21;125:22;126:4;
    128:21,22;134:15
**attorney/client (1)**
    55:7
**attorneys (5)**
    21:9;22:19;30:11;35:1;
    37:14
**attorneys' (2)**
    70:9;74:1
**attorney's (1)**
    128:15
**author (1)**
    73:9
**authorities (2)**
    91:22;125:21
**authority (12)**
    27:14;32:13,15,21,23;
    33:4;76:6;93:5;100:12;
    103:12;114:3;123:15
**automatically (1)**
    75:23
**avoidable (2)**
    85:24;130:13
**award (1)**
    65:22
**aware (9)**
    22:17,21;35:12;76:3,9;
    93:2;100:9;103:13;122:18
**away (1)**
    104:21

## B

**back (10)**
    20:6;29:7;30:7;37:18;
    49:20;59:9;62:6;68:21;
    72:10;128:1
**background (1)**
    13:14
**Bad (2)**
    99:1,2
**Bank (1)**
    7:21
**Bar (18)**

75:19;79:9,12;82:8;91:21;
92:6;93:19;94:10,12,19;
96:6;98:5;101:8;105:1,23;
110:18;125:21;127:19
**bare (2)**
    90:14,24
**Barrett (1)**
    7:24
**base (6)**
    14:2;19:19;20:2,9;21:17;
    103:11
**based (11)**
    14:8,17;17:11;20:17;
    90:13;110:13;119:5,11;
    120:4;126:4;129:6
**basic (1)**
    126:19
**basically (3)**
    37:2;45:24;107:16
**basing (1)**
    21:12
**basis (10)**
    39:10;47:11,24;49:15;
    58:17;103:19;111:22;
    126:20;127:5,8
**BBO (1)**
    73:13
**beat (2)**
    110:22;127:9
**became (2)**
    129:19;132:11
**become (2)**
    42:20;129:24
**becoming (1)**
    65:18
**begin (2)**
    7:3;45:17
**beginning (3)**
    8:10;41:20;97:10
**begins (4)**
    65:10;75:13;85:23;100:21
**Behalf (6)**
    3:4,15;9:2;101:3;108:2;
    134:6
**behind (6)**
    56:7;57:17,19;58:17;59:5;
    63:9
**Belfi (10)**
    16:6;22:18;23:20,21,23;
    24:1,4,7;67:16,21
**belief (3)**
    26:1;31:11;94:6
**believes (1)**
    111:22
**beneficiary (1)**
    56:2
**benefit (2)**
    61:2;63:14
**benefits (1)**
    92:3
**besides (1)**
    41:15
**best (9)**

22:11;42:5;75:15;76:24;
84:24;86:2;96:10;101:12;
130:15
**better (3)**
    13:11;46:19;105:21
**beyond (6)**
    11:19;17:15;35:10;76:6;
    93:5;102:10
**bit (1)**
    130:8
**bkelly@nixonpeabodycom (1)**
    3:22
**Board (1)**
    75:19
**bodies (1)**
    119:21
**body (4)**
    116:20;118:17,20;119:2
**book (1)**
    109:3
**bootstrapped (5)**
    76:4,10,16,18;93:3
**Boston (2)**
    3:6,17
**both (7)**
    20:15;65:10;67:15;86:15;
    92:10;116:22;122:8
**bottom (1)**
    100:20
**bound (8)**
    28:17;117:15;118:3,5,10;
    121:2,8,15
**breach (1)**
    127:7
**break (3)**
    92:15,18;93:9
**BRIAN (3)**
    3:18;9:1;134:4
**briefly (1)**
    13:2
**bring (3)**
    9:24;86:10;88:6
**bunch (1)**
    89:3
**business (4)**
    44:23,24;108:14,15
**businesses (1)**
    44:22

## C

**Cabraser (2)**
    8:20,22
**call (10)**
    10:10;18:19;43:14;52:2;
    59:20,21;106:10,11;108:12;
    109:11
**called (4)**
    7:6;73:7;108:20;114:7
**calling (2)**
    56:20;106:5
**calls (2)**
    58:5;108:3

**came (3)**
    43:14,16;103:9
**Camille (1)**
    15:19
**can (37)**
    9:20;12:5;14:19;15:15;
    24:19;25:3;36:11;52:2;
    53:24;54:5;55:19;59:8,20,
    21;61:14;62:6;63:20;70:23;
    71:13;74:10;76:23;80:8;
    83:8,12;85:11;87:17;91:17;
    104:9;105:6;112:1;118:9;
    122:10;124:16;126:9,9;
    127:20;131:12
**candor (1)**
    98:16
**CANTY (3)**
    5:4;8:15,15
**car (1)**
    106:13
**care (2)**
    69:18,21
**careful (1)**
    115:4
**carefully (1)**
    47:23
**case (88)**
    10:18;12:6;13:11,17;
    15:15;24:16;27:16;28:10,
    14;33:5,7;35:9;39:18;42:13;
    43:1;45:8,11,11,15;46:6;
    47:2;48:2,9;49:8,16,22;50:6,
    20;51:10,24;53:8,9;54:7,9,
    11,13,16,19,21;55:24;56:11,
    13,13;57:1,4,7,9;58:19;61:9,
    10;62:11,16,22;64:1,3,10,
    18,20;66:9;67:5;69:9;72:3,
    4,5;74:19;77:23,23;78:3;
    87:5,6;88:8,24;91:16;100:9;
    101:19,22;104:2;105:4;
    108:17;111:9,19;116:19;
    120:3,9;122:19;123:22;
    128:1;129:9
**case-by-case (2)**
    47:24;49:15
**cases (26)**
    46:11;47:4,17;48:4,22;
    49:3;51:8,11;52:22;53:11,
    17,18,18;54:7;55:12;58:19;
    59:17,18;60:4,5;77:8;91:7;
    92:14;101:10;117:20;
    127:20
**catch (1)**
    110:24
**cause (2)**
    117:21;126:21
**caused (2)**
    55:5,6
**causes (1)**
    126:23
**caution (2)**
    9:21;91:14
**caveats (1)**

9:17

**central (1)**
18:14

**certain (1)**
120:15

**certainly (13)**
24:13;26:8,9;27:13;33:6;
46:16;64:2;87:20;100:15;
114:21;116:6;127:16;
131:11

**certification (1)**
132:10

**certified (3)**
129:19;133:9,16

**certify (1)**
135:7

**change (8)**
31:17,17;35:23;68:17;
81:18;104:10;115:14;116:9

**changed (8)**
20:10,11,16;28:14;63:21;
115:3,11,12

**changes (6)**
11:15;29:2,4;131:24,24;
132:4

**changing (3)**
20:7;114:3,5

**characterize (1)**
131:12

**charge (6)**
113:21;115:18,20;119:10;
121:19;122:5

**charged (1)**
122:6

**charges (1)**
88:6

**Chargois (36)**
18:20;19:18;21:19;29:17;
35:9,13;39:18;41:24;42:4,
10;43:11,14,17,22,22,23;
44:9;45:19,24;48:16;53:16;
58:2,24;60:11;61:3;62:21;
66:3;67:18;68:22;74:17;
102:7,22;103:1;108:18,19,
24

**Chargois' (5)**
35:18;42:1,19;43:9;61:24

**chasing (1)**
104:24

**CHOATE (3)**
3:3;8:13,17

**chose (1)**
27:14

**circles (1)**
74:16

**circular (1)**
60:20

**circumstance (1)**
79:16

**circumstances (6)**
43:4,7;57:18;89:20;90:16;
99:18

**circumvent (1)**

**cite (2)**
99:20;101:5

**cites (3)**
24:17;76:6;93:5

**citizens (1)**
120:1

**civil (1)**
126:18,23

**claim (4)**
29:17;99:24;127:4,7

**claims (1)**
99:21

**class (17)**
23:16;65:21;129:13,14,
19,20;130:3;132:10,11,18;
133:4,7,8,9,15,16,16

**clause (1)**
41:1

**clear (7)**
25:12,19;50:24;51:1,4;
104:12;112:21

**clearly (2)**
9:19;89:1

**client (94)**
18:18;19:4,6,17;21:3;
23:4;24:9,15,20;25:4,5,9;
27:18;28:3,4,8,22,24,24;
29:8,24;30:3;31:3,20,21;
32:8,9,11;33:2,18,19;34:10,
12;37:3,3;42:10;44:24;
46:24;47:2;49:5,22,23;50:9;
52:12;53:15;54:9,20,21;
58:4,22;59:17;61:5,17,18,
22;63:12;64:19,20,21;
70:18;71:2,13;72:6;78:14,
16,17;86:4;92:3;94:21;
95:19;101:9,18,18,22;104:2;
108:3,4,15;112:1;125:23,24;
126:3,11;128:13,22,23;
129:9,20;130:17;131:4,24;
132:2,7,11

**clients (9)**
28:21;48:1;57:20;77:4;
92:6;95:7;105:7;129:14;
130:1

**client's (6)**
61:2;63:14;86:5;102:2,4;
130:19

**close (1)**
77:22

**co-counsel (1)**
62:10

**Code (10)**
28:6;34:3;83:10;88:14;
113:19;114:1;115:10;120:8;
121:3;125:9

**codified (7)**
27:16;113:5;119:16,17;
122:12;124:11,20

**Cold (6)**
106:5,10,11;108:3,12,19

**co-lead (2)**

**commas (1)**
41:2

**comment (1)**
98:24

**common (11)**
34:19;44:14;46:23;47:21;
49:10,17;52:16;55:15,17,20;
120:1

**Commonwealth (1)**
28:19

**compensated (2)**
11:24;60:11

**compensation (1)**
12:3

**competent (7)**
56:10,12,15;57:22;61:2,5;
63:13

**complete (4)**
16:2;70:24;90:13;135:10

**compliance (21)**
19:24;21:13;24:3;33:8,11;
70:16;86:2;87:2,19,20;
88:13;89:21;90:18,22;91:3,
10,18;92:2;113:18;130:2,15

**complicated (1)**
27:8

**complied (14)**
18:16;19:16,23;20:8,15,
18;23:1;29:13;66:4;69:1,13;
70:20;88:19;126:13

**comply (15)**
21:5;27:17,20;28:5,22,24;
78:12;79:21;86:12;87:3,7;
91:19;95:9;113:17;124:18

**concealed (1)**
67:18

**conceivably (1)**
43:5

**concentrate (1)**
52:3

**concept (1)**
55:22

**concern (1)**
65:21

**concerned (1)**
67:24

**concerning (1)**
65:18

**concerns (1)**
88:9

**conclude (1)**
100:5

**concluded (1)**
104:3

**concludes (1)**
134:13

**concluding (1)**
23:1

**conclusion (2)**
18:15;66:2

**conduct (20)**
12:13;28:7;83:10;106:16;

**111:24;113:5;115:6;118:14;
120:7,21;121:4,16,18;
122:13;123:1,6;124:21;
125:8,13;126:14**

**confident (1)**
92:11

**confirming (1)**
65:14

**conflicts (1)**
126:24

**conform (1)**
121:8

**conformed (1)**
122:24

**conjunction (3)**
10:21;11:8;126:22

**connection (8)**
21:11;30:13;35:3;37:8;
38:7;42:13;109:14,15

**connotes (2)**
27:6;64:8

**consciously (1)**
71:14

**consent (26)**
26:16;33:20,21,24;34:1,2,
4,5,8;35:21;66:2;67:1,7;
68:8;70:18;72:6;78:17;86:6;
89:18,19;90:1,12,24;128:14;
130:3,19

