# EX. 229

**William Wendel**

1

                                        Volume:  1
                                        Pages:  1-216
                                        Exhibits:  1-6

                         JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

-----------------------------------------------X


In Re:  STATE STREET ATTORNEYS FEES


-----------------------------------------------X



                         630 8th Avenue
                         New York, New York

                         April 3, 2018
                         8:48 a.m. to 1:00 p.m.


B E F O R E:

     Special Master Honorable GERALD ROSEN,
     United States District Court, Retired

     MELISSA GILMORE, Reporter


                    DEPOSITION OF

               WILLIAM BRADLEY WENDEL

Page 2

```
 1  A P P E A R A N C E S:

 2

 3  BARRETT & SINGAL

 4  On Behalf of the Special Master

 5       One Beacon Street, Suite 1320

 6       Boston, Massachusetts 02108-3106

 7  BY:  WILLIAM F. SINNOTT, ESQ.

 8       ELIZABETH J. McEVOY, ESQ.

 9       617-720-5090

10       wsinnott@barrettsingal.com

11       emcevoy@barrettsingal.com

12

13

14  JAMS

15       150 West Jefferson, Suite 850

16       Detroit, Michigan 48226

17  BY:  THE HON. GERALD ROSEN (Ret.), ESQ.

18       313-872-1100

19

20

21

22

23

24
```

Page 4

```
 1  A P P E A R A N C E S:  (Cont'd)

 2

 3  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

 4  On Behalf of Lieff Cabraser

 5       275 Battery Street, 29th Floor

 6       San Francisco, California 94111

 7  BY:  RICHARD M. HEIMANN, ESQ.

 8       ROBERT L. LIEFF, ESQ.

 9       415-956-1000

10       rheimann@lchb.com

11

12

13  KELLER ROHRBACK, LLP

14  On Behalf of ERISA Plaintiffs

15       1201 Third Avenue, Suite 3200

16       Seattle, Washington 98101

17  BY:  T. DAVID COPLEY, ESQ. (Via telephone)

18       206-623-1900

19       dcopley@kellerrohrback.com

20

21

22

23

24
```

Page 3

```
 1     A P P E A R A N C E S: (Cont'd)

 2

 3  CHOATE HALL & STEWART LLP

 4  On Behalf of Labaton Sucharow

 5  Two International Place

 6  Boston, Massachusetts 02110

 7     BY: JOAN A. LUKEY, ESQ.

 8  STUART M. GLASS, ESQ.

 9  617-248-5000

10  joan.lukey@choate.com

11  sglass@choate.com

12

13

14  NIXON PEABODY, LLP

15  On Behalf of Thornton Law Firm

16  100 Summer Street

17  Boston, Massachusetts 02110-2131

18     BY: BRIAN T. KELLY, ESQ.

19  JOSHUA SHARP, ESQ. (Via telephone)

20  EMILY CRANDALL HARLAN, ESQ. (Via telephone)

21  617-345-1065

22  bkelly@nixonpeabody.com

23

24
```

Page 5

```
 1     A P P E A R A N C E S: (Cont'd)

 2

 3     ALSO PRESENT:

 4  MICHAEL CANTY, Labaton Sucharow

 5  MICHAEL THORNTON, Thornton Law Firm

 6  LINDA HYLENSKI, ESQ., JAMS

 7  PROFESSOR STEPHEN GILLERS

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 6

```
 1   ------------------ I N D E X ------------------
 2   WITNESS                EXAMINATION BY        PAGE
 3   WILLIAM BRADLEY WENDEL  MR. SINNOTT            9
 4
 5
 6   --------------- E X H I B I T S ---------------
 7   WENDEL       DESCRIPTION              FOR I.D.
 8   Exhibit 1    Curriculum Vitae of W.        12
 9                Bradley Wendel
10   Exhibit 2    Expert Report of              14
11                Professor W. Bradley
12                Wendel, dated March 26,
13                2018
14   Exhibit 3    Letter from Labaton           24
15                Sucharow, dated
16                February 8, 2011, Bates
17                Stamped LBS011060 through
18                11062
19   Exhibit 4    E-Mail Chain, Bates           33
20                Stamped LBS017455 through
21                17456
22
23
24
```

Page 7

```
 1   ------------ E X H I B I T S (Cont'd)-----------
 2   WENDEL       DESCRIPTION              FOR I.D.
 3   Exhibit 5    Joint Response by Labaton     134
 4                Sucharow LLP and Chargois
 5                & Herron, LLP, dated
 6                July 30, 2008, Bates
 7                Stamped LBS017738 through
 8                17755
 9   Exhibit 6    Excerpt of Deposition of      142
10                George Hopkins, dated
11                September 5, 2017
12
13
14                (EXHIBITS TO BE PRODUCED)
15
16
17
18
19
20
21
22
23
24
```

Page 8

```
 1   P R O C E E D I N G S
 2       MR. SINNOTT: For the record, this
 3   is a deposition, and the matter is
 4   Arkansas Teacher Retirement System, Number
 5   11-cv-10230-MLW.  Special Master Gerald
 6   Rosen, who is to my right, has been
 7   appointed by the Honorable Mark Wolf as
 8   the special master in this investigation.
 9       And, in addition to Judge Rosen, my
10   name is William Sinnott, S-I-N-N-O-T-T,
11   from the firm of Barrett & Singal.
12       To my left also on our team is
13   Attorney Elizabeth McEvoy, M-C, capital
14   E-V-O-Y, of our firm, and to her left is
15   Professor Stephen Gillers, who has also
16   previously testified as an expert in this
17   matter.
18       Madam Court Reporter, if the witness
19   could be sworn.
20   W I L L I A M   B R A D L E Y   W E N D E L,
21   called as a witness, having been duly
22   sworn by a Notary Public, was examined
23   and testified as follows:
24       MS. LUKEY: Before we begin, may I
```

Page 9

```
 1   just note for the record an objection to
 2   having Professor Gillers present for the
 3   testimony of Labaton's experts.  I don't
 4   understand why somebody who's proffered as
 5   an expert would be present for the other
 6   experts, and I do think it causes some
 7   discomfort in a relatively small field
 8   where everybody knows each other.  We
 9   obviously have not had experts present.
10       THE SPECIAL MASTER: You haven't
11   asked.  I would have certainly permitted
12   it.
13       MS. LUKEY: Well, it's not the norm,
14   usually, in civil discovery, but these
15   have been unusual proceedings, shall we
16   say.  So I note our objection for the
17   record.  Thank you.
18       MR. KELLY: The Thornton firm joins
19   that objection.
20       MR. SINNOTT: Any other comments
21   before we begin?
22   EXAMINATION BY
23       MR. SINNOTT:
24   Q.  Professor, if you could state your
```

Page 10

1  full name for the record?
2  A.  Sure.  My name is William Bradley
3     Wendel, W-E-N-D-E-L.  I go by Brad.
4  Q.  Thank you, sir.  And we will talk
5  more about your background in a moment.
6     MR. SINNOTT: But if counsel could
7  identify themselves, beginning with Joan,
8  and going around the table?
9     MS. LUKEY: Certainly.  Joan Lukey
10  from Choate Hall, on behalf of Labaton
11  Sucharow.
12     MR. CANTY: Michael Canty from
13  Labaton Sucharow.
14     MR. GLASS: Stuart Glass, Choate
15  Hall, also for Labaton.
16     MR. HEIMANN: Richard Heimann from
17  Lieff Cabraser.
18     MR. LIEFF: Robert Lieff, Lieff
19  Cabraser.
20     MR. THORNTON: Michael Thornton from
21  Thornton Law Firm.
22     MR. KELLY: Brian Kelly, Nixon
23  Peabody, for the Thornton Law Firm.
24     MR. SINNOTT: On the telephone,

Page 11

1  beginning with David, could you identify
2  yourself and your affiliation?
3     MR. COPLEY: Yes.  David Copley,
4  Keller Rohrback, representing the ERISA
5  plaintiffs.
6     MR. SINNOTT: Okay.  And, Emily, if
7  you could identify yourself.
8     MS. HARLAN: Emily Harlan of Nixon
9  Peabody, for the Thornton Law Firm.
10     MR. SINNOTT: Thank you.  And Josh?
11     MR. SHARP: Joshua Sharp of Nixon
12  Peabody for the Thornton Law Firm.
13     MR. SINNOTT: And has anyone else
14  joined us on the telephone?
15     All right.  Hearing none.
16  BY MR. SINNOTT:
17  Q.  Good morning, sir.
18  A.  Good morning.
19  Q.  Professor, if you could please
20  answer some questions that I will have, just
21  very brief questions on your background, but
22  let me first ask you, a CV was provided to us
23  with your report.
24     Is that CV a current CV?

Page 12

1  A.  Yes.
2     MR. SINNOTT: And Madam Court
3  Reporter, if this could be marked as
4  Exhibit 1.
5     (Wendel Exhibit 1, Curriculum Vitae
6  of W. Bradley Wendel, marked for
7  identification.)
8  Q.  And, Professor, looking at that item
9  that's been marked as Exhibit 1, is that your
10  current CV?
11  A.  Yes, it is.
12  Q.  Are there any changes or additions
13  that need to be made to that CV?
14  A.  No.
15  Q.  Is there any other relevant
16  experience that informs your opinions beyond
17  what's in that CV?
18  A.  No.
19  Q.  And are you being paid to render
20  your opinions here today?
21  A.  Yes, I'm being paid for my time in
22     preparing and taking this deposition.
23  Q.  All right, sir.  And what's the rate
24  at which you are being compensated?

Page 13

1  A.  $650 per hour.
2  Q.  All right.  And approximately how
3  many hours have you spent, up until this point,
4  in rendering your opinions and the time you
5  spent preparing?
6  A.  Probably about 15, 15 or 20.
7  Q.  Okay.  And do you have any idea what
8  the amount that you've been compensated or you
9  are due to be compensated is?
10  A.  Well, I haven't looked exactly, but
11     that times my hourly rate.
12  Q.  All right, sir.  And how did you
13  prepare for your testimony today?
14  A.  Today -- well, so yesterday, I came
15     in and met with Joan and Mike and Stu and just
16     talked about my report and my opinions.
17  Q.  All right, sir.  And your report
18  that was submitted --
19     MR. SINNOTT: Madam Court Reporter,
20  if I could ask that this item be marked as
21  Exhibit 2.
22     (Wendel Exhibit 2, Expert Report of
23  Professor W. Bradley Wendel, dated
24  March 26, 2018, marked for

Page 14

1   identification.)
2   Q.  Sir, I'm showing you this item
3   that's been marked as Exhibit 2, and the
4   heading is "Expert Report, March 26, 2018,
5   Professor W. Bradley Wendel."
6       Is that the report that you've
7   submitted in this case?
8   A.  Yes, it is.
9   Q.  And between pages 2 and 11 in that
10  report, there is a factual statement.
11      Do you see that, sir?
12  A.  Yes, I do.
13  Q.  All right.  Who drafted that factual
14  statement?
15  A.  That was prepared by counsel just
16  for convenience, really.  I offered to do the
17  facts myself based on the documents, but they
18  have the citations handy and they were able to
19  do it, so they agreed to do it for me.
20  Q.  All right.  Could you describe how
21  that process worked?  Was it all done at the
22  same time or was there an interactive element
23  to it?  What do you recall as far as the
24  compilation of that factual statement?

Page 15

1   A.  Well, it was interactive in the
2   sense that they initially sent me a few
3   documents to review to understand the case and
4   to start formulating opinions and start talking
5   about what my opinions would be, and then as I
6   needed more documents, I requested more, and
7   they sent more and I looked at those and read
8   depositions.
9       They drafted the statement of facts
10  and I looked at it, and then took a look at the
11  underlying documents in support.
12  Q.  All right.  And what were the
13  underlying documents that you --
14  A.  Deposition transcripts, e-mails,
15  reports, mostly deposition transcripts.
16  Q.  All right.  And do you recall which
17  deposition transcripts you reviewed?
18  A.  Well, so Hopkins, I remember
19  reviewing that, Belfi.  You know, there are a
20  lot of names.  I'm kind of trying to remember
21  who -- Chargois, I looked at that one.
22      MS. LUKEY:  If it helps, I believe
23  we provided what's cited in the facts, and
24  you will find the facts should carry over

Page 16

1   among all experts.  We prepared the
2   submission and gave it to each of them.  I
3   don't know if any of them made any
4   modifications, but that's what we did.
5       THE WITNESS:  No, I didn't modify
6   the facts.
7   Q.  Who decided what documents you would
8   receive?
9   A.  It was kind of interactive.  They
10  sent me things, and then I said I would like to
11  see this, and they sent me some more things.
12  We went back and forth.
13  Q.  With respect to the transcripts you
14  referred to, did you receive entire transcripts
15  or just excerpts?
16  A.  Entire transcripts.
17  Q.  And did you read the entire
18  transcripts or just portions that were pointed
19  out to you?
20  A.  They weren't pointed out to me.  I
21  searched them.  I, you know, used a word search
22  and looked through them that way.  I kind of
23  skimmed them all, and then looked more
24  carefully at specific portions of them.

Page 17

1   Q.  And with respect to your opinions in
2   Exhibit 2, begin on page 11 and go to page 22,
3   and page 11, who wrote those opinions?
4   A.  I wrote them.
5   Q.  Did you have any assistance in
6   writing those?
7   A.  No.  They looked at them and made a
8   couple suggestions and comments, but I drafted
9   this.
10  Q.  All right.  Did any other attorneys,
11  outside of yourself, engage in an interactive
12  process on the opinions?
13  A.  We talked about them a little bit,
14  but there was really very little back and
15  forth.  We talked about what my opinion would
16  be, and then once I drafted it, I sent it to
17  them for comments, but it was mostly my work.
18  Q.  And when you say "for comments," did
19  you receive any comments?
20  A.  I did.  I received a few
21  suggestions.
22  Q.  All right.  Do you remember what
23  those suggestions were?
24  A.  Just editorial things, really.

Page 18

1    **Nothing changing the substance of the opinion.**
2    Q.   And with respect to the research
3    that went into your opinion, did you conduct
4    that?
5    A.   I did, yes.
6    Q.   Did you receive any assistance in
7    that?
8    A.   No.
9    Q.   All right.  So you did all of that
10   by yourself and none of it was done by counsel?
11   A.   That's correct.
12   Q.   All right.  Let me ask you some
13   questions with respect to your opinions
14   contained in Exhibit 2.
15       So let me ask you this, Professor.
16   You discuss in your report ATRS -- and if I
17   could refer to them as Arkansas for short?
18   A.   Sure.
19   Q.   Written consent to the fee-sharing
20   agreement and Labaton firm's compliance with
21   Rule 1.5(e).  You write about the compliance
22   with the pre-2011 rule which provides that a
23   division of a fee between lawyers who are not
24   in the same firm may be made only if, after

Page 19

1    informing the client that a division of fees
2    will be made, the client consents to the joint
3    participation and the total fee is reasonable,
4    correct, sir?
5    A.   That's correct.
6    Q.   And upon what disclosures do you
7    base your opinion that Arkansas was informed
8    that a division of fees would be made and that
9    it consented to joint participation?
10       MS. LUKEY: Objection.  By
11   "disclosures," do you mean what material
12   provided to him or documents?  Just
13   wondering about the word "disclosures."
14       MR. SINNOTT: Yeah.
15   Q.   The documents that were provided to
16   you.
17   A.   So I may not have exactly all of the
18   chronology memorized, but as I reviewed the
19   documents, it appeared that there was quite a
20   bit of discussion back and forth between
21   partners from the Labaton firm and
22   representatives of Arkansas Teachers, Christa
23   Clark, Paul Doane, and then subsequently the
24   new executive director, George Hopkins.

Page 20

1        There was a lot of discussion about
2    the structure of that engagement, who would be
3    providing legal services and what they would be
4    doing, and whether they would be associating
5    with local counsel.
6        Now, I understand local counsel is a
7    term that -- is a term of art, maybe.  I don't
8    mean it to be a term of art.  I just mean it to
9    be there's a local law firm that will be doing
10   something, leaving open for now what that is,
11   but Labaton lawyers talked to Arkansas
12   Teachers' representatives and told them that
13   they may be working with a local law firm and
14   may be dividing their fees with that firm.
15   Q.   All right.  And you referenced
16   Christa Clark.
17       What were the documents from Christa
18   Clark that you reviewed in formulating your
19   opinion?
20   A.   Well, again, I don't remember
21   whether that was an e-mail or a letter or
22   someone testifying to this, but I think it was
23   an e-mail, actually.  I think she e-mailed back
24   to someone at Labaton saying I understand that

Page 21

1    you may be working with the local law firm, and
2    that's fine.
3        There was also some -- some
4    communication pertaining to the, I would call
5    it an RFP, but I guess they call it an RFQ
6    process of getting Labaton approved to be a
7    provider of services to the state, and Labaton
8    said to her, we may be working with a local law
9    firm, can we both be on this RFQ.  And she
10   said, well, no, just because of the way the
11   state procurement system works, we need only
12   one law firm being the principal law firm, and
13   then beyond that, if you want to share your
14   fees with somebody else, that's fine.  We just
15   need one law firm to be the principal law firm
16   and we would like that to be you.
17   Q.   And have you reviewed the RFQ?
18   A.   The document itself, no, I have not.
19   Q.   Then how did you receive information
20   on that RFQ?
21   A.   Well, again, there was e-mail back
22   and forth.  I have a bunch of e-mails.  They
23   are all listed by Bates numbers, so I don't
24   really remember which one is which, but there

Page 22

1   was an e-mail from Christa Clark to Labaton
2   lawyers discussing this process.
3   Q.  All right.  And in addition to the
4   RFQ and the Christa Clark exchange, which
5   you're not sure whether it was an e-mail or
6   other correspondence, what other documents did
7   you review with respect to Labaton's compliance
8   with 1.5(e)?
9   A.  Well, there were a number of e-mails
10   back and forth between Labaton lawyers and
11   Hopkins ultimately culminating in a written
12   engagement agreement which went through a
13   couple of drafts.  And both drafts of that
14   engagement letter mention the possibility of
15   fee division with another law firm.
16       And then ultimately -- ultimately,
17   Hopkins agreed with that, and there were some
18   e-mails back and forth where Hopkins said, you
19   know, yes, I understand this, and that's fine
20   with -- with us, fine with Arkansas Teachers.
21   Q.  All right.  So when did these
22   e-mails take place?
23   A.  They took place before the
24   engagement.  I think the time was something

Page 23

1   like February 2011, I don't recall exactly,
2   February or March, but it was before the work
3   started up on this State Street matter.
4   Q.   And when was the retention agreement
5   that you referred to executed?
6   A.  I don't know exactly, February or
7   March, I believe.
8   Q.   And you read that retention
9   agreement?
10   A.  I did.
11   Q.   And that retention agreement states,
12   does it not, that Arkansas agrees that Labaton
13   may allocate fees to local or liaison counsel
14   as referral fees or for other services
15   performed in connection with the litigation?
16   MS. LUKEY:  Objection.  If you're
17   purporting to quote the document, you did
18   not quote it accurately.  If you're not
19   purporting to quote it, please tell the
20   witness that what you're reading from is
21   not the document.
22   MR. SINNOTT:  Well, let me provide
23   the document itself.
24   MS. LUKEY:  Please.

Page 24

1   MR. SINNOTT: Madam Court Reporter,
2   if this could be marked as Exhibit 3.
3       (Linda Hylenski joins on the
4   telephone at this time.)
5       (Wendel Exhibit 3, Letter from
6   Labaton Sucharow, dated February 8, 2011,
7   Bates Stamped LBS011060 through 11062,
8   marked for identification.)
9   MR. HEIMANN: Since you are not
10   circulating copies of these documents,
11   would you be very precise what it is so we
12   know what you're talking about?
13   MR. SINNOTT: I have some additional
14   copies, Richard.
15   MR. HEIMANN: Thank you.
16   BY MR. SINNOTT:
17   Q.   Looking at Exhibit 3, Professor, let
18   me direct your attention to the top of page 2.
19   And let me read it verbatim.
20       "Arkansas Teacher agrees that
21   Labaton Sucharow may allocate fees to other
22   attorneys who serve as local or liaison counsel
23   as referral fees or for other services
24   performed in connection with the litigation."

Page 25

1       Is that an accurate statement?
2   A.  Yes.
3   MR. SINNOTT: And give me a moment.
4   Judge?
5   THE SPECIAL MASTER: Yeah, let me,
6   just for clarification, the sentence that
7   Bill Sinnott was just referring to, how do
8   you read that?  Do you read -- in this
9   sense, do you read that as -- the clause
10   "as referral fees" set off by commas as
11   modifying the previous local or liaison
12   counsel as referral fees or do you read it
13   as a self-standing permission for referral
14   fees?
15   THE WITNESS: Well, I read that
16   sentence as providing notice to the client
17   that other attorneys may serve as local or
18   liaison counsel or they may receive
19   referral fees or they may provide other
20   services.  That's how I read that
21   sentence.
22   THE SPECIAL MASTER: So three
23   separate clauses there; serving as local
24   or liaison counsel, as referral fees, or

Page 26

1  for other services.
2      THE WITNESS: That's right.
3      THE SPECIAL MASTER: And you don't
4  read "or for other services" as modifying
5  the previous "who serve as local or
6  liaison counsel, as referral fees."
7      THE WITNESS: I read those as
8  alternatives.  They are not exclusive
9  alternatives.  They could be referral fees
10  or other services or both, but they are
11  alternatives to an entitlement to
12  compensation for these other attorneys.
13      THE SPECIAL MASTER: Okay.  So you
14  don't read, "as referral fees" as simply
15  modifying the previous clause "who serve
16  as local or liaison counsel"?
17      THE WITNESS: No.  I see them as
18  alternatives.
19      THE SPECIAL MASTER: Okay.
20      BY MR. SINNOTT:
21  Q.  All right, sir.  And with respect to
22  your report on page 14, actually beginning on
23  page 13, you talk about the Saggese case,
24  correct?

Page 27

1  A.  Yes.
2  Q.  And is it fair to say that you
3  believe that Saggese is distinguishable from
4  this case because the fee-sharing arrangement
5  between Saggese and the Kelleys arose after the
6  Kelleys had already started representing Doe;
7  is that correct?
8  A.  Yes.
9  Q.  Let me ask you this, isn't it true
10  that the Saggese courts -- the Saggese court
11  referred to the fact that the Kelleys
12  acquiesced in a referral fee to Saggese on the
13  Doe matter two months into their
14  representation?  And you recall that, don't
15  you, sir?
16  A.  Yes.
17  Q.  But didn't the court make that
18  reference only to make the point that this was
19  the time Doe's consent could have been obtained
20  because it's the first time that the division
21  of fee agreement was reached?
22      MS. LUKEY: Objection.
23  A.  Well, there are -- there are a lot
24  of things going on in Saggese.  I don't think

Page 28

1  the only important fact is the midstream
2  modification.  I think that is an important
3  fact.  And I cited that ABA opinion in my
4  report just to highlight that.  That's
5  something that I spend time on in class to make
6  sure that students understand that once you
7  have an ongoing matter and there's already been
8  a fee arrangement agreed to, modifications are
9  viewed somewhat skeptically and there has to be
10  disclosure and, basically, a reason for the
11  changed arrangement after the matter has
12  commenced.
13      That's an important fact.  That's
14  not the only fact driving Saggese.  The court
15  clearly wanted to announce a new rule
16  prospectively and require written consent.  And
17  so it did that.  So the lack of writing is also
18  a fact, but there's not only one factor that
19  underlies the result in Saggese.
20      THE SPECIAL MASTER: Could I ask,
21  you do, in your report, call out the
22  difference between an agreement made at
23  the inception which continues on, and what
24  you characterize as a midstream change.

Page 29

1  And you say that midstream changes are
2  looked at with more skepticism.
3      THE WITNESS: Right.
4      THE SPECIAL MASTER: You also, in
5  your report, I think, rely upon, in
6  finding consent, the original RFQ process
7  which took place some time up to October
8  of 2008, and you indicate that that
9  informs the relationship between Arkansas
10  and ATRS as it relates to Mr. Chargois,
11  correct?
12      MS. LUKEY: Objection.
13      THE WITNESS: Yes.
14      THE SPECIAL MASTER: And then you
15  focus on the agreement that was reached on
16  February 8 of 2011 in the retention
17  agreement and say that that constitutes
18  consent to a referral fee.
19      THE WITNESS: Yes.
20      THE SPECIAL MASTER: And I believe
21  it's your view, and correct me, that these
22  two, taken together, and the conversations
23  that Ms. Clark had with Mr. Belfi,
24  although I think you would acknowledge you

1 personally don't have any idea what took
2 place in those conversations, as creating
3 the relationship which provides the
4 context for the consent given February 8
5 of 2011; is that right?
6    **MS. LUKEY:** Objection.
7    **THE WITNESS:** I would be a little
8 careful here. And you see this in places
9 in the rules. There are times when an
10 attorney's duties are viewed in the
11 context of a relationship, an ongoing
12 client relationship. And then there are
13 times when the duties depend upon
14 particular matters. There are kind of
15 matter-by-matter rules.
16    So one of the fee rules, 1.5(b), I
17 think, says that the attorney, at the
18 outset of a matter, has an obligation to
19 explain the basis of a fee. So there are
20 matter-by-matter duties, and then there
21 are relationship-wide duties.
22    The midstream modification stuff
23 from the ABA opinion really talks about an
24 ongoing matter. So the question is,

1 during the pendency of a matter is an
2 attorney trying to change the fee
3 arrangement. And there, there will be
4 some skepticism if the attorney is trying
5 to change things again.
6    That's different from saying what
7 information does the client need to
8 understand, what does an attorney have to
9 communicate to a client. That takes place
10 in the context of an ongoing relationship.
11 So some of the things that happened
12 earlier can inform the client's decision
13 at a later point in time.
14    So I would just be careful in
15 distinguishing between kind of
16 relationship duties and matter-by-matter
17 duties.
18    **THE SPECIAL MASTER:** A fair point.
19 Let's look at the e-mail from Christa
20 Clark, who was Arkansas' chief counsel, in
21 October of 2008, back to Mr. Belfi, and
22 what it contemplated, okay? Because I
23 think your answer to my question about
24 whether this informed the relationship was

1 yes. Yes?
2    **THE WITNESS:** Yes.
3    **THE SPECIAL MASTER:** Okay. I'm not
4 going to read the whole thing. You can
5 maybe call it out for him, but I will read
6 the --
7    **MS. LUKEY:** Well, I don't have it.
8    **THE SPECIAL MASTER:** It's the
9 October 13, 2008.
10    **MS. LUKEY:** I know what it is. I
11 did not bring the boxes of documents.
12    **THE WITNESS:** You are testing my
13 memory here.
14    **THE SPECIAL MASTER:** It's in page 6
15 of the facts in your report.
16    So, looking at paragraph 2, she
17 says, "If your firm is doing the
18 monitoring and providing the financial
19 backing for the case, I think it is most
20 appropriate that we add your firm
21 independently to the list of approved
22 firms. Your firm may affiliate that
23 firm," meaning Chargois & Herron, because
24 she refers to that back in the first

1 paragraph.
2    **MS. LUKEY:** I'm going to place it in
3 front of -- the full document which
4 Elizabeth just handed me.
5    **THE SPECIAL MASTER:** This is the
6 October 13, 2008 e-mail, LBS017456.
7    (Wendel Exhibit 4, E-Mail Chain,
8 Bates Stamped LBS017455 through 17456,
9 marked for identification.)
10    **THE SPECIAL MASTER:** "Your firm may
11 affiliate that firm or utilize them as
12 independent contractors. If you deem," it
13 says "is appropriate," but it could be --
14 should be probably if, "if you deem it
15 appropriate," or "if you deem it is
16 appropriate, on a case-by-case basis.
17 There would be no requirement that you use
18 them if it was not a necessary and
19 appropriate expense of the case," correct?
20    **THE WITNESS:** That's what it says.
21    **THE SPECIAL MASTER:** Okay. So given
22 the background and at other parts in your
23 report, you indicate that the relationship
24 between Labaton and Chargois started off

Page 34

1 initially with the contemplation that
2 Mr. Chargois and his firm was going to be
3 serving as local or liaison counsel.
4    **THE WITNESS:** Yes.
5    **THE SPECIAL MASTER:** And then, at
6 some point later, when that didn't work
7 out, this arrangement or agreement that we
8 have all been referring to in which
9 Mr. Chargois and his firm would receive
10 20 percent of any fees in which Labaton
11 served as lead or co-lead counsel and
12 Arkansas was lead or co-lead plaintiff,
13 right?
14    **THE WITNESS:** Right.
15    **THE SPECIAL MASTER:** So that
16 relationship changed.  He was no longer
17 going to be serving as a local or liaison
18 role.  He was simply going to be getting a
19 fee as a percentage of every case in which
20 Labaton was lead counsel and Arkansas was
21 lead plaintiff, right?  So that changed,
22 didn't it?
23    **THE WITNESS:** Which he was entitled
24 to under the agreement, yes.  The

Page 35

1 relationship changed in that Hopkins said,
2 I don't need to work through local
3 counsel.
4    **THE SPECIAL MASTER:** We will get to
5 Mr. Hopkins.
6    **THE WITNESS:** But that's the nature
7 of the change, is that he said I don't
8 need to work through some local counsel.
9 I can work directly with Labaton.  That's
10 what changed about the relationship.
11    What didn't change is the underlying
12 agreement, the contract, that Labaton and
13 Chargois had to pay a referral fee.
14    **THE SPECIAL MASTER:** We will get to
15 that.
16    **THE WITNESS:** Okay.
17    **THE SPECIAL MASTER:** The
18 relationship changed from a situation in
19 which, at the time of the application as
20 monitoring counsel, Chargois & Herron were
21 on the application, and were going to
22 serve as joint monitoring counsel, and the
23 contemplation was that there would be
24 local -- that Chargois would serve in a

Page 36

1 capacity as local or liaison counsel,
2 right?
3    **THE WITNESS:** You said a couple
4 things.  You said that they would serve as
5 joint monitoring counsel.  I don't think
6 that was ever contemplated, but they would
7 serve as local or liaison counsel at the
8 outset.
9    **THE SPECIAL MASTER:** Well, you're
10 right.  Let me break it down.
11    The application was an application
12 for monitoring counsel, and it was made
13 jointly between Labaton and Chargois &
14 Herron, right?
15    **THE WITNESS:** Before Clark bounced
16 it back.
17    **THE SPECIAL MASTER:** Yes.
18    **THE WITNESS:** Yes, yes.
19    **THE SPECIAL MASTER:** And, at the
20 time, at the very least as between Labaton
21 and Chargois, it was their contemplation
22 that Mr. Chargois and his firm would serve
23 in a capacity as local or liaison counsel
24 at the time.

Page 37

1    **THE WITNESS:** That was one of the
2 things they were being compensated for,
3 yes, at the time.
4    **THE SPECIAL MASTER:** Okay.  And then
5 later, on February 8 of 2011, when the
6 retention agreement was signed, and
7 reading it the way you read it, there is a
8 permissive payment of referral fees
9 separate and independent from local or
10 liaison counsel, right?
11    **THE WITNESS:** Right.  So the
12 language in the retention agreement
13 permits the payment of fees for service
14 either as local or liaison counsel or for
15 referral fees.
16    **THE SPECIAL MASTER:** Okay.  By this
17 time, the relationship between Labaton and
18 the Chargois & Herron firm had changed.
19    **THE WITNESS:** Yes.
20    **THE SPECIAL MASTER:** And, by this
21 time, the relationship was that there
22 would be a fee for the original
23 introduction of the Labaton firm to ATRS
24 without any requirement that it be -- that

Page 38

1 he be local counsel or liaison counsel,
2 right?
3    **THE WITNESS:** Well, the fee was for
4 whatever it was for. So there was an
5 agreement between Labaton and the Chargois
6 firm to provide introductions to serve as
7 liaison counsel and also to receive
8 referral fees. And so there was this
9 ongoing entitlement to a fee that Chargois
10 had which continued through to the 2011
11 engagement.
12    **THE SPECIAL MASTER:** So nothing in
13 that relationship changed to the extent
14 that Arkansas should have been more fully
15 informed as to what was then, on
16 February 8 of 2011, the nature of the
17 relationship as opposed to local or
18 liaison counsel, nothing changed.
19    **MS. LUKEY:** Objection.
20    **THE WITNESS:** Well, you said we will
21 get to Hopkins later, so maybe we can hold
22 this until we talk about Hopkins, but the
23 engagement letter has to be read in the
24 context of what Hopkins knew and the

Page 39

1 negotiations back and forth. And he
2 basically said, yes, I know you have this
3 relationship with the local firm. I don't
4 want to get into the details. That's
5 between you. I'm fine with that.
6    And then the language of this
7 engagement agreement was drafted with that
8 understanding in mind.
9    **THE SPECIAL MASTER:** So this was not
10 any kind of a midstream change, the fact
11 that the original contemplation, and we
12 can go back and look at the permissive
13 language in Christa Clark's e-mail, and
14 then the broader language as referral
15 fees, because he was certainly not acting
16 as local or liaison counsel by this time.
17    **THE WITNESS:** Right. The midstream
18 thing, I want to be careful with this,
19 because now we are back on matter by
20 matter. And that ABA opinion talks about
21 changes in fee arrangements within a
22 particular matter. So we don't have the
23 matter in question starting yet.
24    This engagement agreement pertains

Page 40

1 to the new matter, the State Street
2 matter, and there's negotiation back and
3 forth between the parties about what
4 should the fee arrangement be. That's
5 established. Here it is in the engagement
6 agreement. Now we have a matter.
7    From here, going forward, any
8 modification is midstream as that ABA
9 opinion understands that term.
10    But the midstream idea doesn't
11 pertain to an attorney/client
12 relationship. It pertains to
13 matter-by-matter fee arrangements for a
14 particular matter.
15    **THE SPECIAL MASTER:** So the Christa
16 Clark e-mail you can consider in the
17 context of creating the entire
18 relationship, but then when a letter comes
19 three years later, almost three years
20 later -- well, two and a half years
21 later -- two and a half years later in
22 which the relationship between Labaton and
23 Chargois and the basis upon which Chargois
24 is being paid has changed fairly

Page 41

1 significantly.
2    **MS. LUKEY:** Objection.
3    **THE SPECIAL MASTER:** And that does
4 not have to be disclosed in further detail
5 to the client, to Arkansas, in this case.
6    **MS. LUKEY:** Objection.
7    **THE WITNESS:** There has to be a
8 communication between the lawyer and
9 client sufficient to inform the client as
10 much as the client needs to know to make a
11 decision about whether the client will
12 accept that fee arrangement.
13    So a lot of these rules you have to
14 kind of read altogether. So I think about
15 the discussions around the fees as also
16 informed by the reasonable communication
17 rule, Rule 1.4. And Rule 1.4 requires
18 reasonable communication.
19    The Christa Clark e-mail goes toward
20 understanding whether the law firm had
21 communicated in a reasonable manner with
22 the client. This is information that the
23 client needed to know.
24    Subsequent communications back and

Page 42

1   forth between Arkansas Teachers' agents
2   and the law firm also goes to the duty of
3   communication, and it goes to whether the
4   client's decision was adequately informed
5   to constitute consent.
6       And here you have, in 2011,
7   communication back and forth between a
8   representative of Arkansas Teachers and
9   Labaton, where the Arkansas Teachers'
10  representative said, look, I don't want to
11  be involved in how you allocate fees as
12  long as the total fee is reasonable.
13      This is somebody who's experienced
14  in hiring these sorts of outside counsel.
15  He knows the kinds of disputes and issues
16  that might arise and he said, that's not
17  my concern.
18      So that goes to show that the client
19  knows what it needs to know in order to
20  protect its interests and in order to
21  negotiate with the law firm about what the
22  fee arrangement should be.
23      **THE SPECIAL MASTER:** I think, on
24  page 13 of your opinion, you imply, at

Page 43

1   least, if not state directly, that the
2   consent that's given must be informed
3   consent.
4       **THE WITNESS:** No.
5       **THE SPECIAL MASTER:** Okay.
6       **THE WITNESS:** I do not say that.  I
7   don't mean to imply that.  Informed
8   consent is a defined term in the rules.
9   The drafters of the rules know how to use
10  that language when they want to use it,
11  and it does not appear in the fee rule.
12      **THE SPECIAL MASTER:** So under
13  1.5(e), is it your testimony that the
14  consent given by the client does not have
15  to be informed consent as used in the
16  rules?
17      **THE WITNESS:** That is correct.  It
18  does not have to be informed consent as
19  that term is defined in Rule 1.5, yes.
20      **THE SPECIAL MASTER:** What public
21  policy would that serve if a client does
22  not have to be given sufficient
23  information to make a decision about a
24  relationship or payments that are going to

Page 44

1   be made?
2       **MS. LUKEY:** Objection.
3       **THE WITNESS:** Well, there actually
4   is a difference between places in the
5   rules where informed consent is used and
6   the fee rules.  And I talk about this when
7   we do fees.
8       An interesting aspect of attorneys'
9   fees is the lawyer and client start out in
10  kind of an arm's length relationship, and
11  they are beginning as any parties would to
12  a contract.  They are negotiating back and
13  forth.  They can drive hard bargains.
14  That's okay.
15      Once the matter is started, once
16  there is a fiduciary relationship, then
17  things change a little bit, and fiduciary
18  duties may sometimes require specific
19  disclosure in order to predicate consent.
20  So conflicts, for example, that's the
21  classic place where informed consent is
22  the language.
23      Once you have a fiduciary
24  relationship, the conflict rules recognize

Page 45

1   that, and place the onus on the lawyer to
2   provide certain consent and, basically,
3   put the lawyer on notice that if
4   subsequently there's a question about
5   adequacy of disclosure, it's the burden on
6   the lawyer to provide the full disclosure.
7       That recognizes the transition from
8   a kind of arm's length market transaction
9   into a fiduciary relationship.  And it's
10  subtle, because there can be fiduciary
11  aspects to fee arrangements, that's the
12  point of the ABA opinion on the midstream
13  modifications, but at the outset,
14  particularly with sophisticated parties,
15  commercial parties, this is an arm's
16  length negotiation, and the rules permit
17  that.  And elsewhere in the restatement,
18  for example, it talks about contract law
19  basically governing fee contracts.
20      They are contracts in that sense.
21  And they are importantly different from
22  places where lawyers have fiduciary
23  obligations to clients.
24      **THE SPECIAL MASTER:** So, in a

Page 46

1 contract, a party to the contract may
2 withhold, as part of the relationship,
3 material information from the other party
4 in negotiating that contract.
5    MS. LUKEY: Objection.
6    THE WITNESS: Well, not withhold,
7 but suppose there's a negotiation where
8 one party says, I have a supplier and we
9 have a contract and the terms go like
10 this, and the other party to the contract
11 says, I don't want to get into that, how
12 much are you going to sell me the widgets
13 for. I don't really care about your
14 supplier relationship. Just tell me,
15 what's the price of the widgets, what's
16 the quality of the widgets, what do I have
17 to pay for it.
18    That's fine, as a matter of contract
19 law. And that's the sort of negotiation
20 that the parties are permitted to engage
21 in.
22    THE SPECIAL MASTER: So if I
23 understand your testimony, there is no
24 contract relationship specifically as to

Page 47

1 Mr. Chargois arising out of the e-mail
2 from Christa Clark.
3    MS. LUKEY: Objection.
4    THE WITNESS: I don't have an
5 opinion about whether there was a contract
6 between Arkansas Teachers and Chargois.
7    THE SPECIAL MASTER: No, no. Maybe
8 I misstated it.
9    There is nothing that is part of the
10 contract relationship in the
11 Arkansas/State Street case in the e-mail
12 from Christa Clark that is part of the
13 contractual relationship as to the State
14 Street case.
15    THE WITNESS: Well, it goes into the
16 parties' knowledge, and it goes into the
17 context of the bargaining. So the State
18 Street matter was negotiated, not out of
19 the blue, but in the context of an ongoing
20 attorney/client relationship where both
21 parties knew something about the other.
22    So this informs the subsequent deal,
23 subsequent bargaining, but it does not,
24 itself -- it's not conclusive of the terms

Page 48

1 of that arrangement. It's background
2 information.
3    THE SPECIAL MASTER: And then, when
4 they get to the actual relationship itself
5 in the State Street case, the retention
6 letter that was executed February 8 of
7 2011 creates the actual contractual
8 relationship and nothing else?
9    THE WITNESS: So I would call that
10 "the matter." Again, I want to
11 distinguish between the attorney/client
12 relationship, which may be ongoing across
13 a number of matters, and the terms of the
14 financial relationship -- sorry -- that's
15 the wrong word -- the terms of the
16 financial arrangement with respect to that
17 matter.
18    So you can have matter-by-matter
19 renegotiation of terms in a kind of arm's
20 length posture. And, again, the rules
21 contemplate that. So you have an ongoing
22 attorney/client relationship. There are
23 some duties owed. There are ongoing
24 duties of confidentiality. There are

Page 49

1 conflicts duties. There are things like
2 that.
3    But can the fee terms be
4 renegotiated matter by matter without
5 invoking the whole apparatus of that ABA
6 opinion? Yes.
7    So the terms of the financial
8 arrangement are particular to the State
9 Street representation, and they were
10 negotiated in 2011.
11    Again, against the background of
12 what the parties know about each other.
13    THE SPECIAL MASTER: And when that
14 changes or when that relationship begins,
15 the informed consent in the document that
16 formalizes the agreement as to the matter
17 does not require informed consent?
18    THE WITNESS: Right. I want to be,
19 again, very careful with terms that are
20 used in the rules as terms of art, and
21 informed consent is one.
22    And it's not in the fee rules,
23 again, I think, for the policy reasons we
24 have been talking about, to recognize that

Page 50

1  the negotiation of a fee arrangement is
2  not fundamentally within the context of
3  fiduciary obligations.
4      And, again, the drafters of the
5  rules know how to use that language when
6  they want to and they drop it in where
7  needed.  It's quite interesting that it's
8  not in the fee rules.  And there's a
9  reason for that.  And that is because this
10  is an arm's length bargaining situation.
11     THE SPECIAL MASTER: Even though
12  there was a pre-existing relationship?
13     THE WITNESS: Yes.
14     THE SPECIAL MASTER: And, in fact,
15  they had, by this point, a number of cases
16  in which Arkansas had been represented by
17  Labaton and Mr. Chargois had paid a fee --
18  had been paid a fee.
19     MS. LUKEY: Objection.
20     THE WITNESS: It's interesting,
21  right?  The attorney/client relationship
22  is a blend of fiduciary duties and
23  contract duties.  That's just fundamental
24  to that relationship.

Page 51

1      And it makes it important to be
2  careful about which context you're in
3  because those are two different kinds of
4  legal regimes of rules and they apply in
5  different ways at different times to the
6  representation of clients.
7      THE SPECIAL MASTER: So let me ask
8  you this question.  If informed consent
9  was required as to the nature of the
10  relationship between Labaton and Chargois
11  in February of 2011, I want you to assume
12  that it was required, would the consent
13  given in this case comply with the consent
14  requirement that was in effect at the
15  time, the notice and consent requirement
16  that was in effect at the time, February
17  of 2011?
18     MS. LUKEY: Objection.  I'm going to
19  note for the record just that
20  hypotheticals are supposed to be based
21  either upon facts in evidence or to be in
22  evidence.  So I object.
23     THE WITNESS: That's a very
24  interesting question, actually.  And the

Page 52

1  paradigm of informed consent is where you
2  have a bunch of information spelled out
3  for the client about the risks and
4  benefits and available alternatives and
5  all that good stuff, and the client signs.
6      When you have a client that already
7  knows that stuff and says, yeah, yeah, I
8  got that, I don't need you to explain this
9  to me, I'm willing to consent, does that
10  constitute informed consent?  I would
11  argue yes, but I would also, if I were a
12  general counsel to a law firm, say you
13  want to make sure you get this in writing
14  just so that subsequently, if this is
15  litigated, you have a record of what was
16  disclosed to the client.
17     But, in principle, if the client
18  knows the information the client needs to
19  know or has said, I'm not interested in
20  finding that out, I think that that does
21  constitute informed consent.  However,
22  that's dangerous as a matter of practice.
23     And so it's best practices to get
24  written consent, to get the predicate for

Page 53

1  consent in the document and have that in
2  your files.
3      THE SPECIAL MASTER: So I'm trying
4  to understand your answer.
5      If Arkansas did not know that the
6  relationship had changed between Labaton
7  and Chargois and that Chargois was going
8  to be getting 20 percent on every single
9  case in which Arkansas was lead counsel
10  for doing no work, and Arkansas was never
11  told this at any time, that would,
12  nevertheless, be informed consent?
13     MS. LUKEY: Objection.
14     THE WITNESS: Well, let me give you
15  another -- a counterhypothetical --
16     THE SPECIAL MASTER: I would like
17  you to just answer the question, please,
18  and then give me a counterhypothetical.
19     MS. LUKEY: If you can answer, go
20  ahead and answer, please.
21     THE WITNESS: Okay.  I was going to
22  do that with reference to a situation in
23  which informed consent was clearly
24  required, which is a conflict situation.

Page 54

1  And one could imagine a case in which the
2  client, who has to give informed consent
3  to the conflict, already knows or says I
4  have a feeling I know what's going on
5  here, and I really don't want to get into
6  it, so you don't have to tell me, I'm
7  willing to waive the conflict.
8      That's close to the situation that
9  you posit, and I think that's close, but
10 could be informed consent.
11     So to answer your question and,
12 again, informed consent is not the
13 standard, I just want to be clear that we
14 are working with hypotheticals here,
15 informed consent is not the standard.
16     I think this is a close and
17 extremely interesting case it would be fun
18 to write about, but it's on the right side
19 of the line here, and it can constitute
20 informed consent.
21     **THE SPECIAL MASTER:** Would you say
22 that, in procuring the consent from the
23 client, it was not material that the
24 client know that Mr. Chargois was not only

Page 55

1  in the picture, but in the picture in a
2  different way?  He would not be performing
3  local counsel responsibilities or liaison
4  counsel responsibilities.  He would only
5  be getting a fee.  Is that a material fact
6  or not --
7      **MS. LUKEY:** Objection.
8      **THE SPECIAL MASTER:** -- to informing
9  the client of a division of fees?
10     **MS. LUKEY:** Objection.
11     **THE WITNESS:** Okay.  Two-part
12 answer.  This is where I think we differ
13 in our assumption about what's going on in
14 the facts.
15     **THE SPECIAL MASTER:** I'm just
16 asking --
17     **MS. LUKEY:** He's answering, Your
18 Honor, with all due respect.
19     **THE SPECIAL MASTER:** Excuse me,
20 Joan.
21     **MS. LUKEY:** He is answering the
22 question.  Would you please let him
23 answer?
24     **THE SPECIAL MASTER:** He's changing

Page 56

1  the question.
2      **MS. LUKEY:** He is not.  You have
3  repeatedly, when you didn't like the way
4  the answer was coming out, interrupted
5  witnesses.  Please let this expert answer.
6      He said he was going to respond in
7  two different ways to your question.
8  Please allow him to do that, sir.
9      **THE SPECIAL MASTER:** I still want an
10 answer to my question.  Is it a material
11 fact?  Then you can answer however you
12 want.
13     **THE WITNESS:** Okay.  The answer is I
14 believe that Arkansas Teachers was aware
15 of that fact.  I believe, from reading the
16 testimony of Hopkins, that he is well
17 aware that the national counsel he deals
18 with as monitoring counsel have referral
19 relationships with local counsel.  So I
20 believe he was aware of that.
21     In addition, it is a material fact
22 that there is another local counsel
23 relationship, but given the permissible
24 fee divisions contemplated by Rule 1.5(e),

Page 57

1  I think all the client needs to know is
2  there is local counsel.
3      Now, the client may ask, what are
4  they doing?  And the lawyer then must
5  answer truthfully, but the existence of
6  local counsel, liaison counsel, referral
7  counsel, whatever you want to call it, is
8  required to be disclosed to the client.
9  The client needs to know that.  We know
10 that.
11     What exactly that local counsel is
12 doing is the sort of thing that the client
13 can ask about, but, in this case, the
14 client was uninterested in finding out the
15 details.  So in that sense, it is
16 material, but it was well within the
17 knowledge of the parties that there was
18 this relationship with this law firm in
19 Texas and Arkansas.
20     **THE SPECIAL MASTER:** You've kind of
21 conflated a number of different things and
22 I want to drill down.
23     I think you said that Mr. Hopkins
24 was aware of this fact.  I want to make

Page 58

1 sure we are focusing on the same fact.
2    The fact I'm asking you to focus on
3 is that Mr. Chargois and his firm would no
4 longer be acting in a local counsel or
5 liaison counsel capacity despite February
6 of 2011, but, rather, he would simply be
7 being paid an ongoing fee in every matter
8 of 20 percent of Labaton's total fee.
9 That's the fact that I'm asking you is
10 material.
11    MS. LUKEY: Objection.
12    THE WITNESS: Right.  And so Hopkins
13 clearly knew the first thing, because he
14 said, I don't want to deal with Chargois.
15 So he knew --
16    THE SPECIAL MASTER: The first thing
17 being?
18    THE WITNESS: You said two things.
19 You said, here is the material fact, this
20 is, I think, what you asked, was Hopkins
21 aware that Chargois & Herron would no
22 longer be serving as local counsel and
23 that they were entitled to a referral fee.
24 So that's two pieces of this.

Page 59

1    THE SPECIAL MASTER: Okay.
2    THE WITNESS: He is clearly aware of
3 the first piece of this, because he said,
4 I don't want to deal with them anymore.
5    As to the second, is he aware that
6 they have a contractual entitlement to a
7 referral fee, I don't know.  But he is a
8 sophisticated guy who understands how the
9 plaintiff's class action bar works, and
10 I'm certain that he must have known that,
11 and certainly could have asked and
12 followed up.
13    THE SPECIAL MASTER: Known?  By that
14 you mean?
15    THE WITNESS: Sorry.  The second
16 piece of this, which is that there may be
17 a referral agreement between Chargois &
18 Herron and Labaton.  Now, I may be
19 misremembering the testimony.  There may
20 be some point where he said, yeah, I knew
21 about the referral fee.
22    But I don't remember whether he knew
23 about that or not.  I do know that he
24 said, I don't really want to know about

Page 60

1 the financial relationship between your
2 two law firms.  That's not my concern.
3    My concern is that Labaton receive a
4 reasonable fee and perform quality
5 services for us, and that's all I want to
6 know about.
7    THE SPECIAL MASTER: So the fact
8 that Mr. Chargois was going to receive
9 20 percent in every case, including State
10 Street, for doing no work, just that piece
11 of it, is that a material fact that should
12 have been disclosed to the client?
13    MS. LUKEY: Objection.
14    THE WITNESS: Under the rules, there
15 is no requirement that that be made
16 explicit.  And that's the difference
17 between what I think you're driving at and
18 trying to kind of put into the idea of
19 informed consent and what the rules
20 actually require.
21    So the short answer to your question
22 is no.
23    Now, it's hard to give a short
24 answer because materiality isn't really

Page 61

1 the idea.  It's a question of informed
2 consent versus consent.  It's a question
3 of disclosure and reasonable
4 communication.  These are all words and
5 concepts that are used in the Rules of
6 Professional Conduct.
7    But to the extent my opinion is
8 about the Rules of Professional Conduct
9 and not contract law or something outside
10 of that, the word "materiality" isn't in
11 there anywhere.  That idea isn't doing any
12 work.
13    So I want to keep coming back to
14 this informed consent versus consent, you
15 know, written, whatever.  I want to make
16 sure that we stay in the four corners of
17 the rules.
18    THE SPECIAL MASTER: So let me
19 just -- as I understand your answers,
20 taken at large, on this issue of the
21 relationship having changed between
22 Labaton and Chargois from one that was
23 contemplated to be local counsel, liaison
24 counsel, vis-a-vis, Arkansas, to one in

Page 62

1 which he was receiving only a fee, in that
2 context, correct me -- I'm going to go
3 through to make sure I understand your
4 testimony, each piece of it, okay?
5    One, what I'll refer to as the
6 20 percent piece.
7    **THE WITNESS:** Okay.
8    **THE SPECIAL MASTER:** Which means
9 20 percent --
10    **THE WITNESS:** Entitlement.
11    **THE SPECIAL MASTER:** -- entitlement.
12 I will refer to that as the 20 percent
13 piece.
14    **THE WITNESS:** Okay.
15    **THE SPECIAL MASTER:** That is not a
16 material piece of information to informing
17 the client and obtaining the client's
18 consent under 1.5(e).
19    **MS. LUKEY:** Objection.
20    **THE WITNESS:** Again, I want to be
21 careful because I was specifically asked
22 to talk about the Rules of Professional
23 Conduct. Materiality is not part of that
24 analysis. There are other places in the

Page 63

1 rules where materiality is a word, but
2 it's not used here.
3    The rules I'm looking at and
4 thinking about in forming this opinion are
5 Rule 1.4, reasonable communication, 1.5 on
6 fees.
7    The word "material" doesn't appear
8 anywhere in there. I'm not trying to be
9 difficult, but I want to be precise. And
10 there's a difference between consent and
11 informed consent. So I want to be careful
12 with those words, too.
13    I don't want the word "material" to
14 be in this analysis. It's not in my
15 opinion, and it doesn't do any work in the
16 rules that we're talking about here.
17    **THE SPECIAL MASTER:** Is part of your
18 answer to my question on informed consent,
19 which is the larger question that you
20 identified, is part of your answer that
21 the change of the relationship to what
22 became the 20 percent relationship is not
23 material to obtaining consent under the
24 rule?

Page 64

1    **MS. LUKEY:** Objection. Your Honor,
2 he has twice told you the materiality and
3 informed consent are not the proper terms.
4 And, yet, you continue to ask it.
5    **THE SPECIAL MASTER:** All right,
6 Joan. I had to instruct you the other day
7 on Rule 30(c). I don't want to have to
8 instruct you again.
9    You will not suggest answers in your
10 questions.
11    **MS. LUKEY:** I am not suggesting
12 anything, Your Honor. And may I remind
13 you that this is supposed to be an
14 investigative proceeding, not a
15 prosecution?
16    **THE SPECIAL MASTER:** I'm trying to
17 get an answer.
18    **MS. LUKEY:** Well, he can't answer
19 you. You built into the preface of your
20 last question that he had said on the
21 issue of informed consent, and you went on
22 from there. He has told you informed
23 consent is not in these rules.
24 Materiality is not in the rules.

Page 65

1    **THE SPECIAL MASTER:** I now consider
2 you in violation of Rule 30(c).
3    All right. Next. Do you understand
4 my question?
5    **THE WITNESS:** I do. And I'm not
6 trying to be difficult.
7    **THE SPECIAL MASTER:** Thank you.
8    **THE WITNESS:** But a couple things.
9 I don't think informed consent is the
10 right analytical framework.
11    Number two, even if it were -- so
12 I'm going to accept the premise of your
13 question, even if it were, which I don't
14 think it is the right analytical
15 framework, and, again, I'm not trying to
16 be difficult, materiality is not the
17 language. The definition of informed
18 consent is full disclosure of risks and
19 benefits and available alternatives.
20    And, look, I'm sorry to be picky
21 about this. But, you know, this is the
22 way the rules work. They are drafted like
23 a statute. And so you really take the
24 language seriously.

Page 66

1    So I want to keep the word
2  "materiality" out.  I'm happy to talk
3  about, in a hypothetical sense, informed
4  consent, but if we are going to talk about
5  informed consent, then the language is
6  full disclosure of risks and benefits and
7  available alternatives.
8    **THE SPECIAL MASTER:** Okay.  I
9  understand that.
10   **THE WITNESS:** Okay.
11   **THE SPECIAL MASTER:** But what I'm
12  trying to do is to understand each piece
13  of your opinion that the consent that was
14  obtained under Rule 1.5(e) was appropriate
15  to the rule or in compliance with the
16  rule.  One piece of that is whether or not
17  the disclosure that the relationship had
18  changed was, I'm using the word
19  "material," you can use the word
20  "important to receiving the consent," my
21  question remains the same, was it
22  important in obtaining the consent for
23  Arkansas to know that?
24   **MS. LUKEY:** Objection.

Page 67

1    **THE WITNESS:** Okay.  So now I
2  understand that we are back on my opinion.
3  So the train had gone off on a side track
4  here, talking about informed consent.  And
5  that was a hypothetical, and that was
6  fine.  I'm happy to talk about
7  hypotheticals.
8    But now if we are back to my
9  opinion, what my opinion is in reliance on
10  the language of Rule 1.5(e) is, based on
11  the idea of consent in Rule 1.5(e) and
12  reasonable communication in Rule 1.4.  So
13  I know you don't like this idea of there's
14  already been information conveyed to the
15  client and the client knows that, and the
16  fee agreement was negotiated in the
17  context of that information that had
18  already been conveyed, but the information
19  about the presence of Chargois and what
20  the contractual relationship in Rule 1.4
21  between Chargois and Labaton had been conveyed to
22  Arkansas Teachers' representatives and
23  they knew enough to either, if they chose,
24  follow up and ask for more details and

Page 68

1  drill down farther into the relationship,
2  or say, we know enough, this is fine, I'll
3  sign here.
4    That's a combination of the consent
5  requirement in 1.5(e), which was modified
6  by Saggese to become written consent, and
7  1.4 on reasonable communication.  That's
8  my opinion.
9    **THE SPECIAL MASTER:** So as to this
10  change in the relationship, and given the
11  context that you have identified, the
12  burden was on the client to ask further
13  questions about the nature of the
14  relationship between Chargois & Herron and
15  Labaton.
16   **THE WITNESS:** I know that sounds
17  kind of strange.  But, yes.  You know,
18  that's this interesting mix of contractual
19  and fiduciary, market and fiduciary norms
20  that is part of the negotiation of a fee
21  arrangement.
22    It is, in fact, between
23  sophisticated parties, on the client to
24  say, okay, you've told me you have this

Page 69

1  relationship with this other law firm, can
2  you tell me more about it.
3    Now, if the client had asked that,
4  the law firm would have to answer
5  truthfully.  But if the client said, I
6  don't care, that's okay.  There's no
7  further duty on the lawyer at that point
8  to provide additional information.  That's
9  what it means to be in an arm's length
10  bargaining situation and not in a
11  fiduciary negotiation.
12   **THE SPECIAL MASTER:** Okay.  And I
13  think part of your answer was, if informed
14  consent as defined in the rules was read
15  into 1.5(e), nevertheless, there would be
16  informed consent here; is that right?
17   **THE WITNESS:** Yes.
18   **THE SPECIAL MASTER:** Okay.
19   **BY MR. SINNOTT:**
20  Q.  So let me just get away even from
21  the word "informed" or "materiality" and ask
22  you a couple questions.
23    So in order to comply with the
24  consent requirement of 1.5(e), it's your

Page 70

1 testimony that it was not necessary that Belfi
2 inform Hopkins about the 20 percent. Is that
3 your testimony?
4 A. Yes.
5 Q. All right. But it would be
6 necessary for consent under 1.5(e) that Belfi
7 inform Hopkins about Chargois' existence or the
8 fact that Chargois had a relationship with the
9 firm; is that correct?
10    MS. LUKEY: Objection.
11 A. Well, that there may be local
12 counsel or co-counsel or some other law firm
13 with whom we will be dividing fees. There has
14 to be some information about the possibility of
15 a fee division with another law firm. That's
16 in the language of the rule, but not the
17 details of the relationship between Labaton and
18 Chargois.
19 Q. But, in this particular case, I
20 believe you testified that, according to Belfi,
21 Hopkins said to him, I'm aware of that
22 relationship with local counsel, but not
23 interested, correct?
24 A. Right.

Page 71

1 Q. You would agree that that level,
2 basic as it is, is necessary in order for there
3 to be consent under 1.5(e), correct?
4    MS. LUKEY: Objection.
5 A. Well, again, this is a hypothetical,
6 but I don't know that it's necessary to
7 identify the law firm. I would be willing to
8 say that the consent required under Rule 1.5(e)
9 would be satisfied by a disclosure that we may
10 engage local counsel. We may engage another
11 law firm to provide services and we may divide
12 our fee with that firm.
13 Q. So it's your testimony that, in
14 order to satisfy the consent requirement of
15 1.5(e), a specific relationship does not have
16 to be referenced?
17 A. Right. This is -- the rules --
18 here's the thing with the rules. The rules are
19 a floor. They don't purport to exhaust all of
20 what a lawyer should do in the relationship
21 with a client.
22    And so outside the context of a
23 client that already knows about the
24 relationship with this law firm, Chargois, if a

Page 72

1 lawyer said what I said a second ago, we may
2 retain co-counsel, of course, the client is
3 going to say, who, for what purpose? And
4 that's part of the negotiation and part of the
5 communication.
6    So the rule doesn't purport to say
7 all of the things that a lawyer ought to do.
8 It merely sets a floor. It says, at a minimum,
9 you got to do this. And other things that a
10 lawyer may have to do, which is part of best
11 practices or things your liability insurer
12 tells you to do, the rules don't purport to
13 recognize all of those principles and duties.
14    So is it in compliance with the rule
15 to say we may retain co-counsel, we may
16 associate with co-counsel, we may have a local
17 counsel, that satisfies the rule. But, of
18 course, in any attorney/client relationship,
19 there's going to be communication back and
20 forth and negotiation back and forth beyond
21 what the rule requires as a floor.
22 Q. So just to take that a step further.
23 So that requirement of consent can be to any --
24 any law firm in the world. Is that what you're

Page 73

1 saying?
2 A. Sure. In fact, there are ethics
3 opinions on using law firms in the world. You
4 have a law firm in India that does your
5 document review for you or something. That's
6 part of it.
7 Q. And, in your opinion, it's
8 sufficient for consent that there be a
9 reference to -- that there not be a reference
10 to a specific firm, correct?
11 A. For consent as required by the
12 rules, yes.
13 Q. Now, 1.5(e) says, "A division of a
14 fee between lawyers who are not in the same
15 firm may be made only if, after informing the
16 client that a division of fees will be made,
17 the client consents to the joint participation
18 and the total fee is reasonable."
19    MS. LUKEY: Could I just establish
20 you're reading from the rule that was in
21 effect at the time?
22    MR. SINNOTT: The earlier rule, yes.
23    MS. LUKEY: Thank you.
24 Q. That's your understanding of the

1  rule, correct?
2  A.  That's the rule.
3  Q.  Yeah.  And would you agree that the
4  clause "after informing the client that a
5  division of fees will be made" is a, in time
6  terms, temporal terms, a very specific
7  statement?
8      MS. LUKEY: Objection.
9  A.  Well, it's interesting in temporal
10 terms, especially when you read that rule in
11 the context of Saggese and the timing
12 requirement there.  The rule kind of
13 contemplates different stages.
14     So, at the outset, the client is
15 informed that we may associate with another law
16 firm.  Then, subsequently, the client needs to
17 know this is, you know, this is the fee that we
18 are paying to the other law firm based on
19 whatever contractual arrangement there is or
20 whatever grounds the entitlement of the other
21 law firm to a fee.
22     But so there's kind of a going
23 forward, like an ex ante information
24 requirement, and then, subsequently, further

1  information may need to be provided, again, as
2  a matter of reasonable communication.
3  Q.  So you don't believe that the
4  statement that "a division of fees will be
5  made" is specific as to a particular division
6  of fees?
7  A.  Well, no.
8      MS. LUKEY: Objection.
9  A.  In some ways, it can't be, in some
10 cases where the other law firm's entitlement to
11 fees isn't established until latter.  The rule
12 just requires that, at the outset, the client
13 be informed about the possibility of dividing
14 fees with another firm.
15 Q.  So it could be, once again, any
16 other firm, correct?
17 A.  Yes.
18 Q.  But that wasn't the case here based
19 on your understanding of the facts, was it?
20 A.  Right.  So, again, the background to
21 this engagement agreement is the understanding
22 that the Chargois is the other firm in the
23 scenario.
24 Q.  What was, in your understanding,

1  Hopkins told by Belfi?
2  A.  I could go back and look at the
3  facts.  If you are asking what do I recall
4  sitting here now, I believe that Hopkins was
5  told by Belfi something to the effect that, and
6  I'm not trying to quote anybody's testimony,
7  you know we have this relationship with this
8  Chargois firm in Texas and Arkansas, right, and
9  Hopkins said, yeah.
10     So there was a reference to the firm
11 that Arkansas Teachers had already dealt with,
12 and Hopkins knew that they were still around.
13 Q.  And what do you base that
14 recollection of the facts on?
15 A.  Again, this is what I recall as I
16 sit here now.  I read the deposition of Belfi,
17 the deposition of Hopkins, the e-mail traffic
18 back and forth.  It's just kind of based on all
19 of that reading.
20 Q.  But you testified, in questioning by
21 Judge Rosen, that this is a close case,
22 correct?
23     MS. LUKEY: Objection.
24 A.  Let me, again, be careful.  What is

1  a close case is if, contrary to the way the
2  rules work, if the idea of informed consent, as
3  that concept is used elsewhere in the model
4  rules, if that were to apply to this situation,
5  that would be a close case.  I actually think
6  kind of interesting, might be a fun law school
7  exam question to write.
8      But that's in the counterfactual
9  world in which informed consent provides the
10 standard.
11     If that were the standard, this
12 would be a close and interesting case, but it's
13 not the standard.
14     THE SPECIAL MASTER: Could I just
15 interject here?
16     You're aware that the retention
17 agreement contemplated a class action, and
18 that Arkansas would be the class
19 representative?
20     THE WITNESS: Yes.
21     THE SPECIAL MASTER: Does that
22 change your opinion at all as to the
23 nature of consent that is required?
24     THE WITNESS: No.

Page 78

1    THE SPECIAL MASTER: By being class
2  representative, there would be duties to
3  the class and to adequately represent the
4  class, correct?
5    MS. LUKEY: Objection.
6    THE WITNESS: Yes.
7    THE SPECIAL MASTER: And the fact
8  that Arkansas is now undertaking this case
9  and Labaton to represent Arkansas on
10  behalf of a class does not change the
11  nature of the consent required in
12  understanding, the client understanding
13  who's going to be paid what?
14    THE WITNESS: No. Because the duly
15  authorized agent of the class
16  representative, Arkansas Teachers, is
17  Hopkins. You can only communicate with an
18  entity through natural person agents, and
19  the client representative here is Hopkins.
20    THE SPECIAL MASTER: So Arkansas'
21  responsibilities are no greater as a class
22  representative than it would be if Labaton
23  was representing it only independently and
24  not as a class representative.

Page 79

1    MS. LUKEY: Objection. Your Honor,
2  I'm not objecting to your questioning. I
3  just want to point out he's not proffered
4  as a class expert.
5    THE SPECIAL MASTER: I understand.
6    THE WITNESS: I don't know if you
7  meant to say this, but you said Arkansas
8  Teachers' responsibility and Labaton. I
9  don't know if you meant to use separate
10  parties.
11    Labaton's responsibilities to its
12  client are the same in this case.
13  Arkansas Teachers, the client, as the
14  class representative, this is outside my
15  area of expertise. I'm not a civil
16  procedures person at all. They may have
17  duties to the class as a matter of Rule
18  23. I don't know that stuff. So I'm not
19  going to go there, but Labaton's duties
20  are to its client. That's to whom the
21  duties are owed.
22    THE SPECIAL MASTER: And the fact
23  that its client is now going to be or
24  contemplated to be performing class

Page 80

1  representative -- in a class
2  representative role, responsible for class
3  representative obligations to a class or a
4  putative class, that's -- that doesn't
5  play into your opinion?
6    MS. LUKEY: Objection.
7    THE WITNESS: No, because the basic
8  agency structure of the attorney/client
9  relationship is the same. You have the
10  principal here, Arkansas Teachers, which
11  is responsible for making decisions about
12  protecting itself and presumably carrying
13  out other duties that it owes to others,
14  and it communicates through its authorized
15  representative with the law firm about how
16  the law firm should carry out its
17  obligations. And that works the same in a
18  ordinary one-off single client
19  representation and a class. The agency
20  structure is the same.
21    Now, I'm not opining about what
22  duties arise out of Rule 23 or anything
23  else. That's not my area of expertise.
24    THE SPECIAL MASTER: Okay. So just

Page 81

1  to summarize. As to your opinion as to
2  compliance with Rule 1.5(e), it is not
3  relevant to your opinion that Arkansas
4  would have duties to a putative class or a
5  later certified class?
6    THE WITNESS: That's correct.
7    BY MR. SINNOTT:
8  Q.  Let me just take it back, if I
9  might, Professor, to 1.5(e) in effect at the
10  time.
11    So after saying that -- after
12  informing the client that a division of fees
13  will be made, the client consents to the joint
14  participation and the total fee is reasonable,
15  what does the phrase "joint participation" mean
16  to you?
17  A. Did you read the Mass. rule or the
18   model rule?
19  Q.  The Mass. rule in effect pre-2011.
20  A. Pre-Saggese.
21    MS. LUKEY: Not pre-Saggese.
22  Pre-amendment to the rule.
23  A.  Well, joint participation just means
24   that they are entitled to participate in the

Page 82

1  division of fee. I know that sounds circular,
2  but that goes back to the interesting question
3  that divides Massachusetts and other states
4  which is what may a law firm receive fees for.
5  And, in Massachusetts, the answer is referrals
6  in addition to providing other sorts of legal
7  services.
8      So the joint participation is just a
9  shorthand way of saying "for whatever they are
10  entitled to receive fees for."
11  Q.  And, in your opinion, that would
12  include for nothing?
13  A.  In Massachusetts, it could also be
14  for a referral. It could be for a referral
15  from one firm to another of a client.
16  Q.  Would you agree that Massachusetts
17  is a bit of an outlier in that respect?
18  A.  Well, that's a minority position. I
19  actually -- I don't know the 50-state count,
20  but there are other states that permit bare
21  referral fees.
22  Q.  Does California permit it?
23  A.  I don't recall.
24  Q.  Does Texas permit it?

Page 83

1  A.  I'm pretty sure Texas does not. I
2  think I remember doing some work in Texas a
3  while ago, and I'm pretty sure they do not.
4  Q.  Does Virginia permit it?
5  A.  I don't recall.
6  Q.  Do you know if Labaton informed any
7  of the other jurisdictions, in which there were
8  Arkansas cases, of Damon Chargois?
9      MS. LUKEY: Objection.
10  A.  I have no idea.
11  Q.  If those cases were required
12  notification beyond just this general referral,
13  a division of fees may take place with some
14  lawyers in the future, is that your
15  understanding -- let me rephrase that.
16      In these other states, that would
17  not be sufficient, correct?
18      MS. LUKEY: Objection. He has not
19  been tendered for other states. I really
20  consider this to be quite an inappropriate
21  questioning, Bill. That's not within the
22  scope of what the special master is
23  directed to investigate.
24      MR. SINNOTT: Thank you.

Page 84

1  A.  Are you asking me whether Chargois
2  had to comply with different states' rules
3  because he was a Texas lawyer or Arkansas
4  lawyer?
5  Q.  No. I'm asking you if Labaton had
6  to comply.
7      MS. LUKEY: Objection.
8  A.  No. Because Massachusetts law
9  governs this.
10  Q.  Do you know if Labaton revealed its
11  relationship with Damon Chargois in any of the
12  other Arkansas cases?
13      MS. LUKEY: Objection.
14  A.  I don't know.
15  Q.  But, in this case, in any event, I
16  believe you testified that, according to Belfi,
17  Hopkins had told him I'm aware of that
18  relationship with local counsel, but not
19  interested, in so many words, correct?
20  A.  Yes.
21  Q.  And that I don't want to deal with
22  Chargois, I believe you said as well, correct?
23      MS. LUKEY: Objection.
24  A.  I don't recall him saying I don't

Page 85

1  want to deal with Chargois. I -- and you
2  summarized it well at first, which is I'm just
3  not interested in getting into the details of
4  the relationship you have with local counsel.
5  Q.  All right. And when did these
6  conversations take place?
7  A.  I don't recall exactly the timing.
8  They were prior to the engagement letter. So I
9  assume in 2010, late 2010, early 2011. I don't
10  have the exact dates.
11  Q.  All right. What's the significance
12  of those statements to your opinion?
13  A.  The significance is that the
14  communications back and forth between Belfi and
15  Hopkins go to both the duty of reasonable
16  communication and the duty of obtaining consent
17  to the division of fees with the Chargois firm.
18  Q.  And how do they go to the issue of
19  consent?
20  A.  Well, in order for the client to
21  consent, the client has to have the opportunity
22  to participate meaningfully in a conversation
23  about the matter under discussion, and it is
24  the client's option to ask for more information

Page 86

1 and to say I want to see the contract that you
2 have with Chargois.  Hopkins could have done
3 that.
4     It's also the client's option to
5 say, whatever.  That's for you all to worry
6 about, not my concern.
7     That's the meaningful conversation
8 and communication that has to occur in order
9 for the client to consent to the fee
10 arrangement.
11 Q.   And you would agree that those
12 statements to Hopkins, those statements by
13 Hopkins to Belfi indicated that he was
14 communicating and he was consenting, correct?
15 A.   Sure.
16 Q.   And they were prerequisite to
17 1.5(e), correct?
18 A.   Well, something like that.  So it
19 doesn't have to be exactly that communication,
20 but there has to be some kind of meaningful
21 communication, meaningful participation by the
22 client in the decision-making process.
23 Q.   All right.  And you believe that
24 Mr. Hopkins was given that opportunity?

Page 87

1 A.   Clearly.
2 Q.   All right.  And he needed to be
3 given that opportunity, correct?
4 A.   Yes.
5 Q.   Otherwise, this would not satisfy
6 1.5(e)'s consent requirement?
7 A.   Just one small footnote.  Hopkins or
8 another authorized class representative.  It
9 doesn't have to be Hopkins.  But it's someone
10 authorized to speak and act on behalf of the
11 client.
12 Q.   And, in this case, the
13 representative was Hopkins, correct?
14 A.   Yes.
15 Q.   And he was speaking on behalf of the
16 class, correct?
17     MS. LUKEY: Objection.
18 A.   Now we're getting into civil
19 procedure, which I don't know.  He's speaking
20 on behalf of Arkansas Teachers.
21 Q.   All right.  Thank you.
22     Just to get back quickly to the --
23     (Discussion off the record.)
24 Q.   You may recall that I was asking you

Page 88

1 about the Saggese case earlier, and I believe I
2 asked you that -- whether it was true that the
3 Saggese court referred to the fact that the
4 Kelleys acquiesced in a referral fee to Saggese
5 on that Doe matter two months into their
6 representation, only to make the point that
7 this was the time Doe's consent could have been
8 obtained because it's the first time that the
9 division of fee agreement was reached, correct?
10     MS. LUKEY: Objection.
11 A.   So, again, this is back to that
12 two-part timing issue in Rule 1.5(e).  I think,
13 and I can't quote Saggese chapter and verse,
14 but -- but what should have happened is that
15 the lawyer should have said, I have a
16 relationship with another law firm and I may
17 share the fee, and then later there would be a
18 more particularized basis for making the
19 division of the fee, and then you inform the
20 client of that.
21     But the reason it becomes, again, to
22 use the term "midstream modification," is that
23 this kind of gets sprung on the client after
24 the relationship had commenced, after there had

Page 89

1 already been an arrangement about the
2 attorney's entitlement to compensation.
3 Q.   But isn't it true that, in Saggese,
4 that fee-sharing agreement wasn't reached until
5 two months into the Kelleys work on behalf of
6 Doe?
7 A.   Well, and that's the problem.  And
8 so it's not that midstream modifications can't
9 happen, it's just that they have to be
10 accompanied by a lot of conversation and
11 disclosure.
12     And so if you could imagine the
13 lawyer saying, okay -- the other thing is there
14 should be some change of circumstances to
15 justify a change in the middle of a matter.
16 Well, you know, why all of a sudden is this new
17 law firm coming around?  The client needs to
18 know about that.
19     And so one could imagine this case
20 coming out differently if the lawyer had said,
21 hey, it's become necessary to associate another
22 law firm.  Who knows why.  Maybe there are
23 issues that are outside our area of expertise.
24 Maybe we need specialized representation on

Page 90

1 something.  It's not going to drive up your
2 total fee, but we need to share now with expert
3 outside counsel in something related that just
4 came up in the case, is that okay.  And the
5 client says, yeah, thanks for letting us know.
6 Sure, it's fine, as long as it doesn't increase
7 our total fee.  That could have happened.
8     So I don't want you to misunderstand
9 my reliance on that ABA opinion.  It's not
10 saying you can never change fee arrangements in
11 the middle of a matter.  It's just that there
12 has to be communication with the client about
13 the reasons for it.
14 Q.  But you would agree that, because
15 the fee-sharing agreement wasn't reached until
16 two months into the case, until the Kelleys
17 work for Doe, they couldn't have informed Doe
18 earlier, could they?
19 A.  Well, in that case, if there wasn't
20 an agreement until later, then, no, they
21 couldn't inform them until there was an
22 agreement.  But, at that point, there has to be
23 conversation and information about the
24 relationship with the other law firm.

Page 91

1 Q.  Sure.  But you agree that they could
2 not have informed them of a fee-sharing
3 agreement that hadn't taken place yet, correct?
4 A.  Well, sure.  If it doesn't exist,
5 then you can't inform the client about it.
6 Q.  So there was no midstream in that
7 case, was there?
8 A.  It's still midstream modification.
9 So the clients and the lawyer have a fee
10 arrangement, and then the matter is moving
11 forward.  Now, the law firm wants to associate
12 other counsel for whatever reason.  That is a
13 midstream modification.
14 Q.  So you consider it a midstream
15 modification even if there was no way that they
16 could have notified them later on?
17 A.  Sure.  And, again, the ABA opinion
18 doesn't say you can't do.  It just says you
19 have to then inform the client and have a
20 conversation about the basis for the
21 modification.
22 Q.  So the failure to inform Doe earlier
23 didn't affect the court's holding in that case,
24 did it?

Page 92

1 A.  Boy, you're asking me about a case
2 that I don't live with and teach and know
3 intimately.  But I think that sounds right.
4 Q.  All right.  So that case would have
5 been decided the same way, even if the division
6 of fee agreement had predated the time that the
7 Kelleys accepted Doe as a client?
8 A.  No.  That, I don't think is right.
9 Then it may be the case that the court would
10 say you failed in your duty of reasonable
11 communication.  And, again, I want to make sure
12 you are reading 1.4 and 1.5 together.
13     If that arrangement had existed and
14 predated the two months in or whatever that
15 was, then the lawyer could be said to have done
16 something improper.  You knew about this and
17 didn't inform the client.  Why did you do that?
18     That's different from the
19 relationship is cooking along and the matter is
20 moving forward, and then it becomes necessary
21 to associate outside counsel.  There is no
22 failure of communication up to that point
23 because there was no relationship with outside
24 counsel.

Page 93

1     So it would be different if there
2 had been a relationship with outside counsel
3 that would have been relevant to negotiating
4 the original fee arrangement that the law firm
5 didn't mention to the client.
6 Q.  So you'd agree that, unlike Saggese,
7 the Chargois arrangement, by a long time,
8 predated the agreement in State Street,
9 correct?
10 A.  Yes.
11 Q.  So would you agree that what you
12 referred in your report as the court's concern
13 in Saggese would have required Labaton to
14 comply with 1.5(e) at or before ATRS retained
15 it for the State Street matter?
16     MS. LUKEY:  Objection.
17 A.  Yes.  And they did.  So they were
18 required to inform Arkansas Teachers of the
19 possibility of sharing fees with local counsel.
20 They did.  And because that relationship
21 predated their retention in the State Street
22 matter, that's part of what reasonable
23 communication would have required.
24 Q.  So when did that reasonable

Page 94

1  communication take place?
2  A.  Well, again, I don't know the exact
3  dates.
4      And, also, to repeat what I said
5  earlier, this negotiation happened in the
6  context of a background of a lot of information
7  that the parties already had.  So the
8  reasonable communication included the Christa
9  Clark exchange.  It included the Belfi Hopkins
10  exchange.  It included what the parties knew
11  about the relationship Labaton had with
12  Chargois.  That's all part of the background.
13      The specific negotiation about State
14  Street happened in the late 2010, early 2011
15  time frame.  But, again, that wasn't in a
16  vacuum.  That was in the context of what the
17  parties already knew about each other.
18  Q.   And what specifically did Arkansas
19  need to know about the Chargois relationship?
20  A.  What they wanted to know, and I mean
21  that -- you know, they had the opportunity to
22  participate meaningfully in the conversation.
23  Hopkins, the executive director of Arkansas
24  Teachers, had a chance to ask whatever

Page 95

1  questions he wanted.
2      The law firm wasn't hiding anything.
3  They weren't refusing to disclose something.
4  They simply said, Mr. Hopkins, do you want to
5  know about this?  And he said, no.  He said,
6  I've been in this business a long time.  I know
7  how the class action bar works.  I don't want
8  to deal with this.  It's a mess.  It's
9  complicated.  I'm satisfied if you provide the
10  services you're going to provide and the total
11  fee be reasonable.
12      So he was given the opportunity to
13  find out whatever he wanted to know.
14  Q.   All right.  And is there any
15  significance, in your opinion, to events that
16  happened prior to Hopkins' tenure as executive
17  director?
18  A.  Any significance?  Well, so the
19  relationship between client and counsel is an
20  ongoing thing.  And, you know, organizational
21  clients are legal persons.  They are legal
22  fictions.  Agents come and go.
23      So you had Doane replaced by
24  Hopkins.  There was a relationship between

Page 96

1  Doane and Labaton, but that's a relationship
2  between Arkansas Teachers and Labaton.  So that
3  information is kind of corporate knowledge.
4  It's part of the organizational client's
5  background and knowledge.
6      And it would be relevant to what the
7  client knew about its law firm's relationship
8  with Chargois.
9  Q.   So that background would not be
10  dispositive to any agreement.  Is that your
11  testimony?
12      MS. LUKEY: Objection.
13  A.  Well, no one thing is dispositive.
14  This is all part of the knowledge that the
15  parties have about each other.
16  Q.   What did Doane know about the
17  Chargois arrangement?
18  A.  I don't recall specifically what he
19  knew.  He dealt with Chargois.  I don't know
20  what details he knew about the relationship
21  Chargois had with Labaton.
22  Q.   What did, if you know, Christa Clark
23  know about the relationship between Chargois
24  and Labaton?

Page 97

1  A.  All I know about Christa Clark is
2  what was in that e-mail exchange.  And, you
3  know, she said there's another law firm, they
4  are doing other work, we'd just as soon you be
5  the sole firm on our state procurement system,
6  and you can work out the division of fees among
7  yourselves.  That's what Christa Clark knew
8  about them.
9  Q.   All right.  And what about the RFQ,
10  what did that say with respect to the
11  relationship between Chargois and Labaton?
12  A.  I don't recall specifically, and I'm
13  sorry, I sort of blanked on that.
14      I do remember looking at it, and
15  there was some language in there about, you
16  know, what we are going to do.  I just don't
17  have, as we sit here now, a clear recollection
18  of what exactly that language was.
19  Q.   Would you agree that that RFQ was
20  specifically about service of these firms or of
21  Labaton ultimately selected as monitoring
22  counsel, correct?
23      MS. LUKEY: So, Bill, you are
24  referring to the response to the RFQ?  You

Page 98

1  are talking about the response as opposed
2  to --
3      MR. SINNOTT: I'm sorry.  Let me
4  clarify that.
5  A.  You mean the documents submitted in
6     response to the RFQ?
7  Q.  That's right.
8  A.  So that was the firm bidding.  You
9     know, state procurement law is not my expertise
10    at all.  But my understanding is the firm was
11    bidding to be, I don't know what you call it,
12    panel counsel or something like that, available
13    to do work for the state.  And so they were
14    requesting to be on a state registry of law
15    firms that would do work along these lines,
16    securities class action stuff, monitoring, that
17    kind of work.
18 Q.  And would you agree that the State
19    Street case was not referenced in that
20    application?
21 A.  I don't recall.  Given the timing of
22    these two things, it seems odd that it would
23    be.  So I'm guessing that, no, it wasn't
24    referenced, but I don't recall specifically.

Page 99

1  Q.  And would you agree that that
2     application did not contemplate a referral
3     arrangement?
4  A.  I don't recall.
5  Q.  But you've seen that application,
6     correct?
7  A.  I did in the process of working
8     through my report.  I just, right now, sorry,
9     I'm blanking on it.  There's a lot of documents
10    in this case.
11 Q.  Let me just show you a copy of it.
12     THE SPECIAL MASTER: I just want to,
13  while he is looking for the document, I
14  want to clarify one thing.
15     Is it your belief that Mr. Hopkins
16  himself knew about Mr. Chargois in any
17  capacity or Chargois and Herron or the law
18  firm of Chargois & Herron?  And I'm
19  referring here only to the state of
20  Mr. Hopkins' knowledge.
21     THE WITNESS: It is my belief, and I
22  don't know that I could give you
23  documentary proof of this, but it is my
24  belief that Hopkins knew exactly what was

Page 100

1  going on.  He has been around Arkansas a
2  long time.  He knows the players.  He
3  knows exactly what's going on.
4      He is familiar with the practices of
5  the securities class action bar.  You
6  know, he knows who's who.  He gets it.
7  It's my belief that he is actually quite
8  well informed about what he needs to know.
9      THE SPECIAL MASTER: You said what
10 he needs to know.  Does that include -- do
11 you believe that Mr. Hopkins knew
12 specifically about Mr. Chargois and the
13 Chargois Herron firm?
14     MS. LUKEY: Objection.
15     THE WITNESS: I believe, and this is
16 now just all speculation, but I do
17 believe, and as I was reading this, I was
18 forming my own narrative about what must
19 be going on, I believe that Hopkins knows
20 exactly how referral arrangements work in
21 a plaintiff's bar, and he gets it.
22     And he understands that there are
23 local firms that originate clients and
24 they have relationships with clients, and

Page 101

1  they refer it out to national counsel and
2  they get paid for it.
3      Clearly, he understands how this all
4  works.  And that's why he didn't want to
5  get into it.  Because he said, it's all a
6  mess.  I don't want to be part of this.  I
7  don't want to be inundated with local law
8  firms who are trying to suck up to me and
9  broker these Arkansas cases out to
10 national firms.  I got to beat them off
11 with a stick, and I'd just as soon avoid
12 the whole thing.
13     He has been around and he knows the
14 players.  So it's my belief that he
15 understands exactly how this works.
16     THE SPECIAL MASTER: That's
17 different from whether or not he knew
18 about Chargois and Chargois & Herron.
19     THE WITNESS: Well, he knew that
20 Chargois had had a relationship with
21 Labaton, and he knew who Chargois was.
22 They had an Arkansas office.
23     THE SPECIAL MASTER: What do you
24 base that on?

Page 102

1    THE WITNESS: You're asking me to
2  speculate. I'm kind of filling in the
3  details for myself, thinking who this guy
4  is and what he must know, and what his
5  experience is in his position. Arkansas
6  is a small state. Little Rock is a small
7  town. He knows the players.
8    I'm just -- again, this is -- I
9  couldn't, you know, cite this in a
10  deposition, because I'm just kind of
11  filling this all in, but, of course, when
12  you read documents, you think, what must
13  be going on here.
14    You're asking me, what's my belief.
15  That's my belief.
16    THE SPECIAL MASTER: Mr. Hopkins
17  testified that he didn't know
18  Mr. Chargois, didn't know anything about
19  the relationship until this -- until this
20  matter, until the special master's
21  investigation.
22    THE WITNESS: He did, but he also
23  said -- it was a funny bit in his
24  deposition, where he said, I'm just

Page 103

1  inundated by these guys. And I think he
2  probably saw Chargois as just one of these
3  many, many local lawyers who were just
4  constantly pestering him for work.
5    That was a very striking part of his
6  deposition testimony. So, to me, it feels
7  like he was saying, geez, these guys are
8  all the same. There's just hundreds of
9  them buzzing around Little Rock. That was
10  the impression that I got from his
11  testimony.
12    THE SPECIAL MASTER: I want you to
13  assume this. I'm not indicating here that
14  I have found this, but I want you to
15  assume this.
16    If, as part of Arkansas'
17  responsibility as class representative, it
18  was required to have knowledge of the
19  relationship here, what we have referred
20  to as the 20 percent relationship, would
21  it have been important for Labaton to have
22  informed Arkansas of the Chargois
23  20 percent relationship in obtaining
24  consent under Rule 1.5(e)?

Page 104

1    MS. LUKEY: Objection.
2    THE WITNESS: Okay. So I'm happy to
3  grant that assumption.
4    My reaction to that assumption is if
5  that's truly the duty of the class
6  representative, then Hopkins failed. Then
7  Hopkins fell down on the job.
8    You know, he didn't do the due
9  diligence that he was required to do.
10  And, you know, if, that's really, in fact,
11  his duty, then bad on him as executive
12  director of Arkansas Teachers.
13    I don't know if Rule 23, in fact,
14  imposes that requirement -- yeah, yeah,
15  yeah. But if that is, in fact, his
16  requirement, then Hopkins should be -- you
17  know, hang his head in shame for not doing
18  due diligence in this case.
19    THE SPECIAL MASTER: And should
20  Labaton have informed, as class counsel or
21  counsel for the putative class, should
22  Labaton have informed Hopkins of this
23  relationship, the 20 percent relationship?
24    MS. LUKEY: Objection.

Page 105

1    THE WITNESS: No, because nothing in
2  the rules purports to speak to whatever
3  the client's due diligence requirements
4  are.
5    The rules require reasonable
6  communication. The rules require consent.
7  The rules aren't trying to anticipate what
8  every client may need to know or may want
9  to know.
10    So if that is, in fact, a due
11  diligence requirement of Arkansas Teachers
12  here, that's for Arkansas Teachers. The
13  rules only speak to one side of that
14  relationship. They speak to what lawyers
15  have to do.
16    And the rules don't purport to speak
17  to what clients have to do as part of
18  their own obligations to whomever they owe
19  obligations to.
20    THE SPECIAL MASTER: So even if it
21  is a responsibility of the class
22  representative to be informed on these
23  kinds of fee relationships, and
24  particularly here, a fee for which a

Page 106

1 lawyer is going to be performing no work,
2 the lawyer has no responsibility, under
3 Rule 1.5(e), to inform the client of this
4 relationship in obtaining the consent?
5    MS. LUKEY: Objection.
6    THE WITNESS: That is correct,
7 particularly when the client has said, I'm
8 not going there.  I don't want to know
9 about it.
10    The rules are based on a division of
11 responsibility between lawyer and client,
12 and when the client says, I'm satisfied,
13 the lawyer has no obligation to say
14 anything more beyond that.
15    THE SPECIAL MASTER: So, in that
16 sense, the failure would be the client's
17 not to ask and not the lawyer's not to
18 inform?
19    MS. LUKEY: Objection.
20    THE WITNESS: Exactly.
21    THE SPECIAL MASTER: Are you ready
22 for a break?
23    MR. SINNOTT: On the phone, we are
24 going to take a 15-minute break.  So we

Page 107

1 will be back here at 10:45.
2    (Recess taken.)
3    BY MR. SINNOTT:
4 Q.  Professor, I want to pick up on a
5 couple of things just before the break that
6 were discussed in your testimony, and
7 specifically something that was discussed both
8 with myself and with Judge Rosen.
9    Is it your testimony that, once
10 Hopkins said to Belfi, I don't want to know
11 about the division of fees with Chargois, that
12 Labaton's duty to Arkansas was satisfied?
13 A.  Yes.
14 Q.  So your testimony is that Labaton
15 was not obliged to counsel Hopkins on the
16 potential risks or implications to its members?
17 A.  That's right.
18 Q.  No obligation at all?
19 A.  That's correct.
20    THE SPECIAL MASTER: What if, by
21 taking this position, Mr. Hopkins'
22 position, I don't want to know, I don't
23 want to know anything about referral fees,
24 I don't want to know anything about

Page 108

1 division of fees, I don't want to know
2 anything about local counsel or liaison
3 counsel, I don't want to know anything
4 about any of these things, Arkansas, in
5 its role as class representative, was
6 going to be at risk for not being able to
7 perform its duties to the class.
8    MS. LUKEY: Objection.
9    THE WITNESS: That's my testimony in
10 the context of this case with this
11 representative, Hopkins, his knowledge,
12 his experience and the course of dealing
13 between the parties and what he knew.
14    I'm not making this as a general
15 proposition.  I'm just stating that, given
16 what Hopkins knew and his experience
17 working with Labaton, specifically, and
18 monitoring counsel, generally, he
19 reasonably could have decided not to
20 involve himself in the details of the
21 fee-sharing arrangement.
22    THE SPECIAL MASTER: And if, by
23 doing that in this case, in which Arkansas
24 was going to be class representative, if

Page 109

1 by doing that, Arkansas was putting itself
2 at risk of violating duties to the class,
3 Labaton would have no responsibility to
4 inform Hopkins of the nature of the
5 Chargois relationship in order to seek its
6 consent under Rule 1.5(e)?
7    MS. LUKEY: Objection.
8    THE WITNESS: Well, that's kind of a
9 way-out hypothetical, because I think this
10 is a long, long way from the cases in
11 which a lawyer with an ongoing
12 professional relationship with a client
13 may have an obligation to counsel the
14 client about something that it may be
15 doing that may cause it to incur
16 liability.
17    I understand those cases are out
18 there, and there aren't too many of them,
19 actually.  I teach a few of them, and they
20 are kind of increasingly older and
21 outliary cases, but there are cases in
22 which a lawyer would have a duty to a
23 client to basically protect the client
24 from incurring legal liability to someone

Page 110

1  else.  That is true.
2    I just think this is so far from one
3  of those cases that I don't even really
4  know how to answer that question.  It's
5  just a completely different universe, but
6  there are cases in which a lawyer's duty
7  might potentially be to inform a client
8  that, by the way, you have this duty.
9    **THE SPECIAL MASTER:** So the
10  agreement that we're talking about, the
11  retention agreement, is at a relatively
12  early stage in this case, in fact.
13    **THE WITNESS:** You mean the 2011?
14    **THE SPECIAL MASTER:** The 2011,
15  right.
16    **THE WITNESS:** Uh-huh.
17    **THE SPECIAL MASTER:** There's a
18  contemplation, I think you would agree,
19  that Arkansas would be class counsel --
20  I'm sorry -- class representative, and
21  that Labaton would be class counsel,
22  correct?
23    **MS. LUKEY:** Objection.
24    **THE WITNESS:** Yes.

Page 111

1    **THE SPECIAL MASTER:** There was a
2  contemplation that Arkansas would be class
3  representative, yes?
4    **THE WITNESS:** I think so.  I don't
5  know, but I think so.
6    **THE SPECIAL MASTER:** And a
7  contemplation that Labaton would be class
8  counsel, yes.
9    **MS. LUKEY:** Objection.
10    **THE WITNESS:** I think so.
11    **THE SPECIAL MASTER:** Which would
12  then trigger the obligation to
13  Mr. Chargois, under this larger agreement,
14  what we have called the 20 percent
15  obligation.
16    **MS. LUKEY:** Objection.
17    **THE WITNESS:** Well, the obligation
18  to Chargois was there anyway.  So there
19  was an agreement to pay 20 percent of fees
20  that arose out of the relationship between
21  the two law firms.  That's not contingent
22  upon anything -- well, sorry.
23    It's just a general obligation to
24  share fees with Chargois.

Page 112

1    **THE SPECIAL MASTER:** Okay.  But with
2  respect to this specific case, the
3  retention of Labaton by Arkansas in its
4  role as a potential class representative,
5  would trigger the obligation to Chargois
6  in this case.
7    **THE WITNESS:** Correct.
8    **THE SPECIAL MASTER:** Okay.  Now,
9  that's in an early stage, yes?  Because
10  they -- at this point, the case hasn't
11  been filed, right?
12    **THE WITNESS:** Right.
13    **THE SPECIAL MASTER:** What if the
14  nature of Arkansas' obligations change at
15  the point at which the class is certified,
16  and it becomes definite that there is now
17  a certified class, does the nature of
18  Labaton's obligations to inform Arkansas
19  change to more fully tell Arkansas, which
20  is now the class representative, of the
21  nature of this relationship?
22    **THE WITNESS:** I don't have enough
23  information, really, to answer that.  I'm
24  not trying to be evasive.  I just don't

Page 113

1  consider myself a civil procedure expert.
2    And one of the things that I always
3  emphasize when I teach professional
4  responsibility is that these obligations
5  kind of sit on top of other duties.  And
6  so what duties the lawyer owes to the
7  client are provided by some substantive
8  area of law, and then there are
9  professional responsibility obligations on
10  top of that.
11    So in order for me to have an
12  opinion in any meaningful way about what
13  the lawyer's duties would be, I would have
14  to know more than I do about the
15  obligations created under the Rules of
16  Civil Procedure that would be obligations
17  of Arkansas Teachers to the class.
18    I have had this experience, you
19  know, getting burned by not knowing the
20  underlying law of X, and I'm teaching this
21  stuff in class, and there's some smart
22  person in the back who sticks up their
23  hand and says, no, you're totally out to
24  lunch about this.

Page 114

1  So I just don't want to get into
2  speculating about something that I don't
3  know enough about.
4      THE SPECIAL MASTER: Well, I would
5  like you to assume, for purposes of asking
6  that question, and, again, I quickly add,
7  I have not formed an opinion on this, but
8  I would like you to assume that, at the
9  point at which the class is certified and
10  Arkansas is class representative for that
11  class, that, at that point, Arkansas has
12  obligations to the class to be informed on
13  the nature of the fee relationships,
14  including the Chargois relationship, who
15  was being paid in this case 20 percent of
16  Labaton's fees for doing no work.
17      MS. LUKEY: Objection.
18      THE WITNESS: Again, not trying to
19  be difficult, but is that obligation
20  something that a reasonable lawyer doing
21  securities class action work would have
22  reason to know about or is it an
23  obligation specific to that case somehow
24  that the lawyers wouldn't have been able

Page 115

1  to anticipate?  The reason I ask that
2  question is that lawyer's reasonable care
3  obligations, which include all sorts of
4  things, including disclosure and
5  counseling clients, really depend on what
6  a reasonable lawyer should know.
7      This sounds to me like something
8  that is kind of unusual and different in
9  class action practice.  So if something
10  kind of comes up that's new and different,
11  I wouldn't expect the lawyers to
12  necessarily be able to anticipate that.
13      On the other hand, if it were
14  something that is just normal and routine
15  and part of class action practice, then
16  the lawyers should probably be able to
17  anticipate it and would have addressed it
18  earlier.  So I'm just not quite sure what
19  the nature of that duty is.
20      And these cases about advising
21  clients to protect them from the client
22  getting into trouble generally rely upon
23  it being knowable to a reasonable lawyer
24  that the client is going to find itself in

Page 116

1  a situation of legal liability.
2      THE SPECIAL MASTER: Okay.  I'm
3  asking you to assume that, at least at the
4  point -- or just for purposes of
5  answering, at least at the point when the
6  class is certified, that Arkansas would
7  have an obligation to be informed of the
8  Chargois relationship, would Labaton, at
9  this point at least, at that point the
10  class is certified, have a concomitant
11  obligation to inform Arkansas of the
12  nature of the Chargois relationship?
13      MS. LUKEY: Objection.
14      THE WITNESS: Can you just tell me,
15  sorry, is that obligation something that
16  they should have known was going to be
17  Arkansas Teachers' obligation?
18      THE SPECIAL MASTER: If it was
19  important to the obligation of a class
20  representative to know this as part of its
21  responsibilities as class representative,
22  would Labaton have had an obligation then
23  to inform Arkansas of the Chargois
24  relationship?

Page 117

1      MS. LUKEY: Objection.
2      THE WITNESS: And there's case law
3  establishing this duty?
4      THE SPECIAL MASTER: I'm just asking
5  you to assume it.
6      MS. LUKEY: Objection.
7      THE WITNESS: Okay.  But let's craft
8  the hypothetical together.
9      Is there case law, is it clear to
10  the lawyer at the outset that the class
11  representative will have this obligation?
12      THE SPECIAL MASTER: Whether it was
13  clear or should be clear, if it was an
14  important obligation of a class
15  representative to know about this
16  relationship in its role as representative
17  of a class --
18      MS. LUKEY: Objection.
19      THE SPECIAL MASTER: -- should the
20  law firm then know or should the law firm
21  then inform the class representative of
22  the relationship?
23      MS. LUKEY: Objection.
24      THE WITNESS: Okay.  Here's the

Page 118

1 answer that I'm going to give, which will
2 pick up your hypothetical, but I can't
3 modify it beyond this.
4     If and to the extent that it is
5 established that the class representative
6 will have this obligation, then, yes, the
7 law firm may, I'm not saying must, but may
8 have a duty to go back and have a further
9 communication with the client. That's my
10 answer.
11     **THE SPECIAL MASTER:** About the
12 Chargois relationship?
13     **THE WITNESS:** Yes.
14     **BY MR. SINNOTT:**
15 Q. Let me follow up on that, Professor.
16     You talked about Mr. Hopkins being a
17 sophisticated class representative, correct?
18 A. Yes.
19 Q. What have you assumed that George
20 Hopkins knew about the responsibilities of the
21 named class plaintiff to the class?
22     **MS. LUKEY:** Objection.
23 A. Well, I'm assuming that, as someone
24 who has worked with outside counsel in

Page 119

1 securities class actions cases in the past, he
2 understands the nature of those obligations.
3 What exactly those are is something that I
4 don't know, I don't do, but I assume that he's
5 familiar with what is required as being class
6 representative in a securities class action
7 case.
8 Q. So you're making an assumption based
9 on a general category of what an individual
10 placed as he is would know were his
11 obligations?
12     **MS. LUKEY:** Objection.
13 A. Yes.
14 Q. You are not basing it on anything
15 specific in the record, correct?
16     **MS. LUKEY:** Objection.
17 A. That's correct.
18 Q. Let me pick up on that. Page 14 and
19 15, you talk about the ratification by Hopkins.
20     Do you recall discussing that?
21 A. Yes.
22 Q. So it's fair to say that Mr. Hopkins
23 purported to ratify the Chargois arrangement in
24 that affidavit, correct?

Page 120

1 A. Yes.
2 Q. Now, some of this is going to sound
3 a little familiar, but it's a little bit
4 different in this context.
5     Assume, for the purposes of my
6 question, that, at the time George Hopkins
7 signed that affidavit that Arkansas continued
8 as a class representative for the plaintiff
9 class, okay?
10 A. Okay.
11 Q. Does a class representative have a
12 fiduciary duty to the class?
13 A. I believe, based on what I know
14 about class action procedure, the answer is
15 yes, but I'm not an expert in that area.
16 Q. All right. What are the elements of
17 fiduciary duty?
18     **MS. LUKEY:** Objection, only because
19 it's outside his report, not to the form
20 of the question.
21 A. That's also a big and complicated
22 question and something that a bunch of people
23 in the field are actively researching right
24 now.

Page 121

1     The short answer is it varies quite
2 a bit by context. So fiduciary duty is a broad
3 umbrella term. It includes duties of corporate
4 officers and directors, trustees, lawyers to
5 clients. There are all sorts of fiduciary
6 duties.
7     So the precise scope of the duties
8 and their specifications varies by what context
9 we are talking about.
10 Q. So in the context of a class
11 representative and his class, what are the
12 elements of the fiduciary duty?
13 A. I don't know.
14 Q. Before it asked Mr. Hopkins to file
15 his affidavit, do you believe that Labaton, as
16 counsel to Arkansas, had a duty to inform him
17 of the requirements imposed by his
18 organization's fiduciary duty to the class and
19 of any risk to Arkansas in ratifying a
20 $4.1 million payment to Chargois?
21     **MS. LUKEY:** Objection.
22 A. In this case, given his experience,
23 given his position, given that he is a lawyer,
24 no.

In Re:  State Street Attorneys Fees

Page 122

1  Q.  They had no obligation?
2  A.  In this case, under those
3  assumptions.
4  Q.  Do you know if Labaton gave any
5  advice in this regard?
6  A.  I don't.
7  Q.  If they had, would that have
8  affected your opinion?
9      MS. LUKEY: Objection.
10 A.  It would depend on what the advice
11 was, what they were called upon to advise him
12 on.  I don't know.
13 Q.  But you're saying that even if they
14 didn't, doesn't matter, because they weren't
15 obliged to, correct?
16     MS. LUKEY: Objection.
17 A.  Yes.
18 Q.  Let's assume that Judge Wolf has the
19 power to redirect the money that was paid to
20 Chargois to the class which Arkansas
21 represented as a fiduciary, and you would agree
22 that Arkansas represented that class as a
23 fiduciary, correct?
24     MS. LUKEY: Objection.

Page 123

1  A.  Again, based on what I know about
2  class action procedure, yes.
3  Q.  With that in mind, do you have a
4  view on whether Hopkins acted properly as a
5  fiduciary to the class in ratifying the
6  Chargois arrangement?
7      MS. LUKEY: Objection.
8  A.  No.  That's outside my area of
9  expertise.
10 Q.  We know what the benefit would be to
11 the class if that $4.1 million that had been
12 paid to Chargois went to the class, correct?
13     MS. LUKEY: Objection.
14 A.  Yes.
15 Q.  What benefit was there to the class
16 in Hopkins ratifying the payment to Chargois?
17     MS. LUKEY: Objection.
18 A.  This is part of the way a lot of
19 different plaintiff-side representations are
20 structured.  Mass tort cases work this way.
21 Securities class action cases work this way.
22     It's often necessary to combine the
23 functions of finding clients, financing
24 representation, providing legal services.  This

Page 124

1  is all part of what plaintiffs' lawyers do.
2      And it's often divided up among
3  different law firms.  And it's easy, after the
4  fact, to say a referring law firm got a
5  windfall.  But, ex ante, it may make sense for
6  a national law firm to have relationships with
7  referring law firms around the country because
8  they don't have access to the local networks
9  where they would find clients.
10     They don't have the ability to
11 develop clients on their own.  They need to
12 partner with other law firms.
13     This is actually very common in
14 personal injury and mass tort cases and class
15 action representations.
16 Q.  So based on the record in this case,
17 what was the benefit to the class in Hopkins
18 signing the ratification?
19     MS. LUKEY: Objection.
20 A.  Hopkins signing the ratification
21 simply acknowledged an obligation that the law
22 firm already had.
23     The benefit to the class has to be
24 viewed ex ante.  And I'm not trying to be all

Page 125

1  academic on this, but it is true that sometimes
2  things look like a windfall in hindsight, which
3  made sense at the outset.
4      This is a classic problem of
5  contingency fees.  Suppose a lawyer is able to
6  settle a case early on, with less work than a
7  lawyer had anticipated.  It might look like a
8  windfall.  It might look like, wow, the lawyer
9  got paid an effective hourly rate of some big
10 number.
11     But, at the outset, it might have
12 been a reasonable decision to make about the
13 risks that the parties were accepting.
14     Here, you have a referral
15 arrangement entered into with Chargois that I
16 would assume, these are competent lawyers who
17 entered into this agreement, I would assume
18 made sense at the time.  And things changed.
19 Later, there is what seems to be a windfall,
20 but my understanding and what I take Hopkins to
21 be doing is simply saying, look, a deal is a
22 deal.  They had a contract, I'm going to abide
23 by that.
24     That's what I understand him to be

Page 126

1   doing, and there actually is a benefit to the
2   class if you see it from the point of view of
3   what the parties contemplated at the outset.
4   Q.   So who decides what the benefit is
5   to the class?
6        MS. LUKEY: Objection.
7   A.   The lawyers negotiate among
8   themselves about how to divvy up the provision
9   of legal services, and then the law firm
10  negotiates with the client about how the law
11  firm will be compensated, and the law firm and
12  the client representative make a decision about
13  what fee arrangement appears to them to be fair
14  and reasonable.
15  Q.   And you've discussed something that
16  sounds like a process, a discussion. Is that a
17  fair statement?
18  A.   Yes.
19  Q.   And did that discussion take place
20  in this case?
21       MS. LUKEY: Objection.
22  A.   Absolutely.
23  Q.   Tell me how it took place.
24  A.   Well, we have talked about this

Page 127

1   earlier, but it's the series of communications
2   between representatives of Arkansas Teachers
3   and Labaton lawyers about the nature of the
4   services to be provided, whether there would be
5   other law firms involved and whether there
6   would be fee sharing.
7        That, I assume, is only one part of
8   a much larger discussion about setting the fee
9   amount, negotiating about all sorts of other
10  things that I assume were negotiated. They are
11  not part of this issue, so I didn't look at it,
12  but I assume that there were a lot of issues
13  that were discussed between Labaton and
14  Arkansas Teachers.
15  Q.   And it's your testimony that the
16  direct benefit to a class of $4.1 million was
17  outweighed by other benefits?
18       MS. LUKEY: Objection.
19  A.   No. My testimony is that you can't
20  meaningfully evaluate reasonableness in
21  hindsight. You have to look at what risks and
22  responsibilities are allocated among all of the
23  parties at the outset, and these are big,
24  complicated cases, and it can be difficult to

Page 128

1   forecast how everything exactly will shake out
2   in the end.
3        But there are reasonable fees that
4   may be agreed to at the outset which may later,
5   in hindsight, turn out to look like somebody
6   got a windfall, but that's just what happens
7   with contracts. You allocate risks and
8   benefits and sometimes one party does better
9   than the other. That's just the way contracts
10  are. But they have to be evaluated for
11  reasonableness when -- at the time they were
12  entered into.
13  Q.   All right. Let me just ask you to
14  assume that Judge Wolf concludes that Hopkins,
15  and this is a hypothetical, that Hopkins can no
16  longer adequately represent the class at the
17  time he signed this affidavit. So there was no
18  ratification.
19       Assuming that, do any of your
20  opinions change?
21       MS. LUKEY: Objection.
22  A.   I'm sorry. Not to be picky, but do
23  you mean that he decides that Arkansas Teachers
24  can no longer represent the class? Because I

Page 129

1   take it that's the class representative. Or is
2   he making a decision kind of within corporate
3   law about Hopkins' compliance with his duties
4   to his client?
5   Q.   The latter.
6   A.   How does he have the authority to do
7   that?
8   Q.   He has the authority to accept or
9   reject the -- the allocation, and this would be
10  part of that power.
11       MS. LUKEY: Objection. Bill, I want
12  to be clear on the record that we are not
13  contending the ratification by George was
14  for the class. We are only -- it was
15  submitted as ratification for Arkansas,
16  not for the class, in case there was any
17  question about that. I think I said that
18  at the last deposition, but just to be
19  clear.
20       MR. SINNOTT: Yep.
21  A.   Do you want me to keep going? I
22  assume --
23  Q.   Does that change your opinion?
24  That's the question that's outstanding.

Page 130

1  A.  Given what Joan just said, no.
2  Q.  All right.
3      THE SPECIAL MASTER: Could I ask, on
4  this issue of client, once the class is
5  certified, does the class become a client
6  of Labaton?
7      MS. LUKEY: Objection.
8      THE WITNESS: No, the client remains
9  Arkansas Teachers.  The representation of
10  Arkansas Teachers and the duties that are
11  owed to that client are in light of that
12  client's role as representative of the
13  class, but the class does not become a
14  client of the law firm.
15      THE SPECIAL MASTER: Who is, then,
16  the lawyers for the class, if not Labaton?
17  You understand Labaton was lead counsel
18  here.
19      THE WITNESS: I do.  And that's the
20  interesting thing about class action
21  procedure.  Again, what I know about it is
22  that, because of exactly that problem that
23  you identify, there are a lot of
24  procedural protections for the class to

Page 131

1  make sure that the class is treated
2  fairly.
3      There are duties on the part of the
4  class representative.  The district court
5  makes findings about the adequacy of
6  representation.  And there's a supervisory
7  power in the court that is not present in
8  non-class litigation.
9      So there are procedural protections
10  to deal with exactly that problem, which
11  is who is the lawyer for the class.  And
12  the answer is it's dealt with
13  procedurally.  The lawyer's client is the
14  class representative.
15      THE SPECIAL MASTER: So there would
16  be no obligation, then, of Arkansas to
17  be -- I'm sorry.  Let me rephrase it.
18      There would be no obligation of
19  Labaton to inform the members of the class
20  of these kinds of fee arrangements so that
21  the class could make determinations as to
22  whether or not this fee arrangement was in
23  the class' interest?
24      MS. LUKEY: Objection.

Page 132

1      THE WITNESS: Unless there is
2  something about class action procedure
3  that I don't know, there is nothing as a
4  matter of the Rules of Professional
5  Conduct that would create that obligation.
6      THE SPECIAL MASTER: Who's
7  representing the interests of the class,
8  then, before the court?
9      MS. LUKEY: Objection.
10      THE WITNESS: Again, now we are
11  outside my area of expertise again.  But
12  this is exactly why the whole process is
13  designed in the way that it is, to require
14  a lot of review by the court of the
15  adequacy of the class representation to
16  represent the interests of class.  Rule 23
17  has these requirements of the
18  representative, of adequacy and all that.
19      That's meant to take that concern
20  into account.  This is dealt with
21  procedurally by the rules.  It's not --
22  and this is true in a lot of context,
23  actually, in legal ethics, there may be a
24  responsibility someplace out there in the

Page 133

1  system, but that doesn't mean that it all
2  falls on the lawyer to personally satisfy
3  all sorts of other obligations that other
4  actors owe.  So it's dealt with by Rule
5  23.
6      THE SPECIAL MASTER: So for purposes
7  of the Chargois relationship, the
8  20 percent relationship that we have
9  called it, at the time the class is
10  certified, Labaton has no broader
11  responsibilities of providing information
12  to the class than it had before the class
13  was certified.
14      MS. LUKEY: Objection.
15      THE WITNESS: No.  And here I am
16  relying on people who know more about
17  class action procedure than I do, but I
18  believe this is actually completely
19  routine, that arrangements like this exist
20  all the time in class action procedure,
21  and they are never disclosed to the court.
22  They are never inquired into.
23      They are just allowed to be part of
24  the fee arrangement that the class

Page 134

1   representative has with its counsel and
2   it's customary to do it this way.
3      **THE SPECIAL MASTER:** So the class,
4   then, after it's certified, is not
5   Labaton's client.
6      **MS. LUKEY:** Objection.
7      **THE SPECIAL MASTER:** Is that right?
8      **THE WITNESS:** Yes.
9      **THE SPECIAL MASTER:** Is that your
10  understanding?
11     **THE WITNESS:** Yes.
12     **BY MR. SINNOTT:**
13  Q.  Professor, let me show you --
14     **MR. SINNOTT:** And before I ask, have
15  it marked, the document that begins
16  LBS017738, the RFQ, if you will, dated
17  July 30, 2008.
18     (Wendel Exhibit 5, Joint Response by
19  Labaton Sucharow LLP and Chargois &
20  Herron, LLP, dated July 30, 2008, Bates
21  Stamped LBS017738 through 17755, marked
22  for identification.)
23  Q.   And my question is going to
24  reference page 13, but look at the document for

Page 135

1   as long as you need to, to familiarize yourself
2   with it.
3      Have you seen this document before?
4   **A.  I have, yes.  (Perusing.)**
5   Q.  All right.  Professor, I would like
6   you to look at page 13, and section 5.10.  And
7   just for the record, you've seen RFQs in the
8   past and RFPs in the past, correct?
9   **A.  Yes.  Although, in my own practice,**
10  **we didn't deal with government entities.  And**
11  **so I'm not very familiar with government**
12  **procurement procedures.**
13  Q.  Would it be a fair statement, even
14  based on that limited knowledge of procedures,
15  to say that the documents themselves typically
16  contain a series of questions for the applicant
17  to fill in about their firm and their
18  background and their capacity to perform the
19  contract?  Would that be a fair statement?
20  **A.  Yes.**
21     **MS. LUKEY:** Objection, just because
22  it's outside the scope of the report and
23  his expertise.
24  Q.  So looking at 5.10, and indulge me

Page 136

1   while I read this.
2      "Please describe proposed billing
3   arrangements, including contingency fees, for
4   securities litigation.  If other than
5   contingency fees are contemplated, please state
6   the range of hourly billing rates, by
7   timekeeper status (paralegal, first or
8   third-year associate, et cetera, staff
9   attorney, shareholder or partner, of counsel,
10  et cetera) of all attorneys and paralegals
11  proposed for assignment to ATRS matters.  State
12  what discount, if any, to these rates the firm
13  proposes to provide to ATRS.
14     "While this RFQ primarily seeks the
15  services of one lead attorney, the involvement
16  of other firm attorneys may be required from
17  time to time, depending on the matter."
18     So do you see that?
19  A.  Yes.
20  Q.  And would you agree with me that
21  there is a response of Labaton that goes on to
22  the next page, page 14?
23  A.  Yes.
24  Q.   And then there's a response by

Page 137

1   Chargois & Herron that goes onto the next page,
2   and then ends at the bottom of the next page,
3   page 15?
4   **A.  Yes.**
5   Q.  So looking at those responses, where
6   do you see a referral relationship referenced
7   by either Labaton or Chargois & Herron?
8   **A.  It's not in this document.  This is**
9   **just an explanation of the fees that they may**
10  **charge if engaged by Arkansas Teachers**
11  **directly.  This doesn't speak to what ended up**
12  **being the relationship, which is the retention**
13  **of Labaton.  And then it kind of -- I know**
14  **Christa Clark used the term "subcontractor."**
15  **That's not exactly right.**
16     **THE SPECIAL MASTER:** Independent
17  contractor.
18     **THE WITNESS:** Yeah, something like
19  that.
20  **A.  So the relationship that was**
21  **eventually formed isn't really addressed by**
22  **this.  This is just what a direct retention of**
23  **these two firms would -- would look like.**
24  Q.  All right.  So would you agree with

Page 138

1  me that this document, at least with respect to
2  that question, 5.10, on LBS017751, and the
3  responses of Labaton and Chargois on the
4  following pages, does not satisfy 1.5(e)'s
5  requirement that the client be informed that a
6  division of fees will be made?
7      MS. LUKEY: Objection.
8  A.  Well, by itself, no.  But it
9  certainly is part of the conversation that
10 would happen between the client and the law
11 firms.
12     Suppose that they were both retained
13 and, you know, there was a sharing -- one firm
14 billed the client for some amount and shared it
15 with the other, that would be discussed, but
16 this document by itself does not spell out that
17 relationship.
18 Q.  Well, in what conversation did
19 Labaton and Hopkins discuss this RFQ?
20     MS. LUKEY: Objection.
21 A.  Yeah.  No, this is, sorry, getting
22 outside my area of expertise.  But I understand
23 that the RFQ merely qualified the law firm to
24 be available to the state entities, including

Page 139

1  Arkansas Teachers, as counsel.  It got it on a
2  panel, basically, of lawyers, and it was not
3  really contemplated as a retention agreement.
4  It was just basically getting it in the system,
5  so to speak.
6      So once it's in the system, there
7  has to be a further conversation about a
8  particular retention in a particular matter.
9  That's what I'm kind of piecing together based
10 on what I know about this, this process, which
11 isn't that much.
12 Q.  All right.  But my question is, you
13 said that this was part of the conversation.
14     Was it part of the conversation with
15 Hopkins?
16     MS. LUKEY: Objection.
17 A.  Well, it's part of the conversation
18 with Arkansas Teachers.  So Hopkins and Clark
19 and Doane and others are representatives of the
20 client.  You know, organizational clients are
21 funny.  They have legal personhood, but they
22 only act through human person agents.
23     And so there's knowledge imputed to
24 the corporation, the entity here, and how does

Page 140

1  it get that knowledge?  Through human
2  representatives.
3      So this is part of what Arkansas
4  Teachers knows.  It's information that is
5  relevant to the ultimate retention of the firm,
6  but it's not itself a retention agreement.
7  Q.  And you agree it does not refer to
8  referrals or fee arrangements, correct?
9      MS. LUKEY: Objection.
10 A.  Yes.
11 Q.  And when you talk about that
12 conversation, it's your testimony that that
13 conversation need not be with the individual
14 that's making the decision on whether to
15 approve a referral arrangement?
16 A.  Well, it ordinarily would be someone
17 who is responsible for that sort of thing.
18     One could imagine, again, this is
19 all hypothetical, that this is dealt with by
20 somebody in the procurement office or
21 something, and they get the firm qualified as
22 panel counsel, and then, at some point, a
23 representative, let's say an in-house lawyer or
24 the managing director or someone like that,

Page 141

1  comes back to the law firm and says, we want to
2  retain you.
3      Now, I would assume that person
4  would then go back and look at this, and would
5  go back and look through the files they have on
6  this law firm, and they would learn what the
7  organization has to know.  I would assume
8  that's part of the contracting process, but
9  that's on the client side.
10     The law firm deals with the client
11 representative and assumes that person speaks
12 on behalf of the client and within the scope of
13 their authority.
14 Q.  So you're not claiming that Hopkins
15 was ever made aware of this document by
16 Labaton, are you?
17     MS. LUKEY: Objection.
18 A.  I'm assuming that Hopkins looked at
19 it, but I don't know one way or the other.  I
20 would assume that's just part of what he does
21 in retaining a law firm, but I don't know.
22 Q.  You're just making that assumption
23 based on, once again, the position of George
24 Hopkins in Arkansas, correct?

Page 142

1    MS. LUKEY: Objection.
2  A.  Yes, and what one would normally do
3  in a situation like this.
4    MR. SINNOTT: Madam Court Reporter,
5  if I could have this document marked as an
6  exhibit.  And this is an excerpt from the
7  deposition of George Hopkins, dated
8  September 5, 2017, as Exhibit 6.
9    (Wendel Exhibit 6, Excerpt of
10  Deposition of George Hopkins, dated
11  September 5, 2017, marked for
12  identification.)
13  Q.  And, sir, looking at Exhibit 6, if
14  you could direct your attention to page 59, and
15  you will see that, beginning on line 5, I ask
16  Mr. Hopkins a question, "To your knowledge,
17  George, did anyone -- and I'm not looking for
18  anyone who mentioned a name -- but did anyone
19  ever tell you about a referring attorney --
20  Eric or Christopher tell you about an attorney
21  having referred you -- referred them to
22  Arkansas Teachers?"
23    And Hopkins responds, "No," correct?
24  A.  Yes.

Page 143

1  Q.  And then I ask, "And is it fair to
2  say that it's just within the last several
3  weeks that you became aware of a referring
4  attorney?"
5    And Mr. Hopkins responds, "Yes.  But
6  can I speak to that a little bit?"
7    And I said, "Of course."
8    And he says, "In a small state like
9  Arkansas, you've already heard some of the
10  background that I've given that, you know, that
11  it's -- you know, if you're not careful, you
12  end up over there, you know, in somebody's
13  senate office or house office, and people
14  crowding around you, you know, asking you a
15  bunch of questions and trying to persuade you,
16  pressure you to do all those kinds of things."
17    And I believe you referenced
18  Hopkins' concern about people trying to get
19  contracts through him, correct?
20    MS. LUKEY: Objection.  Just for the
21  record, that wasn't the end of his answer.
22    MR. SINNOTT: No.  Okay.
23    MS. LUKEY: It's a long answer.  I
24  understand that.

Page 144

1  A.  I did reference this several-page
2  explanation by Hopkins.  I did mention that
3  earlier, yes.
4  Q.  All right.  Would you agree with me
5  that, as to the question of whether anyone told
6  him about a referring attorney, that his answer
7  was no?
8    MS. LUKEY: Objection.
9  A.  He says that.
10  Q.  I want to go back to something you
11  said earlier in response to my question
12  about -- one of my questions about 1.5(e), and
13  I believe you said that 1.5(e) is satisfied
14  even if the referring law firm is not
15  identified in the request for consent, correct?
16  A.  Yes.
17  Q.  Let me ask you this, and excluding
18  matters in -- where a fee is paid to -- cases
19  in which the fee is paid to a referring
20  attorney, passed on as an expense, can you cite
21  any authority to support that opinion, that
22  1.5(e) is satisfied even if the law firm is not
23  identified in the request for consent?
24  A.  I don't have a case name, but the

Page 145

1  practice in the plaintiffs' personal injury
2  bar, mass tort cases and things like that, is
3  to make reference to outside counsel.  They may
4  or may not be identified.  A law firm may
5  contemplate that it's going to need to retain
6  separate outside counsel for a matter.  It may
7  leave that open ended, because it hasn't yet
8  found the firm that it wants to retain, but it
9  wants to get the client's consent at the outset
10  to the retention of outside counsel.
11    It's just a very common practice to
12  say -- I've seen many, many, many engagement
13  agreements between law firms and their clients,
14  and they will say things like, we may, from
15  time to time, need to retain outside counsel
16  and, you know, we will do so for the purposes
17  of providing specialized expertise or something
18  like that.  That's fairly common.
19  Q.  All right.  Aside from the fact of
20  whether it's common, can you cite a case that's
21  upheld that as being sufficient for 1.5(e) to
22  be satisfied?
23  A.  Well, let's put it this way.  I
24  can't think of a case in which it's held that

Page 146

1  it's not.  So I can't recall doing research
2  on -- and I have done this work in -- not just
3  in this case, but advising clients in other
4  cases -- when I have looked through the
5  Lawyers' Manual on Professional Conduct or the
6  ABA Annotated Model Rules or something like
7  that, I can't recall seeing a case that said
8  because you didn't name the other law firm, the
9  disclosure is not sufficient.
10 Q.  All right.  But the answer to my
11 question, I guess, is no, that you can't cite a
12 case that says that that's sufficient?
13 A.  I can't think of one off the top of
14 my head, no.
15 Q.  All right.  On page 21 of your
16 report, you discuss Massachusetts Rule of
17 Professional Conduct 3.3.
18    And would you agree with me that, in
19 comment 3 to Rule 3.3, it's forbidden -- I'm
20 sorry, 3.3, comment 3 forbids a true statement
21 that's intended to mislead through omission?
22 A.  I think that's a reasonable
23 interpretation of that comment.  And, you know,
24 I picked up on a suggestion in Professor

Page 147

1  Gillers' report with a citation to Bronston,
2  which kind of stands for that proposition in
3  the field, that the comment should be
4  interpreted to regulate kind of literally true,
5  but misleading statements.
6  Q.  Well, in fact, in Bronston, that was
7  a non-responsive statement, wasn't it?
8  A.  Well, Bronston is funny.  The court
9  held that was not a sufficient basis for a
10 perjury conviction.  It's sort of
11 non-responsive, but it's sort of a cute evasion
12 also.  I love teaching this case, because the
13 students kind of split on whether it was
14 non-responsive or evasive or a lie.  It's kind
15 of dancing around the truth.
16 Q.  But, ultimately, he was cleared of
17 that charge, correct?
18 A.  As a matter of federal perjury law,
19 yes.
20 Q.  And I think you were just
21 referencing this.  In his report, Professor
22 Gillers cited two state bar opinions on the
23 application of 3.3.  And in one opinion, these
24 were called half truths.

Page 148

1     Did you read those opinions?
2  A.  I did not read those opinions.  I
3  know the law of half truths, and I certainly
4  teach this stuff.  I don't recall which ones he
5  cited.
6  Q.  Do you agree with this statement, "A
7  representation stating the truth, so far as it
8  goes, but which the maker knows or believes to
9  be materially misleading because of its failure
10 to state additional or qualifying matter, is a
11 fraudulent misrepresentation"?
12    Do you agree with that statement?
13    MS. LUKEY:  Objection.
14 A.  I would never venture an opinion on
15 that proposition in the abstract.  And I'm not
16 trying to be evasive here.
17    What all of these cases reveal, and
18 I know Judge Rosen's case, the DeZarn case, I
19 have taught that case, too, what all of these
20 cases about fraud and Rule 3.3 and perjury and
21 all of this reveal is you have to be extremely
22 attentive to the context.
23    And what the question was and what
24 the answer was, and what was known, I would

Page 149

1  never venture an opinion about something at
2  that level of generality.
3  Q.  So you are not prepared to agree or
4  disagree with that statement?
5  A.  Not at that level of generality, no.
6  Q.  Would you agree that a statement
7  that is a fraudulent misrepresentation through
8  omission, in Massachusetts, also violates Rule
9  3.3(a)?
10    MS. LUKEY:  Objection.
11 A.  Well, Rule 3.3 is only about duties
12 to the court.  Older case law used to talk, and
13 older rules, I think, talk about fraud on the
14 tribunal.  And the rules have moved away from
15 that phraseology and they now talk about false
16 statements of law or fact.
17    So the rule on statements to the
18 tribunal is 3.3(a), and that's the language
19 that I want to use.
20    I don't want to talk about fraud.
21 Now, there is a rule on fraud on the tribunal,
22 and that encompasses things like witness
23 tampering or obstruction of justice.  So there
24 is an incorporation of that, but the false

Page 150

1 statements rule doesn't really use the word
2 "fraud."
3    So I want to talk in terms of false
4 statement of law or fact.
5 Q.  All right.  Would you agree that,
6 with respect to a tribunal, that a fraudulent
7 misrepresentation, or however you want to
8 characterize it, is also a violation of 3.3(a)?
9    MS. LUKEY: Objection.
10 A.  So Rule 3.3(a) says a lawyer may not
11 make a false statement of law or fact.  That's
12 what 3.3 says.
13 Q.  As you may know, but I want you to
14 assume, the notice of pendency to the class
15 informed recipients that, in September, the
16 lawyer's fee petitions would be placed on the
17 website for the State Street FX class action.
18    Assume that this happened, and the
19 petition listed the Lodestar of numerous firms,
20 including customer class counsel.
21    My question is, would it be rational
22 for a class member to conclude, from the fee
23 petition, that only lawyers listed on it would
24 receive a payment from the class recovery?

Page 151

1    MS. LUKEY: Objection.
2 A.  I'm sorry, but I have no opinion at
3 all about what a member of the class might take
4 that to mean.  I honestly have no idea.
5 Q.  All right.  I want you to assume,
6 hypothetically, once again, assume
7 hypothetically that there was no e-mail from
8 Christa Clark and no reference to other counsel
9 in the retention agreement.
10    Is it still your opinion that
11 Labaton would have complied, however
12 imperfectly, with Rule 1.5(e)?
13    MS. LUKEY: Objection.
14 A.  So if the only facts you're changing
15 are no Christa Clark e-mail and no reference in
16 the engagement agreement, we still have the
17 back and forth with Hopkins.  Is that part of
18 the facts I can work with?
19 Q.  Sure.  Tell me, would that be
20 sufficient?
21 A.  In that case, it's sufficient, yes.
22 Q.  So you would have to have that back
23 and forth with Hopkins?
24 A.  You would have to have some

Page 152

1 informing Hopkins of the possibility of a fee
2 sharing, yes, or someone like Hopkins in his
3 position.
4 Q.  I want you to assume,
5 hypothetically, that the court were to conclude
6 that when the Chargois arrangement was entered
7 into, Labaton lawyers never viewed it as a
8 division of fee agreement within the meaning of
9 the applicable division of fee rules in each of
10 the jurisdictions in which Labaton represented
11 Arkansas, and that they never intended to
12 inform Arkansas about the Chargois arrangement.
13    On those assumptions, would Labaton
14 have violated 1.5(e)?
15    MS. LUKEY: Objection.  Again, I
16 don't think it's proper to be inquiring
17 about other jurisdictions.  And I object
18 to the form as well, and the assumptions.
19 A.  So let me make sure I have the facts
20 right, and taking Joan's restriction to
21 Massachusetts, because that is what I'm
22 testifying about, are you asking whether the
23 communications back and forth with Hopkins
24 would have been sufficient if -- I'm sorry.

Page 153

1 This is where I'm not quite sure I understand
2 your question.
3    Are you just varying the subjective
4 beliefs of the Labaton lawyers or the objective
5 facts of this transaction?  And I'm not trying
6 to be academic and difficult.  I honestly don't
7 quite know what the question is.
8 Q.  No.  I will read it again, because
9 it's a long question, but I think those points
10 are clear.
11    Assume hypothetically that the court
12 were to conclude that, when the Chargois
13 arrangement was entered, Labaton lawyers never
14 viewed it as a division of fee agreement within
15 the meaning of the applicable division of fee
16 rules in each of the jurisdictions in which
17 Labaton represented Arkansas, first off.  And
18 that they never intended to inform Arkansas
19 about the Chargois arrangement.
20    Assuming those two hypothetical
21 factors, would Labaton have violated 1.5(e)?
22    MS. LUKEY: Objection.  Again, I
23 must object to the reference to other
24 jurisdictions.  That is not within the

Page 154

1  purview of this investigation.
2     MR. SINNOTT: Thank you.
3  A.  Okay.  I know you say that's clear,
4  but I'm having a hard time.
5     So on the assumption that Labaton
6  believed that it did not have an obligation to
7  disclose this to the client because it didn't
8  fall within Rule 1.5(e), the reason I'm making
9  that assumption is that you said Labaton did
10  not believe it to be a fee division agreement,
11  so if they didn't believe it to be a fee
12  division agreement, they must think it's
13  something else.
14     So if they think it's something
15  else, it must be something like an outside
16  contractor that provides, I don't know,
17  e-discovery service or something like that,
18  let's just say.
19     So if they thought it was something
20  like that, that was not required to be
21  disclosed to the client under Rule 1.5(e), then
22  they didn't disclose it to the client under
23  Rule 1.5(e), they wouldn't have violated the
24  rule.

Page 155

1     Now, I'm not basing that on their
2  subjective belief that it doesn't violate the
3  rule.  I'm just saying that they presumably
4  believed that because it was the sort of thing
5  that wouldn't have to be disclosed.
6     Now, if you are asking me if they
7  just made a mistake, maybe they might have,
8  they might not have, but the record doesn't
9  show that they did.
10     If you are asking if they are
11  mistaken in failing to provide some
12  information, then, yeah, that might happen, but
13  that's not what happened here.
14  Q.  Right.  But I'm asking you to assume
15  that it wasn't a mistake, that Labaton never
16  viewed this as a division of fee agreement, and
17  that they never intended to inform Arkansas
18  about the arrangement.  They never intended to
19  inform Arkansas of the arrangement,
20  hypothetical.
21     MS. LUKEY: Objection.
22  Q.  On those assumptions, would there
23  have been a violation of 1.5(e)?
24  A.  Could I take a look at 1.5(e)

Page 156

1  quickly?
2  Q.  Absolutely.
3     THE SPECIAL MASTER: As it existed
4  in February 2011.
5  A.  (Perusing.)  Okay.  So I take it
6  what you're getting at is the lawyer's mental
7  state, and I'm kind of a hawk on that when I
8  teach this stuff.
9     And there's a very interesting, kind
10  of undiscussed issue in the Rules of
11  Professional Conduct where there's no express
12  mens rea term.  Some rules talk about a lawyer
13  shall not knowingly, a lawyer reasonably should
14  know, or whatever, but there are rules where
15  the mens rea term is silent.  And there's a
16  question whether that's strict liability rule
17  or something else.
18     And my colleague, Nancy Moore, has a
19  really, really interesting article on that.
20  And she says, look, it's not necessarily the
21  case that it's a strict liability rule.  You
22  have to use techniques of statutory
23  interpretation to figure out what the mens rea
24  should be.

Page 157

1     So, here, I don't know.  I honestly
2  haven't thought about it, and I would have to
3  go back and look hard at this to figure out
4  whether this rule means to be a strict
5  liability rule.  Meaning if the fee arrangement
6  has to be disclosed and they didn't disclose
7  it, then they are subject to discipline.
8  That's a strict liability rule.
9     If, on the other hand, the rule
10  should be if they should have known that it was
11  required to be disclosed and they didn't
12  disclose it, that's a negligence rule, and it
13  could be a knowledge rule, too.
14     I honestly don't know what mens rea
15  term should be filled in there.  I haven't
16  thought about it.
17     THE SPECIAL MASTER: So picking up
18  on Bill's point, assuming that when
19  Labaton did this retention agreement in
20  February of 2011 with Arkansas, 1.5(e) was
21  never even in its contemplation, they
22  never considered it, and it was not
23  attempting to comply with Rule 1.5(e) or
24  with Saggese, it was simply a retention

In Re:  State Street Attorneys Fees

Page 158

1  agreement, would your answer still be the
2  same, that there was no obligation to
3  inform the client of the Chargois
4  relationship and the nature of the
5  Chargois relationship?
6      **MS. LUKEY:** Objection.
7      **THE WITNESS:** What I would say to
8  that is the subjective motivations of the
9  lawyer at the time are irrelevant.
10     So I look at engagement agreements
11 all the time.  And there are things in
12 there that I know the law firm's general
13 counsel has put in there because their
14 insurer banged on them about it, or they
15 read a case or something like that, and I
16 bet you nine out of ten partners in that
17 law firm would have no idea why that
18 provision is in the agreement.  It's in
19 there because it has to be, and the law
20 firm is protecting itself, and the lawyers
21 don't subjectively have any view, one way
22 or the other, about what that provision is
23 doing in there.
24     These are objective tests in the

Page 159

1  sense that the client is entitled to a
2  certain amount of disclosure and a certain
3  amount of information.  The client either
4  got it or didn't.
5      And the standard is not what the
6  lawyers meant a particular communication
7  to be.  It is, is there information
8  exchanged back and forth from a kind of
9  objective point of view.
10     I don't mean to impugn lawyers, but
11 the law of lawyering can sometimes be
12 technical, and I don't necessarily think
13 that every engagement partner necessarily
14 understands what every single line of an
15 engagement agreement is meant to do from
16 the point of view of loss prevention or
17 liability or compliance with the rules.
18     **THE SPECIAL MASTER:** So it's an
19 objective test?
20     **THE WITNESS:** Yes.
21     **THE SPECIAL MASTER:** Did the lawyers
22 comply with 1.5(e) or didn't they?
23     **THE WITNESS:** That's right.
24     **THE SPECIAL MASTER:** And their

Page 160

1  intent to comply at the time is not
2  relevant to the inquiry.
3      **THE WITNESS:** Correct.
4      **THE SPECIAL MASTER:** So if, and I
5  will qualify this in just a moment, if
6  Labaton, in fact, had other agreements,
7  retention agreements with Arkansas in
8  other cases in which those jurisdictions
9  did require something more than was
10 required at the time in the Massachusetts
11 rule, and those did not comply with those
12 jurisdictions, and circumstantially that
13 might indicate that Labaton was not
14 looking to comply with 1.5(e) at all, that
15 it was oblivious to it or simply didn't --
16 wasn't concerned with compliance, that
17 would not change your answer because it's
18 an objective test.  They either complied
19 in Massachusetts or they didn't.
20     **MS. LUKEY:** Objection.
21     **THE WITNESS:** That's correct.
22     **THE SPECIAL MASTER:** Okay.
23     **BY MR. SINNOTT:**
24 Q.  Would your analysis be the same for

Page 161

1  7.2(b)?
2      **MS. LUKEY:** Sorry.  What analysis?
3      **MR. SINNOTT:** His reluctance to make
4  that finding.
5      **MS. LUKEY:** I'm sorry.  I don't
6  understand the question, Bill.  Would you
7  state the whole thing?
8      **THE SPECIAL MASTER:** Yes.  You have
9  to state the whole thing for the witness
10 with the preface that you want.
11     **MR. SINNOTT:** I will come back to
12 that in a moment.
13     **BY MR. SINNOTT:**
14 Q.  I want you to assume that Attorney
15 Smith tells Attorney Jones, I'm going to give
16 you 10 percent of any fee I get from a client
17 you recommend.  Nothing in writing.  Client is
18 never told -- no client is ever told about the
19 arrangement.
20     Jones then recommends that the
21 client -- that clients retain Smith.  Smith
22 gives Jones 10 percent of all the fees he gets
23 from those matters.
24     Has Smith violated 7.2(b)?

Page 162

1     MS. LUKEY: Objection.
2  A.  No.
3  Q.  When Arkansas retained Labaton in
4  the State Street matter, the retainer agreement
5  anticipated that it would be a class action
6  with Arkansas as the named plaintiff, correct?
7  A.  (Perusing.)
8  Q.  I believe you answered this one when
9  Judge Rosen asked earlier, but maybe it's
10 slightly different.
11 A.  Well, I get tangled up sometimes in
12 where I have gone with these hypotheticals.  I
13 don't remember whether I said that it assumed
14 that it would be class counsel.  The letter
15 says what it says.
16    THE SPECIAL MASTER: I think I used
17 the word "contemplated."
18    THE WITNESS: Okay.  Contemplated, I
19 can live with.
20 Q.  Okay.  What do you understand to be
21 the obligations of a class representative to a
22 putative class?
23    MS. LUKEY: Objection.
24 A.  I don't know.

Page 163

1  Q.  You don't know.  Okay.
2     What do you understand the
3  obligations of a class representative to a
4  certified settlement class?
5     MS. LUKEY: Objection.
6  A.  I'm not a civil procedure expert.  I
7  don't know.
8  Q.  Okay.
9     THE SPECIAL MASTER: Could I pick up
10 on that?
11    And if you don't know this, then,
12 just say it.  In terms of the procedural
13 posture of this case, do you understand
14 that there were three cases that were
15 consolidated for pre-trial purposes?
16    THE WITNESS: Yes.
17    THE SPECIAL MASTER: Do you
18 understand that two of those cases
19 involved claims of violation of ERISA --
20 of provisions of the ERISA statute?
21    THE WITNESS: Yes.
22    THE SPECIAL MASTER: In one of those
23 cases, you had an institutional class
24 representative called Andover.

Page 164

1     Do you understand that?
2     THE WITNESS: I did not follow the
3  details of the ERISA litigation, so I
4  don't know.  I'm willing to assume that
5  that's the case.
6     THE SPECIAL MASTER: And in the
7  other, what we will call the ERISA case,
8  there were four individuals who were
9  members of -- I will use a word that's
10 going to cause you to pop up here and say
11 it's not a word, but ERISA-fied plans.
12    Do you know what I mean?
13    MS. LUKEY: Objection.
14    MR. SINNOTT: It's a good word.
15    THE WITNESS: I know nothing about
16 ERISA.  I'm willing to assume that there
17 is such a thing as ERISA-fied plans.
18    THE SPECIAL MASTER: Plans covered
19 by ERISA, and these were four individuals.
20    THE WITNESS: Yes.
21    THE SPECIAL MASTER: These three
22 cases were all consolidated for pre-trial
23 purposes.
24    THE WITNESS: Yes.

Page 165

1     THE SPECIAL MASTER: Okay.  The
2  class was then certified at a preliminary
3  hearing after settlement was reached.
4     Do you understand that?
5     THE WITNESS: Okay.  Yes.
6     THE SPECIAL MASTER: And as part of
7  that certified class, there were members
8  of the class that included the named class
9  representatives in the other two classes,
10 Andover and these four individuals.
11    MS. LUKEY: You mean the other two
12 cases?
13    THE SPECIAL MASTER: I'm sorry.
14 Yes, the other two cases.
15    Do you understand that?
16    THE WITNESS: I'm willing to accept
17 it.  I don't have that at my fingertips
18 from having read the background materials,
19 but I'm willing to agree with that.
20    THE SPECIAL MASTER: Okay.  And
21 that, in fact, the application for
22 preliminary approval was triple captioned
23 with these three cases.
24    THE WITNESS: Okay.

Page 166

1     **THE SPECIAL MASTER:** Do you know
2 that?
3     **THE WITNESS:** I'm willing to accept
4 it.
5     **THE SPECIAL MASTER:** Is it your
6 testimony, then, that -- one other fact.
7 Sorry.
8     Labaton was appointed lead counsel
9 for the certified class.
10     **THE WITNESS:** Which of the three
11 certified classes?
12     **THE SPECIAL MASTER:** There were not
13 three certified classes. There was just
14 one settlement class certified.
15     **THE WITNESS:** Okay.
16     **THE SPECIAL MASTER:** That included
17 the named representatives of the other two
18 classes, as well as all the members --
19     **THE WITNESS:** Okay.
20     **THE SPECIAL MASTER:** -- of those
21 what we call the ERISA plans.
22     **THE WITNESS:** Got it.
23     **THE SPECIAL MASTER:** Okay. And now
24 you can assume that Labaton was appointed

Page 167

1 lead counsel of that settlement class. If
2 you want, I can read you the definition of
3 the class.
4     **THE WITNESS:** I'm fine with that.
5     **THE SPECIAL MASTER:** Okay. Is it
6 your testimony that Labaton owed no duty
7 of disclosure, first, to the class
8 representatives of those two ERISA
9 classes, to disclose the Chargois
10 agreement to them?
11     **MS. LUKEY:** Objection.
12     **MR. HEIMANN:** Objection.
13     **MS. LUKEY:** This is outside his
14 area.
15     **THE SPECIAL MASTER:** I want to
16 understand what he knows.
17     **THE WITNESS:** I will tell you
18 exactly what would happen if someone
19 called me and asked me that question. I
20 would walk right next door to my
21 colleague, who is a civil procedure
22 expert, and I would say, hey, Zack, I have
23 a question for you. I have no idea.
24     One thing that I've learned from

Page 168

1 teaching since 1999 is I stay within the
2 lines. I know what I know, and what I
3 don't know, I ask for help.
4     I have no idea, and I wouldn't
5 venture an opinion on that if someone
6 asked me.
7     **THE SPECIAL MASTER:** Okay. Would
8 your answer, then, be the same as to
9 whether or not, first, the class, as a
10 whole, was a client of Labaton?
11     **MS. LUKEY:** Objection.
12     **THE SPECIAL MASTER:** The certified
13 class.
14     **MS. LUKEY:** Objection.
15     **THE WITNESS:** So I don't want to
16 reopen stuff we talked about before, but I
17 do think that it's important to be careful
18 about what is owed and who the client is.
19     The client is who the client is.
20 What the lawyer's duties are may vary by
21 underlying substantive law that I am not
22 expressing an opinion about.
23     So to the extent any of your
24 questions are asking for opinions about

Page 169

1 what Rule 23 or other aspects of class
2 procedure require, I don't know. I am
3 giving an opinion about what the Rules of
4 Professional Conduct require as between
5 Labaton and Arkansas Teachers.
6     **THE SPECIAL MASTER:** But not
7 Arkansas Teachers in its role as class
8 representative and its obligations to the
9 class?
10     **THE WITNESS:** That's right.
11     **THE SPECIAL MASTER:** Okay. Would
12 your answer, then, be the same as to
13 whether or not Labaton, as class lead
14 counsel, owed any duty of disclosure under
15 1.5(e) to the ERISA class representatives?
16     **MS. LUKEY:** Objection.
17     **THE SPECIAL MASTER:** I'm sorry. Let
18 me rephrase it.
19     To the named ERISA class
20 representatives in the other two cases.
21     **MS. LUKEY:** Objection.
22     **THE WITNESS:** Well, not only do they
23 owe no duty, but those parties are
24 separately represented. And so Labaton

Page 170

1  had better not be talking to them,
2  actually.
3      THE SPECIAL MASTER: Would Labaton
4  owe a duty of disclosure to the lawyers
5  for those class representatives in the
6  other two cases --
7      MS. LUKEY: Objection.
8      THE SPECIAL MASTER: -- such that
9  the lawyers could disclose to the ERISA
10  class representatives in those other two
11  cases?
12      MS. LUKEY: Objection.
13      THE WITNESS: No.
14      THE SPECIAL MASTER: Would Labaton
15  owe a duty of full disclosure, and here
16  I'm changing a little bit, and by full
17  disclosure I'm talking about the entire
18  scope of the relationship to its
19  co-counsel for what we have called the
20  customer class, and here I'm specifically
21  referring to the Lieff Cabraser firm and
22  to the Thornton law firm.
23      MS. LUKEY: Objection.
24      THE WITNESS: No.

Page 171

1      THE SPECIAL MASTER: So if the Lieff
2  Cabraser firm and the Thornton firm
3  undertook to share the Chargois fee in
4  equal parts, would Labaton owe a duty of
5  disclosure to those two firms to disclose
6  the full nature of the relationship in the
7  sense of Chargois not performing any work
8  but receiving, as part of an earlier
9  agreement, the 20 percent share?
10      MS. LUKEY: Objection.
11      THE WITNESS: No.  And keep in mind
12  that the rule here protects the client,
13  and it's about the communication with the
14  client, not co-counsel.
15      Co-counsel have communications back
16  and forth.  They make whatever agreements
17  they do, but those aren't governed by this
18  rule, which is about the attorney's
19  relationship with the attorney's client.
20      THE SPECIAL MASTER: So there's
21  nothing -- you're only opining, I gather,
22  on the Massachusetts Rules of Professional
23  Responsibility, right?
24      THE WITNESS: That's correct.

Page 172

1      THE SPECIAL MASTER: Okay.  So there
2  is nothing in the Massachusetts Rules of
3  Professional Responsibility that would
4  require Labaton to fully disclose the
5  nature of its relationship with Chargois
6  and specifically the fact that Chargois
7  was doing no work on this case to Lieff
8  and Thornton, despite the fact that they
9  had agreed, or they were agreeing, to
10  share in the fee?
11      MS. LUKEY: Objection.
12      THE WITNESS: That's correct.
13      THE SPECIAL MASTER: Is it within
14  your area of expertise to opine on legal
15  obligations between lawyers outside the
16  Rules of Professional Conduct?
17      MS. LUKEY: Objection.  Do you mean
18  like contract obligations?
19      THE SPECIAL MASTER: Or other legal
20  obligations.
21      We are trying to conduct a
22  deposition here.  You are not on mute,
23  Linda.
24      MR. SINNOTT: Linda, could you put

Page 173

1  it on mute, please?
2      MS. HYLENSKI: It's not me.
3      (Discussion off the record.)
4      THE WITNESS: No, in answer to your
5  question.  I would not consider myself an
6  expert on contract law or, for example,
7  there are people who write about intra
8  firm duties that, you know, associates owe
9  the firm or whatever.  I don't consider
10  myself an expert on that.
11      THE SPECIAL MASTER: So you're not
12  here to testify upon the obligations that
13  Labaton, as lead counsel, would have had
14  to its co-counsel and what we've referred
15  to as the customer class, or to the
16  lawyers in the ERISA, representing the
17  ERISA members in the other two cases?
18      THE WITNESS: That's right.
19      BY MR. SINNOTT:
20  Q.  Let me ask some similar sounding
21  questions, but unrelated to duties of
22  communication to disclosure or contract law.
23      Are conflicts of interest within
24  your area of expertise?

Page 174

1 A. Yes.
2 Q. All right. Let's assume that Judge
3 Wolf, had he been informed of the Chargois
4 arrangement, could have disallowed the payment
5 to Chargois and ordered that the money,
6 instead, be awarded to the class.
7     Assume that he had that authority.
8 What interest, if any, did the members of the
9 settlement class have in preferring that
10 Chargois & Herron get the money instead?
11     MS. LUKEY: Objection.
12 A. I don't see that as a conflict of
13 interest issue. It's a question about whether
14 a lawyer could reasonably conclude, on behalf
15 of a client, that there was something
16 potentially beneficial to the representation of
17 affected institutions in having a network of
18 referral relationships with local law firms.
19     That's not a conflict. That's
20 really a question of is it worth it to have
21 these referral relationships, and that's just a
22 question of the lawyer's judgment in entering
23 into these referral arrangements.
24     It doesn't -- it doesn't really hang

Page 175

1 on the conflict of interest rules in any way.
2 Q. Let me ask another question. Assume
3 further that the customer class counsel
4 represented the class before Judge Wolf after
5 certification of the settlement class. In
6 other words, I want you to assume, as a matter
7 of law, that the class was the client of
8 Labaton, Lieff and Thornton.
9     On that assumption, did these firms
10 have any responsibilities to try to secure the
11 Chargois payment for the benefit of their
12 client, the class?
13     MR. HEIMANN: Objection.
14 Q. Rather than for Chargois?
15     MS. LUKEY: Objection.
16 A. Are you asking whether they should
17 have tried to get out of a contractual
18 obligation that they had entered into with the
19 Chargois & Herron firm?
20 Q. Well, I'm asking you whether they
21 had a responsibility to do that.
22     MS. LUKEY: Objection.
23 A. Boy, I would never want to say that
24 a law firm has an obligation to try to get out

Page 176

1 of a contract it had. It might choose to do
2 so, but that's certainly not an obligation that
3 the firm has.
4 Q. So is it your testimony that
5 agreements between lawyers supersede
6 responsibilities to a class?
7     MS. LUKEY: Objection.
8 Q. Or to a client?
9     MS. LUKEY: Objection.
10 A. No. My testimony is a deal is a
11 deal. I don't want law firms believing they're
12 duty bound to try to break contracts. That's a
13 really terrible thing to think that law firms
14 ought to do.
15     I'm not saying it's a super session
16 issue. It's just that they have this deal and
17 it's a deal. They stand by it.
18     It seems kind of perverse to say,
19 oh, the rules of legal ethics require me to try
20 to break contracts. I would never conclude
21 that.
22     THE SPECIAL MASTER: Could I
23 interject a question here? You may have
24 answered this, but I want to give you

Page 177

1 another opportunity, okay?
2     Assume that the class members, after
3 certification of the class, were Labaton's
4 clients. I want you to assume that, okay?
5     Would Labaton have had an
6 obligation, then, to inform the class, as
7 its clients, of the Chargois relationship?
8     MS. LUKEY: Objection.
9     MR. HEIMANN: Objection.
10     THE WITNESS: So this is something
11 that comes a lot when you teach the rule
12 on organizational relationships and
13 client's Rule 1.13. And, you know, for a
14 while there, there was an idea that you
15 may have an obligation to a group or to an
16 agglomeration of individuals somehow. And
17 it's still sometimes the case that, with
18 small, informal organizations, a lawyer
19 may have an obligation to the group.
20 That's an extremely scary and dangerous
21 situation to be in and wise lawyers avoid
22 it if at all possible.
23     But with respect to just about any
24 other kind of organization you can

In Re: State Street Attorneys Fees

William Wendel
April 3, 2018

Page 178

1  imagine, there is a law constituting that
2  organization and setting out lines of
3  authority.  And the obligation under Rule
4  1.13(a) is you follow the lines of
5  authority.
6      And I teach this from day one when
7  we do corporate representation.  You know,
8  don't start trying to take into account
9  the interests of all the members of some
10  organization.  Go by chain of command.
11  And that's to prevent lawyers from getting
12  stuck between, you know, conflicting
13  obligations.
14      So now is where I have to go next
15  door to my colleague and ask what class
16  action procedure establishes as the chain
17  of command.  I would find out what that
18  requires, and I would say to the law firm
19  to go through chain of command.
20      Don't see yourself as having an
21  obligation to something called the group
22  or the class.  That's really dangerous.
23      So -- and, you know, again, how that
24  procedure works, I don't know for sure.

Page 179

1  I'm more comfortable thinking that through
2  in the corporate context, because I have
3  read those cases and taught them a lot,
4  but the basic principle is the same.
5  There's a line of authority established.
6  Work through it.
7      **THE SPECIAL MASTER:** You're making
8  my question a little more complex than it
9  needs to be.
10      I'm asking you to assume that the
11  class members were Labaton's clients.  We
12  can go through the record.  There are
13  portions -- parts in the record in which
14  both Labaton lawyers and other lawyers
15  make statements that they recognize the
16  ERISA people as their clients, maybe not
17  solely their clients, maybe clients of
18  others as well, but as their clients.
19      But what I want you to assume, just
20  for purposes of this question, is that
21  once the class was certified, the class
22  was -- the class members were Labaton's
23  clients.
24      **MS. LUKEY:** Objection.

Page 180

1      **THE WITNESS:** I don't think I'm
2  trying to overcomplicate this.  It's like
3  saying, imagine that Citibank shareholders
4  are your clients.
5      You know, in a manner of speaking,
6  that may be true, and I think lawyers who
7  represent corporate clients sometimes
8  think all these shareholders are our
9  clients.  And that may be true as a manner
10  of speaking, but in terms of
11  operationalizing duties that are owed, you
12  have to look at who is empowered to speak
13  and act on behalf of this group, Citibank
14  shareholders or the class.
15      I'm really trying to simplify, not
16  complicate this, actually.  Because if you
17  have duties to the class in this general
18  sense, then you could conceivably have
19  duties to all kinds of different people or
20  entities, and they might conflict.  And
21  the same is true of Citibank shareholders,
22  which is why there are procedures for
23  figuring out who's authorized to act on
24  behalf of that group.

Page 181

1      If a law firm ever were in a
2  situation where it laterally had duties to
3  a hundred different people, I would say
4  withdraw immediately.  It's dangerous.
5      But that's why it's only a manner of
6  speaking to say the duty is to the class.
7  That's just kind of a way of thinking
8  about who ultimately has the legal
9  entitlements that the law firm is
10  representing.
11      But that's only a manner of
12  speaking.  It's not the way that duties
13  actually ever get worked out under the
14  Rules of Professional Conduct.
15      **THE SPECIAL MASTER:** Assume that
16  Labaton viewed, in this case, the ERISA
17  class members as their clients.  Assume
18  that.
19      Did they, then, have an obligation
20  to disclose the Chargois relationship to
21  the ERISA class members?  Or at least to
22  their lawyers so that their lawyers could
23  then inform them?
24      **MS. LUKEY:** Objection.

Page 182

1    THE WITNESS: So, again, I think
2  this has got to be only understood as a
3  manner of speaking. And I don't think a
4  literal lawyer/client relationship gets
5  established by the certification of that
6  settlement class to include the ERISA
7  class members such that all sorts of other
8  obligations under the Rules of
9  Professional Conduct attach to that class.
10    Now, if someone, who is an expert in
11  class action law can tell me, oh, yes,
12  they become actually literally clients of
13  the law firm for conflicts purposes, for
14  confidentiality, all that kind of stuff,
15  then I think class action procedure would
16  have to be remade in a lot of ways.
17    I think it would be very, very
18  complicated to work out how the Rules of
19  Professional Conduct intersect with that.
20    So if that were the case, then I
21  think a whole lot of things would be
22  different. I really just don't know how
23  to think about it in that case.
24    THE SPECIAL MASTER: So if there's

Page 183

1  no obligation of Labaton to the class as
2  the client or to the ERISA members of the
3  class and their lawyers to inform them,
4  and the ERISA members of the class
5  interests diverge from the class
6  representative, Arkansas, how does the
7  class get protected?
8    MS. LUKEY: Objection.
9    THE WITNESS: Well, that's an issue
10  that I only know a little bit about from
11  having taught cases involving classes with
12  subclasses and things like that. And that
13  starts to get very complicated and law
14  firms find themselves in tricky situations
15  sometimes.
16    The answer may be that the court
17  supervision is adequate to deal with that.
18  The answer may be that you might need to
19  appoint separate counsel for subclasses.
20  Again, this is more of a class action
21  procedure issue than I'm comfortable
22  talking about.
23    I do know enough that, when I get
24  into this area, I slow down and talk to

Page 184

1  people who know something about this and
2  collaborate. I would talk to people who
3  know something more about class action
4  procedure than I do to answer that
5  question.
6    THE SPECIAL MASTER: So you're
7  simply not able to answer the question.
8    THE WITNESS: That's correct.
9    THE SPECIAL MASTER: It's not within
10  your area of expertise.
11    THE WITNESS: Well, you know, look,
12  my area of expertise is what it is, but I
13  also believe in collaborating with people
14  who know more than I do about other
15  things, and I don't want to go off, you
16  know, half cocked on a class procedure
17  when I wouldn't do it if I were advising a
18  client.
19    You know, I would associate with
20  somebody who's an expert in this area.
21    THE SPECIAL MASTER: I'm just trying
22  to understand what your view is on who
23  protects class members where the specific
24  class members may have divergent interests

Page 185

1  from the class representative and from
2  lead counsel, and those class members are
3  not given information about something that
4  they might object to. Who protects them?
5    MS. LUKEY: Objection.
6    THE WITNESS: So my view about that
7  is it is probably dealt with in all of the
8  litigation that goes into and all of the
9  hearings and all of the submissions that
10  go into selecting class counsel and
11  identifying class representatives for
12  representativeness and all of that.
13    I am confident that there is an
14  answer in Rule 23 someplace. I just don't
15  know what it is.
16    THE SPECIAL MASTER: What if the
17  court is told, we can represent everybody
18  in this class?
19    MS. LUKEY: Objection.
20    THE WITNESS: Well, I'm pretty sure
21  that's not how it works. I assume there's
22  more than just a kind of bare assertion.
23    THE SPECIAL MASTER: Assume there is
24  an assertion at several points that these

Page 186

1  are our clients, we can represent
2  everybody.
3      MS. LUKEY: Objection.
4      THE WITNESS: My point is there's
5  more than an assertion. There's a record.
6  There's a lot of submission. And I assume
7  that the court has enough to go on to make
8  that decision.
9      BY MR. SINNOTT:
10 Q.  Professor, on page 10 of your
11 report, footnote 8, you write that, "Although
12 it became apparent that Chargois' total
13 contribution would be limited to the initial
14 assistance in introducing Labaton to ARTRS,
15 Chargois maintained that he was entitled to
16 20 percent of any fee earned by Labaton," and
17 there's some Bates and transcript references.
18     The footnote then goes on to say,
19 "Chargois intimated that he would seek legal
20 redress to vindicate his perceived contractual
21 rights if necessary." And there are more
22 cites.
23     And then it says, "Labaton was
24 concerned by the possibility of litigation in

Page 187

1  Texas state court."
2      Did I accurately read that outside
3  of the references --
4  A.  Yes.
5  Q.  -- the citations?
6      Did Labaton have a conflict of
7  interest between the interest of the certified
8  class on the one hand and its own interest in
9  wishing to avoid a lawsuit in Texas state court
10 by Chargois?
11     MS. LUKEY: Objection.
12 A.  Well, I don't want to talk about
13 duties to a certified class. I'm not accepting
14 that formulation of what their obligations are.
15 They have duties to Labaton as their client.
16     On that assumption, however, there's
17 no conflict between the duties they owe to
18 Labaton and the concern for --
19 Q.  Do you mean to Arkansas?
20 A.  Sorry, sorry, sorry. Arkansas, yes.
21     There is no conflict between duties
22 they owe to Arkansas Teachers and their own
23 interests because they are not trying to
24 protect a purely personal interest. They are

Page 188

1      acting pursuant to a contractual obligation
2      that they have to Chargois.
3          They are simply saying the contract
4      requires this. We owe this obligation under
5      the contract.
6  Q.  So you're saying there is no
7      conflict with respect to Arkansas, and you
8      can't give an opinion as to whether there was a
9      conflict with the certified class?
10         MS. LUKEY: Objection.
11 A.  That's right.
12         MS. LUKEY: Slow down.
13 Q.  Can a finding that a class
14 counsel -- strike that.
15     Can a finding that class counsel
16 labored under a conflict between the interest
17 of the class and their own interest support a
18 financial sanction in the exercise of a
19 district judge's discretion?
20         MS. LUKEY: Objection.
21 A.  The sanctions that are available for
22      conflict of interest are generally limited to
23      whatever is necessary to rectify the impact of
24      that conflict on the trial process.

Page 189

1          So there actually are tons of
2      inherent power cases involving the trial
3      court's authority to disqualify counsel for a
4      conflict of interest.
5          It's well established that that is
6      about ensuring the integrity of the trial
7      process. It's not really a disciplinary
8      process. It's not really about enforcing
9      duties that the law firm has to a client. It's
10     really just about maintaining the integrity of
11     the process.
12         So the district court would not have
13     authority in this case to order financial
14     penalties for a conflict of interest.
15 Q.  Do you agree with the statement "A
16 competent lawyer representing a class
17 representative in a putative or certified class
18 action should advise the client on his
19 obligations, including his fiduciary
20 obligations to the putative or settlement
21 class"?
22         MS. LUKEY: Objection.
23 A.  At that level of generality, that's
24      just kind of a truism. A lawyer has an

Page 190

1  obligation to effectively represent the client.
2  And if the client seeks advice on some matter,
3  the lawyer should provide effective advice.
4      If the lawyer reasonably should know
5  that the client needs protection, the lawyer
6  should provide it, but that's just saying that
7  a lawyer has an obligation of reasonable care.
8  And so, yes, I agree with that.
9  Q.  All right.  And I believe this was
10 part of what you just stated on your own, but
11 you agree that, in that situation, the lawyer
12 must protect the client against claims that the
13 client violated his fiduciary or other duties
14 to the class?
15     MS. LUKEY: Objection.
16 A.  No, that's not what I said.
17 Q.  All right.  Could you clarify?
18 A.  What I said is that the lawyer has
19 an obligation to provide reasonably competent
20 assistance.
21     Now, as a subset of that, there may
22 be a case in which the lawyer knows that the
23 client is about to incur liability, let's just
24 say to some third party or something, and the

Page 191

1  client doesn't realize that the client is going
2  to incur liability, and this activity is within
3  the scope of representation, there may be,
4  although this is a little bit tricky, there may
5  be situations in which a lawyer has to provide
6  advice to prevent the client from incurring
7  legal liability.
8      But, again, I don't want to do this
9  at a very high level of generality.  It's kind
10 of meaningless.
11 Q.  But I believe you used the
12 expression previously, and I didn't hear it in
13 your clarification that the lawyer must protect
14 the client, correct?
15     MS. LUKEY: Objection.
16 A.  The reason you didn't hear it in my
17 clarification is because I think, stated at
18 that high level of abstraction, it's not really
19 a meaningful principle.
20     It's -- yeah, it's true in the sense
21 that, you know, a lawyer has got to be a good
22 lawyer, but what's interesting is what does
23 that actually mean?  What specific duties does
24 that entail?  And that's going to depend on the

Page 192

1  facts.
2  Q.  So under the facts, assuming that
3  the facts were that Mr. Hopkins might be
4  considered to have a violated his fiduciary or
5  other duties to Arkansas, is it your testimony
6  that that's too abstract to opine on whether
7  the law firm advising Hopkins had a duty to
8  advise him as to that risk?
9      MS. LUKEY: Objection.
10 A.  Yes, it is too abstract.  You would
11 need to specify in what respect he allegedly
12 violating his duties, to whom, why, what does
13 the law firm know about this, what should the
14 law firm know about this, is there a duty of
15 inquiry, is there a duty of taking
16 responsibility for this aspect of Hopkins'
17 duties to his employer.  Those are all things
18 that would have to be specified before I could
19 say anything meaningful about that.
20     THE SPECIAL MASTER: Could I ask
21 you, you referred earlier in our colloquy
22 to the lawyer's obligation of explanation
23 in procuring a client's consent.  And I
24 think you said that it was necessary to

Page 193

1  explain to the client or to make the
2  client aware sufficiently to permit the
3  client to make informed decisions
4  regarding the representation; is that
5  right?
6      MS. LUKEY: Objection.
7      THE WITNESS: I want to be very
8  careful here, because we went off on a
9  whole bunch of tangents about informed
10 consent.
11     So if we're talking about a decision
12 that is governed by the informed consent
13 requirement, so let's just take an example
14 like conflicts of interest, which clearly
15 are governed by the requirement of
16 informed consent, then the burden is on
17 the lawyer to ensure that the client has
18 adequate knowledge of the risks, benefits
19 and alternatives, if we are in an informed
20 consent context.
21     THE SPECIAL MASTER: Okay.  And is
22 it your testimony that 1.5(e) is not an
23 informed consent context?
24     THE WITNESS: That is correct.

Page 194

1    THE SPECIAL MASTER: So under
2  1.5(e), there is no obligation to explain
3  a matter to the client, Arkansas, to the
4  extent reasonably necessary to permit
5  Arkansas to make informed decisions
6  regarding representation; is that right?
7    MS. LUKEY: Objection.
8    THE WITNESS: So I'm going to fall
9  back on the language of Rule 1.5(e), which
10 says the client has to consent to the
11 joint participation.
12   So that really could be just a
13 matter of the client knows that there's a
14 joint participation. It's all the rule
15 requires. It's considerably less than
16 informed consent.
17   THE SPECIAL MASTER: You are
18 familiar with Rule 1.4?
19   THE WITNESS: Sure.
20   MS. LUKEY: Your Honor, if I may,
21 respectfully --
22   THE SPECIAL MASTER: Massachusetts
23 Rule 1.4.
24   MS. LUKEY: It appeared that the

Page 195

1  questions were being provided by Professor
2  Gillers, and, for the record, we object to
3  the use of, presumably, an independent
4  expert for that purpose.
5    THE WITNESS: Did you ask if I'm
6  familiar with Massachusetts Rule 1.4?
7    THE SPECIAL MASTER: Yes.
8    THE WITNESS: Yes.
9    THE SPECIAL MASTER: Okay. So is it
10 your testimony, then, that Massachusetts
11 Rule 1.4(b), which requires that a lawyer
12 explain a matter to the extent reasonably
13 necessary to permit the client to make
14 informed decisions regarding the
15 representation, is it your testimony that
16 that does not apply to Rule 1.5(e)?
17   THE WITNESS: No. It does apply to
18 the lawyer/client relationship generally,
19 but it doesn't get you all the way to the
20 level of informed consent.
21   So Rule 1.4 is a tailored contextual
22 rule. It says reasonable, as reasonably
23 necessary. That may vary quite a lot,
24 depending on what the client already

Page 196

1  knows, the client's level of
2  sophistication, the client's preferences
3  regarding involvement in the decision
4  making.
5    So one of the things that I teach
6  when I teach the communication rule is one
7  of the benefits clients get from hiring
8  lawyers is they don't have to be involved
9  in all these decisions. They can offload
10 that to the lawyer and say, here, you deal
11 with it. That's your problem.
12   And that's reasonable. So
13 reasonable communication has to be
14 understood in that context.
15   And so reasonable communication here
16 means just that, reasonable under the
17 circumstances. It doesn't shift the
18 burden. It just means that the lawyer has
19 to provide whatever communication is
20 reasonable under the circumstances.
21   THE SPECIAL MASTER: So I want to
22 understand. Is Rule 1.4(b) read into Rule
23 1.5(e)?
24   THE WITNESS: I wouldn't say --

Page 197

1    MS. LUKEY: Objection.
2    THE WITNESS: I wouldn't say it's
3  read into. I would say they both state
4  duties that apply in connection with
5  forming a lawyer/client relationship and
6  negotiating a fee agreement.
7    THE SPECIAL MASTER: So, in this
8  particular retention agreement that we are
9  talking about between Labaton and
10 Arkansas, does 1.4(b) apply?
11   THE WITNESS: Yes.
12   THE SPECIAL MASTER: Okay. I take
13 it from your previous answers, and now
14 this answer, that you believe that Labaton
15 sufficiently explained the Chargois
16 relationship to the extent it was
17 reasonably necessary to permit Arkansas to
18 make informed decisions regarding the
19 representation?
20   THE WITNESS: Yes. Although I think
21 you put the word "informed" in there.
22   THE SPECIAL MASTER: That's because
23 it's in the rule.
24   THE WITNESS: So to make fully

Page 198

1 informed decisions. I just want to make
2 sure that we don't --
3 **THE SPECIAL MASTER:** It's in the
4 rule.
5 **MS. LUKEY:** It's in 1.4.
6 **THE SPECIAL MASTER:** 1.4(b).
7 **MS. LUKEY:** Not in 1.5(e).
8 **THE SPECIAL MASTER:** Correct.
9 **THE WITNESS:** Right. And the
10 question you just asked me, the answer is
11 yes. I just want to make sure we are
12 clear that we are not up to the informed
13 consent level, which is a different
14 animal.
15 **THE SPECIAL MASTER:** I'm not sure,
16 with all that back and forth, we got the
17 clear answer. So let me restate the
18 question and the answer.
19 The question was, you believe that
20 the information that Arkansas had at the
21 time that it signed the retention
22 agreement, that Labaton had sufficiently
23 explained the matter to the extent
24 reasonably necessary to permit Arkansas to

Page 199

1 make informed decisions regarding the
2 representation.
3 **THE WITNESS:** Yes.
4 **THE SPECIAL MASTER:** Okay. Now, I
5 want to go back to my earlier question
6 about the class as clients.
7 I want you to assume that the class
8 was a client of Labaton. I want you to
9 assume that. Did Labaton satisfy its
10 obligation to the class to explain the
11 Chargois relationship to the extent
12 reasonably necessary to permit the client,
13 the class members, to make informed
14 decisions regarding the representation?
15 **MS. LUKEY:** Objection.
16 **MR. HEIMANN:** Objection as well.
17 **THE WITNESS:** Okay. My answer is
18 going to be based on the assumption that
19 there is procedure and there's chain of
20 command. And that Arkansas Teachers is
21 the class representative.
22 If that turns out not to be right as
23 a matter of class action law, you can
24 disregard this opinion but on the

Page 200

1 assumption that that is the procedure for
2 communicating with the class, then my
3 answer is yes.
4 **THE SPECIAL MASTER:** That Arkansas
5 had sufficient information, as class
6 representation, to be informed of the
7 matter to the extent reasonably necessary
8 to permit the client, the class, to make
9 informed decisions regarding the
10 representation in this case, Labaton's
11 representation as lead counsel of the
12 class?
13 **MS. LUKEY:** Objection.
14 **MR. HEIMANN:** Objection.
15 **THE WITNESS:** Yes.
16 **THE SPECIAL MASTER:** Okay. Again, I
17 want you to assume that the class and its
18 members, including the ERISA plans and the
19 ERISA individuals as well as all other
20 members of the plans were clients.
21 **MR. HEIMANN:** Your Honor, can we
22 have a continuing objection to any
23 question that includes the notion that the
24 class members were clients of these law

Page 201

1 firms?
2 **THE SPECIAL MASTER:** Sure.
3 **MR. HEIMANN:** Thank you.
4 **MS. LUKEY:** I may assert it, anyway,
5 but fine.
6 **MR. KELLY:** Same for us as well, for
7 Thornton.
8 **MS. LUKEY:** Your Honor, just
9 respectfully, a reminder, with the time
10 constraints, that the next witness is
11 here, Professor Joy. He has e-mailed that
12 he is sitting outside.
13 **THE SPECIAL MASTER:** We are at 18
14 minutes to one.
15 **MS. LUKEY:** Right.
16 **THE SPECIAL MASTER:** When the class
17 was certified under 1.4(a), did Labaton
18 have an obligation to promptly inform the
19 client, by this I am talking about the
20 class representatives here or including
21 the ERISA -- including the ERISA members
22 of the class, of the circumstance of the
23 Chargois relationship?
24 **MS. LUKEY:** Objection.

Page 202

1    THE SPECIAL MASTER: Under 1.4(a).
2    MS. LUKEY: Objection.
3    THE WITNESS: I'm going to answer I
4  don't know, because your question depends
5  on assumptions about things that I just
6  don't know whether they even happen.  So
7  I'm just going to say I don't know.
8    THE SPECIAL MASTER: Okay.
9    BY MR. SINNOTT:
10 Q.   And let me just follow up.
11   You agreed with Judge Rosen that
12 Labaton reasonably explained its relationship
13 with Damon Chargois to George Hopkins, correct?
14   MS. LUKEY: Objection.
15 A.   Yes.
16 Q.   In the course of your review of --
17 strike that.
18   And I believe earlier you testified
19 that you inferred from Hopkins' experience that
20 he was a sophisticated player, if you will; is
21 that correct?
22   MS. LUKEY: Objection.
23 A.   Yes.
24 Q.   All right.  In the course of

Page 203

1  reviewing this matter for purposes of writing
2  your report, were you shown a series of e-mails
3  in which Eric Belfi blind copied Damon Chargois
4  on his communications with -- certain
5  communications with George Hopkins?
6  A.   I don't specifically remember that.
7  Q.   For example, on May 10, 2010,
8  LBS018439, Chargois & Herron were blind copied
9  on an e-mail from Belfi to Hopkins concerning a
10 blue ribbon report for Goldman Sachs
11 litigation.
12   Does that refresh your memory at
13 all?
14 A.   Unfortunately, it doesn't.  I
15 reviewed a lot of e-mails.  I don't
16 specifically recall that e-mail now sitting
17 here.
18 Q.   And do you recall an e-mail on May 6
19 of 2010, LBS017505 -- and, by the way, these
20 are cited on page 39 of Professor Gillers'
21 report, and in that one, Tim Herron was blind
22 copied on an e-mail from Belfi to Hopkins
23 updating him on the status of the Hartford
24 securities litigation.

Page 204

1    Do you remember seeing that one?
2  A.   I don't.  I'm sorry.
3  Q.   And LBS018437 to 438, a May 15 and
4  16, 2010 e-mail chain from Hopkins to Belfi
5  concerning the potential joint filing of a case
6  with Nix Patterson, which was forwarded by
7  Belfi to Chargois without any copy to Hopkins.
8    Do you remember seeing that?
9  A.   I don't.  Sorry.  The e-mails all
10 were among the first things I reviewed, and
11 then I read a bunch of deposition transcripts.
12 And I'm sorry, I'm just blanking on it right
13 now.
14 Q.   Well, rather than read the other
15 several bullets, did you read these particular
16 e-mails, a series of e-mails in which Belfi
17 blind copied Chargois or Chargois & Herron on
18 communications with client, George Hopkins?
19   MS. LUKEY: Objection.
20 A.   I believe I did, but could you
21 explain the significance of that for my
22 opinion?  I would be happy to answer a question
23 if you kind of fill in the facts what this is
24 driving at.

Page 205

1  Q.   Let me just lay the foundation first
2  by asking if you --
3  A.   Yes, I did.
4  Q.   You did read those.
5    And it's fair to say that there were
6  seven, I believe, in the record conversations
7  in 2010 and 2013 in which communications with
8  Hopkins were either forwarded without Hopkins
9  being cc'd on the forwarding or in which
10 Chargois or Chargois & Herron were blind
11 copied?  Do you recall seeing those?
12   MS. LUKEY: Objection.  He said he
13 recalled generally.  You're asking if he
14 specifically recalled seven in those two
15 years?
16 Q.   Approximately seven?
17   MS. LUKEY: Objection.
18 A.   That sounds right.  And I think I
19 see what you're driving at.  He's blind copied,
20 and you're saying he should be face copied so
21 that Hopkins can see that Chargois is out there
22 someplace?
23 Q.   Is that what you believe?
24 A.   No, I don't believe that.  Because

Page 206

1 Hopkins has said, I don't want to know about
2 your relationships with local counsel.  And I
3 think it was appropriate to blind copy or
4 forward and not pester Hopkins with this after
5 Hopkins has said, I don't want communications
6 about your relationship with Chargois or any
7 other local counsel.
8 Q.  Assume that Hopkins never told
9 Belfi, I don't want to know about your local
10 counsel.
11     Would it be reasonable to infer that
12 these blind copies and forwarding of messages
13 would indicate an attempt to keep information
14 away from George Hopkins?
15     MS. LUKEY: Objection.
16 A.  No.  I think it's an attempt to
17 honor his expectation that his e-mail box not
18 be cluttered.  The reasonable communication
19 rule very clearly doesn't require that you
20 communicate every little thing to your client.
21 You would drive your client to despair if you
22 did that.
23     So the reasonable communication rule
24 requires only communication of what the client

Page 207

1 needs to know in order to participate
2 intelligently in the representation.  And
3 cc'ing the client on every piece of e-mail back
4 and forth would be wrong, in fact.  Not a
5 violation of the rules, but it would be
6 annoying.
7     And it's certainly not the sort of
8 thing that the rules require.
9 Q.  But I don't know if you listened to
10 my question carefully.
11     Assume that Hopkins never told
12 Belfi, I don't want to know about your local
13 counsel.
14     MS. LUKEY: Objection.
15 Q.  So, in other words, Hopkins is in
16 the dark about this referral relationship.
17     MS. LUKEY: Objection.
18 Q.  Assuming that, do these e-mails
19 indicate to you an attempt to circumvent George
20 Hopkins?
21     MS. LUKEY: Objection.
22 A.  I was assuming that Hopkins had
23 said, I don't want to know the details about
24 local counsel in which case it would be

Page 208

1 appropriate not to share the details.
2     If Hopkins had no idea that there
3 was local counsel, then we are back to square
4 one with Rule 1.5(e).  There wouldn't be
5 consent to the division of fees.
6 Q.  Right.  But my question --
7     MR. KELLY: I object to asking him
8 to assume things that are not only not in
9 the record, but are contradicted by the
10 record.  And then asking him to speculate
11 about such things.
12     MS. LUKEY: That's an objection I
13 made previously, Bill, but the
14 hypothetical rule is what it is.
15     MR. SINNOTT: I understand the
16 objection.
17     THE SPECIAL MASTER: All right.
18     BY MR. SINNOTT:
19 Q.  So your testimony is that that would
20 not be in compliance with 1.5(e)?
21 A.  Yes.
22 Q.  Thank you.
23     MR. SINNOTT: For everyone's
24 purposes, we are wrapping up.

Page 209

1 Q.  On page 16 of your report,
2 Professor, you indicate that Rule 7.2(b)
3 prohibits only payments to non-lawyers.
4     Is that a fair statement?
5 A.  Yes.
6 Q.  Where in the rule do you read that
7 7.2(b) applies to referrals with non-lawyers?
8 A.  It's the only way to make sense of
9 the relationship between 7.2(b) and 1.5(e).
10 There are different rules in the Rules of
11 Professional Conduct dealing with different
12 situations.  And as a basic matter of statutory
13 interpretation, you interpret one provision to
14 harmonize and make sense with the other.
15     And so you have a rule on sharing
16 fees with lawyers, which, in Massachusetts
17 permits referral fees.  And then you have a
18 rule that says no payments for referrals.  That
19 has to mean from non-lawyers.  Otherwise, it
20 wouldn't make sense.  It would be a non-super
21 fluidy or whatever.  There's some principle of
22 statutory interpretation that says you read two
23 provisions together to make sense.
24 Q.  All right.  So you're making a

Page 210

1 statutory interpretation. You're not
2 suggesting that it's contained within 7.2(b)
3 itself?
4 A. Well, it's the only sensible way to
5 read Rule 7.2(b).
6 Q. All right. Let me ask you this. I
7 want you to assume that Attorney Smith
8 recommends that a personal injury client
9 retains Attorney Jones. Smith and Jones have a
10 written fee-sharing agreement, but the client
11 is not told about it.
12    Jones settles the case for $300,000.
13 Jones then gives Smith 20 percent of the
14 settlement pursuant to his agreement with
15 Smith.
16    Later on, the client is told about
17 the agreement for the first time, and asked to
18 ratify it. The client refuses to ratify it.
19    Has Jones violated 1.5(e)?
20    MS. LUKEY: Objection.
21 A. I got a bit lost in the facts, but I
22 think you said that the client never knew of
23 the fee-sharing agreement.
24 Q. That's correct.

Page 211

1 A. So then that would be a violation of
2 the rule, yes.
3 Q. All right. Thank you.
4    Do you agree with this statement,
5 "Legal ethics experts should not offer an
6 opinion, even if defensible, unless they would
7 adopt that opinion if they were the judge in
8 the case"?
9 A. I don't agree with that. I know
10 Professor Gillers has said that. And he and I,
11 I think, come out a little bit differently on
12 this.
13    I would be willing to, and have,
14 offered an opinion that is defensible. I don't
15 like to offer opinions that are aggressive or
16 out there. I like to stay well within my
17 comfort zone. But that's different from saying
18 what I would do if I were a judge.
19    Now, it happens in this case that
20 all of my opinions are what I would do if I
21 were a judge, but I actually don't think his
22 statement about the ethics of experts is
23 exactly right. It's close, but it's not
24 exactly right.

Page 212

1 Q. Let's say you were called to testify
2 in court on the issue of why the $4.1 million
3 payment should not be given to the class, what
4 would you say in support of upholding the
5 payment?
6    MS. LUKEY: Objection.
7 A. I would say what I said here. You
8 know, here's my heuristic for expert work. I
9 think sometimes these reports get disclosed.
10 They are available on Westlaw. They get
11 searched. They get read. People write about
12 them. I gave an opinion in a case that became
13 the basis of a Law Review article. So I have
14 to give opinions that I'm comfortable with.
15 And I do.
16    And, in this case, what I would say
17 is what I said before. The folk morality of
18 this is a deal is a deal. And there's a
19 contract with Chargois, and it makes sense.
20 It's the sort of thing that goes on in the
21 plaintiffs' bar.
22    It's the way client development
23 happens in this area of practice. It's common.
24 And there is a benefit to the class. This is

Page 213

1 how you get classes constructed and certified.
2    You find clients. And that often
3 occurs through referral arrangements. And so
4 the $4.1 million fee is just the value that
5 that 20 percent interest happened to have,
6 given the settlement that was reached in the
7 attorneys' fees portion of the settlement. So
8 I would be very comfortable testifying in court
9 and for that opinion to be disclosed.
10    I would defend it publicly, to say
11 that the law firm entered into what, ex ante,
12 seemed like a reasonable referral arrangement
13 with another law firm and this is the result.
14 Q. All right. Thank you, sir.
15    MR. SINNOTT: That's all I have.
16 Joan?
17    MS. LUKEY: I have no questions for
18 the witness.
19    MR. SINNOTT: Okay. Richard?
20    MR. HEIMANN: No questions.
21    MR. SINNOTT: Brian?
22    MR. KELLY: No assumptions. No
23 hypotheticals. No questions.
24    MR. SINNOTT: On the line, David, on

Page 214

1   behalf of Keller Rohrback, any questions?
2      **MR. COPLEY:** No questions.  Thank
3   you.
4      **MR. SINNOTT:** Okay.  And seeing how
5   there are no further questions, this
6   deposition is concluded.  So we can go off
7   the record.
8      (Time noted:  1:00 p.m.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 215

1      A C K N O W L E D G M E N T
2
3   STATE OF            )
4      :ss
5   COUNTY OF            )
6
7   I, WILLIAM BRADLEY WENDEL, hereby certify
8   that I have read the transcript of my testimony
9   taken under oath in my deposition; that the
10   transcript is a true, complete and correct record
11   of my testimony, and that the answers on the
12   record as given by me are true and correct.
13
14
15   _____
16      WILLIAM BRADLEY WENDEL
17
18
19   Signed and subscribed to before me
20   this _____ day of _____, 2018.
21
22
23   _____
24   Notary Public, State of _____

Page 216

1            C E R T I F I C A T E
2
3   STATE OF NEW YORK      )
4                          :ss
5   COUNTY OF RICHMOND      )
6
7            I, MELISSA GILMORE, a Notary Public
8   within and for the State of New York, do hereby
9   certify:
10            That WILLIAM BRADLEY WENDEL, the
11   witness whose deposition is hereinbefore set
12   forth, was duly sworn by me and that such
13   deposition is a true record of the testimony
14   given by such witness.
15            I further certify that I am not
16   related to any of the parties to this action by
17   blood or marriage; and that I am in no way
18   interested in the outcome of this matter.
19            IN WITNESS WHEREOF, I have hereunto
20   set my hand this 6th day of April, 2018.
21
22
23
24   MELISSA GILMORE

**$**

**$300,000 (1)**
210:12

**$4.1 (5)**
121:20;123:11;127:16;
212:2;213:4

**$650 (1)**
13:1

**A**

**ABA (9)**
28:3;30:2;39:20;40:8;
45:12;49:5;90:9;91:17;
146:6

**abide (1)**
125:22

**ability (1)**
124:10

**able (7)**
14:18;108:6;114:24;
115:12,16;125:5;184:7

**Absolutely (2)**
126:22;156:2

**abstract (3)**
148:15;192:6,10

**abstraction (1)**
191:18

**academic (2)**
125:1;153:6

**accept (5)**
41:12;65:12;129:8;
165:16;166:3

**accepted (1)**
92:7

**accepting (2)**
125:13;187:13

**access (1)**
124:8

**accompanied (1)**
89:10

**according (2)**
70:20;84:16

**account (2)**
132:20;178:8

**accurate (1)**
25:1

**accurately (2)**
23:18;187:2

**acknowledge (1)**
29:24

**acknowledged (1)**
124:21

**acquiesced (2)**
27:12;88:4

**across (1)**
48:12

**act (4)**
87:10;139:22;180:13,23

**acted (1)**
123:4

**acting (3)**
39:15;58:4;188:1

**action (26)**
59:9;77:17;95:7;98:16;
100:5;114:21;115:9,15;
119:6;120:14;123:2,21;
124:15;130:20;132:2;
133:17,20;150:17;162:5;
178:16;182:11,15;183:20;
184:3;189:18;199:23

**actions (1)**
119:1

**actively (1)**
120:23

**activity (1)**
191:2

**actors (1)**
133:4

**actual (2)**
48:4,7

**actually (20)**
20:23;26:22;44:3;51:24;
60:20;77:5;82:19;100:7;
109:19;124:13;126:1;
132:23;133:18;170:2;
180:16;181:13;182:12;
189:1;191:23;211:21

**add (2)**
32:20;114:6

**addition (4)**
8:9;22:3;56:21;82:6

**additional (3)**
24:13;69:8;148:10

**additions (1)**
12:12

**addressed (2)**
115:17;137:21

**adequacy (4)**
45:5;131:5;132:15,18

**adequate (2)**
183:17;193:18

**adequately (3)**
42:4;78:3;128:16

**adopt (1)**
211:7

**advice (3)**
122:5,10;190:2,3;191:6

**advise (3)**
122:11;189:18;192:8

**advising (4)**
115:20;146:3;184:17;
192:7

**affect (1)**
91:23

**affected (2)**
122:8;174:17

**affidavit (4)**
119:24;120:7;121:15;
128:17

**affiliate (2)**
32:22;33:11

**affiliation (1)**
11:2

**again (42)**
20:20;21:21;48:10,20;
49:11,19,23;50:4;54:12;
62:20;64:8;65:15;71:5;75:1,
15,20;76:15,24;88:11,21;
91:17;92:11;94:2,15;102:8;
114:6,18;123:1;130:21;
132:10,11;140:18;141:23;
151:6;152:15;153:8,22;
178:23;182:1;183:20;191:8;
200:16

**against (2)**
49:11;190:12

**agency (2)**
80:8,19

**agent (1)**
78:15

**agents (4)**
42:1;78:18;95:22;139:22

**agglomeration (1)**
177:16

**aggressive (1)**
211:15

**ago (2)**
72:1;83:3

**agree (29)**
71:1;74:3;82:16;86:11;
90:14;91:1;93:6,11;97:19;
98:18;99:1;110:18;122:21;
136:20;137:24;140:7;144:4;
146:18;148:6,12;149:3,6;
150:5;165:19;189:15;190:8,
11;211:4,9

**agreed (6)**
14:19;22:17;28:8;128:4;
172:9;202:11

**agreeing (1)**
172:9

**agreement (60)**
18:20;22:12;23:4,9,11;
27:21;28:22;29:15,17;34:7,
24;35:12;37:6,12;38:5;39:7,
24;40:6;49:16;59:17;67:16;
75:21;77:17;88:9;89:4;
90:15,20,22;91:3;92:6;93:8;
96:10;110:10,11;111:13,19;
125:17;139:3;140:6;151:9,
16;152:8;153:14;154:10,12;
155:16;157:19;158:1,18;
159:15;162:4;167:10;171:9;
197:6,8;198:22;210:10,14,
17,23

**agreements (6)**
145:13;158:10;160:6,7;
171:16;176:5

**agrees (2)**
23:12;24:20

**ahead (1)**
53:20

**allegedly (1)**
192:11

**allocate (4)**
23:13;24:21;42:11;128:7

**allocated (1)**
127:22

**allocation (1)**
129:9

**allow (1)**
56:8

**allowed (1)**
133:23

**almost (1)**
40:19

**along (2)**
92:19;98:15

**alternatives (8)**
26:8,9,11,18;52:4;65:19;
66:7;193:19

**although (5)**
29:24;135:9;186:11;
191:4;197:20

**altogether (1)**
41:14

**always (1)**
113:2

**among (6)**
16:1;97:6;124:2;126:7;
127:22;204:10

**amount (5)**
13:8;127:9;138:14;159:2,
3

**analysis (4)**
62:24;63:14;160:24;161:2

**analytical (2)**
65:10,14

**Andover (2)**
163:24;165:10

**animal (1)**
198:14

**Annotated (1)**
146:6

**announce (1)**
28:15

**annoying (1)**
207:6

**answered (2)**
162:8;176:24

**ante (4)**
74:23;124:5,24;213:11

**anticipate (4)**
105:7;115:1,12,17

**anticipated (2)**
125:7;162:5

**anymore (1)**
59:4

**apparatus (1)**
49:5

**apparent (1)**
186:12

**appear (2)**
43:11;63:7

**appeared (2)**
19:19;194:24

**appears (1)**
126:13

**applicable (2)**

152:9;153:15

**applicant (1)**
135:16

**application (9)**
35:19,21;36:11,11;98:20;
99:2,5;147:23;165:21

**applies (1)**
209:7

**apply (6)**
51:4;77:4;195:16,17;
197:4,10

**appoint (1)**
183:19

**appointed (3)**
8:7;166:8,24

**appropriate (8)**
32:20;33:13,15,16,19;
66:14;206:3;208:1

**approval (1)**
165:22

**approve (1)**
140:15

**approved (2)**
21:6;32:21

**approximately (2)**
13:2;205:16

**area (16)**
79:15;80:23;89:23;113:8;
120:15;123:8;132:11;
138:22;167:14;172:14;
173:24;183:24;184:10,12,
20;212:23

**argue (1)**
52:11

**arise (2)**
42:16;80:22

**arising (1)**
47:1

**Arkansas (113)**
8:4;18:17;19:7,22;20:11;
22:20;23:12;24:20;29:9;
34:12,20;38:14;41:5;42:1,8,
9;47:6;50:16;53:5,9,10;
56:14,57:19;61:24;66:23;
67:22;76:8,11;77:18;78:8,9,
16;79:7,13;80:10;81:3;83:8;
84:3,12;87:20;93:18;94:18,
23;96:2;100:1;101:9,22;
102:5;103:22;104:12;
105:11,12;107:12;108:4,23;
109:1;110:19;111:2;112:3,
18,19;113:17;114:10,11;
116:6,11,17,23;120:7;
121:16,19;122:20,22;127:2,
14;128:23;129:15;130:9,10;
131:16;137:10;139:1,18;
140:3;141:24;142:22;143:9;
152:11,12;153:17,18;
155:17,19;157:20;160:7;
162:3,6;169:5,7;183:6;
187:19,20,22;188:7;192:5;
194:3,5;197:10,17;198:20,
24;199:20;200:4

**Arkansas' (4)**
31:20;78:20;103:16;
112:14

**Arkansas/State (1)**
47:11

**arm's (6)**
44:10;45:8,15;48:19;
50:10;69:9

**arose (2)**
27:5;111:20

**around (11)**
10:8;31:5;41:15;76:12;
89:17;100:1;101:13;103:9;
124:7;143:14;147:15

**arrangement (40)**
27:4;28:8,11;31:3;34:7;
40:4;41:12;42:22;48:1,16;
49:8;50:1;68:21;74:19;
86:10;89:1;91:10;92:13;
93:4,7;96:17;99:3;108:21;
119:23;123:6;125:15;
126:13;131:22;133:24;
140:15;152:6,12;153:13,19;
155:18,19;157:5;161:19;
174:4;213:12

**arrangements (11)**
39:21;40:13;45:11;90:10;
100:20;131:20;133:19;
136:3;140:8;174:23;213:3

**art (3)**
20:7,8;49:20

**article (2)**
156:19;212:13

**ARTRS (1)**
186:14

**Aside (1)**
145:19

**aspect (2)**
44:8;192:16

**aspects (2)**
45:11;169:1

**assert (1)**
201:4

**assertion (3)**
185:22,24;186:5

**assignment (1)**
136:11

**assistance (4)**
17:5;18:6;186:14;190:20

**associate (7)**
72:16;74:15;89:21;91:11;
92:21;136:8;184:19

**associates (1)**
173:8

**associating (1)**
20:4

**assume (52)**
51:11;85:9;103:13,15;
114:5,8;116:3;117:5;119:4;
120:5;122:18;125:16,17;
127:7,10,12;128:14;129:22;
141:3,7,20;150:14,18;151:5,
6;152:4;153:11;155:14;

161:14;164:4,16;166:24;
174:2,7;175:2,6;177:2,4;
179:10,19;181:15,17;
185:21,23;186:6;199:7,9;
200:17;206:8;207:11;208:8;
210:7

**assumed (2)**
118:19;162:13

**assumes (1)**
141:11

**assuming (8)**
118:23;128:19;141:18;
153:20;157:18;192:2;
207:18,22

**assumption (11)**
55:13;104:3,4;119:8;
141:22;154:5,9;175:9;
187:16;199:18;200:1

**assumptions (6)**
122:3;152:13,18;155:22;
202:5;213:22

**ATRS (6)**
18:16;29:10;37:23;93:14;
136:11,13

**attach (1)**
182:9

**attempt (3)**
206:13,16;207:19

**attempting (1)**
157:23

**attention (2)**
24:18;142:14

**attentive (1)**
148:22

**Attorney (16)**
8:13;30:17;31:2,4,8;
136:9,15;142:19,20;143:4;
144:6,20;161:14,15;210:7,9

**attorney/client (7)**
40:11;47:20;48:11,22;
50:21;72:18;80:8

**attorneys (6)**
17:10;24:22;25:17;26:12;
136:10,16

**attorneys' (2)**
44:8;213:7

**attorney's (4)**
30:10;89:2;171:18,19

**authority (10)**
129:6,8;141:13;144:21;
174:7;178:3,5;179:5;189:3,
13

**authorized (5)**
78:15;80:14;87:8,10;
180:23

**available (7)**
52:4;65:19;66:7;98:12;
138:24;188:21;212:10

**avoid (5)**
101:11;177:21;187:9

**awarded (1)**
174:6

**aware (13)**

56:14,17,20;57:24;58:21;
59:2,5;70:21;77:16;84:17;
141:15;143:3;193:2

**away (5)**
69:20;149:14;206:14

## B

**back (48)**
16:12;17:14;19:20;20:23;
21:21;22:10,18;31:21;
32:24;36:16;39:1,12,19;
40:2;41:24;42:7;44:12;
61:13;67:2,8;72:19,20;76:2,
18;81:8;82:2;85:14;87:22;
88:11;107:1;113:22;118:8;
141:1,4,5;144:10;151:17,22;
152:23;157:3;159:8;161:11;
171:15;194:9;198:16;199:5;
207:3;208:3

**background (13)**
10:5;11:21;33:22;48:1;
49:11;75:20;94:6,12;96:5,9;
135:18;143:10;165:18

**backing (1)**
32:19

**bad (1)**
104:11

**banged (1)**
158:14

**bar (7)**
59:9;95:7;100:5,21;145:2;
147:22;212:21

**bare (2)**
82:20;185:22

**bargaining (4)**
47:17,23;50:10;69:10

**bargains (1)**
44:13

**Barrett (1)**
8:11

**base (3)**
19:7;76:13;101:24

**based (15)**
14:17;51:20;67:10;74:18;
75:18;76:18;106:10;119:8;
120:13;123:1;124:16;
135:14;139:9;141:23;
199:18

**basic (4)**
71:2;80:7;179:4;209:12

**basically (7)**
28:10;39:2;45:2,19;
109:23;139:2,4

**basing (2)**
119:14;155:1

**basis (7)**
30:19;33:16;40:23;88:18;
91:20;147:9;212:13

**Bates (5)**
21:23;24:7;33:8;134:20;
186:17

**beat (1)**

101:10
**became (4)**
63:22;143:3;186:12;
212:12
**become (5)**
68:6;89:21;130:5,13;
182:12
**becomes (3)**
88:21;92:20;112:16
**begin (3)**
8:24;9:21;17:2
**beginning (5)**
10:7;11:1;26:22;44:11;
142:15
**begins (2)**
49:14;134:15
**Behalf (13)**
3:4,15;10:10;78:10;87:10,
15,20;89:5;141:12;174:14;
180:13,24;214:1
**Belfi (22)**
15:19;29:23;31:21;70:1,6,
20;76:1,5,16;84:16;85:14;
86:13;94:9;107:10;203:3,9,
22;204:4,7,16;206:9;207:12
**belief (8)**
99:15,21,24;100:7;
101:14;102:14,15;155:2
**beliefs (1)**
153:4
**believes (1)**
148:8
**believing (1)**
176:11
**beneficial (1)**
174:16
**benefit (9)**
123:10,15;124:17,23;
126:1,4;127:16;175:11;
212:24
**benefits (7)**
52:4;65:19;66:6;127:17;
128:8;193:18;196:7
**best (2)**
52:23;72:10
**bet (1)**
158:16
**better (2)**
128:8;170:1
**beyond (6)**
12:16;21:13;72:20;83:12;
106:14;118:3
**bidding (2)**
98:8,11
**big (3)**
120:21;125:9;127:23
**Bill (6)**
25:7;83:21;97:23;129:11;
161:6;208:13
**billed (1)**
138:14
**billing (2)**
136:2,6

**Bill's (1)**
157:18
**bit (13)**
17:13;19:20;44:17;82:17;
102:23;120:3;121:2;143:6;
170:16;183:10;191:4;
210:21;211:11
**bkelly@nixonpeabodycom (1)**
3:22
**blanked (1)**
97:13
**blanking (2)**
99:9;204:12
**blend (1)**
50:22
**blind (8)**
203:3,8,21;204:17;
205:10,19;206:3,12
**blue (2)**
47:19;203:10
**Boston (2)**
3:6,17
**both (8)**
21:9;22:13;26:10;47:20;
85:15;107:7;138:12;179:14;
197:3
**bottom (1)**
137:2
**bounced (1)**
36:15
**bound (1)**
176:12
**box (1)**
206:17
**boxes (1)**
32:11
**Boy (2)**
92:1;175:23
**Brad (1)**
10:3
**Bradley (6)**
10:2;12:6;13:23;14:5;
215:7,16
**break (6)**
36:10;106:22,24;107:5;
176:12,20
**BRIAN (3)**
3:18;10:22;213:21
**brief (1)**
11:21
**bring (1)**
32:11
**broad (1)**
121:2
**broader (2)**
39:14;133:10
**broker (1)**
101:9
**Bronston (3)**
147:1,6,8
**built (1)**
64:19
**bullets (1)**

204:15
**bunch (6)**
21:22;52:2;120:22;
143:15;193:9;204:11
**burden (4)**
45:5;68:12;193:16;196:18
**burned (1)**
113:19
**business (1)**
95:6
**buzzing (1)**
103:9

**C**

**Cabraser (4)**
10:17,19;170:21;171:2
**California (1)**
82:22
**call (9)**
21:4,5;28:21;32:5;48:9;
57:7;98:11;164:7;166:21
**called (10)**
8:21;111:14;122:11;
133:9;147:24;163:24;
167:19;170:19;178:21;
212:1
**came (2)**
13:14;90:4
**can (45)**
21:9;31:12;32:4;35:9;
38:21;39:12;40:16;44:13;
45:10;48:18;49:3;53:19;
54:19;56:11;57:13;66:19;
69:1;72:23;78:17;90:10;
97:6;116:14;127:24;128:15,
24;143:6;144:20;145:20;
151:18;159:11;162:19;
166:24;167:2;177:24;
179:12;182:11;185:17;
186:1;188:13,15;196:9;
199:23;200:21;205:21;
214:6
**CANTY (3)**
5:4;10:12,12
**capacity (5)**
36:1,23;58:5;99:17;
135:18
**capital (1)**
8:13
**captioned (1)**
165:22
**care (4)**
46:13;69:6;115:2;190:7
**careful (11)**
30:8;31:14;39:18;49:19;
51:2;62:21;63:11;76:24;
143:11;168:17;193:8
**carefully (1)**
16:24;207:10
**carry (2)**
15:24;80:16
**carrying (1)**

80:12
**case (89)**
14:7;15:3;26:23;27:4;
32:19;33:19;34:19;41:5;
47:11,14;48:5;51:13;53:9;
54:1,17;57:13;60:9;70:19;
75:18;76:21;77:1,5,12;78:8;
79:12;84:15;87:12;88:1;
89:19;90:4,16,19;91:7,23;
92:1,4,9;98:19;99:10;
104:18;108:10,23;110:12;
112:2,6,10;114:15,23;117:2,
9;119:7;121:22;122:2;
124:16;125:6;126:20;
129:16;144:24;145:20,24;
146:3,7,12;147:12;148:18,
18,19;149:12;151:21;
156:21;158:15;163:13;
164:5,7;172:7;177:17;
181:16;182:20,23;189:13;
190:22;200:10;204:5;
207:24;210:12;211:8,19;
212:12,16
**case-by-case (1)**
33:16
**cases (38)**
50:15;75:10;83:8,11;
84:12;101:9;109:10,17,21,
21;110:3,6;115:20;119:1;
123:20,21;124:14;127:24;
144:18;145:2;146:4;148:17,
20;160:8;163:14,18,23;
164:22;165:12,14,23;
169:20;170:6,11;173:17;
179:3;183:11;189:2
**category (1)**
119:9
**cause (2)**
109:15;164:10
**causes (1)**
9:6
**cc'd (1)**
205:9
**cc'ing (1)**
207:3
**certain (5)**
45:2;59:10;159:2,2;203:4
**certainly (8)**
9:11;10:9;39:15;59:11;
138:9;148:3;176:2;207:7
**certification (3)**
175:5;177:3;182:5
**certified (25)**
81:5;112:15,17;114:9;
116:6,10;130:5;133:10,13;
134:4;163:4;165:2,7;166:9,
11,13,14;168:12;179:21;
187:7,13;188:9;189:17;
201:17;213:1
**certify (1)**
215:7
**cetera (2)**
136:8,10

**Chain (6)**
33:7;178:10,16,19;
199:19;204:4

**chance (1)**
94:24

**change (19)**
28:24;31:2,5;35:7,11;
39:10;44:17;63:21;68:10;
77:22;78:10;89:14,15;
90:10;112:14,19;128:20;
129:23;160:17

**changed (14)**
28:11;34:16,21;35:1,10,
18;37:18;38:13,18;40:24;
53:6;61:21;66:18;125:18

**changes (4)**
12:12;29:1;39:21;49:14

**changing (4)**
18:1;55:24;151:14;170:16

**chapter (1)**
88:13

**characterize (2)**
28:24;150:8

**charge (2)**
137:10;147:17

**Chargois (126)**
15:21;29:10;32:23;33:24;
34:2,9;35:13,20,24;36:13,
21,22;37:18;38:5,9;40:23,
23;47:1,6;50:17;51:10;53:7,
7;54:24;58:3,14,21;59:17;
60:8;61:22;67:19,21;68:14;
70:8;18;71:24;75:22;76:8;
83:8;84:1,11,22;85:1,17;
86:2;93:7;94:12,19;96:8,17,
19,21,23;97:11;99:16,17,18;
100:12,13;101:18,18,20,21;
102:18;103:2,22;107:11;
109:5;111:13,18,24;112:5;
114:14;116:8,12,23;118:12;
119:23;121:20;122:20;
123:6,12,16;125:15;133:7;
134:19;137:1,7;138:3;
152:6,12;153:12,19;158:3,5;
167:9;171:3,7;172:5,6;
174:3,5,10;175:11,14,19;
177:7;181:20;186:15,19;
187:10;188:2;197:15;
199:11;201:23;202:13;
203:3,8;204:7,17,17;205:10,
10,21;206:6;212:19

**Chargois' (2)**
70:7;186:12

**chief (1)**
31:20

**CHOATE (3)**
3:3;10:10,14

**choose (1)**
176:1

**chose (1)**
67:23

**Christa (18)**
19:22;20:16,17;22:1,4;

31:19;39:13;40:15;41:19;
47:2,12;94:8;96:22;97:1,7;
137:14;151:8,15

**Christopher (1)**
142:20

**chronology (1)**
19:18

**circular (1)**
82:1

**circulating (1)**
24:10

**circumstance (1)**
201:22

**circumstances (3)**
89:14;196:17,20

**circumstantially (1)**
160:12

**circumvent (1)**
207:19

**citation (1)**
147:1

**citations (2)**
14:18;187:5

**cite (4)**
102:9;144:20;145:20;
146:11

**cited (5)**
15:23;28:3;147:22;148:5;
203:20

**cites (1)**
186:22

**Citibank (3)**
180:3,13,21

**civil (7)**
9:14;79:15;87:18;113:1,
16;163:6;167:21

**claiming (1)**
141:14

**claims (2)**
163:19;190:12

**clarification (3)**
25:6;191:13,17

**clarify (3)**
98:4;99:14;190:17

**Clark (20)**
19:23;20:16,18;22:1,4;
29:23;31:20;36:15;40:16;
41:19;47:2,12;94:9;96:22;
97:1,7;137:14;139:18;
151:8,15

**Clark's (1)**
39:13

**class (223)**
28:5;59:9;77:17,18;78:1,
3,4,10,15,21,24;79:4,14,17,
24;80:1,2,3,4,19;81:4,5;
87:8,16;95:7;98:16;100:5;
103:17;104:5,20,21;105:21;
108:5,7,24;109:2;110:19,20,
21;111:2,7;112:4,15,17,20;
113:17,21;114:9,10,11,12,
21;115:9,15;116:6,10,19,21;
117:10,14,17,21;118:5,17,

21,21;119:1,5,6;120:8,9,11,
12,14;121:10,11,18;122:20,
22;123:2,5,11,12,15,21;
124:14,17,23;126:2,5;
127:16;128:16,24;129:1,14,
16;130:4,5,13,13,16,20,24;
131:1,4,11,14,19,21;132:2,7,
15,16;133:9,12,12,17,20,24;
134:3;150:14,17,20,22,24;
151:3;162:5,14,21,22;163:3,
4,23;165:2,7,8,8;166:9,14;
167:1,3,7;168:9,13;169:1,7,
9,13,15,19;170:5,10,20;
173:15;174:6,9;175:3,4,5,7,
12;176:6;177:2,3,6;178:15,
22;179:11,21,21,22;180:14,
17;181:6,17,21;182:6,7,9,
11,15;183:1,3,4,5,7,20;
184:3,16,23,24;185:1,2,10,
11,18;187:8,13;188:9,13,15,
17;189:16,17,21;190:14;
199:6,7,10,13,21,23;200:2,5,
8,12,17,24;201:16,20,22;
212:3,24

**class' (1)**
131:23

**classes (7)**
165:9;166:11,13,18;
167:9;183:11;213:1

**classic (2)**
44:21;125:4

**clause (3)**
25:9;26:15;74:4

**clauses (1)**
25:23

**clear (11)**
54:13;97:17;117:9,13,13;
129:12,19;153:10;154:3;
198:12,17

**cleared (1)**
147:16

**clearly (8)**
28:15;53:23;58:13;59:2;
87:1;101:3;193:14;206:19

**client (168)**
19:1,2;25:16;30:12;31:7,
9;41:5,9,9,10,11,22,23;
42:18;43:14,21;44:9;52:3,5,
6,16,17,18;54:2,23,24;55:9;
57:1,3,8,9,12,14;60:12;
62:17;67:15,15;68:12,23;
69:3,5;71:21,23;72:2;73:16,
17;74:4,14,16;75:12;78:12,
19;79:12,13,20,23;80:18;
81:12,13;82:15;85:20,21;
86:9,22;87:11;88:20,23;
89:17;90:5,12;91:5,19;92:7,
17;93:5;95:19;96:7;105:8;
106:3,7,11,12;109:12,14,23,
23;110:7;113:7;115:21,24;
118:9;126:10,12;129:4;
130:4,5,8,11,14;131:13;
134:5;138:5,10,14;139:20;

141:9,10,12;154:7,21,22;
158:3;159:1,3;161:16,17,18,
21;168:10,18,19,19;171:12,
14,19;174:15;175:7,12;
176:8;183:2;184:18;187:15;
189:9,18;190:1,2,5,12,13,
23;191:1,1,6,14;193:1,2,3,
17;194:3,10,13;195:13,24;
199:8,12;200:8;201:19;
204:18;206:20,21,24;207:3;
210:8,10,16,18,22;212:22

**clients (36)**
45:23;51:6;91:9;95:21;
100:23,24;105:17;115:5,21;
121:5;123:23;124:9,11;
139:20;145:13;146:3;
161:21;177:4,7;179:11,16,
17,17,18,23;180:4,7,9;
181:17;182:12;186:1;196:7;
199:6;200:20,24;213:2

**client's (14)**
31:12;42:4;62:17;85:24;
86:4;96:4;105:3;106:16;
130:12;145:9;177:13;
192:23;196:1,2

**close (8)**
54:8,9,16;76:21;77:1,5,
12;211:23

**cluttered (1)**
206:18

**cocked (1)**
184:16

**co-counsel (4)**
70:12;72:2,15,16;170:19;
171:14,15;173:14

**co-lead (2)**
34:11,12

**collaborate (1)**
184:2

**collaborating (1)**
184:13

**colleague (3)**
156:18;167:21;178:15

**colloquy (1)**
192:21

**combination (1)**
68:4

**combine (1)**
123:22

**comfort (1)**
211:17

**comfortable (4)**
179:1;183:21;212:14;
213:8

**coming (4)**
56:4;61:13;89:17,20

**command (4)**
178:10,17,19;199:20

**commas (1)**
25:10

**commenced (2)**
28:12;88:24

**comment (4)**

146:19,20,23;147:3
**comments (5)**
9:20;17:8,17,18,19
**commercial (1)**
45:15
**common (5)**
124:13;145:11,18,20;
212:23
**communicate (3)**
31:9;78:17;206:20
**communicated (1)**
41:21
**communicates (1)**
80:14
**communicating (2)**
86:14;200:2
**communication (35)**
21:4;41:8,16,18;42:3,7;
61:4;63:5;67:12;68:7;72:5,
19;75:2;85:16;86:8,19,21;
90:12;92:11,22;93:23;94:1,
8;105:6;118:9;159:6;
171:13;173:22;196:6,13,15,
19;206:18,23,24
**communications (10)**
41:24;85:14;127:1;
152:23;171:15;203:4,5;
204:18;205:7;206:5
**compensated (5)**
12:24;13:8,9;37:2;126:11
**compensation (2)**
26:12;89:2
**competent (3)**
125:16;189:16;190:19
**compilation (1)**
14:24
**complete (1)**
215:10
**completely (2)**
110:5;133:18
**complex (1)**
179:8
**compliance (10)**
18:20,21;22:7;66:15;
72:14;81:2;129:3;159:17;
160:16;208:20
**complicate (1)**
180:16
**complicated (5)**
95:9;120:21;127:24;
182:18;183:13
**complied (2)**
151:11;160:18
**comply (10)**
51:13;69:23;84:2,6;93:14;
157:23;159:22;160:1,11,14
**conceivably (1)**
180:18
**concept (1)**
77:3
**concepts (1)**
61:5
**concern (8)**

42:17;60:2,3;86:6;93:12;
132:19;143:18;187:18
**concerned (2)**
160:16;186:24
**concerning (2)**
203:9;204:5
**conclude (5)**
150:22;152:5;153:12;
174:14;176:20
**concluded (1)**
214:6
**concludes (1)**
128:14
**conclusive (1)**
47:24
**concomitant (1)**
116:10
**conduct (15)**
18:3;61:6,8;62:23;132:5;
146:5,17;156:11;169:4;
172:16,21;181:14;182:9,19;
209:11
**confident (1)**
185:13
**confidentiality (2)**
48:24;182:14
**conflated (1)**
57:21
**conflict (18)**
44:24;53:24;54:3,7;
174:12,19;175:1;180:20;
187:6,17,21;188:7,9,16,22,
24;189:4,14
**conflicting (1)**
178:12
**conflicts (5)**
44:20;49:1;173:23;
182:13;193:14
**connection (3)**
23:15;24:24;197:4
**consent (100)**
18:19;27:19;28:16;29:6,
18;30:4;42:5;43:2,3,8,14,15,
18;44:5,19,21;45:2;49:15,
17,21;51:8,12,13,15;52:1,9,
10,21,24;53:1,12,23;54:2,
10,12,15,20,22;60:19;61:2,
2,14,14;62:18;63:10,11,18,
23;64:3,21,23;65:9,18;66:4,
5,13,20,22;67:4,11;68:4,6;
69:14,16,24;70:6;71:3,8,14;
72:23;73:8,11;77:2,9,23;
78:11;85:16,19,21;86:9;
87:6;88:7;103:24;105:6;
106:4;109:6;144:15,23;
145:9;192:23;193:10,12,16,
20,23;194:10,16;195:20;
198:13;208:5
**consented (1)**
19:9
**consenting (1)**
86:14
**consents (3)**

19:2;73:17;81:13
**consider (7)**
40:16;65:1;83:20;91:14;
113:1;173:5,9
**considerably (1)**
194:15
**considered (2)**
157:22;192:4
**consolidated (2)**
163:15;164:22
**constantly (1)**
103:4
**constitute (4)**
42:5;52:10,21;54:19
**constitutes (1)**
29:17
**constituting (1)**
178:1
**constraints (1)**
201:10
**constructed (1)**
213:1
**contain (1)**
135:16
**contained (2)**
18:14;210:2
**Cont'd (2)**
3:1;5:1
**contemplate (3)**
48:21;99:2;145:5
**contemplated (11)**
31:22;36:6;56:24;61:23;
77:17;79:24;126:3;136:5;
139:3;162:17,18
**contemplates (1)**
74:13
**contemplation (8)**
34:1;35:23;36:21;39:11;
110:18;111:2,7;157:21
**contending (1)**
129:13
**context (27)**
30:4,11;31:10;38:24;
40:17;47:17,19;50:2;51:2;
62:2;67:17;68:11;71:22;
74:11;94:6,16;108:10;
120:4;121:2,8,10;132:22;
148:22;179:2;193:20,23;
196:14
**contextual (1)**
195:21
**contingency (3)**
125:5;136:3,5
**contingent (1)**
111:21
**continue (1)**
64:4
**continued (2)**
38:10;120:7
**continues (1)**
28:23
**continuing (1)**
200:22

**contract (24)**
35:12;44:12;45:18;46:1,1,
4,9,10,18,24;47:5,10;50:23;
61:9;86:1;125:22;135:19;
172:18;173:6,22;176:1;
188:3,5;212:19
**contracting (1)**
141:8
**contractor (2)**
137:17;154:16
**contractors (1)**
33:12
**contracts (7)**
45:19,20;128:7,9;143:19;
176:12,20
**contractual (7)**
47:13;48:7;59:6;67:20;
68:18;74:19;175:17;186:20;
188:1
**contradicted (1)**
208:9
**contrary (1)**
77:1
**contribution (1)**
186:13
**convenience (1)**
14:16
**conversation (14)**
85:22;86:7;89:10;90:23;
91:20;94:22;138:9,18;
139:7,13,14,17;140:12,13
**conversations (4)**
29:22;30:2;85:6;205:6
**conveyed (3)**
67:14,18,21
**conviction (1)**
147:10
**cooking (1)**
92:19
**copied (7)**
203:3,8,22;204:17;
205:11,19,20
**copies (3)**
24:10,14;206:12
**COPLEY (3)**
11:3,3;214:2
**copy (3)**
99:11;204:7;206:3
**corners (1)**
61:16
**corporate (6)**
96:3;121:3;129:2;178:7;
179:2;180:7
**corporation (1)**
139:24
**correspondence (1)**
22:6
**counsel (110)**
10:6;14:15;18:10;20:5,6;
23:13;24:22;25:12,18,24;
26:6,16;31:20;34:3,11,20;
35:3,8,20,22;36:1,5,7,12,23;
37:10,14;38:1,1,7,18;39:16;

42:14;52:12;53:9;55:3,4;
56:17,18,19,22;57:2,6,6,7,
11;58:4,5,22;61:23,24;
70:12,22;71:10;72:17;
84:18;85:4;90:3;91:12;
92:21,24;93:2,19;95:19;
97:22;98:12;101:1;104:20,
21;107:15;108:2,3,18;
109:13;110:19,21;111:8;
118:24;121:16;130:17;
134:1;136:9;139:1;140:22;
145:3,6,10,15;150:20;151:8;
158:13;162:14;166:8;167:1;
169:14;173:13;175:3;
183:19;185:2,10;188:14,15;
189:3;200:11;206:2,7,10;
207:13,24;208:3
**counseling (1)**
  115:5
**count (1)**
  82:19
**counterfactual (1)**
  77:8
**counterhypothetical (2)**
  53:15,18
**country (1)**
  124:7
**COUNTY (1)**
  215:5
**couple (6)**
  17:8;22:13;36:3;65:8;
  69:22;107:5
**course (7)**
  72:2,18;102:11;108:12;
  143:7;202:16,24
**Court (27)**
  8:18;12:2;13:19;24:1;
  27:10,17;28:14;88:3;92:9;
  131:4,7;132:8,14;133:21;
  142:4;147:8;149:12;152:5;
  153:11;183:16;185:17;
  186:7;187:1,9;189:12;
  212:2;213:8
**courts (1)**
  27:10
**court's (3)**
  91:23;93:12;189:3
**covered (1)**
  164:18
**craft (1)**
  117:7
**CRANDALL (1)**
  3:20
**create (1)**
  132:5
**created (1)**
  113:15
**creates (1)**
  48:7
**creating (2)**
  30:2;40:17
**crowding (1)**
  143:14

**culminating (1)**
  22:11
**current (2)**
  11:24;12:10
**Curriculum (1)**
  12:5
**customary (1)**
  134:2
**customer (4)**
  150:20;170:20;173:15;
  175:3
**cute (1)**
  147:11
**CV (6)**
  11:22,24,24;12:10,13,17

# D

**Damon (4)**
  83:8;84:11;202:13;203:3
**dancing (1)**
  147:15
**dangerous (4)**
  52:22;177:20;178:22;
  181:4
**dark (1)**
  207:16
**dated (6)**
  13:23;24:6;134:16,20;
  142:7,10
**dates (2)**
  85:10;94:3
**David (3)**
  11:1,3;213:24
**day (3)**
  64:6;178:6;215:20
**deal (18)**
  47:22;58:14;59:4;84:21;
  85:1;95:8;125:21,22;
  131:10;135:10;176:10,11,
  16,17;183:17;196:10;
  212:18,18
**dealing (2)**
  108:12;209:11
**deals (2)**
  56:17;141:10
**dealt (7)**
  76:11;96:19;131:12;
  132:20;133:4;140:19;185:7
**decided (3)**
  16:7;92:5;108:19
**decides (2)**
  126:4;128:23
**decision (11)**
  31:12;41:11;42:4;43:23;
  125:12;126:12;129:2;
  140:14;186:8;193:11;196:3
**decision-making (1)**
  86:22
**decisions (10)**
  80:11;193:3;194:5;
  195:14;196:9;197:18;198:1;
  199:1,14;200:9

**deem (3)**
  33:12,14,15
**defend (1)**
  213:10
**defensible (2)**
  211:6,14
**defined (3)**
  43:8,19;69:14
**definite (1)**
  112:16
**definition (2)**
  65:17;167:2
**depend (5)**
  30:13;115:5;122:10;
  191:24
**depending (2)**
  136:17;195:24
**depends (1)**
  202:4
**deposition (17)**
  8:3;12:22;15:14,15,17;
  76:16,17;102:10,24;103:6;
  129:18;142:7,10;172:22;
  204:11;214:6;215:9
**depositions (1)**
  15:8
**describe (2)**
  14:20;136:2
**designed (1)**
  132:13
**despair (1)**
  206:21
**despite (2)**
  58:5;172:8
**detail (1)**
  41:4
**details (11)**
  39:4;57:15;67:24;70:17;
  85:3;96:20;102:3;108:20;
  164:3;207:23;208:1
**determinations (1)**
  131:21
**develop (1)**
  124:11
**development (1)**
  212:22
**DeZarn (1)**
  148:18
**differ (1)**
  55:12
**difference (4)**
  28:22;44:4;60:16;63:10
**different (27)**
  31:6;45:21;51:3,5,5;55:2;
  56:7;57:21;74:13;84:2;
  92:18;93:1;101:17;110:5;
  115:8,10;120:4;123:19;
  124:3;162:10;180:19;181:3;
  182:22;198:13;209:10,11;
  211:17
**differently (2)**
  89:20;211:11
**difficult (6)**

**diligence (6)**
  63:9;65:6,16;114:19;
  127:24;153:6
**direct (4)**
  24:18;127:16;137:22;
  142:14
**directed (1)**
  83:23
**directly (3)**
  35:9;43:1;137:11
**director (5)**
  19:24;94:23;95:17;
  104:12;140:24
**directors (1)**
  121:4
**disagree (1)**
  149:4
**disallowed (1)**
  174:4
**disciplinary (1)**
  189:7
**discipline (1)**
  157:7
**disclose (10)**
  95:3;154:7,22;157:6,12;
  167:9;170:9;171:5;172:4;
  181:20
**disclosed (11)**
  41:4;52:16;57:8;60:12;
  133:21;154:21;155:5;157:6,
  11;212:9;213:9
**disclosure (20)**
  28:10;44:19;45:5,6;61:3;
  65:18;66:6,17;71:9;89:11;
  115:4;146:9;159:2;167:7;
  169:14;170:4,15,17;171:5;
  173:22
**disclosures (3)**
  19:6,11,13
**discomfort (1)**
  9:7
**discount (1)**
  136:12
**discovery (1)**
  9:14
**discretion (1)**
  188:19
**discuss (3)**
  18:16;138:19;146:16
**discussed (5)**
  107:6,7;126:15;127:13;
  138:15
**discussing (2)**
  22:2;119:20
**discussion (8)**
  19:20;20:1;85:23;87:23;
  126:16,19;127:8;173:3
**discussions (1)**
  41:15
**dispositive (2)**
  96:10,13
**disputes (1)**

**42**:15
**disqualify (1)**
189:3
**disregard (1)**
199:24
**distinguish (1)**
48:11
**distinguishable (1)**
27:3
**distinguishing (1)**
31:15
**district (3)**
131:4;188:19;189:12
**diverge (1)**
183:5
**divergent (1)**
184:24
**divide (1)**
71:11
**divided (1)**
124:2
**divides (1)**
82:3
**dividing (3)**
20:14;70:13;75:13
**division (32)**
18:23;19:1,8;22:15;27:20;
55:9;70:15;73:13,16;74:5;
75:4,5;81:12;82:1;83:13;
85:17;88:9,19;92:5;97:6;
106:10;107:11;108:1;138:6;
152:8,9;153:14,15;154:10,
12;155:16;208:5
**divisions (1)**
56:24
**divvy (1)**
126:8
**Doane (5)**
19:23;95:23;96:1,16;
139:19
**document (17)**
21:18;23:17,21,23;33:3;
49:15;53:1;73:5;99:13;
134:15,24;135:3;137:8;
138:1,16;141:15;142:5
**documentary (1)**
99:23
**documents (17)**
14:17;15:3,6,11,13;16:7;
19:12,15,19;20:17;22:6;
24:10;32:11;98:5;99:9;
102:12;135:15
**Doe (8)**
27:6,13;88:5;89:6;90:17,
17;91:22;92:7
**Doe's (2)**
27:19;88:7
**done (5)**
14:21;18:10;86:2;92:15;
146:2
**don't (149)**
9:3;16:3;20:7,20;21:23;
23:1,6;26:3,14;27:14,24;

30:1;32:7;35:2,7;36:5;39:3,
22;42:10;43:7;46:11,13;
47:4;52:8;54:5,6;58:14;
59:4,7,22,24;63:13;64:7;
65:9,13;67:13;69:6;71:6,19;
72:12;75:3;79:6,9,18;82:19,
23;83:5;84:14,21,24,24;
85:7,9;87:19;90:8;92:2,8;
94:2;95:7;96:18,19;97:12,
16;98:11,21,24;99:4,22;
101:6,7;104:13;105:16;
106:8;107:10,22,22,24;
108:1,3;110:3;111:4;
112:22,24;114:1,2;119:4,4;
121:13;122:6,12;124:8,10;
132:3;141:19,21;144:24;
148:4;149:20;152:16;153:6;
154:16;157:1,14;158:21;
159:10,12;161:5;162:13,24;
163:1,7,11;164:4;165:17;
168:3,15;169:2;173:9;
174:12;176:11;178:8,20,24;
180:1;182:3,22;184:15;
185:14;187:12;191:8;196:8;
198:2;202:4,6,7;203:6,15;
204:2,9;205:24;206:1,5,9;
207:9,12,23;211:9,14,21
**door (2)**
167:20;178:15
**down (6)**
36:10;57:22;68:1;104:7;
183:24;188:12
**drafted (6)**
14:13;15:9;17:8,16;39:7;
65:22
**drafters (2)**
43:9;50:4
**drafts (2)**
22:13,13
**drill (2)**
57:22;68:1
**drive (3)**
44:13;90:1;206:21
**driving (4)**
28:14;60:17;204:24;
205:19
**drop (1)**
50:6
**due (6)**
13:9;55:18;104:8,18;
105:3,10
**duly (2)**
8:21;78:14
**during (1)**
31:1
**duties (51)**
30:10,13,20,21;31:16,17;
44:18;48:23,24;49:1;50:22,
23;72:13;78:2;79:17,19,21;
80:13,22;81:4;108:7;109:2;
113:5,6,13;121:3,6,7;129:3;
130:10;131:3;149:11;
168:20;173:8,21;180:11,17,

19;181:2,12;187:13,15,17,
21;189:9;190:13;191:23;
192:5,12,17;197:4
**duty (31)**
42:2;69:7;85:15,16;92:10;
104:5,11;107:12;109:22;
110:6,8;115:19;117:3;
118:8;120:12,17;121:2,12,
16,18;167:6;169:14,23;
170:4,15;171:4;176:12;
181:6;192:7,14,15

**E**

**earlier (15)**
31:12;73:22;88:1;90:18;
91:22;94:5;115:18;127:1;
144:3,11;162:9;171:8;
192:21;199:5;202:18
**early (5)**
85:9;94:14;110:12;112:9;
125:6
**earned (1)**
186:16
**easy (1)**
124:3
**e-discovery (1)**
154:17
**editorial (1)**
17:24
**effect (6)**
51:14,16;73:21;76:5;81:9,
19
**effective (2)**
125:9;190:3
**effectively (1)**
190:1
**either (7)**
37:14;51:21;67:23;137:7;
159:3;160:18;205:8
**element (1)**
14:22
**elements (2)**
120:16;121:12
**Elizabeth (2)**
8:13;33:4
**else (8)**
11:13;21:14;48:8;80:23;
110:1;154:13,15;156:17
**elsewhere (2)**
45:17;77:3
**e-mail (24)**
20:21,23;21:21;22:1,5;
31:19;33:6,7;39:13;40:16;
41:19;47:1,11;76:17;97:2;
151:7,15;203:9,16,18,22;
204:4;206:17;207:3
**e-mailed (2)**
20:23;201:11
**e-mails (11)**
15:14;21:22;22:9,18,22;
203:2,15;204:9,16,16;
207:18

**EMILY (3)**
3:20;11:6,8
**emphasize (1)**
113:3
**employer (1)**
192:17
**empowered (1)**
180:12
**encompasses (1)**
149:22
**end (3)**
128:2;143:12,21
**ended (2)**
137:11;145:7
**ends (1)**
137:2
**enforcing (1)**
189:8
**engage (4)**
17:11;46:20;71:10,10
**engaged (1)**
137:10
**engagement (16)**
20:2;22:12,14,24;38:11,
23;39:7,24;40:5;75:21;85:8;
145:12;151:16;158:10;
159:13,15
**enough (6)**
67:23;68:2;112:22;114:3;
183:23;186:7
**ensure (1)**
193:17
**ensuring (1)**
189:6
**entail (1)**
191:24
**entered (7)**
125:15,17;128:12;152:6;
153:13;175:18;213:11
**entering (1)**
174:22
**entire (5)**
16:14,16,17;40:17;170:17
**entities (3)**
135:10;138:24;180:20
**entitled (6)**
34:23;58:23;81:24;82:10;
159:1;186:15
**entitlement (8)**
26:11;38:9;59:6;62:10,11;
74:20;75:10;89:2
**entitlements (1)**
181:9
**entity (2)**
78:18;139:24
**equal (1)**
171:4
**Eric (2)**
142:20;203:3
**ERISA (24)**
11:4;163:19,20;164:3,7,
16,19;166:21;167:8;169:15,
19;170:9;173:16,17;179:16;

181:16,21;182:6;183:2,4;
200:18,19;201:21,21
**ERISA-fied (2)**
164:11,17
**especially (1)**
74:10
**ESQ (6)**
3:7,8,18,19,20;5:6
**establish (1)**
73:19
**established (6)**
40:5;75:11;118:5;179:5;
182:5;189:5
**establishes (1)**
178:16
**establishing (1)**
117:3
**et (2)**
136:8,10
**ethics (5)**
73:2;132:23;176:19;
211:5,22
**evaluate (1)**
127:20
**evaluated (1)**
128:10
**evasion (1)**
147:11
**evasive (3)**
112:24;147:14;148:16
**Even (15)**
50:11;65:11,13;69:20;
91:15;92:5;105:20;110:3;
122:13;135:13;144:14,22;
157:21;202:6;211:6
**event (1)**
84:15
**events (1)**
95:15
**eventually (1)**
137:21
**everybody (3)**
9:8;185:17;186:2
**everyone's (1)**
208:23
**evidence (2)**
51:21,22
**E-V-O-Y (1)**
8:14
**ex (4)**
74:23;124:5,24;213:11
**exact (2)**
85:10;94:2
**exactly (22)**
13:10;19:17;23:1,6;57:11;
85:7;86:19;97:18;99:24;
100:3,20;101:15;106:20;
119:3;128:1;130:22;131:10;
132:12;137:15;167:18;
211:23,24
**exam (1)**
77:7
**EXAMINATION (1)**

9:22
**examined (1)**
8:22
**example (5)**
44:20;45:18;173:6;
193:13;203:7
**excerpt (2)**
142:6,9
**excerpts (1)**
16:15
**exchange (4)**
22:4;94:9,10;97:2
**exchanged (1)**
159:8
**excluding (1)**
144:17
**exclusive (1)**
26:8
**Excuse (1)**
55:19
**executed (2)**
23:5;48:6
**executive (4)**
19:24;94:23;95:16;104:11
**exercise (1)**
188:18
**exhaust (1)**
71:19
**Exhibit (17)**
12:4,5,9;13:21,22;14:3;
17:2;18:14;24:2,5,17;33:7;
134:18;142:6,8,9,13
**exist (2)**
91:4;133:19
**existed (2)**
92:13;156:3
**existence (2)**
57:5;70:7
**expect (1)**
115:11
**expectation (1)**
206:17
**expense (2)**
33:19;144:20
**experience (7)**
12:16;102:5;108:12,16;
113:18;121:22;202:19
**experienced (1)**
42:13
**expert (17)**
8:16;9:5;13:22;14:4;56:5;
79:4;90:2;113:1;120:15;
163:6;167:22;173:6,10;
182:10;184:20;195:4;212:8
**expertise (13)**
79:15;80:23;89:23;98:9;
123:9;132:11;135:23;
138:22;145:17;172:14;
173:24;184:10,12
**experts (6)**
9:3,6,9;16:1;211:5,22
**explain (7)**
30:19;52:8;193:1;194:2;

195:12;199:10;204:21
**explained (3)**
197:15;198:23;202:12
**explanation (1)**
137:9;144:2;192:22
**explicit (1)**
60:16
**express (1)**
156:11
**expressing (1)**
168:22
**expression (1)**
191:12
**extent (10)**
38:13;61:7;118:4;168:23;
194:4;195:12;197:16;
198:23;199:11;200:7
**extremely (3)**
54:17;148:21;177:20

**F**

**face (1)**
205:20
**fact (42)**
27:11;28:1,3,13,14,18;
39:10;50:14;55:5;56:11,15,
21;57:24;58:1,2,9,19;60:7,
11;68:22;70:8;73:2;78:7;
79:22;88:3;104:10,13,15;
105:10;110:12;124:4;
145:19;147:6;149:16;150:4,
11;160:6;165:21;166:6;
172:6,8;207:4
**factor (1)**
28:18
**factors (1)**
153:21
**facts (20)**
14:17;15:9,23,24;16:6;
32:15;51:21;55:14;75:19;
76:3,14;151:14,18;152:19;
153:5;192:1,2,3;204:23;
210:21
**factual (3)**
14:10,13,24
**failed (2)**
92:10;104:6
**failing (1)**
155:11
**failure (4)**
91:22;92:22;106:16;148:9
**fair (10)**
27:2;31:18;119:22;
126:13,17;135:13,19;143:1;
205:5;209:4
**fairly (3)**
40:24;131:2;145:18
**fall (2)**
154:8;194:8
**falls (1)**
133:2
**false (4)**

149:15,24;150:3,11
**familiar (6)**
100:4;119:5;120:3;
135:11;194:18;195:6
**familiarize (1)**
135:1
**far (3)**
14:23;110:2;148:7
**farther (1)**
68:1
**February (14)**
23:1,2,6;24:6;29:16;30:4;
37:5;38:16;48:6;51:11,16;
58:5;156:4;157:20
**federal (1)**
147:18
**fee (91)**
18:23;19:3;22:15;27:12,
21;28:8;29:18;30:16,19;
31:2;34:19;35:13;37:22;
38:3,9;39:21;40:4,13;41:12;
42:12,22;43:11;44:6;45:11,
19;49:3,22;50:1,8,17,18;
55:5;56:24;58:7,8,23;59:7,
21;60:4;62:1;67:16;68:20;
70:15;71:12;73:14,18;
74:17,21;81:14;82:1;86:9;
88:4,9,17,19;90:2,7,10;91:9;
92:6;93:4;95:11;105:23,24;
114:13;126:13;127:6,8;
131:20,22;133:24;140:8;
144:18,19;150:16,22;152:1,
8,9;153:14,15;154:10,11;
155:16;157:5;161:16;171:3;
172:10;186:16;197:6;213:4
**feeling (1)**
54:4
**feels (1)**
103:6
**fees (60)**
19:1,8;20:14;21:14;23:13,
14;24:21,23;25:10,12,14,19,
24;26:6,9,14;34:10;37:8,13,
15;38:8;39:15;41:15;42:11;
44:7,9;55:9;63:6;70:13;
73:16;74:5;75:4,6,11,14;
81:12;82:4,10,21;83:13;
85:17;93:19;97:6;107:11,
23;108:1;111:19,24;114:16;
125:5;128:3;136:3,5;137:9;
138:6;161:22;208:5;209:16,
17;213:7
**fee-sharing (8)**
18:19;27:4;89:4;90:15;
91:2;108:21;210:10,23
**fell (1)**
104:7
**few (3)**
15:2;17:20;109:19
**fictions (1)**
95:22
**fiduciary (23)**
44:16,17,23;45:9,10,22;

50:3,22;68:19,19;69:11;
120:12,17;121:2,5,12,18;
122:21,23;123:5;189:19;
190:13;192:4

**field (3)**
9:7;120:23;147:3

**figure (2)**
156:23;157:3

**figuring (1)**
180:23

**file (1)**
121:14

**filed (1)**
112:11

**files (2)**
53:2;141:5

**filing (1)**
204:5

**fill (2)**
135:17;204:23

**filled (1)**
157:15

**filling (2)**
102:2,11

**financial (7)**
32:18;48:14,16;49:7;60:1;
188:18;189:13

**financing (1)**
123:23

**find (7)**
15:24;95:13;115:24;
124:9;178:17;183:14;213:2

**finding (7)**
29:6;52:20;57:14;123:23;
161:4;188:13,15

**findings (1)**
131:5

**fine (11)**
21:2,14;22:19,20;39:5;
46:18;67:6;68:2;90:6;167:4;
201:5

**fingertips (1)**
165:17

**Firm (126)**
3:15;5:5;8:11,14;9:18;
10:21,23;11:9,12;18:24;
19:21;20:9,13,14;21:1,9,12,
12,15,15;22:15;32:17,20,22,
23;33:10,11;34:2,9;36:22;
37:18,23;38:6;39:3;41:20;
42:2,21;52:12;57:18;58:3;
69:1,4;70:9,12,15;71:7,11,
12,24;72:24;73:4,10,15;
74:16,18,21;75:14,16,22;
76:8,10;80:15,16;82:4,15;
85:17;88:16;89:17,22;
90:24;91:11;93:4;95:2;97:3,
5;98:8,10;99:18;100:13;
117:20,20;118:7;124:4,6,22;
126:9,11,11;130:14;135:17;
136:12,16;138:13,23;140:5,
21;141:1,6,10,21;144:14,22;
145:4,8;146:8;158:17,20;

170:21,22;171:2,2;173:8,9;
175:19,24;176:3;178:18;
181:1,9;182:13;189:9;
192:7,13,14;213:11,13

**firms (24)**
32:22;60:2;73:3;97:20;
98:15;100:23;101:8,10;
111:21;124:3,7,12;127:5;
137:23;138:11;145:13;
150:19;171:5;174:18;175:9;
176:11,13;183:14;201:1

**firm's (4)**
18:20;75:10;96:7;158:12

**first (15)**
11:22;27:20;32:24;58:13,
16;59:3;85:2;88:8;136:7;
153:17;167:7;168:9;204:10;
205:1;210:17

**floor (3)**
71:19;72:8,21

**fluidy (1)**
209:21

**focus (2)**
29:15;58:2

**focusing (1)**
58:1

**folk (1)**
212:17

**follow (5)**
67:24;118:15;164:2;
178:4;202:10

**followed (1)**
59:12

**following (1)**
138:4

**follows (1)**
8:23

**footnote (3)**
87:7;186:11,18

**forbidden (1)**
146:19

**forbids (1)**
146:20

**forecast (1)**
128:1

**form (2)**
120:19;152:18

**formalizes (1)**
49:16

**formed (2)**
114:7;137:21

**forming (3)**
63:4;100:18;197:5

**formulating (2)**
15:4;20:18

**formulation (1)**
187:14

**forth (22)**
16:12;17:15;19:20;21:22;
22:10,18;39:1;40:3;42:1,7;
44:13;72:20,20;76:18;
85:14;151:17,23;152:23;
159:8;171:16;198:16;207:4

**forward (5)**
40:7;74:23;91:11;92:20;
206:4

**forwarded (2)**
204:6;205:8

**forwarding (2)**
205:9;206:12

**found (2)**
103:14;145:8

**foundation (1)**
205:1

**four (4)**
61:16;164:8,19;165:10

**frame (1)**
94:15

**framework (2)**
65:10,15

**fraud (3)**
148:20;149:13,20,21;
150:2

**fraudulent (3)**
148:11;149:7;150:6

**front (1)**
33:3

**full (8)**
10:1;13:3;45:6;65:18;
66:6;170:15,16;171:6

**fully (4)**
38:14;112:19;172:4;
197:24

**fun (2)**
54:17;77:6

**functions (1)**
123:23

**fundamental (1)**
50:23

**fundamentally (1)**
50:2

**funny (3)**
102:23;139:21;147:8

**further (9)**
41:4;68:12;69:7;72:22;
74:24;118:8;139:7;175:3;
214:5

**future (1)**
83:14

**FX (1)**
150:17

## G

**gather (1)**
171:21

**gave (3)**
16:2;122:4;212:12

**geez (1)**
103:7

**general (7)**
52:12;83:12;108:14;
111:23;119:9;158:12;
180:17

**generality (4)**
149:2,5;189:23;191:9

**generally (5)**
108:18;115:22;188:22;
195:18;205:13

**George (13)**
19:24;118:19;120:6;
129:13;141:23;142:7,10,17;
202:13;203:5;204:18;
206:14;207:19

**Gerald (1)**
8:5

**gets (5)**
88:23;100:6,21;161:22;
182:4

**GILLERS (6)**
5:7;8:15;9:2;147:22;
195:2;211:10

**Gillers' (2)**
147:1;203:20

**given (22)**
30:4;33:21;43:2,14,22;
51:13;56:23;68:10;86:24;
87:3;95:12;98:21;108:15;
121:22,23,23;130:1;143:10;
185:3;212:3;213:6;215:12

**gives (2)**
161:22;210:13

**giving (1)**
169:3

**GLASS (3)**
3:8;10:14,14

**goes (5)**
41:19;42:2,3,18;47:15,16;
82:2;136:21;137:1;148:8;
185:8;186:18;212:20

**Goldman (1)**
203:10

**Good (5)**
11:17,18;52:5;164:14;
191:21

**governed (3)**
171:17;193:12,15

**governing (1)**
45:19

**government (2)**
135:10,11

**governs (1)**
84:9

**grant (1)**
104:3

**greater (1)**
78:21

**grounds (1)**
74:20

**group (5)**
177:15,19;178:21;180:13,
24

**guess (2)**
21:5;146:11

**guessing (1)**
98:23

**guy (2)**
59:8;102:3

**guys (2)**

103:1,7

# H

half (5)
40:20,21;147:24;148:3;
184:16
HALL (3)
3:3;10:10,15
hand (4)
113:23;115:13;157:9;
187:8
handed (1)
33:4
handy (1)
14:18
hang (2)
104:17;174:24
happen (5)
89:9;138:10;155:12;
167:18;202:6
happened (9)
31:11;88:14;90:7;94:5,14;
95:16;150:18;155:13;213:5
happens (3)
128:6;211:19;212:23
happy (4)
66:2;67:6;104:2;204:22
hard (4)
44:13;60:23;154:4;157:3
HARLAN (3)
3:20;11:8,8
harmonize (1)
209:14
Hartford (1)
203:23
hawk (1)
156:7
head (2)
104:17;146:14
heading (1)
14:4
hear (2)
191:12,16
heard (1)
143:9
Hearing (2)
11:15;165:3
hearings (1)
185:9
HEIMANN (12)
10:16,16;24:9,15;167:12;
175:13;177:9;199:16;
200:14,21;201:3;213:20
held (2)
145:24;147:9
help (1)
168:3
helps (1)
15:22
hereby (1)
215:7
here's (3)

71:18;117:24;212:8
Herron (20)
32:23;35:20;36:14;37:18;
58:21;59:18;68:14;99:17,
18;100:13;101:18;134:20;
137:1,7;174:10;175:19;
203:8,21;204:17;205:10
heuristic (1)
212:8
hey (2)
89:21;167:22
hiding (1)
95:2
high (2)
191:9,18
highlight (1)
28:4
himself (2)
99:16;108:20
hindsight (3)
125:2;127:21;128:5
hiring (2)
42:14;196:7
hold (1)
38:21
holding (1)
91:23
honestly (4)
151:4;153:6;157:1,14
Honor (8)
55:18;64:1,12;79:1;
194:20;200:21;201:8;
206:17
Honorable (1)
8:7
Hopkins (103)
15:18;19:24;22:11,17,18;
35:1,5;38:21,22,24;56:16;
57:23;58:12,20;70:2,7,21;
76:1,4,9,12,17;78:17,19;
84:17;85:15;86:2,12,13,24;
87:7,9,13;94:9,23;95:4,24;
99:15,24;100:11,19;102:16;
104:6,7,16,22;107:10,15;
108:11,16;109:4;118:16,20;
119:19,22;120:6;121:14;
123:4,16;124:17,20;125:20;
128:14,15;138:19;139:15,
18;141:14,18,24;142:7,10,
16,23;143:5;144:2;151:17,
23;152:1,2,23;192:3,7;
202:13;203:5,9,22;204:4,7,
18;205:8,8,21;206:1,4,5,8,
14;207:11,15,20,22;208:2
Hopkins' (7)
95:16;99:20;107:21;
129:3;143:18;192:16;
202:19
hour (1)
13:1
hourly (3)
13:11;125:9;136:6
hours (1)

13:3
house (1)
143:13
human (2)
139:22;140:1
hundred (1)
181:3
hundreds (1)
103:8
HYLENSKI (3)
5:6;24:3;173:2
hypothetical (11)
66:3;67:5;71:5;109:9;
117:8;118:2;128:15;140:19;
153:20;155:20;208:14
hypothetically (4)
151:6,7;152:5;153:11
hypotheticals (5)
51:20;54:14;67:7;162:12;
213:23

# I

idea (16)
13:7;30:1;40:10;60:18;
61:1,11;67:11,13;77:2;
83:10;151:4;158:17;167:23;
168:4;177:14;208:2
identification (6)
12:7;14:1;24:8;33:9;
134:22;142:12
identified (5)
63:20;68:11;144:15,23;
145:4
identify (5)
10:7;11:1,7;71:7;130:23
identifying (1)
185:11
imagine (6)
54:1;89:12,19;140:18;
178:1;180:3
immediately (1)
181:4
impact (1)
188:23
imperfectly (1)
151:12
implications (1)
107:16
imply (2)
42:24;43:7
important (10)
28:1,2,13;51:1;66:20,22;
103:21;116:19;117:14;
168:17
importantly (1)
45:21
imposed (1)
121:17
imposes (1)
104:14
impression (1)
103:10

improper (1)
92:16
impugn (1)
159:10
imputed (1)
139:23
inappropriate (1)
83:20
inception (1)
28:23
include (4)
82:12;100:10;115:3;182:6
included (5)
94:8,9,10;165:8;166:16
includes (2)
121:3;200:23
including (10)
60:9;114:14;115:4;136:3;
138:24;150:20;189:19;
200:18;201:20,21
incorporation (1)
149:24
increase (1)
90:6
increasingly (1)
109:20
incur (3)
109:15;190:23;191:2
incurring (2)
109:24;191:6
independent (4)
33:12;37:9;137:16;195:3
independently (2)
32:21;78:23
India (1)
73:4
indicate (6)
29:8;33:23;160:13;
206:13;207:19;209:2
indicated (1)
86:13
indicating (1)
103:13
individual (2)
119:9;140:13
individuals (5)
164:8,19;165:10;177:16;
200:19
indulge (1)
135:24
infer (1)
206:11
inferred (1)
202:19
inform (30)
31:12;41:9;70:2,7;88:19;
90:21;91:5,19,22;92:17;
93:18;106:3,18;109:4;
110:7;112:18;116:11,23;
117:21;121:16;131:19;
152:12;153:18;155:17,19;
158:3;177:6;181:23;183:3;
201:18

**informal (1)**
177:18

**information (30)**
21:19;31:7;41:22;43:23;
46:3;48:2;52:2,18;62:16;
67:14,17,18;69:8;70:14;
74:23;75:1;85:24;90:23;
94:6;96:3;112:23;133:11;
140:4;155:12;159:3,7;
185:3;198:20;200:5;206:13

**informed (76)**
19:7;31:24;38:15;41:16;
42:4;43:2,7,15,18;44:5,21;
49:15,17,21;51:8;52:1,10,
21;53:12,23;54:2,10,12,15,
20;60:19;61:1,14;63:11,18;
64:3,21,22;65:9,17;66:3,5;
67:4;69:13,16,21;74:15;
75:13;77:2,9;83:6;90:17;
91:2;100:8;103:22;104:20,
22;105:22;114:12;116:7;
138:5;150:15;174:3;193:3,
9,12,16,19,23;194:5,16;
195:14,20;197:18,21;198:1,
12;199:1,13;200:6,9

**informing (7)**
19:1;55:8;62:16;73:15;
74:4;81:12;152:1

**informs (3)**
12:16;29:9;47:22

**inherent (1)**
189:2

**in-house (1)**
140:23

**initial (1)**
186:13

**initially (2)**
15:2;34:1

**injury (1)**
124:14;145:1;210:8

**inquired (1)**
133:22

**inquiring (1)**
152:16

**inquiry (2)**
160:2;192:15

**instead (2)**
174:6,10

**institutional (1)**
163:23

**institutions (1)**
174:17

**instruct (2)**
64:6,8

**insurer (2)**
72:11;158:14

**integrity (2)**
189:6,10

**intelligently (1)**
207:2

**intended (5)**
146:21;152:11;153:18;
155:17,18

**intent (1)**
160:1

**interactive (4)**
14:22;15:1;16:9;17:11

**interest (16)**
131:23;173:23;174:8,13;
175:1;187:7,7,8,24;188:16,
17,22;189:4,14;193:14;
213:5

**interested (4)**
52:19;70:23;84:19;85:3

**interesting (14)**
44:8;50:7,20;51:24;54:17;
68:18;74:9;77:6,12;82:2;
130:20;156:9,19;191:22

**interests (7)**
42:20;132:7,16;178:9;
183:5;184:24;187:23

**interject (2)**
77:15;176:23

**International (1)**
3:5

**interpret (1)**
209:13

**interpretation (5)**
146:23;156:23;209:13,22;
210:1

**interpreted (1)**
147:4

**interrupted (1)**
56:4

**intersect (1)**
182:19

**intimated (1)**
186:19

**intimately (1)**
92:3

**into (36)**
18:3;27:13;39:4;45:9;
46:11;47:15,16;54:5;60:18;
64:19;68:1;69:15;80:5;85:3;
87:18;88:5;89:5;90:16;
101:5;114:1;115:22;125:15,
17;128:12;132:20;133:22;
152:7;174:23;175:18;178:8;
183:24;185:8,10;196:22;
197:3;213:11

**intra (1)**
173:7

**introducing (1)**
186:14

**introduction (1)**
37:23

**introductions (1)**
38:6

**inundated (2)**
101:7;103:1

**investigate (1)**
83:23

**investigation (3)**
8:8;102:21;154:1

**investigative (1)**
64:14

**invoking (1)**
49:5

**involve (1)**
108:20

**involved (4)**
42:11;127:5;163:19;196:8

**involvement (2)**
136:15;196:3

**involving (2)**
183:11;189:2

**irrelevant (1)**
158:9

**issue (12)**
61:20;64:21;85:18;88:12;
127:11;130:4;156:10;
174:13;176:16;183:9,21;
212:2

**issues (3)**
42:15;89:23;127:12

**item (3)**
12:8;13:20;14:2

## J

**JAMS (1)**
5:6

**JOAN (8)**
3:7;10:7,9;13:15;55:20;
64:6;130:1;213:16

**joanlukey@choatecom (1)**
3:10

**Joan's (1)**
152:20

**job (1)**
104:7

**joined (1)**
11:14

**joins (2)**
9:18;24:3

**joint (13)**
19:2,9;35:22;36:5;73:17;
81:13,15,23;82:8;134:18;
194:11,14;204:5

**jointly (1)**
36:13

**Jones (8)**
161:15,20,22;210:9,9,12,
13,19

**Josh (1)**
11:10

**JOSHUA (2)**
3:19;11:11

**Joy (1)**
201:11

**Judge (14)**
8:9;25:4;76:21;107:8;
122:18;128:14;148:18;
162:9;174:2;175:4;202:11;
211:7,18,21

**judge's (1)**
188:19

**judgment (1)**
174:22

**July (2)**
134:17,20

**jurisdictions (7)**
83:7;152:10,17;153:16,
24;160:8,12

**justice (1)**
149:23

**justify (1)**
89:15

## K

**keep (5)**
61:13;66:1;129:21;
171:11;206:13

**Keller (2)**
11:4;214:1

**Kelleys (7)**
27:5,6,11;88:4;89:5;
90:16;92:7

**KELLY (7)**
3:18;9:18;10:22,22;201:6;
208:7;213:22

**kind (46)**
15:20;16:9,22;30:14;
31:15;39:10;41:14;44:10;
45:8;48:19;57:20;60:18;
68:17;74:12,22;76:18;77:6;
86:20;88:23;96:3;98:17;
102:2,10;109:8,20;113:5;
115:8,10;129:2;137:13;
139:9;147:2,4,13,14;156:7,
9;159:8;176:18;177:24;
181:7;182:14;185:22;
189:24;191:9;204:23

**kinds (6)**
42:15;51:3;105:23;
131:20;143:16;180:19

**knew (25)**
38:24;47:21;58:13,15;
59:20,22;67:23;76:12;
92:16;94:10,17;96:7,19,20;
97:7;99:16,24;100:11;
101:17,19,21;108:13,16;
118:20;210:22

**know (175)**
15:19;16:3,21;22:19;23:6;
24:12;32:10;39:2;41:10,23;
42:19;43:9;49:12;50:5;
52:19;53:5;54:4,24;57:1,9,
9;59:7,23,24;60:6;61:15;
65:21;66:23;67:13;68:2,16,
17;71:6;74:17,17;76:7;79:6,
9,18;82:1,19;83:6;84:10,14;
87:19;89:16,18;90:5;92:2;
94:2,19,20,21;95:5,6,13,20;
96:16,19,22,23;97:1,3,16;
98:9,11;99:22;100:6,8,10;
102:4,9,17,18;104:8,10,13,
17;105:8,9;106:8;107:10,22,
23,24;108:1,3;110:4;111:5;
113:14,19;114:3,22;115:6;
116:20;117:15,20;119:4,10;

120:13;121:13;122:4,12;
123:1,10;130:21;132:3;
133:16;137:13;138:13;
139:10,20;141:7,19,21;
143:10,11,12,14;145:16;
146:23;148:3,18;150:13;
153:7;154:3,16;156:14;
157:1,14;158:12;162:24;
163:1,7,11;164:4,12,15;
166:1;168:2,2,3;169:2;
173:8;177:13;178:7,12,23,
24;180:5;182:22;183:10,23;
184:1,3,11,14,16,19;185:15;
190:4;191:21;192:13,14;
202:4,6,7;206:1,9;207:1,9,
12,23;211:9;212:8

**knowable (1)**
115:23

**knowing (1)**
113:19

**knowingly (1)**
156:13

**knowledge (14)**
47:16;57:17;96:3,5,14;
99:20;103:18;108:11;
135:14;139:23;140:1;
142:16;157:13;193:18

**known (5)**
59:10,13;116:16;148:24;
157:10

**knows (21)**
9:8;42:15,19;52:7,18;
54:3;67:15;71:23;89:22;
100:2,3,6,19;101:13;102:7;
140:4;148:8;167:16;190:22;
194:13;196:1

# L

**Labaton (124)**
3:4;5:4;10:10,13,15;
18:20;19:21;20:11,24;21:6,
7;22:1,10;23:12;24:6,21;
33:24;34:10,20;35:9,12;
36:13,20;37:17,23;38:5;
40:22;42:9;50:17;51:10;
53:6;59:18;60:3;61:22;
67:21;68:15;70:17;78:9,22;
79:8;83:6;84:5,10;93:13;
94:11;96:1,2,21,24;97:11,
21;101:21;103:21;104:20,
22;107:14;108:17;109:3;
110:21;111:7;112:3;116:8,
22;121:15;122:4;127:3,13;
130:6,16,17;131:19;133:10;
134:19;136:21;137:7,13;
138:3,19;141:16;151:11;
152:7,10,13;153:4,13,17,21;
154:5,9;155:15;157:19;
160:6,13;162:3;166:8,24;
167:6;168:10;169:5,13,24;
170:3,14;171:4;172:4;
173:13;175:8;177:5;179:14;
181:16;183:1;186:14,16,23;
187:6,15,18;197:9,14;
198:22;199:8,9;201:17;
202:12

**Labaton's (13)**
9:3;22:7;58:8;79:11,19;
107:12;112:18;114:16;
134:5;177:3;179:11,22;
200:10

**labored (1)**
188:16

**lack (1)**
28:17

**language (16)**
37:12;39:6,13,14;43:10;
44:22;50:5;65:17,24;66:5;
67:10;70:16;97:15,18;
149:18;194:9

**large (1)**
61:20

**larger (3)**
63:19;111:13;127:8

**last (3)**
64:20;129:18;143:2

**late (2)**
85:9;94:14

**later (15)**
31:13;34:6;37:5;38:21;
40:19,20,21,21;81:5;88:17;
90:20;91:16;125:19;128:4;
210:16

**laterally (1)**
181:2

**latter (2)**
75:11;129:5

**Law (122)**
3:15;5:5;10:21,23;11:9,
12;20:9,13;21:1,8,12,12,15,
15;22:15;41:20;42:2,21;
45:18;46:19;52:12;57:18;
60:2;61:9;69:1,4;70:12,15;
71:7,11,24;72:24;73:3,4;
74:15,18,21;75:10;77:6;
80:15,16;82:4;84:8;88:16;
89:17,22;90:24;91:11;93:4;
95:2;96:7;97:3;98:9,14;
99:17;101:7;111:21;113:8,
20;117:2,9,20,20;118:7;
124:3,4,6,7,12,21;126:9,10,
11;127:5;129:3;130:14;
138:10,23;141:1,6,10,21;
144:14,22;145:4,13;146:8;
147:18;148:3;149:12,16;
150:4,11;158:12,17,19;
159:11;168:21;170:22;
173:6,22;174:18;175:7,24;
176:11,13;178:1,18;181:1,9;
182:11,13;183:13;189:9;
192:7,13,14;199:23;200:24;
212:13;213:11,13

**lawsuit (1)**
187:9

**lawyer (59)**
41:8;44:9;45:1,3,6;57:4;
69:7;71:20;72:1,7,10;84:3,
4;88:15;89:13,20;91:9;
92:15;106:1,2,11,13;109:11,
22;113:6;114:20;115:6,23;
117:10;121:23;125:5,7,8;
131:11;133:2;140:23;
150:10;156:12,13;158:9;
174:14;177:18;189:16,24;
190:3,4,5,7,11,18,22;191:5,
13,21,22;193:17;195:11;
196:10,18

**lawyer/client (3)**
182:4;195:18;197:5

**lawyering (1)**
159:11

**lawyers (42)**
18:23;20:11;22:2,10;
45:22;73:14;83:14;103:3;
105:14;114:24;115:11,16;
121:4;124:1;125:16;126:7;
127:3;130:16;139:2;150:23;
152:7;153:4,13;158:20;
159:6,10,21;170:4,9;172:15;
173:16;176:5;177:21;
178:11;179:14,14;180:6;
181:22,22;183:3;196:8;
209:16

**Lawyers' (1)**
146:5

**lawyer's (10)**
106:17;110:6;113:13;
115:2;131:13;150:16;156:6;
168:20;174:22;192:22

**lay (1)**
205:1

**LBS011060 (1)**
24:7

**LBS017455 (1)**
33:8

**LBS017456 (1)**
33:6

**LBS017505 (1)**
203:19

**LBS017738 (2)**
134:16,21

**LBS017751 (1)**
138:2

**LBS018437 (1)**
204:3

**LBS018439 (1)**
203:8

**lead (13)**
34:11,12,20,21;53:9;
130:17;136:15;166:8;167:1;
169:13;173:13;185:2;
200:11

**learn (1)**
141:6

**learned (1)**
167:24

**least (7)**
36:20;43:1;116:3,5,9;

**138:1;181:21**

**leave (1)**
145:7

**leaving (1)**
20:10

**left (2)**
8:12,14

**legal (18)**
20:3;51:4;82:6;95:21,21;
109:24;116:1;123:24;126:9;
132:23;139:21;172:14,19;
176:19;181:8;186:19;191:7;
211:5

**length (6)**
44:10;45:8,16;48:20;
50:10;69:9

**less (2)**
125:6;194:15

**letter (8)**
20:21;22:14;24:5;38:23;
40:18;48:6;85:8;162:14

**letting (1)**
90:5

**level (9)**
71:1;149:2,5;189:23;
191:9,18;195:20;196:1;
198:13

**liability (12)**
72:11;109:16,24;116:1;
156:16,21;157:5,8;159:17;
190:23;191:2,7

**liaison (23)**
23:13;24:22;25:11,18,24;
26:6,16;34:3,17;36:1,7,23;
37:10,14;38:1,7,18;39:16;
55:3;57:6;58:5;61:23;108:2

**lie (1)**
147:14

**Lieff (8)**
10:17,18,18,18;170:21;
171:1;172:7;175:8

**light (1)**
130:11

**limited (3)**
135:14;186:13;188:22

**LINDA (4)**
5:6;24:3;172:23,24

**line (5)**
54:19;142:15;159:14;
179:5;213:24

**lines (4)**
98:15;168:2;178:2,4

**list (1)**
32:21

**listed (3)**
21:23;150:19,23

**listened (1)**
207:9

**literal (1)**
182:4

**literally (2)**
147:4;182:12

**litigated (1)**

52:15
**litigation (9)**
23:15;24:24;131:8;136:4;
164:3;185:8;186:24;203:11,
24
**little (15)**
17:13,14;30:7;44:17;
102:6;103:9;120:3,3;143:6;
170:16;179:8;183:10;191:4;
206:20;211:11
**live (2)**
92:2;162:19
**LLP (4)**
3:3,14;134:19,20
**local (55)**
20:5,6,9,13;21:1,8;23:13;
24:22;25:11,17,23;26:5,16;
34:3,17;35:2,8,24;36:1,7,23;
37:9,14;38:1,17;39:3,16;
55:3;56:19,22;57:2,6,11;
58:4,22;61:23;70:11,22;
71:10;72:16;84:18;85:4;
93:19;100:23;101:7;103:3;
108:2;124:8;174:18;206:2,
7,9;207:12,24;208:3
**Lodestar (1)**
150:19
**long (10)**
42:12;90:6;93:7;95:6;
100:2;109:10,10;135:1;
143:23;153:9
**longer (5)**
34:16;58:4,22;128:16,24
**look (24)**
15:10;31:19;39:12;42:10;
65:20;76:2;125:2,7,8,21;
127:11,21;128:5;134:24;
135:6;137:23;141:4,5;
155:24;156:20;157:3;
158:10;180:12;184:11
**looked (10)**
13:10;15:7,10,21;16:22,
23;17:7;29:2;141:18;146:4
**looking (11)**
12:8;24:17;32:16;63:3;
97:14;99:13;135:24;137:5;
142:13,17;160:14
**loss (1)**
159:16
**lost (1)**
210:21
**lot (19)**
15:20;20:1;27:23;41:13;
89:10;94:6;99:9;123:18;
127:12;130:23;132:14,22;
177:11;179:3;182:16,21;
186:6;195:23;203:15
**love (1)**
147:12
**LUKEY (182)**
3:7;8:24;9:13;10:9,9;
15:22;19:10;23:16,24;
27:22;29:12;30:6;32:7,10;

33:2;38:19;41:2,6;44:2;
46:5;47:3;50:19;51:18;
53:13,19;55:7,10,17,21;
56:2;58:11;60:13;62:19;
64:1,11,18;66:24;70:10;
71:4;73:19,23;74:8;75:8;
76:23;78:5;79:1;80:6;81:21;
83:9,18;84:7,13,23;87:17;
88:10;93:16;96:12;97:23;
100:14;104:1,24;106:5,19;
108:8;109:7;110:23;111:9,
16;114:17;116:13;117:1,6,
18,23;118:22;119:12,16;
120:18;121:21;122:9,16,24;
123:7,13,17;124:19;126:6,
21;127:18;128:21;129:11;
130:7;131:24;132:9;133:14;
134:6;135:21;138:7,20;
139:16;140:9;141:17;142:1;
143:20,23;144:8;148:13;
149:10;150:9;151:1,13;
152:15;153:22;155:21;
158:6;160:20;161:2,5;
162:1,23;163:5;164:13;
165:11;167:11,13;168:11,
14;169:16,21;170:7,12,23;
171:10;172:11,17;174:11;
175:15,22;176:7,9;177:8;
179:24;181:24;183:8;185:5,
19;186:3;187:11;188:10,12,
20;189:22;190:15;191:15;
192:9;193:6;194:7,20,24;
197:1;198:5,7;199:15;
200:13;201:4,8,15,24;202:2,
14,22;204:19;205:12,17;
206:15;207:14,17,21;
208:12;210:20;212:6;
213:17
**lunch (1)**
113:24

**M**

**Madam (5)**
8:18;12:2;13:19;24:1;
142:4
**maintained (1)**
186:15
**maintaining (1)**
189:10
**maker (1)**
148:8
**makes (3)**
51:1;131:5;212:19
**making (11)**
80:11;88:18;108:14;
119:8;129:2;140:14;141:22;
154:8;179:7;196:4;209:24
**managing (1)**
140:24
**manner (6)**
41:21;180:5,9;181:5,11;
182:3

**Manual (1)**
146:5
**many (8)**
13:3;84:19;103:3,3;
109:18;145:12,12,12
**March (4)**
13:24;14:4;23:2,7
**Mark (1)**
8:7
**marked (13)**
12:3,6,9;13:20,24;14:3;
24:2,8;33:9;134:15,21;
142:5,11
**market (2)**
45:8;68:19
**Mass (5)**
81:17,19;123:20;124:14;
145:2
**Massachusetts (18)**
3:6,17;82:3,5,13,16;84:8;
146:16;149:8;152:21;
160:10,19;171:22;172:2;
194:22;195:6,10;209:16
**Master (193)**
8:5,8;9:10;25:5,22;26:3,
13,19;28:20;29:4,14,20;
31:18;32:3,8,14;33:5,10,21;
34:5,15;35:4,14,17;36:9,17,
19;37:4,16,20;38:12;39:9;
40:15;41:3;42:23;43:5,12,
20;45:24;46:22;47:7;48:3;
49:13;50:11,14;51:7;53:3,
16;54:21;55:8,15,19,24;
56:9;57:20;58:16;59:1,13;
60:7;61:18;62:8,11,15;
63:17;64:5,16;65:1,7;66:8,
11;68:9;69:12,18;77:14,21;
78:1,7,20;79:5,22;80:24;
83:22;99:12;100:9;101:16,
23;102:16;103:12;104:19;
105:20;106:15,21;107:20;
108:22;110:9,14,17;111:1,6,
11;112:1,8,13;114:4;116:2,
18;117:4,12,19;118:11;
130:3,15;131:15;132:6;
133:6;134:3,7,9;137:16;
156:3;157:17;159:18,21,24;
160:4,22;161:8;162:16;
163:9;17,22;164:6,18,21;
165:1,6,13,20;166:1,5,12,16,
20,23;167:5,15;168:7,12;
169:6,11,17;170:3,8,14;
171:1,20;172:1,13,19;
173:11;176:22;179:7;
181:15;182:24;184:6,9,21;
185:16,23;192:20;193:21;
194:1,17,22;195:7,9;196:21;
197:7,12,22;198:3,6,8,15;
199:4;200:4,16;201:2,13,16;
202:1,8;208:17
**master's (1)**
102:20
**material (15)**

19:11;46:3;54:23;55:5;
56:10,21;57:16;58:10,19;
60:11;62:16;63:7,13,23;
66:19
**materiality (9)**
60:24;61:10;62:23;63:1;
64:2,24;65:16;66:2;69:21
**materially (1)**
148:9
**materials (1)**
165:18
**matter (56)**
8:3,17;23:3;27:13;28:7,
11;30:18,24;31:1;39:19,20,
22,23;40:1,2,6,14;44:15;
46:18;47:18;48:10,17;49:4,
4,16;52:22;58:7,7;75:2;79:17;
85:23;88:5;89:15;90:11;
91:10;92:19;93:15,22;
102:20;122:14;132:4;
136:17;139:8;145:6;147:18;
148:10;162:4;175:6;190:2;
194:3,13;195:12;198:23;
199:23;200:7;203:1;209:12
**matter-by-matter (5)**
30:15;20;31:16;40:13;
48:18
**matters (5)**
30:14;48:13;136:11;
144:18;161:23
**may (78)**
8:24;18:24;19:17;20:13,
14;21:1,8;23:13;24:21;
25:17,18,19;32:22;33:10;
44:18;46:1;48:12;57:3;
59:16,18,19;64:12;70:11;
71:9,10,11;72:1,10,15,15,
16;73:15;74:15;75:1;79:16;
82:4;83:13;87:24;88:16;
92:9;105:8,8;109:13,14,15;
118:7;124:5;128:4,4;
132:23;136:16;137:9;145:3,
4,4,6,14;150:10,13;168:20;
176:23;177:15,19;180:6,9;
183:16,18;184:24;190:21;
191:3,4;194:20;195:23;
201:4;203:7,18;204:3
**maybe (10)**
20:7;32:5;38:21;47:7;
89:22,24;155:7;162:9;
179:16,17
**M-C (1)**
8:13
**McEvoy (1)**
8:13
**mean (19)**
19:11;20:8,8;43:7;59:14;
81:15;94:20;98:5;110:13;
128:23;133:1;151:4;159:10;
164:12;165:11;172:17;
187:19;191:23;209:19
**meaning (4)**
32:23;152:8;153:15;157:5

**meaningful (6)**
86:7,20,21;113:12;
191:19;192:19
**meaningfully (3)**
85:22;94:22;127:20
**meaningless (1)**
191:10
**means (6)**
62:8;69:9;81:23;157:4;
196:16,18
**meant (5)**
79:7,9;132:19;159:6,15
**member (2)**
150:22;151:3
**members (24)**
107:16;131:19;164:9;
165:7;166:18;173:17;174:8;
177:2;178:9;179:11,22;
181:17,21;182:7;183:2,4;
184:23,24;185:2;199:13;
200:18,20,24;201:21
**memorized (1)**
19:18
**memory (2)**
32:13;203:12
**mens (4)**
156:12,15,23;157:14
**mental (1)**
156:6
**mention (3)**
22:14;93:5;144:2
**mentioned (1)**
142:18
**merely (2)**
72:8;138:23
**mess (2)**
95:8;101:6
**messages (1)**
206:12
**met (1)**
13:15
**MICHAEL (4)**
5:4,5;10:12,20
**middle (2)**
89:15;90:11
**midstream (15)**
28:1,24;29:1;30:22;39:10,
17;40:8,10;45:12;88:22;
89:8;91:6,8,13,14
**might (17)**
42:16;77:6;81:9;110:7;
125:7,8,11;151:3;155:7,8,
12;160:13;176:1;180:20;
183:18;185:4;192:3
**Mike (1)**
13:15
**million (5)**
121:20;123:11;127:16;
212:2;213:4
**mind (3)**
39:8;123:3;171:11
**minimum (1)**
72:8

**minority (1)**
82:18
**minutes (1)**
201:14
**mislead (1)**
146:21
**misleading (2)**
147:5;148:9
**misremembering (1)**
59:19
**misrepresentation (3)**
148:11;149:7;150:7
**misstated (1)**
47:8
**mistake (2)**
155:7,15
**mistaken (1)**
155:11
**misunderstand (1)**
90:8
**mix (1)**
68:18
**model (3)**
77:3;81:18;146:6
**modification (8)**
28:2;30:22;40:8;88:22;
91:8,13,15,21
**modifications (4)**
16:4;28:8;45:13;89:8
**modified (1)**
68:5
**modify (2)**
16:5;118:3
**modifying (3)**
25:11;26:4,15
**moment (4)**
10:5;25:3;160:5;161:12
**money (3)**
122:19;174:5,10
**monitoring (9)**
32:18;35:20,22;36:5,12;
56:18;97:21;98:16;108:18
**months (5)**
27:13;88:5;89:5;90:16;
92:14
**Moore (1)**
156:18
**morality (1)**
212:17
**more (25)**
10:5;15:6,6,7;16:11,23;
29:2;38:14;67:24;69:2;
85:24;88:18;106:14;112:19;
113:14;133:16;160:9;179:1,
8;183:20;184:3,14;185:22;
186:5,21
**morning (2)**
11:17,18
**most (1)**
32:19
**mostly (2)**
15:15;17:17
**motivations (1)**

158:8
**moved (1)**
149:14
**moving (2)**
91:10;92:20
**much (4)**
41:10;46:12;127:8;139:11
**must (12)**
43:2;57:4;59:10;100:18;
102:4,12;118:7;153:23;
154:12,15;190:12;191:13
**mute (2)**
172:22;173:1
**myself (6)**
14:17;102:3;107:8;113:1;
173:5,10

# N

**name (6)**
8:10;10:1,2;142:18;
144:24;146:8
**named (5)**
118:21;162:6;165:8;
166:17;169:19
**names (1)**
15:20
**Nancy (1)**
156:18
**narrative (1)**
100:18
**national (4)**
56:17;101:1,10;124:6
**natural (1)**
78:18
**nature (18)**
35:6;38:16;51:9;68:13;
77:23;78:11;109:4;112:14,
17,21;114:13;115:19;
116:12;119:2;127:3;158:4;
171:6;172:5
**necessarily (4)**
115:12;156:20;159:12,13
**necessary (18)**
33:18;70:1,6;71:2,6;
89:21;92:20;123:22;186:21;
188:23;192:24;194:4;
195:13,23;197:17;198:24;
199:12;200:7
**need (19)**
12:13;21:11,15;31:7;35:2,
8;52:8;75:1;89:24;90:2;
94:19;105:8;124:11;135:1;
140:13;145:5,15;183:18;
192:11
**needed (4)**
15:6;41:23;50:7;87:2
**needs (12)**
41:10;42:19;52:18;57:1,9;
74:16;89:17;100:8,10;
179:9;190:5;207:1
**negligence (1)**
157:12

**negotiate (2)**
42:21;126:7
**negotiated (4)**
47:18;49:10;67:16;127:10
**negotiates (1)**
126:10
**negotiating (5)**
44:12;46:4;93:3;127:9;
197:6
**negotiation (11)**
40:2;45:16;46:7,19;50:1;
68:20;69:11;72:4,20;94:5,
13
**negotiations (1)**
39:1
**network (1)**
174:17
**networks (1)**
124:8
**nevertheless (2)**
53:12;69:15
**new (5)**
19:24;28:15;40:1;89:16;
115:10
**Next (7)**
65:3;136:22;137:1,2;
167:20;178:14;201:10
**nine (1)**
158:16
**Nix (1)**
204:6
**NIXON (4)**
3:14;10:22;11:8,11
**non-class (1)**
131:8
**none (2)**
11:15;18:10
**non-lawyers (3)**
209:3,7,19
**non-responsive (3)**
147:7,11,14
**non-super (1)**
209:20
**norm (1)**
9:13
**normal (1)**
115:14
**normally (1)**
142:2
**norms (1)**
68:19
**Notary (2)**
8:22;215:24
**note (3)**
9:1,16;51:19
**noted (1)**
214:8
**notice (4)**
25:16;45:3;51:15;150:14
**notification (1)**
83:12
**notified (1)**
91:16

**notion (1)**
200:23
**Number (7)**
8:4;22:9;48:13;50:15;
57:21;65:11;125:10
**numbers (1)**
21:23
**numerous (1)**
150:19

# O

**oath (1)**
215:9
**object (6)**
51:22;152:17;153:23;
185:4;195:2;208:7
**objecting (1)**
79:2
**objection (158)**
9:1,16,19;19:10;23:16;
27:22;29:12;30:6;38:19;
41:2,6;44:2;46:5;47:3;
50:19;51:18;53:13;55:7,10;
58:11;60:13;62:19;64:1;
66:24;70:10;71:4;74:8;75:8;
76:23;78:5;79:1;80:6;83:9,
18;84:7,13,23;87:17;88:10;
93:16;96:12;100:14;104:1,
24;106:5,19;108:8;109:7;
110:23;111:9,16;114:17;
116:13;117:1,6,18,23;
118:22;119:12,16;120:18;
121:21;122:9,16,24;123:7,
13,17;124:19;126:6,21;
127:18;128:21;129:11;
130:7;131:24;132:9;133:14;
134:6;135:21;138:7,20;
139:16;140:9;141:17;142:1;
143:20;144:8;148:13;
149:10;150:9;151:1,13;
152:15;153:22;155:21;
158:6;160:20;162:1,23;
163:5;164:13;167:11,12;
168:11,14;169:16,21;170:7,
12,23;171:10;172:11,17;
174:11;175:13,15,22;176:7,
9;177:8,9;179:24;181:24;
183:8;185:5,19;186:3;
187:11;188:10,20;189:22;
190:15;191:15;192:9;193:6;
194:7;197:1;199:15,16;
200:13,14,22;201:24;202:2,
14,22;204:19;205:12,17;
206:15;207:14,17,21;
208:12,16;210:20;212:6
**objective (5)**
153:4;158:24;159:9,19;
160:18
**obligation (46)**
30:18;106:13;107:18;
109:13;111:12,15,17,23;
112:5;114:19,23;116:7,11,

15,17,19,22;117:11,14;
118:6;122:1;124:21;131:16,
18;132:5;154:6;158:2;
175:18,24;176:2;177:6,15,
19;178:3,21;181:19;183:1;
188:1,4;190:1,7,19;192:22;
194:2;199:10;201:18
**obligations (29)**
45:23;50:3;80:3,17;
105:18,19;112:14,18;113:4,
9,15,16;114:12;115:3;119:2,
11;133:3;162:21;163:3;
169:8;172:15,18,20;173:12;
178:13;182:8;187:14;
189:19,20
**obliged (2)**
107:15;122:15
**oblivious (1)**
160:15
**obstruction (1)**
149:23
**obtained (3)**
27:19;66:14;88:8
**obtaining (6)**
62:17;63:23;66:22;85:16;
103:23;106:4
**obviously (1)**
9:9
**occur (1)**
86:8
**occurs (1)**
213:3
**October (4)**
29:7;31:21;32:9;33:6
**odd (1)**
98:22
**off (11)**
25:10;33:24;67:3;87:23;
101:10;146:13;153:17;
173:3;184:15;193:8;214:6
**offer (2)**
211:5,15
**offered (2)**
14:16;211:14
**office (4)**
101:22;140:20;143:13,13
**officers (1)**
121:4
**offload (1)**
196:9
**often (3)**
123:22;124:2;213:2
**older (3)**
109:20;149:12,13
**omission (2)**
146:21;149:8
**once (12)**
17:16;28:6;44:15,15,23;
75:15;107:9;130:4;139:6;
141:23;151:6;179:21
**one (63)**
15:21;21:12,15,24;28:18;
30:16;37:1;46:8;49:21;54:1;

61:22,24;62:5;66:16;82:15;
87:7;89:19;96:13;99:14;
103:2;105:13;110:2;113:2;
127:7;128:8;136:15;138:13;
140:18;141:19;142:2;
144:12;146:13;147:23;
158:21;162:8;163:22;166:6,
14;167:24;178:6;187:8;
196:5,6;201:14;203:21;
204:1;208:4;209:13
**one-off (1)**
80:18
**ones (1)**
148:4
**ongoing (12)**
28:7;30:11,24;31:10;38:9;
47:19;48:12,21,23;58:7;
95:20;109:11
**only (33)**
18:24;21:11;27:18;28:1,
14,18;54:24;55:4;62:1;
73:15;78:17,23;88:6;99:19;
105:13;120:18;127:7;
129:14;139:22;149:11;
150:23;151:14;169:22;
171:21;181:5,11;182:2;
183:10;206:24;208:8;209:3,
8;210:4
**onto (1)**
137:1
**onus (1)**
45:1
**open (2)**
20:10;145:7
**operationalizing (1)**
180:11
**opine (2)**
172:14;192:6
**opining (2)**
80:21;171:21
**opinion (52)**
17:15;18:1,3;19:7;20:19;
28:3;30:23;39:20;40:9;
42:24;45:12;47:5;49:6;61:7;
63:4,15;66:13;67:2,9,9;
68:8;73:7;77:22;80:5;81:1,
3;82:11;85:12;90:9;91:17;
95:15;113:12;114:7;122:8;
129:23;144:21;147:23;
148:14;149:1;151:2,10;
168:5,22;169:3;188:8;
199:24;204:22;211:6,7,14;
212:12;213:9
**opinions (19)**
12:16,20;13:4,16;15:4,5;
17:1,3,12;18:13;73:3;
128:20;147:22;148:1,2;
168:24;211:15,20;212:14
**opportunity (8)**
85:21;86:24;87:3;94:21;
95:12;177:1

**option (2)**
85:24;86:4
**order (12)**
42:19,20;44:19;69:23;
71:2,14;85:20;86:8;109:5;
113:11;189:13;207:1
**ordered (1)**
174:5
**ordinarily (1)**
140:16
**ordinary (1)**
80:18
**organization (4)**
141:7;177:24;178:2,10
**organizational (4)**
95:20;96:4;139:20;177:12
**organizations (1)**
177:18
**organization's (1)**
121:18
**original (4)**
29:6;37:22;39:11;93:4
**originate (1)**
100:23
**others (3)**
80:13;139:19;179:18
**Otherwise (2)**
87:5;209:19
**ought (2)**
72:7;176:14
**out (43)**
16:19,20;28:21;32:5;34:7;
44:9;47:1,18;52:2,20;56:4;
57:14;66:2;79:3;80:13,16,
22;89:20;95:13;97:6;101:1,
9;109:17;111:20;113:23;
128:1,5;132:24;138:16;
156:23;157:3;158:16;
175:17,24;178:2,17;180:23;
181:13;182:18;199:22;
205:21;211:11,16
**outliary (1)**
109:21
**outlier (1)**
82:17
**outset (12)**
30:18;36:8;45:13;74:14;
75:12;117:10;125:3,11;
126:3;127:23;128:4;145:9
**outside (25)**
17:11;42:14;61:9;71:22;
79:14;89:23;90:3;92:21,23;
93:2;118:24;120:19;123:8;
132:11;135:22;138:22;
145:3,6,10,15;154:15;
167:13;172:15;187:2;
201:12
**outstanding (1)**
129:24
**outweighed (1)**
127:17
**over (2)**
15:24;143:12

**overcomplicate (1)**
180:2

**owe (10)**
105:18;133:4;169:23;
170:4,15;171:4;173:8;
187:17,22;188:4

**owed (7)**
48:23;79:21;130:11;
167:6;168:18;169:14;
180:11

**owes (2)**
80:13;113:6

**own (8)**
100:18;105:18;124:11;
135:9;187:8,22;188:17;
190:10

**P**

**page (21)**
17:2,3;24:18;26:22,23;
32:14;42:24;119:18;134:24;
135:6;136:22,22;137:1,2,3;
142:14;146:15;186:10;
203:20;209:1

**pages (2)**
14:9;138:4

**paid (14)**
12:19,21;40:24;50:17,18;
58:7;78:13;101:2;114:15;
122:19;123:12;125:9;
144:18,19

**panel (3)**
98:12;139:2;140:22

**paradigm (1)**
52:1

**paragraph (2)**
32:16;33:1

**paralegal (1)**
136:7

**paralegals (1)**
136:10

**part (40)**
46:2;47:9,12;62:23;63:17,
20;68:20;69:13;72:4,4,10;
73:6;93:22;94:12;96:4,14;
101:6;103:5,16;105:17;
115:15;116:20;123:18;
124:1;127:7,11;129:10;
131:3;133:23;138:9;139:13,
14,17;140:3;141:8,20;
151:17;165:6;171:8;190:10

**participate (4)**
81:24;85:22;94:22;207:1

**participation (10)**
19:3,9;73:17;81:14,15,23;
82:8;86:21;194:11,14

**particular (11)**
30:14;39:22;40:14;49:8;
70:19;75:5;139:8,8;159:6;
197:8;204:15

**particularized (1)**
88:18

**particularly (3)**
45:14;105:24;106:7

**parties (19)**
40:3;44:11;45:14,15;
46:20;47:21;49:12;57:17;
68:23;79:10;94:7,10,17;
96:15;108:13;125:13;126:3;
127:23;169:23

**parties' (1)**
47:16

**partner (3)**
124:12;136:9;159:13

**partners (2)**
19:21;158:16

**parts (3)**
33:22;171:4;179:13

**party (6)**
46:1,3,8,10;128:8;190:24

**passed (1)**
144:20

**past (3)**
119:1;135:8,8

**Patterson (1)**
204:6

**Paul (1)**
19:23

**pay (3)**
35:13;46:17;111:19

**paying (1)**
74:18

**payment (9)**
37:8,13;121:20;123:16;
150:24;174:4;175:11;212:3,
5

**payments (3)**
43:24;209:3,18

**PEABODY (4)**
3:14;10:23;11:9,12

**penalties (1)**
189:14

**pendency (2)**
31:1;150:14

**people (12)**
120:22;133:16;143:13,18;
173:7;179:16;180:19;181:3;
184:1,2,13;212:11

**per (1)**
13:1

**perceived (1)**
186:20

**percent (22)**
34:10;53:8;58:8;60:9;
62:6,9,12;63:22;70:2;
103:20,23;104:23;111:14,
19;114:15;133:8;161:16,22;
171:9;186:16;210:13;213:5

**percentage (1)**
34:19

**perform (3)**
60:4;108:7;135:18

**performed (2)**
23:15;24:24

**performing (4)**

55:2;79:24;106:1;171:7

**perjury (3)**
147:10,18;148:20

**permissible (1)**
56:23

**permission (1)**
25:13

**permissive (2)**
37:8;39:12

**permit (12)**
45:16;82:20,22,24;83:4;
193:2;194:4;195:13;197:17;
198:24;199:12;200:8

**permits (2)**
37:13;209:17

**permitted (2)**
9:11;46:20

**person (6)**
78:18;79:16;113:22;
139:22;141:3,11

**personal (3)**
124:14;145:1;187:24;
210:8

**personally (2)**
30:1;133:2

**personhood (1)**
139:21

**persons (1)**
95:21

**persuade (1)**
143:15

**pertain (1)**
40:11

**pertaining (1)**
21:4

**pertains (2)**
39:24;40:12

**Perusing (3)**
135:4;156:5;162:7

**perverse (1)**
176:18

**pester (1)**
206:4

**pestering (1)**
103:4

**petition (2)**
150:19,23

**petitions (1)**
150:16

**phone (1)**
106:23

**phrase (1)**
81:15

**phraseology (1)**
149:15

**pick (4)**
107:4;118:2;119:18;163:9

**picked (1)**
146:24

**picking (1)**
157:17

**picky (2)**
65:20;128:22

**picture (2)**
55:1,1

**piece (10)**
59:3,16;60:10;62:4,6,13,
16;66:12,16;207:3

**pieces (1)**
58:24

**piecing (1)**
139:9

**Place (15)**
3:5;22:22,23;29:7;30:2;
31:9;33:2;44:21;45:1;83:13;
85:6;91:3;94:1;126:19,23

**placed (2)**
119:10;150:16

**places (4)**
30:8;44:4;45:22;62:24

**plaintiff (5)**
34:12,21;118:21;120:8;
162:6

**plaintiffs (1)**
11:5

**plaintiffs' (3)**
124:1;145:1;212:21

**plaintiff's (2)**
59:9;100:21

**plaintiff-side (1)**
123:19

**plans (6)**
164:11,17,18;166:21;
200:18,20

**play (1)**
80:5

**player (1)**
202:20

**players (2)**
100:2;101:14;102:7

**please (11)**
11:19;23:19,24;53:17,20;
55:22;56:5,8;136:2,5;173:1

**pm (1)**
214:8

**point (27)**
13:3;27:18;31:13,18;34:6;
45:12;50:15;59:20;69:7;
79:3;88:6;90:22;92:22;
112:10,15;114:9,11;116:4,5,
9,9;126:2;140:22;157:18;
159:9,16;186:4

**pointed (2)**
16:18,20

**points (2)**
153:9;185:24

**policy (2)**
43:21;49:23

**pop (1)**
164:10

**portion (1)**
213:7

**portions (3)**
16:18,24;179:13

**posit (1)**
54:9

**position (7)**
82:18;102:5;107:21,22;
121:23;141:23;152:3
**possibility (6)**
22:14;70:14;75:13;93:19;
152:1;186:24
**possible (1)**
177:22
**posture (2)**
48:20;163:13
**potential (3)**
107:16;112:4;204:5
**potentially (2)**
110:7;174:16
**power (4)**
122:19;129:10;131:7;
189:2
**practice (7)**
52:22;115:9,15;135:9;
145:1,11;212:23
**practices (3)**
52:23;72:11;100:4
**pre-2011 (2)**
18:22;81:19
**Pre-amendment (1)**
81:22
**precise (3)**
24:11;63:9;121:7
**predated (4)**
92:6,14;93:8,21
**predicate (2)**
44:19;52:24
**pre-existing (1)**
50:12
**preface (2)**
64:19;161:10
**preferences (1)**
196:2
**preferring (1)**
174:9
**preliminary (2)**
165:2,22
**premise (1)**
65:12
**prepare (1)**
13:13
**prepared (3)**
14:15;16:1;149:3
**preparing (2)**
12:22;13:5
**prerequisite (1)**
86:16
**Pre-Saggese (2)**
81:20,21
**presence (1)**
67:19
**PRESENT (5)**
5:3;9:2,5,9;131:7
**pressure (1)**
143:16
**presumably (3)**
80:12;155:3;195:3
**pre-trial (2)**

163:15;164:22
**pretty (3)**
83:1,3;185:20
**prevent (2)**
178:11;191:6
**prevention (1)**
159:16
**previous (4)**
25:11;26:5,15;197:13
**previously (3)**
8:16;191:12;208:13
**price (1)**
46:15
**primarily (1)**
136:14
**principal (3)**
21:12,15;80:10
**principle (4)**
52:17;179:4;191:19;
209:21
**principles (1)**
72:13
**prior (2)**
85:8;95:16
**Probably (5)**
13:6;33:14;103:2;115:16;
185:7
**problem (5)**
89:7;125:4;130:22;
131:10;196:11
**procedural (3)**
130:24;131:9;163:12
**procedurally (2)**
131:13;132:21
**procedure (20)**
87:19;113:1,16;120:14;
123:2;130:21;132:2;133:17,
20;163:6;167:21;169:2;
178:16,24;182:15;183:21;
184:4,16;199:19;200:1
**procedures (4)**
79:16;135:12,14;180:22
**proceeding (1)**
64:14
**proceedings (1)**
9:15
**process (15)**
14:21;17:12;21:6;22:2;
29:6;86:22;99:7;126:16;
132:12;139:10;141:8;
188:24;189:7,8,11
**procurement (5)**
21:11;97:5;98:9;135:12;
140:20
**procuring (2)**
54:22;192:23
**Professional (18)**
61:6,8;62:22;109:12;
113:3,9;132:4;146:5,17;
156:11;169:4;171:22;172:3,
16;181:14;182:9,19;209:11
**PROFESSOR (23)**
5:7;8:15;9:2,24;11:19;

12:8;13:23;14:5;18:15;
24:17;81:9;107:4;118:15;
134:13;135:5;146:24;
147:21;186:10;195:1;
201:11;203:20;209:2;
211:10
**proffered (2)**
9:4;79:3
**prohibits (1)**
209:3
**promptly (1)**
201:18
**proof (1)**
99:23
**proper (2)**
64:3;152:16
**properly (1)**
123:4
**proposed (2)**
136:2,11
**proposes (1)**
136:13
**proposition (3)**
108:15;147:2;148:15
**prosecution (1)**
64:15
**prospectively (1)**
28:16
**protect (6)**
42:20;109:23;115:21;
187:24;190:12;191:13
**protected (1)**
183:7
**protecting (2)**
80:12;158:20
**protection (1)**
190:5
**protections (2)**
130:24;131:9
**protects (3)**
171:12;184:23;185:4
**provide (16)**
23:22;25:19;38:6;45:2,6;
69:8;71:11;95:9,10;136:13;
155:11;190:3,6,19;191:5;
196:19
**provided (8)**
11:22;15:23;19:12,15;
75:1;113:7;127:4;195:1
**provider (1)**
21:7
**provides (4)**
18:22;30:3;77:9;154:16
**providing (7)**
20:3;25:16;32:18;82:6;
123:24;133:11;145:17
**provision (4)**
126:8;158:18,22;209:13
**provisions (3)**
163:20;209:23
**Public (3)**
8:22;43:20;215:24
**publicly (1)**

213:10
**purely (1)**
187:24
**purport (4)**
71:19;72:6,12;105:16
**purported (1)**
119:23
**purporting (2)**
23:17,19
**purports (1)**
105:2
**purpose (2)**
72:3;195:4
**purposes (11)**
114:5;116:4;120:5;133:6;
145:16;163:15;164:23;
179:20;182:13;203:1;
208:24
**pursuant (2)**
188:1;210:14
**purview (1)**
154:1
**put (6)**
45:3;60:18;145:23;
158:13;172:24;197:21
**putative (6)**
80:4;81:4;104:21;162:22;
189:17,20
**putting (1)**
109:1

**Q**

**qualified (2)**
138:23;140:21
**qualify (1)**
160:5
**qualifying (1)**
148:10
**quality (2)**
46:16;60:4
**quickly (3)**
87:22;114:6;156:1
**quite (9)**
19:19;50:7;83:20;100:7;
115:18;121:1;153:1,7;
195:23
**quote (5)**
23:17,18,19;76:6;88:13

**R**

**range (1)**
136:6
**rate (3)**
12:23;13:11;125:9
**rates (2)**
136:6,12
**rather (3)**
58:6;175:14;204:14
**ratification (6)**
119:19;124:18,20;128:18;
129:13,15

**ratify (3)**
119:23;210:18,18
**ratifying (3)**
121:19;123:5,16
**rational (1)**
150:21
**rea (4)**
156:12,15,23;157:14
**reached (7)**
27:21;29:15;88:9;89:4;
90:15;165:3;213:6
**reaction (1)**
104:4
**read (43)**
15:7;16:17;23:8;24:19;
25:8,8,9,12,15,20;26:4,7,14;
32:4,5;37:7;38:23;41:14;
69:14;74:10;76:16;81:17;
102:12;136:1;148:1,2;
153:8;158:15;165:18;167:2;
179:3;187:2;196:22;197:3;
204:11,14,15;205:4;209:6,
22;210:5;212:11;215:8
**reading (7)**
23:20;37:7;56:15;73:20;
76:19;92:12;100:17
**ready (1)**
106:21
**realize (1)**
191:1
**really (31)**
14:16;17:14,24;21:24;
30:23;46:13;54:5;59:24;
60:24;65:23;83:19;104:10;
110:3;112:23;115:5;137:21;
139:3;150:1;156:19,19;
174:20,24;176:13;178:22;
180:15;182:22;189:7,8,10;
191:18;194:12
**reason (8)**
28:10;50:9;88:21;91:12;
114:22;115:1;154:8;191:16
**reasonable (39)**
19:3;41:16,18,21;42:12;
60:4;61:3;63:5;67:12;68:7;
73:18;75:2;81:14;85:15;
92:10;93:22,24;94:8;95:11;
105:5;114:20;115:2,6,23;
125:12;126:14;128:3;
146:22;190:7;195:22;
196:12,13,15,16,20;206:11,
18,23;213:12
**reasonableness (2)**
127:20;128:11
**reasonably (13)**
108:19;156:13;174:14;
190:4,19;194:4;195:12,22;
197:17;198:24;199:12;
200:7;202:12
**reasons (2)**
49:23;90:13
**recall (23)**
14:23;15:16;23:1;27:14;

76:3,15;82:23;83:5;84:24;
85:7;87:24;96:18;97:12;
98:21,24;99:4;119:20;
146:1,7;148:4;203:16,18;
205:11
**recalled (2)**
205:13,14
**receive (13)**
16:8,14;17:19;18:6;21:19;
25:18;34:9;38:7;60:3,8;
82:4,10;150:24
**received (1)**
17:20
**receiving (3)**
62:1;66:20;171:8
**Recess (1)**
107:2
**recipients (1)**
150:15
**recognize (4)**
44:24;49:24;72:13;179:15
**recognizes (1)**
45:7
**recollection (2)**
76:14;97:17
**recommend (1)**
161:17
**recommends (2)**
161:20;210:8
**record (24)**
8:2;9:1,17;10:1;51:19;
52:15;87:23;119:15;124:16;
129:12;135:7;143:21;155:8;
173:3;179:12,13;186:5;
195:2;205:6;208:9,10;
214:7;215:10,12
**recovery (1)**
150:24
**rectify (1)**
188:23
**redirect (1)**
122:19
**redress (1)**
186:20
**refer (5)**
18:17;62:5,12;101:1;
140:7
**reference (11)**
27:18;53:22;73:9,9;76:10;
134:24;144:1;145:3;151:8,
15;153:23
**referenced (6)**
20:15;71:16;98:19,24;
137:6;143:17
**references (2)**
186:17;187:3
**referencing (1)**
147:21
**referral (41)**
23:14;24:23;25:10,12,13,
19,24;26:6,9,14;27:12;
29:18;35:13;37:8,15;38:8;
39:14;56:18;57:6;58:23;

59:7,17,21;82:14,14,21;
83:12;88:4;99:2;100:20;
107:23;125:14;137:6;
140:15;174:18,21,23;
207:16;209:17;213:3,12
**referrals (4)**
82:5;140:8;209:7,18
**referred (10)**
16:14;23:5;27:11;88:3;
93:12;103:19;142:21,21;
173:14;192:21
**referring (12)**
25:7;34:8;97:24;99:19;
124:4,7;142:19;143:3;
144:6,14,19;170:21
**refers (1)**
32:24
**refresh (1)**
203:12
**refuses (1)**
210:18
**refusing (1)**
95:3
**regard (1)**
122:5
**regarding (8)**
193:4;194:6;195:14;
196:3;197:18;199:1,14;
200:9
**regimes (1)**
51:4
**registry (1)**
98:14
**regulate (1)**
147:4
**reject (1)**
129:9
**related (1)**
90:3
**relates (1)**
29:10
**relationship (126)**
29:9;30:3,11,12;31:10,16,
24;33:23;34:16;35:1,10,18;
37:17,21;38:13,17;39:3;
40:12,18,22;43:24;44:10,16,
24;45:9;46:2,14,24;47:10,
13,20;48:4,8,12,14,22;
49:14;50:12,21,24;51:10;
53:6;56:23;57:18;60:1;
61:21;63:21,22;66:17;
67:20;68:1,10,14;69:1;70:8,
17,22;71:15,20,24;72:18;
76:7;80:9;84:11,18;85:4;
88:16,24;90:24;92:19,23;
93:2,20;94:11,19;95:19,24;
96:1,7,20,23;97:11;101:20;
102:19;103:19,20,23;
104:23,23;105:14;106:4;
109:5,12;111:20;112:21;
114:14;116:8,12,24;117:16,
22;118:12;133:7,8;137:6,12,
20;138:17;158:4,5;170:18;

171:6,19;172:5;177:7;
181:20;182:4;195:18;197:5,
16;199:11;201:23;202:12;
206:6;207:16;209:9
**relationships (9)**
56:19;100:24;105:23;
114:13;124:6;174:18,21;
177:12;206:2
**relationship-wide (1)**
30:21
**relatively (2)**
9:7;110:11
**relevant (6)**
12:15;81:3;93:3;96:6;
140:5;160:2
**reliance (2)**
67:9;90:9
**reluctance (1)**
161:3
**rely (2)**
29:5;115:22
**relying (1)**
133:16
**remade (1)**
182:16
**remains (2)**
66:21;130:8
**remember (12)**
15:18,20;17:22;20:20;
21:24;59:22;83:2;97:14;
162:13;203:6;204:1,8
**remind (1)**
64:12
**reminder (1)**
201:9
**render (1)**
12:19
**rendering (1)**
13:4
**renegotiated (1)**
49:4
**renegotiation (1)**
48:19
**reopen (1)**
168:16
**repeat (1)**
94:4
**repeatedly (1)**
56:3
**rephrase (3)**
83:15;131:17;169:18
**replaced (1)**
95:23
**report (26)**
11:23;13:16,17,22;14:4,6,
10;18:16;26:22;28:4,21;
29:5;32:15;33:23;93:12;
99:8;120:19;135:22;146:16;
147:1,21;186:11;203:2,10,
21;209:1
**Reporter (5)**
8:18;12:3;13:19;24:1;
142:4

**reports (2)**
15:15;212:9
**represent (9)**
78:3,9;128:16,24;132:16;
180:7;185:17;186:1;190:1
**representation (24)**
27:14;49:9;51:6;80:19;
88:6;89:24;123:24;130:9;
131:6;132:15;148:7;174:16;
178:7;191:3;193:4;194:6;
195:15;197:19;199:2,14;
200:6,10,11;207:2
**representations (2)**
123:19;124:15
**representative (55)**
42:8,10;77:19;78:2,16,19,
22,24;79:14;80:1,2,3,15;
87:8,13;103:17;104:6;
105:22;108:5,11,24;110:20;
111:3;112:4,20;114:10;
116:20,21;117:11,15,16,21;
118:5,17;119:6;120:8,11;
121:11;126:12;129:1;
130:12;131:4,14;132:18;
134:1;140:23;141:11;
162:21;163:3,24;169:8;
183:6;185:1;189:17;199:21
**representativeness (1)**
185:12
**representatives (15)**
19:22;20:12;67:22;127:2;
139:19;140:2;165:9;166:17;
167:8;169:15,20;170:5,10;
185:11;201:20
**represented (7)**
50:16;122:21,22;152:10;
153:17;169:24;175:4
**representing (7)**
11:4;27:6;78:23;132:7;
173:16;181:10;189:16
**request (2)**
144:15,23
**requested (1)**
15:6
**requesting (1)**
98:14
**require (14)**
28:16;44:18;49:17;60:20;
105:5,6;132:13;160:9;
169:2,4;172:4;176:19;
206:19;207:8
**required (19)**
51:9,12;53:24;57:8;71:8;
73:11;77:23;78:11;83:11;
93:13,18,23;103:18;104:9;
119:5;136:16;154:20;
157:11;160:10
**requirement (18)**
33:17;37:24;51:14,15;
60:15;68:5;69:24;71:14;
72:23;74:12,24;87:6;
104:14,16;105:11;138:5;
193:13,15

**requirements (3)**
105:3;121:17;132:17
**requires (8)**
41:17;72:21;75:12;
178:18;188:4;194:15;
195:11;206:24
**research (2)**
18:2;146:1
**researching (1)**
120:23
**respect (16)**
16:13;17:1;18:2,13;22:7;
26:21;48:16;55:18;82:17;
97:10;112:2;138:1;150:6;
177:23;188:7;192:11
**respectfully (2)**
194:21;201:9
**respond (1)**
56:6
**responds (2)**
142:23;143:5
**response (7)**
97:24;98:1,6;134:18;
136:21,24;144:11
**responses (2)**
137:5;138:3
**responsibilities (10)**
55:3,4;78:21;79:11;
116:21;118:20;127:22;
133:11;175:10;176:6
**responsibility (13)**
79:8;103:17;105:21;
106:2,11;109:3;113:4,9;
132:24;171:23;172:3;
175:21;192:16
**responsible (3)**
80:2,11;140:17
**restate (1)**
198:17
**restatement (1)**
45:17
**restriction (1)**
152:20
**result (2)**
28:19;213:13
**retain (7)**
72:2,15;141:2;145:5,8,15;
161:21
**retained (3)**
93:14;138:12;162:3
**retainer (1)**
162:4
**retaining (1)**
141:21
**retains (1)**
210:9
**retention (24)**
23:4,8,11;29:16;37:6,12;
48:5;77:16;93:21;110:11;
112:3;137:12,22;139:3,8;
140:5,6;145:10;151:9;
157:19,24;160:7;197:8;
198:21

**Retirement (1)**
8:4
**reveal (2)**
148:17,21
**revealed (1)**
84:10
**review (6)**
15:3;22:7;73:5;132:14;
202:16;212:13
**reviewed (6)**
15:17;19:18;20:18;21:17;
203:15;204:10
**reviewing (2)**
15:19;203:1
**RFP (1)**
21:5
**RFPs (1)**
135:8
**RFQ (14)**
21:5,9,17,20;22:4;29:6;
97:9,19,24;98:6;134:16;
136:14;138:19,23
**RFQs (1)**
135:7
**ribbon (1)**
203:10
**Richard (3)**
10:16;24:14;213:19
**right (103)**
8:6;11:15;12:23;13:2,12,
17;14:13,20;15:12,16;17:10,
22;18:9,12;20:15;22:3,21;
26:2,21;29:3;30:5;34:13,14,
21;36:2,10,14;37:10,11;
38:2;39:17;49:18;50:21;
54:18;58:12;64:5;65:3,10,
14;69:16;70:5,24;71:17;
75:20;76:8;85:5,11;86:23;
87:2,21;92:3,4,8;95:14;
97:9;98:7;99:8;107:17;
110:15;112:11,12;120:16,
23;128:13;130:2;134:7;
135:5;137:15,24;139:12;
144:4;145:19;146:10,15;
150:5;151:5;152:20;155:14;
159:23;167:20;169:10;
171:23;173:18;174:2;
188:11;190:9,17;193:5;
194:6;198:9;199:22;201:15;
202:24;204:12;205:18;
208:6,17;209:24;210:6;
211:3,23,24;213:14
**rights (1)**
186:21
**risk (4)**
108:6;109:2;121:19;192:8
**risks (8)**
52:3;65:18;66:6;107:16;
125:13;127:21;128:7;
193:18
**Robert (1)**
10:18
**Rock (2)**

102:6;103:9
**Rohrback (2)**
11:4;214:1
**role (7)**
34:18;80:2;108:5;112:4;
117:16;130:12;169:7
**Rosen (6)**
8:6,9;76:21;107:8;162:9;
202:11
**Rosen's (1)**
148:18
**routine (2)**
115:14;133:19
**Rule (102)**
18:21,22;28:15;41:17,17,
17;43:11,19;56:24;63:5,24;
64:7;65:2;66:14,15,16;
67:10,11,12;70:16;71:8;
72:6,14,17,21;73:20,22;
74:1,2,10,12;75:11;79:17;
80:22;81:2,17,18,19,22;
88:12;103:24;104:13;106:3;
109:6;132:16;133:4;146:16,
19;148:20;149:8,11,17,21;
150:1,10;151:12;154:8,21,
23,24;155:3;156:16,21;
157:4,5,8,9,12,13,23;
160:11;169:1;171:12,18;
177:11,13;178:3;185:14;
194:9,14,18,23;195:6,11,16,
21,22;196:6,22,22;197:23;
198:4;206:19,23;208:4,14;
209:2,6,15,18;210:5;211:2
**rules (70)**
30:9,15,16;41:13;43:8,9,
16;44:5,6,24;45:16;48:20;
49:20,22;50:5,8;51:4;60:14,
19;61:5,8,17;62:22;63:1,3,
16;64:23,24;65:22;69:14;
71:17,18,18;72:12;73:12;
77:2,4;84:2;105:2,5,6,7,13,
16;106:10;113:15;132:4,21;
146:6;149:13,14;152:9;
153:16;156:10,12,14;
159:17;169:3;171:22;172:2,
16;175:1;176:19;181:14;
182:8,18;207:5,8;209:10,10

**S**

**Sachs (1)**
203:10
**Saggese (19)**
26:23;27:3,5,10,10,12,24;
28:14,19;68:6;74:11;88:1,3,
4,13;89:3;93:6,13;157:24
**same (18)**
14:22;18:24;58:1;66:21;
73:14;79:12;80:9,17,20;
92:5;103:8;158:2;160:24;
168:8;169:12;179:4;180:21;
201:6
**sanction (1)**

188:18

**sanctions (1)**
188:21

**satisfied (7)**
71:9;95:9;106:12;107:12;
144:13,22;145:22

**satisfies (1)**
72:17

**satisfy (5)**
71:14;87:5;133:2;138:4;
199:9

**saw (1)**
103:2

**saying (20)**
20:24;31:6;73:1;81:11;
82:9;84:24;89:13;90:10;
103:7;118:7;122:13;125:21;
155:3;176:15;180:3;188:3,
6;190:6;205:20;211:17

**scary (1)**
177:20

**scenario (1)**
75:23

**school (1)**
77:6

**scope (6)**
83:22;121:7;135:22;
141:12;170:18;191:3

**search (1)**
16:21

**searched (2)**
16:21;212:11

**second (3)**
59:5,15;72:1

**section (1)**
135:6

**secure (1)**
175:10

**securities (8)**
98:16;100:5;114:21;
119:1,6;123:21;136:4;
203:24

**seeing (5)**
146:7;204:1,8;205:11;
214:4

**seek (2)**
109:5;186:19

**seeks (2)**
136:14;190:2

**seemed (1)**
213:12

**seems (3)**
98:22;125:19;176:18

**selected (1)**
97:21

**selecting (1)**
185:10

**self-standing (1)**
25:13

**sell (1)**
46:12

**senate (1)**
143:13

**sense (18)**
15:2;25:9;45:20;57:15;
66:3;106:16;124:5;125:3,
18;159:1;171:7;180:18;
191:20;209:8,14,20,23;
212:19

**sensible (1)**
210:4

**sent (5)**
15:2,7;16:10,11;17:16

**sentence (3)**
25:6,16,21

**separate (5)**
25:23;37:9;79:9;145:6;
183:19

**separately (1)**
169:24

**September (3)**
142:8,11;150:15

**series (4)**
127:1;135:16;203:2;
204:16

**seriously (1)**
65:24

**serve (11)**
24:22;25:17;26:5,15;
35:22,24;36:4,7,22;38:6;
43:21

**served (1)**
34:11

**service (3)**
37:13;97:20;154:17

**services (16)**
20:3;21:7;23:14;24:23;
25:20;26:1,4,10;60:5;71:11;
82:7;95:10;123:24;126:9;
127:4;136:15

**serving (4)**
25:23;34:3,17;58:22

**session (1)**
176:15

**set (1)**
25:10

**sets (1)**
72:8

**setting (2)**
127:8;178:2

**settle (1)**
125:6

**settlement (11)**
163:4;165:3;166:14;
167:1;174:9;175:5;182:6;
189:20;210:14;213:6,7

**settles (1)**
210:12

**seven (3)**
205:6,14,16

**several (3)**
143:2;185:24;204:15

**several-page (1)**
144:1

**sglass@choatecom (1)**
3:11

**shake (1)**
128:1

**shall (2)**
9:15;156:13

**shame (1)**
104:17

**share (8)**
21:13;88:17;90:2;111:24;
171:3,9;172:10;208:1

**shared (1)**
138:14

**shareholder (1)**
136:9

**shareholders (4)**
180:3,8,14,21

**sharing (5)**
93:19;127:6;138:13;
152:2;209:15

**SHARP (3)**
3:19;11:11,11

**shift (1)**
196:17

**short (4)**
18:17;60:21,23;121:1

**shorthand (1)**
82:9

**show (4)**
42:18;99:11;134:13;155:9

**showing (1)**
14:2

**shown (1)**
203:2

**side (4)**
54:18;67:3;105:13;141:9

**sign (1)**
68:3

**signed (5)**
37:6;120:7;128:17;
198:21;215:19

**significance (5)**
85:11,13;95:15,18;204:21

**significantly (1)**
41:1

**signing (2)**
124:18,20

**signs (1)**
52:5

**silent (1)**
156:15

**similar (1)**
173:20

**simplify (1)**
180:15

**simply (10)**
26:14;34:18;58:6;95:4;
124:21;125:21;157:24;
160:15;184:7;188:3

**Singal (1)**
8:11

**single (3)**
53:8;80:18;159:14

**SINNOTT (51)**
8:2,10;9:20,23;10:6,24;

11:6,10,13,16;12:2;13:19;
19:14;23:22;24:1,13,16;
25:3,7;26:20;69:19;73:22;
81:7;83:24;98:3;106:23;
107:3;118:14;129:20;
134:12,14;142:4;143:22;
154:2;160:23;161:3,11,13;
164:14;172:24;173:19;
186:9;202:9;208:15,18,23;
213:15,19,21,24;214:4

**S-I-N-N-O-T-T (1)**
8:10

**sit (3)**
76:16;97:17;113:5

**sitting (3)**
76:4;201:12;203:16

**situation (12)**
35:18;50:10;53:22,24;
54:8;69:10;77:4;116:1;
142:3;177:21;181:2;190:11

**situations (3)**
183:14;191:5;209:12

**skeptically (1)**
28:9

**skepticism (2)**
29:2;31:4

**skimmed (1)**
16:23

**slightly (1)**
162:10

**slow (2)**
183:24;188:12

**small (6)**
9:7;87:7;102:6,6;143:8;
177:18

**smart (1)**
113:21

**Smith (8)**
161:15,21,21,24;210:7,9,
13,15

**sole (1)**
97:5

**solely (1)**
179:17

**somebody (6)**
9:4;21:14;42:13;128:5;
140:20;184:20

**somebody's (1)**
143:12

**somehow (2)**
114:23;177:16

**someone (11)**
20:22,24;87:9;109:24;
118:23;140:16,24;152:2;
167:18;168:5;182:10

**someplace (1)**
132:24;185:14;205:22

**sometimes (9)**
44:18;125:1;128:8;
159:11;162:11;177:17;
180:7;183:15;212:9

**somewhat (1)**
28:9

**soon (2)**
97:4;101:11
**sophisticated (5)**
45:14;59:8;68:23;118:17;
202:20
**sophistication (1)**
196:2
**sorry (26)**
48:14;59:15;65:20;97:13;
98:3;99:8;110:20;111:22;
116:15;128:22;131:17;
138:21;146:20;151:2;
152:24;161:2,5;165:13;
166:7;169:17;187:20,20,20;
204:2,9,12
**sort (9)**
46:19;57:12;97:13;
140:17;147:10,11;155:4;
207:7;212:20
**sorts (7)**
42:14;82:6;115:3;121:5;
127:9;133:3;182:7
**sound (1)**
120:2
**sounding (1)**
173:20
**sounds (6)**
68:16;82:1;92:3;115:7;
126:16;205:18
**speak (9)**
87:10;105:2,13,14,16;
137:11;139:5;143:6;180:12
**speaking (7)**
87:15,19;180:5,10;181:6,
12;182:3
**speaks (1)**
141:11
**Special (194)**
8:5,8;9:10;25:5,22;26:3,
13,19;28:20;29:4,14,20;
31:18;32:3,8,14;33:5,10,21;
34:5,15;35:4,14,17;36:9,17,
19;37:4,16,20;38:12;39:9;
40:15;41:3;42:23;43:5,12,
20;45:24;46:22;47:7;48:3;
49:13;50:11,14;51:7;53:3,
16;54:21;55:8,15,19,24;
56:9;57:20;58:16;59:1,13;
60:7;61:18;62:8,11,15;
63:17;64:5,16;65:1,7;66:8,
11;68:9;69:12,18;77:14,21;
78:1,7,20;79:5,22;80:24;
83:22;99:12;100:9;101:16,
23;102:16,20;103:12;
104:19;105:20;106:15,21;
107:20;108:22;110:9,14,17;
111:1,6,11;112:1,8,13;
114:4;116:2,18;117:4,12,19;
118:11;130:3,15;131:15;
132:6;133:6;134:3,7,9;
137:16;156:3;157:17;
159:18,21,24;160:4,22;
161:8;162:16;163:9,17,22;

164:6,18,21;165:1,6,13,20;
166:1,5,12,16,20,23;167:5,
15;168:7,12;169:6,11,17;
170:3,8,14;171:1,20;172:1,
13,19;173:11;176:22;179:7;
181:15;182:24;184:6,9,21;
185:16,23;192:20;193:21;
194:1,17,22;195:7,9;196:21;
197:7,12,22;198:3,6,8,15;
199:4;200:4,16;201:2,13,16;
202:1,8;208:17
**specialized (2)**
89:24;145:17
**specific (12)**
16:24;44:18;71:15;73:10;
74:6;75:5;94:13;112:2;
114:23;119:15;184:23;
191:23
**specifically (15)**
46:24;62:21;94:18;96:18;
97:12,20;98:24;100:12;
107:7;108:17;170:20;172:6;
203:6,16;205:14
**specifications (1)**
121:8
**specified (1)**
192:18
**specify (1)**
192:11
**speculate (2)**
102:2;208:10
**speculating (1)**
114:2
**speculation (1)**
100:16
**spell (1)**
138:16
**spelled (1)**
52:2
**spend (1)**
28:5
**spent (2)**
13:3,5
**split (1)**
147:13
**sprung (1)**
88:23
**square (1)**
208:3
**ss (1)**
215:4
**staff (1)**
136:8
**stage (2)**
110:12;112:9
**stages (1)**
74:13
**Stamped (3)**
24:7;33:8;134:21
**stand (1)**
176:17
**standard (6)**
54:13,15;77:10,11,13;

159:5
**stands (1)**
147:2
**start (4)**
15:4,4;44:9;178:8
**started (4)**
23:3;27:6;33:24;44:15
**starting (1)**
39:23
**starts (1)**
183:13
**state (38)**
9:24;21:7,11;23:3;40:1;
43:1;47:13,17;48:5;49:8;
60:9;93:8,15,21;94:13;97:5;
98:9,13,14,18;99:19;102:6;
136:5,11;138:24;143:8;
147:22;148:10;150:17;
156:7;161:7,9;162:4;187:1,
9;197:3;215:3,24
**stated (2)**
190:10;191:17
**statement (22)**
14:10,14,24;15:9;25:1;
74:7;75:4;126:17;135:13,
19;146:20;147:7;148:6,12;
149:4,6;150:4,11;189:15;
209:4;211:4,22
**statements (8)**
85:12;86:12,12;147:5;
149:16,17;150:1;179:15
**states (5)**
23:11;82:3,20;83:16,19
**states' (1)**
84:2
**stating (2)**
108:15;148:7
**status (2)**
136:7;203:23
**statute (2)**
65:23;163:20
**statutory (4)**
156:22;209:12,22;210:1
**stay (3)**
61:16;168:1;211:16
**step (1)**
72:22
**STEPHEN (2)**
5:7;8:15
**STEWART (1)**
3:3
**stick (1)**
101:11
**sticks (1)**
113:22
**still (7)**
56:9;76:12;91:8;151:10,
16;158:1;177:17
**strange (1)**
68:17
**Street (16)**
3:16;23:3;40:1;47:11,14,
18;48:5;49:9;60:10;93:8,15,

21;94:14;98:19;150:17;
162:4
**strict (4)**
156:16,21;157:4,8
**strike (2)**
188:14;202:17
**striking (1)**
103:5
**structure (3)**
20:2;80:8,20
**structured (1)**
123:20
**Stu (1)**
13:15
**STUART (2)**
3:8;10:14
**stuck (1)**
178:12
**students (2)**
28:6;147:13
**stuff (10)**
30:22;52:5,7;79:18;98:16;
113:21;148:4;156:8;168:16;
182:14
**subclasses (2)**
183:12,19
**subcontractor (1)**
137:14
**subject (1)**
157:7
**subjective (3)**
153:3;155:2;158:8
**subjectively (1)**
158:21
**submission (2)**
16:2;186:6
**submissions (1)**
185:9
**submitted (4)**
13:18;14:7;98:5;129:15
**subscribed (1)**
215:19
**Subsequent (3)**
41:24;47:22,23
**subsequently (5)**
19:23;45:4;52:14;74:16,
24
**subset (1)**
190:21
**substance (1)**
18:1
**substantive (2)**
113:7;168:21
**subtle (1)**
45:10
**Sucharow (7)**
3:4;5:4;10:11,13;24:6,21;
134:19
**suck (1)**
101:8
**sudden (1)**
89:16
**sufficient (12)**

41:9;43:22;73:8;83:17;
145:21;146:9,12;147:9;
151:20,21;152:24;200:5
**sufficiently (3)**
193:2;197:15;198:22
**suggest (1)**
64:9
**suggesting (2)**
64:11;210:2
**suggestion (1)**
146:24
**suggestions (3)**
17:8,21,23
**summarize (1)**
81:1
**summarized (1)**
85:2
**Summer (1)**
3:16
**super (1)**
176:15
**supersede (1)**
176:5
**supervision (1)**
183:17
**supervisory (1)**
131:6
**supplier (2)**
46:8,14
**support (4)**
15:11;144:21;188:17;
212:4
**suppose (3)**
46:7;125:5;138:12
**supposed (2)**
51:20;64:13
**Sure (29)**
10:2;18:18;22:5;28:6;
52:13;58:1;61:16;62:3;73:2;
83:1,3;86:15;90:6;91:1,4,
17;92:11;115:18;131:1;
151:19;152:19;153:1;
178:24;185:20;194:19;
198:2,11,15;201:2
**sworn (2)**
8:19,22
**System (6)**
8:4;21:11;97:5;133:1;
139:4,6

**T**

**table (1)**
10:8
**tailored (1)**
195:21
**talk (19)**
10:4;26:23;38:22;44:6;
62:22;66:2,4;67:6;119:19;
140:11;149:12,13,15,20;
150:3;156:12;183:24;184:2;
187:12
**talked (7)**

13:16;17:13,15;20:11;
118:16;126:24;168:16
**talking (14)**
15:4;24:12;49:24;63:16;
67:4;98:1;110:10;121:9;
170:1,17;183:22;193:11;
197:9;201:19
**talks (3)**
30:23;39:20;45:18
**tampering (1)**
149:23
**tangents (1)**
193:9
**tangled (1)**
162:11
**taught (3)**
148:19;179:3;183:11
**teach (9)**
92:2;109:19;113:3;148:4;
156:8;177:11;178:6;196:5,6
**Teacher (2)**
8:4;24:20
**Teachers (31)**
19:22;22:20;42:8;47:6;
56:14;76:11;78:16;79:13;
80:10;87:20;93:18;94:24;
96:2;104:12;105:11,12;
113:17;127:2,14;128:23;
130:9,10;137:10;139:1,18;
140:4;142:22;169:5,7;
187:22;199:20
**Teachers' (6)**
20:12;42:1,9;67:22;79:8;
116:17
**teaching (3)**
113:20;147:12;168:1
**team (1)**
8:12
**technical (1)**
159:12
**techniques (1)**
156:22
**telephone (5)**
3:19,20;10:24;11:14;24:4
**tells (2)**
72:12;161:15
**temporal (2)**
74:6,9
**ten (1)**
158:16
**tendered (1)**
83:19
**tenure (1)**
95:16
**term (12)**
20:7,7,8;40:9;43:8,19;
88:22;121:3;137:14;156:12,
15;157:15
**terms (16)**
46:9;47:24;48:13,15,19;
49:3,7,19,20;64:3;74:6,6,10;
150:3;163:12;180:10
**terrible (1)**

176:13
**test (2)**
159:19;160:18
**testified (7)**
8:16,23;70:20;76:20;
84:16;102:17;202:18
**testify (2)**
173:12;212:1
**testifying (3)**
20:22;152:22;213:8
**testimony (32)**
9:3;13:13;43:13;46:23;
56:16;59:19;62:4;70:1,3;
71:13;76:6;96:11;103:6,11;
107:6,9,14;108:9;127:15,19;
140:12;166:6;167:6;176:4,
10;192:5;193:22;195:10,15;
208:19;215:8,11
**testing (1)**
32:12
**tests (1)**
158:24
**Texas (8)**
57:19;76:8;82:24;83:1,2;
84:3;187:1,9
**thanks (1)**
90:5
**thinking (4)**
63:4;102:3;179:1;181:7
**third (1)**
190:24
**third-year (1)**
136:8
**Thornton (15)**
3:15;5:5,5,9:18;10:20,20,
21,23;11:9,12;170:22;
171:2;172:8;175:8;201:7
**though (1)**
50:11
**thought (3)**
154:19;157:2,16
**three (8)**
25:22;40:19,19;163:14;
164:21;165:23;166:10,13
**Tim (1)**
203:21
**timekeeper (1)**
136:7
**times (4)**
13:11;30:9,13;51:5
**timing (4)**
74:11;85:7;88:12;98:21
**today (3)**
12:20;13:13,14
**together (5)**
29:22;92:12;117:8;139:9;
209:23
**told (16)**
20:12;53:11;64:2,22;
68:24;76:1,5;84:17;144:5;
161:18,18;185:17;206:8;
207:11;210:11,16
**tons (1)**

189:1
**took (5)**
15:10;22:23;29:7;30:1;
126:23
**top (4)**
24:18;113:5,10;146:13
**tort (3)**
123:20;124:14;145:2
**total (9)**
19:3;42:12;58:8;73:18;
81:14;90:2,7;95:10;186:12
**totally (1)**
113:23
**toward (1)**
41:19
**town (1)**
102:7
**track (1)**
67:3
**traffic (1)**
76:17
**train (1)**
67:3
**transaction (2)**
45:8;153:5
**transcript (3)**
186:17;215:8,10
**transcripts (8)**
15:14,15,17;16:13,14,16,
18;204:11
**transition (1)**
45:7
**treated (1)**
131:1
**trial (3)**
188:24;189:2,6
**tribunal (4)**
149:14,18,21;150:6
**tricky (2)**
183:14;191:4
**tried (1)**
175:17
**trigger (2)**
111:12;112:5
**triple (1)**
165:22
**trouble (1)**
115:22
**true (14)**
27:9;88:2;89:3;110:1;
125:1;132:22;146:20;147:4;
180:6,9,21;191:20;215:10,
12
**truism (1)**
189:24
**truly (1)**
104:5
**trustees (1)**
121:4
**truth (2)**
147:15;148:7
**truthfully (2)**
57:5;69:5

**truths (2)**
147:24;148:3
**try (4)**
175:10,24;176:12,19
**trying (26)**
15:20;31:2,4;53:3;60:18;
63:8;64:16;65:6,15;66:12;
76:6;101:8;105:7;112:24;
114:18;124:24;143:15,18;
148:16;153:5;172:21;178:8;
180:2,15;184:21;187:23
**turn (1)**
128:5
**turns (1)**
199:22
**twice (1)**
64:2
**Two (33)**
3:5;27:13;29:22;40:20,21;
51:3;56:7;58:18,24;60:2;
65:11;88:5;89:5;90:16;
92:14;98:22;111:21;137:23;
147:22;153:20;163:18;
165:9,11,14;166:17;167:8;
169:20;170:6,10;171:5;
173:17;205:14;209:22
**Two-part (2)**
55:11;88:12
**typically (1)**
135:15

### U

**ultimate (1)**
140:5
**ultimately (6)**
22:11,16,16;97:21;
147:16;181:8
**umbrella (1)**
121:3
**under (31)**
34:24;43:12;60:14;62:18;
63:23;66:14;70:6;71:3,8;
85:23;103:24;106:2;109:6;
111:13;113:15;122:2;
154:21,22;169:14;178:3;
181:13;182:8;188:4,16;
192:2;194:1;196:16,20;
201:17;202:1;215:9
**underlies (1)**
28:19
**underlying (5)**
15:11,13;35:11;113:20;
168:21
**understands (7)**
40:9;59:8;100:22;101:3,
15;119:2;159:14
**understood (2)**
182:2;196:14
**undertaking (1)**
78:8
**undertook (1)**
171:3

**undiscussed (1)**
156:10
**Unfortunately (1)**
203:14
**uninterested (1)**
57:14
**universe (1)**
110:5
**Unless (2)**
132:1;211:6
**unlike (1)**
93:6
**unrelated (1)**
173:21
**unusual (2)**
9:15;115:8
**up (27)**
13:3;23:3;29:7;59:12;
67:24;90:1,4;92:22;101:8;
107:4;113:22;115:10;118:2,
15;119:18;124:2;126:8;
137:11;143:12;146:24;
157:17;162:11;163:9;
164:10;198:12;202:10;
208:24
**updating (1)**
203:23
**upheld (1)**
145:21
**upholding (1)**
212:4
**upon (9)**
19:6;29:5;30:13;40:23;
51:21;111:22;115:22;
122:11;173:12
**use (12)**
33:17;43:9,10;50:5;66:19;
79:9;88:22;149:19;150:1;
156:22;164:9;195:3
**used (11)**
16:21;43:15;44:5;49:20;
61:5;63:2;77:3;137:14;
149:12;162:16;191:11
**using (1)**
66:18;73:3
**usually (1)**
9:14
**utilize (1)**
33:11

### V

**vacuum (1)**
94:16
**value (1)**
213:4
**varies (2)**
121:1,8
**vary (2)**
168:20;195:23
**varying (1)**
153:3
**venture (3)**

148:14;149:1;168:5
**verbatim (1)**
24:19
**verse (1)**
88:13
**versus (2)**
61:2,14
**Via (2)**
3:19,20
**view (8)**
29:21;123:4;126:2;
158:21;159:9,16;184:22;
185:6
**viewed (7)**
28:9;30:10;124:24;152:7;
153:14;155:16;181:16
**vindicate (1)**
186:20
**violate (1)**
155:2
**violated (7)**
152:14;153:21;154:23;
161:24;190:13;192:4;
210:19
**violates (1)**
149:8
**violating (2)**
109:2;192:12
**violation (6)**
65:2;150:8;155:23;
163:19;207:5;211:1
**Virginia (1)**
83:4
**vis-a-vis (1)**
61:24
**Vitae (1)**
12:5

### W

**waive (1)**
54:7
**walk (1)**
167:20
**wants (3)**
91:11;145:8,9
**way (30)**
16:22;21:10;37:7;55:2;
56:3;65:22;77:1;82:9;91:15;
92:5;109:10;110:8;113:12;
123:18,20,21;128:9;132:13;
134:2;141:19;145:23;
158:21;175:1;181:7,12;
195:19;203:19;209:8;210:4;
212:22
**way-out (1)**
109:9
**ways (4)**
51:5;56:7;75:9;182:16
**website (1)**
150:17
**weeks (1)**
143:3

**Wendel (12)**
10:3;12:5,6;13:22,23;
14:5;24:5;33:7;134:18;
142:9;215:7,16
**W-E-N-D-E-L (1)**
10:3
**weren't (3)**
16:20;95:3;122:14
**Westlaw (1)**
212:10
**what's (11)**
12:17,23;15:23;46:15,15;
54:4;55:13;85:11;100:3;
102:14;191:22
**whole (9)**
32:4;49:5;101:12;132:12;
161:7,9;168:10;182:21;
193:9
**whomever (1)**
105:18
**who's (7)**
9:4;42:13;78:13;100:6;
132:6;180:23;184:20
**widgets (3)**
46:12,15,16
**William (11)**
8:10;10:2;215:7,16
**willing (9)**
52:9;54:7;71:7;164:4,16;
165:16,19;166:3;211:13
**windfall (5)**
124:5;125:2,8,19;128:6
**wise (1)**
177:21
**wishing (1)**
187:9
**withdraw (1)**
181:4
**withhold (2)**
46:2,6
**within (18)**
39:21;50:2;57:16;83:21;
129:2;141:12;143:2;152:8;
153:14,24;154:8;168:1;
172:13;173:23;184:9;191:2;
210:2;211:16
**without (4)**
37:24;49:4;204:7;205:8
**witness (164)**
8:18,21;16:5;23:20;25:15;
26:2,7,17;29:3,13,19;30:7;
32:2,12;33:20;34:4,14,23;
35:6,16;36:3,15,18;37:1,11,
19;38:3,20;39:17;41:7;43:4,
6,17;44:3;46:6;47:4,15;
48:9;49:18;50:13,20;51:23;
53:14,21;55:11;56:13;
58:12,18;59:2,15;60:14;
62:7,10,14,20;65:5,8;66:10;
67:1;68:16;69:17;77:20,24;
78:6,14;79:6;80:7;81:6;
99:21;100:15;101:19;102:1,
22;104:2;105:1;106:6,20;

108:9;109:8;110:13,16,24;
111:4,10,17;112:7,12,22;
114:18;116:14;117:2,7,24;
118:13;130:8,19;132:1,10;
133:15;134:8,11;137:18;
149:22;158:7;159:20,23;
160:3,21;161:9;162:18;
163:16,21;164:2,15,20,24;
165:5,16,24;166:3,10,15,19,
22;167:4,17;168:15;169:10,
22;170:13,24;171:11,24;
172:12;173:4,18;177:10;
180:1;182:1;183:9;184:8,
11;185:6,20;186:4;193:7,
24;194:8,19;195:5,8,17;
196:24;197:2,11,20,24;
198:9;199:3,17;200:15;
201:10;202:3;213:18

**witnesses (1)**
56:5
**Wolf (5)**
8:7;122:18;128:14;174:3;
175:4
**wondering (1)**
19:13
**word (17)**
16:21;19:13;48:15;61:10;
63:1,7,13;66:1,18,19;69:21;
150:1;162:17;164:9,11,14;
197:21
**words (5)**
61:4;63:12;84:19;175:6;
207:15
**work (35)**
17:17;23:2;34:6;35:2,8,9;
53:10;60:10;61:12;63:15;
65:22;77:2;83:2;89:5;90:17;
97:4,6;98:13,15,17;100:20;
103:4;106:1;114:16,21;
123:20,21;125:6;146:2;
151:18;171:7;172:7;179:6;
182:18;212:8
**worked (3)**
14:21;118:24;181:13
**working (6)**
20:13;21:1,8;54:14;99:7;
108:17
**works (8)**
21:11;59:9;80:17;95:7;
101:4,15;178:24;185:21
**world (3)**
72:24;73:3;77:9
**worry (1)**
86:5
**worth (1)**
174:20
**wow (1)**
125:8
**wrapping (1)**
208:24
**write (6)**
18:21;54:18;77:7;173:7;
186:11;212:11

**writing (5)**
17:6;28:17;52:13;161:17;
203:1
**Written (7)**
18:19;22:11;28:16;52:24;
61:15;68:6;210:10
**wrong (2)**
48:15;207:4
**wrote (2)**
17:3,4

---

**Y**

**years (5)**
40:19,19,20,21;205:15
**Yep (1)**
129:20
**yesterday (1)**
13:14

---

**Z**

**Zack (1)**
167:22
**zone (1)**
211:17

---

**0**

**02110 (1)**
3:6
**02110-2131 (1)**
3:17

---

**1**

**1 (3)**
12:4,5,9
**1.13 (1)**
177:13
**1.13a (1)**
178:4
**1.4 (11)**
41:17,17;63:5;67:12;68:7;
92:12;194:18,23;195:6,21;
198:5
**1.4a (2)**
201:17;202:1
**1.4b (4)**
195:11;196:22;197:10;
198:6
**1.5 (3)**
43:19;63:5;92:12
**1.5b (1)**
30:16
**1.5e (51)**
18:21;22:8;43:13;56:24;
62:18;66:14;67:10,11;68:5;
69:15,24;70:6;71:3,8,15;
73:13;81:2,9;86:17;88:12;
93:14;103:24;106:3;109:6;
144:12,13,22;145:21;
151:12;152:14;153:21;

154:8,21,23;155:23,24;
157:20,23;159:22;160:14;
169:15;193:22;194:2,9;
195:16;196:23;198:7;208:4,
20;209:9;210:19
**1.5e's (2)**
87:6;138:4
**1:00 (1)**
214:8
**10 (4)**
161:16,22;186:10;203:7
**10:45 (1)**
107:1
**100 (1)**
3:16
**11 (3)**
14:9;17:2,3
**11062 (1)**
24:7
**11-cv-10230-MLW (1)**
8:5
**13 (6)**
26:23;32:9;33:6;42:24;
134:24;135:6
**14 (3)**
26:22;119:18;136:22
**15 (5)**
13:6,6;119:19;137:3;
204:3
**15-minute (1)**
106:24
**16 (2)**
204:4;209:1
**17456 (1)**
33:8
**17755 (1)**
134:21
**18 (1)**
201:13
**1999 (1)**
168:1

---

**2**

**2 (8)**
13:21,22;14:3,9;17:2;
18:14;24:18;32:16
**20 (21)**
13:6;34:10;53:8;58:8;
60:9;62:6,9,12;63:22;70:2;
103:20,23;104:23;111:14,
19;114:15;133:8;171:9;
186:16;210:13;213:5
**2008 (6)**
29:8;31:21;32:9;33:6;
134:17,20
**2010 (7)**
85:9,9;94:14;203:7,19;
204:4;205:7
**2011 (19)**
23:1;24:6;29:16;30:5;
37:5;38:10,16;42:6;48:7;
49:10;51:11,17;58:6;85:9;

94:14;110:13,14;156:4;
157:20
**2013 (1)**
205:7
**2017 (2)**
142:8,11
**2018 (3)**
13:24;14:4;215:20
**21 (1)**
146:15
**22 (1)**
17:2
**23 (7)**
79:18;80:22;104:13;
132:16;133:5;169:1;185:14
**26 (2)**
13:24;14:4

---

**3**

**3 (5)**
24:2,5,17;146:19,20
**3.3 (7)**
146:17,19,20;147:23;
148:20;149:11;150:12
**3.3a (2)**
149:9,18;150:8,10
**30 (2)**
134:17,20
**30c (2)**
64:7;65:2
**39 (1)**
203:20

---

**4**

**4 (1)**
33:7
**438 (1)**
204:3

---

**5**

**5 (4)**
134:18;142:8,11,15
**5.10 (3)**
135:6,24;138:2
**50-state (1)**
82:19
**59 (1)**
142:14

---

**6**

**6 (5)**
32:14;142:8,9,13;203:18
**617-248-5000 (1)**
3:9
**617-345-1065 (1)**
3:21

---

**7**

**7.2b (7)**
   161:1,24;209:2,7,9;210:2,
5

**8**

**8 (7)**
   24:6;29:16;30:4;37:5;
38:16;48:6;186:11