# EX. 230

**Bruce Green**

1

```
                         Volume:  1
                         Pages:  1-181
                         Exhibits:  1-6

            JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

-----------------------------------------X

In Re:  STATE STREET ATTORNEYS FEES

-----------------------------------------X


                    620 8th Avenue
                    New York, New York

                    April 4, 2018
                    8:40 a.m. to 12:34 p.m.



B E F O R E:

    Special Master Honorable GERALD ROSEN,
    United States District Court, Retired

    MELISSA GILMORE, Reporter


              DEPOSITION OF

              BRUCE GREEN
```

Page 2

```
1  A P P E A R A N C E S :

2

3  BARRETT & SINGAL

4  On Behalf of the Special Master

5       One Beacon Street, Suite 1320

6       Boston, Massachusetts 02108-3106

7  BY:  WILLIAM F. SINNOTT, ESQ.

8       ELIZABETH J. McEVOY, ESQ.

9       617-720-5090

10      wsinnott@barrettsingal.com

11      emcevoy@barrettsingal.com

12

13

14  JAMS

15      150 West Jefferson, Suite 850

16      Detroit, Michigan 48226

17  BY:  THE HON. GERALD ROSEN (Ret.), ESQ.

18      313-872-1100

19

20

21

22

23

24
```

Page 4

```
1  A P P E A R A N C E S :  (Cont'd)

2

3  LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP

4  On Behalf of Lieff Cabraser

5       275 Battery Street, 29th Floor

6       San Francisco, California 94111

7  BY:  RICHARD M. HEIMANN, ESQ.

8       ROBERT L. LIEFF, ESQ.

9       415-956-1000

10      rheimann@lchb.com

11

12

13  KELLER ROHRBACK, LLP

14  On Behalf of ERISA Plaintiffs

15      1201 Third Avenue, Suite 3200

16      Seattle, Washington 98101

17  BY:  T. DAVID COPLEY, ESQ. (Via telephone)

18      206-623-1900

19      dcopley@kellerrohrback.com

20

21

22

23

24
```

Page 3

```
1     A P P E A R A N C E S : (Cont'd)

2

3  CHOATE HALL & STEWART LLP

4  On Behalf of Labaton Sucharow

5  Two International Place

6  Boston, Massachusetts 02110

7     BY: JOAN A. LUKEY, ESQ.

8  STUART M. GLASS, ESQ.

9  617-248-5000

10  joan.lukey@choate.com

11  sglass@choate.com

12

13

14  NIXON PEABODY, LLP

15  On Behalf of Thornton Law Firm

16  100 Summer Street

17  Boston, Massachusetts 02110-2131

18     BY: BRIAN T. KELLY, ESQ.

19  JOSHUA SHARP, ESQ. (Via telephone)

20  EMILY CRANDALL HARLAN, ESQ. (Via telephone)

21  617-345-1065

22  bkelly@nixonpeabody.com

23

24
```

Page 5

```
1     A P P E A R A N C E S : (Cont'd)

2

3     ALSO PRESENT:

4  MICHAEL CANTY, Labaton Sucharow

5  MICHAEL THORNTON, Thornton Law Firm

6  LINDA HYLENSKI, ESQ., JAMS (Via telephone)

7  PROFESSOR STEPHEN GILLERS

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

Page 6

```
1  ----------------- I N D E X -----------------
2  WITNESS              EXAMINATION BY      PAGE
3  BRUCE GREEN          MR. SINNOTT          10
4
5
6  --------------- E X H I B I T S ---------------
7  GREEN      DESCRIPTION           FOR I.D.
8  Exhibit 1  Curriculum Vitae of Bruce   10
9             A. Green
10 Exhibit 2  Report of Bruce A. Green,    14
11            dated March 25, 2018
12 Exhibit 3  Excerpt of Deposition        34
13            Transcript of Damon
14            Chargois, dated 10/2/17
15 Exhibit 4  E-Mail Chain, Bates          47
16            Stamped LBS017593 - 7594
17 Exhibit 5  New York Ethics Opinion     104
18            1128, New York State Bar
19            Association Committee on
20            Professional Ethics
21 Exhibit 6  Letter from Labaton         115
22            Sucharow, dated 2/8/11
23
24         (EXHIBITS RETURNED TO ATTORNEY SINNOTT)
```

Page 7

1  B R U C E   G R E E N, called as a witness,
2  having been duly sworn by a Notary
3  Public, was examined and testified as
4  follows:
5
6     **MR. SINNOTT:** My name is William
7  Sinnott, S-I-N-O-T-T-T. I'm with the firm
8  of Barrett & Singal. I'm counsel to the
9  special master. The special master is the
10 Honorable Gerald T. Rosen, retired,
11 formerly of the United States District
12 Court in Detroit, Michigan.
13    Judge Rosen has been appointed as
14 special master by the Honorable Mark L.
15 Wolf. And this is a special investigation
16 related to Arkansas Teacher Retirement
17 System versus State Street Bank, Number
18 11-cv-10230-MLW.
19    Also on the special master's team to
20 my left is Attorney Elizabeth McEvoy, also
21 of the firm of Barrett & Singal. And
22 Professor Stephen Gillers is to her left
23 of New York University Law School.
24    On the telephone line for the

Page 8

1  special master's team is Attorney Linda
2  Hylenski.
3     And, at this time, I'd ask that the
4  participants that are in the room identify
5  themselves, beginning with our witness.
6  Bruce, if you could identify yourself for
7  the record.
8     **THE WITNESS:** Bruce Green.
9     **MS. LUKEY:** Joan Lukey from Choate
10 Hall for Labaton Sucharow. And while I'm
11 speaking, let me note my objection to
12 Professor Gillers' presence.
13    **MR. CANTY:** Michael Canty for
14 Labaton.
15    **MR. GLASS:** Stuart Glass, Choate
16 Hall, for Labaton.
17    **MR. HEIMANN:** Richard Heimann from
18 Lieff Cabraser.
19    **MR. LIEFF:** Robert Lieff, Lieff
20 Cabraser.
21    **MR. THORNTON:** Michael Thornton,
22 Thornton Law Firm.
23    **MR. KELLY:** Brian Kelly from Nixon
24 Peabody on behalf of Thornton Law Firm,

Page 9

1  and we join in Labaton's objection to
2  Professor Gillers' presence here.
3     **MR. SINNOTT:** Thank you.
4     And on the telephone, I would ask
5  that each party introduce themselves,
6  beginning with Josh.
7     **MR. SHARP:** This is Joshua Sharp of
8  Nixon Peabody for the Thornton Law Firm.
9     **MR. SINNOTT:** David?
10    **MR. COPLEY:** David Copley, Keller
11 Rohrback, on behalf of the ERISA
12 plaintiffs.
13    **MR. SINNOTT:** And other than Linda
14 Hylenski on the phone, whom I have already
15 identified, has anyone joined the
16 telephone conversation?
17    Okay. Hearing no response. As
18 usual, if those of you that are on the
19 telephone have difficulty hearing any of
20 the questioning or answers, please let us
21 know at the soon as possible point so that
22 we don't have to repeat or call on the
23 court reporter to read the examination
24 back.

Page 10

1    And, by the same token, I'd ask that
2  everyone that is in the room, should you
3  ask a question or give a response, please
4  try to keep your voices up so that those
5  on the phone can hear it as well.
6    All right.  Good morning, everyone.
7  This is the examination of Professor Bruce
8  Green.
9    And Madam Court Reporter, at this
10  time, I'm going to hand you Professor
11  Green's CV and ask that that be marked as
12  an exhibit.
13    (Green Exhibit 1, Curriculum Vitae
14  of Bruce A. Green, marked for
15  identification.)
16  EXAMINATION BY
17    **MR. SINNOTT:**
18  Q.   And, Professor Green, I'm showing
19    you Exhibit 1.
20      Is that the CV that you attached to
21    your expert report?
22  **A.  I assume it is.  It's my CV.**
23  Q.  All right.  Looking at that now, is
24    that the most recent copy of your CV?

Page 11

1  **A.  (Perusing.)  No.  This was as of the**
2    **time I signed my expert report, but my current**
3    **CV would have some additional programs in which**
4    **I've spoken.**
5  Q.  Okay.  Could you just briefly tell
6    us what those would be, without getting into
7    specifics?
8  **A.  I don't know if I remember them all,**
9    **but I spoke recently at an NYU program based**
10    **around an article that a Cardoza professor**
11    **named Jessica Roth wrote.  And since -- I see**
12    **that the last program here is March 2.  So I**
13    **think there were other programs in March at**
14    **which I spoke.**
15  Q.  Okay.  And in addition to those
16    programs, any other changes or additions that
17    you can recall?
18  **A.  There are some -- there's at least**
19    **one additional writing.  Maybe more.  But the**
20    **one that comes to mind is an article online in**
21    **The Hill on the question of whether the**
22    **president can direct the Department of Justice**
23    **in criminal cases.**
24  Q.  Okay.  I'm sure that's one we would

Page 12

1  all like to go and read after this examination.
2    **THE SPECIAL MASTER:** Try telling him
3  he can't, or anything else he can't do.
4  Q.  Beyond those programs --
5    **MR. SHARP:** Bill, I can hear you and
6  the judge perfectly.  I'm having a little
7  bit of difficulty hearing the witness.
8    **THE SPECIAL MASTER:** Let's push this
9  a little closer.  We need one of those
10  yellow construction site banners over
11  those wires.
12    **MR. SINNOTT:** Josh, we will do our
13  best, but please let us know if anyone on
14  the phone is having a similar problem.
15    **BY MR. SINNOTT:**
16  Q.  Okay.  Professor, other than those
17  programs and articles that you've mentioned,
18  are there any other relevant experiences that
19  inform the opinion that you submitted in this
20  case?
21  **A.  I don't know that those were**
22  **relevant to my opinion in this case either, but**
23  **nothing in the past month.**
24  Q.  Okay.  And are you being compensated

Page 13

1  for your time here today?
2  **A.  Yes.**
3  Q.  And what's your rate of
4  compensation?
5  **A.  $950 an hour.**
6  Q.  And approximately how many hours
7  have you spent on this case so far?
8  **A.  Maybe around 60.**
9  Q.  And did you prepare for your
10  testimony today?
11  **A.  I did.**
12  Q.  And how did you do that?
13  **A.  I reread my report.  I read the**
14  **deposition transcripts I was given and looked**
15  **at the documents I was given.**
16    **I met on Friday with Ms. Lukey and**
17  **spoke with her.  I read, again, Professor**
18  **Gillers' report.  I thought about the case.**
19  Q.  Okay.
20  **A.  And I met for several minutes this**
21  **morning with Ms. Lukey.**
22  Q.  All right.  Thank you, sir.
23    Now, you drafted a rebuttal report
24  in this case, correct?

Page 14

1  A.  Yes.
2     MR. SINNOTT: And Madam Court
3  Reporter, if I could ask that this be
4  marked as Exhibit 2.
5     (Green Exhibit 2, Report of Bruce A.
6  Green, dated March 25, 2018, marked for
7  identification.)
8  Q.  Sir, would you look at that and tell
9  me, is that the rebuttal report that you
10  drafted in this case?
11  A.  Yes.
12  Q.  And I direct your attention to the
13  factual statement that appears on page 3 to 12
14  of your report, which is now marked as
15  Exhibit 2.
16     Who drafted that factual statement?
17  A.  I don't know which lawyer drafted
18  it.  It was drafted by -- it was provided to me
19  by counsel for Labaton.
20  Q.  What, if any, involvement did you
21  have in the process of drafting it?
22  A.  Of drafting the facts?
23  Q.  Yes.
24  A.  I didn't physically draft this at

Page 15

1  all, but throughout the process of preparing my
2  report I had conversations with counsel for
3  Labaton which may have or may not have informed
4  how they drafted it.
5  Q.  Did the factual statement change at
6  all during the course of your participation in
7  the process?
8  A.  From the time I was retained, you
9  mean?
10  Q.  Yes, sir.
11  A.  I was provided prior drafts that
12  differed from the one that's in my report.
13  Q.  And did you do -- in the course of
14  your examination of the facts in that report,
15  did you suggest additional facts were needed at
16  any time?
17  A.  I may have, yes.
18  Q.  Did the facts that were presented to
19  you remain static through the completion of
20  your report or did that factual statement
21  change at some point in time?
22  A.  Well, as I said, I was given an
23  earlier draft that was different from the one
24  that's ultimately included in my report.

Page 16

1  Q.  Okay.  So the one that was
2  ultimately included involved changes from that
3  earlier draft?
4  A.  Right.
5  Q.  And did you review the underlying
6  documents cited in your report?
7  A.  I have reviewed them.
8  Q.  Okay.  And which ones did you
9  review?
10  A.  I reviewed probably all of them.  I
11  reviewed the deposition transcripts that are
12  cited here.  I reviewed the documents that are
13  cited here.  As I understand, I was provided
14  them all and I read what I was provided.
15  Q.  For the deposition transcripts, did
16  you read the entire transcript or did you just
17  read specific portions that you were directed
18  to?
19  A.  Neither one, really.  I read the
20  transcripts, but I skimmed the parts that
21  appeared to have no relevance to my opinion.
22  Q.  All right, sir.  Thank you.
23     And, sir, directing your attention
24  to pages 12 to 25 of your report, who wrote

Page 17

1  those opinions?
2  A.  I did.
3  Q.  And did you have any assistance?
4  A.  Well, I wrote prior drafts that were
5  reviewed by Labaton's counsel.  So I guess, to
6  that extent, I had assistance or input, but I
7  don't rely on, for example, student research
8  assistants.
9  Q.  Okay.  And the review by Labaton's
10  counsel, did that result in any changes to your
11  opinion?
12  A.  Yes.
13  Q.  All right.  Tell us about that.
14  A.  About the process?
15  Q.  Yes.
16  A.  I prepared a draft.  It was reviewed
17  by Labaton's counsel.  They sent me
18  suggestions.  I had further conversations with
19  them.  I incorporated some of the suggestions.
20  I did another draft.  We did that, I think,
21  more than once.
22     And then, ultimately, I was done and
23  signed the report.
24  Q.  And do you remember what it was that

Page 18

1  the counsel suggested to you with respect to
2  your opinions?
3  **A.  I don't.**
4  Q.  But is it fair to say that your
5  drafting of these opinions was an interactive
6  process with counsel for Labaton?
7  **A.  I'm not sure what you mean by**
8  **interactive.  It was essentially the process**
9  **that I described.  I had the primary**
10 **responsibility for it.  I did the first draft**
11 **and I had ultimate responsibility for the**
12 **opinions starting on page 12, but I did get**
13 **input.**
14 Q.  All right.  And you say that you did
15 not use student researchers.
16    Did you personally perform all of
17 the research that's summarized in your opinion?
18 **A.  Yes and no.  I'm not sure what you**
19 **mean by the research summarized in my opinion.**
20 **There was certainly cases that were**
21 **provided to me early on or that were reflected**
22 **in Professor Gillers' report.  And so to that**
23 **extent, I guess I wasn't doing the research**
24 **because the research had already been done, but**

Page 19

1  **to the extent that that's not the case, I did**
2  **the research.**
3  Q.  Did Labaton or counsel for Labaton
4  do any of the research for you?
5  **A.  Again, I'm not sure what you mean.**
6  **They did, for example, early in preparing this,**
7  **provide either cites to material or copies to**
8  **material, and some of the material in here was**
9  **provided to me by them either at the outset or**
10 **while I was drafting this.  So to that extent,**
11 **I received material from them.**
12 **I also, as I said, you know,**
13 **reviewed Professor Gillers' report and looked**
14 **at the material that derived from Professor**
15 **Gillers' research, but other than that, this**
16 **reflects my own research.**
17 Q.  All right.  Thank you.
18    And let me just ask you this.  I
19 think it's implicit in your question, but were
20 there any occasions when you expressed to
21 counsel for Labaton, we need to look into the
22 following areas?
23 **A.  No.**
24 Q.  All right.

Page 20

1  **A.  Not that I recall.**
2  Q.  All right, sir.  Thank you.
3    Now, sir, looking at your report and
4  specifically the section that begins on page 14
5  that Rule 7.2(b) is inapplicable, is it fair to
6  say that the crux of this statement is that
7  it's inapplicable because Chargois, Damon
8  Chargois was not compensated for recommending a
9  client?
10   **MS. LUKEY:** Objection.
11 **A.  No, that's not fair to say.**
12 Q.  All right.  But you do say that he
13 did not recommend a client, correct?
14 **A.  No, I don't say that.**
15 Q.  Well, do you say he simply
16 facilitated an introduction?
17 **A.  Where are you reading?  The second**
18 **line from the bottom of page 14 --**
19 Q.  Yes.
20 **A.  -- of the report says, "Chargois**
21 **simply facilitated an introduction."  That's a**
22 **direct quote.**
23   **THE SPECIAL MASTER:** And if I could
24 direct you to the paragraph on top of

Page 21

1  that, just above the subsection A.  You
2  say, "7.2(b) does not apply here for two
3  independent reasons.  One, Labaton did not
4  compensate Chargois for recommending its
5  services."
6    **THE WITNESS:** I did say that, but
7  that's not the question I was asked.
8    **THE SPECIAL MASTER:** Okay.  So is
9  one of your independent bases that -- for
10 finding 7.2(b) does not apply, that
11 Mr. Chargois was not compensated for
12 recommending his services?
13   **THE WITNESS:** Labaton was not
14 compensated -- did not compensate Chargois
15 for recommending Labaton's services.  I
16 think that -- when the question was asked
17 to me, the question was about recommending
18 a client.
19   The point is here that Chargois did
20 not recommend Labaton to the Arkansas
21 Teacher.
22   **THE SPECIAL MASTER:** Okay.
23   **BY MR. SINNOTT:**
24 Q.  Thank you for that clarification.

Page 22

1    Would it be fair to say that,
2  operating from the facts that were given to
3  you, you don't know what Chargois or Herron
4  might have said to Executive Director Doane or
5  Senator Faris, do you?
6  A.   Obviously, I wasn't there, but I
7  would say, based on the facts I was given and
8  also the depositions, including responses to
9  the questions that were asked to Damon Chargois
10  and to Labaton's counsel, there was no --
11  nothing in the deposition transcripts, as I
12  read them, to suggest that a recommendation was
13  made as defined by the comment to 7.2.
14    So I think there's -- it's not just
15  based on the facts, the assumed facts that I
16  was given.  It's also based on the -- the
17  evidence that's underlying the assumed facts.
18  Q.   What was it about the facts, as you
19  were familiar with them, and as were presented
20  to you by counsel for Labaton, that took this
21  out of the ambit of a recommendation?
22  A.   Okay.  So the comment defines a
23  recommendation, essentially, as an endorsement
24  or vouching for the lawyer's credentials,

Page 23

1  abilities, competences, character or other
2  professional qualities.
3    There was no evidence that I saw
4  that anyone from the Chargois firm endorsed or
5  vouched for the Labaton firm's credentials,
6  abilities, competence, character or other
7  professional qualities in communications with
8  representatives of Arkansas Teachers.
9    When the interaction was described
10  by Chargois, it was described as an
11  introduction to Senator Faris.  And I think he
12  even may have recalled a phone call, but there
13  was nothing in the phone call that, as
14  described by him that I recall, that reflected
15  a recommendation.
16    Also, in the testimony of the
17  Labaton representatives, when they testified
18  about what they understood Chargois did or what
19  they were compensating Chargois for, they never
20  reflected in their testimony and they were
21  examined by -- by you, they never reflected in
22  their testimony that they had made a
23  recommendation.
24    And I actually recall, in one of the

Page 24

1  deposition transcripts, where the special
2  master described in a question, I think, the
3  interaction as door opening, perhaps, or
4  something, but I never saw anything in the
5  special master's characterization of the
6  interaction as a recommendation or a vouching.
7    So my clear impression, based on
8  everything I've read as well as the assumed
9  facts is that there is no evidence in the
10  record that a recommendation was made.
11    THE SPECIAL MASTER: Can I ask
12  you -- you used the word, I think, on page
13  15, rather than a recommendation that he
14  facilitated the opening.
15    Is the facilitation and
16  recommendation, if there was a
17  recommendation, mutually exclusive?  Is it
18  possible to facilitate and recommend?
19    THE WITNESS: Sure.
20    MS. LUKEY: Objection.
21    THE WITNESS: It's possible to make
22  a recommendation and to facilitate a
23  relationship.
24    In this case, I didn't see any

Page 25

1  evidence in the deposition transcripts,
2  and I would say I understand that, at the
3  time of the depositions, that there was a
4  theory that there might have been a
5  recommendation under 7.2 and, to me, the
6  deposition examinations were pretty
7  rigorous, and there were times when I
8  thought the witnesses' recollections were
9  probed pretty vigorously.
10    And so one would have expected, I
11  would have expected, reading this, that if
12  there were recommendations made, that
13  would have been explored and elicited
14  through the questions.  And so I drew the
15  inference that, since the people who would
16  know were questioned and weren't -- you
17  know, didn't testify about any
18  recommendations, that there's no -- were
19  no recommendations or at least there's no
20  evidence of recommendations.
21    THE SPECIAL MASTER: Would you agree
22  that the difference between a facilitation
23  and a recommendation that there would
24  be -- there can be a gray area?

Page 26

1    **MS. LUKEY:** Objection.
2    **THE WITNESS:** I'm not exactly sure
3    what the question means.
4    Facilitation is not a word used in
5    the rules.  It's my own characterization
6    of what I think occurred.  The
7    recommendation is the word used in 7.2.
8    I think there can be areas where
9    there's a clear recommendation and areas
10   where it's ambiguous whether
11   recommendations were made.
12   So, in that sense, I think there is
13   certainly room for grayness.  I didn't see
14   any grayness here because there was no
15   suggestion in the evidence that I saw, at
16   least in my reading of it, that there was
17   a recommendation made by anyone from the
18   Chargois firm.
19   **THE SPECIAL MASTER:** What if
20   Mr. Chargois calls Mr. Doane cold, as he
21   testified he did, and says I've been
22   working with a law firm from New York that
23   specializes in securities litigation and
24   helping institutional investors.  I've

Page 27

1    worked with them extensively, and they are
2    really terrific, and we would like to have
3    an opportunity to come in and meet with
4    you and talk to you about the services.
5    Is that a recommendation?
6    **MS. LUKEY:** Objection.
7    **THE WITNESS:** I think saying they
8    are really terrific is endorsing or
9    vouching for their abilities.
10   **THE SPECIAL MASTER:** Okay.  And if
11   they say, I'm working with a New York law
12   firm that specializes in institutional
13   investors, there's a difference there?
14   **MS. LUKEY:** Objection.
15   **THE WITNESS:** Well, there's
16   certainly a difference because you don't
17   have the explicit vouching for their
18   abilities that you would have when you say
19   they are terrific.
20   If the question is could somebody
21   view that as a recommendation, leaving
22   aside the other half of my opinion, I
23   think if a non-lawyer in a situation said
24   a law firm, you know, specializes in

Page 28

1    whatever, to me, that's a statement of
2    fact.  It's not endorsement or vouching
3    for their abilities, credentials,
4    whatever, but I could see saying, in that
5    situation, that's gray.
6    **THE SPECIAL MASTER:** Okay.  Is there
7    a difference, for purposes of 7.2(b),
8    between a recommendation under the rule
9    and solicitation under the rule?
10   **THE WITNESS:** Yes.
11   **THE SPECIAL MASTER:** Could you tell
12   us what that difference is?
13   **THE WITNESS:** Okay.  I don't have
14   the Massachusetts rule in front of me, but
15   I will tell you what I think solicitation
16   generally means.  And I say generally
17   because, for example, in my state of New
18   York, words like advertising and
19   solicitation are given defined meanings
20   that are not necessarily the meanings they
21   have in other places.
22   But, in general, solicitation means,
23   for purposes of the rules, means in-person
24   communication by a lawyer with a

Page 29

1    prospective client in order to secure the
2    client's engagement of the lawyer or a
3    telephonic or something like equivalent
4    communication initiated by the lawyer for
5    the purposes of trying to undertake an
6    engagement.
7    **THE SPECIAL MASTER:** So under the
8    New York rule that you're referring to
9    would what happened here between
10   Mr. Chargois and Paul Doane, would that be
11   a solicitation?
12   **MS. LUKEY:** Objection.
13   **THE WITNESS:** So what I was giving
14   was my understanding of the general
15   definition of solicitation.
16   **THE SPECIAL MASTER:** I'm sorry.  I
17   thought you were --
18   **THE WITNESS:** No.  So New York has a
19   complicated advertising and solicitation
20   rule, which I can't even begin to
21   remember.
22   **THE SPECIAL MASTER:** In your
23   understanding, just -- is what
24   Mr. Chargois did here in this set of

1  facts, is that solicitation as opposed to
2  recommendation?
3      **MS. LUKEY:** Objection.
4      **THE WITNESS:** Well, you're asking
5  me, based on your description of
6  Mr. Chargois' testimony of what he did?
7      **THE SPECIAL MASTER:** It's actually
8  based on his testimony. I can read his
9  testimony.
10     **MS. LUKEY:** It's your memory of his
11 testimony.
12     **THE WITNESS:** I don't remember his
13 testimony that well, and I know issues
14 were contested, but if Chargois cold
15 called a non-lawyer, who was a prospective
16 client, then I suppose that's potentially
17 a solicitation. I would need to know how
18 it's defined in whatever jurisdiction
19 defines solicitation.
20     **THE SPECIAL MASTER:** I don't want to
21 try to play games or mislead you. So let
22 me read his testimony. There's certainly
23 other parts, but this is the operative
24 part of the content.

1      This is Mr. Chargois' testimony on
2  page 33, starting on -- I'm trying not to
3  read too much. We are all familiar with
4  this, but you're not. And I do want to
5  give you some context, in fairness.
6      To get the full relationship, you
7  have to read page 31 and 32, but I think I
8  can summarize it. I'm sure Joan will
9  object.
10     But, basically, Mr. Chargois says
11 that he was asked if he could introduce
12 Mr. Belfi and others from Labaton to
13 institutional investors.
14     Mr. Chargois indicated -- I'm trying
15 to find the line, but he indicated --
16 somebody can help me here -- but he did
17 indicate he really didn't even know what
18 an intuitional investor was.
19     **MR. HEIMANN:** I don't think that's
20 correct, Your Honor. I don't think he
21 ever said that.
22     **MS. LUKEY:** It's not in the part we
23 had yesterday.
24     **THE SPECIAL MASTER:** I know it's

1  not. It's in another part. Let me read
2  the language, please. It's in the same
3  deposition.
4      "When you say they asked you to make
5  introductions, what type of persons did
6  they want to meet?
7      "ANSWER: Eric explained to me that
8  he -- part of his job at Labaton was
9  networking and client development or
10 cultivation -- I don't remember the word,
11 but something along those lines, and that
12 they did not have a presence in Little
13 Rock and that we did and that if we could
14 help introduce them to institutional
15 investors or folks that could help them
16 get introductions to institutional
17 investors.
18     "And what was the basis of your
19 knowledge of institutional investors?
20     "ANSWER: I had none."
21     I can keep reading if you want.
22     "Again, if you could just give us a
23 timeframe.
24     "Around the same timeframe, early

1  2007.
2      "Same timeframe as the HCC case?"
3  And he goes on.
4      Then he says, "Why do you think
5  Labaton asked" --
6      "QUESTION: Why do you think Labaton
7  asked you to help them meet institutional
8  investors when you didn't have any history
9  in that world?
10     "ANSWER: When Eric Belfi came
11 down -- this is prior to Little Rock. He
12 came down to Houston, I believe it was a
13 hearing in the HCC matter. We got to know
14 each other in talking what do you do, what
15 do you do, what else do you do, and I told
16 him we had a Little Rock law firm."
17     So, at best, Mr. Chargois had little
18 history or knowledge of what an
19 institutional investor was.
20     **MS. LUKEY:** Objection.
21     **MR. HEIMANN:** Objection.
22     **MR. SINNOTT:** Madam Court Reporter,
23 could we mark that as Exhibit 3, please?
24     (Green Exhibit 3, Excerpt of

Page 34

1  Deposition Transcript of Damon Chargois,
2  dated October 2, 2017, marked for
3  identification.)
4      **THE SPECIAL MASTER:** At any rate,
5  after this, there is a phone conversation
6  or a meeting with a Senator Faris, who was
7  the senator chairing the state senate
8  committee with oversight responsibilities
9  for state pensions.  And the testimony is
10 that Senator Faris suggested to Mr. Herron
11 that they contact Mr. Doane, who was then
12 the executive director of Arkansas, and
13 the relationship went on.
14     At some point, I mean, there's six
15 or seven pages of testimony here, and I'm
16 trying to encapsulate it for you, but at
17 some point he says that he, Mr. Chargois,
18 called Mr. Doane, that it was a cold call.
19     And question to -- the question is,
20 "Tell us about that.
21     "Tim was friends with Senator
22 Faris -- Steve Faris, and asked him do you
23 know anyone or point us to anyone we might
24 be able to talk to, and he told Tim that

Page 35

1  recently a gentleman named Paul Doane had
2  taken over Arkansas Teachers, and you
3  might want to give him a try.  Good luck.
4      "Did he facilitate that introduction
5  in any way?
6      **"ANSWER:** No, sir.  Tim just told me
7  about it and I looked up Paul Doane and
8  called him.
9      **"THE SPECIAL MASTER:** Cold?
10     **"THE WITNESS:** Yes, sir.
11     **"QUESTION:** And what was Mr. Doane's
12 response when you called him?
13     **"ANSWER:** The gist of it was who are
14 you and why are you calling me, but I told
15 him who I was and who our firm was.  We're
16 local not far from your office and how I
17 got his name and why I was calling.
18     **"QUESTION:** Okay.  And did he offer
19 to help you?
20     **"ANSWER:** I don't understand.
21     **"QUESTION:** Did he ask you to come
22 in for a meeting?  Or did he --
23     **"WITNESS:** No, sir.
24     **"QUESTION:** -- extend -- you know,

Page 36

1  try to arrange for you to talk again with
2  him?
3      **"ANSWER:** No, sir.
4      **"QUESTION:** All right.  What did he
5  say?
6      **"ANSWER:** He listened to what I had
7  to say, and I asked him if I could meet
8  with him.  And then I told him that, you
9  know, I was working with a New York law
10 firm that specializes in institutional
11 investors.
12     **"QUESTION:** Okay.  So how did you
13 leave it after that conversation?
14     **"ANSWER:** Let me know if you're
15 willing to give us some time.
16     **"QUESTION:** Okay.  And what happened
17 next?
18     **"ANSWER:** He -- I don't know if it
19 was a follow-up call by me or if it was
20 that call, but he ultimately agreed to
21 meet.
22     **"QUESTION:** Okay.  And did you meet
23 with him by yourself or were you
24 accompanied by someone else?

Page 37

1      **"ANSWER:** The Labaton -- I believe
2  it was Eric Belfi and Chris Keller, but I
3  can't swear to that.  I know Eric Belfi
4  was there.  I don't know if Chris Keller
5  was there."
6      And it goes on.
7      Just in the context of what I've now
8  read to you, would you characterize that
9  as a solicitation?
10     **MS. LUKEY:** Objection.
11     **THE WITNESS:** So I guess I would say
12 a couple of things.  And one is I don't
13 have the Arkansas rule, which I think
14 would govern, so -- and I'm not an
15 Arkansas ethicist.  I think, given how
16 solicitation is generally understood, that
17 cold calling a potential client who's not
18 a lawyer is generally regarded as a
19 solicitation.
20     I would say that cold calling a
21 corporate executive, or the equivalent in
22 this case, I have never seen somebody
23 disciplined for something like this.  So
24 if it's a solicitation under Arkansas

Page 38

1 ethics rules, I would think it's a pretty
2 de minimis one.
3     And just to put it into context of
4 this case and the rest of the part that
5 you read, I didn't see anything that
6 suggested that the Labaton firm was asking
7 Mr. Chargois to solicit or to cold call.
8     I think my recollection is they
9 understood that Chargois had a
10 relationship with Arkansas Teachers, but
11 in any event, the part that you read me
12 suggested that they were looking for an
13 introduction, not a solicitation in
14 violation of solicitation rules.
15     **THE SPECIAL MASTER:** What is the
16 difference, please?
17     **THE WITNESS:** Between an
18 introduction and solicitation?
19     **THE SPECIAL MASTER:** When it's a
20 cold call, the person doing the calling.
21     **THE WITNESS:** Well, they could have
22 arranged -- well, they could have done
23 either of two things, Chargois.  One is if
24 they had a relationship already, which I

Page 39

1 think the Labaton firm assumed they did,
2 with Arkansas Teachers, then the phone
3 call would not have been a solicitation.
4     And, second of all, they could have
5 initiated the contact with Mr. Doane by
6 e-mail or, you know, letter or by other
7 means that are not conventionally regarded
8 as solicitation under the rules, and those
9 also would have facilitated.
10     **THE SPECIAL MASTER:** There may be a
11 factual difference between what Labaton
12 testifies it believed was any pre-existing
13 relationship between Arkansas and
14 Mr. Chargois and Mr. Chargois' belief.
15 Put that aside.
16     Separately, based on Mr. Chargois'
17 testimony, is that a solicitation?
18     **MS. LUKEY:** Objection.
19     **THE WITNESS:** So you're asking me
20 if -- if Chargois, in fact, cold called a
21 non-lawyer representative of Arkansas
22 Teachers, and I'm assuming that Doane
23 isn't a lawyer, would that technically be
24 solicitation under Arkansas Rules of

Page 40

1 Professional Conduct.  And my answer is I
2 don't know the Arkansas Rules of
3 Professional Conduct.  I don't know how
4 they're interpreted, so I can't really
5 answer that question.
6     I think that if it were regarded as
7 a solicitation, it would be about the most
8 de minimis solicitation one could imagine,
9 and I would highly doubt that it would be
10 disciplined anywhere in the country.
11     **THE SPECIAL MASTER:** Are you
12 familiar with any of the Massachusetts
13 rules that govern solicitation?
14     **THE WITNESS:** I have not studied
15 them in connection with my testimony.
16 That wasn't one of the subjects of my
17 testimony.
18     **THE SPECIAL MASTER:** So you are not
19 prepared to offer an opinion as to whether
20 this would be solicitation under the
21 Massachusetts rule?
22     **THE WITNESS:** Well, I think it's
23 plainly not solicitation under the
24 Massachusetts rule, because the

Page 41

1 Massachusetts rule would not have applied
2 in 2008 to whatever communications
3 Mr. Chargois had with Arkansas Teachers.
4     **THE SPECIAL MASTER:** So the rule
5 that would have applied to solicitation
6 would be the Arkansas rule?
7     **THE WITNESS:** I believe, if
8 Mr. Chargois is a Little Rock, Arkansas,
9 lawyer communicating a prospective
10 Arkansas client in Arkansas, that the
11 Arkansas rules would apply.
12     **THE SPECIAL MASTER:** If it was a
13 solicitation on behalf of a New York firm,
14 would the New York rules have anything to
15 say about it or have any application?
16     **MS. LUKEY:** Objection.
17     **THE WITNESS:** So you're asking me
18 what I believe is a choice of law question
19 in New York?
20     **THE SPECIAL MASTER:** Right.
21     **THE WITNESS:** Whether New York
22 disciplinary authorities, if they were
23 bringing a disciplinary action against the
24 Labaton firm for causing someone to

1  solicit in Arkansas, whether they would
2  apply the Arkansas rules or the New York
3  rules.
4      One point I would make here is, from
5  the testimony I've seen, Labaton didn't
6  cause Chargois to cold call somebody who
7  Chargois didn't, in fact, have a
8  relationship with.  And so I don't see how
9  the Labaton firm could be the subject of a
10  New York disciplinary action here based on
11  having caused Chargois to solicit, but I
12  suppose if you change the facts here and
13  ask the question, I think that's a really
14  interesting question.
