# EX. 232

**ETHICAL REPORT FOR SPECIAL MASTER GERALD E. ROSEN**

**Professor Stephen Gillers**
**Elihu Root Professor of Law**
**New York University School of Law**
**February 23, 2018**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

| | | | |
|---|---|---|---|
| I. | | INTRODUCTION TO OPINION | 1 |
| II. | | FACTUAL BACKGROUND | 2 |
| | A. | THE *STATE STREET* LITIGATION | 2 |
| | | i. *ORIGINS* | 2 |
| | | ii. *FILING OF THE ATRS "CUSTOMER CLASS" COMPLAINT* | 2 |
| | | iii. *THE ERISA COMPLAINTS* | 4 |
| | | iv. *THE BONY MELLON MDL* | 6 |
| | | v. *CONSOLIDATION OF THE STATE STREET CASES* | 7 |
| | | vi. *HYBRID MEDIATION-DISCOVERY PROCESS* | 8 |
| | | vii. *ERISA FEE ALLOCATION* | 9 |
| | | viii. *STAFF ATTORNEY COST-SHARING AGREEMENT* | 11 |
| | | ix. *SETTLEMENT AND NOTICE TO CLASS MEMBERS* | 16 |
| | |    a. Involvement of Government Agencies | 16 |
| | |    b. Preparation and Filing of Settlement Documents | 17 |
| | | x. *FEE PETITION REQUESTING ATTORNEYS' FEES* | 19 |
| | |    a. Fee Negotiations Among Customer Class Counsel | 19 |
| | |    b. Submission of the Fee Petition | 21 |
| | |    c. The Labaton Template and Inaccuracies in Declaration Language | 22 |
| | |    d. Staff Attorney Time | 24 |

**Page**

| | | | |
|---|---|---|---|
| xi. | *COURT APPROVAL OF THE SETTLEMENT AND FEE AWARD* | | 25 |
| | a. | Preliminary Approval | 25 |
| | b. | Final Approval | 27 |
| xii. | *DISTRIBUTION OF SETTLEMENT AND ATTORNEYS' FEES* | | 28 |
| | a. | Payment of Fees and Expenses | 29 |
| B. | INVOLVEMENT OF LABATON AND CHARGOIS IN THE STATE STREET CASE | | 31 |
| i. | *LABATON'S INTRODUCTION TO ATRS* | | 31 |
| ii. | *THE CHARGOIS "ARRANGEMENT"* | | 33 |
| iii. | *THE ATRS REQUEST FOR QUALIFICATIONS (RFQ)* | | 36 |
| iv. | *ATRS' LACK OF KNOWLEDGE OF THE CHARGOIS ARRANGEMENT* | | 37 |
| | a. | Agreement Among Labaton, Lieff and Thornton to Share in the Payment of Labaton's Obligation to Chargois | 40 |
| v. | *LIEFF'S AND THORNTON'S LIMITED KNOWLEDGE OF THE CHARGOIS ARRANGEMENT* | | 42 |
| vi. | *ERISA COUNSEL'S LACK KNOWLEDGE OF CHARGOIS ARRANGEMENT* | | 46 |
| vii. | *PAYMENTS TO CHARGOIS PURSUANT TO THE CHARGOIS ARRANGEMENT* | | 48 |
| C. | SCRUTINY OF THE STATE STREET SETTLEMENT AND SPECIAL MASTER'S APPOINTMENT | | 49 |
| i. | *THE BOSTON GLOBE INQUIRY* | | 49 |
| ii. | *NOVEMBER 10, 2016 LETTER TO THE COURT* | | 50 |

**Page**

| | | |
|---|---|---|
| | iii. *THE "CLAW BACK" LETTER* | 52 |
| | iv. *APPOINTMENT OF SPECIAL MASTER* | 53 |

III.  QUESTIONS PRESENTED                                                  54

IV  OPINION                                                                55

A.  WHERE THE COURT IS CALLED ON TO APPLY A RULE OF
PROFESSIONAL CONDUCT, IT SHOULD APPLY THE
MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT
RATHER THAN THE RULES OF ANOTHER JURISDICTION.
FEDERAL COMMON LAW ALSO GOVERNS ISSUES
BEFORE THE COURT                                                           55

    i. *APPLICATION OF MASSACHUSETTS RULES OF
PROFESSIONAL CONDUCT*                                                      55

    ii. *ADDITIONAL REASONS TO APPLY THE
MASSACHUSETTS PROFESSIONAL CONDUCT RULES
IN THIS CASE*                                                              57

    iii. *FEDERAL LAW GOVERNS OTHER ISSUES BEFORE
THE COURT*                                                                 57

B.  THE CHARGOIS ARRANGEMENT IS AN UNETHICAL
PAYMENT FOR THE RECOMMENDATION OF A CLIENT,
NOT A VALID DIVISION OF FEE AGREEMENT                                      58

    i. *RULE 7.2(b)*                                            58

    ii. *LABATON DID NOT COMPLY WITH RULE 1.5(e).
IT PAID CHARGOIS FOR RECOMMENDING A CLIENT
IN VIOLATION OF RULE 7.2(b)*                                               59

    iii. *LABATON'S OWN CONDUCT, OBJECTIVELY VIEWED,
IS INCONSISTENT WITH THE CLAIM THAT THE
CHARGOIS ARRANGEMENT WAS A VALID DIVISION OF
FEE AGREEMENT*                                                             61

**Page**

     *iv.*     *COURT OPINIONS IN DISPUTES BETWEEN LAWYERS*
                   *DO NOT RENDER THE CHARGOIS ARRANGEMENT*
                   *A VALID DIVISION OF FEE AGREEMENT*     64

     *v.*     *CONCLUSION*     66

C.     EVEN IF THE CHARGOIS ARRANGEMENT COULD BE DEEMED
     A VALID DIVISION OF FEE AGREEMENT, AND NOT AN
     IMPROPER PAYMENT FOR RECOMMENDING A CLIENT,
     LABATON, THORNTON, AND LIEFF WERE OBLIGATED TO
     DISCLOSE THE CHARGOIS ARRANGEMENT TO THE COURT     66

     *i.*     *DISCLOSURE TO THE COURT IS REQUIRED UNDER*
                   *THE MASSACHUSETTS RULES OF PROFESSIONAL*
                   *CONDUCT AND FEDERAL LAW*     66

     *ii.*     *FEDERAL CASE LAW CONTRADICTS LABATON'S NARROW*
                   *VIEW OF ITS DISCLOSURE OBLIGATIONS TO THE COURT*     68

     *iii.*     *THE MASSACHUSETTS RULES OF PROFESSIONAL*
                   *CONDUCT ALSO REJECT LABATON'S VIEW THAT IT HAD*
                   *NO DUTY TO DISCLOSE THE CHARGOIS ARRANGEMENT*
                   *TO THE COURT UNLESS THE COURT ASKED*     71

     *iv.*     *LABATON'S CLAIM THAT IT HAD NO DUTY TO DISCLOSE*
                   *THE CHARGOIS ARRANGEMENT TO THE COURT OR TO*
                   *CLASS MEMBERS BECAUSE IT WAS PAYING CHARGOIS*
                   *FROM ITS OWN FEE AWARD IS INCORRECT AS A MATTER*
                   *OF FACT AND LAW*     72

     *v.*     *A LAWYER'S MISCONDUCT MAY AFFECT A COURT'S*
                   *DETERMINATION OF THE AMOUNT OF FEES TO AWARD*     73

     vi.     *CONCLUSION*     74

D.     LABATON, THORNTON, AND LIEFF CABRASER EACH HAD
     A DUTY TO DISCLOSE THE CHARGOIS PAYMENTS IN THE
     "NOTICE OF PENDENCY" SENT TO MEMBERS OF THE
     CUSTOMER AND ERISA CLASS     75

**Page**

  i. *CLASS COUNSEL HAD A FIDUCIARY AND ETHICAL*
   *DUTY TO DISCLOSE THE CHARGOIS ARRANGEMENT*
   *TO THE CLASS MEMBERS AND DID NOT* 75

  ii. *CONCLUSION* 78

$E. GARRETT BRADLEY'S DECLARATION CONTAINS FALSE
  STATEMENTS OF FACT AND FALSE "EVIDENCE," IN
  VIOLATION OF RULES 3.3(a)(1) AND 3.3(a)(3) BECAUSE THE
  FALSE STATEMENTS WERE MADE KNOWINGLY.  THE
  DECLARATION ALSO VIOLATED RULE 8.4(c)'S
  PROHIBITION OF MISREPRESENTATIONS AND DECEIT.
  SEPARATELY, GARRETT BRADLEY'S DECLARATION
  VIOLATED FED. R. CIV. P. 11 BECAUSE BRADLEY FAILED TO
  CONDUCT "AN INQUIRY REASONABLE UNDER THE
  CIRCUMSTANCES" TO ESTABLISH THAT HIS FACTUAL
  CONTENTIONS HAVE EVIDENTIARY SUPPORT" 79

  i. *FILING OF THE FEE PETITION* 79

  ii. *GARRETT BRADLEY VIOLATED RULE 3.3(a) BECAUSE*
   *HE KNEW THAT HIS DECLARATION CONTAINED FALSE*
   *STATEMENTS* 81

  iii. *APPLICATION OF RULE 3.3 AND FEDERAL*
   *JURISPRUDENCE TO THE BRADLEY DECLARATION* 82

  iv. *APPLICATION OF FED. R. CIV. P. 11 TO THE BRADLEY*
   *DECLARATION* 84

  v. *CONCLUSION* 84

I.      **INTRODUCTION TO OPINION**

Special Master Gerald Rosen has retained me to answer certain questions regarding the professional conduct of lawyers in the captioned case. I briefly state my qualifications to offer my opinions. A current resume is attached to this Report. [EX. 49]. I agreed to an hourly rate of $900 for my work in this matter.

I am Elihu Root Professor of Law at New York University School of Law, where I have taught since 1978. My major area of research and teaching are the ethical rules and laws governing American lawyers. I am the author of *Regulation of Lawyers: Problems of Law and Ethics,* a widely used law school casebook first published by Little, Brown (now Aspen) in 1985 with an 11th edition in 2018. With Roy Simon (and Andrew Perlman as of 2008), I have edited *Regulation of Lawyers: Statutes and Standards*, published annually by Little, Brown, then Aspen, since 1989. From 2000-2002, I was a member of the ABA's Multijurisdictional Practice Commission, which proposed rule changes (all of them accepted by the ABA House) to recognize the cross-border nature of legal practice. I was a member of the ABA 20/20 Commission (2010-2013), which studied the effects of technology and globalization on the regulation of lawyers and recommended Model Rules amendments, all of which were accepted by the ABA House. In 2011, I received the Michael Franck Award from the ABA's Center for Professional Responsibility. I received The American Bar Foundation's Outstanding Scholar Award in 2015.

In the last four years, I have testified at a deposition in *Ruby v. Allen Matkins*, a JAMS arbitration in Los Angeles. I was retained by counsel for Ruby, Dale Kinsella of Kinsella Weitzman (Santa Monica, CA).

I assume familiarity with the following statement of facts, which was prepared by counsel for the Special Master and which I assume is true for purposes of my opinion.

## II.   FACTUAL BACKGROUND

### A.   THE *STATE STREET* LITIGATION

#### i.   ORIGINS

This case had its genesis in a California *qui tam* action filed under seal on April 14, 2008 by "Associates Against FX Insider Trading" -- relators represented by the Thornton Law Firm ("TLF") and Lieff Cabraser Heimann & Bernstein, LLP ("Lieff") -- on behalf of California public pension funds.   *See* 9/15/16 Declaration of Lawrence Sucharow of Labaton Sucharow LLP in Support of Motion for Final Approval of Class Settlement, MAD No. 11-cv-10230, Dkt. No. 104, ¶ 24; *see also* Thornton 6/19/17 Dep., pp. 35:22 – 36:14. The *qui tam* lawsuit was unsealed and became public on October 20, 2009, when the California Attorney General filed a Complaint-in-Intervention charging State Street with misappropriating more than $56 million from California's two largest public pension funds:  the California Public Employees' Retirement System ("CalPERS") and the California State Teachers' Retirement System ("CalSTRS").   *See People of the State of California, ex rel. Edmund G. Brown, Jr. v. State Street Corporation, et al.,* Cal. Super. Ct. No. 34-2008-00008457-CU-MC-GDS; *see also* Sucharow Decl., ¶ 25; Thornton 6/19/17 Dep., p. 40:1-9.  The Complaint-in-Intervention was the first public indication of State Street's allegedly unfair and deceptive practices concerning indirect FX and the first largescale action concerning FX practices.  Sucharow Decl., ¶ 25; Thornton 6/19/17 Dep., p. 41:11-17.

#### ii.   FILING OF THE ATRS "CUSTOMER CLASS" COMPLAINT

After the allegations against State Street became public, George Hopkins, Executive Director of the Arkansas Teacher Retirement System ("ATRS"), became interested in the issue

since State Street was ATRS's custodial bank.  Hopkins 6/14/17 Dep., pp.  37:11 – 38:15. ATRS

then retained Labaton Sucharow LLP ("Labaton"), which was serving as one of its "monitoring

counsel,"[1] to investigate potential class and individual claims that could be brought against State

Street on behalf of ATRS and its members. This was Labaton's first foray into FX litigation.

Therefore, with ATRS's approval, Labaton teamed with TLF and Lieff, as those firms had

gained knowledge of the area from their representation of the relators in the California *qui tam*

action, and began an investigation. *Id.  See also* George Hopkins Declaration, Dkt. No. 104-1, ¶

8; Thornton 6/19/17 Dep., pp. 43:13 – 44:4.

After investigating and researching the matter, on February 10, 2011, a class action

complaint was filed on behalf of ATRS (superseded by an Amended Complaint on April 15,

2011) alleging violations of the Massachusetts Consumer Protections Act and several common

law claims.  *See Arkansas Teacher Retirement System v. State Street Corp., et al.*, MAD No. 11-

cv-10230, Dkt. Nos. 1, 10 [EX. 1].[2]  As Lead Plaintiff in the action, ATRS purported to represent

a class encompassing

> all institutional investors in foreign securities, including but not limited to public
> and private pension funds, mutual funds, endowment funds and investment
> manager funds, for which State Street served as the custodial bank and executed
> FX trades on a "standing-instruction" or "non-negotiated" basis between January
> 2, 1998 and December 31, 2009, inclusive (the "Class Period"), and which suffered
> damages as a result of the deceptive acts and practices and other misconduct alleged
> herein.

Customer Class Amended Compl., Dkt. No. 10, ¶ 22. [3]

---

[1] "Monitoring counsel" refers to lawyers who review the performance of institutional investors to ensure the
investments are handled appropriately and are not the subject of fraud or other illegal activity.  *See* Eisenberg,
Jonathan, *Litigating Securities Class Actions*, § 1.02(1)(d), "Portfolio Monitoring" (Lexis/Nexis 2017).

[2] The complaints also originally named State Street Corporation ("SSC"), State Street's parent corporation, and the
separate subsidiary State Street Global Markets LLC ("SSGM LLC") as party-defendants.  On May 8, 2012, the
Court entered an Order dismissing all claims asserted against SSC and SSGM LLC.

[3]  The ATRS complaint is referred to by the parties in this action as the "Customer Class Complaint."

Thereafter, on January 12, 2012, Labaton was appointed "Interim Lead Counsel" for the proposed Customer Class; the Thornton Law Firm was designated as liaison counsel, and Lieff Cabraser was designated as additional counsel for the proposed class. *See* Dkt. Nos. 7-8; 28.[4] In making this tri-partite appointment, the Court reasoned that "[e]ach of the firms, including Labaton Sucharow, have extensive experience with complex commercial litigation and class action lawsuits involving financial and securities fraud," and "are knowledgeable [in] the applicable areas of law." 1/12/12 Memorandum and Order, p. 4, Dkt. No. 28. [5]

### iii.   THE ERISA COMPLAINTS

On the heels of the filing of the Customer Class Complaint, two separate complaints alleging ERISA violations were filed.[6] The two sets of plaintiffs in these actions represented

---

[4] "Plaintiff's Assented to Motion for the Appointment of Interim Lead Counsel for the Proposed Class" and supporting brief were filed on April 7, 2011 [Dkt. Nos. 7 and 8] but not ruled upon by the Court until January 12, 2012 [Dkt. No. 28].

[5] No similar appointment was made with respect to ERISA Counsel. However, Labaton, Lieff and Thornton also viewed the ERISA plaintiffs as their clients and Labaton as lead counsel for all class members, including ERISA class members. *See* Chiplock 9/8/17 Dep. pp. 93:24 – 94:2 ("We had a responsibility as class counsel to the class. And that included ERISA plans."); 97:3- 10 ("I felt that customer class counsel had a responsibility to the entire customer class with no distinctions. We didn't discriminate in our class definition. We didn't see the need to when we filed our case.") Goldsmith 9/20/17 Dep., pp. 42:11-14 ("[W] did not assert an ERISA claim in our complaint, but we did allege a class which was broad enough to encompass ERISA governed assets."); 61:11-14 (How much of the settlement would go to ERISA clients "was something that [DOL] were focused on. Of course, we were focused on it as well because they were our clients.") *See also* colloquy at 11/15/12 Lobby Conference:

> MICHAEL THORNTON: I just want to clarify one thing of Mr. Rudman's [State Street's attorney's] excellent summary that we might differ on. There are two clear ERISA cases, Henriquez and Andover, and in the third case, Arkansas, um, the ERISA claims are included in the class definition. So we also have a claim.
> ***
> ROBERT LIEFF: . . . There is an overlap, that's all we're trying to say. We represent the same people.
>
> THE COURT: You do represent the same people?
>
> MR. LIEFF: Yes.

[11/15/12 Lobby Conf. Tr., Dkt. No. 87, pp. 16-17]

[6] "ERISA" refers to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq*.

institutional private ERISA plans whose accounts were invested by State Street (the "ERISA Class").[7]  *See Henriquez, et al. v. State Street Bank and Trust Co.*, MAD No. 11-12049, Dkt. Nos. 1, 24 (the "*Henriquez* complaint") [EX. 2],[8] and *The Andover Companies Savings and Profit Sharing Plan, et al. v. State Street Bank and Trust Co.,* MAD No. 12-11698, Dkt. Nos. 1, 9 (the "*Andover* complaint") [EX. 3].

The named plaintiffs in the *Henriquez* complaint were Arnold Henriquez, Michael T. Cohn, William R. Taylor, and Richard A. Sutherland, all participants in different ERISA plans: Henriquez was a participant in the Waste Management Retirement Savings Plan; Cohn was a participant in the Citigroup 401(k) Plan; Taylor and Sutherland were participants in the Johnson & Johnson Pension Plan (Sutherland also was a participant in the J&J 401(k) plan).  All of these individually named plaintiffs purported to "bring[] this action pursuant to ERISA on behalf of [their respective retirement plans] and [their] participants and beneficiaries...as a class action on behalf of a class of similarly-situated ERISA retirement plans (collectively, the "Plans") and their participants and beneficiaries...." [Henriquez Amended Compl., ¶ 1] [EX. 2].  Two plaintiffs are named in the *Andover* Complaint -- one an institutional plaintiff, The Andover Companies Savings and Profit Sharing Plan, and the other an individual, James Pehoushek-Stangeland.  The complaint alleges that as "a participant in The Boeing Company Voluntary

---

[7]  The ERISA Class was represented by Keller Rohrback L.L.P., Zuckerman Spaeder LLP, McTigue Law LLP, and Beins Axelrod LLP (collectively, "ERISA Counsel").  However, none of these firms was ever appointed "lead counsel" or other official capacity by the Court.  (Although, later, Brian McTigue of McTigue Law, attempted, albeit unsuccessfully, to secure appointment as lead counsel for the ERISA class members. *See* TLF-SST-052975 – 052980 [EX. 4]; TLF-SST-054020 – 54022 [EX. 5]; Sarko 9/8/17 Dep., p. 97:12-21; Sucharow 9/1/17 Dep., p. 93:17-23.)

[8]  The *Henriquez* complaint was originally filed in the United States District Court for the District of Maryland, *see Henriquez v. State Street Bank and Trust Co., et. al.*, MDD No. 11-cv-02920, Dkt. No. 1.  The Maryland complaint, however, was voluntarily dismissed shortly after it was filed, *see id.*, Dkt. Nos. 7-8; it was later re-filed in the U.S. District Court for the District of Massachusetts as a "related case" to the ATRS case.

Investment Plan ("the Boeing Plan") ..., Plaintiff Pehoushek-Stangeland has standing to bring

suit on behalf of the Boeing Plan for losses to the Plan due to breaches of fiduciary duty pursuant

to ERISA sections 409 and 502(a)(2)." [Andover Amended Compl., ¶ 22] [EX. 3].

    Like the Customer Class Complaint, each ERISA complaint alleged that State Street, as

the custodian to individual institutional investors and pension fund accounts, engaged in unfair

and deceptive practices in conducting "indirect" or "standing instruction" foreign currency

exchange ("FX") transactions on behalf of its clients, without disclosure to its clients that these

trades generated mark-ups that inured to the benefit of State Street.  *See* Customer Class

Amended Compl., ¶¶ 8, 62-63 [EX. 1]; *Henriquez* Amended Compl., ¶¶ 80-82 [EX. 2]; *Andover*

Amended Compl., ¶¶ 10, 63-64 [EX. 3].

### iv.   THE BONY MELLON MDL

    While the State Street action proceeded in the District Court for the District of

Massachusetts, a multi-district FX case brought against another custodian bank, the Bank of New

York Mellon, was being litigated in the Southern District of New York. *In re The Bank of N.Y.*

*Mellon Corp. Forex Transactions Litig.*, SDNY No. 12-MD-2335 ("*BONY Mellon*").[9]  Lieff

Cabraser was co-lead counsel for the nation-wide consumer class in the case.  Chiplock 6/16/17

Dep., pp. 23:25 – 24:4; 25:12-22.  TLF, as well as McTigue Law and Keller Rohrback, ERISA

counsel here, also were involved in the case.  Thornton 6/19/17 Dep., 85:18-21; McTigue 7/7/17

Dep., 9:23 – 10:11; 12:22 – 13:4.

    *BONY Mellon* was vigorously litigated for three years, during which intense discovery

took place:  more than 120 depositions were taken and more than 20 million documents were

---

[9]  The first of the various underlying complaints comprising the *BONY Mellon* MDL was filed in 2011, shortly after
the *ATRS* complaint was filed.

produced and reviewed.  Chiplock 6/16/17 Dep., pp. 29:23 – 30:15.  To assist in the document

review, Lieff Cabraser enlisted the help of the firm's staff attorneys ("SAs"),[10] thirteen of whom

later worked on the *State Street* case.  The case finally settled for $335 million in recovery to the

class of custodial clients in September 2015.  *See* 9/24/15 Order and Final Judgment, SDNY No.

12-MD-2335, Dkt. No. 638; Chiplock 6/16/17 Dep., pp. 29:23 – 30:15.[11]  The attorneys'

experience in *BONY Mellon* allowed counsel to develop a baseline of familiarity and expertise

that they brought to the *State Street* case.  Chiplock 6/16/17 Dep., p. 27:11-17.  BONY Mellon

also provided Lieff's SAs hands-on experience in reviewing and analyzing complex, FX-related

documents.  *See* Lieff Cabraser's Responses to First Set of Interrogatories Due on June 1, 2017,

Response No. 3.

### v.  CONSOLIDATION OF THE STATE STREET CASES

During most of 2011-2012, the *State Street* action principally involved motion practice,

and, in particular, briefing and argument of Rule 12(b)(1) and Rule 12(b)(6) motions to dismiss

filed by State Street in the *ATRS* and the *Henriquez* cases. State Street's motion to dismiss the

*ATRS* complaint was fully briefed by both parties and the Court heard arguments on the motion

on May 8, 2012.  At the conclusion of the May 8 hearing, the Court entered an Order dismissing

ATRS's claims against State Street Corporation ("SSC"), the parent corporation, and the separate

State Street subsidiary, State Street Global Market, LLC ("SSGM LLC"), but denied

Defendant's motion in all other respects.  *See* 5/8/12 Order, Dkt. No. 33.  The Court further

---

[10] "Staff attorneys" here were licensed attorneys with relevant experience hired specifically to perform large-scale document review.

[11] Of the $335 million settlement, the attorneys in *BONY Mellon* were awarded $83,750,000 in fees and $2,901,734.19 in total expenses. SDNY No. 12-MD-2335, Dkt. No. 638.

directed counsel to meet to discuss the possibility of settlement and whether they wished to pursue mediation, either privately or before a magistrate judge. *Id.*

In the meantime, on August 8, 2012, State Street also moved to dismiss the *Henriquez* Amended Class Action Complaint. However, no substantive decision was ever rendered on that motion. Instead, on November 15, 2012, shortly after the *Andover* complaint was filed, at the request of counsel, the Court conducted a Lobby Conference to discuss further proceedings. *See* 11/15/12 Lobby Conference Tr., Dkt. No. 64. Counsel proposed, and the Court agreed, that the three cases -- *ATRS, Henriquez* and *Andover* -- proceed in tandem in a "hybrid" mediation during which the parties and counsel could continue to pursue a mediated global settlement, while at the same time delaying a decision on pending motions and engaging in a simultaneous track of "informal" document discovery. 11/15/12 Lobby Conference Tr., pp. 10:15-18; 15:6-7, 19-25, 22:2-10. The Court granted the parties' joint motion to stay the case and ordered that the three actions be consolidated for pre-trial purposes.[12] *Id.*, Tr. at pp. 10, 22, 24; Order to Stay, Dkt. No. 62; Electronic Order Consolidating Cases, Dkt. No. 63.

## vi. HYBRID MEDIATION-DISCOVERY PROCESS

Prior to the Court's endorsement of the hybrid mediation, the parties had selected a mediator, Jonathan Marks, and participated in a few preliminary mediation sessions, developing the framework for exchanging discovery. Sucharow Decl., ¶¶ 89-92; Marks Decl., ¶ 14; 11/15/12 Lobby Conference Tr., Dkt. No. 87, p. 22. In the approximately eighteen months following the November 12, 2012 Lobby Conference, between January 2013 and June 2015, the parties participated in 14 additional in-person mediation sessions with Mediator Marks in Boston, New

---

[12] The Court set an initial deadline of December 1, 2013, at which time the parties would update the Court on the status of the mediation. *See* Dkt. No. 62. At the request of the parties, the Court extended this deadline on several occasions. *See* Dkt. Nos. 66, 71, 75.

York City, and Washington, D.C., each of which involved extensive exchanges of legal theories and damages calculations by both sides.  Sucharow Decl., ¶ 94; *see also* Marks Decl., ¶¶ 23-24.

The mediation sessions were informed by substantial discovery exchanged by the parties. Notably, State Street produced more than nine million pages of documents at the request of the ERISA and Customer classes. Sucharow Decl., ¶ 96. All parties agree that document review was essential to the mediation process. Chiplock 6/16/17 Dep., pp. 116:15 – 117:6; Goldsmith 7/17/17 Dep., pp. 84:15-23, 85:24 – 86:5; Rogers 6/16/17 Dep., pp. 80:4-7, 82:7-13.

### vii. ERISA FEE ALLOCATION

While the hybrid mediation-discovery process was ongoing, in mid-2013, Customer Class Counsel and ERISA Counsel negotiated amongst themselves an agreement for the allocation of attorneys' fees.  Sarko 7/6/17 Dep. p. 57:18-23.  That agreement -- to allocate 9% of the total fee awarded (if successful) to ERISA Counsel -- was based largely on ERISA Counsel's understanding that the total ERISA case volume comprised five to nine percent of the total FX trading volume.  Sarko 7/6/17 Dep., pp. 26:15-16; 59:14-22; Kravitz 7/6/17 Dep., p. 50:10-16.

As the case progressed -- and particularly toward the end of the case -- ERISA Counsel did not view 9% as commensurate with the ERISA trading volume, which was later learned to actually be about 12-15% of the total trading volume, or the value they added to the *State Street* case. Sarko 7/6/17 Dep., p. 64:3-11; Kravitz 7/6/17 Dep., p. 54:7-11. Nonetheless, rather than create friction with Customer Class Counsel over fees,[13] Lynn Sarko, principal counsel for the

---

[13] From the beginning of the mediation, there was already fair degree of tension between and among Customer Class Counsel and ERISA Counsel.  As ERISA Counsel Carl Kravitz testified, "There was definitely a faction on the consumer side that said 'we represent these people, what are you doing in the case?'"  Kravitz 7/6/17 Dep., pp. 28:21-24.  Kravitz explained, "Consumer people did not want us coming in and taking a chunk of their case." *See id.*, pp. 32:16-17; 45:6-17.  "Every extra dollar that went to ERISA came out of the Consumer side."  *Id.*, at p. 51:18-20. The tension between the Customer Class and the ERISA Class further was manifested during the discovery process:  ERISA Counsel were not provided with access to documents State Street had provided to the

ERISA Class, advocated for, and all other ERISA Counsel ultimately agreed to make, a "practical decision" to accept 9% of the fee total. *See* Sarko 7/6/17 Dep., p. 59:18-25. The decision was made, in part, to promote cooperation between counsel, "make the pie bigger" for the class members, and ensure that counsel worked together on the same "team." Sarko 7/6/17 Dep., p. 59:18-25; *see also* Kravitz 7/6/17 Dep., p. 61:18-24.

From August to December 2013, Customer Class and ERISA Counsel exchanged drafts in an attempt to memorialize their agreement to respectively share the fee award 91/9 percent. *See* KR00000006 – 09 (8/30/13 Sarko email to Lieff (proposing draft agreement to capture the 91/9% split)) [EX. 6]; KR00000010 – 18 (9/11/13 Chiplock email to Sarko and Gerber (circulating redlined edits to proposed agreement)) [EX. 7]. While there were several iterations of the agreement, each draft described the ATRS complaint filed by Customer Class Counsel as brought on behalf of "all institutional investors in foreign securities, including public and private pension funds, *ERISA-qualified plans*, mutual funds, endowment funds and investment manager funds, for which State Street served as the custodial bank" (emphasis added). *See* KR00000003 – 05 (8/29/13 Draft, *Agreement Between Counsel for Consumer and ERISA Plaintiffs Regarding Division of Attorneys' Fees* (the "Fee Allocation Agreement") [EX. 8]. Early drafts of the fee allocation agreement included a provision nullifying the 91/9 allocation if either the *ATRS*, *Andover* or *Henriquez* cases resulted in no recovery; that provision was later struck. *See* KR00000024 – 28 (8/30/13 Draft, Fee Allocation Agreement). [EX. 9]. Also removed was a proposed provision that counsels' division of fees was "consistent with the relative volume of FX trading by ERISA and non-ERISA plans as reflected in the data produced

---

Customer Class. Sarko 7/6/17 Dep., p. 44:2-25. Nor were ERISA Counsel allowed access to the Customer Class's database. *Id*., at 45:1-23. Compounding the tension was the fact that there was never an order appointing leadership in the ERISA cases. *Id*., p. 42:24 – 43:3.

by State Street and the prospects of recovery on the various claims alleged, and is therefore reasonable and appropriate." *Id*.

On December 11, 2013, Counsel finally memorialized this agreement in writing. Sarko 7/6/17 Dep.*,* p. 60:4-14; s*ee also* KR00000045 – 50 (Final Fee Allocation Agreement) [EX. 10], Settlement Agreement, Dkt. No. 89, ¶ 21; McTigue, 7/7/17 Dep., pp. 44:23 – 46:18; Thornton 6/19/17 Dep., p. 57:12-16. As part of that written agreement, ERISA and Customer Class Counsel represented that they had "disclosed and explained this Agreement to their respective clients and that their clients have consented to the Division of Fees and other terms herein." *See* Fee Allocation Agreement at ¶ 5 [EX. 10].

The percentage allocated to ERISA Counsel later was increased to 10%, at the suggestion of Customer Class Counsel. Thornton 6/19/17 Dep., pp. 57:17 – 58:1; Sarko 7/6/17 Dep., p. 60:15-17, 60:24-61:12; Kravitz 7/6/17 Dep., p. 59:17-19. While counsel did not amend the original agreement, the 10% increase was memorialized in an email circulated by Nicole Zeiss, Settlement Counsel for Labaton, itemizing the allocation of fees and expenses to the ERISA and Customer Class attorneys. *See* ZS000027 – 28 (11/23/16 Sarko email to Kravitz ("I spoke with Labaton folks yesterday. They didn't want to put it in the formal letter but agreed to send us an email putting the numbers in and confirming the 10 percent.")). [EX. 11]. ERISA Counsel welcomed the increase in percentage. *See* ZS000029 – 30 (11/23/16 Kravitz email to McTigue). [EX. 12].

### *viii.* *STAFF ATTORNEY COST-SHARING AGREEMENT*

Staff attorney-based document review performed throughout the course of the hybrid mediation-discovery process ramped up significantly in January 2015. Chiplock 6/16/17 Dep., pp. 87:22 – 88:24. While the *BONY Mellon* case was being actively litigated in 2013-2014, Lieff

assigned at most five SAs to review documents produced by State Street.  Chiplock 6/16/17
Dep., pp. 107:15 – 108:12. During that time, Labaton also allocated no more than five SAs to
review and analyze documents for the *State Street* case.  Rogers 6/16/17 Dep., p. 57:7-10.[14] As
the hybrid mediation progressed, State Street produced discovery related to the *Hill* case,[15] a
significant production consisting of approximately 10 million pages. Rogers 6/16/17 Dep., pp.
68:25 – 69:11; Chiplock 6/16/17 Dep., p. 88:2-21. The *Hill* production added considerably to the
total volume of unreviewed documents.

By January 2015, the Customer Class began to view discovery with greater urgency,
informed in part by the favorable resolution in the *BONY Mellon* case and also by the fact that
the parties had been mediating for over two years without reaching an agreement to resolve the
case. Chiplock 6/16/17 Dep., p. 111:8-13; Dugar 6/16/17 Dep., p. 85:9-16.  As a result, Labaton
and Lieff, which had recently freed up thirteen SAs as fact discovery in the *BONY Mellon* case
came to a close, expanded their respective document review teams by adding additional SAs to
review and analyze the database of unreviewed material accumulated during the *State Street*
case.  *See* Chiplock 6/16/17 Dep., pp. 109:16 – 110:2; Rogers 6/16/17 Dep., pp. 69:8-14; 74:11-
13.  Between January and March 2015, Labaton bolstered their document review team,
maintaining more than fifteen to twenty different SAs on the *State Street* case at any given time.
Lieff did the same, assigning fifteen SAs (thirteen of whom transitioned directly from the *BONY
Mellon* review) and two "contract" attorneys to complete the review.[16]  Kussin 6/5/17 Dep., p.

---

[14] Michael Rogers recalls that, in 2013, Labaton assigned Todd Kussin, the SA "team leader" in the *State Street*
case, and four SAs to perform document review during 2013 and 2014.  Rogers 6/16/17 Dep., p. 57:7-10.

[15] *Hill v. State Street Corp., et. al.*, MAD No.1:09-cv-12146-GAO.

[16] In March 2015, Lieff Cabraser hired two additional attorneys, employed by an outside staffing agency rather than
the firm. *See* Lieff Cabraser Response to Interrogatory No. 19.

17:6-13, 70:8-9; Dugar 6/16/17 Dep., p. 87:16 – 88:11, 23-24; Lieff Cabraser Response to June 1

Interrogatories, No.19.

All SAs reviewing documents in the *State Street* case received a binder of documents

providing an overview of the case; the binder contained the complaint and related pleadings, an

outline of the case theory, and a list of key terms, search criteria, topics and categories to guide

the SA review. Goldsmith 7/17/17 Dep., pp.77:23 – 78:8; Rogers 6/16/17 Dep., p. 63:3-7; Lesser

6/19/17 Dep., p. 40:12-13. Michael Lesser also drafted emails outlining important information

for the SAs to consider during their review. Lesser 6/19/17 Dep., pp. 40:10 – 41:4.

The Labaton and Lieff SAs were well-qualified and equipped to analyze the documents,

which related to complex FX trading patterns and other financial issues raised in the case.  *See*

Rogers 6/16/17 Dep, pp. 58:12 – 59:7 (SAs hired by Labaton had experience in "complex

litigation, [the] financial industry, . . .  banking, mutual funds, certainly currency trading, or

experience legally on what I would call a financial industry case.") Several of the Lieff SAs had,

in the words of Dan Chiplock of Lieff Cabraser, "been through war in *Bank of New York Mellon*,

and [] [we]re extremely well-versed in the issues." Chiplock 6/16/17 Dep., pp. 109:20-25;

117:16-25.  These SAs not only performed sophisticated document review; they also prepared

substantive subject matter memoranda and deposition notebooks.  Chiplock 6/16/17 Dep. p.

32:12-20, Zaul 6/6/17 Dep., pp. 24:4 – 25:5; Alper 6/5/17 Dep., p. 17:14-16; Oh 6/6/17 Dep., p.

21:20-25; *see also* TLF-SST-005245 – 5270 (Memorandum authored by SA Maritza Bolano)

[EX. 13].

Because TLF did not have SAs, or non-permanent attorneys, of its own, or the facilities

to hire and house new attorneys solely to work on the *State Street* document review, Labaton,

Lieff and TLF entered into an agreement to "allocate" certain SAs employed by and working at

Labaton and Lieff's offices to TLF.  At times, this was referred to as the "10/10/10 agreement[17] -- designating an equal number of SAs to each firm.  The purpose of the cost-sharing agreement was to share the cost and risk burdens of the litigation among the three Customer Class law firms. Chiplock 6/16/17 Dep., pp. 127:23 – 128:5; 131:23 – 133:15; Belfi 6/14/17 Dep, pp. 51:8 – 53:12. [18] While the exact number of SAs fluctuated over the course of the agreement, TLF, in essence, agreed to pay Labaton and Lieff each for five SAs.  G. Bradley 6/19/17 Dep., p. 43:10-13.  TLF did not meet, interview, select, house or supervise the SAs allocated by Labaton or Lieff.  *See* Hoffman 6/6/17 Dep., pp. 62:21, 63:7-17, 64:6-9, 65:3-6; *see also* Chiplock 6/16/17 Dep., pp. 134:17 – 135:19.  And, it did not matter to TLF which SAs it paid for.  *See* G. Bradley 6/19/17 Dep., p. 43:10-13.  Pursuant to this cost-sharing arrangement, Labaton and Lieff designated certain SAs as "TLF," and then billed TLF periodically for the actual costs of the SAs and, in Lieff's case, for the contract attorneys "allocated" to TLF.  *Id.*; *see also* Hoffman 6/6/17 Dep., p. 63:2-7.

TLF's collection of SA hours was conducted piecemeal and largely through administrative staff rather than directly between the attorneys privy to the SA cost-sharing agreement. Evan Hoffman, the most junior member of TLF's litigation team, was tasked with collecting the names and hours of the Lieff SAs allocated to TLF. Hoffman 6/5/17 Dep., p. 57:

---

[17] The concept of the "10/10/10 agreement" was introduced at the beginning of the Special Master's discovery, and while not all Class Counsel were familiar with that exact terminology, they affirmed that purpose of the cost-sharing agreements between Labaton and TLF, and between Lieff and TLF, was to allocate costs and risks equally among all firms by Labaton and Lieff each assigning approximately five SAs to TLF, so that each firm ending up bearing the cost of ten SAs.  *See* G. Bradley 6/19/17 Dep., p. 42:5-13; Chiplock 6/16/17 Dep., p. 133:12-15.

[18] Allocating the SAs was not only a means of equalizing the costs and burdens, but also as Garrett Bradley of TLF admitted, it was "the best way to jack up the load star [sic]…the best way for us [TLF] to increase our load star [sic] and make it comparable to the other two firms…. I was absolutely concerned about Thornton's load star [sic] vis-a-vis the other two firms." G. Bradley 6/19/17 Dep. p. 67:4-13; TLF-011124 – 11126 (2/6/15 G. Bradley Email to Thornton cc'd Lesser) [EX. 14].

11–18. The staffing agency employing the agency attorneys working at Lieff invoiced TLF

directly for the hours performed by those individuals. Hoffman 6/5/17 Dep., p. 62: 6-9. Michael

Bradley, the brother of TLF partner Garrett Bradley, neither worked for a firm or a staffing

agency, and reported his hours to Hoffman by email on a weekly or biweekly basis. Hoffman

6/5/17 Dep., pp. 107: 24-108:7.

For those SAs employed by Lieff, Lieff's accounting department prepared and forwarded

invoices to Hoffman on a regular basis. LCHB Response to Interrogatory No. 38; Hoffman

6/5/17 Dep., pp. 61: 21-62:5.  Similarly, Labaton's accounting office prepared and forwarded

invoices reporting the hours performed by Labaton SAs to Garrett Bradley's attention, copying

TLF administrators, on a monthly basis. Labaton Response to Interrogatory No. 37; *see* LBS –

003775-3776 (4/9/15 Ng Email to G. Bradley attaching April 2015 Invoice) [EX. 15].

At the time Labaton and Lieff agreed to this arrangement, both firms were concerned

primarily with spreading the risks -- and costs -- of the litigation; neither firm focused on what

information would be reported in a potential fee petition. Belfi 6/14/17 Dep., p. 53:10-12. TLF

later claimed all of the SAs allocated to TLF on its lodestar fee petition, accounting for 71.5% of

all TLF hours reported.  *See* Dkt. No. 104-16.[19]  In its fee petition, TLF billed all SA time at an

hourly rate of $425 (a rate approved by the Court for Lieff SAs in *BONY Mellon*). Except for

---

[19] TLF also claimed 406.4 hours of SA time for Michael Bradley, a Massachusetts-licensed attorney and the brother of TLF Managing Partner, Garrett Bradley, who was not affiliated with the firm but performed document review on a contingent basis during the *State Street* case. M. Bradley 6/19/17 Dep., pp. 28:20-23; 70:13-15.  Bradley worked from his own office and did his document review in his free time; he was not supervised by Labaton or Lieff lawyers. M. Bradley 6/19/17 Dep., pp. 49:7-16; 52:3-18, 54:15 – 55:3.  Unlike the Labaton and Lieff SAs, Bradley did not prepare any memoranda or deposition notebooks. *Id*, at p. 46:21-23.  And, the record reveals no written work product created by Michael Bradley.

Bradley worked on a contingent basis; he would only be paid if the class recovered a settlement entitling counsel to fees.  M. Bradley 6/19/17 Dep., p. 70:13-15.  After the Court approved the request for attorneys' fees, Bradley received a payment of $203,200, equal to the numbers reported at $500 per hour.  *Id.*, p. 70:18-23.

three SAs, the $425 per hour rate charged by TLF was greater than the rates requested by Lieff

or Labaton for the same individuals in their lodestar petitions.[20]  Hoffman 6/6/17 Dep., p. 59:5-

12.  No explicit or implicit agreement to allow TLF to claim the Labaton and Lieff SAs on TLF's

lodestar has been disclosed during the Special Master's investigation.

### ix.   SETTLEMENT AND NOTICE TO CLASS MEMBERS

#### a.   Involvement of Government Agencies

The hybrid mediation spanned a period of two and a half years. During this time, while

discovery continued, settlement discussions were ongoing.  In addition to State Street and

plaintiffs' counsel, three government agencies -- the Department of Labor ("DOL"), the

Securities and Exchange Commission ("SEC"), and the Department of Justice ("DOJ") -- were

involved in the negotiations. Each agency independently investigated State Street's alleged

misconduct, and each agency reached its own settlement with State Street in furtherance of their

respective enforcement goals. See Dkt. No. 104, ¶¶ 8, 38; see also Sarko 7/6/17 Dep., p. 41:9-14;

Kravitz 7/6/17 Dep., pp. 56:25 – 57:4. The DOL -- charged with overseeing administration of the

ERISA statute -- paid particular attention to the settlement of the claims of the ERISA plan

participants, ensuring that the settlement recovery amount was adequate and commensurate with

the agency's own evaluation of the case.  Sarko 7/6/17 Dep., p. 79:6-15.  Keller Rohrback's

Lynn Sarko was the lawyer principally responsible for negotiating with the DOL. State Street, in

turn, made it clear that a global settlement with all private class members and all government

---

[20] Rachael Wintterle, a contract attorney housed at Lieff's office, was billed by Lieff at $515 per hour. See Dkt. No. 104-17, Exhibit A. David Alper and Dorothy Hong were billed by Labaton at the same rate as TLF, $425 per hour. See Dkt. No. 104-15, Exhibit A.  Alper had a background in FX training and was a resource for SAs during the State Street case. Alper 6/5/17 Dep., pp. 20: 8-11; 22: 3-8.

agencies was a necessary condition to its willingness to reach a settlement. Sarko 7/6/17 Dep.,

pp. 36:24 – 37:11; *see also* 11/2/16 Hearing Tr., p. 17:8-23.

b.   Preparation and Filing of Settlement Documents

After two and a half years of mediation and negotiation, on June 30, 2015, the parties

reached an agreement-in-principle to settle the consolidated class actions for $300,000,000.00.

Sucharow Decl., ¶ 101.   The terms of a final Term Sheet were negotiated and signed on

September 11, 2015.  *Id.* at ¶ 104.  *See also*, Zeiss 6/14/17 Dep., p. 13:10-22.

Over the ensuing 10 ½ months, Labaton, as Lead Settlement Counsel, undertook the

preparation of the formal settlement documentation.  Nicole Zeiss, Labaton's Settlement

Counsel, had primary responsibility for drafting the settlement agreement and the exhibits for the

settlement agreement, including the preliminary approval motion, brief and order, the plan of

allocation, the judgment, the long-form Notice of Pendency of Class Actions and the Summary

Notice ("Notice"). Zeiss 6/14/17 Dep., pp. 13:10-22; 15:5-6.[21]  Draft versions of the Notice were

circulating among, and reviewed by, Customer Class Counsel and ERISA Counsel.[22]

Zeiss also had the responsibility of preparing the Omnibus Declaration and Brief in

support of Lead Counsel's motion for attorneys' fees and expenses, and for payment of service

awards.  Zeiss 6/14/17 Dep., p. 16:2-6.  This included reviewing and assembling the exhibits to

the brief which consisted of the individual firms' fee declarations and lodestar reports.  *Id.*, p.

---

[21] Rather than have a litigation team member handle settlement, Labaton has compartmentalized its practice, and in that compartmentalization, it created a separate "settlement counsel" position who negotiates and documents all settlements.  Zeiss 6/14/17 Dep., pp. 10:24 – 11:12.  With respect to the *State Street* case, this compartmentalization contributed to some of the problems giving rise to the Special Master's investigation, in particular, the failure to discover the "double-counting" of SAs allocated to TLF and the failure to disclose to the Court Labaton's fee arrangement with Texas attorney Damon Chargois.  These matters are discussed *infra*.

[22] In March 2017, at the request of the Special Master, the Customer Class and ERISA firms each produced a complete record of time entries performed in the *State Street* matter.  These time records indicate that Class Counsel reviewed the Notice and other settlement documents circulated by Zeiss.

16:10-14.  Zeiss drafted the template for the individual fee declarations, circulated it to the other

firms, and worked with them on completing their declarations and exhibits.  *Id*., pp. 16:14-16,

20:18-19.

The Settlement and Fee Petition documents made clear that Labaton was representing

both the Customer Class and the ERISA Class with respect to the settlement of the case.  The

"Notice of Pendency of Class Actions, Proposed Class Settlement, Settlement Hearing, Plan of

Allocation and Any Motion for Attorneys' Fees, Litigation Expenses, and Service Awards,"

which Labaton drafted, bears the case names and numbers of all three class actions, including the

ERISA actions, and provides notice to members of the "Settlement Class" that a Class

Settlement of $300,000,000 has been entered into "by and among (i) plaintiffs Arkansas Teacher

Retirement System ("ARTRS"), Arnold Henriquez, Michael T. Cohn, William R. Taylor,

Richard A. Sutherland, The Andover Companies Employees Savings and Profit Sharing Plan and

James Pehoushek-Stangeland (collectively "Plaintiffs"), on behalf of themselves and each

Settlement Class Member, by and through their counsel, and (ii) State Street Bank and Trust

Company (the "Settling Defendant" or "SSBT")."  *See* Notice of Pendency of Class Actions,

MAD No. 11-cv-10230, Dkt. No. 95-3, filed on August 10, 2016. The Notice further defines the

"Settlement Class" as

> All custody and trust customers of SSBT (including customers for which SSBT served as
> directed trustee, ERISA Plans, and Group Trusts), reflected in SSBT's records as having
> a United States tax address at any time during the period from January 2, 1998 through
> December 31, 2009, inclusive, and that executed one or more Indirect FX Transactions
> with SSBT and/or its subcustodians during the period from January 2l 1998 through
> December 31, 2009, inclusive.

*Id.*

The Notice was widely circulated.

### x. *FEE PETITION REQUESTING ATTORNEYS' FEES*

#### a. Fee Negotiations Among Customer Class Counsel

Around the time the parties reached an agreement-in-principle, Customer Class Counsel engaged in discussions about how to allocate the anticipated fee award among themselves. It is apparent from these discussions that with regard to balancing fees, Lieff and TLF considered their respective roles in the *BONY Mellon* litigation, a fact wholly unrelated to the value added in this case. Dan Chiplock conceded at deposition, as did Garrett Bradley, that the *State Street* and *BONY Mellon* fee discussions became intertwined.  Chiplock 9/8/17 Dep., pp. 22:7 – 23:13; Garrett Bradley 9/14/17 Dep., pp. 114:23 – 125:16.  Contemporaneous emails also reflect the intertwining of the fee negotiations in the two cases. *See* discussion*, infra*.

At the inception of the case, Customer Class Counsel had agreed to a fee sharing arrangement when Labaton teamed with Lieff and TLF, pursuant to which Labaton, Lieff and TLF understood each firm would be entitled to a minimum of 20% of the fee award, with the remaining 40% to be distributed at the end of the litigation, commensurate with each firm's respective contributions to the case.  *See* TLF-SST-033911 – 33913 (5/4/11 letter agreement, p. 2) [EX. 16]; Keller 10/25/17 Dep., pp. 414:14 – 420:10.  *See also*, TLF-SST-040631 (8/28/15 email exchange among Larry Sucharow, Dan Chiplock, Garrett Bradley, M. Thornton, and Bob Lieff regarding the 20-20-20/40 agreement) [EX. 17].

In August 2015, Dan Chiplock expressed an interest in determining the appropriate allocation of the remaining 40%. *Id.*  Garrett Bradley of TLF resisted, opining that the final distribution should wait until the Court made a total fee award.  *Id.*  What became apparent to Chiplock was that TLF viewed any allocation of *State Street* fees as tied to the then yet

undecided *BONY Mellon* fee award. *Id.*[23] ("Not to be difficult but [this is a] very different situation, in other words, from BNYM, (which I know doesn't involve you Larry, but seems to be coloring this discussion.") *See also* TLF-SST-053087 (8/28/15 email from Sucharow to Chiplock ("I believe there are other cases and other agreements which are influencing people's desire to either reach agreement now or later.")) [EX. 18].

Garrett Bradley pressed for an agreement that Lieff share some portion of its allotment in *BONY Mellon* with TLF in recognition of the fact that Thornton had developed the initial FX concept, and refused to settle on an allocation in *State Street* until he saw that TLF was treated "fairly" in *BONY Mellon.* Chiplock 9/8/17 Dep. pp. 22:8 – 23:13; TLF-SST-031166 - 31173 (G. Bradley 8/28/15 email to Bob Lieff ("…I have not agreed that it would be equitable to split the balance of the forty percent the way you described below. What I have said is that may be a fair approach depending on the outcome of our fee in the Mellon matter. If we are treated fairly there, then we will do all we can to treat you fairly in the state street matter…) [EX. 19]; *see also* Bradley to Chiplock email of the same date, *id.* ("What I am pointing out is the inequities of our different positions…. In Mellon … we had created the fx case all we got was some work that resulted in $1.5 million in time.   Now contrast that the State Street where you had no client and no concept…. Once we have an idea of what our Mellon numbers look like, we can discuss how to approach the balance of the 40% with Labaton.") [EX. 19].

Dan Chiplock, the lead attorney in *BONY Mellon*, took exception with the implication that Lieff was not treating TLF fairly in that case.  He pushed back, reminding Bradley in an email two days later that Lieff's role in creating the result in *BONY Mellon* "doubled the value of State Street." *Id.*  (8/30/15 email from Chiplock to Bradley). He further reminded Bradley, "I

---

[23] The settlement in BONY Mellon would be finalized the following month, September 2015.

also gave your firm more assignments than others at the outset in BNYM until it became clear

that the work simply wasn't getting done." *Id.* Bradley asked what Chiplock meant when he

said TLF did not "get the work done." *Id.* "That has never been specified and really should be

to be deemed credible." *Id.* Chiplock agreed to provide Bradley with emails showing the

assignments given to TLF. *Id.*

The discussion turned to lodestar reporting in *State Street* with Chiplock warning

Bradley not to include unwarranted hours in TLF's fee petition:

> In the meantime, while we're on the subject of credibility, I want to point out that we need to be consistent and credible with our lodestar reporting in State Street. We are gathering final lodestar reports now, but I heard third-hand that Mike [Thornton]recently said on a call (that I wasn't on) that Thornton Law Firm was showing $14 million. That number does not comport with the hours Mike Lesser told me for Thornton as of June 29 (around 12,750), which makes more sense given what we know about the work that was done. I am hopeful that Mike T simply misspoke or was guessing when he said $14 million and that we are not going to suddenly see an additional 12,000 hours mysteriously appear on Thornton Law Firm's behalf...Also recognize that your [document] reviewers were all housed outside your firm ad their respective overhead and facilities expenses were paid for by others, which we were happy to do as a courtesy. Thanks.

*Id.*

### b. Submission of the Fee Petition

Customer Class Counsel's discussions about fee sharing were put on hold as *State Street*

settlement negotiations wrapped up, and in advance of the hearing on final approval of the

settlement, Plaintiffs' Counsel submitted to the Court a joint Fee Petition in support of their

request for attorneys' fees in the amount of $74,541,250.00. *See* Dkt. No. 104. The Fee Petition

consisted of the Omnibus Declaration[24] signed by Lawrence Sucharow of Labaton, and nine

---

[24] "Declaration of Lawrence A. Sucharow In Support of (A) Plaintiffs' Assented-To Motion For Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and (B) Lead Counsel's Motion For An Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs." Dkt. No. 104.

individual declarations submitted by each law firm that had filed an appearance in the case. The

individual declarations described the work performed by each firm and the basis for its fee

request. Attached to each declaration was a chart ("Exhibit A") summarizing each firm's

respective lodestar through August 30, 2016. *See* Exhibit A to Dkt. Nos. 104-15, 104-16, 104-17,

104-18, 104-19, 104-20, 104-21, 104-22, 104-23. The narrative descriptions and chart outlines

were taken verbatim from the template provided by Labaton. *See* Zeiss 6/14/17 Dep., pp. 16:10-

16; 21-24.

c. <u>The Labaton Template and Inaccuracies in Declaration
Language</u>

The Labaton template included several paragraphs describing the source of the lodestar

calculations and billing rates. In particular, it included a generic description of the basis for the

hourly rates listed in the lodestar calculation. With the exception of three ERISA firms --

McTigue Law,[25] Zuckerman Spaeder,[26] and Beins Axelrod[27] -- the Customer Class Counsel and

the other ERISA Class Counsel adopted the template language in its entirety.  Specifically,

Labaton provided counsel with the following language:

---

[25] The McTigue Law Firm's individual fee declaration states that "[t]he hourly rates for the attorneys and professional support staff in my Firm included in Exhibit A are the same as my Firm's regular rates otherwise charged for their services, which have been accepted in other complex class actions my firm has been involved in." Dkt. No. 104-18, ¶ 20.

[26] Zuckerman Spaeder's individual fee declaration states that "[t]he hourly rates for the attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions and are charged to clients paying us currently by the hour." Dkt. No. 104-20, ¶ 4.

[27] Beins Axelrod's individual fee declaration states that "[t]he hourly rates charged by the Timekeepers are the Firm's regular rates for contingent cases and those generally charged to clients for their services in non-contingent/hourly matters. Based on my knowledge and experience, these rates are also within the range of rates normally and customarily charged in Washington, D.C. by attorneys of similar qualifications and experience in cases similar to this litigation, and have been approved in connection with other class action settlements. The Firm has charged, and received, an hourly rate of $525.00 in litigation involving fiduciary breach by a former trustee and service providers. The Firm does charge a lower rate to longstanding Fund clients in non-contingency matters and to its Union clients. To serve the public interest, the Firm has also charged reduced rates to individual employees with employment discrimination claims. Dkt. No. 104-22, ¶ 8.

- "The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by each attorney and professional support staff-member of my firm who was involved in the prosecution of the Class Actions, and the lodestar calculation based on my firm's current billing rates. For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court. Time expended in preparing this application for fees and payment of expenses has not been included in this request." (Dkt. Nos. 104-15, ¶ 6; 104-16, ¶ 3; 104-17, ¶ 4; 104-18, ¶ 3; 104-21, ¶ 3; 104-23, ¶ 3).

- The hourly rates for the attorneys and professional support staff in my firm [] are the same as my firm's regular rates charged for their service, which have been accepted in other complex class actions." Dkt. Nos. 104-15, ¶ 7; 104-16, ¶ 4; 104-17, ¶ 5; 104-18, ¶ 4; 104-21, ¶ 4; 104-23, ¶ 4).

TLF adopted the preceding paragraphs verbatim in Garrett Bradley's Declaration, summarizing the basis for TLF's fee request. *See* Dkt. No.104-16. Several representations contained within these paragraphs are inaccurate:

- *Exhibit A is a summary of time spent by attorneys and professional support staff members "of my firm."* None of the SAs were employed by TLF. 3/7/17 Hearing Tr., p. 87:8-10; G. Bradley 6/19/17 Dep., pp. 82:12-21; 83:4-7.

- *The billing rates for the SAs are "based on my firm's current billing rates."* TLF did not maintain "current billing rates" for SAs listed on its lodestar calculation in Exhibit A. 3/7/17 Hearing Tr., p. 87:14-19; G. Bradley 6/19/17 Dep., pp. 48:24 – 49:4; *see also* Exhibit A to Dkt. No. 104-16.

- *For personnel "who are no longer employed," the lodestar is based on their rates for the "final year of employment."* Again, none of the SAs were employed by TLF. 3/7/17 Hearing Tr., p. 87:8-10.

- *The schedule was prepared from "contemporaneous daily time records regularly prepared and maintained by my firm."* TLF did not prepare or maintain daily time records of the hours worked by the SAs listed on its lodestar. Hoffman 6/6/17 Dep., pp. 63:2-7; 69:19-25; 70:12-16; 79:19-23; Kussin 6/5/17 Dep., p. 69:4-17. Nor did TLF maintain contemporaneous time records for the other lawyers working on the *State Street* case. TLF-SST-011246 – 11249 (5/21/14 email from Hoffman to Lesser)("All of the hours are taken from LCHB's chart where there were mentions of

23

discussions with either 'co-counsel' 'team' or, of course, Mike Lesser and/or MPT, GJB." [EX. 20].[28]

▪ The hourly rates "are the same as my firm's regular rates charged for their services." TLF did not maintain "regular rates" for the SAs listed on its lodestar report. 3/7/17 Hearing Tr., p. 88:2-5.

▪ These rates "have been accepted in other complex class actions." With the exception of 4 SAs, the $425 rate charged for the remaining SAs listed on the lodestar, including Michael Bradley, had not been accepted in other complex class actions. G. Bradley 6/19/17 Dep., p. 54:1-7.

Garrett Bradley acknowledged -- both in deposition and during the March 7, 2017 hearing before Judge Wolf -- that TLF's declaration was inaccurate and "should have been clearer." 3/7/17 Hearing Tr., p. 91:4-6; G. Bradley 6/19/17 Dep., p. 82:12-21. At the March 7 hearing, Bradley conceded that the language described above "should have been clarified by me at that time," but was not. 3/7/17 Hearing Tr., p. 88:18-19. There is ample evidence in the record that Garrett Bradley actually knew the Declaration contained inaccurate information but signed it anyway. See, e.g., 3/7/17 Hearing Tr., p. 87:13-14; 88:2-9, 14-18; 91:5-7; 92:3-8.

### d. Staff Attorney Time

Customer Class Counsel's individual fee petitions also included requests for fees for the SAs. On the lodestar summary charts (Exhibit A to the declarations), Labaton listed 25 SAs ("SAs"); Lieff listed 20 SAs; TLF listed 24 SAs. See Sucharow Decl., Dkt. No. 104-15, Ex. A; Chiplock Decl., Dkt. No. 104-17, Ex. A; G. Bradley Decl., Dkt. No. 104-16, Ex. A. In total, Customer Class Counsel reported 59,129.4 hours performed by SAs during the State Street case, accounting for nearly 70% of the Customer Class Counsel's total lodestar. See Labaton's, Lieff's and TLF's Lodestar Reports, Dkt. Nos. 104-15, Ex. A; 104-16, Ex. A; and 104-17, Ex. A;

---

[28] Garrett Bradley and Michael Thornton were asked for contemporaneous records, but never provided any. TLF provided a spreadsheet containing time entries recreated after the fact based on records received from other firms, mainly Lieff, working on the State Street case.

*see also* Master Chart of Lodestars & Expenses, Dkt. No. 104-24.  As the chart below reflects, of

TLF's total of 14,731 claimed hours, 10,537.9 hours (71.5%) were hours worked by "loaned"

Labaton and Lieff SAs.  Specifically, the Customer Class firms' lodestar Reports reflected the

hours and lodestar of partners, associates and SAs in the following amounts:

| FIRM | PARTNERS & ASSOCIATES | STAFF ATTORNEYS |
|---|---|---|
| **LABATON** | 5,783.6 hours | 31,526.4 hours |
| | $4,784,915.50 | $11,684,111.00 |
| **LIEFF** | 2,025.1 hours | 17,065.1 hours |
| | $1,391,346.50 | $7,474,896.50 |
| **TLF** | 4,193.1 hours | 10,537.9 hours |
| | $2,831,287.00 | $4,508,837.00 |

### xi.  *COURT APPROVAL OF THE SETTLEMENT AND FEE AWARD*

#### a.  Preliminary Approval

On August 8, 2016, the Court conducted a Preliminary Class Settlement Hearing, after

which it granted preliminary approval of the class settlement,[29] provisionally certified the

Settlement Class (as defined in the Notice of Pendency of Class Actions), approved the long-

form Notice of Pendency of Class Action and Summary Notice, and appointed Labaton

Sucharow LLP as Lead Counsel for the Settlement Class.  *See* MAD No. 11-cv-10230, Dkt. No.

97.

---

[29] As explained by Goldsmith during the August 8 hearing, "the reason why [class certification is] preliminary and not final is because class members do have a constitutional right to object to class certification if they see fit to do so." 8/8/16 Hearing Tr., p. 6:11-15.

David Goldsmith of Labaton appeared on behalf of the Settlement Class at the hearing. 8/8/16 Hearing Tr., pp. 4-6. Michael Thornton of TLF and Dan Chiplock of Lieff Cabraser, as well as attorneys from the three ERISA firms, also attended the hearing.  *Id.*, pp. 2-4. On behalf of all counsel, Goldsmith addressed plaintiffs' request for preliminary class certification for settlement purposes, which involved meeting a two-prong test to show that class representatives and class counsel adequately represent the class members. 8/8/16 Hearing Tran., pp. 7:24-8:7.  In response to the Court's inquiry whether Labaton could adequately represent both the ERISA and Customer classes, Goldsmith responded that Labaton was "adequate"; he argued that the Court had "no reason to depart" from its initial adequacy findings in the January 12, 2012 Memorandum and Order appointing Labaton as interim class counsel. *Id.*, p. 8:18-22. The Court acknowledged, and Goldsmith agreed, that a class member may opt out of the settlement if he or she "feels that its [sic] interests justify a different path." *Id.*, p. 11:6-13.

The Court further asked Goldsmith to explain why the $300 million private settlement was reasonable, and specifically addressed the role of the DOJ, SEC, and DOL in the settlement process. *Id.*, p. 13:2-7. The Court showed a genuine interest in ensuring that the global settlement was fair to all participants: "if what I'm being asked to approve is going to affect something you've negotiated at arm's length with the [DOJ] and something you've negotiated with the SEC and something you've negotiated with the [DOL], I think that goes into both the reasonableness of the settlement and the fairness of the settlement." *Id.*, p. 18:13-22. Goldsmith affirmed that the reasonableness of the settlement is evidenced, in part, by the fact that DOL signed off on it. *Id.*, p. 18:2-6.

b. Final Approval

On November 2, 2016, a hearing was held on Plaintiffs' Assented to Motion for Final

Approval of Settlement and Lead Counsel's Motion for an Award of Attorneys' Fees and for

Payment of Service Awards.  Goldsmith, accompanied in the courtroom by Zeiss, again

represented the "plaintiffs and settlement class." 11/2/16 Hearing Tr., pp. 3:7-9, 10-11.  Dan

Chiplock of Lieff Cabraser and Carl Kravitz of Zuckerman Spaeder also attended the hearing.

*See id.*, pp. 2-3.[30] During the hearing, the Court approved the settlement, explaining that its

approval was based, in part, on its finding that counsel on both sides "vigorously represented

their clients' interest." 11/2/16 Hearing Tr., p. 21:1-5. The Court also found the proposed Plan of

Allocation to be fair.  *See id.,* p. 22:16-21. The Court further noted the importance of the parties

having reached a global settlement, including settlement with the federal regulators, in particular

the DOL and SEC.  *Id.* at pp. 17:8-23, 38:12-20.

In considering the reasonableness of the attorneys' fees requested, the Court inquired

whether the plaintiffs' fee agreement was disclosed to the class members "at the outset" of the

case, to which Goldsmith responded only that the fee agreement was "consistent with the fee

[plaintiffs were] seeking here." *Id.* p. 26:12-13. In a colloquy with the Court, Goldsmith argued,

"[W]e produced a $300 million settlement…. So I think … a fee of some substance would be in

order, frankly." *Id.*, p. 28:16-20.  The Court acknowledged that the $74 million in fees requested

by counsel "is of some substance," *id*, p. 28:21-25, but noted that none of the class

representatives had objected to that fee request.  *Id*., p. 34-8-9.

---

[30] There is nothing in the record evidence indicating that any other attorneys from Labaton, Lieff, TLF, or any of the
ERISA firms were in attendance at the final approval hearing.

At the conclusion of the hearing, stating that he was "relying heavily on the submissions and what's been said today," Judge Wolf approved a 25% award of attorneys' fees in the amount of $74,541,250.00, plus expenses in the amount of $1,257,699.94. *See id.* p. 35:4-8.  The Court also approved service awards totaling $85,000 -- $25,000 for ATRS and $10,000 for each of the six ERISA plaintiffs.  *Id.* at pp. 33:4-6, 35:9-12. Judgment was entered accordingly.  *See* Order and Final Judgment, Dkt. No. 110.  The Judgment became final on December 2, 2016.

### xii. *DISTRIBUTION OF SETTLEMENT AND ATTORNEYS' FEES*

As provided in the Plan of Allocation approved by the Court at the Final Settlement Hearing, $60 million of the $300 million gross settlement was allocated to the ERISA class plaintiffs, providing ERISA plan participants with a recovery ratio of roughly $2 to every $1 of loss to the class.  *See* Sucharow Decl., Dkt. No. 104, ¶ 134.  The Plan of Allocation further provided that a maximum of $10.9 million of the approximately $75 million in total attorneys' fees could be paid out of the ERISA Class' recovery for attorneys' fees.[31]  This allocation was negotiated and agreed to by Customer Class Counsel and ERISA Counsel after the parties reached the agreement-in-principle on the $300 million settlement, *See* Sucharow Decl., ¶ 139; *see also* Kravitz 7/6/17 Dep., pp. 54:25 – 55:1; 59:11-12; Sarko 7/6/17 Dep., p. 48:19; McTigue 7/7/17 Dep., p. 43:10-11.  In accordance with the Plan of Allocation and the ERISA fee allocation previously agreed upon among the Customer Class Counsel and ERISA Counsel, ERISA Counsel collectively received 10% of the total fee award -- a sum of $7.5 million -- with

---

[31] The $10.9 million cap in attorneys' fees from the ERISA class recovery was negotiated by DOL. Sarko 9/8/17 Dep., p. 66:1-8; Kravitz 9/11/17 Dep., p. 66:8-23; *see also* TLF-SST-052694 – 52696 (8/21/15 email correspondence between Customer Class counsel and ERISA counsel related to negotiations with DOL regarding fees) [EX. 21]; TLF-SST-052697 – 52698 (8/26/15 email from Lynn Sarko to Customer Class counsel and ERISA counsel regarding negotiated deal with DOL) [EX. 22].

the remaining $3.4 million under the agreed-upon $10.9 million ERISA fee cap being paid back to Customer Class Counsel instead of to ERISA Counsel.  *See* Sucharow Decl., ¶¶ 134-139.

### a.   Payment of Fees and Expenses

On September 2, 2016, State Street paid the gross settlement sum of $300 million into a Class Settlement Fund Escrow Account -- an escrow account maintained by Labaton, as Lead Settlement Counsel, with Citibank -- where the funds remained pending entry of Judgment. *See* Stipulation and Agreement of Settlement, Dkt. No. 89; Zeiss 9/14/17 Dep., pp. 122:15, 124:9-11, 130:21-23; *see also* LBS041692 (Citibank Escrow Account Statement).  Under the terms of the Stipulation, Labaton agreed that, once Judgment became final it would "in good faith promptly distribute any award of attorneys' fees and/or payments of litigation expenses among *plaintiffs' counsel.*" Dkt. No. 89 ¶ 21 (emphasis added).

After the Court issued its Order awarding fees, the total sum of the fee award was transferred by Labaton into a Lead Counsel Escrow Fund, also held by Citibank. Zeiss 9/14/17 Dep., pp. 124:16-23; 125: 3-4.  On December 8, 2016, after Judgment became final, Labaton instructed the bank to disburse the fees, expenses, and service awards approved by the Court. *Id.*, p. 125:13-21. The fees and expenses were disbursed by the bank directly to Lieff, TLF, McTigue, Keller Rohrback and Zuckerman Spaeder.  Zeiss 9/14/17 Dep., p. 125:13-21.  Labaton also instructed the bank to transfer approximately $34 million to its firm's IOLA account, out of which Labaton paid the service awards, obligations to "of counsel" attorneys,[32] and

---

[32] "Of counsel" here refers to Goldman Scarlato & Penny. Goldman Scarlato & Penny performed work on the case, and is reflected in the lodestar report Labaton submitted to the Court. Zeiss 9/14/17 Dep., pp., 143:17-20; 144:6-7.

approximately $4.1 million to Texas attorney, Damon Chargois, that same date. *Id.*, pp. 140:21 – 141; 143:4-8.[33]

The $4.1 million payment to Chargois was the fourth largest payment made from the total fee award, and more money than was paid to any ERISA firm. *See* Master Chart of Lodestars, Litigation Expenses and Plaintiffs' Service awards, Dkt. No. 104-24. In coordinating the payment to Chargois, Zeiss instructed Labaton's accounting department to remit payment from the firm's IOLA if "it will be a rush" to pay Chargois. 12/7/16 Zeiss Email to Ng, LBS 032881 – 32883 [EX. 50]. Unlike payments from settlement escrow funds -- governed by escrow agreements -- payments made from Labaton's IOLA account did not require two additional signatures for disbursement. *See* Zeiss 9/14/17 Dep., p. 120:9-23.  Chargois testified that it did not matter to him when, or from which account, the payment was made.  Chargois 10/2/17 Dep. pp. 304:9-10; 305:3-10.

The $4.1 million payment to Chargois was uncovered during the course of the Special Master's investigation.[34]  Chargois never filed an appearance in the *State Street* case, nor did he, or his firm, Chargois & Herron, submit any declaration or lodestar report as part of the *State Street* Fee Petition.  *See* Dkt. Nos. 104, 104-15, 104-16, 104-17, 104-19.

All parties concede Chargois performed no work on the case.

---

[33] Labaton has not yet distributed money to the class members. Zeiss 9/14/17 Dep., p. 133: 2-5, 9-12. As of July 2017, the Class Settlement Account contained $224,978,733.34. *Id.*, p. 132:6-10.

[34] This payment of fees to Chargois first came to light in a batch of emails produced by TLF on August 8, 2017 and gave rise to several additional months of depositions and written discovery. Neither Labaton nor Lieff produced any emails related to Chargois in response to the Special Master's initial requests for production of documents. *See*, *e.g.*, Special Master's First Set of Interrogatories to LCHB (Revised) Nos. 5, 10, 62, 74; Special Master's First Set of Interrogatories to LBS (Revised) Nos. 4, 9, 60, 72; Special Master's First Set of RFPs to LCHB (Revised) 3, 16, 40. After the Chargois relationship was disclosed by the TLF-produced emails in response to the Special Master's initial document requests, both Labaton and Lieff produced a significant number of emails and documents pertaining to the Chargois relationship and payment in response to subsequent document requests by the Special Master specifically related to Chargois.

The names Chargois and/or Chargois & Herron appear nowhere in the Fee Petition or any of its exhibits. *See id.* All parties concede that the Court was never informed about Chargois or the payment of $4.1 million to his firm. *See* Belfi 9/5/17 Dep., pp. 87:24-88:11; 89:1-17; 90:7-12; 122:23-123:5; Goldsmith 9/20/17 Dep., p. 112:10-14; G. Bradley 9/14/17 Dep., pp. 152:19-153:16.

## B.   INVOLVEMENT OF LABATON AND CHARGOIS IN THE STATE STREET CASE

### i.   *LABATON'S INTRODUCTION TO ATRS*

Labaton represented ATRS throughout the *State Street* case, serving as Lead Counsel throughout the litigation. ATRS was headed by Executive Director George Hopkins. Hopkins had succeeded Paul Doane, the previous Executive Director, on December 29, 2008. Hopkins 9/5/17 Dep. p. 14:10-22. [35]

Labaton's relationship with ATRS began in or about 2007. Around that time, Labaton was looking to expand its securities monitoring practice and form new relationships with potential pension fund clients. Keller 10/13/17 Dep., p. 21:1-22; Sucharow 9/1/17 Dep. pp. 15:3-16:19; Chargois 10/2/17 Dep., p. 32:3-22. In an effort to "mak[e] inroads" in the Arkansas community, Labaton sought the assistance of Damon Chargois, a lawyer admitted to practice law in Arkansas and Texas (and who in 2007 maintained law firms under the name Chargois & Herron in each state.)[36] Labaton had previously retained Chargois to serve as its local counsel in

---

[35] After Paul Doane resigned, for a brief period of time ("three or four months") ATRS was headed by an interim director, Gail Bolden, Doane's deputy director. Hopkins 9/5/17 Dep., p. 14:14-22. Hopkins succeeded Gail Bolden. *Id.*, p. 14:18-20.

[36] Chargois & Herron's Arkansas office was closed in late 2009 or early 2010. Chargois 10/2/17 Dep., p. 31:15-17.

*HCC Holdings,*[37] a securities fraud class action case filed in federal court in Houston.[38]  In

September 2007, Chargois introduced Labaton partners Eric Belfi and Christopher Keller to Paul

Doane, Executive Director of ATRS, at that time. Chargois 10/2/17 Dep., pp. 33:24-35:22.

Chargois recalled Belfi asking him in 2007 to introduce him and his partner Chris Keller

to institutional investors in Arkansas, as Labaton was interested in creating client relationships

with institutional investors in that region.  *Id.*, p. 20:4-17.  Chargois readily admitted that at the

time he had no knowledge of any "institutional investors."  *Id.* at p. 20:20. Chargois' then

partner, Tim Herron, did not have any relationships with institutional investors, either. *Id.*, p.

27:16-19.  However, Herron was friends with an Arkansas state senator, Steve Farris, and Farris

suggested to Herron that they might want to try to contact Paul Doane who had then just recently

taken over as Executive Director of the Arkansas Teacher Retirement System.  *Id.*, p. 33:16-21.

Herron told Chargois, and Chargois called Doane.  *Id.*, p. 33:24-34:1.

Chargois explained to Doane that he was working with a New York law firm that

specialized in institutional investors and asked if Doane would meet with him, Belfi and Keller,

and Doane agreed.  *Id.*, p. 34:1-35:3.  Within a week or so, a meeting took place in Little Rock.

Chargois 10/2/17 Dep., p. 35:8-16.  At that initial meeting, "Eric Belfi presented all the services

that Labaton has available and what their -- what they could do and presented as a courtesy that

they could do this monitoring of the portfolio."  Chargois 10/2/17 Dep., p. 36:13-16.  Doane later

came to New York for another meeting with Belfi and Keller at Labaton's offices; Chargois was

not present.  Belfi 9/5/17 Dep., p. 38:2-6.  At this meeting, Labaton did a presentation for Doane

---

[37] *In re HCC Insurance Holdings, Inc. Securities Litig.*, SDTX No. 07-00801.

[38] In contrast to this case, in *HCC Holdings,* Chargois filed an Affidavit in support of the Application for an Award of Attorneys' Fees and Reimbursement of Expenses, which included a lodestar report of his firm, Chargois & Herron LLP.  *See In re HCC Insurance Holdings, Inc.*, SDTX No. 07-00801, Dkt. No. 71-3.

as to what services the firm could provide.  According to Belfi, "[O]nce we did the presentation,

we were kind of put on their radar.  So, at some point later when they did the RFQ [of

prospective monitoring counsel], they sent an RFQ for us to respond to."  Belfi 9/5/17 Dep., p.

37:17-22.

## ii.     THE CHARGOIS "ARRANGEMENT"

As consideration for Chargois' efforts, Belfi and Keller agreed to pay Chargois' firm,

Chargois & Herron, a maximum 20% of any attorney's fees received by Labaton in any litigation

involving an institutional investor for whom Chargois had facilitated the introduction, including

ATRS (hereinafter "the Chargois Arrangement").  Chargois 10/2/17 Dep., pp. 50:18-25; 53:10-

17; Keller 10/25/17 Dep., pp. 315:21-24, 316:11-14.[39]  Both Chargois and Belfi understood that

it was the mere introduction by Chargois to potential institutional investors or potential antitrust

clients that was the basis of the agreement to pay Chargois 20% of any legal fee Labaton earned

on any cases in which Labaton was lead counsel or co-lead counsel and the client was lead or co-

lead plaintiff.[40]  Chargois 10/2/17 Dep., p. 50:18-24; Belfi 9/5/17 Dep., pp. 19:6-21:21. Under

---

[39] Labaton had a similar 20% arrangement with TLF (and in particular, TLF partner, Garrett Bradley). As Christopher Keller of Labaton explained:

> [W]e had a very, sort of, good, productive relationship with the Thornton Law Firm and -- where, you know, we would -- we would jointly get retained by, you know, funds in the Northeast area, which was their sort of area of -- they had lots of relationships within the area. And we, you know, had an understanding they would get, sort of, let's say, up to 20 percent. And the understanding was that, it was going to be somewhat of a, I call it, a turnkey, but I'm using a -- what I mean is we didn't have to do any heavy lifting up in the -- up in the area, because there's a lot -- I mean, we're a national firm. Think about this, so we have over 200 pension fund clients, we may have one within driving distance of our office okay.  So we maintain a national practice and -- but without offices all over the nation. So it's very important, any time that we can leverage others who -- who are ready and willing and able to do the heavy lifting locally, we're happy to sort of let that happen, and, of course, pension funds feel much more comfortable with people they know or people who are close by or were introduced through someone they know, so we made that a -- a -- this is how Labaton was going to build more business.

Keller 10/13/17 Dep., pp. 43:3-44:19

[40] While Chargois understood that he would receive 20%, as Keller testified, Labaton believed that it was only obligated to pay Chargois a percentage of fees proportional to ATRS's share of the contributory losses incurred by all lead plaintiffs. By way of example, if ATRS was named co-lead counsel with another plaintiff in a successful

this arrangement, Chargois was not expected to file an appearance or assume a substantive role in any of the resulting litigation, or even interface with the client. Chargois 10/2/17 Dep., pp. 56:19-24; 57:1-6; Keller 10/25/17 Dep., p. 323:2-4.

While Chargois and Keller attempted on numerous occasions over the years to reduce this agreement to writing, and exchanged several drafts to which they both agreed in large measure, no formal agreement was ever put together; it was wholly "an email relationship." Chargois 10/2/17 Dep., p. 59:8-10 ("Only e-mails. There's no four-corner document that -- in ceremony and signed or anything. It's just an e-mail relationship." *Id*.)  Chargois was very clear that his understanding was that this was not a "referral fee" arrangement, nor was he "local counsel"; it was just an "agreement":

> THE SPECIAL MASTER: What is your understanding of the relationship? And if it evolved from something to something else --
>
> THE WITNESS [Mr. Chargois]:  Right.
>
> THE SPECIAL MASTER: -- we'd be very interested in that.
>
> THE WITNESS: At the very beginning I thought I would be local counsel. I was not.
> . . . .
>       When Eric informed me that [the joint RFQ] had been kicked back, I needed to withdraw, ever since then I've only referred to this as an agreement. I don't have a client so...
>
> THE SPECIAL MASTER: Just an agreement?
>
> THE WITNESS: Just an agreement.
>
> THE SPECIAL MASTER: Not a referral fee arrangement?
>
> THE WITNESS: No, sir.
>
> THE SPECIAL MASTER: Not a local counsel arrangement?

---

litigation, Chargois' payment would not be 20% of Labaton's fee, but would reflect ATRS's pro rata portion of the total loss amount, offsetting the full 20% figure

THE WITNESS: No, sir.

THE SPECIAL MASTER: Not a forwarding fee arrangement?

THE WITNESS: I'm not sure what forwarding fee means.

MR. SINNOTT: Neither are we.

THE SPECIAL MASTER: We weren't either.  I was going to follow up on that and ask you if you've ever heard the term.

THE WITNESS: I have not.

THE SPECIAL MASTER: So just a fee arrangement or just an arrangement?

THE WITNESS: I've always referred to it as our agreement.

Chargois 10/2/17 Dep. pp. 62:10-64:5.

While Labaton's relationship with Chargois began with Chargois & Herron serving as "local counsel" in the *HCC Holdings* Texas class action, it is clear that the relationship evolved over time.  *See* Chargois 10/2/17 Dep., pp. 17:19-21; 38:23-24, 39:1; Sucharow 9/1/17 Dep., p. 81:16-20. As a result, the terminology used to describe the Chargois Arrangement varies greatly between individuals. Counsel has labeled Chargois as "local counsel," or "the local," while on other occasions describing the Chargois Arrangement as based in "referral" or a "referral obligation." *See, e.g.,* LBS027776 (4/24/13 Bradley email to others) [EX. 23]; M. Thornton 9/1/17 Dep., p. 38:13-15; Chiplock 9/8/17 Dep., pp. 68:4-7, 102:3-8; Keller 10/13/17 Dep., pp. 45:11-16; 71:24-72: 4; 96:16-18; 212:5-12. In yet other instances, the Chargois Arrangement is characterized as a "forwarding obligation." Sucharow 9/1/17 Dep., pp. 59:13-19; 86:8-12. Finally, Sucharow testified that he considered Chargois a "joint venturer" working with Labaton to find pension clients. Sucharow. 9/1/17 Dep., p. 16:1-3. Regardless of the title used, it is undisputed that Chargois' sole contribution to -- and only role in -- the *State Street* case was

facilitating an introduction between Labaton and ATRS -- years before the *State Street* case was even contemplated.  Sucharow 9/1/17 Dep., p. 82:7-10.

### iii.    THE ATRS REQUEST FOR QUALIFICATIONS (RFQ)

Chargois' efforts got Labaton the "foot in the door" it wanted and needed with ATRS.  In mid-2008, ATRS issued a Request for Qualifications ("RFQ") to Labaton, among other firms.  Chargois 10/2/17 Dep., p. 37:19-22. On July 30, 2008, Labaton responded by submitting a "joint proposal" on behalf of Labaton and Chargois & Herron.  LBS017738 – 17755 (7/30/08 Joint Response by Labaton Sucharow LLP & Chargois & Herron, LLP) [EX. 24]; *see also* Belfi 9/5/17 Dep., p. 37:20-23.  Labaton, through Belfi, received ATRS's response to the RFQ on October 13, 2008 by email from ATRS Chief Counsel, Christa Clark.  *See* LBS 017455 - 17456 (10/13/08 email from C. Clark) [EX. 25].  Clark advised Belfi that Labaton had been selected as an additional monitoring counsel for ATRS, but that Chargois & Herron was *not* approved as part of the proposal. *Id.*  Clark indicated that while there was no requirement to use Chargois & Herron, Labaton could use Chargois & Herron on a "case by case basis," if they were "a necessary and appropriate expense." *Id.*  Specifically, Clark's email to Belfi stated in relevant part:

> I am pleased to inform you that subject to final approval of the Attorney General's ATRS has selected Labaton Sucharow as an additional monitoring counsel for our system.
>
> I would like to speak to you regarding the additional firm on your submission Chargois & Herron.  This is a little awkward, but since your firms are not legally affiliated, we are unable to process the state contract form with both firms listed.
>
> If your firm is doing the monitoring and providing the financial backing for the cases, I think it is most appropriate that we add your firm independently to the list of approved firms.  Your firm *may affiliate that firm or use them as independent contractors, if you deem is* [sic] *appropriate on a case by case basis.  There would be no requirement that you use them if it was not a necessary and appropriate expense of a case.*  I don't know

how to best handle this point but the state procurement process is not conducive to a joint proposal.

*See* LBS 017456 (10/13/08 email from C. Clark) (emphasis added) [EX. 25].

Chargois understood that his firm was not accepted as part of the RFQ process. Chargois 10/2/17 Dep., pp. 48:15-49:1.

At no point after receiving Clark's email did Labaton inform Ms. Clark, Mr. Doane (or his successor, George Hopkins) of the pre-existing Chargois Arrangement generally, or that it was obligated to pay Chargois a portion of any fees that might be awarded in its representation of ATRS in the *State Street* matter. Belfi, 9/5/17 Dep. pp., 23:5-16; 115:17-21; 118:16-19; Keller 10/25/17 Dep., p. 297:14-16.

### iv.    ATRS' LACK OF KNOWLEDGE OF THE CHARGOIS ARRANGEMENT

Beginning in 2008, Labaton went on to serve as monitoring counsel for ATRS.[41]  Belfi 9/5/17 Dep., p. 18:6-7.  Shortly thereafter, George Hopkins replaced Paul Doane as Executive Director of ATRS.  *Id.*, at 27:16-18.  Belfi explained that Hopkins was a much more direct person, who only wanted to deal with Belfi.  Belfi 9/5/17 Dep., pp. 27:18-28:7, 56:22-57:10. Hence, the relationship between Chargois and ATRS shifted with Hopkins' appointment.  Belfi 9/5/17 Dep., p. 57:11-24.  Labaton no longer needed Chargois to facilitate communications with ATRS.  Nevertheless, Labaton continued to remit payments to Chargois under their previous arrangement to avoid litigation by Chargois that would likely be filed in Chargois' home state, Texas. Belfi 9/5/17 Dep., 58:1-7, 10-15.

---

[41] Labaton continues to serve as one of five firms "on retainer" to ATRS, responsible for monitoring ATRS' investment portfolio and alerting ATRS to potential misappropriation or unexpected monetary loss. Hopkins 6/14/17 Dep., pp. 29:9-22; 30:3-5.

George Hopkins worked closely with Labaton in deciding to file the *State Street* lawsuit, and he remained very involved in the case, including in the mediation process, spending "hundreds of hours" working on the case during its five-year history. Hopkins 6/14/17, p. 102:35.

Labaton sought Hopkins' approval before partnering with Lieff and TLF in the class action litigation. However, Labaton did not seek Hopkins' approval to share information with or remit payment to Chargois. Hopkins, in fact, was never informed of the existence of Damon Chargois nor of any agreement between Labaton and Chargois, much less one that entitled Chargois to 20 percent of any attorney fee recovered by Labaton on behalf of ATRS. *See* Hopkins 9/5/17 Dep., pp. 21:5-10, 64:4-67:11; Belfi 9/5/17 Dep., pp. 18:9-20:17; 24:6-20. [42]

It is apparent from Labaton's email correspondence with George Hopkins that Labaton took pains at every turn not to reveal Damon Chargois, Chargois & Herron, or their 20% interest in ATRS cases to Hopkins. Rather than include Chargois as a co-addressee or cc him on email correspondence concerning ATRS cases in which Chargois & Herron had an interest, Eric Belfi

---

[42] Hopkins testified that he "had no idea" that Chargois had introduced Belfi and Keller to ATRS before his tenure. In fact, Hopkins had never even heard of Damon Chargois or Chargois & Herron prior to their disclosure during the Special Master's investigation in August 2017. Hopkins 9/5/17 Dep, pp. 20:22-21:10; 64:4-65:24.

Hopkins testified regarding his knowledge of Chargois:

Q.   Were you aware that members of a law firm with a Little Rock office had introduced individuals that you would later come to know as Eric Belfi and Chris Keller to influential Arkansas officials in an effort to secure legal work with the state?
A.   I had no idea.
Q.   Are you familiar with the firm name Chargois & Herron?
A.   As of about two weeks, ten days ago.
Q.   But you never encountered them to the best of your recollection years ago?
A.   I had never heard of that firm before.

Hopkins 9/5/17 Dep, pp. 20:22-21:10.

of Labaton either blind-copied Chargois or Herron, or separately forwarded the emails to them,

the effect of both being the same -- to not reveal Chargois & Herron to Hopkins   *See, e.g.,*

- LBS 018439 (Chargois and Herron bcc'd on 5/10/10 email from Belfi to Hopkins re: "Blue Ribbon" report for *Goldman Sachs* litigation) [EX. 26];

- LBS 017505 (Tim Herron bcc'd on 5/6/10 email from Belfi to Hopkins updating status of The Hartford securities litigation) [EX. 27];

- LBS 018437 – 18438 (5/15-16/10 email chain from Hopkins to Belfi re: potential joint filing of a case with Nix Patterson, forwarded by Belfi to Chargois) [EX. 28];

- LBS 020417 – 20418 (5/14/10 letter from Belfi to Hopkins re: *Colonial BancGroup* case, forwarded to Chargois on 5/17/10) [EX. 29];

- LBS 017822 (Chargois bcc'd on 5/2/13 email from Belfi to Hopkins re: motion to dismiss filed in the *Facebook* case) [EX. 30];

- LBS 017824 (10/23/13 email from Belfi to Hopkins re: *Facebook* securities litigation, w/attachments, forwarded to Chargois) [EX. 31];

- LBS 017825 – 17826 (Chargois bcc'd on 7/24/13 email from Belfi to Hopkins re: *Goldman Sachs* trial) [EX. 32].

*See also* Belfi 9/5/17 Dep., pp. 110:5 – 113:5; Keller 10/25/17 Dep., pp. 353:14-354:17; 358:1-24; 463:2-464:2.

Nor did the Retainer Agreement in *State Street* signed by Hopkins disclose the Chargois Arrangement.  The Retainer Agreement provided, in relevant part, that ATRS agrees that Labaton "may divide fees with other attorneys for serving as local, as referral fees, or for other services performed in connection with the Litigation." LBS019948 – 19950 (9/24/10 Retainer Agreement, p. 2) [EX. 33]; *see also* LBS005362 – 5364 (2/8/11 Engagement Letter from Eric Belfi to George Hopkins). [43]  [EX. 34].  It further provided that "[t]he division of attorneys' fees

---

[43] Specifically, the Retainer Agreement provides:

with other counsel may be determined upon a percentage basis or upon time spent in assisting

with the prosecution of the Litigation." *Id*.  The Retainer Agreement did not name any individual

attorney nor specify which, if any, of these "services" it would seek as part of the litigation. *See*

*id.*  It contains only a vague reference to "referral fees," but it does not name Chargois, or

Chargois & Herron, and makes no reference to the obligation to Chargois the ATRS lawsuit

would trigger or how the payment would be made.   Chargois acknowledged he played no role

whatsoever in ATRS's *State Street* lawsuit, and only met George Hopkins once, when he

happened to be in San Francisco visiting his sister and attended an unrelated court hearing.

Chargois 10/2/17 Dep., pp. 54:18-23, 74:21-75:3.

> a.   Agreement Among Labaton, Lieff and Thornton to Share in the
>      Payment of Labaton's Obligation to Chargois

Labaton's obligation to pay Chargois 20% of any fee it might be awarded in State Street

was disclosed to Lieff and TLF in or about April 2013.   The subject was first raised at a meeting

during a Global Justice Network conference, an event organized by Bob Lieff and attended by

Michael Thornton, Garrett Bradley, and Lynn Sarko.[44]  Lieff 9/11/17 Dep., p. 63:10-22.  In an

April 26, 2013 email from Garrett Bradley to Robert Lieff, Michael Thornton, Eric Belfi,

Christopher Keller and Dan Chiplock, and copied to Chargois (referred to by the parties as the

---

Arkansas Teacher agrees that Labaton Sucharow *may allocate fees to other attorneys who serve as local or liaison counsel, as referral fees, or for other services performed in connection with the Litigation.*  The division of attorneys' fees with other counsel may be determined upon a percentage basis or upon time spent assisting with the prosecution of the Litigation.   Any division of fees among counsel will be Labaton Sucharow's sole responsibility and will not increase the fees payable by Arkansas Teacher or the class upon a successful resolution of the Litigation.

LBS 011060 – 11062 (9/24/10 Retainer Agreement) (emphasis added).  [EX. 35].

[44] Bob Lieff testified that he does not have a specific recollection of a conversation with Bradley and Michael Thornton regarding Chargois.  Lieff 9/11/17 Dep., p. 66:2-5. Although Lynn Sarko attended the Global Justice Network meeting, there is no evidence that he was party to any discussion with Bob Lieff, Michael Thornton or Garrett Bradley concerning Chargois and Sarko testified that he did not learn about the Chargois arrangement until it was disclosed in the Special Master's investigation in August 2017.

"Dublin email"), Chargois was referred to as "the local counsel who assists Labaton in matters

involving Arkansas Teachers Retirement System." LBS 025771. In that email, Garrett Bradley

memorialized an agreement reached earlier among the three Customer Class law firms to share in

the payment of Labaton's 20% obligation to Chargois.[45] In relevant part, Bradley's email stated

as follows:

> Bob, as you, Mike and I discussed in Dublin last week, I am sending this e-mail
> regarding the obligation to the local counsel who assists Labaton in matters involving the
> Arkansas Teachers Retirement System. Labaton has an obligation to this counsel, Damon
> Chargois, copied on this e-mail, of 20 percent of the net fee to Labaton in the State Street
> FX cases before Judge Wolf. Currently this amount will be 4 percent because of the
> agreement between Labaton, Thornton and Lieff of a division of 20 percent guaranteed,
> each with the balance to be decided on at a later date. Obviously, this may go up should
> Labaton receive an amount higher than 20 percent. We have agreed that the amount due
> to the local, whatever it turns out to be, 4 or 5, will be paid off the top with the balance
> fee split between Lieff, Labaton, Thornton pursuant to our agreement. The local asks that
> I copy him on this e-mail so he will have confirmation of this agreement. When we spoke
> to him, he was agreeable to this as well. Garrett.

LBS 025771 (4/25/13 G.Bradley email to R. Lieff, M. Thornton, E. Belfi, C.Keller and D.

Chiplock, copied to Chargois)). [EX. 37].

Discussions concerning the specific percentage to be paid Chargois were ongoing while

the parties continued with their hybrid mediation in 2013 and 2014. Later, in late 2015, after the

settlement had initially been agreed to by the parties, Customer Class Counsel all agreed to

allocate 5.5% of their collective fee award to Chargois. Chiplock 9/8/17 Dep., pp. 106:18-107:1.

Labaton, Lieff, and TLF contributed equally to satisfy this obligation. Labaton Sucharow's

8/11/16 Responses to Special Master's Supplemental Interrogatories, Response No. 1(b).

---

[45] During the *State Street* litigation, Garrett Bradley had substantial contact with Belfi and Keller of Labaton, and
Chargois. Bradley attended annual marketing conferences hosted by Labaton and attended by Keller, Belfi, and
Chargois. Then, effective January 1, 2015, through late 2016, Garrett Bradley held a dual role as partner at TLF and
"of counsel" to Labaton. *See* LBS007086 – 7090 (Bradley's Of Counsel Agreement). [EX. 36]. In this role, Bradley
agreed to "assist Labaton partners in identifying and seeking retention by clients for securities." *Id*.

###### v. *LIEFF'S AND THORNTON'S LIMITED KNOWLEDGE OF THE CHARGOIS ARRANGEMENT*

Lieff and TLF were not privy to the origins of the Chargois Arrangement or the details of Labaton's obligation to pay Chargois in all cases in which ATRS is a co-lead counsel. Lieff 9/11/17 Dep., p. 92:2-12; Thornton 9/1/17 Dep., pp. 19-21, 35:12-24.[46] The original cost-sharing agreement circulated -- but never executed -- among Customer Class Counsel in 2011 shortly after the *ATRS* complaint was filed, referenced only that the firms acknowledged that "[t]here is an 'off the top' obligation to referring counsel of 6% of the fees awarded," without any specifics. *See* TLF-SST-033911 – 33913 (5/4/11 letter agreement).[47]  [EX. 16].  However, Garrett Bradley of TLF testified that he had never heard anyone other than Damon Chargois referred to as "referring counsel" by Labaton in connection with the *State Street* litigation, G. Bradley 9/14/17 Dep., p. 43:1-20, and his deposition testimony indicates that he was aware that Labaton had an obligation to pay Chargois a percentage of the fees as early as "around the time the complaint was filed or shortly." *Id.*, p. 44:7-12.[48]  Bradley testified, however, that he did not know that Chargois would not have to do any work for a share of the fees, nor did he know the details of the arrangement.  ("I thought his role was similar to ours; that he did substantive work,

---

[46] Because TLF had received financial compensation from Labaton in connection with its role as non-substantive local counsel in other cases (*see supra,* n. 37), TLF, through Garrett Bradley, was familiar that Labaton had arrangements of this sort.

[47] Christopher Keller, who drafted the letter agreement, testified that the "off the top" percentage to referring counsel -- 6% -- reflected 20% of Labaton's 1/3 share of the fees: "20 percent of a third is 6 point something so we probably just went with 6 percent."  Keller 10/25/17 Dep., p. 419:8-9.

[48]  Bradley testified:

> I believe as early as -- just prior to or right around the time of filing in 2011, I raised with Chris [Keller] how are we going to deal with your obligation to Damon 'cause I was very concerned that he would try to apply for 20 percent of this entire case.
> And I asked them to deal with it.

G. Bradley 9/14/17 Dep. p. 44:7-13.

corresponded with the client, dealt with the client, got authority.  That's what I thought his role was."  *Id.*, at p. 45:10-13; *see also* p. 47:7-8).

 As indicated *supra*, the arrangement was addressed amongst the three Customer Class firms in the April 24, 2013, "Dublin" email in which Garrett Bradley described a financial obligation owed to Chargois. Bradley characterized Chargois as "local counsel who assists Labaton in matters involving the Arkansas Teachers Retirement System." LBS 025771 [EX. 37]. The Labaton attorneys addressed on the email, Chris Keller and Eric Belfi, did not offer any additional explanation. Nor did either attorney inform their co-counsel that Chargois was not performing any work in the matter. Bob Lieff responded to the email on April 23, 2013, stating "I am in full agreement." LBS030997 – 30998, (4/24/13 Lieff Email to G. Bradley, et al.).  [EX. 38].  Eric Belfi responded to the email on May 6, 2013, stating "[w]e are in full agreement." *Id*.

Attorneys from the firms exchanged emails related to the Arrangement again in 2015. On August 28, 2015, Dan Chiplock corresponded with Larry Sucharow, Garrett Bradley and Michael Thornton regarding memorialization of the fee allocation agreement amongst the firms; Chiplock referred to payments to ERISA counsel and "local Arkansas counsel" in relation to the distribution of Customer Class Counsel fees. TLF-SST-053117-53126 (8/28/15 Chiplock Email to Sucharow, G. Bradley, Thornton, and Lieff) [EX. 39]. Garrett Bradley, referencing the prior emails in 2013, replied that there was already "a written agreement between all the parties that the Arkansas component would come off the top" and stated that the "ERISA piece" should be handled the same way. *Id*. As Chris Keller and Eric Belfi were not included on this email exchange, and Larry Sucharow was at that point unaware that Chargois was not performing any work as the local Arkansas counsel, the 2013 characterization of the Chargois role remained uncorrected.

43

The Chargois Arrangement was again raised in email correspondence between the three

firms on July 8, 2016.  Garrett Bradley wrote to Mike Thornton, Larry Sucharow, Dan Chiplock,

Chris Keller, Eric Belfi and Damon Chargois:

> Gentlemen,
>
> As we discuss how to distribute the fee between ourselves and, of course the ERISA attorneys, I have had discussion with Damon Chargois, the local attorney in this matter who has played an important role. Damon and his firm are willing to accept 5.5% of the total fee awarded by the Court in the State Street class case now pending before Judge Wolf. As you know, we had a prior deal with him that his fee would be "off the top". He understands that ERISA counsel is now in the same pool of money. He has agreed to come down to this number with a guarantee that it will be off the court awarded fee number. Please reply all if you agree. Given that it is off the total number their [sic] is no need to add the ERISA counsel to this email chain.

LBS039936 – 39937 (7/8/16 G. Bradley Email to Lieff, Thornton, Sucharow, Chiplock, Keller,

Belfi, and Chargois). [EX. 40]. None of the Labaton attorneys followed up on this email in

writing. Nor does the record contain any evidence that any of the Labaton attorneys informed

their co-counsel, either before or after this email, that Chargois had played no role in the *State*

*Street* case, nor did the Labaton attorneys attempt to explain what "important role" Chargois

played. Bob Lieff and Mike Thornton replied to Bradley's July 8 email expressing their firms'

respective agreement to these terms. *Id.*; LBS031152 – 31153 (7/8/16 Thornton Email to G.

Bradley & 7/8/16 Lieff Email to G. Bradley, et al.) [EX. 41]. Separately, Chris Keller wrote to

Garrett Bradley, "great work getting this done." LBS039936 [EX. 40].

Bob Lieff testified that he thought Chargois was local counsel for Labaton.  *See* Lieff

9/11/17 Dep., p. 67:9-13 ("I thought he was local counsel for Labaton in this particular case I

assumed dealing with the Arkansas fund because that's what local counsel will do. That was my

understanding.")  He further testified that had he known that Chargois had done no work on the

case, he would not have agreed to the allocation of part of his firm's fee award to Chargois.

Lieff 9/11/17 Dep., p. 97:13-16.  Michael Thornton, who was intricately involved in the preliminary discussions between ATRS and Customer Class Counsel encouraging ATRS to file suit, understood only that Chargois was involved in the *State Street* case on a "referral basis" as "local/referring counsel." Thornton 9/1/17 Dep., p. 20:12-17. While members of the Lieff and TLF firms were generally aware of Labaton's obligation -- to be shared by Customer Class Counsel -- to pay Chargois a percentage of Labaton's total fee in the *State Street* case, the exact percentage or details of that arrangement were not discussed until settlement discussions were well underway years into the litigation. Thornton 9/1/17 Dep., pp. 36:16-17, 22-24; 37:1-7.

Even among Labaton attorneys, full knowledge of the Chargois Arrangement was limited to Belfi and Keller.  *See* Sucharow 9/1/17 Dep., p. 17:10-13 ("I'm not sure I ever knew in the sense that I didn't hear 'til later on that there was an obligation to [Chargois].") For example, Larry Sucharow, who described himself as the "lead negotiator and lead strategist" for plaintiffs in the *State Street* case, only learned of Labaton's financial obligation to Chargois in 2015. *Id.,* pp. 18:20-23; 87:1. [49]  Similarly, David Goldsmith, the lead Labaton litigator who appeared on behalf of the purported Settlement Class in the Preliminary and Final Settlement approval hearings before Judge Wolf, did not learn of the Chargois Arrangement until November 21, 2016, several weeks after the Final Approval Hearing**.**  Goldsmith 9/20/17 Dep., pp. 108:20-109:2.[50] Even those who were aware of the Arrangement, were unfamiliar with Chargois' full name.  Sucharow 9/1/17 Dep., pp. 7-9; 35:17-24.

---

[49] Though he testified that he learned of his firm's obligation to Chargois in 2015, Sucharow signed the Omnibus Declaration, which was filed with the Court in September 2016; the Declaration did not disclose the Chargois Arrangement or reference the intended payment to Chargois.

[50] Sucharow and Goldsmith's ignorance of the Chargois is another result of Labaton's compartmentalization.  *See* note 21, *supra.*  Only the client relationship partner, Eric Belfi, and Christopher Keller knew the details of the Chargois Arrangement.

Outside of Labaton attorneys, the terms "forwarding fee" and "referral fee" have no significance in a class action context. 9/11/17 Lieff Dep., p. 79:20-22. Robert Lieff testified that the term local counsel is also not descriptive of Chargois' role, as it is a term of art used to describe an attorney who works for a client on a case-by-case basis and submits a fee petition for services performed in a particular case, an understanding shared by Chargois himself.  Lieff 9/11/17 Dep., p. 80:9-17.  Although they now seek to cast Chargois in the role of "referring" counsel, Labaton attorneys never used the phrase "referring counsel" in discussions with Chargois. Chargois 10/2/17 Dep., p. 64:15-19. And when asked, Chargois did not view his role as either a "referring counsel," "liaison counsel" or "local counsel" in the *State Street* case or any case involving ATRS.  Chargois 10/2/17 Dep., pp. 55: 8-13, 20-24; 63:11 – 64:6**;** this was just "an agreement." *Id.*, p. 63:5-21.

## vi.   *ERISA COUNSEL'S LACK KNOWLEDGE OF CHARGOIS ARRANGEMENT*

Neither Labaton nor any other Customer Class Counsel ever informed ERISA Counsel of Labaton's obligation to Chargois, or Chargois' role in connection with this case. Sarko 9/8/17 Dep., pp. 56:18 – 57:9, 71:14-23; Kravtiz 9/11/17 Dep. p. 70:8-10; McTigue, 9/8/17 Dep., p. 17:14-21. Like Hopkins, ERISA Counsel only learned of the Chargois Arrangement as a result of the Special Master's investigation in or about August 2017. Sarko 9/8/17 Dep., 71:14-23; Kravitz 9/11/17 Dep. 70:8-10; McTigue 9/8/17 Dep., p. 17:14-21.  One effect of the Customer Class Counsel's failure to disclose the Chargois Arrangement to ERISA Counsel was the non-disclosure to the ERISA class representatives and members themselves.

As with Hopkins, Labaton was at pains to keep ERISA Counsel from learning about Chargois or the Chargois Arrangement. *See e.g.,* Sucharow response to G. Bradley email regarding proposed Claw Back letter addressed only to Customer Class Counsel advising "no

reason for ERISA to see Damon's split." TLF-SST-012272 – 12274 (11/22/16 Sucharow Email

to Goldsmith, G. Bradley, Keller, Belfi) [EX. 42]; LBS039936 – 39937 ("Given that it is off the

total number their [sic] is no need to add the ERISA counsel to this email chain.") [EX. 40];

TLF-SST-053117-53126 [EX. 39].

ERISA Counsel testified that had they known of the Chargois Arrangement during the

*State Street* case, they would have proceeded differently in several material respects. Lynn Sarko

testified that had he known of the Chargois Arrangement, he "absolutely" would have felt an

obligation to disclose [the Arrangement] to the ERISA class representatives and get their

informed consent. Sarko 9/8/17 Dep., p. 91:4-15. Moreover, had he become aware that an

attorney who did no work on the case would receive in excess of $4 million prior to signing the

ERISA Fee Allocation in 2013, Sarko would not have agreed to the award of only 9% (which

became 10%) of the total fee award to ERISA Counsel. *Id.* pp.75:2-22, 78:19-79:4.  The other

ERISA counsel, Brian McTigue and Carl Kravitz of Zuckerman Spaeder, testified that they

would not have agreed to it, either.  *See* McTigue 9/8/17 Dep. p. 21:15-24; Kravitz 9/11/17 Dep.,

pp. 83:3-84:22. In fact, the purported purpose of the Fee Allocation was to align interest "on the

same team" and develop a level of trust between the ERISA lawyers and Customer Class

lawyers. Sarko 9/8/17 Dep., p. 82:8-15.

Sarko testified further that he would not have agreed to file a joint fee petition with the

Court had he known of the intended payment to Chargois, which, in his opinion, should have

disclosed. Sarko 9 /8/17 Dep., pp. 75:2-7, 78:24-79:3. Nor would he have signed the Claw Back

Agreement (*see* Section III, *infra*) agreeing to reimburse Labaton for any reduction in the fee

award imposed by the Court as a result of the November 10, 2016 letter to the Court admitting

the overstatement of the *State Street* lodestar (discussed *infra*). Sarko 9/8/17 Dep., pp. 75:2-22, 78:19 – 79:4.

Sarko also was the chief liaison with the DOL during the mediation, and he testified he would have been obligated to tell the DOL about Chargois and his arrangement with Labaton for a cut of the fees.  Sarko 9/8/17 Dep. p. 76:14-22.  In Sarko's opinion, if the DOL had the information about Chargois, the Department would have had questions, and the settlement would have "blown up" because State Street was insisting on a global settlement which could not be achieved without the DOL's approval.  *Id.*, p. 84:3-5.

### vii.    PAYMENTS TO CHARGOIS PURSUANT TO THE CHARGOIS ARRANGEMENT

Since the Chargois Arrangement began in 2008, Labaton has represented ATRS in at least nine cases for which it has paid Chargois a percentage of the Labaton's total fee award:

- *In re A10 Networks, Inc. Shareholder Litigation,* No. 2015-1-CV-276207 (Cal. Super. Ct. Jan 29, 2015)

- *Brado v. Vocera Communications, Inc.* No. 13-CV-3567 (N.D. Cal. Aug.1, 2013)

- *Perry v. Spectrum Pharmaceuticals, Inc.*, No. 13-CV- 0433 (D. Nev. Mar.14, 2013)

- *Hoppaugh v. K12 Inc.,* No. 12-CV-0103 (E.D. Va. Jan. 30, 2012)

- *In re Hewlett –Packard Company Securities Litigation,* No. 11-CV-1404 (C.D. Cal. Sept. 13, 2011)

- *Arkansas Teacher Retirement System v. State Street Corporation,* No. 11-CV-10230 (D. Mass. Feb 10, 2011)

- *In re Beckman Coulter, Inc. Securities Litigation,* No. 10-CV-1327 (C.D. Cal. Sept. 3, 2010)

- *In re Colonial BancGroup, Inc. Securities Litigation*, No. 09-CV-0104 (M.D. Ala. Feb. 9, 2009)

- ████████████████████████████████████████ ■

Labaton Response to Special Master's Supplemental Interrogatory, 1(a); Chargois 10/2/17 Dep.,

pp. 54:2-3; 65:1-71:13.[52] In each of these cases, Labaton paid Chargois a percentage -- more

often amounting to 10 - 15% than the originally agreed-upon 20% -- of Labaton's total fee

award. Chargois 10/2/17 Dep., p. 60:17-20.[53] Neither Chargois nor any Chargois & Herron

attorneys entered an appearance or did any work in any of these actions.

## C.    SCRUTINY OF THE STATE STREET SETTLEMENT AND SPECIAL MASTER'S APPOINTMENT

### i.    THE BOSTON GLOBE INQUIRY

By all accounts, the $300 million settlement reflected an excellent result for the class

members and was the product of the highly professional and skilled work of the class's law

firms. Sarko 7/6/17 Dep., p. 109:22-23; Kravtiz 7/6/17 Dep., pp. 105:23-106:7; Hopkins 6/14/17

Dep., p. 100:1-10. However, on November 8, 2016 -- less than a week after the Court had

---

[51] Chargois testified that *In re Capacitors* was not an ATRS case, and, hence, not covered by the agreement. *See* Chargois 10/2/17 Dep., p.65:4-7.

[52] While not identified in response to discovery, media reports also identify Labaton filing on behalf of ATRS, and being named co-lead counsel in a multi-trillion-dollar action alleging that many of the country's leading banks harmed both the United States government and private investors by rigging the management of 13 trillion dollars in securities sold by the U.S. Department of Treasury in *In Re:  Treasury Securities Auction Antitrust Litigation,* (S.D.N.Y. 2017). Potentially, the Chargois Arrangement would cover this case, as well

[53] Chargois was not happy with the frequent reductions in the amounts Labaton paid his firm.  He expressed his frustration in an October 18, 2014 email to Labaton:

> "…I am very concerned that you guys are attempting to significantly, substantially and materially alter our agreement. Our deal with Labaton is straightforward. We got you ATRS as a client after considerable favors, political activity, money spent and time dedicated in Arkansas, and Labaton would use ATRS to seek lead counsel appointments in institutional investor fraud and misrepresentation cases. Where Labaton is successful in getting appointed lead counsel and obtains a settlement or judgment award, we split Labaton's attorney fee award 80/20 period. As I said in my text to you regarding HP and your allocation, I understand the circumstances in this case and am okay with the fee split in this instance. We are not changing our fee split agreement for all the other pension fund cases. You promised me that you would give me advanced notice of when you guys would seek a modification or accommodation on a given settlement, and I want you to keep that going forward."

LBS017593 - 17594 (10/18/14 Chargois email to Belfi) [EX. 43]; *see also* Chargois 10/2/17 Dep., pp. 253:2-255:4.

approved the Settlement and entered Judgment -- the *Boston Globe* contacted counsel for TLF to inquire about the apparent duplication of certain SA names listed on the individual firm lodestar reports of Customer Class Counsel submitted as part of the Joint Fee Petition. Garrett Bradley 6/19/17 Dep., pp. 85:23-86:11; David Goldsmith 7/17/17 Dep., p. 132:16-24. Following this inquiry, attorneys from Labaton, Lieff, and TLF immediately conducted internal reviews to determine what, if any, information in their fee petitions may have been incorrect. *See* Goldsmith 7/17/17 Dep., p. 137:11-19; G. Bradley 6/19/17 Dep., pp. 86:15 – 87:12**.**

After conducting their internal reviews, Labaton, Lieff and TLF unanimously conceded that the *State Street* Fee Petition overstated hours worked by Customer Class Counsel by 9,322.9 hours due to the double-counting of certain lawyers' hours, resulting in a lodestar overstatement of $4,058,654.50.[54]  Specifically, the Fee Petition attributed hours of staff (and contract) attorneys allocated by Lieff and Labaton to TLF for purposes of cost-sharing not only to the lodestar petitions of Lieff and Labaton -- the SA host firms -- but also to TLF's lodestar.  This dramatically inflated the lodestar of TLF.  *See* 11/10/16 Letter from David J. Goldsmith to Hon. Mark L. Wolf, Dkt. No. 116.  [EX. 44].

### ii. NOVEMBER 10, 2016 LETTER TO THE COURT

After Labaton, TLF, and Lieff confirmed that the double-counting alleged by the *Globe* had, in fact, occurred, David Goldsmith of Labaton took the lead in writing a letter to the Court to explain what had happened.  *See* 11/10/16 Letter from David J. Goldsmith ("Goldsmith Letter"), Dkt. No.116 [EX. 44]; G. Bradley 6/1917 Dep., p. 87:15-17; Goldsmith 7/17/17 Dep., pp. 143:25-144:5. Various iterations of the letter were circulated among Customer Class Counsel and ERISA Counsel, and ultimately approved by all, before the letter was filed with the Court.

---

[54] The ERISA Counsel's lodestar reports were unaffected by the double-counting.

*Id.*, p. 144:5-9. The Goldsmith Letter explained that due to "inadvertent errors," Plaintiffs'

Counsel's reported combined time and lodestar were incorrect. Of the reported 86,113.7 hours,

9,322.9 hours were overstated. Of the reported lodestar of $ 41,323,895.75, $ 4,058,654.5 was

overstated.  11/10/16 Goldsmith Letter, p. 2. [EX. 44]. The internal review revealed that 17 SAs

had been listed on both the TLF and Labaton lodestar reports, and for these SAs, the billing rates

on the TLF report were in most instances higher.  Goldsmith 7/17/17 Dep., p. 142:12-19.  Lieff

also confirmed that six SAs on TLF's lodestar report also appeared on Lieff's report.  Chiplock

6/16/17 Dep., p. 164:9-17; *see also* Goldsmith 11/10/16 Letter to the Court, Dkt. No. 116. [EX.

44].

Shortly thereafter, the *Boston Globe* published a report detailing the "double-counting"

issue addressed by the Goldsmith Letter and raising additional questions about the accuracy and

reliability of the attorneys' fees, including questions concerning the billing rates charged for the

SAs and contract attorneys, and for the work in the case done by the Garrett Bradley's brother,

Michael Bradley -- who was not employed by TLF -- including the $500 per hour rate at which

Michael Bradley's work was included in Thornton's lodestar.[55]

The Goldsmith Letter did not attempt to explain how or why the double-counting

occurred.  Nor did Labaton take this opportunity to disclose the Chargois Arrangement.  (Of

course, Goldsmith, himself, did not know about Chargois at the time he wrote the letter to the

Court.)[56]

---

[55] *See* Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE, December 17, 2016, https://www.bostonglobe.com/metro/2016/12/17/
lawyers-overstated-legal-costs-millions-state-street-case-opening-window-questionable-billing-
practices/tmeeuAaEaa4Ki6VhBpQHQM/story html.  [EX. 45].

[56] This is another instance of problems created at Labaton as a result of its compartmentalization of its practice.  *See* notes 21 and 49, *supra*.

### iii.    THE "CLAW BACK" LETTER

After the November 10, 2016 letter was delivered, Plaintiffs' Counsel awaited a response

from the Court.  Recognizing that the Court might respond adversely and ultimately decide to

reduce the fee award, on November 21, 2016, at the direction of Labaton's Chairman, Lawrence

Sucharow, David Goldsmith drafted a letter which Sucharow then sent to all counsel -- including

ERISA Counsel -- for their signature, asking all counsel to agree to refund to Labaton, for re-

deposit into the State Street escrow account, their respective pro-rata share of any court-ordered

reduction of fees, expenses and/or service awards ("Claw Back Letter").  *See* Goldsmith 7/17/17

Dep., pp. 152:17-155:13; *see also* TLF-SST-012264 – 12266 (11/21/16 Sucharow Draft Letter to

Counsel) [EX. 46].

Bob Lieff and Sarko agreed, pending a breakdown of the fees to be paid out on December

8.  The issue of whether to send a similar letter to Chargois was raised in an email addressed

only to Customer Class Counsel by Garrett Bradley, to which Sucharow responded:

> Need two letters with breakdown, ERISA just gets sent to ERISA counsel with 10
> percent off the top and then a third each.  Class co-counsel get one with ERISA 10
> percent off the top, Damon's percentage also off the top, and each of class co-counsel
> split with the percentages agreed to.  *In short, no reason for ERISA to see Damon's split.*
> *They only need to see their 10 percent and then split three ways.*  By the way, I want to
> asterisk the 10 percent to ERISA with a footnote saying although our fee agreement with
> ERISA counsel only provides for a 9 percent allocation, co-class counsel have
> determined to increase that to 10 percent in light of the excellent work and contribution
> of ERISA counsel.

TLF-SST-012272 – 12274 (11/22/16 Sucharow Email to Goldsmith, G. Bradley, Keller, Belfi)

(emphasis added).  [EX. 42].

Larry Sucharow then also directed Goldsmith to send a separate claw-back letter to

Damon Chargois for his signature, as well.  Goldsmith 9/20/17 Dep., p. 171:14-23.  Accordingly,

Goldsmith drafted a letter for Eric Belfi, the "ATRS relationship partner" with Labaton to send to Chargois. *Id*, p. 172:10-15. *See also* Belfi 9/5/17 Dep. p. 93:13-16.

### iv.   *APPOINTMENT OF SPECIAL MASTER*

With questions having been raised as to the accuracy and reliability of the lodestar reports which had been submitted by Plaintiffs' counsel and relied upon by the Court in awarding fees, the Court proposed the appointment of a Special Master to investigate these issues and prepare a Report and Recommendation concerning them. *See* 2/6/17 Memorandum and Order, Dkt. No. 117. [EX. 47]. The Court thereafter held a hearing on March 7, 2017 to discuss, among other issues, the appointment of Hon. Gerald E. Rosen (Ret.) as the Special Master.[57] The following day, on March 8, 2017, the Court appointed Hon. Gerald E. Rosen, ret., as Special Master to investigate and prepare a Report and Recommendation as to:

> (1)    the accuracy and reliability of counsels' fee petitions;  (2)  the accuracy and reliability of representations made in David Goldsmith November 10, 2016 letter to the Court; (3) the accuracy and reliability of representations made by parties requesting service awards; (4) the reasonableness of attorneys' fees, expenses, service awards previously ordered and whether any of them should be reduced; and (5) whether any misconduct occurred in connection with the award of attorneys' fees, and if so, whether such misconduct should be sanctioned.

3/8/17 Memorandum and Order, Dkt. No. 173 (footnotes omitted). [EX. 48].

The Special Master retained William F. Sinnott, Esq. of the law firm Donoghue, Barrett & Singal, P.C. (now "Barrett & Singal, P.C.") to assist in the investigation. The Special Master also retained John Toothman as a technical adviser, and later, Professor Stephen Gillers as an expert on the ethical and professional conduct issues raised in this case.

---

[57] Prior to the hearing, all of the law firms agreed to the appointment of Judge Rosen, except McTigue Law. McTigue initially filed a written objection to the appointment of Judge Rosen, *see* McTigue Law's Response to 2/6/17 Order, Dkt. No. 138, but on the record at the hearing, withdrew that objection. *See* 3/7/17 Hearing Tr., Dkt. No. 176, p. 55:3-4.

### III.    QUESTIONS PRESENTED

The facts set forth above raise at least the following ethical issues:

I.      Whose professional conduct rules governed the obligations of class counsel in the *State Street* matter?

      a.      *Answer: The Massachusetts Rules of Professional Conduct. Federal law also informs the answers to several of the issues raised here.*

II.     Was the arrangement with Chargois ("the Chargois Arrangement") a valid division of fee agreement under Massachusetts Rule 1.5(e)?

      a.      *Answer: No. It was an improper payment for recommending a client.*

III.    Did class counsel have a duty to inform the Court of the Chargois Arrangement, whether or not the Chargois Arrangement was a valid division of fee agreement?

      a.      *Answer: Yes. Federal case law and the Massachusetts Rules of Professional Conduct both required class counsel to inform the Court of the Chargois Arrangement.*

IV.     Did class counsel have a duty to inform the certified settlement class of the Chargois Arrangement whether or not it was a valid division of fee agreement?

      a.      *Answer: Yes. Their fiduciary duty and the Massachusetts Rules of Professional Conduct required class counsel to inform the certified settlement class of the Chargois Arrangement.*

V.      Did Garrett Bradley's lodestar declaration comply with the Massachusetts Rules of Professional Conduct and Fed. R. Civ. P. 11?

      a.      *Answer: No. The Declaration violated Rule 3.3(a) because, as I have been asked to assume, Bradley knew that it contained false statements when he filed it. Separately, the Declaration violated Fed. R. Civ. P. 11 because Bradley filed it without conducting "an inquiry reasonable under the circumstances" to establish that there was "evidentiary support" for the facts in it.*

IV.   **OPINION**

A.   **WHERE THE COURT IS CALLED ON TO APPLY A RULE OF PROFESSIONAL CONDUCT, IT SHOULD APPLY THE MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT RATHER THAN THE RULES OF ANOTHER JURISDICTION. FEDERAL COMMON LAW ALSO GOVERNS ISSUES BEFORE THE COURT**

i.   *APPLICATION OF MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT*

Counsel's duties in this case are governed by two bodies of authority: the rules of professional conduct *and* federal law.  The determination of whose professional conduct rules govern counsel's conduct is straightforward. The United States District Court for the District of Massachusetts, the jurisdiction in which the State Street case was pending, expressly adopts the Massachusetts Rules of Professional Conduct. *See* L.R., D. Mass. 83.6.1 (incorporating rules promulgated by the Supreme Judicial Court). The Massachusetts Rules of Professional Conduct themselves -- in particular Rule 8.5(b)(1) -- reaffirm that Massachusetts ethical rules govern all conduct in matters pending before a "governmental tribunal [i.e. a court] …unless the rules of the tribunal provide otherwise." *See* Rule 8.5(b)(1); *see also* Rule 1.0(p). This includes applying Massachusetts' choice of law analytical framework in addition to Massachusetts substantive rules. Rule 8.5, cmt. [4].

Counsel's *pro hac vice* admission applications to the District Court in Massachusetts in the State Street case expressly acknowledged that the Massachusetts Rules of Professional Conduct would govern their behavior. To gain admission *pro hac vice* in this Court, each attorney was required to certify, under oath, that he or she "has read and agrees to comply with the Local Rules of the United States District Court for the District of Massachusetts."  Local

Rule 83.5.1(b)(1)(C).[58] The Local Rules, in turn, incorporate the Massachusetts Rules of Professional Conduct.

Massachusetts Rule 8.5 cmt. [4] provides that a Court's "choice of law rule" might lead to application of another jurisdiction's rule. But that would not be so on the facts before the Special Master. The District Court addressed the choice of law issue in *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 188 F.Supp.2d 115 (D. Mass. 2002), where "a law professor" who was "putatively an expert on tobacco litigation," sought to enforce an oral fee-splitting arrangement with the law firm for whom he consulted. In weighing several different factors, the Court relied heavily on one factor in particular: place of performance, deeming bar admissions not dispositive of the inquiry. *See id.* at 119, 121, 122-123. Thus, the Massachusetts Rules of Professional Conduct governed the dispute between the expert -- admitted to practice only in New York -- and the defendant, a South Carolina law firm, where the expert had performed the bulk of his legal work in Massachusetts. *Id.* at 123. Application of Massachusetts law would not, however, prevent other states with an interest in the litigation from disciplining attorneys over whom it had authority. *Id.*

Applying the *Daynard* Court's analysis to the conduct of counsel in the State Street case, Massachusetts Rules of Professional Conduct should, again, apply.  The ethical issues here predominantly arise out of counsel's conduct *before the Court* as well as written submissions to the Court and duties to disclose information to the class representatives and class members

---

[58] The previous version of this rule in effect in 2011, L.R., D. Mass 83.5.1(a)(1) (amended Jan. 1, 2015), required that attorneys seeking admission to the District Court "(ii) ha[ve] satisfied the examination requirements as defined by the District Committee on Admissions relating to familiarity with the Federal Rules of Civil Procedure, the Federal Rules of Evidence, principles of federal jurisdiction and venue, and rules relating to professional responsibility; and (iii) ha[ve] filed a certificate …. attesting to familiarity with the local rules of this district."

whom counsel represented in the litigation. Unlike Daynard, himself, counsel here actually appeared before the Court on more than one occasion.

### ii.   ADDITIONAL REASONS TO APPLY THE MASSACHUSETTS PROFESSIONAL CONDUCT RULES IN THIS CASE

For three other reasons the Court should apply the Massachusetts professional conduct rules. First, applying to each lawyer the rules of the particular jurisdiction in which that lawyer is admitted could subject different lawyers to different rules and possibly different outcomes for their work in the same litigation. Second, among the rules relevant here are rules that describe duties to the Court itself. The Court has a strong interest in assuring that the behavior of lawyers practicing before it is governed by its own rules, not the rules elsewhere. Third, the relevant rules also describe duties to members of the certified class who reside in many jurisdictions and whose rules may vary. As in *Daynard,* other jurisdictions in which these questions may arise can apply their own rules.[59] *See id*. at 123.

### iii.   FEDERAL LAW GOVERNS OTHER ISSUES BEFORE THE COURT

As stated, federal law also governs the issues discussed herein and, in particular, the obligation of class counsel to disclose to the Court their intention to give Damon Chargois -- an unaffiliated lawyer who did not appear in, work on, or accept responsibility for the litigation -- millions of dollars from the fee that counsel requested from the Court. *See* Section C (ii), *infra.*

---

[59] Application of Massachusetts law will not, moreover, prevent courts or disciplinary authorities in other states from enforcing their respective rules of professional responsibility, if implicated by the conduct of any attorney in this matter. *Daynard*, 188 F. Supp. 2d at 123. Similarly, application of Massachusetts law will not prevent courts in other jurisdictions from analyzing and applying the relevant principles of contract enforcement or public policy considerations recognized in other states, if called upon to do so.

## B.   THE CHARGOIS ARRANGEMENT IS AN UNETHICAL PAYMENT FOR THE RECOMMENDATION OF A CLIENT, NOT A VALID DIVISION OF FEE AGREEMENT

### i.   RULE 7.2(b)

The Arrangement between Labaton and Chargois violates the prohibition in Rule 7.2(b), which forbids a lawyer to "give anything of value to a person for recommending the lawyer's services."[60]  Mass. R. Prof. C. 7.2(b) (current through Feb. 1, 2018). This was the language of Rule 7.2(b) in February 2011, when ATRS retained Labaton in this case, and it still is. *See* Mass. R. Prof. C. 7.2(b) (amended March 26, 2015). As explained below, "person" includes Chargois, who was paid for recommending Labaton to ATRS. In 2011 and today, an exception in Rule 7.2(b) provides that a lawyer "may pay fees permitted by Rule 1.5(e)." Until March 2011, Rule 1.5(e) provided:

> A division of a fee between lawyers who are not in the same firm may be made only if, after informing the client that a division of fees will be made, the client consents to the joint participation and the total fee is reasonable.

Mass. R. Prof. C. 1.5(e) (amended Dec. 22, 2010, eff. March 15, 2011).

In 2007, the Supreme Judicial Court remedied three defects with Rule 1.5(e). *Saggese v. Kelley*, 445 Mass. 434, 442-443 (2007). The rule did not have a writing requirement, it did not say *who* should obtain client consent, and it did not say precisely *when* the client must be notified of the fee division. *Id*.  The Court's opinion corrected these defects by declaring how the rule "will be construed" thereafter. *Id*. at 443.

> These problems are avoidable in fee-sharing situations if the referring lawyer, who usually is in the best position to secure compliance with rule 1.5(e), is required to disclose the fee-sharing agreement to the client before the referral is made and secures the client's consent *in writing*. The rule will be construed to require this in fee-sharing agreements that are formed after the issuance of the rescript in this decision. Although the primary responsibility for compliance will fall on referring lawyers, lawyers to whom

---

[60] Labaton and Chargois exchanged emails and two drafts but never finalized an agreement. *See pp. 10, 33, supra.*

referrals are made are not absolved of all responsibility, and should confirm, before
undertaking such representations, that there has been compliance with Rule 1.5(e).

*Id*. at 443 (emphasis in original).[61]

### ii.   *LABATON DID NOT COMPLY WITH RULE 1.5(e). IT PAID CHARGOIS FOR RECOMMENDING A CLIENT IN VIOLATION OF RULE 7.2(b)*

Labaton did not "confirm…compliance with Rule 1.5(e)" when ATRS retained it in this

matter. It did not tell ATRS about Chargois and get its written (or any) consent. Labaton admits

as much, but in partial mitigation cites an email from Christa Clark, ATRS's chief counsel, and

language in its February 2011 retainer agreement with ATRS. Neither the 2008 Clark email, nor

the language in the retainer agreement, satisfies the requirements of Rule 1.5(e) as construed in

February 2011.

The Clark email, informing Labaton that the Chargois firm would *not* be "additional

monitoring counsel," added this paragraph:

> If your firm is doing the monitoring and providing the financial backing for the
> cases, I think it is most appropriate that we add your firm independently to the list of
> approved firms. Your firm may affiliate that firm or use them as independent contractors,
> if you deem is [sic] appropriate on a case by case basis. There would be no requirement
> that you use them if it was not a necessary and appropriate expense of a case. I don't
> know how to best handle this point but the state procurement process is not conducive to
> a joint proposal.

Labaton's retainer agreement with ATRS in this case provides:

> Arkansas Teacher agrees that Labaton Sucharow may allocate fees to other
> attorneys who serve as local or liaison counsel, as referral fees, or for other services
> performed in connection with the Litigation. The division of attorneys' fees with other

---

[61] Effective March 15, 2011, the *Saggese* Court's writing requirement was added to Rule 1.5(e). Mass. R. Prof. C.
1.5(e) (current through Feb. 1, 2018). Rule 1.5(e) currently reads:

> A division of a fee (including a referral fee) between lawyers who are not in the same firm may be made
> only if the client is notified before or at the time the client enters into a fee agreement for the matter that a
> division of fees will be made and consents to the joint participation in writing and the total fee is
> reasonable. This limitation does not prohibit payment to a former partner or associate pursuant to a
> separation or retirement agreement. *Id.*

counsel may be determined upon a percentage basis or upon time spent assisting with the prosecution of the Litigation. Any division of fees among counsel will be Labaton Sucharow's sole responsibility and will not increase the fees payable by Arkansas Teacher or the class upon a successful resolution of the Litigation.

For the following reasons, this generic language is inadequate to comply with Rule 1.5 as revised by the Supreme Judicial Court in *Saggese*: (a) ATRS was not notified "before the referral [was] made" that Labaton's fee would be divided with Chargois; and (b) ATRS never consented to the fee division "in writing." *See Saggese*, 445 Mass. at 442-443. Nor did the Clark email and the retainer agreement satisfy Rule 1.5(e) as it then read *even without regard to Saggese*. In February 2011, the rule permitted a fee division "only" after notice to the client "that a division of fees will be made" and the client consents, neither of which occurred here. Mass. R. Prof. C. 1.5(e) (amended Dec. 22, 2010, eff. March 15, 2011). Indeed, the facts reflect that Labaton attorneys took pains to ensure that George Hopkins, ATRS's Executive Director, would not become aware of the Chargois Arrangement. *See supra*, p. 38.

Labaton's failure denied ATRS the protection of Rule 1.5(e). If Hopkins had been told about Chargois, he could have asked for details of the financial arrangement. Labaton would have been required to tell him.[62] He could have asked what Chargois' contributions to the case were expected to be. He could have asked to know more about Chargois' qualifications and to

---

[62] The comment to the rule at the time expanded the disclosure obligation in the text of the rule itself. Whereas the black letter rule required notice to the client that "a division of fees will be made," the comment required that lawyers go further, if the client asks, and disclose "the *share* of each lawyer." (Emphasis added.) The difference is between saying "we are dividing the fee," which the black letter rule required, and saying if asked, "I am going to get 70 percent and he is going to get 30 percent." More specifically, the comment in February 2011 provided: "The Massachusetts rule does not require disclosure of the fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer." Mass. R. Prof. C. 1.5(e) cmt. [4A] (amended Dec. 22, 2010, eff. March 15, 2011.) Today, the same obligation to provide the greater detail on request appears in cmt. [7A] of Massachusetts Rule 1.5, which states: "Unlike ABA Model Rule 1.5(e), Paragraph (e) does not require that the division of fees be in proportion to the services performed by each lawyer or require the lawyer to assume joint responsibility for the representation in order to be entitled to a share of the fee. The Massachusetts rule does not require disclosure of the fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer." Mass. R. Prof. Cond. 1.5, cmt. [7A].

meet him. He could have negotiated to have money slated for Chargois instead to go to the class. He could have consulted counsel on whether to "consen[t] to the joint participation."

Because the secret Chargois Arrangement did not satisfy the requirements of Rule 1.5(e) in February 2011, it does not fall within the exception to the prohibition against giving "anything of value to a person for recommending the lawyer's services," and therefore violates Rule 7.2(b). The *Daynard* Court recognized that non-compliance with the division of fee rule means that a payment will violate the rule against paying for client recommendations: "Daynard is nothing like the plaintiffs in many cases who are denied enforcement of their 'fee-splitting' contracts, which are in reality fee-referral contracts." *Daynard,* 188 F. Supp. 2d at 131, citing *Holstein v. Grossman*, 616 N.E.2d 1224, 1229 (1993) (holding that a "fee-sharing agreement which is primarily based on a client referral is unenforceable as a matter of public policy where the undisputed facts show that the referred client never consented in writing to the attorneys' arrangement").

### iii.    *LABATON'S OWN CONDUCT, OBJECTIVELY VIEWED, IS INCONSISTENT WITH THE CLAIM THAT THE CHARGOIS ARRANGEMENT WAS A VALID DIVISION OF FEE AGREEMENT*

Whether a division of fee agreement complies with a jurisdiction's rule is an objective inquiry. It asks: Were the rule's requirements satisfied?[63] Objectively viewed, Labaton's own conduct is, in the following ways, inconsistent with its current claim that it had a valid division of fee agreement with Chargois.

Although Labaton asked ATRS's permission to add Lieff and Thornton as counsel for ATRS, it did not inform Hopkins about Chargois. In fact, it did the opposite. It acted to conceal

---

[63] Both *Saggese* and *Daynard* determined whether the purported agreement satisfied the conditions in Rule 1.5(e), the fee division rule. *See Saggese*, 445 Mass. at 441; *Daynard*, 188 F. Supp. 2d at 123.

the existence of the Chargois Arrangement from ATRS. It did this by blind copying Chargois on emails that included George Hopkins and by forwarding to Chargois, alone, email exchanges with Hopkins.

Labaton also concealed the Chargois Arrangement from customer and ERISA class members even after being appointed "Lead Counsel for the Settlement Class" in August 2016. Its NOTICE OF PENDENCY OF CLASS ACTIONS did not disclose the Chargois Arrangement. The ERISA representatives and class members were its clients, as Labaton lawyers have indicated on numerous occasions. *See* Section D (i), *infra.*

Labaton did not disclose to the Thornton and Lieff Cabraser law firms, which were contributing to the payments to Chargois, the true nature of those payments when it became apparent that those firms may have misunderstood Chargois' role. In an April 26, 2013, email on which Keller and Belfi of Labaton were copied, Garrett Bradley referred to Chargois as "the local counsel who assists Labaton in matters involving" ATRS. In a July 8, 2016, email from Garrett Bradley, on which Keller, Belfi, and Sucharow were copied, Chargois is referred to as "the local attorney in this matter who has played an important role." Each characterization of Chargois is false or misleading. Chargois was getting paid for a client recommendation only. The Labaton lawyers who were recipients of the emails had knowledge of the Chargois Arrangement but did not correct Bradley's characterizations, as would have been expected if they believed that the Chargois Arrangement was a valid division of fee agreement. *See, e.g.*, pp. 42-44, *supra.*

Labaton never informed the Court of the Chargois Arrangement, despite a legal obligation to do so. *See* Section C, *infra*.

If Labaton considered the Chargois Arrangement a true division of fee agreement, one would have expected it to finalize the agreement and adjust it to comply with the division of fee

rules in each jurisdiction in which it represented ATRS. For example, both before and after it

filed this action, Labaton represented ATRS in three matters in courts in California, whose rule is

set out below.[64] Labaton did not comply with that rule's provisions, which, among other things,

require the client's written consent after "a full disclosure has been made in writing that a

division of fees will be made and the terms of such division." Cal. R. Prof. C. 2-200(A)(1)

(current through Jan. 1, 2018).

By early 2009, after George Hopkins replaced Paul Doane as ATRS Executive Director,

Labaton knew that it would not get the substantial help from Chargois that it had apparently

anticipated. Chargois had no relationship with Hopkins. As a result of this "unexpected turn of

events," Labaton "believed that the fee sharing agreement had been based upon a condition that

was not being satisfied." (Response by Labaton Sucharow LLP to Special Master's September 7,

2017 Request for Supplemental Submission, at 2.) But Labaton continued to pay Chargois

anyway, "fearing that [Chargois] would otherwise sue the Firm in state court in Texas, an event

that could have an extremely adverse impact on a firm that works extensively with public

pension and retirement plans." *Id*.[65] That motive may have served the firm's own interests at the

---

[64] California Rule of Professional Conduct 2-200 provides:

> (A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless:
>
>> (1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and
>>
>> (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200.
>
> (B) Except as permitted in paragraph (A) of this rule or rule 2-300, a member shall not compensate, give, or promise anything of value to any lawyer for the purpose of recommending or securing employment of the member or the member's law firm by a client, or as a reward for having made a recommendation resulting in employment of the member or the member's law firm by a client….

[65] The Labaton Response further states at page 10: "Labaton Sucharow was justifiably concerned that litigation over a fee dispute would be harmful to its reputation and to its relationship with ATRS, and also concerned that, as Chargois threatened, a Texas state court would rule in Chargois & Herron's favor."

time, as it appears to have viewed them, but it is inconsistent with a claim that the Chargois Arrangement was a valid division of fee agreement in the various states in which the firm represented ATRS. Labaton's interests, furthermore, would be contrary to the interests of its clients because Chargois would get paid out of settlement funds the Court might award even though Labaton believed "a condition" of the agreement "was not being satisfied."

Labaton's explanation for concealing the Chargois Arrangement from the Court and the certified class is legally and factually wrong. Labaton contends that because the Chargois payment would be paid from customer counsel's award of counsel fees, no one other than ATRS, Thornton, and Lieff had any right to know about it. Yet, as Labaton itself recognized, counsel had *no fees* to *divide* with Chargois unless and until the Court awarded counsel fees to class counsel. The Court needed to know, and class counsel were required to inform it, about the Chargois Arrangement in deciding whether to award fees, to whom, and in what amount. *See* Section C, *infra.*

### iv.   *COURT OPINIONS IN DISPUTES BETWEEN LAWYERS DO NOT RENDER THE CHARGOIS ARRANGEMENT A VALID DIVISION OF FEE AGREEMENT*

On occasion, a lawyer will seek to deny another lawyer his or her promised fee, citing a failure to tell the client about the agreement or to put it in writing (or both), as a jurisdiction's rule required. On one hand, the agreement does not comply with the rule. On the other hand, refusing to enforce it would let one lawyer keep the entire fee even where he or she was equally culpable of the violation.

*Saggese v. Kelley, supra,* enforced an oral agreement between a referring and referred lawyers where the client, who was *not* a fiduciary, later ratified the agreement. 434 Mass at 442. The Court wrote that the referred lawyers could not rely on the failure to comply with the rule

"to absolve them of their contractual obligation." *Id*. at 441. But the Court "emphasize[d] that although failure to comply with the rule may not necessarily render a contract unenforceable *between lawyers*, it may subject both lawyers to disciplinary action upon division of a fee." *Id*. at 443 (emphasis added).

In a division of fee case in federal court in Massachusetts, a law firm of record refused to pay a lawyer for work it had allegedly retained him to do in exchange for an oral promise of five percent of any recovery. *Daynard*, 188 F. Supp. 2d at 117. The firm in that case argued noncompliance with the Rule 1.5(e) governing division of fees excused it from performing under the contract. *Id*. at 118. The court held that the oral promise was enforceable, citing the lawyer's "valuable" work across more than a decade, the fact that his work appeared "proportional to the alleged contract amount," and the fact that the lawyer's work on the matter was not concealed. *Id*. at 131. In other words, the agreement "was not a 'secret' fee-splitting agreement." *Id*. at 130.

These two cases respond to the equities between lawyers when a division of fee rule is violated and one of the lawyers wants to keep the entire fee. In *Saggese,* an individual client (not a class representative) ratified the agreement and was not harmed. *See* 434 Mass. at 444. In *Daynard,* the clients were states acting through their attorneys general, some of whom did know of Daynard's work and did not object. 188 F. Supp. 2d at 129. Furthermore, Daynard worked on the matters over the course of a decade. *Id*. at 131. There was no "taking advantage of uninformed clients." *Id*. at 131. The Court said that refusal to enforce the agreement would "smack of injustice." *Id*. at 132.

The equities here are different. The question here does not arise in a fee dispute between Chargois and Labaton. This is not a case where a referred lawyer, equally to blame, cites the rule in order to keep the entire fee for himself. This is not a case where a law firm, which benefitted

for a decade from the work of an unaffiliated lawyer, now seeks to renege on its promise.

Labaton's duties were owed to ATRS, the class ATRS purported to represent, and the Court. It

did not inform the ATRS Executive Director, the customer and ERISA class members, or the

Court itself of the Chargois Arrangement. Unlike in *Daynard*, Chargois did no work at all and

the Chargois Arrangement was "secret." *See id*. at 130.

*v.* **CONCLUSION**

Massachusetts forbids a lawyer to "give anything of value to a person for recommending

the lawyer's services." Rule 7.2(b). A lawyer is a "person" within the meaning of the rule. There

is an exception for fees permitted by Rule 1.5(e), which is the Massachusetts division of fee rule.

In February 2011, for a fee to fall within Rule 1.5(e), the client must be informed of the fee

division before the referral is made and consent in writing.

Because Labaton did not comply with the writing or notification requirements of Rule

1.5(e), the exception in Rule 7.2(b) is not available to Labaton.

The harm here is greater than it would be for an individual client. Hopkins was a

fiduciary for ATRS and ATRS purported to represent a class. Uninformed, Hopkins could not

seek legal advice on how best to protect the putative class.

**C.  EVEN IF THE CHARGOIS ARRANGEMENT COULD BE DEEMED A
    VALID DIVISION OF FEE AGREEMENT, AND NOT AN IMPROPER
    PAYMENT FOR RECOMMENDING A CLIENT, LABATON,
    THORNTON, AND LIEFF WERE OBLIGATED TO DISCLOSE THE
    CHARGOIS ARRANGEMENT TO THE COURT.**

*i.  DISCLOSURE TO THE COURT IS REQUIRED UNDER THE
    MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT AND
    FEDERAL LAW*

The obligation of customer counsel to have informed the Court of the Chargois

Arrangement arises under federal case law as well as the Massachusetts Rules of Professional

66

Conduct. *See, e.g., Rodriguez v. Disner*, 688 F.3d 645, 654 (9th Cir. 2012) ("Although the application of the common fund doctrine is a matter of federal courts' equitable powers, we have frequently looked to state law for guidance in determining when an ethical violation affects an attorney's entitlement to fees.") (citation omitted). Here, both federal and state sources apply. Labaton and its expert rely on Fed. R. Civ. P. 23(h)(1) and 54(d)(2) to support their contention that, unless the Court asked, there was no duty to inform the Court of the Chargois Arrangement. (Labaton Memo at 19-23; Sarrouf Decl. at 10.) Labaton attorney Chris Keller stated during the negotiations that, whatever the fee allocation amongst Customer Class Counsel might be, the court need not be informed. TLF-SST-052209 (8/28/15 email correspondence between Bradley and Keller, 'cc Sucharow) ("We should talk this through. The court absolutely need not understand what the allocation of fees is amongst counsel so that should not be included in any document to be filed with the court…") [EX. 51].

While there may not have been a duty under Rules 23 and 54 to disclose the division of fees among those lawyers *whom the Court knew about*, and so could inquire, the Court could not be expected to ask counsel about a division of fees with Chargois, a lawyer who had not appeared in the case and whom it did not know about. Labaton's construction of its obligation under Rule 54(d)(2), endorsed by its expert, would impose on the Court the affirmative responsibility to ask: "Is anyone else getting any portion of the attorney's fees you are asking me to award and whose existence you have not revealed?" As discussed below, the Court had no such responsibility.

The Court itself dispelled any uncertainty about what it expected. Just before approving Lead Counsel's fee request in full, the Court said: "I'm relying heavily on the submissions and what's been said today." 11/2/16 Hearing. Tr., p. 35:4-5.  Nicole Zeiss of Labaton and Daniel

Chiplock of Lieff were in the courtroom when the Court made this statement. Both knew about the intention to pay Chargois. Neither spoke up. David Goldsmith of Labaton, who was also in the courtroom, learned of the Chargois Arrangement within weeks and did not disclose it although he had quickly disclosed to the Court the double-counting of SA time.

Earlier in the proceeding, the Court specifically asked to be reminded "of the terms of allocation." Mr. Goldsmith said, "I didn't want there to be something that was left that Your Honor wanted to hear." He then described the allocation to the class followed by a description of the basis for the fee request. *Id.* at 21 *et seq.* Chargois was not mentioned.

### ii.    FEDERAL CASE LAW CONTRADICTS LABATON'S NARROW VIEW OF ITS DISCLOSURE OBLIGATIONS TO THE COURT

Case law, including cases from the District of Massachusetts, amply supports recognition of the Court's fiduciary responsibility to protect the class and the Court's reliance on counsel to be forthcoming with the information the Court needs in order to do so. Private agreements among counsel do not bind the Court, which can ignore them if they reward those who did little or nothing to serve the class. Nor is the Court bound to honor the retainer agreement between counsel and the named class members. The cases that follow reflect the expansive language that District and Circuit Courts use to describe class counsel's duties to the Court and the Court's duties to the class.

*In re Volkswagen and Audi Warranty Extension Litigation*, 89 F.Supp.3d 155, 183 (D. Mass. 2015):

> While fee sharing agreements among counsel may be respected or treated as presumptively reasonable in a district court's allocation of attorneys' fees, persuasive authority convinces this Court that it is not bound blindly to follow such private arrangements. *See, e.g., In re FPI/Agretech Sec. Litig.,* 105 F.3d 469, 473 (9th Cir.1997) ("[A] court may reject a fee allocation agreement where it finds that the agreement rewards an attorney in disproportion to the benefits that attorney conferred upon the class—even if the allocation in fact has no impact on the class."); *In re "Agent*

*Orange" Prod. Liab. Litig.,* 818 F.2d 216, 223 (2d Cir.1987) (rejecting authority that "allows counsel to divide the award among themselves in *any* manner they deem satisfactory under a private fee sharing agreement"). *Cf. In re Cendant Corp. Litig.,* 264 F.3d 201, 282–83 (3rd Cir.2001) (holding that although retainer agreements in class actions enjoy a presumption of reasonableness at the fee award stage, the presumption may "be abrogated entirely were the court to find that the assumptions underlying the original retainer agreement had been materially altered by" unforeseeable developments). More important than the terms of a private agreement are the actual contributions each firm made to the prosecution of this case and the interests of the plaintiff class.

*In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 71 (D. Mass. 2005):

> As this Court recently noted, "[b]oth the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litig.,* 360 F.Supp.2d 166, 192 (D.Mass.2005) (citations omitted). Although settlement is often a more favorable result than litigation, "the court has a fiduciary duty to absent members of the class in light of the potential for conflicts of interest among class representatives and class counsel and the absent members." *In re Lupron*, 228 F.R.D. at 94 (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods.,*55 F.3d 768, 805 (3d Cir.1995) ("Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims."))…. *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279–80 (7th Cir.2002) (Posner, J.) (noting the concern that a lawyer's self interest may trump the interests of the class members "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions. We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries.")

*In re "Agent Orange" Product Liability Litigation*, 818 F.2d 216, 223 (2nd Cir. 1987):

> There is authority for a court, under certain circumstances, to award a lump sum fee to class counsel in an equitable fund action under the lodestar approach and then to permit counsel to divide this lodestar-based fee among themselves under the terms of a private fee sharing agreement. ... We *reject* this authority, however, to the extent it allows counsel to divide the award among themselves in *any* manner they deem satisfactory under a private fee sharing agreement. Such a division overlooks the district court's role as protector of class interests under Fed. R. Civ. P. 23(e) and its role of assuring reasonableness in the awarding of fees in equitable fund cases. ... *cf. Jones v. Amalgamated Warbasse Houses, Inc.,* 721 F.2d 881, 884 (2d Cir.1983) ("if the court finds good reason to do so, it may reject an agreement as to attorneys' fees just as it may reject an agreement as to the substantive claims"), *cert. denied,* 466 U.S. 944, 104 S. Ct. 1929, 80 L.Ed.2d 474 (1984). In addition, this approach overlooks the class attorneys'

"duty ... to be sure that the court, in passing on [the] fee application, has all the facts" as well as their "fiduciary duty to the ... class not to overreach." *Lewis v. Teleprompter Corp.,* 88 F.R.D. 11, 18 (S.D.N.Y.1980). [Emphasis added.]

*In re FPI Agretech Securities Litigation*, 105 F.3d 469, 474 (9th Cir. 1997):[66]

We reject Chuck's [counsel's] proposed rule that a district court may decline to approve a fee allocation only if it is contrary to the interests of the class or in violation of rules of professional conduct. Instead, we hold that the relative efforts of, and benefits conferred upon the class by, co-counsel are proper bases for refusing to approve a fee allocation proposal….

Chuck next argues that the district court should have treated the fee allocation proposal as an enforceable contract. However, the cases on which Chuck relies are inapposite. Neither case involved attorneys' fees in a class action, and such fees derive from principles of equity, not contract. More importantly, both cases involved formal fee agreements, whereas here the parties merely submitted orally a fee allocation proposal, arrived at, figuratively speaking, "on the courthouse steps," for the court's approval. We decline to curb the district courts' broad discretion in exercising their equitable power to award attorneys' fees in common fund class actions by requiring that fee allocation proposal be treated as enforceable contracts. [Internal citations omitted.]

*Lewis v. Teleprompter Corp.,* 88 F.R.D. 11, 18 (S.D.N.Y. 1980):

Wolf Popper has argued that it should be a matter of indifference to the court how the pie is sliced, if the fee requested is on its face a reasonable one, and if the results accomplished warrant its award. It suggests that it is routine for the court simply to fix the amount of the fee, and then to leave it to the various plaintiffs' attorneys involved to decide for themselves how the fee is to be allocated that, in fact, it is a service to the court not to burden it with the nuts and bolts of determining distribution. While I appreciate Wolf Popper's solicitude, I reject its argument. Wolf Popper has overlooked two important obligations which are part and parcel of its role as plaintiffs' counsel: the duty of its members and associates as officers of the court to be sure that the court, in passing on its fee application, has all the facts; and its fiduciary duty to the shareholder class not to overreach.

Federal case law also recognizes the special danger of conflicts between a lawyer and her

client at the fee-determination stage in common fund cases. The economic interests of the two

are then directly adverse because the greater the fee to the lawyer, the less will be the recovery to

the class. *See, e.g., In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 307 (3rd Cir. 2005):

---

[66] Lieff was co-lead counsel in this case and participated in the dispute over allocation of legal fees.

Case 1:11-cv-10230-MLW   Document 401-234   Filed 07/23/18   Page 78 of 302

The determination of attorneys' fees in class action settlements is fraught with the potential for a conflict of interest between the class and class counsel. *See* [*In re Cendant Corp. Litig.*, 264 F.3d 201, 254-255 (3rd Cir. 2001) (explaining that because clients seek to maximize recovery and lawyers seek to maximize fees, "there is often a conflict between the economic interests of clients and their lawyers, and this fact creates reason to fear that class counsel will be highly imperfect agents for the class"); [*In re Cendant PRIDE*, 243 F.3d 722, 730 (3d Cir. 2001) (discussing "the danger inherent in the relationship among the class, class counsel, and defendants" and recognizing "an especially acute need for close judicial scrutiny of fee arrangements in class action settlements") (internal quotations omitted); Fed. R. Civ. P. 23(h), 2003 Advisory Committee Notes ("Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process.").

### iii. THE MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT ALSO REJECT LABATON'S VIEW THAT IT HAD NO DUTY TO DISCLOSE THE CHARGOIS ARRANGEMENT TO THE COURT UNLESS THE COURT ASKED

Apart from federal law, the omission of the Chargois payment from the fee application

violated Rules 3.3(a) and Rule 8.4(c) even if the balance of the application was literally true.

Rule 3.3(a)(1) provides: "A lawyer shall not knowingly make a false statement of fact or law to a

tribunal or fail to correct a false statement of material fact or law previously made to the tribunal

by the lawyer." Mass. R. Prof. C. 3.3(a)(1) (current through February 1, 2018). Rule 3.3(a)(3)

provides in part that a lawyer "shall not knowingly offer evidence that the lawyer knows to be

false." Rule 8.4(c) provides: "It is professional misconduct for a lawyer to engage in conduct

involving dishonesty, fraud, deceit or misrepresentation." Mass. R. Prof. C. 8.4(c) (current

through February 1, 2018).

A true statement can violate these rules through omission. Rule 3.3, cmt. [3] ("There are

circumstances where failure to make a disclosure is the equivalent of an affirmative

misrepresentation."); *In re O'Toole*, 2015 WL 9309021, at *5 (Mass. St. Bar. Disp. Bd. 2015)

("'[H]alf-truths may be as actionable as whole lies.'… Statements that are 'technically accurate'

or 'literally true,' but that nevertheless are 'clearly intended to mislead' or 'beg[ ] [a] false

inference' amount, in appropriate cases, to false statements within the meaning of" Rules

3.3(a)(1) and 4.1(a)); *In the Matter of An Attorney*, 2007 WL 4284758, at *4 (Mass. St. Bar Disp.

Bd. 2007) ("It is not a defense to these charges that the individual statements made in the letter

could be read as literally true. Literal truth may be a defense to a criminal charge of perjury.")

Compare *Bronston v. United States*, 409 U.S. 353 (1973) with *United States v. DeZarn*, 157 F.3d

1042 (6th Cir. 1998).  But Rule 8.4(c) 'prohibits more than outright perjury. Attorneys may not

engage in conduct involving dishonesty, fraud, deceit, or misrepresentation....'").

In-courtroom statements and submissions to the Court, class counsel offered information

about the fees they would request and the identities of the law firms who would share in those

fees. They also identified $1.257 million in expenses and $85,000 in service awards. The Court

could assume that the lawyers who were going to participate in the fee it was asked to award

were the lawyers who appeared before it because no other lawyer was identified. But here, that

assumption would be wrong. In order for class counsel's statements and submissions to the Court

*not* to mislead the Court through omission, Rule 3.3 required them to disclose to the Court the

Chargois Arrangement and their intention to pay Chargois more than $4 million from the class

recovery.

> ### iv.     *LABATON'S CLAIM THAT IT HAD NO DUTY TO DISCLOSE THE CHARGOIS ARRANGEMENT TO THE COURT OR TO CLASS MEMBERS BECAUSE IT WAS PAYING CHARGOIS FROM ITS OWN FEE AWARD IS INCORRECT AS A MATTER OF FACT AND LAW*

It is *not* true, as Labaton claims, that the Court, the named plaintiffs, and the members of

the certified settlement class, had no interest in the Chargois payment on the theory that

Customer Class Counsel were paying it out of their own fee award. This argument is both legally

and factually wrong. Labaton's fee did not, and would not, exist unless and until the Court

awarded it. Labaton itself recognized as much in the Notice of Pendency of Class Actions (discussed further below) among other places. The Notice states: "Lead Counsel…will apply to the Court for an order awarding attorneys' fees…." (Page 4.) *See also* page 9, stating the question in the conditional tense ("*If* the Court awards fees" at a particular rate…) (emphasis added).

In deciding the amount of fee to award to class counsel, and to whom to award it, the Court, as a fiduciary for the class including unnamed class members, needed *first* to know – and class counsel had a duty to tell it – who would be participating in any fee the Court in its discretion might award from the class recovery and the basis for the claim. Labaton's contrary argument would keep the Court in the dark and deny it the very information it needed in order to decide how much of the undifferentiated settlement funds should go to counsel, and which counsel, and how much should go to the class. Quite simply, until the Court made that decision, *there was no fee to divide.* The Court was empowered, for example, as an exercise of its equitable power and fiduciary duty to the class, to deny any part of the recovery to Chargois, who never appeared and who did no work, and instead to direct that the money intended for him should instead go to the class.[67]

### v.    A LAWYER'S MISCONDUCT MAY AFFECT A COURT'S DETERMINATION OF THE AMOUNT OF FEES TO AWARD

In the First Circuit and elsewhere, lawyer misconduct may influence fee decisions.

*Travers v. Flight Services & Systems, Inc.*, 808 F.3d 525, 542 (1st Cir. 2015):

> "'It is well settled in this circuit that the district court has the duty and responsibility to supervise the conduct of attorneys who appear before it, and that ... [d]enial of attorneys' fees may be a proper sanction' for attorney misconduct. *Culebras Enters. Corp. v. Rivera–Rios*, 846 F.2d 94, 97 (1st Cir. 1988); *see also Wong v. Luu*, 472 Mass. 208, 218 (2015) (holding that '[t]he inherent powers necessary to preserve the court's authority to

---

[67] As stated, the *Daynard* Court cited Daynard's "valuable" contribution to the success of the litigation in upholding his claim. *Daynard,* 188 F. Supp. 2d. at 131.

accomplish justice include the power to sanction an attorney' for misconduct by assessing fees")."

*Rodriguez v. Disner*, *supra*, applied this doctrine in a class action. Analyzed objectively (and nearly all conflicts issues are analyzed objectively), Labaton may have wished to conceal the Chargois payments because anyone who learned of them could claim – successfully in my view -- that they were unethical payments for the recommendation of a client and seek appropriate remedies. Such a finding could be harmful not only in this case, but also in the other ATRS cases in which the firm concealed the Arrangement or did not comply with a jurisdiction's division of fee rule. We would then have a conflict between the firm's disclosure duties to the Court and its clients and its own interest in concealing the existence of the Chargois Arrangement.

Both that conflict and the separate failure of class counsel to disclose the Chargois Arrangement to the Court -- and to class members (who are discussed *infra*) -- as required by federal law and the Massachusetts Rules of Professional Conduct, could properly influence the Court's determination of the amount of fees to award and to whom.

### *vi.*     *CONCLUSION*

Their duty to the Court required Labaton, Thornton, and Lieff to disclose the Chargois Arrangement (and intended payment) to the Court before it awarded fees from which Chargois would be (and was) paid. This is true whether or not the Chargois Arrangement complies with Rule 1.5(e).

### D.   LABATON, THORNTON, AND LIEFF CABRASER EACH HAD A DUTY TO DISCLOSE THE CHARGOIS PAYMENTS IN THE "NOTICE OF PENDENCY" SENT TO MEMBERS OF THE CUSTOMER AND ERISA CLASS

The unnamed members of the certified class were entitled to know about the Chargois Arrangement before they were called upon to decide, with legal advice if desired, whether to opt out, or object, to the settlement, and later, the fee request made by Customer Class Counsel. Both decisions would precede the Court's decision on any fee award and, thus, called upon the class members to make an informed decision before there was a fee award to share with Chargois.

On August 8, 2016, David Goldsmith of Labaton appeared before Judge Wolf for the "plaintiffs and the settlement class." Michael Thornton of Thornton and Daniel Chiplock of Lieff Cabraser appeared for the same clients. "We are here," the Court said, "with regard to the motion for preliminary certification of class action and preliminary approval of the proposed class settlement." 8/8/16 Hearing Tr., p. 4. The Court concluded that it was "appropriate to certify a class for settlement purposes." It then certified "the proposed class for settlement purposes only." *Id.* at 4, 11. Previously, in January 2012, the Court had appointed Labaton as "interim lead counsel to act on behalf of all plaintiffs and the proposed class." It had appointed Thornton as "liaison counsel for plaintiff and the proposed class" and Lieff Cabraser to "serve as additional attorney for the plaintiff and the proposed class." *See* 1/12/12 Memorandum and Order, p. 5, Dkt. No. 28. When the Court certified the settlement class in August 2016, the firms continued to hold these positions.

### i.   *CLASS COUNSEL HAD A FIDUCIARY AND ETHICAL DUTY TO DISCLOSE THE CHARGOIS ARRANGEMENT TO THE CLASS MEMBERS AND DID NOT*

At least as of August 8, 2016, Labaton, Lieff, and Thornton had attorney-client relationships with the certified settlement class and its members. In that role, they had

responsibility for the "Notice of Pendency of Class Actions" (the "Notice of Pendency") dated

August 22, 2016, which Labaton prepared, which Nicole Zeiss circulated to Lieff and Thornton,

and which was then sent to the customer and ERISA class members. The Notice of Pendency's

caption identifies ATRS, Henriquez, and the Andover Companies as named plaintiffs. It refers to

the "class action lawsuits (collectively, the 'Class Actions')." It defines the "Settlement Class"

as follows:

> All custody and trust customers of SSBT (including customers for which SSBT served as
> directed trustee, ERISA Plans, and Group Trusts), reflected in SSBT's records as having
> a United States tax address at any time during the period from January 2, 1998 through
> December 31, 2009, inclusive, and that executed one or more Indirect FX Transactions
> with SSBT and/or its subcustodians during the period from January 2, 1998 through
> December 31, 2009, inclusive. *Id*. at 3.

Labaton Sucharow and Lawrence Sucharow are identified as "Lead Counsel." *Id.* at 2,

14. No other law firm or lawyer is identified. Recipients were told "Lead Counsel, on behalf of

ERISA Counsel and Customer Counsel, will apply to the Court for an order awarding attorneys'

fees in an amount not to exceed $74,541,250.00." *Id*. at 4, 13. Recipients are also told that

attorneys' fees for ERISA counsel will not exceed $10,900,000.00 and they are told how fees for

the other counsel will be computed "if the Court awards the total amount of fees that Lead

Counsel intend to request." *Id*. at 9. Labaton's phone number, website, and email address are

given as a source of "[a]dditional information." *Id*. at 2. Recipients are told their right to opt out

and to object and how to do so. *Id*. at 2.

Recipients of the Notice were *not* told about the Chargois Arrangement although this

information – that a lawyer who did no work to produce the class recovery and who accepted no

legal responsibility for the work of others stood to receive more than $4 million from the class

recovery – was relevant to "The Allocation of Settlement Proceeds," including the completeness

of the "attorneys' fees" disclosures in the Notice. That information could reasonably have

influenced members of the class in deciding whether to exercise the right to object to the

disclosure regarding attorneys' fees. As important, it may have affected the advice that ERISA

counsel would have given their clients.[68] At the August 8, 2016 hearing, the Court specifically

recognized that class members could object to the requested fee. It said: "As I understand it,

counsel will seek up to 25 percent, roughly $76 million, of the common fund. The class members

will have an opportunity to be heard on the propriety of that." 8/8/16 Hrg. Tr., pp. 22:23 – 23:1.

At least as of August 8, Labaton, Thornton, and Lieff also had fiduciary duties to the

unnamed members of the certified settlement class. *Piambino v. Bailey*, 757 F.2d 1112, 1139

(11th Cir. 1985)("The lawyers who bring these [Rule 23] cases have a heavy fiduciary

responsibility to their clients -- especially those who are absent and those in the minority whose

interests are at odds with the named plaintiffs and their group -- to the trial judge and to the

people, who provide the forums and governmental resources for these suits."); *Singer v. AT&T*

*Corp*, 185 F.R.D. 681, 690 (S.D. Fla. 1998)("The class attorney has a fiduciary duty to the court

as well as to each member of the class.").[69]

As fiduciaries and lawyers for the unnamed certified class members -- and lawyers are

fiduciaries for their clients as a matter of law[70] -- Labaton, Thornton, and Lieff had a duty to give

---

[68] ERISA counsel Lynn Sarko testified that it would have affected his advice. *See infra*. Beyond this, the fact that the ERISA lawyers received only approximately $7.5 million of the $10.9 million allocated for fee awards out of the ERISA class's share of the funds, with the $3.4 million balance going back to the Customer Class Counsel, would (they testified) have informed the ERISA lawyers' conduct of the case and agreement to accept only a $7.5 million share of the fees; several of the ERISA lawyers testified to this. *See, e.g.*, Sarko 9/8/2017 Dep., pp. 28:10-49:18; 74:23-82:24; 90:13-92:18; McTigue 9/8/17 Dep., pp. 21:15-30:9; Kravitz 9/11/17 Dep., 68:20-71:22; 82:6-85:17; 101:16-102:23; 113:22-115:3

[69] Courts have held that attorneys for *putative* classes – pre-certification -- have fiduciary and ethical obligations to unnamed class members after the complaint is filed. *In re General Motors Corporation Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 801 (3rd Cir. 1995)("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed.").

[70] *Washington Legal Foundation v. Massachusetts Bar Foundation*, 993 F.2d 962, 974 (1st Cir. 1993)("The relationship between lawyer and client in Massachusetts is fiduciary as a matter of law.").

their clients information relevant to decisions that belonged to the client. One decision that belongs to a client is whether or not to settle. Mass. R. Prof. C. 1.2(a), 1.4(a)(current through February 1, 2018)[71]; *Moores v. Greenberg*, 834 F.2d 1105 (1st Cir. 1987)("As part and parcel of [the duty to a client], a lawyer must keep his client seasonably apprised of relevant developments, including opportunities for settlement.").[72] This is the very decision the Notice of Pendency presented to the recipients in the Notice -- i.e., whether to settle on the terms in the Notice or to object.

## ii. CONCLUSION

As fiduciaries and lawyers, Labaton, Thornton, and Lieff had a duty to provide the unnamed customer and ERISA members of the class whom they represented after the Court certified the class for settlement purposes on August 8, 2016, of the existence of the Chargois Arrangement and its terms when, in the Notice of Pendency, they purported to inform class members of the terms of the settlement, including anticipated counsel fee requests, and explained their options to object or opt out.

---

[71] Rule 1.2(a) provides in part: "A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter." Rule 1.4(a)(1) provides: "A lawyer shall promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f) is required by these Rules." Rule 1.4(b) provides: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Rule 1.0(f) provides: "'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." *See also* Restatement (Third) of Law Governing Lawyers (2000), §§ 20(3) and 22(1).

[72] A lawyer is an agent and the law of agency separately creates a duty to inform. *Gagnon v. Coombs*, 39 Mass. App. Ct. 144, 156 (1995) ("An agent's duty to make full disclosure to the principal of all material facts relevant to the agency is a necessary corollary to the fundamental agency obligations of undivided loyalty and utmost good faith.")

**E.    GARRETT BRADLEY'S DECLARATION CONTAINS FALSE STATEMENTS OF FACT AND FALSE "EVIDENCE," IN VIOLATION OF RULES 3.3(a)(1) AND 3.3(a)(3) BECAUSE THE FALSE STATEMENTS WERE MADE KNOWINGLY. THE DECLARATION ALSO VIOLATED RULE 8.4(c)'S PROHIBITION OF MISREPRESENTATIONS AND DECEIT. SEPARATELY, GARRETT BRADLEY'S DECLARATION VIOLATED FED. R. CIV. P. 11 BECAUSE BRADLEY FAILED TO CONDUCT "AN INQUIRY REASONABLE UNDER THE CIRCUMSTANCES" TO ESTABLISH THAT HIS FACTUAL CONTENTIONS HAVE "EVIDENTIARY SUPPORT"**

### i.    *FILING OF THE FEE PETITION*

The Court's task when class counsel requests attorney fees is to identify what the market would have recognized as a reasonable rate for counsel's service to the class. To aid the court in fulfilling its fiduciary duty to the class, counsel will provide information to persuade the Court that the requested fee is reasonable. When lawyers seek attorneys' fees, their interests and the interests of the client they represent are economically adverse, which heightens the need for the Court to be especially vigilant. *In re Rite Aid Corp. Securities Litigation*, 396 F. 3d at 307. As discussed, *supra,* in Section C (ii), the Court is not bound by a fee agreement between counsel and class representatives or among themselves.

Naturally, a court may first look to the evidence counsel submits in support of a fee request, which was the purpose of the Bradley Declaration. But courts must also independently evaluate the requested fee against reasonable market rates for the particular lawyer. "While fee sharing agreements among counsel may be respected or treated as presumptively reasonable in a district court's allocation of attorneys' fees, persuasive authority convinces this Court that it is not bound blindly to follow such private arrangements." *In re Volkswagen and Audi Warranty Extension Litigation,* 89 F. Supp. at 183. In *In re Citigroup Inc. Securities Litigation,* 965 F.Supp.2d 369, 393-394 (S.D.N.Y. 2013), the Court awarded $200 hourly for contract lawyers, writing that:

The lodestar figure should be based on market rates in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. The Court must determine the rate a paying client would be willing to pay…. In other words, if the class were a reasonable, paying client free to choose its counsel and negotiate rates, what hourly rate would it accept for the attorneys and other professional staff employed here? (internal quotations and citations omitted)

Labaton submitted the Bradley Declaration dated September 14, 2016, as part of the materials in support of the fee applications of the several law firms. It is evidence upon which the Court was invited to base its fee award.[73]

The Bradley Declaration states under oath in paragraphs 3 and 4:

> 3. The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by each attorney and professional support staff-member of my firm who was involved in the prosecution of the Class Actions, and the lodestar calculation is based on my firm's current billing rates. For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court. Time expended in preparing this application for fees and payment of expenses has not been included in this request.

> 4. The hourly rate for attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions.

Paragraphs 5 and 6 implicitly incorporate some of these statements.[74]

These paragraphs were taken verbatim from a template prepared by Labaton and shared with Thornton and Lieff.

---

[73] I understand that a separate issue addressed by the Special Master is that SAs on Exhibit A of the Bradley Declaration were also identified by Labaton or Lieff in their request for fees – i.e. some were double- counted.

[74] These paragraphs state:

> 5. The total number of hours expended on this litigation by my firm during the Time Period is 15,302.5 hours. The total lodestar for my firm for those hours is $7,460,139.

> 6. My firm's lodestar figures are based upon the firm's billing rates, which rates do not include charges for expenses items. Expense items are bill separately and such charges are not duplicated in my firm's billing rates.

### ii. *GARRETT BRADLEY VIOLATED RULE 3.3(a) BECAUSE HE KNEW THAT HIS DECLARATION CONTAINED FALSE STATEMENTS*

Exhibit A to the Garrett Bradley Declaration uses the designation "SA" to identify 24 "staff attorneys." Total compensation requested for the SAs is $4,508,837 at an hourly rate of $425 for each, except that one "SA," Michael Bradley, is billed at $500. Additional compensation requested for four Thornton partners and one associate totals $2,831,287.  The Declaration contains numerous false statements. I am asked to assume that Garrett Bradley knew these statements were false when he submitted his Declaration. *See*, *e.g*., pp. 23-24.

- The Declaration states: *Exhibit A contains professional support staff members "of my firm."* None of the SAs are support staff members of the Thornton law firm.

- The Declaration states: *The billing rates for the SAs are "based on my firm's current billing rates."* The firm did not have "current billing rates" for these lawyers.

- The Declaration states: *For personnel "who are no longer employed," the lodestar is based on their rates for the "final year of employment."* None of the SAs were ever "employed" at Thornton.

- The Declaration states: *The schedule was prepared from "contemporaneous daily time records regularly prepared and maintained by my firm."*  The SAs worked at Labaton or Lieff, which prepared their time records and is where those records were maintained. Or they were prepared and maintained by an agency. Other TLF attorneys also did not keep contemporaneous time records.[75]

- The Declaration states: *The hourly rates "are the same as my firm's regular rates charged for their services."* Thornton had no "regular rates" for the SAs.

- The Declaration states: *These rates "have been accepted in other complex class actions."* This is true for four of the SAs but it is not true for the other 20, including Michael Bradley.

---

[75] *See supra*, n. 28.

Although Goldsmith of Labaton informed the Court in the November 10, 2016 letter that SA time was double-counted in the lodestars of Customer Class Counsel, and although attorneys listed in the Thornton lodestar were among those who were double- counted (except Michael Bradley), Thornton did not inform the Court of the false statements in its lodestar.

The characterization of Michael Bradley, Garrett Bradley's brother, is especially serious. Contrary to the Garrett Bradley Declaration, Michael Bradley's $500 hourly rate had never been accepted by a Court in a complex class action. Michael Bradley had not been a staff member of the Thornton law firm. The Thornton law firm did not have a current billing rate for him or prepare and maintain his time records. It did not supervise him. There appears to be no physical evidence of the work for which he was paid $203,200. I am asked to assume that "[u]nlike the Labaton and Lieff SAs, Michael Bradley did not prepare any memoranda or deposition notebooks. And, the record reveals no written work product created by Michael Bradley."

### iii. APPLICATION OF RULE 3.3 AND FEDERAL JURISPRUDENCE TO THE BRADLEY DECLARATION

To exercise its fiduciary duty to protect the class when responding to a law firm's fee request, the Court required accurate and complete information about the contributions of the firm seeking counsel fees. That information would inform the hourly rate the Court would approve for SAs and contract (or agency) attorneys. For example, the Court could consider not merely the fact that a law firm assumed financial responsibility for the expense of a staff lawyer, but also whether it assigned legal work to those lawyers, supervised their work, and provided them with a place to work and research support. The Court might also consider as relevant to its decision the fact that the rate requested for these lawyers was nearly nine times their cost to the law firm. The question is not what the Court would or would not do based on such information but the relevance of the information to the Court's exercise of its judgment as a fiduciary for the class.

While the Court was informed of the hourly rate *claimed* for the SAs, other statements in the Bradley Declaration, which could reasonably affect the Court's decision whether to approve that rate, are false.

Analysis of the Bradley Declaration is rooted in the rule governing a lawyer's duty of candor to the Court and federal case law. As noted in Section C (iii), *supra,* Rule 3.3(a)(1) provides: "(a) A lawyer shall not knowingly (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." A lawyer who unknowingly offers false "evidence" to a tribunal and comes to know of its falsity must take reasonable remedial measures if the evidence is material. Rule 3.3(a)(3). Here, that would have required correction of the falsity. Rule 1.0(g) defines "knowingly." "'Knowingly,' 'known,' or 'knows' denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." Rule 8.4(c) forbids "conduct involving dishonesty, fraud, deceit or misrepresentation."

The Court was not bound by how the several law firms chose to allocate fees or SA time among themselves. "More important than the terms of a private agreement are the actual contributions each firm made to the prosecution of this case and the interests of the plaintiff class." *In re Volkswagen,* 89 F. Supp. 3d at 183; *In re FPI/Agretech Sec. Litig.,* 105 F.3d 469, 473 (9th Cir.1997) ("[A] court may reject a fee allocation agreement where it finds that the agreement rewards an attorney in disproportion to the benefits that attorney conferred upon the class—even if the allocation in fact has no impact on the class"); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d at 223 (rejecting authority that "allows counsel to divide the award among themselves in *any* manner they deem satisfactory under a private fee sharing agreement"). In

making a fee award, the Court would of course be cognizant of the fact that the money paid to the law firms would necessarily come from the class recovery.

### iv.     APPLICATION OF FED. R. CIV. P. 11 TO THE BRADLEY DECLARATION

Federal Rule of Civil Procedure 11(b)(3) required Bradley to conduct "an inquiry reasonable under the circumstances" to ascertain that the facts he was asserting in his Declaration had "evidentiary support," which Bradley did not do because, as I am asked to assume, he knew that statements in the Declaration were false.[76]

### v.     CONCLUSION

Garrett Bradley prepared the "evidence" -- in his sworn Declaration -- from a template Labaton circulated. This is "evidence" in the sense that it is information declared to be true and upon which the Court was invited to issue a ruling.  He is governed by Rules 3.3 and 8.4.  Rule 3.3 prohibits knowing false statements to a tribunal. Rule 8.4(c) forbids "conduct involving dishonesty [and] deceit." Bradley knew the statements in his Declaration were false. Federal law separately required reasonable care to ensure that the information provided to the Court for the exercise of its discretion be true. A reasonable inquiry would quickly have identified these statements as false if Bradley did not already know it.

---

[76] The cited provision of the Rule continues: "or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

STEPHEN GILLERS

February 23, 2018

# EX. 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM**,** on Behalf of Itself and All Others Similarly Situated,<br><br>           Plaintiffs,<br><br>   -against-<br><br>STATE STREET CORPORATION, STATE STREET BANK AND TRUST COMPANY, and STATE STREET GLOBAL MARKETS, LLC,<br><br>          Defendants. | CIVIL ACTION NO. _____<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

Plaintiff Arkansas Teacher Retirement System ("ARTRS"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, makes the following allegations against Defendants State Street Corporation, State Street Bank and Trust Company ("State Street Bank" or the "Bank"), and State Street Global Markets, LLC ("State Street Global") (collectively, "State Street", or "Defendants") based upon the investigation of counsel, except as to the allegations pertaining specifically to Plaintiff that are based on personal knowledge.

## I.  <u>INTRODUCTION</u>

1.     State Street Bank, through its headquarters in Boston, Massachusetts, serves as the custodian for over 40% of public pension funds in the United States.  State Street Bank is the largest such custodian in the country, and had $4.4 trillion in pension assets under custody globally as of March 31, 2010.  State Street Bank also serves as the custodian for many non-public investment funds and other investors.  As custodian, State Street Bank is responsible, *inter alia*, for undertaking (through affiliates such as State Street Global) the foreign currency

exchange ("FX") transactions necessary to facilitate a custodial customer's purchases or sales of foreign assets or the repatriation other foreign funds.

2.      For over a decade, State Street, in violation of Massachusetts law, has maintained an unfair and deceptive practice whereby FX transactions are conducted so as to maximize profits to State Street (stemming from volatility in FX rates) at the expense of a substantial segment of its custodial customers.  In sum, Defendants have charged many of their custodial customers (a) inflated FX rates when buying foreign currency for those customers, and (b) deflated FX rates when selling foreign currency for those customers, and pocketed the difference between the actual and reported rates.

3.      Defendants' unfair and deceptive practices remained unknown to Plaintiff and the Class because, *inter alia,* the account statements Defendants provided to the affected custodial customers reported the FX transactions as having taken place at unspecified times during a 12 or 24-hour period, and as using FX rates falling within the "high-low" range of that period. However, the FX rates that State Street reported and applied to the transactions for these custodial customers were incorrect.  State Street arrived at the reported FX rates "after the fact," often hours after performing the relevant FX transactions for the custodial customers.

4.      Defendants' unfair and deceptive FX practice has generated as much as $500 million in profits annually for State Street, or roughly half of State Street's FX profits for the last ten years.  This is money taken directly out of the pockets of State Street's custodial customers.

5.      ARTRS brings this suit as a class action on behalf of all similarly affected custodial customers of State Street, except those government pension funds that are covered by independent qui tam actions that have been unsealed, or that become unsealed during the

pendency of this action (the "Class"), in order to recover the proceeds unlawfully obtained through State Street's FX activities, and for injunctive relief.

## II.    JURISDICTION AND VENUE

6.     This Court has jurisdiction over the claims pursuant to the Court's diversity jurisdiction.  28 U.S.C. § 1332(a), and 28 U.S.C. § 1331 because Count Three arises under federal law.

7.     This Court also has jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2)(A) and (C).  With respect to CAFA, (i) the amount in controversy exceeds the jurisdictional amount, (ii) the Class consists of hundreds, and perhaps thousands, of injured parties, and (iii) some members of the Class are citizens of States other than those of Defendants.

8.     Venue in this judicial District is proper under 28 U.S.C. § 1391(b)(1) and (2).  A substantial part of the events or omissions giving rise to the claims occurred within this District.  Defendants reside in and transact business in this District.  Defendants are citizens of the Commonwealth of Massachusetts and are headquartered in this District.

## III.    PARTIES

9.     Since 2001, and at all times relevant hereto, Defendants and their subsidiaries, have served as the domestic and international custodial bank for the ARTRS' pension fund.[1]  Since at least July 1, 2001, Defendants, as custodian for the ARTRS pension fund, have been responsible for executing the purchase, sale and pricing of FX contracts for the accounts of ARTRS.

---

[1] State Street Bank and Trust also serves as the securities lending agent for the fund.

10.     ARTRS is a cost-sharing, multiple-employer defined benefit pension plan that covers any person employed by an employer covered by ARTRS.  ARTRS employers include any public school, public educational agency, or other eligible employer participating in ARTRS.

11.     As of June 30, 2009, ARTRS included 343 participating employers and more than 115,000 members.  Since 2001, ARTRS employers have made actual contributions to ARTRS of $2,436,510,000.

12.     As of June 30, 2009, ARTRS possessed net pension assets of approximately $8,802,987,225.  As of the same date, ARTRS's net assets represented a funding ratio of 75.7% funded, reflecting an amortized funding horizon of 45.4 years.

13.     As of June 30, 2009, ARTRS maintained a "Global Equity" asset class target percentage of 30% of ARTRS assets.  As of the last annual report, ARTRS maintained an actual Global Equity investment percentage of 28.9%, reflecting a total international investment of $2,542,601,000.  ARTRS's Global Equity investments are the single largest asset class investment for ARTRS.

14.     ARTRS paid Defendants $851,413 for custodial fees in fiscal year 2009.  The annual fees paid to Defendants by ARTRS do not include the Defendants' hidden FX charges.

15.     Defendant State Street Corporation is a Massachusetts corporation headquartered in Suffolk County in Boston, Massachusetts with an address of State Street Financial Center, One Lincoln Street, Boston, MA 02111.  State Street provides (or has provided) custodial banking services and FX services to ARTRS and the proposed Class through State Street, State Street Bank and Trust, and their subsidiaries, agents, employees and co-conspirators.  State Street's FX trading desk is located in Boston, Massachusetts.   State Street Corporation touts

4

itself and its subsidiaries as the "No. 1 servicer of U.S. pension plans," and as of March 31, 2010, had $4.4 trillion in pension assets under custody globally.

16.     Defendant State Street Bank is headquartered in Boston, Massachusetts and has offices in various other states.  State Street Bank currently provides (or has provided) custodial banking services and FX services to ARTRS and the proposed Class.  State Street Bank is a wholly-owned subsidiary of State Street Corporation.

17.     Defendant State Street Global Markets, formerly known as State Street Capital Markets, is headquartered in Boston, Massachusetts and has offices in various other states.  State Street Global Markets currently provides (or has provided) custodial banking services and FX services to ARTRS and the proposed Class.  In particular, State Street Global Markets provides specialized investment research and trading in foreign exchange, equities, fixed income and derivatives for State Street's custodial customers.  State Street Global Markets is a wholly-owned subsidiary of State Street Corporation.

18.     At all relevant times, each of the Defendants was and is the agent, employee, employer, joint venturer, representative, alter ego, subsidiary and/or partner of one or more of the other Defendants, and was, in performing the acts complained of herein, acting within the scope of such agency, employment, joint venture, or partnership authority, and/or is in some other way responsible for the acts of one or more of the other Defendants.

## IV.     CLASS ACTION ALLEGATIONS

19.     This action is brought and may properly be maintained as a class action pursuant to Rules 23(a)(1)-(4), and 23(b)(2) and (3) of the Federal Rules of Civil Procedure and Mass. Gen. Laws c. 93A, § 11.  This action satisfies the procedural requirements set forth by Rule 23 and c. 93A, § 11.

20.     This suit is a class action brought on behalf of a Class defined as all public and private pension funds, mutual funds, endowment funds, investment manager funds, and any other funds for whom State Street Bank served as the custodial bank and executed FX trades on an "indirect" or "custody" basis since 1998, except those government pension funds that are covered by independent qui tam actions that have been unsealed, or that become unsealed during the pendency of this action, and which have suffered damages as a result of the conduct alleged herein.  It is brought pursuant to Rule 23(b)(2) for injunctive or declaratory relief, and Rule 23(b)(3) for money damages.

21.     Also excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

22.     The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable.

23.     There are questions of law and fact common to the Class, including:

(a)     Did Defendants engage in unfair and deceptive acts and practices in connection with  FX transactions so as to maximize profits to Defendants at the expense of their custodial customers?

(b)     Did Defendants charge their custodial customers incorrect FX rates, and pocket the difference between the actual and incorrect rates?

(c)     Did Defendants provide account statements to their custodial customers that reported incorrect FX rates?

(d)     Did the Defendant's actions with respect to the Class violate the

Massachusetts Consumer Protection Act, Mass. Gen. Laws c. 93A, and Massachusetts common

law?

(e)     Did Plaintiff and Class members suffer monetary damages as a result of

the Defendant's actions and if so, what is the proper measure of those damages?

(f)     Is the Class entitled to injunctive relief?

24.     Plaintiff's claims are typical of the claims of the members of the Class and the

named Plaintiff is a member of the Class described herein.

25.     The named Plaintiff is willing and prepared to serve the Court and the proposed

Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiff

will fairly and adequately protect the interests of the Class and has no interests adverse to or

which directly and irrevocably conflict with the interests of other members of the class.

26.     The interests of the named Plaintiff are co-extensive with, and not antagonistic to,

those of the absent Class members.  The named Plaintiff will undertake to represent and protect

the interests of absent Class members.

27.     The named Plaintiff has engaged the services of the undersigned counsel.  These

counsel are experienced in complex class action litigation, will adequately prosecute this action,

and will assert and protect the rights of, and otherwise represent, the named Plaintiff and absent

Class members.

28.     The questions of law and fact common to the Class, as summarized in ¶ 23 above,

predominate over any questions affecting only individual members, in satisfaction of Rule

23(b)(3), and each such common question warrants class certification under Rule 23(c)(4).

29.     A class action is superior to other available methods for the adjudication of this controversy.  Individualized litigation increases the delay and expense to all parties and the court system given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be far more fair, efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

30.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Compared to individualized actions, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

31.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

32.     In the alternative, the above-referenced Class may be certified under Rule 23(b)(1) because:

(a)     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members' claims which would establish incompatible standards of conduct for Defendants; and

(b)     The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter, be dispositive of the interests of other members of the class who are not parties to the adjudications, or which would substantially impair or impede the ability of other Class members to protect their interests.

## V.      DEFENDANTS' FX PRICING PRACTICES

### A.      Background On Defendants' Relationship With Custodial Customers

33.      State Street holds itself out on its website as the "No. 1 servicer of U.S. pension plans" and the "leading custodian worldwide."  In its Annual Report on Form 10-K for fiscal year end December 31, 2007, State Street reported that it had $15.3 trillion in assets under custody and $1.98 trillion in assets under management as of December 31, 2007.  Assets under custody grew at a compound annual rate of 13% between 2004 and 2007, according to the 2007 10-K.  In the 2007 Annual Report to Shareholders, Ronald Logue, State Street's Chief Executive Officer, stated that State Street had achieved 30 consecutive years of growth in operating earnings per share.

34.      For 2008, notwithstanding the troubled economic climate, State Street continued to report positive growth in operating earnings per share.

35.      According to State Street's 2007 Form 10-K, "fee revenue" from "trading services," which includes FX revenue, grew from $862 million in 2006 to $1.152 billion in 2007, an increase of 34%.  State Street further reported in its Annual Reports filed with the S.E.C., foreign exchange trading revenues increased from $468 million in 2005 to $611 million in 2006, to $802 million to 2007, and to $1.08 billion in 2008, or an annual increase of 31% in 2006 and 2007 and 35% in 2007 and 2008.  Over the past ten years State Street has reported foreign exchange trading revenues of more than $4 billion. Approximately one-half of these revenues were derived from the FX pricing practices alleged herein.

36.      State Street reported on its website on January 31, 2008 that it "currently services more than 40 percent of the public fund business in the United States through its dedicated public fund team, with customers in 33 states and the District of Columbia, Puerto Rico and the U.S. Virgin Islands."

37.    Neither ARTRS nor the Class authorized Defendants to charge FX rates other than those in effect at the time of the foreign currency trades. Nor have ARTRS or the Class ever approved the retention by Defendants of the difference between the actual FX cost and the incorrect amounts charged by Defendants. Nonetheless, Defendants charged ARTRS and the Class FX rates that were not the actual charges incurred. Defendants then made unfair and deceptive claims and statements regarding higher FX rates than were actually paid by Defendants in connection with purchases of foreign currencies on behalf of ARTRS and the Class, and lower FX rates than were credited to Defendants in connection with sales of foreign currencies on behalf of ARTRS and the Class.  Defendants kept the excess of these two rates for themselves.  Defendants had no right to retain such monies as "profit" on these FX transactions.

38.    When such funds were wrongly kept by Defendants, ARTRS and the Class suffered monetary damages.

39.    Upon information and belief, Defendants carried out these unfair or deceptive acts and practices by executing FX transactions requested by the Plaintiff and proposed Class as follows.  Upon receipt of a request requiring a FX transaction, Defendants would execute a trade to fill the request at the FX rate at some point thereafter in the trading day.

40.    Regardless of the price paid by Defendants for the FX transaction necessitated by the Plaintiff and proposed Class' FX trade, Defendants thereafter charged Plaintiff and proposed Class, a different, less favorable rate than the one at which Defendants actually settled the FX transaction on the interbank market.

41.    Regardless of the rate for the FX trade by the Defendants, the Plaintiff and proposed Class would receive a less favorable exchange rate, the extremes of which would only be controlled by the volatility of the market, *i.e.* "range of the day" pricing.

42.     By substituting a different FX rate and price for the foreign currency trades of the Plaintiff and proposed Class, Defendants' unfairly and deceptively claimed to have paid a different rate than Defendants had actually paid to settle the trade.

43.     By engaging in this practice Defendants unfairly and deceptively collected money directly from, and at the expense of, their custodial clients.

44.     Because any reports that the Plaintiff and proposed Class would have received from Defendants would have indicated that each FX transaction was completed at a rate within the range of FX rates prevailing during that day, the Plaintiff and proposed Class were unable to discover this conduct.

45.     FX transactions on behalf of the Plaintiff and proposed Class would be initiated by sending a transaction request, usually by electronic means, to the custody side of the Bank, called the Securities Processing Unit.  The request would then be sent electronically by custody to the Bank's trading desk, where it would appear on software used by the FX traders, called the Money Order Management System (sometimes also referred to as the "Market Order Management System" or "MOMS").

46.     Upon the transaction request appearing in MOMS, the FX trader would check the status of the two currencies involved, set a price, and then execute the FX transaction. The transaction would be executed or "settled" in most cases by the bank trader making a transaction on the interbank FX market – usually through another bank. If the trader did the trade through another bank, a record of the trade would be entered into that other bank's system, and that bank would then send a confirmation of the trade to Defendants.

47.     Defendants then confirmed the transaction through a separate software system, called Wall Street Systems[2], which memorialized it.  At that point, the unfair and deceptive FX rate, or "spread," was determined and added to the custodial clients' costs.   That is, Defendants' FX traders executed the trade at an interbank rate and then the additional cost (for purchases) or remitted a lesser payment (for sales) was added for transmission or charge to the custodial clients, such as the Plaintiff and proposed Class.

48.     The FX price actually paid by the Defendants would also be noted by the trader in his or her "blotter," an informal running log or notebook of the trader's currency positions through the day.  The Defendants maintain all relevant records of these transactions.

49.     By pricing the Bank's custodial FX trades later in the day, the Bank obtained the widest possible "range of the day."  Typically, there is at least some FX rate volatility every day, often occurring at times when key financial indices are reported, such as interest rate announcements in major countries.  The bigger the range of the day, the bigger the Bank's profits on each custodial FX trade.

51.     The difference between actual and charged rates to the Plaintiff and proposed Class can be very large.  For example, if a pension fund placed a request to purchase 10 million Euro and the FX rate for EUR is 1.5355 at 10:00 a.m., but then the FX rate goes to 1.5475 at 3:30 p.m., a difference of .0120, the potential "profit" to State Street from their FX practices would be $120,000 (.0120 x 10,000,000 = $120,000).

52.     When State Street traded FX, it always did so at the interbank rate.  Through the conduct alleged herein, State Street's custodial FX clients never received the interbank rate for their trades.

---

[2] Prior to Wall Street Systems, Defendants utilized another program that served the same function.  That program was known as "IBIS" or "IBS."

53.     Damages to the Plaintiff and the proposed Class, however, would be even greater than the amount added to or subtracted from the interbank trade, because by paying the higher rate, proposed Class members would have lost the opportunity for those monies to appreciate. Over a ten or eleven year period, due to compounding and lost investment opportunities, a charge of 1% of the assets of the Plaintiff and proposed Class would grow to damages of approximately 3%. In other words, whatever the size of the overcharge or undercharge for a particular buy or sell transaction, the size of the damages would increase by threefold over 10 to 11 years.

### B.     All Trades Executed by the Defendants Are Equally Affected

54.     The conduct described herein affects the Plaintiff and proposed Class each time Defendants executed a FX trade for the Plaintiff or proposed Class. Although Defendants may not execute all of the Plaintiff's and the proposed Class' FX trades, the ones they do execute, often known as "indirect," "custody," "non-negotiated" or "standing instruction" trades, always suffer the Defendants' pricing practices, as described herein.

55.     Defendants, as the custodial bank for the Plaintiff and proposed Class, transacted the following FX trades for the Plaintiff and proposed Class: income repatriation trades; dividend payment and repatriation trades; emerging market trades; portfolio and foreign asset-based FX trades; all other non-negotiated and/or standing instruction trades, including spot, forward, and swap trades.

56.     When the Defendants executed these FX trades for Plaintiff and the proposed Class, they unfairly and deceptively priced these trades to their benefit and to the detriment of the Plaintiff and the proposed Class. This conduct was possible because Plaintiff and proposed Class believed that the Defendants maintained a duty with respect to them and because the

Defendants never informed the Plaintiff and proposed Class of their practice of charging higher or lower FX rates on FX trades executed by the Defendants.

58.     Defendants' unfair practices affected all State Street custodial clients whose FX trades were executed by State Street.  State Street treated all custodial FX clients equally when over-pricing or under-pricing the FX fees they paid.  Without any regard to their respective custodial contracts, State Street treated all custodial client FX trades exactly the same, for each currency, for each trade.

### C.    **The California Attorney General Action**

67.     Plaintiff is aware of at least one ongoing governmental action against Defendants arising out of similar conduct alleged in this Complaint.  The California Attorney General, on behalf of the people of the State of California, filed a Complaint in Intervention for violation of the California False Claims Act, Cal. Gov. Code, § 12651, against State Street and State Street California, Inc. charging the defendants with misappropriating over $56 million from the accounts of California's two largest pension plans – the California Public Employees' Retirement System ("CalPERS"), and the California State Teachers' Retirement System ("CalSTRS") – over a multi-year period in connection with the same FX practices pled in this Complaint.  State Street acted as custodian for CalPERS and CalSTRS during that time.

68.     The California Attorney General alleges that State Street inflated FX rates when buying foreign securities for CalPERS and CalSTRS, deflated FX rates when selling foreign securities, and pocketed the difference.   The Attorney General further alleges that State Street hid its wrongful conduct by entering incorrect FX exchange rates into State Street's FX trading computer programs, and providing  false records to CalPERS and CalSTRS.

69. The California Attorney General action is the only qui tam action against State Street that has been unsealed to date.

## FIRST CLAIM FOR RELIEF

### Violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A

70. Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs and further allege:

71. At all relevant times hereto the Defendants were engaged in trade or commerce.

72. While engaged in trade or commerce, Defendants engaged in unfair and deceptive acts and practices, as alleged in this complaint, in violation of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A, §§ 2, 11, including, without limitation:

(a) Unfairly and deceptively charging FX transactions so as to maximize profits to Defendants at the expense of their custodial customers;

(b) Unfairly and deceptively charging their custodial customers incorrect FX rates, and pocketing the difference between the actual and incorrect rates;

(c) Unfairly and deceptively providing account statements to their custodial customers that reported incorrect FX rates;

(d) Unfairly and deceptively engaged in custodial FX services that failed to conform to Defendants' representations and/or descriptions of their services; and

(e) Violating Attorney General Regulations, including 940 CMR §§ 3.16(1-2).

73. These acts or practices violated sections 2 and 11 of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A.

74. As a result of the unfair and deceptive conduct of Defendants, Plaintiff ARTRS sustained damages including but not limited to the damages detailed above, incorporated herein.

## SECOND CLAIM FOR RELIEF

### Breach of Agent's Duty of Loyalty

76.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs.

77.     Plaintiff and the Class requested Defendants to act on their behalf to execute the FX transactions necessary to facilitate their purchases and sales of foreign securities.

78.     Defendants entered into an agency relationship with Plaintiff and each of the Class members.

79.     Defendants, by virtue of their capacity as agents for Plaintiff and the Class, and Defendants' superior knowledge and position of control as well as the confidence and trust placed in them by Plaintiff and the Class, owed the duty of loyalty to Plaintiff while executing FX transactions.

80.     Defendants breached their duty of loyalty to Plaintiff and each of the Class members by: (a) over or under stating FX rates so as to maximize profits to Defendants at the expense of their custodial customers; (b) charging their custodial customers incorrect FX rates, and pocketing the difference between the actual and incorrect rates; (c) provided account statements to their custodial customers that reported incorrect FX rates; and (d) failing to conform their FX services to Defendants' representations and/or descriptions of their services.

81.     As a result of Defendants' breach, Plaintiff and the Class sustained damages, including, but not limited to, the damages detailed above.  Accordingly, Plaintiff and the Class are entitled to an award of monetary damages in an amount to be determined at trial.

# THIRD CLAIM FOR RELIEF

## Request for Declaratory Relief Pursuant to the Declaratory
## Judgment Act, 28 U.S.C. § 2201 et seq.

82.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every

allegation contained in the above paragraphs.

83.     As set forth above, Plaintiff contends that Defendants engaged in unfair and

deceptive FX trading activities, whereas Defendants maintain their conduct in connection with

FX trading is and has been proper.

84.     As such, an actual controversy exists between Plaintiff and the Class and

Defendants concerning the parties' rights and duties with respect to Defendants' FX trading

activities.

85.     The parties require this Court's declaration as to their respective rights, duties and

any other relevant legal relations, whether or not the parties could seek or are otherwise entitled

to further relief.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff demands judgment for itself and other members of the proposed

Class as follows:

1)     With regard to the First Claim for Relief, that the Court certify this action as a

class action and enter judgment against Defendants in an amount equal to three times the amount

of damages that Plaintiff and the Class have sustained as a result of Defendants' actions;

2)     With regard to the Second Claim for Relief, that the Court certify this action as a

class action and find the Defendants breached their duties of loyalty to Plaintiff and the Class,

and award damages appropriate to compensate Plaintiff and the Class;

3)      With regard to the Third Claim for Relief, that the Court certify this action as a class action and enter an order in favor of Plaintiff and the Class declaring that Defendants engaged in unfair and deceptive conduct in connection with FX transactions entered into on behalf of Plaintiff and the Class;

4)      That Plaintiff and the Class be awarded all costs and expenses of this action, including attorneys' fees; and

5)      That Plaintiff and the Class be awarded all such other relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  February 10, 2011                    Respectfully submitted,

**THORNTON & NAUMES LLP**

By: __/s/ Garrett J. Bradley_____

Michael P. Thornton
Garrett J. Bradley
100 Summer Street, 30th Fl.
Boston, MA 02110
Telephone:  (617) 720-1333
Facsimile:  (617) 720-2445

**LABATON SUCHAROW, LLP**
Joel H. Bernstein
Eric Belfi
Paul Scarlato
140 Broadway
New York, NY  10005
Telephone:  (212) 907-0839
Facsimile:  (212) 883-7039

.

**LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP**
Steven E. Fineman
Daniel P. Chiplock
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

**LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP**
Richard M. Heimann
Lexi J. Hazam
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. (415) 956-1000
Fax. (415) 956-1008

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ARKANSAS TEACHER RETIREMENT
SYSTEM, on behalf of itself and all others
similarly situated,

                              Plaintiffs,

        - against -

STATE STREET CORPORATION, STATE
STREET BANK AND TRUST COMPANY and
STATE STREET GLOBAL MARKETS, LLC,

                              Defendants.

No. 11-CV-10230 (MLW)

**AMENDED CLASS
ACTION COMPLAINT**

Jury Trial Demanded

Plaintiff Arkansas Teacher Retirement System ("ARTRS"), individually and on behalf of

all other similarly situated entities, by its undersigned attorneys, for its Amended Class Action

Complaint against Defendants State Street Corporation, State Street Bank and Trust Company

("State Street Bank"), and State Street Global Markets, LLC (collectively, "State Street" or

"Defendants"), alleges the following upon personal knowledge as to itself and its own acts, and

upon information and belief as to all other matters.

**I.      INTRODUCTION**

        1.      State Street was the custodian bank for ARTRS and the other institutional

investors that constitute the Class.  A custodian bank is an institution that holds securities on

behalf of investors.  The responsibilities entrusted to a custodian include the guarding and

safekeeping of securities, delivering or accepting traded securities, and collecting principal,

interest, and dividend payments on held securities.  Custodians may also perform ancillary

services for their clients.  Custodians are typically used by institutional investors who do not

wish to leave securities on deposit with their broker-dealers or investment managers. By separating these duties, the use of custodians—at least in theory—reduces the risk of fraud or other misconduct. An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

2. State Street Bank is the nation's second-largest custodian bank, with $21.5 trillion in assets, including $4.7 trillion in pension assets, under custody and administration as of December 31, 2010. State Street charged ARTRS and its other custodial clients hundreds of millions of dollars a year in fees for custodial services.

3. As part of its array of ancillary custodial services, State Street executed foreign currency exchange ("FX") transactions on behalf of its clients in order to facilitate clients' purchases or sales of foreign securities or the repatriation of foreign currency into U.S. dollars. During the past decade, pension funds and other institutional investors have increasingly looked to overseas companies and securities markets in order to diversify their holdings and maximize investment returns. The necessity for pension funds, in particular, to invest in foreign securities in order to properly diversify and meet their funding requirements is well-known to and appreciated by custodians such as State Street, as pension funds' investment guidelines are publicly and readily available.

4. Because foreign investments are bought and sold in the foreign currencies of the nations in which they are issued, U.S.-based investors necessarily must purchase and sell those foreign currencies in order to complete the transactions.

5. ARTRS and the members of the Class reposed a high degree of trust in State Street. ARTRS and Class members authorized State Street to execute FX transactions under conditions in which State Street controlled all aspects of FX trades, including the cost. ARTRS

and Class members depended upon State Street not only to execute FX trades honestly, but also to accurately report the FX rate and generally carry out the trades in a manner consistent with their custodial services contracts ("Custodian Contracts") and State Street's other written representations.

6.     ARTRS's Custodian Contracts expressly provided that State Street would execute FX transactions for no additional fees above the substantial annual flat fee ARTRS paid for custodial services.  Indeed, while ARTRS's Custodian Contracts with State Street authorized State Street to charge ARTRS for additional fees for certain ancillary services, they did not authorize additional fees for executing FX transactions.

7.     In successive "Investment Manager Guides" made available to its custodial clients and their outside investment managers, State Street explained that the pricing of FX trades is ***"based on the market rates at the time the trade is executed."***  Thus, State Street assured its custodial clients, including ARTRS and the Class, that FX rates would reflect only the execution price, without additional fees or mark-ups.

8.     Despite these express provisions in the Investment Manager Guides and Custodian Contracts, in addition to the annual flat fees it charged its custodial clients, State Street has undertaken an unfair and deceptive practice since at least 1998 whereby FX transactions were conducted so as to maximize exorbitant and undisclosed profits to State Street at the direct expense of ARTRS and Class members.  State Street charged its custodial clients inflated FX rates when buying foreign currency for them, reported deflated FX rates when selling foreign currency for them, and in both cases pocketed the difference between the actual and reported rates.  In this regard, State Street charged ARTRS and the Class incorrect and often

fictitious FX rates unrelated to the market-based rates State Street actually paid or received in executing the FX trades.

9.      ARTRS and other Class members could not reasonably have detected State Street's deception.  Nothing in the FX rates State Street actually reported to its clients indicated that those rates included hidden and unauthorized mark-ups (or mark-downs).

10.     State Street's unfair and deceptive FX trading practices, perpetrated on ARTRS and the Class, generated hundreds of millions of dollars in profits annually for State Street.  This money was taken directly from the pockets of ARTRS and Class members.

11.     ARTRS brings this action as a class action on behalf of all similarly affected custodial clients of State Street during the Class Period defined below, except for those covered by independent *qui tam* actions that have been or that become unsealed during the pendency of this action, in order to recover the proceeds State Street reaped from Class members through its unfair and deceptive FX trading practices.

## II.      JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), because this is a class action filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds, if not thousands, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount; and many members of the proposed Class, including Plaintiff, are citizens of States other than Massachusetts.  This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different States and the matter in controversy with respect to the claims of the named Plaintiff exceeds the jurisdictional amount, and pursuant to 28 U.S.C. § 1367(a).

13.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2).

A substantial part of the acts or omissions giving rise to Plaintiff's claims occurred within this

judicial district.  Defendants are citizens of the Commonwealth of Massachusetts, and are

headquartered in and conduct substantial operations within this judicial district.

## III.     PARTIES

### A.     Plaintiff ARTRS

14.     ARTRS, based in Little Rock, Arkansas, is a cost-sharing, multiple-employer

defined benefit pension plan that provides retirement benefits to public school and other public

education-related employees in the State of Arkansas.  ARTRS was established by Act 266 of

1937, as an Office of Arkansas State government, for the purpose of providing retirement

benefits for employees of any school or other educational agency participating in the system.  As

of June 30, 2009, ARTRS included 343 participating employers and more than 115,000

members, and had net assets held in trust for pension benefits exceeding $8.8 billion.

15.     Like many institutional investors, ARTRS invests some of its net pension assets

in foreign securities, referred to by ARTRS as "Global Equity" securities.  Global Equity

investments are ARTRS's single largest investment asset class.  As of September 30, 2009, and

consistent with its investment guidelines, ARTRS's Global Equity investments constituted

approximately 33% of its net pension assets, worth more than $3.2 billion.  That percentage

remained consistent through the end of 2010.

16.     State Street has been ARTRS's exclusive custodian bank since 1998.  ARTRS

paid State Street $851,412.83 for disclosed and agreed-upon custodial fees for fiscal year 2009

(July 1, 2008-June 30, 2009).  Such fees did not include State Street's hidden and unauthorized

FX trading charges.

### B.     Defendants

17.     Defendant State Street Corporation is a Massachusetts corporation headquartered at State Street Financial Center, One Lincoln Street, Boston, Massachusetts 02111.

18.     During the Class Period, State Street Corporation provided custodial banking and FX services to ARTRS and other members of the Class through State Street Bank and Trust, and its subsidiaries, agents, employees and co-conspirators.  At all relevant times, State Street's FX trading desk was located in Boston.

19.     Defendant State Street Bank is a wholly owned subsidiary of State Street Corporation and is similarly headquartered in Boston.  During the Class Period, State Street Bank provided custodial banking and FX services to ARTRS and members of the Class.

20.     Defendant State Street Global Markets, formerly known as State Street Capital Markets, is a wholly owned subsidiary of State Street Corporation and is similarly headquartered in Boston.  During the Class Period, State Street Global Markets provided custodial banking and FX services to ARTRS and members of the Class.  In particular, State Street Global Markets provides specialized investment research and trading in foreign exchange, equities, fixed income, and derivatives for State Street's custodial clients.

## IV.     CLASS ACTION ALLEGATIONS

21.     This action is brought and may properly be maintained as a class action pursuant to Rules 23(a)(1)-(4) and 23(b)(3) of the Federal Rules of Civil Procedure and Massachusetts General Laws ch. 93A, §§ 9 and 11.  This action satisfies the procedural requirements set forth by Rule 23 and ch. 93A, §§ 9 and 11.

22.     This suit is a class action brought for money damages on behalf of a Class defined as all institutional investors in foreign securities, including but not limited to public and private pension funds, mutual funds, endowment funds and investment manager funds, for which State

Street served as the custodial bank and executed FX trades on a "standing-instruction" or "non-negotiated" basis between January 2, 1998 and December 31, 2009, inclusive (the "Class Period"), and which suffered damages as a result of the deceptive acts and practices and other misconduct alleged herein. Excluded from the Class are custodial clients of State Street that are covered by independent *qui tam* actions that have been unsealed or that are unsealed during the pendency of this action. Also excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such entity.

23. The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable.

24. There are questions of law and fact common to the Class, including whether:

(a) State Street engaged in unfair and deceptive acts and practices in connection with FX transactions, so as to maximize its own profits at the expense of its custodial clients;

(b) State Street charged and reported to its custodial customers FX rates that did not reflect the actual cost of the FX transaction to State Street, and instead included hidden and unauthorized mark-ups (or mark-downs);

(c) State Street pocketed the difference between the actual, market-based FX rates and the false FX rates reported and charged to its custodial clients;

(d) State Street's acts and omissions with respect to ARTRS and the Class violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A;

(e)     State Street's acts and omissions with respect to ARTRS and the Class violated Massachusetts state and common law; and

(f)     State Street's acts and omissions caused ARTRS and the Class to suffer money damages and, if so, the proper measure of those damages.

25.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff is a member of the Class described herein.

26.     Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or which directly and irrevocably conflict with the interests of other members of the class.

27.     The interests of the Plaintiff are co-extensive with, and not antagonistic to, those of the absent Class members.  Plaintiff will undertake to represent and protect the interests of absent Class members.

28.     The undersigned counsel for Plaintiff and the Class are experienced in complex class action litigation, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiff and absent Class members.

29.     The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

30.     A class action is superior to other available methods for the adjudication of this controversy.  Individual litigation by all Class members would increase the delay and expense to the parties and the Court given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be more fair,

efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

31.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  Compared to individual actions by each Class member, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     The Nature of FX Trading

#### 1.     The Increasing Necessity of FX Trading in a Global Investment Portfolio

32.     During the past decade, in order to meet their investment and funding objectives, U.S.-based institutional investors have found it increasingly necessary to enter the overseas securities markets and expand the global scope of their investment portfolios.  ARTRS, for example, held approximately 15% of its investment portfolio in global markets as of mid-2003. By September 2009, however, that percentage had increased to more than 33%.

33.     Institutional investors that buy and sell foreign securities, such as ARTRS and other Class members, must engage in FX trading because the purchases, sales, dividends, and interest payments are all transacted in the currency of the nation in which the relevant securities exchange sits.

34.     If, for example, a U.S. investor wishes to buy shares of stock in a German company that trades on a German securities exchange, the investor must sell U.S. dollars and purchase euros in order buy those shares.  Further, any cash dividends paid on that German stock will be denominated in euros.  To "repatriate" those dividends, the investor must sell the euros

received and purchase dollars.  Accordingly, FX transactions are the means for converting U.S. dollars into foreign currency and vice versa.

### 2.  How FX Trading Works

35.  FX trading takes place around the world on a nearly 24-hour cycle, five-and-a-half days a week.  The official FX trading week begins at 7:00 a.m. New Zealand time on Monday, with each subsequent trading day ending at 5:00 p.m. New York City time.

36.  For each currency bought and sold during the course of the FX trading day, there will necessarily be a high trade and a low trade, with all other trades falling somewhere in between.  This information is determined through trade data monitored and tracked by proprietary services such as, but not limited to, Electronic Brokerage System ("EBS") and Reuters.

37.  The difference between the low trade and the high trade is called the "range of the day."  More precisely, the "spot range of the day" refers to FX rates as of a specific and prompt settlement date, usually two business days after the trade date.  To more accurately measure the trade cost for FX transactions that settle prior to or later than the date for spot trades, participants in the FX market also look to the "forward-adjusted range of the day."  Because FX trades do not always settle two days after the trade, the forward-adjusted range of the day is a more conservative and accurate measurement such that it takes into account the interest rate differential that exists at the time of trade between the trade date and settlement date for the underlying currencies.

38.  By way of example, assume 100 FX trades in euros-for-dollars (EUR-USD) during the course of one trading day.  If the lowest rate trade occurred at $1.25 to buy €1.00, and the highest rate trade occurred at $1.35 to buy €1.00, the range of the day would be $1.25-$1.35.

39.     Another useful measure is the daily "mid-rate," which is simply the sum of the forward-adjusted daily high and forward-adjusted daily low, divided by two.  This rate reflects the "average" FX rate in a given currency on a given day.

40.     The daily mid-rate is significant because of the absence of publicly accessible data showing the precise time of day at which FX trades occur (as exists with stock trading, for example) and because State Street did not disclose such information to its clients.  By looking at the mid-rate over a significant period of time, however, one can reasonably estimate the average FX trade cost on any given day.  Over the course of a month or years, it is reasonable to expect FX trades to regress to the mid-rate.  On any given day, some trades might settle above or below the daily mid-rate, but over increasingly lengthy periods of time, a significant number of FX trades can be expected to occur at or extremely close to the mid-rate.

### 3.     Negotiated vs. Non-Negotiated FX Trades

41.     State Street gave ARTRS and other custodial clients a choice with respect to the manner in which FX trades would be conducted.  In a "negotiated," or "active," FX trade, a custodial client or its outside investment manager would personally communicate the trade information to a State Street FX trader.  The State Street FX trader would then quote a rate, which would be accepted or rejected.  If accepted, State Street would execute the FX trade at the agreed-upon price, which could include a modest mark-up.

42.     A "non-negotiated" or "standing-instruction" FX trade is essentially the opposite of a negotiated trade.  There is no arm's-length negotiation of the price between the parties to the transaction.  With non-negotiated or standing-instruction trades, custodial clients and their outside investment managers do not negotiate rates with State Street, and State Street does not quote rates.  Instead, as the name "standing-instruction" suggests, custodial clients simply report the desired currency transaction to State Street, and trust and rely upon State Street, using "best

execution" practices, to execute the trade on the client's behalf. According to its Investment Manager Guides, State Street referred to standing-instruction FX transactions as "Indirect Deals" between 2000 and May 2008, and "Institutional Investors FX Trading" between May 2008 and November 2009. Since November 2009, State Street has referred to such trading as "Custody FX."

43. State Street's custodial clients, including ARTRS and the Class, reasonably expected that standing-instruction FX trades would have no mark-ups or fees. This was in view of, among other things, (a) the hefty annual fees custodial clients paid State Street to serve as custodian over their assets, (b) the Custodian Contracts and associated fee schedules that gave no indication that standing-instruction FX trading would incur extra fees or mark ups, and did not authorize any such fees or mark-ups, and (c) State Street's Investment Manager Guides that assured custodial clients and outside investment managers that the price of FX trades was **"based on the market rates at the time the trade is executed."**

44. Institutional investors typically requested that State Street and other custodians handle the smaller FX transactions, mostly the repatriation of dividend and interest payments, through standing instructions because the amount of each trade rarely justified the time and effort required for a negotiated trade.

### B. ARTRS Placed its Trust in State Street as its Custodian Bank, Relying on State Street's Expertise and Loyalty

45. Since at least September 15, 1998, State Street, as ARTRS's custodian bank, executed the majority of ARTRS's FX transactions for its accounts, including purchases and sales of U.S. and foreign currency as well as repatriations of dividends and interest payments into U.S. dollars.

46.     ARTRS, like other Class members, reposed a high degree of trust in State Street to execute standing-instruction FX transactions.  In conducting these transactions, State Street occupied a superior position to ARTRS due to its control over all aspects of the FX trade, including the timing of the trades, and most importantly, the price at which the trades were executed.

47.     ARTRS depended upon State Street not only to execute the FX trades, but also to accurately and honestly report the FX rate and to carry out the trades in accordance with their Custodian Contracts, associated fee schedules, and guidelines as set forth in the Investment Manager Guides.

48.     Additionally, separate and apart from the Custodian Contracts and Investment Manager Guides, ARTRS, like State Street's other custodial clients, had a reasonable expectation that the FX rates that State Street charged (or credited) on standing-instruction FX trades would accurately reflect the true rates of those FX trades.  There is no reason a custodial client would expect its custodian bank—to which it was paying substantial annual fees for custodial services—to charge (or credit) it in connection with standing-instruction FX trades at any rate other than the actual rate for the FX trade.

C.     **State Street's Custodian Contracts and Investment Manager Guidelines Were Predicated on No-Cost FX Trading**

49.     ARTRS's initial Custodian Contract with State Street was dated September 15, 1998.  The parties superseded that contract on July 1, 2001 with a new Custodian Contract containing nearly identical terms and provisions.  The second contract was superseded by a Custodian Contract signed June 29, 2004, also containing identical provisions.  That third contract was eventually superseded by a Custodian Contract dated June 30, 2009, containing identical relevant terms.

50.     Each of the Custodian Contracts provided that State Street "shall be entitled to compensation for its services and expenses as Custodian" for ARTRS pursuant to "a written Fee Schedule between the parties."

51.     ARTRS and State Street agreed to and executed a series of Fee Schedules covering the following periods:

(a)     Effective September 15, 1998 through June 30, 2001;

(b)     Effective July 1, 2001 through June 30, 2004;

(c)     Effective July 1, 2004 through June 30, 2007;

(d)     Effective July 1, 2007 through June 30, 2009 (as revised);

(e)     Effective April 1, 2008 through June 30, 2009 (as revised);

(f)     Effective November 1, 2008 through June 30, 2009; and

(g)     Effective July 1, 2009 through June 30, 2014.

52.     The Fee Schedule effective September 15, 1998 provided for an "estimated total annual fee" of $233,534.  The remaining Fee Schedules provided for an annual flat fee to be paid by ARTRS to State Street for services as custodian:

(a)     $600,000 per year from July 1, 2001 through June 30, 2004;

(b)     $500,000 per year from July 1, 2004 through June 30, 2007;

(c)     $400,000 per year from July 1, 2007 through June 30, 2009, with a subsequent revision to $320,000 from April 1, 2008 through June 30, 2009; and

(d)     $200,000 per year from July 1, 2009 through June 30, 2014.

53.     The Fee Schedules also set forth certain categories of ancillary services for which State Street was permitted to charge ARTRS additional fees, including Wire Fees, Reporting Fees, Delivery Fees and Subcustody Fees.

54.     None of these particular ancillary service categories relate in any way to FX trading.  The Custodian Contracts did not state that those ancillary fees relate to FX trading or that State Street would impose any fees in connection with FX trading.

55.     Unlike most of the later Fee Schedules, which were silent as to fees and charges for FX trading, the September 15, 1998 Fee Schedule specifically mentioned FX trading, stating that **"No Charge"** would be assessed for any foreign exchange executed through State Street.

56.     The July 1, 2009 Fee Schedule also mentions FX trading: State Street specifically stated that "[t]ransaction costs for all foreign exchange trades transacted through State Street **will be waived.**"  (Emphasis added.)

57.     As such, for more than a decade, ARTRS's Custodian Contracts with State Street (a) expressly provided that standing-instruction FX trades would be executed free of charge; or (b) did not list FX transactions among the services for which it was permitted to charge an additional fee or any other cost above the annual flat fee.

58.     Substantially similar terms were employed in the Custodian Contracts for other members of the Class during the Class Period.

59.     Additionally, during the Class Period, State Street provided Investment Manager Guides to custodial clients and outside investment managers that contained comprehensive information about State Street's custody practices and services, including procedural requirements, costs, and features.  The many services described therein included "State Street Foreign Exchange Transactions."

60.     During the Class Period, State Street issued no fewer than 15 distinct Investment Manager Guides, including those dated July 9, 2003; August 9, 2005; September 26, 2006; October 17, 2006; November 20, 2006; December 15, 2006; January 25, 2007; October 30, 2007; November 21, 2007; December 19, 2007; January 28, 2008; May 1, 2008; October 31, 2008; December 30, 2008; and January 23, 2009, to custodial clients and outside investment managers.

61.     State Street represented in each of these Investment Manager Guides that "State Street Foreign Exchange Transactions . . . are *priced based on the market rates at the time the trade is executed."* (Emphasis added.)

### D.     State Street's Deceptive Scheme Overcharged ARTRS and the Class for Standing-Instruction FX Trades

62.     State Street's FX practices diverged from what the Custodian Contracts authorized and what the Investment Manager Guides represented.  Despite assurances that FX transactions would be based on market rates, State Street reported and charged ARTRS and the Class FX rates on standing-instruction trades far above what State Street actually paid for foreign currency (or far below what State Street actually received for sales of foreign currency)— oftentimes, at rates that actually fell *outside of the range of the day.*

63.     As such, unbeknownst to ARTRS and the Class, State Street reported FX rates on standing-instruction trades to its clients that did not reflect the actual cost or proceeds of the FX transaction to State Street, and instead included a hidden and unauthorized mark-up.  Put simply, State Street invented the FX rates it reported and charged (or credited) to ARTRS and the Class. State Street paid or received one rate for FX, reported to ARTRS and Class members another rate that was either higher (in the case of a purchase) or a lower (in the case of a sale), and pocketed the difference.

64.     When custodial clients or their agents requested that State Street execute an FX transaction, the request was routed electronically via State Street's Market Order Management System (MOMS) to a group of "risk traders" working at State Street's FX trading desk who then executed the FX trades by entering trade information that did not reflect the actual rate State Street paid or received.

65.     To illustrate the deception, assume again the example set forth above—100 euro-for-dollar trades on a given day that ranged from $1.25 to $1.35 (the "range of the day") to purchase €1.00, with a day's mid-rate of $1.30.  On any, and all, standing-instruction euro-for-dollar trades on behalf of its custodian clients, State Street would have paid a rate between $1.25 and $1.35 for those euros, but reported to its clients that it paid more.  State Street charged its clients the false higher amount and kept the difference.

66.     This conclusion is supported by Plaintiffs' analysis of ten years of FX transactions executed by State Street on behalf of and reported to ARTRS.  Between January 3, 2000 and December 31, 2010, ARTRS had a total 10,784 FX transactions with reliable data.  Among these 10,784 transactions, 4,216, or 39%, were non-negotiated, standing-instruction trades.  These 4,216 FX trades had an aggregate trading volume exceeding $1.2 billion.

67.     In conducting the analysis, ARTRS's FX trades were compared to other FX trades logged and tracked in a comprehensive database of more than 2 million buy-side currency trades.  By comparing ARTRS's trades in certain currencies with the same currency pair trades in the database, one can estimate the trading cost of ARTRS's standing-instruction FX trades in relation to trades made worldwide.  For purposes of this analysis, the trading cost is the difference between the day's mid-rate and the rate that State Street charged (or credited) to ARTRS for standing-instruction FX trades.

68. State Street did not report to ARTRS (or any other Class member) the actual time of execution of any FX trade. Therefore, comparing the day's mid-rate to the standing-instruction FX rates State Street charged (or credited) to ARTRS is the best method of determining whether State Street charged (or credited) ARTRS a rate based on the actual market rate at the time of execution, as State Street represented in its Investment Manager Guides.

69. State Street derived its false FX rates by adding (on purchases) or subtracting (on sales) "basis points" or "pips" from the actual FX rate. A basis point, or pip, is a unit equal to 1/100th of a percentage point. For example, the smallest move the euro/dollar currency pair generally makes is 1/100th of a penny, or one basis point.

70. For the period of January 3, 2000 through December 31, 2010, the FX rates that State Street reported and charged (or credited) to ARTRS on its 4,216 non-negotiated FX trades were, on average, ***17.8 basis points*** above or below the day's mid-rate. In other words, the FX rates that State Street reported and charged (or credited) to ARTRS for standing-instruction FX trades, on average and during this 10-year period, created a trading cost 17.8 basis points higher than the average FX rate (the day's mid-rate).

71. By way of example, assume that the rate State Street actually paid to purchase €1.00 on a given day was $1.31551. If State Street charged ARTRS 17.8 basis points more than it paid, the rate would be $1.31729 ($1.31729 - $1.31551 = 0.00178). For a purchase of €10 million, the undisclosed profit to State Street on that single trade—and the concomitant unknown loss by ARTRS—would be $17,800. Accordingly, the difference in total trading costs between the actual and false rates can be very large.

72. Tellingly, for the same 10-year period, the FX rates that State Street reported and charged (or credited) to ARTRS on its more than 6,500 ***negotiated*** FX trades added, on average,

only *3.6 basis points* in trading costs as compared to the day's mid-rate. As such, while the FX trades executed by State Street pursuant to so-called "best execution" practices incurred trading costs of 17.8 basis points on average, the FX trades actively negotiated between State Street and ARTRS or its outside investment managers incurred trading costs of only 3.6 basis points on average.

73.     The false or fictitious nature of the FX rates State Street reported and charged (or credited) to ARTRS is further demonstrated when viewing ARTRS's standing-instruction FX trades in the context of the forward-adjusted range of the day. Among ARTRS's 4,216 standing-instruction FX trades, *2,217, or 53%, fell entirely outside the forward-adjusted range of the day.* These 2,217 FX trades, with a total volume exceeding $200 million, added trading costs on average of *64.4 basis points* over the day's mid-rate—an enormous hidden and unauthorized mark-up. Using the above example of a purchase of €10 million, an undisclosed fee of 64.4 basis points would result in a $64,400 profit to State Street on that single transaction.

74.     Rates consistently above (or below) the daily mid-rate alone demonstrate that State Street was not fulfilling its duties as a custodian by charging a hidden mark-up, and they demonstrate a violation of the terms of the Custodian Contracts and the representations in the Investment Manager Guides. But when more than half of all standing-instruction FX trades for a particular custodial client fall *outside* the forward-adjusted range of the day, it becomes clear that those reported FX rates were not actual, market-based FX rates, but were instead fictitious and designed solely to gouge the custodial client and, in turn, its beneficiaries. In the case of public pension funds, the beneficiaries include teachers, police officers, firefighters and many other public workers.

75.     There is no rational, honest basis for a professional FX market participant like State Street, or indeed any FX market participant, to charge an FX rate outside the forward-adjusted range of the day without disclosing it.  The day's range defines the range at which primary dealing banks and custodian banks transacted in FX during that trading day.  The fictitious nature of rates assigned outside the forward-adjusted range of the day illustrates, perhaps most starkly, the unfair and deceptive nature of State Street's standing-instruction FX trading practices.  In short, these practices were designed to enrich State Street while deceiving and unfairly depriving institutional clients such as ARTRS and the Class of much-needed funds.

**E.     State Street's Deceptive Acts and Practices Could Not Reasonably Be Detected by ARTRS and the Class**

76.     Neither ARTRS nor any Class member reasonably could have discovered State Street's deceptive acts and practices concerning FX trading during the Class Period.  State Street executed hundreds if not thousands of FX trades on behalf of its custodial clients every month.  The periodic reports State Street sent to ARTRS and the Class showed only the rate that State Street charged for its FX trades.  The reports did not include the range of the day, the daily mid-rate, or any indication of the time of the day that the trade was executed (known as "time-stamps").  Accordingly, there was no way for ARTRS and the Class to reasonably determine, or even suspect, that State Street was secretly charging more than it actually paid for FX or was paying clients less than it actually received for FX.

77.     It was reasonable for ARTRS and the Class to presume that the prices reflected in the reports State Street provided to them were an accurate representation of the true cost of the FX trades.  With respect to ARTRS specifically, the Custodian Contracts expressly provided that the "Custodian shall render to the [Plaintiff] a monthly report of all monies received or paid on

behalf of the Fund[.]"  Accordingly, State Street had an affirmative obligation to report accurately the amount of money it was paying or receiving for FX.

78.     Furthermore, based on the Investment Manager Guides' assurance that FX rates would be "priced based on the market rates at the time the trade is executed," neither ARTRS nor the Class had any reason to suspect that they were being charged (or credited) anything other the rate that State Street itself had paid or received on those standing-instruction FX transactions.

79.     Moreover, as alleged above, State Street occupied a position of trust and confidence with respect to its custodial clients.  Those clients would not, and did not, suspect that the custodian in which that trust resided, would profit to a gross and undisclosed degree on the services for which they paid a handsome annual fee.  Indeed, those custodial clients would, and did, presume that the custodian bank would act in and not against their best interests.

**F.     Events After October 2009 Begin to Shed Light
         on State Street's Deceptive Acts and Practices**

80.     On October 20, 2009, the Attorney General of California filed a Complaint in Intervention for violation of the California False Claims Act, Cal. Gov. Code § 12651, charging State Street with misappropriating more than $56 million from the accounts of California's two largest pension plans—CalPERS and CalSTRS—over a multi-year period in connection with the same unfair and deceptive FX practices alleged herein.  *People of the State of Cal. ex rel. Brown v. State Street Corp.*, Case No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento County Oct. 20, 2009).

81.     The California Attorney General alleges that State Street reported inflated FX rates when buying foreign securities for CalPERS and CalSTRS, reported deflated FX rates when selling foreign securities for them, and pocketed the difference between the reported and actual rates.  The Attorney General further alleges that State Street hid its wrongful conduct by

21

entering incorrect FX exchange rates into State Street's electronic FX trading systems and providing false records to CalPERS and CalSTRS.

82.     In the months that followed, State Street dramatically changed its FX trading policies and disclosure and so informed ARTRS and other Class members.  Under these new policies, State Street admitted for the first time that it had systematically imposed additional charges for FX trading.  For example, in an excerpt from an updated Investment Manager Guide dated November 20, 2009, State Street advised custodial clients that it would post on its website, my.statestreet.com, "current mark-ups and mark-downs used by State Street Global Markets for [standing-instruction] foreign exchange transaction requests."

83.     In a similar message sent to custodial clients, State Street admitted that **_"[s]ince December 2009_**, State Street has provided to all of its custody clients and their investment managers via our dedicated client portal, my.statestreet.com, comprehensive disclosure of the pricing and execution methodology (including the maximum mark-up or mark-down that may be applied) for each of its Indirect [standing-instruction] FX Services."  (Emphasis added.)  State Street added that "on the day after a trade is executed, State Street provides for each currency pair the reference interbank rates and the times at which they are obtained, the actual rates, the daily high/low range at the time of pricing (where applicable) and the actual mark-up or mark-down that was applied."

84.     State Street altered its practices to allow custodial clients more complete access to FX trading data only after its deceptive acts and practices began to be revealed.  State Street's late disclosure that it charged mark-ups and mark-downs on standing-instruction FX trades contradicts its previous repeated assurances that FX rates would be based on market rates at the time the trade is executed.

85.     According to a study conducted by an independent FX analyst after the California *qui tam* complaint was unsealed and State Street altered its FX policies, the cost of standing-instruction FX trades dropped by a remarkable ***63%.***  The study analyzed 498,940 FX spot and forward trades (196,280 standing-instruction trades and 302,660 negotiated trades) executed during 2000-2010, and found that investors who had their custodian banks, including State Street, execute FX trades on a standing-instruction basis during 2010 saw an overall 63% drop in trading costs from their average trading costs for the years 2000-2009.

### FIRST CLAIM FOR RELIEF

**Violation of the Massachusetts
Consumer Protection Act, M.G.L. ch. 93A, § 11
(Asserted Against All Defendants on
Behalf of Plaintiff ARTRS and the Class)**

86.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

87.     At all relevant times hereto State Street was engaged in trade or commerce.

88.     While engaged in trade or commerce, State Street engaged in unfair and deceptive acts and practices, as alleged in this Complaint, in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 11, including, without limitation:

(a)     Unfairly and deceptively pricing standing-instruction FX trades for custodial clients such as ARTRS and the Class in a manner designed to maximize profits to State Street at the direct and undisclosed expense of those custodial clients;

(b)     Unfairly and deceptively reporting false and fictitious FX rates for standing-instruction FX trades to State Street's custodial clients such as ARTRS

and the Class rather than the actual rates at which State Street had effected those

trades;

      (c)      Pocketing the difference between the actual FX rates at which

State Street effected custodial clients' standing-instruction FX trades and the false

and fictitious rates State Street reported to those custodial clients;

      (d)      taking undisclosed profits on standing-instruction FX trades from

custodial clients such as ARTRS and the Class that grossly exceeded the

customary prices at which similar services were readily obtainable in negotiated

FX transactions by like Class members; and

      (e)      Violating Attorney General Regulations, including

940 CMR §§ 3.16(1-2).

      89.      These acts or practices violated Sections 2 and 11 of the Massachusetts Consumer

Protection Act, Mass. Gen. Laws ch. 93A.

      90.      State Street's unfair and deceptive acts or practices related to standing-instruction

FX transactions occurred primarily and substantially in Massachusetts, where State Street's FX

trading desk is located.

      91.      As a result of the unfair and deceptive conduct of State Street, ARTRS and the

Class sustained economic damages in an amount no less than the difference between (a) the

actual dollar amounts paid or received by State Street when conducting standing-instruction FX

trades for ARTRS and the Class and (b) the false and fictitious dollar amounts charged or

credited by State Street to ARTRS and the Class for those same trades.

      92.      State Street is in a unique position to know the exact amount of damages

sustained by ARTRS and the Class as a result of State Street's unfair and deceptive conduct,

because, *inter alia,* throughout the Class Period, State Street did not provide time-stamps to its custodial clients for its standing-instruction FX trades.

93. State Street's unfair and deceptive conduct as described herein was willful and intentional, accordingly entitling Plaintiff and the Class to up to treble, but no less than double, damages, plus costs (including attorneys' fees).

94. Application of Mass. Gen. Laws ch. 93A to all Class members located throughout the United States, regardless of their state or residence, is appropriate because Defendants are located and engage in trade or commerce in Massachusetts and are thus subject to the laws of the Commonwealth. Defendants are registered to do business in Massachusetts, and their principal place of business is located in Massachusetts, from which they controlled and directed the deceptive and unfair practices described herein, including conducting FX trades on behalf of ARTRS and the Class. Further, on information and belief, all employees of Defendants directly involved in the activities complained of herein are based in Massachusetts.

## SECOND CLAIM FOR RELIEF

**Violation of the Massachusetts
Consumer Protection Act, M.G.L. ch. 93A, § 9
(Asserted Against All Defendants on
Behalf of Plaintiff ARTRS and the Class)**

95. Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

96. This claim for relief is pleaded in the alternative to the First Claim for Relief on behalf of Plaintiff and those members of the Class who, as not-for-profit entities utilizing State Street to conduct FX transactions, were engaged in the furtherance of their core mission, which includes investing and building retirement funds for public employees.

97. While engaged in trade or commerce, State Street engaged in unfair and deceptive acts and practices, as alleged in this Complaint, in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 9, including, without limitation:

(a)     Unfairly and deceptively pricing standing-instruction FX trades for custodial clients such as ARTRS and the Class in a manner designed to maximize profits to State Street at the direct and undisclosed expense of those custodial clients;

(b)     Unfairly and deceptively reporting false and fictitious FX rates for standing-instruction FX trades to State Street's custodial clients such as ARTRS and the Class rather than the actual rates at which State Street had effected those trades for those customers;

(c)     Pocketing the difference between the actual FX rates at which State Street effected custodial clients' standing-instruction FX trades and the false and fictitious rates State Street reported to those custodial clients;

(d)     taking undisclosed profits on standing-instruction FX trades from custodial clients such as ARTRS and the Class that grossly exceeded the customary prices at which similar services were readily obtainable in negotiated FX transactions by like Class members; and

(e)     Violating Attorney General Regulations, including 940 CMR §§ 3.16(1-2).

98. These acts or practices violated Sections 2 and 9 of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A.

99.     State Street's unfair and deceptive acts or practices related to standing-instruction FX transactions occurred primarily and substantially in Massachusetts, where State Street's FX trading desk is located.

100.     As a result of the unfair and deceptive conduct of State Street, Plaintiff ARTRS and the Class sustained economic damages in an amount no less than the difference between (a) the actual dollar amounts paid or received by State Street when conducting standing-instruction FX trades for ARTRS and the Class and (b) the false and fictitious dollar amounts charged or credited by State Street to ARTRS and the Class for those same trades.

101.     State Street is in a unique position to know the exact amount of damages sustained by ARTRS and the Class as a result of State Street's unfair and deceptive conduct, because, *inter alia,* throughout the Class Period, State Street did not provide time-stamps to its custodial clients for its standing-instruction FX trades.

102.     Pursuant to the Mass. Gen. Laws. Ann. ch. 93A, § 9(3), on February 16, 2011—more than thirty (30) days prior to the filing of this Amended Class Action Complaint, which asserts, for the first time, a claim pursuant to Mass. Gen Laws ch. 93A, § 9—Plaintiff mailed, via certified mail, return receipt requested, a written demand for relief to State Street identifying the claimants and reasonably describing the unfair acts or practices relied upon and the injuries suffered.  State Street's response on March 18, 2011 contested Plaintiff's allegations and refused to make a reasonable (or any) offer of relief.  The refusal to grant relief was made in bad faith with knowledge or reason to know that the acts of the Defendants violated Mass. Gen. Laws Ann. ch. 93A, § 2.

103.     State Street's unfair and deceptive conduct as described herein was willful and intentional, accordingly entitling Plaintiff and the Class to treble damages, plus costs (including attorneys' fees).

104.     Application of Mass. Gen. Laws ch. 93A to all Class members located throughout the United States, regardless of their state or residence, is appropriate because Defendants are located and engage in trade or commerce in Massachusetts and are thus subject to the laws of the Commonwealth.  Defendants are registered to do business in Massachusetts, and their principal place of business is located in Massachusetts, from which they controlled and directed the deceptive and unfair practices described herein, including conducting FX trades on behalf of ARTRS and the Class.  Further, on information and belief, all employees of Defendants directly involved in the activities complained of herein are based in Massachusetts.

## THIRD CLAIM FOR RELIEF

**Breach of Duty of Trust
(Asserted Against All Defendants on
Behalf of Plaintiff ARTRS and the Class)**

105.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

106.     Plaintiff and the members of the Class placed their trust in Defendants to execute standing-instruction FX transactions necessary to facilitate the purchases and sales of foreign securities for the accounts of Plaintiff and the Class.

107.     Defendants occupied a superior position to Plaintiff and the Class such that they controlled all aspects of standing-instruction FX trading, including the timing of the FX trades and the prices at which the trades were executed and settled.  Plaintiff and the Class were entirely

dependent on Defendants to execute the FX trades and accurately report the price at which FX trades were settled.

108.    Defendants understood that Plaintiff and the members of the Class placed their confidence and trust in Defendants to report FX trades accurately.

109.    Defendants, by virtue of their superior knowledge and position of control as well as the confidence and trust placed in them by Plaintiff and the Class, owed a duty of loyalty to Plaintiff and the Class in connection with carrying out standing-instruction FX transactions.

110.    Defendants, by virtue of their capacity as custodian for Plaintiff and the Class, and their superior knowledge and position of control as well as the confidence and trust placed in them by Plaintiff and the Class, owed a duty of disclosure in connection with carrying out standing-instruction FX transactions.

111.    Defendants breached their duty of loyalty to Plaintiff and each of the Class members by: (a) charging Plaintiff and the Class higher FX rates than State Street actually paid when buying foreign currency; (b) paying Plaintiff and the Class lower FX rates than State Street actually received when selling foreign currency; (c) pocketing the difference between State Street's actual costs and the rates charged to Plaintiff and the Class; and (d) hiding their conduct by providing account statements to the Plaintiff and the Class that reported only the date on which standing-instruction FX trades were executed, and the price charged to Plaintiff and the Class, yet omitting important information such as the actual time the trade was executed, and the actual cost of the trade to State Street, that would have enabled Plaintiff and the Class to realize they were paying in excess of State Street's actual costs or receiving less than State Street's actual proceeds.

29

112.     Defendants breached their duty of disclosure to Plaintiff and each of the Class members by providing account statements to the Plaintiff and the Class that omitted the actual cost of the trade to State Street and the actual time the trade was executed.

113.     As a result of Defendants' breaches of duty, Plaintiff and the Class sustained damages, including, but not limited to, the difference between the amount of State Street's actual costs and the amounts charged to Plaintiff and the Class when purchasing foreign currency, and the difference between the amounts State Street received and the amounts paid to Plaintiff and the Class when selling foreign currency.  Accordingly, Plaintiff and the Class are entitled to an award of money damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

**Negligent Misrepresentation**
**(Asserted Against All Defendants on**
**Behalf of Plaintiff ARTRS and the Class)**

114.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

115.     Defendants' activities complained-of herein were performed in the course of State Street's business acting as custodian bank for Plaintiff and the members of the Class.

116.     In connection therewith, Defendants supplied Plaintiff and the Class with periodic reports and statements, including monthly reports and trade confirmations, regarding the purchase and sale of foreign currency by State Street on behalf of Plaintiff and the Class.  The reports and statements were provided by State Street for the guidance of Plaintiff and the Class in their business transactions.

117.    The reports and statements State Street provided to Plaintiff and the Class omitted material information about the actual cost to State Street of the purchases and sales of foreign currency, and omitted to state the actual time the foreign currency was purchased or sold by State Street.  Due to State Street's material omissions, Plaintiff and the Class were therefore unable to determine that State Street was charging them in excess of State Street's actual and reasonable costs for FX purchases, and remitting to Plaintiff and the Class less than the amounts State Street received for FX sales.

118.    Because of State Street's special position of trust with respect to Plaintiff and the Class, and because of its superior position controlling all aspects of standing-instruction FX trading and reporting, State Street had a duty to disclose the omitted material information to Plaintiff and the Class.  State Street's position of trust and superior position creates the duty to disclose.

119.    Justifiable reliance is presumed because this Claim for Relief is based on Defendants' material omissions.

120.    Defendants failed to exercise reasonable care or competence in obtaining or communicating the allegedly omitted information to Plaintiff and the Class.

121.    Defendants' negligent misrepresentations caused pecuniary loss to Plaintiff and the Class.

122.    Accordingly, Plaintiff and the Class are entitled to an award of money damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

**Breach of Contract**
**(Asserted Against Defendant State Street**
**Bank on Behalf of Plaintiff ARTRS Individually)**

123.    Plaintiff repeats and re-alleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs and further alleges:

124.    Plaintiff brings this Claim for Relief for breach of contract on behalf of itself individually.

125.    Plaintiff entered into valid, binding Custodian Contracts with State Street Bank, pursuant to which State Street Bank agreed to, *inter alia*, provide services as custodian of the Plaintiff's assets.

126.    The first Custodian Contract was dated September 15, 1998.  It was terminated and superseded by a written Custodian Contract dated July 1, 2001, containing nearly identical relevant terms.  It, too, was terminated and superseded by a written Custodian Contract dated June 29, 2004, containing identical relevant terms.  That Custodian Contract was terminated and superseded by another written Custodian Contact dated June 30, 2009 containing identical relevant terms.

127.    This Claim for Relief is brought pursuant to the law of the State of Arkansas.  Each Custodian Contract provided that it "shall be construed and the provisions thereof interpreted under and in accordance with the laws of the State of Arkansas to the extent not pre-empted by federal law."

128.    One of the services State Street Bank agreed to provide to ARTRS pursuant to the Custodian Contracts is the purchase or sale of FX, including pursuant to "standing instructions": "The Custodian is permitted to pay out of moneys of Plaintiff's account, upon proper

instructions, and which may be 'standing instructions' . . . [f]or the purchase or sale of foreign exchange or foreign exchange contracts for the account of the Fund, including transactions executed with or through the Custodian, its agents or its subcustodians."

129.    The Custodian Contracts specified that the amount by which State Street Bank was entitled to be compensated for the services it performs for ARTRS pursuant to the Contracts would be set forth in a written Fee Schedule agreed-to by the parties: "The Custodian shall be entitled to compensation for its services and expenses as Custodian set forth in a written Fee Schedule between the parties hereto until a different compensation shall be in writing agreed upon between the System [ARTRS] and the Custodian."

130.    ARTRS and State Street Bank agreed to and executed the following Fee Schedules:

    (a)    Effective September 15, 1998 through June 30, 2001;

    (b)    Effective July 1, 2001 through June 30, 2004;

    (c)    Effective July 1, 2004 through June 30, 2007;

    (d)    Effective July 1, 2007 through June 30, 2009 (as revised);

    (e)    Effective April 1, 2008 through June 30, 2009 (as revised);

    (f)    Effective November 1, 2008 through June 30, 2009; and

    (g)    Effective July 1, 2009 through June 30, 2014.

131.    The Fee Schedules each provided for an annual flat fee to be paid by ARTRS to State Street Bank for its services as custodian, and set forth certain categories of services, such as Domestic Transaction Charges and Global Transaction charges, for which State Street Bank was permitted to charge ARTRS an additional fee.

132.     The Fee Schedule dated September 15, 1998 discusses FX trading, stating that "***No charge*** will be assessed for each foreign exchange executed through a third party.  Foreign exchange through State Street – ***No Charge.***"  (Emphases in original.)

133.     The Fee Schedules dated July 1, 2001; July 1, 2004; July 1, 2007; April 1, 2008; and November 1, 2008 do not mention FX trading or list FX trading as one of the services for which State Street Bank is permitted to charge Plaintiff an additional fee.  Accordingly, each of these Fee Schedules contemplated that State Street Bank shall not be compensated for the purchase or sale of foreign exchange over and above the annual flat fee.

134.     The Fee Schedule dated July 1, 2009 also makes this clear, and expressly states that "[t]ransaction costs for all foreign exchange trades transacted through State Street will be waived."  Accordingly, State Street Bank is not permitted to charge ARTRS for the purchase or sale of FX above the annual flat fee under the terms of the Custodian Contract.

135.     In the months after the California Attorney General filed its Complaint in Intervention against State Street on October 20, 2009, State Street Bank informed ARTRS of "current mark-ups and mark-downs used by State Street Global Markets for [standing-instruction] foreign exchange transaction requests."  These "mark-ups and mark-downs" continue to breach the express terms of the June 29, 2009 Custodian Contract and associated Fee Schedule (effective July 1, 2009 through June 30, 2014), which states that "[t]ransaction costs for all foreign exchange trades transacted through State Street will be waived."

136.     State Street's practices, detailed herein, of charging ARTRS inflated FX rates when buying foreign currency, and deflated FX rates when selling foreign currency, constitute a hidden and unauthorized charge to ARTRS above the annual flat fee.

137.     By charging ARTRS the hidden and unauthorized fees described herein, State Street Bank has breached the Custodian Contracts, and ARTRS has suffered substantial money damages as a result of that breach.

138.     The Custodian Contracts further provided that "[t]he Custodian shall render to the System [ARTRS] a monthly report of all monies received or paid on behalf of the System and an itemized statement of the securities for which it is accountable under this Contract as of the end of each month, as well as a list of all securities transactions that remain unsettled at that time."

139.     State Street, however, provided ARTRS with monthly reports that showed only the price being charged to the Plaintiff for standing-instruction FX trades and the date of the trade.  State Street omitted important information, such as the time-stamp of the actual time of the trade, and the actual price at which State Street paid for the purchase or sale of foreign exchange so as to hide the fact that ARTRS was being charged a secret profit on the trade.

140.     State Street Bank's failure to comply with the Custodian Contracts' reporting requirement constitutes an additional breach of the Contracts, and ARTRS has suffered substantial monetary damages as a result thereof.

141.     There is no limitations period that would act as a bar to this Claim for Relief pursuant to the maxim *nullum tempus occurrit regi* recognized under Arkansas law. Notwithstanding, ARTRS could not have discovered State Street Bank's breach even in the exercise of due diligence until the earliest, the unsealing of the California Attorney General complaint against State Street because, *inter alia,* the reports State Street provided to ARTRS showed only the price charged to Plaintiff for standing-instruction FX trades and the date of the trade.  By omitting important information, such as a time-stamp and the actual price paid or

received by State Street, Defendants hid or actively concealed their improper conduct.

Accordingly, even if a statute of limitations were to apply, it was tolled by State Street's actions.

**Prayer for Relief**

WHEREFORE, Plaintiff demands judgment for itself and all other members of the

proposed Class as follows:

A.      With regard to the First Claim for Relief, that the Court certify this action as a

class action and enter judgment against Defendants in an amount equal to up to three but no less

than two times the amount of damages Plaintiff and the Class have sustained as a result of

Defendants' actions, plus costs (including attorneys' fees);

B.      With regard to the Second Claim for Relief, that the Court certify this action as a

class action and enter judgment against Defendants in an amount equal to three times the amount

of damages Plaintiff and the Class have sustained as a result of Defendants' actions, plus costs

(including attorneys' fees);

C.      With regard to the Third Claim for Relief, that the Court certify this action as a

class action, find that Defendants breached their duties of trust to Plaintiff and the Class, and

award appropriate compensatory damages to Plaintiff and the Class in an amount to be

determined at trial;

D.      With regard to the Fourth Claim for Relief, that the Court certify this action as a

class action, find that Defendants negligently misrepresented to Plaintiff and the Class the hidden

fees charged in connection with FX trading, and award appropriate compensatory damages to

Plaintiff and the Class in an amount to be determined at trial;

E.      With regard to the Fifth Claim for Relief, that the Court find that Defendant State Street Bank breached each of its Custodian Contracts with Plaintiff, and award appropriate compensatory damages to Plaintiff in an amount to be determined at trial;

F.      That the Court award Plaintiff and the Class all costs and expenses of this action, including reasonable attorneys' and experts' fees; and

G.      That the Court award Plaintiff and the Class such other relief as the Court deems just and proper.

**<u>Demand for Jury Trial</u>**

Plaintiff demands a trial by jury of all issues so triable.

Dated:  April 15, 2011

THORNTON & NAUMES, LLP

By: _ /s/ Garrett J. Bradley_____
Michael P. Thornton (BBO #497390)
Garrett J. Bradley (BBO #629240)
Evan R. Hoffman (BBO #678975)
100 Summer Street, 30th Floor
Boston, Massachusetts  02110
Telephone:  (617) 720-1333
Facsimile:   (617) 720-2445

*Liaison Counsel for Plaintiff*
*ARTRS and Proposed Interim*
*Liaison Counsel for the Class*

LABATON SUCHAROW LLP
Joel H. Bernstein
Christopher J. Keller
Eric J. Belfi
David J. Goldsmith
Paul J. Scarlato
Michael H. Rogers
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477

*Counsel for Plaintiff*
*ARTRS and Proposed Interim*
*Lead Counsel for the Class*

.

LIEFF CABRASER HEIMANN
   & BERNSTEIN, LLP
Steven E. Fineman
Daniel P. Chiplock
Michael J. Miarmi
Daniel R. Leathers
250 Hudson Street, 8th Floor
New York, New York  10013
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

*Attorneys for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT
## FOR THE STATE OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> STATE STREET CORPORATION, STATE STREET BANK AND TRUST COMPANY and STATE STREET GLOBAL MARKETS, LLC, <br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Action
No. 11-CV-10230 (MLW)

## CERTIFICATE OF SERVICE

I hereby certify that the forgoing Plaintiffs' Amended Class Action Complaint was filed through the ECF System on April 15, 2011 and accordingly will be served electronically upon all registered participants identified on the Notice of Electronic Filing.

/s/ Garrett J. Bradley
Garrett J. Bradley (BBO# 629240)
THORNTON & NAUMES, LLP
100 Summer Street, 30th Floor
Boston, MA 02110
Ph. (617) 720-1333
Fax (617) 720-2445
jbradley@tenlaw.com

Dated: April 15, 2011

# EX. 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Arnold Henriquez, on behalf of the Waste ) Management Retirement Savings Plan, and all ) other similarly situated plans, ) ) Plaintiffs, ) ) v. ) ) State Street Bank and Trust Company, ) State Street Global Markets, LLC ) and Does 1-20 ) ) Defendants. ) | **C.A. No.:** |

## CLASS ACTION COMPLAINT

Plaintiff Arnold Henriquez alleges the following on behalf of the Waste Management Retirement Savings Plan ("Plan") and its participants and beneficiaries and a class of similarly-situated ERISA retirement plans (collectively, "Plans") and their participants and beneficiaries against State Street Bank and Trust Company ("SSBT") and State Street Global Markets, LLC ("SSGM") based on the investigative efforts of private whistleblower firms, the State of California, the Securities and Exchange Commission ("SEC"), and an investigation by counsel, which included reviewing: Internal Revenue Service Forms 5500 ("Form 5500") filed with the United States Department of Labor ("DOL"); filings with the United States Securities and Exchange Commission, including Annual Reports on Form 10-K; and other publicly available documents related to this action.

## I.    NATURE OF THE ACTION

1.    This is a civil enforcement action brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq., and in particular under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), to recover losses and obtain equitable relief on behalf of the Plan, and all other similarly situated plans.

2.      SSBT and SSGM (collectively, "Defendants") were required to act prudently and solely in the interest of the Plans' participants and beneficiaries in their capacity as ERISA fiduciaries.  On information and belief, rather than fulfilling their fiduciary duties under ERISA (the "highest known to the law")[1], the Defendants charged improper, undisclosed markups on transactions in foreign currency ("FX transactions" or "FX trading").

3.      The Plan and the similarly situated Plans are established and sponsored by private entities in accordance with ERISA.

4.      Plaintiff alleges that Defendants violated ERISA by causing the Plans, or collective funds operated by Defendants in which the Plans were invested, to execute FX transactions at exchange rates favorable to Defendants and reporting those transactions at less favorable rates.  These transactions were prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

5.      Plaintiff also alleges that Defendants failed to act solely in the interest of the participants and beneficiaries of the Plans and breached their fiduciary duties of prudence and loyalty with respect to the Plans.  Specifically, Plaintiff alleges that Defendants, as fiduciaries of the Plans, violated their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104 by causing the Plans or the collective funds operated by Defendants in which the Plans were invested to engage in transactions that were not to the exclusive benefit of the Plans or their participants and beneficiaries.

## II.      JURISDICTION AND VENUE

6.      ERISA provides for exclusive federal jurisdiction over these claims.  The Plan is an "employee benefit plan" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and Mr. Henriquez is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), who is authorized pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), to

---

[1] _Donovan v. Bierwirth_, 680 F.2d 263, 272 n.8 (2d Cir. 1982)

bring the present action on behalf of the Plan and its participants and beneficiaries to obtain appropriate relief.

7.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.       Venue is proper in this district pursuant to 28 U.S.C. ' 1391(b) and ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this district and the Defendants reside and may be found in this district.

## III.     PARTIES

*A.     Plaintiffs*

9.       **Plaintiff Arnold Henriquez.**  Plaintiff Arnold Henriquez is a participant in the Waste Management Retirement Savings Plan, an ERISA-covered defined contribution plan.  At all material times from the second quarter of 2005 through the second quarter of 2009, Mr. Henriquez invested in the "International Equity Fund"[2] sponsored by SSBT and offered by the Plan.  Mr. Henriquez also invested in other funds sponsored by SSBT and offered by the Plan during the Class Period, including the Large Cap Equity Fund, the Small Cap Equity Fund, the Conservative Asset Allocation Fund, the Moderate Asset Allocation Fund, the Aggressive Allocation Fund, the Bond Market and the SSgA Target Retirement 2030 Fund.  Mr. Henriquez resides in Frederick, Maryland.  Mr. Henriquez brings this action as a representative plaintiff on behalf of all similarly situated plans.

10.      **Defendant State Street Bank and Trust Company ("SSBT").**  Defendant State Street Bank and Trust Company is incorporated in Massachusetts and is headquartered in

---

[2] The "International Equity Fund" is the fund name used by SSBT on disclosures to participants in the Plan.  The International Equity Fund's name, according to the International Equity Fund's Forms 5500 for 2009 and 2010, filed by SSBT with DOL, is the "Active Intl Stock Selection SL SF CL I (CM8J [sic]."  From 2006 through 2008, the International Equity Fund's name, according to the International Equity Fund's Forms 5500 filed by SSBT with DOL was the "International Alpha Select SL Series Fund – [sic]."  The foreign fund names may refer to the International Equity Fund at a particular point in time, as well as to one or more of several classes of interests offered in the International Equity Fund.

Boston, Massachusetts. Defendant State Street Bank and Trust Company directly, or indirectly through one or more subsidiaries, operates as a custodial bank for ERISA covered benefit plans and for collective investment funds offered by defined contribution plans. SSBT is a subsidiary of State Street Corporation, a financial holding company headquartered in Boston, Massachusetts.

11. **Defendant State Street Global Markets, LLC ("SSGM")**. Defendant State Street Global Markets, LLC, a subsidiary of State Street Corporation, is incorporated in Delaware and is headquartered in Boston, Massachusetts. SSGM describes itself as "the investment research and trading arm of State Street Corporation." It provides specialized investment research and trading in foreign exchange, equities, fixed income, and derivatives to ERISA covered benefit plans.

12. **Defendants Does 1-20**. Does 1-20 are fiduciaries of the Plans relevant to this lawsuit whose exact identities will be ascertained through discovery.

## IV. FACTUAL BACKGROUND

*A. The Plans.*

13. **Waste Management Retirement Savings Plan**. The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Pursuant to ERISA, the relief requested in this action is for the benefit of the Plan.

14. **Other Similarly Situated Plans**. Defendants provide services similar to those provided to the Plan to other, similarly situated Plans, either directly as plan custodian or indirectly as custodian of funds in which the Plans invest.

*B. Defendants' Fiduciary Status*

15. Every plan governed by ERISA must have fiduciaries to administer and manage the plan. A custodial bank is among these fiduciaries.

16.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA §402(a)(1), but also any other persons who in fact perform fiduciary functions.  ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i) (stating that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. . .") (emphasis added).

17.     Defendants functioned as fiduciaries to the Plan by exercising authority and control over Plan assets.

18.     SSBT served as custodian for the Plans' assets, including both defined benefit and defined contribution plans. As custodian, SSBT is a fiduciary under ERISA. SSBT is a fiduciary of the Plan and owed fiduciary duties to the Plan and its participants under ERISA.

19.     SSGM exercised authority and control over plan assets in its role as SSBT's affiliate responsible for setting the exchange rates on FX transactions and executing those transactions.  As discussed below, this process created the maximum spread between the marked up custody exchange rate offered to custodial clients and the marked down exchange rate used to process repatriation and other FX transactions.

*C.     Retirement Plan Investment Strategy*

20.     There are two types of retirement plans, defined benefit plans and defined contributions plans.  Both types of retirement plans, especially over the last decade, have found it to be necessary and prudent to expand their investments to include exposure to foreign markets. Accordingly, defined benefit plans have expanded international holdings, and defined contribution plans frequently include at least one, if not several, international investment options.

21.     Retirement plans regularly purchase and sell foreign securities, receive dividends that are paid in foreign currencies, or participate in other investments that require the exchange

of foreign currency into and from US Dollars ("USD"), that is, FX trading, either directly or through participation in collective investment funds.

22.     A "custodian" is an institution that holds securities on behalf of investors. The responsibilities entrusted to a custodian include the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities. Custodians may also perform ancillary services for their clients. Custodians are typically used by institutional investors who do not wish to leave securities on deposit with their broker-dealers or investment managers. The use of a custodial bank is intended to reduce the risk of misconduct by separating the custodial and asset management duties. An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

23.     SSBT served as custodian for ERISA covered defined benefit plans.

24.     SSBT operated collective investment funds invested in foreign securities in which ERISA covered defined contribution plans invested during the Class Period.  SSBT served as custodian for these collective investment funds.  Collective investment funds that invest in foreign securities, such as the SSBT-sponsored International Equity Fund offered in the Plan, must engage in FX transactions in order to buy and sell securities, to repatriate dividends or interest payments, and to engage in other transactions.

25.     Class members placed a high degree of trust in Defendants.  Plaintiff and the Class depended upon Defendants to both execute and report FX trades honestly and accurately.

26.     SSBT described itself as "a leading specialist in meeting the needs of institutional investors." In its Class Period filings with the SEC, the Company repeatedly stated that its customer relationships were "predicated upon our reputation as a fiduciary and a service provider that adheres to the highest standards of ethics, service quality and regulatory compliance." One of the services provided by SSBT to its custodial clients was the execution of foreign exchange

transactions, which allowed clients to purchase and sell foreign securities or engage in currency trades.

D.    *SSBT's Scheme*

27.    On October 20, 2009, the California Attorney General ("California AG") filed a complaint alleging that State Street had overcharged two of California's largest public pension funds by tens of millions of dollars for foreign exchange trades conducted over a period of at least eight years. The California AG's action was based on an extensive eighteen-month investigation, which included interviewing witnesses and reviewing hundreds of thousands of internal State Street documents.

28.    On information and belief, and according to the California AG, Defendants, starting in 2001, added an undisclosed and substantial "mark-up" to the exchange rate it used when making foreign exchange trades for its clients. The scheme was simple and not disclosed to the Plans. Defendants had agreements with their large custodial clients that obligated Defendants to charge their clients the same "exchange rate" as the one that Defendants actually used to execute foreign exchange trades requested by the client. Rather than doing so, however, SSGM would execute the trade at one exchange rate without informing its client, and then monitor fluctuations in the rate throughout the day. Then, before the end of the day, SSGM would pick a rate that was more beneficial to Defendants, and tell its clients that the trade had occurred at this other, false rate.

29.    For instance, if the transaction was a purchase of a foreign security, SSGM would charge the client a higher foreign exchange rate that occurred later in the day, thus causing the client to pay more than what SSGM had already paid. If the transaction was a sale of a foreign security, SSGM would charge the client a lower foreign exchange, thus paying the client less than what SSGM actually received. In either event, Defendants would take for itself the

difference between the amount for which the trade was actually executed and the amount that SSBT charged its clients.

30.     Defendants' clients, including the Plans, had no way of discovering the truth because the records, including statements of account and transaction records provided by State Street in the ordinary course to their clients, including the Plans, showed only that the trade had been executed within the range of rates occurring during that day, notwithstanding that the rate reported was not the actual rate for the transaction. Defendants' clients, including the Plans, were never informed of the actual rates at which FX transactions were made.  Defendants' providing such incomplete statements and transaction records to their clients, including the Plans, was a course of conduct designed to conceal evidence of their breaches of fiduciary duty and prohibited transactions set forth herein.  The Plans were not on actual or constructive notice of such evidence despite their exercise of reasonable diligence.

31.     All foreign exchange transactions are executed at a prevailing exchange rate, which determines how much one currency is worth in terms of another. The most commonly used exchange rate is the Interbank Rate, which fluctuates throughout each day and is tracked and published by various industry sources. Throughout the Class Period, Defendants executed two types of foreign exchange transactions for its clients. Some of Defendants' clients would conduct "direct" or "negotiated" foreign exchange trades. In a direct trade, an institution would contact a Defendants' representative who would quote an exchange rate that the institution could accept or reject. If Defendants' rate was sufficiently competitive, the client would accept and the trade would be executed at the agreed upon exchange rate. Defendants would collect a fee for processing the trade and pass along the cost of the exchange rate to its client.

32.     For more than 75% of SSBT's large custodial clients, however, Defendants would conduct "indirect" or "standing instruction" foreign exchange trades. In a standing instruction trade, neither the institution nor its outside investment manager would be quoted an exchange

rate. Instead, the client would request a transaction involving a foreign exchange (such as a purchase of foreign securities), and Defendants would execute the transaction pursuant to its contract with its client. On information and belief, under the terms of SSBT's custodial arrangements, SSBT was obligated to provide its clients the same exchange rate that Defendants actually used to make the trade. This arrangement was supposed to be beneficial to Defendants' clients because, among other things, they would not have to incur the expense and time of identifying and choosing the most competitive exchange rate.

33. Defendants, on information and belief, executed FX transactions on behalf of their own collective investment funds using the same standing instruction method. SSBT, as custodian of their own funds, were not subject to substantial scrutiny on these transactions beyond internal controls.

34. However, this was not the case for all clients. Those clients who conducted direct trades would be quoted an exchange rate by SSGM before executing the transaction. These clients – often large hedge funds – typically had easy access to an alternate price source, such as Bloomberg or Reuters, to double-check the truthfulness of SSGM's rate quotes. Accordingly, Defendants could not overcharge these clients, and thus referred to them internally as "smart" clients or "smart money."

35. As detailed by the California AG, the other clients or their investment managers would initiate a foreign exchange transaction by sending a request, often electronically, to the Securities Processing Unit of SSBT, which was located on the "custody side" of the Company. This request was then sent electronically to the State Street foreign exchange trading desk in SSGM, where it would appear on the Market Order Management System ("MOMS") software used by Defendants' traders.

36. The duty of "best execution" requires that a broker-dealer seek to obtain for its customers the most favorable terms reasonably available under the circumstances. At a

minimum, therefore, "best execution standards" require that Defendants execute trades on terms that are no less favorable than those offered to unrelated parties in a comparable arm's-length transaction.

37.     Plaintiff and the Class reasonably expected, because Defendants represented and because ERISA so requires, that they or the collective investment funds they participated in would be offered terms on "standing instructions" trades that were no less favorable than those offered by Defendants to unrelated parties in comparable arm's-length FX transactions.

38.     FX trading takes place around the world on a nearly 24-hour cycle, five-and-a-half days a week. The official FX trading week begins at 7:00 a.m., New Zealand time on Monday, with each subsequent trading day ending at 5:00 p.m., New York City time.

39.     On information and belief, SSGM's FX traders were informed of SSBT's aggregated standing instruction trade requirements during the course of the day. The FX traders will, that day, trade on the interbank FX market in order to satisfy SSBT's standing instruction positions. This process is called "offsetting" the trades.

40.     On information and belief, upon receipt of the request, SSGM's foreign exchange traders checked the exchange rate, set a price, and executed the transaction, which typically occurred early in the day because SSGM traders were at their desks by 7 a.m. Eastern Standard Time. All of those transactions were then entered by the trader into a separate software system called Wall Street Systems ("WSS"), which memorialized the transaction and charged the cost (for purchases) or remitted the payment (for sales) directly to Defendants. The WSS recorded time stamps for the actual, "real time" transaction.

41.     On information and belief, although the transaction was now completed and the price locked in, Defendants did not inform the client. Instead, on information and belief, SSGM observed market fluctuations until sometime around 3 p.m. in the afternoon and then assigned either a higher exchange rate (for purchases) or a lower exchange rate (for sales) to the foreign

exchange transactions that occurred during that day. SSGM then applied that rate to all of the "standing instruction" foreign exchange transactions it had conducted that day.

42.     On information and belief, at all relevant times to this Complaint, this pricing scheme was used for FX transactions for both custodial clients and for transactions involving SSBT's collective investment funds.

43.     With each FX trade priced in this manner, Defendants did not simply profit; they made the biggest possible profit on each trade, based upon the range-of-the-day's FX rates at the point the trade was priced for the Plan.

44.     Because Defendants' scheme always priced the trades at the very lowest or very highest rates of the day, Defendants were able to make a profit without any risk to SSBT.

45.     On information and belief, by pricing trades in this manner for their standing instruction trades, Defendants secured a spread ten to twenty or more times greater than when a custodial client directly negotiated an FX transaction. That is, Defendants' profits arising from their custodial standing instruction trades were as much as ten to twenty times higher than their profits from comparable, arm's length FX transactions.

46.     On information and belief, Defendants' practice of pricing trades in this manner and taking the largest possible mark-up or mark-down was not disclosed to custodial clients like the Plan over the period of time relevant to this Complaint.

47.     On information and belief, all Defendants' custodial clients who had standing instruction trades (including spot, forward, swaps, repatriation, and major, minor, emerging, and regulated market trades) suffered from the same inaccurate FX pricing.

48.     On information and belief, all of Defendants' collective investment funds which invested in foreign securities and used standing instruction trades (including spot, forward, swaps, repatriation, and major, minor, emerging, and regulated market trades) suffered from the same inaccurate FX pricing.

49.     On information and belief, end-of-month reports were prepared by Defendants on or before mid-month. These reports listed the custodial client's FX trades by date, amount, and price, i.e., the fictitious FX rate (as reported to the custody side of SSBT by its FX traders). These reports never contained time-stamps for the FX trades, but there was nothing on the report that would lead a custodial client to suspect that it or a collective investment fund in which it participated had been unfairly charged exorbitant mark-ups (or mark-downs) on its FX trades.

E.     *SSBT Makes Exceptions for Certain Clients, Offering Them Special Pricing*

50.     On information and belief, over time, SSBT developed a special class of custodial clients that did not receive the high or low range-of-the-day pricing suffered by other custodial clients, like the Plans or the collective trusts in which the Plans invested. These clients, known internally as "smart money clients," still received the same standing instruction custodial services as the other entities like the Plans or the collective trusts the Plans invested in, but received particular treatment when their FX requirements come to SSBT's FX dealing room.

51.     On information and belief, instead of these custodial clients' FX trades being included with the others, like the Plan or the collective trusts in which the Plans invested, and subject to the extreme range-of-the-day mark-up and mark-down, these clients were allowed to deal directly with Defendants – usually by phone – and were given the chance to directly negotiate prices for their FX requirements for that day, every day, despite their trades coming to SSBT as standing instruction trades.

52.     As a result, the "smart money" custodial clients always received better pricing than their fellow custodial clients who are still subject to SSBT's pricing schemes.

53.     On information and belief, Defendants did not disclose to clients like the Plan over the period of time relevant to this Complaint their practice of providing certain clients, the "smart money clients," FX transactions, resulting from direct dealings on standing instruction trades.

# V. CLASS ALLEGATIONS

54. **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plan and its participants and beneficiaries and the following class of similarly-situated persons (the "Class"):

> All qualified ERISA Plans and the participants and beneficiaries thereof for which State Street Bank and Trust Company or State Street Global Markets, LLC provided foreign exchange transactional services, as custodian of its assets, or by acting as custodian of collective trusts in which those ERISA Plans invested, at any time between January 1, 2001 and October 19, 2009 (the "Class Period").

Class treatment is appropriate in this case because it would promote judicial economy by adjudicating the Defendants' fiduciary breach with respect to all of the Plans and participants and beneficiaries in the class.

55. **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that hundreds of ERISA Plans throughout the country invested in these collective trusts during the Class Period, and sustained losses as a result of the Defendants' imprudent FX trading activities. Defendants have more than $5.2 trillion of pension assets under custody. These assets could all be exposed to Defendants' improper pricing scheme. Plaintiff believes that hundreds of ERISA plans are also exposed to Defendants' collective investment funds with investments in foreign securities. For example, Schedule D to the Form 5500 filed by Defendants for the Active Intl Stock Selection SL SF CL I (CM8J fund for 2009 alone lists nine defined contribution plans and assets of nearly $389 million. State Street Bank and Trust Company, Active Intl Stock Selection SL SF CL I (CM8J [sic], Annual Return/Report of Employee Benefit Plan (Form 5500), at Schedule H, Part I (December 31, 2009).

13

56.     **Commonality**. The claims of Plaintiff and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by Defendants with regard to management of its FX trading program. The questions of law and fact common to the Class include, but are not limited to:

> a.     Whether Defendants breached their fiduciary duties to the Plans by using an FX trading scheme to overcharge the Plans, or the collective investment funds in which the Plans invested, for FX trading;
>
> b.     Whether Defendants' self-interested FX transactions constituted transactions prohibited under ERISA's statutory restrictions;
>
> c.     Whether Defendants' fiduciary breaches caused losses to the Plans; and
>
> d.     Whether Defendants' prohibited transactions caused losses to the Plans.

57.     **Typicality**. Plaintiff's claims on behalf of his Plan are not only typical of, but the same as, claims that would be brought with respect to other Plans.  If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same claims based upon the same conduct of the Defendants, using the same legal arguments to prove Defendants' liability, and would be seeking the same relief.

58.     **Adequacy**. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in class action and ERISA litigation.  Plaintiff has no interests antagonistic to, or in conflict with those of the Class. Plaintiff has undertaken to protect vigorously the interests of the absent members of the Class.

59.     **Rule 23(b)(1)(A) & (B) Requirements**. Class action status is warranted under Fed. R. Civ. P. 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual

members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

60. **Rule 23(b)(2) Requirements**. Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole. No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties.

61. **Rule 23(b)(3) Requirements**. In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VI.  CLAIMS FOR RELIEF

### COUNT I

**Engaging in Self-Interested Prohibited Transactions**
**(Violation of § 406 of ERISA, 29 U.S.C. § 1106 by Defendants)**

62. All previous averments are incorporated herein.

63. At all relevant times, the Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control over Plan assets.

64. The Defendants, by their actions throughout the Class Period, caused the Plans to engage in unfairly and unreasonably priced FX transactions.

65. During the Class Period, Defendants engaged in FX transactions using plan assets that were not for the exclusive benefit of the Plans' or their participants.

66. Through their FX transactions and pricing scheme, Defendants dealt with assets of the Plans for their own financial benefit and for their own account. This is a violation of ERISA § 406(b)(1) & (3), 29 U.S.C. 1106(b)(1) & (3).

67. As a direct and proximate result of these prohibited transaction violations, the Plans, directly or indirectly, paid millions of dollars in transaction fees that were prohibited by ERISA and suffered millions of dollars in losses.

68. Pursuant to ERISA Defendants are liable to disgorge all fees paid them for the Plans' FX transactions, restore all losses suffered by the Plans as a result of the prohibited transactions, and all profits earned on the fees paid by the Plans to Defendants.

## COUNT II

**Breach of Duties of Prudence and Loyalty**
**(Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Defendants)**

69. All previous averments are incorporated herein.

70. Defendants breached their ERISA fiduciary duties of prudence and loyalty by, inter alia:

    a. Using plan assets for the own benefit, causing losses to the Plans and the participants;

    b. Charging the Plans (or the collective trusts in which the Plans invested) fees for FX trading that were unreasonable and in excess of what Defendants had agreed to charge;

    c. Failing to disclose to the Plans, their fiduciaries, or participants the amount of fees being charged for FX trading, that those fees were in excess of what Defendants had agreed to charge, and that other clients were charged less for the same services;

71. These actions during the Class Period were breaches of Defendants fiduciary duties of loyalty and prudence to the Plans under ERISA and Defendants did not execute their

fiduciary responsibilities for the exclusive benefit of the Plans. § 404(a)(1)(A), (B), 29 U.S.C. §§ 1104(a)(1)(A), (B).

72. Defendants committed these breaches consistently from 2001 to 2009, during each FX transaction involving assets of the Plans.

73. As a direct and proximate result of these breaches of duty, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, realized losses.

74. Pursuant to ERISA the Defendants are liable to restore all losses suffered by the Plans caused by the Defendants' breaches of fiduciary duty.

## COUNT III

### Liability for Breach of Co-fiduciary
### (Violation of § 405 of ERISA, 29 U.S.C. § 1105)

75. All previous averments are incorporated herein.

76. SSGM violated ERISA, 29 U.S.C. §1105(a)(1), by knowingly undertaking to conceal SSBT's fiduciary breaches. It did so through the actions and omissions of its employees and agents by concealing and failing to provide complete and accurate information to the Plans regarding the cost of FX transactions.

77. SSGM violated ERISA, 29 U.S.C. §1105(a)(3), because it knew that SSBT had breached its fiduciary duties of prudence and loyalty, but failed to take reasonable steps under the circumstances to remedy the breach.

78. On account of SSGM's violations of these provisions, SSGM is liable for the breach of its co-fiduciary, SSBT.

79. As a result of SSGM's actions, the Plans suffered losses.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

80.     Declare that the Defendants have violated ERISA's prohibited transactions provisions;

81.     Declare that the Defendants breached their fiduciary duties under ERISA;

82.     Issue an order compelling a proper accounting of the foreign exchange transactions in which the Plans have engaged;

83.     Issue an order compelling Defendants to restore all losses caused to the Plans;

84.     Issue an order compelling the Defendants to disgorge all fees paid and incurred to Defendants, including any profits thereon;

85.     Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

86.     Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as custodian to the Plans;

87.     That this action be certified as a class action and that each Class be designated to receive the amounts restored to the Plans by Defendants and a constructive trust be established for distribution to the extent required by law;

88.     Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

89.     Award Plaintiffs their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

90.     Award such other and further relief as the Court deems equitable and just.

Dated:  November 18, 2011

Respectfully Submitted,
Arnold Henriquez,
By his attorneys,

/s/ Catherine M. Campbell
Catherine M. Campbell, Esq.
BBO # 549397
/s/ Renee J. Bushey
Renee J. Bushey, Esq.
BBO # 629444
**Feinberg, Campbell & Zack, PC**
177 Milk Street, Suite 300
Boston, MA 02109-3408
Tel: (617) 338-1976
Fax: (617) 338-7070
cmc@fczlaw.com

J. Brian McTigue
(Pro Hac Vice to be filed)
bmctigue@mctiguelaw.com

Bryan T. Veis
(Pro Hac Vice to be filed)

James A. Moore
(Pro Hac Vice to be filed)

**McTigue & Veis, LLP**
4530 Wisconsin Avenue, NW
Suite 300
Washington, DC  20016
Tel:  (202) 364-6900
Fax: (202) 364-9960

Counsel for Plaintiff

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

ARNOLD HENRIQUEZ, MICHAEL T. COHN,
WILLIAM R. TAYLOR, RICHARD A.
SUTHERLAND,  AND THOSE SIMILARLY
SITUATED,

        Plaintiffs,

v.

STATE STREET BANK AND TRUST
COMPANY and STATE STREET
GLOBAL MARKETS LLC AND DOES
1-20,
        Defendants.

CIVIL ACTION No.
11-cv-12049-MLW

---

## AMENDED CLASS ACTION COMPLAINT

1.     Plaintiffs Arnold Henriquez (bringing this action pursuant to ERISA on behalf of

the Waste Management Retirement Savings Plan ("WM Plan") and its participants and

beneficiaries), Michael Cohn (bringing this action pursuant to ERISA on behalf of the Citigroup

401(k) Plan ("Citi Plan") and its participants and beneficiaries), and William Taylor and Richard

Sutherland (both bringing this action pursuant to ERISA on behalf of the Retirement Plan of

Johnson and Johnson ("J&J Plan") and its participants and beneficiaries) (collectively,

"Plaintiffs") bring this action as a class action on behalf of a class of similarly-situated ERISA

retirement plans (collectively, the "Plans") and their participants and beneficiaries against State

Street Bank and Trust Company ("SSBT") and State Street Global Markets, LLC ("SSGM")

(collectively, "Defendants").  The allegations below are based on the investigative efforts of

private whistleblower firms, the State of California, the Securities and Exchange Commission

("SEC"), and an investigation by counsel, which included reviewing: Internal Revenue Service

Forms 5500 ("Forms 5500") filed with the United States Department of Labor ("DOL"); filings

with the United States Securities and Exchange Commission, including Annual Reports on

Forms 10-K; documents filed in other litigation; and other publicly available documents related

to this action.

## I. <u>NATURE OF THE ACTION</u>

2.      This is a civil enforcement action brought pursuant to the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, and in particular under ERISA

§§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), to recover losses and obtain

equitable relief on behalf of the WM Plan, the Citi Plan, and the J&J Plan (the "Named

Plaintiffs' Plans"), and pursuant to applicable law as a class action to obtain relief for all other

similarly situated ERISA plans.

3.      SSBT and SSGM were required to act prudently and solely in the interest of the

Plans' participants and beneficiaries in their capacity as ERISA fiduciaries.  On information and

belief, rather than fulfilling their fiduciary duties under ERISA (the "highest known to the

law"),[1] the Defendants charged, or allowed to be charged, improper, undisclosed markups on

transactions in foreign currency ("FX transactions" or "FX trading") and engaged in prohibited

transactions in connection with such FX transactions.

4.      The Named Plaintiffs' Plans and the similarly situated Plans are established and

sponsored by private entities in accordance with ERISA.

---

[1] *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

2

5.      Plaintiffs allege that Defendants violated ERISA by causing the Plans, or collective funds (the "Collective Investment Funds") operated by SSBT in which the Plans were invested, to purchase foreign securities through the use of FX transactions at rates favorable to Defendants.  These transactions were prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

6.      Plaintiffs also allege that Defendants failed to act solely in the interest of the participants and beneficiaries of the Plans and breached their fiduciary duties of prudence and loyalty with respect to the Plans.  Specifically, Plaintiffs allege that Defendants, as fiduciaries of the Plans, violated their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, by causing the Plans or the Collective Investment Funds operated by Defendants in which the Plans were invested to engage in transactions that were not to the exclusive benefit of the Plans or their participants and beneficiaries.

## II. JURISDICTION AND VENUE

7.      ERISA provides for exclusive federal jurisdiction over these claims.  The Plans are "employee benefit plans" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and Plaintiffs are participants in the Named Plaintiffs' Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), who are authorized pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), to bring the present action on behalf of those plans and their participants and beneficiaries to obtain appropriate relief.

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and ERISA

§ 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which

relief is sought occurred in this district and the Defendants reside and may be found in this

district.

### III. PARTIES

*A.    Plaintiffs*

10.      **Plaintiff Arnold Henriquez** is a participant in the WM Plan, an ERISA-covered

plan.  At all material times from the second quarter of 2005 through the second quarter of 2009,

Mr. Henriquez invested in the "International Equity Fund" [2] sponsored by SSBT and offered by

the Plan.  Mr. Henriquez also invested in other funds sponsored by SSBT and offered by the WM

Plan during the Class Period, including the Large Cap Equity Fund, the Small Cap Equity Fund,

the Conservative Asset Allocation Fund, the Moderate Asset Allocation Fund, the Aggressive

Allocation Fund, the Bond Market, and the SSgA Target Retirement 2030 Fund.  Mr. Henriquez

resides in Frederick, Maryland.

11.      **Plaintiff Michael T. Cohn** is a participant in the Citi Plan, an ERISA-covered

plan.  At all material times from his initial enrollment in the Citi Plan in January 2005 through

---

[2] The "International Equity Fund" is the fund name used by SSBT on disclosures to participants in the WM Plan.  The International Equity Fund's name, according to the International Equity Fund's Forms 5500 for 2009 and 2010, filed by SSBT with DOL, is the "Active Intl Stock Selection SL SF CL I (CM8J [*sic*]."  From 2006 through 2008, the International Equity Fund's name, according to the International Equity Fund's Forms 5500 filed by SSBT with DOL was the "International Alpha Select SL Series Fund – [*sic*]."  From 1999 to 2005, the WM Plan offered the SSgA International Growth Opportunities Fund Series A Non-Lending as the "International Equity Fund."  The foregoing fund names may refer to the International Equity Fund at a particular point in time, as well as to one or more of several classes of interests offered in the International Equity Fund.

August 2007 Mr. Cohn was invested in the "Aggressive Focus Fund" offered by the Citigroup

401(k) Plan. According to the Citigroup 401(k) Plan Aggressive Focus Fund Fact Sheet for the

second quarter of 2004, this fund had the objective of "seek[ing] as high a total return over time

as is consistent with a primary emphasis on equity securities and a secondary emphasis on fixed-

income and money market securities." The Aggressive Focus Fund was a "fund of funds"

managed by SSBT that included two funds focused on international equities: (a) the Daily

EAFE Index Securities Lending Series – Class T; and (b) the Daily Emerging Markets Index

Non Lending Series Fund. These two funds accounted for 24% of the Aggressive Focus Fund's

total holdings in 2004. In September 2007, the Citigroup 401(k) Plan changed its investment

options, and Mr. Cohn invested in the newly offered "Emerging Market Equity" collective

investment fund. He is still invested in that fund as of the date of this complaint. This Emerging

Market Equity fund has used SSBT as an investment manager since it was first offered to the

Citigroup 401(k) Plan in 2007. Mr. Cohn resides in Highland Park, Illinois.

12.    **Plaintiff William R. Taylor** is a participant in the Retirement Plan of Johnson

and Johnson, an ERISA-covered plan. Mr. Taylor began working at Johnson and Johnson and

accruing service towards his pension benefit on September 21, 1998. At all relevant times to this

complaint, SSBT served as the trustee and custodian of both the J&J Plan and the Johnson and

Johnson Pension and Savings Plan Master Trust in which the J&J Plan was wholly invested. Mr.

Taylor resides in Aston, Pennsylvania. The J&J plan holds foreign investments in both

international securities that cannot be purchased on a domestic exchange and foreign currency.

Each of these types of holdings requires FX transactions.

13.    **Plaintiff Richard A. Sutherland** is a participant in the Retirement Plan of

Johnson and Johnson, an ERISA-covered plan. Mr. Taylor began working at Johnson and

Johnson and accruing service towards his pension benefit on January 1, 1999. At all relevant times to this complaint, SSBT served as the trustee and custodian of both the J&J Plan and Johnson and Johnson Pension and Savings Plan Master Trust in which the defined benefit plan was wholly invested. Mr. Sutherland resides in Albuquerque, New Mexico. The J&J plan holds foreign investments in both international securities that cannot be purchased on a domestic exchange and foreign currency. Each of these types of holdings requires FX transactions.

B.    *Defendants*

14.    **Defendant State Street Bank and Trust Company** ("SSBT") is incorporated in Massachusetts and is headquartered in Boston, Massachusetts. Defendant State Street Bank and Trust Company directly, or indirectly through one or more subsidiaries, operates as a custodial bank for ERISA-covered benefit plans and for the Collective Investment Funds offered by ERISA-covered plans. SSBT is a subsidiary of State Street Corporation, a financial holding company headquartered in Boston, Massachusetts. SSBT describes itself as a leading specialist in meeting the needs of institutional investors. In its Class Period filings with the SEC, State Street Corporation repeatedly stated that its customer relationships were predicated upon our reputation as a fiduciary and a service provider that adheres to the highest standards of ethics, service quality and regulatory compliance. One of the services provided by SSBT to its custodial clients was the execution of FX transactions, which allowed clients to purchase and sell foreign securities or to engage in foreign currency trades for other purposes. Another of the services provided by SSBT to its custodial clients is investment management of custodial client assets through the use of "collective investment funds," which are described more fully below.

6

15.     **Defendant State Street Global Markets, LLC** ("SSGM"), a subsidiary of State

Street Corporation, is incorporated in Delaware and is headquartered in Boston, Massachusetts.

SSGM is a broker/dealer registered with the SEC, the Financial Industry Regulatory Authority,

ten self-regulatory authorities, and fifty-three U. S. states and territories.  SSGM is the only State

Street Corporation subsidiary registered as a brokerage firm.  SSGM is the corporate successor

of State Street Brokerage Services, Inc. and State Street Capital Markets, LLC.  On or about June

1, 1999, State Street Capital Markets, LLC assumed all of the assets and liabilities of State Street

Brokerage Services. Inc.  State Street Brokerage Services, Inc. was dissolved, but "State Street

Brokerage Services," not followed by "Inc.," continued to exist as a division of State Street

Capital Markets, LLC.  On or about March 1, 2002, SSGM assumed all of the assets and

liabilities of State Street Capital Markets, LLC.  SSGM describes itself as "the investment

research and trading arm of State Street Corporation."  SSGM provides specialized investment

research and trading in foreign exchange, equities, fixed income, and derivatives to ERISA

covered benefit plans.  Confusingly, in their answer to the complaint-in-intervention of the

California Attorney General described below,[3] SSBT and SSGM assert that SSBT executed FX

transactions for its clients through a division of SSBT called "State Street Global Markets,"

which was a separate entity from Defendant State Street Global Markets, LLC.  In marketing

documents for its "Foreign Exchange Global Strategy,"[4] State Street Corporation has described

---

[3]*People of the State of Calif. v. State Street Corp.*, Case No. 34-2008-00008457-CU-MC-GDS.
(Cal. Super. Ct., Sacramento County, April 12, 2010.).

[4] State Street Corporation added further confusion through its marketing materials, which state
that "[p]roducts and services outlined in this document are offered to professional investors
through State Street Global Markets LLC, which is a member of FINRA and SIPC, and State
Street Bank and Trust Company, State Street Global Markets International Limited and State
Street Bank Europe Limited, all of which are authorized and regulated by the Financial Services
Authority in the United Kingdom, and their affiliates."   State Street Global Markets, *Foreign
Exchange Global Strategy*, www.statestreetglobalmarkets.com, 09-SGM08041209 (2010).

"State Street Global Markets" as "the marketing name and a registered trademark of State Street Corporation, used for its financial markets business and that of its affiliates."[5] Any action taken by the "State Street Global Markets" division of SSBT was an action of SSBT.

16.     State Street Corporation, SSBT, and SSGM are under common control within the meaning of 29 C.F.R. § 2510.3-21(e)(1)(i).  Further, State Street Corporation, SSBT, and SSGM are "affiliates" within the meaning of (a) Prohibited Transaction Exemption 94-20, § IV.(d), (e), 59 Fed. Reg. 8022-02, 8026 (Feb. 17, 1994) and (b) Prohibited Transaction Exemption 98-54 §IV. (e), (l), 63 Fed. Reg. 63503, 63510, because they directly or indirectly, or through one or more intermediaries, control, are controlled by, or are under common control with each other.

17.     **Defendants Does 1-20** are fiduciaries of the Plans relevant to this lawsuit whose exact identities will be ascertained through discovery.

## IV. THE FOREIGN EXCHANGE SCHEME

*A.       SSBT's General FX Trading Practices for Non-ERISA Clients*

18.     According to its September 26, 2006 Investment Manager Guide, SSBT purported to offer two generic types of foreign exchange transactions to third party investment managers for SSBT's custody clients.  It offered "direct deals" whereby investment managers "deal[t] foreign exchange directly with [SSBT] Treasury trading desks."  SSBT also offered "indirect deals" whereby "requests to execute a foreign exchange transaction [could be] sent to the processing site with the related securities instruction or as a separate instruction."  As set forth below, indirect deals were also sometimes described as "standing instruction" trades.

---

[5] *Id.*

19. According to a class action securities fraud complaint filed in this Court on July 29, 2010 (*Hill v. State Street Corp.*, Document No. 51, Master Docket No. 09-cv-12146-NG), for more than 75% of SSBT's large custodial clients, Defendants would conduct "indirect" or "standing instruction" foreign exchange trades, as described in SSBT's September 26, 2006 Investment Manager Guide. Under the terms of SSBT's custodial arrangements, SSBT was obligated to provide its clients the same exchange rate that Defendants actually used to make the trade. This arrangement was supposed to be beneficial to Defendants' clients because, among other things, they would not have to incur the expense and time of identifying and choosing the most competitive exchange rate.

20. On October 20, 2009, based upon an investigation undertaken after the sealed filing of a *qui tam* complaint by "Associates Against FX Insider Trading" on the personal knowledge of Associates' partners, the California Attorney General ("California AG") filed a complaint alleging that SSBT, SSGM, and a third entity, State Street California Inc., had systematically overcharged two of California's largest public pension funds by tens of millions of dollars for foreign exchange trades conducted over a period of at least eight years. *People of the State of Calif. v. State Street Corp.*, Case No. 34-2008-00008457-CU-MC-GDS. (Cal. Super. Ct., Sacramento County Oct. 20, 2009.).

21. The California AG's action was based on an extensive eighteen-month investigation, which included interviewing witnesses and reviewing hundreds of thousands of internal State Street documents.

22. On information and belief, and according to the *qui tam* relators and the California AG, Defendants herein, starting in 2001, added an undisclosed and substantial "mark-up" to the exchange rate they used when making foreign exchange trades for its clients.

9

23.     The California AG's allegations of undisclosed "mark-ups" were based in part on the sworn testimony of a former SSBT employee who worked on the same trading floor as the SSBT or SSGM foreign exchange traders and who overheard how SSBT or SSGM foreign exchange traders were marking up FX trade prices.  This trader, in sworn testimony, described the practices of SSBT's FX traders as a "totally unethical thing to do" and said that the FX Traders practices were not within the "industry standard."  *People of the State of Calif. v. State Street,* Declaration of Kenny V. Nguyen, Case No. 34-2008-00008457-CU-MC-GDS (January 31, 2012).

24.     The California AG went on to explain that Defendants had agreements with their large custodial clients that obligated Defendants to charge their clients the same exchange rate as the one that Defendants actually used to execute FX trades requested by the client.  Rather than doing so, however, SSBT or SSGM would execute the trade at one exchange rate, and then monitor fluctuations in the rate throughout the day.  Then, before the end of the day, SSBT or SSGM would pick a rate that was more beneficial to Defendants, and tell its clients that the trade had occurred at this other, false rate.

25.     The California *qui tam* relators explained that, for instance, if the transaction was a purchase of a foreign security, SSGM or SSBT would execute the transaction, but would charge the client a higher foreign exchange rate that occurred later in the day, thus causing the client to pay more for the security in U.S. Dollars than the U.S. Dollar value at the time SSBT or SSGM executed the transaction.  If the transaction was a sale of a foreign security, SSBT or SSGM would execute the transaction, but would credit the client at a lower foreign exchange rate, thus paying the client less in U.S. Dollars  than the U.S. Dollar value of what SSBT or SSGM actually received at the time SSBT or SSGM executed the transaction.  In either event, Defendants would

take for themselves the difference between the amount for which the trade was actually executed by SSBT or SSGM and the amount that SSBT or SSGM charged its custody clients for the transaction.

26. According to the California AG complaint-in-intervention and a subsequent amended class action complaint filed in the District of Massachusetts,[6] Defendants' clients did not discover the truth because the records, including statements of account and transaction records provided by SSBT in the ordinary course to their clients, showed only that the trade had been executed within the range of rates occurring during that day, notwithstanding that the rate reported was not the actual rate for the transaction. Defendants' clients were not informed of the actual rates at which FX transactions were made. Defendants' providing such incomplete statements and transaction records to their clients was a course of conduct designed to conceal evidence of their breaches of fiduciary duty and prohibited transactions set forth herein.

B.    *How SSBT's Foreign Exchange Trading Scheme Worked*

27. As detailed by the California relators, clients or their investment managers would initiate a foreign exchange transaction by sending a request, often electronically, to the Securities Processing Unit of SSBT, which was located on the "custody side" of the Company. This request was then sent electronically to the State Street foreign exchange trading desk in SSGM, where it would appear on the Market Order Management System ("MOMS") software used by Defendants' traders.

28. According to the Arkansas State Teacher Retirement System amended class action complaint, SSBT or SSGM's FX traders were informed of SSBT's aggregated standing

---

[6] *Arkansas State Teacher Retirement System v. State Street Corp.*, No. 11-CV-10230 (MLW) (April 15, 2011).

instruction trade requirements during the course of the day. The FX traders would, that day, trade on the interbank FX market in order to satisfy SSBT's standing instruction positions.

29.     According to a class action securities fraud complaint filed in this Court ("*Hill*"),[7] upon receipt of the request, SSBT or SSGM's foreign exchange traders checked the exchange rate, set a price, and executed the transaction, which typically occurred early in the day because SSBT or SSGM traders were at their desks by 7 a.m. Eastern Standard Time. All of those transactions were then entered by the trader into a separate software system called Wall Street Systems ("WSS"), which memorialized the transaction and charged the cost (for purchases) or remitted the payment (for sales) directly to Defendants. The WSS recorded time stamps for the actual, real time transaction.

30.     According to the *Hill* class action securities fraud complaint, although the transaction was now completed and the price locked in, Defendants did not inform the client. Instead, on information and belief, SSBT or SSGM observed market fluctuations until sometime around 3 p.m. and then assigned either a higher exchange rate (for purchases) or a lower exchange rate (for sales) to the foreign exchange transactions that occurred during that day. SSGM then applied that rate to all of the "standing instruction" foreign exchange transactions it had conducted that day.

31.     On information and belief, at all relevant times to this Complaint, this pricing scheme was used for FX transactions for both custodial clients, including custodial ERISA plan clients, and for transactions involving the Collective Investment Funds.

---

[7] *Hill v. State Street Corporation*, Document No. 51, Master Docket No. 09-cv-12146-NG. (July 29, 2010).

32. On information and belief, with each FX trade priced in this manner, Defendants did not simply profit; they made excessive profits on each trade, based upon the range-of-the-day's FX rates at the point the trade was priced for the Plan.

33. On information and belief, because Defendants' scheme always priced the trades at or near the very lowest or very highest rates of the day, Defendants were able to make a profit with minimal risk to SSBT.

34. According to the California AG complaint-in-intervention, Defendants' practice of pricing trades in this manner and taking the largest possible mark-up or mark-down was not disclosed to custodial clients over the period of time relevant to that Complaint.

35. On information and belief, Defendants' practice of pricing trades in this manner and taking an excessive mark-up or excessive mark-down was not disclosed to investors in the Collective Investment Funds over the period of time relevant to this Complaint.

*C.*    *SSBT Made Exceptions for Certain Clients, Offering Them Special Pricing*

36. According to the class action securities fraud complaint filed in this Court on July 29, 2010 (*Hill v. State Street Corporation*, Document No. 51, Master Docket No. 09-cv-12146-NG), over time, SSBT developed a special class of custodial clients that did not receive the excessively high or excessively low range-of-the-day pricing suffered by other custodial clients, including ERISA plans. Those clients who conducted "direct trades" would be quoted an exchange rate by SSBT or SSGM before executing the transaction. These clients – often large hedge funds – typically had easy access to an alternate price source, such as Bloomberg or Reuters, to double-check the truthfulness of SSBT or SSGM's rate quotes. Accordingly,

Defendants could not overcharge these clients, and thus referred to them internally as "smart" clients or "smart money."

37.     According to the class action securities fraud complaint, instead of including FX trades for these custodial clients with other clients' trades, and subject to the excessive range-of-the-day mark-ups and mark-downs, these clients were allowed to deal directly with Defendants and were given the chance to directly negotiate prices for their FX requirements for that day, despite their trades coming to SSBT as standing instruction trades.

38.     As a result, according to the class action securities fraud complaint, the "smart money" custodial clients received better pricing than their fellow custodial clients who are still subject to SSBT's excessive pricing schemes.

## V. FACTUAL BACKGROUND OF ERISA PLAN CLAIMS

*A.     The Plans.*

39.     **Waste Management Retirement Savings Plan.** The WM Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

40.     **Citigroup 401(k) Plan.** The Citi Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

41.      **Retirement Plan of Johnson and Johnson.** The J&J Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

42.     **Other Similarly Situated ERISA Plans**.  Defendants provide services similar to those provided to the Waste, Citi, and J&J Plans to other, similarly situated Plans, either directly as plan custodian or indirectly as custodian of funds in which the Plans invest.

14

B.    *Retirement Plan Investments in Foreign Securities*

43.    There are two types of ERISA-covered pension plans — defined benefit plans and defined contribution plans.  Both types of retirement plans have, especially over the last decade, found it necessary and prudent to expand their investments to include exposure to foreign markets.  Accordingly, defined benefit plans have expanded international holdings, and defined contribution plans frequently include at least one, if not several, international investment options.

44.    ERISA-covered plans regularly purchase and sell foreign securities in order to increase diversification and take advantage of opportunities for higher returns.  Retirement plans that invest in foreign securities receive principal, dividends, and interest that are paid in foreign currencies, or participate in other investments that require the exchange of foreign currency into and from US Dollars ("USD"), either directly or through participation in collective investment funds.  As a result, the purchase and sale of currencies incidental to a foreign securities transaction is vital to a plan's participation in the international securities markets and to the acquisition, holding, and disposition of foreign securities.

45.    SSBT served as trustee and custodian to the WM Plan.  Beginning in 1999, the WM Plan offered participants the option to invest in certain Collective Investment Funds, the SSgA International Growth Opportunities Fund Series A Non-Lending.  For purposes of communications with the WM Plan and its participants, this fund was named the "International Equity Fund."  The International Equity Fund is described more fully below.  Another example is the SSgA Target Retirement 2030 Fund offered to WM Plan participants.  In 2008, the SSgA Target Retirement 2030 Fund invested in another SSBT Collective Investment Fund, the SSgA MSCI ACWI EX-US Index Fund, a collective investment fund that held foreign securities and

15

would have been, directly or indirectly, party to FX transactions executed by SSBT or its affiliate SSGM. Neither of these Collective Investment Funds could have been operated without FX transactions, whether or not those transactions were executed at the fund level or at the brokerage level. SSBT, as the operator and manager of these funds, was ultimately responsible for the funds' FX transactions.

46. SSBT served as trustee and custodian to the Citi Plan. Similarly, the Citi Plan in 2008 offered four international Collective Investment Funds (either directly or as part of an underlying investment of the fund) operated and managed by SSBT: the SSgA EAFE Fund; the SSgA International Small Cap Fund; the SSgA MSCI EAFE Fund; and the SSgA MSCI Emerging Markets Free [*sic*]. None of these funds could have been operated without FX transactions, whether those transactions were executed at the Collective Investment Fund level or brokerage level. SSBT, as the operator and manager of these funds, was ultimately responsible for those FX transactions.

47. SSBT served as trustee and custodian to the J&J Plan. The J&J Plan did not invest in the Collective Investment Funds. Rather, the J&J Plan directly held foreign assets, including currency, such as Euros, and foreign securities that could not have been purchased on a domestic exchange. An example of one such security is Elpida Memory Inc, a Japanese stock available only on a Japanese exchange. The J&J Plan could not have made use of foreign currencies or purchased foreign securities which are not traded on U.S. securities exchanges without FX transactions. On information and belief, SSBT, as trustee and custodian of the J&J Plan, executed some or all of the J&J Plan's foreign currency transactions in the relevant period.

C.    *Defendants' Fiduciary Status*

16

48. Every plan governed by ERISA must have fiduciaries to administer and manage the plan. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA §402(a)(1), but also any other person who in fact performs fiduciary functions. ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i) (a person is a fiduciary "to the extent … he exercises any discretionary authority or discretionary control respecting management of such plan or *exercises any authority or control respecting management or disposition of its assets*…") (emphasis added).

49. An ERISA fiduciary is required to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and … for the exclusive purpose of … providing benefits to participants and beneficiaries and … defraying the reasonable expenses of administering the plan …." ERISA § 404(a)(1)(A)(i), (ii), 29 U.S.C. § 1104(a)(1)(A)(i), (ii).

50. Moreover, ERISA prohibits certain transactions. Specifically, unless exempted pursuant to ERISA § 408, 29 U.S.C. 1108:

A fiduciary with respect to a plan shall not--

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

ERISA §406(b), 29 U.S.C. 1106(b). As described below, Defendants functioned as fiduciaries to the Named Plans both by acting as trustee and custodian for the Plans and by exercising authority and control over Plan assets.

1. *SSBT as Custodian*

51. An ERISA-covered Plan's custodial bank is an ERISA fiduciary. A "custodian" is an institution that holds securities on behalf of investors. The responsibilities entrusted to a custodian include the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities. Custodians may also perform ancillary services for their clients. Custodians are typically used by institutional investors who do not wish to leave securities on deposit with their broker-dealers or investment managers. The use of a custodial bank is intended to reduce the risk of misconduct by separating the custodial and asset management duties. An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

52. SSBT served as the custodian for many ERISA-covered pension plans. Specifically, SSBT served as custodian for the Named Plans' assets. As custodian, SSBT was a fiduciary under ERISA and owed fiduciary duties to the Named Plans. SSGM also exercised authority and control over the Plans' assets in its role as SSBT's affiliate responsible for setting the exchange rates on FX transactions and executing those transactions. As discussed above, this process created the excessive spread between the marked-up FX exchange rates charged to custodial ERISA plan clients and the marked-down FX exchange rates used to process repatriation of principal, dividends, and interest paid in foreign currencies, and other FX transactions.

2. *SSBT as Investment Manager of Collective Investment Funds for ERISA Plans*

18

53.     SSBT sponsored and operated the Collective Investment Funds and offered them to the ERISA plans, including the Plans and the Similarly Situated ERISA Plans.  SSBT served as custodian and trustee for the Collective Investment Funds.  The Collective Investment Funds were under the exclusive management and control of SSBT.

54.     On information and belief, all of the Collective Investment Funds which invested in foreign securities suffered from the same inaccurate FX pricing described in the California *qui tam* complaint, the California AG complaint-in-intervention, and the *Hill* securities fraud class action complaint.  *See* ¶¶ 18-38, *supra*.

55.     Investments in collective investment funds are equity interests in a separate legal entity, but are not publicly-offered securities or securities issued by an investment company registered under the Investment Company Act of 1940, *i.e.*, mutual funds.  Under ERISA, unlike mutual funds and other publicly-offered securities, investments in collective investment funds are subject to a unique "look-through" rule, pursuant to which, the "plan assets" of an ERISA-covered plan include **both** its undivided "equity interest [in the entity] **and** an undivided interest in each of the underlying assets of the entity …".  29 C.F.R. § 2510.3-101(a)(2); *see also* ERISA § 3(42), 29 C.F.R. § 1002(42) (authority of Secretary of Labor to define term "plan assets" by regulation) (emphasis added).  Specifically, when a Plan acquires or holds an interest in a common or collective trust fund, that is, a Collective Investment Fund, "its assets include its investment and an undivided interest *in each of the underlying assets* of the entity."  *Id*. § 2510.3-101(h)(1) (emphasis added).

56.     "[A]ny person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with

respect to such assets for a fee (direct or indirect) is a fiduciary of the investing plan." *Id*. §

2510.3-101(a).

57.     As the sponsor and operator of the Collective Investment Funds, SSBT exercised

authority or control with respect to the management or disposition of plan assets.  Accordingly,

SSBT was a fiduciary of each and every ERISA Plan which invested in the Collective

Investment Funds, including the Named Plaintiffs' Plans and the Plans, with respect to the

underlying assets of each and every SSBT Collective Investment Fund.

58.     In addition, according to SSBT documents provided by the WM Plan in April 2002

to a participant in the WM Plan in response to the participant's request for plan documents

pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), on or about January 1, 1999, the

Investment Committee of the WM Plan appointed SSBT to act as Investment Manager of the

WM Plan "as such term is defined in Section 3(38) of [ERISA]" with respect to designated assets

of the WM Plan.  The designated assets included five of the Collective Investment Funds, one of

which was the "International Growth Opportunities Fund Series A," that is, the International

Equity Fund.  Accordingly, SSBT also had authority and control over plan assets in its capacity

as Investment Manager, including assets invested in the Collective Investment Funds, and

specifically including assets invested in the International Equity Fund.  This arrangement

continued throughout the WM Plan's association with SSBT, regardless of the specific

international equity fund being offered to participants at any given time.

> 3.     *Foreign Exchange Transactions Under ERISA*

59.     Certain of the Collective Investment Funds SSBT operated and offered to ERISA-

covered plans during the Class Period invested in foreign securities.  SSBT served as custodian

and trustee for these Collective Investment Funds.  Collective investment funds that invest in

foreign securities, or a person acting on their behalf, must engage in FX transactions in order to

buy and sell securities, to repatriate dividends or interest payments, and to engage in other

transactions.  As the trustee of the Collective Investment Funds, SSBT was authorized to convert

any monies into any currency through foreign exchange transactions and responsible for ensuring

that these transactions were within the bounds of SSBT's fiduciary responsibilities and the

limitations of ERISA.

60.    For example, according to SSBT documents provided by the WM Plan in April

2002 to a participant in the WM Plan in response to the participant's request for plan documents

pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), the stated investment objective of the

International Equity Fund in the Waste Management Plan was "to provide long-term capital

appreciation through equity investments *in markets outside the United States*."  (Emphasis

added).

61.    The WM Plan's Investment Policy Statement noted that "[t]he goal of the

International Equity Fund is to invest in a portfolio of common stocks that will provide a vehicle

for investing in a broad cross section of non-U.S. equities."  The International Equity Fund was

also permitted to invest in equity-based derivatives of foreign securities and fixed income

securities issued by governments and corporations located in those countries.  The "investable

universe" of the International Equity Fund was "the equities of all developed market countries,

excluding the U.S., including American Depositary Receipts."  The International Equity Fund's

benchmark was the "MSCI-EAFE Index, an index of more than 1,100 stocks in 21 countries

outside of North and South America …."

4.     *SSGM as a Functional Fiduciary of ERISA Plan Assets*

62.     As noted above, many of the securities purchased, held, or sold in the Collective Investment Funds were foreign securities that could not be purchased or sold except on foreign securities exchanges in transactions denominated in foreign currencies.

63.     As described more fully below, as a practical matter, unless a Collective Investment Fund invested solely in American Depositary Receipts or derivatives issued in the jurisdiction of the United States, the Investment Manager of the Collective Investment Fund, *i.e.*, SSBT, or some person acting on its behalf, such as a broker, was required to engage in foreign currency transactions in order to acquire equity securities "in markets outside the United States."  Any funds used to acquire such securities at any level within SSBT, or through any affiliate thereof, would constitute "plan assets" under 29 C.F.R. § 2510.3-101.

64.     On information and belief, SSGM provided brokerage services, that is, the purchase and sale of foreign securities, to the Collective Investment Funds.  To the extent that the Collective Investment Funds settled such purchases and sales in U.S. Dollars, the Collective Investment Funds did not engage directly in FX trading in connection with the purchase or sale of foreign securities.  Rather, they engaged in FX trading indirectly through SSGM, in that SSGM would have executed a purchase or sale of a foreign security in foreign currency and then converted the transaction to a U.S. Dollar-denominated transaction for purposes of settlement with the Collective Investment Funds.

65.     On information and belief, SSGM also served as the conduit for the repatriation of dividend, principal, and interest payments by issuers of foreign securities and for receipt of proceeds of sales of foreign securities, and engaged in FX transactions in order to remit such payments to the Collective Investment Funds in U.S. Dollars.

22

66. SSGM's conversion of foreign currency to U.S. dollars constituted the exercise of authority or control respecting the management or disposition of the underlying assets of the Collective Investment Funds and, therefore, of assets of the ERISA Plans, within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(1), and 29 C.F.R. § 2510.3-101(a). Accordingly, SSGM was a fiduciary of the ERISA Plans.

5.    *Defendants' Prohibited Transactions*

67. According to its September 26, 2006 Investment Manager Guide, SSBT purported to comply with a special procedure when effecting foreign exchange transactions for ERISA trust and custody clients. Until at least September 26, 2006, the so-called "FX Procedure" purported to be "designed to satisfy the conditions of Prohibited Transaction Exemption 94-20 ("PTE 94-20"). A prohibited transaction exemption permit[ted] certain 'directed' FX transactions between [SSBT] and its ERISA clients." Under the ERISA "FX Procedure," SSBT "agree[d] to post to its website on a daily basis, a specific buy rate and sell rate for each currency. Each ERISA plan manager [could] direct [SSBT] to effect the plan's FX transactions, including income repatriation and buy/sell related transactions at the posted rates or at rates more favorable if market conditions warrant."

68. The September 26, 2006 Investment Manager Guide did not, however, address foreign exchange transactions conducted in connection with assets managed directly by SSBT, as in the Collective Investment Funds. Under the terms of PTE 94-20, FX transactions generated by SSBT as investment manager of the Collective Investment Funds and executed by SSBT or SSGM could not be conducted under this so-called "FX Procedure," because, among other things, SSBT as investment manager would be dealing with itself, regardless of whether the FX

23

transactions were conducted internally at SSBT or through its affiliate, SSGM, without the benefit of an independent fiduciary.

69.    Nor was there any other applicable prohibited transaction exemption.  As set forth above, the terms of FX transactions conducted on behalf of the Collective Investment Funds were conducted on terms less favorable than the terms generally available in comparable arm's length FX transactions between unrelated parties and on terms less favorable than the terms generally afforded by the bank in comparable arm's length FX transactions between unrelated parties.  Accordingly, the Defendants could not engage in FX transactions in connection with plan assets in the Collective Investment Funds without engaging in a prohibited transaction.

## VI. CLASS ALLEGATIONS

70.    **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plan and its participants and beneficiaries and the following class of similarly-situated persons (the "Class"):

> All qualified ERISA Plans (including the participants and beneficiaries thereof) for which State Street Bank and Trust Company or State Street Global Markets, LLC served as investment manager (including serving as the manager of a collective trust in which such a Plan invested) or trustee or custodian of assets and for which State Street Bank and Trust Company or State Street Global Markets, LLC provided foreign currency exchange transactional services (including foreign currency transactional services provided to entities such as collective trusts that held such ERISA Plans' assets), at any time between January 1, 2001 and the present (the "Class Period").

Class treatment is appropriate in this case because it would promote judicial economy by adjudicating the Plaintiffs' ERISA fiduciary breach and prohibited transaction claims with respect to all of the Plans and participants and beneficiaries in the class.

71.     **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of ERISA Plans throughout the country invested in the Collective Investment Funds during the Class Period, and sustained losses as a result of the Defendants' imprudent FX trading activities. Defendants have more than $5.2 trillion of pension assets under custody.  These assets could all be exposed to Defendants' improper pricing scheme.  Plaintiffs believe that hundreds of ERISA plans are also exposed to the Collective Investment Funds with investments in foreign securities.

72.     **Commonality.** The claims of Plaintiffs and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by Defendants with regard to management of its FX trading program.  The questions of law and fact common to the Class include, but are not limited to:

a.      Whether Defendants breached their fiduciary duties to the Plans by using an FX trading scheme to overcharge the Plans, or the Collective Investment Funds in which the Plans invested, for FX trading;

b.      Whether Defendants' self-interested FX transactions constituted transactions prohibited under ERISA's statutory restrictions;

c.      Whether Defendants' fiduciary breaches caused losses to the Plans; and

d.      Whether Defendants' prohibited transactions caused losses to the Plans.

73.     **Typicality.**  Plaintiffs' claims on behalf of their Plans are not only typical of, but the same as, claims that would be brought with respect to other Plans.  If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same

claims based upon the same conduct of the Defendants, using the same legal arguments to prove Defendants' liability, and would be seeking the same relief.

74. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel that are competent and experienced in class action and ERISA litigation. Plaintiffs have no interests antagonistic to, or in conflict with those of the Class. Plaintiffs have undertaken to protect vigorously the interests of the absent members of the Class.

75. **Rule 23(b)(1)(A) & (B) Requirements.** Class action status is warranted under Fed. R. Civ. P. 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

76. **Rule 23(b)(2) Requirements.** Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole. No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties.

77. **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any

questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VII. CLAIMS FOR RELIEF

## COUNT I

**Engaging in Self-Interested Prohibited Transactions**
**(Violation of § 406 of ERISA, 29 U.S.C. § 1106 by Defendants)**

78.     All previous averments are incorporated herein.

79.     At all relevant times, the Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control over ERISA plan assets.

80.     The Defendants, by their actions throughout the Class Period, caused the Plans to engage in unfairly and unreasonably priced FX transactions.

81.     During the Class Period, Defendants engaged in FX transactions using plan assets that were not for the exclusive benefit of the Plans' or their participants.

82.     Through their FX transactions and pricing scheme, Defendants dealt with assets of the Plans for their own financial benefit and for their own account.  This is a violation of ERISA § 406(b)(1) & (3), 29 U.S.C. 1106(b)(1) & (3).

83.     As a direct and proximate result of these prohibited transaction violations, the Plans, directly or indirectly, paid millions of dollars in transaction fees that were prohibited by ERISA and suffered millions of dollars in losses.

84.     Pursuant to ERISA, Defendants are liable to disgorge all fees paid them for the

Plans' FX transactions, to restore all losses suffered by the Plans as a result of the prohibited

transactions, and to disgorge all profits earned on the fees paid by the Plans to Defendants.

## COUNT II

### Breach of Duties of Prudence and Loyalty
### (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Defendants)

85.     All previous averments are incorporated herein.

86.     Defendants breached their ERISA fiduciary duties of prudence and loyalty by,

*inter alia*:

  a.  Using plan assets for the own benefit, causing losses to the Plans and the
      participants;

  b.  Charging the Plans (or the Collective Investment Funds in which the Plans
      invested) fees for FX trading that were unreasonable and in excess of what
      Defendants had agreed to charge;

  c.  Failing to disclose to the Plans, their fiduciaries, or participants the amount of
      fees being charged for FX trading, that those fees were in excess of what
      Defendants had agreed to charge, and that other clients were charged less for
      the same services;

87.     These actions during the Class Period were breaches of Defendants' fiduciary

duties of loyalty and prudence to the Plans under ERISA, and Defendants did not execute their

fiduciary responsibilities for the exclusive benefit of the Plans.  § 404(a)(1)(A), (B), 29 U.S.C.

§§ 1104(a)(1)(A), (B).

88.     Defendants committed these breaches during each FX transaction involving assets

of the Plans.

28

89.     As a direct and proximate result of these breaches of duty, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, realized losses.

90.     Pursuant to ERISA, the Defendants are liable to restore all losses suffered by the Plans caused by the Defendants' breaches of fiduciary duty.

## COUNT III

### Liability for Breach of Co-fiduciary
### (Violation of § 405 of ERISA, 29 U.S.C. § 1105)

91.     All previous averments are incorporated herein.

92.     SSGM violated ERISA, 29 U.S.C. §1105(a)(1), by knowingly undertaking to conceal SSBT's fiduciary breaches.  It did so through the actions and omissions of its employees and agents by concealing and failing to provide complete and accurate information to the Plans regarding the cost of FX transactions.

93.     SSGM violated ERISA, 29 U.S.C. §1105(a)(3), because it knew that SSBT had breached its fiduciary duties of prudence and loyalty, but failed to take reasonable steps under the circumstances to remedy the breach.

94.     On account of SSGM's violations of these provisions, SSGM is liable for the breach of its co-fiduciary, SSBT.

95.     As a result of SSGM's actions, the Plans suffered losses.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.  Declare that the Defendants have violated ERISA's prohibited transactions provisions;

29

b.  Declare that the Defendants breached their fiduciary duties under ERISA;

c.  Issue an order compelling a proper accounting of the foreign exchange transactions in which the Plans have engaged;

d.  Issue an order compelling Defendants to restore all losses caused to the Plans (or that will be caused to the Plans after the filing of this Complaint);

e.  Issue an order compelling the Defendants to disgorge all fees paid and incurred to Defendants (or that will be paid or incurred by the Plans after the filing of this Complaint), including any profits thereon;

f.  Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

g.  Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as custodian to the Plans;

h.  That this action be certified as a class action and that each Class be designated to receive the amounts restored to the Plans by Defendants and a constructive trust be established for distribution to the extent required by law;

i.  Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

j.  Award Plaintiffs their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

k.  Award such other and further relief as the Court deems equitable and just.

Dated:    February 24 , 2012

By:  /s/ Bryan T. Veis
J. Brian McTigue (*pro hac vice*)
Bryan T. Veis (*pro hac vice*)
James A. Moore (*pro hac vice*)
**McTigue & Veis, LLP**
4530 Wisconsin Ave, NW
Suite 300
Washington, DC 20016
202-364-6900
Fax: 202-364-9960
Email: bveis@mctiguelaw.com
        bmctigue@mctiguelaw.com
        jmoore@mctiguelaw.com

**Catherine M. Campbell**
**Renee J. Bushey**
Feinberg, Campbell & Zack, P.C.
3rd Floor
177 Milk Street
Boston, MA 02109
617-338-1976
Fax: 617-338-7070
Email: cmc@fczlaw.com
        rjb@fczlaw.com

**Jonathan G. Axelrod** (*pro hac vice*)
Beins, Axelrod, P.C.
1625 Mass. Ave. NW
Washington, DC 20036
202-328-7222
Email: jaxelrod@beinsaxelrod.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Bryan T. Veis, hereby certify that on February 24, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/  Bryan T. Veis

# EX. 3

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| The Andover Companies Employee Savings and Profit Sharing Plan on behalf of itself, and James Pehoushek-Stangeland, and all others similarly situated, | ) ) ) ) ) | No. |
| Plaintiffs, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| vs. | ) ) | |
| State Street Bank and Trust Company, and State Street Global Markets, LLC, | ) ) | |
| Defendants. | | |

## PLAINTIFFS' CLASS ACTION COMPLAINT

**Table of Contents**

I.     PRELIMINARY STATEMENT ................................................................. 1

II.    JURISDICTION AND VENUE ............................................................... 4

III.   PARTIES ................................................................................................. 5

     A.    Plaintiff Alan Kober ................................................................. 5

     B.    Plaintiff James Pehoushek-Stangeland ................................... 6

     C.    Defendants ................................................................................ 7

IV.   CLASS ACTION ALLEGATIONS ......................................................... 8

V.    SUBSTANTIVE ALLEGATIONS ........................................................ 11

     A.    The Nature of FX Trading Generally ..................................... 11

           1.    The Increasing Necessity of FX Trading in a Global
                 Investment Portfolio .................................................... 11

           2.    How FX Trading Works ............................................... 12

     B.    Negotiated vs. Non-Negotiated FX Trades: Trades for Custodial
          Clients ..................................................................................... 13

           1.    Custodial Clients Relied Upon State Street's Expertise and
                 Loyalty ........................................................................ 14

           2.    State Street's Custodial Contracts and Investment Manager
                 Guidelines Were Predicated on No-Cost FX Trading ........... 15

           3.    State Street's Deceptive Scheme Overcharged Custodial
                 Clients for Standing-Instruction FX Trades ............................ 16

           4.    For its Custodial Clients, State Street's Deceptive Acts and
                 Practices Could Not Reasonably Be Detected. ....................... 20

     C.    Events After October 2009 Begin to Shed Light on State Street's
          Deceptive FX Trading Practices ............................................. 20

     D.    FX Trading and State Street's Commingled ERISA Fund Clients .................... 22

           1.    The Plaintiffs' Plans .................................................... 22

           2.    Defendants' Fiduciary Status ...................................... 24

     E.    State Street's FX trades were prohibited transactions under ERISA
          and corresponding federal regulations. ................................. 28

VI.   PRAYER FOR RELIEF .......................................................................... 35

Plaintiff Alan Kober, as Trustee and fiduciary of The Andover Companies Employees Savings and Profit Sharing Plan (the "Andover Plan"), on behalf of the Andover Plan, and Plaintiff James Pehoushek-Stangeland as a participant and beneficiary of The Boeing Company Voluntary Investment Plan ("Boeing Plan") and all other ERISA Plans (together, the "Plans") that suffered losses as a result of State Street's foreign currency exchange trading practices as alleged herein, by and through its undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

## I.  PRELIMINARY STATEMENT

1.      This complaint arises from Defendants State Street Bank and Trust Company ("State Street Bank"), and State Street Global Markets, LLC's ("SSGM") (collectively, "State Street" or "Defendants") self-dealing and imprudent management of the Plans' commingled funds managed by State Street in violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). This is a civil enforcement action brought pursuant to 29 U.S.C. §§ 1001, *et seq.*, and under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), to recover losses and obtain equitable relief on behalf of the Plans and all other similarly situated Plans. State Street Bank and SSGM were required to act prudently and solely in the interest of the Plans' participants and beneficiaries in their capacity as ERISA fiduciaries. In particular, State Street breached its fiduciary duties under ERISA by purchasing and selling foreign securities through the use of foreign currency exchange transactions at rates favorable to Defendants. These transactions were prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

2.      Plaintiffs also allege that Defendants failed to act solely in the interest of the participants and beneficiaries of the Plans and breached their fiduciary duties of prudence and loyalty with respect to the Plans. Specifically, Plaintiffs allege that Defendants, as fiduciaries of the Plans, violated their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, by causing the

Plans to engage in transactions that were not for the exclusive benefit of the Plans or their participants and beneficiaries.

3.      State Street was the trustee for the Defined Contribution Plans Master Trust Agreement between Merrimack Mutual Fire Insurance Company and State Street Bank and Trust Company dated September 1, 2002, and investment manager for the Andover Plan's assets invested in State Street's proprietary commingled funds ("the Funds").

4.      State Street was the trustee for The Boeing Company Employee Savings Plans Master Trust ("Boeing Master Trust") and managed certain funds in the Boeing Master Trust. As of December 31, 2011, the assets of The Boeing Company Voluntary Investment Plan (the "Boeing Plan") comprised 100 percent of the Boeing Master Trust. The Boeing Master Trust holds the Boeing Plan's assets that are invested in State Street's Funds.

5.      As investment manager for the commingled Funds, State Street Bank contracted on behalf of the Funds for which it served as investment manager for custodial services from its affiliated State Street entities such as SSGM. State Street additionally served as custodial bank for certain of the Plans in the Class including the Boeing Plan, and this also served as a custodian bank for all the foreign currency transactions at issue for certain of the ERISA-covered plans.

6.      A custodian bank is an institution that holds securities on behalf of investors. The role of a custodian bank is to safeguard and record movement of assets, including holding assets and securities in safekeeping with appropriate valuations, arranging settlement of all purchases and sales and deliveries in and out of the account, administering corporate actions for securities, and maintaining and managing all cash transactions, including foreign currency transactions. Custodians are typically used by investors who do not wish to leave securities on deposit with their broker-dealers or investment managers. By separating these duties, the use of custodians— at least in theory—reduces the risk of fraud or other misconduct. An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

7.      As of 2011, State Street held approximately $22.8 trillion in assets under custody and administration, making it one of the largest providers of custodial services in the world.[1] State Street charged the Plans, in combination with its other clients hundreds of millions of dollars a year in fees for custodial services.

8.      As part of its array of ancillary custodial services. State Street executed foreign currency exchange ("FX") transactions on behalf of its clients in order to facilitate clients' purchases or sales of foreign securities or the repatriation of foreign currency into U.S. dollars. During the past decade, pension funds and other institutional investors have increasingly looked to overseas companies and securities markets in order to diversify their holdings and maximize investment returns. Because foreign investments are bought and sold in the foreign currencies of the nations in which they are issued, U.S.-based investors necessarily must purchase and sell those foreign currencies in order to complete the transactions.

9.      Mr. Kober and Mr. Pehoushek-Stangeland ("the Plaintiffs") and the members of the Class reposed a high degree of trust in State Street. As trustee and investment manager for their Funds, and a fiduciary, State Street Bank authorized its affiliated entities, such as SSGM, to execute FX transactions under conditions in which the State Street Defendants controlled all aspects of FX trades, including the cost borne by Plaintiffs. Plaintiffs and the Class members depended upon State Street not only to execute FX trades honestly, but also to carry them out on terms no less favorable than the terms generally available in comparable arm's length FX transactions between unaffiliated and unrelated parties.

10.      Despite these legal obligations, State Street has undertaken an unfair and deceptive practice since at least 1998, whereby FX transactions were conducted behind a veil of secrecy so as to maximize exorbitant and undisclosed profits to State Street at the direct expense of the Plaintiffs' Plans and other Class Members. Upon information and belief, State Street charged its custodial clients and the Funds inflated FX rates when buying foreign currency on

---

[1] *See* http://www.statestreetglobalmarkets.com/ (follow link to "Foreign Exchange Global Strategy") (last visited September 12, 2012).

their behalf, and deflated FX rates when selling foreign currency for them, and in both cases pocketed the difference. In this regard, State Street charged the Plans and the Class incorrect and often fictitious FX rates unrelated to the market-based rates State Street was actually paying or received when SSGM executed the FX trades.

11. The Plans and other Class members could not reasonably have detected State Street's deception. For the Funds and their fiduciaries and participants, the transaction was essentially conducted and reported between two affiliated State Street entities (State Street Bank and SSGM) and not reported on the fund fact sheets or otherwise reported to Plan sponsors, such as Mr. Kober, or to Plan beneficiaries, such as Mr. Pehoushek-Stangeland. For its clients, nothing in the FX rates State Street actually reported indicated that the rates being charged included hidden and unauthorized mark-ups (or mark-downs).

12. State Street's unfair and deceptive FX trading practices, perpetrated on the Plans and the Class, generated hundreds of millions of dollars in profits annually for State Street. This money was taken directly from the pockets of the Plans and Class members' retirement accounts.

13. Mr. Kober and Mr. Pehoushek-Stangeland bring this action as a class action on behalf of all similarly affected ERISA clients of State Street during the Class Period defined below, in order to recover the proceeds State Street reaped from Class members through its unfair and deceptive FX trading practices.

## II. JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

15. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

## III.   PARTIES

**A.   Plaintiff Alan Kober**

16.     Plaintiff Alan Kober is an Individual Trustee of The Andover Companies Employees' Savings and Profit Sharing Plan (the "Andover Plan") pursuant to § 10.03 of The Andover Companies Employees' Savings and Profit Sharing Plan and Trust Agreement, Amended and Restated Effective as of January 1, 1989. In this capacity, Mr. Kober is a Plan fiduciary with standing to bring claims for breach of fiduciary duty on behalf of the Plan pursuant to ERISA §§ 409 and § 502(a)(2).

17.     Plaintiff Merrimack Mutual Fire Insurance Company ("Merrimack Mutual") is the designated Plan Administrator for the Andover Plan. The Andover Plan is an ERISA-qualified defined contribution plan established for the benefit of the employees of Merrimack Mutual and its sister companies, Cambridge Mutual Fire Insurance Company, and Bay State Insurance Company, which, together with Merrimack Mutual, comprise the Andover Companies ("Andover Companies"). Andover Companies is a New England mutual insurance institution which offers insurance programs and is managed from its headquarters in Andover, Massachusetts.

18.     As trustee for the Andover Plan, pursuant to Section 4.1 of the Master Trust Agreement, State Street Bank was required to exercise power and authority over the investment accounts for which it has express investment management discretion, or upon the direction of the Investment Manager. The investment power of the trustee includes the power to "purchase and sell foreign exchange and contracts for foreign exchange, including transactions entered into with State Street Bank and Trust Company, its agents or its subcustodians." The Master Trust Agreement further provides that nothing in the plans requires any investment manager to make any investments which constitute a prohibited transaction.

19.     Pursuant to the Investment Manager Agreement between State Street Bank and Merrimack Mutual entered on April 1, 2001, State Street Bank was appointed investment

manager pursuant to Section 3(38) of ERISA with respect to all cash, securities, or other property designated by client.

20.     During the relevant time period, the Andover Plan offered participants investments in several State Street Bank-sponsored commingled Funds as part of the Plan's core investments. International Equity Funds were one category of core investments for the Andover Plan, which also included Stable Value Funds, Fixed Income Funds, Balanced Funds and Domestic Equity Funds. During the class period, the Andover Plan included the following proprietary commingled International Equity Funds to participants for investment: International Growth Opportunities Securities Lending Class A Fund, and SSgA Daily International Alpha Select. State Street Bank served as the Trustee for Andover Plan, and served as the Investment Manager for Andover Companies Plan's investment in the International Equity Funds. The Andover Companies Plan suffered losses as a result of State Street's unfair and deceptive FX trading practices on behalf of the International Equity Funds.

**B.     Plaintiff James Pehoushek-Stangeland**

21.     Plaintiff James Pehoushek-Stangeland is a resident of Seattle, Washington. He works for the Boeing Company and is a participant in the Boeing Plan, an ERISA-qualified retirement plan. Accordingly, Plaintiff Pehoushek-Stangeland has standing to bring suit on behalf of the Boeing Plan for losses to the Plan due to breaches of fiduciary duty pursuant to ERISA §§ 409, and § 502(a)(2).

22.     During the relevant time period, the Boeing Plan offered participants investments in several State Street Bank-sponsored commingled Funds as part of the Plan's core investments. The International Index Fund was one category of core investments for the Boeing Plan, which also included Lifecycle Funds, Stable Value Funds, Bond Funds, Balanced Funds, and Domestic Equity Funds. During the Class Period, the Boeing Plan included the following proprietary State Street Funds: the State Street Bank Global All Cap Equity ex-US Index Securities Lending Series Fund Class I ("State Street Bank Global Lending Fund"); and the State Street Bank Global All Cap Equity ex-US Index Non-Lending Series Fund Class A ("State Street Bank Global Non-

Lending Fund"), for participants to invest in. As of December 31, 2010, the Boeing Plan held approximately $1.98 billion in Plan assets in the State Street Bank Global Lending Fund. As of December 31, 2011, the Boeing Plan held approximately $1.863 billion in the State Street Bank Global Non-Lending Fund. As of December 31, 2010, and December 31, 2011, these investments constituted approximately 6% of the Boeing Master, respectively.

23.     State Street served as the Trustee for the Boeing Master Trust, which holds the assets of the Boeing Plan, and as the investment manager for certain funds in the Boeing Master Trust. The Boeing Plan suffered losses as a result of State Street's unfair and deceptive FX trading practices on behalf of the International Index Fund (together with Plaintiff Kober's international funds, "The International Equity Funds").

24.     The Plaintiffs have standing to bring this action, and pursuant to Federal Rules of Civil Procedure 23, to bring a representative action on behalf of the Andover Plan and the Boeing Plan, and the class of Plans which incurred losses as a result of State Street's breach of its fiduciary duties as the Investment Manager and custodian of FX trades for the Plans' investments in the International Equity Fund(s) and/or the International Index Fund(s).

**C.     Defendants**

25.     Defendant State Street Bank is the trustee of the Plans. All money that employees contribute to the Plans is held in a trust fund, and State Street Bank is responsible for safekeeping of the funds. State Street Bank is also the investment manager for the Andover Plan, and provides investment management and custodial services to the Boeing Plan.

26.     Defendant State Street Bank is a registered financial holding company with its principal place of business in Boston, Massachusetts. During the Class Period, State Street Bank directly, or indirectly through one or more subsidiaries provided custodial banking and FX trading services to ERISA-covered benefit plans and for the Funds offered by ERISA-covered Plans, such as the Plans. One of the services provided by State Street Bank to its custodial clients was the execution of FX transactions, which allowed clients to purchase and sell foreign securities or to engage in foreign currency trades for other purposes.

7

27.     Defendant SSGM, formerly known as State Street Capital Markets, is similarly headquartered in Boston. SSGM is the "investment research and trading arm of State Street Corporation" and it provides trading in foreign exchange for its clients. SSGM provides specialized investment research and trading in foreign exchange, equities, fixed income, and derivatives to ERISA-covered benefit plans. During the Class Period, SSGM provided custodial banking and FX services to the Plans and members of the Class.

## IV.  CLASS ACTION ALLEGATIONS

28.     **Class Definition.** Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Andover Plan and the Boeing Plan, and the following class of persons similarly situated (the "Class"):

> All qualified ERISA plans, and the participants, beneficiaries, and named fiduciaries of those plans, that invested directly or indirectly in the State Street Bank commingled Funds, which includes the "International Equity Funds" identified in this complaint; or for which State Street Bank provided investment management or custodial services, that utilized SSGM's FX trading services, and suffered damages as a result of the deceptive acts and practices and other misconduct alleged herein, at any time between January 2, 1998 and the present. Excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officer, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such entity.

29.     **Numerosity.** The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of ERISA-covered benefit plans throughout the country offered the International Equity Funds and/or utilized State Street's trust or custodial services and that these plans collectively have tens of thousands of participants and beneficiaries.

30.     **Commonality.** The claims of Plaintiffs and the members of the Class have a common origin and share a common basis. The claims of all Class members originate from the same misconduct, breaches of duties, and violations of ERISA, perpetrated by Defendants.

Proceeding as a class is particularly appropriate here because the International Equity Funds are proprietary commingled funds that are held in collective trusts managed by State Street Bank, in which assets of every plan that invests in the International Equity Funds are pooled, and therefore, State Street's deceptive acts and practices and misconduct regarding its FX trading practices affected all plans that invested in the International Equity Funds in the same manner. Similarly, for the custodial clients, State Street's deceptive acts and practices concerning FX trading were perpetrated on a class-wide basis.

31. There are questions of law and fact common to the Class, including:

(a) Whether Defendants breached their fiduciary duties under ERISA by overcharging the Plans or Funds at issue in which the Plans invested, for their FX trading practices;

(b) Whether Defendants engaged in unfair and deceptive acts and practices in connection with FX transactions, so as to maximize their own profits at the expense of the Plans;

(c) Whether Defendants' self-interested FX transactions constituted prohibited transactions under ERISA;

(d) Whether Defendants pocketed the difference between the actual, market-based FX rates and the false FX rates reported and charged to the Plans and the International Equity Funds;

(e) Whether Defendant SSGM failed to provide complete and accurate information to plan sponsors, fiduciaries, and participants when they entered into the FX trading transactions on behalf of the Plans and the International Equity Funds;

(f) Whether Defendants' acts proximately caused losses to the Plans, and if so, the appropriate relief to which Plaintiffs, on behalf of the Plans and the Class are entitled;

32. **Typicality.** Plaintiffs are willing and prepared to serve the Court and the proposed Class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other members of the class.

33.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs are members of the Class described herein.

34.     The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

35.     A class action is superior to other available methods for the adjudication of this controversy. Individual litigation by all Class members would increase the delay and expense to the parties and the Court given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be more fair, efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

36.     **Adequacy.** The interests of the Plaintiffs are co-extensive with, and not antagonistic to, those of the absent Class members. Plaintiffs will undertake to represent and protect the interests of absent Class members. The undersigned counsel for Plaintiffs and the Class are experienced in class action, complex, and ERISA litigation, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and absent Class members.

37.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Compared to individual actions by each Class member, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

38.     **Rule 23(b)(1)(A) & (B) Requirements.** Class action status in this ERISA action is warranted under Federal Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the

interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

39.     **Rule 23(b)(2) Requirements.** Certification under 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

40.     **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## V.     SUBSTANTIVE ALLEGATIONS

**A.     The Nature of FX Trading Generally**

**1.     The Increasing Necessity of FX Trading in a Global Investment Portfolio**

41.     During the past decade, in order to meet their investment and funding objectives, U.S.-based institutional investors have found it increasingly necessary to enter the overseas securities markets and expand the global scope of their investment portfolios. The International Equity Funds offered by State Street to institutional investors, for example, generally invest the bulk of their assets in securities or stocks of companies whose headquarters and/or primary business is outside of the United States.

42.     Institutional investors that buy and sell foreign securities, such as State Street on behalf of the Plans and the other Class members, must engage in FX trading because the purchases, sales, dividends, and interest payments are all transacted in the currency of the nation in which the relevant securities exchange sits.

43.     If, for example, a U.S. investor wishes to buy shares of stock in a German company that trades on a German securities exchange, the investor must sell U.S. dollars and purchase euros in order buy those shares. Further, any cash dividends paid on that German stock will be denominated in euros. To "repatriate" those dividends, the investor must sell the euros

received and purchase dollars. Accordingly, FX transactions are the means for converting U.S. dollars into foreign currency and vice versa.

**2. How FX Trading Works**

44.    FX trading takes place around the world on a nearly 24-hour cycle, five-and-a half days a week. The official FX trading week begins at 7:00 a.m. New Zealand time on Monday, with each subsequent trading day ending at 5:00 p.m. New York City time.

45.    For each currency bought and sold during the course of the FX trading day, there will necessarily be a high trade and a low trade, with all other trades falling somewhere in between. This information is determined through trade data monitored and tracked by proprietary services such as, but not limited to, Electronic Brokerage System ("EBS") and Reuters.

46.    The difference between the low trade and the high trade is called the "range of the day." More precisely, the "spot range of the day" refers to FX rates as of a specific and prompt settlement date, usually two business days after the trade date. To more accurately measure the trade cost for FX transactions that settle prior to or later than the date for spot trades, participants in the FX market also look to the "forward-adjusted range of the day." Because FX trades do not always settle two days after the trade, the forward-adjusted range of the day is a more conservative and accurate measurement such that it takes into account the interest rate differential that exists at the time of trade between the trade date and settlement date for the underlying currencies.

47.    By way of example, assume 100 FX trades in euros-for-dollars (EUR-USD) during the course of one trading day. If the lowest rate trade occurred at $1.25 to buy €1.00, and the highest rate trade occurred at $1.35 to buy €1.00, the range of the day would be $1.25-$1.35.

48.    Another useful measure is the daily "mid-rate," which is simply the sum of the forward-adjusted daily high and forward-adjusted daily low, divided by two. This rate reflects the "average" FX rate in a given currency on a given day.

49.    The daily mid-rate is significant because of the absence of publicly accessible data showing the precise time of day at which FX trades occur (as exists with stock trading, for

example) and because State Street did not disclose such information to its clients. By looking at the mid-rate over a significant period of time, however, one can reasonably estimate the average FX trade cost on any given day. Over the course of a month or years, it is reasonable to expect FX trades to regress to the mid-rate. On any given day, some trades might settle above or below the daily mid-rate, but over increasingly lengthy periods of time, a significant number of FX trades can be expected to occur at or extremely close to the mid-rate.

**B.      Negotiated vs. Non-Negotiated FX Trades:  Trades for Custodial Clients**

50.      As set forth in the *Arkansas State Teacher Retirement System v. State Street Corp.*, No. 11-cv-10230 (MLW) (Apr. 15, 2011) complaint, State Street gave its custodial clients a choice with respect to the manner in which FX trades would be conducted. In a "negotiated," or "active," FX trade, a custodial client or its outside investment manager would personally communicate the trade information to a State Street FX trader. The State Street FX trader would then quote a rate, which would be accepted or rejected. If accepted, State Street would execute the FX trade at the agreed-upon price, which could include a modest mark-up.

51.      A "non-negotiated" or "standing-instruction" FX trade is essentially the opposite of a negotiated trade. There is no arm's-length negotiation of the price between the parties to the transaction. With non-negotiated or standing-instruction trades, custodial clients and their outside investment managers do not negotiate rates with State Street, and State Street does not quote rates. Instead, as the name "standing-instruction" suggests, custodial clients simply report the desired currency transaction to State Street, and trust and rely upon State Street, using "best execution" practices, to execute the trade on the client's behalf. According to its Investment Manager Guides, State Street referred to standing-instruction FX transactions as "Indirect Deals" between 2000 and May 2008, and "Institutional Investors FX Trading" between May 2008 and November 2009. Since November 2009, State Street has referred to such trading as "Custody FX."

52.      State Street's custodial clients reasonably expected that standing-instruction FX trades would have no mark-ups or fees. This was in view of, among other things, (a) the hefty

annual fees custodial clients paid State Street to serve as custodian over their assets, (b) the Custodian Contracts and associated fee schedules that gave no indication that standing-instruction FX trading would incur extra fees or mark ups, and did not authorize any such fees or mark-ups, and (c) State Street's Investment Manager Guides that assured custodial clients and outside investment managers that the price of FX trades was *"based on the market rates at the time the trade is executed."*

53.     Institutional investors typically requested that State Street and other custodians handle the smaller FX transactions, mostly the repatriation of dividend and interest payments, through standing instructions because the amount of each trade rarely justified the time and effort required for a negotiated trade.

**1.      Custodial Clients Relied Upon State Street's Expertise and Loyalty**

54.     Since at least 1998, State Street executed the majority of custodial client FX transactions for its accounts, including purchases and sales of U.S. and foreign currency as well as repatriations of dividends and interest payments into U.S. dollars.

55.     Custodial clients reposed a high degree of trust in State Street to execute standing-instruction FX transactions. In conducting these transactions, State Street occupied a superior position to its custodial clients due to its control over all aspects of the FX trade, including the timing of the trades, and most importantly, the price at which the trades were executed.

56.     Custodial clients depended upon State Street not only to execute the FX trades, but also to accurately and honestly report the FX rate and to carry out the trades in accordance with their custodial contracts, associated fee schedules, and guidelines as set forth in the Investment Manager Guides.

57.     Additionally, separate and apart from the custodial contracts and Investment Manager Guides, State Street's custodial clients had a reasonable expectation that the FX rates that State Street charged (or credited) on standing-instruction FX trades would accurately reflect the true rates of those FX trades. There is no reason a custodial client would expect its custodian bank—to which it was paying substantial annual fees for custodial services—to charge (or

14

credit) it in connection with standing-instruction FX trades at any rate other than the actual rate for the FX trade.

### 2. State Street's Custodial Contracts and Investment Manager Guidelines Were Predicated on No-Cost FX Trading

58.     State Street's form custodial contracts provided that State Street "shall be entitled to compensation for its services and expenses as Custodian" pursuant to "a written Fee Schedule between the parties."

59.     Custodial clients and State Street agreed to and executed a series of Fee Schedules covering the time period from 1998 to the present.

60.     The Fee Schedules either provided estimated annual fees or annual flat fees for State Street's services as a custodian.

61.     The Fee Schedules also set forth certain categories of ancillary services for which State Street was permitted to charge additional fees, including Wire Fees, Reporting Fees, Delivery Fees and Subcustody Fees.

62.     None of these particular ancillary service categories relate in any way to FX trading. The Custodian Contracts did not state that those ancillary fees relate to FX trading or that State Street would impose any fees in connection with FX trading.

63.     For one non-ERISA client, the Arkansas Teacher Retirement System ("ARTRS"), for more than a decade, its custodial contracts with State Street (a) expressly provided that standing-instruction FX trades would be executed free of charge; or (b) did not list FX transactions among the services for which it was permitted to charge an additional fee or any other cost above the annual flat fee.

64.     Upon information and belief, substantially similar terms were employed in the Custodial Contracts for other members of the ERISA Class during the Class Period.

65.     Additionally, during the Class Period, State Street provided Investment Manager Guides to custodial clients and outside investment managers that contained comprehensive information about State Street's custody practices and services, including procedural

15

requirements, costs, and features. The many services described therein included "State Street Foreign Exchange Transactions."

66.     During the Class Period, State Street issued no fewer than 15 distinct Investment Manager Guides, including those dated July 9, 2003; August 9, 2005; September 26, 2006; October 17, 2006; November 20, 2006; December 15, 2006; January 25, 2007; October 30, 2007; November 21, 2007; December 19, 2007; January 28, 2008; May 1, 2008; October 31, 2008; December 30, 2008; and January 23, 2009, to custodial clients and outside investment managers.

67.     State Street represented in each of these Investment Manager Guides that "State Street Foreign Exchange Transactions . . . are *priced based on the market rates at the time the trade is executed."* (Emphasis added.)

### 3.     State Street's Deceptive Scheme Overcharged Custodial Clients for Standing-Instruction FX Trades

68.     State Street's FX practices diverged from what the Custodial Contracts authorized and what the Investment Manager Guides represented. Despite assurances that FX transactions would be based on market rates, State Street reported and charged its custodial clients FX rates on standing-instruction trades far above what State Street actually paid for foreign currency (or far below what State Street actually received for sales of foreign currency)— oftentimes, at rates that actually fell *outside of the range of the day.*

69.     As such, unbeknownst to its custodial clients, State Street reported FX rates on standing-instruction trades to its clients that did not reflect the actual cost or proceeds of the FX transaction to State Street, and instead included a hidden and unauthorized mark-up. Put simply, State Street invented the FX rates it reported and charged (or credited) to its custodial clients. State Street paid or received one rate for FX, reported to its custodial clients another rate that was either higher (in the case of a purchase) or a lower (in the case of a sale), and pocketed the difference.

16

70.     When custodial clients or their agents requested that State Street execute an FX transaction, the request was routed electronically via State Street's Market Order Management System (MOMS) to a group of "risk traders" working at State Street's FX trading desk who then executed the FX trades by entering trade information that did not reflect the actual rate State Street paid or received.

71.     To illustrate the deception, assume again the example set forth above—100 euro-for-dollar trades on a given day that ranged from $1.25 to $1.35 (the "range of the day") to purchase €1.00, with a day's mid-rate of $1.30. On any, and all, standing-instruction euro-for-dollar trades on behalf of its custodian clients, State Street would have paid a rate between $1.25 and $1.35 for those euros, but reported to its clients that it paid more. State Street then would have charged its clients the false higher amount and kept the difference.

72.     This conclusion is supported by the analysis from non-ERISA custodial client ARTRS of ten years of FX transactions executed by State Street on behalf of and reported to ARTRS. Between January 3, 2000 and December 31, 2010, ARTRS had a total 10,784 FX transactions with reliable data. Among these 10,784 transactions, 4,216, or 39%, were non-negotiated, standing-instruction trades. These 4,216 FX trades had an aggregate trading volume exceeding $1.2 billion.

73.     In conducting the analysis, ARTRS found that its FX trades were logged and compared to other FX trades logged and tracked in a comprehensive database of more than 2 million buy-side currency trades. By comparing ARTRS's trades in certain currencies with the same currency pair trades in the database, one can estimate the trading cost of ARTRS's standing-instruction FX trades by State Street in relation to trades made worldwide. For purposes of this analysis, the trading cost is the difference between the day's mid-rate and the rate that State Street charged (or credited) to ARTRS for standing-instruction FX trades.

74.     State Street did not report to ARTRS (or any other ERISA-covered custodial client) the actual time of execution of any FX trade. Therefore, comparing the day's mid-rate to the standing instruction FX rates State Street charged (or credited) to ARTRS was the best

17

method of determining whether State Street charged (or credited) ARTRS a rate based on the actual market rate at the time of execution, as State Street represented it would do in its Investment Manager Guides.

75.     The analysis by ARTRS made clear that State Street derived its false FX rates by adding (on purchases) or subtracting (on sales) "basis points" or "pips" from the actual FX rate. A basis point, or pip, is a unit equal to 1/100th of a percentage point. For example, the smallest move the euro/dollar currency pair generally makes is 1/100th of a penny, or one basis point.

76.     For the period of January 3, 2000 through December 31, 2010, the FX rates that State Street reported and charged (or credited) to ARTRS on its 4,216 non-negotiated FX trades were, on average, *17.8 basis points* above or below the day's mid-rate. In other words, the FX rates that State Street reported and charged (or credited) to ARTRS for standing-instruction FX trades, on average and during this 10-year period, created a trading cost 17.8 basis points higher than the average FX rate (the day's mid-rate).

77.     By way of example, assume that the rate State Street actually paid to purchase €1.00 on a given day was $1.31551. If State Street charged ARTRS 17.8 basis points more than it paid, the rate would be $1.31729 ($1.31729 - $1.31551 = 0.00178). For a purchase of €10 million, the undisclosed profit to State Street on that single trade—and the concomitant unknown loss by ARTRS—would be $17,800. Accordingly, the difference in total trading costs between the actual and false rates can be very large.

78.     Tellingly, for the same 10-year period, the FX rates that State Street reported and charged (or credited) to ARTRS on its more than 6,500 *negotiated* FX trades added, on average, only *3.6 basis points* in trading costs as compared to the day's mid-rate. As such, while the FX trades executed by State Street pursuant to so-called "best execution" practices incurred trading costs of 17.8 basis points on average, the FX trades actively negotiated between State Street and ARTRS or its outside investment managers incurred trading costs of only 3.6 basis points on average.

79.     The false or fictitious nature of the FX rates State Street reported and charged (or credited) to ARTRS was further demonstrated when reviewing ARTRS's standing-instruction FX trades in the context of the forward-adjusted range of the day. Among ARTRS's 4,216 standing instruction FX trades, *2,217, or 53%, fell entirely outside the forward-adjusted range of the day.* These 2,217 FX trades, with a total volume exceeding $200 million, added trading costs on average of *64.4 basis points* over the day's mid-rate—an enormous hidden and unauthorized mark-up. For example, on a purchase of €10 million, an undisclosed fee of 64.4 basis points would result in a $64,400 profit to State Street on that single transaction alone.

80.     Rates consistently above (or below) the daily mid-rate alone demonstrate that State Street was not fulfilling its duties as a custodian by charging a hidden mark-up, and they demonstrate a violation of the terms of the custodial Contracts and the representations in the Investment Manager Guides. But when more than half of all standing-instruction FX trades for a particular custodial client fall *outside* the forward-adjusted range of the day, it becomes clear that those reported FX rates were not actual, market-based FX rates, but were instead fictitious and designed solely to gouge the custodial client and, in turn, its beneficiaries.

81.     There is no rational, honest basis for a professional FX market participant like State Street, or indeed any FX market participant, to charge an FX rate outside the forward adjusted range of the day without disclosing it. The day's range defines the range at which primary dealing banks and custodian banks transacted in FX during that trading day. The fictitious nature of rates assigned outside the forward-adjusted range of the day illustrates, perhaps most starkly, the unfair and deceptive nature of State Street's standing-instruction FX trading practices. In short, these practices were designed to enrich State Street while deceiving and unfairly depriving institutional clients such as ARTRS and State Street's other custodial clients of much-needed funds.

**4. For its Custodial Clients, State Street's Deceptive Acts and Practices Could Not Reasonably Be Detected.**

82.     No custodial client could have reasonably discovered State Street's deceptive acts and practices concerning FX trading during the Class Period. State Street executed hundreds if not thousands of FX trades on behalf of its custodial clients every month. The periodic reports State Street sent to clients showed only the rate that State Street charged for its FX trades. The reports did not include the range of the day, the daily midrate, or any indication of the time of the day that the trade was executed (known as "timestamps"). Accordingly, there was no way for custodial clients to reasonably determine, or even suspect, that State Street was secretly charging more than it actually paid for FX or was paying clients less than it actually received for FX.

83.     It was reasonable for custodial clients to presume that the prices reflected in the reports State Street provided to them were an accurate representation of the true cost of the FX trades. Custodial contracts provided that monthly reports of monies received or paid on behalf of the client would be given to the client. Accordingly, State Street had an affirmative obligation to report accurately the amount of money it was paying or receiving for FX.

84.     Furthermore, based on the Investment Manager Guides' assurance that FX rates would be "priced based on the market rates at the time the trade is executed," no custodial client had any reason to suspect that they were being charged (or credited) anything other the rate that State Street itself had paid or received on those standing-instruction FX transactions.

85.     Moreover, as alleged above, State Street occupied a position of trust and confidence with respect to its custodial clients. Those clients would not, and did not, suspect that the custodian in which that trust resided, would profit to a gross and undisclosed degree on the services for which they paid a handsome annual fee. Indeed, those custodial clients would, and did, presume that the custodian bank would act in and not against their best interests.

**C.    Events After October 2009 Begin to Shed Light on State Street's Deceptive FX Trading Practices**

86.     On October 20, 2009, the Attorney General of California filed a Complaint in Intervention for violation of the California False Claims Act, Cal. Gov. Code § 12651, charging

State Street with misappropriating more than $56 million from the accounts of California's two largest pension plans—CalPERS and CalSTRS—over a multi-year period in connection with the same unfair and deceptive FX practices alleged herein. *People of the State of Cal. ex rel. Brown v. State Street Corp.*, No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento County Oct. 20, 2009).

87. The California Attorney General alleged that State Street reported inflated FX rates when buying foreign securities for CalPERS and CalSTRS, reported deflated FX rates when selling foreign securities for them, and pocketed the difference between the reported and actual rates. The Attorney General further alleged that State Street hid its wrongful conduct by entering incorrect FX exchange rates into State Street's electronic FX trading systems and providing false records to CalPERS and CalSTRS.

88. The California Attorney General's allegations of undisclosed "mark-ups" were based in part on the sworn testimony of a former State Street Bank employee who worked on the same trading floor as the State Street Bank and SSGM foreign exchange traders and who overheard how State Street Bank or SSGM foreign exchange traders were marking up FX trade prices. This trader, in sworn testimony, described the practices of State Street Bank's FX traders as a "totally unethical thing to do" and said that the FX Traders' practices were not within the "industry standard." *People of the State of Cal. ex rel Brown v. State Street*, No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento County Jan. 31, 2012) (Declaration of Kenny V. Nguyen).

89. In the months that followed, State Street dramatically changed its FX trading policies and disclosures and so informed its custodial clients. Under these new policies, State Street admitted for the first time that it had systematically imposed additional charges for FX trading. For example, in an excerpt from an updated Investment Manager Guide dated November 20, 2009, State Street advised custodial clients that it would post on its website, my.statestreet.com, "current mark-ups and mark-downs used by State Street Global Markets for [standing-instruction] foreign exchange transaction requests."

21

90.     In a similar message sent to custodial clients such as ARTRS, State Street admitted that **"[s]ince December 2009**, State Street has provided to all of its custody clients and their investment managers via our dedicated client portal, my.statestreet.com, comprehensive disclosure of the pricing and execution methodology (including the maximum mark-up or mark-down that may be applied) for each of its Indirect [standing-instruction] FX Services." (Emphasis added.) State Street added that "on the day after a trade is executed, State Street provides for each currency pair the reference interbank rates and the times at which they are obtained, the actual rates, the daily high/low range at the time of pricing (where applicable) and the actual mark-up or markdown that was applied."

91.     State Street thus altered its practices to allow custodial clients more complete access to FX trading data only after its deceptive acts and practices began to be revealed. State Street's late disclosure that it charged mark-ups and mark-downs on standing-instruction FX trades contradicts its previous repeated assurances that FX rates would be based on market rates at the time the trade is executed.

92.     According to a study conducted by an independent FX analyst after the California *qui tam* complaint was unsealed and State Street altered its FX policies, the cost of standing instruction FX trades dropped by a remarkable **63%.** The study analyzed 498,940 FX spot and forward trades (196,280 standing-instruction trades and 302,660 negotiated trades) executed during 2000-2010, and found that investors who had their custodian banks, including State Street, execute FX trades on a standing-instruction basis during 2010 saw an overall 63% drop in trading costs from their average trading costs for the years 2000-2009.

**D.      FX Trading and State Street's Commingled ERISA Fund Clients**

**1.      The Plaintiffs' Plans**

93.     The Andover Plan and the Boeing Plan are "employee pension benefit plans" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

94.     Defendants provide FX trading services similar to those provided to the Andover Plan and the Boeing Plan to other similarly situated Plans, either directly as a plan custodian, or trustee, or indirectly as investment manager for the commingled Funds in which the Plans invest.

95.     There are two types of ERISA-covered pension plans: defined benefit plans and defined contribution plans. Both types of plans have found it necessary and prudent to expand their investments to include exposure to foreign markets. Accordingly, defined benefit plans have expanded international holdings, and defined contribution plans frequently include at least one, if not several, international investment options.

96.     ERISA-covered plans regularly purchase and sell foreign securities in order to increase diversification and take advantage of opportunities for higher returns. Retirement plans that invest in foreign securities receive principal, dividends, and interest that are paid in foreign currencies, or participate in other investments that require the exchange of foreign currency into and from US Dollars ("USD"), either directly or through participation in the commingled Funds. As a result, the purchase and sale of currencies incidental to a foreign securities transaction is vital to a plan's participation in international securities markets and to the acquisition, holding, and disposition of foreign securities.

97.     State Street served as trustee and investment manager for the Andover Plan. Beginning in 2001, the Andover Plan offered participants the option to invest in certain International Equity Funds, including the International Growth Opportunities Securities Lending Class A Fund, and the SSgA Daily International Alpha Select Fund. These International Equity Funds held foreign securities and would have been, directly, or indirectly, party to FX transactions executed by SSGM pursuant to instructions from State Street Bank. Neither of these Funds could have been operated without FX transactions, whether or not these transactions were executed at the fund level or at the brokerage level. State Street Bank, as the investment manager and fiduciary for these commingled funds, was ultimately responsible for the funds' FX transactions undertaken by SSGM.

98.     State Street served as trustee and investment manager for the Boeing Plan. The Boeing Plan offered participants the option to invest in certain International Equity Funds, including the International Index Fund. This International Equity Fund sought to provide long-term total return, and attempted to match the Morgan Stanley Capital International All Country World Investable Market Index. This is an index composed of global developed and emerging countries outside the U.S. The fund seeks to achieve its goal by investing in a wide variety of international equity securities issued throughout the world, excluding the U.S. The foreign-held securities in this fund would have been, directly, or indirectly, party to FX transactions executed by SSGM pursuant to instructions from State Street. This commingled investment fund could not have been operated without FX transactions, whether or not these transactions were executed at the fund level or at the brokerage level. State Street Bank, as the investment manager and fiduciary for this commingled fund, was ultimately responsible for the fund's FX transactions.

### 2.     Defendants' Fiduciary Status

99.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S. C. § 1002(21)(A)(i).

100.     Under ERISA, an investment manager is a fiduciary. ERISA defines investment manager as:

> (38) any fiduciary (other than a trustee or named fiduciary, as defined in section 1102 (a)(2) of this title)—
>
> (A) who has the power to manage, acquire, or dispose of any asset of a plan;
>
> (B) who

(i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.];

(ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b–3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

(iii) is a bank, as defined in that Act; or

(iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

Section 3(38), 29 U.S.C. § 1002(38).

101.    Here, State Street served as the Investment Manager for the International Equity Funds in Plaintiffs' Plans and, upon information and belief, hundreds of other plans as well. In this capacity, State Street was responsible for prudently and loyally managing the assets that were invested in the International Equity Funds, and authorizing, reviewing and controlling the coduct of any State Street Affiliate or representative engaging in activities affecting the value or performance of the Funds for which State Street served as Investment Manager.

102.    State Street expressly acknowledges its status as Investment Manager in the Plan documents for the Andover Plan, including the Plan's December 31, 2006 and June 30, 2007 Fact Sheets.

103.    Upon information and belief, State Street has similarly acknowledged its fiduciary status as Investment Manager for the commingled Funds for all other ERISA-covered Plans that offer the International Equity Funds as an investment option for participants' retirement savings.

104.    Upon information and belied, all of the commingled Funds which invested in foreign securities suffered from the same inaccurate FX pricing described in the California qui

tam complaint, the California Attorney General complaint-in-intervention, and the ARTRS complaint for standing-instruction FX trades.

105.　Under ERISA, investments in commingled Funds are subject to a "look-through" rule, pursuant to which, the "plan assets" of an ERISA-covered plan include both its undivided "equity interest [in the entity] and an undivided interest in each of the underlying assets of the entity …". 29 C.F.R. § 2510.3-101(a)(2); *see also* ERISA § 3(42), 29 C.F.R. § 1002(42) (authority of Secretary of Labor to define term "plan assets" by regulation). Specifically, when a Plan acquires or holds an interest in a commingled Fund, "its assets include its investment and an undivided interest in each of the underlying assets of the entity." *Id.* § 2510.3-101(h)(1).

106.　"[A]ny person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect) is a fiduciary of the investing plan." *Id.* § 2510.3-101(a).

107.　As the sponsor and investment manager for the commingled Funds, State Street Bank exercised authority and control with respect to the management or disposition of the Plans' assets. Accordingly, State Street Bank was a fiduciary of each and every ERISA Plan which invested in the commingled Funds, including the Plaintiffs' Plans and the Plans of the putative class members with respect to the underlying assets of each and every State Street Bank-sponsored commingled Fund.

108.　As trustee for certain of the commingled Funds, State Street Bank was authorized to convert any monies into currency through foreign exchange transactions and was responsible for ensuring that these transactions were within the bounds of State Street Bank's fiduciary responsibilities and the limitations of ERISA.

109.　State Street Bank and SSGM also functioned as fiduciaries to the Plans and the Class by acting as trustee and investment manager for the Andover Plan and the Boeing Plan, and for the commingled Funds, and by exercising authority and control over the Plans' assets.

110.     Upon information and belief, SSGM provided brokerage services to the Funds, that is, the purchase and sale of foreign securities to the commingled investment funds. To the extent that the Funds settled such purchases and sales in U.S. Dollars, the commingled Funds did not engage directly in FX trading in connection with the purchase or sale of foreign securities, but they did engage in FX trading indirectly when SSGM executed a purchase or sale of a foreign security in foreign currency and then converted the transaction to a U.S. Dollar-denominated transaction for purposes of settlement with the commingled Funds.

111.     SSGM also served as a conduit for the repatriation of dividend, principal, and interest payments by issuers of foreign securities and for receipt of proceeds of sales of foreign securities, and engaged in FX transactions in order to remit such payments to the commingled Funds in U.S. Dollars.

112.     SSGM, in serving as a broker for the Plans' accounts also was bound to act in the customer's interest when transacting such business for the account, and therefore, had the duty not to misrepresent any fact material to the transaction, and to disclose adequate information to the fiduciaries of the Plans, and in the course of that transaction did not have a general fiduciary duty, but did have a limited transactional fiduciary duty to the Plans as a broker. In its role as State Street Bank's affiliate, SSGM was responsible for setting the exchange rates on FX transactions and executing those transactions. This process created the excessive spread between the marked-up FX exchange rates charged to custodial ERISA plan clients and the marked-down FX exchange rates used to process repatriation of principal, dividends, and interest paid in foreign currencies, and other FX transactions.

113.     SSGM's conversion of foreign currency to U.S. dollars constituted the exercise of authority or control respecting the management or disposition of the underlying assets of the commingled investment funds and, therefore, of assets of the ERISA Plans, within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(1), and 29 C.F.R. § 2510.3-101(a). Accordingly, State Street Bank and SSGM were functional fiduciaries of the ERISA Plans.

**E.     State Street's FX trades were prohibited transactions under ERISA and corresponding federal regulations.**

114.    ERISA § 406(a), 29 U.S.C. §1106(a), prohibits transactions between a plan and a party in interest; this broad prohibition is subject to numerous exemptions to allow the normal course of business with regard to investment management. Foreign currency exchanges between an employee benefit plan and a bank or a broker-dealer or an affiliate thereof which is a party in interest with respect to such plans are exempted from the prohibition provided they meet certain conditions. First, the terms of the transaction must not be less favorable to the plan than the terms generally available in comparable arm's-length foreign exchange transactions between parties; second, neither the bank, the broker-dealer, nor any affiliate thereof may have any discretionary authority or control with respect to the investment of the plan assets involved in the transaction. Prohibited Transaction Exemption 94-20, 59 Fed. Reg. 8022-02 (February 17, 1994). Prohibited Transaction Exemption ("PTE") 94-20 also required that any such transaction be directed by a fiduciary independent of the bank, broker-dealer, or any affiliate. PTE 98-54 modified this requirement to allow such transactions to occur pursuant to "standing instructions," authorized in writing by the independent fiduciary. Prohibited Transaction Exemption 98-54, 63 Fed. Reg. 63503-63510 (November 13, 1998). The requirements that the transactions be at arm's-length and that the bank, broker-dealer, or affiliate thereof not have any investment discretion with respect to the transaction are codified at 29 U.S.C. § 1108(b)(18) (effective August 17, 2006).

115.    State Street Bank and SSGM are "affiliates" within the meaning of the Prohibited Transaction Exemption and they directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with each other.

116.    Notwithstanding any standing instructions or written authorization by the Plans, State Street did not meet the requirements for the foreign exchange exemption, because the transactions were in fact consistently less favorable to the Plans than the terms generally available in comparable arm's-length foreign exchange transactions between parties, and because State Street exercised discretionary authority and control over the investments and plan assets

involved in the transactions. Thus, State Street's FX trades do not fall under PTE 94-20 or under PTE 98-54.

117.    Furthermore, ERISA § 406(b), 29 U.S.C. § 1106(b), prohibits transactions between a plan and a fiduciary that amount to self-dealing.[2]  Plaintiffs allege that State Street's FX trading practices amounted to self-dealing because State Street consistently negotiated rates, or charged rates for the FX transactions that were favorable to State Street, and unfavorable to its fiduciary clients, and State Street thus had a conflict of interest with regard to its FX trading practices for Plaintiffs and other class members.

## COUNT I

### Breach of Duties of Prudence and Loyalty

### (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by State Street Bank)

118.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

119.    Defendant State Street Bank is an "investment manager" within the meaning of ERISA section 3(38), 29 U.S.C. § 1002(38), because it (i) has the power to manage, acquire, or dispose of plan assets placed in its custody; (ii) is a bank within the meaning of the Investment Advisers Act of 1940; and (iii) has acknowledged in writing that it is a fiduciary with respect to the Plans.

120.    As an investment manager, State Street Bank is a fiduciary under ERISA and bound by the duties of prudence and loyalty laid out in ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1). These duties mean that as a broker for the Plaintiffs' Plans, State Street Bank is bound to act in the customer's interest when transacting business for the account, and thus

---

[2] 29 U.S.C. §1106 (b) Transactions between plan and fiduciary
A fiduciary with respect to a plan shall not—
(1) deal with the assets of the plan in his own interest or for his own account,
(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

bound, for example, to disclose fully to the Plans all the details of the relevant FX trading transactions it was undertaking for the account.

121.    State Street Bank has breached its ERISA fiduciary duties of prudence and loyalty because it knew or should have known that SSGM has been charging the Plans (or the commingled Funds in which the Plans invested) rates for FX trading that were unfavorable or unreasonable, above the market rates, and/or in excess of what SSGM had agreed to charge, but did not ensure, by negotiation or otherwise, that SSGM's rates were reasonable, at or above the market rate, and/or not in excess of what SSGM had agreed to charge.

122.    These breaches of fiduciary duty involved assets of the Plans on which fees were levied by State Street Bank or SSGM.

123.    Section 409(a) of ERISA, 29 U.S.C. § 1109(a), imposes liability on State Street Bank for these breaches and requires State Street Bank to make good to the Plans the losses resulting from its breaches.

124.    To enforce the relief available under section 409(a), 29 U.S.C. § 1109(a), Plaintiffs assert this claim against State Street Bank under ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2).

125.    Further, pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), State Street Bank must provide other appropriate equitable relief to redress its breaches of duty and enforce its fiduciary duties.

## COUNT II

### Breach of Duties of Prudence and Loyalty

### (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by SSGM)

126.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

127.    SSGM is a fiduciary under ERISA section 3(21)(A), 29 U.S.C. § 1002, with respect to the Plans because it exercises authority or control respecting management or disposition of the Plans' assets.

128.     As a fiduciary, SSGM is bound by the duties of prudence and loyalty laid out in ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1).

129.     SSGM has breached these duties or prudence and loyalty by charging the Plans (or the commingled Funds in which the Plans invested) fees for FX trading that were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge.

130.     These breaches of fiduciary duty involved assets of the Plans over which SSGM had authority or control.

131.     Section 409(a) of ERISA, 29 U.S.C. § 1109(a), imposes liability on SSGM for these breaches and requires SSGM to make good to the Plans the losses resulting from its breaches.

132.     To enforce the relief available under section 409(a), 29 U.S.C. § 1109(a), Plaintiffs assert this claim against SSGM under ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2).

133.     Further, pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), SSGM must provide other appropriate equitable relief to redress its breaches of duty and enforce its fiduciary duties.

### COUNT III

### Prohibited Transactions

### (Violations of § 406(a)(1)(C)-(D) of ERISA, 29 U.S.C. § 1106(a)(1)(C)-(D) by State Street Bank and SSGM)

134.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

135.     ERISA section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that the transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

136.     ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that the transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

137.     As noted above, State Street Bank is a fiduciary with respect to the Plans.

138.     SSGM is a "party in interest" within the meaning of ERISA section 3(14), 29 U.S.C. § 1002(14), for at least two independently sufficient reasons: it is a fiduciary with respect to the Plans, and it is a person providing services to the Plans.

139.     By allowing SSGM to charge the Plans (or the commingled Funds in which the Plans invested) fees for FX trading that were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge—and by doing so when it knew or should have known that SSGM was charging the Plans such fees—State Street Bank violated ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D). Further, by charging such fees, SSGM violated ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D).

140.     While ERISA section 408(b)(2), 29 U.S.C. § 1108(b)(2), provides an exemption from the prohibitions of ERISA section 406(a), 29 U.S.C. § 1106(a), for contracting or making reasonable arrangements with a party in interest for, *inter alia*, services necessary for the establishment or operation of the plan, that exemption is only met if no more than reasonable compensation is paid. Here, that exemption does not apply because the fees charged by SSGM were unfavorable or unreasonable and/or above market rates.

141.     While there is another exemption from the prohibitions of ERISA section 406(a), 29 U.S.C. § 1106(a), for foreign currency exchanges between an employee benefit plan and a bank or a broker-dealer or an affiliate thereof which is a party in interest with respect to a plan, that exemption does not apply here for two independently sufficient reasons: because (1) the terms of the transactions were less favorable to the Plans than the terms generally available in comparable arm's-length foreign exchange transactions; and (2) SSGM had discretionary authority or control with respect to the investment of plan assets.

142.     Pursuant to ERISA section 502(a)(2) and (a)(3), 29 U.S.C. § 1132(a)(2) & (a)(3), State Street Bank and SSGM are liable to restore the losses to the Plan and provide other appropriate equitable relief.

## COUNT IV

### (Co-Fiduciary Liability, against SSGM and State Street Bank)

143.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

144.     As alleged above, SSGM and State Street Bank are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty and prudence.

145.     ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (1) he or she knows of such a breach and fails to remedy it, (2) knowingly participates in a breach, or (3) enables a breach. The Co-Fiduciary Defendants breached all three of these provisions.

146.     State Street Bank and SSGM knew of the breaches of the other party because upon information and belief, the two entities work closely together, and State Street Bank knew that SSGM was not providing full disclosure in its role as a broker for the FX transactions.

147.     Neither State Street Bank nor SSGM undertook any efforts to halt or alter the fees being charged by SSGM by the commingled Funds, or more fully negotiate those fees.

148.     State Street Bank and SSGM knowingly participated in the breaches of the other party because they continued to engage in the transactions over a course of years, were fully aware that full disclosure had not been made to the Plan sponsors, fiduciaries or participants regarding the FX trading rates their Funds were being charged and the fact that those rates were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge.

149.     State Street Bank and SSGM enabled the other party's breach because they were fully aware that full disclosure had not been made to the Plan sponsors, fiduciaries or participants regarding the rates their funds were being charged for FX trading and the fact that those rates were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge.

150.     Pursuant to ERISA § 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT V

## (Violations of § 406(a)(1)(C)-(D) of ERISA, 29 U.S.C. § 1106(a)(1)(C)-(D) by SSGM, alleged in the alternative)

151.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

152.     As alleged above, SSGM was a party in interest under ERISA.

153.     As alleged above, SSGM violated ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D).

154.     Even if SSGM were not a fiduciary, SSGM would still be liable under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), to provide appropriate equitable relief due to its violations of ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D).

## COUNT VI

## (Knowing participation in a breach of fiduciary duty by SSGM, alleged in the alternative)

155.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

156.     Even if SSGM were not a fiduciary, SSGM knowingly participated in State Street Bank's breach of its fiduciary duties to the Plans, as alleged in Count I.

157. As a sophisticated financial institution, SSGM fully understood the duties that fiduciaries such as State Street Bank have under ERISA.

158. Despite this understanding, SSGM participated in—indeed, was the *cause* of—State Street Bank's violation of its fiduciary duties as alleged in Count I.

159. Under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), the Plans are entitled to equitable restitution from SSGM with respect to the excess amounts paid to it by the Plans, as well as other appropriate equitable relief.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1. Declare that the Defendants have violated ERISA's prohibited transactions provisions;

2. Declare that the Defendants breached their fiduciary duties under ERISA;

3. Issue an order compelling a proper accounting of the foreign exchange transactions in which the Plans and the Funds have engaged;

4. Issue an order compelling Defendants to restore all losses caused to the Plans (or that will be caused to the Plans after the filing of this Complaint);

5. Issue an order compelling the Defendants to disgorge all fees paid and incurred to Defendants (or that will be paid or incurred by the Plans after the filing of this Complaint), including any profits thereon;

6. Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

7. Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as custodians to the Plans;

8. That this action be certified as a class action and that each Class be designated to receive the amounts restored to the Plans by Defendants and a constructive trust be established for distribution to the extent required by law;

9.      Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

10.     Award Plaintiffs their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

11.     Award such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs hereby demand a jury on all issues so triable.


Dated: September 12, 2012


**HUTCHINGS, BARSAMIAN,
MANDELCORN & ZEYTOONIAN, LLP**

By: s/ Theodore M. Hess-Mahan
        Theodore M. Hess-Mahan, Esq. BBO #
        110 Cedar Street, Suite 250
        Wellesley Hills, MA 02481
        Telephone: 781-431-2231
        Facsimile: 781-431-8726
        *thess-mahan@hutchingsbarsamian.com*

**KELLER ROHRBACK, L.L.P.**
        Lynn Lincoln Sarko (*pro hac vice pending*)
        Derek W. Loeser (*pro hac vice pending*)
        Laura R. Gerber (*pro hac vice pending*)
        1201 3rd Avenue, Suite 3200
        Seattle, WA 98101
        Telephone: 206-623-1900
        Facsimile: 206-623-8986
        *lsarko@kellerrohrback.com*
        *dloeser@kellerrohrback.com*
        *lgerber@kellerrohrback.com*

        ***Counsel for Plaintiffs***

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| The Andover Companies Employee Savings and Profit Sharing Plan on behalf of itself, and James Pehoushek-Stangeland, and all others similarly situated, | ) ) ) ) | No. 1: 12-cv-11698 MLW |
| Plaintiffs, | ) ) | **DEMAND FOR JURY TRIAL** |
| vs. | ) ) | |
| State Street Bank and Trust Company, | ) ) | |
| Defendant. | ) | |

# PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT

## Table of Contents

I.     INTRODUCTION ................................................................................. 1

II.    JURISDICTION AND VENUE ......................................................... 4

III.   PARTIES ............................................................................................ 5

    A.    Plaintiff Alan Kober.............................................................. 5

    B.    Plaintiff James Pehoushek-Stangeland ............................... 6

    C.    Defendant State Street Bank and Trust Company ............... 7

IV.   SUBSTANTIVE ALLEGATIONS ................................................... 8

    A.    Foreign Exchange Trading is Essential to Plaintiffs' Ability to Meet Their Retirement Plan Investment Needs ................................... 8

        1.    The Necessity of FX Trading in a Global Investment Portfolio ................................................................. 8

        2.    How FX Trading Works ........................................... 9

        3.    Negotiated vs. Non-Negotiated FX Trades............. 10

    B.    State Street's Provision of FX Trades to its Custodial Clients ........................... 10

        1.    State Street's Clients Relied Upon State Street's Expertise and Loyalty ............................................... 11

        2.    State Street's Custodial Contracts and Investment Manager Guidelines Were Predicated on No-Cost FX Trading ........................... 11

        3.    State Street's Deceptive Scheme Overcharged Clients for Non-Negotiated FX Trades................................... 13

        4.    State Street's Deceptive Acts and Practices Could Not Reasonably Be Detected. ......................................... 17

    C.    Events After October 2009 Begin to Shed Light on State Street's Deceptive FX Trading Practices ................................................................. 17

    D.    Facts Bearing on Fiduciary Breach for State Street's ERISA Clients .......................................................... 22

    E.    Defendant's Fiduciary Status under ERISA ...................... 24

        1.    The Nature of Fiduciary Status. ............................. 24

        2.    Defendant State Street's Fiduciary Status............... 25

    F.    The Relevant Law ............................................................... 27

        1.      Fiduciary Duties under ERISA ................................................................. 27

        2.      Prohibited Transactions under ERISA ...................................................... 28

            a.      ERISA § 406(b) is an absolute bar against self-
                  dealing ........................................................................................ 28

            b.      ERISA § 406(a) prohibits party-in-interest
                  transactions ................................................................................. 29

            c.      Foreign currency exchange exemptions ...................................... 29

        3.      Civil Remedies under ERISA ................................................................. 31

V.      CLASS ACTION ALLEGATIONS ............................................................. 32

VI.     CAUSES OF ACTION ................................................................................. 35

VII.    PRAYER FOR RELIEF ............................................................................... 39

This is a classic case of self-dealing. The ERISA-qualified retirement plans of Plaintiffs suffered losses because Defendant State Street Bank and Trust Company did not prudently safeguard their assets, instead permitting its currency traders to pilfer plan assets by improperly marking up and marking down foreign currency trades. This self-dealing occurred whenever State Street needed to exchange currency on behalf of the plans. Rather than seek the best price for the plans' foreign currency exchange transactions—or even the actual market rate—State Street used one of its divisions, State Street Global Markets, to execute the foreign currency exchange trades to benefit its own accounts. In executing these trades, Global Markets did not charge the plans what the transaction cost. Nor did Global Markets charge a rate based on the cost of the transaction. Instead, Global Markets systematically priced the trades based on the worst price of the trading day, and pocketed profits at the plans' expense. State Street manipulated the currency transactions to the plans' detriment despite its duty as a fiduciary under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA") to protect the plans' assets. Because this practice was widespread and uniform, it forms the basis for claims on behalf of a class of ERISA Plans ("the Plans"). This lawsuit seeks to recover the losses the Plans suffered as a result of State Street's self-dealing.

## I.   INTRODUCTION

1.      Plaintiffs' allegations are based on personal knowledge as to themselves and their own acts, and on information and belief and the investigation of counsel as to all other matters.[1]

2.      Plaintiffs are Alan Kober, a trustee and fiduciary for The Andover Companies Employees' Savings and Profit Sharing Plan, and James Pehoushek-Stangeland, a participant in The Boeing Company Voluntary Investment Plan. Plaintiffs trusted State Street Bank with their

---

[1] Counsel's investigation included review of: (i) plan documents, (ii) publicly available data and news articles, and (iii) review of the pleadings and documents on file in *Hill v. State St. Corp.*, No. 09-12146 (D. Mass.); *Demory v. State St. Corp.*, No. 10-10064 (D. Mass.); *Richard v. State St. Corp.*, No. 10-10184 (D. Mass.); *Ark. Teacher Ret. Sys. v. State St. Corp.*, No. 11-10230 (D. Mass.);; *Henriquez v. State St. Bank & Trust Co.*, No. 11-12049 (D. Mass.); *State of Cal. v. State St. Corp.*, No. 08-08457 (Cal. Sup. Ct. Sacramento Cnty.); and *People of Cal. v. State St. Corp.*, No. 08-8457 (Cal. Sup. Ct. Sacramento Cnty.).

retirement savings and suffered losses as a result of State Street's self-dealing FX trading scheme.

3.      Defendant State Street Bank and Trust Company's ("State Street Bank" or "State Street") undertook self-dealing and imprudent management of Plaintiffs' ERISA-covered funds in two ways. Some of the Plans offered their participants investment options that included State Street Bank-sponsored commingled funds—that is, pools of assets created and aggregated by State Street Bank for a number of different investors and plans—that required foreign currency ("FX") trades, while other defined benefit Plans hired State Street to serve as custodian to undertake FX trades of plan assets. In either circumstance, the self-dealing and imprudent management by State Street violates ERISA.

4.      For both defined contribution and defined benefit Plans, State Street was an ERISA fiduciary. State Street was an ERISA fiduciary because it served as the trustee and investment manager to the Plans and commingled funds through its State Street Global Advisors ("SSgA") division, and as the investment manager it exercised discretionary control over Plan assets. One example of State Street's discretionary control is that as investment manager for the commingled funds SSgA negotiated or contracted with State Street Global Markets ("Global Markets") to execute FX transactions to facilitate purchases or sales of foreign securities for the funds, or to repatriate profits made abroad.

5.      State Street was also an ERISA fiduciary in its provision of trustee and custodian services. In serving as trustee and custodian to the defined benefit and defined contribution Plans, State Street acted as more than a "plain vanilla" custodian of assets—that is, it did more than perform administrative and ministerial duties. Instead, Global Markets took control of Plan assets and exercised discretion when it entered into FX transactions on behalf of the Plans. Rather than simply executing FX transactions according to market rates at the time requests were received, Global Markets utilized its control over Plan assets and the FX process to impose unauthorized, undisclosed mark-ups or mark-downs on the rates for the FX transactions and pocketed the difference. In so doing, it was a functional ERISA fiduciary.

6.     As a custodial bank, State Street Bank holds securities on behalf of investors. Clients hire custodians to do several things, including: safeguard and record movement of assets; arrange settlement of all purchases and sales; and maintain and manage all cash transactions, including FX transactions. Custodians are typically used by investors who do not wish to leave securities on deposit with their broker-dealers or investment managers. By separating the duties of investment manager and custodian, an investor—at least in theory—reduces the risk of fraud or other misconduct.

7.     As of September 2012, State Street held approximately $23.44 trillion in assets under custody and administration, making it one of the largest providers of custodial services in the world. In fact, as of December 31, 2011, State Street's SSgA division was the largest manager of institutional assets worldwide, the largest manager of assets for tax-exempt organizations (primarily pension and retirement plans) in the U.S., and the third largest investment manager in the world. State Street charged Plaintiffs and the Plans in the putative class hundreds of millions of dollars a year in fees for custodial and investment management services. A significant amount of State Street's revenue, however, was comprised of ill-gotten gains from self-dealing FX transactions.

8.     Under ERISA, Plaintiffs may recover losses and obtain equitable relief on behalf of the Plans and all others similarly situated. ERISA demands that State Street act prudently and solely in the interest of those who, like Plaintiffs, have invested money in accounts covered by ERISA. This duty to act prudently and solely in the interest of Plaintiffs and others is a fiduciary duty, and fiduciary duties are among the strongest in the law.

9.     ERISA also creates strict liability for certain types of prohibited transactions, such as State Street's self-dealing in charging unauthorized mark-ups and mark-downs to the Plans on the FX trades through its Global Market division, and then pocketing the difference. The undisclosed mark-ups and mark-downs were not for the exclusive benefit of the Plans or their participants and beneficiaries, but rather benefitted State Street Bank.

3

10.     Despite its legal obligations to Plaintiffs, State Street has undertaken an unfair and deceptive practice from at least 1998-2009 (hereinafter, "Class Period"). Namely, State Street Bank has overseen and been responsible for the FX transaction practices described herein. These transactions were undertaken behind a veil of secrecy that allowed State Street to make exorbitant and undisclosed profits at the direct expense of the Plans. State Street charged the Plans marked-up FX rates when buying foreign currency on their behalf, and marked-down FX rates when selling foreign currency for the Plans, and in both cases pocketed the difference. State Street charged the Plans and the Proposed Class fictitious FX rates unrelated to the market-based rates State Street was actually paying.

11.     The Plaintiffs, the Plans, and other Class members could not have detected State Street's deception. For the commingled funds, the transaction was conducted between two internal State Street divisions (SSgA and Global Markets) and was not reported on the fund fact sheets or otherwise reported to Plan sponsors. While State Street's custodial clients may have received a report of the rates that they were charged, without receiving a corollary report showing the range of actual trades for the currency pairs at issue, they could not detect that they were being charged hidden and unauthorized mark-ups (or mark-downs) on their FX trades.

12.     State Street's unfair and deceptive FX trading practices generated hundreds of millions of dollars in profits annually for State Street—money that should have gone to Plaintiffs and the Proposed Class.

13.     Plaintiffs bring this class action on behalf of all similarly affected ERISA clients of State Street during the Class Period, to recover the proceeds State Street reaped from Class members through its unfair and deceptive FX trading practices.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1331 and 29 U.S.C. section 1132(e)(1). Plaintiffs' claims are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

15.     Venue is proper in this district pursuant to 29 U.S.C. section 1132(e)(2).

## III.   PARTIES

**A.   Plaintiff Alan Kober**

16.     Plaintiff Alan Kober is an Individual Trustee of The Andover Companies Employees' Savings and Profit Sharing Plan (the "Andover Plan"). In this capacity, Mr. Kober is a Plan fiduciary with standing to bring claims for breach of fiduciary duty on behalf of the Plan pursuant to ERISA sections 409 and 502(a)(2).

17.     Merrimack Mutual Fire Insurance Company ("Merrimack Mutual") is the designated Plan Administrator for the Andover Plan. The Andover Plan is an ERISA-qualified defined contribution plan established for the benefit of the employees of Merrimack Mutual and its sister companies, Cambridge Mutual Fire Insurance Company, and Bay State Insurance Company, which, together with Merrimack Mutual, comprise the Andover Companies ("Andover Companies").

18.     During the Class Period, the Andover Plan offered participants investments in several SSgA-sponsored commingled funds, including international equity funds such as State Street's International Growth Opportunities Securities Lending Class A Fund, and the SSgA Daily International Alpha Select fund.

19.     By contract, State Street Bank served as both the Trustee for the Andover Plan and as an ERISA fiduciary and Investment Manager for the Andover Companies Plan investments from 2001 through approximately 2009.

20.     As trustee for the Andover Plan, State Street Bank was required to exercise power and authority over the investment accounts for which it had express investment management discretion, or upon the direction of the Investment Manager. Pursuant to section 4.1(o) of the Master Trust Agreement, the investment power of the trustee included the power to "purchase and sell foreign exchange and contracts for foreign exchange, including transactions entered into with State Street Bank and Trust Company, its agents or its subcustodians."

21.     By separate contract, State Street Bank served as investment manager for the Andover Plan's assets invested in State Street's proprietary commingled funds. Pursuant to

section 1 of the Investment Manager Agreement, State Street was both a discretionary investment manager and a designated ERISA fiduciary pursuant to section 3(38) of ERISA with respect to all cash, securities, or other property designated by the Andover Plan.

**B.   Plaintiff James Pehoushek-Stangeland**

22.    Plaintiff James Pehoushek-Stangeland is a resident of Seattle, Washington. He is an employee of the Boeing Company and is a participant in The Boeing Company Voluntary Investment Plan ("the Boeing Plan"). Accordingly, Plaintiff Pehoushek-Stangeland has standing to bring suit on behalf of the Boeing Plan for losses to the Plan due to breaches of fiduciary duty pursuant to ERISA sections 409 and 502(a)(2).

23.    The Boeing Plan is an ERISA-qualified defined contribution plan established for the benefit of the employees of the Boeing Company, a multinational aerospace and defense corporation headquartered in Chicago, Illinois.

24.    By contract, State Street Bank served as Trustee for The Boeing Company Employee Savings Plans Master Trust ("Boeing Master Trust").

25.    During the Class Period, the Boeing Plan offered its participants investment options in several SSgA-sponsored commingled funds. Among the international equity funds offered were the SSgA Global All Cap Equity ex-US Index Non-Lending Series Fund Class A ("SSgA Global Non-Lending Fund"), which Boeing designated as the "International Index Fund."

26.    As of December 31, 2010, the Boeing Plan held approximately $1.98 billion in Plan assets in the International Index Fund. As of December 31, 2011, the Boeing Plan held approximately $1.863 billion in the fund. These investments constituted approximately 6% of the Boeing Plan investments.

27.    The International Index Fund invests in an index comprised of global developed and emerging country stocks from outside the U.S. Its international investments require exchange of participants' U.S. dollars into various foreign currencies, and SSgA utilizes Global Markets for the FX transactions.

28.     Due to the "fund of funds" structure of many offerings in the Boeing Plan, the International Index Fund appears in multiple placed in the Boeing Plan portfolio: not only as a stand-alone investment option, but also as part of the Balanced Index Fund and each of the nine Lifecycle Funds, which are the target retirement options for Boeing Plan participants.

29.     During the class period, Plaintiff Pehoushek-Stangeland invested in SSgA's International Index Fund, directly as well as indirectly through the Lifecycle 2040 Fund and the Balanced Index Fund.

30.     Plaintiffs use the term "International Equity Funds" to collectively denote the SSgA-sponsored commingled international equity funds that required purchases and repatriation of foreign currency by Global Markets, and that were investment offerings in the Boeing and Andover Plans, as well as for other members of the Proposed Class.

**C.     Defendant State Street Bank and Trust Company**

31.     Defendant State Street Bank is a registered financial holding company with its principal place of business in Boston, Massachusetts.

32.     State Street Bank's business activities are organized into three segments or divisions: investment management provided by SSgA, custodial services provided by Global Markets, and institutional services provided by State Street Investor Services.

33.     SSgA is a division of Defendant State Street Bank responsible for investment management. The SSgA division of State Street Bank provides asset management, and is billed as the "Fiduciary Heritage of State Street Corporation."

34.     Global Markets is also a division of Defendant State Street Bank. Global Markets provides custodial services to clients, including processing the FX transactions at issue herein. Global Markets processes these FX transactions at the direction of SSgA on behalf of the International Equity Funds and the Plans.

35.     State Street Bank is also the Trustee for the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans (also referred to as the "commingled funds"). This was the trust pursuant to which State Street created, offered, and maintained the

various commingled funds—the funds that were offered to the Andover Plan and the Boeing Plan for their retirement plans.

36.     The terms of the relevant Amended and Restated Declaration of Trust establish that State Street Bank and Trust Company was the trustee for the commingled funds, and that the funds were under the exclusive management and control of State Street Bank. Pursuant to the Declaration of Trust, State Street Bank had the power to hold, manage, and control all property held in the trust, or power to delegate responsibility for management of the assets to ERISA-qualified investment managers. State Street Bank also had the power to convert any monies into any currency through foreign exchange transactions to the extent permitted under ERISA. Accordingly, investment management for the commingled ERISA funds was conducted through State Street Bank's SSgA division, and FX trading through the Global Markets division.

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Foreign Exchange Trading is Essential to Plaintiffs' Ability to Meet Their Retirement Plan Investment Needs

#### 1.   The Necessity of FX Trading in a Global Investment Portfolio

37.     Investors such as the Plans have found it increasingly necessary to enter the overseas securities markets and expand the global scope of their investment portfolios. These investments may offer increased diversification and greater returns than domestic investments alone.

38.     Institutional investors that buy and sell foreign securities, such as Global Markets on behalf of the Plans, must trade currency because purchases, sales, dividends, and interest payments are all transacted in the currency of the nation in which the relevant securities exchange sits. Just as you need euros, yuan, or yen to buy coffee in Berlin, Beijing, or Tokyo, you need those same currencies to buy securities in Germany, China or Japan.

39.     A U.S. investor must use euros to buy shares that trade on a German securities exchange. To get those euros, you must sell U.S. dollars and purchase euros. Similarly, dividends

or interest earned in Germany will be paid in euros, and turning those gains into dollars requires exchanging euros for dollars.

40.     For a U.S. investor to receive proceeds from the sale of foreign securities, the foreign currency received from the sale must be converted into the currency of one's own country. This process is called repatriation. The rate of exchange matters because it impacts the proceeds of any investment made in foreign currency.

**2.     How FX Trading Works**

41.     The values of different currencies "float" against each other. That is, they vary based on factors ranging from supply and demand to political and economic trends. While the price of coffee at a Berlin café might be €2 all week long, it might cost $ 2.50 on Monday morning and $2.72 by Friday.

42.     FX trading occurs on a nearly 24-hour cycle, five-and-a half days a week. The official FX trading day begins at 7:00 a.m. New Zealand time and ends at 5:00 p.m. New York City time.

43.     For each currency bought and sold during the course of the FX trading day, there will necessarily be a high trade and a low trade. This information is tracked by proprietary services such as Electronic Brokerage System ("EBS") and Reuters.

44.     The difference between the low trade and the high trade is called the "range of the day." The "spot range of the day" refers to FX rates as of a specific and prompt settlement date, usually two business days after the trade date. To more accurately measure the trade cost for FX transactions that settle prior to or later than the date for spot trades, traders in the FX market also look to the "forward-adjusted range of the day." Because FX trades do not always settle two days after the trade, the forward-adjusted range of the day is a more conservative and accurate measurement because it takes into account the interest rate differential between the trade date and settlement date for the underlying currencies.

45.     If, during one trading day, the lowest trade was $1.25 to buy €1.00, and the highest rate trade was $1.35 to buy €1.00, the range of the day would be $1.25-$1.35.

46.     Another useful measure for analyzing FX trades is the daily "mid-rate," which is simply the sum of the forward-adjusted daily high and forward-adjusted daily low, divided by two. This rate reflects the "average" FX rate in a given currency pair on a given day.

47.     The daily mid-rate is significant to this case because Plaintiffs cannot discover the precise time of day when FX trades occurred (in contrast to stock trading, for example). By looking at the daily mid-rate over a significant period of time, one can reasonably estimate the average FX trade cost on any given day. Over time, FX trades will regress to the mid-rate.

### 3.     Negotiated vs. Non-Negotiated FX Trades

48.     In a "negotiated," or "active," FX trade, an investor communicates directly with a FX trader. The FX trader quotes a rate for a proposed transaction, which is accepted, rejected or countered—in other words, actively negotiated. If a deal is reached, the trader executes the FX trade at the agreed-upon price. Negotiated trades can potentially achieve better rates for an investor, but the process requires greater resources.

49.     In a "non-negotiated," "standing-instruction," or "indirect" trade there is no arm's-length negotiation of the price between the investor and the trader. Instead, clients simply report the desired currency transaction to the bank, trusting and relying on the bank to execute the trade on the client's behalf using "best execution" practices. Plaintiffs' allegations herein complain solely of State Street Bank's practices with regard to non-negotiated trades.

## B.     State Street's Provision of FX Trades to its Custodial Clients

50.     Institutional investors, such as pension plans like the Arkansas Teacher Retirement System ("Arkansas Teachers"), typically requested that State Street handle the smaller FX transactions, mostly the repatriation of dividend and interest payments, through non-negotiated trades because the amount of each trade rarely justified the time and effort required for a negotiated trade.

51.     State Street's clients reasonably expected that non-negotiated FX trades would have no mark-ups or mark-downs, for at least three reasons: (1) custodial clients already paid State Street hefty annual fees to serve as custodian over their assets; (2) the Custodian Contracts

and associated fee schedules indicated no extra fees or mark ups, and did not authorize any such fees or mark-ups; and (c) State Street's Investment Manager Guides assured custodial clients and investment managers that the price of FX trades was *"based on the market rates at the time the trade is executed."* (Emphasis added).

### 1. State Street's Clients Relied Upon State Street's Expertise and Loyalty

52. Custodial clients placed a high degree of trust in State Street to execute non-negotiated FX transactions. In conducting these transactions, State Street occupied a superior position to its custodial clients due to its control over all aspects of the FX trade, including the information that its traders had about the FX market, the timing of the trades, and most importantly, the prices at which the trades were executed.

53. Custodial clients depended on Global Markets not only to execute the FX trades, but also to accurately and honestly report the FX rate to them, and to carry out the trades in accordance with their custodial contracts, associated fee schedules, and guidelines as set forth in the Investment Manager Guides.

54. Consistent with the custodial contracts and Investment Manager Guides, State Street's clients also had a reasonable expectation that the FX rates that State Street charged (or credited) on non-negotiated FX trades would accurately reflect the true market-rates of those FX trades. And there is no reason a custodial client would expect its custodian bank—to which it was paying substantial annual fees for custodial services—to charge non-negotiated FX trades at something other than the actual rate for the FX trade.

### 2. State Street's Custodial Contracts and Investment Manager Guidelines Were Predicated on No-Cost FX Trading

55. For State Street's custodial clients, such as the Arkansas Teachers, the contracts provided that State Street "shall be entitled to compensation for its services and expenses as Custodian" pursuant to "a written Fee Schedule between the parties." Custodial clients and State Street agreed to and executed a series of fee schedules covering the class period.

11

56.     The fee schedules either provided estimated annual fees or annual flat fees for State Street's services as a custodian.

57.     State Street's custodial contracts (a) expressly provided that non-negotiated FX trades would be executed free of charge; or (b) did not list FX transactions among the services for which it was permitted to charge an additional fee or any other cost above the annual flat fee.

58.     The fee schedules did set forth certain categories of ancillary services for which State Street was permitted to charge additional fees, including Wire Fees, Reporting Fees, Delivery Fees and Subcustody Fees. None of these ancillary service categories relate to FX trading for non-negotiated trades.

59.     The Custodian Contracts did not state that State Street would impose any fees in connection with FX trading.

60.     State Street consistently stated that "Foreign Exchange Transactions . . . are *priced based on the market rates at the time the trade is executed."* (Emphasis added). This promise was made in Investment Manager Guides for custodial clients and investment managers. These Guides contained comprehensive information about State Street's custody practices and services, including procedural requirements, costs, and information on "State Street Foreign Exchange Transactions."

61.     During the Class Period, State Street issued at least 15 Investment Manager Guides, including those dated July 9, 2003; August 9, 2005; September 26, 2006; October 17, 2006; November 20, 2006; December 15, 2006; January 25, 2007; October 30, 2007; November 21, 2007; December 19, 2007; January 28, 2008; May 1, 2008; October 31, 2008; December 30, 2008; January 23, 2009, November 20, 2009 and December 1, 2009.

62.     State Street represented in each of these Investment Manager Guides that "State Street Foreign Exchange Transactions . . . are *priced based on the market rates at the time the trade is executed."* (Emphasis added.)

12

**3.      State Street's Deceptive Scheme Overcharged Clients for Non-Negotiated FX Trades**

63.     Despite State Street's representations that FX transactions were priced based on market rates at the time the trades were executed, State Street's FX practices diverged from what the Custodial Contracts authorized and what the Investment Manager Guides represented. Instead, State Street reported and charged its custodial clients FX rates on non-negotiated trades far above what State Street actually paid for foreign currency (or far below what State Street actually received for sales of foreign currency)—oftentimes, at rates that actually fell outside of the range of the day.

64.     However, unbeknownst to its custodial clients, when State Street reported FX rates on non-negotiated trades to its clients, those statements did not reflect the actual cost or proceeds of the FX transactions, and instead reflected rates that Global Markets selected at its discretion. Put simply, State Street invented the FX rates it reported and charged (or credited) to its custodial clients. State Street paid or received one rate for FX during the trading day, yet reported to its custodial clients another rate that was either higher (in the case of a purchase) or a lower (in the case of a sale), and pocketed the difference.

65.     For example, when custodial clients or their agents requested that State Street execute an FX transaction, the request was routed electronically via State Street's Market Order Management System (MOMS) to a group of "risk traders" working at Global Market's FX trading desk. A Global Markets FX trader would execute the transaction at whatever the current exchange rate was (the "actual rate") using the Wall Street System ("WSS"). The rate reported by Global Markets for the transaction, however, was not the rate State Street charged clients. The trader would instead charge the client a rate selected at his discretion at the end of the day, after seeing the day's range of FX transaction rates for the relevant currencies. This manipulation allowed Global Markets to mark up or mark down rates, charge rates that were most favorable to itself rather than in the best interest of the Plans, and pocket the difference between the actual

rate and the rate entered by its traders—which could amount to tens of thousands of dollars from a single FX transaction.[2]

66.    To illustrate the breach of fiduciary duty and failure to disclose, assume again the example set forth above—trades on a given day that ranged from $1.25 to $1.35 (the "range of the day") to purchase €1.00, with a day's mid-rate of $1.30. On any, and all, non-negotiated euro-for-dollar trades on behalf of its custodian clients, State Street would have paid a rate between $1.25 and $1.35, but reported to its clients that it paid at least $1.35, and sometimes more than that. State Street also kept the difference.

67.    This conclusion is supported by the analysis from non-ERISA custodial client Arkansas Teachers of ten years of FX transactions executed by State Street on behalf of and reported to Arkansas Teachers. The Teachers reviewed almost 11,000 foreign currency trades between 2000 and 2010. About 4,216, or 39%, were non-negotiated trades.

68.    The Arkansas Teachers compared its FX trades to other FX trades for the same currency pairs in a comprehensive database of more than 2 million trades, which allowed it to estimate the trading cost of the Teachers' non-negotiated FX trades. The trading cost is the difference between the day's mid-rate and the rate that State Street charged (or credited) to the Arkansas Teachers for non-negotiated FX trades.

69.    State Street did not report the actual time of execution of any FX trade, so using the day's mid-rate was the best method to see whether State Street charged (or credited) the actual market rate at the time of execution, as State Street had promised to do.

70.    The Arkansas Teachers determined that State Street overcharged for FX trading. State Street charged fictitious FX rates by adding (on purchases) or subtracting (on sales) "basis

---

[2]    For example, the *Wall Street Journal* examined one trade of 8.1 million euros for dollars made by Bank of New York Mellon on behalf of a large pension fund. There the trader reported to the pension fund that the trade was $1.3610. On that day, however, euro/dollar trades occurred between $1.3704 and $1.3604. Had the trade settled at the higher end of the range of the day, which was $1.3704, the pension fund would have gotten an extra $76,012. The *Wall Street Journal* analyzed over 9,400 trades processed over a decade and found that 58% of the currency trades were within the 10% of the day's range least favorable to the client. Carrick Mollenkamp & Tom McGinty, *Inside a Battle Over Forex*, Wall St. J., May 23, 2011.

points" or "pips" from the actual FX rate. (A basis point is 1/100th of a percentage point. For example, the smallest move the euro/dollar currency pair generally makes is 1/100th of a penny, or one basis point.) State Street would add or subtract as much as it could get away with, by selecting a rate close to either the high or low extreme of the range of the day. During periods of increased market volatility, when currency prices fluctuated more and the currency trading ranges of the day were wider, allowed State Street to skim more off the top of each non-negotiated FX trade.

71.     From January 3, 2000, through December 31, 2010, the FX rates that State Street reported and charged (or credited) to the Arkansas Teachers on **non-negotiated FX trades** were, **on average, 17.8 basis points above or below the day's mid-rate**. In other words, every foreign exchange transaction cost the Arkansas Teachers 17.8 basis points higher than the average FX rate (or the day's mid-rate).

72.     If State Street actually paid $1.31551 to purchase €1.00, it charged the Teachers $1.31729, or 17.8 basis points extra. For a purchase of €10 million, the undisclosed profit to State Street on that single trade—and the concomitant unknown loss to the Teachers—was $17,800. During the years the Arkansas Teachers examined, State Street executed over $1.2 billion in standing order FX trades, meaning that State Street kept about $2 million dollars of the Arkansas Teachers' money.

73.     State Street routinely reported and charged (or credited) fictitious prices for its FX trades. For instance, 53% of the standing-order (non-negotiated) trades analyzed by the Arkansas Teachers actually fell entirely outside the forward-adjusted range of the day, *see supra* at ¶44. These trades alone, over $200 million worth, actually added trading costs of *64.4 basis points* over the day's mid-rate—an enormous hidden and unauthorized mark-up. For example, on a purchase of €10 million, an undisclosed fee of 64.4 basis points means a $64,400 profit to State Street.

74.     Rates consistently above (or below) the daily mid-rate alone demonstrate that Global Markets was charging a hidden mark-up that diverted assets of its clients and the Plans to

15

State Street, thereby breaching its fiduciary duties.. These actions also violated the terms of the custodial contracts and the representations in the Investment Manager Guides. When more than half of non-negotiated trades fall outside the forward-adjusted range of the day, it is plausible that those reported FX rates were not actual, market-based FX rates, but were instead fictitious and designed solely to gouge State Street's clients and, in turn, their beneficiaries.

75.     There is no rational, honest basis for a professional FX market participant like Global Markets to charge a rate outside the forward-adjusted range of the day without disclosing it. The basis for this practice was rather, self-interested profit for State Street, to the significant detriment of its clients. State Street Corporation's revenue from FX trading services grew dramatically during the Class Period, due in significant part to its manipulation of the FX rates charged to clients for non-negotiated FX trades.

**State Street Corporation's FX Trading Revenue 2004-2008**

| Year-End | FX Revenue | % increase from prior year |
|----------|------------|----------------------------|
| 2004 | $420 million | N/A |
| 2005 | $468 million | 11% |
| 2006 | $661 million | 41% |
| 2007 | $802 million | 21% |
| 2008 | $1.08 billion | 34% |

76.     State Street Corporation publicly acknowledged how market conditions provided profit-making opportunities for its FX business when it stated the following during an earnings call[3] held on October 16, 2007:

> [W]hile market conditions in the third quarter presented challenges ... it also created more opportunities in foreign exchange and in securities finance than we usually expect in the third quarter.... Revenue from foreign exchange increased 98% from the year ago quarter, and 29% from the second quarter.

77.     Tellingly, from 2000 to 2010, the FX rates that State Street reported and charged (or credited) to the Arkansas Teachers on more than 6,500 negotiated FX trades added, on

---

[3] Earnings calls are teleconferences in which public companies discusses the financial results of a reporting period.

average, only **3.6 basis points** to the day's mid-rate. In other words, State Street padded its profits, at Plaintiffs' expense, by about 14 basis points per trade for non-negotiated trades.

### 4. State Street's Deceptive Acts and Practices Could Not Reasonably Be Detected

78. Sophisticated custodial clients such as the Arkansas Teachers were not able to discover the manner in which State Street deceptively marked-up and marked-down FX transactions during the Class Period. The periodic reports State Street sent to clients showed only the rate that State Street charged for its FX trades. The reports did not include the range of the day, the daily mid-rate, or any indication of the time of the day that the trade was executed (known as "timestamps"). Accordingly, clients could not reasonably determine, or even suspect, that State Street was secretly charging more than it actually paid for FX or was paying clients less than it actually received for FX.

79. Custodial clients also reasonably presumed that State Street's reports accurately represented the true cost of the FX trades. Pursuant to the custodial contracts, State Street made monthly reports of monies received or paid on behalf of the client. Accordingly, State Street had an affirmative obligation to report accurately the amount it was paying or receiving for FX trades.

80. Furthermore, based on the Investment Manager Guides' assurance that FX rates would be "priced based on the market rates at the time the trade is executed," no custodial client had any reason to suspect that they were being charged (or credited) anything other the rate that State Street itself had paid or received on those standing-instruction FX transactions.

81. Because sophisticated custodial clients such as Arkansas Teachers could not uncover State Street's deceptive FX trading practices—even when they had directly negotiated FX trades as a reference—less sophisticated clients had no chance at all.

### C. Events After October 2009 Begin to Shed Light on State Street's Deceptive FX Trading Practices

82. On October 20, 2009, the Attorney General of California intervened in a whistleblower lawsuit that was filed in California state court. The suit alleged State Street

misappropriated more than $56 million from California's two largest pension plans using the same unfair and deceptive FX practices alleged here. *People of the State of Cal. ex rel. Brown v. State St. Corp.*, No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento Cnty. Oct. 20, 2009).

83.    The California Attorney General alleged that State Street reported inflated FX rates when buying foreign securities, reported deflated FX rates when selling foreign securities, and pocketed the difference. The Attorney General further alleged that State Street hid its wrongful conduct by entering incorrect FX rates into State Street's electronic FX trading systems and providing false records to clients.

84.    The California Attorney General has represented that its allegations of undisclosed "mark-ups" are supported in part by the sworn testimony of a former State Street Bank employee, William Strazzullo, who worked on the same trading floor as the State Street Bank and Global Markets FX traders. He overheard how State Street Bank or Global Markets FX traders were marking up FX trade prices. This trader described the practices of State Street Bank's FX traders as a "totally unethical thing to do" and said that the FX traders' practices were not within the "industry standard." Declaration of Kenny V. Nguyen in Support of Plaintiff's Memorandum and Points and Authorities in Response to Defendants' Motion for Protective Order, Exhibit U at 4 (Plaintiffs' Oct. 6, 2011 letter to Defendants), *People of Cal., v. State St. Corp.*, No. 08-8457 (Cal. Super. Ct. Sacramento Cnty. Jan. 24, 2012).

85.    After the California Attorney General filed suit, State Street dramatically changed its FX trading policies and disclosures and so informed its clients. Under these new policies, State Street admitted for the first time that it had systematically imposed additional charges for FX trading. These policy differences are made clear by comparing State Street's Investment Manager Guides published in 2006 and 2009.

86.    The 2006 Investment Manager Guide said little about FX transactions. What it did say would have misled clients into thinking that State Street was protecting, rather than pocketing, clients' assets. The 2006 Guide assures clients that State Street has taken steps "to

18

ensure compliance with certain ERISA requirements" by "effect[ing] foreign exchange transactions for its ERISA trust and custody clients under a special 'FX procedure.'" September 26, 2006 Investment Manager Guide at 37.

87. In contrast, in the 2009 Investment Manager Guide, State Street dramatically increased its disclosures, and admitted that it was adding undisclosed charges to every foreign exchange transaction. In contrast to earlier disclosures, the 2009 Investment Manager Guide clearly states that foreign exchange transactions are not included in custodial services: "all foreign exchange services . . . are separate and independent of any services provided to custody clients." November 20, 2009, Investment Manager Guide at 36. In divulging this practice for the first time, State Street told customers that the FX charges would be "adjusted from time to time" but posted each business day on a website. *Id*. 2009 Investment Manager Guide at 37.

88. These new revelations stood in sharp contrast to State Street's previous communications. The 2006 Investment Manager Guide stated that standing-order (non-negotiated) foreign exchange transactions were "provided as part of each account opening" for ERISA clients. September 26, 2006 Investment Manager Guide at 37. Rather than explaining the charges it was imposing, in 2006 State Street hid that information and posted only the "buy rate and sell rate for each currency." September 26, 2006 Investment Manager Guide at 37. Indeed, the 2006 Guide assured clients that foreign exchange transactions would be done at these posted rates "or rates more favorable if market conditions warrant." *Id*.

89. Contrary to its 2006 promise to improve on posted rates, State Street's 2009 Investment Manager Guide stated that the "pricing of any transaction . . . is not determined by reference to any actual cost." November 20, 2009 Investment Manager Guide at 35. That is, in 2009 State Street *admitted* that the prices it had disclosed to custodial clients and others were not market prices, or prices State Street paid, but "prices" that increased its profits by padding fees on FX transactions.

90. Also in 2009, State Street Bank disclosed that a non-negotiated FX request "*is unlikely, in most circumstances, to be completed at the same or as favorable an execution rate as*

*it would be*" if the trade were negotiated directly. 2009 Investment Manager Guide at 38. This simple disclosure, not made in previous Investment Manager Guides, finally discloses what State Street Bank had been hiding for years: FX trades contained hidden fees that disadvantaged Plaintiffs and the Proposed Class at State Street's benefit.

91.     In a similar message sent to custodial clients such as the Arkansas Teachers, State Street admitted that **"[s]ince December 2009**, State Street has provided to all of its custody clients and their investment managers via our dedicated client portal, my.statestreet.com, comprehensive disclosure of the pricing and execution methodology (including the maximum mark-up or mark-down that may be applied) for each of its Indirect [non-negotiated] FX Services." (Emphasis added.) State Street added that "on the day after a trade is executed, State Street provides for each currency pair the reference interbank rates and the times at which they are obtained, the actual rates, the daily high/low range at the time of pricing (where applicable) and the actual mark-up or markdown that was applied."

92.     State Street thus altered its practices only after its deceptive acts and practices were publicly revealed. State Street's late disclosure that it charged mark-ups and mark-downs on non-negotiated FX trades contradicts its previous repeated assurances in contracts and the Investment Manager Guides that FX rates would be based on market rates at the time the trade is executed.

93.     According to a study conducted by an independent FX analyst, after State Street altered its FX policies, the cost of non-negotiated FX trades dropped by a remarkable ***63%.*** The study analyzed 498,940 FX spot and forward trades (196,280 non-negotiated trades and 302,660 negotiated trades) executed during 2000-2010, and found that investors who had their custodial banks, including State Street, execute FX trades on a standing-instruction or non-negotiated basis during 2010 saw an overall 63% drop in trading costs from their average trading costs for the years 2000-2009.

94.     Correspondingly, State Street's FX trading revenue decreased 56% from the fourth quarter of 2008 ($330 million) to the fourth quarter of 2009 ($144 million).

95.     While State Street attributed this revenue decrease to lower "customer volumes"
and a decrease in "currency volatility," State Street Corporation's 2009 Form 10-K filing stated
that customer volumes declined by only 16% from 2008 to 2009, and currency volatility
decreased by only 4%. State Street Corp. Annual Report (Form 10-K) (Feb. 22, 2012) ("2009
Form 10-K") at 41. A substantial portion of the 56% decline was the direct result of the
California Attorney General's intervention, which forced State Street to stop its profitable self-
dealing.

96.     In fact, State Street Corporation conceded in its 2009 Form 10-K filing that
disclosing its FX transaction profits on non-negotiated trades for its custodial clients would
likely continue to affect its revenues and profits from these transactions:

> In light of the action commenced by the California Attorney General, we are providing
> customers with greater transparency into the pricing of this product and other alternatives
> offered by us for addressing their foreign exchange requirements. Although we believe
> such disclosures will address customer interests for increased transparency, over time
> such action may result in pressure on our pricing of this product or result in clients
> electing other foreign exchange execution options, which would have an adverse impact
> on the revenue from, and profitability of, this product for us.

2009 Form 10-K at 12-13.

97.     The State Street whistleblower—whose allegations formed the basis of the
California Attorney General lawsuit—alleged that State Street had generated $400 million in
improperly obtained FX trading revenue annually, constituting one-third of Defendant's trading
revenue.

98.     Without discovery of State Street's internal documents it is impossible to
determine how much State Street overcharged the Plans and other members of the Proposed
Class. However, in *Hill v. State Street Corp.,* No. 09-12146, 2011 WL 3420439 at *32 n.25 (D.
Mass. Aug. 3, 2011), Judge Gertner found that participants in State Street's own ERISA defined
contribution plan offered a "logical rationale for calculating that about 30% of State Street's
reported FX revenue in the years before October 2009" was attributable to the improper self-
dealing on non-negotiated trades, based on the 56% FX revenue decline in the quarter

immediately following the Attorney General's suit. Assuming that 30% of State Street's revenue for FX trading during the relevant period was attributable to self-dealing, State Street's clients, including Plaintiffs' Plans, and the Plans of the Proposed Class, have overpaid State Street for its services by hundreds of millions of dollars.

**D.     Facts Bearing on Fiduciary Breach for State Street's ERISA Clients**

99.     ERISA-covered defined contribution plans like the Andover Plan and the Boeing Plan invested in foreign securities (and hence foreign currency) through their State Street Bank-sponsored commingled funds. The commingled funds received principal, dividends, and interest that were paid in foreign currencies, or participated in other investments that required the exchange of foreign currency into and from US Dollars. The Andover Plan offered participants the option to invest in certain State Street-sponsored commingled International Equity Funds, including the International Growth Opportunities Securities Lending Class A Fund, and the SSgA Daily International Alpha Select Fund. Likewise, the Boeing Plan offered participants the option to invest in certain State Street-sponsored commingled International Equity Funds, including the International Index Fund held by Plaintiff Pehoushek-Stangeland.

100.     These International Equity Funds invest in a wide variety of international equity securities issued throughout the world. To purchase or sell the foreign securities in these funds, and then repatriate the funds to clients, FX transactions were required. As investment manager for the commingled funds, SSgA negotiated or contracted with its affiliate, Global Markets, for the FX transactions. State Street Bank, in its various roles as the trustee, investment manager, and custodian for the commingled funds, was a fiduciary with discretion and control over the funds' FX transactions ordered by SSgA and undertaken by Global Markets.

101.     As investment manager for the commingled funds, SSgA had discretion as to the type and nature of instructions it gave Global Markets when undertaking FX trades. Upon information and belief, rather than negotiating each FX trade for the funds, SSgA placed non-negotiated trade orders with Global Markets. Provision of standing instructions by SSgA was insufficient from a fiduciary duty standpoint because in so doing, State Street failed to

22

appropriately limit the designated price range and time period for the requested FX transactions. This fiduciary breach was compounded by SSgA's apparent failure to monitor, detect, and rectify Global Markets' mark-ups and mark-downs of the trades for its ERISA clients. As a result, State Street Bank engaged in a multi-year, self-dealing FX trade scheme—that is, it allowed SSgA and Global Markets to breach their fiduciary duties and act against Plaintiffs' interests in FX transactions year after year, and knew that SSgA and Global Markets would in fact act against Plaintiffs' interests.

102.    SSgA, as the internal investment manager, would initiate FX transactions required for the investment management of the commingled funds through the MOMS system. *See supra* at ¶65. To do so, SSgA would submit a request to the Securities Processing Unit of State Street through MOMS, which would then pass the order on to the Global Markets FX trading desk. Placing non-negotiated trades allowed Global Markets to mark-up or mark-down rates and charge rates that were most favorable to itself, rather than in the best interest of the Plans. SSgA and Global Markets thereby both exercised discretion over Plan assets.

103.    Because Plan fiduciaries whose Plans invested in the commingled funds entrusted all aspects of the investment management to State Street, including the FX transactions required for international purchases and sales, State Street had control over all aspects of the FX transactions. Neither the time stamp nor the rate of the actual FX transaction was disclosed to the Plans, their fiduciaries, or participants, by SSgA.

104.    Over time, and with SSgA requesting and Global Markets executing thousands of FX transactions annually as part of the management of the Funds, Global Market's discretionary pilfering of Plan assets added up to large losses to participants and beneficiaries. State Street thus took advantage of its already-profitable relationship as trustee, investment manager, and custodian for the funds (and Plans) to rake in additional unauthorized profits.

105.    Defendant State Street Bank, through its investment management division, SSgA, and its trading arm, Global Markets, provided FX trading services similar to those provided to the Andover Plan and the Boeing Plan to other Plans in the class, in its roles as trustee,

custodian, and investment manager. With no direction from the Plans, State Street commingled assets of the Plans, controlled where the Plans' assets were deposited and how and when they were invested and disbursed, and controlled all aspects of the FX transactions for the Plans, including Global Market's unauthorized mark-ups and mark-downs for non-negotiated trades on behalf of the funds, which amounted to State Street's self-dealing and taking of Plan assets for its own use and benefit.

106. State Street Bank also served as an ERISA fiduciary to defined benefit plans in the putative class. On information and belief, State Street provided custodial services and commingled fund investment options to the defined benefit plans and utilized non-negotiated FX transactions in a like manner to the transactions executed on behalf of its public fund clients and the defined contribution commingled fund clients. *See supra* at ¶¶50-81.

## E. Defendant's Fiduciary Status under ERISA

### 1. The Nature of Fiduciary Status

107. There are two types of fiduciaries under ERISA: "named fiduciaries" and "*de facto* fiduciaries."

108. **Named Fiduciaries**. Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

109. Investment managers are also ERISA fiduciaries. Under ERISA:
(38) The term "investment manager" means any fiduciary (other than a trustee or named fiduciary, as defined in section 1102 (a)(2) of this title)—

(A) who has the power to manage, acquire, or dispose of any asset of a plan;

(B) who

(i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.];

(ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b–3a (a)], is

24

registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

(iii) is a bank, as defined in that Act; or

(iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

ERISA § 3(38), 29 U.S.C. § 1002(38).

110.    *De Facto* **Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under section 402(a)(1), 29 U.S.C. section 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus a person is a fiduciary to the extent

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

**2.      Defendant State Street's Fiduciary Status**

111.    In the relevant Amended and Restated Declaration of Trust, State Street acknowledged its fiduciary status as Trustee with exclusive management and control of the commingled funds for all the ERISA-covered plans that offered the International Equity Funds as an investment option for participants' retirement savings.

112.    As a trustee for the commingled funds with exclusive management and control State Street Bank authorized its investment management division to manage the commingled funds, and authorized Global Markets to convert any monies needed for the funds' operation into

the required currency through FX transactions of Plan assets. State Street Bank also served as a trustee and investment manager to the Plans pursuant to separate contracts. At all times, State Street Bank had the duty to prudently and loyally manage Plan assets, discretion to select appropriate service providers and custodians, and the duty to monitor its various divisions to ensure that these transactions were within the bounds of its fiduciary responsibilities and the limitations of ERISA.

113.    State Street Bank, through its SSgA division, served as the Investment Manager for the International Equity Funds in Plaintiffs' Plans and, upon information and belief, numerous other plans. In this capacity, SSgA was responsible for prudently and loyally managing Plan assets, and authorizing, reviewing and controlling the conduct of any other State Street division or representative engaged in activities affecting the value or performance of the Funds for which State Street served as Investment Manager.

114.    Under ERISA, investments in commingled Funds are subject to a "look-through" rule, pursuant to which, the "plan assets" of an ERISA-covered plan include both its undivided "equity interest [in the entity] and an undivided interest in each of the underlying assets of the entity …". 29 C.F.R. § 2510.3-101(a)(2); *see also* ERISA § 3(42), 29 U.S.C. § 1002(42) (authority of Secretary of Labor to define term "plan assets" by regulation). Specifically, when a Plan acquires or holds an interest in a commingled Fund, "its assets include its investment and an undivided interest in each of the underlying assets of the entity." 29 C.F.R. § 2510.3-101(h)(1).

115.    "[A]ny person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect) is a fiduciary of the investing plan." *Id*. § 2510.3-101(a).

116.    As investment manager for the commingled funds, State Street Bank, through its SSgA division, exercised authority and control with respect to the management or disposition of the Plans' assets. Accordingly, State Street Bank was a fiduciary of each and every ERISA Plan which invested in the International Equity Funds, including the Plaintiffs' Plans and the Plans of

the Proposed Class members with respect to the underlying assets of each and every State Street Bank-sponsored commingled fund.

117.     State Street Bank, through its Global Markets division, also functioned as a fiduciary to the Plans and the Class by acting as trustee and custodian for the commingled funds, and by exercising authority and control over the Plans' assets when undertaking FX transactions for the International Equity Funds as to the price and timing for these transactions involving Plan assets.

118.     Global Market's conversion of U.S. dollars to foreign currency, and foreign currency to U.S. dollars constituted the exercise of authority or control respecting the management or disposition of the underlying assets of the commingled investment funds and, therefore, of assets of the ERISA Plans, within the meaning of ERISA section 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(1), and 29 C.F.R. section 2510.3-101(a). This is particularly so because Global Markets exercised discretion in choosing when and how to execute the trades, and whether to mark up or mark down the FX transactions over the market rates that Global Markets had received for the transactions, and then profited and engaged in self-dealing by pocketing the difference for itself. Accordingly, Global Markets was also a functional fiduciary of the ERISA Plans.

**F.     The Relevant Law**

**1.     Fiduciary Duties under ERISA**

119.     ERISA sections 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

120.     These fiduciary duties under ERISA sections 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). They entail, among other things:

> (a)     The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives for a plan;

> (b)     The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

> (c)     The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

### 2.     Prohibited Transactions under ERISA

121.     In addition to ERISA's extensive fiduciary duty provisions, the statute categorically bars certain transactions deemed likely to injure a plan. *See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000).

### a.     ERISA § 406(b) is an absolute bar against self-dealing

122.     ERISA section 406(b), 29 U.S.C. § 1106(b), prohibits certain transactions between fiduciaries and a plan. The statute sets forth an "absolute bar against self dealing" by a fiduciary. *See Brock v. Hendershott*, 840 F.2d 339, 341 (6th Cir. 1988). ERISA section 406(b) provides the following:

> A fiduciary with respect to a plan shall not—

> (1) deal with the assets of the plan in his own interest or for his own account,

> (2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**b.      ERISA § 406(a) prohibits party-in-interest transactions**

123.    ERISA section 406(a), 29 U.S.C. §1106(a), prohibits transactions between a plan

and a party in interest. A "party in interest" is defined broadly with respect to an ERISA-

qualified plan and includes, among others, any fiduciary, counsel, or employee of such employee

benefit plan, as well as any person providing services to such plan. ERISA § 3(14), 29 U.S.C. §

1002(14). Section 406(a)(1) provides the following:

> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> (B) lending of money or other extension of credit between the plan and a party in interest;
>
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
>
> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

**c.      Foreign currency exchange exemptions**

124.    Section 406(a)'s prohibitions against transactions with a party in interest are

subject to numerous exemptions to allow the normal course of business with regard to

investment management. *See* ERISA § 408, 29 U.S.C. § 1108. Foreign currency exchanges

between an employee benefit plan and a bank or a broker-dealer or an affiliate thereof which is a

party in interest with respect to such plans are exempted from the prohibition provided they meet

certain conditions.

> (18) Foreign exchange transactions.— Any foreign exchange transactions, between a bank or broker-dealer (or any affiliate of either), and a plan (as

defined in section 1002(3) of this title) with respect to which such bank or broker-dealer (or affiliate) is a trustee, custodian, fiduciary, or other party in interest, if—

(A) the transaction is in connection with the purchase, holding, or sale of securities or other investment assets (other than a foreign exchange transaction unrelated to any other investment in securities or other investment assets),

(B) at the time the foreign exchange transaction is entered into, **the terms of the transaction are not less favorable to the plan than the terms generally available in comparable arm's length foreign exchange transactions between unrelated partie**s, or the terms afforded by the bank or broker-dealer (or any affiliate of either) in comparable arm's-length foreign exchange transactions involving unrelated parties,

(C) the exchange rate used by such bank or broker-dealer (or affiliate) for a particular foreign exchange transaction does not deviate by more than 3 percent from the interbank bid and asked rates for transactions of comparable size and maturity at the time of the transaction as displayed on an independent service that reports rates of exchange in the foreign currency market for such currency, and

(D) the bank or broker-dealer (or any affiliate of either) does not have investment discretion, or provide investment advice, with respect to the transaction.

ERISA § 408(b)(18), 29 U.S.C. § 1108(b)(18) (emphasis added).

125. This section existed first as a Department of Labor ("DOL") regulation, Prohibited Transaction Exemption 94-20, 59 Fed. Reg. 8022-02 (Feb. 17, 1994), and was later codified as 29 U.S.C. § 1108(b)(18) (effective Aug.17, 2006). Prohibited Transaction Exemption (PTE) 94-20 required that foreign exchange transactions be "directed" by a plan fiduciary *independent of the bank, broker dealer, or affiliate*. Four years later the DOL promulgated another regulation, to allow non-negotiated trades within carefully circumscribed conditions. Prohibited Transaction Exemption 98-54, 63 Fed. Reg. 63503-63510 (Nov. 13, 1998). PTE 98-54 exempts FX transactions "performed under a written authorization [i.e., standing instructions]…by a fiduciary of the plan…independent of the bank or broker-dealer engaging in the covered transaction." Section III(e), 63 Fed. Reg. at 63508.

126.     Although PTE 94-20 and PTE 98-54 carve out a limited space for execution of FX transactions within the ERISA regulatory scheme, these exemptions do not relieve State Street of fiduciary responsibility. As the DOL explained,

The Department wishes to point out that ERISA's general standards of fiduciary conduct would apply to the standing instruction arrangements permitted by this class exemption. Section 404 of ERISA requires, among other things, that a fiduciary discharge his duties with respect to a plan solely in the interest of the plan's participants and beneficiaries and in a prudent fashion.63 Fed. Reg. at 63505.

### 3.     Civil Remedies under ERISA

127.     ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant or a fiduciary for relief under ERISA section 409, 29 U.S.C. § 1109.

128.     ERISA section 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

129.     ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to seek equitable relief from Defendant, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

130.     Plaintiffs therefore bring this action under the authority of ERISA section 502(a)(2) for relief under ERISA section 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by the Defendant for violations under ERISA sections 404(a)(1) and 406, as well as pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3) for

equitable relief from Defendant as fiduciary , including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

## V.   CLASS ACTION ALLEGATIONS

131.   **Class Definition.** Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Andover Plan and the Boeing Plan, and the following class of persons similarly situated (the "Class"):

> All qualified ERISA plans, and the participants, beneficiaries, and named fiduciaries of those plans, that invested directly or indirectly in the State Street Bank commingled Funds, which includes the "International Equity Funds" identified in this complaint; or for which State Street Bank provided investment management or custodial services, that utilized State Street Global Market's indirect FX trading services, and suffered damages as a result of the deceptive acts and practices and other misconduct alleged herein, at any time between January 2, 1998 and December 31, 2009. Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and the officer, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such entity.

132.   Plaintiffs reserve the right to modify the class definition before moving for class certification, including a reservation of right to seek to certify subclasses of State Street's clients, or extension of the class period, if information gained during this litigation, through discovery or otherwise, reveals that modifying the class definition or seeking subclasses would be appropriate.

133.   **Numerosity.** The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that numerous ERISA-covered benefit plans throughout the country offered the commingled International Equity Funds and that these plans collectively have tens of thousands of participants and beneficiaries.

134.   **Commonality.** The claims of Plaintiffs and the members of the Class have a common origin and share a common basis. The claims of all Class members originate from the same misconduct, breaches of duties, and violations of ERISA, perpetrated by Defendant.

Proceeding as a class is particularly appropriate here the claim goes to the same type of currency trade instruction, indirect trades, conducted by Global Markets on behalf of the funds, and also on behalf of custodial clients, and therefore, State Street's deceptive acts and practices and misconduct regarding its FX trading practices affected all Plans were uniform and widespread.

135.     There are questions of law and fact common to the Class, including:

(a) Whether Defendant breached its fiduciary duties under ERISA by selecting its internal division to conduct the FX transactions for the Funds;

(b) Whether Defendant breached its fiduciary duties under ERISA by failing to prudently and loyally manage Plan assets when it permitted its affiliate to conduct FX transactions;

(c) Whether Defendant breached its fiduciary duties under ERISA by marking-up or marking-down the FX transactions for the Funds at issue and passing a lower NAV to the Plaintiffs' Plans or the funds;;

(d) Whether Defendant pocketed the difference between the actual, market-based FX rates it received when entering into the FX transactions, and the FX rates that were reported and charged to the commingled funds, and the Plans;

(e) Whether Defendant breached its fiduciary duties under ERISA by pocketing the difference between the actual, market-based FX rates and the mark-ups and mark-downs, and maximized profit to State Street at the expense of Plan assets;

(f) Whether Defendant's self-interested FX transactions constituted prohibited transactions under ERISA; and,

(g) Whether Defendant's acts proximately caused losses to the Plans, and if so, the appropriate relief to which Plaintiffs, on behalf of the Plans and the Class are entitled.

136.     **Typicality.** Plaintiffs are willing and prepared to serve the Court and the proposed Class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other members of the class.

137.     Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs are members of the Class described herein.

138.     The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

139.     A class action is superior to other available methods for the adjudication of this controversy. Individual litigation by all Class members would increase the delay and expense to the parties and the Court given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be more fair, efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

140.     **Adequacy.** The interests of the Plaintiffs are co-extensive with, and not antagonistic to, those of the absent Class members. Plaintiffs will undertake to represent and protect the interests of absent Class members. The undersigned counsel for Plaintiffs and the Class are experienced in class action, complex, and ERISA litigation, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and absent Class members.

141.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Compared to individual actions by each Class member, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

142.     **Rule 23(b)(1)(A) & (B) Requirements.** Class action status in this ERISA action is warranted under Federal Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

143. **Rule 23(b)(2) Requirements.** Certification under 23(b)(2) is warranted because Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

144. **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VI.   CAUSES OF ACTION

### COUNT I

### ERISA Prohibited Transactions

### (Violations of § 406(b)(1) of ERISA, 29 U.S.C. § 1106(b)(1))

145. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

146. Defendant State Street Bank is a fiduciary based on its discretionary control over Plan assets for the purposes of FX transactions.

147. ERISA section 406(b), 29 U.S.C. § 1106(b), prohibits transactions between a plan and a fiduciary that amount to self-dealing. Plaintiffs allege that State Street's FX trading practices amounted to self-dealing because State Street Bank, through its Global Markets division, consistently used its discretionary control over Plan assets to select for itself the most favorable FX rate based on the range of the day, regardless of the actual rate at the time the transaction occurred, and pocketed the difference between the two rates, causing its fiduciary clients, the Plaintiffs' Plans, and other members of the Proposed Class to suffer losses.

148. State Street's practice of FX transaction rate manipulation was nothing less than a fiduciary dealing with the assets of a plan for its own account. Fiduciary self-dealing is categorically prohibited by ERISA section 406(b), 29 U.S.C. § 1106(b).

149.     Pursuant to ERISA section 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) & (3), State Street Bank is liable to restore the losses to the Plans and provide other appropriate equitable relief.

## COUNT II

## Breach of Duties of Prudence and Loyalty

## (Violation of § 404 of ERISA, 29 U.S.C. § 1104)

150.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

151.     Defendant State Street Bank, through its SSgA division, is an "investment manager" within the meaning of ERISA section 3(38), 29 U.S.C. § 1002(38), because it (i) has the power to manage, acquire, or dispose of plan assets placed in its custody; (ii) is a bank within the meaning of the Investment Advisers Act of 1940; and (iii) has acknowledged in writing that it is a fiduciary with respect to the Plans.

152.     As a fiduciary under ERISA, State Street Bank is bound by the duties of prudence and loyalty laid out in ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1). These duties mean that as an investment manager for the Plaintiffs' Plans, State Street Bank is bound to act in the customer's interest when transacting business for the account, and thus bound, for example, to disclose fully to the Plans all the details of the relevant FX trading transactions it was undertaking, or negotiating on behalf of the funds, including the mark-ups or mark-downs that the funds were receiving for the FX trades.

153.     As a fiduciary, State Street also had a duty to monitor its internal Global Markets division. Through its Global Markets division, State Street Bank knew that it was charging unauthorized mark-ups and mark-downs for the non-negotiated trades rather than the actual transaction rates and pocketing the difference.

154.     State Street Bank has breached its ERISA fiduciary duties of prudence and loyalty because it knew that its Global Markets division was charging the Plans (or the commingled funds in which the Plans invested) unauthorized mark-ups and mark-downs for FX trading that

were unfavorable or unreasonable, above the transactional rates, and/or in excess of what Global Markets had agreed to charge, but did not ensure, by negotiation or otherwise, that Global Market's rates were in the best interest of the Plans.

155.     State Street, through its Global Markets division, has breached the duties of prudence and loyalty by charging the Plans (or the commingled Funds in which the Plans invested) unauthorized mark-ups or mark-downs over the actual FX trade rates that were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge.

156.     These breaches of fiduciary duty involved assets of the Plans on which fees were levied by State Street Bank. .

157.     Section 409(a) of ERISA, 29 U.S.C. § 1109(a), imposes liability on State Street Bank for these breaches and requires State Street Bank to make good to the Plans the losses resulting from its breaches.

158.     To enforce the relief available under ERISA section 409(a), 29 U.S.C. § 1109(a), Plaintiffs assert this claim against State Street Bank under ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2).

159.     Further, pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), State Street Bank must provide other appropriate equitable relief to redress its breaches of duty and enforce its fiduciary duties.

## COUNT III

### ERISA Prohibited Transactions

### (Violations of § 406(a)(1)(C) & (D) of ERISA, 29 U.S.C. § 1106(a)(1)(C) & (D))

160.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

161.     ERISA section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that the

transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

162.     ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that the transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

163.     As noted above, State Street Bank is a fiduciary with respect to the Plans.

164.     State Street Bank, State Street Global Advisors, and State Street Global Markets are "affiliates" within the meaning of the Prohibited Transaction Exemption and they directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with each other.

165.     Global Markets, as an affiliate of State Street Bank, is a "party in interest" within the meaning of ERISA section 3(14), 29 U.S.C. § 1002(14), for at least two independently sufficient reasons: it is a functional fiduciary with respect to the Plans, and it is a person providing services to the Plans.

166.     By allowing Global Markets to manipulate FX transaction prices to the detriment of the plan and pocket the difference between the actual transaction rate and the rate selected by Global Markets, State Street Bank violated ERISA section 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D). State Street Bank caused the Plans to engage in transactions while knowing that such transactions constituted a direct or indirect transfer of assets of the Plans to a party in interest, Global Markets.

167.     While ERISA section 408(b)(18), 29 U.S.C. § 1108(b)(18), provides an exemption from the prohibitions of ERISA section 406(a), 29 U.S.C. § 1106(a), for foreign currency exchanges between an employee benefit plan and a bank or a broker-dealer or an affiliate thereof which is a party in interest with respect to a plan, the exemption only applies if, at the time the FX transaction is entered into, the terms of the transaction are not less favorable to the plan than the terms generally available in comparable arm's-length foreign exchange

transactions, and if the bank or broker-dealer (or any affiliate of either) does not have investment discretion, or provide investment advice, with respect to the transaction. The exemption does not apply here for two independently sufficient reasons: (1) the terms of the FX transactions, by which Global Markets essentially ensured that its clients would always get the worst exchange rate of the day, were indeed less favorable to the Plans than comparable arm's-length transactions, and (2) State Street, SSgA, and Global Markets had investment discretion (and SSgA provided investment advice) with respect to the investment of plan assets when it entered into the transactions. Thus, State Street's FX trades do not fall under the narrow exemption of section 408(b)(18).

168.     Pursuant to ERISA section 502(a)(2) & (3), 29 U.S.C. § 1132(a)(2) & (3), State Street Bank is liable to restore the losses to the Plans and provide other appropriate equitable relief.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.     Declare that the Defendant has violated ERISA's prohibited transactions provisions;

2.     Declare that the Defendant breached its fiduciary duties under ERISA;

3.     Issue an order compelling a proper accounting of the FX transactions in which the Plans and other members of the Proposed Class have engaged;

4.     Issue an order compelling Defendant to restore all losses caused to the Plans (or that will be caused to the Plans after the filing of this Complaint);

5.     Issue an order compelling the Defendant to disgorge all fees paid and incurred to Defendant or its affiliates (or that will be paid or incurred by the Plans after the filing of this Complaint), including any profits thereon;

6.     Order equitable restitution and other appropriate equitable monetary relief against the Defendant;

7.      Award such other equitable, injunctive, or remedial relief as may be appropriate, including the permanent removal of the Defendant from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as FX custodian to the Plans;

8.      That this action be certified as a class action and that the Class be designated to receive the amounts restored to the Plans by Defendant and a constructive trust be established for distribution to the extent required by law;

9.      Enjoin Defendant collectively, and each affiliate individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

10.     Award Plaintiffs their attorneys' fees and costs pursuant to ERISA section 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

11.     Award such other and further relief as the Court deems equitable and just.

## **JURY DEMAND**

Plaintiffs hereby demand a jury on all issues so triable.


Dated: October 18, 2012

**HUTCHINGS, BARSAMIAN,
MANDELCORN & ZEYTOONIAN, LLP**

By: s/ Theodore M. Hess-Mahan
    Theodore M. Hess-Mahan, Esq. BBO #557109
    110 Cedar Street, Suite 250
    Wellesley Hills, MA 02481
    Telephone: 781-431-2231
    Facsimile: 781-431-8726
    *thess-mahan@hutchingsbarsamian.com*

**KELLER ROHRBACK, L.L.P.**
Lynn Lincoln Sarko (*pro hac vice pending)*
Derek W. Loeser (*pro hac vice pending)*
Laura R. Gerber (*pro hac vice pending)*
1201 3rd Avenue, Suite 3200
Seattle, WA 98101
Telephone: 206-623-1900
Facsimile: 206-623-8986
*lsarko@kellerrohrback.com*
*dloeser@kellerrohrback.com*
*lgerber@kellerrohrback.com*

***Counsel for Plaintiffs***

# EX. 4

| From: | Sucharow, Lawrence <LSucharow@labaton.com> |
|---|---|
| Sent: | Friday, August 28, 2015 12:04 PM |
| To: | Lynn Sarko |
| Cc: | Daniel P. Chiplock; rlieff@lieff.com; Michael Thornton; Garrett J. Bradley; Goldsmith, David |
| Subject: | Re: SSBT: Draft STIPULATION AND AGREEMENT OF SETTLEMENT |

I didn't get the email from Brian. So I don't intend to respond.

Others who receive the email Caroline should respond. I am only seeking the same powers but all of the lead counsel in all other cases I've been in received.

Of course I intend to honor all commitments, contracts, obligations, agreements, understandings buy what ever name or title. But especially those that are in writing like Brian's.

Sent from my iPhone

> On Aug 28, 2015, at 1:02 PM, Lynn Sarko <lsarko@KellerRohrback.com> wrote:

>

> We need to be careful about this as the DOL had asked if there were any agreements on fees between counsel. I would never answer their question. And then they seem to forget about it.

> But I'd rather not highlight it and have the DOL go sideways on us.

>

> Sent from my iPhone

>

> On Aug 28, 2015, at 9:35 AM, Brian McTigue <bmctigue@mctiguelaw.com<mailto:bmctigue@mctiguelaw.com>> wrote:

>

> I don't agree with lead settlement counsel distributing attorney's fees and expenses in its sole discretion. Attorney's fees and expenses should be distributed pursuant to the existing, written agreements of counsel.

>

> _____

> J. Brian McTigue

> McTigue Law LLP

> 4530 Wisconsin Ave. N.W.

> Suite 300

> Washington, DC 20016

> (202) 364-6900 ext. 300

> (202) 364-9960 fax

> bmctigue@mctiguelaw.com<mailto:bmctigue@mctiguelaw.com>

> www.mctiguelaw.com<http://www.mctiguelaw.com/>

> Member of the District of Columbia and California Bars

>

>

> The information contained in this E-mail transmission may be privileged and confidential and is intended solely for use by the individual or entity named as the recipient thereof. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this transmission is prohibited. If you have received this transmission error, or have any reason to believe that you may have received it in error please notify us immediately by calling the attached telephone number so we may arrange to retrieve this transmission at no cost to you.

1

Confidential: Produced Pursuant to Court Order.

> 
> From: Chiplock, Daniel P. [mailto:DCHIPLOCK@lchb.com]
> Sent: Friday, August 28, 2015 9:29 AM
> To: 'Sucharow, Lawrence' <LSucharow@labaton.com<mailto:LSucharow@labaton.com>>
> Cc: Zeiss, Nicole <NZeiss@labaton.com<mailto:NZeiss@labaton.com>>; Lynn Sarko
<lsarko@kellerrohrback.com<mailto:lsarko@kellerrohrback.com>>; rlieff@lieff.com<mailto:rlieff@lieff.com>; Michael
Thornton <MThornton@tenlaw.com<mailto:MThornton@tenlaw.com>>; Garrett J. Bradley
<gbradley@tenlaw.com<mailto:gbradley@tenlaw.com>>; Michael Lesser
<MLesser@tenlaw.com<mailto:MLesser@tenlaw.com>>; Evan Hoffman
<EHoffman@tenlaw.com<mailto:EHoffman@tenlaw.com>>; Kravitz, Carl S.
<ckravitz@zuckerman.com<mailto:ckravitz@zuckerman.com>>; Brian McTigue
<bmctigue@mctiguelaw.com<mailto:bmctigue@mctiguelaw.com>>; Rogers, Michael H.
<MRogers@labaton.com<mailto:MRogers@labaton.com>>; Goldsmith, David
<dgoldsmith@labaton.com<mailto:dgoldsmith@labaton.com>>
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> OK, sounds good.  I will also get you whatever edits I have to the settlement docs by noon.
> 
> From: Sucharow, Lawrence [mailto:LSucharow@labaton.com]
> Sent: Friday, August 28, 2015 9:28 AM
> To: Chiplock, Daniel P.
> Cc: Zeiss, Nicole; Lynn Sarko; rlieff@lieff.com<mailto:rlieff@lieff.com>; Michael Thornton; Garrett J. Bradley; Michael
Lesser; Evan Hoffman; Kravitz, Carl S.; Brian McTigue; Rogers, Michael H.; Goldsmith, David
> Subject: Re: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> I am speaking to Paine today at around 10 AM to both report to him and get his update.
> I'll report back and advise whether we should send the revised term sheet. I expect we should but let's hold off for
another hour.
> 
> Sent from my iPhone
> 
> On Aug 28, 2015, at 9:19 AM, Chiplock, Daniel P. <DCHIPLOCK@lchb.com<mailto:DCHIPLOCK@lchb.com>> wrote:
> This looks OK to me, thanks.  I'm happy to send it (after you've done the other redline) to Paine, if you like.  Or
someone else can, no matter.
> 
> From: Zeiss, Nicole [mailto:NZeiss@labaton.com]
> Sent: Thursday, August 27, 2015 3:27 PM
> To: Lynn Sarko; 'rlieff@lieff.com<mailto:rlieff@lieff.com>'; Chiplock, Daniel P.; Michael Thornton; Garrett J. Bradley;
Michael Lesser; 'Evan Hoffman'; 'Kravitz, Carl S.'; 'Brian McTigue'
> Cc: Rogers, Michael H.; Sucharow, Lawrence; Goldsmith, David
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> Dear all,
> 
> We've had some additional exchanges about the term sheet and, specifically, para 8(n).  I believe the attached draft
resolves those issues and that there is consensus that the attached accurately reflects the basic DOL fee deal.  If you
disagree, please let us know asap.
> 
> When someone wants to send this to Paine, or the DOL, I will need a run a different redline for them.
> 
> Thanks
> 

2

> 
> 
> 
> 
> 
> 
> <image001.jpg><http://labaton.com/>
> Nicole M. Zeiss | Partner
> 140 Broadway, New York, New York 10005
> T: (212) 907-0867 |  F: (212) 883-7067
> E: nzeiss@labaton.com<mailto:nzeiss@labaton.com>  |  W: www.labaton.com<http://www.labaton.com/>
> 
> <image002.jpg><http://www.linkedin.com/company/labaton-sucharow-llp>
<image003.jpg><https://twitter.com/LabatonSucharow> <image004.jpg><https://www.facebook.com/pages/Labaton-Sucharow-LLP/443111702425065>
> 
> From: Zeiss, Nicole
> Sent: Wednesday, August 26, 2015 5:09 PM
> To: Sucharow, Lawrence; Lynn Sarko; Goldsmith, David; 'rlieff@lieff.com<mailto:rlieff@lieff.com>'; Daniel P. Chiplock; Michael Thornton; Garrett J. Bradley; Michael Lesser; 'Evan Hoffman'; 'Kravitz, Carl S.'; 'Brian McTigue'
> Cc: Rogers, Michael H.
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> Attached is the term sheet showing the changes discussed below, plus one additional change to para 8(n) that might help.
> 
> Thanks
> 
> 
> 
> 
> 
> 
> 
> <image005.jpg><http://labaton.com/>
> Nicole M. Zeiss | Partner
> 140 Broadway, New York, New York 10005
> T: (212) 907-0867 |  F: (212) 883-7067
> E: nzeiss@labaton.com<mailto:nzeiss@labaton.com>  |  W: www.labaton.com<http://www.labaton.com/>
> 
> <image006.jpg><http://www.linkedin.com/company/labaton-sucharow-llp>
<image007.jpg><https://twitter.com/LabatonSucharow> <image008.jpg><https://www.facebook.com/pages/Labaton-Sucharow-LLP/443111702425065>
> 
> From: Sucharow, Lawrence
> Sent: Wednesday, August 26, 2015 4:34 PM
> To: Lynn Sarko; Goldsmith, David; 'rlieff@lieff.com<mailto:rlieff@lieff.com>'; Daniel P. Chiplock; Michael Thornton; Garrett J. Bradley; Michael Lesser; 'Evan Hoffman'; 'Kravitz, Carl S.'; 'Brian McTigue'
> Cc: Zeiss, Nicole; Rogers, Michael H.
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> Then we can probably forget my proposed changes.

3

Confidential: Produced Pursuant to Court Order.

TLF-SST-052977

> 
> From: Lynn Sarko [mailto:lsarko@KellerRohrback.com]
> Sent: Wednesday, August 26, 2015 4:26 PM
> To: Sucharow, Lawrence; Goldsmith, David; 'rlieff@lieff.com<mailto:rlieff@lieff.com>'; Daniel P. Chiplock; Michael Thornton; Garrett J. Bradley; Michael Lesser; 'Evan Hoffman'; 'Kravitz, Carl S.'; 'Brian McTigue'
> Cc: Zeiss, Nicole; Rogers, Michael H.
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> Sure.   If it works for them – its fine with me
> 
> Lynn Lincoln Sarko
> Managing Partner
> 
> Keller Rohrback L.L.P.
> 1201 Third Avenue, Suite 3200
> Seattle, WA 98101
> 
> Phone: (206) 623-1900
> Fax: (206) 623-3384
> E-mail: lsarko@kellerrohrback.com<mailto:lsarko@kellerrohrback.com>
> 
> From: Sucharow, Lawrence [mailto:LSucharow@labaton.com]
> Sent: Wednesday, August 26, 2015 1:25 PM
> To: Lynn Sarko <lsarko@KellerRohrback.com<mailto:lsarko@KellerRohrback.com>>; Goldsmith, David <dgoldsmith@labaton.com<mailto:dgoldsmith@labaton.com>>; 'rlieff@lieff.com<mailto:rlieff@lieff.com>' <rlieff@lieff.com<mailto:rlieff@lieff.com>>; Daniel P. Chiplock <DCHIPLOCK@lchb.com<mailto:DCHIPLOCK@lchb.com>>; Michael Thornton <MThornton@tenlaw.com<mailto:MThornton@tenlaw.com>>; Garrett J. Bradley <gbradley@tenlaw.com<mailto:gbradley@tenlaw.com>>; Michael Lesser <MLesser@tenlaw.com<mailto:MLesser@tenlaw.com>>; 'Evan Hoffman' <EHoffman@tenlaw.com<mailto:EHoffman@tenlaw.com>>; 'Kravitz, Carl S.' <ckravitz@zuckerman.com<mailto:ckravitz@zuckerman.com>>; 'Brian McTigue' <bmctigue@mctiguelaw.com<mailto:bmctigue@mctiguelaw.com>>
> Cc: Zeiss, Nicole <NZeiss@labaton.com<mailto:NZeiss@labaton.com>>; Rogers, Michael H. <MRogers@labaton.com<mailto:MRogers@labaton.com>>
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> Can we leave para 8(n) the general way it is and protect the DOL through the express provision of para 12 limiting fees charged to ERISA allocation to $10.9 million?
> 
> From: Lynn Sarko [mailto:lsarko@KellerRohrback.com]
> Sent: Wednesday, August 26, 2015 3:42 PM
> To: Goldsmith, David; 'rlieff@lieff.com<mailto:rlieff@lieff.com>'; Daniel P. Chiplock; Michael Thornton; Garrett J. Bradley; Michael Lesser; 'Evan Hoffman'; 'Kravitz, Carl S.'; 'Brian McTigue'
> Cc: Sucharow, Lawrence; Zeiss, Nicole; Rogers, Michael H.
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> David
> Thanks for sending this.  Sorry, I had misunderstood what you were saying on our call earlier today.
> 
> Two things:
> 

4

TLF-SST-052978

> 1.  I do think the language you proposed for paragraph 12 works—but just change it to $10.9 million.
> 2. On paragraph 8(n)- the problem is the word "fees"—since the DOL has given us a hard number for ERISA fees—that won't be going up or down.   So—question—can we get rid of the word "fees" in this paragraph—does it still work?
>
> What do you think??
>
> Lynn
>
> Lynn Lincoln Sarko
> Managing Partner
>
> Keller Rohrback L.L.P.
> 1201 Third Avenue, Suite 3200
> Seattle, WA 98101
>
> Phone: (206) 623-1900
> Fax: (206) 623-3384
> E-mail: lsarko@kellerrohrback.com<mailto:lsarko@kellerrohrback.com>
>
> From: Goldsmith, David [mailto:dgoldsmith@labaton.com]
> Sent: Wednesday, August 19, 2015 2:59 PM
> To: 'rlieff@lieff.com<mailto:rlieff@lieff.com>' <rlieff@lieff.com<mailto:rlieff@lieff.com>>; Daniel P. Chiplock <DCHIPLOCK@lchb.com<mailto:DCHIPLOCK@lchb.com>>; Michael Thornton <MThornton@tenlaw.com<mailto:MThornton@tenlaw.com>>; Garrett J. Bradley <gbradley@tenlaw.com<mailto:gbradley@tenlaw.com>>; Michael Lesser <MLesser@tenlaw.com<mailto:MLesser@tenlaw.com>>; 'Evan Hoffman' <EHoffman@tenlaw.com<mailto:EHoffman@tenlaw.com>>; Lynn Sarko <lsarko@KellerRohrback.com<mailto:lsarko@KellerRohrback.com>>; 'Kravitz, Carl S.' <ckravitz@zuckerman.com<mailto:ckravitz@zuckerman.com>>; 'Brian McTigue' <bmctigue@mctiguelaw.com<mailto:bmctigue@mctiguelaw.com>>
> Cc: Sucharow, Lawrence <LSucharow@labaton.com<mailto:LSucharow@labaton.com>>; Zeiss, Nicole <NZeiss@labaton.com<mailto:NZeiss@labaton.com>>; Rogers, Michael H. <MRogers@labaton.com<mailto:MRogers@labaton.com>>
> Subject: SST--Proposed Revision to Term Sheet for DOL Deal
>
> All:  The below reflects our proposed revisions to the Term Sheet (in red boldface) to reflect the imminent deal with the DOL on fees and expenses as certain of us discussed this morning (DOL has advised that they want the deal memorialized in the Term Sheet).  Please comment.  Thanks.
>
>
> 8(n).     Plan of Allocation. . . . The amount allocated to the ERISA Plans and Investment Companies and other Settlement Class Members shall be increased or decreased by their proportional share (with respect to the Class Settlement Amount) of any interest, costs (including costs of notice and administration), expenses (including taxes), and fees and expenses of Plaintiffs' Counsel obtained or paid pursuant to permission of the Court.  However, notice and administration expenses attributable solely to the claims of Class Members categorized as Group Trusts shall be paid solely out of the ERISA allocation, and the cost of any ERISA Independent Fiduciary shall be borne solely by SSBT and shall not be paid out of the Class Settlement Amount.
>
> 12.     Plaintiffs' Counsel's Attorneys' Fees and Expenses.     Plaintiffs' Counsel's attorneys' fees and expenses, as awarded by the Court, shall be paid from the Class Escrow Account immediately upon award by the Court into an escrow account governed by an escrow agreement between Interim Lead Counsel, SSBT and a bank or other institution agreed upon by SSBT and Interim Lead Counsel (the "Interim Lead Counsel Escrow Account"), notwithstanding any appeals of

Confidential: Produced Pursuant to Court Order.                                                                                    TLF-SST-052979

the Settlement or the fee and expense award.  Plaintiffs' Counsel shall may apply for their fees and expenses and any service awards for Plaintiffs against the entire Class Settlement Amount, but in no event shall more than Ten Million Nine Hundred Thousand Dollars ($10,900,000.00) in fees be paid out of the $60 million portion of the Class Settlement Amount allocated to ERISA Plans, as referenced in Paragraph 8(n) above.  In the event that the Effective Date does not occur or SSBT promptly provides written notice representing in good faith that the Effective Date has not and cannot occur due to developments with the DOJ Settlement, DOL Settlement, and/or SEC Settlement and explaining the grounds for the notice, Plaintiffs' Counsel severally shall be obliged to pay to SSBT all amounts paid to them from the Interim Lead Counsel Escrow Account within fourteen (14) business days.  The prevailing party in any action to collect any amount due under this paragraph shall be entitled to recover interest and all of its costs of collection, including attorneys' fees.  Should the fee and expense award be reduced by the Court or on appeal, all such fees and expenses received by Plaintiffs' Counsel in excess of those that are ultimately approved shall be repaid to the Class Escrow Account, along with interest at the Class Escrow Account rate of interest.

>
>
>
>
>
>
> [http://www.labaton.com/images/email-logo.jpg]<http://www.labaton.com/>
> David J. Goldsmith | Partner
> 140 Broadway, New York, New York 10005
> T: (212) 907-0879 | F: (212) 883-7079
> E: dgoldsmith@labaton.com<mailto:dgoldsmith@labaton.com>  |  W: www.labaton.com<http://www.labaton.com/>
>
> [http://www.labaton.com/images/email-linkedin.gif]<http://www.linkedin.com/company/labaton-sucharow-llp>
[http://www.labaton.com/images/email-twitter.gif] <https://twitter.com/LabatonSucharow>
[http://www.labaton.com/images/email-facebook.gif] <https://www.facebook.com/pages/Labaton-Sucharow-LLP/443111702425065>
>
>
> ***Privilege and Confidentiality Notice***
>
> This electronic message contains information that is (a) LEGALLY PRIVILEGED, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not the Addressee(s), or the person responsible for delivering this to the Addressee(s), you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please contact us immediately at 212-907-0700 and take the steps necessary to delete the message completely from your computer system. Thank you.
>
>
>
>
> This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.
>
>
> This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

Confidential: Produced Pursuant to Court Order.

TLF-SST-052980

# EX. 5

| From: | Garrett Bradley |
|---|---|
| **Sent:** | Wednesday, September 2, 2015 11:05 AM |
| **To:** | Sucharow; Lawrence |
| **Subject:** | Re: State Street FX - revised term sheet |

My gut tells me they will press for a fee agreement deal or withhold signature at some point in the process. They may threaten their own fee app. State street may want us all on the dotted line but I wanted to raise it and have you think about it. It may be too late.

Garrett

> On Sep 2, 2015, at 12:02 PM, Sucharow, Lawrence <LSucharow@labaton.com> wrote:
>
> Never thought of it.
> Why, is there a problem?
>
> -----Original Message-----
> From: Garrett Bradley [mailto:GBradley@tenlaw.com]
> Sent: Wednesday, September 02, 2015 11:59 AM
> To: Sucharow, Lawrence
> Subject: Re: State Street FX - revised term sheet
>
> aren't you lead and Lieff Liason?  no way around everyone signing?
>
> Garrett
>
>> On Sep 2, 2015, at 11:28 AM, Sucharow, Lawrence <LSucharow@labaton.com> wrote:
>>
>> All Plaintiffs' Counsel for both Term Sheet and Stip.
>>
>> -----Original Message-----
>> From: Garrett Bradley [mailto:GBradley@tenlaw.com]
>> Sent: Wednesday, September 02, 2015 11:25 AM
>> To: Sucharow, Lawrence
>> Subject: Re: State Street FX - revised term sheet
>>
>> Larry,
>>
>> Does any other counsel need to sign off besides you for the consumer side?
>>
>> Garrett
>>
>>> On Sep 2, 2015, at 11:16 AM, Sucharow, Lawrence <LSucharow@labaton.com> wrote:
>>>
>>> I don't necessarily disagree, but would want it under my designation as Interim Lead Class Counsel, such as Interim Lead ERISA Sub-Class Counsel.
>>> That having been said, only the Court can make that designation, it is NOT a self-appointed title.
>>>

1

Confidential: Produced Pursuant to Court Order.

>>> -----Original Message-----
>>> From: Chiplock, Daniel P. [mailto:DCHIPLOCK@lchb.com]
>>> Sent: Wednesday, September 02, 2015 11:14 AM
>>> To: Robert L. Lieff; Sucharow, Lawrence; Michael Thornton
>>> Subject: FW: State Street FX - revised term sheet
>>>
>>> I'm going to respectfully suggest that we give Lynn this designation, if there needs to be one, in order to head this off.
>>>
>>> -----Original Message-----
>>> From: Lynn Sarko [mailto:lsarko@KellerRohrback.com]
>>> Sent: Wednesday, September 02, 2015 11:10 AM
>>> To: Sucharow, Lawrence
>>> Cc: Chiplock, Daniel P.; Lieff, Robert L.; Garrett J. Bradley; Michael Thornton; Zeiss, Nicole
>>> Subject: Re: State Street FX - revised term sheet
>>>
>>> I will call him
>>>
>>> Sent from my iPhone
>>>
>>> On Sep 2, 2015, at 8:09 AM, Sucharow, Lawrence <LSucharow@labaton.com<mailto:LSucharow@labaton.com>> wrote:
>>>
>>> Lynn this is getting crazy.  We don't believe there is a need for such a designation, but if so, he should move before the Court so we can oppose.
>>> If I talk to him there may be a schism created.  I suggest you ask him what the heck he's doing.
>>>
>>> From: Chiplock, Daniel P. [mailto:DCHIPLOCK@lchb.com]
>>> Sent: Wednesday, September 02, 2015 10:57 AM
>>> To: Sucharow, Lawrence; Lynn Sarko; Robert L. Lieff
>>> Subject: RE: State Street FX - revised term sheet
>>>
>>> I'm sure you guys noticed that Brian has appointed himself Interim Lead ERISA Counsel in the signature block?
>>>
>>> From: Sucharow, Lawrence [mailto:LSucharow@labaton.com]
>>> Sent: Tuesday, September 01, 2015 11:07 PM
>>> To: Lynn Sarko
>>> Cc: Zeiss, Nicole; Chiplock, Daniel P.; Rogers, Michael H.; Goldsmith, David
>>> Subject: Re: State Street FX - revised term sheet
>>>
>>> Lynn, you and I should discuss how best to handle Brian, I completely agree with you.
>>>
>>> Perhaps a side letter from me as lead counsel saying I intend to abide by the agreement entered into between class counsel and ERISA counsel, dated, whatever, would satisfy him?
>>>
>>> Lawrence Sucharow
>>> Labaton Sucharow, LLP
>>> Sent from my iPad
>>>
>>> On Sep 1, 2015, at 10:43 PM, Lynn Sarko <lsarko@KellerRohrback.com<mailto:lsarko@KellerRohrback.com>> wrote:
>>> This is what went to the DOL as a draft.

Confidential: Produced Pursuant to Court Order.                          TLF-SST-054021

>>>

>>> Lynn

>>>

>>> Lynn Lincoln Sarko

>>> Managing Partner

>>>

>>> Keller Rohrback L.L.P.

>>> 1201 Third Avenue, Suite 3200

>>> Seattle, WA 98101

>>>

>>> Phone: (206) 623-1900

>>> Fax: (206) 623-3384

>>> E-mail: lsarko@kellerrohrback.com<mailto:lsarko@kellerrohrback.com>

>>>

>>>

>>> ***Privilege and Confidentiality Notice***

>>>

>>> This electronic message contains information that is (a) LEGALLY PRIVILEGED, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not the Addressee(s), or the person responsible for delivering this to the Addressee(s), you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please contact us immediately at 212-907-0700 and take the steps necessary to delete the message completely from your computer system. Thank you.

>>>

>>>

>>> <#1397344v11_Active_ - State Street - Term Sheet.DOCX> <State Street - Term Sheet - State Street - Term Sheet.pdf>

>>>

>>>

>>> This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

>>>

>>>

>>> This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

>> This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in notifying us.

> This e-mail and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom they are addressed. This communication may contain material protected by the attorney-client privilege. If you are not the intended recipient or the person responsible for delivering the e-mail to the intended recipient, be advised that you have received this e-mail in error and that any use, dissemination, forwarding, printing, or copying of this e-mail is strictly prohibited. If you have received this e-mail in error; please immediately notify us by telephone at (800) 431-4600. You will be reimbursed for reasonable costs incurred in notifying us.

Confidential: Produced Pursuant to Court Order.

TLF-SST-054022

# EX. 6

| From: | Lynn Sarko |
| --- | --- |
| To: | Lynn Sarko; 'Lieff, Robert L.' |
| CC: | 'rlieff@lieff.com'; Lynn Sarko; Laura Gerber |
| Sent: | 8/30/2013 1:22:50 PM |
| Subject: | RE: State Street |
| Attachments: | FeeAgreement083013.docx |

Robert

I have signoff from the ERISA counsel on the fee division between the ERISA and Consumer counsel that we discussed this morning. Attached is a draft agreement that reflects the 91%/9% split.

I have received approval from the other ERISA counsel.

Regards,

Lynn

Lynn L. Sarko
Keller Rohrback LLP
206-224-7552


On Aug 28, 2013, at 2:31 PM, "Lieff, Robert L." <RLIEFF@lchb.com<mailto:RLIEFF@lchb.com>> wrote:

Lynn,

We are waiting to receive from you a draft agreement between ERISA and Consumer plaintiffs. Can we have it this week? We are drafting a settlement agreement for all plaintiffs including ERISA and defendants. Thanks.

Robert

<image001.gif>

Robert L. Lieff
Of Counsel
rlieff@lchb.com<mailto:rlieff@lchb.com>
t 415.956.1000
f 415.956.1008
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
www.lieffcabraser.com<http://www.lieffcabraser.com>


This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.


This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

### AGREEMENT BETWEEN COUNSEL
### FOR CONSUMER AND ERISA PLAINTIFFS
### REGARDING DIVISION OF ATTORNEYS' FEES

This Agreement Between Counsel For Consumer And ERISA Plaintiffs Regarding Division Of Attorneys' Fees (the "Agreement") is made and entered into by and between: Labaton Sucharow LLP, Thornton & Naumes, LLP, and Lieff Cabraser Heimann & Bernstein, LLP (collectively, "Counsel for Consumer Plaintiffs"), on the one hand, and McTigue Law LLP, Zuckerman Spaeder LLP, Beins, Axelrod, P.C., Richardson, Patrick, Westbrook & Brickman, and Keller Rohrback L.L.P. (collectively, Counsel for ERISA Plaintiffs), on the other hand (the "Parties"). This Agreement shall be effective as of _____, 2013.

### RECITALS

WHEREAS, Counsel for Consumer Plaintiffs have filed the lawsuit captioned *Arkansas Teacher Retirement System vs. State Street Corporation, et. al., No. 11-cv-10230 MLW* (*"ARTRS"*), in the United States District Court for the District of Massachusetts, alleging on behalf of their client, the Arkansas Teacher Retirement System ("ARTRS"), and a putative class of all institutional investors in foreign securities, including public and private pension funds, ERISA-qualified plans, mutual funds, endowment funds and investment manager funds, for which State Street served as the custodial bank and executed FX trades on an "indirect," "standing-instruction," or "non-negotiated" basis alleging state law claims against State Street Corporation, State Street Bank and Trust Company, and others, but no claims under ERISA.

1.      WHEREAS, Counsel for ERISA Plaintiffs have filed two lawsuits captioned *Arnold Henriquez, et. al., vs. State Street Bank and Trust Company,, et. al.,* No. 11-cv-12049 MLW (*"Henriquez"*), and *Andover Companies, et. al., vs. State Street Bank and Trust Company,* No. 12-cv-11698 MLW (*"Andover"*), in the United States District Court for the District of

KR00000007

Massachusetts, alleging on behalf of their clients, Arnold Henriquez (as a participant and beneficiary of the Waste Management Retirement Savings Plan), Michael T. Cohn (as a participant and beneficiary of the Citigroup 401(k) Plan), William R. Taylor and Richard A. Sutherland (each as participants and beneficiaries of the Retirement Plan of Johnson & Johnson), Alan Kober as a Trustee of The Andover Companies' Savings and Profit Sharing Plan, and James Pehoushek-Stangeland, as a participant and beneficiary of The Boeing Company Voluntary Investment Plan), and putative classes of private (ERISA) pension plans for which State Street served as the custodial bank and executed FX trades on an "indirect," "standing-instruction," or "non-negotiated" basis, alleging breaches of federal ERISA law against State Street Bank and Trust Company, and others, but none of the other state law claims alleged by ARTRS.

WHEREAS, the *ARTRS, Andover* and *Henriquez* cases are all pending before the same judge and are being mediated and litigated together and the Parties believe that it is in the best interests of their respective clients and the putative classes that they are seeking to represent that, where appropriate and consistent with their obligations to advocate for their respective clients, they work cooperatively in the litigation against State Street Corporation and the other defendants, and further, that agreeing to a division of attorneys' fees, as set forth below, is in the best interests of their respective clients.

NOW, THEREFORE, for good and valuable consideration, including the mutual promises contained herein, the sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

1. The Parties agree that any attorneys' fee agreed, awarded and/or approved by the Court in connection with the *ARTRS, Andover or Henriquez* cases, whether the

2

KR00000008

product of settlement or litigated resolution of the cases, shall be divided 91 % to Counsel for Consumer Plaintiffs and 9 % to Counsel for ERISA Plaintiffs (the "Division of Fees").

2. The Parties agree that the Division of Fees shall apply whether the attorneys' fees agreed, awarded and/or approved by the Court is a single sum for all claims and cases or otherwise.

3. The Parties agree that they will each remain responsible for representing the interests of their respective clients and that nothing herein limits in any way their obligations to represent and exercise independent judgment on behalf of their respective clients.

4. The Parties agree that the terms of this Agreement may be disclosed to the Court, if any of them believes it appropriate to do so.

5. The Parties represent that they have disclosed and explained this Agreement to their respective clients and that their clients have consented to the Division of Fees and other terms herein.

6. This Agreement does not impact or change the Parties' rights and ability to seek the reimbursement of litigation expenses; nor does it contain any agreement on the sharing of expenses.

7. This Agreement is governed by the substantive law of the Commonwealth of Massachusetts.

CONFIDENTIAL

KR00000009