# EX. 46

**Draft Copy**

**Labaton Sucharow**
**11/21/2016 6:45 PM**

**Lawrence A. Sucharow**
Partner
212 907 0860      direct
212 883 7060      fax
lsucharow@labaton.com

November 21, 2016

By E-Mail

Michael P. Thornton, Esq.
Thornton Law Firm LLP
100 Summer Street, 30th Floor
Boston, Massachusetts  02110

Lynn Lincoln Sarko, Esq.
Keller Rohrback L.L.P.
1201 Third Avenue, Suite 3200
Seattle, Washington  98101

Daniel P. Chiplock, Esq.
Lieff Cabraser Heimann & Bernstein, LLP
250 Hudson Street, 8th Floor
New York, New York  10013

Carl S. Kravitz, Esq.
Zuckerman Spaeder LLP
1800 M Street, N.W.
Washington, D.C.  20036

Robert L. Lieff, Esq.
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, California  94111

J. Brian McTigue, Esq.
McTigue Law LLP
4530 Wisconsin Ave, N.W., Suite 300
Washington, D.C.  20016

Re:     *Arkansas Teacher Retirement System v. State Street Bank & Trust Co.*,
         No. 11-CV-10230 MLW (D. Mass.)
         *Henriquez v. State Street Bank & Trust Co.*,
         No. 11-CV-12049 MLW (D. Mass.)
         *The Andover Companies Employee Savings*
            *& Profit Sharing Plan v. State Street Bank & Trust Co.*,
         No. 12-CV-11698 MLW (D. Mass.)

Dear Counsel:

As you are aware, on November 8, 2016, after Judge Wolf issued the Order Awarding Attorneys'
Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs (the "Fee
Order," ECF No. 111), counsel in the *Arkansas* action received an inquiry from the *Boston Globe*
concerning certain of the individual firm lodestar reports supporting our motion for attorneys' fees.

In response, as you are also aware, we filed a detailed letter with the Court on November 10, 2016
("Letter," ECF No. 116).  The Letter disclosed certain inadvertent errors in these submissions, and
provided a corrected combined time spent, corrected combined lodestar, and the resulting corrected
multiplier.  Because the fee was determined based on the percentage-of-fund method, and the
overstatement of the lodestar resulted only in a modest increase in the multiplier cross-check, we

Confidential: Produced Pursuant to Court Order.

All Counsel in State Street FX Cases
November 21, 2016
Page 2

argued that the fee was fully supportable under the Court's stated rationale and that no changes were required.

Further, the Letter offered our apology for the errors, and indicated that we were available to respond to any questions or concerns the Court may have.

The Fee Order and the Court's Order and Final Judgment (the "Judgment," ECF No. 110) become Final on December 2, 2016, and the Settlement will become Effective shortly thereafter, on December 7, 2016.[1]  Because there were no objections to the Settlement or requested fees, no Class member has standing to appeal the Fee Order or Judgment.

As of today, the Court has not acted in response to the Letter.  If the Court remains silent as of close of business on December 7, 2016, we will begin the process of withdrawing the approved fees, expenses, and service awards from the Lead Counsel Escrow Account for prompt distribution to your respective firms pursuant to our agreements.

It is possible, however, that the Court, on or after December 8, 2016, will respond adversely to the Letter and ultimately reduce the fee award.  This could occur after the fees, expenses and service awards have been distributed to your respective firms (and to the other ERISA counsel).

Accordingly, before we distribute your share of the fees, expenses, and service awards, we will require an undertaking, evidenced by your signature below, confirming your agreement to refund to us within five (5) business days, for redeposit into the Lead Counsel Escrow Account, your *pro rata* share of any Court-ordered reduction of fees, expenses, and/or service awards.

Please sign below and return an executed copy to us.  Thank you for your cooperation.  Please let me know if you have any questions.

Very truly yours,

Lawrence A. Sucharow

---

[1] The time to appeal the Judgment and Fee Order expires on December 2, 2016 (a Friday), 30 days after entry.  *See* Settlement Agmt. ¶ 1(z)(iii).  After that, however, State Street has two (2) business days to make its formal settlement offer to the SEC before the Effective Date is reached.  That brings the Effective Date to December 7.

Confidential: Produced Pursuant to Court Order.

All Counsel in State Street FX Cases
November 21, 2016
Page 3

LAS/idi

ACCEPTED AND AGREED:

| | |
|---|---|
| Thornton Law Firm LLP | Lieff Cabraser Heimann & Bernstein, LLP |
| Name: _____ | Name: _____ |
| Dated: _____, 2016 | Dated: _____, 2016 |

| | |
|---|---|
| Robert L. Lieff, Esq. | Keller Rohrback L.L.P. |
| Name: _____ | Name: _____ |
| Dated: _____, 2016 | Dated: _____, 2016 |

| | |
|---|---|
| Zuckerman Spaeder LLP | McTigue Law LLP |
| Name: _____ | Name: _____ |
| Dated: _____, 2016 | Dated: _____, 2016 |

Confidential: Produced Pursuant to Court Order.

# EX. 47

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br>     Plaintiff <br><br>       v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) C.A. No. 11-10230-MLW <br> ) <br> ) <br> ) <br> ) |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN,WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br>     Plaintiff <br><br>       v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 11-12049-MLW <br> ) <br> ) <br> ) |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND and all others similarly situated, <br>     Plaintiff <br><br>       v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br>     Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) C.A. No. 12-11698-MLW <br> ) <br> ) <br> ) |

MEMORANDUM AND ORDER

WOLF, D.J.                                    February 6, 2017

I.   SUMMARY

Questions have arisen with regard to the accuracy and reliability of information submitted by plaintiffs' counsel on

which the court relied, among other things, in deciding that it
was reasonable to award them almost $75,000,000 in attorneys' fees
and more than $1,250,000 in expenses.  The court now proposes to
appoint former United States District Judge Gerald Rosen as a
special master to investigate those issues and prepare a Report
and Recommendation for the court concerning them.  After providing
plaintiffs' counsel an opportunity to object and be heard, the
court would decide whether the original award of attorneys' fees
remains reasonable, whether it should be reduced, and, if
misconduct has been demonstrated, whether sanctions should be
imposed.

The court is now, among other things, providing plaintiffs'
counsel the opportunity to consent or to object to: the appointment
of a special master generally; to the appointment of Judge Rosen
particularly; and to the proposed terms of any appointment.  A
hearing to address the possible appointment of a special master
will be held on March 7, 2017, at 10:00 a.m.

II.  BACKGROUND

After a hearing on November 2, 2016, the court approved a
$300,000,000 settlement in this class action in which it was
alleged that defendant State Street Bank and Trust overcharged its
customers in connection with certain foreign exchange
transactions.  It also employed the "common fund" method to
determine the amount of attorneys' fees to award.  See In re

Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig., 56 F.3d 295, 305 (1st Cir. 1995). The court found to be reasonable an award to class counsel of $74,541,250 in attorneys' fees and $1,257,697.94 in expenses. That award represented about 25% of the common fund.

Like many judges, and consistent with this court's long practice, the court tested the reasonableness of the requested award, in part, by measuring it against what the nine law firms representing plaintiffs stated was their total "lodestar" of $41,323,895.75. See Nov. 2, 2016 Transcript ("Tr.") at 30-31, 34; see also Manual for Complex Litigation (Fourth) § 14.122 (2004) ("the lodestar is . . . useful as a cross-check on the percentage method" of determining reasonable attorneys' fees); Vizcaino v. Microsoft Corp., 290 F.3d 1043, 1050 (9th Cir. 2002) ("[T]he lodestar may provide a useful perspective on the reasonableness of a given percentage award."). Plaintiffs' counsel represented that the total requested award involved a multiplier of $1.8%, which they argued was reasonable in view of the risk they undertook in taking this case on a contingent fee. See Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees (Docket No. 103-1) at 24-25 ("Fees Award Memo").

A lodestar is properly calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate. See Blum v. Stenson, 465 U.S. 886, 889 (1984). The

3

Supreme Court has instructed that "[r]easonable fees . . . are to be calculated according to the prevailing rates in the relevant community." Id. at 895. "[T]he rate that private counsel actually charges for her services, while not conclusive, is a reliable indicum of market value." United States v. One Star Class Sloop Sailboat built in 1930 with hull no. 721, named "Flash II", 546 F.3d 26, 40 (1st Cir. 2008)(emphasis added).[1]

In their memorandum in support of the fee request, plaintiffs' counsel represented that to calculate the lodestar they had used "current rather than historical billing rates," for attorneys working on this case. Fees Award Memo. (Docket No. 103-1) at 24. Similarly, in the related affidavits filed on behalf of each law firm counsel stated that "the hourly rates for the attorneys and professional support staff in my firm . . . are the same as my firm's regular rates charged for their services . . . ." See, e.g., Declaration of Garett J. Bradley on behalf of Thornton Law Firm LLP ("Thornton") (Docket No. 104-16) at ¶4; Declaration of Lawrence A. Sucharow on behalf of Labaton Sucharow LLP ("Labaton") (Docket No. 104-15) at ¶7. In view of the well-established jurisprudence and the representations of counsel, the court understood that in calculating the lodestar plaintiffs' law firms

---

[1] The First Circuit cited a common fund case, In re Cont'l III Sec. Litig., 962 F.2d 566, 568 (7th Cir. 1992), for this proposition.

4

had used the rates they each customarily actually charged paying clients for the services of each attorney and were representing that those rates were comparable to those actually charged by other attorneys to their clients for similar services in their community.

On November 10, 2016, David J. Goldsmith of Labaton, on behalf of plaintiffs' counsel, filed the letter attached hereto as Exhibit A (Docket No. 116). Mr. Goldsmith noted that the court had used the lodestar calculated by counsel as a check concerning the reasonableness of the percentage of the common fund requested for attorneys' fees. Id. at 3, n.4. Counsel stated that as a result of an "inquiry from the media" "inadvertent errors [had] just been discovered in certain written submissions from Labaton Sucharow LLP, Thornton Law Firm LLP, and Lieff Cabraser Heiman & Bernstein LLP supporting Lead Counsel's motion for attorneys' fees . . . ." Id. at 1. Counsel reported that the hours of certain staff attorneys, who were paid by the hour primarily to review documents, had been included in the lodestar reports of more than one firm. Id. at 1-2. He also stated that in some cases different billing rates had been attributed to particular staff attorneys by different firms. Id. at 3.

The double-counting resulted in inflating the number of hours worked by more than 9,300 and inflating the total lodestar by more than $4,000,000. Id. at 2-3. As a result, counsel stated a multiplier of 2, rather than 1.8, should have been used to test

the reasonableness of the request for an award of $74,541,250 as attorneys' fees. Id. at 3. Counsel asserted that the award nevertheless remained reasonable and should not be reduced. Id. The letter did not indicate that the reported lodestar may not have been based on what plaintiffs' counsel, or others in their community, actually customarily charged paying clients for the type of work done by the staff attorneys in this case. Nor did the letter raise any question concerning the reliability of the representations concerning the number of hours each attorney reportedly worked on this case.

Such questions, among others, have now been raised by the December 17, 2016 Boston Globe article headlined "Critics hit law firms' bills after class action lawsuits" which is attached as Exhibit B. For example, the article reports that the staff attorneys involved in this case were typically paid $25-$40 an hour. In calculating the lodestar, it was represented to the court that the regular hourly billing rates for the staff attorneys were much higher -- for example, $425 for Thornton, see Docket No. 104-15 at 7-8 of 14, and $325-440 for Labaton, see Docket No. 104-15 at 7-8 of 52. A representative of Labaton reportedly confirmed the accuracy of the article in this respect. See Ex. B at 3.

The court now questions whether the hourly rates plaintiffs' counsel attributed to the staff attorneys in calculating the lodestar are, as represented, what these firms actually charged

6

for their services or what other lawyers in their community charge paying clients for similar services. This concern is enhanced by the fact that different firms represented that they customarily charged clients for the same lawyer at different rates. In general, the court wonders whether paying clients customarily agreed to pay, and actually paid, an hourly rate for staff attorneys that is about ten times more than the hourly cost, before overhead, to the law firms representing plaintiffs.

In addition, the article raises questions concerning whether the hours reportedly worked by plaintiffs' attorneys were actually worked. Most prominently, the article accurately states that Michael Bradley, the brother of Thornton Managing Partner Garrett Bradley, was represented to the court as a staff attorney who worked 406.40 hours on this case. See Docket No. 104-15 at 7 of 14. Garrett Bradley also represented that the regular rate charged for his brother's services was $500 an hour. Id. However the article states, without reported contradiction, that "Michael Bradley . . . normally works alone, often making $53 an hour as a court appointed defendant in [the] Quincy [Massachusetts] District Court." Ex. B at 1. These apparent facts cause the court to be concerned about whether Michael Bradley actually worked more than 400 hours on this case and about whether Thornton actually regularly charged paying clients $500 an hour for his services.

