# EX. 233

**SUPPLEMENTAL ETHICAL REPORT FOR SPECIAL MASTER GERALD E. ROSEN**

**Professor Stephen Gillers**
**Elihu Root Professor of Law**
**New York University School of Law**
**May 8, 2018**

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| I. | INTRODUCTION TO OPINION | 1 |
| II. | FACTUAL BACKGROUND | 4 |
| | A. THE *STATE STREET* LITIGATION | 4 |
| | i. *ORIGINS* | 4 |
| | ii. *FILING OF THE ATRS "CUSTOMER CLASS" COMPLAINT* | 5 |
| | iii. *THE ERISA COMPLAINTS* | 7 |
| | iv. *THE BONY MELLON MDL* | 9 |
| | v. *CONSOLIDATION OF THE STATE STREET CASES* | 10 |
| | vi. *HYBRID MEDIATION-DISCOVERY PROCESS* | 11 |
| | vii. *ERISA FEE ALLOCATION* | 11 |
| | viii. *STAFF ATTORNEY COST-SHARING AGREEMENT* | 14 |
| | ix. *SETTLEMENT AND NOTICE TO CLASS MEMBERS* | 18 |
| | a. Involvement of Government Agencies | 18 |
| | b. Preparation and Filing of Settlement Documents | 19 |
| | x. *FEE PETITION REQUESTING ATTORNEYS' FEES* | 21 |
| | a. Fee Negotiations Among Customer Class Counsel | 21 |
| | b. Submission of the Fee Petition | 23 |
| | c. The Labaton Template and Inaccuracies in Declaration Language | 24 |
| | d. Staff Attorney Time | 27 |

**Page**

xi. *COURT APPROVAL OF THE SETTLEMENT AND FEE AWARD* ............... 28

    a. Preliminary Approval ............... 28

    b. Final Approval ............... 29

xii. *DISTRIBUTION OF SETTLEMENT AND ATTORNEYS' FEES* ............... 30

    a. Payment of Fees and Expenses ............... 31

B. INVOLVEMENT OF LABATON AND CHARGOIS IN THE STATE STREET CASE ............... 33

i. *LABATON'S INTRODUCTION TO ATRS* ............... 33

ii. *THE CHARGOIS "ARRANGEMENT"* ............... 35

    a. Labaton's Compartmentalization of Knowledge of the Chargois Arrangement ............... 38

iii. *THE ATRS REQUEST FOR QUALIFICATIONS (RFQ)* ............... 40

iv. *ATRS' LACK OF KNOWLEDGE OF THE CHARGOIS ARRANGEMENT* ............... 41

    a. Agreement Among Labaton, Lieff and Thornton to Share in the Payment of Labaton's Obligation to Chargois ............... 45

v. *LIEFF'S AND THORNTON'S LIMITED KNOWLEDGE OF THE CHARGOIS ARRANGEMENT* ............... 46

    a. Thornton's Knowledge of the Chargois Arrangement ............... 47

    b. Lieff's Knowledge of the Chargois Arrangement ............... 49

    c. Inconsistency of Information Regarding the Chargois Arrangement ............... 52

vi. *ERISA COUNSEL'S LACK KNOWLEDGE OF CHARGOIS ARRANGEMENT* ............... 54

**Page**

        vii.    *PAYMENTS TO CHARGOIS PURSUANT TO THE*
                *CHARGOIS ARRANGEMENT*     55

    C.    SCRUTINY OF THE STATE STREET SETTLEMENT AND
         SPECIAL MASTER'S APPOINTMENT     57

        i.     *THE BOSTON GLOBE INQUIRY*     57

        ii.    *NOVEMBER 10, 2016 LETTER TO THE COURT*     58

        iii.   *THE "CLAW BACK" LETTER*     60

        iv.   *APPOINTMENT OF SPECIAL MASTER*     61

III.   QUESTIONS PRESENTED     62

IV.   OPINION     63

    A.    WHERE THE COURT IS CALLED ON TO APPLY A RULE OF
         PROFESSIONAL CONDUCT, IT SHOULD APPLY THE
         MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT
         RATHER THAN THE RULES OF ANOTHER JURISDICTION.
         FEDERAL COMMON LAW ALSO GOVERNS ISSUES
         BEFORE THE COURT     63

        i.     *APPLICATION OF MASSACHUSETTS RULES OF*
                *PROFESSIONAL CONDUCT*     63

        ii.    *ADDITIONAL REASONS TO APPLY THE*
                *MASSACHUSETTS PROFESSIONAL CONDUCT RULES*
                *IN THIS CASE*     65

        iii.   *FEDERAL LAW GOVERNS OTHER ISSUES BEFORE*
                *THE COURT*     65

    B.    THE CHARGOIS ARRANGEMENT IS AN UNETHICAL
         PAYMENT FOR THE RECOMMENDATION OF A CLIENT UNDER
         RULE 7.2(B) UNLESS IT SATISFIES THE REQUIREMENTS OF
         RULE 1.5(E) AS A VALID DIVISION OF FEE AGREEMENT     66

        i.     *RULE 7.2(b)*     66

        ii.    *BECAUSE LABATON DID NOT COMPLY WITH RULE 1.5(e),*
                *IT PAID CHARGOIS FOR RECOMMENDING A CLIENT*

**Page**

*IN VIOLATION OF RULE 7.2(b)*                                68

iii.  *LABATON'S OWN CONDUCT, OBJECTIVELY VIEWED,*
      *IS INCONSISTENT WITH THE CLAIM THAT THE*
      *CHARGOIS ARRANGEMENT WAS A VALID DIVISION OF*
      *FEE AGREEMENT*                                       70

iv.   *COURT OPINIONS IN DISPUTES BETWEEN LAWYERS*
      *DO NOT RENDER THE CHARGOIS ARRANGEMENT*
      *A VALID DIVISION OF FEE AGREEMENT*                   73

v.    *LABATON'S POSITION*                                  75

vi.   *FURTHER ANALYSIS AND CONCLUSION*                     75

C.    THE CHRGOIS ARRANGEMENT SHOULD HAVE BEEN
      DISCLOSED TO THE COURT                                76

i.    *DISCLOSURE TO THE COURT WAS REQUIRED UNDER*
      *THE MASSACHUSETTS RULES OF PROFESSIONAL*
      *CONDUCT AND FEDERAL LAW*                             77

ii.   *FEDERAL CASE LAW CONTRADICTS LABATON'S NARROW*
      *VIEW OF ITS DISCLOSURE OBLIGATIONS TO THE COURT*     79

iii.  *THE MASSACHUSETTS RULES OF PROFESSIONAL*
      *CONDUCT REQUIRED DISCLOSURE OF THE THE*
      *CHARGOIS ARRANGEMENT TO THE COURT BY THOSE*
      *WHO KNEW ITS TERMS*                                  84

iv.   *OMISSION OF THE CHARGOIS ARRANGEMENT FROM*
      *THE SEPTEMBER 15, 2016 FEE PETITION VIOLATED*
      *RULE 11 FED. R. CIV. P.*                             94

v.    *ANY CLAIM THAT THERE WAS NO DUTY TO DISCLOSE*
      *THE CHARGOIS ARRANGEMENT TO THE COURT OR TO*
      *CLASS MEMBERS BECAUSE IT WOULD BE PAID FROM*
      *COUNSEL'S FEE AWARD IS INCORRECT AS A MATTER*
      *OF FACT AND LAW*                                     96

vi.   *A LAWYER'S MISCONDUCT MAY AFFECT A COURT'S*
      *DETERMINATION OF THE AMOUNT OF FEES TO AWARD*        97

vii.  *CONCLUSION*                                          97

**Page**

D.  THE CHARGOIS ARRANGEMENT SHOULD HAVE BEEN
    DISCLOSED TO MEMBERS OF THE CLASS.                          97

    i.   *CLASS COUNSEL WHO KNEW THE TERMS OF THE*
         *CHARGOIS ARRANGEMENT HAD A FIDUCIARY AND*
         *ETHICAL DUTY TO DISCLOSE THE CHARGOIS*
         *ARRANGEMENT TO CLASS MEMBERS*                          98

    ii.  *CONCLUSION*                                           103

E.  GARRETT BRADLEY'S DECLARATION CONTAINS FALSE
    STATEMENTS OF FACT AND FALSE "EVIDENCE," IN
    VIOLATION OF RULES 3.3(a)(1) AND 3.3(a)(3) BECAUSE THE
    FALSE STATEMENTS WERE MADE KNOWINGLY.  THE
    DECLARATION ALSO VIOLATED RULE 8.4(c)'S
    PROHIBITION OF MISREPRESENTATIONS AND DECEIT.
    SEPARATELY, GARRETT BRADLEY'S DECLARATION
    VIOLATED FED. R. CIV. P. 11 BECAUSE BRADLEY FAILED TO
    CONDUCT "AN INQUIRY REASONABLE UNDER THE
    CIRCUMSTANCES" TO ESTABLISH THAT HIS FACTUAL
    CONTENTIONS HAVE "EVIDENTIARY SUPPORT"                     103

    i.    *FILING OF THE FEE PETITION*                          104

    ii.   *GARRETT BRADLEY VIOLATED RULE 3.3(a) BECAUSE*
          *HE KNEW THAT HIS DECLARATION CONTAINED FALSE*
          *STATEMENTS*                                          105

    iii.  *APPLICATION OF RULE 3.3 AND FEDERAL*
          *JURISPRUDENCE TO THE BRADLEY DECLARATION*            107

    iv.   *APPLICATION OF FED. R. CIV. P. 11 TO THE BRADLEY*
          *DECLARATION*                                         108

    v.    *CONCLUSION*                                          109

## I.   <u>INTRODUCTION TO OPINION</u>

Special Master Gerald Rosen has retained me to answer certain questions regarding the professional conduct of lawyers in the captioned case. I briefly state my qualifications to offer my opinions. A current resume is attached to this Report. [EX. 68]. I agreed to an hourly rate of $900 for my work in this matter.

I was initially retained to advise the Special Master and his counsel on the rules and laws governing lawyers. One or more customer class counsel asked to depose me. That changed my role. I submitted a Report on February 23, 2018 based on facts prepared by Judge Rosen and his counsel and which I was asked to assume were true for purposes of my Report. I was deposed on March 20, 2018. The three customer counsel firms then submitted Reports from a total of seven experts, all of whom testified after I did. An eighth customer counsel expert submitted a Report before I drafted my Report, which responds to it. He then testified after I did but I continued my testimony after he concluded.

I sat through or listened on the telephone to the testimony of all customer class experts with the exception of a few hours of Professor Joy's testimony due to my class schedule. I also attended the oral argument before Judge Rosen on April 13, 2018.  I have read the memoranda submitted by customer counsel after the close of testimony. I have been asked to augment my Report to consider positions of the other experts.[1]

---

[1] For example, Professor Joy stated globally in his Declaration: "There Was Not an Ethical Duty or Legal Requirement for Labaton to Provide Notice to the Court of Its Fee Sharing Arrangement with Chargois & Herron in the Case of Arkansas Teacher Retirement System v. State Street Corp." Declaration of Peter A. Joy, p. 31. But his declaration omits reference to Rule 3.3(d), Cmt. 14A to Rule 3.3, the duty of candor to the Court, and Rule 11, so he does not explain why those sources did not create an "ethical duty" or "requirement" to disclose the Chargois Arrangement to the Court. Asked about that at his deposition, Professor Joy denied that Rule 3.3(d), Cmt. 14A, and the duty of candor required disclosure of the Chargois Arrangement to the Court. *See, e.g.*:

>       **THE SPECIAL MASTER:** So to put a cap on it, in those instances in which there's not a court rule and not a standing order, the lawyers has not obligation, the lawyer, here, lead counsel, has no obligation to inform the court whatsoever, either under any Rule of Civil Procedure or under the rules of

The facts that I am asked to assume for purposes of my opinion have now been revised in light of the testimony, oral argument, and the Special Master's Review and Recommendations. These facts were prepared by Judge Rosen and his counsel. The opinions that follow are based on them. I understand that I am the equivalent of a court appointed expert. FRE 706.

In response to Labaton's arguments about the opinions I am qualified to give, I take note that the District Court in Massachusetts has recognized legal ethics experts under FRE 702. *Weber v. Sanborn*, 526 F. Supp. 2d 135 (D. Mass. 2007), allowed the expert testimony Andrew Perlman, then a professor at Suffolk University Law School, now its dean. Dean Perlman was allowed to testify about the professional conduct rules in both Massachusetts and New Hampshire, although he was not a member of the New Hampshire bar. The Court permitted his testimony on the following topics:

> Based on his credentials, specifically his teaching experience, Perlman is qualified to offer an expert opinion about: (1) whether an attorney-client relationship existed between Weber and PL & P; (2) whether PL & P engaged in conduct that failed to conform with the governing Rules of Professional Conduct and fell below the standard of care of the average and ordinary qualified practitioner; and (3) whether this conduct proximately caused damages to Weber. *Id.* at 147.

---

candor to the court and, particularly in light comment 14A and the nature of a settlement brought to the court in a non-adversary context.
    **MS, LUKEY:** Objection.
    **THE WITNESS:** That's correct, no obligation.

Joy Deposition at 119. *See also* Joy Deposition at 154 ("The duty of candor to the Court did not require disclosure of the fee-sharing arrangement").
    While Timothy Dacey, unlike Professor Joy, cited Rule 3.3(d) and Cmt. 14A in his Declaration, Expert Report of Timothy Dacey, p.12, the Declaration did not connect these authorities to the facts of this case. At his deposition, he did not take a firm position on either provision ("I haven't really completely thought through that issue" and "Let me put it this way: I have not thought through all the permutations of where this could come up" Dacey 4/9/18 Dep., pp. 27: 10-11, 33: 13-15), except that as regards Lieff Cabraser, he "concluded...that they did not know any material facts that would have required them to speak up without a specific request." Asked if a firm that did know those facts would have such a duty, he replied over an objection from Ms. Lukey: "That was my – I assume that for purposes of my opinion." *Id.*, p. 33:24 -34:5.

The Court also allowed Dean Perlman, who had not before been an expert witness in the area, to testify to "principles of substantive law."

> PL & P argues that the Preamble to the Rules from both New Hampshire and Massachusetts state that legal rules or *principles of substantive law* external to the Rules determine whether a client-lawyer relationship exists. Though Perlman referred to the Rules, his conclusion was further supported by an American Bar Association Formal Opinion and the Restatement (Third) of the Law Governing Lawyers….

> Perlman's use of the Rules was as a threshold affirmation that dual representation is ethically permissible. Rule 1.13(e) expressly states that a lawyer representing an entity "may also represent any of its directors, officers, employees, members, shareholders, or other constituents." N.H. R. Prof. Conduct 1.13(e); Mass. R. Prof. Conduct 1.13(e). To explain *when* such dual representation exists, Perlman relied on *principles of substantive law* external to the Rules, namely, the ABA Formal Opinion and the Restatement (Third) of the Law Governing Lawyers. *Id.* (emphasis added).[2]

Labaton has argued that I am (admittedly) not an expert on Rules 23 and 54 of the Federal Rules of Civil Procedure. Although those rules necessarily form part of the background for my opinions, none of my opinions relies on them.

**My Qualifications**

I am Elihu Root Professor of Law at New York University School of Law, where I have taught since 1978. My major area of research and teaching are the ethical rules and laws governing American lawyers. I am the author of *Regulation of Lawyers: Problems of Law and Ethics,* a widely used law school casebook first published by Little, Brown (now Aspen) in 1985 with an 11th edition in 2018. With Roy Simon (and Andrew Perlman as of 2008), I have edited *Regulation of Lawyers: Statutes and Standards*, published annually by Little, Brown, then

---

[2] *See also Fishman v. Brooks*, 396 Mass. 643, 650 (1986) (while "violation of a canon of ethics or a disciplinary rule…is not itself an actionable breach of duty to a client…if a plaintiff can demonstrate that a disciplinary rule was intended to protect one in his position, a violation of that rule may be some evidence of the attorney's negligence." The Court added: "Of course, an expert on the duty of care of an attorney properly could base his opinion on an attorney's failure to conform to a disciplinary rule." *Id*.

3

Aspen, since 1989. From 2000-2002, I was a member of the ABA's Multijurisdictional Practice Commission, which proposed rule changes (all of them accepted by the ABA House) to recognize the cross-border nature of legal practice. I was a member of the ABA 20/20 Commission (2010-2013), which studied the effects of technology and globalization on the regulation of lawyers and recommended Model Rules amendments, all of which were accepted by the ABA House. In 2011, I received the Michael Franck Award from the ABA's Center for Professional Responsibility. I received The American Bar Foundation's Outstanding Scholar Award in 2015.

I have testified as a legal ethics expert in court, by deposition, or by written submission many dozens of times in the last thirty years and in several states. I am admitted only in New York.  In the last four years, I have testified at a deposition in *Ruby v. Allen Matkins*, a JAMS arbitration in Los Angeles. I was retained by Dale Kinsella of Kinsella Weitzman (Santa Monica, CA), counsel for Mr. Ruby.

II.    **FACTUAL BACKGROUND**

    A.    **THE *STATE STREET* LITIGATION**

        *i.  ORIGINS*

This case had its genesis in a California *qui tam* action filed under seal on April 14, 2008 by "Associates Against FX Insider Trading" -- relators represented by the Thornton Law Firm ("TLF") and Lieff Cabraser Heimann & Bernstein, LLP ("Lieff") -- on behalf of California public pension funds.  *See* 9/15/16 Declaration of Lawrence Sucharow of Labaton Sucharow LLP in Support of Motion for Final Approval of Class Settlement, MAD No. 11-cv-10230, Dkt. No. 104, ¶ 24; *see also* Thornton 6/19/17 Dep., pp. 35:22 – 36:14. The *qui tam* lawsuit was unsealed and became public on October 20, 2009, when the California Attorney General filed a

Complaint-in-Intervention charging State Street with misappropriating more than $56 million from California's two largest public pension funds:  the California Public Employees' Retirement System ("CalPERS") and the California State Teachers' Retirement System ("CalSTRS").  *See People of the State of California, ex rel. Edmund G. Brown, Jr. v. State Street Corporation, et al.,* Cal. Super. Ct. No. 34-2008-00008457-CU-MC-GDS; *see also* Sucharow Decl., ¶ 25; Thornton 6/19/17 Dep., p. 40:1-9.  The Complaint-in-Intervention was the first public indication of State Street's allegedly unfair and deceptive practices concerning indirect FX and the first largescale action concerning FX practices.  Sucharow Decl., ¶ 25; Thornton 6/19/17 Dep., p. 41:11-17.

### ii.   FILING OF THE ATRS "CUSTOMER CLASS" COMPLAINT

After the allegations against State Street became public, George Hopkins, Executive Director of the Arkansas Teacher Retirement System ("ATRS"), became interested in the issue since State Street was ATRS's custodial bank.  Hopkins 6/14/17 Dep., pp.  37:11 – 38:15. ATRS then retained Labaton Sucharow LLP ("Labaton"), which was serving as one of its "monitoring counsel,"[3] to investigate potential class and individual claims that could be brought against State Street on behalf of ATRS and its members. This was Labaton's first foray into FX litigation. Therefore, with ATRS's approval, Labaton teamed with TLF and Lieff, as those firms had gained knowledge of the area from their representation of the relators in the California *qui tam* action, and began an investigation. *Id.  See also* George Hopkins Declaration, Dkt. No. 104-1, ¶ 8; Thornton 6/19/17 Dep., pp. 43:13 – 44:4.

---

[3] "Monitoring counsel" refers to lawyers who review the performance of institutional investors to ensure the investments are handled appropriately and are not the subject of fraud or other illegal activity. *See* Eisenberg, Jonathan, *Litigating Securities Class Actions,* § 1.02(1)(d), "Portfolio Monitoring" (Lexis/Nexis 2017).

After investigating and researching the matter, on February 10, 2011, a class action complaint was filed on behalf of ATRS (superseded by an Amended Complaint on April 15, 2011) alleging violations of the Massachusetts Consumer Protections Act and several common law claims.  *See Arkansas Teacher Retirement System v. State Street Corp., et al.*, MAD No. 11-cv-10230, Dkt. Nos. 1, 10 [EX. 1].[4]  As Lead Plaintiff in the action, ATRS purported to represent a class encompassing

> all institutional investors in foreign securities, including but not limited to public and private pension funds, mutual funds, endowment funds and investment manager funds, for which State Street served as the custodial bank and executed FX trades on a "standing-instruction" or "non-negotiated" basis between January 2, 1998 and December 31, 2009, inclusive (the "Class Period"), and which suffered damages as a result of the deceptive acts and practices and other misconduct alleged herein.

Customer Class Amended Compl., Dkt. No. 10, ¶ 22. [5]

Thereafter, on January 12, 2012, Labaton was appointed "Interim Lead Counsel" for the proposed Customer Class; the Thornton Law Firm was designated as liaison counsel, and Lieff Cabraser was designated as additional counsel for the proposed class.  *See* Dkt. Nos. 7-8; 28.[6]  In making this tri-partite appointment, the Court reasoned that "[e]ach of the firms, including Labaton Sucharow, have extensive experience with complex commercial litigation and class

---

[4] The complaints also originally named State Street Corporation ("SSC"), State Street's parent corporation, and the separate subsidiary State Street Global Markets LLC ("SSGM LLC") as party-defendants.  On May 8, 2012, the Court entered an Order dismissing all claims asserted against SSC and SSGM LLC.

[5]  The ATRS complaint is referred to by the parties in this action as the "Customer Class Complaint."

[6]  "Plaintiff's Assented to Motion for the Appointment of Interim Lead Counsel for the Proposed Class" and supporting brief were filed on April 7, 2011 [Dkt. Nos. 7 and 8] but not ruled upon by the Court until January 12, 2012 [Dkt. No. 28].

action lawsuits involving financial and securities fraud," and "are knowledgeable [in] the

applicable areas of law."  1/12/12 Memorandum and Order, p. 4, Dkt. No. 28. [7]

### iii.   THE ERISA COMPLAINTS

On the heels of the filing of the Customer Class Complaint, two separate complaints

alleging ERISA violations were filed.[8]  The two sets of plaintiffs in these actions represented

institutional private ERISA plans whose accounts were invested by State Street (the "ERISA

Class").[9]  *See Henriquez, et al. v. State Street Bank and Trust Co.*, MAD No. 11-12049, Dkt.

Nos. 1, 24 (the "*Henriquez* complaint") [EX. 2],[10] and *The Andover Companies Savings and*

---

[7] No similar appointment was made with respect to ERISA Counsel.  However, Labaton, Lieff and Thornton also viewed the ERISA plaintiffs as their clients and Labaton as lead counsel for all class members, including ERISA class members. *See* Chiplock 9/8/17 Dep. pp. 93:24 – 94:2 ("We had a responsibility as class counsel to the class. And that included ERISA plans."); 97:3- 10 ("I felt that customer class counsel had a responsibility to the entire customer class with no distinctions. We didn't discriminate in our class definition. We didn't see the need to when we filed our case.") Goldsmith 9/20/17 Dep., pp. 42:11-14 ("[W] did not assert an ERISA claim in our complaint, but we did allege a class which was broad enough to encompass ERISA governed assets."); 61:11-14 (How much of the settlement would go to ERISA clients "was something that [DOL] were focused on. Of course, we were focused on it as well because they were our clients.")  *See also* colloquy at 11/15/12 Lobby Conference:

> MICHAEL THORNTON:  I just want to clarify one thing of Mr. Rudman's [State Street's attorney's] excellent summary that we might differ on. There are two clear ERISA cases, Henriquez and Andover, and in the third case, Arkansas, um, the ERISA claims are included in the class definition. So we also have a claim.
> ***
> ROBERT LIEFF:  . . . There is an overlap, that's all we're trying to say. We represent the same people.
>
> THE COURT: You do represent the same people?
>
> MR. LIEFF: Yes.

[11/15/12 Lobby Conf. Tr., Dkt. No. 87, pp. 16-17]

[8] "ERISA" refers to the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq*.

[9]  The ERISA Class was represented by Keller Rohrback L.L.P., Zuckerman Spaeder LLP, McTigue Law LLP, and Beins Axelrod LLP (collectively, "ERISA Counsel").  However, none of these firms was ever appointed "lead counsel" or other official capacity by the Court.  (Although, later, Brian McTigue of McTigue Law, attempted, albeit unsuccessfully, to secure appointment as lead counsel for the ERISA class members. *See* TLF-SST-052975 – 052980 [EX. 4]; TLF-SST-054020 – 54022 [EX. 5]; Sarko 9/8/17 Dep., p. 97:12-21; Sucharow 9/1/17 Dep., p. 93:17-23.)

[10]  The *Henriquez* complaint was originally filed in the United States District Court for the District of Maryland, *see Henriquez v. State Street Bank and Trust Co., et. al.*, MDD No. 11-cv-02920, Dkt. No. 1.  The Maryland complaint,

*Profit Sharing Plan, et al. v. State Street Bank and Trust Co.*, MAD No. 12-11698, Dkt. Nos. 1, 9 (the "*Andover* complaint") [EX. 3].

The named plaintiffs in the *Henriquez* complaint were Arnold Henriquez, Michael T. Cohn, William R. Taylor, and Richard A. Sutherland, all participants in different ERISA plans: Henriquez was a participant in the Waste Management Retirement Savings Plan; Cohn was a participant in the Citigroup 401(k) Plan; Taylor and Sutherland were participants in the Johnson & Johnson Pension Plan (Sutherland also was a participant in the J&J 401(k) plan). All of these individually named plaintiffs purported to "bring[] this action pursuant to ERISA on behalf of [their respective retirement plans] and [their] participants and beneficiaries...as a class action on behalf of a class of similarly-situated ERISA retirement plans (collectively, the "Plans") and their participants and beneficiaries...." [Henriquez Amended Compl., ¶ 1] [EX. 2]. Two plaintiffs are named in the *Andover* Complaint -- one an institutional plaintiff, The Andover Companies Savings and Profit Sharing Plan, and the other an individual, James Pehoushek-Stangeland. The complaint alleges that as "a participant in The Boeing Company Voluntary Investment Plan ("the Boeing Plan") ..., Plaintiff Pehoushek-Stangeland has standing to bring suit on behalf of the Boeing Plan for losses to the Plan due to breaches of fiduciary duty pursuant to ERISA sections 409 and 502(a)(2)." [Andover Amended Compl., ¶ 22] [EX. 3].

Like the Customer Class Complaint, each ERISA complaint alleged that State Street, as the custodian to individual institutional investors and pension fund accounts, engaged in unfair and deceptive practices in conducting "indirect" or "standing instruction" foreign currency exchange ("FX") transactions on behalf of its clients, without disclosure to its clients that these trades generated mark-ups that inured to the benefit of State Street. *See* Customer Class

---

however, was voluntarily dismissed shortly after it was filed, *see id.*, Dkt. Nos. 7-8; it was later re-filed in the U.S. District Court for the District of Massachusetts as a "related case" to the ATRS case.

Amended Compl., ¶¶ 8, 62-63 [EX. 1]; *Henriquez* Amended Compl., ¶¶ 80-82 [EX. 2]; *Andover* Amended Compl., ¶¶ 10, 63-64 [EX. 3].

### iv.   THE BONY MELLON MDL

While the State Street action proceeded in the District Court for the District of Massachusetts, a multi-district FX case brought against another custodian bank, the Bank of New York Mellon, was being litigated in the Southern District of New York. *In re The Bank of N.Y. Mellon Corp. Forex Transactions Litig.*, SDNY No. 12-MD-2335 ("*BONY Mellon*").[11]   Lieff Cabraser was co-lead counsel for the nation-wide consumer class in the case.  Chiplock 6/16/17 Dep., pp. 23:25 – 24:4; 25:12-22.  TLF, as well as McTigue Law and Keller Rohrback, ERISA counsel here, also were involved in the case.  Thornton 6/19/17 Dep., 85:18-21; McTigue 7/7/17 Dep., 9:23 – 10:11; 12:22 – 13:4.

*BONY Mellon* was vigorously litigated for three years, during which intense discovery took place:  more than 120 depositions were taken and more than 20 million documents were produced and reviewed.  Chiplock 6/16/17 Dep., pp. 29:23 – 30:15.  To assist in the document review, Lieff Cabraser enlisted the help of the firm's staff attorneys ("SAs"),[12] thirteen of whom later worked on the *State Street* case.  The case finally settled for $335 million in recovery to the class of custodial clients in September 2015.  *See* 9/24/15 Order and Final Judgment, SDNY No. 12-MD-2335, Dkt. No. 638; Chiplock 6/16/17 Dep., pp. 29:23 – 30:15. [13]  The attorneys' experience in *BONY Mellon* allowed counsel to develop a baseline of familiarity and expertise

---

[11]   The first of the various underlying complaints comprising the *BONY Mellon* MDL was filed in 2011, shortly after the *ATRS* complaint was filed.

[12] "Staff attorneys" here were licensed attorneys with relevant experience hired specifically to perform large-scale document review.

[13] Of the $335 million settlement, the attorneys in *BONY Mellon* were awarded $83,750,000 in fees and $2,901,734.19 in total expenses. SDNY No. 12-MD-2335, Dkt. No. 638.

that they brought to the *State Street* case.  Chiplock 6/16/17 Dep., p. 27:11-17.  BONY Mellon

also provided Lieff's SAs hands-on experience in reviewing and analyzing complex, FX-related

documents.  *See* Lieff Cabraser's Responses to First Set of Interrogatories Due on June 1, 2017,

Response No. 3.

### v.  CONSOLIDATION OF THE STATE STREET CASES

During most of 2011-2012, the *State Street* action principally involved motion practice,

and, in particular, briefing and argument of Rule 12(b)(1) and Rule 12(b)(6) motions to dismiss

filed by State Street in the *ATRS* and the *Henriquez* cases. State Street's motion to dismiss the

*ATRS* complaint was fully briefed by both parties and the Court heard arguments on the motion

on May 8, 2012.  At the conclusion of the May 8 hearing, the Court entered an Order dismissing

ATRS's claims against State Street Corporation ("SSC"), the parent corporation, and the separate

State Street subsidiary, State Street Global Market, LLC ("SSGM LLC"), but denied

Defendant's motion in all other respects.  *See* 5/8/12 Order, Dkt. No. 33.  The Court further

directed counsel to meet to discuss the possibility of settlement and whether they wished to

pursue mediation, either privately or before a magistrate judge.  *Id.*

In the meantime, on August 8, 2012, State Street also moved to dismiss the *Henriquez*

Amended Class Action Complaint.  However, no substantive decision was ever rendered on that

motion.  Instead, on November 15, 2012, shortly after the *Andover* complaint was filed, at the

request of counsel, the Court conducted a Lobby Conference to discuss further proceedings.  *See*

11/15/12 Lobby Conference Tr., Dkt. No. 64.  Counsel proposed, and the Court agreed, that the

three cases -- *ATRS, Henriquez* and *Andover* -- proceed in tandem in a "hybrid" mediation during

which the parties and counsel could continue to pursue a mediated global settlement, while at the

same time delaying a decision on pending motions and engaging in a simultaneous track of

"informal" document discovery. 11/15/12 Lobby Conference Tr., pp. 10:15-18; 15:6-7, 19-25, 22:2-10. The Court granted the parties' joint motion to stay the case and ordered that the three actions be consolidated for pre-trial purposes.[14]  *Id.*, Tr. at pp. 10, 22, 24; Order to Stay, Dkt. No. 62; Electronic Order Consolidating Cases, Dkt. No. 63.

### vi.  *HYBRID MEDIATION-DISCOVERY PROCESS*

Prior to the Court's endorsement of the hybrid mediation, the parties had selected a mediator, Jonathan Marks, and participated in a few preliminary mediation sessions, developing the framework for exchanging discovery. Sucharow Decl., ¶¶ 89-92; Marks Decl., ¶ 14; 11/15/12 Lobby Conference Tr., Dkt. No. 87, p. 22.  In the approximately eighteen months following the November 12, 2012 Lobby Conference, between January 2013 and June 2015, the parties participated in 14 additional in-person mediation sessions with Mediator Marks in Boston, New York City, and Washington, D.C., each of which involved extensive exchanges of legal theories and damages calculations by both sides.  Sucharow Decl., ¶ 94; *see also* Marks Decl., ¶¶ 23-24.

The mediation sessions were informed by substantial discovery exchanged by the parties. Notably, State Street produced more than nine million pages of documents at the request of the ERISA and Customer classes. Sucharow Decl., ¶ 96. All parties agree that document review was essential to the mediation process. Chiplock 6/16/17 Dep., pp. 116:15 – 117:6; Goldsmith 7/17/17 Dep., pp. 84:15-23, 85:24 – 86:5; Rogers 6/16/17 Dep., pp. 80:4-7, 82:7-13.

### vii.  *ERISA FEE ALLOCATION*

While the hybrid mediation-discovery process was ongoing, in mid-2013, Customer Class Counsel and ERISA Counsel negotiated amongst themselves an agreement for the allocation of attorneys' fees.  Sarko 7/6/17 Dep. p. 57:18-23.  That agreement -- to allocate 9%

---

[14] The Court set an initial deadline of December 1, 2013, at which time the parties would update the Court on the status of the mediation. *See* Dkt. No. 62. At the request of the parties, the Court extended this deadline on several occasions. *See* Dkt. Nos. 66, 71, 75.

of the total fee awarded (if successful) to ERISA Counsel -- was based largely on ERISA

Counsel's understanding that the total ERISA case volume comprised five to nine percent of the

total FX trading volume.  Sarko 7/6/17 Dep., pp. 26:15-16; 59:14-22; Kravitz 7/6/17 Dep., p.

50:10-16.

As the case progressed -- and particularly toward the end of the case -- ERISA Counsel

did not view 9% as commensurate with the ERISA trading volume, which was later learned to

actually be about 12-15% of the total trading volume, or the value they added to the *State Street*

case. Sarko 7/6/17 Dep., p. 64:3-11; Kravitz 7/6/17 Dep., p. 54:7-11. Nonetheless, rather than

create friction with Customer Class Counsel over fees,[15] Lynn Sarko, principal counsel for the

ERISA Class, advocated for, and all other ERISA Counsel ultimately agreed to make, a

"practical decision" to accept 9% of the fee total. *See* Sarko 7/6/17 Dep., p. 59:18-25. The

decision was made, in part, to promote cooperation between counsel, "make the pie bigger" for

the class members, and ensure that counsel worked together on the same "team."  Sarko 7/6/17

Dep., p. 59:18-25; *see also* Kravitz 7/6/17 Dep., p. 61:18-24.

From August to December 2013, Customer Class and ERISA Counsel exchanged drafts

in an attempt to memorialize their agreement to respectively share the fee award 91/9 percent.

*See* KR00000006 – 09 (8/30/13 Sarko email to Lieff (proposing draft agreement to capture the

91/9% split)) [EX. 6]; KR00000010 – 18 (9/11/13 Chiplock email to Sarko and Gerber

(circulating redlined edits to proposed agreement)) [EX. 7]. While there were several iterations

---

[15] From the beginning of the mediation, there was already fair degree of tension between and among Customer Class Counsel and ERISA Counsel.  As ERISA Counsel Carl Kravitz testified, "There was definitely a faction on the consumer side that said 'we represent these people, what are you doing in the case?'"  Kravitz 7/6/17 Dep., pp. 28:21-24.  Kravitz explained, "Consumer people did not want us coming in and taking a chunk of their case." *See id.*, pp. 32:16-17; 45:6-17.  "Every extra dollar that went to ERISA came out of the Consumer side."  *Id.*, at p. 51:18-20. The tension between the Customer Class and the ERISA Class further was manifested during the discovery process:  ERISA Counsel were not provided with access to documents State Street had provided to the Customer Class.  Sarko 7/6/17 Dep., p. 44:2-25. Nor were ERISA Counsel allowed access to the Customer Class's database.  *Id.*, at 45:1-23.  Compounding the tension was the fact that there was never an order appointing leadership in the ERISA cases.  *Id.*, p. 42:24 – 43:3.

of the agreement, each draft described the ATRS complaint filed by Customer Class Counsel as brought on behalf of "all institutional investors in foreign securities, including public and private pension funds, *ERISA-qualified plans*, mutual funds, endowment funds and investment manager funds, for which State Street served as the custodial bank" (emphasis added). *See* KR00000003 – 05 (8/29/13 Draft, *Agreement Between Counsel for Consumer and ERISA Plaintiffs Regarding Division of Attorneys' Fees* (the "Fee Allocation Agreement") [EX. 8]. Early drafts of the fee allocation agreement included a provision nullifying the 91/9 allocation if either the *ATRS*, *Andover* or *Henriquez* cases resulted in no recovery; that provision was later struck. *See* KR00000024 – 28 (8/30/13 Draft, Fee Allocation Agreement).  [EX. 9].  Also removed was a proposed provision that counsels' division of fees was "consistent with the relative volume of FX trading by ERISA and non-ERISA plans as reflected in the data produced by State Street and the prospects of recovery on the various claims alleged, and is therefore reasonable and appropriate." *Id*.

On December 11, 2013, Counsel finally memorialized this agreement in writing.  Sarko 7/6/17 Dep., p. 60:4-14; s*ee also* KR00000045 – 50 (Final Fee Allocation Agreement) [EX. 10], Settlement Agreement, Dkt. No. 89, ¶ 21; McTigue, 7/7/17 Dep., pp. 44:23 – 46:18; Thornton 6/19/17 Dep., p. 57:12-16.  As part of that written agreement, ERISA and Customer Class Counsel represented that they had "disclosed and explained this Agreement to their respective clients and that their clients have consented to the Division of Fees and other terms herein." *See* Fee Allocation Agreement at ¶ 5 [EX. 10].

The percentage allocated to ERISA Counsel later was increased to 10%, at the suggestion of Customer Class Counsel.  Thornton 6/19/17 Dep., pp. 57:17 – 58:1; Sarko 7/6/17 Dep., p. 60:15-17, 60:24-61:12; Kravitz 7/6/17 Dep., p. 59:17-19. While counsel did not amend the

original agreement, the 10% increase was memorialized in an email circulated by Nicole Zeiss,

Settlement Counsel for Labaton, itemizing the allocation of fees and expenses to the ERISA and

Customer Class attorneys. *See* ZS000027 – 28 (11/23/16 Sarko email to Kravitz ("I spoke with

Labaton folks yesterday. They didn't want to put it in the formal letter but agreed to send us an

email putting the numbers in and confirming the 10 percent.")).  [EX. 11].  ERISA Counsel

welcomed the increase in percentage.  *See* ZS000029 – 30 (11/23/16 Kravitz email to

McTigue).  [EX. 12].

### *viii.   STAFF ATTORNEY COST-SHARING AGREEMENT*

Staff attorney-based document review performed throughout the course of the hybrid

mediation-discovery process ramped up significantly in January 2015.  Chiplock 6/16/17 Dep.,

pp. 87:22 – 88:24.  While the *BONY Mellon* case was being actively litigated in 2013-2014, Lieff

assigned at most five SAs to review documents produced by State Street.  Chiplock 6/16/17

Dep., pp. 107:15 – 108:12. During that time, Labaton also allocated no more than five SAs to

review and analyze documents for the *State Street* case.  Rogers 6/16/17 Dep., p. 57:7-10. [16] As

the hybrid mediation progressed, State Street produced discovery related to the *Hill* case,[17] a

significant production consisting of approximately 10 million pages. Rogers 6/16/17 Dep., pp.

68:25 – 69:11; Chiplock 6/16/17 Dep., p. 88:2-21. The *Hill* production added considerably to the

total volume of unreviewed documents.

By January 2015, the Customer Class began to view discovery with greater urgency,

informed in part by the favorable resolution in the *BONY Mellon* case and also by the fact that

the parties had been mediating for over two years without reaching an agreement to resolve the

---

[16] Michael Rogers recalls that, in 2013, Labaton assigned Todd Kussin, the SA "team leader" in the *State Street* case, and four SAs to perform document review during 2013 and 2014.  Rogers 6/16/17 Dep., p. 57:7-10.

[17] *Hill v. State Street Corp., et. al.*, MAD No.1:09-cv-12146-GAO.

case. Chiplock 6/16/17 Dep., p. 111:8-13; Dugar 6/16/17 Dep., p. 85:9-16.  As a result, Labaton

and Lieff, which had recently freed up thirteen SAs as fact discovery in the *BONY Mellon* case

came to a close, expanded their respective document review teams by adding additional SAs to

review and analyze the database of unreviewed material accumulated during the *State Street*

case.  *See* Chiplock 6/16/17 Dep., pp. 109:16 – 110:2; Rogers 6/16/17 Dep., pp. 69:8-14; 74:11-

13.  Between January and March 2015, Labaton bolstered their document review team,

maintaining more than fifteen to twenty different SAs on the *State Street* case at any given time.

Lieff did the same, assigning fifteen SAs (thirteen of whom transitioned directly from the *BONY*

*Mellon* review) and two "contract" attorneys to complete the review.[18]  Kussin 6/5/17 Dep., p.

17:6-13, 70:8-9; Dugar 6/16/17 Dep., p. 87:16 – 88:11, 23-24; Lieff Cabraser Response to June 1

Interrogatories, No.19.

     All SAs reviewing documents in the *State Street* case received a binder of documents

providing an overview of the case; the binder contained the complaint and related pleadings, an

outline of the case theory, and a list of key terms, search criteria, topics and categories to guide

the SA review. Goldsmith 7/17/17 Dep., pp.77:23 – 78:8; Rogers 6/16/17 Dep., p. 63:3-7; Lesser

6/19/17 Dep., p. 40:12-13. Michael Lesser also drafted emails outlining important information

for the SAs to consider during their review. Lesser 6/19/17 Dep., pp. 40:10 – 41:4.

     The Labaton and Lieff SAs were well-qualified and equipped to analyze the documents,

which related to complex FX trading patterns and other financial issues raised in the case.  *See*

Rogers 6/16/17 Dep, pp. 58:12 – 59:7 (SAs hired by Labaton had experience in "complex

litigation, [the] financial industry, . . .  banking, mutual funds, certainly currency trading, or

experience legally on what I would call a financial industry case.") Several of the Lieff SAs had,

---

[18] In March 2015, Lieff Cabraser hired two additional attorneys, employed by an outside staffing agency rather than the firm. *See* Lieff Cabraser Response to Interrogatory No. 19.

in the words of Dan Chiplock of Lieff Cabraser, "been through war in *Bank of New York Mellon*, and [] [we]re extremely well-versed in the issues." Chiplock 6/16/17 Dep., pp. 109:20-25; 117:16-25. These SAs not only performed sophisticated document review; they also prepared substantive subject matter memoranda and deposition notebooks. Chiplock 6/16/17 Dep. p. 32:12-20; Zaul 6/6/17 Dep., pp. 24:4 – 25:5; Alper 6/5/17 Dep., p. 17:14-16; Oh 6/6/17 Dep., p. 21:20-25; *see also* TLF-SST-005245 – 5270 (Memorandum authored by SA Maritza Bolano) [EX. 13].

Because TLF did not have SAs, or non-permanent attorneys, of its own, or the facilities to hire and house new attorneys solely to work on the *State Street* document review, Labaton, Lieff and TLF entered into an agreement to "allocate" certain SAs employed by and working at Labaton and Lieff's offices to TLF. At times, this was referred to as the "10/10/10 agreement[19] -- designating an equal number of SAs to each firm. The purpose of the cost-sharing agreement was to share the cost and risk burdens of the litigation among the three Customer Class law firms. Chiplock 6/16/17 Dep., pp. 127:23 – 128:5; 131:23 – 133:15; Belfi 6/14/17 Dep, pp. 51:8 – 53:12. [20] While the exact number of SAs fluctuated over the course of the agreement, TLF, in essence, agreed to pay Labaton and Lieff each for five SAs. G. Bradley 6/19/17 Dep., p. 43:10-13. TLF did not meet, interview, select, house or supervise the SAs allocated by Labaton or Lieff. *See* Hoffman 6/6/17 Dep., pp. 62:21, 63:7-17, 64:6-9, 65:3-6; *see also* Chiplock 6/16/17

---

[19] The concept of the "10/10/10 agreement" was introduced at the beginning of the Special Master's discovery, and while not all Class Counsel were familiar with that exact terminology, they affirmed that the purpose of the cost-sharing agreements between Labaton and TLF, and between Lieff and TLF, was to allocate costs and risks equally among all firms by Labaton and Lieff each assigning approximately five SAs to TLF, so that each firm ending up bearing the cost of ten SAs. *See* G. Bradley 6/19/17 Dep., p. 42:5-13; Chiplock 6/16/17 Dep., p. 133:12-15.

[20] Allocating the SAs was not only a means of equalizing the costs and burdens, but also as Garrett Bradley of TLF admitted, it was "the best way to jack up the load star [sic]…the best way for us [TLF] to increase our load star [sic] and make it comparable to the other two firms…. I was absolutely concerned about Thornton's load star [sic] vis-a-vis the other two firms." G. Bradley 6/19/17 Dep. p. 67:4-13; TLF-011124 – 11126 (2/6/15 G. Bradley Email to Thornton cc'd Lesser) [EX. 14].

Dep., pp. 134:17 – 135:19.  And, it did not matter to TLF which SAs it paid for.  *See* G. Bradley 6/19/17 Dep., p. 43:10-13.  Pursuant to this cost-sharing arrangement, Labaton and Lieff designated certain SAs as "TLF," and then billed TLF periodically for the actual costs of the SAs and, in Lieff's case, for the contract attorneys "allocated" to TLF.  *Id.*; *see also* Hoffman 6/6/17 Dep., p. 63:2-7.

TLF's collection of SA hours was conducted piecemeal and largely through administrative staff rather than directly between the attorneys privy to the SA cost-sharing agreement. Evan Hoffman, the most junior member of TLF's litigation team, was tasked with collecting the names and hours of the Lieff SAs allocated to TLF. Hoffman 6/5/17 Dep., p. 57: 11–18. The staffing agency employing the agency attorneys working at Lieff invoiced TLF directly for the hours performed by those individuals. Hoffman 6/5/17 Dep., p. 62: 6-9. Michael Bradley, the brother of TLF partner Garrett Bradley, neither worked for a firm or a staffing agency, and reported his hours to Hoffman by email on a weekly or biweekly basis. Hoffman 6/5/17 Dep., pp. 107: 24-108:7.

For those SAs employed by Lieff, Lieff's accounting department prepared and forwarded invoices to Hoffman on a regular basis. LCHB Response to Interrogatory No. 38; Hoffman 6/5/17 Dep., pp. 61: 21-62:5.  Similarly, Labaton's accounting office prepared and forwarded invoices reporting the hours performed by Labaton SAs to Garrett Bradley's attention, copying TLF administrators, on a monthly basis. Labaton Response to Interrogatory No. 37; *see* LBS – 003775-3776 (4/9/15 Ng Email to G. Bradley attaching April 2015 Invoice) [EX. 15].

At the time Labaton and Lieff agreed to this arrangement, both firms were concerned primarily with spreading the risks -- and costs -- of the litigation; neither firm focused on what information would be reported in a potential fee petition. Belfi 6/14/17 Dep., p. 53:10-12. TLF

later claimed all of the SAs allocated to TLF on its lodestar fee petition, accounting for 71.5% of

all TLF hours reported.  *See* Dkt. No. 104-16.[21]  In its fee petition, TLF billed all SA time at an

hourly rate of $425 (a rate approved by the Court for Lieff SAs in *BONY Mellon*). Except for

three SAs, the $425 per hour rate charged by TLF was greater than the rates requested by Lieff

or Labaton for the same individuals in their lodestar petitions.[22]  Hoffman 6/6/17 Dep., p. 59:5-

12.  No explicit agreement to allow TLF to claim the Labaton and Lieff SAs on TLF's lodestar

has been disclosed during the Special Master's investigation.[23]

### ix.   *SETTLEMENT AND NOTICE TO CLASS MEMBERS*

#### a.   Involvement of Government Agencies

The hybrid mediation spanned a period of two and a half years. During this time, while

discovery continued, settlement discussions were ongoing.  In addition to State Street and

---

[21] TLF also claimed 406.4 hours of SA time for Michael Bradley, a Massachusetts-licensed attorney and the brother of TLF Managing Partner, Garrett Bradley, who was not affiliated with the firm but performed document review on a contingent basis during the *State Street* case. M. Bradley 6/19/17 Dep., pp. 28:20-23; 70:13-15.  Bradley worked from his own office and did his document review in his free time; he was not supervised by Labaton or Lieff lawyers. M. Bradley 6/19/17 Dep., pp. 49:7-16; 52:3-18, 54:15 – 55:3.  Unlike the Labaton and Lieff SAs, Bradley did not prepare any memoranda or deposition notebooks. *Id*, at p. 46:21-23.  And, the record reveals no written work product created by Michael Bradley.

      Bradley worked on a contingent basis; he would only be paid if the class recovered a settlement entitling counsel to fees. M. Bradley 6/19/17 Dep., p. 70:13-15.  After the Court approved the request for attorneys' fees, Bradley received a payment of $203,200, equal to the numbers reported at $500 per hour.  *Id.*, p. 70:18-23.

[22] Rachael Wintterle, a contract attorney housed at Lieff's office, was billed by Lieff at $515 per hour. *See* Dkt. No. 104-17, Exhibit A. David Alper and Dorothy Hong were billed by Labaton at the same rate as TLF, $425 per hour. *See* Dkt. No. 104-15, Exhibit A.  Alper had a background in FX training and was a resource for SAs during the *State Street* case. Alper 6/5/17 Dep., pp. 20: 8-11; 22: 3-8.

[23] Some of the attorneys from Labaton, Lieff and TLF, however, independently made assumptions based on the circumstances that TLF would claim the SA time on its lodestar.  *See e.g.*, G. Bradley 6/19/17 Dep., p. 48:1-5 ("We just assumed -- I just assumed where the local counsel were on the papers, we're litigating the case, we're putting the fee up, why wouldn't we put the people up that we were paying for?"); Chiplock 6/16/17 Dep., p. 136:10-19 ("I would say it was completely understood by me when I talked with Garrett that that would be how it worked, because it was obvious to me that if you pay for the work that is being done, then, just as with any other employee when you're paying them, that you include their hours in your lodestar when you report it at the end of the day."); Rogers 6/16/17 Dep., pp. 91:18 – 92:16 ("I certainly assumed [TLF] would [claim the SA time on their fee petition]. . . . They were paying for it up-front, I assume they wanted to get paid on the back end."); Hoffman Dep., p. 58:12-16 ("My understanding was that for attorneys who Thornton was financially responsible for, they would be included on whatever the ultimate fee petition that Thornton would submit."); *see also* TLF-SST-011206 (6/29/15 email from Mike Lesser of TLF to Dan Chiplock of Lieff Cabraser) [EX. 52].

plaintiffs' counsel, three government agencies -- the Department of Labor ("DOL"), the Securities and Exchange Commission ("SEC"), and the Department of Justice ("DOJ") -- were involved in the negotiations. Each agency independently investigated State Street's alleged misconduct, and each agency reached its own settlement with State Street in furtherance of their respective enforcement goals. *See* Dkt. No. 104, ¶¶ 8, 38; *see also* Sarko 7/6/17 Dep., p. 41:9-14; Kravitz 7/6/17 Dep., pp. 56:25 – 57:4. The DOL -- charged with overseeing administration of the ERISA statute -- paid particular attention to the settlement of the claims of the ERISA plan participants, ensuring that the settlement recovery amount was adequate and commensurate with the agency's own evaluation of the case.  Sarko 7/6/17 Dep., p. 79:6-15.  Keller Rohrback's Lynn Sarko was the lawyer principally responsible for negotiating with the DOL. State Street, in turn, made it clear that a global settlement with all private class members and all government agencies was a necessary condition to its willingness to reach a settlement. Sarko 7/6/17 Dep., pp. 36:24 – 37:11; *see also* 11/2/16 Hearing Tr., p. 17:8-23.

b.   Preparation and Filing of Settlement Documents

After two and a half years of mediation and negotiation, on June 30, 2015, the parties reached an agreement-in-principle to settle the consolidated class actions for $300,000,000.00. Sucharow Decl., ¶ 101.  The terms of a final Term Sheet were negotiated and signed on September 11, 2015.  *Id.* at ¶ 104.  *See also*, Zeiss 6/14/17 Dep., p. 13:10-22.

Over the ensuing 10 ½ months, Labaton, as Lead Settlement Counsel, undertook the preparation of the formal settlement documentation.  Nicole Zeiss, Labaton's Settlement Counsel, had primary responsibility for drafting the settlement agreement and the exhibits for the settlement agreement, including the preliminary approval motion, brief and order, the plan of allocation, the judgment, the long-form Notice of Pendency of Class Actions and the Summary

19

Notice ("Notice"). Zeiss 6/14/17 Dep., pp. 13:10-22; 15:5-6.[24]  Draft versions of the Notice were

circulating among, and reviewed by, Customer Class Counsel and ERISA Counsel.[25]

Zeiss also had the responsibility of preparing the Omnibus Declaration and Brief in

support of Lead Counsel's motion for attorneys' fees and expenses, and for payment of service

awards.  Zeiss 6/14/17 Dep., p. 16:2-6.  This included reviewing and assembling the exhibits to

the brief which consisted of the individual firms' fee declarations and lodestar reports.  *Id.*, p.

16:10-14.  Zeiss drafted the template for the individual fee declarations, circulated it to the other

firms, and worked with them on completing their declarations and exhibits.  *Id.*, pp. 16:14-16,

20:18-19.

The Settlement and Fee Petition documents made clear that Labaton was representing

both the Customer Class and the ERISA Class with respect to the settlement of the case.  The

"Notice of Pendency of Class Actions, Proposed Class Settlement, Settlement Hearing, Plan of

Allocation and Any Motion for Attorneys' Fees, Litigation Expenses, and Service Awards,"

which Labaton drafted, bears the case names and numbers of all three class actions, including the

ERISA actions, and provides notice to members of the "Settlement Class" that a Class

Settlement of $300,000,000 has been entered into "by and among (i) plaintiffs Arkansas Teacher

Retirement System ("ARTRS"), Arnold Henriquez, Michael T. Cohn, William R. Taylor,

Richard A. Sutherland, The Andover Companies Employees Savings and Profit Sharing Plan and

---

[24] Rather than have a litigation team member handle settlement, Labaton has compartmentalized its practice, and in that compartmentalization, it created a separate "settlement counsel" position who negotiates and documents all settlements.  Zeiss 6/14/17 Dep., pp. 10:24 – 11:12; Keller 10/13/17 Dep., p. 79:18-20.  With respect to the *State Street* case, this compartmentalization contributed to some of the problems giving rise to the Special Master's investigation, in particular, the failure to discover the "double-counting" of SAs allocated to TLF and the failure to disclose to the Court Labaton's fee arrangement with Texas attorney Damon Chargois.  These matters are discussed *infra*.

[25] In March 2017, at the request of the Special Master, the Customer Class and ERISA firms each produced a complete record of time entries performed in the *State Street* matter.  These time records indicate that Class Counsel reviewed the Notice and other settlement documents circulated by Zeiss.

James Pehoushek-Stangeland (collectively "Plaintiffs"), on behalf of themselves and each

Settlement Class Member, by and through their counsel, and (ii) State Street Bank and Trust

Company (the "Settling Defendant" or "SSBT")."  *See* Notice of Pendency of Class Actions,

MAD No. 11-cv-10230, Dkt. No. 95-3, filed on August 10, 2016. The Notice further defines the

"Settlement Class" as

> All custody and trust customers of SSBT (including customers for which SSBT
> served as directed trustee, ERISA Plans, and Group Trusts), reflected in SSBT's records
> as having a United States tax address at any time during the period from January 2, 1998
> through December 31, 2009, inclusive, and that executed one or more Indirect FX
> Transactions with SSBT and/or its subcustodians during the period from January 2l 1998
> through December 31, 2009, inclusive. *Id.*

The Notice was widely circulated.

### *x.  FEE PETITION REQUESTING ATTORNEYS' FEES*

#### a.  Fee Negotiations Among Customer Class Counsel

Around the time the parties reached an agreement-in-principle, Customer Class Counsel

engaged in discussions about how to allocate the anticipated fee award among themselves. It is

apparent from these discussions that with regard to balancing fees, Lieff and TLF considered

their respective roles in the *BONY Mellon* litigation, a fact wholly unrelated to the value added in

this case. Dan Chiplock conceded at deposition, as did Garrett Bradley, that the *State Street* and

*BONY Mellon* fee discussions became intertwined.  Chiplock 9/8/17 Dep., pp. 22:7 – 23:13;

Garrett Bradley 9/14/17 Dep., pp. 114:23 – 125:16.  Contemporaneous emails also reflect the

intertwining of the fee negotiations in the two cases. *See* discussion*, infra*.

At the inception of the case, Customer Class Counsel had agreed to a fee sharing

arrangement when Labaton teamed with Lieff and TLF, pursuant to which Labaton, Lieff and

TLF understood each firm would be entitled to a minimum of 20% of the fee award, with the

remaining 40% to be distributed at the end of the litigation, commensurate with each firm's

respective contributions to the case.  *See* TLF-SST-033911 – 33913 (5/4/11 letter agreement, p.

2) [EX. 16]; Keller 10/25/17 Dep., pp. 414:14 – 420:10.  *See also*, TLF-SST-040631 (8/28/15

email exchange among Larry Sucharow, Dan Chiplock, Garrett Bradley, M. Thornton, and Bob

Lieff regarding the 20-20-20/40 agreement) [EX. 17].

      In August 2015, Dan Chiplock expressed an interest in determining the appropriate

allocation of the remaining 40%. *Id.*  Garrett Bradley of TLF resisted, opining that the final

distribution should wait until the Court made a total fee award.  *Id.*  What became apparent to

Chiplock was that TLF viewed any allocation of *State Street* fees as tied to the then yet

undecided *BONY Mellon* fee award. *Id.*[26] ("Not to be difficult but [this is a] very different

situation, in other words, from BNYM, (which I know doesn't involve you Larry, but seems to

be coloring this discussion.") *See also*TLF-SST-053087 (8/28/15 email from Sucharow to

Chiplock ("I believe there are other cases and other agreements which are influencing people's

desire to either reach agreement now or later.")) [EX. 18].

      Garrett Bradley pressed for an agreement that Lieff share some portion of its allotment in

*BONY Mellon* with TLF in recognition of the fact that Thornton had developed the initial FX

concept, and refused to settle on an allocation in *State Street* until he saw that TLF was treated

"fairly" in *BONY Mellon.*  Chiplock 9/8/17 Dep. pp.  22:8 – 23:13; TLF-SST-031166 - 31173 (G.

Bradley 8/28/15 email to Bob Lieff ("…I have not agreed that it would be equitable to split the

balance of the forty percent the way you described below. What I have said is that may be a fair

approach depending on the outcome of our fee in the Mellon matter. If we are treated fairly

there, then we will do all we can to treat you fairly in the state street matter…) [EX. 19]; *see also*

Bradley to Chiplock email of the same date, *id.* ("What I am pointing out is the inequities of our

different positions…. In Mellon … we had created the fx case all we got was some work that

---

[26] The settlement in BONY Mellon would be finalized the following month, September 2015.

resulted in $1.5 million in time.   Now contrast that the State Street where you had no client and no concept…. Once we have an idea of what our Mellon numbers look like, we can discuss how to approach the balance of the 40% with Labaton.") [EX. 19].

Dan Chiplock, the lead attorney in *BONY Mellon*, took exception with the implication that Lieff was not treating TLF fairly in that case.  He pushed back, reminding Bradley in an email two days later that Lieff's role in creating the result in *BONY Mellon* "doubled the value of State Street." *Id.*  (8/30/15 email from Chiplock to Bradley). He further reminded Bradley, "I also gave your firm more assignments than others at the outset in BNYM until it became clear that the work simply wasn't getting done." *Id.*  Bradley asked what Chiplock meant when he said TLF did not "get the work done." *Id.*  "That has never been specified and really should be to be deemed credible." *Id.* Chiplock agreed to provide Bradley with emails showing the assignments given to TLF.  *Id.*

 The discussion turned to lodestar reporting in *State Street* with Chiplock warning Bradley not to include unwarranted hours in TLF's fee petition:

> In the meantime, while we're on the subject of credibility, I want to point out that we need to be consistent and credible with our lodestar reporting in State Street.  We are gathering final lodestar reports now, but I heard third-hand that Mike [Thornton]recently said on a call (that I wasn't on) that Thornton Law Firm was showing $14 million. That number does not comport with the hours Mike Lesser told me for Thornton as of June 29 (around 12,750), which makes more sense given what we know about the work that was done.  I am hopeful that Mike T simply misspoke or was guessing when he said $14 million and that we are not going to suddenly see an additional 12,000 hours mysteriously appear on Thornton Law Firm's behalf…Also recognize that your [document] reviewers were all housed outside your firm ad their respective overhead and facilities expenses were paid for by others, which we were happy to do as a courtesy. Thanks.

*Id.*

### b.  Submission of the Fee Petition

Customer Class Counsel's discussions about fee sharing were put on hold as *State Street* settlement negotiations wrapped up, and in advance of the hearing on final approval of the settlement, Plaintiffs' Counsel submitted to the Court a joint Fee Petition in support of their request for attorneys' fees in the amount of $74,541,250.00.  *See* Dkt. No. 104. The Fee Petition consisted of the Omnibus Declaration[27] signed by Lawrence Sucharow of Labaton, and nine individual declarations submitted by each law firm that had filed an appearance in the case.[28] Labaton posted the Omnibus Declaration, complete with exhibits, to the settlement website making relevant case information available to the class members.[29] The individual declarations described the work performed by each firm and the basis for its fee request. Attached to each declaration was a chart ("Exhibit A") summarizing each firm's respective lodestar through August 30, 2016. *See* Exhibit A to Dkt. Nos. 104-15, 104-16, 104-17, 104-18, 104-19, 104-20, 104-21, 104-22, 104-23. The narrative descriptions and chart outlines were taken verbatim from the template provided by Labaton. *See* Zeiss 6/14/17 Dep., pp. 16:10-16; 21-24.

           c.   The Labaton Template and Inaccuracies in Declaration Language

The Labaton template included several paragraphs describing the source of the lodestar calculations and billing rates. In particular, it included a generic description of the basis for the

---

[27] "Declaration of Lawrence A. Sucharow In Support of (A) Plaintiffs' Assented-To Motion For Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and (B) Lead Counsel's Motion For An Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs."  Dkt. No. 104.

[28] The Omnibus Fee Petition listed ten firms, each of which submitted a lodestar calculation identifying the names and rates of individual attorneys and staff at their respective firms. *See* Labaton Sucharow (Dkt. No. 104-15); the Thornton Law Firm (Dkt. No. 104-16); Lieff Cabraser Heimann and Bernstein (Dkt. No. 104-17); Keller Rohrback, LLC (Dkt. No. 104-18); Hutchings, Barsamiam Mandelcorn, LLP (Dkt. No. 104-18); the McTigue Law Firm (Dkt. No. 104-19); Zuckerman Spaeder, LLP (Dkt. No. 104-20); Feingberg, Campbell & Zack, P.C. (Dkt. No. 104-21); Beins, Axelrod, P.C. (Dkt. No. 104-22); and Richardson, Patrick, Westbrook, and Brickman, LLC (Dkt. No. 104-23).

[29] Available at http://www.labaton.com/en/cases/State-Street-Corp.cfm (Last visited on April 17, 2018).

hourly rates listed in the lodestar calculation. With the exception of three ERISA firms --

McTigue Law,[30] Zuckerman Spaeder,[31] and Beins Axelrod [32] -- the Customer Class Counsel and

the other ERISA Class Counsel adopted the template language in its entirety.  Specifically,

Labaton provided counsel with the following language:

- "The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by each attorney and professional support staff-member of my firm who was involved in the prosecution of the Class Actions, and the lodestar calculation based on my firm's current billing rates. For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court. Time expended in preparing this application for fees and payment of expenses has not been included in this request." (Dkt. Nos. 104-15, ¶ 6; 104-16, ¶ 3; 104-17, ¶ 4; 104-18, ¶ 3; 104-21, ¶ 3; 104-23, ¶ 3).

- The hourly rates for the attorneys and professional support staff in my firm [] are the same as my firm's regular rates charged for their service, which have been accepted in other complex class actions." Dkt. Nos. 104-15, ¶ 7; 104-16, ¶ 4; 104-17, ¶ 5; 104-18, ¶ 4; 104-21, ¶ 4; 104-23, ¶ 4).

TLF adopted the preceding paragraphs verbatim in Garrett Bradley's Declaration,

summarizing the basis for TLF's fee request. *See* Dkt. No.104-16. Several representations

contained within these paragraphs are inaccurate:

---

[30] The McTigue Law Firm's individual fee declaration states that "[t]he hourly rates for the attorneys and professional support staff in my Firm included in Exhibit A are the same as my Firm's regular rates otherwise charged for their services, which have been accepted in other complex class actions my firm has been involved in." Dkt. No. 104-18, ¶ 20.

[31] Zuckerman Spaeder's individual fee declaration states that "[t]he hourly rates for the attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions and are charged to clients paying us currently by the hour." Dkt. No. 104-20, ¶ 4.

[32] Beins Axelrod's individual fee declaration states that "[t]he hourly rates charged by the Timekeepers are the Firm's regular rates for contingent cases and those generally charged to clients for their services in non-contingent/hourly matters. Based on my knowledge and experience, these rates are also within the range of rates normally and customarily charged in Washington, D.C. by attorneys of similar qualifications and experience in cases similar to this litigation, and have been approved in connection with other class action settlements. The Firm has charged, and received, an hourly rate of $525.00 in litigation involving fiduciary breach by a former trustee and service providers. The Firm does charge a lower rate to longstanding Fund clients in non-contingency matters and to its Union clients. To serve the public interest, the Firm has also charged reduced rates to individual employees with employment discrimination claims. Dkt. No. 104-22, ¶ 8.

25

- *Exhibit A is a summary of time spent by attorneys and professional support staff members "of my firm."* None of the SAs were employed by TLF. 3/7/17 Hearing Tr., p. 87:8-10; G. Bradley 6/19/17 Dep., pp. 82:12-21; 83:4-7.

- *The billing rates for the SAs are "based on my firm's current billing rates."* TLF did not maintain "current billing rates" for SAs listed on its lodestar calculation in Exhibit A. 3/7/17 Hearing Tr., p. 87:14-19; G. Bradley 6/19/17 Dep., pp. 48:24 – 49:4; *see also* Exhibit A to Dkt. No. 104-16.

- *For personnel "who are no longer employed," the lodestar is based on their rates for the "final year of employment."* Again, none of the SAs were employed by TLF. 3/7/17 Hearing Tr., p. 87:8-10.

- *The schedule was prepared from "contemporaneous daily time records regularly prepared and maintained by my firm."* TLF did not prepare or maintain daily time records of the hours worked by the SAs listed on its lodestar. Hoffman 6/6/17 Dep., pp. 63:2-7; 69:19-25; 70:12-16; 79:19-23; Kussin 6/5/17 Dep., p. 69:4-17. Nor did Garrett Bradley and Michael Thornton maintain sufficiently reliable contemporaneous daily time records. TLF-SST-011246 – 11249 (5/21/14 email from Hoffman to Lesser)("All of the hours are taken from LCHB's chart where there were mentions of discussions with either 'co-counsel' 'team' or, of course, Mike Lesser and/or MPT, GJB." [EX. 20].[33]

- *The hourly rates "are the same as my firm's regular rates charged for their services."* TLF did not maintain "regular rates" for the SAs listed on its lodestar report. 3/7/17 Hearing Tr., p. 88:2-5.

- *These rates "have been accepted in other complex class actions."* With the exception of 4 SAs, the $425 rate charged for the remaining SAs listed on the lodestar, including Michael Bradley, had not been accepted in other complex class actions. G. Bradley 6/19/17 Dep., p. 54:1-7.

Garrett Bradley acknowledged -- both in deposition and during the March 7, 2017

hearing before Judge Wolf -- that TLF's declaration was inaccurate and "should have been

clearer."  3/7/17 Hearing Tr., p. 91:4-6; G. Bradley 6/19/17 Dep., p. 82:12-21. At the March 7

---

[33] Garrett Bradley and Michael Thornton were asked for contemporaneous records. TLF produced calendar entries as well as several documents bearing handwritten notations purporting to be Bradley's and Thornton's contemporaneous daily time records. TLF also, at the Special Master's request, provided an excel spreadsheet containing time entries recreated after the fact based on records received from other firms, mainly Lieff, working on the State Street case.

hearing, Bradley conceded that the language described above "should have been clarified by me at that time," but was not. 3/7/17 Hearing Tr., p. 88:18-19. There is ample evidence in the record that Garrett Bradley actually knew the Declaration contained inaccurate information but signed it anyway. *See, e.g.,* 3/7/17 Hearing Tr., p. 87:13-14; 88:2-9, 14-18; 91:5-7; 92:3-8.

### d.  Staff Attorney Time

Customer Class Counsel's individual fee petitions also included requests for fees for the SAs.  On the lodestar summary charts (Exhibit A to the declarations), Labaton listed 25 SAs ("SAs"); Lieff listed 20 SAs; TLF listed 24 SAs.  *See* Sucharow Decl., Dkt. No. 104-15, Ex. A; Chiplock Decl., Dkt. No. 104-17, Ex. A; G. Bradley Decl., Dkt. No. 104-16, Ex. A.   In total, Customer Class Counsel reported 59,129.4 hours performed by SAs during the *State Street* case, accounting for nearly 70% of the Customer Class Counsel's total lodestar.  *See* Labaton's, Lieff's and TLF's Lodestar Reports, Dkt. Nos. 104-15, Ex. A; 104-16, Ex. A; and 104-17, Ex. A; *see also* Master Chart of Lodestars & Expenses, Dkt. No. 104-24.  As the chart below reflects, of TLF's total of 14,731 claimed hours, 10,537.9 hours (71.5%) were hours worked by "loaned" Labaton and Lieff SAs.  Specifically, the Customer Class firms' lodestar Reports reflected the hours and lodestar of partners, associates and SAs in the following amounts:

| FIRM | PARTNERS & ASSOCIATES | STAFF ATTORNEYS |
|---|---|---|
| **LABATON** | 5,783.6 hours | 31,526.4 hours |
|  | $4,784,915.50 | $11,684,111.00 |
| **LIEFF** | 2,025.1 hours | 17,065.1 hours |
|  | $1,391,346.50 | $7,474,896.50 |
| **TLF** | 4,193.1 hours | 10,537.9 hours |

| | $2,831,287.00 | $4,508,837.00 |
|---|---|---|

### xi.   *COURT APPROVAL OF THE SETTLEMENT AND FEE AWARD*

#### a.   Preliminary Approval

On August 8, 2016, the Court conducted a Preliminary Class Settlement Hearing, after which it granted preliminary approval of the class settlement,[34] provisionally certified the Settlement Class (as defined in the Notice of Pendency of Class Actions), approved the long-form Notice of Pendency of Class Action and Summary Notice, and appointed Labaton Sucharow LLP as Lead Counsel for the Settlement Class.  *See* MAD No. 11-cv-10230, Dkt. No. 97.

David Goldsmith of Labaton appeared on behalf of the Settlement Class at the hearing. 8/8/16 Hearing Tr., pp. 4-6. Michael Thornton of TLF and Dan Chiplock of Lieff Cabraser, as well as attorneys from the three ERISA firms, also attended the hearing.  *Id*., pp. 2-4. On behalf of all counsel, Goldsmith addressed plaintiffs' request for preliminary class certification for settlement purposes, which involved meeting a two-prong test to show that class representatives and class counsel adequately represent the class members. 8/8/16 Hearing Tran., pp. 7:24-8:7.  In response to the Court's inquiry whether Labaton could adequately represent both the ERISA and Customer classes, Goldsmith responded that Labaton was "adequate"; he argued that the Court had "no reason to depart" from its initial adequacy findings in the January 12, 2012 Memorandum and Order appointing Labaton as interim class counsel. *Id*., p. 8:18-22. The Court acknowledged, and Goldsmith agreed, that a class member may opt out of the settlement if he or she "feels that its [sic] interests justify a different path." *Id*., p. 11:6-13.

---

[34] As explained by Goldsmith during the August 8 hearing, "the reason why [class certification is] preliminary and not final is because class members do have a constitutional right to object to class certification if they see fit to do so." 8/8/16 Hearing Tr., p. 6:11-15.

The Court further asked Goldsmith to explain why the $300 million private settlement was reasonable, and specifically addressed the role of the DOJ, SEC, and DOL in the settlement process. *Id.*, p. 13:2-7. The Court showed a genuine interest in ensuring that the global settlement was fair to all participants: "if what I'm being asked to approve is going to affect something you've negotiated at arm's length with the [DOJ] and something you've negotiated with the SEC and something you've negotiated with the [DOL], I think that goes into both the reasonableness of the settlement and the fairness of the settlement." *Id.*, p. 18:13-22. Goldsmith affirmed that the reasonableness of the settlement is evidenced, in part, by the fact that DOL signed off on it. *Id.*, p. 18:2-6.

### b. Final Approval

On November 2, 2016, a hearing was held on Plaintiffs' Assented to Motion for Final Approval of Settlement and Lead Counsel's Motion for an Award of Attorneys' Fees and for Payment of Service Awards.  Goldsmith, accompanied in the courtroom by Zeiss, again represented the "plaintiffs and settlement class." 11/2/16 Hearing Tr., pp. 3:7-9, 10-11.  Dan Chiplock of Lieff Cabraser and Carl Kravitz of Zuckerman Spaeder also attended the hearing. *See id.*, pp. 2-3. Garrett Bradley and Mike Thornton of TLF also were in attendance.  *See* G. Bradley 9/14/17 Dep., pp. 152:19 – 153:11. [35] During the hearing, the Court approved the settlement, explaining that its approval was based, in part, on its finding that counsel on both sides "vigorously represented their clients' interest." 11/2/16 Hearing Tr., p. 21:1-5. The Court also found the proposed Plan of Allocation to be fair.  *See id.,* p. 22:16-21. The Court further noted the importance of the parties having reached a global settlement, including settlement with the federal regulators, in particular the DOL and SEC.  *Id.* at pp. 17:8-23, 38:12-20.

---

[35] There is nothing in the record evidence indicating that any other attorneys from Labaton, Lieff, TLF, or any of the ERISA firms were in attendance at the final approval hearing.

In considering the reasonableness of the attorneys' fees requested, the Court inquired whether the plaintiffs' fee agreement was disclosed to the class members "at the outset" of the case, to which Goldsmith responded only that the fee agreement was "consistent with the fee [plaintiffs were] seeking here." *Id.* p. 26:12-13. In a colloquy with the Court, Goldsmith argued, "[W]e produced a $300 million settlement…. So I think … a fee of some substance would be in order, frankly." *Id.*, p. 28:16-20.  The Court acknowledged that the $74 million in fees requested by counsel "is of some substance," *id*, p. 28:21-25, but noted that none of the class representatives had objected to that fee request.  *Id.*, p. 34-8-9.

At the conclusion of the hearing, stating that he was "relying heavily on the submissions and what's been said today," Judge Wolf approved a 25% award of attorneys' fees in the amount of $74,541,250.00, plus expenses in the amount of $1,257,699.94. *See id.* p. 35:4-8.  The Court also approved service awards totaling $85,000 -- $25,000 for ATRS and $10,000 for each of the six ERISA plaintiffs.  *Id.* at pp. 33:4-6, 35:9-12. Judgment was entered accordingly.  *See* Order and Final Judgment, Dkt. No. 110.  The Judgment became final on December 2, 2016.

### *xii. DISTRIBUTION OF SETTLEMENT AND ATTORNEYS' FEES*

As provided in the Plan of Allocation approved by the Court at the Final Settlement Hearing, $60 million of the $300 million gross settlement was allocated to the ERISA class plaintiffs, providing ERISA plan participants with a recovery ratio of roughly $2 to every $1 of loss to the class.  *See* Sucharow Decl., Dkt. No. 104, ¶ 134.  The Plan of Allocation further provided that a maximum of $10.9 million of the approximately $75 million in total attorneys' fees could be paid out of the ERISA Class' recovery for attorneys' fees.[36]  This allocation was

---

[36] The $10.9 million cap in attorneys' fees from the ERISA class recovery was negotiated by DOL. Sarko 9/8/17 Dep., p. 66:1-8; Kravitz 9/11/17 Dep., p. 66:8-23; *see also* TLF-SST-052694 – 52696 (8/21/15 email correspondence between Customer Class counsel and ERISA counsel related to negotiations with DOL regarding

negotiated and agreed to by Customer Class Counsel and ERISA Counsel after the parties

reached the agreement-in-principle on the $300 million settlement, *See* Sucharow Decl., ¶ 139;

*see also* Kravitz 7/6/17 Dep., pp. 54:25 – 55:1; 59:11-12; Sarko 7/6/17 Dep., p. 48:19; McTigue

7/7/17 Dep., p. 43:10-11.  In accordance with the Plan of Allocation and the ERISA fee

allocation previously agreed upon among the Customer Class Counsel and ERISA Counsel,

ERISA Counsel collectively received 10% of the total fee award -- a sum of $7.5 million -- with

the remaining $3.4 million under the agreed-upon $10.9 million ERISA fee cap being paid back

to Customer Class Counsel instead of to ERISA Counsel.  *See* Sucharow Decl., ¶¶ 134-139.

### a.   Payment of Fees and Expenses

On September 2, 2016, State Street paid the gross settlement sum of $300 million into a

Class Settlement Fund Escrow Account -- an escrow account maintained by Labaton, as Lead

Settlement Counsel, with Citibank -- where the funds remained pending entry of Judgment. *See*

Stipulation and Agreement of Settlement, Dkt. No. 89; Zeiss 9/14/17 Dep., pp. 122:15, 124:9-11,

130:21-23; *see also* LBS041692 (Citibank Escrow Account Statement).  Under the terms of the

Stipulation, Labaton agreed that, once Judgment became final it would "in good faith promptly

distribute any award of attorneys' fees and/or payments of litigation expenses among *plaintiffs'*

*counsel.*" Dkt. No. 89 ¶ 21 (emphasis added).

After the Court issued its Order awarding fees, the total sum of the fee award was

transferred by Labaton into a Lead Counsel Escrow Fund, also held by Citibank. Zeiss 9/14/17

Dep., pp. 124:16-23; 125: 3-4.  On December 8, 2016, after Judgment became final, Labaton

instructed the bank to disburse the fees, expenses, and service awards approved by the Court. *Id*.,

p. 125:13-21. The fees and expenses were disbursed by the bank directly to Lieff, TLF,

---

fees) [EX. 21]; TLF-SST-052697 – 52698 (8/26/15 email from Lynn Sarko to Customer Class counsel and ERISA
counsel regarding negotiated deal with DOL) [EX. 22].

McTigue, Keller Rohrback and Zuckerman Spaeder.  Zeiss 9/14/17 Dep., p. 125:13-21.  Labaton

also instructed the bank to transfer approximately $34 million to its firm's IOLA account, out of

which Labaton paid the service awards, obligations to "of counsel" attorneys,[37] and

approximately $4.1 million to Texas attorney, Damon Chargois, that same date. *Id.*, pp. 140:21 –

141; 143:4-8.[38]

     The $4.1 million payment to Chargois was the fourth largest payment made from the total

fee award, and more money than was paid to any ERISA firm. *See* Master Chart of Lodestars,

Litigation Expenses and Plaintiffs' Service awards, Dkt. No. 104-24. In coordinating the

payment to Chargois, Zeiss instructed Labaton's accounting department to remit payment from

the firm's IOLA if "it will be a rush" to pay Chargois. 12/7/16 Zeiss Email to Ng, LBS 032881 –

32883 [EX. 50]. Unlike payments from settlement escrow funds -- governed by escrow

agreements -- payments made from Labaton's IOLA account did not require two additional

signatures for disbursement. *See* Zeiss 9/14/17 Dep., p. 120:9-23.  Chargois testified that it did

not matter to him when, or from which account, the payment was made.  Chargois 10/2/17 Dep.

pp. 304:9-10; 305:3-10.

     The $4.1 million payment to Chargois was uncovered during the course of the Special

Master's investigation.[39]  Chargois never filed an appearance in the *State Street* case, nor did he,

---

[37] "Of counsel" here refers to Goldman Scarlato & Penny. Goldman Scarlato & Penny performed work on the case, and is reflected in the lodestar report Labaton submitted to the Court. Zeiss 9/14/17 Dep., pp., 143:17-20; 144:6-7.

[38] Labaton has not yet distributed money to the class members. Zeiss 9/14/17 Dep., p. 133: 2-5, 9-12. As of July 2017, the Class Settlement Account contained $224,978,733.34. *Id.*, p. 132:6-10.

[39] This payment of fees to Chargois first came to light in a batch of emails produced by TLF on August 8, 2017 and gave rise to several additional months of depositions and written discovery. Neither Labaton nor Lieff produced any emails related to Chargois in response to the Special Master's initial requests for production of documents. *See, e.g.,* Special Master's First Set of Interrogatories to LCHB (Revised) Nos. 5, 10, 62, 74; Special Master's First Set of Interrogatories to LBS (Revised) Nos. 4, 9, 60, 72; Special Master's First Set of RFPs to LCHB (Revised) 3, 16, 40. After the Chargois relationship was disclosed by the TLF-produced emails in response to the Special Master's initial document requests, both Labaton and Lieff produced a significant number of emails and documents pertaining to the

or his firm, Chargois & Herron, submit any declaration or lodestar report as part of the *State Street* Fee Petition. *See* Dkt. Nos. 104, 104-15, 104-16, 104-17, 104-19.

All parties concede Chargois performed no work on the case.

The names Chargois and/or Chargois & Herron appear nowhere in the Fee Petition or any of its exhibits. *See id.* All parties concede that the Court was never informed about Chargois or the payment of $4.1 million to his firm. *See* Belfi 9/5/17 Dep., pp. 87:24-88:11; 89:1-17; 90:7-12; 122:23-123:5; Goldsmith 9/20/17 Dep., p. 112:10-14; G. Bradley 9/14/17 Dep., pp. 152:19-153:16.[40] Failure to include payment to Chargois in the fee petition was a material omission.

## B.   INVOLVEMENT OF LABATON AND CHARGOIS IN THE STATE STREET CASE

### i.   *LABATON'S INTRODUCTION TO ATRS*

Labaton represented ATRS throughout the *State Street* case, serving as Lead Counsel throughout the litigation. ATRS was headed by Executive Director George Hopkins. Hopkins had succeeded Paul Doane, the previous Executive Director, on December 29, 2008. Hopkins 9/5/17 Dep. p. 14:10-22. [41]

Labaton's relationship with ATRS began in or about 2007. Around that time, Labaton -- which frequently acts as monitoring counsel[42] for its clients --was looking to expand its securities

---

Chargois relationship and payment in response to subsequent document requests by the Special Master specifically related to Chargois.

[40] In fact, Sucharow testified that the only impact a fee award has on a class is the "total amount" of attorney's fees awarded. *See* Sucharow 9/1/17 Dep., p. 35: 14-19.

[41] After Paul Doane resigned, for a brief period of time ("three or four months") ATRS was headed by an interim director, Gail Bolden, Doane's deputy director. Hopkins 9/5/17 Dep., p. 14:14-22. Hopkins succeeded Gail Bolden. *Id.*, p. 14:18-20.

[42] *See* note 3, *supra*. As monitoring counsel, Labaton uses sophisticated in-house investigators and analysts to oversee a client's portfolio of securities investments for signs of possible securities law violations. If Labaton believes a client's portfolio may have been involved in a securities violation that could lead to a viable case, Labaton may ask the client whether it would be interested in serving as lead plaintiff in a potential class action litigation based on those violations. *See* Available at http://www.labaton.com/en/practiceareas/Institutional-Investor-

monitoring practice and form new relationships with potential pension fund clients in the

Southwest. Keller 10/13/17 Dep., p. 21:1-22; Sucharow 9/1/17 Dep. pp. 15:3-16:19; Chargois

10/2/17 Dep., p. 32:3-22. In an effort to "mak[e] inroads" in the Arkansas community, Labaton

sought the assistance of Damon Chargois, a lawyer admitted to practice law in Arkansas and

Texas (and who, in 2007, maintained law firms under the name Chargois & Herron in each

state.)[43] Labaton had previously retained Chargois to serve as its local counsel in *HCC*

*Holdings,*[44] a securities fraud class action case filed in federal court in Houston.[45]  In September

2007, Chargois introduced Labaton partners Eric Belfi and Christopher Keller to Paul Doane,

Executive Director of ATRS, at that time. Chargois 10/2/17 Dep., pp. 33:24-35:22.

Chargois recalled Belfi asking him in 2007 to introduce him and his partner Chris Keller

to institutional investors in Arkansas, as Labaton was interested in creating client relationships

with institutional investors in that region.  *Id.*, p. 20:4-17.  Chargois readily admitted that at the

time he had no knowledge of any "institutional investors."  *Id.* at p. 20:20. Chargois' then

partner, Tim Herron, did not have any relationships with institutional investors, either. *Id.*, p.

27:16-19.  However, Herron was friends with an Arkansas state senator, Steve Farris, who at the

time, served on the Arkansas legislature's Joint Committee on Public Retirement and Social

Security which had an oversight role with respect to ATRS.  Hopkins 9/5/17 Dep., pp. 35:6 –

36:8.

---

Protection-Services.cfm (last visited April __, 2018). Because Labaton's representation is contingent on the occurrence and detection of securities violations, it "takes a while for people… to understand [Labaton's work] to the point where it can be useful to them." Keller 10/13/17 Dep., p. 24: 20-23.

[43] Chargois & Herron's Arkansas office was closed in late 2009 or early 2010.  Chargois 10/2/17 Dep., p. 31:15-17.

[44] *In re HCC Insurance Holdings, Inc. Securities Litig.*, SDTX No. 07-00801.

[45] In contrast to this case, in *HCC Holdings,* Chargois filed an Affidavit in support of the Application for an Award of Attorneys' Fees and Reimbursement of Expenses, which included a lodestar report of his firm, Chargois & Herron LLP.  *See In re HCC Insurance Holdings, Inc.*, SDTX No. 07-00801, Dkt. No. 71-3.

Farris suggested to Herron that they might want to try to contact Paul Doane who had

then just recently taken over as Executive Director of the Arkansas Teacher Retirement System.

Chargois 10/2/17 Dep., pp. 33:16-21.   Herron told Chargois, and Chargois called Doane.  *Id.*, p.

33:24-34:1.

Chargois explained to Doane that he was working with a New York law firm that

specialized in institutional investors and asked if Doane would meet with him, Belfi and Keller,

and Doane agreed.  *Id.*, p. 34:1-35:3.  Within a week or so, a meeting took place in Little Rock.

Chargois 10/2/17 Dep., p. 35:8-16.  At that initial meeting, "Eric Belfi presented all the services

that Labaton has available and what their -- what they could do and presented as a courtesy that

they could do this monitoring of the portfolio."  Chargois 10/2/17 Dep., p. 36:13-16.  Doane later

came to New York for another meeting with Belfi and Keller at Labaton's offices; Chargois was

not present.  Belfi 9/5/17 Dep., p. 38:2-6.  At this meeting, Labaton did a presentation for Doane

as to what services the firm could provide.  According to Belfi, "[O]nce we did the presentation,

we were kind of put on their radar.  So, at some point later when they did the RFQ [of

prospective monitoring counsel], they sent an RFQ for us to respond to."  Belfi 9/5/17 Dep., p.

37:17-22.

### ii.    THE CHARGOIS "ARRANGEMENT"

As consideration for Chargois' efforts, Belfi and Keller agreed to pay Chargois' firm,

Chargois & Herron, a maximum 20% of any attorney's fees received by Labaton in any litigation

involving an institutional investor for whom Chargois had facilitated the introduction, including

ATRS (hereinafter "the Chargois Arrangement").  Chargois 10/2/17 Dep., pp. 50:18-25; 53:10-

17; Keller 10/25/17 Dep., pp. 315:21-24, 316:11-14.[46] Both Chargois and Belfi understood that

it was the mere introduction by Chargois to potential institutional investors or potential antitrust

clients that was the basis of the agreement to pay Chargois 20% of any legal fee Labaton earned

on any cases in which Labaton was lead counsel or co-lead counsel and the client was lead or co-

lead plaintiff.[47] Chargois 10/2/17 Dep., p. 50:18-24; Belfi 9/5/17 Dep., pp. 19:6-21:21. Under

this arrangement, Chargois was not expected to file an appearance or assume a substantive role

in any of the resulting litigation, or even interface with the client. Chargois 10/2/17 Dep., pp.

56:19-24; 57:1-6; Keller 10/25/17 Dep., p. 323:2-4.

While Chargois and Keller attempted on numerous occasions over the years to reduce

this agreement to writing, and exchanged several drafts to which they both agreed in large

measure, no formal agreement was ever put together; it was wholly "an email relationship."

Chargois 10/2/17 Dep., p. 59:8-10 ("Only e-mails. There's no four-corner document that -- in

---

[46] Labaton had previously entered into an agreement to pay TLF approximately 20% of its total fee to  in cases
where TLF (and in particular, TLF partner, Garrett Bradley) interacted with local, pension fund clients. As
Christopher Keller of Labaton explained:

> [W]e had a very, sort of, good, productive relationship with the Thornton Law Firm and -- where, you
> know, we would -- we would jointly get retained by, you know, funds in the Northeast area, which was
> their sort of area of -- they had lots of relationships within the area. And we, you know, had an
> understanding they would get, sort of, let's say, up to 20 percent. And the understanding was that, it was
> going to be somewhat of a, I call it, a turnkey, but I'm using a -- what I mean is we didn't have to do any
> heavy lifting up in the -- up in the area, because there's a lot -- I mean, we're a national firm. Think about
> this, so we have over 200 pension fund clients, we may have one within driving distance of our office
> okay.  So we maintain a national practice and -- but without offices all over the nation. So it's very
> important, any time that we can leverage others who -- who are ready and willing and able to do the heavy
> lifting locally, we're happy to sort of let that happen, and, of course, pension funds feel much more
> comfortable with people they know or people who are close by or were introduced through someone they
> know, so we made that a -- a -- this is how Labaton was going to build more business.

Keller 10/13/17 Dep., pp. 43:3-44:19

[47] While Chargois understood that he would receive 20%, as Keller testified, Labaton believed that it was only
obligated to pay Chargois a percentage of fees proportional to ATRS's share of the contributory losses incurred by
all lead plaintiffs. By way of example, if ATRS was named co-lead counsel with another plaintiff in a successful
litigation, Chargois' payment would not be 20% of Labaton's fee, but would reflect ATRS's pro rata portion of the
total loss amount, offsetting the full 20% figure

ceremony and signed or anything. It's just an e-mail relationship." *Id*.)  Chargois was very clear that his understanding was that this was not a "referral fee" arrangement, nor was he "local counsel"; it was just an "agreement":

> THE SPECIAL MASTER: What is your understanding of the relationship? And if it evolved from something to something else --
>
> THE WITNESS [Mr. Chargois]:  Right.
>
> THE SPECIAL MASTER: -- we'd be very interested in that.
>
> THE WITNESS: At the very beginning I thought I would be local counsel. I was not.
> . . . .
>         When Eric informed me that [the joint RFQ] had been kicked back, I needed to withdraw, ever since then I've only referred to this as an agreement. I don't have a client so...
>
> THE SPECIAL MASTER: Just an agreement?
>
> THE WITNESS: Just an agreement.
>
> THE SPECIAL MASTER: Not a referral fee arrangement?
>
> THE WITNESS: No, sir.
>
> THE SPECIAL MASTER: Not a local counsel arrangement?
>
> THE WITNESS: No, sir.
>
> THE SPECIAL MASTER: Not a forwarding fee arrangement?
>
> THE WITNESS: I'm not sure what forwarding fee means.
>
> MR. SINNOTT: Neither are we.
>
> THE SPECIAL MASTER: We weren't either.  I was going to follow up on that and ask you if you've ever heard the term.
>
> THE WITNESS: I have not.
>
> THE SPECIAL MASTER: So just a fee arrangement or just an arrangement?
>
> THE WITNESS: I've always referred to it as our agreement.

Chargois 10/2/17 Dep. pp. 62:10-64:5.

While Labaton's relationship with Chargois began with Chargois & Herron serving as "local counsel" in the *HCC Holdings* Texas class action, it is clear that the relationship evolved over time. *See* Chargois 10/2/17 Dep., pp. 17:19-21; 38:23-24, 39:1; Sucharow 9/1/17 Dep., p. 81:16-20. As a result, the terminology used to describe the Chargois Arrangement varies greatly between individuals. Counsel has labeled Chargois as "local counsel," or "the local," while on other occasions describing the Chargois Arrangement as based in "referral" or a "referral obligation." *See, e.g.,* LBS027776 (4/24/13 Bradley email to others) [EX. 23]; M. Thornton 9/1/17 Dep., p. 38:13-15; Chiplock 9/8/17 Dep., pp. 68:4-7, 102:3-8; Keller 10/13/17 Dep., pp. 45:11-16; 71:24-72: 4; 96:16-18; 212:5-12. In yet other instances, the Chargois Arrangement is characterized as a "forwarding obligation." Sucharow 9/1/17 Dep., pp. 59:13-19; 86:8-12. Finally, Sucharow testified that he considered Chargois a "joint venturer" working with Labaton to find pension clients. Sucharow. 9/1/17 Dep., p. 16:1-3. Regardless of the title used, it is undisputed that Chargois' sole contribution to -- and only role in -- the *State Street* case was facilitating an introduction between Labaton and ATRS -- years before the *State Street* case was even contemplated.  Sucharow 9/1/17 Dep., p. 82:7-10.

### a.  Labaton's Compartmentalization of Knowledge of the Chargois Arrangement

While the initial discussions to partner with Chargois included only Keller and Belfi of the Labaton firm, Larry Sucharow -- Co-Chairman and, in effect, managing partner of Labaton[48] -- learned of the firm's obligation to pay Chargois (a "referring attorney") a portion of the total

---

[48] In 1982, Sucharow was named partner of the firm. Sometime thereafter, he became managing partner. He served in that role for "many years" until his appointment as Chairman of the firm. As Chairman, Sucharow assumed duties of both the Chairman and managing partner. Sucharow 6/14/17 Dep., p. 10:18-11:4. Sucharow currently is Co-Chairman of the firm. *See* http://www.labaton.com/en/ourpeople/Lawrence-Sucharow.cfm (Last visited April 16, 2018).

attorney's fees by 2015.[49] Sucharow 9/1/17 Dep., p.18:2-11; 20-13. Sucharow, who acted as the "lead negotiator and lead strategist" in the *State Street* case,  knew of Chargois' entitlement for which he did not perform any substantive work or bill any time on the case. Sucharow 9/1/17 Dep., p. 86:18- 87:1.  At least as of 2015, Sucharow knew that Chargois had no role in the *State Street* case beyond the initial introduction to ATRS. *See id*.

Much of Sucharow's lack of knowledge of the Chargois Arrangement can be attributed to Labaton's compartmentalization of its practice.  Christopher Keller, who is Co-Chairman of the firm and a member of the firm's Executive Committee,[50] testified the decision to compartmentalize the practice was done in an effort to modernize and improve efficiency.  *See* Keller 10/13/17 Dep., p. 79:18-20.  The end result of compartmentalization, however, was that often attorneys in one department were generally unaware of decisions made or work done by attorneys in another department, even where the same client or lawsuit is involved.  *See* notes 24, *supra* & 62, 68 *infra*. For example, Nicole Zeiss, who worked exclusively in Settlements, was not privy to decisions made by attorneys in the Litigation department or by the Relationship attorneys.  Zeiss 6/14/17 Dep., p. 79:5 - 80: 24.  Her involvement in the *State Street* case was "strictly as settlement counsel." *Id*., at p. 79:5-9.  Similarly, litigators, such as David Goldsmith, was not privy to client agreements entered into by the firms Relationship attorneys.  *See* Goldsmith 9/29/17 Dep., pp. 112:10 – 113:9; *see also* Keller 10/13/17 Dep., p. 77:13-17

---

[49] Sucharow testifies that "[it] may be that I *should have known* [prior to 2015] because I know we had some ongoing relationship with him, but it was nothing that was in the forefront of my mind." Sucharow 9/1/17 Dep., p.18:3-6. While the full nature of the Chargois Arrangement -- payment for performing no work on the case -- was not initially disclosed to Sucharow, he learned first-hand that Chargois did not work on the case after becoming involved in the settlement process. Sucharow 9/1/17 Dep., 18:24-19:1.

[50] *See* http://www.labaton.com/en/ourpeople/Christopher-Keller.cfm (last visited on 4/18/17).  In addition to his management duties as Labaton's Co-Chairman and as a member of the firm's Executive Committee, Keller currently leads, the Case Development Group, which is composed of attorneys, in-house investigators, financial analysts, and forensic accountants. The group is responsible for evaluating clients' financial losses and analyzing their potential legal claims both in and outside of the U.S. and tracking trends that are of potential concern to investors.  *See id.*

(Labaton's Relationship attorneys perform client development duties and "[t]he client -- the client, you know, development, is a very kind of a siloed thing within the firm. They -- they -they operate, you know, a lot on the road, amongst themselves.")

As a consequence, the fee arrangement Eric Belfi, Labaton's "Relationship" partner, and Christopher Keller agreed to with Damon Chargois was not shared with the Labaton attorneys who were involved with the litigation and settlement of the *State Street* case.

David Goldsmith, who was Labaton's principal litigator in *State Street*, never knew about Damon Chargois or his fee arrangement until November 21, 2016 -- several weeks after the *State Street* settlement had been approved by the Court. 111:13 – 113:9.  Nicole Zeiss, Labaton's "Settlement Counsel," who appeared with Goldsmith at the Final Approval Hearing before Judge Wolf, testified that in her role as settlement counsel,  she had a "general understanding" that Chargois and his firm had worked with Labaton "to develop relationships with clients in different cases," but she did not have any knowledge of the details of the firm's relationship with him.  Zeiss 9/14/17 Dep., p. 19:17-21.

### iii. THE ATRS REQUEST FOR QUALIFICATIONS (RFQ)

Chargois' efforts got Labaton the "foot in the door" it wanted and needed with ATRS.  In mid-2008, ATRS issued a Request for Qualifications ("RFQ") to Labaton, among other firms. Chargois 10/2/17 Dep., p. 37:19-22. On July 30, 2008, Labaton responded by submitting a "joint proposal" on behalf of Labaton and Chargois & Herron.  LBS017738 – 17755 **(**7/30/08 Joint Response by Labaton Sucharow LLP & Chargois & Herron, LLP) [EX. 24]; *see also* Belfi 9/5/17 Dep., p. 37:20-23.  Labaton, through Belfi, received ATRS's response to the RFQ on October 13, 2008 by email from ATRS Chief Counsel, Christa Clark.  *See* LBS 017455 - 17456 (10/13/08 email from C. Clark) [EX. 25].  Clark advised Belfi that Labaton had been selected as

an additional monitoring counsel for ATRS, but that Chargois & Herron was *not* approved as

part of the proposal. *Id.* Clark indicated that while there was no requirement to use Chargois &

Herron, Labaton could use Chargois & Herron on a "case by case basis," if they were "a

necessary and appropriate expense." *Id.* Specifically, Clark's email to Belfi stated in relevant

part:

> I am pleased to inform you that subject to final approval of the Attorney General's
> ATRS has selected Labaton Sucharow as an additional monitoring counsel for our
> system.
>
> I would like to speak to you regarding the additional firm on your submission
> Chargois & Herron. This is a little awkward, but since your firms are not legally
> affiliated, we are unable to process the state contract form with both firms listed.
>
> If your firm is doing the monitoring and providing the financial backing for the cases, I
> think it is most appropriate that we add your firm independently to the list of approved
> firms. Your firm *may affiliate that firm or use them as independent contractors, if you
> deem is* [sic] *appropriate on a case by case basis. There would be no requirement that
> you use them if it was not a necessary and appropriate expense of a case.* I don't know
> how to best handle this point but the state procurement process is not conducive to a joint
> proposal.

*See* LBS 017456 (10/13/08 email from C. Clark) (emphasis added) [EX. 25].

     Chargois understood that his firm was not accepted as part of the RFQ process. Chargois

10/2/17 Dep., pp. 48:15-49:1.

     At no point after receiving Clark's email did Labaton inform Ms. Clark, Mr. Doane (or

his successor, George Hopkins) of the pre-existing Chargois Arrangement generally, or that it

was obligated to pay Chargois a portion of any fees that might be awarded in its representation of

ATRS in the *State Street* matter. Belfi, 9/5/17 Dep. pp., 23:5-16; 115:17-21; 118:16-19; Keller

10/25/17 Dep., p. 297:14-16.

### iv.    *ATRS' LACK OF KNOWLEDGE OF THE CHARGOIS ARRANGEMENT*

Beginning in 2008, Labaton went on to serve as monitoring counsel for ATRS.[51]  Belfi 9/5/17 Dep., p. 18:6-7.  Shortly thereafter, George Hopkins replaced Paul Doane as Executive Director of ATRS.  *Id*., at 27:16-18.  Belfi explained that Hopkins was a much more direct person, who only wanted to deal with Belfi.  Belfi 9/5/17 Dep., pp. 27:18-28:7, 56:22-57:10.  Hence, the relationship between Chargois and ATRS shifted with Hopkins' appointment.  Belfi 9/5/17 Dep., p. 57:11-24.  Labaton no longer needed Chargois to facilitate communications with ATRS.  Nevertheless, Labaton continued to remit payments to Chargois under their previous arrangement to avoid litigation by Chargois that would likely be filed in Chargois' home state, Texas. Belfi 9/5/17 Dep., 58:1-7, 10-15.

George Hopkins worked closely with Labaton in deciding to file the *State Street* lawsuit, and he remained very involved in the case, including in the mediation process, spending "hundreds of hours" working on the case during its five-year history. Hopkins 6/14/17, p. 102:35.

Labaton sought Hopkins' approval before partnering with Lieff and TLF in the class action litigation.  However, Labaton did not seek Hopkins' approval to share information with or remit payment to Chargois.  Hopkins, in fact, was never informed of the existence of Damon Chargois nor of any agreement between Labaton and Chargois, much less one that entitled Chargois to 20 % of any attorney fee recovered by Labaton on behalf of ATRS.  *See* Hopkins 9/5/17 Dep., pp. 21:5-10, 64:4-67:11; Belfi 9/5/17 Dep., pp. 18:9-20:17; 24:6-20. [52]

---

[51] Labaton continues to serve as one of five firms "on retainer" to ATRS, responsible for monitoring ATRS' investment portfolio and alerting ATRS to potential misappropriation or unexpected monetary loss. Hopkins 6/14/17 Dep., pp. 29:9-22; 30:3-5.

[52] Hopkins testified that he "had no idea" that Chargois had introduced Belfi and Keller to ATRS before his tenure. In fact, Hopkins had never even heard of Damon Chargois or Chargois & Herron prior to their disclosure during the Special Master's investigation in August 2017. Hopkins 9/5/17 Dep, pp. 20:22-21:10; 64:4-65:24.

Hopkins testified regarding his knowledge of Chargois:

It is apparent from Labaton's email correspondence with George Hopkins that Labaton took pains at every turn not to reveal Damon Chargois, Chargois & Herron, or their 20% interest in ATRS cases to Hopkins.  Rather than include Chargois as a co-addressee or cc him on email correspondence concerning ATRS cases in which Chargois & Herron had an interest, Eric Belfi of Labaton either blind-copied Chargois or Herron, or separately forwarded the emails to them, the effect of both being the same -- to not reveal Chargois & Herron to Hopkins   *See, e.g.,*

- LBS 018439 (Chargois and Herron bcc'd on 5/10/10 email from Belfi to Hopkins re: "Blue Ribbon" report for *Goldman Sachs* litigation) [EX. 26];

- LBS 017505 (Tim Herron bcc'd on 5/6/10 email from Belfi to Hopkins updating status of The Hartford securities litigation) [EX. 27];

- LBS 018437 – 18438 (5/15-16/10 email chain from Hopkins to Belfi re: potential joint filing of a case with Nix Patterson, forwarded by Belfi to Chargois) [EX. 28];

- LBS 020417 – 20418 (5/14/10 letter from Belfi to Hopkins re: *Colonial BancGroup* case, forwarded to Chargois on 5/17/10) [EX. 29];

- LBS 017822 (Chargois bcc'd on 5/2/13 email from Belfi to Hopkins re: motion to dismiss filed in the *Facebook* case) [EX. 30];

- LBS 017824 (10/23/13 email from Belfi to Hopkins re: *Facebook* securities litigation, w/attachments, forwarded to Chargois) [EX. 31];

---

Q.     Were you aware that members of a law firm with a Little Rock office had introduced individuals that you would later come to know as Eric Belfi and Chris Keller to influential Arkansas officials in an effort to secure legal work with the state?
A.      I had no idea.
Q.     Are you familiar with the firm name Chargois & Herron?
A.     As of about two weeks, ten days ago.
Q.     But you never encountered them to the best of your recollection years ago?
A.     I had never heard of that firm before.

Hopkins 9/5/17 Dep, pp. 20:22-21:10.

In a Declaration sent to the Special Master on March 17, 2018 -- five weeks before the filing of this R&R -- George Hopkins confirms that he had no knowledge of the Chargois agreement, but states that he "did not want to know the specifics of fee allocations between Labaton and other attorneys," and purports to "ratify that [the Chargois] agreement."   Hopkins 3/15/18 Declaration, ¶¶ 7, 10, 16.  [EX. 53].

- LBS 017825 – 17826 (Chargois bcc'd on 7/24/13 email from Belfi to Hopkins re: *Goldman Sachs* trial) [EX. 32].

*See also* Belfi 9/5/17 Dep., pp. 110:5 – 113:5; Keller 10/25/17 Dep., pp. 353:14-354:17; 358:1-24; 463:2-464:2.

Nor did the Retainer Agreement in *State Street* signed by Hopkins disclose the Chargois Arrangement.  The Retainer Agreement provided, in relevant part, that ATRS agrees that Labaton "may divide fees with other attorneys for serving as local, as referral fees, or for other services performed in connection with the Litigation." LBS019948 – 19950 (9/24/10 Retainer Agreement, p. 2) [EX. 33]; *see also* LBS005362 – 5364 (2/8/11 Engagement Letter from Eric Belfi to George Hopkins).[53]  [EX. 34].  It further provided that "[t]he division of attorneys' fees with other counsel may be determined upon a percentage basis or upon time spent in assisting with the prosecution of the Litigation." *Id*.  The Retainer Agreement did not name any individual attorney nor specify which, if any, of these "services" it would seek as part of the litigation. *See id.*  It contains only a vague reference to "referral fees," but it does not name Chargois, or Chargois & Herron, and makes no reference to the obligation to Chargois the ATRS lawsuit would trigger or how the payment would be made.   Chargois acknowledged he played no role whatsoever in ATRS's *State Street* lawsuit, and only met George Hopkins once, when he happened to be in San Francisco visiting his sister and attended an unrelated court hearing. Chargois 10/2/17 Dep., pp. 54:18-23, 74:21-75:3.

---

[53] Specifically, the Retainer Agreement provides:

> Arkansas Teacher agrees that Labaton Sucharow *may allocate fees to other attorneys who serve as local or liaison counsel, as referral fees, or for other services performed in connection with the Litigation*.  The division of attorneys' fees with other counsel may be determined upon a percentage basis or upon time spent assisting with the prosecution of the Litigation.  Any division of fees among counsel will be Labaton Sucharow's sole responsibility and will not increase the fees payable by Arkansas Teacher or the class upon a successful resolution of the Litigation.

LBS 011060 – 11062 (9/24/10 Retainer Agreement) (emphasis added).  [EX. 35].

Labaton's purported reason for not informing Hopkins of the Chargois Arrangement is because Hopkins "did not want to know." *See* Hopkins 3/15/18 Declaration [EXH 53]; Belfi 9/5/17 Dep., pp. 23:17 – 24:5. This was a unilateral decision by Belfi, however, who concluded after meeting Hopkins that Hopkins would appreciate a more direct relationship. Belfi 9/5/17 Dep., pp. 27-28; 56-57. According to Belfi, the subject of Chargois "did not come up," and admittedly, Belfi did not want to bring another attorney not from Labaton into the case, Belfi 9/5/17 Dep., pp. 110, 122.

a.    Agreement Among Labaton, Lieff and Thornton to Share in the Payment of Labaton's Obligation to Chargois

Labaton's obligation to pay Chargois 20% of any fee it might be awarded in State Street was disclosed to Lieff and TLF in or about April 2013.  The subject was first raised at a meeting during a Global Justice Network conference, an event organized by Bob Lieff and attended by Michael Thornton, Garrett Bradley, and Lynn Sarko.[54]  Lieff 9/11/17 Dep., p. 63:10-22.  In an April 26, 2013 email from Garrett Bradley to Robert Lieff, Michael Thornton, Eric Belfi, Christopher Keller and Dan Chiplock, and copied to Chargois (referred to by the parties as the "Dublin email"), Chargois was referred to as "the local counsel who assists Labaton in matters involving Arkansas Teachers Retirement System."  LBS 025771.  In that email, Garrett Bradley memorialized an agreement reached earlier among the three Customer Class law firms to share in the payment of Labaton's 20% obligation to Chargois.[55]  In relevant part, Bradley's email stated as follows:

---

[54] Bob Lieff testified that he does not have a specific recollection of a conversation with Bradley and Michael Thornton regarding Chargois.  Lieff 9/11/17 Dep., p. 66:2-5. Although Lynn Sarko attended the Global Justice Network meeting, there is no evidence that he was party to any discussion with Bob Lieff, Michael Thornton or Garrett Bradley concerning Chargois and Sarko testified that he did not learn about the Chargois arrangement until it was disclosed in the Special Master's investigation in August 2017.

[55] During the *State Street* litigation, Garrett Bradley had substantial contact with Belfi and Keller of Labaton, and Chargois. Bradley attended annual marketing conferences hosted by Labaton and attended by Keller, Belfi, and

Bob, as you, Mike and I discussed in Dublin last week, I am sending this e-mail regarding the obligation to the local counsel who assists Labaton in matters involving the Arkansas Teachers Retirement System. Labaton has an obligation to this counsel, Damon Chargois, copied on this e-mail, of 20 percent of the net fee to Labaton in the State Street FX cases before Judge Wolf. Currently this amount will be 4 percent because of the agreement between Labaton, Thornton and Lieff of a division of 20 percent guaranteed, each with the balance to be decided on at a later date. Obviously, this may go up should Labaton receive an amount higher than 20 percent. We have agreed that the amount due to the local, whatever it turns out to be, 4 or 5, will be paid off the top with the balance fee split between Lieff, Labaton, Thornton pursuant to our agreement. The local asks that I copy him on this e-mail so he will have confirmation of this agreement. When we spoke to him, he was agreeable to this as well. Garrett.

LBS 025771 (4/25/13 G.Bradley email to R. Lieff, M. Thornton, E. Belfi, C.Keller and D.

Chiplock, copied to Chargois)). [EX. 37].

Discussions concerning the specific percentage to be paid Chargois were ongoing while

the parties continued with their hybrid mediation in 2013 and 2014.  Later, in late 2015, after the

settlement had initially been agreed to by the parties, Customer Class Counsel all agreed to

allocate 5.5% of their collective fee award to Chargois. Chiplock 9/8/17 Dep., pp. 106:18-107:1.

Labaton, Lieff, and TLF contributed equally to satisfy this obligation.  Labaton Sucharow's

8/11/16 Responses to Special Master's Supplemental Interrogatories, Response No. 1(b).

###### v.      LIEFF'S AND THORNTON'S[56] LIMITED KNOWLEDGE OF THE CHARGOIS ARRANGEMENT

Lieff and TLF were not privy to the origins of the Chargois Arrangement or the details of

Labaton's obligation to pay Chargois in all cases in which ATRS is a co-lead counsel. Lieff

9/11/17 Dep., p. 92:2-12; Thornton 9/1/17 Dep., pp. 19-21, 35:12-24. The original cost-sharing

agreement circulated -- but never executed -- among Customer Class Counsel in 2011 shortly

---

Chargois. Then, effective January 1, 2015, through late 2016, Garrett Bradley held a dual role as partner at TLF and "of counsel" to Labaton. *See* LBS007086 – 7090 (Bradley's Of Counsel Agreement).  [EX. 36]. In this role, Bradley agreed to "assist Labaton partners in identifying and seeking retention by clients for securities." *Id*.

[56] As discussed *infra*, Garrett Bradley stood in a unique position vis-à-vis Labaton (see note 55, *supra*), and specifically, the Chargois Arrangement. Thus, Bradley's knowledge must be considered separately from that of the other Thornton attorneys.

after the *ATRS* complaint was filed, referenced only that the firms acknowledged that "[t]here is an 'off the top' obligation to referring counsel of 6% of the fees awarded," without any specifics. *See* TLF-SST-033911 – 33913 (5/4/11 letter agreement).[57]

The arrangement was next addressed amongst the three Customer Class firms in the April 24, 2013, "Dublin" email in which Garrett Bradley described a financial obligation owed to Chargois. Bradley characterized Chargois as "local counsel who assists Labaton in matters involving the Arkansas Teachers Retirement System." LBS 025771 [EX. 37].  The Labaton attorneys addressed on the email, Chris Keller and Eric Belfi, did not offer any additional explanation. Nor did either attorney inform their co-counsel that Chargois was not performing any work in the matter. Bob Lieff responded to the email on April 23, 2013, stating "I am in full agreement." LBS030997 – 30998, (4/24/13 Lieff Email to G. Bradley, et al.).  [EX. 38].  Eric Belfi responded to the email on May 6, 2013, stating "[w]e are in full agreement." *Id.*

While members of the Lieff and TLF firms were generally aware of Labaton's obligation -- to be shared by Customer Class Counsel -- to pay Chargois a percentage of Labaton's total fee in the *State Street* case, the exact percentage or details of that arrangement were not discussed until settlement discussions were well underway years into the litigation. Thornton 9/1/17 Dep., pp. 36:16-17, 22-24; 37:1-7.

a.    Thornton's Knowledge of the Chargois Arrangement

Garrett Bradley of TLF received an initial draft of the proposed cost-sharing agreement on May 23, 2011.  TLF-SST-033910 (5/23/11 Keller to Bradley).  [EX. 54].  Although the "referring counsel" was not identified in the proposed cost-sharing agreement, Bradley testified

---

[57] Christopher Keller, who drafted the letter agreement, testified that the "off the top" percentage to referring counsel -- 6% -- reflected 20% of Labaton's 1/3 share of the fees: "20 percent of a third is 6 point something so we probably just went with 6 percent."  Keller 10/25/17 Dep., p. 419:8-9.

that he had never heard anyone other than Damon Chargois referred to as "referring counsel" by Labaton in connection with the *State Street* litigation, G. Bradley 9/14/17 Dep., p. 43:1-20, and his deposition testimony indicates that he was aware that Labaton had an obligation to pay Chargois a percentage of the fees at least as early as "around the time the complaint was filed or shortly." *Id.*, p. 44:7-12.[58]  Bradley testified, however, that he did not know that Chargois would not have to do any work for a share of the fees, nor did he know the details of the arrangement. ("I thought his role was similar to ours; that he did substantive work, corresponded with the client, dealt with the client, got authority.  That's what I thought his role was." *Id.*, at p. 45:10-13; *see also* p. 47:7-8).[59]

Michael Thornton was included as an addressee of the May 4, 2011 draft letter, but testified that he never received or reviewed that letter at the time. Thornton 9/1/18 Dep., p. 148:6. Mr. Thornton testified that he was unaware of Chargois until Garrett Bradley told him of an obligation to pay "local/referring counsel" in or about 2013, and even then, did not know Chargois by name. *Id.*, p. 148:7-13; p. 20: 14-17; p. 35: 14-24. While it is clear that Mr. Thornton understood that Chargois was entitled to receive a portion of the fees awarded in the

---

[58]  Bradley testified:

> I believe as early as -- just prior to or right around the time of filing in 2011, I raised with Chris [Keller] how are we going to deal with your obligation to Damon 'cause I was very concerned that he would try to apply for 20 percent of this entire case.
> And I asked them to deal with it.

G. Bradley 9/14/17 Dep. p. 44:7-13.

[59] Other evidence in the record suggests that Bradley likely knew more about Chargois than this testimony might indicate.  Record evidence shows that Bradley, Chargois, Belfi and Keller spent a considerable amount of time together during Labaton's "marketing" conferences during this period. In addition, Bradley held a dual role from January 1, 2015 through late 2016 as TLF's Managing Partner and as "Of Counsel" to Labaton with the sole responsibility of client development.  Further, Labaton's General Counsel, Mike Stocker, asked Bradley -- and not Labaton's own lawyers, Eric Belfi or Chris Keller -- to intervene with Chargois in handling negotiations with Chargois when negotiations over Chargois' fee in the case became more pointed.  *See* 6/21/16 email, TLF-SST-012527 – 012528.  [EX. 55].  Beyond this, TLF, through Bradley, had arrangements with Labaton similar to its arrangement with Chargois.

*State Street* case due to his role in securing Labaton a position on the monitoring panel, *id*. at pp. 44: 8-22; 36: 16-19, Mr. Thornton did not know that Chargois was entitled to receive 20% payment in every case in which ATRS served as a lead or co-lead counsel. *Id*., at p. 44: 16-24. And while Chargois did not serve as forum local counsel in the case, Mr. Thornton understood that Chargois was a referring attorney, i.e. an attorney who referred the matter to ATRS because he was either not competent or it was not his role to bring action on behalf of ATRS against State Street. *Id*. at p. 38: 4-11; p. 42:2-16.

> b.    Lieff's Knowledge of the Chargois Arrangement

Bob Lieff and Dan Chiplock, both recipients of the "Dublin" email, testified that they understood Damon Chargois to be performing some substantive role as local counsel for Labaton in the State Street litigation, serving the class by assisting the ATRS client locally in Arkansas. Lieff 9/11/17 Dep., pp. 58-80; Chiplock 9/8/17 Dep., pp. 101-116. In arriving at that understanding of the Chargois role, each relied both upon their understanding of Labaton's role as lead counsel and the representations made by Garrett Bradley in relation to Chargois. *See* 4/5/18 Declaration of Daniel Chiplock, ¶¶5-6; LBS 025771 [EX. 56], LCHB-0053483 (4/24/13 "Dublin email," in which Garrett Bradley referred to Chargois as "the local counsel who assists Labaton in matters involving Arkansas Teachers Retirement System" and to which Bob Lieff replied that he was in full agreement as to the proposed allocation) [EX. 57].

Bob Lieff testified that he thought Chargois was local counsel for Labaton dealing with the client in Arkansas. *See* Lieff 9/11/17 Dep., p. 67:9-13 ("I thought he was local counsel for Labaton in this particular case I assumed dealing with the Arkansas fund because that's what local counsel will do. That was my understanding.")  He further testified that had he known that

Chargois had done no work on the case, he would not have agreed to the allocation of part of his firm's fee award to Chargois.  Lieff 9/11/17 Dep., p. 97:13-16.

Informing both Lieff and Chiplock's belief that Chargois played a local role was their recent experience in *BONY Mellon*, in which LCHB's local counsel interfaced with their Ohio pension fund client but otherwise had little contact with co-lead counsel and non-lead counsel participating in the New York litigation. *See* Lieff 9/11/17 Dep., pp. 58-80; Chiplock 9/8/17 Dep., pp. 101-116; 4/5/18 Declaration of Daniel Chiplock, ¶6. Subsequent email communications between Labaton, TLF and LCHB in 2015 describing a financial obligation to a local Arkansas attorney reinforced LCHB's belief that Chargois fulfilled some local role in the case. *See, e.g.*, TLF-SST-040617-40618 [EX. 58], LCHB-0053491-53492 (8/6/2015 Bradley email to Lieff and Thornton regarding "Fee discussions" related to BONY Mellon and State Street, with reference to "arkansas local") [EX. 59]; LCHB-0053493 [EX. 60], TLF-SST-038574-38579 (8/28/15 Lieff email to Bradley and Thornton regarding State Street and referring to Arkansas local counsel; Bradley response to same) [EX. 61]; TLF-SST-053117-53126 (8/28/15 Chiplock email to Sucharow, Bradley and Thornton regarding memorialization of the fee allocation agreement amongst the firms, and referencing payments to ERISA counsel and "local Arkansas counsel" in relation to the distribution of Customer Class Counsel fees; ) [EX. 62]; LCHB0053513-53521 (continuation of correspondence amongst counsel regarding same) [EX. 63]; LCHB-0053507-53512 (8/28/15 separate correspondence between Chiplock and Lieff regarding same) [EX. 64]; LCHB-0053531-53532 (8/30/15 further response from Bradley to Chiplock, Lieff, and Sucharow referring to the "Arkansas firm" and the prior April 2013 correspondence, noting that there was already a "written agreement between all the parties that the Arkansas component would come off the top") [EX. 65]. Neither Labaton or Bradley

corrected these characterizations of the Chargois role as local counsel. Related communications from Chiplock to Lieff in mid-2016 demonstrate that Chiplock still believed that Chargois occupied this role during the finalization of the Fee Petition. LCHB-0053538-53540 (forwarding 2013 and 2015 email correspondence) [EX. 66]; LCHB-0053541 (forwarding 2013 correspondence and referencing calculation of "local counsel's" fee) [EX. 67].

Attorneys from the firms exchanged emails related to the Arrangement again in 2015. On August 28, 2015, Dan Chiplock corresponded with Larry Sucharow, Garrett Bradley and Michael Thornton regarding memorialization of the fee allocation agreement amongst the firms; Chiplock referred to payments to ERISA counsel and "local Arkansas counsel" in relation to the distribution of Customer Class Counsel fees. TLF-SST-053117-53126 (8/28/15 Chiplock Email to Sucharow, G. Bradley, Thornton, and Lieff) [EX. 39]. Garrett Bradley, referencing the prior emails in 2013, replied that there was already "a written agreement between all the parties that the Arkansas component would come off the top" and stated that the "ERISA piece" should be handled the same way. *Id*. As Chris Keller and Eric Belfi were not included on this email exchange, and Larry Sucharow was at that point unaware that Chargois was not performing any work as the local Arkansas counsel, the 2013 characterization of the Chargois role remained uncorrected.

The Chargois Arrangement was the subject of another email correspondence between the three firms on July 8, 2016, this time referencing Chargois as a "local attorney in this matter who has played an important role:

Gentlemen,

As we discuss how to distribute the fee between ourselves and, of course the ERISA attorneys, I have had discussion with Damon Chargois, the local attorney in this matter who has played an important role. Damon and his firm are willing to accept 5.5% of the total fee awarded by the Court in the State Street class case now pending before Judge

51

Wolf. As you know, we had a prior deal with him that his fee would be "off the top". He understands that ERISA counsel is now in the same pool of money. He has agreed to come down to this number with a guarantee that it will be off the court awarded fee number. Please reply all if you agree. Given that it is off the total number their [sic] is no need to add the ERISA counsel to this email chain.

LBS039936 – 39937 (7/8/16 G. Bradley Email to Lieff, Thornton, Sucharow, Chiplock, Keller, Belfi, and Chargois). [EX. 40].

At no time in this multi-year correspondence was the nature of Chargois' role -- *i.e.,* as a referring attorney -- made clear. None of the Labaton attorneys followed up on the July 2016 correspondence in writing. Nor does the record contain any evidence that any of the Labaton attorneys informed their co-counsel, either before or after this email, that Chargois had played no role at all in the *State Street* case, nor did the Labaton attorneys attempt to explain what "important role" Chargois played. Bob Lieff and Mike Thornton replied to Bradley's July 8 email expressing their firms' respective agreement to these terms. *Id.*; LBS031152 – 31153 (7/8/16 Thornton Email to G. Bradley & 7/8/16 Lieff Email to G. Bradley, et al.) [EX. 41]. Separately, Chris Keller wrote to Garrett Bradley, "great work getting this done." LBS039936 [EX. 40].

        c.      Inconsistency of Information Regarding the Chargois Arrangement

Even among Labaton attorneys, full knowledge of the Chargois Arrangement was limited to Belfi and Keller.  *See* Sucharow 9/1/17 Dep., p. 17:10-13 ("I'm not sure I ever knew in the sense that I didn't hear 'til later on that there was an obligation to [Chargois].") For example, Larry Sucharow, who described himself as the "lead negotiator and lead strategist" for plaintiffs in the *State Street* case, only learned of Labaton's financial obligation to Chargois in 2015.  *Id.,*

pp. 18:20-23; 87:1. [60]  Similarly, David Goldsmith, the lead Labaton litigator who appeared on

behalf of the purported Settlement Class in the Preliminary and Final Settlement approval

hearings before Judge Wolf, did not learn of the Chargois Arrangement until November 21,

2016, several weeks after the Final Approval Hearing. Goldsmith 9/20/17 Dep., pp. 108:20-

109:2. [61]Even those who were aware of the Arrangement, were unfamiliar with Chargois' full

name.  Sucharow 9/1/17 Dep., pp. 7-9; 35:17-24. [62]

Outside of Labaton attorneys, the terms "forwarding fee" and "referral fee" have no

significance in a class action context. 9/11/17 Lieff Dep., p. 79:20-22. Robert Lieff testified that

the term local counsel is also not descriptive of Chargois' role, as it is a term of art used to

describe an attorney who works for a client on a case-by-case basis and submits a fee petition for

services performed in a particular case, an understanding shared by Chargois himself.  Lieff

9/11/17 Dep., p. 80:9-17.  Although they now seek to cast Chargois in the role of "referring"

counsel, Labaton attorneys never used the phrase "referring counsel" in discussions with

Chargois. Chargois 10/2/17 Dep., p. 64:15-19. And when asked, Chargois did not view his role

as either a "referring counsel," "liaison counsel" or "local counsel" in the *State Street* case or any

---

[60] Though he testified that he learned of his firm's obligation to Chargois in 2015, Sucharow signed the Omnibus Declaration, which was filed with the Court in September 2016; the Declaration did not disclose the Chargois Arrangement or reference the intended payment to Chargois. *See* Dkt # 104-1, 104-15.

[61] David Goldsmith testified that he first learned of Chargois and his fee arrangement with Labaton on November 21, 2016.  Goldsmith 9/20/17 Dep., pp.111:13 -112:9.  He further testified that he had no idea that a payment was going to be made to Chargois out of the class funds or that Chargois payment was going to be 5.5 % of the total $75 million fee award. *Id.*, pp. 112:10 – 113:9.  Goldsmith admitted that this was important information and that he would have liked to have known about it before he went before Judge Wolf at the Fairness Hearing. *Id.* Goldsmith further admitted he knew of no work done by Chargois on the *State Street* case, nor had any other Labaton lawyer told him that Chargois did any work on the matter.  *Id.* at pp. 114:11 – 115:13.

[62] Sucharow and Goldsmith's ignorance of the Chargois is another result of Labaton's compartmentalization.  *See* note 24, *supra*.  Only the client relationship partner, Eric Belfi, and Christopher Keller knew the details of the Chargois Arrangement.

case involving ATRS.  Chargois 10/2/17 Dep., pp. 55: 8-13, 20-24; 63:11 – 64:6**;** this was just "an agreement." *Id.*, p. 63:5-21.

### vi.    *ERISA COUNSEL'S LACK KNOWLEDGE OF CHARGOIS ARRANGEMENT*

Neither Labaton nor any other Customer Class Counsel ever informed ERISA Counsel of Labaton's obligation to Chargois, or Chargois' role in connection with this case. Sarko 9/8/17 Dep., pp. 56:18 – 57:9, 71:14-23; Kravtiz 9/11/17 Dep. p. 70:8-10; McTigue, 9/8/17 Dep., p. 17:14-21. Like Hopkins, ERISA Counsel only learned of the Chargois Arrangement as a result of the Special Master's investigation in or about August 2017. Sarko 9/8/17 Dep., 71:14-23; Kravitz 9/11/17 Dep. 70:8-10; McTigue 9/8/17 Dep., p. 17:14-21.  One effect of the Customer Class Counsel's failure to disclose the Chargois Arrangement to ERISA Counsel was the nondisclosure to the ERISA class representatives and members themselves.

As with Hopkins, Labaton was at pains to keep ERISA Counsel from learning about Chargois or the Chargois Arrangement. *See e.g.,* Sucharow response to G. Bradley email regarding proposed Claw Back letter addressed only to Customer Class Counsel advising "no reason for ERISA to see Damon's split." TLF-SST-012272 – 12274 (11/22/16 Sucharow Email to Goldsmith, G. Bradley, Keller, Belfi) [EX. 42]; LBS039936 – 39937 ("Given that it is off the total number their [sic] is no need to add the ERISA counsel to this email chain.") [EX. 40]; TLF-SST-053117-53126 [EX. 39].

ERISA Counsel testified that had they known of the Chargois Arrangement during the *State Street* case, they would have proceeded differently in several material respects. Lynn Sarko testified that had he known of the Chargois Arrangement, he "absolutely" would have felt an obligation to disclose [the Arrangement] to the ERISA class representatives and get their informed consent. Sarko 9/8/17 Dep., p. 91:4-15. Moreover, had he become aware that an

attorney who did no work on the case would receive in excess of $4 million prior to signing the ERISA Fee Allocation in 2013, Sarko would not have agreed to the award of only 9% (which became 10%) of the total fee award to ERISA Counsel. *Id.* pp.75:2-22, 78:19-79:4.  The other ERISA counsel, Brian McTigue and Carl Kravitz of Zuckerman Spaeder, testified that they would not have agreed to it, either.  *See* McTigue 9/8/17 Dep. p. 21:15-24; Kravitz 9/11/17 Dep., pp. 83:3-84:22. In fact, the purported purpose of the Fee Allocation was to align interest "on the same team" and develop a level of trust between the ERISA lawyers and Customer Class lawyers. Sarko 9/8/17 Dep., p. 82:8-15.

Sarko testified further that he would not have agreed to file a joint fee petition with the Court had he known of the intended payment to Chargois, which, in his opinion, should have disclosed. Sarko 9 /8/17 Dep., pp. 75:2-7, 78:24-79:3. Nor would he have signed the Claw Back Agreement (*see* Section C (iii), *infra*) agreeing to reimburse Labaton for any reduction in the fee award imposed by the Court as a result of the November 10, 2016 letter to the Court admitting the overstatement of the *State Street* lodestar (discussed *infra*). Sarko 9/8/17 Dep., pp. 75:2-22, 78:19 – 79:4.

Sarko also was the chief liaison with the DOL during the mediation, and he testified he would have been obligated to tell the DOL about Chargois and his arrangement with Labaton for a cut of the fees.  Sarko 9/8/17 Dep. p. 76:14-22.  In Sarko's opinion, if the DOL had the information about Chargois, the Department would have had questions, and the settlement would have "blown up" because State Street was insisting on a global settlement which could not be achieved without the DOL's approval.  *Id.*, p. 84:3-5.

### vii.   *PAYMENTS TO CHARGOIS PURSUANT TO THE CHARGOIS ARRANGEMENT*

Since the Chargois Arrangement began in 2008, Labaton has represented ATRS in at least nine cases for which it has paid Chargois a percentage of the Labaton's total fee award:

- *In re A10 Networks, Inc. Shareholder Litigation,* No. 2015-1-CV-276207 (Cal. Super. Ct. Jan 29, 2015)

- *Brado v. Vocera Communications, Inc.* No. 13-CV-3567 (N.D. Cal. Aug.1, 2013)

- *Perry v. Spectrum Pharmaceuticals, Inc.*, No. 13-CV- 0433 (D. Nev. Mar.14, 2013)

- *Hoppaugh v. K12 Inc.,* No. 12-CV-0103 (E.D. Va. Jan. 30, 2012)

- *In re Hewlett –Packard Company Securities Litigation,* No. 11-CV-1404 (C.D. Cal. Sept. 13, 2011)

- *Arkansas Teacher Retirement System v. State Street Corporation,* No. 11-CV-10230 (D. Mass. Feb 10, 2011)

- *In re Beckman Coulter, Inc. Securities Litigation,* No. 10-CV-1327 (C.D. Cal. Sept. 3, 2010)

- *In re Colonial BancGroup, Inc. Securities Litigation*, No. 09-CV-0104 (M.D. Ala. Feb. 9, 2009)

- *In re Capacitors Antitrust Litigation*, No. 14-CV-3264-JD (N.D. Cal.) [63]

Labaton Response to Special Master's Supplemental Interrogatory, 1(a); Chargois 10/2/17 Dep., pp. 54:2-3; 65:1-71:13.[64] In each of these cases, Labaton paid Chargois a percentage -- more often amounting to 10 - 15% than the originally agreed-upon 20% -- of Labaton's total fee

---

[63] Chargois testified that *In re Capacitors* was not an ATRS case, and, hence, not covered by the agreement. *See* Chargois 10/2/17 Dep., p.65:4-7.

[64] While not identified in response to discovery, media reports also identify Labaton filing on behalf of ATRS, and being named co-lead counsel in a multi-trillion-dollar action alleging that many of the country's leading banks harmed both the United States government and private investors by rigging the management of 13 trillion dollars in securities sold by the U.S. Department of Treasury in *In Re:  Treasury Securities Auction Antitrust Litigation,* (S.D.N.Y. 2017). Potentially, the Chargois Arrangement would cover this case, as well

award. Chargois 10/2/17 Dep., p. 60:17-20.[65] Neither Chargois nor any Chargois & Herron

attorneys entered an appearance or did any work in any of these actions.

## C.    SCRUTINY OF THE STATE STREET SETTLEMENT AND SPECIAL MASTER'S APPOINTMENT

### i.    *THE BOSTON GLOBE INQUIRY*

By all accounts, the $300 million settlement reflected an excellent result for the class

members and was the product of the highly professional and skilled work of the class's law

firms. Sarko 7/6/17 Dep., p. 109:22-23; Kravtiz 7/6/17 Dep., pp. 105:23-106:7; Hopkins 6/14/17

Dep., p. 100:1-10. However, on November 8, 2016 -- less than a week after the Court had

approved the Settlement and entered Judgment -- the *Boston Globe* contacted counsel for TLF to

inquire about the apparent duplication of certain SA names listed on the individual firm lodestar

reports of Customer Class Counsel submitted as part of the Joint Fee Petition. Garrett Bradley

6/19/17 Dep., pp. 85:23-86:11; David Goldsmith 7/17/17 Dep., p. 132:16-24. Following this

inquiry, attorneys from Labaton, Lieff, and TLF immediately conducted internal reviews to

determine what, if any, information in their fee petitions may have been incorrect. *See* Goldsmith

7/17/17 Dep., p. 137:11-19; G. Bradley 6/19/17 Dep., pp. 86:15 – 87:12.

---

[65] Chargois was not happy with the frequent reductions in the amounts Labaton paid his firm.  He expressed his frustration in an October 18, 2014 email to Labaton:

> "…I am very concerned that you guys are attempting to significantly, substantially and materially alter our agreement. Our deal with Labaton is straightforward. We got you ATRS as a client after considerable favors, political activity, money spent and time dedicated in Arkansas, and Labaton would use ATRS to seek lead counsel appointments in institutional investor fraud and misrepresentation cases. Where Labaton is successful in getting appointed lead counsel and obtains a settlement or judgment award, we split Labaton's attorney fee award 80/20 period. As I said in my text to you regarding HP and your allocation, I understand the circumstances in this case and am okay with the fee split in this instance. We are not changing our fee split agreement for all the other pension fund cases. You promised me that you would give me advanced notice of when you guys would seek a modification or accommodation on a given settlement, and I want you to keep that going forward."

LBS017593 - 17594 (10/18/14 Chargois email to Belfi) [EX. 43]; *see also* Chargois 10/2/17 Dep., pp. 253:2-255:4.

After conducting their internal reviews, Labaton, Lieff and TLF unanimously conceded that the *State Street* Fee Petition overstated hours worked by Customer Class Counsel by 9,322.9 hours due to the double-counting of certain lawyers' hours, resulting in a lodestar overstatement of $4,058,654.50.[66]  Specifically, the Fee Petition attributed hours of staff (and contract) attorneys allocated by Lieff and Labaton to TLF for purposes of cost-sharing not only to the lodestar petitions of Lieff and Labaton -- the SA host firms -- but also to TLF's lodestar.  This dramatically inflated the lodestar of TLF.  *See* 11/10/16 Letter from David J. Goldsmith to Hon. Mark L. Wolf, Dkt. No. 116.  [EX. 44].

### ii.  NOVEMBER 10, 2016 LETTER TO THE COURT

After Labaton, TLF, and Lieff confirmed that the double-counting alleged by the *Globe* had, in fact, occurred, David Goldsmith of Labaton took the lead in writing a letter to the Court to explain what had happened.  *See* 11/10/16 Letter from David J. Goldsmith ("Goldsmith Letter"), Dkt. No.116 [EX. 44]; G. Bradley 6/1917 Dep., p. 87:15-17; Goldsmith 7/17/17 Dep., pp. 143:25-144:5. Various iterations of the letter were circulated among Customer Class Counsel and ERISA Counsel, and ultimately approved by all, before the letter was filed with the Court. *Id.*, p. 144:5-9. The Goldsmith Letter explained that due to "inadvertent errors," Plaintiffs' Counsel's reported combined time and lodestar were incorrect. Of the reported 86,113.7 hours, 9,322.9 hours were overstated. Of the reported lodestar of $ 41,323,895.75, $ 4,058,654.5 was overstated.  11/10/16 Goldsmith Letter, p. 2. [EX. 44]. The internal review revealed that 17 SAs had been listed on both the TLF and Labaton lodestar reports, and for these SAs, the billing rates on the TLF report were in most instances higher.  Goldsmith 7/17/17 Dep., p. 142:12-19.  Lieff also confirmed that six SAs on TLF's lodestar report also appeared on Lieff's report.  Chiplock

---

[66] The ERISA Counsel's lodestar reports were unaffected by the double-counting.

6/16/17 Dep., p. 164:9-17; *see also* Goldsmith 11/10/16 Letter to the Court, Dkt. No. 116. [EX. 44].

Shortly thereafter, the *Boston Globe* published a report detailing the "double-counting" issue addressed by the Goldsmith Letter and raising additional questions about the accuracy and reliability of the attorneys' fees, including questions concerning the billing rates charged for the SAs and contract attorneys, and for the work in the case done by the Garrett Bradley's brother, Michael Bradley -- who was not employed by TLF -- including the $500 per hour rate at which Michael Bradley's work was included in Thornton's lodestar.[67]

The Goldsmith Letter did not attempt to explain how or why the double-counting occurred.  Nor did Labaton take this opportunity to disclose the Chargois Arrangement.  (Of course, Goldsmith, himself, did not know about Chargois at the time he wrote the letter to the Court.)[68]

---

[67] *See* Andrea Estes, *Critics hit law firms' bills after class-action lawsuits*, BOSTON GLOBE, December 17, 2016, https://www.bostonglobe.com/metro/2016/12/17/ lawyers-overstated-legal-costs-millions-state-street-case-opening-window-questionable-billing-practices/tmeeuAaEaa4Ki6VhBpQHQM/story html.  [EX. 45].

[68] This is another instance of problems created at Labaton as a result of its compartmentalization of its practice.  *See* notes 24 and 62, *supra*.

### iii.     THE "CLAW BACK" LETTER

After the November 10, 2016 letter was delivered, Plaintiffs' Counsel awaited a response

from the Court.  Recognizing that the Court might respond adversely and ultimately decide to

reduce the fee award, on November 21, 2016, at the direction of Labaton's Chairman, Lawrence

Sucharow, David Goldsmith drafted a letter which Sucharow then sent to all counsel -- including

ERISA Counsel -- for their signature, asking all counsel to agree to refund to Labaton, for re-

deposit into the State Street escrow account, their respective pro-rata share of any court-ordered

reduction of fees, expenses and/or service awards ("Claw Back Letter").  *See* Goldsmith 7/17/17

Dep., pp. 152:17-155:13; *see also* TLF-SST-012264 – 12266 (11/21/16 Sucharow Draft Letter to

Counsel) [EX. 46].

Bob Lieff and Sarko agreed, pending a breakdown of the fees to be paid out on December

8.  The issue of whether to send a similar letter to Chargois was raised in an email addressed

only to Customer Class Counsel by Garrett Bradley, to which Sucharow responded:

> Need two letters with breakdown, ERISA just gets sent to ERISA counsel with 10
> percent off the top and then a third each.  Class co-counsel get one with ERISA 10
> percent off the top, Damon's percentage also off the top, and each of class co-counsel
> split with the percentages agreed to.  *In short, no reason for ERISA to see Damon's split.*
> *They only need to see their 10 percent and then split three ways.*  By the way, I want to
> asterisk the 10 percent to ERISA with a footnote saying although our fee agreement with
> ERISA counsel only provides for a 9 percent allocation, co-class counsel have
> determined to increase that to 10 percent in light of the excellent work and contribution
> of ERISA counsel.

TLF-SST-012272 – 12274 (11/22/16 Sucharow Email to Goldsmith, G. Bradley, Keller, Belfi)

(emphasis added).  [EX. 42].

Larry Sucharow then also directed Goldsmith to send a separate claw-back letter to

Damon Chargois for his signature, as well.  Goldsmith 9/20/17 Dep., p. 171:14-23.  Accordingly,

Goldsmith drafted a letter for Eric Belfi, the "ATRS relationship partner" with Labaton to send to Chargois.  *Id*, p. 172:10-15.  *See also* Belfi 9/5/17 Dep. p. 93:13-16.

### iv.    *APPOINTMENT OF SPECIAL MASTER*

With questions having been raised as to the accuracy and reliability of the lodestar reports which had been submitted by Plaintiffs' counsel and relied upon by the Court in awarding fees, the Court proposed the appointment of a Special Master to investigate these issues and prepare a Report and Recommendation concerning them. *See* 2/6/17 Memorandum and Order, Dkt. No. 117.  [EX. 47].  The Court thereafter held a hearing on March 7, 2017 to discuss, among other issues, the appointment of Hon. Gerald E. Rosen (Ret.) as the Special Master.[69] The following day, on March 8, 2017, the Court appointed Hon. Gerald E. Rosen, ret., as Special Master to investigate and prepare a Report and Recommendation as to:

> (1)      the accuracy and reliability of counsels' fee petitions;  (2)  the accuracy and reliability of representations made in David Goldsmith November 10, 2016 letter to the Court; (3) the accuracy and reliability of representations made by parties requesting service awards; (4) the reasonableness of attorneys' fees, expenses, service awards previously ordered and whether any of them should be reduced; and (5) whether any misconduct occurred in connection with the award of attorneys' fees, and if so, whether such misconduct should be sanctioned.

3/8/17 Memorandum and Order, Dkt. No. 173 (footnotes omitted). [EX. 48].

The Special Master retained William F. Sinnott, Esq. of the law firm Donoghue, Barrett & Singal, P.C. (now "Barrett & Singal, P.C.") to assist in the investigation. The Special Master also retained John Toothman as a technical adviser, and later, Professor Stephen Gillers as an expert on the ethical and professional conduct issues raised in this case.

---

[69] Prior to the hearing, all of the law firms agreed to the appointment of Judge Rosen, except McTigue Law. McTigue initially filed a written objection to the appointment of Judge Rosen, *see* McTigue Law's Response to 2/6/17 Order, Dkt. No. 138, but on the record at the hearing, withdrew that objection.  *See* 3/7/17 Hearing Tr., Dkt. No. 176, p. 55:3-4.

## III.   QUESTIONS PRESENTED

I have been asked to address the following questions:

I.   Whose professional conduct rules and what law governed the obligations of class counsel in this matter?

*Answer: The Massachusetts Rules of Professional Conduct. Federal law also governs issues raised here.*

II.   Was the arrangement with Chargois ("the Chargois Arrangement"[70]) a valid division of fee agreement under Massachusetts Rule 1.5(e)?

*Answer: No. The Chargois Arrangement does not comply with Rule 1.5(e) of the Massachusetts Rules of Profession Conduct. It is, therefore, within the prohibition in Rule 7.2(b) against paying a "person" to recommend a lawyer.*

III.   Should the Chargois Arrangement have been disclosed to the Court before the Court awarded fees in this matter?

*Answer: Yes. Federal law and the Massachusetts Rules of Professional Conduct required that counsel who knew the terms of the Chargois Arrangement inform the Court before it awarded fees in this matter.*

IV.   Should the Chargois Arrangement have been disclosed to the members of the certified settlement class?

*Answer: Yes. Fiduciary duty and the Massachusetts Rules of Professional Conduct required that counsel who knew the terms of the Chargois Arrangement inform the certified settlement class.*

V.   Did Garrett Bradley's lodestar declaration comply with the Massachusetts Rules of Professional Conduct and Rule 11, Fed. R. Civ. P.?

*Answer: No. The Declaration violated Rule 3.3(a) because, as I have been asked to assume, Bradley knew that it contained false statements when he filed it. Separately, the Declaration violated Rule 11 because Bradley filed it without conducting "an inquiry reasonable under the circumstances" to establish that there was "evidentiary support" for the facts in it.*

---

[70] I will use the term "Chargois Arrangement" to refer to the puported agreement by Labaton Sucharow to pay Chargois or Chargois & Herron twenty percent of the fees Labaton earned from its work for ATRS. The payment, as I am asked to assume, was meant to compensate Chargois for recommending Labaton to ATRS in 2008. The Arrangement did not require Chargois to do any work on ATRS matters or to accept responsibility for any work Labaton did for ATRS. *See* pp. 35-38.

IV.    OPINION

A.    **WHERE THE COURT IS CALLED ON TO APPLY A RULE OF PROFESSIONAL CONDUCT, IT SHOULD APPLY THE MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT RATHER THAN THE RULES OF ANOTHER JURISDICTION. FEDERAL COMMON LAW ALSO GOVERNS ISSUES BEFORE THE COURT**

*Weber* and *Fishman (supra* pages 2-3) were not disciplinary cases. They recognized, however, that the violation of professional conduct rules may be relevant in deciding whether a law firm or lawyer has violated a duty to a client. Similarly, I cite these rules because they are relevant to the law firms' duties to ATRS, the class, and the Court. I offer no opinion on what, if any, remedy or sanction is appropriate.

i.    *APPLICATION OF MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT*

Counsel's duties in this case are governed by two bodies of authority: the rules of professional conduct *and* federal law.[71]  The determination of whose professional conduct rules govern counsel's conduct is straightforward. The United States District Court for the District of Massachusetts, the jurisdiction in which the State Street case was pending, expressly adopts the Massachusetts Rules of Professional Conduct. *See* L.R., D. Mass. 83.6.1 (incorporating rules promulgated by the Supreme Judicial Court). The Massachusetts Rules of Professional Conduct themselves -- in particular Rule 8.5(b)(1) -- reaffirm that Massachusetts ethical rules govern all conduct in matters pending before a "governmental tribunal [i.e. a court] …unless the rules of the tribunal provide otherwise." *See* Rule 8.5(b)(1); *see also* Rule 1.0(p).

Admissions for *pro hac vice* status in the District Court in Massachusetts, such as those obtained by out-of-state counsel in the State Street case, requires an express acknowledgement

---

[71] Unless otherwise noted, all references to a rule of professional conduct are to the Massachusetts Rules of Professional Conduct.

that the Massachusetts Rules of Professional Conduct govern the applicant's behavior. To gain

admission *pro hac vice* in this Court, each attorney was required to certify, under oath, that he or

she "has read and agrees to comply with the Local Rules of the United States District Court for

the District of Massachusetts."  Local Rule 83.5.1(b)(1)(C).[72] The Local Rules, in turn,

incorporate the Massachusetts Rules of Professional Conduct.

Massachusetts Rule 8.5 cmt. [4] provides that a Court's "choice of law rule" might lead

to application of another jurisdiction's rule. But that would not be so on the facts before the

Special Master. The District Court addressed the choice of law issue in *Daynard v. Ness, Motley,*

*Loadholt, Richardson & Poole, P.A.*, 188 F.Supp.2d 115 (D. Mass. 2002), where "a law

professor" who was "putatively an expert on tobacco litigation," sought to enforce an oral fee-

splitting arrangement with the law firm for whom he consulted. In weighing several different

factors, the Court relied heavily on the place of performance, deeming bar admissions not

dispositive of the inquiry. *See id*. at 119, 121, 122-123. Thus, the Massachusetts Rules of

Professional Conduct governed the dispute between the expert -- admitted to practice only in

New York -- and the defendant, a South Carolina law firm -- where the expert had performed the

bulk of his legal work in Massachusetts. *Id.* at 123. Application of Massachusetts law would not,

however, prevent other states with an interest in the litigation from disciplining attorneys over

whom it had authority. *Id.*

Applying the *Daynard* Court's analysis to the conduct of counsel in the *State Street* case,

Massachusetts Rules of Professional Conduct should, again, apply.  The ethical issues here

predominantly arise out of counsel's conduct *before the Court* as well as written submissions to

---

[72] The previous version of this rule in effect in 2011, L.R., D. Mass 83.5.1(a)(1) (amended Jan. 1, 2015), required
that attorneys seeking admission to the District Court "(ii) ha[ve] satisfied the examination requirements as defined
by the District Committee on Admissions relating to familiarity with the Federal Rules of Civil Procedure, the
Federal Rules of Evidence, principles of federal jurisdiction and venue, and rules relating to professional
responsibility; and (iii) ha[ve] filed a certificate .... attesting to familiarity with the local rules of this district."

the Court and duties to disclose information to the class representatives and class members, whom the Court had an obligation to protect. Unlike Attorney Daynard, counsel here actually appeared before the Court on more than one occasion.

### ii.   ADDITIONAL REASONS TO APPLY THE MASSACHUSETTS PROFESSIONAL CONDUCT RULES IN THIS CASE

For three other reasons, the Court should apply the Massachusetts professional conduct rules. First, applying to each lawyer the rules of the particular jurisdiction in which that lawyer is admitted could subject different lawyers to different rules and possibly different outcomes for their work in the same litigation. Second, among the rules relevant here are rules that describe duties to the Court itself. The Court has a strong interest in assuring that the behavior of lawyers practicing before it is governed by its own rules, not the rules elsewhere. Third, the relevant rules also describe duties to members of the certified class who reside in many jurisdictions, whose rules may vary. As in *Daynard,* other jurisdictions in which these questions may arise can apply their own rules.[73] *See id*. at 123.

### iii.   FEDERAL LAW ALSO GOVERNS ISSUES BEFORE THE COURT

As stated, federal law also governs issues discussed here and, in particular, the obligation of class counsel to disclose the Chargois Arrangement. *See* Section C (ii), *infra.*

---

[73] Application of Massachusetts law will not prevent courts elsewhere from enforcing their own rules of professional responsibility. *Daynard*, 188 F. Supp. 2d at 123. Similarly, application of Massachusetts law will not prevent courts in other jurisdictions from analyzing and applying the relevant principles of contract enforcement or public policy considerations recognized in other states, if called upon to do so.

**B.      THE CHARGOIS ARRANGEMENT IS AN UNETHICAL PAYMENT FOR THE RECOMMENDATION OF A CLIENT UNDER RULE 7.2(b) UNLESS IT SATISFIES THE REQUIREMENTS OF RULE 1.5(e) AS A VALID DIVISION OF FEE AGREEMENT.**

*i.      RULE 7.2(b)*

Rule 7.2(b) forbids a lawyer to "give anything of value to a person for recommending the lawyer's services."[74]  Mass. R. Prof. C. 7.2(b). This was the language of Rule 7.2(b) in February 2011, when ATRS retained Labaton in this case, and it still is.[75] *See* Mass. R. Prof. C. 7.2(b) (last amended March 26, 2015). As explained below, "person" includes Chargois, who was paid for recommending Labaton to ATRS. In 2011 and today, an exception in Rule 7.2(b)(5), or its predecessor, Rule 7.2(c)(4), provides that a lawyer "may pay fees permitted by Rule 1.5(e)." If a payment is within the exception, it is removed from the prohibition in Rule 7.2(b). Until March 2011, Rule 1.5(e) provided:

> A division of a fee between lawyers who are not in the same firm may be made only if, after informing the client that a division of fees will be made, the client consents to the joint participation and the total fee is reasonable.

Mass. R. Prof. C. 1.5(e) (amended Dec. 22, 2010, eff. March 15, 2011).

In 2005, the Supreme Judicial Court remedied three defects that it identified in Rule 1.5(e). *Saggese v. Kelley*, 445 Mass. 434, 442-443 (2005). First: The rule did not have a writing requirement. Second: It did not say *who* should obtain client consent. Third: It did not say *when* the client must be notified of the fee division. *Id.*  The Court's opinion corrected these omissions by declaring how the rule "will be construed" thereafter. *Id.* at 443.

---

[74] Labaton and Chargois exchanged emails and two drafts but never finalized an agreement. *See* p. 36, *supra*.

[75] The version of Rule 7.2 in effect in 2011 differed slightly from current wording of the Rule. Rule 7.2(c), as it then appeared, contained substantially similar language to the current Rule 7.2(b), though the format of the rule changed. It read: "A lawyer shall not give anything of value to a person for recommending the lawyer's services, except that a lawyer may … (4) pay referral fees permitted by Rule 1.5(e)." *See* 7.2(c)(eff. 2011). Rule 7.2 was later amended to its current form on March 26, 2015, effective July 1, 2015.

These problems are avoidable in fee-sharing situations if the referring lawyer, who usually is in the best position to secure compliance with rule 1.5(e), is required to disclose the fee-sharing agreement to the client before the referral is made and secures the client's consent *in writing*. The rule will be construed to require this in fee-sharing agreements that are formed after the issuance of the rescript in this decision. Although the primary responsibility for compliance will fall on referring lawyers, lawyers to whom referrals are made are not absolved of all responsibility, and should confirm, before undertaking such representations, that there has been compliance with Rule 1.5(e).

*Id*. at 443 (emphasis in original). [76] A Westlaw search for

## "RULE 1.5(e)" AND FEES

in the database for the Massachusetts Supreme Judicial Court quickly brings up only *Saggese*

and one other case.

One or more Labaton experts opined that Rule 7.2(b) does not apply when the "person"

who is paid for recommending a client to a lawyer is a lawyer. Chargois is a lawyer. For two

reasons, this construction of the rule is wrong. Currently, Rule 7.2 or its comment uses the word

"nonlawyer" five times. If the drafters wished to limit the category of "person" to non-lawyers,

they would have used the word "nonlawyer," not "person."  (The Rules also use the terms

"nonlawyer" elsewhere. *See, e.g*., Rule 5.4 and its comment, which use the term "nonlawyer"

seven times.) Second, if the word "person" was intended to exclude lawyers, there would be no

need for the exception in Rule 7.2(b)(5) for fee agreements that divide fees between *lawyers*.

That exception makes sense only if "person" includes lawyers. Apart from this, if "person" did

not include lawyers, a lawyer could make the following offer to another lawyer: "I will pay you

---

[76] Effective March 15, 2011, the *Saggese* Court's writing requirement was added to Rule 1.5(e). Mass. R. Prof. C. 1.5(e) (current through Feb. 1, 2018). Rule 1.5(e) currently reads:

A division of a fee (including a referral fee) between lawyers who are not in the same firm may be made only if the client is notified before or at the time the client enters into a fee agreement for the matter that a division of fees will be made and consents to the joint participation in writing and the total fee is reasonable. This limitation does not prohibit payment to a former partner or associate pursuant to a separation or retirement agreement. *Id*.

$5000 for every client who retains me on your recommendation whether or not I eventually earn

a fee in the referred matter." Because that arrangement would not be *a division of fees* because

compensation would not depend on earning fees, it would not satisfy Rule 1.5(e) and violate

Rule 7.2(b).[77]

The *Daynard* Court, in distinguishing Daynard's fee, recognized that non-compliance

with the division of fee rule can mean that payment to a lawyer for a recommendation can violate

Rule 7.2(b): "[Attorney] Daynard is nothing like the plaintiffs in many cases who are denied

enforcement of their 'fee-splitting' contracts, which are in reality fee-referral contracts."

*Daynard,* 188 F. Supp. 2d at 131, citing *Holstein v. Grossman*, 616 N.E.2d 1224, 1229 (1993)

(holding that a "fee-sharing agreement which is primarily based on a client referral is

unenforceable as a matter of public policy where the undisputed facts show that the referred

client never consented in writing to the attorneys' arrangement"). This observation would have

been unnecessary if lawyers could receive fees for recommendations alone.

### ii.      BECAUSE LABATON DID NOT COMPLY WITH RULE 1.5(e), IT PAID CHARGOIS FOR RECOMMENDING A CLIENT IN VIOLATION OF RULE 7.2(b)(2)

Bringing the Chargois Arrangement within Rule 1.5(e), as it was written both at the time

and now, removes that Arrangement from the prohibition in Rule 7.2(b) against paying Chargois

for a recommendation. Labaton, however, did not tell ATRS (or George Hopkins) about

Chargois or get written (or any) consent. According to the statement of facts (p.43):

> Labaton's purported reason for not informing Hopkins of the Chargois
> Arrangement is because Hopkins "did not want to know." was a unilateral decision by
> Belfi, however, who concluded after meeting Hopkins that he would appreciate a more
> direct relationship. According to Belfi, the subject of Chargois "did not come up," and

---

[77] The Labaton experts who said that "person" does not include lawyers explained that Rule 7.2(b)(5) was "surplusage" or "redundant." This is wrong. If "person" does not include lawyers, then Rule 7.2(b)(5) *contradicts* Rule 7.2(b).

admittedly, Belfi did not want to bring another attorney not from Labaton into the case. (internal citations omitted).

In mitigation, Labaton cites a 2008 email from Christa Clark, ATRS's then-chief counsel, and language in the firm's February 2011 Retainer Agreement with ATRS. Labaton and some of its experts argue that these provisions mean either that Labaton fully complied with Rule 1.5(e) or that compliance was at worst "imperfect."

But neither the 2008 Clark email, nor the language in the Retainer Agreement, satisfies the requirements of Rule 1.5(e) as construed in *Saggese*.

The Clark email, informing Labaton that the Chargois' firm would *not* be "additional monitoring counsel," added this paragraph:

> If your firm is doing the monitoring and providing the financial backing for the cases, I think it is most appropriate that we add your firm independently to the list of approved firms. Your firm may affiliate that firm or use them as independent contractors, if you deem is [sic] appropriate on a case by case basis. There would be no requirement that you use them if it was not a necessary and appropriate expense of a case. I don't know how to best handle this point but the state procurement process is not conducive to a joint proposal. *See* p. 41, *supra*.

Labaton's retainer agreement with ATRS in this case provides:

> Arkansas Teacher agrees that Labaton Sucharow may allocate fees to other attorneys who serve as local or liaison counsel, as referral fees, or for other services performed in connection with the Litigation. The division of attorneys' fees with other counsel may be determined upon a percentage basis or upon time spent assisting with the prosecution of the Litigation. Any division of fees among counsel will be Labaton Sucharow's sole responsibility and will not increase the fees payable by Arkansas Teacher or the class upon a successful resolution of the Litigation. *See* pp. 44, *supra*.

For the following reasons, these provisions are inadequate to comply with the requirements of Rule 1.5 as revised by the Supreme Judicial Court in *Saggese*: (a) ATRS was not notified "before the referral is made" that Labaton's fee would be divided with Chargois; and (b) ATRS never consented to the fee division "in writing." *See Saggese*, 445 Mass. at 442-443. With

regard to (a), the sensible way to read "before the referral is made" is "before the client retains the referred lawyer." When the Supreme Judicial Court amended the rule in December 2010, effective March 15, 2011, it used the phrase "before or at the time the client enters into a fee agreement." The amended rule was available at the time of the ATRS retainer agreement in February 2011.

Rule 1.5(e), then and now, has as its object protection of the client. If Hopkins had been told about Chargois, he could have rejected the Chargois Arrangement, just as ATRS had earlier refused to list Chargois as "monitoring counsel." He could have asked for details of the financial arrangement. Labaton would have been required to tell him.[78] Hopkins could have asked what Chargois' contributions to the case were expected to be. He could have asked to know more about Chargois' qualifications and to meet him. He could have negotiated to have money slated for Chargois to go instead to the class. He could have asked for advice or consulted other counsel on the obligations of ATRS as the representative of a putative class. But Hopkins did not know about Chargois because Belfi decided that this information was not relevant to Hopkins' representation of the class.

### iii. LABATON'S OWN CONDUCT, OBJECTIVELY VIEWED, IS INCONSISTENT WITH THE CLAIM THAT THE CHARGOIS ARRANGEMENT WAS A VALID DIVISION OF FEE AGREEMENT

---

[78] The Comment to Rule 1.5(e), effective in February 2011, at the time expanded the disclosure obligation in the text of the rule itself. Whereas the plain language of 1.5(e) required notice to the client that "a division of fees will be made," the Comment required that, if the client asks, lawyers go further and disclose "the *share* of each lawyer." (Emphasis added.) The difference is between saying "we are dividing the fee," which the black letter rule required, and saying if asked, "I am going to get 70 percent and he is going to get 30 percent." More specifically, the Comment in February 2011 provided: "The Massachusetts rule does not require disclosure of the fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer." Mass. R. Prof. C. 1.5(e) cmt. [4A] (amended Dec. 22, 2010, eff. March 15, 2011.) Today, the same obligation to provide the greater detail on request appears in cmt. [7A] of Massachusetts Rule 1.5, which states: "Unlike ABA Model Rule 1.5(e), Paragraph (e) does not require that the division of fees be in proportion to the services performed by each lawyer or require the lawyer to assume joint responsibility for the representation in order to be entitled to a share of the fee. The Massachusetts rule does not require disclosure of the fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer." Mass. R. Prof. Cond. 1.5, cmt. [7A].

Whether a division of fee agreement complies with a jurisdiction's rule is an objective inquiry. It asks: Did counsel's conduct satisfy the rule's requirements?[79] Objectively viewed, Labaton's own conduct is, in the following ways, inconsistent with its current claim that it had a valid division of fee agreement with Chargois.

Although Labaton asked ATRS's permission to add Lieff and Thornton as counsel for ATRS, it did not inform Hopkins about Chargois. Instead, it blind copied Chargois on emails that included George Hopkins and forwarded to Chargois alone email exchanges with Hopkins.

Labaton did not disclose to the Thornton and Leiff Cabraser law firms, which were contributing to the payments to Chargois, the true nature of those payments when it appeared that those firms may have misunderstood Chargois' role. In an April 26, 2013, email on which Keller and Belfi of Labaton were copied, Garrett Bradley referred to Chargois as "the local counsel who assists Labaton in matters involving" ATRS. In a July 8, 2016, email from Garrett Bradley, on which Keller, Belfi, and Sucharow were copied, Chargois is referred to as "the local attorney in this matter who has played an important role." Each characterization of Chargois is false or misleading. Chargois was getting paid for a client recommendation only.[80] The Labaton lawyers who were recipients of the emails had knowledge of the terms of the Chargois Arrangement but

---

[79] Both *Saggese* and *Daynard* determined whether the purported agreement satisfied the conditions in Rule 1.5(e), the fee division rule in Massachusetts. *See Saggese*, 445 Mass. at 441; *Daynard*, 188 F. Supp. 2d at 123.

[80] Labaton and some of its experts say that Rule 7.2(b) is in any event inapplicable because Chargois only made an introduction, not a recommendation. That view would eviscerate the rule and allow lawyers and nonlawyers alike to get paid for "introductions" so long as they were careful not to use the word "recommend" or variants. It would allow the proverbial ambulance driver to get a reward every time he "introduced" an accident victim to a lawyer by handing out the lawyer's cards while avoiding the word "recommend." The facts I've been asked to assume say that "Chargois explained to Doane that *he was working with* a New York law firm that *specialized in institutional investors* and asked if Doane would meet with him, Belfi and Keller, and Doane agreed." *See* p. 35, *supra*. (Emphasis added.) That is a recommendation and would be understood as such.

did not correct Bradley's characterizations, as would have been expected if they believed that the Chargois Arrangement was a valid division of fee agreement.

If Labaton considered the Chargois Arrangement a true division of fee agreement, one would have expected it to finalize the agreement and adjust it to comply with the division of fee rules in each jurisdiction in which Labaton then or later represented ATRS. For example, both before and after it filed this action, Labaton represented ATRS in a total of four matters in courts in California, whose rule is set out below.[81] Labaton did not comply with that rule's provisions, which, among other things, require the client's written consent after "a full disclosure has been made in writing that a division of fees will be made and the terms of such division." Cal. R. Prof. C. 2-200(A)(1) (adopted Nov. 28 ,1988; eff. May 27, 1989).

By early 2009, after George Hopkins replaced Paul Doane as ATRS Executive Director, Labaton knew that it would not get the substantial, legal help from Chargois that it had apparently anticipated. Chargois had no relationship with Hopkins. As a result of this "unexpected turn of events," Labaton "believed that the fee sharing agreement had been based upon a condition that was not being satisfied." (Response by Labaton Sucharow LLP to Special

---

[81] California Rule of Professional Conduct 2-200 provides:

> (A) A member shall not divide a fee for legal services with a lawyer who is not a partner of, associate of, or shareholder with the member unless:
>
> > (1) The client has consented in writing thereto after a full disclosure has been made in writing that a division of fees will be made and the terms of such division; and
> >
> > (2) The total fee charged by all lawyers is not increased solely by reason of the provision for division of fees and is not unconscionable as that term is defined in rule 4-200.
>
> (B) Except as permitted in paragraph (A) of this rule or rule 2-300, a member shall not compensate, give, or promise anything of value to any lawyer for the purpose of recommending or securing employment of the member or the member's law firm by a client, or as a reward for having made a recommendation resulting in employment of the member or the member's law firm by a client….
>
> This rule was adopted November 28, 1988, and became effective May 27, 1989.

Master's September 7, 2017 Request for Supplemental Submission, pg. 2.) But Labaton continued to pay Chargois anyway, "fearing that [Chargois] would otherwise sue the Firm in state court in Texas, an event that could have an extremely adverse impact on a firm that works extensively with public pension and retirement plans." *Id.*[82] That motive may have served the firm's own interests at the time, as it appears to have viewed them, but it is inconsistent with a claim that the Chargois Arrangement was a *valid* division of fee agreement in the various states in which the firm represented ATRS. Labaton's interests, furthermore, would be contrary to the interests of its clients because Chargois would get paid out of settlement funds the Court might award even though Labaton believed "a condition" of the agreement "was not being satisfied."

### iv.   *COURT OPINIONS IN DISPUTES BETWEEN LAWYERS DO NOT RENDER THE CHARGOIS ARRANGEMENT A VALID DIVISION OF FEE AGREEMENT*

On occasion, a lawyer will seek to deny another lawyer his or her promised fee, citing a failure to tell the client about the agreement or to put it in writing (or both), as a jurisdiction's rule required. On one hand, the agreement does not comply with the rule. On the other hand, refusing to enforce a purported fee-sharing agreement would let one lawyer keep the entire fee even where he or she was equally culpable of the violation.

*Saggese v. Kelley, supra,* enforced an oral agreement between a referring and referred lawyers where the client, who was *not* a fiduciary, later ratified the agreement. 434 Mass at 442. The Court wrote that the referred lawyers could not rely on the failure to comply with the rule "to absolve them of their contractual obligation." *Id*. at 441. But the Court "emphasize[d] that although failure to comply with the rule may not necessarily render a contract unenforceable

---

[82] The Labaton Response further states at page 10: "Labaton Sucharow was justifiably concerned that litigation over a fee dispute would be harmful to its reputation and to its relationship with ATRS, and also concerned that, as Chargois threatened, a Texas state court would rule in Chargois & Herron's favor."

*between lawyers*, it may subject both lawyers to disciplinary action upon division of a fee." *Id*. at 443 (emphasis added).

In a division of fee case in federal court in Massachusetts, a law firm of record refused to pay a lawyer for work it had allegedly retained him to do in exchange for an oral promise of five percent of any recovery. *Daynard*, 188 F. Supp. 2d at 117. The firm in that case argued noncompliance with the Rule 1.5(e), governing division of fees, excused it from performing under the contract. *Id*. at 118. The court held that the oral promise was enforceable, citing the lawyer's "valuable" work across more than a decade, the fact that his work appeared "proportional to the alleged contract amount," and the fact that the lawyer's work on the matter was not concealed. *Id*. at 131.

These two cases respond to the equities between lawyers when a division of fee rule is violated and one of the lawyers wants to keep the entire fee. In *Saggese,* an individual client (not a class representative) ratified the agreement and was not harmed. *See* 434 Mass. at 444. In *Daynard,* the clients were states acting through their attorneys general, some of whom did know of Daynard's work and did not object. 188 F. Supp. 2d at 129. Furthermore, Daynard worked on the matters over the course of a decade. *Id*. at 131. There was no "taking advantage of uninformed clients." *Id*. at 131. The Court said that refusal to enforce the agreement would "smack of injustice." *Id*. at 132.

The validity of the $4.1 million payment to Chargois does not arise in a fee dispute between Chargois and Labaton. This is not a case where a referred lawyer, equally to blame, cites the rule in order to keep the entire fee for himself. This is not a case where a law firm, which (and whose clients) benefitted for a decade from the work of an unaffiliated lawyer, now

seeks to renege on its promise. Labaton's duties were owed to ATRS, to the class ATRS

purported to represent -- and after certification did represent -- as a fiduciary, and to the Court.

### v.       LABATON'S POSITION

In argument and expert testimony, Labaton has advanced the position that an "imperfect"

effort to comply with Rule 1.5(e) should not default to the prohibition against paying for

recommendations under Rule 7.2(b), and that its compliance with the rule was either perfect or at

worst imperfect. In support of the position that it fully or imperfectly complied with Rule 1.5(e),

Labaton or its experts cite (i) the Christa Clark 2008 email appointing Labaton as "additional

monitoring counsel" and adding that it "may affiliate [Chargois & Herron] or use them as

independent contractors, if you deem [it] appropriate on a case by case basis;" (ii) the language

in the 2011 Retainer Agreement with ATRS giving Labaton permission to "allocate fees to other

attorneys who serve as local or liaison counsel, as referral fees, or for other services performed in

connection with the Litigation;" and (iii) Belfi's perception at the time ATRS retained Labaton in

this case that George Hopkins had no interest in knowing how fees would be divided among

counsel. Years later, Hopkins confirmed the accuracy of Belfi's perception when, in the course

of the Special Master's investigation, he learned of the Chargois Arrangement for the first time.

*See* pp. 41-44, *supra.*

### vi.      FURTHER ANALYSIS AND CONCLUSION

Labaton failed to comply with Rule 1.5(e). The fact that the Supreme Judicial Court has

enforced a non-compliant division of fee agreement in a contest between referring and referred

lawyers, each of whom was responsible for the violation, did not, as the Court wrote, make the

agreement immune to discipline. "We emphasize that although failure to comply with the rule

may not necessarily render a contract unenforceable between lawyers, it may subject both lawyers to disciplinary action upon division of a fee." *Saggese,* 445 Mass. at 706.

Labaton did not *forget* to disclose the Chargois Arrangement to George Hopkins. It chose not to do so because Belfi testified that he *chose* not to share the information with Hopkins, and he inferred that Hopkins did not want to know how the class lawyers were dividing fees. In a March 2018 Declaration, Hopkins wrote that he had told Belfi "I do not want to know the specifics of fee allocations between Labaton and other attorneys." Hopkins 3/15/18 Declaration, ¶¶ 10, 14.[83]

This explanation is inadequate. There is a difference between not wishing to know "the specifics of fee allocations," as Hopkins says he said, and not wishing to know *who* was sharing in the fee. Labaton asked Hopkins for permission to add Lieff and Thornton to the representation of ATRS. It could have done the same for Chargois & Herron without violating Hopkins' desire to remain uninformed of the "specifics" of any fee division. Indeed, Rule 1.5(e) at the time (and still) *did not require* Labaton to tell Hopkins "the specifics" unless he asked. The rule required only that Labaton "disclose the fee-sharing agreement to the client before the referral is made and secur[e] the client's consent in writing*." Saggese* at 443. Labaton could have complied with the rule *and* have honored Hopkins' "express" and "clear instructions." *Id.* at ¶¶14, 16.[84]

## C.  THE CHARGOIS ARRANGEMENT SHOULD HAVE BEEN DISCLOSED TO THE COURT.

---

[83] In his Declaration, Hopkins wrote that he was "ratifying Labaton's fee-sharing agreement with Chargois & Herron." *Id.* at ¶17. Hopkins does not say if he was ratifying it only on behalf of ATRS or whether he was purporting to do so for the entire class.

[84] It bears mention that Hopkins was not Labaton's client. ATRS was the client. "A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents." Rule 1.13(a). Nor was ATRS an individual client. It purported to be, and then became, a class representative, taking on fiduciary duties (and therefore potential liability) to the certified class. The Chargois fee would be paid not by Hopkins or even ATRS, but from the class's recovery. *See* C(v), *infra.*

**i.     *DISCLOSURE TO THE COURT WAS REQUIRED UNDER THE MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT AND FEDERAL LAW***

The obligation of Customer Class Counsel to have informed the Court of the Chargois Arrangement arises under federal case law as well as the Massachusetts Rules of Professional Conduct. *See*, *e.g.*, *Rodriguez v. Disner*, 688 F.3d 645, 654 (9th Cir. 2012) ("Although the application of the common fund doctrine is a matter of federal courts' equitable powers, we have frequently looked to state law for guidance in determining when an ethical violation affects an attorney's entitlement to fees.") (citation omitted). Here, both federal and state sources apply. Labaton and several experts rely on Fed. R. Civ. P. 23(h)(1) and 54(d)(2) to support their contention that, unless the Court asked, there was no duty to inform the Court of the Chargois Arrangement. (Labaton Response, pp 19-23; Rubenstein 4/9/18 Dep., p. 74: 9-12; Sarrouf 3/24/18 Dep., 270: 22- 271: 2. Labaton attorney Chris Keller stated during the negotiations that, whatever the fee allocation amongst Customer Class Counsel might be, the court need not be informed. TLF-SST-052209 (8/28/15 email correspondence between Bradley and Keller, 'cc Sucharow) ("We should talk this through. The court absolutely need not understand what the allocation of fees is amongst counsel so that should not be included in any document to be filed with the court…") [EX. 51].

While there may not have been a duty under Rules 23 and 54 to disclose the division of fees among those lawyers *whom the Court knew about*, and so could inquire, the Court could not be expected to ask counsel about a division of fees with Chargois, a lawyer who had not appeared in the case and whom it did not know about. Labaton's construction of its obligation under Rule 54(d)(2) would impose on the Court the affirmative responsibility to ask: "Is anyone else getting any portion of the attorney's fees you are asking me to award whose existence you

have not revealed?" As discussed below, the Court had no such responsibility. I do not rely on Rules 23 and 54 for my opinion.

The Court itself dispelled any uncertainty about what it expected. Just before approving Lead Counsel's fee request in full, the Court said: "I'm relying heavily on the submissions and what's been said today." 11/2/16 Hearing. Tr., p. 35:4-5. Chargois was not mentioned. But Mr. Goldsmith did not know about the Chargois Arrangement and the lawyers who did know about it were not in Court.[85]

Earlier in the proceeding, the Court said: "Is there anything you feel I didn't say that I should have?" and asked to be reminded "of the terms of allocation." Mr. Goldsmith replied, "I didn't want there to be something that was left that Your Honor wanted to hear." He then described the allocation among the members of the class. *Id.* at 21 *et seq.* In my deposition, it was pointed out that this particular colloquy related only to the allocation among class members, not to the fee request, which the Court turned to next. ("So now with regard to requests for attorneys' fees." *Id.* at 22.) The implication seems to be that there was, therefore, no failure to inform the Court of the Chargois Arrangement after the Court spoke. This reading would have merit if there were then no discussion of fees.  But the Court's statement does express the Court's reliance on information from counsel. That reliance was underscored when shortly thereafter the colloquy *did turn to fees*. "I'm relying heavily on the submissions and what's been said today," the Court said directly before finding that the "requests for attorneys' fees of $74, 541, 250 is reasonable." *Id.* at 35.

---

[85] The Rules partly mitigate the risks associated with compartmentalization of functions within a firm by imposing certain managerial responsibilities on partners and others. Rule 5.1(a) provides: "A partner in a law firm, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm, shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that all lawyers in the firm conform to the Rules of Professional Conduct." Further reducing the risk attendant on compartmentalization, Rule 8.4 provides: "It is professional misconduct for a lawyer to… (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another."

### ii.   FEDERAL CASE LAW CONTRADICTS LABATON'S NARROW VIEW OF ITS DISCLOSURE OBLIGATIONS TO THE COURT

Case law, including cases from the District of Massachusetts, amply supports recognition of the Court's fiduciary responsibility to protect the class and the Court's reliance on counsel to be forthcoming with the information the Court needs in order to do so. Private agreements among counsel do not bind the Court, which can ignore them if they reward those who did little or nothing to serve the class. Nor is the Court bound to honor the retainer agreement between counsel and the named class members. The cases that follow reflect the expansive language that District and Circuit Courts use to describe class counsel's duties to the Court and the Court's duties to the class.

*In re Volkswagen and Audi Warranty Extension Litigation*, 89 F.Supp.3d 155, 183 (D. Mass. 2015):

> While fee sharing agreements among counsel may be respected or treated as presumptively reasonable in a district court's allocation of attorneys' fees, persuasive authority convinces this Court that it is not bound blindly to follow such private arrangements. *See, e.g., In re FPI/Agretech Sec. Litig.,* 105 F.3d 469, 473 (9th Cir.1997) ("[A] court may reject a fee allocation agreement where it finds that the agreement rewards an attorney in disproportion to the benefits that attorney conferred upon the class—even if the allocation in fact has no impact on the class."); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d 216, 223 (2d Cir.1987) (rejecting authority that "allows counsel to divide the award among themselves in *any* manner they deem satisfactory under a private fee sharing agreement"). *Cf. In re Cendant Corp. Litig.,* 264 F.3d 201, 282–83 (3rd Cir.2001) (holding that although retainer agreements in class actions enjoy a presumption of reasonableness at the fee award stage, the presumption may "be abrogated entirely were the court to find that the assumptions underlying the original retainer agreement had been materially altered by" unforeseeable developments). More important than the terms of a private agreement are the actual contributions each firm made to the prosecution of this case and the interests of the plaintiff class.

*In re Relafen Antitrust Litigation*, 231 F.R.D. 52, 71 (D. Mass. 2005):

As this Court recently noted, "[b]oth the United States Supreme Court and the Courts of Appeals have repeatedly emphasized the important duties and responsibilities that devolve upon a district court pursuant to Rule 23(e) prior to final adjudication and settlement of a class action suit." *In re Relafen Antitrust Litig.,* 360 F.Supp.2d 166, 192 (D.Mass.2005) (citations omitted). Although settlement is often a more favorable result than litigation, "the court has a fiduciary duty to absent members of the class in light of the potential for conflicts of interest among class representatives and class counsel and the absent members." *In re Lupron*, 228 F.R.D. at 94 (citing *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods.,* 55 F.3d 768, 805 (3d Cir.1995) ("Rule 23(e) imposes on the trial judge the duty of protecting absentees, which is executed by the court's assuring the settlement represents adequate compensation for the release of the class claims."))…. *Reynolds v. Beneficial Nat'l Bank,* 288 F.3d 277, 279–80 (7th Cir.2002) (Posner, J.) (noting the concern that a lawyer's self interest may trump the interests of the class members "requires district judges to exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions. We and other courts have gone so far as to term the district judge in the settlement phase of a class action suit a fiduciary of the class, who is subject therefore to the high duty of care that the law requires of fiduciaries.")

*In re "Agent Orange" Product Liability Litigation*, 818 F.2d 216, 223 (2nd Cir. 1987):

There is authority for a court, under certain circumstances, to award a lump sum fee to class counsel in an equitable fund action under the lodestar approach and then to permit counsel to divide this lodestar-based fee among themselves under the terms of a private fee sharing agreement. *…* We *reject* this authority, however, to the extent it allows counsel to divide the award among themselves in *any* manner they deem satisfactory under a private fee sharing agreement. Such a division overlooks the district court's role as protector of class interests under Fed. R. Civ. P. 23(e) and its role of assuring reasonableness in the awarding of fees in equitable fund cases. *… cf. Jones v. Amalgamated Warbasse Houses, Inc.,* 721 F.2d 881, 884 (2d Cir.1983) ("if the court finds good reason to do so, it may reject an agreement as to attorneys' fees just as it may reject an agreement as to the substantive claims"), *cert. denied,* 466 U.S. 944, 104 S. Ct. 1929, 80 L.Ed.2d 474 (1984). *In addition, this approach overlooks the class attorneys' "duty … to be sure that the court, in passing on [the] fee application, has all the facts" as well as their "fiduciary duty to the … class not to overreach." Lewis v. Teleprompter Corp.,* 88 F.R.D. 11, 18 (S.D.N.Y.1980). [Emphasis added.]

The *Agent Orange* Court then added (818 F.2d at 226):

We do agree with the district court's ruling that in all future class actions counsel must inform the court of the existence of a fee sharing agreement at the

time it is formulated. This holding may well diminish many of the dangers posed to the rights of the class. Only by reviewing the agreement prospectively will the district courts be able to prevent potential conflicts from arising, either by disapproving improper agreements or by reshaping them with the assistance of counsel to conform more closely with the principles of *Grinnell I* and *Grinnell II.* In the present case, however, where the district court was not made aware of the agreement, and the potential for a conflict of interest arising was substantial, *the adoption of a rule for future cases in no way alleviates the fatal flaws of this agreement and does not offset the need for its invalidation.* [Emphasis added].

*In re FPI Agretech Securities Litigation*, 105 F.3d 469, 474 (9th Cir. 1997):[86]

We reject Chuck's [counsel's] proposed rule that a district court may decline to approve a fee allocation only if it is contrary to the interests of the class or in violation of rules of professional conduct. Instead, we hold that the relative efforts of, and benefits conferred upon the class by, co-counsel are proper bases for refusing to approve a fee allocation proposal….

Chuck next argues that the district court should have treated the fee allocation proposal as an enforceable contract. However, the cases on which Chuck relies are inapposite. Neither case involved attorneys' fees in a class action, and such fees derive from principles of equity, not contract. More importantly, both cases involved formal fee agreements, whereas here the parties merely submitted orally a fee allocation proposal, arrived at, figuratively speaking, "on the courthouse steps," for the court's approval. We decline to curb the district courts' broad discretion in exercising their equitable power to award attorneys' fees in common fund class actions by requiring that fee allocation proposal be treated as enforceable contracts. [Internal citations omitted.]

*Lewis v. Teleprompter Corp.,* 88 F.R.D. 11, 18 (S.D.N.Y. 1980), which *Agent Orange* cited:

Wolf Popper has argued that it should be a matter of indifference to the court how the pie is sliced, if the fee requested is on its face a reasonable one, and if the results accomplished warrant its award. It suggests that it is routine for the court simply to fix the amount of the fee, and then to leave it to the various plaintiffs' attorneys involved to decide for themselves how the fee is to be allocated that, in fact, it is a service to the court not to burden it with the nuts and bolts of determining distribution. While I appreciate Wolf Popper's solicitude, I reject its argument. Wolf Popper has overlooked two important obligations which are part and parcel of its role as plaintiffs' counsel: the duty of its members and associates as officers of the court to be sure that the court, in passing on its fee application, has all the facts; and its fiduciary duty to the shareholder class not to overreach.

---

[86] Lieff was co-lead counsel in this case and participated in the dispute over allocation of legal fees.

Federal case law also recognizes the special danger of conflicts between a lawyer and her client at the fee-determination stage in common fund cases. The economic interests of the two are then directly adverse because the greater the fee to the lawyer, the less will be the recovery to the class. *See, e.g., In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 307 (3rd Cir. 2005):

> The determination of attorneys' fees in class action settlements is fraught with the potential for a conflict of interest between the class and class counsel. *See* [*In re Cendant Corp. Litig.*, 264 F.3d 201, 254-255 (3rd Cir. 2001) (explaining that because clients seek to maximize recovery and lawyers seek to maximize fees, "there is often a conflict between the economic interests of clients and their lawyers, and this fact creates reason to fear that class counsel will be highly imperfect agents for the class"); [*In re Cendant PRIDE*, 243 F.3d 722, 730 (3d Cir. 2001) (discussing "the danger inherent in the relationship among the class, class counsel, and defendants" and recognizing "an especially acute need for close judicial scrutiny of fee arrangements in class action settlements") (internal quotations omitted); Fed. R. Civ. P. 23(h), 2003 Advisory Committee Notes ("Active judicial involvement in measuring fee awards is singularly important to the proper operation of the class-action process.").

In argument and testimony, Labaton has questioned the applicability of the disclosure directive in *Agent Orange* and *Lewis v. Teleprompter*. These are cases from the Second Circuit, not the First Circuit. I agree that they do not *obligate* lawyers appearing in a Court in the First Circuit.[87] They are, however, instructive on counsel's duties, especially when coupled with the requirements of Massachusetts Rule of Professional Conduct 3.3 and its comment, next discussed. The *Volkswagen* case, *supra,* from the District of Massachusetts, cites to one of the pages of *Agent Orange* in which the Second Circuit emphasized counsel's disclosure duties. A lawyer conscientiously researching those duties in this District would find *Volkswagen* and its citation to *Agent Orange.* The question for any lawyer in light of these authorities would then be

---

[87] I also agree that the particular fee agreement in *Agent Orange* created potential conflicts that the Chargois Arrangement did not.   "Because we find that the agreement before us violates established principles governing awards of attorneys' fees in equitable fund class actions and creates a strong possibility of a conflict of interest between class counsel and those they were charged to represent, we reverse the district court's approval of the agreement. Accordingly, the fees originally allocated by the district court, based on the reasonable value of services actually rendered, will be distributed to the members of the PMC." *Agent Orange*, 818 F.2d at 218.

"how do I understand my duty of candor to the Court with regard to the disclosure of the

Chargois Arrangement?"

Labaton, at my deposition and in its advocacy, seems to challenge the continued vitality

of the holding in *Agent Orange* in light of subsequent events within the Second Circuit. I

disagree with any such challenge. First, it should be clear that the Second Circuit's requirement

of disclosure did not depend on whether a local rule then required disclosure of the terms of the

particular side agreement in *Agent Orange*. The Second Circuit held more broadly that an

approach that allows counsel to decide how to divide fees "overlooks the class attorneys' 'duty ...

to be sure that the court, in passing on [the] fee application, has all the facts' as well as their

'fiduciary duty to the ... class not to overreach.' *Lewis v. Teleprompter Corp.,* 88 F.R.D. 11, 18

(S.D.N.Y.1980)."

Second, nothing in the subsequent history Labaton cites disturbed the holding in *Agent

Orange.* That history is explained in the notes of the Second Circuit's Rules Committee:

> The Committee in 2011 recommended that prior Local Rule 23.1 regarding class actions be deleted as unnecessary. The Second Circuit's recent decision in *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 137 n.2 (2d Cir. 2016), stated that the prior Local Rule is not redundant with Fed R. Civ. P. 23(h) regarding fee sharing arrangements. The Committee therefore recommends reinstating Local Rule 23.1 and combining it with Local Rule 23.1.1 to cover both class actions and derivative actions. Local Rules for Eastern & Southern Districts of New York., Local Civ. R. 23.1 [2016 Cmt.].

> The *Bernstein* footnote cited by the Committee, and spurring it to reinstate a rule, said:

> Formerly, the local civil rules of the Southern District of New York required that all fee applicants in derivative and class actions disclose to the court "any fee sharing agreements with anyone." By a rule amendment effective July 11, 2011—three weeks before BLB & G submitted its fee petition—the automatic-disclosure provision was repealed as to class actions. *See* S.D.N.Y. Local Civil Rule 23.1 (repealed effective July 11, 2011); S.D.N.Y. Local Civil Rule 23.1.1. According to the Joint Committee on Local Rules note, the committee recommended that the automatic-disclosure rule as applied to class

actions be deleted "because it is redundant [with] ... Fed.R.Civ.P. 23(h)." Federal
Rule 23(h), in turn, does not mandate automatic disclosure of all fee-sharing
arrangements in class actions. *Bernstein v. Bernstein Litowitz Berger &
Grossman LLP*, 814 F.3d 132, 137 n.2 (2d Cir. 2016).

In other words, in 2016, after *Bernstein*, the Committee undid its 2011 deletion of a local

rule for disclosure of fee recipients in class actions. It did this because, contrary to what the

Committee had initially articulated, the rule was not redundant of Rule 23(h). None of this back-

and-forth affects the holdings cited in *Agent Orange* and *Lewis*. The new local rule may now

obviate the need for the *Agent Orange* disclosure instruction, but it does not, and of course could

not, "overrule" it.

### iii.   THE MASSACHUSETTS RULES OF PROFESSIONAL CONDUCT REQUIRED DISCLOSURE OF THE CHARGOIS ARRANGEMENT TO THE COURT BY THOSE WHO KNEW ITS TERMS

On September 15, 2016, Lawrence Sucharow submitted a Declaration to the Court "in

support of," among other things, "an award of attorneys' fees." Dkt. # 104-1. The Sucharow

Declaration appended nine individual fee declarations from nine law firms. At the same time, the

Sucharow Declaration was also posted on the website for the class, where it would be available

to class members. *See* p. 24, *supra*. The Notice of Pendency, sent to them in August, directed

class members to this site, and in particular, this document. The filing also identified $1.257

million in expenses and $85,000 in service awards. The payment to Chargois is not included in

this filing.

Rule 3.3(a)(1) provides: "A lawyer shall not knowingly make a false statement of fact or

law to a tribunal or fail to correct a false statement of material fact or law previously made to the

tribunal by the lawyer." Mass. R. Prof. C. 3.3(a)(1) (amended March 26, 2015, eff. July 1, 2015).

Rule 3.3(a)(3) provides in part that a lawyer "shall not knowingly offer evidence that the lawyer

knows to be false  except as provided in Rule 3.3(e)," whose subject is criminal cases. Rule

8.4(c) provides: "It is professional misconduct for a lawyer to engage in conduct involving

dishonesty, fraud, deceit or misrepresentation." Mass. R. Prof. C. 8.4(c) (amended March 26,

2015, eff. July 1, 2015).

A true statement can violate these rules through omission. Rule 3.3, cmt. [3] ("There are

circumstances where failure to make a disclosure is the equivalent of an affirmative

misrepresentation."); *In re O'Toole*, 2015 WL 9309021, at *5 (Mass. St. Bar. Disp. Bd. 2015)

("'[H]alf-truths may be as actionable as whole lies.'… Statements that are 'technically accurate'

or 'literally true,' but that nevertheless are 'clearly intended to mislead' or 'beg[ ] [a] false

inference' amount, in appropriate cases, to false statements within the meaning of" Rules

3.3(a)(1) and 4.1(a)). In *In the Matter of An Attorney*, 2007 WL 4284758, at *4 (Mass. St. Bar

Disp. Bd. 2007), the Board wrote:

> It is not a defense to these charges that the individual statements made in the letter could be read as literally true. Literal truth may be a defense to a criminal charge of perjury. *Compare Bronston v. United States*, 409 U.S. 353 (1973) with *United States v. DeZarn*, 157 F.3d 1042 (6th Cir. 1998). But Rule 8.4(c) "prohibits more than outright perjury. Attorneys may not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation ...." *Matter of Dittami*, 12 Mass. Att'y Disc. R. 98, 112 (1996) (applying predecessor to Rule 8.4(c)). *See also Matter of Moore*, 442 Mass. 285, 292 n. 10, 20 Mass. Att'y Disc. R. 400, 408 n.10 (2004); *Matter of Harlow*, 20 Mass. Att'y Disc. R. 212, 216-218 (2004) (misleading partial disclosure violated 8.4(c)).

The same principles abide in the commercial world.[88]

---

[88]  Section 551 of the Restatement of Torts (Second) provides:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.
(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated…

(b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading…

The Chargois Arrangement should have been identified in the fee petition in order to comply with Rule 3.3(a). That information was highly relevant to the Court's exercise of its fiduciary duty to protect the class because (i) the Court could otherwise reasonably have assumed that the lawyers who would participate in the fee were solely the lawyers whose lodestars were included in the petition; (ii) the request for expenses and incentive payments, which are not part of the lodestar, would support the inference that all beneficiaries were included; (iii) the size of the Chargois fee could reasonably have influenced the Court to direct that his fee go instead to the class recovery; (iv) especially is this so because the payment was solely in exchange for a recommendation some nine years earlier; (v) the Court could find that the class had no interest in paying Chargois for his service to Labaton; and (vi) the Court could reasonably, though incorrectly, have assumed that if there were a problem with the fee request, the class representative would have raised it, unaware that ATRS also did not know about Chargois.

Supporting this view of the relevance of the Chargois Arrangement is the fact that an experienced class action lawyer, Bob Lieff, testified that had he known that Chargois had done no work on the case, he would not have agreed to the allocation of part of his firm's fee award to Chargois.[89]

My opinion rests on the extraordinary nature of Chargois' compensation, both in amount and the basis for it – a recommendation made years earlier. Nondisclosure meant that no one who might have questioned the propriety of the Chargois Arrangement – not the class

---

Section 551(2) has been followed in Massachusetts. *See, e.g., Nota Constr. Corp. v. Keyes Assoc.*, 45 Mass. App. Ct. 15, 18 (1998).

[89] Bob Lieff testified that he thought Chargois was local counsel for Labaton dealing with the client in Arkansas. *See* Lieff 9/11/17 Dep., p. 67:9-13 ("I thought he was local counsel for Labaton in this particular case I assumed dealing with the Arkansas fund because that's what local counsel will do. That was my understanding.")  He further testified that had he known that Chargois had done no work on the case, he would not have agreed to the allocation of part of his firm's fee award to Chargois.  Lieff 9/11/17 Dep., p. 97:13-16.

representative, not the class members, not the Court – knew about it and so were unable to do so. It is not necessary to conclude that class counsel must inform the Court, or the class, of every lawyer who seeks a fee in a matter for the work he or she performed. Those are not the facts before the Court.

### Comment 14A and Rule 3.3(d)

My opinion is further supported by Comment 14A to Rule 3.3, which provides:

> When adversaries present a joint petition to a tribunal, such as a joint petition to approve the settlement of a class action suit or the settlement of a suit involving a minor, the proceeding loses its adversarial character and in some respects takes on the form of an *ex parte* proceeding. The lawyers presenting such a joint petition thus have the same duties of candor to the tribunal as lawyers in *ex parte* proceedings and should be guided by Rule 3.3(d).

Rule 3.3(d) is discussed below.

So far as I can tell, Massachusetts is the only American jurisdiction with the text of Comment 14A. The comment recognizes that when there is no adverse party, the Court is denied the benefit of an adversary proceeding. There is, then, no opponent who can bring to the Court's attention facts or legal authorities that challenge the contentions or citations of the lawyer appearing before the court. In argument and through its experts, Labaton contends that Comment 14A does not literally apply here because the fee petition was not presented by "adversaries." It was presented by a single former adversary. The other former adversary, State Street, did not jointly present the fee petition because it had no interest in the fees the Court might award. Although it remained no less true that the "proceeding" on the fee petition lost "its adversarial character in some respects," it is argued that Comment 14A is inapplicable by its terms. This way of reading a rule *might* be defensible, if rather precise, in a commercial negotiation, but it is a crabbed view if looked at from the perspective of a lawyer's duty of candor to the Court, and to my mind wrong given the obvious policy that informs the Comment. The traditional precepts of

the adversary system do not apply in the same way when lawyers talk to a judge as when they talk to each other.

Moreover, this is *not* a situation where disclosure to the Court would have harmed a client or waived a privilege. If it were, a lawyer might sometimes be able credibly to resolve real doubts in favor of the client. But here disclosure could only *benefit* the client, the class, by giving the Court, which is charged to protect class members, the opportunity to consider the effect of the Chargois Arrangement. Indeed, it is hard to understand what countervailing interests could have justified nondisclosure. To whom did Labaton owe a competing duty not to disclose?

### Candor to the Court

In arguing that Rules 23 and 54 were the sole sources of its duty to the Court, that the Second Circuit precedent is not binding in the First Circuit, and that Comment 14A does not literally apply, Labaton subordinates any duty its lawyers may have had as officers of the Court.

I appreciate, as Labaton has argued, that the phrase "candor to the Court" is not an unbounded source of duty, entirely untethered to rules, custom, or case law. But the word "candor" should at least guide a lawyer's understanding of his or her duties as an officer of the court. One question presented in *Pearson v. First NH Mortgage Corp.*, 200 F.3d 30, 38 (1st Cir. 1999), was whether a law firm had concealed its conflict of interest from the Bankruptcy Court. Citing case law and Bankruptcy Rules, the Court found that it had. But the Court also identified a broader duty of candor to the Court:

> Here, Attorney Gannon made an affirmative misrepresentation to the court, which did not comport with his duty of candor. *See*, *e.g.,*NHRPC 3.3(a)(1), comment ("There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."); *In re Tri–Cran,* 98 B.R. at 616 (" 'Since attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court.' ") (citation omitted); *cf. Burns v. Windsor Ins. Co.,* 31 F.3d 1092, 1095 (11th Cir.1994) ("Every lawyer is an officer of the

court ... [and] he always has a duty of candor to the tribunal;" *United States v. Shaffer Equip. Co.,* 11 F.3d 450, 457 (4th Cir.1993) ("[A] general duty of candor to the court exists in connection with an attorney's role as an officer of the court."); *cf. also Erickson v. Newmar Corp.,* 87 F.3d 298, 303 (9th Cir.1996) ("[I]t is th[e] court which is authorized to supervise the conduct of the members of its bar ... [and has] a responsibility to maintain public confidence in the legal profession.").

*Pearson* cites the Fourth Circuit's influential decision in *Shaffer Equipment* to recognize a "general duty of candor to the court." *Schaffer Equipment* was an environmental civil case, in which the government failed to disclose false testimony at the deposition of its expert witness and then moved for summary judgment without relying on his opinion. The government claimed that it had not violated the terms of West Virginia's then-counterpart to Rule 3.3, which governed. The District Court dismissed the government's case because of its nondisclosure, citing both West Virginia Rule 3.3 and the duty of candor to the Court. The government appealed. On the page of its opinion cited by *Pearson,* the Fourth Circuit wrote that the professional conduct rules are not the sole source of a lawyer's duty of candor.

It appears that the district court, in finding that the government's attorneys violated a duty of candor to the court, applied the general duty of candor imposed on all attorneys as officers of the court, as well as the duty of candor defined by Rule 3.3. Although the court referred to Rule 3.3, it also described the duty of candor more broadly as that duty attendant to the attorney's role as an officer of the court with a "continuing duty to inform the Court of any development which may conceivably affect the outcome of litigation." It concluded, "Thus, attorneys are expected to bring directly before the Court all those conditions and circumstances which are relevant in a given case."  In its brief, the government did not address the existence, nature, and scope of any general duty of candor and whether its attorneys violated that duty. Nevertheless, we are confident that a general duty of candor to the court exists in connection with an attorney's role as an officer of the court.

Our adversary system for the resolution of disputes rests on the unshakable foundation that truth is the object of the system's process which is designed for the purpose of dispensing justice. However, because no one has an exclusive insight into truth, the process depends on the adversarial presentation of evidence, precedent and custom, and argument to reasoned conclusions—all directed with unwavering effort to what, in good faith, is believed to be true on

matters material to the disposition. Even the slightest accommodation of deceit or a lack of candor in any material respect quickly erodes the validity of the process. As soon as the process falters in that respect, the people are then justified in abandoning support for the system in favor of one where honesty is preeminent. (Internal citations omitted.)[90]

These cases establish that lawyers have a duty of candor to the court that goes beyond the text of Rule 3.3.  So does *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 959 (9th Cir. 2009), where an incentive "arrangement was not disclosed when it should have been and where it was plainly relevant, at the class certification stage." The "arrangement" there was between class counsel and class representatives and created a conflict between their interests and the interest of the class. The trial Court had "observed that the parties' failure to disclose their agreement to the court, and to the class, violated the contracting representatives' *fiduciary duties to the class and duty of candor to the court*." (Emphasis added.) The Ninth Circuit wrote: "We agree." True, the Chargois Arrangement did not create a client-client conflict, as did the arrangement in *Rodriquez.* But *Rodriguez* is relevant here because it holds that withholding "plainly relevant" information from the class and the Court can violate the fiduciary duty to the former and the requirement of candor to the latter.

Apart from Comment 14A and a lawyer's duty of candor as an officer of the court, Rule 3.3(d) explicitly required disclosure of the Chargois Arrangement to the Court. Rule 3.3(d) provides:

> In an *ex parte* proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse.  Mass. R. Prof. C. 3.3(d).

---

[90] Further distinguishing duties under [West Virginia's] Rule 3.3 from the duty of candor, the *Shaffer Equipment* Court wrote:  "While Rule 3.3 articulates the duty of candor to the tribunal as a necessary protection of the decision-making process, and Rule 3.4 articulates an analogous duty to opposing lawyers, neither these rules nor the entire Code of Professional Responsibility displaces the broader general duty of candor and good faith required to protect the integrity of the entire judicial process (internal citation omitted)." *Shaffer Equipment*, 11 F.3d at 458.

Labaton relies on Comment 14 as an aide to interpreting Rule 3.3(d). I rely on it, too, but I think it cuts the other way. That Comment provides:

> Ordinarily, an advocate has the limited responsibility of presenting one side of the matters that a tribunal should consider in reaching a decision; the conflicting position is expected to be presented by the opposing party. However, in any *ex parte* proceeding, such as an application for a temporary restraining order, there is no balance of presentation by opposing advocates. The object of an *ex parte* proceeding is nevertheless to yield a substantially just result. The judge has an affirmative responsibility to accord the absent party just consideration. The lawyer for the represented party has the correlative duty to make disclosures of material facts known to the lawyer and that the lawyer reasonably believes are necessary to an informed decision. Rule 3.3(d) does not change the rules applicable in situations covered by specific substantive law, such as presentation of evidence to grand juries, applications for search or other investigative warrants and the like. *Id*. at [cmt. 14].

In my opinion, Rule 3.3(d) encompasses the present situation. We must begin with the universal recognition that at the fee determination stage, the interests of class counsel and the class are adverse. *In re Rite Aid Corp.,* 396 F. 3d at 307. The fee will be paid from the class recovery. Consequently, although class counsel remains counsel for the certified class, with the fiduciary duties that lawyers owe clients, at the fee stage, class counsel are understood to be advocating their own interests, not the class's interests. This presents a rare instance in which lawyers are permitted, in fact expected, to prefer their own interests above those of their current clients. We accept it. It is written into class action law and procedure. But it is then also true that that the class interests are *not* represented when lawyers petition for a fee, which is why the proceeding is properly understood to be *ex parte*. Only one of two interests is present before the Court. Only by denying that the class has any interest at all in the size of the fee is it possible to interpret proceeding as *not* being *ex parte*. Or to put it affirmatively, because the class does have an interest, but lacks an advocate (unless there is an objector), the proceeding *is* within Rule

3.3(d). And because Rule 3.3(d) applies, the Court should be given the information that will

enable it to protect the unrepresented class.

It seems to me that Labaton wants it both ways. It argues that Comment 14A does not

apply because the fee petition was not a "joint petition" of "adversaries," but rather a petition by

a single former adversary. But at the same time, it denies that there was an unrepresented party

(its own clients) before the Court, whose interests were adverse to the firm's interests when the

firm petitioned for fees.

Professor Rubenstein and Labaton say that the solution was for the judge to ask the right

question. But Professor Rubenstein testified that his opinion was limited to duties under Rules 23

and 54. Rubenstein 4/9/18 Dep., p. 198: 21-24. He offered no opinion on duties that have their

source elsewhere. I accept Professor Rubenstein's interpretation of the Rules of Civil Procedure.

Rule 3.3(d) – and in my view, Comment 14A – are two sources of other duties.

It may be that if the Chargois Arrangement had been disclosed, the Court would award

the same fee. Or not. The Court was not obligated to do so. I did not (and could not) testify to

what the Court would or would not have done, or what it should or should not have done. My

testimony is that the Court should have been informed.

Labaton's Rebuttal Memorandum (p. 28) quotes the final sentence of Comment 14 to

argue that Rule 3.3(d) is subordinate to Rules 23 and 54. That sentence reads: "Rule 3.3(d) *does*

*not change* the rules applicable in situations covered by specific substantive law, such as

presentation of evidence to grand juries, applications for search or other investigative warrants

and the like." (emphasis added.) The argument seems to be that Rules 23 and 54 displace Rule

3.3(d) (and maybe all of Rule 3.3). But the final sentence of Rule 3.3(d) permits no such claim.

The rules for grand jury presentations and search warrant applications exclude third persons and

are meant to be *ex parte*. If the Comment were applied to them, it would "change" them. Applying Rule 3.3(d) to a class action fee application does not "change" Rules 23 and 54, which easily coexists with Rule 3.3(d). Neither contradicts the other. Indeed, Comment 14A recognizes that coexistence because it cites class actions specifically.

### Rule 1.5(a)

At my deposition, Judge Rosen asked whether in my opinion Rule 1.5(a) applied to a lawyer who was part of a division of fee agreement under Rule 1.5(e).  That is, even if the total fee for all lawyers in a division of fee agreement is "reasonable," as Rule 1.5(e) requires, can the fee for any individual lawyer who is a party to the agreement violate Rule 1.5(a)? Rule 1.5(a) forbids "clearly excessive" fees and identifies a non-exclusive list of eight factors that can be weighed to determine whether or not a fee is clearly excessive.  No factor is dispositive and some will be inapplicable in a particular situation. For example, the "results obtained" factor is retrospective and cannot be evaluated when the lawyer first "enter[ed] into an agreement."

A straight analysis of the text of the two rules tells us that Rule 1.5(a) is applicable to the fee of any individual lawyer in a division of fee agreement under Rule 1.5(e).  The subject of Rule 1.5(e) is a division of *fees*. The subject of Rule 1.5(a) is *fees*. "Fee" is the same word both places. Neither rule exempts a lawyer from the requirements of the other rule.

Apart from statutory construction, as a matter of policy, applying Rule 1.5(a) to a division of fees is the right result. Otherwise, a lawyer whose fee would be clearly excessive under Rule 1.5(a) if she were to send a separate invoice would be able to avoid Rule 1.5(a)'s requirements by teaming up with other lawyers, who collectively send a single invoice, so long as their total fee was reasonable. The view that Rule 1.5(a) doesn't apply to an individual

lawyer's fee under Rule 1.5(e) would, therefore, allow a lawyer to "launder" a clearly excessive fee.

In answering Judge Rosen's questions at my deposition, I did not say, nor do I now say, whether the Chargois fee is clearly excessive. In fact, for a very good reason, I did not address Rule 1.5(a) in my Report. The Court has the power to abrogate the Chargois fee if it chooses to do so without having to find that the fee is clearly excessive under Rule 1.5(a).  The Court is not bound by counsel's fee agreement. Given that inherent authority, whether or not Rule 1.5(a) could apply is of marginal relevance.

### iv.     *OMISSION OF THE CHARGOIS ARRANGEMENT FROM THE SEPTEMBER 15, 2016 FEE PETITION VIOLATED RULE 11 FED. R. CIV. P.*

I have been asked to address whether the omission of the Chargois Arrangement from the September 15, 2016 fee petition also violated Fed. R. Civ. P. 11 ("Rule 11"). Rule 3.3(a) and Rule 11 overlap. The same facts that establish a violation of the Rule 3.3(a) can also reveal a violation of Rule 11. Here they do.

Rule 11 is in one way even broader than Rule 3.3(a). Its test is objective reasonableness, rather than subjective knowledge. Rule 11(b)(3) provides:

> By presenting to the court a pleading, written motion, or other paper -- whether by signing, filing, submitting, or later advocating it -- an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances…

> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

Rule 11 "requires that an attorney make reasonable inquiry to assure that all pleadings, motions and papers filed with the court are factually well-grounded, legally tenable and not

interposed for any improper purpose." *Cooter & Gell v. Hartmax Corp*., 496 U.S. 384, 393

(1990). Thus, counsel is held to standards of due diligence and objective

reasonableness." *Mariani v. Doctors Assoc. Inc.,* 983 F.2d 5, 7 (1st Cir. 1993).

A finding of bad faith is not required. *E.E.O.C. v. Tandem Computers, Inc*. 158 F.R.D.

224 (D. Mass. 1994)("Imposition of Rule 11 sanctions does not require a finding of bad faith.

The test as to whether an attorney made a reasonable inquiry prior to signing a pleading is an

objective standard of reasonableness under the circumstances at the time the attorney acted.  Of

course, in determining whether sanctions are appropriate, courts must avoid chilling an attorney's

enthusiasm or creativity")(internal citations omitted).

The Seventh Circuit has held that *omission* of facts can violate Rule 11, just as it can

under Rule 3.3(a). In that case, L&M, a law firm for a Creditors' Committee requested a

continuance before a bankruptcy judge. It gave as its reason the fact that the firm had been

retained as counsel on the day of the hearing so "it had not had adequate time to prepare for it."

The request was denied. In imposing Rule 11 sanctions on appeal from the Bankruptcy Court,

the District Court called the request "disingenuous because Committee makes no mention of

[L&M's] significant involvement in the case *before* the hearing." *In re Ronco, Inc*. 838 F.2d 212,

214-215 (7th Cir. 1988) (emphasis in original). On further appeal, the Seventh Circuit wrote:

> We believe that the district court was correct in determining that two
> aspects of the appellant's argument with respect to the need for a continuance
> were sanctionable. The appellant did not disclose in its initial brief to the district
> court that it had previously represented a single unsecured creditor in the
> bankruptcy action prior to its representation of the Creditors' Committee
> beginning on February 24, 1984. This information was highly relevant to the
> question of whether the bankruptcy judge should have granted a continuance. As
> the representative of a single creditor, L&M had been required to face the issue
> of whether the Banks' liens were valid and, indeed, had filed a discovery request.
> *While the appellant did not misstate an empirical fact, it did omit facts that were
> highly relevant to an accurate characterization of the facts that were stated.
> Such an obvious omission placed a heavy burden on a court. The presentation*

> *amounts, in its totality, to a half-truth that can be just as misleading, sometimes more misleading, than an absolutely false representation.* For purposes of determining whether sanctions are appropriate, it is not relevant that a later submission by the appellees brought the truth to light.  The impact on the court and on the opposing party occurs when the initial omission is made. Later correction does not permit a recoupment of the time, energy or, in some cases, money that has already been expended.

*Id.* at 218 (emphasis added).

The fee petition was a "written motion" or "other paper" within the meaning of Rule 11. Omission of the Chargois Arrangement from the September 15, 2016 fee petition was, moreover, "highly relevant to an accurate characterization of the facts stated." My reasons for concluding the nondisclosure of the Chargois Arrangement violates Rule 11 are the same as my reasons for concluding that the fee petition did not comply with Rule 3.3(a), *supra* pages 84-88.

### v. *ANY CLAIM THAT THERE WAS NO DUTY TO DISCLOSE THE CHARGOIS ARRANGEMENT TO THE COURT OR TO CLASS MEMBERS BECAUSE IT WOULD BE PAID FROM COUNSEL'S FEE AWARD IS INCORRECT AS A MATTER OF FACT AND LAW*

It is *not* true that the Court, the named plaintiffs, and the members of the certified settlement class had no interest in the Chargois payment on the theory that Customer Class Counsel would pay it out of their own fee award. Counsel's fee did not, and would not, exist unless and until the Court awarded it. Labaton itself recognized as much in the Notice of Pendency of Class Actions among other places. The Notice states: "Lead Counsel…will apply to the Court for an order awarding attorneys' fees…." (Page 4.) *See also* page 9, stating the question in the conditional tense ("*If* the Court awards fees" at a particular rate…) (emphasis added).

In deciding the amount of fee to award to class counsel, and to whom to award it, the Court, as a fiduciary for the class including class members named and unnamed, needed *first* to know who would be participating in any fee the Court in its discretion might award from the

class recovery and the basis for the claim. A contrary argument would deny the Court the very information it needed in order to decide how much of the undifferentiated settlement funds should go to counsel, and which counsel, and how much should go to the class. Quite simply, until the Court made that decision, *there was no fee to divide.* The Court was empowered, for example, as an exercise of its equitable power and fiduciary duty to the class, to deny any part of the recovery to Chargois and instead to direct that money to the class.

### *vi.*    *A LAWYER'S MISCONDUCT MAY AFFECT A COURT'S DETERMINATION OF THE AMOUNT OF FEES TO AWARD*

In the First Circuit and elsewhere, lawyer misconduct may influence fee decisions.

*Travers v. Flight Services & Systems, Inc.*, 808 F.3d 525, 542 (1st Cir. 2015):

> "[I]t is well settled in this circuit that the district court has the duty and responsibility to supervise the conduct of attorneys who appear before it, and that ... [d]enial of attorneys' fees may be a proper sanction" for attorney misconduct. *Culebras Enters. Corp. v. Rivera–Rios*, 846 F.2d 94, 97 (1st Cir. 1988); *see also Wong v. Luu*, 472 Mass. 208, 218 (2015) (holding that "[t]he inherent powers necessary to preserve the court's authority to accomplish justice include the power to sanction an attorney' for misconduct" by assessing fees).

Indeed, *Rodriguez v. Disner*, *supra*, applied this doctrine in a class action.

### *vi.*    *CONCLUSION*

Counsel's duty to the Court required that those who knew the terms of the Chargois Arrangement disclose the arrangement to the Court before it awarded fees from which Chargois would be (and was) paid.

### D.    THE CHARGOIS ARRANGEMENT SHOULD HAVE BEEN DISCLOSED TO MEMBERS OF THE CLASS.

The unnamed members of the certified class were entitled to know about the Chargois Arrangement before they were called upon to decide, with legal advice if desired, whether to opt

out or object to the settlement, or to the fee request made by Customer Class Counsel. Both decisions naturally precede the Court's decision on any fee award.

On August 8, 2016, David Goldsmith of Labaton appeared before Judge Wolf for the "plaintiffs and the settlement class." Michael Thornton of Thornton and Daniel Chiplock of Lieff Cabraser appeared for the same clients. "We are here," the Court said, "with regard to the motion for preliminary certification of class action and preliminary approval of the proposed class settlement." 8/8/16 Hearing Tr., p. 4. The Court concluded that it was "appropriate to certify a class for settlement purposes." It then certified "the proposed class for settlement purposes only." *Id.* at 4, 11. Previously, in January 2012, the Court had appointed Labaton as "interim lead counsel to act on behalf of all plaintiffs and the proposed class." It had appointed Thornton as "liaison counsel for plaintiff and the proposed class" and Lieff Cabraser to "serve as additional attorney for the plaintiff and the proposed class." *See* 1/12/12 Memorandum and Order, p. 5, Dkt. No. 28. When the Court certified the settlement class in August 2016, the firms continued to hold these positions.

### i.   *CLASS COUNSEL WHO KNEW THE TERMS OF THE CHARGOIS ARRANGEMENT HAD A FIDUCIARY AND ETHICAL DUTY TO DISCLOSE THE CHARGOIS ARRANGEMENT TO CLASS MEMBERS*

At least as of August 8, 2016, Labaton, Lieff Cabraser, and Thornton maintained attorney-client relationships with the certified settlement class and its members. In that role, they had responsibility for the "Notice of Pendency of Class Actions," dated August 22, 2016, which Labaton prepared, which Nicole Zeiss circulated to Lieff and Thornton, and which was then sent to the Customer and ERISA class members. *See* pp. 19-21, *supra*. The Notice of Pendency's caption identifies ATRS, Henriquez, and the Andover Companies as named plaintiffs. It refers to

the "class action lawsuits (collectively, the 'Class Actions')."  It defines the "Settlement Class"

as follows:

> All custody and trust customers of SSBT (including customers for which SSBT
> served as directed trustee, ERISA Plans, and Group Trusts), reflected in SSBT's
> records as having a United States tax address at any time during the period from
> January 2, 1998 through December 31, 2009, inclusive, and that executed one or
> more Indirect FX Transactions with SSBT and/or its subcustodians during the
> period from January 2, 1998 through December 31, 2009, inclusive.

> Notice, p. 3.

> Labaton Sucharow and Lawrence Sucharow are identified as "Lead Counsel." *Id.* at 2,

14. No other law firm or lawyer is identified. Class members receiving the Notice are told only

that:

- "Lead Counsel, on behalf of ERISA Counsel and Customer Counsel, will apply to
  the Court for an order awarding attorneys' fees in an amount not to exceed
  $74,541,250.00." (*Id*. at 4, 13);

- Attorneys' fees for ERISA counsel will not exceed $10.9 million, and about how
  fees for the other counsel will be computed "if the Court awards the total amount
  of fees that Lead Counsel intend to request." (*Id*. at 9);

- They can obtain "[a]dditional information" by calling Labaton's phone number,
  website, and email address, as provided." (*Id*. at 2); and

- They have a right to opt out and to object and provided information on how to do
  so. (*Id*. at 2).

Recipients of the Notice were *not* told about the Chargois Arrangement although this

information -- that a lawyer who did no work to produce the class recovery and who accepted no

legal responsibility for the work of others stood to receive more than $4 million from the class

recovery – was relevant to "The Allocation of Settlement Proceeds," including the completeness

of the attorneys' fees" disclosures in the Notice. That information could reasonably have

influenced members of the class in deciding whether to exercise the right to object to the

disclosure regarding attorneys' fees. As important, it may have affected the advice ERISA

99

Counsel[91] would have given their clients. At the August 8, 2016 hearing, the Court specifically

recognized that class members could object to the requested fee. It said: "As I understand it,

counsel will seek up to 25 percent, roughly $76 million, of the common fund. The class members

will have an opportunity to be heard on the propriety of that." 8/8/16 Hearing. Tr., pp. 22:23 –

23:1.

In this District, *Fulco v. Continental Cable Vision, Inc.*, 789 F.Supp.2d 45, 47 (D. Mass.

1992), recognized the formation of an attorney-client relationship between class counsel and the

class after the class is certified. "While this is apparently a case of first impression in the First

Circuit, I agree with courts which have held that 'once the court enters an order certifying

a class, an attorney-client relationship arises between all members of

the class and class counsel.'"  (Citations omitted.) *Newberg on Class Actions* §19.2 (5th ed.)

similarly states:

> [O]nce a class has been certified, the default presumption is that there is
> an attorney-client relationship between class counsel and the absent class
> members. This is certainly true in some contexts. Thus, for example, courts and
> commentators have held that absent class members *are* class counsel's clients for
> communications purposes. This means that opposing counsel must treat absent
> class members in a certified class as "represented parties" for communications
> purposes and can only communicate with them through counsel. [Emphasis in
> original.]

And at least as of August 8, Labaton, Thornton, and Lieff also had fiduciary duties to the

unnamed members of the certified settlement class. *Piambino v. Bailey*, 757 F.2d 1112, 1139

(11th Cir. 1985)("The lawyers who bring these [Rule 23] cases have a heavy fiduciary

---

[91] ERISA attorney Lynn Sarko testified that it would have affected his advice. Sarko 9/8/17 Dep., pp. 75-80. Beyond this, the fact that the ERISA lawyers received only approximately $7.5 million of the $10.9 million allocated for fee awards out of the ERISA class's share of the funds, with the $3.4 million balance going back to the Customer Class Counsel, would (they testified) have informed the ERISA lawyers' conduct of the case and agreement to accept only a $7.5 million share of the fees; several of the ERISA lawyers testified to this.  *See, e.g.*, Sarko 9/8/2017 Dep., pp. 28:10-49:18; 74:23-82:24; 90:13-92:18; McTigue 9/8/17 Dep., pp. 21:15-30:9; Kravitz 9/11/17 Dep., 68:20-71:22; 82:6-85:17; 101:16-102:23; 113:22-115:3

responsibility to their clients -- especially those who are absent and those in the minority whose interests are at odds with the named plaintiffs and their group -- to the trial judge and to the people, who provide the forums and governmental resources for these suits."); *Singer v. AT&T Corp*, 185 F.R.D. 681, 690 (S.D. Fla. 1998)("The class attorney has a fiduciary duty to the court as well as to each member of the class.").[92]

Because representing an entire class presents special considerations not present when the client is an individual or an entity, certain professional conduct rules have been held to apply in a different way or not at all, and Labaton has identified narrow exceptions to argue that a lawyer's duty inform a client also does not apply here. That argument is wrong.

The most noteworthy exception concerns former client conflicts. If the class divides, the question arises whether counsel who had represented the unified class can now represent a segment of it against another segment whose members were, until then, counsel's clients. Rule 1.9(a) forbids adverse representation on the same or substantially related matter when a former client is an individual client. But to disqualify class counsel in these circumstances would be highly inefficient and courts will not routinely do so. *See In re Agent Orange Product Liab. Lit.,* 800 F.2d 14, 19 (2nd Cir. 1986)("[W]e conclude that the traditional rules that have been developed in the course of attorneys' representation of the interests of clients outside of the class action context should not be mechanically applied to the problems that arise in the settlement of class action litigation.")

Another area in which a court might choose not to apply a professional conduct rule to class actions concerned the former rule (now superseded) that said that a lawyer could not

---

[92] Courts have held that attorneys for *putative* classes -- pre-certification -- have fiduciary and ethical obligations to unnamed class members after the complaint is filed. *In re General Motors Corporation Pick-Up Truck Fuel Tank Products Liability Litigation*, 55 F.3d 768, 801 (3rd Cir. 1995)("Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed.").

advance litigation costs unless the client was responsible to repay them even if it lost. For obvious reasons, *Rand v. Monsanto,* 926 F.2d 596, 600 (7th Cir 1991), rejected that rule in a class action. Application of the rule would spell the end of class actions as we know them because few, if any, persons would be willing to serve as class representative given the expense of mounting a class action.  Labaton cites *Rand* at page 33 of its Rebuttal Memorandum for the overinclusive suggestion that "courts have recognized [that] class actions are legally unique situations that do not always neatly fit within the standard framework of ethical rules." Yes, courts have recognized that class actions do not "*always* fit within the framework of ethical rules," but the situations in which courts do not apply traditional rules are few and tailored. They also tend to be situations in which doing so will favor the class, a segment of it, or the feasibility of class litigation. These situations are not a reason to relieve class action lawyers from ethical obligations that *benefit* the class and *supplement*, not contradict, duties to clients under Fed. R. Civ. P. 23.

As fiduciaries and lawyers for the unnamed certified class members -- and lawyers are fiduciaries for their clients as a matter of law[93] -- customer class counsel had a duty to give their clients information relevant to decisions that belonged to the client. That is also a duty imposed by Massachusetts Rules of Professional Conduct 1.2(a) and1.4(a)(last amended March 26, 2015, eff. July 1, 2015);[94] One decision that belongs to a client is whether or not to settle. *Moores v.*

---

[93] *Washington Legal Foundation v. Massachusetts Bar Foundation*, 993 F.2d 962, 974 (1st Cir. 1993)("The relationship between lawyer and client in Massachusetts is fiduciary as a matter of law.").

[94] Rule 1.2(a) provides in part: "A lawyer shall abide by a client's decision whether to accept an offer of settlement of a matter." Rule 1.4(a)(1) provides: "A lawyer shall promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f) is required by these Rules." Rule 1.4(b) provides: "A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." Rule 1.0(f), in turn, provides: "'Informed consent' denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." *See also* Restatement (Third) of Law Governing Lawyers (2000), §§ 20(3) and 22(1).

*Greenberg*, 834 F.2d 1105 (1st Cir. 1987)("As part and parcel of [the duty to a client], a lawyer must keep his client seasonably apprised of relevant developments, including opportunities for settlement.").[95] This is the very decision the Notice of Pendency presented to the recipients -- i.e., whether to settle on the terms in the Notice or to object.

As with my discussion of duties to the Court above, my opinion here addresses the extraordinary situation presented by the Chargois Arrangement. Class members were told their "legal rights," which included their right to object to the anticipated fee application, but they were not given information that could reasonably have prompted an objection. They could assume that ATRS was fulfilling its fiduciary duties to the class but ATRS did not know about the Chargois Arrangement. The Notice of Pendency told them that the Court had appointed Labaton Sucharow for the Settlement Class, of which they were told they were members. They could assume that Labaton Sucharow was protecting their interests as its clients.

### ii.   CONCLUSION

As fiduciaries, counsel who knew the nature of the Chargois Arrangement had a duty to provide the unnamed customer and ERISA members of the class, whom they represented after the Court certified the class for settlement purposes on August 8, 2016, of the existence of the Chargois Arrangement and its terms. Rule 1.2(a) and Rule 1.4(b) imposed the same duty.

**E.    GARRETT BRADLEY'S DECLARATION CONTAINS FALSE STATEMENTS OF FACT AND FALSE "EVIDENCE," IN VIOLATION OF RULES 3.3(a)(1) AND 3.3(a)(3) BECAUSE THE FALSE STATEMENTS WERE MADE KNOWINGLY. THE DECLARATION ALSO VIOLATED RULE 8.4(c)'S PROHIBITION OF MISREPRESENTATIONS AND DECEIT. SEPARATELY, GARRETT BRADLEY'S DECLARATION VIOLATED FED. R. CIV. P. 11 BECAUSE BRADLEY FAILED TO**

---

[95] A lawyer is an agent and the law of agency separately creates a duty to inform. *Gagnon v. Coombs*, 39 Mass. App. Ct. 144, 156 (1995) ("An agent's duty to make full disclosure to the principal of all material facts relevant to the agency is a necessary corollary to the fundamental agency obligations of undivided loyalty and utmost good faith.")

**CONDUCT "AN INQUIRY REASONABLE UNDER THE CIRCUMSTANCES" TO ESTABLISH THAT HIS FACTUAL CONTENTIONS HAVE "EVIDENTIARY SUPPORT"**

### i.     *FILING OF THE FEE PETITION*

The Court's task when class counsel requests attorneys' fees is to identify what the market would have recognized as a reasonable rate for counsel's service to the class. To aid the court in fulfilling its fiduciary duty to the class, counsel will provide information to persuade the Court that the requested fee is reasonable. When lawyers seek attorneys' fees, their interests and the interests of the client they represent are economically adverse, which heightens the need for the Court to be especially vigilant. *See In re Rite Aid Corp. Securities Litigation*, 396 F. 3d at 307. As discussed, *supra,* in Section C(iii), the Court is not bound by a fee agreement between counsel and class representatives or among themselves.

Naturally, a court may first look to the evidence counsel submits in support of a fee request, which was the purpose of the Bradley Declaration. But courts must also independently evaluate the requested fee against reasonable market rates for the particular lawyer. "While fee sharing agreements among counsel may be respected or treated as presumptively reasonable in a district court's allocation of attorneys' fees, persuasive authority convinces this Court that it is not bound blindly to follow such private arrangements." *In re Volkswagen and Audi Warranty Extension Litigation,* 89 F. Supp. at 183. In *In re Citigroup Inc. Securities Litigation,* 965 F.Supp.2d 369, 393-394 (S.D.N.Y. 2013), the Court awarded $200 hourly for contract lawyers, writing that:

> The lodestar figure should be based on market rates in line with those [rates] prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. The Court must determine the rate a paying client would be willing to pay.... In other words, if the class were a reasonable, paying client free to choose its counsel and negotiate rates, what hourly rate would it accept for the attorneys and other professional staff

employed here? (internal quotations and citations omitted)

Labaton submitted the Bradley Declaration dated September 14, 2016, as part of the

materials in support of the fee applications of the several law firms. It is evidence upon which the

Court was invited to base its fee award.[96]

The Bradley Declaration states under oath in paragraphs 3 and 4:

>      3. The schedule attached hereto as Exhibit A is a summary indicating the amount of time spent by each attorney and professional support staff-member of my firm who was involved in the prosecution of the Class Actions, and the lodestar calculation is based on my firm's current billing rates. For personnel who are no longer employed by my firm, the lodestar calculation is based upon the billing rates for such personnel in his or her final year of employment by my firm. The schedule was prepared from contemporaneous daily time records regularly prepared and maintained by my firm, which are available at the request of the Court. Time expended in preparing this application for fees and payment of expenses has not been included in this request.

>      4. The hourly rate for attorneys and professional support staff in my firm included in Exhibit A are the same as my firm's regular rates charged for their services, which have been accepted in other complex class actions.

Paragraphs 5 and 6 implicitly incorporate some of these statements.[97]

These paragraphs were taken verbatim from a template prepared by Labaton and shared

with Thornton and Lieff.

>      ## ii.  GARRETT BRADLEY VIOLATED RULE 3.3(a) BECAUSE HE KNEW THAT HIS DECLARATION CONTAINED FALSE STATEMENTS

---

[96] I understand that a separate issue addressed by the Special Master is that certain staff attorneys listed on Exhibit A of the Bradley Declaration were also identified by Labaton or Lieff in their request for fees -- i.e. some were double-counted.

[97] These paragraphs state:

>      5. The total number of hours expended on this litigation by my firm during the Time Period is 15,302.5 hours. The total lodestar for my firm for those hours is $7,460,139.

>      6. My firm's lodestar figures are based upon the firm's billing rates, which rates do not include charges for expenses items. Expense items are bill separately and such charges are not duplicated in my firm's billing rates.

Exhibit A to the Garrett Bradley Declaration uses the designation "SA" to identify 24 "staff attorneys." Total compensation requested for the SAs is $4,508,837 at an hourly rate of $425 for each, except that one "SA," Michael Bradley, is billed at $500. Additional compensation requested for four Thornton partners and one associate totals $2,831,287. The Declaration contains numerous false statements. I am asked to assume that Garrett Bradley knew these statements were false when he submitted his Declaration. *See*, *e.g.*, pp. 23-24.

- The Declaration states: *Exhibit A contains professional support staff members "of my firm."* None of the SAs are support staff members of the Thornton law firm.

- The Declaration states: *The billing rates for the SAs are "based on my firm's current billing rates."* The firm did not have "current billing rates" for these lawyers.

- The Declaration states: *For personnel "who are no longer employed," the lodestar is based on their rates for the "final year of employment."* None of the SAs were ever "employed" at Thornton.

- The Declaration states: *The schedule was prepared from "contemporaneous daily time records regularly prepared and maintained by my firm."* The SAs worked at Labaton or Lieff, which prepared their time records and is where those records were maintained. Or they were prepared and maintained by an agency. Other TLF attorneys may have kept contemporaneous time records.

- The Declaration states: *The hourly rates "are the same as my firm's regular rates charged for their services."* Thornton had no "regular rates" for the SAs.

- The Declaration states: *These rates "have been accepted in other complex class actions."* This is true for four of the SAs but it is not true for the other 20, including Michael Bradley.

Although Goldsmith of Labaton informed the Court in the November 10, 2016 letter that SA time was double-counted in the lodestars of Customer Class Counsel, and although attorneys listed in the Thornton lodestar were among those who were double- counted (except Michael Bradley), Thornton did not inform the Court of false statements in its lodestar.

106

The characterization of Michael Bradley, Garrett Bradley's brother, is especially serious. Contrary to the Garrett Bradley Declaration, Michael Bradley's $500 hourly rate had never been accepted by a Court in a complex class action. Michael Bradley had not been a staff member of the Thornton law firm. The Thornton law firm did not have a current billing rate for him or prepare and maintain his time records. It did not supervise him. There appears to be no physical evidence of the work for which he was paid $203,200. I am asked to assume that "[u]nlike the Labaton and Lieff SAs, Michael Bradley did not prepare any memoranda or deposition notebooks. And, the record reveals no written work product created by Michael Bradley."

### iii.   APPLICATION OF RULE 3.3 AND FEDERAL JURISPRUDENCE TO THE BRADLEY DECLARATION

To exercise its fiduciary duty to protect the class when responding to a law firm's fee request, the Court required accurate and complete information about the contributions of the firm seeking counsel fees. That information would inform the hourly rate the Court would approve for SAs and contract (or agency) attorneys. For example, the Court could consider not merely the fact that a law firm assumed financial responsibility for the expense of a staff lawyer, but also whether it assigned legal work to those lawyers, supervised their work, and provided them with a place to work and research support.  The Court might also consider as relevant to its decision the fact that the rate requested for these lawyers was nearly nine times their cost to the law firm. The question is not what the Court would or would not do based on such information but the relevance of the information to the Court's exercise of its judgment as a fiduciary for the class. While the Court was informed of the hourly rate *claimed* for the SAs, other statements in the Bradley Declaration, which could reasonably affect the Court's decision whether to approve that rate, are false.

Analysis of the Bradley Declaration is rooted in the rule governing a lawyer's duty of candor to the Court and federal case law. As noted in Section C (iii), *supra,* Rule 3.3(a)(1) provides: "(a) A lawyer shall not knowingly (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." A lawyer who unknowingly offers false "evidence" to a tribunal and comes to know of its falsity must take reasonable remedial measures if the evidence is material. Rule 3.3(a)(3). Here, that would have required correction of the falsity. Rule 1.0(g) defines "knowingly." "'Knowingly,' 'known,' or 'knows' denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances." Rule 8.4(c) forbids "conduct involving dishonesty, fraud, deceit or misrepresentation."

The Court was not bound by how the several law firms chose to allocate fees or SA time among themselves. "More important than the terms of a private agreement are the actual contributions each firm made to the prosecution of this case and the interests of the plaintiff class." *In re Volkswagen,* 89 F. Supp. 3d at 183; *In re FPI/Agretech Sec. Litig.,* 105 F.3d 469, 473 (9th Cir.1997) ("[A] court may reject a fee allocation agreement where it finds that the agreement rewards an attorney in disproportion to the benefits that attorney conferred upon the class—even if the allocation in fact has no impact on the class"); *In re "Agent Orange" Prod. Liab. Litig.,* 818 F.2d at 223 (rejecting authority that "allows counsel to divide the award among themselves in *any* manner they deem satisfactory under a private fee sharing agreement"). In making a fee award, the Court would of course be cognizant of the fact that the money paid to the law firms would necessarily come from the class recovery.

### iv.   *APPLICATION OF FED. R. CIV. P. 11 TO THE BRADLEY DECLARATION*

Federal Rule of Civil Procedure 11(b)(3) required Bradley to conduct "an inquiry reasonable under the circumstances" to ascertain that the facts he was asserting in his Declaration had "evidentiary support," which Bradley did not do because, as I am asked to assume, he knew that statements in the Declaration were false.[98]

### v.    CONCLUSION

Garrett Bradley prepared the "evidence" -- in his sworn Declaration -- from a template Labaton circulated. This is "evidence" in the sense that it is information declared to be true and upon which the Court was invited to issue a ruling.  He is governed by Rules 3.3 and 8.4.  Rule 3.3 prohibits knowing false statements to a tribunal. Rule 8.4(c) forbids "conduct involving dishonesty [and] deceit." Bradley knew the statements in his Declaration were false. Federal law separately required reasonable care to ensure that the information provided to the Court for the exercise of its discretion be true. The reasonable inquiry required by Rule 11 would quickly have identified these statements as false if Bradley did not already know it.

_____
STEPHEN GILLERS

May 8, 2018

---

[98] The cited provision of the Rule continues: "or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."

# EX. 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM**,** on Behalf of Itself and All Others Similarly Situated, | CIVIL ACTION NO. _____ |
| Plaintiffs, | CLASS ACTION COMPLAINT |
| -against- | |
| STATE STREET CORPORATION, STATE STREET BANK AND TRUST COMPANY, and STATE STREET GLOBAL MARKETS, LLC, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Arkansas Teacher Retirement System ("ARTRS"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, makes the following allegations against Defendants State Street Corporation, State Street Bank and Trust Company ("State Street Bank" or the "Bank"), and State Street Global Markets, LLC ("State Street Global") (collectively, "State Street", or "Defendants") based upon the investigation of counsel, except as to the allegations pertaining specifically to Plaintiff that are based on personal knowledge.

## I.      <u>INTRODUCTION</u>

1.      State Street Bank, through its headquarters in Boston, Massachusetts, serves as the custodian for over 40% of public pension funds in the United States. State Street Bank is the largest such custodian in the country, and had $4.4 trillion in pension assets under custody globally as of March 31, 2010. State Street Bank also serves as the custodian for many non-public investment funds and other investors. As custodian, State Street Bank is responsible, *inter alia*, for undertaking (through affiliates such as State Street Global) the foreign currency

exchange ("FX") transactions necessary to facilitate a custodial customer's purchases or sales of foreign assets or the repatriation other foreign funds.

2.      For over a decade, State Street, in violation of Massachusetts law, has maintained an unfair and deceptive practice whereby FX transactions are conducted so as to maximize profits to State Street (stemming from volatility in FX rates) at the expense of a substantial segment of its custodial customers.  In sum, Defendants have charged many of their custodial customers (a) inflated FX rates when buying foreign currency for those customers, and (b) deflated FX rates when selling foreign currency for those customers, and pocketed the difference between the actual and reported rates.

3.      Defendants' unfair and deceptive practices remained unknown to Plaintiff and the Class because, *inter alia,* the account statements Defendants provided to the affected custodial customers reported the FX transactions as having taken place at unspecified times during a 12 or 24-hour period, and as using FX rates falling within the "high-low" range of that period. However, the FX rates that State Street reported and applied to the transactions for these custodial customers were incorrect.  State Street arrived at the reported FX rates "after the fact," often hours after performing the relevant FX transactions for the custodial customers.

4.      Defendants' unfair and deceptive FX practice has generated as much as $500 million in profits annually for State Street, or roughly half of State Street's FX profits for the last ten years.  This is money taken directly out of the pockets of State Street's custodial customers.

5.      ARTRS brings this suit as a class action on behalf of all similarly affected custodial customers of State Street, except those government pension funds that are covered by independent qui tam actions that have been unsealed, or that become unsealed during the

pendency of this action (the "Class"), in order to recover the proceeds unlawfully obtained through State Street's FX activities, and for injunctive relief.

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over the claims pursuant to the Court's diversity jurisdiction. 28 U.S.C. § 1332(a), and 28 U.S.C. § 1331 because Count Three arises under federal law.

7. This Court also has jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d)(2)(A) and (C). With respect to CAFA, (i) the amount in controversy exceeds the jurisdictional amount, (ii) the Class consists of hundreds, and perhaps thousands, of injured parties, and (iii) some members of the Class are citizens of States other than those of Defendants.

8. Venue in this judicial District is proper under 28 U.S.C. § 1391(b)(1) and (2). A substantial part of the events or omissions giving rise to the claims occurred within this District. Defendants reside in and transact business in this District. Defendants are citizens of the Commonwealth of Massachusetts and are headquartered in this District.

## III. PARTIES

9. Since 2001, and at all times relevant hereto, Defendants and their subsidiaries, have served as the domestic and international custodial bank for the ARTRS' pension fund.[1] Since at least July 1, 2001, Defendants, as custodian for the ARTRS pension fund, have been responsible for executing the purchase, sale and pricing of FX contracts for the accounts of ARTRS.

---

[1] State Street Bank and Trust also serves as the securities lending agent for the fund.

10.     ARTRS is a cost-sharing, multiple-employer defined benefit pension plan that covers any person employed by an employer covered by ARTRS.  ARTRS employers include any public school, public educational agency, or other eligible employer participating in ARTRS.

11.     As of June 30, 2009, ARTRS included 343 participating employers and more than 115,000 members.  Since 2001, ARTRS employers have made actual contributions to ARTRS of $2,436,510,000.

12.     As of June 30, 2009, ARTRS possessed net pension assets of approximately $8,802,987,225.  As of the same date, ARTRS's net assets represented a funding ratio of 75.7% funded, reflecting an amortized funding horizon of 45.4 years.

13.     As of June 30, 2009, ARTRS maintained a "Global Equity" asset class target percentage of 30% of ARTRS assets.  As of the last annual report, ARTRS maintained an actual Global Equity investment percentage of 28.9%, reflecting a total international investment of $2,542,601,000.  ARTRS's Global Equity investments are the single largest asset class investment for ARTRS.

14.     ARTRS paid Defendants $851,413 for custodial fees in fiscal year 2009.  The annual fees paid to Defendants by ARTRS do not include the Defendants' hidden FX charges.

15.     Defendant State Street Corporation is a Massachusetts corporation headquartered in Suffolk County in Boston, Massachusetts with an address of State Street Financial Center, One Lincoln Street, Boston, MA 02111.  State Street provides (or has provided) custodial banking services and FX services to ARTRS and the proposed Class through State Street, State Street Bank and Trust, and their subsidiaries, agents, employees and co-conspirators.  State Street's FX trading desk is located in Boston, Massachusetts.   State Street Corporation touts

itself and its subsidiaries as the "No. 1 servicer of U.S. pension plans," and as of March 31, 2010, had $4.4 trillion in pension assets under custody globally.

16.     Defendant State Street Bank is headquartered in Boston, Massachusetts and has offices in various other states.  State Street Bank currently provides (or has provided) custodial banking services and FX services to ARTRS and the proposed Class.  State Street Bank is a wholly-owned subsidiary of State Street Corporation.

17.     Defendant State Street Global Markets, formerly known as State Street Capital Markets, is headquartered in Boston, Massachusetts and has offices in various other states.  State Street Global Markets currently provides (or has provided) custodial banking services and FX services to ARTRS and the proposed Class.  In particular, State Street Global Markets provides specialized investment research and trading in foreign exchange, equities, fixed income and derivatives for State Street's custodial customers.  State Street Global Markets is a wholly-owned subsidiary of State Street Corporation.

18.     At all relevant times, each of the Defendants was and is the agent, employee, employer, joint venturer, representative, alter ego, subsidiary and/or partner of one or more of the other Defendants, and was, in performing the acts complained of herein, acting within the scope of such agency, employment, joint venture, or partnership authority, and/or is in some other way responsible for the acts of one or more of the other Defendants.

## IV.     CLASS ACTION ALLEGATIONS

19.     This action is brought and may properly be maintained as a class action pursuant to Rules 23(a)(1)-(4), and 23(b)(2) and (3) of the Federal Rules of Civil Procedure and Mass. Gen. Laws c. 93A, § 11.  This action satisfies the procedural requirements set forth by Rule 23 and c. 93A, § 11.

20.     This suit is a class action brought on behalf of a Class defined as all public and private pension funds, mutual funds, endowment funds, investment manager funds, and any other funds for whom State Street Bank served as the custodial bank and executed FX trades on an "indirect" or "custody" basis since 1998, except those government pension funds that are covered by independent qui tam actions that have been unsealed, or that become unsealed during the pendency of this action, and which have suffered damages as a result of the conduct alleged herein.  It is brought pursuant to Rule 23(b)(2) for injunctive or declaratory relief, and Rule 23(b)(3) for money damages.

21.     Also excluded from the Class are Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of any such individual or entity.

22.     The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable.

23.     There are questions of law and fact common to the Class, including:

(a)     Did Defendants engage in unfair and deceptive acts and practices in connection with  FX transactions so as to maximize profits to Defendants at the expense of their custodial customers?

(b)     Did Defendants charge their custodial customers incorrect FX rates, and pocket the difference between the actual and incorrect rates?

(c)     Did Defendants provide account statements to their custodial customers that reported incorrect FX rates?

6

(d)     Did the Defendant's actions with respect to the Class violate the Massachusetts Consumer Protection Act, Mass. Gen. Laws c. 93A, and Massachusetts common law?

(e)     Did Plaintiff and Class members suffer monetary damages as a result of the Defendant's actions and if so, what is the proper measure of those damages?

(f)     Is the Class entitled to injunctive relief?

24.     Plaintiff's claims are typical of the claims of the members of the Class and the named Plaintiff is a member of the Class described herein.

25.     The named Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity with all of the obligations and duties material thereto.  Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or which directly and irrevocably conflict with the interests of other members of the class.

26.     The interests of the named Plaintiff are co-extensive with, and not antagonistic to, those of the absent Class members.  The named Plaintiff will undertake to represent and protect the interests of absent Class members.

27.     The named Plaintiff has engaged the services of the undersigned counsel.  These counsel are experienced in complex class action litigation, will adequately prosecute this action, and will assert and protect the rights of, and otherwise represent, the named Plaintiff and absent Class members.

28.     The questions of law and fact common to the Class, as summarized in ¶ 23 above, predominate over any questions affecting only individual members, in satisfaction of Rule 23(b)(3), and each such common question warrants class certification under Rule 23(c)(4).

29.     A class action is superior to other available methods for the adjudication of this controversy.  Individualized litigation increases the delay and expense to all parties and the court system given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be far more fair, efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

30.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Compared to individualized actions, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

31.     Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

32.     In the alternative, the above-referenced Class may be certified under Rule 23(b)(1) because:

(a)     The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members' claims which would establish incompatible standards of conduct for Defendants; and

(b)     The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter, be dispositive of the interests of other members of the class who are not parties to the adjudications, or which would substantially impair or impede the ability of other Class members to protect their interests.

## V.     DEFENDANTS' FX PRICING PRACTICES

### A.     Background On Defendants' Relationship With Custodial Customers

33.     State Street holds itself out on its website as the "No. 1 servicer of U.S. pension plans" and the "leading custodian worldwide."  In its Annual Report on Form 10-K for fiscal year end December 31, 2007, State Street reported that it had $15.3 trillion in assets under custody and $1.98 trillion in assets under management as of December 31, 2007.  Assets under custody grew at a compound annual rate of 13% between 2004 and 2007, according to the 2007 10-K.  In the 2007 Annual Report to Shareholders, Ronald Logue, State Street's Chief Executive Officer, stated that State Street had achieved 30 consecutive years of growth in operating earnings per share.

34.     For 2008, notwithstanding the troubled economic climate, State Street continued to report positive growth in operating earnings per share.

35.     According to State Street's 2007 Form 10-K, "fee revenue" from "trading services," which includes FX revenue, grew from $862 million in 2006 to $1.152 billion in 2007, an increase of 34%.  State Street further reported in its Annual Reports filed with the S.E.C., foreign exchange trading revenues increased from $468 million in 2005 to $611 million in 2006, to $802 million to 2007, and to $1.08 billion in 2008, or an annual increase of 31% in 2006 and 2007 and 35% in 2007 and 2008.  Over the past ten years State Street has reported foreign exchange trading revenues of more than $4 billion. Approximately one-half of these revenues were derived from the FX pricing practices alleged herein.

36.     State Street reported on its website on January 31, 2008 that it "currently services more than 40 percent of the public fund business in the United States through its dedicated public fund team, with customers in 33 states and the District of Columbia, Puerto Rico and the U.S. Virgin Islands."

37.     Neither ARTRS nor the Class authorized Defendants to charge FX rates other than those in effect at the time of the foreign currency trades. Nor have ARTRS or the Class ever approved the retention by Defendants of the difference between the actual FX cost and the incorrect amounts charged by Defendants. Nonetheless, Defendants charged ARTRS and the Class FX rates that were not the actual charges incurred. Defendants then made unfair and deceptive claims and statements regarding higher FX rates than were actually paid by Defendants in connection with purchases of foreign currencies on behalf of ARTRS and the Class, and lower FX rates than were credited to Defendants in connection with sales of foreign currencies on behalf of ARTRS and the Class.  Defendants kept the excess of these two rates for themselves.  Defendants had no right to retain such monies as "profit" on these FX transactions.

38.     When such funds were wrongly kept by Defendants, ARTRS and the Class suffered monetary damages.

39.     Upon information and belief, Defendants carried out these unfair or deceptive acts and practices by executing FX transactions requested by the Plaintiff and proposed Class as follows.  Upon receipt of a request requiring a FX transaction, Defendants would execute a trade to fill the request at the FX rate at some point thereafter in the trading day.

40.     Regardless of the price paid by Defendants for the FX transaction necessitated by the Plaintiff and proposed Class' FX trade, Defendants thereafter charged Plaintiff and proposed Class, a different, less favorable rate than the one at which Defendants actually settled the FX transaction on the interbank market.

41.     Regardless of the rate for the FX trade by the Defendants, the Plaintiff and proposed Class would receive a less favorable exchange rate, the extremes of which would only be controlled by the volatility of the market, *i.e.* "range of the day" pricing.

42.     By substituting a different FX rate and price for the foreign currency trades of the Plaintiff and proposed Class, Defendants' unfairly and deceptively claimed to have paid a different rate than Defendants had actually paid to settle the trade.

43.     By engaging in this practice Defendants unfairly and deceptively collected money directly from, and at the expense of, their custodial clients.

44.     Because any reports that the Plaintiff and proposed Class would have received from Defendants would have indicated that each FX transaction was completed at a rate within the range of FX rates prevailing during that day, the Plaintiff and proposed Class were unable to discover this conduct.

45.     FX transactions on behalf of the Plaintiff and proposed Class would be initiated by sending a transaction request, usually by electronic means, to the custody side of the Bank, called the Securities Processing Unit.  The request would then be sent electronically by custody to the Bank's trading desk, where it would appear on software used by the FX traders, called the Money Order Management System (sometimes also referred to as the "Market Order Management System" or "MOMS").

46.     Upon the transaction request appearing in MOMS, the FX trader would check the status of the two currencies involved, set a price, and then execute the FX transaction. The transaction would be executed or "settled" in most cases by the bank trader making a transaction on the interbank FX market – usually through another bank. If the trader did the trade through another bank, a record of the trade would be entered into that other bank's system, and that bank would then send a confirmation of the trade to Defendants.

47.     Defendants then confirmed the transaction through a separate software system, called Wall Street Systems[2], which memorialized it.  At that point, the unfair and deceptive FX rate, or "spread," was determined and added to the custodial clients' costs.   That is, Defendants' FX traders executed the trade at an interbank rate and then the additional cost (for purchases) or remitted a lesser payment (for sales) was added for transmission or charge to the custodial clients, such as the Plaintiff and proposed Class.

48.     The FX price actually paid by the Defendants would also be noted by the trader in his or her "blotter," an informal running log or notebook of the trader's currency positions through the day.  The Defendants maintain all relevant records of these transactions.

49.     By pricing the Bank's custodial FX trades later in the day, the Bank obtained the widest possible "range of the day."  Typically, there is at least some FX rate volatility every day, often occurring at times when key financial indices are reported, such as interest rate announcements in major countries.  The bigger the range of the day, the bigger the Bank's profits on each custodial FX trade.

51.     The difference between actual and charged rates to the Plaintiff and proposed Class can be very large.  For example, if a pension fund placed a request to purchase 10 million Euro and the FX rate for EUR is 1.5355 at 10:00 a.m., but then the FX rate goes to 1.5475 at 3:30 p.m., a difference of .0120, the potential "profit" to State Street from their FX practices would be $120,000 (.0120 x 10,000,000 = $120,000).

52.     When State Street traded FX, it always did so at the interbank rate.  Through the conduct alleged herein, State Street's custodial FX clients never received the interbank rate for their trades.

---

[2] Prior to Wall Street Systems, Defendants utilized another program that served the same function.  That program was known as "IBIS" or "IBS."

53.     Damages to the Plaintiff and the proposed Class, however, would be even greater than the amount added to or subtracted from the interbank trade, because by paying the higher rate, proposed Class members would have lost the opportunity for those monies to appreciate. Over a ten or eleven year period, due to compounding and lost investment opportunities, a charge of 1% of the assets of the Plaintiff and proposed Class would grow to damages of approximately 3%.  In other words, whatever the size of the overcharge or undercharge for a particular buy or sell transaction, the size of the damages would increase by threefold over 10 to 11 years.

### B.     All Trades Executed by the Defendants Are Equally Affected

54.     The conduct described herein affects the Plaintiff and proposed Class each time Defendants executed a FX trade for the Plaintiff or proposed Class.  Although Defendants may not execute all of the Plaintiff's and the proposed Class' FX trades, the ones they do execute, often known as "indirect," "custody," "non-negotiated" or "standing instruction" trades, always suffer the Defendants' pricing practices, as described herein.

55.     Defendants, as the custodial bank for the Plaintiff and proposed Class, transacted the following FX trades for the Plaintiff and proposed Class: income repatriation trades; dividend payment and repatriation trades; emerging market trades; portfolio and foreign asset-based FX trades; all other non-negotiated and/or standing instruction trades, including spot, forward, and swap trades.

56.     When the Defendants executed these FX trades for Plaintiff and the proposed Class, they unfairly and deceptively priced these trades to their benefit and to the detriment of the Plaintiff and the proposed Class.  This conduct was possible because Plaintiff and proposed Class believed that the Defendants maintained a duty with respect to them and because the

Defendants never informed the Plaintiff and proposed Class of their practice of charging higher or lower FX rates on FX trades executed by the Defendants.

58.     Defendants' unfair practices affected all State Street custodial clients whose FX trades were executed by State Street.  State Street treated all custodial FX clients equally when over-pricing or under-pricing the FX fees they paid.  Without any regard to their respective custodial contracts, State Street treated all custodial client FX trades exactly the same, for each currency, for each trade.

### C.    The California Attorney General Action

67.     Plaintiff is aware of at least one ongoing governmental action against Defendants arising out of similar conduct alleged in this Complaint.  The California Attorney General, on behalf of the people of the State of California, filed a Complaint in Intervention for violation of the California False Claims Act, Cal. Gov. Code, § 12651, against State Street and State Street California, Inc. charging the defendants with misappropriating over $56 million from the accounts of California's two largest pension plans – the California Public Employees' Retirement System ("CalPERS"), and the California State Teachers' Retirement System ("CalSTRS") – over a multi-year period in connection with the same FX practices pled in this Complaint.  State Street acted as custodian for CalPERS and CalSTRS during that time.

68.     The California Attorney General alleges that State Street inflated FX rates when buying foreign securities for CalPERS and CalSTRS, deflated FX rates when selling foreign securities, and pocketed the difference.   The Attorney General further alleges that State Street hid its wrongful conduct by entering incorrect FX exchange rates into State Street's FX trading computer programs, and providing  false records to CalPERS and CalSTRS.

69.     The California Attorney General action is the only qui tam action against State Street that has been unsealed to date.

## FIRST CLAIM FOR RELIEF

### Violation of the Massachusetts Consumer Protection Act, M.G.L. c. 93A

70.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs and further allege:

71.     At all relevant times hereto the Defendants were engaged in trade or commerce.

72.     While engaged in trade or commerce, Defendants engaged in unfair and deceptive acts and practices, as alleged in this complaint, in violation of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A, §§ 2, 11, including, without limitation:

(a)     Unfairly and deceptively charging FX transactions so as to maximize profits to Defendants at the expense of their custodial customers;

(b)     Unfairly and deceptively charging their custodial customers incorrect FX rates, and pocketing the difference between the actual and incorrect rates;

(c)     Unfairly and deceptively providing account statements to their custodial customers that reported incorrect FX rates;

(d)     Unfairly and deceptively engaged in custodial FX services that failed to conform to Defendants' representations and/or descriptions of their services; and

(e)     Violating Attorney General Regulations, including 940 CMR §§ 3.16(1-2).

73.     These acts or practices violated sections 2 and 11 of the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A.

74.     As a result of the unfair and deceptive conduct of Defendants, Plaintiff ARTRS sustained damages including but not limited to the damages detailed above, incorporated herein.

## SECOND CLAIM FOR RELIEF

### Breach of Agent's Duty of Loyalty

76.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs.

77.     Plaintiff and the Class requested Defendants to act on their behalf to execute the FX transactions necessary to facilitate their purchases and sales of foreign securities.

78.     Defendants entered into an agency relationship with Plaintiff and each of the Class members.

79.     Defendants, by virtue of their capacity as agents for Plaintiff and the Class, and Defendants' superior knowledge and position of control as well as the confidence and trust placed in them by Plaintiff and the Class, owed the duty of loyalty to Plaintiff while executing FX transactions.

80.     Defendants breached their duty of loyalty to Plaintiff and each of the Class members by: (a) over or under stating FX rates so as to maximize profits to Defendants at the expense of their custodial customers; (b) charging their custodial customers incorrect FX rates, and pocketing the difference between the actual and incorrect rates; (c) provided account statements to their custodial customers that reported incorrect FX rates; and (d) failing to conform their FX services to Defendants' representations and/or descriptions of their services.

81.     As a result of Defendants' breach, Plaintiff and the Class sustained damages, including, but not limited to, the damages detailed above.  Accordingly, Plaintiff and the Class are entitled to an award of monetary damages in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### Request for Declaratory Relief Pursuant to the Declaratory
### Judgment Act, 28 U.S.C. § 2201 et seq.

82.    Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs.

83.    As set forth above, Plaintiff contends that Defendants engaged in unfair and deceptive FX trading activities, whereas Defendants maintain their conduct in connection with FX trading is and has been proper.

84.    As such, an actual controversy exists between Plaintiff and the Class and Defendants concerning the parties' rights and duties with respect to Defendants' FX trading activities.

85.    The parties require this Court's declaration as to their respective rights, duties and any other relevant legal relations, whether or not the parties could seek or are otherwise entitled to further relief.

### PRAYER FOR RELIEF

WHEREFORE Plaintiff demands judgment for itself and other members of the proposed Class as follows:

1)    With regard to the First Claim for Relief, that the Court certify this action as a class action and enter judgment against Defendants in an amount equal to three times the amount of damages that Plaintiff and the Class have sustained as a result of Defendants' actions;

2)    With regard to the Second Claim for Relief, that the Court certify this action as a class action and find the Defendants breached their duties of loyalty to Plaintiff and the Class, and award damages appropriate to compensate Plaintiff and the Class;

3)      With regard to the Third Claim for Relief, that the Court certify this action as a class action and enter an order in favor of Plaintiff and the Class declaring that Defendants engaged in unfair and deceptive conduct in connection with FX transactions entered into on behalf of Plaintiff and the Class;

4)      That Plaintiff and the Class be awarded all costs and expenses of this action, including attorneys' fees; and

5)      That Plaintiff and the Class be awarded all such other relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated:  February 10, 2011                            Respectfully submitted,

                                                    **THORNTON & NAUMES LLP**

                                                    By: __/s/ Garrett J. Bradley_____

                                                    Michael P. Thornton
                                                    Garrett J. Bradley
                                                    100 Summer Street, 30th Fl.
                                                    Boston, MA 02110
                                                    Telephone:  (617) 720-1333
                                                    Facsimile:  (617) 720-2445

                                                    **LABATON SUCHAROW, LLP**
                                                    Joel H. Bernstein
                                                    Eric Belfi
                                                    Paul Scarlato
                                                    140 Broadway
                                                    New York, NY  10005
                                                    Telephone:  (212) 907-0839
                                                    Facsimile:  (212) 883-7039

.

**LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP**
Steven E. Fineman
Daniel P. Chiplock
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

**LIEFF CABRASER HEIMANN &
    BERNSTEIN, LLP**
Richard M. Heimann
Lexi J. Hazam
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Tel. (415) 956-1000
Fax. (415) 956-1008

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>                   Plaintiffs,<br><br>  - against -<br><br>STATE STREET CORPORATION, STATE STREET BANK AND TRUST COMPANY and STATE STREET GLOBAL MARKETS, LLC,<br><br>               Defendants. | No. 11-CV-10230 (MLW)<br><br>**AMENDED CLASS<br>ACTION COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff Arkansas Teacher Retirement System ("ARTRS"), individually and on behalf of all other similarly situated entities, by its undersigned attorneys, for its Amended Class Action Complaint against Defendants State Street Corporation, State Street Bank and Trust Company ("State Street Bank"), and State Street Global Markets, LLC (collectively, "State Street" or "Defendants"), alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters.

## I.    INTRODUCTION

1.    State Street was the custodian bank for ARTRS and the other institutional investors that constitute the Class.  A custodian bank is an institution that holds securities on behalf of investors.  The responsibilities entrusted to a custodian include the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities.  Custodians may also perform ancillary services for their clients.  Custodians are typically used by institutional investors who do not

wish to leave securities on deposit with their broker-dealers or investment managers. By separating these duties, the use of custodians—at least in theory—reduces the risk of fraud or other misconduct. An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

2.       State Street Bank is the nation's second-largest custodian bank, with $21.5 trillion in assets, including $4.7 trillion in pension assets, under custody and administration as of December 31, 2010. State Street charged ARTRS and its other custodial clients hundreds of millions of dollars a year in fees for custodial services.

3.       As part of its array of ancillary custodial services, State Street executed foreign currency exchange ("FX") transactions on behalf of its clients in order to facilitate clients' purchases or sales of foreign securities or the repatriation of foreign currency into U.S. dollars. During the past decade, pension funds and other institutional investors have increasingly looked to overseas companies and securities markets in order to diversify their holdings and maximize investment returns. The necessity for pension funds, in particular, to invest in foreign securities in order to properly diversify and meet their funding requirements is well-known to and appreciated by custodians such as State Street, as pension funds' investment guidelines are publicly and readily available.

4.       Because foreign investments are bought and sold in the foreign currencies of the nations in which they are issued, U.S.-based investors necessarily must purchase and sell those foreign currencies in order to complete the transactions.

5.       ARTRS and the members of the Class reposed a high degree of trust in State Street. ARTRS and Class members authorized State Street to execute FX transactions under conditions in which State Street controlled all aspects of FX trades, including the cost. ARTRS

and Class members depended upon State Street not only to execute FX trades honestly, but also to accurately report the FX rate and generally carry out the trades in a manner consistent with their custodial services contracts ("Custodian Contracts") and State Street's other written representations.

6.      ARTRS's Custodian Contracts expressly provided that State Street would execute FX transactions for no additional fees above the substantial annual flat fee ARTRS paid for custodial services.  Indeed, while ARTRS's Custodian Contracts with State Street authorized State Street to charge ARTRS for additional fees for certain ancillary services, they did not authorize additional fees for executing FX transactions.

7.      In successive "Investment Manager Guides" made available to its custodial clients and their outside investment managers, State Street explained that the pricing of FX trades is ***"based on the market rates at the time the trade is executed."***  Thus, State Street assured its custodial clients, including ARTRS and the Class, that FX rates would reflect only the execution price, without additional fees or mark-ups.

8.      Despite these express provisions in the Investment Manager Guides and Custodian Contracts, in addition to the annual flat fees it charged its custodial clients, State Street has undertaken an unfair and deceptive practice since at least 1998 whereby FX transactions were conducted so as to maximize exorbitant and undisclosed profits to State Street at the direct expense of ARTRS and Class members.  State Street charged its custodial clients inflated FX rates when buying foreign currency for them, reported deflated FX rates when selling foreign currency for them, and in both cases pocketed the difference between the actual and reported rates.  In this regard, State Street charged ARTRS and the Class incorrect and often

fictitious FX rates unrelated to the market-based rates State Street actually paid or received in executing the FX trades.

9. ARTRS and other Class members could not reasonably have detected State Street's deception. Nothing in the FX rates State Street actually reported to its clients indicated that those rates included hidden and unauthorized mark-ups (or mark-downs).

10. State Street's unfair and deceptive FX trading practices, perpetrated on ARTRS and the Class, generated hundreds of millions of dollars in profits annually for State Street. This money was taken directly from the pockets of ARTRS and Class members.

11. ARTRS brings this action as a class action on behalf of all similarly affected custodial clients of State Street during the Class Period defined below, except for those covered by independent *qui tam* actions that have been or that become unsealed during the pendency of this action, in order to recover the proceeds State Street reaped from Class members through its unfair and deceptive FX trading practices.

## II.   JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d), because this is a class action filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds, if not thousands, of proposed Class members; the aggregate amount in controversy exceeds the jurisdictional amount; and many members of the proposed Class, including Plaintiff, are citizens of States other than Massachusetts. This Court also has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different States and the matter in controversy with respect to the claims of the named Plaintiff exceeds the jurisdictional amount, and pursuant to 28 U.S.C. § 1367(a).

13. Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391(b)(1) and (2). A substantial part of the acts or omissions giving rise to Plaintiff's claims occurred within this judicial district. Defendants are citizens of the Commonwealth of Massachusetts, and are headquartered in and conduct substantial operations within this judicial district.

## III.    PARTIES

### A.    Plaintiff ARTRS

14. ARTRS, based in Little Rock, Arkansas, is a cost-sharing, multiple-employer defined benefit pension plan that provides retirement benefits to public school and other public education-related employees in the State of Arkansas. ARTRS was established by Act 266 of 1937, as an Office of Arkansas State government, for the purpose of providing retirement benefits for employees of any school or other educational agency participating in the system. As of June 30, 2009, ARTRS included 343 participating employers and more than 115,000 members, and had net assets held in trust for pension benefits exceeding $8.8 billion.

15. Like many institutional investors, ARTRS invests some of its net pension assets in foreign securities, referred to by ARTRS as "Global Equity" securities. Global Equity investments are ARTRS's single largest investment asset class. As of September 30, 2009, and consistent with its investment guidelines, ARTRS's Global Equity investments constituted approximately 33% of its net pension assets, worth more than $3.2 billion. That percentage remained consistent through the end of 2010.

16. State Street has been ARTRS's exclusive custodian bank since 1998. ARTRS paid State Street $851,412.83 for disclosed and agreed-upon custodial fees for fiscal year 2009 (July 1, 2008-June 30, 2009). Such fees did not include State Street's hidden and unauthorized FX trading charges.

## B.    Defendants

17.    Defendant State Street Corporation is a Massachusetts corporation headquartered at State Street Financial Center, One Lincoln Street, Boston, Massachusetts 02111.

18.    During the Class Period, State Street Corporation provided custodial banking and FX services to ARTRS and other members of the Class through State Street Bank and Trust, and its subsidiaries, agents, employees and co-conspirators.  At all relevant times, State Street's FX trading desk was located in Boston.

19.    Defendant State Street Bank is a wholly owned subsidiary of State Street Corporation and is similarly headquartered in Boston.  During the Class Period, State Street Bank provided custodial banking and FX services to ARTRS and members of the Class.

20.    Defendant State Street Global Markets, formerly known as State Street Capital Markets, is a wholly owned subsidiary of State Street Corporation and is similarly headquartered in Boston.  During the Class Period, State Street Global Markets provided custodial banking and FX services to ARTRS and members of the Class.  In particular, State Street Global Markets provides specialized investment research and trading in foreign exchange, equities, fixed income, and derivatives for State Street's custodial clients.

## IV.    CLASS ACTION ALLEGATIONS

21.    This action is brought and may properly be maintained as a class action pursuant to Rules 23(a)(1)-(4) and 23(b)(3) of the Federal Rules of Civil Procedure and Massachusetts General Laws ch. 93A, §§ 9 and 11.  This action satisfies the procedural requirements set forth by Rule 23 and ch. 93A, §§ 9 and 11.

22.    This suit is a class action brought for money damages on behalf of a Class defined as all institutional investors in foreign securities, including but not limited to public and private pension funds, mutual funds, endowment funds and investment manager funds, for which State

Street served as the custodial bank and executed FX trades on a "standing-instruction" or

"non-negotiated" basis between January 2, 1998 and December 31, 2009, inclusive (the "Class

Period"), and which suffered damages as a result of the deceptive acts and practices and other

misconduct alleged herein. Excluded from the Class are custodial clients of State Street that are

covered by independent *qui tam* actions that have been unsealed or that are unsealed during the

pendency of this action. Also excluded from the Class are Defendants, any entity in which

Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives,

heirs, successors, subsidiaries, and/or assigns of any such entity.

23.     The members of the Class are so numerous that joinder of all members

individually, in one action or otherwise, is impracticable.

24.     There are questions of law and fact common to the Class, including whether:

(a)     State Street engaged in unfair and deceptive acts and practices in

connection with FX transactions, so as to maximize its own profits at the expense

of its custodial clients;

(b)     State Street charged and reported to its custodial customers FX

rates that did not reflect the actual cost of the FX transaction to State Street, and

instead included hidden and unauthorized mark-ups (or mark-downs);

(c)     State Street pocketed the difference between the actual, market-

based FX rates and the false FX rates reported and charged to its custodial clients;

(d)     State Street's acts and omissions with respect to ARTRS and the

Class violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch.

93A;

(e)  State Street's acts and omissions with respect to ARTRS and the Class violated Massachusetts state and common law; and

(f)  State Street's acts and omissions caused ARTRS and the Class to suffer money damages and, if so, the proper measure of those damages.

25.  Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff is a member of the Class described herein.

26.  Plaintiff is willing and prepared to serve the Court and the proposed Class in a representative capacity with all of the obligations and duties material thereto. Plaintiff will fairly and adequately protect the interests of the Class and has no interests adverse to or which directly and irrevocably conflict with the interests of other members of the class.

27.  The interests of the Plaintiff are co-extensive with, and not antagonistic to, those of the absent Class members. Plaintiff will undertake to represent and protect the interests of absent Class members.

28.  The undersigned counsel for Plaintiff and the Class are experienced in complex class action litigation, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiff and absent Class members.

29.  The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

30.  A class action is superior to other available methods for the adjudication of this controversy. Individual litigation by all Class members would increase the delay and expense to the parties and the Court given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be more fair,

efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

31.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.  Compared to individual actions by each Class member, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     The Nature of FX Trading

#### 1.     The Increasing Necessity of FX Trading in a Global Investment Portfolio

32.     During the past decade, in order to meet their investment and funding objectives, U.S.-based institutional investors have found it increasingly necessary to enter the overseas securities markets and expand the global scope of their investment portfolios.  ARTRS, for example, held approximately 15% of its investment portfolio in global markets as of mid-2003.  By September 2009, however, that percentage had increased to more than 33%.

33.     Institutional investors that buy and sell foreign securities, such as ARTRS and other Class members, must engage in FX trading because the purchases, sales, dividends, and interest payments are all transacted in the currency of the nation in which the relevant securities exchange sits.

34.     If, for example, a U.S. investor wishes to buy shares of stock in a German company that trades on a German securities exchange, the investor must sell U.S. dollars and purchase euros in order buy those shares.  Further, any cash dividends paid on that German stock will be denominated in euros.  To "repatriate" those dividends, the investor must sell the euros

received and purchase dollars.  Accordingly, FX transactions are the means for converting U.S. dollars into foreign currency and vice versa.

> **2.      How FX Trading Works**

35.      FX trading takes place around the world on a nearly 24-hour cycle, five-and-a-half days a week.  The official FX trading week begins at 7:00 a.m. New Zealand time on Monday, with each subsequent trading day ending at 5:00 p.m. New York City time.

36.      For each currency bought and sold during the course of the FX trading day, there will necessarily be a high trade and a low trade, with all other trades falling somewhere in between.  This information is determined through trade data monitored and tracked by proprietary services such as, but not limited to, Electronic Brokerage System ("EBS") and Reuters.

37.      The difference between the low trade and the high trade is called the "range of the day."  More precisely, the "spot range of the day" refers to FX rates as of a specific and prompt settlement date, usually two business days after the trade date.  To more accurately measure the trade cost for FX transactions that settle prior to or later than the date for spot trades, participants in the FX market also look to the "forward-adjusted range of the day."  Because FX trades do not always settle two days after the trade, the forward-adjusted range of the day is a more conservative and accurate measurement such that it takes into account the interest rate differential that exists at the time of trade between the trade date and settlement date for the underlying currencies.

38.      By way of example, assume 100 FX trades in euros-for-dollars (EUR-USD) during the course of one trading day.  If the lowest rate trade occurred at $1.25 to buy €1.00, and the highest rate trade occurred at $1.35 to buy €1.00, the range of the day would be $1.25-$1.35.

39.     Another useful measure is the daily "mid-rate," which is simply the sum of the forward-adjusted daily high and forward-adjusted daily low, divided by two.  This rate reflects the "average" FX rate in a given currency on a given day.

40.     The daily mid-rate is significant because of the absence of publicly accessible data showing the precise time of day at which FX trades occur (as exists with stock trading, for example) and because State Street did not disclose such information to its clients.  By looking at the mid-rate over a significant period of time, however, one can reasonably estimate the average FX trade cost on any given day.  Over the course of a month or years, it is reasonable to expect FX trades to regress to the mid-rate.  On any given day, some trades might settle above or below the daily mid-rate, but over increasingly lengthy periods of time, a significant number of FX trades can be expected to occur at or extremely close to the mid-rate.

### 3.     Negotiated vs. Non-Negotiated FX Trades

41.     State Street gave ARTRS and other custodial clients a choice with respect to the manner in which FX trades would be conducted.  In a "negotiated," or "active," FX trade, a custodial client or its outside investment manager would personally communicate the trade information to a State Street FX trader.  The State Street FX trader would then quote a rate, which would be accepted or rejected.  If accepted, State Street would execute the FX trade at the agreed-upon price, which could include a modest mark-up.

42.     A "non-negotiated" or "standing-instruction" FX trade is essentially the opposite of a negotiated trade.  There is no arm's-length negotiation of the price between the parties to the transaction.  With non-negotiated or standing-instruction trades, custodial clients and their outside investment managers do not negotiate rates with State Street, and State Street does not quote rates.  Instead, as the name "standing-instruction" suggests, custodial clients simply report the desired currency transaction to State Street, and trust and rely upon State Street, using "best

execution" practices, to execute the trade on the client's behalf. According to its Investment Manager Guides, State Street referred to standing-instruction FX transactions as "Indirect Deals" between 2000 and May 2008, and "Institutional Investors FX Trading" between May 2008 and November 2009. Since November 2009, State Street has referred to such trading as "Custody FX."

43. State Street's custodial clients, including ARTRS and the Class, reasonably expected that standing-instruction FX trades would have no mark-ups or fees. This was in view of, among other things, (a) the hefty annual fees custodial clients paid State Street to serve as custodian over their assets, (b) the Custodian Contracts and associated fee schedules that gave no indication that standing-instruction FX trading would incur extra fees or mark ups, and did not authorize any such fees or mark-ups, and (c) State Street's Investment Manager Guides that assured custodial clients and outside investment managers that the price of FX trades was ***"based on the market rates at the time the trade is executed."***

44. Institutional investors typically requested that State Street and other custodians handle the smaller FX transactions, mostly the repatriation of dividend and interest payments, through standing instructions because the amount of each trade rarely justified the time and effort required for a negotiated trade.

**B. ARTRS Placed its Trust in State Street as its Custodian Bank, Relying on State Street's Expertise and Loyalty**

45. Since at least September 15, 1998, State Street, as ARTRS's custodian bank, executed the majority of ARTRS's FX transactions for its accounts, including purchases and sales of U.S. and foreign currency as well as repatriations of dividends and interest payments into U.S. dollars.

46.     ARTRS, like other Class members, reposed a high degree of trust in State Street to execute standing-instruction FX transactions.  In conducting these transactions, State Street occupied a superior position to ARTRS due to its control over all aspects of the FX trade, including the timing of the trades, and most importantly, the price at which the trades were executed.

47.     ARTRS depended upon State Street not only to execute the FX trades, but also to accurately and honestly report the FX rate and to carry out the trades in accordance with their Custodian Contracts, associated fee schedules, and guidelines as set forth in the Investment Manager Guides.

48.     Additionally, separate and apart from the Custodian Contracts and Investment Manager Guides, ARTRS, like State Street's other custodial clients, had a reasonable expectation that the FX rates that State Street charged (or credited) on standing-instruction FX trades would accurately reflect the true rates of those FX trades.  There is no reason a custodial client would expect its custodian bank—to which it was paying substantial annual fees for custodial services—to charge (or credit) it in connection with standing-instruction FX trades at any rate other than the actual rate for the FX trade.

**C.     State Street's Custodian Contracts**
        **and Investment Manager Guidelines**
        **Were Predicated on No-Cost FX Trading**

49.     ARTRS's initial Custodian Contract with State Street was dated September 15, 1998.  The parties superseded that contract on July 1, 2001 with a new Custodian Contract containing nearly identical terms and provisions.  The second contract was superseded by a Custodian Contract signed June 29, 2004, also containing identical provisions.  That third contract was eventually superseded by a Custodian Contract dated June 30, 2009, containing identical relevant terms.

50. Each of the Custodian Contracts provided that State Street "shall be entitled to compensation for its services and expenses as Custodian" for ARTRS pursuant to "a written Fee Schedule between the parties."

51. ARTRS and State Street agreed to and executed a series of Fee Schedules covering the following periods:

(a) Effective September 15, 1998 through June 30, 2001;

(b) Effective July 1, 2001 through June 30, 2004;

(c) Effective July 1, 2004 through June 30, 2007;

(d) Effective July 1, 2007 through June 30, 2009 (as revised);

(e) Effective April 1, 2008 through June 30, 2009 (as revised);

(f) Effective November 1, 2008 through June 30, 2009; and

(g) Effective July 1, 2009 through June 30, 2014.

52. The Fee Schedule effective September 15, 1998 provided for an "estimated total annual fee" of $233,534. The remaining Fee Schedules provided for an annual flat fee to be paid by ARTRS to State Street for services as custodian:

(a) $600,000 per year from July 1, 2001 through June 30, 2004;

(b) $500,000 per year from July 1, 2004 through June 30, 2007;

(c) $400,000 per year from July 1, 2007 through June 30, 2009, with a subsequent revision to $320,000 from April 1, 2008 through June 30, 2009; and

(d) $200,000 per year from July 1, 2009 through June 30, 2014.

53. The Fee Schedules also set forth certain categories of ancillary services for which State Street was permitted to charge ARTRS additional fees, including Wire Fees, Reporting Fees, Delivery Fees and Subcustody Fees.

54. None of these particular ancillary service categories relate in any way to FX trading. The Custodian Contracts did not state that those ancillary fees relate to FX trading or that State Street would impose any fees in connection with FX trading.

55. Unlike most of the later Fee Schedules, which were silent as to fees and charges for FX trading, the September 15, 1998 Fee Schedule specifically mentioned FX trading, stating that **"No Charge"** would be assessed for any foreign exchange executed through State Street.

56. The July 1, 2009 Fee Schedule also mentions FX trading: State Street specifically stated that "[t]ransaction costs for all foreign exchange trades transacted through State Street *will be waived.*" (Emphasis added.)

57. As such, for more than a decade, ARTRS's Custodian Contracts with State Street (a) expressly provided that standing-instruction FX trades would be executed free of charge; or (b) did not list FX transactions among the services for which it was permitted to charge an additional fee or any other cost above the annual flat fee.

58. Substantially similar terms were employed in the Custodian Contracts for other members of the Class during the Class Period.

59. Additionally, during the Class Period, State Street provided Investment Manager Guides to custodial clients and outside investment managers that contained comprehensive information about State Street's custody practices and services, including procedural requirements, costs, and features. The many services described therein included "State Street Foreign Exchange Transactions."

15

60.     During the Class Period, State Street issued no fewer than 15 distinct Investment Manager Guides, including those dated July 9, 2003; August 9, 2005; September 26, 2006; October 17, 2006; November 20, 2006; December 15, 2006; January 25, 2007; October 30, 2007; November 21, 2007; December 19, 2007; January 28, 2008; May 1, 2008; October 31, 2008; December 30, 2008; and January 23, 2009, to custodial clients and outside investment managers.

61.     State Street represented in each of these Investment Manager Guides that "State Street Foreign Exchange Transactions . . . are *priced based on the market rates at the time the trade is executed."*  (Emphasis added.)

**D.     State Street's Deceptive Scheme Overcharged ARTRS and the Class for Standing-Instruction FX Trades**

62.     State Street's FX practices diverged from what the Custodian Contracts authorized and what the Investment Manager Guides represented.  Despite assurances that FX transactions would be based on market rates, State Street reported and charged ARTRS and the Class FX rates on standing-instruction trades far above what State Street actually paid for foreign currency (or far below what State Street actually received for sales of foreign currency)— oftentimes, at rates that actually fell *outside of the range of the day.*

63.     As such, unbeknownst to ARTRS and the Class, State Street reported FX rates on standing-instruction trades to its clients that did not reflect the actual cost or proceeds of the FX transaction to State Street, and instead included a hidden and unauthorized mark-up.  Put simply, State Street invented the FX rates it reported and charged (or credited) to ARTRS and the Class. State Street paid or received one rate for FX, reported to ARTRS and Class members another rate that was either higher (in the case of a purchase) or a lower (in the case of a sale), and pocketed the difference.

64.     When custodial clients or their agents requested that State Street execute an FX transaction, the request was routed electronically via State Street's Market Order Management System (MOMS) to a group of "risk traders" working at State Street's FX trading desk who then executed the FX trades by entering trade information that did not reflect the actual rate State Street paid or received.

65.     To illustrate the deception, assume again the example set forth above—100 euro-for-dollar trades on a given day that ranged from $1.25 to $1.35 (the "range of the day") to purchase €1.00, with a day's mid-rate of $1.30.  On any, and all, standing-instruction euro-for-dollar trades on behalf of its custodian clients, State Street would have paid a rate between $1.25 and $1.35 for those euros, but reported to its clients that it paid more.  State Street charged its clients the false higher amount and kept the difference.

66.     This conclusion is supported by Plaintiffs' analysis of ten years of FX transactions executed by State Street on behalf of and reported to ARTRS.  Between January 3, 2000 and December 31, 2010, ARTRS had a total 10,784 FX transactions with reliable data.  Among these 10,784 transactions, 4,216, or 39%, were non-negotiated, standing-instruction trades.  These 4,216 FX trades had an aggregate trading volume exceeding $1.2 billion.

67.     In conducting the analysis, ARTRS's FX trades were compared to other FX trades logged and tracked in a comprehensive database of more than 2 million buy-side currency trades.  By comparing ARTRS's trades in certain currencies with the same currency pair trades in the database, one can estimate the trading cost of ARTRS's standing-instruction FX trades in relation to trades made worldwide.  For purposes of this analysis, the trading cost is the difference between the day's mid-rate and the rate that State Street charged (or credited) to ARTRS for standing-instruction FX trades.

68.     State Street did not report to ARTRS (or any other Class member) the actual time of execution of any FX trade.  Therefore, comparing the day's mid-rate to the standing-instruction FX rates State Street charged (or credited) to ARTRS is the best method of determining whether State Street charged (or credited) ARTRS a rate based on the actual market rate at the time of execution, as State Street represented in its Investment Manager Guides.

69.     State Street derived its false FX rates by adding (on purchases) or subtracting (on sales) "basis points" or "pips" from the actual FX rate.  A basis point, or pip, is a unit equal to 1/100th of a percentage point.  For example, the smallest move the euro/dollar currency pair generally makes is 1/100th of a penny, or one basis point.

70.     For the period of January 3, 2000 through December 31, 2010, the FX rates that State Street reported and charged (or credited) to ARTRS on its 4,216 non-negotiated FX trades were, on average, ***17.8 basis points*** above or below the day's mid-rate.  In other words, the FX rates that State Street reported and charged (or credited) to ARTRS for standing-instruction FX trades, on average and during this 10-year period, created a trading cost 17.8 basis points higher than the average FX rate (the day's mid-rate).

71.     By way of example, assume that the rate State Street actually paid to purchase €1.00 on a given day was $1.31551.  If State Street charged ARTRS 17.8 basis points more than it paid, the rate would be $1.31729 ($1.31729 - $1.31551 = 0.00178).  For a purchase of €10 million, the undisclosed profit to State Street on that single trade—and the concomitant unknown loss by ARTRS—would be $17,800.  Accordingly, the difference in total trading costs between the actual and false rates can be very large.

72.     Tellingly, for the same 10-year period, the FX rates that State Street reported and charged (or credited) to ARTRS on its more than 6,500 ***negotiated*** FX trades added, on average,

only **3.6 basis points** in trading costs as compared to the day's mid-rate.  As such, while the FX trades executed by State Street pursuant to so-called "best execution" practices incurred trading costs of 17.8 basis points on average, the FX trades actively negotiated between State Street and ARTRS or its outside investment managers incurred trading costs of only 3.6 basis points on average.

73.     The false or fictitious nature of the FX rates State Street reported and charged (or credited) to ARTRS is further demonstrated when viewing ARTRS's standing-instruction FX trades in the context of the forward-adjusted range of the day.  Among ARTRS's 4,216 standing-instruction FX trades, **2,217, or 53%, fell entirely outside the forward-adjusted range of the day.**  These 2,217 FX trades, with a total volume exceeding $200 million, added trading costs on average of **64.4 basis points** over the day's mid-rate—an enormous hidden and unauthorized mark-up.  Using the above example of a purchase of €10 million, an undisclosed fee of 64.4 basis points would result in a $64,400 profit to State Street on that single transaction.

74.     Rates consistently above (or below) the daily mid-rate alone demonstrate that State Street was not fulfilling its duties as a custodian by charging a hidden mark-up, and they demonstrate a violation of the terms of the Custodian Contracts and the representations in the Investment Manager Guides.  But when more than half of all standing-instruction FX trades for a particular custodial client fall ***outside*** the forward-adjusted range of the day, it becomes clear that those reported FX rates were not actual, market-based FX rates, but were instead fictitious and designed solely to gouge the custodial client and, in turn, its beneficiaries.  In the case of public pension funds, the beneficiaries include teachers, police officers, firefighters and many other public workers.

75.     There is no rational, honest basis for a professional FX market participant like

State Street, or indeed any FX market participant, to charge an FX rate outside the forward-

adjusted range of the day without disclosing it.  The day's range defines the range at which

primary dealing banks and custodian banks transacted in FX during that trading day.  The

fictitious nature of rates assigned outside the forward-adjusted range of the day illustrates,

perhaps most starkly, the unfair and deceptive nature of State Street's standing-instruction FX

trading practices.  In short, these practices were designed to enrich State Street while deceiving

and unfairly depriving institutional clients such as ARTRS and the Class of much-needed funds.

### E.    State Street's Deceptive Acts and Practices Could Not Reasonably Be Detected by ARTRS and the Class

76.     Neither ARTRS nor any Class member reasonably could have discovered State

Street's deceptive acts and practices concerning FX trading during the Class Period.  State Street

executed hundreds if not thousands of FX trades on behalf of its custodial clients every month.

The periodic reports State Street sent to ARTRS and the Class showed only the rate that State

Street charged for its FX trades.  The reports did not include the range of the day, the daily mid-

rate, or any indication of the time of the day that the trade was executed (known as "time-

stamps").  Accordingly, there was no way for ARTRS and the Class to reasonably determine, or

even suspect, that State Street was secretly charging more than it actually paid for FX or was

paying clients less than it actually received for FX.

77.     It was reasonable for ARTRS and the Class to presume that the prices reflected in

the reports State Street provided to them were an accurate representation of the true cost of the

FX trades.  With respect to ARTRS specifically, the Custodian Contracts expressly provided that

the "Custodian shall render to the [Plaintiff] a monthly report of all monies received or paid on

behalf of the Fund[.]"  Accordingly, State Street had an affirmative obligation to report accurately the amount of money it was paying or receiving for FX.

78.     Furthermore, based on the Investment Manager Guides' assurance that FX rates would be "priced based on the market rates at the time the trade is executed," neither ARTRS nor the Class had any reason to suspect that they were being charged (or credited) anything other the rate that State Street itself had paid or received on those standing-instruction FX transactions.

79.     Moreover, as alleged above, State Street occupied a position of trust and confidence with respect to its custodial clients.  Those clients would not, and did not, suspect that the custodian in which that trust resided, would profit to a gross and undisclosed degree on the services for which they paid a handsome annual fee.  Indeed, those custodial clients would, and did, presume that the custodian bank would act in and not against their best interests.

**F.     Events After October 2009 Begin to Shed Light on State Street's Deceptive Acts and Practices**

80.     On October 20, 2009, the Attorney General of California filed a Complaint in Intervention for violation of the California False Claims Act, Cal. Gov. Code § 12651, charging State Street with misappropriating more than $56 million from the accounts of California's two largest pension plans—CalPERS and CalSTRS—over a multi-year period in connection with the same unfair and deceptive FX practices alleged herein.  *People of the State of Cal. ex rel. Brown v. State Street Corp.*, Case No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento County Oct. 20, 2009).

81.     The California Attorney General alleges that State Street reported inflated FX rates when buying foreign securities for CalPERS and CalSTRS, reported deflated FX rates when selling foreign securities for them, and pocketed the difference between the reported and actual rates.  The Attorney General further alleges that State Street hid its wrongful conduct by

entering incorrect FX exchange rates into State Street's electronic FX trading systems and providing false records to CalPERS and CalSTRS.

82.     In the months that followed, State Street dramatically changed its FX trading policies and disclosure and so informed ARTRS and other Class members.  Under these new policies, State Street admitted for the first time that it had systematically imposed additional charges for FX trading.  For example, in an excerpt from an updated Investment Manager Guide dated November 20, 2009, State Street advised custodial clients that it would post on its website, my.statestreet.com, "current mark-ups and mark-downs used by State Street Global Markets for [standing-instruction] foreign exchange transaction requests."

83.     In a similar message sent to custodial clients, State Street admitted that **"*[s]ince December 2009***, State Street has provided to all of its custody clients and their investment managers via our dedicated client portal, my.statestreet.com, comprehensive disclosure of the pricing and execution methodology (including the maximum mark-up or mark-down that may be applied) for each of its Indirect [standing-instruction] FX Services."  (Emphasis added.)  State Street added that "on the day after a trade is executed, State Street provides for each currency pair the reference interbank rates and the times at which they are obtained, the actual rates, the daily high/low range at the time of pricing (where applicable) and the actual mark-up or mark-down that was applied."

84.     State Street altered its practices to allow custodial clients more complete access to FX trading data only after its deceptive acts and practices began to be revealed.  State Street's late disclosure that it charged mark-ups and mark-downs on standing-instruction FX trades contradicts its previous repeated assurances that FX rates would be based on market rates at the time the trade is executed.

85.     According to a study conducted by an independent FX analyst after the California *qui tam* complaint was unsealed and State Street altered its FX policies, the cost of standing-instruction FX trades dropped by a remarkable **63%.**  The study analyzed 498,940 FX spot and forward trades (196,280 standing-instruction trades and 302,660 negotiated trades) executed during 2000-2010, and found that investors who had their custodian banks, including State Street, execute FX trades on a standing-instruction basis during 2010 saw an overall 63% drop in trading costs from their average trading costs for the years 2000-2009.

## FIRST CLAIM FOR RELIEF

**Violation of the Massachusetts**
**Consumer Protection Act, M.G.L. ch. 93A, § 11**
**(Asserted Against All Defendants on**
**Behalf of Plaintiff ARTRS and the Class)**

86.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

87.     At all relevant times hereto State Street was engaged in trade or commerce.

88.     While engaged in trade or commerce, State Street engaged in unfair and deceptive acts and practices, as alleged in this Complaint, in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 11, including, without limitation:

(a)     Unfairly and deceptively pricing standing-instruction FX trades for custodial clients such as ARTRS and the Class in a manner designed to maximize profits to State Street at the direct and undisclosed expense of those custodial clients;

(b)     Unfairly and deceptively reporting false and fictitious FX rates for standing-instruction FX trades to State Street's custodial clients such as ARTRS

23

and the Class rather than the actual rates at which State Street had effected those

trades;

(c)     Pocketing the difference between the actual FX rates at which

State Street effected custodial clients' standing-instruction FX trades and the false

and fictitious rates State Street reported to those custodial clients;

(d)     taking undisclosed profits on standing-instruction FX trades from

custodial clients such as ARTRS and the Class that grossly exceeded the

customary prices at which similar services were readily obtainable in negotiated

FX transactions by like Class members; and

(e)     Violating Attorney General Regulations, including

940 CMR §§ 3.16(1-2).

89.     These acts or practices violated Sections 2 and 11 of the Massachusetts Consumer

Protection Act, Mass. Gen. Laws ch. 93A.

90.     State Street's unfair and deceptive acts or practices related to standing-instruction

FX transactions occurred primarily and substantially in Massachusetts, where State Street's FX

trading desk is located.

91.     As a result of the unfair and deceptive conduct of State Street, ARTRS and the

Class sustained economic damages in an amount no less than the difference between (a) the

actual dollar amounts paid or received by State Street when conducting standing-instruction FX

trades for ARTRS and the Class and (b) the false and fictitious dollar amounts charged or

credited by State Street to ARTRS and the Class for those same trades.

92.     State Street is in a unique position to know the exact amount of damages

sustained by ARTRS and the Class as a result of State Street's unfair and deceptive conduct,

because, *inter alia,* throughout the Class Period, State Street did not provide time-stamps to its custodial clients for its standing-instruction FX trades.

93.     State Street's unfair and deceptive conduct as described herein was willful and intentional, accordingly entitling Plaintiff and the Class to up to treble, but no less than double, damages, plus costs (including attorneys' fees).

94.     Application of Mass. Gen. Laws ch. 93A to all Class members located throughout the United States, regardless of their state or residence, is appropriate because Defendants are located and engage in trade or commerce in Massachusetts and are thus subject to the laws of the Commonwealth.  Defendants are registered to do business in Massachusetts, and their principal place of business is located in Massachusetts, from which they controlled and directed the deceptive and unfair practices described herein, including conducting FX trades on behalf of ARTRS and the Class.  Further, on information and belief, all employees of Defendants directly involved in the activities complained of herein are based in Massachusetts.

## SECOND CLAIM FOR RELIEF

**Violation of the Massachusetts**
**Consumer Protection Act, M.G.L. ch. 93A, § 9**
**(Asserted Against All Defendants on**
**Behalf of Plaintiff ARTRS and the Class)**

95.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

96.     This claim for relief is pleaded in the alternative to the First Claim for Relief on behalf of Plaintiff and those members of the Class who, as not-for-profit entities utilizing State Street to conduct FX transactions, were engaged in the furtherance of their core mission, which includes investing and building retirement funds for public employees.

97.     While engaged in trade or commerce, State Street engaged in unfair and deceptive acts and practices, as alleged in this Complaint, in violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 2, 9, including, without limitation:

(a)     Unfairly and deceptively pricing standing-instruction FX trades for custodial clients such as ARTRS and the Class in a manner designed to maximize profits to State Street at the direct and undisclosed expense of those custodial clients;

(b)     Unfairly and deceptively reporting false and fictitious FX rates for standing-instruction FX trades to State Street's custodial clients such as ARTRS and the Class rather than the actual rates at which State Street had effected those trades for those customers;

(c)     Pocketing the difference between the actual FX rates at which State Street effected custodial clients' standing-instruction FX trades and the false and fictitious rates State Street reported to those custodial clients;

(d)     taking undisclosed profits on standing-instruction FX trades from custodial clients such as ARTRS and the Class that grossly exceeded the customary prices at which similar services were readily obtainable in negotiated FX transactions by like Class members; and

(e)     Violating Attorney General Regulations, including 940 CMR §§ 3.16(1-2).

98.     These acts or practices violated Sections 2 and 9 of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A.

99.     State Street's unfair and deceptive acts or practices related to standing-instruction FX transactions occurred primarily and substantially in Massachusetts, where State Street's FX trading desk is located.

100.    As a result of the unfair and deceptive conduct of State Street, Plaintiff ARTRS and the Class sustained economic damages in an amount no less than the difference between (a) the actual dollar amounts paid or received by State Street when conducting standing-instruction FX trades for ARTRS and the Class and (b) the false and fictitious dollar amounts charged or credited by State Street to ARTRS and the Class for those same trades.

101.    State Street is in a unique position to know the exact amount of damages sustained by ARTRS and the Class as a result of State Street's unfair and deceptive conduct, because, *inter alia,* throughout the Class Period, State Street did not provide time-stamps to its custodial clients for its standing-instruction FX trades.

102.    Pursuant to the Mass. Gen. Laws. Ann. ch. 93A, § 9(3), on February 16, 2011—more than thirty (30) days prior to the filing of this Amended Class Action Complaint, which asserts, for the first time, a claim pursuant to Mass. Gen Laws ch. 93A, § 9—Plaintiff mailed, via certified mail, return receipt requested, a written demand for relief to State Street identifying the claimants and reasonably describing the unfair acts or practices relied upon and the injuries suffered.  State Street's response on March 18, 2011 contested Plaintiff's allegations and refused to make a reasonable (or any) offer of relief.  The refusal to grant relief was made in bad faith with knowledge or reason to know that the acts of the Defendants violated Mass. Gen. Laws Ann. ch. 93A, § 2.

103.     State Street's unfair and deceptive conduct as described herein was willful and intentional, accordingly entitling Plaintiff and the Class to treble damages, plus costs (including attorneys' fees).

104.     Application of Mass. Gen. Laws ch. 93A to all Class members located throughout the United States, regardless of their state or residence, is appropriate because Defendants are located and engage in trade or commerce in Massachusetts and are thus subject to the laws of the Commonwealth.  Defendants are registered to do business in Massachusetts, and their principal place of business is located in Massachusetts, from which they controlled and directed the deceptive and unfair practices described herein, including conducting FX trades on behalf of ARTRS and the Class.  Further, on information and belief, all employees of Defendants directly involved in the activities complained of herein are based in Massachusetts.

### THIRD CLAIM FOR RELIEF

**Breach of Duty of Trust**
**(Asserted Against All Defendants on**
**Behalf of Plaintiff ARTRS and the Class)**

105.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

106.     Plaintiff and the members of the Class placed their trust in Defendants to execute standing-instruction FX transactions necessary to facilitate the purchases and sales of foreign securities for the accounts of Plaintiff and the Class.

107.     Defendants occupied a superior position to Plaintiff and the Class such that they controlled all aspects of standing-instruction FX trading, including the timing of the FX trades and the prices at which the trades were executed and settled.  Plaintiff and the Class were entirely

dependent on Defendants to execute the FX trades and accurately report the price at which FX trades were settled.

108.    Defendants understood that Plaintiff and the members of the Class placed their confidence and trust in Defendants to report FX trades accurately.

109.    Defendants, by virtue of their superior knowledge and position of control as well as the confidence and trust placed in them by Plaintiff and the Class, owed a duty of loyalty to Plaintiff and the Class in connection with carrying out standing-instruction FX transactions.

110.    Defendants, by virtue of their capacity as custodian for Plaintiff and the Class, and their superior knowledge and position of control as well as the confidence and trust placed in them by Plaintiff and the Class, owed a duty of disclosure in connection with carrying out standing-instruction FX transactions.

111.    Defendants breached their duty of loyalty to Plaintiff and each of the Class members by: (a) charging Plaintiff and the Class higher FX rates than State Street actually paid when buying foreign currency; (b) paying Plaintiff and the Class lower FX rates than State Street actually received when selling foreign currency; (c) pocketing the difference between State Street's actual costs and the rates charged to Plaintiff and the Class; and (d) hiding their conduct by providing account statements to the Plaintiff and the Class that reported only the date on which standing-instruction FX trades were executed, and the price charged to Plaintiff and the Class, yet omitting important information such as the actual time the trade was executed, and the actual cost of the trade to State Street, that would have enabled Plaintiff and the Class to realize they were paying in excess of State Street's actual costs or receiving less than State Street's actual proceeds.

112.     Defendants breached their duty of disclosure to Plaintiff and each of the Class members by providing account statements to the Plaintiff and the Class that omitted the actual cost of the trade to State Street and the actual time the trade was executed.

113.     As a result of Defendants' breaches of duty, Plaintiff and the Class sustained damages, including, but not limited to, the difference between the amount of State Street's actual costs and the amounts charged to Plaintiff and the Class when purchasing foreign currency, and the difference between the amounts State Street received and the amounts paid to Plaintiff and the Class when selling foreign currency.  Accordingly, Plaintiff and the Class are entitled to an award of money damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

### Negligent Misrepresentation
### (Asserted Against All Defendants on
### Behalf of Plaintiff ARTRS and the Class)

114.     Plaintiff repeats and realleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs, as well as those in support of the other claims for relief asserted on behalf of the Class, and further alleges:

115.     Defendants' activities complained-of herein were performed in the course of State Street's business acting as custodian bank for Plaintiff and the members of the Class.

116.     In connection therewith, Defendants supplied Plaintiff and the Class with periodic reports and statements, including monthly reports and trade confirmations, regarding the purchase and sale of foreign currency by State Street on behalf of Plaintiff and the Class.  The reports and statements were provided by State Street for the guidance of Plaintiff and the Class in their business transactions.

117.    The reports and statements State Street provided to Plaintiff and the Class omitted material information about the actual cost to State Street of the purchases and sales of foreign currency, and omitted to state the actual time the foreign currency was purchased or sold by State Street.  Due to State Street's material omissions, Plaintiff and the Class were therefore unable to determine that State Street was charging them in excess of State Street's actual and reasonable costs for FX purchases, and remitting to Plaintiff and the Class less than the amounts State Street received for FX sales.

118.    Because of State Street's special position of trust with respect to Plaintiff and the Class, and because of its superior position controlling all aspects of standing-instruction FX trading and reporting, State Street had a duty to disclose the omitted material information to Plaintiff and the Class.  State Street's position of trust and superior position creates the duty to disclose.

119.    Justifiable reliance is presumed because this Claim for Relief is based on Defendants' material omissions.

120.    Defendants failed to exercise reasonable care or competence in obtaining or communicating the allegedly omitted information to Plaintiff and the Class.

121.    Defendants' negligent misrepresentations caused pecuniary loss to Plaintiff and the Class.

122.    Accordingly, Plaintiff and the Class are entitled to an award of money damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

**Breach of Contract
(Asserted Against Defendant State Street
Bank on Behalf of Plaintiff ARTRS Individually)**

123.     Plaintiff repeats and re-alleges, as if fully set forth herein at length, each and every allegation contained in the above paragraphs and further alleges:

124.     Plaintiff brings this Claim for Relief for breach of contract on behalf of itself individually.

125.     Plaintiff entered into valid, binding Custodian Contracts with State Street Bank, pursuant to which State Street Bank agreed to, *inter alia*, provide services as custodian of the Plaintiff's assets.

126.     The first Custodian Contract was dated September 15, 1998.  It was terminated and superseded by a written Custodian Contract dated July 1, 2001, containing nearly identical relevant terms.  It, too, was terminated and superseded by a written Custodian Contract dated June 29, 2004, containing identical relevant terms.  That Custodian Contract was terminated and superseded by another written Custodian Contact dated June 30, 2009 containing identical relevant terms.

127.     This Claim for Relief is brought pursuant to the law of the State of Arkansas. Each Custodian Contract provided that it "shall be construed and the provisions thereof interpreted under and in accordance with the laws of the State of Arkansas to the extent not pre-empted by federal law."

128.     One of the services State Street Bank agreed to provide to ARTRS pursuant to the Custodian Contracts is the purchase or sale of FX, including pursuant to "standing instructions": "The Custodian is permitted to pay out of moneys of Plaintiff's account, upon proper

instructions, and which may be 'standing instructions' . . . [f]or the purchase or sale of foreign exchange or foreign exchange contracts for the account of the Fund, including transactions executed with or through the Custodian, its agents or its subcustodians."

129.     The Custodian Contracts specified that the amount by which State Street Bank was entitled to be compensated for the services it performs for ARTRS pursuant to the Contracts would be set forth in a written Fee Schedule agreed-to by the parties: "The Custodian shall be entitled to compensation for its services and expenses as Custodian set forth in a written Fee Schedule between the parties hereto until a different compensation shall be in writing agreed upon between the System [ARTRS] and the Custodian."

130.     ARTRS and State Street Bank agreed to and executed the following Fee Schedules:

    (a)     Effective September 15, 1998 through June 30, 2001;

    (b)     Effective July 1, 2001 through June 30, 2004;

    (c)     Effective July 1, 2004 through June 30, 2007;

    (d)     Effective July 1, 2007 through June 30, 2009 (as revised);

    (e)     Effective April 1, 2008 through June 30, 2009 (as revised);

    (f)     Effective November 1, 2008 through June 30, 2009; and

    (g)     Effective July 1, 2009 through June 30, 2014.

131.     The Fee Schedules each provided for an annual flat fee to be paid by ARTRS to State Street Bank for its services as custodian, and set forth certain categories of services, such as Domestic Transaction Charges and Global Transaction charges, for which State Street Bank was permitted to charge ARTRS an additional fee.

132.     The Fee Schedule dated September 15, 1998 discusses FX trading, stating that "***No charge*** will be assessed for each foreign exchange executed through a third party.  Foreign exchange through State Street – ***No Charge.***"  (Emphases in original.)

133.     The Fee Schedules dated July 1, 2001; July 1, 2004; July 1, 2007; April 1, 2008; and November 1, 2008 do not mention FX trading or list FX trading as one of the services for which State Street Bank is permitted to charge Plaintiff an additional fee.  Accordingly, each of these Fee Schedules contemplated that State Street Bank shall not be compensated for the purchase or sale of foreign exchange over and above the annual flat fee.

134.     The Fee Schedule dated July 1, 2009 also makes this clear, and expressly states that "[t]ransaction costs for all foreign exchange trades transacted through State Street will be waived."  Accordingly, State Street Bank is not permitted to charge ARTRS for the purchase or sale of FX above the annual flat fee under the terms of the Custodian Contract.

135.     In the months after the California Attorney General filed its Complaint in Intervention against State Street on October 20, 2009, State Street Bank informed ARTRS of "current mark-ups and mark-downs used by State Street Global Markets for [standing-instruction] foreign exchange transaction requests."  These "mark-ups and mark-downs" continue to breach the express terms of the June 29, 2009 Custodian Contract and associated Fee Schedule (effective July 1, 2009 through June 30, 2014), which states that "[t]ransaction costs for all foreign exchange trades transacted through State Street will be waived."

136.     State Street's practices, detailed herein, of charging ARTRS inflated FX rates when buying foreign currency, and deflated FX rates when selling foreign currency, constitute a hidden and unauthorized charge to ARTRS above the annual flat fee.

137.    By charging ARTRS the hidden and unauthorized fees described herein, State Street Bank has breached the Custodian Contracts, and ARTRS has suffered substantial money damages as a result of that breach.

138.    The Custodian Contracts further provided that "[t]he Custodian shall render to the System [ARTRS] a monthly report of all monies received or paid on behalf of the System and an itemized statement of the securities for which it is accountable under this Contract as of the end of each month, as well as a list of all securities transactions that remain unsettled at that time."

139.    State Street, however, provided ARTRS with monthly reports that showed only the price being charged to the Plaintiff for standing-instruction FX trades and the date of the trade.  State Street omitted important information, such as the time-stamp of the actual time of the trade, and the actual price at which State Street paid for the purchase or sale of foreign exchange so as to hide the fact that ARTRS was being charged a secret profit on the trade.

140.    State Street Bank's failure to comply with the Custodian Contracts' reporting requirement constitutes an additional breach of the Contracts, and ARTRS has suffered substantial monetary damages as a result thereof.

141.    There is no limitations period that would act as a bar to this Claim for Relief pursuant to the maxim *nullum tempus occurrit regi* recognized under Arkansas law. Notwithstanding, ARTRS could not have discovered State Street Bank's breach even in the exercise of due diligence until the earliest, the unsealing of the California Attorney General complaint against State Street because, *inter alia,* the reports State Street provided to ARTRS showed only the price charged to Plaintiff for standing-instruction FX trades and the date of the trade.  By omitting important information, such as a time-stamp and the actual price paid or

received by State Street, Defendants hid or actively concealed their improper conduct. Accordingly, even if a statute of limitations were to apply, it was tolled by State Street's actions.

## **Prayer for Relief**

WHEREFORE, Plaintiff demands judgment for itself and all other members of the proposed Class as follows:

A.      With regard to the First Claim for Relief, that the Court certify this action as a class action and enter judgment against Defendants in an amount equal to up to three but no less than two times the amount of damages Plaintiff and the Class have sustained as a result of Defendants' actions, plus costs (including attorneys' fees);

B.      With regard to the Second Claim for Relief, that the Court certify this action as a class action and enter judgment against Defendants in an amount equal to three times the amount of damages Plaintiff and the Class have sustained as a result of Defendants' actions, plus costs (including attorneys' fees);

C.      With regard to the Third Claim for Relief, that the Court certify this action as a class action, find that Defendants breached their duties of trust to Plaintiff and the Class, and award appropriate compensatory damages to Plaintiff and the Class in an amount to be determined at trial;

D.      With regard to the Fourth Claim for Relief, that the Court certify this action as a class action, find that Defendants negligently misrepresented to Plaintiff and the Class the hidden fees charged in connection with FX trading, and award appropriate compensatory damages to Plaintiff and the Class in an amount to be determined at trial;

E.      With regard to the Fifth Claim for Relief, that the Court find that Defendant State

Street Bank breached each of its Custodian Contracts with Plaintiff, and award appropriate

compensatory damages to Plaintiff in an amount to be determined at trial;

F.      That the Court award Plaintiff and the Class all costs and expenses of this action,

including reasonable attorneys' and experts' fees; and

G.      That the Court award Plaintiff and the Class such other relief as the Court deems

just and proper.

## **Demand for Jury Trial**

Plaintiff demands a trial by jury of all issues so triable.


Dated:  April 15, 2011                     THORNTON & NAUMES, LLP

                                           By:  _/s/ Garrett J. Bradley_____
                                           Michael P. Thornton (BBO #497390)
                                           Garrett J. Bradley (BBO #629240)
                                           Evan R. Hoffman (BBO #678975)
                                           100 Summer Street, 30th Floor
                                           Boston, Massachusetts  02110
                                           Telephone:  (617) 720-1333
                                           Facsimile:   (617) 720-2445

                                           *Liaison Counsel for Plaintiff*
                                           *ARTRS and Proposed Interim*
                                           *Liaison Counsel for the Class*

LABATON SUCHAROW LLP
Joel H. Bernstein
Christopher J. Keller
Eric J. Belfi
David J. Goldsmith
Paul J. Scarlato
Michael H. Rogers
140 Broadway
New York, New York  10005
Telephone:  (212) 907-0700
Facsimile:   (212) 818-0477

*Counsel for Plaintiff*
*ARTRS and Proposed Interim*
*Lead Counsel for the Class*

LIEFF CABRASER HEIMANN
  & BERNSTEIN, LLP
Steven E. Fineman
Daniel P. Chiplock
Michael J. Miarmi
Daniel R. Leathers
250 Hudson Street, 8th Floor
New York, New York  10013
Telephone:  (212) 355-9500
Facsimile:   (212) 355-9592

*Attorneys for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT
## FOR THE STATE OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| STATE STREET CORPORATION, STATE STREET BANK AND TRUST COMPANY and STATE STREET GLOBAL MARKETS, LLC, | ) ) ) ) |
| Defendants. | ) ) |

Civil Action
No. 11-CV-10230 (MLW)

## CERTIFICATE OF SERVICE

I hereby certify that the forgoing Plaintiffs' Amended Class Action Complaint was filed through the ECF System on April 15, 2011 and accordingly will be served electronically upon all registered participants identified on the Notice of Electronic Filing.

/s/ Garrett J. Bradley
Garrett J. Bradley (BBO# 629240)
THORNTON & NAUMES, LLP
100 Summer Street, 30th Floor
Boston, MA  02110
Ph. (617) 720-1333
Fax (617) 720-2445
jbradley@tenlaw.com

Dated:  April 15, 2011

# EX. 2

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| Arnold Henriquez, on behalf of the Waste Management Retirement Savings Plan, and all other similarly situated plans, | ) ) ) ) | |
| Plaintiffs, | ) ) | **C.A. No.:** |
| v. | ) ) | |
| State Street Bank and Trust Company, State Street Global Markets, LLC and Does 1-20 | ) ) ) ) | |
| Defendants. | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Arnold Henriquez alleges the following on behalf of the Waste Management Retirement Savings Plan ("Plan") and its participants and beneficiaries and a class of similarly-situated ERISA retirement plans (collectively, "Plans") and their participants and beneficiaries against State Street Bank and Trust Company ("SSBT") and State Street Global Markets, LLC ("SSGM") based on the investigative efforts of private whistleblower firms, the State of California, the Securities and Exchange Commission ("SEC"), and an investigation by counsel, which included reviewing: Internal Revenue Service Forms 5500 ("Form 5500") filed with the United States Department of Labor ("DOL"); filings with the United States Securities and Exchange Commission, including Annual Reports on Form 10-K; and other publicly available documents related to this action.

## I.    NATURE OF THE ACTION

1.    This is a civil enforcement action brought pursuant to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, et seq., and in particular under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), to recover losses and obtain equitable relief on behalf of the Plan, and all other similarly situated plans.

2.      SSBT and SSGM (collectively, "Defendants") were required to act prudently and solely in the interest of the Plans' participants and beneficiaries in their capacity as ERISA fiduciaries.  On information and belief, rather than fulfilling their fiduciary duties under ERISA (the "highest known to the law")[1], the Defendants charged improper, undisclosed markups on transactions in foreign currency ("FX transactions" or "FX trading").

3.      The Plan and the similarly situated Plans are established and sponsored by private entities in accordance with ERISA.

4.      Plaintiff alleges that Defendants violated ERISA by causing the Plans, or collective funds operated by Defendants in which the Plans were invested, to execute FX transactions at exchange rates favorable to Defendants and reporting those transactions at less favorable rates.  These transactions were prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

5.      Plaintiff also alleges that Defendants failed to act solely in the interest of the participants and beneficiaries of the Plans and breached their fiduciary duties of prudence and loyalty with respect to the Plans.  Specifically, Plaintiff alleges that Defendants, as fiduciaries of the Plans, violated their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104 by causing the Plans or the collective funds operated by Defendants in which the Plans were invested to engage in transactions that were not to the exclusive benefit of the Plans or their participants and beneficiaries.

## II.      JURISDICTION AND VENUE

6.      ERISA provides for exclusive federal jurisdiction over these claims.  The Plan is an "employee benefit plan" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and Mr. Henriquez is a participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), who is authorized pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), to

---

[1] _Donovan v. Bierwirth_, 680 F.2d 263, 272 n.8 (2d Cir. 1982)

bring the present action on behalf of the Plan and its participants and beneficiaries to obtain appropriate relief.

7.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

8.      Venue is proper in this district pursuant to 28 U.S.C. ' 1391(b) and ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which relief is sought occurred in this district and the Defendants reside and may be found in this district.

## III.    PARTIES

*A.      Plaintiffs*

9.      **Plaintiff Arnold Henriquez.**  Plaintiff Arnold Henriquez is a participant in the Waste Management Retirement Savings Plan, an ERISA-covered defined contribution plan.  At all material times from the second quarter of 2005 through the second quarter of 2009, Mr. Henriquez invested in the "International Equity Fund"[2] sponsored by SSBT and offered by the Plan.  Mr. Henriquez also invested in other funds sponsored by SSBT and offered by the Plan during the Class Period, including the Large Cap Equity Fund, the Small Cap Equity Fund, the Conservative Asset Allocation Fund, the Moderate Asset Allocation Fund, the Aggressive Allocation Fund, the Bond Market and the SSgA Target Retirement 2030 Fund.  Mr. Henriquez resides in Frederick, Maryland.  Mr. Henriquez brings this action as a representative plaintiff on behalf of all similarly situated plans.

10.     **Defendant State Street Bank and Trust Company ("SSBT").**  Defendant State Street Bank and Trust Company is incorporated in Massachusetts and is headquartered in

---

[2] The "International Equity Fund" is the fund name used by SSBT on disclosures to participants in the Plan.  The International Equity Fund's name, according to the International Equity Fund's Forms 5500 for 2009 and 2010, filed by SSBT with DOL, is the "Active Intl Stock Selection SL SF CL I (CM8J [sic]."  From 2006 through 2008, the International Equity Fund's name, according to the International Equity Fund's Forms 5500 filed by SSBT with DOL was the "International Alpha Select SL Series Fund – [sic]."  The foreign fund names may refer to the International Equity Fund at a particular point in time, as well as to one or more of several classes of interests offered in the International Equity Fund.

Boston, Massachusetts. Defendant State Street Bank and Trust Company directly, or indirectly through one or more subsidiaries, operates as a custodial bank for ERISA covered benefit plans and for collective investment funds offered by defined contribution plans. SSBT is a subsidiary of State Street Corporation, a financial holding company headquartered in Boston, Massachusetts.

11. **Defendant State Street Global Markets, LLC ("SSGM")**. Defendant State Street Global Markets, LLC, a subsidiary of State Street Corporation, is incorporated in Delaware and is headquartered in Boston, Massachusetts. SSGM describes itself as "the investment research and trading arm of State Street Corporation." It provides specialized investment research and trading in foreign exchange, equities, fixed income, and derivatives to ERISA covered benefit plans.

12. **Defendants Does 1-20**. Does 1-20 are fiduciaries of the Plans relevant to this lawsuit whose exact identities will be ascertained through discovery.

## IV. FACTUAL BACKGROUND

*A. The Plans.*

13. **Waste Management Retirement Savings Plan**. The Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A). Pursuant to ERISA, the relief requested in this action is for the benefit of the Plan.

14. **Other Similarly Situated Plans**. Defendants provide services similar to those provided to the Plan to other, similarly situated Plans, either directly as plan custodian or indirectly as custodian of funds in which the Plans invest.

*B. Defendants' Fiduciary Status*

15. Every plan governed by ERISA must have fiduciaries to administer and manage the plan. A custodial bank is among these fiduciaries.

16.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA §402(a)(1), but also any other persons who in fact perform fiduciary functions.  ERISA §3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i) (stating that a person is a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets. . .") (emphasis added).

17.     Defendants functioned as fiduciaries to the Plan by exercising authority and control over Plan assets.

18.     SSBT served as custodian for the Plans' assets, including both defined benefit and defined contribution plans. As custodian, SSBT is a fiduciary under ERISA. SSBT is a fiduciary of the Plan and owed fiduciary duties to the Plan and its participants under ERISA.

19.     SSGM exercised authority and control over plan assets in its role as SSBT's affiliate responsible for setting the exchange rates on FX transactions and executing those transactions.  As discussed below, this process created the maximum spread between the marked up custody exchange rate offered to custodial clients and the marked down exchange rate used to process repatriation and other FX transactions.

*C.      Retirement Plan Investment Strategy*

20.     There are two types of retirement plans, defined benefit plans and defined contributions plans.  Both types of retirement plans, especially over the last decade, have found it to be necessary and prudent to expand their investments to include exposure to foreign markets.  Accordingly, defined benefit plans have expanded international holdings, and defined contribution plans frequently include at least one, if not several, international investment options.

21.     Retirement plans regularly purchase and sell foreign securities, receive dividends that are paid in foreign currencies, or participate in other investments that require the exchange

of foreign currency into and from US Dollars ("USD"), that is, FX trading, either directly or through participation in collective investment funds.

22.     A "custodian" is an institution that holds securities on behalf of investors. The responsibilities entrusted to a custodian include the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities. Custodians may also perform ancillary services for their clients. Custodians are typically used by institutional investors who do not wish to leave securities on deposit with their broker-dealers or investment managers. The use of a custodial bank is intended to reduce the risk of misconduct by separating the custodial and asset management duties. An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

23.     SSBT served as custodian for ERISA covered defined benefit plans.

24.     SSBT operated collective investment funds invested in foreign securities in which ERISA covered defined contribution plans invested during the Class Period.  SSBT served as custodian for these collective investment funds.  Collective investment funds that invest in foreign securities, such as the SSBT-sponsored International Equity Fund offered in the Plan, must engage in FX transactions in order to buy and sell securities, to repatriate dividends or interest payments, and to engage in other transactions.

25.     Class members placed a high degree of trust in Defendants.  Plaintiff and the Class depended upon Defendants to both execute and report FX trades honestly and accurately.

26.     SSBT described itself as "a leading specialist in meeting the needs of institutional investors." In its Class Period filings with the SEC, the Company repeatedly stated that its customer relationships were "predicated upon our reputation as a fiduciary and a service provider that adheres to the highest standards of ethics, service quality and regulatory compliance." One of the services provided by SSBT to its custodial clients was the execution of foreign exchange

transactions, which allowed clients to purchase and sell foreign securities or engage in currency trades.

D.    *SSBT's Scheme*

27.    On October 20, 2009, the California Attorney General ("California AG") filed a complaint alleging that State Street had overcharged two of California's largest public pension funds by tens of millions of dollars for foreign exchange trades conducted over a period of at least eight years. The California AG's action was based on an extensive eighteen-month investigation, which included interviewing witnesses and reviewing hundreds of thousands of internal State Street documents.

28.    On information and belief, and according to the California AG, Defendants, starting in 2001, added an undisclosed and substantial "mark-up" to the exchange rate it used when making foreign exchange trades for its clients. The scheme was simple and not disclosed to the Plans. Defendants had agreements with their large custodial clients that obligated Defendants to charge their clients the same "exchange rate" as the one that Defendants actually used to execute foreign exchange trades requested by the client. Rather than doing so, however, SSGM would execute the trade at one exchange rate without informing its client, and then monitor fluctuations in the rate throughout the day. Then, before the end of the day, SSGM would pick a rate that was more beneficial to Defendants, and tell its clients that the trade had occurred at this other, false rate.

29.    For instance, if the transaction was a purchase of a foreign security, SSGM would charge the client a higher foreign exchange rate that occurred later in the day, thus causing the client to pay more than what SSGM had already paid. If the transaction was a sale of a foreign security, SSGM would charge the client a lower foreign exchange, thus paying the client less than what SSGM actually received. In either event, Defendants would take for itself the

difference between the amount for which the trade was actually executed and the amount that SSBT charged its clients.

30.     Defendants' clients, including the Plans, had no way of discovering the truth because the records, including statements of account and transaction records provided by State Street in the ordinary course to their clients, including the Plans, showed only that the trade had been executed within the range of rates occurring during that day, notwithstanding that the rate reported was not the actual rate for the transaction. Defendants' clients, including the Plans, were never informed of the actual rates at which FX transactions were made.  Defendants' providing such incomplete statements and transaction records to their clients, including the Plans, was a course of conduct designed to conceal evidence of their breaches of fiduciary duty and prohibited transactions set forth herein.  The Plans were not on actual or constructive notice of such evidence despite their exercise of reasonable diligence.

31.     All foreign exchange transactions are executed at a prevailing exchange rate, which determines how much one currency is worth in terms of another. The most commonly used exchange rate is the Interbank Rate, which fluctuates throughout each day and is tracked and published by various industry sources. Throughout the Class Period, Defendants executed two types of foreign exchange transactions for its clients. Some of Defendants' clients would conduct "direct" or "negotiated" foreign exchange trades. In a direct trade, an institution would contact a Defendants' representative who would quote an exchange rate that the institution could accept or reject. If Defendants' rate was sufficiently competitive, the client would accept and the trade would be executed at the agreed upon exchange rate. Defendants would collect a fee for processing the trade and pass along the cost of the exchange rate to its client.

32.     For more than 75% of SSBT's large custodial clients, however, Defendants would conduct "indirect" or "standing instruction" foreign exchange trades. In a standing instruction trade, neither the institution nor its outside investment manager would be quoted an exchange

rate. Instead, the client would request a transaction involving a foreign exchange (such as a purchase of foreign securities), and Defendants would execute the transaction pursuant to its contract with its client. On information and belief, under the terms of SSBT's custodial arrangements, SSBT was obligated to provide its clients the same exchange rate that Defendants actually used to make the trade. This arrangement was supposed to be beneficial to Defendants' clients because, among other things, they would not have to incur the expense and time of identifying and choosing the most competitive exchange rate.

33.    Defendants, on information and belief, executed FX transactions on behalf of their own collective investment funds using the same standing instruction method.  SSBT, as custodian of their own funds, were not subject to substantial scrutiny on these transactions beyond internal controls.

34.    However, this was not the case for all clients.  Those clients who conducted direct trades would be quoted an exchange rate by SSGM before executing the transaction. These clients – often large hedge funds – typically had easy access to an alternate price source, such as Bloomberg or Reuters, to double-check the truthfulness of SSGM's rate quotes. Accordingly, Defendants could not overcharge these clients, and thus referred to them internally as "smart" clients or "smart money."

35.    As detailed by the California AG, the other clients or their investment managers would initiate a foreign exchange transaction by sending a request, often electronically, to the Securities Processing Unit of SSBT, which was located on the "custody side" of the Company. This request was then sent electronically to the State Street foreign exchange trading desk in SSGM, where it would appear on the Market Order Management System ("MOMS") software used by Defendants' traders.

36.    The duty of "best execution" requires that a broker-dealer seek to obtain for its customers the most favorable terms reasonably available under the circumstances. At a

minimum, therefore, "best execution standards" require that Defendants execute trades on terms that are no less favorable than those offered to unrelated parties in a comparable arm's-length transaction.

37.    Plaintiff and the Class reasonably expected, because Defendants represented and because ERISA so requires, that they or the collective investment funds they participated in would be offered terms on "standing instructions" trades that were no less favorable than those offered by Defendants to unrelated parties in comparable arm's-length FX transactions.

38.    FX trading takes place around the world on a nearly 24-hour cycle, five-and-a-half days a week. The official FX trading week begins at 7:00 a.m., New Zealand time on Monday, with each subsequent trading day ending at 5:00 p.m., New York City time.

39.    On information and belief, SSGM's FX traders were informed of SSBT's aggregated standing instruction trade requirements during the course of the day. The FX traders will, that day, trade on the interbank FX market in order to satisfy SSBT's standing instruction positions. This process is called "offsetting" the trades.

40.    On information and belief, upon receipt of the request, SSGM's foreign exchange traders checked the exchange rate, set a price, and executed the transaction, which typically occurred early in the day because SSGM traders were at their desks by 7 a.m. Eastern Standard Time. All of those transactions were then entered by the trader into a separate software system called Wall Street Systems ("WSS"), which memorialized the transaction and charged the cost (for purchases) or remitted the payment (for sales) directly to Defendants. The WSS recorded time stamps for the actual, "real time" transaction.

41.    On information and belief, although the transaction was now completed and the price locked in, Defendants did not inform the client. Instead, on information and belief, SSGM observed market fluctuations until sometime around 3 p.m. in the afternoon and then assigned either a higher exchange rate (for purchases) or a lower exchange rate (for sales) to the foreign

exchange transactions that occurred during that day. SSGM then applied that rate to all of the "standing instruction" foreign exchange transactions it had conducted that day.

42.     On information and belief, at all relevant times to this Complaint, this pricing scheme was used for FX transactions for both custodial clients and for transactions involving SSBT's collective investment funds.

43.     With each FX trade priced in this manner, Defendants did not simply profit; they made the biggest possible profit on each trade, based upon the range-of-the-day's FX rates at the point the trade was priced for the Plan.

44.     Because Defendants' scheme always priced the trades at the very lowest or very highest rates of the day, Defendants were able to make a profit without any risk to SSBT.

45.     On information and belief, by pricing trades in this manner for their standing instruction trades, Defendants secured a spread ten to twenty or more times greater than when a custodial client directly negotiated an FX transaction. That is, Defendants' profits arising from their custodial standing instruction trades were as much as ten to twenty times higher than their profits from comparable, arm's length FX transactions.

46.     On information and belief, Defendants' practice of pricing trades in this manner and taking the largest possible mark-up or mark-down was not disclosed to custodial clients like the Plan over the period of time relevant to this Complaint.

47.     On information and belief, all Defendants' custodial clients who had standing instruction trades (including spot, forward, swaps, repatriation, and major, minor, emerging, and regulated market trades) suffered from the same inaccurate FX pricing.

48.     On information and belief, all of Defendants' collective investment funds which invested in foreign securities and used standing instruction trades (including spot, forward, swaps, repatriation, and major, minor, emerging, and regulated market trades) suffered from the same inaccurate FX pricing.

49.     On information and belief, end-of-month reports were prepared by Defendants on or before mid-month. These reports listed the custodial client's FX trades by date, amount, and price, i.e., the fictitious FX rate (as reported to the custody side of SSBT by its FX traders). These reports never contained time-stamps for the FX trades, but there was nothing on the report that would lead a custodial client to suspect that it or a collective investment fund in which it participated had been unfairly charged exorbitant mark-ups (or mark-downs) on its FX trades.

E.     *SSBT Makes Exceptions for Certain Clients, Offering Them Special Pricing*

50.     On information and belief, over time, SSBT developed a special class of custodial clients that did not receive the high or low range-of-the-day pricing suffered by other custodial clients, like the Plans or the collective trusts in which the Plans invested. These clients, known internally as "smart money clients," still received the same standing instruction custodial services as the other entities like the Plans or the collective trusts the Plans invested in, but received particular treatment when their FX requirements come to SSBT's FX dealing room.

51.     On information and belief, instead of these custodial clients' FX trades being included with the others, like the Plan or the collective trusts in which the Plans invested, and subject to the extreme range-of-the-day mark-up and mark-down, these clients were allowed to deal directly with Defendants – usually by phone – and were given the chance to directly negotiate prices for their FX requirements for that day, every day, despite their trades coming to SSBT as standing instruction trades.

52.     As a result, the "smart money" custodial clients always received better pricing than their fellow custodial clients who are still subject to SSBT's pricing schemes.

53.     On information and belief, Defendants did not disclose to clients like the Plan over the period of time relevant to this Complaint their practice of providing certain clients, the "smart money clients," FX transactions, resulting from direct dealings on standing instruction trades.

# V. CLASS ALLEGATIONS

54. **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plan and its participants and beneficiaries and the following class of similarly-situated persons (the "Class"):

> All qualified ERISA Plans and the participants and beneficiaries thereof for which State Street Bank and Trust Company or State Street Global Markets, LLC provided foreign exchange transactional services, as custodian of its assets, or by acting as custodian of collective trusts in which those ERISA Plans invested, at any time between January 1, 2001 and October 19, 2009 (the "Class Period").

Class treatment is appropriate in this case because it would promote judicial economy by adjudicating the Defendants' fiduciary breach with respect to all of the Plans and participants and beneficiaries in the class.

55. **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that hundreds of ERISA Plans throughout the country invested in these collective trusts during the Class Period, and sustained losses as a result of the Defendants' imprudent FX trading activities. Defendants have more than $5.2 trillion of pension assets under custody. These assets could all be exposed to Defendants' improper pricing scheme. Plaintiff believes that hundreds of ERISA plans are also exposed to Defendants' collective investment funds with investments in foreign securities. For example, Schedule D to the Form 5500 filed by Defendants for the Active Intl Stock Selection SL SF CL I (CM8J fund for 2009 alone lists nine defined contribution plans and assets of nearly $389 million. State Street Bank and Trust Company, Active Intl Stock Selection SL SF CL I (CM8J [sic], Annual Return/Report of Employee Benefit Plan (Form 5500), at Schedule H, Part I (December 31, 2009).

56. **Commonality**. The claims of Plaintiff and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by Defendants with regard to management of its FX trading program. The questions of law and fact common to the Class include, but are not limited to:

  a. Whether Defendants breached their fiduciary duties to the Plans by using an FX trading scheme to overcharge the Plans, or the collective investment funds in which the Plans invested, for FX trading;

  b. Whether Defendants' self-interested FX transactions constituted transactions prohibited under ERISA's statutory restrictions;

  c. Whether Defendants' fiduciary breaches caused losses to the Plans; and

  d. Whether Defendants' prohibited transactions caused losses to the Plans.

57. **Typicality**. Plaintiff's claims on behalf of his Plan are not only typical of, but the same as, claims that would be brought with respect to other Plans. If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same claims based upon the same conduct of the Defendants, using the same legal arguments to prove Defendants' liability, and would be seeking the same relief.

58. **Adequacy**. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel that is competent and experienced in class action and ERISA litigation. Plaintiff has no interests antagonistic to, or in conflict with those of the Class. Plaintiff has undertaken to protect vigorously the interests of the absent members of the Class.

59. **Rule 23(b)(1)(A) & (B) Requirements**. Class action status is warranted under Fed. R. Civ. P. 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual

members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

60.     **Rule 23(b)(2) Requirements**. Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole. No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties.

61.     **Rule 23(b)(3) Requirements**. In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VI.     CLAIMS FOR RELIEF

### COUNT I

**Engaging in Self-Interested Prohibited Transactions**
**(Violation of § 406 of ERISA, 29 U.S.C. § 1106 by Defendants)**

62.     All previous averments are incorporated herein.

63.     At all relevant times, the Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control over Plan assets.

64.     The Defendants, by their actions throughout the Class Period, caused the Plans to engage in unfairly and unreasonably priced FX transactions.

65.     During the Class Period, Defendants engaged in FX transactions using plan assets that were not for the exclusive benefit of the Plans' or their participants.

66.     Through their FX transactions and pricing scheme, Defendants dealt with assets of the Plans for their own financial benefit and for their own account.  This is a violation of ERISA § 406(b)(1) & (3), 29 U.S.C. 1106(b)(1) & (3).

67.     As a direct and proximate result of these prohibited transaction violations, the Plans, directly or indirectly, paid millions of dollars in transaction fees that were prohibited by ERISA and suffered millions of dollars in losses.

68.     Pursuant to ERISA Defendants are liable to disgorge all fees paid them for the Plans' FX transactions, restore all losses suffered by the Plans as a result of the prohibited transactions, and all profits earned on the fees paid by the Plans to Defendants.

## COUNT II

### Breach of Duties of Prudence and Loyalty
### (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Defendants)

69.     All previous averments are incorporated herein.

70.     Defendants breached their ERISA fiduciary duties of prudence and loyalty by, inter alia:

    a.  Using plan assets for the own benefit, causing losses to the Plans and the participants;

    b.  Charging the Plans (or the collective trusts in which the Plans invested) fees for FX trading that were unreasonable and in excess of what Defendants had agreed to charge;

    c.  Failing to disclose to the Plans, their fiduciaries, or participants the amount of fees being charged for FX trading, that those fees were in excess of what Defendants had agreed to charge, and that other clients were charged less for the same services;

71.     These actions during the Class Period were breaches of Defendants fiduciary duties of loyalty and prudence to the Plans under ERISA and Defendants did not execute their

fiduciary responsibilities for the exclusive benefit of the Plans. § 404(a)(1)(A), (B), 29 U.S.C. §§ 1104(a)(1)(A), (B).

72. Defendants committed these breaches consistently from 2001 to 2009, during each FX transaction involving assets of the Plans.

73. As a direct and proximate result of these breaches of duty, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, realized losses.

74. Pursuant to ERISA the Defendants are liable to restore all losses suffered by the Plans caused by the Defendants' breaches of fiduciary duty.

## COUNT III

### Liability for Breach of Co-fiduciary
### (Violation of § 405 of ERISA, 29 U.S.C. § 1105)

75. All previous averments are incorporated herein.

76. SSGM violated ERISA, 29 U.S.C. §1105(a)(1), by knowingly undertaking to conceal SSBT's fiduciary breaches. It did so through the actions and omissions of its employees and agents by concealing and failing to provide complete and accurate information to the Plans regarding the cost of FX transactions.

77. SSGM violated ERISA, 29 U.S.C. §1105(a)(3), because it knew that SSBT had breached its fiduciary duties of prudence and loyalty, but failed to take reasonable steps under the circumstances to remedy the breach.

78. On account of SSGM's violations of these provisions, SSGM is liable for the breach of its co-fiduciary, SSBT.

79. As a result of SSGM's actions, the Plans suffered losses.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

80. Declare that the Defendants have violated ERISA's prohibited transactions provisions;

81. Declare that the Defendants breached their fiduciary duties under ERISA;

82. Issue an order compelling a proper accounting of the foreign exchange transactions in which the Plans have engaged;

83. Issue an order compelling Defendants to restore all losses caused to the Plans;

84. Issue an order compelling the Defendants to disgorge all fees paid and incurred to Defendants, including any profits thereon;

85. Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

86. Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as custodian to the Plans;

87. That this action be certified as a class action and that each Class be designated to receive the amounts restored to the Plans by Defendants and a constructive trust be established for distribution to the extent required by law;

88. Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

89. Award Plaintiffs their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

90. Award such other and further relief as the Court deems equitable and just.

Dated: November 18, 2011

Respectfully Submitted,
Arnold Henriquez,
By his attorneys,

/s/ Catherine M. Campbell
Catherine M. Campbell, Esq.
BBO # 549397
/s/ Renee J. Bushey
Renee J. Bushey, Esq.
BBO # 629444
**Feinberg, Campbell & Zack, PC**
177 Milk Street, Suite 300
Boston, MA 02109-3408
Tel: (617) 338-1976
Fax: (617) 338-7070
cmc@fczlaw.com

J. Brian McTigue
(Pro Hac Vice to be filed)
bmctigue@mctiguelaw.com

Bryan T. Veis
(Pro Hac Vice to be filed)

James A. Moore
(Pro Hac Vice to be filed)

**McTigue & Veis, LLP**
4530 Wisconsin Avenue, NW
Suite 300
Washington, DC  20016
Tel:  (202) 364-6900
Fax: (202) 364-9960

Counsel for Plaintiff