# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

ARNOLD HENRIQUEZ, MICHAEL T. COHN,
WILLIAM R. TAYLOR, RICHARD A.
SUTHERLAND,  AND THOSE SIMILARLY
SITUATED,

        Plaintiffs,

v.

STATE STREET BANK AND TRUST
COMPANY and STATE STREET
GLOBAL MARKETS LLC AND DOES
1-20,
        Defendants.

CIVIL ACTION No.
11-cv-12049-MLW

---

## <u>AMENDED CLASS ACTION COMPLAINT</u>

1.     Plaintiffs Arnold Henriquez (bringing this action pursuant to ERISA on behalf of

the Waste Management Retirement Savings Plan ("WM Plan") and its participants and

beneficiaries), Michael Cohn (bringing this action pursuant to ERISA on behalf of the Citigroup

401(k) Plan ("Citi Plan") and its participants and beneficiaries), and William Taylor and Richard

Sutherland (both bringing this action pursuant to ERISA on behalf of the Retirement Plan of

Johnson and Johnson ("J&J Plan") and its participants and beneficiaries) (collectively,

"Plaintiffs") bring this action as a class action on behalf of a class of similarly-situated ERISA

retirement plans (collectively, the "Plans") and their participants and beneficiaries against State

Street Bank and Trust Company ("SSBT") and State Street Global Markets, LLC ("SSGM")

(collectively, "Defendants").  The allegations below are based on the investigative efforts of

private whistleblower firms, the State of California, the Securities and Exchange Commission

("SEC"), and an investigation by counsel, which included reviewing: Internal Revenue Service

Forms 5500 ("Forms 5500") filed with the United States Department of Labor ("DOL"); filings

with the United States Securities and Exchange Commission, including Annual Reports on

Forms 10-K; documents filed in other litigation; and other publicly available documents related

to this action.

## I. <u>NATURE OF THE ACTION</u>

2.     This is a civil enforcement action brought pursuant to the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, and in particular under ERISA

§§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), to recover losses and obtain

equitable relief on behalf of the WM Plan, the Citi Plan, and the J&J Plan (the "Named

Plaintiffs' Plans"), and pursuant to applicable law as a class action to obtain relief for all other

similarly situated ERISA plans.

3.     SSBT and SSGM were required to act prudently and solely in the interest of the

Plans' participants and beneficiaries in their capacity as ERISA fiduciaries.  On information and

belief, rather than fulfilling their fiduciary duties under ERISA (the "highest known to the

law"),[1] the Defendants charged, or allowed to be charged, improper, undisclosed markups on

transactions in foreign currency ("FX transactions" or "FX trading") and engaged in prohibited

transactions in connection with such FX transactions.

4.     The Named Plaintiffs' Plans and the similarly situated Plans are established and

sponsored by private entities in accordance with ERISA.

---

[1] <u>*Donovan v.Bierwirth*</u>, 680 F.2d 263, 272 n.8 (2d Cir. 1982).

2

5.     Plaintiffs allege that Defendants violated ERISA by causing the Plans, or collective funds (the "Collective Investment Funds") operated by SSBT in which the Plans were invested, to purchase foreign securities through the use of FX transactions at rates favorable to Defendants.  These transactions were prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

6.     Plaintiffs also allege that Defendants failed to act solely in the interest of the participants and beneficiaries of the Plans and breached their fiduciary duties of prudence and loyalty with respect to the Plans.  Specifically, Plaintiffs allege that Defendants, as fiduciaries of the Plans, violated their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, by causing the Plans or the Collective Investment Funds operated by Defendants in which the Plans were invested to engage in transactions that were not to the exclusive benefit of the Plans or their participants and beneficiaries.

## II. JURISDICTION AND VENUE

7.     ERISA provides for exclusive federal jurisdiction over these claims.  The Plans are "employee benefit plans" within the meaning of ERISA § 3(3), 29 U.S.C. § 1002(3), and Plaintiffs are participants in the Named Plaintiffs' Plans within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7), who are authorized pursuant to ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3), to bring the present action on behalf of those plans and their participants and beneficiaries to obtain appropriate relief.

8.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and ERISA

§ 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the fiduciary breaches for which

relief is sought occurred in this district and the Defendants reside and may be found in this

district.

## III. <u>PARTIES</u>

*A.      Plaintiffs*

10.      **Plaintiff Arnold Henriquez** is a participant in the WM Plan, an ERISA-covered

plan.  At all material times from the second quarter of 2005 through the second quarter of 2009,

Mr. Henriquez invested in the "International Equity Fund" [2] sponsored by SSBT and offered by

the Plan.  Mr. Henriquez also invested in other funds sponsored by SSBT and offered by the WM

Plan during the Class Period, including the Large Cap Equity Fund, the Small Cap Equity Fund,

the Conservative Asset Allocation Fund, the Moderate Asset Allocation Fund, the Aggressive

Allocation Fund, the Bond Market, and the SSgA Target Retirement 2030 Fund.  Mr. Henriquez

resides in Frederick, Maryland.

11.      **Plaintiff Michael T. Cohn** is a participant in the Citi Plan, an ERISA-covered

plan.  At all material times from his initial enrollment in the Citi Plan in January 2005 through

---

[2] The "International Equity Fund" is the fund name used by SSBT on disclosures to participants
in the WM Plan.  The International Equity Fund's name, according to the International Equity
Fund's Forms 5500 for 2009 and 2010, filed by SSBT with DOL, is the "Active Intl Stock
Selection SL SF CL I (CM8J [*sic*]."  From 2006 through 2008, the International Equity Fund's
name, according to the International Equity Fund's Forms 5500 filed by SSBT with DOL was
the "International Alpha Select SL Series Fund – [*sic*]."  From 1999 to 2005, the WM Plan
offered the SSgA International Growth Opportunities Fund Series A Non-Lending as the
"International Equity Fund."  The foregoing fund names may refer to the International Equity
Fund at a particular point in time, as well as to one or more of several classes of interests offered
in the International Equity Fund.

August 2007 Mr. Cohn was invested in the "Aggressive Focus Fund" offered by the Citigroup 401(k) Plan. According to the Citigroup 401(k) Plan Aggressive Focus Fund Fact Sheet for the second quarter of 2004, this fund had the objective of "seek[ing] as high a total return over time as is consistent with a primary emphasis on equity securities and a secondary emphasis on fixed-income and money market securities." The Aggressive Focus Fund was a "fund of funds" managed by SSBT that included two funds focused on international equities: (a) the Daily EAFE Index Securities Lending Series – Class T; and (b) the Daily Emerging Markets Index Non Lending Series Fund. These two funds accounted for 24% of the Aggressive Focus Fund's total holdings in 2004. In September 2007, the Citigroup 401(k) Plan changed its investment options, and Mr. Cohn invested in the newly offered "Emerging Market Equity" collective investment fund. He is still invested in that fund as of the date of this complaint. This Emerging Market Equity fund has used SSBT as an investment manager since it was first offered to the Citigroup 401(k) Plan in 2007. Mr. Cohn resides in Highland Park, Illinois.

12.    **Plaintiff William R. Taylor** is a participant in the Retirement Plan of Johnson and Johnson, an ERISA-covered plan. Mr. Taylor began working at Johnson and Johnson and accruing service towards his pension benefit on September 21, 1998. At all relevant times to this complaint, SSBT served as the trustee and custodian of both the J&J Plan and the Johnson and Johnson Pension and Savings Plan Master Trust in which the J&J Plan was wholly invested. Mr. Taylor resides in Aston, Pennsylvania. The J&J plan holds foreign investments in both international securities that cannot be purchased on a domestic exchange and foreign currency. Each of these types of holdings requires FX transactions.

13.    **Plaintiff Richard A. Sutherland** is a participant in the Retirement Plan of Johnson and Johnson, an ERISA-covered plan. Mr. Taylor began working at Johnson and

Johnson and accruing service towards his pension benefit on January 1, 1999. At all relevant times to this complaint, SSBT served as the trustee and custodian of both the J&J Plan and Johnson and Johnson Pension and Savings Plan Master Trust in which the defined benefit plan was wholly invested. Mr. Sutherland resides in Albuquerque, New Mexico. The J&J plan holds foreign investments in both international securities that cannot be purchased on a domestic exchange and foreign currency. Each of these types of holdings requires FX transactions.

B.    Defendants

14.    **Defendant State Street Bank and Trust Company** ("SSBT") is incorporated in Massachusetts and is headquartered in Boston, Massachusetts. Defendant State Street Bank and Trust Company directly, or indirectly through one or more subsidiaries, operates as a custodial bank for ERISA-covered benefit plans and for the Collective Investment Funds offered by ERISA-covered plans. SSBT is a subsidiary of State Street Corporation, a financial holding company headquartered in Boston, Massachusetts. SSBT describes itself as a leading specialist in meeting the needs of institutional investors. In its Class Period filings with the SEC, State Street Corporation repeatedly stated that its customer relationships were predicated upon our reputation as a fiduciary and a service provider that adheres to the highest standards of ethics, service quality and regulatory compliance. One of the services provided by SSBT to its custodial clients was the execution of FX transactions, which allowed clients to purchase and sell foreign securities or to engage in foreign currency trades for other purposes. Another of the services provided by SSBT to its custodial clients is investment management of custodial client assets through the use of "collective investment funds," which are described more fully below.

6

15.      **Defendant State Street Global Markets, LLC** ("SSGM"), a subsidiary of State Street Corporation, is incorporated in Delaware and is headquartered in Boston, Massachusetts. SSGM is a broker/dealer registered with the SEC, the Financial Industry Regulatory Authority, ten self-regulatory authorities, and fifty-three U. S. states and territories.  SSGM is the only State Street Corporation subsidiary registered as a brokerage firm.  SSGM is the corporate successor of State Street Brokerage Services, Inc. and State Street Capital Markets, LLC.  On or about June 1, 1999, State Street Capital Markets, LLC assumed all of the assets and liabilities of State Street Brokerage Services. Inc.  State Street Brokerage Services, Inc. was dissolved, but "State Street Brokerage Services," not followed by "Inc.," continued to exist as a division of State Street Capital Markets, LLC.  On or about March 1, 2002, SSGM assumed all of the assets and liabilities of State Street Capital Markets, LLC.  SSGM describes itself as "the investment research and trading arm of State Street Corporation."  SSGM provides specialized investment research and trading in foreign exchange, equities, fixed income, and derivatives to ERISA covered benefit plans.  Confusingly, in their answer to the complaint-in-intervention of the California Attorney General described below,[3] SSBT and SSGM assert that SSBT executed FX transactions for its clients through a division of SSBT called "State Street Global Markets," which was a separate entity from Defendant State Street Global Markets, LLC.  In marketing documents for its "Foreign Exchange Global Strategy,"[4] State Street Corporation has described

---

[3]*People of the State of Calif. v. State Street Corp.*, Case No. 34-2008-00008457-CU-MC-GDS. (Cal. Super. Ct., Sacramento County, April 12, 2010.).

[4] State Street Corporation added further confusion through its marketing materials, which state that "[p]roducts and services outlined in this document are offered to professional investors through State Street Global Markets LLC, which is a member of FINRA and SIPC, and State Street Bank and Trust Company, State Street Global Markets International Limited and State Street Bank Europe Limited, all of which are authorized and regulated by the Financial Services Authority in the United Kingdom, and their affiliates."   State Street Global Markets, *Foreign Exchange Global Strategy*, www.statestreetglobalmarkets.com, 09-SGM08041209 (2010).

"State Street Global Markets" as "the marketing name and a registered trademark of State Street Corporation, used for its financial markets business and that of its affiliates."[5]  Any action taken by the "State Street Global Markets" division of SSBT was an action of SSBT.

16.     State Street Corporation, SSBT, and SSGM are under common control within the meaning of 29 C.F.R. § 2510.3-21(e)(1)(i).  Further, State Street Corporation, SSBT, and SSGM are "affiliates" within the meaning of (a) Prohibited Transaction Exemption 94-20, § IV.(d), (e), 59 Fed. Reg. 8022-02, 8026 (Feb. 17, 1994) and (b) Prohibited Transaction Exemption 98-54 §IV. (e), (l), 63 Fed. Reg. 63503, 63510, because they directly or indirectly, or through one or more intermediaries, control, are controlled by, or are under common control with each other.

17.     **Defendants Does 1-20** are fiduciaries of the Plans relevant to this lawsuit whose exact identities will be ascertained through discovery.

## IV. <u>THE FOREIGN EXCHANGE SCHEME</u>

A.      *SSBT's General FX Trading Practices for Non-ERISA Clients*

18.     According to its September 26, 2006 Investment Manager Guide, SSBT purported to offer two generic types of foreign exchange transactions to third party investment managers for SSBT's custody clients.  It offered "direct deals" whereby investment managers "deal[t] foreign exchange directly with [SSBT] Treasury trading desks."  SSBT also offered "indirect deals" whereby "requests to execute a foreign exchange transaction [could be] sent to the processing site with the related securities instruction or as a separate instruction."  As set forth below, indirect deals were also sometimes described as "standing instruction" trades.

---

[5] *Id.*

8

19.     According to a class action securities fraud complaint filed in this Court on July 29, 2010 (*Hill v. State Street Corp.*, Document No. 51, Master Docket No. 09-cv-12146-NG), for more than 75% of SSBT's large custodial clients, Defendants would conduct "indirect" or "standing instruction" foreign exchange trades, as described in SSBT's September 26, 2006 Investment Manager Guide.  Under the terms of SSBT's custodial arrangements, SSBT was obligated to provide its clients the same exchange rate that Defendants actually used to make the trade. This arrangement was supposed to be beneficial to Defendants' clients because, among other things, they would not have to incur the expense and time of identifying and choosing the most competitive exchange rate.

20.     On October 20, 2009, based upon an investigation undertaken after the sealed filing of a *qui tam* complaint by "Associates Against FX Insider Trading" on the personal knowledge of Associates' partners, the California Attorney General ("California AG") filed a complaint alleging that SSBT, SSGM, and a third entity, State Street California Inc., had systematically overcharged two of California's largest public pension funds by tens of millions of dollars for foreign exchange trades conducted over a period of at least eight years.  *People of the State of Calif. v. State Street Corp.*, Case No. 34-2008-00008457-CU-MC-GDS. (Cal. Super. Ct., Sacramento County Oct. 20, 2009.).

21.     The California AG's action was based on an extensive eighteen-month investigation, which included interviewing witnesses and reviewing hundreds of thousands of internal State Street documents.

22.     On information and belief, and according to the *qui tam* relators and the California AG, Defendants herein, starting in 2001, added an undisclosed and substantial "mark-up" to the exchange rate they used when making foreign exchange trades for its clients.

9

23.    The California AG's allegations of undisclosed "mark-ups" were based in part on the sworn testimony of a former SSBT employee who worked on the same trading floor as the SSBT or SSGM foreign exchange traders and who overheard how SSBT or SSGM foreign exchange traders were marking up FX trade prices.  This trader, in sworn testimony, described the practices of SSBT's FX traders as a "totally unethical thing to do" and said that the FX Traders practices were not within the "industry standard."  *People of the State of Calif. v. State Street,* Declaration of Kenny V. Nguyen, Case No. 34-2008-00008457-CU-MC-GDS (January 31, 2012).

24.    The California AG went on to explain that Defendants had agreements with their large custodial clients that obligated Defendants to charge their clients the same exchange rate as the one that Defendants actually used to execute FX trades requested by the client.  Rather than doing so, however, SSBT or SSGM would execute the trade at one exchange rate, and then monitor fluctuations in the rate throughout the day.  Then, before the end of the day, SSBT or SSGM would pick a rate that was more beneficial to Defendants, and tell its clients that the trade had occurred at this other, false rate.

25.    The California *qui tam* relators explained that, for instance, if the transaction was a purchase of a foreign security, SSGM or SSBT would execute the transaction, but would charge the client a higher foreign exchange rate that occurred later in the day, thus causing the client to pay more for the security in U.S. Dollars than the U.S. Dollar value at the time SSBT or SSGM executed the transaction.  If the transaction was a sale of a foreign security, SSBT or SSGM would execute the transaction, but would credit the client at a lower foreign exchange rate, thus paying the client less in U.S. Dollars  than the U.S. Dollar value of what SSBT or SSGM actually received at the time SSBT or SSGM executed the transaction.  In either event, Defendants would

10

take for themselves the difference between the amount for which the trade was actually executed by SSBT or SSGM and the amount that SSBT or SSGM charged its custody clients for the transaction.

26.     According to the California AG complaint-in-intervention and a subsequent amended class action complaint filed in the District of Massachusetts,[6] Defendants' clients did not discover the truth because the records, including statements of account and transaction records provided by SSBT in the ordinary course to their clients, showed only that the trade had been executed within the range of rates occurring during that day, notwithstanding that the rate reported was not the actual rate for the transaction. Defendants' clients were not informed of the actual rates at which FX transactions were made. Defendants' providing such incomplete statements and transaction records to their clients was a course of conduct designed to conceal evidence of their breaches of fiduciary duty and prohibited transactions set forth herein.

B.      *How SSBT's Foreign Exchange Trading Scheme Worked*

27.     As detailed by the California relators, clients or their investment managers would initiate a foreign exchange transaction by sending a request, often electronically, to the Securities Processing Unit of SSBT, which was located on the "custody side" of the Company. This request was then sent electronically to the State Street foreign exchange trading desk in SSGM, where it would appear on the Market Order Management System ("MOMS") software used by Defendants' traders.

28.     According to the Arkansas State Teacher Retirement System amended class action complaint, SSBT or SSGM's FX traders were informed of SSBT's aggregated standing

---

[6] *Arkansas State Teacher Retirement System v. State Street Corp.*, No. 11-CV-10230 (MLW) (April 15, 2011).

instruction trade requirements during the course of the day. The FX traders would, that day, trade

on the interbank FX market in order to satisfy SSBT's standing instruction positions.

29.    According to a class action securities fraud complaint filed in this Court ("*Hill*"),[7]

upon receipt of the request, SSBT or SSGM's foreign exchange traders checked the exchange

rate, set a price, and executed the transaction, which typically occurred early in the day because

SSBT or SSGM traders were at their desks by 7 a.m. Eastern Standard Time. All of those

transactions were then entered by the trader into a separate software system called Wall Street

Systems ("WSS"), which memorialized the transaction and charged the cost (for purchases) or

remitted the payment (for sales) directly to Defendants. The WSS recorded time stamps for the

actual, real time transaction.

30.    According to the *Hill* class action securities fraud complaint, although the

transaction was now completed and the price locked in, Defendants did not inform the client.

Instead, on information and belief, SSBT or SSGM observed market fluctuations until sometime

around 3 p.m. and then assigned either a higher exchange rate (for purchases) or a lower

exchange rate (for sales) to the foreign exchange transactions that occurred during that day.

SSGM then applied that rate to all of the "standing instruction" foreign exchange transactions it

had conducted that day.

31.    On information and belief, at all relevant times to this Complaint, this pricing

scheme was used for FX transactions for both custodial clients, including custodial ERISA plan

clients, and for transactions involving the Collective Investment Funds.

---

[7] *Hill v. State Street Corporation*, Document No. 51, Master Docket No. 09-cv-12146-NG. (July 29, 2010).

32.     On information and belief, with each FX trade priced in this manner, Defendants did not simply profit; they made excessive profits on each trade, based upon the range-of-the-day's FX rates at the point the trade was priced for the Plan.

33.     On information and belief, because Defendants' scheme always priced the trades at or near the very lowest or very highest rates of the day, Defendants were able to make a profit with minimal risk to SSBT.

34.     According to the California AG complaint-in-intervention, Defendants' practice of pricing trades in this manner and taking the largest possible mark-up or mark-down was not disclosed to custodial clients over the period of time relevant to that Complaint.

35.     On information and belief, Defendants' practice of pricing trades in this manner and taking an excessive mark-up or excessive mark-down was not disclosed to investors in the Collective Investment Funds over the period of time relevant to this Complaint.

*C.      SSBT Made Exceptions for Certain Clients, Offering Them Special Pricing*

36.     According to the class action securities fraud complaint filed in this Court on July 29, 2010 (*Hill v. State Street Corporation*, Document No. 51, Master Docket No. 09-cv-12146-NG), over time, SSBT developed a special class of custodial clients that did not receive the excessively high or excessively low range-of-the-day pricing suffered by other custodial clients, including ERISA plans.  Those clients who conducted "direct trades" would be quoted an exchange rate by SSBT or SSGM before executing the transaction.  These clients – often large hedge funds – typically had easy access to an alternate price source, such as Bloomberg or Reuters, to double-check the truthfulness of SSBT or SSGM's rate quotes.  Accordingly,

Defendants could not overcharge these clients, and thus referred to them internally as "smart" clients or "smart money."

37.     According to the class action securities fraud complaint, instead of including FX trades for these custodial clients with other clients' trades, and subject to the excessive range-of-the-day mark-ups and mark-downs, these clients were allowed to deal directly with Defendants and were given the chance to directly negotiate prices for their FX requirements for that day, despite their trades coming to SSBT as standing instruction trades.

38.     As a result, according to the class action securities fraud complaint, the "smart money" custodial clients received better pricing than their fellow custodial clients who are still subject to SSBT's excessive pricing schemes.

## V. FACTUAL BACKGROUND OF ERISA PLAN CLAIMS

*A.     The Plans.*

39.     **Waste Management Retirement Savings Plan.** The WM Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

40.     **Citigroup 401(k) Plan.** The Citi Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

41.      **Retirement Plan of Johnson and Johnson.** The J&J Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

42.     **Other Similarly Situated ERISA Plans**.  Defendants provide services similar to those provided to the Waste, Citi, and J&J Plans to other, similarly situated Plans, either directly as plan custodian or indirectly as custodian of funds in which the Plans invest.

14

B.    *Retirement Plan Investments in Foreign Securities*

43.    There are two types of ERISA-covered pension plans — defined benefit plans and defined contribution plans.  Both types of retirement plans have, especially over the last decade, found it necessary and prudent to expand their investments to include exposure to foreign markets.  Accordingly, defined benefit plans have expanded international holdings, and defined contribution plans frequently include at least one, if not several, international investment options.

44.    ERISA-covered plans regularly purchase and sell foreign securities in order to increase diversification and take advantage of opportunities for higher returns.  Retirement plans that invest in foreign securities receive principal, dividends, and interest that are paid in foreign currencies, or participate in other investments that require the exchange of foreign currency into and from US Dollars ("USD"), either directly or through participation in collective investment funds.  As a result, the purchase and sale of currencies incidental to a foreign securities transaction is vital to a plan's participation in the international securities markets and to the acquisition, holding, and disposition of foreign securities.

45.    SSBT served as trustee and custodian to the WM Plan.  Beginning in 1999, the WM Plan offered participants the option to invest in certain Collective Investment Funds, the SSgA International Growth Opportunities Fund Series A Non-Lending.  For purposes of communications with the WM Plan and its participants, this fund was named the "International Equity Fund."  The International Equity Fund is described more fully below.  Another example is the SSgA Target Retirement 2030 Fund offered to WM Plan participants.  In 2008, the SSgA Target Retirement 2030 Fund invested in another SSBT Collective Investment Fund, the SSgA MSCI ACWI EX-US Index Fund, a collective investment fund that held foreign securities and

15

would have been, directly or indirectly, party to FX transactions executed by SSBT or its affiliate SSGM. Neither of these Collective Investment Funds could have been operated without FX transactions, whether or not those transactions were executed at the fund level or at the brokerage level. SSBT, as the operator and manager of these funds, was ultimately responsible for the funds' FX transactions.

