# EX. 234

# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated<br><br>Plaintiffs,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant | )<br>)<br>) No. 11-cv-10230 MLW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND and those similarly situated,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20<br><br>Defendants. | )<br>)<br>) No. 11-cv-12049 MLW<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| THE ANDOVER COMPANIES EMPLOYEES SAVINGS AND PROFIT SHARING PLAN, on behalf of itself and JAMES PEHOUSHEK-STRANGELAND, and all others similarly situated,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) No. 11-cv-11698 MLW<br>)<br>)<br>)<br>)<br>) |

# EXPERT REPORT OF WILLIAM B. RUBENSTEIN

1.      I am the Sidley Austin Professor of Law at Harvard Law School and a leading

national expert on class action law generally and class action fees in particular.[1]  The law firm

Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") has retained me to provide my

expert opinion in response to the class action aspects of Professor Stephen Gillers's *Ethical

Report for Special Master Gerald E. Rosen* (hereafter "Gillers Report"), dated February 23,

2018, and his subsequent deposition testimony, provided on March 20–21.  Based on my review

of these materials and the record in this case,[2] I state the following three opinions:

- ***Rule 23 does not require disclosure of fee allocation agreements absent judicial
  order, courts rarely order disclosure or involve themselves in fee allocation, and
  the Court in this case issued no such order.***  (Part I, *infra*).  Rule 23(h) governs
  the procedures for fee awards to class counsel in class action cases.  Rule 23(h)(1)
  states that the fee petition must be made according to the provisions of Rule
  54(d)(2).  Rule 54(d)(2) states that a fee petitioner must disclose "the terms of any
  agreement about fees for the services for which the claim is made," only "if the
  court so orders."  Class action practice accords with the letter of the law.  For
  purposes of this Report, I undertook an empirical review of all class action
  settlements in cases filed in this District in the past seven years.  In the 127
  settlements identified, I found not a single order requiring disclosure of fee
  agreements and only a handful of cases in which the Court even addressed fee
  agreements in any way.  In this case, Judge Wolf did not utilize his authority to
  order disclosure of fee agreements.

- ***Professor Gillers's four attempts to advocate around the text of Rules 23 and 54
  are unconvincing.***  (Part II, *infra*).  Professor Gillers proposes a modified reading
  of Rules 23/54, requiring class counsel affirmatively to identify lawyers receiving
  a fee allocation whose identities may be unknown to the Court.  The text of the

---

[1] In a report that I submitted to the Special Master on July 31, 2017, I provided my qualifications
to serve as an expert and disclosed my prior relationship to this case and these firms, *see* Expert
Declaration of William B. Rubenstein 3–12 (July 31, 2017).  I therefore do not repeat that
information here.  The primary addition to my c.v. since that time is that the United States
District Court for the Eastern District of Pennsylvania appointed me to serve as the court's expert
witness on certain attorney's fees issues in the NFL concussion litigation, a task that I completed
this winter. *See In re National Football League Players' Concussion Injury Litigation,* No. 2:12-
md-02323-AB, ECF No. 8376 (Sept. 14, 2017).

[2] A list of the documents that I have reviewed is attached as Exhibit A.

applicable rules does not support this reading, no court has ever articulated it, it is at odds with an understanding of class action practice, and it requires a tortured use of the English language to defend.  Similarly, Professor Gillers provides a set of six random snippets of class action law to argue that the principles underlying class action practice require disclosure of fee agreements absent judicial request. Although the principles themselves are largely unobjectionable, they do not magically reverse the language of Rule 54.  This is particularly true in that the class action experts who drafted Rule 23(h) were well aware of these principles, yet struck the balance between the court's duty to absent class members and class counsel's representational authority by adopting the letter of Rule 54.  Professor Gillers's Report implies that the Court investigated the fee allocation at the fairness hearing, triggering duties of disclosure and candor; he conceded at his deposition that the Court did not do so explicitly and his efforts to show that the Court did so implicitly are unconvincing.  Finally, Professor Gillers argues that federal common law/equity required Lieff Cabraser to have sensed wrong-doing, inquired into the Chargois Arrangement,[3] and then reported it to the Court; but when presented with the facts surrounding Lieff Cabraser's actual knowledge in real time, Professor Gillers conceded that the firm lacked the information to detect wrong-doing and hence no investigatory duty – which would have been futile in any case – or disclosure obligation attached.  In short, given Labaton's communications concerning Chargois's relationship to and work on the case, Lieff Cabraser simply had no reason to question the veracity of Chargois's fee allocation.

- **Rule 23 does not require disclosure of fee allocation agreements in the class's notice.**  (Part III, *infra*). Rule 23(e)(1) requires a court to provide notice to the class of a proposed class action settlement and Rule 23(h)(1) requires notice to the class of a proposed fee petition.  Neither section requires provision of fee *allocation* agreements to the class.  In a case in which the Court did not require disclosure of fee agreements under Rule 54(d)(2), counsel had no duty to supply fee allocation information to the class.

2.      I am a strong proponent of transparency in the class action fee process and a strong believer that the more information the Court has, the better for the class.  I am equally committed to the rule of law, that is, to not confusing my preference for what the law should be

---

[3] This phase is a defined term in Professor Gillers's report.  Gillers Report at 33 ("As consideration for Chargois' efforts, Belfi and Keller agreed to pay Chargois' firm, Chargois & Herron, a maximum 20% of any attorney's fees received by Labaton in any litigation involving an institutional investor for whom Chargois had facilitated the introduction, including ATRS (hereinafter 'the Chargois Arrangement').").

with the reality of what the law is.  Current class action law and practice simply do not support

the conclusion that Lieff Cabraser had an obligation to disclose the limited (and ultimately

inaccurate) information it had about the Chargois Arrangement to the Court or to the class,

absent an order requiring disclosure of fee agreements.

## I.
## RULE 23 DOES NOT REQUIRE DISCLOSURE OF FEE AGREEMENTS ABSENT JUDICIAL ORDER AND JUDGE WOLF ISSUED NO SUCH ORDER IN THIS CASE

3.       Fees in class action cases of this magnitude proceed in two phases: *first*, the court

awards an aggregate fee to all class counsel following the filing of a motion, notice to and

possible objection by the class, and a hearing; *second*, the aggregate fee is allocated among the

lawyers whose work benefitted the class.[4]  While the court has complete authority over both the

aggregate fee and the ultimate allocation, judges almost invariably leave allocation to lead

counsel's initial discretion, saving judicial intervention for those instances in which the lawyers

are unable to agree on an allocation.[5]

---

[4] *See* William B. Rubenstein, 5 *Newberg on Class Actions* § 15:23 (5th ed. 2014 & Supp. 2018) (hereafter "Rubenstein, *Newberg on Class Actions*").

[5] Such deference is typically premised on expertise.  *See, e.g.*, *In re High Sulfur Content Gasoline Prod. Liab. Litig.*, 517 F.3d 220, 234 (5th Cir. 2008) ("It is likely that lead counsel may be in a better position than the court to evaluate the contributions of all counsel seeking recovery of fees.").  Courts are also content to permit counsel to self-allocate because the job is a messy one.  *See* William B. Rubenstein, *Divvying Up the Pot: Who Divides Aggregate Fee Awards, How, and How Publicly?*, 1 Class Action Attorney Fee Digest 127 (May 2007) ("But once the aggregate fee has been awarded, to whom does it go and who decides?  Technically, the court has the power to decide which plaintiff attorneys get what amount of money.  But no judge in her right mind wants to undertake this task, particularly in cases involving large numbers of plaintiff attorneys.").  Yet judicial involvement is occasionally necessary, particularly as lead counsel is not a disinterested allocator.  *See In re Diet Drugs Prod. Liab. Litig.*, 401 F.3d 143, 173 (3d Cir. 2005) (Ambro, J., concurring) ("[C]ounsel have inherent conflicts.  They make recommendations on their own fees and thus have a financial interest in the outcome.  How much deference is due the fox who recommends how to divvy up the chickens?").

4.      Fee agreements may arise in either phase.[6]  At the fee-setting stage, there may be agreements between the class representative and class counsel (particularly in cases governed by the Private Securities Litigation Reform Act of 1995 (PSLRA)),[7] or agreements between class counsel and the defendants,[8] that may be pertinent in setting the aggregate fee.  At the allocation stage, there may be agreements between and among the lawyers whose work generated the class's recovery;[9] indeed, if the lawyers are able to allocate the fee among themselves without judicial involvement, the allocation accord itself is effectively an agreement about fees.

5.      Rule 23(h), enacted in 2003, provides clear guidance to these fee processes.[10]  It mandates notice and opportunity to be heard to the class for the aggregate fee-setting,[11] as the class's interests are directly at stake.  And it leaves allocation and other fee agreements to the lawyers, absent a judicial order requiring disclosure.  Specifically, Rule 23 adopts the procedures of Rule 54(d)(2), as applicable.[12]  Both Rule 23[13] and Rule 54[14] require a fee claim to be made

---

[6] *See* Rubenstein, 5 *Newberg on Class Actions*, *supra* note 4, at § 15:12 (describing range of agreements).

