# EX. 235

**Professor William Rubenstein**

1

Volume:  1

Pages: 1-223

Exhibits:  1-5

JAMS

Reference No. 1345000011/C.A. No. 11-10230-MLW

------------------------------------

In Re:  STATE STREET ATTORNEYS FEES

------------------------------------

BEFORE: Special Master Honorable Gerald Rosen,

United States District Court, Retired

DEPOSITION of PROFESSOR WILLIAM B. RUBENSTEIN

April 9, 2018, 9:12 a.m.-2:52 p.m.

JAMS

One Beacon Street

Boston, Massachusetts

Court Reporter:  Paulette Cook, RPR/RMR

Page 2

```
 1  A P P E A R A N C E S :
 2
 3      DONOGHUE BARRETT & SINGAL
 4      By William F. Sinnott, Esq.
 5      Elizabeth J. McEvoy, Esq.
 6      One Beacon Street, Suite 1320
 7      Boston, Massachusetts 02108-3106
 8      617-720-5090/wsinnott@dbslawfirm.com
 9              and
10      JAMS
11      By Linda Hylenski, Esq. (via teleconference)
12      150 West Jefferson
13      Detroit, Michigan 48226
14      313-872-1100
15      Counsel for the Special Master
16
17
18      NIXON PEABODY, LLP
19      By Brian T. Kelly, Esq.
20      100 Summer Street
21      Boston, Massachusetts 02110-2131
22      617-345-1065/bkelly@nixonpeabody.com
23      Counsel for the Thornton Law Firm
24          [appearances continued]
```

Page 3

```
 1  A P P E A R A N C E S (cont.):
 2
 3      LIEFF, CABRASER, HEIMANN & BERNSTEIN, LLP
 4      By Richard M. Heimann, Esq.
 5      Robert L. Lieff, Esq.
 6      275 Battery Street, 29th Floor
 7      San Francisco, California 94111
 8      415-956-1000/rheimann@lchb.com
 9      Counsel for Leiff Cabraser
10
11      CHOATE HALL & STEWART, LLP
12      Joan A. Lukey, Esq. (joined via
13      teleconference a.m. - present in person p.m.)
14      Stuart M. Glass, Esq.
15      Two International Place
16      Boston, Massachusetts 02110
17      617-248-5000/joan.lukey@choate.com
18              and
19      LABATON SUCHAROW, LLP
20      By Michael Canty, Esq.
21      140 Broadway
22      New York, New York 10005
23      212-907-0882/mcanty@labaton.com
24      Counsel for Labaton Sucharow, LLP
```

Page 4

```
 1
 2  ALSO PRESENT: Michael Thornton, Esq.
 3  Professor Stephen M. Gillers
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 5

```
 1              I N D E X
 2
 3  Examination of:                          Page
 4  PROFESSOR WILLIAM B. RUBENSTEIN
 5  By Mr. Sinnott                             8
 6  By Mr. Heimann                           207
 7  By Mr. Kelly                             215
 8
 9
10
11          E X H I B I T S
12  No.                                      Page
13  Exhibit 1    Expert Report of William      9
14               B. Rubenstein
15  Exhibit 2    Expert Declaration of       129
16               William B. Rubenstein
17               7/31/17
18  Exhibit 3    Newberg on Class Actions    130
19               13:40 (5th ed.)
20  Exhibit 4    Document                    210
21               TLF-SST-043022-24
22  Exhibit 5    Document                    211
23               TLF-SST-052975-80
24
```

In Re:  State Street Attorneys Fees

Professor William Rubenstein
April 9, 2018

Page 6

1    P R O C E E D I N G S

2

3    **MR. SINNOTT:** Good morning, everyone.

4    Professor, thank you for being here.

5    Paulette, if the witness could be sworn.

6    (Witness duly sworn.)

7    **MR. SINNOTT:** Good morning, everyone.

8    This is the deposition of Professor Rubenstein.  My

9    name is Bill Sinnott, S-I-N-N-O-T-T.  I'm counsel to

10   the special master.

11   The special master has been appointed by

12   Judge Mark Wolf in connection with Arkansas Teacher

13   Retirement System versus State Street Bank & Trust

14   Company, number 11-cv-10230-MLW.

15   The special master is The Honorable

16   Gerald Rosen who is at my right formerly of the

17   United States District Court in Detroit, Michigan.

18   Also on the special master's team to my

19   left is Attorney Elizabeth McEvoy also of Barrett &

20   Singal.  To the special master's right is Professor

21   Stephen Gillers.

22   We expect that Attorney Linda Hylenski

23   will join us momentarily.  She is also on the

24   special master's team.  And I would imagine that

Page 7

1    we'll have other participants join us by telephone

2    during the course of the morning and afternoon.

3    At this time I would ask that the

4    participants in the room identify themselves and

5    their affiliation for purposes of the record.  And,

6    Mike, if we could start with you.

7    **MR. CANTY:** Michael Canty, Labaton

8    Sucharow.

9    **MR. GLASS:** Stuart Glass, Choate Hall &

10   Stewart for Labaton firm.

11   **MR. HEIMANN:** Richard Heimann for Lieff

12   Cabraser.

13   **MR. LIEFF:** Robert Lieff, Lieff

14   Cabraser.

15   **MR. THORNTON:** Michael Thornton,

16   Thornton Law Firm.

17   **MR. KELLY:** Brian Kelly -- good

18   morning -- of Nixon Peabody on behalf of the

19   Thornton Law Firm.

20   **MR. SINNOTT:** All right.  Good morning,

21   everyone.

22   And I would just caution you that, as

23   usual, we have at least one phone participant today

24   and probably several so that I could ask -- if I

Page 8

1    could ask that the witness and questioners keep

2    their voices up so that the folks on the phone can

3    hear, and I would offer the same caution when the

4    telephone participants join us, that if they can't

5    hear something, that they let us know at the

6    earliest possible moment they have trouble hearing

7    us so that we don't have to reread the record or

8    repeat testimony.

9    All right.  As I indicated, this is the

10   deposition of Professor William Rubenstein.

11   **EXAMINATION**

12   **BY MR. SINNOTT:**

13

14   Q.  Good morning, professor.

15   **A.  Good morning.**

16   Q.  And, sir, you have provided an expert report

17   to the special master; is that correct, sir?

18   **A.  Yes.**

19   Q.  All right.

20   **MR. SINNOTT:** Paulette -- Madam Court

21   Reporter, if this document could be marked as the

22   next exhibit.

23   **MR. HEIMANN:** Do you want to swear the

24   witness?

Page 9

1    **MR. SINNOTT:** He's been sworn.  Do you

2    think we need to do it again, Richard?

3    **MR. HEIMANN:** No.

4    **THE SPECIAL MASTER:** Double sworn.

5    **MR. SINNOTT:** As soon as that's marked,

6    I'll show you that document.  Take your time,

7    Paulette.

8    (Exhibit 1 marked

9    for identification.)

10   **MR. SINNOTT:** Thank you, Madam Court

11   Reporter.

12   **BY MR. SINNOTT:**

13   Q.  And, sir, viewing Exhibit 1, is that the

14   expert report that you submitted to the special

15   master in this matter?

16   **A.  Yes. I've submitted two.  This is the**

17   **second one.**

18   Q.  All right.  The first one that you submitted

19   was in approximately -- on approximately July 31st

20   of 2017?

21   **A.  That sounds right, yes.**

22   Q.  Okay.  Now, sir, with respect to that

23   document, did you also submit on a prior occasion a

24   CV?

Page 10

1  A.  With my first expert declaration on July 31,
2  2017 I submitted a CV.
3  Q.  All right, sir.  With respect to your CV,
4  which I won't mark as an exhibit although we do have
5  that document, is it fair to say that you have a
6  background and experience in class actions?
7  A.  Yes.  Yes, I was a practitioner in class
8  action law for about a decade, and I've been a
9  teacher and scholar and academic writing about class
10  actions for over 20 years now -- 25 years.
11  Q.  All right.  And you consider yourself an
12  expert in the field?
13  A.  I do.
14  Q.  And specifically do you consider yourself an
15  expert in the area of attorney fee awards?
16  A.  In class actions in particular, yes.
17  Q.  Okay.  So all aspects of that class actions
18  would fall under that category of expertise?
19  A.  Well, I just finished writing a ten-volume
20  treatise on --
21     PHONE LINE CONFERENCE:  The following
22  participant has entered the conference:  Linda
23  Hylenski.
24  A.  So I'll have to confess that, yeah, I have

Page 11

1  expertise on the whole gamut.
2  Q.  With respect to your prior experience as an
3  expert, I believe in your CV -- strike that.
4     In your previous report on July 31st of
5  2017 in paragraph 8 you described some of your
6  expert witness work for and against a number of
7  firms involved in this matter as well as current and
8  past legal work on behalf of the Thornton Law Firm
9  including at the inception of this case.
10     Could you describe for the special
11  master and participants what your experience was
12  first of all with Lieff Cabraser in the past?
13  A.  Yeah, I don't have the document you're
14  referring to in front of me.
15     THE WITNESS:  Do you have the July --
16     MR. HEIMANN:  I don't unfortunately.
17  A.  But I think I wrote there that I've been an
18  expert witness hired by the Lieff Cabraser firm I
19  think two, three times.
20  Q.  Okay.
21  A.  I've been an expert witness and a lawyer
22  against the Lieff Cabraser firm probably five or six
23  times.
24  Q.  All right, sir.  And how about your prior

Page 12

1  work with or against Labaton?
2  A.  I've been hired as an expert witness by the
3  Labaton firm I think two or three times.  I don't
4  know exactly.  And I've probably been an expert
5  witness against them, but I don't know exactly.
6     Again, I don't know exactly what I wrote
7  in that paragraph.  I'd have to look at it again.
8  Q.  All right, sir.  Just your best memory is
9  fine.  Thornton Law Firm same question, please.
10  A.  I've worked with the Thornton Law Firm for
11  probably a decade on a number of different
12  occasions, and on those occasions I would say that I
13  worked not as an expert witness for them but as an
14  expert consultant providing consulting advice and
15  legal advice to them.
16  Q.  All right, sir.  And Keller Rohrback, same
17  question.
18  A.  I worked with Keller Rohrback as potentially
19  co-counsel on a case, and I've worked as an expert
20  witness for them on two or three occasions in the
21  past, and I probably worked as an expert witness
22  against them as well.
23  Q.  Have you worked for or against any of the
24  other firms that were listed on the joint fee

Page 13

1  petition to your knowledge?
2  A.  I don't -- most of the other firms on the
3  joint fee petition were smaller ERISA firms my
4  memory is, and I wasn't familiar with any of those.
5  Q.  All right.  But you do remember Keller
6  Rohrback?
7  A.  Of course, yes.
8  Q.  Have you ever been retained by a defense
9  firm or a class objector?
10  A.  Yes.  Both.
11  Q.  Could you describe those for us, please?
12  A.  I've been retained by defense firms on a
13  number of occasions.  I'd have to go back through my
14  CV.  I'm working for a large insurance company right
15  now.  I've worked for a handful of Fortune 500
16  companies as expert witness in class action cases
17  and attorneys' fees cases.
18     If you want, we can go through my CV,
19  and I can point out the particular cases that I've
20  worked for for defendants.
21  Q.  No, sir, but if you could just give us a
22  general idea as to the scope of your work on behalf
23  of the defendants?
24  A.  Yeah, I've been an expert witness in about

Page 14

1   close to a hundred cases -- 75 to a hundred cases.
2   A lot of my work has been on attorneys' fees, and I
3   get asked this question are you more plaintiff
4   oriented or defense oriented.
5       A lot of the stuff that I do isn't
6   plaintiff versus defendant per se.  A lot of times
7   it's plaintiffs fighting with each other or
8   questions on whether the plaintiff should get a
9   certain amount of money from the class.
10      But there are a number of occasions
11  where I've been hired by defendants both to defend
12  against fee petitions in class action cases.
13      I've also testified for defendants on
14  questions that were -- I've also testified for
15  defendants on questions about the binding effect of
16  a class action settlement and whether it precludes a
17  later class action on a number of occasions.
18      I think -- again, I'd have to look at my
19  CV to go through it, but I think those two sets of
20  issues, attorneys' fees and preclusive effect, are
21  the main ones I've worked with defendants on.
22  Q.  All right, sir.  Thank you.
23      How about class objectors?  Have you
24  done any work on their behalf?

Page 15

1   A.  Yes.
2   Q.  Could you describe that, please?
3   A.  Sure.  I was hired as an expert witness for
4   objectors in one of the cases I litigated against --
5   I was an expert witness against Lieff Cabraser, and
6   I was an expert witness on some of the practices
7   involved in that case hired by objectors to a
8   settlement in that case.
9       I've also represented objectors in
10  vouching that they should get attorneys' fees in
11  certain instances where their work contributed to
12  the class' relief.
13  Q.  All right, sir.  Thank you.
14      Sir, with respect to your time here
15  today, are you being compensated?
16  A.  Yes.
17  Q.  And what's your rate of compensation?
18  A.  I think it's $1100 an hour.
19  Q.  And approximately how many hours have you
20  spent on this case up until this point?  Estimate.
21  A.  Going back a year from -- I have no idea.
22  Q.  Can you estimate whether it's more than a
23  hundred hours?
24  A.  I can't.  If you're asking me have I been

Page 16

1   paid more than $100,000, the answer would be yes.
2   Q.  And was your rate the same with respect to
3   the work that you did in the -- on your July 31,
4   2017 declaration?
5   A.  Yes.
6   Q.  So it was $1100 per hour?
7   A.  Yes.  To be clear, I charge a flat fee for a
8   written declaration.  Once I've submitted the
9   written declaration, I charge an hourly rate of
10  $1100 an hour.  I think that's this contract.
11      The hourly rate has changed in the last
12  year.
13  Q.  As you prepared that July 31, 2017
14  declaration, did counsel inform you about the
15  existence of a referral agreement with Chargois &
16  Herron or with Damon Chargois?
17  A.  I don't remember hearing about that issue
18  until after later in the proceedings.
19  Q.  Have you prepared for your testimony here
20  today?
21  A.  Yes.
22  Q.  And how did you prepare for it?
23  A.  I read over a number of documents in the
24  case, depositions from last week.  I read Professor

Page 17

1   Gillers' report again.  I read -- looked at his
2   depositions.  I looked over my report, and I had a
3   telephone conference with the counsel who've
4   retained me.
5   Q.  And when was that telephone conference?
6   A.  Friday.
7   Q.  And, sir, you indicated in preparation for
8   today you reviewed documents as well as depositions.
9   Let me direct your attention to your fact statement
10  on pages 1 to 8 of the instant report, the report --
11  strike that.  Wrong affidavit.
12      Sir, with respect to the facts that
13  you've relied on in this case, how were those
14  provided to you?
15  A.  Well, again, we're talking about the present
16  testimony or last July or both?
17  Q.  Your present testimony first.
18  A.  Present testimony?  I looked at the facts
19  that were provided to Professor Gillers by your team
20  of course, and I -- again, I've read over a number
21  of the depositions, and I learned about facts from
22  reading the depositions.
23      And then I've talked to the counsel who
24  retained me about some of the facts of the case as

Page 18

1  well.  So my factual understanding I think has those
2  three bases to it.
3  Q.   All right.  And tell me with respect to the
4  documents that you've listed in your expert report,
5  how were those documents selected for you to review?
6  A.   We're now talking about the current report?
7  Q.   Yes, sir.
8  A.   So we're in Exhibit A.
9  Q.   That's right.
10  A.   I know when Lieff Cabraser first called me
11  about this, they sent me Professor Gillers' report,
12  and I think from there probably everything are
13  things that I asked for.  It may be that they
14  supplied me some documents.  I don't remember.
15  I tended to do my own research.  I like
16  getting on PACER and going through the whole PACER
17  history of the case and looking at all the
18  documents.  I tend to do that in almost every case
19  I'm involved in.
20  In fact, I often do it before I'm
21  retained to be sure I'm understanding the case and
22  the whole thing.
23  They may have sent me a few documents at
24  the beginning of this, but the rest of this is

Page 19

1  probably as I started reading I asked them for.  I
2  know that's true of a lot of these deposition
3  transcripts.  I asked for them.  I was interested in
4  reading them.
5  Q.   So with respect to those deposition
6  transcripts, you list ten of them.
7  Did you read the entire transcript?  Did
8  you read selected portions?  A combination?  What's
9  your best memory on that?
10  A.   Well, I definitely did not read portions
11  selected by counsel who hired me.  I asked for the
12  transcript of the deposition, and I looked through
13  them.
14  I read some of them more closely than
15  others.  They're kind of -- were fascinating reads.
16  But some of them I skipped through.  I can't say I
17  read every word of every one of them.
18  Q.   And other than the documents that you've
19  listed in Exhibit A to your expert report, did you
20  review any additional documents?
21  A.   You know, I try to be complete when I do
22  this.  And I have a system with my research
23  assistants to make that work.
24  So the only thing I would have -- I

Page 20

1  would guess I would have added to this -- again, I
2  say at the beginning everything I read last summer.
3  And then anything that came up subsequent to my
4  written report, which I think were the depositions
5  last week, would probably be what I read beyond
6  this.
7  Q.   All right, sir.  And you mentioned that you
8  had a research assistant or assistants provide help
9  to you in this case?
10  A.   Yes.
11  Q.   What did -- first of all, how many research
12  assistants worked on this case?
13  A.   On this phase of the case, I think two.
14  Q.   All right.  And on the previous phase of the
15  case?
16  A.   I think four.
17  Q.   And you had four working -- when you say
18  previous phase of the case, is that in preparation
19  for your July 31, 2017 declaration?
20  A.   That's correct.  And in both instances we
21  did a lot of empirical work where we looked at
22  reported cases and crunched some numbers and ran
23  data, and the students did a lot of that work.
24  Here I think my students went through

Page 21

1  like 1200 cases from the District of Massachusetts
2  in the last six years.
3  Q.   And that was the empirical study that you
4  discuss in your report?
5  A.   Correct.
6  Q.   Sir, with respect to the opinions in your
7  March 26, 2018 report, who wrote those opinions?
8  A.   I did.
9  Q.   And did you have any assistance in writing
10  those opinions?
11  A.   No.
12  Q.   And is it fair to say that your research
13  assistants provided some assistance to you?
14  A.   Again, they primarily provided assistance
15  doing the empirical work.  Other than that,
16  everything here is me.  They didn't -- I don't think
17  there's any even legal research they did here for
18  this.
19  Q.   All right.  So your research assistants
20  didn't do any of the legal research.  They were
21  strictly confined to the empirical study?
22  A.   Correct.
23  Q.   So you did your own legal research?
24  A.   I do.

Page 22

1 Q.  All right.  Now, sir, let me direct your
2 attention to your expert report and direct your
3 attention to page 3 first of all.
4     The heading -- your first of three
5 sections in your report I believe states that Rule
6 23 does not require disclosure of fee agreements
7 absent judicial order, and Judge Wolf issued no such
8 order in this case.
9     Have I correctly read that title for
10 Section 1?
11 A.  Yes.
12 Q.  And, sir, is it fair to say that your basic
13 premise contained in paragraph 3 is -- or one of
14 your basic premises is that the aggregate fee is
15 allocated among the lawyers whose work benefited the
16 class?  Did I read that correctly?
17 A.  In paragraph 3 the first sentence --
18     PHONE LINE CONFERENCE: The following
19 participant has entered the conference:  Joan.
20 A.  In paragraph 3 the first sentence identifies
21 the two phases of the fee petition and fee work in a
22 case like this, the petition phase where the Court
23 decides in the aggregate how much the attorneys are
24 getting and then the allocation phase where the

Page 23

1 attorneys or the Court divide the fee up, and I do
2 state precisely what you said in the second of those
3 phases "the aggregate fee is allocated among the
4 lawyers whose work benefited the class."
5 Q.  All right.  But that's relegated to the
6 allocation phase; is that correct?
7 A.  I'm not sure what "that" means in your
8 question.  I'm sorry, I don't mean to be difficult.
9     The allocation phase is when the fee is
10 split among the attorneys.
11 Q.  Right.  But with respect to your statement
12 "the aggregate fee is allocated among the lawyers
13 whose work benefited the class," are you speaking
14 about the allocation phase with respect to that
15 clause?
16 A.  Yeah.  I use that phrase, that's correct.  I
17 think it's an important distinction in a big case
18 like this that there are these two phases; that the
19 fee is set in the aggregate in the first phase.
20 That's the important phase 'cause that's when the
21 class' money is being taken from the class.  And
22 that's the key to the whole thing in my opinion.
23     And then once the Court has decided that
24 that's a fair fee to take from the client, then the

Page 24

1 question of how the lawyers divide that fee up among
2 themselves is what I refer to as the allocation
3 phase which I think has less pertinence for the
4 class in most cases.
5     THE SPECIAL MASTER: Does the Court have
6 authority in both phases however --
7     THE WITNESS: Absolutely.
8     MR. HEIMANN: He hadn't finished the
9 question.
10     THE SPECIAL MASTER: Thank you, Richard.
11 Does the Court have authority in both
12 phases as to both the aggregate fee and the ultimate
13 allocation?
14     THE WITNESS: Yes.  The Court -- yes.
15 The Court has the authority in both phases, absolute
16 authority in terms of how much money is taken from
17 the class.
18     And I think that's the key phase, and if
19 we refer to the Court as a fiduciary for the absent
20 class members in that phase.  And then in the
21 allocation phase it's the allocation of money coming
22 out of a class action in front of the Court, and the
23 Court has the authority to decide.
24     THE SPECIAL MASTER: But the Court would

Page 25

1 also have authority in the first phase as to
2 allocation if it saw something that it deemed unfair
3 to the class before it approved the aggregate fee,
4 yes?
5     THE WITNESS: Judge, I think you're
6 suggesting in some sense that there could be
7 allocational instances that would arise in the
8 second phase that might affect the class, and you
9 might think about them during the first phase.
10     THE SPECIAL MASTER: No, that's not what
11 I'm suggesting.
12     THE WITNESS: Okay.  Try again.  I'm
13 sorry.
14     THE SPECIAL MASTER: If there is
15 something that the Court sees in what you say is the
16 first phase -- I'm calling it the "fairness hearing"
17 at which a settlement is approved --
18     THE WITNESS: Yeah.
19     THE SPECIAL MASTER: -- and all
20 allocations, both allocations among class members
21 but also allocations as to fees among attorneys, the
22 Court has authority in that first phase if it sees
23 something in the allocation that it believes is
24 inappropriate or perhaps in some way unfair to the

Page 26

1 class, correct?
2 **THE WITNESS:** I feel like what you're
3 saying is if the Court undertakes the allocation as
4 part of the fee petition phase, in that instance
5 it's essentially the way you're describing it
6 collapsed what I'm describing as two separate phases
7 into one. And its authority would be there.
8 **THE SPECIAL MASTER:** Before the fee is
9 awarded?
10 **THE WITNESS:** Again, most courts don't
11 allocate before the fee is awarded.
12 **THE SPECIAL MASTER:** I'm not asking
13 about most courts.
14 I'm only asking you if the Court has
15 authority at that phase to make decisions about
16 allocation?
17 And then I'll try -- after you answer
18 that question, I'll try a hypothetical on you.
19 **MR. HEIMANN:** Well, that is a
20 hypothetical, judge.
21 **THE SPECIAL MASTER:** No, that is not.
22 The first part is not --
23 **MR. HEIMANN:** Well --
24 **THE SPECIAL MASTER:** -- a hypothetical.

Page 27

1 It's a very direct question.
2 **MR. HEIMANN:** All right. Then I object
3 to it if it's not a hypothetical.
4 **THE SPECIAL MASTER:** Is there anything
5 about the question you don't understand, professor?
6 **THE WITNESS:** I'm a little -- just to be
7 very clear, you're asking me what the law -- what my
8 opinion of what the law is?
9 **THE SPECIAL MASTER:** Yes.
10 **THE WITNESS:** Yes. And you're asking me
11 if the Court -- I've kind of -- I write a treatise.
12 I try to describe how courts do this, and I've
13 described this as a two-stage process.
14 You're asking me, hey, if a Court does
15 both stages at stage one does it have the authority
16 to do it that way. Yeah, I guess it does. I've not
17 seen courts do that, but I don't think they lack the
18 authority to do that.
19 **THE SPECIAL MASTER:** Okay. So if a
20 Court sees an agreement -- this is the hypothetical
21 part.
22 If a Court sees the agreement -- sees an
23 agreement of the allocation of fees before -- before
24 it has actually approved the settlement and the fees

Page 28

1 for the attorneys, you would agree that the Court at
2 that point could question about the allocation?
3 First could raise questions about the allocation?
4 **THE WITNESS:** So as I understand the
5 question, if allocational information is provided to
6 the Court or the Court asks for it and comes upon it
7 prior to what I'm describing as the allocation
8 phase, does the Court have the authority to look
9 into that question? Yes.
10 **THE SPECIAL MASTER:** And you would agree
11 that the Court also has authority if it finds the
12 allocation in any way unfair to reject the proposed
13 allocation and either reallocate it or perhaps give
14 some of it to the class?
15 **THE WITNESS:** A Court has authority over
16 the allocation of attorneys' fees in a class action.
17 And if the Court finds the proposed allocation
18 unacceptable from the Court's point of view, the
19 Court has the authority to remedy that.
20 In the Agent Orange case, for instance,
21 that your experts talked about, the Court
22 reallocated the money among the attorneys because it
23 wasn't happy with the way the agreements did it.
24 Could the Court instead of reallocating

Page 29

1 among the attorneys take some of the allocation and
2 return it to the class? I imagine it could. I've
3 not seen a Court do that precisely because they
4 separate these two phases. Once it's been decided
5 that the aggregate fee is fair, it's unlikely that
6 we need to return the money to the class.
7 But I doubt the Court lacks the
8 authority to do that.
9 **THE SPECIAL MASTER:** All right. Thank
10 you. In fact, on footnote 5 in that section, it's
11 on page 3.
12 **THE WITNESS:** Yes.
13 **THE SPECIAL MASTER:** You call that out
14 specifically, don't you?
15 Quoting from One Class Action Attorney
16 Fee Digest May of 2007. You say -- after the quote
17 you say, "Technically the Court has the power to
18 decide which plaintiffs' attorneys get what amount
19 of money."
20 And then you go on to say, "But no judge
21 in her right mind wants to undertake this task
22 particularly in cases involving large number of
23 attorneys."
24 We'll put aside the question of whether

Page 30

1 judges are in their right mind when they see
2 something they don't like.
3      And then --
4      MR. HEIMANN: I object to that comment,
5 your Honor.
6      THE WITNESS: That's not what I said.
7      THE SPECIAL MASTER: I'm putting it
8 aside, Richard.
9      MR. HEIMANN: I object to the comment.
10      MR. GLASS: I join in that objection.
11      THE SPECIAL MASTER: And then you say,
12 "Yet, judicial involvement is occasionally
13 necessarily particularly as lead counsel is not a
14 disinterested allocator."  And then you quote In Re:
15 Diet Drugs Product Liability Litigation Judge Ambro
16 concurring "counsel have inherent conflicts."
17      "They make recommendations on their own
18 fees and thus have a financial interest in the
19 outcome.  How much deference is due the fox who
20 recommends how to divvy up the chickens?"  And
21 there's a question mark at the end of that.
22      That would certainly indicate that you
23 believe that the Court has the authority to either
24 reallocate fees before approving the fees or --

Page 31

1 among counsel or to take some of the fees that were
2 going to be allocated to counsel and give some of it
3 to the class?
4      MR. HEIMANN: Objection.
5      THE WITNESS: Yeah, I would only tweak
6 the last thing you say in the sense that's saying
7 give some of the fees that were going to be
8 allocated to counsel, I think I say give some of the
9 fees that the fee petition in the petition phase
10 were going to go to counsel.
11      And as a remedy for misallocation, the
12 Court could return some of that money to the class.
13 I think the Court would have that authority, yes.
14      THE SPECIAL MASTER: Okay.  Thank you.
15      BY MR. SINNOTT:
16 Q.   And just to follow up on that, professor,
17 when Judge Ambro writes that "counsel have inherent
18 conflicts," do you agree with that?
19 A.  Well, again, what he's referring to here is
20 something very specific.  So let's -- let me zero in
21 on it.
22      The way I'm describing this, there are
23 two phases, and in the second phase, the allocation
24 phase, the way most courts handle this is that they

Page 32

1 ask the lead counsel to propose an allocation in the
2 hopes that lead counsel will propose an allocation
3 and get all of the lawyers to agree to the
4 allocation, and the Court therefore doesn't have to
5 involve itself.
6      And in that setting what Judge Ambro is
7 saying is lead counsel who's proposing the
8 allocation is themselves involved.  They're also
9 proposing how much they're going to get.  And so
10 there's some question there about how disinterested
11 they are.
12      There's unique tension though because
13 lead counsel also would like to leave the Court out
14 of it.  So it has some incentive to try to propose
15 an allocation that everyone agrees to; and, you
16 know, that's the hope of what we're balancing here
17 is that if they do that well, the Court doesn't have
18 to get involved in these attorney inter --
19 intra-attorney disputes.
20 Q.   All right.  But let me ask you again do you
21 agree that "counsel have inherent conflicts" under
22 those circumstances?
23      MR. HEIMANN: Well, objection.  He's
24 answered that question.

Page 33

1 A.   Again, with specifically lead counsel who's
2 charged with proposing the initial allocation is
3 what Judge Ambro's referring to, and I agree with
4 him that there's a conflict in some sense.
5      What I'm trying to point out is there's
6 also incentives that help temper the conflict a
7 little bit.
8 Q.   All right.  You know, obviously Judge Ambro
9 makes reference to lead counsel making
10 recommendations on their own fees and thus having a
11 financial interest in the outcome.
12      Are there any other inherent conflicts
13 for lead counsel that in your experience may exist?
14 A.  In allocating fees?
15 Q.   Yes, sir.
16 A.  Among all the counsel when they're
17 undertaking this task?
18 Q.   Yes, sir.
19 A.  I think that would be the primary one.
20 Again, if -- you know, if you're lead counsel in one
21 of these cases, your hope is you're going to be lead
22 counsel in another one of these cases.  So you want
23 to do a good job.  And one of the ways of doing a
24 good job is in this setting getting the other

Page 34

1  lawyers to agree to the allocation you're proposing,
2  not having to involve the Court in the allocation.
3      In my experience I do a lot of work with
4  MDL judges; and when MDL judges get an MDL for the
5  first time or even multiple times, there are a lot
6  of people that apply to be lead counsel. And a lot
7  of times the MDL judges will talk to each other have
8  you worked with this person before, how'd she do in
9  your case.
10     And so there's a reputational interest
11 the lead counsel have that's part of this whole
12 process, too. They want to -- they want to make the
13 MDL work. They want to work with the MDL judge and
14 make that work.
15     So I think there's a lot of -- a lot of
16 factors that go into how they're thinking about the
17 allocation, and their self-interest is definitely
18 one of them. These are entrepreneurial lawyers, but
19 it's not the only one.
20     THE SPECIAL MASTER: I'm curious that in
21 arriving at these allocations amongst themselves in
22 these large class actions, is there a duty of candor
23 by lead counsel to other counsel to disclose what
24 might be material facts?

Page 35

1      THE WITNESS: Again, I don't -- I'm not
2  fighting the question. I'm happy to answer it and
3  talk about it.
4      You're now asking me another question
5  that's --
6      THE SPECIAL MASTER: I am, yes.
7      THE WITNESS: -- not in Professor
8  Gillers' report?
9      THE SPECIAL MASTER: Correct.
10     THE WITNESS: All right. So I'm here as
11 a rebuttal witness, and I haven't prepared --
12     THE SPECIAL MASTER: I understand. But
13 you are an expert on class action which I assume
14 includes the divvying up of fees among class
15 counsel.
16     THE WITNESS: Correct. So if you're
17 asking me to describe what the law is on this,
18 there's very little.
19     The main precedent in my opinion is the
20 fifth circuit case called In Re: High Sulfur, and
21 there was kind of an allocation that was behind
22 closed doors, and the fifth circuit opinion takes
23 the position that there should be transparency in
24 the allocation and that each attorney should be told

Page 36

1  what every other attorney is getting in the
2  allocation. And I support that strongly in my
3  treatise. I say transparency is a good idea in
4  these circumstances.
5      So I don't know if I'd say that a Court
6  has articulated it as a duty of candor. I would
7  rather say that the courts have thought about this
8  as a transparency issue that the lead counsel is
9  open about what the allocation is.
10     Whenever I think about this I'm reminded
11 when I was growing up my father was an accountant,
12 and he ran a small accounting firm in Pittsburgh,
13 and he allocated the partnership benefits at the end
14 of the year. And he told me he would meet with all
15 his partners and tell them what they were getting,
16 and everyone was very happy. And then he would
17 release the book that showed what everyone else was
18 getting, and he'd have to meet with them all again a
19 second time because they were all unhappy at that
20 point. And so, you know --
21     THE SPECIAL MASTER: The first stage
22 doesn't sound like a law firm. The second stage
23 does having been on the management part --
24     THE WITNESS: So I think the

Page 37

1  transparency is an important aspect to this for that
2  reason.
3      THE SPECIAL MASTER: So the touchstone
4  in your view would be transparency meaning
5  disclosure of material facts so that other counsel
6  can make a determination as to whether or not
7  they're getting their fair share?
8      MR. GLASS: Objection.
9      THE SPECIAL MASTER: Is that a fair way
10 to put it?
11     MR. GLASS: Objection.
12     THE WITNESS: I've really thought about
13 this in terms of disclosure of how much. I'm kind
14 of copying what my father says. You say to all the
15 lawyers here's how I'm distributing this.
16     And I should say one other thing about
17 this. I think in most of these cases you should
18 also know what everyone's lodestar is at that point.
19     As I point out in my report here, about
20 half the cases the lodestar -- the amount of time
21 that counsel spent not submitted to the Court, and
22 so it's not clear all the attorneys would have the
23 information that lead counsel has about the time
24 that the other attorneys had spent on the case.

Page 38

1    So I think if I were doing this, I would
2  make sure to share with all the attorneys here's
3  everyone's lodestar, and here's how I'm divvying up
4  the money.
5    **THE SPECIAL MASTER:** So is it not a good
6  practice to make agreements before the lodestars are
7  known as to allocation of fees amongst counsel?
8  And -- let's just leave it at that.
9    **MR. HEIMANN:** You're asking him is it
10 not a good practice?
11   **THE SPECIAL MASTER:** Is it not a good
12 practice?
13   **MR. KELLY:** Sorry.  What is not a good
14 practice?
15   **THE SPECIAL MASTER:** To make agreements
16 to allocate fees before the lodestar is known.
17   **MR. GLASS:** Objection.
18   **THE WITNESS:** That's a tough question
19 and let me say why.
20   It feels like a different question, your
21 Honor, for this reason:  When the lawyers are
22 starting these cases, they're trying to think about
23 what their investment in the case is going to be and
24 what their potential return on the case is going to

Page 39

1  be and how much time and effort are they going to
2  put into the case.
3    And take this case for instance.  If
4  Labaton is lead counsel and Lieff Cabraser's coming
5  aboard and they're thinking, you know, how much --
6  how many attorneys should we put on this case, they
7  want to get a sense of, well, how are the fees going
8  to be divided up in the back end.
9    And so like any other investment,
10 they're making an important investment of millions
11 of dollars of their time here, I would imagine that
12 there would be agreements up front about how to
13 think about that.  And I -- you know, I learn from
14 my experience in doing -- in seeing how this all
15 works, and I think what you see in this case feels
16 somewhat right which is there was some agreement as
17 to some portion of the fee, and then some we'll
18 decide the rest at the end.
19   And I think they need some certainty in
20 terms of the amount of money and time they're going
21 to invest in the case up -- that they're going to
22 get some of that back in the back end.  I'm not sure
23 agreements before anyone's lodestar is put in are
24 necessarily a bad thing.

Page 40

1    We want to encourage lawyers to invest
2  in a case, and we may need to have them to have such
3  agreements in order to make them comfortable to
4  invest millions of dollars in the case.
5    **THE SPECIAL MASTER:** I want to go back
6  to this issue of transparency in making these
7  agreements as to the allocation of fees amongst
8  class counsel.
9    What information should be made
10 available to the various counsel before they agree
11 on an allocation?
12   **MR. HEIMANN:** Now I'm going to object.
13 Maybe I can have a standing objection.  You're going
14 way beyond his report now.
15   **THE SPECIAL MASTER:** I am going beyond
16 his report.
17   **MR. HEIMANN:** And I object to that.  I
18 don't think it's appropriate for you to do that with
19 a rebuttal expert witness.
20   As long as I get the objection on the
21 record, he can answer it if he thinks he can then
22 respond.
23   **THE SPECIAL MASTER:** It actually is not
24 beyond one of the premises in his understanding of

Page 41

1  the facts in his report, and I'll get to that.
2    **MR. HEIMANN:** I would disagree.  So I
3  would be interested to see you get to it.
4    **THE WITNESS:** I'm sorry, can you repeat
5  the question?  Sorry.
6    **MR. HEIMANN:** We can have the court
7  reporter read it back.
8    (Reporter read back.)
9    **MR. GLASS:** Objection.
10   **THE WITNESS:** So as I understand the
11 question, you're saying if there's a lead counsel
12 that's going to propose the initial allocation, in
13 proposing that initial allocation what information
14 should they give.
15   **THE SPECIAL MASTER:** Or at any point in
16 the allocation process -- or at any point in the
17 process of agreeing upon the fee allocation, either
18 the initial or subsequently or the final.
19   **MR. HEIMANN:** And you're asking him for
20 what his view is what is good practice or best
21 practice or what is required under the law?
22   **THE SPECIAL MASTER:** I'm asking what
23 constitutes transparency?  That was what -- what
24 kind of information should be provided?

Page 42

1    **MR. GLASS:** Objection.
2    **THE WITNESS:** It's a question -- again,
3  in my experience the main thing to be provided by
4  the counsel are the lodestar and -- and then the
5  proposed allocation.
6    And I think what most lawyers do is they
7  look at their lodestar, and they see, hey, I'm
8  getting 1.12 of my lodestar, and you're getting 2.4
9  of your lodestar, and they call lead counsel and say
10  why is he getting two-and-a-half, and I'm getting
11  1.2.  And then lead counsel says something like his
12  contributions were more important.
13    **THE SPECIAL MASTER:** Are those the only
14  material facts, the facts contained in a lodestar?
15    **THE WITNESS:** No.  Again, for what the
16  reason I just said, lead counsel may well say
17  something like the value of his contribution were
18  more important, and that's why I'm allocating more
19  money than the lodestar represents.
20    Look, there's no secret we're talking
21  about this case and the facts of this case.  And I
22  think one of the things, obviously, you're concerned
23  about is the allocation of Mr. Chargois.
24    According to what I'm saying, at the

Page 43

1  point at which the allocation would have happened if
2  the lodestar had been shared, the lawyers would have
3  seen that he had little or no lodestar in the case
4  and might have been asked questions.
5    **THE SPECIAL MASTER:** And that's
6  exactly my question.
7    You know that Mr. Lieff has testified
8  that when the agreement was made amongst what we
9  call the customer class counsel -- and, indeed, a
10  number of the e-mails and other documents
11  indicate -- that it was Mr. Lieff's understanding
12  from what he was told that Mr. Chargois was
13  performing in the role of local counsel or liaison
14  counsel.
15    He was not told that the agreement was
16  to pay Mr. Chargois dated back long before the case
17  started; that it was an agreement to pay
18  Mr. Chargois 20 percent of Labaton's fee on every
19  case in which Arkansas was lead plaintiff and
20  Labaton was lead counsel.
21    He says he was also not told that -- he
22  was also not told that Mr. Chargois had done no work
23  on the case and provided no value in the case
24  itself.

Page 44

1    Would that have been material
2  information that lead counsel should have shared
3  with the other co-counsel in the case?  And I should
4  add that Mr. Bradley -- Garrett Bradley also
5  testified to the same effect.
6    **MR. GLASS:** Objection.
7    **MR. HEIMANN:** Objection.  This is
8  outside the scope of this witness as an expert
9  witness.
10    **THE WITNESS:** So, again, my
11  understanding -- and it's consistent with what you
12  just said -- Lieff Cabraser was under the
13  understanding that he was serving as local counsel
14  in the case.
15    And, in fact, I talk in my report --
16    **THE SPECIAL MASTER:** You do.
17    **THE WITNESS:** -- about the fact that
18  then when Mr. Chargois submitted no lodestar at the
19  time of the fee petition, how did Lieff Cabraser
20  understand -- how might have Lieff Cabraser
21  understood that at that time and how they might have
22  thought all kinds of things other than there was an
23  agreement, and he wasn't doing anything in the case
24  whatsoever.

Page 45

1    So I think what your question is
2  consistent with my understanding of Lieff Cabraser's
3  very limited knowledge.  You then asked me was there
4  a duty upon Labaton to provide more information
5  about the Chargois Arrangement.
6    And I'm not exactly -- I'm not running
7  from the question.  I'm not exactly sure how to
8  answer it.  When you say duty, you're asking about
9  ethical duty --
10    **THE SPECIAL MASTER:** Actually, I used
11  the word "obligation."
12    **THE WITNESS:** Obligation.  Is there a
13  legal obligation?  I don't know.  Is there an
14  ethical obligation?  That's not my area of
15  expertise.
16    Is it a best practice for class counsel
17  -- lead counsel in certain such circumstance?  Maybe
18  not.  But primarily because you want to maintain
19  good relationships with the other lawyers who are
20  working on the case.  And this is reputationally not
21  going to be a great thing if the other lawyers find
22  out about this after the fact and feel like they
23  weren't treated fairly in this way.
24    There's an aspect of the allocation

Page 46

1  phase in which you kind of feel like the lawyers
2  will work it out between themselves; and, frankly,
3  if they feel like they've been harmed in one case,
4  they may then, you know, think about that
5  reputational interest in future cases.
6      But I don't -- it's harder for me to say
7  -- put my finger on a legal obligation that Labaton
8  had to the other lawyers per se. I've not seen
9  anything litigated like that.
10     I have no doubt that if the Court had
11 asked for the agreements, that Labaton would have
12 had a legal duty to provide the agreements at that
13 point.
14     THE SPECIAL MASTER: I'm actually not
15 asking about the Court at this point.
16     I'm asking about the obligation of
17 Labaton as lead counsel to other counsel to fully
18 disclose the nature and origins of the Chargois
19 agreement.
20     MR. HEIMANN: Objection again. It's
21 outside the scope of this witness' testimony.
22     THE SPECIAL MASTER: It's actually not,
23 Richard. On pages 22 and 23 he relies for his facts
24 on exactly what Mr. Lieff's testimony was. I don't

Page 47

1  want to have to read the whole thing.
2      But he relies on -- in part at least on
3  the fact that Lieff Cabraser had no knowledge of the
4  background and true nature of the Chargois
5  agreement.
6      MR. HEIMANN: I maintain my objection.
7      THE SPECIAL MASTER: Okay.
8      THE WITNESS: Again, the question --
9  you're asking again do they have an obligation.
10     THE SPECIAL MASTER: Yes.
11     THE WITNESS: And I guess I'd give the
12 same answer again.
13     I'm breaking it down into a legal
14 obligation. I don't know anything in class action
15 law that addresses this directly. I don't think
16 it's a great practice for the reasons that I've
17 already testified to.
18     And, you know, lead counsel in a case
19 like this --
20     THE SPECIAL MASTER: I'm sorry, you
21 don't think what is a great practice?
22     THE WITNESS: Again, my testimony is
23 that when lead counsel is dividing up the fees, it's
24 a -- it's in my opinion a best practice to share the

Page 48

1  lodestar that everyone has and to explain then when
2  asked why you're divvying up the fees in particular
3  ways.
4      And in this case had that happened, at
5  some point someone may have said here's Chargois'
6  lodestar, and there is nothing, and someone would
7  have asked a question. And I think at that point
8  Labaton would have said here's why we're giving that
9  amount of money -- should have said. If they were
10 asked that question.
11     THE SPECIAL MASTER: And are you aware
12 that Mr. Lieff testified that had he known that
13 Mr. Chargois did no work on the case, contributed no
14 value, did not serve as local counsel, he would not
15 have agreed on behalf of Lieff to share Labaton's
16 obligation to Mr. Chargois?
17     MR. HEIMANN: Can we see that testimony,
18 judge?
19     MR. GLASS: Objection.
20     THE SPECIAL MASTER: I believe that
21 fairly summarizes it.
22     MR. HEIMANN: No, I object because
23 frequently I have found your summaries to be
24 inaccurate.

Page 49

1      I don't see any reason why we can't look
2  at the testimony if you're going to ask him --
3      THE SPECIAL MASTER: We can call it up.
4  Assume it, please.
5      MR. GLASS: Objection.
6      MR. HEIMANN: Assume that Lieff
7  testified to that effect, and then what is the
8  question?
9      THE SPECIAL MASTER: My question is does
10 that increase the obligation or bear upon your
11 answer of whether there was an obligation to
12 disclose it to the customer class counsel?
13     MR. HEIMANN: All right. Again,
14 objection. It's beyond the scope of this witness'
15 testimony as an expert witness.
16     MR. GLASS: I object as well.
17     THE WITNESS: I think what you're
18 asking, if I understand it correctly, is you're
19 using Mr. Lieff's testimony to say that this is a
20 material fact.
21     THE SPECIAL MASTER: Correct.
22     THE WITNESS: Yeah.
23     THE SPECIAL MASTER: At least it was
24 material to him.

Page 50

1  THE WITNESS: Yeah.  And given that it's
2  a material fact, does that increase their duty to
3  disclose it?
4  THE SPECIAL MASTER: Obligation.
5  THE WITNESS: Obligation.
6  And, again, I -- I go back to the same
7  answer I had before.
8  If the Court is involved and the Court
9  asks, absolutely.  If you're talking about a private
10  agreement among them, I don't know any law on the
11  subject.  It would be my testimony that if I were
12  wanting to be lead counsel repeatedly, I'd be as
13  forthright as possible in these circumstances.
14  THE SPECIAL MASTER: So more in the
15  nature of a best practice than an obligation?
16  THE WITNESS: I think that sounds right.
17  But again it's not...
18  It's not something I prepared, I think,
19  to testify on that point specifically and I've
20  thought a lot about.  As I'm right here, most judges
21  leave this to the lawyers.
22  I think a lot of the allocation stuff
23  goes to the lawyers' reputational interests and
24  trust that they build up with other lawyers in these

Page 51

1  cases.
2  BY MR. SINNOTT:
3  Q.  Well, let me just focus on your report for a
4  minute and the statement you make in paragraph 7
5  where you say in practice judges rarely order
6  disclosure of agreements as to fees.
7  Do you see that, sir?
8  THE REPORTER: Did you say "really"
9  order or "rarely"?
10  THE SPECIAL MASTER: Rarely.
11  MR. SINNOTT: Rarely.
12  A.  I do see that paragraph 7 first sentence.
13  Q.  You're troubled by that, aren't you?
14  A.  Yes.  And let me say in the treatise I wrote
15  years before these facts arose I point out that the
16  judges have the authority to ask.  They rarely do
17  it.  And I specifically encourage them to do it
18  more.
19  Q.  And notwithstanding your belief that the
20  Federal Rules of Civil Procedure do not require it,
21  why are you troubled, and why do you urge them to do
22  it more often?
23  A.  Let me put this in perspective.  Two reasons
24  -- really one main reason.

Page 52

1  The reason is that occasionally the fee
2  agreements directly affect the class members'
3  interest, and there are two aspects to the fee
4  again.  There's the fee petition stage and the fee
5  allocation stage.
6  At the fee petition stage the key thing
7  I adamantly advocate for in the treatise is that
8  counsel -- that the Court make counsel submit their
9  lodestar, and the reason I do that is because it
10  makes transparent how much profit they're making at
11  the class' expense, what the multiplier is.
12  And I think class members lose millions,
13  if not tens of millions, of dollars a year because
14  judges don't ask for submission of the lodestar and
15  crosscheck the percentage of work.  At the
16  allocation phase I think this is much less pertinent
17  but pertinent nevertheless.  I spend a paragraph on
18  it in the treatise.
19  I suggest that they should make
20  agreements known for the same reason.  Occasionally
21  agreements have a negative effect on the class
22  members' recovery.
23  And I think the Agent Orange case is a
24  perfect -- is the best example of this, far better

Page 53

1  than this case in some ways.
2  What I worry about and what the judges
3  worry about a lot are investors and particularly
4  third-party investors.  Agent Orange is a little
5  different because they're kind of second-party
6  investors, but they're outsiders who have an
7  interest in the lawsuit.  And you worry that the
8  attorneys' incentives may be skewed by those outside
9  investors.
10  And what I suggest here is that the fee
11  agreements should be disclosed in part to make sure
12  that the class hasn't been harmed by some agreements
13  that have been made with respect to fees.
14  Q.  All right.  And you've advocated for that in
15  the treatise?
16  A.  Softly, yes.
17  Q.  But you've advocated for it?
18  A.  Yes.
19  Q.  And specifically let me make reference to 5,
20  Newberg on Class Actions Section 15-12 which states
21  once again qualifying that -- where you see the Rule
22  54 in the federal rules fit in, you say, "While Rule
23  54(d)(2)(B)4 makes disclosure of such agreements
24  dependent on a judicial order..."  -- and, by the

Page 54

1  way, the heading for 15-12 is Fee Procedures At
2  Class Actions' Conclusion--Disclosure of Fee-Related
3  Agreements Requirement.
4      MR. HEIMANN: So you're reading from the
5  treatise; is that correct?
6      MR. SINNOTT: Yes, sir.
7      BY MR. SINNOTT:
8  Q.  But going down to that paragraph, if I could
9  begin again.
10     "While Rule 54(d)(2)(B)4 makes
11  disclosure of such disagreements dependent on a
12  judicial order, there are at least two reasons that
13  courts should regularly order disclosure.  First,
14  given that the Court is acting as a fiduciary for
15  absent class members in overseeing the settlement
16  approval and fee process, there is a strong argument
17  that requiring transparency as to the fees is in the
18  class' interest, and hence a Court should so order
19  their disclosure."
20     So if I could just direct your attention
21  to requiring transparency as to the fees is in the
22  class' interest so as to suggest disclosure, what
23  was the interest in the class in this undisclosed
24  payment going to Chargois & Herron?

Page 55

1      MR. GLASS: Objection.
2      MR. HEIMANN: Objection.  Beyond the
3  scope of this witness' testimony as an expert.
4  A.  So, actually, I think I see this slightly
5  different in some ways -- in the following way:  I
6  appreciate the concern about the Chargois payment.
7  I see it as an allocation issue more than a class
8  issue for a few reasons, and I'll just go through
9  them and explain why I say that.
10     Number one, in this case I think
11  everyone agrees this is a good class action --
12  actually an excellent class action.  The results and
13  what the lawyers did here is really tremendous.
14     A lot of class actions are copycat cases
15  or piggyback cases on government actions.  This is
16  an important case that the lawyers did themselves,
17  invested a lot of money in and brought a terrific
18  result for the class.  I don't think anyone really
19  argues with that.
20     And so I think I kind of start from the
21  place that they did a good job, and they were paid
22  fairly.
23     Second, when I look at Chargois'
24  involvement, I don't see anything like in the Agent

Page 56

1  Orange case where anyone's worried that the payment
2  to Chargois conflicted with the class' interest in
3  litigating the case.
4      When I say that, there's no evidence
5  that anyone thought during the case, well, we should
6  take this to trial, but we have to pay Chargois so
7  let's settle now, or we should settle, but we have
8  to pay Chargois so let's take this to trial or
9  something like that.
10     That's what we worried about in Agent
11  Orange.  You don't really have any of that here with
12  Chargois.
13     Third, I don't think there's any
14  evidence -- you guys have got all of the e-mails
15  back and forth.  And I don't also see any evidence
16  there was an overreaching for the aggregate fee
17  because of Chargois.  There's nothing in the e-mails
18  that says, you know, this is a 20 percent case, but
19  we owe Chargois 5 percent so let's get 25 percent
20  for the class or anything like that.
21     I think the 25 percent is a fair fee,
22  and in my terms it's a two multiplier which I think
23  is far more important than the percentage.  It's a
24  two multiplier.  And for what the attorneys

Page 57

1  accomplished here a two multiplier is a perfectly
2  reasonable -- in fact, quite a modest fee for them.
3  I don't see any evidence that the Chargois fee
4  payment kind of made them overreach in terms of the
5  fee that they were asking for here.
6      And fourth -- finally, I just throw in
7  one other thing.  I think when you look at the Agent
8  Orange case, you have the second circuit there
9  talking about what you really worry about which is
10  that an agreement as to fees alters the incentives
11  in representing the class.
12     And there what the Court was worried
13  about was the investment return that the lawyers
14  were getting -- some of the lawyers were getting
15  would mean you would settle the case before it
16  should be settled in the class' interest or litigate
17  too long against the class' interests.
18     And that the second circuit -- notice
19  the second circuit's very upset about this.  This is
20  an outrageous set of fee agreements.  Notice what
21  they didn't do.  Even though the class' interests
22  were at stake, they didn't give the class back the
23  money.  They just kind of reorganized the money
24  among the lawyers who were in the case themselves --

Page 58

1  throughout the agreements reorganized the money.
2      I just don't -- I'm not defending the
3  Chargois payment per se --
4      PHONE LINE CONFERENCE: The following
5  participant has entered the conference.
6  A.  I'm not saying you shouldn't be upset about
7      it.  But I see it less as a fee petition interest
8      affecting the class than as an allocation interest
9      that maybe he shouldn't have been allocated money,
10     and you could give it back to the class if you want.
11     You could reallocate it, but I don't see
12     how it had a direct effect on the litigation here
13     and undermined the class' interest which is the most
14     important thing at the end of the day.
15     THE SPECIAL MASTER: So if I could
16  understand.  Is your testimony that because the
17  overall fee was reasonable when juxtaposed against
18  the results in the complexities of the case and the
19  challenges, the payment to Chargois raises no issues
20  for the class?
21     THE WITNESS: That's an interesting way
22  of putting it.  I wouldn't exactly say it that way.
23     Again, because the fee petition stage I
24  think was fair and the fee was fair as an overall

Page 59

1  fee, at the allocation stage if you don't think
2  Chargois should have been allocated some money, I
3  don't think that misallocation to Chargois affected
4  the class' recovery in the case or what they -- how
5  they were represented in the case directly.
6      THE SPECIAL MASTER: You've sort of
7  taken my question and put it on your own terms.  I'd
8  like you to answer my question.
9      Is your testimony then that because the
10  overall fee was reasonable to the result, the class
11  has no interest in the payment to Mr. Chargois?
12     MR. HEIMANN: Objection.  Outside the
13  scope of this witness' testimony as an expert.
14     MR. GLASS: Objection.
15     THE WITNESS: A lot turns on how you
16  understand the Chargois payment in that regard.  And
17  I think it's a misallocation.  If you were to go so
18  far as to say there was something to find, that
19  there was something illegal about it -- and I
20  haven't made that conclusion -- then it would be
21  hard for me to say the class had no interest in that
22  allocation.
23     But, again, my testimony is that
24  allocation generally comes after fee setting.  I'm

Page 60

1  comfortable with the fee setting here.  The
2  allocation may have gone wrong.  I'm not sure how
3  the class was directly harmed by that.
4      THE SPECIAL MASTER: In this case the
5  allocation to Mr. Chargois was actually agreed upon
6  by counsel before the fee petition was approved.
7  Are you aware of that?
8      THE WITNESS: Again, I'm aware that from
9  Lieff Cabraser's standpoint their understanding was
10  that they were agreeing to an allocation of a fee to
11  local counsel in the case.
12     THE SPECIAL MASTER: Yeah.  But the
13  agreement as to allocation in terms of timing and
14  your division was made before the fee petition
15  itself.
16     MR. HEIMANN: You mean the decision on
17  the fee petition?  Or the submission of the fee
18  petition?  Or the drafting of the fee petition?
19     THE SPECIAL MASTER: The agreement on
20  the allocation to Mr. Chargois was made before the
21  submission of the fee petition.
22     THE WITNESS: And?
23     THE SPECIAL MASTER: Does that say
24  anything about your view on the propriety of the

Page 61

1  allocation here?  As I understand it, you've divided
2  up allocation pre approval and then allocation post
3  approval.
4      MR. HEIMANN: And you're representing
5  that that's the fact?  I don't know.
6      THE SPECIAL MASTER: I believe it is.
7      MR. HEIMANN: I don't know one way or
8  the other.
9      THE SPECIAL MASTER: I believe it is.
10  It certainly is the fact that the allocation was
11  made before the fee petition was approved.  That is
12  certainly the fact.
13     MR. HEIMANN: That I'll agree with.
14     THE SPECIAL MASTER: Yeah.
15     THE WITNESS: I think I'm dividing up
16  something slightly different.  It is less a temporal
17  thing than it is a substantive thing.
18     The substantive thing is how much money
19  is the class giving up versus how are the lawyers
20  then going to split up that money.  And, you know,
21  how much money the class is giving up, based on my
22  expertise I think they got a good deal.  How the
23  money was divided up...
24     THE SPECIAL MASTER: That goes back to

Page 62

1  the earlier question about whether the class has an
2  interest at the time of the allocation, whether the
3  allocation is made before the fee petition, before
4  the hearing on the fee petition or after.
5  And my question to you is doesn't the
6  class have some interest, at least in knowing about
7  the allocation to Mr. Chargois in this case?
8  **MR. GLASS:** Objection.
9  **THE WITNESS:** I thought you were going
10 to end the sentence doesn't the class have some
11 interest in knowing about the allocation period.
12 My answer to that would be yes.
13 **THE SPECIAL MASTER:** I wish you would
14 just answer my questions instead of rephrasing.
15 My question was does the class have some
16 interest in knowing about the allocation to
17 Mr. Chargois?
18 **MR. HEIMANN:** Well, I object now again
19 because we don't know now whether you mean the
20 Chargois Arrangement --
21 **THE SPECIAL MASTER:** Yes.  The fee
22 allocation.
23 **MR. HEIMANN:** Just the amount?
24 **THE SPECIAL MASTER:** Well, more than the

Page 63

1  amount.  The fact that he did no work on the case.
2  The fact that he was not local counsel.  The fact
3  that he did not appear in the case.  The fact that
4  the arrangement -- I guess it would be the entire
5  Chargois Arrangement.
6  **MR. GLASS:** Objection.
7  **THE WITNESS:** Again, I would approach
8  this question by -- you want to make up a rule after
9  the fact.  I wrote a treatise before the fact, and
10 before the fact I said I hope all the fee agreements
11 would be -- that the Court would order that the fee
12 agreements be made transparent.
13 So I'm agreeing before the fact that I'd
14 love all this stuff to be transparent.  Has nothing
15 to do with Chargois.  I'm not making up a rule for
16 one case.  I'm saying I would like fee allocations
17 to be transparent in every case.
18 So I'm on record saying that, and I'm
19 comfortable with that.  I don't need a special rule
20 for this case.
21 But I should say I'm on record saying
22 that and therefore urging the Court to order that
23 this stuff be made transparent.  That's what the
24 rule structure is.

Page 64

1  **THE SPECIAL MASTER:** Hm hm.
2  **THE WITNESS:** And if the judge had
3  followed my order -- my recommendation, we wouldn't
4  be here.
5  **THE SPECIAL MASTER:** You understand, I'm
6  sure, the background in this case which is a little
7  different than most cases in terms of the posture of
8  the case as it went to the judge for approval of the
9  settlement class and the fee petition and the entire
10 settlement in that there were three cases, two of
11 which were ERISA cases, that were consolidated for
12 pretrial purposes.  You're aware of that?
13 **THE WITNESS:** I'm aware there are three
14 cases consolidated for pretrial purposes.  You had
15 said this is different than most cases.  There are
16 lots of different ways these work.  Sometimes it
17 works this way.  So yes.
18 **THE SPECIAL MASTER:** And that it is
19 possible that the interests of all of the different
20 class members were not completely aligned as to the
21 allocation of fees.
22 **MR. GLASS:** Objection.
23 **THE WITNESS:** So your question is am I
24 aware that in this case --

Page 65

1  **THE SPECIAL MASTER:** To start with, are
2  you aware of the procedural posture first of all?
3  **MR. GLASS:** Objection.
4  **THE WITNESS:** So my understanding the
5  Arkansas cases file.  There are also some
6  ERISA-related complaints that come later which is
7  fairly typical in these cases.  And then they all
8  get consolidated.  Eventually they're settled as one
9  single case, one class settlement, one class.
10 I don't -- I worry about the sense that
11 there are conflicts among class members as to fees.
12 If there are conflicts among class members, that
13 makes class certification more problematic.
14 And I think there was a little bit of
15 transparency in the class notice and in the
16 settlement agreement about the ERISA -- the members
17 of the class whose claims were ERISA based and how
18 they might be treated slightly differently, and all
19 of that was made transparent.  So I'm aware of all
20 that background.
21 **THE SPECIAL MASTER:** Should the Chargois
22 Arrangement have been noticed to the class because
23 of this procedural posture in which three different
24 cases were consolidated together and the class

Page 66

representatives of all three were in different
classes to begin with, and then there was one
settlement class that included all of these
different class members?

**MR. HEIMANN:** Objection.

**MR. GLASS:** Objection.

**THE WITNESS:** I don't -- I feel like
you're struggling to find some way of --

**THE SPECIAL MASTER:** I think everybody's
struggling here.

**THE WITNESS:** Yeah.

**MR. GLASS:** Objection.

**THE WITNESS:** From my point of view --
and I think this is what I testified to -- it's not
complicated. The judge should have ordered that the
fee agreements be released. He didn't do that. And
absent him doing that, I just don't think there was
an obligation to make public any of the fee
agreements.

And I count like a dozen -- at least a
dozen fee agreements in this case. And I just don't
think the judge ordered their release, and I don't
think, as I testified, that there's a need to put it
in the notice in the case.

Page 67

And I don't understand how the ERISA --
consolidation of the ERISA cases in the one class
changes that conclusion of mine.

**THE SPECIAL MASTER:** It really goes back
to this issue of transparency that you've
identified. Not only was the Chargois Arrangement
not fully disclosed to the other customer class
counsel, it was not disclosed at all to the ERISA
lawyers.

And my question to you is was there any
obligation to, at the very least, disclose the
Chargois Arrangement to the ERISA lawyers, if not to
the class, so that they could then advise their
class representatives, their named representatives
in the two other actions?

**MR. HEIMANN:** Objection. Beyond the
scope of this witness' testimony as an expert.

**MR. GLASS:** Objection.

**THE WITNESS:** Yeah, I think the way I'm
hearing your question -- and I don't mean to be
fighting it -- it sounds like an allocation --
you're asking me in the allocation process should
they have made known to the ERISA lawyers the
Chargois Arrangement?

Page 68

**THE SPECIAL MASTER:** Yes.

**THE WITNESS:** And I just fall back on
the testimony I said earlier. I think it would have
been a best practice to say here's how we're
allocating, and here's who's getting what and here's
why.

**THE SPECIAL MASTER:** You understand that
the ERISA lawyers have testified that had they known
about this, they would not have agreed to the
allocation?

**THE WITNESS:** And, again, I experience
that as a similar question as to materiality to
Mr. Lieff and his testimony, and I think I'm saying
that if I were lead counsel in these circumstances,
I would consider it a best practice to be
transparent about what I'm doing, and I wish Judge
Wolf had ordered transparency of the fee agreements
here.

**THE SPECIAL MASTER:** There's also
another interesting wrinkle to this case that may be
different from most cases which was the involvement
of governmental agencies in the negotiation of the
settlement.

There's been testimony that State Street

Page 69

was insisting upon what we've all called a global
settlement to include the governmental agencies but
particularly the Department of Labor who, of course,
has oversight responsibility over ERISA-fied funds
and ERISA-fied claims.

There is other testimony and evidence in
the record that the Department of Labor was very
interested in this settlement and particularly in
the amount of fees should it -- the Chargois
Arrangement -- have been disclosed to the Department
of Labor?

**MR. GLASS:** Objection.

**MR. HEIMANN:** Objection. Beyond the
scope of this witness' testimony as an expert.

**THE WITNESS:** You're asking me should
Labaton have disclosed the Chargois Arrangement --

**THE SPECIAL MASTER:** That could have
been accomplished in any number of ways. It could
have been accomplished through the notice process.
It could have been accomplished by giving notice to
other lawyers who were dealing directly with the
Department of Labor. It could have been
accomplished whether Labaton did it directly or not.

Should it -- should the Chargois

Page 70

1  Arrangement and the particulars of it here have been
2  disclosed to the governmental agencies who were very
3  much a part of the negotiation process?
4      MR. HEIMANN: Objection.
5      MR. GLASS: Objection.
6      THE WITNESS: But, again, from Lieff
7  Cabraser's point of view, they thought Chargois was
8  the local counsel.  So you're asking me should
9  Labaton --
10     THE SPECIAL MASTER: Yes.
11     THE WITNESS: -- have disclosed some
12  facts about the Chargois Arrangement.
13     And I -- you know, I wish Judge Wolf had
14  ordered disclosure of fee agreements.  I don't know
15  if there was an obligation other than that.  The law
16  is clear that fee agreements should be disclosed
17  when the Court orders them, and I wish he had
18  ordered them to do that, and they would have been
19  disclosed.
20     I --
21     THE SPECIAL MASTER: So you're -- I'm
22  sorry, were you done?
23     THE WITNESS: I was going to say one
24  other thing.  And, again, I'm not fighting the sense

Page 71

1  that you might -- that there's concern about the
2  Chargois Arrangement.
3      If there had been disclosure of it say
4  in the class notice, I think in fairness to Labaton
5  they would have been part of the process of writing
6  the class notice, and I think they would have tried
7  to explain in the class notice that some of the fees
8  in this case are going to a lawyer who we've worked
9  with in the past in conjunction with the client in
10 this case.  There's one named plaintiff that was
11 willing to step up and take on State Street in this
12 circumstance.
13     We got that named plaintiff because of
14 our portfolio monitoring work in response to a
15 request by the state to apply for such a position.
16 We've been providing that service, and it's been of
17 great value to the shareholders beyond Arkansas in
18 stepping up.  And because of that value, we have an
19 arrangement with the lawyer who introduced us to
20 them that he gets a part of our fee in these cases.
21     So that kind of notice is slightly
22 different than the way you keep describing the
23 notice.  So I think there would have been some sense
24 in which if we got to that point -- if the judge had

Page 72

1  asked them to -- for the agreements, had seen this
2  agreement, had said now let's tell the class, it
3  would have been framed -- they would have argued it
4  should have been framed in those kinds of terms.
5      THE SPECIAL MASTER: So it seems that
6  you are pinning all of this on the fact that the
7  judge didn't ask under Rule 54, and there was no
8  local court rule?  Is that right?
9      MR. HEIMANN: Objection --
10     MR. GLASS: Objection.
11     MR. HEIMANN: -- to the judge said "all
12 of this."
13     THE SPECIAL MASTER: The lack of --
14 thank you, Richard.  Let me rephrase it.
15     You are pinning all of the
16 non-obligation to disclose the Chargois Arrangement
17 on the fact that Judge Wolf didn't ask, did not have
18 a standing order and that there was no local rule,
19 correct?
20     MR. GLASS: Objection.
21     THE WITNESS: Yes "and."  Correct.  I
22 hesitate to say I'm pinning it.  I'm saying the
23 rules were clear.  And the judge could have and in
24 my treatise I argued I hope he does ask for these.

Page 73

1      And so he bears some of the
2  responsibility here, yes, absolutely.
3      THE SPECIAL MASTER: It sounds like
4  you're saying he bears all of the responsibility.
5  Either he or the Court as a whole in adopting a
6  local rule.
7      THE WITNESS: Another way I think about
8  this -- and I'm kind of agreeing with you.  I'm not
9  totally comfortable with it, but I'm kind of
10 agreeing with you.
11     I think about it this way:  When I was
12 writing the treatise section five years ago without
13 the Chargois facts in my head but knowing a lot
14 about class action law, I said, boy, I hope judges
15 ask for this.
16     If instead I had written in the treatise
17 what your expert wrote, I don't think it would have
18 been believable.  I think it was made up after the
19 fact to fit the facts of this case.
20     THE SPECIAL MASTER: Well, my expert was
21 actually opining under the Rules of Evidence.
22     THE WITNESS: He says a lot about class
23 action law, too.  Doesn't anymore --
24     THE SPECIAL MASTER: We don't need to

Page 74

1  argue about that, but...
2      My question to you is very succinct.  In
3  this case as to the Chargois Arrangement, the burden
4  is entirely -- the burden of disclosure is entirely
5  upon either Judge Wolf or the Court to adopt a local
6  rule or a specific court order or even just him
7  asking at the hearing?  Is that accurate?
8      MR. GLASS: Objection.
9      THE WITNESS: I think Rule 23 and Rule
10  54 are clear that fee agreements must be disclosed
11  upon judicial order.  And absent that, that's
12  correct.  With one caveat.
13      Again, I divide this up into these two
14  phases.  During the allocational phase stuff comes
15  out among the lawyers, and then it gets raised, and
16  it can be raised that way in that setting.
17      I think what you have here is a
18  situation where you found out something during -- in
19  your investigation you found out something about the
20  allocation.  I don't think it really affected the
21  class that much.
22      I think you and Judge Wolf have every
23  power to say this was a bad allocation if that's
24  what you think, and we think the money should be

Page 75

1  reallocated or sent back to the class.  But going
2  forward either -- I am adamantly saying the rule was
3  clear.  The judge has to order the fee agreements.
4  And I hope they follow my advice and order them in
5  the future.  And this is a great case to show why
6  they should do it.  Or change the rule.
7      THE SPECIAL MASTER: You actually
8  anticipated my next question which is what phase are
9  we in now?  Are we in the allocation phase still now
10  that we've discovered --
11      THE WITNESS: Yes --
12      MR. HEIMANN: I don't know that the
13  question had been finished but --
14      THE SPECIAL MASTER: Are we in the
15  allocation phase now that we've discovered the
16  Chargois Arrangement?
17      MR. HEIMANN: Now I object again.  This
18  is well beyond the scope of this witness' testimony
19  as an expert.
20      THE WITNESS: For reasons I said
21  earlier, your Honor, when you discovered the
22  Chargois payment, I think you did discover something
23  about the allocation.
24      I nonetheless, like you, asked myself do

Page 76

1  I think this harmed the class in the way the second
2  circuit asked in the Agent Orange case.  Were the
3  fee agreements such that it changed the mechanics of
4  the litigation in ways that upset the class'
5  interests?
6      So I asked myself those questions, and I
7  just don't see any evidence that there was -- that
8  Chargois played any -- that anyone's worry about
9  Chargois played any role in the litigation of this
10  case whatsoever.  I really do feel like it's an
11  allocational thing.
12      THE SPECIAL MASTER: So the lawyers for
13  the ERISA members of the class have testified that
14  had they known about the Chargois Arrangement, they
15  would not have recommended the settlement to their
16  representatives -- named representatives.
17      MR. HEIMANN: Objection.  That's not
18  their testimony, your Honor.
19      THE SPECIAL MASTER: We don't need any
20  speaking objections, Richard.
21      MR. HEIMANN: You ought to be honest to
22  the record, judge, really.
23      THE SPECIAL MASTER: Rule 30(c).  I'm
24  happy to read.

Page 77

1      MR. HEIMANN: Please do.
2      MR. GLASS: I'm objecting as well, but I
3  don't think there's a question pending yet.
4      (Pause.)
5  BY MR. SINNOTT:
6  Q.  I'm going to ask some questions while we're
7  digging that out, professor.
8  A.  Sure.
9  Q.  Let me see if I understand you correctly.
10      In the treatise where it says there's a
11  strong argument that requiring transparency as to
12  the fees is in the class interest, and hence a Court
13  should so order their disclosure, you're not saying
14  that it's any less in the class interest if the
15  class got a good deal, are you?
16      MR. GLASS: Objection.
17  A.  No, but that is the point, right?
18      The reason to disclose the fees is to
19  make sure the class' interests weren't undercut in
20  any way by the agreements that were made.  And so
21  the transparency and disclosure is a means to an
22  end, and the end is making sure the class' interests
23  weren't sold out in some ways.
24  Q.  Would you agree it's in the class' interest

Page 78

1  to get a better deal on occasion?
2      MR. GLASS: Objection.
3  A.  I was raised by a Jewish mother.  You always
4      want a better deal.
5  Q.  I'll take that as a yes in deference to your
6      Jewish mother.
7  A.  I think the Court's role is to make sure
8      that the class -- both the class and class counsel
9      get a fair deal.
10         The Court has a real interest in making
11     sure that the lawyers are paid fairly 'cause the
12     whole system is premised upon the lawyers investing
13     their own money, and we want them to be able to do
14     that.
15         And so I think the Court has a strong
16     interest in making sure the lawyers are fairly paid
17     and at the same time has a very important interest
18     in making sure the class doesn't overpay.
19  Q.  But you're not saying that your advocacy for
20     transparency and the imperative of transparency ends
21     when the lead counsel or class counsel determine
22     that there's been a good deal, are you?
23     MR. GLASS: Objection.
24  Q.  Good deal for the class?

Page 79

1      MR. GLASS: Objection.
2  A.  No.  I think I've already testified that in
3     my opinion the allocation phase should be
4     transparent as well.
5  Q.  All right.  Thank you.
6         Now in Section 1 on page 3 --
7  A.  We're going back to my current report?
8  Q.  Yes, sir.
9  A.  Okay.
10  Q.  And you quoted from High Sulfur previously.
11  A.  Hm hm.
12  Q.  But looking at footnote 5, it says, does it
13     not, it is -- quoting from High Sulfur.  "It is
14     likely that lead counsel may be in a better position
15     than the Court to evaluate the contributions of all
16     counsel seeking recovery of fees."
17         Did I read that correctly?
18  A.  Yes.
19  Q.  What do you understand the Court to have
20     meant by contributions in High Sulfur?
21  A.  Well, again, I've testified that in -- we're
22     talking about the allocation phase, and the fifth
23     circuit's there saying -- as I do in the next quote
24     -- generally speaking, the Court's going to defer to

Page 80

1  lead counsel to allocate in the first instance.
2      And the reason it's going to do that is
3  that lead counsel is essentially running a small law
4  firm -- often a big law firm in running one of these
5  cases, and in doing so it has the best understanding
6  of the value -- not just the time but also the value
7  of various contributions to the case.
8      Those contributions can be -- they can
9  be heavy lifting, pure hours.  They can be brilliant
10  thoughts, creative ideas.  They can actually be
11  monetary investments in the case.
12      This case was going to be lost, and at
13  the last minute someone came in and invested this
14  amount of money and enabled us to depose an expert
15  witness and win the case on that ground.
16      So I think what lead counsel knows
17  better than anyone having run the law firm on the
18  plaintiffs' side of the case is all of the types of
19  contributions that went into the case and what value
20  they -- how they served the class, what value they
21  brought to the class.
22  Q.  All right.  Professor, but based on your
23  understanding of the facts in this case, what was
24  the contribution of Chargois & Herron?

Page 81

1      MR. HEIMANN: Objection.  Beyond the
2  scope of this witness' testimony as an expert.
3      MR. GLASS: Objection.
4  A.  You know, I've written and taught about this
5  for a long time, and I have perhaps a little more
6  forgiveness in some ways in the following sense:
7  That I think the Labaton firm made the decision that
8  Chargois had brought enough value by introducing
9  them to the Arkansas plaintiff that it was worth it
10  to them to give him some benefit of the cases they
11  got in working with Arkansas.
12      So I think what Arkansas -- what
13  Arkansas brought to this case is that they stepped
14  up and were a named plaintiff in a situation where
15  no one else would do that.  You have to remember
16  that the whistleblower case was unsealed about a
17  year and a half before the Arkansas case was ever
18  brought.
19      And so my guess -- and this is just a
20  pure guess -- is that the lawyers were looking for a
21  client for a year and a half and didn't find one
22  until the Arkansas plaintiff agreed to step up.
23      Why did the Arkansas plaintiff agree to
24  do that?  Because Labaton had an ongoing

Page 82

```
1   relationship with them.  They were performing
2   portfolio monitoring for them.  The Arkansas Fund
3   trusted Labaton because of that.  And that
4   relationship I think is very valuable to the class
5   getting 300 million dollars in relief here.
6        So you then go back to its origin, and
7   Labaton feels like it has some indebtedness, I
8   guess, to the origin of that relationship.
9        So, you know, I think you could say
10  there's a but-for cause if -- if Labaton had never
11  met the Arkansas Fund, there may never have been a
12  State Street case.
13  Q.  And you believe that that constituted a
14  contribution to the State Street case?
15  A.  Again, you could make an argument that it's
16  a but-for cause.
17  Q.  But you would agree that in the State Street
18  litigation based on your understanding of the facts
19  there was no contribution?
20      MR. GLASS: Objection.  He just answered
21  that.
22  A.  Again, it's my understanding -- and, again,
23  I have no -- I'm not a fact witness.  It's my
24  understanding that Mr. Chargois was not directly
```

Page 83

```
1   involved in the State Street litigation, but my
2   testimony is, you know, really you got to go back to
3   the congress' enactment of the Private Securities
4   Litigation Reform Act of 1995.
5        When it was enacted in 1995, I predicted
6   that it would fail because no institutional investor
7   would ever step up to run a securities case.  It was
8   a crazy idea.  I was basically right.  No private
9   institutional investor really ever has.
10       The public institutional investors have
11  done so, but it's really out of the genius I think
12  of the entrepreneurial attorneys to engage them in
13  this process and get them involved.
14       And so I have a kind of long, deep
15  understanding of these relationships, and I think,
16  for better or for worse, congress created a
17  situation that required the plaintiffs' attorneys to
18  get institutional investor clients interested in
19  securities class actions, and the plaintiffs'
20  attorneys are kind of ingenious in finding portfolio
21  monitoring as a way of engaging institutional
22  investors to serve the public interest by stepping
23  up and doing that.
24       And in that sense, you know, you're
```

Page 84

```
1   looking at the warts part of it, but how did they do
2   it?  They got people like Chargois to introduce them
3   to the Arkansas funds in the world, and the Arkansas
4   Fund stepped up in this case, and it's kind of a
5   but-for cause in some ways.
6   Q.  All right.  And that but-for cause is not
7   undermined in your view by the fact that there was
8   no work in this particular litigation?
9       MR. HEIMANN: Again objection.  Beyond
10  the scope.
11      MR. GLASS: Objection.
12  A.  It doesn't make it any less of a but-for
13  cause.  It could have been more of a but-for cause,
14  but it doesn't make it any less of a but-for cause.
15  Q.  So an introduction years prior to this
16  litigation in your opinion would constitute the work
17  or contributions called for?
18      MR. GLASS: Objection.
19  A.  I can imagine -- I think what I'm testifying
20  -- again, I'm not a fact witness here, but I think
21  what I'm testifying to is apparently Labaton thought
22  so.
23  Q.  And that's enough as far as you're
24  concerned?
```

Page 85

```
1   A.  Well, I'm not -- now I'm a little bit lost.
2   You asked me how I would interpret what the fifth
3   circuit means by contribution.
4   Q.  Yes, sir.
5   A.  And I said lodestar, creative ideas, hard
6   work, investment opportunities.  And one possibility
7   I guess you're asking me is could Labaton interpret
8   contribution to be the introduction.
9       Yeah, I think they could interpret it
10  that way.
11  Q.  But I notice that in that list of
12  contributions and how the fifth circuit might
13  interpret it you didn't list making an introduction,
14  correct?
15  A.  You're saying -- I said making an
16  introduction could be interpreted as a contribution.
17  Q.  No.  What I'm saying is when you testified
18  as to what contributions could consist of, the list
19  of items that you provided did not include making an
20  introduction, did it?
21      MR. GLASS: Objection.
22      MR. HEIMANN: Meaning in the testimony
23  he gave a few minutes ago is what you're asking
24  about?
```

Page 86

1    MR. SINNOTT: Yes, sir.
2  A.  I don't remember.
3  Q.  But to you the important thing is what
4  Labaton thought a contribution was?
5    MR. GLASS: Objection.
6  A.  I'm sorry.  I'm a little bit lost.  I think
7  -- I think I'm now testifying that I could imagine
8  that Labaton -- it appears Labaton did put value on
9  the introduction sufficient to give him a share in
10  future cases.
11    And I'm just reflecting back what I see.
12  I'm not a fact witness here.  But what I see in the
13  facts is that to Labaton that introduction was
14  important enough that they were willing to agree to
15  give him a portion of what their share of future
16  cases would be coming out of that introduction.
17    It's a business deal.  It happens to be
18  a business deal about lawsuits, but it's a business
19  deal.
20  Q.  Are there limitations to that kind of a
21  business deal as far as what can constitute
22  contributions?
23    MR. GLASS: Objection.
24    MR. HEIMANN: Objection on scope.

Page 87

1  A.  Well, there's certainly -- I think you're
2  asking are the limitations on with whom lawyers can
3  share their fees, and there are certainly ethical
4  limitations on that which I'm not testifying to.
5    I'm not sure -- we're putting a lot of
6  -- we're reading a lot into one word in the fifth
7  circuit opinion.  I'm not sure -- well, I'd stop
8  there.
9    I'd say I think the major limitations
10  can be from the ethics rules because they so limit
11  that you can't share a fee with non-lawyers, for
12  instance.  They so circumscribe who's in the circle
13  of potential sharing of fees.  That kind of is far
14  more important than anything else.
15  Q.  So can you opine as to when judicial
16  involvement would be necessary in assessing whether
17  a party had or would it be necessary at all in
18  assessing whether a party had contributed to a case?
19    MR. GLASS: Objection.
20  A.  Yeah, again, there's a huge incentive for
21  self-policing here because -- and this is why I like
22  transparency.  When the lawyers -- when lead counsel
23  says to the other lawyers here's who I'm giving the
24  fees to, you'd hope someone would say, Bob Smith?

Page 88

1  I've never heard of Bob Smith; why are we giving
2  money to Bob Smith?  He had nothing to do with this
3  case.
4    So there's a lot of self-policing.  And
5  if lead counsel said Bob Smith is my second cousin,
6  and we're giving him money, I suspect at some point
7  someone would go to the Court and say, judge, you
8  know, they're divvying up money in ways that don't
9  seem right.
10  Q.  All right.
11    THE SPECIAL MASTER: In deference to
12  Richard, I want to read the entire quote I was
13  thinking of from Mr. Sarko who was one of the
14  lawyers for one of the ERISA-named representatives
15  in one of the two ERISA suits.
16    He was the lawyer for what we've
17  referred to as the Andover case.
18    THE WITNESS: Right.
19    THE SPECIAL MASTER: This was a question
20  by Mr. Sinnott: "What would you have done, counsel,
21  if during the course of this case you had learned
22  about Mr. Chargois?
23    Answer:  Well, I think in my answer if
24  we go back to the original time, the 9 percent deal,

Page 89

1  I would not have agreed to that."
2    He's talking here about the fee
3  agreement.
4    "I guess I would not have agreed to file
5  a joint petition if some money was going to
6  Mr. Chargois now that all this information has come
7  out.  I mean the first thing is I would have asked
8  some questions, but I think that's -- you know,
9  that's 20/20 hindsight.
10    I think the real issue is if I would
11  have known this information, I would have not agreed
12  to file a joint petition because I would not have
13  wanted -- I mean bluntly in order to do that, I
14  would have had to first talk to the other ERISA
15  counsel, and they would not have agreed.  I would
16  have had to get approval from the named plaintiffs
17  who would not have agreed.  I mean you've met our
18  named plaintiffs.  They're straight shooters.  They
19  would say this doesn't sound right."
20    I can go on if you want me to.
21    MR. HEIMANN: No, but you understand the
22  difference between that and what you said when you
23  represented in your question that they had said they
24  wouldn't have gone -- that they wouldn't have agreed

Page 90

1 to the settlement agreement.
2     And they're talking about fees, not the
3 settlement agreement.
4     THE WITNESS: Joint petition.
5     THE SPECIAL MASTER: It's a little
6 unclear, but, at any rate, they would not have
7 agreed to the fees.  Let's limit it now to that.
8     MR. GLASS: Objection.
9     THE WITNESS: What I heard in what
10 you're reading is --
11     THE SPECIAL MASTER: That the named
12 plaintiffs -- the ERISA-named plaintiffs in the
13 other cases would not have agreed to the fees.
14     THE WITNESS: Well, I think what he's
15 testifying -- what I heard was that they would not
16 have agreed to a joint fee petition with Labaton in
17 those circumstances.
18     THE SPECIAL MASTER: That's one of the
19 things he's saying, yes.  At the very least they're
20 saying I would have had to get approval from the
21 named plaintiffs who would not have agreed.
22     It may be a little unclear as to what
23 they would not have agreed to, but at the very least
24 they would not have agreed to a payment going to

Page 91

1 Mr. Chargois under the Chargois Arrangement at the
2 very least.
3     MR. GLASS: Objection.  That's not what
4 it says.
5     MR. HEIMANN: What's the question?
6     THE SPECIAL MASTER: Does that in any
7 way impact your view that it was not necessary to
8 give notice of the Chargois Arrangement to the
9 settlement class?
10     MR. GLASS: Objection.
11     THE WITNESS: No.
12     THE SPECIAL MASTER: Why not?
13     THE WITNESS: First of all, I hear the
14 testimony as saying our clients wouldn't have agreed
15 to a joint fee petition.  So they wouldn't have
16 agreed to a joint fee petition.
17     I don't know -- I think -- I think what
18 you're getting at is if we had originally said
19 Mr. Lieff would find this material, Keller Rohrback
20 would have found it material, now I think you're
21 adding in maybe the class representatives would have
22 found this material.
23     THE SPECIAL MASTER: Okay.  I'll accept
24 that, yes.

Page 92

1     THE WITNESS: And, again, I -- you know,
2 I come back to my testimony here.  The rules are
3 clear.  The judge orders --
4     THE SPECIAL MASTER: Sorry.
5     THE WITNESS: Are you all right?
6     THE SPECIAL MASTER: I don't know.  I
7 just got a cramp.  I'm okay.
8     THE WITNESS: Those are the most painful
9 cramps I've had myself.
10     THE SPECIAL MASTER: Didn't have my
11 banana this morning.  Sorry.
12     THE WITNESS: I think it's a hundred
13 percent clear there that if the judge had ordered
14 the fee agreements to be disclosed, they should have
15 been disclosed.
16     But looking at the agreements after the
17 fact and working backwards and saying now that we
18 know what they are should they be, I have a harder
19 time with that.  I think the rules are pretty clear.
20     THE SPECIAL MASTER: So we're back to
21 the judge ordering it, the "it" being the disclosure
22 of the Chargois Arrangement, even as to the notice
23 of the class.
24     THE WITNESS: The judge had many

Page 93

1 opportunities here.  There was an interim counsel
2 appointment at the front end of the case.  There was
3 a preliminary approval before notice went to the
4 class.
5     He could have asked for the fee
6 agreements at every stage, learned about the
7 Chargois Arrangement, decided whether -- frankly,
8 the judge may well have said that ain't happening at
9 that point, or could have decided how to describe it
10 to the class and put it in the class notice and say
11 let's see what the class says about it.
12     Judge Wolf never did any of that.  And
13 the rules are clear.
14     MR. HEIMANN: Can we take a break at a
15 convenient moment?
16     THE SPECIAL MASTER: Yes.  This is a
17 good moment.
18     I do have a -- I have a conference call
19 I've got to do at noon.  So let's take a short
20 break, and then we can have our lunch break at noon,
21 okay?
22     MR. SINNOTT: All right.  So it's 11
23 o'clock.  11:05?
24     THE SPECIAL MASTER: 11:10 maybe.

Page 94

1    (A recess was taken.)
2    MR. SINNOTT: Is anyone on the phone?
3    MS. LUKEY: I am.  This is Joan.
4    MR. SINNOTT: All right, Joan.  Linda,
5  are you on the phone?
6    MS. HYLENSKI: Yes, I am.
7    CONTINUED EXAMINATION BY MR. SINNOTT:
8  Q.   Professor, let me direct your attention to
9  page 4 of your report and paragraph 4.
10    You talk in that first paragraph fee
11  agreements may arise in either phase.  And then you
12  say at the fee-setting stage there may be agreements
13  between the class representative and class counsel,
14  particularly in cases governed by the Private
15  Securities Litigation Reform Act of 1995, or
16  agreements between class counsel and the defendants
17  that may be pertinent in setting the aggregate fee.
18    And that phrase "agreements between
19  class counsel and the defendants" is footnoted, and
20  in footnote 8 you indicate these are often called
21  "clear sailing agreements," and you cite the
22  treatise.
23    Let me just talk very briefly about
24  clear sailing agreements as referenced in footnote

Page 95

1  8. And in Newberg 13-9 you say clear sailing
2  agreements are agreements whereby the defendant
3  agrees not to contest class counsel's fee petition
4  as long as it does not exceed a specified amount.
5    And then you say, "These agreements are
6  troubling because they demonstrate that class
7  counsel negotiated some aspect of their fee
8  arrangement with the defendant when counsel's
9  ethical obligation is to the class, not to its own
10  fees."
11    So striking that you use the expression
12  "these agreements are troubling" and -- you say
13  they demonstrate that some aspect of the fee
14  arrangement was negotiated by class counsel with the
15  defendant because the ethical obligation should be
16  to the class, not its own fees.
17    And counsel's ethical obligation -- when
18  we refer to class counsel who negotiated this, is
19  that to the entire class?
20    MR. GLASS: Objection.
21  A.   23(g) specifically says that class counsel's
22  ethical obligations are to the entire class, and it
23  explicitly makes clear that although there's an
24  attorney/client type relationship with the class

Page 96

1  representative, class counsel's client is the entire
2  class.
3    And so it's kind of a peculiar
4  situation.  They may have an individual client, but
5  regardless of that, their ethical obligation as
6  class counsel is to the entire class.
7  Q.   Because you don't want divided loyalties.
8    Is that a fair statement?
9  A.   Well, the reason 23(g) did this is
10  completely different.  There are situations in which
11  the class representative who's kind of standing in
12  as the client may say, for instance, don't take this
13  settlement, even though class counsel thinks it's a
14  good settlement for the whole class; and having been
15  a class action attorney myself in many cases
16  sometimes you have class representatives who are
17  unique, peculiar, have their own views, and the
18  rules want to make quite clear that it's class
19  counsel's obligation to do what's in the best
20  interest of the whole class, even if the class
21  representative has a different particular idea.
22    This had been a conflict, and Rule 23
23  tried to clarify that class counsel's serving the
24  interest of the entire class.

Page 97

1  Q.   All right.  And we'll talk more about that
2  later.
3    But are some of those same concerns
4  implicated in a blind referral arrangement or
5  referral agreement such as the Chargois Arrangement?
6    MR. GLASS: Objection.
7  A.   I -- I don't understand the question.
8  Q.   You've articulated some of the concerns in
9  these clear sailing agreements, the matter that the
10  primary concern of which is that the interest of the
11  class are not being paramount.
12    Is that a fair paraphrasing of your
13  concern?
14  A.   Well, in the clear sailing agreement what
15  you would worry about is that the class counsel's
16  trading off the class' interest for their fees.  So
17  that the defendant says, hey, you know what, if
18  you'll agree to settle the whole case for 50
19  million, we'll agree not to contest a fee up to 35
20  percent.  But if you hold out for a hundred million,
21  we're going to fight you on fees or something like
22  that.
23    That's the tension there.  And I don't
24  see how the Chargois Arrangement has anything to do

Page 98

1 with that.
2 Q.  Are you aware that State Street was not the
3 only case that Chargois -- was not the only case
4 that Arkansas served as lead plaintiff?
5 A.  I'm aware that Arkansas's been lead
6 plaintiff in other cases.
7 Q.  And are you aware that Chargois stood to
8 receive fees in those other cases as well?
9 A.  I'm aware that he stood to receive fees in
10 some other cases, yes.
11 Q.  All right.  And are you aware that that
12 relationship arising out of his introduction of
13 Labaton to Arkansas continued beyond State Street?
14     MR. GLASS:  Objection.
15 A.  When you say beyond State Street, State
16 Street's still ongoing it sounds to me like.
17 Q.  And it may never end.
18 A.  Yeah, I don't know what that means.
19     THE SPECIAL MASTER:  Oh, it's going to
20 end.
21 Q.  If the judge could have kicked me at that
22 comment, I think he would have.
23     You understand that Chargois --
24 initially Chargois & Herron, and at least Chargois,

Page 99

1 currently still stands to make referral fees or
2 whatever you want to call them, some sort of fees as
3 a result of other Arkansas cases, correct?
4     MR. GLASS:  Objection.
5 A.  Yeah, look, I think what you're trying to
6 ask me is the following -- which I think I've
7 testified to already -- I did ask this question when
8 I think about this case, and I went through this
9 earlier, is the Chargois Arrangement, did it get in
10 the way of the class' interest here, and I think
11 that's what you're getting at again.
12 Q.  It is.
13 A.  Yeah.  And, again, the way I looked at it
14 myself was to say in litigating this case was
15 Labaton's indebtedness to Chargois, did it interfere
16 with how they litigated the case in any way
17 whatsoever or interfered with anyone related to this
18 case.
19     Frankly, it's kind of interesting that
20 no one else knew about it, or Lieff didn't know
21 about it, seems to really have played no role in
22 this.
23     Remember what I just said about the
24 clear sailing agreement.  What you worry about in

Page 100

1 the clear sailing agreement is, hey, okay, if
2 they're going to let us get 35 percent, we'll settle
3 lower than we would otherwise settle; and what I
4 said earlier about the Chargois Arrangement is I
5 can't see how the lawyers cared about it at all when
6 they were dealing with State Street and doing the
7 best they could on behalf of the class against State
8 Street.  I just don't think it figured in.
9     You got all the e-mails.  You got
10 everything anyone ever said about Chargois, and I
11 just don't think there's any evidence anyone was
12 saying, boy, we'd love to take this case to trial,
13 but we owe Damon Chargois so we can't go to trial,
14 or we should try to get more money, or we shouldn't
15 get more money.
16     I just felt like it was something
17 they're going to deal with at the end of the case in
18 terms of the allocation, but I don't see it creating
19 the same kinds of concerns that the Agent Orange
20 case created -- the agreements in the Agent Orange
21 case created or the clear sailing agreements in
22 theory could create and why judges worry about.
23     THE SPECIAL MASTER:  Are you saying that
24 if the class had received notice of the Chargois

Page 101

1 Arrangement, that class members could not rationally
2 or reasonably have objected to it?
3     THE WITNESS:  Again, if it had been --
4 if notice had been given to the class, and we've
5 talked a little bit about what it would sound like,
6 putting it in the best light possible from Labaton's
7 point of view and explaining why they made this
8 arrangement.
9     If you put it in the class notice, no,
10 absolutely, you're saying to the class here's
11 something that's happening in this case; do you want
12 to object, or do you not want to object to it.
13 You'd be inviting them to react to it by putting it
14 in the class notice.
15     THE SPECIAL MASTER:  And my question
16 following on that is are you saying that class
17 members could not reasonably object to the payment
18 -- the Chargois Arrangement in the payment of four
19 million dollars to Mr. Chargois?
20     MR. GLASS:  Objection.
21     THE WITNESS:  Are you asking for my
22 opinion whether it was a good payment or not?  Is
23 that what you're asking?
24     THE SPECIAL MASTER:  I'm asking you if

Page 102

1  it would have been reasonable for at least some of
2  the class members to have objected to the payment to
3  Mr. Chargois?
4      MR. GLASS: Objection.
5      THE SPECIAL MASTER: Had they received
6  notice.
7      MR. GLASS: Objection.
8      THE WITNESS: I like class member
9  objections. So I'm going to answer yes. But I like
10 them because they focus the Court and help bring
11 information to the Court.
12     In saying yes I'm not necessarily saying
13 they would have won or they would have been right,
14 but I think it's a good thing when class members
15 bring things to the attention of the Court.
16     Remember the Court has a fiduciary duty
17 to the absent class members. I read that in saying
18 to the Court wake up; it's on your shoulders. It's
19 all on your shoulders. You got to do something
20 here.
21     And it's just more helpful -- it's, you
22 know, somewhat helpful if a class member will come
23 forward and say look at this in particular.
24     THE SPECIAL MASTER: But, of course,

Page 103

1  they can only do that if they're given notice of it,
2  correct?
3      THE WITNESS: Yes, correct. The class
4  members can't object to what they don't know about.
5  That's why I want judges to take the authority that
6  they have and use it.
7      BY MR. SINNOTT:
8  Q.  Let me direct your attention, professor, to
9  page 6 of your report and paragraph 7. And in that
10 paragraph you talk about an empirical study that you
11 conducted that yielded no cases in which disclosure
12 of fee agreements under Rule 54 was ordered.
13     Is that a correct statement?
14 A.  Yeah. I don't want to overclaim here. I
15 use the phrase "empirical investigation." You know,
16 my students and I quickly looked at a thousand
17 dockets but did a pretty good job.
18 Q.  Okay. And what importance do you draw from
19 this study or this review?
20 A.  What I draw from this review is that the
21 lawyers' actions in this case are consistent with
22 class action practice, and class action law says
23 that fee agreements have to be disclosed only upon
24 judicial order. And what I found in this

Page 104

1  investigation was that judges rarely order it, and
2  lawyers rarely disclose it.
3      And so what happened here is kind of
4  consistent with what happens in class action
5  practice, and there is nothing that the lawyers did
6  here that was unusual.
7  Q.  Did your research assistants read the
8  pleadings or transcripts in each of these cases?
9  A.  Yeah. So it's amazing what they did. And
10 they walked me through it, and then I spot checked
11 it, but we went -- they went through the dockets.
12 And you pull up the docket. Then they search to see
13 if there was a settlement.
14     If there was a settlement -- and we got
15 down to 127 cases with a settlement. If there was a
16 settlement, they then searched for all of the
17 fee-related documents that were submitted in the
18 settlement process and read the transcripts as
19 available of the preliminary fairness hearing -- the
20 preliminary approval hearing and the fairness
21 hearing, if they were available.
22     So we looked through everything we could
23 find that was on PACER that was public to see if any
24 of these agreements had been submitted to the Court

Page 105

1  or asked for.
2  Q.  And how many of the 127 cases that your
3  research identified was there a fee to a lawyer who
4  had not been identified to the Court at all and who
5  was getting paid solely for a recommendation or
6  introduction and did no work?
7      MR. GLASS: Objection.
8  A.  Of course, we'd have no way of knowing that,
9  unfortunately, because the judges do not make
10 transparent the fee allocation information, although
11 they have the authority to do it.
12     So I don't have -- we generally don't
13 have the fee allocation information in any of those
14 cases.
15 Q.  And it's fair to say that this empirical
16 review that you did would not reasonably turn up
17 fees that were not disclosed to the Court?
18 A.  Again, when you say not disclosed, I would
19 say that unless a judge asks how are the fees being
20 allocated and then puts that information on paper
21 when it's submitted to the Court, that information
22 would not be publicly available. It depends on the
23 Court to request and make available the fee
24 allocation.

Page 106

1  Q.  Sure.  So in cases where -- let's say there
2  might have been cases where fees were concealed from
3  the Court.
4      There wouldn't be anything in the record
5  for your research assistants to learn, would there?
6      **MR. GLASS:** Objection.
7  **A.  I don't -- my research assistants weren't**
8  **looking to see if there are other Damon Chargois**
9  **arrangements or what you're all calling the**
10 **"Chargois Arrangement."**
11     **They were looking to see what class**
12 **action practice was in this district with regard to**
13 **whether fee agreements were submitted to the Court**
14 **and/or asked for by the Court.**
15     **It's a different empirical project.  If**
16 **you said to me we want you to go out and discover**
17 **every Chargois-type arrangement that exists in the**
18 **world, this isn't the empirical investigation I**
19 **would undertake.**
20 Q.  Sure.  Would it be fair to say that even if
21 you did say that or if you said I want you to go out
22 and find cases where fees were concealed, there'd be
23 nothing to find, correct --
24     **MR. GLASS:** Objection.

Page 107

1  Q.  -- because by nature of those arrangements
2  there'd be nothing in the record?
3      **MR. GLASS:** Objection.
4  **A.  Again, I see this case slightly differently**
5  **in the sense that I wouldn't -- I would put this**
6  **under the practices that evolve with the PSLRA, and**
7  **I could do an empirical investigation of PSLRA cases**
8  **and what fee information is available in the PSLRA**
9  **context and who gets paid.**
10     **As we talked about earlier, I wrote a**
11 **little piece about some of that a few years ago.**
12 Q.  All right, sir.
13     Let me direct your attention, professor,
14 to page 8, Section 2.  And the heading reads
15 Professor Gillers' attempts to advocate around the
16 text of Rules 23 and 54 are unconvincing.
17     Did I read that correctly?
18 **A.  Yes.**
19 Q.  And among the things that you reference
20 here, would you say that Professor Gillers wrongly
21 assumed that the identities of lawyers working on a
22 class action case are known to the Court at the fee
23 stage?  Is that a fair summary?
24 **A.  In one part of this section I say that I**

Page 108

1  **think the mistake he was making was mistaking the**
2  **lodestar submission for a fee allocation submission.**
3  Q.  All right.  But you read the November 2nd
4  fairness hearing, correct?
5  **A.  Yes.  The transcript.**
6  Q.  The transcript of it.  Is it fair to say
7  that Judge Wolf reviewed the lodestars as a
8  crosscheck?
9      **MR. HEIMANN:** You mean he referred --
10 are you representing that he referred to the
11 lodestar as a crosscheck at the hearing itself?
12     **MR. SINNOTT:** No.  He reviewed the
13 lodestars for purposes of being a crosscheck.
14     **MR. HEIMANN:** And you're saying that's
15 referenced at the fee hearing?
16     **MR. SINNOTT:** I'm asking, yes, if that
17 was reflected in the November 2nd transcript.
18     **MR. HEIMANN:** Can you tell me where in
19 the transcript you had in mind?
20     **MR. SINNOTT:** Sure.  We'll dig that out,
21 and we'll indicate it.
22     **BY MR. SINNOTT:**
23 Q.  Is that your recollection?
24 **A.  No -- well, let's be clear.**

Page 109

1      **My recollection is that the lawyers**
2  **submitted their lodestar for crosscheck purposes.**
3  **This is a percentage of work case.  The lodestar was**
4  **submitted to see what the multiplier was going to**
5  **be, the crosscheck.**
6  Q.  Yeah.
7  **A.  I don't remember -- I may be wrong, but I**
8  **don't recollect that at the fairness hearing the**
9  **Court reviewed the lodestar submission at all.**
10 Q.  Let me direct your attention to page 11.
11 You talk about a variety of situations in which the
12 Court does not know the identities of counsel
13 sharing in the fee award.
14     Do you see that, sir?
15 **A.  I do.**
16 Q.  Third line from the top.  Can you describe
17 those situations?
18 **A.  Sure.  So, number one, I said in a**
19 **percentage award case, unless the Court asks the**
20 **lawyers to submit their lodestar for crosscheck**
21 **purposes, the Court's not going to have the**
22 **identities of the lawyers who worked on the case.**
23 **It's just going to have a fee petition from lead**
24 **counsel perhaps.  Maybe signed by other counsel,**

Page 110

1 maybe not.
2     But it's not going to have the breakdown
3 of who all the lawyers were, what all they were
4 doing, etcetera. I'm in another case right now
5 where there are 50 -- there are 63 law firms in the
6 case, 300 timekeepers. If the Court hadn't asked
7 for the lodestar breakdown, it probably would have
8 known only of the four lead counsel in the case.
9     So this is a huge thing, one I'm very,
10 very critical about. But in about half the cases
11 that are percentage award cases, probably 40 percent
12 of all class actions the judges never ask for a
13 lodestar breakdown, and they don't know most of the
14 identities of many of the lawyers working on the
15 case, especially in the big cases. So that's the
16 big category.
17     You have other lawyers who may not show
18 up in the lodestar. Sometimes lawyers are tardy
19 getting their lodestar submissions to lead counsel,
20 and they just don't put 'em in. In this case Lieff
21 Cabraser, for instance, said any timekeeper with
22 fewer than five hours they didn't put them in.
23     There's an ERISA law firm in this case
24 that doesn't show up in the lodestar for some

Page 111

1 reason. No one put them in the lodestar submission.
2 I don't know why.
3     There are investors in cases sometimes
4 who might not show up in the lodestar submission,
5 but I think -- or whose identity might not be known
6 to the Court. So I think I have a variety of
7 circumstances where that could happen.
8 Q.  All right.
9     MR. SINNOTT: So, Richard, in response
10 to your question on page 30 of the November 2, 2016
11 fairness hearing transcript, line 18 Attorney
12 Goldsmith says, "Finally, your Honor, there was one
13 other matter I did want to note on the fee, if I
14 may, which is that many courts apply a lodestar
15 crosscheck. It's not required."
16     And Judge Wolf responds: "And I do
17 that."
18     And subsequently on page 35 of that same
19 transcript on line 3 Judge Wolf in presenting his
20 decision in this case starts off by saying, "So,
21 again, I'll decide this orally." And he talks about
22 the request for attorneys' fees and expenses as
23 being reasonable.
24     Then on line 12, if you drop down, he

Page 112

1 says, "I have used the percentage of common fund
2 method. I've used the reasonable lodestar to check
3 on that."
4     So I guess, getting back to my question,
5 you'd agree that in this particular case and in this
6 hearing Judge Wolf was reviewing the lodestars as a
7 crosscheck?
8 A.  No, I wouldn't agree with that.
9 Q.  Why not?
10 A.  I think what he's doing at the hearing is
11 discussing the method. He's saying I used the
12 percentage method with the lodestar crosscheck. I
13 don't think at the hearing he's reviewing the
14 lodestar at all.
15 Q.  So you don't consider that to be a review of
16 the lodestar?
17 A.  I do not.
18 Q.  On page 11 you talk about the question the
19 Court should have asked, that being who all is
20 sharing in the fee. And -- do you see that, sir?
21 A.  I do.
22 Q.  And let me ask you in your opinion who would
23 counsel being asked that question have to list in
24 response?

Page 113

1     MR. GLASS: Objection.
2 A.  Anyone who was sharing in the fee.
3 Q.  And that would include Damon Chargois?
4 A.  Correct. In this case.
5 Q.  Let me move ahead to page 13. I want to
6 thank you for teaching me what the word capacious
7 means.
8     But beyond that, you state a series of
9 principles beginning on the following page, the
10 fiduciary role of the Court, and you describe in the
11 treatise Section 13-40 which highlights novel and
12 noteworthy aspects of the Court's role in approving
13 a settlement --
14     MR. HEIMANN: You've lost me, Bill.
15     MR. SINNOTT: Let me see if I can
16 find...
17     (Pause.)
18     BY MR. SINNOTT:
19 Q.  So specifically in the subheading 1 case law
20 including cases from the district -- strike that.
21 Let me just back up.
22     Professor Gillers provides snippets from
23 six random class action cases to set out four
24 generic principles of class action law. And you

Page 114

1  list number 1 as case law including cases from the
2  district of Massachusetts amply supports recognition
3  of the Court's fiduciary duty to protect the class
4  and the Court's reliance on counsel to be
5  forthcoming with the information the Court needs in
6  order to do so.
7     So you're quoting Professor Gillers in
8  that; is that correct?
9  **A. That's correct. That's his language.**
10 Q.  Right. But then in the footnote you --
11 footnote number 34, after you've cited where in
12 Professor Gillers' report this appears, you say see
13 generally Rubenstein for Newberg on class action
14 supra note 4 at Section 13-40, fiduciary role of the
15 Court.
16    And with respect to that 13-40, would
17 you agree that that section of the treatise
18 highlights novel and noteworthy aspects of the
19 Court's role in approving a settlement?
20 **A. I would agree with one thing. Chapter 13 is**
21 **about settlement approval --**
22 Q.  Yep.
23 **A. -- not fees in particular.**
24    **But -- and in Chapter 13 I guess, yeah,**

Page 115

1  **from the heading in Section 40 of Chapter 13 I talk**
2  **about the fact that in approving the settlement --**
3  **and, frankly, I would also say fees -- the Court is**
4  **acting as a fiduciary for absent class members.**
5  Q.  Okay.
6  **A. Without having the treatise in front of**
7  **me -- you're reading something. I don't have the**
8  **language --**
9  **MR. HEIMANN:** Sorry, you don't have it
10 memorized?
11 **THE WITNESS:** I don't have it memorized.
12 **A. So I don't know what you're reading.**
13 Q.  I'm disappointed.
14 **A. Yeah.**
15 Q.  Let me see if we have that.
16 **THE SPECIAL MASTER:** While you're
17 looking for that -- we're skipping ahead a little
18 bit, but I want to get this in before lunch because
19 I want to go to this issue of notice to the class
20 and what would have been reasonable, and I'm trying
21 to understand the relationship between Rule 23(e),
22 settlement notice requirement, and Rule 23(h), the
23 fee notice.
24    Rule 23(e) requires that the notice of

Page 116

1  -- that the settlement be fair and reasonable and
2  adequate and that class members have the right to
3  object to the settlement if it doesn't hit this
4  mark. I mean -- right?
5  **THE WITNESS:** Correct.
6  **THE SPECIAL MASTER:** So, as you say on
7  page 29, to safeguard class members' opportunity to
8  object, notice must be sufficiently clear and
9  informed to make those opportunities meaningful.
10 Right?
11 **THE WITNESS:** Correct.
12 **THE SPECIAL MASTER:** Thus Rule 23 does
13 not require that fee allocations be explained to the
14 class members.
15    That's a general statement that fee
16 allocations generally not be required --
17 **THE WITNESS:** I think that's fair.
18 **THE SPECIAL MASTER:** -- to be included
19 in the notice?
20 **THE WITNESS:** I think that's fair, yes.
21 **THE SPECIAL MASTER:** Does that change
22 when -- and here I'm still focusing on 23(e).
23    Does that change when you have a
24 situation like we have here where lawyers obtaining

Page 117

1  a payment for having done nothing in the case, not
2  appeared in the case, not filed a lodestar, does
3  that change at all?
4  **MR. GLASS:** Objection.
5  **THE WITNESS:** I don't know of any cases
6  that say that.
7     Again, I feel like we're kind of trying
8  to make up a rule to fit the facts of this case
9  after the fact. And I'm describing here -- I'm
10 actually quoting from the treatise what I say the
11 rules are in general.
12    So I'm not kind of reverse engineering
13 what I think the rules are, but, rather, this is
14 what they are, the way they're written.
15 **THE SPECIAL MASTER:** What about 23(h)
16 and notice of the content? 23(h)(2) I believe the
17 object of that rule is that class members have the
18 right to object to the fee. Correct?
19 **THE WITNESS:** Yes.
20 **THE SPECIAL MASTER:** And then you go on
21 to say the right to object connotes that class
22 members ought to be given sufficient time to do so,
23 but it also means that class members must be given
24 sufficient information to do so.

Page 118

1    THE WITNESS: Correct.
2    THE SPECIAL MASTER: That seems
3  unobjectionable, that statement?
4    THE WITNESS: Agreed.
5    THE SPECIAL MASTER: Agreed. And then
6  you go on and say, "I've strongly advocated for the
7  position that class counsel should make their
8  lodestar known to the Court and to the class so as
9  to assess the extent to which the proposed award
10  reflects a multiplier of the lodestar. I have
11  similarly argued that fee allocation agreements
12  should be made known to the class."
13    And then you caveat that by saying "but
14  I do so within the terms of the governing legal
15  regime."
16    "I contend that using their authority
17  under 54(d)(2) the Court should require greater
18  disclosure of fee allocation agreements."
19    So you seem to be conflating there the
20  obligation of the Court to ask lawyers under 54(d)
21  about fee allocations with the obligation of class
22  counsel to give notice sufficient to inform the
23  class and sufficient information to give them the
24  opportunity to object.

Page 119

1    You seem to be conflating those two
2  considerations. Is that right?
3    MR. GLASS: Objection.
4    THE WITNESS: Somewhat. Rule 23 -- you
5  said class counsel's obligation under Rule 23 to
6  give notice to the class.
7    Rule 23 is actually peculiarly written,
8  and it's different than the phrasing of who has the
9  duty to give notice, whether it's the Court or the
10  lawyers.
11    My own opinion is it's the Court's duty
12  to make sure the class members have all the
13  information that they need. And so I would say it's
14  the Court's duty to make sure of this. Regardless
15  of what the lawyers want to disclose, the Court has
16  an obligation to make sure that the class members
17  have all the information they need with regard to
18  the settlement and the fees.
19    And I do say here -- I think what I'm
20  conflating is if the Court does what I want them to
21  do and says make the fee allocation agreements --
22  disclose the fee allocation agreements, then I think
23  that information should be conveyed to the class as
24  well.

Page 120

1    The Court has thought enough to ask for
2  it; let's then give it to the class members as well.
3    THE SPECIAL MASTER: We all know in
4  practice that the lawyers draft the notice to the
5  class of settlement, right?
6    THE WITNESS: Um --
7    THE SPECIAL MASTER: Draft.
8    THE WITNESS: Yes and no. They also
9  nowadays, as you probably know, have professional
10  companies that do this.
11    THE SPECIAL MASTER: Yes.
12    THE WITNESS: Yeah. And so there's a --
13  in my experience the lawyers and these professional
14  notice givers will come up with a notice. I never
15  know who writes the first draft. Sometimes I think
16  these companies do. Sometimes the lawyers do.
17    The Court then has to approve the
18  notice, but rarely does the Court write the notice
19  in the first instance, yeah.
20    THE SPECIAL MASTER: It's either done by
21  one of these companies at the direction of class
22  counsel, correct? Or class counsel itself?
23    MR. HEIMANN: Well, I know you don't
24  want speaking objections, but I know of exceptions

Page 121

1  where the Court writes the notice.
2    THE SPECIAL MASTER: I'm going to get to
3  that. At any rate, yes?
4    THE WITNESS: Generally speaking, that's
5  my understanding.
6    THE SPECIAL MASTER: So I believe what
7  you're saying here again is that the burden is on
8  the Court at the notice stage to make sure that fee
9  allocation agreements are in the class notice?
10    THE WITNESS: I'm saying Rule 23 puts
11  that burden on the Court, that's correct. I'm not
12  saying it's the burden. I'm saying Rule 23 says
13  that's the burden's on the Court. That's how the
14  framers wrote it.
15    They -- the experts who wrote this
16  picked up the language of Rule 54 and put that
17  burden on the Court.
18    THE SPECIAL MASTER: And the obligation
19  under Rule 23(h)(2) that class members be given
20  sufficient information to do so, meaning to object
21  to a fee petition, is an obligation as to fee
22  agreements and allocation agreements that is on the
23  Court?
24    MR. GLASS: Objection.

Page 122

1    THE WITNESS: Yes.  And I think the
2 drafters thought to put that obligation on the Court
3 because allocation agreements are much less likely
4 to affect the class' interest whereas what you have
5 to give the class information about is what's the
6 magnitude of the fee that's being sought and where's
7 it coming from and how much are we paying for the
8 fees.  That's the stuff they're centrally interested
9 in.
10    I think we'd agree in most cases the fee
11 allocation would be distracting to the class members
12 I think the drafters thought.  And rather than
13 inundate them with that information, give them the
14 key information they need to know.  How much am I
15 paying the lawyers.  How the lawyers split it up is
16 their problem.  How much am I paying for the lawyer.
17    THE SPECIAL MASTER: And the obligation
18 to provide sufficient information for the class
19 means that as to fee allocation agreements the Court
20 has to ask?  Yes?
21    THE WITNESS: Yes.  That's what Rule 23
22 says.  That's correct.
23    And, again, remember, you know, in this
24 case I can count at least a dozen different fee

Page 123

1 agreements.  At least a dozen different fee
2 agreements in this case.  And this is a small case
3 relatively speaking -- I mean it's a big case, 300
4 million dollars, but the quantity of lawyers to
5 create it is relatively small.  I don't know what a
6 notice would look like with a dozen fee agreements
7 explained.  Or more.
8    And I think Rule 23 focuses the limited
9 time of the federal judge -- you know this better
10 than any of us in this room -- on the key thing in
11 the class' interest which is how much is the class
12 paying.
13    THE SPECIAL MASTER: How much is the
14 class paying in the aggregate in fees.
15    THE WITNESS: Yeah.
16    THE SPECIAL MASTER: And an important
17 part of that information for it to be sufficient is
18 not to know whether the lawyers getting money did
19 any work at all on the case?  That's not important
20 for the class to know?
21    MR. GLASS: Objection.
22    THE WITNESS: I don't think that's my
23 testimony.
24    I think my testimony is in my opinion I

Page 124

1 would hope the judge would ask for the fee
2 agreements and learn if such a situation existed and
3 inquire into it and figure out what the judge felt
4 about it and whether the class should know about it.
5    THE SPECIAL MASTER: It's a lot to put
6 on a judge.
7    Separate and aside from what Rule 54
8 says and the incorporation of Rule 54 into Rule 23,
9 you said earlier the class only knows what it knows
10 and can only object to what it knows, right?
11    Is that -- obviously that's a --
12    THE WITNESS: Sounds like a truism.
13    THE SPECIAL MASTER: -- truism.  That
14 was the word I was going to use.  It's also true of
15 a judge.
16    And this burden of requiring the judge
17 to ask in every case tell me everything about every
18 fee agreement, you know, that is in this case, don't
19 judges have the right to rely upon what the lawyers
20 are giving them as to be all of the necessary and
21 material important information?
22    MR. GLASS: Objection.
23    THE SPECIAL MASTER: Without having to
24 ask is anybody getting a fee here that didn't work

Page 125

1 in the case, this didn't appear in the lodestar,
2 that didn't appear in the case?
3    MR. GLASS: Objection.
4    MR. HEIMANN: I'd object to that
5 question as compound.  There are at least four
6 questions there.
7    THE SPECIAL MASTER: You can answer any
8 one of them or all of them.
9    THE WITNESS: I -- the sense that you're
10 -- it's a lot to ask of a judge.  I think we ask an
11 enormous amount of federal judges.  They're
12 incredibly busy in a wide range of things.
13    And then at this moment in a class
14 action lawsuit we say to the federal judge, hey,
15 you're now a fiduciary for absent class members is
16 an enormous burden to put on judges, but I think the
17 courts that use that language do so specifically to
18 remind the judge you're the backstop.  It's up to
19 you.  And you have to do something here.
20    And I in writing the treatise am saying
21 to the judges you're busy, rely on me, and I'll tell
22 you.  I'm an expert in this area.  Here's what I
23 think you should be doing.  Ask for the lodestar and
24 do a crosscheck and get the fee agreements and make

Page 126

1 sure there's no chicanery going on.
2     And I'm not -- by the way, I'm not
3 testifying there was any chicanery.  I'm not taking
4 a position here but --
5     **THE SPECIAL MASTER:** There was a
6 generalized chicanery going on here.
7     **THE WITNESS:** Generalized comment, yeah.
8     So I don't dispute that that's putting a
9 lot on the federal judge, and I'm trying to help.  I
10 do a lot of work with federal judges trying to get
11 them to understand this.
12     **THE SPECIAL MASTER:** My question was --
13 the other part of my compound question was doesn't
14 the judge have the right to expect the lawyers to
15 tell him or her everything that the judge should
16 know so that the judge can fully perform his or her
17 fiduciary duties to the class?
18     **MR. GLASS:** Objection.
19     **THE WITNESS:** I'd answer it this way,
20 your Honor.  I think that lawyers have the right to
21 rely on the rules, and the rule is the Court can ask
22 for the fee agreements if they want.
23     I think beyond that, it's a tough
24 question for a lawyer to answer because you're now

Page 127

1 asking them to interpret what would be pertinent to
2 a judge, and it varies wildly.
3     Remember 40 percent of the judges don't
4 even ask for a lodestar submission which I find
5 outrageous.  So are the lawyers then required to
6 submit the lodestar when the judge doesn't ask for
7 it?  I find it incredibly pertinent.
8     But if a judge doesn't ask for it, are
9 they supposed to predict that the judge really means
10 to ask for it and didn't?
11     Now I appreciate your reaction to the
12 Chargois Arrangement makes it feel very negative,
13 and you think you should have been told it.  I
14 suspect there are other judges who would think, wow,
15 this is the price of doing business in a PSLRA, and
16 a firm like Labaton has to give away this amount of
17 money for this introduction, that's kind of an
18 amazing fact.  I'm busy.
19     And so I think that lawyers appearing in
20 these cases have the right to rely on the rule
21 structure, and it's hard to put on them a burden to
22 predict what else would be important for the judge
23 to know.
24     **THE SPECIAL MASTER:** All right.  It's

Page 128

1 11:59.  I have to -- you can continue, Bill.
2     **THE WITNESS:** Or not.
3     **THE SPECIAL MASTER:** We'll break for
4 lunch.  We're going to continue.  This feels a lot
5 ask like "Don't Ask, Don't Tell."
6     **MR. HEIMANN:** So I object to that.
7     **THE WITNESS:** I know more about "Don't
8 Ask, Don't Tell" than anyone in the room.  Why does
9 it feel like Don't Ask --
10     **THE SPECIAL MASTER:** If the judge
11 doesn't ask -- maybe it should be "doesn't ask,
12 don't tell."
13     **MR. HEIMANN:** I mean is that really a
14 question?
15     **THE SPECIAL MASTER:** Yes.
16     **MR. GLASS:** Objection.
17     **THE WITNESS:** It's not -- I don't think
18 it's a fair way of stating it because it implies
19 that there's always hiding going on, and I just
20 don't think that's a fair way of characterizing
21 class action lawyers in general.
22     **THE SPECIAL MASTER:** Okay.  If you want
23 -- if you folks want to continue, I have to go get
24 on this call.

Page 129

1     **MR. HEIMANN:** We generally want to break
2 for lunch at some reasonable point.  Now is fine if
3 you want or if you want to continue --
4     **MR. SINNOTT:** Why don't we break now for
5 45 minutes?
6     **THE SPECIAL MASTER:** Yeah.
7     **MR. SINNOTT:** Forty-five minutes, and
8 then we'll resume.
9     (A lunch recess was taken.)
10     **MR. SINNOTT:** Welcome back, everyone.
11     Paulette, I have in my hand the expert
12 declaration of Professor Rubenstein dated July 31,
13 2017 and the accompanying exhibits which include his
14 CV and publications.
15     So at this time I'd like to offer this
16 as an exhibit.
17     (Exhibit 2 marked
18     for identification.)
19     **BY MR. SINNOTT:**
20 Q.  Professor, for purposes of authentication,
21   if you could look at that and confirm that that's
22   your July 31, 2017 declaration?
23 **A.  It looks like it, yes.**
24 Q.  Okay.  And does that include a CV as well in

Page 130

1 the content?
2 **A.  Yes.**
3 **Q.**  All right, thank you.
4      Now prior to the break I had started to
5 ask you some questions about your report and the
6 section that begins on page 13 through 17, and I
7 brought up a section of the Newberg treatise, and
8 specifically this is under the title of Chapter 13
9 Settlement, Roman numeral four, Final Judicial
10 Approval of Proposed Class Action Settlements,
11 Section 13-40 Fiduciary Role of the Court.
12     **MR. SINNOTT:** Paulette, if we could mark
13 that as Exhibit 3.
14     (Exhibit 3 marked
15     for identification.)
16     **BY MR. SINNOTT:**
17 **Q.**  All right, professor, if you'd look at that
18 document before you.
19 **A.  Okay.**
20 **Q.**  And directing your attention to the first
21 paragraph, it says, "Rule 23 requires judicial
22 approval of any settlement of a class action
23 lawsuit.  That requirement distinguishes settlement
24 of a class suit from settlement of a non-class suit:

Page 131

1 The latter requires no judicial approval in most
2 circumstances."
3      And then you go on to say, "A Court must
4 approve a class action settlement because the
5 parties that are present in settling the case, the
6 class counsel, the class representatives and the
7 defendants, are proposing to compromise the rights
8 of absent class members.  The settlement process
9 aims to ensure that the interest of these absent
10 class members are safeguarded.  It primarily does so
11 by charging the judge with that responsibility in
12 requiring her judicial stamp approval."
13     Then you talk about three components or
14 aspects of this process in this fiduciary
15 responsibility -- fiduciary role of the Court.
16     And in the first bullet you say, "First,
17 so central is the protection of absent class
18 members' rights that the Court is said to have a
19 fiduciary duty toward absent class members during
20 the settlement of a class suit.  This is a peculiar
21 judicial function as the normal job of a Court is to
22 act as a neutral arbiter between two competing
23 parties, not as the fiduciary for a group of
24 people."

Page 132

1      And then in the second bullet you say,
2 "Second, the Court's role as fiduciary is primarily
3 to ensure that the class's own agents, its class
4 representatives and class counsel have not sold out
5 its interest in settling this case.  In this sense
6 the Court's activity is to review the work that
7 lawyers have undertaken to make sure it is
8 noncollusive in nature and successful in substance.
9 This, too, is a peculiar judicial function
10 particularly to the extent it requires the Court to
11 examine how class counsel has carried on extra
12 judicial negotiations on behalf of the class."
13     And then in the third bullet you write:
14 "Third, to make matters worse, the presentation of
15 the settlement for judicial approval is
16 non-adversarial in nature:  The prior competing
17 parties, class counsel and the defendants have
18 resolved their differences and are now in harmony
19 seeking the Court's approval.  The Court is
20 therefore required to make a decision using a mode
21 of decision making unfamiliar to courts.  Typically
22 courts resolve an issue after the parties present
23 their cases in an adversarial matter.  In a class
24 settlement absent objectors, the Court is presented

Page 133

1 information representing only one side of the
2 issue."  And in parentheses pro settlement.  "And
3 even if objectors appear and argue against the
4 settlement, the pro settlement presentation is
5 typically far stronger.  Hence, the Court often
6 lacks the information necessary to make a truly
7 informed decision."
8      And then let me just -- before I ask you
9 some questions, let me just read the next few lines.
10     "In sum, at the settlement of a class
11 suit, the law requires the judge to act as a
12 fiduciary, making an unusual, largely non-legal
13 judgment and to do so in an informational vacuum.
14 The manual for complex litigation describes this
15 peculiar judicial task this way:  Because there is
16 typically no client with the motivation, knowledge
17 and resources to protect its own interest, the judge
18 must adopt the role of a skeptical client and
19 critically examine the class certification elements,
20 the proposed settlement terms and procedures for
21 implementation."
22     So let me ask you a few questions on
23 that section, at least the portions that I've
24 covered here.

Page 134

1    It sounds like, you know, words like "to
2  make matters worse," this is a process for the judge
3  -- this fiduciary role -- that's fraught with
4  difficulties?  Is that a fair statement, professor?
5  A.  Yes and no.  Yes in the sense that, as I
6  describe, it's an unfamiliar -- it's not the formal
7  thing judges do.  So it can be difficult in that
8  regard.
9      No in the sense that settlement's a good
10  thing.  The judicial system strongly encourages
11  settlement.  The next or previous section of this
12  treatise emphasizes how much weight is given to
13  settlement, and I think at the moment of settlement
14  there's kind of a congratulatory sense that the
15  legal system has for itself.
16      So on the one hand, you know, you put
17  the Court in a difficult role; on the other hand,
18  it's a good moment generally speaking.
19  Q.  Is it fair to say that the system and the
20  fiduciary role of the Court in particular relies
21  upon the good faith of the parties?
22  A.  Yes.  You know, I feel like you all want to
23  read a lot into that further than I do.
24  Q.  Well, in your treatise you talk about how

Page 135

1  the Court's role is -- in the second bullet -- to
2  ensure that the class' own agents, its class
3  representatives and class counsel have not sold out
4  its interest in settling the case.
5      So what am I reading into that?  That's
6  a very valid consideration, is it not?
7  A.  Yeah.  Three things I think we differ on.
8      Number one, when I see that the Court is
9  a fiduciary for the class members, I immediately
10  think that means the Court has a responsibility to
11  do something.  I don't immediately think that means
12  the parties have a responsibility to do something.
13      The whole point of the appellate court
14  saying to the district court you are a fiduciary is
15  to say to the trial judge, sit up, do something;
16  you're a fiduciary duty to the absent class members.
17  So the first thing I think is I don't want to slough
18  over or forget how important it is that the Court is
19  the fiduciary here.
20      Second, if you kept reading on the next
21  page, I say under the -- it's my second point now;
22  it's my third point here -- the Court has available
23  to it a variety of mechanisms for actively seeking
24  assistance.

Page 136

1      And as I've testified in writing and
2  throughout the day, one of those mechanisms is the
3  Rule 23 via Rule 54 says to the Court you can ask
4  for fee agreements to be submitted to the Court.
5      So that's a second thing that I think is
6  important.
7      And, third, the other thing I think here
8  is that I, for the reasons I've testified throughout
9  the day, am not convinced that the class' interests
10  were compromised by the Chargois Arrangement at the
11  moment that we're talking about here --
12  Q.  Well, let me ask you this --
13  A.  -- if ever.
14  Q.  Do you -- are you finished?
15  A.  I'm sorry, I said "if ever" at the end of
16  that.
17  Q.  Okay.  Because you do specifically make
18  reference to class representatives and class counsel
19  not selling out its interest -- the class' interest.
20  I'm assuming you mean there in settling the case.
21      Have you seen the declaration of George
22  Hopkins that was submitted last month?
23  A.  Yes.
24  Q.  And do you recall that in that declaration

Page 137

1  Mr. Hopkins indicates that he didn't know about the
2  Chargois Arrangement?
3  A.  I'm willing to accept -- I don't recall the
4  specifics of it, but that sounds right.
5  Q.  All right.  And do you recall him writing
6  words to the effect that he didn't want to know?
7  A.  I recall him testifying to that effect,
8  correct.
9  Q.  Do you regard that declaration and
10  specifically those portions of it that I just asked
11  you about as a disqualifier or as undermining
12  Mr. Hopkins' ability to be an adequate class
13  representative?
14      MR. HEIMANN: Objection.
15      MS. LUKEY: Objection.  I already
16  stipulated he was only ratifying Arkansas Teachers
17  Retirement System.
18      MR. HEIMANN: I'm objecting on the
19  grounds that it's beyond the scope of this witness'
20  testimony as an expert in this matter.
21  A.  So, again, now you're asking me do I think
22  George Hopkins was an adequate -- George Hopkins and
23  the Arkansas Teachers were adequate class
24  representatives?

Page 138

1  Q.  Yes, sir.
2  A.  And, again, I'm testifying here as a
3  rebuttal witness to Professor Gillers, and we agree
4  Professor Gillers said nothing about this whatsoever
5  in his report.
6      So you're asking me to testify to
7  something fresh that I haven't had a chance to read
8  the argument in favor of, if there is one.
9  Q.  Yes, sir.
10  A.  And so if this becomes a pertinent fact, I
11  would then have the opportunity to update my
12  opinions after having to reflect on them since I am
13  here as a rebuttal witness.
14      I don't -- so here's the way I would
15  think of this question:  You're asking is the class
16  representative a good monitor of fee allocations
17  among class counsel, and I would say that the class
18  action law -- I'm now describing class action law to
19  you -- doesn't depend on the class representative in
20  the fee allocation process very much, if at all.
21      And I would come back here and say,
22  look, the thing we're reading from my treatise says
23  the Court is the fiduciary; the Court is the
24  fiduciary for the absent class members at this

Page 139

1  point.
2      I know of very few instances, if any, in
3  which class counsel present the fee allocation to
4  the class representative, go over the details of it
5  with the class representative, ask the class
6  representative to sign off on it and proceed in that
7  particular manner.
8      If you read the cases about the fee
9  allocation process like High Sulfur, Agent Orange,
10  actually all the cases your expert cites, not one of
11  them mentions the class representative as being part
12  of that process.
13      In Agent Orange, for instance, the
14  second circuit said this arrangement is outrageous
15  because the class representative didn't approve it,
16  or the class representative did approve it, and it's
17  still outrageous or something like that.
18      So we generally don't think as the class
19  representative of being a monitor of the fee
20  allocation process.  There's one exception.
21      That exception is cases litigated
22  literally under PSLRA, the Private Securities
23  Litigation Reform Act of 1995, and the exception
24  occurs because the relationship is switched.

Page 140

1      Under the PSLRA the Court appoints lead
2  plaintiffs, and the lead plaintiffs then select lead
3  counsel.  And so in that circumstance where the lead
4  plaintiff has the legal responsibility to choose the
5  lead counsel, the Court has to sign off on it, but
6  they choose the lead counsel.
7      In that situation some courts, the third
8  and second circuit in particular, have held that
9  there's some deference to the class representative
10  -- lead plaintiff -- if they approve the fee
11  allocation, there'll be some deference -- some
12  deference, still judicial approval -- that some
13  deference to lead plaintiffs in the PSLRA context.
14  And a kind of -- it's very specialized.
15      It reverses everything we know, but it's
16  because the lead plaintiff in the PSLRA case is
17  hiring the lawyer for the class.
18  Q.  All right.  So let me just back up.
19      What is the responsibility of in this
20  case George Hopkins with respect to the members of
21  the class?
22      MS. LUKEY:  Objection.
23  A.  I'm not sure how to answer that question.
24  The Arkansas Teachers Fund -- I think that's the

Page 141

1  name of it.  Let's say Arkansas.  They're the class
2  representative, but I think at the end there's a
3  handful of class representatives.  They're one of
4  the class representatives.  And their
5  responsibilities to the class are those that go with
6  being class representative.
7      There's probably a whole book of the
8  treatise on this topic which we don't really have
9  time for.  The shorthand version would be to some
10  extent the class representative plays the function
11  of being the client for the absent class members,
12  stands in as the client to the lawyer for the absent
13  class members.  And in a pretty limited way.
14      And I say that for two reasons.  What we
15  ask of class representatives are basically two
16  things:  Number one, that they don't have obvious
17  conflicts of interest; and, number two, that they
18  hit some minimum threshold of performing their job,
19  and the threshold is put at a minimum so that in a
20  lot of cases the defendants will attempt to
21  disqualify the proposed class representative and
22  depose them.
23      And at that deposition it will come out
24  that the proposed class representative doesn't know

Page 142

1   very much about the lawsuit, doesn't understand the
2   lawsuit, doesn't understand the law, may not
3   completely understand their functions, and
4   nonetheless courts are very forgiving and say the
5   class representative is fine in these circumstances.
6       So, you know, I don't want to pretend we
7   expect too much of the class representative in class
8   action lawsuits.
9   Q.   Are the courts forgiving enough to say that
10  a class representative who says he doesn't wish to
11  know about a fee allocation is doing his job to his
12  members?
13      MS. LUKEY: Objection.
14  A.   Look, the law says that the judge is a
15  fiduciary and oversees fee allocation.  Ninety-nine
16  percent of the judges say we don't want to know.
17  Q.   But that's not what I'm asking you.
18  A.   I know, but that's my answer.
19      If the judges themselves who have the
20  ultimate authority to oversee the fee allocation do
21  not want to know and do not get involved, I don't
22  see how the judges can then say to the class we
23  expect more from the class representative, who I've
24  just said is expected to know very little, and not

Page 143

1   really to be able to oversee and manage the lawyers.
2       It's precisely why we make the judge the
3   fiduciary for the absent class members, and the
4   judges themselves neglect this authority.
5   Q.   But let's get away from the responsibility
6   of the judges, and let me ask you about the
7   responsibility of the class representative.
8       Would it be reasonable for an Arkansas
9   class member to feel that he or she was entitled to
10  a class representative that was actively in the know
11  about issues of attorney allocation?
12      MS. LUKEY: Objection.
13  A.   When you say an Arkansas class member,
14  you're asking me specifically about a member of the
15  State Street class who happened to be a resident of
16  Arkansas?
17  Q.   No.  I'm asking you about -- Arkansas's our
18  shorthand for --
19  A.   Oh, for this case.
20  Q.   -- ATRS.
21  A.   Any class member in the case?
22  Q.   Yes.
23  A.   If you stopped someone on the street and
24  says are you a member of the class, someone's

Page 144

1   representing you, are you asking me what that person
2   would say?
3   A.   I don't know what the person would say.
4   Would it be reasonable --
5   Q.   No, I'm not asking you that.
6       I'm asking you what the responsibility
7   of a class representative such as George Hopkins
8   would be to that inquiry from one of his members?
9       MS. LUKEY: Objection.
10  A.   Well, you asked me would it be reasonable
11  for the class member to expect something, and I said
12  I don't know how to answer that question from the
13  class member's point of view.
14      I can tell you what class action law
15  thinks about this question, and what I'm telling you
16  is class action law has no expectation that a class
17  representative in a standard non-PSLRA case will
18  oversee the fee allocation process.
19      I don't know of a single fee allocation
20  case that references the class representative's
21  involvement in any way whatsoever, even the cases in
22  which they kind of suggest the judge should have
23  done more.
24  Q.   Well, have you been involved in cases in

Page 145

1   which a class representative had a conflict of
2   interest or where there was something preventing
3   that class representative from adequately
4   representing the class?
5   A.   Yes.
6   Q.   Tell us about that.  How many cases?
7   A.   Oh, I've probably -- I'd have to go through
8   my CV and my history, but I can think of at least a
9   handful off the top of my head.
10  Q.   Okay.  And what was the problem with the
11  class representative in those cases as best you
12  recall?
13  A.   You know what?  I'm sorry, I should back up.
14      The cases that I'm thinking of have more
15  to do with class counsel's relationship with the
16  class representative and that relationship going
17  wrong more than the class representative themselves
18  having done something wrong.
19  Q.   All right.
20  A.   So in one case lawyers said to the class
21  representative if you agree to this settlement,
22  you'll get an incentive award which is a kind of
23  bonus that the class representative gets at the end.
24  But if you don't agree to the settlement, you won't

Page 146

1  get that.
2     And I was an expert testifying that I
3  didn't think that was appropriate to be made to the
4  class representative because if the class
5  representative didn't agree with the proposed
6  settlement, that was information that the lawyer
7  should want to hear rather than coercing them into
8  agreeing to the settlement.
9     And I've been in other cases where class
10  counsel -- there are often situations in which there
11  are competing class actions. Someone has a good
12  class action going. It's going very well. All of a
13  sudden, lo and behold, out of nowhere the whole case
14  settles in another court somewhere across the
15  country that precludes that the case go forward.
16     The lawyers in the good case --
17     THE WITNESS: Are you getting down my
18  hands?
19  A.  The lawyers in the good case then go in and
20  object to the proposed settlement that's going to
21  preclude their case, and in some sense they're
22  saying to the judge in objecting to the settlement
23  that the proposed settlement isn't fair, adequate
24  and reasonable, and the class representatives in

Page 147

1  that case and class counsel shouldn't have approved
2  it or proposed it.
3     I was in another case in which I was
4  actually an expert witness for objectors in a case
5  where there was an antitrust case against BARBRI --
6  the bar preparation course.
7  Q.  Yeah?
8  A.  The class consisted of everyone who took the
9  bar preparation course which, of course, is all the
10  lawyers.
11     So the proposed class representatives
12  were all lawyers, and the proposed class
13  representatives had thought up the case and
14  bargained in advance for themselves to get an
15  incentive award on a sliding-scale basis.
16     And the ninth circuit struck that down
17  as being a conflict of interest between their duties
18  to the class and their own self-interest in the
19  case. And so there's an example of kind of a class
20  representative gone bad. Lawyers' class
21  representatives gone bad.
22  Q.  Well, I think all of us in the room want to
23  know can we still join that class?
24  A.  Exactly. So there's a few examples.

Page 148

1  Q.  Okay.
2  A.  But the ninth circuit case sticks out
3  because it's so rare that the class representatives
4  are found inadequate. Absent them being, you know,
5  the first cousin of the lawyer or the sister of the
6  lawyer or brother of the lawyer or something like
7  that.
8  Q.  All right. Let me ask you specifically
9  about the fiduciary duty of the Court. Is the Court
10  only bound by Rules 23 and 54 in carrying out its
11  fiduciary duty?
12     MS. LUKEY: Objection.
13  A.  I wouldn't say the Court was only bound by
14  23 and 54. I would have said the Court is -- in
15  this case what we're talking about, I would say the
16  Court is authorized by Rule 23 and 54 specifically
17  to ask for the disclosure of fee agreements.
18     So I don't know if it's bound by that.
19  Rule 23 and Rule 54 are what structure the fee
20  process in class action cases.
21  Q.  Yeah. Let me put it another way.
22     Are those rules the only mechanism by
23  which the Court can scrutinize the circumstances in
24  which a fee petition is made?

Page 149

1  A.  It's hard to answer that question in the
2  abstract. Rule 23 clearly sets out a process and
3  the structure for the fee process in class action
4  cases. It's the governing rule. In the case we're
5  talking about it has a specific subpart directly on
6  point.
7     So, you know, look, I feel like you all
8  are trying very hard to find a way around that
9  specific law, and you've built kind of a group
10  Goldberg contraption with lots of other things going
11  on but --
12  Q.  Well, thank you very much.
13  A.  -- from where I sit there's a specifically
14  rule directly on point. Just doesn't happen to say
15  what you want it to say, but it's there.
16  Q.  Well, you're an expert on class actions,
17  correct?
18  A.  Yes.
19  Q.  You're not an expert on ethics, correct?
20  A.  You know, I never know how to answer that
21  question. I like to think of myself as having
22  ethics. And use of the word "expert" -- we're now
23  talking about it in the context of an expert
24  witness -- depends on how you define that.

Page 150

1  Q.  Well, would you be prepared to opine as an
2  expert on ethics with Judge Wolf at some point in
3  the near future?
4  A.  I'm not here as an expert on ethics.
5  Q.  There's an old expression that "when you're
6  a hammer every problem in the world looks like a
7  nail."
8     When you're an expert on class actions,
9  does every problem in the world look like a class
10 action problem?
11 MS. LUKEY: Objection.
12 A.  I'm not testifying that there are no ethical
13 rules involved in lawyering. I'm here as a rebuttal
14 witness because your ethics expert testified as to
15 the content of class action law.
16 Q.  But you are not opining as an expert on
17 ethics, correct?
18 A.  I'm not here as an expert on ethics.
19 There's someone waiting outside that I will be happy
20 to cede the seat who is Lieff Cabraser's expert on
21 ethics.
22 Q.  Let's see if I can save us a little time.
23 So if you'll just bear with me.
24    (Pause.)

Page 151

1     BY MR. SINNOTT:
2  Q.  Just as a related question, would you agree
3  that lawyers for a class may have obligations to the
4  Court or to the class other than under Rules 23 and
5  54?
6     MS. LUKEY: Objection.
7  Q.  Putting aside whether they did or did not in
8  this case.
9     MS. LUKEY: Objection.
10 A.  I think all lawyers in any case have an
11 obligation to follow the ethics rules that govern
12 the practice that they're in.
13 Q.  Okay. Would you agree that after
14 certification in this case that the class and its
15 members were clients of class counsel?
16 A.  So I've written a lot about this question,
17 and my answer is there is no answer to this
18 question.
19    And to be more specific, they are
20 clients for some purposes, and they're not clients
21 for other purposes.
22 Q.  All right. Could you explain that?
23 A.  Sure. After a class is certified, the class
24 members are clients for the following purpose --

Page 152

1  we're now talking about the ethics rules. Again, I
2  should qualify this by saying I'm not here as an
3  expert on the ethics rules --
4  Q.  Okay.
5  A.  -- but I have written a section in the
6  treatise on this.
7     And, for instance, once the class is
8  certified, they are clients for purposes of say
9  defendants wanting to communicate with the class
10 members. In a normal lawsuit the defendants can't
11 communicate directly with the plaintiff; they have
12 to communicate through the ethics rules with the
13 plaintiff's lawyer.
14    Similarly, once a class has been
15 certified, the class members are considered clients
16 of the class lawyer for those purposes, and
17 defendant communications have to be through the
18 lawyer.
19    On the other hand, they're not clients
20 for some other purposes. For instance, in conflicts
21 rules are much laxer so that in a normal lawsuit the
22 lawyer representing a client has to clear all types
23 of conflicts like representing the opponent in a
24 different lawsuit.

Page 153

1     But it's much different in a class
2  action lawsuit because of the absent members of the
3  class, and there's all kinds of overlapping
4  possibilities, and we don't think of the client --
5  class members being clients for conflicts purposes
6  in quite the same way we would in an individual
7  lawsuit. Top of which, Rule 23's commentary makes
8  quite clear that class members can't fire their
9  lawyer. And so they're very much unlike clients in
10 that regard.
11 Q.  Would you agree that after certification
12 counsel has a fiduciary duty to class -- the class
13 and to its members?
14 A.  So, again, you're asking me a question that
15 I think isn't Rule 23 specific. I would say that in
16 reading the case law courts sometimes use that
17 language, but, again, I'd be very careful about what
18 it means because there's a whole set of cases, and
19 I'll now walk you through these -- there's a whole
20 set of cases in which former class members sue class
21 counsel for malpractice, and in those malpractice
22 cases their cause of actions brings in breach of
23 fiduciary duty. And in many of those cases the
24 courts will say that the class action lawyers

Page 154

1  complied with Rule 23, and therefore they did not
2  breach their fiduciary duties and hence appear to
3  conflate what those two things mean.
4      So I think the phrase comes up class --
5  Q.  Wasn't that a case --
6      MS. LUKEY:  Wait.  You interrupted him.
7  Q.  I'm sorry, go ahead.
8  A.  I think that the phrase is used that class
9  counsel have fiduciary duties to the class, but it's
10  kind of used in a general generic sense, and it's
11  very hard to be more specific about what that means.
12  Q.  Well, weren't those examples that you just
13  described cases in which the Court found there was
14  not a fiduciary duty?
15  A.  No, I'm sorry.  I might not have been clear.
16  What the Court found was that there was not a breach
17  of the fiduciary duty because Rule 23 had been
18  complied with, and hence in some ways what the
19  Court's saying is that whatever fiduciary duty the
20  lawyer had was co-extensive with its Rule 23 duties.
21      And if that's the case, then Rule 23
22  creates the set of so-called fiduciary duties that
23  we're talking about.
24  Q.  Okay.  Thank you.

Page 155

1      And prior to certification, before the
2  class is certified, what duties does counsel for a
3  putative class and for the putative class
4  representative owe to the class and its members?
5  A.  Again, speaking most carefully under Rule 23
6  because Rule 23(g) and the commentary that the
7  advisory committee notes speak directly to this
8  question.
9      There's really three possibilities here.
10  There's a lawyer who files a putative class action
11  full stop.  There's the appointment of interim class
12  counsel without class certification which actually
13  happened in this case.  And then there's for class
14  certification, and there are varying -- there are
15  varying things that happen at each stage.
16      The Supreme Court has been quite clear
17  if you're not literally class counsel you lack the
18  ability to bind the class in a recent case they so
19  held.  I'm not actually entirely sure they're right
20  but they so held.
21      On the other hand, Rule 23's commentary
22  makes clear that any lawyer who files a putative
23  class action should beware of the actions they take
24  because of the effect it may have on absent class

Page 156

1  members.  So Rule 23's commentary suggests that
2  there's some duty that arises in the filing of a
3  putative class action.
4  Q.  Okay.  Thank you.
5      What if at a hearing in this matter that
6  Judge Wolf had asked counsel or had said to counsel
7  why didn't you tell me about Chargois, and assume
8  the lawyers had retained you as an expert and asked
9  how they should reply to that question, how would
10  you advise them?
11      MS. LUKEY:  Objection.
12  A.  So I'm sorry.  Walk me through this again.
13  Q.  Sure.
14  A.  There's a hearing -- like tomorrow?
15  Q.  Judge Wolf -- or at some point in the past
16  Judge Wolf says why didn't you tell me about
17  Chargois?
18      MR. HEIMANN:  Before or after the fee
19  award?  Does if matter for your question?
20      MR. SINNOTT:  After the fee award.
21      MS. LUKEY:  Objection.
22      BY MR. SINNOTT:
23  Q.  How would you respond?
24      MS. LUKEY:  Objection.  Sorry.

Page 157

1  A.  So to make this so I understand it, let's
2  say Judge Wolf reads everything that's happened
3  here, and the Chargois Arrangement has come out and
4  says to one of the lawyers why didn't you tell me
5  about the Chargois Arrangement?
6  Q.  Yes, sir.
7  A.  You're asking me what advice I would give
8  that lawyer about how to answer that question?
9  Q.  Right.
10  A.  So now I'm a --
11  Q.  The question has not been answered yet.
12  A.  Yes.
13  Q.  And your clients say how do we answer that
14  question?
15  A.  Well, I'd say I have a conflict of interest
16  because I'm an expert witness in this case.  I can't
17  now be consulting counsel.
18      THE SPECIAL MASTER:  In the abstract.
19      THE WITNESS:  Yeah.
20  A.  I think, you know, I'd pretty much say what
21  I said which is I think he should be honest with the
22  Court and tell the Court the way you understood the
23  rules.
24      There was no requirement to disclose fee

Page 158

1  agreements absent judicial request.
2  Q.  All right, sir.
3  A.  If you can honestly say that.
4  Q.  Yeah.  Let me direct your attention to pages
5  22 and 23 of your report.  And the header at the top
6  of page 22 says Professor Gillers has identified no
7  facts supporting the conclusion that federal common
8  law/equity required Lieff Cabraser to inquire into
9  or disclose to the Court information about the
10  Chargois Arrangement.
11  (Pause.)
12  Q.  Specifically within this section you
13  indicate that 5.5 percent of the total fee award
14  such as occurred in this case is not an unusually
15  high referral fee.
16  A.  Hm hm.
17  Q.  What's a referral fee?  How do you define
18  that?
19  A.  I say the 5.5 percent is not an unusual --
20  MR. HEIMANN: Yeah, I'm not finding
21  that.
22  Q.  Are you relying on that?
23  A.  I don't know what you're talking about.
24  Q.  Just give me a moment to find that.

Page 159

1  THE SPECIAL MASTER: I think you were
2  relying on some testimony that we've had or at least
3  a statement that was made that 5.5 percent was not
4  -- we can find it.
5  A.  What I say -- it's on page 24.  I say
6  Mr. Lieff who has roughly 50 years of experience in
7  class action law testified that the amount paid
8  Chargois, which I don't think was 5.5 percent, for
9  what he understood to be local counsel work did not
10  seem on its face to be unusual.
11  But I -- yeah.  Is that what you're
12  referring to?
13  THE SPECIAL MASTER: I think that's it.
14  MR. SINNOTT: Yes, that section.
15  A.  He's here if you want to talk to him.
16  MR. LIEFF: I'm not an expert.
17  Q.  We've already heard from him.
18  A.  Okay.
19  Q.  Let me ask that question again though.  How
20  do you define a referral fee?  Or do you?
21  MR. HEIMANN: Are you referring to the
22  use of the referral fee in that sentence when he's
23  referring to --
24  MR. SINNOTT: No, in general terms.

Page 160

1  MR. HEIMANN: Oh.
2  BY MR. SINNOTT:
3  Q.  What's a referral fee?
4  A.  How do I define a referral fee?
5  Q.  Yeah.
6  A.  You're asking me a question now not about
7  class action law.  So I think it's a question about
8  legal practice, of legal ethics or one or the other?
9  Q.  All right.  So would it be fair to say that
10  your expertise in class actions does not inform your
11  definition of what a referral fee is?
12  A.  That's probably fair, yeah.
13  Q.  All right.
14  A.  Maybe.  I don't know.  There's some
15  situations in which referral fees come up in class
16  actions.  So I'd have to say my studying of class
17  actions over many years, my work in the field has
18  given me some data points about referral fees.  I
19  wouldn't consider myself a world expert on referral
20  fees.
21  Q.  All right.  Among those data points does
22  your expertise in class actions inform you as to the
23  reasonableness of referral fees?
24  A.  I'd be hesitant to call myself an expert on

Page 161

1  what a reasonable referral fee is.  There's an old
2  saying a third of a third.  Anytime I ask lawyers
3  about it, they -- especially when I'm asking for a
4  referral fee, they tell me that's not what it is.
5  Q.  All right.  Thank you.
6  Let me direct your attention to page 27
7  and the header for this under Roman numeral three
8  says Rule 23 does not require disclosure of fee
9  allocation agreements in the class notice.
10  So my -- and you then go on to describe
11  that the Court -- as part of the class action
12  settlement approval process the Court must direct
13  notice in a reasonable manner to all class members
14  who would be bound by the proposal, and notice of a
15  motion of attorneys' fees by class counsel must be
16  directed to class members in a reasonable manner.
17  And you subsequently argue that Rule 23
18  only requires that the settlement notice be fair,
19  reasonable and adequate and that class members have
20  the right to object to the settlement.
21  Is that a fair statement?
22  A.  No.  The settlement has to be fair,
23  reasonable and adequate.
24  Q.  Yes.

Page 162

1 A.  The class members have a right to object.  I
2   think what I was trying to say here is that those
3   two ideas inform what should be put into the notice.
4 Q.  All right.  So you're not saying that the
5   notice needs to be fair, reasonable and adequate?
6 A.  The notice has to hit the mark of -- I
7   forget the exact language of Rule 23; I'd have to go
8   back and look, but then it has to hit the
9   Constitutional mark that it has to be reasonable.
10 Q.  Is it accurate to say that 23(h)(2)
11   guarantees that class members have a right to object
12   to the fee motion?
13 A.  Yes.
14 Q.  And that sufficient information should be
15   provided upon which to object to that fee motion?
16 A.  I'm not sure (h)(2) says that exactly, but I
17   would say that exactly -- I do say that exactly.
18 Q.  All right.  So you would agree with that?
19 A.  Yes.
20 Q.  What information must be disclosed in order
21   for the class to have sufficient information upon
22   which to object?
23 A.  The key piece -- two key pieces of
24   information are how much are the attorneys asking

Page 163

1   for literally.  What's the level of the fee request?
2       And I think implicit -- explicit is --
3   'cause this hugely goes together with the settlement
4   notice -- how much is the class getting.  So kind of
5   how much is the -- are the lawyers getting and what
6   are the class getting.  It's kind of a combination
7   of those two things are the bases of making sense of
8   the fee request and whether it seems to be a
9   reasonable -- for a class member to assess whether
10   it seems like a reasonable fee request.
11       Again, my own opinion -- this is not the
12   law -- is that the class members should be given a
13   sense of what multiplier of class counsel's lodestar
14   the fee request is.  I wished that were the law, but
15   it's not.
16       I think that it's an important fact to
17   determine the sufficiency -- the fairness of the fee
18   request because it shows you how much profit they're
19   getting on your case.
20       Now having said that, you know, most
21   courts don't agree with me, and I think in most
22   individual arrangements when you hire a contingent
23   fee lawyer, they usually don't keep a lodestar, and
24   you don't know what multiple of their time they're

Page 164

1   making.  So I'm kind of in the minority in thinking
2   this.
3 Q.  Well, minority or not, why do you think that
4   would be important?  Why do you advocate for that?
5     MS. LUKEY:  Objection.
6 A.  I advocate it -- I spend dozens of pages on
7   this in the treatise.  I think the problem with the
8   percentage award is that 25 percent in one case and
9   25 percent in another case could mean completely
10   different things.
11       In one case it could be the counsel's
12   lodestar; in another case it could be 20 times their
13   lodestar.  To say, oh, all we're asking for is 25
14   percent, we always get 25 percent, yeah, but what
15   does it mean.  What's your lodestar?
16       That -- if I'm a class member, I want to
17   know, you know -- I think the lawyers should be
18   fairly paid.  And in being an advocate of the
19   lodestar crosscheck, I'm also an advocate of them
20   getting a multiplier.  But not a ten multiplier.
21   Not a 20 multiplier.  And the multiplier should fit
22   the case.  That's I think the most important thing.
23       I think the allocational stuff takes a
24   backseat to that in every way.  And if I have a

Page 165

1   judge in front of me, and I say you have a fiduciary
2   duty, and in the abstract here's how I want you to
3   spend your time, I want you to spend your time
4   figuring out what the multiplier is.  Let the
5   lawyers work out the allocation.
6 Q.  All right.  In what manner should the class
7   receive information as to their grounds for
8   objection?
9     MS. LUKEY:  Objection.
10 A.  I'm sorry, could you -- I apologize.
11 Q.  Sure.
12 A.  Could you say that again?
13 Q.  How do you propose that class members
14   receive information on grounds by which they can
15   object to a fee award?
16     MS. LUKEY:  Objection.
17 A.  That I think is a good question.  I'm
18   actually -- I have several concerns here I've talked
19   about in the treatise.
20       I think in today's world everything
21   should be at a settlement website.  And this
22   generally happens in big cases.  There'll be a
23   settlement website, and the fee petition will be put
24   at the settlement website.  I don't -- you know,

Page 166

1  it's a lot to ask of most class members to go to a
2  settlement website and read the fee petition. It's
3  crazy to assume they'd know how to go on PACER and
4  get the documents off of PACER.
5     So my own feeling about this is the
6  class members should -- there's a notice that will
7  go out to them in some way, but there should be a
8  repository to which they have access of the
9  pertinent information which would be the fee
10 petition and the declarations that go with the fee
11 petition, and they'd be able to take a look at that
12 if they had the time and interest in doing so.
13    So I'm an advocate for the website. The
14 other thing I talk about in the treatise is the
15 time. Needless to say, the lawyers want to file the
16 fee petition with as little time as possible before
17 the objection deadline. And I'm a big proponent of
18 pushing that out giving the class 30 days, 60 days
19 to take a look. They often want to do it in 14
20 days. I think you've got to give the class
21 information that's easily accessible, and you've got
22 to give them time to review that information.
23    We don't generally give them allocation
24 information as part of that, and I'm not entirely

Page 167

1  sure we should. I would really like to focus anyone
2  who cares on the multiplier and not inundate them
3  with, you know -- and again, in this relatively big
4  case -- small case you've got, you know, 20 some, 15
5  some fee agreements. I'm not sure I would put them
6  all at the settlement site.
7     THE SPECIAL MASTER: You have advocated
8  though that information about the fee allocation
9  agreement should be known to the class? Have you
10 not advocated for that? I thought you had.
11    THE WITNESS: I mean I think I -- well,
12 I say the fee agreement should be made available,
13 yeah.
14    THE SPECIAL MASTER: Fee allocation
15 agreements.
16    THE WITNESS: Fee allocation would be
17 one of the agreements, correct. Yeah.
18    THE SPECIAL MASTER: Okay.
19    THE WITNESS: Yeah. If the judge asks
20 for them and gets them, then -- first of all,
21 there'll be on PACER at that point, but, yeah, they
22 should probably put them at the settlement website.
23 I think maybe -- that's a good question. I haven't
24 thought this through 'cause it never happens.

Page 168

1     The judge might want to parse through
2  them. In this case you've got six class
3  representatives. So they're going to be retainer
4  agreements I assume with each of the class
5  representatives, and maybe the judge wants to look
6  through and say let's put these six up but not these
7  six or put all twelve up or whatever. You got the
8  third, third and third with the ERISA lawyers, the
9  two sets of ERISA lawyers and then subagreements
10 with other ERISA lawyers and that they're sharing
11 agreements among them and -- so I don't know. I
12 mean the Court would have to decide how much of that
13 the class would want to see.
14    THE SPECIAL MASTER: You may have
15 answered this while I was gone, and I apologize for
16 missing some of the deposition, but I think you said
17 earlier that the settlement class was a client of
18 class counsel. Is that right?
19    THE WITNESS: What I said is yes and no.
20 And I'm not being evasive.
21    What I say in the treatise -- and I have
22 a whole section on this -- is once a class is
23 certified, class members are considered clients for
24 some reasons and not for others -- for some purposes

Page 169

1  and not for others. And I gave examples of each. I
2  can go back over it if you want me to.
3     THE SPECIAL MASTER: This is when I was
4  out of the room?
5     THE WITNESS: Yes.
6     THE SPECIAL MASTER: Okay. Not
7  necessary.
8     BY MR. SINNOTT:
9  Q.  Do you agree that a class member can consult
10 with a lawyer about whether to object to a
11 settlement?
12 A.  Absolutely.
13 Q.  And would you agree that if a class member
14 requests information on fee allocations, that it
15 should be provided?
16 A.  You know, I think I cite the case here where
17 that didn't happen. There was an objector who
18 sought discovery of the fee agreements, and the
19 Court denied discovery of the fee agreements.
20    I think, you know, my general view of
21 transparency would probably say why not make the fee
22 agreements transparent, and I think you all would
23 take the position after what happened in this case
24 this is a good example of why we should make them

Page 170

1  transparent, so we could see them.
2      So I -- if there were a lawyer who
3  sought them -- sought discovery at that point and
4  tried to get the fee agreements made public, I'm not
5  sure why a Court would not make them public.
6  Q.  Okay.  In an article you wrote called The
7  Fairness Hearing:  Adversarial and Regulatory
8  Approaches -- do you recall that?
9  A.  Yes.
10 Q.  All right.  Two thousand six UCLA Law
11 Review.
12     In that article you proposed
13 court-designated attorney to serve as a devil's
14 advocate I believe was the expression used in
15 evaluating class action settlements.  Is that a fair
16 summary?
17 A.  You know, it sounds like you read it more
18 recently than I did.  In that article --
19     THE SPECIAL MASTER: We have just the
20 guy for you.
21     THE WITNESS: So I heard.
22     MR. SINNOTT: Let's not go there.
23 A.  In that article I examine four
24 possibilities.  I think the devil's advocate was one

Page 171

1  of them.  I had a -- like a rating agency, like a
2  restaurant rating agency where you put a sign up and
3  say this is a B settlement or A settlement.
4      So I had -- I was looking at different
5  ways of assisting the Court in its oversight
6  process, and devil's -- appointing a lawyer to
7  advocate was one of them.  Using money, making the
8  lawyers put up a bond; and if the settlement was
9  denied, having them forfeit the bond was another
10 one.
11     And I went through a series of
12 mechanisms of trying to perfect the fairness
13 hearing.  That was one of them.  I don't remember
14 that I advocated for that one, but I may have.  I
15 don't remember which one I came down in favor of.
16 Q.  What were your grounds for believing that
17 devil's advocate was necessary to the settlement
18 process?
19 A.  Yeah, again, I think I was exploring the
20 idea.  I'm not sure I was in favor of it, but it
21 goes back to what we were talking about earlier;
22 that the judge at the fairness hearing is hearing a
23 one-sided presentation of the issues and doesn't
24 have the benefit of an adversarial presentation.

Page 172

1      And judges are best I think -- they're
2  most familiar with the process of making an
3  adversarial decision.  So let's give them an
4  adversarial presentation.
5      Sometimes you have that when objectors
6  show up, but sometimes the objectors are worse.  And
7  the idea would be make -- make the process worse
8  because they have their own interests.  And the idea
9  of the Court-appointed devil's advocate would be to
10 be kind of more of a straight shooter.
11     I think I ended up having concerns about
12 that proposal because it implies that the devil's
13 advocate would have to come up with a problem all
14 the time, and maybe there's no problem.  So maybe
15 the person who was assigned that role then have
16 have to say, look, I looked into this, your Honor,
17 and I think that I couldn't find anything to object
18 to.  So I wasn't sure kind of how that would all
19 play out in the end.
20 Q.  Just to refresh your memory with a quote,
21 you wrote:  "When attorneys file a motion seeking
22 preliminary approval of a class action settlement,
23 the Court could appoint an attorney to argue against
24 the settlement."

Page 173

1      So you say "could" appoint --
2  A.  Yep.
3  Q.  -- an attorney to argue against the
4  settlement.
5      And then you go on to say, "A
6  Court-designated attorney could function in a
7  similar manner.  She would take the position that
8  the settlement is not fair, reasonable and adequate
9  within the terms of Rule 23(e)(1)(C) or the
10 equivalent state rule.  Each Court could maintain a
11 list of attorneys in the community capable of
12 providing this function and could pay the appointed
13 attorney using public funds or from the settlement
14 if it is a monetary settlement."
15     Does that sound familiar?
16 A.  Sure.
17 Q.  All right.  You still believe in that?
18 A.  I'm not sure I was proposing that.  I was
19 laying -- again, I don't remember, but I think I was
20 laying out here's an option.
21     So when you say do you still believe in
22 that, I'm not sure I even believed in it.  I was
23 laying it out as an option there.
24 Q.  All right.  And later on you say, "The

Page 174

1   advantages of the devil's advocate concept mirror
2   the advantages of Court-appointed criminal
3   attorneys.  The requirement that a person perform
4   this task helps to ensure that the system gives
5   attention and respect to arguments against depriving
6   individuals of liberty or property thereby serving a
7   legitimate function."  You use the analogy of
8   Court-appointed criminal attorneys.
9       Were you concerned about a lack of
10  equilibrium or parody between class members and
11  sophisticated counsel who might be recommending a
12  settlement?
13      MS. LUKEY: Objection.
14  A.  Well, I put it slightly differently.  Look,
15  most class action cases are about small amounts of
16  money, and that's why they're class action cases.
17      There's not enough money at issue to
18  fund the litigation if you don't aggregate the
19  claims that are -- so that the clients, the class
20  members themselves, they're not only somewhat
21  unsophisticated -- most of them are not lawyers, but
22  they don't just have enough money in interest in
23  most cases to spend a lot of time providing
24  oversight of the attorneys.  So there's kind of an

Page 175

1   oversight process inherent of what the class action
2   is -- an oversight problem inherent to what the
3   class action is.
4       And, you know, that's why we have these
5   varying mechanisms.  We have the judge acting as a
6   fiduciary in some respects.  We have class
7   representatives which we kind of pretend do this but
8   don't really do a good job of it in most cases, and
9   we struggle.
10      And that's what I was struggling with in
11  this article, to figure out how to deal with the
12  fact that the absent class members lack both the
13  sophistication and the incentive to provide
14  significant monitoring of their class counsel.
15  Q.  All right.  And considering that -- those
16  shortcomings or lack of parody, do you think it's
17  reasonable that a class member in considering
18  whether to object to the notice of pendency with
19  respect to Chargois can do so when there's no
20  information there to object to?
21      MS. LUKEY: Objection.
22  A.  So you're asking --
23  Q.  Let me put it another way.
24  A.  Yeah.

Page 176

1   Q.  Could a class member reasonably have
2   considered the Chargois fee in deciding whether or
3   not to object to the fee application as the notice
4   of pendency told the members they could do so under
5   the circumstances in this case?
6       MS. LUKEY: Objection.
7   A.  I guess you're asking me would any class
8   member have had reason to know about the Chargois
9   Arrangement.
10  Q.  Yes.  That's one way of -- one component of
11  it.
12  A.  That's a factual question.  As I understand
13  the facts, I think the answer to that question is
14  no.
15  Q.  All right.  And would not that circumstance
16  be exacerbated if there was a class representative
17  that had professed to not want to know about fee
18  allocations?
19      MS. LUKEY: Objection.
20  A.  And I would add a Court that professed not
21  to want to know about fee allocations, too.
22  Remember it was the Court that had the authority to
23  ask for the disclosure of fee agreements and didn't
24  do it.

Page 177

1       And again, my testimony -- and I'll
2   repeat it -- is that I don't expect much of the
3   class representatives as to fee allocation, nor does
4   class action law.  I don't know of a single class
5   action case that says the class representatives
6   oversee fee allocation.  In all the cases that your
7   expert cited no one ever mentions a class
8   representative as being a key factor in the fee
9   allocations or the fee agreements.  It's the Court.
10      And so, no, the class here didn't have
11  information about the Chargois Arrangement.  The
12  Court never required the disclosure of fee
13  agreements.
14      I should at -- and, you know, I'll keep
15  adding this as long as I'm here -- two things:  I'm
16  not sure the class was harmed by the Chargois
17  Arrangement for the reasons I went through this
18  morning.  And, second of all, if you had taken the
19  time to explain why a firm like Labaton would agree
20  to share its fees with someone like Chargois in the
21  class notice, I don't know how much class members
22  would have focused on that, understood it and/or
23  objected to it.
24  Q.  Of course, we'll never know because the

Page 178

1 class members were not aware of it, were they?
2 MS. LUKEY: Objection.
3 A. Again, you're asking me a factual question,
4 and the answer factually -- I'm not a fact witness,
5 but I think the answer's no.
6 Q. You're not saying that the notice is, if you
7 will, a paper drill in the process, are you?
8 MS. LUKEY: Objection.
9 A. Paper drill?
10 Q. Does the -- the notice has to mean
11 something, doesn't it?
12 A. Yes. Yeah. I mean, yeah, the notice is
13 important -- is an important part of the process.
14 It's the point at which you tell the class, hey,
15 this is what you're getting, and here's what the
16 lawyers are getting, and here's what we did, and
17 here's why they're getting it, and here's what
18 happened.
19 Q. And if the notice does not contain full
20 information, it does not fulfill its purpose, does
21 it?
22 MS. LUKEY: Objection.
23 A. If the notice doesn't contain information
24 relevant to a class member figuring out, (a), if the

Page 179

1 settlement is fair, adequate and reasonable from
2 their perspective, and, (b), if the aggregate
3 attorneys' fees seem appropriate for the case, then
4 the notice hasn't provided -- served its purpose.
5 Q. And how does it benefit the class to give
6 Damon Chargois 4.1 million dollars from the class
7 recovery rather than to ask Judge Wolf to redirect
8 the money to the class?
9 MS. LUKEY: Objection.
10 MR. HEIMANN: Objection. Beyond the
11 scope.
12 MS. LUKEY: I'm objecting, too, but I'm
13 not stating my reasons because I've been asked not
14 to.
15 THE SPECIAL MASTER: You can state them
16 concisely in a non-suggestive manner under Rule
17 30(c). Non-argumentative --
18 MS. LUKEY: It was a hypothetical that
19 built in a fact that's not in evidence or expected
20 to be in evidence.
21 THE SPECIAL MASTER: Thank you.
22 A. Look, Bill, I could go through the fee
23 allocation lawyer by lawyer and ask the same
24 question. Why is Mike Thornton getting

Page 180

1 two-and-a-half times his lodestar, and someone else
2 is getting one time their lodestar? Why does that
3 benefit the class?
4 And, you know, there are answers to that
5 question. The value he brought to the case. Lead
6 counsel made the decision that that was, you know,
7 the worth of his services.
8 You got to remember I'm -- I'm a total
9 transparency person. I'm all for the Court ordering
10 this. There are some stuff on the other side of
11 this which is class counsel's running a law firm,
12 and it's providing a set of legal services with its
13 own money. It's investing millions of dollars of
14 its own money, and we want them to do this. You
15 have to give them some leeway to run their law firm.
16 So, you know, I think the argument on
17 the other side is this isn't something -- you know,
18 absent criminal stuff going on -- let the lawyers
19 run their law firm, and let's see in the aggregate
20 that the class not overpay, and my feeling is let's
21 see what the multiplier is, make sure the class
22 isn't overpaying.
23 How the lawyers split up the money
24 amongst themselves is part and parcel of how we get

Page 181

1 them to invest in these lawsuits in the first place,
2 and you got to give them some -- what's the word?
3 -- authority to do that.
4 THE SPECIAL MASTER: I'm trying to
5 understand your point on this. I thought I did
6 earlier but maybe not.
7 Is your testimony that so long as the
8 aggregate fee is commensurate to the result, the
9 lodestar, hours worked, then the specific allocation
10 of lawyers' fees is not the business of the class,
11 is not -- the class doesn't have an interest in
12 that?
13 THE WITNESS: Yes. With the exception
14 I'm a little bit more -- I like transparency partly
15 'cause I learn a lot from it, and it helps me teach
16 people how these cases work and understand how they
17 work.
18 And so I kind of like the transparency.
19 I'd like to know how the fees are allocated. I
20 learn from these cases. Unfortunately, all this
21 stuff's under seal so I can never talk about it
22 again.
23 But, generally speaking, when I look at
24 the allocation from your point of view, the

Page 182

1  questions I'd ask -- which I said earlier -- are did
2  the Chargois Arrangement -- did the allocational
3  arrangements pervert the incentives in representing
4  the class.  And if they didn't, then I think it's
5  fair to let the lawyers work it out among themselves
6  just as the second circuit suggested in Agent Orange
7  where you had perverted incentives in that case.
8    THE SPECIAL MASTER: So that may answer
9  the second part of my question.
10   If the aggregate fee is reasonable, then
11 is it your further opinion that the class has no
12 interest in a situation such as this in which a
13 lawyer is paid 5.5 percent of the fee for doing no
14 work, never appearing, pursuant to an agreement that
15 predates even the case by years?
16   MS. LUKEY: Objection.
17   THE WITNESS: I'd separate the two, and
18 I'd say the following thing:  I don't think anyone
19 in the State Street class was harmed by the Chargois
20 Arrangement.  At least I haven't seen facts.  And,
21 again, I come back to all the e-mails you've seen.
22   I've not seen anything where anyone said
23 we got to settle 'cause we got to pay Damon or
24 anything like that.  I don't think anyone in the

Page 183

1  State Street class was harmed by Chargois
2  Arrangement.  Point one.
3    Point two.  Now that you've uncovered
4  the Chargois Arrangement, it helps us understand the
5  practices that have arisen really under the PSLRA,
6  and that might be a subject congress would want to
7  look at again some day.  We passed the PSLRA.  We
8  wanted institutional investors to take the lead in
9  these cases.  Look what we've created, and maybe
10 we're not happy with what we've created in that way.
11   I don't see the investors -- I don't see
12 the class in the State Street being directly harmed
13 by that.  And I will say that, you know, as many
14 warts as it seems like on the system, there are some
15 good stuff that's come from the PSLRA.  All things
16 being equal, attorneys' fees have come down.  In
17 many of these cases the institutional investors
18 actually negotiate lower fees up front from class
19 counsel.
20   And I think in a case like this -- I'm
21 guessing -- we only got Arkansas to step forward
22 because Labaton had this arrangement with them to
23 report fully on monitoring.
24   So in the old days you had, you know,

Page 184

1  the Milberg Weiss firm; they had clients who had one
2  share of stock in every stock in The Stock Exchange.
3  Congress didn't like that, and they went to this
4  system.  And it encouraged portfolio monitoring and
5  the Chargois arrangements, but you have
6  institutional investors playing kind of an important
7  role in this stuff.
8    It just has, you know, some warts to the
9  system.
10   THE SPECIAL MASTER: So you seem to be
11 saying here that because in your view the class was
12 not harmed, the class had no interest in being
13 informed of the Chargois Arrangement.  Is that
14 accurate?
15   THE WITNESS: Again, yes.  I would say
16 the judge had every authority to ask about the fee
17 agreements; and had he done so and given them to the
18 class, terrific.
19   But when I'm reverse engineering looking
20 back from the end of the case, the questions I ask
21 are similar to what I see the second circuit asking
22 in Agent Orange.  Did this pervert the incentives of
23 the lawyers to the detriment of the class?  And now,
24 judge, that's just a factual question.

Page 185

1    I haven't seen it in this case that it
2  perverted the lawyers' incentives in representing
3  the class.  In what I've read about the case I
4  haven't seen that evidence.  So I don't feel like
5  this class was directly harmed by the Chargois
6  Arrangement.
7    THE SPECIAL MASTER: And therefore the
8  class had no interest in being informed in the
9  notice?
10   MS. LUKEY: Objection.
11   THE WITNESS: And, again, I think the
12 public's interest in the whole system creates some
13 interest in this kind of information being out
14 there, and that's why I'd like judges to ask about
15 it.  But I don't see that it was the kind of
16 information that had to be put in the class notice
17 in this case for those reasons.
18   THE SPECIAL MASTER: I think you're
19 answering my question is yes, right?
20   MS. LUKEY: Objection.
21   THE WITNESS: Try me again.  I'm sorry.
22   THE SPECIAL MASTER: Why don't we have
23 the court reporter read back my last question?
24   THE WITNESS: Judge, I promise you I'm

Page 186

1 not trying to prolong this.
2     (Reporter read back.)
3     MR. HEIMANN: Are you insisting on a yes
4 or no answer to that?
5     THE SPECIAL MASTER: I'd like a yes or
6 no answer.
7     MR. HEIMANN: He can give you a yes or
8 no answer, and then he's entitled to explain it.
9     THE SPECIAL MASTER: Let's start with a
10 yes or no answer. I think he's explained it, but if
11 he wants to explain it again, then he can.
12     THE WITNESS: All right. No. I don't
13 feel like the question is fair because you have to
14 ask the question ex-ante which is was the class
15 notice wrong for any reason when it went out. And
16 the judge didn't ask for the disclosure of the fee
17 agreements. I don't think there was anything
18 missing from the class notice.
19     Ex post we find out about the Chargois
20 Arrangement. Now that we know about the Chargois
21 Arrangement, you want me to go back and say should
22 the class notice have been different now that I know
23 about the Chargois Arrangement.
24     THE SPECIAL MASTER: I don't think I'm

Page 187

1 going to get a yes or a no answer, but, okay, that's
2 fine.
3     MR. HEIMANN: You got an answer. It was
4 no with an explanation.
5     THE SPECIAL MASTER: Which built in the
6 assumption that the judge has to ask. Which we know
7 that's his testimony. So that's fine.
8     MR. HEIMANN: I know that -- well, I'll
9 be quiet.
10     THE SPECIAL MASTER: My question focused
11 only on whether the class had an interest in knowing
12 as part of the 23(h) notice process -- whether the
13 class had an interest in knowing about the Chargois
14 arrangements independent of whether the judge asked
15 or not.
16     MR. KELLY: And now we're defining
17 interest --
18     THE SPECIAL MASTER: Whether they had an
19 interest in knowing.
20     MR. KELLY: -- or some legal duty?
21     MS. LUKEY: I would join in that
22 objection.
23     MR. HEIMANN: There's no question.
24     THE SPECIAL MASTER: There is a

Page 188

1 question.
2     MR. HEIMANN: Oh, I'm sorry.
3     THE WITNESS: And now I think I
4 understand a little better. So I think I would say
5 this: The Chargois Arrangement is a fee allocation
6 arrangement, and we -- class action law generally
7 does not put fee allocation information in the class
8 notice. And so you want me to say, therefore, I'm
9 saying the class has no interest in that. It's not
10 -- I wouldn't quite say that.
11     But I would say it's not an expected
12 part of the notice process in a class action that
13 the allocations as to what each lawyer's getting is
14 put in the notice.
15     If the class members want to know that
16 information, they can come forward and ask the Court
17 to release it. I hope the Court would. But it's
18 not expected in a class action that the allocation
19 as to what each lawyer is getting is ever in the
20 notice in a class.
21     BY MR. SINNOTT:
22 Q. Professor, was there a lodestar check in
23 this case?
24 A. So the lawyers applied for a fee award based

Page 189

1 on a percentage of the settlement.
2 Q. Yep.
3 A. They asked for 25 percent. They then also
4 submitted their lodestar for crosscheck purposes
5 which is very different than saying the award was
6 based on their lodestar.
7     All they were saying to the Court in
8 submitting their lodestar is, look, this is how many
9 hours we spent on the case. So if you give us 25
10 percent, we'll be getting twice as much as we would
11 be getting using our hourly rates. And, therefore,
12 our profit, if you will, our multiplier is twice our
13 hourly rates, and we think that's reasonable in
14 these circumstances.
15     So the lodestar was submitted for
16 crosscheck purposes, but it was not a lodestar-based
17 fee award which is a whole different thing. It
18 makes the lodestar far more important.
19 Q. So -- maybe I'm missing this.
20     What role, if any, do those lodestar
21 calculations have in the plaintiffs seeking approval
22 from Judge Wolf?
23 A. Yeah, good, good. This is really important.
24 In a lodestar-based fee award like a fee-shifting

Page 190

1  case where the defendant is directly going to pay
2  the fee, when you submit your lodestar and the Court
3  approves the lodestar, you're getting dollar for
4  dollar. You're submitting your lodestar here, and
5  you're saying here's what I want payment for, and
6  the Court goes kind of hour by hour, if you recall,
7  or lawyer by lawyer or however, firm by firm, and
8  pays that lodestar. The lodestar itself is like the
9  bill that you're submitting to the Court.
10      In a percentage award case the lodestar
11  is not a bill that you're submitting to the Court.
12  It's like a credit check. It's a crosscheck.
13  You're saying give me 25 percent, and the Court's
14  thinking to itself is 25 the right number. Is it
15  too much? Is it too little?
16      And the only way of assessing whether 25
17  percent is the right number -- the one way of doing
18  it -- I think the only good way of doing it is to
19  say what multiple of your lodestar -- when the
20  lawyers submit their lodestar for crosscheck
21  purposes, the law is very clear on this. In almost
22  every circuit the law is we don't look at the
23  lodestar for crosscheck purposes hour by hour; we
24  don't think about it in those terms.

Page 191

1      It's just like a back-of-the-envelope
2  calculation. And the reason is partly we went to
3  the percentage method to get judges out of the
4  business of doing a lodestar audit going line by
5  line, and it's much easier to award a percentage.
6      So if you put the lodestar crosscheck
7  back in, you've introduced all the downsides of the
8  lodestar method, and so courts are very clear that
9  in using the lodestar for crosscheck purposes it's
10  just kind of more like a back-of-the-envelope check.
11  Q. All right. But even on that
12  back-of-the-envelope check, shouldn't the Court be
13  able to rely on the identification of the lawyers
14  who worked on the case contained within those
15  lodestar calculations?
16  A. What I say in the footnote in this report is
17  that we don't worry at all about underinclusion in a
18  lodestar crosscheck. We kind of encourage
19  underinclusion because if there's underinclusion,
20  people are left out. It means that the lawyers are
21  submitting a lower lodestar for crosscheck purposes,
22  and that means that the multiplier -- the profit
23  that they're getting -- seems higher.
24      And so they want to leave people out of

Page 192

1  the lodestar and submit a high cross -- and get a
2  higher multiplier and they think they can get it,
3  let me them go for that.
4      What we worry about a lot is the exact
5  opposite; that they're going to pad the lodestar
6  with all kinds of extra hours and bring down their
7  multiplier and make their fee award more reasonable.
8      So, generally speaking, in doing the
9  back-of-the-envelope crosscheck, we don't care that
10  hours are left out or that people are left out. We
11  like it. 'Cause it means the lawyers are asking for
12  a higher profit and seem to think they can justify
13  it.
14  Q. Even in cases where the lawyer did nothing?
15      MS. LUKEY: Objection.
16  A. Well, if the lawyer has no lodestar in the
17  case, then they're not going to show up in the
18  lodestar crosscheck.
19  Q. And that back-of-the-envelope assessment of
20  the value of the attorney's work is not frustrated
21  by the lack of identification of that lawyer?
22  A. No, on the contrary. Again, it's -- we're
23  only using a lodestar for a crosscheck. And so if
24  you're not in the lodestar for crosscheck purposes,

Page 193

1  the fee petitioner's goal is harder to reach. The
2  more lodestar they leave out, the more multiplier
3  they're getting of their lodestar, and the harder
4  their task becomes.
5      And so there's no -- from the Court's
6  point of view if they want to ask for a three
7  multiplier and leave time out of their lodestar,
8  they better prove they can -- they're worth the
9  three multiplier rather than a two multiplier. So
10  we don't worry about underinclusion in the lodestar
11  for crosscheck purposes.
12      And if the lawyer doesn't have any
13  lodestar, if it's an investing lawyer or a referring
14  lawyer or something along those lines, they wouldn't
15  show up in the lodestar crosscheck anyway. They'd
16  only be getting a share of someone's else's
17  lodestar.
18  Q. It's strictly a factor of multiplication?
19  A. You minimize it. To me the lodestar
20  crosscheck is the key to the whole thing because
21  it's precisely putting your finger on what the
22  profit is.
23      And the profit on a
24  hundred-million-dollar case, and the profit in a

Page 194

two-million-dollar case are wildly different at the 25 or 30 percent, but it's the multiplier that brings them altogether. If it's one time your lodestar, two times the lodestar, it's going to be the same one time your lodestar or two times your lodestar in a 50-million-dollar case as a maybe two-million-dollar case.

Q. In this particular case before approving lead counsel's fee request, Judge Wolf said "I'm relying heavily on the submissions and what's been said today," and then he approved the fee request.

What did Judge Wolf mean when he said that?

MS. LUKEY: Objection.

A. What do I think he meant?

Q. Yeah.

A. I think he meant he was relying on the submissions. You know, that he was relying on the submission.

I don't know what to add -- what I could add to that. What I don't think he meant is that I asked you for fee agreements.

Q. Well, let's say Judge Wolf had said I'm relying heavily on what counsel said in ruling on

Page 195

the fee petition, do you think that counsel would have been required to disclose the Chargois Arrangement?

MS. LUKEY: Objection.

A. So go back in time five years. I'm sitting in my office writing a treatise, and I'm on this section of the treatise, disclosure of fee agreements, and I write in the treatise the parties have to disclose a fee agreement under two circumstances: One, if the Court asks for it; or, two, if the judge says at the fairness hearing I'm relying on the submission of the parties, I just don't think that passes the laugh test.

Q. What would the Court have to have asked in order for Chargois's arrangement to be revealed?

A. How are the fees being allocated would be one way of asking. Please disclose the fee agreements would be another way of asking.

Q. All right.

THE SPECIAL MASTER: So I just want to understand your testimony.

So Judge Wolf's statement before he approved the fees and the settlement that "I'm relying heavily on what has been submitted here"

Page 196

could not under any circumstances be construed as the judge telling the lawyers, hey, I'm relying on what you guys are giving me? And I'm trusting you to tell me that this is everything I need to know?

MS. LUKEY: Objection.

MR. HEIMANN: That's two questions, maybe three. I object.

THE SPECIAL MASTER: You can pick any one.

MS. LUKEY: Objection nonetheless.

THE WITNESS: I would say one hundred percent if Judge Wolf had said how are the fees being allocated or disclose the fee agreements, and no one had mentioned Damon Chargois, and he then said at the fairness hearing I'm relying on what you're telling me, I think in those circumstances you'd have a real problem.

I don't think Judge Wolf was interested in the fee allocation. It didn't come up. And I don't -- it doesn't distinguish him from most judges in these circumstances.

THE SPECIAL MASTER: So by saying I'm relying heavily on the submissions and what's been said here or words to that effect, he wasn't asking

Page 197

enough in order to elicit information about the Chargois Arrangement?

THE WITNESS: He did not ask the lawyers to disclose their fee agreements, correct.

THE SPECIAL MASTER: Okay.

BY MR. SINNOTT:

Q. Professor, given the Court's fiduciary duty to the class, the power of the Court which you've acknowledged to abrogate the Chargois fee, your own frequent emphasis that you've referred to on transparency in class action settlements and fee determinations, class counsel's fiduciary duty to the certified class and its members as their lawyers and the fact that at the fee determination stage the lawyers and the class have opposing interests, does it trouble you that no one, not Hopkins, not the class members and not the judge, were told that a lawyer who did no work for the class was going to get 4.1 million dollars for a recommendation or representation and so those parties could do nothing to question the payment?

MS. LUKEY: Objection.

A. It bothers me that judges do not use their authority to ask for fee agreements. If Judge Wolf

Page 198

1  had used his authority and found out about the
2  Chargois Arrangement, I am not sure the knowledge of
3  that arrangement as I know it now would bother me as
4  much as I think it bothers you all for the reasons
5  that I've testified to.
6      But I think -- you know, the law is
7  clear here, and the lawyers have every reason to
8  rely on the clearness, the clarity of the law. Rule
9  23 and Rule 54 could not be more clear in saying
10 they should disclose fee agreements -- they must
11 disclose fee agreements when the Court orders them
12 to do so.
13 Q.  So again it comes back to the judge not
14 asking the question?
15 A.  Yes.  You make it sound like I'm crazy for
16 saying that.  It's the law.  It's what the law says.
17     The judge has a fiduciary duty to absent
18 class members.  She, he -- he, in this case Judge
19 Wolf, should be asking these questions.  That's what
20 I'm telling him.
21 Q.  And just to be clear once again, your
22 opinion is based on Rules 23 and 54 of the Federal
23 Rules of Civil Procedure?
24 A.  Yes.

Page 199

1      THE SPECIAL MASTER: Not on any ethical
2  rules or ethical obligations?
3      THE WITNESS: I'm not here as an ethics
4  expert, correct.
5      THE SPECIAL MASTER: Okay.
6      THE WITNESS: I did read your ethics
7  expert's report, and I'm not convinced that -- it
8  didn't convince me that it trumps the clear rule
9  structure of Rule 23 and 54.
10     THE SPECIAL MASTER: You may have
11 answered this question when I was out of the room.
12 If so, that's fine.
13     Was Arkansas the class representative
14 for the entire settlement class after -- once the
15 class was certified?
16     THE WITNESS: One of several I believe.
17     THE SPECIAL MASTER: Okay.  The others
18 being?
19     THE WITNESS: I think in the --
20     MR. HEIMANN: I don't think so.  This is
21 on the record.  I think there was only one class
22 representative for the settlement class.
23     THE SPECIAL MASTER: Well, I'm asking --
24 you know the procedural posture here.  The

Page 200

1  procedural posture was there were three separate
2  cases.  In each of these cases there were named
3  class representatives.
4      Then the case was consolidated for
5  pretrial purposes and settled during the pretrial on
6  this two-track discovery and mediation.
7      At that point there was a preliminary
8  hearing in August of 2016, and the class was
9  certified, and that class included members from all
10 three of the cases including the ERISA -- the
11 members of ERISA funds that were in the other two
12 cases.
13     THE WITNESS: Yeah.
14     THE SPECIAL MASTER: So my question to
15 you is was Arkansas the class representative for
16 that settlement class?
17     THE WITNESS: That's a factual question,
18 and my memory I thought was that the settlement
19 agreement defined class representative to include
20 all of the class representatives from all of those
21 putative class actions.
22     If Richard's suggesting -- my memory may
23 be wrong on that point, but I think Arkansas was at
24 least one of, if not the only one.

Page 201

1      THE SPECIAL MASTER: Well, we'll look at
2  the settlement agreement and see if it calls out
3  the others.
4      In your view under 23(a)(4) was Arkansas
5  -- if Arkansas was the class representative, was
6  Arkansas an adequate class representative for the
7  entire settlement class?
8      THE WITNESS: This is not a question
9  I --
10     THE SPECIAL MASTER: I understand you
11 haven't opined on it --
12     THE WITNESS: Yeah.
13     THE SPECIAL MASTER: -- but you're an
14 expert --
15     THE WITNESS: Yeah.
16     THE SPECIAL MASTER: -- and the adequacy
17 under 23(a)(4) is certainly within your strike zone.
18     THE WITNESS: Yeah, yeah, yeah.  I just
19 haven't drilled down on it.  I mean it's a big
20 question.  You have to look through the whole thing.
21 Sitting here today, I don't have any reason to
22 believe they weren't.
23     And I think what you're suggesting --
24 and I'll just put it out there -- is their

Page 202

1 disinterest in the fee allocation suggests that they
2 were an inadequate class representative.
3     **THE SPECIAL MASTER:** One of the
4 questions, certainly --
5     **MS. LUKEY:** Your Honor, that was covered
6 while you were out.
7     **THE SPECIAL MASTER:** That was covered?
8     **THE WITNESS:** Briefly. I'll be happy to
9 say it again.
10     I just -- what I tried to say earlier,
11 I'd love to think the class representatives were
12 monitoring class counsel and the fee allocation
13 arrangements, but I think it's completely
14 unrealistic to believe that. And outside of the
15 PSLRA, none of the cases about fee allocation ever
16 referenced the class representative as being a
17 player in that.
18     So Agent Orange, all the other cases
19 your expert cites that are class action cases, none
20 of them say this fee allocation process went bad
21 because the class representative wasn't a part of it
22 or didn't sign off on it or wasn't informed of it.
23 I don't think anyone even talks about it.
24     **THE SPECIAL MASTER:** I was going to --

Page 203

1 I'm asking the question for perhaps a different
2 reason. And I'm asking you to help me here.
3     Knowing what we know now with the
4 benefit of hindsight, would it have been better to
5 have broken this settlement class into subclasses
6 and have what we've been referring to as the
7 customer class and the ERISA class in subclasses?
8     And maybe everything else remaining the
9 same, the allocation to the ERISA class, the
10 allocation to the customer class, but to have -- for
11 purposes of managing it and managing the notice
12 process, would that have been a better way to handle
13 it?
14     **MS. LUKEY:** Objection.
15     **THE WITNESS:** From what I've -- in my
16 review of the case, I was more surprised about the
17 differentials between what the ERISA class members
18 got and the non-ERISA class members got and the
19 potential conflict that created 'cause it felt like
20 the non-ERISA class members were getting less money
21 per dollar and were paying higher fees per dollar
22 than the ERISA class members were paying. And
23 that's a potential conflict which was made somewhat
24 transparent in the class notice.

Page 204

1     That to me may have called for
2 subclassing. I think it was okay. May have called
3 for subclassing. The Chargois Arrangement I don't
4 -- I don't completely understand how that all gets
5 mixed up in all of that. To me the differentials
6 are far more important than the fee allocation from
7 the class' perspective.
8     **THE SPECIAL MASTER:** Effectively,
9 weren't all of the class members then being asked to
10 effectively share in the Chargois Arrangement, even
11 though the only sharing was done on the surface by
12 the customer class?
13     **MS. LUKEY:** Objection.
14     **THE SPECIAL MASTER:** 'Cause they were
15 all handled as one class.
16     **THE WITNESS:** Well, that's a hard
17 question to answer 'cause, you know, I'm chafing at
18 the sense that any of the class members were
19 involved in the Chargois Arrangement.
20     They were all taxed an aggregate
21 attorney's fee, and the attorneys' fees were
22 allocated by the attorneys. The ERISA class members
23 did quite well. They were only taxed 18 percent.
24 The rest of the class was taxed over 25 percent to

Page 205

1 balance that out.
2     So it seems to me the ERISA class
3 members did really well. I'm not worried about the
4 ERISA class members. They seem to have done great.
5     Look, I understand why you would be
6 concerned about the Chargois Arrangement, and I
7 think if I had students it would take me a whole
8 seminar to go through the PSLRA and all the
9 practices and teach it all.
10     I don't completely understand why you're
11 concerned about the ERISA versus non-ERISA stuff as
12 to the attorneys and whatnot. That part I
13 understand less I have to say.
14     **THE SPECIAL MASTER:** One of the reasons
15 I'm asking about it, and I am concerned about it, is
16 because of the testimony of the ERISA lawyers
17 themselves.
18     **THE WITNESS:** Yeah, and part of their
19 testimony the way I understood it -- and I know
20 they're not here today, and I've worked with the
21 Keller firm many times, and I have great respect for
22 them; I think they're a terrific firm -- just felt
23 like a little bit like they felt like they didn't
24 get enough money at the end of the day.

Page 206

```
1    And that part of the fee allocation I'm
2  not worried about Keller Rohrback.  They'll do fine.
3      THE SPECIAL MASTER: Did you read the
4  testimony of Lynn Sarko and Carl Kravitz?
5      THE WITNESS: Not Kravitz.  I read
6  Lynn's testimony.
7      THE SPECIAL MASTER: Just Lynn Sarko's?
8      THE WITNESS: Yeah.  I haven't read
9  Kravitz.
10     THE SPECIAL MASTER: Let's stick with
11  Lynn Sarko's.  Is it fair to say that he seemed to
12  you to be concerned about the fact that he simply
13  wasn't told about it at all?
14     MS. LUKEY: Objection.
15     THE WITNESS: He testified that he was
16  concerned that he wasn't told about it.  I think
17  that sounds right.  He also testified he wasn't
18  happy with the 9 or 10 percent.
19     THE SPECIAL MASTER: So knowing what we
20  know now with the benefit of hindsight, would it
21  have been a good idea to have handled these for
22  purposes of settlement approval at the fairness
23  hearing as separate subclasses.
24     MS. LUKEY: Objection.
```

Page 207

```
1      THE WITNESS: Knowing what we know now
2  about two different things.  One is the Chargois
3  Arrangement.  I don't think the Chargois Arrangement
4  has to me -- to me it has no meaning for ERISA
5  versus non-ERISA.  I can't figure out what it does.
6      Knowing what we know now which we knew
7  then, which is the potential conflict between the
8  ERISA and non-ERISA class members, I think it's a
9  close call, but I think making transparent what the
10  discrepancy was between the two, the judge handled
11  that fine I think in those circumstances.
12     THE SPECIAL MASTER: All right.  I don't
13  have anything else.
14     MR. SINNOTT: I'm done.  That concludes
15  our examination.  Richard?
16     MR. HEIMANN: Yes, I have a few
17  questions.
18     EXAMINATION
19     BY MR. HEIMANN:
20
21  Q.  You were asked about -- a few moments ago
22  about what was said by the judge at the fairness
23  hearing regarding what he had relied upon.  Correct?
24  A.  Yes.
```

Page 208

```
1  Q.  All right.  I'm putting in front of you now
2  a copy of the settlement agreement itself in this
3  case.
4      And I'll ask you, first of all, as you
5  understand it, would that agreement have been
6  presented to the Court at least as early as the
7  preliminary hearing on preliminary approval?
8  A.  It should have been, and I believe it was.
9  Q.  All right.
10  A.  It's got a PACER number on it consistent
11  with that.
12  Q.  All right.  And is there any discussion in
13  the settlement agreement about the procedure that
14  was to be followed with respect to the allocation of
15  the attorneys' fees to be awarded among the
16  plaintiffs' counsel?
17  A.  Yes.
18  Q.  And what does that provide, if you would,
19  please?  And give us the page number while you're
20  doing that.
21  A.  I'm in paragraph 21 which is on PACER page
22  28 to 29.  And it's on the settlement -- it's on the
23  settlement agreement page 27 to 28, but it's
24  paragraph 21.
```

Page 209

```
1      And it lays out 9 percent in the
2  aggregate shall be distributed to ERISA counsel in
3  full satisfaction of ERISA counsel's interest in any
4  attorneys' fees awards -- is this what you're asking
5  me?
6  Q.  Yes, that's part of it.
7  A.  And of the attorneys' fees awarded by the
8  Court, if any, 91 percent in the aggregate shall be
9  distributed to counsel for plaintiff -- counsel for
10  plaintiff and/or the class in the ARTRS action in
11  full satisfaction of customer counsel's interest in
12  any attorneys' fees awarded by the Court.
13  Q.  How is that to be allocated according to the
14  agreement?
15      Not in terms of percentages, but how was
16  the decision to be made according to the settlement
17  agreement?
18  A.  Oh.  If customer counsel disagree about the
19  amount of the fee to be distributed amongst customer
20  counsel by lead counsel, they shall mediate their
21  dispute with Jonathan B. Marks, esquire.  If
22  unsuccessful, present the dispute to Court for
23  presentation.
24      I think you're saying -- I think you're
```

Page 210

1  asking me and showing me the settlement agreement
2  itself explained to the Court that lead counsel
3  would be overseeing the fee allocation and that the
4  lawyers had set up a dispute resolution mechanism
5  with regard to the fee allocation process, and that
6  dispute resolution mechanism had a mediator followed
7  by appeal to the Court if there were disputes about
8  the allocation.
9  Q.  All right.  And in your experience and based
10  upon your academic work, how common is it in a class
11  action for the Court to leave up to lead counsel in
12  the first instance the allocation of attorneys' fees
13  among the various plaintiffs' counsel?
14  A.  I'd say it happens close to a hundred
15  percent of the cases.
16    MR. HEIMANN: Miss Reporter, if you
17  could mark as the next exhibit in order this e-mail
18  exchange.  The last e-mail I think is dated August
19  8.
20    Then after that the next e-mail exchange
21  where the last e-mail is dated August 28.
22    (Exhibit 4 marked
23    for identification.)
24    (Exhibit 5 marked

Page 211

1    for identification.)
2    BY MR. HEIMANN:
3  Q.  So you've been asked a number of times today
4  about testimony by Lynn Sarko regarding what he
5  might have done had certain permission about
6  Chargois Arrangement been made known to him,
7  correct?
8  A.  Yes.
9  Q.  And you were asked specifically questions
10  about whether or not in your view the payment to
11  Chargois should have been disclosed to the ERISA
12  counsel including Mr. Sarko?
13  A.  Yes, I think I was.
14  Q.  Also questions about whether or not the
15  payment to Mr. Chargois should have been disclosed
16  to the Department of Labor, either directly or
17  through ERISA counsel?
18  A.  I think I was asked that, yep.
19  Q.  Take a look please, if you would, at this
20  first document.  That's the e-mail that ends -- the
21  last e-mail's August 9 from Mr. Sarko.  If you look
22  at the top.
23  A.  Hm hm.
24  Q.  So it's an e-mail from Mr. Sarko dated

Page 212

1  August 9 addressed to a number of lawyers including
2  Bradley, Chiplock, Sucharow, Lieff, Thornton,
3  Goldsmith.  Do you see that?
4  A.  I do.
5  Q.  With copies to Kravitz and McTigue.  Do you
6  see that?
7  A.  I do.
8  Q.  And Mr. Sarko wrote in the e-mail: "I want
9  to share a few thoughts prior to Tuesday's call with
10  the DOL." Do you see that?
11  A.  I do.
12  Q.  So that would suggest, would it not, that
13  the lawyers who are on this e-mail string were
14  getting together to talk about or consider issues
15  that Mr. Sarko wanted to address in advance of a
16  call with the Department of Labor.
17  A.  It does.
18  Q.  And the first item -- the first line item is
19  the DOL wants to talk about the amount of attorneys'
20  fees in the ERISA portion of the case only.  Do you
21  see that?
22  A.  I do.
23  Q.  I want you to drop over to the next page
24  where the e-mail continues.  You'll see a section

Page 213

1  about a third of the way down that begins "expect
2  the DOL to ask."  Do you see that?
3  A.  I do.
4  Q.  And then there's a numbered 1 paragraph
5  where he says, "Are the attorneys planning on filing
6  one fee application or separate application?"
7    Do you see that?
8  A.  I do.
9  Q.  And now the next paragraph.  And this is the
10  one I want to focus on.
11    Mr. Sarko wrote are there -- under the
12  heading "expect the DOL to ask," item 2 he says,
13  "Are there deals/arrangements on how to divide the
14  fees between the class lawyers, and are we willing
15  to tell the DOL what those arrangements are? (I have
16  stayed away from commenting on this and have always
17  changed the subject or ignored their question--as I
18  feel it is none of their business)."
19    Do you see that?
20  A.  I do.
21  Q.  Does that suggest to you that Mr. Sarko was
22  unwilling to share information with the Department
23  of Labor about fee arrangements of deals when the
24  DOL was asking about it?

Page 214

1  A.  It does.
2  Q.  To go over to the next e-mail string, this
3  from the -- the last e-mail's August 28, 2015.  Do
4  you see that?
5  A.  I do.
6  Q.  The context -- well, below that e-mail from
7  Mr. Sucharow is an e-mail from Mr. Sarko again dated
8  August 28 where he writes to -- it looks to me the
9  people that are on the string of this e-mail which
10  includes many of the same folks I just mentioned a
11  moment ago, the lawyers -- both the ERISA lawyers
12  and the customer lawyers.
13  A.  Yes.
14  Q.  Because he's responding to an e-mail from
15  Mr. McTigue in which Mr. McTigue wrote:  "I don't
16  agree with lead settlement's counsel distributing
17  attorneys' fees and expenses in its sole discretion.
18  Attorneys' fees and expenses should be distributed
19  pursuant to the existing written agreements of
20  counsel."
21      Do you see that?
22  A.  I do.
23  Q.  And then Mr. Sucharow responded to that
24  e-mail as follows: --

Page 215

1  A.  Sarko -- Mr. Sarko?
2  Q.  Mr. Sarko.  Just above the McTigue e-mail
3  you'll see it reads -- on August 28, Lynn Sarko
4  wrote --
5  A.  Hm hm.
6  Q.  -- and then here's what he wrote.  "We need
7  to be careful about this as the DOL had asked if
8  there were any agreements on fees between counsel.
9  I would never answer their question, and then they
10  seem to forget about it.  But I'd rather not
11  highlight it and have the DOL go sideways on us."
12      Do you see that?
13  A.  I do.
14  Q.  Does that suggest to you that Mr. Sarko was
15  concerned that if he disclosed the fee arrangements
16  that he was aware of they might have problems with
17  the DOL?
18  A.  It does.
19      MR. HEIMANN: That's all I have.
20      MR. SINNOTT: Brian.
21      MR. KELLY: Quick question for you,
22  Professor.
23      EXAMINATION
24      BY MR. KELLY:

Page 216

1  Q.  You said at the outset that the corrected
2  multiplier of two -- it started out 1.8, but once
3  they took out the double counting stuff, it became a
4  multiplier of two.  You found it to be both
5  reasonable and modest.  Could you explain that?
6  A.  Sure.  Brian, I think -- I forget the exact
7  numbers.  You're reminding me it started out as
8  being 1.8.  My memory is that after the correction
9  it was around two.
10  Q.  Yep.
11  A.  And I think I testified originally back a
12  year ago that a two multiplier is consistent with --
13  in fact, plausibly modest for this case.  You have
14  to look at empirical data on multipliers and in what
15  circumstances lawyers deserve multipliers.
16      And, in fact, in my treatise I have what
17  I refer to as a multiplier calculator and in which I
18  set out a series of factors, and using those factors
19  I would have guessed there might have been a higher
20  multiplier in this case.
21      And those factors include the following:
22  Number one, the -- this is a novel one-off case.
23  This is not a case piggybacking government cases,
24  and this is a case where the lawyers themselves

Page 217

1  working with the whistleblowers had developed the
2  case and I think a very important case in that
3  regard deserving of a good multiplier.
4      Second, the rewards that they got for
5  the class I think everyone agrees are quite
6  tremendous.  It's a 300-million-dollar settlement.
7      Third, it appears -- and I think partly
8  due to Judge Wolf -- it was done in a fairly
9  efficient manner and in a good way which kept the
10  multiplier kind of lower than it might otherwise
11  have been in a different case.
12      And, you know, I'd have to think about
13  it some more, but just looking at it, I was
14  surprised that it didn't have a higher multiplier.
15  A multiplier of two is modest.
16      One other fact I would put in here is
17  there's a time investment of the money; and the
18  longer the case goes, you might get a higher
19  multiplier because part of what the multiplier
20  should be capturing is the time of investment and
21  money.
22      So putting all these factors together, I
23  wouldn't have been surprised in a 300-million-dollar
24  settlement to see a three or a four multiplier.  I

Page 218

1  should add multipliers are often higher the higher
2  the settlement.  And so I wouldn't have been
3  surprised, and I think it would have been justified
4  to see a three or four.
5      Just by way of comparison, I've just
6  finished being a Court-appointed expert in the NFL
7  concussion case.  And the judge in the NFL
8  concussion case just approved a fee an award on
9  112.5 million dollars on what may be a
10 billion-dollar settlement.  So it's about an 11
11 percent award.
12     All I care about is the multiplier, and
13 in that case the lawyers are getting a three
14 multiplier -- 2.96, something like that.  And they
15 literally did nothing except negotiate a settlement.
16 Now they would argue with me about this, but they --
17 there was no discovery.  There was nothing but one
18 motion and a settlement.  And so a two multiplier is
19 -- the class did very well.  They were very well
20 served.
21 Q.  Okay.  Final question.
22     Mr. Sinnott asked you a series of
23 questions about what you think Judge Wolf was
24 thinking when he said various things, but I don't

Page 219

1  think I heard him ask you what you may think Judge
2  Wolf was thinking when he said -- on June 23rd prior
3  to the submission of any fee declarations when Judge
4  Wolf said, "I usually start with 25 percent in
5  mind."
6      Did you get a chance to review that
7  transcript at all?
8  A.  I remember hearing that.  And, again, I
9  don't -- you know, you're asking me to say what I
10 think Judge Wolf was thinking.  I think Judge Wolf
11 was thinking I usually start with 25 percent.
12     The ninth circuit, for instance, has
13 what's called a benchmark of 25 percent.  And I
14 think a lot of courts kind of start in class action
15 cases with a 25 percent.  It's hard to know in a
16 300-million-dollar case is 25 percent too much or
17 too little.  It's a little different than a
18 10-million-dollar case.
19     And that's why I'm a strong believer in
20 the multiplier, and I think Judge Wolf did quite the
21 right thing here.  You guys put in your multiplier;
22 he was able to do a crosscheck.  The lawyers put in
23 the multiplier.  They were able to do a crosscheck
24 and see that the multiplier was a two.

Page 220

1      And so the 25 percent he started with
2  turned out to be a reasonable, again if not a
3  modest, fee.
4      MR. HEIMANN: Nothing further.
5      MR. SINNOTT: Joan?
6      MS. LUKEY: Nothing.  Thank you.
7      MR. SINNOTT: Judge, anything else?
8      THE SPECIAL MASTER: Just have a
9  followup, but before I ask that, I want to make sure
10 I understood Richard's question -- the very last
11 question he asked.
12     Could you go back and find it please
13 about what Mr. Sarko was referring to on this April
14 28, 2015 --
15     THE REPORTER: August 28?
16     THE SPECIAL MASTER: Yes.  Did I say
17 April?  August.
18     (Reporter read back.)
19     THE SPECIAL MASTER: So Mr. Sarko -- in
20 Mr. Heimann's question about what you thought he was
21 conveying included the predicate "that he was aware
22 of."
23     Mr. Sarko was aware of a lot of things
24 that he did not disclose to the DOL.  He was not

Page 221

1  aware of the Chargois Arrangement.
2      MS. LUKEY: Objection.
3      THE WITNESS: Okay.
4      THE SPECIAL MASTER: So does that change
5  your answer at all as to whether or not he would
6  have been concerned about the Chargois Arrangement?
7      MR. HEIMANN: That wasn't the question,
8  your Honor.  That wasn't my question.  So I object.
9      THE SPECIAL MASTER: All right.  Let me
10 ask it then in the predicate that Mr. Heimann asked,
11 he asked "that he was aware of."  He being
12 Mr. Sarko, right?
13     He was not aware of the Chargois
14 Arrangement.
15     THE WITNESS: Is that a question?
16     MS. LUKEY: I'm sorry?  Objection.
17     THE SPECIAL MASTER: Is that your
18 understanding that he was not aware of the Chargois
19 Arrangement?
20     THE WITNESS: It's my understanding that
21 Mr. Sarko was not aware of the Chargois Arrangement.
22     THE SPECIAL MASTER: That's all I wanted
23 to ask.
24     THE WITNESS: Okay.

Page 222

1    **MR. SINNOTT:** All right.  With that,
2  this examination is concluded.  Thank you,
3  professor.
4    **THE WITNESS:** Thank you.
5    (Whereupon the proceedings
6    adjourned at 2:52 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 223

1                    CERTIFICATE
2  COMMONWEALTH OF MASSACHUSETTS)
3  SUFFOLK, SS.                )
4
5      I, Paulette M. Cook, Registered Merit Reporter
6  and Notary Public in and for the Commonwealth of
7  Massachusetts, do hereby certify that WILLIAM B.
8  RUBENSTEIN, the witness whose deposition is
9  hereinbefore set forth, was duly sworn by me and
10  that such deposition is a true record of the
11  testimony given by the witness.
12      I further certify that I am neither related to
13  or employed by any of the parties in or counsel to
14  this action, nor am I financially interested in the
15  outcome of this action.
16      In witness whereof, I have hereunto set my hand
17  and seal this 10th day of April, 2018.
18
19
20
21                          Notary Public
22
23  My commission expires:
24  February 5, 2021

**$**

**$100,000 (1)**
16:1
**$1100 (3)**
15:18;16:6,10

**A**

**ability (2)**
137:12;155:18
**able (6)**
78:13;143:1;166:11;
191:13;219:22,23
**aboard (1)**
39:5
**above (1)**
215:2
**abrogate (1)**
197:9
**absent (25)**
22:7;24:19;54:15;66:17;
74:11;102:17;115:4;125:15;
131:8,9,17,19;132:24;
135:16;138:24;141:11,12;
143:3;148:4;153:2;155:24;
158:1;175:12;180:18;
198:17
**absolute (1)**
24:15
**Absolutely (5)**
24:7;50:9;73:2;101:10;
169:12
**abstract (3)**
149:2;157:18;165:2
**academic (2)**
10:9;210:10
**accept (2)**
91:23;137:3
**access (1)**
166:8
**accessible (1)**
166:21
**accompanying (1)**
129:13
**accomplished (5)**
57:1;69:18,19,20,23
**According (3)**
42:24;209:13,16
**accountant (1)**
36:11
**accounting (1)**
36:12
**accurate (3)**
74:7;162:10;184:14
**acknowledged (1)**
197:9
**across (1)**
146:14
**Act (5)**
83:4;94:15;131:22;
133:11;139:23

**acting (3)**
54:14;115:4;175:5
**action (62)**
10:8;13:16;14:12,16,17;
24:22;28:16;29:15;35:13;
47:14;55:11,12;73:14,23;
96:15;103:22,22;104:4;
106:12;107:22;113:23,24;
114:13;125:14;128:21;
130:10,22;131:4;138:18,18;
142:8;144:14,16;146:12;
148:20;149:3;150:10,15;
153:2,24;155:10,23;156:3;
159:7;160:7;161:11;170:15;
172:22;174:15,16;175:1,3;
177:4,5;188:6,12,18;197:11;
202:19;209:10;210:11;
219:14
**actions (22)**
10:6,10,16,17;34:22;
53:20;55:14,15;67:15;
83:19;103:21;110:12;
146:11;149:16;150:8;
153:22;155:23;160:10,16,
17,22;200:21
**Actions' (1)**
54:2
**actively (2)**
135:23;143:10
**activity (1)**
132:6
**actually (19)**
27:24;40:23;45:10;46:14,
22;55:4,12;60:5;73:21;75:7;
80:10;117:10;119:7;139:10;
147:4;155:12,19;165:18;
183:18
**adamantly (2)**
52:7;75:2
**add (5)**
44:4;176:20;194:20,21;
218:1
**added (1)**
20:1
**adding (2)**
91:21;177:15
**additional (1)**
19:20
**address (1)**
212:15
**addressed (1)**
212:1
**addresses (1)**
47:15
**adequacy (1)**
201:16
**adequate (11)**
116:2;137:12,22,23;
146:23;161:19,23;162:5;
173:8;179:1;201:6
**adequately (1)**
145:3
**adjourned (1)**

222:6
**adopt (2)**
74:5;133:18
**adopting (1)**
73:5
**advance (2)**
147:14;212:15
**advantages (2)**
174:1,2
**adversarial (5)**
132:23;170:7;171:24;
172:3,4
**advice (2)**
12:14,15;75:4;157:7
**advise (2)**
67:13;156:10
**advisory (1)**
155:7
**advocacy (1)**
78:19
**advocate (14)**
52:7;107:15;164:4,6,18,
19;166:13;170:14,24;171:7,
17;172:9,13;174:1
**advocated (6)**
53:14,17;118:6;167:7,10;
171:14
**affect (3)**
25:8;52:2;122:4
**affected (2)**
59:3;74:20
**affecting (1)**
58:8
**affidavit (1)**
17:11
**affiliation (1)**
7:5
**afternoon (1)**
7:2
**again (87)**
9:2;12:6,7;14:18;17:1,15,
20;20:1;21:14;25:12;26:10;
31:19;32:20;33:1,20;35:1;
36:18;42:2,15;44:10;46:20;
47:8,9,12,22;49:13;50:6,17;
52:4;53:21;54:9;58:23;
59:23;60:8;62:18;63:7;
68:11;70:6,24;74:13;75:17;
79:21;82:15,22,22;84:9,20;
87:20;92:1;99:11,13;101:3;
105:18;107:4;111:21;117:7;
121:7;122:23;137:21;138:2;
152:1;153:14,17;155:5;
156:12;159:19;163:11;
165:12;167:3;171:19;
173:19;177:1;178:3;181:22;
182:21;183:7;184:15;
185:11,21;186:11;192:22;
198:13,21;202:9;214:7;
219:8;220:2
**against (17)**
11:6,22;12:1,5,22,23;
14:12;15:4,5;57:17;58:17;

100:7;133:3;147:5;172:23;
173:3;174:5
**agencies (3)**
68:22;69:2;70:2
**agency (2)**
171:1,2
**Agent (14)**
28:20;52:23;53:4;55:24;
56:10;57:7;76:2;100:19,20;
139:9,13;182:6;184:22;
202:18
**agents (2)**
132:3;135:2
**aggregate (19)**
22:14,23;23:3,12,19;
24:12;25:3;29:5;56:16;
94:17;123:14;174:18;179:2;
180:19;181:8;182:10;
204:20;209:2,8
**ago (6)**
73:12;85:23;107:11;
207:21;214:11;216:12
**agree (33)**
28:1,10;31:18;32:3,21;
33:3;34:1;40:10;61:13;
77:24;81:23;82:17;86:14;
97:18,19;112:5,8;114:17,20;
122:10;138:3;145:21,24;
146:5;151:2,13;153:11;
162:18;163:21;169:9,13;
177:19;214:16
**agreed (20)**
48:15;60:5;68:9;81:22;
89:1,4,11,15,17,24;90:7,13,
16,21,23,24;91:14,16;118:4,
5
**agreeing (6)**
41:17;60:10;63:13;73:8,
10;146:8
**agreement (38)**
16:15;27:20,22,23;39:16;
43:8,15,17;44:23;46:19;
47:5;50:10;57:10;60:13,19;
65:16;72:2;89:3;90:1,3;
97:5,14;99:24;100:1;
124:18;167:9,12;182:14;
195:9;200:19;201:2;208:2,
5,13,23;209:14,17;210:1
**agreements (96)**
22:6;28:23;38:6,15;39:12,
23;40:3,7;46:11,12;51:6;
52:2,20,21;53:11,12,23;
54:3;57:20;58:1;63:10,12;
66:16,19,21;68:17;70:14,16;
72:1;74:10;75:3;76:3;77:20;
92:14,16;93:6;94:11,12,16,
18,21,24;95:2,2,5,12;97:9;
100:20,21;103:12,23;
104:24;106:13;118:11,18;
119:21,22;121:9,22,22;
122:3,19;123:1,2,6;124:2;
125:24;126:22;136:4;
148:17;158:1;161:9;167:5,

15,17;168:4,11;169:18,19,
22;170:4;176:23;177:9,13;
184:17;186:17;194:22;
195:8,18;196:13;197:4,24;
198:10,11;214:19;215:8

**agrees (4)**
32:15;55:11;95:3;217:5

**ahead (3)**
113:5;115:17;154:7

**aims (1)**
131:9

**ain't (1)**
93:8

**aligned (1)**
64:20

**allocate (3)**
26:11;38:16;80:1

**allocated (14)**
22:15;23:3,12;31:2,8;
36:13;58:9;59:2;105:20;
181:19;195:16;196:13;
204:22;209:13

**allocating (3)**
33:14;42:18;68:5

**allocation (133)**
22:24;23:6,9,14;24:2,13,
21,21;25:2,23;26:3,16;
27:23;28:2,3,7,12,13,16,17;
29:1;31:23;32:1,2,4,8,15;
33:2;34:1,2,17;35:21,24;
36:2,9;38:7;40:7,11;41:12,
13,16,17;42:5,23;43:1;
45:24;50:22;52:5,16;55:7;
58:8;59:1,22,24;60:2,5,10,
13,20;61:1,2,2,10;62:2,3,7,
11,16,22;64:21;67:21,22;
68:10;74:20,23;75:9,15,23;
79:3,22;100:18;105:10,13,
24;108:2;118:11,18;119:21,
22;121:9,22;122:3,11,19;
138:20;139:3,9,20;140:11;
142:11,15,20;143:11;
144:18,19;161:9;165:5;
166:23;167:8,14,16;177:3,6;
179:23;181:9,24;188:5,7,18;
196:19;202:1,12,15,20;
203:9,10;204:6;206:1;
208:14;210:3,5,8,12

**allocational (6)**
25:7;28:5;74:14;76:11;
164:23;182:2

**allocations (14)**
25:20,20,21;34:21;63:16;
116:13,16;118:21;138:16;
169:14;176:18,21;177:9;
188:13

**allocator (1)**
30:14

**almost (2)**
18:18;190:21

**along (1)**
193:14

**alters (1)**

**57:10**

**although (3)**
10:4;95:23;105:10

**altogether (1)**
194:3

**always (4)**
78:3;128:19;164:14;
213:16

**amazing (2)**
104:9;127:18

**Ambro (4)**
30:15;31:17;32:6;33:8

**Ambro's (1)**
33:3

**among (24)**
22:15;23:3,10,12;24:1;
25:20,21;28:22;29:1;31:1;
33:16;35:14;50:10;57:24;
65:11,12;74:15;107:19;
138:17;160:21;168:11;
182:5;208:15;210:13

**amongst (6)**
34:21;38:7;40:7;43:8;
180:24;209:19

**amount (15)**
14:9;29:18;37:20;39:20;
48:9;62:23;63:1;69:9;80:14;
95:4;125:11;127:16;159:7;
209:19;212:19

**amounts (1)**
174:15

**amply (1)**
114:2

**analogy (1)**
174:7

**and/or (3)**
106:14;177:22;209:10

**Andover (1)**
88:17

**answered (5)**
32:24;82:20;157:11;
168:15;199:11

**answer's (1)**
178:5

**anticipated (1)**
75:8

**antitrust (1)**
147:5

**anymore (1)**
73:23

**apologize (2)**
165:10;168:15

**apparently (1)**
84:21

**appeal (1)**
210:7

**appear (5)**
63:3;125:1,2;133:3;154:2

**appeared (1)**
117:2

**appearing (2)**
127:19;182:14

**appears (3)**

**86:8;114:12;217:7**

**appellate (1)**
135:13

**application (3)**
176:3;213:6,6

**applied (1)**
188:24

**apply (3)**
34:6;71:15;111:14

**appoint (2)**
172:23;173:1

**appointed (2)**
6:11;173:12

**appointing (1)**
171:6

**appointment (2)**
93:2;155:11

**appoints (1)**
140:1

**appreciate (2)**
55:6;127:11

**approach (1)**
63:7

**Approaches (1)**
170:8

**appropriate (3)**
40:18;146:3;179:3

**approval (21)**
54:16;61:2,3;64:8;89:16;
90:20;93:3;104:20;114:21;
130:10,22;131:1,12;132:15,
19;140:12;161:12;172:22;
189:21;206:22;208:7

**approve (5)**
120:17;131:4;139:15,16;
140:10

**approved (9)**
25:3,17;27:24;60:6;61:11;
147:1;194:11;195:23;218:8

**approves (1)**
190:3

**approving (5)**
30:24;113:12;114:19;
115:2;194:8

**approximately (3)**
9:19,19;15:19

**April (2)**
220:13,17

**arbiter (1)**
131:22

**area (3)**
10:15;45:14;125:22

**argue (6)**
74:1;133:3;161:17;
172:23;173:3;218:16

**argued (3)**
72:3,24;118:11

**argues (1)**
55:19

**argument (5)**
54:16;77:11;82:15;138:8;
180:16

**arguments (1)**

**174:5**

**arise (2)**
25:7;94:11

**arisen (1)**
183:5

**arises (1)**
156:2

**arising (1)**
98:12

**Arkansas (32)**
6:12;43:19;65:5;71:17;
81:9,11,12,13,17,22,23;82:2,
11;84:3,3;98:4,13;99:3;
137:16,23;140:24;141:1;
143:8,13,16;183:21;199:13;
200:15,23;201:4,5,6

**Arkansas's (2)**
98:5;143:17

**arose (1)**
51:15

**around (3)**
107:15;149:8;216:9

**Arrangement (73)**
45:5;62:20;63:4,5;65:22;
67:6,12,24;69:10,16;70:1,
12;71:2,19;72:16;74:3;
75:16;76:14;91:1,8;92:22;
93:7;95:8,14;97:4,5,24;
99:9;100:4;101:1,8,18;
106:10,17;127:12;136:10;
137:2;139:14;157:3,5;
158:10;176:9;177:11,17;
182:2,20;183:2,4,22;184:13;
185:6;186:20,21,23;188:5,6;
195:3,15;197:2;198:2,3;
204:3,10,19;205:6;207:3,3;
211:6;221:1,6,14,19,21

**arrangements (10)**
106:9;107:1;163:22;
182:3;184:5;187:14;202:13;
213:15,23;215:15

**arriving (1)**
34:21

**article (5)**
170:6,12,18,23;175:11

**articulated (2)**
36:6;97:8

**ARTRS (1)**
209:10

**aside (4)**
29:24;30:8;124:7;151:7

**aspect (4)**
37:1;45:24;95:7,13

**aspects (5)**
10:17;52:3;113:12;
114:18;131:14

**assess (2)**
118:9;163:9

**assessing (3)**
87:16,18;190:16

**assessment (1)**
192:19

**assigned (1)**

172:15

**assistance (4)**
21:9,13,14;135:24

**assistant (1)**
20:8

**assistants (8)**
19:23;20:8,12;21:13,19;
104:7;106:5,7

**assisting (1)**
171:5

**assume (6)**
35:13;49:4,6;156:7;166:3;
168:4

**assumed (1)**
107:21

**assuming (1)**
136:20

**assumption (1)**
187:6

**ATRS (1)**
143:20

**attempt (1)**
141:20

**attempts (1)**
107:15

**attention (13)**
17:9;22:2,3;54:20;94:8;
102:15;103:8;107:13;
109:10;130:20;158:4;161:6;
174:5

**Attorney (15)**
6:19,22;10:15;29:15;
32:18;35:24;36:1;96:15;
111:11;143:11;170:13;
172:23;173:3,6,13

**attorney/client (1)**
95:24

**attorneys (26)**
22:23;23:1,10;25:21;28:1,
22;29:1,18,23;37:22,24;
38:2;39:6;56:24;83:12,17,
20;162:24;172:21;173:11;
174:3,8,24;204:22;205:12;
213:5

**attorneys' (19)**
13:17;14:2,20;15:10;
28:16;53:8;111:22;161:15;
179:3;183:16;204:21;
208:15;209:4,7,12;210:12;
212:19;214:17,18

**attorney's (2)**
192:20;204:21

**audit (1)**
191:4

**August (10)**
200:8;210:18,21;211:21;
212:1;214:3,8;215:3;
220:15,17

**authentication (1)**
129:20

**authority (29)**
24:6,11,15,16,23;25:1,22;
26:7,15;27:15,18;28:8,11,

15,19;29:8;30:23;31:13;
51:16;103:5;105:11;118:16;
142:20;143:4;176:22;181:3;
184:16;197:24;198:1

**authorized (1)**
148:16

**available (8)**
40:10;104:19,21;105:22,
23;107:8;135:22;167:12

**award (20)**
109:13,19;110:11;118:9;
145:22;147:15;156:19,20;
158:13;164:8;165:15;
188:24;189:5,17,24;190:10;
191:5;192:7;218:8,11

**awarded (5)**
26:9,11;208:15;209:7,12

**awards (2)**
10:15;209:4

**aware (22)**
48:11;60:7,8;64:12,13,24;
65:2,19;98:2,5,7,9,11;178:1;
215:16;220:21,23;221:1,11,
13,18,21

**away (3)**
127:16;143:5;213:16

## B

**back (44)**
13:13;15:21;39:8,22,22;
40:5;41:7,8;43:16;50:6;
56:15;57:22;58:10;61:24;
67:4;68:2;75:1;79:7;82:6;
83:2;86:11;88:24;92:2,20;
112:4;113:21;129:10;
138:21;140:18;145:13;
162:8;169:2;171:21;182:21;
184:20;185:23;186:2,21;
191:7;195:5;198:13;216:11;
220:12,18

**background (4)**
10:6;47:4;64:6;65:20

**back-of-envelope (5)**
191:1,10,12;192:9,19

**backseat (1)**
164:24

**backstop (1)**
125:18

**backwards (1)**
92:17

**bad (5)**
39:24;74:23;147:20,21;
202:20

**balance (1)**
205:1

**balancing (1)**
32:16

**banana (1)**
92:11

**Bank (1)**
6:13

**bar (2)**

147:6,9

**BARBRI (1)**
147:5

**bargained (1)**
147:14

**Barrett (1)**
6:19

**based (8)**
61:21;65:17;80:22;82:18;
188:24;189:6;198:22;210:9

**bases (2)**
18:2;163:7

**basic (2)**
22:12,14

**basically (2)**
83:8;141:15

**basis (1)**
147:15

**bear (2)**
49:10;150:23

**bears (2)**
73:1,4

**became (1)**
216:3

**becomes (2)**
138:10;193:4

**begin (2)**
54:9;66:2

**beginning (3)**
18:24;20:2;113:9

**begins (2)**
130:6;213:1

**behalf (7)**
7:18;11:8;13:22;14:24;
48:15;100:7;132:12

**behind (1)**
35:21

**behold (1)**
146:13

**belief (1)**
51:19

**believable (1)**
73:18

**believer (1)**
219:19

**believes (1)**
25:23

**believing (1)**
171:16

**below (1)**
214:6

**benchmark (1)**
219:13

**benefit (6)**
81:10;171:24;179:5;
180:3;203:4;206:20

**benefited (3)**
22:15;23:4,13

**benefits (1)**
36:13

**best (15)**
12:8;19:9;41:20;45:16;
47:24;50:15;52:24;68:4,15;

80:5;96:19;100:7;101:6;
145:11;172:1

**better (11)**
52:24;78:1,4;79:14;80:17;
83:16;123:9;188:4;193:8;
203:4,12

**beware (1)**
155:23

**beyond (18)**
20:5;40:14,15,24;49:14;
55:2;67:16;69:13;71:17;
75:18;81:1;84:9;98:13,15;
113:8;126:23;137:19;
179:10

**big (9)**
23:17;80:4;110:15,16;
123:3;165:22;166:17;167:3;
201:19

**Bill (6)**
6:9;113:14;128:1;179:22;
190:9,11

**billion-dollar (1)**
218:10

**bind (1)**
155:18

**binding (1)**
14:15

**bit (8)**
33:7;65:14;85:1;86:6;
101:5;115:18;181:14;
205:23

**blind (1)**
97:4

**bluntly (1)**
89:13

**Bob (4)**
87:24;88:1,2,5

**bond (2)**
171:8,9

**bonus (1)**
145:23

**book (2)**
36:17;141:7

**Both (14)**
13:10;14:11;17:16;20:20;
24:6,11,12,15;25:20;27:15;
78:8;175:12;214:11;216:4

**bother (1)**
198:3

**bothers (2)**
197:23;198:4

**bound (4)**
148:10,13,18;161:14

**boy (2)**
73:14;100:12

**Bradley (3)**
44:4,4;212:2

**breach (3)**
153:22;154:2,16

**break (7)**
93:14,20,20;128:3;129:1,
4;130:4

**breakdown (3)**

110:2,7,13
**breaking (1)**
47:13
**Brian (3)**
7:17;215:20;216:6
**briefly (2)**
94:23;202:8
**brilliant (1)**
80:9
**bring (3)**
102:10,15;192:6
**brings (2)**
153:22;194:3
**broken (1)**
203:5
**brother (1)**
148:6
**brought (7)**
55:17;80:21;81:8,13,18;
130:7;180:5
**build (1)**
50:24
**built (3)**
149:9;179:19;187:5
**bullet (4)**
131:16;132:1,13;135:1
**burden (9)**
74:3,4;121:7,11,12,17;
124:16;125:16;127:21
**burden's (1)**
121:13
**business (8)**
86:17,18,18,21;127:15;
181:10;191:4;213:18
**busy (3)**
125:12,21;127:18
**but-for (7)**
82:10,16;84:5,6,12,13,14

## C

**Cabraser (13)**
7:12,14;11:12,18,22;15:5;
18:10;44:12,19,20;47:3;
110:21;158:8
**Cabraser's (5)**
39:4;45:2;60:9;70:7;
150:20
**calculation (1)**
191:2
**calculations (2)**
189:21;191:15
**calculator (1)**
216:17
**call (11)**
29:13;42:9;43:9;49:3;
93:18;99:2;128:24;160:24;
207:9;212:9,16
**called (9)**
18:10;35:20;69:1;84:17;
94:20;170:6;204:1,2;219:13
**calling (2)**
25:16;106:9

**calls (1)**
201:2
**came (3)**
20:3;80:13;171:15
**can (58)**
8:2;13:18,19;15:22;37:6;
40:13,21,21;41:4,6;48:17;
49:3;74:16;80:8,8,9,10;
84:19;86:21;87:2,10,15;
89:20;93:14,20;103:1;
108:18;109:16;113:15;
122:24;124:10;125:7;
126:16,21;128:1;134:7;
136:3;142:22;144:14;145:8;
147:23;148:23;150:22;
158:3;159:4;165:14;169:2,
9;175:19;179:15;181:21;
186:7,11;188:16;192:2,12;
193:8;196:8
**candor (2)**
34:22;36:6
**Canty (2)**
7:7,7
**capable (1)**
173:11
**capacious (1)**
113:6
**capturing (1)**
217:20
**care (2)**
192:9;218:12
**cared (1)**
100:5
**careful (2)**
153:17;215:7
**carefully (1)**
155:5
**cares (1)**
167:2
**Carl (1)**
206:4
**carried (1)**
132:11
**carrying (1)**
148:10
**case (230)**
11:9;12:19;15:7,8,20;
16:24;17:13,24;18:17,18,21;
20:9,12,13,15,18;22:8,22;
23:17;28:20;34:9;35:20;
37:24;38:23,24;39:2,3,6,15,
21;40:2,4;42:21,21;43:3,16,
19,23,23;44:3,14,23;45:20;
46:3;47:18;48:4,13;52:23;
53:1;55:10,16;56:1,3,5,18;
57:8,15,24;58:18;59:4,5;
60:4,11;62:7;63:1,3,16,17,
20;64:6,8,24;65:9;66:21,24;
68:20;71:8,10;73:19;74:3;
75:5;76:2,10;80:7,11,12,15,
18,19,23;81:13,16,17;82:12,
14;83:7;84:4;87:18;88:3,17,
21;93:2;97:18;98:3,3;99:8,

14,16,18;100:12,17,20,21;
101:11;103:21;107:4,22;
109:3,19,22;110:4,6,8,15,20,
23;111:20;112:5;113:4,19;
114:1;117:1,2,8;122:24;
123:2,2,3,19;124:17,18;
125:1,2;131:5;132:5;135:4;
136:20;140:16,20;143:19,
21;144:17,20;145:20;
146:13,15,16,19,21;147:1,3,
4,5,13,19;148:2,15;149:4;
151:8,10,14;153:16;154:5,
21;155:13,18;157:16;
158:14;163:19;164:8,9,11,
12,22;167:4,4;168:2;169:16,
23;176:5;177:5;179:3;
180:5;182:7,15;183:20;
184:20;185:1,3,17;188:23;
189:9;190:1,10;191:14;
192:17;193:24;194:1,6,7,8;
198:18;200:4;203:16;208:3;
212:20;216:13,20,22,23,24;
217:2,2,11,18;218:7,8,13;
219:16,18
**cases (100)**
13:16,17,19;14:1,1,12;
15:4;20:22;21:1;24:4;29:22;
33:21,22;37:17,20;38:22;
46:5;51:1;55:14,15;64:7,10,
11,14,15;65:5,7,24;67:2;
68:21;71:20;80:5;81:10;
86:10,16;90:13;94:14;
96:15;98:6,8,10;99:3;
103:11;104:8,15;105:2,14;
106:1,2,22;107:7;110:10,11,
15;111:3;113:20,23;114:1;
117:5;122:10;127:20;
132:23;139:8,10,21;141:20;
144:21,24;145:6,11,14;
146:9;148:20;149:4;153:18,
20,22,23;154:13;165:22;
174:15,16,23;175:8;177:6;
181:16,20;183:9,17;192:14;
200:2,2,10,12;202:15,18,19;
210:15;216:23;219:15
**category (2)**
10:18;110:16
**cause (18)**
23:20;78:11;82:10,16;
84:5,6,13,13,14;153:22;
163:3;167:24;181:15;
182:23;192:11;203:19;
204:14,17
**caution (2)**
7:22;8:3
**caveat (2)**
74:12;118:13
**cede (1)**
150:20
**central (1)**
131:17
**centrally (1)**
122:8

**certain (4)**
14:9;15:11;45:17;211:5
**certainly (7)**
30:22;61:10,12;87:1,3;
201:17;202:4
**certainty (1)**
39:19
**certification (7)**
65:13;133:19;151:14;
153:11;155:1,12,14
**certified (7)**
151:23;152:8,15;155:2;
168:23;197:13;199:15;
200:9
**chafing (1)**
204:17
**challenges (1)**
58:19
**chance (2)**
138:7;219:6
**change (5)**
75:6;116:21,23;117:3;
221:4
**changed (3)**
16:11;76:3;213:17
**changes (1)**
67:3
**Chapter (4)**
114:20,24;115:1;130:8
**characterizing (1)**
128:20
**charge (2)**
16:7,9
**charged (1)**
33:2
**charging (1)**
131:11
**Chargois (130)**
16:15,16;42:23;43:12,16,
18,22;44:18;45:5;46:18;
47:4;48:13,16;54:24;55:6;
56:2,6,8,12,17,19;57:3;58:3,
19;59:2,3,11,16;60:5,20;
62:7,17,20;63:5,15;65:21;
67:6,12,24;69:9,16,24;70:7,
12;71:2;72:16;73:13;74:3;
75:16,22;76:8,9,14;80:24;
81:8;82:24;84:2;88:22;89:6;
91:1,1,8;92:22;93:7;97:5,
24;98:3,7,23,24,24;99:9,15;
100:4,10,13,24;101:18,19;
102:3;106:8,10;113:3;
127:12;136:10;137:2;156:7,
17;157:3,5;158:10;159:8;
175:19;176:2,8;177:11,16,
20;179:6;182:2,19;183:1,4;
184:5,13;185:5;186:19,20,
23;187:13;188:5;195:2;
196:14;197:2,9;198:2;
204:3,10,19;205:6;207:2,3;
211:6,11,15;221:1,6,13,18,
21
**Chargois' (2)**

48:5;55:23
**Chargois's (1)**
195:15
**Chargois-type (1)**
106:17
**check (5)**
112:2;188:22;190:12;
191:10,12
**checked (1)**
104:10
**chicanery (3)**
126:1,3,6
**chickens (1)**
30:20
**Chiplock (1)**
212:2
**Choate (1)**
7:9
**choose (2)**
140:4,6
**circle (1)**
87:12
**circuit (16)**
35:20,22;57:8,18;76:2;
85:3,12;87:7;139:14;140:8;
147:16;148:2;182:6;184:21;
190:22;219:12
**circuit's (2)**
57:19;79:23
**circumscribe (1)**
87:12
**circumstance (4)**
45:17;71:12;140:3;176:15
**circumstances (17)**
32:22;36:4;50:13;68:14;
90:17;111:7;131:2;142:5;
148:23;176:5;189:14;
195:10;196:1,16,21;207:11;
216:15
**cite (2)**
94:21;169:16
**cited (2)**
114:11;177:7
**cites (2)**
139:10;202:19
**Civil (2)**
51:20;198:23
**claims (3)**
65:17;69:5;174:19
**clarify (1)**
96:23
**clarity (1)**
198:8
**class (500)**
10:6,7,9,16,17;13:9,16;
14:9,12,16,17,23;22:16;
23:4,13,21;24:4,17,20,22;
25:3,8,20;26:1;28:14,16;
29:2,6,15;31:3,12;34:22;
35:13,14;40:8;43:9;45:16;
47:14;49:12;52:2,12,21;
53:12,20;54:2,15,23;55:7,
11,12,14,18;56:20;57:11,22;

58:8,10,20;59:10,21;60:3;
61:19,21;62:1,6,10,15;64:9,
20;65:9,9,11,12,13,15,17,22,
24;66:3,4;67:2,7,13,14;71:4,
6,7;72:2;73:14,22;74:21;
75:1;76:1,13;77:12,14,15;
78:8,8,8,18,21,24;80:20,21;
82:4;83:19;91:9,21;92:23;
93:4,10,10,11;94:13,13,16,
19;95:3,6,9,14,16,18,19,21,
22,24;96:1,2,6,6,11,13,14,
15,16,18,20,20,23,24;97:11,
15;100:7,24;101:1,4,9,10,
14,16;102:2,8,14,17,22;
103:3,22,22;104:4;106:11;
107:22;110:12;113:23,24;
114:3,13;115:4,19;116:2,7,
14;117:17,21,23;118:7,8,12,
21,23;119:5,6,12,16,23;
120:2,5,21,22;121:9,19;
122:5,11,18;123:11,14,20;
124:4,9;125:13,15;126:17;
128:21;130:10,22,24;131:4,
6,6,8,10,17,19,20;132:3,4,
11,12,17,23;133:10,19;
135:2,3,9,16;136:18,18;
137:12,23;138:15,17,17,18,
19,24;139:3,4,5,5,11,15,16,
18;140:9,17,21;141:1,3,4,5,
6,10,11,13,15,21,24;142:5,7,
7,10,22,23;143:3,7,9,10,13,
15,21,24;144:7,11,13,14,16,
16,20;145:1,3,4,11,15,16,17,
20,23;146:4,4,9,11,12,24;
147:1,8,11,12,18,19,20,23;
148:3,20;149:3,16;150:8,9,
15;151:3,4,14,15,23,23;
152:7,9,14,15,16;153:1,3,5,
8,12,12,20,20,24;154:4,8,9;
155:2,3,3,4,10,11,12,13,17,
18,23,24;156:3;159:7;160:7,
10,15,16,22;161:9,11,13,15,
16,19;162:1,11,21;163:4,6,
9,12,13;164:16;165:6,13;
166:1,6,18,20;167:9;168:2,
4,13,17,18,22,22,23;169:9,13;
170:15;172:22;174:10,15,
16,19;175:1,3,6,12,14,17;
176:1,7,16;177:3,4,4,5,7,10,
16,21,21;178:1,14,24;179:5,
6,8;180:3,11,20,21;181:10,
11;182:4,11,19;183:1,12,18;
184:11,12,18,23;185:3,5,8,
16;186:14,18,22;187:11,13;
188:6,7,9,12,15,18,20;197:8,
11,12,13,15,17,18;198:18;
199:13,14,15,21,22;200:3,8,
9,15,16,19,20,21;201:5,6,7;
202:2,11,12,16,19,21;203:5,
7,7,9,10,17,18,20,22,24;
204:9,12,15,18,24;205:2,
4;207:8;209:10;210:10;
213:14;217:5;218:19;

219:14
**class' (23)**
15:12;23:21;52:11;54:18,
22;56:2;57:16,17,21;58:13;
59:4;76:4;77:19,22,24;
97:16;99:10;122:4;123:11;
135:2;136:9,19;204:7
**classes (1)**
66:2
**class's (1)**
132:3
**clause (1)**
23:15
**clear (34)**
16:7;27:7;37:22;70:16;
72:23;74:10;75:3;92:3,13,
19;93:13;94:21,24;95:1,23;
96:18;97:9,14;99:24;100:1,
21;108:24;116:8;152:22;
153:8;154:15;155:16,22;
190:21;191:8;198:7,9,21;
199:8
**clearly (1)**
149:2
**clearness (1)**
198:8
**client (13)**
23:24;71:9;81:21;96:1,4,
12;133:16,18;141:11,12;
152:22;153:4;168:17
**clients (15)**
83:18;91:14;151:15,20,
20,24;152:8,15,19;153:5,9;
157:13;168:23;174:19;
184:1
**close (3)**
14:1;207:9;210:14
**closed (1)**
35:22
**closely (1)**
19:14
**co-counsel (2)**
12:19;44:3
**coercing (1)**
146:7
**co-extensive (1)**
154:20
**collapsed (1)**
26:6
**combination (2)**
19:8;163:6
**comfortable (4)**
40:3;60:1;63:19;73:9
**coming (4)**
24:21;39:4;86:16;122:7
**commensurate (1)**
181:8
**comment (4)**
30:4;9:98:22;126:7
**commentary (4)**
153:7;155:6,21;156:1
**commenting (1)**
213:16

**committee (1)**
155:7
**common (3)**
112:1;158:7;210:10
**communicate (3)**
152:9,11,12
**communications (1)**
152:17
**community (1)**
173:11
**companies (4)**
13:16;120:10,16,21
**Company (2)**
6:14;13:14
**comparison (1)**
218:5
**compensated (1)**
15:15
**compensation (1)**
15:17
**competing (3)**
131:22;132:16;146:11
**complaints (1)**
65:6
**complete (1)**
19:21
**completely (7)**
64:20;96:10;142:3;164:9;
202:13;204:4;205:10
**complex (1)**
133:14
**complexities (1)**
58:18
**complicated (1)**
66:15
**complied (2)**
154:1,18
**component (1)**
176:10
**components (1)**
131:13
**compound (2)**
125:5;126:13
**compromise (1)**
131:7
**compromised (1)**
136:10
**concealed (2)**
106:2,22
**concept (1)**
174:1
**concern (4)**
55:6;71:1;97:10,13
**concerned (10)**
42:22;84:24;174:9;205:6,
11,15;206:12,16;215:15;
221:6
**concerns (5)**
97:3,8;100:19;165:18;
172:11
**concisely (1)**
179:16
**concluded (1)**

222:2
**concludes (1)**
207:14
**conclusion (3)**
59:20;67:3;158:7
**Conclusion-Disclosure (1)**
54:2
**concurring (1)**
30:16
**concussion (2)**
218:7,8
**conducted (1)**
103:11
**CONFERENCE (9)**
10:21,22;17:3,5;22:18,19;
58:4,5;93:18
**confess (1)**
10:24
**confined (1)**
21:21
**confirm (1)**
129:21
**conflate (1)**
154:3
**conflating (3)**
118:19;119:1,20
**conflict (9)**
33:4,6;96:22;145:1;
147:17;157:15;203:19,23;
207:7
**conflicted (1)**
56:2
**conflicts (10)**
30:16;31:18;32:21;33:12;
65:11,12;141:17;152:20,23;
153:5
**congratulatory (1)**
134:14
**congress (3)**
83:16;183:6;184:3
**congress' (1)**
83:3
**conjunction (1)**
71:9
**connection (1)**
6:12
**connotes (1)**
117:21
**consider (6)**
10:11,14;68:15;112:15;
160:19;212:14
**consideration (1)**
135:6
**considerations (1)**
119:2
**considered (3)**
152:15;168:23;176:2
**considering (2)**
175:15,17
**consist (1)**
85:18
**consisted (1)**
147:8

**consistent (6)**
44:11;45:2;103:21;104:4;
208:10;216:12
**consolidated (5)**
64:11,14;65:8,24;200:4
**consolidation (1)**
67:2
**constitute (2)**
84:16;86:21
**constituted (1)**
82:13
**constitutes (1)**
41:23
**Constitutional (1)**
162:9
**construed (1)**
196:1
**consult (1)**
169:9
**consultant (1)**
12:14
**consulting (2)**
12:14;157:17
**contain (2)**
178:19,23
**contained (3)**
22:13;42:14;191:14
**contend (1)**
118:16
**content (3)**
117:16;130:1;150:15
**contest (2)**
95:3;97:19
**context (4)**
107:9;140:13;149:23;
214:6
**contingent (1)**
163:22
**continue (4)**
128:1,4,23;129:3
**CONTINUED (2)**
94:7;98:13
**continues (1)**
212:24
**contract (1)**
16:10
**contraption (1)**
149:10
**contrary (1)**
192:22
**contributed (3)**
15:11;48:13;87:18
**contribution (8)**
42:17;80:24;82:14,19;
85:3,8,16;86:4
**contributions (10)**
42:12;79:15,20;80:7,8,19;
84:17;85:12,18;86:22
**convenient (1)**
93:15
**conveyed (1)**
119:23
**conveying (1)**

220:21
**convince (1)**
199:8
**convinced (2)**
136:9;199:7
**copies (1)**
212:5
**copy (1)**
208:2
**copycat (1)**
55:14
**copying (1)**
37:14
**corrected (1)**
216:1
**correction (1)**
216:8
**correctly (6)**
22:9,16;49:18;77:9;79:17;
107:17
**counsel (144)**
6:9;16:14;17:3,23;19:11;
30:13,16;31:1,2,8,10,17;
32:1,2,7,13,21;33:1,9,13,16,
20,22;34:6,11,23,23;35:15;
36:8;37:5,21,23;38:7;39:4;
40:8,10;41:11;42:4,9,11,16;
43:9,13,14,20;44:2,13;
45:16,17;46:17,17;47:18,23;
48:14;49:12;50:12;52:8,8;
60:6,11;63:2;67:8;68:14;
70:8;78:8,21,21;79:14,16;
80:1,3,16;87:22;88:5,20;
89:15;93:1;94:13,16,19;
95:7,14,18;96:6,13;109:12,
24,24;110:8,19;112:23;
114:4;118:7,22;120:22,22;
131:6;132:4,11,17;135:3;
136:18;138:17;139:3;140:3,
5,6;146:10;147:1;151:15;
153:12,21;154:9;155:2,12,
17;156:6,6;157:17;159:9;
161:15;168:18;174:11;
175:14;180:6;183:19;
194:24;195:1;202:12;
208:16;209:2,9,9,18,20,20;
210:2,11,13;211:12,17;
214:16,20;215:8
**counsel's (17)**
95:3,8,17,21;96:1,19,23;
97:15;119:15;145:15;163:13;
164:11;180:11;194:9;
197:12;209:3,11
**count (2)**
66:20;122:24
**counting (1)**
216:3
**country (1)**
146:15
**course (11)**
7:2;13:7;17:20;69:3;
88:21;102:24;105:8;147:6,
9,9;177:24

**Court (178)**
6:17;8:20;9:10;22:22;
23:1,23;24:5,11,14,15,19,22,
23,24;25:15,22;26:3,14;
27:11,14,20,22;28:1,6,6,8,
11,15,17,19,21,24;29:3,7,17;
30:23;31:12,13;32:4,13,17;
34:2;36:5;37:21;41:6;46:10,
15;50:8,8;52:8;54:14,18;
57:12;63:11,22;70:17;72:8;
73:5;74:5,6;77:12;78:10,15;
79:15,19;88:7;102:10,11,15,
16,18;104:24;105:4,17,21,
23;106:3,13,14;107:22;
109:9,12,19;110:6;111:6;
112:19;113:10;114:5,15;
115:3;118:8,17,20;119:9,15,
20;120:1,17,18;121:1,8,11,
13,17,23;122:2,19;126:21;
130:11;131:3,15,18,21;
132:10,19,24;133:5;134:17,
20;135:8,10,13,14,18,22;
136:3,4;138:23,23;140:1,5;
146:14;148:9,9,13,14,16,23;
151:4;154:13,16;155:16;
157:22,22;158:9;161:11,12;
168:12;169:19;170:5;171:5;
172:23;173:10;176:20,22;
177:9,12;180:9;185:23;
188:16,17;189:7;190:2,6,9,
11;191:12;195:10,14;197:8;
198:11;208:6;209:8,12,22;
210:2,7,11
**Court-appointed (4)**
172:9;174:2,8;218:6
**court-designated (2)**
170:13;173:6
**courts (19)**
26:10,13;27:12,17;31:24;
36:7;54:13;111:14;125:17;
132:21,22;140:7;142:4,9;
153:16,24;163:21;191:8;
219:14
**Court's (18)**
28:18;78:7;79:24;109:21;
113:12;114:3,4,19;119:11,
14;132:2,6,19;135:1;
154:19;190:13;193:5;197:7
**cousin (2)**
88:5;148:5
**covered (3)**
133:24;202:5,7
**cramp (1)**
92:7
**cramps (1)**
92:9
**crazy (3)**
83:8;166:3;198:15
**create (2)**
100:22;123:5
**created (6)**
83:16;100:20,21;183:9,
10;203:19

**creates (2)**
154:22;185:12
**creating (1)**
100:18
**creative (2)**
80:10;85:5
**credit (1)**
190:12
**criminal (3)**
174:2,8;180:18
**critical (1)**
110:10
**critically (1)**
133:19
**cross (1)**
192:1
**crosscheck (30)**
52:15;108:8,11,13;109:2,
5,20;111:15;112:7,12;
125:24;164:19;189:4,16;
190:12,20,23;191:6,9,18,21;
192:9,18,23,24;193:11,15,
20;219:22,23
**crunched (1)**
20:22
**curious (1)**
34:20
**current (3)**
11:7;18:6;79:7
**currently (1)**
99:1
**customer (10)**
43:9;49:12;67:7;203:7,10;
204:12;209:11,18,19;214:12
**CV (10)**
9:24;10:2,3;11:3;13:14,
18;14:19;129:14,24;145:8

**D**

**Damon (7)**
16:16;100:13;106:8;
113:3;179:6;182:23;196:14
**data (4)**
20:23;160:18,21;216:14
**dated (6)**
43:16;129:12;210:18,21;
211:24;214:7
**day (5)**
58:14;136:2,9;183:7;
205:24
**days (4)**
166:18,18,20;183:24
**deadline (1)**
166:17
**deal (14)**
61:22;77:15;78:1,4,9,22,
24;86:17,18,19,21;88:24;
100:17;175:11
**dealing (2)**
69:21;100:6
**deals (1)**
213:23

**deals/arrangements (1)**
213:13
**decade (2)**
10:8;12:11
**decide (5)**
24:23;29:18;39:18;
111:21;168:12
**decided (4)**
23:23;29:4;93:7,9
**decides (1)**
22:23
**deciding (1)**
176:2
**decision (9)**
60:16;81:7;111:20;
132:20,21;133:7;172:3;
180:6;209:16
**decisions (1)**
26:15
**declaration (11)**
10:1;16:4,8,9,14;20:19;
129:12,22;136:21,24;137:9
**declarations (1)**
166:10;219:3
**deemed (1)**
25:2
**deep (1)**
83:14
**defend (1)**
14:11
**defendant (7)**
14:6;95:2,8,15;97:17;
152:17;190:1
**defendants (13)**
13:20,23;14:11,13,15,21;
94:16,19;131:7;132:17;
141:20;152:9,10
**defending (1)**
58:2
**defense (3)**
13:8,12;14:4
**defer (1)**
79:24
**deference (7)**
30:19;78:5;88:11;140:9,
11,12,13
**define (4)**
149:24;158:17;159:20;
160:4
**defined (1)**
200:19
**defining (1)**
187:16
**definitely (2)**
19:10;34:17
**definition (1)**
160:11
**demonstrate (2)**
95:6,13
**denied (2)**
169:19;171:9
**Department (7)**
69:3,7,10,22;211:16;

212:16;213:22
**depend (1)**
138:19
**dependent (2)**
53:24;54:11
**depends (2)**
105:22;149:24
**depose (2)**
80:14;141:22
**deposition (7)**
6:8;8:10;19:2,5,12;
141:23;168:16
**depositions (6)**
16:24;17:2,8,21,22;20:4
**depriving (1)**
174:5
**describe (10)**
11:10;13:11;15:2;27:12;
35:17;93:9;109:16;113:10;
134:6;161:10
**described (3)**
11:5;27:13;154:13
**describes (1)**
133:14
**describing (7)**
26:5,6;28:7;31:22;71:22;
117:9;138:18
**deserve (1)**
216:15
**deserving (1)**
217:3
**details (1)**
139:4
**determination (2)**
37:6;197:14
**determinations (1)**
197:12
**determine (2)**
78:21;163:17
**detriment (1)**
184:23
**Detroit (1)**
6:17
**developed (1)**
217:1
**devil's (7)**
170:13,24;171:6,17;
172:9,12;174:1
**Diet (1)**
30:15
**differ (1)**
135:7
**difference (1)**
89:22
**differences (1)**
132:18
**different (32)**
12:11;38:20;53:5;55:5;
61:16;64:7,15,16,19;65:23;
66:1,4;68:21;71:22;96:10,
21;106:15;119:8;122:24;
123:1;152:24;153:1;164:10;
171:4;186:22;189:5,17;

194:1;203:1;207:2;217:11;
219:17
**differentials (2)**
203:17;204:5
**differently (3)**
65:18;107:4;174:14
**difficult (3)**
23:8;134:7,17
**difficulties (1)**
134:4
**dig (1)**
108:20
**Digest (1)**
29:16
**digging (1)**
77:7
**direct (13)**
17:9;22:1,2;27:1;54:20;
58:12;94:8;103:8;107:13;
109:10;158:4;161:6,12
**directed (1)**
161:16
**directing (1)**
130:20
**direction (1)**
120:21
**directly (15)**
47:15;52:2;59:5;60:3;
69:21,23;82:24;149:5,14;
152:11;155:7;183:12;185:5;
190:1;211:16
**disagree (2)**
41:2;209:18
**disagreements (1)**
54:11
**disappointed (1)**
115:13
**disclose (20)**
34:23;46:18;49:12;50:3;
67:11;72:16;77:18;104:2;
119:15,22;157:24;158:9;
195:2,9,17;196:13;197:4;
198:10,11;220:24
**disclosed (19)**
53:11;67:7,8;69:10,16;
70:2,11,16,19;74:10;92:14,
15;103:23;105:17,18;
162:20;211:11,15;215:15
**disclosure (23)**
22:6;37:5,13;51:6;53:23;
54:11,13,19,22;70:14;71:3;
74:4;77:13,21;92:21;
103:11;118:18;148:17;
161:8;176:23;177:12;
186:16;195:7
**discover (2)**
75:22;106:16
**discovered (3)**
75:10,15,21
**discovery (5)**
169:18,19;170:3;200:6;
218:17
**discrepancy (1)**

207:10
**discretion (1)**
  214:17
**discuss (1)**
  21:4
**discussing (1)**
  112:11
**discussion (1)**
  208:12
**disinterest (1)**
  202:1
**disinterested (2)**
  30:14;32:10
**dispute (5)**
  126:8;209:21,22;210:4,6
**disputes (2)**
  32:19;210:7
**disqualifier (1)**
  137:11
**disqualify (1)**
  141:21
**distinction (1)**
  23:17
**distinguish (1)**
  196:20
**distinguishes (1)**
  130:23
**distracting (1)**
  122:11
**distributed (4)**
  209:2,9,19;214:18
**distributing (2)**
  37:15;214:16
**District (6)**
  6:17;21:1;106:12;113:20;
  114:2;135:14
**divide (4)**
  23:1;24:1;74:13;213:13
**divided (4)**
  39:8;61:1,23;96:7
**dividing (2)**
  47:23;61:15
**division (1)**
  60:14
**divvy (1)**
  30:20
**divvying (4)**
  35:14;38:3;48:2;88:8
**docket (1)**
  104:12
**dockets (2)**
  103:17;104:11
**document (7)**
  8:21;9:6,23;10:5;11:13;
  130:18;211:20
**documents (12)**
  16:23;17:8;18:4,5,14,18,
  23;19:18,20;43:10;104:17;
  166:4
**DOL (10)**
  212:10,19;213:2,12,15,24;
  215:7,11,17;220:24
**dollar (4)**

190:3,4;203:21,21
**dollars (10)**
  39:11;40:4;52:13;82:5;
  101:19;123:4;179:6;180:13;
  197:19;218:9
**done (15)**
  14:24;43:22;70:22;83:11;
  88:20;117:1;120:20;144:23;
  145:18;184:17;204:11;
  205:4;207:14;211:5;217:8
**don't (166)**
  8:7;11:13,16;12:3,5,6;
  13:2;16:17;18:14;21:16;
  23:8;26:10;27:5,17;29:14;
  30:2;35:1;36:5;40:18;45:13;
  46:6,24;47:14,15,21;49:1;
  50:10;52:14;55:18,24;
  56:11,13,15;57:3;58:2,11;
  59:1,3;61:5,7;62:19;63:19;
  65:10;66:7,17,21,22;67:1,
  20;70:14;73:17,24;74:20;
  75:12;76:7,19;77:3;86:2;
  88:8;91:17;92:6;96:7,12;
  97:7,23;98:18;100:8,11,18;
  103:4,14;105:12,12;106:7;
  109:7,8;110:13,20;111:2;
  112:13,15;115:7,9,11,12;
  117:5;120:23;123:5,22;
  124:18;126:8;127:3;128:5,
  5,7,8,9,12,17,20;129:4;
  135:11,17;137:3;138:14;
  139:18;141:8,16;142:6,16,
  21;144:3,12,19;145:24;
  148:18;153:4;158:23;159:8;
  160:14;163:21,23,24;
  165:24;166:23;168:11;
  171:13,15;173:19;174:18,
  22;175:8;177:2,4,21;182:18,
  24;183:11,11;185:4,15,22;
  186:12,17,24;190:22,24;
  191:17;192:9;193:10;
  194:20,21;195:13;196:18,
  20;199:20;201:21;202:23;
  204:3,4;205:10;207:3,12;
  214:15;218:24;219:9
**doors (1)**
  35:22
**Double (2)**
  9:4;216:3
**doubt (2)**
  29:7;46:10
**down (11)**
  47:13;54:8;104:15;
  111:24;146:17;147:16;
  171:15;183:16;192:6;
  201:19;213:1
**downsides (1)**
  191:7
**dozen (5)**
  66:20,21;122:24;123:1,6
**dozens (1)**
  164:6
**draft (3)**

120:4,7,15
**drafters (2)**
  122:2,12
**drafting (1)**
  60:18
**draw (2)**
  103:18,20
**drill (2)**
  178:7,9
**drilled (1)**
  201:19
**drop (2)**
  111:24;212:23
**Drugs (1)**
  30:15
**due (2)**
  30:19;217:8
**duly (1)**
  6:6
**during (8)**
  7:2;25:9;56:5;74:14,18;
  88:21;131:19;200:5
**duties (7)**
  126:17;147:17;154:2,9,
  20,22;155:2
**duty (27)**
  34:22;36:6;45:4,8,9;
  46:12;50:2;102:16;114:3;
  119:9,11,14;131:19;135:16;
  148:9,11;153:12,23;154:14,
  17,19;156:2;165:2;187:20;
  197:7,12;198:17

# E

**earlier (12)**
  62:1;68:3;75:21;99:9;
  100:4;107:10;124:9;168:17;
  171:21;181:6;182:1;202:10
**earliest (1)**
  8:6
**early (1)**
  208:6
**easier (1)**
  191:5
**easily (1)**
  166:21
**effect (10)**
  14:15,20;44:5;49:7;52:21;
  58:12;137:6,7;155:24;
  196:24
**Effectively (2)**
  204:8,10
**efficient (1)**
  217:9
**effort (1)**
  39:1
**either (9)**
  28:13;30:23;41:17;73:5;
  74:5;75:2;94:11;120:20;
  211:16
**elements (1)**
  133:19

**elicit (1)**
  197:1
**Elizabeth (1)**
  6:19
**else (9)**
  36:17;81:15;87:14;99:20;
  127:22;180:1;203:8;207:13;
  220:7
**else's (1)**
  193:16
**em (1)**
  110:20
**e-mail (16)**
  210:17,18,20,21;211:20,
  24;212:8,13,24;214:2,6,7,9,
  14,24;215:2
**e-mails (5)**
  43:10;56:14,17;100:9;
  182:21
**e-mail's (2)**
  211:21;214:3
**emphasis (1)**
  197:10
**emphasizes (1)**
  134:12
**empirical (11)**
  20:21;21:3,15,21;103:10,
  15;105:15;106:15,18;107:7;
  216:14
**enabled (1)**
  80:14
**enacted (1)**
  83:5
**enactment (1)**
  83:3
**encourage (3)**
  40:1;51:17;191:18
**encouraged (1)**
  184:4
**encourages (1)**
  134:10
**end (19)**
  30:21;36:13;39:8,18,22;
  58:14;62:10;77:22,22;93:2;
  98:17,20;100:17;136:15;
  141:2;145:23;172:19;
  184:20;205:24
**ended (1)**
  172:11
**ends (2)**
  78:20;211:20
**engage (1)**
  83:12
**engaging (1)**
  83:21
**engineering (2)**
  117:12;184:19
**enormous (2)**
  125:11,16
**enough (9)**
  81:8;84:23;86:14;120:1;
  142:9;174:17,22;197:1;
  205:24

**ensure (4)**
131:9;132:3;135:2;174:4
**entered (3)**
10:22;22:19;58:5
**entire (11)**
19:7;63:4;64:9;88:12;
95:19,22;96:1,6,24;199:14;
201:7
**entirely (4)**
74:4,4;155:19;166:24
**entitled (2)**
143:9;186:8
**entrepreneurial (2)**
34:18;83:12
**equal (1)**
183:16
**equilibrium (1)**
174:10
**equivalent (1)**
173:10
**ERISA (36)**
13:3;64:11;65:16,17;67:1,
2,8,12,23;68:8;76:13;88:15;
89:14;110:23;168:8,9,10;
200:10,11;203:7,9,17,22;
204:22;205:2,4,11,16;207:4,
8;209:2,3;211:11,17;
212:20;214:11
**ERISA-fied (2)**
69:4,5
**ERISA-named (2)**
88:14;90:12
**ERISA-related (1)**
65:6
**especially (2)**
110:15;161:3
**Esq (1)**
4:2
**esquire (1)**
209:21
**essentially (2)**
26:5;80:3
**Estimate (2)**
15:20,22
**etcetera (1)**
110:4
**ethical (11)**
45:9,14;87:3;95:9,15,17,
22;96:5;150:12;199:1,2
**ethics (16)**
87:10;149:19,22;150:2,4,
14,17,18,21;151:11;152:1,3,
12;160:8;199:3,6
**evaluate (1)**
79:15
**evaluating (1)**
170:15
**evasive (1)**
168:20
**even (17)**
21:17;34:5;57:21;74:6;
92:22;96:13,20;106:20;
127:4;133:3;144:21;173:22;

182:15;191:11;192:14;
202:23;204:10
**Eventually (1)**
65:8
**everybody's (1)**
66:9
**everyone (11)**
6:3,7;7:21;32:15;36:16,
17;48:1;55:11;129:10;
147:8;217:5
**everyone's (2)**
37:18;38:3
**evidence (11)**
56:4,14,15;57:3;69:6;
73:21;76:7;100:11;179:19,
20;185:4
**evolve (1)**
107:6
**Ex (1)**
186:19
**exacerbated (1)**
176:16
**exact (3)**
162:7;192:4;216:6
**exactly (12)**
12:4,5,6;43:6;45:6,7;
46:24;58:22;147:24;162:16,
17,17
**EXAMINATION (6)**
8:11;94:7;207:15,18;
215:23;222:2
**examine (1)**
132:11;133:19;170:23
**example (3)**
52:24;147:19;169:24
**examples (3)**
147:24;154:12;169:1
**ex-ante (1)**
186:14
**exceed (1)**
95:4
**excellent (1)**
55:12
**except (1)**
218:15
**exception (4)**
139:20,21,23;181:13
**exceptions (1)**
120:24
**Exchange (3)**
184:2;210:18,20
**exhibit (13)**
8:22;9:8,13;10:4;18:8;
19:19;129:16,17;130:13,14;
210:17,22,24
**exhibits (1)**
129:13
**exist (1)**
33:13
**existed (1)**
124:2
**existence (1)**
16:15

**existing (1)**
214:19
**exists (1)**
106:17
**expect (8)**
6:22;126:14;142:7,23;
144:11;177:2;213:1,12
**expectation (1)**
144:16
**expected (4)**
142:24;179:19;188:11,18
**expense (1)**
52:11
**expenses (3)**
111:22;214:17,18
**experience (11)**
10:6;11:2,11;33:13;34:3;
39:14;42:3;68:11;120:13;
159:6;210:9
**expert (64)**
8:16;9:14;10:1,12,15;
11:3,6,18,21;12:2,4,13,14,
19,21;13:16,24;15:3,5,6;
18:4;19:19;22:2;35:13;
40:19;44:8;49:15;55:3;
59:13;67:17;69:14;73:17,
20;75:19;80:14;81:2;
125:22;129:11;137:20;
139:10;146:2;147:4;149:16,
19,22,23;150:2,4,8,14,16,18,
20;152:3;156:8;157:16;
159:16;160:19,24;177:7;
199:4;201:14;202:19;218:6
**expertise (6)**
10:18;11:1;45:15;61:22;
160:10,22
**experts (2)**
28:21;121:15
**expert's (1)**
199:7
**explain (8)**
48:1;55:9;71:7;151:22;
177:19;186:8,11;216:5
**explained (4)**
116:13;123:7;186:10;
210:2
**explaining (1)**
101:7
**explanation (1)**
187:4
**explicit (1)**
163:2
**explicitly (1)**
95:23
**exploring (1)**
171:19
**expression (3)**
95:11;150:5;170:14
**extent (3)**
118:9;132:10;141:10
**extra (2)**
132:11;192:6

---

# F

**face (1)**
159:10
**fact (42)**
17:9;18:20;29:10;44:15,
17;45:22;47:3;49:20;50:2;
57:2;61:5,10,12;63:1,2,2,3,
9,9,10,13;72:6,17;73:19;
82:23;84:7,20;86:12;92:17;
115:2;117:9;127:18;138:10;
163:16;175:12;178:4;
179:19;197:14;206:12;
216:13,16;217:16
**factor (2)**
177:8;193:18
**factors (5)**
34:16;216:18,18,21;
217:22
**facts (22)**
17:12,18,21,24;34:24;
37:5;41:1;42:14,14,21;
46:23;51:15;70:12;73:13,
19;80:23;82:18;86:13;
117:8;158:7;176:13;182:20
**factual (5)**
18:1;176:12;178:3;
184:24;200:17
**factually (1)**
178:4
**fail (1)**
83:6
**fair (37)**
10:5;21:12;22:12;23:24;
29:5;37:7,9;56:21;58:24,24;
78:9;96:8;97:12;105:15;
106:20;107:23;108:6;116:1,
17,20;128:18,20;134:4,19;
146:23;160:9,12;161:18,21,
22;162:5;170:15;173:8;
179:1;182:5;186:13;206:11
**fairly (8)**
45:23;48:21;55:22;65:7;
78:11,16;164:18;217:8
**fairness (15)**
25:16;71:4;104:19,20;
108:4;109:8;111:11;163:17;
170:7;171:12,22;195:11;
196:15;206:22;207:22
**faith (1)**
134:21
**fall (2)**
10:18;68:2
**familiar (3)**
13:4;172:2;173:15
**far (9)**
52:24;56:23;59:18;84:23;
86:21;87:13;133:5;189:18;
204:6
**fascinating (1)**
19:15
**father (2)**

36:11;37:14

**favor (3)**
138:8;171:15,20

**Federal (9)**
51:20;53:22;123:9;
125:11,14;126:9,10;158:7;
198:22

**fee (237)**
10:15;12:24;13:3;14:12;
16:7;22:6,14,21,21;23:1,3,9,
12,19,24;24:1,12;25:3;26:4,
8,11;29:5,16;31:9;39:17;
41:17;43:18;44:19;52:1,3,4,
4,6;53:10;54:1,16;56:16,21;
57:2,3,5,20;58:7,17,23,24;
59:1,10,24;60:1,6,10,14,17,
17,18,21;61:11;62:3,4,21;
63:10,11,16;64:9;66:16,18,
21;68:17;70:14,16;71:20;
74:10;75:3;76:3;87:11;89:2;
90:16;91:15,16;92:14;93:5;
94:10,17;95:3,7,13;97:19;
103:12,23;105:3,10,13,23;
106:13;107:8,22;108:2,15;
109:13,23;111:13;112:20;
113:2;115:23;116:13,15;
117:18;118:11,18,21;
119:21,22;121:8,21,21;
122:6,10,19,24;123:1,6;
124:1,18,24;125:24;126:22;
136:4;138:16,20;139:3,8,19;
140:10;142:11,15,20;
144:18,19;148:17,19,24;
149:3;156:18,20;157:24;
158:13,15,17;159:20,22;
160:3,4,11;161:1,4,8;
162:12,15;163:1,8,10,14,17,
23;165:15,23;166:2,9,10,16;
167:5,8,12,14,16;169:14,18,
19,21;170:4;176:2,3,17,21,
23;177:3,6,8,9,12;179:22;
181:8;182:10,13;184:16;
186:16;188:5,7,24;189:17,
24;190:2;192:7;193:1;
194:9,11,22;195:1,7,9,17;
196:13,19;197:4,9,11,14,24;
198:10,11;202:1,12,15,20;
204:6,21;206:1;209:19;
210:3,5;213:6,23;215:15;
218:8;219:3;220:3

**feel (15)**
26:2;45:22;46:1,3;66:7;
76:10;117:7;127:12;128:9;
134:22;143:9;149:7;185:4;
186:13;213:18

**feeling (2)**
166:5;180:20

**feels (4)**
38:20;39:15;82:7;128:4

**Fee-Related (2)**
54:2;104:17

**fees (85)**
13:17;14:2,20;15:10;

25:21;27:23,24;28:16;
30:18,24,24;31:1,7,9;33:10,
14;35:14;38:7,16;39:7;40:7;
47:23;48:2;51:6;53:13;
54:17,21;57:10;64:21;
65:11;69:9;71:7;77:12,18;
79:16;87:3,13,24;90:2,7,13;
95:10,16;97:16,21;98:8,9;
99:1,2;105:17,19;106:2,22;
111:22;114:23;115:3;
119:18;122:8;123:14;
160:15,18,20,23;161:15;
177:20;179:3;181:10,19;
183:16,18;195:16,23;
196:12;203:21;204:21;
208:15;209:4,7,12;210:12;
212:20;213:14;214:17,18;
215:8

**fee-setting (1)**
94:12

**fee-shifting (1)**
189:24

**felt (5)**
100:16;124:3;203:19;
205:22,23

**few (11)**
18:23;55:8;85:23;107:11;
133:9,22;139:2;147:24;
207:16,21;212:9

**fewer (1)**
110:22

**fiduciary (41)**
24:19;54:14;102:16;
113:10;114:3,14;115:4;
125:15;126:17;130:11;
131:14,15,19,23;132:2;
133:12;134:3,20;135:9,14,
16,19;138:23,24;142:15;
143:3;148:9,11;153:12,23;
154:2,9,14,17,19,22;165:1;
175:6;197:7,12;198:17

**field (2)**
10:12;160:17

**fifth (6)**
35:20,22;79:22;85:2,12;
87:6

**fight (1)**
97:21

**fighting (4)**
14:7;35:2;67:21;70:24

**figure (3)**
124:3;175:11;207:5

**figured (1)**
100:8

**figuring (2)**
165:4;178:24

**file (5)**
65:5;89:4,12;166:15;
172:21

**filed (1)**
117:2

**files (2)**
155:10,22

**filing (2)**
156:2;213:5

**final (3)**
41:18;130:9;218:21

**finally (2)**
57:6;111:12

**financial (2)**
30:18;33:11

**find (17)**
45:21;59:18;66:8;81:21;
91:19;104:23;106:22,23;
113:16;127:4,7;149:8;
158:24;159:4;172:17;
186:19;220:12

**finding (2)**
83:20;158:20

**finds (2)**
28:11,17

**fine (8)**
12:9;129:2;142:5;187:2,7;
199:12;206:2;207:11

**finger (2)**
46:7;193:21

**finished (5)**
10:19;24:8;75:13;136:14;
218:6

**fire (1)**
153:8

**firm (27)**
7:10,16,19;11:8,18,22;
12:3,9,10;13:9;36:12,22;
80:4,4,17;81:7;110:23;
127:16;177:19;180:11,15,
19;184:1;190:7,7;205:21,22

**firms (6)**
11:7;12:24;13:2,3,12;
110:5

**first (41)**
9:18;10:1;11:12;17:17;
18:10;20:11;22:3,4,17,20;
23:19;25:1,9,16,22;26:22;
28:3;34:5;36:21;51:12;
54:13;65:2;80:1;89:7,14;
91:13;94:10;120:15,19;
130:20;131:16,16;135:17;
148:5;167:20;181:1;208:4;
210:12;211:20;212:18,18

**fit (4)**
53:22;73:19;117:8;164:21

**five (4)**
11:22;73:12;110:22;195:5

**flat (1)**
16:7

**focus (4)**
51:3;102:10;167:1;213:10

**focused (2)**
177:22;187:10

**focuses (1)**
123:8

**focusing (1)**
116:22

**folks (3)**
8:2;128:23;214:10

**follow (3)**
31:16;75:4;151:11

**followed (3)**
64:3;208:14;210:6

**following (11)**
10:21;22:18;55:5;58:4;
81:6;99:6;101:16;113:9;
151:24;182:18;216:21

**follows (1)**
214:24

**followup (1)**
220:9

**footnote (5)**
29:10;79:12;94:20,24;
114:10,11;191:16

**footnoted (1)**
94:19

**forfeit (1)**
171:9

**forget (4)**
135:18;162:7;215:10;
216:6

**forgiveness (1)**
81:6

**forgiving (2)**
142:4,9

**formal (1)**
134:6

**former (1)**
153:20

**formerly (1)**
6:16

**forth (1)**
56:15

**forthcoming (1)**
114:5

**forthright (1)**
50:13

**Fortune (1)**
13:15

**Forty-five (1)**
129:7

**forward (5)**
75:2;102:23;146:15;
183:21;188:16

**found (11)**
48:23;74:18,19;91:20,22;
103:24;148:4;154:13,16;
198:1;216:4

**four (10)**
20:16,17;101:18;110:8;
113:23;125:5;130:9;170:23;
217:24;218:4

**fourth (1)**
57:6

**fox (1)**
30:19

**framed (2)**
72:3,4

**framers (1)**
121:14

**frankly (4)**
46:2;93:7;99:19;115:3

**fraught (1)**
134:3
**frequent (1)**
197:10
**frequently (1)**
48:23
**fresh (1)**
138:7
**Friday (1)**
17:6
**front (8)**
11:14;24:22;39:12;93:2;
115:6;165:1;183:18;208:1
**frustrated (1)**
192:20
**fulfill (1)**
178:20
**full (4)**
155:11;178:19;209:3,11
**fully (4)**
46:17;67:7;126:16;183:23
**function (6)**
131:21;132:9;141:10;
173:6,12;174:7
**functions (1)**
142:3
**Fund (6)**
82:2,11;84:4;112:1;
140:24;174:18
**funds (4)**
69:4;84:3;173:13;200:11
**further (3)**
134:23;182:11;220:4
**future (5)**
46:5;75:5;86:10,15;150:3

**G**

**gamut (1)**
11:1
**Garrett (1)**
44:4
**gave (2)**
85:23;169:1
**general (7)**
13:22;116:15;117:11;
128:21;154:10;159:24;
169:20
**generalized (2)**
126:6,7
**generally (14)**
59:24;79:24;105:12;
114:13;116:16;121:4;129:1;
134:18;139:18;165:22;
166:23;181:23;188:6;192:8
**generic (2)**
113:24;154:10
**genius (1)**
83:11
**George (5)**
136:21;137:22,22;140:20;
144:7
**Gerald (1)**

6:16
**gets (6)**
71:20;74:15;107:9;
145:23;167:20;204:4
**Gillers (9)**
4:3;6:21;17:19;107:20;
113:22;114:7;138:3,4;158:6
**Gillers' (5)**
17:1;18:11;35:8;107:15;
114:12
**given (12)**
50:1;54:14;101:4;103:1;
117:22,23;121:19;134:12;
160:18;163:12;184:17;
197:7
**givers (1)**
120:14
**gives (1)**
174:4
**giving (10)**
48:8;61:19,21;69:20;
87:23;88:1,6;124:20;
166:18;196:3
**GLASS (62)**
7:9,9;30:10;37:8,11;
38:17;41:9;42:1;44:6;48:19;
49:5,16;55:1;59:14;62:8;
63:6;64:22;65:3;66:6,12;
67:18;69:12;70:5;72:10,20;
74:8;77:2,16;78:2,23;79:1;
81:3;82:20;84:11,18;85:21;
86:5,23;87:19;90:8;91:3,10;
95:20;97:6;98:14;99:4;
101:20;102:4,7;105:7;
106:6,24;107:3;113:1;
117:4;119:3;121:24;123:21;
124:22;125:3;126:18;
128:16
**global (1)**
69:1
**goal (1)**
193:1
**goes (7)**
50:23;61:24;67:4;163:3;
171:21;190:6;217:18
**Goldberg (1)**
149:10
**Goldsmith (2)**
111:12;212:3
**Good (44)**
6:3,7;7:17,20;8:14,15;
33:23,24;36:3;38:5,10,11,
13;41:20;45:19;55:11,21;
61:22;77:15;78:22,24;
93:17;96:14;101:22;102:14;
103:17;134:9,18,21;138:16;
146:11,16,19;165:17;
167:23;169:24;175:8;
183:15;189:23,23;190:18;
206:21;217:3,9
**govern (1)**
151:11
**governed (1)**

94:14
**governing (2)**
118:14;149:4
**government (2)**
55:15;216:23
**governmental (3)**
68:22;69:2;70:2
**great (7)**
45:21;47:16,21;71:17;
75:5;205:4,21
**greater (1)**
118:17
**ground (1)**
80:15
**grounds (4)**
137:19;165:7,14;171:16
**group (2)**
131:23;149:9
**growing (1)**
36:11
**guarantees (1)**
162:11
**guess (12)**
20:1;27:16;47:11;63:4;
81:19,20;82:8;85:7;89:4;
112:4;114:24;176:7
**guessed (1)**
216:19
**guessing (1)**
183:21
**guy (1)**
170:20
**guys (3)**
56:14;196:3;219:21

**H**

**h2 (1)**
162:16
**half (4)**
37:20;81:17,21;110:10
**Hall (1)**
7:9
**hammer (1)**
150:6
**hand (5)**
129:11;134:16,17;152:19;
155:21
**handful (3)**
13:15;141:3;145:9
**handle (2)**
31:24;203:12
**handled (3)**
204:15;206:21;207:10
**hands (1)**
146:18
**happen (4)**
111:7;149:14;155:15;
169:17
**happened (8)**
43:1;48:4;104:3;143:15;
155:13;157:2;169:23;
178:18

**happening (2)**
93:8;101:11
**happens (4)**
86:17;104:4;165:22;
167:24;210:14
**happy (8)**
28:23;35:2;36:16;76:24;
150:19;183:10;202:8;
206:18
**hard (8)**
59:21;85:5;127:21;149:1,
8;154:11;204:16;219:15
**harder (4)**
46:6;92:18;193:1,3
**harmed (10)**
46:3;53:12;60:3;76:1;
177:16;182:19;183:1,12;
184:12;185:5
**harmony (1)**
132:18
**head (2)**
73:13;145:9
**header (2)**
158:5;161:7
**heading (5)**
22:4;54:1;107:14;115:1;
213:12
**hear (4)**
8:3,5;91:13;146:7
**heard (6)**
88:1;90:9,15;159:17;
170:21;219:1
**hearing (30)**
8:6;16:17;25:16;62:4;
67:20;74:7;104:19,20,21;
108:4,11,15;109:8;111:11;
112:6,10,13;156:5,14;170:7;
171:13,22,22;195:11;
196:15;200:8;206:23;
207:23;208:7;219:8
**heavily (4)**
194:10,24;195:24;196:23
**heavy (1)**
80:9
**HEIMANN (86)**
7:11,11;8:23;9:3;11:16;
24:8;26:19,23;27:2;30:4,9;
31:4;32:23;38:9;40:12,17;
41:2,6,19;44:7;46:20;47:6;
48:17,22;49:6,13;54:4;55:2;
59:12;60:16;61:4,7,13;
62:18,23;66:5;67:16;69:13;
70:4;72:9,11;75:12,17;
76:17,21;77:1;81:1;84:9;
85:22;86:24;89:21;91:5;
93:14;108:9,14,18;113:14;
115:9;120:23;125:4;128:6,
13;129:1;137:14,18;156:18;
158:20;159:21;160:5,1;
179:10;186:3,7;187:3,8,23;
188:2;196:6;199:20;207:16,
19;210:16;211:2;215:19;
220:4;221:7,10

**Heimann's (1)**
220:20
**held (3)**
140:8;155:19,20
**help (5)**
20:8;33:6;102:10;126:9;
203:2
**helpful (2)**
102:21,22
**helps (3)**
174:4;181:15;183:4
**hence (5)**
54:18;77:12;133:5;154:2,
18
**here's (20)**
37:15;38:2,3;48:5,8;68:4,
5,5;87:23;101:10;125:22;
138:14;165:2;173:20;
178:15,16,17,17;190:5;
215:6
**Herron (4)**
16:16;54:24;80:24;98:24
**hesitant (1)**
160:24
**hesitate (1)**
72:22
**hey (7)**
27:14;42:7;97:17;100:1;
125:14;178:14;196:2
**hiding (1)**
128:19
**High (7)**
35:20;79:10,13,20;139:9;
158:15;192:1
**higher (9)**
191:23;192:2,12;203:21;
216:19;217:14,18;218:1,1
**highlight (1)**
215:11
**highlights (2)**
113:11;114:18
**hindsight (3)**
89:9;203:4;206:20
**hire (1)**
163:22
**hired (6)**
11:18;12:2;14:11;15:3,7;
19:11
**hiring (1)**
140:17
**history (2)**
18:17;145:8
**hit (4)**
116:3;141:18;162:6,8
**Hm (10)**
64:1,1;79:11,11;158:16,
16;211:23,23;215:5,5
**hold (1)**
97:20
**honest (2)**
76:21;157:21
**honestly (1)**
158:3

**Honor (9)**
30:5;38:21;75:21;76:18;
111:12;126:20;172:16;
202:5;221:8
**Honorable (1)**
6:15
**hope (9)**
32:16;33:21;63:10;72:24;
73:14;75:4;87:24;124:1;
188:17
**hopes (1)**
32:2
**Hopkins (7)**
136:22;137:1,22,22;
140:20;144:7;197:16
**Hopkins' (1)**
137:12
**hour (7)**
15:18;16:6,10;190:6,6,23,
23
**hourly (4)**
16:9,11;189:11,13
**hours (8)**
15:19,23;80:9;110:22;
181:9;189:9;192:6,10
**how'd (1)**
34:8
**huge (2)**
87:20;110:9
**hugely (1)**
163:3
**hundred (7)**
14:1,1;15:23;92:12;97:20;
196:11;210:14
**hundred-million-dollar (1)**
193:24
**Hylenski (3)**
6:22;10:23;94:6
**hypothetical (6)**
26:18,20,24;27:3,20;
179:18

**I**

**idea (9)**
13:22;15:21;36:3;83:8;
96:21;171:20;172:7,8;
206:21
**ideas (3)**
80:10;85:5;162:3
**identification (7)**
9:9;129:18;130:15;
191:13;192:21;210:23;
211:1
**identified (4)**
67:6;105:3,4;158:6
**identifies (1)**
22:20
**identify (1)**
7:4
**identities (4)**
107:21;109:12,22;110:14
**identity (1)**

**111:5
ignored (1)**
213:17
**illegal (1)**
59:19
**imagine (5)**
6:24;29:2;39:11;84:19;
86:7
**immediately (2)**
135:9,11
**impact (1)**
91:7
**imperative (1)**
78:20
**implementation (1)**
133:21
**implicated (1)**
97:4
**implicit (1)**
163:2
**implies (2)**
128:18;172:12
**importance (1)**
103:18
**important (29)**
23:17,20;37:1;39:10;
42:12,18;55:16;56:23;
58:14;78:17;86:3,14;87:14;
123:16,19;124:21;127:22;
135:18;136:6;163:16;164:4,
22;178:13,13;184:6;189:18,
23;204:6;217:2
**inaccurate (1)**
48:24
**inadequate (2)**
148:4;202:2
**inappropriate (1)**
25:24
**incentive (5)**
32:14;87:20;145:22;
147:15;175:13
**incentives (7)**
33:6;53:8;57:10;182:3,7;
184:22;185:2
**inception (1)**
11:9
**include (7)**
69:2;85:19;113:3;129:13,
24;200:19;216:21
**included (4)**
66:3;116:18;200:9;220:21
**includes (2)**
35:14;214:10
**including (6)**
11:9;113:20;114:1;
200:10;211:12;212:1
**incorporation (1)**
124:8
**increase (2)**
49:10;50:2
**incredibly (2)**
125:12;127:7
**indebtedness (2)**

82:7;99:15
**indeed (1)**
43:9
**independent (1)**
187:14
**indicate (5)**
30:22;43:11;94:20;
108:21;158:13
**indicated (2)**
8:9;17:7
**indicates (1)**
137:1
**individual (3)**
96:4;153:6;163:22
**individuals (1)**
174:6
**inform (5)**
16:14;118:22;160:10,22;
162:3
**information (54)**
28:5;37:23;40:9;41:13,24;
44:2;45:4;89:6,11;102:11;
105:10,13,20,21;107:8;
114:5;117:24;118:23;
119:13,17,23;121:20;122:5,
13,14,18;123:17;124:21;
133:1,6;146:6;158:9;
162:14,20,21,24;165:7,14;
166:9,21,22,24;167:8;
169:14;175:20;177:11;
178:20,23;185:13,16;188:7,
16;197:1;213:22
**informational (1)**
133:13
**informed (5)**
116:9;133:7;184:13;
185:8;202:22
**ingenious (1)**
83:20
**inherent (6)**
30:16;31:17;32:21;33:12;
175:1,2
**initial (4)**
33:2;41:12,13,18
**initially (1)**
98:24
**inquire (2)**
124:3;158:8
**inquiry (1)**
144:8
**insisting (2)**
69:1;186:3
**instance (13)**
26:4;28:20;39:3;80:1;
87:12;96:12;110:21;120:19;
139:13;152:7,20;210:12;
219:12
**instances (4)**
15:11;20:20;25:7;139:2
**instant (1)**
17:10
**instead (3)**
28:24;62:14;73:16

**institutional (8)**
    83:6,9,10,18,21;183:8,17;
    184:6
**insurance (1)**
    13:14
**inter (1)**
    32:18
**interest (59)**
    30:18;33:11;34:10;46:5;
    52:3;53:7;54:18,22,23;56:2;
    57:16;58:7,8,13;59:11,21;
    62:2,6,11,16;77:12,14,24;
    78:10,16,17;83:22;96:20,24;
    97:10,16;99:10;122:4;
    123:11;131:9;132:5;133:17;
    135:4;136:19,19;141:17;
    145:2;147:17;157:15;
    166:12;174:22;181:11;
    182:12;184:12;185:8,12,13;
    187:11,13,17,19;188:9;
    209:3,11
**interested (6)**
    19:3;41:3;69:8;83:18;
    122:8;196:18
**interesting (3)**
    58:21;68:20;99:19
**interests (10)**
    50:23;57:17,21;64:19;
    76:5;77:19,22;136:9;172:8;
    197:15
**interfere (1)**
    99:15
**interfered (1)**
    99:17
**interim (2)**
    93:1;155:11
**interpret (5)**
    85:2,7,9,13;127:1
**interpreted (1)**
    85:16
**interrupted (1)**
    154:6
**into (17)**
    26:7;28:9;34:16;39:2;
    47:13;74:13;80:19;87:6;
    124:3,8;134:23;135:5;
    146:7;158:8;162:3;172:16;
    203:5
**intra-attorney (1)**
    32:19
**introduce (1)**
    84:2
**introduced (2)**
    71:19;191:7
**introducing (1)**
    81:8
**introduction (11)**
    84:15;85:8,13,16,20;86:9,
    13,16;98:12;105:6;127:17
**inundate (2)**
    122:13;167:2
**invest (4)**
    39:21;40:1,4;181:1

**invested (2)**
    55:17;80:13
**investigation (5)**
    74:19;103:15;104:1;
    106:18;107:7
**investing (3)**
    78:12;180:13;193:13
**investment (7)**
    38:23;39:9,10;57:13;85:6;
    217:17,20
**investments (1)**
    80:11
**investor (3)**
    83:6,9,18
**investors (11)**
    53:3,4,6,9;83:10,22;
    111:3;183:8,11,17;184:6
**inviting (1)**
    101:13
**involve (2)**
    32:5;34:2
**involved (12)**
    11:7;15:7;18:19;32:8,18;
    50:8;83:1,13;142:21;
    144:24;150:13;204:19
**involvement (5)**
    30:12;55:24;68:21;87:16;
    144:21
**involving (1)**
    29:22
**issue (11)**
    16:17;36:8;40:6;55:7,8;
    67:5;89:10;115:19;132:22;
    133:2;174:17
**issued (1)**
    22:7
**issues (5)**
    14:20;58:19;143:11;
    171:23;212:14
**item (3)**
    212:18,18;213:12
**items (1)**
    85:19

---

## J

**Jewish (2)**
    78:3,6
**Joan (4)**
    22:19;94:3,4;220:5
**job (8)**
    33:23,24;55:21;103:17;
    131:21;141:18;142:11;
    175:8
**join (6)**
    6:23;7:1;8:4;30:10;
    147:23;187:21
**joint (8)**
    12:24;13:3;89:5,12;90:4,
    16;91:15,16
**Jonathan (1)**
    209:21
**Judge (111)**

    6:12;22:7;25:5;26:20;
    29:20;30:15;31:17;32:6;
    33:3,8;34:13;48:18;64:2,8;
    66:15,22;68:16;70:13;
    71:24;72:7,11,17,23;74:5,
    22;75:3;76:22;88:7;92:3,13,
    21,24;93:8,12;98:21;
    105:19;108:7;111:16,19;
    112:6;123:9;124:1,3,6,15,
    16;125:10,14,18;126:9,14,
    15,16;127:2,6,8,9,22;
    128:10;131:11;133:11,17;
    134:2;135:15;142:14;143:2;
    144:22;146:22;150:2;156:6,
    15,16;157:2;165:1;167:19;
    168:1,5;171:22;175:5;
    179:7;184:16,24;185:24;
    186:16;187:6,14;189:22;
    194:9,12,23;195:11,22;
    196:2,12,18;197:17,24;
    198:13,17,18;207:10,22;
    217:8;218:7,23;219:1,3,10,
    10,20;220:7
**judges (33)**
    30:1;34:4,4,7;50:20;51:5,
    16;52:14;53:2;73:14;
    100:22;103:5;104:1;105:9;
    110:12;124:19;125:11,16,
    21;126:10;127:3,14;134:7;
    142:16,19,22;143:4,6;172:1;
    185:14;191:3;196:20;
    197:23
**judgment (1)**
    133:13
**judicial (19)**
    22:7;30:12;53:24;54:12;
    74:11;87:15;103:24;130:9,
    21;131:1,12,21;132:9,12,15;
    133:15;134:10;140:12;
    158:1
**July (10)**
    9:19;10:1;11:4,15;16:3,
    13;17:16;20:19;129:12,22
**June (1)**
    219:2
**justified (1)**
    218:3
**justify (1)**
    192:12
**juxtaposed (1)**
    58:17

---

## K

**keep (4)**
    8:1;71:22;163:23;177:14
**Keller (6)**
    12:16,18;13:5;91:19;
    205:21;206:2
**KELLY (7)**
    7:17,17;38:13;187:16,20;
    215:21,24
**kept (2)**

    135:20;217:9
**key (9)**
    23:22;24:18;52:6;122:14;
    123:10;162:23,23;177:8;
    193:20
**kicked (1)**
    98:21
**kind (48)**
    19:15;27:11;35:21;37:13;
    41:24;46:1;53:5;55:20;57:4,
    23;71:21;73:8,9;83:14,20;
    84:4;86:20;87:13;96:3,11;
    99:19;104:3;117:7,12;
    127:17;134:14;140:14;
    144:22;145:22;147:19;
    149:9;154:10;163:4,6;
    164:1;172:10,18;174:24;
    175:7;181:18;184:6;185:13,
    15;190:6;191:10,18;217:10;
    219:14
**kinds (5)**
    44:22;72:4;100:19;153:3;
    192:6
**knew (2)**
    99:20;207:6
**know (142)**
    8:5;12:4,5,6;18:10;19:2,
    21;32:16;33:8,20;36:5,20;
    37:18;39:5,13;43:7;45:13;
    46:4;47:14,18;50:10;56:18;
    61:5,7,20;62:19;70:13,14;
    75:12;81:4;82:9;83:2,24;
    88:8;89:8;91:17;92:1,6,18;
    97:17;98:18;99:20;102:22;
    103:4,15;109:12;110:13;
    111:2;115:12;117:5;120:3,
    9,15,23,24;122:14,23;123:5,
    9,18,20;124:4,18;126:16;
    127:23;128:7;134:1,16,22;
    137:1,6;139:2;140:15;
    141:24;142:6,11,16,18,21,
    24;143:10;144:3,12,19;
    145:13;147:23;148:4,18;
    149:7,20,20;157:20;158:23;
    160:14;163:20,24;164:17,
    17;165:24;166:3;167:3,4;
    168:11;169:16,20;170:17;
    175:4;176:8,17,21;177:4,14,
    21,24;180:4,6,16,17;181:19;
    183:13,24;184:8;186:20,22;
    187:6,8;188:15;194:18,20;
    196:4;198:3,6;199:24;
    203:3;204:17;205:19;
    206:20;207:1,6;217:12;
    219:9,15
**knowing (12)**
    62:6,11,16;73:13;105:8;
    187:11,13,19;203:3;206:19;
    207:1,6
**knowledge (5)**
    13:1;45:3;47:3;133:16;
    198:2
**known (15)**

38:7,16;48:12;52:20;
67:23;68:8;76:14;89:11;
107:22;110:8;111:5;118:8,
12;167:9;211:6
**knows (4)**
80:16;124:9,9,10
**Kravitz (4)**
206:4,5,9;212:5

# L

**Labaton (31)**
7:7,10;12:1,3;39:4;43:20;
45:4;46:7,11,17;48:8;69:16,
23;70:9;71:4;81:7,24;82:3,
7,10;84:21;85:7;86:4,8,8,13;
90:16;98:13;127:16;177:19;
183:22
**Labaton's (4)**
43:18;48:15;99:15;101:6
**Labor (7)**
69:3,7,11,22;211:16;
212:16;213:23
**lack (7)**
27:17;72:13;155:17;
174:9;175:12,16;192:21
**lacks (2)**
29:7;133:6
**language (6)**
114:9;115:8;121:16;
125:17;153:17;162:7
**large (3)**
13:14;29:22;34:22
**largely (1)**
133:12
**last (15)**
16:11,24;17:16;20:2,5;
21:2;31:6;80:13;136:22;
185:23;210:18,21;211:21;
214:3;220:10
**later (5)**
14:17;16:18;65:6;97:2;
173:24
**latter (1)**
131:1
**laugh (1)**
195:13
**Law (51)**
7:16,19;10:8;11:8;12:9,
10;27:7,8;35:17;36:22;
41:21;47:15;50:10;70:15;
73:14,23;80:3,4,17;103:22;
110:5,23;113:19,24;114:1;
133:11;138:18,18;142:2,14;
144:14,16;149:9;150:15;
153:16;159:7;160:7;163:12,
14;170:10;177:4;180:11,15,
19;188:6;190:21,22;198:6,8,
16,16
**law/equity (1)**
158:8
**lawsuit (10)**
53:7;125:14;130:23;

142:1,2;152:10,21,24;153:2,
7
**lawsuits (3)**
86:18;142:8;181:1
**lawyer (39)**
11:21;71:8,19;88:16;
105:3;122:16;126:24;
140:17;141:12;146:6;148:5,
6,6;152:13,16,18,22;153:9;
154:20;155:10,22;157:8;
163:23;169:10;170:2;171:6;
179:23,23;182:13;188:19;
190:7,7;192:14,16,21;
193:12,13,14;197:18
**lawyering (1)**
150:13
**lawyers (116)**
22:15;23:4,12;24:1;32:3;
34:1,18;37:15;38:21;40:1;
42:6;43:2;45:19,21;46:1,8;
50:21,24;55:13,16;57:13,14,
24;61:19;67:9,12,23;68:8;
69:21;74:15;76:12;78:11,
12,16;81:20;87:2,22,23;
88:14;100:5;104:2,5;
107:21;109:1,20,22;110:3,
14,17,18;116:24;118:20;
119:10,15;120:4,13,16;
122:15,15;123:4,18;124:19;
126:14,20;127:5,19;128:21;
132:7;143:1;145:20;146:16,
19;147:10,12;151:3,10;
153:24;156:8;157:4;161:2;
163:5;164:17;165:5;166:15;
168:8,9,10;171:8;174:21;
178:16;180:18,23;182:5;
184:23;188:24;190:20;
191:13,20;192:11;196:2;
197:3,13,15;198:7;205:16;
210:4;212:1,13;213:14;
214:11,11,12;216:15,24;
218:13;219:22
**lawyers' (5)**
50:23;103:21;147:20;
181:10;185:2
**lawyer's (1)**
188:13
**laxer (1)**
152:21
**laying (3)**
173:19,20,23
**lays (1)**
209:1
**lead (57)**
30:13;32:1,2,7,13;33:1,9,
13,20,21;34:6,11,23;36:8;
37:23;39:4;41:11;42:9,11,
16;43:19,20;44:2;45:17;
46:17;47:18,23;50:12;
68:14;78:21;79:14;80:1,3,
16;87:22;88:5;98:4,5;
109:23;110:8,19;140:1,2,2,
3,5,6,10,13,16;180:5;183:8;

194:9;209:20;210:2,11;
214:16
**learn (5)**
39:13;106:5;124:2;
181:15,20
**learned (3)**
17:21;88:21;93:6
**least (21)**
7:23;47:2;49:23;54:12;
62:6;66:20;67:11;90:19,23;
91:2;98:24;102:1;122:24;
123:1;125:5;133:23;145:8;
159:2;182:20;200:24;208:6
**leave (7)**
32:13;38:8;50:21;191:24;
193:2,7;210:11
**leeway (1)**
180:15
**left (4)**
6:19;191:20;192:10,10
**legal (16)**
11:8;12:15;21:17,20,23;
45:13;46:7,12;47:13;
118:14;134:15;140:4;160:8,
8;180:12;187:20
**legitimate (1)**
174:7
**less (10)**
24:3;52:16;58:7;61:16;
77:14;84:12,14;122:3;
203:20;205:13
**level (1)**
163:1
**Liability (1)**
30:15
**liaison (1)**
43:13
**liberty (1)**
174:6
**Lieff (30)**
7:11,13,13,13;11:12,18,
22;15:5;18:10;39:4;43:7;
44:12,19,20;45:2;47:3;
48:12,15;49:6;60:9;68:13;
70:6;91:19;99:20;110:20;
150:20;158:8;159:6,16;
212:2
**Lieff's (3)**
43:11;46:24;49:19
**lifting (1)**
80:9
**light (1)**
101:6
**likely (2)**
79:14;122:3
**limit (2)**
87:10;90:7
**limitations (4)**
86:20;87:2,4,9
**limited (3)**
45:3;123:8;141:13
**Linda (3)**
6:22;10:22;94:4

**LINE (10)**
10:21;22:18;58:4;109:16;
111:11,19,24;191:4,5;
212:18
**lines (2)**
133:9;193:14
**list (7)**
19:6;85:11,13,18;112:23;
114:1;173:11
**listed (3)**
12:24;18:4;19:19
**literally (4)**
139:22;155:17;163:1;
218:15
**litigate (1)**
57:16
**litigated (4)**
15:4;46:9;99:16;139:21
**litigating (2)**
56:3;99:14
**Litigation (13)**
30:15;58:12;76:4,9;82:18;
83:1,4;84:8,16;94:15;
133:14;139:23;174:18
**little (24)**
27:6;33:7;35:18;43:3;
53:4;64:6;65:14;81:5;85:1;
86:6;90:5,22;101:5;107:11;
115:17;142:24;150:22;
166:16;181:14;188:4;
190:15;205:23;219:17,17
**lo (1)**
146:13
**local (11)**
43:13;44:13;48:14;60:11;
63:2;70:8;72:8,18;73:6;
74:5;159:9
**lodestar (94)**
37:18,20;38:3,16;39:23;
42:4,7,8,9,14,19;43:2,3;
44:18;48:1,6;52:9,14;85:5;
108:2,11;109:2,3,9,20;
110:7,13,18,19,24;111:1,4,
14;112:2,12,14,16;117:2;
118:8,10;125:1,23;127:4,6;
163:13,23;164:12,13,15,19;
180:1,2;181:9;188:22;
189:4,6,8,15,18,20;190:2,3,
4,8,8,10,19,20,23;191:4,6,8,
9,15,18,21;192:1,5,16,18,23,
24;193:2,3,7,10,13,15,17,19;
194:4,4,5,6
**lodestar-based (2)**
189:16,24
**lodestars (4)**
38:6;108:7,13;112:6
**long (8)**
40:20;43:16;57:17;81:5;
83:14;95:4;177:15;181:7
**longer (1)**
217:18
**look (35)**
12:7;14:18;28:8;42:7,20;

49:1;55:23;57:7;99:5;
102:23;123:6;129:21;
130:17;138:22;142:14;
149:7;150:9;162:8;166:11,
19;168:5;172:16;174:14;
179:22;181:23;183:7,9;
189:8;190:22;201:1,20;
205:5;211:19,21;216:14
**looked (9)**
17:1,2,18;19:12;20:21;
99:13;103:16;104:22;
172:16
**looking (11)**
18:17;79:12;81:20;84:1;
92:16;106:8,11;115:17;
171:4;184:19;217:13
**looks (3)**
129:23;150:6;214:8
**lose (1)**
52:12
**lost (4)**
80:12;85:1;86:6;113:14
**lot (36)**
14:2,5,6;19:2;20:21,23;
34:3,5,6,15,15;50:20,22;
53:3;55:14,17;59:15;73:13,
22;87:5,6;88:4;124:5;
125:10;126:9,10;128:4;
134:23;141:20;151:16;
166:1;174:23;181:15;192:4;
219:14;220:23
**lots (2)**
64:16;149:10
**love (3)**
63:14;100:12;202:11
**lower (4)**
100:3;183:18;191:21;
217:10
**loyalties (1)**
96:7
**LUKEY (45)**
94:3;137:15;140:22;
142:13;143:12;144:9;
148:12;150:11;151:6,9;
154:6;156:11,21,24;164:5;
165:9,16;174:13;175:21;
176:6,19;178:2,8,22;179:9,
12,18;182:16;185:10,20;
187:21;192:15;194:14;
195:4;196:5,10;197:22;
202:5;203:14;204:13;
206:14,24;220:6;221:2,16
**lunch (5)**
93:20;115:18;128:4;
129:2,9
**Lynn (5)**
206:4,7,11;211:4;215:3
**Lynn's (1)**
206:6

# M

**Madam (2)**

8:20;9:10
**magnitude (1)**
122:6
**main (4)**
14:21;35:19;42:3;51:24
**maintain (3)**
45:18;47:6;173:10
**major (1)**
87:9
**makes (10)**
33:9;52:10;53:23;54:10;
65:13;95:23;127:12;153:7;
155:22;189:18
**making (20)**
33:9;39:10;40:6;52:10;
63:15;77:22;78:10,16,18;
85:13,15,19;108:1;132:21;
133:12;163:7;164:1;171:7;
172:2;207:9
**malpractice (2)**
153:21,21
**manage (1)**
143:1
**management (1)**
36:23
**managing (2)**
203:11,11
**manner (7)**
139:7;161:13,16;165:6;
173:7;179:16;217:9
**manual (1)**
133:14
**many (16)**
15:19;20:11;39:6;92:24;
96:15;105:2;110:14;111:14;
145:6;153:23;160:17;
183:13,17;189:8;205:21;
214:10
**March (1)**
21:7
**Mark (8)**
6:12;10:4;30:21;116:4;
130:12;162:6,9;210:17
**marked (7)**
8:21;9:5,8;129:17;130:14;
210:22,24
**Marks (1)**
209:21
**Massachusetts (2)**
21:1;114:2
**master (203)**
6:10,11,15;8:17;9:4,15;
11:11;24:5,10,24;25:10,14,
19;26:8,12,21,24;27:4,9,19;
28:10;29:9,13;30:7,11;
31:14;34:20;35:6,9,12;
36:21;37:3,9;38:5,11,15;
40:5,15,23;41:15,22;42:13;
43:5;44:16;45:10;46:14,22;
47:7,10,20;48:11,20;49:3,9,
21,23;50:4,14;51:10;58:15;
59:6;60:4,12,19,23;61:6,9,
14,24;62:13,21,24;64:1,5,

18;65:1,21;66:9;67:4;68:1,
7,19;69:17;70:10,21;72:5,
13;73:3,20,24;75:7,14;
76:12,19,23;88:11;19;90:5,
11,18;91:6,12,23;92:4,6,10,
20;93:16,24;98:19;100:23;
101:15,24;102:5,24;115:16;
116:6,12,18,21;117:15,20;
118:2,5;120:3,7,11,20;
121:2,6,18;122:17;123:13,
16;124:5,13,23;125:7;126:5,
12;127:24;128:3,10,15,22;
129:6;157:18;159:1,13;
167:7,14,18;168:14;169:3,6;
170:19;179:15,21;181:4;
182:8;184:10;185:7,18,22;
186:5,9,24;187:5,10,18,24;
195:20;196:8,22;197:5;
199:1,5,10,17,23;200:14;
201:1,10,13,16;202:3,7,24;
204:8,14;205:14;206:3,7,10,
19;207:12;220:8,16,19;
221:4,9,17,22
**master's (3)**
6:18,20,24
**material (11)**
34:24;37:5;42:14;44:1;
49:20,24;50:2;91:19,20,22;
124:21
**materiality (1)**
68:12
**matter (8)**
9:15;11:7;97:9;111:13;
132:23;137:20;156:5,19
**matters (2)**
132:14;134:2
**may (36)**
18:13,23;29:16;33:13;
40:2;42:16;46:4;48:5;53:8;
60:2;68:20;79:14;82:11;
90:22;93:8;94:11,12,17;
96:4,12;98:17;109:7;
110:17;111:14;142:2;151:3;
155:24;168:14;171:14;
182:8;199:10;200:22;204:1,
2;218:9;219:1
**Maybe (18)**
40:13;45:17;58:9;91:21;
93:24;109:24;110:1;128:11;
160:14;167:23;168:5;
172:14,14;181:6;183:9;
189:19;196:7;203:8
**McEvoy (1)**
6:19
**McTigue (4)**
52:5;214:15,15;215:2
**MDL (6)**
34:4,4,4,7,13,13
**mean (22)**
23:8;57:15;60:16;62:19;
67:20;89:7,13,17;108:9;
116:4;123:3;128:13;136:20;
154:3;164:9,15;167:11;

168:12;178:10,12;194:12;
201:19
**meaning (4)**
37:4;85:22;121:20;207:4
**meaningful (1)**
116:9
**means (15)**
23:7;77:21;85:3;98:18;
113:7;117:23;122:19;127:9;
135:10,11;153:18;154:11;
191:20,22;192:11
**meant (4)**
79:20;194:15,17,21
**mechanics (1)**
76:3
**mechanism (3)**
148:22;210:4,6
**mechanisms (4)**
135:23;136:2;171:12;
175:5
**mediate (1)**
209:20
**mediation (1)**
200:6
**mediator (1)**
210:6
**meet (2)**
36:14,18
**member (16)**
102:8,22;143:9,13,14,21,
24;144:11;163:9;164:16;
169:9,13;175:17;176:1,8;
178:24
**members (83)**
24:20;25:20;52:12;54:15;
64:20;65:11,12,16;66:4;
76:13;101:1,17;102:2,14,17;
103:4;115:4;116:2,14;
117:17,22,23;119:12,16;
120:2;121:19;122:11;
125:15;131:8,10,19;135:9,
16;138:24;140:20;141:11,
13;142:12;143:3;144:8;
151:15,24;152:10,15;153:2,
5,8,13,20;155:4;156:1;
161:13,16,19;162:1,11;
163:12;165:13;166:1,6;
168:23;174:10,20;175:12;
176:4;177:21;178:1;188:15;
197:13,17;198:18;200:9,11;
203:17,18,20,22;204:9,18,
22;205:3,4;207:8
**members' (4)**
52:2,22;116:7;131:18
**member's (1)**
144:13
**memorized (2)**
115:10,11
**memory (7)**
12:8;13:4;19:9;172:20;
200:18,22;216:8
**mentioned (3)**
20:7;196:14;214:10

**mentions (2)**
139:11;177:7
**met (2)**
82:11;89:17
**method (5)**
112:2,11,12;191:3,8
**Michael (3)**
4:2;7:7,15
**Michigan (1)**
6:17
**might (21)**
25:8,9;34:24;43:4;44:20,
21;65:18;71:1;85:12;106:2;
111:4,5;154:15;168:1;
174:11;183:6;211:5;215:16;
216:19;217:10,18
**Mike (2)**
7:6;179:24
**Milberg (1)**
184:1
**million (8)**
82:5;97:19,20;101:19;
123:4;179:6;197:19;218:9
**millions (5)**
39:10;40:4;52:12,13;
180:13
**mind (4)**
29:21;30:1;108:19;219:5
**mine (1)**
67:3
**minimize (1)**
193:19
**minimum (2)**
141:18,19
**minority (2)**
164:1,3
**minute (2)**
51:4;80:13
**minutes (3)**
85:23;129:5,7
**mirror (1)**
174:1
**misallocation (3)**
31:11;59:3,17
**Miss (1)**
210:16
**missing (3)**
168:16;186:18;189:19
**mistake (1)**
108:1
**mistaking (1)**
108:1
**mixed (1)**
204:5
**mode (1)**
132:20
**modest (5)**
57:2;216:5,13;217:15;
220:3
**moment (9)**
8:6;93:15,17;125:13;
134:13,18;136:11;158:24;
214:11

**momentarily (1)**
6:23
**moments (1)**
207:21
**monetary (2)**
80:11;173:14
**money (45)**
14:9;23:21;24:16,21;
28:22;29:6,19;31:12;38:4;
39:20;42:19;48:9;55:17;
57:23,23;58:1,9;59:2;61:18,
20,21,23;74:24;78:13;
80:14;88:2,6,8;89:5;100:14,
15;123:18;127:17;171:7;
174:16,17,22;179:8;180:13,
14,23;203:20;205:24;
217:17,21
**monitor (2)**
138:16;139:19
**monitoring (7)**
71:14;82:2;83:21;175:14;
183:23;184:4;202:12
**month (1)**
136:22
**more (42)**
14:3;15:22;16:1;19:14;
42:12,18,18;45:4;50:14;
51:18,22;55:7;56:23;62:24;
65:13;81:5;84:13;87:14;
97:1;100:14,15;102:21;
123:7;128:7;142:23;144:23;
145:14,17;151:19;154:11;
170:17;172:10;181:14;
189:18;191:10;192:7;193:2,
2;198:9;203:16;204:6;
217:13
**morning (9)**
6:3,7;7:2,18,20;8:14,15;
92:11;177:18
**most (27)**
13:2;24:4;26:10,13;31:24;
37:17;42:6;50:20;58:13;
64:7,15;68:21;92:8;110:13;
122:10;131:1;155:5;163:20,
21;164:22;166:1;172:2;
174:15,21,23;175:8;196:20
**mother (2)**
78:3,6
**motion (5)**
161:15;162:12,15;172:21;
218:18
**motivation (1)**
133:16
**move (1)**
113:5
**much (40)**
22:23;24:16;30:19;32:9;
37:13;39:1,5;52:10,16;
61:18,21;70:3;74:21;122:3,
7,14,16;123:11,13;134:12;
138:20;142:1,7;149:12;
152:21;153:1,9;157:20;
162:24;163:4,5,18;168:12;

177:2,21;189:10;190:15;
191:5;198:4;219:16
**multiple (3)**
34:5;163:24;190:19
**multiplication (1)**
193:18
**multiplier (42)**
52:11;56:22,24;57:1;
109:4;118:10;163:13;
164:20,20,21,21;165:4;
167:2;180:21;189:12;
191:22;192:2,7;193:2,7,9,9;
194:2;216:2,4,12,17,20;
217:3,10,14,15,19,24;
218:12,14,18;219:20,21,23,
24
**multipliers (3)**
216:14,15;218:1
**must (9)**
74:10;116:8;117:23;
131:3;133:18;161:12,15;
162:20;198:10
**myself (8)**
75:24;76:6;92:9;96:15;
99:14;149:21;160:19,24

## N

**nail (1)**
150:7
**name (2)**
6:9;141:1
**named (10)**
67:14;71:10,13;76:16;
81:14;89:16,18;90:11,21;
200:2
**nature (6)**
46:18;47:4;50:15;107:1;
132:8,16
**near (1)**
150:3
**necessarily (3)**
30:13;39:24;102:12
**necessary (7)**
87:16,17;91:7;124:20;
133:6;169:7;171:17
**need (13)**
9:2;29:6;39:19;40:2;
63:19;66:23;73:24;76:19;
119:13,17;122:14;196:4;
215:6
**Needless (1)**
166:15
**needs (2)**
114:5;162:5
**negative (2)**
52:21;127:12
**neglect (1)**
143:4
**negotiate (2)**
183:18;218:15
**negotiated (3)**
95:7,14,18

**negotiation (2)**
68:22;70:3
**negotiations (1)**
132:12
**neutral (1)**
131:22
**nevertheless (1)**
52:17
**Newberg (4)**
53:20;95:1;114:13;130:7
**next (11)**
8:22;75:8;79:23;133:9;
134:11;135:20;210:17,20;
212:23;213:9;214:2
**NFL (2)**
218:6,7
**Ninety-nine (1)**
142:15
**ninth (3)**
147:16;148:2;219:12
**Nixon (1)**
7:18
**non-adversarial (1)**
132:16
**Non-argumentative (1)**
179:17
**non-class (1)**
130:24
**noncollusive (1)**
132:8
**none (3)**
202:15,19;213:18
**non-ERISA (5)**
203:18,20;205:11;207:5,8
**nonetheless (3)**
75:24;142:4;196:10
**non-lawyers (1)**
87:11
**non-legal (1)**
133:12
**non-obligation (1)**
72:16
**non-PSLRA (1)**
144:17
**non-suggestive (1)**
179:16
**noon (2)**
93:19,20
**nor (1)**
177:3
**normal (3)**
131:21;152:10,21
**note (2)**
111:13;114:14
**notes (1)**
155:7
**noteworthy (2)**
113:12;114:18
**notice (71)**
57:18,20;65:15;66:24;
69:19,20;71:4,6,7,21,23;
85:11;91:8;92:22;93:3,10;
100:24;101:4,9,14;102:6;

103:1;115:19,22,23,24;
116:8,19;117:16;118:22;
119:6,9;120:4,14,14,18,18;
121:1,8,9;123:6;161:9,13,
14,18;162:3,5,6;163:4;
166:6;175:18;176:3;177:21;
178:6,10,12,19,23;179:4;
185:9,16;186:15,18,22;
187:12;188:8,12,14,20;
203:11,24

**noticed (1)**
65:22

**notwithstanding (1)**
51:19

**novel (3)**
113:11;114:18;216:22

**November (3)**
108:3,17;111:10

**nowadays (1)**
120:9

**nowhere (1)**
146:13

**number (25)**
6:14;11:6;12:11;13:13;
14:10,17;16:23;17:20;
29:22;43:10;55:10;69:18;
109:18;114:1,11;135:8;
141:16,17;190:14,17;
208:10,19;211:3;212:1;
216:22

**numbered (1)**
213:4

**numbers (2)**
20:22;216:7

**numeral (2)**
130:9;161:7

## O

**object (37)**
27:2;30:4,9;40:12,17;
48:22;49:16;62:18;75:17;
101:12,12,17;103:4;116:3,8;
117:17,18,21;118:24;
121:20;124:10;125:4;128:6;
146:20;161:20;162:1,11,15,
22;165:15;169:10;172:17;
175:18,20;176:3;196:7;
221:8

**objected (3)**
101:2;102:2;177:23

**objecting (4)**
77:2;137:18;146:22;
179:12

**objection (120)**
30:10;31:4;32:23;37:8,11;
38:17;40:13,20;41:9;42:1;
44:6,7;46:20;47:6;48:19;
49:5,14;55:1,2;59:12,14;
62:8;63:6;64:22;65:3;66:5,
6,12;67:16,18;69:12,13;
70:4,5;72:9,10,20;74:8;
76:17;77:16;78:2,23;79:1;

81:1,3;82:20;84:9,11,18;
85:21;86:5,23,24;87:19;
90:8;91:3;95:20;97:6;
98:14;99:4;101:20;102:4,7;
105:7;106:6,24;107:3;
113:1;117:4;119:3;121:24;
123:21;124:22;125:3;
126:18;128:16;137:14,15;
140:22;142:13;143:12;
144:9;148:12;150:11;151:6,
9;156:11,21,24;164:5;165:8,
9,16;166:17;174:13;175:21;
176:6,19;178:2,8,22;179:9,
10;182:16;185:10,20;
187:22;192:15;194:14;
195:4;196:5,10;197:22;
203:14;204:13;206:14,24;
221:2,16

**objections (3)**
76:20;102:9;120:24

**objector (2)**
13:9;169:17

**objectors (9)**
14:23;15:4,7,9;132:24;
133:3;147:4;172:5,6

**obligation (31)**
45:11,12,13,14;46:7,16;
47:9,14;48:16;49:10,11;
50:4,5,15;66:18;67:11;
70:15;95:9,15,17;96:5,19;
118:20,21;119:5,16;121:18,
21;122:2,17;151:11

**obligations (3)**
95:22;151:3;199:2

**obtaining (1)**
116:24

**obvious (1)**
141:16

**obviously (3)**
33:8;42:22;124:11

**occasion (2)**
9:23;78:1

**occasionally (3)**
30:12;52:1,20

**occasions (6)**
12:12,12,20;13:13;14:10,
17

**occurred (1)**
158:14

**occurs (1)**
139:24

**o'clock (1)**
93:23

**off (7)**
97:16;111:20;139:6;
140:5;145:9;166:4;202:22

**offer (2)**
8:3;129:15

**office (1)**
195:6

**often (8)**
18:20;51:22;80:4;94:20;
133:5;146:10;166:19;218:1

**old (3)**
150:5;161:1;183:24

**Once (10)**
16:8;23:23;29:4;53:21;
152:7,14;168:22;198:21;
199:14;216:2

**one (100)**
7:23;9:17,18;15:4;19:17;
22:13;26:7;27:15;29:15;
33:19,20,22,23;34:18,19;
37:16;40:24;42:22;46:3;
51:24;55:10;57:7;61:7;
63:16;65:8,9,9;66:2;67:2;
70:23;71:10;74:12;80:4;
81:15,21;85:6;87:6;88:13,
14,15;90:18;99:20;107:24;
109:18;110:9;111:1,12;
114:20;120:21;125:8;133:1;
134:16;135:8;136:2;138:8;
139:10,20;141:3,16;144:8;
145:20;157:4;160:8;164:8,
11;167:17;170:24;171:7,10,
13,14,15;176:10,10;177:7;
180:2;183:2;184:1;190:17;
194:3,5;195:10,17;196:9,11,
14;197:16;199:16,21;
200:24,24;202:3;204:15;
205:14;207:2;213:6,10;
216:22;217:16;218:17

**one-off (1)**
216:22

**ones (1)**
14:21

**one-sided (1)**
171:23

**ongoing (2)**
81:24;98:16

**only (31)**
19:24;26:14;31:5;34:19;
42:13;67:6;98:3,3;103:1,23;
110:8;124:9,10;133:1;
137:16;148:10,13,22;
161:18;174:20;183:21;
187:11;190:16,18;192:23;
193:16;199:21;200:24;
204:11,23;212:20

**open (1)**
36:9

**opine (2)**
87:15;150:1

**opined (1)**
201:11

**opining (2)**
73:21;150:16

**opinion (15)**
23:22;27:8;35:19,22;
47:24;79:3;84:16;87:7;
101:22;112:22;119:11;
123:24;163:11;182:11;
198:22

**opinions (4)**
21:6,7,10;138:12

**opponent (1)**

152:23

**opportunities (3)**
85:6;93:1;116:9

**opportunity (3)**
116:7;118:24;138:11

**opposing (1)**
197:15

**opposite (1)**
192:5

**option (2)**
173:20,23

**orally (1)**
111:21

**Orange (14)**
28:20;52:23;53:4;56:1,11;
57:8;76:2;100:19,20;139:9,
13;182:6;184:22;202:18

**order (26)**
22:7,8;40:3;51:5,9;53:24;
54:12,13,18;63:11,22;64:3;
72:18;74:6,11,15;77:3,4;77:13;
89:13;103:24;104:1;114:6;
162:20;195:15;197:1;
210:17

**ordered (7)**
66:15,22;68:17;70:14,18;
92:13;103:12

**ordering (2)**
92:21;180:9

**orders (3)**
70:17;92:3;198:11

**oriented (2)**
14:4,4

**origin (2)**
82:6,8

**original (1)**
88:24

**originally (2)**
91:18;216:11

**origins (1)**
46:18

**others (5)**
19:15;168:24;169:1;
199:17;201:3

**otherwise (2)**
100:3;217:10

**ought (2)**
76:21;117:22

**out (67)**
13:19;24:22;29:13;32:13;
33:5;37:19;45:22;46:2;
51:15;74:15,18,19;77:7,23;
83:11;86:16;89:7;97:20;
98:12;106:16,21;108:20;
113:23;124:3;132:4;135:3;
136:19;141:23;146:13;
148:2,10;149:2;157:3;
165:4,5;166:7,18;169:4;
172:19;173:20,23;175:11;
178:24;182:5;185:13;
186:15,19;191:3,20,24;
192:10,10;193:2,7;198:1;
199:11;201:2,24;202:6;

205:1;207:5;209:1;216:2,3,
7,18;220:2

**outcome (2)**
30:19;33:11

**outrageous (4)**
57:20;127:5;139:14,17

**outset (1)**
216:1

**outside (6)**
44:8;46:21;53:8;59:12;
150:19;202:14

**outsiders (1)**
53:6

**over (13)**
10:10;16:23;17:2,20;
28:15;69:4;135:18;139:4;
160:17;169:2;204:24;
212:23;214:2

**overall (3)**
58:17,24;59:10

**overclaim (1)**
103:14

**overlapping (1)**
153:3

**overpay (2)**
78:18;180:20

**overpaying (1)**
180:22

**overreach (1)**
57:4

**overreaching (1)**
56:16

**oversee (4)**
142:20;143:1;144:18;
177:6

**overseeing (2)**
54:15;210:3

**oversees (1)**
142:15

**oversight (5)**
69:4;171:5;174:24;175:1,
2

**owe (3)**
56:19;100:13;155:4

**own (20)**
18:15;21:23;30:17;33:10;
59:7;78:13;95:9,16;96:17;
119:11;132:3;133:17;135:2;
147:18;163:11;166:5;172:8;
180:13,14;197:9

## P

**PACER (8)**
18:16,16;104:23;166:3,4;
167:21;208:10,21

**pad (1)**
192:5

**page (22)**
22:3;29:11;79:6;94:9;
103:9;107:14;109:10;
111:10,18;112:18;113:5,9;
116:7;130:6;135:21;158:6;

159:5;161:6;208:19,21,23;
212:23

**pages (4)**
17:10;46:23;158:4;164:6

**paid (9)**
16:1;55:21;78:11,16;
105:5;107:9;159:7;164:18;
182:13

**painful (1)**
92:8

**paper (3)**
105:20;178:7,9

**paragraph (18)**
11:5;12:7;22:13,17,20;
51:4,12;52:17;54:8;94:9,10;
103:9,10;130:21;208:21,24;
213:4,9

**paramount (1)**
97:11

**paraphrasing (1)**
97:12

**parcel (1)**
180:24

**parentheses (1)**
133:2

**parody (2)**
174:10;175:16

**parse (1)**
168:1

**part (28)**
26:4,22;27:21;34:11;
36:23;47:2;53:11;70:3;71:5,
20;84:1;107:24;123:17;
126:13;139:11;161:11;
166:24;178:13;180:24;
182:9;187:12;188:12;
202:21;205:12,18;206:1;
209:6;217:19

**participant (4)**
7:23;10:22;22:19;58:5

**participants (4)**
7:1,4;8:4;11:11

**particular (12)**
10:16;13:19;48:2;84:8;
96:21;102:23;112:5;114:23;
134:20;139:7;140:8;194:8

**particularly (7)**
29:22;30:13;53:3;69:3,8;
94:14;132:10

**particulars (1)**
70:1

**parties (9)**
131:5,23;132:17,22;
134:21;135:12;195:8,12;
197:20

**partly (3)**
181:14;191:2;217:7

**partners (1)**
36:15

**partnership (1)**
36:13

**party (2)**
87:17,18

**passed (1)**
183:7

**passes (1)**
195:13

**past (5)**
11:8,12;12:21;71:9;
156:15

**Paulette (5)**
6:5;8:20;9:7;129:11;
130:12

**Pause (4)**
77:4;113:17;150:24;
158:11

**pay (7)**
43:16,17;56:6,8;173:12;
182:23;190:1

**paying (7)**
122:7,15,16;123:12,14;
203:21,22

**payment (19)**
54:24;55:6;56:1;57:4;
58:3,19;59:11,16;75:22;
90:24;101:17,18,22;102:2;
117:1;190:5;197:21;211:10,
15

**pays (1)**
190:8

**Peabody (1)**
7:18

**peculiar (5)**
96:3,17;131:20;132:9;
133:15

**peculiarly (1)**
119:7

**pendency (2)**
175:18;176:4

**pending (1)**
77:3

**people (8)**
34:6;84:2;131:24;181:16;
191:20,24;192:10;214:9

**per (6)**
14:6;16:6;46:8;58:3;
203:21,21

**percent (40)**
43:18;56:18,19,19,21;
88:24;92:13;97:20;100:2;
110:11;127:3;142:16;
158:13,19;159:3,8;164:8,9,
14,14;182:13;189:3,10;
190:13,17;194:2;196:12;
204:23,24;206:18;209:1,8;
210:15;218:11;219:4,11,13,
15,16;220:1

**percentage (12)**
52:15;56:23;109:3,19;
110:11;112:1,12;164:8;
189:1;190:10;191:3,5

**percentages (1)**
209:15

**perfect (2)**
52:24;171:12

**perfectly (1)**

**passed (1)**

**perform (2)**
126:16;174:3

**performing (3)**
43:13;82:1;141:18

**perhaps (5)**
25:24;28:13;81:5;109:24;
203:1

**period (2)**
62:11

**permission (1)**
211:5

**person (4)**
34:8;144:1,3;172:15;
174:3;180:9

**perspective (3)**
51:23;179:2;204:7

**pertinence (1)**
24:3

**pertinent (7)**
52:16,17;94:17;127:1,7;
138:10;166:9

**pervert (2)**
182:3;184:22

**perverted (2)**
182:7;185:2

**petition (38)**
13:1,3;22:21,22;26:4;
31:9,9;44:19;52:4,6;58:7,
23;60:6,14,17,18,18,21;
61:11;62:3,4;64:9;89:5,12;
90:4,16;91:15,16;95:3;
109:23;121:21;148:24;
165:23;166:2,10,11,16;
195:1

**petitioner's (1)**
193:1

**petitions (1)**
14:12

**phase (34)**
20:13,14,18;22:22,24;
23:6,9,14,19,20;24:3,18,20,
21;25:1,8,9,16,22;26:4,15;
28:8;31:9,23,24;46:1;52:16;
74:14;75:8,9,15;79:3,22;
94:11

**phases (10)**
22:21;23:3,18;24:6,12,15;
26:6;29:4;31:23;74:14

**phone (7)**
7:23;8:2;10:21;22:18;
58:4;94:2,5

**phrase (5)**
23:16;94:18;103:15;
154:4,8

**phrasing (1)**
119:8

**pick (1)**
196:8

**picked (1)**
121:16

**piece (2)**
107:11;162:23

**pieces (1)**
162:23
**piggyback (1)**
55:15
**piggybacking (1)**
216:23
**pinning (3)**
72:6,15,22
**Pittsburgh (1)**
36:12
**place (2)**
55:21;181:1
**plaintiff (18)**
14:3,6,8;43:19;71:10,13;
81:9,14,22,23;98:4,6;140:4,
10,16;152:11;209:9,10
**plaintiffs (10)**
14:7;89:16,18;90:12,12,
21;140:2,2,13;189:21
**plaintiffs' (6)**
29:18;80:18;83:17,19;
208:16;210:13
**plaintiff's (1)**
152:13
**planning (1)**
213:5
**plausibly (1)**
216:13
**play (1)**
172:19
**played (3)**
76:8,9;99:21
**player (1)**
202:17
**playing (1)**
184:6
**plays (1)**
141:10
**pleadings (1)**
104:8
**please (9)**
12:9;13:11;15:2;49:4;
77:1;195:17;208:19;211:19;
220:12
**pm (1)**
222:6
**point (44)**
13:19;15:20;28:2,18;33:5;
36:20;37:18,19;41:15,16;
43:1;46:13,15;48:5,7;50:19;
51:15;66:13;70:7;71:24;
77:17;88:6;93:9;101:7;
129:2;135:13,21,22;139:1;
144:13;149:6,14;150:2;
156:15;167:21;170:3;
178:14;181:5,24;183:2,3;
193:6;200:7,23
**points (2)**
160:18,21
**portfolio (4)**
71:14;82:2;83:20;184:4
**portion (3)**
39:17;86:15;212:20

**portions (4)**
19:8,10;133:23;137:10
**position (7)**
35:23;71:15;79:14;118:7;
126:4;169:23;173:7
**possibilities (3)**
153:4;155:9;170:24
**possibility (1)**
85:6
**possible (5)**
8:6;50:13;64:19;101:6;
166:16
**post (2)**
61:2;186:19
**posture (5)**
64:7;65:2,23;199:24;
200:1
**potential (5)**
38:24;87:13;203:19,23;
207:7
**potentially (1)**
12:18
**power (3)**
29:17;74:23;197:8
**practice (20)**
38:6,10,12,14;41:20,21;
45:16;47:16,21,24;50:15;
51:5;68:4,15;103:22;104:5;
106:12;120:4;151:12;160:8
**practices (4)**
15:6;107:6;183:5;205:9
**practitioner (1)**
10:7
**pre (1)**
61:2
**precedent (1)**
35:19
**precisely (4)**
23:2;29:3;143:2;193:21
**preclude (1)**
146:21
**precludes (2)**
14:16;146:15
**preclusive (1)**
14:20
**predates (1)**
182:15
**predicate (2)**
220:21;221:10
**predict (2)**
127:9,22
**predicted (1)**
83:5
**preliminary (7)**
93:3;104:19,20;172:22;
200:7;208:7,7
**premise (1)**
22:13
**premised (1)**
78:12
**premises (2)**
22:14;40:24
**preparation (4)**

17:7;20:18;147:6,9
**prepare (1)**
16:22
**prepared (5)**
16:13,19;35:11;50:18;
150:1
**PRESENT (8)**
4:2;17:15,17,18;131:5;
132:22;139:3;209:22
**presentation (6)**
132:14;133:4;171:23,24;
172:4;209:23
**presented (2)**
132:24;208:6
**presenting (1)**
111:19
**pretend (2)**
142:6;175:7
**pretrial (1)**
64:12,14;200:5,5
**pretty (4)**
92:19;103:17;141:13;
157:20
**preventing (1)**
145:2
**previous (4)**
11:4;20:14,18;134:11
**previously (1)**
79:10
**price (1)**
127:15
**primarily (4)**
21:14;45:18;131:10;132:2
**primary (2)**
33:19;97:10
**principles (2)**
113:9,24
**prior (9)**
9:23;11:2,24;28:7;84:15;
130:4;132:16;155:1;212:9;
219:2
**private (5)**
50:9;83:3,8;94:14;139:22
**pro (2)**
133:2,4
**probably (16)**
7:24;11:22;12:4,11,21;
18:12;19:1;20:5;110:7,11;
120:9;141:7;145:7;160:12;
167:22;169:21
**problem (10)**
122:16;145:10;150:6,9,
10;164:7;172:13,14;175:2;
196:17
**problematic (1)**
65:13
**problems (1)**
215:16
**procedural (4)**
65:2,23;199:24;200:1
**Procedure (3)**
51:20;198:23;208:13
**Procedures (2)**

54:1;133:20
**proceed (1)**
139:6
**proceedings (2)**
16:18;222:5
**process (35)**
27:13;34:12;41:16,17;
54:16;67:22;69:19;70:3;
71:5;83:13;104:18;131:8,
14;134:2;138:20;139:9,12,
20;144:18;148:20;149:2,3;
161:12;171:6,18;172:2,7;
175:1;178:7,13;187:12;
188:12;202:20;203:12;
210:5
**Product (1)**
30:15
**professed (2)**
176:17,20
**professional (2)**
120:9,13
**Professor (33)**
4:3;6:4,8,20;8:10,14;
16:24;17:19;18:11;27:5;
31:16;35:7;77:7;80:22;94:8;
103:8;107:13,15,20;113:22;
114:7,12;129:12,20;130:17;
134:4;138:3,4;158:6;
188:22;197:7;215:22;222:3
**profit (8)**
52:10;163:18;189:12;
191:22;192:12;193:22,23,24
**project (1)**
106:15
**prolong (1)**
186:1
**promise (1)**
185:24
**property (1)**
174:6
**proponent (1)**
166:17
**proposal (2)**
161:14;172:12
**propose (5)**
32:1,2,14;41:12;165:13
**proposed (15)**
28:12,17;42:5;118:9;
130:10;133:20;141:21,24;
146:5,20,23;147:2,11,12;
170:12
**proposing (7)**
32:7,9;33:2;34:1;41:13;
131:7;173:18
**propriety (1)**
60:24
**protect (2)**
114:3;133:17
**protection (1)**
131:17
**prove (1)**
193:8
**provide (6)**

20:8;45:4;46:12;122:18;
175:13;208:18
**provided (13)**
8:16;17:14,19;21:13,14;
28:5;41:24;42:3;43:23;
85:19;162:15;169:15;179:4
**provides (1)**
113:22
**providing (5)**
12:14;71:16;173:12;
174:23;180:12
**PSLRA (13)**
107:6,7,8;127:15;139:22;
140:1,13,16;183:5,7,15;
202:15;205:8
**public (7)**
66:18;83:10,22;104:23;
170:4,5;173:13
**publications (1)**
129:14
**publicly (1)**
105:22
**public's (1)**
185:12
**pull (1)**
104:12
**pure (2)**
80:9;81:20
**purpose (3)**
151:24;178:20;179:4
**purposes (25)**
7:5;64:12,14;108:13;
109:2,21;129:20;151:20,21;
152:8,16,20;153:5;168:24;
189:4,16;190:21,23;191:9,
21;192:24;193:11;200:5;
203:11;206:22
**pursuant (2)**
182:14;214:19
**pushing (1)**
166:18
**put (42)**
29:24;37:10;39:2,6,23;
46:7;51:23;59:7;66:23;86:8;
93:10;101:9;107:5;110:20,
22;111:1;121:16;122:2;
124:5;125:16;127:21;
134:16;141:19;148:21;
162:3;165:23;167:5,22;
168:6,7;171:2,8;174:14;
175:23;185:16;188:7,14;
191:6;201:24;217:16;
219:21,22
**putative (6)**
155:3,3,10,22;156:3;
200:21
**puts (2)**
105:20;121:10
**putting (10)**
30:7;58:22;87:5;101:6,13;
126:8;151:7;193:21;208:1;
217:22

## Q

**qualify (1)**
152:2
**qualifying (1)**
53:21
**quantity (1)**
123:4
**question-as (1)**
213:17
**questioners (1)**
8:1
**Quick (1)**
215:21
**quickly (1)**
103:16
**quiet (1)**
187:9
**quite (9)**
57:2;96:18;153:6,8;
155:16;188:10;204:23;
217:5;219:20
**quote (5)**
29:16;30:14;79:23;88:12;
172:20
**quoted (1)**
79:10
**Quoting (4)**
29:15;79:13;114:7;117:10

## R

**raise (1)**
28:3
**raised (3)**
74:15,16;78:3
**raises (1)**
58:19
**ran (2)**
20:22;36:12
**random (1)**
113:23
**range (1)**
125:12
**rare (1)**
148:3
**rarely (8)**
51:5,9,10,11,16;104:1,2;
120:18
**rate (6)**
15:17;16:2,9,11;90:6;
121:3
**rates (2)**
189:11,13
**rather (7)**
36:7;117:13;122:12;
146:7;179:7;193:9;215:10
**ratifying (1)**
137:16
**rating (2)**
171:1,2
**rationally (1)**

101:1
**Re (2)**
30:14;35:20
**reach (1)**
193:1
**react (1)**
101:13
**reaction (1)**
127:11
**read (38)**
16:23,24;17:1,20;19:7,8,
10,14,17;20:2,5;22:9,16;
41:7,8;47:1;76:24;79:17;
88:12;102:17;104:7,18;
107:17;108:3;133:9;134:23;
138:7;139:8;166:2;170:17;
185:3,23;186:2;199:6;
206:3,5,8;220:18
**reading (12)**
17:22;19:1,4;54:4;87:6;
90:10;115:7,12;135:5,20;
138:22;153:16
**reads (4)**
19:15;107:14;157:2;215:3
**real (3)**
78:10;89:10;196:17
**reallocate (3)**
28:13;30:24;58:11
**reallocated (2)**
28:22;75:1
**reallocating (1)**
28:24
**really (25)**
37:12;51:8,24;55:13,18;
56:11;57:9;67:4;74:20;
76:10,22;83:2,9,11;99:21;
127:9;128:13;141:8;143:1;
155:9;167:1;175:8;183:5;
189:23;205:3
**reason (18)**
37:2;38:21;42:16;49:1;
51:24;52:1,9,20;77:18;80:2;
96:9;111:1;176:8;186:15;
191:2;198:7;201:21;203:2
**reasonable (30)**
57:2;58:17;59:10;102:1;
111:23;112:2;115:20;116:1;
129:2;143:8;144:4,10;
146:24;161:1,13,16,19,23;
162:5,9;163:9,10;173:8;
175:17;179:1;182:10;
189:13;192:7;216:5;220:2
**reasonableness (1)**
160:23
**reasonably (4)**
101:2,17;105:16;176:1
**reasons (13)**
47:16;51:23;54:12;55:8;
75:20;136:8;141:14;168:24;
177:17;179:13;185:17;
198:4;205:14
**rebuttal (5)**
35:11;40:19;138:3,13;

150:13
**recall (7)**
136:24;137:3,5,7;145:12;
170:8;190:6
**receive (4)**
98:8,9;165:7,14
**received (2)**
100:24;102:5
**recent (1)**
155:18
**recently (1)**
170:18
**recess (2)**
94:1;129:9
**recognition (1)**
114:2
**recollect (1)**
109:8
**recollection (2)**
108:23;109:1
**recommendation (3)**
64:3;105:5;197:19
**recommendations (2)**
30:17;33:10
**recommended (1)**
76:15
**recommending (1)**
174:11
**recommends (1)**
30:20
**record (10)**
7:5;8:7;40:21;63:18,21;
69:7;76:22;106:4;107:2;
199:21
**recovery (4)**
52:22;59:4;79:16;179:7
**redirect (1)**
179:7
**refer (4)**
24:2,19;95:18;216:17
**reference (4)**
33:9;53:19;107:19;136:18
**referenced (3)**
94:24;108:15;202:16
**references (1)**
144:20
**referral (17)**
16:15;97:4,5;99:1;158:15,
17;159:20,22;160:3,4,11,15,
18,19,23;161:1,4
**referred (4)**
88:17;108:9,10;197:10
**referring (9)**
11:14;31:19;33:3;159:12,
21,23;193:13;203:6;220:13
**reflect (1)**
138:12
**reflected (1)**
108:17
**reflecting (1)**
86:11
**reflects (1)**
118:10

**Reform (3)**
    83:4;94:15;139:23
**refresh (1)**
    172:20
**regard (8)**
    59:16;106:12;119:17;
    134:8;137:9;153:10;210:5;
    217:3
**regarding (2)**
    207:23;211:4
**regardless (2)**
    96:5;119:14
**regime (1)**
    118:15
**regularly (1)**
    54:13
**Regulatory (1)**
    170:7
**reject (1)**
    28:12
**related (2)**
    99:17;151:2
**relationship (9)**
    82:1,4,8;95:24;98:12;
    115:21;139:24;145:15,16
**relationships (2)**
    45:19;83:15
**relatively (3)**
    123:3,5;167:3
**release (3)**
    36:17;66:22;188:17
**released (1)**
    66:16
**relegated (1)**
    23:5
**relevant (1)**
    178:24
**reliance (1)**
    114:4
**relied (2)**
    17:13;207:23
**relief (2)**
    15:12;82:5
**relies (3)**
    46:23;47:2;134:20
**rely (6)**
    124:19;125:21;126:21;
    127:20;191:13;198:8
**relying (11)**
    158:22;159:2;194:10,17,
    18,24;195:12,24;196:2,15,
    23
**remaining (1)**
    203:8
**remedy (2)**
    28:19;31:11
**remember (16)**
    13:5;16:17;18:14;81:15;
    86:2;99:23;102:16;109:7;
    122:23;127:3;171:13,15;
    173:19;176:22;180:8;219:8
**remind (1)**
    125:18

**reminded (1)**
    36:10
**reminding (1)**
    216:7
**reorganized (2)**
    57:23;58:1
**repeat (3)**
    8:8;41:4;177:2
**repeatedly (1)**
    50:12
**rephrase (1)**
    72:14
**rephrasing (1)**
    62:14
**reply (1)**
    156:9
**report (33)**
    8:16;9:14;11:4;17:1,2,10,
    10;18:4,6,11;19:19;20:4;
    21:4,7;22:2,5;35:8;37:19;
    40:14,16;41:1;44:15;51:3;
    79:7;94:9;103:9;114:12;
    130:5;138:5;158:5;183:23;
    191:16;199:7
**reported (1)**
    20:22
**Reporter (10)**
    8:21;9:11;41:7,8;51:8;
    185:23;186:2;210:16;
    220:15,18
**repository (1)**
    166:8
**representation (1)**
    197:20
**representative (50)**
    94:13;96:1,11,21;137:13;
    138:16,19;139:4,5,6,11,15,
    16,19;140:9;141:2,6,10,21,
    24;142:5,7,10,23;143:7,10;
    144:7,17;145:1,3,11,16,17,
    21,23;146:4,5;147:20;
    155:4;176:16;177:8;199:13,
    22;200:15,19;201:5,6;202:2,
    16,21
**representatives (29)**
    66:1;67:14,14;76:16,16;
    88:14;91:21;96:16;131:6;
    132:4;135:3;136:18;137:24;
    141:3,4,15;146:24;147:11,
    13,21;148:3;168:3,5;175:7;
    177:3,5;200:3,20;202:11
**representative's (1)**
    144:20
**represented (3)**
    15:9;59:5;89:23
**representing (10)**
    57:11;61:4;108:10;133:1;
    144:1;145:4;152:22,23;
    182:3;185:2
**represents (1)**
    42:19
**reputational (3)**
    34:10;46:5;50:23

**reputationally (1)**
    45:20
**request (11)**
    71:15;105:23;111:22;
    158:1;163:1,8,10,14,18;
    194:9,11
**requests (1)**
    169:14
**require (5)**
    22:6;51:20;116:13;
    118:17;161:8
**required (9)**
    41:21;83:17;111:15;
    116:16;127:5;132:20;158:8;
    177:12;195:2
**Requirement (5)**
    54:3;115:22;130:23;
    157:24;174:3
**requires (6)**
    115:24;130:21;131:1;
    132:10;133:11;161:18
**requiring (5)**
    54:17,21;77:11;124:16;
    131:12
**reread (1)**
    8:7
**research (13)**
    18:15;19:22;20:8,11;
    21:12,17,19,20,23;104:7;
    105:3;106:5,7
**resident (1)**
    143:15
**resolution (2)**
    210:4,6
**resolve (1)**
    132:22
**resolved (1)**
    132:18
**resources (1)**
    133:17
**respect (18)**
    9:22;10:3;11:2;15:14;
    16:2;17:12;18:3;19:5;21:6;
    23:11,14;53:13;114:16;
    140:20;174:5;175:19;
    205:21;208:14
**respects (1)**
    175:6
**respond (2)**
    40:22;156:23
**responded (1)**
    214:23
**responding (1)**
    214:14
**responds (1)**
    111:16
**response (3)**
    71:14;111:9;112:24
**responsibilities (1)**
    141:5
**responsibility (12)**
    69:4;73:2,4;131:11,15;
    135:10,12;140:4,19;143:5,7;

    144:6
**rest (3)**
    18:24;39:18;204:24
**restaurant (1)**
    171:2
**result (4)**
    55:18;59:10;99:3;181:8
**results (2)**
    55:12;58:18
**resume (1)**
    129:8
**retained (6)**
    13:8,12;17:4,24;18:21;
    156:8
**retainer (1)**
    168:3
**Retirement (2)**
    6:13;137:17
**return (5)**
    29:2,6;31:12;38:24;57:13
**revealed (1)**
    195:15
**reverse (2)**
    117:12;184:19
**reverses (1)**
    140:15
**review (11)**
    18:5;19:20;103:19,20;
    105:16;112:15;132:6;
    166:22;170:11;203:16;
    219:6
**reviewed (4)**
    17:8;108:7,12;109:9
**reviewing (2)**
    112:6,13
**rewards (1)**
    217:4
**Richard (10)**
    7:11;9:2;24:10;30:8;
    46:23;72:14;76:20;88:12;
    111:9;207:15
**Richard's (1)**
    200:22;220:10
**right (113)**
    6:16,20;7:20;8:9,19;9:18,
    21;10:3,11;11:24;12:8,16;
    13:5,14;14:22;15:13;18:3,9;
    20:7,14;21:19;22:1;23:5,11;
    27:2;29:9,21;30:1;32:20;
    33:8;35:10;39:16;49:13;
    50:16,20;53:14;72:8;77:17;
    79:5;80:22;83:8;84:6;88:9,
    10,18;89:19;92:5;93:22;
    94:4;97:1;98:11;102:13;
    107:12;108:3;110:4;111:8;
    114:10;116:2,4,10;117:18,
    21;119:2;120:5;124:10,19;
    126:14,20;127:20,24;130:3,
    17;137:4,5;140:18;145:19;
    148:8;151:22;155:19;157:9;
    158:2;160:9,13,21;161:5,20;
    162:1,4,11,18;165:6;168:18;
    170:10;173:17,24;175:15;

176:15;185:19;186:12;
190:14,17;191:11;195:19;
206:17;207:12;208:1,9,12;
210:9;219:21;221:9,12;
222:1
**rights (2)**
131:7,18
**Robert (1)**
7:13
**Rohrback (5)**
12:16,18;13:6;91:19;
206:2
**role (19)**
43:13;76:9;78:7;99:21;
113:10,12;114:14,19;
130:11;131:15;132:2;
133:18;134:3,17,20;135:1;
172:15;184:7;189:20
**Roman (2)**
130:9;161:7
**room (6)**
7:4;123:10;128:8;147:22;
169:4;199:11
**Rosen (1)**
6:16
**roughly (1)**
159:6
**Rubenstein (4)**
6:8;8:10;114:13;129:12
**Rule (69)**
22:5;53:21,22;54:10;63:8,
15,19,24;72:7,8,18;73:6;
74:6,9,9;75:2,6;76:23;
96:22;103:12;115:21,22,24;
116:12;117:8,17;119:4,5,7;
121:10,12,16,19;122:21;
123:8;124:7,8,8;126:21;
127:20;130:21;136:3,3;
148:16,19,19;149:2,4,14;
153:7,15;154:1,17,20,21;
155:5,6,21;156:1;161:8,17;
162:7;173:9,10;179:16;
198:8,9;199:8,9
**Rules (26)**
51:20;53:22;72:23;73:21;
87:10;92:2,19;93:13;96:18;
107:16;117:11,13;126:21;
148:10,22;150:13;151:4,11;
152:1,3,12,21;157:23;
198:22,23;199:2
**ruling (1)**
194:24
**run (4)**
80:17;83:7;180:15,19
**running (4)**
45:6;80:3,4;180:11

## S

**safeguard (1)**
116:7
**safeguarded (1)**
131:10

**sailing (8)**
94:21,24;95:1;97:9,14;
99:24;100:1,21
**same (17)**
8:3;12:9,16;16:2;44:5;
47:12;50:6;52:20;78:17;
97:3;100:19;111:18;153:6;
179:23;194:5;203:9;214:10
**Sarko (21)**
88:13;206:4;211:4,12,21,
24;212:8,15;213:11,21;
214:7;215:1,1,2,3,14;
220:13,19,23;221:12,21
**Sarko's (2)**
206:7,11
**satisfaction (2)**
209:3,11
**save (1)**
150:22
**saw (1)**
25:2
**saying (55)**
26:3;31:6;32:7;41:11;
42:24;58:6;63:16,18,21;
68:13;72:22;73:4;75:2;
77:13;78:19;79:23;85:15,
17;90:19,20;91:14;92:17;
100:12,23;101:10,16;
102:12,12,17;108:14;
111:20;112:11;118:13;
121:7,10,12,12;125:20;
135:14;146:22;152:2;
154:19;161:2;162:4;178:6;
184:11;188:9;189:5,7;
190:5,13;196:22;198:9,16;
209:24
**scholar (1)**
10:9
**scope (14)**
13:22;44:8;46:21;49:14;
55:3;59:13;67:17;69:14;
75:18;81:2;84:10;86:24;
137:19;179:11
**scrutinize (1)**
148:23
**se (3)**
14:6;46:8;58:3
**seal (1)**
181:21
**search (1)**
104:12
**searched (1)**
104:16
**seat (1)**
150:20
**second (25)**
9:17;23:2;25:8;31:23;
36:19,22;55:23;57:8,18,19;
76:1;88:5;132:1,2;135:1,20,
21;136:5;139:14;140:8;
177:18;182:6,9;184:21;
217:4
**second-party (1)**

53:5
**secret (1)**
42:20
**Section (22)**
22:10;29:10;53:20;73:12;
79:6;107:14,24;113:11;
114:14,17;115:1;130:6,7,11;
133:23;134:11;152:5;
158:12;159:14;168:22;
195:7;212:24
**sections (1)**
22:5
**Securities (3)**
83:3,7,19;94:15;139:22
**seeing (1)**
39:14
**seeking (5)**
79:16;132:19;135:23;
172:21;189:21
**seem (9)**
88:9;118:19;119:1;
159:10;179:3;184:10;
192:12;205:4;215:10
**seemed (1)**
206:11
**seems (8)**
72:5;99:21;118:2;163:8,
10;183:14;191:23;205:2
**sees (5)**
25:15,22;27:20,22,22
**select (1)**
140:2
**selected (3)**
18:5;19:8,11
**self-interest (2)**
34:17;147:18
**self-policing (2)**
87:21;88:4
**selling (1)**
136:19
**seminar (1)**
205:8
**sense (20)**
25:6;31:6;33:4;39:7;
65:10;70:24;71:23;81:6;
83:24;107:5;125:9;132:5;
134:5,9,14;146:21;154:10;
163:7,13;204:18
**sent (3)**
18:11,23;75:1
**sentence (5)**
22:17,20;51:12;62:10;
159:22
**separate (7)**
26:6;29:4;124:7;182:17;
200:1;206:23;213:6
**series (4)**
113:8;171:11;216:18;
218:22
**serve (3)**
48:14;83:22;170:13
**served (4)**
80:20;98:4;179:4;218:20

**service (1)**
71:16
**services (2)**
180:7,12
**serving (3)**
44:13;96:23;174:6
**set (9)**
23:19;57:20;113:23;
153:18,20;154:22;180:12;
210:4;216:18
**sets (3)**
14:19;149:2;168:9
**setting (6)**
32:6;33:24;59:24;60:1;
74:16;94:17
**settle (7)**
56:7,7;57:15;97:18;100:2,
3;182:23
**settled (3)**
57:16;65:8;200:5
**settlement (104)**
14:16;15:8;25:17;27:24;
54:15;64:9,10;65:9,16;66:3;
68:23;69:2,8;76:15;90:1,3;
91:9;96:13,14;104:13,14,15,
16,18;113:13;114:19,21;
115:2,22;116:1,3;119:18;
120:5;130:9,22,23,24;131:4,
8,20;132:15,24;133:2,4,4,
10,20;134:11,13,13;145:21,
24;146:6,8,20,22,23;161:12,
18,20,22;163:3;165:21,23,
24;166:2;167:6,22;168:17;
169:11;171:3,3,8,17;172:22,
24;173:4,8,13,14;174:12;
179:1;189:1;195:23;199:14,
22;200:16,18;201:2,7;
203:5;206:22;208:2,13,22,
23;209:16;210:1;217:6,24;
218:2,10,15,18
**Settlements (3)**
130:10;170:15;197:11
**settlement's (2)**
134:9;214:16
**settles (1)**
146:14
**settling (4)**
131:5;132:5;135:4;136:20
**several (3)**
7:24;165:18;199:16
**shall (3)**
209:2,8,20
**share (14)**
37:7;38:2;47:24;48:15;
86:9,15;87:3,11;177:20;
184:2;193:16;204:10;212:9;
213:22
**shared (2)**
43:2;44:2
**shareholders (1)**
71:17
**sharing (6)**
87:13;109:13;112:20;

113:2;168:10;204:11

**shooter (1)**
172:10

**shooters (1)**
89:18

**short (1)**
93:19

**shortcomings (1)**
175:16

**shorthand (2)**
141:9;143:18

**shoulders (2)**
102:18,19

**show (8)**
9:6;75:5;110:17,24;111:4;
172:6;192:17;193:15

**showed (1)**
36:17

**showing (1)**
210:1

**shows (1)**
163:18

**side (1)**
80:18;133:1;180:10,17

**sideways (1)**
215:11

**sign (4)**
139:6;140:5;171:2;202:22

**signed (1)**
109:24

**significant (1)**
175:14

**similar (3)**
68:12;173:7;184:21

**similarly (2)**
118:11;152:14

**simply (1)**
206:12

**Singal (1)**
6:20

**single (3)**
65:9;144:19;177:4

**SINNOTT (52)**
6:3,7,9;7:20;8:12,20;9:1,
5,10,12;31:15;51:2,11;54:6,
7;77:5;86:1;88:20;93:22;
94:2,4,7;103:7;108:12,16,
20,22;111:9;113:15,18;
129:4,7,10,19;130:12,16;
151:1;156:20,22;159:14,24;
160:2;169:8;170:22;188:21;
197:6;207:14;215:20;
218:22;220:5,7;222:1

**S-I-N-N-O-T-T (1)**
6:9

**sister (1)**
148:5

**sit (2)**
135:15;149:13

**site (1)**
167:6

**sitting (2)**
195:5;201:21

**situation (8)**
74:18;81:14;83:17;96:4;
116:24;124:2;140:7;182:12

**situations (5)**
96:10;109:11,17;146:10;
160:15

**six (7)**
11:22;21:2;113:23;168:2,
6,7;170:10

**skeptical (1)**
133:18

**skewed (1)**
53:8

**skipped (1)**
19:16

**skipping (1)**
115:17

**sliding-scale (1)**
147:15

**slightly (6)**
55:4;61:16;65:18;71:21;
107:4;174:14

**slough (1)**
135:17

**small (6)**
36:12;80:3;123:2,5;167:4;
174:15

**smaller (1)**
13:3

**Smith (4)**
87:24;88:1,2,5

**snippets (1)**
113:22

**so-called (1)**
154:22

**Softly (1)**
53:16

**sold (3)**
77:23;132:4;135:3

**sole (1)**
214:17

**solely (1)**
105:5

**someone (10)**
48:5,6;80:13;87:24;88:7;
143:23;146:11;150:19;
177:20;180:1

**someone's (2)**
143:24;193:16

**Sometimes (9)**
64:16;96:16;110:18;
111:3;120:15,16;153:16;
172:5,6

**somewhat (5)**
39:16;102:22;119:4;
174:20;203:23

**somewhere (1)**
146:14

**soon (1)**
9:5

**sophisticated (1)**
174:11

**sophistication (1)**

175:13

**sorry (21)**
23:8;25:13;38:13;41:4,5;
47:20;70:22;86:6;92:4,11;
115:9;136:15;145:13;154:7,
15;156:12,24;165:10;
185:21;188:2;221:16

**sort (2)**
59:6;99:2

**sought (4)**
122:6;169:18;170:3,3

**sound (5)**
36:22;89:19;101:5;
173:15;198:15

**sounds (10)**
9:21;50:16;67:21;73:3;
98:16;124:12;134:1;137:4;
170:17;206:17

**speak (1)**
155:7

**speaking (10)**
23:13;76:20;79:24;
120:24;121:4;123:3;134:18;
155:5;181:23;192:8

**special (207)**
6:10,11,15,18,20,24;8:17;
9:4,14;11:10;24:5,10,24;
25:10,14,19;26:8,12,21,24;
27:4,9,19;28:10;29:9,13;
30:7,11;31:14;34:20;35:6,9,
12;36:21;37:3,9;38:5,11,15;
40:5,15,23;41:15,22;42:13;
43:5;44:16;45:10;46:14,22;
47:7,10,20;48:11,20;49:3,9,
21,23;50:4,14;51:10;58:15;
59:6;60:4,12,19,23;61:6,9,
14,24;62:13,21,24;63:19;
64:1,5,18;65:1,21;66:9;
67:4;68:1,7,19;69:17;70:10,
21;72:5,13;73:3,20,24;75:7,
14;76:12,19,23;88:11,19;
90:5,11,18;91:6,12,23;92:4,
6,10,20;93:16,24;98:19;
100:23;101:15,24;102:5,24;
115:16;116:6,12,18,21;
117:15,20;118:2,5;120:3,7,
11,20;121:2,6,18;122:17;
123:13,16;124:5,13,23;
125:7;126:5,12;127:24;
128:3,10,15,22;129:6;
157:18;159:1,13;167:7,14,
18;168:14;169:3,6;170:19;
179:15,21;181:4;182:8;
184:10;185:7,18,22;186:5,9,
24;187:5,10,18,24;195:20;
196:8,22;197:5;199:1,5,10,
17,23;200:14;201:1,10,13,
16;202:3,7,24;204:8,14;
205:14;206:3,7,10,19;
207:12;220:8,16,19;221:4,9,
17,22

**specialized (1)**
140:14

**specific (8)**
31:20;74:6;149:5,9;
151:19;153:15;154:11;
181:9

**specifically (18)**
10:14;29:14;33:1;50:19;
51:17;53:19;95:21;113:19;
125:17;130:8;136:17;
137:10;143:14;148:8,16;
149:13;158:12;211:9

**specifics (1)**
137:4

**specified (1)**
95:4

**spend (5)**
52:17;164:6;165:3,3;
174:23

**spent (4)**
15:20;37:21,24;189:9

**split (4)**
23:10;61:20;122:15;
180:23

**spot (1)**
104:10

**stage (14)**
27:15;36:21,22;52:4,5,6;
58:23;59:1;93:6;94:12;
107:23;121:8;155:15;
197:14

**stages (1)**
27:15

**stake (1)**
57:22

**stamp (1)**
131:12

**standard (1)**
144:17

**standing (3)**
40:13;72:18;96:11

**standpoint (1)**
60:9

**stands (2)**
99:1;141:12

**start (7)**
7:6;55:20;65:1;186:9;
219:4,11,14

**started (6)**
19:1;43:17;130:4;216:2,7;
220:1

**starting (1)**
38:22

**starts (1)**
111:20

**State (22)**
6:13;23:2;68:24;71:11,15;
82:12,14,17;83:1;98:2,13,
15,15;100:6,7;113:8;
143:15;173:10;179:15;
182:19;183:1,12

**statement (11)**
17:9;23:11;51:4;96:8;
103:13;116:15;118:3;134:4;
159:3;161:21;195:22

**States (3)**
  6:17;22:5;53:20
**stating (2)**
  128:18;179:13
**stayed (1)**
  213:16
**step (4)**
  71:11;81:22;83:7;183:21
**Stephen (2)**
  4:3;6:21
**stepped (2)**
  81:13;84:4
**stepping (2)**
  71:18;83:22
**Stewart (1)**
  7:10
**stick (1)**
  206:10
**sticks (1)**
  148:2
**still (9)**
  75:9;98:16;99:1;116:22;
  139:17;140:12;147:23;
  173:17,21
**stipulated (1)**
  137:16
**stock (3)**
  184:2,2,2
**stood (2)**
  98:7,9
**stop (2)**
  87:7;155:11
**stopped (1)**
  143:23
**straight (2)**
  89:18;172:10
**Street (17)**
  6:13;68:24;71:11;82:12,
  14,17;83:1;98:2,13,15;
  100:6,8;143:15,23;182:19;
  183:1,12
**Street's (1)**
  98:16
**strictly (2)**
  21:21;193:18
**strike (4)**
  11:3;17:11;113:20;201:17
**striking (1)**
  95:11
**string (3)**
  212:13;214:2,9
**strong (4)**
  54:16;77:11;78:15;219:19
**stronger (1)**
  133:5
**strongly (3)**
  36:2;118:6;134:10
**struck (1)**
  147:16
**structure (5)**
  63:24;127:21;148:19;
  149:3;199:9
**struggle (1)**

175:9
**struggling (3)**
  66:8,10;175:10
**Stuart (1)**
  7:9
**students (4)**
  20:23,24;103:16;205:7
**study (4)**
  21:3,21;103:10,19
**studying (1)**
  160:16
**stuff (13)**
  14:5;50:22;63:14,23;
  74:14;122:8;164:23;180:10,
  18;183:15;184:7;205:11;
  216:3
**stuff's (1)**
  181:21
**subagreements (1)**
  168:9
**subclasses (3)**
  203:5,7;206:23
**subclassing (2)**
  204:2,3
**subheading (1)**
  113:19
**subject (3)**
  50:11;183:6;213:17
**submission (12)**
  52:14;60:17,21;108:2,2;
  109:9;111:1,4;127:4;
  194:19;195:12;219:3
**submissions (4)**
  110:19;194:10,18;196:23
**submit (7)**
  9:23;52:8;109:20;127:6;
  190:2,20;192:1
**submitted (18)**
  9:14,16,18;10:2;16:8;
  37:21;44:18;104:17,24;
  105:21;106:13;109:2,4;
  136:4,22;189:4,15;195:24
**submitting (5)**
  189:8;190:4,9,11;191:21
**subpart (1)**
  149:5
**subsequent (1)**
  20:3
**subsequently (3)**
  41:18;111:18;161:17
**substance (1)**
  132:8
**substantive (2)**
  61:17,18
**successful (1)**
  132:8
**succinct (1)**
  74:2
**Sucharow (4)**
  7:8;212:2;214:7,23
**sudden (1)**
  146:13
**sue (1)**

153:20
**sufficiency (1)**
  163:17
**sufficient (10)**
  86:9;117:22,24;118:22,
  23;121:20;122:18;123:17;
  162:14,21
**sufficiently (1)**
  116:8
**suggest (7)**
  52:19;53:10;54:22;
  144:22;212:12;213:21;
  215:14
**suggested (1)**
  182:6
**suggesting (4)**
  25:6,11;200:22;201:23
**suggests (2)**
  156:1;202:1
**suit (4)**
  130:24,24;131:20;133:11
**suits (1)**
  88:15
**Sulfur (5)**
  35:20;79:10,13,20;139:9
**sum (1)**
  133:10
**summaries (1)**
  48:23
**summarizes (1)**
  48:21
**summary (2)**
  107:23;170:16
**summer (1)**
  20:2
**supplied (1)**
  18:14
**support (1)**
  36:2
**supporting (1)**
  158:7
**supports (1)**
  114:2
**supposed (1)**
  127:9
**supra (1)**
  114:14
**Supreme (1)**
  155:16
**Sure (47)**
  15:3;18:21;23:7;38:2;
  39:22;45:7;53:11;60:2;64:6;
  77:8,19,22;78:7,11,16,18;
  87:5,7;106:1,20;108:20;
  109:18;119:12,14,16;121:8;
  126:1;132:7;140:23;151:23;
  155:19;156:13;162:16;
  165:11;167:1,5;170:5;
  171:20;172:18;173:16,18,
  22;177:16;180:21;198:2;
  216:6;220:9
**surface (1)**
  204:11

surprised (4)
  203:16;217:14,23;218:3
**suspect (2)**
  88:6;127:14
**swear (1)**
  8:23
**switched (1)**
  139:24
**sworn (4)**
  6:5,6;9:1,4
**System (12)**
  6:13;19:22;78:12;134:10,
  15,19;137:17;174:4;183:14;
  184:4,9;185:12

---

**T**

---

**talk (18)**
  34:7;35:3;44:15;89:14;
  94:10,23;97:1;103:10;
  109:11;112:18;115:1;
  131:13;134:24;159:15;
  166:14;181:21;212:14,19
**talked (5)**
  17:23;28:21;101:5;
  107:10;165:18
**talking (16)**
  17:15;18:6;42:20;50:9;
  57:9;79:22;89:2;90:2;
  136:11;148:15;149:5,23;
  152:1;154:23;158:23;
  171:21
**talks (2)**
  111:21;202:23
**tardy (1)**
  110:18
**task (5)**
  29:21;33:17;133:15;
  174:4;193:4
**taught (1)**
  81:4
**taxed (3)**
  204:20,23,24
**teach (2)**
  181:15;205:9
**Teacher (2)**
  6:12;10:9
**Teachers (3)**
  137:16,23;140:24
**teaching (1)**
  113:6
**team (3)**
  6:18,24;17:19
**Technically (1)**
  29:17
**telephone (2)**
  7:1;8:4;17:3,5
**telling (4)**
  144:15;196:2,16;198:20
**temper (1)**
  33:6
**temporal (1)**
  61:16

**ten (2)**
19:6;164:20
**tend (1)**
18:18
**tended (1)**
18:15
**tens (1)**
52:13
**tension (2)**
32:12;97:23
**ten-volume (1)**
10:19
**terms (16)**
24:16;37:13;39:20;56:22;
57:4;59:7;60:13;64:7;72:4;
100:18;118:14;133:20;
159:24;173:9;190:24;
209:15
**terrific (3)**
55:17;184:18;205:22
**test (1)**
195:13
**testified (23)**
14:13,14;43:7;44:5;47:17;
48:12;49:7;66:14,23;68:8;
76:13;79:2,21;85:17;99:7;
136:1,8;150:14;159:7;
198:5;206:15,17;216:11
**testify (2)**
50:19;138:6
**testifying (10)**
84:19,21;86:7;87:4;90:15;
126:3;137:7;138:2;146:2;
150:12
**testimony (44)**
8:8;16:19;17:16,17,18;
46:21,24;47:22;48:17;49:2,
15,19;50:11;55:3;58:16;
59:9,13,23;67:17;68:3,13,
24;69:6,14;75:18;76:18;
81:2;83:2;85:22;91:14;92:2;
123:23,24;137:20;159:2;
177:1;181:7;187:7;195:21;
205:16,19;206:4,6;211:4
**theory (1)**
100:22
**thereby (1)**
174:6
**there'd (2)**
106:22;107:2
**therefore (7)**
32:4;63:22;132:20;154:1;
185:7;188:8;189:11
**there'll (3)**
140:11;165:22;167:21
**thinking (10)**
34:16;39:5;88:13;145:14;
164:1;190:14;218:24;219:2,
10,11
**Third (14)**
56:13;109:16;132:13,14;
135:22;136:7;140:7;161:2,
2;168:8,8,8;213:1;217:7

**third-party (1)**
53:4
**Thornton (10)**
4:2;7:15,15,16,19;11:8;
12:9,10;179:24;212:2
**though (6)**
32:12;57:21;96:13;
159:19;167:8;204:11
**thought (18)**
36:7;37:12;44:22;50:20;
56:5;62:9;70:7;84:21;86:4;
120:1;122:2,12;147:13;
167:10,24;181:5;200:18;
220:20
**thoughts (2)**
80:10;212:9
**thousand (2)**
103:16;170:10
**three (21)**
11:19;12:3,20;18:2;22:4;
64:10,13;65:23;66:1;
131:13;135:7;155:9;161:7;
193:6,9;196:7;200:1,10;
217:24;218:4,13
**threshold (2)**
141:18,19
**throughout (3)**
58:1;136:2,8
**throw (1)**
57:6
**thus (3)**
30:18;33:10;116:12
**timekeeper (1)**
110:21
**timekeepers (1)**
110:6
**times (12)**
11:19,23;12:3;14:6;34:5,
7;164:12;180:1;194:4,5;
205:21;211:3
**timing (1)**
60:13
**title (2)**
22:9;130:8
**today (8)**
7:23;15:15;16:20;17:8;
194:11;201:21;205:20;
211:3
**today's (1)**
165:20
**together (4)**
65:24;163:3;212:14;
217:22
**told (11)**
35:24;36:14;43:12,15,21,
22;127:13;176:4;197:17;
206:13,16
**tomorrow (1)**
156:14
**took (2)**
147:8;216:3
**top (5)**
109:16;145:9;153:7;

158:5;211:22
**topic (1)**
141:8
**total (2)**
158:13;180:8
**totally (1)**
73:9
**touchstone (1)**
37:3
**tough (2)**
38:18;126:23
**toward (1)**
131:19
**trading (1)**
97:16
**transcript (9)**
19:7,12;108:5,6,17,19;
111:11,19;219:7
**transcripts (4)**
19:3,6;104:8,18
**transparency (22)**
35:23;36:3,8;37:1,4;40:6;
41:23;54:17,21;65:15;67:5;
68:17;77:11,21;78:20,20;
87:22;169:21;180:9;181:14,
18;197:11
**transparent (13)**
52:10;63:12,14,17,23;
65:19;68:16;79:4;105:10;
169:22;170:1;203:24;207:9
**treated (2)**
45:23;65:18
**treatise (33)**
10:20;27:11;36:3;51:14;
52:7,18;53:15;54:5;63:9;
72:24;73:12,16;77:10;
94:22;113:11;114:17;115:6;
117:10;125:20;130:7;
134:12,24;138:22;141:8;
152:6;164:7;165:19;166:14;
168:21;195:6,7,8;216:16
**tremendous (1)**
55:13;217:6
**trial (5)**
56:6,8;100:12,13;135:15
**tried (4)**
71:6;96:23;170:4;202:10
**trouble (2)**
8:6;197:16
**troubled (2)**
51:13,21
**troubling (2)**
95:6,12
**true (3)**
19:2;47:4;124:14
**truism (2)**
124:12,13
**truly (1)**
133:6
**trumps (1)**
199:8
**Trust (2)**
6:13;50:24

**trusted (1)**
82:3
**trusting (1)**
196:3
**try (8)**
19:21;25:12;26:17,18;
27:12;32:14;100:14;185:21
**trying (12)**
33:5;38:22;99:5;115:20;
117:7;126:9,10;149:8;
162:2;171:12;181:4;186:1
**Tuesday's (1)**
212:9
**turn (1)**
105:16
**turned (1)**
220:2
**turns (1)**
59:15
**tweak (1)**
31:5
**twelve (1)**
168:7
**twice (2)**
189:10,12
**two (35)**
9:16;11:19;12:3,20;14:19;
20:13;22:21;23:18;26:6;
29:4;31:23;51:23;52:3;
54:12;56:22,24;57:1;64:10;
67:15;74:13;88:15;119:1;
131:22;141:14,15,17;154:3;
162:3,23;163:7;168:9;
170:10;177:15;182:17;
183:3;193:9;194:4,5;195:9,
11;196:6;200:11;207:2,10;
216:2,4,9,12;217:15;218:18;
219:24
**two-and-a-half (2)**
42:10;180:1
**two-million-dollar (2)**
194:1,7
**two-stage (1)**
27:13
**two-track (1)**
200:6
**type (1)**
95:24
**types (2)**
80:18;152:22
**typical (1)**
65:7
**Typically (3)**
132:21;133:5,16

---

# U

**UCLA (1)**
170:10
**ultimate (2)**
24:12;142:20
**Um (1)**
120:6

**unacceptable (1)**
28:18
**unclear (2)**
90:6,22
**unconvincing (1)**
107:16
**uncovered (1)**
183:3
**under (29)**
10:18;32:21;41:21;44:12;
72:7;73:21;91:1;103:12;
107:6;118:17,20;119:5;
121:19;130:8;135:21;
139:22;140:1;151:4;155:5;
161:7;176:4;179:16;181:21;
183:5;195:9;196:1;201:4,
17;213:11
**undercut (1)**
77:19
**underinclusion (4)**
191:17,19,19;193:10
**undermined (2)**
58:13;84:7
**undermining (1)**
137:11
**understood (6)**
44:21;157:22;159:9;
177:22;205:19;220:10
**undertake (2)**
29:21;106:19
**undertaken (1)**
132:7
**undertakes (1)**
26:3
**undertaking (1)**
33:17
**undisclosed (1)**
54:23
**unfair (3)**
25:2,24;28:12
**unfamiliar (2)**
132:21;134:6
**unfortunately (3)**
11:16;105:9;181:20
**unhappy (1)**
36:19
**unique (2)**
32:12;96:17
**United (1)**
6:17
**unless (2)**
105:19;109:19
**unlike (1)**
153:9
**unlikely (1)**
29:5
**unobjectionable (1)**
118:3
**unrealistic (1)**
202:14
**unsealed (1)**
81:16
**unsophisticated (1)**

174:21
**unsuccessful (1)**
209:22
**unusual (4)**
104:6;133:12;158:19;
159:10
**unusually (1)**
158:14
**unwilling (1)**
213:22
**up (70)**
8:2;15:20;20:3;23:1;24:1;
30:20;31:16;35:14;36:11;
38:3;39:8,12,21;47:23;48:2;
49:3;50:24;61:2,15,19,20,
21,23;63:8,15;71:11,18;
73:18;74:13;81:14,22;83:7,
23;84:4;88:8;97:19;102:18;
104:12;105:16;110:18,24;
111:4;113:21;117:8;120:14;
121:16;122:15;125:18;
130:7;135:15;140:18;
145:13;147:13;154:4;
160:15;168:6,7;171:2,8;
172:6,11,13;180:23;183:18;
192:17;193:15;196:19;
204:5;210:4,11
**update (1)**
138:11
**upon (16)**
28:6;41:17;45:4;49:10;
60:5;69:1;74:5,11;78:12;
103:23;124:19;134:21;
162:15,21;207:23;210:10
**upset (3)**
57:19;58:6;76:4
**urge (1)**
51:21
**urging (1)**
63:22
**use (11)**
23:16;95:11;103:6,15;
124:14;125:17;149:22;
153:16;159:22;174:7;
197:23
**used (8)**
45:10;112:1,2,11;154:8,
10;170:14;198:1
**using (9)**
49:19;118:16;132:20;
171:7;173:13;189:11;191:9;
192:23;216:18
**usual (1)**
7:23
**usually (3)**
163:23;219:4,11

**V**

**vacuum (1)**
133:13
**valid (1)**
135:6

**valuable (1)**
82:4
**value (13)**
42:17;43:23;48:14;71:17,
18;80:6,6,19,20;81:8;86:8;
180:5;192:20
**varies (1)**
127:2
**variety (3)**
109:11;111:6;135:23
**various (4)**
40:10;80:7;210:13;218:24
**varying (3)**
155:14,15;175:5
**version (1)**
141:9
**versus (5)**
6:13;14:6;61:19;205:11;
207:5
**via (1)**
136:3
**view (16)**
28:18;37:4;41:20;60:24;
66:13;70:7;84:7;91:7;101:7;
144:13;169:20;181:24;
184:11;193:6;201:4;211:10
**viewing (1)**
9:13
**views (1)**
96:17
**voices (1)**
8:2
**vouching (1)**
15:10

**W**

**Wait (1)**
154:6
**waiting (1)**
150:19
**wake (1)**
102:18
**walk (1)**
153:19;156:12
**walked (1)**
104:10
**wants (4)**
29:21;168:5;186:11;
212:19
**warts (3)**
84:1;183:14;184:8
**way (59)**
25:24;26:5;27:16;28:12,
23;31:22,24;37:9;40:14;
45:23;54:1;55:5;58:21,22;
61:7;64:17;66:8;67:19;
71:22;73:7,11;74:16;76:1;
77:20;83:21;85:10;91:7;
99:10,13,16;105:8;117:14;
126:2,9;128:18,20;133:15;
138:14;141:13;144:21;
148:21;149:8;153:6;157:22;

164:24;166:7;175:23;
176:10;183:10;190:16,17,
18;195:17,18;203:12;
205:19;213:1;217:9;218:5
**ways (13)**
33:23;48:3;53:1;55:5;
64:16;69:18;76:4;77:23;
81:6;84:5;88:8;154:18;
171:5
**website (6)**
165:21,23,24;166:2,13;
167:22
**week (2)**
16:24;20:5
**weight (1)**
134:12
**Weiss (1)**
184:1
**Welcome (1)**
129:10
**weren't (7)**
45:23;77:19,23;106:7;
154:12;201:22;204:9
**whatnot (1)**
205:12
**what's (13)**
15:17;19:8;91:5;96:19;
122:5;158:17;160:3;163:1;
164:15;181:2;194:10;
196:23;219:13
**whatsoever (5)**
44:24;76:10;99:17;138:4;
144:21
**Whenever (1)**
36:10
**whereas (1)**
122:4
**whereby (1)**
95:2
**where's (1)**
122:6
**Whereupon (1)**
222:5
**whistleblower (1)**
81:16
**whistleblowers (1)**
217:1
**whole (22)**
11:1;18:16,22;23:22;
34:11;47:1;73:5;78:12;
96:14,20;97:18;135:13;
141:7;146:13;153:18,19;
168:22;185:12;189:17;
193:20;201:20;205:7
**who's (5)**
32:7;33:1;68:5;87:12;
96:11
**whose (5)**
22:15;23:4,13;65:17;
111:5
**who've (1)**
17:3
**wide (1)**

125:12
**wildly (2)**
127:2;194:1
**William (1)**
8:10
**willing (4)**
71:11;86:14;137:3;213:14
**win (1)**
80:15
**wish (5)**
62:13;68:16;70:13,17;
142:10
**wished (1)**
163:14
**within (5)**
118:14;158:12;173:9;
191:14;201:17
**without (4)**
73:12;115:6;124:23;
155:12
**witness (179)**
6:5,6;8:1,24;11:6,15,18,
21;12:2,5,13,20,21;13:16,
24;15:3,5,6;24:7,14;25:5,12,
18;26:2,10;27:6,10;28:4,15;
29:12;30:6;31:5;35:1,7,10,
11,16;36:24;37:12;38:18;
40:19;41:4,10;42:2,15;44:8,
9,10,17;45:12;47:8,11,22;
49:15,17,22;50:1,5,16;
58:21;59:15;60:8,22;61:15;
62:9;63:7;64:2,13,23;65:4;
66:7,11,13;67:19;68:2,11;
69:15;70:6,11,23;72:21;
73:7,22;74:9;75:11,20;
80:15;82:23;84:20;86:12;
88:18;90:4,9,14;91:11,13;
92:1,5,8,12,24;101:3,21;
102:8;103:3;115:11;116:5,
11,17,20;117:5,19;118:1,4;
119:4;120:6,8,12;121:4,10;
122:1,21;123:15,22;124:12;
125:9;126:7,19;128:2,7,17;
138:3,13;146:17;147:4;
149:24;150:14;157:16,19;
167:11,16,19;168:19;169:5;
170:21;178:4;181:13;
182:17;184:15;185:11,21,
24;186:12;188:3;196:11;
197:3;199:3,6,16,19;200:13,
17;201:8,12,15,18;202:8;
203:15;204:16;205:18;
206:5,8,15;207:1;221:3,15,
20,24;222:4
**witness' (9)**
46:21;49:14;55:3;59:13;
67:17;69:14;75:18;81:2;
137:19
**Wolf (33)**
6:12;22:7;68:17;70:13;
72:17;74:5,22;93:12;108:7;
111:16,19;112:6;150:2;
156:6,15,16;157:2;179:7;

189:22;194:9,12,23;196:12,
18;197:24;198:19;217:8;
218:23;219:2,4,10,10,20
**Wolf's (1)**
195:22
**won (1)**
102:13
**word (7)**
19:17;45:11;87:6;113:6;
124:14;149:22;181:2
**words (3)**
134:1;137:6;196:24
**work (46)**
11:6,8;12:1;13:22;14:2,
24;15:11;16:3;19:23;20:21,
23;21:15;22:15,21;23:4,13;
34:3,13,13,14;43:22;46:2;
48:13;52:15;63:1;64:16;
71:14;84:8,16;85:6;105:6;
109:3;123:19;124:24;
126:10;132:6;159:9;160:17;
165:5;181:16,17;182:5,14;
192:20;197:18;210:10
**worked (16)**
12:10,13,18,19,21,23;
13:15,20;14:21;20:12;34:8;
71:8;109:22;181:9;191:14;
205:20
**working (8)**
13:14;20:17;45:20;81:11;
92:17;107:21;110:14;217:1
**works (2)**
39:15;64:17
**world (6)**
84:3;106:18;150:6,9;
160:19;165:20
**worried (5)**
56:1,10;57:12;205:3;
206:2
**worry (12)**
53:2,3,7;57:9;65:10;76:8;
97:15;99:24;100:22;191:17;
192:4;193:10
**worse (5)**
83:16;132:14;134:2;
172:6,7
**worth (3)**
81:9;180:7;193:8
**wow (1)**
127:14
**wrinkle (1)**
68:20
**write (4)**
27:11;120:18;132:13;
195:8
**writes (4)**
31:17;120:15;121:1;214:8
**writing (9)**
10:9,19;21:9;71:5;73:12;
125:20;136:1;137:5;195:6
**written (10)**
16:8;9;20:4;73:16;81:4;
117:14;119:7;151:16;152:5;

214:19
**Wrong (7)**
17:11;60:2;109:7;145:17,
18;186:15;200:23
**wrongly (1)**
107:20
**wrote (16)**
11:17;12:6;21:7;51:14;
63:9;73:17;107:10;121:14,
15;170:6;172:21;212:8;
213:11;214:15;215:4,6

**Y**

**year (7)**
15:21;16:12;36:14;52:13;
81:17,21;216:12
**years (11)**
10:10,10;21:2;51:15;
73:12;84:15;107:11;159:6;
160:17;182:15;195:5
**Yep (5)**
114:22;173:2;189:2;
211:18;216:10
**yielded (1)**
103:11

**Z**

**zero (1)**
31:20
**zone (1)**
201:17

**1**

**1 (8)**
9:8,13;17:10;22:10;79:6;
113:19;114:1;213:4
**1.12 (1)**
42:8
**1.2 (1)**
42:11
**1.8 (2)**
216:2,8
**10 (1)**
206:18
**10-million-dollar (1)**
219:18
**11 (4)**
93:22;109:10;112:18;
218:10
**11:05 (1)**
93:23
**11:10 (1)**
93:24
**11:59 (1)**
128:1
**112.5 (1)**
218:9
**11-cv-10230-MLW (1)**
6:14
**12 (1)**

111:24
**1200 (1)**
21:1
**127 (2)**
104:15;105:2
**13 (6)**
113:5;114:20,24;115:1;
130:6,8
**13-40 (4)**
113:11;114:14,16;130:11
**13-9 (1)**
95:1
**14 (1)**
166:19
**15 (1)**
167:4
**15-12 (2)**
53:20;54:1
**17 (1)**
130:6
**18 (2)**
111:11;204:23
**1995 (4)**
83:4,5;94:15;139:23

**2**

**2 (4)**
107:14;111:10;129:17;
213:12
**2.4 (1)**
42:8
**2.96 (1)**
218:14
**2:52 (1)**
222:6
**20 (6)**
10:10;43:18;56:18;
164:12,21;167:4
**20/20 (1)**
89:9
**2007 (1)**
29:16
**2015 (2)**
214:3;220:14
**2016 (2)**
111:10;200:8
**2017 (8)**
9:20;10:2;11:5;16:4,13;
20:19;129:13,22
**2018 (1)**
21:7
**21 (2)**
208:21,24
**22 (3)**
46:23;158:5,6
**23 (35)**
22:6;46:23;74:9;96:22;
107:16;116:12;119:4,5,7;
121:10,12;122:21;123:8;
124:8;130:21;136:3;148:10,
14,16,19;149:2;151:4;
153:15;154:1,17,20,21;

155:5;158:5;161:8,17;
162:7;198:9,22;199:9
**23a4 (2)**
  201:4,17
**23e (3)**
  115:21,24;116:22
**23e1C (1)**
  173:9
**23g (3)**
  95:21;96:9;155:6
**23h (3)**
  115:22;117:15;187:12
**23h2 (3)**
  117:16;121:19;162:10
**23rd (1)**
  219:2
**23's (3)**
  153:7;155:21;156:1
**24 (1)**
  159:5
**25 (20)**
  10:10;56:19,21;164:8,9,
  13,14;189:3,9;190:13,14,16;
  194:2;204:24;219:4,11,13,
  15,16;220:1
**26 (1)**
  21:7
**27 (2)**
  161:6;208:23
**28 (8)**
  208:22,23;210:21;214:3,
  8;215:3;220:14,15
**29 (2)**
  116:7;208:22
**2nd (2)**
  108:3,17

---

### 3

**3 (9)**
  22:3,13,17,20;29:11;79:6;
  111:19;130:13,14
**30 (3)**
  111:10;166:18;194:2
**300 (3)**
  82:5;110:6;123:3
**300-million-dollar (3)**
  217:6,23;219:16
**30c (2)**
  76:23;179:17
**31 (6)**
  10:1;16:3,13;20:19;
  129:12,22
**31st (2)**
  9:19;11:4
**34 (1)**
  114:11
**35 (3)**
  97:19;100:2;111:18

---

### 4

**4 (4)**

---

94:9,9;114:14;210:22
**4.1 (2)**
  179:6;197:19
**40 (3)**
  110:11;115:1;127:3
**45 (1)**
  129:5

---

### 5

**5 (5)**
  29:10;53:19;56:19;79:12;
  210:24
**5.5 (5)**
  158:13;159:3,8;182:13
**50 (3)**
  97:18;110:5;159:6
**500 (1)**
  13:15
**50-million-dollar (1)**
  194:6
**54 (17)**
  53:22;72:7;74:10;103:12;
  107:16;121:16;124:7,8;
  136:3;148:10,14,16,19;
  151:5;198:9,22;199:9
**54d (1)**
  118:20
**54d2 (1)**
  118:17
**54d2B4 (2)**
  53:23;54:10

---

### 6

**6 (1)**
  103:9
**60 (1)**
  166:18
**63 (1)**
  110:5

---

### 7

**7 (3)**
  51:4,12;103:9
**75 (1)**
  14:1

---

### 8

**8 (6)**
  11:5;17:10;94:20;95:1;
  107:14;210:19

---

### 9

**9 (5)**
  88:24;206:18;209:1;
  211:21;212:1
**91 (1)**
  209:8

---