# EX. 238

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20,<br><br>Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>STATE STREET BANK AND TRUST COMPANY,<br><br>Defendant. | No. 12-cv-11698 MLW |

**RESPONSE BY LABATON SUCHAROW LLP TO SPECIAL MASTER'S
SEPTEMBER 7, 2017 REQUEST FOR SUPPLEMENTAL SUBMISSION**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

## <u>TABLE OF CONTENTS</u>

I.     PRELIMINARY STATEMENT OF FACTS ................................................. 1

II.    PRELIMINARY STATEMENT OF LAW ................................................... 3

III.   STATEMENT OF FACTS RELEVANT TO DETERMINATION OF EFFECT OF CHARGOIS & HERRON FEE ALLOCATION ON APPROPRIATENESS OF FEE AWARD ................................................................................................... 4

IV.   RESPONSE TO ISSUES RAISED BY THE SPECIAL MASTER ............... 15

    A.    The Payment of a Portion of the Fee Award to Chargois & Herron was Permissible Under Controlling Massachusetts Rules of Professional Conduct ................................................................................................... 16

    B.    Customer Counsel Had No Obligation to Disclose the Chargois & Herron Payment to the Court ........................................................................... 19

        1.    There was no provision of law, court rule, or order that required Customer Counsel to disclose a fee-sharing agreement to the Court ....... 19

        2.    The Imperfect Disclosure to George Hopkins did not create an obligation to disclose the Chargois & Herron payment to the Court where no obligation otherwise existed ..................................................... 24

    C.    The Firm's Incomplete Disclosure of the Chargois & Herron Agreement to ARTRS Does Not Justify Imposition of a Sanction ............................................. 25

    D.    Customer Counsel Had No Obligation to Disclose the Chargois & Herron Payment to ERISA Counsel ........................................................................ 29

    E.    Customer Counsel Had No Obligation to Disclose the Chargois & Herron Payment to the ERISA Plaintiffs ............................................................ 32

    F.    Labaton Sucharow Had No Obligation to Disclose Further Details Regarding Chargois & Herron To Customer Counsel ......................................... 35

    G.    There Was Nothing Improper About Paying Chargois & Herron from Labaton Sucharow's IOLA Account ........................................................... 36

V.    BEST PRACTICES ................................................................................. 37

VI.   CONCLUSION ........................................................................................ 40

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bezdek v. Vibram USA Inc.*,
  79 F. Supp. 3d 324 (D. Mass. 2015) .........................................................20, 21, 23

*Bower v. Bunker Hill Company*,
  689 F. Supp. 1032 (E.D. Wash. 1985) .................................................................34

*Fishman v. Brooks*,
  396 Mass. 643 (1986) ..........................................................................................24

*Fulco v. Cont'l Cablevision, Inc.*,
  789 F. Supp. 45 (D. Mass. 1992) ........................................................................34

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)..............................................................................................21

*Kas v. Financial General Bankshares, Inc.*,
  796 F.2d 508 (D.C. Cir. 1986).............................................................................24

*Latorraca v. Centennial Techs., Inc.*,
  834 F. Supp. 2d 25 (D. Mass. 2011) ....................................................................21

*In re Lupron Mktg. & Sales Practices Litig.*,
  No. 01-CV-10861-RGS, 2005 U.S. Dist. LEXIS 17456 (D. Mass. Aug. 17,
  2005) .....................................................................................................................21

*In re McKesson HBOC, Inc. Securities Litigation*,
  126 F. Supp. 2d 1239 (N.D. Cal. 2000) ...............................................................34

*Medoff v. CVS Caremark Corp.*,
  No. 09-cv-554-JNL, 2016 U.S. Dist. LEXIS 19135 (D.R.I. Feb. 17, 2016) ...................20, 21

*Norton Frickey, P.C. v. James B. Turner, P.C.*,
  94 P.3d 1266 (Colo. App. 2004)...........................................................................33

*Saggese v. Kelley*,
  837 N.E.2d 699 (Mass. 2005) ...............................................................................27

*In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*,
  56 F.3d 295 (1st Cir. 1995).............................................................................20, 21

*Werner v. Werner*,
  267 F.3d 288 (3d Cir. 2001)..................................................................................24

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*Wong v. Luu,*
  472 Mass. 208 (2015) ...............................................................................................25

**Statutes**

Ark. Code Ann. § 10-3-701 (2017).............................................................................6

Ark. Code Ann. § 10-3-703 (2017).............................................................................6

N. Y. Judiciary Law § 497 (2) ..................................................................................37

N.Y. Judiciary Law § 497 (4)(a)...............................................................................37

**Other Authorities**

ABA Model Code Disciplinary Rule 2-107(A)(2) ...................................................18

ABA Model Rule 1.5(e).............................................................................................18

ABA Model Rule 8.5(b)(1)........................................................................................16

ABA/BNA Lawyers' Manual on Professional Conduct (2014) ...............................33

D. Mass. Local Rule 83.6.1.......................................................................................16

D. Mass. Local Rule 83.6.4(b)..................................................................................26

D. Mass. Local Rule 83.6.5.......................................................................................26

F.R.A.P. 4(a)(1) ........................................................................................................14

Fed. R. Civ. P. 23(h)..................................................................................................20

Fed. R. Civ. P. 32(h)(1).............................................................................................19

Fed. R. Civ. P. 54 ..........................................................................................19, 22, 23

Geoffrey C. Hazard et al., *The Law of Lawyering* § 9.20 (4th ed. 2017) ....................28

Gilda M. Tuoni, *Massachusetts Attorney Conduct Manual* (1992).........................17, 18

Harold Brown, *ABA Code of Professional Responsibility*, 17 Ann. Surv. Mass. L.
  730 (1969-1970).....................................................................................................18

 http://www.labaton.com/en/practiceareas/Institutional-Investor-Protection-
  Services.cfm (last visited Oct. 11, 2017) .................................................................4

https://www.arktimes.com/ArkansasBlog/archives/2008/10/23/doane-to-depart
  (last visited Oct. 17, 2017)........................................................................................9

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

*In The Matter of Adoption of Model Rules of Professional Conduct, Petition of the Boston Bar Association*, S-4357 (1988)...................................................................18

James Bolan et al., *Ethical Lawyering in Massachusetts* § 5.5.2 (4th ed. 2014)...........18

Joseph M. McLaughlin, 2 *McLaughlin on Class Actions* §1:11 (13th ed. 2016) ........34

Leo Boyle, *The Referral Fee Rule: If It's Not Broken, Don't Fix It*, 34 Boston Bar Journal 26, 26 (May/June 1990) ............................................................28

Mass. R. Prof. C. 1.0(r) ....................................................................................16

Mass. R. Prof. C. 1.5...................................................................................*passim*

Mass. R. Prof. C. 8.5(b)(1)..............................................................................16

Mass. S.J.C. Rule 3.07 ....................................................................................16

Mass. S.J.C. Rule 4:01(1) ................................................................................25

Massachusetts Disciplinary Rule 2-107 ............................................................18

*MBA Opinion* No. 12-02 (2012) .....................................................................16

*MBA Opinion* No. 76-3 (1976) .......................................................................18

N. Y. R. Prof. C. 1.15(a) .................................................................................36

Rules Advisory Committee Proposed Revisions to Massachusetts Rules of Professional Conduct Rules 1.0-6.2, 7.1-7.5, 8.1-8.4 ..............................................29

Texas Disciplinary Rule of Professional Conduct 1.04(f)(1) .....................................18

William B. Rubenstein, *Newberg on Class Actions* § 15:12 (5th ed. 2016)..................19

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Labaton Sucharow LLP ("Labaton Sucharow" or the "Firm") respectfully provides this response to the Special Master's September 7, 2017 invitation for a further supplemental submission pertaining to the participation of Damon Chargois ("Chargois") and his firm, Chargois & Herron, in the fee award to the Firm and its customer-side co-counsel Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") and The Thornton Law Firm ("Thornton") in the State Street litigation.

## I.   **PRELIMINARY STATEMENT OF FACTS**[1]

Although Labaton Sucharow's relationship with Chargois & Herron[2] has changed over time, its business agreement with Chargois & Herron has not.  After the initial introduction of the Firm to the then-Executive Director of the Arkansas Teacher Retirement System ("ARTRS" or the "Client") by Chargois & Herron, i.e., during the RFQ process and in the early period after Labaton Sucharow was selected as panel monitoring counsel, the Firm expected that the two firms would jointly represent ARTRS:  Chargois & Herron would serve as a key interface with ARTRS, handling issues local to the client and providing the client with the comfort of readily accessible local counsel, while Labaton Sucharow would provide the actual monitoring of events relating to ARTRS's investments that could lead to litigation.[3]  With the introduction and the

---

[1]  This section presents a summary overview.  Detailed facts, with record references, follow.

[2]  Although Labaton Sucharow does not know the details (other than as Chargois described them in his deposition), the Firm understands that Chargois has used different names to describe his firm or firms.  In this response, "Chargois & Herron" is used throughout, even where a different name may have been used at that particular time.

[3]  Although the Firm and Chargois & Herron jointly responded to the RFQ, ARTRS's Chief Counsel informed Labaton Sucharow that, for administrative purposes, Chargois & Herron could not be listed on the same "state contract form" as Labaton Sucharow.  LBS017456.  As explained further below, this was not a "rejection" of Chargois & Herron by ARTRS; rather, Labaton Sucharow was added to the list of approved firms and given permission to "affiliate" Chargois & Herron.  *Id.*  ARTRS's Chief Counsel has not been deposed, but Labaton Sucharow witnesses took this to mean that they were free to affiliate with Chargois & Herron as they saw fit.  *See infra* at pp. 6-8.  Accordingly, the Firm continued with the expectation that the representation of ARTRS would be a joint effort on the terms set forth above.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

expected division of responsibilities in mind, Labaton Sucharow agreed that Chargois & Herron would receive 20% of any fees awarded to the Firm, in cases where ARTRS was a named plaintiff and the Firm was appointed lead or co-lead counsel.

Shortly after Labaton Sucharow was awarded panel status, ARTRS changed Executive Directors, resulting in a new administration with no ties to either Chargois or his partner Tim Herron. Labaton Sucharow partner Eric Belfi, who focused substantial attention on the Firm's business development efforts, therefore developed his own relationship with the new Executive Director, George Hopkins, and Chargois & Herron's role dissipated. Unfortunately, the fee allocation agreement between the Firm and Chargois & Herron had not contemplated such a turn of events; and Chargois continued to take the position that his firm was entitled to share in Labaton Sucharow's fees pursuant to the agreement.

Labaton Sucharow was displeased with the unexpected turn of events, and believed that the fee sharing agreement had been based upon a condition that was not being satisfied. Although increasingly dissatisfied with the passage of time, Labaton Sucharow continued sharing fees with Chargois & Herron, fearing that the latter would otherwise sue the Firm in state court in Texas,[4] an event that could have an extremely adverse impact on a firm that works extensively with public pension and retirement plans. This litigation (the "SST Litigation") was the most recent matter in which Chargois & Herron benefited from the agreement, which the Firm believes ends with the conclusion of its current panel contract with ARTRS. After discussions with Garrett Bradley of Thornton, Chargois agreed that, instead of calculating the payment as an amount equivalent to 20% of Labaton Sucharow's fee allocation, in this case the payment to Chargois & Herron would be calculated as 5.5% of the total fee award, jointly paid

---

[4] Indeed, Chargois implicitly threatened to do just that (*see* Belfi 2d Dep. 58:5-59:22; LBS031137), although Chargois claimed a lack of memory in that regard (Chargois Dep. 320:9-14).

by the three customer-side law firms.  Chargois & Herron thus received a portion of the allocations of Labaton Sucharow, Thornton and Lieff Cabraser, but no portion of the allocations of the ERISA firms.  And, of course, none of the Chargois & Herron allocation came from the pool of proceeds designated for class members in either the customer action or the ERISA action, which was consolidated with the customer action for pre-trial purposes.

