# EX. 240

**Report of Bruce A. Green**
**Re: Labaton Sucharow**
**March 25, 2018**

## BACKGROUND

I am a full-time Professor at Fordham Law School, where I hold the Louis Stein Chair and direct the Louis Stein Center for Law and Ethics. I have been retained as an expert on behalf of Labaton Sucharow ("Labaton") to provide objective opinions regarding certain questions of professional conduct under review by Special Master Rosen.

## QUALIFICATIONS

I am an attorney admitted to practice in the State of New York. As reflected in my curriculum vitae, which is attached to this report as Exhibit A, I have been a member of the full-time faculty of Fordham Law School since 1987, having previously served as a law clerk to Judge James L. Oakes of the U.S. Court of Appeals for the Second Circuit, as a law clerk to Justice Thurgood Marshall of the U.S. Supreme Court, and as an Assistant United States Attorney for the Southern District of New York.

I have regularly taught courses in the area of lawyers' professional conduct at Fordham Law School and elsewhere since 1987, I speak frequently at CLE programs on the subject of lawyers' professional conduct, and I have authored a variety of scholarly articles and other writings on this subject. I have also co-authored a casebook on this subject which is now in its third edition (*Professional Responsibility, A Contemporary Approach* (West 3d ed. 2017)).

I have engaged in various other professional activities relating to lawyers' professional conduct. On the state and local level, I currently chair the New York City Bar's Committee on Professional Ethics, and I serve as a member and past chair of the New York State Bar

1

Association's Committee on Professional Ethics – both of which issue opinions interpreting the New York Rules of Professional Conduct. I previously served as a member of the Departmental Disciplinary Committee of the New York State Supreme Court, Appellate Division, First Department.

Nationally, I serve on the Multistate Professional Responsibility Examination drafting committee and previously served for three years on the American Bar Association ("ABA") Standing Committee on Ethics and Professional Responsibility. I also previously chaired the ethics committees of both the ABA Litigation Section and the ABA Criminal Justice Section, served on the ABA Litigation Section's Task Force on Settlement Ethics, served as reporter to the ABA Commission on Multijurisdictional Practice and to the ABA Task Force on Attorney-Client Privilege, and chaired the Section on Professional Responsibility of the Association of American Law Schools.

I occasionally provide expert opinions on questions of lawyers' professional conduct, including in the context of litigation in which the applicable standards of professional conduct are disputed. I provide opinions in my individual capacity and do not speak on behalf of any of the above-listed entities or other entities with which I have worked. I am being compensated at my regular rate of $950 per hour for my work on this matter, including for preparing this report. My compensation is not contingent on my opinions or on the outcome of this matter.

## RELEVANT FACTS

I have no first-hand knowledge of the relevant facts. For purposes of forming opinions in this case, I have been asked to rely on the facts set forth below. Additionally, I have reviewed the following: (1) Response by Labaton Sucharow LLP to Special Master's September 7, 2017 Request for Supplemental Submission, (2) Professor Stephen Gillers's "Ethical Report for

2

Special Master Gerald E. Rosen," (3) Expert Declaration of Camille F. Sarrouf, and (4)

Declaration of George Hopkins.

## ASSUMED FACTS

### 1.    Background

Labaton Sucharow ("Labaton") is a plaintiffs' law firm that focuses on large-scale and

complex class action litigation, which often involves securities matters.  In the context of its

securities work, Labaton frequently acts as "monitoring counsel" for its clients.  In that role,

Labaton monitors the client's portfolio of securities investments for signs of possible securities

law violations, such as a drop in stock price.  *See, e.g.*, Portfolio Monitoring and Case

Evaluation[1]; LBS017739-41.  In doing so, Labaton uses sophisticated in-house investigators and

analysts to monitor the securities market.  Keller Dep. Day 1 35:2-14.  If Labaton believes a

client's portfolio may have been involved in a securities violation that could lead to a viable

case, Labaton may ask the client whether it would be interested in serving as lead plaintiff in a

class action case.  Portfolio Monitoring and Case Evaluation; LBS017739-41.  If the client

agrees, Labaton may represent the client in the litigation.  *Id.*; *see also* Sucharow 2d Dep.

115:13-116:15.

Because of its complex role as monitoring counsel, it "takes a while for people to . . .

understand [Labaton's work] to the point where it can be useful to them."  Keller Dep. Day 1

24:20-23.  Thus, Labaton relies on informational presentations that explain Labaton's work to

potential clients, such as institutional investors.  Keller Dep. Day 1 21:8-18, 24:10-27:10.  These

presentations are often the first step in Labaton's retention by a potential client.  From there,

---

[1] *Available at* http://www.labaton.com/en/practiceareas/Institutional-Investor-Protection-Services.cfm (last visited March 9, 2018).

Labaton typically participates in a submission process before being selected to represent an institutional investor.  Keller Dep. Day 1 37:19-38:10.

