# EX. 241

**Expert Report, March 26, 2018**
**Professor Peter A. Joy**

## I.     QUALIFICATIONS AND DISCLOSURES

I was retained by Labaton Sucharow ("Labaton") to prepare a legal ethics report and to render my independent expert opinion on certain questions.  I agreed to an hourly rate of $400 for time in a non-testimonial context and an hourly rate of $500 for time in a testimonial context, which includes time spent testifying and/or waiting to testify at hearings, depositions, trials or any dispute resolution processes.  The following describes my qualifications to offer my opinions in this matter, and a current CV is attached to this Report [Exhibit 1] and incorporated herein.

I am an attorney at law admitted to practice and on active status and in good standing in the State of Missouri (1998), the State of Ohio (1977), and I was admitted to practice in the District of Columbia (1979), where I am in good standing but on inactive status.  I have also been admitted to practice before the U.S. Supreme Court (1995), the Sixth Circuit Court of Appeals (1983), the Third Circuit Court of Appeals (1984), the Fifth Circuit Court of Appeals (1999), the Eighth Circuit Court of Appeals (1999), and the District Court for the Northern District of Ohio.  I have had a Martindale-Hubbell AV rating since 1980.

I am the Henry Hitchcock Professor of Law at Washington University in St. Louis School of Law, where I have taught since 1998.  I previously taught at Case Western Reserve School of Law from 1978-1980, and 1981-1998.  I have also had visiting professor positions at other universities in the United States and other countries.

My major areas of teaching are legal ethics, clinical teaching, and trial practice and procedure.  My primary area of research and scholarship is legal ethics, though I also write about legal education and less about trial practice and procedure.  I teach legal ethics both in classroom setting and in an applied setting through clinical courses.  I am a co-author of *Professional Responsibility: A Contemporary Approach* (3d ed. West 2017), and co-author of the second and

2

third editions of the teaching manual for that textbook.  I have published another book, several book chapters, and numerous articles on issues of legal ethics, and the articles have appeared in law reviews, American Bar Association (ABA) publications, and state and local bar association publications.  I am a columnist (previously contributing-editor) for an ethics column for the ABA publication *Criminal Justice*.  My legal ethics scholarship has been cited widely, including by: United States House of Representatives, Committee on the Judiciary, Committee Report, Lawsuit Abuse Reduction Act of 2011, 112-174 (resubmitted in 2013, 2015, and 2017); *ABA/BNA Lawyers' Manual on Professional Conduct*; *Annotated Model Rules of Professional Conduct*; ABA Standing Committee on Ethics and Professional Development; Association of the Bar of the City of New York Committee on Professional and Judicial Ethics; Supreme Court of Ohio Board of Professional Conduct; and various state and federal court decisions.  I am frequently quoted by news media on a variety of legal ethics issues, including several quotes in the *ABA Journal*.

I am a member of the American Bar Association, ABA Center for Professional Responsibility, Missouri Bar Association, and a former member of the Ohio Bar Association, Cleveland Bar Association, and Cuyahoga County Bar Association.  I was a Special Investigator for the Ohio Supreme Court Board of Commissioners on Character and Fitness (1990-91), and I served on the following bar committees: Cleveland Bar Association Ethics Committee (1987-98) and Advertising Committee (1989-90); Cuyahoga County Bar Association Ethics Committee (1989-90, 1991-98, Vice-Chair, 1997-98), Judicial Selection/Standards Committee (1994-98), and Lawyer Referral Service Committee (1996); and the Joint Cleveland-Cuyahoga County Bar Admissions Committee (1987-92).  I am also a former member of the executive committee and a former chair of the Association of American Law Schools' Professional Responsibility Section.

3

I am a frequent presenter in the area of legal ethics for continuing legal education (CLE) courses sponsored by federal and state courts, bar associations, law firms, and law schools. Sponsoring organizations include: the ABA; the ABA Center for Professional Responsibility; the Federal Judicial Center; and the Federal District Court for the Eastern District of Missouri.

I have been retained as a consulting expert for legal ethics issues in more than a dozen different states, and those issues have included fee sharing, advertising,  of counsel arrangements, conflicts of interest, confidentiality and attorney-client privilege, and other legal ethics issues.  I have been retained as a testimonial expert witness in Ohio, Missouri, Kansas, Illinois, and New York on issues of legal malpractice, professional discipline for alleged ethics violations, and other legal ethics issues, though not all matters required my testimony in court.  I have testified as an expert in state courts in Ohio and Missouri, and in Federal District Courts for the Northern District of Ohio and the District of Kansas.

In the past five years, I have testified in a hearing in *United States v. Lorenzo Black*, Case No. 16-CR-20032, United States District Court for the District of Kansas.  I testified pro bono in that hearing on behalf of the Federal Public Defender for the District of Kansas.

## II.   FACTUAL ASSUMPTIONS

For the purposes of rendering this report and my opinions, I have assumed the following facts provided to me by Choate Hall & Stewart LLP, counsel for Labaton.  I addition, I have reviewed certain documents and items referenced in the factual assumptions.

Labaton is a plaintiffs' law firm that focuses on large-scale and complex class action litigation, which often involves securities matters.  In the context of its securities work, Labaton frequently acts as "monitoring counsel" for its clients.  In that role, Labaton monitors the client's portfolio of securities investments for signs of possible securities law violations, such as a drop

in stock price.  *See, e.g.*, Portfolio Monitoring and Case Evaluation[1]; LBS017739-41.  In doing

so, Labaton uses sophisticated in-house investigators and analysts to monitor the securities

market.  Keller Dep. Day 1 35:2-14.  If Labaton believes a client's portfolio may have been

involved in a securities violation that could lead to a viable case, Labaton may ask the client

whether it would be interested in serving as lead plaintiff in a class action case.  Portfolio

Monitoring and Case Evaluation; LBS017739-41.  If the client agrees, Labaton may represent

the client in the litigation.  *Id.*; *see also* Sucharow 2d Dep. 115:13-116:15.

Because of its complex role as monitoring counsel, it "takes a while for people to …

understand [Labaton's work] to the point where it can be useful to them."  Keller Dep. Day 1

24:20-23.  Thus, Labaton relies on informational presentations that explain Labaton's work to

potential clients, such as institutional investors.  Keller Dep. Day 1 21:8-18, 24:10-27:10.  These

presentations are often the first step in Labaton's retention by a potential client.  From there,

Labaton typically participates in a submission process before being selected to represent an

institutional investor.  Keller Dep. Day 1 37:19-38:10.

### A.  Labaton's Relationship with Damon Chargois

Chargois & Herron was a law firm based in Little Rock, Arkansas.  Labaton's

relationship with Chargois & Herron originated through Labaton partner, Eric Belfi.  Belfi met

Damon Chargois, a partner at Chargois & Herron, in approximately 2004, when Belfi worked at

a different law firm and came into contact with Chargois during a litigation matter pending in the

Southern District of New York.  *See* Labaton Sucharow LLP's Response to Special Master

---

[1]  *Available at* http://www.labaton.com/en/practiceareas/Institutional-Investor-Protection-Services.cfm
(last visited March 9, 2018).

Honorable Gerald E. Rosen's (Ret.) Supplemental Interrogatories to Labaton Sucharow LLP ("Response to Supplemental Interrogatories") at 4; Belfi 2d Dep. 12:21-13:4.[2]

Belfi joined Labaton Sucharow in 2006.  He focused on building and maintaining client relationships for Labaton.  Belfi Dep. 9:7-23.  Early in Belfi's tenure at Labaton, he was approached by Chargois, who told him that he had "some opportunities" to introduce Labaton to "pension plans in the Texas, Arkansas, Oklahoma region."  Belfi 2d Dep at 13:10-13.  Belfi "asked him to proceed."  *Id.*  By mid-2007, Chargois was focused on introducing Labaton to the Arkansas Teachers Retirement System ("ARTRS"), along with other entities that may have been interested in Labaton's services.  Keller Dep. Day 1 156:6-13; LBS031465.  In addition, beginning in spring of 2007, Chargois served as local counsel for Labaton on a class action case pending in Texas.  Keller Dep. Day 1 146:8-149; LBS017411.  In that role, Chargois participated in mediation and performed other legal work.  Chargois Dep. 17:7-18:22; 121:4-22:12; Keller Dep. Day 1 175:20-176:11; LBS031585.

**B. Labaton's Early Contact with ARTRS**

Tim Herron, Chargois' partner in his Little Rock office, knew Steve Farris, an Arkansas state senator who served in an oversight role with respect to ARTRS.  *See* LBS040318; LBS017432; Chargois Dep. 33:16-21; Hopkins 2d Dep. 35:6-36:8 (explaining that Farris served on the Arkansas legislature's Joint Committee on Public Retirement and Social Security Programs); Ark. Code Ann. §§ 10-3-701 and 10-3-703 (2017) (assigning oversight responsibilities to the joint committee).

Herron arranged for Belfi and his Labaton partner Chris Keller to meet with Senator Farris in August of 2007.  Keller viewed this initial meeting as educational in nature and

---

[2] Chargois apparently did not recall this meeting during his deposition, because he testified that he first met Belfi through a friend, when Belfi was already working at Labaton.  Chargois Dep. 16:8-23.

designed to explain Labaton's work as monitoring counsel to Senator Farris.  Keller Dep. Day 1

20:3-21:18.  In connection with that meeting, Chargois informed Belfi and Keller that they

would need to "impress[] the Senator with [their] firm credentials" in order to have a chance to

retain ARTRS as a client.  Keller Dep. Day 1 157:6-159:9; LBS017432.  Apparently, Chargois

remarked after the meeting that Belfi and Keller "did well" and "represent[ed] the firm very

well" in the meeting with Senator Farris.  LBS040322; LBS017438; Keller Dep. Day 1 20:3-10.

Chargois later stated that he and Herron felt "very optimistic about Labaton firm's doing a lot of

good things in Arkansas.  This is thanks to [Belfi and Keller] representing the firm very well" to

Farris.  LBS017437.[3]

        After this initial meeting, Senator Farris and/or Herron introduced Belfi and Keller to

Paul Doane, the Executive Director of ARTRS at the time.  Belfi 2d Dep. 38:10-15.  In

September or October 2007, Doane visited Labaton's offices in New York City while he was in

the area on other business.  Belfi 2d Dep. 38:2-6, 41:11-13.  Belfi was traveling at the time, so

Doane met with Keller during that trip.  Keller Dep. Day 1 33:10-34:18; LBS040524-A.  Keller

introduced Doane to members of the firm and showed him the office.  Keller Dep. Day 1 35:2-

23.  Doane expressed interest in Labaton after the meeting but explained that retention of

Labaton would require further review by ARTRS and a request for proposals.  LBS040524-A;

Keller Dep. Day 1 180:7-21.

        According to Chargois, during the fall of 2007 Senator Farris maintained contact with

Doane regarding the possibility that Labaton would represent ARTRS as monitoring counsel.

---

[3]The testimony regarding this initial meeting is somewhat inconsistent.  Chargois testified that, at Senator
Farris' suggestion, he placed a "cold" telephone call to ARTRS director Paul Doane.  Chargois Dep.
33:12-35:7.  During this conversation, Chargois explained that Chargois & Herron was a local firm
working with a New York firm specializing in representing institutional investors.  Id.  As a result,
according to Chargois, Doane met with Eric Belfi and possibly Chris Keller in Little Rock.  Chargois
Dep. 35:8-36:20.  However, while Keller testified that he met Senator Farris in Little Rock, he does not
believe that Doane was present.  Keller Dep. Day 1 32:12-33:23.

LBS017442.[4]  Chargois and Tim Herron continued to relay information regarding Senator Farris'

contact with ARTRS and other funds that could potentially be interested in Labaton's services.

LBS017450; Keller Dep. Day 1 193:2-196:2.  Similarly, in spring of 2008, Herron

communicated information regarding Senator Farris' contact with Doane and the possibility that

ARTRS would retain Labaton.  LBS017451; LBS017453; Keller Dep. Day 1 218:18-224:16.

### C. ARTRS' Retention of Labaton

In mid-2008, ARTRS issued a Request for Qualifications ("RFQ") which invited firms to

submit qualifications to become additional monitoring counsel to the fund.  Labaton and

Chargois & Herron submitted a joint RFQ response on July 30, 2008.  LBS017738-55;

LBS017756-67.  Labaton contemplated that, if selected as panel monitoring counsel, both firms

would work on the litigation, if any, filed on ARTRS's behalf.  Belfi 2d Dep. 18:14-19; Keller

Dep. Day 1 47:24-49:3.  Labaton would serve as the lead counsel, and Chargois & Herron would

work with ARTRS in Little Rock.  Belfi 2d Dep. 26:15-27:15; Keller Dep. Day 1 44:8-46:21.

On October 13, 2008, ARTRS's Chief Counsel, Christa Clark, emailed Belfi and

informed him that "ATRS has selected Labaton Sucharow as an additional monitoring counsel

for our system."  LBS017456.  Clark further stated:

> I would like to speak with you regarding the additional firm on your submission
> Chargois & Herron.  This is a little awkward, but since your firms are not legally
> affiliated, we are unable to process the state contract form with both firms listed.

> If your firm is doing the monitoring and providing the financial backing for the
> cases, I think it is most appropriate that we add your firm independently to the list
> of approved firms.   Your firm may affiliate that firm or utilize them as
> independent contractors, if you deem it appropriate [sic], on a case by case basis.
> There would be no requirement that you use them if it was not a necessary and
> appropriate expense of a case.  I don't know how to best handle this point but the
> state procurement process is not conductive to a joint proposal.

---

[4] Concurrently, Chargois purportedly continued to seek introductions for Labaton with other entities. *E.g.*, LBS031472 ("Damon is really moving on all of the fronts.").

*Id.*[5]

After receiving this email, Belfi had a telephone conversation with Clark.  Belfi 2d Dep. 114:2-22, 117:20-118:10.  Belfi explained to Clark that Labaton "would be working with Chargois & Herron" and that Chargois & Herron "were going to be involved in the relationship." Belfi 2d Dep 117:20-118:10.

In October 2008, very shortly after ARTRS selected Labaton as monitoring counsel, Doane departed as ARTRS's executive director.  *See* Arkansas Times, "Doane to depart," Oct. 28, 2008.[6]  The new Executive Director, George Hopkins, began in or about December 2008. Hopkins Dep. 10:17-21.  Meanwhile, Clark – ARTRS' Chief Counsel – remained in her position at ARTRS until approximately October 2009.  *See* Arkansas Democrat-Gazette, "Faulted on Contracts, Teacher-System Lawyer Quits," October 22, 2009.[7]

Unlike Doane, Hopkins did not know Tim Herron or the Chargois & Herron firm. Hopkins 2d Dep. 21:5-10.  A few months after Hopkins began at ARTRS, Belfi and then-managing partner Lawrence Sucharow met with him in Little Rock.  Belfi 2d Dep. 27:18-21. Because Belfi got along well with Hopkins, and because Hopkins desired a direct relationship without intermediaries, Belfi became Hopkins' primary contact with regard to Labaton's monitoring relationship.  Belfi 2d Dep. 27:21-28:7, 56:22-57:10; Hopkins 2d Dep. 60:8-62:16.

---

[5]  Given the nature of the relationship, discussed below, the payment to Chargois & Herron was never an "expense of a case."  Keller Dep. Day 2 302:24-304:8.  Except where they appeared as counsel in Court, Chargois & Herron only received a portion of Labaton's attorneys' fees, which themselves were awarded on a percentage basis that were unrelated to "expenses."

[6]  *Available at* https://www.arktimes.com/ArkansasBlog/archives/2008/10/23/doane-to-depart (last visited March 9, 2018).

[7]  *Available at* https://www.pressreader.com/usa/arkansas-democrat-gazette/20091022/283927403838722 (last visited March 9, 2018).

Thus, Chargois & Herron were uninvolved with ARTRS as Belfi's relationship with Hopkins developed.  Belfi 2d Dep. 57:5-19

On September 24, 2010, Belfi sent Hopkins a draft retention letter for the State Street matter, which contained the following provision:

> Arkansas Teacher agrees that Labaton may divide fees with other attorneys for serving as local counsel, as referral fees, or for other services performed in connection with the litigation.  The division of attorneys' fees with other counsel may be determined upon a percentage basis or upon time spent in assisting the prosecution of an action. The division of fees with other counsel is Labaton's sole responsibility and will not increase the fees payable upon a successful resolution of the litigation.

LBS019948-50.  On February 8, 2011, Belfi sent a slightly revised, final retention letter to Hopkins with a modified first sentence to the quoted paragraph:  "Arkansas Teacher agrees that Labaton Sucharow may allocate fees to other attorneys who serve as local or liaison counsel, as referral fees, or for other services performed in connection with the Litigation."  LBS011061. Throughout this case, Chargois & Herron's portion of the State Street fee has been referred to by witnesses and in documents as, among other things, a "referral fee," a "local counsel" fee, and a "liaison fee."

During Labaton's representation of ARTRS, Belfi spoke with Hopkins about "how fees worked."  Belfi 2d Dep. 23:17-23.  According to Belfi, Hopkins said that "he only wanted to deal with [Labaton] and wasn't concerned about how [Labaton] would cut fees up if [they were] working with other firms."  *Id.*  Hopkins was only interested in the aggregate attorney fee amount, rather than allocations of that aggregate fee among various firms.  *Id.* at 23:24-24:5. According to Belfi, Hopkins "was not concerned with who [Labaton was] splitting fees with." *Id.* at 120:11-22.  Belfi believed that Hopkins "didn't want to deal with" allocations of fees between lawyers.  *Id.*  Hopkins' testimony supports this belief.  Hopkins 2d Dep. 68:23-69:3 ("I told Eric if I ever want to know about your attorney fees and who all you hired, I'll ask you.

10

And, you know, on any case because I intentionally didn't want to know a whole lot."); *id.* at

73:11-19 ("I don't feel misled because I made it real clear to them that I didn't want to be the

gatekeeper on all this attorney relationship.  And I think if they thought I wanted to know, they

would have told me because Eric always said if you ever want to see how we do all these fees,

just let me know.  And I said that's fine."); *see also id.* at 74:10-75:8.

### D.  Labaton's Agreement with Chargois

Early in the relationship between Labaton and Chargois & Herron, Belfi, Keller, and

Damon Chargois discussed the terms of an agreement between the two firms.  The crux of the

agreement was that when Chargois & Herron facilitated the introduction between Labaton and a

client, Chargois & Herron would receive up to 20% of the gross attorney fees Labaton earned

representing that client, if the client was a named plaintiff and Labaton was appointed lead or co-

lead counsel.  *See*, *e.g.*, LBS031185; Keller Dep. Day 1 42:15-46:14; Chargois Dep. 50:11-

52:24, 162:19-164:2.  Initially, the understanding was that Chargois would play a local counsel

role relative to the entities with which he facilitated introductions, and that he would be active

assisting in litigating Labaton's cases if needed.  *See* Belfi 2d Dep. 26:15-23, 27:11-15; Keller

Dep. Day 1 44:8-46:21.

Labaton's agreement with Chargois was never reduced to a formal written contract.

However, as Labaton's relationship with ARTRS developed, Chargois and Labaton began to

formalize their agreement.  In February 2009, Chargois indicated that he expected a relatively

informal arrangement, but expressed the terms as he understood them in a written email.

