# EX. 242

## UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ARKANSAS TEACHER RETIREMENT SYSTEM, on behalf of itself and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 11-cv-10230 MLW |
| ARNOLD HENRIQUEZ, MICHAEL T. COHN, WILLIAM R. TAYLOR, RICHARD A. SUTHERLAND, and those similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, STATE STREET GLOBAL MARKETS, LLC and DOES 1-20, <br><br> Defendants. | No. 11-cv-12049 MLW |
| THE ANDOVER COMPANIES EMPLOYEE SAVINGS AND PROFIT SHARING PLAN, on behalf of itself, and JAMES PEHOUSHEK-STANGELAND, and all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> STATE STREET BANK AND TRUST COMPANY, <br><br> Defendant. | No. 12-cv-11698 MLW |

**Expert Report of Hal R. Lieberman**

CONFIDENTIAL – SUBJECT TO PROTECTIVE ORDER

Hal R. Lieberman
Emery Celli Brinckerhoff & Abady LLP
600 Fifth Avenue, 10th Floor
New York, NY 10020
212-763-5000

On behalf of Labaton Sucharow LLP ("Labaton"), I have been retained to provide an expert ethics opinion responding, in part, to the "Ethical Report for Special Master Gerald E. Rosen" authored by Professor Stephen Gillers. Specifically, my opinions will address Professor Gillers' contention that the fee-splitting arrangement between Labaton and the referring law firm, Chargois & Herron ("Chargois"), constituted an unethical payment for the recommendation of a client, and not a valid division of fee arrangement in accordance with the applicable Massachusetts Rule of Professional Conduct ("Mass. Rule") 1.5(e).

My primary opinion, based on my experience as an attorney whose practice for the past thirty-five years has focused on legal ethics and professional discipline in Massachusetts and New York, based on relevant case law, and based on standard treatises, including one interpreting the Massachusetts Rules of Professional Conduct,[1] is that Professor Gillers is incorrect. For the reasons more fully set forth below, in my view the fee-splitting arrangement at issue constituted an ethically valid and enforceable agreement, in accordance with Mass. Rule 1.5(e), because:

- Mass Rule 1.5(e) does not require that a referring law firm (Chargois) perform any work in order to receive a portion of the fee award allocated to trial counsel (Labaton and other firms);

- Mass. Rule 1.5(e) does not require disclosure to the client of the precise fee division to which the lawyers have agreed;

---

[1] *See*, e.g., *The Restatement (Third) of the Law Governing Lawyers*, ALI (2000); the ABA's *Annotated Rules of Professional Conduct* (8th Ed., 2015); *Massachusetts Professional Responsibility*, Gilda Tuoni Russell (Lexis Nexis, 2nd Ed., 2003).

- While Mass. Rule 1.5(e) requires disclosure to the client of the fee-splitting arrangement, Labaton substantially complied with that obligation, and the facts fully support the conclusion that Labaton's client, the Arkansas Teacher Retirement System ("ARTRS"), knowingly consented thereto;

- Even if Labaton's compliance with Mass. Rule 1.5(e)'s disclosure to client requirement was deemed technically deficient – which I do not believe would be appropriate - insofar as the successor Executive Director of ARTRS did not assent in writing at the time to a fee-splitting agreement with Chargois specifically, given the factual circumstances, in my opinion that insubstantial "deficiency" is not a basis to sanction, discipline, or penalize Labaton.

The opinions set forth *infra* are offered as my best professional assessment of the pertinent ethical concerns raised by the Court and its Special Master, and the reasonable and customary standards that apply. My compensation in connection with this matter is $750 per hour.

## I.   <u>Professional Qualifications</u>

My qualifications as an expert on lawyers' ethics and disciplinary enforcement are set forth in detail in the resume that is attached hereto as Exhibit "A." It describes my educational background, legal experience, bar admissions, academic affiliations, professional activities, bar committee memberships, publications and participation as a lecturer at bar seminars or on CLE panels related to professional responsibility or attorney discipline. In brief, I have worked in the field of legal ethics and attorney discipline on a full-time basis for the past thirty-five years, initially (1984 – 1987) as an Assistant Bar Counsel in the Massachusetts Office of the Bar Counsel, and subsequently, from June, 1987 until June, 1998, as Principal Trial Counsel and then

as Chief Counsel to the Departmental Disciplinary Committee (the "Committee") for New York's First Judicial Department (covering approximately 75,000 lawyers in Manhattan and the Bronx). In those positions, I reviewed literally thousands of lawyer disciplinary matters, including numerous cases involving interpretation of the lawyer disciplinary rules and rules of professional conduct concerning, among other things, the ethics of referral fees. During the same period, I formally prosecuted more than 50 cases involving lawyer misconduct, and personally handled hundreds of less serious matters.

