# EX. 243

**Expert Report – March 26, 2018**
**Professor W. Bradley Wendel**

**I.      Introduction, Qualifications, and Summary of Opinion.**

I have been retained by Labaton Sucharow ("Labaton") to testify concerning the firm's

compliance with the applicable Rules of Professional Conduct. I am a tenured full Professor of

Law and the Associate Dean for Academic Affairs at Cornell Law School in Ithaca, New York.

My primary area of teaching and research specialization is legal ethics, professional

responsibility, and the law governing lawyers. I am a co-editor of a widely adopted law school

casebook, Hazard, Koniak, Cramton, Cohen & Wendel, The Law and Ethics of Lawyering, now

in its Sixth Edition with Foundation Press; the sole author of a textbook, Wendel, Professional

Responsibility: Examples and Explanations, now in its Fifth Edition, with Wolters Kluwer; and

co-editor of a rules supplement, Martyn, Fox & Wendel, The Law Governing Lawyers: National

Rules, Standards, Statutes, and State Lawyer Codes, also with Wolters Kluwer. In addition I

have published numerous law review articles on these topics. I have regularly taught law school

courses on legal ethics and professional responsibility for 18 years, frequently teach CLE

programs on legal ethics for practicing lawyers throughout the country, including a recent North

Carolina Bar Association statewide CLE on truthfulness in the practice of law, at which I was the

keynote presenter. Since 2007, I have been a member of the drafting committee for the

Multistate Professional Responsibility Examination (MPRE). In 2011-12 I served as a Reporter

to a working group within the ABA Commission on Ethics 20/20, which considered amendments

to the ABA Model Rules of Professional Conduct. In 2012 I was the recipient of the Sanford D.

Levy Memorial Award from the New York State Bar Committee on Professional Ethics. In 2015

I served as Vice Chair and Subcommittee Co-Chair for the New York State Commission on

Statewide Attorney Discipline.

Within the last four years, I have testified by deposition in *Wadler v. Bio-Rad Laboratories, Inc.*, U.S. District Court, N.D. California, Case No. 3:15-CV-2356 JCS, on November 17, 2016. I was retained by counsel for plaintiff, the former general counsel of a corporation who was fired for blowing the whistle on violations of the Foreign Corrupt Practices Act.

## II.     Facts Assumed for this Opinion.

The following statement of facts was prepared by counsel for Labaton. I assume these facts to be true for the purposes of my opinion. I have reviewed the documents supporting the statement of facts prepared by counsel. I have also reviewed Labaton's Response to the Special Master Report, the Ethical Report of Professor Stephen Gillers, and the Expert Declaration of Camille F. Sarrouf.

### A.     Background.

Labaton is a plaintiffs' law firm that focuses on large-scale and complex class action litigation, which often involves securities matters. In the context of its securities work, Labaton frequently acts as "monitoring counsel" for its clients. In that role, Labaton monitors the client's portfolio of securities investments for signs of possible securities law violations, such as a drop in stock price. *See, e.g.*, Portfolio Monitoring and Case Evaluation[1]; LBS017739-41. In doing so, Labaton uses sophisticated in-house investigators and analysts to monitor the securities market. Keller Dep. Day 1 35:2-14. If Labaton believes a client's portfolio may have been involved in a securities violation that could lead to a viable case, Labaton may ask the client whether it would be interested in serving as lead plaintiff in a class action case. Portfolio Monitoring and Case

---

[1] *Available at* http://www.labaton.com/en/practiceareas/Institutional-Investor-Protection-Services.cfm (last visited March 9, 2018).

Evaluation; LBS017739-41. If the client agrees, Labaton may represent the client in the litigation. *Id.*; *see also* Sucharow 2d Dep. 115:13-116:15.

Because of its complex role as monitoring counsel, it "takes a while for people to . . . understand [Labaton's work] to the point where it can be useful to them." Keller Dep. Day 1 24:20-23. Thus, Labaton relies on informational presentations that explain Labaton's work to potential clients, such as institutional investors. Keller Dep. Day 1 21:8-18, 24:10-27:10. These presentations are often the first step in Labaton's retention by a potential client. From there, Labaton typically participates in a submission process before being selected to represent an institutional investor. Keller Dep. Day 1 37:19-38:10.

### B. Labaton's Relationship with Damon Chargois.

Chargois & Herron was a law firm based in Little Rock, Arkansas. Labaton's relationship with Chargois & Herron originated through Labaton partner, Eric Belfi. Belfi met Damon Chargois, a partner at Chargois & Herron, in approximately 2004, when Belfi worked at a different law firm and came into contact with Chargois during a litigation matter pending in the Southern District of New York. *See* Labaton Sucharow LLP's Response to Special Master Honorable Gerald E. Rosen's (Ret.) Supplemental Interrogatories to Labaton Sucharow LLP ("Response to Supplemental Interrogatories") at 4; Belfi 2d Dep. 12:21-13:4.[2]

Belfi joined Labaton Sucharow in 2006. He focused on building and maintaining client relationships for Labaton. Belfi Dep. 9:7-23. Early in Belfi's tenure at Labaton, he was approached by Chargois, who told him that he had "some opportunities" to introduce Labaton to "pension plans in the Texas, Arkansas, Oklahoma region." Belfi 2d Dep at 13:10-13. Belfi "asked him to proceed." *Id.* By mid-2007, Chargois was focused on introducing Labaton to the

---

[2] Chargois apparently did not recall this meeting during his deposition, because he testified that he first met Belfi through a friend, when Belfi was already working at Labaton. Chargois Dep. 16:8-23.

