# EX. 244

# EXPERT REPORT OF TIMOTHY DACEY

I have been retained by the firm of Lieff Cabraser Heimann & Bernstein, LLP ("Lieff Cabraser") to provide an expert opinion in connection with proceedings before the Special Master in the case of *Arkansas Teachers Retirement System v. State Street Bank & Trust Company,* No. 11-cv-10230 MLW (D. Mass.).  My qualifications to render such an opinion are summarized in Attachment A.

Specifically, I have been asked whether, in my opinion, lawyers at Lieff Cabraser violated the Massachusetts Rules of Professional Conduct by failing to disclose to the Court or to class members that a portion of the fee awarded by the Court would be shared with the firm of Chargois & Herron.  In my opinion, they did not.  To violate the duty of candor imposed by Rules 3.3 and 8.4(c), a lawyer must have actual knowledge that his or her statements are false or misleading.  Based on the facts as I understand them, the lawyers at Lieff Cabraser lacked the requisite state of mind to establish a violation of these Rules.  It is also my opinion that neither Rule 1.2 nor Rule 1.4 of the Rules of Professional Conduct required lawyers at Lieff Cabraser to disclose the incomplete and inaccurate information available to them about the Chargois arrangements to class members when the motion for an award of attorneys' fees was filed in 2016.

I explain the factual and legal basis for my opinion in more detail below.

## I.    FACTUAL BACKGROUND

In reaching my opinion, I have consulted the documents listed on Attachment B.  The relevant facts, as I understand them, are as follows.

a.   Overview of the State Street Litigation

Since 2008, the firm of Labaton Sucharow LLP has represented the Arkansas Teacher

Retirement System ("ATRS") as one of its securities monitoring counsel.  Sometime in 2009,

ATRS retained Labaton to investigate whether ATRS had claims against State Street Bank,

which served as custodian for assets held by ATRS, relating to foreign exchange transactions

executed by the Bank on ATRS's behalf.  With the knowledge and approval of ATRS, Labaton

subsequently associated with Lieff Cabraser and the Thornton Law Firm, both of which had

relevant previous experience in litigation involving foreign exchange transactions by custodial

banks.

In 2011, ATRS, represented by the three firms, filed a Class Action Complaint against

State Street in the United States District Court for the District of Massachusetts, claiming among

other things that State Street's practices in executing certain types of foreign exchange trades

violated the Massachusetts Consumer Protection Act, Mass. Gen. Laws c. 93A.  The complaint

alleged that ATRS brought the suit on its own behalf and on behalf of a class consisting of all

funds for which State Street served as custodian bank and executed the specific types of foreign

exchange trades at issue.  Complaint ¶ 20.  In 2012, the Court appointed Labaton interim lead

counsel, the Thornton firm as liaison counsel, and Lieff Cabraser as additional counsel.  The

2011 lawsuit has sometimes been referred to as the "Customer Class Action" and the three law

firms as "Customer Counsel."

In late 2012, the Customer Class Action was consolidated for pre-trial purposes with

three class action lawsuits brought against State Street of behalf of ERISA plans for which State

Street served as custodian and the individual participants in such funds, asserting statutory

ERISA claims distinct from the claims asserted in the Customer Class Action on behalf of all State Street custodial customers.  These lawsuits have been referred to as the "ERISA Actions" and the three law firms representing the plaintiffs in those lawsuits as "ERISA Counsel."  In 2013, Class Counsel and ERISA Counsel reached an agreement that ERISA Counsel would share in 9% of any fee awarded by the Court in the consolidated cases, later increased to 10%.

In July 2016, after extensive negotiations overseen by an experienced mediator, Jonathan Marks, the parties to the consolidated actions reported to the Court that settlement had been reached and filed the Settlement Agreement with the Court.  Under the terms of the Agreement, State Street agreed to create a settlement fund of $300 million in full satisfaction of the claims asserted in both the Customer Class Action and the ERISA Class Actions.  The Agreement designated the Labaton firm as Lead Counsel for the entire settlement class, subject to approval by the Court, and provided that Lead Counsel would apply for an award of attorneys' fees, expenses, and service awards from the $300 million in an amount not to exceed $76,400,000, or approximately 25% of the settlement fund.  The Agreement disclosed that 9% of the fee awarded by the Court would be distributed to ERISA Counsel and 91% to Customer Counsel, as agreed between Customer and ERISA Counsel in 2013.  The Agreement further provided:

> If Customer Counsel disagree about the amount of the fee to be distributed amongst Customer Counsel by Lead Counsel, they shall mediate their dispute with Jonathan B. Marks, Esq. and, if unsuccessful, present the dispute to the Court for a determination. Settlement Agreement ¶ 21.