**consented (2)**
68:23;70:5

**consents (5)**
19:6;25:6;31:22;33:19;
61:22

**consider (1)**
125:7

**consideration (5)**
87:10,21;100:16;133:6,13

**considered (4)**
70:23;71:13;122:4;125:7

**considering (1)**
84:4

**consistent (2)**
80:15;81:15

**constitutes (1)**
75:4

**construction (8)**
82:20,21,24;83:20;84:11,
16;90:10;99:5

**construe (1)**
106:16

**construed (4)**
83:18;86:7;98:3;130:20

**construing (1)**
82:2

**consumer (2)**
92:4;119:7

**contact (1)**
49:5

**contained (1)**
23:6

**Cont'd (2)**
3:1;5:1

**contemplate (2)**
56:6;71:1
**contemplates (1)**
41:9
**context (10)**
44:8,22;74:11;75:13;
89:15,15,19;117:18;122:15;
126:8
**continued (1)**
44:6
**continues (1)**
49:23
**continuing (2)**
46:19;49:16
**contra (1)**
54:7
**contract (9)**
39:9,11,14;86:13;88:16;
126:23;127:7;128:20,24
**Contrary (2)**
18:14;112:18
**contributed (1)**
100:3
**conversations (3)**
22:12,18;23:11
**convey (1)**
31:9
**copies (1)**
11:13
**COPLEY (3)**
9:11,11;134:8
**copy (6)**
36:4,6;66:14,18;80:6,9
**core (1)**
94:6
**corroborates (1)**
66:23
**counsel (46)**
7:13;12:20,21;13:22;
14:12,17;17:2;21:10,21,23;
30:12;35:2;37:5,6,15,19;
38:4,22;39:17,19,20;40:7,
12,22,24;41:15;42:21;44:3;
46:2,12;47:12,14,18,19;
57:22;58:23;61:3,5;63:12;
65:7;67:5;75:10;92:24;
100:3;102:14;111:5
**counterintuitive (1)**
117:3
**counts (2)**
70:6;88:11
**COUNTY (1)**
135:5
**couple (1)**
36:3
**course (5)**
10:17;12:18;15:11;28:23;
38:12
**Court (56)**
7:17;10:24;18:2;25:16;
26:2,9,18,20,24;27:7,9;
28:18,18;33:1;60:1;77:11,
16;85:4;86:19;88:8;95:11;

100:12,15;104:3;112:21;
113:4,10;114:2,11,17,22;
115:3,23;116:7;118:4,12,13;
119:12,14;120:4,5;121:10,
21;122:11,20,24;123:4,24;
124:10,18;126:6;127:21;
128:2,7;130:12;131:10
**courts (14)**
24:13;33:7;62:8;64:14;
65:2;76:11;88:16;112:5,9,
10;116:22;126:16,21;129:5
**court's (3)**
75:17;85:2;113:12
**covers (1)**
84:4
**CRANDALL (1)**
3:20
**created (1)**
75:1
**criminal (2)**
106:23;115:19
**critical (1)**
114:12
**criticized (1)**
115:9
**crossed (1)**
76:22
**current (1)**
80:20
**Currently (1)**
80:18
**Curriculum (1)**
11:3
**CV (5)**
10:22;11:7,13,16,19

# D

**dabble (1)**
63:18
**Damon (4)**
29:17;35:9,13;67:18
**date (2)**
115:24;116:2
**David (3)**
9:10,11;134:6
**day (4)**
10:12;119:17;128:2;
135:20
**Daynard (7)**
24:16;88:24;89:8,11;
99:18;100:2,11
**days (1)**
131:22
**dead (2)**
110:22;127:10
**decision (9)**
25:13;28:18;85:17;86:9;
113:12;116:24;118:4;
127:18;130:23
**declaration (1)**
15:19,20;16:23;17:2,16;
29:14,18,19;65:13;66:6,8,

16;67:14;69:15;101:5
**defense (3)**
27:24;28:15;116:18
**defensible (2)**
111:7,17
**define (1)**
71:5
**definition (2)**
33:23;34:2
**degree (7)**
15:3;79:12;82:7;96:5;
98:4;105:23;110:17
**depend (1)**
128:18
**depending (1)**
110:5
**depends (2)**
43:3;122:14
**deposition (7)**
12:13,17;13:8;15:20;16:1;
43:8;135:9
**deprive (1)**
70:10
**deprived (2)**
71:2,14
**describe (6)**
12:16;13:23;15:16;99:14;
102:4;115:5
**described (2)**
46:15;54:8
**describing (1)**
55:21
**description (2)**
51:7;55:16
**deserve (1)**
102:17
**details (1)**
71:23
**Detroit (1)**
7:17
**developed (1)**
58:20
**dicta (6)**
127:15,23;128:6,7;
130:24;131:1
**dictum (2)**
26:8;114:7
**difference (7)**
39:7;44:16;58:1,12;59:1,
6;103:24
**differences (1)**
58:14
**different (19)**
30:22;40:3,4,10,13;41:22;
42:1;51:12;70:5;80:24;
99:22;100:11,22;109:7;
117:15;118:8;121:7,11;
130:10
**differentiating (1)**
100:6
**differently (1)**
40:20
**difficult (1)**

88:4
**direct (8)**
65:6;75:9;84:21;85:19;
86:21;94:2;99:13;100:19
**directing (2)**
18:11;102:11
**directly (2)**
53:13;54:6
**director (2)**
43:15;108:20
**disagree (1)**
115:6
**disciplinary (12)**
86:15;87:18;91:7,22;
92:12;93:19;107:23;113:9;
116:20;120:3,7;123:2
**discipline (13)**
75:24;87:10;88:11;90:5;
91:4,19;107:13;113:15;
114:13;117:18;122:6,7;
125:21
**disciplined (7)**
75:17;85:2,5;91:9;115:8;
120:4;125:1
**disciplining (1)**
113:14
**disclose (6)**
18:17;19:17;21:22;86:3;
130:16;131:3
**disclosed (9)**
21:18,24;22:1,8;25:18;
71:7,18,20;131:18
**disclosure (6)**
69:4,5,24;70:18,23;88:2
**discretion (4)**
100:16;117:12;118:7;
122:5
**discussed (2)**
72:12;76:11
**discussing (1)**
125:20
**Discussion (2)**
85:15;129:13
**discussions (2)**
14:17;65:17
**dishonest (1)**
121:17
**disjunctive (1)**
38:10
**dispute (1)**
129:7
**disputes (2)**
77:9;92:7
**disqualification (1)**
126:24
**dissimilar (2)**
55:22;127:20
**distinction (5)**
53:19,23,24;54:3;110:15
**distinctions (1)**
121:20
**distinguish (1)**
99:17

**distortion (1)**
9:23

**District (1)**
7:16

**districted (1)**
65:20

**divide (1)**
66:3

**divided (2)**
41:1;74:2

**division (31)**
19:2,5;20:24;21:3;22:20;
23:4;24:10,19;25:3,5,9;
27:19;29:8;30:1,5,17;31:3,9,
18,21;32:9;33:3,17,18;
61:17;67:9;86:16;89:18;
90:15,24;95:18

**divisions (1)**
103:4

**divorced (1)**
54:22

**document (1)**
11:1

**documented (1)**
75:21

**documents (8)**
12:19;13:6,8,12;15:15,17;
67:6,11

**done (5)**
26:2;51:7;72:2;103:18;
116:16

**don't (78)**
10:1;16:4,8,8;18:18;
19:23;22:15,16;23:19,22;
25:1;26:1;29:2;31:1,13;
32:15;34:1;37:21;38:17,20,
23;39:22;41:5;44:19;46:4,
20,21;48:11;54:2,4;62:18;
66:19,19;67:12,21;68:14;
70:13,21;73:17;76:14;77:3,
10,16,21;82:23;85:8;89:23;
91:6,8,11,15;92:1;93:19;
95:5,7;101:24;103:9,17;
108:12;110:24;111:20,20;
113:1;120:9;122:15;127:2;
129:15,17,21;130:5;131:2,9;
132:4,14,16,21,22;133:21

**door (1)**
54:18

**dot (1)**
76:22

**doubt (3)**
16:4;97:19;126:13

**down (4)**
49:2;86:10;110:6;113:3

**draft (3)**
73:13,16,17

**drafted (3)**
11:12;13:18;66:8

**drafters (1)**
98:22

**drafting (2)**
99:1,2

**Drawing (1)**
76:8

**due (5)**
88:9;90:11;114:8,13;
117:6

**duly (1)**
7:7

**during (1)**
15:11

**duties (1)**
117:10

**duty (1)**
117:19

# E

**earliest (1)**
10:1

**effect (3)**
61:15;115:21;116:21

**effective (4)**
115:14,16,24;116:1

**effort (3)**
13:21;64:14,14

**eight (1)**
53:11

**either (8)**
20:19,19,19;33:5;44:1,2;
52:10;54:3

**electronically (1)**
80:7

**Elizabeth (1)**
7:23

**else (7)**
9:15;15:21;17:17;49:8;
70:21;96:7;133:19

**embodied (1)**
122:19

**EMILY (3)**
3:20;9:13;25:22

**emphasis (1)**
92:9

**emphasize (2)**
79:23;86:12

**emphasized (1)**
67:23

**encapsulate (1)**
32:1

**encompass (1)**
17:19

**encourage (5)**
63:15;64:5;101:8,17;
104:23

**encouraging (1)**
9:18

**enforce (6)**
77:2;88:18;100:13;
114:23;116:21;129:5

**enforceable (2)**
50:7;75:22

**enforced (6)**
24:14;25:16;26:18;33:8;
85:5;122:7

**enforcement (5)**
32:17;88:10,15;107:23;
123:3

**enforcing (3)**
88:16;116:13;118:7

**engage (2)**
75:21;121:16

**engagement (12)**
30:7;36:4;66:9,13;67:16;
101:1;128:21,24;131:21,24;
132:4,7

**engages (2)**
105:24;107:3

**Engaging (1)**
106:2

**enough (1)**
122:16

**ensure (1)**
101:10

**entitled (1)**
61:7

**equities (13)**
87:21;88:20;99:19,22;
100:10,13,17,21;101:21,23;
128:19;129:2,6

**Eric (3)**
16:6;22:18;67:16

**ERISA (1)**
9:12

**especially (1)**
101:10

**ESQ (6)**
3:7,8,18,19,20;5:6

**essentially (2)**
47:13;104:3

**estate (1)**
44:22

**estimate (2)**
12:5,8

**ethical (1)**
117:23

**ethics (15)**
33:5;45:4;72:14;73:7;
77:17,19;97:5;111:6,16,21,
22,24;112:4,8,10

**even (22)**
24:15;26:19;35:12;49:14;
53:16;57:9,13,15;61:10;
62:15,21;72:4;74:4;85:5;
95:7;108:4;109:23;111:7,
17;116:12;119:13;129:6