15      I'm not sure I a hundred percent
16  know the answer.  It would seem to me the
17  answer would be that if the solicitation
18  is permissible under Arkansas law, then
19  Labaton hasn't caused Chargois to do
20  anything improper and, therefore, I don't
21  see the New York rule as being applied in
22  a New York disciplinary action.
23      But, of course, the whole thing is
24  hypothetical in the extreme because it's

1  almost inconceivable that a New York
2  disciplinary authority would proceed after
3  a firm in Labaton's position based on
4  facts like these.
5      THE SPECIAL MASTER: We got into
6  this through the doorway of my question,
7  what the difference was between
8  solicitation and a recommendation.
9      Would you agree, at least from --
10  based on Mr. Chargois' testimony of the
11  cold call and he says he's working with a
12  New York firm, I'm quoting now from page
13  34, I will quote it directly, line 19, "He
14  listened to what I had to say and I asked
15  him if I could meet him.  And then I told
16  him that, you know, I was working with a
17  New York law firm that specializes in
18  institutional investors."
19      Is there, in that, an implicit
20  recommendation?
21      MS. LUKEY: Objection.
22      THE WITNESS: So I don't think --
23  well, I don't think there's a
24  recommendation for purposes of 7.2(b).  I

1  don't know that 7.2(b) applies, in
2  general, to implicit recommendations.  I
3  don't think -- now you're asking me to
4  parse his recollection, I'm not sure how
5  many years later, almost a decade later,
6  of a conversation that he had or that he
7  thinks he had with Mr. Doane.
8      It's not a verbatim account.  I
9  doubt very much that it's a verbatim
10  recollection.  And so I'm a little
11  leery -- wary of sort of parsing his
12  reconstructed recollection of a
13  nine-year-old conversation and saying that
14  that's an implied recommendation.
15      I was an English major, so I did
16  spend a lot of time parsing, you know,
17  language and reading things into it, but I
18  certainly don't think, based on this
19  testimony, you can make a finding fairly
20  that there was a recommendation under
21  7.2(b).
22      THE SPECIAL MASTER: Let me try it
23  again.
24      THE WITNESS: Okay.

1      THE SPECIAL MASTER: I'm not asking
2  you to try to peel back the skin of
3  Mr. Chargois' memory.  I'm not asking you
4  to parse through his memory.
5      I'm asking you only on the face of
6  what he testified to, lines 19 through 23,
7  whether that testimony, assuming it's
8  right or accurate, would constitute an
9  implicit recommendation?
10      MS. LUKEY: Objection.
11      THE WITNESS: So my opinion is if
12  Chargois said to Doane, "I am working with
13  a New York law firm that specializes in
14  institutional investors," that would not
15  be a recommendation for purposes of
16  7.2(b).
17      THE SPECIAL MASTER: Okay.  Explicit
18  or implicit?
19      MS. LUKEY: Objection.
20      THE WITNESS: I don't know that an
21  implicit recommendation of this kind would
22  come within 7.2(b).
23      My opinion is if you want to
24  characterize it as an implicit

Page 46

1 recommendation, it doesn't come under
2 7.2(b). I don't know, myself, what's
3 implicitly being said here about the
4 qualifications of the Labaton firm.
5     THE SPECIAL MASTER: Beyond that
6 they specialize --
7     THE WITNESS: Well, that's explicit.
8     THE SPECIAL MASTER: Yeah.  And
9 that's not -- the fact that they said --
10 that Mr. Chargois said a New York firm
11 that specializes does not carry a
12 recommendation connotation to it?
13     MS. LUKEY: Objection.
14     THE WITNESS: To me, that's a
15 description of the work that the Labaton
16 firm does.  If they did personal injury
17 work, it would not be -- this would not be
18 a relevant introduction.
19     THE SPECIAL MASTER: Bill.
20     BY MR. SINNOTT:
21 Q.  Are you familiar with what
22 Mr. Chargois -- how Mr. Chargois viewed his
23 role with Arkansas?
24     MS. LUKEY: Objection.

Page 47

1 Q.  Well, let me phrase it this way.
2     What's your understanding with
3 respect to the issue of solicitation as to how
4 Damon Chargois viewed his role in bringing
5 Arkansas to Labaton?
6     MS. LUKEY: Objection.
7 **A.  I guess I don't understand your**
8 **question.**
9 Q.  Sure.  Let me be a little bit more
10 specific.
11     Among the materials that you were
12 shown, do you recall if you were shown an
13 e-mail thread dated October 18, 2014, and I'm
14 referring to LBS017593 and 594, from Damon
15 Chargois to Eric Belfi, and specifically --
16     MR. SINNOTT: What exhibit number
17 was that yesterday?
18     MS. LUKEY: Exhibit 3.
19     MR. SINNOTT: Mark this as Exhibit 4
20 for today's deposition.
21     (Green Exhibit 4, E-Mail Chain,
22 Bates Stamped LBS017593 through 17594,
23 marked for identification.)
24 Q.  So, Professor, I'd ask that you look

Page 48

1 at that document and you're welcome to look at
2 the entire document, but my question will deal
3 with the final, what appears to be the final
4 e-mail on that thread, which begins at the
5 bottom of that first page where it says,
6 "Original message from Damon Chargois," and
7 goes onto the next page.
8 **A.  Is there a particular paragraph you**
9 **want me to look at?**
10 Q.  Yes.  I want you to look at the
11 second paragraph of that message, but if you
12 need to look at the first --
13 **A.  Can you just tell me how it begins?**
14 Q.  Sure.  "I am very concerned."
15 **A.  Sure.  I see it.  (Perusing.)**
16 Q.  All right.  So you have had a chance
17 to look at that?
18 **A.  Yes.**
19 Q.  Have you seen this before?
20 **A.  Yes.**
21 Q.  Having seen this before, what do you
22 understand the context of that particular
23 e-mail to be?  What prompted that e-mail?
24 **A.  My understanding is that there was a**

Page 49

1 **question about whether the Chargois firm would**
2 **receive any money upon the successful**
3 **conclusion of the State Street Bank case, and**
4 **that this was a -- Mr. Chargois' communication**
5 **with Eric Belfi of Labaton on why the Chargois**
6 **firm ought to be receiving money.**
7 Q.  All right.  And specifically with
8 respect to that paragraph that I asked you to
9 look at, for the record, it says, and this is
10 Mr. Chargois to Mr. Belfi, "I am very concerned
11 that you guys are attempting to significantly,
12 substantially and materially alter our
13 agreement.  Our deal with Labaton is
14 straightforward.  We got you ATRS as a client,
15 (after considerable favors, political activity,
16 money spent and time dedicated in Arkansas) and
17 Labaton would use ATRS to seek lead counsel
18 appointments in institutional investor fraud
19 and misrepresentation cases."
20     Now, is it fair to say that, in that
21 paragraph, in that sentence that I just read,
22 Mr. Chargois describes the activities that were
23 undertaken in obtaining Arkansas as a client
24 for Labaton?

Page 50

1     MS. LUKEY: Objection.
2  A.  Are you asking me based on personal
3  knowledge, based on my having read the rest of
4  the evidence or something else?
5  Q.  No.  I'm saying, based on that
6  sentence that I just read, does Mr. Chargois
7  not say here that -- let me break it down.
8     "We got you ATRS as a client,"
9  correct?
10 A.  Are you asking me if that's what it
11 says here?
12    MS. LUKEY: Objection.
13 Q.  Yes.
14 A.  Yes, you correctly read it.
15 Q.  And then, in parentheses, he
16 describes, does he not, the steps that Chargois
17 took in getting ATRS as a client?
18    MS. LUKEY: Objection.
19 A.  Again, I would say, are you asking
20 me based on personal knowledge?  I don't have
21 any knowledge.
22 Q.  No, I'm not asking your personal
23 knowledge.
24 A.  You asked me, are these the steps

Page 51

1  that he took.  I don't know whether these are
2  the steps that he took.
3  Q.  I'm asking you if that's what it
4  says, that he's describing the steps that he
5  took.
6  A.  That isn't what you asked.
7     MS. LUKEY: We will stipulate to the
8  writing, if you want, that that's what is
9  written there, as you read it correctly,
10 that's fine.
11 A.  He's describing steps he claims he
12 took, but I don't know whether he is describing
13 steps that he, in fact, took.  In the material
14 that Judge Rosen read to me before, it makes it
15 pretty plain that Mr. Chargois didn't take
16 these steps.
17    THE SPECIAL MASTER: In fairness, I
18 only read you the snippet of the
19 deposition dealing with the opening of the
20 relationship.
21    THE WITNESS: Okay.
22 A.  Well, either he took these steps or
23 he didn't.  I have no basis of knowledge.
24 Q.  All right.  But, of course, you

Page 52

1  don't have personal knowledge.
2  A.  Right.  I do not have personal
3  knowledge.
4  Q.  But what I'm asking is --
5     THE SPECIAL MASTER: Just as you
6  don't have personal knowledges of any of
7  the conversations that Mr. Belfi had that
8  he testified to about what the
9  relationship was, right?
10    THE WITNESS: I have no personal
11 knowledge of any of the facts in this
12 case.
13 Q.  Is it clear to you, in that sentence
14 that I referred you to, that Damon Chargois is
15 claiming to have expended considerable favors,
16 political activity, money spent and time
17 dedicated in Arkansas in getting ATRS as a
18 client for Labaton?
19 A.  That's how I read that.
20 Q.  Thank you.  Is that solicitation?
21    MS. LUKEY: Objection.
22    THE SPECIAL MASTER: Assume that
23 it's true.  For purposes of the question,
24 assume that it's true.

Page 53

1  A.  I have no idea.  It doesn't say here
2  whose favors or what political activity or how
3  the money was spent or how he dedicated his
4  time.  If he dedicated his time to
5  solicitation, he solicited.  If he dedicated
6  his time to something else, it wasn't
7  solicitation.
8  Q.  But the fact is you don't have any
9  knowledge, either personal knowledge or based
10 on the facts that were presented to you by
11 counsel for Labaton, as to what Chargois or
12 Herron actually said to Mr. Doane or to Senator
13 Faris about Labaton, correct?
14 A.  That was -- I lost track of the
15 question.
16    I certainly have no personal
17 knowledge.  The only knowledge I have is based
18 on my having read the transcripts that I was
19 provided.
20 Q.  All right.  Does it follow from your
21 opinion, Professor, that if Chargois & Herron
22 did not recommend Labaton within the meaning of
23 7.2(b), then Labaton did not need to comply
24 with 1.5(e) to avoid violating 7.2(b)?

Page 54

1    MS. LUKEY: Objection.
2  A.  I truly don't understand what you
3  just said, but I think I could respond.
4  Q.  Please do.
5  A.  Okay. It's my opinion that if
6  Labaton did not pay Chargois to recommend
7  Labaton's services to Arkansas Teachers, then
8  Labaton did not violate Rule 7.2(b), period.
9    It may be, and it would require a
10  separate analysis, that Labaton violated Rule
11  1.5(e). That would be a separate question.
12  That is independent of the question under Rule
13  7.2(b).
14  Q.  All right. So let me see if I can
15  follow up on that.
16    Is it your view, under this part of
17  your report, that Labaton paid Chargois for an
18  introduction only, and that, therefore, it was
19  not dividing a fee with Chargois & Herron?
20    MS. LUKEY: Objection.
21  A.  Are you asking, is that the opinion
22  I'm expressing at page 14?
23  Q.  Yes, sir.
24  A.  No, I'm not expressing that opinion

Page 55

1  at page 14.
2  Q.  Let me ask you if you are expressing
3  that view anywhere. Is it your view that
4  Labaton paid Chargois for an introduction only,
5  and that, as a result, it was not dividing a fee
6  with Chargois & Herron?
7    MS. LUKEY: Objection.
8  A.  No, that's not my opinion. My
9  opinion is, one, Labaton did not violate Rule
10  7.2(b).
11    And, two, and separately, for
12  separate reasons expressed later in my report,
13  Labaton did not violate Rule 1.5(e).
14  Q.  Well, did Labaton need to comply
15  with 1.5(e) at all if Chargois & Herron merely
16  facilitated an introduction?
17    MS. LUKEY: Objection.
18  A.  Labaton needed to comply with Rule
19  1.5(e) if Rule 1.5(e) was applicable, if there
20  was an agreement to share fees with Chargois.
21  That is an independent question from the
22  question of whether Rule 7.2(b) applies based
23  on your theory or a theory that Labaton paid
24  Chargois for recommending Labaton's services.

Page 56

1  Those are two separate questions.
2    THE SPECIAL MASTER: Your testimony
3  here raises an interesting question that I
4  would like your opinion on.
5    7.2(b), on its face, says that a
6  lawyer may not give anything of value. I
7  don't have it in front of me, but --
8    THE WITNESS: (Handing.)
9    THE SPECIAL MASTER: Okay. Good.
10    A lawyer shall not give anything of
11  value to a person for recommending a
12  lawyer's services.
13    There is a subsection in (b)(5) that
14  excepts out a division of fees under
15  1.5(e).
16    Do you view 1.5(e) as a safe harbor
17  from the general prohibition in 7.2(b)?
18    THE WITNESS: So I address this
19  beginning at page 15 of my report. I'm
20  not sure I would describe it as a safe
21  harbor.
22    What I would say is that fee-sharing
23  arrangements between lawyers are not
24  regarded as recommendations for purposes

Page 57

1  of one point -- for purposes of 7.2(b).
2    And do you want me to elaborate?
3    THE SPECIAL MASTER: Yeah. I was
4  going to ask you what the distinction
5  you're drawing is.
6    THE WITNESS: Between -- I'm not
7  sure.
8    THE SPECIAL MASTER: Between safe
9  harbor, at least as I understand what a
10  safe harbor is, and what you say it is.
11    I think you said that subsection 5
12  says it doesn't apply to fee-sharing
13  agreements under Rule 1.5(e).
14    MS. LUKEY: Objection.
15    THE SPECIAL MASTER: So what I'm
16  asking you is, isn't that a safe harbor
17  from the larger prohibition?
18    MS. LUKEY: Objection.
19    THE WITNESS: So I guess partly
20  turns on what you mean by safe harbor.
21  It's not a phrase that I'm using.
22    And so what I think -- well, I don't
23  want to guess on what you mean. So there
24  is that problem.

Page 58

1  **THE SPECIAL MASTER:** I don't want
2  you to guess on what I mean by safe
3  harbor.
4  Is it an exception to the general
5  proscription under 7.2(b)?
6  **THE WITNESS:** Okay. No, I don't
7  read it that way. And so Massachusetts
8  has this provision 7.2(b). It's not in
9  the ABA model rules.
10  And the model rule states, I think
11  it's generally understood, that
12  fee-sharing arrangements that may involve
13  a recommendation are not what 7.2(b)
14  covers. Here, the Massachusetts rule
15  makes it crystal clear by having this
16  provision.
17  I think what it means is to
18  emphasize that fee-sharing arrangements
19  are okay in Massachusetts. Massachusetts,
20  by the way, has a more liberal fee-sharing
21  rule than other states. And that fee
22  sharing that's generally covered by 1.5(e)
23  is not the sort of thing that 7.2(b) is
24  meant to cover.

Page 59

1  I don't know that I would call it an
2  exception. I think it -- because even
3  absent this provision, fee sharing
4  wouldn't be covered under 7.2(b).
5  **THE SPECIAL MASTER:** Does the rule
6  not characterize Rule 7.2(b)(5) as an
7  exception?
8  **THE WITNESS:** Yes.
9  **THE SPECIAL MASTER:** But you don't
10  believe it's an exception.
11  **THE WITNESS:** Well, I guess the
12  question is, in what sense you mean.
13  I think that fee sharing, generally,
14  is excluded from the rule. I think this
15  provision is designed to make that crystal
16  clear.
17  I think, absent this provision, that
18  would still be the case, as it is in Model
19  Rule 6.
20  **THE SPECIAL MASTER:** Then why put
21  (b)(5) in?
22  **MS. LUKEY:** Objection.
23  **THE SPECIAL MASTER:** If that's true,
24  why put (b)(5) in? Would that not be

Page 60

1  surplusage?
2  **MS. LUKEY:** Objection.
3  **THE WITNESS:** Actually, I think this
4  is surplusage. And I think the reason is
5  what we know about the Massachusetts
6  fee-sharing provision. Massachusetts is
7  more open to fee sharing than most, if not
8  all, other states.
9  In other states that have the model
10  rule provision, it's restricted to
11  arrangements where there's joint
12  responsibility between the two lawyers who
13  are sharing fees or where the fee sharing
14  is based on the amount of work each does.
15  In Massachusetts, based on what I've
16  read, including the Saggese case, they are
17  more open to fee sharing. I think it's
18  fair in the context of the history and in
19  the context of 1.5(e) to read this as,
20  indeed, surplusage, but making it crystal
21  clear, as I say, that fee sharing is not
22  prohibited by 7.2(b).
23  **THE SPECIAL MASTER:** So even if
24  subsection 5 were not in the rule, a

Page 61

1  lawyer who fails to comply with 1.5(e) and
2  blatantly gives something of value to a
3  person for recommending the lawyer's
4  services is not subject to 7.2(b), is that
5  your understanding? Absent the exception.
6  **MS. LUKEY:** Objection.
7  **THE WITNESS:** You asked the question
8  as if it follows from what I said, but
9  just to parse the question, first of all,
10  you said "who gives something of value to
11  someone." Well, clearly, none of this
12  relates to giving something of value to
13  non-lawyers.
14  So I assume you mean who gives
15  something of value to a lawyer, but I
16  don't want to make that assumption because
17  you asked the question --
18  **THE SPECIAL MASTER:** Then let me
19  read it as you've defined it, rather than
20  my question.
21  "A lawyer shall not give anything of
22  value to a lawyer for recommending the
23  lawyer's services."
24  And you can read it without the

1 exception in subsection 5.
2     **MS. LUKEY:** Objection.
3     **THE SPECIAL MASTER:** That would
4 not -- that would not implicate Rule
5 7.2(b).
6     **MS. LUKEY:** Objection.
7     **THE WITNESS:** Well, if it's -- a
8 lawyer gives something of value to a
9 lawyer to recommend the first lawyer's
10 services, and it's not in the context of a
11 fee-sharing provision, then I guess it
12 could be taken back to 7.2, and that would
13 be true in Massachusetts or in a model
14 rule state, but that's not the question
15 you asked me before.
16     **THE SPECIAL MASTER:** So your
17 testimony, then, would be 7.2(b) has
18 nothing to say about a lawyer who gives
19 something of value to another lawyer for
20 recommending the lawyer's services.
21     **THE WITNESS:** Are you asking if that
22 was my testimony?
23     **THE SPECIAL MASTER:** Is that your
24 understanding of the rule?

1     **THE WITNESS:** No.
2     **THE SPECIAL MASTER:** What is your
3 understanding of the rule?
4     **THE WITNESS:** My understanding of
5 the rule is, as relevant here, that giving
6 something of value -- I mean, it's easier
7 if I give the lawyer's names, but if
8 Labaton gave something of value to
9 Chargois to recommend Labaton's services,
10 and it wasn't in the context of a
11 fee-sharing agreement, then it might well
12 be taken back to 7.2(b), and that would be
13 true in the model rules or in
14 Massachusetts.
15     **THE SPECIAL MASTER:** Thank you.  And
16 is that why you believe that subsection 5,
17 the exception, is surplusage?
18     **MS. LUKEY:** Objection.
19     **THE WITNESS:** I think it's
20 surplusage because, even without that
21 language, in all of the states that don't
22 have that language, it's understood that
23 fee-sharing arrangements are not
24 violations of 7.2(b), even if, in the

1 context of the fee-sharing arrangement, a
2 recommendation is made.
3     And so I believe that the
4 Massachusetts rule is, even without that
5 language, it would come out the same.
6     **BY MR. SINNOTT:**
7 Q.  Professor, let me direct your
8 attention to page 16 of your report,
9 specifically to footnote 13.  And footnote 13
10 reads, "I am unaware of any drafting history
11 suggesting that the Massachusetts drafters
12 intended Rule 7.2(b) to apply where lawyers
13 enter into fee-division agreements that are
14 generally permitted by Rule 1.5(e), but that do
15 not fully satisfy Rule 1.5(e)'s procedural
16 requirement."
17     Could you explain that analysis?
18 What do you mean by that?
19 A.  By that sentence?
20 Q.  Yes, sir.
21 **A.  Okay.  1.5(e) has both a substantive**
22 **and a procedural requirement.  The substantive**
23 **requirement is that the total fee has to be**
24 **reasonable, and that's, I think, the main point**

1 **of the rule.**
2     **And so if you look at the Saggese**
3 **decision, it says that the purpose of the rule**
4 **is to make sure that, in the context of a**
5 **fee-sharing arrangement, the total fee is not**
6 **excessive, but there's also a procedural**
7 **requirement.**
8     **The current rule, the procedural**
9 **requirement, includes both notice and written**
10 **consent.  In the rule, as it existed at the**
11 **time, it didn't require the writing, but I --**
12 **it required notice of a fee-sharing arrangement**
13 **and consent.**
14     **In the Saggese case, they use the**
15 **term, I think, "imperfect fee splitting**
16 **arrangement" to express a situation where you**
17 **have a fee-sharing arrangement that would be**
18 **permissible, generally, under 1.5(e) or under**
19 **the prior code provision, but that the**
20 **procedural aspect of this was not fully**
21 **complied with.**
22     **What I -- and that is my**
23 **understanding of the potential argument that**
24 **may be made here about what happened here.  I**

Page 66

1 don't think anybody is arguing, as I
2 understand, that the total fee was
3 unreasonable, but I think there's a suggestion
4 in some of what I've read, and in the questions
5 that have been asked, that the procedural
6 requirement was not perfectly complied with.
7    So what I wanted to know was, in
8 that kind of situation, if there is a
9 recommendation that's made in the context of an
10 imperfect fee-sharing arrangement, might 7.2(b)
11 apply to that recommendation.
12    And so one of the questions I wanted
13 to know was whether, from what I could tell of
14 the drafting history, and I only saw, you know,
15 what was published, obviously, I have no
16 insight in the conversations that took place,
17 was there anything in the drafting history of
18 7.2(b) and 1.5(e) to suggest that an
19 imperfect -- a procedurally imperfect
20 fee-sharing arrangement that involved a
21 recommendation might violate 7.2(b) because
22 there was compensation for recommendation of
23 the lawyer's services.
24    And what I'm saying here is I'm not

Page 67

1 aware of anything in the drafting history that
2 suggests that the Massachusetts drafters meant
3 7.2(b) to apply to that situation.
4    THE SPECIAL MASTER: Could I ask you
5 this?  Is your view that 7.2(b) does
6 not -- is not implicated by what you call
7 an imperfect fee-sharing arrangement, is
8 that something that would go to the nature
9 of any sanction or discipline under 7.2(b)
10 or is that your view simply as a matter of
11 law, that if 1.5(e) is not complied with
12 then 7.2(b) even if it is not complied
13 with, does not apply?
14    THE WITNESS: I would say the
15 latter.  My opinion is that 7.2(b), where
16 a recommendation is made in the context of
17 an imperfect fee-sharing arrangement does
18 not apply.  1.5(e), obviously, would
19 apply.  And so if you have a fee-sharing
20 arrangement that's generally subject to
21 1.5(e), and you don't have, under today's
22 rule, for example, if you don't have a
23 writing, you have consent, but it's oral,
24 you have notice, you have, you know, an

Page 68

1 imperfect fee-sharing arrangement because
2 the procedural aspect isn't complied with,
3 even though the total fee is reasonable, I
4 think that would be a violation of 1.5(e).
5 Whether it's sanctioned or not is a
6 different question, but I don't think it
7 would be a violation of 7.2(b) for reasons
8 I express in my report, which I would be
9 happy to explain.
10    THE SPECIAL MASTER: All right.  So
11 your view is that, if it's an imperfect
12 attempt to comply with 1.5(e), 7.2(b)
13 simply has nothing to say about discipline
14 or sanction or anything else?  It's simply
15 not a violation at all of 7.2(b)?
16    THE WITNESS: Well, first of all,
17 you need a recommendation.  Otherwise,
18 7.2(b) doesn't even kick in.  But if there
19 is a recommendation made in the context of
20 the procedurally imperfect fee-sharing
21 arrangement, I do not believe 7.2(b)
22 applies, period.
23    THE SPECIAL MASTER: Suppose there's
24 no attempt at all, I'm not saying that

Page 69

1 happened here, but just suppose there's no
2 attempt at all to comply with 1.5(e), no
3 notice to the client of division of fees,
4 no consent by the client, just a bare
5 recommendation and a payment for that.
6 Would 7.2(b) then be implicated?
7    MS. LUKEY: Objection.
8    THE WITNESS: Yeah, I think it could
9 be.  If it's not a fee-sharing
10 arrangement, but it's a pure payment for a
11 recommendation, I think 7.2(b) could
12 apply.
13    THE SPECIAL MASTER: Okay.  So your
14 distinction there as to the
15 inapplicability of 7.2(b) rests on
16 imperfect compliance?
17    MS. LUKEY: Objection.
18    THE WITNESS: In this case, it rests
19 on two things.  One is there's not a
20 recommendation, but leaving that aside,
21 where there is a recommendation, yes, I
22 think there's a difference between
23 imperfect compliance because you still
24 have a fee-sharing arrangement that's

Page 70

1 generally subject to 1.5(e) and something
2 that's not a fee-sharing arrangement
3 that's not subject to 1.5(e).
4     THE SPECIAL MASTER: So is another
5 way of saying this, if a lawyer attempts
6 to comply with 1.5(e), but falls short,
7 gives notice to the client that a referral
8 fee may be paid, but falls short of the
9 specific requirements, at that point,
10 7.2(b) falls away and has nothing to say
11 about the lawyer's conduct.
12     THE WITNESS: I wouldn't describe it
13 that way. I would say that 1.5(e) governs
14 fee-sharing arrangements, and 7.2(b) does
15 not govern fee-sharing arrangements, and
16 so if you have a fee-sharing arrangement
17 that doesn't adequately comply with the
18 requirements of 1.5(e), then you have a
19 violation of 1.5(e). That's what the rule
20 is there to do, to govern fee-sharing
21 arrangements.
22     7.2(b) is there to govern payments
23 to others for recommending the lawyer's
24 services. In general, the history of it

Page 71

1 wasn't about payments to lawyers. It was
2 about, you know, ambulance chasers or
3 things like that.
4     I think that conceivably can apply
5 to payments of lawyers if lawyers are
6 acting as ambulance chasers. The fact
7 that they have a law license doesn't make
8 them privileged to chase ambulances, but a
9 1.5(e) fee-sharing arrangement is not
10 ambulance chasing.
11     THE SPECIAL MASTER: Okay. Let me
12 see if we can agree on this, then, because
13 I think I do understand you now.
14     For disciplinary purposes, when a
15 lawyer has a fee-sharing agreement,
16 imperfect or not -- let's take yours,
17 imperfect. A lawyer has an imperfect
18 fee-sharing agreement with another lawyer
19 that fails to comply with 1.5(e). 7.2(b)
20 is not implicated at all for purposes of
21 discipline. It falls only under 1.5(e);
22 is that correct?
23     THE WITNESS: That's fair.
24     THE SPECIAL MASTER: Okay. Thank

Page 72

1 you.
2     BY MR. SINNOTT:
3 Q. Let me just circle back to --
4     THE SPECIAL MASTER: I just want to
5 close the loop.
6     A complete failure to even attempt
7 to comply, no notice, no consent by the
8 client, no notice to the client, no
9 consent by the client, just a bare
10 recommendation, that implicates 7.2(b),
11 yes?
12     MS. LUKEY: Objection.
13     THE WITNESS: So the question, to
14 me, would be are you paying for the
15 recommendation, period. Or do you have a
16 fee-sharing arrangement?
17     THE SPECIAL MASTER: I'm asking you
18 to assume -- I'm asking you to assume that
19 all there is is a recommendation and no
20 attempt to comply with 1.5(e), no notice
21 to the client, no consent by the client.
22     MS. LUKEY: Objection.
23     THE WITNESS: Well, again, if it's a
24 pure payment, for example, I'll give you

Page 73

1 $10,000 for making a recommendation. I
2 think that's within 7.2.
3     If it's I'll pay you $10,000 if I
4 snag the client, if you make a
5 recommendation, I think that's within 7.2.
6     If you have a fee-sharing
7 arrangement and the fee, total fee is
8 reasonable, but you didn't do the
9 procedural stuff that you're supposed to
10 do, I think that's a 1.5(e) problem.
11     THE SPECIAL MASTER: So, in that
12 latter situation, you've called out 1.5(e)
13 occupies the field totally, and 7.2(b) has
14 nothing to say about it?
15     THE WITNESS: Right. I think, if
16 it's a fee-sharing arrangement, that's
17 generally governed by 1.5(e), it's
18 governed by 1.5(e).
19     I think the disciplinary authorities
20 in Massachusetts have the full range of
21 discipline available to them based on how
22 serious they think the Rule 1.5 violation
23 is.
24     So whether or not it's 1.5(e) or 7.2

Page 74

1 doesn't limit their disciplinary
2 authority, but I think that the
3 authorities would look to 1.5(e) as the
4 basis for discipline.
5    THE SPECIAL MASTER: You've read
6 Professor Gillers' report?
7    THE WITNESS: I did.
8    THE SPECIAL MASTER: So perhaps this
9 is where you part company with him?
10    THE WITNESS: We definitely see it
11 differently here.
12    THE SPECIAL MASTER: And the point
13 at which you part company with him is what
14 happens if a lawyer fails to comply with
15 1.5(e). I believe Professor Gillers would
16 say, if the lawyer does not comply with
17 1.5(e), then you are into 7.2(b).
18    Your view is that so long as there
19 is an attempt to comply with 1.5(e),
20 7.2(b) is not implicated at all; is that
21 right?
22    THE WITNESS: I wouldn't put it that
23 way. I'd say if you have a fee-sharing
24 arrangement, that's generally governed by

Page 75

1 1.5(e).
2    THE SPECIAL MASTER: How is that
3 different than what I said, please?
4    THE WITNESS: Could you read back
5 what the judge said?
6    THE SPECIAL MASTER: I'm truly
7 trying to understand where you and
8 Professor Gillers part company.
9    (Record read.)
10    THE WITNESS: So I'm not sure what
11 you mean by "an attempt to comply." So if
12 by attempt to comply you mean there's a
13 fee-sharing arrangement, but you don't
14 adequately give notice or adequate consent
15 or adequate writing, then I would agree
16 with that. But since I didn't know
17 exactly what you meant --
18    THE SPECIAL MASTER: I will accept
19 it. That's what I meant.
20    THE WITNESS: Okay.
21    BY MR. SINNOTT:
22 Q. Let me just follow up on that,
23 Professor.
24    Does a client's refusal to consent

Page 76

1 to an agreement to divide fees take it out of
2 1.5(e) so that 7.2(b) applies?
3    MS. LUKEY: Objection.
4 A. I'm sorry. Could you ask that
5 again?
6 Q. Sure. Let's say the client refuses
7 to consent to an agreement to divide fees.
8 That takes it out of 1.5(e), correct?
9    MS. LUKEY: Objection.
10 A. I don't understand the question.
11    Where is the recommendation here?
12 So far, in your question, there's not a
13 recommendation.
14 Q. And then there's a recommendation,
15 but the precedent to that or the follow-up to
16 that, I should say, is the client then says I'm
17 not going to consent to that agreement.
18 A. Was there a payment for the
19 recommendation?
20 Q. Yes.
21 A. So can you just tell me the sequence
22 of events?
23 Q. So there is an agreement between
24 counsel for recommendation to divide fees.

Page 77

1 There is a payment for that, and then the
2 client says, I didn't agree to that.
3    Under your analysis, what does that
4 mean?
5 A. So, again -- so lawyer A says to
6 lawyer B, please recommend my services to the
7 client, and pays lawyer B, at that point, to
8 make the recommendation?
9 Q. Yes.
10 A. That doesn't sound like fee
11 splitting to me. It sounds like payment for
12 recommendation.
13 Q. Okay. Let me just back up a little
14 bit. And this is an assumption I want you to
15 make, a hypothetical assumption.
16    A prospective client consults with
17 Attorney Jones, who says I don't handle that
18 kind of work, but let me introduce you to
19 Attorney Smith.
20    Now, my question is, would it be
21 rational for the client to conclude that
22 Attorney Jones is recommending Attorney Smith?
23    MS. LUKEY: Objection.
24 A. I would say it would not be

Page 78

1  irrational.
2  Q.  It would not be irrational?
3  A.  Right.
4  Q.  So it would be rational?
5  A.  Yeah.
6  Q.  And, in this particular case, would
7  it not be irrational for Executive Director
8  Doane to conclude, in light of the fact that
9  Chargois has contacted a state senator who's
10 made an introduction to Mr. Doane, that
11 Mr. Doane has agreed to sit down with Chargois
12 and Labaton Attorney Eric Belfi, and Chargois
13 and Belfi, in fact, do go and meet with
14 Mr. Doane, would it not be irrational for
15 Mr. Doane to conclude that Chargois is
16 recommending Eric Belfi and Labaton?
17     MS. LUKEY:  Objection.
18 A.  Do you want me to view that as a
19 pure hypothetical or do you want me to view it
20 in the context of what I know or something
21 else?
22 Q.  I want you to assume those facts are
23 true, and tell me if, based on those facts,
24 just as you did for the previous hypothetical,

Page 79

1  you can conclude that it would not be
2  irrational or it would be rational, to put it
3  another way, for Doane to conclude that
4  Chargois is recommending Eric Belfi?
5     MS. LUKEY:  Objection.
6  A.  So, again, it's hard for me to -- if
7  assuming I could remember what you said, it
8  would be hard for me to separate it from what I
9  know in this case and view it as the equivalent
10 of Smith and Jones.
11    In the context of this case, where
12 Doane apparently doesn't know Chargois from a
13 hole in the wall, so that Chargois'
14 recommendation, even if there were one, that
15 was explicit, these guys are terrific lawyers,
16 wouldn't mean anything to Doane; where Chargois
17 doesn't do this kind of work, and so doesn't
18 even have a basis for forming a judgment about
19 whether Labaton is terrific; where, in order to
20 get Arkansas Teachers as a client, you have to
21 basically go through an RFQ process; where, in
22 fact, Labaton basically pitches its own
23 qualifications, I don't think that, in the
24 context of this case, there's an implied or

Page 80

1  express or meaningful recommendation.
2     I don't know what Doane would think,
3  and whatever Doane thinks, I doubt he's
4  irrational.  So I'm sure whatever he, in fact,
5  thought was rational.
6     But, to me, there's a sort of angels
7  dancing on the head of a pin quality to your
8  question because you have to think about the
9  purpose of the rule, right?
10    The purpose of the rule is to make
11 sure that clients aren't -- or prospective
12 clients aren't misled to think that somebody is
13 making a disinterested recommendation that
14 would influence the client when they are
15 trusted by the client when, in fact, it's not
16 disinterested, it's paid for.
17    Nobody in Doane's situation, if
18 there is a recommendation made, is going to
19 give it any weight.  Nobody is going to think
20 that Chargois is disinterested since, you know,
21 Chargois presumably wants to collaborate with
22 Labaton.  Nobody is going to be -- the purposes
23 of the rule are not implicated at all.
24    And so to parse the meaning of the

Page 81

1  word "recommendation" and then to parse what
2  Chargois thinks he remembers having said or
3  what one imagines having been said or what the
4  implications are of the meeting seems, I don't
5  want to say ridiculous, because I think that
6  would be sort of unfairly derogatory, but I
7  just don't think it gets at what Rule 7.2(b) is
8  trying to accomplish, and I don't think that a
9  disciplinary authority or a court exercising
10 disciplinary authority would think that the
11 rule was violated here.