7

The acknowledged double-counting of hours by staff attorneys and the matters discussed in the article raise broader questions about the accuracy and reliability of the representations plaintiffs' counsel made in their calculation of the lodestar generally. These questions -- which at this time are only questions -- also now cause the court to be concerned about whether the award of almost $75,000,000 in attorneys' fees was reasonable.

III. THE PROPOSED SPECIAL MASTER

In view of the foregoing, the court proposes to appoint a special master to investigate and report concerning the accuracy and reliability of the representations that were made in connection with the request for an award of attorneys' fees and expenses, the reasonableness of the award of $74,541,250 in attorneys' fees and $1,257,697.94 in expenses, and any related issues that may emerge in the special master's investigation. In the final judgment entered on November 11, 2016, the court retained jurisdiction over, among other things, the determination of attorneys' fees and other matters related or ancillary to them. See Final Judgment (Docket No. 110) at 10. Federal Rule of Civil Procedure 23(h)(4) states that in class actions "the court may refer issues related to the amount of the [attorneys' fee] award to a special master . . . as provided in Rule 54(d)(2)(D)." Federal Rule of Civil Procedure 54(d)(2)(D) states that "the court may refer issues concerning the value of services to a special master under Rule 53 without regard

8

to the limitations of Rule 53(a)(1)."  As the 1993 Advisory Committee's Note explains, "the rule [] explicitly permits . . . the court to refer issues regarding the amount of a fee award in a particular case to a master under Rule 53. . . . This authorization eliminates any controversy as to whether such references are permitted . . . ."  Fed. R. Civ. P. 54 Advisory Committee's Note to 1993 Amendment.

The court proposes to exercise this authority to appoint Gerald Rosen, a recently retired United States District Judge for the Eastern District of Michigan, to serve as special master; Judge Rosen's biography is attached as Exhibit C.  The court proposes to authorize Judge Rosen to investigate all issues relating to the award of attorneys' fees in this case.  If appointed, he would be empowered to, among other things, subpoena documents from plaintiffs' counsel and third parties, interview witnesses, and take testimony under oath.  Judge Rosen would be authorized to communicate with the court ex parte on procedural matters, but encouraged to minimize ex parte communications, and to avoid them if possible.  He would be expected to complete his duties within six-months of his appointment, if possible.

At the conclusion of his investigation, Judge Rosen would prepare for the court a Report and Recommendation concerning: (1) the accuracy and reliability of the representations made by plaintiffs' counsel in their request for an award of attorneys'

fees and expenses, including, but not limited to, whether counsel employed the correct legal standards and had proper factual bases for what they represented to be the lodestar for each firm and the total lodestar; (2) the reasonableness of the amount of attorneys' fees and expenses that were awarded, including whether they should be reduced; and (3) whether any misconduct occurred; and, if so, (4) whether it should be sanctioned, see, e.g., In re: Deepwater Horizon, 824 F.3d 571, 576-77 (5th Cir. 2016). The court would provide plaintiffs' counsel an opportunity to object to the Report and Recommendation and, if appropriate, conduct a hearing concerning any objections. See Fed. R. Civ. Proc. 53(f)(1). The special master's report would be reviewed pursuant to Federal Rule of Civil Procedure 53(f)(3), (4) & (5).

Judge Rosen would be compensated at his regular hourly rate as a member of JAMS of $800 an hour or $11,000 a day.[2] Judge Rosen could be assisted by other attorneys and staff, who would be compensated at a reasonable rate approved in advance by the court. Judge Rosen and anyone assisting him would also be reimbursed for their reasonable expenses.

The fees and expenses of the Special Master would be paid, by the court, from the $74,541,250 awarded to plaintiffs' counsel.

---

[2] The court notes that plaintiffs' counsel reported billing rates of up to $1,000 an hour. See, e.g., Docket No. 104-17 at 8 of 135.

The court may order that up to $2,000,000 be returned to the Clerk of the District Court for this purpose.

As required by Federal Rule of Civil Procedure 53(b)(3)(A), Judge Rosen has submitted an affidavit disclosing whether there is any ground for his disqualification under 28 U.S.C. §455, which is attached as Exhibit D. The only matter disclosed relates to Elizabeth Cabraser, a partner in one of plaintiffs' law firms. Ms. Cabraser reportedly worked 29.50 hours on this case. Judge Rosen reports that about four years ago he asked Ms. Cabraser to become, with him and others, a co-author of the book <u>Federal Employment Litigation</u>. Since then they have had annually, independently submitted updates to different chapters of the book. They, and the other authors, share royalties from the book. In addition, Judge Rosen and Ms. Cabraser have participated together on panels on class actions. Although at least one lawyer from plaintiffs' law firms has appeared before Judge Rosen, Judge Rosen has had no other association with any of them.

Judge Rosen represents that he has no bias or prejudice concerning anyone involved in this matter, or any personal knowledge of potentially disputed facts concerning it. Therefore, it does not appear that his disqualification would be required by 28 U.S.C. §455(b)(1). It also appears to Judge Rosen and the court that his relationship with Ms. Cabraser could not cause a reasonable person to question his impartiality. Therefore, it

appears that his recusal would not be justified pursuant to
§455(a).  See United States v. Sampson, 12 F. Supp. 3d 203, 205-
08 (D. Mass. 2014) (Wolf, D.J.) (discussing standards for recusal
under §455(a)).[3]

However, the court is providing plaintiffs' counsel the
opportunity to consent to the appointment of Judge Rosen as special
master on the terms discussed in this Memorandum, register any
objections, and/or comment on the proposal.  Among other things,
plaintiffs' counsel may propose alternative eligible candidates
for possible appointment.  See Fed. R. Civ. P. 53(b)(1).[4]

    IV.  ORDER

    In view of the foregoing it is hereby ORDERED that:

    1.  Plaintiffs' counsel shall file by February 20, 2017, a
memorandum addressing, among other things deemed relevant: whether
they object to the appointment of a special master; whether they
object to the selection of Judge Rosen if a special master is to

---

[3] Ideally, the court would propose a special master who presents
no question of possible recusal.  However, the court has found
in exploring potential candidates to serve as special master
that lawyers in larger law firms are unavailable because their
firms have adversarial relationships with plaintiffs' counsel in
other cases.  Therefore, the court concluded that proposing a
recently retired judge would be most feasible and appropriate.

[4] Any proposed alternative candidate must file an affidavit
demonstrating that he or she does not have any conflict of
interest and is not subject to disqualification pursuant to 28
U.S.C. §455.

be appointed; whether they believe Judge Rosen's disqualification would be required under 28 U.S.C. § 455(a) or (b) and, in any event, whether they waive any such ground for disqualification; whether they object to any of the terms of the appointment and powers of a special master discussed in this Memorandum; and whether they propose the appointment of someone other than Judge Rosen as special master. Counsel shall provide an explanation, with supporting authority, for any objection or comment.

2. A hearing to address the proposed appointment of a special master generally, and Judge Rosen particularly, shall be held on March 7, 2017, at 10:00 a.m. Each of plaintiffs' counsel who submitted an affidavit in support of the request for an award of attorney's fees, see Docket Nos. 104-15 - 104-24, shall attend.[5] Michael Bradley shall also attend. In addition the representative of each lead plaintiff who supervised this litigation (not a lawyer) shall attend.[6]

---

[5] Such counsel are: Lawrence A. Sucharow of Labaton; Garrett J. Bradley of Thornton; Daniel P. Chiplock of Lieff, Cabraser, Heimann & Bernstein, LLP; Lynn Sarko of Keller Rohrback LLP; J. Brian McTigue of McTigue Law; Carl S. Kravtiz of Zuckerman Spaeder LLP; Catherine M. Campbell of Feinberg, Campbell & Zack, PC; Jonathan G. Axelrod of Beins, Axelrod, PC; and Kimberly Keevers Palmer of Richardson, Patrick, Westbrook & Brickman, LLC.

[6] Such individuals are: George Hopkins on behalf of Arkansas Teacher Retirement System; Arnold Henriquez; Michael T. Cohn; William R. Taylor; Richard A. Sutherland; James Pehoushek-

Judge Rosen shall also be present and may be questioned. Regardless of whether Judge Rosen is appointed special master, the court will order that he receive reasonable compensation for his time and expenses from the fee award previously made to plaintiffs' counsel.

/s/ Mark L. Wolf
_____
UNITED STATES DISTRICT JUDGE

---

Stangeland; and Janet A. Wallace on behalf of The Andover Companies Employee Savings and Profit Sharing Plan.

# EXHIBIT A

# Labaton Sucharow

David J. Goldsmith
Partner
212 907 0879 direct
212 883 7079 fax
dgoldsmith@labaton.com

November 10, 2016

<u>By ECF</u>

Hon. Mark L. Wolf
United States District Judge
United States District Court
District of Massachusetts
John Joseph Moakley
  United States Courthouse
1 Courthouse Way
Boston, Massachusetts  02210

Re:    Arkansas Teacher Retirement System v. State Street Bank & Trust Co.,
       No. 11-CV-10230 MLW

Dear Judge Wolf:

We are writing respectfully to advise the Court of inadvertent errors just discovered in certain
written submissions from Labaton Sucharow LLP, Thornton Law Firm LLP, and Lieff Cabraser
Heimann & Bernstein LLP supporting Lead Counsel's motion for attorneys' fees, which the Court
granted following the fairness hearing held on November 2, 2016.  *See* Order Awarding Attorneys'
Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs ("Fee Order,"
ECF No. 111).

These mistakes came to our attention during internal reviews that were conducted in response to an
inquiry from the media received after the hearing.  The purpose of this letter is to disclose the error
and provide a corrected lodestar and multiplier.  We respectfully submit that the error should have
no impact on the Court's ruling on attorneys' fees.

As the Court is aware, the submissions supporting Lead Counsel's fee application included
individual declarations submitted on behalf of Labaton Sucharow, Thornton, and Lieff Cabraser,
reporting each firm's lodestar and number of hours billed.  *See* ECF Nos. 104-15, at 7-9; 104-16, at
7-8; 104-17, at 8-9; *see also* ECF No. 104-24 (Master Chart).

The professionals and paraprofessionals listed in these firms' respective lodestar reports include
persons denoted as Staff Attorneys, or "SAs."  SAs are bar-admitted, experienced attorneys hired on
a temporary, though generally long-term, basis, and are paid by the hour.  The SAs in this action

# Labaton
# Sucharow

Hon. Mark L. Wolf
United States District Judge
November 10, 2016
Page 2

were tasked principally with reviewing and analyzing the millions of pages of documents produced by State Street.

Seventeen (17) of the SAs listed on the Thornton lodestar report are also listed as SAs on the Labaton Sucharow lodestar report.[1] Six (6) of the SAs listed on the Thornton lodestar report are also listed as SAs on the Lieff Cabraser lodestar report.[2] Both sets of overlap reflect the fact that as the litigation proceeded, efforts were made to share costs among counsel, such that financial responsibility for certain SAs located at Labaton Sucharow's and Lieff Cabraser's offices was borne by Thornton.

We have now determined that:

- The hours of the Alper SAs reported in the Thornton lodestar report mistakenly were also reported in the Labaton Sucharow lodestar report.
- Certain hours reported by one of the Alper SAs (S. Dolben) in the Thornton lodestar report mistakenly duplicated certain hours of another Alper SA (D. Fouchong).
- A portion of the hours of two of the Jordan SAs reported in the Thornton lodestar report (C. Jordan and J. Zaul) mistakenly were also reported in the Lieff Cabraser lodestar report.
- The hours of two other Jordan SAs (A. Ten Eyck and R. Wintterle) mistakenly were included in the Lieff Cabraser lodestar report.[3]

Because of these inadvertent errors, Plaintiffs' Counsel's reported combined lodestar of $41,323,895.75, and reported combined time of 86,113.7 hours, were overstated. *See* ECF No. 104-24 (Master Chart).

---

[1] These SAs, listed alphabetically, are D. Alper, E. Bishop, N. Cameron, M. Daniels, S. Dolben, D. Fouchong, J. Grant, I. Herrick, D. Hong, C. Orji, D. Packman, A. Powell, A. Rosenbaum, J. Saad, B. Schulman, A. Vaidya, and R. Yamada (collectively, the "Alper SAs"). *Compare* ECF No. 104-16, at 7-8 (Thornton lodestar report) *with* ECF No. 104-15, at 7-8 (Labaton Sucharow lodestar report).