46. SSBT served as trustee and custodian to the Citi Plan. Similarly, the Citi Plan in 2008 offered four international Collective Investment Funds (either directly or as part of an underlying investment of the fund) operated and managed by SSBT: the SSgA EAFE Fund; the SSgA International Small Cap Fund; the SSgA MSCI EAFE Fund; and the SSgA MSCI Emerging Markets Free [*sic*]. None of these funds could have been operated without FX transactions, whether those transactions were executed at the Collective Investment Fund level or brokerage level. SSBT, as the operator and manager of these funds, was ultimately responsible for those FX transactions.

47. SSBT served as trustee and custodian to the J&J Plan. The J&J Plan did not invest in the Collective Investment Funds. Rather, the J&J Plan directly held foreign assets, including currency, such as Euros, and foreign securities that could not have been purchased on a domestic exchange. An example of one such security is Elpida Memory Inc, a Japanese stock available only on a Japanese exchange. The J&J Plan could not have made use of foreign currencies or purchased foreign securities which are not traded on U.S. securities exchanges without FX transactions. On information and belief, SSBT, as trustee and custodian of the J&J Plan, executed some or all of the J&J Plan's foreign currency transactions in the relevant period.

C.    *Defendants' Fiduciary Status*

16

48.     Every plan governed by ERISA must have fiduciaries to administer and manage the

plan.  ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under ERISA

§402(a)(1), but also any other person who in fact performs fiduciary functions.  ERISA

§3(21)(A)(i), 29 U.S.C. §1002(21)(A)(i) (a person is a fiduciary "to the extent … he exercises

any discretionary authority or discretionary control respecting management of such plan or

***exercises any authority or control respecting management or disposition of its assets***…")

(emphasis added).

49.     An ERISA fiduciary is required to "discharge his duties with respect to a plan

solely in the interest of the participants and beneficiaries and … for the exclusive purpose of …

providing benefits to participants and beneficiaries and … defraying the reasonable expenses of

administering the plan …."  ERISA § 404(a)(1)(A)(i), (ii), 29 U.S.C. § 1104(a)(1)(A)(i), (ii).

50.     Moreover, ERISA prohibits certain transactions.  Specifically, unless exempted

pursuant to ERISA § 408, 29 U.S.C. 1108:

A fiduciary with respect to a plan shall not--

> **(1)** deal with the assets of the plan in his own interest or for his own account,

> **(2)** in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

> **(3)** receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

ERISA §406(b), 29 U.S.C. 1106(b).  As described below, Defendants functioned as fiduciaries to

the Named Plans both by acting as trustee and custodian for the Plans and by exercising authority

and control over Plan assets.

### 1. *SSBT as Custodian*

51.    An ERISA-covered Plan's custodial bank is an ERISA fiduciary.  A "custodian" is an institution that holds securities on behalf of investors.  The responsibilities entrusted to a custodian include the guarding and safekeeping of securities, delivering or accepting traded securities, and collecting principal, interest, and dividend payments on held securities. Custodians may also perform ancillary services for their clients.  Custodians are typically used by institutional investors who do not wish to leave securities on deposit with their broker-dealers or investment managers.  The use of a custodial bank is intended to reduce the risk of misconduct by separating the custodial and asset management duties.  An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

52.    SSBT served as the custodian for many ERISA-covered pension plans. Specifically, SSBT served as custodian for the Named Plans' assets.  As custodian, SSBT was a fiduciary under ERISA and owed fiduciary duties to the Named Plans.  SSGM also exercised authority and control over the Plans' assets in its role as SSBT's affiliate responsible for setting the exchange rates on FX transactions and executing those transactions.  As discussed above, this process created the excessive spread between the marked-up FX exchange rates charged to custodial ERISA plan clients and the marked-down FX exchange rates used to process repatriation of principal, dividends, and interest paid in foreign currencies, and other FX transactions.

### 2. *SSBT as Investment Manager of Collective Investment Funds for ERISA Plans*

53.     SSBT sponsored and operated the Collective Investment Funds and offered them to the ERISA plans, including the Plans and the Similarly Situated ERISA Plans.  SSBT served as custodian and trustee for the Collective Investment Funds.  The Collective Investment Funds were under the exclusive management and control of SSBT.

54.     On information and belief, all of the Collective Investment Funds which invested in foreign securities suffered from the same inaccurate FX pricing described in the California *qui tam* complaint, the California AG complaint-in-intervention, and the *Hill* securities fraud class action complaint.  *See* ¶¶ 18-38, *supra*.

55.     Investments in collective investment funds are equity interests in a separate legal entity, but are not publicly-offered securities or securities issued by an investment company registered under the Investment Company Act of 1940, *i.e.*, mutual funds.  Under ERISA, unlike mutual funds and other publicly-offered securities, investments in collective investment funds are subject to a unique "look-through" rule, pursuant to which, the "plan assets" of an ERISA-covered plan include ***both*** its undivided "equity interest [in the entity] ***and*** an undivided interest in each of the underlying assets of the entity …".  29 C.F.R. § 2510.3-101(a)(2); *see also* ERISA § 3(42), 29 C.F.R. § 1002(42) (authority of Secretary of Labor to define term "plan assets" by regulation) (emphasis added).  Specifically, when a Plan acquires or holds an interest in a common or collective trust fund, that is, a Collective Investment Fund, "its assets include its investment and an undivided interest ***in each of the underlying assets*** of the entity."  *Id*. § 2510.3-101(h)(1) (emphasis added).

56.     "[A]ny person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with

respect to such assets for a fee (direct or indirect) is a fiduciary of the investing plan." *Id.* §
2510.3-101(a).

57.     As the sponsor and operator of the Collective Investment Funds, SSBT exercised
authority or control with respect to the management or disposition of plan assets.  Accordingly,
SSBT was a fiduciary of each and every ERISA Plan which invested in the Collective
Investment Funds, including the Named Plaintiffs' Plans and the Plans, with respect to the
underlying assets of each and every SSBT Collective Investment Fund.

58.     In addition, according to SSBT documents provided by the WM Plan in April 2002
to a participant in the WM Plan in response to the participant's request for plan documents
pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), on or about January 1, 1999, the
Investment Committee of the WM Plan appointed SSBT to act as Investment Manager of the
WM Plan "as such term is defined in Section 3(38) of [ERISA]" with respect to designated assets
of the WM Plan.  The designated assets included five of the Collective Investment Funds, one of
which was the "International Growth Opportunities Fund Series A," that is, the International
Equity Fund.  Accordingly, SSBT also had authority and control over plan assets in its capacity
as Investment Manager, including assets invested in the Collective Investment Funds, and
specifically including assets invested in the International Equity Fund.  This arrangement
continued throughout the WM Plan's association with SSBT, regardless of the specific
international equity fund being offered to participants at any given time.

### 3.     *Foreign Exchange Transactions Under ERISA*

59.     Certain of the Collective Investment Funds SSBT operated and offered to ERISA-
covered plans during the Class Period invested in foreign securities.  SSBT served as custodian

and trustee for these Collective Investment Funds. Collective investment funds that invest in

foreign securities, or a person acting on their behalf, must engage in FX transactions in order to

buy and sell securities, to repatriate dividends or interest payments, and to engage in other

transactions. As the trustee of the Collective Investment Funds, SSBT was authorized to convert

any monies into any currency through foreign exchange transactions and responsible for ensuring

that these transactions were within the bounds of SSBT's fiduciary responsibilities and the

limitations of ERISA.

60.     For example, according to SSBT documents provided by the WM Plan in April

2002 to a participant in the WM Plan in response to the participant's request for plan documents

pursuant to ERISA § 104(b)(4), 29 U.S.C. § 1024(b)(4), the stated investment objective of the

International Equity Fund in the Waste Management Plan was "to provide long-term capital

appreciation through equity investments *in markets outside the United States*." (Emphasis

added).

61.     The WM Plan's Investment Policy Statement noted that "[t]he goal of the

International Equity Fund is to invest in a portfolio of common stocks that will provide a vehicle

for investing in a broad cross section of non-U.S. equities." The International Equity Fund was

also permitted to invest in equity-based derivatives of foreign securities and fixed income

securities issued by governments and corporations located in those countries. The "investable

universe" of the International Equity Fund was "the equities of all developed market countries,

excluding the U.S., including American Depositary Receipts." The International Equity Fund's

benchmark was the "MSCI-EAFE Index, an index of more than 1,100 stocks in 21 countries

outside of North and South America …."

4.      *SSGM as a Functional Fiduciary of ERISA Plan Assets*

62.    As noted above, many of the securities purchased, held, or sold in the Collective Investment Funds were foreign securities that could not be purchased or sold except on foreign securities exchanges in transactions denominated in foreign currencies.

63.    As described more fully below, as a practical matter, unless a Collective Investment Fund invested solely in American Depositary Receipts or derivatives issued in the jurisdiction of the United States, the Investment Manager of the Collective Investment Fund, *i.e.*, SSBT, or some person acting on its behalf, such as a broker, was required to engage in foreign currency transactions in order to acquire equity securities "in markets outside the United States."  Any funds used to acquire such securities at any level within SSBT, or through any affiliate thereof, would constitute "plan assets" under 29 C.F.R. § 2510.3-101.

64.    On information and belief, SSGM provided brokerage services, that is, the purchase and sale of foreign securities, to the Collective Investment Funds.  To the extent that the Collective Investment Funds settled such purchases and sales in U.S. Dollars, the Collective Investment Funds did not engage directly in FX trading in connection with the purchase or sale of foreign securities.  Rather, they engaged in FX trading indirectly through SSGM, in that SSGM would have executed a purchase or sale of a foreign security in foreign currency and then converted the transaction to a U.S. Dollar-denominated transaction for purposes of settlement with the Collective Investment Funds.

65.    On information and belief, SSGM also served as the conduit for the repatriation of dividend, principal, and interest payments by issuers of foreign securities and for receipt of proceeds of sales of foreign securities, and engaged in FX transactions in order to remit such payments to the Collective Investment Funds in U.S. Dollars.

22

66.     SSGM's conversion of foreign currency to U.S. dollars constituted the exercise of authority or control respecting the management or disposition of the underlying assets of the Collective Investment Funds and, therefore, of assets of the ERISA Plans, within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(1), and 29 C.F.R. § 2510.3-101(a).  Accordingly, SSGM was a fiduciary of the ERISA Plans.

> *5.    Defendants' Prohibited Transactions*

67.     According to its September 26, 2006 Investment Manager Guide, SSBT purported to comply with a special procedure when effecting foreign exchange transactions for ERISA trust and custody clients.  Until at least September 26, 2006, the so-called "FX Procedure" purported to be "designed to satisfy the conditions of Prohibited Transaction Exemption 94-20 ("PTE 94-20").  A prohibited transaction exemption permit[ted] certain 'directed' FX transactions between [SSBT] and its ERISA clients."  Under the ERISA "FX Procedure," SSBT "agree[d] to post to its website on a daily basis, a specific buy rate and sell rate for each currency.  Each ERISA plan manager [could] direct [SSBT] to effect the plan's FX transactions, including income repatriation and buy/sell related transactions at the posted rates or at rates more favorable if market conditions warrant."

68.     The September 26, 2006 Investment Manager Guide did not, however, address foreign exchange transactions conducted in connection with assets managed directly by SSBT, as in the Collective Investment Funds.  Under the terms of PTE 94-20, FX transactions generated by SSBT as investment manager of the Collective Investment Funds and executed by SSBT or SSGM could not be conducted under this so-called "FX Procedure," because, among other things, SSBT as investment manager would be dealing with itself, regardless of whether the FX

23

transactions were conducted internally at SSBT or through its affiliate, SSGM, without the benefit of an independent fiduciary.

69.     Nor was there any other applicable prohibited transaction exemption.  As set forth above, the terms of FX transactions conducted on behalf of the Collective Investment Funds were conducted on terms less favorable than the terms generally available in comparable arm's length FX transactions between unrelated parties and on terms less favorable than the terms generally afforded by the bank in comparable arm's length FX transactions between unrelated parties.  Accordingly, the Defendants could not engage in FX transactions in connection with plan assets in the Collective Investment Funds without engaging in a prohibited transaction.

## VI. CLASS ALLEGATIONS

70.     **Class Definition**. Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Plan and its participants and beneficiaries and the following class of similarly-situated persons (the "Class"):

> All qualified ERISA Plans (including the participants and beneficiaries thereof) for which State Street Bank and Trust Company or State Street Global Markets, LLC served as investment manager (including serving as the manager of a collective trust in which such a Plan invested) or trustee or custodian of assets and for which State Street Bank and Trust Company or State Street Global Markets, LLC provided foreign currency exchange transactional services (including foreign currency transactional services provided to entities such as collective trusts that held such ERISA Plans' assets), at any time between January 1, 2001 and the present (the "Class Period").

Class treatment is appropriate in this case because it would promote judicial economy by adjudicating the Plaintiffs' ERISA fiduciary breach and prohibited transaction claims with respect to all of the Plans and participants and beneficiaries in the class.

71. **Numerosity**. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of ERISA Plans throughout the country invested in the Collective Investment Funds during the Class Period, and sustained losses as a result of the Defendants' imprudent FX trading activities. Defendants have more than $5.2 trillion of pension assets under custody. These assets could all be exposed to Defendants' improper pricing scheme. Plaintiffs believe that hundreds of ERISA plans are also exposed to the Collective Investment Funds with investments in foreign securities.

72. **Commonality.** The claims of Plaintiffs and all Class members originate from the same misconduct, breaches of duties and violations of ERISA perpetrated by Defendants with regard to management of its FX trading program. The questions of law and fact common to the Class include, but are not limited to:

  a. Whether Defendants breached their fiduciary duties to the Plans by using an FX trading scheme to overcharge the Plans, or the Collective Investment Funds in which the Plans invested, for FX trading;

  b. Whether Defendants' self-interested FX transactions constituted transactions prohibited under ERISA's statutory restrictions;

  c. Whether Defendants' fiduciary breaches caused losses to the Plans; and

  d. Whether Defendants' prohibited transactions caused losses to the Plans.

73. **Typicality.** Plaintiffs' claims on behalf of their Plans are not only typical of, but the same as, claims that would be brought with respect to other Plans. If cases were brought and prosecuted individually, each of the members of the Class would be required to prove the same

claims based upon the same conduct of the Defendants, using the same legal arguments to prove Defendants' liability, and would be seeking the same relief.

74. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel that are competent and experienced in class action and ERISA litigation. Plaintiffs have no interests antagonistic to, or in conflict with those of the Class. Plaintiffs have undertaken to protect vigorously the interests of the absent members of the Class.

75. **Rule 23(b)(1)(A) & (B) Requirements.** Class action status is warranted under Fed. R. Civ. P. 23(b)(1)(A), because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.  Class action status is also warranted under Rule 23(b)(1)(B), because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

76. **Rule 23(b)(2) Requirements.** Certification under Rule 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other equitable relief with respect to the Class as a whole.  No plan-by-plan inquiry would be required to determine whether Defendants' breached their fiduciary duties.

77. **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to Class members predominate over any

26

questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VII. CLAIMS FOR RELIEF

### COUNT I

**Engaging in Self-Interested Prohibited Transactions**
**(Violation of § 406 of ERISA, 29 U.S.C. § 1106 by Defendants)**

78.     All previous averments are incorporated herein.

79.     At all relevant times, the Defendants acted as fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by exercising authority and control over ERISA plan assets.

80.     The Defendants, by their actions throughout the Class Period, caused the Plans to engage in unfairly and unreasonably priced FX transactions.

81.     During the Class Period, Defendants engaged in FX transactions using plan assets that were not for the exclusive benefit of the Plans' or their participants.

82.     Through their FX transactions and pricing scheme, Defendants dealt with assets of the Plans for their own financial benefit and for their own account.  This is a violation of ERISA § 406(b)(1) & (3), 29 U.S.C. 1106(b)(1) & (3).

83.     As a direct and proximate result of these prohibited transaction violations, the Plans, directly or indirectly, paid millions of dollars in transaction fees that were prohibited by ERISA and suffered millions of dollars in losses.

84.     Pursuant to ERISA, Defendants are liable to disgorge all fees paid them for the Plans' FX transactions, to restore all losses suffered by the Plans as a result of the prohibited transactions, and to disgorge all profits earned on the fees paid by the Plans to Defendants.

## COUNT II

### Breach of Duties of Prudence and Loyalty
### (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by Defendants)

85.     All previous averments are incorporated herein.

86.     Defendants breached their ERISA fiduciary duties of prudence and loyalty by, *inter alia*:

   a.   Using plan assets for the own benefit, causing losses to the Plans and the participants;

   b.   Charging the Plans (or the Collective Investment Funds in which the Plans invested) fees for FX trading that were unreasonable and in excess of what Defendants had agreed to charge;

   c.   Failing to disclose to the Plans, their fiduciaries, or participants the amount of fees being charged for FX trading, that those fees were in excess of what Defendants had agreed to charge, and that other clients were charged less for the same services;

87.     These actions during the Class Period were breaches of Defendants' fiduciary duties of loyalty and prudence to the Plans under ERISA, and Defendants did not execute their fiduciary responsibilities for the exclusive benefit of the Plans.  § 404(a)(1)(A), (B), 29 U.S.C. §§ 1104(a)(1)(A), (B).

88.     Defendants committed these breaches during each FX transaction involving assets of the Plans.

28

89.     As a direct and proximate result of these breaches of duty, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, realized losses.

90.     Pursuant to ERISA, the Defendants are liable to restore all losses suffered by the Plans caused by the Defendants' breaches of fiduciary duty.

## COUNT III

### Liability for Breach of Co-fiduciary
### (Violation of § 405 of ERISA, 29 U.S.C. § 1105)

91.     All previous averments are incorporated herein.

92.     SSGM violated ERISA, 29 U.S.C. §1105(a)(1), by knowingly undertaking to conceal SSBT's fiduciary breaches.  It did so through the actions and omissions of its employees and agents by concealing and failing to provide complete and accurate information to the Plans regarding the cost of FX transactions.

93.     SSGM violated ERISA, 29 U.S.C. §1105(a)(3), because it knew that SSBT had breached its fiduciary duties of prudence and loyalty, but failed to take reasonable steps under the circumstances to remedy the breach.

94.     On account of SSGM's violations of these provisions, SSGM is liable for the breach of its co-fiduciary, SSBT.

95.     As a result of SSGM's actions, the Plans suffered losses.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

a.  Declare that the Defendants have violated ERISA's prohibited transactions provisions;

29

b. Declare that the Defendants breached their fiduciary duties under ERISA;

c. Issue an order compelling a proper accounting of the foreign exchange transactions in which the Plans have engaged;

d. Issue an order compelling Defendants to restore all losses caused to the Plans (or that will be caused to the Plans after the filing of this Complaint);

e. Issue an order compelling the Defendants to disgorge all fees paid and incurred to Defendants (or that will be paid or incurred by the Plans after the filing of this Complaint), including any profits thereon;

f. Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

g. Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as custodian to the Plans;

h. That this action be certified as a class action and that each Class be designated to receive the amounts restored to the Plans by Defendants and a constructive trust be established for distribution to the extent required by law;

i. Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

j. Award Plaintiffs their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

k. Award such other and further relief as the Court deems equitable and just.

Dated:   February 24 , 2012

By:   /s/ Bryan T. Veis
J. Brian McTigue (*pro hac vice*)
Bryan T. Veis (*pro hac vice*)
James A. Moore (*pro hac vice*)
**McTigue & Veis, LLP**
4530 Wisconsin Ave, NW
Suite 300
Washington, DC 20016
202-364-6900
Fax: 202-364-9960
Email: bveis@mctiguelaw.com
        bmctigue@mctiguelaw.com
        jmoore@mctiguelaw.com

**Catherine M. Campbell**
**Renee J. Bushey**
Feinberg, Campbell & Zack, P.C.
3rd Floor
177 Milk Street
Boston, MA 02109
617-338-1976
Fax: 617-338-7070
Email: cmc@fczlaw.com
        rjb@fczlaw.com

**Jonathan G. Axelrod** (*pro hac vice*)
Beins, Axelrod, P.C.
1625 Mass. Ave. NW
Washington, DC 20036
202-328-7222
Email: jaxelrod@beinsaxelrod.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I, Bryan T. Veis, hereby certify that on February 24, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/  Bryan T. Veis

# EX. 3

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| The Andover Companies Employee Savings and Profit Sharing Plan on behalf of itself, and James Pehoushek-Stangeland, and all others similarly situated, | ) ) ) ) | No. |
| Plaintiffs, | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| vs. | ) | |
| | ) | |
| State Street Bank and Trust Company, and State Street Global Markets, LLC, | ) ) | |
| Defendants. | | |

**PLAINTIFFS' CLASS ACTION COMPLAINT**

## Table of Contents

I.     PRELIMINARY STATEMENT ................................................................ 1

II.    JURISDICTION AND VENUE ........................................................... 4

III.   PARTIES ............................................................................................. 5

      A.     Plaintiff Alan Kober................................................................. 5

      B.     Plaintiff James Pehoushek-Stangeland .................................. 6

      C.     Defendants ............................................................................. 7

IV.   CLASS ACTION ALLEGATIONS ..................................................... 8

V.     SUBSTANTIVE ALLEGATIONS ...................................................... 11

      A.     The Nature of FX Trading Generally...................................... 11

            1.     The Increasing Necessity of FX Trading in a Global
                   Investment Portfolio................................................... 11

            2.     How FX Trading Works ............................................ 12

      B.     Negotiated vs. Non-Negotiated FX Trades:  Trades for Custodial
          Clients ................................................................................... 13

            1.     Custodial Clients Relied Upon State Street's Expertise and
                   Loyalty ...................................................................... 14

            2.     State Street's Custodial Contracts and Investment Manager
                   Guidelines Were Predicated on No-Cost FX Trading ........... 15

            3.     State Street's Deceptive Scheme Overcharged Custodial
                   Clients for Standing-Instruction FX Trades............................ 16

            4.     For its Custodial Clients, State Street's Deceptive Acts and
                   Practices Could Not Reasonably Be Detected. ...................... 20

      C.     Events After October 2009 Begin to Shed Light on State Street's
          Deceptive FX Trading Practices ............................................ 20

      D.     FX Trading and State Street's Commingled ERISA Fund Clients.................... 22

            1.     The Plaintiffs' Plans.................................................. 22

            2.     Defendants' Fiduciary Status .................................... 24

      E.     State Street's FX trades were prohibited transactions under ERISA
          and corresponding federal regulations. .................................. 28

VI.   PRAYER FOR RELIEF ...................................................................... 35

Plaintiff Alan Kober, as Trustee and fiduciary of The Andover Companies Employees Savings and Profit Sharing Plan (the "Andover Plan"), on behalf of the Andover Plan, and Plaintiff James Pehoushek-Stangeland as a participant and beneficiary of The Boeing Company Voluntary Investment Plan ("Boeing Plan") and all other ERISA Plans (together, the "Plans") that suffered losses as a result of State Street's foreign currency exchange trading practices as alleged herein, by and through its undersigned attorneys, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.

## I. PRELIMINARY STATEMENT

1.       This complaint arises from Defendants State Street Bank and Trust Company ("State Street Bank"), and State Street Global Markets, LLC's ("SSGM") (collectively, "State Street" or "Defendants") self-dealing and imprudent management of the Plans' commingled funds managed by State Street in violation of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). This is a civil enforcement action brought pursuant to 29 U.S.C. §§ 1001, *et seq.*, and under ERISA §§ 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) and (a)(3), to recover losses and obtain equitable relief on behalf of the Plans and all other similarly situated Plans. State Street Bank and SSGM were required to act prudently and solely in the interest of the Plans' participants and beneficiaries in their capacity as ERISA fiduciaries. In particular, State Street breached its fiduciary duties under ERISA by purchasing and selling foreign securities through the use of foreign currency exchange transactions at rates favorable to Defendants. These transactions were prohibited transactions under ERISA § 406, 29 U.S.C. § 1106.