[7] Class counsel's retainer agreement with an individual class representative is rarely pertinent to their final fee given the general lack of sophistication of most class representatives.  *See* Rubenstein, 5 *Newberg on Class Actions, supra* note 4, at § 15:74.  In PSLRA cases, however, the class representatives (called "lead plaintiffs") are often large institutional investors who are statutorily charged with selecting class counsel (called "lead counsel") and who sometimes negotiate sophisticated fee agreements with class counsel; courts are more likely to respect such agreements when taxing the class for counsel's fee.  *Id.* at § 15:75.

[8] These are often called "clear sailing agreements." *See* Rubenstein, 4 *Newberg on Class Actions, supra* note 4, at § 13:9.  For a discussion of courts' deference to them, *see id.* at § 15:76.

[9] *See* Rubenstein, 5 *Newberg on Class Actions, supra* note 4, at § 15:23.

[10] Fed. R. Civ. P. 23(h).

[11] Fed. R. Civ. P. 23(h)(1).

[12] *Id.* ("A claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this subdivision (h), at a time the court sets.").

by motion.   Rule 54(d)(2)(B) sets forth the required content of a fee motion, including the requirement that the motion must "disclose, ***if the court so orders***, the terms of any agreement about fees for the services for which the claim is made."[15]   Rule 23(h) and Rule 54 are therefore clear in mandating the submission of fee agreements – including those concerning the allocation of fees among counsel – only upon court order.

6.   Occasionally, local district court rules mandate disclosure of fee agreements,[16] but this is rare:  even the Northern District of California – which has elaborate procedural guidance governing class action settlement approval, including the requirement that counsel submit their lodestar for cross-check purposes – does not mandate disclosure of fee-sharing agreements.[17] The District of Massachusetts has no local rule on point – indeed, no local rule regarding class

---

[13] *Id.* ("[A] claim for an award must be made by motion under Rule 54(d)(2) . . . .").

[14] Fed. R. Civ. P. 54(d)(2)(A) ("A claim for attorney's fees . . . must be made by motion unless the substantive law requires those fees to be proved at trial as an element of damages.").

[15] Fed. R. Civ. P. 54(d)(2)(B)(iv) (emphasis added).

[16] *See, e.g.*, S.D.N.Y. Civ. R. 23.1 ("Fees for attorneys or others shall not be paid upon recovery or compromise in a class action or a derivative action on behalf of a corporation except as allowed by the Court after a hearing upon such notice as the Court may direct.  The notice shall include a statement of the names and addresses of the applicants for such fees and the amounts requested respectively and shall disclose any fee sharing agreements with anyone."); D. Ariz. Civ. R. 54.2(d) ("Unless otherwise ordered, the following documentation shall be attached to each memorandum of points and authorities filed in support of a motion for award of attorneys' fees and related non-taxable expenses . . . . A complete copy of any written fee agreement, or a full recitation of any oral fee agreement, must be attached to the supporting memorandum.  If no fee agreement exists, then counsel must attach a statement to that effect."); *see also id.* at 54.2(j)(6) (applying general documentation rule to class actions).

[17] *See* U.S. District Court for the Northern District of California, *Procedural Guidance for Class Action Settlements*, *available at* https://www.cand.uscourts.gov/ClassActionSettlementGuidance (last accessed Mar. 23, 2018).

action practice (or Rule 54) at all.[18]  Some judges also maintain standing rules for litigation in their courtroom that could, in theory, address this topic.  Judge Wolf has no such rules.[19]

7.      In practice, judges rarely order disclosure of agreements as to fees.[20]  To confirm that statement for purposes of this Report, my research assistants and I conducted an empirical investigation of the dockets in all class action cases filed in this District since February 2, 2011 (the date on which this action was filed).[21]  Among the 1,226 dockets we reviewed, 127 reached a class action settlement.  In those 127 class action settlements, we found not a single judicial order requiring that the lawyer disclose fee agreements under Rule 54(d)(2).  In fact, other than reference to clear sailing agreements,[22] agreements as to fees were referenced in only about five cases altogether.  In one case, the Magistrate Judge asked the lawyers during a conference if "there [was] any fee agreement with anybody in this case," to which class counsel responded by noting that they had entered into a contingency-fee agreement with the named plaintiff that they could submit if the court desired; we found no evidence that the court followed up on this matter, and class counsel received the fees it requested.  In another case, the plaintiffs' attorneys disclosed *sua sponte* that two class counsel firms that were jointly representing one of the named

---

[18] *See* Local Rules of the United States District Court for the District of Massachusetts, *available at* http://www.mad.uscourts.gov/general/pdf/LC/2017%20LOCAL%20RULES%20-%20effective%20July%202017.pdf (last accessed on March 23, 2018).

[19] *See* Judge Wolf, Mark L. – "Chambers Procedures/Standing Orders/Sample Orders:  N/A," *available at* http://www.mad.uscourts.gov/boston/wolf.htm (last accessed on March 23, 2018).

[20] I have urged them to change this practice.  *See* Rubenstein, 5 *Newberg on Class Actions*, *supra* note 4, at § 15:12 (stating that "[w]hile Rule 54(d)(2)(B)(iv) makes disclosure of such agreements dependent on a judicial order, there are at least two reasons that courts should regularly order disclosure" and discussing policy rationale in support of disclosure).

[21] A full explanation of the method of the study and results is attached as Exhibit B.

[22] *See* note 8, *supra*.

plaintiffs had agreed to evenly divide their fees regardless of their individual lodestars; we again found no evidence that the court followed up on this matter, and the court granted class counsel's fee petition for the amount requested without commenting on the agreement.  The final three cases were the Massachusetts, New Hampshire, and Rhode Island versions of 46 state-wide class actions against Sprint litigated by the same group of attorneys.  Class counsel in all three cases disclosed that the group of firms that had settled the entire set of cases with the defendant had agreed to share a portion of the fee awards they received from each individual action.  The courts in all three cases signed near-identical fee-approval agreements and do not appear to have inquired further about the fee-sharing agreement.  Although it is possible that we missed some information in reviewing more than 1,000 dockets in a short period of time, I am confident that our data provide empirical support for the conclusion that courts rarely request fee allocation agreements and that class counsel do not typically volunteer fee allocation agreements without specific instruction from the court.  This conclusion is further supported by the fact that a search in Westlaw for the operative legal rule – 54(d)(2)(B)(iv) – turns up 13 cases, only two of which contain the words "class action;" one is the Second Circuit's decision in the *Bernstein* case discussed below,[23] and the other denies a motion by a class member seeking disclosure of lead counsel's fee agreements with the lead plaintiffs.[24]

---

[23] *See* note 42, *infra*.

[24] *In re MGM Mirage Sec. Litig.*, No. 2:09-CV-1558-GMN-VCF, 2016 WL 344503, at *2 (D. Nev. Jan. 27, 2016) ("In light of Lead Plaintiffs' unanimous declarations that each Lead Plaintiff agrees to Lead Counsel's 25% contingent fee, any benefit derived from production of Lead Counsel's retainer agreements is outweighed by the cost and delay associated with producing the retainer agreements.  CoPERA's request for Lead Counsel's retainer agreements is denied.").

8.      Applying class action law and practice to the facts of this case, it is inarguable that:

- Rule 23(h)(2) and Rule 54(d)(2) require disclosure of fee agreements only upon judicial order.

- The District of Massachusetts maintains no local rule that mandates disclosure of agreements as to fees.

- Judge Wolf has no standing order in his Court that mandates disclosure of agreements as to fees.

- Judge Wolf made no Rule 23/54 order mandating disclosure of agreements as to fees.

9.      Given the governing legal structure, the absence of any local rule, standing order, or specific Rule 23/54 judicial order requiring disclosure of fee agreements, it is my first expert opinion that the parties settling this case generally, and Lieff Cabraser in particular, complied with the requirements of Rule 23 as to disclosure of fee agreements.

## II.
## PROFESSOR GILLERS'S ATTEMPTS TO ADVOCATE
## AROUND THE TEXT OF RULES 23 AND 54 ARE UNCONVINCING

10.     Professor Gillers attempts to evade application of the clear mandate of Rules 23(h)(2)/54(b)(2) in four distinct ways:  (a) by advocating that it does not apply to non-identified counsel; (b) by advocating that background principles trump reliance on the terms of the Rules; (c) by advocating that the Court, at the fairness hearing, implicitly solicited allocation information; and (d) by advocating that some general common law/equity principles required Lieff Cabraser to discern problems with, inquire into, and thence disclose the Chargois Arrangement.  None of these efforts is convincing.