## II.  PRELIMINARY STATEMENT OF LAW

Based upon various statements made by and questions posed to witnesses by the Special Master or his counsel, the Firm understands that the Special Master is concerned about the following purported failures to disclose: Failure to disclose the fee allocation for no work performed to:  (1) the client ARTRS, (2) the Court, (3) ERISA counsel, and (4) class members, and failure to disclose that the client had not approved the fee allocation to (5) Thornton and Lieff Cabraser (together with Labaton Sucharow, "Customer Counsel").  As discussed below, with the exception of the first category, no such disclosures were required (although in some instances the Firm believes that the information was nonetheless known to various of the constituencies).

As discussed below, under the Massachusetts Rules of Professional Conduct, which control in these circumstances, the only disclosure required was a full and complete disclosure to the client.  Labaton Sucharow acknowledges that, erroneously, the disclosure to Hopkins was incomplete and imperfect.  For the reasons also discussed below, however, that incomplete disclosure to the client does not justify sanctions in this case.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### III.   STATEMENT OF FACTS RELEVANT TO DETERMINATION OF EFFECT OF CHARGOIS & HERRON FEE ALLOCATION ON APPROPRIATENESS OF FEE AWARD[5]

Labaton Sucharow's relationship with Chargois & Herron originated through Labaton Sucharow partner, Eric Belfi.  Belfi met Chargois in approximately 2004, when Belfi worked at a different law firm and met Chargois in connection with a litigation matter.  *See* Labaton Sucharow LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) Supplemental Interrogatories to Labaton Sucharow LLP ("Response to Supplemental Interrogatories") at 4; Belfi 2d Dep. 12:21-13:4.[6]  As Belfi understood Chargois's work, Chargois & Herron did "some litigation, but mostly what they do is they find clients, and they refer [the matters] to other law firms."  Belfi 2d Dep. 13:7-9.

Labaton Sucharow, a plaintiffs' class action law firm with a strong focus on securities litigation, often serves as "monitoring counsel" for its clients.  In such situations, the Firm monitors the client's portfolio of investments — without charge to the client — for events (*e.g.*, a drop in stock price) that might indicate a securities disclosure violation.  *See, e.g.*, Portfolio Monitoring and Case Evaluation[7]; LBS017739-41.  If an investment in the client's portfolio declines in value as a result of a potential securities violation, the Firm may ask whether the client would be willing to serve as lead plaintiff in a securities case.  *Id.*  Only if the client agrees does the Firm begin representing the client in litigation.  *Id.*; *see also* Sucharow 2d Dep. 115:13-116:15.

---

[5]  This Supplemental Submission deals exclusively with the issue of what, if any, effect the allocation of a portion of the Customer Counsel's fees to Chargois & Herron should have on the fee award.  The original issues considered by the Master have been addressed previously in the Firm's original Submission.

[6]  Chargois apparently did not recall this meeting during his deposition, because he testified that he first met Belfi through a friend, when Belfi was already working at Labaton Sucharow.  Chargois Dep. 16:8-23.

[7]  *Available at* http://www.labaton.com/en/practiceareas/Institutional-Investor-Protection-Services.cfm (last visited Oct. 11, 2017).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Belfi joined Labaton Sucharow in 2006, serving primarily in a role developing new clients, maintaining existing ones, and serving as the client contact in connection with ongoing litigation.  Belfi Dep. 9:7-23.  After the move, Chargois approached him about opportunities to introduce the Firm to pension plans in the Texas, Arkansas and Oklahoma regions, and Belfi agreed.  Belfi 2d Dep. 13:10-14.  Although the precise date of the earliest discussions is somewhat unclear, Belfi, Chargois and Labaton Sucharow partner Christopher Keller discussed the terms of an agreement between the two firms:  In a case brought on behalf of a fund for which Chargois & Herron facilitated the introduction, Chargois & Herron would generally receive 20% of the gross attorney fees based on what Labaton Sucharow earned, although the percentage would be lower in certain circumstances.  *See*, *e.g.*, LBS031185; Chargois Dep. 50:11-52:24, 162:19-164:2.  As explained below, Labaton Sucharow's intention was that Chargois & Herron would serve as local counsel to the clients whose introductions they successfully facilitated, and would provide such assistance as would appropriately be provided by lawyers in geographic proximity to, and with an existing relationship with, a client.  *See* Belfi 2d Dep. 26:15-23, 27:11-15; Keller Dep. Day 1 44:8-46:21.

In April 2009, by which time Chargois & Herron had successfully facilitated an introduction with ARTRS as described below, Chargois sent a draft letter agreement to Belfi and Keller seeking to memorialize the previous discussions in writing.  LBS030985-87.  Keller edited the document and sent a return draft that, among other things, inserted an arbitration clause.  LBS031192-95.  While a written agreement was never finalized (Response to Supplemental Interrogatories at 8), Chargois at least viewed it as enforceable (LBS031137; Belfi 2d Dep. 58:1-22).

ARTRS was among the funds as to which Labaton Sucharow wished to serve on the

monitoring panel.  Tim Herron, Chargois' partner in Little Rock, knew Steve Farris, an Arkansas

state senator who played an oversight role with respect to ARTRS.  *See* LBS040318;

LBS017432; Chargois Dep. 33:16-21; Hopkins 2d Dep. 35:6-36:8 (explaining that Farris served

on the Arkansas legislature's Joint Committee on Public Retirement and Social Security

Programs); Ark. Code Ann. §§ 10-3-701 and 10-3-703 (2017) (assigning oversight

responsibilities to the joint committee).

Herron arranged a meeting for Belfi and Keller with Senator Farris in August of 2007,

and they explained the services that the Firm provides.  LBS040322; LBS 017438 (in which

Chargois observes "[y]ou guys did well" and "represent[ed] the firm very well" in the meeting

with Senator Farris); Keller Dep. Day 1 20:3-10, 32:20-24.  Thereafter, Senator Farris and/or

Herron introduced Belfi and Keller to Paul Doane, the Executive Director of ARTRS at the time.

LBS040329.  In September or October 2007, Doane visited the Firm's offices in New York City

while he was in the area on other business.  Belfi 2d Dep. 38:2-6, 41:11-13.  Belfi was traveling

at the time, so Doane met with Keller during that trip.  Keller Dep. Day 1 33:10-34:18;

LBS040524-A. [8]

In mid-2008, ARTRS issued a Request for Qualifications ("RFQ") which invited firms to

submit qualifications to become additional monitoring counsel to the fund.  Labaton Sucharow

---

[8] During depositions, questions arose about an email chain following this visit.  LBS040523-A; *see, e.g.*, Belfi 2d Dep. 43:3-47:6; Hopkins 2d Dep. 43:6-46:17.  In the first email, Paul Doane tells Belfi that he appreciated the visit but clarifies that "this is an involved process and will involve further review and probably a formal RFP process."  LBS040524-A.  Thereafter, Herron states in an email that Doane "is going to be extremely careful in all public statements to avoid any difficulty" and that "[t]he Senator is cautious and doesn't want any impropriety to by [*sic*] imputed and wants this thing to proceed under the radar."  LBS040523-A.  Belfi explained that, in his mind, this simply meant that the process was going to proceed according to required protocol, with issuance of an RFQ followed by a chance for the Firm and Chargois & Herron to make a submission.  Belfi 2d Dep. 46:18-47:6.  The specific language appears to be attributable to Herron's harmless tendency to overstate and self-promote, and does not suggest any kind of improper influence or that a decision to select Labaton Sucharow had already been made.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

and Chargois & Herron submitted a joint RFQ response on July 30, 2008.  LBS017738-55;

LBS017756-67.  Labaton Sucharow contemplated that, if selected as panel monitoring counsel,

both firms would work on the litigation, if any, filed on ARTRS's behalf.  Belfi 2d Dep. 18:14-

19; Keller Dep. Day 1 47:24-49:3.  The plan was that Labaton Sucharow would serve as the lead

counsel, and Chargois & Herron, with its Arkansas nexus and connections, would serve as

counsel working locally with the client.[9]  Belfi 2d Dep. 26:15-27:15; Keller Dep. Day 1 44:8-

46:21.  The responsibilities assigned to this type of co-counsel could range from being the "on

the ground" attorneys in Arkansas, responsible for coordinating with the client regarding

updates, document review and discovery responses, preparation for depositions, and the like, to

serving as co-counsel in virtually any other aspect of the litigation.  Belfi 2d Dep. 26:15-23;

Keller Dep. Day 1 44:20-46:2; Sucharow 2d Dep. 113:8-115:12; Lieff Dep. at 80:9-14.  As

witnesses from Labaton Sucharow and other firms testified, although this position is not the

same as a courtroom "local counsel," attorneys who are local to the client and work as co-

counsel on litigation matters are common in connection with Plaintiffs' class action work on

behalf of funds.  Sometimes this type of local counsel is even required by the client.  *See, e.g.*,

Belfi 2d Dep. 26:15-18; Sucharow 2d Dep. 113:8-115:12; Lieff Dep. 80:21-81:12.[10]

On October 13, 2008, ARTRS's Chief Counsel, Christa Clark, emailed Belfi and advised

that "ATRS has selected Labaton Sucharow as an additional monitoring counsel for our system."

LBS017456.  She went on to say:

---

[9]  As has become apparent in discovery, Firm attorneys sometimes used the phrase "local counsel" when
referring to law firms in physical proximity to, and with some relationship with, a client.  In such
circumstances, the meaning differed from that of "local counsel" in litigation.  In the latter instance, the
phrase refers to locally admitted members of the Bar in the venue where litigation is pending.

[10]  Given that representatives of multiple firms explained this local counsel role, it is of no moment that
some witnesses who have different types of practices are not familiar with this type of arrangement.  *Cf.*
Sarko 2d Dep. 62:16-63:7.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

I would like to speak with you regarding the additional firm on your submission Chargois & Herron. This is a little awkward, but since your firms are not legally affiliated, we are unable to process the state contract form with both firms listed.

If your firm is doing the monitoring and providing the financial backing for the cases, I think it is most appropriate that we add your firm independently to the list of approved firms. Your firm may affiliate that firm or utilize them as independent contractors, if you deem is appropriate [*sic*], on a case by case basis. There would be no requirement that you use them if it was not a necessary and appropriate expense of a case. I don't know how to best handle this point but the state procurement process is not conductive to a joint proposal.

*Id.* As the email clearly indicates, the ARTRS system could not administratively accommodate a single panel monitoring member comprised of two unaffiliated firms seeking to act jointly. *Id.* Although ARTRS did not approve Chargois & Herron as panel counsel, it did inform Labaton Sucharow that the Firm had the authority and discretion to affiliate with Chargois & Herron in any case in which the Firm chose to do so, qualifying only that "[t]here would be no *requirement* that you use them if it was not a necessary and appropriate expense of a case."[11] *Id.* (emphasis added); *see also* Belfi 2d Dep. 114:2-22, 117:20-118:10 (explaining that to the best of his recollection, Belfi had a follow-up conversation with Ms. Clark about the fact that Labaton Sucharow would be working with Chargois & Herron); Keller Dep. Day 1 49:10-22, 50:19-23; Keller Dep. Day 2 296:11-22.