## II.   Labaton's Relationship with Damon Chargois

Chargois & Herron was a law firm based in Little Rock, Arkansas.  Labaton's relationship with Chargois & Herron originated through Labaton partner, Eric Belfi.  Belfi met Damon Chargois, a partner at Chargois & Herron, in approximately 2004, when Belfi worked at a different law firm and came into contact with Chargois during a litigation matter pending in the Southern District of New York.  *See* Labaton Sucharow LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) Supplemental Interrogatories to Labaton Sucharow LLP ("Response to Supplemental Interrogatories") at 4; Belfi 2d Dep. 12:21-13:4.[2]

Belfi joined Labaton Sucharow in 2006.  He focused on building and maintaining client relationships for Labaton.  Belfi Dep. 9:7-23.  Early in Belfi's tenure at Labaton, he was approached by Chargois, who told him that he had "some opportunities" to introduce Labaton to "pension plans in the Texas, Arkansas, Oklahoma region."  Belfi 2d Dep at 13:10-13.  Belfi "asked him to proceed."  *Id.*  By mid-2007, Chargois was focused on introducing Labaton to the Arkansas Teachers Retirement System ("ARTRS"), along with other entities that may have been interested in Labaton's services.  Keller Dep. Day 1 156:6-13; LBS031465.  In addition, beginning in spring of 2007, Chargois served as local counsel for Labaton on a class action case pending in Texas.  Keller Dep. Day 1 146:8-149:19; LBS017411.  In that role, Chargois

---

[2]  Chargois apparently did not recall this meeting during his deposition, because he testified that he first met Belfi through a friend, when Belfi was already working at Labaton. Chargois Dep. 16:8-23.

participated in mediation and performed other legal work. Chargois Dep. 17:7-18:22; 121:4-22:12; Keller Dep. Day 1 175:20-176:11; LBS031585.

### III.   Labaton's Early Contact with ARTRS

Tim Herron, Chargois's partner in his Little Rock office, knew Steve Farris, an Arkansas state senator who served in an oversight role with respect to ARTRS. *See* LBS040318; LBS017432; Chargois Dep. 33:16-21; Hopkins 2d Dep. 35:6-36:8 (explaining that Farris served on the Arkansas legislature's Joint Committee on Public Retirement and Social Security Programs); Ark. Code Ann. §§ 10-3-701 and 10-3-703 (2017) (assigning oversight responsibilities to the joint committee).

Herron arranged for Belfi and his Labaton partner Chris Keller to meet with Senator Farris in August of 2007. Keller viewed this initial meeting as educational in nature and designed to explain Labaton's work as monitoring counsel to Senator Farris. Keller Dep. Day 1 20:3-21:18. In connection with that meeting, Chargois informed Belfi and Keller that they would need to "impress[] the Senator with [their] firm's credentials" in order to have a chance to retain ARTRS as a client. Keller Dep. Day 1 157:6-159:9; LBS017432. Apparently, Chargois remarked after the meeting that Belfi and Keller "did well" and "represent[ed] the firm very well" in the meeting with Senator Farris. LBS040322; LBS017438; Keller Dep. Day 1 20:3-10. Chargois later stated that he and Herron felt "very optimistic about Labaton firm's doing a lot of good things in Arkansas. This is thanks to [Belfi and Keller] representing the firm very well" to Farris. LBS017437.[3]

---

[3] The testimony regarding this initial meeting is somewhat inconsistent. Chargois testified that, at Senator Farris' suggestion, he placed a "cold" telephone call to ARTRS director Paul Doane. Chargois Dep. 33:12-35:7. During this conversation, Chargois explained that Chargois & Herron was a local firm working with a New York firm specializing in representing

After this initial meeting, Senator Farris and/or Herron introduced Belfi and Keller to
Paul Doane, the Executive Director of ARTRS at the time. Belfi 2d Dep. 38:10-15. In
September or October 2007, Doane visited Labaton's offices in New York City while he was in
the area on other business. Belfi 2d Dep. 38:2-6, 41:11-13. Belfi was traveling at the time, so
Doane met with Keller during that trip. Keller Dep. Day 1 33:10-34:18; LBS040524-A. Keller
introduced Doane to members of the firm and showed him the office. Keller Dep. Day 1 35:2-
23. Doane expressed interest in Labaton after the meeting but explained that retention of
Labaton would require further review by ARTRS and a request for proposals. LBS040524-A;
Keller Dep. Day 1 180:7-21.

According to Chargois, during the fall of 2007 Senator Farris maintained contact with
Doane regarding the possibility that Labaton would represent ARTRS as monitoring counsel.
LBS017442.[4] Chargois and Tim Herron continued to relay information regarding Senator Farris'
contact with ARTRS and other funds that could potentially be interested in Labaton's services.
LBS017450; Keller Dep. Day 1 193:2-196:2. Similarly, in spring of 2008, Herron
communicated information regarding Senator Farris' contact with Doane and the possibility that
ARTRS would retain Labaton. LBS017451; LBS017453; Keller Dep. Day 1 218:18-224:16.

## IV.    ARTRS' Retention of Labaton

In mid-2008, ARTRS issued a Request for Qualifications ("RFQ") which invited firms to
submit qualifications to become additional monitoring counsel to the fund. Labaton and

---

institutional investors. *Id.* As a result, according to Chargois, Doane met with Eric Belfi and
possibly Chris Keller in Little Rock. Chargois Dep. 35:8-36:20. However, while Keller testified
that he met Senator Farris in Little Rock, he does not believe that Doane was present. Keller
Dep. Day 1 32:12-33:23.

Chargois & Herron submitted a joint RFQ response on July 30, 2008. LBS017738-55; LBS017756-67. Labaton contemplated that, if selected as panel monitoring counsel, both firms would work on the litigation, if any, filed on ARTRS's behalf. Belfi 2d Dep. 18:14-19; Keller Dep. Day 1 47:24-49:3. Labaton would serve as the lead counsel, and Chargois & Herron would work with ARTRS in Little Rock. Belfi 2d Dep. 26:15-27:15; Keller Dep. Day 1 44:8-46:21.