LBS030990.  Roughly one week later, Chargois inquired whether a written "letter agreement"

would be necessary.  LBS030993; Keller Dep. Day 1 255:16-257:4.  Chargois and Keller

discussed via email the terms of the potential contract.  LBS031492; Keller Dep. Day 1 258:8-

19.  In April 2009, Chargois sent a draft letter agreement to Belfi and Keller seeking to memorialize the previous discussions in writing.  LBS030985-87.  Keller edited the document and sent a return draft that, among other things, inserted an arbitration clause.  LBS031192-95.  While a written agreement was never finalized (Response to Supplemental Interrogatories at 8), Chargois at least viewed it as enforceable.  LBS031137; Belfi 2d Dep. 58:1-22.  As time passed, Labaton and Chargois maintained the basic referral arrangement of an 80/20 fee split, if ARTRS became a named plaintiff and Labaton was appointed lead or co-lead counsel.[8]

Because ARTRS was the only named plaintiff in Civil Action No. 11-cv-10230 MLW, i.e., the action on behalf of the putative class of customers of State Street,[9] the three Customer Class Law Firms (Labaton, Lieff Cabraser, and the Thornton Law Firm) agreed in 2013 that they would share in paying the allocation to Chargois & Herron from their own fee awards. LBS027776.  Garrett Bradley of the Thornton firm handled the discussions with Lieff Cabraser and Chargois regarding this point.  *Id.*; Bradley 2d Dep. 53:14-54:10.[10]

In June 2016, well after a settlement agreement-in-principle had been reached, Bradley reached out to Chargois for further discussions regarding Chargois' fee allocation.  TLF-SST-

---

[8] Although it became apparent that Chargois' total contribution would be limited to the initial assistance in introducing Labaton to ARTRS, Chargois maintained that he was entitled to 20% of any fee earned by Labaton.  LBS017594; LBS030876; Belfi 2d Dep. 58:5-15.  Chargois intimated that he would seek legal redress to vindicate his perceived contractual right, if necessary.  Belfi 2d Dep. 58:5-59:22; Chargois Dep. 59:6-60:4; Keller Dep. Day 1 130:19-131:12.  Labaton was concerned by the possibility of litigation in Texas state court.  *See* Belfi 2d Dep. 58:16-59:22; Keller Dep. Day 1 130:22-132:3; Keller Dep. Day 2 541:19-543:23.

[9]  Civil Action Nos. 11-cv-12049 MLW and 12-cv-11698 MLW, involving the ERISA Plaintiffs, were consolidated with the customer action for pre-trial purpose.

[10] Bradley explained that he took on the role of negotiating with Chargois & Herron because he had a friendly relationship with Chargois, and he wanted to reach agreement out of concern that, because ARTRS was the only named (non-ERISA) plaintiff, Chargois could say his firm was entitled to 20% of the overall fee award, not just the portion that Labaton Sucharow received.  Bradley 2d Dep. 53:14-54:10; *see also* Belfi 2d Dep. 94:5-23; Keller Dep. Day 1 122:6-124:19.

060973.  Bradley negotiated an agreement that Chargois & Herron would receive an amount equal to 5.5% of the total fee award (basically, a percentage that would be approximately equivalent to 20% of Labaton's anticipated share of the total fee), which would be funded by the three Customer Class Law Firms, by agreement, from their respective shares of the award. LBS040924; Bradley 2d Dep. 93:16-22.[11]

Given his desire not to be informed of the allocation of fees among counsel (Hopkins Dec. at ¶¶10-12, 14), George Hopkins personally was unaware of the Chargois agreement until August or September of 2017. Id. ¶ 7.  Thereafter, when informed of the details of the fee-sharing agreement between the Customer Class Law Firms and Chargois in this case, Hopkins expressly consented to and ratified the agreement.  *Id.* at ¶¶ 16-17.

The fee-sharing arrangement was not disclosed to the Court or to the class.  No local rule or court rule required disclosure to the Court, nor did the Court have a standing order, or case specific order, requiring disclosure.

## III.    SUMMARY OF QUESTIONS ADDRESSED AND OPINIONS RENDERED IN THIS REPORT

I have been retained by Labaton to render legal ethics opinions on the following issues, and in formulating my opinions I have reviewed relevant ethics rules, case authority, other legal and ethics authorities, and relied upon my own professional knowledge, experience, skill, training and education:

---

[11] In that June 21, 2016 email to Chargois cited above, Bradley discussed ERISA counsel and what percentage would be allocated to them in the context of his dialogue with Chargois about what percentage would be paid to Chargois & Herron.  TLF-SST-060973.  No Labaton lawyers were copied on this communication, and there is no evidence in the record suggesting that lawyers from Labaton saw it before this investigation.  *Id.*  Bradley explained that he was simply providing the context of the ERISA firms as background and as a negotiating point with Chargois.  Bradley 2d Dep. 84:9-85:20; Keller Dep. Day 2 534:23-535:24.  Bradley's reference in that 2016 conversation did nothing to change the agreement that the ERISA lawyers had struck with Customer Counsel more than two years earlier.

1.  If there is a flawed or imperfect division of fee arrangement between law firms and a client under Massachusetts' Rules of Professional Conduct (Mass. R. Prof. C.) 1.5(e), is a resulting fee division between the law firms considered under Mass. R. Prof. C. 7.2(c),[12] which prohibits a lawyer giving anything of value to a person for recommending the lawyer's services?

    **Answer: No.** As will be explained more fully below, I have concluded to a reasonable degree of professional certainty that under both the ethics rules and legal precedent in Massachusetts, a flawed or imperfect division of fee arrangement between law firms and a client under Mass. R. Prof. C. 1.5(e) does not convert any resulting fee division between the law firms into a matter in which Mass. R. Prof. C. 7.2(b) would be controlling. There is nothing in Massachusetts case law or other authorities that would support the proposition that a flawed or imperfect division of fee arrangement between law firms and a client under Mass R. Prof. C. 1.5(e) should be considered under Mass. R. Prof. C. 7.2(c). [See *infra* IV.A. for a more complete analysis.]

2.  Whether there was an ethical or legal requirement for Labaton to provide notice to the Court of its fee sharing arrangement with Chargois & Herron in the case of *Arkansas Teacher Retirement System v. State Street Corp., et al.*, MAD No. 11-cv-10230?

    **Answer: No.** As will be explained more fully below, I have concluded to a reasonable degree of professional certainty that there was no ethical or legal requirement for Labaton to provide notice to the Court of its fee sharing arrangement with Chargois & Herron in the case of *Arkansas Teacher Retirement System v. State Street Corp., et al.*, MAD No. 11-cv-10230. Neither Fed. R. Civ. P. 23(h) nor 54(d) require fee sharing arrangements to be disclosed to the Court. No local rule or court rule required disclosure to the Court, nor did the Court have a standing order, or case specific order, requiring disclosure. The Board of Judges of the Eastern District of New York and the Southern District of New York adopted, and the Judicial Council of the Second Circuit, adopted Local Rule 23.1 to provide for disclosure of "any fee sharing agreements with anyone" after the Second Circuit's decision in *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 137 n.2 (2nd Cir. 2016), made it clear that without such a local rule or court order disclosure of fee sharing agreements is not required. In addition, neither Mass. R. Prof. C. 3.3(a) nor 8.4(c) independently create an ethical duty that required Labaton to disclose to the Court its fee sharing arrangement with Chargois & Herron, nor did the lack of disclosure of the fee sharing agreement violate these ethics rules. [See *infra* IV.B. for a more complete analysis.]

---

[12] During the relevant time period, including when Belfi sent a final retention letter to Hopkins on February 8, 2011, the provision stating that a lawyer not give anything of value to a person recommending the lawyer's services, with some exceptions, appeared in section (c) and not (b) of Mass. R. Prof. C. 7.2. *See* Exhibit 2. Mass. R. Prof. C. 7.2 was amended on March 26, 2015, effective July 1, 2015, section (b) of the former version of 7.2 was deleted, and section (c) became section (b). *See* Exhibit 3.

3.  Whether there was an ethical or legal requirement for Labaton to provide notice of the fee sharing agreement between Labaton and Chargois & Herron to the class members in the above-stated case?

> **Answer:  No.**  As will be explained more fully below, I have concluded to a reasonable degree of professional certainty that there was no ethical or legal requirement for Labaton to provide notice of the fee sharing agreement between Labaton and Chargois & Herron to the class members in the above-stated case. Disclosure to class members flows both from class counsel's disclosure obligations to the Court and from class counsel's obligations to class members. Without a disclosure obligation to the Court and without a clear obligation to disclose how fees would be divided to the class, there was no obligation for Labaton to disclose the fee sharing agreement with Chargois & Herron to the class members. [See *infra* IV.C. for a more complete analysis.]

4.  Do courts or ethics authorities impose sanctions on or discipline a lawyer or law firm when a legal or ethical duty is unclear?

> **Answer:  No.**  Courts and ethics authorities do not impose sanctions on or discipline a lawyer or law firm when a legal or ethical duty is unclear. Mass. R. Prof. C. Scope [5] states, in pertinent part:

>> The Rules presuppose that disciplinary assessment of a lawyer's conduct will be made on the basis of the facts and circumstances as they existed at the time of the conduct in question and in recognition of the fact that a lawyer often has to act on uncertain or incomplete evidence of the situation. Moreover, the Rules presuppose that whether or not discipline should be imposed for a violation, and the severity of a sanction, depend on all the circumstances, including the willfulness and seriousness of the violation, extenuating factors, and whether there have been previous violations.

>> If at the time of an alleged violation of a legal or ethical duty the legal or ethical duty is unclear, the facts and circumstances, as well as fundamental due process, guide courts and ethics authorities to refrain from imposing sanctions or discipline on a lawyer or a law firm. [See *infra* IV.D. for a more complete analysis.]

5.  Does Mass. R. Prof. C. 1.5(a) prohibition on a "clearly excessive fee" apply to the Mass. R. Prof. 1.5(e) "division of a fee (including a referral fee) between lawyers who are not in the same firm"?

> **Answer:  No**. Mass. R. Prof. C. 1.5(a) prohibition on a "clearly excessive fee" does not apply to the Mass. R. Prof. 1.5(e) "division of a fee (including a referral fee) between lawyers who are not in the same firm." Mass. R. Prof. C. 1.5 has to be construed in its entirety, and it is clear that Mass. R. Prof. C. 1.5(a) prohibition on a "clearly excessive fee" does not apply to each lawyer's share of fee pursuant to a division of fee under

Mass. R. Prof. C. 1.5(e) because (e) requires that "the total fee is reasonable." [See *infra* IV.E. for a more complete analysis.]

## IV.   REASONING AND SUPPORT FOR EXPERT OPINIONS

### A.   A Flawed or Imperfect Division of Fee Arrangement Between Law Firms and a Client Under Massachusetts' Rules of Professional Conduct (Mass. R. Prof. C.) 1.5(e) and a  Resulting Fee Division Between the Law Firms Should Not Be Considered a Violation of Mass. R. Prof. C. 7.2(c)

*1.   There is no authority in Massachusetts or the First Circuit holding that a division of attorney fees under a fee arrangement that does not fully comply with Mass. R. Prof. C. 1.5(e), or the equivalent ethics rule to Mass. R. Prof. C. 1.5(e), would violate Mass. R. Prof. C. 7.2(c), or the equivalent ethics rule to Mass. R. Prof. C. 7.2(c)*

Massachusetts state courts, Massachusetts disciplinary authorities, and the United States District Court for Massachusetts have never considered a fee division between law firms based on a flawed or imperfect division of fee arrangement between law firms and a client under Mass. R. Prof. C. 1.5(e) to be a violation Mass. R. Prof. C. 7.2(c).  In addition, no other District Court in the First Circuit has conflated any state's version of ABA Model Rule of Professional Conduct ("Model Rule") 1.5(e) with the equivalent of Mass. R. Prof. C. 7.2(c).

There are very few Massachusetts cases that discuss client-attorney fee agreements that do not fully comply with Mass. R. Prof. C. 1.5(e), and none of those cases even mention Mass. R. Prof. C. 7.2(c).  For example, *Saggese v. Kelley*, 837 N.E.2d 699 (Mass. 2005), involved a dispute between an attorney, Alfred Saggese, who had an oral fee sharing agreement with Kelley Law Associates, P.C. ("Kelleys").[13]  *Id*. at 702-03.  When Saggese sought payment of his expected referral fee, the Kelleys argued that the oral fee sharing agreement should not be enforced because it violated Mass. DR 2-107(A)(1), which was in effect at the time of the client-attorney relationship was formed and was replaced with Mass. R. P. C. 1.5(e).  *Id*. at 703.  The

---

[13] Initially, Kelley Law Associates, P.C. was known as Kelley & Donovan, P.C.  *Saggese* 837 N.E.2d at 701-02.

Kelleys did not argue, and the Court did not consider, that payment to Saggese would violate the old Massachusetts Disciplinary Rule that was the equivalent of Mass R. Prof. C. 7.2(c), or Mass. R. Prof. C. 7.2(c), prohibiting giving anything of value to a person for recommending the lawyer's services, which Saggese had done for the Kelleys.

The Court in *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A*., 188 F. Supp.2d 115 (D. Mass 2002) was faced with an "oral fee-splitting agreement made in contravention of the rules of professional conduct . . . ." *Id*. at 117.  In considering the oral fee-splitting agreement to be "an imperfect fee agreement," the Court only looked to Mass. R. Prof. C. 1.5(e) and the corresponding N.Y. Code of Prof'l Resp. DR 2-107(A). *Id*. at 124.  Again, at no time did the court consider Mass. R. Prof. C. 7.2(c) or the corresponding disciplinary rule in New York.

I conducted additional legal research into the following materials: other Massachusetts state court cases; advisory ethics opinions of the Committee on Professional Ethics for Massachusetts Bar Association; advisory ethics opinions of the Boston Bar Association Ethics Committee; articles and reports of the Massachusetts Board of Bar Overseers;[14] a selection of public Disciplinary Decisions of the Massachusetts Board of Bar Overseers;[15] all of the available non-public discipline matters called Admonitions by the Massachusetts Board of Bar

---

[14] I reviewed "The Year in Ethics and Bar Discipline" reports for all available years, 2007 to 2017, "That Was The Year That Was: Noteworthy Decisions On Ethics And Bar Discipline in 2003," and all reports that mentioned fees, advertising, or solicitation found on the Massachusetts Board of Bar Overseers website. *Articles*, MASSACHUSETTS BOARD OF BAR OVERSEERS, https://www.massbbo.org/Ethics.

[15] There appear to be hundreds of public disciplinary decisions on the Massachusetts Board of Bar Overseers.  *See Disciplinary Decisions*, MASSACHUSETTS BOARD OF BAR OVERSEERS, https://www.massbbo.org/Decisions.  There is no apparent way to search the decisions based on the alleged rule violation or subject matter, and I determined that there were too many decisions to review individually.  Instead, I reviewed the first ten cases in alphabetical order that were decided in 2017, and then selected the first and last case or cases (some individuals had multiple disciplinary cases or rulings) for each letter of the alphabet.

Overseers;[16] searched and reviewed United States District Court opinions in the First Circuit, and

searched and reviewed First Circuit Court opinions.  I could not find a single case that held, or

any disciplinary decision, ethics opinion, or bar report that stated, that a division of attorney fees

under a fee arrangement that does not fully comply with Mass. R. Prof. C. 1.5(e), or the

equivalent ethics rule to Mass. R. Prof. C. 1.5(e), would violate Mass. R. Prof. C. 7.2(c), or the

equivalent ethics rule to Mass. R. Prof. C. 7.2(c).

There were two Admonition matters, discussed below, that have some relevance.  Unlike

the case for which this report is being written where the engagement letter contained permission

for fee sharing, including referral fees, the two Admonitions involved matters in which there was

no notice to or consent of the client.

Admonition No. 16-25 (2016), https://bbopublic.blob.core.windows.net/web/f/admon-

2016.pdf, is classified "Improper Division of Fee with Other Lawyer [Mass. R. Prof. C. 1.5(e)].

This Admonition involves two respondents, A and B, who were both lawyers.  Respondent A,

the referring lawyer, took a referral fee when "[n]either lawyer notified or obtained the prior or

contemporaneous written approval of the client of the referral fee taken by Respondent A."  *Id*.

When the client later learned of the referral fee, the client "brought the matter of the

unauthorized referral fee to the attention of bar counsel."  *Id*. The Admonition held that for

"failing to obtain the client's advance, written consent to the division of fees, the respondents

violated Mass. R. Prof. C. 1.5(e).  They each received an admonition for their conduct in this

matter."  *Id*.  If in 2016, or any time before 2016, ethics authorities in Massachusetts viewed

sharing fees in violation of Mass. R. Prof. C. 1.5(e) as a violation of Mass. R. Prof. C. 7.2(b)

---

[16] I reviewed all of the Admonitions issued from 1999 through March 20, 2018. I searched these using the find function and "1.5(e)" and then "7.2" to identify Admonitions that dealt with fee sharing or giving a thing of value to another person for referring a client.

(previously Mass. R. Prof. C. 7.2(c)), then, in my opinion, I would have expected the Admonition to discuss a violation of Mass. R. Prof. 7.2(b).

The only other Admonition to mention an improper fee sharing is Admonition No. 99-58 (1999), https://bbopublic.blob.core.windows.net/web/f/admon.pdf, which is classified "Improper Division of Fee with Other Lawyer [DR 2-107(A(1)]."  In this Admonition, a client consulted with respondent, a lawyer admitted to practice in Massachusetts, about a summons the client had received in a Rhode Island matter.  *Id*. The client paid the respondent a consultation fee and the respondent referred the client to a lawyer in Rhode Island.  *Id*. The client paid the Rhode Island lawyer a retainer of $1,500, and, thereafter without the client's knowledge the Rhode Island lawyer sent respondent $500, one-third of the initial retainer.  *Id*. The client only learned of this division of fee after she discharged the Rhode Island lawyer and obtained her file to give to successor counsel.  *Id*. She questioned payment to respondent and filed a complaint with Bar Counsel.  *Id*. The Admonition found:  "By failing to obtain the client's consent to a division of fees, the respondent violated Canon Two, DR 2-107(A)(1), as well as the analogous Rhode Island Rule of Professional Conduct 1.5(e).  The respondent received an admonition for his conduct in this matter."  *Id*.  Again, there is no mention of any violation of Rhode Island R. Prof. C. 7.2 or the equivalent Disciplinary Rule in Massachusetts.

> ### 2. *Leading resources on legal ethics do not maintain that a violation of Model Rule 1.5(e), or a jurisdiction's equivalent ethics rule to Mass. R. Prof. C. 1.5(e), is also a violation of Model Rule 7.2(b), or a jurisdiction's equivalent ethics rule to Mass. R. Prof. C. 7.2(c)*

In researching this issue and in forming my opinions, I also reviewed leading legal ethics resources, including treatises and texts on legal ethics, and I could not find any authority for the proposition that a violation of either the Model Rule 1.5(e), or a jurisdiction's version of Mass. R. Prof. C. 1.5(e), is also a violation of Model Rule 7.2(b), or a state's version of Mass. R. Prof.

C. 7.2(c).  These authorities either are silent on this issue or, in one instance, state that the original Model Rule 7.2(c), which is the equivalent of Mass. R. Prof. C. 7.2(c) at the relevant time, does not apply to lawyers.