Further, in my capacity as Chief Counsel to New York's disciplinary committee, I provided my professional opinion on legal ethics and disciplinary issues on numerous occasions to Justices of the Appellate Division and the Appellate Term, to the New York Office of Court Administration, to other state and federal judges (including, frequently, the Chair of the Grievance Committee for the Southern District of New York), to lawyer and non-lawyer members of the Committee, to bar committees, and to members of the bar who sought my advice. Additionally, for thirteen years I was a member of the adjunct faculty of Brooklyn Law School, where I taught a course entitled The Legal Profession, was recently an Adjunct Professor at Columbia Law School teaching legal ethics, and have been a visiting lecturer on legal ethics at a number of other law schools, including Harvard Law School in Massachusetts. I have also published articles for professional journals on the subject of legal ethics and professional discipline, have lectured widely in the field, and have served on New York State, New York City and New York County bar committees concerned with professional discipline and professional responsibility. In 1996, I was elected to membership in the American Law Institute and served on the Members' Consultative Group for the Restatement of the Law Governing Lawyers. I was formerly a member of the Ethics Committee of the Boston Bar Association, a member of the

Committee on Professional Ethics of the New York City Bar Association, a member of the Committee on Professional Responsibility of the New York City Bar Association, the principal author of N.Y. City Op. 2000-1 (2000), and I was Chair of the Committee on Professional Discipline of the New York City Bar Association.  Since 1998, I have provided expert testimony on legal ethics, professional discipline, and legal malpractice in approximately 40 cases, state and federal.  I am co-author of *NEW YORK ATTORNEY DISCIPLINE: PRACTICE AND PROCEDURE* (ALM, 2017) and a regular columnist for the *New York Law Journal* on the subject of Professional Discipline.

## II.     Assumed Facts

For purposes of the opinions expressed below, I rely upon the following facts provided to me by Labaton's counsel as well as the Declaration of George Hopkins, Executive Director of ARTRS:

### A.     Background

Labaton Sucharow ("Labaton") is a plaintiffs' law firm that focuses on large-scale and complex class action litigation, which often involves securities matters.  In the context of its securities work, Labaton frequently acts as "monitoring counsel" for its clients.  In that role, Labaton monitors the client's portfolio of securities investments for signs of possible securities law violations, such as a drop in stock price.  *See, e.g.*, Portfolio Monitoring and Case Evaluation[2]; LBS017739-41.  In doing so, Labaton uses sophisticated in-house investigators and analysts to monitor the securities market.  Keller Dep. Day 1 35:2-14.  If Labaton believes a client's portfolio may have been involved in a securities violation that could lead to a viable case, Labaton may ask the client whether it would be interested in serving as lead plaintiff in a

---

[2] *Available at* http://www.labaton.com/en/practiceareas/Institutional-Investor-Protection-Services.cfm (last visited March 9, 2018).

class action case.  Portfolio Monitoring and Case Evaluation; LBS017739-41.  If the client

agrees, Labaton may represent the client in the litigation.  *Id.*; *see also* Sucharow 2d Dep.

115:13-116:15.

Because of its complex role as monitoring counsel, it "takes a while for people to . . .

understand [Labaton's work] to the point where it can be useful to them."  Keller Dep. Day 1

24:20-23.  Thus, Labaton relies on informational presentations that explain Labaton's work to

potential clients, such as institutional investors.  Keller Dep. Day 1 21:8-18, 24:10-27:10.  These

presentations are often the first step in Labaton's retention by a potential client.  From there,

Labaton typically participates in a submission process before being selected to represent an

institutional investor.  Keller Dep. Day 1 37:19-38:10.

**B.     Labaton's Relationship with Damon Chargois**

Chargois & Herron was a law firm based in Little Rock, Arkansas.  Labaton's

relationship with Chargois & Herron originated through Labaton partner, Eric Belfi.  Belfi met

Damon Chargois, a partner at Chargois & Herron, in approximately 2004, when Belfi worked at

a different law firm and came into contact with Chargois during a litigation matter pending in the

Southern District of New York.  *See* Labaton Sucharow LLP's Response to Special Master

Honorable Gerald E. Rosen's (Ret.) Supplemental Interrogatories to Labaton Sucharow LLP

("Response to Supplemental Interrogatories") at 4; Belfi 2d Dep. 12:21-13:4.[3]

Belfi joined Labaton Sucharow in 2006.  He focused on building and maintaining client

relationships for Labaton.  Belfi Dep. 9:7-23.  Early in Belfi's tenure at Labaton, he was

approached by Chargois, who told him that he had "some opportunities" to introduce Labaton to

"pension plans in the Texas, Arkansas, Oklahoma region."  Belfi 2d Dep at 13:10-13.  Belfi

---

[3] Chargois apparently did not recall this meeting during his deposition, because he testified that he first met Belfi through a friend, when Belfi was already working at Labaton.  Chargois Dep. 16:8-23.