Arkansas Teachers Retirement System ("ARTRS"), along with other entities that may have been interested in Labaton's services. Keller Dep. Day 1 156:6-12, LBS031465. In addition, beginning in spring of 2007, Chargois served as local counsel for Labaton on a class action case pending in Texas. Keller Dep. Day 1 146:8-149:18; LBS017411. In that role, Chargois participated in mediation and performed other legal work. Chargois Dep. 17:7-18:22; 121:4-22:12 Keller Dep. Day 1 175:20-176:11; LBS031585.

### C.    Labaton's Early Contact with ARTRS.

Tim Herron, Chargois' partner in his Little Rock office, knew Steve Farris, an Arkansas state senator who served in an oversight role with respect to ARTRS. *See* LBS040318; LBS017432; Chargois Dep. 33:16-21; Hopkins 2d Dep. 35:6-36:8 (explaining that Farris served on the Arkansas legislature's Joint Committee on Public Retirement and Social Security Programs); Ark. Code Ann. §§ 10-3-701 and 10-3-703 (2017) (assigning oversight responsibilities to the joint committee).

Herron arranged for Belfi and his Labaton partner Chris Keller to meet with Senator Farris in August of 2007. Keller viewed this initial meeting as educational in nature and designed to explain Labaton's work as monitoring counsel to Senator Farris. Keller Dep. Day 1 20-21. In connection with that meeting, Chargois informed Belfi and Keller that they would need to "impress[] the Senator with [their] firm credentials" in order to have a chance to retain ARTRS as a client. Keller Dep. Day 1 157:6-159:9; LBS017432. Apparently, Chargois remarked after the meeting that Belfi and Keller "did well" and "represent[ed] the firm very well" in the meeting with Senator Farris. LBS040322; LBS017438; Keller Dep. Day 1 20:3-10. Chargois later stated that he and Herron felt "very optimistic about Labaton firm's doing a lot of good

things in Arkansas. This is thanks to [Belfi and Keller] representing the firm very well" to Farris. LBS017437.[3]

After this initial meeting, Senator Farris and/or Herron introduced Belfi and Keller to Paul Doane, the Executive Director of ARTRS at the time. Belfi 2d Dep. 38:10-15. In September or October 2007, Doane visited Labaton's offices in New York City while he was in the area on other business. Belfi 2d Dep. 38:2-6, 41:11-13. Belfi was traveling at the time, so Doane met with Keller during that trip. Keller Dep. Day 1 33:10-34:18; LBS040524-A. Keller introduced Doane to members of the firm and showed him the office. Keller Dep. Day 1 35:2-23. Doane expressed interest in Labaton after the meeting but explained that retention of Labaton would require further review by ARTRS and a request for proposals. LBS040524-A; Keller Dep. Day 1 180:7-21.

According to Chargois, during the fall of 2007 Senator Farris maintained contact with Doane regarding the possibility that Labaton would represent ARTRS as monitoring counsel. LBS017442.[4] Chargois and Tim Herron continued to relay information regarding Senator Farris' contact with ARTRS and other funds that could potentially be interested in Labaton's services. LBS017450; Keller Dep. Day 1 193:2-196:2. Similarly, in spring of 2008, Herron communicated information regarding Senator Farris' contact with Doane and the possibility that ARTRS would retain Labaton. LBS017451; LBS017453; Keller Dep. Day 1 218:18-224:16.

---

[3] The testimony regarding this initial meeting is somewhat inconsistent. Chargois testified that, at Senator Farris' suggestion, he placed a "cold" telephone call to ARTRS director Paul Doane. Chargois Dep. 33:12-35:74. During this conversation, Chargois explained that Chargois & Herron was a local firm working with a New York firm specializing in representing institutional investors. *Id.* As a result, according to Chargois, Doane met with Eric Belfi and possibly Chris Keller in Little Rock. Chargois Dep. 35:8-36:20. However, while Keller testified that he met Senator Farris in Little Rock, he does not believe that Doane was present. Keller Dep. Day 1 32:12-33:23.

[4] Concurrently, Chargois purportedly continued to seek introductions for Labaton with other entities. *E.g.*, LBS031472 ("Damon is really moving on all of the fronts.").

### D.     ARTRS' Retention of Labaton.

In mid-2008, ARTRS issued a Request for Qualifications ("RFQ") which invited firms to submit qualifications to become additional monitoring counsel to the fund. Labaton and Chargois & Herron submitted a joint RFQ response on July 30, 2008. LBS017738-55; LBS017756-67. Labaton contemplated that, if selected as panel monitoring counsel, both firms would work on the litigation, if any, filed on ARTRS's behalf. Belfi 2d Dep. 18:14-19; Keller Dep. Day 1 47:24-49:3. Labaton would serve as the lead counsel, and Chargois & Herron would work with ARTRS in Little Rock. Belfi 2d Dep. 26:15-27:15; Keller Dep. Day 1 44:8-46:21.