I understand that the method for allocating the aggregate fee award described in Paragraph 21 is widely used in class actions.  *See* Expert Report of William Rubenstein dated March 27, 2018, ¶3 and n. 6.  ("Second Rubenstein Report).

After notice and hearing, the Court gave preliminary approval to the settlement, approved a settlement class, appointed Labaton as Lead Counsel, and approved the sending of a Notice of

Settlement to members of the settlement class.  The Notice of Settlement informed class members that Lead Counsel would apply for an award of attorneys' fees not to exceed $74,541,250, litigation expenses of no more than $1,750,000, and service awards in the aggregate of $85,000, which together total approximately 25% of the settlement fund.  Notice of Settlement, pages 5, 17.  For additional details about the settlement, the Notice directed class members to the Labaton firm website and to www.StateStreetIndirectFXClassSettlement.com. The Notice did not address the allocation of fees among counsel.  No class member objected to the proposed settlement or opted out of the class.

In September 2016, Lead Counsel filed a Motion for Final Approval of the Settlement and for Approval of Attorneys' Fees, supported by an affidavit by Lawrence Sucharow of the Labaton firm (the "Affidavit") and affidavits from Customer Counsel, ERISA Counsel, and three other law firms that had filed appearances in the ERISA cases.  The motion sought a total award of fees for all plaintiffs' counsel in the total amount of $74,541,250, an amount equal to 24.85% of the settlement fund.  Affidavit ¶ 162.  The affidavits of the individual law firms disclosed, in summary tabular form, the hours worked by each attorney and paralegal on the consolidated cases, the customary hourly charge for each professional, and the lodestar amount for each firm. An exhibit to the affidavit added up the individual firm lodestars to produce a total lodestar for use as a cross-check on the requested fee award.  Affidavit, Ex. 25.  The Affidavit represented that the fee award requested in the Motion for Approval of Attorneys' Fees was 1.8 times the total lodestar amount disclosed in the law firms' affidavits.  Affidavit ¶ 178.

On November 2, 2016, the Court heard argument on the Motions for Final Approval and for Approval of Attorneys' fees.  Attorney David Goldsmith of the Labaton firm spoke on behalf of all the law firms representing the plaintiffs.  After ruling from the bench that the class was

properly certified and the settlement amount of $300 million was fair to the class, the Court turned to the issue of attorneys' fees, prefacing the discussion by observing that it was appropriate to use the percentage of a common fund approach in determining the attorneys' fees to be awarded. Hearing Transcript at 22-23. Mr. Goldsmith argued that a fee award of 25% of the settlement fund was reasonable in light of the results achieved, citing and discussing cases in the First Circuit and elsewhere that used the percentage approach. Mr. Goldsmith also acknowledged that many courts apply a "lodestar cross check" and that, if the Court awarded a 25% fee, the lodestar multiple would be 1.8, which he characterized as "pretty low under the circumstances." Tr. at 30. The Court did not ask how the fee would be divided among the plaintiffs' counsel. At the conclusion of the hearing, the Court, applying the percentage of the common fund approach and a lodestar cross-check, found that the total fee requested was reasonable. Tr. at 35. Final judgment entered that same day.

    b.  Discovery of Errors in the Lodestar Calculation.

    On November 8, 2016, a reporter for *The Boston Globe* contacted the Thornton firm and raised questions about the lodestar figures submitted to the Court. Further investigation revealed that some staff attorney time listed on Labaton's and Lieff Cabraser's affidavits had also been included in Thornton's lodestar figures and that some attorneys had been assigned different rates by different firms. On November 10, 2016, after consultation among the three law firms, Mr. Goldsmith wrote the Court to disclose the mistakes and provide corrected lodestar information. The corrections resulted in a reduction of 9,322.9 in total hours, a reduction of $4,058,654.50 in the total lodestar used as a cross-check on the fee award, and an increase in the lodestar multiplier from 1.8 to 2.0. Goldsmith Letter, p. 3. Even as adjusted, the lodestar multiplier was comfortably within the range of multipliers approved by the courts in other class action cases.

Expert Declaration of William B. Rubenstein dated July 31, 2017, ¶45 ("First Rubenstein Report").

    c.   <u>Labaton's Arrangement with Chargois & Herron</u>

I understand that the Labaton firm was first introduced to ATRS by attorneys at the firm of Chargois & Herron in 2007.  In exchange for Chargois' help in making the introduction, Labaton agreed to pay the Chargois firm a maximum of 20% of any fee that Labaton received representing an institutional investor introduced by the Chargois firm, including ATRS. The agreement did not require the Chargois firm to perform any additional work in connection with the cases that Labaton brought or assume any responsibility for such cases. This agreement is referred to on page 33 of Professor Gillers' Report as the "Chargois Arrangement."  The Gillers Report raises questions about whether the Chargois Arrangement was properly disclosed to and approved by ATRS, as required by Rule 1.5(e).