**event (1)**
67:22

**eventual (1)**
95:2

**eventually (2)**
133:8,15

**everyone's (1)**
18:23

**evidence (2)**
29:12;75:18

**evolve (1)**
14:16,20

**evolved (3)**
14:15;15:9,10

**exactly (4)**
45:14;70:14;101:13;132:4

**examination (3)**
7:3;10:5;134:14

**examined (1)**
7:8

**example (8)**
17:6;26:15;88:2;105:8;
126:10;127:22;128:1;129:6

**excellent (3)**
47:20,20;48:3

**except (2)**
54:6;81:4

**exception (1)**
81:4

**exceptions (1)**
106:8

**excerpts (2)**
15:20;16:1

**excess (1)**
12:10

**excludes (1)**
110:17

**excuse (1)**
114:20

**execution (1)**
68:6

**executive (2)**
43:15;108:20

**exercise (1)**
118:7

**exercised (2)**
60:2,3

**Exhibit (7)**
11:2,3,7;18:5,6,10;85:16

**existed (3)**
66:5;113:19;114:1

**existence (4)**
21:19;35:8,17,18

**existing (4)**
115:9;119:12;126:15;
127:14

**exists (1)**
116:14

**expansive (2)**
76:7;93:6

**experience (4)**
11:19;32:18;110:14;119:5

**experienced (3)**
56:12,14;101:12

**expert (16)**
11:8,10;18:4,6,9;57:14;
73:6;82:24;97:4;99:4;
111:21;112:1,3,5;113:1;
133:5

**expertise (1)**
56:9

**experts (3)**
57:10;111:6,16

**explain (3)**
48:14;54:5;98:21

**express (1)**
  78:4
**expression (1)**
  27:3

# F

**face (2)**
  38:15;103:3
**facilitating (1)**
  109:24
**fact (16)**
  14:22;15:1,5;35:21;40:15;
  41:7;42:9;58:18;71:21;
  76:10;95:18;97:9;98:21;
  100:1;102:6;115:22
**factor (2)**
  87:23;129:3
**facts (18)**
  13:13,17;14:2,3,7,9,12,13;
  15:11;18:15;20:3;22:22,24;
  43:4,7;66:1;122:15,16
**factual (3)**
  13:18;53:24;54:3
**failure (2)**
  86:12;126:5
**fair (2)**
  23:15;93:11
**familiar (4)**
  72:13;73:19;80:12;82:20
**far (1)**
  94:24
**far-reaching (2)**
  119:19,20
**fashion (1)**
  67:8
**fast (1)**
  99:10
**February (2)**
  20:16;44:6
**fee (97)**
  19:2,7;20:24;23:14,14;
  25:16;26:5;31:23;32:12;
  34:13;37:6;39:19;41:11,14,
  18,21;42:6,23,23;43:2,24;
  44:10,13,17,19,20;45:1,3,4,
  23;47:2,10;48:19,23;49:6;
  50:6;51:19;54:24;55:2,10,
  17;56:1,3,6,8;59:8,22;60:16,
  17,23,23;61:7,19;63:15,21,
  24;65:18,22;67:8;70:1,19;
  71:10;72:11;74:1,4,9,11;
  76:1;77:2,2,5,7,12,15;78:6;
  86:16;89:18;90:15;94:20;
  95:2,18;96:6;99:23;100:24;
  103:3,4,7;104:1,6,7;105:6;
  107:4,14;109:24;110:2,10;
  131:19
**feel (1)**
  56:10
**feelings (1)**
  70:3
**fees (63)**

18:19;19:5,18;21:3,8,10;
22:20;23:4;24:10,19;25:3,5,
10;27:19;29:9;30:1,5,11,12,
17;31:3,9,18,21;32:9;33:3,
17,18;35:1,2;37:13,15;38:3,
5,5,6,21;39:16;40:6,21,23;
41:14;57:17,20;58:10,17;
59:5,24;60:17;61:18;63:10;
64:6;65:21;66:3;67:9;70:9;
77:9,10;81:7;101:2;103:18,
21,22
**fee-sharing (12)**
  32:19;85:24;86:4,7;88:19;
  101:9,17;130:3,13,17,21;
  131:4
**fee-splitting (15)**
  24:14;25:17;33:9;34:14;
  50:10;52:12;65:15;69:6,17,
  24;71:6,21,22;75:22;101:4
**field (1)**
  112:6
**fields (1)**
  124:1
**fight (1)**
  33:10
**figured (1)**
  97:13
**file (2)**
  54:10;62:10
**filed (3)**
  53:17,18;62:22
**final (4)**
  21:6;86:11;93:2;102:20
**finally (1)**
  130:9
**find (4)**
  66:14,17;73:12;102:7
**finder's (4)**
  44:16,19,20;45:1
**finding (2)**
  105:7,9
**finds (1)**
  44:24
**finish (1)**
  92:24
**Fire (1)**
  104:21
**Firm (15)**
  3:15;5:5;8:24;9:2,8;
  16:19;19:3;21:1;31:19;
  45:24;69:5;74:3;76:2;100:8;
  108:22
**firms (4)**
  34:14;65:19;89:4;101:2
**first (14)**
  8:9;19:20;21:22;22:7;
  30:8;32:1;41:23;43:16;45:6;
  72:22;84:23;87:19;103:12;
  113:9
**five (1)**
  98:23
**Flattery (1)**
  97:11

**floating (6)**
  46:10,15;59:13,16,20,21
**focus (6)**
  36:13;66:6;91:23;92:1;
  108:18;125:18
**focused (2)**
  67:3;92:7
**focusing (4)**
  50:15,19;65:20;99:19
**folks (1)**
  9:3
**follow (3)**
  28:11;105:3;133:2
**followed (2)**
  42:14,15
**following (4)**
  33:11;75:17;85:2;94:3;
  102:12;115:9
**follows (2)**
  7:9;100:5
**follow-up (1)**
  90:17
**footnote (1)**
  72:18
**foregoing (1)**
  66:1
**form (3)**
  20:17;41:10;52:13
**formality (1)**
  28:12
**formed (2)**
  86:8;130:21
**former (2)**
  117:8;119:6
**Formerly (1)**
  7:16
**forms (1)**
  39:9
**formulate (1)**
  17:9
**formulated (1)**
  17:8
**formulating (1)**
  14:14
**forth (2)**
  121:2;123:23
**forward (5)**
  25:15;27:10;44:6;47:3;
  113:13
**forwarding (2)**
  76:1;100:23
**found (4)**
  15:2;68:22;117:22;130:10
**four (3)**
  40:9,14;54:17
**fraudulent (1)**
  121:17
**free (1)**
  101:2
**frequently (1)**
  51:20
**fresh (1)**
  18:23

**friend (3)**
  58:6;97:7;103:9
**full (4)**
  19:1,24;20:8;90:13
**fully (3)**
  20:8,14,18
**Fund (1)**
  37:10
**funds (1)**
  92:1
**further (5)**
  52:16;73:1;130:1;132:17;
  133:24
**future (4)**
  26:21;55:12;60:5;115:24

# G

**gave (2)**
  66:24;67:1
**geez (1)**
  68:20
**general (4)**
  15:16;21:20,23;86:23
**generally (3)**
  92:1,8;106:7
**genesis (1)**
  44:4
**George (7)**
  15:19;16:6;22:2,8,19;
  29:14,16
**Gerald (1)**
  7:15
**Gerry (1)**
  36:17
**gestation (1)**
  62:23
**gets (4)**
  48:2;51:22;97:17;109:24
**Gilda (1)**
  72:16
**GILLERS (11)**
  5:7;8:1;24:17;76:6;93:5;
  96:20,24;99:15,15;100:9;
  102:24
**Gillers' (1)**
  15:18;17:11,15;18:14
**given (5)**
  55:16;60:9;90:13;122:16;
  135:12
**gives (3)**
  90:24;94:20;95:21
**giving (1)**
  96:9
**GLASS (3)**
  3:8;8:17,17
**goes (1)**
  44:23
**Good (7)**
  10:7,8;73:22;87:13;101:7;
  116:19;119:1
**govern (1)**
  119:9

**governing (1)**
124:21
**government (3)**
117:8,9;119:6
**governs (1)**
120:21
**great (1)**
102:8
**greater (1)**
28:12
**guess (2)**
33:13;66:13
**guidance (1)**
17:3
**guilty (1)**
117:22
**guy (1)**
68:21

## H

**Hal (9)**
7:3,11;8:12;11:4;18:4,7;
104:13;135:7,16
**half (2)**
10:12;98:1
**HALL (3)**
3:3;8:14,18
**handed (1)**
113:3
**Handing (1)**
36:8
**handle (5)**
56:11,13,24;57:22;63:18
**handled (3)**
48:4;101:11;113:6
**handling (1)**
52:14
**hands (1)**
72:21
**happen (3)**
48:9;53:4;80:5
**happened (9)**
45:11;49:4;53:5;54:16;
57:4,6;61:20;101:14;108:17
**happens (4)**
44:13;51:21;55:15;128:7
**happy (1)**
126:3
**harbor (1)**
79:20
**hard (2)**
80:8;87:14
**HARLAN (2)**
3:20;25:22
**head (1)**
26:24
**heading (1)**
102:21
**hear (2)**
9:20,22
**heard (5)**
77:24;79:14;96:13,20,22

**Hearing (2)**
9:16;134:11
**heavily (1)**
126:17
**HEIMANN (2)**
8:19,19
**held (8)**
114:16;118:16;120:11,12,
20;123:7,13;124:8
**help (2)**
112:9,11
**helpful (1)**
13:13
**helping (1)**
101:10
**henceforth (1)**
52:15
**hereby (1)**
135:7
**Herron (2)**
43:22;45:24
**hey (2)**
58:5;89:5
**high (2)**
28:18;88:8
**highest (7)**
118:4,17,20;119:2;
121:10;123:14;124:9
**himself (1)**
99:24
**hire (1)**
49:23
**hired (1)**
58:22
**hit (1)**
106:13
**holds (1)**
100:7
**Honorable (1)**
7:15
**Hopkins (26)**
15:19;16:7;21:24;22:2,8,
13,19;23:6,12;29:15,16;
65:12,16;66:12;67:19,23;
68:5,8,11,15,16,20;69:12,
14;70:10;101:3
**Hopkins' (1)**
21:20
**horse (2)**
110:22;127:10
**hospital (1)**
106:12
**hospitals (1)**
105:9
**hour (2)**
12:4;98:1
**hours (2)**
12:5,10
**HYLENSKI (4)**
5:6;8:4,6;9:5
**hypothetical (2)**
52:21;89:17

## I

**idea (8)**
63:11;64:6;68:20;77:6;
81:16;98:14;103:10;126:19
**identification (3)**
11:5;18:8;85:18
**identified (1)**
9:4
**identify (1)**
8:10
**ie (1)**
74:4
**ignorance (1)**
114:20
**ignore (1)**
84:6
**ill (1)**
20:13
**illegal (1)**
121:16
**imagine (1)**
41:13
**immediately (1)**
72:20
**imperfect (11)**
33:8;77:12;87:20;88:18;
89:21;90:18,21;91:3,10,18;
92:2
**imperfectly (1)**
75:21
**implementing (1)**
114:3
**implicated (1)**
107:20
**implies (2)**
33:24;34:5
**imply (1)**
56:19
**important (11)**
23:24;26:9;69:21,23;
70:16;71:2,14,18;87:23;
116:4;127:23
**imposed (1)**
122:10
**impression (1)**
14:22
**Improper (10)**
106:1,4,7;107:5,8,11,13,
17;108:8,11
**include (2)**
20:13;71:1
**including (4)**
42:1;43:9,10;106:9
**inconsistent (3)**
118:21;119:11;122:23
**incorporated (1)**
46:1
**Indeed (1)**
65:15
**independent (6)**
39:2;49:12,13;68:14;

112:14,20
**independently (1)**
39:1
**indicate (6)**
24:9;25:8;40:22;41:9;
43:11;99:6
**indicated (1)**
69:11,14
**indicates (1)**
70:8
**individual (1)**
67:3
**ineffective (1)**
76:13
**infer (1)**
36:22
**inform (7)**
29:24;35:8,13,16;61:17;
125:24;126:5
**information (9)**
20:9;70:11;71:1,3,6,15,18,
20;90:14
**informed (20)**
24:9;25:9;28:21;30:22;
32:8;33:21,24;34:5,9,23;
35:21;67:8,13;71:13;72:6;
89:19,20,24;90:1,2
**informing (9)**
19:4;21:3;23:3;25:4;29:8;
31:2,20;33:2,18
**informs (2)**
11:20;42:7
**initial (3)**
49:6,24;54:23
**initially (3)**
14:23;42:17;74:8
**initiated (1)**
63:4
**injured (1)**
105:10
**In-person (1)**
106:6
**input (1)**
17:17
**insight (1)**
14:19
**instance (1)**
120:17
**instant (2)**
42:24;65:15
**institutional (1)**
43:13
**instructing (1)**
127:19
**instruction (1)**
112:18
**insulates (2)**
79:13;82:8
**interest (9)**
46:19;49:16;59:17,21;
60:4;92:5;101:7;102:5;
126:24
**interested (9)**