12 Q.  But that's not what I asked you.
13    MS. LUKEY:  Objection.
14 A.  Well, I don't know what you're
15 asking me, then.  I thought it was a responsive
16 answer.
17 Q.  All of those things that you cited
18 that made this a non-recommendation, including
19 the RFQ, including what you claim Doane knew
20 about Chargois' familiarity with Labaton, what
21 could Chargois have done or said that would
22 have made it a recommendation?
23    MS. LUKEY:  Objection.
24 A.  Well, I think if Chargois said, I'm

Page 82

1  familiar with Labaton's qualifications and the
2  nature of the work that they do, and they do
3  excellent work as -- on behalf of institutional
4  investors in class actions, I would think
5  that's a recommendation.
6      I would also think it's meaningless
7  and not the sort of thing that a disciplinary
8  authority would care about, but I think it
9  would be, technically, on the language of the
10  rules, defined in the comment that would be a
11  recommendation.
12  Q.  But didn't you say earlier that even
13  if Chargois had said to Doane, I recommend
14  these people, that Doane would have discounted
15  it?
16      MS. LUKEY: Objection.
17  A.  Well, based on what I understand in
18  this case, Chargois' recommendation would not
19  be significant the way it would be if a
20  client's general counsel or trusted lawyer
21  friend made a recommendation of a lawyer to
22  represent that individual, because, A, there's
23  a whole process, the RFQ process that you have
24  to go through here; B, Doane is a pretty

Page 83

1  sophisticated person acting on behalf of a
2  fairly sophisticated client.
3      So I don't think the problems that
4  the rule is directed at would be implicated
5  even if there were a recommendation, but, of
6  course, Chargois could have made a
7  recommendation.
8  Q.  By your view, an attorney can say to
9  another attorney, I highly recommend this
10  person, this attorney, and you're not prepared
11  to accept, on face value, that in every case
12  that would constitute a recommendation?
13      MS. LUKEY: Objection.
14  A.  Are you asking if that's what I said
15  or if that's what I think?
16  Q.  If that's what you think.
17  A.  No. I think, if a lawyer recommends
18  or, rather, if someone recommends a lawyer's
19  services, I recommend this lawyer, that's a
20  recommendation under the rule.
21      Is it something that the
22  disciplinary authorities would regard as a
23  violation of 7.2(b), that they would pursue in
24  disciplinary cases? It depends on the context.

Page 84

1      Here, I think the context makes any
2  recommendation by Chargois, if one was made,
3  trivial, and not something that implicates the
4  purposes of the rule.
5      It doesn't create the harms against
6  which the rule was designed to protect. It's
7  not something that a serious disciplinary
8  authority would care about and may not be
9  something that they would even think violates
10  the rule, because the rules, in the end of the
11  day, are supposed to be rules of reason, and
12  where the purposes of the rules are not
13  implicated, oftentimes, they are not thought to
14  be violated.
15      But, of course, a recommendation is
16  a recommendation.
17  Q.  Thank you. And, again, would it be
18  rational for Doane to conclude, in light of the
19  services that Chargois claimed had happened, if
20  they were true, that Chargois was recommending
21  Labaton?
22      MS. LUKEY: Objection.
23  A.  I don't know what Doane thought, but
24  if Doane thought that Chargois was implicitly

Page 85

1  vouching for the quality of Labaton's work,
2  based on the very little knowledge that
3  Chargois had, I don't think it would
4  implicate -- violate 7.2(b), but whatever he
5  thought, he would have thought. He wasn't an
6  irrational person.
7      THE SPECIAL MASTER: This raises an
8  interesting question of your view of the
9  interpretation of 7.2(b).
10      Is it viewed from an objective
11  standard or from a subjective standard?
12  Do you understand what I'm getting at? In
13  other words, do you view it objectively,
14  what an objective, disinterested person
15  would look at the rule, or subjectively by
16  virtue of the intent of the "recommender"
17  and the recipient of the recommendation?
18      THE WITNESS: So I think the rule
19  has a subjective quality to it, but most
20  of the rules, and this one included, are
21  also objective.
22      So the rule says a lawyer shall not
23  give anything of value to a person for
24  recommending the lawyer's services. So

Page 86

1  there is a subjective aspect to this in
2  that the question is, what did Labaton
3  think it was giving money to Chargois for.
4      So if Labaton thought they were
5  buying a car -- if Labaton thought they
6  were buying a car from Chargois, and
7  that's what they thought they were giving
8  the money for, and they don't get a car,
9  they get a recommendation, then I don't
10  think Labaton violated the rule. So to
11  that extent, it's subjective, but what is
12  a recommendation? That, I think, is an
13  objective standard.
14      THE SPECIAL MASTER: Do you believe,
15  based on the facts that you know here,
16  that Labaton did not think that
17  Mr. Chargois was making a recommendation
18  of Labaton to Mr. Doane?
19      THE WITNESS: I haven't seen
20  anything, and I read deposition
21  transcripts of three Labaton lawyers, I
22  didn't see anything there that indicated
23  they thought they were buying
24  recommendations.

Page 87

1      They thought they were -- that
2  Chargois was making, as I understand it,
3  was making introductions, and that was the
4  word that I saw over and over again.
5      THE SPECIAL MASTER: Or as you put
6  it, a facilitation of the relationship?
7      THE WITNESS: That's my description.
8  I think the word that was used in the
9  testimony was introduction.
10      THE SPECIAL MASTER: So you don't
11  think that Labaton, in asking, from
12  Labaton's perspective, in asking Mr. Doane
13  for a meeting to hear about Labaton's
14  services, that there was an implicit
15  recommendation, that they expected from
16  Mr. Chargois an implicit recommendation?
17      MS. LUKEY: Objection.
18      THE WITNESS: From what I've read,
19  not only in the transcripts but also in
20  some of the documents, Labaton was
21  pitching its own services. This wasn't
22  the kind of situation that 7.2(b) is
23  concerned about, where a client has a
24  relationship with lawyer A, who it trusts

Page 88

1  or actually, if you're talking about
2  7.2(b), with person A, who the prospective
3  client trusts, and person A recommends a
4  lawyer and the prospective client relies
5  on that recommendation.
6      I think, here, Labaton pitched its
7  services when Doane went up to New York to
8  visit Labaton. They pitched their
9  services when they made the response to
10  the RFQ. I think that -- from what we now
11  know if, in fact, Chargois had no
12  relationship with Arkansas Teachers, but
13  cold called Doane, any, quote/unquote,
14  recommendation would have been trivial, de
15  minimus, meaningless for purposes of 7.2.
16      THE SPECIAL MASTER: So you think
17  Labaton engaged Chargois to make this
18  introduction with no expectation
19  whatsoever that Mr. Chargois would say
20  something positive about Labaton?
21      THE WITNESS: I don't know what
22  Labaton's expectation was, but my
23  understanding, from what I read of what
24  they were paying for, was not

Page 89

1  recommendations, but door-opening
2  introductions.
3      THE SPECIAL MASTER: And following
4  up on that, implicit in the kind of door
5  opening that they were asking Mr. Chargois
6  to do, is not a recommendation of
7  services.
8      MS. LUKEY: Objection.
9      THE WITNESS: In my reading of the
10  transcripts, I didn't see it.
11      THE SPECIAL MASTER: Why on earth
12  would somebody ask somebody to make a
13  recommendation of services for purposes of
14  an introduction if they didn't think it
15  was going to be a positive recommendation?
16      MS. LUKEY: Objection.
17      THE SPECIAL MASTER: Let me rephrase
18  that to be fair.
19      Why on earth would somebody ask
20  somebody to make an introduction, who is
21  familiar with that lawyer's services and
22  ability to serve a client, and not believe
23  that the person who is making the
24  introduction would say something positive

Page 90

1 about the law firm?
2     MS. LUKEY: Objection.
3     THE WITNESS: You are asking the
4 abstract or in the context of this case?
5     THE SPECIAL MASTER: You can take it
6 any way you want.  I'm asking you to --
7 I'm asking you to impose a little common
8 sense and understanding of human nature.
9 That's all I'm asking you to do.
10     MS. LUKEY: Objection.
11     THE WITNESS: So in the context of
12 this case, Labaton wanted to get a
13 face-to-face meeting with Doane.  It
14 wanted to get its foot in the door.
15     What it cared about was an
16 opportunity to pitch its services.  It
17 wasn't looking to Chargois to pitch its
18 services.  It was going to pitch its own
19 services.  It was going to explain its own
20 qualifications.
21     THE SPECIAL MASTER: Is that
22 exclusive?  Because it's going to pitch
23 its own services, is that exclusive of
24 believing that Mr. Chargois would also put

Page 91

1 his seal of approval on their services?
2     MS. LUKEY: Objection.
3     THE WITNESS: No, they are not
4 exclusive.  But, you know, I can only
5 testify based on the facts I'm given,
6 which include depositions, which -- where
7 I think really able and vigorous lawyers
8 had the opportunity to question three
9 Labaton lawyers about what they thought.
10 And I didn't see in there, and maybe I
11 missed it, but I didn't see in their
12 testimony where they said they thought
13 that they were paying Chargois for a
14 recommendation for something that comes
15 within 7.2(b), and as I read it, it was
16 clear that that's not what they wanted,
17 because they were capable of explaining
18 their own value, explaining their own
19 experience, explaining why they should be
20 hired to monitor the Arkansas Teachers',
21 you know, stock holdings.
22     THE SPECIAL MASTER: So, in your
23 view, all Mr. Chargois was doing was

Page 92

1 making a cold call and opening the door.
2     MS. LUKEY: Objection.
3     THE SPECIAL MASTER: Is that right?
4     THE WITNESS: I'm not -- A, I wasn't
5 there, so I have no personal view.  B, I'm
6 not the fact finder here.  But C, based on
7 what I've read, I didn't see any evidence
8 of a recommendation.  I just didn't see
9 it.  And the language in which everybody
10 has talked about this, that I noticed in
11 the transcripts, was introduction, not
12 recommendation.
13     So I didn't see that that's what
14 Labaton thought it was paying for.  I
15 didn't see that's what Chargois actually
16 did.  I just didn't see it.  And if I
17 missed it, then I missed it.
18     BY MR. SINNOTT:
19 Q.  But you've testified that even if
20 there was the language of a recommendation,
21 that that would not necessarily be dispositive
22 for you that there was a recommendation in this
23 case, correct?
24     MS. LUKEY: Objection.

Page 93

1 A.  If there's a recommendation, there's
2 a recommendation.  Is it something that I
3 think, in the context of this case, would
4 violate 7.2(b)?  Well, first of all, I don't
5 because there was a fee-sharing arrangement,
6 but leaving that aside, I think that, in the
7 context of this case, it's so trivial or de
8 minimus or meaningless, it does not implicate
9 the purposes of the rule or create the harms
10 that the rules is designed to protect against.
11     So I think there's a pretty good
12 argument that the rule itself is not violated,
13 even if you want to call this a recommendation.
14 Q.  When was the fee-sharing agreement
15 perfected in this case?
16 A.  I don't know what you mean by
17 "perfected."
18 Q.  Well, when was it --
19     THE SPECIAL MASTER: Executed?
20 Q.  -- executed or drafted?
21     MS. LUKEY: Objection.
22 A.  Well, in my recollection of the
23 testimony, is that there wasn't a signed
24 agreement, or at least nobody found one.  That

Page 94

1  there were writings that memorialized an
2  understanding, and that the understanding was
3  reached around 2008 or 2009.  I think 2008.
4  Q.  When were those e-mails, as far as
5  you recall?
6  A.  I don't recall the date.
7  Q.  Assuming that those e-mails took
8  place long after this introduction or
9  recommendation or however we want to
10  characterize the Doane meeting, what would you
11  point to as constituting a division of fees
12  agreement?
13      MS. LUKEY: Objection.
14  A.  What would I point to?  My
15  understanding is that there was an oral
16  understanding or arrangement, certainly,
17  Chargois thought there was, that was reached
18  before Arkansas Teachers formally retained
19  Labaton as monitoring counsel, and that that
20  then gets reflected in a draft agreement that
21  nobody can find a signed copy of, and that may
22  not have been signed.
23      It gets reflected in e-mail
24  communications.  It gets reflected in

Page 95

1  conversations.
2  Q.  But prior to the Doane meeting, what
3  can you point to as indicative of a fee-sharing
4  agreement?
5  A.  Prior to the Doane meeting?
6  Q.  Yes, sir.
7  A.  I don't know the timing of the
8  conversation that the Labaton and Chargois
9  firms had concerning what -- their
10  understanding about a fee-sharing arrangement,
11  I don't know the timing.
12  Q.  When did the clients, in this case,
13  Arkansas, consent to the joint participation of
14  Labaton?
15      MS. LUKEY: I'm sorry.  In what
16  manner?  In what context?  Are you talking
17  about this case, State Street?
18      MR. SINNOTT: Yes, of course.
19      MS. LUKEY: In the context of State
20  Street.
21  A.  What do you mean by "the joint
22  participation of Labaton"?
23  Q.  I know you're familiar with 1.5 and
24  1.5(e).  A division of a fee between lawyers

Page 96

1  who are not in the same firm may be made only
2  if, after informing the client that the
3  division of fees will be made, the client
4  consents to the joint participation and the
5  total fee is reasonable.
6      You are very familiar with that,
7  sir?
8  A.  Yes.
9  Q.  When was the client's consent
10  effected with respect to Damon Chargois and
11  Labaton in this matter?
12  A.  Are you asking me, when did they
13  give consent under -- that complied with 1.5(e)
14  or are you asking something else?
15  Q.  Yes, under 1.5(e).
16  A.  I think, on the date that Arkansas
17  Teachers signed the retention letter in the
18  State Street Bank case, they gave consent that
19  satisfied 1.5(e).  I can't remember the date,
20  but if I can look through the facts, I can --
21  Q.  February of 2011, would that refresh
22  your memory?
23      THE SPECIAL MASTER: February 8,
24  does that refresh your recollection?

Page 97

1      MS. LUKEY: I will stipulate that's
2  the date on the engagement letter.
3  A.  Yeah.  I am looking now at page 9 of
4  my report.
5  Q.  Before we discuss 1.5 at length, let
6  me just ask you a couple of questions.
7      Do Massachusetts rules restrict the
8  amount of money that a law firm can pay for an
9  introduction?
10      MS. LUKEY: Objection.
11  A.  To pay them for an introduction?
12  You're sort of putting this in the context of
13  1.5(e), in the context of a fee-sharing
14  arrangement?
15  Q.  Yes, sir.
16  A.  So I think 1.5(e) requires that the
17  total fee be reasonable.  So that if a lawyer
18  has a fee agreement with a client for the
19  lawyer to receive an hourly rate or a
20  percentage -- percentage fee basis or something
21  else, the total fee has to be reasonable.  I
22  don't believe that 1.5(e) regulates how that
23  total fee gets divided as between the lawyers
24  who are in a fee-sharing arrangement under

1  **1.5(e).**
2      **THE SPECIAL MASTER:** So is that to
3  say that there is no limit?
4      **THE WITNESS:** Well, it's limited by
5  the total amount -- I'm sorry. I
6  interrupted you.
7      **THE SPECIAL MASTER:** If the total
8  amount is reasonable, is that to say there
9  is no limit on the amount that can be paid
10  for an introduction pursuant to a
11  fee-sharing agreement?
12      **THE WITNESS:** Well, assuming the
13  fees are shared between two lawyers, one
14  of whom makes an introduction, that's what
15  they are being paid for?
16      **THE SPECIAL MASTER:** And only that.
17      **THE WITNESS:** No, I don't think it
18  regulates. Obviously, it's capped by the
19  total fee and the total fee has to be
20  reasonable, but it does not limit the
21  amount that's paid out of the total share
22  to the lawyer who made the introduction.
23      **THE SPECIAL MASTER:** So if, just
24  hypothetically, it's not what we have

1  here, before everybody objects, but if,
2  just hypothetically, because I'm trying to
3  understand your view, the division of fee
4  provided 50 percent to the introducing
5  lawyer, and the total fee was reasonable,
6  there is no -- that's not a problem under
7  Massachusetts rule?
8      **THE WITNESS:** That doesn't violate
9  1.5(e) or 1.5(a).
10      So, for example, let's suppose I'm a
11  very wealthy lawyer, and I have made all
12  the money I need to make, but I love
13  trying cases and I'm looking for a client
14  who I can represent in a constitutional
15  challenge to, I don't want to complete the
16  sentence because, you know, it will offend
17  somebody, constitutional challenge to
18  something that I don't like, and I say to
19  a lawyer, if you can find me a client who
20  has standing, I don't need the money, I'll
21  give you half my fee to do this
22  constitutional civil rights action, where
23  I'm going to be entitled to fees, because
24  the money means nothing to me. I want the

1  challenge, the glory, you know, or take,
2  for example, you know, David Boies and Ted
3  Olsen, who did, you know -- you know, to
4  them, I don't think the money meant
5  anything. I thought making the point,
6  arguing in the Supreme Court, there's a
7  lot of it that gave them joy and was of
8  great value to them.
9      I don't think, assuming they
10  received a fee, that it would have been
11  about the fee.
12      I don't think Rule 1.5(e) and 1.5(a)
13  would have precluded Ted Olsen and David
14  Boies from giving away their fee to
15  anybody, including the person who
16  introduced them to clients, who had
17  standing, who were willing to stay the
18  course, who were willing to be deposed,
19  who were willing to be out in public, who
20  were willing to be the face of the case.
21      I think that would have been
22  perfectly fine under the Massachusetts
23  rule.
24      **THE SPECIAL MASTER:** In such a case,

1  do you think the client should be told the
2  amount, where there is more than a
3  relatively small share of the total fee,
4  where the share is very large, do you
5  think the client should be told that there
6  is going to be a fee paid?
7      **MS. LUKEY:** Objection.
8      **THE SPECIAL MASTER:** That -- for the
9  introduction that is very large?
10      **MS. LUKEY:** Objection.
11      **THE WITNESS:** So I guess you could
12  take the question a number of different
13  ways. I don't know -- if you're asking,
14  is it required under 1.5(e) or under the
15  Massachusetts rules? Generally, I'd say
16  no.
17      If you're asking, is it best
18  practices? I don't know. It kind of
19  depends on whether and why it would be
20  significant to the client. So I think
21  it's contextual.
22      **MR. SINNOTT:** Can I suggest a break?
23      **THE SPECIAL MASTER:** Fine.
24      **MR. SINNOTT:** We are going to take a

Page 102

1   15-minute break.  So we will be back here
2   at five minutes -- six minutes before 11.
3   Let's call it five minutes before 11.
4       (Recess taken.)
5       **MR. SINNOTT:** We are back on the
6   record.  It's 11:00, and just to take the
7   roll call of phone participants.  Josh,
8   are you there?
9       **MR. SHARP:** Yes.
10      **MR. SINNOTT:** And David?  David
11  Copley?
12      Okay.  Linda?  Linda, are you there?
13      **MS. HYLENSKI:** I'm here.
14      **MR. SINNOTT:** Okay.  Thanks, Linda.
15  David, have you joined us?
16      Okay.  So we have Josh and Linda on
17  the phone line.  Has anyone else joined
18  us?  Okay.  Thank you.
19      **BY MR. SINNOTT:**
20  Q.  Professor, I wanted to just kind of
21  close out my questioning on 7.2(b) before the
22  break, but let me start with that and then we
23  will move on.
24      On page 16 or 17 of your report, you

Page 103

1   say that -- I believe it's the bottom of page
2   16, that you are aware of no judicial decision.
3   **A.  Unaware.**
4       **MS. LUKEY:** He said you are aware of
5   none.
6   Q.  I will read it, rather than
7   paraphrasing it.
8       "I am unaware of any judicial
9   decision arising in the disciplinary setting or
10  any other context or any secondary authority
11  holding that compensating a lawyer for a
12  referral in the context of an imperfect
13  fee-sharing arrangement violates Rule 7.2(b)."
14      Does the fact that courts or
15  regulatory bodies have not discussed Rule
16  7.2(b) and 1.5(e) in a single opinion render
17  those rules ineffective as written?
18      **MS. LUKEY:** Objection.
19  **A.  I think the rules are both effective**
20  **as written if by effective you mean by**
21  **effective in the law.**
22  Q.  So the rules are effective?
23  **A.  Both rules are effective.**
24  Q.  All right.  And are you familiar

Page 104

1   with a New York ethics opinion and, obviously,
2   I'll show you this because I can't imagine the
3   numbers would resonate with you, New York
4   Ethics Opinion 1128, New York State Bar
5   Association Committee on Professional Ethics.
6   Topic, referral fees, division of fees with the
7   state and with other attorneys, Opinion Number
8   1128.
9       **MR. SINNOTT:** And, Madam Court
10  Reporter, if we can have that marked as an
11  exhibit.
12      (Green Exhibit 5, New York Ethics
13  Opinion 1128, New York State Bar
14  Association Committee on Professional
15  Ethics, marked for identification.)
16  **A.  (Perusing.)**
17  Q.  Have you seen this before,
18  Professor?
19  **A.  I should have because I'm on the**
20  **committee.**
21  Q.  Okay.
22  **A.  I wasn't involved in the drafting of**
23  **it.  I don't remember it, but I certainly had**
24  **the opportunity to.**

Page 105

1   Q.  And would it be fair to state, based
2   on your familiarity with New York and
3   Massachusetts Rules of Professional Conduct,
4   that where there is a reference to 1.5(g) in
5   this opinion, it's the equivalent of
6   Massachusetts Rule 1.5(e)?
7       **MS. LUKEY:** Objection.
8   Q.  Except for bare referrals?
9   **A.  Are you asking if they are the same?**
10  **They both deal with fee sharing among lawyers.**
11  **Obviously, they are drafted differently.**
12  Q.  Okay.  And that 7.2(a), as referred
13  to here, is the equivalent of 7.2(b) in
14  Massachusetts Rules of Professional Conduct?
15  **A.  It's the counterpart.  They both**
16  **deal with payments to somebody for a**
17  **recommendation of a lawyer's services, but they**
18  **are also drafted differently, I believe.**
19  Q.  All right.  Thank you.
20      Now, obviously, this, as most
21  opinions, are fact specific, but in looking at
22  this opinion, would you agree with me that
23  7.2(b) or the New York equivalent, and 1.5(e)
24  or the New York equivalent, are, in fact,

Page 106

1   discussed in a single opinion as applying to
2   fee sharing between lawyers?
3       MS. LUKEY: Objection.
4   A.  Are you asking whether this opinion
5   refers to both rules?  Yes.
6   Q.   And it's an opinion relative to fee
7   sharing between lawyers, correct?
8       MS. LUKEY: Objection.
9   A.  Among other things.
10  Q.   Among other things.  But you had not
11  referred to this or reviewed this when you
12  wrote your report, correct?
13  A.  Correct.
14  Q.   All right, sir.  Let me talk about
15  Labaton's compliance with 1.5(e) and,
16  obviously, we touched on it during our
17  discussion of 7.2(b), but because the language
18  is important, let me just read it again.
19      "A division of a fee between lawyers
20  who are not in the same firm may be made only
21  if, after informing the client that a division
22  of fees will be made, the client consents to
23  the joint participation and the total fee is
24  reasonable."

Page 107

1       Now, how did Labaton -- I want to
2   you ask how Labaton met the requirements of
3   1.5(e).  And we are going to refer to 1.5(e)
4   here in the context of how it was written prior
5   to February of -- as of February 2011, when the
6   retention agreement was signed.
7       So what I want to ask you is this,
8   Professor.  Upon what information in the
9   factual statement provided to you did you
10  assume that Arkansas, and I'll use ATRS and
11  Arkansas interchangeably, that Arkansas knew
12  that Labaton would divide fees with lawyers who
13  are not in the same firm?
14  A.  Well, I relied, in part, on the
15  draft retention letter from September 24, 2010
16  and the signed final retention letter of
17  February 8, 2011, and on Mr. Hopkins -- well, I
18  think -- I don't know if this was explicit in
19  the facts I was given, but it's pretty clear
20  that Mr. Hopkins understood that if this became
21  a class action, there would be other lawyers
22  involved in the class action who would be
23  splitting the fees that were awarded by the
24  court if it was a successful class action.

Page 108

1   Q.   I'm sorry.  With respect to
2   Mr. Hopkins, that last part, what was the
3   information you relied on?
4   A.  I don't remember if it was explicit
5   in the facts given to me, but I think -- I
6   assumed, and I think I made it clear in my
7   report, that Mr. Hopkins understood that if the
8   class action became a class action and was
9   successful, that there would be other lawyers
10  involved that would be receiving whatever fee
11  the court ultimately awarded.
12  Q.   And what do you base that assumption
13  on, what facts?
14  A.  Well, I now base it on the fact that
15  he was a lawyer, he was a very attentive
16  representative of the class representative,
17  which had been a class representative in other
18  class actions, that it's typical in class
19  actions for there to be multiple lawyers
20  involved, that, in general, in class actions,
21  the court, if it's successful, the court awards
22  the attorney's fee, that the multiple lawyers
23  involved in class actions conventionally share
24  the fee that's awarded by the court.

Page 109

1       I think, as a lawyer, he would have
2   known that.
3   Q.   So you infer knowledge on the part
4   of Mr. Hopkins based on the fact that he's a
5   lawyer, correct?
6       MS. LUKEY: Objection.
7   A.  He's a lawyer.  He's a lawyer for an
8   entity that goes out of its way to become a
9   class representative, that's been a class
10  representative in other class actions, who, as
11  I understand it, was regarded as being a pretty
12  attentive, involved representative of the class
13  representative in the lawsuit.
14      So I think it's a -- and when I drew
15  that inference, the lawyers who retained me as
16  an expert didn't contradict it.  So I assume
17  that it was something that they were prepared to
18  prove.
19  Q.   Aside from the fact that you had an
20  experienced, highly-placed lawyer in
21  Mr. Hopkins, what was Mr. Hopkins told about
22  division of fees?
23      MS. LUKEY: Objection.
24  A.  Are you asking my recollection of

Page 110

1 his testimony?
2 Q.   I'm asking you --
3 A.   I have no personal knowledge of what
4 he was told.
5 Q.   Of course you don't have any
6 knowledge, but as far as the facts that were
7 presented to you, did you strictly rely on the
8 fact that he was an experienced, well-placed
9 lawyer, or were there other facts that led you
10 to conclude that Hopkins was aware that Labaton
11 would be working with Chargois & Herron moving
12 forward?
13     MS. LUKEY: Objection.
14 A.   That's a different question from
15 what you asked me before.  Before, you were
16 asking me about fee sharing generally.  And my
17 understanding is, and I can't imagine that it's
18 disputed here, that Hopkins would have known,
19 in general terms, that there would be fee
20 sharing, that there would be more than one
21 lawyer beyond the Labaton firm working on the
22 matter, and that the ultimate fee awarded by
23 the court, if there was one, would be shared
24 among the lawyers.

Page 111

1     Now you're asking me about Chargois.
2 So I just want to be clear that I wasn't
3 testifying about Chargois.
4 Q.   No, I understand.
5     But getting back to the fee sharing
6 in general, is it your testimony that a client
7 does not need to be informed of fee sharing?
8     MS. LUKEY: Objection.
9 A.   Well, if there is fee sharing, then
10 I think 1.5(e) required the lawyer to be
11 informed that division of fees will be made.
12 Q.   Okay.  And how was Hopkins informed
13 that a division of fees would be made?
14 A.   Well, again, I think it's clear from
15 the circumstances both that, in the draft
16 retention letter and the February 8, 2011,
17 retention letter, that Arkansas Teacher agreed
18 that fees could be shared.
19     And I think it's a very, very strong
20 assumption that Mr. Hopkins understood that
21 there would, in fact, be fee sharing in this
22 case, because that's conventionally how class
23 actions worked, and he was familiar with how
24 class actions worked.

Page 112

1 Q.   All right.  So if you've got a
2 experienced, savvy or well-placed lawyer --
3 A.   If I -- and I apologize for
4 interrupting -- certainly, as the case
5 progressed, he knew that there were multiple
6 lawyers involved in the case, because Labaton
7 was not the only lawyer who appeared as counsel
8 in this case, the Lieff Cabraser firm and the
9 Thornton firm as well, and I -- though I don't
10 recall whether it's specifically in the facts I
11 was asked to assume, but it's certainly
12 reflected in, I think, his testimony that, you
13 know, that he was engaged.  So he would have
14 known that there were at least those three
15 firms involved.
16     THE SPECIAL MASTER: Did you see in
17 the record that, in fact, Labaton
18 specifically advised Mr. Hopkins that
19 Lieff and Thornton would be involved in
20 the case on behalf of Arkansas?
21     THE WITNESS: I don't recall that,
22 but if he did, then that's a better answer
23 to the question I was giving than the ones
24 I have been giving so far, because then he

Page 113

1 did specifically have notice that there
2 would be fee sharing.
3     THE SPECIAL MASTER: Fee sharing
4 between those firms.
5     THE WITNESS: That's correct.
6     BY MR. SINNOTT:
7 Q.   Was Hopkins aware that Labaton would
8 be fee sharing specifically with Damon Chargois
9 or his firm?
10 A.   I don't believe so.
11     MS. LUKEY: Objection.
12 A.   Not -- not until this -- the post --
13 whatever you call these proceedings.
14 Q.   The investigation?
15 A.   Yeah, if you -- yes.
16 Q.   Did he need to be informed that
17 Chargois & Herron would be part of a
18 fee-sharing agreement?
19 A.   Not under Rule 1.5(e).
20     THE SPECIAL MASTER: Could I follow
21 up, please?
22     THE WITNESS: Sure.
23     THE SPECIAL MASTER: Under Rule
24 1.5(e), what is the extent of information

Page 114

1  required to be given to the client about a
2  division of fees?
3      **THE WITNESS:** Well, the rule says,
4  after informing the client that a division
5  of fees will be made, which, to me, means
6  that a division of fees will be made.  It
7  doesn't say with whom or in what amount.
8      There are other Professional Conduct
9  Rules that are explicit about what's
10  required and/or are interpreted to require
11  more, but I don't think this one did at
12  the time.
13      **THE SPECIAL MASTER:** So as long as
14  the lawyer says to the client, we are
15  going to divide fees with other lawyers,
16  that complies with 1.5(e)?
17      **THE WITNESS:** As 1.5(e) existed in
18  Massachusetts at the time, I believe so.
19      **THE SPECIAL MASTER:** Putting aside
20  Saggese, which did require a writing,
21  putting aside Saggese.
22      **THE WITNESS:** Right.
23      **THE SPECIAL MASTER:** So no further
24  explanation, no further information need

Page 115

1  to be -- need be given in order to fall
2  under the protections of 1.5(e).
3      **THE WITNESS:** Well, if the client
4  asks, then I think you give more
5  information.  So it's an invitation for a
6  conversation, but I don't think the rule
7  itself required you to give more
8  information to a client who wasn't
9  interested in hearing more or didn't
10  express interest.
11      **THE SPECIAL MASTER:** Do we have the
12  retention letter?  I might be jumping
13  ahead of you a little bit.
14      **MR. SINNOTT:** That's fine.
15      **THE SPECIAL MASTER:** Do you have
16  that?
17      **MS. LUKEY:** I have it.
18      **MR. SINNOTT:** It was introduced to
19  both witnesses yesterday.
20      **THE SPECIAL MASTER:** Let's mark this
21  as a separate exhibit.
22      (Green Exhibit 6, Letter from
23  Labaton Sucharow, dated February 8, 2011,
24  marked for identification.)

Page 116

1      **THE SPECIAL MASTER:** So it's not a
2  lengthy document, but there are several
3  pages to it, a page and a half to two
4  pages here.
5      Could I ask you to just look at that
6  and indicate which part of that letter
7  provides the information to the client
8  that there would be a division of fees?
9      **THE WITNESS:** I think the paragraph
10  at the top of page 2 provides the client's
11  consent to a fee division, and I think the
12  notice of the fee, that there would be a
13  fee division.
14      This obviously provides notice that
15  there could be a fee division, but that
16  there would be, would be a combination of
17  what you described before, that Arkansas
18  Teacher was told that Lieff Cabraser and
19  the Thornton firm would, in fact, be
20  participating.
21      And I think Hopkins' general
22  knowledge of the way these things work
23  would have, combined with this, provided
24  information that the client -- excuse

Page 117

1  me -- that a fee division would, in fact,
2  be made.
3      **THE SPECIAL MASTER:** So you don't
4  have to tell the client anything more
5  than, under the Massachusetts rule and
6  under Saggese, in effect, at the time -- I
7  want to put aside the writing requirement,
8  but you don't have to tell the client
9  anything more than we are going to divide
10  fees in this case.
11      **THE WITNESS:** As I read the rule,
12  no, at that time.  If the client asked,
13  obviously, you would answer the client's
14  questions.  Here, the client didn't want
15  to know and affirmatively indicated that,
16  but the rule itself does not require more,
17  as I read the rule.
18      **THE SPECIAL MASTER:** Okay.  As
19  regards Mr. Chargois now, and the
20  agreement that Labaton had with
21  Mr. Chargois, which portion of that
22  paragraph that you've pointed to does
23  Mr. Chargois fall under?
24      **THE WITNESS:** When you say "which

Page 118

1  portion does he fall under," are you
2  meaning which portion provides consent to
3  dividing fee --
4      **THE SPECIAL MASTER:** Provides
5  notice.  And as to Mr. Chargois, which
6  portion provides notice that Mr. Chargois,
7  not him specifically, but that somebody
8  who was involved in the case, as he was,
9  was going to be involved.
10     **MS. LUKEY:** Objection.
11     **THE WITNESS:** So if you're asking
12  what provides notice for -- that's
13  required by the rule?
14     **THE SPECIAL MASTER:** Uh-huh.
15     **THE WITNESS:** I think the rule
16  requires informing the client that a
17  division of fees will be made, and that
18  the client was informed that a division of
19  fees will be made.
20     It didn't require informing the
21  client specifically with whom, all of the
22  lawyers with whom fees would be divided.
23  It didn't require specifically how the fee
24  division will be made.  It didn't require

Page 119

1  those things.
2      So I think that this is adequate
3  consent.  I think the notice is provided
4  by this, together with other things, but I
5  don't think that this specifically refers
6  to Chargois.  I think it permits the fee
7  sharing with Chargois.
8      **THE SPECIAL MASTER:** Okay.  But this
9  paragraph does call out fee sharing for
10  specific purposes, right?
11     **THE WITNESS:** It allows -- it
12  authorizes Labaton to share fees with
13  attorneys who serve as local counsel,
14  serve as liaison counsel, who -- to
15  provide fees as referral fees or to
16  provide fees for other services performed
17  in connection with the litigation.
18     **THE SPECIAL MASTER:** There's been a
19  lot of discussion.  You were an English
20  major, apparently.
21     **THE WITNESS:** I was.
22     **THE SPECIAL MASTER:** There's been a
23  lot of discussion about how to deconstruct
24  that sentence.  And I think there are a

Page 120

1  number of different ways.  I don't know if
2  you and I had similar grammar teachers who
3  approached it similar, but I don't want to
4  get into that.
5      Under which part of these permissive
6  roles does Mr. Chargois fall in the
7  context of the State Street case?
8      **THE WITNESS:** Right.  I would say
9  that, as I understand the facts, you could
10  view the payment as a referral fee.  You
11  could view it as a payment for their
12  availability to serve as liaison counsel,
13  although, in fact, they didn't serve in
14  that role, but I would say referral fee
15  would probably be the more descriptive
16  one.
17     **THE SPECIAL MASTER:** Okay.  As you
18  may or may not know, there has been a lot
19  of discussion in this investigation about
20  exactly what it was that Mr. Chargois was
21  doing for his fee, and some disagreement,
22  including by Mr. Chargois, who said he was
23  not receiving a referral fee.
24     To him, he said -- his testimony

Page 121

1  was, we can get it out, this was not a
2  referral fee.  I asked him if he was local
3  counsel in this case.  No.  Was he liaison
4  counsel?  No.  Was this a referral fee?