[2] These SAs, listed alphabetically, are C. Jordan, A. McClelland, A. Ten Eyck, V. Weiss, R. Wintterle, and J. Zaul (collectively, the "Jordan SAs"). *Compare* ECF No. 104-16, at 7 (Thornton lodestar report) *with* ECF No. 104-17, at 8 (Lieff Cabraser lodestar report).

[3] The lodestar reports in the individual firm declarations submitted by ERISA counsel (ECF Nos. 104-18 to 104-23) are unaffected.

# Labaton Sucharow

Hon. Mark L. Wolf
United States District Judge
November 10, 2016
Page 3

We have corrected these errors by removing the duplicative time. When a given SA had different hourly billing rates, we removed the time billed at the higher rate. Deducting the duplicative time from the $41.32 million reported combined lodestar results in a reduced combined lodestar of **$37,265,241.25**, and a reduced combined time of 76,790.8 hours.

Cross-checking the $37.27 million reduced combined lodestar against the $74,541,250 percentage-based fee awarded by the Court yields a lodestar multiplier of **2.00**.[4] This is higher than the 1.8 multiplier we proffered in our submissions and during the hearing.

Plaintiffs' counsel respectfully submits that a 2.00 multiplier remains reasonable and well-within the range of multipliers found reasonable for cross-check purposes in common fund cases within the First Circuit, and that such an enhancement of the reduced lodestar represented by the 24.85% fee awarded by the Court remains well-supported by the $300 million Settlement obtained and fees awarded in comparable cases. *See* Fee Brief, ECF No. 103-1, at 24-25.

Accordingly, Plaintiffs' counsel respectfully submits that the Court should adhere to its ruling on attorneys' fees. *See* Fee Order ¶¶ 4, 6 (ECF No. 111)[5]; Nov. 2, 2016 Hrg. Tr. at 36:1-2 (finding 1.8 multiplier "reasonable").

We sincerely apologize to the Court for the inadvertent errors in our written submissions and presentation during the hearing. We are available to respond to any questions or concerns the Court may have.

Respectfully submitted,

David J. Goldsmith

---

[4] The Court found it "appropriate in this case to use the percentage of the common fund approach in determining the amount of attorneys' fees that should be awarded." Nov. 2, 2016 Hrg. Tr. at 22:25-23:2; *see also id.* at 35:12-13 ("I have used the percentage of common fund method. I've used the reasonable lodestar to check on that.").

[5] The Fee Order, at Paragraph 6(d), references the approximately 86,000 combined hours and $41.32 million combined lodestar reported in our written submissions.

**Labaton**
**Sucharow**

Hon. Mark L. Wolf
United States District Judge
November 10, 2016
Page 4

DJG/idi

cc:    All Counsel of Record
       (by ECF)

<u>Certificate of Service</u>

I certify that on November 10, 2016, I caused the foregoing Letter to be filed through the ECF system in the above-captioned action, and accordingly to be served electronically upon all registered participants identified on the Notices of Electronic Filing.

*/s/ David J. Goldsmith*
David J. Goldsmith

# EXHIBIT B

SPOTLIGHT FOLLOW-UP

# Critics hit law firms' bills after class-action lawsuits

**By Andrea Estes** | GLOBE STAFF DECEMBER 17, 2016

Attorneys at the Thornton Law Firm had just helped win a $300 million settlement from State Street Bank and Trust in a complicated lawsuit involving eight other law firms. Now, it was time to submit their legal fees to the judge so that they could get paid.

That's when the younger brother of Thornton managing partner Garrett Bradley emerged as a $500-an-hour "staff attorney" at the Boston firm.

Michael Bradley is a lawyer, but he normally works alone, often making $53 an hour as a court-appointed defender in Quincy District Court, records show. Yet, according to his older brother's sworn statement on Sept. 14, 2016, Michael Bradley's services were worth nearly 10 times that rate in the State Street case.

The elder Bradley said Michael worked 406.4 hours on the lawsuit, which centered on international currency trades, at a cost of $203,200.

Michael Bradley wasn't the only lawyerfor whose work Thornton claimed stratospheric — and questionable — legal costs in the filing to US District Court Judge Mark L. Wolf. Garrett Bradley listed 23 other staff attorneys, each with hourly rates of $425, who collectively accounted for $4 million in costs.

Comments



View Story

# Law firm 'bonuses' tied to political donations

A small Boston law firm became a top funder of the national Democratic Party by paying lawyers "bonuses" for their political donations.

### Candidates returning donations from Thornton Law Firm attorneys

### Hassan to return law firm's donations

---

But one of the lawyers told the Globe he was actually paid just $30 an hour for his services — and not by Thornton. Like all the other staff attorneys on Garrett Bradley's list, except his brother, he worked for another firm in the case, which also counted his hours on its list of costs.

The sworn statement by Garrett Bradley — until recently an assistant House majority leader on Beacon Hill — raises troubling questions about the way Thornton and the other firms that brought the State Street lawsuit tallied legal costs to justify their enormous $75.8 million payday.



BRADLEY FOR SELECTMAN

**Michael Bradley, Quincy attorney.**

Tweet   Share   75

More than 90 percent of the costs that Thornton and two other law firms submitted to Judge Wolf came from the work of staff attorneys — all of them assigned hourly rates at least 10 times higher than the $25 to $40 an hour typical for these low-level positions — which involves document review.

A spokesman for the lead law firm in the case acknowledged that hourly rates the firms listed for staff attorneys were above the lawyers' actual wages, but argued that, essentially, everyone does it. Diana Pisciotta, spokeswoman for the Labaton Sucharow law firm in New York City, called it "commonly accepted practice throughout the legal community."

Critics of the way lawyers are paid in class-action lawsuits acknowledge that firms often dramatically mark up the rates of their lower-paid attorneys when seeking legal fees in court, but they say Thornton has pushed the practice to an extreme.

"This happens all the time," said Ted Frank, a lawyer at the Competitive Enterprise Institute in Washington and a leading national critic of legal fees in class-action lawsuits. "Lawyers pad their bills with overstated hourly work to make their fee request seem less of a windfall."

Lawyers in class-action lawsuits commonly receive a major share of any settlement because they are taking the risk that, if they lose, they will be paid nothing.

In fact, plaintiffs in the State Street case, many of them public pension funds, agreed in advance to set aside a quarter of any settlement for attorneys in their lawsuit alleging that the Boston-based bank routinely overcharged clients for their foreign currency exchanges, costing them more than $1 billion.

But, to actually collect the money, lawyers document their costs by filing affidavits under penalty of perjury.

The accounting must be based on actual time records, listing the names and hourly rates of the lawyers who worked on the case, and the total amount billed. The hourly rate is supposed to be what the lawyer would charge a paying client for

similar work, including the lawyer's salary and a markup for office costs and other expenses.

That's where, critics of contingency fee lawsuits say, lawyers have a built-in opportunity to inflate their bills. And, for a variety of reasons, their bills often get little scrutiny.

"Imagine you're a lawyer and you're allowed to write your own check for your fee," explained Lester Brickman, a Yeshiva University law professor and author of "Lawyer Barons: What Their Contingency Fees Really Cost America."

"I could write $3,000, but I could add a zero and write $30,000 or add two zeroes and charge $300,000," Brickman said. "That's the honor system."

Thornton officials insist that they did nothing wrong and that the 23 staff attorneys who actually work for Labaton or a firm in San Francisco belonged on Thornton's list.

Under a cost-sharing agreement between the firms, Thornton paid part of their wages while they were reviewing millions of pages of documents in the State Street case. These lawyers just receive their usual salary and don't share in the proceeds from the settlement.

Garrett Bradley's brother, by contrast, will receive the $203,200 listed for him on the filing to Judge Wolf, according to Thornton spokesman Peter Mancusi, who noted that Michael Bradley, unlike the other staff attorneys, was not paid previously for his work.

Neither Michael Bradley nor a spokesman for Thornton would say what he did on the case, but the spokesman described him as an experienced prosecutor and fraud investigator.

Globe questions about the legal bills prompted the lead law firm in the State Street case to submit an extraordinary letter to Judge Wolf admitting that Thornton and

$4 million. Comments director, David Goldsmith of Labaton Sucharow, blamed the inflated bills on "inadvertent errors."

According to Goldsmith's Nov. 10 letter, Labaton and another firm, Lieff Cabraser Heimann & Bernstein, claimed the same staff attorneys that Thornton had listed on its legal expenses, double-counting the lawyers' cost. Goldsmith said the double-counted lawyers were employees of either Labaton or Lieff Cabraser, but their hours and costs should have been counted only once — by Thornton Law.

To resolve the issue, he said, the other firms dropped the lawyers and Thornton lowered the hourly rate it charged for numerous staff attorneys because it had assigned a higher rate than the other firms.

Despite the resulting drop in combined legal fees, Goldsmith urged Wolf not to reduce the lawyers' payment from the settlement. In class-action cases, lawyers commonly receive a payment that not only covers costs, but a financial reward for bringing a risky case that could have failed and paid nothing.

Goldsmith suggested that Wolf simply boost the reward to offset the reduced legal fees so that the firms still split the same $74 million, including $14 million for Thornton.

"We respectfully submit that the error should have no impact on the court's ruling on attorneys' fees," wrote Goldsmith, whose firm often joins forces with Thornton.

That may not be enough to satisfy Wolf, who has a reputation for closely questioning claims made in his court.

He called the legal fees "reasonable" at a Nov. 2 hearing and praised the plaintiffs' lawyers for taking on a "novel, risky case." But he approved the fees in part based on sworn statements that the lawyers now admit were in error. Wolf could reduce their payments, which were issued earlier this month, or hold a hearing to determine whether the lawyers knowingly submitted false information, a serious breach of professional ethics.

"The double-counting was likely the result of sloppiness, assuming that there would be no objectors' or court scrutiny of the fee request," said Frank, who has successfully challenged several settlements and fee requests in other cases, recouping more than $100 million for class members.

Get **Fast Forward** in your inbox:

Forget yesterday's news. Get what you need today in this early-morning email.

| Enter email address |
|---|

**Sign Up**

Frank said the problems with the legal fees go beyond the double-counting of attorneys. Other law firms contacted by the Globe said it's common to list an hourly rate for an attorney several times higher than the attorney's own pay, because the law firm has many other expenses aside from the lawyer him or herself. However, Thornton listed attorneys' rates at up to 14 times the lawyer's wages.

Frank said his analysis suggests that the $75.8 million award to the nine law firms was excessive — by at least $20 million and as much as $48.3 million — in part because the lawyers asked too much in the first place. He said that the lawyers' own documents show that, in similarly sized settlements, the legal fees average only 17.8 percent.

Thornton Law Firm, a personal injury firm that specializes in asbestos-related cases, is already the target of three investigations for its controversial campaign contribution program in which the law firm paid millions of dollars in "bonuses" to partners that offset their political contributions.

Federal prosecutors as well as two other agencies are investigating whether the bonuses were an illegal "straw donor" scheme to allow the firm to vastly exceed limits on campaign contributions. Thornton officials have insisted they did nothing wrong, because the bonuses were paid out of the lawyers' own equity in the firm.

Tweet   Share        75

Thornton's features in the State Street case feed into a larger debate about how lawyers get paid in class-action lawsuits. Defenders of paying lawyers on contingency say the prospect of a high payoff encourages lawyers to take on exceptionally difficult cases, such as suing a wealthy bank like State Street.

However, Frank said there's little oversight of lawyers' fee claims. Defendants usually don't care what the plaintiffs' lawyers receive, because their costs don't change regardless of how much the plaintiffs' lawyers receive.

And individual plaintiffs typically get too little money to have a strong incentive to challenge legal fees. In the State Street case, the 1,300 plaintiffs would see increases in their individual payments of only about $20,000 apiece if the lawyers' fees were reduced by $20 million, Frank calculated. A plaintiff might have to spend that much or more to hire another lawyer to investigate.

None of the plaintiffs in the State Street case objected to their lawyers' request for legal fees. But neither the lawyers nor their clients apparently noticed that the exact same hours for nearly two dozen staff attorneys were claimed by more than one law firm.

"The mistakes came to our attention during internal reviews that were conducted in response to an inquiry from the media," explained Labaton partner Goldsmith, in his letter to Wolf.

Nor did they notice that Thornton consistently assigned a higher rate than the other firms for the same attorneys — often a difference of $90 an hour.

Labaton officials, in a prepared statement, said the affidavits supporting the fee request weren't as important as the percentage of the settlement fund the lawyers sought — just over 25 percent, once expenses are added.

"This fee award is reviewed by the Court for fairness . . . we believe the fees awarded are still fair," wrote Diana Pisciotta, a spokeswoman for Labaton.

In addition to its fees from the State Street case, Thornton Law will receive a portion of the $20 million the Securities and Exchange Commission awarded a whistle-blower who alerted regulators to State Street's international currency practices.