2.       Plaintiffs also allege that Defendants failed to act solely in the interest of the participants and beneficiaries of the Plans and breached their fiduciary duties of prudence and loyalty with respect to the Plans. Specifically, Plaintiffs allege that Defendants, as fiduciaries of the Plans, violated their fiduciary duties under ERISA § 404, 29 U.S.C. § 1104, by causing the

Plans to engage in transactions that were not for the exclusive benefit of the Plans or their participants and beneficiaries.

3.    State Street was the trustee for the Defined Contribution Plans Master Trust Agreement between Merrimack Mutual Fire Insurance Company and State Street Bank and Trust Company dated September 1, 2002, and investment manager for the Andover Plan's assets invested in State Street's proprietary commingled funds ("the Funds").

4.    State Street was the trustee for The Boeing Company Employee Savings Plans Master Trust ("Boeing Master Trust") and managed certain funds in the Boeing Master Trust. As of December 31, 2011, the assets of The Boeing Company Voluntary Investment Plan (the "Boeing Plan") comprised 100 percent of the Boeing Master Trust. The Boeing Master Trust holds the Boeing Plan's assets that are invested in State Street's Funds.

5.    As investment manager for the commingled Funds, State Street Bank contracted on behalf of the Funds for which it served as investment manager for custodial services from its affiliated State Street entities such as SSGM. State Street additionally served as custodial bank for certain of the Plans in the Class including the Boeing Plan, and this also served as a custodian bank for all the foreign currency transactions at issue for certain of the ERISA-covered plans.

6.    A custodian bank is an institution that holds securities on behalf of investors. The role of a custodian bank is to safeguard and record movement of assets, including holding assets and securities in safekeeping with appropriate valuations, arranging settlement of all purchases and sales and deliveries in and out of the account, administering corporate actions for securities, and maintaining and managing all cash transactions, including foreign currency transactions. Custodians are typically used by investors who do not wish to leave securities on deposit with their broker-dealers or investment managers. By separating these duties, the use of custodians— at least in theory—reduces the risk of fraud or other misconduct. An independent custodian ensures that the investor has unencumbered ownership of the securities other agents represent to have purchased on its behalf.

7.      As of 2011, State Street held approximately $22.8 trillion in assets under custody and administration, making it one of the largest providers of custodial services in the world.[1] State Street charged the Plans, in combination with its other clients hundreds of millions of dollars a year in fees for custodial services.

8.      As part of its array of ancillary custodial services. State Street executed foreign currency exchange ("FX") transactions on behalf of its clients in order to facilitate clients' purchases or sales of foreign securities or the repatriation of foreign currency into U.S. dollars. During the past decade, pension funds and other institutional investors have increasingly looked to overseas companies and securities markets in order to diversify their holdings and maximize investment returns. Because foreign investments are bought and sold in the foreign currencies of the nations in which they are issued, U.S.-based investors necessarily must purchase and sell those foreign currencies in order to complete the transactions.

9.      Mr. Kober and Mr. Pehoushek-Stangeland ("the Plaintiffs") and the members of the Class reposed a high degree of trust in State Street. As trustee and investment manager for their Funds, and a fiduciary, State Street Bank authorized its affiliated entities, such as SSGM, to execute FX transactions under conditions in which the State Street Defendants controlled all aspects of FX trades, including the cost borne by Plaintiffs. Plaintiffs and the Class members depended upon State Street not only to execute FX trades honestly, but also to carry them out on terms no less favorable than the terms generally available in comparable arm's length FX transactions between unaffiliated and unrelated parties.

10.     Despite these legal obligations, State Street has undertaken an unfair and deceptive practice since at least 1998, whereby FX transactions were conducted behind a veil of secrecy so as to maximize exorbitant and undisclosed profits to State Street at the direct expense of the Plaintiffs' Plans and other Class Members. Upon information and belief, State Street charged its custodial clients and the Funds inflated FX rates when buying foreign currency on

---

[1] *See* http://www.statestreetglobalmarkets.com/ (follow link to "Foreign Exchange Global Strategy") (last visited September 12, 2012).

their behalf, and deflated FX rates when selling foreign currency for them, and in both cases pocketed the difference. In this regard, State Street charged the Plans and the Class incorrect and often fictitious FX rates unrelated to the market-based rates State Street was actually paying or received when SSGM executed the FX trades.

11.     The Plans and other Class members could not reasonably have detected State Street's deception. For the Funds and their fiduciaries and participants, the transaction was essentially conducted and reported between two affiliated State Street entities (State Street Bank and SSGM) and not reported on the fund fact sheets or otherwise reported to Plan sponsors, such as Mr. Kober, or to Plan beneficiaries, such as Mr. Pehoushek-Stangeland. For its clients, nothing in the FX rates State Street actually reported indicated that the rates being charged included hidden and unauthorized mark-ups (or mark-downs).

12.     State Street's unfair and deceptive FX trading practices, perpetrated on the Plans and the Class, generated hundreds of millions of dollars in profits annually for State Street. This money was taken directly from the pockets of the Plans and Class members' retirement accounts.

13.     Mr. Kober and Mr. Pehoushek-Stangeland bring this action as a class action on behalf of all similarly affected ERISA clients of State Street during the Class Period defined below, in order to recover the proceeds State Street reaped from Class members through its unfair and deceptive FX trading practices.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1). The claims asserted herein are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

15.     Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

### III.   PARTIES

**A.   Plaintiff Alan Kober**

16.     Plaintiff Alan Kober is an Individual Trustee of The Andover Companies Employees' Savings and Profit Sharing Plan (the "Andover Plan") pursuant to § 10.03 of The Andover Companies Employees' Savings and Profit Sharing Plan and Trust Agreement, Amended and Restated Effective as of January 1, 1989. In this capacity, Mr. Kober is a Plan fiduciary with standing to bring claims for breach of fiduciary duty on behalf of the Plan pursuant to ERISA §§ 409 and § 502(a)(2).

17.     Plaintiff Merrimack Mutual Fire Insurance Company ("Merrimack Mutual") is the designated Plan Administrator for the Andover Plan. The Andover Plan is an ERISA-qualified defined contribution plan established for the benefit of the employees of Merrimack Mutual and its sister companies, Cambridge Mutual Fire Insurance Company, and Bay State Insurance Company, which, together with Merrimack Mutual, comprise the Andover Companies ("Andover Companies"). Andover Companies is a New England mutual insurance institution which offers insurance programs and is managed from its headquarters in Andover, Massachusetts.

18.     As trustee for the Andover Plan, pursuant to Section 4.1 of the Master Trust Agreement, State Street Bank was required to exercise power and authority over the investment accounts for which it has express investment management discretion, or upon the direction of the Investment Manager. The investment power of the trustee includes the power to "purchase and sell foreign exchange and contracts for foreign exchange, including transactions entered into with State Street Bank and Trust Company, its agents or its subcustodians." The Master Trust Agreement further provides that nothing in the plans requires any investment manager to make any investments which constitute a prohibited transaction.

19.     Pursuant to the Investment Manager Agreement between State Street Bank and Merrimack Mutual entered on April 1, 2001, State Street Bank was appointed investment

manager pursuant to Section 3(38) of ERISA with respect to all cash, securities, or other property designated by client.

20.     During the relevant time period, the Andover Plan offered participants investments in several State Street Bank-sponsored commingled Funds as part of the Plan's core investments. International Equity Funds were one category of core investments for the Andover Plan, which also included Stable Value Funds, Fixed Income Funds, Balanced Funds and Domestic Equity Funds. During the class period, the Andover Plan included the following proprietary commingled International Equity Funds to participants for investment: International Growth Opportunities Securities Lending Class A Fund, and SSgA Daily International Alpha Select. State Street Bank served as the Trustee for Andover Plan, and served as the Investment Manager for Andover Companies Plan's investment in the International Equity Funds. The Andover Companies Plan suffered losses as a result of State Street's unfair and deceptive FX trading practices on behalf of the International Equity Funds.

**B.      Plaintiff James Pehoushek-Stangeland**

21.     Plaintiff James Pehoushek-Stangeland is a resident of Seattle, Washington. He works for the Boeing Company and is a participant in the Boeing Plan, an ERISA-qualified retirement plan. Accordingly, Plaintiff Pehoushek-Stangeland has standing to bring suit on behalf of the Boeing Plan for losses to the Plan due to breaches of fiduciary duty pursuant to ERISA §§ 409, and § 502(a)(2).

22.     During the relevant time period, the Boeing Plan offered participants investments in several State Street Bank-sponsored commingled Funds as part of the Plan's core investments. The International Index Fund was one category of core investments for the Boeing Plan, which also included Lifecycle Funds, Stable Value Funds, Bond Funds, Balanced Funds, and Domestic Equity Funds. During the Class Period, the Boeing Plan included the following proprietary State Street Funds: the State Street Bank Global All Cap Equity ex-US Index Securities Lending Series Fund Class I ("State Street Bank Global Lending Fund"); and the State Street Bank Global All Cap Equity ex-US Index Non-Lending Series Fund Class A ("State Street Bank Global Non-

Lending Fund"), for participants to invest in. As of December 31, 2010, the Boeing Plan held approximately $1.98 billion in Plan assets in the State Street Bank Global Lending Fund. As of December 31, 2011, the Boeing Plan held approximately $1.863 billion in the State Street Bank Global Non-Lending Fund. As of December 31, 2010, and December 31, 2011, these investments constituted approximately 6% of the Boeing Master, respectively.

23.     State Street served as the Trustee for the Boeing Master Trust, which holds the assets of the Boeing Plan, and as the investment manager for certain funds in the Boeing Master Trust. The Boeing Plan suffered losses as a result of State Street's unfair and deceptive FX trading practices on behalf of the International Index Fund (together with Plaintiff Kober's international funds, "The International Equity Funds").

24.     The Plaintiffs have standing to bring this action, and pursuant to Federal Rules of Civil Procedure 23, to bring a representative action on behalf of the Andover Plan and the Boeing Plan, and the class of Plans which incurred losses as a result of State Street's breach of its fiduciary duties as the Investment Manager and custodian of FX trades for the Plans' investments in the International Equity Fund(s) and/or the International Index Fund(s).

**C.      Defendants**

25.     Defendant State Street Bank is the trustee of the Plans. All money that employees contribute to the Plans is held in a trust fund, and State Street Bank is responsible for safekeeping of the funds. State Street Bank is also the investment manager for the Andover Plan, and provides investment management and custodial services to the Boeing Plan.

26.     Defendant State Street Bank is a registered financial holding company with its principal place of business in Boston, Massachusetts. During the Class Period, State Street Bank directly, or indirectly through one or more subsidiaries provided custodial banking and FX trading services to ERISA-covered benefit plans and for the Funds offered by ERISA-covered Plans, such as the Plans. One of the services provided by State Street Bank to its custodial clients was the execution of FX transactions, which allowed clients to purchase and sell foreign securities or to engage in foreign currency trades for other purposes.

27.     Defendant SSGM, formerly known as State Street Capital Markets, is similarly headquartered in Boston. SSGM is the "investment research and trading arm of State Street Corporation" and it provides trading in foreign exchange for its clients. SSGM provides specialized investment research and trading in foreign exchange, equities, fixed income, and derivatives to ERISA-covered benefit plans. During the Class Period, SSGM provided custodial banking and FX services to the Plans and members of the Class.

## IV.    CLASS ACTION ALLEGATIONS

28.     **Class Definition.** Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Andover Plan and the Boeing Plan, and the following class of persons similarly situated (the "Class"):

> All qualified ERISA plans, and the participants, beneficiaries, and named
> fiduciaries of those plans, that invested directly or indirectly in the State Street
> Bank commingled Funds, which includes the "International Equity Funds"
> identified in this complaint; or for which State Street Bank provided investment
> management or custodial services, that utilized SSGM's FX trading services, and
> suffered damages as a result of the deceptive acts and practices and other
> misconduct alleged herein, at any time between January 2, 1998 and the present.
> Excluded from the Class are Defendants, any entity in which Defendants have a
> controlling interest, and the officer, directors, affiliates, legal representatives,
> heirs, successors, subsidiaries, and/or assigns of any such entity.

29.     **Numerosity.** The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that hundreds of ERISA-covered benefit plans throughout the country offered the International Equity Funds and/or utilized State Street's trust or custodial services and that these plans collectively have tens of thousands of participants and beneficiaries.

30.     **Commonality.** The claims of Plaintiffs and the members of the Class have a common origin and share a common basis. The claims of all Class members originate from the same misconduct, breaches of duties, and violations of ERISA, perpetrated by Defendants.

Proceeding as a class is particularly appropriate here because the International Equity Funds are proprietary commingled funds that are held in collective trusts managed by State Street Bank, in which assets of every plan that invests in the International Equity Funds are pooled, and therefore, State Street's deceptive acts and practices and misconduct regarding its FX trading practices affected all plans that invested in the International Equity Funds in the same manner. Similarly, for the custodial clients, State Street's deceptive acts and practices concerning FX trading were perpetrated on a class-wide basis.

31.     There are questions of law and fact common to the Class, including:

(a) Whether Defendants breached their fiduciary duties under ERISA by overcharging the Plans or Funds at issue in which the Plans invested, for their FX trading practices;

(b) Whether Defendants engaged in unfair and deceptive acts and practices in connection with FX transactions, so as to maximize their own profits at the expense of the Plans;

(c) Whether Defendants' self-interested FX transactions constituted prohibited transactions under ERISA;

(d) Whether Defendants pocketed the difference between the actual, market-based FX rates and the false FX rates reported and charged to the Plans and the International Equity Funds;

(e) Whether Defendant SSGM failed to provide complete and accurate information to plan sponsors, fiduciaries, and participants when they entered into the FX trading transactions on behalf of the Plans and the International Equity Funds;

(f) Whether Defendants' acts proximately caused losses to the Plans, and if so, the appropriate relief to which Plaintiffs, on behalf of the Plans and the Class are entitled;

32.     **Typicality.** Plaintiffs are willing and prepared to serve the Court and the proposed Class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other members of the class.

33. Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs are members of the Class described herein.

34. The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

35. A class action is superior to other available methods for the adjudication of this controversy. Individual litigation by all Class members would increase the delay and expense to the parties and the Court given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be more fair, efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

36. **Adequacy.** The interests of the Plaintiffs are co-extensive with, and not antagonistic to, those of the absent Class members. Plaintiffs will undertake to represent and protect the interests of absent Class members. The undersigned counsel for Plaintiffs and the Class are experienced in class action, complex, and ERISA litigation, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and absent Class members.

37. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Compared to individual actions by each Class member, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

38. **Rule 23(b)(1)(A) & (B) Requirements.** Class action status in this ERISA action is warranted under Federal Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the

interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

39.    **Rule 23(b)(2) Requirements.** Certification under 23(b)(2) is warranted because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

40.    **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## V.    SUBSTANTIVE ALLEGATIONS

**A.    The Nature of FX Trading Generally**

**1.    The Increasing Necessity of FX Trading in a Global Investment Portfolio**

41.    During the past decade, in order to meet their investment and funding objectives, U.S.-based institutional investors have found it increasingly necessary to enter the overseas securities markets and expand the global scope of their investment portfolios. The International Equity Funds offered by State Street to institutional investors, for example, generally invest the bulk of their assets in securities or stocks of companies whose headquarters and/or primary business is outside of the United States.

42.    Institutional investors that buy and sell foreign securities, such as State Street on behalf of the Plans and the other Class members, must engage in FX trading because the purchases, sales, dividends, and interest payments are all transacted in the currency of the nation in which the relevant securities exchange sits.

43.    If, for example, a U.S. investor wishes to buy shares of stock in a German company that trades on a German securities exchange, the investor must sell U.S. dollars and purchase euros in order buy those shares. Further, any cash dividends paid on that German stock will be denominated in euros. To "repatriate" those dividends, the investor must sell the euros

received and purchase dollars. Accordingly, FX transactions are the means for converting U.S. dollars into foreign currency and vice versa.

**2.  How FX Trading Works**

44.     FX trading takes place around the world on a nearly 24-hour cycle, five-and-a half days a week. The official FX trading week begins at 7:00 a.m. New Zealand time on Monday, with each subsequent trading day ending at 5:00 p.m. New York City time.

45.     For each currency bought and sold during the course of the FX trading day, there will necessarily be a high trade and a low trade, with all other trades falling somewhere in between. This information is determined through trade data monitored and tracked by proprietary services such as, but not limited to, Electronic Brokerage System ("EBS") and Reuters.

46.     The difference between the low trade and the high trade is called the "range of the day." More precisely, the "spot range of the day" refers to FX rates as of a specific and prompt settlement date, usually two business days after the trade date. To more accurately measure the trade cost for FX transactions that settle prior to or later than the date for spot trades, participants in the FX market also look to the "forward-adjusted range of the day." Because FX trades do not always settle two days after the trade, the forward-adjusted range of the day is a more conservative and accurate measurement such that it takes into account the interest rate differential that exists at the time of trade between the trade date and settlement date for the underlying currencies.

47.     By way of example, assume 100 FX trades in euros-for-dollars (EUR-USD) during the course of one trading day. If the lowest rate trade occurred at $1.25 to buy €1.00, and the highest rate trade occurred at $1.35 to buy €1.00, the range of the day would be $1.25-$1.35.

48.     Another useful measure is the daily "mid-rate," which is simply the sum of the forward-adjusted daily high and forward-adjusted daily low, divided by two. This rate reflects the "average" FX rate in a given currency on a given day.

49.     The daily mid-rate is significant because of the absence of publicly accessible data showing the precise time of day at which FX trades occur (as exists with stock trading, for

12

example) and because State Street did not disclose such information to its clients. By looking at the mid-rate over a significant period of time, however, one can reasonably estimate the average FX trade cost on any given day. Over the course of a month or years, it is reasonable to expect FX trades to regress to the mid-rate. On any given day, some trades might settle above or below the daily mid-rate, but over increasingly lengthy periods of time, a significant number of FX trades can be expected to occur at or extremely close to the mid-rate.

**B.    Negotiated vs. Non-Negotiated FX Trades:  Trades for Custodial Clients**

50.    As set forth in the *Arkansas State Teacher Retirement System v. State Street Corp.*, No. 11-cv-10230 (MLW) (Apr. 15, 2011) complaint, State Street gave its custodial clients a choice with respect to the manner in which FX trades would be conducted. In a "negotiated," or "active," FX trade, a custodial client or its outside investment manager would personally communicate the trade information to a State Street FX trader. The State Street FX trader would then quote a rate, which would be accepted or rejected. If accepted, State Street would execute the FX trade at the agreed-upon price, which could include a modest mark-up.

51.    A "non-negotiated" or "standing-instruction" FX trade is essentially the opposite of a negotiated trade. There is no arm's-length negotiation of the price between the parties to the transaction. With non-negotiated or standing-instruction trades, custodial clients and their outside investment managers do not negotiate rates with State Street, and State Street does not quote rates. Instead, as the name "standing-instruction" suggests, custodial clients simply report the desired currency transaction to State Street, and trust and rely upon State Street, using "best execution" practices, to execute the trade on the client's behalf. According to its Investment Manager Guides, State Street referred to standing-instruction FX transactions as "Indirect Deals" between 2000 and May 2008, and "Institutional Investors FX Trading" between May 2008 and November 2009. Since November 2009, State Street has referred to such trading as "Custody FX."

52.    State Street's custodial clients reasonably expected that standing-instruction FX trades would have no mark-ups or fees. This was in view of, among other things, (a) the hefty

annual fees custodial clients paid State Street to serve as custodian over their assets, (b) the

Custodian Contracts and associated fee schedules that gave no indication that standing-

instruction FX trading would incur extra fees or mark ups, and did not authorize any such fees or

mark-ups, and (c) State Street's Investment Manager Guides that assured custodial clients and

outside investment managers that the price of FX trades was *"based on the market rates at the*

*time the trade is executed."*

53.     Institutional investors typically requested that State Street and other custodians

handle the smaller FX transactions, mostly the repatriation of dividend and interest payments,

through standing instructions because the amount of each trade rarely justified the time and effort

required for a negotiated trade.

**1.      Custodial Clients Relied Upon State Street's Expertise and Loyalty**

54.     Since at least 1998, State Street executed the majority of custodial client FX

transactions for its accounts, including purchases and sales of U.S. and foreign currency as well

as repatriations of dividends and interest payments into U.S. dollars.

55.     Custodial clients reposed a high degree of trust in State Street to execute standing-

instruction FX transactions. In conducting these transactions, State Street occupied a superior

position to its custodial clients due to its control over all aspects of the FX trade, including the

timing of the trades, and most importantly, the price at which the trades were executed.

56.     Custodial clients depended upon State Street not only to execute the FX trades,

but also to accurately and honestly report the FX rate and to carry out the trades in accordance

with their custodial contracts, associated fee schedules, and guidelines as set forth in the

Investment Manager Guides.

57.     Additionally, separate and apart from the custodial contracts and Investment

Manager Guides, State Street's custodial clients had a reasonable expectation that the FX rates

that State Street charged (or credited) on standing-instruction FX trades would accurately reflect

the true rates of those FX trades. There is no reason a custodial client would expect its custodian

bank—to which it was paying substantial annual fees for custodial services—to charge (or

credit) it in connection with standing-instruction FX trades at any rate other than the actual rate for the FX trade.

**2.    State Street's Custodial Contracts and Investment Manager Guidelines Were Predicated on No-Cost FX Trading**

58.    State Street's form custodial contracts provided that State Street "shall be entitled to compensation for its services and expenses as Custodian" pursuant to "a written Fee Schedule between the parties."

59.    Custodial clients and State Street agreed to and executed a series of Fee Schedules covering the time period from 1998 to the present.

60.    The Fee Schedules either provided estimated annual fees or annual flat fees for State Street's services as a custodian.

61.    The Fee Schedules also set forth certain categories of ancillary services for which State Street was permitted to charge additional fees, including Wire Fees, Reporting Fees, Delivery Fees and Subcustody Fees.

62.    None of these particular ancillary service categories relate in any way to FX trading. The Custodian Contracts did not state that those ancillary fees relate to FX trading or that State Street would impose any fees in connection with FX trading.

63.    For one non-ERISA client, the Arkansas Teacher Retirement System ("ARTRS"), for more than a decade, its custodial contracts with State Street (a) expressly provided that standing-instruction FX trades would be executed free of charge; or (b) did not list FX transactions among the services for which it was permitted to charge an additional fee or any other cost above the annual flat fee.

64.    Upon information and belief, substantially similar terms were employed in the Custodial Contracts for other members of the ERISA Class during the Class Period.

65.    Additionally, during the Class Period, State Street provided Investment Manager Guides to custodial clients and outside investment managers that contained comprehensive information about State Street's custody practices and services, including procedural

requirements, costs, and features. The many services described therein included "State Street Foreign Exchange Transactions."

66.     During the Class Period, State Street issued no fewer than 15 distinct Investment Manager Guides, including those dated July 9, 2003; August 9, 2005; September 26, 2006; October 17, 2006; November 20, 2006; December 15, 2006; January 25, 2007; October 30, 2007; November 21, 2007; December 19, 2007; January 28, 2008; May 1, 2008; October 31, 2008; December 30, 2008; and January 23, 2009, to custodial clients and outside investment managers.

67.     State Street represented in each of these Investment Manager Guides that "State Street Foreign Exchange Transactions . . . are *priced based on the market rates at the time the trade is executed."* (Emphasis added.)