8

(A)
Rules 23/54 Do Not Distinguish Between Identified and Non-identified Counsel

11.     Professor Gillers initially acknowledges, as he must, the clear text of Rule 23(h)

and Rule 54, but he then aims to qualify the text's application with the following modifier:

> While there may not have been a duty under Rules 23 and 54 to disclose the division of fees among those lawyers *whom the Court knew about*, and so could inquire, the Court could not be expected to ask counsel about a division of fees with Chargois, a lawyer who had not appeared in the case and whom it did not know about.   Labaton's construction of its obligation under Rule 54(d)(2), endorsed by its expert, would impose on the Court the affirmative responsibility to ask: "Is anyone else getting any portion of the attorney's fees you are asking me to award and whose existence you have not revealed?"[25]

As is evident from this text, Professor Gillers is obviously offering an interpretation of Rule

54(d)(2), specifically, that the Rule does not require the disclosure of fee agreements among

known counsel absent judicial order, but that it places on class counsel an affirmative obligation

to disclose fee agreements between known and unknown counsel in all circumstances.   Five

aspects of this approach, and the passage above, are telling.

     a.     *First,* Professor Gillers himself repudiated this entire argument at his

deposition, disclaiming any reliance on Rule 54 "as the source of authority or obligation to

disclose participation of a lawyer whom the Court does not know about."[26]

---

[25] Gillers Report at 67 (emphasis in original).

[26] The full colloquy reads:

> Q:     All right.   What are the circumstances under Rule 54 which specifically says under (d)(2)(B) that disclosure is only required if the Court orders it -- what are the circumstances, if any, in which you say that disclosure is required even if the Court didn't order it?

> A:     I'm not relying on Rule 54 as the source of authority or obligation to disclose participation of a lawyer whom the Court does not know about.

9

b.      *Second*, it is not surprising that Professor Gillers repudiated his reliance on Rule 54 as the source of this argument, as neither the text of Rule 23 nor that of Rule 54 contains the qualifier for which Professor Gillers once advocated.

c.      *Third*, Professor Gillers does not cite a single case that supports the modifier that he once proposed.

d.      *Fourth*, Professor Gillers's desired qualifier embodied a misunderstanding of class action law.  It wrongly assumed that a class action court generally knows the identities of most of the lawyers who work on a class action case, likely because Professor Gillers assumes class counsel's lodestar is routinely submitted to a court at the fee stage.  But in about 80% of class action cases, courts award fees according to the percentage method and in about half of those cases, courts do not ask for and counsel do not supply the lawyers' lodestar[27] – that is, the names of all of the timekeepers in the case, the hours they spent on the matter, and their hourly rates.[28]  Thus, in nearly 40% of class action cases, courts are not provided the names of lawyers who worked on the case and who might, on that ground, be in line to receive a portion of the award.  Moreover, class action fee awards are sometimes allocated to other lawyers, such as

---

Gillers Dep. 114:23–115:7, Mar. 20, 2018 [hereinafter Gillers Dep.].  Under questioning from counsel for the Special Master, Professor Gillers repeated the concession.  *See id.* at 349:11–13 ("Q:  All right. How about Rule 54? Was your opinion based on that?  A: No.").

[27] *See* Rubenstein, 5 *Newberg on Class Actions*, *supra* note 4, at § 15:67 (stating that courts use a pure percentage approach in 37.8% of cases and a percentage approach with a lodestar cross-check in 42.8% of cases) (reporting on data from Theodore Eisenberg & Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. Empirical Legal Stud. 248, 272 (2010)).

[28] Courts do not ask and counsel do not supply their lodestar because most circuits explicitly provide district courts with discretion as to whether to perform such a "lodestar cross-check" in percentage award cases.  *See* Rubenstein, 5 *Newberg on Class Actions*, *supra* note 4, at § 15:88 (surveying circuit approaches).

those who helped fund the case or whose work prior to the class action helped secure the class's relief.[29]   Even if counsel submit a lodestar for cross-check purposes, these lawyers may not appear there.   There are, therefore, a variety of situations in which the identities of counsel sharing in a fee award are routinely unknown to the class action court.   This fact renders Gillers' once-proposed modifier peculiar:  as the class court often does not know the identity of many lawyers working on the case, the obvious question an interested court would ask is, "Who all is sharing in the fee?," not, "Who is sharing in the fee that I don't know about?"   Put differently, a theatre-goer would understand that she could identify the actors during the play but that she would need a playbill to identify the crew.   So too, the class action experts who drafted Rule 23(h) were well aware that a class action case encompasses cast and crew – and they nonetheless chose the default embodied in Rule 54:  that fee allocation agreements need not be disclosed absent judicial request, that the judge must ask for the playbill.   Class action law and practice thus belie the new qualifier for which Professor Gillers once advocated, but no longer defends.[30]

        e.     *Fifth*, Professor Gillers's once-proposed modifier is tendentiously framed in two critical respects.  He initially writes, "While there may not have been a duty under Rules 23 and 54 to disclose the division of fees among those lawyers *whom the Court knew about*, and

---

[29] *See* Fed. R. Civ. P. 23(h) advisory committee's note to 2003 amendment ("In some situations, there may be a basis for making an award to other counsel whose work produced a beneficial result for the class, such as attorneys who acted for the class before certification but were not appointed class counsel, or attorneys who represented objectors to a proposed settlement under Rule 23(e) or to the fee motion of class counsel.   Other situations in which fee awards are authorized by law or by agreement of the parties may exist.").   *See generally* Rubenstein, 5 *Newberg on Class Actions*, *supra* note 4, at § 15:22.

[30] For a further discussion of the facts in this paragraph, *see* ¶ 13(a), *infra*.

so could inquire . . . ."[31]  This is an odd phrase because it implies that a court can ask the lawyers

how a fee is being allocated among lawyers identified but somehow would be unduly burdened if

it had to make the more general inquiry as to who *all* is getting a fee.  But in fact the latter

locution – "How are the fees being allocated?" – is actually a far simpler and more natural one

than Gillers's baseline – "How is the fee being allocated among the lawyers who have appeared

in the case?"  Professor Gillers then writes:  "Is anyone else getting any portion of the attorney's

fees you are asking me to award and *whose existence you have not revealed*?"  This, too, is

tendentiously framed as it implies a (non-existent) obligation on the part of class counsel to

"reveal" information and suggests that class counsel is otherwise "hiding" information.  Written

less argumentatively – "Is anyone other than class counsel getting any portion of the attorney's

fees you are asking me to award whose existence I might not know of?" or, more naturally and

simply, "How are the fees being allocated?" – the question perfectly captures the "affirmative

responsibility" that Rule 23(h) and Rule 54(d)(2) do in fact "impose" upon a court.  Absent

Professor Gillers's tortured approach, it is really not much of an imposition for a court to ask,

"How are the fees being allocated?" as Rule 54(d)(2) proposes.

    f.  In short, the modified Rule 23(h)/54(b)(2) for which Professor Gillers

advocated in writing, he himself has now repudiated and, in any case, is not the letter of those

Rules, is not supported by a single case, does not comport with a sound understanding of class

action practice, and requires peculiar linguistic contortions to defend.

---

[31] Gillers Report at 67 (emphasis in original).

(B)
Background Principles Do Not Reverse the Language of Rules 23/54

12.     Equally unconvincing is Professor Gillers's second attempt to advocate around

the text of Rules 23 and 54, an effort that relies upon the principles underlying class action law.

Specifically, under a heading entitled "Federal Case Law Contradicts Labaton's Narrow View of

its Disclosure Obligations to the Court,"[32] Professor Gillers provides snippets from six random[33]

class action cases to set out four generic principles of class action law:

1. "Case law, including cases from the District of Massachusetts, amply supports recognition of the Court's fiduciary duty to protect the class and the Court's reliance on counsel to be forthcoming with the information the Court needs in order to do so."[34]

2. "Private agreements among counsel do not bind the Court, which can ignore them if they reward those who did little or nothing to serve the class."[35]

3. "[A] court [is not] bound to honor the retainer agreement between counsel and the named class members."[36]

---

[32] Gillers Report at 68.

[33] Two of the cases are district court decisions from this District (one from 2005, one from 2015), three are circuit court cases from other circuits (a Second Circuit case from 1987, a Third Circuit case from 2005, and a Ninth Circuit case from 1997), and the sixth is a 1980 district court case from a different judicial district.  Professor Gillers does not acknowledge that most of these cases arise from inapposite legal and factual settings and he does not discuss the many other cases that interpret the rules less capaciously than these snippets imply.  Moreover, not one of these cases is either a Supreme Court case or a First Circuit case that would have provided controlling precedent governing the lawyers in this case.

[34] *Id.* at 68–70.  *See generally* Rubenstein, 4 *Newberg on Class Actions*, *supra* note 4, at § 13:40 ("Fiduciary role of court").

[35] Gillers Report at 68–70.  *See generally* Rubenstein, 5 *Newberg on Class Actions*, *supra* note 4, at § 15:23 ("[I]t is axiomatic that the court has the ultimate authority to determine how the aggregate fee is to be allocated among counsel.")