During the same month that Labaton Sucharow was selected as additional monitoring counsel to ARTRS (October 2008), Paul Doane departed — unexpectedly at least from the Firm's perspective — as ARTRS's executive director. *See* Arkansas Times, "Doane to depart,"

---

[11]  Given the nature of the relationship, discussed below, the payment to Chargois & Herron was never an "expense of a case." Keller Dep. Day 2 302:24-304:8. Except where they appeared as counsel in Court, Chargois & Herron only received a portion of Labaton Sucharow's attorneys' fees, which themselves were awarded on a percentage basis that were unrelated to "expenses."

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Oct. 28, 2008.[12]   The new Executive Director, George Hopkins, began in or about December 2008.  Hopkins Dep. 10:17-21.  Hopkins did not know Tim Herron or the Chargois & Herron firm.  Hopkins 2d Dep. 21:5-10.  Belfi and then-managing partner Lawrence Sucharow traveled to Little Rock, Arkansas, to meet with Hopkins, the new client representative, a few months after he began.  Belfi 2d Dep. 27:18-21.  Belfi and Hopkins related to each other quickly and well.  Going forward, Belfi therefore handled the relationship personally, deducing (correctly) that this was Hopkins' preference.  Belfi 2d Dep. 27:21-28:7, 56:22-57:10; Hopkins 2d Dep. 60:8-62:16.

Over time, the relationship between Belfi and Hopkins grew stronger, leaving no room for the "local counsel" role that had initially been anticipated for Chargois & Herron.  Belfi 2d Dep. 57:5-19.  Nevertheless, Chargois took the position that his firm was still owed 20% of recovered fees in cases brought on behalf of ARTRS.  He pushed back hard in response to any suggestion that his "share" of the Firm's fees should be reduced or eliminated.  LBS017594 (in which Chargois proclaims, among other things, that "[w]here Labaton is successful in getting appointed lead counsel and obtains a settlement or judgment award, we split Labaton's attorney fee award 80/20.  Period."); LBS030876; Belfi 2d Dep. 58:5-15.  Chargois claimed that the absence of a signed written agreement was immaterial, because the email and other correspondence constituted a binding contract under Texas law.  Belfi 2d Dep. 58:10-59:12; Chargois Dep. 59:6-60:4; Keller Dep. Day 1 130:19-131:12.  Although Chargois claimed to have no such recollection during his deposition, Belfi testified that Chargois effectively threatened to file suit in Texas state court in Galveston if Labaton Sucharow did not honor the agreement.

---

[12]   *Available at* https://www.arktimes.com/ArkansasBlog/archives/2008/10/23/doane-to-depart (last visited Oct. 17, 2017).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Belfi 2d Dep. 58:5-59:22; *see also* Keller Dep. Day 1 130:22-131:132:3.[13]   Labaton Sucharow

was justifiably concerned that litigation over a fee dispute would be harmful to its reputation and

to its relationship with ARTRS, and also concerned that, as Chargois threatened, a Texas state

court would rule in Chargois & Herron's favor.  *See* Belfi 2d Dep. 58:16-59:22; Keller Dep. Day

1 130:22-132:3; Keller Dep. Day 2 541:19-543:23 (describing Chargois' Sept. 2, 2016 email at

LBS031137 as "push-back with a setup – with a potential contractual claim setup").

On September 24, 2010, before the SST Litigation was filed, Belfi sent Hopkins a draft

retention letter for the matter, which contained the following:

> Arkansas Teacher agrees that Labaton may divide fees with other attorneys for
> serving as local counsel, as referral fees, or for other services performed in
> connection with the litigation.  The division of attorneys' fees with other counsel
> may be determined upon a percentage basis or upon time spent in assisting the
> prosecution of an action. The division of fees with other counsel is Labaton's sole
> responsibility and will not increase the fees payable upon a successful resolution
> of the litigation.

LBS019948-50.  On February 8, 2011, Belfi sent a slightly revised, final retention letter to

Hopkins with a modified first sentence to the quoted paragraph, allowing for allocation of "local

*or liaison*" fees.  LBS011061 (emphasis added).  Hence, ARTRS was aware of the potential for a

division of fees at the Firm's discretion for referral fees and local or liaison fees, among the

several characterizations used for Chargois & Heron's allocation by the witnesses and in the

documents in this case.

---

[13]  Chargois' claim that he never made these statements is not credible.  During his deposition, he
repeatedly complained that Labaton Sucharow was attempting to pay him less than the 20% to which he
apparently believes he is entitled.  *See, e.g.*, Chargois Dep. 66:4-67:7, 186:7-13, 226:20-24 .  He also
refused to say that he would abandon the agreement going forward if Labaton Sucharow refused to pay
him a share of any future settlements.  *Id.* at 323:4-324:1.  Viewed in full context, Labaton Sucharow was
more than reasonable in believing that Chargois was an actual litigation risk if the Firm attempted to walk
away from the agreement.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Because ARTRS was the only named plaintiff in Civil Action No. 11-cv-10230 MLW, i.e., the action on behalf of the putative class of customers of State Street — as contrasted with the ERISA class plaintiffs in Civil Action Nos. 11-cv-12049 MLW and 12-cv-11698 MLW, which were consolidated with the customer action for pre-trial purpose — the three Customer Counsel agreed in 2013 that they would share in paying the allocation to Chargois & Herron from their own fee awards.  LBS027776.  Garrett Bradley of the Thornton firm handled the discussions with Lieff Cabraser and Chargois regarding this point.  *Id.*; Bradley 2d Dep. 53:14-54:10.  Bradley explained that he took on the role of negotiating with Chargois & Herron because he had a friendly relationship with Chargois, and he wanted to reach agreement out of concern that, because ARTRS was the only named (non-ERISA) plaintiff, Chargois could say his firm was entitled to 20% of the overall fee award, not just the portion that Labaton Sucharow received.  *Id.*; *see also* Belfi 2d Dep. 94:5-23; Keller Dep. Day 1 122:6-124:19.

On April 24, 2013, Bradley sent a confirming email, copied to Chargois, that memorialized the agreement that the three firms would jointly pay the Chargois & Herron portion of any fee award.  LBS027776.  Bradley referred to Chargois & Herron in that confirmatory correspondence as "local counsel" or "the local."  *Id.*  This characterization did not raise any eyebrows at Labaton Sucharow, likely because (as explained above) that is how the relationship began; and, at that time Belfi (and perhaps Keller) were likely the only Labaton Sucharow attorneys who knew that Chargois & Herron was not performing any work in connection with ARTRS.  *See, e.g.*, Sucharow 2d Dep. 17:8-13; Zeiss 2d Dep. 49:23-51:5; Goldsmith 2d Dep. 108:20-109:6, 111:9-114:5; Keller Dep. Day 1 99:6-100:4.[14]

---

[14]  Lieff Cabraser and Thornton certainly were aware that Chargois & Herron was not local counsel in the courtroom use of that phrase, because at no time did Chargois & Herron enter an appearance in the litigation.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

In June 2016, well after a settlement agreement-in-principle had been reached, Bradley reached out to Chargois for further discussions regarding the payment to Chargois & Herron. TLF-SST-060973. Bradley negotiated an agreement that Chargois & Herron would receive an amount equal to 5.5% of the total fee award (basically, a percentage calculated off the top that would be approximately equivalent to 20% of Labaton Sucharow's anticipated share of the total fee), which would be funded by the three Customer Counsel from their respective shares of the award. LBS040924; Bradley 2d Dep. 93:16-22. At various depositions, the Special Master or his counsel raised questions regarding the June 21, 2016 email to Chargois cited above, in which Bradley discussed ERISA counsel and what percentage will be allocated to them in the context of his dialogue with Chargois about what percentage would be paid to Chargois & Herron. TLF-SST-060973. No Labaton Sucharow lawyers were copied on this communication, and there is no evidence in the record suggesting that lawyers from Labaton Sucharow saw it before this investigation. *Id.* In any case, as Bradley explained, he was simply providing the context of the ERISA firms as background and as a negotiating point with Chargois. Bradley 2d Dep. 84:9-85:20; Keller Dep. Day 2 534:23-535:1 (observing that "Damon didn't exactly negotiate heavily and was probably thrilled to get what he was getting"). Bradley's reference in that 2016 conversation did nothing to change the agreement that the ERISA lawyers had struck with Customer Counsel more than two years earlier.

The fee sharing arrangement with Chargois did not impact the amount payable to the class, the overall amount of the fee award, or the amount of the fee owed and paid to ERISA counsel. Although the Chargois & Herron amount was computed as a percentage of the total fee award, the 5.5% of the total was merely a negotiated extrapolation of (approximately) 20% of Labaton's share of the total fee. Hence, the Chargois & Herron fee remained based only on the

fee allocation to which Labaton Sucharow was entitled, and it was paid only by the three

Customer Counsel from their allocations of the fee.  *See, e.g.*, Sucharow 2d Dep. 28:8-13; Zeiss

2d Dep. 51:10-22, 59:16-19; Goldsmith 2d Dep. 164:20-165:13; LBS041840.  By the time

Customer Counsel authorized these payments from their allocations to Chargois & Herron,

ERISA counsel had long since agreed to their own allocation relative to the Customer Counsel.

At the time that the ERISA cases were consolidated for pre-trial purposes with the ARTRS case,

ERISA counsel negotiated with Customer Counsel and reached an agreement that ERISA

counsel would receive 9% of the total fee award, should one be entered at the conclusion of the

case, and Customer Counsel would receive 91%.  TLF-SST-015649-54.  The 9% was based

upon the estimated amount of losses allegedly suffered by putative ERISA class members when

compared to putative Customer Class members.[15]  Sarko 2d Dep. 48:19-24; McTigue 2d Dep.

15:15-22.  In the end, Customer Counsel voluntarily increased ERISA counsel's allocation to

10% and reduced their own to 90%.  Sucharow 2d Dep. 29:2-6.  The payment to Chargois &

Herron did not impact this amount paid to ERISA counsel because it came exclusively from the

amounts paid to Customer Counsel.

The Settlement Agreement provided that, "[u]nless otherwise ordered by the Court, and

subject to the provisions of the Lead Counsel Escrow Account, Lead Counsel will in good faith

promptly distribute any award of attorneys' fees and/or payment of Litigation Expenses among

Plaintiffs' counsel."  Settlement Agreement and Release (ECF No. 89) at ¶ 21.  The Court

entered its Order Awarding Attorneys' Fees, Payment of Litigation Expenses, and Payment of

Service Awards to Plaintiffs ("Order Awarding Fees") (ECF No. 111) on November 2, 2016, the

---

[15]  Despite what some suggested during depositions, ERISA class members did not suffer 20% of the total
losses.  Rather, the Department of Labor used its leverage to extract a premium, which is why $60 million
out of the total $300 million settlement was allocated to ERISA class members.  *See infra* at pp. 31-32.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

same day it entered judgment (ECF No. 110).  Because no person filed a notice of appeal, on

December 2, 2016 (30 days later), that order became final.  *See* F.R.A.P. 4(a)(1).  Accordingly,

Labaton Sucharow was required to "promptly" distribute the attorneys' fees to the various firms,

which at that point were held in the Lead Counsel Escrow Account.