On October 13, 2008, ARTRS's Chief Counsel, Christa Clark, emailed Belfi and informed him that "ATRS has selected Labaton Sucharow as an additional monitoring counsel for our system." LBS017456. Clark further stated:

> I would like to speak with you regarding the additional firm on your submission Chargois & Herron. This is a little awkward, but since your firms are not legally affiliated, we are unable to process the state contract form with both firms listed.
>
> If your firm is doing the monitoring and providing the financial backing for the cases, I think it is most appropriate that we add your firm independently to the list of approved firms. Your firm may affiliate that firm or utilize them as independent contractors, if you deem is appropriate [sic], on a case by case basis. There would be no requirement that you use them if it was not a necessary and appropriate expense of a case. I don't know how to best handle this point but the state procurement process is not conductive to a joint proposal.

*Id.* [5]

After receiving this email, Belfi had a telephone conversation with Clark. Belfi 2d Dep. 114:2-22, 117:20-118:10. Belfi explained to Clark that Labaton "would be working with Chargois & Herron" and that Chargois & Herron "were going to be involved in the relationship." Belfi 2d Dep 117:20-118:10.

---

[4] Concurrently, Chargois purportedly continued to seek introductions for Labaton with other entities. *E.g.*, LBS031472 ("Damon is really moving [on] all of the fronts.").

[5] Given the nature of the relationship, discussed below, the payment to Chargois & Herron was never an "expense of a case." Keller Dep. Day 2 302:24-304:8. Except where they appeared as counsel in Court, Chargois & Herron only received a portion of Labaton's attorneys' fees, which themselves were awarded on a percentage basis that were unrelated to "expenses."

In October 2008, very shortly after ARTRS selected Labaton as monitoring counsel, Doane departed as ARTRS's executive director. *See* Arkansas Times, "Doane to depart," Oct. 28, 2008.[6] The new Executive Director, George Hopkins, began in or about December 2008. Hopkins Dep. 10:17-21. Meanwhile, Clark – ARTRS' Chief Counsel – remained in her position at ARTRS until approximately October 2009. *See* Arkansas Democrat-Gazette, "Faulted on Contracts, Teacher-System Lawyer Quits," October 22, 2009.[7]

Unlike Doane, Hopkins did not know Tim Herron or the Chargois & Herron firm. Hopkins 2d Dep. 21:5-10. A few months after Hopkins began at ARTRS, Belfi and then-managing partner Lawrence Sucharow met with him in Little Rock. Belfi 2d Dep. 27:18-21. Because Belfi got along well with Hopkins, and because Hopkins desired a direct relationship without intermediaries, Belfi became Hopkins' primary contact with regard to Labaton's monitoring relationship. Belfi 2d Dep. 27:21-28:7, 56:22-57:10; Hopkins 2d Dep. 60:8-62:16. Thus, Chargois & Herron were uninvolved with ARTRS as Belfi's relationship with Hopkins developed. Belfi 2d Dep. 57:5-19.

On September 24, 2010, Belfi sent Hopkins a draft retention letter for the State Street matter, which contained the following provision:

> Arkansas Teacher agrees that Labaton may divide fees with other attorneys for serving as local counsel, as referral fees, or for other services performed in connection with the litigation. The division of attorneys' fees with other counsel may be determined upon a percentage basis or upon time spent in assisting the prosecution of an action. The division of fees with other counsel is Labaton's sole

---

[6] *Available at* https://www.arktimes.com/ArkansasBlog/archives/2008/10/23/doane-to-depart (last visited March 9, 2018).

[7] *Available at* https://www.pressreader.com/usa/arkansas-democrat-gazette/20091022/283927403838722 (last visited March 9, 2018).

responsibility and will not increase the fees payable upon a successful resolution of the litigation.

LBS019948-50.  On February 8, 2011, Belfi sent a slightly revised, final retention letter to

Hopkins with a modified first sentence to the quoted paragraph:  "Arkansas Teacher agrees that

Labaton Sucharow may allocate fees to other attorneys who serve as local or liaison counsel, as

referral fees, or for other services performed in connection with the Litigation."  LBS011061.

Throughout this case, Chargois & Herron's portion of the State Street fee has been referred to by

witnesses and in documents as, among other things, a "referral fee," a "local counsel" fee, and a

"liaison fee."

During Labaton's representation of ARTRS, Belfi spoke with Hopkins about "how fees

worked."  Belfi 2d Dep. 23:17-23.  According to Belfi, Hopkins said that "he only wanted to deal

with [Labaton] and wasn't concerned about how [Labaton] would cut fees up if [they were]

working with other firms."  Id.  Hopkins was only interested in the aggregate attorney fee

amount, rather than allocations of that aggregate fee among various firms.  Id. at 23:24-24:5.

According to Belfi, Hopkins "was not concerned with who [Labaton was] splitting fees with."

Id. at 120:11-22.  Belfi believed that Hopkins "didn't want to deal with" allocations of fees

between lawyers.  Id.  Hopkins' testimony supports this belief.  Hopkins 2d Dep. 68:23-69:3 ("I

told Eric if I ever want to know about your attorney fees and who all you hired, I'll ask you.

And, you know, on any case because I intentionally didn't want to know a whole lot.");  id. at

73:11-19 ("I don't feel misled because I made it real clear to them that I didn't want to be the

gatekeeper on all this attorney relationship.  And I think if they thought I wanted to know, they

would have told me because Eric always said if you ever want to see how we do all these fees,

just let me know.  And I said that's fine.");  see also id. at 74:10-75:8.

## V.   Labaton's Agreement with Chargois

Early in the relationship between Labaton and Chargois & Herron, Belfi, Keller, and

Damon Chargois discussed the terms of an agreement between the two firms.  The crux of the

agreement was that when Chargois & Herron facilitated the introduction between Labaton and a

client, Chargois & Herron would receive up to 20% of the gross attorney fees Labaton earned

representing that client, if the client was a named plaintiff and Labaton was appointed lead or co-

lead counsel.  *See, e.g.*, LBS031185; Keller Dep. Day 1 42:15-46:14; Chargois Dep. 50:11-

52:24, 162:19-164:2.  Initially, the understanding was that Chargois would play a local counsel

role relative to the entities with which he facilitated introductions, and that he would be active

assisting in litigating Labaton's cases if needed.  *See* Belfi 2d Dep. 26:15-23, 27:11-15; Keller

Dep. Day 1 44:8-46:21.