### a) *Some authority maintains that Model Rule 7.2(c) does not apply to lawyers sharing fees*

Cornell Law Professor W. Wolfram has stated:  "The prohibition in MR 7.2(c)[17] is broader in that it prohibits giving anything of value to a person for recommending the lawyer's services except for advertising and lawyer referral plans.  *Its comment,[18] however, suggests that it is limited to traditional touting arrangements* (§ 14.2.5)"  (emphasis added). *Charles W. Wolfram, Modern Legal Ethics* § 14.2.4, at 782 n.58 (1986).  Professor Wolfram goes on to explain what the touting and related arrangements targeted in Model Rule 7.2(c) typically involve:

> Lawyers – either directly or through their runners, cappers, or touts – have paid money to taxi drivers in "divorce haven" states who brought prospective divorce clients from the airport to the lawyer's office; have accepted referrals from a nonlawyer who solicited prospective clients of a mass accident for the lawyer in the hope of becoming his investigator; have paid gratuities to police officers, ambulance drivers, doctors and other medical workers in emergency rooms, or professional runners who might be first award of a personal injury, or to bail bond

---

[17] At the time that Professor Wolfram was writing, ABA Model Rule 7.2(c) provided:  "A lawyer shall not give anything of value to a person for recommending the lawyer's services, except that the lawyer may pay the reasonable cost of advertising or written communication permitted by this Rule and pay the usual charge of a not-for-profit lawyer referral service or other legal service organization."  ABA Model Rule 7.2(c) (1986).

[18] The comment to which Professor Wolfram referred was titled "Paying Others to Recommend a Lawyer," and it stated:

> A lawyer is allowed to pay for advertising permitted by this Rule, but otherwise is not permitted to pay another person for channeling professional work.  This restriction does not prevent an organization or person other than the lawyer from advertising or recommend the lawyer's services.  Thus, a lawyer may participate in not-for-profit lawyer referral programs and pay the usual fees charged by such programs.  Paragraph (c) does not prohibit paying regular compensation to an assistant, such as a secretary, to prepare communications permitted by this Rule.

ABA Center for Professional Responsibility, The Legislative History of the Model Rules of Professional Conduct: Their Development in the ABA House of Delegates 182 (1987).

writers or others involved in the criminal process; or have had nonlawyer
employees find and sign up prospective clients.

*Id*. at § 14.2.5, at 786.

According to Professor Wolfram, Model Rule 7.2(c) is aimed at lawyers, or those

working for lawyers in some capacity, *paying nonlawyer persons*, such as taxi drivers, police

officers, ambulance drivers, doctors, other medical professionals, bail bond writers, nonlawyer

employees, and other "nonlawyers" for referring clients or signing up prospective clients.   In

Professor Wolfram's account, none of the impermissible payments to other persons involve fee

sharing among lawyers who are not members of the same firm.

### b)   *The legislative history of Model Rule 7.2(c) and Model Rule 1.5(e) does not support the conclusion that Model Rule 7.2(c) applies to lawyers sharing fees*

The *Proposed Final Draft Model Rules of Professional Conduct* discusses what was to

become ABA Model Rule 7.2, and it contains comparisons with the relevant ABA Model Code

of Professional Responsibility Disciplinary Rules and legal background with case citations and

notes.  *ABA Commission on Evaluation of Professional Standards*, *Proposed Final Draft Model

Rules of Professional Conduct* 255-61 (1981).  There is nothing in the Model Code comparisons,

the cases cited, or the notes that maintain that the prohibition against giving anything of value to

a person embodied in Model Rule 7.2(c) also referred to sharing fees with another lawyer. Nor is

there anything in the discussion of what was to become Model Rule 1.5 and comments to Model

Rule 1.5, *id*. at 44-52, that suggests that a fee sharing agreement that does not fully comply with

the requirements of Model Rule 1.5(e) (which was proposed Model Rule 1.5(d) in the draft)

should be considered under Model Rule 7.2(c).

There are two official ABA publications for the legislative history of the ABA Model

Rules, and the historical accounts in neither publication support the conclusion that an imperfect

fee sharing agreement with what was to become Model Rule 1.5(e) should be considered under what was to become Model Rule 7.2(b). *ABA Center for Professional Responsibility, The Legislative History of the Model Rules of Professional Conduct: Their Development in the ABA House of Delegates* 39-47, 178-82 (1987); *ABA Center for Professional Responsibility, A Legislative History: The Development of ABA Model Rules of Professional Conduct 1982-2005* at 77-97, 709-31.

The absence in the legislative history drawing a connection between imperfect fee agreements under Model Rule 1.5(e) and giving anything of value to a person under Model Rule 7.2(b) is an indication that these two ethics rules should not be conflated because each addresses a different ethical issue.

> ### c) *None of the authoritative example disciplinary cases and ethics opinions based on the equivalent of Mass. R. Prof. 7.2(c) involve dividing fees with or giving anything of value to lawyers, nor do disciplinary cases involving the equivalent of Mass. R. Prof. C. 1.5(e) refer to the equivalent of Mass. R. Prof. C. 7.2(c)*

The ABA's *Annotated Model Rules of Professional Conduct* provides examples of how states' versions of the Model Rules are interpreted and applied.  In discussing current Model Rule 7.2(b) prohibiting compensating others for recommending a lawyer, none of the eight disciplinary cases or the fifteen state advisory ethics opinions that this authoritative reference identifies and discusses involve fee sharing with or giving anything of value to a lawyer.  *Ellen J. Bennett et al., Annotated Model Rules of Professional Conduct, Eighth Edition* 604-05 (8th ed. 2015) ("*Annotated Model Rules of Professional Conduct*").  This reference also identifies two disciplinary cases as examples of typical disciplinary cases involving state versions of Model Rule 1.5(e), and neither of these fee sharing cases are discussed in the context of a state's equivalent to Mass. R. Prof. C. 7.2(c).  *Id*. at 96.

22

The ABA describes that *Annotated Model Rules of Professional Conduct* as "the ABA's definitive resource for information about courts, disciplinary bodies, and ethics committees apply the lawyer ethics rules."  *Annotated Model Rules of Professional Conduct, Eighth Edition*, AmericanBar.org, https://tinyurl.com/y9tlhx65**.**  The following excerpt contains the description of the disciplinary cases collected to illustrate Model Rule 7.2(b), and in every instance the representative cases selected involve persons who are not lawyers:

> Unless the exceptions of paragraph (b) apply, a lawyer may not pay someone else to recommend his or her services.  *See People v. Shipp*, 793 P.2d 574 (Colo. 1990) (suspending lawyer for paying his inmate *client* to refer other inmates to him); *In re Maniscalco*, 564 S.E.2d 186 (Ga. 2002) (payment to operator of lawyer referral business who used *nonlawyer* "runners" to obtain clients violates rule even if lawyer initially did not know about runners and believe operator was a lawyer and refused to pay percentage of fees after learning truth); *Office of Disciplinary Counsel v. Au*, 113 P.3d 203 (haw. 2005) (lawyer paid *nonlawyer* runner 5 percent of fees earned on cases that runner referred); In re Geoff, 837 So.2d 1201 (La. 2003) (lawyer suspended for participating in scheme to employ *nonlawyer* "runners" to refer personal injury clients); *Son v. Margolius, Mallios, Davis, Rider & Tomar*, 709 A.2d 112 (Md. 1998) (sufficient evidence for trial whether fee paid to personal injury client's *nonlawyer* "consultant" who referred case to law firm was a referral fee in violation of the rule; summary judgment reversed); *Emil v. Miss. Bar*, 690 So.2d 301 (Miss. 1997) (lawyer suspended for using paid *investigator* to find prospective person injury clients); *In re Disciplinary Action against McCray*, 755 N.W.2d 835 (N.D. 2008) (lawyer paid *marketing firm* to tout firm's service as credit repair seminars); *Cincinnati Bar Ass'n v. Haas*, 699 N.E.2d 919 (Ohio 1998) (lawyer suspended for paying *insurance salesperson* for referring person injury clients) . . . .

*Id*. at 604 (emphasis added).  Out of these eight disciplinary cases, the authors' descriptions of four of the cases specifically refer to the persons receiving payment as *nonlawyers*, and in the remaining cases the nonlawyers receiving payment are a client, an investigator, a marketing firm, and an insurance salesperson.

The *Annotated Model Rules of Professional Conduct* also summarizes fifteen advisory ethics opinions addressing states' versions of Mass. R. 7.2(c), and these ethics opinion cover a range of topics such as directly giving a thing of value to a nonlawyer for referrals, giving a thing

of value indirectly to clients on a pro bono reduced fee bases in exchange for client referrals, and

the permissibility of giving nominal gifts for referrals under certain situations. *See id*. at 604-05.

All of these ethics opinions involve some aspect of giving a thing of value to nonlawyers for

referrals, and none of these ethics opinions involved fee sharing with lawyers.

In addition to the cases and ethics opinions focusing on state ethics rules that are the

equivalent to Mass. R. Prof. C. 7.2(c), the *Annotated Model Rules of Professional Conduct*

provides two examples of disciplinary cases involving the equivalent to Mass. R. Prof. C. 1.5(e).

*Id*. at 96.  Neither of these two cases involving the violation of a state's ethics rule that is the

equivalent of Mass. R. Prof. C. 1.5(e) also discuss the state's ethics rule that is equivalent of

Mass. R. Prof. C. 7.2(c).  *See Statewide Grievance Comm. v. Dixon*, 772 A.2d 160, 165 (Conn.

App. Ct. 2001) (finding Rule 1.5(e) violated when current counsel divided fees with client's

former counsel without informing client, without obtaining the client's consent, and over the

client's objection); *Cleveland Bar Ass'n v. Mishler*, 886 N.E.2d 818, 825 (Ohio 2008) (finding

no violation of fee sharing rule when lawyer did not bill client for payment made to a lawyer not

in the same firm).

> **d)  *Leading treatises and texts do not maintain that fee sharing between lawyers
> pursuant to an imperfect fee agreement under Model Rule 1.5(e), or a state's
> version of Mass. R. Prof. C. 1.5(e), becomes a violation of Model Rule 7.2(b), or
> a state's version of Mass. R. Prof. C. 7.2(c)***

In addition to the legislative history of the Model Rules and the cases and ethics opinions

in the *Annotated Model Rules of Professional Conduct*, other leading treatises and texts do not

maintain that fee sharing between lawyers pursuant to an imperfect fee agreement under Model

Rule 1.5(e), or a state's version of Mass. R. Prof. C. 1.5(e), becomes a violation of Model Rule

7.2(b), or a state's version of Mass. R. Prof. C. 7.2(c).  In reaching this conclusion, I reviewed

the *Restatement (Third) of the Law Governing Lawyers ("Restatement")*, *The Law of Lawyering*,

and *Lawyer Law*, which are generally considered leading treatises and texts concerning the ethical obligations of lawyers.  The following discusses each in turn.

The *Restatement* does not conflate fee sharing among lawyers under circumstances where a fee sharing rule is not strictly followed into giving something of value to a person.  The *Restatement* has a section titled "Fee-Splitting Between Lawyers Not in the Same Firm." *American Law Institute, Restatement (Third) The Law Governing Lawyers* § 47 (1986-2017). Comments and Reporter's Notes to this section discuss a number of different aspects of fee sharing, but none of the discussion states that fee sharing between lawyers that does not comport with the requirements in the *Restatement,* or in a state's version of Mass. R. Prof. C. 1.5(e), becomes a violation of a state's version of Mass. R. Prof. C. 7.2(c).  *See id*., 332-40.   The *Restatement* does not have a direct corresponding section for giving a thing of value to a person for a referral, but a comment to § 10, "Limitations on Nonlawyer Involvement in a Law Firm," states:  "The general prohibition against fee-splitting with nonlawyers is often applied to schemes for compensating a nonlawyer for referring clients (e.g., ABA Model Rules of Professional Conduct, Rule 5.4(a), which is directly prohibited by ABA Model Rule 7.2(c) (with exceptions, "a lawyer shall not give a thing of value to a person for recommending the lawyer's services").  *Id*. at § 10 cmt. (d).

*The Law of Lawyering* discusses fee sharing among lawyers.  *Geoffrey C. Hazard, Jr., et al., The Law of Lawyering* § 9.20 (4th ed. 2015).  This section discusses fee splitting and the enforceability of referral fee agreements, and the authors note that "Model Rule 1.5(e) now permits fee splitting in virtually all situations, provided the client agrees to the arrangement in writing."  *Id*. at § 9.20, 9-73.  They also note that fee splitting can also involve the "forwarding" of cases and that in some instances "whatever portion of the total fee is paid to the first lawyer is

nothing more than a referral or 'finder's fee.'" *Id*. Nothing in the discussion of fee sharing states that fee sharing between lawyers not in the same firm becomes a violation of the prohibition on giving anything of value to a person for recommending the lawyer's services. The discussion of Model Rule 7.2(b) focuses on advertising and exceptions to the rule against giving something of value to a person for recommending the lawyer's services. *Id*. at § 60.02. It discusses the prohibition on "[u]sing a 'runner' (such as an ambulance driver or a hospital nurse) to drum up business in person" and notes that this would also violate other ethics rules. *Id*. at § 60.02, 60-6. *The Law of Lawyering* does not conflate an imperfect fee sharing arrangement under Model Rule 1.5(e) with a violation of Model Rule 7.2(b).

The final text I reviewed is *Lawyer Law*, which is published by the ABA Center for Professional Responsibility. *Thomas D. Morgan, Lawyer Law: Comparing the ABA Model Rules of Professional Conduct with the ALI Restatement (Third) of the Law Governing Lawyers* (2005) ("*Lawyer Law*"). This text divides its discussion into fee-splitting among lawyers, *id*. at 727-32, fee-splitting with nonlawyers, *id*. at 732-35, and referrals. *Id*. at 733-38. None of the discussion states that an imperfect fee sharing arrangement under either Model Rule 1.5(e) or a state's version of the rule should be considered a violation of Model Rule 7.2(b) or a state's version of the rule.

> e) **No case in other possibly relevant jurisdictions has held that a violation of the equivalent ethics rule to Mass. R. Prof. C. 1.5(e) is a violation of the equivalent ethics rule to Mass. R. Prof. C. 7.2(c)**

I was also asked to research the ethics rules and cases in Arkansas, New York, and Texas, and I could not find any state or federal case that considered a fee division between law firms based on a flawed or imperfect division of fee arrangement between law firms and a client to be controlled by a state's ethics rule that is the equivalent of Mass. R. Prof. C. 7.2(c). In doing this

research, I found an ethics rule that explicitly states that the equivalent of Mass. R. Prof. C.

7.2(c) does not apply to lawyers:

Texas Disciplinary Rules of Professional Conduct 7.03 states, in pertinent part:

**Rule 7.03. Prohibited Solicitations and Payments**

(b) A lawyer shall not pay, give, or offer to pay or give anything of value *to a person not licensed to practice law* for soliciting prospective clients for, or referring clients or prospective clients to, any lawyer or firm, except that a lawyer may pay reasonable fees for advertising and public relations services rendered in accordance with this Rule and may pay the usual charges of a lawyer referral service that meets the requirements of Occupational Code Title 5, Subtitle B, Chapter 952 (emphasis added).

This Texas rule makes it explicit that persons licensed to practice law in Texas are excluded

under the ethics rule that is the equivalent Mass. R. Prof. C. 7.2(c).

> *f)   The agreement between Labaton and ARTRS satisfied the requirements of Mass. R. Prof. C. 1.5(e)*

Labaton's engagement letter with ARTRS for the State Street Litigation met the

requirements of Mass. R. Prof. C. 1.5(e) as it existed at the time of the engagement letter.

Although Mass. R. Prof. C. 1.5(e) did not require Labaton to identify the referring attorney, the

extent to which ARTRS's consent was sufficiently informed requires an understanding of how

the client-lawyer relationship between ARTRS and Labaton developed.

Labaton and Chargois & Herron jointly submitted a response to an ARTRS Request for

Qualifications ("RFQ") on July 30, 2008.   LBS017738-55; LBS017756-67.  If litigation on

behalf of ARTRS would occur, Labaton anticipated being lead counsel and Chargois & Herron

would serve as local counsel for ARTRS through the Little Rock, Arkansas, office of Chargois &

Herron.  Belfi 2d Dep. 26:15-27:15; Keller Dep. Day 1 44:8-46:21.

When ARTRS selected Labaton as one of its monitoring counsel in 2008, its Chief

Counsel, Christa Clark, stated, in relevant part, that because Labaton and Chargois & Herron

"are not legally affiliated, we are unable to process the state contract form with both firms listed. . . . Your firm may affiliate that firm [Chargois & Herron] or utilize them as independent contractors, if you deem is appropriate [sic], on a case by case basis." LBS017456. Eric Belfi from Labaton later explained to Clark that Labaton "would be working with Chargois & Herron" and that Chargois & Herron "were going to be involved in the relationship." Belfi 2d Dep. 117:20-118:10.

At the time that ARTRS chose Labaton as monitoring counsel, the Executive Director of ARTRS was Paul Doane, who knew of the Chargois & Herron law firm and its joint proposal with Labaton. Doane left ARTRS after Labaton had been selected as monitoring counsel, and he was replaced by George Hopkins, who did not know the Chargois & Herron firm. Hopkins 2d Dep. 21:5-10. While Hopkins did not know of the Chargois & Herron firm, in his deposition Hopkins testified that, "I told Eric if I ever want to know about your attorney fees and who all you hired, I'll ask you." *Id*. at 68:23-69:3. Hopkins also testified that, "I don't feel misled because I made it real clear to them that I didn't want to be the gatekeeper on all this attorney relationship. And I think if they thought I wanted to know, they would have told me because Eric always said if you ever want to see how we do all these fees, just let me know. And I said that's fine." *Id*. at 73:11-19.

On February 8, 2011, Belfi of Labaton sent ARTRS a final retention letter for litigation involving State Street, and the retention letter contained this clause:

> Arkansas Teacher agrees that Labaton Sucharow may allocate fees to other attorneys who serve as local or liaison counsel, as referral fees, or for other services performed in connection with the Litigation. The division of attorneys' fees with other counsel may be determined upon a percentage basis or upon time spent in assisting the prosecution of an action. The division of fees with other counsel is Labaton's sole responsibility and will not increase the fees payable upon a successful resolution of the litigation.

LBS019948-50; LBS011061.

Mass. R. P. C. 1.5(e), in effect until March 2011, stated, in pertinent part: "A division of a fee between lawyers who are not in the same firm may be made only if, after informing the client that a division of fees will be made, the client consents to the joint participation and the total fee is reasonable." Comment [4A] to Mass. R. P. C. 1.5 further explained:

> Paragraph (e), unlike ABA Model Rule 1.5(e), does not require that the division of fees be in proportion to the services performed by each lawyer unless, with a client's written consent, each lawyer assumes joint responsibility for the representation. . . . The Massachusetts rule does not require disclosure of the fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer.

Mass. R. Prof. C. 1.5(e) in effect in February 2011,[19] when Labaton and ARTRS finalized their fee agreement, permitted Labaton to share fees with Chargois & Herron for its role in securing ARTRS as a client. Mass. R. Prof. C. 1.5(e) also did not require Labaton to disclose how it would divide its fees with Chargois & Herron, and did not expressly require that the division of fees be confirmed in writing. The fee agreement Labaton had with ARTRS permitted Labaton to allocate fees to other lawyers, including as referral fees. The fee agreement did not – and was not specifically required to – identify Chargois & Herron. The omission of Chargois & Herron's name was consistent with previous instructions from Hopkins. Further, in the context of the monitoring counsel role, former counsel Christa Clark, with whose knowledge ARTRS should be charged, was aware of Chargois & Herron, had given written permission for Labaton to affiliate with or use Chargois & Herron as Labaton deemed appropriate, LBS017456, and had been told by Belfi that Labaton would be affiliating with Chargois & Herron.

---

[19] In December 2010, Mass. R. P. C. 1.5(e) was amended, effective March 15, 2011, to state, in pertinent part: "A division of a fee (including a referral fee) between lawyers who are not in the same firm may be made only if the client is notified before or at the time the client enters into the fee agreement for the matter that a division of fees will be made and consents to the joint participation in writing and the total fee is reasonable."