"asked him to proceed." *Id.* By mid-2007, Chargois was focused on introducing Labaton to the Arkansas Teachers Retirement System ("ARTRS"), along with other entities that may have been interested in Labaton's services. Keller Dep. Day 1 156:6-13; LBS031465. In addition, beginning in spring of 2007, Chargois served as local counsel for Labaton on a class action case pending in Texas. Keller Dep. Day 1 146:8-149:19; LBS017411. In that role, Chargois participated in mediation and performed other legal work. Chargois Dep. 17:7-18:22; 121:4-22:12; Keller Dep. Day 1 175:20-176:11; LBS031585.

## C.   Labaton's Early Contact with ARTRS

Tim Herron, Chargois' partner in his Little Rock office, knew Steve Farris, an Arkansas state senator who served in an oversight role with respect to ARTRS. *See* LBS040318; LBS017432; Chargois Dep. 33:16-21; Hopkins 2d Dep. 35:6-36:8 (explaining that Farris served on the Arkansas legislature's Joint Committee on Public Retirement and Social Security Programs); Ark. Code Ann. §§ 10-3-701 and 10-3-703 (2017) (assigning oversight responsibilities to the joint committee).

Herron arranged for Belfi and his Labaton partner Chris Keller to meet with Senator Farris in August of 2007. Keller viewed this initial meeting as educational in nature and designed to explain Labaton's work as monitoring counsel to Senator Farris. Keller Dep. Day 1 20:3-21:18. In connection with that meeting, Chargois informed Belfi and Keller that they would need to "impress[] the Senator with [their] firm's credentials" in order to have a chance to retain ARTRS as a client. Keller Dep. Day 1 157:6-159:9; LBS017432. Apparently, Chargois remarked after the meeting that Belfi and Keller "did well" and "represent[ed] the firm very well" in the meeting with Senator Farris. LBS040322; LBS017438; Keller Dep. Day 1 20:3-10. Chargois later stated that he and Herron felt "very optimistic about Labaton firm's doing a lot of

good things in Arkansas. This is thanks to [Belfi and Keller] representing the firm very well" to Farris. LBS017437.[4]

After this initial meeting, Senator Farris and/or Herron introduced Belfi and Keller to Paul Doane, the Executive Director of ARTRS at the time. Belfi 2d Dep. 38:10-15. In September or October 2007, Doane visited Labaton's offices in New York City while he was in the area on other business. Belfi 2d Dep. 38:2-6, 41:11-13. Belfi was traveling at the time, so Doane met with Keller during that trip. Keller Dep. Day 1 33:10-34:18; LBS040524-A. Keller introduced Doane to members of the firm and showed him the office. Keller Dep. Day 1 35:2-23. Doane expressed interest in Labaton after the meeting but explained that retention of Labaton would require further review by ARTRS and a request for proposals. LBS040524-A; Keller Dep. Day 1 180:7-21.

According to Chargois, during the fall of 2007 Senator Farris maintained contact with Doane regarding the possibility that Labaton would represent ARTRS as monitoring counsel. LBS017442.[5] Chargois and Tim Herron continued to relay information regarding Senator Farris' contact with ARTRS and other funds that could potentially be interested in Labaton's services. LBS017450; Keller Dep. Day 1 193:2-196:2. Similarly, in spring of 2008, Herron communicated information regarding Senator Farris' contact with Doane and the possibility that ARTRS would retain Labaton. LBS017451; LBS017453; Keller Dep. Day 1 218:18-224:16.

---

[4] The testimony regarding this initial meeting is somewhat inconsistent. Chargois testified that, at Senator Farris' suggestion, he placed a "cold" telephone call to ARTRS director Paul Doane. Chargois Dep. 33:12-35:7. During this conversation, Chargois explained that Chargois & Herron was a local firm working with a New York firm specializing in representing institutional investors. *Id.* As a result, according to Chargois, Doane met with Eric Belfi and possibly Chris Keller in Little Rock. Chargois Dep. 35:8-36:20. However, while Keller testified that he met Senator Farris in Little Rock, he does not believe that Doane was present. Keller Dep. Day 1 32:12-33:23.

[5] Concurrently, Chargois purportedly continued to seek introductions for Labaton with other entities. *E.g.*, LBS031472 ("Damon is really moving [on] all of the fronts.").