On October 13, 2008, ARTRS's Chief Counsel, Christa Clark, emailed Belfi and informed him that "ATRS has selected Labaton Sucharow as an additional monitoring counsel for our system." LBS017456. Clark further stated:

> I would like to speak with you regarding the additional firm on your submission Chargois & Herron. This is a little awkward, but since your firms are not legally affiliated, we are unable to process the state contract form with both firms listed.
>
> If your firm is doing the monitoring and providing the financial backing for the cases, I think it is most appropriate that we add your firm independently to the list of approved firms. Your firm may affiliate that firm or utilize them as independent contractors, if you deem is appropriate [*sic*], on a case by case basis. There would be no requirement that you use them if it was not a necessary and appropriate expense of a case. I don't know how to best handle this point but the state procurement process is not conductive to a joint proposal.

*Id.*[5]

After receiving this email, Belfi had a telephone conversation with Clark. Belfi 2d Dep. 114:2-22, 117:20-118:10. Belfi explained to Clark that Labaton "would be working with

---

[5] Given the nature of the relationship, discussed below, the payment to Chargois & Herron was never an "expense of a case." Keller Dep. Day 2 302:24-304:8. Except where they appeared as counsel in Court, Chargois & Herron only received a portion of Labaton's attorneys' fees, which themselves were awarded on a percentage basis that were unrelated to "expenses."

Chargois & Herron" and that Chargois & Herron "were going to be involved in the relationship." Belfi 2d Dep 117:20-118:10.

In October 2008, very shortly after ARTRS selected Labaton as monitoring counsel, Doane departed as ARTRS's executive director. *See* Arkansas Times, "Doane to depart," Oct. 28, 2008.[6] The new Executive Director, George Hopkins, began in or about December 2008. Hopkins Dep. 10:17-21. Meanwhile, Clark – ARTRS' Chief Counsel – remained in her position at ARTRS until approximately October 2009. *See* Arkansas Democrat-Gazette, "Faulted on Contracts, Teacher-System Lawyer Quits," October 22, 2009.[7]

Unlike Doane, Hopkins did not know Tim Herron or the Chargois & Herron firm. Hopkins 2d Dep. 21:5-10. A few months after Hopkins began at ARTRS, Belfi and then-managing partner Lawrence Sucharow met with him in Little Rock. Belfi 2d Dep. 27:18-21. Because Belfi got along well with Hopkins, and because Hopkins desired a direct relationship without intermediaries, Belfi became Hopkins' primary contact with regard to Labaton's monitoring relationship. Belfi 2d Dep. 27:21-28:7, 56:22-57:10; Hopkins 2d Dep. 60:8-62:16. Thus, Chargois & Herron were uninvolved with ARTRS as Belfi's relationship with Hopkins developed. Belfi 2d Dep. 57:5-19.

On September 24, 2010, Belfi sent Hopkins a draft retention letter for the State Street matter, which contained the following provision:

> Arkansas Teacher agrees that Labaton may divide fees with other attorneys for serving as local counsel, as referral fees, or for other services performed in connection with the litigation. The division of attorneys' fees with other counsel may be determined upon a percentage basis or upon time spent in assisting the prosecution of an action. The division of fees with other counsel is Labaton's sole

---

[6] *Available at* https://www.arktimes.com/ArkansasBlog/archives/2008/10/23/doane-to-depart (last visited March 9, 2018).

[7] *Available at* https://www.pressreader.com/usa/arkansas-democrat-gazette/20091022/283927403838722 (last visited March 9, 2018).

responsibility and will not increase the fees payable upon a successful resolution of the litigation.

LBS019948-50. On February 8, 2011, Belfi sent a slightly revised, final retention letter to Hopkins with a modified first sentence to the quoted paragraph: "Arkansas Teacher agrees that Labaton Sucharow may allocate fees to other attorneys who serve as local or liaison counsel, as referral fees, or for other services performed in connection with the Litigation." LBS011061. Throughout this case, Chargois & Heron's portion of the State Street fee has been referred to by witnesses and in documents as, among other things, a "referral fee," a "local counsel" fee, and a "liaison fee."

During Labaton's representation of ARTRS, Belfi spoke with Hopkins about "how fees worked." Belfi 2d Dep. at 23:17-23. According to Belfi, Hopkins said that "he only wanted to deal with [Labaton] and wasn't concerned about how [Labaton] would cut fees up if [they] were working with other firms." *Id*. Hopkins was only interested in the aggregate attorney fee amount, rather than allocations of that aggregate fee among various firms. *Id.* at 23:24-24:5. According to Belfi, Hopkins "was not concerned with who [Labaton was] splitting fees with." *Id.* at 120:11-22. Belfi believed that Hopkins "didn't want to deal with" allocations of fees between lawyers. *Id.* Hopkins' testimony supports this belief. Hopkins 2d Dep.68:23-69:3 ("I told Eric if I ever want to know about your attorney fees and who all you hired, I'll ask you. And, you know, on any case because I intentionally didn't want to know a whole lot."); *id.* at 73:11-19 ("I don't feel misled because I made it real clear to them that I didn't want to be the gatekeeper on all this attorney relationship. And I think if they thought I wanted to know, they would have told me because Eric always said if you ever want to see how we do all these fees, just let me know. And I said that's fine."); *see also id.* at 74:10-75:8.