Lieff Cabraser first became aware that Labaton had some relationship with the Chargois firm in April 2013, when Garrett Bradley of the Thornton firm circulated an email stating that Labaton had an obligation to share 20% of its fee in the State Street litigation with Damon Chargois, whom Bradley described as "local counsel who assists Labaton in matters involving the Arkansas Teachers Retirement System."  Mr. Bradley proposed that Mr. Chargois instead get 4% "off the top" of any total attorneys' fees awarded in the State Street litigation.  Bradley asked Robert Lieff to confirm that whatever Labaton owed the Chargois firm would be paid "off the top," thereby spreading the cost of Mr. Chargois' fee among all Customer Counsel, before Customer Counsel divided any fee award among themselves.  Mr. Lieff agreed.  *See* Email string dated April 24, 2013 (LCHB 0053538-39).

In August 2015, Dan Chiplock of Lieff Cabraser inquired about the details of the proposed allocation of attorneys' fees amongst Class Counsel, including how "ERISA and local Arkansas counsel fits in."  Mr. Bradley replied by indicating he had re-sent a copy of the April 2013 email exchange concerning the Chargois firm.  *See* Email string dated August 29-30, 2015 (LCHB 0053531-32).

In July 2016, in connection with further negotiations among counsel about allocation of fees, Garrett Bradley sent an email to attorneys on the Customer Counsel team including Bob Lieff and Dan Chiplock reporting that Damon Chargois was willing to accept 5.5% of the total fee awarded in the State Street case, to be paid "off the top."  The email described Chargois as "the local attorney in this matter who has played an important role."  *See* Email dated July 8, 2016 (LCHB 0053542).

Other emails sent or received by Lieff Cabraser attorneys consistently described the Chargois firm as "local counsel."  See Response by Lieff Cabraser Heimann & Bernstein to Special Master's September 7, 2017 Request for Supplemental Submission ("Lieff Cabraser Response to September 7 Request"), ¶¶2-4.

 I understand that no attorney at Lieff Cabraser had any direct contact with Damon Chargois or anyone else associated with his firm.  No attorney knew the terms of the Chargois Arrangement, apart from was what was disclosed in Garrett Bradley's emails.  Based on the very limited information provided in Bradley's emails, both Robert Lieff and Dan Chiplock believed that Chargois & Herron was performing the role of local counsel dealing directly with ATRS personnel in Arkansas about the State Street litigation, similar to the role that Lieff Cabraser's local counsel in Ohio played in the BNY Mellon litigation.  Lieff Dep. Transcript at 60-61, 73-74; Chiplock Dep. Transcript at 102-116.  No one at Lieff Cabraser was aware that the Chargois

firm had performed no work on the State Street lawsuit, or understood that there may be an issue about whether the fee-sharing agreement between Labaton and the Chargois firm had been properly approved by ATRS, until September 2017, when the underlying arrangement between Labaton and Chargois first came to light in the deposition of Eric Belfi, a Labaton attorney, taken by the Special Master.  Lieff Cabraser Response, ¶ 6.  That deposition took place ten months after the hearing on the motions for final approval of the settlement and award of attorneys' fees.

II.   OPINION

I agree that the Massachusetts Rules of Professional Conduct govern the conduct of the Lieff Cabraser lawyers who appeared in the State Street lawsuit, for the reasons given in Professor Gillers' Report at 55-56.  In this Report, I will focus on a lawyer's duty of candor under Rules 3.3 and 8.4(c) of the Massachusetts Rules and will then briefly address Professor Gillers' contention that Rules 1.2 and 1.4 imposes additional obligations of disclosure to absent class members.  In applying the Massachusetts Rules, I have tried to keep in mind the following admonition in paragraph 5 of the Scope section of the Rules:

> The Rules presuppose that disciplinary assessment of a lawyer's conduct will be made <u>on the basis of the facts and</u> <u>circumstances as they existed at the time of the conduct in</u> <u>question</u> and in recognition of the fact that a lawyer often has to act on uncertain or incomplete evidence of the situation. (*Emphasis added*).

a.   <u>Rule 3.3</u>

Rule 3.3 provides, in relevant part:

(a)   A lawyer shall not <u>knowingly</u>:
    (1)   make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; . . .

(b)   A lawyer who represents a client in an adjudicative proceeding and who <u>knows</u> that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. . . .