23:13;29:20,21;30:4;
41:17,19;42:3;86:23;87:16
**interests (1)**
102:2
**International (1)**
3:5
**interpret (4)**
33:20;36:22;93:21;126:21
**interpretation (16)**
32:1,14,24;67:14;76:4,10,
16,19;78:1;79:15;93:3,13;
96:14;104:23;126:18;
127:14
**interpreted (1)**
67:17
**interpreting (1)**
119:3
**into (17)**
26:24;34:6,7;51:8;54:10;
62:23;74:10;87:21;90:1,7;
95:22;100:16;103:7;115:21;
131:11;133:5,13
**introduced (3)**
42:10;59:18;75:1
**introducing (1)**
47:1
**introduction (16)**
42:16,19,24;43:12;46:24;
48:21;49:7;53:6;54:18,24;
55:6;57:8,12,16;58:3;110:1
**investigation (1)**
41:20
**investors (1)**
43:13
**involved (4)**
49:19;53:16;65:17;93:20
**involvement (9)**
48:17,18,21;49:14,24;
53:8,12;55:11;67:18
**involves (1)**
51:24
**Irrespective (1)**
61:8
**issuance (2)**
86:8;130:22
**issue (10)**
14:24;15:9;35:22;49:9;
67:4;68:7;72:10;77:5;102:9;
129:1
**issues (3)**
83:15;112:10;126:24

**J**

**JAMS (1)**
5:6
**JOAN (3)**
3:7;8:13;134:1
**joanlukey@choatecom (1)**
3:10
**joined (1)**
9:15
**joint (14)**

13:21;19:6;31:22;33:19;
61:22;62:5,24;63:22,22;
64:8,12,24;103:19,19
**Josh (2)**
9:6,9
**JOSHUA (2)**
3:19;9:7
**Judge (20)**
7:18;36:19;47:5;49:10,17;
89:5;91:21;96:9;104:9;
106:20;111:9,19;112:2,2,14;
117:3;125:16;127:10;132:5;
133:19
**judges (1)**
112:23
**judge's (1)**
112:18
**judgment (5)**
49:13;56:21,24;60:1;
79:10
**Judicial (10)**
113:4;114:2,17,22;
118:17;119:2,21;122:20;
123:14;124:18
**juris (1)**
114:11
**jurisdiction (10)**
73:24;76:5,17;93:4;118:5,
18;120:12;121:10;123:19;
124:10
**jurisdictions (1)**
64:3
**justifying (1)**
99:24

**K**

**keep (4)**
99:23;104:13,19;110:21
**Keller (2)**
9:12;134:7
**Kelley (1)**
85:17
**KELLY (4)**
3:18;9:1,1;134:5
**kept (1)**
100:24
**kind (8)**
12:14;42:23;46:2,10;58:8;
63:20;71:5;89:1
**knew (7)**
28:9;53:16;61:10;67:1;
73:2,11;89:11
**know (66)**
16:4,5;22:16;23:19,22;
28:11;32:10;44:20;46:20;
47:5,9;48:2,3,11;54:4;58:5;
62:15,21,24;66:19,20;67:1,
4,21;68:2;72:11;73:18,20;
74:17;77:3,10,16,21;83:9;
88:3;91:6,9,11,15;95:7;
99:4;103:9;107:15;108:4;
114:10,11,19,19;118:16;

120:9,11,13,15,16,20;121:5;
122:15;123:7,13,22,23;
124:2,8;129:7;131:12;132:4
**knowing (1)**
23:13
**knowingly (2)**
118:12;122:18
**knowledge (9)**
22:1,12;32:17;45:18;
75:16;76:24;84:24;109:2;
121:19
**knowledgeable (1)**
112:3
**knows (4)**
47:19;56:11;58:4;72:4

**L**

**Labaton (52)**
3:4;5:4;8:14,16,18;12:20,
21;13:22;14:1,12;17:2;
18:16;19:15,23;21:4,8;
22:19;23:1;30:10;34:24;
35:8,12;36:23;37:2;39:10;
41:15;42:11,20;43:10,21,24;
44:2,8;45:21,23;46:1,11;
49:22,23;53:14;58:21;
65:10;66:2;70:8,10;74:21,
24;101:1;102:7,8,13;108:18
**labors (2)**
99:15,17
**land (5)**
120:12,17,20;121:9;124:9
**language (13)**
32:16;36:15;38:18;80:14,
16,20,21;83:5,6,22,23;90:8;
126:17
**last (6)**
10:12;13:4;76:8;97:18,20,
21
**later (4)**
20:16;62:23;98:1;126:2
**latter (1)**
28:2
**Law (46)**
3:15;5:5;8:2,24;9:2,8;
16:19;33:5,7;34:14;65:19;
76:2;79:6;82:7;89:2,4;96:5;
98:4;100:2;101:13;105:23;
108:21;110:17;111:22;
112:8,8;114:20;115:21;
118:16,20,22;120:11,16,20;
121:9;122:10,18,22;123:7,
13,23;124:8,10,17,19,21
**lawyer (160)**
27:24;28:15,16;45:5,5,6;
46:23;47:1,1,18;48:2,3;49:4,
11,19,21;50:1,4,5,11,12;
51:8,9,13,14,21;52:1,5,7,8,9,
10,14,15,21,22;53:1,5,6,14,
14,15;54:8,11,12,13,17,20,
23;55:11;56:8,11,14,20,21,
23,24;57:7,8;58:3,6;59:19;

60:3,12,24;61:7,16;62:9,11;
64:22;71:9;72:2;74:2,4,5;
75:16;77:1,13,15;78:14,15;
79:5,8,11;81:1,5,12,21,22;
82:2;85:1;86:1;88:5,7;89:8;
94:8,15,15,16,16,19,20,22;
95:2;96:4,5;99:23;100:1;
101:12;103:23;105:19,22;
106:15;107:3,12,23;108:2,3,
5;109:11,24;110:8;113:2,9,
14,15,21,22;114:13;115:1,7;
116:8,18;117:8,9,14,21;
118:3,10,11,15,23;120:3,4;
121:8,15,19;122:13,17,22;
123:7,13,21;124:8;126:9,10,
13;128:22;129:15;130:14
**lawyers (42)**
19:3;20:24;25:17;27:24;
28:1,16;31:19;33:10;47:6,9;
50:8;63:15;68:1;69:10;71:9;
75:20;76:21;77:1,8;78:23,
24;79:3;84:4;85:4,6;86:14,
15;88:3,22,24;89:4;92:7;
94:13;97:23;104:24;105:12;
108:12;110:12;114:15;
120:1,10,19
**lawyer's (5)**
81:3;106:16;121:3,3;
126:4
**lawyer-to-lawyer (1)**
77:18
**laypeople (1)**
105:13
**layperson (1)**
105:19
**lead (4)**
44:1,2;46:11,12
**learned (1)**
67:15
**learning (1)**
68:19
**least (2)**
56:7;59:24
**left (2)**
7:23,24
**legal (16)**
32:13,15,21,23;33:4;45:4;
53:22;72:14;73:7;97:5;
111:6,16,21,24;112:3,10
**less (1)**
89:4
**letter (17)**
15:7;18:13;21:7;29:12;
30:7;36:4,12;66:9,13;68:6;
70:8;87:23;91:13,14;101:1;
116:14;128:21
**letters (2)**
22:9;67:16
**liaison (13)**
21:9;30:12;35:2;37:4,14,
18;38:4,22;39:17,20;40:12,
22,24
**liberalize (1)**

64:5

**license (1)**
79:6

**Lieberman (19)**
7:4;8:11,12;11:3,4,6,23;
18:4,6,7;19:9;20:22;66:7;
74:16;84:21;85:16;134:15;
135:7,16

**Lieff (5)**
8:19,21,21,21;134:12

**lien (4)**
46:10,15;59:13,21

**light (1)**
90:16

**likelihood (1)**
93:16

**limitation (1)**
47:3

**LINDA (3)**
5:6;8:3,6

**line (2)**
9:23;23:7

**listening (1)**
102:16

**litigated (2)**
77:4,9

**litigation (19)**
21:11;30:14;35:4;37:9;
38:7;42:17,21;45:17;46:2;
52:1,2,4;76:24;77:4;100:4;
101:11;102:9;108:23;
126:18

**litigator (1)**
47:20

**litigators (1)**
47:12

**little (1)**
130:8

**LLP (2)**
3:3,14

**local (14)**
21:9;30:12;35:1;37:4,6,
14,18;38:4,21;39:16,19;
40:12,21,24

**long (6)**
23:14;62:6;71:6;81:11;
98:4;104:1

**longer (1)**
79:5

**long-time (1)**
31:7

**look (7)**
31:15;61:14;78:1,2;85:7,
10;129:2

**looked (1)**
87:22

**looking (3)**
73:1;90:5;92:5

**looks (1)**
79:19

**lot (2)**
51:21;89:8

**lots (1)**

133:21

**loudly (1)**
9:19

**love (1)**
58:7

**lower (1)**
85:20

**LUKEY (87)**
3:7;8:13,13;24:11,21;
26:4,6,22;30:2,24;31:12;
32:22;33:22;34:11;35:15,
24;36:8;37:16,20;38:14,16;
39:12;41:3,12;44:11,18;
45:2;46:13;48:10,24;50:2;
51:17;57:5;59:15;60:13;
62:17;66:10;67:10,20;
68:10;69:2,22;70:12;71:4,
16;72:16;74:12;79:7;80:2,5,
10,21;83:24;84:7,12;87:12;
89:22;90:19;91:5;93:14;
95:4,10;97:8,13;98:10;99:8,
11;100:14;105:2;107:9;
108:10;109:6;111:2;117:5;
119:23;121:13;123:8,20;
124:5,23;125:4;126:12;
128:17;131:17;132:12;
133:10;134:2

**lying (1)**
106:12

## M

**Madam (2)**
10:24;18:2

**main (2)**
15:13;67:22

**maintains (1)**
79:6

**makes (6)**
39:7;46:23;49:12;56:23;
58:2;94:20

**making (1)**
23:1

**mandated (1)**
27:7

**many (8)**
12:5;27:12;76:20;81:24;
88:6;92:11,11;116:18

**March (1)**
11:11

**mark (2)**
11:2;18:5

**marked (4)**
11:4;18:7,10;85:17

**Mass (5)**
18:17;75:24;100:7;103:1,
3

**Massachusetts (20)**
3:6,17;25:13;28:19;34:3;
47:7,9;64:2;71:11;72:14;
73:7;74:1;75:19;80:12;
89:12;91:11;106:24;116:23;
122:20;124:1

**master (223)**
7:14,14,19;34:15;36:2,10,
20;37:12,17,23;38:9,12,15,
20,24;39:5,8,15,23;40:4,8,
15,18;41:6,17;42:7,12,22;
43:6;44:15,21;45:7,10,14,
19;46:5,9,18,22;47:22;48:8,
13,16;49:11,11,18;50:14,17,
19,24;51:3,6,18;52:5,17,20;
53:3,21;54:4;55:4,9,14;56:5,
18;57:3,6,11,24;58:11,15;
59:4,8,11,16;60:19,22;61:8,
13,21;62:5,13,15,20;63:3,6,
8;64:7,17,23;65:4;66:15;
71:23;72:9,19,24;73:4,11,
22;74:15,22;75:3,7;78:8,11,
21;79:4,11,18,24;80:19,23;
81:10,20;82:5,7,11,15,19;
83:1,4,14,17;84:3,10,14,19;
85:14;86:22;87:6,15;88:21;
89:7,16;90:12,23;91:2,17;
92:18;94:5,11;95:1,6,14,17,
24;96:2,11,15,19,23;97:3,
17,21;98:11,15;104:5,11,13,
18,22;105:5,14,20;106:4,9,
14,21;107:2,7,10,18;108:1,
16;109:4,8,19,23;110:7,16,
21;112:22;114:15;115:13,
22;116:3,6;117:2,11;118:1,
15,24;119:13,18,24;120:10,
19,23;121:6,24;122:3,9;
123:5,11,18;124:3,6,14,24;
125:12;127:11;129:8,17,23;
130:7;131:14,18,23;132:6,9,
15,20,24;133:20