5  No.  He said it was just an agreement.
6  But put that aside.
7      Do you believe that what
8  Mr. Chargois did in this case was a
9  referral for purposes of being paid a
10  referral fee?
11     **MS. LUKEY:** Objection to the first
12  part.
13     **THE WITNESS:** So, as an English
14  major, I would say, to parse your
15  question, do you mean was this a referral
16  fee within the meaning of 1.5(e), which
17  specifically refers to referral fees?  Was
18  this a referral fee for purposes of
19  Labaton's agreement with Arkansas Teacher?
20  Or do you mean, is this a referral fee in
21  some other sense?
22     **THE SPECIAL MASTER:** Let's take it
23  one by one.
24     Was, as you understand it within the

Page 122

1  meaning of the Rules of Professional
2  Conduct, including the Massachusetts rule
3  here, was this a referral fee?
4      **THE WITNESS:** So I would say that
5  this was a payment that was permitted by
6  1.5(e).  Whether you call it a referral
7  fee or not, I don't think anything turns
8  on that, because 1.5(e) itself doesn't
9  limit the reasons for which you're sharing
10  a fee with another lawyer.
11      **THE SPECIAL MASTER:** Except for one
12  thing, right?  The contract here, the
13  retention agreement, calls out the
14  specific purposes for which payments may
15  be divided, fees may be divided.
16      **THE WITNESS:** Well, you asked me to
17  take it one at a time.  So I was starting
18  with 1.5(e).
19      **THE SPECIAL MASTER:** Oh, I see.  I'm
20  sorry.
21      **THE WITNESS:** So, again, whether
22  it's a referral fee under 1.5(e) or not, I
23  don't think anything turns on it.  I tend
24  to think it's a referral fee under 1.5(e),

Page 123

1  but you wouldn't need to -- you know, you
2  wouldn't get interpretive opinions because
3  whether it is or it isn't, the fee sharing
4  is permitted.
5      Whether it is under the contract or
6  not is a contract interpretation question,
7  I guess.  Since the contract was drafted
8  by Labaton, you'd kind of construe it in
9  light of what Arkansas Teachers understood
10  because, generally, you construe
11  ambiguities, if there is one here, against
12  the lawyer drafter.
13      I don't know what Hopkins thought,
14  but from what I gather, Hopkins thinks
15  that this fee-sharing arrangement is fine.
16      **THE SPECIAL MASTER:** Ex post facto?
17      **MS. LUKEY:** Objection.
18      **THE WITNESS:** If you discredit his
19  testimony, then there's no evidence about
20  what he thought at all.  So I don't know
21  that you can draw the contrary conclusion.
22      **THE SPECIAL MASTER:** Let's take it
23  one at a time.
24      The contract permits, as you said,

Page 124

1  Labaton to allocate fees to other
2  attorneys who serve as, and I'm going to
3  read it the way you want to read it, not
4  the other way that it could be read, but I
5  will read it the way you want to read it,
6  who serve as local counsel, right?
7      **MS. LUKEY:** Objection.
8      **THE SPECIAL MASTER:** Is there any
9  possibility that, in this case to which
10  this agreement applied, that Mr. Chargois'
11  role could be construed as local counsel?
12      **THE WITNESS:** Well, from what I
13  read, there was a lot of back and forth
14  about what local counsel means as well.
15  If, by local counsel, you mean a lawyer
16  who's admitted to the local bar who
17  appears before the court as local counsel,
18  then, obviously, he's not local counsel.
19      If you mean somebody who's counsel
20  in the location where the client is, I
21  think he was willing to serve as local
22  counsel, or at least Labaton thought he
23  was here, which may be the same as liaison
24  counsel.

Page 125

1      **THE SPECIAL MASTER:** Yes.  We are
2  talking about at the time the contract was
3  executed.
4      **THE WITNESS:** Right.  My
5  understanding is that Labaton -- and all
6  I'm doing, by the way, I have no firsthand
7  knowledge.  I'm just drawing on my
8  recollection of the testimony.
9      My understanding is Labaton thought
10  that -- oh, I guess, by the time of the
11  contract, they probably didn't expect
12  Chargois to act as local counsel or as
13  liaison counsel.  They did at the time of
14  the fee-sharing arrangement, I think.
15      **THE SPECIAL MASTER:** Let's skip over
16  referral fees for now, okay, and go to "or
17  for other services performed in connection
18  with the litigation," capital L, meaning
19  the case, right?
20      **THE WITNESS:** Right.
21      **THE SPECIAL MASTER:** Would you agree
22  that he performed, he, Chargois, performed
23  no other services in connection with the
24  litigation?

Page 126

1    THE WITNESS: Yes.
2    THE SPECIAL MASTER: So let's go
3  back to referral fees.
4    Was this, what he was paid here, a
5  referral fee for this litigation?
6    THE WITNESS: I guess I would need
7  to know what you mean by referral fee for
8  this litigation.
9    THE SPECIAL MASTER: You are the
10  expert. I want to know what you think.
11    MS. LUKEY: You added another
12  phrase.
13    THE WITNESS: You asked the
14  question, is this a referral fee for this
15  litigation.
16    THE SPECIAL MASTER: I'm reading --
17  I am reading directly from the permissive
18  use, according to the construction that he
19  wants.
20    MS. LUKEY: But you added the phrase
21  "for this litigation."
22    THE SPECIAL MASTER: Yes.
23    MS. LUKEY: It says "referral fee."
24    THE SPECIAL MASTER: All right. I'm

Page 127

1  sorry. In connection with the litigation,
2  in connection with the litigation. That's
3  what it says.
4    MS. LUKEY: Objection. It's a
5  question of which phrase is modifying on
6  the end portion as well, and I'm not --
7  that's up to him.
8    THE WITNESS: Well, I was going to
9  make a similar point.
10    THE SPECIAL MASTER: I'm sure you
11  were. That's the problem. But go ahead.
12  We have had this discussion.
13    MS. LUKEY: I really respectfully
14  object.
15    THE SPECIAL MASTER: I know, Joan.
16    MS. LUKEY: And this is something
17  you and I need to discuss.
18    THE SPECIAL MASTER: We are going to
19  have a direct discussion about this. I
20  promise you.
21    MS. LUKEY: We are going to have a
22  very direct discussion, because it's very
23  troubling to me, the things you have said.
24    THE SPECIAL MASTER: And me, Joan.

Page 128

1  I have been doing this for 27 years, and I
2  have been teaching evidence for 27 years.
3  I know exactly what a speaking objection
4  is and I know exactly what Rule 30(c)
5  permits. We will have a discussion about
6  it later, okay.
7    MS. LUKEY: I hope that we will,
8  because this has been troubling me deeply,
9  and I think I have been maligned unfairly.
10  I just want that to be on the record.
11    And I respectfully request that you
12  refrain from making the comments, such as
13  "I'm sure you did" to this witness. That
14  was unnecessary, sir.
15    So let's go ahead, and let's you and
16  I have a talk, because this is a serious
17  matter.
18    THE SPECIAL MASTER: It is serious,
19  Joan.
20    MS. LUKEY: More so to me than to
21  you, I suspect. And we should discuss it.
22    THE SPECIAL MASTER: All right.
23    THE WITNESS: Okay.
24    MR. HEIMANN: I missed the question.

Page 129

1  I'm sorry. Is there a question pending?
2    THE SPECIAL MASTER: Good point,
3  Richard. Let me re-ask the question.
4    We have gone through the other
5  permitted roles and services that were
6  permitted by the agreement.
7    "Who serve as local counsel or
8  liaison counsel," I think you said that
9  Mr. Chargois, in connection with this
10  case, did not serve as either local or
11  liaison counsel, correct?
12    THE WITNESS: Correct.
13    THE SPECIAL MASTER: And I think we
14  have also agreed that he provided no other
15  services in this litigation, correct?
16    THE WITNESS: Correct.
17    THE SPECIAL MASTER: So that gets us
18  to referral fees.
19    My question to you is, in this
20  litigation, was this a referral fee?
21    THE WITNESS: Okay. I think it's
22  fairly construed as a referral fee, and I
23  gather, after the fact, Mr. Hopkins thinks
24  so as well.

Page 130

1  THE SPECIAL MASTER: Okay. Which
2  begs the question, what is a referral fee?
3  THE WITNESS: I don't think it's a
4  defined term in the Massachusetts rule, so
5  I think it generally refers to a fee given
6  to another lawyer for referring a client,
7  which could be any number of things.
8  It could be a lawyer who has an
9  established lawyer/client relationship
10  with the client who recommends the
11  lawyer's services. It could be a lead.
12  It could be something that leads to the
13  creation of a lawyer/client relationship.
14  I don't think it has any specific meaning.
15  THE SPECIAL MASTER: It's just a
16  phrase without meaning?
17  THE WITNESS: No, it's not without
18  meaning. I think it's not a specifically
19  defined term. I think some of the terms
20  in Rules of Professional Conduct are
21  defined. There's a definition, section
22  1.0, that gives you definitions. I don't
23  think this is defined, at least as far as
24  I recall, in the Massachusetts rules.

Page 131

1  If you're talking about what it
2  means in here, in the contract, it's not
3  specifically defined either. So I can't
4  speak to what Arkansas Teachers and
5  Labaton understood at the time. All I can
6  tell you is what I think it means, and I
7  did.
8  THE SPECIAL MASTER: So on page 17
9  of your opinion, if you could turn to
10  that, please.
11  At the bottom, you cite
12  Massachusetts Legal Ethics, Substance and
13  Practice, at page 185.
14  Do you see that?
15  THE WITNESS: Yes.
16  THE SPECIAL MASTER: And it says,
17  explaining that "unlike most every other
18  jurisdiction in the nation, Massachusetts
19  permits an attorney's fee to be divided
20  with a lawyer who does not practice in the
21  firm of the primary lawyer (i.e., a
22  referral fee) even if the referring lawyer
23  does nothing more than refer the matter."
24  I should complete the sentence,

Page 132

1  which is "quintessentially a Massachusetts
2  practice and tradition."
3  Is there not an implication there
4  that referral fee refers to referring the
5  matter, being the case at hand?
6  MS. LUKEY: Objection.
7  THE WITNESS: Are you asking my
8  reading of the -- the secondary authority,
9  the Massachusetts Legal Ethics, Substance
10  and Practice?
11  THE SPECIAL MASTER: Which you
12  cited.
13  THE WITNESS: Yeah. I think that in
14  the context of this quote, that the author
15  of that secondary authority is referring
16  to referring matters, not referring
17  clients. I think that's the normal -- not
18  normal. I think that's the -- ordinarily
19  what happens. It's probably rarer to
20  refer a client who has multiple matters in
21  sequence than it is to refer somebody who
22  has just one matter.
23  THE SPECIAL MASTER: You earlier
24  characterized the relationship that

Page 133

1  Mr. Chargois, as between Labaton and
2  Arkansas, as being an introduction.
3  THE WITNESS: I think that's how the
4  witnesses characterized it.
5  THE SPECIAL MASTER: You
6  characterized it in your report as a
7  facilitation.
8  THE WITNESS: Right.
9  THE SPECIAL MASTER: Either one.
10  Take either one.
11  THE WITNESS: Okay.
12  THE SPECIAL MASTER: Do you agree
13  that it was not an introduction or a
14  facilitation for this matter, the State
15  Street matter?
16  MS. LUKEY: Objection.
17  THE WITNESS: I don't think the
18  State Street matter was specifically
19  contemplated at the time, but it was
20  certainly contemplated that it was an
21  introduction for purposes of Labaton
22  eventually representing Arkansas in
23  fee-generating class action cases, not
24  simply to represent them as an unpaid

Page 134

1   monitor of their stock portfolio.
2       THE SPECIAL MASTER: And that is
3   sufficient, in your view, to be a referral
4   fee within the contemplation of the
5   February 8 letter?
6       THE WITNESS: You know --
7       MS. LUKEY: Objection.
8       THE WITNESS: Again, I would say I'm
9   not here as a contract expert. I don't
10  know what Mr. Hopkins and Labaton
11  understood this to mean.
12      I do understand that Mr. Hopkins has
13  no objection to this. So, presumably,
14  thinks it's contemplated by the letter.
15      I don't see why it wouldn't be a
16  referral fee within the contemplation of
17  the agreement, but I certainly think it's
18  a referral fee within my understanding of
19  the term.
20      THE SPECIAL MASTER: So a lawyer who
21  makes an initial introduction, three years
22  before, for a general monitoring
23  relationship which may lead to cases or
24  not, but may lead to cases, thereby has a

Page 135

1   referral fee for every individual case in
2   which that client is involved? Yes? Is
3   that your view?
4       MS. LUKEY: Objection.
5       THE WITNESS: So I'm not sure I
6   understand the question.
7       Are you asking me if, assuming there
8   is such an arrangement --
9       THE SPECIAL MASTER: Yes.
10      THE WITNESS: -- to receive a fee
11  growing out of future cases, whether
12  that's fairly described as a referral fee?
13      THE SPECIAL MASTER: For the
14  introduction.
15      THE WITNESS: I think, if the
16  introduction leads to future cases for
17  that client and there's an agreement that
18  the lawyer receiving the referral will
19  divide fees in those future cases, then
20  that's fairly described as a referral fee,
21  and I will just give you -- I will give
22  you an example.
23      I chaired for three years the
24  committee that oversees the New York City

Page 136

1   Bar's referral service. And they believe
2   that what they were doing was referring
3   lawyers to prospective clients. And their
4   rules provided for a fee. And it was a
5   fee based on a percentage of the fee that
6   was generated, growing out of the
7   referral.
8       And I know, at one time, we had the
9   conversation, what if we refer a client
10  and multiple matters develop in sequence,
11  not just the matter that we made the
12  referral for, can we seek a fee for those?
13      Now, I don't remember whether, in
14  the end, they decided to receive the
15  fee -- seek the fee or not. That was a
16  question of what the local rules of the
17  referral service were, but I think, if
18  they -- their rules provided for a fee in
19  sequential matters, that would be, in an
20  equivalent situation with a lawyer, not a
21  referral service, it would be a referral
22  fee.
23      I don't know why the fee for the
24  first matter would be a referral fee,

Page 137

1   which I assume everyone agrees it would
2   be, and for successive matters would be
3   called something else. I'm not sure what
4   else you would call it.
5       THE SPECIAL MASTER: Successive
6   unrelated matters with different parties,
7   different roles?
8       MS. LUKEY: Objection.
9       THE WITNESS: Well, the same client.
10      THE SPECIAL MASTER: Same client.
11      THE WITNESS: Right. So if you make
12  an arrangement that I will receive a
13  referral fee for this particular matter,
14  and future matters, I won't receive a fee,
15  that's fine. But if you make an
16  arrangement, I will receive a fee for the
17  first class action and any other class
18  actions in which Arkansas is a class
19  representative, I don't know what else you
20  would call that fee other than a referral
21  fee. It seems to be fairly characterized
22  as a referral fee.
23      THE SPECIAL MASTER: How about a
24  finder's fee?

Page 138

1    **MS. LUKEY:** Objection.
2    **THE SPECIAL MASTER:** Doesn't that
3  sound like a finder's fee?
4    **MS. LUKEY:** Objection.
5    **THE WITNESS:** I have never seen the
6  term "finder's fee" used in connection
7  with lawyers referring clients.
8    I suppose you could -- you know, I
9  don't know what the finder's fee
10  conventionally means, but I've never seen
11  it used in this context.
12    **THE SPECIAL MASTER:** So a fee that
13  is paid across the board for all cases
14  arising out of the introduction of the
15  client is a referral fee within the
16  division of fee rule, the Massachusetts
17  Rule 1.5(e)?
18    **THE WITNESS:** Well, I guess I would
19  say again, nothing turns on that, because
20  1.5(e) doesn't limit the purposes for
21  which you are sharing the fee with a
22  lawyer, but I do think it's fairly
23  characterized as a referral fee under
24  1.5(e) of Massachusetts.

Page 139

1    **THE SPECIAL MASTER:** So do you not
2  agree, then, with the characterization in
3  the secondary source you cited on page 17,
4  even if the referring lawyer does nothing
5  more than refer the matter?
6    **MS. LUKEY:** Objection.
7    **THE WITNESS:** Well, I agree with the
8  source, and I quoted the source.
9    I don't think it goes on to say,
10  however, if the referring lawyer did not
11  refer this specific matter, but merely
12  referred the client or referred a previous
13  matter involving the client, then that's
14  not a referral fee under the rule.  It
15  doesn't say that.
16    So I don't read into this an implied
17  exclusion of the referral fee in this
18  case.
19    **THE SPECIAL MASTER:** Does the fact
20  that the client was not referred in this
21  matter say anything about the level of
22  information that should be given to the
23  client or the nature of the consent that
24  should be given by the client?

Page 140

1    **MS. LUKEY:** Objection.
2    **THE WITNESS:** When you say "should,"
3  I'm assuming you mean required under Rule
4  1.5(e)?
5    **THE SPECIAL MASTER:** Yes.
6    **THE WITNESS:** No.
7    **THE SPECIAL MASTER:** So there is no
8  obligation in this case for Labaton to
9  have said anything more than we are going
10  to -- under the rule, anything more than
11  we are going to be allocating fees to
12  other lawyers in this case?
13    **THE WITNESS:** And get consent.
14    **THE SPECIAL MASTER:** And get consent
15  to that.
16    **THE WITNESS:** Yes.  I think that's
17  what the rule required.
18    **THE SPECIAL MASTER:** Does the rule
19  require informed consent?
20    **THE WITNESS:** Not by its terms.
21    **THE SPECIAL MASTER:** So we would not
22  read into the rule any level of
23  information beyond that which you've said
24  need be given -- need be given to the

Page 141

1  client?
2    **THE WITNESS:** Right.  I don't think
3  you could discipline a lawyer -- well, I
4  mean, the rule is not in effect now, but
5  at the time, I don't think a lawyer in
6  Massachusetts would be disciplined for
7  failing to give additional information
8  beyond what the rule itself, on its face,
9  requires, unless asked, of course.
10    In that case, I think you have to be
11  candid with the client and answer the
12  questions.
13    **THE SPECIAL MASTER:** So simply
14  saying there is going to be a division of
15  a fee is sufficient?
16    **THE WITNESS:** Yes.  I think if you
17  say I'm going to be bringing in other
18  lawyers outside the Labaton firm, we are
19  going to divide fees, and the client says,
20  I don't want to know about the fee-sharing
21  arrangement, I don't care, that's fine
22  with me, I don't think you have to shove
23  more information down the client's throat.
24    **THE SPECIAL MASTER:** Is there an

Page 142

1  implication in what you've just said, and
2  we can have the court reporter read it
3  back, that bringing in other lawyers in
4  this case means that those lawyers are
5  going to provide some value to the case,
6  some service in the case?
7      MS. LUKEY: Objection.
8      THE WITNESS: Well, you know, I made
9  up a quote.  It wasn't, I think, the only
10 way in which you could satisfy the rule.
11     I think if you say to the client,
12 which the client already knows, I'm going
13 to be dividing fees with other lawyers
14 outside my firm, and the client has no
15 interest in knowing more and affirmatively
16 tells you that, I think you have satisfied
17 the rules that the client gives consent.
18     THE SPECIAL MASTER: Suppose the
19 rule is required to -- is read, rather, to
20 require something more.  And at the time
21 the agreement is made, nothing more is
22 told other than what we have talked about,
23 that there will be a division of a fee,
24 but later the client learns that, in fact,

Page 143

1  the division of the fee is going to go to
2  a lawyer who did no work in the case,
3  didn't appear in the case, didn't appear
4  on the Lodestar petitions, is it
5  appropriate for the client later to ratify
6  the fee?
7      MS. LUKEY: Objection.
8      THE WITNESS: So I'm not sure
9  exactly what you're asking.  I don't think
10 there's anything inappropriate about a
11 client ratifying.  I mean, that goes to, I
12 suppose, how the client construes its own
13 interests.
14     Clients can do what they want to.
15 I'm assuming what you really mean is, is
16 the ratification effective in some way
17 to --
18     THE SPECIAL MASTER: Yes.
19     THE WITNESS: So I guess the
20 question -- one question, I wonder, I'm
21 trying to wind back, your original
22 question is, when you say assuming the
23 rule required more, more disclosure than
24 was given.

Page 144

1      THE SPECIAL MASTER: Correct.
2      THE WITNESS: Whether you mean the
3  rule itself or do you mean the Saggese
4  case or do you mean something else?
5      THE SPECIAL MASTER: Let's broaden
6  it, and say existing law at the time
7  required something more than just a bare
8  statement that there would be a division
9  of fees.
10     MS. LUKEY: Objection.
11     THE SPECIAL MASTER: Let's say
12 that -- let's assume it's read that way.
13 And the client knows nothing more until
14 much later and says, oh, it's okay, I
15 ratify it retroactively.
16     MS. LUKEY: Objection.
17     THE SPECIAL MASTER: Is that
18 ratification effective?
19     THE WITNESS: Apparently, in
20 Massachusetts, under Saggese, it's
21 effective.  I didn't write the opinion.
22     THE SPECIAL MASTER: What if the
23 client refuses, then what?
24     MS. LUKEY: To ratify?

Page 145

1      THE SPECIAL MASTER: Yeah.  What if
2  the client says, hey, wait a minute.  I
3  didn't know that you were going to be
4  giving a very large fee to somebody who
5  added no value to this case, did nothing
6  in this case, never appeared in the case,
7  was not disclosed to the court, I'm not
8  going to approve that, I'm not going to
9  agree to it, then what?
10     MS. LUKEY: Objection.
11     THE WITNESS: Then what for -- with
12 regard to the lawyer's obligation to the
13 other lawyer, the lawyer's contractual
14 obligation to the client, for discipline
15 or something else?
16     THE SPECIAL MASTER: The lawyer's
17 obligation to the client.
18     THE WITNESS: Okay.
19     MS. LUKEY: Objection.
20     THE WITNESS: I think that if the
21 client refused to pay the fee, and I'm
22 taking it out of this case now, so let's
23 suppose a conventional case where a lawyer
24 and client have a conventional fee

Page 146

1 arrangement, for whatever, $15 an hour or
2 a percentage or whatever.
3    And then, when it came time at the
4 end -- okay.  When it came time to pay the
5 fee, the client said, you violated 1.5(e)
6 because you didn't give me adequate notice
7 when I agreed to the fee-sharing
8 arrangement, I suppose you could have a
9 contract dispute between the lawyer and
10 the client regarding whether and to what
11 extent the fee agreement is enforceable
12 and, if not, you know, whether there's
13 quantum meruit or something else, and I
14 can say I have not studied the issue of
15 how it would play out in Massachusetts at
16 the time, but I think that, you know, a
17 court would have to figure out whether
18 this is a substantial breach of the fee
19 agreement and whether it's meaningful for
20 purposes of enforcing the fee.
21    I would think a court would say,
22 where you have a fee-sharing agreement
23 that was consented to, but there was
24 another piece of information that wasn't

Page 147

1 disclosed, you would probably want to know
2 whether that was really meaningful
3 information or not, and whether it would
4 have made a difference.  And if it would
5 have made a difference to the client, then
6 how does that factor into a contract
7 action.
8    That's all beyond what I've looked
9 at in this case.
10    THE SPECIAL MASTER: If a court were
11 to find that it was, in your word,
12 meaningful information that the client
13 should have had, would that take it out of
14 1.5(e)?
15    MS. LUKEY: Objection.
16    THE WITNESS: I'm not sure what you
17 mean.  I was talking about a contract.
18    THE SPECIAL MASTER: Let me rephrase
19 the question.
20    I want you to assume that a court
21 were to find that there was insufficient
22 information given to the client to procure
23 the client's consent under 1.5(e), and the
24 client says, I'm not agreeing to it, you

Page 148

1 never told me about this, this or this,
2 and I'm not agreeing to this division of
3 fee, would that take the division of fee
4 out of 1.5(e)?
5    MS. LUKEY: Objection.
6    THE WITNESS: I don't know what you
7 mean by "out of 1.5(e)."  Do you mean
8 would it violate 1.5(e)?
9    THE SPECIAL MASTER: You can put it
10 that way.
11    THE WITNESS: Okay.  So if you have
12 a rule different from the Massachusetts
13 rule that requires specific information to
14 be given and the specific information
15 isn't given, then I guess, by definition,
16 that violates 1.5(e).
17    THE SPECIAL MASTER: So another way
18 of saying this might be that, as we read
19 1.5(e) at the time, where it says "may be
20 made only if, after informing the client
21 that a division of fee will be made,"
22 construction would turn on the phrase
23 "informing the client" and what that
24 means; is that right?

Page 149

1    MS. LUKEY: Objection.
2    THE WITNESS: I think that the
3 conversation we are having is about the
4 meaning of informing the client.
5    THE SPECIAL MASTER: Yes.  And your
6 view, and if I'm misstating your view,
7 please tell me, that it is sufficient to
8 comply with 1.5(e) to simply tell the
9 client that a division of fee will be
10 made; is that right?
11    THE WITNESS: That's exactly what
12 the rule says.
13    THE SPECIAL MASTER: No further
14 information need be given?
15    THE WITNESS: The rule doesn't
16 provide for it, unlike the rules of some
17 other jurisdictions.
18    THE SPECIAL MASTER: All of that
19 calls into question who the client is in a
20 class action in which the contemplated
21 case is a class action, and it is
22 contemplated that the client will be the
23 class representative.  Then the question
24 is who the client is, right?

Page 150

1    MS. LUKEY: Objection.
2    THE WITNESS: I don't agree with
3  you.
4    THE SPECIAL MASTER: It says "the
5  client," right?
6    MS. LUKEY: Objection.
7    THE WITNESS: It does say "the
8  client."  Are you asking me my reason?
9    THE SPECIAL MASTER: I will.
10   THE WITNESS: The rule does say "the
11  client."
12   THE SPECIAL MASTER: And you agree
13  that the retention agreement here
14  contemplates Labaton serving as a class
15  representative in a class action.
16   MR. HEIMANN: I think you misspoke.
17   MS. LUKEY: You said Labaton.
18   THE SPECIAL MASTER: I'm sorry.
19  Arkansas.  Thank you.
20   THE WITNESS: The agreement
21  contemplates the possibility that Arkansas
22  Teacher will be class representative in a
23  class action.
24   THE SPECIAL MASTER: Okay.  So, at

Page 151

1  the point at which a class is certified,
2  does a class become a client?
3    MS. LUKEY: Objection.
4    THE WITNESS: I think the class
5  probably becomes a client, the nascent
6  class before the class is certified.
7    THE SPECIAL MASTER: Okay.  Is there
8  then an obligation, and I do want you to
9  assume that Arkansas, I almost said
10  Labaton again, I do want you to assume
11  that Arkansas is the class representative
12  for the class.
13   Is the class a client for purposes
14  of this retention agreement?
15   MS. LUKEY: Objection.
16   THE WITNESS: Not in my reading of
17  this, no.
18   THE SPECIAL MASTER: I want you to
19  assume further that, at the time the class
20  is certified, Labaton is named lead
21  counsel for the class, and that that's
22  contemplated in the agreement.
23   Is the class a client of Labaton?
24   THE WITNESS: The class is a client

Page 152

1  of Labaton when Labaton becomes class
2  counsel, for sure.
3    THE SPECIAL MASTER: At that point,
4  is there an obligation to go to the class
5  and provide information about the
6  fee-sharing agreement and that there would
7  be a division of fee to the entire class?
8    MS. LUKEY: Objection.
9    THE WITNESS: Are you asking is
10  there an obligation under 1.5(e) or is
11  there an obligation?
12   In my view the kinds of notice you
13  give to a class is governed by Rule 23 and
14  case law that develops under Rule 23.  I'm
15  not a civil procedure expert or a Rule 23
16  expert.  I haven't studied the case law as
17  it applies in this case.
18   I don't think that the rules, in
19  general, were meant to deal with what
20  kinds of notice you give to classes after
21  a class is certified.
22   MS. LUKEY: I'm sorry.  Can we just
23  clarify which rules he meant in his
24  answer?

Page 153

1    THE WITNESS: The Rules of
2  Professional Conduct.
3    THE SPECIAL MASTER: Putting it
4  another way, once the class is certified
5  and becomes a client of Labaton, is there
6  any -- under Rule 1.5(e), is there any
7  obligation to give any kind of further
8  notice to the class about a division of a
9  fee.
10   THE WITNESS: Not under Rule 1.5(e).
11   THE SPECIAL MASTER: So the notice
12  that was given to Labaton -- to Arkansas
13  by Labaton in the February 8 agreement is
14  sufficient for the class?
15   THE WITNESS: I didn't say that.  I
16  think, if there's another obligation, the
17  source of the obligation is not the Rules
18  of Professional Conduct.  It's the case
19  law that has developed over the years
20  under rule -- under Rule 23 of the Rules
21  of Civil Procedure.
22   THE SPECIAL MASTER: Okay.  I assume
23  you are not here to opine on those rules.
24   THE WITNESS: I am not.

Page 154

BY MR. SINNOTT:

Q. Let me just back up a little bit,
Professor, and ask you a couple more questions
about the engagement and the surrounding
circumstances.

I believe you testified that Hopkins
was informed by Labaton that Lieff Cabraser and
Thornton law firm would be participating in the
case, correct?

A. I'm almost tempted to say I thought
Judge Rosen testified to that.

THE SPECIAL MASTER: I did. I said
that. I wasn't testifying. I was
assuming it as a fact in evidence.

Q. Is that your understanding?

A. It is now.

Q. All right. At the time that you
wrote your opinion, were you aware that Labaton
had informed Hopkins that Lieff and Thornton
would participate?

A. I don't believe so.

Q. All right. Would that have been
significant to you?

A. I think it would have further

Page 155

bolstered the opinions that I had already
reached.

Q. Well, let's say that Labaton and
Lieff's presence in the case had been discussed
with Mr. Hopkins.

Would it have been covered in this
February 8, 2011, engagement letter?

MS. LUKEY: Objection.

Q. Would it have been appropriate,
under Rule 1.5(e), in this -- based on this
engagement letter?

MS. LUKEY: Objection.

A. I think that fee sharing of the
total fee awarded by Judge Wolf with Lieff
Cabraser and the Thornton firm was both
permissible under 1.5(e) and permitted by the
February 8, 2011, contract.

Q. And what, in the February 8, 2011,
contract permitted it?

A. I believe this would be covered by
the sentence, "Arkansas Teacher agrees that
Labaton Sucharow may allocate fees to other
attorneys who serve as local or liaison
counsel, as referral fees, or for other

Page 156

services performed in connection with the
litigation."

And if it's not specifically covered
by that, I think that it's fairly implicit in
the agreement because, surely, Arkansas would
have understood that if a fee is awarded by the
court, it will be shared among the lawyers who
work on the matter.

Q. So let's assume that Hopkins was
informed that Lieff Cabraser and Thornton Law
Firm would be participating in the case, okay?

Would it be reasonable for Hopkins,
at a later point in time, such as in September
of 2017, after the settlement of the case, to
say, look, you told me specifically about the
participation of those two firms. You never
told me about this guy, I don't consent to it?

MS. LUKEY: Objection.

Q. Would that have been reasonable?

MS. LUKEY: Sorry. Objection.

A. Well, so you're sort of not asking a
question about Rules of Professional Conduct,
which is where I do my work.

You are asking me about what would

Page 157

be reasonable for a representative of the lead
plaintiff.

I don't really have a basis to judge
the reasonableness of that, but viewed in the
context of the evidence, my opinion, not really
as an expert on how lead plaintiffs are
supposed to conduct themselves, I would say it
would seem pretty unreasonable, given that
Hopkins had previously said he doesn't want to
know details about how the fees are being
divided, and he said that at the outset to
Labaton. It would be kind of unreasonable for
him to say, but I wish you'd told me this
particular detail.

Q. Let me direct your attention to page
20 of your report. And three lines up from the
bottom you say, "There is nothing to suggest
that ATRS wanted or needed more information
about how class counsel's court-awarded fees
would be divided."

Do you see that, sir?

A. Yes.

Q. When you say "there was nothing to
suggest," are you stating that there is an

Page 158

1 absence in the record that was presented to
2 you, the factual record, of information on that
3 or are you saying that you drew inferences from
4 the information that was presented to you?
5      MS. LUKEY: Objection.
6 A.  I'm not exactly sure how to answer
7 that, but Hopkins, as I understand it, made it
8 plain to Labaton that he didn't want
9 information about the fee division.  So I think
10 that that, which is a fact, that both I was
11 asked to assume and that is reflected in the
12 deposition transcript, supports that
13 observation of mine at the bottom of page 20.
14 Q.  All right.  And just above that,
15 Professor, you say, "In this case, ATRS knew,
16 in general, that multiple counsel would be
17 involved in the class action and would divide
18 fees, and its consent was memorialized in
19 writing, which in any event, was not required
20 by the text of Rule 1.5(e) at the time."
21      What, if anything, do you assume
22 that George Hopkins knew about the existence or
23 role of a referring attorney in the State
24 Street case?

Page 159

1      MS. LUKEY: Objection.
2 A.  I don't assume he knew anything
3 about the existence of a referring attorney.  I
4 think he authorized fee sharing with a
5 referring attorney if there was any.
6      So he knew that there was a
7 possibility of a referring attorney, but I
8 don't think he had specific knowledge that
9 Chargois had made a referral.
10 Q.  Do you have any legal authority to
11 support your opinion that Hopkins' knowledge of
12 the possibility of a fee-sharing arrangement
13 was sufficient to satisfy 1.5(e)?
14 A.  I don't think that alone would be
15 sufficient to satisfy Rule 1.5(e).
16      I think what you need is information
17 that there will be a division of fees among
18 lawyers, and you need consent to that division.
19 Q.  And is it your opinion that that
20 consent can be to the possibility of a future
21 fee-sharing agreement?
22 A.  Yes.
23 Q.  Now, I want to direct your attention
24 to page 21 to 23, where you opine that

Page 160

1 Labaton's imperfect fee-sharing arrangement
2 does not warrant sanction.
3      MS. LUKEY: Objection.  I think he
4 said "if," but I won't say anything more.
5      MR. SINNOTT: Did I read that
6 improperly, Labaton's imperfect?
7      MS. LUKEY: I don't think I'm
8 supposed to say anything, so I'm not going
9 to say anything.
10      THE SPECIAL MASTER: I think you
11 were intending to read the subsection on
12 page 21, "Labaton's imperfect fee-sharing
13 agreement does not warrant sanction."
14      MR. SINNOTT: Did I not read that
15 correctly?
16      THE SPECIAL MASTER: No.  I think
17 you did, but the record will be what it
18 is.
19      BY MR. SINNOTT:
20 Q.  So you talk about the Daynard
21 decision.
22 A.  Uh-huh.
23 Q.  And is it fair to say that it's your
24 conclusion that nothing in Daynard suggests

Page 161

1 that a law firm should forfeit fees for failing
2 to comply with 1.5(e)?  Is that a correct
3 assessment?
4 A.  I would say nothing in Daynard
5 suggests there should be fee forfeiture for
6 imperfect fee sharing of the kind that is -- is
7 argued occurred here, and as arguably occurred
8 in Daynard.
9 Q.  Did Daynard address the impact that
10 fee disclosure would have on the class in a
11 class action matter?
12 A.  No.
13 Q.  And on page 24 to 25 of your
14 opinion, following the heading "Labaton's Fee
15 Sharing with Chargois Did Not Violate Rule
16 1.5(a)."
17      THE SPECIAL MASTER: On page 24.
18      MR. SINNOTT: 24, yeah.
19 Q.  I'm going on to page 25.  Is it fair
20 to say that you take issue with Professor
21 Gillers' interpretation that 1.5(a) applies to
22 individual referral fees paid under a Rule
23 1.5(e) fee-sharing arrangement?