# How low-paid lawyers count toward big legal bills

Comments

Law firms commonly hire junior-level "staff attorneys" to review documents for $25 to $40 an hour. Thornton Law Firm took advantage of these low-paid lawyers to make millions in its lawsuit against State Street Bank.

1   Thornton says it employed 24 staff attorneys in the State Street case.



staff attorneys

2   In court documents, Thornton listed the hourly rates for the staff attorneys at $425 to $500, more than ten times their actual pay.

| One attorney's actual pay | $30 | |
|---|---|---|
| Rate listed by Thornton | | $425 |

3   Thornton said the staff attorneys worked more than 10,000 hours on the case at a total cost of $4.5 million, accounting for 60 percent of the total costs of the case.

4   A federal judge approved Thornton's bills, and gave them a bonus for taking on such a risky lawsuit.

5   But there was a problem: 23 of Thornton's 24 staff attorneys were also listed as lawyers for other law firms working on the same case. Thornton and the other law firms double-counted the work of the staff attorneys, inflating their combined bills by $4 million.

6   The lawyers admitted the "inadvertent errors" to the judge and asked him not to reduce their legal fees.

**SOURCE: Court records**      GLOBE STAFF

## Related

W.L. Cl.

Twe  Share   75

# EXHIBIT C





**T:** 313-872-1100
**F:** 313-872-1101

**Case Manager**

Donna Vinson
JAMS
400 Renaissance
Center
26th Floor
Detroit, MI 48243
313-872-1100 Phone
313-872-1101 Fax
Email:
dvinson@jamsadr.com

*"Mediation works, and can produce great benefits much more efficiently than other approaches. There are four keys to success: candor, cooperation, creativity and courage. If the Detroit bankruptcy is any guide, early and committed use of mediated negotiation is likely to produce benefits that otherwise might never be achievable."*
*-Hon. Gerald E. Rosen (Ret.)*

*"Judge Rosen was indispensable and critical to the successful conclusion of the case. He and his fellow mediators were heroic in their commitment of time*

**Hon. Gerald E. Rosen (Ret.)**

**Hon. Gerald E. Rosen (Ret.)** joins JAMS following 26 years of distinguished service on the federal bench as a United States District Judge for the Eastern District of Michigan, including seven years as that Court's Chief Judge.

While on the bench, Judge Rosen had wide experience in facilitating settlements between parties in a great many cases, including highly complex Multi-District Litigation (MDL) matters and class actions. Most recently, the Judge served as the Chief Judicial Mediator for the Detroit Bankruptcy case—the largest, most complex municipal bankruptcy in our nation's history—which resulted in an agreed upon, consensual plan of adjustment in just 17 months.

Prior to taking the bench, the Judge was a Senior Partner at the law firm of Miller, Canfield, Paddock and Stone where he was a trial lawyer specializing in commercial, employment and constitutional litigation.

*Read **counsel comments** about Judge Rosen's skills and style as a neutral.*

**ADR Experience and Qualifications**

Judge Rosen has extensive experience in the resolution of complex disputes in the following areas:

- Antitrust
- Bankruptcy (Municipal)
- Business/Commercial
- Class Action/Mass Tort
- Employment/FMLA
- Civil Rights/§1983
- Intellectual Property
- Real Property
- Securities
- Special Master/Discovery Referee

**Representative Matters**

- **Antitrust**
    - *Cason-Merenda v. Detroit Medical Center*, No. 06-15601 (Nurse wage case)
    - *In re Northwest Airlines Corp., et al.*, Antitrust Litigation, No. 96-74711 (Hidden-city ticketing case)
- **Arbitration**
    - *Quixtar Inc. v. Brady*, No. 08-14346, and *Amway Global v. Woodward*, No. 09-12946 (Addressing arbitrability of disputes and confirmation of arbitrator's award)
- **Bankruptcy**
    - *In re: City of Detroit* (Chapter 9 municipal bankruptcy)
    - *United States v. City of Detroit* (Detroit water and sewer case) (Mediated settlements)
- **Class Action/Mass Tort**
    - *Tankersley v. Ameritech Publishing, Inc.* (FLSA collective action and Rule 23 class action)
    - *Marquis v. Tecumseh Products Co.*, No. 99-75971 (Class action alleging sexual harassment at manufacturing plant)
    - *In re Rio Hair Naturalizer Products*, MDL 1055 (Multi-district product liability action)

*and effort in the entire process."*
*-Detroit Bankruptcy Counsel*

*"[Y]ou demonstrate[d] a keen sense of how to get parties moving together and closing deals."*
*-Financial Creditor Party, Detroit Bankruptcy*

- **Employment/FMLA**
  - *Redd v. Brotherhood of Maintenance of Way Employees Division of International Brotherhood of Teamsters*, No. 08-11457 (ERISA)
- **Civil Rights/§1983**
  - *Cheolas v. City of Harper Woods*, No. 06-11885 (Po ce ra d of party w th underage dr nk ng)
  - *Flagg v. City of Detroit*, No. 05-74253 (Tamara Greene case)
- **Intellectual Property**
  - *I.E.E. International Electronics & Engineering, S.A. v. TK Holdings Inc.*, No. 10-13487 (Veh c e occupant sensors patent)
  - *Lear Automotive Dearborn, Inc. v. Johnson Controls, Inc.*, No. 04-73461 (Remote-contro garage door opener patent)
- **Real Property**
  - *United States v. Certain Land Situated in the City of Detroit* (Detro t Internat ona Br dge and condemnat on case)
- **Securities**
  - *In re General Motors Corp. Securities and Derivative Litigation*, MDL No. 06-1749
  - *In re Collins & Aikman Corp. Securities Litigation*, No. 03-71173
  - *In re: Delphi Corporation Securities*, Der vat ve & "ERISA" L t gat on, MDL 1725 (Mu t -d str ct secur t es fraud/ERISA act on)

**Honors, Memberships, and Professional Activities**

- W de y pub shed on a w de range of top cs nc ud ng, c v procedure, ev dence, due process, cr m na aw, abor aw and ega advert s ng, nc ud ng:
  - Co-Author, *Federal Civil Trials and Evidence*, The Rutter Group Pract ce Gu de, 1999-Present
  - Co-Author, *Federal Employment Litigation*, The Rutter Group Pract ce Gu de, 2006-2016
  - Co-Author, *Michigan Civil Trials and Evidence*, The Rutter Group M ch gan Pract ce Gu de, 2008-2016
  - Contr but ng Ed tor, *Federal Civil Procedure Before Trial*, The Rutter Group Pract ce Gu de, 2008-2016
- Co-Cha r, Jud c a Eva uat on Comm ttee for the U.S. D str ct Court for the Eastern D str ct of M ch gan, 1983-1988
- Adjunct Professor, Ev dence:
  - Un vers ty of M ch gan Law Schoo , 2008
  - Wayne State Un vers ty Law Schoo , 1992-Present
  - Un vers ty of Detro t-Mercy Law Schoo , 1994-1996
  - Thomas M. Coo ey Law Schoo , 2004-2013
- U.S. Representat ve, Un ted States Department of State s Ru e of Law Program n Moscow, Russ a; Tb s , Georg a; Be j ng, Ch na; Ca ro, Egypt, Hebrew Un vers ty (Jerusa em); and Ma ta
- Jud c a Consu tant, Un ted States Departments of State and Just ce m ss ons to Tha and and the Ukra ne
- Member, S xth C rcu t Jud c a Counc , 2009-2015
- Member, Board of D rectors, Federa Judges Assoc at on, 1996-2002
- Member on the Board of D rectors of severa char tab e organ zat ons, nc ud ng: Focus: HOPE; the Detro t Symphony Orchestra; the Commun ty Foundat on of Southeastern M ch gan and the M ch gan Chapter of the Federa st Soc ety
- Member, Board of Adv sors, George Wash ngton Un vers ty Law Schoo , 2005-Present
- Member, U.S. Jud c a Conference, Comm ttee on Cr m na Law, 1995-2001
- Found ng Member, M ch gan Inte ectua Property Inn of Court

**Selected Articles About the Detroit Bankruptcy**

- *Howes: Detroit Bankruptcy Kudos Widely Shared*, Detro t News, February 26, 2015.
- *Detroit Bankruptcy Shows Mediation Can Get the Job Done*, Detro t Free Press, January 18, 2015.
- *Detroit Bankruptcy Pros Write Off Millions in Fees*, Detro t Free Press, December 11, 2014.
- *How Detroit Was Reborn*, Detro t Free Press, Spec a Sect on, November 9, 2014.
- *Judge, A Mediator in Bankruptcy, Sees Hope for Detroit*, Detro t Free Press, November 9, 2014.

Hon Gerald E Rosen (Ret ) JAMS Med ator and Arb trator General B ography
400 Rena ssance Center • 26th Floor • Detro t M ch gan 48243 • Tel 313 872 1100 • Fax 313 872 1101 • www.jamsadr.com
Page 2 of 3

- *Finding $816 Million, and Fast, to Save Detroit*, The New York Times, November 7, 2014.
- *Judge Rosen s Tough Tack on Cred tors He ped Speed Detro t Bankruptcy Case*, Cra n s Detro t Bus ness, November 6, 2014.
- *Mediator in Detroit Bankruptcy Walks Fine Line Between City, Creditors*, The Wa Street Journa , February 14, 2014.
- *How Mediation Has Put Detroit Bankruptcy on the Road to Resolution*, Detro t Free Press, February, 2, 2014.
- *Detroit Emerges From Nation's Largest Municipal Bankruptcy*, Los Ange es T mes, November 10, 2014.

## Background and Education

- Un ted States D str ct Judge, Eastern D str ct of M ch gan (Detro t), 1990-2017
  - Ch ef Judge, 2009-2015
  - Judge by Des gnat on, Un ted States Court of Appea s for the S xth C rcu t, Repeated Appo ntments
- Sen or Partner, M er, Canf e d, Paddock and Stone, spec a z ng n commerc a , emp oyment, rea property, and const tut ona t gat on, 1979-1990
- J.D., George Wash ngton Un vers ty Law Schoo , 1979
- Leg s at ve Ass stant, Un ted States Senate, Sen. Robert P. Gr ff n (R-MI), 1974-1979
- B.A., Sen or Fe ow, Po t ca Sc ence Ka amazoo Co ege, 1973

## Disclaimer

Th s page s for genera nformat on purposes. JAMS makes no representat ons or warrant es regard ng ts accuracy or comp eteness. Interested persons shou d conduct the r own research regard ng nformat on on th s webs te before dec d ng to use JAMS, nc ud ng nvest gat on and research of JAMS neutra s. See More

Hon Gerald E Rosen (Ret ) JAMS Med ator and Arb trator General B ography
400 Rena ssance Center • 26th Floor • Detro t M ch gan 48243 • Tel 313 872 1100 • Fax 313 872 1101 • www.jamsadr.com
Page 3 of 3

# EXHIBIT D

## AFFIDAVIT OF GERALD E. ROSEN

Gerald E. Rosen, being duly sworn, deposes and says

1. That I make this affidavit based upon personal knowledge.
2. That I served as a United States District Judge for the Eastern District of Michigan from March 14, 1990 through January 31, 2017.
3. That I have been asked by United States District Judge Mark L. Wolf about my availability and ability to serve as the Special Master in a matter involving the application for attorney fees and costs to the Court in the case of *Arkansas Teacher Retirement System on behalf of itself and all others similarly situated v. State Street Bank and Trust Company,* C.A. No. 11-10230 – MLW.
4. That the law firms submitting applications for fees and costs in this matter are: Labaton Sucharow LLP, The Thornton Law Firm LLP, Leiff Cabraser Heimann & Bernstein LLP, Keller Rohrback LLP, McTigue Law LLP, Zuckerman Spaeder LLP, Richardson Patrick Westbrook & Brickman LLC, Beins Axelrod PC, and Feinberg Campbell & Zack PC.
5. That pursuant to FRCivP 53(b)(3)(A) and 28 USC §455, a potential Special Master must disclose any possible conflicts or other grounds for disqualification.
6. That I do not believe there are any grounds for my disqualification to serve as a Special Master under 28 USC §455(b) and that no reasonable person would have grounds to question my impartiality under 28 USC §455(a).
7. That although there are no grounds for disqualification, I do wish to disclose a relationship with one of the named partners of one of the involved law firms, Leiff Cabraser Heimann & Bernstein.
8. That I have known Elizabeth Cabraser of that firm for approximately four years and first met her when she was recommended to me as a potential new co-author of a then-existing book on which I am a co-author, *Federal Employment Litigation*, published by The Rutter Group, a subsidiary of Thomson Reuters.
9. That after I met with Ms. Cabraser and discussed the book, I asked her to join as a co-author. She agreed, and joined the book in 2013. The other current co-authors include Judge Amy St. Eve (ND IL), Judge Marvin Aspen (ND IL), and attorney Thomas Schuck of the Taft Stettinius & Hollister law firm.
10. That each of the five co-authors share an approximate 16% royalty from the publisher, paid semi-annually. The royalty income of one co-author is independent of that of the other co-authors.
11. That the co-authors update the book annually and divide the update work by allocating chapters with each co-author updating two or three chapters. The updates are submitted independently to the publisher, who edits the updates for incorporation into the book.
12. That beyond this, over the past four years I have attended continuing legal education programs with Ms. Cabraser and have spoken with her on two or three panels unrelated to our book.
13. That I have no other relationship with Ms. Cabraser or any other member of her firm.