### 3.     State Street's Deceptive Scheme Overcharged Custodial Clients for Standing-Instruction FX Trades

68.     State Street's FX practices diverged from what the Custodial Contracts authorized and what the Investment Manager Guides represented. Despite assurances that FX transactions would be based on market rates, State Street reported and charged its custodial clients FX rates on standing-instruction trades far above what State Street actually paid for foreign currency (or far below what State Street actually received for sales of foreign currency)— oftentimes, at rates that actually fell *outside of the range of the day.*

69.     As such, unbeknownst to its custodial clients, State Street reported FX rates on standing-instruction trades to its clients that did not reflect the actual cost or proceeds of the FX transaction to State Street, and instead included a hidden and unauthorized mark-up. Put simply, State Street invented the FX rates it reported and charged (or credited) to its custodial clients. State Street paid or received one rate for FX, reported to its custodial clients another rate that was either higher (in the case of a purchase) or a lower (in the case of a sale), and pocketed the difference.

16

70. When custodial clients or their agents requested that State Street execute an FX transaction, the request was routed electronically via State Street's Market Order Management System (MOMS) to a group of "risk traders" working at State Street's FX trading desk who then executed the FX trades by entering trade information that did not reflect the actual rate State Street paid or received.

71. To illustrate the deception, assume again the example set forth above—100 euro-for-dollar trades on a given day that ranged from $1.25 to $1.35 (the "range of the day") to purchase €1.00, with a day's mid-rate of $1.30. On any, and all, standing-instruction euro-for-dollar trades on behalf of its custodian clients, State Street would have paid a rate between $1.25 and $1.35 for those euros, but reported to its clients that it paid more. State Street then would have charged its clients the false higher amount and kept the difference.

72. This conclusion is supported by the analysis from non-ERISA custodial client ARTRS of ten years of FX transactions executed by State Street on behalf of and reported to ARTRS. Between January 3, 2000 and December 31, 2010, ARTRS had a total 10,784 FX transactions with reliable data. Among these 10,784 transactions, 4,216, or 39%, were non-negotiated, standing-instruction trades. These 4,216 FX trades had an aggregate trading volume exceeding $1.2 billion.

73. In conducting the analysis, ARTRS found that its FX trades were logged and compared to other FX trades logged and tracked in a comprehensive database of more than 2 million buy-side currency trades. By comparing ARTRS's trades in certain currencies with the same currency pair trades in the database, one can estimate the trading cost of ARTRS's standing-instruction FX trades by State Street in relation to trades made worldwide. For purposes of this analysis, the trading cost is the difference between the day's mid-rate and the rate that State Street charged (or credited) to ARTRS for standing-instruction FX trades.

74. State Street did not report to ARTRS (or any other ERISA-covered custodial client) the actual time of execution of any FX trade. Therefore, comparing the day's mid-rate to the standing instruction FX rates State Street charged (or credited) to ARTRS was the best

method of determining whether State Street charged (or credited) ARTRS a rate based on the actual market rate at the time of execution, as State Street represented it would do in its Investment Manager Guides.

75.     The analysis by ARTRS made clear that State Street derived its false FX rates by adding (on purchases) or subtracting (on sales) "basis points" or "pips" from the actual FX rate. A basis point, or pip, is a unit equal to 1/100th of a percentage point. For example, the smallest move the euro/dollar currency pair generally makes is 1/100th of a penny, or one basis point.

76.     For the period of January 3, 2000 through December 31, 2010, the FX rates that State Street reported and charged (or credited) to ARTRS on its 4,216 non-negotiated FX trades were, on average, **_17.8 basis points_** above or below the day's mid-rate. In other words, the FX rates that State Street reported and charged (or credited) to ARTRS for standing-instruction FX trades, on average and during this 10-year period, created a trading cost 17.8 basis points higher than the average FX rate (the day's mid-rate).

77.     By way of example, assume that the rate State Street actually paid to purchase €1.00 on a given day was $1.31551. If State Street charged ARTRS 17.8 basis points more than it paid, the rate would be $1.31729 ($1.31729 - $1.31551 = 0.00178). For a purchase of €10 million, the undisclosed profit to State Street on that single trade—and the concomitant unknown loss by ARTRS—would be $17,800. Accordingly, the difference in total trading costs between the actual and false rates can be very large.

78.     Tellingly, for the same 10-year period, the FX rates that State Street reported and charged (or credited) to ARTRS on its more than 6,500 **_negotiated_** FX trades added, on average, only **_3.6 basis points_** in trading costs as compared to the day's mid-rate. As such, while the FX trades executed by State Street pursuant to so-called "best execution" practices incurred trading costs of 17.8 basis points on average, the FX trades actively negotiated between State Street and ARTRS or its outside investment managers incurred trading costs of only 3.6 basis points on average.

79.     The false or fictitious nature of the FX rates State Street reported and charged (or credited) to ARTRS was further demonstrated when reviewing ARTRS's standing-instruction FX trades in the context of the forward-adjusted range of the day. Among ARTRS's 4,216 standing instruction FX trades, *2,217, or 53%, fell entirely outside the forward-adjusted range of the day.* These 2,217 FX trades, with a total volume exceeding $200 million, added trading costs on average of *64.4 basis points* over the day's mid-rate—an enormous hidden and unauthorized mark-up. For example, on a purchase of €10 million, an undisclosed fee of 64.4 basis points would result in a $64,400 profit to State Street on that single transaction alone.

80.     Rates consistently above (or below) the daily mid-rate alone demonstrate that State Street was not fulfilling its duties as a custodian by charging a hidden mark-up, and they demonstrate a violation of the terms of the custodial Contracts and the representations in the Investment Manager Guides. But when more than half of all standing-instruction FX trades for a particular custodial client fall *outside* the forward-adjusted range of the day, it becomes clear that those reported FX rates were not actual, market-based FX rates, but were instead fictitious and designed solely to gouge the custodial client and, in turn, its beneficiaries.

81.     There is no rational, honest basis for a professional FX market participant like State Street, or indeed any FX market participant, to charge an FX rate outside the forward adjusted range of the day without disclosing it. The day's range defines the range at which primary dealing banks and custodian banks transacted in FX during that trading day. The fictitious nature of rates assigned outside the forward-adjusted range of the day illustrates, perhaps most starkly, the unfair and deceptive nature of State Street's standing-instruction FX trading practices. In short, these practices were designed to enrich State Street while deceiving and unfairly depriving institutional clients such as ARTRS and State Street's other custodial clients of much-needed funds.

### 4. For its Custodial Clients, State Street's Deceptive Acts and Practices Could Not Reasonably Be Detected.

82.     No custodial client could have reasonably discovered State Street's deceptive acts and practices concerning FX trading during the Class Period. State Street executed hundreds if not thousands of FX trades on behalf of its custodial clients every month. The periodic reports State Street sent to clients showed only the rate that State Street charged for its FX trades. The reports did not include the range of the day, the daily midrate, or any indication of the time of the day that the trade was executed (known as "timestamps"). Accordingly, there was no way for custodial clients to reasonably determine, or even suspect, that State Street was secretly charging more than it actually paid for FX or was paying clients less than it actually received for FX.

83.     It was reasonable for custodial clients to presume that the prices reflected in the reports State Street provided to them were an accurate representation of the true cost of the FX trades. Custodial contracts provided that monthly reports of monies received or paid on behalf of the client would be given to the client. Accordingly, State Street had an affirmative obligation to report accurately the amount of money it was paying or receiving for FX.

84.     Furthermore, based on the Investment Manager Guides' assurance that FX rates would be "priced based on the market rates at the time the trade is executed," no custodial client had any reason to suspect that they were being charged (or credited) anything other the rate that State Street itself had paid or received on those standing-instruction FX transactions.

85.     Moreover, as alleged above, State Street occupied a position of trust and confidence with respect to its custodial clients. Those clients would not, and did not, suspect that the custodian in which that trust resided, would profit to a gross and undisclosed degree on the services for which they paid a handsome annual fee. Indeed, those custodial clients would, and did, presume that the custodian bank would act in and not against their best interests.

### C. Events After October 2009 Begin to Shed Light on State Street's Deceptive FX Trading Practices

86.     On October 20, 2009, the Attorney General of California filed a Complaint in Intervention for violation of the California False Claims Act, Cal. Gov. Code § 12651, charging

State Street with misappropriating more than $56 million from the accounts of California's two largest pension plans—CalPERS and CalSTRS—over a multi-year period in connection with the same unfair and deceptive FX practices alleged herein. *People of the State of Cal. ex rel. Brown v. State Street Corp.*, No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento County Oct. 20, 2009).

87.     The California Attorney General alleged that State Street reported inflated FX rates when buying foreign securities for CalPERS and CalSTRS, reported deflated FX rates when selling foreign securities for them, and pocketed the difference between the reported and actual rates. The Attorney General further alleged that State Street hid its wrongful conduct by entering incorrect FX exchange rates into State Street's electronic FX trading systems and providing false records to CalPERS and CalSTRS.

88.     The California Attorney General's allegations of undisclosed "mark-ups" were based in part on the sworn testimony of a former State Street Bank employee who worked on the same trading floor as the State Street Bank and SSGM foreign exchange traders and who overheard how State Street Bank or SSGM foreign exchange traders were marking up FX trade prices. This trader, in sworn testimony, described the practices of State Street Bank's FX traders as a "totally unethical thing to do" and said that the FX Traders' practices were not within the "industry standard." *People of the State of Cal. ex rel Brown v. State Street*, No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento County Jan. 31, 2012) (Declaration of Kenny V. Nguyen).

89.     In the months that followed, State Street dramatically changed its FX trading policies and disclosures and so informed its custodial clients. Under these new policies, State Street admitted for the first time that it had systematically imposed additional charges for FX trading. For example, in an excerpt from an updated Investment Manager Guide dated November 20, 2009, State Street advised custodial clients that it would post on its website, my.statestreet.com, "current mark-ups and mark-downs used by State Street Global Markets for [standing-instruction] foreign exchange transaction requests."

21

90.     In a similar message sent to custodial clients such as ARTRS, State Street admitted that **"[s]ince December 2009**, State Street has provided to all of its custody clients and their investment managers via our dedicated client portal, my.statestreet.com, comprehensive disclosure of the pricing and execution methodology (including the maximum mark-up or mark-down that may be applied) for each of its Indirect [standing-instruction] FX Services." (Emphasis added.) State Street added that "on the day after a trade is executed, State Street provides for each currency pair the reference interbank rates and the times at which they are obtained, the actual rates, the daily high/low range at the time of pricing (where applicable) and the actual mark-up or markdown that was applied."

91.     State Street thus altered its practices to allow custodial clients more complete access to FX trading data only after its deceptive acts and practices began to be revealed. State Street's late disclosure that it charged mark-ups and mark-downs on standing-instruction FX trades contradicts its previous repeated assurances that FX rates would be based on market rates at the time the trade is executed.

92.     According to a study conducted by an independent FX analyst after the California *qui tam* complaint was unsealed and State Street altered its FX policies, the cost of standing instruction FX trades dropped by a remarkable **63%.** The study analyzed 498,940 FX spot and forward trades (196,280 standing-instruction trades and 302,660 negotiated trades) executed during 2000-2010, and found that investors who had their custodian banks, including State Street, execute FX trades on a standing-instruction basis during 2010 saw an overall 63% drop in trading costs from their average trading costs for the years 2000-2009.

**D.      FX Trading and State Street's Commingled ERISA Fund Clients**

     **1.      The Plaintiffs' Plans**

93.     The Andover Plan and the Boeing Plan are "employee pension benefit plans" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).

94.     Defendants provide FX trading services similar to those provided to the Andover Plan and the Boeing Plan to other similarly situated Plans, either directly as a plan custodian, or trustee, or indirectly as investment manager for the commingled Funds in which the Plans invest.

95.     There are two types of ERISA-covered pension plans: defined benefit plans and defined contribution plans. Both types of plans have found it necessary and prudent to expand their investments to include exposure to foreign markets. Accordingly, defined benefit plans have expanded international holdings, and defined contribution plans frequently include at least one, if not several, international investment options.

96.     ERISA-covered plans regularly purchase and sell foreign securities in order to increase diversification and take advantage of opportunities for higher returns. Retirement plans that invest in foreign securities receive principal, dividends, and interest that are paid in foreign currencies, or participate in other investments that require the exchange of foreign currency into and from US Dollars ("USD"), either directly or through participation in the commingled Funds. As a result, the purchase and sale of currencies incidental to a foreign securities transaction is vital to a plan's participation in international securities markets and to the acquisition, holding, and disposition of foreign securities.

97.     State Street served as trustee and investment manager for the Andover Plan. Beginning in 2001, the Andover Plan offered participants the option to invest in certain International Equity Funds, including the International Growth Opportunities Securities Lending Class A Fund, and the SSgA Daily International Alpha Select Fund. These International Equity Funds held foreign securities and would have been, directly, or indirectly, party to FX transactions executed by SSGM pursuant to instructions from State Street Bank. Neither of these Funds could have been operated without FX transactions, whether or not these transactions were executed at the fund level or at the brokerage level. State Street Bank, as the investment manager and fiduciary for these commingled funds, was ultimately responsible for the funds' FX transactions undertaken by SSGM.

98.     State Street served as trustee and investment manager for the Boeing Plan. The Boeing Plan offered participants the option to invest in certain International Equity Funds, including the International Index Fund. This International Equity Fund sought to provide long-term total return, and attempted to match the Morgan Stanley Capital International All Country World Investable Market Index. This is an index composed of global developed and emerging countries outside the U.S. The fund seeks to achieve its goal by investing in a wide variety of international equity securities issued throughout the world, excluding the U.S. The foreign-held securities in this fund would have been, directly, or indirectly, party to FX transactions executed by SSGM pursuant to instructions from State Street. This commingled investment fund could not have been operated without FX transactions, whether or not these transactions were executed at the fund level or at the brokerage level. State Street Bank, as the investment manager and fiduciary for this commingled fund, was ultimately responsible for the fund's FX transactions.

## 2.     Defendants' Fiduciary Status

99.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S. C. § 1002(21)(A)(i).

100.     Under ERISA, an investment manager is a fiduciary. ERISA defines investment manager as:

> (38) any fiduciary (other than a trustee or named fiduciary, as defined in section 1102 (a)(2) of this title)—
>
> (A) who has the power to manage, acquire, or dispose of any asset of a plan;
>
> (B) who

(i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.];

(ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b–3a (a)], is registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

(iii) is a bank, as defined in that Act; or

(iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

Section 3(38), 29 U.S.C. § 1002(38).

101.    Here, State Street served as the Investment Manager for the International Equity Funds in Plaintiffs' Plans and, upon information and belief, hundreds of other plans as well. In this capacity, State Street was responsible for prudently and loyally managing the assets that were invested in the International Equity Funds, and authorizing, reviewing and controlling the coduct of any State Street Affiliate or representative engaging in activities affecting the value or performance of the Funds for which State Street served as Investment Manager.

102.    State Street expressly acknowledges its status as Investment Manager in the Plan documents for the Andover Plan, including the Plan's December 31, 2006 and June 30, 2007 Fact Sheets.

103.    Upon information and belief, State Street has similarly acknowledged its fiduciary status as Investment Manager for the commingled Funds for all other ERISA-covered Plans that offer the International Equity Funds as an investment option for participants' retirement savings.

104.    Upon information and belied, all of the commingled Funds which invested in foreign securities suffered from the same inaccurate FX pricing described in the California qui

tam complaint, the California Attorney General complaint-in-intervention, and the ARTRS complaint for standing-instruction FX trades.

105. Under ERISA, investments in commingled Funds are subject to a "look-through" rule, pursuant to which, the "plan assets" of an ERISA-covered plan include both its undivided "equity interest [in the entity] and an undivided interest in each of the underlying assets of the entity …". 29 C.F.R. § 2510.3-101(a)(2); *see also* ERISA § 3(42), 29 C.F.R. § 1002(42) (authority of Secretary of Labor to define term "plan assets" by regulation). Specifically, when a Plan acquires or holds an interest in a commingled Fund, "its assets include its investment and an undivided interest in each of the underlying assets of the entity." *Id.* § 2510.3-101(h)(1).

106. "[A]ny person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect) is a fiduciary of the investing plan." *Id.* § 2510.3-101(a).

107. As the sponsor and investment manager for the commingled Funds, State Street Bank exercised authority and control with respect to the management or disposition of the Plans' assets. Accordingly, State Street Bank was a fiduciary of each and every ERISA Plan which invested in the commingled Funds, including the Plaintiffs' Plans and the Plans of the putative class members with respect to the underlying assets of each and every State Street Bank-sponsored commingled Fund.

108. As trustee for certain of the commingled Funds, State Street Bank was authorized to convert any monies into currency through foreign exchange transactions and was responsible for ensuring that these transactions were within the bounds of State Street Bank's fiduciary responsibilities and the limitations of ERISA.

109. State Street Bank and SSGM also functioned as fiduciaries to the Plans and the Class by acting as trustee and investment manager for the Andover Plan and the Boeing Plan, and for the commingled Funds, and by exercising authority and control over the Plans' assets.

110.    Upon information and belief, SSGM provided brokerage services to the Funds, that is, the purchase and sale of foreign securities to the commingled investment funds. To the extent that the Funds settled such purchases and sales in U.S. Dollars, the commingled Funds did not engage directly in FX trading in connection with the purchase or sale of foreign securities, but they did engage in FX trading indirectly when SSGM executed a purchase or sale of a foreign security in foreign currency and then converted the transaction to a U.S. Dollar-denominated transaction for purposes of settlement with the commingled Funds.

111.    SSGM also served as a conduit for the repatriation of dividend, principal, and interest payments by issuers of foreign securities and for receipt of proceeds of sales of foreign securities, and engaged in FX transactions in order to remit such payments to the commingled Funds in U.S. Dollars.

112.    SSGM, in serving as a broker for the Plans' accounts also was bound to act in the customer's interest when transacting such business for the account, and therefore, had the duty not to misrepresent any fact material to the transaction, and to disclose adequate information to the fiduciaries of the Plans, and in the course of that transaction did not have a general fiduciary duty, but did have a limited transactional fiduciary duty to the Plans as a broker. In its role as State Street Bank's affiliate, SSGM was responsible for setting the exchange rates on FX transactions and executing those transactions. This process created the excessive spread between the marked-up FX exchange rates charged to custodial ERISA plan clients and the marked-down FX exchange rates used to process repatriation of principal, dividends, and interest paid in foreign currencies, and other FX transactions.

113.    SSGM's conversion of foreign currency to U.S. dollars constituted the exercise of authority or control respecting the management or disposition of the underlying assets of the commingled investment funds and, therefore, of assets of the ERISA Plans, within the meaning of ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(1), and 29 C.F.R. § 2510.3-101(a). Accordingly, State Street Bank and SSGM were functional fiduciaries of the ERISA Plans.

**E.  State Street's FX trades were prohibited transactions under ERISA and corresponding federal regulations.**

114.   ERISA § 406(a), 29 U.S.C. §1106(a), prohibits transactions between a plan and a party in interest; this broad prohibition is subject to numerous exemptions to allow the normal course of business with regard to investment management. Foreign currency exchanges between an employee benefit plan and a bank or a broker-dealer or an affiliate thereof which is a party in interest with respect to such plans are exempted from the prohibition provided they meet certain conditions. First, the terms of the transaction must not be less favorable to the plan than the terms generally available in comparable arm's-length foreign exchange transactions between parties; second, neither the bank, the broker-dealer, nor any affiliate thereof may have any discretionary authority or control with respect to the investment of the plan assets involved in the transaction. Prohibited Transaction Exemption 94-20, 59 Fed. Reg. 8022-02 (February 17, 1994). Prohibited Transaction Exemption ("PTE") 94-20 also required that any such transaction be directed by a fiduciary independent of the bank, broker-dealer, or any affiliate. PTE 98-54 modified this requirement to allow such transactions to occur pursuant to "standing instructions," authorized in writing by the independent fiduciary. Prohibited Transaction Exemption 98-54, 63 Fed. Reg. 63503-63510 (November 13, 1998). The requirements that the transactions be at arm's-length and that the bank, broker-dealer, or affiliate thereof not have any investment discretion with respect to the transaction are codified at 29 U.S.C. § 1108(b)(18) (effective August 17, 2006).

115.   State Street Bank and SSGM are "affiliates" within the meaning of the Prohibited Transaction Exemption and they directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with each other.

116.   Notwithstanding any standing instructions or written authorization by the Plans, State Street did not meet the requirements for the foreign exchange exemption, because the transactions were in fact consistently less favorable to the Plans than the terms generally available in comparable arm's-length foreign exchange transactions between parties, and because State Street exercised discretionary authority and control over the investments and plan assets

involved in the transactions. Thus, State Street's FX trades do not fall under PTE 94-20 or under PTE 98-54.

117.    Furthermore, ERISA § 406(b), 29 U.S.C. § 1106(b), prohibits transactions between a plan and a fiduciary that amount to self-dealing.[2]  Plaintiffs allege that State Street's FX trading practices amounted to self-dealing because State Street consistently negotiated rates, or charged rates for the FX transactions that were favorable to State Street, and unfavorable to its fiduciary clients, and State Street thus had a conflict of interest with regard to its FX trading practices for Plaintiffs and other class members.

## COUNT I

### Breach of Duties of Prudence and Loyalty

### (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by State Street Bank)

118.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

119.    Defendant State Street Bank is an "investment manager" within the meaning of ERISA section 3(38), 29 U.S.C. § 1002(38), because it (i) has the power to manage, acquire, or dispose of plan assets placed in its custody; (ii) is a bank within the meaning of the Investment Advisers Act of 1940; and (iii) has acknowledged in writing that it is a fiduciary with respect to the Plans.

120.    As an investment manager, State Street Bank is a fiduciary under ERISA and bound by the duties of prudence and loyalty laid out in ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1). These duties mean that as a broker for the Plaintiffs' Plans, State Street Bank is bound to act in the customer's interest when transacting business for the account, and thus

---

[2] 29 U.S.C. §1106 (b) Transactions between plan and fiduciary
A fiduciary with respect to a plan shall not—
(1) deal with the assets of the plan in his own interest or for his own account,
(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or
(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

bound, for example, to disclose fully to the Plans all the details of the relevant FX trading transactions it was undertaking for the account.

121.    State Street Bank has breached its ERISA fiduciary duties of prudence and loyalty because it knew or should have known that SSGM has been charging the Plans (or the commingled Funds in which the Plans invested) rates for FX trading that were unfavorable or unreasonable, above the market rates, and/or in excess of what SSGM had agreed to charge, but did not ensure, by negotiation or otherwise, that SSGM's rates were reasonable, at or above the market rate, and/or not in excess of what SSGM had agreed to charge.

122.    These breaches of fiduciary duty involved assets of the Plans on which fees were levied by State Street Bank or SSGM.

123.    Section 409(a) of ERISA, 29 U.S.C. § 1109(a), imposes liability on State Street Bank for these breaches and requires State Street Bank to make good to the Plans the losses resulting from its breaches.

124.    To enforce the relief available under section 409(a), 29 U.S.C. § 1109(a), Plaintiffs assert this claim against State Street Bank under ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2).

125.    Further, pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), State Street Bank must provide other appropriate equitable relief to redress its breaches of duty and enforce its fiduciary duties.

## COUNT II

### Breach of Duties of Prudence and Loyalty

### (Violation of § 404 of ERISA, 29 U.S.C. § 1104 by SSGM)

126.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

127.    SSGM is a fiduciary under ERISA section 3(21)(A), 29 U.S.C. § 1002, with respect to the Plans because it exercises authority or control respecting management or disposition of the Plans' assets.

128. As a fiduciary, SSGM is bound by the duties of prudence and loyalty laid out in ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1).

129. SSGM has breached these duties or prudence and loyalty by charging the Plans (or the commingled Funds in which the Plans invested) fees for FX trading that were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge.