[36] Gillers Report at 68–70.  *See generally* Rubenstein, 5 *Newberg on Class Actions*, *supra* note 4, at § 15:74 (reviewing law on deference to the fee arrangement embodied in an individual retainer agreement executed between counsel and the named plaintiff and reporting that "Courts have rejected this approach—with a few exceptions discussed below—on the grounds that such fee

13

4.  "Federal case law also recognizes the special danger of conflicts between a lawyer and her client at the fee-determination stage in common fund cases."[37]

While – with one caveat[38] – the principles themselves are anodyne, Professor Gillers's use of them to reverse the language of Rule 54(d)(2) is anything but.

a.    *First*, Professor Gillers's advocacy once again ignores the fact that the framers of Rule 23(h) were well aware of the principles set forth in his random set of snippets, yet chose to have Rule 23(h) cross-reference Rule 54(d).[39]  In other words, the class action law experts who wrote the rule after study and public input balanced the principles at stake by authorizing class counsel to keep fee-sharing arrangements confidential absent an explicit judicial order to the contrary.

---

agreements are largely irrelevant to a court's evaluation of the reasonableness of a proposed fee.").

[37] Gillers Report at 70–71.  *See generally* Rubenstein, 5 *Newberg on Class Actions*, *supra* note 4, at § 15:15 (discussing class members' right to object to fees and importance of safeguarding processes for objections).

[38] Professor Gillers's first principle states that, "Case law, including cases from the District of Massachusetts, amply supports recognition of the Court's fiduciary duty to protect the class and *the Court's reliance on counsel to be forthcoming with the information the Court needs in order to do so*."  Gillers Report at 68 (emphasis added).   He presents only two cases that address the highlighted second part of this sentence, regarding counsel's responsibility to the court:  the Southern District of New York's 1980 decision in *Lewis v. Teleprompter* and the Second Circuit's 1987 *Agent Orange* decision which quotes *Lewis*.  Neither is from this District.  It is not quite precise, therefore, to conclude either that this proposition is supported by cases from this District or that it is "amply" supported.

[39] Fed. R. Civ. P. 23(h) advisory committee's note to 2003 amendment ("Courts have also given weight to agreements among the parties regarding the fee motion, and to agreements between class counsel and others about the fees claimed by the motion.  Rule 54(d)(2)(B) provides: 'If directed by the court, the motion shall also disclose the terms of any agreement with respect to fees to be paid for the services for which claim is made.'  The agreement by a settling party not to oppose a fee application up to a certain amount, for example, is worthy of consideration, but the court remains responsible to determine a reasonable fee.  'Side agreements' regarding fees provide at least perspective pertinent to an appropriate fee award.").

b.      *Second*, Professor Gillers's advocacy position is illogical, as demonstrated by the following example.  Assume a posted traffic sign explicitly states that the speed limit is 35 miles per hour, yet a police officer arrests a driver for travelling at 25 miles per hour and explains that (1) she has a duty to protect the public; (2) cars are dangerous; (3) a driver's belief about what is reasonable does not trump that duty and need not be deferred to; (4) the driver's interests may conflict with those of pedestrians and other drivers.  While the officer's points are pertinent, no one alone – nor the combination of the four – is sufficient to trump the explicitly posted speed limit, *i.e.*, the balance struck by the governing regulatory authority.  So too here: the applicable federal rule states in no uncertain terms that class counsel must provide agreements to the Court ___*if the court so orders*___.  The presence of four underlying principles guiding judicial review no more trump that explicit federal rule than do the principles underlying automobile safety trump a posted speed limit.

c.      *Third*, a review of the language of the cases from which Professor Gillers draws his snippets makes his argument even more far-fetched than the history and logic suggest. Professor Gillers's central case is the Second Circuit's 1987 decision in the *Agent Orange* litigation.[40]  In that decision, the Second Circuit articulates the precise duty for which Professor Gillers advocates: "in all future class actions counsel must inform the court of the existence of a fee-sharing agreement at the time it is formulated."[41]  Yet oddly, in extracting his snippets, Professor Gillers does not even quote this language.  He likely omitted that specific language because it just as likely is based on local rules in the Second Circuit, not on his general

---

[40] Professor Gillers testified that his methodology in selecting these particular snippets started from this case and involved reading cases it cited and cases citing it.  Gillers Dep. 244:1–12.

[41] *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216, 226 (2d Cir. 1987).

principles,[42] and because it certainly is not controlling of practice in the First Circuit.  But what

that means is that the structure of this argument is, "If you read these six random snippets you'll

see that they create a generalized duty to disclose, but please ignore the one sentence in the key

case that literally creates a specific duty to disclose."  If merely stating the structure of this

---

[42] In the *Agent Orange* case, a local rule (then 5(a), now 23.1) compelled disclosure of fee agreements, but Judge Weinstein initially waived its application to the case.  *In re Agent Orange Prod. Liab. Litig.*, 597 F. Supp. 740, 869 (E.D.N.Y. 1984).  When a pertinent agreement later surfaced, he opined that the local rules should be altered to compel disclosure of fee agreements at their inception, not just at the time of the fee petition.  *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1452, 1464 (E.D.N.Y. 1985) ("The fee application notice requirements of Local Rule 5(a) were waived in this class action 'because of the need for continued intensive work by the attorneys until the close of the fairness hearings and because of the complexity of the fee applications.'  At the time the court allowed this waiver it was unaware of the existence of the PMC's fee-sharing arrangement.  Disclosure of a fee-sharing agreement at the beginning of every class action is preferable to disclosure after settlement on application for attorney fees.  Based on the Agent Orange PMC agreement problems, the Board of Judges of the United States District Court for the Eastern District of New York has unanimously agreed at one of its regular monthly meetings that Local Rule 5 should be modified to require early notice.  This amendment will minimize fee-sharing problems in future litigations.").  The Second Circuit then embraced this aspect of Judge Weinstein's opinion.  *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 216, 226 (2d Cir. 1987) ("We do agree with the district court's ruling that in all future class actions counsel must inform the court of the existence of a fee sharing agreement at the time it is formulated.  This holding may well diminish many of the dangers posed to the rights of the class.").  The local rule was briefly repealed as it applied to class actions, leading the Second Circuit to hold that, "Federal Rule 23(h) . . . does not mandate automatic disclosure of all fee-sharing arrangements in class actions."  *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 138 n.2 (2d Cir. 2016).  After *Bernstein*, the Southern and Eastern Districts re-enacted the local disclosure rule, *see* note 16, *supra*.

This history – which fully contradicts Professor Gillers's belief that *Agent Orange* "preceded the adoption of a local rule," Gillers Dep. 124:4-7; 347:15-22 – provides fair evidence that the rule-makers and judges in the Second Circuit do not understand *Agent Orange*'s key sentence to mandate disclosure absent an applicable rule.  If they did, surely the Second Circuit would have noted that fact in the *Bernstein* decision and the local rule-makers would have either cited *Agent Orange* in enacting local rule 23.1 or not enacted 23.1 since it would be unnecessary if anyone thought *Agent Orange* stood for the principle absent a local rule.  This is particularly true in light of the fact that Congress's 2003 enactment of Rule 23(h)(2), adopting Rule 54(d)(2)'s approach, post-dates *Agent Orange* and hence would, in any case, displace a common law approach to the contrary.

argument does not suffice to refute it, our class action jurisprudence has achieved terminal silence.[43]

        d.    Again, not surprisingly, when pressed on his authority for a disclosure requirement within federal law at his deposition, Professor Gillers could offer only *Agent Orange* and was forced to concede that there is no applicable precedent in the First Circuit, no local rules in the federal courts here, no standing orders, and no order in this case.[44]  Put simply, Professor Gillers could find no existing federal authority for his disclosure requirement that would apply to the lawyers in this case generally, and to Lieff Cabraser in particular.

        e.    In sum, the class action principles that Professor Gillers culls from a random sample of class action cases are important, to be sure, but underlying principles do not reverse the clear language of explicit rules.

(C)
**The Court Did Not Solicit Fee Allocation Information At the Fairness Hearing**

        13.    Professor Gillers makes two separate suggestions in his written report that the Court, at the final approval hearing, asked for fee allocation information and that counsel, in failing to provide it, thereby violated professional responsibility rules (and perhaps certain amorphous federal law norms).[45]  Professor Gillers concedes that Judge Wolf never explicitly

---

[43] *Cf. Romer v. Evans*, 517 U.S. 620, 639 (1996) (Scalia, J., dissenting) ("If merely stating this alleged 'equal protection' violation does not suffice to refute it, our constitutional jurisprudence has achieved terminal silliness.").

[44] Gillers Dep. 130:1–133:22.

[45] While Professor Gillers often premises these points on the rules of professional responsibility, in other places he implies – with a remarkable lack of precision – that these principles arise from "federal common law and the judge's equity jurisdiction and authority."  Gillers Dep. at 351:24–352:1.  I can only assume from this statement that he is alluding to the snippets of class action law that he provided in his written report.