In light of the double counting error, which had been disclosed to the Court several weeks

earlier, the Firm wanted to be sure that all counsel receiving a portion of the fee award would

refund their respective portion of the payment should the Court order a recalculation.

Accordingly, the Firm circulated a "clawback letter" or "undertaking" which it requested that

each firm or counsel sign.  LBS017922.  Bradley replied by email, which he sent only to several

partners at Labaton Sucharow, saying "I think you should put Damon on this letter."

LBS017920.  Goldsmith responded that the Firm was planning to do a separate letter to

Chargois, after which Sucharow gave more detail about the calculation and explained that the

separate letter made sense because there was no reason for the ERISA counsel "to see Damon's

split," given that they were paying no part of it.[16]  *Id.*; *see also* Sucharow 2d Dep. 26:9-26:24

(discussing this exchange, and explaining that he "see[s] no rational explanation as to why

[ERISA counsel] would need" information about the payment to Chargois & Herron).

Following execution of claw back letters, Labaton Sucharow distributed the attorneys'

fees from the Lead Counsel Escrow Account as required.  Zeiss 2d Dep. 124:16-126:2.  From

that account, fees and expenses were paid to Lieff and Thornton, as well as to Keller Rohrback,

---

[16]  Although Sarko requested that Labaton Sucharow "circulate the fee and expense breakdown"
(LBS017934), Chargois' allocation was a fee split, not an "expense," and Sarko was clearly not looking
for a fee breakdown among individual Customer Counsel (or to their referring counsel), because ERISA
counsel provided no such breakdown to Customer Counsel or, indeed, even to each other.  *See* Keller
Rohrback L.L.P.'s Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Second
Supplemental Interrogatories at 8; McTigue Law LLP's Responses to Special Master Honorable Gerald
E. Rosen's (Ret.) Second Supplemental Interrogatories to McTigue Law at 5; Zuckerman Spaeder LLP's
Answers to Special Master's Second Supplemental Interrogatories at 5.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

McTigue Law, and Zuckerman Spaeder (collectively, the "Three Main ERISA Firms").  Zeiss 2d Dep. 125:16-21, 139:9-14; LBS041874-75.  Fees and expenses payable to Labaton Sucharow and Chargois & Herron, as well as service award payments (which Labaton Sucharow would send along to the respective named plaintiffs), were transmitted to Labaton Sucharow.  Zeiss 2d Dep. 125:22-126:2.

Each of the Three Main ERISA Firms received 1/3 of the 10% of the attorneys' fee award that was allocated for ERISA counsel.  Labaton Sucharow understands that those firms had fee-sharing obligations to other firms, some of which submitted affidavits in support of the fee petition, and at least one of which did not.  Until they responded recently to interrogatories (which the Special Master served at Labaton Sucharow's request), none of the ERISA counsel ever shared with Labaton Sucharow or the Court the amount of the fee award the various firms were paid, much less the basis for the share they received, what facts they disclosed or discussed when they negotiated their fee sharing agreements with other ERISA counsel, or whether or how the work they did on the SST Litigation related to the amount they received.  *See* McTigue Law LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Second Supplemental Interrogatories to McTigue Law at 5-6 (agreements "were not submitted to the Court" and "McTigue . . . did not disclose to Customer Counsel the division of fees among *Henriquez* Counsel"); Zuckerman Spaeder LLP's Answers to Special Master's Second Supplemental Interrogatories at 5 ("precise amounts were not disclosed"); Keller Rohrback L.L.P.'s Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Second Supplemental Interrogatories at 5-8 (amounts shared with Hutchings Barsamian not disclosed to the Court or Customer Counsel).

## IV.   RESPONSE TO ISSUES RAISED BY THE SPECIAL MASTER

Labaton Sucharow addresses below the main topics regarding the payment to Chargois & Herron that it understands are the focus of the Special Master's inquiry.  Should the Special

Master have follow-up questions regarding these or other points, the Firm requests that it be given the opportunity to respond and respectfully reserves its right to supplement this submission accordingly.

**A.**     **The Payment of a Portion of the Fee Award to Chargois & Herron was Permissible Under Controlling Massachusetts Rules of Professional Conduct.**

Although ARTRS is an Arkansas entity, the ethical propriety of the payment to Chargois & Herron in connection with the SST Litigation is governed by the Massachusetts Rules of Professional Conduct:[17]

> In any exercise of the disciplinary authority of this jurisdiction, the rules of professional conduct to be applied shall be as follows: (1) for conduct in connection with a matter pending before a government tribunal, the rules of the jurisdiction in which the tribunal sits, unless the rules of the tribunal provide otherwise . . .

Mass. R. Prof. C. 8.5(b)(1); *see also* D. Mass Local Rule 83.6.1 (making the Massachusetts Rules of Professional Conduct the governing rules in this Court); *MBA Opinion* No. 12-02 (2012) ("Massachusetts rules govern a fee contract entered into in another state relating to litigation in a Massachusetts court"); ABA Model Rule 8.5(b)(1).  The Court's order appointing the Special Master also cited the Massachusetts Rules of Professional Conduct as a governing source of authority.  *See* March 8, 2017 Memorandum and Order (ECF No. 173) at 3.

The payment of a portion of Customer Counsel's share of the fee award to Chargois & Herron is governed by Massachusetts Rules of Professional Conduct 1.5.  Subsection (e) of that rule states that the "division of a fee (including a referral fee) between lawyers who are not in the same firm" is permissible, provided client disclosure and consent requirements are met[18] and "the

---

[17]  The Massachusetts Rules of Professional Conduct are contained within Supreme Judicial Court Rule 3.07.  They are referred to and cited hereinafter as "Massachusetts Rules of Professional Conduct" or "Mass. R. Prof. C."  *See* Mass. R. Prof. C. 1.0(r).

[18]  The disclosure and consent requirements are discussed in Sections B and C, *infra*.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

total fee is reasonable." Mass. R. Prof. C. 1.5(e). Labaton Sucharow respectfully suggests that the reasonableness of the total fee has already been determined, and that no reason exists to disturb that finding and ruling. *See* Order Awarding Fees (ECF No. 111) (finding the percentage-based award reasonable in light of "the factors considered within the First Circuit"); Memorandum in Support of Motion for Attorney Fees (ECF No. 103-1).[19] Indeed, virtually every witness who was asked that question has agreed. *See, e.g.,* Kravitz 2d Dep. 118:9-119:12; Sarko Dep. 134:4-11; Cohn Dep. 18:20-19:1.

It is important to note — particularly in light of questions and statements of the Special Master or his counsel that seemed to suggest a contrary belief — that under the governing Massachusetts Rules of Professional Conduct, Chargois & Herron was *not* required to work on the SST Litigation to receive a share of the fee award. Massachusetts Rule of Professional Conduct 1.5(e) "does not require that the division of fees be in proportion to the services performed by each lawyer or require the lawyer to assume joint responsibility for the representation in order to be entitled to a share of the fee." Mass. R. Prof. C. 1.5, cmt. [7A]; *see also* Expert Declaration of Camille F. Sarrouf ¶¶ 19-20; Gilda M. Tuoni, *Massachusetts Attorney Conduct Manual*, at 2-61 (1992) ("the absence of such requirement effectively allows for 'referral' fees to be paid"). Massachusetts has a long history of allowing what some refer to as a "forwarding fee" or "origination fee." Sarrouf Decl. ¶¶ 20-21. Indeed, Massachusetts expressly chose not to adopt the requirements of proportionality or joint responsibility that exist in the

---

[19] As Labaton Sucharow has explained, the unfortunate "double counting" issue did not impact this conclusion. The lodestar is used as a cross-check and is only implicated by one of the eight express findings the Court made in approving the award. Order Awarding Fees (ECF No. 111) at 4-5; *see also* Consolidated Response by Labaton Sucharow LLP, Lieff Cabraser Heimann & Bernstein LLP, and Thornton Law Firm LLP to Special Master's July 5, 2017 Request for Supplemental Submission at 3.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

ABA's Model Rule 1.5(e) [20] and the rules of some states. *Id.* ¶ 20. Massachusetts Disciplinary Rule ("DR") 2-107, the predecessor of the current Rule 1.5, also omitted these requirements. *See MBA Opinion* No. 76-3 (1976) ("When the Supreme Judicial Court, in its Rule 3:22, adopted the Canons generally, it omitted DR 2-107 (A)(2). Thus, in the common 'referral fee' situation, a referral need not measure the services or responsibility of the referring attorney.").[21]

Nor does it matter what term is used to describe the arrangement, e.g., referral fee, forwarding fee, origination fee, or as Mr. Chargois adamantly urged, "[j]ust an agreement" (Chargois Dep. 62:3-13).[22] Under the Massachusetts Rules of Professional Conduct, characterizations are irrelevant, as is the fact that the arrangement has applied to multiple litigation matters. Massachusetts Rule of Professional Responsibility 1.5(e) governs *any* "division of a fee (including a referral fee) between lawyers who are not in the same firm." Pursuant to that rule, a payment of a portion of Customer Counsel's fee award to Chargois &

---

[20] ABA Model Rule 1.5(e) provides that "[a] division of a fee between lawyers who are not in the same firm may be made only if: (1) the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation; (2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and (3) the total fee is reasonable."

[21] In 1972, in rejecting the proportionality and joint responsibility requirements urged by the ABA Model Code Disciplinary Rule 2-107(A)(2), the Supreme Judicial Court concluded that these requirements "would interfere with the established custom of dividing fees with forwarding counsel." James Bolan et al., *Ethical Lawyering in Massachusetts* § 5.5.2 (4th ed. 2014); *see also* Harold Brown, *ABA Code of Professional Responsibility*, 17 Ann. Surv. Mass. L. 730, 738 (1969-1970) (describing the proportionality and joint responsibility requirements proposed by the ABA as "a radical departure from widespread custom of long duration"). Then again in 1988, "much debate arose" with respect to the proportionality and joint representation requirements of ABA Model Rule 1.5(e). Gilda M. Tuoni, *Massachusetts Attorney Conduct Manual*, at 2-61 n.218 (1992). Given the long history of referral fees in Massachusetts, the Supreme Judicial Court rejected those additional requirements. *See In The Matter of Adoption of Model Rules of Professional Conduct, Petition of the Boston Bar Association*, S-4357 (1988).

[22] Labaton Sucharow suggests that the only reasonable inference to be drawn from Chargois' position is that he wishes both to avoid sanctions under the ethical rules of his own jurisdiction (Texas) which — unlike Massachusetts — requires referral fees to be "in proportion to the professional services performed by each lawyer" or "made between lawyers who assume joint responsibility for the representation" (Texas Disciplinary Rule of Professional Conduct 1.04(f)(1)), and to preserve the purported breach of contract claim with which he previously threatened Labaton Sucharow if the Firm did not pay pursuant to the controversial email agreement.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Herron was permissible, even though that firm did not work on the SST Litigation.