Labaton's agreement with Chargois was never reduced to a formal written contract.

However, as Labaton's relationship with ARTRS developed, Chargois and Labaton began to

formalize their agreement.  In February 2009, Chargois indicated that he expected a relatively

informal arrangement, but expressed the terms as he understood them in a written email.

LBS030990.  Roughly one week later, Chargois inquired whether a written "letter agreement"

would be necessary.  LBS030993; Keller Dep. Day 1 255:16-257:4.  Chargois and Keller

discussed via email the terms of the potential contract.  LBS031492; Keller Dep. Day 1 258:8-

19.  In April 2009, Chargois sent a draft letter agreement to Belfi and Keller seeking to

memorialize the previous discussions in writing.  LBS030985-87.  Keller edited the document

and sent a return draft that, among other things, inserted an arbitration clause.  LBS031192-95.

While a written agreement was never finalized (Response to Supplemental Interrogatories at 8),

Chargois at least viewed it as enforceable.  LBS031137; Belfi 2d Dep. 58:1-22.  As time passed,

Labaton and Chargois maintained the basic referral arrangement of an 80/20 fee split, if ARTRS became a named plaintiff and Labaton was appointed lead or co-lead counsel.[8]

Because ARTRS was the only named plaintiff in Civil Action No. 11-cv-10230 MLW, i.e., the action on behalf of the putative class of customers of State Street,[9] the three Customer Class Law Firms (Labaton, Lieff Cabraser, and the Thornton Law Firm) agreed in 2013 that they would share in paying the allocation to Chargois & Herron from their own fee awards. LBS027776. Garrett Bradley of the Thornton firm handled the discussions with Lieff Cabraser and Chargois regarding this point. *Id.*; Bradley 2d Dep. 53:14-54:10.[10]

In June 2016, well after a settlement agreement-in-principle had been reached, Bradley reached out to Chargois for further discussions regarding Chargois's fee allocation. TLF-SST-060973. Bradley negotiated an agreement that Chargois & Herron would receive an amount equal to 5.5% of the total fee award (basically, a percentage that would be approximately equivalent to 20% of Labaton's anticipated share of the total fee), which would be funded by the

---

[8] Although it became apparent that Chargois's total contribution would be limited to the initial assistance in introducing Labaton to ARTRS, Chargois maintained that he was entitled to 20% of any fee earned by Labaton. LBS017594; LBS030876; Belfi 2d Dep. 58:5-15. Chargois intimated that he would seek legal redress to vindicate his perceived contractual right, if necessary. Belfi 2d Dep. 58:5-59:22; Chargois Dep. 59:6-60:4; Keller Dep. Day 1 130:19-131:12. Labaton was concerned by the possibility of litigation in Texas state court. *See* Belfi 2d Dep. 58:16-59:22; Keller Dep. Day 1 130:22-132:3; Keller Dep. Day 2 541:19-543:23.

[9] Civil Action Nos. 11-cv-12049 MLW and 12-cv-11698 MLW, involving the ERISA Plaintiffs, were consolidated with the customer action for pre-trial purpose.

[10] Bradley explained that he took on the role of negotiating with Chargois & Herron because he had a friendly relationship with Chargois, and he wanted to reach agreement out of concern that, because ARTRS was the only named (non-ERISA) plaintiff, Chargois could say his firm was entitled to 20% of the overall fee award, not just the portion that Labaton Sucharow received. Bradley 2d Dep. 53:14-54:10; *see also* Belfi 2d Dep. 94:5-23; Keller Dep. Day 1 122:6-124:19.

three Customer Class Law Firms, by agreement, from their respective shares of the award. LBS040924; Bradley 2d Dep. 93:16-22.[11]

Given his desire not to be informed of the allocation of fees among counsel (Hopkins Dec. at ¶¶10-12, 14), George Hopkins personally was unaware of the Chargois agreement until August or September of 2017. Id. ¶ 7. Thereafter, when informed of the details of the fee-sharing agreement between the Customer Class Law Firms and Chargois in this case, Hopkins expressly consented to and ratified the agreement. Id. at ¶¶ 16-17.

The fee-sharing arrangement was not disclosed to the Court or to the class. No local rule or court rule required disclosure to the Court, nor did the Court have a standing order, or case specific order, requiring disclosure.

## OPINIONS

### 1.   Summary of Opinions

For purposes of this report, the parties have agreed that the applicable professional conduct rules are those of the Massachusetts Rules of Professional Conduct ("Massachusetts Rules"). The governing rule for fee divisions was Massachusetts Rule 1.5(e), as it existed prior to March 15, 2011. The text of that rule required client consent but did not require a writing or specify when the consent needed to be obtained.

---

[11] In that June 21, 2016 email to Chargois cited above, Bradley discussed ERISA counsel and what percentage would be allocated to them in the context of his dialogue with Chargois about what percentage would be paid to Chargois & Herron. TLF-SST-060973. No Labaton lawyers were copied on this communication, and there is no evidence in the record suggesting that lawyers from Labaton saw it before this investigation. Id. Bradley explained that he was simply providing the context of the ERISA firms as background and as a negotiating point with Chargois. Bradley 2d Dep. 84:9-85:20; Keller Dep. Day 2 534:23-535:24. Bradley's reference in that 2016 conversation did nothing to change the agreement that the ERISA lawyers had struck with Customer Counsel more than two years earlier.