Hopkins stated in a written declaration that he did not desire to be informed of the allocation of fees among counsel, and so informed Belfi.  Hopkins Dec. at ¶¶10-12, 14. Although Hopkins stated that he was personally unaware of the Chargois agreement until August or September of 2017, *id*. ¶ 7, when Hopkins was informed of the details of the fee-sharing agreement between the Customer Class Law Firms and Chargois & Herron in this case, he expressly consented to and ratified the agreement in writing.  *Id.* at ¶¶ 16-17.

Mass. R. Prof. C. 1.5(e), which was in effect at the time of the retention letter between Labaton and ARTRS, was discussed in *Saggese v. Kelley*, 837 N.E.2d 699, 706 (Mass. 2005). As discussed previously, *Saggese* dealt with the enforcement of an oral fee sharing agreement wherein Saggese sought one-third, or a total of $90,931.50 of fees, for referring to the Kelleys a client for whom the Kelleys obtained an attorney's fees award of $309,498.  *Id*. at 702.  In *Saggese*, the client was unaware of the referral fee arrangement between the Kelleys and Saggese, but later consented to it.  *Id*. at 705.  The Court stated:  "Ratification is not the preferred method to obtain a client's consent to a fee-sharing agreement, but it is adequate."  *Id*.  The Court then found "that the fee-sharing agreement was not void as against public policy or unenforceable for failure to comply with the applicable fee-sharing rule prior to the client referral, and the judge did not err in so ruling."  *Id*.

The Court in *Saggese* then addresses a matter not at issue in the case, which it denominated as "Future fee-sharing agreements."  *Id*.  It noted that Mass. R. Prof. C. 1.5(e), in effect at that time, "does not speak to when disclosure to the client must be made, who must make the disclosure, or when consent must be given."  *Id*.  The Court then declared that Mass. R. Prof. C. 1.5(e) would be construed in the future so that the lawyer, preferably the referring lawyer, "is required to disclose the fee-sharing agreement to the client before the referral is made

and secures the client's consent *in writing*."  *Id*.  The Court continued that if the referring lawyer

does not comply, the lawyer who undertakes the representation "should confirm, before

undertaking such representations, that there has been compliance with rule 1.5(e)."  *Id*.  In the

present matter, Labaton secured the client's consent to fee sharing in writing, including with

regard to referral fees, in the engagement letter for the representation.  In this way, Labaton

complied with how the Court in *Saggese* stated Mass. R. Prof. C. 1.5(e) should be construed.

However, if the Special Master or the Court concludes that the written consent did not

constitute perfect compliance with Mass. R. Prof. C. 1.5(e), there is precedent in the United

States District Court, District of Massachusetts, considering an "imperfect fee agreement" that

does not comply fully with Mass. R. Prof. C. 1.5(e).  In *Daynard v. Ness, Motley, Loadholt,*

*Richardson & Poole, P.A*., 188 F. Supp.2d 115 (D. Mass 2002), an "oral fee-splitting agreement

made in contravention of the rules of professional conduct," *id*. at 117, was nonetheless held

enforceable.  *Id*. at 132.

### B.  There Was Not an Ethical Duty or Legal Requirement for Labaton to Provide Notice to the Court of Its Fee Sharing Arrangement with Chargois & Herron in the Case of *Arkansas Teacher Retirement System v. State Street Corp., et al*., MAD No. 11-cv-10230

For there to be an ethical duty or legal obligation for Labaton to provide notice to the

Court of its fee sharing agreement with Chargois & Herron, such a duty would have to originate

in one of these:  the Federal Rules of Civil Procedure ("Fed. R. Civ. P."); a local court rule for

the United States District Court, District of Massachusetts; a standing order issued by the

Honorable Judge Mark L. Wolf applicable to all cases or to all class action cases; a special order

issued by the Honorable Judge Mark L. Wolf applicable to the instant case; or clear precedent

either from the United States Supreme Court, the First Circuit, or the District of Massachusetts.

My research into this matter did not reveal any rule, order, or clear precedent.  As will be

described in greater detail below, without a legal duty to provide notice to the Court of its fee

sharing agreement, Labaton could not have an ethical obligation to do so under Mass. R. Prof. C.

3.3 or 8.4(c).  The only other basis for finding a violation of Mass. R. Prof. C. 3.3 or 8.4(c)

would be if Labaton knowingly made a misrepresentation to the Court, or engaged in dishonesty,

fraud, deceit or misrepresentation, which the record demonstrates it did not.

### 1. The Federal Rules of Civil Procedure did not require Labaton to disclose to the Court the fee sharing agreement it had with Chargois & Herron

The two Federal Rules of Civil Procedure that are relevant to this inquiry are Fed. R. Civ. P.

R. 23(h) and Fed. R. Civ. P. 54(d). Neither rule requires notice of fee sharing agreements with

the court.

Fed. R. Civ. P. 23(h) does not, on its own, require the automatic disclosure of fee sharing

agreements to the court in class actions.  Fed. R. Civ. P. 23(h) addresses the issue of attorney's

fees and nontaxable costs in a certified class action, and it provides, in pertinent part: "(1) A

claim for an award must be made by motion under Rule 54(d)(2), subject to the provisions of this

subdivision (h), at a time the court sets."  The rule does not address the issue of fee sharing

agreements.

In *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132 (2nd Cir.

2016), a lawyer had raised "ethical and legal implications of the arrangement" in which the law

firm Bernstein Litowitz Berger & Grossman LLP ("BLB & G") paid a lawyer in a different firm

without disclosing the payment to the Court in its fee petition.  *Id*. at 137.  The Court stated:

> Formerly, the local civil rules of the Southern District of New York required that
> the fee applicants in derivative and class actions disclose to the court "any fee
> sharing agreements with anyone." By a rule amendment effective July 11, 2011—
> three weeks before BLB & G submitted its fee petition—the automatic-disclosure
> provision was repealed as to class actions. *See* S.D.N.Y. Local Civil Rule 23.1
> (repealed effective July 11, 2011); S.D.N.Y. Local Civil Rule 23.1.1. According
> to the Joint Committee on Local Rules note, the committee recommended that the

> automatic-disclosure rule as applied to class actions be deleted "because it is redundant [with] ... Fed. R. Civ. P. 23(h)." Federal Rule 23(h), in turn, does not mandate automatic disclosure of all fee-sharing arrangements in class actions.

*Id*. at 137 n.2.  Thus, the Second Circuit recognized that Fed. R. Civ. P. 23(h) "does not mandate automatic disclosure of all fee-sharing arrangements in class actions."  *Id*.

As a result of the *Bernstein* decision, the Joint Committee on Local Rules recommended, the Board of Judges of the Eastern District of New York and the Southern District of New York adopted, and the Judicial Council of the Second Circuit approved, Local Rule 23.1, which states, in pertinent part:

> Fees for attorneys or others shall not be paid upon recovery or compromise in a class action or derivative action on behalf of a corporation except as allowed by the Court after a hearing upon such notice as the Court may direct.  The notice shall include a statement of the names and addresses of the applicants for such fees and the amounts requested respectively and shall disclose any fee sharing arrangements with anyone.

Local Rules of the United States District Courts for the  Southern and Eastern Districts of New York Local Civil Rule 23.1 (effective Nov. 1, 2017), http://www.nysd.uscourts.gov/rules/rules.-pdf.

The 2016 Committee Note to Local Rule 23.1 states:

> The Committee in 2011 recommended that prior Local Rule 23.1 regarding class actions be deleted as unnecessary.  The Second Circuit's recent decision in *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3d 132, 137 n.2 (2nd Cir. 2016), stated that the prior Local Rule is not redundant with Fed. R. Civ. P. 23(h) regarding fee sharing arrangements.  The Committee therefore recommends reinstating Local Rule 23.1 and combining it with Local rule 23.1.1 to cover both class actions and derivative actions.

*Id*.

The *Bernstein* case, the resulting Local Rule 23.1, and the Committee Note regarding Local Rule 23.1, establish two important points concerning the legal obligation to notify a United States District Court of a fee sharing agreement in a class action case.  First, the Second Circuit

has decided that on its own Fed. R. Civ. P. 23(h) does not require a law firm to notify a District Court of a fee sharing agreement with others.  Second, there is no obligation to notify a District Court of a fee sharing agreement unless there is precedent in a particular Circuit or District Court, a local court rule, a standing order, or a case specific order requiring disclosure of a fee sharing agreement.

Based on my research, I have concluded that the First Circuit has not addressed the issue of whether Fed. R. Civ. P. 23(h) on its own terms requires disclosure of fee sharing agreements. I have also determined there is no clear precedent in either the First Circuit or the District of Massachusetts that has held that Fed. R. Civ. P. 23(h) requires disclosure of a fee sharing agreement to the court.

In addition to Fed. R. Civ. P. 23(h), Fed. R. Civ. P. 54(d) also does not, on its own, require the disclosure of all fee sharing agreements to the court in class actions.  Rather, Fed. R. Civ. P. 54(d)(2)(B)(iv) states that a motion for attorney fees must "disclose, *if the court so orders*, the terms of any agreement about fees for the services for which the claim is made" (emphasis added).  Thus, Fed. R. Civ. P. 54(d)(2)(B)(iv) specifically states that disclosure of any fee agreement is not required unless ordered by the court.

Based on my research, I have concluded that there is no precedent from the First Circuit Court of Appeals that has held that Fed. R. Civ. P. 54 requires disclosure of any fee agreement without a court order or local rule.  I have also determined that there is no precedent in the District of Massachusetts holding that Fed. R. Civ. P. 54 requires disclosure of any fee agreement without a court order or local rule.

**2. *There was no local court rule or standing order in the District of Massachusetts or the First Circuit that required Labaton to disclose to the Court the fee sharing agreement it had with Chargois & Herron***

I reviewed the website for the District of Massachusetts and searched the Court Website Links, http://www.uscourts.gov/about-federal-courts/federal-courts-public/court-website-links, and I could not find a local rule for the District of Massachusetts or any rule issued by the First Circuit that would have required Labaton to disclose to the Court the fee sharing agreement it had with Chargois & Herron.  I also looked at the website for the Honorable Judge Mark L. Wolf, http://www.mad.uscourts.gov/boston/wolf.htm, and under the heading "Chambers Procedures/Standing Orders/Sample Orders" it stated "N/A", which I understood to mean "not applicable" in that there were no Chambers Procedures, Standing Orders, or Sample Orders accessible from the website.

### 3. *Cases cited for the proposition that Labaton had a legal duty to disclose to the Court the fee sharing agreement it had with Chargois & Herron are not applicable to the facts in this matter*

Upon examination, the underlying facts of the cases cited in the Ethical Report for Special Master Honorable Gerald E. Rosen ("Ethical Report") for the proposition that Labaton had a legal duty to disclose to the Court the fee sharing agreement it had with Chargois & Herron make the reasoning in the cases inapplicable to the instant matter.  There is no clear and controlling federal case law that required Labaton to disclose to the Court its fee sharing agreement with Chargois & Herron.

### a) *District of Massachusetts cases discussed in the Ethical Report*

There are no First Circuit cases and only two District of Massachusetts cases cited in the Ethical Report.  Neither of the District of Massachusetts cases holds that there is a disclosure obligation in the District of Massachusetts requiring a law firm to disclose to the Court its fee sharing agreement with others.  In addition, the underlying facts of the cases cited are distinct from the instant matter.

### i)   *In re Volkswagen and Audi Warranty Extension Litigation*

In *In re Volkswagen and Audi Warranty Extension Litigation*, 89 F.supp.3d 155, 183 (D.

Mass. 2018), the Court addressed a number of issues including a request of a non-class counsel

firm to consider the effect of a joint venture agreement that the non-class counsel firm

maintained covered issues litigated before the court.  *Id*. at 182.  The joint venture agreement

contained fee-sharing clauses, and non-class counsel sought fees in the class action pursuant to

the joint venture agreement and the fee-sharing clauses.  *Id*.  The Court noted that the joint

venture agreement had already been the subject of a breach of contract action between some of

the firms in Alabama state court, "but the claims appear to have been dismissed in light of the fee

motions pending in this Court."  *Id*.  The Court concluded that the "joint venture agreement and

the circumstances under which it was made . . . has no effect on the pending matters in this case.

*Id*.  The Court noted that the joint venture agreement was "rendered moot by the consolidation of

cases – only some of which were being tried by firms in the joint venture – into this multidistrict

class action litigation, and by the subsequent appointment of other, non-joint venture firms to the

Class Counsel team."  *Id*.  "Simply put, there is no way for this Court to reconcile the agreement

with what this case became."  *Id*. at 183.  Thus, the joint venture agreement was both "rendered

moot" and not applicable to the Volkswagen and Audi warranty extension class action.

After concluding that the joint venture agreement was not applicable to the class action,

the Court stated, "even if the joint venture agreement did more neatly fit the circumstances of

this litigation, the Court is not inclined to defer to its strictures."  *Id*.  The Court then proceeded

to state the passage quoted in the Ethical Report about the Court not being "bound blindly to

follow such private arrangements."  *Id*.

It is clear from the underlying facts that *In re Volkswagen* is much different than the instant matter. *In re Volkswagen* dealt with a fee dispute among class counsel and non-class counsel that was brought to the Court's attention. If all of the counsel involved had believed that the joint venture agreement was applicable and had shared fees pursuant to it, it would not have been brought to the Court's attention. When the Court was asked to decide the applicability of the joint venture agreement, it decided that it was rendered moot and not applicable. At no point in its consideration did the Court announce a rule that in class actions the Court must be notified of fee sharing agreements.

### ii) *In re Relafen Antitrust Litigation*

*In re Relafen Antitrust Litigation*, 231 F.R.D. 52 (Mass. 2005) involved a nationwide consumer class action, and the Court's decision focused on approval of a proposed settlement. Id. 57. The court did not discuss a joint venture, as in *In re Volkswagen*, nor any type of fee sharing agreement. The language quoted in the Ethical Report comes in the context of the Court's discussion of its fairness determination of the settlement. *Id*. at 71. Nothing in the language quoted and at no place in this decision does the Court announce a rule that in class actions the Court must be notified of fee sharing agreements.

### b) *Other cases discussed in the Ethical Report*

The Ethical Report also quotes from and discusses cases from the Second Circuit, Third Circuit, Ninth Circuit, and the United States District Court, Southern District of New York. None of these cases cited to Supreme Court authority requiring notice to the Court of fee sharing agreements, and none of these cases announce a rule that would require notice of fee sharing agreements to the Court in class actions in the District of Massachusetts. In addition, the underlying facts of the cases cited are distinct from the instant matter.

i)      *In re "Agent Orange" Product Liability Litigation*

*In re "Agent Orange" Product Liability Litigation*, 818 F.2d 216 (2d Cir. 1987),

focuses on the District Court's approval of a fee sharing agreement entered into by a nine-

member Plaintiffs' Management Committee ("PMC").  *Id.* at 217.  Under the agreement, each

PMC member who contributed funds for general litigation expenses would receive a "three-fold

return on his investment prior to the distribution of other fees awarded to individual PMC

members by the district court."  *Id*. A non-investing member challenged the validity of the

agreement on two bases:  the ethics prohibition against a lawyer acquiring an interest in an

action, and as an impermissible fee sharing agreement.  *Id*.

The District Court was not advised of the fee sharing agreement until four months after a

settlement was reached, and "the district court approved the agreement, holding that 'there is no

reason to believe that the existence of the PMC's fee-sharing agreement had any appreciable

untoward effect on the decision to settle.'"  *Id*. at 218.  The Second Circuit Court reversed,

finding that the agreement "violates established principles governing awards of attorneys' fees in

equitable fund class actions and creates a strong possibility of a conflict of interest between class

counsel and those they were charged to represent."  *Id*.

The Court noted that the District Court had waived a local rule "requiring notice to the

class of all fee applications *and fee sharing agreements* prior to the hearing on such fee

petitions." *Id*. at 219. The Court also noted that the District Court was unaware of the PMC

agreement when it waived the local rule.  *Id*.

In reviewing the agreement and the dispute among the counsel over fees, the Court stated

that "tying the fee to be received by individual PMC members to the amounts advanced for

expenses, [the agreement] completely distorted the lodestar approach to fee awards."  *Id*. at 222.

The Court continued:  "The distortion was so substantial as to increase the fees awarded to one investor by over twelve times that which the district judge had determined to be just and reasonable, and, in a second case, to decrease the otherwise just and reasonable compensation of a non-investor by nearly two-thirds." *Id*. at 223.

The excerpt from *In re "Agent Orange"* quoted in the Ethical Report comes directly after this reasoning by the Second Circuit.  Thus, the language excerpted does not deal with a fee sharing agreement like the one between Labaton and Chargois & Herron, but rather an agreement for a return on advancing litigation expenses that distorted the fee award by the District Court.

*In re "Agent Orange"* informs, and is consistent with, my opinion that without a standing order, specific order, inquiry from the court, local court rule, or precedent in a Circuit, there is no obligation to disclose fee sharing agreements with a court.

### ii)      *In re Rite Aid Corp. Securities Litigation*

*In re Rite Aid Corp. Securities Litigation*, 396 F.3d 294, 307 (3rd Cir. 2005) is an appeal of a District Court's decision on the reasonableness of attorney fees following a fairness hearing and the process used in calculating the fees.  *Id*. at 296.  A class member, Walter Kaufman, filed the appeal objecting to the fees awarded and to the fact that the District Court did not appoint a guardian or fee award expert to protect the interests of the class members.  *Id*. at 299.  The Third Circuit Court found that the District Court had erred in one respect, which was failing to use the blended hourly rates of all of the attorneys working on the case in approving a lodestar cross-check multiplier of 4.07, reflecting the average hourly billing rate of the senior-most partners at lead co-counsel firms.  *Id*. at 306.

The final point the Court addressed was the issue of the District Court failing to appoint a guardian or fee award expert to protect the interests of the class members.  *Id*. at 307-08.  The excerpt of this case quoted in the Ethical Report is from the Court's discussion of this issue and the obligation of the District Court Judge to protect the class's interests.  *Id*. at 307.  On this point, the Court decided that the District Court Judge did not abuse his discretion in deciding the fee award without appointing a guardian or fee award expert.  *Id*. at 308.

Nothing in *In re Rite Aid Corp.* dealt with a client agreement that permitted fee sharing or notice to the court of a fee sharing agreement. The holding in *In re Rite Aid Corp*. does not announce a rule or create precedent that would have required Labaton to disclose its fee sharing agreement with Chargois & Herron to the Court.

### iii)      *In re FPI/Agretech Securities Litigation*

*In re FPI/Agretech Securities Litigation*, 105 F.3d 469 (9th Cir. 1997) involves an attorneys' fee dispute.  The dispute arose after an attorney, Jamie Chuck, filed an application for allocation of fees from an aggregate attorneys' fee award.  *Id*. at 472.  Another law firm, Lieff Cabraser & Heimann ("LCH") contested Chuck's right to a portion of the fee.  *Id*. At a hearing on the matter, LCH requested an opportunity for the attorneys to work out a compromise, and the District Court granted that request.  *Id*.  When presented with the a compromise agreement on how to divide the fees from the aggregate attorneys' fee award, the District Court Judge rejected it and denied Chuck any portion of the fees.  *Id*.

The excerpted passage quoted in the Ethical Report comes from the Ninth Circuit Court's explanation why the District Court Judge and the Court are not required to approve an agreement when "the parties merely submitted orally a fee allocation proposal, arrived at, figuratively speaking, 'on the courthouse steps'."  *Id*. at 474.  Thus, the agreement in *In re FPI/Agretech* is

much different than the fee sharing agreement in the instant matter.  The agreement in *In re FPI/Agretech* did not have its origin in an agreement with a client that permitted fee sharing. The issue before the *In re FPI/Agretech* Court was a fee dispute among lawyers.