**D.     ARTRS' Retention of Labaton**

In mid-2008, ARTRS issued a Request for Qualifications ("RFQ") which invited firms to submit qualifications to become additional monitoring counsel to the fund.  Labaton and Chargois & Herron submitted a joint RFQ response on July 30, 2008.  LBS017738-55; LBS017756-67.  Labaton contemplated that, if selected as panel monitoring counsel, both firms would work on the litigation, if any, filed on ARTRS's behalf.  Belfi 2d Dep. 18:14-19; Keller Dep. Day 1 47:24-49:3.  Labaton would serve as the lead counsel, and Chargois & Herron would work with ARTRS in Little Rock.  Belfi 2d Dep. 26:15-27:15; Keller Dep. Day 1 44:8-46:21.

On October 13, 2008, ARTRS's Chief Counsel, Christa Clark, emailed Belfi and informed him that "ATRS has selected Labaton Sucharow as an additional monitoring counsel for our system."  LBS017456.  Clark further stated:

> I would like to speak with you regarding the additional firm on your submission Chargois & Herron.  This is a little awkward, but since your firms are not legally affiliated, we are unable to process the state contract form with both firms listed.
>
> If your firm is doing the monitoring and providing the financial backing for the cases, I think it is most appropriate that we add your firm independently to the list of approved firms.   Your firm may affiliate that firm or utilize them as independent contractors, if you deem is appropriate [sic], on a case by case basis. There would be no requirement that you use them if it was not a necessary and appropriate expense of a case.  I don't know how to best handle this point but the state procurement process is not conductive to a joint proposal.

*Id.* [6]

After receiving this email, Belfi had a telephone conversation with Clark.  Belfi 2d Dep. 114:2-22, 117:20-118:10.  Belfi explained to Clark that Labaton "would be working with

---

[6] Given the nature of the relationship, discussed below, the payment to Chargois & Herron was never an "expense of a case."  Keller Dep. Day 2 302:24-304:8. Except where they appeared as counsel in Court, Chargois & Herron only received a portion of Labaton's attorneys' fees, which themselves were awarded on a percentage basis that were unrelated to "expenses."

Chargois & Herron" and that Chargois & Herron "were going to be involved in the relationship."
Belfi 2d Dep 117:20-118:10.

In October 2008, very shortly after ARTRS selected Labaton as monitoring counsel,
Doane departed as ARTRS's executive director. *See* Arkansas Times, "Doane to depart," Oct.
28, 2008.[7] The new Executive Director, George Hopkins, began in or about December 2008.
Hopkins Dep. 10:17-21. Meanwhile, Clark – ARTRS' Chief Counsel – remained in her position
at ARTRS until approximately October 2009. *See* Arkansas Democrat-Gazette, "Faulted on
Contracts, Teacher-System Lawyer Quits," October 22, 2009.[8]

Unlike Doane, Hopkins did not know Tim Herron or the Chargois & Herron firm.
Hopkins 2d Dep. 21:5-10. A few months after Hopkins began at ARTRS, Belfi and then-
managing partner Lawrence Sucharow met with him in Little Rock. Belfi 2d Dep. 27:18-21.
Because Belfi got along well with Hopkins, and because Hopkins desired a direct relationship
without intermediaries, Belfi became Hopkins' primary contact with regard to Labaton's
monitoring relationship. Belfi 2d Dep. 27:21-28:7, 56:22-57:10; Hopkins 2d Dep. 60:8-62:16.
Thus, Chargois & Herron were uninvolved with ARTRS as Belfi's relationship with Hopkins
developed. Belfi 2d Dep. 57:5-19.

On September 24, 2010, Belfi sent Hopkins a draft retention letter for the State Street
matter, which contained the following provision:

> Arkansas Teacher agrees that Labaton may divide fees with other attorneys for
> serving as local counsel, as referral fees, or for other services performed in
> connection with the litigation. The division of attorneys' fees with other counsel
> may be determined upon a percentage basis or upon time spent in assisting the
> prosecution of an action. The division of fees with other counsel is Labaton's sole

---

[7] *Available at* https://www.arktimes.com/ArkansasBlog/archives/2008/10/23/doane-to-depart (last visited March 9, 2018).

[8] *Available at* https://www.pressreader.com/usa/arkansas-democrat-gazette/20091022/283927403838722 (last visited March 9, 2018).

responsibility and will not increase the fees payable upon a successful resolution of the litigation.

LBS019948-50. On February 8, 2011, Belfi sent a slightly revised, final retention letter to Hopkins with a modified first sentence to the quoted paragraph: "Arkansas Teacher agrees that Labaton Sucharow may allocate fees to other attorneys who serve as local or liaison counsel, as referral fees, or for other services performed in connection with the Litigation." LBS011061. Throughout this case, Chargois & Herron's portion of the State Street fee has been referred to by witnesses and in documents as, among other things, a "referral fee," a "local counsel" fee, and a "liaison fee."