### E.     Labaton's Agreement with Chargois.

Early in the relationship between Labaton and Chargois & Herron, Belfi, Keller, and Damon Chargois discussed the terms of an agreement between the two firms. The crux of the agreement was that when Chargois & Herron facilitated the introduction between Labaton and a client, Chargois & Herron would receive up to 20% of the gross attorney fees Labaton earned representing that client, if the client was a named plaintiff and Labaton was appointed lead or co-lead counsel. *See*, *e.g.*, LBS031185; Keller Dep. Day 1 42:15-46:14; Chargois Dep. 50:11-52:24, 162:19-164:2. Initially, the understanding was that Chargois would play a local counsel role relative to the entities with which he facilitated introductions, and that he would be active assisting in litigating Labaton's cases if needed. *See* Belfi 2d Dep. 26:15-23, 27:11-15; Keller Dep. Day 1 44:8-46:21.

Labaton's agreement with Chargois was never reduced to a formal written contract. However, as Labaton's relationship with ARTRS developed, Chargois and Labaton began to formalize their agreement. In February 2009, Chargois indicated that he expected a relatively informal arrangement, but expressed the terms as he understood them in a written email. LBS030990. Roughly one week later, Chargois inquired whether a written "letter agreement" would be necessary. LBS030993; Keller Dep. Day 1 255:16-257:4. Chargois and Keller discussed via email the terms of the potential contract. LBS031492; Keller Dep. Day 1 258:8-19. In April 2009, Chargois sent a draft letter agreement to Belfi and Keller seeking to memorialize the previous discussions in writing. LBS030985-87. Keller edited the document and sent a return draft that, among other things, inserted an arbitration clause. LBS031192-95. While a written agreement was never finalized (Response to Supplemental Interrogatories at 8), Chargois at least viewed it as enforceable. LBS031137; Belfi 2d Dep. 58:1-22. As time passed, Labaton and

Chargois maintained the basic referral arrangement of an 80/20 fee split, if ARTRS became a named plaintiff and Labaton was appointed lead or co-lead counsel.[8]

Because ARTRS was the only named plaintiff in Civil Action No. 11-cv-10230 MLW, i.e., the action on behalf of the putative class of customers of State Street,[9] the three Customer Class Law Firms (Labaton, Lieff Cabraser, and the Thornton Law Firm) agreed in 2013 that they would share in paying the allocation to Chargois & Herron from their own fee awards. LBS027776. Garrett Bradley of the Thornton firm handled the discussions with Lieff Cabraser and Chargois regarding this point. *Id.*; Bradley 2d Dep. 53:14-54:10.[10]

In June 2016, well after a settlement agreement-in-principle had been reached, Bradley reached out to Chargois for further discussions regarding Chargois' fee allocation. TLF-SST-060973. Bradley negotiated an agreement that Chargois & Herron would receive an amount equal to 5.5% of the total fee award (basically, a percentage calculated off the top that would be approximately equivalent to 20% of Labaton's anticipated share of the total fee), which would be funded by the three Customer Class Law Firms from their respective shares of the award. LBS040924; Bradley 2d Dep. 93:16-22.[11]

---

[8] Although it became apparent that Chargois' total contribution would be limited to the initial assistance in introducing Labaton to ARTRS, Chargois maintained that he was entitled to 20% of any fee earned by Labaton. LBS017594; LBS030876; Belfi 2d Dep. 58:5-15. Chargois intimated that he would seek legal redress to vindicate his perceived contractual right, if necessary. Belfi 2d Dep. 58:5-59:22; Chargois Dep. 59:6-60:4; Keller Dep. Day 1 130:19-131:12. Labaton was concerned by the possibility of litigation in Texas state court. *See* Belfi 2d Dep. 58:16-59:22; Keller Dep. Day 1 130:22-132:3; Keller Dep. Day 2 541:19-543:23.

[9] Civil Action Nos. 11-cv-12049 MLW and 12-cv-11698 MLW, involving the ERISA Plaintiffs, were consolidated with the customer action for pre-trial purpose.

[10] Bradley explained that he took on the role of negotiating with Chargois & Herron because he had a friendly relationship with Chargois, and he wanted to reach agreement out of concern that, because ARTRS was the only named (non-ERISA) plaintiff, Chargois could say his firm was entitled to 20% of the overall fee award, not just the portion that Labaton Sucharow received. Bradley 2d Dep. 53:15-54:10; *see also* Belfi 2d Dep. 94:5-23; Keller Dep. Day 1 122:6-124:19.

[11] In that June 21, 2016 email to Chargois cited above, Bradley discussed ERISA counsel and what percentage would be allocated to them in the context of his dialogue with Chargois about what percentage

Given his desire not to be informed of the allocation of fees among counsel (Hopkins Dec. at ¶¶ 10-12, 14), George Hopkins personally was unaware of the Chargois agreement until August or September of 2017. *Id.* ¶ 7. Thereafter, when informed of the details of the fee-sharing agreement between the Customer Class Law Firms and Chargois in this case, Hopkins expressly consented to and ratified the agreement. *Id.* at ¶¶ 16-17.

The fee-sharing arrangement was not disclosed to the Court or to the class. No local rule or court rule required disclosure to the Court, nor did the Court have a standing order, or case specific order, requiring disclosure.