(d)     In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts <u>known</u> to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse. *(Emphasis added).*

The critical terms "knowingly," "knows," and "know" are defined in the Terminology section of the Rules as follows:

"Knowingly," "known," or "knows" denotes actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances. Rule 1.0(g).

The second sentence permits a Court or disciplinary agency to find that a lawyer had actual knowledge of a fact from circumstantial evidence, even if the lawyer denies such knowledge.

The standard of actual knowledge differs from the "reasonably should know" standard employed in some Rules. *See, e.g.,* Rule 4.3. Under the Rules, "reasonably should know" means what "a lawyer of reasonable prudence and competence" would ascertain regarding the matter in question. Rule 1.0(m).

b.  <u>Rule 8.4(c).</u>

Rule 8.4(c) provides:

It is professional misconduct for a lawyer to:

(c)     engage in conduct involving dishonesty, fraud, deceit or misrepresentation; . . .

This Rule, unlike Rule 3.3, does not expressly define the state of mind required to find a violation of the Rule. The term "fraud," however, is defined in the Rules as conduct "that is fraudulent under substantive or procedural law and has a purpose to deceive." Rule 1.0(e). Moreover, Massachusetts decisions applying Rule 8.4 require proof that the lawyer's conduct was knowing. *See, e.g., Matter of Zak,* 476 Mass. 1034, 1038 (2017) (lawyer's statements contained "deliberate falsehoods"); *Matter of Murray,* 455 Mass. 872, 881 (2010) (no violation because the lawyer had "no intent to deceive."). I conclude, therefore, that the mental element required to show a violation of 8.4(c) is the same as the mental element required under Rule 3.3:

a lawyer must have actual knowledge that his or her statements or other conduct are false or misleading.

    c. <u>Application of Duty of Candor to Lieff Cabraser Attorneys.</u>

In applying Rules 3.3 and 8.4(b) to the conduct of the Lieff Cabraser attorneys in this case, I find it helpful to distinguish the different ways in which a statement may be fraudulent or misleading.

<u>First</u>, a statement of fact may itself be incorrect.  The total lodestar amount reported to the Court in the Motion for Attorneys' Fees was false in this primary sense.  The error was, however, unintentional and was corrected as soon as it came to the lawyers' attention, so there was no violation of Rule 3.3 or 8.4(b).

<u>Second</u>, a statement of fact may be true as far as it goes but omit some critical information necessary to understand the significance of the statement for the purpose it was made, thus creating a misleading impression.  An example of this type of fraud can be found in *Kannavos v. Annino*, 356 Mass. 42 (1969), which has been cited and followed in disciplinary cases.  *See Matter of O'Toole*, 2015 WL 9309021 (Ma.St.Bar.Disp.Bd.), cited in Professor Gillers' Report at 71.  In *Kannavos*, an owner advertised a building for sale as a multi-family, income-producing property.  The owner knew but did not disclose that multi-family use in that location was illegal under the city's zoning ordinance.  The Court held that the owner's statements about the use of the property were materially incomplete and therefore constituted fraud.  As the Court explained:

> Although there may be 'no duty imposed upon one party to a transaction to speak for the information of the other * * * if he does speak with reference to a given point of information, voluntarily or at the other's request, he is bound to speak honestly and to divulge all the material facts bearing upon the point that lie within his knowledge. Fragmentary information may be as misleading * * * as active misrepresentation, and

half-truths may be as **712 actionable as whole lies * * *.' *See* Harper & James, Torts, s 7.14. *Kannavos v. Annino*, 356 Mass. 42, 48, 247 N.E.2d 708, 711–12 (1969).

In *Kannavos,* the owner's statements were intended to and did in fact attract a buyer who was interested in an income-producing property. The fact that the use of the property was illegal was plainly "a material fact bearing upon the point" of the owner's statement.

In the present case, the attorneys for the plaintiffs collectively applied for a single fee award for all legal services rendered based on a percentage of the fund recovered for the class, which I understand from Professor Rubenstein's First Report is consistent with the law in the First Circuit and the most common approach courts take to awarding fees in common fund cases. Rubenstein First Report ¶ 12 and n. 4. In addition, most of the firms that filed appearances in the State Street litigation also provided summary information about hours worked and billing rates to permit the Court to calculate a lodestar and perform a lodestar cross-check. To perform a lodestar cross-check, as I understand it, the Court divides the total lodestar number into the fee award requested, yielding a lodestar multiple. The multiple facilitates comparison with fee awards in other case, *see Manual for Complex Litigation,* §14.122, and a high multiple may indicate that the fee requested is disproportionate to the time and effort the lawyers put into the case and the risks they undertook. As Professor Rubenstein explains in his First Report,

> ". . . [U]sing a lodestar cross-check enables a court to make a rough estimate of counsel's lodestar for the purpose of ensuring against a windfall." First Rubenstein Report, ¶ 15.