**master's (2)**
7:22;8:7

**materially (1)**
115:12

**matter (28)**
7:19;45:9,12,20;46:6;
48:19;51:12,13;52:14;
56:19;57:23;62:3;68:16,17;
69:8;70:5;74:6,9,18,18;
75:5;77:14;97:11;101:6;
102:9;104:8;116:12;128:19

**mattered (1)**
68:12

**matters (5)**
47:14;52:23;63:17;96:7;
101:11

**may (34)**
16:5,9;19:4;21:1,8;23:11;
29:19;30:11,19;31:4,9,19,
21;32:9;33:3,17;34:24;
36:23;37:13;40:16;50:22;
57:23;66:11;70:8;77:19;
81:5;86:13,14;103:1;112:3,
7;118:20,21;122:21

**Maybe (14)**
22:12;51:11,12;52:19;
58:4;72:24;82:21;99:9,12;
105:20;112:11;120:9;121:6;

128:8

**McEvoy (6)**
7:23;73:13,17;80:8,14,18

**mean (27)**
13:15;14:11;22:15;27:20,
23;28:1,15;48:12;70:14;
87:5;89:1,13;98:3;101:24;
102:3;106:2;110:12;111:21;
112:2,4;116:13;117:17;
120:14;126:19;129:4,10;
132:5

**meaningful (2)**
61:4;67:4

**meaningfully (1)**
100:22

**means (3)**
30:20;64:13;98:19

**meant (2)**
27:9;132:21

**meet (6)**
36:19,20;58:7;102:7;
108:7,23

**meeting (5)**
12:24;13:3;43:16,17;
108:6

**meetings (1)**
43:19

**member (10)**
79:9,12;94:9,11,19;96:5,
24;98:5;105:23;110:18

**members (3)**
105:1;129:13,20

**membership (1)**
82:8

**memorized (1)**
19:1

**memory (1)**
86:18

**mentioned (4)**
13:6;72:17;77:21;93:9

**merely (1)**
82:12

**met (2)**
12:21;36:16

**MICHAEL (4)**
5:4,5;8:15,23

**Michigan (1)**
7:17

**middle (3)**
75:12;84:22;93:1

**might (18)**
15:22;24:6;34:13;37:4,5,
7;67:17;91:8;93:10,12;
109:17,18;112:14;116:12;
121:20;125:5,10;127:6

**mightily (2)**
99:16,17

**Mike (1)**
102:18

**million (2)**
68:23;103:24

**mind (5)**
18:18,24;20:10,11;85:12

**minimum (1)**
90:14
**minute (1)**
92:16
**minutes (1)**
92:19
**mirror (1)**
27:17
**misappropriation (1)**
91:24
**misconduct (3)**
113:22;119:10;122:1
**mistakenly (1)**
10:10
**misunderstood (1)**
50:23
**modest (1)**
56:22
**modify (1)**
39:16
**Modifying (3)**
37:17;38:21;40:21
**moment (1)**
55:21
**money (1)**
91:23
**monitoring (2)**
42:18;58:23
**month (1)**
24:7
**more (28)**
11:13;20:9;22:16;31:24;
32:10;34:15,18,24;47:23;
48:1;54:5;55:11;56:12,12,
14,15;67:3;74:5;86:23;90:8;
95:18;97:24;104:14,19,20;
111:13;127:10;133:21
**most (4)**
18:24;47:13;87:22;101:12
**motions (1)**
127:1
**move (1)**
94:2
**much (3)**
62:22;88:17;89:15
**myself (2)**
13:21;71:20

**N**

**name (4)**
7:12;69:4;71:8;88:3
**nation (1)**
73:24
**nationally (1)**
97:4
**nature (1)**
42:4
**near (1)**
65:10
**necessarily (3)**
86:13;116:10,11
**necessary (4)**

35:12;66:17,20;81:16
**need (8)**
11:16;32:10;37:4,5,7;
121:5;127:17;133:21
**needed (1)**
14:6
**needs (2)**
25:9;32:10
**neglect (1)**
91:24
**neither (3)**
75:16;85:1;100:6
**New (11)**
8:1;33:23;47:6,10;91:7,
10;106:23;107:1;108:21;
116:23;123:24
**newer (1)**
15:1
**next (3)**
41:7;65:24;119:17
**Nice (2)**
36:18,20
**nicer (1)**
97:14
**nine (1)**
48:22
**NIXON (3)**
3:14;9:1,8
**non-compliance (1)**
128:15
**none (2)**
9:16;72:5
**nonetheless (1)**
75:22
**non-lawyer (4)**
58:4;98:19,22;99:7
**non-lawyers (2)**
58:10;79:2
**nor (2)**
75:18;99:5
**normal (1)**
83:19
**Notably (3)**
75:13,15;84:24
**Notary (2)**
7:8;135:24
**note (1)**
102:18
**noted (1)**
134:17
**notice (14)**
24:15,20;62:10;78:16;
88:1,9;114:8,12,16;116:4,8;
130:2;132:1,17
**notion (3)**
46:1;103:13;115:7
**notwithstanding (2)**
88:7;116:24
**Number (5)**
7:21;47:6,9;48:4;80:24

**O**

**oath (1)**
135:9
**object (1)**
97:8
**objected (1)**
70:4
**Objection (73)**
24:11,21;26:4,6,22;30:2,
24;31:12;32:22;33:22;
34:11;35:15,24;37:16,20;
38:14,16;39:12;41:3,12;
44:11,18;45:2;46:13;48:10,
24;50:2;51:17;57:5;59:15;
60:13;62:17;66:10;67:10,
20;68:10;69:2,22;70:12;
71:4,16;74:12;79:7;80:2;
83:24;84:7,12;87:12;89:22;
90:19;91:5;93:14;95:4,10;
98:10;99:8;100:14;105:2;
107:9;108:10;117:5;119:23;
121:13;123:8,20;124:5,23;
125:4;126:12;128:17;
131:17;132:12;133:10
**obligation (4)**
19:16;29:23;30:4;117:23
**obligations (2)**
18:17;23:2
**obscure (1)**
77:19
**obtained (1)**
66:2
**obviate (2)**
29:23;30:4
**obviates (2)**
70:9,14
**occasions (1)**
12:22
**Off (2)**
85:14,15
**offer (2)**
111:7,17
**offering (1)**
112:17
**offhand (1)**
16:9
**offset (1)**
41:1
**often (2)**
45:1;112:9
**old (3)**
15:5;114:19;120:8
**once (6)**
12:22;14:11;30:6;58:22,
22;91:13
**One (26)**
14:21;23:10;45:5;52:13;
53:10;58:13;73:18;77:1;
82:18;83:15;84:2,5;94:17;
95:17;97:24;101:11;104:19;
111:12;112:4;117:13;120:9;
122:21;127:11;133:6,14;
134:11
**ongoing (1)**

47:11
**only (24)**
19:4;21:1;22:21;25:4;
31:20;33:17;48:20;49:6;
54:13;55:1;58:12;65:21;
71:19;76:24;82:16;83:8;
90:9,14;97:24;103:4;
117:19;119:24;125:2;
128:19
**opened (1)**
54:18
**operated (1)**
14:14
**operative (2)**
35:22;36:14
**opinion (59)**
11:20;14:2,8;15:3,4,5;
16:12,14,20,21;17:22;20:5;
26:7,23;27:1;34:22;35:5,11,
23;36:11;46:21;55:13;
68:14,18,24;74:14;75:18;
76:12;77:17,20;84:1;85:2,8,
9,10;93:23,24;96:10;
100:21;103:2;104:10;111:7,
8,17,18;112:13,17;113:2;
114:7;129:11,15,18,22,24;
130:6;132:14,16,21,23
**opinions (5)**
11:20;33:6;112:5;133:5,
13
**opposed (3)**
63:23;77:15;118:5;120:5
**optional (5)**
26:12,13,17;27:21;33:1
**oral (3)**
47:15;89:3;129:5
**order (6)**
12:17;13:9;22:4;24:8;
112:19;118:12
**original (1)**
48:20
**others (1)**
16:10
**otherwise (3)**
78:18;115:8;127:23
**ought (1)**
128:3
**out (19)**
10:4;15:2,2;19:21;28:10;
33:7;43:13,16;44:23;56:13;
58:20,24;64:4;68:22;79:9;
91:12;92:5;102:19;109:3
**outset (1)**
47:16
**outside (1)**
29:11
**over (4)**
10:15;18:3;32:17;46:10
**overall (7)**
23:14;32:12;65:22;70:1,
19;77:7;104:1
**Overseers (1)**
75:19

owe (2)
117:10,19
own (6)
42:2;76:7;93:5;110:13;
119:5,5

## P

page (21)
18:11;20:18;22:14;30:9;
36:13;39:5;65:7;72:23;
75:10;84:23;85:20,21;93:1;
94:3,3;99:13,14,20;100:20;
102:12,20
pages (2)
13:19;16:13
paid (11)
40:23;41:24;42:23;44:9;
45:5;48:19;54:24;68:22;
96:6;103:23;109:24
palooza (1)
10:11
paragraph (10)
36:13;65:9,24;75:12;
84:22;85:23;86:11;93:1;
100:20;102:20
pardon (1)
10:10
parse (3)
40:20;47:22;49:2
part (5)
29:24;42:15;56:7;99:24;
127:3
participants (3)
8:9;9:20,22
participate (1)
63:19
participated (3)
43:18,19;62:2
participation (14)
19:6;31:22;33:20;60:2;
61:23;62:1,6;63:1,22;64:8,
10,12,24;103:19
particular (8)
21:13;51:24;58:20;63:13,
17;101:13;111:23;121:18
parties (2)
29:24;66:14
partner (1)
65:11
party (1)
109:10
pass (2)
11:1;18:3
past (1)
52:18
pay (4)
37:5,7;81:7;101:2
paying (2)
58:10;79:1
payment (9)
39:3,17;40:5;42:4;43:1;
100:23;102:21,22,24

payments (1)
39:23
PEABODY (3)
3:14;9:2,8
people (10)
18:24;32:18;38:3;41:22;
51:22;81:24;92:13;105:9;
108:12;125:6
people's (2)
13:14;41:21
percent (3)
43:23;104:6,9
perfect (1)
33:11
perfectly (2)
81:14;106:3
perform (1)
17:21
performed (7)
21:11;30:13;35:3;37:8;
38:6;40:1;41:8
perhaps (2)
42:20;99:3
period (8)
14:24;82:5,6,9,10;95:24;
96:1;110:18
perjury (1)
91:24
permission (4)
30:19,20,21;37:10
permissive (4)
36:24;39:2;81:5,7
permits (1)
74:1
permitted (3)
36:23;39:11;81:7
person (15)
12:23;13:1;76:2;77:15;
78:6;81:2,11,22,23;82:3,9;
98:18;106:12;110:11,17
personally (1)
17:21
Perusing (2)
11:9,22
phone (10)
8:3;9:6,10,14,20,22;
43:14;108:2;109:3;134:11
phrase (8)
21:13;23:3;29:8;37:13;
38:9;41:7;64:7;114:19
picks (2)
108:2;109:2
piece (2)
64:9,13
Place (3)
3:5;82:17;130:11
plain (2)
32:16;38:18
plaintiff (2)
44:1;46:12
plaintiffs (1)
9:12
plays (1)