24 A.  If that's Professor Gillers'

Page 162

1  opinion, that the fee to Chargois here is
2  governed by 1.5(a), then I disagree with that.
3  Q.   In fact, you opine that no separate
4  analysis is appropriate under Rule 1.5(a) in
5  circumstances where a fee division relates to a
6  referral fee, correct?
7      MS. LUKEY: Objection.
8  A.   Where are you reading?
9  Q.   On 24.
10 A.   Yes.
11 Q.   Do you see that?
12 A.   Yes.
13 Q.   All right.  So that's a correct
14 statement of your opinion, correct?
15 A.   That is a quote from my opinion in
16 the context of the four paragraphs I devote to
17 this issue, yes.
18 Q.   Well, what's your legal authority
19 for that opinion?
20 A.   When you say "legal authority," are
21 you asking, is there a case that I'm citing?
22 I'm obviously not citing a case.
23      Are you asking, what's my reason for
24 the opinion?

Page 163

1  Q.   Well, let me start with the cases or
2  other legal authority.  Is there any?
3  A.   I think that what significance is an
4  absence of authority for Professor Gillers'
5  view.  So there are many, many, many cases in
6  Massachusetts and throughout the country in
7  which lawyers participate in fee-sharing
8  agreements that are governed by 1.5(e).
9      In some of them, the division of
10 fees is in proportion of the work done by the
11 lawyers, but in many, many cases, it's not.
12     In jurisdictions governed by the
13 Model Rules of Professional Conduct, you can
14 share a fee with a lawyer who does absolutely
15 no work on the case, as long as the lawyer
16 shares -- has joint responsibility, which, in
17 many jurisdictions, just means that you're on
18 the hook for a malpractice judgment.
19     In those jurisdictions, and
20 including in Massachusetts, where you don't
21 even need joint authority, as far as I know,
22 there is not a single case where the court has
23 said or disciplinary authority has said or
24 anybody else with authority has said you view

Page 164

1  both portions of the referral fee under 1.5(a)
2  and Professor Gillers hasn't cited a case
3  either, as far as I know.
4      (Emily Harlan attends telephonically
5  at this time.)
6  A.   And so what I think is most
7  important here, or particularly important, is
8  the absence of authority for a proposition that
9  would obviously be relevant in many, many, many
10 cases if that proposition were true, which I
11 don't believe it is.
12 Q.   And would you agree that there is an
13 absence of authority for your opinion as well?
14     MS. LUKEY: Objection.
15 A.   I think it has never occurred to
16 anybody who writes on this that the portion,
17 the individual portions of a shared fee would
18 be each subject to 1.5(a) analysis.  And so,
19 yes, there's no opinion that I'm aware of, even
20 considering that proposition.
21 Q.   Would 1.5(a) ever apply to a
22 referral fee -- a referral fee payment to
23 another lawyer?
24 A.   I guess I'm not really sure what you

Page 165

1  mean.  You mean in the context of a fee-sharing
2  arrangement or something else?
3  Q.   Yes, yes.
4  A.   Well, if it's a fee-sharing
5  arrangement governed by 1.5(e), the requirement
6  is that the total fee be reasonable.  It
7  doesn't require that each portion, in itself,
8  be reasonable or not excessive.
9  Q.   So there are reasonableness
10 limitations on such a fee, correct?
11 A.   The total fee must be reasonable,
12 which I assume Judge Wolf thought it was,
13 because he authorized the fee.
14     THE SPECIAL MASTER: He didn't know
15 about the Chargois agreement and the
16 proposed payment at the time to Chargois,
17 though.
18     MS. LUKEY: Objection.
19     THE SPECIAL MASTER: You understand
20 that?
21     MS. LUKEY: Objection.
22     THE WITNESS: That I understand?  Is
23 that a question?
24     THE SPECIAL MASTER: Yes.  You

Page 166

1 understand that, question mark.
2    THE WITNESS: Yes.
3    THE SPECIAL MASTER: While he's
4 looking, are you here to offer any
5 opinions on whether there was an
6 obligation by lead counsel to inform the
7 court of the payment to be paid to
8 Mr. Chargois?
9    THE WITNESS: No, I'm not here to
10 give an opinion on that, just to be clear,
11 by no means.
12    THE SPECIAL MASTER: Just to close
13 the loop on this. I'm not here talking
14 about under 1.5(e).
15    Assume that other counsel in the
16 case were not told about the Chargois
17 agreement, specifically the lawyers that
18 were representing the ERISA plaintiffs in
19 the other two cases that were
20 tri-captioned, are you here to offer an
21 opinion about whether there was an
22 obligation to tell those lawyers about the
23 Chargois agreement in their capacity as
24 representing the ERISA members of the

Page 167

1 class?
2    THE WITNESS: I'm not here to offer
3 an opinion on that.
4    THE SPECIAL MASTER: Assume there is
5 testimony from co-counsel for the customer
6 class that, although they were told about
7 the Chargois agreement, they were not told
8 that he did no work and that they were not
9 told that he would -- that he would be
10 contributing no value to the case, and
11 that they were not told that the
12 obligation to Mr. Chargois went back to an
13 agreement that preexisted the case.
14    Do you have any opinion on whether
15 there was an obligation to inform
16 co-counsel for the customer class?
17    MS. LUKEY: Objection.
18    THE WITNESS: I wasn't asked to give
19 an opinion on that. I didn't focus on the
20 facts relevant to that. I don't have an
21 opinion on that.
22    BY MR. SINNOTT:
23 Q. Professor, at page 24, the last
24 paragraph, you talk about the fairness of

Page 168

1 division among lawyers, and just to put it in
2 context, the paragraph begins, "When one lawyer
3 shares a legal fee with another, Rule 1.5(e)
4 expressly provides that the total fee must be
5 reasonable, but the rule does not say or
6 intimate that if the fee is then shared with
7 others, no share may be excessive.
8    "And the rules provide no benchmarks
9 for calculating whether a lawyer who makes a
10 referral or who, in a state adopting the ABA
11 model rule formulation, assumes joint
12 responsibility, is receiving a clearly
13 excessive portion of an otherwise reasonable
14 fee.
15    "This goes to the fairness of the
16 division among lawyers, not to the fairness of
17 the client's fee, and is a matter for the
18 lawyers to work out among themselves.
19    "The Professional Conduct Rules are
20 meant to protect clients and the public, not to
21 protect lawyers from overreaching by their
22 colleagues."
23    Do the Mass. Rules of Professional
24 Conduct govern the fairness of division among

Page 169

1 lawyers?
2 A. I think not. That's the point I'm
3 making, that Rule 1.5 is meant to protect
4 clients from excessive fees, and 1.5(e), in
5 particular, according to the Massachusetts
6 Supreme Judicial Court, is meant to protect
7 clients from excessive fees.
8    So I don't think the rule is
9 designed to make sure that, as between two
10 lawyers who are sharing a reasonable fee, that
11 the fee division is fair as between them. They
12 can take care of themselves. They don't need
13 1.5(e) to protect them.
14 Q. Well, other than Rule 1.5(e), are
15 you aware of any other rules or principles that
16 apply to the fairness of the division of fees
17 among lawyers?
18    MS. LUKEY: Objection.
19 A. In a fee-sharing context?
20 Q. Yes.
21 A. I suppose, if the lawyers are
22 partners in a law firm, the partnership
23 agreement might govern. If the lawyers are in
24 an employment relationship, the contract

Page 170

1  governing the relationship may govern the
2  fairness of the allocation.
3      If they are in a fee-sharing
4  arrangement, as you allegedly have here, I
5  think you have here, then that arrangement
6  would govern the allocation.
7      I don't know which other principles,
8  but I don't think that the Rules of
9  Professional Conduct would govern.
10 Q.  Let me ask you --
11     MS. LUKEY: Can I just respectfully
12 point out we've got seven minutes, just
13 because I'm concerned about his --
14     THE SPECIAL MASTER: Could I ask you
15 this?  I want to test your hypothesis that
16 Rule 1.5(a) has nothing to say about the
17 referral fee here.
18     What if the referral fee, I'm not
19 implying that it was, but what if the
20 referral fee in question to the lawyer who
21 did no work on the case, contributed no
22 value, was 90 percent of the total fee in
23 the case, but the total fee was
24 reasonable, are you saying that Rule

Page 171

1  1.5(e) has nothing to say?  It's not
2  implicated at all in the court's
3  determination?
4      THE WITNESS: Sure.  That's exactly
5  what I'm saying.
6      THE SPECIAL MASTER: Okay.
7      BY MR. SINNOTT:
8  Q.  Tell me if you agree with this
9  statement, Professor.
10     "Legal ethics experts should not
11 offer an opinion, even if defensible, unless
12 they would adopt that opinion if they were the
13 judge in the case."
14     Do you agree with that?
15     MS. LUKEY: Objection.
16 A.  I would need to know the context in
17 which it was written.  I think there's a lot of
18 situations where ethics experts give opinion
19 where there is no judge, and won't be a judge,
20 and I think it's fine to give opinions in those
21 cases as well.
22     So I'd really need to know more
23 about the context.  I think people who are
24 ethics experts should give opinions that they

Page 172

1  believe.
2  Q.  All right.  And are you prepared to
3  testify in court before Judge Wolf that he
4  should rule as you've opined today?
5      MS. LUKEY: Objection.
6  A.  I wouldn't presume to tell a judge
7  how to rule.  I would tell the judge what I
8  believe to be true about the rules and their
9  application.  If the judge asked me, I suppose
10 I would answer whatever question the judge
11 asked, but I wouldn't, going in, expect to give
12 that testimony.
13     THE SPECIAL MASTER: So if the judge
14 said -- if you were testifying and if the
15 judge said, do you expect me to rely on
16 your opinion, what would you say?
17     THE WITNESS: I'm not sure what --
18 when the spirit moves me in that event,
19 but I think that courts give varying
20 degrees of weight to expert testimony.  I
21 don't know whether courts always need
22 expert testimony on the meaning of Rules
23 of Professional Conduct, which are
24 domestic law.

Page 173

1      I think, to the extent that the
2  judge is looking to experts and cares
3  about their testimony, the court should
4  really give my testimony whatever weight
5  he thinks it deserves based on how
6  persuasive my reasoning is and anything
7  else that the court thinks is relevant.
8      THE SPECIAL MASTER: Just one or two
9  final questions.  We have got five
10 minutes.
11     Do you think Rule 1.5(e), as you
12 construe it, the Massachusetts rule,
13 provides adequate protection to clients?
14     MS. LUKEY: Objection.
15     THE WITNESS: So now you're asking
16 me if I were a rule drafter in
17 Massachusetts, is this the rule that I
18 would draft?
19     THE SPECIAL MASTER: You can phrase
20 it that way.
21     THE WITNESS: I'm trying to
22 understand.
23     THE SPECIAL MASTER: I want you to
24 assume that the rule is as you've

Page 174

1  construed it.
2      THE WITNESS: Uh-huh. Right.
3      THE SPECIAL MASTER: It doesn't mean
4  I'm going to construe it that way, but
5  assuming that the rule is as you've
6  construed it, do you think it provides
7  adequate protection to clients to make
8  decisions about fee allocations and
9  divisions of fees?
10     THE WITNESS: So part of the reason
11 I find that hard is because Massachusetts
12 itself is trying to achieve a more limited
13 purpose than the rules of other
14 jurisdictions.
15     As I understand the Massachusetts
16 court, it sees the principal function or
17 the one that it expresses in Saggese as --
18 or Saggese -- as preventing an excessive
19 fee.
20     I think that the rule --
21     THE SPECIAL MASTER: And protecting
22 clients. There's language in Saggese that
23 talks about protecting -- the purpose of
24 the rule is protecting clients.

Page 175

1      THE WITNESS: Right. I think, in
2  the context of this case, the client was
3  protected by the rule as I interpret it.
4      Whether it ought to be more
5  demanding for the benefit of different
6  clients in different cases, I haven't
7  given any thought to, really. I don't
8  think, if I were a rule drafter in New
9  York, I guess, in a sense I am, because
10 I'm on the committee on standards of
11 attorney conduct, that, you know, proposes
12 rules to the state bar, that then proposes
13 them to the courts, I don't think I would
14 run out and say, let's replace our version
15 of 1.5(e) with the Massachusetts version,
16 as I construe the Massachusetts version.
17     THE SPECIAL MASTER: But your view
18 of the Massachusetts rule is that, to
19 comply with Rule 1.5(e), putting aside the
20 writing requirement, that to comply with
21 1.5(e), all the client has to be told is
22 that there will be a division of fee,
23 correct?
24     THE WITNESS: That's what the rule

Page 176

1  says.
2      THE SPECIAL MASTER: No further
3  information needs to be given about who's
4  going to get the fee, who's going to get
5  how much, the purposes for which the fee
6  can be given or anything else. Just that
7  there is going to be just the bare
8  statement, that there will be a division
9  of a fee.
10     So my question to you is, construing
11 it that way, do you think the rule
12 provides adequate protection to the
13 client?
14     MS. LUKEY: Objection.
15     THE WITNESS: Bearing in mind that
16 if the client asks, you have to answer the
17 questions, and bearing in mind the limited
18 purpose for which Massachusetts has its
19 rule, and given -- well, you know, I
20 guess, you know, it's hard to put myself
21 in the shoes of a Massachusetts rule
22 maker.
23     I think it would be fair to draft a
24 more demanding rule or to interpret the

Page 177

1  current rule in a more demanding way. In
2  general, there's no harm done if more
3  information is provided.
4      So if I were the rule drafter, I
5  would probably require more, with the
6  caveat that I wouldn't run around
7  disciplining lawyers who didn't perfectly
8  comply with the more demanding rule.
9      THE SPECIAL MASTER: Should there be
10 a separate rule where the client is going
11 to be a class representative and may well
12 represent a class with more diverse
13 interests that may not be totally aligned,
14 should there be a more demanding rule
15 requiring more information to be given to
16 that client?
17     THE WITNESS: To me, that is a
18 question about Rule 23 and the case law,
19 what do classes or their representatives
20 need to know.
21     It's not -- I would say the answer
22 is you shouldn't put it in Rule 1.5(e)
23 because that develops -- first of all, the
24 rule drafters don't have that much

Page 178

1  expertise.
2      Second of all, they don't draft
3  rules at that level of particularity.
4      And third of all, you have judicial
5  supervision of class actions.  So the
6  place to do it would be in either the
7  Rules of Civil Procedure or in courts'
8  local rules, or however else courts in
9  class actions express their requirements
10  about what lawyers for classes are
11  supposed to tell their clients.  And more
12  than that, I don't have a view on, because
13  I'm not a class action specialist.
14      **THE SPECIAL MASTER:** But not by
15  reading more information, a requirement of
16  more information to the client into Rule
17  1.5(e)?
18      **THE WITNESS:** I don't think that's
19  the job that Rule 1.5(e) was meant to do.
20  And you hit lawyers by surprise unfairly
21  if you interpret the rule to do the work
22  that judges are supposed to do in class
23  actions under Rule 23.
24      **MS. LUKEY:** Your Honor, it's a

Page 179

1  little after 12:30.
2      **THE SPECIAL MASTER:** It is 12:32.
3  Do you have anything else, Bill?
4      **MR. SINNOTT:** Nothing further.
5  Joan, do you have anything?
6      **MS. LUKEY:** In light of the time,
7  no.
8      **MR. SINNOTT:** Richard?
9      **MR. HEIMANN:** No questions.
10      **MR. SINNOTT:** Brian?
11      **MR. KELLY:** No questions.  Thank
12  you.
13      **MR. SINNOTT:** David, on behalf of
14  Keller Rohrback?
15      **MR. COPLEY:** No questions.  Thank
16  you.
17      **MR. SINNOTT:** Okay.  Hearing no
18  questions, this examination is concluded.
19  Thank you, Professor.
20      **MS. LUKEY:** Thank you both for
21  finishing in the time allowed.
22      (Time noted:  12:34 p.m.)
23
24

Page 180

1      A C K N O W L E D G M E N T
2
3  STATE OF          )
4                    :ss
5  COUNTY OF         )
6
7      I, BRUCE GREEN, hereby certify that
8  I have read the transcript of my testimony taken
9  under oath in my deposition; that the transcript
10  is a true, complete and correct record of my
11  testimony, and that the answers on the record as
12  given by me are true and correct.
13
14
15  _____
16      BRUCE GREEN
17
18
19  Signed and subscribed to before me
20  this _____ day of _____, 2018.
21
22
23  _____
24  Notary Public, State of _____

Page 181

1      C E R T I F I C A T E
2
3  STATE OF NEW YORK      )
4                         :ss
5  COUNTY OF RICHMOND     )
6
7      I, MELISSA GILMORE, a Notary Public
8  within and for the State of New York, do hereby
9  certify:
10      That BRUCE GREEN, the witness whose
11  deposition is hereinbefore set forth, was duly
12  sworn by me and that such deposition is a true
13  record of the testimony given by such witness.
14      I further certify that I am not
15  related to any of the parties to this action by
16  blood or marriage; and that I am in no way
17  interested in the outcome of this matter.
18      IN WITNESS WHEREOF, I have hereunto
19  set my hand this 9th day of April, 2018.
20
21
22
23
24  MELISSA GILMORE

## $

**$10,000 (2)**
73:1,3
**$15 (1)**
146:1
**$950 (1)**
13:5

## A

**ABA (2)**
58:9;168:10
**abilities (5)**
23:1,6;27:9,18;28:3
**ability (1)**
89:22
**able (2)**
34:24;91:7
**above (2)**
21:1;158:14
**absence (4)**
158:1;163:4;164:8,13
**absent (3)**
59:3,17;61:5
**absolutely (1)**
163:14
**abstract (1)**
90:4
**accept (2)**
75:18;83:11
**accompanied (1)**
36:24
**accomplish (1)**
81:8
**according (2)**
126:18;169:5
**account (1)**
44:8
**accurate (1)**
45:8
**achieve (1)**
174:12
**across (1)**
138:13
**act (1)**
125:12
**acting (2)**
71:6;83:1
**action (19)**
41:23;42:10,22;99:22;
107:21,22,24;108:8,8;
133:23;137:17;147:7;
149:20,21;150:15,23;
158:17;161:11;178:13
**actions (12)**
82:4;108:18,19,20,23;
109:10;111:23,24;137:18;
178:5,9,23
**activities (1)**
49:22
**activity (3)**

49:15;52:16;53:2
**actually (6)**
23:24;30:7;53:12;60:3;
88:1;92:15
**added (3)**
126:11,20;145:5
**addition (1)**
11:15
**additional (4)**
11:3,19;15:15;141:7
**additions (1)**
11:16
**address (2)**
56:18;161:9
**adequate (7)**
75:14,15;119:2;146:6;
173:13;174:7;176:12
**adequately (2)**
70:17;75:14
**admitted (1)**
124:16
**adopt (1)**
171:12
**adopting (1)**
168:10
**advertising (1)**
28:18;29:19
**advised (1)**
112:18
**affirmatively (2)**
117:15;142:15
**again (18)**
13:17;19:5;32:22;36:1;
44:23;50:19;72:23;76:5;
77:5;79:6;84:17;87:4;
106:18;111:14;122:21;
134:8;138:19;151:10
**against (4)**
41:23;84:5;93:10;123:11
**agree (16)**
25:21;43:9;71:12;75:15;
77:2;105:22;125:21;133:12;
139:2,7;145:9;150:2,12;
164:12;171:8,14
**agreed (5)**
36:20;78:11;111:17;
129:14;146:7
**agreeing (2)**
147:24;148:2
**agreement (45)**
49:13;55:20;63:11;71:15,
18;76:1,7,17,23;93:14,24;
94:12,20;95:4;97:18;98:11;
107:6;113:18;117:20;121:5,
19;122:13;124:10;129:6;
134:17;135:17;142:21;
146:11,19,22;150:13,20;
151:14,22;152:6;153:13;
156:5;159:21;160:13;
165:15;166:17,23;167:7,13;
169:23
**agreements (3)**
57:13;64:13;163:8

**agrees (2)**
137:1;155:21
**ahead (3)**
115:13;127:11;128:15
**aligned (1)**
177:13
**allegedly (1)**
170:4
**allocate (2)**
124:1;155:22
**allocating (1)**
140:11
**allocation (2)**
170:2,6
**allocations (1)**
174:8
**allowed (1)**
179:21
**allows (1)**
119:11
**almost (4)**
43:1;44:5;151:9;154:10
**alone (1)**
159:14
**along (1)**
32:11
**alter (1)**
49:12
**although (2)**
120:13;167:6
**always (1)**
172:21
**ambiguities (1)**
123:11
**ambiguous (1)**
26:10
**ambit (1)**
22:21
**ambulance (3)**
71:2,6,10
**ambulances (1)**
71:8
**Among (12)**
47:11;105:10;106:9,10;
110:24;156:7;159:17;168:1,
16,18,24;169:17
**amount (8)**
60:14;97:8;98:5,8,9,21;
101:2;114:7
**analysis (5)**
54:10;64:17;77:3;162:4;
164:18
**and/or (1)**
114:10
**angels (1)**
80:6
**apologize (1)**
112:3
**apparently (3)**
79:12;119:20;144:19
**appear (2)**
143:3,3
**appeared (3)**

16:21;112:7;145:6
**appears (3)**
14:13;48:3;124:17
**applicable (1)**
55:19
**application (2)**
41:15;172:9
**applied (4)**
41:1,5;42:21;124:10
**applies (6)**
44:1;55:22;68:22;76:2;
152:17;161:21
**apply (15)**
21:2,10;41:11;42:2;57:12;
64:12;66:11;67:3,13,18,19;
69:12;71:4;164:21;169:16
**applying (1)**
106:1
**appointed (1)**
7:13
**appointments (1)**
49:18
**approached (1)**
120:3
**appropriate (3)**
143:5;155:9;162:4
**approval (1)**
91:1
**approve (1)**
145:8
**approximately (1)**
13:6
**area (1)**
25:24
**areas (3)**
19:22;26:8,9
**arguably (1)**
161:7
**argued (1)**
161:7
**arguing (2)**
66:1;100:6
**argument (2)**
65:23;93:12
**arising (2)**
103:9;138:14
**Arkansas (54)**
7:16;21:20;23:8;34:12;
35:2;37:13,15,24;38:10;
39:2,13,21,24;40:2;41:3,6,8,
10,10,11;42:1,2,18;46:23;
47:5;49:16,23;52:17;54:7;
79:20;88:12;91:21;94:18;
95:13;96:16;107:10,11,11;
111:17;112:20;116:17;
121:19;123:19;131:4;133:2,
22;137:18;150:19,21;151:9,
11;153:12;155:21;156:5
**around (5)**
11:10;13:8;32:24;94:3;
177:6
**arrange (1)**
36:1

**arranged (1)**
  38:22
**arrangement (43)**
  64:1;65:5,12,16,17;66:10,
  20;67:7,17,20;68:1,21;
  69:10,24;70:2,16;71:9;
  72:16;73:7,16;74:24;75:13;
  93:5;94:16;95:10;97:14,24;
  103:13;123:15;125:14;
  135:8;137:12,16;141:21;
  146:1,8;159:12;160:1;
  161:23;165:2,5;170:4,5
**arrangements (8)**
  56:23;58:12,18;60:11;
  63:23;70:14,15,21
**article (2)**
  11:10,20
**articles (1)**
  12:17
**aside (10)**
  27:22;39:15;69:20;93:6;
  109:19;114:19,21;117:7;
  121:6;175:19
**aspect (3)**
  65:20;68:2;86:1
**assessment (1)**
  161:3
**assistance (2)**
  17:3,6
**assistants (1)**
  17:8
**Association (2)**
  104:5,14
**assume (25)**
  10:22;52:22,24;61:14;
  72:18,18;78:22;107:10;
  109:16;112:11;137:1;
  144:12;147:20;151:9,10,19;
  153:22;156:9;158:11,21;
  159:2;165:12;166:15;167:4;
  173:24
**assumed (5)**
  22:15,17;24:8;39:1;108:6
**assumes (1)**
  168:11
**assuming (12)**
  39:22;45:7;79:7;94:7;
  98:12;100:9;135:7;140:3;
  143:15,22;154:14;174:5
**assumption (5)**
  61:16;77:14,15;108:12;
  111:20
**ATRS (8)**
  49:14,17;50:8,17;52:17;
  107:10;157:18;158:15
**attached (1)**
  10:20
**attempt (8)**
  68:12,24;69:2;72:6,20;
  74:19;75:11,12
**attempting (1)**
  49:11
**attempts (1)**

**arranged (1)**
  70:5
**attends (1)**
  164:4
**attention (5)**
  14:12;16:23;64:8;157:15;
  159:23
**attentive (2)**
  108:15;109:12
**Attorney (15)**
  7:20;8:1;77:17,19,22,22;
  78:12;83:8,9,10;158:23;
  159:3,5,7;175:11
**attorneys (4)**
  104:7;119:13;124:2;
  155:23
**attorney's (2)**
  108:22;131:19
**author (1)**
  132:14
**authorities (4)**
  41:22;73:19;74:3;83:22
**authority (19)**
  43:2;74:2;81:9,10;82:8;
  84:8;103:10;132:8,15;
  159:10;162:18,20;163:2,4,
  21,23,24;164:8,13
**authorized (2)**
  159:4;165:13
**authorizes (1)**
  119:12
**availability (1)**
  120:12
**available (1)**
  73:21
**avoid (1)**
  53:24
**awarded (6)**
  107:23;108:11,24;110:22;
  155:14;156:6
**awards (1)**
  108:21
**aware (8)**
  67:1;103:2,4;110:10;
  113:7;154:18;164:19;
  169:15
**away (2)**
  70:10;100:14

**B**

**b5 (3)**
  56:13;59:21,24
**back (16)**
  9:24;45:2;62:12;63:12;
  72:3;75:4;77:13;102:1,5;
  111:5;124:13;126:3;142:3;
  143:21;154:2;167:12
**Bank (3)**
  7:17;49:3;96:18
**banners (1)**
  12:10
**Bar (4)**
  104:4,13;124:16;175:12

**bare (5)**
  69:4;72:9;105:8;144:7;
  176:7
**Barrett (2)**
  7:8,21
**Bar's (1)**
  136:1
**base (2)**
  108:12,14
**based (33)**
  11:9;22:7,15,16;24:7;
  30:5,8;39:16;42:10;43:3,10;
  44:18;50:2,3,5,20;53:9,17;
  55:22;60:14,15;73:21;
  78:23;82:17;85:2;86:15;
  91:5;92:6;105:1;109:4;
  136:5;155:10;173:5
**bases (1)**
  21:9
**basically (3)**
  31:10;79:21,22
**basis (6)**
  32:18;51:23;74:4;79:18;
  97:20;157:3
**Bates (1)**
  47:22
**Bearing (2)**
  176:15,17
**became (2)**
  107:20;108:8
**become (2)**
  109:8;151:2
**becomes (3)**
  151:5;152:1;153:5
**begin (1)**
  29:20
**beginning (3)**
  8:5;9:6;56:19
**begins (4)**
  20:4;48:4,13;168:2
**begs (1)**
  130:2
**Behalf (9)**
  3:4,15;8:24;9:11;41:13;
  82:3;83:1;112:20;179:13
**Belfi (12)**
  31:12;33:10;37:2,3;47:15;
  49:5,10;52:7;78:12,13,16;
  79:4
**belief (1)**
  39:14
**believing (1)**
  90:24
**benchmarks (1)**
  168:8
**benefit (1)**
  175:5
**best (3)**
  12:13;33:17;101:17
**better (1)**
  112:22
**Beyond (6)**
  12:4;46:5;110:21;140:23;

**bare (5)**
  141:8;147:8
**Bill (3)**
  12:5;46:19;179:3
**bit (5)**
  12:7;47:9;77:14;115:13;
  154:2
**bkelly@nixonpeabodycom (1)**
  3:22
**blatantly (1)**
  61:2
**board (1)**
  138:13
**bodies (1)**
  103:15
**Boies (2)**
  100:2,14
**bolstered (1)**
  155:1
**Boston (2)**
  3:6,17
**both (13)**
  64:21;65:9;103:19,23;
  105:10,15;106:5;111:15;
  115:19;155:15;158:10;
  164:1;179:20