14. That I have no relationships with any of the other law firms or lawyers in the case. However, it bears mention that one firm, Keller Rohrback LLP, concluded by settlement an antitrust class action before me in 2015-2016, and one of the partners of that firm, Lynn Sarko, was one of the lead lawyers on that case. Other than this, lawyers from the other firms may have appeared before me in cases over my judicial career, but I have no specific recollection of such lawyers.

15. That this affidavit is made under pain and penalty of perjury.

Further affiant sayeth not.

Gerald E. Rosen

3 February 2017

# EX. 48

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, Plaintiff | ) ) ) ) | |
| | ) | C.A. No. 11-10230-MLW |
| v. | ) ) | |
| STATE STREET BANK AND TRUST COMPANY, Defendants. | ) ) ) | |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN,WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, Plaintiff | ) ) ) ) ) ) | |
| v. | ) ) | C.A. No. 11-12049-MLW |
| STATE STREET BANK AND TRUST COMPANY, Defendants. | ) ) ) | |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND and all others similarly situated, Plaintiff | ) ) ) ) ) ) ) | |
| v. | ) ) | C.A. No. 12-11698-MLW |
| STATE STREET BANK AND TRUST COMPANY, Defendants. | ) ) ) | |

MEMORANDUM AND ORDER

WOLF, D.J.                                             March 8, 2017

In a February 6, 2017 Order the court gave notice that it was considering appointing, pursuant to Federal Rule of Civil Procedure 53, Retired United States District Judge Gerald Rosen as

a Master to investigate and submit a Report and Recommendation concerning issues that have emerged concerning the court's award of more than $75,000,000 in attorneys' fees, expenses, and service awards in this class action. The parties[1] responded to that Order. A hearing concerning this matter was held on March 7, 2017.

For the reasons described in detail at the March 7, 2017 hearing, it is hereby ORDERED that pursuant to Federal Rule of Civil Procedure 53:

1.    Judge Rosen is appointed as Master (the "Master").[2]  The Master may retain any firm, organization, or individual he deems necessary to assist him in the performance of his duties.

2.    The Master shall investigate and prepare a Report and Recommendation concerning all issues relating to the attorneys' fees, expenses, and service awards previously made in this case. The Report and Recommendation shall address, at least: (a) the

---

[1] In this Order, the nine law firms that served as class counsel and the named plaintiffs are collectively referred to as the "parties."

[2] After the disclosure required by Federal Rule of Civil Procedure 53(a)(2)&(b)(3) and discussion at the hearing, each of the law firms representing members of the class agreed that Judge Rosen's disqualification is not required by 28 U.S.C. §455(a) or (b). The McTigue Law firm withdrew its earlier objection under §455(a). Each firm also waived any possible objection under §455(a) as permitted by §455(e).  The court also found that Judge Rosen's disqualification is not required by §455.

accuracy and reliability of the representations made by the parties in their requests for awards of attorneys' fees and expenses, including but not limited to whether counsel employed the correct legal standards and had a proper factual basis for what was represented to be the lodestar for each firm; (b) the accuracy and reliability of the representations made in the November 10, 2016 letter from David Goldsmith, Esq. of Labaton Sucharow, LLP to the court (Docket No. 116); (c) the accuracy and reliability of the representations made by the parties requesting service awards; (d) the reasonableness of the amounts of attorneys' fees, expenses, and service awards previously ordered, and whether any or all of them should be reduced; (e) whether any misconduct occurred in connection with such awards; and, if so, (f) whether it should be sanctioned, see e.g. Fed. R. Civ. P. 11(b)(3)&(c); Massachusetts Supreme Judicial Court Rule of Professional Conduct 3.3(a)(1)&(3).

3. The Master shall proceed with all reasonable diligence, and either submit his Report and Recommendation by October 10, 2017 or request an extension of time to do so. See Fed. R. Civ. P. 53(b)(2).

4. The Master shall have the authority described in Federal Rule of Civil Procedure 53(c)(1) and (2). Therefore, among other things, the Master shall have the authority to compel, take, and record evidence. This includes the authority to: require the

3

production of documents and other records from the parties and third-parties; require responses to interrogatories, and other requests for information and admissions; conduct depositions; and conduct hearings.

5.     The Master may communicate ex parte with any party. See Fed. R. Civ. P. 53(b)(2)(B).

6.     The Master may communicate ex parte with the court on administrative matters.   The Master may also, ex parte, request permission to communicate with the court ex parte on particular substantive matters. Requests for ex parte communications with the court on substantive matters should be minimized.[3]   See Fed. R. Civ. P. 53(b)(2)(B).

---

[3] In the February 6, 2017 Memorandum and Order the court proposed to permit the Master to communicate ex parte with the court only concerning administrative matters. At the March 7, 2017 hearing the court stated it might allow the Master to request an opportunity for an ex parte communication on a substantive matter. The court subsequently reviewed several orders appointing masters which all authorize ex parte communications with the court on any matter.  The court now finds that substantive communications should not be completely prohibited in this case because there may be some unforeseen need for them.

As the February 6, 2017 Order did not provide notice that the court may allow the Master to communicate with it ex parte regarding substantive matters, and the court did not state at the March 7, 2017 hearing that it would do so, the parties may, by March 16, 2017, object to the granting of this authority and explain the basis for their objection.  If any objection is made, the court will consider this issue further.

4

7.     The Master may also request that a submission to the court which is being served on one or more parties be made under seal.

8.     Any order issued by the Master shall be filed for entry on the docket of this case and served on each party.  See Fed. R. Civ. P. 53(d).  However, the Master may request that an order be filed under seal and/or not be served on any party or all parties.

9.     Any objection to an order issued by the Master shall be filed within 10 days of service.  Any responses shall be filed within 10 days of the service of such objection.   Any such objection will be decided in the manner described in Federal Rule of Civil Procedure 53(f).

10.    The Master's Report and Recommendation shall be served promptly on each party.  See Fed. R. Civ. P. 53(e).

11.    The Master shall make and preserve a complete record of the evidence concerning his recommended findings of fact and any conclusions of law.  Such record shall be filed with the Master's Report and Recommendation.  The Master may move to have the record filed under seal.  If any such motion is made and granted, the court may require that a redacted version be filed for the public record.  See Fed. R. Civ. P. 53(b)(2)(C)&(D).

5

12.   Action on the Master's Report and Recommendation will be taken in the manner described in Federal Rule of Civil Procedure 53(f).

13.   Labaton Sucharow, LLP, shall, by March 14, 2017, pay to the Clerk of the United States District Court for the District of Massachusetts $2,000,000.[4]  This payment shall be made only from the award of attorneys' fees and expenses distributed to Labaton Sucharow, LLP, the Thornton Law Firm LLP, and Lieff, Cabrasser, Heimann & Bernstein LLP. See Fed R. Civ. P. 53(g)(3). This payment is without prejudice to any right such firms may have to seek contribution from other firms which received some of the attorneys' fees awarded on November 2, 2016 if that award is reduced in the future. It is the court's intention, however, that this $2,000,000 come solely from the funds distributed to the foregoing three firms that generated the issue that prompted the appointment of the Master.

14.   From the fund established pursuant to paragraph 13 hereinabove, the court will pay the reasonable fees and the expenses of the Master and any firm, organization, or individual he may retain to assist him.  The court understands that the Master

_____

[4] If the expense of the Master's work exceeds $2,000,000, the court will order additional payments.

6

will charge $800 per hour for his services and finds that rate to be reasonable.

The Master shall submit monthly, ex parte and under seal, a request for payment with a description of the hours worked and the services rendered, as well as supporting documentation for any expenses to be reimbursed.

The court intends to disclose the cost of the Master at the conclusion of these proceedings.

15. As the Master will be exercising judicial authority and performing judicial functions, the Master and those assisting him shall have the immunities of judicial officers of the United States. See Nystedt v. Nigro, 700 F.3d 25, 30 (1st Cir. 2012).

16. This Order may be modified upon request of the Master or a party, or by the court sua sponte, after providing notice and an opportunity to be heard. See Fed. R. Civ. P. 53(b)(4).


UNITED STATES DISTRICT JUDGE

7

# EX. 49

[November 2017]

# STEPHEN GILLERS

Elihu Root Professor of Law
(vice dean 1999-2004)
New York University
School of Law
40 Washington Square South
New York, NY 10012

(212) 998-6264 (tel)
(212) 995-4658 (fax)
stephen.gillers@nyu.edu

**AREAS OF TEACHING**     Regulation of Lawyers and Professional Responsibility
Evidence; Law and Literature; Media Law

**PRIOR COURSES**     Civil Procedure, Agency, Advocacy of Civil Claims, Federal Courts

**PUBLICATIONS**     BOOKS AND ANTHOLOGIES:

Regulation of Lawyers:  Problems of Law and Ethics (Aspen Law &
Business, 11th ed., December 2017).  The first edition of this popular
casebook was published in 1985.  Norman Dorsen was a co-author on
the first two editions.  Stephen Gillers is the sole author of the third
through ninth editions.  The first four editions were published by
Little, Brown & Co., which then sold its law book publishing
operation to Aspen.

Regulation of Lawyers:  Statutes and Standards (with Roy Simon and
Andrew Perlman) (Aspen Law & Business) This is a compilation with
editorial comment.  The first volume was published in 1989.  Updated
versions have been published annually thereafter. As of the 2009
edition, Andrew Perlman has joined as a co-editor.

"The Legal Industry of Tomorrow Arrived Yesterday: How Lawyers
Must Respond," in The Relevant Lawyer (ABA 2015).

Regulation of the Legal Profession (Aspen 2009). This is 400+ page
book  in the Aspen "Essentials" series explains  ethics rules and laws
governing American lawyers and judges.

**PUBLICATIONS**
(continued)

Investigating the FBI (co-Editor with P. Watters) (Doubleday, 1973; Ballantine, 1974)

None of Your Business:  Government Secrecy in America (co-Editor with N. Dorsen) (Viking, 1974; Penguin, 1975).

Getting Justice:  The Rights of People (Basic Books, 1971; revised paperback, New American Library, May 1973).

I'd Rather Do It Myself:  How to Set Up Your Own Law Firm (Law Journal Press, 1977).

Looking At Law School:  A Student Guide From the Society of American Law Teachers (editor and contributor) (Taplinger, 1977; NAL, 1977; revised ed., NAL, 1984; third ed., NAL, 1990).

The Rights of Lawyers and Clients (Avon, 1979).

"Four Policemen in London and Amsterdam," in R. Schrank (ed.) American Workers Abroad (MIT Press, 1979).

"Dispute Resolution in Prison:  The California Experience," and "New Faces in the Neighborhood Mediating the Forest Hills Housing Dispute," both in R. Goldmann (ed.) Roundtable Justice:  Case Studies in Conflict Resolution (Westview Press, 1980).

"The American Legal Profession," in A. Morrison (ed.), Fundamentals of American Law (Oxford University Press 1996).

The Elsinore Appeal: People v. Hamlet (St. Martin's Press 1996).  This book contains the text of Hamlet together with briefs and oral argument for and against affirmance of Prince Hamlet's (imaginary) murder convictions.  The book arose out of a symposium sponsored by the Association of the Bar of the City of New York.

"In the Pink Room," in Legal Ethics: Law Stories (D. Rhode & D. Luban, eds.) (Foundation Press, 2006) (also published as a freestanding monograph).

PUBLICATIONS
(continued)

ARTICLES:

Uniform Legal Ethics Rules? No – An Elusive Dream Not Worth the Chase, 22 The Professional Lawyer __ (2014)

The Two-Year Law Degree: Undesireable but Perhaps Unavoidable, 2013 N.Y.U. J. Legis. & Pub. Pol'y Quorum 4 (2013)

How To Make Rules for Lawyers: The Professional Responsibility of the Legal Profession, 40 Pepperdine L. Rev. 365 (2013) (Symposium issue on *The Lawyer of the Future*).