130. These breaches of fiduciary duty involved assets of the Plans over which SSGM had authority or control.

131. Section 409(a) of ERISA, 29 U.S.C. § 1109(a), imposes liability on SSGM for these breaches and requires SSGM to make good to the Plans the losses resulting from its breaches.

132. To enforce the relief available under section 409(a), 29 U.S.C. § 1109(a), Plaintiffs assert this claim against SSGM under ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2).

133. Further, pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), SSGM must provide other appropriate equitable relief to redress its breaches of duty and enforce its fiduciary duties.

## COUNT III

### Prohibited Transactions

### (Violations of § 406(a)(1)(C)-(D) of ERISA, 29 U.S.C. § 1106(a)(1)(C)-(D) by State Street Bank and SSGM)

134. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

135. ERISA section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that the transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

136.     ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that the transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

137.     As noted above, State Street Bank is a fiduciary with respect to the Plans.

138.     SSGM is a "party in interest" within the meaning of ERISA section 3(14), 29 U.S.C. § 1002(14), for at least two independently sufficient reasons: it is a fiduciary with respect to the Plans, and it is a person providing services to the Plans.

139.     By allowing SSGM to charge the Plans (or the commingled Funds in which the Plans invested) fees for FX trading that were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge—and by doing so when it knew or should have known that SSGM was charging the Plans such fees—State Street Bank violated ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D). Further, by charging such fees, SSGM violated ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D).

140.     While ERISA section 408(b)(2), 29 U.S.C. § 1108(b)(2), provides an exemption from the prohibitions of ERISA section 406(a), 29 U.S.C. § 1106(a), for contracting or making reasonable arrangements with a party in interest for, *inter alia*, services necessary for the establishment or operation of the plan, that exemption is only met if no more than reasonable compensation is paid. Here, that exemption does not apply because the fees charged by SSGM were unfavorable or unreasonable and/or above market rates.

141.     While there is another exemption from the prohibitions of ERISA section 406(a), 29 U.S.C. § 1106(a), for foreign currency exchanges between an employee benefit plan and a bank or a broker-dealer or an affiliate thereof which is a party in interest with respect to a plan, that exemption does not apply here for two independently sufficient reasons: because (1) the terms of the transactions were less favorable to the Plans than the terms generally available in comparable arm's-length foreign exchange transactions; and (2) SSGM had discretionary authority or control with respect to the investment of plan assets.

142.     Pursuant to ERISA section 502(a)(2) and (a)(3), 29 U.S.C. § 1132(a)(2) & (a)(3), State Street Bank and SSGM are liable to restore the losses to the Plan and provide other appropriate equitable relief.

## COUNT IV

### (Co-Fiduciary Liability, against SSGM and State Street Bank)

143.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

144.     As alleged above, SSGM and State Street Bank are fiduciaries pursuant to ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1) and ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they are bound by the duties of loyalty and prudence.

145.     ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if (1) he or she knows of such a breach and fails to remedy it, (2) knowingly participates in a breach, or (3) enables a breach. The Co-Fiduciary Defendants breached all three of these provisions.

146.     State Street Bank and SSGM knew of the breaches of the other party because upon information and belief, the two entities work closely together, and State Street Bank knew that SSGM was not providing full disclosure in its role as a broker for the FX transactions.

147.     Neither State Street Bank nor SSGM undertook any efforts to halt or alter the fees being charged by SSGM by the commingled Funds, or more fully negotiate those fees.

148.     State Street Bank and SSGM knowingly participated in the breaches of the other party because they continued to engage in the transactions over a course of years, were fully aware that full disclosure had not been made to the Plan sponsors, fiduciaries or participants regarding the FX trading rates their Funds were being charged and the fact that those rates were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge.

149. State Street Bank and SSGM enabled the other party's breach because they were fully aware that full disclosure had not been made to the Plan sponsors, fiduciaries or participants regarding the rates their funds were being charged for FX trading and the fact that those rates were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge.

150. Pursuant to ERISA § 502(a)(2) and (a)(3), 29 U.S.C. §§ 1132(a)(2) & (a)(3), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count and to provide other equitable relief as appropriate.

## COUNT V

### (Violations of § 406(a)(1)(C)-(D) of ERISA, 29 U.S.C. § 1106(a)(1)(C)-(D) by SSGM, alleged in the alternative)

151. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

152. As alleged above, SSGM was a party in interest under ERISA.

153. As alleged above, SSGM violated ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D).

154. Even if SSGM were not a fiduciary, SSGM would still be liable under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), to provide appropriate equitable relief due to its violations of ERISA section 406(a)(1)(C)-(D), 29 U.S.C. § 1106(a)(1)(C)-(D).

## COUNT VI

### (Knowing participation in a breach of fiduciary duty by SSGM, alleged in the alternative)

155. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

156. Even if SSGM were not a fiduciary, SSGM knowingly participated in State Street Bank's breach of its fiduciary duties to the Plans, as alleged in Count I.

157.    As a sophisticated financial institution, SSGM fully understood the duties that fiduciaries such as State Street Bank have under ERISA.

158.    Despite this understanding, SSGM participated in—indeed, was the *cause* of—State Street Bank's violation of its fiduciary duties as alleged in Count I.

159.    Under ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), the Plans are entitled to equitable restitution from SSGM with respect to the excess amounts paid to it by the Plans, as well as other appropriate equitable relief.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.    Declare that the Defendants have violated ERISA's prohibited transactions provisions;

2.    Declare that the Defendants breached their fiduciary duties under ERISA;

3.    Issue an order compelling a proper accounting of the foreign exchange transactions in which the Plans and the Funds have engaged;

4.    Issue an order compelling Defendants to restore all losses caused to the Plans (or that will be caused to the Plans after the filing of this Complaint);

5.    Issue an order compelling the Defendants to disgorge all fees paid and incurred to Defendants (or that will be paid or incurred by the Plans after the filing of this Complaint), including any profits thereon;

6.    Order equitable restitution and other appropriate equitable monetary relief against the Defendants;

7.    Award such other equitable or remedial relief as may be appropriate, including the permanent removal of the Defendants from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as custodians to the Plans;

8.    That this action be certified as a class action and that each Class be designated to receive the amounts restored to the Plans by Defendants and a constructive trust be established for distribution to the extent required by law;

9.     Enjoin Defendants collectively, and each of them individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

10.     Award Plaintiffs their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

11.     Award such other and further relief as the Court deems equitable and just.

## JURY DEMAND

Plaintiffs hereby demand a jury on all issues so triable.


Dated: September 12, 2012

<div style="margin-left:40%">

**HUTCHINGS, BARSAMIAN,
MANDELCORN & ZEYTOONIAN, LLP**

By: s/ Theodore M. Hess-Mahan
     Theodore M. Hess-Mahan, Esq. BBO #
     110 Cedar Street, Suite 250
     Wellesley Hills, MA 02481
     Telephone: 781-431-2231
     Facsimile: 781-431-8726
     *thess-mahan@hutchingsbarsamian.com*

**KELLER ROHRBACK, L.L.P.**
Lynn Lincoln Sarko (*pro hac vice pending*)
Derek W. Loeser (*pro hac vice pending*)
Laura R. Gerber (*pro hac vice pending*)
1201 3rd Avenue, Suite 3200
Seattle, WA 98101
Telephone: 206-623-1900
Facsimile: 206-623-8986
*lsarko@kellerrohrback.com*
*dloeser@kellerrohrback.com*
*lgerber@kellerrohrback.com*

***Counsel for Plaintiffs***

</div>

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| The Andover Companies Employee Savings and Profit Sharing Plan on behalf of itself, and James Pehoushek-Stangeland, and all others similarly situated, | ) ) ) ) | |
|---|---|---|
| Plaintiffs, | ) ) | No. 1: 12-cv-11698 MLW |
| | ) | **DEMAND FOR JURY TRIAL** |
| vs. | ) ) | |
| State Street Bank and Trust Company, | ) ) | |
| Defendant. | ) | |

**PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

## **Table of Contents**

I.     INTRODUCTION ...................................................................................... 1

II.    JURISDICTION AND VENUE ............................................................... 4

III.   PARTIES .................................................................................................. 5

       A.    Plaintiff Alan Kober .................................................................... 5

       B.    Plaintiff James Pehoushek-Stangeland ...................................... 6

       C.    Defendant State Street Bank and Trust Company ...................... 7

IV.    SUBSTANTIVE ALLEGATIONS ......................................................... 8

       A.    Foreign Exchange Trading is Essential to Plaintiffs' Ability to
             Meet Their Retirement Plan Investment Needs .......................... 8

             1.    The Necessity of FX Trading in a Global Investment
                   Portfolio ............................................................................ 8

             2.    How FX Trading Works ..................................................... 9

             3.    Negotiated vs. Non-Negotiated FX Trades...................... 10

       B.    State Street's Provision of FX Trades to its Custodial Clients ......... 10

             1.    State Street's Clients Relied Upon State Street's Expertise
                   and Loyalty ..................................................................... 11

             2.    State Street's Custodial Contracts and Investment Manager
                   Guidelines Were Predicated on No-Cost FX Trading ........... 11

             3.    State Street's Deceptive Scheme Overcharged Clients for
                   Non-Negotiated FX Trades............................................. 13

             4.    State Street's Deceptive Acts and Practices Could Not
                   Reasonably Be Detected. ................................................ 17

       C.    Events After October 2009 Begin to Shed Light on State Street's
             Deceptive FX Trading Practices ............................................... 17

       D.    Facts Bearing on Fiduciary Breach for State Street's ERISA
             Clients ....................................................................................... 22

       E.    Defendant's Fiduciary Status under ERISA ............................. 24

             1.    The Nature of Fiduciary Status. ...................................... 24

             2.    Defendant State Street's Fiduciary Status...................... 25

       F.    The Relevant Law ..................................................................... 27

      1.     Fiduciary Duties under ERISA ................................................................ 27

      2.     Prohibited Transactions under ERISA ..................................................... 28

            a.     ERISA § 406(b) is an absolute bar against self-dealing ................................................................................ 28

            b.     ERISA § 406(a) prohibits party-in-interest transactions ............................................................................ 29

            c.     Foreign currency exchange exemptions ...................................... 29

      3.     Civil Remedies under ERISA ................................................................. 31

V.     CLASS ACTION ALLEGATIONS ................................................................. 32

VI.    CAUSES OF ACTION ..................................................................................... 35

VII.   PRAYER FOR RELIEF .................................................................................... 39

This is a classic case of self-dealing. The ERISA-qualified retirement plans of Plaintiffs suffered losses because Defendant State Street Bank and Trust Company did not prudently safeguard their assets, instead permitting its currency traders to pilfer plan assets by improperly marking up and marking down foreign currency trades. This self-dealing occurred whenever State Street needed to exchange currency on behalf of the plans. Rather than seek the best price for the plans' foreign currency exchange transactions—or even the actual market rate—State Street used one of its divisions, State Street Global Markets, to execute the foreign currency exchange trades to benefit its own accounts. In executing these trades, Global Markets did not charge the plans what the transaction cost. Nor did Global Markets charge a rate based on the cost of the transaction. Instead, Global Markets systematically priced the trades based on the worst price of the trading day, and pocketed profits at the plans' expense. State Street manipulated the currency transactions to the plans' detriment despite its duty as a fiduciary under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001, *et seq.* ("ERISA") to protect the plans' assets. Because this practice was widespread and uniform, it forms the basis for claims on behalf of a class of ERISA Plans ("the Plans"). This lawsuit seeks to recover the losses the Plans suffered as a result of State Street's self-dealing.

## I.  INTRODUCTION

1.     Plaintiffs' allegations are based on personal knowledge as to themselves and their own acts, and on information and belief and the investigation of counsel as to all other matters.[1]

2.     Plaintiffs are Alan Kober, a trustee and fiduciary for The Andover Companies Employees' Savings and Profit Sharing Plan, and James Pehoushek-Stangeland, a participant in The Boeing Company Voluntary Investment Plan. Plaintiffs trusted State Street Bank with their

---

[1] Counsel's investigation included review of: (i) plan documents, (ii) publicly available data and news articles, and (iii) review of the pleadings and documents on file in *Hill v. State St. Corp.*, No. 09-12146 (D. Mass.); *Demory v. State St. Corp.*, No. 10-10064 (D. Mass.); *Richard v. State St. Corp.*, No. 10-10184 (D. Mass.); *Ark. Teacher Ret. Sys. v. State St. Corp.*, No. 11-10230 (D. Mass.);; *Henriquez v. State St. Bank & Trust Co.*, No. 11-12049 (D. Mass.); *State of Cal. v. State St. Corp.*, No. 08-08457 (Cal. Sup. Ct. Sacramento Cnty.); and *People of Cal. v. State St. Corp.*, No. 08-8457 (Cal. Sup. Ct. Sacramento Cnty.).

retirement savings and suffered losses as a result of State Street's self-dealing FX trading scheme.

3.    Defendant State Street Bank and Trust Company's ("State Street Bank" or "State Street") undertook self-dealing and imprudent management of Plaintiffs' ERISA-covered funds in two ways. Some of the Plans offered their participants investment options that included State Street Bank-sponsored commingled funds—that is, pools of assets created and aggregated by State Street Bank for a number of different investors and plans—that required foreign currency ("FX") trades, while other defined benefit Plans hired State Street to serve as custodian to undertake FX trades of plan assets. In either circumstance, the self-dealing and imprudent management by State Street violates ERISA.

4.    For both defined contribution and defined benefit Plans, State Street was an ERISA fiduciary. State Street was an ERISA fiduciary because it served as the trustee and investment manager to the Plans and commingled funds through its State Street Global Advisors ("SSgA") division, and as the investment manager it exercised discretionary control over Plan assets. One example of State Street's discretionary control is that as investment manager for the commingled funds SSgA negotiated or contracted with State Street Global Markets ("Global Markets") to execute FX transactions to facilitate purchases or sales of foreign securities for the funds, or to repatriate profits made abroad.

5.    State Street was also an ERISA fiduciary in its provision of trustee and custodian services. In serving as trustee and custodian to the defined benefit and defined contribution Plans, State Street acted as more than a "plain vanilla" custodian of assets—that is, it did more than perform administrative and ministerial duties. Instead, Global Markets took control of Plan assets and exercised discretion when it entered into FX transactions on behalf of the Plans. Rather than simply executing FX transactions according to market rates at the time requests were received, Global Markets utilized its control over Plan assets and the FX process to impose unauthorized, undisclosed mark-ups or mark-downs on the rates for the FX transactions and pocketed the difference. In so doing, it was a functional ERISA fiduciary.

2

6.     As a custodial bank, State Street Bank holds securities on behalf of investors. Clients hire custodians to do several things, including: safeguard and record movement of assets; arrange settlement of all purchases and sales; and maintain and manage all cash transactions, including FX transactions. Custodians are typically used by investors who do not wish to leave securities on deposit with their broker-dealers or investment managers. By separating the duties of investment manager and custodian, an investor—at least in theory—reduces the risk of fraud or other misconduct.

7.     As of September 2012, State Street held approximately $23.44 trillion in assets under custody and administration, making it one of the largest providers of custodial services in the world. In fact, as of December 31, 2011, State Street's SSgA division was the largest manager of institutional assets worldwide, the largest manager of assets for tax-exempt organizations (primarily pension and retirement plans) in the U.S., and the third largest investment manager in the world. State Street charged Plaintiffs and the Plans in the putative class hundreds of millions of dollars a year in fees for custodial and investment management services. A significant amount of State Street's revenue, however, was comprised of ill-gotten gains from self-dealing FX transactions.

8.     Under ERISA, Plaintiffs may recover losses and obtain equitable relief on behalf of the Plans and all others similarly situated. ERISA demands that State Street act prudently and solely in the interest of those who, like Plaintiffs, have invested money in accounts covered by ERISA. This duty to act prudently and solely in the interest of Plaintiffs and others is a fiduciary duty, and fiduciary duties are among the strongest in the law.

9.     ERISA also creates strict liability for certain types of prohibited transactions, such as State Street's self-dealing in charging unauthorized mark-ups and mark-downs to the Plans on the FX trades through its Global Market division, and then pocketing the difference. The undisclosed mark-ups and mark-downs were not for the exclusive benefit of the Plans or their participants and beneficiaries, but rather benefitted State Street Bank.

3

10.     Despite its legal obligations to Plaintiffs, State Street has undertaken an unfair and deceptive practice from at least 1998-2009 (hereinafter, "Class Period"). Namely, State Street Bank has overseen and been responsible for the FX transaction practices described herein. These transactions were undertaken behind a veil of secrecy that allowed State Street to make exorbitant and undisclosed profits at the direct expense of the Plans. State Street charged the Plans marked-up FX rates when buying foreign currency on their behalf, and marked-down FX rates when selling foreign currency for the Plans, and in both cases pocketed the difference. State Street charged the Plans and the Proposed Class fictitious FX rates unrelated to the market-based rates State Street was actually paying.

11.     The Plaintiffs, the Plans, and other Class members could not have detected State Street's deception. For the commingled funds, the transaction was conducted between two internal State Street divisions (SSgA and Global Markets) and was not reported on the fund fact sheets or otherwise reported to Plan sponsors. While State Street's custodial clients may have received a report of the rates that they were charged, without receiving a corollary report showing the range of actual trades for the currency pairs at issue, they could not detect that they were being charged hidden and unauthorized mark-ups (or mark-downs) on their FX trades.

12.     State Street's unfair and deceptive FX trading practices generated hundreds of millions of dollars in profits annually for State Street—money that should have gone to Plaintiffs and the Proposed Class.

13.     Plaintiffs bring this class action on behalf of all similarly affected ERISA clients of State Street during the Class Period, to recover the proceeds State Street reaped from Class members through its unfair and deceptive FX trading practices.

## II.     JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. section 1331 and 29 U.S.C. section 1132(e)(1). Plaintiffs' claims are brought as a class action under Rule 23 of the Federal Rules of Civil Procedure.

15.     Venue is proper in this district pursuant to 29 U.S.C. section 1132(e)(2).

# III. PARTIES

## A. Plaintiff Alan Kober

16. Plaintiff Alan Kober is an Individual Trustee of The Andover Companies Employees' Savings and Profit Sharing Plan (the "Andover Plan"). In this capacity, Mr. Kober is a Plan fiduciary with standing to bring claims for breach of fiduciary duty on behalf of the Plan pursuant to ERISA sections 409 and 502(a)(2).

17. Merrimack Mutual Fire Insurance Company ("Merrimack Mutual") is the designated Plan Administrator for the Andover Plan. The Andover Plan is an ERISA-qualified defined contribution plan established for the benefit of the employees of Merrimack Mutual and its sister companies, Cambridge Mutual Fire Insurance Company, and Bay State Insurance Company, which, together with Merrimack Mutual, comprise the Andover Companies ("Andover Companies").

18. During the Class Period, the Andover Plan offered participants investments in several SSgA-sponsored commingled funds, including international equity funds such as State Street's International Growth Opportunities Securities Lending Class A Fund, and the SSgA Daily International Alpha Select fund.

19. By contract, State Street Bank served as both the Trustee for the Andover Plan and as an ERISA fiduciary and Investment Manager for the Andover Companies Plan investments from 2001 through approximately 2009.

20. As trustee for the Andover Plan, State Street Bank was required to exercise power and authority over the investment accounts for which it had express investment management discretion, or upon the direction of the Investment Manager. Pursuant to section 4.1(o) of the Master Trust Agreement, the investment power of the trustee included the power to "purchase and sell foreign exchange and contracts for foreign exchange, including transactions entered into with State Street Bank and Trust Company, its agents or its subcustodians."

21. By separate contract, State Street Bank served as investment manager for the Andover Plan's assets invested in State Street's proprietary commingled funds. Pursuant to

section 1 of the Investment Manager Agreement, State Street was both a discretionary investment manager and a designated ERISA fiduciary pursuant to section 3(38) of ERISA with respect to all cash, securities, or other property designated by the Andover Plan.

**B.    Plaintiff James Pehoushek-Stangeland**

22.    Plaintiff James Pehoushek-Stangeland is a resident of Seattle, Washington. He is an employee of the Boeing Company and is a participant in The Boeing Company Voluntary Investment Plan ("the Boeing Plan"). Accordingly, Plaintiff Pehoushek-Stangeland has standing to bring suit on behalf of the Boeing Plan for losses to the Plan due to breaches of fiduciary duty pursuant to ERISA sections 409 and 502(a)(2).

23.    The Boeing Plan is an ERISA-qualified defined contribution plan established for the benefit of the employees of the Boeing Company, a multinational aerospace and defense corporation headquartered in Chicago, Illinois.

24.    By contract, State Street Bank served as Trustee for The Boeing Company Employee Savings Plans Master Trust ("Boeing Master Trust").

25.    During the Class Period, the Boeing Plan offered its participants investment options in several SSgA-sponsored commingled funds. Among the international equity funds offered were the SSgA Global All Cap Equity ex-US Index Non-Lending Series Fund Class A ("SSgA Global Non-Lending Fund"), which Boeing designated as the "International Index Fund."

26.    As of December 31, 2010, the Boeing Plan held approximately $1.98 billion in Plan assets in the International Index Fund. As of December 31, 2011, the Boeing Plan held approximately $1.863 billion in the fund. These investments constituted approximately 6% of the Boeing Plan investments.

27.    The International Index Fund invests in an index comprised of global developed and emerging country stocks from outside the U.S. Its international investments require exchange of participants' U.S. dollars into various foreign currencies, and SSgA utilizes Global Markets for the FX transactions.

6

28.     Due to the "fund of funds" structure of many offerings in the Boeing Plan, the International Index Fund appears in multiple placed in the Boeing Plan portfolio: not only as a stand-alone investment option, but also as part of the Balanced Index Fund and each of the nine Lifecycle Funds, which are the target retirement options for Boeing Plan participants.

29.     During the class period, Plaintiff Pehoushek-Stangeland invested in SSgA's International Index Fund, directly as well as indirectly through the Lifecycle 2040 Fund and the Balanced Index Fund.

30.     Plaintiffs use the term "International Equity Funds" to collectively denote the SSgA-sponsored commingled international equity funds that required purchases and repatriation of foreign currency by Global Markets, and that were investment offerings in the Boeing and Andover Plans, as well as for other members of the Proposed Class.

**C.     Defendant State Street Bank and Trust Company**

31.     Defendant State Street Bank is a registered financial holding company with its principal place of business in Boston, Massachusetts.

32.     State Street Bank's business activities are organized into three segments or divisions: investment management provided by SSgA, custodial services provided by Global Markets, and institutional services provided by State Street Investor Services.

33.     SSgA is a division of Defendant State Street Bank responsible for investment management. The SSgA division of State Street Bank provides asset management, and is billed as the "Fiduciary Heritage of State Street Corporation."

34.     Global Markets is also a division of Defendant State Street Bank. Global Markets provides custodial services to clients, including processing the FX transactions at issue herein. Global Markets processes these FX transactions at the direction of SSgA on behalf of the International Equity Funds and the Plans.

35.     State Street Bank is also the Trustee for the State Street Bank and Trust Company Investment Funds for Tax Exempt Retirement Plans (also referred to as the "commingled funds"). This was the trust pursuant to which State Street created, offered, and maintained the

7

various commingled funds—the funds that were offered to the Andover Plan and the Boeing Plan for their retirement plans.