17

inquired into how the fees were to be allocated,[46] but he nonetheless creatively interprets two

passages in the fairness hearing transcript as fee allocation discussions.   The first of these

arguments misunderstands class action practice and the second misrepresents the record.

        a.     Professor Gillers states:

> In [] courtroom statements and submissions to the Court, class counsel offered
> information about the fees they would request *and the identities of the law firms who*
> *would share in those fees* . . . The Court could assume that the lawyers who were going to
> participate in the fee it was asked to award were the lawyers who appeared before it
> because no other lawyer was identified.   But here, that assumption would be wrong.   In
> order for class counsel's statements and submissions to the Court not to mislead the Court
> through omission, Rule 3.3 required them to disclose to the Court the Chargois
> Arrangement and their intention to pay Chargois more than $4 million from the class
> recovery.[47]

Professor Gillers's statement that class counsel offered information about "who would share in

the fees," implies that counsel provided fee allocation information to the Court.   In reaching that

conclusion, Professor Gillers appears to confuse the submission of class counsel's lodestar for

cross-check purposes in a percentage award case with a fee allocation submission.   The former

apprises the court about who worked on the case,[48] but its function is not to apprise the court of,

---

[46] *See* Gillers Dep. 143:16–144:1 ("Q. Have you reviewed the hearing transcripts in this case?
A. Read them, yes.   Q. And from that review you are aware that at no time did the judge pose
any inquiry as to how counsel were dividing fees, even among those who were disclosed - - A.
Yes. Q. -- correct?   A. -- I'm aware of that."); *see also id.* at 147:4–11 ("Q. And then when you
say by omission, that is, there was misrepresentation by omission, are you stating that in your
memory of your review of the hearing that Judge Wolf asked about the allocation -- not between
ERISA funds and customer class members but allocation among the attorneys?   Is it your
memory he asked?   A. No, it's not."); *see also id.* at 176:23–177:4 ("Q. Okay.   Just so that we're
clear, there is nowhere in the transcript where Judge Wolf instructs or orders or directs that class
counsel disclose the existence of any underlying referral fee agreements, correct?   A. In that
language, no, you're correct.").

[47] Gillers Report at 72 (emphasis added).

[48] As discussed below, *see* note 63, *infra*, a lodestar cross-check submission may not reflect the
time of all the lawyers who worked on the case.   In this case, for example, Lead Counsel did not

and hence it need not reflect, how the fees will be allocated once awarded.  In allocating fees among counsel, each lawyer's relative lodestar may be pertinent, but it is rarely controlling,[49] and, as noted above,[50] lawyers who do not appear in the lodestar cross-check submission may nonetheless be eligible for a portion of the fee.  Thus his conclusion that "[i]n order for class counsel[] . . . not to mislead the Court through omission" they were "required to disclose to the Court the Chargois Arrangement" rests upon the faulty assumption that class counsel had made a presentation to the Court of how the fees would be allocated.  In fact, the Court never asked, and counsel therefore never provided, information as to (including agreements about) how the fees would be allocated.  The Court – or an observer – may have assumed that some of the lawyers identified in the lodestar cross-check submission would be among those receiving an allocation,

---

submit to the Court the time of a law firm (that I assumed served as local counsel) in one of the ERISA complaints as part of the lodestar cross-check submission.  *Compare The Andover Companies Employee Savings and Profit Sharing Plan v. State Street Bank,* No. 1:12-cv-11698, ECF No. 1 at 38 (listing Hutchings, Barsamian, Mandelcorn & Zeytoonian, LLP, as first counsel), *with* ECF No. 104-24 (Master Chart of Lodestars, Litigation Expenses, and Plaintiffs' Service Awards, not listing lodestar for Hutchings, Barsamian, Mandelcorn & Zeytoonian, LLP).

Class action law does not worry about such an omission.  The lodestar cross-check's sole purpose is to ensure against a windfall.  *See* Rubenstein, 5 *Newberg on Class Actions*, *supra* note 4, at § 15:85.  If class counsel omit time from the lodestar cross-check submission, it is only to their detriment as it serves to increase their multiplier, *i.e.*, the measurement of their profit.  *See id.* at § 15:87 (on multipliers).  Class action law worries that the lodestar cross-check creates incentives for class counsel to pad their hours, not to winnow them, *id.* at § 15:86 (on the costs and benefits of the lodestar cross-check), and therefore in lodestar cross-check submissions, the lawyers tend to spend time explaining to the court how many hours they struck out of their submissions.  *See, e.g.,* ECF No. 104-17 (explaining, in Lieff Cabraser lodestar cross-check submission, that "any personnel who billed fewer than 5 hours in the litigation have not been included in my firm's total [lodestar cross-check submission].").

[49] *See id.* at § 15:23 (explaining that fees are allocated according to a series of factors, not just time).

[50] *See ¶* 11(d), *supra*.

but that assumption does not turn the lodestar cross-check submission into a partial fee allocation filing.[51]

       b.     Professor Gillers states:

> The Court itself dispelled any uncertainty about what it expected.  Just before approving Lead Counsel's fee request in full, the Court said: "I'm relying heavily on the submissions and what's been said today."  Nicole Zeiss of Labaton and Daniel Chiplock of Lieff were in the courtroom when the Court made this statement.  Both knew about the intention to pay Chargois.  Neither spoke up. David Goldsmith of Labaton, who was also in the courtroom, learned of the Chargois Arrangement within weeks and did not disclose it although he had quickly disclosed to the Court the double-counting of SA time.  Earlier in the proceeding, the Court specifically asked to be reminded "of the terms of allocation."  Mr. Goldsmith said, "I didn't want there to be something that was left that Your Honor wanted to hear."  He then described the allocation to the class followed by a description of the basis for the fee request. Chargois was not mentioned.[52]

Professor Gillers engages in two mischaracterizations in this passage.  *First,* the only discussion

of "allocation" in the fairness hearing transcript had nothing to do with *fees*:  it concerned the

---

[51] At his deposition, Professor Gillers expanded his definition of what would constitute an event triggering the requirement that class counsel disclose all fee allocation details to encompass either (1) the fact that the parties explicitly identified the magnitude of fees attributable to those with ERISA-based claims and/or (2) the fact that the class notice mentioned fees at all.  Gillers Dep. 196:13–200:10.

    The first disclosure identified above spoke to where the fees were coming from, not to whom specifically they were going, and it highlighted the critical fact that, depending upon the ultimate aggregate fee level, ERISA-based class members could recover more on their claims than the rest of the class members.  *See* ECF No. 95-3 at 6.  This information was provided to disclose potential conflicts among the class members, not to provide the Court or class with specific fee allocation information.

    Professor Gillers' second proposition above is nonsensical:  all class action notices necessarily encompass the level of fees counsel will seek, *see* Fed. R. Civ. P. 23(h)(1), but the very same section of the very same rule adopts Rule 54(d)(2), which states that agreements as to fees need be disclosed only upon court order.  It therefore simply cannot be the case that because class counsel provides notice to the class of the level of fees it will seek it must therefore provide the specific amounts each lawyer will be allocated if/when the Court approves a fee.

[52] Gillers Report at 67–68 (citations omitted).

"plan of allocation" of the class's recovery among various class groups;[53] that phrase is a defined term in this case's settlement agreement unrelated to fees[54] and Professor Gillers's subjective view of the term for his advocacy purposes[55] cannot trump the parties' and Court's contemporaneous understanding of the term, as objectively documented in the settlement agreement. *Second*, Professor Gillers turns the Court's statement, "I'm relying heavily on the submissions and what's been said today," into the conclusion that the Court "dispelled any uncertainty about what it expected," although that statement, too, had absolutely nothing to do with fee allocation and hardly can be read as one "dispelling all uncertainty," given Rule 54(d)(2)'s explicit language directly on point.

c.     Because Professor Gillers himself concedes that the Court never explicitly inquired into fee allocation, and his more creative excursions to pretend that the Court did so implicitly are unconvincing, it is fair to conclude that there simply was no discussion of specific fee allocation information at the hearing and hence there was no misinformation provided to the Court for Lieff Cabraser to correct or amend.

---

[53] ECF No. 114 at 21 ("MR. GOLDSMITH: '[D]id you want to hear any particular discussion of the terms of *plan of allocation*?" . . . THE COURT: Why don't you remind me of the terms of allocation.") (emphasis added).

[54] *See* ECF No. 89 at 15 ("'Plan of Allocation' means the proposed plan for allocating the Net Class Settlement Fund to Settlement Class Members, which, subject to approval of the Court, shall be substantially in the form described in the Notice.").

[55] Gillers Dep. 169:15–16 ("A. My understanding is the plan of allocation includes all allocation."); 171:1–5 ("A. I understood the term plan of allocation as used elsewhere more broadly to include allocating money from the class settlement to everyone who gets money from the class settlement.").