**B.     Customer Counsel Had No Obligation to Disclose the Chargois & Herron Payment to the Court.**

1.     *There was no provision of law, court rule, or order that required Customer Counsel to disclose a fee-sharing agreement to the Court.*

Federal Rule of Civil Procedure 54(d)(2)(B) provides that, unless a statute or court order provides otherwise, a motion for attorney's fees must:  (i) be filed within 14 days after judgment enters, (ii) specify the judgment and the statute, rule, or other grounds entitling the movant to the award, (iii) state the amount of attorney's fees the movant seeks, and (iv) "disclose, *if the court so orders*, the terms of any agreement about fees for the services for which the claim is made" (emphasis added).[23]  Thus, the rule is not merely silent as to whether fee arrangements must be disclosed to the court; it specifically calls them out as something that must be disclosed *only if specifically ordered.*  Fed. R. Civ. P. 54(d)(2)(B)(iv); see also Fed. R. Civ. P. 54, 1993 Notes of Advisory Committee, ¶ 8 (reinforcing that the obligation "to disclose any fee agreement, including those between . . . attorneys sharing a fee to be awarded . . . " only exists "[i]f directed by the Court" to do so).  The leading class action treatise, Newberg on Class Actions ("Newberg"), similarly notes in the specific context of class actions that Rule 54(d)(2)(B)(iv) "makes disclosure of such agreements dependent on a judicial order."  William B. Rubenstein, *Newberg on Class Actions* § 15:12 at 33-36 (5th ed. 2016).  Although Newberg goes on to *recommend* that courts order disclosure of private fee agreements, that recommendation is premised upon the fact that absent such an order, disclosure is not required under the rule.  *Id.*

No local rule exists in this jurisdiction that obligated Customer Counsel to disclose a fee-sharing arrangement with Damon Chargois to the Court.  Nor did Judge Wolf have in place a

---

[23]  Fed. R. Civ. P. 32(h)(1) requires that motions for attorneys' fees in a class action be brought pursuant to Rule 54(d)(2).

standing order, case management order, or any other order that imposed such an obligation. This is not surprising given that, as witnesses who practice regularly in this area testified, most judges do not become involved in the allocation of a fee award among counsel. *See, e.g.*, Zeiss 2d Dep. 62:19-63:12; Keller Dep. Day 2 501:7-22. Given that the Court never ordered or even requested that fee agreements or the allocation among counsel be disclosed, and absent an applicable rule or standing order requiring such disclosure, there is no basis to say that Labaton Sucharow specifically or Customer Counsel generally were required to disclose details regarding the Chargois & Herron payment.[24] *See* Sarrouf Decl. ¶¶ 29-31.

The lack of inquiry by the Court into the fee allocation among lawyers is not surprising given the role of the Court in fee award proceedings in class actions. The question before the Court in this context was whether the total fees sought were reasonable. Fed. R. Civ. P. 23(h); *see Bezdek v. Vibram USA Inc.*, 79 F. Supp. 3d 324, 350 (D. Mass. 2015), *aff'd*, 2015 U.S. App. LEXIS 22925 (1st Cir. Dec. 31, 2015). "'[I]n a common fund case the district court, in the exercise of its informed discretion, may calculate counsel fees either on a percentage of the fund basis or by fashioning a lodestar.'" *Medoff v. CVS Caremark Corp.*, No. 09-cv-554-JNL, 2016 U.S. Dist. LEXIS 19135, at *25 (D.R.I. Feb. 17, 2016) (quoting *In re Thirteen Appeals Arising Out of San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 307 (1st Cir. 1995)). "A

---

[24] Despite what certain witnesses now say, ERISA counsel clearly reached a similar conclusion because none of the ERISA firms disclosed to the Court the details of their fee-sharing arrangements with other ERISA firms. *See* Keller Rohrback L.L.P.'s Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Second Supplemental Interrogatories at 5-6 and 8 (explaining that allocations were not disclosed to the Court); McTigue Law LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Second Supplemental Interrogatories to McTigue Law at 5-6 (agreements with other ERISA counsel not disclosed to the Court); Zuckerman Spaeder LLP's Answers to Special Master's Second Supplemental Interrogatories at 5 (amounts paid to other firms were not disclosed). The opinions they advance now, without authority, are beside the point. *See, e.g.*, Kravitz 2d Dep. 105:9-14 ("And so my sort of gut reaction, without being able to cite you anything technical, is that Judge Wolf should have had that information. But, as I said, that is my personal view of this. I cannot cite you a technical rule. I can't cite you a case. I can only tell you what I think.").

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

percentage of the fund is precisely that:  under that method, counsel receive a percentage of the recovered funds.  Employing the lodestar method, on the other hand, requires the court to 'determin[e] the number of hours productively spent on the litigation and multiply[] those hours by reasonable hourly rates.'"  *Medoff*, 2016 U.S. Dist. LEXIS 19135, at *25-26 (quoting *In re Thirteen Appeals*, 56 F.3d at 305).  In the First Circuit, courts normally employ the percentage of the fund method and then use the lodestar method only as a cross-check on the reasonableness of the fee request.  *Id.* at *26.  When using the percentage of the fund method, courts within the circuit "generally award fees in the range of 20-30%, with 25% as the benchmark."  *Bezdek*, 79 F. Supp. 3d at 349 (quoting *Latorraca v. Centennial Techs., Inc.*, 834 F. Supp. 2d 25, 27-28 (D. Mass. 2011)) (internal quotation marks omitted); *see also In re Lupron Mktg. & Sales Practices Litig.*, No. 01-CV-10861-RGS, 2005 U.S. Dist. LEXIS 17456, at *18 (D. Mass. Aug. 17, 2005) ("Courts in the First Circuit have recognized that fee awards in common fund cases typically range from 20 to 30 percent.").[25]

In assessing the reasonableness of a requested fee award, courts in the First Circuit consider a set of factors:

> (1) the size of the fund and the number of persons benefitted; (2) the skill, experience, and efficiency of the attorneys involved; (3) the complexity and duration of the litigation; (4) the risks of the litigation; (5) the amount of time devoted to the case by counsel; (6) awards in similar cases; and (7) public policy considerations, if any.

*Id.* at *12.  Among these factors, "the most critical factor is the degree of success obtained."  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).  It is undisputed here that the $300 million

---

[25]  Here, the requested fees represented 24.85% of the settlement fund and a 2.0 multiple of the lodestar, a modest multiplier compared to cases of similar size in the First Circuit.  The original calculation of the lodestar multiplier submitted to the Court was 1.8; the 2.0 reflects the multiplier after the double-counting error was removed from the lodestar submissions.  *See* Letter from D. Goldsmith to the Court, November 10, 2016 (ECF No. 116).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

settlement achieved in this case was an enormously favorable outcome for the class and represented a tremendous amount of effort by Plaintiffs' counsel. *See, e.g.*, Order Awarding Fees (ECF No. 111) at 4; Sarko 2d Dep. 44:16-17 ("It was a fabulous settlement. There was a fabulous recovery."). Neither that factor nor any others require the Court to investigate the fee allocation among counsel. Although one factor, the amount of time devoted to the case by counsel, asks how much time or work counsel performed during the case, even that inquiry does not ask what percentage each attorney will receive, whether the money paid to one attorney will then be shared with another, or whether the amount allocated to a lawyer is based upon that lawyer's specific work on the case or other factors. *See id.* Thus, the issue of fee allocation was simply not germane to the Court's analysis.

Based on questions and statements of the Special Master or his counsel, the Special Master appears reluctant to accept the absence of a disclosure requirement. *See, e.g.*, Hopkins 2d Dep. 66:11-21; Sucharow 2d Dep. 31:1-4; Zeiss 2d Dep. 53:8-54:20. The skepticism appears to suggest that FRCP 54(d)(2)(B) is overridden by the general rubric concerning candor to the tribunal, or because a party should err on the side of more disclosure and "transparency." *See, e.g.*, Sucharow 2d Dep. 54:6-12 ("In such a non-adversary process, does class counsel not have a heightened obligation of transparency and disclosure . . . ? Does the Court not have an obligation there to know everything?"). Labaton Sucharow respectfully suggests that the express language of FRCP 54(d)(2)(B)(iv), a rule specifically addressing whether a motion for attorney's fees must disclose "the terms of any agreement about fees for the services for which the claim is made" and concluding that it need not unless "the court so orders," cannot be reconciled with such an interpretation of general principles of candor and transparency. While such principles are generally admirable, they do not permit for sufficiently specific application in this

circumstance to provide attorneys with meaningful guidance.  *See* Sarrouf Decl. ¶ 30.  At the

very least, it would be improper to retroactively penalize Customer Counsel, or Labaton

Sucharow, for a gloss on Rule 54 that, to the best of Labaton Sucharow's knowledge, has not

been enunciated previously.  Indeed, if the principle that full disclosure of fee allocations to the

Court is required, that principle would necessarily be applicable across the board, to ERISA

counsel as well as Customer Counsel.  Labaton Sucharow does not advocate such a position,

because it flies in the face of FRCP 54(d)(2)(B).  The Firm simply notes that one party or group

of parties cannot fairly be sanctioned or criticized for conduct in which another party or group

has engaged without repercussions.

Moreover, if the controlling theory is that candor and transparency require disclosure of

all information whether or not required under the applicable rules, e.g., hourly time entry backup,

expense backup, and other related items that would fill multiple bankers' boxes for most

petitions, the fee petition process would become unworkably slow and burdensome, making it far

more difficult for the Court to sort through and find the key information needed to decide the

actual question before it — whether the percentage of the total fund is reasonable.  *See Bezdek*,

79 F. Supp. 3d at 350 ("Regardless of the calculation method employed, the touchstone of the

inquiry is reasonableness.").  Thus the rule identifies certain information that *must* be provided,

and then broadly permits the Court to require more by order in a specific case, or more generally

by standing order or by local rule.  Fed. R. Civ. P. 54(d)(2)(B) and (D) (allowing "special

procedures to resolve fee-related issues" and simplifying the process of referral of fee petitions to

a special master or magistrate judge).  Customer Counsel should not be criticized or penalized

for disclosing exactly what the drafters of the rule chose to require.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

### 2.    *The Imperfect Disclosure to George Hopkins did not create an obligation to disclose the Chargois & Herron payment to the Court where no obligation otherwise existed.*

Labaton Sucharow acknowledges that George Hopkins should have been given more complete information about the Chargois & Herron payment, and that Belfi, who was in charge of the relationship, should have obtained explicit consent in writing to the division of fees. Mass. R. Prof. C. 1.5(e); *see* Section C, *infra* (discussing a number of mitigating factors present here). Research has identified no authority, however, suggesting that the remedy, or penalty, for an imperfect or inadequate disclosure to a client of a fee sharing agreement is that the lawyer must disclose the agreement to the Court. Such a requirement would put the Court in the inappropriate position of having to assess whether a partial, or even total, ethical lapse in dealing with a client modifies the Court's responsibility under the particular circumstances (here, the determination of what constitutes a reasonable attorneys' fee on a percentage of the fund basis).

It is well established in Massachusetts that an ethical violation does not give rise to independent cause of action. *See Fishman v. Brooks*, 396 Mass. 643, 649 (1986) (noting that a violation of a disciplinary rule does not itself constitute "an actionable breach of a duty to a client"); Mass. R. Prof. C. Scope, Cmt. [6] (same). Following the same rationale, the Special Master should not, in essence, create a new rule saying that a possible ethical violation regarding client disclosure gives rise to an independent duty to disclose to the Court. Such a rule would, in effect, turn one violation into two, [26] while undermining the processes designed to investigate and adjudicate such potential violations. *See* Section C, *infra*. Because there is no authority

---

[26] Similar attempts to turn one violation into two, based on failure to disclose the first, have been rejected in other contexts. *See, e.g.*, *Werner v. Werner*, 267 F.3d 288, 299 (3d Cir. 2001) ("a plaintiff may not 'bootstrap' a claim of breach of fiduciary duty into a federal securities law by alleging that directors failed to disclose the breach of fiduciary duty") (quoting *Kas v. Financial General Bankshares, Inc.*, 796 F.2d 508, 516 (D.C. Cir. 1986)).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

supporting the existence of this type of derivative disclosure obligation, there is no basis to find that imperfect disclosure to Hopkins rendered Labaton Sucharow's disclosure to the Court inadequate.