As explained below, Massachusetts Rule 7.2(b), a subsection of the Massachusetts advertising rule, is not applicable to this case; and, if it were, Labaton did not violate it for two independent reasons.  First, Labaton did not compensate Chargois (or anyone else) "for recommending [Labaton's] services" to ARTRS.  Second, a payment pursuant to a fee-sharing agreement generally permitted by Rule 1.5(e) would not be subject to sanction under Rule 7.2(b).

Furthermore, Rule 1.5(e) – as in effect in February 2011 – permitted Labaton to divide its legal fees in the State Street Bank class action with lawyers of other firms, including Chargois, as long as (1) Labaton's total fee was reasonable, which it was, and (2) Labaton satisfied the Rule's procedural requirement of notice and consent before dividing the fee.  ARTRS knew that multiple law firms would divide fees in the class action and authorized Labaton in writing to "allocate fees to other attorneys who serve as local or liaison counsel, as referral fees, or for other services performed in connection with the Litigation."  This notice and consent appears to have been satisfactory on the face of the Rule as it existed at that time.  Moreover, nothing suggests that ARTRS was inadequately informed or misled or that Labaton intended to mislead it.  When ARTRS learned of Chargois's compensation, it had no objection and acknowledged that it did not previously want or need further detail.

Given the relative insubstantiality of any alleged omission by Labaton, any monetary or reputational sanction would be excessive.  In fee disputes, as the District Court discussed at length in *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 178 F. Supp. 2d 9 (D. Mass. 2001), courts may take different approaches to "imperfect fee-splitting agreements."  Under Massachusetts law, imperfect compliance with Rule 1.5(e) does not call for invalidating a fee-sharing agreement.  *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 188 F.

Supp. 2d 115 (D. Mass. 2002). Further, from a disciplinary perspective, a single procedural imperfection, as alleged in this case, would ordinarily not be sanctioned.

Finally, Rule 1.5(a) does not apply to the fee division between Labaton and Chargois.

**2.      Rule 7.2(b) is inapplicable**

Rule 7.2(b) of the Massachusetts Rules provides, subject to exception, that "[a] lawyer shall not give anything of value to a person for recommending the lawyer's services." It is based on Rule 7.2(b) of the ABA Model Rules of Professional Conduct ("ABA Model Rules"), on which other states have based similar rules.

Rule 7.2(b), the advertising rule, serves several conceivable purposes. It protects a prospective client from being influenced by a self-interested recommendation or from being misled to believe the recommendation is disinterested when in fact it is financially motivated. Additionally, the financial incentive may conceivably motivate the person recommending the lawyer to solicit prospective clients in ways that are otherwise impermissible.

Rule 7.2(b) does not apply here for two independent reasons: (1) Labaton did not compensate Chargois "for recommending" its services; and (2) in any event, Rule 7.2(b) does not apply to recommendations made by lawyers pursuant to imperfect fee-sharing arrangements.

a.      *Labaton did not compensate Chargois "for recommending" its services.*

Labaton's fee sharing arrangement did not violate the letter of Rule 7.2(b). As Comment [5] to Rule 7.2 states: "A communication contains a recommendation if it endorses or vouches for a lawyer's credentials, abilities, competence, character, or other professional qualities." Based on the facts provided for my consideration, Chargois did not endorse or vouch for Labaton's professional qualities. Chargois simply facilitated an introduction. In 2007, Chargois introduced Labaton to Senator Farris who in turn introduced Labaton to Paul Doane, ARTRS's

14

then-Executive Director. ARTRS selected Labaton in 2008 through an RFQ process to serve as one of ARTRS's monitoring counsel. Labaton agreed to compensate Chargois for initiating these introductions and for its anticipated work as co-counsel in future litigations. By February of 2011, by which time ARTRS had formally retained Labaton in this lawsuit against State Street Bank, ARTRS already knew Labaton from its ongoing work as monitoring counsel. Labaton had no need for a recommendation and none was made by Chargois, who at that point had no relationship with ARTRS. ARTRS engaged Labaton as monitoring counsel (and, later, in the class action) based on Labaton's qualifications and experience, as advanced by Labaton itself in meetings and via the RFQ process. Thus, the original fee-sharing arrangement was not compensation "for recommending" Labaton but for helping Labaton secure an opportunity to pitch its own services as well as for anticipated future work by Chargois.

Nor did Labaton's fee sharing arrangement violate the purpose of Rule 7.2(b). There is nothing to suggest that ARTRS relied on a self-interested recommendation, that Labaton or Chargois misled ARTRS, or that Chargois otherwise overstepped in helping Labaton secure a new client.

      b.     *Rule 7.2(b) does not apply to imperfect fee-sharing arrangements.*

Even assuming for argument's sake that Labaton agreed to share legal fees with Chargois in part to compensate Chargois "for recommending" its services, Labaton did not violate Rule 7.2(b). Notwithstanding the ordinary restriction on paying for recommendations, Rule 7.2(b)(5) expressly provides that "a lawyer may . . . pay fees permitted by Rule 1.5(e)." The provision makes explicit that Rule 7.2(b) does not apply to fees shared pursuant to fee-sharing arrangements between lawyers of different firms under Rule 1.5(e). This exception is only implicit in ABA Model Rule 7.2(b), which does not specifically refer to Rule 1.5(e).