Nothing in *In re FPI/Agretech* dealt with a client agreement that permitted fee sharing or notice to the court of a fee sharing agreement. The holding in *In re FPI/Agretech* does not announce a rule or create precedent that would have required Labaton to disclose its fee sharing agreement with Chargois & Herron to the Court.

### iv)   *Lewis v. Teleprompter Corp.*

*Lewis v. Teleprompter Corp.*, 88 F.R.D. 11 (S.D.N.Y. 1980) involved an application for attorney fees by lead counsel ("Wolf Popper") and two other firms ("Pomerantz" and "Kaufman"), and lead counsel's opposition to attorney fees filed by attorneys representing other plaintiffs.  *Id*. at 11.  In the course of considering fee applications, the Court was advised that there were "undisclosed fee-splitting agreements between legal counsel and certain other plaintiffs' counsel [the Pomerantz and Kaufman firms] on whose behalf lead counsel applies for fees," and undisclosed agreements to pay additional lawyers attorney fees for furnishing clients to lead counsel.  *Id*. at 16-17.  Among these undisclosed agreements was the one between Wolf Popper and Pomerantz, in which the Court found "the fee agreement was directly related to Pomerantz' support of Wolf Popper's application to be lead counsel."  *Id*. at 19.  This agreement had not be disclosed to the trial court judge at the time of consolidation of different related lawsuits.  *Id*.  Similarly, the Court found that agreement between Wolf Popper and Kaufman "was directly related to Wolf Popper's application to be lead counsel," which Kaufman supported.  *Id*. at 20.

Next, the Court addressed "forwarding fee agreements with two other attorneys." *Id.* These agreements were made by Wolf Popper with two other attorneys who essentially provided Wolf Popper with clients.

From reading the case, it is clear that Court was upset with the various arrangements Wolf Popper entered into to obtain support for its application to be lead counsel. *Id.* 19-20. Indeed, this is the first issue the Court addressed after the passage of the opinion excerpted in the Ethical Report. The Court also disapproved of the agreements Wolf Popper made with two other lawyers who provided clients to Wolf Popper.

The underlying facts and the types of agreements in *Lewis v. Teleprompter Corp.* are much different than the agreement Labaton had with ARTRS that expressly stated that Labaton could allocate fees to other counsel, including referral fees. The circumstances of *Lewis v. Teleprompter* are also distinct in that the Court was called upon to resolve a dispute among attorneys before approving attorney fee applications.

Nothing *Lewis v. Teleprompter Corp.* involved a client agreement that permitted fee sharing or notice to the court of such a fee sharing agreement. The holding in *Lewis v. Teleprompter Corp.* does not announce a rule or create precedent that would have required Labaton to disclose its fee sharing agreement with Chargois & Herron to the Court.

### 4. *Neither Mass. R. Prof. C. 3.3(a) nor Mass. R. Prof. C. 8.4(c) required Labaton to disclose to the Court its fee sharing agreement with Chargois & Herron*

At all times relevant to this matter, Mass. R. Prof. C. 3.3(a) stated, in pertinent parts: "A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; (2) [omitted]; or (3) offer evidence that the lawyer knows to be false, except as provided in Rule 3.3(e). . . ." In addition, Mass. R. Prof. C. 8.4(c) stated: "It is professional misconduct for a

lawyer to engage in conduct involving dishonesty, fraud, deceit or misrepresentation." As will be discussed more fully below, neither Mass. R. Prof. C. 3.3(a) nor 8.4(c) required Labaton to disclose to the Court its fee sharing agreement with Chargois & Herron.

For there to be an ethical duty for Labaton to disclose to the Court its fee sharing agreement with Chargois & Herron under Mass. R. Prof. C. 3.3(a) or 8.4(c), the ethical duty would have to be based on Labaton *knowingly* engaging in impermissible conduct. As described previously in Part IV.B. of this Ethics Report, I could not find any legal obligation for Labaton to disclose its fee sharing agreement to the Court either based on the Federal Rules of Civil Procedure, a local court rule, order of the Court, inquiry from the Court, or controlling precedent in the First Circuit or the District of Massachusetts.

Without such legal obligation to notify the Court of its fee sharing agreement with Chargois & Herron, Labaton was not on express or constructive notice that it had an obligation to do so. Even if there had been controlling precedent, a local court rule, or arguably some other constructive notice to Labaton, neither Mass. R. Prof. C. 3.3(a) nor 8.4(c) would be violated unless there was actual notice to Labaton, or sufficient facts and circumstances from which to infer Labaton's knowledge of the precedent, local court rule, or other requirement to disclose to the Court the fee sharing agreement with Chargois & Herron.

Mass. R. Prof. C. 1.0 addresses terminology in the Massachusetts Rules of Professional Conduct, and it states, in pertinent part: "'Knowingly,' 'known,' or 'knows' denotes actual knowledge of the fact in question. A person's knowledge may be inferred from the circumstances.'" Thus, to violate Mass. R. Prof. C. 3.3(a) Labaton would have had to have actual knowledge of both an obligation to notify the Court of its fee sharing agreement with

Chargois & Herron, and it would have had to knowingly make false statements or offer false evidence.

Comment [3] to Mass R. Prof. C. 3.3 states:  "There are circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation."  For an omission to be the equivalent of a misrepresentation, the omission has to occur where there is a duty to speak. This opinion is supported by my research into Mass. R. Prof. C. 3.3(a), the ABA Model Rule 3.3(a), state ethics rules that correspond to Mass. R. Prof. C. 3.3(a), review of disciplinary cases addressing this issue, my knowledge, skill, and experience.

Without a legal obligation to disclose the fee sharing agreement to the Court, the next inquiry is whether Labaton engaged in dishonesty, fraud, deceit, or made a misrepresentation to the Court.  Based on the factual assumptions and my review of certain documents and materials cited in the factual assumptions, I find no basis to conclude that Labaton engaged in dishonesty, fraud, deceit, or misrepresentations to the Court.

Mass. R. Prof. 8.4(c)'s prescription against a lawyer engaging "in conduct involving dishonesty, fraud, deceit or misrepresentation" involves specific intent on the part of a lawyer to violate this ethics rule by engaging in fraud or deceit.  While dishonesty and misrepresentation may not require specific intent, dishonesty and misrepresentation require scienter of at least knowingly as required in Mass. R. Prof. C. 3.3(a), or recklessness.  *See, e.g., In re Discipline of an Attorney*, 884 N.E.2d 450, 462 (2008) (holding that the "assertion of a lien on a client's potential recovery when the lawyer knows he has no right to do so plainly constitutes misrepresentation and is dishonest" and violates Mass. R. Prof. C. 8.4(c)); *In re Surrick*, 338 F.3d 224, 234 (3d Cir. 2003) (stating that "misrepresentation" – one of the types of misconduct prohibited by RPC 8.4(c) – included statements made with reckless disregard for the truth");

*In re Iowa Supreme Court Att'y Discipline Bd. v. Netti*, 797 N.W.2d 591, 605 (Iowa 2011) (holding that "some level of scienter that is greater than negligence to find a violation of rule Rule 32: 8.4(c)"); *In re Skagen*, 149 P.3d 1171 (Or. 2006) ("Although proving that a lawyer acted dishonestly does not require evidence that the lawyer intended to deceive, it does require a mental state of knowledge – that is, that the accused lawyer know that his conduct was culpable in some respect.").

In addition, Mass. R. Prof. C. 1.0(e) states: "'Fraud' or 'fraudulent' denotes conduct that is fraudulent under substantive or procedural law and has a purpose to deceive."  Comment [1] to Mass. R. Prof. C. 1.0 further amplifies this definition and further explains, in pertinent part: "When used in these Rules, the terms 'fraud' or 'fraudulent' refer to conduct that is characterized as such under the substantive or procedural law and has a purpose to deceive.  *This does not include merely negligent misrepresentation or negligent failure to apprise another of relevant information*" (emphasis added).

If the Court decided that the fee sharing agreement between Labaton and Chargois & Herron was relevant information that the Court wanted before approving the fee award to class counsel, negligence on Labaton's part is not sufficient to find a violation of Mass. R. Prof. C. 8.4(c).  There would have to be at least at least a knowing or reckless misrepresentation to the Court to constitute a violation of Mass. R. Prof. C. 8.4(c).  A few Admonition cases illustrate this.

 Admonition No. 17.07 (2017), https://bbopublic.blob.core.windows.net/web/f/-admon2017.pdf, involved a respondent representing a client in a personal injury matter, and the respondent signed the client's signature on a formal release of claim rather than have the client

sign the release.  The Admonition held:  "By furnishing the insurance company with a release he knew had not been signed by the client, the respondent violated Mass. R. Prof. C. 8.4(c).  *Id*.

Admonition No. 16-11 (2016), https://bbopublic.blob.core.windows.net/web/f/-admon2016.pdf, involved a respondent who notarized the signature of the co-purchaser of an investment property without seeing the co-purchaser sign the documents.  The Admonition held: "By notarizing the signature of a person who was not present before him, the respondent violated Mass. R. Prof. C. 8.4(c)."  *Id***.**

Admonition No. 15-26 (2015), https://bbopublic.blob.core.windows.net/web/f/-admon2015.pdf, dealt with a respondent representing a wife in a divorce in which she was to remain in the marital home while the husband made the mortgage payments.  The husband subsequently lost his job, and the respondent's client informed respondent that she feared that her husband would not make payments and she wanted to sell the house.  *Id*.  The respondent filed a motion with the probate court for permission to sell the house, and stated in the motion, "on information and belief, the mortgage currently is not being paid by [the husband] and the parties are as risk of losing their equity in the martial home."  *Id*.  This was not true because the husband had been current in the mortgage payments, and respondent's client had not told respondent that her husband was behind in the mortgage payments.  *Id*.  The Admonition held: "By making an assertion to the court without adequate basis in fact to do so, the respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentations, in violation of Mass. R. Prof. C. 8.4(c); and conduct prejudicial to the administration of justice, in violation of Mass. R. Prof. C. 8.4(d)."  *Id*.

The facts and reasoning of the cases in the Ethical Report additionally shows that in each instance a lawyer either made a misrepresentation or failed to speak up under circumstances

where there was a clear obligation to do so.   A review of those cases is useful to seeing that Mass. R. Prof. C. 3.3 and 8.4(c) are not applicable in this matter.

### a) *In re O'Toole*

*In re O'Toole*, 2015 WL 90309021 (Mass. St. Bar Disp. Bd. 2015) is a disciplinary matter involving respondent and statements he made that the Disciplinary Board determined were "half truths" and "clearly meant to mislead." *Id*. at *5.   Respondent's client was ordered to pay plaintiffs $192,500, and execution issued for approximately $211,000, including interest.   *Id*. at *1.   Respondent's client eventually wired a total of $192,000 to respondent, who informed the plaintiffs' attorney that he had that amount available for payment on July 8, 2008. *Id*. at *2. Plaintiffs' lawyer replied that the wire transfer to the plaintiffs could be made, but that the total owed was approximately $211,000.   *Id*.   Respondent did not wire any funds to plaintiffs or their counsel, but, in mid-July, transferred approximately $35,000 back to the client in order for the client to make his payroll.   *Id*.   In early August, the client then instructed to return the balance of the funds, which respondent did.   *Id*.

Later in August, the plaintiffs' lawyer wrote to respondent that the plaintiffs planned to begin execution proceedings.   *Id*.   The respondent then made a series of statements that the Disciplinary Board said were not "the failure fully to disclose," but rather "the respondent engaged in affirmative misrepresentations."   *Id*. *5.   The Disciplinary Board continued:   "It matters little that he crafted those misrepresentations in formulations that, while facially ambiguous, could be expected to deceive, and did so."   *Id*.

To illustrate the type of affirmative misrepresentations the respondent made, consider the first statement that the Disciplinary Board found to be misleading.   The first affirmative misrepresentation was a voice mail respondent left for the plaintiffs' attorney in response to the

plaintiffs' lawyer writing to respondent that the plaintiffs planned to begin execution proceedings.  Id at *2.  In the voice mail, the respondent stated that "the money . . . is available to the extent that it was available previously."  *Id*. at *2.  The Disciplinary Board stated:  "In theory, this statement could have meant that the client was still willing to pay the plaintiffs $192,500.  In context, however, it would have been understood to mean that that sum was still in the respondent's possession, available to be paid.  By this point, however, the respondent knew that the client was unlikely to be capable of satisfying the judgment against him."  *Id*.

The other misrepresentations are similar, and all are affirmative misrepresentations.  *In re O'Toole* is not a case about omissions, but one about deliberate misrepresentations.

### b)  *In the Matter of Attorney*

*In the Matter of Attorney*, 2007 WL 4284758 (Mass. St. Bar Disp. Bd. 2007) the Disciplinary Board found a violation of Mass. R. Prof. C. 8.4(c) when respondent sent a letter that the Disciplinary Board found, under the circumstances, "was deliberately misleading."  *Id*. at *4.  The letter was calculated to be misleading in several respects because it set out facts and responded to concerns of the opposing party in a way that "deliberately misleads the reader."  *Id*.

It is clear from the facts of this case, and analysis of the Disciplinary Board, that this case did not deal with an omission but rather a deliberate plan to mislead that was obvious given the wording of the letter and the circumstances under which it was written.  *In the Matter of Attorney* is not a case about omissions, but one about deliberate misrepresentations.

### c)  *Comparing Bronston v. United States with United States v. DeZarn and statements and submissions of class counsel*

In *Bronston v. United States*, 409 U.S. 353 (1973), the Supreme Court reversed a perjury conviction because the defendant had given a literally true but unresponsive answer.  *Id*. at 361-62.  *United States DeZarn*, 157 F.3d 1042 (6th Cir. 1998), is distinguished from *Bronston*

because the defendant, DeZarn, gave "unequivocal and directly and fully responsive answers to questions asked," and in context there was "more than ample context and evidence to test the meaning and context." *Id*. at 1051.  Unlike the literally true unresponsive answer in *Bronston*, in *DeZarn* the defendant gave directly responsive answers under circumstances where a finder of fact could conclude that they were calculated to be misleading and false.  *Id*.

The Ethical Report cites to these cases in the context of discussing in-court statements and submissions to the Court by class counsel concerning "the identities of the law firms who would share in those fees."  Ethical Report at 72.  The Ethical Report then asserts:  "The Court could assume that the lawyers who were going to participate in the fee it was asked to award were the lawyers who appeared before it because no other lawyer was identified."  *Id*.  Assuming arguendo that the Court did in fact have that assumption, it is my opinion that the Court's assumption alone is not enough to serve as the basis for a violation of Mass. R. Prof. C. 3.3(a) or 8.4(c) unless it can be shown that the Labaton knew that this was the Court's assumption. That is, unless the Court's assumption was communicated to class counsel, class counsel could not know what the Court was assuming.

In addition, I believe that assertion in the Ethical Report that the "Court could assume that the lawyers who were going to participate in the fee . . . were the lawyers who appeared before it" is speculative and overbroad for at least two reasons.

First, as discussed in Part IV.B of this Ethics Report, some judges and some District Courts have realized that in order to know to whether a fee award will be shared with a lawyer or law firm not in a fee application, it is necessary to have a local court rule, a standing order, a case specific order, or the Court has to inquire of class counsel about fee sharing agreements.  If this was not the case, then either Rule Civ. P. R. 23(h) or 54(d) or controlling authority for the

District of Massachusetts would make it clear that all fee sharing agreements must be disclosed to the Court.

Second, it is well-understood that while class action attorney fees are awarded to law firms on the basis of fee applications of the lawyers in the individual law firms working on the class action, how each law firm divides the fees among the lawyers in the firm is not necessarily based on the fee petition.  Indeed, an originating lawyer in a law firm may not even be listed in a fee petition but may receive a very large share of the fee awarded to the firm.  Or, a partnership agreement in a law firm may reallocate a portion of fees awarded in a class action to lawyers in the firm who may have not worked on the class action. I believe that a judge would know that, in awarding a fee to a law firm, exactly how the fee is divided, and to whom the fee will be divided, is not necessarily in a fee petition or stated to the court.

### C. There Was Not an Ethical Duty or Legal Requirement for Labaton to Provide Notice to the Class of Its Fee Sharing Arrangement with Chargois & Herron in the Case of *Arkansas Teacher Retirement System v. State Street Corp., et al.*, MAD No. 11-cv-10230

There was no ethical or legal requirement for Labaton to provide notice of the fee sharing agreement between Labaton and Chargois & Herron to the class members in the above-stated case.  Disclosure to class members flows both from class counsel's disclosure obligations to the Court and from class counsel's obligations to class members.  Without a disclosure obligation to the Court and without a clear obligation to disclose how fees would be divided to the class, there was no obligation for Labaton to disclose to the fee sharing agreement with Chargois & Herron to the class members.

Nothing in Fed. R. Civ. P. 54(d) or 23(h) states that class counsel has an obligation to give notice of fee sharing agreements to class members.  In addition, the cases cited previously in Part IV.B. of this Ethics Report do not discuss the issue of notice to class members of the fee

sharing, fee-splitting, or even the return on investment agreements they reviewed.  I reviewed

additional cases, law review articles, and other materials,[20] and none of the cases or materials I

reviewed stated that there was a legal or ethical duty for class counsel to notify class members of

fee sharing agreements.

In reaching my opinion, I also paid particular attention to the treatise, *Newberg on Class*

*Actions*.  *William B Rubenstein, Newberg on Class Actions* (5th ed. (2016) (West online version,

Dec. 2017 Update) ("*Newberg*").  Some sections in Newberg are helpful in understanding the

basis for my opinion.

Section 8:25 of *Newberg* states that "Rule 23(h)(1) requires that a court considering a

motion for reasonable attorney's fees . . . direct notice to class members 'in a reasonable

manner.'  Yet other than requiring that the notice be made 'in a reasonable manner,' Rule 23

does not dictate any specific content that the notice must contain."  *Id*. at § 8:25.  *Newberg*

continues that class members "must be given sufficient information" to be able to object to the

fee motion.  *Id*.  *Newberg* states that this requires that this information must conform to Fed. R.

Civ. P. 23(h), and *Newberg* explains:

> Rule 23(h) requires that the fee petition be made by motion according to Rule
> 54(d), and Rule 54, in turn requires that the motion: (ii) specify the judgment and
> statute, rule, or other grounds entitling the movant to the award; (iii) state the
> amount sought or provide a fair estimate of it; and (iv) *disclose, if the court so
> orders, the terms of any agreement about fees* for the services for which the claim
> is made.

*Id*. (emphasis added).  *Newberg* makes it clear that notice to the class of "any agreement about

fees" starts with an order from the court requiring disclosure in the fee petition.

---

[20] *See, e.g, Barbara J. Rothstein & Thomas E. Willging, Managing Class Action Litigation: A Pocket
Guide for Judges*, FEDERAL JUDICIAL CENTER (3rd ed. 2010), https://www.fjc.gov/sites/default/files/-
2012/ClassGd3.pdf (omitting reference to fee sharing agreements); Written Submission of Judge Arlin
Adams to Third Circuit Task Force on Appointment of Counsel in Class Action Lawsuits (Mar. 14,
2001), http://www.ca3.uscourts.gov/sites/ca3/-files/adams1.pdf (discussing class counsel issues and
omitting reference to fee sharing).

Another section of the *Newberg* states "Rule 54(d)(2)'s motion requirement—concerning disclosure of fee agreements—is discretionary with the court. *Id*. at § 15:11. In the following section, Newberg opines that "courts should regularly order disclosure" of fee agreements. *Id*. at § 15:12.

Absent a legal duty to disclose to class members the fee sharing agreement with Chargois & Herron, Labaton did not have an ethical duty to do so.