During Labaton's representation of ARTRS, Belfi spoke with Hopkins about "how fees worked." Belfi 2d Dep. 23:17-23. According to Belfi, Hopkins said that "he only wanted to deal with [Labaton] and wasn't concerned about how [Labaton] would cut fees up if [they were] working with other firms." *Id.* Hopkins was only interested in the aggregate attorney fee amount, rather than allocations of that aggregate fee among various firms. *Id.* at 23:24-24:5. According to Belfi, Hopkins "was not concerned with who [Labaton was] splitting fees with." *Id.* at 120:11-22. Belfi believed that Hopkins "didn't want to deal with" allocations of fees between lawyers. *Id.* Hopkins' testimony supports this belief. Hopkins 2d Dep. 68:23-69:3 ("I told Eric if I ever want to know about your attorney fees and who all you hired, I'll ask you. And, you know, on any case because I intentionally didn't want to know a whole lot."); *id.* at 73:11-19 ("I don't feel misled because I made it real clear to them that I didn't want to be the gatekeeper on all this attorney relationship. And I think if they thought I wanted to know, they would have told me because Eric always said if you ever want to see how we do all these fees, just let me know. And I said that's fine."); *see also id.* at 74:10-75:8.

E.      **Labaton's Agreement with Chargois**

Early in the relationship between Labaton and Chargois & Herron, Belfi, Keller, and

Damon Chargois discussed the terms of an agreement between the two firms.  The crux of the

agreement was that when Chargois & Herron facilitated the introduction between Labaton and a

client, Chargois & Herron would receive up to 20% of the gross attorney fees Labaton earned

representing that client, if the client was a named plaintiff and Labaton was appointed lead or co-

lead counsel.  *See, e.g.*, LBS031185; Keller Dep. Day 1 42:15-46:14; Chargois Dep. 50:11-

52:24, 162:19-164:2.  Initially, the understanding was that Chargois would play a local counsel

role relative to the entities with which he facilitated introductions, and that he would be active

assisting in litigating Labaton's cases if needed.  *See* Belfi 2d Dep. 26:15-23, 27:11-15; Keller

Dep. Day 1 44:8-46:21.

Labaton's agreement with Chargois was never reduced to a formal written contract.

However, as Labaton's relationship with ARTRS developed, Chargois and Labaton began to

formalize their agreement.  In February 2009, Chargois indicated that he expected a relatively

informal arrangement, but expressed the terms as he understood them in a written email.

LBS030990.  Roughly one week later, Chargois inquired whether a written "letter agreement"

would be necessary.  LBS030993; Keller Dep. Day 1 255:16-257:4.  Chargois and Keller

discussed via email the terms of the potential contract.  LBS031492; Keller Dep. Day 1 258:8-

19.  In April 2009, Chargois sent a draft letter agreement to Belfi and Keller seeking to

memorialize the previous discussions in writing.  LBS030985-87.  Keller edited the document

and sent a return draft that, among other things, inserted an arbitration clause.  LBS031192-95.

While a written agreement was never finalized (Response to Supplemental Interrogatories at 8),

Chargois at least viewed it as enforceable.  LBS031137; Belfi 2d Dep. 58:1-22.  As time passed,

Labaton and Chargois maintained the basic referral arrangement of an 80/20 fee split, if ARTRS became a named plaintiff and Labaton was appointed lead or co-lead counsel.[9]

Because ARTRS was the only named plaintiff in Civil Action No. 11-cv-10230 MLW, i.e., the action on behalf of the putative class of customers of State Street,[10] the three Customer Class Law Firms (Labaton, Lieff Cabraser, and the Thornton Law Firm) agreed in 2013 that they would share in paying the allocation to Chargois & Herron from their own fee awards. LBS027776. Garrett Bradley of the Thornton firm handled the discussions with Lieff Cabraser and Chargois regarding this point. *Id.*; Bradley 2d Dep. 53:14-54:10.[11]

In June 2016, well after a settlement agreement-in-principle had been reached, Bradley reached out to Chargois for further discussions regarding Chargois' fee allocation. TLF-SST-060973. Bradley negotiated an agreement that Chargois & Herron would receive an amount equal to 5.5% of the total fee award (basically, a percentage that would be approximately equivalent to 20% of Labaton's anticipated share of the total fee), which would be funded by the three Customer Class Law Firms, by agreement, from their respective shares of the award. LBS040924; Bradley 2d Dep. 93:16-22.[12]

---

[9] Although it became apparent that Chargois' total contribution would be limited to the initial assistance in introducing Labaton to ARTRS, Chargois maintained that he was entitled to 20% of any fee earned by Labaton. LBS017594; LBS030876; Belfi 2d Dep. 58:5-15. Chargois intimated that he would seek legal redress to vindicate his perceived contractual right, if necessary. Belfi 2d Dep. 58:16-59:22; Chargois Dep. 59:6-60:4; Keller Dep. Day 1 130:19-131:12. Labaton was concerned by the possibility of litigation in Texas state court. *See* Belfi 2d Dep. 58:16-59:22; Keller Dep. Day 1 130:22-132:3; Keller Dep. Day 2 541:19-543:23.