## III.   Opinion.

### A.   Labaton Obtained the Written Consent of ARTRS to the Fee-Sharing Arrangement.

A national law firm such as Labaton must dedicate effort and resources to building and maintaining relationships with clients. The Texas law firm of Chargois & Herron had relationships with a State Senator in Arkansas who had an oversight role with respect to a potential client, ARTRS. Either the Senator or Chargois & Herron partner Tim Herron introduced a Labaton partner to the Executive Director of ARTRS, Paul Doane. Subsequently, Labaton and Chargois & Herron jointly submitted a proposal to serve as counsel for the ARTRS, with Chargois & Herron serving in a role as local liaison and relationship-management counsel. Labaton and Chargois & Herron initially intended that both firms would provide legal services to the ARTRS. However, for reasons related to state procurement procedures, counsel for the

---

would be paid to Chargois & Herron. TLF-SST-060973. No Labaton lawyers were copied on this communication, and there is no evidence in the record suggesting that lawyers from Labaton saw it before this investigation. *Id.* Bradley explained that he was simply providing the context of the ERISA firms as background and as a negotiating point with Chargois. Bradley 2d Dep. 84:9-85:20; Keller Dep. Day 2 534:23-535. Bradley's reference in that 2016 conversation did nothing to change the agreement that the ERISA lawyers had struck with Customer Counsel more than two years earlier.

ARTRS, Christa Clark, requested that Labaton be listed as the sole firm serving as monitoring counsel. Aware of Labaton's association with Chargois & Herron, Clark agreed that Labaton could share responsibility for the representation with the local firm. She wrote: "Your firm may affiliate [Chargois & Herron] or utilize them as independent contractors, if you deem is appropriate [sic], on a case by case basis." Labaton partner Eric Belfi orally explained to Clark that Labaton would continue to work in association with Chargois & Herron.

The retainer letter agreed upon by Labaton and the ARTRS indicates that "Arkansas Teacher agrees that Labaton Sucharow may allocate fees to other attorneys who serve as local or liaison counsel, as referral fees, or for other services performed in connection with the Litigation."

The applicable rule on sharing fees with other lawyers is Mass. R. Prof. Conduct 1.5(e) in effect at the time of the engagement in February 2011,[12] which provided:

> A division of a fee between lawyers who are not in the same firm may be made only if, after informing the client that a division of fees will be made, the client consents to the joint participation and the total fee is reasonable.

The client was notified of the association of Labaton with Chargois & Herron at the outset of the monitoring relationship and the retainer letter for the litigation that was a product of the monitoring permitted a division of fees. Both Eric Belfi and new ARTRS Executive Director George Hopkins testified that Belfi and Hopkins had conversations about the division of fees, and that Hopkins said, essentially, that he did not care how the firms divided up the fee as long as the total amount was reasonable. In my opinion, the writings exchanged by Labaton and the ARTRS constitutes client "consent[] to the joint participation," as was required by Mass. RPC 1.5(e). Unlike the version of Rule 1.5(e) in the ABA Model Rules, the Massachusetts rule does

---

[12] For the reasons given on pp. 55-56 of his Report, I agree with Prof. Gillers that the Massachusetts Rules of Professional Conduct govern the conduct of the lawyers in this matter.

not require that the client give consent to the "share each lawyer will receive" of the joint fee. *Compare* Model Rules of Prof'l Conduct, Rule 1.5(e).

Prof. Gillers relies on additional requirements set out in *Saggese v. Kelley*, 837 N.E.2d 699 (Mass. 2005). Prof. Gillers reads *Saggese* to impose a requirement of contemporaneous written consent by the client to the fee-sharing agreement. In my opinion, the email from Christa Clark and the retainer letter satisfy the writing requirement and they also satisfy the timing requirement, because both were acknowledged in writing by the client before the commencement of the representation. Prof. Gillers argues that the email from Christa Clark and the subsequent engagement letter fail to satisfy the writing requirement of Mass. RPC 1.5(e). *See* Gillers Report, p. 59. But there is no reason to believe these writings are insufficient. Discussing the requirement in the conflict of interest rules that informed consent be "confirmed in writing," Comment [20] to Mass. RPC 1.7 states: "Such a writing may consist of a document executed by the client or one that the lawyer promptly records and transmits to the client following an oral consent. See Rule 1.0(c). See also Rule 1.0(q) (writing includes electronic transmission)." Exchanges of emails are frequently sufficient to constitute written consent (or "consent confirmed in writing") to important decisions such as a client waiving a conflict of interest.

It is important to recognize that the court's concern in *Saggese* was with so-called midstream modifications of fee agreements. *Saggese*, 837 N.E.2d at 705-06. It is true that modifications of existing fee agreements are regarded with considerable skepticism because of the fiduciary nature of the lawyer-client relationship. *See* ABA Comm. on Ethics and Prof'l Resp., Formal Op. 11-458 (2011). Additional, very specific disclosures, as well as a substantive showing of changed circumstances, may be required for a midstream modification of an existing fee agreement. The interpretation by the Supreme Judicial Court of the fee-sharing rule is aligned

with this concern to avoid pressure on clients to accede to a lawyer's request for a modified (and presumably more favorable to the lawyer) fee arrangement. *See Saggese*, 837 N.E.2d at 706. In this case, the agreement to share fees with Chargois & Herron was not adopted after the commencement of the representation. Rather, the relationship with Chargois & Herron, and the sharing of fees, was within the contemplation of the parties from the outset.