Nothing in the lodestar affidavits served as an implied representation that the fee award will be distributed in proportion to the lodestars of the individual firms or that the firms submitting affidavits were all the firms who might share in the award. *See* Second Rubenstein

Report, ¶ 13(a). [1]  In fact, the Settlement Agreement disclosed that the fee award would be allocated among counsel by agreement, unless a dispute arose.  Agreement, ¶ 21.  Accordingly, nothing in the limited and inaccurate information available to Lieff Cabraser lawyers in 2016 would have alerted them that they needed to say something about the Chargois Arrangement in order to permit the Court to perform an appropriate lodestar cross-check.  Accordingly, I conclude that the Lieff Cabraser lawyers' failure to disclose what little they knew about the Chargois Arrangement was not fraudulent in this second sense.

Third, a statement may be fraudulent if a person knows that he or she is under a duty to speak but says nothing.  A duty to speak without being asked commonly arises in fiduciary relationships.  See e.g. *Restatement (Third) Of Agency* § 8.11 (2006); *Restatement (Third) of the Law Governing Lawyers* § 20 (2000).  An example of this type of duty is found in Rule 3.3(d), which requires that a lawyer in an *ex parte* proceedings disclose material facts known to the lawyer to the court, even if the facts are adverse.  Comment [14A] to the Massachusetts version of Rule 3.3 recognizes that the duties in Rule 3.3(d) may apply when adversaries jointly request relief from a court, "such as a joint petition to approve the settlement of a class action lawsuit."

To establish this third type of fraud, it is essential to show that a person knew he or she had a duty to speak without being prompted.  In my experience, lawyers who wish to understand their duties in connection with pending litigation start by consulting the Federal Rules of Civil Procedure.  I assume for purposes of my opinion that the lawyers at Lieff Cabraser were familiar with the Rules and thus had actual knowledge of what the Rules required.  Rule 23(h)(1) specifies that a claim for an award of attorneys' fees  in a class action must be made by motion

---

[1] As Professor Rubenstein points out in his Second Report, there are a variety of reasons why Lead Counsel might have legitimately decided to omit the Chargois firm from the lodestar submission. Rubenstein Second Report, ¶14, n. 66.

"in accordance with Rule 54(d)(2)."  Rule 54(d)(2) in turn specifies what issues a motion for fees must address, including "the terms of any agreement for fees,"  but only if the court so orders. Rule 54(d)(2)(B)(iv).  Thus a lawyer who consulted Rules 23 and 54(d) would not be aware of any duty to disclose the terms of agreements among the lawyers about allocation of fees in the absence of a court order, because there is none under those rules.

A lawyer may also know that there is a duty to disclose if the Local Rules or customary practices of the courts where the lawyer appears establish such a duty.  Unlike the local rules of some other jurisdictions (such as the Southern and Eastern Districts of New York), there is no Local Rule in the District of Massachusetts addressing motions for an award of fees in class actions or other cases.  To determine the customary practices in District of Massachusetts, I have relied on Professor Rubenstein's Second Report, which reports the results of a survey of all in class action settlements in the District of Massachusetts since February 2011.  The survey established that there were 127 such cases.  In none of these cases did the court order that fee agreements be disclosed.  In only a handful of the cases were fee agreements even mentioned. Second Rubenstein Report at ¶ 7.  Thus, a lawyer familiar with the customary practices in the District of Massachusetts would conclude that there was no duty to disclose fee agreements unless the court specifically so ordered.

During oral argument on the Motion for Attorneys' Fees in the State Street litigation, the Court did ask one question about Labaton's agreement with ATRS, which Mr. Goldsmith answered.  Hearing Transcript, p. 26   The Court did not ask any other questions about fee agreements or allocations and did not order any further disclosures.  Nothing in these facts establishes that the lawyers at Lieff Cabraser knew of any duty to say more.