61:3
please (5)
9:24;61:14;62:1;78:9;
111:12
pm (1)
134:17
point (8)
12:6;24:22;54:22;58:23;
79:23;80:22;126:2;131:14
pointed (1)
30:8
policies (2)
72:12;93:6
policy (9)
56:7,19;57:17,19;58:17;
59:5;63:9;79:1;101:7
position (5)
75:20;86:2;89:5;117:8;
130:15
positions (1)
13:15
possibilities (4)
40:3,5,10,13
possibility (1)
91:12
possible (5)
10:1;28:11;39:21;93:15;
100:23
possibly (3)
92:15;123:17,22
post-Saggese (1)
126:5
potential (2)
42:17;90:5
practically (1)
93:16
practice (15)
14:6;25:15,21;26:12;27:4,
6,10;55:15,17,20;56:9;
63:16;72:15;73:8;74:3
practicing (2)
73:3;79:5
practitioner (6)
10:13,16;27:15,22;28:20;
31:7
preceded (1)
42:24
precedence (1)
119:1
precisely (1)
23:22
preclude (1)
58:9
precluded (1)
105:17
predecessor (1)
21:20
pre-existing (2)
109:4,9
preferred (5)
25:14,21;26:12;27:4,6
preliminaries (1)
10:3

preparation (3)
12:12,14;13:7
prepare (1)
12:17
prepared (1)
13:3
preparing (1)
12:18
pre-Saggese (1)
125:23
PRESENT (2)
5:3;97:9
presumably (1)
28:10;70:4;77:5
presume (3)
120:16,18;123:23
presumption (1)
83:5
pretty (2)
88:17;96:3
previous (1)
57:14
previously (1)
128:12
primary (1)
74:3
prior (2)
16:21;83:10
private (6)
91:8;93:10,11;127:3,6;
128:12
probable (1)
117:21
Probably (5)
12:11;15:13,22;47:7;
82:13
problem (2)
113:13;118:19
problems (4)
85:24;114:8,9;130:12
process (8)
13:24;14:11;15:12;57:22;
88:9;90:11;114:8,13
profession (1)
97:1
Professional (25)
28:6,7;34:4;60:6,10,15;
83:10,11;88:14;93:23,24;
96:10;111:24;113:20;
115:10;120:6,21;121:4;
123:1,6;124:21;125:8,9,13;
126:14
PROFESSOR (20)
5:7;8:1;10:10,11,15;
15:18;17:11,15;18:14;
24:17;76:6;89:2;93:4;96:20,
23;99:15,15;100:2,9;102:23
promulgated (1)
15:1
pronounced (8)
118:17,21;121:9;123:14;
124:9,17;126:6;127:13
proper (5)

54:15;106:3;107:5;108:8,
14
**proportion (2)**
63:24;103:18
**proportionate (1)**
63:20
**prosecute (2)**
117:19;119:9
**prosecutes (1)**
117:13
**prosecuting (2)**
27:23;88:5
**prosecutor (9)**
90:4;115:17,20;116:16,
17;117:13,19,24;118:6
**prosecutorial (2)**
117:12;122:4
**prosecutors (1)**
117:9
**prospective (2)**
23:16;113:17
**prospectively (2)**
114:24;119:15
**protecting (1)**
65:20
**protection (1)**
92:4
**protector (1)**
119:7
**prove (1)**
69:9
**provide (2)**
14:1,8
**provided (6)**
12:20;20:3;65:13;68:8;
69:15;112:5
**providing (1)**
13:13
**provision (5)**
19:2;20:22;21:5;70:7;
79:20
**prudence (1)**
114:11
**Public (4)**
7:8;91:15;101:7;135:24
**publicity (1)**
128:4
**published (1)**
116:11
**pull (1)**
80:6
**purport (1)**
82:23
**purpose (8)**
41:16;56:1;61:1;81:11,13;
83:7,21;96:16
**purposes (10)**
20:4;24:2;55:23;63:1;
81:21;82:1;90:9,11;123:5;
129:11
**pursuant (2)**
44:7;83:19
**put (8)**

31:10;55:19;72:20;75:1;
76:23;81:17,17;98:7
**putative (2)**
133:7,15

---

### Q

**questioners (1)**
9:18
**quibbling (1)**
64:18
**quite (1)**
131:9
**quote (1)**
36:7
**quoted (1)**
36:10

---

### R

**raises (1)**
118:24
**ramifications (1)**
119:20
**rate (1)**
12:2
**rather (2)**
57:1;63:18
**ratification (1)**
66:16
**ratified (1)**
101:3
**rationales (1)**
100:7
**re (1)**
114:12
**read (32)**
19:14;23:7;27:1;34:5;
36:11;37:12,21;38:1,7,18,
20,24;39:16,22;40:9,18,19;
41:4,5;42:22;65:3;74:10;
75:14;83:20,21;84:23;90:1,
7;103:7;110:12;111:12;
135:8
**reading (9)**
17:15;19:10;34:7;36:23;
40:8;76:7;93:6;99:17;
110:19
**reads (2)**
19:2,9
**ready (1)**
7:2
**real (4)**
44:22;55:23;118:19;131:6
**really (10)**
12:7,8;28:13;64:4,19;
67:24;87:23;88:11;110:3;
118:2
**reason (1)**
27:2
**reasonable (10)**
19:7;31:23;32:12;61:19;
70:2,19;103:5;104:1;

109:14;123:4
**reasonableness (2)**
77:7;103:6
**reasonably (2)**
126:9,10
**reasons (1)**
112:4
**recall (2)**
15:23;16:8,8;67:11
**receive (3)**
16:2;17:17;43:23
**received (3)**
14:11;48:23;91:13
**receives (3)**
47:1;49:6;107:4
**recent (2)**
11:13;20:9
**recently (2)**
65:13;102:24
**Recess (1)**
92:20
**recognized (3)**
97:4;101:8;126:22
**recommendation (6)**
57:13,15;78:14;94:21;
96:7;109:10
**recommender (1)**
98:4
**recommending (7)**
81:3,12;96:4;104:6;105:8,
10;113:15
**record (6)**
7:1,12;85:14,15;135:10,
11
**redundancy (3)**
83:12,15,18
**redundant (6)**
82:14,15,18;83:23;84:9,
18
**reemphasize (1)**
66:24
**reemphasizes (1)**
66:24
**reenforces (1)**
74:13
**refer (7)**
47:13;48:5;52:8;62:6;
63:17;74:6,9
**referee (1)**
65:18
**reference (3)**
22:15;85:11;102:23
**referenced (1)**
30:8
**referencing (1)**
13:6
**referral (67)**
21:10;30:12;35:2;37:6,15;
38:5,21;39:16,18;40:21,23;
41:18,21;42:6,23;43:2;
44:10,13;45:3,22;47:10;
51:18;55:2,10,17;56:1,3,6,8;
57:17,20,21;58:10,17;59:5,

22,23;60:16,17,17,22,23;
63:9,15;64:6,15,20,21;67:8;
72:11;74:4,9,10;77:2,5,9,10,
12,14;78:6;86:5;100:23;
101:2;130:18;131:5,9,19
**referral-fee (1)**
76:21
**referrals (4)**
47:4;77:18;78:23;79:2
**referred (19)**
13:10;45:1,12,12,15,20;
47:17;49:21;50:5;53:14;
54:11;59:19;62:12;73:6;
74:18,20,22;88:4;94:16
**referring (39)**
13:5;33:5;37:18;45:8;
47:18;48:1,6;49:4,12,19;
50:4,12,20;51:9,14,16;52:6,
21;53:6;56:21;57:8;59:12;
61:6;62:3;70:11;74:5;75:4;
76:18;77:14;86:1;94:14,17;
96:4;100:1,3,8;103:23;
113:11;130:14
**refers (3)**
45:4;53:1;56:13
**reflected (1)**
93:12
**refresh (1)**
86:18
**regard (1)**
95:1
**regulation (1)**
32:17
**regulator (3)**
27:23;31:8;119:6
**regulatory (3)**
69:8;113:8,14
**relate (1)**
59:9
**relates (3)**
41:10,14;77:22
**relationship (16)**
21:19;39:10;44:5;49:20;
51:15;52:9;53:13;55:7;
58:21;59:1;63:4,5;108:13;
109:2,5,9
**relationships (2)**
101:9,17
**relevant (6)**
11:18;69:12;110:3,4,6,8
**relied (1)**
115:1
**reluctant (1)**
113:21
**rely (3)**
14:7;33:13;126:17
**relying (1)**
113:22
**remain (2)**
14:13;65:22
**remember (1)**
94:14
**reminds (1)**

97:22
**render (1)**
    86:13
**repeat (1)**
    71:20
**repeatedly (1)**
    67:23
**report (26)**
    10:18,21;11:8,11,21;
    12:19;13:9,12,20;14:5,14;
    15:18;16:14;17:11,16,19;
    18:4,6,10;22:14,22,24;
    24:17;65:7;66:22;99:20
**Reporter (2)**
    10:24;18:3
**represent (1)**
    54:21
**representative (4)**
    133:7,8,15,16
**representing (2)**
    28:1;92:13
**request (1)**
    14:7
**require (9)**
    34:18,23;62:9;69:4;71:11,
    17;86:7;100:8;130:20
**required (5)**
    70:18;72:5;86:3;90:8;
    130:16
**requirement (6)**
    26:16;33:16;34:8;35:7;
    103:7;126:1
**requirements (1)**
    126:6
**requires (6)**
    25:3;69:5,7;71:19;88:2;
    103:4
**rescript (2)**
    86:9;130:22
**research (4)**
    16:18,22;17:22,23
**resources (1)**
    91:23
**respect (15)**
    9:17;15:11,14;16:12;
    20:22;21:2;22:20,23;23:6;
    24:23;27:18;34:9;100:11;
    112:21;117:6
**respected (1)**
    96:24
**respond (2)**
    17:12;51:22
**Responsibility (9)**
    28:6;34:4;63:23;83:11;
    88:14;103:20;113:20;
    115:10;125:10
**rest (1)**
    81:15
**restate (1)**
    124:6
**restatement (1)**
    78:2
**result (2)**

43:20;102:8
**results (2)**
    47:21;101:14
**retain (2)**
    37:4;57:21
**retained (1)**
    57:11
**retainer (1)**
    128:20
**retains (1)**
    94:22
**retention (8)**
    15:7;21:6,14;22:9;23:7;
    29:12;68:6;70:7
**retired (1)**
    7:15
**Retirement (1)**
    7:20
**retract (1)**
    128:13
**retroactively (1)**
    65:14
**reversal (1)**
    116:20
**reversed (1)**
    22:4
**reverts (1)**
    49:20
**review (1)**
    12:13
**reviewed (1)**
    12:19
**revised (1)**
    20:17
**revisit (1)**
    10:2
**Richard (2)**
    8:19;134:3
**right (54)**
    9:13,16;10:3,17;11:10,23;
    12:9,24;13:16,23;14:10;
    15:14,24;16:11;17:13;18:1;
    21:12;22:10,23;23:17;
    26:11;27:2;29:16;30:6,21;
    32:20;38:2;40:1,10;58:16;
    60:16;64:22;67:5;69:20;
    72:7,8;75:9,12;79:22;81:20;
    85:20;86:17;96:3,21;
    100:18;102:15;109:22;
    113:23,24;127:3,6;132:24;
    133:17;134:10
**right-hand (1)**
    85:21
**rights (1)**
    92:5
**Robert (1)**
    8:21
**Rohrback (2)**
    9:12;134:7
**role (7)**
    35:9,13,17;49:13;60:11;
    61:3,4
**room (2)**