**bottom (6)**
  20:18;48:5;103:1;131:11;
  157:17;158:13
**breach (1)**
  146:18
**break (4)**
  50:7;101:22;102:1,22
**BRIAN (3)**
  3:18;8:23;179:10
**briefly (1)**
  11:5
**bringing (4)**
  41:23;47:4;141:17;142:3
**broaden (1)**
  144:5
**Bruce (7)**
  8:6,8;10:7,14;14:5;180:7,
  16
**buying (3)**
  86:5,6,23

**C**

**Cabraser (7)**
  8:18,20;112:8;116:18;
  154:7;155:15;156:10
**calculating (1)**
  168:9
**call (22)**
  9:22;23:12,13;34:18;
  36:19,20;38:7,20;39:3;42:6;
  43:11;59:1;67:6;92:1;93:13;
  102:3,7;113:13;119:9;
  122:6;137:4,20
**called (9)**
  7:1;30:15;34:18;35:8,12;
  39:20;73:12;88:13;137:3
**calling (5)**

35:14,17;37:17,20;38:20
**calls (3)**
  26:20;122:13;149:19
**came (4)**
  33:10,12;146:3,4
**can (47)**
  10:5;11:17,22;12:5;24:11;
  25:24;26:8;30:8;31:4,16;
  32:21;44:19;48:13;54:14;
  61:24;71:4,12;76:21;79:1;
  83:8;90:5;91:4;94:21;95:3;
  96:20,20;97:8;98:9;99:14,
  19;101:22;104:10;121:1;
  123:21;131:5;136:12;142:2;
  143:14;146:14;148:9;
  152:22;159:20;163:13;
  169:12;170:11;173:19;
  176:6
**candid (1)**
  141:11
**CANTY (3)**
  5:4;8:13,13
**capable (1)**
  91:17
**capacity (1)**
  166:23
**capital (1)**
  125:18
**capped (1)**
  98:18
**car (3)**
  86:5,6,8
**Cardoza (1)**
  11:10
**care (4)**
  82:8;84:8;141:21;169:12
**cared (1)**
  90:15
**cares (1)**
  173:2
**carry (1)**
  46:11
**case (89)**
  12:20,22;13:7,18,24;
  14:10;19:1;24:24;33:2;
  37:22;38:4;49:3;52:12;
  59:18;60:16;65:14;69:18;
  78:6;79:9,11,24;82:18;
  83:11;90:4,12;92:23;93:3,7,
  15;95:12,17;96:18;100:20,
  24;111:22;112:4,6,8,20;
  117:10;118:8;120:7;121:3,
  8;124:9;125:19;129:10;
  132:5;135:1;139:18;140:8,
  12;141:10;142:4,5,6;143:2,
  3;144:4;145:5,6,6,22,23;
  147:9;149:21;152:14,16,17;
  153:18;154:9;155:4;156:11,
  14;158:15,24;162:21,22;
  163:15,22;164:2;166:16;
  167:10,13;170:21,23;
  171:13;175:2;177:18
**cases (19)**

11:23;18:20;49:19;83:24;
  99:13;133:23;134:23,24;
  135:11,16,19;138:13;163:1,
  5,11;164:10;166:19;171:21;
  175:6
**cause (1)**
  42:6
**caused (1)**
  42:11,19
**causing (1)**
  41:24
**caveat (1)**
  177:6
**certainly (12)**
  18:20;26:13;27:16;30:22;
  44:18;53:16;94:16;104:23;
  112:4,11;133:20;134:17
**certified (5)**
  151:1,6,20;152:21;153:4
**certify (1)**
  180:7
**Chain (1)**
  47:21
**chaired (1)**
  135:23
**chairing (1)**
  34:7
**challenge (3)**
  99:15,17;100:1
**chance (1)**
  48:16
**change (3)**
  15:5,21;42:12
**changes (3)**
  11:16;16:2;17:10
**character (2)**
  23:1,6
**characterization (3)**
  24:5;26:5;139:2
**characterize (4)**
  37:8;45:24;59:6;94:10
**characterized (5)**
  132:24;133:4,6;137:21;
  138:23
**Chargois (126)**
  20:7,8,20;21:4,11,14,19;
  22:3,9;23:4,10,18,19;26:18,
  20;29:10,24;30:14;31:10,
  14;33:17;34:1,17;38:7,9,23;
  39:14,20;41:3,8;42:6,7,11,
  19;45:12;46:10,22,22;47:4,
  15;48:6;49:1,5,10,22;50:6,
  16;51:15;52:14;53:11,21;
  54:6,17,19;55:4,6,15,20,24;
  63:9;78:9,11,12,15;79:4,12,
  16;80:20,21;81:2,21,24;
  82:13;83:6;84:2,19,20,24;
  85:3;86:3,6,17;87:2,16;
  88:11,17,19;89:5;90:17,24;
  91:13,24;92:15;94:17;95:8;
  96:10;110:11;111:1,3;
  113:8,17;117:19,21,23;
  118:5,6;119:6,7;120:6,20,

22;121:8;125:12,22;129:9;
  133:1;159:9;161:15;162:1;
  165:15,16;166:8,16,23;
  167:7,12
**Chargois' (11)**
  30:6;31:1;39:14,16;43:10;
  45:3;49:4;79:13;81:20;
  82:18;124:10
**chase (1)**
  71:8
**chasers (2)**
  71:2,6
**chasing (1)**
  71:10
**CHOATE (3)**
  3:3;8:9,15
**choice (1)**
  41:18
**Chris (2)**
  37:2,4
**circle (1)**
  72:3
**circumstances (3)**
  111:15;154:5;162:5
**cite (1)**
  131:11
**cited (7)**
  16:6,12,13;81:17;132:12;
  139:3;164:2
**cites (1)**
  19:7
**citing (2)**
  162:21,22
**City (1)**
  135:24
**civil (4)**
  99:22;152:15;153:21;
  178:7
**claim (1)**
  81:19
**claimed (1)**
  84:19
**claiming (1)**
  52:15
**claims (1)**
  51:11
**clarification (1)**
  21:24
**clarify (1)**
  152:23
**class (62)**
  82:4;107:21,22,24;108:8,
  8,16,17,18,18,20,23;109:9,9,
  10,12;111:22,24;133:23;
  137:17,17,18;149:20,21,23;
  150:14,15,22,23;151:1,2,4,6,
  6,11,12,13,19,21,23,24;
  152:1,4,7,13,21;153:4,8,14;
  157:19;158:17;161:10,11;
  167:1,6,16;177:11,12;178:5,
  9,13,22
**classes (3)**
  152:20;177:19;178:10

**clear (12)**
  24:7;26:9;52:13;58:15;
  59:16;60:21;91:16;107:19;
  108:6;111:2,14;166:10
**clearly (2)**
  61:11;168:12
**client (123)**
  20:9,13;21:18;29:1;30:16;
  32:9;37:17;41:10;49:14,23;
  50:8,17;52:18;69:3,4;70:7;
  72:8,8,9,21,21;73:4;76:6,16;
  77:2,7,16,21;79:20;80:14,
  15;83:2;87:23;88:3,4;89:22;
  96:2,3;97:18;99:13,19;
  101:1,5,20;106:21,22;111:6;
  114:1,4,14;115:3,8;116:7,
  24;117:4,8,12,14;118:16,18,
  21;124:20;130:6,10;132:20;
  135:2,17;136:9;137:9,10;
  138:15;139:12,13,20,23,24;
  141:1,11,19;142:11,12,14,
  17,24;143:5,11,12;144:13,
  23;145:2,14,17,21,24;146:5,
  10;147:5,12,22,24;148:20,
  23;149:4,9,19,22,24;150:5,
  8,11;151:2,5,13,23,24;
  153:5;175:2,21;176:13,16;
  177:10,16;178:16
**clients (17)**
  80:11,12;95:12;100:16;
  132:17;136:3;138:7;143:14;
  168:20;169:4,7;173:13;
  174:7,22,24;175:6;178:11
**client's (9)**
  29:2;75:24;82:20;96:9;
  116:10;117:13;141:23;
  147:23;168:17
**close (3)**
  72:5;102:21;166:12
**closer (1)**
  12:9
**co-counsel (2)**
  167:5,16
**code (1)**
  65:19
**cold (13)**
  26:20;30:14;34:18;35:9;
  37:17,20;38:7,20;39:20;
  42:6;43:11;88:13;92:1
**collaborate (1)**
  80:21
**colleagues (1)**
  168:22
**combination (1)**
  116:16
**combined (1)**
  116:23
**comment (3)**
  22:13,22;82:10
**comments (1)**
  128:12
**committee (6)**
  34:8;104:5,14,20;135:24;

175:10

**common (1)**
90:7

**communicating (1)**
41:9

**communication (3)**
28:24;29:4;49:4

**communications (3)**
23:7;41:2;94:24

**company (3)**
74:9,13;75:8

**compensate (2)**
21:4,14

**compensated (4)**
12:24;20:8;21:11,14

**compensating (2)**
23:19;103:11

**compensation (2)**
13:4;66:22

**competence (1)**
23:6

**competences (1)**
23:1

**complete (4)**
72:6;99:15;131:24;180:10

**completion (1)**
15:19

**compliance (3)**
69:16,23;106:15

**complicated (1)**
29:19

**complied (6)**
65:21;66:6;67:11,12;68:2;
96:13

**complies (1)**
114:16

**comply (21)**
53:23;55:14,18;61:1;
68:12;69:2;70:6,17;71:19;
72:7,20;74:14,16,19;75:11,
12;149:8;161:2;175:19,20;
177:8

**conceivably (1)**
71:4

**concerned (4)**
48:14;49:10;87:23;170:13

**concerning (1)**
95:9

**conclude (7)**
77:21;78:8,15;79:1,3;
84:18;110:10

**concluded (1)**
179:18

**conclusion (3)**
49:3;123:21;160:24

**Conduct (18)**
40:1,3;70:11;105:3,14;
114:8;122:2;130:20;153:2,
18;156:22;157:7;163:13;
168:19,24;170:9;172:23;
175:11

**connection (9)**
40:15;119:17;125:17,23;

127:1,2;129:9;138:6;156:1

**connotation (1)**
46:12

**consent (28)**
65:10,13;67:23;69:4;72:7,
9,21;75:14,24;76:7,17;
95:13;96:9,13,18;116:11;
118:2;119:3;139:23;140:13,
14,19;142:17;147:23;
156:17;158:18;159:18,20

**consented (1)**
146:23

**consents (2)**
96:4;106:22

**considerable (2)**
49:15;52:15

**considering (1)**
164:20

**constitute (2)**
45:8;83:12

**constituting (1)**
94:11

**constitutional (3)**
99:14,17,22

**construction (3)**
12:10;126:18;148:22

**construe (5)**
123:8,10;173:12;174:4;
175:16

**construed (4)**
124:11;129:22;174:1,6

**construes (1)**
143:12

**construing (1)**
176:10

**consults (1)**
77:16

**contact (2)**
34:11;39:5

**contacted (1)**
78:9

**Cont'd (2)**
3:1;5:1

**contemplated (6)**
133:19,20;134:14;149:20,
22;151:22

**contemplates (2)**
150:14,21

**contemplation (2)**
134:4,16

**content (1)**
30:24

**contested (1)**
30:14

**context (40)**
31:5;37:7;38:3;48:22;
60:18,19;62:10;63:10;64:1;
65:4;66:9;67:16;68:19;
78:20;79:11,24;83:24;84:1;
90:4,11;93:3,7;95:16,19;
97:12,13;103:10,12;107:4;
120:7;132:14;138:11;157:5;
162:16;165:1;168:2;169:19;

171:16,23;175:2

**contextual (1)**
101:21

**contract (15)**
122:12;123:5,6,7,24;
125:2,11;131:2;134:9;
146:9;147:6,17;155:17,19;
169:24

**contractual (1)**
145:13

**contradict (1)**
109:16

**contrary (1)**
123:21

**contributed (1)**
170:21

**contributing (1)**
167:10

**conventional (2)**
145:23,24

**conventionally (4)**
39:7;108:23;111:22;
138:10

**conversation (9)**
9:16;34:5;36:13;44:6,13;
95:8;115:6;136:9;149:3

**conversations (5)**
15:2;17:18;52:7;66:16;
95:1

**copies (1)**
19:7

**COPLEY (4)**
9:10,10;102:11;179:15

**copy (2)**
10:24;94:21

**corporate (1)**
37:21

**correctly (3)**
50:14;51:9;160:15

**counsel (43)**
7:8;14:19;15:2;17:5,10,
17;18:1,6;19:3,21;22:10,20;
49:17;53:11;76:24;82:20;
94:19;112:7;119:13,14;
120:12;121:3,4;124:6,11,14,
15,17,18,19,22,24;125:12,
13;129:7,8,11;151:21;
152:2;155:24;158:16;166:6,
15

**counsel's (1)**
157:19

**counterpart (1)**
105:15

**country (2)**
40:10;163:6

**COUNTY (1)**
180:5

**couple (3)**
37:12;97:6;154:3

**course (10)**
15:6,13;42:23;51:24;83:6;
84:15;95:18;100:18;110:5;
141:9

**Court (29)**
7:12;9:23;10:9;14:2;
33:22;81:9;100:6;104:9;
107:24;108:11,21,21,24;
110:23;124:17;142:2;145:7;
146:17,21;147:10,20;156:7;
163:22;166:7;169:6;172:3;
173:3,7;174:16

**court-awarded (1)**
157:19

**courts (5)**
103:14;172:19,21;175:13;
178:8

**courts' (1)**
178:7

**court's (1)**
171:2

**cover (1)**
58:24

**covered (5)**
58:22;59:4;155:6,20;
156:3

**covers (1)**
58:14

**CRANDALL (1)**
3:20

**create (2)**
84:5;93:9

**creation (1)**
130:13

**credentials (3)**
22:24;23:5;28:3

**criminal (1)**
11:23

**crux (1)**
20:6

**crystal (3)**
58:15;59:15;60:20

**cultivation (1)**
32:10

**current (3)**
11:2;65:8;177:1

**Curriculum (1)**
10:13

**customer (2)**
167:5,16

**CV (5)**
10:11,20,22,24;11:3

## D

**Damon (9)**
20:7;22:9;34:1;47:4,14;
48:6;52:14;96:10;113:8

**dancing (1)**
80:7

**date (4)**
94:6;96:16,19;97:2

**dated (4)**
14:6;34:2;47:13;115:23

**David (8)**
9:9,10;100:2,13;102:10,
10,15;179:13

**day (2)**
84:11;180:20
**Daynard (5)**
160:20,24;161:4,8,9
**de (4)**
38:2;40:8;88:14;93:7
**deal (5)**
48:2;49:13;105:10,16;
152:19
**dealing (1)**
51:19
**decade (1)**
44:5
**decided (1)**
136:14
**decision (4)**
65:3;103:2,9;160:21
**decisions (1)**
174:8
**deconstruct (1)**
119:23
**dedicated (5)**
49:16;52:17;53:3,4,5
**deeply (1)**
128:8
**defensible (1)**
171:11
**defined (10)**
22:13;28:19;30:18;61:19;
82:10;130:4,19,21,23;131:3
**defines (2)**
22:22;30:19
**definitely (1)**
74:10
**definition (3)**
29:15;130:21;148:15
**definitions (1)**
130:22
**degrees (1)**
172:20
**demanding (5)**
175:5;176:24;177:1,8,14
**Department (1)**
11:22
**depends (2)**
83:24;101:19
**deposed (1)**
100:18
**deposition (14)**
13:14;16:11,15;22:11;
24:1;25:1,6;32:3;34:1;
47:20;51:19;86:20;158:12;
180:9
**depositions (3)**
22:8;25:3;91:6
**derived (1)**
19:14
**derogatory (1)**
81:6
**describe (2)**
56:20;70:12
**described (8)**
18:9;23:9,10,14;24:2;

**116:17;135:12,20**
**describes (2)**
49:22;50:16
**describing (3)**
51:4,11,12
**description (3)**
30:5;46:15;87:7
**descriptive (1)**
120:15
**deserves (1)**
173:5
**designed (4)**
59:15;84:6;93:10;169:9
**detail (1)**
157:14
**details (1)**
157:10
**determination (1)**
171:3
**Detroit (1)**
7:12
**develop (1)**
136:10
**developed (1)**
153:19
**development (1)**
32:9
**develops (2)**
152:14;177:23
**devote (1)**
162:16
**differed (1)**
15:12
**difference (11)**
25:22;27:13,16;28:7,12;
38:16;39:11;43:7;69:22;
147:4,5
**different (11)**
15:23;68:6;75:3;101:12;
110:14;120:1;137:6,7;
148:12;175:5,6
**differently (3)**
74:11;105:11,18
**difficulty (2)**
9:19;12:7
**direct (9)**
11:22;14:12;20:22,24;
64:7;127:19,22;157:15;
159:23
**directed (2)**
16:17;83:4
**directing (1)**
16:23
**directly (2)**
43:13;126:17
**Director (3)**
22:4;34:12;78:7
**disagree (1)**
162:2
**disagreement (1)**
120:21
**disciplinary (16)**
41:22,23;42:10,22;43:2;

**71:14;73:19;74:1;81:9,10;**
82:7;83:22,24;84:7;103:9;
163:23
**discipline (7)**
67:9;68:13;71:21;73:21;
74:4;141:3;145:14
**disciplined (3)**
37:23;40:10;141:6
**disciplining (1)**
177:7
**disclosed (2)**
145:7;147:1
**disclosure (2)**
143:23;161:10
**discounted (1)**
82:14
**discredit (1)**
123:18
**discuss (3)**
97:5;127:17;128:21
**discussed (3)**
103:15;106:1;155:4
**discussion (8)**
106:17;119:19,23;120:19;
127:12,19,22;128:5
**disinterested (4)**
80:13,16,20;85:14
**dispositive (1)**
92:21
**dispute (1)**
146:9
**disputed (1)**
110:18
**distinction (2)**
57:4;69:14
**District (1)**
7:11
**diverse (1)**
177:12
**divide (9)**
76:1,7,24;107:12;114:15;
117:9;135:19;141:19;
158:17
**divided (7)**
97:23;118:22;122:15,15;
131:19;157:11,20
**dividing (4)**
54:19;55:5;118:3;142:13
**division (46)**
56:14;69:3;94:11;95:24;
96:3;99:3;104:6;106:19,21;
109:22;111:11,13;114:2,4,6;
116:8,11,13,15;117:1;
118:17,18,24;138:16;
141:14;142:23;143:1;144:8;
148:2,3,21;149:9;152:7;
153:8;158:9;159:17,18;
162:5;163:9;168:1,16,24;
169:11,16;175:22;176:8
**divisions (1)**
174:9
**Doane (37)**
22:4;26:20;29:10;34:11,

**18;35:1,7;39:5,22;44:7;**
45:12;53:12;78:8,10,11,14,
15;79:3,12,16;80:2,3;81:19;
82:13,14,24;84:18,23,24;
86:18;87:12;88:7,13;90:13;
94:10;95:2,5
**Doane's (2)**
35:11;80:17
**document (3)**
48:1,2;116:2
**documents (4)**
13:15;16:6,12;87:20
**domestic (1)**
172:24
**done (6)**
17:22;18:24;38:22;81:21;
163:10;177:2
**don't (141)**
9:22;11:8;12:21;14:17;
17:7;18:3;20:14;22:3;27:16;
28:13;30:12,20;31:19,20;
32:10;35:20;36:18;37:4,12;
40:2,3;42:8,20;43:22,23;
44:1,3,18;45:20;46:2;47:7;
50:20;51:1,12;52:1,6;53:8;
54:2;56:7;57:22;58:1,6;
59:1,9;61:16;63:21;66:1;
67:21,22;68:6;75:13;76:10;
77:17;79:23;80:2;81:4,7,8,
14;83:3;84:23;85:3;86:8,9;
87:10;88:21;93:4,16;94:6;
95:7,11;97:22;98:17;99:15,
18,20;100:4,9,12;101:13,18;
104:23;107:18;108:4;110:5;
112:9,21;113:10;114:11;
115:6;117:3,8;119:5;120:1,
3;122:7,23;123:13,20;130:3,
14,22;133:17;134:9,15;
136:13,23;137:19;138:9;
139:9,16;141:2,5,20,21,22;
143:9;148:6;150:2;152:18;
154:21;156:17;157:3;159:2,
8,14;160:7;163:20;164:11;
167:20;169:8,12;170:7,8;
172:21;175:7,13;177:24;
178:2,12,18
**door (4)**
24:3;89:4;90:14;92:1
**door-opening (1)**
89:1
**doorway (1)**
43:6
**doubt (3)**
40:9;44:9;80:3
**down (5)**
33:11,12;50:7;78:11;
141:23
**draft (12)**
14:24;15:23;16:3;17:16,
20;18:10;94:20;107:15;
111:15;173:18;176:23;
178:2
**drafted (10)**

13:23;14:10,16,17,18;
15:4;93:20;105:11,18;123:7
**drafter (4)**
123:12;173:16;175:8;
177:4
**drafters (3)**
64:11;67:2;177:24
**drafting (9)**
14:21,22;18:5;19:10;
64:10;66:14,17;67:1;104:22
**drafts (2)**
15:11;17:4
**draw (1)**
123:21
**drawing (2)**
57:5;125:7
**drew (3)**
25:14;109:14;158:3
**duly (1)**
7:2
**during (2)**
15:6;106:16

**E**

**earlier (4)**
15:23;16:3;82:12;132:23
**early (3)**
18:21;19:6;32:24
**earth (2)**
89:11,19
**easier (1)**
63:6
**effect (2)**
117:6;141:4
**effected (1)**
96:10
**effective (8)**
103:19,20,21,22,23;
143:16;144:18,21
**either (12)**
12:22;19:7,9;38:23;51:22;
53:9;129:10;131:3;133:9,
10;164:3;178:6
**elaborate (1)**
57:2
**elicited (1)**
25:13
**Elizabeth (1)**
7:20
**else (22)**
12:3;33:15;36:24;50:4;
53:6;68:14;78:21;96:14;
97:21;102:17;137:3,4,19;
144:4;145:15;146:13;
163:24;165:2;173:7;176:6;
178:8;179:3
**e-mail (7)**
39:6;47:13,21;48:4,23,23;
94:23
**e-mails (2)**
94:4,7
**EMILY (2)**

3:20;164:4
**emphasize (1)**
58:18
**employment (1)**
169:24
**encapsulate (1)**
34:16
**end (4)**
84:10;127:6;136:14;146:4
**endorsed (1)**
23:4
**endorsement (2)**
22:23;28:2
**endorsing (1)**
27:8
**enforceable (1)**
146:11
**enforcing (1)**
146:20
**engaged (2)**
88:17;112:13
**engagement (6)**
29:2,6;97:2;154:4;155:7,
11
**English (3)**
44:15;119:19;121:13
**enter (1)**
64:13
**entire (3)**
16:16;48:2;152:7
**entitled (1)**
99:23
**entity (1)**
109:8
**equivalent (8)**
29:3;37:21;79:9;105:5,13,
23,24;136:20
**Eric (9)**
32:7;33:10;37:2,3;47:15;
49:5;78:12,16;79:4
**ERISA (3)**
9:11;166:18,24
**ESQ (6)**
3:7,8,18,19,20;5:6
**essentially (2)**
18:8;22:23
**established (1)**
130:9
**ethicist (1)**
37:15
**ethics (11)**
38:1;104:1,4,5,12,15;
131:12;132:9;171:10,18,24
**even (24)**
23:12;29:20;31:17;59:2;
60:23;63:20,24;64:4;67:12;
68:3,18;72:6;79:14,18;
82:12;83:5;84:9;92:19;
93:13;131:22;139:4;163:21;
164:19;171:11
**event (3)**
38:11;158:19;172:18
**events (1)**

76:22
**eventually (1)**
133:22
**everybody (2)**
92:9;99:1
**everyone (3)**
10:2,6;137:1
**evidence (12)**
22:17;23:3;24:9;25:1,20;
26:15;50:4;92:7;123:19;
128:2;154:14;157:5
**Ex (1)**
123:16
**exactly (9)**
26:2;75:17;120:20;128:3,
4;143:9;149:11;158:6;171:4
**examination (6)**
9:23;10:7,16;12:1;15:14;
179:18
**examinations (1)**
25:6
**examined (2)**
7:3;23:21
**example (8)**
17:7;19:6;28:17;67:22;
72:24;99:10;100:2;135:22
**excellent (1)**
82:3
**Except (2)**
105:8;122:11
**exception (7)**
58:4;59:2,7,10;61:5;62:1;
63:17
**excepts (1)**
56:14
**Excerpt (1)**
33:24
**excessive (7)**
65:6;165:8;168:7,13;
169:4,7;174:18
**excluded (1)**
59:14
**exclusion (1)**
139:17
**exclusive (4)**
24:17;90:22,23;91:4
**excuse (1)**
116:24
**Executed (3)**
93:19,20;125:3
**Executive (4)**
22:4;34:12;37:21;78:7
**exercising (1)**
81:9
**exhibit (16)**
10:12,13,19;14:4,5,15;
33:23,24;47:16,18,19,21;
104:11,12;115:21,22
**existed (2)**
65:10;114:17
**existence (2)**
158:22;159:3
**existing (1)**

144:6
**expect (3)**
125:11;172:11,15
**expectation (2)**
88:18,22
**expected (3)**
25:10,11;87:15
**expended (1)**
52:15
**experience (1)**
91:20
**experienced (3)**
109:20;110:8;112:2
**experiences (1)**
12:18
**expert (10)**
10:21;11:2;109:16;
126:10;134:9;152:15,16;
157:6;172:20,22
**expertise (1)**
178:1
**experts (4)**
171:10,18,24;173:2
**explain (3)**
64:17;68:9;90:19
**explained (1)**
32:7
**explaining (5)**
91:17,18,19,20;131:17
**explanation (1)**
114:24
**explicit (7)**
27:17;45:17;46:7;79:15;
107:18;108:4;114:9
**explored (1)**
25:13
**express (5)**
65:16;68:8;80:1;115:10;
178:9
**expressed (2)**
19:20;55:12
**expresses (1)**
174:17
**expressing (3)**
54:22,24;55:2
**expressly (1)**
168:4
**extend (1)**
35:24
**extensively (1)**
27:1
**extent (8)**
17:6;18:23;19:1,10;86:11;
113:24;146:11;173:1
**extreme (1)**
42:24

**F**

**face (5)**
45:5;56:5;83:11;100:20;
141:8
**face-to-face (1)**

90:13
**facilitate (3)**
  24:18,22;35:4
**facilitated (5)**
  20:16,21;24:14;39:9;
  55:16
**facilitation (6)**
  24:15;25:22;26:4;87:6;
  133:7,14
**fact (32)**
  28:2;39:20;42:7;46:9;
  51:13;53:8;71:6;78:8,13;
  79:22;80:4,15;88:11;92:6;
  103:14;105:21,24;108:14;
  109:4,19;110:8;111:21;
  112:17;116:19;117:1;
  120:13;129:23;139:19;
  142:24;154:14;158:10;
  162:3
**facto (1)**
  123:16
**factor (1)**
  147:6
**facts (29)**
  14:22;15:14,15,18;22:2,7,
  15,15,17,18;24:9;30:1;
  42:12;43:4;52:11;53:10;
  78:22,23;86:15;91:5;96:20;
  107:19;108:5,13;110:6,9;
  112:10;120:9;167:20
**factual (7)**
  14:13,16;15:5,20;39:11;
  107:9;158:2
**failing (2)**
  141:7;161:1
**fails (3)**
  61:1;71:19;74:14
**failure (1)**
  72:6
**fair (13)**
  18:4;20:5,11;22:1;49:20;
  60:18;71:23;89:18;105:1;
  160:23;161:19;169:11;
  176:23
**fairly (8)**
  44:19;83:2;129:22;
  135:12,20;137:21;138:22;
  156:4
**fairness (8)**
  31:5;51:17;167:24;
  168:15,16,24;169:16;170:2
**fall (4)**
  115:1;117:23;118:1;120:6
**falls (4)**
  70:6,8,10;71:21
**familiar (10)**
  22:19;31:3;40:12;46:21;
  82:1;89:21;95:23;96:6;
  103:24;111:23
**familiarity (2)**
  81:20;105:2
**far (9)**
  13:7;35:16;76:12;94:4;

110:6;112:24;130:23;
163:21;164:3
**Faris (7)**
  22:5;23:11;34:6,10,22,22;
  53:13
**favors (3)**
  49:15;52:15;53:2
**February (12)**
  96:21,23;107:5,5,17;
  111:16;115:23;134:5;
  153:13;155:7,17,18
**fee (179)**
  54:19;55:5;58:21;59:3,13;
  60:7,13,17,21;64:23;65:5,
  15;66:2;68:3;70:8;73:7,7,
  77:10;95:24;96:5;97:17,18,
  20,21,23;98:19,19;99:3,5,
  21;100:10,11,14;101:3,6;
  105:10;106:2,6,19,23;
  108:10,22,24;110:16,19,22;
  111:5,7,9,21;113:2,3,8;
  116:11,12,13,15;117:1;
  118:3,23;119:6,9;120:10,14,
  21,23;121:2,4,10,16,18,20;
  122:3,7,10,22,24;123:3;
  126:5,7,14,23;129:20,22;
  130:2,5;131:19,22;132:4;
  134:4,16,18;135:1,10,12,20;
  136:4,5,5,12,15,15,18,22,23,
  24;137:13,14,16,20,21,22,
  24;138:3,6,9,12,15,16,21,23;
  139:14,17;141:15;142:23;
  143:1,6;145:4,21,24;146:5,
  11,18,20;148:3,3,21;149:9;
  152:7;153:9;155:13,14;
  156:6;158:9;159:4;161:5,6,
  10,14;162:1,5,6;163:14;
  164:1,17,22,22;165:6,10,11,
  13;168:3,4,6,14,17;169:10,
  11;170:17,18,20,22,23;
  174:8,19;175:22;176:4,5,9
**fee-division (1)**
  64:13
**fee-generating (1)**
  133:23
**fees (57)**
  55:20;56:14;60:13;69:3;
  76:1,7,24;94:11;96:3;98:13;
  99:23;104:6,6;106:22;
  107:12,23;109:22;111:11,
  13,18;114:2,5,6,15;116:8;
  117:10;118:17,19,22;
  119:12,15,15,16;121:17;
  122:15;124:1;125:16;126:3;
  129:18;135:19;140:11;
  141:19;142:13;144:9;
  155:22,24;157:10,19;
  158:18;159:17;161:1,22;
  163:10;169:4,7,16;174:9
**fee-sharing (60)**
  56:22;57:12;58:12,18,20;
  60:6;62:11;63:11,23;64:1;
  65:5,12,17;66:10,20;67:7,

17,19;68:1,20;69:9,24;70:2,
14,15,16,20;71:9,15,18;
72:16;73:6,16;74:23;75:13;
93:5,14;95:3,10;97:13,24;
98:11;103:13;113:18;
123:15;125:14;141:20;
146:7,22;152:6;159:12,21;
160:1,12;161:23;163:7;
165:1,4;169:19;170:3
**field (1)**
  73:13
**figure (1)**
  146:17
**final (4)**
  48:3,3;107:16;173:9
**find (6)**
  31:15;94:21;99:19;
  147:11,21;174:11
**finder (1)**
  92:6
**finder's (4)**
  137:24;138:3,6,9
**finding (2)**
  21:10;44:19
**fine (8)**
  51:10;100:22;101:23;
  115:14;123:15;137:15;
  141:21;171:20
**finishing (1)**
  179:21
**Firm (47)**
  3:15;5:5;7:7,21;8:22,24;
  9:8;23:4;26:18,22;27:12,24;
  33:16;35:15;36:10;38:6;
  39:1;41:13,24;42:9;43:3,12,
  17;45:13;46:4,10,16;49:1,6;
  90:1;96:1;97:8;106:20;
  107:13;110:21;112:8,9;
  113:9;116:19;131:21;
  141:18;142:14;154:8;
  155:15;156:11;161:1;
  169:22
**firms (4)**
  95:9;112:15;113:4;156:16
**firm's (1)**
  23:5
**first (11)**
  18:10;48:5,12;61:9;62:9;
  68:16;93:4;121:11;136:24;
  137:17;177:23
**firsthand (1)**
  125:6
**five (3)**
  102:2,3;173:9
**focus (1)**
  167:19
**folks (1)**
  32:15
**follow (4)**
  53:20;54:15;75:22;113:20
**following (3)**
  19:22;89:3;161:14
**follows (2)**

7:4;61:8
**follow-up (2)**
  36:19;76:15
**foot (1)**
  90:14
**footnote (2)**
  64:9,9
**forfeit (1)**
  161:1
**forfeiture (1)**
  161:5
**formally (1)**
  94:18
**formerly (1)**
  7:11
**forming (1)**
  79:18
**formulation (1)**
  168:11
**forth (1)**
  124:13
**forward (1)**
  110:12
**found (1)**
  93:24
**four (1)**
  162:16
**fraud (1)**
  49:18
**Friday (1)**
  13:16
**friend (1)**
  82:21
**friends (1)**
  34:21
**front (2)**
  28:14;56:7
**full (2)**
  31:6;73:20
**fully (2)**
  64:15;65:20
**function (1)**
  174:16
**further (9)**
  17:18;114:23,24;149:13;
  151:19;153:7;154:24;176:2;
  179:4
**future (5)**
  135:11,16,19;137:14;
  159:20

## G

**games (1)**
  30:21
**gather (2)**
  123:14;129:23
**gave (3)**
  63:8;96:18;100:7
**general (15)**
  28:22;29:14;44:2;56:17;
  58:4;70:24;82:20;108:20;
  110:19;111:6;116:21;

134:22;152:19;158:16;
177:2
**generally (17)**
28:16,16;37:16,18;58:11,
22;59:13;64:14;65:18;
67:20;70:1;73:17;74:24;
101:15;110:16;123:10;
130:5
**generated (1)**
136:6
**gentleman (1)**
35:1
**George (1)**
158:22
**Gerald (1)**
7:10
**gets (6)**
81:7;94:20,23,24;97:23;
129:17
**GILLERS (5)**
5:7;7:22;74:15;75:8;
164:2
**Gillers' (10)**
8:12;9:2;13:18;18:22;
19:13,15;74:6;161:21,24;
163:4
**gist (1)**
35:13
**given (31)**
13:14,15;15:22;22:2,7,16;
28:19;37:15;91:5;107:19;
108:5;114:1;115:1;130:5;
139:22,24;140:24,24;
143:24;147:22;148:14,15;
149:14;153:12;157:8;175:7;
176:3,6,19;177:15;180:12
**gives (8)**
61:2,10,14;62:8,18;70:7;
130:22;142:17
**giving (9)**
29:13;61:12;63:5;86:3,7;
100:14;112:23,24;145:4
**GLASS (3)**
3:8;8:15,15
**glory (1)**
100:1
**goes (7)**
33:3;37:6;48:7;109:8;
139:9;143:11;168:15
**Good (5)**
10:6;35:3;56:9;93:11;
129:2
**govern (10)**
37:14;40:13;70:15,20,22;
168:24;169:23;170:1,6,9
**governed (8)**
73:17,18;74:24;152:13;
162:2;163:8,12;165:5
**governing (1)**
170:1
**governs (1)**
70:13
**grammar (1)**

120:2
**gray (2)**
25:24;28:5
**grayness (2)**
26:13,14
**great (1)**
100:8
**Green (13)**
8:8;10:8,13,14,18;14:5,6;
33:24;47:21;104:12;115:22;
180:7,16
**Green's (1)**
10:11
**growing (2)**
135:11;136:6
**guess (19)**
17:5;18:23;37:11;47:7;
57:19,23;58:2;59:11;62:11;
101:11;123:7;125:10;126:6;
138:18;143:19;148:15;
164:24;175:9;176:20
**guy (1)**
156:17
**guys (2)**
49:11;79:15

# H

**half (3)**
27:22;99:21;116:3
**HALL (3)**
3:3;8:10,16
**hand (2)**
10:10;132:5
**Handing (1)**
56:8
**handle (1)**
77:17
**happened (5)**
29:9;36:16;65:24;69:1;
84:19
**happens (2)**
74:14;132:19
**happy (1)**
68:9
**harbor (7)**
56:16,21;57:9,10,16,20;
58:3
**hard (4)**
79:6,8;174:11;176:20
**HARLAN (2)**
3:20;164:4
**harm (1)**
177:2
**harms (2)**
84:5;93:9
**HCC (2)**
33:2,13
**head (1)**
80:7
**heading (1)**
161:14
**hear (3)**

10:5;12:5;87:13
**Hearing (6)**
9:17,19;12:7;33:13;115:9;
179:17
**HEIMANN (7)**
8:17,17;31:19;33:21;
128:24;150:16;179:9
**help (5)**
31:16;32:14,15;33:7;
35:19
**helping (1)**
26:24
**hereby (1)**
180:7
**Herron (9)**
22:3;34:10;53:12,21;
54:19;55:6,15;110:11;
113:17
**hey (1)**
145:2
**highly (2)**
40:9;83:9
**highly-placed (1)**
109:20
**Hill (1)**
11:21
**hired (1)**
91:21
**history (8)**
33:8,18;60:18;64:10;
66:14,17;67:1;70:24
**hit (1)**
178:20
**holding (1)**
103:11
**holdings (1)**
91:22
**hole (1)**
79:13
**Honor (2)**
31:20;178:24
**Honorable (2)**
7:10,14
**hook (1)**
163:18
**hope (1)**
128:7
**Hopkins (26)**
107:17,20;108:2,7;109:4,
21,21;110:10,18;111:12,20;
112:18;113:7;123:13,14;
129:23;134:10,12;154:6,19;
155:5;156:9,12;157:9;
158:7,22
**Hopkins' (2)**
116:21;159:11
**hour (2)**
13:5;146:1
**hourly (1)**
97:19
**hours (1)**
13:6
**Houston (1)**

33:12
**human (1)**
90:8
**hundred (1)**
42:15
**HYLENSKI (4)**
5:6;8:2;9:14;102:13
**hypothesis (1)**
170:15
**hypothetical (4)**
42:24;77:15;78:19,24
**hypothetically (2)**
98:24;99:2

# I

**idea (1)**
53:1