A Profession, If You Can Keep It: How Information Technology and Fading Borders Are Reshaping the Law Marketplace and What We Should Do About It, 63 Hastings L.J. 953 (2012)

Guns, Fruit, Drugs, and Documents: A Criminal Defense Lawyer's Responsibility for Real Evidence, 63 Stan. L. Rev. 813 (2011)

Is Law (Still) An Honorable Profession?, 19 Professional Lawyer 23 (2009)(based on a talk at Central Synagogue in Manhattan).

Professional Identity: 2011 Michael Franck Award Acceptance Speech, 21 Professional Lawyer 6 (2011).

Choosing and Working with Estate and Foundation Counsel to Secure an Artistic and Philanthropic Legacy, in The Artist as Philanthropist, volume 2, page 293 (The Aspen Institute Program on Philanthropy and Social Innovation 2010)

Virtual Clients:  An Idea in Search of a Theory (with Limits),  42 Valparaiso L. Rev. 797 (2008)  (Tabor lecture).

The "Charles Stimson" Rule and Three Other Proposals to Protect Lawyers From Lawyers, 36 Hofstra L. Rev. 323 (2007)

A Tendency to Deprave and Corrupt:  The Transformation of American Obscenity Law from *Hicklin* to *Ulysses II*, 85 Washington U. L. Rev. 215 (2007)

Some Problem with Model Rule 5.6(a), Professional Lawyer (ABA 2007 Symposium Issue).

Monroe Freedman's Solution to the Criminal Defense Lawyer's Trilemma Is Wrong as a Matter of Policy and Constitutional Law, 34 Hofstra L. Rev. 821 (2006)

Stephen Gillers

ARTICLES
(continued)

"In the Pink Room," <u>TriQuarterly</u> 124.

<u>Free the Lawyers:  A Proposal to Permit No-Sue Promises in Settlement Agreements,</u> 18 Georgetown J. Legal Ethics 291 (2005) (with Richard W. Painter).

<u>Lessons from the Multijurisdictional Practice Commission: The Art of Making Change,</u> 44 Ariz. L. Rev. 685 (2002).

<u>Speak No Evil: Settlement Agreements Conditioned On Noncooperation Are Illegal and Unethical,</u> 31 Hofstra L. Rev.  1 (2002) (reprinted at 52 Defense L.J. 769 (2003)).

<u>"If Elected, I Promise [_____]"–What Should Judicial Candidates Be Allowed to Say?</u> 35 Ind. L. Rev. 735 (2002).

<u>Legal Ethics: Art or Theory?,</u> 58 Annual Survey Am. L. 49 (2001).

<u>The Anxiety of Influence,</u> 27 Fla. St. L. Rev. 123 (1999) (discussing rules that restrict multidisciplinary practice.

<u>Can a Good Lawyer Be a Bad Person?</u> 2 J. Inst. Study of Legal Ethics 131 (1999) (paper delivered at conference "Legal Ethics: Access to Justice" at Hofstra University School of Law, April 5-7, 1998).

<u>More About Us: Another Take on the Abusive Use of Legal Ethics Rules,</u> 11 Geo. J. Legal Ethics 843 (1998).

<u>Caveat Client: How the Proposed Final Draft of the Restatement of the Law Governing Lawyers Fails to Protect Unsophisticated Consumers in Fee Agreements With Lawyers,</u> 10 Geo. J. Legal Ethics 581 (1997).

Participant, <u>Ethical Issues Arising From Congressional Limitations on Legal Services Lawyers,</u> 25 Fordham Urban Law Journal 357 (1998) (panel discussion).

<u>The Year: 2075, the Product: Law,</u> 1 J. Inst. Study of Legal Ethics 285 (1996) (paper delivered on the future of the legal profession at Hofstra University Law School's conference "Legal Ethics: The Core Issues").

<u>Getting Personal,</u> 58 Law & Contemp. Probs. 61 (Summer/Autumn 1995) (contribution to symposium on teaching legal ethics).

ARTICLES
(continued)

Against the Wall, 43 J. Legal Ed. 405 (1993) (ethical considerations for the scholar as advocate).

Participant, Disqualification of Judges (The Sarokin Matter): Is It a Threat to Judicial Independence?, 58 Brooklyn L. Rev. 1063 (1993) (panel discussion).

The New Old Idea of Professionalism, 47 The Record of the Assoc Bar of the City of N.Y. 147 (March 1992).

The Case of Jane Loring-Kraft: Parent, Lawyer, 4 Geo. J. Legal Ethics 115 (1990).

Taking L.A. Law More Seriously, 98 Yale L.J. 1607 (1989) (contribution to symposium on popular legal culture).

Protecting Lawyers Who Just Say No, 5 Ga. St. L. Rev. 1 (1988) (article based on Henry J. Miller Distinguished Lecture delivered at Georgia State University College of Law).

Model Rule 1.13(c) Gives the Wrong Answer to the Question of Corporate Counsel Disclosure, 1 Geo. J. Legal Ethics 289 (1987).

The Compelling Case Against Robert H. Bork, 9 Cardozo L. Rev. 33 (1987).

Ethics That Bite:  Lawyers' Liability to Third Parties, 13 Litigation 8 (Winter 1987).

Can a Good Lawyer Be a Bad Person?, 84 Mich. L. Rev. 1011 (1986).

Proving the Prejudice of Death-Qualified Juries After Adams v. Texas:  An Essay Review of Life in the Balance, 47 Pitt. L. Rev. 219 (1985), cited in Lockhart v. McCree, 476 U.S. 162, 197, 201 (1986) (Marshall, J., dissenting).

What We Talked About When We Talked About Ethics: A Critical View of the Model Rules, 46 Ohio St. L.J. 243 (1985).

The Quality of Mercy:  Constitutional Accuracy at the Selection Stage of Capital Sentencing, 18 U.C. Davis L. Rev. 1037 (1985).

Berger Redux, 92 Yale L.J. 731 (1983) (Review of Death Penalties by Raoul Berger).

**ARTICLES**
(continued)

Selective Incapacitation:  Does It Offer More or Less?, 38 The Record of the Assoc. Bar City of N.Y. 379 (1983).

Great Expectations:  Conceptions of Lawyers at the Angle of Entry, 33 J. Legal Ed. 662 (1983).

Perspectives on the Judicial Function in Criminal Justice (Monograph, Assoc. Bar City of N.Y., 1982).

Deciding Who Dies, 129 U. Pa. L. Rev. 1 (1980) (quoted and cited as "valuable" in Spaziano v. Florida, 468 U.S. 447, 487 n.33 (1984) (Stevens, J., dissenting); also cited in Zant v. Stephens, 462 U.S. 862, 878 n.17, 879 n.19 (1983); Lockhart v. McCree, 476 U.S. 162, 191 (1986) (Marshall, J., dissenting); Callins v. Collins, 114 S.Ct. 1127, 1134 n.4 (1994) (Blackmun, J., dissenting); and Harris v. Alabama, 115 S.Ct. 1031, 1038-39 (1995) (Stevens, J., dissenting).

Numerous articles in various publications, including The New York Times, The Nation, American Lawyer, The New York Law Journal, The National Law Journal, Newsday, and the ABA Journal.  See below for selected bibliography.

**AWARDS**

**2015 Recipient of the American Bar Foundation Outstanding Scholar Award** for dedication to the regulation of and ethics in the legal profession.

**2011 Recipient, Michael Franck Award.** Michael Franck Award from the ABA's Center for Professional Responsibility. The Award is given annually for "significant contributions to the work of the organized bar….noteworthy scholarly contributions made in academic settings, [and] creative judicial or legislative initiatives undertaken to advance the professionalism of lawyers…are also given consideration."

**DVDS**

"Adventures in Legal Ethics and Further Adventures in Legal Ethics": videotape of thirteen dramatic vignettes professionally produced and directed and raising issues of legal ethics.  Author, Producer.  (1994)

"Dinner at Sharswood's Café," a videotape raising legal ethics issues. Author,  Producer. (1996)

"Amanda Kumar's Case," a 38-minute story raising more than two dozen legal ethics issues.  Author. (1998)

**TRIBUTES**

To Honorable Gus J. Solomon, printed at 749 Federal Supplement LXXXI and XCII (1991).

Truth, Justice, and White Paper, 27 Harv. Civ. R. Civ. Lib. L. Rev. 315 (1992) (to Norman Dorsen).

Irving Younger: Scenes from the Public Life, 73 Minn. L. Rev. 797 (1989).

**OTHER
TEACHING**

Visiting Professor of Law, Harvard Law School, Winter 1988 Semester;

Adjunct Professor of Law, Yeshiva University, Cardozo Law School, Spring 1986, Spring 1987, and Fall 1988 Semesters.
Course:  The Legal Profession.

Adjunct Associate Professor of Law, Brooklyn Law School, 1976-78.

**PRIOR EMPLOYMENT**

1973 - 1978
Private practice of law
Warner and Gillers, P.C. (1975-78)

1974 - 1978
Executive Director
Society of American Law Teachers, Inc.

1971 - 1973
Executive Director, Committee for
Public Justice

1969 - 1971
Associate, Paul, Weiss, Rifkind,
Wharton & Garrison

1968 - 1969
Judicial Clerk to Chief Judge
Gus J. Solomon, Federal District Court
for the District of Oregon, Portland, Oregon

Stephen Gillers

**SELECTED**
**TESTIMONY**

Testimony on "Nomination of Sandra Day O'Connor to the Supreme Court of the United States", Hearings, before the Senate Committee on the Judiciary, 97th Congress, 1st Sess., Sept. 11, 1981.

Testimony on S. 2216, "Habeas Corpus Reform Act of 1982", Hearings, before the Senate Committee on the Judiciary, 97th Congress, 2d Sess., April 1, 1982.

Testimony on H.R. 5679, "Criminal Code Revision Act of 1981", Hearings, before the House of Representatives, Committee on the Judiciary, 97th Congress, 2d Sess., April 22, 1982.

Testimony on S. 653, "Habeas Corpus Procedures Amendment Act of 1981", Hearings, before the Senate Committee on the Judiciary, 97th Congress, 1st Sess., November 13, 1981.

Testimony on S. 8875 and A. 11279, "A Proposed Code of Evidence for the State of New York", before Senate and Assembly Codes and Judiciary Committees, February 25, 1983.

Testimony before A.B.A. Commission on Women in the Profession, Philadelphia, February 6, 1988.

Testimony on the nomination of William Lucas to be Assistant Attorney General for Civil Rights, before the Senate Committee on the Judiciary, 101st Congress, 1st Sess., July 20, 1989.

Testimony on the nomination of Vaughn Walker to be United States District Judge for the Northern District of California, before the Senate Committee on the Judiciary, 101st Congress, 1st Sess., November 9, 1989.

**PUBLIC**
**LECTURES**
(partial list)

Tabor Lecture, Valparaiso University School of Law, April 12, 2007. This event consisted of two lectures. A public lecture was entitled "Here's the Gun: A Lawyer's Responsibility for Real Evidence." The Bench and Bar lecture, which will be published in the school's law review, is entitled "Virtual Clients: An Idea in Search of a Theory (With Limits)."

Paul M. Van Arsdell, Jr., Memorial Lecture, University of Illinois, College of Law, March 7, 2005: "Do Lawyers Share Moral Responsibility for Torture at Guantanamo and Abu Ghraib?"

Howard Lichtenstein Distinguished Professorship of Legal Ethics Lecture Series, "In Praise of Confidentiality (and Its Exceptions)," delivered at Hofstra University School of Law, November 12, 2003.

8

Henry J. Miller Distinguished Lecture, Georgia State University College of Law, May 11, 1988.  "Protecting Lawyers Who Just Say No."

First Annual South Carolina Bar Foundation Lecture, April 9, 1992, University of South Carolina Law School, Columbia, South Carolina.  "Is the Legal Profession Dead?  Yearning to Be Special in an Ordinary Age."

Philip B. Blank Memorial Forum on Attorney Ethics, Pace University School of Law, April 8, 1992.  "The Owl and the Fox: The Transformation of Legal Work in a Commodity Culture."

Speaker on Judicial Ethics, ABA Appellate Judges' Seminar and Flaschner Judicial Institute, September 29, 1993, Boston, Massachusetts.

Baker-McKenzie Ethics Lecture, Loyola University Chicago School of Law, October 13, 1993, Chicago, Illinois ("Bias Issues in Legal Ethics:  Two Unfinished Dramas").

The Sibley Lecture, University of Georgia School of Law, Athens, Georgia, November 10, 1993 ("Telling Stories in School: The Pedagogy of Legal Ethics").

Participant,  "Ethics in America" series (to be) broadcast on PBS 2007, produced by Columbia University Seminars on Media and Society.