36. The terms of the relevant Amended and Restated Declaration of Trust establish that State Street Bank and Trust Company was the trustee for the commingled funds, and that the funds were under the exclusive management and control of State Street Bank. Pursuant to the Declaration of Trust, State Street Bank had the power to hold, manage, and control all property held in the trust, or power to delegate responsibility for management of the assets to ERISA-qualified investment managers. State Street Bank also had the power to convert any monies into any currency through foreign exchange transactions to the extent permitted under ERISA. Accordingly, investment management for the commingled ERISA funds was conducted through State Street Bank's SSgA division, and FX trading through the Global Markets division.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Foreign Exchange Trading is Essential to Plaintiffs' Ability to Meet Their Retirement Plan Investment Needs

#### 1. The Necessity of FX Trading in a Global Investment Portfolio

37. Investors such as the Plans have found it increasingly necessary to enter the overseas securities markets and expand the global scope of their investment portfolios. These investments may offer increased diversification and greater returns than domestic investments alone.

38. Institutional investors that buy and sell foreign securities, such as Global Markets on behalf of the Plans, must trade currency because purchases, sales, dividends, and interest payments are all transacted in the currency of the nation in which the relevant securities exchange sits. Just as you need euros, yuan, or yen to buy coffee in Berlin, Beijing, or Tokyo, you need those same currencies to buy securities in Germany, China or Japan.

39. A U.S. investor must use euros to buy shares that trade on a German securities exchange. To get those euros, you must sell U.S. dollars and purchase euros. Similarly, dividends

or interest earned in Germany will be paid in euros, and turning those gains into dollars requires exchanging euros for dollars.

40.     For a U.S. investor to receive proceeds from the sale of foreign securities, the foreign currency received from the sale must be converted into the currency of one's own country. This process is called repatriation. The rate of exchange matters because it impacts the proceeds of any investment made in foreign currency.

**2.     How FX Trading Works**

41.     The values of different currencies "float" against each other. That is, they vary based on factors ranging from supply and demand to political and economic trends. While the price of coffee at a Berlin café might be €2 all week long, it might cost $ 2.50 on Monday morning and $2.72 by Friday.

42.     FX trading occurs on a nearly 24-hour cycle, five-and-a half days a week. The official FX trading day begins at 7:00 a.m. New Zealand time and ends at 5:00 p.m. New York City time.

43.     For each currency bought and sold during the course of the FX trading day, there will necessarily be a high trade and a low trade. This information is tracked by proprietary services such as Electronic Brokerage System ("EBS") and Reuters.

44.     The difference between the low trade and the high trade is called the "range of the day." The "spot range of the day" refers to FX rates as of a specific and prompt settlement date, usually two business days after the trade date. To more accurately measure the trade cost for FX transactions that settle prior to or later than the date for spot trades, traders in the FX market also look to the "forward-adjusted range of the day." Because FX trades do not always settle two days after the trade, the forward-adjusted range of the day is a more conservative and accurate measurement because it takes into account the interest rate differential between the trade date and settlement date for the underlying currencies.

45.     If, during one trading day, the lowest trade was $1.25 to buy €1.00, and the highest rate trade was $1.35 to buy €1.00, the range of the day would be $1.25-$1.35.

46.     Another useful measure for analyzing FX trades is the daily "mid-rate," which is simply the sum of the forward-adjusted daily high and forward-adjusted daily low, divided by two. This rate reflects the "average" FX rate in a given currency pair on a given day.

47.     The daily mid-rate is significant to this case because Plaintiffs cannot discover the precise time of day when FX trades occurred (in contrast to stock trading, for example). By looking at the daily mid-rate over a significant period of time, one can reasonably estimate the average FX trade cost on any given day. Over time, FX trades will regress to the mid-rate.

### 3.     Negotiated vs. Non-Negotiated FX Trades

48.     In a "negotiated," or "active," FX trade, an investor communicates directly with a FX trader. The FX trader quotes a rate for a proposed transaction, which is accepted, rejected or countered—in other words, actively negotiated. If a deal is reached, the trader executes the FX trade at the agreed-upon price. Negotiated trades can potentially achieve better rates for an investor, but the process requires greater resources.

49.     In a "non-negotiated," "standing-instruction," or "indirect" trade there is no arm's-length negotiation of the price between the investor and the trader. Instead, clients simply report the desired currency transaction to the bank, trusting and relying on the bank to execute the trade on the client's behalf using "best execution" practices. Plaintiffs' allegations herein complain solely of State Street Bank's practices with regard to non-negotiated trades.

### B.     State Street's Provision of FX Trades to its Custodial Clients

50.     Institutional investors, such as pension plans like the Arkansas Teacher Retirement System ("Arkansas Teachers"), typically requested that State Street handle the smaller FX transactions, mostly the repatriation of dividend and interest payments, through non-negotiated trades because the amount of each trade rarely justified the time and effort required for a negotiated trade.

51.     State Street's clients reasonably expected that non-negotiated FX trades would have no mark-ups or mark-downs, for at least three reasons: (1) custodial clients already paid State Street hefty annual fees to serve as custodian over their assets; (2) the Custodian Contracts

and associated fee schedules indicated no extra fees or mark ups, and did not authorize any such fees or mark-ups; and (c) State Street's Investment Manager Guides assured custodial clients and investment managers that the price of FX trades was *"based on the market rates at the time the trade is executed."* (Emphasis added).

### 1. State Street's Clients Relied Upon State Street's Expertise and Loyalty

52.     Custodial clients placed a high degree of trust in State Street to execute non-negotiated FX transactions. In conducting these transactions, State Street occupied a superior position to its custodial clients due to its control over all aspects of the FX trade, including the information that its traders had about the FX market, the timing of the trades, and most importantly, the prices at which the trades were executed.

53.     Custodial clients depended on Global Markets not only to execute the FX trades, but also to accurately and honestly report the FX rate to them, and to carry out the trades in accordance with their custodial contracts, associated fee schedules, and guidelines as set forth in the Investment Manager Guides.

54.     Consistent with the custodial contracts and Investment Manager Guides, State Street's clients also had a reasonable expectation that the FX rates that State Street charged (or credited) on non-negotiated FX trades would accurately reflect the true market-rates of those FX trades. And there is no reason a custodial client would expect its custodian bank—to which it was paying substantial annual fees for custodial services—to charge non-negotiated FX trades at something other than the actual rate for the FX trade.

### 2. State Street's Custodial Contracts and Investment Manager Guidelines Were Predicated on No-Cost FX Trading

55.     For State Street's custodial clients, such as the Arkansas Teachers, the contracts provided that State Street "shall be entitled to compensation for its services and expenses as Custodian" pursuant to "a written Fee Schedule between the parties." Custodial clients and State Street agreed to and executed a series of fee schedules covering the class period.

11

56.     The fee schedules either provided estimated annual fees or annual flat fees for State Street's services as a custodian.

57.     State Street's custodial contracts (a) expressly provided that non-negotiated FX trades would be executed free of charge; or (b) did not list FX transactions among the services for which it was permitted to charge an additional fee or any other cost above the annual flat fee.

58.     The fee schedules did set forth certain categories of ancillary services for which State Street was permitted to charge additional fees, including Wire Fees, Reporting Fees, Delivery Fees and Subcustody Fees. None of these ancillary service categories relate to FX trading for non-negotiated trades.

59.     The Custodian Contracts did not state that State Street would impose any fees in connection with FX trading.

60.     State Street consistently stated that "Foreign Exchange Transactions . . . are *priced based on the market rates at the time the trade is executed."* (Emphasis added). This promise was made in Investment Manager Guides for custodial clients and investment managers. These Guides contained comprehensive information about State Street's custody practices and services, including procedural requirements, costs, and information on "State Street Foreign Exchange Transactions."

61.     During the Class Period, State Street issued at least 15 Investment Manager Guides, including those dated July 9, 2003; August 9, 2005; September 26, 2006; October 17, 2006; November 20, 2006; December 15, 2006; January 25, 2007; October 30, 2007; November 21, 2007; December 19, 2007; January 28, 2008; May 1, 2008; October 31, 2008; December 30, 2008; January 23, 2009, November 20, 2009 and December 1, 2009.

62.     State Street represented in each of these Investment Manager Guides that "State Street Foreign Exchange Transactions . . . are *priced based on the market rates at the time the trade is executed."* (Emphasis added.)

12

3.      **State Street's Deceptive Scheme Overcharged Clients for Non-Negotiated FX Trades**

63.     Despite State Street's representations that FX transactions were priced based on market rates at the time the trades were executed, State Street's FX practices diverged from what the Custodial Contracts authorized and what the Investment Manager Guides represented. Instead, State Street reported and charged its custodial clients FX rates on non-negotiated trades far above what State Street actually paid for foreign currency (or far below what State Street actually received for sales of foreign currency)—oftentimes, at rates that actually fell outside of the range of the day**.**

64.     However, unbeknownst to its custodial clients, when State Street reported FX rates on non-negotiated trades to its clients, those statements did not reflect the actual cost or proceeds of the FX transactions, and instead reflected rates that Global Markets selected at its discretion. Put simply, State Street invented the FX rates it reported and charged (or credited) to its custodial clients. State Street paid or received one rate for FX during the trading day, yet reported to its custodial clients another rate that was either higher (in the case of a purchase) or a lower (in the case of a sale), and pocketed the difference.

65.     For example, when custodial clients or their agents requested that State Street execute an FX transaction, the request was routed electronically via State Street's Market Order Management System (MOMS) to a group of "risk traders" working at Global Market's FX trading desk. A Global Markets FX trader would execute the transaction at whatever the current exchange rate was (the "actual rate") using the Wall Street System ("WSS"). The rate reported by Global Markets for the transaction, however, was not the rate State Street charged clients. The trader would instead charge the client a rate selected at his discretion at the end of the day, after seeing the day's range of FX transaction rates for the relevant currencies. This manipulation allowed Global Markets to mark up or mark down rates, charge rates that were most favorable to itself rather than in the best interest of the Plans, and pocket the difference between the actual

rate and the rate entered by its traders—which could amount to tens of thousands of dollars from a single FX transaction.[2]

66.     To illustrate the breach of fiduciary duty and failure to disclose, assume again the example set forth above—trades on a given day that ranged from $1.25 to $1.35 (the "range of the day") to purchase €1.00, with a day's mid-rate of $1.30. On any, and all, non-negotiated euro-for-dollar trades on behalf of its custodian clients, State Street would have paid a rate between $1.25 and $1.35, but reported to its clients that it paid at least $1.35, and sometimes more than that. State Street also kept the difference.

67.     This conclusion is supported by the analysis from non-ERISA custodial client Arkansas Teachers of ten years of FX transactions executed by State Street on behalf of and reported to Arkansas Teachers. The Teachers reviewed almost 11,000 foreign currency trades between 2000 and 2010. About 4,216, or 39%, were non-negotiated trades.

68.     The Arkansas Teachers compared its FX trades to other FX trades for the same currency pairs in a comprehensive database of more than 2 million trades, which allowed it to estimate the trading cost of the Teachers' non-negotiated FX trades. The trading cost is the difference between the day's mid-rate and the rate that State Street charged (or credited) to the Arkansas Teachers for non-negotiated FX trades.

69.     State Street did not report the actual time of execution of any FX trade, so using the day's mid-rate was the best method to see whether State Street charged (or credited) the actual market rate at the time of execution, as State Street had promised to do.

70.     The Arkansas Teachers determined that State Street overcharged for FX trading. State Street charged fictitious FX rates by adding (on purchases) or subtracting (on sales) "basis

---

[2]  For example, the *Wall Street Journal* examined one trade of 8.1 million euros for dollars made by Bank of New York Mellon on behalf of a large pension fund. There the trader reported to the pension fund that the trade was $1.3610. On that day, however, euro/dollar trades occurred between $1.3704 and $1.3604. Had the trade settled at the higher end of the range of the day, which was $1.3704, the pension fund would have gotten an extra $76,012. The *Wall Street Journal* analyzed over 9,400 trades processed over a decade and found that 58% of the currency trades were within the 10% of the day's range least favorable to the client. Carrick Mollenkamp & Tom McGinty, *Inside a Battle Over Forex*, Wall St. J., May 23, 2011.

points" or "pips" from the actual FX rate. (A basis point is 1/100th of a percentage point. For example, the smallest move the euro/dollar currency pair generally makes is 1/100th of a penny, or one basis point.) State Street would add or subtract as much as it could get away with, by selecting a rate close to either the high or low extreme of the range of the day. During periods of increased market volatility, when currency prices fluctuated more and the currency trading ranges of the day were wider, allowed State Street to skim more off the top of each non-negotiated FX trade.

71.     From January 3, 2000, through December 31, 2010, the FX rates that State Street reported and charged (or credited) to the Arkansas Teachers on **non-negotiated FX trades** were, **on average, 17.8 basis points above or below the day's mid-rate**. In other words, every foreign exchange transaction cost the Arkansas Teachers 17.8 basis points higher than the average FX rate (or the day's mid-rate).

72.     If State Street actually paid $1.31551 to purchase €1.00, it charged the Teachers $1.31729, or 17.8 basis points extra. For a purchase of €10 million, the undisclosed profit to State Street on that single trade—and the concomitant unknown loss to the Teachers—was $17,800. During the years the Arkansas Teachers examined, State Street executed over $1.2 billion in standing order FX trades, meaning that State Street kept about $2 million dollars of the Arkansas Teachers' money.

73.     State Street routinely reported and charged (or credited) fictitious prices for its FX trades. For instance, 53% of the standing-order (non-negotiated) trades analyzed by the Arkansas Teachers actually fell entirely outside the forward-adjusted range of the day, *see supra* at ¶44. These trades alone, over $200 million worth, actually added trading costs of ***64.4 basis points*** over the day's mid-rate—an enormous hidden and unauthorized mark-up. For example, on a purchase of €10 million, an undisclosed fee of 64.4 basis points means a $64,400 profit to State Street.

74.     Rates consistently above (or below) the daily mid-rate alone demonstrate that Global Markets was charging a hidden mark-up that diverted assets of its clients and the Plans to

State Street, thereby breaching its fiduciary duties.. These actions also violated the terms of the custodial contracts and the representations in the Investment Manager Guides. When more than half of non-negotiated trades fall outside the forward-adjusted range of the day, it is plausible that those reported FX rates were not actual, market-based FX rates, but were instead fictitious and designed solely to gouge State Street's clients and, in turn, their beneficiaries.

75.     There is no rational, honest basis for a professional FX market participant like Global Markets to charge a rate outside the forward-adjusted range of the day without disclosing it. The basis for this practice was rather, self-interested profit for State Street, to the significant detriment of its clients. State Street Corporation's revenue from FX trading services grew dramatically during the Class Period, due in significant part to its manipulation of the FX rates charged to clients for non-negotiated FX trades.

**State Street Corporation's FX Trading Revenue 2004-2008**

| Year-End | FX Revenue | % increase from prior year |
|----------|------------|-----------------------------|
| 2004 | $420 million | N/A |
| 2005 | $468 million | 11% |
| 2006 | $661 million | 41% |
| 2007 | $802 million | 21% |
| 2008 | $1.08 billion | 34% |

76.     State Street Corporation publicly acknowledged how market conditions provided profit-making opportunities for its FX business when it stated the following during an earnings call[3] held on October 16, 2007:

> [W]hile market conditions in the third quarter presented challenges ... it also created more opportunities in foreign exchange and in securities finance than we usually expect in the third quarter.... Revenue from foreign exchange increased 98% from the year ago quarter, and 29% from the second quarter.

77.     Tellingly, from 2000 to 2010, the FX rates that State Street reported and charged (or credited) to the Arkansas Teachers on more than 6,500 negotiated FX trades added, on

---

[3] Earnings calls are teleconferences in which public companies discusses the financial results of a reporting period.

average, only **3.6 basis points** to the day's mid-rate. In other words, State Street padded its profits, at Plaintiffs' expense, by about 14 basis points per trade for non-negotiated trades.

### 4. State Street's Deceptive Acts and Practices Could Not Reasonably Be Detected

78.     Sophisticated custodial clients such as the Arkansas Teachers were not able to discover the manner in which State Street deceptively marked-up and marked-down FX transactions during the Class Period. The periodic reports State Street sent to clients showed only the rate that State Street charged for its FX trades. The reports did not include the range of the day, the daily mid-rate, or any indication of the time of the day that the trade was executed (known as "timestamps"). Accordingly, clients could not reasonably determine, or even suspect, that State Street was secretly charging more than it actually paid for FX or was paying clients less than it actually received for FX.

79.     Custodial clients also reasonably presumed that State Street's reports accurately represented the true cost of the FX trades. Pursuant to the custodial contracts, State Street made monthly reports of monies received or paid on behalf of the client. Accordingly, State Street had an affirmative obligation to report accurately the amount it was paying or receiving for FX trades.

80.     Furthermore, based on the Investment Manager Guides' assurance that FX rates would be "priced based on the market rates at the time the trade is executed," no custodial client had any reason to suspect that they were being charged (or credited) anything other the rate that State Street itself had paid or received on those standing-instruction FX transactions.

81.     Because sophisticated custodial clients such as Arkansas Teachers could not uncover State Street's deceptive FX trading practices—even when they had directly negotiated FX trades as a reference—less sophisticated clients had no chance at all.

### C. Events After October 2009 Begin to Shed Light on State Street's Deceptive FX Trading Practices

82.     On October 20, 2009, the Attorney General of California intervened in a whistleblower lawsuit that was filed in California state court. The suit alleged State Street

misappropriated more than $56 million from California's two largest pension plans using the same unfair and deceptive FX practices alleged here. *People of the State of Cal. ex rel. Brown v. State St. Corp.*, No. 34-2008-00008457-CU-MC-GDS (Cal. Super. Ct. Sacramento Cnty. Oct. 20, 2009).

83.     The California Attorney General alleged that State Street reported inflated FX rates when buying foreign securities, reported deflated FX rates when selling foreign securities, and pocketed the difference. The Attorney General further alleged that State Street hid its wrongful conduct by entering incorrect FX rates into State Street's electronic FX trading systems and providing false records to clients.

84.     The California Attorney General has represented that its allegations of undisclosed "mark-ups" are supported in part by the sworn testimony of a former State Street Bank employee, William Strazzullo, who worked on the same trading floor as the State Street Bank and Global Markets FX traders. He overheard how State Street Bank or Global Markets FX traders were marking up FX trade prices. This trader described the practices of State Street Bank's FX traders as a "totally unethical thing to do" and said that the FX traders' practices were not within the "industry standard." Declaration of Kenny V. Nguyen in Support of Plaintiff's Memorandum and Points and Authorities in Response to Defendants' Motion for Protective Order, Exhibit U at 4 (Plaintiffs' Oct. 6, 2011 letter to Defendants), *People of Cal., v. State St. Corp.*, No. 08-8457 (Cal. Super. Ct. Sacramento Cnty. Jan. 24, 2012).

85.     After the California Attorney General filed suit, State Street dramatically changed its FX trading policies and disclosures and so informed its clients. Under these new policies, State Street admitted for the first time that it had systematically imposed additional charges for FX trading. These policy differences are made clear by comparing State Street's Investment Manager Guides published in 2006 and 2009.

86.     The 2006 Investment Manager Guide said little about FX transactions. What it did say would have misled clients into thinking that State Street was protecting, rather than pocketing, clients' assets. The 2006 Guide assures clients that State Street has taken steps "to

ensure compliance with certain ERISA requirements" by "effect[ing] foreign exchange transactions for its ERISA trust and custody clients under a special 'FX procedure.'" September 26, 2006 Investment Manager Guide at 37.

87.     In contrast, in the 2009 Investment Manager Guide, State Street dramatically increased its disclosures, and admitted that it was adding undisclosed charges to every foreign exchange transaction. In contrast to earlier disclosures, the 2009 Investment Manager Guide clearly states that foreign exchange transactions are not included in custodial services: "all foreign exchange services . . . are separate and independent of any services provided to custody clients." November 20, 2009, Investment Manager Guide at 36. In divulging this practice for the first time, State Street told customers that the FX charges would be "adjusted from time to time" but posted each business day on a website. *Id*. 2009 Investment Manager Guide at 37.

88.     These new revelations stood in sharp contrast to State Street's previous communications. The 2006 Investment Manager Guide stated that standing-order (non-negotiated) foreign exchange transactions were "provided as part of each account opening" for ERISA clients. September 26, 2006 Investment Manager Guide at 37. Rather than explaining the charges it was imposing, in 2006 State Street hid that information and posted only the "buy rate and sell rate for each currency." September 26, 2006 Investment Manager Guide at 37. Indeed, the 2006 Guide assured clients that foreign exchange transactions would be done at these posted rates "or rates more favorable if market conditions warrant." *Id*.

89.     Contrary to its 2006 promise to improve on posted rates, State Street's 2009 Investment Manager Guide stated that the "pricing of any transaction . . . is not determined by reference to any actual cost." November 20, 2009 Investment Manager Guide at 35. That is, in 2009 State Street *admitted* that the prices it had disclosed to custodial clients and others were not market prices, or prices State Street paid, but "prices" that increased its profits by padding fees on FX transactions.

90.     Also in 2009, State Street Bank disclosed that a non-negotiated FX request "*is unlikely, in most circumstances, to be completed at the same or as favorable an execution rate as*

*it would be*" if the trade were negotiated directly. 2009 Investment Manager Guide at 38. This simple disclosure, not made in previous Investment Manager Guides, finally discloses what State Street Bank had been hiding for years: FX trades contained hidden fees that disadvantaged Plaintiffs and the Proposed Class at State Street's benefit.

91.     In a similar message sent to custodial clients such as the Arkansas Teachers, State Street admitted that **"[s]ince December 2009**, State Street has provided to all of its custody clients and their investment managers via our dedicated client portal, my.statestreet.com, comprehensive disclosure of the pricing and execution methodology (including the maximum mark-up or mark-down that may be applied) for each of its Indirect [non-negotiated] FX Services." (Emphasis added.) State Street added that "on the day after a trade is executed, State Street provides for each currency pair the reference interbank rates and the times at which they are obtained, the actual rates, the daily high/low range at the time of pricing (where applicable) and the actual mark-up or markdown that was applied."

92.     State Street thus altered its practices only after its deceptive acts and practices were publicly revealed. State Street's late disclosure that it charged mark-ups and mark-downs on non-negotiated FX trades contradicts its previous repeated assurances in contracts and the Investment Manager Guides that FX rates would be based on market rates at the time the trade is executed.

93.     According to a study conducted by an independent FX analyst, after State Street altered its FX policies, the cost of non-negotiated FX trades dropped by a remarkable *63%.* The study analyzed 498,940 FX spot and forward trades (196,280 non-negotiated trades and 302,660 negotiated trades) executed during 2000-2010, and found that investors who had their custodial banks, including State Street, execute FX trades on a standing-instruction or non-negotiated basis during 2010 saw an overall 63% drop in trading costs from their average trading costs for the years 2000-2009.

94.     Correspondingly, State Street's FX trading revenue decreased 56% from the fourth quarter of 2008 ($330 million) to the fourth quarter of 2009 ($144 million).

95.     While State Street attributed this revenue decrease to lower "customer volumes" and a decrease in "currency volatility," State Street Corporation's 2009 Form 10-K filing stated that customer volumes declined by only 16% from 2008 to 2009, and currency volatility decreased by only 4%. State Street Corp. Annual Report (Form 10-K) (Feb. 22, 2012) ("2009 Form 10-K") at 41. A substantial portion of the 56% decline was the direct result of the California Attorney General's intervention, which forced State Street to stop its profitable self-dealing.

96.     In fact, State Street Corporation conceded in its 2009 Form 10-K filing that disclosing its FX transaction profits on non-negotiated trades for its custodial clients would likely continue to affect its revenues and profits from these transactions:

> In light of the action commenced by the California Attorney General, we are providing customers with greater transparency into the pricing of this product and other alternatives offered by us for addressing their foreign exchange requirements. Although we believe such disclosures will address customer interests for increased transparency, over time such action may result in pressure on our pricing of this product or result in clients electing other foreign exchange execution options, which would have an adverse impact on the revenue from, and profitability of, this product for us.