(D)

**Professor Gillers Has Identified No Facts Supporting the Conclusion that Federal Common Law/Equity Required Lieff Cabraser to Inquire Into or Disclose to the Court Information About the Chargois Arrangement**

14.     Lieff Cabraser was in no way involved in the Chargois Arrangement and Professor Gillers accordingly conceded at his deposition that his written report provided no basis for implicating the firm.[56]  Yet in that setting he generated, for the first time,[57] an argument that some unspecified body of law required Lieff Cabraser's lawyers to (a) have smelled a rat, (b) inquired into it, and (c) disclosed it to the Court.[58]  Because the threshold points (a) and (b) do not apply to Lieff Cabraser, however, no disclosure obligation ever arose in fact.

        a.     *No visible evidence of wrongdoing.*  Professor Gillers bases his new argument that Lieff Cabraser should have detected wrongdoing on the ideas that (i) Chargois did no work on this particular case and (ii) yet received what he alleges is an unusually high fee.[59] Professor Gillers concedes that the first of these premises does not actually apply to Lieff Cabraser, as the firm was informed that Chargois was undertaking legal work on the class's behalf as local counsel and the firm had no reason to doubt those representations.[60]  Furthermore,

---

[56] Gillers Dep. 226:24–227:17; *id.* at 229:23–231:8.

[57] *Id.* at 228:14–17 ("Q. Where is that in your report, sir?  A. It's not. Q. It's not in your report? A. No.").

[58] Again, to the extent this argument is based on federal class action law, it appears to emanate from Professor Gillers's six random snippets of class action law, as he provides no other pertinent federal cases in his report, *see* note 33, *supra*.  But again, as he made up this argument at his deposition, *see supra* note 57, and in so doing cited no law, I have no basis upon which to identify its alleged legal foundation.

[59] Gillers Dep. 227:4–18.

[60] *Id.* at 228:1–13 ("My opinion is based on the fact that all Lieff knows is that Chargois has been characterized as local counsel and is getting 4.1 million dollars and that the class has never been told when invited to consider whether to object to counsel fees.  *So I think you make a valuable*

although Labaton submitted no lodestar for Chargois when the firm filed the full fee petition,[61]

given Labaton's representations to Lieff Cabraser that Chargois was serving as local counsel and

working on the case in that capacity,[62] Lieff Cabraser would have been justified in assuming that

Chargois had spent time on the case but that Labaton had decided not to submit that time as part

of its lodestar cross-check submission.[63] Professor Gillers's second supposition is that the

"unusual nature of the payment for a local counsel would have at least impelled the firm in

protecting its client to look into the matter,"[64] specifically referencing the fact that Chargois was

in line to receive roughly $4 million.[65]   Yet Professor Gillers – who acknowledged that he is not

---

point that the knowledge of Lieff may be such that it didn't trigger any need to disclose Chargois
because of his valuable contributions.") (emphasis added).

[61] Lead counsel typically collect, ideally scrutinize, and ultimately submit the lodestar
submissions for each of the many firms in a large case like this without necessarily sharing each
firm's lodestar with all other firms at this fee stage.  Here, for instance, Lead Counsel submitted
each individual firm's lodestar submission as an Exhibit to his own fee declaration.  See ECF No.
104.  Lieff Cabraser's lawyer testified that he "didn't have control over what went in," and that
he had anticipated that "a declaration was going to be filed by this local counsel, too,"
referencing Chargois.  Chiplock Dep. 132:17–24, Sep. 8, 2017 [hereinafter Chiplock Dep.].

[62] Id. at 109:22–110:18, 118:9–22, 130:11–16; see also Lieff Dep. 58:15–59:17, 61:9–21, 64:16–
67:17, 72:15–74:5, 92:17–93:13, Sep. 11, 2017 [hereinafter Lieff Dep.].

[63] Lieff Cabraser might have assumed that Labaton did not include Chargois' lodestar in the
cross-check for any number of routine reasons:  (1) application of its billing discretion as Lead
Counsel; (2) because it did not think it appropriate to include local counsel's time in the lodestar
cross-check submission; (3) because it did not believe it needed to rely on those hours to justify
its sought-after multiplier; or (4) simply because Chargois was delinquent in submitting his
lodestar records to Lead Counsel.  Any of these would have been legitimate reasons to omit
Chargois' time from the lodestar cross-check submission – as noted above, see note 48, supra,
one of the local ERISA counsel's time was not submitted in this case's lodestar – while
nonetheless not omitting Chargois from sharing in the aggregate fee.  And any of these
explanations would have been far more obvious to Lieff Cabraser at the time than jumping to the
assumption that Labaton might have misled it about Chargois' relationship to the case.

[64] Gillers Dep. 228:6–13.

[65] Id. at 229:9–10.

an expert on class action law[66] and that he has no class action experience[67] – conceded he had no

basis for assessing the reasonableness of a (referral) fee in class action lawsuits,[68] while Robert

Lieff – who has roughly 50 years of experience in class action law[69] – testified that the amount

paid Chargois (for what he understood to be local counsel work) did not "seem on the face of it

to be unusual."[70]   The record therefore simply does not support the conclusion that Lieff

Cabraser had knowledge that anything was amiss.

        b.    *Inquiry futile.*  If Lieff Cabraser had inquired about the nature of

Chargois's work on or connection to the case, that inquiry would have been directed to the

Labaton firm, which was Lead Counsel in the case and which had represented Chargois's role to

Lieff Cabraser.   There is little doubt that such an inquiry would likely have been futile.   A lead

counsel's relationship with local counsel and the client are generally proprietary attorney-client

relationships (particularly in the PSLRA context) and Labaton would have been unlikely to be

forthcoming about further details of these relationships.   Indeed, Chris Keller testified that the

firm had not disclosed Garrett Bradley's service as local counsel in another case for precisely

these reasons.[71]   Similarly, Eric Belfi testified that the motivating factor in not disclosing the

---

[66] *Id.* at 15:16–19.

[67] *Id.* at 177:23–178:4.

[68] *Id.* at 237:9–12 ("Q.  Do you have any clue as to what a typical referral fee arrangement is in these situations?  A. No. . . .").

[69] Lieff Dep. 78:9–10.

[70] *Id.* at 93:20.

[71] Keller Dep. 203:14–204:21, Oct. 13, 2017 ("A:  Well, there's – there's proprietary sort of relationship information.  Again, that's one aspect.  Q:  What is that -- what do you mean by that?  A:  If -- if we put his name on these papers, that means our competitors know that that firm has relationships with these clients and that means they'll be calling them up trying to poach them as local counsel.").

Chargois Arrangement was a fear that Chargois might sue for breach of contract and that such a suit would disrupt the firm's relationship with the Arkansas client.[72]   Finally, Lawrence Sucharow testified that he believed the details of the Chargois Arrangement "irrelevant,"[73] just his firm's "business obligation" that had nothing to do with anyone else,[74] and that he made the decision not to disclose them (to ERISA counsel) for that reason.   The record in this case therefore amply supports the conclusion that had any inquiry obligation arisen with respect to Lieff Cabraser, the ensuing inquiry would have proven futile.

      c.    *No disclosure requirement triggered.*   Thus, when presented at his deposition with the facts of what Lieff Cabraser actually knew in real time, Professor Gillers was forced to concede that no disclosure obligation likely attached to them.   Specifically, Lieff Cabraser's lawyer laid out a series of assumptions that paralleled the firm's knowledge in this case:  (i) that Chargois served as local counsel; (ii) that he performed work commensurate with his proposed allocation; (iii) that the client was aware of and had approved of Chargois involvement and share in writing; and (iv) again (at Gillers's suggestion) that Lieff Cabraser believed Chargois contributions to the case made his proposed fee not unreasonable.[75]   Presented with those circumstances, Professor Gillers conceded that no disclosure obligation arose, stating: "Fine.  If all that is true, then I -- then my opinion is not that there was a need to disclose it."[76]

* * *

---

[72] Belfi Dep. 58:1–59:21, 89:4–17, 90:7–12, Sep. 5, 2017.

[73] Sucharow Dep. 38:21–39:22, Sep. 1, 2017.

[74] *Id.* at 94:15–95:6.

[75] Gillers Dep. 219:21–221:22.

[76] *Id.* at 222:7–9.

15.     For the foregoing reasons, Professor Gillers simply misstates the facts of this case

and the law in concluding that:

> In deciding the amount of fee to award to class counsel, ***and to whom to award it***, the Court, as a fiduciary for the class including unnamed class members, needed *first* to know – ***and class counsel had a duty to tell it*** – who would be participating in any fee the Court in its discretion might award from the class recovery and the basis for the claim.[77]

The Court in this case undertook no inquiry into the question of "to whom to award it" and

accordingly never ordered the disclosure of fee agreements, as it was authorized to do under Rule

54(d)(2).  Professor Gillers similarly misstates the underlying policy in further concluding that,

> Labaton's contrary argument would keep the Court in the dark and deny it the very information it needed in order to decide how much of the undifferentiated settlement funds should go to counsel, and which counsel, and how much should go to the class.[78]

Counsel's respect for Rule 23(h) and Rule 54(d) neither "keep the Court in the dark" nor "deny it

. . . information."   On the contrary, the rule structure could not be clearer in setting forth

precisely what a court needs to do should it desire to review underlying fee agreements:  ask.