**C.     The Firm's Incomplete Disclosure of the Chargois & Herron Agreement to ARTRS Does Not Justify Imposition of a Sanction.**

The Special Master should not recommend a sanction based on the imperfect disclosure to ARTRS.  Respectfully, it is not the role of a court overseeing litigation (or by extension, a special master appointed by the court) to impose a sanction for inadequate or imperfect disclosure of a fee agreement to a party.  Although a court may sanction ethical violations that are, in effect, a wrong committed upon the court, a court should not investigate every possible failure to comply with a Rule of Professional Conduct.  When an alleged failure does not directly impact the proceedings, there are processes in place that are designed to investigate and resolve the issue:

- Massachusetts law places the inquiry within the jurisdiction of the Board of Bar Overseers.  *See* Mass. S.J.C. Rule 4:01(1) ("[a]ny lawyer or foreign legal consultant admitted to, or engaging in, the practice of law in this commonwealth shall be subject to this court's exclusive disciplinary jurisdiction and the provisions of this rule as amended from time to time"); *Wong v. Luu*, 472 Mass. 208, 219 (2015) (finding that a judge's inherent power to enter a sanction for violation of the Rules of Professional Conduct is limited to instances where such action "is necessary to punish, deter, or remedy misconduct that threatens a judge's ability to ensure the fair administration of justice" and that in other instances, the proper procedure is a referral to the Board of Bar Overseers) (internal citations omitted).

- For attorneys practicing in this federal district, there is a relatively new and

complicated procedure that allows "Disciplinary Proceedings" based on alleged violations of the Massachusetts Rules of Professional Responsibility that come to the attention of the presiding judge.  *See* Local Rule 83.6.5.[27]  The presiding judge conducts the initial investigation and has a variety of referral options, including to the appropriate state authorities.

Here, although the disclosure to Hopkins was imperfect, in no way did it constitute litigation misconduct or an issue that was directed toward the Court or an issue that impacted the litigation.  For example, there is no evidence to suggest that the disclosure to Hopkins impacted the question before the Court, *i.e.*, whether the amount of the fees requested was reasonable. Accordingly, this is a matter that properly rests in the hands of the client, and/or appropriate disciplinary authority.

Even if this were the appropriate forum in which to investigate the disclosure to Hopkins, mitigating factors militate against the imposition of sanctions.  This is not a situation where either the existence of Chargois & Herron or the possible payment of referral or liaison fees was hidden from ARTRS.  To the contrary, ARTRS knew of the relationship between Chargois & Herron, stated that Labaton Sucharow was free to associate with Chargois & Herron if the firm wished to do so (LBS017456), and agreed through its engagement letter that Labaton was free to pay referral fees to others from the Firm's own fees (LBS019948-50; LBS011061).  Although the disclosure did not include the specific percentage or amount of the sharing arrangement, such disclosure is not required in Massachusetts.  *See* Mass. R. Prof. C. 1.5(e), cmt. [7A] ("The

---

[27]  The new rules, adopted in 2015, appear to contemplate a division similar to the one that exists in Massachusetts state court:  the court handling a litigation matter remains authorized to impose a sanction "for contempt of court or for litigation misconduct" (Local Rule 83.6.4(b)), but for other possible violations of the Massachusetts Rules of Professional Conduct, the court would invoke the process that puts the matter in a separate proceeding before the presiding judge.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Massachusetts rule does not require disclosure of the fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer."). Nonetheless, the disclosure was imperfect: It did not specifically disclose the nature of the arrangement, which evolved with the change of Executive Directors, nor was the client's written assent obtained.[28]

Second, both Hopkins and Belfi testified that, when asked, Hopkins told Belfi that he wanted to deal with Labaton Sucharow and would leave it to the Firm to decide with which other lawyers it would affiliate. Belfi 2d Dep. 27:21-28:7, 56:22-57:10; Hopkins Dep. 60:8-62:16 . Relatedly, Hopkins (and thus ARTRS) have now effectively ratified the fee sharing relationship. *See* Hopkins 2d Dep. 73:1-75:10; *Saggese v. Kelley*, 837 N.E.2d 699, 705 (Mass. 2005) (declining to sanction attorney under precursor to Mass. R. Prof. C. 1.5(e) for failure to disclose fee sharing arrangement, finding, among other things, that the client's actions constituted adequate ratification of fee-sharing agreement). The fact that the Executive Director of the client that was "wronged" (to the extent anyone was wronged), did not want more information at the time, and does not feel misled, is a significant mitigating factor.

Third, any question about whether a sanction would be appropriate requires consideration of the reason behind and objectives of the disclosure rules. The applicable disclosure rules in

---

[28] Although Belfi did "blind courtesy copy" or forward ARTRS information to Chargois & Herron separately from his communication with Hopkins, this was after the firms made their joint submission. As Belfi explained, this practice began when Hopkins had very recently come on as Executive Director: "It was a brand new person. I did not want to bring another person in that wasn't from our firm at this point. So I thought it was best to just keep him apprised but not put him on the correspondence." Belfi 2d Dep. 110:12-18; *see also id.* at 111:9-22 ("I didn't know if Tim knew who George was or if George knew who Tim was . . . I really just wanted to keep it very uncomplicated"). (As explained, *infra*, Hopkins subsequently told Belfi that he did not want to know specific information about other attorneys with which the Firm was affiliating.) Belfi was not improperly revealing privileged information in these communications, because he "believe[d] them to be co-counsel with us" and indeed, for a period of time, Chargois & Herron was counsel to ARTRS in litigation involving HCC Insurance Holdings. *See, e.g.,* Zeiss 2d Dep. 16:18-17:1.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Massachusetts do not prohibit fee sharing.  Rather, recognizing that referral fees and other fee sharing relationships can be good for the client because they encourage cases to be handled by the best lawyers for that case, the rules merely seek to impose controls.  *See, e.g.*, Leo Boyle, *The Referral Fee Rule: If It's Not Broken, Don't Fix It*, 34 Boston Bar Journal 26, 26 (May/June 1990) (citing a 1987 FTC comment that "forcefully stated to the S.J.C. that changing the rule would be a detriment to consumers, reducing consumer access to highly competent and specialized legal counsel."); Geoffrey C. Hazard et al., *The Law of Lawyering* § 9.20, at 73-74 (4th ed. 2017) (noting that the practice of fee splitting "can also serve both the public interest and the interests of clients in many situations.").  Here, the record confirms time and again that the SST Litigation was litigated zealously and vigorously, and that the result was good for the client and for the class.  *See, e.g.*, Sarko 2d Dep. 44:16-17; McTigue 2d Dep. 42:25-43:25; Kravitz 2d. Dep. 118:14-21.  Even if a technical violation of the disclosure requirement occurred, this is not an appropriate case to take the extreme step of imposing a sanction.

Finally, it is important to note that the failure to obtain more fulsome consent was a technical lapse by a single person at the Firm.  There is no evidence to suggest that anyone at Labaton Sucharow, apart from Eric Belfi, was aware that Hopkins had not been fully advised of the relationship and provided consent.  *See, e.g.*, Zeiss 2d Dep. 74:15-18; Goldsmith 2d Dep. 162:9-15; Sucharow 2d Dep. 51:14-21; Keller Dep. Day 1 94:23-95:10.  Such an omission by one partner should not be the basis for imposition of a sanction.  Indeed, it is noteworthy in this regard that, although the controlling Massachusetts Rules of Professional Conduct create obligations with respect to attorneys, they do not impose obligations upon law firms, as entities. To the contrary, in 2015 the Supreme Judicial Court declined to adopt a provision recommended by the Rules Advisory Committee that would have imposed responsibility on law firms.  *See*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Rules Advisory Committee Proposed Revisions to Massachusetts Rules of Professional Conduct Rules 1.0-6.2, 7.1-7.5, 8.1-8.4, as revised as of May 14, 2014, at proposed Rule 5.1(d); March 2015 Supreme Judicial Court Order adopting changes to the Rules of the Supreme Judicial Court (adopting rule without proposed Rule 5.1(d)).

In light of the partial disclosure to ARTRS that occurred and in consideration of the foregoing mitigating factors, the Special Master should not recommend a sanction based on the incomplete disclosure to ARTRS regarding the payment to Chargois & Herron in this matter.

**D.      Customer Counsel Had No Obligation to Disclose the Chargois & Herron Payment to ERISA Counsel.**

As explained above, no information was improperly withheld from ERISA counsel.[29]  To the contrary, Labaton Sucharow genuinely believed and continues to believe that ERISA counsel had no reason to know what Customer Counsel planned to do with their portion of the fee award, because it did not impact what ERISA counsel received or what they were entitled to receive. *See* Sucharow 2d Dep. 26:9-24; *see also id.* at 23:8-15; Goldsmith 2d Dep. 167:12-168:21; Zeiss 2d Dep. 80:22-81:5.  ERISA counsel struck their agreement to receive 9% of the fee early in the litigation, based on estimates of losses, and they received that to which they had agreed, with a sweetener to 10% at the end.  Sucharow 2d Dep. 29:2-6; 48:19-24; Sarko 2d Dep. 48:19-24; McTigue 2d Dep. 15:15-22.  The payment to Chargois & Herron came from the Customer Counsel's share of the award and, thus, did not impact ERISA counsel's share.

There is no law, rule or regulation that required Customer Counsel to disclose this obligation to ERISA counsel.  *See* Sarrouf Decl. ¶¶ 23-25.  To the contrary, referral fees or other fee-sharing arrangements are common and they are *not* generally disclosed among Plaintiffs'

---

[29]  Indeed, Mr. Lieff testified that he may have informed Mr. Sarko of the existence of the fee-sharing arrangement, although he acknowledged that Mr. Sarko's present recollection is that he did not.  Lieff Dep. 90:5-18, 104:1-11.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

counsel. *See* Keller Dep. Day 1 117:8-14 (explaining that referring relationships are confidential and can be sensitive because, if known, a competitor "would be calling them up and taking them out to lunch next week"); Sarrouf Decl. ¶ 24; Zeiss 2d Dep. 76:12-14; Sucharow 2d Dep. 59:13-22; Goldsmith Dep. 19-23, 130:3-8. Indeed, ERISA counsel never shared the details of their own fee splitting arrangements with Customer Counsel. *See* Keller Rohrback L.L.P.'s Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Second Supplemental Interrogatories at 7-8; McTigue Law LLP's Responses to Special Master Honorable Gerald E. Rosen's (Ret.) Second Supplemental Interrogatories to McTigue Law at 5-6; Zuckerman Spaeder LLP's Answers to Special Master's Second Supplemental Interrogatories at 5.[30]

Any claim now by ERISA counsel that, had they known that Customer Counsel were paying a portion of the fee to Chargois & Herron they would not have agreed to the deal they struck (*see, e.g.*, Sarko 2d Dep. 75:2-7.), rings hollow. They urge, with the benefit of hindsight and their unique position in this investigation, that they would have used this fee-sharing obligation as a negotiating tactic to extract more than that to which they had agreed. Such a purely strategic consideration does not create a legal obligation on Customer Counsel's part to disclose. To the contrary, ERISA counsel's self-serving testimony appears to be little more than an attempt to use these proceedings to increase their fee award after-the-fact. *See, e.g.*, Kravitz 2d Dep. 115:13-116:4; McTigue 2d Dep. 24:11-25:2.