Professor Gillers reads Rule 7.2(b)(5) to mean that when one lawyer recommends another's services in connection with a fee-sharing agreement permitted by Rule 1.5(e), but the lawyers do not then fully comply with Rule 1.5(e)'s requirement of notice and/or written consent,[12] the lawyer dividing his or her fees violates not only Rule 1.5(e) but also Rule 7.2(b)(5). This reading is not compelled by the language of Rule 7.2(b)(5), which can just as plausibly be read to mean that the solicitation rule excepts fee sharing pursuant to arrangements of the type that are generally "permitted by Rule 1.5(e)."[13]

Chargois's recommendation (if one was made) and Labaton's compensation for it would not in themselves have been impermissible. At worst, this was what *Daynard*, 188 F. Supp. 2d at 123, called "imperfect fee splitting," where a lawyer fails to give adequate notice or properly obtain consent. While a lawyer may be subject to sanction under Rule 1.5(e) for noncompliance with its procedural requirement, there is no reason why drafters or adopters of the Massachusetts Rules or similar rules would want the lawyer to be subject to sanction under Rule 7.2(b) as well, based solely on the lack of notice and/or written consent. It would be unfair and misleading to say that the lawyer's failing involved an improper solicitation, and it would be disproportionately harsh to subject the lawyer to an additional sanction for an improper solicitation under Rule 7.2(b), which mis-describes and overstates the lawyer's lapse.

I am unaware of any judicial decision arising in the disciplinary setting or any other context, or any secondary authority holding that compensating a lawyer for a referral in the

---

[12] Professor Gillers appears to rely upon the language or the subsequent version of Massachusetts Rule 1.5(e), rather than the version actually in effect in February of 2011.

[13] I am unaware of any drafting history suggesting that the Massachusetts drafters intended Rule 7.2(b) to apply where lawyers enter into fee division agreements that are generally permitted by Rule 1.5(e) but that do not fully satisfy Rule 1.5(e)'s procedural requirement.

16

context of an imperfect fee-sharing arrangement violates Rule 7.2(b).  Nor have I found any

ethics opinion of the Massachusetts or Boston bar associations to this effect.  While courts have

leeway to interpret professional conduct rules liberally, to address a question on which the

professional conduct rules are otherwise silent, there is no good reason to break new ground in

this case, where another rule already addresses the challenged conduct.

**3.**      **At worst, Labaton complied imperfectly with Rule 1.5(e)**

At the time the State Street engagement began, Rule 1.5(e) provided that: "A division of

a fee between lawyers who are not in the same firm may be made only if, after informing the

client that a division of fees will be made, the client consents to the joint participation and the

total fee is reasonable."  Rule 1.5(e) was not amended into its current form until March 15, 2011

– a month after formalization of the ARTRS engagement of Labaton.[14]

Under Rule 1.5(e), Labaton could agree to pay Chargois a portion of its fee in the State

Street Bank class action, as long as Labaton complied with the substantive and procedural

requirements of the Rule.  The Rule does not forbid fee sharing for any legitimate purpose and

has always been interpreted to allow referrals (as expressly contemplated in the current version

of the Rule). *See Massachusetts Legal Ethics: Substance and Practice* at 185 (2017) (explaining

that "[u]nlike almost every other jurisdiction in the nation, Massachusetts permits an attorney's

fee to be divided with a lawyer who does not practice in the firm of the primary lawyer (i.e., a

referral fee), even if the referring lawyer does nothing more than refer the matter," which is

---

[14] The current rule provides: "A division of a fee (including a referral fee) between lawyers who are not in the same firm may be made only if the client is notified before or at the time the client enters into a fee agreement for the matter that a division of fees will be made and consents to the joint participation in writing and the total fee is reasonable."

"quintessentially a Massachusetts practice and tradition.")[15]  When the fee-sharing agreement was first made, Labaton contemplated that Chargois would serve essentially as liaison counsel, but this was not required under the Massachusetts Rules.  Unlike ABA Model Rule 1.5(e), Massachusetts Rule 1.5(e) does not require lawyers receiving a portion of a fee to have a role or responsibility regarding the matter.[16]  Labaton could agree to share its fee with Chargois without any expectation of work or responsibility on Chargois's part.  The payment would be permissible as compensation for the boost Chargois previously gave to Labaton's retention as ARTRS's monitoring counsel, for Chargois's availability to provide legal services, as a settlement of Chargois's potential claim against Labaton, or for any other lawful purpose.

The substantive requirement of Rule 1.5(e) is that "the total fee [be] reasonable."  Since the District Court would and did determine class counsel's fee pursuant to Rule 23 and related case law, there could be no doubt about the reasonableness of Labaton's fee, whether viewed at the time ARTRS engaged Labaton to pursue the class action against State Street Bank or in hindsight.  ARTRS's current Executive Director, George Hopkins, has affirmed that he believes the total fee was fair and reasonable given Labaton's outstanding work, and that the fee-sharing arrangement with Chargois "had no effect on the interests of the class."

Procedurally, Rule 1.5(e), as in effect in February 2011, required that the client be informed "that a division of fees will be made" and "consent[] to the joint participation" before the fee is divided.  Labaton met these requirements.  ARTRS unarguably knew that Labaton would divide fees with "lawyers who are not in the same firm" – that is, with other class counsel

---

[15] Available at https://bbopublic.blob.core.windows.net/web/f/BBO_Draft_Treatise.pdf.

[16] *See Daynard*, 188 F. Supp. at 124 n.5 (noting the relative leniency of the Massachusetts rule).

at the very least, and consented to fee sharing.  Moreover, after it selected Labaton as monitoring

counsel, ARTRS was aware that Labaton would be working with Chargois & Herron moving

forward.  Thus, before any fee was divided, ARTRS was aware that Labaton would be dividing

its fees and knew that Chargois & Herron, along with other firms, may be sharing in the fees.

Labaton therefore complied with the relevant version of Rule 1.5(e).