### D. Courts and Ethics Authorities Do Not Impose Sanctions on or Discipline a Lawyer or Law Firm When a Legal or Ethical Duty Is Unclear

Courts and ethics authorities do not impose sanctions on or discipline a lawyer or law firm when a legal or ethical duty is unclear. When a legal or ethical duty is unclear, courts and disciplinary authorities follow basic principles of fairness and due process and do not impose sanctions or punishment.

Mass. R. Prof. C. Scope [5] states, in pertinent part:

The Rules presuppose that disciplinary assessment of a lawyer's conduct will be made on the basis of the facts and circumstances as they existed at the time of the conduct in question and in recognition of the fact that a lawyer often has to act on uncertain or incomplete evidence of the situation. Moreover, the Rules presuppose that whether or not discipline should be imposed for a violation, and the severity of a sanction, depend on all the circumstances, including the willfulness and seriousness of the violation, extenuating factors, and whether there have been previous violations.

As this passage suggests, courts and ethics authorities must take into consideration "all of the circumstances, including willfulness," and willfulness cannot be present when a legal or ethical duty is unclear.

In *In re Crossen*, 800 N.E.2d 352, 379 (Mass. 2008), the Supreme Judicial Court of Massachusetts stated: "Due process requires fair notice of the proscribed conduct, meaning that attorneys may not be subject to rules that are so broad that they implicate concerns about

'potential random application or unclear meaning,' i.e., rules that are unconstitutionally vague."

*Id*. at 379 (citing *Matter of Discipline of an Attorney*, 815 N.E.2d 1072 (Mass. 2004)).  If a legal

or ethical obligation is not clear, sanctions or discipline based on such an unclear obligation

would violate the principle announced in *Crossen* and other Massachusetts disciplinary cases.

Section 3.28 the Rules of the Board of Bar Overseers for Massachusetts also states that in

disciplinary proceedings there is "the burden of proof by a preponderance of the evidence."

Index to the Rules of the Board of Bar Overseers Section 3.28 (effective 9/1/17), *Massachusetts

Board of Bar Overseers*, https://www.massbbo.org/Rules; *see also Matter of Hocika*, 809 N.E.2d

1013, 1015-16 (2004) (finding "substantial evidence" to support hearing officer's findings of

ethics violations).  When a legal or ethical duty is unclear, there cannot be a "preponderance" or

"substantial" evidence of the scienter required for the violation of the legal or ethical duty.

Otherwise, courts or disciplinary authorities would be randomly imposing sanctions on or

disciplining lawyers and law firms, which would not only lack fairness but would undermine

public confidence in the judicial system and bar disciplinary authorities.

Finally, the *Annotated Standards for Imposing Lawyer Sanctions* states:  "It is a well-

established principle that the punishment of lawyers is not the purpose of lawyer disciplinary

sanctions."  *ABA Center for Professional Responsibility, Annotated Standards for Imposing

Lawyer Sanctions* Standard 1.1, at 11 (2015).  Rather, the purpose of attorney discipline is to

protect the public and to deter other attorneys from engaging in the same prohibited conduct.

*See, e.g., Matter of Concemi,* 662 N.E.2d 1030, 1033 (1994) ("We must consider what measure

of discipline is necessary to protect the public and deter other attorneys from the same

behavior."); *In re Balliro*, 899 N.E.2d 794, (1994) (stating that in determining discipline

protection of the public and deterrence of other lawyers is the aim) (quoting *Matter of Concemi*, 662 N.E.2d 1030, 1033 (1994).

E.   **Mass. R. Prof. C. 1.5(a)'s Prohibition on a "clearly excessive fee" Does Not Apply to the Mass. R. Prof. C. 1.5(e) "division of a fee (including a referral fee) between lawyers who are not in the same firm"**

Mass. R. Prof. C. 1.5 has to be construed in its entirety, and it is clear that Mass. R. Prof. C. 1.5(a) prohibition on a "clearly excessive fee" does not apply to each lawyer's *share of a fee* pursuant to a division of fee under Mass. R. Prof. C. 1.5(e) because (e) requires that "the total fee is reasonable." Mass. R. Prof. C. 1.5(a)'s purpose is to ensure that the client is protected from being charged illegal or clearly excessive attorney fees or unreasonable expenses. When it comes to the division of fee, the same client protection purpose is found in the Mass. R. Prof. C. 1.5(e) requirement that "the total fee is reasonable."

The Massachusetts Supreme Judicial Court has recognized that client protection is the rationale for Mass. R. Prof. C. 1.5(e). In *Saggese v. Kelley*, 837 N.E.2d 699 (Mass. 2005), the Court noted that the trial judge enforced the oral fee sharing agreement Saggese had with the Kelleys even if Mass. R. Prof. C. 1.5(e) had been violated "because the rule was intended to protect the client from excessive fees, and here the client was not harmed because the referral fees came directly out of the Kelleys' hourly rate, which had not been adjusted upward as a result of the referral." *Id*. at. 703. In discussing whether the older equivalent to Massachusetts Disciplinary Rule of Mass. R Prof. C. 1.5(e) was controlling, the Court stated: "The rule, and it is immaterial which version applies, was intended to protect clients from unreasonable fees." *Id*. at 704.

Applying Mass. R. Prof. C. 1.5(a) to a lawyer's share in a division of fee under Mass. R. Prof. C. 1.5(e) is also contrary to Massachusetts Rules of Professional Conduct's approval of a

pure forwarding or referral fee.  Comment [7A], previously Comment [4A] in February 2011,[21] to Mass. R. Prof. C. 1.5, states, in pertinent part: "Unlike ABA Model Rule 1.5(e), Paragraph (e) does not require that the division of fees be in proportion to the services performed by each lawyer or require the lawyer to assume joint responsibility for the representation in order to be entitled to a share of the fee."  The rule and its comment makes it clear that a lawyer's share of a division of fee is permissible as long as the total fee is reasonable.

In addition to relying on my knowledge, skill, experience, and training, in reaching this opinion, I conducted research into the following resources: Massachusetts state court cases; advisory ethics opinions of the Committee on Professional Ethics for Massachusetts Bar Association; advisory ethics opinions of the Boston Bar Association Ethics Committee; articles and reports of the Massachusetts Board of Bar Overseers;[22] and all of the available non-public discipline matters called Admonitions by the Massachusetts Board of Bar Overseers.[23]  I could not locate a single case, advisory ethics opinion, or any authority for the proposition that a lawyer's *share* of a fee in a division of fee under Mass. R. Prof. C. 1.5(e) must not be clearly excessive.  I also performed additional research into this issue, and none of the sources I reviewed support the view that each lawyer's share of a fee in a division of fee under Mass. R. Prof. C. 1.5(e) must not be clearly excessive.

---

[21] Mass. R. Prof. C. 1.5, cmt. [4A] in effect in February 2011 is worded slightly differently, and it provided: "Paragraph (e), unlike ABA Model Rule 1.5(e), does not require that the division of fees be in proportion to the services performed by each lawyer unless, with a client's written consent, each lawyer assumes joint responsibility for the representation."

[22] See *supra* note 14 for a description of the articles and reports I reviewed."

[23] I reviewed all of the Admonitions issued from 1999 through March 20, 2018. I searched these using the find function and "1.5(a)" and then "1.5(e)" to identify Admonitions so see if any discussed whether a lawyer's share of fee when dividing a fee must not be "clearly excessive."

## V.     <u>CONCLUSION</u>

As discussed in greater detail above, I have concluded to a reasonable degree of professional certainty that:

- A Flawed or Imperfect Division of Fee Arrangement Between Law Firms and a Client Under Mass. R. Prof. C. 1.5(e) and a Resulting Fee Division Between the Law Firms Should Not Be Considered a Violation of Mass. R. Prof. C. 7.2(c).

- There Was Not an Ethical Duty or Legal Requirement for Labaton to Provide Notice to the Court of Its Fee Sharing Arrangement with Chargois & Herron in the Case of *Arkansas Teacher Retirement System v. State Street Corp., et al*., MAD No. 11-cv-10230.

- There Was Not an Ethical Duty or Legal Requirement for Labaton to Provide Notice to the Class Members of Its Fee Sharing Arrangement with Chargois & Herron in the Case of *Arkansas Teacher Retirement System v. State Street Corp., et al*., MAD No. 11-cv-10230.

- Courts and Ethics Authorities Do Not Impose Sanctions on or Discipline a Lawyer or Law Firm When a Legal or Ethical Duty Is Unclear.

- Mass. R. Prof. C. 1.5(a) Prohibition on a "clearly excessive fee" Does Not Apply to the Mass. R. Prof. 1.5(e) "division of a fee (including a referral fee) between lawyers who are not in the same firm."

These are my independent opinions formed on my own and without the assistance of any person. These opinions are based upon my knowledge, skill, experience, training, and education, and informed by the facts assumed, materials I reviewed, and research I performed. I reserve the right to expand upon or modify the opinions in this report if presented with additional facts or materials, or if I conduct supplemental research after the submission of this report.

March 26, 2018                                    _____
                                                  Peter A. Joy

**PETER A. JOY**
WASHINGTON UNIVERSITY IN ST. LOUIS SCHOOL OF LAW
One Brookings Drive, Campus Box 1120
St. Louis, Missouri 63130
(314) 935-6445 Phone; (314) 935-4029 Fax
joy@wustl.edu

**Appointments:**

WASHINGTON UNIVERSITY IN ST. LOUIS SCHOOL OF LAW, St. Louis, Missouri
        Henry Hitchcock Professor of Law, 2010 to present
        Vice Dean, January 2010-July 2012
        Professor of Law and Director of the Criminal Justice Clinic, 1998-present
        Director of Trial and Advocacy Program, 2002-06
        Israel Treiman Research Fellow, 2001-02
        Visiting Associate Professor of Law, Summer 1997 and Fall 1992

CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW, Cleveland, Ohio
        Professor of Law and Director of Clinical Program, 1998
        Assistant Professor of Law and Director of Clinical Program, 1984-98
        Acting Director of Clinical Program and Assistant Professor of Law, 1983-84
        Supervising Attorney in Clinical Program, 1981-83 and 1978-80

**Other Teaching and Research:**

Campbell Visiting Fellowship, Monash University, Melbourne, Australia, May 2016
Visiting Professor of Law, Utrecht University, Utrecht, Netherlands, January 2015
Visiting Scholar, Hitotsubashi University Law School, Kunitachi, Japan, 2012 and 2013
Visiting Professor of Research, Northumbria University, Newcastle Upon Tyne, UK, 2009-15
Visiting Professor of Law, St. Louis University, Spring 2006
Visiting Professor of Law, Aoyama-Gakuin University, Tokyo, Japan, Summer  2003

**Books:**

PROFESSIONAL RESPONSIBILITY: A CONTEMPORARY APPROACH (West, 3d ed. 2017) (co-author)

AUSTRALIAN CLINICAL LEGAL EDUCATION (ANU Press, 2017) (co-author)

PROFESSIONAL RESPONSIBILITY: A CONTEMPORARY APPROACH, TEACHER'S MANUAL (WEST, 2d & 3d 2015 & 2017) (co-author)

DO NO WRONG: ETHICS FOR PROSECUTORS AND DEFENDERS (ABA, 2009) (co-author)

CLINICAL EDUCATION FOR THIS MILLENNIUM: THE THIRD WAVE (Miche & Osaka trans. 2005) (co-author) (Japanese language)

**Book Chapters:**

*Competency of Counsel: Mitigation and National Standards of Practice*, *in* TELL THE CLIENT'S STORY: MITIGATION IN CRIMINAL AND DEATH PENALTY CASES (Monahan & Clark, eds. ABA, 2017) (co-author)

*Ethics: Criminal Practice and the Media, in* MEDIA COVERAGE IN CRIMINAL JUSTICE CASES (Taslitz ed. ABA, 2013) (co-author)

*Ethics in Criminal Advocacy, in* THE STATE OF CRIMINAL JUSTICE 2015 (Wojcik ed. ABA, 2015) (co-author)

*Ethics in Criminal Advocacy, in* THE STATE OF CRIMINAL JUSTICE 2014 (Wojcik ABA, 2014) (co-author)

*Ethics in Criminal Advocacy, in* THE STATE OF CRIMINAL JUSTICE 2013 (Raeder ed. ABA, 2013) (co-author)

*Ethics in Criminal Advocacy, in* THE STATE OF CRIMINAL JUSTICE 2012 (Raeder ed. ABA, 2012)

*Ethics in Criminal Advocacy, in* THE STATE OF CRIMINAL JUSTICE 2011 (Raeder ed. ABA, 2011) (co-author)

*Japan's New Clinical Programs: A Study in Light and Shadow, in* GLOBAL CLINICAL MOVEMENT (Bloch ed. Oxford University 2011) (co-author)

*Ethics in Criminal Advocacy, in* THE STATE OF CRIMINAL JUSTICE 2010 (Raeder ed. ABA, 2010) (co-author)

*Criminal Law Clinics in the United States: Variation, History and the Quality of Student Representation*, *in* DEVELOPMENT OF LAWYERS BY CLINICAL LEGAL EDUCATION (Shigeo Miyagawa ed. 2007) (Japanese language)

**Articles and Essays:**

*The Uneasy History of Experiential Education in U.S. Law Schools*, __ DICKINSON LAW REVIEW ___ (forthcoming 2018)

*A Judge's Duty to Do Justice: Ensuring the Accused's Right to the Effective Assistance of Counsel*, 46 HOFSTRA LAW REVIEW 139 (2018)

*"What Do I Do with the Porn on My Computer?": How a Lawyer Should Counsel Clients about Physical Evidence*, 54 *American Criminal Law Review* 751 (2017) (co-author)

*ABA Standard 405(c): Two Steps Forward and One Step Back for Legal Education*, 66 JOURNAL OF LEGAL EDUCATION 606 (2017)

*Lawyers Serving as Judges, Prosecutors, and Defense Lawyers at the Same Time: Legal Ethics and Municipal Courts*, 49 WASHINGTON JOURNAL OF LAW & POLICY 23 (2016)

*Monroe Freedman's Influence on Legal Education*, 45 HOFSTRA LAW REVIEW 649 (2016)

*Race Matters in Jury Selection,* 109 NORTHWESTERN UNIVERSITY LAW REVIEW ONLINE 180 (2015)

*Unequal Assistance of Counsel,* 24 KANSAS JOURNAL OF LAW & PUBLIC POLICY 518 (2015)

*Systemic Barriers to Effective Assistance of Counsel in Plea Bargaining*, 99 IOWA LAW REVIEW 2103 (2014) (co-author)

*Law Schools and the Legal Profession:  A Way Forward*, 46 AKRON LAW REVIEW 177 (2014)

*Prosecutors' Disclosure Obligations in the U.S.*, 42 HITOTSUBASHI JOURNAL OF LAW & POLITICS 51 (2014) (co-author)

*The Criminal Discovery Problem: Is Legislation a Solution?,* 52 WASHBURN LAW JOURNAL 37 (2012)

*Why Lawyers Should Assess Lawyers' Ethics*, 15 LEGAL ETHICS 405 (2012)

*The Cost of Clinical Legal Education*, 32  BOSTON COLLEGE JOURNAL OF LAW & SOCIAL JUSTICE 309 (2012)

*Rationing Justice by Rationing Lawyers,* 37 WASHINGTON UNIVERSITY JOURNAL OF LAW & POLICY 205 (2011)

*Government Interference with Law School Clinics and Access to Justice:  When Is There a Legal Remedy*, 61 CASE WESTERN RESERVE LAW REVIEW 1087 (2011)

*Ensuring the Ethical Representation of Clients in the Face of Excessive Caseloads*, 75 MISSOURI LAW REVIEW 771 (2010)

*'Kneecapping' Academic Freedom*, 69 ACADEME 8 (2010) (co-author)

*Constructing Systemic Safeguards Against Informant Perjury,* 7 OHIO STATE JOURNAL OF CRIMINAL LAW 677 (2010)

*Lawyering in the Academy: The Intersection of Academic Freedom and Professional Responsibility*, 59 J. LEGAL EDUC. 97 (2009) (co-author)

*Commemoration of the Founding of the Japan Clinical Legal Education Association*, 1 LAWYERS & CLINICAL EDUCATION 21 (2009) (Japanese language)

*The Evolution of ABA Standards for Clinical Faculty*, 75 TENNESSEE LAW REVIEW 183 (2008) (co-author)

*Introduction: New Directions in Clinical Legal Education – Law for the People*, 28 WASHINGTON UNIVERSITY JOURNAL OF LAW & POLICY 1 (2008)

*Brady and Jailhouse Informants: Responding to Injustice*, 57 CASE WESTERN RESERVE LAW REVIEW 619 (2007)

*The Relationship Between Prosecutorial Misconduct and Wrongful Convictions: Shaping Remedies for a Broken System*, 84 WISCONSIN LAW REVIEW 399 (2006); reprinted in BENCH AND BAR: ETHICS (Reddy ed. Amicus Books 2008)

*Building Clinical Legal Education Programs in a Country Without a Tradition of Graduate Professional Legal Education: Japan Educational Reform as a Case Study*, 12 CLINICAL LAW REVIEW 417 (2006) (co-author)

*Political Interference in Clinical Programs: Lessons from the U.S. Experience*, 7 INTERNATIONAL JOURNAL OF CLINICAL LEGAL EDUCATION 83 (2006)

*Lawyer Ethics and the Expanding Role of the Media in Criminal Cases*, 17 PROFESSIONAL LAWYER 1 (2006) (co-author)

*Prosecution Clinics: Dealing with Professional Role*, 74 MISSISSIPPI LAW JOURNAL 955 (2005)

*Criminal Law Clinics in the United States: Variation, History and the Quality of Student Representation*, 7 WASEDA PROCEEDINGS OF COMPARATIVE LAW 93 (2005)

*Reflection in Action: Constructing New Clinical Teacher Training by Using Lessons Learned from New Clinicians*, 11 CLINICAL LAW REVIEW 49 (2004) (co-author)

*Teaching Ethics in the Criminal Law Course*, 48 ST. LOUIS UNIVERSITY LAW J. 1239 (2004)

*The Ethical Obligations of Law School Clinic Students as Student Lawyers,* 45 SOUTH TEXAS LAW REVIEW 815 (2004)

*Evolution of ABA Externship Standards: Steps in the Right Direction,* 10 CLINICAL LAW REVIEW 681 (2004)

*The Relationship Between Civil Rule 11 and Lawyer Discipline: An Empirical Analysis Suggesting Institutional Choices in the Regulation of Lawyers*, 37 LOYOLA OF LOS ANGELES LAW REVIEW 765 (2004)

*An Ethics Critique of Interference in Law School Clinics*, 71 FORDHAM LAW REVIEW 1971 (2003) (co-author)

*The Law School Clinic as a Model Ethical Law Office,* 30 WILLIAM MITCHELL LAW REVIEW 35 (2003)

*Teaching Ethics in Evidence*, 22 QUINNIPIAC LAW REVIEW 961 (2003) (co-author)

*Making Ethics Opinions Meaningful: Toward More Effective Regulation of Lawyers= Conduct*, 15 GEORGETOWN JOURNAL OF LEGAL ETHICS 313 (2002)

*Conflict of Interest and Competency Issues in Law Clinic Practice*, 9 CLINICAL LAW REVIEW 493 (2002) (co-author)

*A Professionalism Creed for Judges: Leading by Example*, 52 SOUTH CAROLINA LAW REVIEW 667 (2001)

*Clinical Education for This Millennium: The Third Wave*, 7 CLINICAL LAW REVIEW 1 (2000) (co-author)

*Political Interference with Clinical Legal Education: Denying Access to Justice*, 74 TULANE LAW REVIEW 235 (1999)

*Access to Justice, Academic Freedom, and Political Interference: A Clinical Program Under Siege*, 4 CLINICAL LAW REVIEW 531 (1998) (co-author)