[10] Civil Action Nos. 11-cv-12049 MLW and 12-cv-11698 MLW, involving the ERISA Plaintiffs, were consolidated with the customer action for pre-trial purpose.

[11] Bradley explained that he took on the role of negotiating with Chargois & Herron because he had a friendly relationship with Chargois, and he wanted to reach agreement out of concern that, because ARTRS was the only named (non-ERISA) plaintiff, Chargois could say his firm was entitled to 20% of the overall fee award, not just the portion that Labaton Sucharow received. Bradley 2d Dep. 53:14-54:10; *see also* Belfi 2d Dep. 94:5-23; Keller Dep. Day 1 122:6-124:19.

[12] In that June 21, 2016 email to Chargois cited above, Bradley discussed ERISA counsel and what percentage would be allocated to them in the context of his dialogue with Chargois about what percentage would be paid to

Given his desire not to be informed of the allocation of fees among counsel (Hopkins Dec. at ¶¶10-12, 14), George Hopkins personally was unaware of the Chargois agreement until August or September of 2017. Id. ¶ 7. Thereafter, when informed of the details of the fee-sharing agreement between the Customer Class Law Firms and Chargois in this case, Hopkins expressly consented to and ratified the agreement. *Id.* at ¶¶ 16-17.

The fee-sharing arrangement was not disclosed to the Court or to the class. No local rule or court rule required disclosure to the Court, nor did the Court have a standing order, or case specific order, requiring disclosure.

## III.   Questions Posed

1) Whether the facts support the conclusion that Labaton substantially complied with its obligation under Mass. Rule 1.5(e) to disclose to its client, ARTRS, that its fees would be shared with Chargois?
Answer:  Yes.

2) Whether, because disclosure to ARTRS of its fee-splitting arrangement with Chargois may have been imperfect in that ARTRS' new Executive Director did not consent in writing to a division of fee with Damon Chargois or Chargois & Herron specifically, Labaton should therefore be sanctioned, disciplined, otherwise penalized by this Court?
Answer:  No.

3) Whether the payment to Chargois violated Mass. Rule 1.5(a)?
Answer:  No.

---

Chargois & Herron. TLF-SST-060973. No Labaton lawyers were copied on this communication, and there is no evidence in the record suggesting that lawyers from Labaton saw it before this investigation. *Id.*  Bradley explained that he was simply providing the context of the ERISA firms as background and as a negotiating point with Chargois. Bradley 2d Dep. 84:9-85:20; Keller Dep. Day 2 534:23-535:24. Bradley's reference in that 2016 conversation did nothing to change the agreement that the ERISA lawyers had struck with Customer Counsel more than two years earlier.

IV.   **Opinions**

Mass. Rule 1.5(e) is a more liberal rule with respect to fee sharing among unaffiliated law firms than similar provisions in the prior ABA Model Code, the current ABA Model Rules, and fee-splitting rules in most other jurisdictions.

In February 2011, when ARTRS engaged Labaton for the State Street litigation, Mass. Rule 1.5(e) stated, in pertinent part:

> (e)  A division of a fee between lawyers who are not in the same firm may be made only if, after informing the client that a division of fees will be made, the client consents to the joint participation and the total fee is reasonable.

At that time, the Supreme Judicial Court had applied a gloss to Rule 1.5(e) through its decision in *Saggese v. Kelly*, 445 Mass. 434 (2005), which construed the rule prospectively to require written consent obtained before the referral.  However, that interpretation was not codified.  On March 15, 2011, the following version of 1.5(e) was adopted:

> (e)  A division of a fee (including a referral fee) between lawyers who are not in the same firm may be made only if the client is notified before or at the time the client enters into a fee agreement for the matter that a division of fees will be made and consents to the joint participation in writing and the total fee is reasonable.