In my opinion, the negotiations between Labaton and the ARTRS and the written consent provided by Clark and Hopkins satisfy the requirements of Mass. RPC 1.5(e) and the interpretation placed on the rule by the *Saggese* court. It is worth noting again, however, that the text of the fee-sharing rule in effect at the time the fee agreement between Labaton and the ARTRS was entered into does not require written consent, although the *Saggese* opinion does. *See Saggese*, 445 Mass. 434, 443. The amendment to Rule 1.5(e) formally requiring written consent took effect on March 15, 2011. Labaton sent its final engagement letter to the ARTRS on February 8, 2011. Thus, the agreement was not subject to the requirement of written consent, unless pursuant to a court decision without the benefit of rulemaking and the rule. As noted above, even if it were, my opinion is that it satisfies the requirement. From the standpoint of proper professional conduct, however, it is significant that the firm (which was admitted *pro hac vice* from out of state, and thus not as likely to be familiar with recent cases interpreting the Massachusetts Rules of Professional Conduct) complied with the requirements of the rule in effect at the time.

In substance, both Mass. RPC 1.5(e) and *Saggese* are concerned with the client having sufficient information to be able to object to the lawyer's proposed fee arrangement. As ARTRS Executive Director George Hopkins testified, he was uninterested *at the time the contract pertaining to the matter was formed* with the details of any sharing of fees among law firms

representing the ARTRS. In his Declaration he reaffirmed that he was concerned with ensuring that the total fee was reasonable, but he did not want to play the role of referee between law firms regarding their arrangement for dividing up the total fee. See Hopkins Dec. ¶¶ 11-12. (Hopkins is a lawyer and was presumably well aware of the considerations that the law firms may take into account in deciding how to divide up the total fee.) His subsequent express ratification of the fee-sharing arrangement is evidence that it did not disadvantage the client in any way, but it is clear under both the text of Mass RPC 1.5(e) and *Saggese* that the consent requirement then in effect was met.

### B.   Even if Labaton Had Failed to Perfect Its Fee-Sharing Agreement with Chargois, the Matter Does Not Fall Within Rule 7.2(b), on Referrals by Non-Lawyers.

Prof. Gillers makes a creative, and as far as I know unprecedented, argument in his Report to the Special Master. *See* Gillers Dep. at 52-56. He contends that, in the event a fee-sharing agreement with another lawyer does not comply with every element of Mass. RPC 1.5(e), the counterparty should be treated as a non-lawyer and the situation governed by the rule prohibiting payments to non-lawyers for referrals. *See* Mass. RPC 7.2(b) (providing that "[a] lawyer shall not give anything of value to a person for recommending the lawyer's services"). In essence, his argument is that an unperfected agreement to engage in otherwise permissible sharing of fees by lawyers not associated in the same law firm transforms the situation into one in which a non-lawyer is providing client referrals. I am unaware of any ethics opinion, reported case, or disciplinary proceeding that takes this position.

To put the matter differently, Prof. Gillers contends that there is a generally applicable rule prohibiting payments for referrals, Mass. RPC 7.2(b), which is subject to a limited exception for lawyer fee-sharing agreements, as provided in Mass. RPC 1.5(e). Assuming this structure, he

then contends that an imperfect (under Rule 1.5(e)) fee-sharing agreement should throw the matter back under the default rule of Rule 7.2(b). *See* Gillers Report, pp. 61, 66. But this is not the right way to understand the relationship of these rules to each other. They are not related as default rule with exceptions; instead, they govern completely different types of activities. Rule 7.2(b) includes a number of exceptions, including not-for-profit lawyer referral services and paying for the reasonable cost of advertising. Rule 7.2(b) is intended to deal with referrals from non-lawyers. Lawyers are disciplined under this rule for employing "runners" or "cappers" to solicit personal-injury clients at accident scenes or hospitals, paying physicians or chiropractors for referring personal-injury clients, using non-lawyer marketing firms to tout a lawyer's services in seminars, and participating in online referral services other than those run by a bar association or a not-for-profit organization. *See* Ellen J. Bennett, et al., *Annotated Model Rules of Professional Conduct* (7th ed. 2011); ABA/BNA *Lawyers' Manual on Professional Conduct* ¶ 81:706-11; 2 Geoffrey C. Hazard, Jr., et al., *The Law of Lawyering* § 56.5 (3d ed. & Supp. 2014). None of these standard reference works on legal ethics discusses Rule 1.5(e) as an exception to Rule 7.2(b), or even mentioned lawyer fee-sharing in connection with the prohibition on payments for referrals. Indeed, in his casebook Prof. Gillers does not mention the purported rule + exception structure in his discussion of solicitation by class-action lawyers. *See* Stephen Gillers, *Regulation of Lawyers: Problems of Law and Ethics* 879-80 (9th ed. 2012).

The Rules of Professional Conduct in Massachusetts differ from the ABA Model Rules in permitting so-called "bare" referral fees, in which the referring law firm need not assume joint responsibility for the representation, nor receive a fee proportional to the value of the legal services it provides. *Compare* ABA Model Rules, RPC 1.5(e). When Massachusetts changed from a system of professional-conduct rules based on the 1969 ABA Model Code to one based

on the 1983 (amended in 2002) Model Rules, the Supreme Judicial Court elected to continue the

practice in Massachusetts of allowing bare referral fees. *See Saggese v. Kelley*, 837 N.E.2d 699,

705 (Mass. 2005). That type of attorney fee-sharing has a long-established history in

Massachusetts. *See also* Expert Declaration of Camille F. Sarrouf, Sr. Thus, even if Prof.