Professor Gillers also contends that a duty to disclose fee arrangements has been established by judicial precedent.  I have reviewed the cases cited in the Gillers Report at pages 68-71.  In most of those cases, the lawyers brought a dispute about fees to the court's attention for resolution.   The cases stand for the general proposition that the court is not bound by agreements among counsel allocating fees and has the power to award fees itself.   Language in *In re Agent Orange Product Liability Litigation*, 818 F.2d 216, 226 (2d Cir. 1987) to the effect that lawyers have a duty to disclose fee allocation agreements without being asked reflects the local rules applicable in the Eastern District of New York where the case was tried.  *See* Second Rubenstein Report, ¶12, n. 45.  In *Bernstein v. Bernstein Litowitz Berger & Grossman LLP*, 814 F.3rd 132, 138 n.2 (2d Cir. 2016), the Second Circuit recognized that Rule 23(h) itself does not require such disclosure.  Citing precedent in another Circuit applying the local rules of different District Court does not establish that the Lieff Cabraser lawyers were aware that they had a duty to disclose what they knew about proposed fee payments to the Chargois firm.

   d.   Professor Gillers' Revised Opinion Regarding the Duty of Lieff Cabraser Lawyers.

At his deposition on March 20, Professor Gillers conceded that the lawyers involved in the State Street lawsuit were not required by the Federal Rules of Civil Procedure to disclose fee allocations among counsel of record unless ordered to do so by the Court.  Gillers Depos. Vol. I at 216-217.   He also acknowledged that Lieff Cabraser's lawyers did not know all the terms of the Chargois Arrangement, and that they thought the Chargois firm was local counsel for ATRS and had rendered valuable services in connection with the class action.  Gillers Depos. Vol. I at 225.  Nevertheless, he contended that the size of the payment to the Chargois firm triggered a duty to investigate what Chargois had done to earn his fee.  Gillers Depos. Vol. I at 226.  Presumably, the argument goes, had the Lieff Cabraser attorneys performed such an

investigation, they would have discovered facts leading them to agree with Professor Gillers that the Chargois Arrangement did not comply with Rule 1.5(e) and that the Chargois fee was clearly excessive under Rule 1.5(a), and would then have been under a duty to report the Chargois Arrangement to the Court.

At best, this is an argument that the Lieff Cabraser lawyers reasonably should have known that the description of Mr. Chargois' role and function provided by co-counsel raised some questions that required further investigation.  It certainly does not establish that the Lieff Cabraser lawyers actually knew they had duty to say something about Mr. Chargois' fee interest in 2016 when the Motion for a Fee Award was submitted to the Court.  In my opinion, without such actual knowledge, there is no violation of the duty of candor established by Rules 3.3 and 8.4(c).

Moreover, the premise of Professor Gillers' argument is that the Lieff Cabraser lawyers had enough information in 2016 to realize that there was something unusual about Labaton's agreement with Chargois that warranted further investigation.  When the motion of an award of fees was submitted the Court in 2016, the Lieff Cabraser lawyers understood that Labaton had agreed to share 20% of its  of its fee with the Chargois firm, that the Chargois firm was acting as local counsel, and that Chargois was performing valuable services for the case.[2]  On the basis of these facts, Mr. Bradley, presumably speaking for Labaton as well, proposed to pay Chargois 5.5% of the total fee.  It is not obvious that an agreement to split a fee 94.5%/5.5% between trial counsel and local counsel is so unusual that it triggers a duty among co-counsel to investigate further, and I found nothing in the record to support such a conclusion.  Moreover, none of the

---

[2] As Professor Rubenstein points out, Lieff Cabraser lawyers would have been justified in assuming that Labaton decided not to submit the Chargois firm's time as part of the lodestar submission for a variety of legitimate reasons.  Second Rubenstein Report, ¶ 14(a), n. 66.  Thus the absence of a lodestar declaration from the Chargois firm did not require the Lieff Cabraser attorneys to investigate further.

information available to Lieff Cabraser lawyers at the time suggested that ATRS had not

properly authorized Mr. Chargois' role and share of the fee.  I therefore disagree with Professor

Gillers' contention that the limited and misleading information available to Lieff Cabraser

attorneys triggered some duty to conduct a further investigation.

    e.   <u>The Duty of Lieff Cabraser Attorneys to Class Members.</u>

       In his Report at pages 75-78, Professor Gillers also contends that each of the firms

designated as attorneys for the class had an ethical duty to disclose the Chargois Arrangement to

absent class members, citing Rules 1.2 and 1.4 of the Rules of Professional Conduct.   It is

undoubtedly true attorneys for the class have fiduciary duties to the class as a whole.  It is not,

however, feasible to require class counsel to follow the letter of Rules 1.2 and 1.4 in dealing with

absent class members.  For example, an individual client has the absolute right under Rule 1.2(a)

to accept or reject settlement for any reason or no reason.  Applying such a rule in class actions

would make settlement impossible.  Similarly, Rules 1.2(a) and 1.4(a)(2) require a lawyer to

consult with an individual client about the means by which the client's objectives are to be

accomplished, including such issues as the expenses to be incurred and the impact legal tactics

on the interests of third parties.  *See* Rule 1.2, Comment [2].  It is plainly impractical to require

lawyers for a class to consult with absent class members about the means for achieving their

objectives.  Accordingly, courts have recognized that duties of lawyers to individual clients

cannot be mechanically applied in class actions.  *See, e.g., In re Agent Orange Prod. Liab. Litig.*,

800 F.2d 14, 19 (2d Cir. 1986) (holding that the traditional rules governing the representation of

individual clients should not be mechanically applied in the settlement of class actions);

Advisory Committee's Notes to Rule 23(g) of the Federal Rules of Civil Procedure (recognizing

that the duties of class counsel may be different than "the customary obligations of counsel to individual clients.")