8:9;19:1
**Rosen (4)**
    7:15,18;36:17;47:5
**routinely (1)**
    94:19
**Ruffalo (1)**
    114:12
**rule (124)**
    14:23;15:1,5;18:17;19:9,
    10,13,14;20:19,20;25:7,8;
    26:10;27:11,16;28:17;31:2,
    8,10;33:12;34:6,7,17,20;
    56:1,3,6;60:16;61:11,14,15;
    62:4;63:1,15;65:1;66:4;
    70:17,17,17;71:5,17,19;
    76:1,5,17;77:13;79:10;80:6;
    81:7;82:2;84:11,16;86:3,6,
    13;87:9,24;88:2,13;89:14,
    23;90:6,7,7,9,18,22;91:19;
    92:3;93:4;98:2,24;100:7;
    102:22;103:1,3,17;106:17,
    18;107:20;109:16,18,20;
    112:19;113:3,4,5,10,19,24;
    114:4,5;115:2,3,6,9,23;
    116:7,8,14,21;118:13,22;
    119:2,3,8,12,14;120:6,7,7;
    121:11,18,22;123:1;126:15;
    127:12;128:3,5;130:8,16,19;
    131:12,22
**rules (40)**
    20:23;28:5,7;58:9;61:6;
    63:21;64:5;76:7,12;77:21;
    81:15;82:17,17,21;83:9,19,
    20,23;93:7,8;105:11,12,15,
    16,18;110:12;111:23;121:2,
    3,15;123:6;125:8,9,12,14,
    15;126:14,17,20,22
**ruling (10)**
    91:12;112:19;113:18;
    114:23;115:5;118:12;
    119:11;120:5;121:21;
    122:24
**rulings (3)**
    114:16;119:20;127:24

## S

**safe (1)**
    79:20
**Saggese (28)**
    25:13,20;26:2,12,14;
    27:12,16,21;28:9,12,22,24;
    75:16;85:1,4,7,16;87:5;
    99:18,23;113:12;114:23;
    115:5;117:1;125:22;127:13;
    128:15;130:8
**same (14)**
    13:8;19:3;21:1;31:19;
    32:7;47:17;51:12;55:22;
    65:23;80:22;84:13;112:12;
    115:15,15
**sanction (4)**
    87:11,18;91:4,20

**sanctioned (2)**
    115:8;125:2
**sanctions (4)**
    75:24;88:11;90:6;92:13
**Sarrouf (1)**
    15:19
**Sarrouf's (3)**
    16:23;17:1,16
**satisfaction (1)**
    24:19
**satisfied (1)**
    77:6
**satisfies (1)**
    31:4
**saw (1)**
    72:19
**saying (9)**
    20:23;28:2;120:24;121:1,
    12;122:17,21;124:22;
    131:10
**scarce (1)**
    56:22
**scenario (1)**
    60:9
**School (1)**
    8:2
**scrutiny (2)**
    103:2,21
**searching (1)**
    98:12
**second (1)**
    65:12
**secondary (2)**
    72:13;73:5
**secondly (1)**
    103:14
**section (3)**
    22:22,24;106:16
**secure (2)**
    86:2;130:15
**secures (2)**
    86:5;130:18
**securities (1)**
    108:22
**seek (1)**
    108:13
**seeking (2)**
    77:14;79:1
**seem (3)**
    41:22;67:6;112:7
**seems (6)**
    25:13;36:14;37:1;83:16;
    124:22;131:1
**sending (1)**
    76:1
**sense (5)**
    55:20;93:18;103:14;
    118:11;131:6
**sentence (7)**
    30:9,18;32:2;40:20;65:12;
    76:9;84:23;86:11;93:2
**separate (1)**
    39:2

**separately (1)**
39:1
**serious (1)**
114:8
**serve (7)**
21:9;30:11;35:1;37:14;
38:4;101:9,18
**served (9)**
53:10;57:18,20;63:10;
96:16;101:22,23;102:2,5
**serves (1)**
46:11
**services (9)**
21:10;30:13;35:3;37:8;
38:6;39:24;41:8,10;81:3
**serving (1)**
39:19,20;40:24
**set (3)**
14:2;121:2;123:23
**sets (1)**
115:24
**several (1)**
12:22
**sglass@choatecom (1)**
3:11
**shall (1)**
80:6;81:1,21;110:8;
119:14
**share (1)**
103:17
**shared (2)**
18:20;19:18
**sharing (1)**
103:8
**SHARP (3)**
3:19;9:7,7
**shocking (1)**
89:1
**short (1)**
100:21
**showing (2)**
11:6;18:9
**shows (1)**
48:18
**side (1)**
85:21
**sides (1)**
92:10
**sign (1)**
66:13
**signed (5)**
66:14,18;67:16;69:16;
135:19
**significance (3)**
58:16,18;66:7
**significant (5)**
66:12,21;68:7;123:3;
127:23
**signing (2)**
15:6;68:5
**similar (1)**
34:2
**simple (1)**

**71:19**
**simply (15)**
19:22;48:20;49:15;57:16;
59:9,20;63:23;66:23;69:5;
78:13,15;103:18;105:7;
110:16;114:5
**Singal (1)**
7:24
**single (5)**
49:16;64:9,9,13;76:12
**SINNOTT (29)**
7:1,11,13;8:5;9:3,9,13;
10:6,24;18:2;34:21;65:5;
75:8;84:20;92:17,21,23;
98:17;102:18;111:3;125:17;
127:9;128:10;133:1,19,23;
134:3,6,10
**S-I-N-N-O-T-T (1)**
7:13
**situation (2)**
48:5;107:19
**situations (3)**
76:21;86:1;130:13
**size (1)**
95:2
**SJC (5)**
27:13;114:1,4;124:1;
125:11
**SJC's (1)**
116:24
**skimpy (1)**
56:23
**slightly (1)**
19:21
**Smith (3)**
48:3;51:10,14
**so-called (1)**
14:24
**solely (1)**
23:6
**Solicitation (20)**
105:14,16,18,24;106:1,2,
5,6,17;107:3,6,8,11,14,17,
20;108:9;109:16,18,20
**somebody (7)**
37:7;58:1;91:13;115:19,
20;119:10;124:16
**somehow (3)**
63:19;77:13;99:22
**sometimes (2)**
47:15;128:9
**somewhere (1)**
77:20
**sophisticated (1)**
67:2
**sorry (11)**
22:3,6;26:13;37:23;50:21;
53:10;74:24;76:15;93:8;
99:10;133:11
**sought (1)**
128:13
**sound (1)**
59:22

**sounds (4)**
59:14,19;74:7;117:4
**source (2)**
72:14;73:5
**speak (3)**
9:19;101:14;119:7
**speaking (4)**
92:2,8;106:7;112:22
**speaks (2)**
26:7,23
**special (225)**
7:14,14,19,22;8:6;34:15;
36:2,10,20;37:12,17,23;
38:9,12,15,20,24;39:5,8,15,
23;40:4,8,15,18;41:6,17;
42:7,12,22;43:6;44:15,21;
45:7,10,14,19;46:5,9,18,22;
47:22;48:8,13,16;49:1,11,
18;50:14,17,19,24;51:3,6,
18;52:5,17,20;53:3,21;54:4;
55:4,9,14;56:5,18;57:3,6,11,
24;58:11,15;59:4,8,11,16;
60:19,22;61:8,13,21;62:5,
13,15,20;63:3,6,8;64:7,17,
23;65:4;66:15;71:23;72:9,
19,24;73:4,11,22;74:15,22;
75:3,7;78:8,11,21;79:4,11,
18,24;80:19,23;81:10,20;
82:5,7,11,15,19;83:1,4,14,
17;84:3,10,14,19;85:14;
86:22;87:6,15;88:21;89:7,
16;90:12,23;91:2,17;92:18;
94:5,11;95:1,6,14,17,24;
96:2,11,15,19,23;97:3,17,
21;98:11,15;104:5,11,13,18,
22;105:5,14,20;106:4,9,14,
21;107:2,7,10,18;108:1,16;
109:4,8,19,23;110:7,16,21;
112:22;114:15;115:13,22;
116:3,6;117:2,11;118:1,15,
24;119:13,18,24;120:10,19,
23;121:6,24;122:3,9;123:5,
11,18;124:3,6,14,24;125:12;
127:11;129:8,17,23;130:7;
131:14,18,23;132:6,9,15,20,
24;133:20
**specialist (1)**
52:2
**specialists (1)**
63:16
**specializes (1)**
108:22
**specific (17)**
22:16;46:6;47:4,4;48:19,
21;49:8,14;50:20;51:10;
53:9,12;54:9;64:18;78:4;
85:11;118:13
**specifically (10)**
20:21;21:2;23:2;27:20;
42:13;47:8;65:9;71:8;76:17;
81:6
**speech (2)**
60:7,7

**split (2)**
23:14;71:10
**splitting (1)**
34:13
**spoke (1)**
19:11
**ss (1)**
135:4
**standards (1)**
125:23
**standpoint (6)**
87:18;88:10,15;92:12;
113:8;114:14
**standpoints (1)**
89:14
**State (8)**
7:20;42:21;45:20;74:18;
75:4;119:21;135:3,24
**stated (4)**
19:1;12:20:15;65:16
**statement (5)**
13:18;14:12,13;101:16;
111:5
**States (6)**
7:16;20:23;21:7;119:22;
127:22;128:3
**static (1)**
14:10
**statute (4)**
83:5,6;106:23;118:22
**statutes (1)**
83:21
**statutory (5)**
82:20,21,24;83:19,22;
90:10;99:5
**STEPHEN (1)**
5:7
**steps (1)**
67:17
**STEWART (1)**
3:3
**stick (1)**
117:7
**still (3)**
95:15;98:12;107:19
**stitch (1)**
50:12
**stop (1)**
60:7
**Strange (1)**
112:7
**strapped (1)**
91:22
**stream (1)**
47:17
**Street (7)**
3:16;7:21;42:21;45:20;
74:18;75:5;106:13
**strictly (1)**
17:13
**strike (2)**
17:14;102:10
**strong (1)**

119:19
**STUART (2)**
3:8;8:17
**stuck (1)**
72:10
**stuff (1)**
127:18
**subject (4)**
75:23;86:14;105:6;107:13
**subjective (2)**
69:12;70:3
**submitted (4)**
10:22;11:7,11,21
**subscribed (1)**
135:19
**subsection (2)**
79:19;81:13
**subsequent (3)**
54:19;59:18;60:4
**subsequently (1)**
74:21;75:17;85:1
**substance (3)**
55:22;72:15;73:8
**substantial (5)**
19:24;20:14;33:8;87:19;
88:12
**substantially (8)**
15:4;18:16;19:16,22;20:8;
32:7;88:18;100:3
**subtle (1)**
121:20
**success (1)**
100:4
**Sucharow (6)**
3:4;5:4;8:14,16;21:8;
30:10
**sued (1)**
126:10
**sufficient (8)**
24:5,8;29:23;50:11;55:10;
62:4;64:15;70:24
**suggest (4)**
25:14;34:9;67:7;88:20
**suggested (1)**
28:23
**suggesting (1)**
28:12
**suggestions (1)**
17:18
**summary (1)**
122:9
**Summer (1)**
3:16
**supervise (1)**
62:11
**support (2)**
18:15;66:1
**suppose (8)**
40:11;43:5;62:20,23;
78:11;79:4;95:11;110:4
**supposed (2)**
56:2;118:23
**Supreme (14)**

113:3;114:2,11,17,22;
115:23;116:7;119:14,21;
122:11,20;124:18;127:21;
128:2
**Sure (23)**
14:1,21;17:4;28:13;39:7,
14;40:13,14;48:15;51:5;
59:13;65:8;71:12;75:11;
78:10;90:20;94:4;105:3;
109:15;111:11;124:14;
129:4;133:12
**surplus (1)**
83:6
**Surplusage (4)**
79:24;80:1;82:12;83:23
**suspect (1)**
18:24
**sworn (2)**
7:5,7
**System (1)**
7:20