**identification (6)**
10:15;14:7;34:3;47:23;
104:15;115:24
**identified (1)**
9:15
**identify (2)**
8:4,6
**ie (1)**
131:21
**imagine (3)**
40:8;104:2;110:17
**imagines (1)**
81:3
**impact (1)**
161:9
**imperfect (19)**
65:15;66:10,19,19;67:7,
17;68:1,11,20;69:16,23;
71:16,17,17;103:12;160:1,6,
12;161:6
**implicate (3)**
62:4;85:4;93:8
**implicated (8)**
67:6;69:6;71:20;74:20;
80:23;83:4;84:13;171:2
**implicates (2)**
72:10;84:3
**implication (2)**
132:3;142:1
**implications (1)**
81:4
**implicit (11)**
19:19;43:19;44:2;45:9,18,
21,24;87:14,16;89:4;156:4
**implicitly (2)**
46:3;84:24
**implied (3)**
44:14;79:24;139:16
**implying (1)**
170:19
**important (3)**
106:18;164:7,7
**impose (1)**
90:7
**impression (1)**

24:7

**improper (1)**
42:20

**improperly (1)**
160:6

**inapplicability (1)**
69:15

**inapplicable (2)**
20:5,7

**inappropriate (1)**
143:10

**include (1)**
91:6

**included (3)**
15:24;16:2;85:20

**includes (1)**
65:9

**including (8)**
22:8;60:16;81:18,19;
100:15;120:22;122:2;
163:20

**inconceivable (1)**
43:1

**incorporated (1)**
17:19

**indeed (1)**
60:20

**independent (4)**
21:3,9;54:12;55:21

**indicate (2)**
31:17;116:6

**indicated (4)**
31:14,15;86:22;117:15

**indicative (1)**
95:3

**individual (4)**
82:22;135:1;161:22;
164:17

**ineffective (1)**
103:17

**infer (1)**
109:3

**inference (2)**
25:15;109:15

**inferences (1)**
158:3

**influence (1)**
80:14

**inform (3)**
12:19;166:6;167:15

**information (30)**
107:8;108:3;113:24;
114:24;115:5,8;116:7,24;
139:22;140:23;141:7,23;
146:24;147:3,12,22;148:13,
14;149:14;152:5;157:18;
158:2,4,9;159:16;176:3;
177:3,15;178:15,16

**informed (10)**
15:3;111:7,11,12;113:16;
118:18;140:19;154:7,19;
156:10

**informing (8)**

96:2;106:21;114:4;
118:16,20;148:20,23;149:4

**initial (1)**
134:21

**initiated (2)**
29:4;39:5

**injury (1)**
46:16

**in-person (1)**
28:23

**input (2)**
17:6;18:13

**insight (1)**
66:16

**institutional (13)**
26:24;27:12;31:13;32:14,
16,19;33:7,19;36:10;43:18;
45:14;49:18;82:3

**insufficient (1)**
147:21

**intended (1)**
64:12

**intending (1)**
160:11

**intent (1)**
85:16

**interaction (3)**
23:9;24:3,6

**interactive (2)**
18:5,8

**interchangeably (1)**
107:11

**interest (2)**
115:10;142:15

**interested (1)**
115:9

**interesting (3)**
42:14;56:3;85:8

**interests (2)**
143:13;177:13

**International (1)**
3:5

**interpret (3)**
175:3;176:24;178:21

**interpretation (3)**
85:9;123:6;161:21

**interpreted (2)**
40:4;114:10

**interpretive (1)**
123:2

**interrupted (1)**
98:6

**interrupting (1)**
112:4

**intimate (1)**
168:6

**into (13)**
11:6;19:21;38:3;43:5;
44:17;64:13;74:17;120:4;
139:16;140:22;147:6;
149:19;178:16

**introduce (4)**
9:5;31:11;32:14;77:18

**introduced (2)**
100:16;115:18

**introducing (1)**
99:4

**introduction (31)**
20:16,21;23:11;35:4;
38:13,18;46:18;54:18;55:4,
16;78:10;87:9;88:18;89:14,
20,24;92:11;94:8;97:9,11;
98:10,14,22;101:9;133:2,13,
21;134:21;135:14,16;
138:14

**introductions (4)**
32:5,16;87:3;89:2

**intuitional (1)**
31:18

**investigation (3)**
7:15;113:14;120:19

**investor (3)**
31:18;33:19;49:18

**investors (11)**
26:24;27:13;31:13;32:15,
17,19;33:8;36:11;43:18;
45:14;82:4

**invitation (1)**
115:5

**involve (1)**
58:12

**involved (15)**
16:2;66:20;104:22;
107:22;108:10,20,23;
109:12;112:6,15,19;118:8,9;
135:2;158:17

**involvement (1)**
14:20

**involving (1)**
139:13

**irrational (7)**
78:1,2,7,14;79:2;80:4;
85:6

**issue (4)**
47:3;146:14;161:20;
162:17

**issues (1)**
30:13

**J**

**JAMS (1)**
5:6

**Jessica (1)**
11:11

**JOAN (7)**
3:7;8:9;31:8;127:15,24;
128:19;179:5

**joanlukey@choatecom (1)**
3:10

**job (2)**
32:8;178:19

**join (1)**
9:1

**joined (3)**
9:15;102:15,17

**joint (8)**
60:11;95:13,21;96:4;
106:23;163:16,21;168:11

**Jones (3)**
77:17,22;79:10

**Josh (3)**
9:6;12:12;102:7,16

**JOSHUA (2)**
3:19;9:7

**joy (1)**
100:7

**Judge (19)**
7:13;12:6;51:14;75:5;
154:11;155:14;157:3;
165:12;171:13,19,19;172:3,
6,7,9,10,13,15;173:2

**judges (1)**
178:22

**judgment (2)**
79:18;163:18

**judicial (4)**
103:2,8;169:6;178:4

**jumping (1)**
115:12

**jurisdiction (2)**
30:18;131:18

**jurisdictions (5)**
149:17;163:12,17,19;
174:14

**Justice (1)**
11:22

**K**

**keep (2)**
10:4;32:21

**Keller (4)**
9:10;37:2,4;179:14

**KELLY (4)**
3:18;8:23,23;179:11

**kick (1)**
68:18

**kind (12)**
45:21;66:8;77:18;79:17;
87:22;89:4;101:18;102:20;
123:8;153:7;157:12;161:6

**kinds (2)**
152:12,20

**knew (7)**
81:19;107:11;112:5;
158:15,22;159:2,6

**know (103)**
9:21;11:8;12:13,21;14:17;
19:12;22:3;25:16,17;27:24;
30:13,17;31:17,24;33:13;
34:23;35:24;36:9,14,18;
37:3,4;39:6;40:2,3;42:16;
51:1,12;59:1;60:5;66:7,13,
14;67:24;71:2;75:16;78:20;
79:9,12;80:2,20;81:14;
84:23;86:15;88:11,21;91:4,
22;93:16;95:7,11,23;99:16;

100:1,2,3,3;101:13,18;
107:18;112:13;117:15;
120:1,18;123:1,13,20;126:7,
10;127:15;128:3,4;134:6,
10;136:8,23;137:19;138:8,
9;141:20;142:8;145:3;
146:12,16;147:1;148:6;
157:10;163:21;164:3;
165:14;170:7;171:16,22;
172:21;175:11;176:19,20;
177:20
**knowing (1)**
142:15
**knowledge (22)**
32:19;33:18;50:3,20,21,
23;51:23;52:1,3,11;53:9,9,
17,17;85:2;109:3;110:3,6;
116:22;125:7;159:8,11
**knowledges (1)**
52:6
**known (3)**
109:2;110:18;112:14
**knows (2)**
142:12;144:13

## L

**Labaton (118)**
3:4;5:4;8:10,14,16;14:19;
15:3;18:6;19:3,3,21;21:3,13,
20;22:20;23:5,17;31:12;
32:8;33:5,6;37:1;38:6;39:1,
11;41:24;42:5,9,19;46:4,15;
47:5;49:5,13,17,24;52:18;
53:11,13,22,23;54:6,8,10,
17;55:4,9,13,14,18,23;63:8;
78:12,16;79:19,22;80:22;
81:20;84:21;86:2,4,5,10,16,
18,21;87:11,20;88:6,8,17,
20;90:12;91:9;92:14;94:19;
95:8,14,22;96:11;107:1,2,
12;110:10,21;112:6,17;
113:7;115:23;117:20;
119:12;123:8;124:1,22;
125:5,9;131:5;133:1,21;
134:10;140:8;141:18;
150:14,17;151:10,20,23;
152:1,1;153:5,12,13;154:7,
18;155:3,22;157:12;158:8
**Labaton's (21)**
9:1;17:5,9,17;21:15;
22:10;43:3;54:7;55:24;63:9;
82:1;85:1;87:12,13;88:22;
106:15;121:19;160:1,6,12;
161:14
**language (10)**
32:2;44:17;63:21,22;64:5;
82:9;92:9,20;106:17;174:22
**large (3)**
101:4,9;145:4
**larger (1)**
57:17
**last (3)**

11:12;108:2;167:23
**later (8)**
44:5,5;55:12;128:6;
142:24;143:5;144:14;
156:13
**latter (2)**
67:15;73:12
**Law (30)**
3:15;5:5;7:23;8:22,24;
9:8;26:22;27:11,24;33:16;
36:9;41:18;42:18;43:17;
45:13;67:11;71:7;90:1;97:8;
103:21;144:6;152:14,16;
153:19;154:8;156:10;161:1;
169:22;172:24;177:18
**lawsuit (1)**
109:13
**lawyer (78)**
14:17;28:24;29:2,4;37:18;
39:23;41:9;56:6,10;61:1,15,
21,22;62:8,9,18,19;70:5;
71:15,17,18;74:14,16;77:5,
6,7;82:20,21;83:17,19;
85:22;87:24;88:4;97:17,19;
98:22;99:5,11,19;103:11;
108:15;109:1,5,7,7,20;
110:9,21;111:10;112:2,7;
114:14;122:10;123:12;
124:15;130:6,8;131:20,21,
22;134:20;135:18;136:20;
138:22;139:4,10;141:3,5;
143:2;145:13,23;146:9;
163:14,15;164:23;168:2,9;
170:20
**lawyer/client (2)**
130:9,13
**lawyers (52)**
56:23;60:12;64:12;71:1,5,
5;79:15;86:21;91:7,9;95:24;
97:23;98:13;105:10;106:2,
7,19;107:12,21;108:9,19,22;
109:15;110:24;112:6;
114:15;118:22;136:3;138:7;
140:12;141:18;142:3,4,13;
156:7;159:18;163:7,11;
166:17,22;168:1,16,18,21;
169:1,10,17,21,23;177:7;
178:10,20
**lawyer's (18)**
22:24;56:12;61:3,23;62:9,
20;63:7;66:23;70:11,23;
83:18;85:24;89:21;105:17;
130:11;145:12,13,16
**LBS017593 (2)**
47:14,22
**lead (8)**
49:17;130:11;134:23,24;
151:20;157:1,6;166:6
**leads (2)**
130:12;135:16
**learns (1)**
142:24
**least (9)**

11:18;25:19;26:16;43:9;
57:9;93:24;112:14;124:22;
130:23
**leave (1)**
36:13
**leaving (3)**
27:21;69:20;93:6
**led (1)**
110:9
**leery (1)**
44:11
**left (2)**
7:20,22
**Legal (8)**
131:12;132:9;159:10;
162:18,20;163:2;168:3;
171:10
**length (1)**
97:5
**lengthy (1)**
116:2
**letter (14)**
39:6;96:17;97:2;107:15,
16;111:16,17;115:12,22;
116:6;134:5,14;155:7,11
**level (3)**
139:21;140:22;178:3
**liaison (8)**
119:14;120:12;121:3;
124:23;125:13;129:8,11;
155:23
**liberal (1)**
58:20
**license (1)**
71:7
**Lieff (11)**
8:18,19,19,19;112:8,19;
116:18;154:7,19;155:14;
156:10
**Lieff's (1)**
155:4
**light (4)**
78:8;84:18;123:9;179:6
**limit (6)**
74:1;98:3,9,20;122:9;
138:20
**limitations (1)**
165:10
**limited (3)**
98:4;174:12;176:17
**LINDA (7)**
5:6;8:1;9:13;102:12,12,
14,16
**line (5)**
7:24;20:18;31:15;43:13;
102:17
**lines (3)**
32:11;45:6;157:16
**listened (2)**
36:6;43:14
**litigation (13)**
26:23;119:17;125:18,24;
126:5,8,15,21;127:1,2;

129:15,20;156:2
**little (15)**
12:6,9;32:12;33:11,16,17;
41:8;44:10;47:9;77:13;85:2;
90:7;115:13;154:2;179:1
**LLP (2)**
3:3,14
**local (17)**
35:16;119:13;121:2;
124:6,11,14,15,16,17,18,21;
125:12;129:7,10;136:16;
155:23;178:8
**location (1)**
124:20
**Lodestar (1)**
143:4
**long (4)**
74:18;94:8;114:13;163:15
**look (15)**
14:8;19:21;47:24;48:1,9,
10,12,17;49:9;65:2;74:3;
85:15;96:20;116:5;156:15
**looked (4)**
13:14;19:13;35:7;147:8
**Looking (9)**
10:23;20:3;38:12;90:17;
97:3;99:13;105:21;166:4;
173:2
**loop (2)**
72:5;166:13
**lost (1)**
53:14
**lot (7)**
44:16;100:7;119:19,23;
120:18;124:13;171:17
**love (1)**
99:12
**luck (1)**
35:3
**LUKEY (144)**
3:7;8:9,9;13:16,21;20:10;
24:20;26:1;27:6,14;29:12;
30:3,10;31:22;33:20;37:10;
39:18;41:16;43:21;45:10,
19;46:13,24;47:6,18;50:1,
12,18;51:7;52:21;54:1,20;
55:7,17;57:14,18;59:22;
60:2;61:6;62:2,6;63:18;
69:7,17;72:12,22;76:3,9;
77:23;78:17;79:5;81:13,23;
82:16;83:13;84:22;87:17;
89:8,16;90:2,10;91:2;92:2,
24;93:21;94:13;95:15,19;
97:1,10;101:7,10;103:4,18;
105:7;106:3,8;109:6,23;
110:13;111:8;113:11;
115:17;118:10;121:11;
123:17;124:7;126:11,20,23;
127:4,13,16,21;128:7,20;
132:6;133:16;134:7;135:4;
137:8;138:1,4;139:6;140:1;
142:7;143:7;144:10,16,24;
145:10,19;147:15;148:5;

149:1;150:1,6,17;151:3,15;
152:8,22;155:8,12;156:18,
20;158:5;159:1;160:3,7;
162:7;164:14;165:18,21;
167:17;169:18;170:11;
171:15;172:5;173:14;
176:14;178:24;179:6,20

## M

**Madam (4)**
10:9;14:2;33:22;104:9
**main (1)**
64:24
**major (3)**
44:15;119:20;121:14
**maker (1)**
176:22
**makes (6)**
51:14;58:15;84:1;98:14;
134:21;168:9
**making (11)**
60:20;73:1;80:13;86:17;
87:2,3;89:23;92:1;100:5;
128:12;169:3
**maligned (1)**
128:9
**malpractice (1)**
163:18
**manner (1)**
95:16
**many (11)**
13:6;44:5;163:5,5,5,11,11,
17;164:9,9,9
**March (3)**
11:12,13;14:6
**Mark (5)**
7:14;33:23;47:19;115:20;
166:1
**marked (10)**
10:11,14;14:4,6,14;34:2;
47:23;104:10,15;115:24
**Mass (1)**
168:23
**Massachusetts (54)**
3:6,17;28:14;40:12,21,24;
41:1;58:7,14,19,19;60:5,6,
15;62:13;63:14;64:4,11;
67:2;73:20;97:7;99:7;
100:22;101:15;105:3,6,14;
114:18;117:5;122:2;130:4,
24;131:12,18;132:1,9;
138:16,24;141:6;144:20;
146:15;148:12;163:6,20;
169:5;173:12,17;174:11,15;
175:15,16,18;176:18,21
**master (214)**
7:9,9,14;12:2,8;20:23;
21:8,22;24:2,11;25:21;
26:19;27:10;28:6,11;29:7,
16,22;30:7,20;31:24;34:4;
35:9;38:15,19;39:10;40:11,
18;41:4,12,20;43:5;44:22;

45:1,17;46:5,8,19;51:17;
52:5,22;56:2,9;57:3,8,15;
58:1;59:5,9,20,23;60:23;
61:18;62:3,16,23;63:2,15;
67:4;68:10,23;69:13;70:4;
71:11,24;72:4,17;73:11;
74:5,8,12;75:2,6,18;85:7;
86:14;87:5,10;88:16;89:3,
11,17;90:5,21;91:23;92:3;
93:19;96:23;98:2,7,16,23;
100:24;101:8,23;112:16;
113:3,20,23;114:13,19,23;
115:11,15,20;116:1;117:3,
18;118:4,14;119:8,18,22;
120:17;121:22;122:11,19;
123:16,22;124:8;125:1,15,
21;126:2,9,16,22,24;127:10,
15,18,24;128:18,22;129:2,
13,17;130:1,15;131:8,16;
132:11,23;133:5,9,12;134:2,
20;135:9,13;137:5,10,23;
138:2,12;139:1,19;140:5,7,
14,18,21;141:13,24;142:18;
143:18;144:1,5,11,17,22;
145:1,16;147:10,18;148:9,
17;149:5,13,18;150:4,9,12,
18,24;151:7,18;152:3;153:3,
11,22;154:12;160:10,16;
161:17;165:14,19,24;166:3,
12;167:4;170:14;171:6;
172:13;173:8,19,23;174:3,
21;175:17;176:2;177:9;
178:14;179:2
**master's (3)**
7:19;8:1;24:5
**material (6)**
19:7,8,8,11,14;51:13
**materially (1)**
49:12
**materials (1)**
47:11
**matter (21)**
33:13;67:10;96:11;
110:22;128:17;131:23;
132:5,22;133:14,15,18;
136:11,24;137:13;139:5,11,
13,21;156:8;161:11;168:17
**matters (7)**
132:16,20;136:10,19;
137:2,6,14
**may (27)**
15:3,3,17;23:12;39:10;
54:9;56:6;58:12;65:24;70:8;
84:8;94:21;96:1;106:20;
120:18,18;122:14,15;
124:23;134:23,24;148:19;
155:22;168:7;170:1;177:11,
13
**Maybe (3)**
11:19;13:8;91:10
**McEvoy (1)**
7:20
**mean (38)**

15:9;18:7,19;19:5;34:14;
57:20,23;58:2;59:12;61:14;
63:6;64:18;75:11,12;77:4;
79:16;93:16;95:21;103:20;
121:15,20;124:15,19;126:7;
134:11;140:3;141:4;143:11,
15;144:2,3,4;147:17;148:7,
7;165:1,1;174:3
**meaning (11)**
53:22;80:24;118:2;
121:16;122:1;125:18;
130:14,16,18;149:4;172:22
**meaningful (4)**
80:1;146:19;147:2,12
**meaningless (3)**
82:6;88:15;93:8
**meanings (2)**
28:19,20
**means (16)**
26:3;28:16,22,23;39:7;
58:17;99:24;114:5;124:14;
131:2,6;138:10;142:4;
148:24;163:17;166:11
**meant (11)**
58:24;67:2;75:17,19;
100:4;152:19,23;168:20;
169:3,6;178:19
**meet (8)**
27:3;32:6;33:7;36:7,21,
22;43:15;78:13
**meeting (8)**
34:6;35:22;81:4;87:13;
90:13;94:10;95:2,5
**members (1)**
166:24
**memorialized (2)**
94:1;158:18
**memory (4)**
30:10;45:3,4;96:22
**mentioned (1)**
12:17
**merely (2)**
55:15;139:11
**meruit (1)**
146:13
**message (2)**
48:6,11
**met (3)**
13:16,20;107:2
**MICHAEL (4)**
5:4,5;8:13,21
**Michigan (1)**
7:12
**might (10)**
22:4;25:4;34:23;35:3;
63:11;66:10,21;115:12;
148:18;169:23
**mind (3)**
11:20;176:15,17
**mine (1)**
158:13
**minimis (2)**
38:2;40:8

15:9;18:7,19;19:5;34:14;
**minimus (2)**
88:15;93:8
**minute (1)**
145:2
**minutes (6)**
13:20;102:2,2,3;170:12;
173:10
**mislead (1)**
30:21
**misled (1)**
80:12
**misrepresentation (1)**
49:19
**missed (4)**
91:11;92:17,17;128:24
**misspoke (1)**
150:16
**misstating (1)**
149:6
**model (8)**
58:9,10;59:18;60:9;62:13;
63:13;163:13;168:11
**modifying (1)**
127:5
**money (12)**
49:2,6,16;52:16;53:3;
86:3,8;97:8;99:12,20,24;
100:4
**monitor (2)**
91:21;134:1
**monitoring (2)**
94:19;134:22
**month (1)**
12:23
**more (46)**
11:19;17:21;47:9;58:20;
60:7,17;101:2;110:20;
114:11;115:4,7,9;117:4,9,
16;120:15;128:20;131:23;
139:5;140:9,10;141:23;
142:15,20,21;143:23,23;
144:7,13;154:3;157:18;
160:4;171:22;174:12;175:4;
176:24;177:1,2,5,8,12,14,
15;178:11,15,16
**morning (2)**
10:6;13:21
**most (7)**
10:24;40:7;60:7;85:19;
105:20;131:17;164:6
**move (1)**
102:23
**moves (1)**
172:18
**moving (1)**
110:11
**much (5)**
31:3;44:9;144:14;176:5;
177:24
**multiple (6)**
108:19,22;112:5;132:20;
136:10;158:16
**must (2)**

165:11;168:4
**mutually (1)**
    24:17
**myself (2)**
    46:2;176:20

## N

**name (2)**
    7:6;35:17
**named (3)**
    11:11;35:1;151:20
**names (1)**
    63:7
**nascent (1)**
    151:5
**nation (1)**
    131:18
**nature (4)**
    67:8;82:2;90:8;139:23
**necessarily (2)**
    28:20;92:21
**need (27)**
    12:9;19:21;30:17;48:12;
    53:23;55:14;68:17;99:12,
    20;111:7;113:16;114:24;
    115:1;123:1;126:6;127:17;
    140:24,24;149:14;159:16,
    18;163:21;169:12;171:16,
    22;172:21;177:20
**needed (3)**
    15:15;55:18;157:18
**needs (1)**
    176:3
**Neither (1)**
    16:19
**networking (1)**
    32:9
**New (31)**
    7:23;26:22;27:11;28:17;
    29:8,18;36:9;41:13,14,19,
    21;42:2,10,21,22;43:1,12,
    17;45:13;46:10;88:7;104:1,
    3,4,12,13;105:2,23,24;
    135:24;175:8
**next (2)**
    36:17;48:7
**nine-year-old (1)**
    44:13
**NIXON (3)**
    3:14;8:23;9:8
**Nobody (5)**
    80:17,19,22;93:24;94:21
**none (3)**
    32:20;61:11;103:5
**non-lawyer (3)**
    27:23;30:15;39:21
**non-lawyers (1)**
    61:13
**non-recommendation (1)**
    81:18
**normal (2)**
    132:17,18

**Notary (2)**
    7:2;180:24
**note (1)**
    8:11
**noted (1)**
    179:22
**notice (21)**
    65:9,12;67:24;69:3;70:7;
    72:7,8,20;75:14;113:1;
    116:12,14;118:5,6,12;119:3;
    146:6;152:12,20;153:8,11
**noticed (1)**
    92:10
**Number (6)**
    7:17;47:16;101:12;104:7;
    120:1;130:7
**numbers (1)**
    104:3
**NYU (1)**
    11:9

## O

**oath (1)**
    180:9
**object (2)**
    31:9;127:14
**objection (119)**
    81:1;9:1;20:10;24:20;
    26:1;27:6,14;29:12;30:3;
    33:20,21;37:10;39:18;
    41:16;43:21;45:10,19;
    46:13,24;47:6;50:1,12,18;
    52:21;54:1,20;55:7,17;
    57:14,18;59:22;60:2;61:6;
    62:2,6;63:18;69:7,17;72:12,
    22;76:3,9;77:23;78:17;79:5;
    81:13,23;82:16;83:13;
    84:22;87:17;89:8,16;90:2,
    10;91:2;92:2,24;93:21;
    94:13;97:10;101:7,10;
    103:18;105:7;106:3,8;
    109:6,23;110:13;111:8;
    113:11;118:10;121:11;
    123:17;124:7;127:4;128:3;
    132:6;133:16;134:7,13;
    135:4;137:8;138:1,4;139:6;
    140:1;142:7;143:7;144:10,
    16;145:10,19;147:15;148:5;
    149:1;150:1,6;151:3,15;
    152:8;155:8,12;156:18,20;
    158:5;159:1;160:3;162:7;
    164:14;165:18,21;167:17;
    169:18;171:15;172:5;
    173:14;176:14
**objective (4)**
    85:10,14,21;86:13
**objectively (1)**
    85:13
**objects (1)**
    99:1
**obligation (15)**
    140:8;145:12,14,17;

151:8;152:4,10,11;153:7,16,
    17;166:6,22;167:12,15
**observation (1)**
    158:13
**obtaining (1)**
    49:23
**Obviously (13)**
    22:6;66:15;67:18;98:18;
    104:1;105:11,20;106:16;
    116:14;117:13;124:18;
    162:22;164:9
**occasions (1)**
    19:20
**occupies (1)**
    73:13
**occurred (4)**
    26:6;161:7,7;164:15
**October (2)**
    34:2;47:13
**offend (1)**
    99:16
**offer (6)**
    35:18;40:19;166:4,20;
    167:2;171:11
**office (1)**
    35:16
**oftentimes (1)**
    84:13
**Olsen (2)**
    100:3,13
**once (2)**
    17:21;153:4
**one (46)**
    11:19,20,24;12:9;15:12,
    23;16:1,19;21:3,9;23:24;
    25:10;37:12;38:2,23;40:8,
    16;42:4;55:9;57:1;66:12;
    69:19;79:14;81:3;84:2;
    85:20;93:24;98:13;110:20,
    23;114:11;120:16;121:23,
    23;122:11,17;123:11,23;
    132:22;133:9,10;136:8;
    143:20;168:2;173:8;174:17
**ones (2)**
    16:8;112:23
**online (1)**
    11:20
**only (15)**
    45:5;51:18;53:17;54:18;
    55:4;66:14;71:21;87:19;
    91:4;96:1;98:16;106:20;
    112:7;142:9;148:20
**onto (1)**
    48:7
**open (2)**
    60:7,17
**opening (5)**
    24:3,14;51:19;89:5;92:1
**operating (1)**
    22:2
**operative (1)**
    30:23
**opine (3)**

153:23;159:24;162:3
**opined (1)**
    172:4
**opinion (52)**
    12:19,22;16:21;17:11;
    18:17,19;27:22;40:19;
    45:11,23;53:21;54:5,21,24;
    55:8,9;56:4;67:15;103:16;
    104:1,4,7,13;105:5,22;
    106:1,4,6;131:9;144:21;
    154:18;157:5;159:11,19;
    161:14;162:1,14,15,19,24;
    164:13,19;166:10,21;167:3,
    14,19,21;171:11,12,18;
    172:16
**opinions (10)**
    17:1;18:2,5,12;105:21;
    123:2;155:1;166:5;171:20,
    24
**opportunity (4)**
    27:3;90:16;91:8;104:24
**opposed (1)**
    30:1
**oral (2)**
    67:23;94:15
**order (3)**
    29:1;79:19;115:1
**ordinarily (1)**
    132:18
**Original (2)**
    48:6;143:21
**others (3)**
    31:12;70:23;168:7
**Otherwise (2)**
    68:17;168:13
**ought (2)**
    49:6;175:4
**out (25)**
    22:21;56:14;64:5;73:12;
    76:1,8;98:21;100:19;
    102:21;109:8;119:9;121:1;
    122:13;135:11;136:6;
    138:14;145:22;146:15,17;
    147:13;148:4,7;168:18;
    170:12;175:14
**outset (2)**
    19:9;157:11
**outside (2)**
    141:18;142:14
**over (6)**
    12:10;35:2;87:4,4;125:15;
    153:19
**overreaching (1)**
    168:21
**oversees (1)**
    135:24
**oversight (1)**
    34:8
**own (11)**
    19:16;26:5;79:22;87:21;
    90:18,19,23;91:18,18,19;
    143:12

# P

**page (30)**
14:13;18:12;20:4,18;
24:12;31:2,7;43:12;48:5,7;
54:22;55:1;56:19;64:8;97:3;
102:24;103:1;116:3,10;
131:8,13;139:3;157:15;
158:13;159:24;160:12;
161:13,17,19;167:23
**pages (4)**
16:24;34:15;116:3,4
**paid (14)**
54:17;55:4,23;70:8;80:16;
98:9,15,21;101:6;121:9;
126:4;138:13;161:22;166:7
**paragraph (10)**
20:24;48:8,11;49:8,21;
116:9;117:22;119:9;167:24;
168:2
**paragraphs (1)**
162:16
**paraphrasing (1)**
103:7
**parentheses (1)**
50:15
**parse (6)**
44:4;45:4;61:9;80:24;
81:1;121:14
**parsing (2)**
44:11,16
**part (18)**
30:24;31:22;32:1,8;38:4,
11;54:16;74:9,13;75:8;
107:14;108:2;109:3;113:17;
116:6;120:5;121:12;174:10
**participants (2)**
8:4;102:7
**participate (2)**
154:20;163:7
**participating (3)**
116:20;154:8;156:11
**participation (6)**
15:6;95:13,22;96:4;
106:23;156:16
**particular (6)**
48:8,22;78:6;137:13;
157:14;169:5
**particularity (1)**
178:3
**particularly (1)**
164:7
**parties (1)**
137:6
**partly (1)**
57:19
**partners (1)**
169:22
**partnership (1)**
169:22
**parts (2)**
16:20;30:23

**party (1)**
9:5
**past (1)**
12:23
**Paul (3)**
29:10;35:1,7
**pay (6)**
54:6;73:3;97:8,11;145:21;
146:4
**paying (4)**
72:14;88:24;91:13;92:14
**payment (12)**
69:5,10;72:24;76:18;77:1,
11;120:10,11;122:5;164:22;
165:16;166:7
**payments (5)**
70:22;71:1,5;105:16;
122:14
**pays (1)**
77:7
**PEABODY (3)**
3:14;8:24;9:8
**peel (1)**
45:2
**pending (1)**
129:1
**pensions (1)**
34:9
**people (3)**
25:15;82:14;171:23
**percent (3)**
42:15;99:4;170:22
**percentage (2)**
97:20,20;136:5;146:2
**perfected (2)**
93:15,17
**perfectly (4)**
12:6;66:6;100:22;177:7
**perform (1)**
18:16
**performed (5)**
119:16;125:17,22,22;
156:1
**perhaps (2)**
24:3;74:8
**period (3)**
54:8;68:22;72:15
**permissible (3)**
42:18;65:18;155:16
**permissive (2)**
120:5;126:17
**permits (4)**
119:6;123:24;128:5;
131:19
**permitted (7)**
64:14;122:5;123:4;129:5,
6;155:16,19
**person (12)**
38:20;56:11;61:3;83:1,10;
85:6,14,23;88:2,3;89:23;
100:15
**personal (12)**
46:16;50:2,20,22;52:1,2,6,

10;53:9,16;92:5;110:3
**personally (1)**
18:16
**persons (1)**
32:5
**perspective (1)**
87:12
**persuasive (1)**
173:6
**Perusing (3)**
11:1;48:15;104:16
**petitions (1)**
143:4
**phone (9)**
9:14;10:5;12:14;23:12,13;
34:5;39:2;102:7,17
**phrase (8)**
47:1;57:21;126:12,20;
127:5;130:16;148:22;
173:19
**physically (1)**
14:24
**piece (1)**
146:24
**pin (1)**
80:7
**pitch (4)**
90:16,17,18,22
**pitched (2)**
88:6,8
**pitches (1)**
79:22
**pitching (1)**
87:21
**Place (4)**
3:5;66:16;94:8;178:6
**places (1)**
28:21
**plain (2)**
51:15;158:8
**plainly (1)**
40:23
**plaintiff (1)**
157:2
**plaintiffs (3)**
9:12;157:6;166:18
**play (2)**
30:21;146:15
**please (12)**
9:20;10:3;12:13;32:2;
33:23;38:16;54:4;75:3;77:6;
113:21;131:10;149:7
**pm (1)**
179:22
**point (23)**
9:21;15:21;21:19;34:14,
17,23;42:4;57:1;64:24;70:9;
74:12;77:7;94:11,14;95:3;
100:5;127:9;129:2;151:1;
152:3;156:13;169:2;170:12
**pointed (1)**
117:22
**political (3)**

10:53:9,16;92:5;110:3
**portfolio (1)**
134:1
**portion (8)**
117:21;118:1,2,6;127:6;
164:16;165:7;168:13
**portions (3)**
16:17;164:1,17
**position (1)**
43:3
**positive (3)**
88:20;89:15,24
**possibility (5)**
124:9;150:21;159:7,12,20
**possible (3)**
9:21;24:18,21
**post (2)**
113:12;123:16
**potential (2)**
37:17;65:23
**potentially (1)**
30:16
**Practice (3)**
131:13,20;132:2,10
**practices (1)**
101:18
**precedent (1)**
76:15
**precluded (1)**
100:13
**preexisted (1)**
167:13
**pre-existing (1)**
39:12
**prepare (1)**
13:9
**prepared (5)**
17:16;40:19;83:10;
109:17;172:2
**preparing (2)**
15:1;19:6
**presence (4)**
8:12;9:2;32:12;155:4
**PRESENT (1)**
5:3
**presented (6)**
15:18;22:19;53:10;110:7;
158:1,4
**president (1)**
11:22
**presumably (2)**
80:21;134:13
**presume (1)**
172:6
**pretty (9)**
25:6,9;38:1;51:15;82:24;
93:11;107:19;109:11;157:8
**preventing (1)**
174:18
**previous (2)**
78:24;139:12
**previously (1)**
157:9

**primary (2)**
18:9;131:21
**principal (1)**
174:16
**principles (2)**
169:15;170:7
**prior (7)**
15:11;17:4;33:11;65:19;
95:2,5;107:4
**privileged (1)**
71:8
**probably (7)**
16:10;120:15;125:11;
132:19;147:1;151:5;177:5
**probed (1)**
25:9
**problem (5)**
12:14;57:24;73:10;99:6;
127:11
**problems (1)**
83:3
**procedural (8)**
64:15,22;65:6,8,20;66:5;
68:2;73:9
**procedurally (2)**
66:19;68:20
**procedure (3)**
152:15;153:21;178:7
**proceed (1)**
43:2
**proceedings (1)**
113:13
**process (9)**
14:21;15:1,7;17:14;18:6,
8;79:21;82:23,23
**procure (1)**
147:22
**professional (19)**
23:2,7;40:1,3;104:5,14;
105:3,14;114:8;122:1;
130:20;153:2,18;156:22;
163:13;168:19,23;170:9;
172:23
**PROFESSOR (32)**
5:7;7:22;8:12;9:2;10:7,10,
18;11:10;12:16;13:17;
18:22;19:13,14;47:24;
53:21;64:7;74:6,15;75:8,23;
102:20;104:18;107:8;154:3;
158:15;161:20,24;163:4;
164:2;167:23;171:9;179:19
**program (2)**
11:9,12
**programs (5)**
11:3,13,16;12:4,17
**progressed (1)**
112:5
**prohibited (1)**
60:22
**prohibition (2)**
56:17;57:17
**promise (1)**
127:20

**prompted (1)**
48:23
**proportion (1)**
163:10
**proposed (1)**
165:16
**proposes (2)**
175:11,12
**proposition (3)**
164:8,10,20
**proscription (1)**
58:5
**prospective (8)**
29:1;30:15;41:9;77:16;
80:11;88:2,4;136:3
**protect (7)**
84:6;93:10;168:20,21;
169:3,6,13
**protected (1)**
175:3
**protecting (3)**
174:21,23,24
**protection (3)**
173:13;174:7;176:12
**protections (1)**
115:2
**prove (1)**
109:18
**provide (7)**
19:7;119:15,16;142:5;
149:16;152:5;168:8
**provided (15)**
14:18;15:11;16:13,14;
18:21;19:9;53:19;99:4;
107:9;116:23;119:3;129:14;
136:4,18;177:3
**provides (11)**
116:7,10,14;118:2,4,6,12;
168:4;173:13;174:6;176:12
**provision (9)**
58:8,16;59:3,15,17;60:6,
10;62:11;65:19
**Public (4)**
7:3;100:19;168:20;180:24
**published (1)**
66:15
**pure (3)**
69:10;72:24;78:19
**purpose (6)**
65:3;80:9,10;174:13,23;
176:18
**purposes (25)**
28:7,23;29:5;43:24;45:15;
52:23;56:24;57:1;71:14,20;
80:22;84:4,12;88:15;89:13;
93:9;119:10;121:9,18;
122:14;133:21;138:20;
146:20;151:13;176:5
**pursuant (1)**
98:10
**pursue (1)**
83:23
**push (1)**

12:8
**put (14)**
38:3;39:15;59:20,24;
74:22;79:2;87:5;90:24;
117:7;121:6;148:9;168:1;
176:20;177:22
**putting (5)**
97:12;114:19,21;153:3;
175:19

**Q**

**qualifications (5)**
46:4;79:23;82:1;90:20;
91:19
**qualities (2)**
23:2,7
**quality (3)**
80:7;85:1,19
**quantum (1)**
146:13
**quintessentially (1)**
132:1
**quote (5)**
20:22;43:13;132:14;
142:9;162:15
**quote/unquote (1)**
88:13
**quoted (1)**
139:8
**quoting (1)**
43:12

**R**

**raises (2)**
56:3;85:7
**range (1)**
73:20
**rarer (1)**
132:19
**rate (3)**
13:3;34:4;97:19
**rather (5)**
24:13;61:19;83:18;103:6;