Participant, "Ethics in America" series, broadcast on PBS February and March 1989, produced by Columbia University Seminars on Media and Society.

 Participant, "The Constitution: That Delicate Balance, Part II" series, broadcast on PBS February and March 1992, produced by Columbia University Seminars on Media and Society.

Lecturer on legal ethics and allied subjects in the U.S. and abroad at hundreds of seminars, CLE events, and conferences organized by private law firms, corporate law departments, the District of Columbia, Second, Fourth, Sixth, Ninth and Federal Circuit Judicial Conferences; American Bar Association; Federal Bar Council; New York State Judiciary; New York City Corporation Counsel; American Museum of Natural History; Practicing Law Institute; Law Journal Seminars; state, local and specialty bar associations (including in Oregon, Nebraska, Illinois, New York, New Jersey, Pennsylvania, Rhode Island, Vermont, and Georgia); corporate law departments; law schools; and law firms.

**LEGAL AND
PUBLIC SERVICE
ACTIVITIES**

<u>Member</u>, ABA 20/20 Commission, 2009- 2013 (appointed by the ABA President to study the future of lawyer regulation).

<u>Chair</u>, American Bar Association Center for Professional Responsibility, Policy Implementation Committee, 2004-2008 (Member 2002-2010).

<u>Member</u>, American Bar Association Commission on Multijurisdictional Practice, 2000-2002.

<u>Consultant</u>, Task Force on Lawyer Advertising of the New York State Bar Association (2005).

Retained by the New Jersey Supreme Court, in connection with the Court's review of the lawyer disciplinary system in New Jersey, to provide an "analysis of the strengths and weaknesses of California's 'centralized' disciplinary system" and to "report on the quality, efficiency, timeliness, and cost effectiveness of the California system...both on its own and compared with the system recommended for New Jersey by the Ethics Commission."  Report filed December 1993.  Oral presentation to the Court, March 1994.

<u>Reporter</u>, Appellate Judges Conference, Commission on Judicial participation in the American Bar Association, (October 1990-August 1991).

<u>Member</u>, David Dinkins Mayoral Transition Search Committee (Legal and Law Enforcement, 1989).

<u>Member</u>, Committee on the Profession, Association of the Bar of the City of New York (1989-1992)

<u>Member</u>, Executive Committee of Professional Responsibility Section, Association of American Law Schools (1985-1991).

<u>Chair</u>, 1989-90 (organized and moderated Section presentation at 1990 AALS Convention on proposals to change the ABA Code of Judicial Conduct).

<u>Counsel</u>, New York State Blue Ribbon Commission to Review Legislative Practices in Relation to Political Campaign Activities of Legislative Employees (1987-88).

<u>Administrator</u>, Independent Democratic Judicial Screening Panel, New York State Supreme Court (1981).

<u>Member</u>, Departmental Disciplinary Committee, First Judicial Department  (1980 - 1983).

<u>Member</u>, Committee on Professional and Judicial Ethics, Association of the Bar of the City of New York (1979 - 1982).

**BAR MEMBERSHIPS**       STATE:

New York (1968)

FEDERAL:

United States Supreme Court (1972);
Second Circuit (1970);
Southern District of New York (1970);
Eastern District of New York (1970)

**LEGAL EDUCATION**       J.D. <u>cum laude</u>, NYU Law School, 1968
Order of the Coif (1968)
Dean's List (1966-68)
University Honors Scholar (1967-68)

**PRELEGAL**       B.A. June 1964, City University of New York
**EDUCATION**       (Brooklyn College)

**DATE OF BIRTH**       November 3, 1943

**OTHER ARTICLES**       (Selected Bibliography 1978-present)

1.       Carter and the Lawyers, The Nation, July 22-29, 1978.

2.       Standing Before the Bar, Bearing Gifts, New York Times, July 30, 1978.

3.       Judgeships on the Merits, The Nation, September 22, 1979.

4.       Entrapment, Where Is Thy Sting?, The Nation, February 23, 1980.

5.       Advice and Consent, New York Times, September 12, 1981.

6.      Lawyers' Silence: Wrong . . . , New York Times, February 14, 1983.

7.      The Warren Court - It Still Lives, The Nation, September 17, 1983.

8.      Burger's Warren Court, New York Times, September 25, 1983.

9.      "I Will Never Forget His Face!", New York Times, April 21, 1984.

10.     Warren Court's Landmarks Still Stand, Newsday, July 29, 1984.

11.     Von Bulow, And Other Soap Operas, New York Times, May 5, 1985.

12.     Statewide Study of Sanctions Needed for Lawyers' Misconduct, New York Law Journal,
        June 6, 1985.

13.     Preventing Unethical Behavior - Something New in Model Rules, New York Law Journal,
        August 30, 1985.

14.     Proposed Model Rules Superior to State's Code, New York Law Journal, October 21, 1985.

15.     Five Ways Proposed to Improve Lawyer Discipline in New York, New York Law Journal,
        January 8, 1986.

16.     Poor Man, Poor Lawyer, New York Times, February 28, 1986.

17.     Proposals To Repair Cracks in Ethical Legal Behavior, New York Law Journal,
        April 17, 1986.

18.     Unethical Conduct: How to Deter It Through Education, Bar Leader (May/June 1986).

19.     The New Negotiation Ethics - Or Did Herb's Lawyer Do Wrong? New York Law Journal,
        June 2, 1986.

20.     The Real Stakes in Tort Reform, The Nation, July 19-26, 1986.

21.     Bernhardt Goetz: Vigilante Or Victim?, Toronto Star, September 10, 1986.

22.     The Message That the Goetz Trial Will Send, Newsday, August 31, 1986.

23.     Amending the Ethics Code - Solicitation, Pre-Paid Plans, Fees, New York Law Journal,
        November 10, 1986.

24.     Amending the Ethics Code - Conflicts of Interest, Screening, New York Law Journal,
        November 12, 1986.

25.     Amending the Ethics Code - Confidentiality and Other Matters, New York Law Journal,

November 13, 1986.

26.    No-Risk Arbs Meet Risk Justice, New York Times, November 23, 1986.

27.    The Meese Lie, The Nation, February 21, 1987.

28.    Amending State Ethics Code - Conflicts of Interest Gone Awry, New York Law Journal, May 18, 1987.

29.    "The Lawyers Said It Was Legal," New York Times, June 1, 1987.

30.    Feminists vs. Civil Libertarians, New York Times, November 8, 1987.

31.    Lessons for the Next Round in Picking a Justice, Newsday, November 11, 1987.

32.    We've Winked For Too Long, National Law Journal, December 21, 1987 (judicial membership in exclusionary clubs).

33.    No More Meeses, New York Times, May 1, 1988.

34.    In Search of Roy Cohn, ABA Journal, June 1, 1988 (book review).

35.    Do Brawley Lawyers Risk Serious Discipline?, New York Law Journal, June 22, 1988.

36.    Have the Brawley Lawyers Broken the Law?, New York Times, July 2, 1988.

37.    Report Demonstrates Why Meese is Unfit to Be Attorney General, Atlanta Journal and Constitution, July 24, 1988.

38.    Ethical Questions for Prosecutors in Corporate-Crime Investigations, New York Law Journal, September 6, 1988.

39.    Restoring Faith at Justice, National Law Journal, November 21, 1988.

40.    Is Bush Repeating Rockefeller's Folly?, New York Times, September 11, 1989.

41.    Standards Time, The Nation, January 29, 1990 (on the subject of legislative ethics).

42.    Abused Children vs. The Bill of Rights, New York Times, August 3, 1990.

43.    Words Into Deeds: Counselor, Can You Spare a Buck?, ABA Journal, November 1990.

44.    Bad Apples, ABA Journal at 96 (March 1991) (book review).

45.    The Gotti Lawyers and the Sixth Amendment, New York Law Journal, August 12, 1991.

46.    Justice or Just Us?  The Door to Dan Quayle's Courthouse Only Swings One Way, ABA

Journal (June 1992) at 109.

47.   Fighting Words (What was once comical is now costly), ABA Journal (August 1992) at 102.

48.   Sensitivity Training: A New Way to Sharpen Your Skills At Spotting Ethics Conflicts, ABA Journal (October 1992) at 107.

49.   Under Color of Law:  Second Circuit Expands Section 1983 Liability for Government Lawyers, ABA Journal (December 1992) at 121.

50.   Cleaning Up the S&L Mess: Courts Are Taking the Duty to Investigate Seriously, ABA Journal (February 1993) at 93.

51.   All Non-Refundable Fee Agreements Are Not Created Equal, New York Law Journal (February 3, 1993) at 1.  (Analyzing appellate decision prohibiting non-refundable fees.)

52.   The Packwood Case: The Senate Is Also on Trial, The Nation (March 29, 1993) at 404.

53.   Conflict of Laws: Real-World Rules for Interstate Regulation of Practice, ABA Journal (April 1993) at 111.

54.   Packwood II, The Nation (May 10, 1993) at 617.

55.   Generation Gap, ABA Journal (June 1993) at 101.  (On the use of a boycott in response to the Colorado anti-gay initiative.)

56.   Future Shocks, ABA Journal (August 1993) at 104.  (Looking back on the practice of law in the 21st century from the year 2103.)

57.   A Rule Without a Reason, ABA Journal (October 1993) at 118.  (Criticism of the prohibition in Rule 5.6(b) against a lawyer agreeing not to restrict future practice in connection with a settlement.)

58.   Too Old to Judge?, ABA Journal (December 1993) at 94.  (Supreme Court justices have life tenure.  Maybe they should not.)

59.   Truth or Consequences, ABA Journal (February 1994) at 103.  (Discovery obligations.)

60.   "Ethical Cannons," in Symposium - Twenty Years of Change, Litigation (Fall 1993).

61.   Stretched Beyond the Limit, Legal Times (March 21, 1994) at 37.  (Analysis of the office of Counsel to the President in light of Bernard Nussbaum's resignation.)  [Same article was reprinted in the Connecticut Law Tribune, the Fulton County (Atlanta) Daily Report, and the Recorder (San Francisco).]

62.   Putting Clients First, ABA Journal (April 1994) at 111. (Discussing cases on lawyers' fiduciary duty.)

63.  Grisham's Law, The Nation (April 18, 1994) at 509.  (The effect of popular culture on Whitewater reporting.)

64.  The Elsinore Appeal: "People v. Hamlet", New York Law Journal (October 11, 1994) at 3. (Brief for Appellee, State of Denmark).  (This was a mock appeal from Hamlet's conviction for the murder of Claudius, Polonius, Ophelia, Laertes, Rosencrantz & Gildenstern, held at the Association of the Bar of the City of New York on October 11, 1994.)

65.  Billing for Costs and Disbursements: What Law Firms Can Charge and Clients Can Expect, monograph published 1995 by Pitney Bowes Management Services.

66.  Clinton Has A Right To Privacy, N.Y. Times, 12/21/95, at ____.

67.  "'Filegate' Was Bad Enough.  Now This?," N.Y. Times, 7/5/96, at A23. (Article criticizing proposal to privatize certain security investigations of government personnel.)

68.  "Whitewater: How to Build a Case Using a Tainted Witness,"  Los Angeles Times, 2/16/97, at M1.

69.  "Hillary Clinton Loses Her Rights," New York Times, 5/4/97, at E15.

70.  "Shakespeare on Trials," IV Federal Bar Council News 16 (June 1997).

71.  "Florida Backs Out On a Deal," New York Times, 10/10/97, at A23.

72.  "The Perjury Loophole," New York Times, 2/18/98, at A21 (discussion of perjury in connection with Kenneth Starr's investigation of President Clinton).

73.  "Any Method to Ginsburg's Madness?" Los Angeles Times, 3/15/98, at M1 (discussion of William Ginsburg's public defense of Monica Lewinsky).

74.  "Whitewater Made Easy," The Nation, 6/1/98, at 8.

75.  "A Highly Strategic Legal Chess Game," Los Angeles Times, June 7, 1998,  at M1 (Starr-Clinton legal maneuvers).

76.  "To Sleep . . . Perchance, to Dream," New York Law Journal, July 8, 1998, at 2.  (Humorous article about bored jurors.)

77.  "Clinton Is No Ordinary Witness," New York Times, 7/28/98, at A15.

78.  "The High Cost of an Ethical Bar," The American Lawyer, July/August 1998, at 87.

79.  "Clinton's Choice: Tell Truth or Dare to Gamble," Los Angeles Times, August 2, 1998, at M1.

80.    "Accurate Lies: The Legal World of Oxymorons," Los Angeles Times, August 30, 1998, at M1.

81.    "A Fool For a Client?" The American Lawyer, October 1998, at 74.  (President Clinton's legal representation in the Lewinsky representation.)