2009 Form 10-K at 12-13.

97.     The State Street whistleblower—whose allegations formed the basis of the California Attorney General lawsuit—alleged that State Street had generated $400 million in improperly obtained FX trading revenue annually, constituting one-third of Defendant's trading revenue.

98.     Without discovery of State Street's internal documents it is impossible to determine how much State Street overcharged the Plans and other members of the Proposed Class. However, in *Hill v. State Street Corp.,* No. 09-12146, 2011 WL 3420439 at *32 n.25 (D. Mass. Aug. 3, 2011), Judge Gertner found that participants in State Street's own ERISA defined contribution plan offered a "logical rationale for calculating that about 30% of State Street's reported FX revenue in the years before October 2009" was attributable to the improper self-dealing on non-negotiated trades, based on the 56% FX revenue decline in the quarter

immediately following the Attorney General's suit. Assuming that 30% of State Street's revenue for FX trading during the relevant period was attributable to self-dealing, State Street's clients, including Plaintiffs' Plans, and the Plans of the Proposed Class, have overpaid State Street for its services by hundreds of millions of dollars.

**D.      Facts Bearing on Fiduciary Breach for State Street's ERISA Clients**

99.      ERISA-covered defined contribution plans like the Andover Plan and the Boeing Plan invested in foreign securities (and hence foreign currency) through their State Street Bank-sponsored commingled funds. The commingled funds received principal, dividends, and interest that were paid in foreign currencies, or participated in other investments that required the exchange of foreign currency into and from US Dollars. The Andover Plan offered participants the option to invest in certain State Street-sponsored commingled International Equity Funds, including the International Growth Opportunities Securities Lending Class A Fund, and the SSgA Daily International Alpha Select Fund. Likewise, the Boeing Plan offered participants the option to invest in certain State Street-sponsored commingled International Equity Funds, including the International Index Fund held by Plaintiff Pehoushek-Stangeland.

100.      These International Equity Funds invest in a wide variety of international equity securities issued throughout the world. To purchase or sell the foreign securities in these funds, and then repatriate the funds to clients, FX transactions were required. As investment manager for the commingled funds, SSgA negotiated or contracted with its affiliate, Global Markets, for the FX transactions. State Street Bank, in its various roles as the trustee, investment manager, and custodian for the commingled funds, was a fiduciary with discretion and control over the funds' FX transactions ordered by SSgA and undertaken by Global Markets.

101.      As investment manager for the commingled funds, SSgA had discretion as to the type and nature of instructions it gave Global Markets when undertaking FX trades. Upon information and belief, rather than negotiating each FX trade for the funds, SSgA placed non-negotiated trade orders with Global Markets. Provision of standing instructions by SSgA was insufficient from a fiduciary duty standpoint because in so doing, State Street failed to

appropriately limit the designated price range and time period for the requested FX transactions. This fiduciary breach was compounded by SSgA's apparent failure to monitor, detect, and rectify Global Markets' mark-ups and mark-downs of the trades for its ERISA clients. As a result, State Street Bank engaged in a multi-year, self-dealing FX trade scheme—that is, it allowed SSgA and Global Markets to breach their fiduciary duties and act against Plaintiffs' interests in FX transactions year after year, and knew that SSgA and Global Markets would in fact act against Plaintiffs' interests.

102.    SSgA, as the internal investment manager, would initiate FX transactions required for the investment management of the commingled funds through the MOMS system. *See supra* at ¶65. To do so, SSgA would submit a request to the Securities Processing Unit of State Street through MOMS, which would then pass the order on to the Global Markets FX trading desk. Placing non-negotiated trades allowed Global Markets to mark-up or mark-down rates and charge rates that were most favorable to itself, rather than in the best interest of the Plans. SSgA and Global Markets thereby both exercised discretion over Plan assets.

103.    Because Plan fiduciaries whose Plans invested in the commingled funds entrusted all aspects of the investment management to State Street, including the FX transactions required for international purchases and sales, State Street had control over all aspects of the FX transactions. Neither the time stamp nor the rate of the actual FX transaction was disclosed to the Plans, their fiduciaries, or participants, by SSgA.

104.    Over time, and with SSgA requesting and Global Markets executing thousands of FX transactions annually as part of the management of the Funds, Global Market's discretionary pilfering of Plan assets added up to large losses to participants and beneficiaries. State Street thus took advantage of its already-profitable relationship as trustee, investment manager, and custodian for the funds (and Plans) to rake in additional unauthorized profits.

105.    Defendant State Street Bank, through its investment management division, SSgA, and its trading arm, Global Markets, provided FX trading services similar to those provided to the Andover Plan and the Boeing Plan to other Plans in the class, in its roles as trustee,

custodian, and investment manager. With no direction from the Plans, State Street commingled assets of the Plans, controlled where the Plans' assets were deposited and how and when they were invested and disbursed, and controlled all aspects of the FX transactions for the Plans, including Global Market's unauthorized mark-ups and mark-downs for non-negotiated trades on behalf of the funds, which amounted to State Street's self-dealing and taking of Plan assets for its own use and benefit.

106.    State Street Bank also served as an ERISA fiduciary to defined benefit plans in the putative class. On information and belief, State Street provided custodial services and commingled fund investment options to the defined benefit plans and utilized non-negotiated FX transactions in a like manner to the transactions executed on behalf of its public fund clients and the defined contribution commingled fund clients. *See supra* at ¶¶50-81.

## E.    Defendant's Fiduciary Status under ERISA

### 1.    The Nature of Fiduciary Status

107.    There are two types of fiduciaries under ERISA: "named fiduciaries" and "*de facto* fiduciaries."

108.    **Named Fiduciaries**. Every ERISA plan must have one or more "named fiduciaries." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). The "administrator" in the plan instrument is automatically a named fiduciary, and in the absence of such a designation, the sponsor is the administrator. ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

109.    Investment managers are also ERISA fiduciaries. Under ERISA:

(38) The term "investment manager" means any fiduciary (other than a trustee or named fiduciary, as defined in section 1102 (a)(2) of this title)—

(A) who has the power to manage, acquire, or dispose of any asset of a plan;

(B) who

(i) is registered as an investment adviser under the Investment Advisers Act of 1940 [15 U.S.C. 80b–1 et seq.];

(ii) is not registered as an investment adviser under such Act by reason of paragraph (1) of section 203A(a) of such Act [15 U.S.C. 80b–3a (a)], is

24

registered as an investment adviser under the laws of the State (referred to in such paragraph (1)) in which it maintains its principal office and place of business, and, at the time the fiduciary last filed the registration form most recently filed by the fiduciary with such State in order to maintain the fiduciary's registration under the laws of such State, also filed a copy of such form with the Secretary;

(iii) is a bank, as defined in that Act; or

(iv) is an insurance company qualified to perform services described in subparagraph (A) under the laws of more than one State; and

(C) has acknowledged in writing that he is a fiduciary with respect to the plan.

ERISA § 3(38), 29 U.S.C. § 1002(38).

110.     *De Facto* **Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under section 402(a)(1), 29 U.S.C. section 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus a person is a fiduciary to the extent

(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,

(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or

(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

**2.      Defendant State Street's Fiduciary Status**

111.     In the relevant Amended and Restated Declaration of Trust, State Street acknowledged its fiduciary status as Trustee with exclusive management and control of the commingled funds for all the ERISA-covered plans that offered the International Equity Funds as an investment option for participants' retirement savings.

112.     As a trustee for the commingled funds with exclusive management and control State Street Bank authorized its investment management division to manage the commingled funds, and authorized Global Markets to convert any monies needed for the funds' operation into

the required currency through FX transactions of Plan assets. State Street Bank also served as a trustee and investment manager to the Plans pursuant to separate contracts. At all times, State Street Bank had the duty to prudently and loyally manage Plan assets, discretion to select appropriate service providers and custodians, and the duty to monitor its various divisions to ensure that these transactions were within the bounds of its fiduciary responsibilities and the limitations of ERISA.

113.    State Street Bank, through its SSgA division, served as the Investment Manager for the International Equity Funds in Plaintiffs' Plans and, upon information and belief, numerous other plans. In this capacity, SSgA was responsible for prudently and loyally managing Plan assets, and authorizing, reviewing and controlling the conduct of any other State Street division or representative engaged in activities affecting the value or performance of the Funds for which State Street served as Investment Manager.

114.    Under ERISA, investments in commingled Funds are subject to a "look-through" rule, pursuant to which, the "plan assets" of an ERISA-covered plan include both its undivided "equity interest [in the entity] and an undivided interest in each of the underlying assets of the entity …". 29 C.F.R. § 2510.3-101(a)(2); *see also* ERISA § 3(42), 29 U.S.C. § 1002(42) (authority of Secretary of Labor to define term "plan assets" by regulation). Specifically, when a Plan acquires or holds an interest in a commingled Fund, "its assets include its investment and an undivided interest in each of the underlying assets of the entity." 29 C.F.R. § 2510.3-101(h)(1).

115.    "[A]ny person who exercises authority or control respecting the management or disposition of such underlying assets, and any person who provides investment advice with respect to such assets for a fee (direct or indirect) is a fiduciary of the investing plan." *Id.* § 2510.3-101(a).

116.    As investment manager for the commingled funds, State Street Bank, through its SSgA division, exercised authority and control with respect to the management or disposition of the Plans' assets. Accordingly, State Street Bank was a fiduciary of each and every ERISA Plan which invested in the International Equity Funds, including the Plaintiffs' Plans and the Plans of

the Proposed Class members with respect to the underlying assets of each and every State Street Bank-sponsored commingled fund.

117.    State Street Bank, through its Global Markets division, also functioned as a fiduciary to the Plans and the Class by acting as trustee and custodian for the commingled funds, and by exercising authority and control over the Plans' assets when undertaking FX transactions for the International Equity Funds as to the price and timing for these transactions involving Plan assets.

118.    Global Market's conversion of U.S. dollars to foreign currency, and foreign currency to U.S. dollars constituted the exercise of authority or control respecting the management or disposition of the underlying assets of the commingled investment funds and, therefore, of assets of the ERISA Plans, within the meaning of ERISA section 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(1), and 29 C.F.R. section 2510.3-101(a). This is particularly so because Global Markets exercised discretion in choosing when and how to execute the trades, and whether to mark up or mark down the FX transactions over the market rates that Global Markets had received for the transactions, and then profited and engaged in self-dealing by pocketing the difference for itself. Accordingly, Global Markets was also a functional fiduciary of the ERISA Plans.

F.      **The Relevant Law**

1.      **Fiduciary Duties under ERISA**

119.    ERISA sections 404(a)(1)(A) and (B), 29 U.S.C. §§ 1104(a)(1)(A) & (B), provide, in pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries, for the exclusive purpose of providing benefits to participants and their beneficiaries, and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

120.    These fiduciary duties under ERISA sections 404(a)(1)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982). They entail, among other things:

(a)    The duty to conduct an independent and thorough investigation into, and to continually monitor, the merits of all the investment alternatives for a plan;

(b)    The duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor; and

(c)    The duty to disclose and inform, which encompasses: (1) a negative duty not to misinform; (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

### 2.    Prohibited Transactions under ERISA

121.    In addition to ERISA's extensive fiduciary duty provisions, the statute categorically bars certain transactions deemed likely to injure a plan. *See Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 241 (2000).

### a.    ERISA § 406(b) is an absolute bar against self-dealing

122.    ERISA section 406(b), 29 U.S.C. § 1106(b), prohibits certain transactions between fiduciaries and a plan. The statute sets forth an "absolute bar against self dealing" by a fiduciary. *See Brock v. Hendershott*, 840 F.2d 339, 341 (6th Cir. 1988). ERISA section 406(b) provides the following:

A fiduciary with respect to a plan shall not—

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

**b.  ERISA § 406(a) prohibits party-in-interest transactions**

123.    ERISA section 406(a), 29 U.S.C. §1106(a), prohibits transactions between a plan

and a party in interest. A "party in interest" is defined broadly with respect to an ERISA-

qualified plan and includes, among others, any fiduciary, counsel, or employee of such employee

benefit plan, as well as any person providing services to such plan. ERISA § 3(14), 29 U.S.C. §

1002(14). Section 406(a)(1) provides the following:

> (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
>
> (A) sale or exchange, or leasing, of any property between the plan and a party in interest;
>
> (B) lending of money or other extension of credit between the plan and a party in interest;
>
> (C) furnishing of goods, services, or facilities between the plan and a party in interest;
>
> (D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or
>
> (E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107 (a) of this title.

**c.  Foreign currency exchange exemptions**

124.    Section 406(a)'s prohibitions against transactions with a party in interest are

subject to numerous exemptions to allow the normal course of business with regard to

investment management. *See* ERISA § 408, 29 U.S.C. § 1108. Foreign currency exchanges

between an employee benefit plan and a bank or a broker-dealer or an affiliate thereof which is a

party in interest with respect to such plans are exempted from the prohibition provided they meet

certain conditions.

> (18) Foreign exchange transactions.— Any foreign exchange transactions, between a bank or broker-dealer (or any affiliate of either), and a plan (as

defined in section 1002(3) of this title) with respect to which such bank or broker-dealer (or affiliate) is a trustee, custodian, fiduciary, or other party in interest, if—

(A) the transaction is in connection with the purchase, holding, or sale of securities or other investment assets (other than a foreign exchange transaction unrelated to any other investment in securities or other investment assets),

(B) at the time the foreign exchange transaction is entered into, **the terms of the transaction are not less favorable to the plan than the terms generally available in comparable arm's length foreign exchange transactions between unrelated parti**es, or the terms afforded by the bank or broker-dealer (or any affiliate of either) in comparable arm's-length foreign exchange transactions involving unrelated parties,

(C) the exchange rate used by such bank or broker-dealer (or affiliate) for a particular foreign exchange transaction does not deviate by more than 3 percent from the interbank bid and asked rates for transactions of comparable size and maturity at the time of the transaction as displayed on an independent service that reports rates of exchange in the foreign currency market for such currency, and

(D) the bank or broker-dealer (or any affiliate of either) does not have investment discretion, or provide investment advice, with respect to the transaction.

ERISA § 408(b)(18), 29 U.S.C. § 1108(b)(18) (emphasis added).

125. This section existed first as a Department of Labor ("DOL") regulation, Prohibited Transaction Exemption 94-20, 59 Fed. Reg. 8022-02 (Feb. 17, 1994), and was later codified as 29 U.S.C. § 1108(b)(18) (effective Aug.17, 2006). Prohibited Transaction Exemption (PTE) 94-20 required that foreign exchange transactions be "directed" by a plan fiduciary *independent of the bank, broker dealer, or affiliate*. Four years later the DOL promulgated another regulation, to allow non-negotiated trades within carefully circumscribed conditions. Prohibited Transaction Exemption 98-54, 63 Fed. Reg. 63503-63510 (Nov. 13, 1998). PTE 98-54 exempts FX transactions "performed under a written authorization [i.e., standing instructions]…by a fiduciary of the plan…independent of the bank or broker-dealer engaging in the covered transaction." Section III(e), 63 Fed. Reg. at 63508.

126.    Although PTE 94-20 and PTE 98-54 carve out a limited space for execution of FX transactions within the ERISA regulatory scheme, these exemptions do not relieve State Street of fiduciary responsibility. As the DOL explained,

The Department wishes to point out that ERISA's general standards of fiduciary conduct would apply to the standing instruction arrangements permitted by this class exemption. Section 404 of ERISA requires, among other things, that a fiduciary discharge his duties with respect to a plan solely in the interest of the plan's participants and beneficiaries and in a prudent fashion.63 Fed. Reg. at 63505.

### 3.    Civil Remedies under ERISA

127.    ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2), provides, in pertinent part, that a civil action may be brought by a participant or a fiduciary for relief under ERISA section 409, 29 U.S.C. § 1109.

128.    ERISA section 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty," provides, in pertinent part:

> any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

129.    ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to seek equitable relief from Defendant, including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

130.    Plaintiffs therefore bring this action under the authority of ERISA section 502(a)(2) for relief under ERISA section 409(a) to recover losses sustained by the Plans arising out of the breaches of fiduciary duties by the Defendant for violations under ERISA sections 404(a)(1) and 406, as well as pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3) for

equitable relief from Defendant as fiduciary , including, without limitation, injunctive relief and, as available under applicable law, constructive trust, restitution, and other monetary relief.

## V.    CLASS ACTION ALLEGATIONS

131.    **Class Definition.** Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and, in the alternative, (b)(3) of the Federal Rules of Civil Procedure on behalf of the Andover Plan and the Boeing Plan, and the following class of persons similarly situated (the "Class"):

> All qualified ERISA plans, and the participants, beneficiaries, and named
> fiduciaries of those plans, that invested directly or indirectly in the State Street
> Bank commingled Funds, which includes the "International Equity Funds"
> identified in this complaint; or for which State Street Bank provided investment
> management or custodial services, that utilized State Street Global Market's
> indirect FX trading services, and suffered damages as a result of the deceptive
> acts and practices and other misconduct alleged herein, at any time between
> January 2, 1998 and December 31, 2009. Excluded from the Class are Defendant,
> any entity in which Defendant has a controlling interest, and the officer, directors,
> affiliates, legal representatives, heirs, successors, subsidiaries, and/or assigns of
> any such entity.

132.    Plaintiffs reserve the right to modify the class definition before moving for class certification, including a reservation of right to seek to certify subclasses of State Street's clients, or extension of the class period, if information gained during this litigation, through discovery or otherwise, reveals that modifying the class definition or seeking subclasses would be appropriate.

133.    **Numerosity.** The members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that numerous ERISA-covered benefit plans throughout the country offered the commingled International Equity Funds and that these plans collectively have tens of thousands of participants and beneficiaries.

134.    **Commonality.** The claims of Plaintiffs and the members of the Class have a common origin and share a common basis. The claims of all Class members originate from the same misconduct, breaches of duties, and violations of ERISA, perpetrated by Defendant.

Proceeding as a class is particularly appropriate here the claim goes to the same type of currency trade instruction, indirect trades, conducted by Global Markets on behalf of the funds, and also on behalf of custodial clients, and therefore, State Street's deceptive acts and practices and misconduct regarding its FX trading practices affected all Plans were uniform and widespread.

135.    There are questions of law and fact common to the Class, including:

(a) Whether Defendant breached its fiduciary duties under ERISA by selecting its internal division to conduct the FX transactions for the Funds;

(b) Whether Defendant breached its fiduciary duties under ERISA by failing to prudently and loyally manage Plan assets when it permitted its affiliate to conduct FX transactions;

(c) Whether Defendant breached its fiduciary duties under ERISA by marking-up or marking-down the FX transactions for the Funds at issue and passing a lower NAV to the Plaintiffs' Plans or the funds;;

(d) Whether Defendant pocketed the difference between the actual, market-based FX rates it received when entering into the FX transactions, and the FX rates that were reported and charged to the commingled funds, and the Plans;

(e) Whether Defendant breached its fiduciary duties under ERISA by pocketing the difference between the actual, market-based FX rates and the mark-ups and mark-downs, and maximized profit to State Street at the expense of Plan assets;

(f) Whether Defendant's self-interested FX transactions constituted prohibited transactions under ERISA; and,

(g) Whether Defendant's acts proximately caused losses to the Plans, and if so, the appropriate relief to which Plaintiffs, on behalf of the Plans and the Class are entitled.

136.    **Typicality.** Plaintiffs are willing and prepared to serve the Court and the proposed Class in a representative capacity with all of the obligations and duties material thereto. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests adverse to or which directly and irrevocably conflict with the interests of other members of the class.

137.    Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs are members of the Class described herein.

138.     The questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class.

139.     A class action is superior to other available methods for the adjudication of this controversy. Individual litigation by all Class members would increase the delay and expense to the parties and the Court given the complex legal and factual issues of the case, and judicial determination of the common legal and factual issues essential to this case would be more fair, efficient and economical as a class action maintained in this forum than in piecemeal individual determinations.

140.     **Adequacy.** The interests of the Plaintiffs are co-extensive with, and not antagonistic to, those of the absent Class members. Plaintiffs will undertake to represent and protect the interests of absent Class members. The undersigned counsel for Plaintiffs and the Class are experienced in class action, complex, and ERISA litigation, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and absent Class members.

141.     Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Compared to individual actions by each Class member, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

142.     **Rule 23(b)(1)(A) & (B) Requirements.** Class action status in this ERISA action is warranted under Federal Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendant. Class action status also is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

143. **Rule 23(b)(2) Requirements.** Certification under 23(b)(2) is warranted because Defendant have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

144. **Rule 23(b)(3) Requirements.** In the alternative, certification under Rule 23(b)(3) is appropriate because questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## VI. CAUSES OF ACTION

### COUNT I

### ERISA Prohibited Transactions

### (Violations of § 406(b)(1) of ERISA, 29 U.S.C. § 1106(b)(1))

145. Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

146. Defendant State Street Bank is a fiduciary based on its discretionary control over Plan assets for the purposes of FX transactions.

147. ERISA section 406(b), 29 U.S.C. § 1106(b), prohibits transactions between a plan and a fiduciary that amount to self-dealing. Plaintiffs allege that State Street's FX trading practices amounted to self-dealing because State Street Bank, through its Global Markets division, consistently used its discretionary control over Plan assets to select for itself the most favorable FX rate based on the range of the day, regardless of the actual rate at the time the transaction occurred, and pocketed the difference between the two rates, causing its fiduciary clients, the Plaintiffs' Plans, and other members of the Proposed Class to suffer losses.

148. State Street's practice of FX transaction rate manipulation was nothing less than a fiduciary dealing with the assets of a plan for its own account. Fiduciary self-dealing is categorically prohibited by ERISA section 406(b), 29 U.S.C. § 1106(b).

149.    Pursuant to ERISA section 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) & (3), State Street Bank is liable to restore the losses to the Plans and provide other appropriate equitable relief.

## COUNT II

### Breach of Duties of Prudence and Loyalty

### (Violation of § 404 of ERISA, 29 U.S.C. § 1104)

150.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

151.    Defendant State Street Bank, through its SSgA division, is an "investment manager" within the meaning of ERISA section 3(38), 29 U.S.C. § 1002(38), because it (i) has the power to manage, acquire, or dispose of plan assets placed in its custody; (ii) is a bank within the meaning of the Investment Advisers Act of 1940; and (iii) has acknowledged in writing that it is a fiduciary with respect to the Plans.

152.    As a fiduciary under ERISA, State Street Bank is bound by the duties of prudence and loyalty laid out in ERISA section 404(a)(1), 29 U.S.C. § 1104(a)(1). These duties mean that as an investment manager for the Plaintiffs' Plans, State Street Bank is bound to act in the customer's interest when transacting business for the account, and thus bound, for example, to disclose fully to the Plans all the details of the relevant FX trading transactions it was undertaking, or negotiating on behalf of the funds, including the mark-ups or mark-downs that the funds were receiving for the FX trades.

153.    As a fiduciary, State Street also had a duty to monitor its internal Global Markets division. Through its Global Markets division, State Street Bank knew that it was charging unauthorized mark-ups and mark-downs for the non-negotiated trades rather than the actual transaction rates and pocketing the difference.

154.    State Street Bank has breached its ERISA fiduciary duties of prudence and loyalty because it knew that its Global Markets division was charging the Plans (or the commingled funds in which the Plans invested) unauthorized mark-ups and mark-downs for FX trading that

were unfavorable or unreasonable, above the transactional rates, and/or in excess of what Global Markets had agreed to charge, but did not ensure, by negotiation or otherwise, that Global Market's rates were in the best interest of the Plans.

155.     State Street, through its Global Markets division, has breached the duties of prudence and loyalty by charging the Plans (or the commingled Funds in which the Plans invested) unauthorized mark-ups or mark-downs over the actual FX trade rates that were unfavorable or unreasonable, above the market rates, and/or in excess of what it had agreed to charge.