16.     In sum, it is my second expert opinion that Lieff Cabraser's duty to the class

action court did ***not*** – as a matter of class action law[79] – require that it "disclose [the knowledge

it had about] the Chargois Arrangement (and intended payment) to the Court before it awarded

fees from which Chargois would be (and was) paid."[80]

---

[77] Gillers Report at 73 (first and third emphases added, second emphasis in original).

[78] *Id.*

[79] I am not opining about Lieff Cabraser's duties under Massachusetts' Rules of Professional Conduct, but it is my understanding that Lieff Cabraser's expert on those rules concurs with this conclusion as well.

[80] *Id.* at 74.

### III.
### RULE 23 DOES NOT REQUIRE DISCLOSURE OF FEE ALLOCATION AGREEMENTS IN THE CLASS NOTICE

17.     As part of the class action ***settlement*** approval process, the "court must direct notice in a reasonable manner to all class members who would be bound by the proposal,"[81] and notice of a motion for ***attorney's fees*** by class counsel must be "directed to class members in a reasonable manner."[82]    Where settlement and fees are occurring simultaneously, Rule 23 envisions a single notice being sent to the class encompassing both,[83] as was done in this case.

18.     Professor Gillers advocates for the position that the class should have been informed of the Chargois Arrangement because information "that a lawyer who did no work to produce the class recovery and who accepted no legal responsibility for the work of others stood to receive more than $4 million from the class recovery . . . could reasonably have influenced members of the class in deciding whether to exercise the right to object to the disclosure regarding attorneys' fees."[84]    This is again a tendentious statement of the facts, at least as Lieff Cabraser knew them:  as just noted, there is no evidence in the record that Lieff Cabraser had knowledge that Chargois undertook no work on this specific case.

---

[81] Fed. R. Civ. P. 23(e)(1).

[82] Fed. R. Civ. P. 23(h)(1).

[83] Fed. R. Civ. P. 23(h) advisory committee's note to 2003 amendment ("In cases in which settlement approval is contemplated under Rule 23(e), notice of class counsel's fee motion should be combined with notice of the proposed settlement, and the provision regarding notice to the class is parallel to the requirements for notice under Rule 23(e).").

[84] Gillers Report at 76–77.

19.     Moreover, Professor Gillers's advocacy in this section is premised on class counsel's general fiduciary duty to the class[85] and on ethical rules (which are beyond the scope of my charge), not on Rule 23 itself – in this section, he does not cite a single provision of Rule 23's notice requirements nor a single Rule 23 notice case.   Similarly, at his deposition, he conceded that he knew of no cases requiring disclosure of fee allocation agreements in the class's notice and disclaimed any reliance on Rule 23.[86]   This is not surprising because the non-tendentious point – that class counsel must disclose fee-sharing agreements in the class's notice – is not supported by the text of Rule 23, nor the cases interpreting it.[87]

a.[88]     *Settlement notice.*   Rule 23(e)(1) requires that a court considering a proposed class action settlement "direct notice in a reasonable manner to all class members who would be bound by the proposal."[89]   Yet other than requiring that the notice be made "in a reasonable manner," Rule 23 does not dictate that the notice contain any specific content, with

---

[85] For a general discussion, *see* Rubenstein, 6 *Newberg on Class Actions*, *supra* note 4, at § 19:2; *see also* note 87, *infra.*

[86] Gillers Dep. 150:3–7 ("Q. Sir, you list some cases in this section, but none of the cases you cite hold that counsel must disclose fee allocations to class members, do they?  A. No."); *id.* at 150:17–22 ("Q. Can you cite us to a case that says that class counsel has the obligation to notify the unnamed class members; that is, the non-named plaintiffs, of a referral fee that's going to come out of class counsel's fee?  A. No."); *id.* at 156:20–157:1 ("You're seeking to impose a duty of disclosure of a fee division that no Court has yet imposed in any written decision, right? A. So far as I know, but it's not -- it's an analysis under the Massachusetts rules.  It's not an analysis under Rule 23.").

[87] In this section of his report, Professor Gillers cites three cases – a 1985 Eleventh Circuit case, a 1995 Third Circuit case, and a 1998 Southern District of Florida case – articulating class counsel's general fiduciary duties in the class action context.  Gillers Report at 77 & n.69.  None of these cases governs in this Circuit, but their general principles would not, in any case, reverse the clear language of the applicable Federal Rules of Civil Procedure.  *See* Part II(B)*, infra.*

[88] This paragraph is taken from Rubenstein, 3 *Newberg on Class Actions*, *supra* note 4, at § 8:17.

[89] Fed. R. Civ. P. 23(e)(2).

one caveat:  if a class is certified at the same time that a settlement is reached, the court must

issue notice that complies with both 23(c)(2)(B)'s certification notice requirements (that do

require specific content)[90] and 23(e)'s settlement notice requirement (which does not).[91]  Aside

from that scenario, the content of the settlement notice itself is dictated by two other aspects of

Rule 23(e):  the requirement that the settlement be fair, reasonable, and adequate[92] and the

guarantee that class members have the right to object to the settlement if, in their opinion, it does

not hit this mark.[93]  To safeguard class members' opportunity to object, notice must be

sufficiently clear and informative to make those opportunities meaningful.  Thus, Rule 23 does

not require that fee allocation agreements be explained to the class in the settlement notice.[94]

       b.[95]    *Fee notice.*  Rule 23(h)(1) requires that a court considering a motion for

reasonable attorney's fees and nontaxable costs in a certified class action direct notice to class

members "in a reasonable manner."[96]  Yet other than requiring that the notice be made "in a

reasonable manner," Rule 23 does not dictate any specific content that the notice must contain.

---

[90]  *See* Fed. R. Civ. P. 23(c)(2)(B) (enumerating seven items that must be contained in certification notice).  For a discussion, see Rubenstein, 3 *Newberg on Class Actions*, *supra* note 4, at § 8:12.

[91]  Fed. R. Civ. P. 23(e)(1) (requiring that notice be sent "in a reasonable manner").

[92]  Fed. R. Civ. P. 23(e)(2).

[93]  Fed. R. Civ. P. 23(e)(5).

[94]  Rule 23's settlement provisions require that parties seeking approval of a proposed settlement "file a statement identifying any agreement made in connection with the proposal."  Fed. R. Civ. P. 23(e)(3).  Courts have not read this to encompass fee allocation agreements, *see* Rubenstein, 5 *Newberg on Class Actions*, *supra* note 4, at § 15:12 & n.15, but even if they did, such a *court-filing* requirement does not automatically translate into a requirement that such agreements be made part of the class notice.

[95]  This paragraph is taken from Rubenstein, 3 *Newberg on Class Actions*, *supra* note 4, at § 8:25.

[96]  Fed. R. Civ. P. 23(h)(1).

The fee notice's content is primarily dictated by Rule 23(h)(2)'s guarantee that class members have the right to object to the fee motion.[97]   The right to object connotes that class members ought to be given sufficient time to do so, but it also means that class members must be given sufficient information to do so.   In the *Newberg* treatise,[98] and elsewhere,[99] I have strongly advocated for the position that class counsel should make their lodestar known to the court – and to the class – so as to assess the extent to which the proposed award reflects a multiplier of that lodestar.   I have similarly argued that fee allocation agreements should be made known to the class,[100] but I do so within the terms of the governing legal regime:   I contend that, using their authority under Rule 54(d)(2), courts should require greater disclosure of fee allocation agreements.   Although I support such an approach on policy grounds, I am transparent in conceding that, absent a court order, Rule 23 contains no requirement that fee allocation agreements be disclosed to the court nor therefore provided to the class in the court's notice.[101]

---

[97] Fed. R. Civ. P. 23(h)(2).

[98] *See* Rubenstein, 3 *Newberg on Class Actions*, *supra* note 4, at § 8:25.

[99] I individually appeared as an *amicus* in a California Supreme Court case that considered the question of whether California law should embrace a percentage or lodestar approach to class action fee awards so as to advocate in support of a rule requiring courts that use a percentage award to undertake a lodestar cross-check.   The Supreme Court embraced my argument in its ruling.   *Laffitte v. Robert Half Int'l Inc.*, 376 P.3d 672, 687 (Cal. 2016) ("The utility of a lodestar cross-check has been questioned on the ground it tends to reintroduce the drawbacks . . . in primary use of the lodestar method, especially the undue consumption of judicial resources and the creation of an incentive to prolong the litigation.   We tend to agree with the amicus curiae brief of Professor William B. Rubenstein that these concerns are likely overstated and the benefits of having the lodestar cross-check available as a tool outweigh the problems its use could cause in individual cases.") (some citations omitted).

[100] *See* Rubenstein, 5 *Newberg on Class Actions*, *supra* note 4, at § 15:12.

[101] Local rule may do so, *see, e.g.*, S.D.N.Y. Civ. R. 23.1, *supra* note 16, but no such Rule exists in this District.

20.     In sum, it is my third expert opinion that neither Rule 23 itself, nor class action notice cases more generally, created a duty upon the Lieff Cabraser firm to disclose the allocation of fees to Chargois, as it understood that allocation at the time, to the class in the class's notice.