As part of an apparent attempt to suggest that the deal they struck was unfair, certain ERISA counsel have suggested that, because $60 million of the $300 million settlement was

---

[30] Similarly, Labaton Sucharow learned only in the context of this investigation that Lieff and Thornton negotiated regarding their portion of the fee award in this case at least in part by discussing fees in a different lawsuit involving BNY Mellon. *See, e.g.,* TLF-SST-040617-18; TLF-SST-038574-79. Lieff and Thornton had these discussions while they were strategizing how they would jointly negotiate with Labaton Sucharow regarding the fee allocation in this case. *Id.* Those firms never revealed any of the details of these negotiations to Labaton Sucharow, nor would the Firm expect that they would.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

earmarked for ERISA claims, the actual amount of losses suffered by ERISA claimants was 20%

of the total. *See, e.g.*, Sarko Dep. 48:19-11. That suggestion is belied by the facts for at least

two distinct reasons. First, the 91%-9% split was negotiated; the parties knew at the time that it

was not an exact split. Indeed, there could never be an exact split, because a number of class

members — referred to in the Settlement Agreement as "Group Trusts" (ECF No. 89 at 11) —

are custodial clients of State Street that have some ERISA-governed assets and some that are not.

Second, under any calculation, it is clear that the losses of ERISA class members were well

below 20% when compared to losses suffered by others in the settlement class. Zeiss 2d Dep.

163:16-164:2. The Department of Labor used its leverage — and the implicit ability to hold up

the settlement — to extract a premium for the ERISA class members. *See, e.g.*, McTigue 2d

Dep. 38:12-20 ("I know we got a premium"); Lieff Dep. 47:23-48:18 (discussing TLF-SST-

051653).

Finally, the $10.9 million cap on fees that was demanded by the Department of Labor and

is referenced in the Stipulation and Agreement of Settlement (ECF No. 089) does not impact this

analysis. A "cap" sets a ceiling, not a floor. Here, it meant that no more than $10.9 million

could be taken from the $60 million of the settlement that was earmarked for ERISA claims.

The provision does not say, and there is no evidence to suggest, that the full amount of that "cap"

was required to be paid to ERISA counsel. Goldsmith 2d Dep. 254:13-255:2. Such a contention

would be directly contrary to the agreement that counsel reached years earlier. *See* TLF-SST-

015649-54 at ¶2 (providing that the 9%-91% division of fees between ERISA and Customer

Counsel "shall apply whether the attorneys' fees agreed, awarded and/or approved by the Court

is a single sum for all claims and cases or otherwise"). Relatedly, any suggestion that the

Chargois & Herron payment needed to be disclosed to the DOL is mistaken. The only

information in the record regarding the DOL and fee allocation is that the DOL asked Sarko what

the breakdown was, and he chose not to give them that information, apparently believing it to be

something they are not entitled to know.  TLF-SST-052975-80.  Certainly Customer Counsel

cannot be faulted for not providing a further breakdown that would show the downstream

payment to Chargois & Herron (which payment did not impact the ERISA class), when Mr.

Sarko chose not to disclose the higher-level allocation among the attorneys actively handling the

litigation.

What Customer Counsel chose to do with their portion of the fee award simply did not

impact ERISA counsel or the amount of the fee award that ERISA counsel received.  They had

no reason to know that a portion would be paid to Chargois & Herron, and the failure to make

such disclosure is not a basis for the ERISA counsel to complain, much less a reason to impose a

sanction or order disgorgement of any portion of the fee.

E.      **Customer Counsel Had No Obligation to Disclose the Chargois & Herron Payment to the ERISA Plaintiffs.**

During depositions, certain of the ERISA counsel introduced the idea that perhaps there

was an obligation to disclose the Chargois & Herron relationship to the ERISA plaintiffs.  *See,*

*e.g.*, Sarko Dep. 91:4-12.  Any such claim by ERISA counsel also rings hollow.  Not one of the

Three Main ERISA Firms who received a distribution of fees from the Lead Counsel Escrow

Fund disclosed complete information to the ERISA plaintiffs regarding their own fee sharing

arrangements.  *See* Keller Rohrback L.L.P.'s Responses to Special Master Honorable Gerald E.

Rosen's (Ret.) Second Supplemental Interrogatories at 7 (explaining that the named plaintiffs

approved ERISA counsel receiving 9% of the aggregate award and approved the 25% award

being sought, but that "[t]he specific dollar allocations of fees to individual class law firms from

the gross fee award was not detailed in any written disclosure to the ERISA named plaintiffs,

other ERISA class member, or the ERISA counsel"); McTigue Law LLP's Responses to Special

Master Honorable Gerald E. Rosen's (Ret.) Second Supplemental Interrogatories to McTigue

Law at 4-5 (contending that the filing and posting of lodestars operated as disclosure to the

ERISA class, but conceding that neither the agreements with Customer Counsel nor agreements

among ERISA attorneys about the sharing of fees were disclosed to ERISA class members);

Zuckerman Spaeder LLP's Answers to Special Master's Second Supplemental Interrogatories at

4 (claiming that ERISA class members had "constructive notice" that other firms might receive

some amount of the fees, but conceding that actual payments by Zuckerman Spaeder to three

different law firms were never disclosed to the ERISA class).  Given the varying, incomplete

disclosure the ERISA counsel made regarding their own fee-sharing arrangements, they should

not be heard to claim, without authority, that Customer Counsel had an obligation to disclose the

payment to Chargois & Herron.

Moreover, there is a reason that fee sharing arrangements are required to be disclosed to a

client, typically in the engagement letter at the commencement of litigation:  It is to allow the

client to choose other counsel if the client does not like the idea of its retained lawyers sharing

fees with others, a practice that (as explained above) is perfectly permissible in Massachusetts.

*See* ABA/BNA Lawyers' Manual on Professional Conduct, at 41:709 (2014) (explaining that the

policy behind the client consent prong of Model rule 1.5(e)(2) "is that clients should be able to

choose which attorney finally represents them and the type of legal fees to be charged.") (quoting

*Norton Frickey, P.C. v. James B. Turner, P.C.*, 94 P.3d 1266, 1268 (Colo. App. 2004)).  Labaton

Sucharow had no engagement letter with the ERISA plaintiffs, who were represented by their

own counsel throughout the litigation.  *See, e.g.,* McTigue Dep. 42:20-24.  Indeed, in the

circumstances of this case, Labaton Sucharow, as lead counsel, was one large step removed from

the typical pre-certification situation because the ERISA plaintiffs were in a separate lawsuit

from the customer plaintiffs, with the lawsuits consolidated for expediency during the pre-trial

process.  ECF No. 63.  There was no attorney-client relationship between Labaton Sucharow and

the ERISA plaintiffs, except arguably by operation of law when the class was certified at the

conclusion of the settlement process.  Goldsmith 2d Dep. 65:4-66:5.  "While lead counsel owes a

generalized duty to unnamed class members [prior to certification], the existence of such a

fiduciary duty does not create an inviolate attorney-client relationship with each and every

member of the putative class."  *In re McKesson HBOC, Inc. Securities Litigation*, 126 F. Supp.

2d 1239, 1245 (N.D. Cal. 2000).  *See Fulco v. Cont'l Cablevision, Inc.*, 789 F. Supp. 45, 47 (D.

Mass. 1992) ("[O]nce the court enters an order certifying a class, an attorney-client relationship

arises between all members of the class and class counsel.") (quoting *Bower v. Bunker Hill

Company*, 689 F. Supp. 1032, 1033 (E.D. Wash. 1985)); Joseph M. McLaughlin, 2 *McLaughlin

on Class Actions* §1:11 (13th ed. 2016) ("The majority rule is that . . . absent class members are

not represented parties prior to class certification and the expiration of any opt-out period.").

Labaton Sucharow has identified no authority suggesting that where, as here, a class is certified

for settlement purposes, a law firm like Labaton Suchrow suddenly becomes obligated to

disclose a fee sharing arrangement pursuant to Mass. R. Prof. C. 1.5(e).[31]  *See* Sarrouf Decl. ¶¶

26-28.

      Nor is there some inherent reason that this particular payment needed to be disclosed to

---

[31]  It would be virtually impossible to comply with such a requirement.  In this case, certification and
conclusion of the opt-out period occurred when the case was essentially over.  It would be illogical to
force a firm like Labaton Sucharow at that point in time to disclose a fee agreement (as well as,
presumably, conflicts that the client may have waived, or the host of other items required to be disclosed
to a client), much less obtain written consent from each class member.  Research has identified no
authority suggesting that these kinds of disclosure obligations arise in connection with this type of
settlement class certification.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

ERISA class members.  The payment to Chargois & Herron did not come from the $225 million of the settlement funds set aside to pay class members, or the $60 million earmarked for ERISA claims.  Likewise, the amount paid to Chargois & Herron did not come from ERISA counsel's agreed-upon 9% share of the fees.  It was a payment made by the three Customer Counsel firms from their shares of the fee award.  The payment did not impact the ERISA class or ERISA counsel in any way.  Therefore, no disclosure was required.

### F.   Labaton Sucharow Had No Obligation to Disclose Further Details Regarding Chargois & Herron To Customer Counsel.

Thornton and Lieff already possessed information as to all relevant points other than Labaton's imperfect disclosure of terms to ARTRS.  More specifically, Lieff and Thornton knew about the relationship, knew the terms of the payment that was required under the agreement, and knew that it was on-going (i.e., not limited to the SST Litigation).  Indeed, it was Garrett Bradley of Thornton who negotiated the application of the on-going fee sharing agreement to this case.  Nonetheless, Labaton Sucharow recognizes with the benefit of hindsight that it would have been prudent for the Firm to share the information known by Belfi (although not others) concerning the imperfect disclosure to ARTRS as well as information regarding Chargois' actual role in the SST litigation, and the lack of written consent from ARTRS, with Thornton and Lieff because those firms were sharing the payment burden.

Representatives from the other firms have testified that they did not know that Chargois & Herron was performing no services on the SST Litigation — although they certainly knew that firm had not filed an appearance in the litigation and did not appear on any lodestar report.  But, as explained above, the Massachusetts Rules of Professional Conduct did not require Chargois & Herron to perform services in order to share in the fees.  Otherwise stated, fees such as referral and forwarding fees are perfectly permissible in Massachusetts.

Lieff and Thornton apparently did not know that the disclosure to ARTRS lacked precise details of the respective roles and payment amount, as well as the consent of George Hopkins, which placed the members of those two firms in the same boat as the members of Labaton Sucharow, other than Eric Belfi.  The lack of fulsome disclosure and of written consent constituted violations, even if inadvertent, of a Massachusetts Rule of Professional Conduct.  But, as discussed above, that violation is visited upon the individual attorney, not any of the three law firms.  Hence, no sanction or disgorgement can be imposed upon any of the firms for Belfi's mistake; and Lieff and Thornton, like Labaton Sucharow, should therefore suffer no consequences.

> **G.    There Was Nothing Improper About Paying Chargois & Herron from Labaton Sucharow's IOLA Account.**

Finally, during depositions there were a number of questions asked about why the payment to Chargois & Herron was transmitted from Labaton Sucharow's Interest on Lawyer Account ("IOLA"), the New York version of what Massachusetts calls an Interest on Lawyers' Trust Account ("IOLTA").  The relevant New York authority provides the following:

- A lawyer "in possession of any funds or other property belonging to another person . . . must not . . . commingle such funds or property with his or her own." N. Y. R. Prof. C. 1.15(a).