Labaton complied with the procedural requirement of Rule 1.5(e).  ARTRS agreed in

writing that "Labaton Sucharow may allocate fees to other attorneys who serve as local or liaison

counsel, as referral fees, or for other services performed in connection with the Litigation."  Rule

1.5(e) did not require detail about the various lawyers' precise roles or about how the fees will be

divided between or among them.[17]  Nor did it explicitly require Labaton to identify all the

lawyers outside the firm who would be compensated out of the court-awarded legal fee.

The state Supreme Judicial Court's decision in *Saggese v. Kelley*, 445 Mass. 434, 443

(2005), called for the client's consent to a fee-sharing agreement to be "secure[d]" in writing,

although Rule 1.5(e), at that time, did not so require.  I understand that the Special Master has

raised a question whether the retention letter adequately secured ARTRS's consent to fee-sharing

in that  there is an argument that the phrase, "Labaton Sucharow *may* allocate fees to other

attorneys" (emphasis added), simply referred to the factual possibility that Labaton would share

fees with other lawyers, and was not meant to acknowledge ARTRS's permission for Labaton to

do so.  (The definition of "may" states that the word expresses both possibility and permission.)

---

[17] At least in the latter respect, Massachusetts Rule 1.5(e) was intended to be less
demanding than ABA Model Rule 1.5(e), which expressly requires the client's agreement "to the
[fee-sharing] arrangement, including the share each lawyer will receive."  In contrast, the
"Massachusetts rule does not explicitly require disclosure of the proportionate share of the fee to
be taken by each lawyer."  Chief Justice Herbert P. Wilkins, *The New Massachusetts Rules of
Professional Conduct: An Overview*, 82 MASS. L. REV. 261, 261 (1997).  This was not an

Particularly in the context of a retention letter setting forth the parties' respective rights and responsibilities, it seems reasonably plain to me that the sentence in question in fact memorializes ARTRS's permission. But even assuming that this was an instance of ambiguous or imperfect drafting, that is of no moment. ARTRS, acting through Mr. Hopkins, in fact consented to Labaton engaging, and sharing fees with, other counsel. ARTRS does not assert that it misunderstood the retainer letter. It does not contest that, by this writing, it meant to memorialize its consent.

Further, the purposes of the procedural requirements were adequately served. In general, the notice-and-consent requirement of Rule 1.5(e), and the writing requirement of *Saggese*, enable the client to make an informed decision whether to retain counsel. Upon being informed, a client may disapprove of a division of labor under a proposed fee-sharing agreement or, in theory, may seek to negotiate a more favorable fee agreement without fee sharing. Or the client may request additional detail about the fee-sharing arrangement that the particular client may find relevant to the client's choice of counsel and the terms of the engagement. Memorializing the client's consent minimizes the likelihood of later disagreements over whether the client received the required notification and approved the arrangement. In this case, ARTRS knew in general that multiple counsel would be involved in the class action and would divide fees, and its consent was memorialized in writing, which in any event was not required by the text of Rule 1.5(e) at the time. ARTRS knew, in particular, that, in its role as monitoring counsel, Labaton was working with Chargois. There is nothing to suggest that ARTRS wanted or needed more information about how class counsel's court-awarded fees would be divided. Labaton's arrangement with Chargois had no implications for the division of labor in the class action, since,

---

oversight but the resolution of a heavily debated question. *Id.* at 261, 263.

by the time of the class action lawsuit, Chargois had no relationship with ARTRS and would not

serve as liaison counsel, as originally contemplated.  And there was no realistic possibility that

ARTRS would seek to negotiate a different fee arrangement based on further information.

Consistent with standard practice in securities class actions, class counsel's fee if the class action

succeeded would be determined by the District Court and paid by the defendants.  ARTRS

considered it irrelevant how the legal fee would be divided and Mr. Hopkins declined Labaton's

offer to explain specifically how legal fees would be divided among counsel.  Based on the facts

provided to me, neither ARTRS nor the class was prejudiced by Labaton's failure to persist.

## 4.      Labaton's imperfect fee-sharing agreement does not warrant sanction

In general, the Massachusetts Rules are not meant to establish rights in civil litigation but

to provide "a basis for a lawyer's self-assessment, or for sanctioning a lawyer under the

administration of a disciplinary authority."  Massachusetts Rules, Scope ¶ [6].  Therefore, even if

Labaton's retention letter did not perfectly comply with the *Saggese* Court's requirement of a

writing, it does not follow that Labaton's fee-sharing agreement with Chargois, or its fee

agreement with ARTRS, is unenforceable.  The leading case of *Daynard v. Ness, Motley,*

*Loadholt, Richardson & Poole, P.A.*, 188 F. Supp. 2d 115 (D. Mass. 2002), illustrates the point.

Applying Massachusetts law, the *Daynard* Court enforced an oral fee-sharing agreement

between a law firm representing states in tobacco litigation and a lawyer-professor hired as a

consultant, even though the states were not informed of the agreement.[18]  While it is true that

---

[18] The Court observed that "[f]ee-splitting agreements, subject to certain procedural
requirements, are perfectly legal," *id.* at 129, and that the failure to inform all of the clients was,
in the context of the case, "less egregious than the more typical hidden fee-splitting agreement
that led to the development of" Rule 1.5(e).  *Id.* at 130.  While there are inevitable factual
distinctions between this case and *Daynard*, they are both cases where the alleged omissions
under Rule 1.5(e) may fairly be characterized as "insubstantial."  *See also Saggese*, 445 Mass. at