*Submission of the Association of American Law Schools to the Supreme Court of the State of Louisiana Concerning the Review of the Supreme Court's Student Practice Rule*, 4 CLINICAL LAW REVIEW 539 (1998) (co-author)

*Clinical Scholarship: Improving the Practice of Law*, 2 CLINICAL LAW REVIEW 385 (1996)

*What We Talk About When We Talk About Professionalism*, 7 GEORGETOWN JOURNAL OF LEGAL ETHICS 987 (1994)

*The MacCrate Report: Moving Toward Integrated Learning Experiences*, 1 CLINICAL LAW REVIEW 401 (1994)

*Report of the Committee on the Future of the In-House Clinic*, 42 JOURNAL OF LEGAL EDUCATION 508 (1994) (contributor)

*Dunleavy v. Local 1617, United Steelworkers: A Shield for Union Members*, 19 UNIVERSITY OF TOLEDO LAW REVIEW 355 (1988)

**Miscellaneous Publications:**

Ethics Columns Co-Authored with Kevin C. McMunigal:

*Prosecutors and Use of Subpoenas,* 33 ABA Criminal Justice ___ (forthcoming Spring 2018)

*Postconviction Prosecutorial Duties*, 32 ABA CRIMINAL JUSTICE 53 (Winter 2018)

*Prosecutors and Literary or Media Deals: Conflicts of Interest Hiding in Plain Sight,* 32 ABA CRIMINAL JUSTICE 41 (Fall 2017)

*Lawyers, Marijuana, and Ethics*, 32 ABA Criminal Justice 29 (SPRING 2017); reprinted in *Best of ABA Sections*, 34 GP SOLO 72 (July/Aug. 2017)

*When Does Monitoring Defendants and Their Lawyers Cross the Line?*, 31 ABA CRIMINAL JUSTICE 48 (Winter 2017)

*Different Rules for Prosecutors*, 31 ABA CRIMINAL JUSTICE 48 (Fall 2016)

*Racial Discrimination and Jury Selection*, 31 ABA CRIMINAL JUSTICE 43 (Summer 2016)

*Misuse of Letterhead by Prosecutors and Attorneys General,* 30 ABA CRIMINAL JUSTICE 48 (Winter 2016)

*The Ethics of Prosecutorial Disclosure,* 30 ABA CRIMINAL JUSTICE 41 (Fall 2015)

*Prosecutorial Conflicts of Interest and Excessive Use of Force by Police*, 30 ABA CRIMINAL JUSTICE 47 (Summer 2015)

*Innocent Defendants Pleading Guilty,* 30 ABA CRIMINAL JUSTICE 45 (Spring 2015)

*ABA Approves Researching Jurors' Public Presence on Internet*, 29 ABA CRIMINAL JUSTICE 50 (Fall 2014)

*Confronting Prosecutors With Their Own Words?,* 29 ABA CRIMNAL JUSTICE 33 (Summer 2014)

*Waivers of Ineffective Assistance of Counsel as Condition of Negotiated Pleas*, 29 ABA CRIMINAL JUSTICE 32 (Spring 2014)

*The Ethics of Talking to the Media*, 29 ABA CRIMINAL JUSTICE 17(Winter 2014) reprinted in *Best of ABA Sections*, 31 GP SOLO 72 (July/Aug. 2014)

*Supervisors, Subordinates, and Sanctions,* 28 ABA CRIMINAL JUSTICE 43 (Fall 2013)

*Internet Marketing,* 28 ABA CRIMINAL JUSTICE 43 (Summer 2013)

*Ethical Concerns of Internet Communications,* 28 ABA CRIMINAL JUSTICE 45 (Winter 2013)

*Client or Prospective Client: What's the Difference?,* 27 ABA CRIMINAL JUSTICE 51(Fall 2012)

*The Ethical Risks of Technology,* 27 ABA CRIMINAL JUSTICE (Summer 2012)

*Does the Lawyer Make a Difference?*, 27 ABA CRIMINAL JUSTICE 46 (Spring 2012)

*Contingent Rewards for Prosecutors,* 27 ABA CRIMINAL JUSTICE 55 (Fall 2011)

*The Problem of Plagiarism as an Ethics Offense,* 26 ABA CRIMINAL JUSTICE 56 (Summer 2011)

*Confidentiality and Ineffective Assistance of Counsel Claims*, 26 ABA CRIMINAL JUSTICE 42 (Winter 2011)

*Deceit in Defense Investigations*, 25 ABA CRIMINAL JUSTICE 36 (Fall 2010)

*Corporate* Miranda *Warnings*, 25 ABA CRIMINAL JUSTICE 47 (Summer 2010)

*Do Two Wrongs Protect a Prosecutor?*, 25 ABA CRIMINAL JUSTICE 23 (Spring 2010)

*ABA Explains Prosecutor's Ethical Disclosure Duty,* 24 ABA CRIMINAL JUSTICE 41 (Winter 2010)

*Amend Rule 11 to Require Disclosure*, 24 ABA CRIMINAL JUSTICE 59 (Fall 2009)

*Incriminating Evidence – Too Hot to Handle?,* 24 ABA CRIMINAL JUSTICE 42 (Summer 2009)

*Are We Blind to Innocence?*, 24 ABA CRIMINAL JUSTICE 49 (Spring 2009)

*Conceding Guilt*, 23 ABA CRIMINAL JUSTICE 57 (Fall 2008)

*Confidentiality and Wrongful Incarceration*, 23 ABA CRIMINAL JUSTICE 46 (Summer 2008)

*New Rules for Scientific and Exculpatory Evidence*, 23 ABA CRIMINAL JUSTICE 44 (Spring 2008)

*Counsel or Client – Who's in Charge?*, 23 ABA CRIMINAL JUSTICE 34 (Winter 2008)

*Prosecutorial Disclosure of Exculpatory Information in the Guilty Plea Context:  Current Law,* 22 ABA CRIMINAL JUSTICE 50 (Fall 2007)

*Prosecutorial Disclosure of Exculpatory Information During Plea Negotiations,* 22 ABA CRIMINAL JUSTICE 42 (Summer 2007)

*Implicit Plea Agreements and Brady Disclosure*, 22 ABA CRIMINAL JUSTICE (Spring 2007)

*Campaign Pledges to Prosecute,* 22 ABA CRIMINAL JUSTICE 40 (Winter 2007)

*Client Autonomy and Choice of Counsel,* 21 ABA CRIMINAL JUSTICE 57 (Fall 2006)

*Corporate Privilege Waivers in Plea Negotiations,* 21 ABA CRIMINAL JUSTICE 42 (Summer 2006)

*To Tape or Not to Tape: Secret Recordings*, 21 ABA CRIMINAL JUSTICE 36 (Spring 2006) reprinted in *The Best Articles Published by the ABA*, 23 GP SOLO 26 (Sept. 2006)

*Destroying Documents*, 20 ABA CRIMINAL JUSTICE 50 (Winter 2006)

*Why Should Prosecutors "Seek Justice"?*, 20 ABA CRIMINAL JUSTICE 65 (Summer 2005)

*Are a Prosecutor's Responsibilities "Special"?* 20 ABA CRIMINAL JUSTICE 58 (Spring 2005)

*Should Prosecutors Use Inconsistent Arguments?*, 19 ABA CRIMINAL JUSTICE 47 (Winter 2005)

*The Role of Lawyers in Client Media Campaigns*, 19 ABA CRIMINAL JUSTICE 48 (Fall 2004)

*Trial by Media: Arguing Cases in the Court of Public Opinion*, 19 ABA CRIMINAL JUSTICE 47 (Summer 2004)

*Clients, Lawyers, and the Media*, 19 ABA CRIMINAL JUSTICE 77 (Spring 2004)

*Thou Shalt Not Use Religion in Closing Argument*, 19 ABA CRIMINAL JUSTICE 43 (Winter 2004)

*Brother's Keeper: Must You Protect Opponent's Confidentiality?*, 18 ABA CRIMINAL JUSTICE 43 (Fall 2003) reprinted in *The Best Articles Published by the ABA*, 21 GP-SOLO 20 (March, 2004)

*Has Gideon's Promise Been Fulfilled?*, 18 ABA CRIMINAL  JUSTICE 46 (Summer 2003)

*Inadequate Representation and Wrongful Convictions*, 18 ABA CRIMINAL JUSTICE 57 (Spring 2003)

*The Alternative Perpetrator Strategy*, 18 ABA CRIMINAL  JUSTICE 32 (Winter 2003)

*The Ethics of Witness Preparation*, 17 ABA CRIMINAL  JUSTICE (Fall 2002)

*The Supreme Court and Defense Counsel Conflicts*, 17 ABA CRIMINAL JUSTICE 40 (Spring 2002)

*Anti-Contact Rule in Criminal Cases*, 17 ABA CRIMINAL JUSTICE 44 (Winter 2002)

*Disclosing Exculpatory Material in Plea Negotiations*, 16 CRIMINAL JUSTICE 41 (Fall, 2001)

     Other Miscellaneous Writings:

*Battering Down Sentence,* THE COMMON READER (Apr. 2017) (Reviewing HEATHER ANN THOMPSON, BLOOD IN THE WATER: THE ATTICA UPRISING OF 1971 AND ITS LEGACY (2016))

*When Justice is Unequal*, NEW YORK TIMES, Feb. 1, 2016, at http://nyt.ms/1WXYUB8 (letter to the editor)

*Prosecutors' Misconduct*, NEW YORK TIMES, April 21, 2015, at A22 (letter to the editor)

*How Damage Caps Harm Public Safety and Justice*, NEW YORK TIMES, Jan. 7, 2015, at A22 (letter to the editor)

ENCYCLOPEDIA OF THE FIRST AMENDMENT (Vile et al. eds. CQ Press 2009) entries:
      "*Bar Admissions*," at 135
      "*In re R.M.J.* (1982)," at 601
      "*Konigsberg v. State Bar* (1961)," at 644

*Spaulding v. Zimmerman: Exploring the Ethics and Morality of Lawyers and Physicians in Practice,* 1277 JURISUTO 80 (2004)

*Law Students in Court: Providing Access to Justice*, eJOURNAL USA ISSUES OF DEMOCRACY, Aug. 2004, *available at* http://usinfo.state.gov/journals/itdhr/0804/ijde/joy.htm

*Professional Legal Ethics: A Comparative Perspective,* (2002) *available at* http://papers.ssrn.com/paper.taf?abstract_id-=321700 (contributor)

*AALS Issues a Strong Statement in Support of Academic Freedom for All Clinical Faculty*, 1 CLINICAL LEGAL EDUCATION NEWSLETTER 35 (2001) (with McCormack)

*'Pay to Play' Justice*, NEW YORK TIMES, Jan. 15, 2000, at A18 (letter to the editor)

*Insulation Needed for Elected Judges*, NATIONAL LAW JOURNAL, Jan. 10, 2000, at A19.

*Clinical Experience Translates to Client Experience*, 11 NATIONAL ASSOCIATION LAW PLACEMENT BULLETIN (1998)

*Ethics Perspectives: What Are the Ethical Ramifications of an "Of Counsel" Affiliation?* 68 CLEVELAND BAR JOURNAL 20 (1997)

*Amendments to Disciplinary Rules Create New Expectations for Ohio Lawyers*, LAW & FACT, Jan.-Feb. 1997, at 12

*Clients Are Consumers, Too*, 82 ABA JOURNAL 120 (April, 1996)

*Losing Titles*, OHIO LAWYER, Jan.-Feb. 1996, at 14.

*A Time to Disrobe to Save Your Honor*, NATIONAL LAW JOURNAL, Aug. 14, 1995, at A19.

*Preserving the Bill of Rights*, LAW & FACT, Jan.-Feb. 1991, at 3

Professional Responsibility Problems for First Year Courses, distributed to every ABA accredited and fee paid law school through Case Western Reserve University School of Law, 1991

*Joinder and Severance*, PUBLIC DEFENDER REPORTER, 17 (Nov.-Dec., 1979) (co-author)

**Editorial and Columnist Positions:**

Columnist (previous title Contributing Editor), ABA CRIMINAL JUSTICE, 2001-present
Board of Editors, INTERNATIONAL JOURNAL OF CLINICAL LEGAL EDUCATION, 2015 -present
ABA Section of Legal Education and Admissions to the Bar Publications Committee, 2015-present
Board of Editors, CLINICAL LAW REVIEW, 2005-11
Board of Editors, OHIO LAWYER, 1996-98

**Presentations (Current Period):**

"The Great Recession and American Legal Education," The Fourth Waseda and UC-Berkeley Joint Conference on Professional Legal Education, Tokyo Japan (December 2017)

"Why Clinicians Should Develop Best Practices for Clinical Legal Education for Their Country," concurrent session INTERNATIONAL JOURNAL OF CLINICAL LEGAL EDUCATION Conference, Newcastle Upon Tyne, UK (July 2017)

"Early Effects of New Experiential Education Standards on Law Schools," lunch plenary at the AALS Directors Conference, Denver, Colorado (May 2017)

"Tumultuous Ten Years and Beyond: Experiences and Prospects of Clinical Legal Education in Japan," concurrent session at the AALS Clinical Conference, Denver, Colorado (May 2017)

"Case Disposition and Its Consequences in Misdemeanor Cases," panel moderator, at Judicial Responsibility for Justice in Criminal Courts National Conference sponsored by the Freedman Institute at Hofstra University School of Law (April 2017)

"Blueprint for the Future of Clinical Legal Education," Campbell Oration, Monash University Law School, Melbourne, Australia (May 2016)

"Emerging Ethics Issues with New Technology," presentation to faculty, students, and alumni at University of Missouri-Columbia School of Law (January 2016)

"ABA Standards, Clinical Legal Education, and the New Normal: Has Anything Changed?," concurrent session at the AALS Clinical Conference, Rancho Mirage, California (May 2015)

"Unequal Assistance of Counsel," KANSAS JOURNAL OF LAW & PUBLIC POLICY Symposium, Lawrence, Kansas (February 2015)

"Prosecutorial Ethics and Criminal Discovery," Japan Federation of Bar Associations (JFBA), Tokyo, Japan (December 2013)

"Criminal Discovery," Hitotsubashi University Law School, Kinatachi, Japan (December 2013)

"Systemic Barriers to Effective Assistance of Counsel in Plea Bargaining," faculty workshop at the University of Denver School of Law, Denver, Colorado (November 2013)

"Systemic Barriers to Effective Assistance of Counsel in Plea Bargaining," Iowa Law Review Symposium, Iowa City, Iowa (October 2013)

"Strengthening Clinical Legal Education by Developing Best Practices:  Comparing Approaches," International Journal of Clinical Legal Education Conference keynote, Brisbane, Australia (July 2013)

"Are We Abandoning the In-House Clinic?  In-House Clinics, Community-Based/Community Lawyering Hybrid Clinics, and Experiential Practicum/Lab Courses," concurrent session at the AALS Clinical Conference, San Juan, Puerto Rico (May 2013)

"Law Schools and the Legal Profession:  A Way Forward," Akron Law Review Symposium, Akron, Ohio (March 2013)

"Evidence of Innocence and Prosecutorial Ethics," Japan Federation of Bar Associations (JFBA), Tokyo, Japan (December 2012)

"Prosecutorial Ethics," Hitotsubashi University Law School, Kinatachi, Japan (December 2012)

"Generational Differences and Criminal Justice Issues in Clinical Courses: From *Perry Mason* and *Andy Griffith* to *LA Law* and *Hill City Blues* to *Law & Order* and *the Wire*," Midwest Clinical Conference, St. Louis University Law School, St. Louis, Missouri (November 2012)

"The Criminal Discovery Problem: Is Legislation a Solution?, faculty workshop at Elon University School of Law, Greensboro, North Carolina (October 2012)

"Federal Criminal Discovery Reform: A Legislative Approach," Mercer Law Review Symposium, Macon, Georgia (October 2012) (commentator)

"Hired Gun? The Principle and Limits of Zealous Advocacy as a Measure of the Ethical Lawyer," University of Northumbria Law School (March 2012)

"Curriculum Development for Improving Legal Education: Building on *Best Practices for Legal Education* and *Educating Lawyers*," faculty workshop,  University of Baltimore School of Law (March 2012)

"Does the First Amendment Protect Attorney Advice, Assistance, and Representation?," moderator, AALS Annual Meeting Professional Responsibility Section Program, Washington, D.C. (January 2012)

"Academic Freedom in Contexts of Experiential Learning and Community-Based Research," State University of New York at Buffalo, School of Law (February 2011)

"Government Control of Law School Clinics," Government Speech Symposium, sponsored by the Case Western Reserve Law Review (November 2010)

"Developing Professional Identity for Lawyers," INTERNATIONAL JOURNAL OF CLINICAL LEGAL EDUCATION Conference keynote, Newcastle upon Tyne, United Kingdom (July 2010)

"Ensuring the Ethical Representation of Clients in the Face of Excessive Caseloads," Broke and Broken: Can We Fix Our State Indigent Defense Systems?", sponsored by the MISSOURI LAW REVIEW (February 2010)

"What Makes an Ethical Lawyer?," Visiting Professor inaugural lecture, University of Northumbria Law School (November 2009)

"Curriculum Development," University of Indiana-Bloomington School of law faculty presentation (November 2009)

"Best Practices for Prosecutors' Offices to Overcome Cognitive Biases," 2009 Hofstra Legal Ethics Conference, Power, Politics & Public Service: The Legal Ethics of Lawyers in Government, Hostra University School of Law (October 2009)

"Lawyering in the Academy: The Intersection of Academic Freedom and Professional Responsibility," lunch keynote at AALS Clinic Directors Conference, Cleveland, Ohio (May 2009)

"The Clinician in Today's Legal Academy," plenary speaker, 2009 Midwest Clinical Conference, University of Indiana-Bloomington School of Law (October 2008)

"Exploring How Large U.S. Law Firms Promote Ethical Practice," Third International Ethics Conference, Brisbane, Australia (July 2008); Monash University Law School faculty seminar, Melbourne, Australia (July 2008)

"Teaching Ethics and Professional Development: Legal Education at a Crossroads," 34th ABA National Conference on Professional Responsibility, Boston, Massachusetts (May 2008)

"Commemoration of the Founding of the Japan Clinical Legal Education Association (JCLEA): Opportunities for Collaboration," keynote, Tokyo, Japan (April 2008)

"*Best Practices* for *Educating Lawyers* & Assessing Clinical Students," 2007 Midwest Clinical Conference, Drake University School of Law (October 2007)

"*Best Practices* for *Educating Lawyers* & Law School Curriculum Planning," University of New Mexico School of Law faculty and staff presentation (October 2007); NOVA School of Law faculty presentation (September 2007)

"Challenging Assumptions About Legal Education: *Best Practices* for *Educating Lawyers*," Association of Legal Writing Directors Conference keynote, University of Denver School of Law (June 2007); Southeast Legal Writing Faculty Conference keynote, NOVA University School of Law (September 2007)

"Legal Education and the Ethical Development of the Legal Professional: Promoting Justice and

Fairness," INTERNATIONAL JOURNAL OF CLINICAL LEGAL EDUCATION Conference, Johannesburg, South Africa (July 2007)

"Criminal Clinical Legal Education in the World: A Professor's View," Criminal Clinical Education in the U.S. and Japan Workshop, sponsored by Waseda University Law School, Tokyo, Japan (March 2007)

"*Brady* and Jailhouse Snitches: Responding to Injustice," Prosecutorial Ethics and the Right to a Fair Trial: The Role of the *Brady* Rule in the Modern Criminal Justice System Symposium, sponsored by the CASE WESTERN RESERVE LAW REVIEW (January 2007)