Comments [7] and [7A] also provide as follows:

*Division of Fee*

[7]  A division of fee is single billing to a client covering the fee of two or more lawyers who are not in the same firm.  A division of fee facilitates association of more than one lawyer in a matter in which neither alone could serve the client as well, and most often is used when the fee is contingent and the division is between a referring lawyer and a trial specialist.  Paragraph (e) permits the lawyers to divide a fee if the client has been informed that a division of fees will be made and consents in writing. A lawyer should only refer a matter to a lawyer whom the referring lawyer reasonably believes is competent to handle the matter. *See* Rule 1.1.

[7A] Paragraph (e), unlike ABA Model Rule 1.5(e), does not require that the division of fees be in proportion to the services performed by each lawyer unless, with a client's written consent, each lawyer assumes joint responsibility for the representation. The Massachusetts rule does not require disclosure of the fee division that the lawyers have agreed to, but if the client requests information on the division of fees, the lawyer is required to disclose the share of each lawyer.

Notably, under either version of the Rule, there is no requirement that any work be performed, or responsibility assumed, by the referring lawyer or law firm, nor that disclosure of the precise division of fees be made unless the client so requests.

A)      *Contrary to Professor Gillers' central argument, the facts support the conclusion that Labaton substantially complied with its obligation under Mass. Rule 1.5(e) to disclose to its client, ARTRS, that its fees could be shared with Chargois.*

Specifically, the record reflects that in mid-2008, in response to a Request for Qualifications ("RFQ") by ARTRS, inviting firms to submit proposals (qualifications) to become additional monitoring counsel to the funds, Labaton and Chargois submitted a *joint* RFQ response. LBS017738-55; LBS017756-67. Following that, a Labaton partner had discussions with ARTRS's then counsel, Christa Clark, regarding the joint submission, during which the Labaton partner expressly informed Clark that Labaton would be working with Chargois and that Chargois "were going to be involved in the relationship." Belfi 2d Dep 117:20-118:10.

Subsequently, in 2010, the Labaton partner sent ARTRS's new executive director, George Hopkins, a draft retention letter for the instant (litigation) matter, which contained a provision that clearly disclosed the fact that Labaton would be authorized to pay referral fees to other attorneys serving as local counsel, but that the overall fee would not increase. LBS019948-50. A slightly modified version of the retention letter, in final form, was sent to Hopkins in 2011. It too contained an almost identical provision, to wit:

"Arkansas Teacher agrees that Labaton Sucharow may allocate fees to
other attorneys who serve as local or liaison counsel, as referral fees, or
for other services performed in connection with the Litigation."
LBS011061.

Both the Labaton partner who interacted with Hopkins, and Hopkins himself, have

testified to conversations about allocation of fees among law firms. Belfi 2d Dep. 23:17-24:5;

Hopkins 2d Dep. 73:11-19. Hopkins has also recently provided a Declaration confirming that he

retroactively approves of the instant fee-splitting arrangement. Indeed, Hopkins has

affirmatively stated that he did not wish to be involved in discussions concerning fee allocation,

or becoming a referee between law firms, because that would have distracted him from focusing

on protecting the class. His only concern about fees was that the overall attorney fee award

remained the same. Declaration of George Hopkins ¶¶ 10-15.

The forgoing facts support the conclusion that Labaton obtained ARTRS' consent to

divide its fees with Chargois, and therefore complied with Rule 1.5 (e), as it then existed. My

opinion does not change even when considering the Supreme Judicial Court's uncodified

statements in *Saggese*. In my opinion the foregoing facts fully support the conclusion that

ARTRS was adequately informed, in writing, at the inception of the retention, and *de facto,* and

retroactively, assented to Labaton's sharing of its fees with Chargois. Professor Gillers' overly

technical focus on the failure to obtain formal *written* consent from Mr. Hopkins elevates form

over substance, ignores relevant case law, and is inconsistent with the policies and goals of Mass.

Rule 1.5(e), as discussed below.

B)    *Even if Labaton's disclosure to Hopkins and the ARTRS was imperfect because
the written consent did not contain any details of the arrangement (which the rule did not
require), Professor Gillers cites no controlling authority for the proposition that Labaton should
be sanctioned, disciplined, or otherwise penalized, because there is none.*

16

There is no support in Massachusetts or First Circuit case law, let alone premised in simple fairness, for the proposition that Labaton's fee-splitting arrangement was invalid, or that Labaton engaged in unethical conduct under Mass. Rule 7.2 by paying a "person" to refer the State Street case. In *Saggese v. Kelley*, 445 Mass. 434, 442-443 (2007), Professor Gillers concedes that the Supreme Judicial Court *enforced* an oral agreement between a referring and referred lawyers where the client, who was not a fiduciary, was only later notified of the agreement (Gillers Report, p. 64).