Gillers's interpretation of the evidence is correct, and Chargois & Herron was compensated only

for referring a client to Labaton, this type of arrangement is permissible under the Massachusetts

Rules of Professional Conduct.

For this reason, the Illinois appellate court decision relied upon by Prof. Gillers (see

Gillers Dep. at 54-57, 81-85), *Holstein v. Grossman*, 616 N.E.2d 1224 (Ill. App. Ct. 1993), does

not shed any light on what a lawyer ethically may do in Massachusetts. The *Holstein* case

differentiates between a bare referral and an agreement under which the referring law firm will

assume joint responsibility for the representation or perform additional legal service. *Id.* at 1232-

33. Leaving aside the issue of whether Chargois & Herron provided services beyond a mere

referral (which, in my opinion, it did), the public policy of Massachusetts and Illinois is very

different with respect to bare referral fees. Law firms, in their capacity as such, and not as non-

lawyers subject to Rule 7.2(b), are permitted in Massachusetts to receive compensation for client

referrals.

### C.   Massachusetts Law Permits Enforcement of Imperfect Fee Agreements.

The *Saggese* case, upon which Prof. Gillers relies heavily in his Report, does not regard

the lack of consent to a fee-sharing agreement as fatal to its enforceability. "Between lawyers, a

fee-sharing agreement that fails to comply with the disciplinary rules is not necessarily

unenforceable." *See Saggese*, 837 N.E.2d at 704. In another case involving an "imperfect fee

agreement" – in that case, imperfect because the lawyer did not obtain the clients' consent – the

District Court in Massachusetts applied a multi-factor test to determine whether to enforce the fee contract. *See Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 188 F. Supp. 2d 115, 125-31 (D. Mass. 2002) (*citing and applying Town Planning & Eng'g Assoc. v. Amesbury Specialty Co.*, 342 N.E.2d 706 (Mass. 1976)). The court explained that "[t]here is no public policy against fee-splitting agreements per se," and ultimately concluded that the policy concerns underlying Mass. RPC 1.5(e) would not be undermined by enforcement of an imperfect fee-sharing agreement. *Id.* at 131.

### D. Any Technical Imperfections in the Fee-Sharing Agreement Are Not Sanctionable.

As discussed above, it is my opinion that the writings exchanged by ARTRS representatives and Labaton lawyers satisfy Mass. RPC 1.5(e). The *Saggese* case does caution that, although an imperfect fee agreement – which this was not -- is enforceable, non-compliance with Rule 1.5(e) may nevertheless subject both lawyers to discipline. *See Saggese*, 837 N.E.2d at 706. Even if the fee agreement here is deemed technically out of compliance with Rule 1.5(e), it is an insignificant violation. Both *Saggese* and *Daynard* emphasize that the purpose of the fee-sharing rule is to inform the client of the arrangement between the lawyers, so that the client can object to anything it believes is disadvantageous in the fee-sharing arrangement. *See Daynard*, 188 F. Supp. 2d at 129; *Saggese*, 837 N.E.2d at 704-05. The retainer letter shows that ARTRS representatives consented to Labaton paying referral fees; and, to the extent that it could be deemed necessary, the Clark email shows that Labaton informed ARTRS that Labaton intended to share those fees with Chargois & Herron. If one were to accept the improper assumption that there was a violation of the letter of the rule even though it was followed in spirit, responsibility for determining whether to impose a disciplinary sanction is committed to an independent statewide process, not to individual courts. *See* ABA/BNA *Lawyers' Manual on Prof'l Conduct*

¶ 101:2001; Restatement (Third) of the Law Governing Lawyers § 5, cmt. b (2000). Federal

courts do have the inherent authority to sanction lawyers, but this authority is limited to cases of

bad-faith conduct. *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 43-45 (1991). Technical non-

compliance with a state rule of professional conduct – particularly one regulating, rather than

prohibiting, a practice – is not the kind of fraud or abuse of the judicial process that justifies

sanctions under the federal court's inherent power.

### E. The Massachusetts Fee-Sharing Rule Does Not Consider the Reasonableness of the Fee Division, But Only the Reasonableness of the Total Fee.

The Massachusetts fee-sharing rule, like ABA Model Rule 1.5(e), requires that the total

fee to the client be reasonable. *See* Mass RPC 1.5(e) (". . . and the total fee is reasonable"). The

reasonableness of the total fee is evaluated using an eight-factor test in Mass. RPC 1.5(a). The

plain text of Mass. RPC 1.5(e) does not permit a reviewing court or disciplinary authority to

second-guess the division of fees agreed upon by two or more law firms, as long as the total fee

is reasonable. George Hopkins has testified that the total fee is reasonable (Hopkins Dec. ¶ 6),

but of course in a class action the court must also approve a fee award, which it did here. From

the point of view of legal ethics, however, the most important aspect of the relationship between

Rule 1.5(a) (reasonableness) and Rule 1.5(e) (fee-sharing) is that the client has an opportunity to

be informed of the fee-sharing arrangement. If the client objects, the client may refuse to consent

or renegotiate the fee arrangement. (That is why *Saggese* and ABA Opinion 11-458 require

additional scrutiny for the modification of a fee contract during the course of an existing

attorney-client relationship.) Hopkins testified that he was indifferent to the agreement the firms

made between themselves for sharing the fee, stating that he had no desire to act as a referee

between law firms, including national and local counsel. Hopkins Dec. ¶ 12. From the client's

point of view, what matters is that the total fee is reasonable. Mass. RPC 1.5(a) and Mass. RPC

- 19 -

1.5(e) both require a reasonable total fee. But neither rule requires that the division of the fee

satisfy the reasonableness criteria in Mass. RPC 1.5(a).