In practice, lawyers for a class communicate with absent class members about settlement and about any application for fees by following the notice provisions in Rules 23(e)(1) and 24(h)(1) of the Rules of Civil Procedure, and by posting relevant documents relating to the settlement on a website accessible to class members.  Those procedures were followed in the State Street case.  Nothing in the Federal Rules or applicable case law requires class counsel to disclose proposed fee allocations in the notice to absent class members.  *See* Second Rubenstein Report, ¶¶ 17-20.  Professor Gillers' claim that the Lieff Cabraser lawyers had a duty to disclose the Chargois Arrangement to class members is simply a variant of his claim that they duty to disclose the arrangement to the Court:  namely, that on the basis of the limited and misleading information available to them in 2016, they should have realized that there was something problematic about letting Chargois share in the fee award and conducted a further investigation, which would have led them to conclude that absent class members needed to know about the Chargois Arrangement. In my opinion, that is Monday morning quarterbacking, not a fair description of the fiduciary duties of Lieff Cabraser lawyers at the time notice was given to the class in 2016.

III.    <u>CONCLUSION</u>

In summary, it is my opinion that:

1.  The Lieff Cabraser lawyers did not knowingly make a false statement of fact to the Court.

2. The Lieff Cabraser lawyers were not required to disclose what they knew about the Chargois Arrangement in order to permit the Court to calculate an appropriate percentage of the settlement to award as a fee or to perform a lodestar cross-check.

3. Nothing in the Federal Rules of Civil Procedure, the Local Rules of the District of Massachusetts, or the customary practices of lawyers in this District required Lieff Cabrasser attorneys to disclose what they knew about the Chargois Arrangement without being ordered to do so.

4. The limited and incorrect information about the Chargois Arrangement known to the Lieff Cabrasser attorneys in 2016 did not trigger a duty of disclosure to the Court or to class members or a duty to further investigate the Arrangement.

Accordingly, I conclude that the Lieff Cabrasser attorneys did not violate the Massachusetts Rules of Professional Conduct. Professor Gillers' contrary opinion, it seems to me, ignores the admonition in the Scope section of the Rules of Professional Conduct that a lawyer's conduct should be judged "on the basis of the facts and circumstances as they existed at the time of the conduct in question and in recognition of the fact that a lawyer often has to act on uncertain or incomplete evidence of the situation." Scope, ¶5.

Dated: March 26, 2018

Timothy J. Dacey

18

4834-2251-9392.1

**ATTACHMENT A**

### Statement of Qualifications of Timothy J. Dacey

I have been asked to state my qualifications to express an opinion regarding the professional conduct of lawyers.

I graduated from law school in 1969 and became a member of the bar of the Massachusetts Supreme Judicial Court in 1970.  Since 1970, I have practiced as a trial lawyer in Boston, Massachusetts at the firms of Hill & Barlow and Goulston & Storrs, representing clients before Massachusetts state and federal courts and arbitration panels in a wide variety of matters, including contract disputes, antitrust cases, construction litigation, probate matters, and professional malpractice cases involving accountants, architects and engineers.

Beginning in the mid-1980's, a substantial portion of my practice (half or more of my time) has been representing lawyers and law firms in malpractice claims and partnership disputes before the Massachusetts Superior Court, the federal district court, and arbitration panels, and in disciplinary matters before the Massachusetts Board of Bar Overseers.  I have also regularly advised lawyers, law firms, and corporate law departments concerning compliance with the Rules of Professional Conduct and other law governing lawyers.

At Hill & Barlow, I was the loss prevention partner and chair of the Ethics Committee. In these positions, I was responsible for managing claims against the firm for professional malpractice and in advising other attorneys in the firm about their ethical responsibilities.  Since joining Goulston & Storrs, I have served as Assistant General Counsel to the firm with responsibilities similar to those I performed at Hill & Barlow.