**T**

**talk (3)**
13:2;43:6;78:23
**talking (7)**
52:18;74:8;90:4;94:13;
106:12;130:9;131:3
**talks (2)**
78:3,24
**Teacher (4)**
7:20;21:7;30:10;37:10
**teaching (1)**
110:14
**team (2)**
7:22;8:7
**technically (3)**
87:9;91:18;122:23
**telephone (7)**
3:19,20;5:6;9:4,16;12:22;
106:10
**telephonically (1)**
25:22
**telling (2)**
119:4;124:16
**ten (2)**
89:5,10
**termed (1)**
43:12
**terms (13)**
13:13;15:16;24:2;58:16;
59:4;70:17;78:4;81:18;
88:16;99:19;112:20;125:21;
131:6
**test (1)**
94:6
**testified (9)**
7:8;57:14;69:15;70:15;
84:8,9;102:24;124:13;
132:13
**testifying (1)**
124:15

**testimony (15)**
10:2;16:5,6,9;22:13;23:5,
9,10;24:13;43:9;48:18;
98:18;113:10;135:8,11
**theme (1)**
55:19
**theoretically (1)**
113:16
**theory (1)**
120:14
**thereby (1)**
75:23
**therefore (4)**
42:18;66:4;77:13;78:5
**thinking (2)**
104:14,19
**third (1)**
109:10
**Thornton (8)**
3:15;5:5,5;8:23,23,24;9:2,
8
**though (4)**
26:19;35:12;48:9;85:3
**thought (7)**
12:7;37:24;50:16;59:23;
72:19;112:14;130:10
**three (4)**
40:3,4;53:7;54:16
**throughout (1)**
80:15
**tie (1)**
130:7
**times (2)**
98:23;129:4
**tired (1)**
99:16
**today (3)**
11:24;13:1,2
**today's (2)**
12:12,17
**together (1)**
14:4
**told (9)**
29:17;34:10,12;50:9;
52:13;74:8;95:20;97:24;
128:23
**took (3)**
67:17;75:19;89:5
**top (5)**
30:9;36:13;65:10;84:5;
99:14
**total (5)**
19:7;31:23;61:19;103:4;
104:7
**totally (3)**
54:21;56:10;58:24
**touched (4)**
53:7;54:8;61:9;72:3
**touches (1)**
49:14
**touching (1)**
49:7
**tough (1)**

69:9
**train (1)**
111:1
**transaction (1)**
79:13
**transcript (2)**
135:8,9
**transcripts (1)**
16:3
**treatise (2)**
73:14,23
**treatises (1)**
78:2
**trial (5)**
47:12,14,18,19;128:4
**tried (3)**
99:23;116:20;128:5
**true (4)**
85:3;124:4;135:10,12
**try (5)**
63:18,19;112:19;115:17,
18
**trying (5)**
15:21;37:2;49:2;51:1;
77:1
**Ts (1)**
76:22
**Tuoni (1)**
72:16
**turned (1)**
15:2
**Two (9)**
3:5;30:22;40:13;77:21;
92:16;93:20;109:6,6;118:7
**type (1)**
51:24
**types (1)**
14:20

**U**

**ultimately (4)**
14:4;92:3;94:21;114:2
**unclear (2)**
27:9;100:10
**uncommon (1)**
46:16
**under (27)**
14:22;18:13,17;19:17;
23:2;28:6;36:24;38:2;39:11;
54:15;61:5;81:23;90:6;
95:15;96:8;98:6;102:21;
105:17;106:17;109:20,20;
114:10,10;117:13;120:8;
128:14;135:9
**underlying (1)**
15:15
**understood (2)**
47:15;51:6
**unenforceable (2)**
86:14;95:13
**unfair (1)**
121:23

**United (4)**
7:16;119:22;127:22;128:2
**University (1)**
8:2
**Unless (3)**
50:3;111:7,17
**Unlike (1)**
73:23
**unnecessary (2)**
80:1;82:12
**unreasonable (1)**
121:22
**unwritten (1)**
52:11
**up (11)**
9:19;12:6;20:6;80:6;
92:24;101:16;102:7;103:9;
108:2;130:8;133:2
**upon (3)**
68:19;86:15;90:13
**use (3)**
13:11;98:22;99:7
**used (9)**
13:7,9;27:3;54:20;73:20;
78:15;98:23;99:6;113:10
**using (1)**
125:23
**usual (1)**
9:17
**usually (4)**
47:15;86:1;130:14;131:8

### V

**value (4)**
81:2,22;110:9,10
**variation (1)**
55:18
**various (2)**
12:19;15:20
**vastly (1)**
41:24
**version (1)**
20:19
**versus (1)**
7:20
**Via (3)**
3:19,20;5:6
**view (23)**
24:18,22;25:20;28:20;
29:22;31:8;41:18;42:2,8;
54:1;67:6;69:12,20;70:9;
76:13;86:24;104:15;105:21;
106:19;107:24;123:4;129:9,
10
**viewed (2)**
83:18;89:14
**viewpoint (1)**
111:23
**views (5)**
41:21,22;42:1;56:3;119:6
**violate (6)**
78:4;102:22;109:16,17;

118:12;124:17
**violated (3)**
77:13;87:9;103:1
**violates (3)**
113:3;121:17;122:18
**violating (2)**
75:24;82:9
**violation (11)**
78:5;95:3;107:16;117:22;
120:6;122:10;124:20;125:3,
6,7,10
**violations (1)**
126:23
**virtue (1)**
56:8
**vis-a-vis (1)**
92:6
**Vitae (1)**
11:4

### W

**walk (1)**
102:19
**wants (1)**
126:3
**washroom (1)**
92:16
**water (1)**
100:7
**way (35)**
10:4;27:1;36:16;37:22;
38:18;39:6,22;40:9,19;41:5,
5;46:14;55:19;59:23;64:4;
65:3;75:2;76:23;78:9;84:2;
93:21;98:2;105:21;106:22;
107:24;108:14;110:5;121:7,
14,14;127:7;131:11,13;
133:6,14
**wealth (1)**
33:7
**week (1)**
13:4
**welcome (2)**
104:16;134:16
**what's (14)**
11:19;12:2;22:21,24;
50:22;55:24;57:24;66:7;
69:23;81:10,12;90:8;
118:23;133:11
**whatsoever (10)**
48:17,18;49:5;55:12;60:2,
3;71:24;78:12;94:7;95:19
**Whenever (1)**
45:16
**whereby (1)**
40:20
**whole (2)**
30:18;36:11
**who's (4)**
58:6;91:9;94:17;101:18
**wilfulness (1)**
122:1

**William (1)**
7:12
**wish (1)**
65:17
**wished (1)**
33:1
**within (1)**
23:6
**without (4)**
47:3;49:24;95:1;105:6
**withstand (1)**
103:2
**witness (209)**
7:5,7,8;12;34:17;36:6,18;
37:1,21;38:1,11,17,23;39:4,
6,13,21;40:2,6,24;42:19;
45:3,8,13,16,22;46:8,14,20;
47:5;48:7,11,15;49:10,17;
50:3,16,18,21;51:2,5,20;
52:7,19;53:2,20;54:2;55:3,5,
13,18;56:16;57:2,19;58:9,
13;59:3,7,10;60:14,21;61:1,
11,16;62:2,8,14,18;63:2,5,7,
11;64:11,21;65:2;66:19;
72:8,17,22;73:2,9,15,19;
74:13,20,24;75:6;78:10,20,
22;79:8,14,22;80:3,11,16;
81:9,14;82:4,6,10,13,16,23;
83:2,8,16;84:1,8,13,17;87:4,
13,17;88:23;89:10,23;
90:20;91:1,6,21;94:9,24;
95:5,11,16,23;96:1,9,13,17,
21;97:2,6,11,15,19;98:8,14;
99:10;104:8,12,16,21;105:3,
11,16;106:1,6,11,19,22;
107:5,12,22;108:11,24;
109:13,22;110:2,11,19,24;
113:7;114:18;115:15;116:1,
5,10;117:6,17;118:10,19;
119:4,16;120:2,14,22;121:1,
14;122:2,8,14;123:9,16,21;
124:12;125:5,14;127:16;
129:10,21;130:5;131:1,16,
20;132:3,8,13,19,22;134:16
**witnesses (2)**
9:18;43:10
**word (8)**
9:21;19:22;20:7,13;89:24;
98:22,23;125:18
**wording (1)**
85:9
**words (4)**
19:14;21:2;31:17;95:8
**work (17)**
50:12,15;52:23,24;58:8;
62:13,14;72:1;73:20;89:6,9,
11;100:1,8;103:18;116:17;
121:15
**worked (2)**
12:6;14:3
**working (2)**
108:5,21

**world (3)**
45:4;98:6;131:7
**worth (1)**
110:13
**write (4)**
10:18;13:9,12;18:13
**writes (1)**
114:6
**writing (8)**
16:21;26:16,19;47:16;
86:6;110:14;126:1;130:19
**written (9)**
28:17;39:14;52:10;76:13;
78:17;88:13;90:22;115:2;
121:22
**wrote (2)**
16:14,19

### Y

**years (15)**
10:15;27:12;32:18;43:1;
53:7;54:16,17;63:6;66:8;
88:6;89:6,10;92:11;116:17,
18
**Yep (1)**
85:22
**yesterday (1)**
24:4
**York (11)**
8:1;33:23;47:6,10;91:7,
10;106:23;107:1;108:21;
116:23;123:24
**Young (1)**
89:5

### Z

**zero (1)**
93:16

### 0

**02110 (1)**
3:6
**02110-2131 (1)**
3:17

### 1

**1 (3)**
11:2,3,7
**1.5 (1)**
54:15
**1.5a (3)**
86:3;102:23;103:1
**1.5e (35)**
18:17;19:17;20:15,17;
23:2;24:2,20,23;25:2;31:15;
34:22;66:4;69:1,3,13;74:11;
76:12;78:4,13;79:21;81:8;
87:2;95:9;100:7;103:3,7;
110:4;126:16;127:5,8,14,15;

128:14;130:2,16
**1:27 (1)**
    7:2
**100 (1)**
    3:16
**11 (1)**
    90:6
**11-cv-10230-MLW (1)**
    7:21
**13 (2)**
    13:19;16:13
**14 (1)**
    20:18
**15 (3)**
    18:11;92:19;116:17
**16 (1)**
    65:7
**17 (3)**
    75:10;84:23;93:1
**18 (2)**
    94:3;99:14
**19 (1)**
    102:20

### 2

**2 (6)**
    18:5,6,10;30:9;36:14;
    106:16
**20 (2)**
    16:13;43:23
**2011 (4)**
    15:1;20:16;44:7;80:17
**2015 (1)**
    73:15
**2017 (1)**
    73:17
**2018 (2)**
    11:11;135:20
**25 (1)**
    12:10
**26 (1)**
    11:11

### 3

**3 (2)**
    13:19;85:16
**3:15 (1)**
    92:22

### 4

**4:02 (1)**
    134:17

### 5

**5 (2)**
    79:19;81:13

### 6

**6 (1)**
    85:20
**617-248-5000 (1)**
    3:9
**617-345-1065 (1)**
    3:21

### 7

**7.2 (14)**
    76:1,5,11,17;77:13;78:5,
    23,24;79:10,15;93:4;95:15;
    110:3,6
**7.2b (24)**
    78:19;79:13,15,16,19;
    80:10,12;81:1,23;82:9;84:4;
    94:7;95:3,22;96:8;97:22;
    98:6,19;104:15,23;105:7;
    106:18;107:19;109:21
**7.2b5 (3)**
    82:11;84:6;98:7
**7.2c (2)**
    80:22,24

### 8

**8 (1)**
    44:6

### 9

**9 (1)**
    22:14
**90 (1)**
    104:6
**99.9 (1)**
    104:9