142:19
**ratification (2)**
143:16;144:18
**ratify (3)**
143:5;144:15,24
**ratifying (1)**
143:11
**rational (5)**
77:21;78:4;79:2;80:5;
84:18
**reached (3)**
94:3,17;155:2
**read (61)**
9:23;12:1;13:13,17;16:14,
16,17,19;22:12;24:8;30:8,
22;31:3,7;32:1;37:8;38:5,
11;49:21;50:3,6,14;51:9,14,
18;52:19;53:18;58:7;60:16,

19;61:19,24;66:4;74:5;75:4,
9;86:20;87:18;88:23;91:15;
92:7;103:6;106:18;117:11,
17;124:3,3,4,5,5,13;139:16;
140:22;142:2,19;144:12;
148:18;160:5,11,14;180:8
**reading (12)**
20:17;25:11;26:16;32:21;
44:17;89:9;126:16,17;
132:8;151:16;162:8;178:15
**reads (1)**
64:10
**really (16)**
16:19;27:2,8;31:17;40:4;
42:13;91:7;127:13;143:15;
147:2;157:3,5;164:24;
171:22;173:4;175:7
**re-ask (1)**
129:3
**reason (5)**
60:4;84:11;150:8;162:23;
174:10
**reasonable (20)**
64:24;68:3;73:8;96:5;
97:17,21;98:8,20;99:5;
106:24;156:12,19;157:1;
165:6,8,11;168:5,13;169:10;
170:24
**reasonableness (2)**
157:4;165:9
**reasoning (1)**
173:6
**reasons (4)**
21:3;55:12;68:7;122:9
**rebuttal (2)**
13:23;14:9
**recall (10)**
11:17;20:1;23:14,24;
47:12;94:5,6;112:10,21;
130:24
**recalled (1)**
23:12
**receive (7)**
49:2;97:19;135:10;
136:14;137:12,14,16
**received (2)**
19:11;100:10
**receiving (5)**
49:6;108:10;120:23;
135:18;168:12
**recent (1)**
10:24
**recently (2)**
11:9;35:1
**Recess (1)**
102:4
**recipient (1)**
85:17
**recollection (8)**
38:8;44:4,10,12;93:22;
96:24;109:24;125:8
**recollections (1)**
25:8

**recommend (11)**
20:13;21:20;24:18;53:22;
54:6;62:9;63:9;77:6;82:13;
83:9,19
**recommendation (93)**
22:12,21,23;23:15,23;
24:6,10,13,16,17,22;25:5,
23;26:7,9,17;27:5,21;28:8;
30:2;43:8,20,24;44:14,20;
45:9,15,21;46:1,12;58:13;
64:2;66:9,11,21,22;67:16;
68:17,19;69:5,11,20,21;
72:10,15,19;73:1,5;76:11,
13,14,19,24;77:8,12;79:14;
80:1,13,18;81:1,22;82:5,11,
18,21;83:5,7,12,20;84:2,15,
16;85:17;86:9,12,17;87:15,
16;88:5,14;89:6,13,15;
91:14;92:8,12,20,22;93:1,2,
13;94:9;105:17
**recommendations (9)**
25:12,18,19,20;26:11;
44:2;56:24;86:24;89:1
**recommender (1)**
85:16
**recommending (16)**
20:8;21:4,12,15,17;55:24;
56:11;61:3,22;62:20;70:23;
77:22;78:16;79:4;84:20;
85:24
**recommends (4)**
83:17,18;88:3;130:10
**reconstructed (1)**
44:12
**record (12)**
8:7;24:10;49:9;75:9;
102:6;112:17;128:10;158:1,
2;160:17;180:10,11
**refer (7)**
107:3;131:23;132:20,21;
136:9;139:5,11
**reference (1)**
105:4
**referral (63)**
70:7;103:12;104:6;
119:15;120:10,14,23;121:2,
4,9,10,15,17,18,20;122:3,6,
22,24;125:16;126:3,5,7,14,
23;129:18,20,22;130:2;
131:22;132:4;134:3,16,18;
135:1,12,18,20;136:1,7,12,
17,21,21,24;137:13,20,22;
138:15,23;139:14,17;
155:24;159:9;161:22;162:6;
164:1,22,22;168:10;170:17,
18,20
**referrals (1)**
105:8
**referred (6)**
52:14;105:12;106:11;
139:12,12,20
**referring (16)**
29:8;47:14;130:6;131:22;

132:4,15,16,16;136:2;138:7;
139:4,10;158:23;159:3,5,7
**refers (5)**
106:5;119:5;121:17;
130:5;132:4
**reflected (9)**
18:21;23:14,20,21;94:20,
23,24;112:12;158:11
**reflects (1)**
19:16
**refrain (1)**
128:12
**refresh (2)**
96:21,24
**refusal (1)**
75:24
**refused (1)**
145:21
**refuses (2)**
76:6;144:23
**regard (2)**
83:22;145:12
**regarded (5)**
37:18;39:7;40:6;56:24;
109:11
**regarding (1)**
146:10
**regards (1)**
117:19
**regulates (2)**
97:22;98:18
**regulatory (1)**
103:15
**related (1)**
7:16
**relates (2)**
61:12;162:5
**relationship (18)**
24:23;31:6;34:13;38:10,
24;39:13;42:8;51:20;52:9;
87:6,24;88:12;130:9,13;
132:24;134:23;169:24;
170:1
**relative (1)**
106:6
**relatively (1)**
101:3
**relevance (1)**
16:21
**relevant (7)**
12:18,22;46:18;63:5;
164:9;167:20;173:7
**relied (2)**
107:14;108:3
**relies (1)**
88:4
**rely (2)**
17:7;110:7;172:15
**remain (1)**
15:19
**remember (10)**
11:8;17:24;29:21;30:12;
32:10;79:7;96:19;104:23;

108:4;136:13
**remembers (1)**
81:2
**render (1)**
103:16
**repeat (1)**
9:22
**rephrase (2)**
89:17;147:18
**replace (1)**
175:14
**report (32)**
10:21;11:2;13:13,18,23;
14:5,9,14;15:2,12,14,20,24;
16:6,24;17:23;18:22;19:13;
20:3,20;54:17;55:12;56:19;
64:8;68:8;74:6;97:4;102:24;
106:12;108:7;133:6;157:16
**reporter (6)**
9:23;10:9;14:3;33:22;
104:10;142:2
**represent (4)**
82:22;99:14;133:24;
177:12
**representative (15)**
39:21;108:16,16,17;
109:9,10,12,13;137:19;
149:23;150:15,22;151:11;
157:1;177:11
**representatives (3)**
23:8,17;177:19
**representing (3)**
133:22;166:18,24
**request (1)**
128:11
**require (12)**
54:9;65:11;114:10,20;
117:16;118:20,23,24;
140:19;142:20;165:7;177:5
**required (13)**
65:12;101:14;111:10;
114:1,10;115:7;118:13;
140:3,17;142:19;143:23;
144:7;158:19
**requirement (10)**
64:16,22,23;65:7,9;66:6;
117:7;165:5;175:20;178:15
**requirements (4)**
70:9,18;107:2;178:9
**requires (3)**
97:16;118:16;141:9;
148:13
**requiring (1)**
177:15
**reread (1)**
13:13
**research (9)**
17:7;18:17,19,23,24;19:2,
4,15,16
**researchers (1)**
18:15
**resonate (1)**
104:3

**respect (5)**
18:1;47:3;49:8;96:10;
108:1
**respectfully (3)**
127:13;128:11;170:11
**respond (1)**
54:3
**response (4)**
9:17;10:3;35:12;88:9
**responses (1)**
22:8
**responsibilities (1)**
34:8
**responsibility (5)**
18:10,11;60:12;163:16;
168:12
**responsive (1)**
81:15
**rest (2)**
38:4;50:3
**restrict (1)**
97:7
**restricted (1)**
60:10
**rests (2)**
69:15,18
**result (2)**
17:10;55:5
**retained (3)**
15:8;94:18;109:15
**retention (10)**
96:17;107:6,15,16;
111:16,17;115:12;122:13;
150:13;151:14
**retired (1)**
7:10
**Retirement (1)**
7:16
**retroactively (1)**
144:15
**review (3)**
16:5,9;17:9
**reviewed (8)**
16:7,10,11,12;17:5,16;
19:13;106:11
**RFQ (4)**
79:21;81:19;82:23;88:10
**Richard (3)**
8:17;129:3;179:8
**ridiculous (1)**
81:5
**right (55)**
10:6,23;13:22;16:4,22;
17:13;18:14;19:17,24;20:2,
12;36:4;41:20;45:8;48:16;
49:7;51:24;52:2,9;53:20;
54:14;68:10;73:15;74:21;
78:3;80:9;92:3;103:24;
105:19;106:14;112:1;
114:22;119:10;120:8;
122:12;124:6;125:4,19,20;
126:24;128:22;133:8;
137:11;141:2;148:24;

149:10,24;150:5;154:17,22;
158:14;162:13;172:2;174:2;
175:1
**rights (1)**
99:22
**rigorous (1)**
25:7
**Robert (1)**
8:19
**Rock (4)**
32:13;33:11,16;41:8
**Rohrback (2)**
9:11;179:14
**role (5)**
46:23;47:4;120:14;
124:11;158:23
**roles (3)**
120:6;129:5;137:7
**roll (1)**
102:7
**room (3)**
8:4;10:2;26:13
**Rosen (4)**
7:10,13;51:14;154:11
**Roth (1)**
11:11
**Rule (153)**
20:5;28:8,9,14;29:8,20;
37:13;40:21,24;41:1,4,6;
42:21;54:8,10,12;55:9,13,
18,19,22;57:13;58:10,14,21;
59:5,6,14,19;60:10,24;62:4,
14,24;63:3,5;64:4,12,14,15;
65:1,3,8,10;67:22;70:19;
73:22;80:9,10,23;81:7,11,
83:4,20;84:4,6,10;85:15,18,
22;86:10;93:9,12;99:7;
100:12,23;103:13,15;105:6;
113:19,23;114:3;115:6;
117:5,11,16,17;118:13,15;
122:2;128:4;130:4;138:16,
17;139:14;140:3,10,17,18,
22;141:4,8;142:10,19;
143:23;144:3;148:12,13;
149:12,15;150:10;152:13,
14,15;153:6,10,20,20;
155:10;158:20;159:15;
161:15,22;162:4;168:3,5,11;
169:3,8,14;170:16,24;172:4,
7;173:11,12,16,17,24;174:5,
20,24;175:3,8,18,19,24;
176:11,19,21,24;177:1,4,8,
10,14,18,22,24;178:16,19,
21,23
**rules (58)**
26:5;28:23;38:1,14;39:8,
24;40:2,13;41:11,14;42:2,3;
58:9;63:13;82:10;84:10,11,
12;85:20;93:10;97:7;
101:15;103:17,19,22,23;
105:3,14;106:5;114:9;
122:1;130:20,24;136:4,16,
18;142:17;149:16;152:18,

23;153:1,17,20,23;156:22;
163:13;168:8,19,23;169:15;
170:8;172:8,22;174:13;
175:12;178:3,7,8
**run (2)**
175:14;177:6

# S

**safe (7)**
56:16,20;57:8,10,16,20;
58:2
**Saggese (11)**
60:16;65:2,14;114:20,21;
117:6;144:3,20;174:17,18,
22
**same (12)**
10:1;32:2,24;33:2;64:5;
96:1;105:9;106:20;107:13;
124:23;137:9,10
**sanction (4)**
67:9;68:14;160:2,13
**sanctioned (1)**
68:5
**satisfied (2)**
96:19;142:16
**satisfy (4)**
64:15;142:10;159:13,15
**savvy (1)**
112:2
**saw (5)**
23:3;24:4;26:15;66:14;
87:4
**saying (12)**
27:7;28:4;44:13;50:5;
66:24;68:24;70:5;141:14;
148:18;158:3;170:24;171:5
**School (1)**
7:23
**seal (1)**
91:1
**second (4)**
20:17;39:4;48:11;178:2
**secondary (4)**
103:10;132:8,15;139:3
**section (2)**
20:4;130:21
**secure (1)**
29:1
**securities (1)**
26:23
**seek (3)**
49:17;136:12,15
**seem (2)**
42:16;157:8
**seems (2)**
81:4;137:21
**sees (1)**
174:16
**senate (1)**
34:7
**Senator (8)**
22:5;23:11;34:6,7,10,21;

53:12;78:9
**sense (5)**
26:12;59:12;90:8;121:21;
175:9
**sent (1)**
17:17
**sentence (8)**
49:21;50:6;52:13;64:19;
99:16;119:24;131:24;
155:21
**separate (8)**
54:10,11;55:12;56:1;79:8;
115:21;162:3;177:10
**Separately (2)**
39:16;55:11
**September (2)**
107:15;156:13
**sequence (3)**
76:21;132:21;136:10
**sequential (1)**
136:19
**serious (4)**
73:22;84:7;128:16,18
**serve (11)**
89:22;119:13,14;120:12,
13;124:2,6,21;129:7,10;
155:23
**service (4)**
136:1,17,21;142:6
**services (38)**
21:5,12,15;27:4;54:7;
55:24;56:12;61:4,23;62:10,
20;63:9;66:23;70:24;77:6;
83:19;84:19;85:24;87:14,
21;88:7,9;89:7,13,21;90:16,
18,19,23;91:1;105:17;
119:16;125:17,23;129:5,15;
130:11;156:1
**serving (1)**
150:14
**set (1)**
29:24
**setting (1)**
103:9
**settlement (1)**
156:14
**seven (2)**
34:15;170:12
**several (2)**
13:20;116:2
**sglass@choatecom (1)**
3:11
**shall (3)**
56:10;61:21;85:22
**share (8)**
55:20;98:21;101:3,4;
108:23;119:12;163:14;
168:7
**shared (6)**
98:13;110:23;111:18;
156:7;164:17;168:6
**shares (2)**
163:16;168:3

**sharing (30)**
58:22;59:3,13;60:7,13,13,
17,21;105:10;106:2,7;
110:16,20;111:5,7,9,21;
113:2,3,8;119:7,9;122:9;
123:3;138:21;155:13;159:4;
161:6,15;169:10
**SHARP (5)**
3:19;9:7,7;12:5;102:9
**shoes (1)**
176:21
**short (2)**
70:6,8
**shove (1)**
141:22
**show (1)**
104:2
**showing (1)**
10:18
**shown (2)**
47:12,12
**signed (9)**
11:2;17:23;93:23;94:21,
22;96:17;107:6,16;180:19
**significance (1)**
163:3
**significant (3)**
82:19;101:20;154:23
**significantly (1)**
49:11
**similar (4)**
12:14;120:2,3;127:9
**simply (8)**
20:15,21;67:10;68:13,14;
133:24;141:13;149:8
**Singal (2)**
7:8,21
**single (3)**
103:16;106:1;163:22
**SINNOTT (41)**
7:6,7;9:3,9,13;10:17;
12:12,15;14:2;21:23;33:22;
46:20;47:16,19;64:6;72:2;
75:21;92:18;95:18;101:22,
24;102:5,10,14,19;104:9;
113:6;115:14,18;154:1;
160:5,14,19;161:18;167:22;
171:7;179:4,8,10,13,17
**S-I-N-O-T-T-T (1)**
7:7
**sit (1)**
78:11
**site (1)**
12:10
**situation (9)**
27:23;28:5;65:16;66:8;
67:3;73:12;80:17;87:22;
136:20
**situations (1)**
171:18
**six (2)**
34:14;102:2
**skimmed (1)**

16:20
**skin (1)**
   45:2
**skip (1)**
   125:15
**small (1)**
   101:3
**Smith (3)**
   77:19,22;79:10
**snag (1)**
   73:4
**snippet (1)**
   51:18
**solicit (3)**
   38:7;42:1,11
**solicitation (34)**
   28:9,15,19,22;29:11,15,
   19;30:1,17,19;37:9,16,19,
   24;38:13,14,18;39:3,8,17,
   24;40:7,8,13,20,23;41:5,13;
   42:17;43:8;47:3;52:20;53:5,
   7
**solicited (1)**
   53:5
**somebody (15)**
   27:20;31:16;37:22;42:6;
   80:12;89:12,12,19,20;99:17;
   105:16;118:7;124:19;
   132:21;145:4
**someone (4)**
   36:24;41:24;61:11;83:18
**soon (1)**
   9:21
**sophisticated (2)**
   83:1,2
**sorry (11)**
   29:16;76:4;95:15;98:5;
   108:1;122:20;127:1;129:1;
   150:18;152:22;156:20
**sort (7)**
   44:11;58:23;80:6;81:6;
   82:7;97:12;156:21
**sound (2)**
   77:10;138:3
**sounds (1)**
   77:11
**source (4)**
   139:3,8,8;153:17
**speak (1)**
   131:4
**speaking (2)**
   8:11;128:3
**special (218)**
   7:9,9,14,15,19;8:1;12:2,8;
   20:23;21:8,22;24:1,5,11;
   25:21;26:19;27:10;28:6,11;
   29:7,16,22;30:7,20;31:24;
   34:4;35:9;38:15,19;39:10;
   40:11,18;41:4,12,20;43:5;
   44:22;45:1,17;46:5,8,19;
   51:17;52:5,22;56:2,9;57:3,8,
   15;58:1;59:5,9,20,23;60:23;
   61:18;62:3,16,23;63:2,15;

67:4;68:10,23;69:13;70:4;
   71:11,24;72:4,17;73:11;
   74:5,8,12;75:2,6,18;85:7;
   86:14;87:5,10;88:16;89:3,
   11,17;90:5,21;91:23;92:3;
   93:19;96:23;98:2,7,16,23;
   100:24;101:8,23;112:16;
   113:3,20,23;114:13,19,23;
   115:11,15,20;116:1;117:3,
   18;118:4,14;119:8,18,22;
   120:17;121:22;122:11,19;
   123:16,22;124:8;125:1,15,
   21;126:2,9,16,22,24;127:10,
   15,18,24;128:18,22;129:2,
   13,17;130:1,15;131:8,16;
   132:11,23;133:5,9,12;134:2,
   20;135:9,13;137:5,10,23;
   138:2,12;139:1,19;140:5,7,
   14,18,21;141:13,24;142:18;
   143:18;144:1,5,11,17,22;
   145:1,16;147:10,18;148:9,
   17;149:5,13,18;150:4,9,12,
   18,24;151:7,18;152:3;153:3,
   11,22;154:12;160:10,16;
   161:17;165:14,19,24;166:3,
   12;167:4;170:14;171:6;
   172:13;173:8,19,23;174:3,
   21;175:17;176:2;177:9;
   178:14;179:2
**specialist (1)**
   178:13
**specialize (1)**
   46:6
**specializes (7)**
   26:23;27:12,24;36:10;
   43:17;45:13;46:11
**specific (11)**
   16:17;47:10;70:9;105:21;
   119:10;122:14;130:14;
   139:11;148:13,14;159:8
**specifically (19)**
   20:4;47:15;49:7;64:9;
   112:10,18;113:1,8;118:7,21,
   23;119:5;121:17;130:18;
   131:3;133:18;156:3,15;
   166:17
**specifics (1)**
   11:7
**spend (1)**
   44:16
**spent (4)**
   13:7;49:16;52:16;53:3
**spirit (1)**
   172:18
**splitting (3)**
   65:15;77:11;107:23
**spoke (3)**
   11:9,14;13:17
**spoken (1)**
   11:4
**ss (1)**
   180:4
**Stamped (1)**

47:22
**standard (3)**
   85:11,11;86:13
**standards (1)**
   175:10
**standing (2)**
   99:20;100:17
**start (2)**
   102:22;163:1
**starting (3)**
   18:12;31:2;122:17
**State (22)**
   7:17;28:17;34:7,9;49:3;
   62:14;78:9;95:17,19;96:18;
   104:4,7,13;105:1;120:7;
   133:14,18;158:23;168:10;
   175:12;180:3,24
**statement (11)**
   14:13,16;15:5,20;20:6;
   28:1;107:9;144:8;162:14;
   171:9;176:8
**States (6)**
   7:11;58:10,21;60:8,9;
   63:21
**static (1)**
   15:19
**stating (1)**
   157:24
**stay (1)**
   100:17
**STEPHEN (2)**
   5:7;7:22
**steps (8)**
   50:16,24;51:2,4,11,13,16,
   22
**Steve (1)**
   34:22
**STEWART (1)**
   3:3
**still (2)**
   59:18;69:23
**stipulate (2)**
   51:7;97:1
**stock (2)**
   91:22;134:1
**straightforward (1)**
   49:14
**Street (10)**
   3:16;7:17;49:3;95:17,20;
   96:18;120:7;133:15,18;
   158:24
**strictly (1)**
   110:7
**strong (1)**
   111:19
**STUART (2)**
   3:8;8:15
**student (2)**
   17:7;18:15
**studied (3)**
   40:14;146:14;152:16
**stuff (1)**
   73:9

**subject (6)**
   42:9;61:4;67:20;70:1,3;
   164:18
**subjective (4)**
   85:11,19;86:1,11
**subjectively (1)**
   85:15
**subjects (1)**
   40:16
**submitted (1)**
   12:19
**subscribed (1)**
   180:19
**subsection (7)**
   21:1;56:13;57:11;60:24;
   62:1;63:16;160:11
**Substance (2)**
   131:12;132:9
**substantial (1)**
   146:18
**substantially (1)**
   49:12
**substantive (2)**
   64:21,22
**successful (4)**
   49:2;107:24;108:9,21
**successive (2)**
   137:2,5
**Sucharow (5)**
   3:4;5:4;8:10;115:23;
   155:22
**sufficient (6)**
   134:3;141:15;149:7;
   153:14;159:13,15
**suggest (6)**
   15:15;22:12;66:18;
   101:22;157:17,24
**suggested (4)**
   18:1;34:10;38:6,12
**suggesting (1)**
   64:11
**suggestion (2)**
   26:15;66:3
**suggestions (2)**
   17:18,19
**suggests (3)**
   67:2;160:24;161:5
**summarize (1)**
   31:8
**summarized (2)**
   18:17,19
**Summer (1)**
   3:16
**supervision (1)**
   178:5
**support (1)**
   159:11
**supports (1)**
   158:12
**suppose (12)**
   30:16;42:12;68:23;69:1;
   99:10;138:8;142:18;143:12;
   145:23;146:8;169:21;172:9

**supposed (6)**
73:9;84:11;157:7;160:8;
178:11,22
**Supreme (2)**
100:6;169:6
**sure (32)**
11:24;18:7,18;19:5;24:19;
26:2;31:8;42:15;44:4;47:9;
48:14,15;56:20;57:7;65:4;
75:10;76:6;80:4,11;113:22;
127:10;128:13;135:5;137:3;
143:8;147:16;152:2;158:6;
164:24;169:9;171:4;172:17
**surely (1)**
156:5
**surplusage (5)**
60:1,4,20;63:17,20
**surprise (1)**
178:20
**surrounding (1)**
154:4
**suspect (1)**
128:21
**swear (1)**
37:3
**sworn (1)**
7:2
**System (1)**
7:17

**T**

**talk (7)**
27:4;34:24;36:1;106:14;
128:16;160:20;167:24
**talked (2)**
92:10;142:22
**talking (7)**
33:14;88:1;95:16;125:2;
131:1;147:17;166:13
**talks (1)**
174:23
**Teacher (7)**
7:16;21:21;111:17;
116:18;121:19;150:22;
155:21
**Teachers (14)**
23:8;35:2;38:10;39:2,22;
41:3;54:7;79:20;88:12;
94:18;96:17;120:2;123:9;
131:4
**Teachers' (1)**
91:21
**teaching (1)**
128:2
**team (2)**
7:19;8:1
**technically (2)**
39:23;82:9
**Ted (2)**
100:2,13
**telephone (7)**
3:19,20;5:6;7:24;9:4,16,

19
**telephonic (1)**
29:3
**telephonically (1)**
164:4
**telling (1)**
12:2
**tells (1)**
142:16
**tempted (1)**
154:10
**tend (1)**
122:23
**term (5)**
65:15;130:4,19;134:19;
138:6
**terms (3)**
110:19;130:19;140:20
**terrific (5)**
27:2,8,19;79:15,19
**test (1)**
170:15
**testified (8)**
7:3;23:17;26:21;45:6;
52:8;92:19;154:6,11
**testifies (1)**
39:12
**testify (3)**
25:17;91:5;172:3
**testifying (3)**
111:3;154:13;172:14
**testimony (40)**
13:10;23:16,20,22;30:6,8,
9,11,13,22;31:1;34:9,15;
39:17;40:15,17;42:5;43:10;
44:19;45:7;56:2;62:17,22;
87:9;91:12;93:23;110:1;
111:6;112:12;120:24;
123:19;125:8;167:5;172:12,
20,22;173:3,4;180:8,11
**Thanks (1)**
102:14
**theory (3)**
25:4;55:23,23
**thereby (1)**
134:24
**therefore (2)**
42:20;54:18
**third (1)**
178:4
**Thornton (15)**
3:15;5:5,5;8:21,21,22,24;
9:8;112:9,19;116:19;154:8,
19;155:15;156:10
**though (3)**
68:3;112:9;165:17
**thought (27)**
13:18;25:8;29:17;80:5;
81:15;84:13,23,24;85:5,5;
86:4,5,7,23;87:1;91:9,12;
92:14;94:17;100:5;123:13,
20;124:22;125:9;154:10;
165:12;175:7

**thread (2)**
47:13;48:4
**three (9)**
86:21;91:8;112:14;
134:21;135:23;157:16
**throat (1)**
141:23
**throughout (2)**
15:1;163:6
**Tim (3)**
34:21,24;35:6
**timeframe (3)**
32:23,24;33:2
**times (1)**
25:7
**timing (2)**
95:7,11
**today (3)**
13:1,10;172:4
**today's (2)**
47:20;67:21
**together (1)**
119:4
**token (1)**
10:1
**told (22)**
33:15;34:24;35:6,14;36:8;
43:15;101:1,5;109:21;
110:4;116:18;142:22;148:1;
156:15,17;157:13;166:16;
167:6,7,9,11;175:21
**took (10)**
22:20;50:17;51:1,2,5,12,
13,22;66:16;94:7
**top (2)**
20:24;116:10
**Topic (1)**
104:6
**total (23)**
64:23;65:5;66:2;68:3;
73:7;96:5;97:17,21,23;98:5,
7,19,19,21;99:5;101:3;
106:23;155:14;165:6,11;
168:4;170:22,23
**totally (2)**
73:13;177:13
**touched (1)**
106:16
**track (1)**
53:14
**tradition (1)**
132:2
**transcript (5)**
16:16;34:1;158:12;180:8,
9
**transcripts (12)**
13:14;16:11,15,20;22:11;
24:1;25:1;53:18;86:21;
87:19;89:10;92:11
**tri-captioned (1)**
166:20
**trivial (3)**
84:3;88:14;93:7

**troubling (2)**
127:23;128:8
**true (11)**
52:23,24;59:23;62:13;
63:13;78:23;84:20;164:10;
172:8;180:10,12
**truly (2)**
54:2;75:6
**trusted (2)**
80:15;82:20
**trusts (2)**
87:24;88:3
**try (7)**
10:4;12:2;30:21;35:3;
36:1;44:22;45:2
**trying (11)**
29:5;31:2,14;34:16;75:7;
81:8;99:2,13;143:21;
173:21;174:12
**turn (2)**
131:9;148:22
**turns (4)**
57:20;122:7,23;138:19
**Two (13)**
3:5;21:2;38:23;55:11;
56:1;60:12;69:19;98:13;
116:3;156:16;166:19;169:9;
173:8
**type (1)**
32:5
**typical (1)**
108:18

**U**

**ultimate (2)**
18:11;110:22
**ultimately (5)**
15:24;16:2;17:22;36:20;
108:11
**unaware (3)**
64:10;103:3,8
**under (63)**
25:5;28:8,9;29:7;37:24;
39:8,24;40:20,23;42:18;
44:20;46:1;54:12,16;56:14;
57:13;58:5;59:4;65:18,18;
67:9,21;71:21;77:3;83:20;
96:13,15;97:24;99:6;
100:22;101:14,14;113:19,
23;115:2;117:5,6,23;118:1;
120:5;122:22,24;123:5;
138:23;139:14;140:3,10;
144:20;147:23;152:10,14;
153:6,10,20,20;155:10,16;
161:22;162:4;164:1;166:14;
178:23;180:9
**underlying (2)**
16:5;22:17
**understood (12)**
23:18;37:16;38:9;58:11;
63:22;107:20;108:7;111:20;
123:9;131:5;134:11;156:6

**undertake (1)**
29:5
**undertaken (1)**
49:23
**unfairly (3)**
81:6;128:9;178:20
**United (1)**
7:11
**University (1)**
7:23
**unless (2)**
141:9;171:11
**unlike (2)**
131:17;149:16
**unnecessary (1)**
128:14
**unpaid (1)**
133:24
**unreasonable (3)**
66:3;157:8,12
**unrelated (1)**
137:6
**up (12)**
10:4;35:7;54:15;75:22;
77:13;88:7;89:4;113:21;
127:7;142:9;154:2;157:16
**upon (2)**
49:2;107:8
**use (5)**
18:15;49:17;65:14;
107:10;126:18
**used (6)**
24:12;26:4,7;87:8;138:6,
11
**using (1)**
57:21
**usual (1)**
9:18

**V**

**value (19)**
56:6,11;61:2,10,12,15,22;
62:8,19;63:6,8;83:11;85:23;
91:18;100:8;142:5;145:5;
167:10;170:22
**varying (1)**
172:19
**verbatim (2)**
44:8,9
**version (3)**
175:14,15,16
**versus (1)**
7:17
**Via (3)**
3:19,20;5:6
**view (29)**
27:21;54:16;55:3,3;56:16;
67:5,10;68:11;74:18;78:18,
19;79:9;83:8;85:8,13;91:24;
92:5;99:3;120:10,11;134:3;
135:3;149:6,6;152:12;
163:5,24;175:17;178:12

**viewed (4)**
46:22;47:4;85:10;157:4
**vigorous (1)**
91:7
**vigorously (1)**
25:9
**violate (9)**
54:8;55:9,13;66:21;85:4;
93:4;99:8;148:8;161:15
**violated (6)**
54:10;81:11;84:14;86:10;
93:12;146:5
**violates (3)**
84:9;103:13;148:16
**violating (1)**
53:24
**violation (7)**
38:14;68:4,7,15;70:19;
73:22;83:23
**violations (1)**
63:24
**virtue (1)**
85:16
**visit (1)**
88:8
**Vitae (1)**
10:13
**voices (1)**
10:4
**vouched (1)**
23:5
**vouching (6)**
22:24;24:6;27:9,17;28:2;
85:1

**W**

**wait (1)**
145:2
**wall (1)**
79:13
**wants (2)**
80:21;126:19
**warrant (2)**
160:2,13
**wary (1)**
44:11
**way (26)**
35:5;47:1;58:7,20;70:5,
13;74:23;79:3;82:19;90:6;
109:8;116:22;124:3,4,5;
125:6;142:10;143:16;
144:12;148:10,17;153:4;
173:20;174:4;176:11;177:1
**ways (2)**
101:13;120:1
**wealthy (1)**
99:11
**weight (3)**
80:19;172:20;173:4
**welcome (1)**
48:1
**well-placed (2)**

**110:8;112:2**
**weren't (1)**
25:16
**what's (6)**
13:3;46:2;47:2;114:9;
162:18,23
**whatsoever (1)**
88:19
**whole (2)**
42:23;82:23
**who's (6)**
37:17;78:9;124:16,19;
176:3,4
**whose (1)**
53:2
**William (1)**
7:6
**willing (5)**
36:15;100:17,18,19,20;
124:21
**wind (1)**
143:21
**wires (1)**
12:11
**wish (1)**
157:13
**within (11)**
45:22;53:22;73:2,5;91:15;
121:16,24;134:4,16,18;
138:15
**without (6)**
11:6;61:24;63:20;64:4;
130:16,17
**witness (180)**
7:1;8:5,8;12:7;21:6,13;
24:19,21;26:2;27:7,15;
28:10,13;29:13,18;30:4,12;
35:10,23;37:11;38:17,21;
39:19;40:14,22;41:7,17,21;
43:22;44:24;45:11,20;46:7,
14;51:21;52:10;56:8,18;
57:6,19;58:6;59:8,11;60:3;
61:7;62:7,21;63:1,4,19;
67:14;68:16;69:8,18;70:12;
71:23;72:13,23;73:15;74:7,
10,22;75:4,10,20;85:18;
86:19;87:7,18;88:21;89:9;
90:3,11;91:3;92:4;98:4,12,
17;99:8;101:11;112:21;
113:5,22;114:3,17,22;115:3;
116:9;117:11,24;118:11,15;
119:11,21;120:8;121:13;
122:4,16,21;123:18;124:12;
125:4,20;126:1,6,13;127:8;
128:13,23;129:12,16,21;
130:3,17;131:15;132:7,13;
133:3,8,11,17;134:6,8;
135:5,10,15;137:9,11;138:5,
18;139:7;140:2,6,13,16,20;
141:2,16;142:8;143:8,19;
144:2,19;145:11,18,20;
147:16;148:6,11;149:2,11,
15;150:2,7,10,20;151:4,16,

**24;152:9;153:1,10,15,24;
165:22;166:2,9;167:2,18;
171:4;172:17;173:15,21;
174:2,10;175:1,24;176:15;
177:17;178:18
**witnesses (2)**
115:19;133:4
**witnesses' (1)**
25:8
**Wolf (4)**
7:15;155:14;165:12;172:3
**wonder (1)**
143:20
**word (8)**
24:12;26:4,7;32:10;81:1;
87:4,8;147:11
**words (2)**
28:18;85:13
**work (18)**
46:15,17;60:14;77:18;
79:17;82:2,3;85:1;116:22;
143:2;156:8,23;163:10,15;
167:8;168:18;170:21;
178:21
**worked (3)**
27:1;111:23,24
**working (8)**
26:22;27:11;36:9;43:11,
16;45:12;110:11,21
**world (1)**
33:9
**write (1)**
144:21
**writes (1)**
164:16
**writing (9)**
11:19;51:8;65:11;67:23;
75:15;114:20;117:7;158:19;
175:20
**writings (1)**
94:1
**written (6)**
51:9;65:9;103:17,20;
107:4;171:17
**wrote (5)**
11:11;16:24;17:4;106:12;
154:18

**Y**

**years (6)**
44:5;128:1,2;134:21;
135:23;153:19
**yellow (1)**
12:10
**yesterday (3)**
31:23;47:17;115:19
**York (31)**
7:23;26:22;27:11;28:18;
29:8,18;36:9;41:13,14,19,
21;42:2,10,21,22;43:1,1,12,
17;45:13;46:10;88:7;104:1,
3,4,12,13;105:2,23,24;

135:24;175:9

## 0

**02110 (1)**
3:6
**02110-2131 (1)**
3:17

## 1

**1 (2)**
10:13,19
**1.0 (1)**
130:22
**1.5 (4)**
73:22;95:23;97:5;169:3
**1.5a (10)**
99:9;100:12;161:16,21;
162:2,4;164:1,18,21;170:16
**1.5e (111)**
53:24;54:11;55:13,15,19,
19;56:15,16;57:13;58:22;
60:19;61:1;64:14,21;65:18;
66:18;67:11,18,21;68:4,12;
69:2;70:1,3,6,13,18,19;71:9,
19,21;72:20;73:10,12,17,18,
24;74:3,15,17,19;75:1;76:2,
8;95:24;96:13,15,19;97:13,
16,22;98:1;99:9;100:12;
101:14;103:16;105:6,23;
106:15;107:3,3;111:10;
113:19,24;114:16,17;115:2;
121:16;122:6,8,18,22,24;
138:17,20,24;140:4;146:5;
147:14,23;148:4,7,8,16,19;
149:8;152:10;153:6,10;
155:10,16;158:20;159:13,
15;161:2,23;163:8;165:5;
166:14;168:3;169:4,13,14;
171:1;173:11;175:15,19,21;
177:22;178:17,19
**1.5e's (1)**
64:15
**1.5g (1)**
105:4
**100 (1)**
3:16
**11 (2)**
102:2,3
**11:00 (1)**
102:6
**1128 (3)**
104:4,8,13
**11-cv-10230-MLW (1)**
7:18
**12 (3)**
14:13;16:24;18:12
**12:30 (1)**
179:1
**12:32 (1)**
179:2
**12:34 (1)**

179:22
**13 (2)**
64:9,9
**14 (4)**
20:4,18;54:22;55:1
**15 (2)**
24:13;56:19
**15-minute (1)**
102:1
**16 (3)**
64:8;102:24;103:2
**17 (3)**
102:24;131:8;139:3
**17594 (1)**
47:22
**18 (1)**
47:13
**185 (1)**
131:13
**19 (2)**
43:13;45:6

## 2

**2 (6)**
11:12;14:4,5,15;34:2;
116:10
**20 (2)**
157:16;158:13
**2007 (1)**
33:1
**2008 (3)**
41:2;94:3,3
**2009 (1)**
94:3
**2010 (1)**
107:15
**2011 (8)**
96:21;107:5,17;111:16;
115:23;155:7,17,18
**2014 (1)**
47:13
**2017 (2)**
34:2;156:14
**2018 (2)**
14:6;180:20
**21 (2)**
159:24;160:12
**23 (8)**
45:6;152:13,14,15;
153:20;159:24;177:18;
178:23
**24 (6)**
107:15;161:13,17,18;
162:9;167:23
**25 (4)**
14:6;16:24;161:13,19
**27 (2)**
128:1,2

## 3

**3 (4)**

14:13;33:23,24;47:18
**30c (1)**
128:4
**31 (1)**
31:7
**32 (1)**
31:7
**33 (1)**
31:2
**34 (1)**
43:13

## 4

**4 (2)**
47:19,21

## 5

**5 (5)**
57:11;60:24;62:1;63:16;
104:12
**50 (1)**
99:4
**594 (1)**
47:14

## 6

**6 (2)**
59:19;115:22
**60 (1)**
13:8
**617-248-5000 (1)**
3:9
**617-345-1065 (1)**
3:21

## 7

**7.2 (8)**
22:13;25:5;26:7;62:12;
73:2,5,24;88:15
**7.2a (1)**
105:12
**7.2b (70)**
20:5;21:2,10;28:7;43:24;
44:1,21;45:16,22;46:2;
53:23,24;54:8,13;55:10,22;
56:5,17;57:1;58:5,8,13,23;
59:4;60:22;61:4;62:5,17;
63:12,24;64:12;66:10,18,21;
67:3,5,9,12,15;68:7,12,15,
18,21;69:6,11,15;70:10,14,
22;71:19;72:10;73:13;
74:17,20;76:2;81:7;83:23;
85:4,9;87:22;88:2;91:15;
93:4;102:21;103:13,16;
105:13,23;106:17
**7.2b5 (1)**
59:6

## 8

**8 (9)**
96:23;107:17;111:16;
115:23;134:5;153:13;155:7,
17,18

## 9

**9 (1)**
97:3
**90 (1)**
170:22