82.    "The Presidency: Out to End Clinton's Mess and Be Happy," Los Angeles Times, October 4, 1998, at M1.

83.    "Protecting Their Own," The American Lawyer, November 1998, at 118.

84.    "Can't We All Just Practice Together: Taking Down 'Trade Barriers' on Lawyers Here and Abroad," Legal Times, November 9, 1998, at 32.

85.    "Beyond the Impeachment Spectacle," Los Angeles Times, November 22, 1998, at M1.

86.    "The Perjury Precedent," New York Times, December 28, 1998, at A27.

87.    "From the Same Set of Facts: A Tale of Two Stories," Los Angeles Times, January 17, 1999, at M1 (about the Clinton impeachment trial).

88.    "The Decline and Fall of Kenneth Starr," Los Angeles Times, February 7, 1999, at M1.

89.    "The Truth About Impeachment," The American Lawyer, March 1999, p. 131.

90.    "The Double Standard," New York Times Book Review, March 21, 1999, at 13 (review of *No Equal Justice* by David Cole).

91.    "Four Officers, One Likely Strategy," New York Times, Saturday, April 3, 1999, at A15.

92.    "The Man in the Middle: Did George Ventura Step Over the Ethical Line?" The American Lawyer, May 1999, p. 80 (discussion of lawyer whistleblowing in light of *State v. George Ventura*). (Reprinted as "Whistleblower, Esq." in New York Law Journal, May 26, 1999 at page 2.)

93.    "Your Client Is A Corporation – Are Its Affiliates Clients Too?"  The New York Professional Responsibility Report, May 1999 , at 1.

94.    "Job Talk (Scenes from the Academic Life)," The American Lawyer, July 1999, at 161. (Satire about law school hiring.)

95.    "The Other Y2K Crisis," The Nation, July 26/August 2, 1999, at 4 (editorial about the year 2000 electoral races).

96.    "Walking the Confidentiality Tightrope," ACCA Docket 20 (September/October 1999) (remarks at ACCA's national conference in 1998).

Stephen Gillers

97.  "Things Old & New – The Code Amendments," New York Professional Responsibility Report (September 1999), at 1.

98.  "Clinton's Chance to Play the King," New York Times,  Sept. 20, 1999 at A17.

99.  "Overprivileged," American Lawyer, October 1999 at 37.  (Discussion of First Amendment protection for journalists.)

100.  "Controlling Conflicts Between Old and New Clients,"  New York Professional Responsibility Report, January 2000 at 3.

101.  "How To Spank Bad Lawyers," American Lawyer, February 2000 at 41.

102.  "A Weak Case, But a Brave Prosecution," New York Times, Wednesday, March 1, 2000 at A23 (the Diallo case).

103.  "Conflicts of Interest in Malpractice Cases," New York Professional Responsibility Report, March 2000 at 1.

104.  "The Court's Picayune Power," New York Times, Thursday, April 20, 2000 at A29.

105.  "Some Misrepresentations Among Corporate Lawyers," New York Professional Responsibility Report, June 2000 at 1.

106.  "Was Hubbell Case About Getting Justice or Getting Even?" Los Angeles Times, June 18, 2000 at M2 (comment on the U.S. Supreme Court's decision in *United States v. Hubbell*, decided June 5, 2000).

107.  "Who Owns the Privilege After a Merger?" New York Professional Responsibility Report, July 2000 at 1.

108.  "Fighting the Future," The American Lawyer, July 2000 at 55.

109.  "Campus Visits Deconstructed," Newsweek: How To Get Into College, 2001 Edition at 46.

110.  "The Court Should Boldly Take Charge," New York Times, Tuesday, November 21, 2000 at A25 (Florida's presidential election recount).

111.  "Who Says the Election Has a Dec. 12 Deadline?"  New York Times, Saturday, December 2, 2000 at A19.

112.  "Motive Is Everything in the Marc Rich Pardon," New York Times, Saturday, February 17, 2001.

113.  "For Justice To Be Blind, Must Judges Be Mute?"  New York Times, Sunday, March 4, 2001 at Section 4, page 3.

114.    "Should Supreme Court Justices Have Life Tenure?"  Reprinted in *The Supreme Court and Its Justices* (Choper J., ed.) (ABA 2001).

115.    Professionalism Symposium, 52 South Carolina L. Rev. 55 (2001) (closing remarks).

116.    "No Lawyers To Call," New York Times, Monday, December 3, 2001 at A19 (ethical and constitutional obligations that will prevent lawyers from participating in military tribunals).

117.    "Let Judicial Candidates Speak," New York Times, Thursday, March 28, 2002 at A31.

118.    "The Flaw in the Andersen Verdict," New York Times, Tuesday, June 18, 2002 at A23.

119.    "Why Judges Should Make Court Documents Public," New York Times, Saturday, November 30, 2002 at A17.

120.    "It's an MJP World," ABA Journal, December 2002 at 51.

121.    "Upholding the Law as Pretrial Publicity Goes Global," New York Times, Sunday, April 27, 2003,  Sec. 4 at 14.

122.    "Court-Sanctioned Secrets Can Kill," Los Angeles Times, Wednesday, May 14, 2003 (reprinted May 15, 2003 in Newsday).

123.    "Make a List," New York Times, June 11, 2003 at 31 (advocating changes in the methods of judicial selection).

124.    "Conflicted About Martha?" American Lawyer (September 2003) (analysis of Martha Stewart indictment).

125.    "The Prudent Jurist," Legal Affairs, January/February 2004.

126.    "On Knowing the Basic Rules of Advocacy," New York Times, February 8, 2004, Sec. 4 at 2 (cross-examination in the Martha Stewart trial).

127.    "The Prudent Jurist," Legal Affairs, March/April 2004.

128.    "Scalia's Flawed Judgment," The Nation, April 19, 2004 at 21.

129.    "Scholars, Hucksters, Copycats, Frauds," Washington Post, April 25, 2004 at B3  (Outlook) (discussion of ethics of academics who put their names on newspaper opinion pieces written by industry).

130.    "The Prudent Jurist," Legal Affairs, May/June 2004 at 17.

131.    "Multijurisdictional Practice of Law:  Merging Theory With Practice," 73 The Bar Examiner 28 (May 2004).

132.   "Tortured Reasoning," American Lawyer (July 2004) (analysis of government lawyer memos addressing the application of various treaties and laws to the treatment of Afghan prisoners).

133.   "Paying the Price of a Good Defense," New York Times, August 13, 2004.

134.   "Improper Advances:  Talking Dream Jobs with the Judge Out of Court," Slate.com, August17, 2005 (with D. Luban and S. Lubet).

135.   "Roberts' Bad Decision," Los Angeles Times, September. 13, 2005 (with D. Luban and S. Lubet).

136.   "No Privilege for Miers," The Nation, November 7, 2005

137.   "Senators, Don't Rubber-Stamp," USA Today, January 5, 2006 at 13A (discussing the Senate's advise and consent responsibility in connection with Alito nomination).

138.   Ethics Column, American Lawyer, page 61 (January 2006) (with Deborah Rhode).

139.   Ethics Column, American Lawyer, page 63 (April 2006) (with Deborah Rhode).

140.   "Bush Postpones 2008 Election," The Nation, August 14/21, 2006 (satire).

141.    "Free the Ulysses Two: Joyce's First U.S. Publishers Were Convicted of Obscenity. It's Time to Clear Them." The Nation, February 19, 2007.

142.   "Twenty Years of Legal Ethics: Past, Present, and Future," 20 Georgetown J. Legal Ethics 321 (2007) (symposium celebrating the 20th anniversary of the journal).

143.   "The Torture Memos," The Nation, April 28, 2008.

144.   "Bar None," American Lawyer (October 2008) (globalization of law practice and how it will effect regulation of the bar).

145.   2011 Michael Franck Award Acceptance Speech, 21 Professional Lawyer 6 (2011).

146.   "Time to Adapt to a Different Marketplace," New York Law Journal, March 27, 2012.

147.   "The Supreme Court Needs a Code of Ethics," Politico (Aug. 8, 2013) (with Charles Geyh).

# EX. 50

Message

| | |
|---|---|
| **From:** | Zeiss, Nicole [/O=GOODKIN LABATON RUDOFF SUCHAROW/OU=FIRST ADMINISTRATIVE GROUP/CN=RECIPIENTS/CN=ZEISSN] |
| **Sent:** | 12/7/2016 5:01:27 PM |
| **To:** | Ng, Cindy [CNg@labaton.com] |
| **CC:** | Goldsmith, David [dgoldsmith@labaton.com] |
| **Subject:** | final work on letter to Citibank |

Damon's allocation should come out of our IOLA. It is fine for that to happen on Friday.

Thanks

**From:** Zeiss, Nicole
**Sent:** Wednesday, December 07, 2016 11:30 AM
**To:** Ng, Cindy
**Cc:** Goldsmith, David
**Subject:** Chargois wire instructions are below

Below are his wire instructions, looks like they match the W-9 and undertaking. Sorry to be all over the place but I have to ask Larry something about whether Damon should be paid out of the Citibank escrow account

**From:** Belfi, Eric J.
**Sent:** Wednesday, December 07, 2016 8:58 AM
**To:** Zeiss, Nicole
**Subject:** Re: Damon

Please use this:

Wells Fargo Bank NA

121000248

Damon J. Chargois

ss#

Routing: ████████

Acct. # ████████████

Wells Fargo

420 Montgomery Street

San Francisco, CA 94104


He needs a new undertaking for Damon Chargois, Esq.


Eric Belfi

Partner

Labaton Sucharow LLP

140 Broadway

New York, N.Y. 10005

o: 1.212.907.0878

c: 1.516.509.5236


On Dec 7, 2016, at 5:01 AM, Zeiss, Nicole <NZeiss@labaton.com> wrote:

Hi again, we have to pull the trigger on this this am so Cindy can finalize the bank letter. Thanks


Sent from my BlackBerry 10 smartphone.

**From:** Zeiss, Nicole

**Sent:** Tuesday, December 6, 2016 11:18 AM

**To:** Belfi, Eric J.

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

**Subject:** Damon

I spoke with David. Do you think we will have time to process his allocation once he wants it, or will it be a rush? If it will be a rush, then I want to tell accounting to bring the money into our IOLA. Otherwise, it can stay in the settlement fund, but it will take some hoops to get it out (Keller AND Larry signature).

## Labaton
## Sucharow

**Nicole M. Zeiss | Partner**

140 Broadway, New York, New York 10005

T: (212) 907-0867 | F: (212) 883-7067

E: nzeiss@labaton.com | W: www.labaton.com

 <image003.gif> 

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

# EX. 51

| From: | Bradley, Garrett J. |
| --- | --- |
| Sent: | Friday, August 28, 2015 5:53 PM |
| To: | Keller, Christopher J. |
| Cc: | Sucharow, Lawrence |
| Subject: | Re: SST--Proposed Revision to Term Sheet for DOL Deal |

I agree. They will threaten their own fee app which I say would invalidate the agreement we have.

Garrett

On Aug 28, 2015, at 4:42 PM, Keller, Christopher J. <ckeller@labaton.com> wrote:

> We should talk this through. The court absolutely need not understand what the allocation of fees is amongst counsel so that should not be included in any document to be filed with the court. I have to say, I am quite overwhelmed with the size genitals lief has in this case in which they have a no client or title. That said, an agreement on allocation will not happen until the fees are actually in and need to be distributed.
>
> Christopher Keller
> Partner || Labaton Sucharow LLP
> 140 Broadway
> New York, NY 10005
> 212-907-0853
>
> On Aug 28, 2015, at 2:49 PM, Sucharow, Lawrence <LSucharow@labaton.com> wrote:
>
>> See entire email stream
>>
>> Sent from my iPhone
>>
>> Begin forwarded message:
>>
>>> **From:** "Sucharow, Lawrence" <LSucharow@labaton.com>
>>> **Date:** August 28, 2015 at 2:39:27 PM EDT
>>> **To:** "Daniel P. Chiplock" <DCHIPLOCK@lchb.com>
>>> **Cc:** "Garrett J. Bradley" <gbradley@tenlaw.com>, Michael Thornton <MThornton@tenlaw.com>, "Robert L. Lieff" <RLIEFF@lchb.com>
>>> **Subject: Re: SST--Proposed Revision to Term Sheet for DOL Deal**
>>>
>>> Also, I believe that there are other cases and other agreements which are influencing people's desire to either reach agreement now or later.
>>>
>>> I don't have a dog in the hunt and don't want to be drawn into it.
>>>
>>> I apologize for any mistakes but I am not in a place where I can edit my emails so I'm just dictating them I'm hoping that spell correct doesn't fuck me up too much.

1

Confidential: Produced Pursuant to Court Order.