156.     These breaches of fiduciary duty involved assets of the Plans on which fees were levied by State Street Bank. .

157.     Section 409(a) of ERISA, 29 U.S.C. § 1109(a), imposes liability on State Street Bank for these breaches and requires State Street Bank to make good to the Plans the losses resulting from its breaches.

158.     To enforce the relief available under ERISA section 409(a), 29 U.S.C. § 1109(a), Plaintiffs assert this claim against State Street Bank under ERISA section 502(a)(2), 29 U.S.C. § 1132(a)(2).

159.     Further, pursuant to ERISA section 502(a)(3), 29 U.S.C. § 1132(a)(3), State Street Bank must provide other appropriate equitable relief to redress its breaches of duty and enforce its fiduciary duties.

## COUNT III

### ERISA Prohibited Transactions

### (Violations of § 406(a)(1)(C) & (D) of ERISA, 29 U.S.C. § 1106(a)(1)(C) & (D))

160.     Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.

161.     ERISA section 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that the

transaction constitutes a direct or indirect furnishing of goods, services, or facilities between the plan and a party in interest.

162.　ERISA section 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if the fiduciary knows or should know that the transaction constitutes a direct or indirect transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

163.　As noted above, State Street Bank is a fiduciary with respect to the Plans.

164.　State Street Bank, State Street Global Advisors, and State Street Global Markets are "affiliates" within the meaning of the Prohibited Transaction Exemption and they directly or indirectly, through one or more intermediaries, control, are controlled by, or are under common control with each other.

165.　Global Markets, as an affiliate of State Street Bank, is a "party in interest" within the meaning of ERISA section 3(14), 29 U.S.C. § 1002(14), for at least two independently sufficient reasons: it is a functional fiduciary with respect to the Plans, and it is a person providing services to the Plans.

166.　By allowing Global Markets to manipulate FX transaction prices to the detriment of the plan and pocket the difference between the actual transaction rate and the rate selected by Global Markets, State Street Bank violated ERISA section 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D). State Street Bank caused the Plans to engage in transactions while knowing that such transactions constituted a direct or indirect transfer of assets of the Plans to a party in interest, Global Markets.

167.　While ERISA section 408(b)(18), 29 U.S.C. § 1108(b)(18), provides an exemption from the prohibitions of ERISA section 406(a), 29 U.S.C. § 1106(a), for foreign currency exchanges between an employee benefit plan and a bank or a broker-dealer or an affiliate thereof which is a party in interest with respect to a plan, the exemption only applies if, at the time the FX transaction is entered into, the terms of the transaction are not less favorable to the plan than the terms generally available in comparable arm's-length foreign exchange

38

transactions, and if the bank or broker-dealer (or any affiliate of either) does not have investment discretion, or provide investment advice, with respect to the transaction. The exemption does not apply here for two independently sufficient reasons: (1) the terms of the FX transactions, by which Global Markets essentially ensured that its clients would always get the worst exchange rate of the day, were indeed less favorable to the Plans than comparable arm's-length transactions, and (2) State Street, SSgA, and Global Markets had investment discretion (and SSgA provided investment advice) with respect to the investment of plan assets when it entered into the transactions. Thus, State Street's FX trades do not fall under the narrow exemption of section 408(b)(18).

168.     Pursuant to ERISA section 502(a)(2) & (3), 29 U.S.C. § 1132(a)(2) & (3), State Street Bank is liable to restore the losses to the Plans and provide other appropriate equitable relief.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

1.     Declare that the Defendant has violated ERISA's prohibited transactions provisions;

2.     Declare that the Defendant breached its fiduciary duties under ERISA;

3.     Issue an order compelling a proper accounting of the FX transactions in which the Plans and other members of the Proposed Class have engaged;

4.     Issue an order compelling Defendant to restore all losses caused to the Plans (or that will be caused to the Plans after the filing of this Complaint);

5.     Issue an order compelling the Defendant to disgorge all fees paid and incurred to Defendant or its affiliates (or that will be paid or incurred by the Plans after the filing of this Complaint), including any profits thereon;

6.     Order equitable restitution and other appropriate equitable monetary relief against the Defendant;

7.      Award such other equitable, injunctive, or remedial relief as may be appropriate, including the permanent removal of the Defendant from any positions of trust with respect to the Plans and the appointment of independent fiduciaries to serve as FX custodian to the Plans;

8.      That this action be certified as a class action and that the Class be designated to receive the amounts restored to the Plans by Defendant and a constructive trust be established for distribution to the extent required by law;

9.      Enjoin Defendant collectively, and each affiliate individually, from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

10.      Award Plaintiffs their attorneys' fees and costs pursuant to ERISA section 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

11.      Award such other and further relief as the Court deems equitable and just.

## **JURY DEMAND**

Plaintiffs hereby demand a jury on all issues so triable.


Dated: October 18, 2012

**HUTCHINGS, BARSAMIAN,
MANDELCORN & ZEYTOONIAN, LLP**

By: s/ Theodore M. Hess-Mahan
    Theodore M. Hess-Mahan, Esq. BBO #557109
    110 Cedar Street, Suite 250
    Wellesley Hills, MA 02481
    Telephone: 781-431-2231
    Facsimile: 781-431-8726
    *thess-mahan@hutchingsbarsamian.com*

**KELLER ROHRBACK, L.L.P.**
Lynn Lincoln Sarko (*pro hac vice pending*)
Derek W. Loeser (*pro hac vice pending*)
Laura R. Gerber (*pro hac vice pending*)
1201 3rd Avenue, Suite 3200
Seattle, WA 98101
Telephone: 206-623-1900
Facsimile: 206-623-8986
*lsarko@kellerrohrback.com*
*dloeser@kellerrohrback.com*
*lgerber@kellerrohrback.com*

***Counsel for Plaintiffs***

# EX. 4

| From: | Sucharow, Lawrence <LSucharow@labaton.com> |
|---|---|
| Sent: | Friday, August 28, 2015 12:04 PM |
| To: | Lynn Sarko |
| Cc: | Daniel P. Chiplock; rlieff@lieff.com; Michael Thornton; Garrett J. Bradley; Goldsmith, David |
| Subject: | Re: SSBT: Draft STIPULATION AND AGREEMENT OF SETTLEMENT |

I didn't get the email from Brian. So I don't intend to respond.

Others who receive the email Caroline should respond. I am only seeking the same powers but all of the lead counsel in all other cases I've been in received.

Of course I intend to honor all commitments, contracts, obligations, agreements, understandings buy what ever name or title. But especially those that are in writing like Brian's.

Sent from my iPhone

> On Aug 28, 2015, at 1:02 PM, Lynn Sarko <lsarko@KellerRohrback.com> wrote:

>

> We need to be careful about this as the DOL had asked if there were any agreements on fees between counsel. I would never answer their question. And then they seem to forget about it.

> But I'd rather not highlight it and have the DOL go sideways on us.

>

> Sent from my iPhone

>

> On Aug 28, 2015, at 9:35 AM, Brian McTigue <bmctigue@mctiguelaw.com<mailto:bmctigue@mctiguelaw.com>> wrote:

>

> I don't agree with lead settlement counsel distributing attorney's fees and expenses in its sole discretion. Attorney's fees and expenses should be distributed pursuant to the existing, written agreements of counsel.

>

> _____

> J. Brian McTigue

> McTigue Law LLP

> 4530 Wisconsin Ave. N.W.

> Suite 300

> Washington, DC 20016

> (202) 364-6900 ext. 300

> (202) 364-9960 fax

> bmctigue@mctiguelaw.com<mailto:bmctigue@mctiguelaw.com>

> www.mctiguelaw.com<http://www.mctiguelaw.com/>

> Member of the District of Columbia and California Bars

>

>

> The information contained in this E-mail transmission may be privileged and confidential and is intended solely for use by the individual or entity named as the recipient thereof. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this transmission is prohibited. If you have received this transmission error, or have any reason to believe that you may have received it in error please notify us immediately by calling the attached telephone number so we may arrange to retrieve this transmission at no cost to you.

1

Confidential: Produced Pursuant to Court Order. TLF-SST-052975

> 
> From: Chiplock, Daniel P. [mailto:DCHIPLOCK@lchb.com]
> Sent: Friday, August 28, 2015 9:29 AM
> To: 'Sucharow, Lawrence' <LSucharow@labaton.com<mailto:LSucharow@labaton.com>>
> Cc: Zeiss, Nicole <NZeiss@labaton.com<mailto:NZeiss@labaton.com>>; Lynn Sarko
<lsarko@kellerrohrback.com<mailto:lsarko@kellerrohrback.com>>; rlieff@lieff.com<mailto:rlieff@lieff.com>; Michael
Thornton <MThornton@tenlaw.com<mailto:MThornton@tenlaw.com>>; Garrett J. Bradley
<gbradley@tenlaw.com<mailto:gbradley@tenlaw.com>>; Michael Lesser
<MLesser@tenlaw.com<mailto:MLesser@tenlaw.com>>; Evan Hoffman
<EHoffman@tenlaw.com<mailto:EHoffman@tenlaw.com>>; Kravitz, Carl S.
<ckravitz@zuckerman.com<mailto:ckravitz@zuckerman.com>>; Brian McTigue
<bmctigue@mctiguelaw.com<mailto:bmctigue@mctiguelaw.com>>; Rogers, Michael H.
<MRogers@labaton.com<mailto:MRogers@labaton.com>>; Goldsmith, David
<dgoldsmith@labaton.com<mailto:dgoldsmith@labaton.com>>
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> OK, sounds good.  I will also get you whatever edits I have to the settlement docs by noon.
> 
> From: Sucharow, Lawrence [mailto:LSucharow@labaton.com]
> Sent: Friday, August 28, 2015 9:28 AM
> To: Chiplock, Daniel P.
> Cc: Zeiss, Nicole; Lynn Sarko; rlieff@lieff.com<mailto:rlieff@lieff.com>; Michael Thornton; Garrett J. Bradley; Michael
Lesser; Evan Hoffman; Kravitz, Carl S.; Brian McTigue; Rogers, Michael H.; Goldsmith, David
> Subject: Re: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> I am speaking to Paine today at around 10 AM to both report to him and get his update.
> I'll report back and advise whether we should send the revised term sheet. I expect we should but let's hold off for
another hour.
> 
> Sent from my iPhone
> 
> On Aug 28, 2015, at 9:19 AM, Chiplock, Daniel P. <DCHIPLOCK@lchb.com<mailto:DCHIPLOCK@lchb.com>> wrote:
> This looks OK to me, thanks.  I'm happy to send it (after you've done the other redline) to Paine, if you like.  Or
someone else can, no matter.
> 
> From: Zeiss, Nicole [mailto:NZeiss@labaton.com]
> Sent: Thursday, August 27, 2015 3:27 PM
> To: Lynn Sarko; 'rlieff@lieff.com<mailto:rlieff@lieff.com>'; Chiplock, Daniel P.; Michael Thornton; Garrett J. Bradley;
Michael Lesser; 'Evan Hoffman'; 'Kravitz, Carl S.'; 'Brian McTigue'
> Cc: Rogers, Michael H.; Sucharow, Lawrence; Goldsmith, David
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> Dear all,
> 
> We've had some additional exchanges about the term sheet and, specifically, para 8(n).  I believe the attached draft
resolves those issues and that there is consensus that the attached accurately reflects the basic DOL fee deal.  If you
disagree, please let us know asap.
> 
> When someone wants to send this to Paine, or the DOL, I will need a run a different redline for them.
> 
> Thanks
> 

2

Confidential: Produced Pursuant to Court Order.

TLF-SST-052976

> 
> 
> 
> 
> 
> 
> <image001.jpg><http://labaton.com/>
> Nicole M. Zeiss | Partner
> 140 Broadway, New York, New York 10005
> T: (212) 907-0867 |  F: (212) 883-7067
> E: nzeiss@labaton.com<mailto:nzeiss@labaton.com>  |  W: www.labaton.com<http://www.labaton.com/>
> 
> <image002.jpg><http://www.linkedin.com/company/labaton-sucharow-llp>
<image003.jpg><https://twitter.com/LabatonSucharow> <image004.jpg><https://www.facebook.com/pages/Labaton-Sucharow-LLP/443111702425065>
> 
> From: Zeiss, Nicole
> Sent: Wednesday, August 26, 2015 5:09 PM
> To: Sucharow, Lawrence; Lynn Sarko; Goldsmith, David; 'rlieff@lieff.com<mailto:rlieff@lieff.com>'; Daniel P. Chiplock; Michael Thornton; Garrett J. Bradley; Michael Lesser; 'Evan Hoffman'; 'Kravitz, Carl S.'; 'Brian McTigue'
> Cc: Rogers, Michael H.
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> Attached is the term sheet showing the changes discussed below, plus one additional change to para 8(n) that might help.
> 
> Thanks
> 
> 
> 
> 
> 
> 
> 
> <image005.jpg><http://labaton.com/>
> Nicole M. Zeiss | Partner
> 140 Broadway, New York, New York 10005
> T: (212) 907-0867 |  F: (212) 883-7067
> E: nzeiss@labaton.com<mailto:nzeiss@labaton.com>  |  W: www.labaton.com<http://www.labaton.com/>
> 
> <image006.jpg><http://www.linkedin.com/company/labaton-sucharow-llp>
<image007.jpg><https://twitter.com/LabatonSucharow> <image008.jpg><https://www.facebook.com/pages/Labaton-Sucharow-LLP/443111702425065>
> 
> From: Sucharow, Lawrence
> Sent: Wednesday, August 26, 2015 4:34 PM
> To: Lynn Sarko; Goldsmith, David; 'rlieff@lieff.com<mailto:rlieff@lieff.com>'; Daniel P. Chiplock; Michael Thornton; Garrett J. Bradley; Michael Lesser; 'Evan Hoffman'; 'Kravitz, Carl S.'; 'Brian McTigue'
> Cc: Zeiss, Nicole; Rogers, Michael H.
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
> 
> Then we can probably forget my proposed changes.

3

Confidential: Produced Pursuant to Court Order.

TLF-SST-052977

>
> From: Lynn Sarko [mailto:lsarko@KellerRohrback.com]
> Sent: Wednesday, August 26, 2015 4:26 PM
> To: Sucharow, Lawrence; Goldsmith, David; 'rlieff@lieff.com<mailto:rlieff@lieff.com>'; Daniel P. Chiplock; Michael
Thornton; Garrett J. Bradley; Michael Lesser; 'Evan Hoffman'; 'Kravitz, Carl S.'; 'Brian McTigue'
> Cc: Zeiss, Nicole; Rogers, Michael H.
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
>
> Sure.   If it works for them – its fine with me
>
> Lynn Lincoln Sarko
> Managing Partner
>
> Keller Rohrback L.L.P.
> 1201 Third Avenue, Suite 3200
> Seattle, WA 98101
>
> Phone: (206) 623-1900
> Fax: (206) 623-3384
> E-mail: lsarko@kellerrohrback.com<mailto:lsarko@kellerrohrback.com>
>
> From: Sucharow, Lawrence [mailto:LSucharow@labaton.com]
> Sent: Wednesday, August 26, 2015 1:25 PM
> To: Lynn Sarko <lsarko@KellerRohrback.com<mailto:lsarko@KellerRohrback.com>>; Goldsmith, David
<dgoldsmith@labaton.com<mailto:dgoldsmith@labaton.com>>; 'rlieff@lieff.com<mailto:rlieff@lieff.com>'
<rlieff@lieff.com<mailto:rlieff@lieff.com>>; Daniel P. Chiplock
<DCHIPLOCK@lchb.com<mailto:DCHIPLOCK@lchb.com>>; Michael Thornton
<MThornton@tenlaw.com<mailto:MThornton@tenlaw.com>>; Garrett J. Bradley
<gbradley@tenlaw.com<mailto:gbradley@tenlaw.com>>; Michael Lesser
<MLesser@tenlaw.com<mailto:MLesser@tenlaw.com>>; 'Evan Hoffman'
<EHoffman@tenlaw.com<mailto:EHoffman@tenlaw.com>>; 'Kravitz, Carl S.'
<ckravitz@zuckerman.com<mailto:ckravitz@zuckerman.com>>; 'Brian McTigue'
<bmctigue@mctiguelaw.com<mailto:bmctigue@mctiguelaw.com>>
> Cc: Zeiss, Nicole <NZeiss@labaton.com<mailto:NZeiss@labaton.com>>; Rogers, Michael H.
<MRogers@labaton.com<mailto:MRogers@labaton.com>>
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
>
> Can we leave para 8(n) the general way it is and protect the DOL through the express provision of para 12 limiting fees
charged to ERISA allocation to $10.9 million?
>
> From: Lynn Sarko [mailto:lsarko@KellerRohrback.com]
> Sent: Wednesday, August 26, 2015 3:42 PM
> To: Goldsmith, David; 'rlieff@lieff.com<mailto:rlieff@lieff.com>'; Daniel P. Chiplock; Michael Thornton; Garrett J.
Bradley; Michael Lesser; 'Evan Hoffman'; 'Kravitz, Carl S.'; 'Brian McTigue'
> Cc: Sucharow, Lawrence; Zeiss, Nicole; Rogers, Michael H.
> Subject: RE: SST--Proposed Revision to Term Sheet for DOL Deal
>
> David
> Thanks for sending this.  Sorry, I had misunderstood what you were saying on our call earlier today.
>
> Two things:
>

4

Confidential: Produced Pursuant to Court Order.

> 1.  I do think the language you proposed for paragraph 12 works—but just change it to $10.9 million.
> 2. On paragraph 8(n)- the problem is the word "fees"—since the DOL has given us a hard number for ERISA fees—that
won't be going up or down.   So—question—can we get rid of the word "fees" in this paragraph—does it still work?
>
> What do you think??
>
> Lynn
>
> Lynn Lincoln Sarko
> Managing Partner
>
> Keller Rohrback L.L.P.
> 1201 Third Avenue, Suite 3200
> Seattle, WA 98101
>
> Phone: (206) 623-1900
> Fax: (206) 623-3384
> E-mail: lsarko@kellerrohrback.com<mailto:lsarko@kellerrohrback.com>
>
> From: Goldsmith, David [mailto:dgoldsmith@labaton.com]
> Sent: Wednesday, August 19, 2015 2:59 PM
> To: 'rlieff@lieff.com<mailto:rlieff@lieff.com>' <rlieff@lieff.com<mailto:rlieff@lieff.com>>; Daniel P. Chiplock
<DCHIPLOCK@lchb.com<mailto:DCHIPLOCK@lchb.com>>; Michael Thornton
<MThornton@tenlaw.com<mailto:MThornton@tenlaw.com>>; Garrett J. Bradley
<gbradley@tenlaw.com<mailto:gbradley@tenlaw.com>>; Michael Lesser
<MLesser@tenlaw.com<mailto:MLesser@tenlaw.com>>; 'Evan Hoffman'
<EHoffman@tenlaw.com<mailto:EHoffman@tenlaw.com>>; Lynn Sarko
<lsarko@KellerRohrback.com<mailto:lsarko@KellerRohrback.com>>; 'Kravitz, Carl S.'
<ckravitz@zuckerman.com<mailto:ckravitz@zuckerman.com>>; 'Brian McTigue'
<bmctigue@mctiguelaw.com<mailto:bmctigue@mctiguelaw.com>>
> Cc: Sucharow, Lawrence <LSucharow@labaton.com<mailto:LSucharow@labaton.com>>; Zeiss, Nicole
<NZeiss@labaton.com<mailto:NZeiss@labaton.com>>; Rogers, Michael H.
<MRogers@labaton.com<mailto:MRogers@labaton.com>>
> Subject: SST--Proposed Revision to Term Sheet for DOL Deal
>
> All:  The below reflects our proposed revisions to the Term Sheet (in red boldface) to reflect the imminent deal with
the DOL on fees and expenses as certain of us discussed this morning (DOL has advised that they want the deal
memorialized in the Term Sheet).  Please comment.  Thanks.
>
>
> 8(n).       Plan of Allocation. . . . The amount allocated to the ERISA Plans and Investment Companies and other
Settlement Class Members shall be increased or decreased by their proportional share (with respect to the Class
Settlement Amount) of any interest, costs (including costs of notice and administration), expenses (including taxes), and
fees and expenses of Plaintiffs' Counsel obtained or paid pursuant to permission of the Court.  However, notice and
administration expenses attributable solely to the claims of Class Members categorized as Group Trusts shall be paid
solely out of the ERISA allocation, and the cost of any ERISA Independent Fiduciary shall be borne solely by SSBT and
shall not be paid out of the Class Settlement Amount.
>
> 12.       Plaintiffs' Counsel's Attorneys' Fees and Expenses.       Plaintiffs' Counsel's attorneys' fees and expenses, as
awarded by the Court, shall be paid from the Class Escrow Account immediately upon award by the Court into an escrow
account governed by an escrow agreement between Interim Lead Counsel, SSBT and a bank or other institution agreed
upon by SSBT and Interim Lead Counsel (the "Interim Lead Counsel Escrow Account"), notwithstanding any appeals of

5

the Settlement or the fee and expense award.  Plaintiffs' Counsel shall may apply for their fees and expenses and any service awards for Plaintiffs against the entire Class Settlement Amount, but in no event shall more than Ten Million Nine Hundred Thousand Dollars ($10,900,000.00) in fees be paid out of the $60 million portion of the Class Settlement Amount allocated to ERISA Plans, as referenced in Paragraph 8(n) above.  In the event that the Effective Date does not occur or SSBT promptly provides written notice representing in good faith that the Effective Date has not and cannot occur due to developments with the DOJ Settlement, DOL Settlement, and/or SEC Settlement and explaining the grounds for the notice, Plaintiffs' Counsel severally shall be obliged to pay to SSBT all amounts paid to them from the Interim Lead Counsel Escrow Account within fourteen (14) business days.  The prevailing party in any action to collect any amount due under this paragraph shall be entitled to recover interest and all of its costs of collection, including attorneys' fees.  Should the fee and expense award be reduced by the Court or on appeal, all such fees and expenses received by Plaintiffs' Counsel in excess of those that are ultimately approved shall be repaid to the Class Escrow Account, along with interest at the Class Escrow Account rate of interest.

>
>
>
>
>
>
> [http://www.labaton.com/images/email-logo.jpg]<http://www.labaton.com/>
> David J. Goldsmith | Partner
> 140 Broadway, New York, New York 10005
> T: (212) 907-0879 | F: (212) 883-7079
> E: dgoldsmith@labaton.com<mailto:dgoldsmith@labaton.com>  |  W: www.labaton.com<http://www.labaton.com/>
>
> [http://www.labaton.com/images/email-linkedin.gif]<http://www.linkedin.com/company/labaton-sucharow-llp> [http://www.labaton.com/images/email-twitter.gif] <https://twitter.com/LabatonSucharow> [http://www.labaton.com/images/email-facebook.gif] <https://www.facebook.com/pages/Labaton-Sucharow-LLP/443111702425065>
>
>
> ***Privilege and Confidentiality Notice***
>
> This electronic message contains information that is (a) LEGALLY PRIVILEGED, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not the Addressee(s), or the person responsible for delivering this to the Addressee(s), you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please contact us immediately at 212-907-0700 and take the steps necessary to delete the message completely from your computer system. Thank you.
>
>
>
>
> This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.
>
>
> This message is intended for the named recipients only. It may contain information protected by the attorney-client or work-product privilege. If you have received this email in error, please notify the sender immediately by replying to this email. Please do not disclose this message to anyone and delete the message and any attachments. Thank you.

Confidential: Produced Pursuant to Court Order.                                                          TLF-SST-052980