* * *

21.     I have testified that:

- ***Rule 23 does not require disclosure of fee allocation agreements absent judicial order, courts rarely so order, and Judge Wolf did not do so in this case.***

- ***Professor Gillers's four attempts to create a disclosure requirement by advocating around the text of Rules 23 and 54 are unconvincing on the law and on the facts of the case as applied to Lieff Cabraser***.

- ***Rule 23 does not require disclosure of fee allocation agreements in the class's notice.***

March 26, 2018                                  _____
                                                William B. Rubenstein

# EXHIBIT A

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

## EXHIBIT A
Partial List of Documents Reviewed by Professor Rubenstein
(other than case law and scholarship on the relevant issues)

*I incorporate by reference the list of 77 documents contained in Exhibit B to the report I submitted to the Special Master on July 31, 2017.  See Exhibit B – Expert Declaration of William B. Rubenstein (July 31, 2017).*

### A. ECF Documents
1. Summary Notice of Pendency of Class Actions, Proposed Settlement, Settlement Hearing, Plan of Allocation, and Any Motion for Attorneys' Fees, Litigation Expenses and Services Awards, ECF No. 95-5
2. Notice of Pendency of Class Actions, Proposed Settlement, Settlement Hearing, Plan of Allocation, and Any Motion for Attorneys' Fees, Litigation Expenses and Services Awards, ECF No. 95-3
3. [Proposed] Memorandum of Law in Support of Plaintiffs' Assented-to Motion for Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class, ECF No. 101-1
4. [Proposed] Memorandum of Law in Support of Lead Counsel's Motion for an Award of Attorneys' Fees, Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, ECF No. 103-1
5. Declaration of Lawrence A. Sucharow in Support of (A) Plaintiffs' Assented-to Motion for Final Approval of Proposed Class Settlement and Plan of Allocation and Final Certification of Settlement Class and (B) Lead Counsel's Motion for an Award of Attorneys' Fees Payment of Litigation Expenses, and Payment of Service Awards to Plaintiffs, ECF No. 104

### B. ECF Documents from Other Cases
1. Plaintiffs' Class Action Complaint, Andover Companies Employee Savings and Profit Sharing Plan v. State Street Bank and Trust Company, No. 1:12-cv-11798, ECF No. 1 (D. Mass. Sept. 12, 2012)
2. Class Action Complaint, Henriquez v. State Street Bank and Trust Company, No. 1-11-cv-12049, ECF No. 1 (D. Mass. Nov. 18, 2011)
3. Declaration of Daniel P. Chiplock in Support of Motion for Attorneys' Fees and Reimbursement of Expenses Filed on Behalf of Lieff Cabraser Heimann & Bernstein, In re Bank of N.Y. Mellon Corp. Forex Transactions Litig., LLP, No. 1:12-md-02335, ECF No. 622-1 (Aug. 17, 2015)

### C. Deposition Transcripts
1. Transcript of Deposition of Lawrence A. Sucharow (Sept. 1, 2017)

2. Transcript of Deposition of Eric Belfi (Sept. 5, 2017)
3. Transcript of Deposition of Daniel P. Chiplock (Sept. 8, 2017)
4. Transcript of Deposition of Lynn Lincoln Sarko (Sept. 8, 2017)
5. Transcript of Deposition of Robert L. Lieff (Sept. 11, 2017)
6. Transcript of Deposition of Damon J. Chargois (Oct. 2, 2017)
7. Transcript of Deposition of Chris Keller (Oct. 13, 2017)
8. Transcript of Deposition of Stephen M. Gillers (Mar. 20, 2018)
9. Transcript of Deposition of Stephen M. Gillers (Mar. 21, 2018)
10. Transcript of Deposition of Camille F. Sarrouf (Mar. 21, 2018)

### D. *Other Documents Generated in Special Master Process*

1. Letter from Eric J. Belfi to George Hopkins (Sept. 24, 2010)
2. Letter from Eric J. Belfi to George Hopkins (Feb. 8, 2011)
3. Email from Robert L. Lieff to Garrett Bradley et al (Apr. 25, 2013)
4. Email from Damon Chargois to Garrett J. Bradley et al (Apr. 25, 2013)
5. Email from Daniel P. Chiplock to Robert L. Lieff et al (Jun. 14, 2016)
6. Email from Garrett J. Bradley to Christopher J. Keller et al (Jul. 7, 2016)
7. Email from Christopher J. Keller to Eric J. Belfi (Sept. 2, 2016)
8. Consolidated Response by Labaton Sucharow LLP, Lieff Cabraser Heimann & Bernstein LLP, and Thornton Law Firm LLP to Special Master's July 5, 2017 Request for Supplemental Submission (Aug. 1, 2017)
9. Expert Declaration of Camille F. Sarrouf (Oct. 31, 2017)
10. Response by Labaton Sucharow LLP to Special Master's September 7, 2017 Request for Supplemental Submission (Nov. 3, 2017)
11. Response by Lieff Cabraser Heimann & Bernstein LLP to Special Master's September 7, 2017 Request for Supplemental Submission (Nov. 3, 2017)
12. Ethical Report for Special Master Gerald E. Rosen (Feb. 23, 2018)
13. Declaration of George Hopkins (Mar. 15, 2018)

# EXHIBIT B

*Arkansas Teacher Retirement System et al.*
*v.*
*State Street Bank and Trust Co.*
C.A. No. 11-10230-MLW; 11-12049-MLW; 12-11698-MLW
Expert Declaration of William B. Rubenstein

**EXHIBIT B**
Methodology for Empirical Study of
Court Orders Relating to Fee Agreements in Class Action Cases

On March 9, 2018, we searched the dockets database in Bloomberg Law using the query <"class action" settlement> for cases filed in all District courts within the First Circuit since February 2, 2011, the date this action was filed. This returned 1,226 dockets. We then examined each docket to determine (1) whether the case was in fact a class action and (2) whether the case had in fact reached the preliminary approval stage. Applying these criteria, we identified a total of 127 class action settlements. Within each of those 127 dockets, we then examined all filings related to the settlement, including: preliminary and final approval motions, memos, exhibits, and declarations; fee petitions; settlement agreements; court orders and opinions; objections; and hearing transcripts. We searched these filings for (A) any evidence that the court had directed class counsel to disclose any agreements regarding the manner in which they allocated fees; (B) submissions from the plaintiffs' attorneys indicating that they had entered into fee agreements amongst themselves, with outside counsel, or with the plaintiffs; and (C) any other evidence that the court or attorneys discussed fee-allocation agreements.

In 122 of 127 dockets, we found nothing more than clear-sailing agreements and references to class counsel's contingency-fee agreements with the named plaintiffs. Five of the dockets we reviewed contained more substantial discussions of fee agreements:

- *Case 1.* The court asked the lawyers during a conference if "there [was] any fee agreement with anybody in this case," to which class counsel responded by noting that they had entered into a contingency-fee agreement with the named plaintiff that they could submit if the court desired.[1] We found no evidence that the court followed up on this matter, and class counsel received the fees it requested.

- *Case 2.* The plaintiffs' attorneys disclosed *sua sponte* that two class counsel firms that were jointly representing one of the named plaintiffs had agreed to evenly divide their fees regardless of their individual lodestars.[2] Similarly, we found no evidence that the court followed up on this matter, and the court granted class counsel's fee petition for the amount requested without commenting on the agreement.

---

[1] *Rossmeisl et al v. A.C. Moore Arts & Crafts, Inc.*, Docket No. 1:17-cv-10219 (D. Mass. Feb 08, 2017).

[2] *In Re: Collecto, Inc., Telephone Consumer Protection Act (TCPA) Litigation*, Docket No. 1:14-md-02513 (D. Mass. Feb 19, 2014).

**B-1**

- *Cases 3-5.*  The final three cases[3] were the Massachusetts, New Hampshire, and Rhode Island versions of forty-six state-wide class actions against Sprint litigated by the same group of attorneys.  Class counsel in all three cases disclosed that the group of firms that had settled the entire set of cases with the defendant had agreed to share a portion of the fee awards they received from each individual action. The courts in all three cases signed near-identical fee-approval agreements and do not appear to have inquired further about the fee-sharing agreement.

Although it is possible that we missed some information in reviewing more than 1,000 dockets in a short period of time, I am confident that our data provide empirical support for the conclusion that courts rarely request fee allocation agreements and that class counsel do not typically volunteer fee-allocation agreements without specific instruction from the court.

---

[3] *Kingsborough et al v. Sprint Communications Company L.P. et al.*, Docket No. 1:14-cv-12049 (D. Mass. May 08, 2014); *Longa Revocable Trust et al v. Sprint Communications Company, L.P.*, Docket No. 1:11-cv-00172 (D.N.H. Apr 11, 2011); *Coombs et al v. Sprint Communications Company, L.P.*, Docket No. 1:11-cv-00144 (D.R.I. Apr 06, 2011).

**B-2**