- However, "[f]unds belonging in part to a client or third person and in part currently or potentially to the lawyer or law firm shall be kept in such special account or accounts, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client or third person, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved."  *Id*., part (b).

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- When third-party funds received by an attorney, "in the judgment of the attorney, are too small in amount or are reasonably expected to be held for too short a time to generate sufficient interest income to justify the expense of administering a segregated account for the benefit of the client or beneficial owner," such funds "shall be deposited in an IOLA account."  N. Y. Judiciary Law §§ 497 (2) and (4)(a).

Here, consistent with these requirements, Labaton Sucharow arranged for one lump-sum transfer from the attorneys' fee escrow account to its IOLA that included (1) the portion of the fee award payable to Labaton Sucharow; (2) the portion of the fee award payable to Labaton Sucharow, Lieff Cabraser and Thornton that was going to be transmitted to Chargois & Herron; and (3) the service awards that belonged to named plaintiffs.  Zeiss 2d Dep. 137:13-138:8; *id.* at 140:21-141:5; LBS041839-43; LBS041970-71.  Thereafter, from its IOLA account, the Firm sent out the service awards, the Chargois & Herron payment, and transferred the portion of the fee award that the Firm would retain to a different Firm account.  Zeiss 2d Dep. 137:13-138:8.  Structuring the transfers in this manner was compliant with the applicable provisions of New York law cited above.

## V.     BEST PRACTICES

Labaton Sucharow previously identified a number of recommended "best practices" aimed at preventing errors like those that prompted the referral to the Special Master.  *See* Consolidated Response by Labaton Sucharow LLP, Lieff Cabraser Heimann & Bernstein LLP, and Thornton Law Firm LLP to Special Master's July 5, 2017 Request for Supplemental Submission at 20-24.  The Special Master has now asked that the Firm propose best practices in connection with Chargois & Herron fee sharing arrangement in this case.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

As explained above, the fee sharing relationship was proper, *except* for the failure to disclose the specific relationship and fee division and to obtain the client's written consent. Identifying specific best practices is a challenge because every attorney should always be conducting him or herself in compliance with the applicable Rules of Professional Conduct, without verification by others. Nevertheless, Labaton Sucharow suggests the following best practices, which it has already begun to implement, for avoiding situations of this nature:

- Training should be undertaken for all partners, even at senior levels, regarding client disclosure and consent requirements. The Firm retained Hal R. Lieberman, a partner at Emery Celli Brinckerhoff and Abady LLP in New York and one of the top legal ethics lawyers in New York, to provide such training and to review the Firm's compliance with all ethical guidelines in its current cases. (Mr. Lieberman's biography is attached as Exhibit A.) Mr. Lieberman conducted ethics training at the Firm on October 10, 2017 to all partners and attorneys involved in business or client development. In addition, the Firm has revised all of its current cases[32] in which it has co-counsel and/or referral arrangements and, with the assistance of Mr. Lieberman, has brought all such arrangements into compliance with applicable ethics requirements.

- Approval should be required by an internal or external ethics counsel of each engagement letter, and no litigation could be undertaken without a signed approved letter. The ethics counsel would ensure, among such other items as s/he deemed appropriate, that the Firm had determined which state(s)' rules of professional conduct applied, and that the letter was tailored to those rules.

---

[32] The one exception is the Chargois & Herron relationship, which the Firm intends to address separately.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

- An in-depth review should be undertaken of all existing on-going and one-off fee splitting agreements with other firms/attorneys to ensure that such agreements are in full compliance with the rules of professional conduct in the applicable state(s). Where non-compliance is identified, the agreements should be modified promptly to bring them into compliance.  If the other firm/attorney refuses to agree to the required modification, the agreement should be promptly terminated as contrary to public policy.

- In firms that employ a "silo" model to allow specialists to effectuate each very specific phase of a litigation, from client intake to settlement documentation, a single individual should be assigned on each litigation team as the case "czar," and that attorney would be personally responsible for ensuring continuity and providing oversight at every phase of the process.  Such individual case "czars" should receive training in the legal and ethical requirements attendant upon each phase and should report annually and at the conclusion of the litigation to the Firm Committee regarding the performance of the team in each phase.

Finally, to the extent that courts wish to be informed, in the context of fee petitions, about any referral relationship or fee sharing agreement that may result in another attorney receiving a portion of a fee, Labaton Sucharow respectfully suggests that those courts should issue a standing order that sets forth precisely what they require.  Clear guidance about what the court does and does not want to receive in connection with a fee petition should help minimize confusion or questions regarding these issues going forward.

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

**VI.**     **CONCLUSION**

For all of the foregoing reasons, Labaton Sucharow respectfully suggests that the Special

Master conclude that the payment to Chargois & Herron was not improper and, although the

disclosure to ARTRS was imperfect, there was no misconduct, no impact on the class or other

counsel, and thus no basis for a sanction or disgorgement regarding the shared fee.

Dated: November 3, 2017                    Respectfully submitted,


                                           By: */s/ Joan A. Lukey*
                                               Joan A. Lukey
                                               Justin J. Wolosz
                                               Choate, Hall & Stewart LLP
                                               Two International Place
                                               Boston, MA 02110

                                               *Counsel for Labaton Sucharow LLP*

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

# EXHIBIT A

# EMERY CELLI BRINCKERHOFF & ABADY LLP

OUR PEOPLE  /  OUR APPROACH  /  OUR WORK



## Hal R. Lieberman

**hlieberman@ecbalaw.com**
**vCard**

Hal Lieberman is the co-author of "New York Attorney Discipline," and the former Principal Trial Attorney and Chief Counsel for the Departmental Disciplinary Committee in New York's First Department. During the past 17 years, he has defended hundreds of lawyers and law firms before disciplinary and grievance committees in connection with lawyer discipline complaints, formal disciplinary prosecutions, reciprocal discipline proceedings, post-conviction disciplinary proceedings, reinstatements, and matters related to bar admissions before the several New York character and fitness committees. Mr. Lieberman is a regular columnist for the *New York Law Journal* on the subject of Professional Discipline. He also publishes a blog, **NYLegalethics.attorney**.

In addition to attorney discipline defense, Mr. Lieberman has been a lecturer in law at Columbia Law School teaching legal ethics, has lectured widely, and published numerous articles on the subjects of legal ethics and professional discipline. He has testified as an expert in legal ethics in approximately 45 civil and criminal adjudications since 1998, including, among others, disqualification motions, legal malpractice cases, partnership disputes, fee disputes, and numerous issues involving interpretation and application of the Rules of Professional Conduct.

Mr. Lieberman joined Emery Celli Brinckerhoff & Abady LLP in 2014. He is the past partner-in-charge of the New York office of Hinshaw & Culbertson LLP, and was the subject of an exclusive interview in the March 23, 2011 issue of the *New York Law Journal*. The article, "Q&A with Hal R. Lieberman," focused on Mr. Lieberman's long and unique experience handling New York attorney disciplinary cases and legal ethics matters more generally, and his views on the state of New York's lawyer discipline system from the perspective of a former Chief Counsel to the Departmental Disciplinary Committee.

## PUBLICATIONS:

**"New York Attorney Discipline Practice and Procedure," book co-author, *New York Law Journal*, 2014 (updated for 2016).**

"Fostering Efficiency in the Attorney Disciplinary Process," *New York Law Journal*, January 21, 2016.

"New 2016 Edition, New York Attorney Discipline Practice and Procedure," *New York Law Journal*, November 13, 2015.

"New York's Catch-All Rule: Is It Needed? Part 2," *New York Legal Ethics Reporter*, November 2, 2015.

"Report on Statewide Attorney Discipline: Uniformity and Fairness," *New York Law Journal*, October 23, 2015.

"New York's Catch-All Rule: Is It Needed? Part 1," *New York Legal Ethics Reporter*, October 1, 2015.

"Is New York's Disciplinary System Truly Broken?" *New York Law Journal*, July 16, 2014.

**Attorney News**

Ten ECBA Attorneys Named as Super Lawyers; One Named as Rising Star

Ten ECBA Attorneys Named as Super Lawyers; Two Named as Rising Stars

Hal Lieberman explains the New Attorney Discipline Rules

NYLJ Publishes Essay by ECBA Lawyers

Hal Lieberman on How to Improve Efficiency in the Attorney Disciplinary Process

**Education**
Harvard Law School, J.D., 1967
University of Chicago, A.B., *cum laude*, 1964

**Admissions**
U.S. Supreme Court
U.S. Court of Appeals for the First and Second Circuits
U.S. District Court for the Districts of Massachusetts, Eastern District of New York, Northern District of New York, Southern District of New York
New York
Massachusetts
State of Israel

"Should Disqualification Lead to Discipline?" *New York Law Journal*, April 4, 2014.

"How Do I Get Back My Law License?" *New York Law Journal*, November 29, 2013.

"Lawyers Who Commit Crimes: Disciplinary Consequences," *New York Law Journal*, August 22, 2013.

"Appellate Review of Disciplinary Decisions," *New York Law Journal*, May 29, 2013.

"Discipline for 'Private Conduct': Rationale and Recent Trends," *New York Law Journal*, Feb. 19, 2013.

"New York's Attorney Discipline System: Does It Meet 'Due Process' Requirements?" *New York Law Journal*, December 28, 2012.

"Attorney Discipline System: Does It Meet 'Due Process' Requirements?" *New York Law Journal*, August 31, 2012.

"The 'Galasso' Case and the Duty of Supervision," co-authored with Katie M. Lachter, New York Law Journal, May 30, 2012.

"New York's Attorney Discipline System: How Much 'Process' is 'Due'," *New York Law Journal*, April 4, 2012.

"New York's Lawyer Disciplinary System – Is it Fair?" Professional Responsibility column, *New York Law Journal*, March 1, 2010.

"Working Knowledge of Conflict of Interest Rules is Essential," *New York Law Journal*, September 2004.

"How to Avoid Common Ethics Problems," *New York Law Journal*, special supplement, October 28, 2002.

"Private Conduct and Professional Discipline," co-authored with Richard Supple, *New York Law Journal*, July 23, 2002.

"Six Clients in Search of a Lawyer: Or, Don't Take the Case," *The New York Professional Responsibility Report*, May 2002.

"Disqualification Denied Again: The Amazonas Case," *The New York Professional Responsibility Report*, July 2001.

"Prospective Client Perjury: A Lawyer's Dilemma," *The New York Professional Responsibility Report*, December 2000.

"Do Disbarred Lawyers Have Constitutional Rights?" *The New York Professional Responsibility Report*, October 2000.

"Be Aware of Ethical Witness Preparation Rules," *New York Law Journal*, May 25, 2000.

"Gidatex v. Campaniello, The Anti-Contact Rule and Subordinate Employees," *The New York Professional Responsibility Report*, January 2000.

"Lawyer Incivility Provokes Three-Month Suspension," *The New York Professional Responsibility Report*, July 1999.

"The Future of Attorney Discipline in New York's First Judicial Department," *The New York Professional Responsibility Report*, February 1999.

COMMERCIAL LITIGATION | CIVIL RIGHTS LITIGATION | ATTORNEY ETHICS | CRIMINAL DEFENSE

600 Fifth Avenue at Rockefeller Center, 10th Floor New York, New York 10020 Tel (212) 763-5000 **Legal Notices**

Attorney Advertising