*Daynard* involved a dispute between the lawyers who entered into the imperfect fee-sharing agreement, nothing in *Daynard* suggests that the law firm should forfeit its fee, or have its fee reduced, because it failed to give complete notice under Rule 1.5(e). There was no intimation that the District Court should deny the disputed amount to both the lawyer and the law firm and return it to the states. (Like the clients in *Daynard*, ARTRS has not sought to invalidate or reduce its lawyer's fee based on the alleged failure to give adequate information about a fee-splitting arrangement. ARTRS believes that Labaton's fee was well earned.)[19]

Moreover, from a disciplinary perspective, even if Labaton's compliance with Rule 1.5(e)'s procedural requirement or with the *Saggese* Court's writing requirement was somehow imperfect, which I do not believe it was, a sense of proportionality and the exercise of prudent judgment are warranted here. It goes without saying that not all violations of ethics rules should be treated the same. The purpose of discipline is to protect the public. Lawyers, like all people, are imperfect, and disciplinary lapses vary in significance. Imperfect compliance with a prophylactic procedural requirement of a professional conduct rule (as construed by a court

---

442 (concluding "that the fee-sharing agreement was not void as against public policy or unenforceable for failure to comply with the applicable fee-sharing rule").

[19] A lawyer may be denied compensation because of serious misconduct related to the representation that "impaired the value of the client's cause of action or otherwise imperiled the client's right to relief." *Kourouvacilis v. Am. Fed. of State, Cty. and Mun. Employees*, 841 N.E.2d 1273, 1282 (2006). But a violation of Rule 1.5(e), standing alone, ordinarily does not rise to that level – and certainly the arguable disclosure violation in this case does not. There is nothing to suggest that Labaton's failure to disclose its specific arrangement with Chargois had any impact on the quality of its work or the outcome of the lawsuit. A fee reduction would be a penalty out of proportion to the alleged wrong. *See, e.g., In re: Austrian and German Bank Holocaust Litigation*, 317 F.3d 191, 200-05 (2d Cir. 2003) ("Whatever deficiency might be thought to arise from [a potential conflict] or from Class Counsel's failure to alert the Court to the potential conflict, the circumstances of this case would not warrant the equitable remedy of fee forfeiture. There is not the slightest indication that any of the Class Counsel who were engaged in this enormously complicated undertaking acted with anything less than the utmost

22

opinion) is unlikely to signify that the lawyer in question poses a threat to future clients or to the public generally. Some wrongs deserve to be sanctioned more seriously than others, and some do not deserve sanction at all, because they are not serious and do not reflect adversely on the lawyer's honesty, trustworthiness or fitness. For example, courts often become aware of lawyers' professional conduct that violates conflict-of-interest rules, rules against frivolous filings, rules against improper arguments, and others, but professional misconduct in litigation is sanctioned selectively and infrequently.

Even egregious misconduct that threatens serious harm, which is not present here, does not necessarily call for professional discipline, if it is aberrational and unlikely to be repeated. A good illustration is provided by Judge Wolf's decision in *United States v. Jones*, 686 F. Supp. 2d 147, 152-58 (D. Mass. 2010). The District Court found that the prosecutor engaged in egregious non-disclosures that threatened to deprive a defendant of due process. But the Court declined to sanction the prosecutor, after determining that her misconduct was not intentional, she was sincerely contrite, and she had undertaken training to prevent future violations. In my experience (based principally on New York practice), a disciplinary authority would conclude that Labaton's alleged misconduct is similarly undeserving of discipline. Likewise, the example of *United States v. Jones*, which, unlike this case, involved serious and prejudicial misconduct, suggests that a court would not impose a sanction pursuant to its supervisory authority in a case like this one.

---

good faith. They achieved extraordinarily beneficial results for their clients.").

**5.      Labaton's fee-sharing with Chargois did not violate Rule 1.5(a)**

In his deposition testimony, Professor Gillers expressed the view that Chargois's portion

of Labaton's court-awarded legal fee must be analyzed independently under Rule 1.5(a), which

provides:  "A lawyer shall not enter into an agreement for, charge, or collect an illegal or clearly

excessive fee . . . ."  The rule lists various factors to be considered, including, first, "the time and

labor required."  Professor Gillers's implication is that it was unethical for Chargois, having

expended no time or labor on the class action, to accept a significant amount out of Labaton's

fee.

Professor Gillers's premise is wrong.  It is true that where two different lawyers are

independently retained pursuant to separate fee agreements, neither lawyer's fee may be "clearly

excessive" under Rule 1.5(a).  But the analysis is different where one lawyer enters into a fee

agreement with the client and shares his fees with another lawyer.  No separate analysis is

appropriate under Rule 1.5(a) in circumstances where a fee division relates to a referral fee.  In

the latter instance, the analysis regarding the propriety of the referral fee is under Rule 1.5(e).

When one lawyer shares a legal fee with another, Rule 1.5(e) expressly provides that the

"total fee" must be "reasonable."  But the rule does not say or intimate that if the fee is then

shared with others, no share may be "excessive", and the rules provide no benchmarks for

calculating whether a lawyer who makes a referral (or who, in a state adopting the ABA Model

Rule formulation, assumes "joint responsibility") is receiving a "clearly excessive" portion of an

otherwise reasonable fee.  This goes to the fairness of the division among lawyers, not to the

fairness of the client's fee, and is a matter for the lawyers to work out among themselves.  The

professional conduct rules are meant to protect clients and the public, not to protect lawyers from

over-reaching by their colleagues.

Professor Gillers cites no judicial or bar opinions supporting his theory of independent analysis of each lawyer's share of a fee under Rule 1.5(a). I am unaware of any. One can assume that Professor Gillers's understanding has not been adopted in Massachusetts.

Dated: March 25, 2018

Bruce A. Green