"Practical Pointers for Developing a Research and Scholarship Agenda," 2006 Midwest Clinical Conference, University of Notre Dame Law School (October 2006)

"The Relationship Between Prosecutorial Misconduct and Wrongful Convictions: Shaping Remedies for a Broken System," Preventing Wrongful Convictions Symposium, sponsored by the WISCONSIN LAW REVIEW (November 2005)

"The Globalization of Clinical Legal Education," Sixth International Clinical Conference, sponsored by UCLA and University of London, Lake Arrowhead, California (October 2005)

"Political Interference in Clinical Programs: Lessons from the U.S. Experience," Third INTERNATIONAL JOURNAL OF CLINICAL LEGAL EDUCATION and Eighth Australian Clinical Legal Education Conferences, Melbourne, Australia (July 2005)

"The Birth of the Waseda Law Clinics: Bridging Theory and Practice," Dedication Lecture at the Opening Ceremony for the Waseda Law School Clinical Program, Tokyo, Japan (May 2005)

"Clinical Legal Education from a Student's Perspective: Learning How to Think and Act Like a Lawyer," Dean's Invited Lecture, Kokugakuin Law School, Tokyo, Japan (May 2005)

Lessons Learned from New Clinicians, CLEA New Clinical Teachers Conference, Cleveland (2009), New Orleans (2007), Chicago (2005) and Vancouver, Canada (2003)

"Challenges of Providing Clinical Programs for Part Time Students," Omiya Law School, Omiya, Japan (December 2004)

"Conflicts of Interest in the Legal and Medical Professions," Legal and Medical Ethics Conference sponsored by the University of Tokyo (December 2004)

"Ready from Day One: What Should Law Graduates Be Able to Do?," 2004 ABA Annual Meeting, Atlanta, Georgia (August 2004)

"The Three Hardest Questions For Clinical Legal Education in Japan," Public Lecture sponsored by the Japan Federation of Bar Associations, Tokyo, Japan (June 2004)

"Challenges Facing the Waseda Law Faculty in Starting a Criminal Clinic," Waseda University Law School (June 2004)

"*Spaulding v. Zimmerman*: Exploring the Ethics and Morality of Lawyers and Physicians in Practice," University of Tokyo (July 2004)

"Teaching Legal Ethics in Law School," Aichi University, Nagoya, Japan (July 2004)

"Legal Ethics and Lawyer Discipline in the United States," sponsored by the ABA-Asia Law Initiative, Komite Kerja Advokat Indonesia, and Pusat Studi Hukum & Kebijakan Indonesia, Workshop on the Indonesian Advocate=s Code of Ethics: Steps Towards Enforcement, Jakarta, Indonesia (February 2004)

"The Ethics of Law Students as Student Lawyers," Faculty Workshop, Kansas University School of Law (November 2003)

ARationing Legal Services in Clinical Programs,@ 2003 Midwest Clinical Teachers Conference, sponsored by University of Minnesota, Hamline, and William Mitchell, St. Paul, Minnesota (November 2003)

"The Ethics of Law School Clinic Students as Student Lawyers,@ SOUTH TEXAS COLLEGE OF LAW REVIEW Symposium (October 2003)

"Recent Developments in Clinical Legal Education and Ethics Instruction in American Law

Schools,  Meeting of the Legal Education Committee of the Japan Federation of Bar Associations, Tokyo, Japan (July 2003)

"The Ethics of Law School Students and Professors," 2003 ABA 29th National Conference on Professional Responsibility, Chicago, Illinois (May 2003)

"Evolution of ABA Externship Standards: Steps in the Right Direction," National Externship Conference, sponsored by The Catholic University School of Law (March 2003)

**Presentations (Beyond Current Period):**

Numerous presentations on various subjects at annual meetings and conferences sponsored by the American Bar Association (ABA), Federal Judicial Center, Association of American Law Schools (AALS), the Clinical Legal Education Association (CLEA), as well as conferences or lectures sponsored by Aoyama Gakuin University, Case Western Reserve University, DePaul University, Hitotsubashi University, Kokugakuin University, Rutgers Law School-Newark, University of Minnesota, Monash University, Northumbria University, Stanford University's Keck Center on Legal Ethics and the Legal Profession, St. Louis University, University of Illinois, University of Kansas, University of Michigan, University of South Carolina, University of Tokyo, Washington University in St. Louis, Waseda University, William Mitchell Law School, and University of

Wisconsin.  Featured speaker at the Cleveland City Club and the Cleveland Council on World Affairs.

Numerous continuing legal education (CLE) presentations to lawyers and judges on a wide range of subjects sponsored by the ABA, state and local bar associations, The Federal Judicial Center, federal district courts, state courts, professional organizations, state and federal prosecutor and public defender offices, and law schools in several states.

**Education:**

J.D., CASE WESTERN RESERVE UNIVERSITY SCHOOL OF LAW (1977);
      Martin Luther King, Jr. Award

A.B., *summa cum laude*, Political Science, YOUNGSTOWN STATE UNIVERSITY (1974);
      The Vindicator Award; *Phi Kappa Phi* Honor Society; Gould Honor Society

**Practice of Law:**

Practice of law in connection with clinical teaching in Ohio and Missouri, supervising attorney and
      direct representation of clinic clients from 1978-98 in Ohio and supervising attorney from
      1998 to present in Missouri; representation of private clients from 1978-98 in Ohio; legal
      ethics consulting and pro bono representation of clients from 1998 to present in Missouri

MECKLER AND MECKLER, Cleveland, Ohio
      Of Counsel (1980-88), primarily civil practice; accepted appointments from the Cuyahoga
      County Court of Common Pleas as an arbitrator and guardian ad litem

CENTER FOR HUMAN SERVICES, Cleveland, Ohio
      Consultant Mediator (1983-88)

LAW STUDENTS CIVIL RIGHTS RESEARCH COUNCIL (LSCRRC), Atlanta, Georgia
      National Co-Director (1977-78)

**Professional Ethics Service:**

Association of American Law Schools Professional Responsibility Section (Chair, 2011) (Executive Committee, 2008-2012)

American Bar Association Asia Law Initiative, Indonesia, 2004 (ethics consultant)

Special Investigator for the Ohio Supreme Court Board of Commissioners on Character and Fitness (1990-91)

Cleveland Bar Association Ethics Committee (1987-98) and Advertising Committee (1989-90)

Cuyahoga County Bar Association в Ethics Committee (1989-90, 1991-98, Vice-Chair, 1997-98)

Judicial Selection/Standards Committee (1994-98)

Joint Cleveland-Cuyahoga County Bar Admissions Committee (1987-92)

**Bar Admission, Memberships and Activities:**

Admitted, Ohio (1977); District of Columbia (1979) (inactive); Missouri (1998); 6th (1983), 3rd (1984), 5th (1999) and 8th (1999) Circuits; U.S. Supreme Court (1995)

American Bar Association, ABA Center for Professional Responsibility, Missouri Bar Association, and former member of the Ohio Bar Association, Cleveland Bar Association, and Cuyahoga County Bar Association

**Public Comment:**

Quoted in various print and electronic media, including *The BBC, The Economist*, *The New York Times, The Wall Street Journal, Christian Science Monitor, Newsweek, Time Magazine, The New Yorker, ABC News, CBS News, CNN, ESPN, Dateline NBC*, *Reuters, National Public Radio, Canada National Television, China Central TV, USA Today, AP Wire*, *The Progressive*, *St. Louis Public Radio*, *The Los Angeles Times, The Boston Herald, The Cleveland Plain Dealer, The St. Louis Post-Dispatch, ABA Journal, ABA Journal eReport, ABA Student Lawyer*, *The American Lawyer, LawyersUSA, Legal Affairs, The Legal Times*, *Law360, The National Law Journal, National Jurist, WNYC,* and other media outlets.

**Consulting and Public Service:**

Outside reviewer for book proposals and articles submitted to: Cambridge University Press; Oxford University Press; Ashgate Publishing; Aspen Publishing; University of Notre Dame Press; *The International Journal of Clinical Legal Education*; *The Journal of Legal Education*; *The Journal of Law, Medicine & Ethics*; *Social Science & Medicine*; and *Nonprofit Management & Leadership*

Qualified as an expert witness for legal ethics and lawyer professional negligence by state and federal courts in Ohio, Missouri, and Kansas and prepared reports for matters in other states

**AV Rating Martindale-Hubbell, 1980-present**

Massachusetts Rules of Professional Conduct (Mass.R.Prof.C.), Rule 7.2

Massachusetts General Laws Annotated Currentness
  Rules of the Supreme Judicial Court (Refs & Annos)
    Chapter Three. Ethical Requirements and Rules Concerning the Practice of Law
      Rule 3:07. Massachusetts Rules of Professional Conduct and Comments (Refs & Annos)
      Information About Legal Services
      **Rule 7.2. Advertising**

**(a)** Subject to the requirements of Rule 7.1, a lawyer may advertise services through public media, such as a telephone directory, legal directory including an electronic or computer-accessed directory, newspaper or other periodical, outdoor advertising, radio or television, or through written, electronic, computer-accessed or similar types of communication not involving solicitation prohibited in Rule 7.3.

**(b)** A copy or recording of an advertisement or written communication of services offered for a fee shall be kept for two years after its last dissemination along with a record of when and where it was used.

**(c)** A lawyer shall not give anything of value to a person for recommending the lawyer's services, except that a lawyer may:

(1) pay the reasonable costs of advertisements or communications permitted by this Rule;

(2) pay the usual charges of a not-for-profit lawyer referral service or legal service organization;

(3) pay for a law practice in accordance with Rule 1.17;

(4) pay referral fees permitted by Rule 1.5(e); and

(5) share a statutory fee award or court-approved settlement in lieu thereof with a qualified legal assistance organization in accordance with Rule 5.4(a)(4).

**(d)** Any communication made pursuant to this rule shall include the name of the lawyer, group of lawyers, or firm responsible for its content.

CREDIT(S)

Adopted June 9, 1997, effective January 1, 1998. Amended December 8, 1997, effective January 1, 1998; amended August 31, 1999, effective October 1, 1999.

COMMENT

2006 Main Volume

[1] To assist the public in obtaining legal services, lawyers should be allowed to make known their services not only through reputation but also through organized information campaigns in the form of advertising.
[2] [Reserved]
[3] Questions of effectiveness and taste in advertising are matters of speculation and subjective judgment. Television and other electronic media, including computer-accessed communications, are now among the most powerful media for getting information to the public. Prohibiting such advertising, therefore, would impede the flow of information about

EXHIBIT 2, p. 1

legal services to many sectors of the public. Limiting the information that may be advertised has a similar effect and assumes that the bar can accurately forecast the kind of information that the public would regard as relevant.

[3A] The advertising and solicitation rules can generally be applied to computer-accessed or other similar types of communications by analogizing the communication to its hard-copy form. Thus, because it is not a communication directed to a specific recipient, a web site or home page would generally be considered advertising subject to this rule, rather than solicitation subject to Rule 7.3. For example, when a targeted e-mail solicitation of a person known to be in need of legal services contains a hot-link to a home page, the e-mail message is subject to Rule 7.3 but the home page itself need not be because the recipient must make an affirmative decision to go to the sender's home page. Depending upon the circumstances, posting of comments to a newsgroup, bulletin board or chat group may constitute targeted or direct contact with prospective clients known to be in need of legal services and may therefore be subject to Rule 7.3. Depending upon the topic or purpose of the newsgroup, bulletin board, or chat group, the posting might also constitute an association of the lawyer or law firm's name with a particular service, field, or area of law amounting to a claim of specialization under Rule 7.4 and would therefore be subject to the restrictions of that rule. In addition, if the lawyer or law firm uses an interactive forum such as a chat group to solicit for a fee professional employment that the prospective client has not requested, this conduct may constitute prohibited personal solicitation under Rule 7.3(d).

[4] Neither this Rule nor Rule 7.3 prohibits communications authorized by law, such as notice to members of a class in class action litigation.

*Record of Advertising*

[5] Paragraph (b) requires that a record of the content and use of advertising be kept in order to facilitate enforcement of this Rule. It does not require that advertising be subject to review prior to dissemination. Such a requirement would be burdensome and expensive relative to its possible benefits, and may be of doubtful constitutionality.

*Paying Others to Recommend a Lawyer*

[6] A lawyer is allowed to pay for advertising permitted by this Rule and for the purchase of a law practice in accordance with the provisions of Rule 1.17, but otherwise is not permitted to pay another person for channeling professional work. However, a legal aid agency or prepaid legal services plan may pay to advertise legal services provided under its auspices. Likewise, a lawyer may participate in not-for-profit lawyer referral programs and pay the usual fees charged by such programs. Paragraph (c) does not prohibit paying regular compensation to an assistant, such as a secretary, to prepare communications permitted by this Rule. Paragraph (c) also excepts from its prohibition the referral fees permitted by Rule 1.5(e).

Corresponding ABA Model Rule. Substantially similar to Model Rule 7.2, except minor differences in (a) and (b), subclauses (4) and (5) were added to paragraph (c), and paragraph (d) was modified.

Corresponding Former Massachusetts Rule. DR 2-101 (B); see DR 2-103.

LIBRARY REFERENCES

2006 Main Volume

Attorney and Client 32(2), 32(9).
Westlaw Topic No. 45.
C.J.S. Attorney and Client §§ 42 to 43, 45 to 46, 87.

Current with amendments received through 3/15/11.

EXHIBIT 2, p. 2

> Massachusetts General Laws Annotated
>     Rules of the Supreme Judicial Court (Refs & Annos)
>         Chapter Three. Ethical Requirements and Rules Concerning the Practice of Law
>             Rule 3:07. Massachusetts Rules of Professional Conduct and Comments (Refs & Annos)
>                 Information About Legal Services

Massachusetts Rules of Professional Conduct (Mass.R.Prof.C.), Rule 7.2

Rule 7.2. Advertising

Currentness

**(a)** Subject to the requirements of Rules 7.1 and 7.3, a lawyer may advertise services through written, recorded or electronic communication, including public media.

**(b)** A lawyer shall not give anything of value to a person for recommending the lawyer's services, except that a lawyer may:

(1) pay the reasonable costs of advertisements or communications permitted by this Rule;

(2) pay the usual charges of a legal service plan, not-for-profit lawyer referral service, or qualified legal assistance organization;

(3) pay for a law practice in accordance with Rule 1.17;

(4) refer clients to another lawyer or a nonlawyer professional pursuant to an agreement not otherwise prohibited under these Rules that provides for the other person to refer clients or customers to the lawyer, if

(i) the reciprocal referral agreement is not exclusive, and

(ii) the client is informed of the existence and nature of the agreement; and

(5) pay fees permitted by Rule 1.5(e) or Rule 5.4(a)(4).

**(c)** Any communication made pursuant to this Rule shall include the name of the lawyer, group of lawyers, or firm responsible for its content.

EXHIBIT 3, p. 1

**Credits**

Adopted June 9, 1997, effective January 1, 1998. Amended December 8, 1997, effective January 1, 1998; amended August 31, 1999, effective October 1, 1999. Amended March 26, 2015, effective July 1, 2015.

**COMMENT**

[1] To assist the public in learning about and obtaining legal services, lawyers should be allowed to make known their services not only through reputation but also through organized information campaigns in the form of **advertising**.

[2] [Reserved]

[3] [Reserved]

[3A] The **advertising** and solicitation rules can generally be applied to computer-accessed or other similar types of communications by analogizing the communication to its hard-copy form. Thus, because it is not a communication directed to a specific recipient, a website or home page would generally be considered **advertising** subject to this Rule, rather than solicitation subject to Rule 7.3. For the distinction between **advertising** governed by this Rule and solicitations governed by Rule 7.3, see Comment 1 to Rule 7.3.

[4] Neither this Rule nor Rule 7.3 prohibits communications authorized by law, such as notice to members of a class in class action litigation.

*Paying Others to Recommend a Lawyer*

[5] Except as permitted under paragraphs (b)(1)-(b)(5), lawyers are not permitted to pay others for recommending the lawyer's services or for channeling professional work in a manner that violates Rule 7.3. A communication contains a recommendation if it endorses or vouches for a lawyer's credentials, abilities, competence, character, or other professional qualities. Paragraph (b)(1), however, allows a lawyer to pay for **advertising** and communications permitted by this Rule, including the costs of print directory listings, on-line directory listings, newspaper ads, television and radio airtime, domain-name registrations, sponsorship fees, banner ads, Internet-based advertisements, and group **advertising**. A lawyer may compensate employees, agents and vendors who are engaged to provide marketing or client development services, such as publicists, public-relations personnel, business-development staff and website designers. See also Rule 5.3 (duties of lawyers and law firms with respect to the conduct of nonlawyers; Rule 8.4(a) (duty to avoid violating the Rules through the acts of another).

[6] A lawyer may pay the usual charges of a legal service plan, not-for-profit lawyer referral service, or qualified legal assistance organization. A legal service plan is a prepaid or group legal service plan or a similar delivery system that assists people who seek to secure legal representation. A lawyer referral service is a consumer-oriented organization that provides unbiased referrals to lawyers with appropriate experience in the subject matter of the representation and affords other client protections, such as complaint procedures or malpractice insurance requirements. A qualified legal assistance organization is defined by Rule 1.0(j).

[7] A lawyer who accepts assignments or referrals from a legal service plan or referrals from a lawyer referral service must act reasonably to assure that the activities of the plan or service are compatible with the lawyer's professional obligations. See Rules 5.3 and 8.4(a). Legal service plans and lawyer referral services may communicate with the public, but such communication must be in conformity with these Rules. Thus, **advertising** must not be false or misleading, as would be

EXHIBIT 3, p. 2

the case if the communications of a group **advertising** program or a group legal services plan would mislead the public to think that it was a lawyer referral service sponsored by a state agency or bar association. Nor could the lawyer allow in-person, telephonic, or real-time contacts that would violate Rule 7.3.

[8] A lawyer also may agree to refer clients to another lawyer or a non-lawyer professional, in return for the undertaking of that person to refer clients or customers to the lawyer. Such reciprocal referral arrangements must not interfere with the lawyer's professional judgment as to making referrals or as to providing substantive legal services. See Rules 2.1 and 5.4(c). Except as provided in Rule 1.5(e), a lawyer who receives referrals from a lawyer or nonlawyer professional must not pay anything for the referral, but the lawyer does not violate paragraph (b) of this Rule by agreeing to refer clients to the other lawyer or nonlawyer professional, so long as the reciprocal referral agreement is not exclusive and the client is informed of the referral agreement. Such arrangements are governed by Rule 1.7, and therefore require the client's informed consent in writing. Reciprocal referral agreements should not be of indefinite duration and should be reviewed periodically to determine whether they comply with these Rules. This Rule does not restrict referrals or divisions of revenues or net income among lawyers within firms comprised of multiple entities.

Relevant Additional Resources
Additional Resources listed below contain your search terms.

LIBRARY REFERENCES
    Attorney and Client ⚷32(2), 32(9).
    Westlaw Topic No. 45.
    C.J.S. Attorney and Client §§ 42 to 43, 45 to 46, 87.

RESEARCH REFERENCES

Treatises and Practice Aids
1 **Mass**. Prac. Series § 2:4, **Advertising** of Divorce and Family Law Services.
1 **Mass**. Prac. Series § 2:6, Computer-Assisted Communications.
41 **Mass**. Prac. Series RPC **R** 5.4, Professional Independence of a Lawyer.

S.J.C. Rule 3:07, Massachusetts Rules of Professional Conduct (**Mass**. **R**. Prof. **C**.), Rule **7.2**, MA **R** S CT RULE 3:07 RPC Rule **7.2**

Current with amendments received thru January 15, 2016.
(**C**) 2016 Thomson Reuters.

EXHIBIT 3, p. 3