Notably, to the best of my knowledge, neither lawyer in *Saggese* was subsequently disciplined following the Court's opinion. Nor is there any evidence that the Massachusetts Board of Bar Overseers took (or has ever taken) the position that lawyers who engage in imperfectly documented but nonetheless enforceable fee-splitting arrangements, are thereby automatically subject to discipline or sanctions for violating Mass. Rule 7.2 by sending a forwarding fee, not to another law firm, but to a "person." I am not aware of any such bootstrapped interpretation or application of Rule 7.2 in *any* jurisdiction, and Professor Gillers cites no authority beyond his own expansive reading of the Rules.

The same applies with even more force as regards Professor Gillers' analysis of *Daynard v. Ness, Motley et al.*, 188 F. Supp. 2d 115 (D. Mass. 2002). In that case, law Professor Richard Daynard, in the context of his substantial contributions to plaintiffs in ground-breaking tobacco litigation, sought to enforce an *oral* fee-splitting agreement "made in contravention of the rules of professional conduct," *Daynard*, 188 F. Supp. 2d at 117. The District Court, per then Chief Judge William Young, held that under Massachusetts law, *"even if the alleged agreement was made in contravention of the rules of professional conduct, it was enforceable."* (emphasis added).

17

Professor Gillers labors mightily to distinguish the circumstances in *Saggese* and *Daynard* by focusing on what he terms the "equities." (Gillers Report, pp. 65-66) He claims that the "equities" are somehow different here, because in *Saggese* the lawyer tried to keep the fee for himself justifying that claim, in part, by the fact that the referring lawyer did no work, and in *Daynard*, that the law professor, as referring counsel, contributed substantially to the success of the litigation. But neither of these alleged differentiating rationales holds water. Mass. Rule 1.5(e) does *not* require the referring firm to do any work on the case, as Professor Gillers is aware. It is also unclear why the "equities" here  are any different with respect to *Daynard*. Labaton and its co-counsel achieved an excellent result for their client, ARTRS, and the class clients it represented. Labaton may not have been able to do so absent Chargois' introduction of Labaton to ARTRS. It is also undisputed that ARTRS is very satisfied with the outcome of the litigation, and that it's Executive Director, Hopkins, ratified the fee-splitting arrangement when he repeatedly testified that he was disinterested in the details of the fee-split as long as the overall fee paid to lawyers was fair and reasonable to his organization, which it indisputably was.

In short, in my opinion the equities here are *not* meaningfully different. The possible payment of a referral or forwarding fee was not kept from ARTRS, which agreed through its engagement letter that Labaton was free to pay referral fees to other law firms. LBS011061. Hopkins, on behalf of ARTRS, ratified the fee-splitting arrangement as well. Declaration of George Hopkins ¶¶ 10-17. As a matter of good policy and the public interest, it is well recognized that the bar should encourage fee sharing relationships that serve the client by helping to ensure that cases, especially litigation matters, like this one, are handled by the best, most experienced lawyer in the particular area of the law. That is exactly what happened here, and the results speak for themselves.

Finally – and critically – even if Labaton did not technically comply with the Court's construction in *Saggese*, it should not be sanctioned for conduct that was not prohibited by a Rule of Professional Conduct during the relevant time period. The Mass. Rules provide the codified notice of what behavior is permissible, and what behavior is not. It would be manifestly unfair to impose a sanction for conduct that did not violate a Rule, but did – arguably – imperfectly comply with the judicial gloss on a Rule. In my opinion, which is informed by decades of practice in the disciplinary realm, an attorney would not be expected to research case law in order to ascertain the relevant standards of conduct, and should not be sanctioned for failing to do so. This would present a due process problem, and would not comport with the spirit of the Rules of Professional Conduct in any jurisdiction. Respectfully, no sanction is warranted.

C)      *The Payment to Chargois Did Not Violate Rule 1.5(a).*

I understand that Professor Gillers recently testified that the payment to Chargois may have violated Mass. Rule 1.5(a). In my opinion, this does not withstand scrutiny. On its face, Mass. Rule 1.5(e) applies to fee divisions and requires only that "the total fee is reasonable." The Rule does not require that each segment of the fee be reasonable. Beyond the plain reading of Mass. Rules 1.5(e) and 1.5(a), in my experience I cannot recall a single instance in which a referral fee was scrutinized for reasonability under the Mass. Rules, nor do I understand how a referral fee even could be scrutinized under the factors set forth in Mass. Rule 1.5(a).

## V.   <u>Conclusion</u>

Thus, in my opinion, to a reasonable degree of professional certainty, Labaton's payment of a referral fee to Chargois was not ethically improper. Nor is there any basis, in my view, to sanction, discipline or otherwise penalize Labaton.

Dated:  March 26, 2018

Respectfully submitted,

Hal R. Lieberman