Further support for this conclusion comes from the comparison of the Massachusetts fee-

sharing rule with the version in the ABA Model Rules. Unlike Massachusetts, which permits

"bare" referral fees, the ABA fee-sharing rule requires that "the division is in proportion to the

services performed by each lawyer or each lawyer assumes joint responsibility for the

representation." ABA Model Rules of Prof'l Conduct, Rule 1.5(e)(1). In other words, there is a

reasonableness requirement in the ABA version, requiring the fee to reflect *either* the amount of

work performed by each law firm or each firm's willingness to be on the hook for potential

malpractice liability. The Massachusetts Supreme Judicial Court declined to adopt the ABA

Model Rules in all their particulars, and adhered to the state's traditional permission for bare

referral fees in Mass. RPC 1.5(e). If the Court had intended to permit scrutiny of the

reasonableness of the fee for each law firm, it could have adopted the ABA Model Rules

language.

### F. The Massachusetts Rules Did Not Mandate Additional Disclosure to the Court.

This opinion relies solely on the Massachusetts Rules of Professional Conduct, although I

believe the result is the same under the Federal Rules of Civil Procedure and other federal law,

such as that governing the district court's inherent authority. Prof. Gillers seeks to ground an

obligation to disclose in Mass. RPC 3.3(a) and RPC 8.4(c). *See* Gillers Report, pp. 71-72. Mass.

RPC 3.3(a) states: "A lawyer shall not knowingly . . . make a false statement of fact or law to a

tribunal or fail to correct a false statement of material fact or law previously made to the tribunal

by the lawyer." Mass. RPC 8.4(c) backstops this obligation by providing that a lawyer may not

"engage in conduct involving dishonesty, fraud, deceit or misrepresentation."[13] Because there is

no record of any affirmative false statement of fact made by Labaton lawyers to the court, and

none is cited in his report, Prof. Gillers's position must depend on Comment [3] to Mass. RPC

3.3: "There are circumstances where failure to make a disclosure is the equivalent of an

affirmative misrepresentation." It is the case that a statement may be literally true but

substantively misleading. Prof. Gillers cites the well-known U.S. Supreme Court case, *Bronston*

*v. United States*, 409 U.S. 352 (1973), which turned on this exchange:

> Q. Do you have any bank accounts in Swiss banks Mr. Bronston?
> A. No, sir.
> Q. Have you ever?
> A. The Company . . . had an account there for about six months, in Zurich.

In fact, the defendant had a *personal* bank account in Zurich for about six months. The

defendant's answer to the question, "have *you* ever had a Swiss bank account?", was literally

true – the company did have a Swiss bank account – but intended to throw the questioner off the

trail of Mr. Bronston's personal account.

Prof. Gillers reads Comment [3] to Mass. RPC 3.3 to prohibit that kind of literally-true-

but-misleading statement, regardless of what the result would be under the criminal law of

perjury, and I agree with that interpretation. *See* Ellen J. Bennett, et al., *Annotated Model Rules*

*of Professional Conduct* 327-29 (7th ed. 2011). The trouble with his argument is not the law but

the facts. I am aware of no statement in the record – and Prof. Gillers does not cite any in his

Report – that would be a *Bronston*-type statement that misleads by omission. The substantive

truth of the matter is that Labaton represented its clients effectively, and was entitled to a fee

---

[13] In this case the citation of Rule 8.4(c) is redundant with Rule 3.3(a), which covers the same ground and sets out the duties of lawyers with specificity. The non-redundant role of Rule 8.4(c) in the ecosystem of the Rules of Professional Conduct is to cover dishonesty by lawyers in connection with conduct that occurs outside the practice of law, but nevertheless bears on the lawyer's character and fitness to practice law. *See* ABA/BNA *Lawyers' Manual on Prof'l Conduct* ¶ 101:401.

award. Part of the effective representation of clients may include working with local counsel who help manage the client relationship. It is also a long-standing practice in the plaintiffs' bar – expressly permitted by the Massachusetts Rules of Professional Conduct – for one firm to act as a source of referrals for another firm that handles the lion's share of the litigation. *See, e.g.*, Nora Freeman Engstrom, *Attorney Advertising and the Contingency Fee Paradox*, 65 Stan. L. Rev. 633, 674-78 (2013) (noting that "[s]ome aggressive attorney advertisers are mostly case brokers; they advertise heavily and, in exchange for a referral fee, distribute the cases they receive to other practitioners"). The client in question – the ARTRS – was aware that Labaton was working with a local law firm, and its current Executive Director indicated that it would not involve itself in the details of how the fee was allocated between Labaton and the local firm. At no time did a Labaton lawyer seek to shade this truth or tiptoe around full disclosure to the court. Even if the truth was that Chargois & Herron really was nothing more than a referring law firm – and again, I believe the evidence is that the parties had contemplated that Chargois & Herron would perform legal services in connection with the representation – there is no evidence that Labaton tried to hide the payment of a referral fee. Nor was there any obvious reason to hide such a fee, in that it would be permitted under the Massachusetts Rules of Professional Conduct.

Dated this 26th day of March, 2018

W. Bradley Wendel