I have been a member of the Committee on Professional Ethics of the Massachusetts Bar Association since 1984 and Vice-Chair of the Committee since 1991.  During my tenure, the Committee has issued several hundred opinions (published and unpublished) for the guidance of

members of the Massachusetts bar.  In addition, as Vice-Chair of the Committee, I have been responsible for providing emergency advice on ethical issues to inquiring lawyers who needed answers before the next regularly scheduled meeting of the Committee.

In 2005 and 2006, I was a member of the American Bar Association's Standing Committee on Ethics and Professional Responsibility.

Since 2012, I have been a member of the Advisory Committee on the Rules of Professional Conduct.  The Committee is appointed by the Massachusetts Supreme Judicial Court to advise the Court concerning proposed amendments to the Rules of Professional Conduct.

Since 2012, I have been a Lecturer at Harvard Law School, where I teach a course on the Legal Profession in the Fall Semester.  The primary focus of the course is on the Rules of Professional Conduct.

I have not testified as an expert witness in the last four years.

I am being compensated at the rate of $710 per hour.

Additional information is on the attached resume.


*Timothy J. Dacey*

# RESUME

*Timothy J. Dacey*
*Goulston & Storrs PC*
*400 Atlantic Avenue*
*Boston, MA 02110*

Education:

    1964:   College of the Holy Cross, A.B., *summa cum laude*

    1969:   Harvard Law School, J.D., *cum laude.*

Employment Experience:

| | |
|---|---|
| 1969-1970: | Law Clerk for Hon. Frank M. Coffin<br>United States Court of Appeals for the First Circuit<br>Portland, ME. |
| 1970-2003: | Associate, then partner and member.<br>Hill & Barlow, P.C.<br>Boston, MA |
| 2003-2010: | Director<br>Goulston & Storrs PC<br>400 Atlantic Avenue<br>Boston, MA 02110 |
| 2010-Present | Of Counsel<br>Goulston & Storrs PC |

Bar Memberships:

    Massachusetts Supreme Judicial Court
    United States District Court, District of Massachusetts
    United States Court of Appeals for the First Circuit
    United States Court of Appeals for the Federal Circuit
    United States Supreme Court

Publications in the last ten years:

    "Retaining Privilege Despite Losing Control of your Subsidiary," New England In-House (January 2008)(with Partrick Curran)

    "Does Your Partnership Agreement Violate the Rules of Professional Conduct,"

Law Firm Partnership & Benefits Report (February 2009)

Chapter on Attorney's Fees in *Ethical Lawyering in Massachusetts,* Massachusetts Continuing Legal Education, 4th ed. 2015.

**ATTACHMENT B**

LIST OF DOCUMENTS CONSULTED BY TIMOTHY DACEY

The following documents relate to the case of *Arkansas Teacher Retirement System v. State Street Corporation,* 1:11-cv-10230-MLW.

1.  Docket entries.

2.  Complaint.

3.  Stipulation and Agreement of Settlement.

4.  Notice of Pendency of Class Actions, Proposed Class Settlement, Settlement Hearing, Plan of Allocation, and Any Motion for Attorneys' Fees, Litigation Expenses, and Service Awards.

5.  Memo of Law in Support of Motion for Approval of Settlement.

6.  Memo of Law in Support of Motion for Attorneys' Fees.

7.  Declaration of Lawrence Sucharow in Support of Motions for Approval of Settlement and for Attorneys' Fees.

8.  Transcript of Hearing on Class Action Settlement on 11/2/16

9.  Letter from D. Goldsmith to Hon. Mark L. Wolf dated 11/10/16.

10. Memorandum and Order dated 2/6/17.

11. Memorandum and Order appointing Judge Rosen as Special Master dated 3/8/17.

12. Expert Declaration of William Rubenstein dated 7/31/17.

13. Consolidated Response by Labaton Sucharow LLP, Lieff Cabraser Heimann & Bernstein LLP, and Thorton Law Firm to Special Master's July 5, 2017 Request for Supplemental Submission dated 8/1/17.

14. Expert Declaration of Camille Sarrouf dated 10/13/17.

15. Response by Lieff Cabraser Heimann & Bernstein LLP to Special Master's September 7, 2017 Request for Supplemental Submission dated 11/3/17.

16. Ethical Report for Special Master Gerald E. Rosen by Professor Stephen Gillers dated 2/23/18.

17. Expert Report of William Rubenstein dated 3/26/18.

18. Deposition of Stephen Gillers taken on 3/20/18.

19. Continued Deposition of Stephen Gillers taken on 3/21/18.

20. Deposition of Daniel P. Chiplock taken on 9/8/17.

21. Deposition of Robert L. Lieff taken on 9/11/17.

22. Emails produced by Lieff Cabraser Heimann & Bernstein LLP to the Special Master relating to the Chargois Arrangement.